# EXHIBIT 1



**NCAA BOARD OF GOVERNORS**
**FEDERAL AND STATE LEGISLATION WORKING GROUP**
**FINAL REPORT AND RECOMMENDATIONS**
**APRIL 17, 2020**

*Executive Summary*.

The Federal and State Legislation Working Group was created by the NCAA Board of Governors in summer 2019 for the purpose of investigating possible responses to proposed state and federal legislation regarding the commercial use of student-athlete name, image or likeness ("NIL").  That proposed legislation, which has been passed in California and Colorado, could significantly limit the ability of the Association to manage the issue of student-athlete NIL commercialization in those states and perhaps others.  It therefore poses a significant potential challenge to the Association's continuing ability to manage its affairs on a national, Association-wide level.

After receiving its charge from the Board, the working group solicited feedback from the NCAA membership and third parties regarding contemporary opportunities for NIL commercialization by college students, and whether existing divisional rules are adequate to address those opportunities. This feedback convinced the working group that current rules related to NIL commercialization are in need of modernization.  The rise of social media and other digital distribution and monetization platforms has dramatically increased the opportunities for college students to make commercial use of their NIL.  Current divisional rules on this subject were drafted long before most of these opportunities existed, and those rules can prevent student-athletes from engaging in NIL-related activities that their nonathlete peers on campus frequently pursue.  Consistent with the Board's direction that student-athletes should be treated the same as students in general, unless a compelling reason to differentiate exists, the working group concluded that divisional rules on student-athlete NIL should be modernized to account for this new media and promotional landscape.

In October 2019, the working group made an interim report to the Board of Governors in which it recommended that the Board authorize changes to NCAA policy and bylaws to permit student-athletes to receive compensation related to their NIL, provided the compensation is consistent with NCAA values and principles and with legal precedent.  The working group requested, and the Board agreed, that the working group's timeframe be extended through April 2020 so that it could continue to work with the membership and divisional legislative groups on modernized NIL bylaws and policy.

This report is the culmination of the working group's subsequent deliberations.   After further consultation with student-athletes, the membership and divisional legislative bodies, the working group makes the following recommendations to the Board of Governors:

1.  The Board should stress to the divisions that any modernization of their NIL bylaws must be accompanied by guardrails sufficient to ensure that:

    a.  Any compensation received by student-athletes for NIL activities represents a genuine payment for use of their NIL, and is not simply a disguised form of pay for athletics participation;

    b.  Schools and conferences play no role in a student-athlete's NIL activities;

NCAA Board of Governors
  Federal and State Legislation Working Group
  Final Report and Recommendations April 17, 2020
Page No. 2
_____

    c.       Student-athletes are not being compensated for uses of their NIL in situations in which they have no legal right to demand such compensation;

    d.       Schools or boosters are not using NIL opportunities as a recruiting inducement;

    e.       The role of third parties in student-athlete NIL activities is regulated; and

    f.       Modernization of NIL rules does not interfere with NCAA members' efforts in the areas of diversity, inclusion or gender equity.

2.    Provided those guardrails are established, the Board should consider encouraging the divisions to permit student-athletes to be compensated for third-party endorsements, including social media "influencer" activity, in appropriate circumstances.  If the divisions make these changes, however, they must take care to prohibit schools or conferences from:  (a) Making endorsement payments themselves; (b) Playing any role in locating, arranging or facilitating endorsement opportunities; or (c) Using, or allowing boosters to use, such opportunities as a recruiting inducement or a means of paying for athletics participation.

3.    The Board should also consider encouraging the divisions to permit student-athletes to be compensated by third parties for use of the student-athlete's NIL in his or her own work product or other business activity, including social media content creation or distribution, provided that the use does not involve athletics participation or play.  Again, if the divisions make these changes, they must take care to prohibit schools or conferences from:  (a) Paying student-athletes for these activities; (b) Playing any role in locating, arranging or facilitating third parties to pay for these activities; or (c) Using, or allowing boosters to use, the possibility of such payments as a recruiting inducement or a means of paying for athletics participation.

4.    The Board should recommend a timeline for divisions to act so that legislative proposals are fully drafted not later than October 31, 2020; voted on not later than January 31, 2021; and effective not later than the start of the 2021-22 academic year.

It became apparent during the working group's deliberations that certain potential avenues for managing the NIL issue are complicated, or precluded altogether, by the potential application of state NIL laws and/or federal antitrust law to the Association's bylaws.  The Presidential Subcommittee on Congressional Action was formed to study these issues in detail and provide guidance to the Board on what actions, if any, the Association should take to seek Congressional assistance in addressing these issues.  The Presidential Subcommittee on Congressional Action has identified distinct legal impediments to the Association's ability to modernize its rules related to NIL and to maintain the model of intercollegiate athletes generally.  Therefore, the subcommittee has put forward a number of recommendations for Board consideration in engaging with Congress, including to seek preemption of state NIL laws.  In offering these recommendations, the subcommittee acknowledges that due to the evolving Congressional landscape, there may be a need for the Association to prioritize one or more of its recommendations in its engagement with Congress.

NCAA Board of Governors
  Federal and State Legislation Working Group
  Final Report and Recommendations April 17, 2020
Page No. 3
_____

The working group believes that its recommendations for modernizing the Association's rules related to student-athlete NIL are on track with the Associations general project for modernizing its bylaws. The Board's acceptance of this report signals the transfer of these efforts from the working group to each division, and the solutions that each of them will develop and ultimately approve on these topics. The working group is confident that, as the Association modernizes, it will continue to identify the appropriate guardrails to further support student-athletes within the context of college sports and higher education.

Finally, the working group is mindful of the COVID-19 pandemic as it delivers this report, and the impact the pandemic is having on higher education and college sports.  The effects of the pandemic have caused enormous disruption to many, including student-athletes.  Although the ultimate impact of the pandemic remains uncertain, this uncertainty must not hinder the efforts to modernize NIL rules intended to benefit student-athletes.

### *Section I - Background.*
1.      **Creation and charge.**  The Federal and State Legislation Working Group was created by the Board of Governors May 14, 2019, in response to legislation introduced by federal and state legislators relating to student-athletes' ability to license and benefit from NIL during their period of participation in NCAA athletics.  The Board acted, in part, because the proposed federal legislation threatened the tax-exempt status of the Association and its members, while the proposed state legislation threatened to create local differences that would make it impossible to host fair national championships and to alter materially the principles of intercollegiate athletics.  The Board felt these legislative initiatives necessitated conversations and agreements about how the membership should respond to the legislative proposals.

The working group was composed of representatives from all three divisions, including three student-athletes:

- Val Ackerman, commissioner, Big East Conference (Division I) (co-chair)
- Jill Bodensteiner, director of athletics, Saint Joseph's University (Division I)
- Bob Bowlsby, commissioner, Big 12 Conference (Division I)
- Don Bruce, faculty athletics representative, University of Tennessee (Division I)
- Rita Cheng, president, Northern Arizona University (Division I)
- Mary Beth Cooper, president, Springfield College (Division III)
- Lauren Cox, student-athlete, Baylor University (Division I)
- John "Jack" DeGioia, president, Georgetown University (Division I)
- Jackson Erdmann, student-athlete, Saint John's University (Division III)
- Rick George, director of athletics, University of Colorado (Division I)
- Carolayne Henry, senior woman administrator, Mountain West Conference (Division I)
- Glen Jones, president, Henderson State University (Division II)
- Scott Larson, athletics compliance coordinator, Lubbock Christian University (Division II)

NCAA Board of Governors
  Federal and State Legislation Working Group
  Final Report and Recommendations April 17, 2020
Page No. 4
_____

- Brandon Lee, student-athlete, University of Missouri (Division I)
- Jacqie McWilliams, commissioner, Central Intercollegiate Athletic Association (Division II)
- Jere Morehead, president, University of Georgia (Division I)
- Darryl Sims, director of athletics, University of Wisconsin-Oshkosh (Division III)
- Gene Smith, director of athletics, The Ohio State University (Division I) (co-chair)
- Tim P. White, chancellor, California State University System (Divisions I and II)
- Carla Williams, director of athletics, University of Virginia (Division I)

The Board created the working group to study whether the Association should maintain its opposition to the proposed state and federal legislation, or whether it should work to develop a process whereby a student-athlete could be compensated for use of his or her NIL in a fashion that would be consistent with the NCAA's core values, mission and principles.  Specifically, the working group was charged:

a.    To consider whether modifications to NCAA rules, policies and practices should be made to allow for NIL payments;

b.    To remain mindful that NIL payments must not be compensation for athletics participation; that paying students as employees for play is anathema to the NCAA mission focused on students competing against students; and that no legislation which permitted either of those outcomes should be considered;

c.    To assure that any proposed legislative solutions kept in mind that student-athlete benefits must be tethered to educational expenses or incidental to participation;

d.    To examine whether any modifications to allow for NIL payments, beyond what the U.S. Circuit Court of Appeals for the Ninth Circuit required in *O'Bannon* and other court rulings, would be achievable and enforceable without undermining the distinction between professional sports and collegiate sports; and

e.    To preserve the Association's ability to sponsor or host fair interstate competitions and national championships.

