Steve W. Berman (*pro hac vice*)
Emilee N. Sisco (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
emilees@hbsslaw.com

Benjamin J. Siegel (256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
bens@hbsslaw.com

*Counsel for Plaintiffs and the Proposed Classes*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| GRANT HOUSE, *et al.*,<br><br>                          Plaintiffs,<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, *et al.*,<br><br>                          Defendants. | No. 4:20-cv-03919 CW<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date:          November 18, 2020<br>Time:          2:30 p.m.<br>Courtroom:  Courtroom 2, 4th Floor<br>Judge:        Hon. Claudia Wilken |
| TYMIR OLIVER, on behalf of himself and all others similarly situated<br><br>                          Plaintiffs,<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, *et al.*,<br><br>                          Defendants. | No. 4:20-cv-04527 CW |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................................1

II.     ARGUMENT ......................................................................................................3

      A.      Legal Standard............................................................................................3

      B.      *O'Bannon* and *Alston* Do Not Foreclose Plaintiffs' Lawsuits.....................3

      C.      Defendants Provide No Basis to Dismiss Any Claim Related to the
            Group Licensing Damages Sub-Class ......................................................13

            1.      Plaintiffs have alleged cognizable injuries on behalf of the
                  Group Licensing Damages Sub-Class. ...........................................13

            2.      Plaintiffs allege harm to competition in a relevant antitrust
                  market. ...........................................................................................19

      D.      Defendants Provide No Basis to Dismiss the *Oliver* Complaint With
            Prejudice ..................................................................................................22

      E.      Should the Court Dismiss Any of Plaintiffs' Claims, They Seek Leave
            to Amend ..................................................................................................25

III.    CONCLUSION .................................................................................................25

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

**Cases**

*Anderson v. Shipowners' Ass'n of Pac. Coast,*
    272 U.S. 359 (1926) ................................................................................................. 21

*Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n,*
    805 F.2d 663 (7th Cir. 1986) ................................................................................... 19

*Blandino-Medina v. Holder,*
    712 F.3d 1338 (9th Cir. 2013) ................................................................................. 17

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977) ................................................................................................. 13

*In re Capacitors Antitrust Litig.,*
    106 F. Supp. 3d 1051 (N.D. Cal. 2015) ................................................................... 25

*Caplan v. CNA Short Term Disability Plan,*
    479 F. Supp. 2d 1108 (N.D. Cal. 2007) ................................................................... 12

*Cnty. of Cook v. MicCon Corp.,*
    773 F.2d 892 (7th Cir. 1985) ................................................................................... 23

*Dora v. Frontline Video, Inc.,*
    15 Cal. App. 4th 536 (1993) .................................................................................... 23

*Downing v. Abercrombie & Fitch,*
    265 F.3d 994 (9th Cir. 2001) ................................................................................... 19

*Dryer v. Nat'l Football League,*
    55 F. Supp. 3d 1181 (D. Minn. 2014) ................................................................ 17, 18

*Dunn v. Phoenix Newspapers, Inc.,*
    735 F.2d 1184 (9th Cir. 1984) ................................................................................... 4

*E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc.,*
    365 U.S. 127 (1961) ................................................................................................. 10

*Eichman v. Fotomat Corp.,*
    759 F.2d 1434 (9th Cir. 1985) ........................................................................... 23, 24

*Ettore v. Philco Television Broad. Corp.,*
    229 F.3d 481 (3d Cir. 1956) .................................................................................... 16

*Frank v. United Airlines, Inc.,*
    216 F.3d 845 (9th Cir. 2000) ................................................................................... 23

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Gautier v. Pro Football, Inc.*,
   304 N.Y. 354 (1952) ................................................................................................ 19

*Gionfriddo v. Major League Baseball*,
   94 Cal. App. 4th 400 (2001) ........................................................................... 18, 19

*Hesse v. Sprint Corp.*,
   598 F.3d 581 (9th Cir. 2010) .................................................................................. 22

*Howard v. Am. Online, Inc.*,
   208 F.3d 741 (9th Cir. 2000) .................................................................................. 24

*Hynix Semiconductors, Inc. v. Rambus, Inc.*,
   2006 WL 1991760 (N.D. Cal. July 14, 2006) ........................................................ 14

*ICTSI Oregon, Inc. v. Int'l Longshore & Warehouse Union*,
   2019 WL 1651038 (D. Or. Apr. 17, 2019) ............................................................. 10

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
   232 F.3d 979 (9th Cir. 2000) .................................................................................... 3

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ............................................................................................... 22

*Maple Flooring Mfrs.' Ass'n v. United States*,
   268 U.S. 563 (1925) ................................................................................................. 4

*Marshall v. ESPN, Inc.*,
   111 F. Supp.3d 815 (M.D. Tenn. 2015) ................................................................. 17

*Marshall v. ESPN Inc.*,
   668 Fed. App'x 155 (6th Cir. 2016) ....................................................................... 17

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
   958 F.3d 1239 (9th Cir. 2020) ......................................................................... passim

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
   375 F. Supp. 3d 1058 (N.D. Cal. 2019) ........................................................... passim

*Nat'l Football League v. Alley, Inc.*,
   624 F. Supp. 6 (S.D. Fla. 1983) ............................................................................. 19

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
   990 F. Supp. 2d 996 (N.D. Cal. 2013) ............................................................. passim

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
   37 F. Supp. 3d 1126 ..................................................................................... 15, 16, 18

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
   513 F.3d 1038 (9th Cir. 2008) ................................................................................ 20

*Nichols v. Citibank, N.A.*,
   715 Fed. App'x 681 (9th Cir. 2018) .......................................................... 24

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
   7 F. Supp. 3d 955 (N.D. Cal. 2014) ............................................... 14, 20, 21

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
   802 F.3d 1049 (9th Cir. 2015) ......................................... 6, 7, 11, 14

*Operating Eng'rs' Pension Trust Fund v. Clark's Welding & Mach.*,
   2009 WL 1324049 (N.D. Cal. May 8, 2009) ................................... 3

*In re Osborne*,
   76 F.3d 306 (9th Cir. 1996) ................................................................... 3

*Palantir Techs., Inc. v. Palantir.net, Inc.*,
   2011 WL 3047327 (N.D. Cal. July 25, 2011) .................................. 12

*Pittsburgh Athletic Co. v. KVQ Broad. Co.*,
   24 F. Supp. 490 (W.D. Pa. 1938) ..................................................... 19

*Radovich v. Nat'l Football League*,
   352 U.S. 445 (1957) ........................................................................... 21

*Rebel Oil Co. v. Atl. Richfield Co.*,
   133 F.R.D. 41 (D. Nev. 1990) ........................................................... 20

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
   442 F.3d 741 (9th Cir. 2006) ............................................................ 24

*Rodriguez v. Serv. Emps. Int'l*,
   755 F. Supp. 2d 1033 (N.D. Cal. 2010) ........................................... 12

*Silvas v. E*Trade Mortg. Corp.*,
   514 F.3d 1001 (9th Cir. 2008) ............................................................ 3

*Sullins v. Exxon/Mobil Corp.*,
   2009 WL 2779172 (N.D. Cal. Sept. 2, 2009) ................................... 12

*Syufy Enters. v. Am. Multicinema, Inc.*,
   793 F.2d 990 (9th Cir. 1986) ............................................................ 20

*Tanaka v. Univ. of S. Cal.*,
   252 F.3d 1059 (9th Cir. 2001) ..................................................... 19, 20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ............................................................................. 3

*United Mine Workers of Am. v. Pennington*,
   381 U.S. 657 (1965) ........................................................................... 10

*United States v. eBay, Inc.*,
   968 F. Supp. 2d 1030 (N.D. Cal. 2013) ................................................................. 21

*Wisc. Interscholastic Athletic Ass'n v. Gannett Co., Inc.*,
   658 F.3d 614 (7th Cir. 2011) ...................................................................... 16, 17

**Statutes**

Ind. Code. Ann. § 32-36-1-1 .................................................................................. 17

Ky Rev. Stat. Ann. § 391.170.................................................................................. 17

**Rules**

Federal Rule of Civil Procedure 12(b)(6)............................................................... 14

1

## I.    INTRODUCTION

2      Defendants contend that Plaintiffs seek a redo of past cases. In fact, it is Defendants who

3   have burdened this Court with recycled legal arguments, about preclusion for example, that have

4   been rejected several times by this Court and only a few months ago by the Ninth Circuit.

5   Defendants' motion also misapplies other legal precedent, ignores the actual allegations made in the

6   complaints, and turns a blind eye to statements made by Defendants themselves—the NCAA and the

7   Power Five Conferences—that are at starkly at odds with their Motion to Dismiss ("Motion" or

8   "Mot.").[1]

9      Plaintiffs' lawsuits allege that Defendants' rules that prohibit Plaintiffs and the other student-

10  athletes they represent from receiving anything of value for the commercial use of their names,

11  images, and likenesses ("NILs") violate the Sherman Act and unjustly enrich Defendants. While

12  Plaintiffs' rights are valued at zero by the NCAA and the Power Five Conferences, these same actors

13  make hundreds of millions of dollars selling the athletic skills and reputations of student-athletes,

14  including via lucrative promotion and sponsorship deals with some of the world's largest companies,

15  such as Nike and Adidas. Defendants have even used student-athletes, including Plaintiffs Grant

16  House and Sedona Prince, in promotional activities and sponsored posts on social media and other

17  platforms. Yet, Defendants' rules forbid student-athletes from commercially benefiting from their

18  own NILs, on social media for example, even though for the vast majority of athletes, many of whom

19  come from impoverished backgrounds, this is the time when their NILs have the most value, and that

20  value will quickly diminish after graduation. Notably, recent statements by Defendants in official

21  reports and letters to Congress admit that the NIL rules are unfair, unnecessary, and should be

22  changed, and many of college sports' most powerful coaches and athletic directors have said the

23  same thing. Like prior lawsuits striking down Defendants' collusive rules when the facts show that

24  those rules are unjustified by any lawful purpose, Plaintiffs' current lawsuits seek to do the same.

