Beth A. Wilkinson (*pro hac vice*)
Rakesh N. Kilaru (*pro hac vice*)
Tamarra Matthews Johnson (*pro hac vice*)
Kieran Gostin (*pro hac vice*)
WILKINSON WALSH LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonwalsh.com
rkilaru@wilkinsonwalsh.com
tmatthewsjohnson@wilkinsonwalsh.com
kgostin@wilkinsonwalsh.com

Rahul Hari (SBN 313528)
WILKINSON WALSH LLP
11601 Wilshire Blvd., Suite 600
Los Angeles, CA 90025
Telephone: (424) 291-9655
Facsimile: (202) 847-4005
rhari@wilkinsonwalsh.com

Attorneys for Defendant
NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION

[Additional Counsel Listed on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| GRANT HOUSE, et al.,<br><br>       Plaintiffs,<br>v.<br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, et al.,<br><br>       Defendants. | No. 4:20-cv-03919-CW<br>No. 4:20-cv-04257-CW<br><br>**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS THE COMPLAINTS** |
| TYMIR OLIVER, on behalf of himself and all others similarly situated,<br><br>       Plaintiffs,<br>v.<br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, et al.,<br><br>       Defendants. | Date:   November 18, 2020<br>Time:   2:30 p.m.<br>Courtroom: Courtroom 2, 4th Floor<br>Before:   Hon. Claudia Wilken |

**TABLE OF CONTENTS**

I.  Plaintiffs' Claims Are Barred By *Stare Decisis* ........................................................................1

II. Plaintiffs' Group Licensing Damages Sub-Class Claim Should Be Dismissed. .....................4

    A.  Plaintiffs Have Failed To Plead Antitrust Injury In The Relevant Market. ................4

    B.  Plaintiffs Have Failed To Allege Injury Because They Do Not Have Any Legally Cognizable Publicity Rights. .................................6

III. Oliver's Complaint Should Be Dismissed With Prejudice Because He Cannot Plead a Viable Claim. ...........................................................................................9

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Alliance Shippers, Inc. v. S. Pac. Transp. Co.*,
   858 F.2d 567 (9th Cir. 1988) ............................................................................................. 4

*Atl. Richfield Co. v. USA Petroleum Co.*,
   495 U.S. 328 (1990) .......................................................................................................... 5

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .......................................................................................................... 9

*County of Cook v. MidCon Corp.*,
   773 F.2d 892 (7th Cir. 1985) ........................................................................................... 12

*Dryer v. NFL*,
   689 F. Supp. 2d 1113 (D. Minn. 2010) ............................................................................. 9

*Dryer v. NFL*,
   55 F. Supp. 3d 1181 (D. Minn. 2014) .......................................................................... 7, 9

*Eichman v. Fotomat Corp.*,
   759 F.2d 1434 (9th Cir. 1985) ......................................................................................... 11

*Ettore v. Philco Television Broad. Corp.*,
   229 F.2d 481 (3d Cir. 1956) .......................................................................................... 8, 9

*Frank v. United Airlines, Inc.*,
   216 F.3d 845 (9th Cir. 2000) ........................................................................................... 11

*Freeman v. MML Bay State Life Ins. Co.*,
   445 F. App'x 577 (3d Cir. 2011) ..................................................................................... 12

*Gionfriddo v. MLB*,
   114 Cal. Rptr. 2d 307 (Cal. Ct. App. 2001) ..................................................................... 7

*Hesse v. Sprint Corp.*,
   598 F.3d 581 (9th Cir. 2010) ........................................................................................... 12

*Howard v. Am. Online, Inc.*,
   208 F.3d 741 (9th Cir. 2000) ........................................................................................... 12

*In re Literary Works in Elec. Databases Copyright Litig.*,
   654 F.3d 242 (2d Cir. 2011) ............................................................................................ 11

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*,
    958 F.3d 1239 (9th Cir. 2020) ................................................................................... *passim*

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
    37 F. Supp. 3d 1126 (N.D. Cal. 2014) ................................................................................ 7

*In re Osborne*,
    76 F.3d 306 (9th Cir. 1996) ............................................................................................. 2, 3

*Marshall v. ESPN*,
    111 F. Supp. 3d 815 (M.D. Tenn. 2015) ........................................................................ 7, 9

*Marshall v. ESPN*,
    668 F. App'x 155 (6th Cir. 2016) ....................................................................................... 6

*Nichols v. Citibank, N.A.*,
    715 F. App'x 681 (9th Cir. 2018) ..................................................................................... 10

*O'Bannon v. NCAA*,
    7 F. Supp. 3d 955 (N.D. Cal. 2014) .......................................................................... *passim*

*O'Bannon v. NCAA*,
    802 F.3d 1049 (9th Cir. 2015) .................................................................................. 1, 7, 8

*Or. Natural Desert Ass'n v. U.S. Forest Serv.*,
    550 F.3d 778 (9th Cir. 2008) ............................................................................................. 2

*Palantir Techs., Inc. v. Palantir.net, Inc.*,
    2011 WL 3047327 (N.D. Cal. July 25, 2011) .................................................................... 1

