Pages 1 - 47

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Claudia Wilken, Judge

```
GRANT HOUSE, et al.,          )
                              )
            Plaintiffs,       )    NO. C-20-3919 CW
                              )
   VS.                        )    Wednesday, November 18, 2020
                              )
NATIONAL COLLEGIATE           )    Oakland, California
ATHLETIC ASSOCIATION, et al.)
                              )
                              )    Motion to Dismiss
            Defendants.       )
_____)
TYMIR OLIVER, et al.,         )
                              )
            Plaintiffs,       )    NO. C-20-4527 CW
                              )
   VS.                        )    Wednesday, November 18, 2020
                              )
NATIONAL COLLEGIATE           )    OAKLAND, CALIFORNIA
ATHLETIC ASSOCIATION, et al.)
                              )
                              )    Motion to Dismiss
                              )
            Defendants.       )
_____)
```

**REPORTER'S TRANSCRIPT OF ZOOM PROCEEDINGS**

For Plaintiffs:          HAGENS BERMAN SOBOL SHAPIRO LLP
                         1301 Second Avenue, Suite 200
                         Seattle, Washington  98101
                **BY:   STEVE W. BERMAN, ESQUIRE**
                        **EMILEE SISCO, ESQUIRE**

                 (Appearances Continued)

Reported By:             Diane E. Skillman, CSR No. 4909
                         Official Court Reporter

        TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

```
 1    For Plaintiffs:          HAGENS BERMAN SOBOL SHAPIRO LLP
                               715 Hearst Avenue, Suite 202
 2                             Berkeley, California 94710
                         BY:  BENJAMIN SIEGEL, ESQUIRE
 3

 4
      For Defendant            WILKINSON WALSH + ESKOVITZ
 5    NCAA:                    2001 M Street NW, 10th Floor
                               Washington, DC 20036
 6                       BY:  BETH A. WILKINSON, ESQUIRE
                             RAKESH KILARU, ESQUIRE
 7

 8    For Defendant            PROSKAUER ROSE LLP
      PAC-12 Conference:       2029 Century Park East, Suite 2400
 9                             Los Angeles, California  90067
                         BY:  SCOTT P. COOPER, ESQUIRE
10

11    For Defendant South-     ROBINSON BRADSHAW & HINSON PA
      eastern Conference:      101 North Tryon Street
12                             Suite 1900
                               Charlotte, North Carolina  28246
13                       BY:  ROBERT W. FULLER, ESQUIRE

14

15    For Defendant The        MAYER BROWN LLP
      Big Ten Conference,      71 South Wacker Drive
16    Inc.:                    Chicago, Illinois  60606-4637
                         BY:  BRITT M. MILLER, ESQUIRE
17

18    For Defendant The Big    POLSINELLI, PC
      12 Conference Inc.,      2950 N. Harwood Street, Suite 2100
19    Conference USA Inc.:     Dallas, Texas 75201
                         BY:  LEANE K. CAPPS, ESQUIRE
20

21    For Defendant Atlantic   SMITH MOORE LEATHERWOOD LLP
      Coast Conference:        101 N. Tryon Street, Suite 1300
22                             Charlotte, North Carolina 28246
                         BY:  D. ERIK ALBRIGHT, ESQUIRE
23

24

25
```

1    <u>Wednesday , November 18, 2020</u>                    <u>3:15 p.m.</u>

2                        P R O C E E D I N G S

3                              o0o

4         **THE COURT:**  Okay.

5         **THE CLERK:**  We are now calling Civil Cases 20-3919 CW

6    House, et al. versus National Collegiate Athletic Association,

7    et al., and case number 20-CV-04527-CW Oliver versus National

8    Collegiate Athletic Association, et al.

9         **MR. BERMAN:**  Good afternoon, Your Honor.  Steve

10   Berman again.  I'm appearing on behalf of plaintiffs for House

11   and Oliver for the plaintiffs.

12        **THE COURT:**  I guess we can do House and Oliver

13   together so we don't have to go through the whole thing twice.

14      Who else do we have for plaintiffs in either House or

15   Oliver?

16        **MR. SIEGEL:**  Good afternoon, Your Honor.  This is Ben

17   Siegel again, co-counsel with Mr. Berman for the plaintiffs.

18        **MS. SISCO:**  Good afternoon, Your Honor.  This is

19   Emilee Sisco also co-counsel for the plaintiffs.

20        **THE COURT:**  Okay.  For NCAA in House and Oliver?

21        **MS. WILKINSON:**  Good afternoon, Your Honor.  Beth

22   Wilkinson for the NCAA, again, in both cases.  And my partner,

23   Rakesh Kilaru, will be arguing for the NCAA and the

24   Conferences this afternoon.

25        **MR. KILARU:**  Good afternoon, Your Honor.

4

1          **THE COURT:**  I see.  There he is over there on the

2    right.  Okay.

3          **MR. KILARU:**  Good afternoon, Your Honor.  Rakesh

4    Kilaru for the NCAA.

5          **THE COURT:**  Okay.  Then I guess we have somebody for

6    all the Conferences.  Shall we try alphabetical order?

7          **MR. FULLER:**  Sure, Your Honor.

8          **THE COURT:**  Start with the Bigs?

9          **MR. ALBRIGHT:**  There's an "A" before the "Bs" if you

10    want me to do that one.

11          **THE COURT:**  Okay.  Let's do that then.

12          **MR. ALBRIGHT:**  Again, this is Erik Albright, Your

13    Honor, for the Atlantic Coast Conference.

14          **MS. MILLER:**  Good afternoon, Your Honor.  Britt

15    Miller on behalf of the Big Ten Conference.

16          **MS. CAPPS:**  Good afternoon, Your Honor.  Leane Capps

17    on behalf of the Big 12 Conference.

18          **MR. COOPER:**  Good afternoon, Your Honor.  Scott

19    Cooper on behalf of the Pac-12 Conference.

20          **MR. FULLER:**  And, finally, Your Honor, Robert Fuller

21    on behalf of the Southeastern Conference.

22          **THE COURT:**  Good afternoon.

23       And I'll say again -- well, you are all the same people,

24    right?  This is being court reported.  The official record is

25    the court reporter's transcript.  The recording that Zoom

```
 1   makes may not be used, photographed, recorded, or rebroadcast
 2   for any purpose at all.  And that would be subject to
 3   sanctions.  The official record is the court reporter's
 4   transcript.  The hearing is available to the public and the
 5   press by way of the Zoom website that is posted on the Court's
 6   website.
 7       So we have defendants' motion to dismiss.  And we can
 8   start with -- don't let me forget, we also have to do the Case
 9   Management Conference.  And that's in both cases.  And we are
10   going to do that after we argue this motion, but don't let me
11   forget to do that.
12       Okay.  So who wants to argue the motion to dismiss for the
13   defendants?  Have you got that worked out?
14           MR. KILARU:  Yes, Your Honor.  I will be arguing,
15   Rakesh Kilaru.
16           THE COURT:  For the Conferences as well?
17           MR. KILARU:  Yes.
18           THE COURT:  Okay.  Go ahead.
19           MR. KILARU:  Thanks, Your Honor.  I am happy to
20   answer any questions you have about the issues that have been
21   presented in the motion, but I think it makes sense to focus
22   on the stare decisis argument and on the group licensing
23   damages subclass claim, which we think has a number of
24   problems.
25           THE COURT:  Well, I will tell you -- I think that we
```

1    have a disconnect here between what you all think their

2    license subclass claim is and what they think their license

3    subclass claim is.

