UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GRANT HOUSE, et al.,<br><br>          Plaintiffs,<br><br>     v.<br><br>NATIONAL COLLEGIATE ATHLETIC<br>ASSOCIATION, et al.,<br><br>          Defendants. | Case Nos. 4:20-cv-03919 CW<br>          4:20-cv-04527 CW<br><br>ORDER GRANTING IN PART AND<br>DENYING IN PART MOTIONS TO<br>DISMISS<br><br>Re: Docket No. 101 in Case<br>No. 4:20-cv-03919 CW<br><br>Docket No. 35 in Case No.<br>4:20-cv-04527 CW |
| TYMIR OLIVER,<br><br>          Plaintiff,<br><br><br>     v.<br><br>NATIONAL COLLEGIATE ATHLETIC<br>ASSOCIATION, et al.,<br><br>          Defendants. | |

United States District Court
Northern District of California

     Now before the Court are Defendants'[1] motions to dismiss the complaint in two separate actions: (1) House v. National Collegiate Athletic Association, 4:20-cv-03919 (House); and (2) Oliver v. National Collegiate Athletic Association, 4:20-cv-04527 (Oliver).  Plaintiffs[2] oppose the motions.  For the reasons set

---

[1] Defendants are the National Collegiate Athletic Association (NCAA), Pac-12 Conference, The Big Ten Conference, The Big 12 Conference, Southeastern Conference, and Atlantic Coast Conference.

[2] The named plaintiffs in House are Sedona Price and Grant House, and the named plaintiff in Oliver is Tymir Oliver (collectively, Plaintiffs).

1    forth below, the Court GRANTS Defendants' motion to dismiss Tymir

2    Oliver's claims for injunctive relief, without leave to amend,

3    and it otherwise DENIES the motions.

4    I.   BACKGROUND

5         In House and Oliver, student-athletes[3] challenge a subset of

6    NCAA rules that "prohibit student-athletes from receiving

7    anything of value in exchange for the commercial use" of their

8    names, images, and likenesses (NIL).  House Compl. ¶¶ 5, 73-80,

9    267-89; Oliver Compl. ¶¶ 5, 55-62, 246-68.  The challenged rules,

10   among other things, prohibit student-athletes from endorsing any

11   commercial product or service while they are in school,

12   regardless of whether they receive any compensation for doing so

13   (Division I Bylaw 12.5.2.1); prohibit student-athletes from

14   receiving compensation for their NIL from outside employment

15   (Division I Bylaws 12.4.1, 12.4.1.1, 12.4.2.3); and prohibit

16   student-athletes from using their NIL to promote their own

17   business ventures or engage in self-employment (Division I Bylaw

18   12.4.4).  House Compl. ¶¶ 77-79; Oliver Compl. ¶¶ 59-61.  The

19   challenged rules also allegedly preclude student-athletes from

20   benefitting financially from their social media posts, personal

21   brands, viral videos depicting their athletic performances,

[3] Grant House is a current student-athlete at Arizona State
University who competes in Division I swimming and diving.  House
Compl. ¶ 27.  Sedona Price is a current student-athlete at the
University of Oregon who competes in Division I women's
basketball.  Id. ¶ 39.  Tymir Oliver is a student-athlete who
competed in Division I football for the University of Illinois.
Oliver Compl. ¶ 27.  These athletes allege that they have not
derived any personal profit from the use of their NIL in
advertisements for their school teams, in their social media
posts, or otherwise, as a result of the NCAA rules they challenge
here.

United States District Court
Northern District of California

apparel sponsorships, and other opportunities related to the use of their NIL.  House Compl. ¶¶ 116-149; Oliver Compl. ¶¶ 98-130. The challenged rules also allegedly prohibit NCAA member conferences and schools from sharing the revenue they make from their broadcasting contracts with networks, marketing contracts with companies that make sports apparel, social medial sponsorships, and other commercial activities that involve the use of student-athletes' NIL.  House Compl. ¶¶ 120-149, 237; Oliver Compl. ¶¶ 101-17, 216.

Plaintiffs aver that, absent the challenged rules, the NCAA and its member conferences and schools would allow student-athletes to take advantage of opportunities to profit from their NIL, and NCAA member conferences and schools would share with student-athletes the revenue they receive from third parties for the commercial use of student-athletes' NIL.

Plaintiffs define the relevant market as follows:

> The relevant market is the nationwide market for the labor of NCAA Division I college athletes.  In this market, current and prospective athletes compete for roster spots on Division I athletic teams.  NCAA Division I member institutions compete to recruit and retain the best players by offering unique bundles of goods and services including scholarships to cover the cost of attendance, tutoring, and academic support services, as well as access to state-of-the-art athletic training facilities, premier coaching, medical treatment, and opportunities to compete at the highest level of college sports, often in front of large crowds and television audiences.  In exchange, student-athletes must provide their athletic services and acquiesce in the use of their NILs by the NCAA and its members for commercial and promotional purposes.  They also implicitly agree to pay any costs of attending college and participating in intercollegiate