The Board of Governors asked the working group to produce a set of Association-wide principles to provide each division guidance in developing a consistent approach on legislation related to NIL payments.  The working group was asked to provide an update to the Board of Governors and the NCAA president August 6, and to deliver an initial report by October 29, 2019.

**2.    Initial meetings and feedback.**  The working group conducted three in-person meetings and four teleconferences between June and October 2019.  During those meetings, the working group received input from a variety of stakeholders, including key representatives of NCAA

NCAA Board of Governors
  Federal and State Legislation Working Group
  Final Report and Recommendations April 17, 2020
Page No. 5
_____

members and membership organizations, as well as individuals with subject matter expertise.[1] The working group also received feedback from student-athletes, including members of the National Student-Athlete Advisory Committees for Divisions I, II and III and other student-athletes, in addition to the student-athlete members of the working group.  These groups and individuals made presentations to the working group and provided supplemental written material for the working group's consideration.

The working group also invited individuals and representatives of organizations to submit written input, including ideas or concepts, related to the working group's charge.  All written input was submitted through an online portal and shared with the working group through the feedback process.

a.    **Feedback from NCAA membership.**  In July 2019, the working group requested feedback on potential NIL modernization from NCAA members and other interested parties.  In this request, the working group asked the NCAA membership to address the following topics:  (1) Challenges and opportunities posed by permitting student-athletes to be compensated for NIL; (2) Potential models for permitting NIL compensation; (3) Whether permitting NIL compensation might affect fair competition, and the possibility of mitigating such effects; (4) Whether it is possible to develop a measure of fair market value for student-athlete NIL; and (5) What steps the membership might take to prevent student-athletes from prioritizing NIL compensation over academic success and team commitment.  The following were highlights of the feedback submitted in response to this survey:

(1)    **Support for rules modernization to accommodate contemporary NIL opportunities**.  Several respondents noted that recent changes in technology, in particular the emergence of social media platforms and the marketing opportunities they provide, has opened up new opportunities for college students to engage in commercial activities involving their NIL.  Respondents felt that NCAA rules needed to be updated to address this changed environment, and to give student-athletes the same opportunities that are available to nonathlete students.  Some respondents also noted that current NCAA rules were complicated and hard to follow, and that both schools and student-athletes would benefit from deregulation that resulted in rules that were more clear and easier to follow.

There was a general desire that modernization not be overly focused on, or reactive to, the opportunities that it might provide to football or men's basketball student-athletes.  In particular, some respondents noted that

---

[1] The working group would like to extend special thanks to the Knight Commission on Intercollegiate Athletics, the Collegiate Commissioners Association, LEAD1 and the Drake Group for their thoughtful input.

_____

permitting student-athletes in other sports, who often receive financial aid less than their cost of attendance, to pursue these opportunities could help them directly offset their educational costs without undermining the Association's model of intercollegiate athletics.

Several respondents raised gender equity concerns, particularly if rules were modified to allow schools to be involved in arranging or providing compensation to student-athletes for use of their NIL.  It was noted that these concerns would be reduced if schools were prohibited from participating in these arrangements.

(2)     **No desire for changes to NIL rules that would undermine the Association's model of amateur intercollegiate athletics.**  While there was significant desire to modernize the NCAA's rules related to student-athlete NIL, NCAA members overwhelmingly indicated that the Association should not make rules changes that would undermine, or fundamentally change, the NCAA's overall model of amateur intercollegiate athletics.

(3)     **Concern over effects on the recruiting process.**  Several respondents expressed concern that modernizing rules related to student-athlete NIL could cause changes to the recruiting process that would harm both schools (by exacerbating recruiting advantages already held by some schools) and student-athletes (by causing student-athletes to place too much emphasis on potential NIL opportunities, rather than academic or athletics opportunities, when choosing their schools).

Respondents also noted, however, that similar dynamics are already present in the recruiting process, and while concern over their exacerbation would justify increased regulation, it should not preclude otherwise beneficial modernization of the NIL rules.

(4)     **Concern over boosters.**  Several respondents noted concern over the possible involvement of representatives of the institution's athletics interests ("boosters") in new commercial NIL arrangements that might be permitted by modernized NIL rules.  Some respondents were concerned that boosters might make payments that were only nominally for legitimate use of student-athlete NIL, and were primarily motivated by a desire to pay student-athletes for their athletics participation or performance.  Other respondents were concerned about the role that new rules might provide to boosters in the recruiting process if the prospect of lucrative endorsement opportunities offered by a school's boosters became a recruiting inducement.  Some commentators suggested that booster activity could be limited by prohibiting student-athletes from commercializing their NIL during the playing season.

NCAA Board of Governors
  Federal and State Legislation Working Group
  Final Report and Recommendations April 17, 2020
Page No. 7
_____

Others suggested adopting a regulatory system in which payments from third parties to student-athletes were compared, and perhaps limited, to a fair market value standard, while noting the difficulty in creating and maintaining such a system.

The working group found all of this feedback to be immensely useful when formulating its recommendations and has incorporated many of the ideas offered in this process in those recommendations.

b. **Information from other sports organizations.**  The working group also received information regarding athlete NIL licensing programs used in Major League Baseball, NFL, NBA and the Olympics.  A focus of the working group's inquiry in this area was whether a group licensing approach to student-athlete NIL, similar to models used in several other sports settings, might be a viable path forward for rule modernization.

One of the critical lessons learned by the working group during its review of these materials was that the group licensing programs that currently exist in professional sports or the Olympics all benefit from legal structures not available to the NCAA or its member institutions, namely the presence of a player's association to serve as a bargaining unit for the athletes (in the case of the NFL and MLB group licensing plans) or the presence of federal legislation conferring antitrust immunity related to sports marketing (in the case of the United States Olympic Committee).  As is explained later in this report, the absence of similar legal structures in intercollegiate athletics greatly complicates the NCAA's ability to pursue a group licensing approach similar to the models used in the professional context.

3. **The working group's October 2019 interim report.**  October 23, 2019, the working group provided an interim report to the Board of Governors.  In its interim report, the working group recommended that the Board adopt the following Association-wide principles:

a.  Payment to a student-athlete for use of his or her name, image or likeness should not be pay for athletics performance or participation; nor should the payment serve as an inducement to select a particular school.

b.  Regulation of a student-athlete's name, image or likeness use should be transparent, narrowly tailored and enforceable, and should facilitate the principle of fair competition among schools in a division, including the integrity of the recruiting process.

c.  A student-athlete should be able to use his or her name, image or likeness in a manner similar to college students who are not student-athletes, unless there is a compelling reason to differentiate.

NCAA Board of Governors
  Federal and State Legislation Working Group
  Final Report and Recommendations April 17, 2020
Page No. 8
_____

Consistent with these principles, the working group recommended that the Board take the following steps:

(1)     Authorize changes to NCAA policy and bylaws to permit student-athletes to receive compensation related to NIL, provided the compensation is consistent with NCAA values and principles, and with legal precedent;

(2)     Reject any approach to NIL compensation that would make student-athletes employees of their schools, or would result in NIL payments being used as a substitute for compensation related to athletics participation or performance; and

(3)     Reaffirm the integrity of the student-athlete recruitment process, so that the prospect of receiving NIL compensation does not exert undue influence on a student's choice of college.

The working group also requested that its timeframe be extended through April 2020 so that it could continue to gather feedback and work with student-athletes and the NCAA membership on the development and adoption of new NCAA legislation in accordance with the working group's recommendations.

**4.     The Board of Governor's October 29 statement and the working group's continuing deliberations.**  In response to the working group's recommendations, the Board of Governors issued a statement October 29, 2019, establishing the following principles and guidelines for modernization of rules relating to commercial licensing of NIL rights:

a.     Assure student-athletes are treated similarly to nonathlete students unless a compelling reason exists to differentiate.

b.     Maintain the priorities of education and the collegiate experience to provide opportunities for student-athlete success.

c.     Ensure rules are transparent, focused and enforceable and facilitate fair and balanced competition.

d.     Make clear the distinction between collegiate and professional opportunities.

e.     Make clear that compensation for athletics performance or participation is impermissible.

f.     Reaffirm that student-athletes are students first and not employees of the university.

g.     Enhance principles of diversity, inclusion and gender equity.

NCAA Board of Governors
  Federal and State Legislation Working Group
  Final Report and Recommendations April 17, 2020
Page No. 9
_____

h.      Protect the recruiting environment and prohibit inducements to select, remain at, or transfer to a specific institution.