25

---

26  [1] "Plaintiffs" refer jointly to the plaintiffs in the *House* Complaint ("HC") and *Oliver* Complaint
   ("OC"). "NCAA" means Defendant National Collegiate Athletic Association, and "Power Five
27  Conferences" means Defendants Pac-12 Conference, The Big Ten Conference, Inc., The Big 12
   Conference, Inc., Southeastern Conference, and Atlantic Coast Conference. "Defendants" refers
28  collectively to the NCAA and Power Five Conferences.

1        Defendants ask this Court at the pleading stage to dismiss the complaints. Their lead

2   argument is that this case is foreclosed by decisions in the *O'Bannon* and *Alston* lawsuits, but

3   Defendants repeat the same preclusion arguments already rejected in *Alston*. The reasoning from

4   *Alston* applies with particular force here, where material factual developments since those cases

5   include Defendants' statements *admitting* that the current NIL restraints should be changed (at least

6   to a certain extent). Defendants also ignore recent evidence indicating that consumer demand for

7   college sports would not suffer if Defendants' rules were changed, and that consumers would

8   become more interested in college sports if these NIL restraints, viewed as exploitative by so many

9   Americans, were scrapped. Nothing in *O'Bannon* or *Alston* precludes these lawsuits, which present

10  the Court with a different factual record, distinct claims, and unique proposed remedies.

11       Defendants also argue that Plaintiffs' claims on behalf of the putative "Group Licensing

12  Damages Sub-Class" should be dismissed or stricken. Defendants ignore this Court's holding in

13  *O'Bannon* that student-athletes' ability to demonstrate value in the licensing of their NILs—and,

14  conversely, harm from denial of the opportunity to negotiate to receive such value—is not dependent

15  on the existence of a legally cognizable right of publicity. And even assuming *arguendo* that this

16  were true, Defendants—again fighting against precedent from *O'Bannon*—fail to show that student-

17  athletes, as a matter of law, cannot assert publicity rights in game broadcasts. Moreover, contrary to

18  Defendants' argument, which ignores the actual allegations in the complaints, Plaintiffs have pled a

19  relevant antitrust market and harm to competition in that market.

20       Finally, in a very narrow challenge, Defendants argue that the *Oliver* action should be

21  dismissed "in full" with prejudice because, allegedly, Plaintiff Tymir Oliver does not have standing

22  to assert his claims. Defendants are wrong because, under controlling law, the fact that Oliver was a

23  member of the *Alston* settlement class does not preclude his distinct damages claims here. Thus,

24  though Defendants are right that as a former student-athlete he cannot seek injunctive relief, Oliver's

25  standing to seek damages is sufficient to reject Defendants' request to dismiss the *Oliver* case in its

26  entirety. Moreover, nothing precludes amending the *Oliver* complaint to add a current student-athlete

27  with standing to pursue injunctive relief, and Defendants do not attempt to argue that current student-

28  athletes and *House* Plaintiffs Sedona Prince and Grant House lack standing to request such relief.

1

## II.    ARGUMENT

2

### A.    Legal Standard

3

In reviewing a motion to dismiss, a court should liberally construe the claims, accept as true

4

all well-pleaded facts and allegations in the complaint, and draw all reasonable inferences in favor of

5

the plaintiffs.[2] In addition, the court must evaluate the claims as alleged in the complaint, not as

6

recast by the defendants.[3] In determining the plausibility of those claims, the court should consider

7

plaintiffs' allegations as a whole, and not evaluate the sufficiency of each allegation independently.[4]

8

Under the Supreme Court's decision in *Continental Ore Co. v. Union Carbide & Carbon Corp.*, this

9

principle is particularly important as applied to antitrust allegations, which cannot be evaluated on a

10

piecemeal basis.[5] Ultimately, "[o]n a motion under Rule 12(b)(6) for failure to state a claim,

11

dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally

12

cognizable claim and the grounds on which it rests."[6]

13

### B.    *O'Bannon* and *Alston* Do Not Foreclose Plaintiffs' Lawsuits

14

Defendants' lead argument is that decisions in the *O'Bannon* and *Alston* cases foreclose

15

Plaintiffs' antitrust claims under the doctrine of *stare decisis*. Mot. at 2-6. But "*stare decisis* is

16

important only for the decision, for the detailed legal consequence following a detailed set of facts."[7]

17

In rejecting similar arguments made by these same defendants only a few months ago, the Ninth

18

Circuit in *Alston* explained that a prior decision does not dictate the outcome of a subsequent case

19

where there are factual differences that are "'material to the application of the rule [at issue] or allow

20

21

22

---

23

[2] *Silvas v. E\*Trade Mortg. Corp.*, 514 F.3d 1001, 1003 (9th Cir. 2008); *Operating Eng'rs' Pension Trust Fund v. Clark's Welding & Mach.*, 2009 WL 1324049, at \*2, \*14 (N.D. Cal. May 8, 2009).

24

[3] *See Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 989-91 (9th Cir. 2000).

25

[4] *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007) ("the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically").

26

[5] 370 U.S. 690, 699 (1962).

27

[6] *In re NCAA Student-Athlete Name & Likeness Licensing Litig. ("O'Bannon I")*, 990 F. Supp. 2d 996, 1000-01 (N.D. Cal. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

28

[7] *In re Osborne*, 76 F.3d 306, 309 (9th Cir. 1996).

the precedent to be distinguished on a principled basis.'"[8] The court further held that "[a]ntitrust decisions are particularly fact-bound. The Supreme Court has long emphasized that the Rule of Reason 'contemplate[s]' 'case-by-case adjudication.'"[9] Quoting the Areeda & Hovenkamp antitrust law treatise, the Ninth Circuit explained that "'[c]ontinuing contracts in restraint of trade,' are 'typically subject to continuing reexamination,' and 'even a judicial holding that a particular agreement is lawful does not immunize it from later suit or preclude its reexamination as circumstances change.'"[10] Plaintiffs allege that a subset of Defendants' rules that "prohibit student-athletes from receiving anything of value in exchange for the commercial use of their NILs" violate the Sherman Act. HC ¶¶ 5, 73-80, 267-89; OC ¶¶ 5, 55-62; 246-68.[11] These claims are not foreclosed by the fact-specific, rule-of-reason decisions in *Alston* and *O'Bannon* because Plaintiffs here allege materially different facts to support distinct claims and unique proposed remedies.

To begin with, *Alston* dealt with distinct claims; as this Court held in that case, "[t]he conduct at issue here is not connected to NIL rights."[12] Thus, while *Alston* provides important guidance, such as to the rule-of-reason mode of analysis, it does not foreclose Plaintiffs' lawsuit, which is focused on the NCAA's rules preventing student-athletes from monetizing their NIL rights. Moreover, the rules challenged in *Alston* related only to compensation and benefits student-athletes receive "*from*

---

[8] *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.* ("*Alston II*"), 958 F.3d 1239, 1253 (9th Cir. 2020) (quoting *Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001)).

[9] *Id.* (quoting *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 899 (2007)); *see also id.* (citing "*Flooring Mfrs.' Ass'n v. United States*, 268 U.S. 563, 579 (1925) ('[E]ach case arising under the Sherman Act must be determined upon the particular facts disclosed by the record, and . . . opinions in those cases must be read in the light of their facts'").

[10] *Alston II*, 958 F.3d at 1253 (quoting Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 1205c3 (4th ed. 2018)). Refusing to accept what the Ninth Circuit held in *Alston*, Defendants submit a partial quote from *Dunn v. Phoenix Newspapers, Inc.*, 735 F.2d 1184, 1186 (9th Cir. 1984). *See* Mot. at 3:10-12. But they misleadingly omit the fact that the court was discussing the appellate standard of review, not *stare decisis* or any other preclusion doctrine. Nothing in *Dunn* undercuts what *Alston* held about how *stare decisis* or any other preclusion analyses should be applied generally, much less how a doctrine should be applied to continuing restraint of trade and a new, distinct challenge based on a different facts.

[11] Plaintiffs also allege claims for unjust enrichment. *See* HC ¶¶ 290-92; OC ¶¶ 269-71. Defendants do not even attempt to show that these claims are foreclosed by *Alston* and/or *O'Bannon*.

[12] *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.* ("*Alston I*"), 375 F. Supp. 3d 1058, 1094 (N.D. Cal. 2019).

1    *their schools.*"[13] By contrast, Plaintiffs here challenge the legality of the NCAA rules that prohibit

2    student-athletes from receiving compensation for their NIL rights not only from their schools, but

3    also from third parties. *See* HC ¶¶ 73-80; OC ¶¶ 55-62.