*Rooney v. Columbia Pictures Indus., Inc.*,
    538 F. Supp. 211 (S.D.N.Y. 1982) .................................................................................... 6

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2013) ............................................................................................. 9

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
    875 F.2d 1369 (9th Cir. 1989) ........................................................................................... 6

*Wis. Interscholastic Athletic Ass'n v. Gannett Co., Inc.*,
    658 F.3d 614 (7th Cir. 2011) ......................................................................................... 7, 8

*Zacchini v. Scripps-Howard Broad. Co.*,
    433 U.S. 562 (1977) ........................................................................................................... 8

Plaintiffs' Opposition lays out a recipe for never-ending litigation. This Court has been presiding over antitrust lawsuits regarding the NCAA's compensation rules for over a decade, first in a challenge to NCAA's rules "prohibit[ing] student-athletes from being paid for the use of their names, images, and likenesses," *O'Bannon v. NCAA*, 802 F.3d 1049, 1052 (9th Cir. 2015), and then in an effort "to dismantle the NCAA's entire compensation framework." *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1247 (9th Cir. 2020) ("*Alston*"). Plaintiffs seek to litigate that claim once again—without identifying *any* changes to the relevant rules, or *any* materially different facts from the record the Ninth Circuit addressed just months ago—based on superficial differences in the way they describe that claim and their desire for different and broader relief. But for all the arguments in the Opposition, Plaintiffs identify no precedent allowing a party to repackage the same challenge again and again because they are unsatisfied with how courts have decided it so far. As explained further below, the complaints should be dismissed without leave to amend.

### I. Plaintiffs' Claims Are Barred By *Stare Decisis*.

Plaintiffs offer nothing to distinguish their complaint from *O'Bannon* on the metric that has actual legal significance to the stare decisis analysis. While they briefly highlight other "NIL opportunities that are now available to student-athletes," Pls.' Opp'n at 5, their own cited authority confirms that "[t]he test of a complaint pursuant to a motion to dismiss lies in the claim, not in the demand." *See Palantir Techs., Inc. v. Palantir.net, Inc.*, 2011 WL 3047327, at *3 (N.D. Cal. July 25, 2011). And the claim they have asserted—a challenge to "the NCAA's rules that prohibit student-athletes from receiving anything of value in exchange for the commercial use of their NILs," HC ¶ 5, OC ¶ 5, is *identical* to the claim adjudicated in *O'Bannon*, namely, an antitrust challenge to "rules [that] prohibit student-athletes from being paid for the use of their names, images, and likenesses," 802 F.3d at 1052. Confirming the point, Plaintiffs do not appear to dispute that they are challenging the same rules as in *O'Bannon*, nor do they attempt to identify any material changes to those rules since *O'Bannon* was decided.

1     Rather than dispute these points, Plaintiffs' Opposition largely rests on the remarkable
2  proposition that they can relitigate *O'Bannon* based on arguments about the NCAA's compensation
3  rules that were resolved in *Alston*—which they improperly attempt to characterize as a narrow decision
4  involving "distinct claims." Pls.' Opp'n at 4. That is revisionist history. As the Ninth Circuit recently
5  observed, *Alston* was a lawsuit "to dismantle the NCAA's entire compensation framework." *Alston*,
6  958 F.3d at 1247.
7     For that reason, Plaintiffs miss the mark in relying on facts already presented to this Court and
8  the Ninth Circuit in *Alston*, including anecdotes about Kyler Murray and Arike Ogunbowale. *See* Pls.'
9  Opp'n at 7–8; Rascher Cross Testimony, *Alston* Trial Tr. at 80:10–18; 81:10–82:12 (Murray); Rascher
10 Direct Testimony, *Alston*, 14-md-2541, ECF No. 994 ¶ 84 (Ogunbowale). *Stare decisis* would have
11 little meaning if plaintiffs could repackage already-considered arguments into a new antitrust
12 complaint targeting the same basic injury—an allegedly unlawful restraint on the compensation
13 student-athletes can receive. *See, e.g.*, *Or. Natural Desert Ass'n v. U.S. Forest Serv.*, 550 F.3d 778,
14 786 (9th Cir. 2008) ("When, as in this case, there are neither new factual circumstances nor a new legal
15 landscape, *stare decisis* is an appropriate basis for our decision."); *In re Osborne*, 76 F.3d 306, 309
16 (9th Cir. 1996) (earlier case controls later case when it "involv[es] identical or similar material facts"
17 as later case).
18    Nor do Plaintiffs succeed in identifying factual differences from *O'Bannon* and *Alston* that are
19 "material to the application of the rule [at issue] or allow the precedent to be distinguished on a
20 principled basis." Pls.' Opp'n at 3–4 (quoting *Alston*, 958 F.3d at 1253) (alteration in original).
21 Plaintiffs' emphasis on the NCAA's continued consideration of changes to the NIL rules, Pls.' Opp'n
22 at 10–11, runs headlong into Ninth Circuit precedent. As in *Alston*, those arguments remain
23 "premature." 958 F.3d at 1265. The NCAA and its members have not adopted any changes to those
24 rules, and the final report Plaintiffs cite—like the report addressed in *Alston*—reaffirms that any
25 revisions proposed and adopted by the Divisions must be "consistent with NCAA values and
26 principles, and with legal precedent." Defs.' Mot. to Dismiss, Ex. 1, NCAA Bd. of Governors Fed. &

State Legislation Working Grp. Final Report & Recommendations at 8 (Apr. 17, 2020); *see also Alston*, 958 F.3d at 1265.