4        It doesn't really help or hurt either side, but I think

5    that you're misinterpreting what they're saying.  So actually,

6    I guess, we can start with that.

7        It seems like you are harkening back to a finding I made

8    in *O'Bannon* which was that there hadn't been a showing of the

9    market for group licenses, but that's not the claim they are

10   making now.  The claim they are making now is really, as I

11   understand it, much more like, frankly, the claim in –– in

12   either *Alston* or *O'Bannon* that's sort of saying the problem is

13   not –– is valuing at zero from the school's perspective what

14   can be given to the student-athletes based on the use of name,

15   image and likeness by the school in getting –– entering into

16   broadcasting contracts.

17       So I don't think that –– and maybe Mr. Berman can tell me

18   I'm wrong about this, but I don't think the claim is sort of

19   like that the athletes should be out there negotiating their

20   own separate contracts with the broadcaster, but that the

21   athletes should be paid more by the schools because the

22   schools are getting all this money from the broadcasters.

23       That's what I think.  Am I right about that, Mr. Berman?

24   Who's arguing?

25            **MR. BERMAN:**  Yes, Your Honor.

1       **THE COURT:**  Is that right?

2       **MR. BERMAN:**  That's right.  Can you hear me?

3       **THE COURT:**  No.  I just wanted to make sure you were

4    the one who was arguing.

5       **MR. BERMAN:**  Yes.

6       **THE COURT:**  So it's really sort of a different theory

7    than the one you are addressing.  Maybe you want to address

8    that, and then we've got your social media theory.

9        Oh.  And then you don't move to dismiss the unjust

10   enrichment claim, so I gather that that would go forward

11   regardless even if the other claims were dismissed.

12       So I think those are my only specific questions.  So you

13   can -- oh.  Then we have the whole problem with Oliver.  You

14   concede that Oliver doesn't -- or the plaintiffs concede that

15   Oliver doesn't have standing to make an injunctive relief

16   claim, but they are also making a damages claim on his behalf,

17   but only under the -- well, they are making a damages claim on

18   his behalf and you are saying that that's barred by the *Alston*

19   settlement.

20       So you can address that.

21       **MR. KILARU:**  Yes, Your Honor.  A number of issues

22   there.  So perhaps I can start with them in order.

23       On the claim regarding group licensing, I think it is

24   better understood to the extent they are asserting an injury

25   relevant to group licensing that that would be a claim in the

1    group licensing submarket, which Your Honor rejected in

2    *O'Bannon*.

3        I mean, that is what Dr. Noll came in and said was the

4    market for that claim, for the negotiation of group licenses

5    in *O'Bannon*.  That is what this Court found.  That was the

6    premise that we went forward on on the idea that there was

7    some group licensing claim.

8        I don't think that there is or can be a dispute, but to

9    the extent that that is their claim, it can't go forward

10   because there isn't an injury to competition in that market.

11       To the extent, as I think Your Honor put it, they are

12   instead trying to articulate some injury in a labor market,

13   that's not a claim that has anything to do with group

14   licenses.  As Your Honor found in *O'Bannon* --

15           **THE COURT:**  No, I think it was poorly named, frankly,

16   Mr. Berman.  I think that calling it "group licensing" is what

17   led to the confusion.  You can probably think of something

18   else to call it.

19           **MR. BERMAN:**  I agree with you, Your Honor.

20           **MR. KILARU:**  Well, I think, Your Honor, to the extent

21   it is a claim for share of broadcast revenue, it is actually

22   best thought of as a group licensing claim.  I think that's

23   what they are asking for, and I think that claim fails for the

24   reasons it failed in *O'Bannon*.

25       But if you instead think of it as a claim that

1    student-athletes should get paid more for the labor that they

2    provide from institutions, then that is squarely precluded by

3    *O'Bannon*.  That was the claim that the Court adjudicated in

4    that case.  The amount of compensation related to group

5    licensing -- excuse me, to name, image, and likeness that

6    student-athletes could receive.

7          **THE COURT:**  Right.  But their arguments would -- that

8    they raise with respect to the rest of the House claim would

9    be the same arguments they've raised with respect to the group

10   license subclass, and that is the differences in the facts,

11   the admissions that have been made since, the legislation, the

12   legal theories, and bylaws, and so on.  I mean, all those

13   arguments they make would apply to that theory as well as to

14   their other theories.

15         **MR. KILARU:**  Well, I think two things on that, Your

16   Honor.  First, I think they are particularly problematic as to

17   that theory because the idea of payment from schools for NIL

18   is the precise thing that was --

19         **THE COURT:**  The idea that what?

20         **MR. KILARU:**  The idea of --

21         **THE COURT:**  You are fading out a little bit.  You

22   need to keep your --

23         **MR. BERMAN:**  I'm having trouble hearing you, Rakesh.

24   Could you speak up a little louder?

25         **MR. KILARU:**  I will try to.  And if not, I can always

1   get a headset.

2       But I think the problem with that claim, to the extent it

3   relates to student license revenues -- excuse me, to the

4   extent it relates to money being provided directly from

5   schools, which is what I understand the group licensing claim

6   to be, that is, I think, the most squarely precluded by

7   *O'Bannon* because that is what was decided there.

8       But I would also say that all of the other things that

9   they have provided as to why they think stare decisis does not

10  preclude, we think are insufficient whether you look at this

11  case as the successor to *O'Bannon* or you look at it as the

12  successor to *Alston*.  And that's because if you look at the

13  way the Ninth Circuit addressed the stare decisis inquiry in

14  *Alston*, there were, as Your Honor knows -- this started in the

15  summary judgment briefing, it continued after that.  There

16  were any number of arguments made by both sides about what was

17  relevant to the question of whether or not this was a new

18  case, whether or not it was a new claim.

19      And ultimately what the Ninth Circuit said mattered in

20  that analysis was two things:  First, that they were

21  challenging a broader set of restrictions than in *O'Bannon*.

22  And second, that they were material changes to those

23  restrictions since the *O'Bannon* record closed.

24      And whether you will get *O'Bannon* as the touch point or

25  *Alston* as the touch point, neither of those things is

1    different here.  It's the same set of rules, the NIL rules

2    that have been at issue in front of this Court again and

3    again.  There's been no change to those rules.

4        And as far as the -- whether there's been any change in

5    the compensational landscape, there hasn't been since *Alston*

6    at all, and there hasn't been relative to name, image and

7    likeness since *O'Bannon*.

8        So just as a stare decisis matter, if we follow what the

9    Ninth Circuit said is the relevant analysis for when you can

10   bring an old claim anew in this area where, I think, really

11   all of these claims get at the same thing, which is the amount

12   of money student-athletes can receive, I think you end up with

13   no ability on the plaintiffs' part to show something that's

14   material under the analysis as the Ninth Circuit has raised

15   it.

16       So that's why we think all of the claims go away, but in

17   particular as to the group licensing claims because of the

18   type of relief being sought is really the exact thing that was

19   decided in *O'Bannon*.

20           **THE COURT:**  Okay.  Did you want to address their

21   arguments, or do you want to hear from Mr. Berman first and

22   then respond?