United States District Court
Northern District of California

> athletics that are not covered by their
> scholarships. . . . The NCAA and its members
> have the ability to control price and
> exclude competition in this market.  All
> NCAA members have agreed to utilize and
> abide by the NCAA's bylaws, including the
> provisions detailed herein, which have been
> used by the NCAA and its members to fix the
> prices at which student-athletes are paid
> for their commercial licensing rights,
> including but not limited to individual and
> group licensing rights, and/or to foreclose
> student-athletes from exercising any such
> rights entirely.  The NCAA and its members
> have the power to exclude from this market
> any member who is found to violate its
> rules. . . . Absent these nationwide
> restraints, Division I conferences and
> schools would compete amongst each other by
> allowing their athletes to take advantage of
> opportunities to utilize, license, and
> profit from their NILs in commercial
> business ventures and promotional activities
> and to share in the conferences' and
> schools' commercial benefits received from
> exploiting student-athletes' names, images,
> and likenesses.  Conferences and schools
> would also compete for recruits by
> redirecting money that they currently spend
> on extravagant facilities and coaching
> salaries to marketing programs and
> educational resources designed to help their
> student-athletes develop and grow their
> personal brand value.

House Compl. ¶¶ 81-87; Oliver Compl. ¶¶ 63-70.

According to Plaintiffs, the rules they challenge cannot be justified on the basis that they are necessary to preserve consumer demand for college sports as a distinct product because any such procompetitive effect, to the extent that it exists, would fall outside of the scope of the relevant market and is therefore irrelevant to the Rule of Reason analysis.  House Compl. ¶¶ 158-60, 179; Oliver Compl. ¶¶ 139-41, 160.

Alternatively, Plaintiffs allege that, to the extent that the preservation of consumer demand for college sports as a distinct product is deemed to be a procompetitive effect within

4

the relevant market, the challenged rules are not necessary to
achieve that effect because (1) the NCAA has granted more than
200 waivers since 2015 permitting student-athletes to use or
profit from their NIL, and demand for college sports has not
decreased as a result, House Compl. ¶¶ 224-27; Oliver Compl. ¶¶
205-08; and (2) recent surveys suggest that consumer demand for
college sports would not decrease if student-athletes were
permitted to profit from their NIL, House Compl. ¶¶ 162-65;
Oliver Compl. ¶¶ 143-46.  Plaintiffs further aver that the NCAA
recently changed its official policy on NIL compensation by
supporting proposals that would permit student-athletes to
receive NIL compensation to some degree.  House Compl. ¶ 18;
Oliver Compl. ¶ 18.  According to Plaintiffs, these facts
demonstrate that it is not the case, as Defendants represented in
prior lawsuits, that permitting student-athletes to receive
compensation for their NIL would irreparably damage demand for
college sports.  House Compl. ¶ 19; Oliver Compl. ¶ 19.

Plaintiffs allege that the challenged rules violate federal
antitrust laws and the common law because they (1) fix at zero
the amount that student-athletes may be paid for the licensing,
use, and sale of their NIL; and (2) foreclose student-athletes
from the market for licensing, use, and sale of their NIL.
Plaintiffs assert claims for (1) conspiracy to fix prices in
violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (2)
group boycott or refusal to deal in violation of Section 1 of the
Sherman Act; and (3) unjust enrichment.  Plaintiffs assert these
claims on their own behalf and on behalf of the following
proposed class and sub-classes.

The "Declaratory and Injunctive Relief Class" is comprised of:

> All current and former student-athletes who compete on, or competed on, an NCAA Division I athletic team at any time between four (4) years prior to the filing of this Complaint and the date of judgment in this matter.

House Compl. ¶ 22 n.16; Oliver Compl. ¶ 22 n.16.  Plaintiffs request an injunction permanently restraining Defendants from enforcing their alleged agreements to restrict the amount of NIL compensation that members of this proposed class can receive. Id.

The "Social Media Damages Sub-Class" is comprised of:

> All current and former student-athletes who compete on, or competed on, an NCAA Division I athletic team at a college or university that is a member of one of the Power Five Conferences, at any time between four (4) years prior to filing of this Complaint and the date of judgment in this matter.

House Compl. ¶ 23 n.17; Oliver Compl. ¶ 23 n.17.  On behalf of this sub-class, Plaintiffs seek the social media earnings that members of this sub-class would have received absent Defendants' unlawful conduct.  Id.

The "Group Licensing Damages Sub-Class" is comprised of:

> All current and former student-athletes who compete on, or competed on, an NCAA Division I men's or women's basketball team or an FBS football team, at a college or university that is a member of one the Power Five Conferences, at any time between four (4) years prior to the filing of this Complaint and the date of judgment in this matter.

House Compl. ¶ 23 n.18; Oliver Compl. ¶ 23 n.18.  On behalf of this sub-class, Plaintiffs seek the share of game telecast group

licensing revenue that members of this sub-class would have received absent Defendants' unlawful conduct.  Id.

II.  LEGAL STANDARD

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  The plaintiff must proffer "enough facts to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 697 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  On a motion under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests.  Twombly, 550 U.S. at 555.  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.