The Board of Governors asked the working group to continue to gather feedback through April 2020 on how best to respond to the state and federal legislative environment, to refine its recommendations on the above principles, and to work with student-athletes, the membership and divisional governance structures on the development and adoption of new NCAA legislation. The Board also asked each division to create new rules to be effective as soon as appropriate, and to be voted on not later than January 2021.

Consistent with the Board's October 29 statement, the working group continued its work in late 2019 and early 2020. The working group met again several times through the middle of April, and continued to consult with the Association's student-athletes, membership and the divisional legislative groups charged with modernizing divisional rules related to NIL. The results of these continuing consultations and deliberation by the working group are set forth below.

### *Section II - The Legal Framework for Student-Athlete Name, Image and Likeness Rights.*

Much of the recent discourse on the potential ability of student-athletes to commercialize their name, image or likeness has depended on the assumption that it is NCAA rules, rather than other legal impediments, that are primarily responsible for student-athletes' inability to do so. A point repeatedly made to the working group when it requested feedback regarding possible rules changes in this area – including feedback from legal scholars on both sides of the issue – is that the ability of athletes to insist on payment for the "use" of their NIL is far more circumscribed than many commentators assume. These respondents stressed – and the working group agrees – that any rules changes made in this area must be cognizant of what student-athlete NIL rights do, and do not, cover, because permitting student-athletes to receive payments for NIL "licenses" that are not legally necessary would be tantamount to permitting thinly veiled payments for nothing other than athletics participation. The remainder of this section explains further the legal parameters within which student-athlete requests for NIL compensation would be carried out.

1.      **The right of publicity.** The commercial value of a student-athlete's name, image or likeness is based in the right of publicity, a legal doctrine that requires third parties to obtain permission from an individual before making commercial use of that individual's NIL. The right of publicity is created by state law and therefore varies from state to state. In its most common form, the right of publicity allows individuals to prevent third parties from making unauthorized use of their NIL "for purposes of trade." Importantly, the concept of "purposes of trade" does ***not*** extend to the use of an individual's NIL in news reporting, commentary, entertainment, works of fiction or nonfiction, or in advertising that is incidental to such uses – even if those uses are undertaken for the purpose of making money. So, for example, there is no need to obtain permission to run a news report about a person, or to write an article about them, or to advertise either of those products. The First Amendment to the US Constitution, and the federal Copyright Act, can also preempt or displace the right of publicity in certain circumstances.

NCAA Board of Governors
  Federal and State Legislation Working Group
  Final Report and Recommendations April 17, 2020
Page No. 10
_____

**2.**     **The right of publicity and sports broadcasting.**  For present purposes, one of the most important limitations on the right of publicity relates to sports broadcasts.  Courts have repeatedly held that neither broadcasting a sporting contest, nor advertising or promoting those broadcasts by using the participants' names or images, violates the publicity rights of the participants.[2]  They have similarly held that rebroadcasting clips from a sports contest, or rebroadcasting the entire contest itself, does not violate the right of publicity unless a clip is used in a manner that promotes or implies endorsement of a product or service other than the broadcast itself.[3]  And courts have held that a person who owns the copyright in a photograph of an athlete or athletics contest can sell that photo without violating the athlete's right of publicity, since in that circumstance the copyright owner's rights under the Copyright Act preempt the athlete's rights under state right of publicity laws.[4]

This means that student-athletes, like other participants in sporting contests, generally have no legal right to prohibit the broadcast or sale of images that are captured while they are playing their sports, or in many other situations associated with their athletics participation.  Unless those images are being used to promote an unrelated, third-party commercial product or service, the right of publicity simply does not apply in those situations.  Because the right of publicity does not apply to live broadcast, rebroadcasts, news accounts or many informational items or pictures, any "NIL" payments received by student-athletes supposedly in consideration for the creation or sale of those products could not be considered legitimate licensing or work product activity.  It would, instead, be little more than payment for participating in the sporting contest itself – literal pay for play.

**3.**     **The NCAA's use of student-athlete name, image and likeness.**  The NCAA has traditionally used student-athlete NIL in the course of promoting its own activities, primarily (but not only) its championships.  For many years, the NCAA requested that student-athletes sign a waiver granting it permission to use their NIL for these purposes; this waiver request was a standard part of the Student-Athlete Statement.  Importantly, the waiver requests made by the NCAA were never used in conjunction with the NCAA's sale of broadcast rights to its championships.  Consistent with the law as described above, the NCAA does not require permission from its student-athletes in order to license the right to broadcast its championships, and it has never sought such permission. Similarly, the NCAA has never purported to convey the right to use student-athlete NIL to its broadcast partners or to any other third parties.  The NCAA has never attempted to make commercial use of student-athlete NIL, and has no intention of doing so in the future.

---

[2]  *Marshall v. ESPN*, 111 F.Supp.3d 815 (M.D. Tenn. 2015), *aff'd*, 668 Fed. Appx. 155 (6th Cir. 2016); *Baltimore Orioles v. MLB Players Ass'n*, 805 F.2d 663 (7th Cir. 1986); *Dryer v. NFL*, 55 F. Supp. 3d 1181 (D. Minn. 2014), *aff'd*, 814 F.3d 938 (8th Cir. 2016).

[3]  *NFL v. Alley, Inc.*, 624 F. Supp. 6 (S.D. Fla. 1983); *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400 (2001); *Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536 (1993).

[4]  *Maloney v. T3Media*, 94 F.Supp.3d 1128 (C.D. Cal. 2015), aff'd, 853 F.3d 1004 (9th Cir. 2017)

NCAA Board of Governors
  Federal and State Legislation Working Group
  Final Report and Recommendations April 17, 2020
Page No. 11
_____

4.  **The *Keller* and *O'Bannon* cases.**  In 2009, two lawsuits were filed against the NCAA related to student-athlete NIL.  One of these cases, *Keller v. Electronic Arts*, was concerned entirely with video games: it accused the NCAA of conspiring with Electronic Arts ("EA") and the Collegiate Licensing Company to make unlicensed use of student-athlete NIL in the NCAA Football and NCAA Basketball video games produced by EA.  The other case, *O'Bannon v. NCAA*, focused on the NIL waivers requested in the Student-Athlete Statement:  it accused the NCAA of using those waivers as "perpetual licenses" to exploit the name, image or likeness of former student-athletes in commercial products long after they had graduated.[5]  As the *O'Bannon* case progressed, it grew to incorporate the allegation that NCAA amateurism rules also unlawfully restrained current student-athletes from being paid for the commercial use of their NIL while they were in school, in products including sports broadcasts and video games.

One of the key legal questions in the *Keller* case was whether Electronic Arts had a First Amendment right to use student-athletes' NIL in its games regardless of whether it had obtained permission from the student-athletes.  The US Court of Appeals for the Ninth Circuit rejected EA's argument and held that the First Amendment did not protect EA from claims that its video games may have violated student-athletes' right of publicity.  The *Keller* case thus established that video games like the previously marketed NCAA Football and NCAA Basketball titles cannot be produced without obtaining permission from student-athletes to use their NIL (if those games indeed utilized student-athlete NIL, a factual question that was never resolved in *Keller*).[6]

Similarly, one of the legal questions in the *O'Bannon* case was whether, in the absence of NCAA amateurism rules, student-athletes would receive payments from schools and/or third parties for the use of their NIL in video games and sports broadcasts.  The trial court in *O'Bannon* said the answer to both questions was "yes."  On the question of whether sports broadcasters are required to obtain licenses from student-athletes, the trial court cited an interim decision of another trial court which had suggested that broadcasters of NFL football games might be required to obtain permission from NFL players in connection with "certain kinds of broadcast footage."[7]  According to the *O'Bannon* trial court, that decision indicated enough uncertainty over the underlying legal landscape to support the plaintiffs' claim that

---

[5]  For much of their time in the courts, the *Keller* and *O'Bannon* cases were collectively known as *In re NCAA Student-Athlete Name & Likeness Licensing Litigation*.

[6]  The *Keller* case settled before the court decided whether EA Sports' digital avatars used in the NCAA Football and NCAA Basketball games actually violated student-athletes' right of publicity.

[7]  Specifically, the *O'Bannon* court relied on an interim order from the *Dryer* case involving NFL players. *See In re NCAA Student-Athlete Name & Likeness Licensing Litig., 37 F. Supp. 3d 1126, 1146 (N.D. Cal. 2014)* (citing *Dryer v. NFL*, 689 F. Supp. 2d 1113, 1123 (D. Minn. 2010)). The *Dryer* trial court later issued an order clarifying that sports broadcasts do ***not*** violate the right of publicity. *See Dryer v. NFL*, 55 F. Supp. 3d at 1195-1200, a conclusion repeated by the District Court and U.S. Court of Appeals for the Sixth Circuit in the *Marshall v. ESPN* case, 111 F. Supp. 3d at 826-27; 668 F. App'x at 157

NCAA Board of Governors
  Federal and State Legislation Working Group
  Final Report and Recommendations April 17, 2020
Page No. 12

_____

current student-athletes could demand a share of the live broadcasting revenues associated with their games, if NCAA amateurism rules permitted them to do so. The *O'Bannon* court also found, however, that there was no evidence that the NCAA had used signed waiver forms to prevent former student-athletes from profiting from their name, image or likeness after they had graduated.