4            While *O'Bannon* did involve a challenge to the NIL rules, that case focused narrowly on the

5    NCAA's prohibition against student-athletes receiving a share of the revenue that the NCAA and its

6    members receive from the use of athletes' NILs in live game broadcasts, related footage, and video

7    games. *O'Bannon* did not address many of the NIL opportunities that are now available to student-

8    athletes, at issue in this lawsuit, and unlawfully prohibited by Defendants' restraints. For example,

9    Plaintiffs allege that, without any procompetitive basis, NCAA rules prevent student-athletes from

10    receiving any compensation for the use of their NILs on social media platforms, including even in

11    their own work product, while the schools simultaneously (and hypocritically) promote their own

12    multimillion-dollar athletic programs on social media using student-athlete NILs. *See e.g.*, HC ¶¶

13    134-36, 229; OC ¶¶ 115-17, 210. The lawsuit describes, for instance, how Arizona State University

14    features its student-athletes, including Plaintiff Grant House, in promotional posts on the school's

15    social media pages, but Mr. House cannot derive any profit from these or his own social media

16    activities, including a swimming podcast he and his brother created before he even enrolled at ASU.

17    *See* HC ¶¶ 37-38. Plaintiff Sedona Prince is similarly restricted from monetizing her personal social

18    media accounts through which she has established an online following of over 70,000. *See* HC ¶ 48.

19    The complaints show the substantial commercial value of these personal rights, and that schools are

20    already competing to offer help to student-athletes to promote themselves online if the NCAA's rules

21    are changed. *See* HC ¶¶ 12-13, 15, 37, 48, 92-94, 233-46; OC ¶¶ 12-13, 15, 73-75, 214-227. The

22    unfairness of the rules is exemplified by the story of UCLA gymnast Katelyn Ohashi, who says, "My

23    senior year [in 2019] my routine went viral with over 100 million views. Along with this came a lot

24    of attention and opportunities, but I couldn't capitalize on them. I was handcuffed by the NCAA

25    rules that prevent me from deriving any benefit from my own name and likeness, despite the fact that

26    after my final meet, I had no pro league to join." HC ¶ 229; OC ¶ 210. Many college coaches have

27

28

[13] *Id.* (emphasis added).

1   decried the inequities of this system, where student-athletes like Ms. Ohashi cannot benefit when

2   they "have incredible value" and "[w]hen they graduate, they're done." HC ¶ 191; OC ¶ 172.

3          Moreover, even with respect to the restrictions that were at issue in *O'Bannon*, the court did

4   not, as Defendants contend, "validate[] NCAA rules limiting NIL compensation." Mot. at 4:2, 20-21.

5   To the contrary, in *O'Bannon*, the Ninth Circuit *affirmed* this Court's determination that the NCAA's

6   NIL restraints were an illegal restraint of trade. And though the Ninth Circuit limited the *relief*

7   ordered by this Court, allowing the NCAA to maintain rules prohibiting cash payments above the

8   cost of attendance ("COA"), its ruling was based on the *specific record* before the court. Defendants

9   ignore the fact that the Ninth Circuit expressly rejected the position they assert here when

10  Defendants tried to make the same argument in *Alston*. Indeed, the *Alston* court was clear in holding

11  that *O'Bannon* does not immunize the NCAA's NIL restrictions from future legal challenges,

12  particularly as circumstances change and new material facts develop.[14]

13         The complaints allege that, in the more than five years since the close of discovery in

14  *O'Bannon*, there have been critical factual developments which demonstrate that Defendants' current

15  rules forbidding student-athletes from monetizing their NILs are unlawful, regardless of the fact that

16  the NCAA's other compensation rules allow for the provision of full COA scholarships. For

17  example, Plaintiffs allege that in the last five years the NCAA has permitted student-athletes to

18  receive a broad range of compensation—both related and unrelated to education—beyond COA.

19  This includes, for example, multimillion-dollar payments to two-sport athletes who compete as

20

21  ────────────────────

22  [14] *See Alston II*, 958 F.3d at 1253-54 (quoting *O'Bannon*'s statement at 802 F.3d at 1079—"'*The
    Rule of Reason requires* that the NCAA permit it schools to provide up to the [COA] to their student

23  athletes. It does not require more.'"—and holding: "In arguing that the[se] sentences. . . foreclose
    the current litigation, the NCAA ignores the inherently fact-dependent nature of a Rule of Reason

24  analysis, which evaluates dynamic market conditions and consumer preferences; the panel majority's
    manifest effort to limit its decision to the record before it; and the majority's mandate that courts
    must continue to subject NCAA rules, including those governing compensation, to antitrust

25  scrutiny."); *see also Alston II*, 958 F.3d at 1246-47 (emphasizing limited scope of *O'Bannon*
    decision based on factual record before the court); *O'Bannon v. Nat'l Collegiate Athletic Ass'n*

26  *("O'Bannon IV")*, 802 F.3d 1049, 1077, 1079 (9th Cir. 2015) (based on the specific evidence before
    the court, plaintiffs had proved entitlement to relief that paying full COA was a less restrictive

27  alternative to the restraints of the NCAA, but plaintiffs "threadbare" and "meager" evidence did not
    support the part of the injunctive relief enjoining rules prohibiting up to $5,000 proposed payments

28  for NIL rights).

professionals in one sport, while retaining collegiate eligibility in another. And in those five years, consumer demand for college athletics has only increased. HC ¶¶ 168-71; OC ¶¶ 149-152. These developments matter because in *O'Bannon*, the court's decision was based largely on the role that the NCAA's so-called "amateurism" rules play in preserving consumer demand for college sports.[15] In *Alston*, the court relied in part on these factual developments in holding that athletes should be allowed to receive additional compensation and benefits in exchange for their athletic services on top of a full COA scholarship.[16] As explained above, the NCAA's rules limiting student-athletes' NIL rights were not at issue in *Alston*. Nevertheless, the same material facts that supported its conclusion that allowing athletes to receive greater compensation for their athletic services would not harm consumer demand also indicate that permitting student-athletes to commercialize their NIL rights would not harm demand. Indeed, if fan interest did not diminish after the NCAA allowed a University of Texas swimmer to receive $740,000 from the Singapore Olympic committee in 2016 or Kyler Murray to receive $9 million from a professional baseball team while he was playing football at the University of Oklahoma in 2018, it is hard to see how payments for social media posts would. These factual developments alone provide a sufficient basis to deny Defendants' Motion.[17]

Moreover, with regard to the specific rights at issue in this lawsuit, in the last five years the NCAA has granted hundreds of waivers to allow student-athletes to use and/or profit from their NILs. Several examples are cited in the complaints. *See* HC ¶¶ 224-27; OC ¶¶ 205-08. One

---

[15] *See O'Bannon IV*, 802 F.3d at 1072-73, 1075-79.

[16] *See Alston II*, 958 F.3d at 1254-55, 1260-62 (rejecting Defendants' *stare decisis* argument in part because it ignored fact-dependent nature of rule of reason analysis that evaluates, *inter alia*, "dynamic market conditions and consumer preferences").

[17] Indeed, the complaints show that while student-athletes are forbidden from doing so, *coaches* profit from lucrative licensing and endorsement deals as well as promotional appearances. *See e.g.*, HC ¶¶ 142-46; OC ¶¶ 123-27. Schools also profit from the sale of licensed merchandise involving student-athlete NILs and by selling "access" to student-athletes. *See e.g.*, HC ¶ 147; OC ¶ 128 (Texas A&M auctioned a seat next to Heisman Trophy winner Johnny Manziel at an athletic department banquet to a booster for $20,000.). However, student-athletes are prohibited from commercially benefitting from licensing deals and promotional activities involving their own NIL. *See* HC ¶¶ 146-48, 231-32, 234; OC ¶¶ 127-29, 212-13, 215. Furthermore, the fact that other students can profit from their NILs (HC ¶¶ 94, 186; OC ¶¶ 76, 167) or the sale of student-athlete autographs (HC ¶ 148; OC ¶ 129), while student-athletes cannot, shows the unfairness of the NCAA's rules and the unlikelihood that allowing student-athletes to benefit in this manner would cause them to be viewed as receiving compensation akin to the professional salaries the court was concerned about in *Alston*.

1   prominent example is a 2018 waiver that allowed Notre Dame basketball player Arike Ogunbowale

2   to compete on the television show *Dancing with the Stars* and to accept as much as $325,000 in prize

3   money if she won. *Id.* It is clear that Ms. Ogunbowale was invited to compete on the show because

4   of her basketball skills and reputation as a star college athlete, including the fame she garnered after

5   hitting a game-winning shot at the buzzer to earn Notre Dame the 2018 national championship (i.e.,

6   she was invited specifically because of the value of her NIL). *Id.* Despite the many instances of

7   student-athletes being able to profit from their NILs because of these waivers, including in very

8   publicized ways like Ogunbowale's performance on *DWTS*, college sports revenues have only

9   continued to explode. This further indicates that allowing other student-athletes to realize similar

10  NIL-related benefits would not cause a decline in consumer demand.[18]

11       There are many other material factual developments, including some not addressed in *Alston*,

12  which further indicate that the NCAA's NIL rules do not serve any lawful purpose. The complaints

13  cite recent surveys, for example, which suggest that fan interest in college sports would not lessen,

14  and in fact would likely ***increase***, if NIL compensation were permitted. HC ¶¶ 162-65; OC ¶¶ 143-

15  46. For example, in a September 2019 survey of 2,500 college undergraduate students, 84% of

16  respondents said that the NCAA takes advantage of college athletes, 80% supported athletes being

17  compensated when their NIL is used to sell video games or merchandise, and 77% said athletes

18  should be allowed to individually profit from their NILs. HC ¶ 163; OC ¶ 144. The results of a

19  November 2019 Turnkey Sports Poll of more than 2,000 senior-level sports industry executives show

20  the same: only 14% of respondents opined that allowing student-athletes to benefit from their NILs

21  would have a negative impact on fan interest, while 45% indicated that such a change would have

22  "no impact," and 35% believed it would positively impact fan interest. HC ¶ 165; OC ¶ 146.