Statements and surveys regarding potential alterations to the NIL rules, Pls.' Opp'n at 8–9, do not constitute "material" new facts either. Once again, much the same types of evidence (indeed, some of the exact same quotes) were in the *Alston* record. *See, e.g.*, Pls.' Mem. in Opp'n to Defs.' Mot. for Summ. J., Ex. 67-A, *Alston*, 14-md-2541, ECF No. 714-10 (Nov. 7, 2017) (deposition transcript of Oliver Luck at which he was asked about a USA Today article quoting him as saying "I do believe that the name, image, likeness for an individual is a fundamental right—that any individual controls his or her name, image, and likeness—and I don't believe that a student-athlete who accepts a grant-in-aid simply waives that right to his or her name, image, and likeness."); Pls.' Opp'n at 9 (identical quote); Pls.' Closing Args., *Alston*, 14-md-2541, ECF No. 1099-4 at 1 (Oct. 19, 2018) (quoting NCAA President Mark Emmert's statement from a CBS Sports interview on February 24, 2018, that "'the rules of the association have accumulated over the years, and there's no doubt in [his] mind, and . . . most of the member universities['] minds, that some of these rules have simply been written for a different age.'" (alterations in original)); Pls.' Opp'n at 9 (quoting similar statements from Emmert); H. Poret Corrected Direct Testimony, *Alston*, 14-md-2541, ECF No. 1044-1 at 5 (Sept. 14, 2018) (Plaintiffs' consumer demand survey, which purported to "measure[] the potential *impact on consumer viewership/attendance* of offering additional forms of compensation or benefits that are not currently permitted by the challenged NCAA rules." (emphasis in original)). To overcome *stare decisis*, Plaintiffs must identify materially new evidence, not just more of the same. *Osborne*, 76 F.3d at 309; *see Alston* MSJ Hr'g Tr., 14-cv-2758, ECF No. 365 at 10:10–11 (Jan. 21, 2018) (to overcome *stare decisis*, Plaintiffs must point to "actually changed facts that [a]re important, not just any old fact").

Finally, there is even less merit to Plaintiffs' passing suggestion that their lawsuit can proceed because they have proposed "less restrictive alternatives . . . that were not previously analyzed by the courts." Pls.' Opp'n at 11. Plaintiffs identify no precedent, in any context, allowing a court to revisit the same claim, based on materially similar facts, simply because a party proposes a different form of

relief. *Alston*'s reference to "the proposed LRAs" in holding that *stare decisis* did not foreclose that case was simply to illustrate that the *O'Bannon* decision was distinguishable as "a narrow challenge to restrictions on NIL compensation," not to suggest that new LRAs alone are sufficient. 958 F.3d at 1254. Plaintiffs ultimately appear to agree, urging consideration of their new LRAs in light of "the different facts now at issue," Pls.' Opp'n at 11, which, as just explained, are illusory. Because this case presents an identical challenge to the same restrictions at issue in *O'Bannon*, it is barred.

Ultimately, Plaintiffs' arguments amount to a request to relitigate *O'Bannon* based on the record in *Alston*, and extend litigation over the NCAA's compensation rules into another decade. Not even the Ninth Circuit's narrow conception of *stare decisis* in *Alston* justifies this shell game. The complaints should be dismissed with prejudice in their entirety.

## II.  Plaintiffs' Group Licensing Damages Sub-Class Claim Should Be Dismissed.

### A.  Plaintiffs Have Failed To Plead Antitrust Injury In The Relevant Market.

As this Court has recognized, "an 'essential element of a Section 1 violation under the rule of reason is injury to competition in the relevant market.'" *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 7 F. Supp. 3d 955, 994 (N.D. Cal. 2014) (quoting *Alliance Shippers, Inc. v. S. Pac. Transp. Co.*, 858 F.2d 567, 570 (9th Cir. 1988)). Plaintiffs have failed to plead this "essential element" as to the Group Licensing Damages Sub-Class.

The Sub-Class claim, brought on behalf of FBS football and Division I basketball student-athletes, seeks "the share of game telecast group licensing revenue that members of this Sub-Class would have received absent Defendants' unlawful conduct." HC ¶ 251; OC ¶ 230. It is in all material respects identical to the group licensing claim this Court confronted in *O'Bannon*, in which student-athletes sought the right to profit from group licenses of their names, images, and likenesses. *O'Bannon*, 7 F. Supp. 3d at 968. Plaintiffs admit the point, describing *O'Bannon* as a lawsuit focused "on the NCAA's prohibition against student-athletes receiving a share of the revenue that the NCAA

and its members receive from the use of athletes' NILs in *live game broadcasts*, related footage, and video games." Pls.' Opp'n at 5 (emphasis added).