23           **MR. KILARU:**  Well, Your Honor, I think you raised a

24   few other issues.  I'm happy to continue to elaborate on the

25   points we just made about the stare decisis piece.

1    I think what they argue are the reasons that this claim

2    can go forward is basically all of the factual issues that

3    this court resolved in *Alston*.  We don't think that works

4    because *Alston* is a broader challenge to the rules.

5    I think it encompassed the challenge in *O'Bannon* and went

6    farther beyond that.  That's what the plaintiffs said when

7    they were defining the class in *Alston* as a class to challenge

8    any bylaws that prohibit compensation above the full cost of

9    attendance.  It's what this Court said when it found that the

10    class was -- when the plaintiffs were challenging rules that

11    limit the compensation they may receive in exchange for their

12    athletic services, and it's what the Ninth Circuit said when

13    it talked about the plaintiff seeking to dismantle the Ninth

14    Circuit -- the NCAA's compensation framework.

15    So I think you take *O'Bannon* and you look at *Alston*; they

16    are really addressing the same set of restraints.  And the

17    question is whether there's anything new that they can come

18    forward with really since the record closed a couple of months

19    ago that would allow them to bring this claim again.

20    And as to that matter, we don't think there's anything

21    that they've provided in their complaint that meets that test.

22    Most of it is evidence that this Court already confronted in

23    both *O'Bannon* and *Alston*.

24    **THE COURT:**  Well, as I say, they have various

25    arguments which include, and I guess I won't do them justice,

1    but basically that there are admissions against interest that

2    have been made, that those -- that there have been changes in

3    the attitude towards the NIL by a lot of the players, that

4    there are rules that were challenged before that are being

5    challenged now.

6       I forget what all the others -- they have a number of

7    arguments that were in the briefs.

8              MR. KILARU:  Yes, Your Honor.  I think on that, I

9    think there's two ways to respond to that.

10      The first is to look at the Ninth Circuit's analysis of

11   stare decisis in *Alston* and see if any of those are relevant

12   arguments for purposes of deciding whether the previous case

13   precludes this one.

14      And as the Ninth Circuit said when it was deciding why

15   that claim could go forward, the things that mattered to the

16   Ninth Circuit were, first, a broader set of rules and, second,

17   changes in those rules.  Neither of those things has happened

18   here.

19             THE COURT:  Okay.  But stare decisis isn't just in

20   *Alston*.  It's a concept in the law.  And there are ways in

21   which one can bring a case that one might argue is similar to

22   a prior case, and it is not just the ones that happened to be

23   the case in *Alston* necessarily.

24             MR. KILARU:  Of course, Your Honor.  But we --

25             THE COURT:  I don't know.  I don't want to

1    characterize the plaintiffs' argument in order for you to

2    respond to it.  I can have them say it first.

3         **MR. KILARU:**  Well, yes, Your Honor.

4     I would say that I think that particularly in this

5    context, with this being the third time that this

6    interconnected set of rules has been challenged, what the

7    Ninth Circuit said in *Alston* about stare decisis, I think, is

8    particularly salient in terms of what this Court should look

9    at in deciding whether to let this claim go forward, because

10   many of the same arguments are being made.

11    But just to take the two things Your Honor mentioned,

12   these supposed admissions and these changes in attitude, I

13   think the Ninth Circuit addressed that when it talked about

14   comments about potential rules changes being a premature

15   argument.

16    The Ninth Circuit addressed in *Alston*, the plaintiffs

17   argued that these sort of changing attitudes, as I think

18   you've described them, or the statements were a reason to

19   expand the injunction still farther than what this Court had

20   entered.  The Ninth Circuit said that that was premature

21   because no rules changes has occurred yet.  That sort of goes

22   to the point I was making earlier about rules changes being

23   particularly material.

24    And I think it would be backwards, respectfully, to say

25   that because there is some consideration to potential rule

1    changes by both the NCAA and Congress, that that's a reason

2    for an Antitrust Court to jump into the fray and address a

3    challenge to the rules as they set out.

4      I know that we have raised this idea of latitude in the

5    past, and I don't think that that's the argument we are making

6    now.  I think the argument we are making now is more whether

7    it makes any sense to allow this case to go forward before

8    there has been any change in the rules in any material factual

9    alteration.

10          **THE COURT:**  Well, I guess plaintiffs could wait

11   until -- I mean, it seems like the NCAA is in the process

12   of -- at least says it is in the process of making changes.

13   We also have the legislation in 33 states, which the Ninth

14   Circuit had asked for briefing on.

15      I wonder if either of those two things would be a reason

16   to either wait or proceed.

17          **MR. KILARU:**  Your Honor --

18          **THE COURT:**  The other thing I'm sort of curious about

19   is Judge Smith's concurrence in his theory that the court got

20   the market wrong or the Ninth Circuit's laws should be changed

21   with respect to cross-market analysis.  And I don't know if

22   that -- plaintiffs don't really argue that, but I don't know

23   if that might have some effect on the stare decisis argument.

24          **MR. KILARU:**  Yes, Your Honor.

25      I think what might happen in the future and what claims

1    might be brought as a result of that are a question that would

2    be best addressed at some future point if a complaint were

3    filed if those things happened.

4        I think you have to take the complaint as it rests now.

5    And as it rests now, it is challenging the same set of

6    constraints that have been adjudicated before, and I think

7    that's exactly why the Ninth Circuit said it's premature.

8        As to Judge Smith's concurrence, it was a concurrence --

9    it was one judge's view.  It does not command a majority of

10   the Ninth Circuit.  So I don't think there's any basis for

11   using that to revisit the way the Court has thought about

12   these issues in the past with the caveat that if the Court

13   concludes that these claims are not barred by stare decisis,

14   as we think they are, we would have a right to present a full

15   and fair defense of why we think these rules are valid as an

16   antitrust matter.

17           **THE COURT:**  Do you think that your, essentially, res

18   judicata argument, vis-a-vis *Oliver*, is stronger than your

19   stare decisis argument vis-a-vis *House*?

20       Do you see any difference between the two?

21           **MR. KILARU:**  I think the case for why Oliver's claim

22   is precluded is quite straightforward given the damages

23   settlement in *Alston* and the fact that he released his claims

24   there.  But we also think that there is a very straightforward

25   argument for why, with no rules having changed in the NIL

1    space, and with these changes that the plaintiffs are

2    highlighting having been called premature by the Ninth

3    Circuit, they shouldn't be allowed to go forward now.

4        You did ask about the *Oliver* piece.  I think the

5    injunctive claim, I think there is agreement, is

6    inappropriate.  As the damages claim, I think it couldn't be

7    clearer that they are based -- that the damages claim there

8    included the factual predicate for the claim here given that

9    the way the *Alston* damages settlement was calculated was in

10   reference to the remedy that was ordered in *O'Bannon* for an

11   NIL-related lawsuit.

12        **THE COURT:**  The remedy was what, the difference

13   between cost of attendance and grant-in-aid, wasn't it?

14        **MR. KILARU:**  Yes, but that was the remedy for an --

15        **THE COURT:**  It wasn't like, we will give you "X"

16   percent of the TV broadcast revenues, or the video game

17   revenues, or anything like that.  It was calculated based on

18   the increase to COA, which actually the NCAA had made itself.