In considering whether the complaint is sufficient to state a claim, the court will take all material allegations as true and construe them in the light most favorable to the plaintiff. Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1061 (9th Cir. 2008).  The court's review is limited to the face of the complaint, materials incorporated into the complaint by reference, and facts of which the court may take judicial notice. Id. at 1061.  However, the court need not accept legal conclusions, including threadbare "recitals of the elements of a cause of action, supported by mere conclusory statements." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555).

United States District Court
Northern District of California

III.  DISCUSSION

     Defendants argue that the complaints in House and Oliver are subject to dismissal with prejudice because (1) the complaints are barred under the doctrine of stare decisis in light of O'Bannon v. Nat'l Collegiate Athletic Ass'n, 802 F.3d 1049 (9th Cir. 2015) (O'Bannon II) and In re Nat'l Collegiate Athletic Ass'n Grant-in-Aid Cap Antitrust Litig., 958 F.3d 1239 (9th Cir. 2020), aff'd sub nom. Nat'l Collegiate Athletic Ass'n v. Alston, No. 20-512, __ S. Ct.__, 2021 WL 2519036 (U.S. June 21, 2021) (Alston II); (2) the claims of the "Group-Licensing Damages Sub-Class" fail as a matter of law because the members of that sub-class have no publicity rights in game broadcasts, and even if they did, Plaintiffs have not alleged injury to competition in the "Group Licensing Market" that was adjudicated in O'Bannon; and (3) the claims of named plaintiff Tymir Oliver fail as a matter of law because he lacks standing to seek injunctive relief as a former student-athlete, and because he released his damages claims in the Alston settlement.

     The Court addresses each of these arguments in turn.

     A.   Stare Decisis

     "Stare decisis binds 'today's Court' to 'yesterday's decisions.'"  Alston II, 958 F.3d at 1253 (citation omitted). "'Insofar as there may be factual differences between the current case' and the prior case, courts 'must determine whether those differences are material to the application of the rule or allow the precedent to be distinguished on a principled basis.'"  Id. (citation omitted).

8

United States District Court
Northern District of California

1    "Antitrust decisions are particularly fact-bound.  The

2    Supreme Court has long emphasized that the Rule of Reason

3    'contemplate[s]' 'case-by-case adjudication.'"  Id. (quoting

4    Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877,

5    899 (2007)).  "Continuing contracts in restraint of trade" are

6    "typically subject to continuing reexamination," and "even a

7    judicial holding that a particular agreement is lawful does not

8    immunize it from later suit or preclude its reexamination as

9    circumstances change."  Phillip Areeda & Herbert Hovenkamp,

10   Antitrust Law: An Analysis of Antitrust Principles and Their

11   Application, ¶ 1205c3 (4th ed. 2018).

12       Defendants argue that stare decisis compels the dismissal of

13   House and Oliver because the Ninth Circuit "validated" in both

14   O'Bannon II and Alston II the NCAA rules limiting student-athlete

15   compensation that Plaintiffs now challenge in House and Oliver.

16   Defendants contend that the claims asserted in House and Oliver

17   are identical to the ones litigated in O'Bannon II, and that the

18   claims in House and Oliver were also encompassed by the Alston

19   litigation because the plaintiffs in Alston challenged the NCAA's

20   entire compensation framework.  See Mot. at 3-4.

21       As an initial matter, the Court is not persuaded by

22   Defendants' contention that the present actions are subject to

23   dismissal on the ground that the Ninth Circuit validated certain

24   NCAA rules limiting NIL compensation in O'Bannon II and Alston

25   II.  The Ninth Circuit made clear in both O'Bannon II and Alston

26   II that any holdings in those cases with respect to whether

27   certain NCAA limits on student-athlete compensation could be

28   enjoined as anticompetitive were based on, and limited to, the

9

1   record presented in those cases.  See. e.g., Alston II, 958 F.3d

2   at 1264 ("[T]his analysis reflects the judgment that limits on

3   cash compensation unrelated to education do not, on this record,

4   constitute anticompetitive conduct and, thus, may not be

5   enjoined.") (emphasis added).  The Ninth Circuit thus left open

6   the possibility for reaching a different conclusion in future

7   litigation to the extent that the parties present a different

8   record.  Indeed, the court of appeals recognized in both O'Bannon

9   II and Alston II that, because the analysis demanded by the Rule

10  of Reason requires the evaluation of "dynamic market conditions

11  and consumer preferences" and is "inherently fact-dependent,"

12  "courts must continue to subject NCAA rules, including those

13  governing compensation, to antitrust scrutiny."  Id. at 1254

14  (citing O'Bannon II, 802 F.3d at 1064 ("The amateurism rules'

15  validity must be proved, not presumed.")).

16      Here, Plaintiffs' allegations, which the Court must construe

17  in their favor at this juncture, raise the reasonable inference

18  that material differences exist between Oliver and House, on the

19  one hand, and O'Bannon and Alston, on the other hand, that

20  distinguish the former from the latter on a principled basis.

21      First, some of the rules that Plaintiffs challenge in House

22  and Oliver were not challenged in O'Bannon or Alston.  These

23  rules include those prohibiting student-athletes from endorsing

24  any commercial product or service while they are in school,

25  regardless of whether they receive any compensation for doing so

26  (Division I Bylaw 12.5.2.1); and prohibiting student-athletes

27  from using their NIL to promote their own business ventures or

28  self-employment (Division I Bylaw 12.4.4).