When the *O'Bannon* case was appealed to the US Court of Appeals for the Ninth Circuit, the Ninth Circuit expressly declined to address the question whether sports broadcasts could potentially violate the participants' right of publicity, noting that its holding in *Keller* that the right of publicity applies to video games made it unnecessary to address the "thornier questions of whether participants in live TV broadcasts of college sporting events have enforceable rights of publicity."[8] The Ninth Circuit's decision in *O'Bannon* was therefore based entirely on the notion that video games require a license of student-athlete publicity rights (if, in fact, the video game utilizes their NIL), and that the NCAA's rules must therefore permit student-athletes to receive NIL licensing payments as long as those payments do not result in student-athletes receiving total financial aid that exceeds their cost of attendance. The *O'Bannon* appellate court specifically rejected the plaintiffs' demand that the NCAA must permit student-athletes to receive NIL payments that exceed their cost of attendance.

5. **The legal framework for student-athlete NIL after *Keller* and *O'Bannon*.** Contrary to what some commentators claim, the *Keller* and *O'Bannon* cases did not cause a significant change in the scope of student-athlete NIL rights. While *Keller* did hold that the First Amendment did not give Electronic Arts the right to make unlicensed use of student-athlete NIL in video games, its holding was limited to video games – a point that the Ninth Circuit itself recognized in 2017 when it declined to extend *Keller's* holding to a case involving the use of student-athlete NIL in photographs.[9] Moreover, the NCAA had never authorized EA or any other third party to use student-athlete likenesses in video games. *Keller's* holding thus did not prohibit any activity in which the NCAA had been engaging.

Although the trial court in *O'Bannon* suggested that student-athletes might have some publicity rights related to the broadcast of their games, the Ninth Circuit in *O'Bannon* specifically declined to adopt that part of the trial court's opinion, and relied instead on *Keller's* holding that the right of publicity protected the use of student-athlete NIL in video games.

Moreover, several cases that were decided after the trial court's decision in *O'Bannon* have rejected the notion that sports broadcasts require licenses from participants. One of these cases, *Marshall v. ESPN*, specifically addressed NCAA student-athletes and held that broadcasting NCAA sporting contests did not violate their right of publicity.

_____

[8] *O'Bannon v. NCAA*, 802 F.3d 1049, 1067 (9th Cir. 2015).

[9] *Maloney v. T3Media, Inc*., 853 F.3d 1004 (holding that the Copyright Act preempts student- athlete NIL rights in still photographs not used for unrelated promotional purposes).

NCAA Board of Governors
  Federal and State Legislation Working Group
  Final Report and Recommendations April 17, 2020
Page No. 13
_____

All of this has led the working group to conclude that any payments made to student- athletes for use of their NIL must be limited to situations in which a NIL license is legally required.  In practice, this means that student-athletes should not be permitted to receive NIL payments related to their appearance in a live sports broadcasts or rebroadcasts; photos or news accounts of those broadcasts; or in other situations in which the law does not require a NIL license.  To permit student-athletes to receive "NIL licensing" payments in situations where no license is needed would be tantamount to permitting pay for athletics participation or performance, flatly inconsistent with the NCAA's model of amateur intercollegiate athletics.

### *Section III - The NCAA's Current Rules Relating to Student-Athlete NIL.*

The following is meant as a brief summary of the current rules related to student-athlete NIL, based on the unique characteristics of each Division, including the exceptions to those rules and the waiver process related to their application.  For a more complete listing, please refer to Bylaw 12.5 (promotional activities) in the Division I, II and III Manuals.

1.    **Prior to enrollment.**

   a.    **Divisions I and III.**  Before enrolling at a Division I or III school and becoming a student-athlete, an athlete may use his or her name, image or likeness to promote or endorse commercial products or services.  However, the athlete may not receive any compensation for doing so (other than reimbursement of expenses) if he or she was chosen to participate based on athletics ability, participation or reputation.

   b.    **Division II.**  Before enrolling at a Division II school and becoming a student-athlete, an athlete may be compensated for the use of his or her name, image or likeness to promote a commercial product or service, with no restrictions, other than it is not permissible for an individual to sign with or receive benefits from an agent.

2.    **After enrollment.**

   a.    **Division I.**  A current Division I student-athlete is not allowed to use his or her name, image or likeness to promote or endorse a commercial product or service.  This is true even if the student-athlete is not compensated.   This restriction also extends to a student-athlete creating his or her own business, regardless of whether the business is related to athletics.

   b.    **Division II.**  A current Division II student-athlete is not permitted to participate in promotional activities related to athletics, or promotional activities in which payment is based on their participation in athletics.  Current Division II student-athletes may, however, participate in, and be paid for, promotional activities that are not related to athletics, including modeling and promoting commercial products or services, provided that payment is not based on athletics participation.

NCAA Board of Governors
  Federal and State Legislation Working Group
  Final Report and Recommendations April 17, 2020
Page No. 14
_____

      c.    **Division III.**  A current Division III student-athlete may use his or her name, image or likeness in modeling and other promotional activities not related to athletics, as well as to promote his or her own business, provided the promotion does not use the student-athlete's status as a student-athlete.  Payment cannot be based on athletics ability, participation or reputation.

**3.**    **Common Exceptions.**  All three divisions have exceptions to these general rules that permit the use of student-athlete NIL in promotional activities.  These exceptions cover school promotions, tax-exempt or charitable promotions, media activities, National Governing Body promotions, camp and congratulatory advertisements.  Student-athletes usually cannot be compensated for participating in these activities, beyond reimbursement for expenses.

All three divisions also allow student-athletes to provide unsolicited opinions on commercial products or services, provided the student-athlete is not compensated (from any source) for doing so.

Finally, in Division I, a current student-athlete may be paid to continue participating in modeling or other nonathletically related promotional activities, if those activities began before college enrollment and the student-athlete became involved for reasons independent of athletics ability.  No reference may be made to the student-athlete's participation in intercollegiate athletics, and the student-athlete may not endorse a commercial product.

**4.**    **Waivers.**  Since 2015, an increasing number of legislative relief waivers have been submitted to the national office requesting relief to allow student-athletes to use their name, image and likeness to promote a business or product.  These waiver requests have generally been approved, provided the following conditions were met:

    a.    The student-athlete was using his or her name, image or likeness to promote his or her own business;

    b.    The student-athlete became involved in the business for reasons unrelated to athletics, and the vocation was not athletically related;

    c.    The student-athlete's institution did not have any involvement with promotional activities related to the business, unless it was part of a class project or program and that benefit is extended to all participating students in the class or program;

    d.    No reference was made to involvement in intercollegiate athletics; and

    e.    The student-athlete was compensated at a rate commensurate with his or her skills and experience related to the vocation, and compensation was not based in any way on his/her athletics ability or reputation.[10]

---

[10] Over 200 of these waiver requests have been submitted since 2015, largely on behalf of Division I student-athletes. Since 2018, institutions have also had the flexibility locally to apply guidelines from a list of pre-approved waivers. It is not possible to accurately account for these local waivers, but they likely significantly exceed those allowed by the NCAA. Additionally, Division III legislation permits Division III student-athletes to engage in these types of NIL activities without seeking a waiver.

NCAA Board of Governors
 Federal and State Legislation Working Group
 Final Report and Recommendations April 17, 2020
Page No. 15
_____

Student-athletes receiving these waivers were also required to obtain prior approval from the director of athletics, and their institution was required to maintain records of approvals of all such activities.

The following are examples of the circumstances in which this waiver process has allowed student-athletes to use their NIL to promote products or businesses:

a.      A student-athlete was allowed to use her name and picture on a website and social media accounts to promote a clothing business that she created;

b.      A student-athlete was allowed to use his name, image and likeness to promote a company that he created to provide personalized nutrition recommendations for clients; and

c.      A student-athlete was allowed to use her name and photograph on a website to promote a photography business that she had created (and which was named after her).

These current rules, including the recent waivers, form the backdrop for the working group's recommendations set forth in Section V, below.