23       Defendants apparently agree. Numerous post-*O'Bannon* statements by representatives of the

24  NCAA and its members support allowing student-athletes to receive NIL compensation and confirm

25

26  ---

27  [18] Defendants argue these waivers don't matter because the rules have not changed since *O'Bannon*.
    Mot. at 5 n.1. *Assuming arguendo* that is true, it ignores that the NCAA's *implementation* of its NIL
    rules also matter. Moreover, that some of these waivers might have been in the *Alston* record does
28  not make them unimportant here, given this lawsuit's specific challenge to Defendants' NIL rules.

1    that such opportunities would not destroy college sports as the NCAA has long claimed. In 2015, for

2    example, NCAA Vice President Oliver Luck said, "I do believe that the name, image, likeness for an

3    individual is a fundamental right—that any individual controls his or her name, image and likeness—

4    and I don't believe that a student-athlete who accepts a grant-in-aid simply waives that right." HC ¶¶

5    10, 202; OC ¶¶ 10, 183. In a March 2020 interview, University of Nebraska Athletic Director,

6    Garrett Klassy, explained that his school has "no concern" about allowing student-athletes the

7    opportunity to monetize their NILs: "We have the most passionate fan base and sponsors in the

8    country and we fully expect them to continue to support Nebraska if NIL legislation changes." HC ¶¶

9    14, 208; OC ¶¶ 14, 189. University of Michigan head football coach, Jim Harbaugh said that he and

10   the UM athletic department are "all for" allowing NIL compensation and believe that "a player

11   should have the same opportunity that a football coach has to profit off their name, image and

12   likeness." HC ¶¶ 14, 209; OC ¶¶ 14, 190.

13           In 2018, NCAA President Mark Emmert acknowledged that the Olympic model, in which

14   athletes are permitted to obtain third-party endorsement deals and other NIL compensation, could be

15   a viable option for intercollegiate athletics. *See* HC ¶ 203; OC ¶ 184. The complaints include several

16   other similar statements by Defendants and their members, all of which were made after *O'Bannon*.[19]

17   And when more than 100 Division I coaches were surveyed by CBS in late 2019, 77% supported an

18   Olympic-style model for college sports. HC ¶ 204; OC ¶ 185. According to Erwin Chemerinsky,

19   Dean of the Cal Berkeley School of Law, "this is not just about elite male athletes in football and

20   basketball. Female athletes in particular, have a great deal to gain . . . because they have far fewer

21   opportunities to play professional sports than male athletes. For many female athletes, college may

22   be the only real time to achieve compensation from their talent. Moreover, if female athletes could

23   market themselves… it likely would raise the profile of women's sports in general and provide even

24

25

---

[19] *See e.g.*, HC ¶ 205; OC ¶ 186 (Michigan AD Warde Manuel on April 24, 2020: "It's the right
thing to do . . . I think this is good for our [student-athletes] . . . It allows them to be considered just
like any other student who would have the opportunity to profit."); HC ¶ 206; OC ¶ 187 (Notre
Dame AD Jack Swarbrick in April 2020: "since regular students have the opportunity to exploit their
name, image and likeness, we've always felt students who are athletes should have a version of
that"); *see also* HC ¶¶ 207, 210; OC ¶¶ 188, 191.

1    more opportunities for female athletes." HC ¶ 197; OC ¶ 178.

2         These Defendants in letters to Congress and NCAA reports have admitted that the current

3    NIL rules are unfair, unnecessary, and should be changed. On May 23, 2020, the Power Five wrote

4    to Congress asserting that legislation should be enacted to "permit Division I student-athletes to

5    pursue payment from third parties for NIL licensing" (currently *forbidden* by NCAA rules), but that

6    a line should be drawn to "maintain the amateur nature of college sports" by prohibiting payments

7    directly from schools or boosters. *See* HC & OC, Ex. A.[20] And, on April 29, 2020, the NCAA in a

8    final report endorsed a broad spectrum of NIL rule changes that include allowing college athletes to

9    be compensated for the commercial use of their NILs in "third-party endorsements or social media

10   influencer activity . . . social media content creation and distribution, promotion of student athlete

11   businesses (music, art, athletic lessons, etc.), and personal promotional activities (autograph signings,

12   etc.)." HC ¶ 214; OC ¶ 195; Mot. Ex. A at 21-24 (recommending NCAA's rules be changed to

13   permit student-athletes to engage in certain commercial NIL activities); *see* HC ¶ 167, OC ¶ 148.

14        Defendants argue that the NCAA final report is irrelevant because in *Alston* the Ninth Circuit

15   held that, on the record before that court, an *earlier* NCAA working group report's discussion of

16   potentially expanding athletes' NIL rights did not mean that the NCAA had yet "'endorsed cash

17   compensation untethered to education.'" Mot. at 5 (quoting *Alston II*, 958 F.3d at 1265). Many of the

18   commercial NIL opportunities that the NCAA has now endorsed its final report are plainly not

19   tethered to education, *e.g.*, promotional autograph signing or social media influencer activity. The

20   NCAA's endorsement of these activities indicate that the NCAA itself does not believe that student-

21   athletes must only receive NIL compensation that is tethered to education in order to preserve

22   demand for college sports, at least to the extent that compensation is from third parties. In any event,

23

24   ─────────────────────
     [20] Contrary to Defendants' argument, nothing in *E.R.R. Presidents Conf. v. Noerr Motor Freight,*
25   *Inc.*, 365 U.S. 127 (1961) and *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965)
     preclude using these statements against Defendants. These cases hold that a Sherman Act claim
26   cannot be predicated on an attempt to pass laws or influence legislators. *See ICTSI Oregon, Inc. v.*
     *Int'l Longshore & Warehouse Union*, 2019 WL 1651038, at *26-27 (D. Or. Apr. 17, 2019). But
27   Plaintiffs are not claiming that any petitioning activity is itself illegal, and Defendants' statements
     during these efforts can be used to show that they agree that certain NIL rights may be granted
28   without destroying "the amateur nature of college sports." *See id.*

the relevant question is whether Defendants have admitted that *any* form of the NIL compensation that is *currently prohibited* by their restraints and requested by Plaintiffs should be permitted— regardless of whether Defendants characterize such compensation as tethered to education or otherwise "consistent with NCAA values and principles" (Mot. at 5:19). Defendants clearly have.[21]

In addition, *O'Bannon* and *Alston* do not foreclose these lawsuits because to the extent Defendants' NIL restraints serve any procompetitive objective (they do not), Plaintiffs propose less restrictive alternatives ("LRAs") that were not previously analyzed by the courts, and certainly not under the factual allegations in these complaints. Plaintiffs allege that possible LRAs might include, for example, that the NCAA could permit schools to at least allow athletes to receive compensation from third parties or compensation for non-game-related commercial uses of their NILs. *See* HC ¶¶ 21, 91, 175, 275; OC ¶¶ 21, 72, 156, 256. That is important because, after affirming this Court's conclusions that the NCAA's rules had anticompetitive effects but nevertheless served a limited procompetitive purpose, the Ninth Circuit's decisions *O'Bannon* and *Alston* assessed whether, under the facts in those cases, *particular* proposed LRAs could achieve the same procompetitive objectives in a substantially less restrictive manner.[22] Nothing in *Alston* or *O'Bannon* precludes this Court from considering whether Plaintiffs' newly proposed LRAs are viable alternatives to Defendants' current restraints, especially under the different facts now at issue. Defendants do not argue to the contrary.

Defendants contend that this Court should dismiss Plaintiffs' claims for relief because the *maximum* injunctive relief Plaintiffs seek is more "broad-ranging" than the injunctions ordered in *Alston* and *O'Bannon* and "their claims for money damages are even more plainly without merit." Mot. at 4:1, 18-19. These arguments fail because, as outlined above, there are material factual

---

[21] Notably, these statements by the NCAA are a complete reversal from positions it took before the federal courts, including in *O'Bannon*. There, the NCAA insisted before the Ninth Circuit that NIL payments—*no matter how small*—would be "anathema to amateurism," would constitute "pay-for-play," and would "blur the clear line between amateur college sports and their professional counterparts." *O'Bannon v. NCAA*, Nos. 14-16601 & 14-17068 (9th Cir.), Brief for NCAA at 3, 57-58. (Nov. 14, 2014, ECF No. 13-1). This further indicates the material change in the NCAA's position on NIL rights since *O'Bannon*.

[22] *See Alston II*, 958 F.3d at 1260-62 (analyzing whether the district court "clearly err[ed]" in determining whether, under the record presented, "the LRA identified" satisfied the third step of the rule-of-reason test); *O'Bannon IV*, 802 F.3d at 1077, 1079 (based on the specific evidence before the court, determining one of two LRA identified by district court satisfied rule of reason's third step).

1    differences between this case and *O'Bannon* and *Alston*. Moreover, this Court has held that, "a

2    motion to dismiss will not be granted merely because a plaintiff requests a remedy to which he is not

3    entitled."[23] Thus, even if this Court may ultimately decline to issue an injunction completely

4    eliminating the NCAA's NIL restraints or determines that Plaintiffs are not entitled to an award of

5    money damages, this does not mean Plaintiffs lose their case. Indeed, as explained above, Plaintiffs

6    have already proposed several potential LRAs and in addition to these, as in *O'Bannon* and *Alston*,

7    the Court could find others to be appropriate on the specific record presented at trial. Defendants'

8    argument about Plaintiffs' claim for money damages also rests on the false premise that the

9    *O'Bannon* court "expressly deemed" "the NCAA [NIL] rules . . . legally valid." Mot. at 4:20-21.