In *O'Bannon*, this Court concluded that the relevant market for that claim was the market "in which television networks seek to acquire group licenses to use FBS football and Division I basketball players' names, images, and likenesses in live game telecasts." 7 F. Supp. 3d at 968. That market was distinct from what this Court called the "college education market," in which "FBS football and Division I basketball schools . . . compete to sell unique bundles of goods and services to elite football and basketball recruits." *Id.* at 965.

Despite pleading the same group licensing claim, Plaintiffs allege no injury to competition in the relevant market for that claim—the group licensing market. Plaintiffs do not identify the buyers or sellers in that market, or how they, or competition, have been harmed. These omissions require dismissal. Under the antitrust laws, "a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (emphasis in original); *see also O'Bannon*, 7 F. Supp. 3d at 997. Plaintiffs have not attempted to make that showing here.

The absence of those allegations is not surprising—they would run directly contrary to *O'Bannon*. There, this Court concluded that student-athletes seeking to profit from group licenses had "failed to show that the challenged NCAA rules harm competition in this submarket." *O'Bannon*, 7 F. Supp. 3d at 996–97; *see also id.* at 998–99. The evidence instead "strongly suggest[ed] that such competition would not occur" and that "[e]njoining the NCAA from enforcing its challenged rules would not change that." *Id.* at 995, 999. In light of these adverse findings, it is incumbent on Plaintiffs to plead facts establishing a plausible antitrust injury. They have not.

Plaintiffs' only response is a complete nonsequitur—they assert they have plausibly alleged an injury to competition in "the nationwide market for the labor of NCAA Division I college athletes." Pls.' Opp'n at 20. But they identify no precedent allowing them to mix and match a claim in one market with an alleged injury in another. The law is in fact to the contrary: "[T]he market for antitrust

| REPLY MEMORANDUM IN SUPPORT OF | Case No. 4:20-cv-03919-CW |
| DEFENDANTS' MOTION TO DISMISS | Case No. 4:20-cv-04527-CW |

5

purposes is the *one* relevant to the particular legal issue at hand." Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 533 (4th ed. 2020) (emphasis in original). And as *O'Bannon* established, the relevant market for a group licensing claim is the group licensing market, not a separate labor market. The participants in the "Division I Labor Market," *i.e.*, "all of the colleges and universities in NCAA Division I" and the student-athletes therein, HC ¶ 82; OC ¶ 64, are not the relevant "group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business" with respect to group licensing. *O'Bannon*, 7 F. Supp. 3d at 986 (quoting *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989)). Confirming the point, Plaintiffs do not bring the Group Licensing Damages Sub-Class claim on behalf of the participants in the "Division I Labor Market," but on behalf of a narrower subset of student-athletes (from FBS football and Division I basketball) that is coextensive with the group that brought the group licensing claim in *O'Bannon*. *See id.* at 965. The Court should reject Plaintiffs' sleight-of-hand and see their argument for what it is—an effort to end-run *O'Bannon* through artful pleading. The only way to plead a plausible group licensing claim is to allege an injury to competition in the intellectual property market for group licenses, which Plaintiffs cannot do. The Group Licensing Damages Sub-Class claim therefore should be dismissed for failure to plead injury in the relevant market.

### B. Plaintiffs Have Failed To Allege Injury Because They Do Not Have Any Legally Cognizable Publicity Rights.

Plaintiffs cannot allege injury based on the deprivation of their "share of game telecast group licensing revenue," HC ¶ 251; OC ¶ 230, for an independent reason: They have no right of publicity in game broadcasts, and therefore no right to recover damages under the Sherman Act.

As multiple circuit courts have concluded, a plaintiff cannot use the antitrust laws to vindicate a nonexistent right. *See Marshall v. ESPN*, 668 F. App'x 155, 157 (6th Cir. 2016) (dismissing antitrust claim based on publicity rights because "those putative rights do not exist"); *see also Rooney v. Columbia Pictures Indus., Inc.*, 538 F. Supp. 211, 229–30 (S.D.N.Y. 1982), *aff'd*, 714 F.2d 117 (2d

1   Cir. 1982). This Court reached the same conclusion in *O'Bannon*, noting the plaintiffs would have to
2   "show that, absent the NCAA's restraint on student-athlete pay, student-athletes would have
3   cognizable rights of publicity in the use of their names, images, and likenesses in live game broadcasts
4   and archival game footage." *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 37 F.
5   Supp. 3d 1126, 1140 (N.D. Cal. 2014).

6   For all their arguments on this issue, Plaintiffs fail to identify any such enforceable right. They
7   first assert they need not identify a legally enforceable right at all, citing the Ninth Circuit's observation
8   in *O'Bannon* that "EA or another video game company would pay NCAA athletes for their NIL rights
9   rather than test the enforceability of those rights in court." Pls.' Opp'n at 14 (quoting *O'Bannon*, 802
10  F.3d at 1069). But as that quote reveals, the Ninth Circuit made that observation in addressing "the
11  right to use . . . NILs in . . . video games," which involve avatars of real people rather than live game
12  broadcasts. *O'Bannon*, 802 F.3d at 1069. The Ninth Circuit expressly declined to extend this payment-
13  to-avoid-litigation rationale to live game broadcasts, describing the relevant question in that context as
14  "whether participants in live TV broadcasts of college sporting events have enforceable rights of
15  publicity." *Id.* at 1067.