19        **MR. KILARU:**  Yes, Your Honor.  But that's what you

20   found was appropriate in relation to the complaint -- the

21   claim that you're describing, which is a claim for a lot more

22   than that.

23        I mean, there was a claim for more NIL revenue.  Oliver

24   settled that claim -- Oliver was part of the settlement in

25   *Alston* that was predicated on that.  And I don't think there's

1    a basis for allowing him to now come back in when the claim

2    is, again, a challenge to those same NIL rules to say that we

3    are going to reopen it.

4        Again, it is sort of a broad connected set of rules here.

5    I think that's one thing that's become very clear over the

6    last 10 years of litigation, and I think his claims do arise

7    out of it.

8        Not to move on from that, but the one point you asked

9    about that I think I haven't addressed yet is the unjust

10   enrichment point.  We do think that claim should be dismissed.

11   I think the law is clear that that is not a standalone cause

12   of action.  It's derivative of another cause of action.

13       And if the Sherman Act claim fails, as we think it must

14   under stare decisis, then that claim must fail, too.  I think

15   there's some cases I can cite to you on that that it's not a

16   standalone --

17          **THE COURT:**  It's not entirely settled in California.

18   I don't know what law we would be looking at.

19          **MR. KILARU:**  I believe it's fairly settled, Your

20   Honor.  I think there's certainly cases that hold that it's

21   not a standalone cause of action.

22       One that comes to mind is a case called *Miletak*, which can

23   be found at 2010 Westlaw 809579.  There also were a number of

24   cases saying that when you raise a Sherman Act claim and an

25   unjust enrichment claim and nothing else, the unjust

1    enrichment claim is basically coextensive with and fails --

2    the Sherman Act claims fails.

3        There's an *Abbott* case I can cite to you on that from

4    2007.  It's 2007 Westlaw 1689899.

5            **THE COURT:**  Okay.  Mr. Berman, do you want to

6    respond?

7            **MR. BERMAN:**  Yes.  Thank you, Your Honor.

8        I will start with *Alston* because I think *Alston* precludes

9    the stare decisis argument put forth by the defendants here.

10       *Alston* said that antitrust decisions are particularly fact

11   bound, and a prior decision doesn't dictate the outcome of the

12   new case.  And there was a continuing duty to examine that

13   that occurred previously before the Court.

14       So if we look at *Alston* -- first, I will take *Alston*, why

15   it's not preclusive, and then I'll do *O'Bannon*.

16       So, in *Alston*, we weren't challenging NIL rights.  We were

17   challenging the compensation that the student-athletes

18   received from schools.  So, in this case, we're challenging

19   the NIL restraints.

20       So we have two different restraints at issue here.  In

21   fact, you wrote at 375 F.Supp. 3d 1058, 1094 that it was clear

22   that the conduct at issue here is not connected to NIL rights.

23       And, in fact, I was recalling the trial today, several

24   times we tried to put in, for example, the Knight Commission

25   which was filled with information about the change in the NIL

1    attitude, you excluded that evidence as not relevant.  So it

2    was a different case.

3        And my Demonstrative 1, I don't know if you had a chance

4    to get that, Your Honor, but it is a table that lists the

5    rules that were challenged in *Alston* versus the rules

6    challenged in the *House* case, and there's zero overlap in

7    those rules.

8        So that takes me to *O'Bannon*.  In *O'Bannon*, I'm focused on

9    live game broadcasts footage and video games.  In this case,

10   we have rights --

11           **THE COURT:**  After you dropped the bobblehead claim.

12           **MR. BERMAN:**  Yes.  But in this case, we have very

13   important rights that weren't even extant in the *O'Bannon*

14   case, and that's social media rights.  So --

15           **THE COURT:**  I was curious about that.  You didn't

16   make this argument, but I wondered -- well, they weren't --

17   that wasn't raised in *O'Bannon*.  I wonder if that's -- if

18   there's -- if that's because you haven't really burst on to

19   the scene yet, this whole influencer and brand monetization

20   hadn't started at that point.

21           **MR. BERMAN:**  That's right, Your Honor.

22       So in this case, one of the important allegations, is that

23   the restraints impermissibly restricts social media rights.

24   We gave you examples of each of the plaintiffs.  For example,

25   plaintiff House, he engages in social media posts for his

1    school at the school's request, but he cannot derive any

2    profit from his own social media, which he's developed.

3         THE COURT:  Does the school get profit from the

4    student's social media?

5         MR. BERMAN:  Yes.  We've alleged that in paragraphs

6    134 and 136 and at 115 and 117 in the *Oliver* complaint.

7      The same thing for Ms. Prince.  She does social media for

8    the school, right.  They can monetize that.  She was in a

9    fight with the NCAA over her eligibility, and people started

10   printing T-shirts, Free Sedona, from the NCAA rules she was

11   challenging.  She had a following of over 70,000 people.  And

12   she could have sold those T-shirts but for the restrictions at

13   issue here.

14     We also have an issue here, not in *O'Bannon*, the

15   negotiating endorsement deals.  So the schools, right, they

16   get endorsement deals from Nike and so forth.  And they get

17   endorsement deals that sometimes use the images of the

18   plaintiffs.  But the plaintiffs can't do their own endorsement

19   deal.

20        THE COURT:  Now that was one -- I have several

21   questions for you, but that was one -- that strikes me as

22   problematic if, as I'm told, that you have your Nike schools

23   and your Adidas schools; how would that work if you went to a

24   school that had a deal with Nike and the coach had a deal with

25   Nike, and you came along as the quarterback or whatever and

1   wanted to make a deal with Adidas, how would that work out?

2        MR. BERMAN:  Or what if you wanted to make a deal

3   with Nike?

4        So maybe a permissible rule, and we are not there yet, is

5   that rule right there; that you can seek an endorsement deal

6   from a company like Nike, if it's the company at your school.

7   Right now you can't do that at all.  I think that is something

8   that we would talk about once we got into the merits of the

9   case.

10        We also, Your Honor, have the autograph signing.  So we

11   have schools who profit by selling access to their athletes to

12   the highest bidder.  That's at paragraph 147 of the *House*

13   complaint.  A student-athlete could not sell access to

14   himself, even though the school can do that.

15        So we have all kinds of restraints at issue here that

16   weren't at issue in the *O'Bannon* case.

17        And the second demonstrative I gave Your Honor is -- I'll

18   call it the admission demonstrative -- that is, since *O'Bannon*

19   and since *Alston*, the schools are saying these students are

20   entitled to compensation for their NIL rights.

21        So in *O'Bannon*, as you know, and I don't want to go into

22   it ad nauseam, they said not a penny more, or the sport will

23   be destroyed.  Now, and I have given you -- I won't go through

24   them all, but for example, head coach in Nebraska, we

25   believe --

1          **THE COURT:**  I've read all those quotes.

2          **MR. BERMAN:**  Okay.  I'm going to stop on the stare

3     decisis thing because I think I've made my point.

4          On the issue of the relevant market, first Your Honor,

5     just to be clear, that motion is not directed at the social

6     media subclass.  So if there's no stare decisis, there's no

7     other challenge to the social media subclass.

8          **THE COURT:**  Oh, really?  That wasn't my impression.

9          **MR. BERMAN:**  Not that I am aware of.

10          **THE COURT:**  Well, I think they moved to dismiss

11     everything except --

12          **MR. BERMAN:**  Stare decisis argument on social media.