10

United States District Court
Northern District of California

1    Second, the claims in House and Oliver are predicated on a
2  different legal theory than the claims in O'Bannon II and Alston
3  II and will therefore involve different facts.  Defendants
4  justified the challenged rules in O'Bannon and Alston on the
5  basis that the rules were necessary to preserve consumer demand
6  for college sports as a distinct product and were thus
7  procompetitive.  In O'Bannon and Alston, the Ninth Circuit
8  credited this argument and the evidence that Defendants submitted
9  in support of it and affirmed this Court's holding that the
10  challenged rules could not be invalidated despite their
11  anticompetitive effects because of their role in preserving
12  consumer demand for college sports as a distinct product.
13  O'Bannon II, 802 F.3d at 1058-59, 1072-74; Alston II, 958 F.3d at
14  1257-60.  By contrast, in House and Oliver, Plaintiffs allege
15  that this procompetitive justification cannot save the rules
16  challenged here from being invalidated because any procompetitive
17  effect that the rules may have on consumer demand for college
18  sports falls outside of the relevant market and any such effect
19  is, therefore, irrelevant to the Rule of Reason analysis.
20    This legal theory is based on Judge Milan Smith's
21  concurrence in Alston II.  There, Judge Smith stated that the
22  scope of the inquiry at step two of the Rule of Reason analysis
23  ought to exclude the consideration of any procompetitive effects
24  in collateral markets in the absence of evidence that such an
25  effect has a corollary impact in the relevant market.  Alston II,
26  958 F.3d at 1271.  Judge Smith explained that, because consumer
27  demand for college sports is collateral to the market for
28  student-athletes' labor, the Ninth Circuit had erred in O'Bannon

II and Alston II in crediting at step two any procompetitive

effect of the challenged rules in those cases on the preservation

of demand for college sports without requiring the NCAA to show

that this effect had a corollary impact on the market for

student-athletes' labor:

> At Step Two, the court did not limit its
> consideration to the procompetitive effects
> of the compensation limits in the market for
> Student-Athletes' athletic services.
> Rather, it found that certain of the
> compensation limits are procompetitive
> because they drive consumer demand for
> college sports by distinguishing collegiate
> from professional athletics.  Id. at 1083.
> In other words, the court found that
> limiting Student-Athletes' pay in the market
> for their services was justified because
> that restraint drove demand for the distinct
> product of college sports in the consumer
> market for sports entertainment.  The court
> did not require that the NCAA prove that
> this impact on consumer demand had a
> corollary procompetitive impact on the
> market for Student-Athletes' services, that
> it "increase[d] output" or "widen[ed] the
> choices 'available to athletes.'"  O'Bannon
> II, 802 F.3d at 1072 (quoting Board of
> Regents, 468 U.S. at 102).  The court did
> not require that the NCAA prove its
> compensation rules, within the defined
> market, "increase competition in the
> economic sense of encouraging others to
> enter the market to offer the product at
> lower cost."  Smith, 593 F.2d at 1186.  It
> was enough for the NCAA to meet its Step Two
> burden that it could show (however feebly) a
> procompetitive effect in a collateral
> market. . . . Under the Rule of Reason
> analysis we affirm today, so long as the
> NCAA cites consumer demand for college
> sports, we allow it to artificially suppress
> competition for collegiate athletes'
> services by limiting their compensation.
> Instead of requiring the NCAA to explain how
> those limits promote schools' competition
> for athletes, we leave Student-Athletes with
> little recourse under the antitrust laws.
> Student-Athletes are thus denied the freedom
> to compete and, in turn, "of compensation
> they would receive in the absence of the

1
2
3
4
5
6

> restraints." <u>Id.</u> at 1068.  Our Rule of
> Reason framework has shifted toward this
> cross-market analysis without direct
> consideration or a robust
> justification. . . . Lacking a robust
> justification, I fear that our cross-market
> Rule of Reason analysis frustrates the very
> purpose of the antitrust laws, in this case
> to the great detriment of Student-Athletes.
> I hope our court will reconsider this issue
> in a case that squarely raises it.

7    <u>Id.</u>

8         In their motion, Defendants do not discuss the fact that

9    Plaintiffs' claims in <u>House</u> and <u>Oliver</u> are predicated on a legal

10   theory addressed in Judge Smith's concurrence in <u>Alston II</u>.  This

11   legal theory would require Defendants to proffer facts that they

12   did not have to proffer in <u>O'Bannon</u> and <u>Alston</u>, namely facts

13   showing that any procompetitive effect of the challenged rules on

14   consumer demand for college sports as a distinct product has a

15   procompetitive impact on the relevant market alleged in <u>House</u> and

16   <u>Oliver</u>, which is the market for student-athletes' labor and the

17   right to use their NIL.