### *Section IV - The Growth in Opportunities for College Students to Make Commercial Use of their NIL Rights.*

As noted earlier, the Board of Governors was primarily motivated to form the working group and charge it with reviewing the NCAA's rules regarding student-athlete NIL by the proposals of state and federal legislation on the topic.  As the working group engaged in its deliberations, however, it became obvious that the Board's action was timely for another reason.  As several respondents pointed out, the last several years have seen a significant increase in the opportunities that college students – *all* college students, not just student-athletes – have to make commercial use of their NIL.  Most of these new opportunities are related to the rise of social media, which has created a demand for promotional activities by college students, and student- athletes, that simply did not exist when the NCAA's current rules on promotional activities were drafted.  As a result, the NCAA's current rules preclude student-athletes from engaging in a wide range of promotional activities that are open to college students generally, a situation that is inconsistent with the NCAA's goal of treating student-athletes in the same manner as the student-body in general whenever possible.  The working group believes that the prevalence of these new promotional activities justifies a significant modernization of current Bylaw 12.5 (promotional activities) and other NCAA rules that touch on this topic.  The rest of this section provides a brief discussion of the primary forms that these new opportunities take.

1.      **Social media "influencer" marketing opportunities.**  One of the important new commercialization opportunities for college students is to become a social media "influencer." An influencer is simply an individual who creates and shares content on social media platforms like Instagram, Youtube, TikTok or Snapchat.  When an influencer acquires

NCAA Board of Governors
  Federal and State Legislation Working Group
  Final Report and Recommendations April 17, 2020
Page No. 16
_____

a following on social media, it becomes possible for them to engage in influencer marketing – that is, modeling, using or promoting a product in their social media posts, in exchange for money or some other thing of value (like free samples of the products that they are promoting). Influencers are often prized as marketers because of the direct line of communication they can have with their followers, which allows them to be more effective than traditional means of advertising in driving engagement with brands.  It is estimated that, globally, brands spend somewhere between 5 and 10 billion dollars a year on influencer marketing.

While the most successful influencers are typically celebrities in their own right and have social media audiences in the millions, commercial opportunities are not limited to influencers with large follower counts.  In recent years brands have also become interested in so called micro-influencers, individuals with follower counts in the hundreds or thousands, not millions.

The smaller size of a micro-influencer's follower count can make their engagement with their followers more genuine and honest, which many brands feel adds to their appeal as a promoter. Micro-influencers can also be much less expensive for brands, with the influencers often being paid hundreds rather than thousands of dollars, or being paid only in terms of being allowed to keep the product that they are promoting.  As brands have come to see micro-influencers as potentially more effective promoters – especially in niche areas, like specialty sports apparel or equipment – they have started to make significant marketing efforts in this area.  This effort has extended to college students.

2. **Digital content creation and distribution.**  The other significant new area of commercial opportunities for students, and student-athletes, is creating and sharing digital content: podcasts, videos, streams of video game sessions, and the like.  There has been a revolution in this area over the last decade, with the barrier to entry lowered dramatically in terms of content creation, distribution and monetization.  Virtually anyone with a smartphone or a modern computer can record a podcast, or a video, or capture themselves playing a video game. Similarly, modern digital content distributions systems like Apple Podcasts, YouTube, Twitch and Patreon have made it trivially easy both to distribute these digital media products to followers, and to monetize them either directly (i.e., by placing the content behind a paywall) or indirectly (by selling advertisements associated with the products).  Like being an influencer, these opportunities are available to – and have been seized by – college students.

As these new means of engaging in promotional or commercial activities have become ubiquitous, student-athletes have frequently sought approval to engage in them through the waiver process.  Waiver requests have ranged from circumstances involving student-athlete owned businesses to requests to promote third-party commercial entities as a model or spokesperson.  In considering these waiver requests, the NCAA staff has not distinguished between the use of social media and traditional promotional activities in the waiver space, although social media and technology have presented additional considerations.

Below are examples of waiver requests filed by student-athletes, or examples posed to staff through the interpretations process, related to the use of student-athletes' NIL on social media to promote products or business:

a.    A field hockey student-athlete was the host of a profitable video series (i.e., vlog) about cooking and nutrition on an online video streaming service.  The student-athlete was paid based on online ad revenue, consistent with other vloggers with similar-sized audiences.  The student-athlete was a nutrition major seeking to become a professional chef.

b.    A baseball student-athlete used a live streaming platform to broadcast himself playing video games.  The student was paid based on online ad revenue, consistent with other gamers of comparable skill and viewership.  The student-athlete wanted to use his name, image and likeness to promote his company (i.e., his channel on the gaming platform) and products he used while gaming (e.g., e-sports equipment manufacturers).

c.    A football student-athlete was the host of a profitable vlog about his experiences as an NCAA student-athlete on an online video streaming service.  The student-athlete included footage of institutional contests and practices in his vlog, as well as interviews with teammates.  The student-athlete was a journalism major and aspires to be a sports broadcaster.

d.    A volleyball student-athlete was a well-known influencer on Instagram.  The student-athlete sought to receive the going rate for sponsored posts on behalf of clothing brands. The student-athlete was selected to promote the clothing brands based on the substantial following she had on Instagram, rather than on her athletics notoriety.

The working group believes the NCAA's rules on promotional activities should be modernized so that examples such as these are clearly addressed by the main text of the rules, rather than being dealt with through the waiver process.  The working group's recommendations for how the rules could be modernized are set forth in the next section.

### *Section V - Additional Recommendations on Association-Wide Principles and Regulatory Framework.*

After gathering additional feedback from student-athletes and the membership, and actively participating in the divisional legislative process, the working group reaffirms its earlier recommendation and the Board of Governors' determination that member schools may permit student-athletes the opportunity to benefit from the use of their NIL in a manner consistent with the values and principles of intercollegiate athletics.  More specifically, the working group has received feedback from all three divisions that illustrates allowing such compensation for some promotional or commercial activities can likely be accommodated in a manner consistent with the NCAA's model of amateur intercollegiate competition.  This will likely be true even if those activities are associated in some way with a student's athletics talents or recognitions, provided that such compensation is not

NCAA Board of Governors
  Federal and State Legislation Working Group
  Final Report and Recommendations April 17, 2020
Page No. 18
_____

provided or arranged by the student's school, and does not amount to compensation for the student's athletics performance for, or association with, his or her school.  For this reason, the working group recommends that the Board of Governors enhance its policy to make clear that the divisions should significantly modernize the NCAA's current rules on promotional activities and commercial use of student-athlete NIL.

1.     **Why significant modernization is appropriate.**   There are several broad reasons for the working group's recommendation that the divisions should consistently modernize their rules on commercial and promotional use of student-athlete NIL.

   a.     **Current rules could prevent student-athletes from pursuing opportunities available to college students generally.**  As noted above, the rise of social media and internet distribution and monetization channels have resulted in a significant increase in the number and type of opportunities that college students have to engage in promotional activities or otherwise monetize their NIL.  The NCAA's current rules tend to prohibit student-athletes from engaging in these activities in a blanket manner, and while the waiver process has permitted some activities not addressed by the language of Bylaw 12.5 (promotional activities), the working group recommends that the rules be thoroughly reworked to address directly the modern NIL environment.  The working group also believes that the rules should generally permit student-athletes to pursue the same kind of promotional opportunities that are available to other students.  This is consistent with the Board of Governors' direction and initial divisional legislative direction that student-athletes should be treated similarly to other college students unless a compelling reason to differentiate exists.

   b.     **The historic distinction between permitted and prohibited promotional activities should be reexamined in light of modern commercialization opportunities.**  The working group also believes that the divisions should consider modernizing the manner in which their bylaws address "traditional" promotional activities, such as television commercials or in-person autograph signings.   The working group has received significant interest in and feedback on these types of activities; indeed, the divisional legislative bodies continue to grapple with these very issues as we provide our final report to the Board of Governors.  Based on the feedback we have received and the considerations of the divisional bodies, we believe that with the appropriate restrictions, a division could permit a student-athlete to be compensated for use of her NIL in a television endorsement of a product, or for signing an autograph.  Any such modernization pursued by the divisions must, however, be accompanied by regulation sufficient to ensure that the newly permitted activities remain consistent with divisional values and philosophies.

   c.     **Concerns about abuse of NIL commercialization are better addressed through proper regulation than prohibition.**  Rather than prohibit entire categories of promotional or commercial activities, the working group believes it is more

NCAA Board of Governors
  Federal and State Legislation Working Group
  Final Report and Recommendations April 17, 2020
Page No. 19

_____

appropriate to address potential abuses through regulation and enforcement. Indeed, the most important check on potential abuse of NIL compensation, and one that the working group recommends maintaining in its entirety, is the current prohibition on NCAA members providing NIL compensation to student-athletes, or arranging for third parties to do so, unless such compensation is part of a total financial aid package that does not exceed cost of attendance.[11] Such payments would quickly threaten to become pay for play, which is why none of the working group's recommendations suggest creating an environment to facilitate them.