10    Again, the Ninth Circuit said no such thing; rather, the court held that the NIL rules are unlawful,

11    and found based on the particular record before it, that one of two specific LRAs withstood rule of

12    reason analysis. Defendants also cite no case law for their proposition that specific types of relief can

13    be dismissed on *stare decisis* grounds at this stage of the litigation. That would be particularly

14    inappropriate and premature in this fact-intensive antitrust case where Plaintiffs have alleged

15    material changes since *O'Bannon* and *Alston* that have yet to be developed on a full record, and this

16    case concerns different claims and requests for relief (including distinct proposed LRAs).[24, 25]

17

18    _____

     [23] *Caplan v. CNA Short Term Disability Plan*, 479 F. Supp. 2d 1108, 1111 (N.D. Cal. 2007) (Wilken,
19    J.); *see also Palantir Techs., Inc. v. Palantir.net, Inc.*, 2011 WL 3047327, at *3 (N.D. Cal. July 25,
     2011) ("[t]he test of a complaint pursuant to a motion to dismiss lies in the claim, not the demand";
20    "it need not appear that the plaintiff can obtain the *specific* relief demanded as long as the court can
     ascertain from the face of the complaint that *some* relief can be granted" (internal quotation marks
21    and citations omitted)); *Rodriguez v. Serv. Emps. Int'l*, 755 F. Supp. 2d 1033, 1054 (N.D. Cal. 2010).

22    [24] *See Sullins v. Exxon/Mobil Corp.*, 2009 WL 2779172, at *8 (N.D. Cal. Sept. 2, 2009) (denying a
     motion to strike much of a prayer for relief because "the motion asks the Court to determine issues of
23    damages that would be more appropriately addressed in a later stage of the litigation when the facts
     underlying Plaintiffs' claims have been more fully developed"; "Defendant may later move for
24    summary adjudication on the availability of damages, or may raise the issue at trial") (Wilken, J.).

25    [25] Although the Court need not reach this issue, an independent basis to deny Defendants' Motion is
     that Defendants' primary asserted procompetitive justifications assessed by the Ninth Circuit
26    decisions in *O'Bannon* and *Alston*, "amateurism's" preservation of consumer demand, were "in a
     market outside the market deemed relevant for the purpose of evaluating a restraint's anticompetitive
27    effects." *Alston II*, 958 F.3d at 1257 n.14. This issue was not considered by those decisions because it
     was not presented by the parties, but Plaintiffs here submit that "outside the competitive market"
28    justifications provide no lawful basis to justify Defendants' restraints, for the reasons explained in
     Judge Smith's concurring opinion in *Alston*. *See id.* & at 1266-71 (Smith, J., concurring).

1    **C.    Defendants Provide No Basis to Dismiss Any Claim Related to the Group Licensing**
2         **Damages Sub-Class**

3         Defendants next argue that Plaintiffs' claims on behalf of the proposed "Group Licensing

4    Damages Sub-Class" should be dismissed or struck. Mot. at 6:13-16. That argument fails because,

5    pursuant this Court's and the Ninth Circuit's decisions in *O'Bannon*, Plaintiffs have alleged that they

6    were injured by Defendants' restraints. Moreover, under controlling law and contrary to Defendants'

7    argument, Plaintiffs have alleged harm to competition in a relevant antitrust market.

          **1.    Plaintiffs have alleged cognizable injuries on behalf of the Group Licensing**
8              **Damages Sub-Class.**

9         Defendants argue that Plaintiffs' claims on behalf of the Group Licensing Damages Sub-

10   Class should be dismissed because, according to Defendants, Plaintiffs have no right of publicity

11   with respect to the use of their NILs in live game broadcasts and archival game footage. Mot. at 7-8.

12   According to Defendants, this means that Plaintiffs have suffered no injury to their "'business or

13   property.'" *Id.* That argument fails for two independent reasons.

14        *First*, Defendants are wrong to suggest that if student-athletes have no publicity rights in

15   game broadcasts, they cannot show "injury to their business or property." Notably, to the extent

16   Defendants purport to be making an antitrust-injury argument, they do not argue that Plaintiffs'

17   injuries are not "of the type the antitrust laws were intended to prevent."[26] Rather, Defendants

18   contend that student-athletes have no publicity rights in game broadcasts and thus, Defendants'

19   argument goes, as a matter of law Plaintiffs cannot show injury from Defendants' rules precluding

20   any form of compensation for use of their NILs in such broadcasts.

21        However, this Court already held in *O'Bannon* that student-athletes' ability to demonstrate

22   value in the licensing of their NILs—and, conversely, harm from denial of the opportunity to

23   negotiate to receive such value—is not dependent on the existence of a legally cognizable right of

24   publicity: "[e]ven if some television networks believed that student-athletes lacked publicity rights in

25   the use of their names, images, and likenesses, they may have still sought to acquire these rights as a

26

27

28   ─────────────────────────
     [26] *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

precautionary measure. Businesses often negotiate licenses to acquire uncertain rights."[27]

The Ninth Circuit's decision is *O'Bannon* is also contrary to Defendants' position. While the Ninth Circuit did not independently analyze the issue of publicity rights in game broadcasts, it rejected the NCAA's related argument that student-athletes cannot show injury-in-fact and antitrust injury from the denial of compensation for use of their NILs in video games because the Copyright Act would preempt any right of publicity claim arising out of such use. The court explained that the "NCAA's argument about the Copyright Act, *even if correct*, is irrelevant to whether the plaintiffs lack standing. On the NCAA's interpretation of the Copyright Act, professional football and basketball players have no enforceable right-of-publicity claims against video game makers either— yet EA currently pays NFL and NBA players for the right to use their NILs in its video games. Thus, there is every reason to believe that, if permitted to do so, EA or another video game company would pay NCAA athletes for their NIL rights rather than test the enforceability of those rights in court."[28] The court concluded "[t]hat the NCAA's rules deny the plaintiffs all *opportunity* to receive this compensation is sufficient to endow them with standing to bring this lawsuit."[29]

To support its conclusion that the plaintiffs had satisfied injury-in-fact and antitrust injury requirements, the Ninth Circuit cited the Wright & Miller treatise in a manner that is applicable here: "[L]oss of an opportunity may constitute injury, even though it is not certain that any benefit would have been realized if the opportunity had been accorded."[30] Plaintiffs allege that Defendants receive enormous sums from television companies for the rights to broadcast events involving student-athletes' NILs, that schools compete vigorously for the best recruits, and that absent Defendants'

---

[27] *O'Bannon v. Nat'l Collegiate Athletic Ass'n ("O'Bannon III")*, 7 F. Supp. 3d 955, 994 (N.D. Cal. 2014) (citing *Distrib. & Mktg., Inc. v. Major League Baseball Advanced Media, L.P.*, 505 F.3d 818, 826 (8th Cir. 2007) (Colloton, J., dissenting) ("CBC surely can 'agree,' as a matter of good business judgment, to bargain away any uncertain First Amendment rights that it may have in exchange for the certainty of what it considers to be an advantageous contractual arrangement."); *Hynix Semiconductors, Inc. v. Rambus, Inc.*, 2006 WL 1991760, at *4 (N.D. Cal. July 14, 2006) ("a negotiating patentee and licensee generally agree to a lower royalty rate if there is uncertainty as to whether the patents are actually valid and infringed").

[28] *O'Bannon IV*, 802 F.3d at 1069 (emphasis added).

[29] *Id.* (emphasis added).

[30] *Id.* (citing 13A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3531.4 (3d ed. 1998)).

1    anticompetitive restraints, market-based competition would lead student-athletes to share in these

2    revenues. *See* HC ¶¶ 87, 120-21, 237; OC ¶¶ 68, 101-02, 218.  As the court explained in *O'Bannon*,

3    even assuming *arguendo* that Plaintiffs do not have a right of publicity, they are not foreclosed as a

4    matter of law from alleging that they were injured by the lost opportunity to be compensated for the

5    use of their NILs in such broadcasts, which is exactly what Defendants' restraints preclude.

6         *Second*, while the foregoing shows that the Court need not determine at this stage whether

7    Plaintiffs have rights of publicity in game broadcasts, if the Court reaches this issue, it can deny

8    Defendants' Motion based on the reasoning applied in *O'Bannon*. In deciding the NCAA's motion to

9    dismiss, this Court acknowledged that certain state right of publicity statutes carve out exceptions for

10   sports broadcasts. Nevertheless, the Court denied the motion, explaining that "Plaintiffs allege harm

11   to a *national* market for the licensing rights to their names, images, and likenesses in game

12   broadcasts. To disprove the existence of this market at the pleading stage, the NCAA would have to

13   identify a law or set of laws that precludes student-athletes from asserting publicity rights to game

14   broadcasts in *every* state."[31] In the national market alleged here, to show as a matter of law that

15   student-athletes could not be harmed by rules prohibiting them from asserting publicity rights, the

16   same showing is required. But as in *O'Bannon*, Defendants again fail "to identify a law or set of laws

17   that precludes student-athletes from asserting publicity rights to game broadcasts in *every* state."

18        At both the motion to dismiss and summary judgment stages in *O'Bannon*, the NCAA

19   attempted to make the required showing by arguing that the First Amendment would trump any

20   rights of publicity student-athletes asserted. This Court rejected that argument, relying on the

21   decision in *Zacchini v. Scripps-Howard Broadcasting Co.*, where the Supreme Court held that the

22   First Amendment did not shield a TV station from a right of publicity claim asserted under Ohio

23   state law by a performer at a county fair who alleged damages stemming from the station's broadcast

24

25

---

[31] *O'Bannon I*, 990 F. Supp. at 1005-1006 (emphasis in original); *see In re NCAA Student-Athlete Name & Likeness Licensing Litig. ("O'Bannon II")*, 37 F. Supp. 3d 1126, 1145-46 (rejecting similar summary judgment argument by the NCAA because it did not "adequately explain[] why [plaintiffs] could not bring [right of publicity] claims in [their states of domicile] or other states").