16  On that issue, there is no longer any debate in the case law: "[A]ll courts in jurisdictions that
17  have decided the matter under their respective laws have held to the contrary for a variety of reasons."
18  *Marshall v. ESPN*, 111 F. Supp. 3d 815, 825 (M.D. Tenn. 2015). Some courts have concluded there
19  are no enforceable publicity rights because only broadcasters, rather than participants, have such rights.
20  *See, e.g.*, *Wis. Interscholastic Athletic Ass'n v. Gannett Co., Inc.* ("*WIAA*"), 658 F.3d 614, 624 (7th
21  Cir. 2011) ("[T]he producer of entertainment is entitled to charge a fee in exchange for consent to
22  broadcast."); *see also* Defs.' Mot. to Dismiss at 8–9 (collecting other authorities spanning decades).
23  Others have reached the same conclusion by finding that there is no enforceable publicity right in
24  broadcasts on matters of public interest, let alone live sports broadcasts. *See, e.g.*, *Dryer v. NFL*, 55
25  F. Supp. 3d 1181, 1199 (D. Minn. 2014) (rejecting right-of-publicity claim in game footage because
26  "Plaintiffs' play in the NFL was and continues to be the subject of public interest"); *Gionfriddo v.*

*MLB*, 114 Cal. Rptr. 2d 307, 314 (Cal. Ct. App. 2001) (same holding with respect to statistics and other data for professional baseball players);[1] *see also* Defs.' Mot. to Dismiss at 9 (collecting cases, again spanning decades).

Plaintiffs offer nothing convincing in response. They first trot out a strawman, observing that the Ninth Circuit rejected the argument "that the First Amendment would trump any rights of publicity student-athletes asserted." Pls.' Opp'n at 15. But the First Amendment and Copyright Act arguments addressed in *O'Bannon* regarding video games, *see* 802 F.3d at 1068, have nothing to do with Defendants' argument here about whether student-athletes have cognizable rights of publicity in live game broadcasts.

Plaintiffs also fail in attempting to establish that performers, in addition to producers, have rights of publicity in broadcasts based on *Zacchini* and *WIAA*. *See* Pls.' Opp'n at 15–16 (citing *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562 (1977), and *WIAA*, 658 F.3d at 614). Those cases certainly make references to performers, as they involved live broadcasts. But the relevant question is not whether the word "performer" appeared in those opinions, but whether those opinions recognized performers to have any enforceable rights of publicity separate and apart from the right that belongs to the producer. They did not. In *Zacchini*, the human cannonball performer was also the producer of the act. 433 U.S. at 576. In *WIAA*, "the creator and disseminator of content" was the athletic association that produced the games. 658 F.3d at 624. And to the extent the *WIAA* court discussed enforceable rights of publicity, it recognized them only in a producer: "*Zacchini* makes clear that the *producer* of entertainment is entitled to charge a fee for consent to broadcast; the First Amendment does not give the media the right to appropriate, without consent or remuneration, the *product* of others." *Id.* (emphases added).[2]

---

[1] Plaintiffs have it backwards in attempting to distinguish *Gionfriddo* because it involved "baseball history." Pls.' Opp'n at 19 (internal quotation marks omitted). The question whether there is greater public interest in live sports broadcasts or historical baseball data answers itself.

[2] Plaintiffs miss the mark in their effort to expand *Zacchini* based on its citation, in a footnote, to a 1956 case from the Third Circuit. *See* Pls.' Opp'n at 16; *see also Zacchini*, 433 U.S. at 572 n.9 (citing *Ettore v. Philco Television Broad. Corp.*, 229 F.2d 481 (3d Cir. 1956)). In *Ettore*, a professional boxer

Indeed, the only decision Plaintiffs cite suggesting the existence of a participant's right to publicity in a sports broadcast is the preliminary district court decision that this Court cited in *O'Bannon*.  Pls.' Opp'n at 18 (citing *Dryer v. NFL*, 689 F. Supp. 2d 1113, 1123 (D. Minn. 2010)).  But the Minnesota district court has since made clear that any such rights of publicity are not enforceable in a materially identical context.  *See Dryer*, 55 F. Supp. 3d at 1195–99.

In the end, Plaintiffs are left arguing that the NCAA has not ruled out the possibility that an enforceable right of publicity may exist in some state.  Pls.' Opp'n at 15.  *Marshall* holds otherwise, *see* 111 F. Supp. 3d at 825, but even setting that point aside, Plaintiffs misapprehend the relevant law.  In "an antitrust case . . . [where] the potential expense of discovery is obviously great," *Somers v. Apple, Inc.*, 729 F.3d 953, 966 (9th Cir. 2013), Plaintiffs must plausibly allege a legal violation to move forward.  Simply saying that they might be able to make one out in the future is not enough.  Moreover, if there were any authority supporting Plaintiffs' unprecedented theory, they would have cited it.  Because Plaintiffs have failed to "state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), their Group Licensing Damages Sub-Class Claim should be dismissed.