13          **THE COURT:**  I think so.

14          **MR. BERMAN:**  Stare decisis argument on the social

15     media.

16          **COURT REPORTER:**  I'm sorry --

17          **THE COURT:**  I'm sorry.

18          **MR. BERMAN:**  Improper market argument on social

19     media.  That's the point I was trying to make.

20          **THE COURT:**  Well, that's true.  But I think it's --

21     they would say that the social media subclass is subject to

22     the same deficiencies as the case as a whole, I'm guessing.

23          **MR. BERMAN:**  They did only on stare decisis grounds.

24     But they don't have, for example --

25          **THE COURT:**  Oh, true.  You're right.  They are not

```
1    saying it's a --
2            MR. BERMAN:  Right.  I didn't want you to lose track
3    of my social media group of --
4            THE COURT:  Right.  Right.
5            MR. BERMAN:  So on the issue of group licensing, I
6    think they are conflating --
7            THE COURT:  Here's my problem with that, and that is
8    the same as I have with the endorsements.  How would it work
9    if the school is trying to make a deal with the broadcasting
10   company to broadcast games and get paid, then how -- how could
11   any individual -- well, I guess that's the answer.
12       An individual couldn't come along and negotiate a separate
13   deal for the broadcast.  The individual would have to go to
14   the school and say, hey, I know how much money you are making
15   on this, you've got to pay me more or I won't come to your
16   school.  They can't say you've got to pay me more or you can't
17   let the broadcast company show my face on the screen; that
18   wouldn't work.
19           MR. BERMAN:  I think you have it almost perfectly
20   right except one thing.
21       I think what we are alleging in our case is that in a
22   world free from the restraints, the schools would compete for
23   the labor of students by saying, hey, come to the University
24   of Oregon.  We have a deal with Nike, we have a deal with Fox
25   Sports.  We are giving the group of football players ten grand
```

1    each if you come to Oregon.  That's how it would work in our

2    view of the world.

3        And I think what defendants have done is conflated the

4    market with damages.  So our market is the market for labor of

5    Division 1 athletes.  It is not a group licensing market.

6        And the group licensing label that we've put on it was

7    just to show the Court there's a distinct measure of damages

8    we are seeking for the student labor market, just like there's

9    a distinct measure of damages we're seeking for the social

10   media class.

11           THE COURT:  It might be tempting to say that the

12   difference between your new case and your older cases is that

13   the new cases address third parties paying the students, like

14   students being able to get money from Nike for endorsements or

15   get money from this website for some sort of social media,

16   whatever it is; that they are not seeking more money from the

17   schools, they are seeking money from third parties.  But that

18   actually isn't the case because they are seeking more money

19   from the schools, not just from third parties.

20        Am I right?

21           MR. BERMAN:  In the social media subsection of the

22   case, I think that what's going to happen and what we allege

23   is that the schools would actually work with students to help

24   them monetize their individual social media rights that would

25   come from third parties.  And it's clear --

1          **THE COURT:**  Or not.  They don't have to help them.

2     The students can do --

3          **MR. BERMAN:**  They don't, but I think they will.

4     Because in a competitive market, if Nebraska, which we allege

5     in the complaint is out there telling students, come to

6     Nebraska, we will help you monetize your social media rights,

7     then there's going to be competition among the schools to help

8     monetize social media rights.

9          **THE COURT:**  Right.  But, for example, the broadcast

10    revenues that you are asking for would come from the schools.

11    The schools would have to make the deal with Fox Sports or

12    whatever it is, and try to recruit the students based on how

13    lucrative their TV broadcast rights were, and the school would

14    have to pay the student.  It wouldn't be a third party paying

15    the student, it would be the school.

16         **MR. BERMAN:**  That's correct.

17         **THE COURT:**  Okay.  I want to look at my notes to see

18    if I had any other questions, unless you had other points you

19    wanted to raise.

20         **MR. BERMAN:**  Just the point on *Oliver*, Your Honor.

21       We don't concede that Mr. Oliver's damages are barred in

22    any way for the same reasons in our stare decisis argument.

23         **THE COURT:**  That's a question I had.  Maybe it's sort

24    of esoteric.  I'm putting you on -- both of you on the spot

25    too much.  I am trying to figure out whether there is a

1    difference between the res judicata argument made against

2    Oliver's damage claim and the stare decisis argument made

3    against the complaint as a whole.

4        Is there some sort of analytical difference between those

5    two arguments?

6            **MR. BERMAN:**  I think the case that we would cite to

7    Your Honor on this is called *Hesse* -- H-E-S-S-E -- *versus*

8    *Sprint*.  It's cited in our brief.

9        And it says that unless the defendants can establish the

10   claims from both cases arise from quote, "an identical factual

11   predicate, then there's no preclusion."

12       I'm not sure whether that decided it on res judicata or

13   stare decisis grounds, but, again, for the reasons I stated

14   earlier, the facts in the *Alston* case, as Your Honor noted,

15   were not based on NIL.  So we don't think Mr. Oliver is

16   precluded.

17           **THE COURT:**  If Oliver were precluded, the corollary

18   would be that all of the people who settled in *Alston* would be

19   precluded from being part of this case.

20           **MR. BERMAN:**  That's right.

21           **THE COURT:**  That might be a lot of them.

22           **MR. BERMAN:**  It would be a pretty sweeping ruling,

23   again, in a case that was not based on NIL, based on different

24   facts.

25           **THE COURT:**  Do you see any way of distinguishing

1    between Oliver's group license claim and his social media

2    claim?

3            **MR. BERMAN:**  Yes, if you wanted to.  But, again, you

4    pointed out during *Alston* that the NIL claims were not before

5    the Court.

6        You were very firm during the trial on this.

7            **THE COURT:**  I don't remember that part.

8            **MR. BERMAN:**  I do.  As a proponent of the evidence, I

9    do.

10       My last point, Your Honor, you asked the question of

11   whether we should wait to see what the NCAA does.  And the

12   answer to that from our perspective is no for a variety of

13   reasons.

14       One is, the statute of limitations is ticking.  So we can

15   only go back four years.  We might as well stop the clock on

16   the damages side of the case.

17       And on the judgment side of the case, we think that our

18   lawsuit has a deterrent effect; that the NCAA knows we are out

19   here.  It's just like when we filed the lawsuit in *Alston*, at

20   that point they were not paying COA.  But after the lawsuit

21   was filed, during the trial of *O'Bannon*, they went to COA.

22       So, we think that having our case go forward, even though

23   the NCAA hasn't decided everything, is the right course at

24   this point.

25           **THE COURT:**  What is your view of the significance, if

1  any, of the 33 states who've passed NIL legislation?

2         MR. BERMAN:  We think that is very significant in

3  this regard:  Because the NCAA took the position in *O'Bannon*,

4  and as you know, that if there was payment, NIL payments, that

5  consumer demand would go down and they would lose their status

6  and demand for the sport.

7     And I think what the legislature action is showing is the

8  opposite.  The legislatures are saying, we love college

9  sports, we want the kids to get paid.  In fact, they are

10  saying we are not going to stop watching, let's just make it

11  fair.

12         THE COURT:  There's no legal significance to that

13  that you point to?