18        Third, Plaintiffs allege new factual matter that post-dates

19   <u>O'Bannon II</u> and <u>Alston II</u>.  This new factual matter raises the

20   inference that, to the extent that the preservation of consumer

21   demand for college sports as a distinct product is deemed to be a

22   procompetitive effect within the relevant market, the challenged

23   rules are not necessary to achieve that effect.  Specifically,

24   Plaintiffs allege that, since <u>O'Bannon II</u> and <u>Alston II</u>,

25   Defendants have admitted that restrictions on student-athlete

26   compensation should be loosened or eradicated[4], thereby

27   _____

28   [4] Defendants argue that some of these statements were made in the

United States District Court
Northern District of California

13

1  contradicting their prior representations in both O'Bannon and

2  Alston that such restrictions were absolutely necessary to

3  preserve consumer demand for college sports.  See, e.g., House

4  Compl. ¶¶ 14, 208.  Plaintiffs also allege that surveys conducted

5  since O'Bannon II and Alston II show that consumers of college

6  sports support eliminating the limitations on student-athletes'

7  ability to capitalize on their own NIL or would not stop

8  consuming college sports if student-athletes were allowed to

9  receive compensation for the use of their NIL.  Id. ¶¶ 163-65.

10  Plaintiffs further aver that, since O'Bannon II and Alston II,

11  Defendants have granted hundreds of waivers to student-athletes

12  to profit from or use their NIL in contravention of the rules

13  challenged here, and consumer demand for college sports has not

14  decreased.  See id. ¶¶ 224-27 (alleging that student-athlete was

15  granted a waiver to participate in television show Dancing with

16  ——————————————

17  context of their "lobbying efforts regarding potential
   legislative action," and for that reason, Plaintiffs cannot

18  "impose antitrust liability on the NCAA" based on these
   statements in light of the Noerr-Pennington doctrine, see Mot. at

19  6; see also Eastern Railroad Presidents Conference v. Noerr Motor
   Freight, Inc., 365 U.S. 127 (1961); United Mine Workers v.

20  Pennington, 381 U.S. 657 (1965).  Pursuant to the Noerr-
   Pennington doctrine, "private actors are immune from antitrust

21  liability for petitioning the government, even when the private
   actors' motives are anticompetitive."  Sanders v. Brown, 504 F.3d

22  903, 912 (9th Cir. 2007) (citations omitted).  Plaintiffs argue
   that the Noerr-Pennington doctrine does not preclude them from

23  seeking to use the statements as party admissions to show that
   Defendants agree that the amateur nature of college sports would

24  not be altered if certain NIL rights are granted to student-
   athletes.  The Court finds that Defendants have not shown that

25  the Noerr-Pennington doctrine precludes Plaintiffs from using the
   statements in question as party admissions to support their

26  claims in this action, which arise from Defendants' alleged
   price-fixing by way of certain NCAA rules and not from

27  Defendants' petitioning activities.  Accordingly, the Noerr-
   Pennington doctrine does not preclude the Court from considering

28  the statements in question as allegations of party admissions in
   the context of resolving the present motion to dismiss.

the Stars and to accept as much as $325,000 if she won). Additionally, Plaintiffs allege that new and potentially highly lucrative opportunities for capitalizing on student-athletes' NIL have emerged since O'Bannon II and Alston II, with social media being one of them.  Id. ¶¶ 134-36, 229.

Fourth, because of the distinct factual and legal differences that exist between House and Oliver and O'Bannon and Alston, Plaintiffs here have proposed less restrictive alternatives that were not considered in the prior cases.  One proposed less restrictive alternative here is to require the NCAA to permit its members to allow student-athletes to receive compensation from third parties for the use of their NIL.  See House Compl. ¶¶ 21, 91, 175, 275.

In light of the foregoing, the Court concludes that material differences distinguish House and Oliver from O'Bannon II and Alston II on a principled basis.  Accordingly, House and Oliver are not subject to dismissal on the basis of stare decisis.

B.   Group-Licensing Damages Sub-Class

Defendants argue that the claims of the "Group Licensing Damages Sub-Class" are subject to dismissal for two reasons. First, Defendants argue that the proposed members of the sub-class have no publicity rights in broadcasts of football or basketball games, which precludes them from alleging the requisite injury to their "business or property" under the Clayton Act, 15 U.S.C. § 15(a).  Second, Defendants contend that, even if the sub-class members had such rights, Plaintiffs cannot establish injury to competition because they have not alleged the same "Group Licensing Market" that was adjudicated in O'Bannon.

15

Defendants argue that, because Plaintiffs' request for a share of broadcasting revenue here is "in all material respects identical" to the request for a share of broadcasting revenue in O'Bannon, Plaintiffs must allege injury to competition "in the relevant market for that claim," which Defendants contend is, and can only be, the "Group Licensing Market" defined and adjudicated in O'Bannon. See Reply at 4-5.

Section 4 of the Clayton Act provides:

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15(a).

A plaintiff suing for violations of federal antitrust law may recover damages if it can show: (1) actual injury caused by the antitrust violation; (2) the directness or indirectness of the injury, taking into account possible duplicative recoveries, complex apportionment, and alternative or superior plaintiffs; and (3) injury of the kind that the antitrust laws were intended to prevent. See Associated Gen. Contractors v. Cal. State Council of Carpenters, 459 U.S. 519, 534 (1983). "Antitrust injury does not arise for purposes of § 4 of the Clayton Act . . . until a private party is adversely affected by an anticompetitive aspect of the defendant's conduct[.]" Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 339 (1990) (citation omitted).