The working group studied the NCAA's rules, received feedback regarding them, and carefully considered how boosters should be treated by any new rules adopted by the divisions. Traditionally, the concern that boosters would circumvent rules against pay for play by making such payments in the school's stead has resulted in NCAA rules that treat boosters as identical to schools for rules purposes. Many in the membership recommended that this treatment of boosters continue in connection with the new NIL commercialization rules, which would have effectively prevented boosters from participating in the many of the new opportunities. While it is a difficult issue, the working group finds that an outright ban in all three divisions could be unnecessarily restrictive.

Instead, the working group suggests that the divisions study whether it is possible to adopt rules and enforcement techniques sufficient to ensure that any compensation paid by boosters purportedly for use of student-athlete NIL represents genuine compensation for use of those NIL rights, separate from athletics participation, rather than disguised payments for athletics participation. These new rules may require the divisions to draw new distinctions between types of boosters when evaluating their participation in student-athlete NIL activities, with some boosters being subjected to enhanced scrutiny due, for example, to their participation in the recruiting process or their long-standing association with an athletics department. Other categories of boosters – for example, someone who qualifies as a booster simply because they made a donation to obtain season tickets, or employed an enrolled student-athlete – may warrant less scrutiny when engaged in NIL activities. For the same reasons, the working group recommends that the Board of Governors encourage each division to adopt enforceable rules ensuring that schools and their boosters do not use the prospect of future NIL commercialization opportunities as an inducement to select, or transfer to, a specific school.

---

[11] The permanent injunction entered by the court in *O'Bannon v. NCAA* prevents the NCAA from prohibiting "the inclusion of compensation for the licensing or use of prospective, current, or former Division I men's basketball and FBS football players' names, images and likenesses in the award of a full grant-in-aid, up to the full cost of attending the respective NCAA member school." Nothing in the working group's recommendations is meant to suggest that schools should be prevented from providing this type of financial aid.

NCAA Board of Governors
  Federal and State Legislation Working Group
  Final Report and Recommendations April 17, 2020
Page No. 20
_____

2.      **Necessary regulation of newly permitted NIL activities.**   While the working group recommends significant modernization of the rules related to student-athlete NIL, it also believes that the divisions must adopt regulations designed to ensure that the newly permitted NIL activities do not undermine America's unique educational model of athletic competition conducted between students, rather than professionals.   In particular, the working group's recommendations to the Board of Governors that it encourage the divisions to significantly modernize their rules related to NIL is inextricably bound to the working group's strong further recommendation that the Board require the divisions to also adopt guardrails embedded in regulations sufficient to ensure the following:

a.      Institutions should encourage student-athletes to keep their academic commitments and not let NIL activities distract or interfere with their academic progress.  Student-athletes should abide by institution and athletics department policies with respect to missed class time and good academic standing;

b.      The compensation earned by student-athletes for NIL activities should represent genuine payments for use of their NIL independent of, rather than payment for, athletics participation or performance;

c.      Outside the context of providing financial aid up to cost of attendance as allowed by prevailing law, schools, conferences and the NCAA should play no role in arranging NIL activities or payments for student-athletes;

d.      Outside the context of providing financial aid up to cost of attendance as allowed by prevailing law, schools, conferences and the NCAA should play no role in student-athletes' NIL activities themselves, including by permitting student-athletes to use their facilities, uniforms, trademarks or other intellectual property;

e.      NIL activities must not be contingent on a prospective student-athlete's enrollment at a particular school or group of schools, nor otherwise used as an inducement by a school or booster;

f.      The use of agents, advisors and professional services by student-athletes in connection with the NIL activities must be regulated; and

g.      NIL activities must not interfere with NCAA member institutions' efforts in the areas of diversity, inclusion or gender equity.

The working group urges the Board to recommend that the divisions pay particular attention to potential recruiting issues created by the modernized NIL rules, and in particular to the possibility that NIL opportunities may be used as direct or indirect inducements during the recruiting process.  Unlike athletes in the professional leagues – whose ability to choose their teams is tightly constrained by mandatory drafts and contract terms, free agency rules, salary

NCAA Board of Governors
  Federal and State Legislation Working Group
  Final Report and Recommendations April 17, 2020
Page No. 21
_____

caps and similar restraints – student-athletes have complete freedom when it comes to selecting which school they will attend.  The ability of students to freely choose the school that best fits their academic and athletics aspirations is one of the defining features of America's model of intercollegiate athletics.  But one result of this freedom is the possibility that students will place undue emphasis on potential NIL opportunities when selecting their schools, to the potential detriment of their academic and athletics careers, and to the potential detriment of fair competition between NCAA members.  Student-athletes may also be exploited by bad actors making false promises of NIL opportunities should they select a particular school, only to have those opportunities fail to materialize after enrollment.  The divisions should take care to adopt guardrails that will, to the extent possible, prevent the new NIL opportunities from distorting student school choice in this manner.

3.     **Specific recommendations.**   After considerable feedback and engagement with student-athletes and the divisional legislative process, the working group recommends that the Board of Governors encourage the divisions' continued consideration of appropriate revisions to their bylaws to permit the student- athlete NIL activities detailed in Section V.C.1, below.

Of course, the working group's endorsement of these activities to the Board of Governors is contingent on each of the divisional governance structures developing adequate measures to implement the guardrails previously established by the Board of Governors and refined above.  Because through our work we have gathered a deeper appreciation that the rules needed to accomplish these modifications may differ from division to division, the working group recommends that the Board of Governors appropriately leave to the divisions the final form of any rules changes.  The working group, however, suggests that the Board encourage the divisional governance structures to pay particular attention to certain potential issues as they develop appropriate guardrails around the newly permitted NIL activities; those are set forth in Section V.C.2.

Understanding the current legal landscape regarding promotional activity, the working group also stresses that it is not recommending that any changes be made to the rules permitting NCAA schools or conferences to make certain promotional uses of student-athlete NIL.  The working group does not intend any of these recommendations to suggest that such uses are no longer appropriate, or that schools or conferences must, should or may compensate student-athletes for those traditional uses.

Finally, the working group acknowledges that, as the divisions consider rules that will significantly expand the ability of student-athletes to engage in previously prohibited commercial activities while retaining NCAA eligibility, they will be in uncharted territory.  It is possible that some of the newly permitted activities will be exploited in unforeseen ways by third parties and damage NCAA values like fair competition, gender equity or the primacy of education over athletics.  The working group recommends that the Board of Governors urge each of the divisions to closely monitor the effect of these newly permitted activities and to be proactive in addressing abuses, including by potentially restricting some of these

NCAA Board of Governors
  Federal and State Legislation Working Group
  Final Report and Recommendations April 17, 2020
Page No. 22
_____

activities if they prove impossible to permit without doing damage to NCAA values or impinge on divisional philosophies.

a.   **Recommended areas in which rules related to NIL should be modernized.**  Based on broad feedback and the working group's understanding of the direction of the divisional bodies, the working group would recommend support for the following two categories of NIL commercial activity by student-athletes, provided that the divisions develop regulation to implement the Board of Governors' principles and guidelines described above.

(1)   **Category One:   Compensation for third-party endorsements.**   The divisions could permit student-athletes to receive compensation for use of their NIL in third-party endorsements or social media influencer activity, including certain activity or endorsements that may be related in some way to athletics. However, we recommend that the divisions take care to prohibit schools or conferences from making these kind of endorsement payments themselves, or having any involvement in student-athlete endorsement activity.   These prohibitions on institutional involvement in student-athlete NIL activity should include, at a minimum, (a) A prohibition on institutions arranging, identifying, facilitating or having any other kind of participation (including by encouraging booster participation) in endorsement deals for their student-athletes; and (b) A prohibition on institutions permitting student-athletes to use the institution's intellectual property in student-athlete endorsements.   For example:

(a)   It could be permissible for a student-athlete at University A to be paid to endorse a commercial product in a television commercial or social media posting, provided that University A's uniform or marks do not appear in the commercial or posting and that the university did not play a role in arranging the opportunity; and

(b)   It could be permissible for a student-athlete to post content to a YouTube channel (e.g., day-in-the-life) and be compensated for endorsement of a particular product (e.g., product placement in the videos) provided that University A did not aid in the production of the content and no university marks are used.

(c)   It should be ***impermissible***, however, for University A to pay a student-athlete for appearing in one of University A's commercials.

(2)   **Category Two:   Compensation for student-athlete work product or business activities.**   The Board should also consider encouraging the divisions to permit student-athletes to receive compensation from third

NCAA Board of Governors
  Federal and State Legislation Working Group
  Final Report and Recommendations April 17, 2020
Page No. 23
_____

parties, but not schools or conferences, for the use of NIL in their work product or business activities, including compensation for:

(a)    Social media content creation and distribution;

(b)    Promotion of student-athlete businesses (music, art, athletic lessons, etc.); and

(c)    Personal promotional activities (autograph signings, etc.).