1    of his entire act without permission.[32] As this Court explained, the "reasoning in *Zacchini* strongly

2    suggests that the First Amendment does not guarantee the media organizations an unfettered right to

3    broadcast entire sporting events without regard for the participating athletes' rights of publicity."[33]

4         Defendants now argue that *Zacchini* does not apply to performers unless they are also the

5    event "producer." Mot. at 10. But that argument is at odds with this Court's well-reasoned decisions

6    in *O'Bannon*. Defendants' position also cannot be reconciled with the Supreme Court's unequivocal

7    holding in *Zacchini*: "we are quite sure that the First and Fourteenth Amendments do not immunize

8    the media when they broadcast a ***performer's*** entire act without his consent."[34] That conclusion is

9    further supported by the fact that the Supreme Court analogized Zacchini's claims to the claims of

10   the professional boxer in *Ettore v. Philco Television Broad. Corp.*[35] In *Ettore*, the Third Circuit held

11   that a network violated the boxer's right of publicity under Pennsylvania, Delaware, New Jersey, and

12   New York state law when it broadcast one of his fights without his consent.[36]

13        Defendants cite *Wisc. Interscholastic Athletic Ass'n v. Gannett Co., Inc.* ("*WIAA*")[37] as

14   supporting their position that only event "promoters" or "producers" have a right to license the

15   broadcast of the event. But, citing *Zacchini¸* the court in *WIAA* clearly identified the interest at stake

16   as including, if not solely encompassing, performers: "Interpreting the First Amendment to provide

17   the media with a right to transmit an entire performance or to prohibit ***performers*** from charging fees

18   would take us back centuries, to a time when ***artists or performers*** were unable to capture the

19   economic value of a performance. Over the long run, this would harm, not help, the interests of free

20   _____

21   [32] 433 U.S. 562, 563-64 (1977); *see O'Bannon II*, 37 F. Supp. 3d at 1140-45 (discussing *Zacchini* in summary judgment decision); *O'Bannon I*, 990 F. Supp. 2d at 1006 (discussing *Zacchini* in motion to dismiss order).

22   [33] *O'Bannon II*, 37 F. Supp. 3d at 1140.

23   [34] 433 U.S. at 575 (emphasis added).

24   [35] 229 F.3d 481 (3d Cir. 1956); *see also O'Bannon II*, 37 F. Supp. 3d at 1141 (discussing *Ettore*).

25   [36] *See Ettore*, 229 F.2d at 491-95; see *also Zacchini*, 433 U.S. at 572 n.9, 575 (citing *Ettore*, 229 F.3d at 486, as an example of the kind of tort at issue in the Supreme Court's decision). Defendants' suggestion that *Zacchini*'s holding applies only to performers who are also "producers" also fails because there is nothing in the Supreme Court's opinion supporting the proposition that Zacchini "produced" the Geauga County Fair, at which his act was featured. *See* 433 U.S. at 563 ("Members of the public attending the fair were not charged a separate admission fee to observe his act.").

28   [37] 658 F.3d 614 (7th Cir. 2011).

1    speech. The First Amendment requires no such folly."[38]

2    Defendants rely heavily on the district court's decision in *Marshall v. ESPN, Inc.*, 111 F.

3    Supp.3d 815 (M.D. Tenn. 2015), arguing that the holding in that case is "directly on point." Mot. at

4    7. Defendants then quote the Sixth Circuit's affirming decision in *Marshall*, misleadingly suggesting

5    (twice) that the court ruled that college athletes have no property interest in their NILs in game

6    broadcasts under any law. *See* Mot. at 7:23-25, 10:19-11:1 (citing *Marshall v. ESPN Inc.*, 668 Fed.

7    App'x 155, 157 (6th Cir. 2016)). But the district court's ruling in *Marshall* was explicit that,

8    "[b]ecause Plaintiffs do not have a right to publicity ***under Tennessee law***—the very basis of their

9    claim that they have a right to be paid for appearing in television broadcasts of games and in

10   advertisements for such broadcasts—they cannot plead any antitrust injury."[39]

11   Thus, while *Marshall* indicates student-athletes may not be able to assert rights of publicity

12   with respect to game broadcasts under Tennessee law, it in no way means they cannot establish such

13   rights under *any* state law. To the contrary, while Tennessee's and certain other state's right of

14   publicity statutes specifically designate sports broadcasting as exempt, many do not.[40] When a state

15   enumerates certain exemptions and does not include sports broadcasts among them, as other states

16   have done, basic principles of statutory construction dictate that sports broadcasts are not exempt.[41]

17   Defendants argue that the district court's summary judgment decision in *Dryer v. Nat'l

18   Football League*[42] undermines this Court's summary judgment decision in *O'Bannon* (Mot. at 9:13-

19   10:2), but that case supports it. To begin with, Defendants mischaracterize this Court's summary

20   judgment decision as having allowed the *O'Bannon* plaintiffs' claims to proceed because "they

21   might have a right to publicity under Minnesota law." Mot. at 9:17-18. In fact, the Court held that

---

[38] *Id.* at 624 (emphasis added).

[39] *Marshall*, 111 F. Supp.3d at 835 (emphasis added); *see also Marshall*, 668 Fed. App'x at 157 (concluding that plaintiffs could not assert a Sherman Act claim because they lacked property rights under *Tennessee statutory and common law*).

[40] *See, e.g.*, Ind. Code. Ann. § 32-36-1-1; Ky Rev. Stat. Ann. § 391.170.

[41] *See Blandino-Medina v. Holder*, 712 F.3d 1338, 1345 (9th Cir. 2013) ("presumption that when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions" (internal quotation marks omitted)).

[42] 55 F. Supp. 3d 1181 (D. Minn. 2014).

1    even if the plaintiffs "did not have right to publicity in their states of domicile," which included

2    Minnesota, "the NCAA has not adequately explained why they could not bring these claims in other

3    states."[43] In addressing Minnesota law only, this Court cited the district court's motion to dismiss

4    order in *Dryer* as suggesting that "athletes may bring such claims under Minnesota law to recover for

5    the unauthorized use of their names and images in at least certain kinds of broadcast footage."[44]

6          Rather than undercutting this Court's conclusion that Minnesota law does not preclude right

7    of publicity claims by student-athletes as a matter of law, the *Dryer* summary judgment decision

8    affirmed that Minnesota recognizes a common law right of publicity.[45] It granted the defendants'

9    motion because the undisputed *evidence* in that case showed that the NFL Films productions at

10   issue[46] fell within a "newsworthiness exception" to right of publicity claims under Minnesota law

11   (and the laws of California, Texas, and New York).[47] Thus, far from invoking the "principles"

12   ascribed to the case law by Defendants (*see* Motion at 10:1-2), *i.e.*, that "performers" have no right

13   of publicity in game broadcasts, *Dryer* supports the conclusion that athletes may bring right of

14   publicity claims for use of their NILs in broadcasts insofar as those broadcasts do not fit within the

15   "newsworthiness exception," for example, when the broadcast is of an entire game, which is exactly

16   where this Court held in *O'Bannon* that *Zacchini* applies most forcefully.[48]

17         Defendants cite other cases they claim demonstrate a "judicial consensus" that participants

18   have no publicity rights in broadcasts of their events. But none of Defendants' cases reach that

19   conclusion. Defendants point to *Gionfriddo v. Major League Baseball*, but *Gionfriddo* had nothing to

20   do with game broadcasts and instead involved the use of former professional baseball players'

21   names, statistics, and images on MLB's website and in-game programs. In finding this use protected

---

[43] *O'Bannon II*, 37 F. Supp. 3d at 1146.

[44] *Id.* at 1145 (citing *Dryer v. Nat'l Football League*, 689 F. Supp. 2d 1113, 1123 (D. Minn. 2010)).

[45] *Dryer*, 55. F Supp. 3d at 1197.

[46] The *Dryer* court described most of these as involving a game or season with "30-minute dramatic narrative[s] featuring music, narration, and clips of important plays from the game itself in real time and slow motion," sometimes including interviews with players. 55 F. Supp. 3d at 1186.

[47] *Id.* at 1197-99.

[48] *O'Bannon II*, 37 F. Supp. at 1142-43. Indeed, the court in *Dryer* held that under Minnesota law the "newsworthiness defense is akin to a First Amendment privilege." 55 F. Supp. 3d at 1199.

by the First Amendment, the court noted that there was a strong public interest in factual background information it characterized as baseball "history."[49]

Defendants rely on other cases in which courts recognized that an event organizer has property rights it can enforce against those who seek to broadcast an event without permission. But whether true or not, that does not mean that performers have no publicity rights in the broadcasts. To the extent these cases referred to performers, those performers were compensated professionals who had contracts with the organizer of the event giving the organizer the right to license their NILs.[50] This is a critical distinction. Unlike the "producers" in these cases, Defendants here do not compensate Plaintiffs for the use of their NILs in any context. Plaintiffs do not seek to preclude the airing of licensed broadcasts, much less argue that licensing rights cannot be granted; they simply oppose collusive agreements between competitors prohibiting them from being compensated at all for the value they add to the game broadcasts through the contribution of their NILs.