### III. Oliver's Complaint Should Be Dismissed With Prejudice Because He Cannot Plead a Viable Claim.

Plaintiffs concede that Oliver has no standing to seek injunctive relief.  They also admit he was a member of the *Alston* damages settlement class, and that the settlement binds him to "broad" release

---

contracted for proceeds from the sale of motion picture rights to a fight, and a third-party broadcaster later used the film without compensating him.  The court concluded that Ettore could maintain a claim for "unfair competition" against the broadcaster based on the "misappropriation for the commercial advantage of one person of a benefit or a property right belonging to another."  *Ettore*, 229 F.2d at 490. The "property right" at issue in *Ettore* was the boxer's contractual right to compensation, not some freestanding right to publicity; the court in fact rejected a "cause of action . . . to protect the individual's right in his own personality."  *Id.* at 493.  Notably, Plaintiffs do not identify a single post-*Ettore* case applying this unfair competition theory, which the court described as "somewhat hazy," *id.* at 490, to an asserted right of publicity—or indeed any case applying it in *any context*.

provisions that bar him from, among other things, asserting future claims based on the conduct alleged in *Alston*. Pls.' Opp'n at 2, 22, 24. With these admissions, Plaintiffs concede that the majority of the *Oliver* complaint is subject to dismissal. Despite these concessions, Plaintiffs attempt to evade the *Alston* settlement's release provisions to save part of Oliver's case by arguing that *some* of his damages claims nonetheless are not barred because they are not based on the "identical factual predicate" as the claims in *Alston*. *Id.* at 24. This argument does not pass the straight-face test.

There can be no question that Oliver's claims are based on the same predicate as the claims he resolved in *Alston*. As Plaintiffs appear to acknowledge, the alleged harm in both cases is the same—antitrust injury arising out of "wrongful deprivation of compensation" in excess of what NCAA rules permit. *See id.* at 23. Plaintiffs' conclusory assertion that the claims nevertheless are "different" is belied by Oliver's own pleading and the *Alston* record. In his complaint, Oliver admits that his claims are rooted in the NCAA's rules regulating "the compensation and benefits that athletes may receive while participating in college sports." OC ¶ 4. As explained above, Plaintiffs attacked those exact rules in *Alston*, which represented an all-out assault on all NCAA rules governing student-athletes' compensation. *See supra* at 2 (citing *Alston*, 958 F.3d at 1247). The fact that Oliver's complaint focuses on "a particular *subset* of the NCAA rules that prohibit student-athletes from receiving anything of value in exchange for the commercial use of their NILs" changes nothing. OC ¶ 5 (emphasis added). Because Oliver's challenge here is encompassed by the challenge in *Alston*, it shares a factual predicate with *Alston*. *See Nichols v. Citibank, N.A.*, 715 F. App'x 681, 682 (9th Cir. 2018) (barring subsequent suit raising narrower version of claims in previous suit due to settlement release).

Plaintiffs' argument that Oliver's current damages claims are unrelated to those asserted in *Alston* is particularly baseless given Plaintiffs' apparent acknowledgment that this action challenges the exact same subset of NCAA rules at issue in *O'Bannon*. That matters because the damages claims asserted in *Alston* (and released by the settlement Oliver joined) were premised on *O'Bannon*'s injunctive relief holding. In particular, *O'Bannon*, which involved a challenge to the NIL rules,

enjoined the NCAA from limiting financial aid to the former grant-in-aid limit rather than the full cost of attendance, and the *Alston* settlement was expressly calculated based on that difference. *See Alston* 10/9/2014 MTD Hr'g Tr., 14-md-2541, ECF No. 133 at 18:8–12 (Oct. 12, 2014); Expert Decl. of Daniel A. Rascher in Support of Motion for Preliminary Approval of Damages Classes, 14-md-2541-CW, ECF No. 560-4 ¶ 11 (Feb. 3, 2017) (explaining damages calculation). The *Alston* settlement was thus inextricably tied to the rules Oliver now challenges.

Moreover, Oliver's claims are not based on new conduct arising after the *Alston* settlement, but on the same NCAA eligibility policy underlying the *Alston* settlement. Plaintiffs do not assert—nor could they—that the NCAA compensation rules Oliver challenges changed between the conclusion of the *Alston* settlement in 2017 and Oliver's final student-athlete season in 2019. Plaintiffs instead point to alleged "factual developments" post-*Alston*, but all of those developments were part of the *Alston* record or materially similar to facts in that record, *see supra* at 2–3, and some do not even apply to Oliver, *see, e.g.*, Pls.' Opp'n at 6–8 (relying on exceptions for two-sport athletes and NCAA waivers). Accordingly, Oliver's claims are correctly characterized as "future claims" based on the same conduct alleged in *Alston* that were released and are now barred by the settlement. *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 247–48 (2d Cir. 2011) (concluding that future damages claims based on conduct that continues in the future may be released by settlement of claims based on the identical factual predicate).