14         MR. BERMAN:  Well --

15         THE COURT:  The Ninth Circuit asked for briefing on

16  it and I sort of wondered whether -- what the legal

17  significance might be of it.  And the same goes for Judge

18  Smith's theory of cross markets in antitrust.  I don't know

19  that that has any effect, since as Mr. Kilaru points out, it's

20  a concurring opinion and sort of said that the Ninth Circuit

21  law was otherwise.

22         MR. BERMAN:  Well, in my view, it is just his

23  opinion.  But what he's saying really would be another basis

24  to deny their motion.

25     Because their procompetitive justification is in the

1    market for consumer demand for NCAA football and basketball.

2    And that's not the market at issue here.

3        So what he's saying is, you know, you wouldn't be looking

4    at that defense at all in this case because it's irrelevant to

5    the market as we've defined it.

6        I don't think that's something the Court needs to weigh in

7    on now because it's not really before the Court in the

8    briefing.

9            THE COURT:  Give me a minute to look at my notes.

10           MR. BERMAN:  Yes, Your Honor.

11               (Pause in the proceedings.)

12           MR. KILARU:  Your Honor, I know you are looking at

13   your notes, but I do have a few points in response whenever --

14           THE COURT:  Yeah, I'll turn back to you when I am

15   finished with Mr. Berman.

16           MR. KILARU:  Thanks.

17               (Pause in the Proceedings.)

18           THE COURT:  I was interested in your point in the

19   complaint that another difference might be different less

20   restrictive alternatives that could be or are being proffered.

21   In particular, you mentioned one that could be that the NCAA

22   would need to allow money to student-athletes for NIL from

23   third parties only.

24       Wouldn't -- as I understand that argument to be, wouldn't

25   require the NCAA to allow the schools to pay themselves, but

1    would only require the schools to allow third parties to pay

2    them, which is similar, at least in the California

3    legislation?  I don't know how all the states' legislation

4    reads.  But the idea of the California legislation is to at

5    least allow third-party payments not to say that schools need

6    to pay more.

7        So can you -- is that something that you could perhaps

8    limit your claim to?  Or is that something one would need to

9    wait until the LRA argument came along?

10           **MR. BERMAN:**  I think that's something -- and we were

11   just giving an example of LRAs that could result in this case

12   that weren't part of *O'Bannon* and weren't part of *Alston*.  But

13   I do think that, as you know from the *Alston* case, determining

14   the scope of the LRAs is a rather fact intensive and expert

15   intensive endeavor, but I think we need to do -- here before

16   we decide that issue.

17           **THE COURT:**  Okay.  Mr. Kilaru, did you want to

18   respond?

19           **MR. KILARU:**  Thanks, Your Honor.  Just on a few

20   points.

21       First, I just want to be clear that our argument is, in

22   fact, that the case as a whole is barred by stare decisis,

23   both the social media class and the group licensing class.  We

24   do believe there are some specific arguments as to the group

25   licensing class, but we do think the case as a whole is

1    precluded.

2         Second, as to the point Your Honor just made about

3    third-party payments, it's not correct that that was not part

4    of *O'Bannon*.  In *O'Bannon*, this Court rejected a third

5    proposed less restrictive alternative.

6         This is at page 1064 of the opinion.  I'm not sure which

7    one it is, but I believe it was -- excuse me, it was the final

8    opinion.  So it's page 984 of the final opinion.

9         Plaintiffs' third proposed alternative allowing

10   student-athletes to receive money for endorsements -- and if

11   you look at the rest of the opinion, it was talking about

12   third-party endorsements -- does not allow a less restrictive

13   way for the NCAA to receive its -- to achieve its purposes.

14        So that third-party payment idea was actually part of

15   *O'Bannon*.  It was rejected as a less restrictive alternative

16   there.  So I think that claim actually shouldn't be allowed to

17   go forward in particular based on the preclusion and stare

18   decisis ideas.

19        Second, I would say -- third, I guess, depending on what

20   they are asking for, I think they are precluded either way,

21   but there are particular problems on the group licensing

22   front.  So to the extent they are asking for more money from

23   schools, directly from schools, that's not a group licensing

24   right.  That's just a claim for more compensation from the

25   schools.  That's precluded by *O'Bannon*.

1          To the extent they are trying to make some argument as to

2     group licenses, some stake of group licenses, there's one

3     other argument we've made that I think is quite important,

4     which is that there is no right student-athletes have in

5     broadcasts.

6          I mean, this is a point that I think there have been a

7     number of cases that have addressed -- we've cited more -- we

8     cited a great deal of them.  And the plaintiffs, who were the

9     ones bringing this claim and have a burden of stating a

10    plausible claim of injury, have to meet that burden, and I

11    don't think they have given you a single case that suggests

12    that it's even debatable whether student-athletes have rights

13    in a broadcast.

14         I think they have offered you really two arguments on this

15    front and neither works.

16            **THE COURT:**  You know, I think that great zucchini

17    case argument has been briefed so many times and so

18    extensively that I am pretty aware of what the cases are and

19    what your respective positions are on that point.

20            **MR. KILARU:**  I appreciate that, Your Honor.

21         Just to make one point clear, though, the argument we are

22    making here is not about whether there's First Amendment

23    preclusion, which I think is what the focus was in the

24    previous cases, it's about whether there's a right of

25    publicity at all.

1          **THE COURT:**  Right.

2          **MR. KILARU:**  And the plaintiffs have not identified a

3    single case in their briefs, not one, that actually says that

4    student-athletes or any participant in a broadcast has a right

5    of publicity.

6          And to the extent they have pressed this argument that we

7    can proceed on the theory that those rights are uncertain and

8    schools may -- and broadcasters may pay for them simply

9    because they are uncertain, I think the Ninth Circuit came

10   pretty close to rejecting that in *O'Bannon* when it declined to

11   extend that theory beyond the context of video games to the

12   context of TV broadcasts.

13         There was a claim for broadcast.  And in the District

14   Court, this Court found that this uncertain rights theory

15   would work in the context of payments for broadcast revenue.

16   But the Ninth Circuit said it was not addressing that

17   question.  It called it a thorny question, and it said the

18   relevant question was whether there are enforceable rights of

19   publicity that exists.

20         I think it would have been quite easy if they agreed with

21   the view that hypothetical rights in the broadcast context

22   were enough for them to say so and address that argument the

23   same way they addressed the video game context.  They actually

24   didn't.  They declined to do it.

25         And I note that Judge Thomas, who wrote the dissent,

1   actually, who thought the decision of the majority didn't go

2   far enough, actually said he wouldn't have found antitrust

3   injury at all but for the video game point.  So I don't think

4   they have any plausible claim for a right of publicity, and

5   thus, I don't think they have any basis to bring the group

6   licensing claim.

7       The last very quick point I'd note, just as factual

8   matter, it's not true that the NCAA monetizes the student --

9   the social media of student-athletes.  That's just not

10  correct.  The Conferences don't do it.  The student-athletes

11  don't do it.  They have their profiles, but we do not monetize

12  those.

13          **THE COURT:**  They do monetize those, or they don't?

14          **MR. KILARU:**  They do not monetize student-athletes --

15          **THE COURT:**  Do they monetize their own school sites?

16          **MR. KILARU:**  Yes, I believe there is social media --

17          **THE COURT:**  I think I saw some screenshots actually

18  and they did seem to have athletes on them.

19          **MR. KILARU:**  Right.  But I think the claim that was

20  made is that we're monetizing the individual student-athletes'

21  social media, which is not correct.