United States District Court
Northern District of California

16

United States District Court
Northern District of California

1    Defendants argue that, as a matter of law, Plaintiffs cannot

2  establish that the members of the proposed "Group Licensing

3  Damages Sub-Class" suffered antitrust injury because Plaintiffs

4  must, but cannot, show that the members of the sub-class have

5  rights of publicity in the use of their NIL "in live game

6  broadcasts and archival game footage."  Mot. at 7.

7    To establish that Plaintiffs have not alleged "antitrust

8  injury," Defendants must show that Plaintiffs' injuries are not

9  of the type that the antitrust laws were intended to prevent.

10  See Associated Gen. Contractors, 459 U.S. at 534; see also

11  O'Bannon II, 802 F.3d at 1067 ("Although the NCAA purports to be

12  making an antitrust-injury argument, it is mistaken.  The NCAA

13  has not contended that the plaintiffs' injuries are not "of the

14  type the antitrust laws were intended to prevent.").  Defendants

15  have made no such showing.

16    Defendants argue that, because the members of the sub-class

17  purportedly have no legal entitlement to broadcasting revenue by

18  way of publicity rights in broadcasts, the members of the sub-

19  class have suffered no injury, as the challenged rules do not

20  deprive them of compensation that they would otherwise receive.

21  This argument is not one about antitrust injury, but rather one

22  about injury in fact.  See O'Bannon II, 802 F.3d at 1067 (holding

23  that "the NCAA has made a garden-variety standing argument" by

24  contending that "the plaintiffs have not been injured in fact by

25  the compensation rules because those rules do not deprive them of

26  any NIL compensation they would otherwise receive").

27    A plaintiff can show that it was injured in fact by alleging

28  that it was deprived of the opportunity to receive compensation

it otherwise would have received but for the challenged conduct. To make this showing, a plaintiff need not establish that it has a legal entitlement to the compensation in question. See id. at 1069 ("That the NCAA's rules deny the plaintiffs all opportunity to receive this compensation is sufficient to endow them with standing to bring this lawsuit.") (citing 13A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3531.4 (3d ed. 1998) ("[L]oss of an opportunity may constitute injury, even though it is not certain that any benefit would have been realized if the opportunity had been accorded.") (collecting cases)).

Here, Plaintiffs allege that, absent the challenged rules, "Division I conferences and schools would compete amongst each other by allowing their athletes to . . . share in the conferences' and schools' commercial benefits received from exploiting student-athletes names, images, and likenesses," which include broadcasting revenue. Oliver Compl. ¶¶ 63-70. These allegations are sufficient to raise the reasonable inference that competition among schools and conferences would increase in the absence of the challenged rules, and that this increased competition would incentivize schools and conferences to share their broadcasting and other commercial revenue with student-athletes even if the student-athletes lacked publicity rights in broadcasts. These allegations are sufficient to claim injury in fact at this juncture.

Defendants have not shown that a different conclusion is warranted. Defendants' reliance on non-binding authorities that suggest that student-athletes may not have a legal entitlement to

broadcasts under the laws of some states is misplaced.  <u>See,</u>
<u>e.g.</u>, <u>Marshall v. ESPN Inc.</u>, 111 F. Supp. 3d 815, 826–27 (M.D.
Tenn. 2015), <u>aff'd sub nom.</u> <u>Marshall v. ESPN</u>, 668 F. App'x 155
(6th Cir. 2016) (dismissing student-athletes' claims predicated
on violations of their right of publicity under Tennessee law on
the ground that "Tennessee recognizes no right of publicity in
sports broadcasts").  Defendants cite these non-binding
authorities to support the proposition that student-athletes
cannot establish injury in fact because they do not have
publicity rights in broadcasts.  But, as discussed above, a
plaintiff is not required to establish that it has a legal
entitlement to the compensation in question to show that it was
injured in fact by a restraint that prevented it from receiving
the compensation.  A plaintiff can establish injury in fact in
this context merely by showing that the restraint deprived it of
the opportunity to receive the compensation.  Plaintiffs here
have satisfied this standard; they have alleged facts from which
the fact-finder could infer that, but for the challenged rules,
schools and conferences would be willing to share their
broadcasting revenue with the members of the sub-class even if
they had no publicity rights in broadcasts, to the extent that
doing so would help the schools and conferences compete with
other schools and conferences for recruits.  Accordingly, the
claims of the sub-class are not subject to dismissal on the
ground that Plaintiffs failed to plead injury in fact.

Defendants also argue that the claims of the sub-class at
issue are subject to dismissal because Plaintiffs have not
alleged facts showing that the challenged rules harm competition

19

in the "Group Licensing Market" that was adjudicated in O'Bannon.
Mot. at 11-12.  This argument is premised on the theory that,
because Plaintiffs here seek a share of broadcasting revenue just
like the plaintiffs in O'Bannon sought a share of broadcasting
revenue, then Plaintiffs are required to allege and rely on the
same relevant market for group licenses adjudicated in O'Bannon,
as the request for a share of broadcasting revenue in both
actions is essentially "identical."  See Reply at 4-5.