Student-athletes could be permitted to be compensated for these activities even if they are related in some general way to fitness or athletics.  The divisions should adopt rules, however, prohibiting schools or conferences from (1) Paying student-athletes for the activities; (2) Arranging, or having any involvement in these activities, or (3) Permitting their intellectual property to be used in these activities.  For example:

(a)    It could be permissible for a student-athlete at University A to conduct an in-person or virtual sports camp and use his or her name, image and likeness to promote the camp, provided that University A's marks and facilities are not used;

(b)    It could be permissible for a student-athlete at University A to be paid for making personal appearances, provided that University A is not involved in arranging for the appearances and University A's marks are not used (e.g., the student-athlete is not permitted to appear in University A's jersey or golf shirt); and

(c)    It could be permissible for a student-athlete at University A to develop a line of clothing and use his or her name, image and likeness to promote the apparel, provided that University A's marks are not used in the promotion or actual apparel.

(d)    It should be ***impermissible***, however, for that student-athlete to be paid for any appearance by or on behalf of University A.

The working group is not recommending any further modernization of bylaws beyond these two categories at this time.  In particular, recognizing the current legal landscape, the working group is not recommending any changes to NCAA rules to permit student-athletes to be compensated for appearing in photographs, broadcasts, clips or other recordings of athletics contests or related activities.  As explained earlier in this report, the right of publicity does not extend to such recordings, which means that any payments to

student-athletes associated with them would not represent legitimate NIL licensing activity by student-athletes. Even if the right of publicity did extend to some of these uses, moreover, the working group believes that any compensation for them would be inconsistent with the collegiate model, due to the tight nexus between athletics participation and NIL in these contexts.

At this time, the working group is also not recommending any changes to NCAA rules to permit group licenses of student-athlete NIL in what are characterized as group products (like video games). There are legal hurdles to such activity that preclude it as a realistic option for implementation at this time. The working group recommends that the NCAA continue to explore whether those legal hurdles can be overcome through efforts described in Section VI, so that this issue can be revisited in 2021 or later.

The working group appreciates that the market response to new opportunities permitted by these proposed rules changes may not be made available in a gender-equal manner. Because schools and conferences may be prohibited from having any direct or indirect involvement in these new opportunities, they will not be able to correct or offset this problem directly, by leveling any imbalance created by the market's offerings. The working group nonetheless encourages schools to make educational resources available to all student-athletes so that they are aware of how they might pursue NIL activities.

**b.** **Recommended areas of regulation of newly permitted NIL activities.** As noted earlier, the working group's recommendations regarding the two categories of potentially permissible activities are contingent on each division creating rules to prevent these new activities from undermining the integrity of the collegiate model and the recruiting process. When considering those regulations, the working group recommends that the Board of Governors encourage the divisions to consider the following issues in particular:

(1)   Whether certain categories of promotional activities (e.g., alcohol, tobacco and sports gambling) should be precluded because they are inconsistent with the NCAA membership's values;

(2)   Whether certain categories of third-party businesses (e.g., athletics shoe and apparel companies) should be precluded from, or have limited participation in, the newly permitted activities, due to their history of encouraging or facilitating recruiting and other rules infractions;

(3)   What adjustments, if any, should be made to NCAA rules regarding promotional and other commercial activity by athletes prior to enrollment at an NCAA institution, including consideration of the disclosure and

enforcement mechanisms that might be required in connection with this issue. Discussion of this issue should explore whether disclosure or enforcement efforts in this area should utilize the assistance of third-party entities at the local, conference or Association-wide levels, in part to help relieve the burden that campus compliance personnel may face attempting to monitor the newly permitted activities;

(4)     How best to implement safeguards to ensure that newly permitted activities do not impose undue burdens on student-athlete time;

(5)     How best to implement safeguards to ensure that newly permitted activities are not utilized by boosters in a manner that circumvents the divisions' amateurism rules. This should include consideration of the disclosure and enforcement mechanisms that may be necessary to monitor the new NIL activities and payments;

(6)     Creating a framework to permit student-athletes to engage and consult with professional services providers in connection with their NIL and business activities (e.g., tax, legal, subject matter experts) consistent with existing federal and state laws; and

(7)     Creating resources on campus to educate student-athletes about the newly permitted activities and in a manner consistent with gender equity.

### *Section VI - Presidential Subcommittee on Congressional Action.*

### *Background.*

One topic that repeatedly came up during the deliberations of the working group was the possibility that the Association's attempts to modernize its rules relating to NIL could be frustrated by antitrust lawsuits, or by state laws that purport to override NCAA rules related to NIL issues. As the working group discussed possible reforms for consideration by the NCAA membership, it became apparent that the potential impediments posed by these outside legal factors could significantly undermine the Association's ability to take meaningful action in this area.

To address this issue, and in response to the introduction of federal NIL legislation and interest in NIL by Members of Congress, November 16, 2019, the Board of Governors Executive Committee directed that a subcommittee of the working group be formed. The purpose of the subcommittee was to provide input to the Board of Governors and the NCAA president on potential assistance that the Association should seek from Congress to support any efforts to modernize the rules in NCAA sports, while maintaining the latitude that the Association needs to further its mission to oversee and promote intercollegiate athletics on a national scale.

NCAA Board of Governors
  Federal and State Legislation Working Group
  Final Report and Recommendations April 17, 2020
Page No. 26
_____

This Presidential Subcommittee on Congressional Action was composed of the presidential members of the working group as well as one independent member of the Board of Governors:

- Rita Cheng, president, Northern Arizona University (Division I)
- Mary Beth Cooper, president, Springfield College (Division III)
- John "Jack" DeGioia, president, Georgetown University (Division I) (chair)
- Michael Drake, president, The Ohio State University (Division I)
- Glen Jones, former vice chair, NCAA Board of Governors (Division II)
- Denis McDonough, The Markle Foundation
- Jere Morehead, president, University of Georgia (Division I)
- Tim P. White, chancellor, California State University System (Divisions I and II)

The Presidential Subcommittee conducted a total of seven meetings and teleconferences between December 16, 2019, and the date of this report. The subcommittee received reports from NCAA legal and legislative affairs staff regarding the potential legal impediments faced by the Association as it considers NIL modernization, as well the effect those impediments may have on the Association's ability to adopt and enforce its bylaws more generally.

For the past 114 years, the NCAA has served as the recognized authority and voice for the millions of student-athletes who have participated in intercollegiate athletics. A member- driven organization comprised of over 1,100 colleges and universities, the overarching purpose of the NCAA is to create a safe, fair and equitable environment that allows student-athletes to reach their full potential in academics, athletics and life. This ambitious ideal is achieved by providing student-athletes with transformational opportunities and experiences through the integration of athletics with academics.

Unfortunately, the evolving legal landscape surrounding NIL and related issues threatens to undermine the intercollegiate athletics model and significantly limit our ability to meet the needs of student-athletes moving forward. Specific modernization reforms that the working group believes are in the best interests of student-athletes and consistent with the collegiate model might prove infeasible as a practical matter due solely to the legal risk that they might create for the Association. While we are sensitive to the legal risks involved, we are more concerned about working in the best interests of our student-athletes to ensure that their voices continue to be heard and that their interests, current and future, are advanced and protected.

Further, the subcommittee believes that the NCAA is the most appropriate and experienced entity to oversee intercollegiate athletics given the uniqueness of the collegiate model of athletics, its member-driven nature and daily connection to student-athletes, the breadth and scope of its administrative operations, its willingness to respond to the evolving needs of student-athletes, and its long track record of providing remarkable opportunities for student-athletes to gain access to higher education.

NCAA Board of Governors
  Federal and State Legislation Working Group
  Final Report and Recommendations April 17, 2020
Page No. 27
_____

***Recommendations.***

In light of the above and driven by our desire to do what is best for our student-athletes, the Presidential Subcommittee urges the NCAA Board of Governors to:

1.   Support the ongoing modernization effort of NCAA rules in areas of student-athlete well-being, including student-athlete experience, health and safety and academic success; and

2.   Immediately engage Congress to accomplish the following:

    a.   Ensure federal preemption over state name, image and likeness laws;

    b.   Establish an antitrust exemption for the Association;

    c.   Safeguard the nonemployment status of student-athletes;

    d.   Maintain the distinction between students-athletes and professional athletes; and

    e.   Uphold the NCAA's values including diversity, inclusion and gender equity.

In offering these recommendations, the subcommittee acknowledges that, due to the evolving Congressional landscape, there may be a need for the Association to prioritize one or more of the above recommendations in its engagement with Congress.

The reasons the Presidential Subcommittee believes these actions are necessary and appropriate are set out below.