### 2.   Plaintiffs allege harm to competition in a relevant antitrust market.

Defendants also argue that Plaintiffs' claims on behalf of the Group Licensing Damages Sub-Class should be dismissed because Plaintiffs cannot establish harm to competition in a "group licensing market." Mot. at 11-12. Defendants rely on *Tanaka v. Univ. of S. Cal.*, where the Ninth

---

[49] 94 Cal. App. 4th 400, 411 (2001). ("In the uses challenged, Baseball is simply making historical facts available to the public through game programs, Web sites and video clips."). Defendants' reliance on *Dora v. Frontline Video, Inc.* is similarly misplaced. *Dora* involved a surfing legend, Mickey Dora, who sued the producer of a video documentary claiming common law and statutory appropriation of his name and likeness. 15 Cal. App. 4th 536 (1993). In concluding that the use was protected by the First Amendment, the court emphasized the fact that Dora's influence on the sport was "the point of the program," and explained that the documentary was a matter of public interest because it was "about a certain time and place in California history and, indeed, in American legend." *Id.* at 543. *Dora* did not establish a public interest in surfing generally that grants a carte blanche right to appropriate images of surfers, which subsequent Ninth Circuit case law confirms. *See Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1002 (9th Cir. 2001) (unauthorized use of famous surfers' pictures not protected by First Amendment, distinguishing *Dora*).

[50] *See, e.g.*, *Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663, 669 (7th Cir. 1986) ("the Players are employees of their respective Clubs"); *Nat'l Football League v. Alley, Inc.*, 624 F. Supp. 6, 9 (S.D. Fla. 1983) ("Dolphins team members have consented to the use of their names and likenesses in game telecasts by participation in televised games and by entering into player contracts granting plaintiffs the right to so use their names and likenesses"); *Pittsburgh Athletic Co. v. KVQ Broad. Co.*, 24 F. Supp. 490, 492 (W.D. Pa. 1938) (the Pittsburgh Pirates "pay[] the players who participate in the game"); *Gautier v. Pro Football, Inc.*, 304 N.Y. 354, 357 (1952) (half-time performer had a contractual deal with the Washington Redskins).

1  Circuit affirmed dismissal of a Sherman Act claim because the plaintiff had not identified any

2  relevant product or geographic market, or established that the challenged rule had an anticompetitive

3  effect in a relevant market.[51] Plaintiffs easily meet the *Tanaka* pleading standard under their actual

4  market allegations, as opposed to the allegations as recast by Defendants.

5  Defendants focus exclusively on this Court's discussion in *O'Bannon* of sub-markets of the

6  putative "Group Licensing Market."[52] However, Defendants fail to show that Plaintiffs here have not

7  pled a relevant antitrust market and harm to competition in that market. Plaintiffs allege that the

8  challenged restraints impact "the nationwide market for the labor of NCAA Division I college

9  athletes." *See* HC ¶¶ 81-95; OC ¶¶ 62-76. Defendants do not deny that this "Division I Labor

10  Market" is a relevant market, and indeed it is closely analogous to the markets that were accepted in

11  *Alston* and *O'Bannon* (with respect to particular sports).[53] Division I schools are purchasers of labor

12  in this market, where they control 100% of the market, and the players are the suppliers. *Id.*[54]

13  Plaintiffs also allege how the NIL restraints harm competition in that market by

14  "undermin[ing] schools' efforts to compete freely for the best college recruits," including but not

15  limited to by limiting competition between schools over whether to allow student-athletes to profit

16  from "game telecast group licensing revenues." *See* HC ¶¶ 23, 87; OC ¶¶ 23, 68. Schools that offered

17  athletes the right to benefit from the revenues generated by group licensing deals, for example,

18

19  [51] 252 F.3d 1059, 1063-64 (9th Cir. 2001) (holding that "[f]ailure to identify a relevant market is a
proper ground for dismissing a Sherman Act claim"). While plausible allegations are required, in the

20  Ninth Circuit, the validity of a relevant market is "typically a factual element rather than a legal
element," so "alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by
summary judgment or trial." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir.

21  2008); *see also Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 994 (9th Cir. 1986) (defining
the relevant market "is a factual issue which is decided by the jury"); *Rebel Oil Co. v. Atl. Richfield*

22  *Co.*, 133 F.R.D. 41, 44 (D. Nev. 1990) ("[t]he Ninth Circuit has established that both market
definition and market power are essentially questions of fact appropriate for jury consideration")

23  (collecting cases), *rev'd in part on other grounds*, 51 F.3d 1421 (9th Cir. 1995).

24  [52] *See O'Bannon III*, 7 F. Supp. 3d at 993-98.

25  [53] *See Alston I*, 375 F. Supp. 3d at 1067 (market, which was similar to one in *O'Bannon*, defined as
"comprising national markets for Plaintiffs' labor in the form of athletic services in men's and

26  women's Division I basketball and FBS football, whereas each class member participates in his or
her sport-specific market"); *O'Bannon III*, 7 F. Supp. 3d at 986-87.

27  [54] In *Alston*, the plaintiffs based their claims on a theory of monopsony power, while in *O'Bannon*,
"the Court had found that the plaintiffs' antitrust claims could be analyzed as a monopoly or,

28  alternatively, as a monopsony." *See Alston I*, 375 F. Supp. 3d at 1067.

1    would be more attractive than schools that declined to offer the same opportunity. *See e.g.*, HC ¶ 84;

2    OC ¶ 65 ("If student-athletes had the opportunity to receive a college education and compete at an

3    elite level of intercollegiate competition without these restrictions, many would choose to do so.").

4            The challenged restraints eliminate this potential manner of competition between colleges,

5    the purchasers of labor in the Division I Labor Market, because they categorically eliminate a term of

6    employment that players, the suppliers of labor in that market, would find advantageous. The

7    restraints allow colleges, on the other hand, to keep 100% of the revenue from their group licensing

8    deals. Because of the restraints, student-athletes cannot receive any NIL compensation, including but

9    not limited to shares of any group licensing deal, which Plaintiffs allege would have occurred absent

10   Defendants' rules. *See* HC ¶¶ 87, 120-21, 237; OC ¶¶ 68, 101-02, 218. The rules fix a material term

11   of the agreements in the Division I Labor Market to Plaintiffs' detriment, and restrain competition

12   between the competitors in this labor market. As this Court explained in *O'Bannon*, it is well settled

13   in law, "including some [cases] decided by the Ninth Circuit, that restraints on competition within a

14   labor market may give rise to an antitrust violation under § 1 of the Sherman Act."[55] Thus, Plaintiffs

15   have alleged anticompetitive effects in a relevant market, the Division I Labor Market.[56]

16           Plaintiffs have more than adequately alleged harm to competition in a relevant market, which

17   is all that is necessary to deny dismissal at the pleading stage. Relatedly, Plaintiffs have alleged how

18   members of the Group-Licensing Damages Sub-Class were harmed by the restraints, and as the

19   Supreme Court has explained, "'[a]t the pleading stage, general factual allegations of injury resulting

20   from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general

21

22   [55] *See O'Bannon III*, 7 F. Supp. 3d at 992-93 (citing cases); *see also Anderson v. Shipowners' Ass'n
     of Pac. Coast*, 272 U.S. 359 (1926) (agreement among ship owners to fix conditions under which

23   they hired personnel violated Sherman Act); *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1039
     (N.D. Cal. 2013) ("'Antitrust law addresses employer conspiracies controlling employment terms

24   precisely because they tamper with the employment market and thereby impair the opportunities of
     those who sell their services there.'" (quoting II Phillip E. Areeda, Herbert Hovenkamp, Roger D.

25   Blair & Christine Piette Durrance, Antitrust Law, ¶ 352c at 254-55 (3d ed. 2007)).

26   [56] *See O'Bannon III*, 7 F. Supp. 3d at 992-93 (holding that by establishing at trial an anticompetitive
     effect in the labor market alleged, plaintiffs had shown "a cognizable harm to competition under the

27   rule of reason"); *see also Radovich v. Nat'l Football League*, 352 U.S. 445 (1957) (agreement among
     employers, owners of professional football teams, to fix a non-price term of employment for players

28   (the employees), harmed competition in the labor market at issue).

1    allegations embrace those specific facts that are necessary to support the claim.'"[57]

2         Moreover, because Plaintiffs have adequately pled harm to competition in a relevant market,

3    whether Plaintiffs have or could have also pled anticompetitive effects in another market—including

4    the "Group Licensing Market" that Defendants chose to focus on in their Motion—is not ripe for

5    resolution. Plaintiffs need not establish the plausibility of pleading a particular market as conceived

6    by Defendants or the plaintiffs in another case.

7    **D.    Defendants Provide No Basis to Dismiss the *Oliver* Complaint With Prejudice**

8         The Court should also reject Defendants' narrow argument that it should dismiss with

9    prejudice the entire *Oliver* action on standing grounds. *See* Mot. at 12-16. Contrary to their

10   arguments, Oliver's status as a member of the *Alston* settlement class does not preclude him from

11   pursuing the damages claims asserted in the *Oliver* action. As Defendants acknowledge, the *Alston*

12   settlement cannot be found to have a preclusive effect on the different claims asserted in this case

13   unless the claims in both cases arise from an "identical factual predicate."[58] As the party seeking

14   preclusion, Defendants have the burden of establishing such a predicate with respect to Oliver's

15   claims. They have not met this burden. Nor can they because, while the release provisions in the

16   *Alston* settlement are broad, they cannot be interpreted to bar claims arising from conduct unrelated

17   to the NCAA rules that were at issue in that case or conduct that occurred after the case was settled.