Plaintiffs identify no authority suggesting otherwise. They first appear to assert that they need not identify a different factual predicate as long as they are raising a new claim challenging a "continuing course of conduct that provided the basis for the earlier claim." Pls.' Opp'n at 23 (citing *Frank v. United Airlines, Inc.*, 216 F.3d 845 (9th Cir. 2000), and *Eichman v. Fotomat Corp.*, 759 F.2d 1434 (9th Cir. 1985)). Even assuming Plaintiffs are raising a new claim, neither of their cases considered whether a release of future claims relating to a continuing policy barred subsequent claims based on that policy. At least two Circuit Courts of Appeals that have considered the issue have concluded that such claims may in fact be released under the identical factual predicate doctrine. *See*

| REPLY MEMORANDUM IN SUPPORT OF | Case No. 4:20-cv-03919-CW |
| DEFENDANTS' MOTION TO DISMISS | Case No. 4:20-cv-04527-CW |

11

*Literary Works*, 654 F.3d at 247–48 (affirming approval of settlement including release of future claims predicated on publishers' selling or licensing the works to third-party sublicensees); *Freeman v. MML Bay State Life Ins. Co.*, 445 F. App'x 577, 579 (3d Cir. 2011) (noting that "[i]t is settled in this circuit that a class representative can enter into a settlement that bars future claims by class members" and finding that claims challenging different "practices" with respect to the same policies at issue in the settled litigation arose from the same factual predicate).

Plaintiffs' efforts to suggest that Oliver's claims actually do have a different factual predicate likewise fail. In *Hesse v. Sprint Corp.*, 598 F.3d 581, 584–86 (9th Cir. 2010), the Ninth Circuit held that a plaintiff's claims were not barred by a prior settlement release where the claims in the earlier case alleged deceptive practices related to billing customers for *federal* business taxes, and the later action alleged deceptive practices related to passing on a *Washington state* business tax to consumers. Here, by contrast, Plaintiffs are challenging a subset of the broader corpus of NCAA rules challenged in *Alston*. Moreover, the *Hesse* court based its "determination that the claims lack an identical factual predicate" on its "observation . . . that the [class representative in the earlier action] did not adequately represent the Washington Plaintiffs as to their B & O Tax Surcharge claims." *Id.* at 591. Here, there is no contention that Oliver was inadequately represented in *Alston* (his attorneys are in fact the same).

Nor does *County of Cook v. MidCon Corp.*, 773 F.2d 892, 908 (7th Cir. 1985), support Plaintiffs' position. As Plaintiffs note, that case stands for the unremarkable proposition that a *broader* challenge in a subsequent case may not be based on the same factual predicate as an earlier, narrower case. Here, the exact opposite is true: The later case (*Oliver*) is narrower than the earlier case (*Alston*), and thus the *Alston* release encompasses Oliver's claims.[3]

---

[3] Plaintiffs' allegation of a new cause of action for unjust enrichment has no bearing on whether the cases meet the "identical factual predicate" test, which bars subsequent actions based on different theories of recovery. *Howard v. Am. Online, Inc.*, 208 F.3d 741 (9th Cir. 2000) (settlement of action for unfair business practices, fraud, breach of contract, unjust enrichment and negligent misrepresentation barred subsequent action repackaging alleged misconduct as RICO claims). Indeed, in *Alston*, Plaintiffs asserted a cause of action under California's unfair competition law, but they conceded dismissal at the *Alston* motion to dismiss hearing because it was duplicative of the antitrust claims. Tr. 21:23-25.

No amendment can rectify these deficiencies in Oliver's claims.  As a result, his complaint must be dismissed with prejudice.

## CONCLUSION

The Court should dismiss the *House* and *Oliver* complaints with prejudice.

DATED: October 23, 2020                                   Respectfully submitted.

| | |
|---|---|
| **WILKINSON WALSH LLP** | **PROSKAUER ROSE LLP** |
| By:  */s/ Beth A. Wilkinson* | By:  */s/ Scott P. Cooper* |
| Beth A. Wilkinson (*pro hac vice*)<br>Rakesh N. Kilaru (*pro hac vice*)<br>Tamarra Matthews Johnson (*pro hac vice*)<br>Kieran Gostin (*pro hac vice*)<br>2001 M Street NW, 10th Floor<br>Washington, DC 20036<br>Telephone: (202) 847-4000<br>Facsimile: (202) 847-4005<br>bwilkinson@wilkinsonwalsh.com<br>rkilaru@wilkinsonwalsh.com<br>tmatthewsjohnson@wilkinsonwalsh.com<br>kgostin@wilkinsonwalsh.com<br><br>Rahul Hari (SBN 313528)<br>11601 Wilshire Blvd., Suite 600<br>Los Angeles, CA 90025<br>Los Angeles, CA 90025<br>Telephone: (424) 291-9655<br>Facsimile: (202) 847-4005<br>rhari@wilkinsonwalsh.com<br><br>Attorneys for Defendant<br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION | Bart H. Williams (SBN 134009)<br>Scott P. Cooper (SBN 96905)<br>Kyle A. Casazza (SBN 254061)<br>Shawn S. Ledingham, Jr. (SBN 275268)<br>Jennifer L. Jones (SBN 284624)<br>2029 Century Park East, Suite 2400<br>Los Angeles, CA 90067<br>Telephone: (310) 557-2900<br>Facsimile: (310) 557-2193<br>bwilliams@proskauer.com<br>scooper@proskauer.com<br>kcasazza@proskauer.com<br>sledingham@proskauer.com<br>jljones@proskauer.com<br><br>Attorneys for Defendant<br>PAC-12 CONFERENCE |