22          **THE COURT:**  Oh, no.  I just wondered if they used the

23  student-athletes' NIL in social media that they in turn

24  monetized.  And it seems like I saw some screenshots of that

25  somewhere.  I don't know where.

1      Okay.

2            **MR. KILARU:**  And then two very quick things.  I know

3      we are getting a little late.

4            **THE COURT:**  And we need to do the Case Management

5      Conference.

6            **MR. KILARU:**  On the point you asked, Your Honor,

7      about the Oliver versus *Alston* -- the Oliver versus stare

8      decisis issue, I think the actual difference is that Oliver

9      has contractually bargained away his rights to pursue damages.

10           So, yes, the stare decisis argument applies to him as

11     well.  But he's actually signed a release of any claims that

12     come out of the --

13           **THE COURT:**  Oh, no.  I was curious about whether the

14     res judicata argument was stronger than the stare decisis

15     argument.

16           **MR. KILARU:**  It is in the sense that you have all of

17     the same arguments plus the contract.  But, you know, I think

18     that for all the student-athletes that signed that release, I

19     think they are in that position.

20           The very last thing I would say is, on the timing --

21           **THE COURT:**  I have a feeling everything is the very

22     last thing.

23           **MR. KILARU:**  I promise this is the last one.  I know

24     everyone who has heard me talk before, has heard me say that a

25     million times.  I promise this is the last one.

1          This notion that the lawsuit should be maintained as a

2     deterrent against the NCAA.  I don't think there's any

3     conception in antitrust injury or antitrust lawsuits that

4     would allow a lawsuit to be maintained simply as having a

5     deterrent effect.

6          I would submit that the fact that legislatures and the

7     NCAA itself are actively considering this set of reforms is

8     all the more reason that the court should not intervene while

9     the rules, as they are now, remain as they were before.

10          **THE COURT:**  Okay.  Let's turn to the Case Management

11     Conference, and we will do that in both cases at the same

12     time.

13          Who is speaking on that?

14          **MR. BERMAN:**  I will be speaking, Your Honor.

15          **THE COURT:**  For defendants?

16          **MR. KILARU:**  Me, as well, Your Honor.

17          **THE COURT:**  Okay.

18          So you have a dispute about whether discovery should be

19     stayed.  I think not.  I think you should start with document

20     discovery and don't get into interrogatories or depositions

21     until things are more clear, but at least you can start on

22     documents.

23          And I don't like to bifurcate discovery because all it

24     leads to is fighting over which side of the bifurcation it

25     comes on.  So as long as it is documents, go ahead and do it.

1    So you've got a little chart here.  What I tried to do and

2    I hope I got somewhere in the ballpark of picking a date that

3    seemed better and then seeing where that led to, but I didn't

4    look to see if they were all weekdays or exactly count out the

5    dates.  I'm going to give you the general concept, and then I

6    hope you can take that and come up with a schedule.

7    We would start with discovery commencing -- I was going to

8    say today, but it's probably too late now, but tomorrow --

9    **MR. BERMAN:**  It's never too late in the day, Your

10   Honor.

11   **THE COURT:**  It's three hours earlier here than it is

12   in the East so they probably wouldn't appreciate it too much.

13   Initial disclosures, I take it you did on November 13th?

14   **MR. KILARU:**  That's correct, Your Honor.

15   **THE COURT:**  And the Case Management Conference we are

16   having right now and the hearing on the motion to dismiss we

17   are having right now.

18   The stipulated order for electronic discovery, I think you

19   can go ahead and do that on December 11th, 2020 as plaintiffs

20   suggest.

21   You both want the deadline for adding additional parties

22   or claims to be 30 days after a ruling on a motion to dismiss.

23   So just for purposes of getting an idea of future dates that

24   are keyed off of this date, I'm just going to say, although I

25   won't promise, but let's -- or even threaten, but let's say I

1    were to get an order out on December 1st, just use that as a

2    placeholder for counting.

3        Then we would have the deadline to add additional parties

4    or claims being something like January 1st, and the answer

5    being something like February 1st of 2021.

6        Then you have completion of production of relevant

7    documents from *Alston* and *O'Bannon*.  Why in the world do you

8    need to produce those?  You don't want another copy of them.

9    Don't you have all those things?

10        Can't you just stipulate that all the *O'Bannon* and *Alston*

11    documents are these documents, too, and get it over with?

12            **MR. KILARU:**  Your Honor --

13        **THE COURT:**  And not another whole set and look at

14    another whole set, unless there's new ones or something.  No,

15    there wouldn't be new ones.  We are talking just about the

16    *Alston* and *O'Bannon* documents.  Why not just agree that those

17    documents are deemed produced in this case?

18            **MR. KILARU:**  Your Honor, I think the reason for that

19    is, that the documents at this point are so unwieldy and so

20    vast.  I mean, I think --

21            **THE COURT:**  It is only going to get worse.

22            **MR. KILARU:**  Well, right, but I think a different --

23            **THE COURT:**  You don't have to agree to it; just have

24    to produce another set of them.

25            **MR. KILARU:**  Right.  But I think a different way to

1    approach that would actually be to have discovery targeted to

2    the claims and the statute of limitations period in this

3    case --

4            **THE COURT:**  But they already have all these

5    documents.  They can just look at them.

6            **MR. KILARU:**  In a different case, Your Honor.  I

7    mean, I think --

8            **THE COURT:**  So what?  It's the same document unless

9    they are making them up.

10           **MR. KILARU:**  Your Honor, I think at the end --

11           **THE COURT:**  If they are not relevant, they are not

12   relevant.  Why should you have to produce them again?

13           **MR. KILARU:**  I think the point is more that we don't

14   think all of those documents should hand-in-glove be deemed

15   admissible in this case --

16           **THE COURT:**  I'm not saying they're admissible.  I'm

17   saying they are deemed produced.  You produced them.  You

18   don't have to produce them again.

19           **MR. KILARU:**  I think, Your Honor, as the case goes

20   on, it will become quite complicated if all of the documents

21   from the previous case are in the record, plus all the new

22   ones.

23           **THE COURT:**  I'm going to deem all the documents from

24   all -- am I right, Mr. Berman?

25           **MR. BERMAN:**  Yes.  That's what we would like to do,

1    Your Honor.

2              **THE COURT:**  I didn't know that, but it seems obvious

3    to me.  So I'm just going to deem all the documents that were

4    produced in *Alston* and *O'Bannon* are deemed produced in this

5    case, unless there's some particular reason for a particular

6    document that's a problem.  Like somebody's privacy or

7    confidentiality or fraudulent forgeries, or some reason for

8    not --

9              **MR. KILARU:**  Your Honor --

10             **THE COURT:**  I'll deem them produced.

11             **MR. KILARU:**  -- we will take your guidance on that.

12   But if I could just suggest, I think this would be an area

13   where it would be appropriate for us to meet and confer with

14   the other side on exactly what should come in.  I think

15   even --

16             **THE COURT:**  I'm not saying it comes in.  I am just

17   saying it's produced.

18             **MR. KILARU:**  Right.  But even their request was only

19   for the production of relevant documents from *Alston* and

20   *O'Bannon*, and not for all the documents.  That's what's in the

21   statement.

22             **THE COURT:**  This is better for you.  You want to go

23   through and find -- cull through them again, and look at them

24   again, and copy them again and figure out what's relevant or

25   not?