"To establish a section 1 violation under the Sherman Act, a
plaintiff must demonstrate three elements: (1) an agreement,
conspiracy, or combination among two or more persons or distinct
business entities; (2) which is intended to harm or unreasonably
restrain competition; and (3) which actually causes injury to
competition, beyond the impact on the claimant, within a field of
commerce in which the claimant is engaged[.]"  McGlinchy v. Shell
Chem. Co., 845 F.2d 802, 811 (9th Cir. 1988) (citations omitted).
"An essential element of a Section 1 violation under the rule of
reason is injury to competition in the relevant market."  All.
Shippers, Inc. v. S. Pac. Transp. Co., 858 F.2d 567, 570 (9th
Cir. 1988) (citation omitted).  A "relevant market"

> encompasses notions of geography as well as
> product use, quality, and description.  The
> geographic market extends to the "'area of
> effective competition' . . . where buyers
> can turn for alternative sources of supply."
> The product market includes the pool of
> goods or services that enjoy reasonable
> interchangeability of use and cross-
> elasticity of demand.

Tanaka v. Univ. of S. California, 252 F.3d 1059, 1063 (9th Cir.
2001) (citations and internal quotation marks omitted).  "Failure

United States District Court
Northern District of California

1    to identify a relevant market is a proper ground for dismissing a

2    Sherman Act claim." Id. (citation omitted).

3         Here, Plaintiffs have adequately pleaded a relevant market,

4    as well as injury to competition in that market.  Plaintiffs

5    allege that the relevant market is the nationwide market for the

6    labor of Division I college athletes, wherein Division I members

7    compete with each other to purchase through bundles of goods and

8    services student-athletes' labor and the right to use their NIL.

9    Plaintiffs further allege that, because Division I members have

10   overwhelming market power as a result of the absence of

11   reasonable substitutes for the opportunities offered by Division

12   I members, the challenged rules allow Division I members to

13   suppress competition that would otherwise exist among them by

14   artificially fixing the price of the bundle of goods and services

15   offered to student-athletes.  In the absence of the challenged

16   rules, Plaintiffs allege, competition among Division I members

17   would increase, resulting in an increase in the price of the

18   bundle of goods and services that Division I members would offer

19   to student-athletes.  Plaintiffs allege that one of the ways in

20   which Division I members could increase the price of the bundle

21   of goods and services in the absence of the challenged rules

22   would be to offer student-athletes a share of the revenue that

23   Division I members derive from the licensing or commercializing

24   of student-athletes' NIL.  See House Compl. ¶¶ 81-87; Oliver

25   Compl. ¶¶ 63-70.

26        The injury to competition that Plaintiffs allege here is the

27   artificial suppression of the price of the bundle of goods and

28   services that student-athletes can receive in exchange for their

21

labor and the right to use their NIL within the nationwide labor
market just described.  This alleged injury is cognizable and
sufficient to survive the present motion to dismiss.  See Atl.
Richfield, 495 U.S. at 341 (noting that "price competition" in
the relevant market is "in the interest of competition"); United
States v. eBay, Inc., 968 F. Supp. 2d 1030, 1039 (N.D. Cal. 2013)
("Antitrust law addresses employer conspiracies controlling
employment terms precisely because they tamper with the
employment market and thereby impair the opportunities of those
who sell their services there.") (citation and internal quotation
marks omitted).

Defendants contend that Plaintiffs are required to plead the
same relevant market that formed the basis of some of the
plaintiffs' claims in O'Bannon, and that their failure to do so
means that Plaintiffs have not alleged injury to competition in a
relevant market.  Defendants, however, have cited no authority to
support the proposition that Plaintiffs in House and Oliver are
required to adopt the same market definition that another set of
plaintiffs relied upon in a different case.  To avoid dismissal
at the pleading stage, Plaintiffs are required to "identify a
relevant market" and plead injury to competition within that
market.  Tanaka, 252 F.3d at 1063 (emphasis added).  For the
reasons discussed above, they have done so here.  Plaintiffs are
not required to do more.

This conclusion is not altered by the fact that the Court
ruled after a bench trial in O'Bannon that the plaintiffs in that
case had failed to show that the rules challenged there had
harmed competition in a sub-market for group licenses.  See

22

O'Bannon v. Nat'l Collegiate Athletic Ass'n, 7 F. Supp. 3d 955, 996-97 (N.D. Cal. 2014), aff'd in part, vacated in part, 802 F.3d 1049 (9th Cir. 2015) (holding that the plaintiffs "failed to show that the challenged NCAA rules harm competition" in the sub-market for group licenses in which "television networks compete for the rights to telecast live FBS football and Division I basketball games" and could purchase the rights from Division I members or from student-athletes in the absence of the challenged rules). Defendants have not shown that the Court's post-trial analysis of the evidence presented in another case with respect to a market different from the one that Plaintiffs allege here is relevant to its determination of the present motions.