1.   **Why Congressional Action is Desirable.**  The Presidential Subcommittee has identified two distinct legal impediments to the Association's ability to modernize its rules relating to NIL, and to maintain its model of amateur intercollegiate athletics more generally.  Those two impediments are (a) The attempts by various state laws to override, in whole or in part, the NCAA's ability effectively to manage issues related to NIL; and (b) The threat of continuing antitrust litigation.

    a.   **Impediments Posed by State NIL Legislation**.  During its deliberations, the subcommittee reviewed the current movement among the states to adopt laws that purport to supplant, in whole or in part, the NCAA's ability to manage effectively in this area.  As of the date of this report, 34 states have introduced bills addressing the topic of payments to college student-athletes for use of their NIL rights.  Two of these bills have become law:  one in California and one in Colorado.  Both laws expressly prohibit the NCAA from adopting rules regarding student-athletes earning compensation as a result of the use of the student's name, image or likeness when that

NCAA Board of Governors
  Federal and State Legislation Working Group
  Final Report and Recommendations April 17, 2020
Page No. 28

————

compensation is paid by third parties.[12]   Other laws under consideration would erode the NCAA's ability to maintain the collegiate model even further.

New York, for example, is considering a law that would, among other things, require that colleges pay their student-athletes a share of ticket revenue earned from sporting events.   Not only would this law undermine the NCAA's model of amateur intercollegiate athletics; it would threaten to transform student-athletes into employees of their schools.

These state laws create two distinct, but related, impediments to the Association's ability to maintain its model of intercollegiate athletics in its current, national form. First, all of these laws contain provisions that are fundamentally incompatible with the NCAA's model of intercollegiate athletics, since they purport to completely remove the NCAA's ability to adopt or enforce rules related to third-party commercialization of student-athlete NIL.   These laws would thus strip the NCAA of the ability to ensure that third-party NIL commercialization was not being conducted in a manner that distorted the process by which student-athletes select which school to attend, or undermined student-athlete welfare, or amounted to the creation of a back-door scheme of pay for play.

Second, the fact that these laws are being considered or adopted by the states, rather than at the federal level, creates the very real possibility that NCAA members in different states will be governed by different rules related to NIL.  If the NCAA simply accepted that the California Fair Pay to Play Act override its rules in California, for example, it would mean that student-athletes attending California schools would be governed by very different rules on NIL than student-athletes attending schools in other states.  This would deal a serious blow to the NCAA's ability to sponsor sports and championships on a truly national level.  It would also gravely undermine the ability of the NCAA's members to achieve their shared goal of fair competition within their divisions.

----

[12]  For example, the California law provides, in pertinent part:

(a)(1)  A postsecondary educational institution shall not uphold any rule, requirement, standard, or other limitation that prevents a student of that institution participating in intercollegiate athletics from earning compensation as a result of the use of the student's name, image, or likeness. Earning compensation from the use of a student's name, image, or likeness shall not affect the student's scholarship eligibility.

(2)  An athletic association, conference, or other group or organization with authority over intercollegiate athletics, including, but not limited to, the National Collegiate Athletic Association, shall not prevent a student of a postsecondary educational institution participating in intercollegiate athletics from earning compensation as a result of the use of the student's name, image, or likeness.

(3)  An athletic association, conference, or other group or organization with authority over intercollegiate athletics, including, but not limited to, the National Collegiate Athletic Association, shall not prevent a postsecondary educational institution from participating in intercollegiate athletics as a result of the compensation of a student athlete for the use of the student's name, image, or likeness.

NCAA Board of Governors
  Federal and State Legislation Working Group
  Final Report and Recommendations April 17, 2020
Page No. 29
_____

The subcommittee has therefore concluded that it is vital for Congress to step in and ensure that any laws pertaining to student-athlete NIL be enacted at the federal, rather than state, level. For this reason, the subcommittee believes it is appropriate and advisable for the Association to partner with Congress to enact a federal law that addresses the issue of compensation to student-athletes for use of name, image or likeness, and preempts state laws on that topic.

b.    **Impediments Posed by Continuing Antitrust Litigation**.  The subcommittee also reviewed the history of antitrust lawsuits brought against the Association over the last several decades. That review revealed that federal antitrust law has frequently been used by aggrieved parties as a tool to attempt to change or undermine the Association's rules. Several of these lawsuits have been brought by third-party business interests, not current or former student-athletes, and have typically attempted to force the Association to change its rules for the benefit of those business interests. While these lawsuits have, for the most part, been unsuccessful, the Association has been required to devote scarce and valuable resources to defending them, resources that could have been better spent on pursuing the Association's other goals.

The Association has also faced several antitrust challenges to its amateurism and eligibility rules brought by current or former student-athletes. The Association has, for the most part, been successful in defending these lawsuits. In response to a recent challenge to the Division I transfer rules, for example, the U.S. Court of Appeals for the Seventh Circuit held that such rules do not violate the antitrust laws because they are "clearly meant to help maintain the revered tradition of amateurism in college sports" and "the preservation of the student-athlete in higher education."[13] Similarly, the U.S. Court of Appeals for the Ninth Circuit recently held that the NCAA's amateurism rules benefit both students and consumers.[14]

The Association's attempts to defend its amateurism rules from antitrust attack have not always been successful, however. Even as it affirmed the beneficial effects of the NCAA's amateurism rules in general, the Ninth Circuit's *O'Bannon* decision endorsed the notion that plaintiffs can use federal antitrust law to attempt to "prove" that there are better ways of preserving amateurism than current NCAA rules. This has led to another round of litigation in which plaintiffs have attempted to use the antitrust laws as a vehicle to second guess the Division I membership on the details of the Division I financial aid rules. The subcommittee is concerned that these sorts of antitrust challenges will continue, and will interfere with the Association's ability to effectively and efficiently regulate intercollegiate athletics contests between its members.

---

[13]  *Deppe v. NCAA*, 893 F.3d 498, 501-503 (7th Cir. 2018).

[14]  *O'Bannon v. NCAA,* 802 F.3d 1049 (9th Cir. 2015).

NCAA Board of Governors
  Federal and State Legislation Working Group
  Final Report and Recommendations April 17, 2020
Page No. 30
_____

The subcommittee's review of this litigation history has led it to conclude that the threat of antitrust lawsuits will continue to impinge on the membership's ability to investigate and adopt common and adequate solutions to pressing issues facing college athletics. For this reason, the subcommittee believes it is appropriate and advisable for the Association to seek an exemption from federal and state antitrust laws.

### *Section VII - Timeline and Phased Divisional Implementation.*

The working group has completed its work with the submission of this report to the Board of Governors. The report recognizes that there is a common, national framework to achieve name, image, and likeness opportunities for student-athletes in a manner that does not compromise the collegiate model. Yet, within that framework, the divisions will have to craft their legislative proposals to meet the needs of their own student-athletes and divisional philosophies. With this report, the divisions have the guidance necessary to complete their work. The divisions may act more quickly than the timeline contemplates but progress must continue and decisive measures should be taken. The divisions are asked to continue to provide periodic reports to the Board of Governors regarding their progress.

***By April 30, 2020.*** This report is delivered to the NCAA Board of Governors for its review. The Board of Governors issues its additional Association-wide guidance to the divisions.

***By August 30, 2020.*** The divisions should have drafted NIL legislative proposals for consideration and divisional governance bodies should have solicited additional membership suggestions regarding permissible activities and appropriate regulation. In particular, the working group recommends that all three divisions consider modifying their rules to permit those activities that have been permitted to date via the Division I waiver process, via rule in Division II or via interpretation in Division III. Further, the divisions should consider modifying their rules to permit commercial or promotional use of NIL by student-athletes related to their own businesses or work product, provided that work product is ***not*** related to athletics.

***By October 31, 2020.*** Divisional governance bodies should have revised NIL proposals and recommended legislation that meets the divisional needs of their student-athletes for commercial or promotional use of their NIL in situations that are ***related to athletics***, or that involve endorsements of commercial products or services. These rules changes will necessarily include the consideration and adoption of safeguards identified earlier, to prevent (among other abuses) NIL opportunities from being used as a recruiting inducement, or boosters using NIL opportunities as back-door pay-for-play. The divisions should also consider whether additional structures may be advisable for the purpose of monitoring athletics-related NIL commercial or promotional activities and whether those structures should exist within the divisions or Association-wide; to regulate the involvement of agents or other service providers in the newly permitted activities; to determine the extent to which any of the modifications should apply to individuals prior to their initial collegiate enrollment; and to address any gender equity concerns raised by the new activities.

NCAA Board of Governors
  Federal and State Legislation Working Group
  Final Report and Recommendations April 17, 2020
Page No. 31
_____

***By January 31, 2021.*** Divisions should have enacted all NIL legislative proposals appropriate for their divisions with effective dates not later than the start of the 2021-22 academic year.

***Future Considerations.*** The divisions should continue to explore whether it is possible to support institutionally managed group licenses for athletically related activities.  As noted earlier, there currently are significant legal impediments to the NCAA adopting this kind of licensing structure; further exploration of these concepts will require clarity from Congress of the NCAA's authority to enact rules or maintain oversight in this area.