18        To the extent Defendants assert Oliver's claims "arise out of the same universe of allegedly

19   anticompetitive NCAA rules" addressed in *Alston*, they are mistaken. As Defendants themselves

20   point out, the *Alston* plaintiffs challenged the NCAA rules that limit the compensation student-

21   athletes may receive *in exchange for their athletic services*. *See* Mot. at 15 (citing *Alston* Findings

22   of Fact & Conclusions of Law, No. 14-md-2541 CW, ECF No. 1162 at 1). Oliver, on the other hand,

23   challenges the NCAA rules that prohibit student-athletes from receiving compensation from any

---

[57] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

[58] *See Hesse v. Sprint Corp.*, 598 F.3d 581, 590-91 (9th Cir. 2010) ("A settlement agreement may preclude a party from bringing a related claim in the future 'even though the claim was not presented and might not have been presentable in the class action,' but only where the released claim is 'based on the identical factual predicate as that underlying the claims in the settled class action.'") (citing *Williams v. Boeing Co.*, 517 F.3d 1120, 1133 (9th Cir. 2008)).

1    source *in exchange for the use of their names, images, and likenesses*. *See* OC ¶ 5. Defendants are

2    wrong to suggest that Oliver merely challenges "a narrower set of rules" or articulates "a different

3    theory of anticompetitive conduct" than the plaintiffs in *Alston*. Oliver challenges a ***different*** set of

4    rules from those at issue in *Alston*, and he advances claims based on a different theory of injury and

5    harm. The harm alleged in *Alston*—and the underlying basis for the settlement of the plaintiffs'

6    damages claims—was the wrongful deprivation of compensation for athletic services that the

7    plaintiffs would have received from their schools absent the NCAA's rules restricting such

8    compensation. Meanwhile, Oliver's alleged harm—and the underlying basis for his damages

9    claims—is the wrongful deprivation of NIL compensation that he and the other class members would

10   have received from their schools and/or third parties absent the NCAA's rules prohibiting such

11   compensation. The legality, propriety, and impact of the NCAA's rules banning NIL compensation

12   were not at issue in *Alston*; thus, Oliver's current claims for monetary damages arising from the

13   application of those rules are not barred by the *Alston* settlement release.[59]

14       Furthermore, as detailed in section II.B *supra*, Plaintiffs' claims in this lawsuit are premised

15   on allegations that include numerous factual developments after the *Alston* settlement was approved

16   on March 21, 2017.[60] The Ninth Circuit has long acknowledged that a settlement agreement cannot

17   preclude the claims in a subsequent action "insofar as the latter alleges wrongful conduct occurring

18   after the settlement date of the former."[61] And it is equally well settled that "[a] claim arising after

19   the date of an earlier judgment is not barred, even if it arises out of a continuing course of conduct

20   that provided the basis for the earlier claim."[62] Courts recognize that, if such releases were

21   permissible and enforceable, settling defendants could essentially immunize themselves in perpetuity

22   from liability for any manner of misconduct. As a matter of contract interpretation, it should be

---

[59] *See Cnty. of Cook v. MicCon Corp.*, 773 F.2d 892, 908 (7th Cir. 1985) (stating that "[w]here . . . only some aspects of an allegedly fraudulent scheme were at issue in the prior suit, a subsequent RICO action based on the entire scheme presumably would not be barred").

[60] *See* Mot. at 13:25 (quoting Order Granting Pls.' Unopposed Mot. for Prelim. Approval of Class Action Settlement and Final J. as to Damages Claims, No. 4:14-md-2541 CW, ECF No. 611).

[61] *Eichman v. Fotomat Corp.*, 759 F.2d 1434, 1439 (9th Cir. 1985).

[62] *Frank v. United Airlines, Inc.*, 216 F.3d 845, 851 (9th Cir. 2000) (citing *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955)).

1   presumed that the parties in *Alston* did not intend their release provisions to apply to the future

2   conduct of the defendants, thereby running afoul of these established standards in the case law.[63]

3   Indeed, the language of the release does not purport to immunize the defendants from liability for

4   ***future conduct***; rather, it prohibits the settling plaintiffs from bringing ***future claims based on the***

5   ***same conduct*** that was alleged in *Alston*.[64]

6         Defendants do not point to any case that would support a different conclusion. In each of the

7   cases Defendants cite, the court found that there was an identical factual predicate warranting

8   preclusion because the allegations forming the basis for the claims in the prior proceeding were

9   either identical to or broader than those alleged in the subsequent action.[65] These cases are inapposite

10  because, as explained above, Oliver's claims are based on different misconduct causing a different

11  injury than was alleged in *Alston* and are further predicated on factual developments that occurred

12  after *Alston* settled. These claims necessarily arise from a distinct "factual predicate."

13        Because Oliver has standing to pursue his damages claims, there is no basis to dismiss his

14  entire case with or without prejudice. Moreover, while Oliver may lack standing as a former student-

15  athlete to seek injunctive relief, his complaint can be amended to add a plaintiff with standing for

16  those claims, and the *Oliver* action may be consolidated with the *House* action. Indeed, Defendants

17  make no argument—and there is none—that Plaintiffs and current student-athletes Grant House and

---

18

19  [63] For the same reasons, the Court should reject Defendants' alternative argument that Oliver's claims are precluded by operation of *res judicata*. *See Eichman*, 759 F.2d at 1438-39 (applying *res judicata* principles and holding that, "because *Eichman I* was settled on September 7, 1977 and judgment was entered as of that date, the causes of action disposed of in *Eichman I* were for pre-September 7, 1977 conduct and the judgment cannot bar suit brought on post-September 7, 1977 conduct").

20

21

22  [64] *See* Order & Final Judgment, No. 14-md-2541 CW, ECF No. 746 at 11-12 (releasing "future claims . . . arising out of or relating in any way to . . . [the] allegations made in Plaintiffs' Actions, or any legal theories that could have been raised on the allegations in Plaintiffs' Actions" (emphasis added)).

23

24  [65] *See e.g.*, *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741 (9th Cir. 2006) (settlement barred subsequent antitrust claims based on the same underlying injury alleged in the prior action); *Nichols v. Citibank, N.A.*, 715 Fed. App'x 681, 682 (9th Cir. 2018) (settlement of class action alleging that employer miscalculated wages through a broad range of misconduct precluded later attempt to bring same claim that employer miscalculated wages despite the fact that the latter claim was focused more narrowly on just one of the forms of misconduct that were at issue in the prior case); *Howard v. Am. Online, Inc.*, 208 F.3d 741 (9th Cir. 2000) (settlement barred later attempt to repackage "identical billing allegations that occurred during the same time period" as a RICO claim).

25

26

27

28

Sedona Prince in the substantively similar *House* action lack standing to pursue injunctive relief.

**E.      Should the Court Dismiss Any of Plaintiffs' Claims, They Seek Leave to Amend**

Should this Court hold that any of Plaintiffs' claims require further factual development, Plaintiffs seek leave to amend their complaints. These are the first complaints filed against any Defendants in this lawsuit. Moreover, leave to amend is freely granted "unless [a court] determines that the pleading could not possibly be cured by the allegation of other facts."[66] Indeed, the following are *non-exclusive* additional facts that Plaintiffs could allege in amended complaints, from a hearing in front of the Senate Committee on Health, Education, Labor & Pensions on September 23, 2020:

- University of Wisconsin chancellor, Rebecca Blank, who testified for defendants during the *Alston* trial, stated: "New opportunities for NIL can exist within the confines of our student-athlete model . . . preserving the educational opportunities for hundreds of thousands, while modernizing endorsement opportunities for all."

- Karen Dennis, the Director of Track & Field at the Ohio State University distinguished NIL compensation from "pay to play" and testified: "Providing our student-athletes the opportunity to monetize their talents through NIL will allow them to grow and use their intellectual and creative talents beyond their athletic abilities. . . . Given the opportunity to brand themselves while in college with technical, intellectual, tangible and legal resources at their disposal, a greater number of student athletes will leave school better prepared for life and global citizenship."

- Utah State University Athletic Director John Hartwell similarly confirmed: "We believe there is a way to provide additional income opportunities to student-athletes through NIL, while preserving the collegiate model and the student-athletes' amateur status."[67]

### III.      CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

---

[66] *See In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1060 (N.D. Cal. 2015) (internal quotation marks omitted).

[67] Full committee hearing and the written testimonies of Rebecca Blank, Karen Dennis, and John Hartwell, are available at: https://www.help.senate.gov/hearings/compensating-college-athletes-examining-the-potential-impact-on-athletes-and-institutions.

1  DATED: October 9, 2020

HAGENS BERMAN SOBOL SHAPIRO, LLP

2

By:  /s/ Steve W. Berman

3
STEVE W. BERMAN (*pro hac vice*)

4  Emilee N. Sisco (*pro hac vice*)
1301 Second Avenue, Suite 2000

5  Seattle, WA 98101
Telephone: (206) 623-7292

6  Facsimile:  (206) 623-0594
steve@hbsslaw.com

7  emilees@hbsslaw.com

8
Benjamin J. Siegel (SBN 256260)

9  HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202

10  Berkeley, CA 94710
Telephone: (510) 725-3000

11  Facsimile:  (510) 725-3001
bens@hbsslaw.com

12

13  Jeffrey L. Kodroff (*pro hac vice*)
Eugene A. Spector (*pro hac vice*)

14  SPECTOR ROSEMAN KODROFF &
WILLS, PC

15  2001 Market Street, Suite 3420
Philadelphia, PA 19103

16  Telephone: (215) 496-0300
Facsimile: (215) 496-6611

17  jkodroff@srkattorneys.com
espector@srkattorneys.com

18

19  *Counsel for Plaintiffs and the Proposed Classes*

20

21

22

23

24

25

26

27

28