| | | |
|---|---|---|
| 1 | **MAYER BROWN LLP** | **ROBINSON BRADSHAW & HINSON, P.A.** |
| 2 | By: ___/s/ Britt M. Miller___ | By: ___/s/ Robert W. Fuller___ |
| 3 | Britt M. Miller (*pro hac vice*) | Robert W. Fuller, III (*pro hac vice*) |
|   | Matthew D. Provance (*pro hac vice*) | Lawrence C. Moore, III (*pro hac vice*) |
| 4 | 71 South Wacker Drive | Pearlynn G. Houck (*pro hac vice*) |
|   | Chicago, IL 60606 | Amanda P. Nitto (*pro hac vice*) |
| 5 | Telephone: (312) 782-0600 | 101 N. Tryon St., Suite 1900 |
|   | Facsimile: (312) 701-7711 | Charlotte, NC 28246 |
| 6 | bmiller@mayerbrown.com | Telephone: (704) 377-2536 |
|   | mprovance@mayerbrown.com | Facsimile: (704) 378-4000 |
| 7 | | rfuller@robinsonbradshaw.com |
|   | Christopher J. Kelly (SBN 276312) | lmoore@robinsonbradshaw.com |
| 8 | Two Palo Alto Square, Suite 300 | phouck@robinsonbradshaw.com |
|   | 3000 El Camino Real | apickens@robinsonbradshaw.com |
| 9 | Palo Alto, CA 94306 | |
|   | Telephone: (650) 331-2000 | Mark J. Seifert (SBN 217054) |
| 10 | Facsimile: (650) 331-2060 | Seifert Law Firm |
|   | cjkelly@mayerbrown.com | 50 California Street, Suite 1500 |
| 11 | | San Francisco, CA 94111 |
|   | Attorneys for Defendant | Telephone: (415) 999-0901 |
| 12 | THE BIG TEN CONFERENCE, INC. | Facsimile: (415) 901-1123 |
| 13 | | mseifert@seifertfirm.com |
| 14 | | |
| 15 | | Attorneys for Defendant |
|   | | SOUTHEASTERN CONFERENCE |

| | |
|---|---|
| **POLSINELLI PC** | **FOX ROTHSCHILD LLP** |
| By: _____/s/ *Leane K. Capps*_____ | By: _____/s/ *D. Erik Albright*_____ |
| Leane K. Capps (*pro hac vice*)<br>Caitlin J. Morgan (*pro hac vice*)<br>D. Rockwell Bower (*pro hac vice*)<br>2950 N. Harwood Street, Suite 2100<br>Dallas, TX 75201<br>Telephone: (214) 397-0030<br>lcapps@polsinelli.com<br>cmorgan@polsinelli.com<br>rbower@polsinelli.com | D. Erik Albright (*pro hac vice*)<br>Gregory G. Holland (*pro hac vice*)<br>230 North Elm Street, Suite 1200<br>Greensboro, NC 27401<br>Telephone: (336) 378-5368<br>Facsimile: (336) 378-5400<br>ealbright@foxrothschild.com<br>gholland@foxrothschild.com |
| Amy D. Fitts (*pro hac vice*)<br>120 W. 12th Street<br>Kansas City, MO 64105<br>Telephone: (816) 218-1255<br>afitts@polsinelli.com | Jonathan P. Heyl (*pro hac vice*)<br>101 N. Tryon Street, Suite 1300<br>Charlotte, NC 28246<br>Telephone: (704) 384-2625<br>Facsimile: (704) 384-2800<br>jheyl@foxrothschild.com |
| Wesley D. Hurst (SBN 127564)<br>2049 Century Park East, Suite 2300<br>Los Angeles, CA 90067<br>Telephone: (310) 556-1801<br>whurst@polsinelli.com | Alexander Hernaez (SBN 201441)<br>345 California Street, Suite 2200<br>San Francisco, CA 94104-2670<br>Telephone: (415) 364-5540<br>Facsimile: (415) 391-4436<br>ahernaez@foxrothschild.com |
| Attorneys for Defendant<br>THE BIG 12 CONFERENCE, INC. | Attorneys for Defendant<br>ATLANTIC COAST CONFERENCE |

**E-FILING ATTESTATION**

I, Beth A. Wilkinson, am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the signatories identified above has concurred in this filing.

*/s/ Beth A. Wilkinson*
BETH A. WILKINSON