1        It's -- the game is over if you don't have to produce them

2    over again.  It doesn't stop you from moving to exclude them.

3        So if you have some particular reason about a particular

4    document, or something, you can tell me about it, but this

5    seems like a no-brainer to me.

6        Now then you want documents to include but not be limited

7    to any structured data requested of a party.  I'm sorry, maybe

8    I should know this, but I do not know what you mean by

9    "structured data."  Like a database?  Statistical tables?

10       What's -- what is structured data?

11            **MR. BERMAN:**  Your Honor, can I defer to one of my

12   colleagues who negotiated that?  I don't really know.

13            **THE COURT:**  You don't know either?

14            **MR. BERMAN:**  No.  Mr. Siegel, you want to do that

15   one?

16            **MR. SIEGEL:**  Thank you, Your Honor.

17       I think what we mean here is that the production of

18   documents would include but not be limited to structured data.

19   So data is like if we had data from defendants on like how

20   much they receive in compensation from, you know, broadcasters

21   or how much they receive in NIL compensation, that the data --

22   databases where this data is stored would be produced, if

23   relevant, alongside the other documents.  We just want to be

24   clear that documents includes that kind of data and doesn't

25   exclude it.

1          A lot of times this data is very relevant to class

2    certification analysis.  Say a class certification expert

3    wants to do damages analysis or impact analysis, we want to

4    make sure their experts are getting data from the parties in

5    enough time so they can do their analysis for class

6    certification.  We want to be clear that that should be

7    produced with the other documents.

8          MR. FULLER:  Your Honor, since only one of the people

9    on the Zoom seems to know what structured data is, can we get

10   a definition so that we know what we're doing?  If something

11   happened to Mr. Siegel, we would all be lost.

12         THE COURT:  I'm just going to -- you will just have

13   to make that obvious in some document production request that

14   explains what it is you want.

15         MR. SIEGEL:  Thank you, Your Honor.

16         THE COURT:  I'm glad it wasn't just me.

17      So as a result of that, not knowing what that was, I

18   actually didn't choose a date for that.  The fight is between

19   June 1 and 12 months after, which would be more like December

20   of 2021.  Let's try for June 1 since you are going to have so

21   many fewer documents to produce because of the *Alston* and

22   *O'Bannon* situation.

23      Then we have deadline to depose plaintiffs' class

24   experts -- I'm sorry, I missed the class cert motion.  The 17

25   months seems to land around May 22nd.  So I'm going to go with

44

1    that for filing.  And then --

2              MR. KILARU:  Sorry, Your Honor.  May?

3              THE COURT:  That can't be right.  No, must be

4    November -- I'm sorry, November 22nd is the one I'm going

5    with.

6         Seventeen months the defendants want would have landed us

7    in May of 2022, but I don't think we need to do that.  Let's

8    say class cert motion and supporting expert reports is

9    November 22nd, 2021.

10        And then the deadline to depose, defendant wants 60 days,

11   so we can do that.  So January 31st.  And then the opposition

12   can come in on February 28th.

13        And the deadline to depose defendants' experts,

14   March 31st.  And class cert reply and rebuttal April 30th.

15        And we will just go with no supplemental depositions will

16   be scheduled and you will need to try to work that out or ask

17   the Court.

18        The hearing of the class cert would end up being on

19   May 31st of 2022.

20        And, again, for purposes of calculation, even though I

21   don't know if it will be done by then, let's assume that I get

22   the order out by June 30th of 2022, and then we go for merit

23   motion discovery cutoff 42 days after that, which would be

24   something like July 15th, 2022.

25        And then we would have merits expert disclosures,

1    something like 35 days later, as defendant says.  That would

2    be August 15th of 2022.  Reply would be something like 60 days

3    after that, October 15th, 2022.  Merits reply a month after

4    that, November 15th, 2022.  Expert discovery cutoff about a

5    month after that, December 15th, 2022.

6         And then plaintiffs make their dispositive motions and

7    *Daubert* motions five or six weeks after that.  So let's call

8    it February 15th, 2023.

9         Now, what I would like in that is one motion.  I don't

10   want six different dispositive motions.  I need one motion.

11   And presumptively it's 25 pages.  I imagine it's not going to

12   be that short, but you need to ask in plenty of time if you

13   want it to be longer.

14        And, really, it's most helpful to have the *Daubert*

15   interspersed with the summary judgment anyway because then you

16   can say, this expert shouldn't be heard to say this, but if he

17   is, then we win anyway because of that.  It is all sort of

18   intertwined.

19        And then the opposition is due on March 31st, 2023, but

20   for defendants, the opposition would be your opposition and

21   your cross-motion and your opposition to *Daubert* and your

22   *Daubert* motions.  So, again, try to do that in 25 pages.  I

23   recognize you probably won't be able to, but you will need to

24   ask for more space to do that.  But it's one big brief that

25   responds to their motion and includes your own motion.

1       Then after that we'd have this reply and opposition, which

2   would be one brief, on April 31st, 2023.  Defendants' reply

3   and opposition on May 31st, 2023.

4       Plaintiffs, what would actually I guess, be a sur-reply

5   assuming we get to that, June 13th, 2023, and we'd try to have

6   the hearing somewhere around July 15th, 2023.  And that would

7   mean that the earliest we could try the case would be

8   something like October of 2023.  And that's very aggressive

9   and probably not realistic, but just to get an idea.

10      If all of that sounds bad, you can sit down and try and

11  work out something better.  Be sure you -- you will have to

12  fix it so everything happens on a weekday and that preferably

13  things happen in multiples of seven.  So if something is due

14  on a weekday, then the thing that's due after that is 14 days,

15  28 days, 35 days, whatever.

16      Is that clear?

17          **MR. KILARU:**  Your Honor, you would like us to submit

18  something that memorializes all these deadlines.  I'm sure we

19  can work it out.

20          **THE COURT:**  Okay.  Anything else then for plaintiff?

21          **MR. BERMAN:**  Your Honor, the only thing I would say

22  is, I miss all my colleagues that I used to be in the

23  courtroom together for many years litigating these cases.

24  It's really nice to see you, Scott, and other defense counsel.

25  I hope you are doing well.

1          Thank you, Your Honor.

2              **THE COURT:**  I will second that.  I hope that by the

3     time we have some of these hearings and trials that we will be

4     back in the courtroom.

5          Anything else from defendants?

6              **MR. KILARU:**  Just one question, Your Honor.

7          We weren't aware if you had referenced the case to a

8     magistrate yet.  Is that something you were planning to do for

9     any disputes that arise as things go forward?

10             **THE COURT:**  Judge Cousins is my person on NCAA.  I

11    haven't told him yet, but he'll probably figure it out.

12             **MR. KILARU:**  I suspect he may see it coming.

13         Other than that, we very much echo everything Mr. Berman

14    said.  We hope we can be back in the courtroom soon.

15             **THE COURT:**  All right.  Great.  Thank you everyone.

16             **MS. MILLER:**  Have a good holiday.

17             **THE COURT:**  You too.

18                 (Proceedings concluded at 4:14 p.m.)

19

20

21

22

23

24

25

### CERTIFICATE OF REPORTER

I, Diane E. Skillman, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*Diane E. Skillman*

DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

Friday, November 20, 2020