Accordingly, the Court denies Defendants' motion to dismiss the claims of the "Group Licensing Damages Sub-Class."

C.   Tymir Oliver's Claims

Defendants argue that the claims of named plaintiff Tymir Oliver must be dismissed because (1) he lacks standing to seek injunctive relief, as he is a former student-athlete; and (2) he lacks standing to seek damages because he was a member of the Division I FBS Football Settlement Class in Alston and released his claims for damages as part of that settlement.

Plaintiffs concede that Tymir Oliver lacks standing to seek injunctive relief. See Opp'n at 2 ("Defendants are right that as a former student-athlete he cannot seek injunctive relief"). In light of this concession, the Court grants Defendants' motion to dismiss Tymir Oliver's claims for injunctive relief, without leave to amend.

1    The Court now turns to the question of whether Tymir

2   Oliver's claims for damages were released in the <u>Alston</u>

3   settlement.  The Court granted final approval to the settlement

4   of the damages claims in <u>Alston</u> on December 6, 2017.  Order and

5   Final Judgment, Docket No. 746 at 2, Case No. 14-md-02541.  It is

6   undisputed that Tymir Oliver was a member of the Division I FBS

7   Football Class as defined in the <u>Alston</u> settlement agreement,

8   which included:

9        All current and former NCAA Division I
         Football Bowl Subdivision ("FBS") football
10       student-athletes who, at any time from March
         5, 2010 through the date of Preliminary
11       Approval of this Settlement [March 21,
         2017], received from an NCAA member
12       institution for at least one academic
         term . . . a Full Athletics Grant-In-Aid."
13
14   <u>Id.</u>; see also <u>Oliver</u> Compl. ¶¶ 27, 29 (alleging that Tymir Oliver

15   was a "Division I student-athlete who competed for the University

16   of Illinois men's football team" beginning in 2016 and that he

17   received a full scholarship from the University of Illinois).

18       As part of the <u>Alston</u> settlement, the members of the

19   Division I FBS Football Class released the following claims:

20       [A]ny and all past, present and future
         claims, demands, rights, actions, suits, or
21       causes of action, for monetary damages of
         any kind (including but not limited to
22       actual damages, statutory damages, and
         exemplary or punitive damages), whether
23       class, individual or otherwise in nature,
         known or unknown, foreseen or unforeseen,
24       suspected or unsuspected, asserted or
         unasserted, contingent or non-contingent,
25       under the laws of any jurisdiction, which
         Releasors or any of them, whether directly,
26       representatively, derivatively, or in any
         other capacity, ever had, now have or
27       hereafter can, shall or may have, arising
         out of or relating in any way to any of the
28       legal, factual, or other allegations made in
         Plaintiffs' Actions, or any legal theories

that could have been raised on the
allegations in Plaintiffs' Actions.  The
Released Claims do not include claims solely
for prospective injunctive relief and
certain other claims expressly excluded from
the release as set forth in the Settlement
Agreement.

Order and Final Judgment at 11-12 (footnote omitted).

    "A settlement agreement may preclude a party from bringing a related claim in the future 'even though the claim was not presented and might not have been presentable in the class action,' but only where the released claim is 'based on the identical factual predicate as that underlying the claims in the settled class action.'"  See Hesse v. Sprint Corp., 598 F.3d 581, 590-91 (9th Cir. 2010) (emphasis added).

    Tymir Oliver's damages claims here are not based on the identical factual predicate as the damages claims in Alston.  As discussed above, his claims are materially distinguishable from those in Alston because they are based on (1) challenges to some rules that were not challenged in Alston; (2) a legal theory that was not raised in Alston, which requires different facts from those litigated in Alston; and (3) new facts that post-date Alston.  Accordingly, the Court cannot conclude at this juncture that Tymir Oliver's claims for damages were released via the Alston settlement.[5]  The Court, therefore, denies Defendants' motion to dismiss Tymir Oliver's claims for damages.

_____

[5] In a footnote, Defendants argue in passing that Tymir Oliver's claims are barred by res judicata.  Res judicata bars a subsequent claim when there is: (i) an identity of claims between the prior and subsequent actions; (ii) a final judgment on the merits; and (iii) identity or privity between the parties.  Media Rights Techs., Inc. v. Microsoft Corp., 922 F.3d 1014, 1020-21 (9th Cir. 2019) (internal citation omitted).  In light of the distinct factual allegations and legal theories upon which Tymir

1    CONCLUSION

2       For the foregoing reasons, the Court GRANTS, without leave

3  to amend, Defendants' motion to dismiss Tymir Oliver's claims for

4  injunctive relief.  The Court otherwise DENIES Defendants'

5  motions to dismiss.

6       IT IS SO ORDERED.

7  Dated:  June 24, 2021

8                                          _____
                                           CLAUDIA WILKEN
9                                          United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26  _____

27  Oliver's claims are predicated, as discussed above, the Court
    cannot conclude at this juncture that there is an identity of
    claims between the claims he asserts here and those in Alston.
28  Accordingly, the Court cannot conclude at this stage that Tymir
    Oliver's claims are barred by res judicata.

26