Steve W. Berman (*pro hac vice*)
Emilee N. Sisco (*pro hac vice*)
Stephanie Verdoia (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
emilees@hbsslaw.com
stephaniev@hbsslaw.com

Benjamin J. Siegel (SBN 256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
bens@hbsslaw.com

*Counsel for Plaintiffs and the Proposed Classes*

Jeffrey L. Kessler (*pro hac vice*)
David G. Feher (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
Adam I. Dale (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4698
Facsimile: (212) 294-4700
jkessler@winston.com
dfeher@winston.com
dgreenspan@winston.com
aidale@winston.com

Jeanifer E. Parsigian (SBN 289001)
WINSTON & STRAWN LLP
101 California Street, 34th Floor
San Francisco, CA 94111
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
jparsigian@winston.com

*Counsel for Plaintiffs and the Proposed Classes*

[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | Case No. 4:20-cv-03919-CW<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION**<br><br>**[PUBLIC REDACTED VERSION]**<br><br>Date:     May 24, 2023<br>Time:    2:30 p.m.<br>Judge:   Hon. Judge Claudia Wilken<br>Courtroom: 2, 4th Floor |

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ........................................................................................... 1

II.    STATEMENT OF FACTS ............................................................................ 3

       A.     Defendants' Prior NIL Rules ........................................................... 3

       B.     Defendants' Interim NIL Rules ........................................................ 5

       C.     Class Members Were Deprived of Substantial NIL Compensation ........................... 8

              1.  Lost Compensation for Broadcast NIL Rights ............................ 8

              2.  Lost Compensation for Video Game NIL Rights .......................... 9

              3.  Lost Compensation for NIL Deals that Would Have Occurred
                  During the Class Period But For the Prior NIL Rules ................. 12

       D.     Defendants' Asserted Procompetitive Justifications Will Be
              Resolved Based on Common Class-Wide Evidence ................................ 15

III.   PROPOSED CLASSES ............................................................................... 16

IV.    ARGUMENT .............................................................................................. 17

       A.     Standards For Class Certification ................................................... 17

       B.     The Elements of Rule 23(a) Are Satisfied ..................................... 18

              1.  The Class Members are Sufficiently Numerous ........................ 18

              2.  Common Questions of Law and Fact Exist ............................... 18

              3.  The Class Representatives' Claims Are Typical ....................... 20

              4.  The Proposed Class Representatives and Their Counsel Will
                  Adequately Represent the Classes ....................................... 22

       C.     Plaintiffs Satisfy the Requirements of Rule 23(b) ......................... 23

              1.  The Injunctive Relief Class Satisfies the Requirements of Rule
                  23(b)(2) ................................................................... 23

              2.  The Damages Classes Satisfy the Requirements of Rule
                  23(b)(3) ................................................................... 24

                  a.     Common Questions of Law and Fact Predominate ............. 24

                         i.  Evidence common to all classes will establish the existence of an

unlawful conspiracy ......................................................... 25

ii. Common evidence will establish the existence of anticompetitive effects in the relevant markets and all other elements of Section 1 liability ................................................................................. 26

iii. Common evidence will also establish class-wide antitrust injury and damages .......................................................................... 27

(1) Lost Compensation from Broadcast NILs ............................ 30

(2) Lost Compensation from Video Game NILs ......................... 31

(3) Lost Compensation From Other Third-Party NIL Opportunities Banned by The Prior NIL Rules .................... 33

b.   A Class Action is Superior to Other Available Methods of Adjudication ................................................ 35

V.    THE COURT SHOULD APPOINT HAGENS BERMAN AND WINSTON & STRAWN AS CLASS COUNSEL ................................................. 37

VI.    CONCLUSION ........................................................................................ 38

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Abdullah v. U.S. Sec. Assoc., Inc.,*
731 F.3d 952 (9th Cir. 2013) .................................................24

*Achzinger v. IDS Prop. Cas. Ins. Co.,*
772 Fed. App'x 416 (9th Cir. 2019) .................................................29

*Amgen, Inc. v. Conn. Ret. Plans and Tr. Funds,*
568 U.S. 455 (2013).................................................25

*In re Apple iPhone Antitrust Litig.,*
2022 WL 1284104 (N.D. Cal. Mar. 29, 2022).................................................26

*In re Apple iPod iTunes Antitrust Litig.,*
2008 WL 5574487 (N.D. Cal. Dec. 22, 2008).................................................27

*B.K. by Next Friend Tinsley v. Snyder,*
922 F.3d 957 (9th Cir. 2019) .................................................21

*Brice Yingling v. eBay, Inc.,*
2010 WL 11575128 (N.D. Cal. July 16, 2010).................................................35

*In re Capacitors Antitrust Litig. (No. III),*
2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) .................................................25

*In re Cardizem CD Antitrust Litig.,*
200 F.R.D. 297 (E.D. Mich. 2001) .................................................35

*Castro v. Sanofi Pasteur Inc.,*
134 F. Supp. 3d 820 (D.N.J. 2015) .................................................27

*Comcast Corp. v. Behrend,*
569 U.S. 27 (2013).................................................28, 29, 35

*In re ConAgra Foods, Inc.,*
90 F.Supp.3d 919 (C.D. Cal. 2015) .................................................35

*Dial Corp. v. News Corp.,*
314 F.R.D. 108 (S.D.N.Y. 2015) .................................................27

*Dupler v. Costco Wholesale Corp.,*
249 F.R.D. 29 (E.D.N.Y. 2008).................................................19

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,*
2006 WL 1530166 (N.D. Cal. June 5, 2006).................................................27, 29, 34

*Freeland v. AT&T Corp.*,
    238 F.R.D. 130 (S.D.N.Y. 2006) ........................................................................27

*Giuliano v. Sandisk Corp.*,
    2015 WL 10890654 (N.D. Cal. May 14, 2015) ...................................................25

*Grant House v. Nat'l Collegiate Athletic Ass'n*,
    545 F. Supp. 3d 804 (N.D. Cal. 2021) ..........................................................15, 28

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1999) ...........................................................................35

*Hawaii v. Standard Oil Co. of Cal.*,
    405 U.S. 251 (1972).............................................................................................17

*In re High-Tech Emp. Antitrust Litig.*,
    985 F. Supp. 2d 1167 (N.D. Cal. 2013) .................................................18, 21, 22

*Hubbard v. RCM Techs. (USA), Inc.*,
    2020 WL 6149694 (N.D. Cal. Oct. 20, 2020) ....................................................18

*Just Film, Inc. v. Buono*,
    847 F.3d 1108 (9th Cir. 2017) .............................................................21, 28, 35

*Kamakahi v. Am. Soc'y for Reprod. Med.*,
    305 F.R.D. 164 (N.D. Cal. 2015).......................................................................20

*In re Lidoderm Antitrust Litig.*,
    2017 WL 679367 (N.D. Cal. Feb. 21, 2017) .....................................................29

*In re Live Concert Antitrust Litig.*,
    247 F.R.D. 98 (C.D. Cal. 2007).........................................................................34

*Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*,
    244 F.3d 1152 (9th Cir. 2001) ...........................................................................35

*Meijer, Inc. v. Abbott Lab'ys*,
    2008 WL 4065839 (N.D. Cal. Aug. 27, 2008) .............................................28, 31

*Miller v. Optimum Choice, Inc.*,
    2006 WL 2130640 (D. Md. July 28, 2006)........................................................19

*Moore v. Apple Inc.*,
    309 F.R.D. 532 (N.D. Cal. 2015).......................................................................24

*Moore v. James H. Matthews & Co.*,
    682 F.2d 830 (9th Cir. 1982) .............................................................................28

*Morelock Enters., Inc. v. Weyerhaeuser Co.*,
    2004 WL 2997526 (D. Or. Dec. 16, 2004) ........................................................36

- ii -

*In re Mushroom Direct Purchaser Antitrust Litig.*,
    319 F.R.D. 158 (E.D. Pa. 2016) ...................................................................6, 27

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-In-Aid Cap Antitrust Litig.*
    *("Alston")*,
    311 F.R.D. 532 (N.D. Cal. 2015) ..................................................... *passim*

*Nat'l Collegiate Athletic Ass'n v. Alston*,
    141 S. Ct. 2141 (2021) ......................................................................38

*In re NCAA Athletic Grant-In-Aid Cap Antitrust Litig.*,
    958 F.3d 1239 (9th Cir. 2020) ...........................................................15

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
    2013 WL 5979327 (N.D. Cal. Nov. 8, 2013) ................................. *passim*

*Nitsch v. Dreamworks Animation SKG Inc.*,
    315 F.R.D. 270 (N.D. Cal. 2016) ........................................................21

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
    802 F.3d 1049 (9th Cir. 2015) ...........................................................28

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) (en banc) ...............................17, 25, 27, 28

*Pecover v. Elec. Arts, Inc.*
    2010 WL 8742757 (N.D. Cal. Dec. 21, 2010) .......................................21

*Pulaski & Middleman, LLC v. Google, Inc.*,
    802 F.3d 979 (9th Cir. 2015) ........................................................18, 29

*Purple Mountain Tr. v. Wells Fargo & Co.*,
    2022 WL 3357835 (N.D. Cal. Aug. 15, 2022) ......................................24

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979) .........................................................................17

*In re Rubber Chems. Antitrust Litig.*,
    232 F.R.D. 346 (N.D. Cal. 2005) ........................................................28

*Smilow v. Sw. Bell Mobile Sys.*,
    323 F.3d 32 (1st Cir. 2003) ...............................................................19

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
    264 F.R.D. 603 (N.D. Cal. 2009) (Wilken, J.) ......................................29

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) .....................................................................24, 29

*Vaquero v. Ashley Furniture Indus., Inc.*,
　824 F.3d 1150 (9th Cir. 2016) ...................................................................29

*Viceral v. Mistras Grp., Inc.*,
　2016 WL 5907869 (N.D. Cal. Oct. 11, 2016) ...........................................25

*In re Victor Techs. Secs. Litig.*,
　102 F.R.D. 53 (N.D. Cal. 1984) .................................................................19

*Wal-Mart Stores, Inc. v. Dukes*,
　564 U.S. 338 (2011) ...................................................................................18

*In re Washington Mut. Mortg.-Backed Sec. Litig.*,
　276 F.R.D. 658 (W.D. Wash. 2011) ..........................................................35

*Whiteway v. FedEx Kinko's Off. & Print Servs., Inc.*,
　2006 WL 2642528 (N.D. Cal. Sept. 14, 2006) ..........................................27

## FEDERAL STATUTES

Sherman Act § 1 ......................................................................................1, 21, 26, 27

## FEDERAL RULES

Federal Rule of Civil Procedure 23 ............................................................ *passim*

## OTHER AUTHORITIES

7AA Charles Alan Wright, Arthur Miller & Mary Kay Kane, Federal Practice and
　Procedure, § 1781 (3d ed. 2005) ................................................................25

6 NEWBERG ON CLASS ACTIONS (4th ed. 2002) ...................................................26

1

<u>**NOTICE OF MOTION AND MOTION**</u>

2

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

3

PLEASE TAKE NOTICE THAT on May 24, 2023, before the Honorable Claudia Wilken,

4

District Court Judge, at the Oakland Courthouse, Courtroom 2, 1301 Clay Street, Oakland, CA 94612,

5

the Class Plaintiffs will and hereby do move the Court pursuant to Rules 23(a) and (b)(2) of the Federal

6

Rules of Civil Procedure for an order certifying the following **Injunctive Relief Class**:

7
8
9
10

- **Injunctive Relief Class**: All college athletes who compete on, competed on, or will compete on a Division I athletic team at any time between June 15, 2020 and the date of judgment in this matter. This Class excludes the officers, directors, and employees of Defendants. This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

11

The Class Plaintiffs further move the Court pursuant to Rules 23(a) and (b)(3) of the Federal

12

Rules of Civil Procedure for an order certifying the following damages classes:

13
14
15
16
17
18

- **Football and Men's Basketball Class**: All current and former college athletes who have received full Grant-in-Aid (GIA) scholarships and compete on, or competed on, a Division I men's basketball team or an FBS football team, at a college or university that is a member of one of the Power Five Conferences (including Notre Dame), at any time between June 15, 2016 and the date of the class certification order in this matter. This Class excludes the officers, directors, and employees of Defendants. This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

19
20
21
22
23

- **Women's Basketball Class:** All current and former college athletes who have received full GIA scholarships and compete on, or competed on, a Division I women's basketball team, at a college or university that is a member of one of the Power Five Conferences (including Notre Dame), at any time between June 15, 2016 and the date of the class certification order in this matter. This Class excludes the officers, directors, and employees of Defendants. This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

24
25
26
27
28

- **Additional Sports Class**: Excluding members of the Football and Men's Basketball Class and members of the Women's Basketball Class, all current or former college athletes who competed on a Division I athletic team prior to July 1, 2021 and who received compensation while a Division I college athlete for use of their name, image, or likeness between July 1, 2021 and the date of the class certification order in this matter and who competed in the same Division I sport prior to July 1, 2021. This Class excludes the officers, directors, and

1
2

employees of Defendants.  This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

3
4
5
6
7
8
9
10
11

This motion is based on this Notice of Motion and Motion, the supporting Memorandum of Points and Authorities, the accompanying Expert Reports of Professor Daniel A. Rascher and Edwin S. Desser, the accompanying Declarations of Steve W. Berman, Jeffrey L. Kessler, Grant House, Sedona Prince, and Tymir Oliver, all exhibits and appendices to such documents, any papers filed in reply, any argument as may be presented at the hearing, and all other papers and records on file in this matter.  Plaintiffs will also move the Court for the appointment of Hagens Berman Sobol Shapiro LLP and Winston & Strawn LLP as Co-Lead Class Counsel for the Classes pursuant to Federal Rule of Civil Procedure 23(g).

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# GLOSSARY OF DEFINED TERMS

| Term | Definition |
|------|------------|
| **Berman Decl.** | Declaration of Steve W. Berman in Support of Plaintiffs' Motion for Class Certification and Appointment of Hagens Berman Sobol Shapiro LLP as Co-lead Class Counsel, filed concurrently herewith. |
| **Complaint** | Consolidated Amended Complaint, filed July 26, 2021, ECF No. 164. |
| **Desser** | Expert Report of Edwin S. Desser in Support of Plaintiffs' Motion for Class Certification, filed concurrently herewith. |
| **Ex.** | Exhibit to the Declaration of Steve W. Berman in Support of Plaintiffs' Motion for Class Certification and Appointment of Hagens Berman Sobol Shapiro LLP as Co-lead Class Counsel, filed concurrently herewith. |
| **House Decl.** | Declaration of Grant House in Support of Plaintiffs' Motion for Class Certification, filed concurrently herewith. |
| **Kessler Decl.** | Declaration of Jeffrey L. Kessler in Support of Plaintiffs' Motion for Class Certification and Appointment of Winston & Strawn as Co-Lead Class Counsel, filed concurrently herewith. |
| **Oliver Decl.** | Declaration of Tymir Oliver in Support of Plaintiffs' Motion for Class Certification, filed concurrently herewith. |
| **Prince Decl.** | Declaration of Sedona Prince in Support of Plaintiffs' Motion for Class Certification, filed concurrently herewith. |
| **Rascher** | Expert Report of Daniel A. Rascher in Support of Plaintiffs' Motion for Class Certification, filed concurrently herewith. |

1

## **STATEMENT OF ISSUES TO BE DECIDED**

2       The issues for this Court to decide are: (1) whether the Court should certify the proposed

3   classes defined in the motion for class action treatment; (2) whether the Court should appoint Plaintiffs

4   as Class Representatives; and (3) whether the Court should appoint Hagens Berman Sobol Shapiro

5   LLP and Winston & Strawn LLP as Co-Lead Class Counsel.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiffs challenge Defendants' horizontal labor market restrictions on class members' ability to earn money from their names, images, and likeness ("NIL").  Before July 1, 2021, Defendants completely banned competition to recruit or retain athletes by offering them NIL compensation or NIL opportunities.  Even after July 1, 2021, when Defendants began permitting *third parties* to pay many forms of NIL compensation, Defendants have continued to collusively agree to forbid *themselves* from directly paying class members for their NILs.  So, for example, Defendants have collectively agreed to *not* share revenues with college athletes to compensate them for using their NILs to obtain immensely lucrative broadcast deals.

The challenged NIL restraints apply ***uniformly*** to all members of the proposed classes.  As a consequence, so too do all of the core liability issues under Plaintiffs' Sherman Act § 1 claim: the existence of a conspiracy (*i.e.*, Defendants' uniform rules), the significant anticompetitive effects that those restraints inflict on relevant labor markets, Defendants' market (monopsony) power in those markets, the lack of validity in Defendants' claimed procompetitive justifications (which, by definition, must apply or not apply to all class members), and the actual and threatened injury to all athletes subject to the rules.  As in *Alston* and *O'Bannon*, these common characteristics of Plaintiffs' Section 1 case challenging NCAA rules make it readily apparent that the proposed injunctive relief class should be certified under Rule 23(b)(2).

As for Plaintiffs' three proposed Rule 23(b)(3) damages classes, the common evidence for proving each of the elements of Plaintiffs' liability claims also demonstrates that common issues predominate.  This includes the liability issue of class-wide antitrust injury.  Each one of Plaintiffs' proposed damages classes—Football and Men's Basketball, Women's Basketball, and Additional Sports—suffered at least one form of class-wide antitrust injury.  And once fact-of-injury is established class-wide, Plaintiffs have a "relaxed" burden to show that the classes can also prove damages through a common methodology.  Plaintiffs have more than satisfied their burden through the accompanying expert economic report of Dr. Daniel Rascher and the accompanying expert sports broadcasting industry report of Mr. Edwin Desser.

The first damages class—the Football and Men's Basketball Class (consisting of such players in the Power Five Conferences plus Notre Dame)—alleges class-wide injury and damages from NCAA rules because class members: (i) were deprived of the opportunity to receive compensation from conferences or schools for using their NILs to secure multibillion dollar television broadcast contracts; and (ii) could not receive payments for their NILs from video game publishers that the evidence clearly shows wanted to license athlete NILs in college football and men's basketball video games.  The accompanying expert reports from Dr. Rascher and Mr. Desser set forth the common evidence that can be used at trial to prove class-wide injury and measure damages on a class-wide basis.

The second damages class—the Women's Basketball Class (limited to women's basketball players in the Power Five Conferences)—likewise suffered a uniform and across-the-board injury in the form of being denied the opportunity to be compensated for their broadcast NILs.  This too is established by Dr. Rascher's and Mr. Desser's reports.

The third damages class—the "Additional Sports Class"—includes all other Division I athletes who (i) received NIL compensation after the NCAA permitted certain third-party NIL deals on July 1, 2021; and (ii) also played their sport in prior seasons when NIL compensation was completely prohibited.  This class definition is thus tailored to cover those Division I athletes whose NILs have proven economic value but were not able to monetize that value earlier in their college careers because of the challenged NCAA rules.  Many members of the Football and Men's Basketball Class and Women's Basketball Class were injured and damaged in this way too.  And, once again, Dr. Rascher identifies the common evidence that can be used to prove injury and measure damages on a class-wide basis.

The remaining Rule 23 class certification requirements are readily established.  There can be no genuine dispute that each of the named Plaintiffs will be adequate and typical class representatives, with common interests and claims, challenging the same NIL rules as all other members of the classes they will represent.  And proposed class counsel—the same lead counsel and firms who served in *Alston*—are well-qualified to serve the same role here.

Finally, this action presents the quintessential set of claims for which class treatment is superior

1   to individual actions.  With thousands of individual class members having damages claims that pale

2   in comparison to the cost of antitrust litigation against these well-resourced Defendants, this is

3   precisely the type of judicially efficient and manageable case for which Rule 23 was designed.

4                               **II.    STATEMENT OF FACTS**

5   **A.    Defendants' Prior NIL Rules**

6          Before July 1, 2021, the NCAA and its members agreed to completely prohibit *all* Division I

7   athletes from receiving compensation for *any* use of their NILs (hereinafter, the "Prior NIL Rules").

8   College athletes were restricted from, among other things, endorsing *any* commercial product or

9   service (Bylaw 12.5.2.1), receiving "*any* remuneration for value or utility that the student-athlete may

10  have for [an] employer because of the publicity, reputation, fame or personal following that he or she

11  has obtained because of athletics ability" (Bylaw 12.4.1.1, emphasis added), or even using their own

12  name, image, or athletic reputation to promote their *own* personal business ventures (Bylaw 12.4.4).[1]

13  Defendants agreed to boycott from the labor markets for college athletic services any athlete who

14  violated these restraints.  Absent these restrictions, conferences and schools would have competed for

15  athletes by both *permitting* them to earn NIL compensation from third parties and by *directly paying*

16  athletes to use their NIL rights.  Rascher ¶¶ 13, 17, 23, 154.

17         Before state legislative efforts and public and legal pressure forced the NCAA to change its

18  Prior NIL Rules, the NCAA's official line was that permitting NIL compensation to college athletes—

19  no matter from whom, for what, or in what amount—would destroy college sports.  For example, in

20  2014, NCAA officials argued that NIL payments—no matter how small and no matter the source—

21  would be "anathema to amateurism," would constitute "pay for play," and would "blur the clear line

22  between college sports and their professional counterparts."[2]  And, in *O'Bannon*, NCAA President

23  Mark Emmert testified that "amateurism in the NCAA is determined as not being provided with

24  benefits above and beyond the cost of being a student, anything that—regardless of the source,

25  regardless of where it comes from, regardless of what it's a provision for, if that is a benefit, financial

26  ───────────────

27         [1] *See* Ex. 1 (providing full text of these Bylaws).
           [2] *See* Ex. 2 (*O'Bannon v. NCAA*, Nos. 14-16601 & 14-17068 (9th Cir.), Brief for NCAA at 57

28  (Nov. 14, 2014, ECF No. 13-1).

or otherwise, that's being provided to someone because they are utilizing their name, image and likeness, then that obviously strikes at that—at that value."[3] As late as 2019, Emmert decried state legislative efforts to allow college athlete NIL compensation, calling them an "existential threat" to the collegiate model.[4]

The NCAA's party line was a pretext.  Even prior to the class period (*i.e.*, before June 15, 2016), numerous NCAA and conference executives were beginning to acknowledge the injustice of prohibiting NCAA athletes from monetizing their NILs.  Notre Dame Athletics Director Jack Swarbrick spoke out about the anticompetitive effects of the NIL restraints in a 2014 interview with CBS Sports: "if our standard had been what's the rule for other students, capturing name, image and likeness outside team activity, the musician at school doesn't have that limitation. I'm not sure why the student-athlete should, either."[5]  In 2015, NCAA Vice President for Regulatory Affairs Oliver Luck stated publicly that "the name, image, likeness for an individual is a fundamental right—that any individual controls his or her name, image and likeness—and I don't believe that a student-athlete who accepts a grant-in-aid simply waives that right to his or her name, image, likeness."[6]

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.[7]

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓."[8]

In a January 2020 interview with ESPN, former NCAA Vice President of Championships Mark Lewis sung an entirely different tune than he did as a Rule 30(b)(6) witness for the NCAA in *Alston*. He admitted that, in college sports, "the priority is to monetize the sport, that's taken precedence over everything else.  If that's the model—and there's nothing wrong with that—then you can't expect the

---

[3] *See* Ex. 3.

[4] *See* Ex. 4.

[5] *See* Ex. 5.

[6] *See* Ex. 6.

[7] Ex. 7 (Document Bates-labeled BIGTEN-NIL_00142305-306 (Pls.' Exhibit 20) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

[8] Ex. 8. (Document Bates-labeled BIG12-GIA_00126667-685 (Bowlsby Ex.1050)).

players to live by the same set of rules [as they did in the past]." Lewis said that "[i]f you go back 30 or 40 years," there were "legitimately differences" between college and professional sports. However, "in this drive for revenue now, the boxes line up the same. Colleges are doing everything that pro sports leagues are doing to make money. So how come you're treating the participants radically different? You can't justify it."[9]

And, at his recent deposition, Jim Delany—the former Big Ten Commissioner who served for most of the class period—bluntly testified ████████████████████████████████████████ ████████████████████████████████[10]

Despite this recognition, Defendants took years to actually change their unlawful Prior NIL Rules. Meanwhile, college athletes continued to suffer massive economic harm. In a 2018 HBO documentary, former University of North Carolina football coach John Shoop talked about the anticompetitive impact that the NCAA's NIL restraints have on college athletes: "At this time in their life, when they really did have incredible value, I was the one absorbing all that value, not them… For some of these young men, these are the four years where their earning potential is higher than it's ever been. This is it. When they graduate, they're done… They're propelling a billion-dollar industry right here and they're getting a sweat suit for it."[11]

**B.    Defendants' Interim NIL Rules**

Even though Defendants knew that their Prior NIL Rules were neither procompetitive nor fair,

---

[9] Ex. 9. *Compare* Ex. 10 (Lewis's testimony as NCAA 30(b)(6) witness in *Alston*) ████████████

[10] Ex. 11.

[11] *See* www.hbo.com/documentaries/student-athlete; *see also* Ex. 12. ████████████

and that college athletes would otherwise be receiving much-needed compensation from their NILs, it was not until October 29, 2019, that the NCAA Division I Board of Governors finally voted to develop a new set of NIL rules which would permit college athletes to receive that compensation.[12]  In April 2020, the NCAA again acknowledged that its "current rules related to NIL commercialization are in need of modernization" and that "allowing such compensation for some promotional or commercial activities can likely be accommodated in a manner consistent with the NCAA's model of amateur intercollegiate competition."[13]  Yet, still, no NIL rule changes were implemented.

It was only on July 1, 2021, after the Supreme Court's unanimous decision affirming this Court's decision in *Alston*, that the NCAA finally enacted an "interim" policy to begin permitting third party NIL deals (hereinafter, the "Interim NIL Rules").[14]  At the time, NCAA President Emmert offered the ironic observation that instituting the Interim NIL Rules marked "an important day for college athletes since they all are now able to take advantage of name, image, and likeness opportunities."[15]  Notably, though, the Interim NIL Rules still did not, and do not, permit *direct* NIL payments to athletes from the NCAA, conferences, or schools.  In essence, after arguing for years that NIL compensation would be the death knell of college sports, Defendants have now embraced NIL compensation, but only insofar as it is paid for by third parties and not out of their own pocketbooks.  Moreover, the NCAA has stated in no uncertain terms that the Interim NIL Rules are not permanent: ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇"[16]  Indeed, all the Prior NIL Rules remain on the NCAA's books.  So, while the Interim NIL Rules are a step in the right direction, they are too little and too late, and temporary.

Once the Prior NIL Rules were suspended, July 1, 2021 became the starting gate for an explosion in third-party NIL opportunities for college athletes.  A broad and diverse spectrum of Division I players have now been able to monetize their NILs in different ways.  *See infra*, Section

---

[12] Ex. 14.

[13] Ex. 15.

[14] *See* Ex. 16 (Interim NIL Rules).

[15] Ex. 17.

[16] Ex. 18.

II.C.3 (discussing NIL compensation since July 1, 2021). This nascent natural experiment vividly demonstrates the widespread monetary harm the Prior NIL Rules caused to college athletes. *See* Rascher ¶¶ 35-46. Such third-party NIL deals, however, do not come close to restoring to college athletes the full value of their NILs.

Among other things, the Interim NIL Rules continue to prohibit the NCAA, conferences, and schools from directly paying college athletes anything for the use of their NILs.[17] And it's not as though Defendants do not have the means to share with athletes the billions of dollars in broadcast revenues that their NILs help to generate for Defendants. Each of the Power Five Conference commissioners now make more than $2 million annually, with the highest paid—former Big Ten commissioner, Jim Delany—reportedly earning $10.3 million in his final year at the conference.[18] The salaries for the top head coaches in FBS football and Division I men's basketball exceed $11 million per year, compensation packages for the top head coaches in Division I women's basketball are approaching $3 million per year, and many athletic directors and assistant coaches are making over $2 million per year.[19] To help pay for these enormous salaries, college athletes play in stadiums and arenas that are filled with logos—endorsements of companies that compensate their colleges—and they compete on national television in uniforms and shoes licensed by their schools, and where broadcasters air commercials for sponsors every few minutes. The continuing restrictions of the Interim NIL Rules, including those that prohibit conferences and schools from compensating college athletes for the use of their NILs in broadcasts or otherwise, deprive college athletes of substantial NIL opportunities and compensation. *See* Rascher ¶ 178 Ex. 12.; Desser § 14.5.

To be sure, Defendants' broadcast contracts also profit from the value of college athletes' playing performances. But because this action only challenges Defendants' NIL restraints, Plaintiffs' experts have analyzed and opined about how to isolate the economic value of class members' NILs in

---

[17] *See* Ex. 16 ("Interim NIL Policy"); *see also* Ex. 54 ("NIL Interim Policy Guidance") (indicating that the Interim Rules also continue to prohibit athletes from receiving compensation from third parties that is based on an athlete's "athletic participation" or "performance" or "contingent upon initial or continuing enrollment at a particular institution").

[18] *See* Ex. 19 ("Top Compensation Packages in College Sports").

[19] *Id.*

broadcasts from the economic value of their playing performance.  *See* Rascher ¶¶ 170-173; Desser §§14.1-14.5.

## C.    Class Members Were Deprived of Substantial NIL Compensation

The burgeoning NIL marketplace confirms the obvious: absent Defendants' unlawful labor market restraints, class members would have earned substantial NIL compensation dating back to June 15, 2016.  *See* Rascher ¶¶ 22, 35-45.  Plaintiffs have identified three categories of such injury and damages that can be proven with class-wide methodologies and evidence: (1) lost NIL broadcast revenues; (2) lost NIL video game revenues; and (3) lost revenues from the third-party NIL deals that have been occurring since July 1, 2021 and would have been occurring since June 15, 2016 but for Defendants' Prior NIL Rules.

Plaintiffs do not contend that all members of each of the three proposed damages classes would have earned each of these types of NIL compensation in the "but for" world.  Accordingly, for each category of injury and damages, Plaintiffs specify the classes and class members that will pursue those damages claims at trial.

### 1.    Lost Compensation for Broadcast NIL Rights

Both the Prior NIL Rules and Interim NIL Rules prohibit the NCAA, conferences, and schools from paying college athletes to use their NILs in broadcasts.  ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Common evidence will show that Defendants' NIL rules prohibiting the NCAA, conferences, and schools from paying class members for the use of their NIL in broadcasts cannot be justified, and that absent the restraints, at the very least, Power Five football (plus Notre Dame) and men's and women's basketball players would have been paid for the use of their NILs in broadcasts.  Just recently, University of Michigan head football coach Jim Harbaugh expressed support for athletes sharing in the broadcast revenues that their NILs help generate:

> You know me, I've always been for NIL, I believe players should have a share in the revenues, and I think that's something that's really possible at Michigan. I think that's where we're

headed. They use their name, image and likeness on the TV broadcasts.  They're the ones signing the mega-TV deals.  And a new one's coming in 2024. Why can't that be an NIL deal right from the Big Ten? Because that's who's negotiating the TV deals, and that's where the big money is.[20]

Similarly, after a group of Big Ten athletes issued a set of demands to Big Ten Commissioner Kevin Warren, including for a share in the conference's newly negotiated $7-billion-dollar broadcast deals,[21] Commissioner Warren admitted that he could "foresee paying [Big Ten] athletes."[22]

The significant economic value that college athletes' NILs add to a broadcast has been evaluated by industry expert Desser—who has negotiated more than $50 billion dollars' worth of sports broadcasting agreements.  Mr. Desser concludes, based on common evidence, that athletes' NILs conservatively constitute ▮ of the total economic value of the broadcast payments made to the Power Five Conferences.  Desser § 14.5.  Mr. Desser *excluded* from his calculation the portion of the broadcast revenues which would be attributable to the economic value of class members' athletic performance.  *Id.* §§ 14.2-14.4.  He did so because Plaintiffs are not challenging Defendants' rules that prohibit the athletes from receiving any cash compensation for playing performance.

Dr. Rascher, in turn, opines that absent the challenged NIL restraints, all members of the Football and Men's Basketball Class and Women's Basketball Class would have been paid for the full economic value of their NIL rights in broadcasts.  Rascher ¶ 169.  More specifically he concludes that competition in the relevant labor markets would have caused this outcome in the but for world absent the NIL restraints.  *See id*; 154-167.  Dr. Rascher has constructed a class-wide methodology that he will be able to use at trial to estimate broadcast NIL damages for all members of both the Football and Men's Basketball Class and the Women's Basketball Class.  Rascher ¶¶ 169-178.

**2.     Lost Compensation for Video Game NIL Rights**

The Court knows from *O'Bannon* and *Keller* that popular college football and men's basketball video games existed for years.  Numerous EA Sports executives testified in *O'Bannon* that EA wanted to license the NILs of college athletes for its college sports video games and tried for years to convince

---

[20] Ex. 20.

[21] Ex. 21.

[22] *See*  Ex. 22; *see also* https://www.youtube.com/watch?v=lAKCBmjAAiU&t=40s (video clip of portion of interview with Commissioner Warren).

1  the NCAA to allow it to happen.  EA Executive VP of Business and Legal Affairs, Joel Linzner, for

2  example, testified that the reason the company had not approached college athletes to license their

3  NILs for video games, as it did with professional athletes, was because NCAA rules prevented it from

4  doing so.[23]  He confirmed that EA had ████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████████"[24]

7  ████████████████████████████████████████████████████, the last new

8  college football video game was released on July 9, 2013 (EA's NCAA Football 14) and the last

9  college basketball video game was released on November 17, 2009 (EA's NCAA Basketball 10).  *See*

10  Rascher ¶ 126.

11  ████████████████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████.[25]  Indeed, in 2019,

13  while Defendants were spinning their wheels over potentially changing the Prior NIL Rules, EA wrote

14  to the NCAA stating that ██████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████████████████████

17  ████████████████████████████████████"[26]

18  ████████████████████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████████████████

23  _____

24  [23] *See* Ex. 23.

    [24] *Id.; see also* Ex. 24 ████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████

26  [25] *See* Ex. 25.  For example, in a 2021 email, ████████████████████████████████████

27  ████████████████████████████████████████████████████████████

28  [26] Ex. 26.





."[27]

."[28]

[29]

For this reason, Dr. Rascher has concluded that players on all 130 FBS football teams during the class period suffered injury and damages by being deprived of the opportunity to license their NILs to EA. Rascher ¶ 130.

Men's college basketball video games also would have existed in the but for world in which the Prior NIL Rules did not exist. . Rascher ¶ 132 (CLC communication to conference licensing directors in 2008).  And the most recent version of the EA college basketball video game included virtually all Division I men's basketball teams—a product

---

[27] Ex. 27.

[28] Ex. 28.

[29] Ex. 29 (emphasis added).

creating NIL opportunities for thousands of Division I men's basketball players.  Rascher ¶ 126.[30]

Based on this and other common evidence, Plaintiffs' economic expert, Dr. Rascher, has opined that, absent the Prior NIL Rules, all members of the Football and Men's Basketball Class, and some members of the Additional Sports Class (those who played on FBS football or Division I men's basketball teams outside of the Power Five Conferences), suffered antitrust injuries and damages from the loss of these video game opportunities.  Rascher ¶¶ 124.  And Dr. Rascher has constructed a common methodology that can be used to estimate these video game damages.  Rascher ¶¶ 144-149 Ex. 3 (Summary of Basketball Video Game Damages), Ex. 4 (Summary of Football Video Game Damages).

### 3. Lost Compensation for NIL Deals that Would Have Occurred During the Class Period But For the Prior NIL Rules

Since the NCAA implemented its Interim NIL Rules on July 1, 2021, thousands of athletes from a variety of Division I sports at hundreds of NCAA schools have received third party payments for their NILs.  These real world transactions demonstrate the significant pent-up demand for college athlete NIL and the substantial harm that the Prior NIL Rules caused to class members.  Based on data collected so far (from over 125 Division I schools and third parties) about the first year in which the Interim NIL Rules were in effect, ove ████ college athletes have been paid for the use of their NILs. Rascher ¶ 196 Ex. 13 (NIL Transaction Summary Statistics).  This natural experiment has thus shown that each of these athletes has value in his or her NIL, and that if they were playing their Division I sport during the class period, they would have earned similar amounts of NIL compensation absent the Prior NIL Rules.

As Blake Lawrence, CEO of Opendorse, explained in an interview, "social media monetization … levels the playing field, as any athlete—from Heisman contenders to walk-ons—can build an audience that sponsors or advertisers value… it may be easier for superstars, but every athlete will have the opportunity to leverage free, widely accessible technology platforms to grow and monetize their NIL … While most will not be national names, organizations in local markets stand to provide

---

[30] All Power Five schools were in the basketball video game, and the very few Division I schools not in the game were all part of easily identifiable categories, such as schools that were only provisionally Division I. Rascher ¶ 126.

real opportunity and receive significant value by partnering with regional and local student-athletes upon changes to NIL regulation."[31]

This has proven to be true. In the period since the Prior NIL Rules were suspended by the NCAA, NIL success stories for Division I athletes have come from every corner of the college sports world. Female athletes, for example, have seen enormous success in the new world in which most third-party NIL deals are permitted. Opendorse reports that "[w]hen football players are excluded from Opendorse's data, women were involved in nearly 53 percent of all activities."[32] As one prominent example, LSU gymnast Olivia Dunne has landed some of the biggest NIL deals in the country, signing with companies such as Vuori Clothing, American Eagle, and health supplement brand, Plant Fuel, among several others.[33] By April 2022, South Carolina basketball player Zia Cooke had signed NIL deals with H&R Block, DoorDash, Bojangles and Fenty Skin (singer Rihanna's line of skincare products).[34] And, on the one-year anniversary of the suspension of the Prior NIL Rules, it was reported that University of Miami basketball players (formerly at Fresno State), Haley and Hanna Cavinder, had already reached nearly $2 million in NIL deals.[35] ███████████████ ███████████████████████████████████████████████████████████ ███████████[36]

Based on the extensive data it has collected in the past year, Opendorse projects continued growth in NIL deals for college athletes, stating that "while year one has seen overwhelming interest from brands, NIL leaders expect the market to grow exponentially in year two."[37] Opendorse's retrospective report concludes that if "NIL's initial phase was all about education and early adoption, the coming year will see a rise of industry experts, mass scale activations, and enhanced buy-in from brand leaders that aren't simply looking for a one-day PR push, but who will instead build powerful

---

[31] Ex. 30.
[32] Ex. 31.
[33] Ex. 32.
[34] Ex. 33.
[35] Ex. 34.
[36] Ex. 11.
[37] Ex. 35.

long-term relationships. . .  Nationwide campaigns are going to be more prevalent in 2022 because of the effectiveness of student-athletes as ambassadors. There was no data that could be shared with those brands prior to NIL.  Now proven effective, the time and spend in the student-athlete market will increase."[38]

The economic evidence in the record reviewed by Dr. Rascher is in accord. It demonstrates that the size and volume of third-party NIL deals is continuing to grow in year two and will grow further after that, as the NIL business matures and colleges and conferences increase their own efforts to support and facilitate athletes' NIL deals.  *See* Rascher ¶¶ 43-45.

Other evidence confirms the market demand for third-party NIL deals that existed during the damages period.  Before the NCAA's Interim NIL Rules went into effect, the Vice President of a leading marketing agency, HireInfluence, said in a *Forbes* interview that "in 2018-2019 alone, our company has developed strategies for at least four to five brands targeting student-athletes, and we have been restricted due to the NCAA regulations.  The demand is already there."[39]  During the damages period, a number of potential buyers of college athlete NILs made similar statements about the demand for college athlete NILs and their immense value.  *See, e.g.*, Ex. 26 ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████ Ex. 38 ███████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████")[40]

As detailed below, Dr. Rascher has constructed a common "before-and-after" methodology

---

[38] *Id.*

[39] Ex. 36.

[40] *See* Ex. 37 (Document Bates-labeled UMC001439)

████████████████████████████████████████████████████████████

████████ *see also* Ex. 38 ███████████████████████████████████████

████████████████████████████████████████████████████████████

that can be used at trial to conservatively estimate the damages suffered by class members as a result of lost third-party NIL opportunities during the damages period.  By definition, *every* member of the Additional Sports Class suffered these damages.  Further, many members of both the Football and Men's Basketball Class and the Women's Basketball Class also suffered such injury and damages. Rascher ¶¶179-180.

**D.    Defendants' Asserted Procompetitive Justifications Will Be Resolved Based on Common Class-Wide Evidence**

[text redacted][41]

As in *Alston* and *O'Bannon*, these asserted procompetitive justifications rest on issues common to all class members.  *See* Rascher ¶¶ 86-95.  Indeed, to defend NIL restraints that apply uniformly to all class members, Defendants' purported justifications must—necessarily—apply, or not apply, to all class members.

Furthermore, Plaintiffs will respond to these ostensible justifications with common evidence and methodologies at trial that will show that they are all unproven and unprovable.  For example, the common evidence already available shows that the explosion of third-party NIL deals since the suspension of the Prior NIL Rules has done nothing to erode consumer demand for college sports.[42] The NCAA, alone, brought in a record $1.16 billion in revenues in 2021—the first year of the Interim NIL Rules.[43]  Just a few months ago, the Big Ten announced new broadcast agreements which will

---

[41] *See* Ex. 39 (NCAA's Supplemental Responses and Objections to Plaintiffs' First Interrogatories to all Defendants at 15-17).

[42] That is assuming, arguendo, that such a claim, in a different market from the restrained labor markets, is even a legally valid defense.  *See In re NCAA Athletic Grant-In-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1269-71 (9th Cir. 2020) (Smith, J. concurring); *Grant House v. Nat'l Collegiate Athletic Ass'n*, 545 F. Supp. 3d 804, 812-14 (N.D. Cal. 2021) (this Court discussing Judge Smith's concurrence).

[43] Ex. 40 (*March Madness Daily: The NCAA's Billion-Dollar Cash Cow*, Sportico, Mar. 26, 2022).

generate more than $1 billion *per year* through the 2029-30 athletic year.[44]  And, in 2021-2022 alone, schools paid approximately $63.2 million to coaches *that were no longer employed*.[45]  Clearly, NIL compensation has not had any negative impact on the consumer demand for college sports and all of this will be demonstrated through evidence common to all class members.

As former Big 12 Commissioner Bowlsby has already admitted: "[t]here was a commonly-held misperception that the sky was going to fall on July 1 and we would be in some sort of Armageddon scenario.  That hasn't happened.  Some things have occurred that raised eyebrows.  But by and large schools are managing it well."[46]  Similarly, Dan Butterly, Commissioner of the Big West Conference, has publicly stated that since the Prior NIL Rules have been suspended: "I don't think there's been any chaos at all.  I think it's been really positive for the students.  They've gone out and looked at their marketability and found what opportunities exist for them. Ultimately, this is going to improve the student-athlete experience."[47]

Indeed, common evidence to be presented at trial—including survey evidence—will show that fans of college sports overwhelmingly support permitting college athletes to monetize their NIL rights, and that eliminating Defendants' NIL restrictions will not reduce consumer demand for college sports.[48]

## III.  PROPOSED CLASSES

Plaintiffs seek certification under Federal Rules of Civil Procedure 23(a) and 23(b)(2) to pursue injunctive relief on behalf of the **Injunctive Relief Class** described in the Notice of Motion and Motion.  Plaintiffs also seek certification under Federal Rules of Civil Procedure 23(a) and 23(b)(3)

---

[44] Ex. 41.

[45] Ex. 42; *see also* Ex. 55 (Notable College FB Coach Severance Buyouts); Ex. 19 (Top Compensation Packages in College Sports).

[46] Ex. 43.

[47] Ex. 44.

[48] *See* Ex. 45 ███████████████████████████████████████████████████████████████████████████████████; *see also* Ex. 46 (*NIL hasn't made a difference for most in enjoyment of college sports, poll finds*, Washington Post (June 30, 2022) (Washington Post-University of Maryland Survey finding 88% of respondents say allowing athletes to be compensated for their NILs "hasn't made a difference" or had a "positive impact" on their enjoyment of college sports).

to pursue damages resulting from Defendants' unlawful restraints on behalf of the following damages classes described in the Notice of Motion and Motion: the **Football and Men's Basketball Class**; the **Women's Basketball Class;** and the **Additional Sports Class**.  As explained in the remainder of this brief, Plaintiffs respectfully submit that the Court should certify each of the proposed classes under Rules 23(a) and (b).

### IV.     ARGUMENT

**A.     Standards For Class Certification**

As the Supreme Court and Ninth Circuit have recognized, antitrust class actions play an important role in the enforcement of the antitrust laws.  *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 667 (9th Cir. 2022) (en banc); *see also Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979); *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 266 (1972).

To certify a class, Plaintiffs must satisfy each element of Rule 23(a) and at least one of the subsections of Rule 23(b).  Rule 23(a) provides that class certification is appropriate if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  *Id.*

As for Rule 23(b), Plaintiffs here seek certification of the Injunctive Relief Class pursuant to Rule 23(b)(2) and the damages classes pursuant to Rule 23(b)(3).  Rule (b)(2)'s requirements are met where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Rule 23(b)(3) permits class certification where common questions of law and fact "predominate over any questions affecting only individual members" and class resolution is "superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  The proposed Classes satisfy all of these requirements.

**B.      The Elements of Rule 23(a) Are Satisfied**

**1.      The Class Members are Sufficiently Numerous**

Classes are generally sufficiently numerous when they are comprised of 40 or more members. *See Hubbard v. RCM Techs. (USA), Inc.*, 2020 WL 6149694, at *1 (N.D. Cal. Oct. 20, 2020).  Each of the putative classes has at least hundreds of members and is thus sufficiently numerous.  Dr. Rascher estimates the Football and Men's Basketball Class to have at least 6,280 members, the Women's Basketball Class to have at least 856 members, and the Additional Sports Class to have at least 7,384 members.  The Injunctive Relief Class has an even greater number of members because it includes all Division I athletes, across all sports and across all conferences. *See* Rascher ¶¶ 11(e), 198 Ex. 14 (After-period Reported NIL Compensation for Eligible Class Members).

**2.      Common Questions of Law and Fact Exist**

To satisfy the commonality requirement, "[e]ven a single [common] question will do," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011),[49] and "courts have consistently held that the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist."  *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013) (quoting *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 593 (N.D. Cal. 2010), *amended in part by* 2011 WL 3268649 (N.D. Cal. July 28, 2011)); *see In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 2013 WL 5979327, at *4 (N.D. Cal., Nov. 8, 2013) ("*O'Bannon*") ("'all that Rule 23(a)(2) requires is 'a single significant question of law or fact'" (quotations omitted)).  This is because "[a]ntitrust liability alone constitutes a common question that 'will resolve an issue that is central to the validity' of each class member's claim 'in one stroke.'"  *High-Tech.*, 985 F. Supp. 2d at 1180 (quoting *Dukes*).  As such, commonality is "usually met in the antitrust . . . context when all class members' claims present common issues including (1) whether the defendant's conduct was actionably anticompetitive under antitrust standards; and (2) whether that conduct produced anticompetitive effects within the relevant product and geographic markets." *O'Bannon*, 2013 WL

---

[49] *Accord Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 n.8 (9th Cir. 2015).

5979327, at \*4 (quoting *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 336 (3d Cir. 2011) (Scirica, J., concurring), *cert. denied*, 132 S. Ct. 1876 (2012)).

Plaintiffs have identified a host of significant questions of law and fact that are common to all members of the classes.  *See* Section IV.C.2.a, *infra*; Complaint ¶¶ 312-13.  Such questions include whether Plaintiffs can establish a horizontal agreement that causes significant anticompetitive effects in relevant markets.  *See, e.g.*, *O'Bannon*, 2013 WL 5979327, at \*4 (whether "NCAA rules have harmed competition" was a common question); *see also* Rascher ¶¶ 29-69, 82-85 (economic evidence relating to the competitive effects of the challenged NIL rules in the relevant labor markets is common to all members of the classes).

Defendants have also pleaded a host of affirmative defenses—which will be assessed to determine if Defendants' conduct was unlawful under the antitrust laws—including the defense that the challenged rules are "lawful, justified, and pro-competitive by preserving the distinction between college and professional sports."[50]  These defenses, which can be considered in determining the issue of commonality, underscore the fact that the requirements of Rule 23(a)(2) are met here.  *See, e.g.*, *Smilow v. Sw. Bell Mobile Sys.*, 323 F.3d 32, 39-40 (1st Cir. 2003); *O'Bannon*, 2013 WL 5979327, at \*4 ("whether the NCAA's procompetitive justifications for its conduct are legitimate" was common question); *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 45 (E.D.N.Y. 2008); *In re Victor Techs. Secs. Litig.*, 102 F.R.D. 53, 62 (N.D. Cal. 1984); *Miller v. Optimum Choice, Inc.*, 2006 WL 2130640, at \*7 (D. Md. July 28, 2006).  *See also* Rascher ¶¶ 85-95 (the economic evidence relating to Defendants' asserted procompetitive justifications is common to all of the members of the classes). The same will be true of any less restrictive alternatives that are presented at trial.  *See Id.* ¶ 95.

All of these common questions revolve around the central issues of the existence and competitive effect of the alleged conspiracy in restraint of trade.  As such, the commonality

---

[50] *See* Answer of Def. NCAA to Consol. Am. Compl. (ECF 170) at 50; Answer and Additional Defenses of Def. Atlantic Coast Conf. to Consol. Am. Compl. (ECF 167) at 46; Answer and Affirmative Defenses of Def. The Big Ten Conf., Inc. to the Consol. Am. Compl. (ECF 171) at 50; Answer of Def. The Big 12 Conf., Inc. (ECF 169) at 50; Answer and Additional Defenses of Def. Pac-12 Conf. to the Consol. Am. Compl. (ECF 172) at 52; Answer and Additional Defenses of Def. Southeastern Conf. to Consol. Am. Compl. (ECF 168) at 46.

1    requirement is satisfied. *See Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 183 (N.D. Cal.

2    2015) ("Plaintiffs['] claim rests on the question of whether the Guidelines constitute an unlawful price

3    fixing agreement. . . . The Court is therefore satisfied that whether the Guidelines violate the antitrust

4    laws is a question common to all class members and susceptible to resolution by common proof, and

5    thus meets Rule 23(a)(2)'s commonality requirement."); *O'Bannon*, 2013 WL 5979327, at *4 (same).

6         **3.    The Class Representatives' Claims Are Typical**

7         The claims of the named Plaintiffs satisfy Rule 23(a)(3)'s typicality requirement.  Plaintiff

8    Grant House is a Division I athlete who competes in the Pac-12 Conference for the Arizona State

9    University men's swimming and diving team.  House began competing for the Sun Devils in 2017 and

10   broke multiple school time records his freshman year.  After strong performances in his sophomore

11   year and winning a gold medal with Team USA in the 2019 Pan American Games, he also became a

12   2019 Google Cloud Academic All-American with his 4.0 GPA.  An elite athlete and student, House

13   was completely prohibited from receiving compensation for the use of his NIL from 2017 through

14   July 1, 2021.  After July 1, he earned NIL compensation.  House Decl. ¶¶ 2-6.  House represents the

15   Injunctive Relief Class and the Additional Sports Class.

16        Plaintiff Sedona Prince is a Division I athlete who competes in the Pac-12 Conference (a Power

17   Five Conference) for the University of Oregon women's basketball team.  In 2018, Plaintiff Prince

18   attended the University of Texas at Austin and subsequently transferred to the University of Oregon

19   after suffering a major leg injury.  Due to the NCAA's transfer rules, she had to sit out the 2019-2020

20   season but has one more year of remaining eligibility for the 2022-2023 season.  Prince led her team

21   in scoring as a starting forward during the 2021-2022 season.  She, additionally, has actively

22   represented college athletes by publicly advocating for gender equity and founding an LGBTQIA+

23   organization for college athletes.  Throughout her playing career and advocacy, Prince was prohibited

24   from receiving compensation for the use of her NIL.  After July 1, 2021, however, she obtained NIL

25   compensation.  Prince Decl. ¶¶ 2-7.  Prince represents the Injunctive Relief Class and the Women's

26   Basketball Class.

27        Plaintiff Tymir Oliver was a Division I athlete who competed in the Big Ten Conference (a

28   Power Five Conference) for the University of Illinois men's football team from 2016 – 2020.  As a

1    team captain, he was a standout on defense and led his team to multiple Big Ten wins during his four-

2    year career. While competing for his university, Plaintiff Oliver was prohibited from receiving

3    compensation for the use of his name, image, or likeness. Oliver Decl. ¶¶ 2-3. Plaintiff Oliver

4    represents the Football and Men's Basketball Class.

5    To satisfy Rule 23(a)(3)'s typicality requirement, named plaintiffs' claims must be "reasonably

6    coextensive with those of absent class members; they need not be substantially identical." *B.K. by

7    Next Friend Tinsley v. Snyder*, 922 F.3d 957, 969-70 (9th Cir. 2019) (quoting *Hanlon v. Chrysler

8    Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1999)). "In antitrust cases, typicality usually will be established

9    by plaintiffs and all class members alleging the same antitrust violations by defendants." *Nitsch v.

10   Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 274 (N.D. Cal. 2016); *High-Tech*, 985 F. Supp. 2d

11   at 1181; *Pecover v. Elec. Arts, Inc.* 2010 WL 8742757, at *11 (N.D. Cal. Dec. 21, 2010).

12   That is precisely the case here. Just like members of all the classes, each class representative

13   has competed as an NCAA Division I college athlete and was subject to uniform NIL restrictions. All

14   class members, including the Class Representatives, allege that those rules are anticompetitive and

15   violate the Sherman Act § 1. All class members, including the Class Representatives, similarly allege

16   that they were injured because, absent the rules, they would have had the opportunity to receive—and

17   would have in fact received—NIL compensation. *See Just Film, Inc. v. Buono*, 847 F.3d 1108, 1118

18   (9th Cir. 2017) ("The requirement of typicality is not primarily concerned with whether each person

19   in a proposed class suffers the same type of damages; rather, it is sufficient for typicality if the plaintiff

20   endured a course of conduct directed against the class.").

21   Moreover, the Class Representatives for each of the damages classes—Sedona Price for

22   Women's Basketball Class, for example—allege that they suffered the same or similar types of injuries

23   as the members of the Class or Classes they represent. Prince alleges that, absent the challenged NIL

24   rules, she would have received broadcast NIL payments from her conference and NIL payments from

25   third parties.[51] This is the same type of injury and damages alleged by other members of the Women's

26   Basketball Class. *See* Rascher ¶ 105; Section IV.C.2.a.iii, *infra*. Thus, typicality is satisfied. *See In*

27

28   _____

     [51] *See* Ex. 47 (Plaintiff Sedona Prince's Objections and Responses to Defendant NCAA's First Set
     of Interrogatories, at 14).

1    *re Nat'l Collegiate Athletic Ass'n Athletic Grant-In-Aid Cap Antitrust Litig. ("Alston")*, 311 F.R.D.

2    532, 546 (N.D. Cal. 2015) ("This [typicality] requirement is usually satisfied if the named plaintiffs

3    have suffered the same or similar injuries as the unnamed class members, the action is based on

4    conduct which is not unique to the named plaintiffs, and other class members were injured by the same

5    course of conduct."); *O'Bannon*, 2013 WL 5979327, at *4.

6         The same is true of House and Oliver.  House alleges that he lost third-party NIL opportunities

7    and suffered economic injury as a result of the Prior NIL Rules.[52]  This is the same type of injuries

8    and damages claimed by each member of the Additional Sports Class.  Rascher ¶ 108.  Oliver alleges

9    that he would have received compensation for his lost video game NIL opportunities and lost broadcast

10   NIL opportunities during the class damages period.[53]  These are the same types of injuries and damages

11   claimed by each member of the Men's Basketball and Football Class.  Rascher ¶¶ 100-01.

###   4.    The Proposed Class Representatives and Their Counsel Will Adequately Represent the Classes

13        Plaintiffs and their counsel will adequately represent the proposed classes.  The test for

14   adequacy turns on two questions: "(1) whether named plaintiffs and their counsel have 'any conflicts

15   of interest with other class members,' and (2) whether named plaintiffs and their counsel 'will

16   prosecute the action vigorously on behalf of the class.'"  *High-Tech*, 985 F. Supp. 2d at 1181; *see*

17   *O'Bannon*, 2013 WL 5979327, at *5 (citing *Hanlon*, 150 F.3d at 1020).

18        The named Plaintiffs are adequate representatives of each of their respective proposed classes.

19   Their interests are aligned with all class members in challenging the lawfulness of the restraints that

20   have restricted compensation class members may receive for use of their NIL rights.  They also align

21   with other class members in proving that the restraints damaged class members.  Plaintiffs have further

22   demonstrated that they will prosecute this action vigorously; each has responded to interrogatories,

23   searched for responsive documents, consulted with counsel about the facts of the case and strategy,

---

[52] *See* Ex. 48 (Plaintiff Grant House's Objections and Responses to Defendant NCAA's First Set of Interrogatories, at 11).

[53] *See* Ex. 49 (Plaintiff Tymir Oliver's Objections and Responses to Defendant NCAA's First Set of Interrogatories, at 10).

1  and discussed discovery sent to Defendants.  Prince Decl., ¶¶ 13-15; House Decl., ¶¶ 9-10; Oliver

2  Decl., ¶¶ 5-6.

3      Furthermore, Plaintiffs' proposed Class Counsel satisfy the adequacy requirement.  In retaining

4  Hagens Berman and Winston & Strawn, Plaintiffs have employed firms with long track records of

5  vigorously prosecuting complex antitrust actions like this one and who are well-versed in antitrust

6  litigation against the NCAA.  Both firms have previously been appointed lead class counsel for NCAA

7  athletes by this Court and have achieved significant litigation success in that role.  *See infra*, Part V.

8  **C.      Plaintiffs Satisfy the Requirements of Rule 23(b)**

9      **1.      The Injunctive Relief Class Satisfies the Requirements of Rule 23(b)(2)**

10      Given the universal application of the challenged NCAA NIL rules, the injunctive and

11  declaratory relief sought would provide uniform relief to all members of the proposed Injunctive Relief

12  Class.  Rule 23(b)(2) applies where defendants have "acted or refused to act on grounds that apply

13  generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate

14  respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  ███████████████████████████

15  ████████████████████████████████████████████████████████████████[54]

16      The Injunctive Relief Class consists of college athletes who compete on, competed on, or will

17  compete on a Division I athletic team at any time between June 15, 2020, and the date of judgment.

18  The Class seeks to permanently enjoin, and have declared unlawful, those rules that the NCAA and

19  conference Defendants have agreed upon to restrict members of the Class from monetizing their NILs.

20  This includes the Interim NIL Rules, which are currently in effect, as well as the Prior NIL Rules,

21  which are still part of the NCAA Bylaws and Constitution Articles and have merely been suspended.[55]

22  Absent an injunction, the NCAA's membership could continue to enforce, and begin enforcing again,

23  any or all of the challenged NIL rules.  There can be no question that an antitrust injunctive class

24  seeking to enjoin common rules of this type meet the requirements of Rule 23(b)(2) for certification.

25      There also can be no dispute that the challenged NIL rules have a common impact on all

26  Injunctive Relief Class members, which can be proven through common economic evidence.  Rascher

27  [54] *E.g.*, Ex. 11 (Delany Dep.); Ex. 50 (Hawley Dep.).

28  [55] *See* Exs.1, 16.

¶ 111-120.  Indeed, in this respect, the Rule 23(b)(2) analysis here is the same as in *O'Bannon* and *Alston*, where the Court certified injunctive-relief classes because "an injunction would offer all class members 'uniform relief' from this harm."  *O'Bannon*, 2013 WL 5979327, at *7 (quoting *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010)); *Alston*, 311 F.R.D. at 546.

### 2.    The Damages Classes Satisfy the Requirements of Rule 23(b)(3)

The three proposed damages classes should be certified because they each meet the predominance and superiority requirements of Rule 23(b)(3).  Namely, as shown below, common questions of law and fact predominate, and a class action is a superior method to adjudicate the classes' claims.

### a.    Common Questions of Law and Fact Predominate

"[T]he predominance analysis under Rule 23(b)(3) focuses on the relationship between the common and individual issues in the case, and tests whether the proposed class is sufficiently cohesive to warrant adjudication by representation."  *Abdullah v. U.S. Sec. Assoc., Inc.*, 731 F.3d 952, 964 (9th Cir. 2013) (internal quotation marks and citation omitted).  "Each element of a claim need not be susceptible to classwide proof."  *Purple Mountain Tr. v. Wells Fargo & Co.*, 2022 WL 3357835, at *2 (N.D. Cal. Aug. 15, 2022).  Rather, "the inquiry is a holistic one, in which the Court considers whether overall, considering the issues to be litigated, common issues will predominate."  *Moore v. Apple Inc.*, 309 F.R.D. 532, 544 (N.D. Cal. 2015); *see Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) ("[t]he predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating individual issues.'" (quoting 2 NEWBERG ON CLASS ACTIONS § 4:49, pp. 195-96 (5th ed. 2012)).

Common questions need not predominate on every issue; rather, where "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson*, 136 S. Ct. at 1045.  Moreover, Plaintiffs need not prove at this stage that these "questions will be answered, on the merits, in favor of the class."  *Amgen, Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 459 (2013) (plaintiffs must "show[] that *questions* common to the class predominate, not

that those questions will be answered, on the merits, in favor of the class") (emphasis in original)); *see Olean*, 31 F.4th at 666-67 ("[A] district court is limited to resolving whether the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial.").

Here, considering the issues to be litigated—whether there has been an unlawful conspiracy that caused anticompetitive effects in the relevant labor markets, whether there are any pro-competitive justifications for the restraints or less restrictive alternatives, the impact of the restraints in causing antitrust injury to class members, and class-wide damages—common issues predominate over any individualized ones.

### i. Evidence common to all classes will establish the existence of an unlawful conspiracy

Antitrust liability in conspiracy cases is inherently a question common to the putative classes because the relevant inquiry is into *Defendants*' conduct, not individual class members' conduct. *See Giuliano v. Sandisk Corp.*, 2015 WL 10890654, at *17 (N.D. Cal. May 14, 2015) ("The question of whether there has been an antitrust violation is a common issue rather than an individual one. In no event will the individual circumstances of particular class members be relevant to the inquiry of whether such a violation has occurred."). For that reason, courts often find that whether a conspiracy exists is a common question that predominates over the other issues in the case. *See e.g.*, *In re Capacitors Antitrust Litig. (No. III)*, 2018 WL 5980139, at *5 (N.D. Cal. Nov. 14, 2018) ("[A]s many courts have noted, the claim of a conspiracy to fix prices inherently lends itself to a finding of . . . predominance, even when the market involves different products and prices."); 6 NEWBERG ON CLASS ACTIONS, § 18.25 (4th ed. 2002) ("[C]ommon liability issues such as conspiracy or monopolization have, almost invariably, been held to predominate over individual issues."); 7AA Charles Alan Wright, Arthur Miller & Mary Kay Kane, Federal Practice and Procedure, § 1781 (3d ed. 2005) ("whether a conspiracy exists is a common question that is thought to predominate over the other issues in the case"); *see also Viceral v. Mistras Grp., Inc.*, 2016 WL 5907869, at *4 (N.D. Cal. Oct. 11, 2016) ("the Court finds that predominance is satisfied because all of Plaintiffs' claims arise from allegations of Mistras's systemic practices and policies, and accordingly, liability may be

1    determined on a classwide basis").

2           This case is a prime example of why the common issue of antitrust liability strongly favors

3    resolving the claims of the damages classes on a class-wide basis.  Here, there is a set of explicit

4    collusive rules that Defendants have agreed to uniformly apply to all Division I college athletes,

5    including but not limited to members of the three damages classes.  Plaintiffs will use common

6    evidence to show that these rules agreed to by Defendants are unreasonable restraints of trade under

7    Section 1 of the Sherman Act, which harmed every class member by limiting their ability to pursue

8    and seek to monetize NIL opportunities.

9                        **ii.    Common evidence will establish the existence of anticompetitive
                                 effects in the relevant markets and all other elements of Section 1
10                               liability**

11          Plaintiffs will utilize class-wide economic evidence to demonstrate that Defendants' conduct

12   caused anticompetitive effects in a relevant market without any procompetitive justification, or to

13   show that liability can be established through a "quick look" application of the rule of reason.  Dr.

14   Rascher's report shows how common economic issues will predominate the rule of reason analysis.

15   Those common issues include: (1) the direct anticompetitive effects of the Defendants' restraints

16   during the class period, including following the change to the Interim NIL Rules on July 1, 2021; (2)

17   identifying relevant markets and, if required, demonstrating market power; (3) the anticompetitive

18   harm resulting from the restraints and the common evidence by which this anticompetitive harm can

19   be proven; and (4) assessing the economic evidence relevant to addressing any procompetitive

20   justifications asserted by Defendants or any less restrictive alternatives.  Rascher ¶¶ 13-95.

21          Notably, courts have repeatedly recognized that these types of rule-of-reason questions are

22   common class-wide issues that support a finding of predominance.  *See In re Apple iPhone Antitrust*

23   *Litig.*, 2022 WL 1284104, at *11 (N.D. Cal. Mar. 29, 2022) (finding the expert's opinion on "market

24   definition constitutes common proof that could resolve whether a relevant market exists"); *O'Bannon*,

25   2013 WL 5979327, at *4 (whether "NCAA rules have harmed competition" in the relevant markets

26   alleged, whether those rules produced "anticompetitive effects," and whether the "NCAA's

27   procompetitive justifications for its conduct are legitimate," were common questions); *Freeland v.*

28   *AT&T Corp.*, 238 F.R.D. 130, 140 (S.D.N.Y. 2006) (a restraint's "anticompetitive effects in the

market" present a "common question[]" for purposes of predominance.); *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 114 (S.D.N.Y. 2015) ("[M]arket definition" turns on "common evidence"); *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 844-45 (D.N.J. 2015) ("procompetitive justifications" are "common issues").[56]

In sum, every rule-of-reason issue here is common to the classes. The common evidence will focus on Defendants' conduct and will include evidence of how Defendants jointly adopt, impose, and enforce NIL rules that have the purpose and effect of restraining competition in the relevant labor markets. The prevalence and importance of these core Section 1 issues militates heavily in favor of class certification. "Where . . . common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain." *Whiteway v. FedEx Kinko's Off. & Print Servs., Inc.*, 2006 WL 2642528, at *10 (N.D. Cal. Sept. 14, 2006) (citing *Smilow*, 323 F.3d at 40).

### iii.   Common evidence will also establish class-wide antitrust injury and damages

As set forth below, Plaintiffs will be able to prove on a class-wide basis (i) antitrust injury (or impact) and (ii) damages. Class-wide methodologies will demonstrate that all members of each proposed class suffered antitrust injury and that all, or virtually all, members of each class suffered measurable monetary damages.

***Antitrust injury.*** At this stage, Plaintiffs are not required to actually prove antitrust injury to each class member and need only demonstrate that impact may be established through class-wide evidence. *Olean*, 31 F.4th at 679. All the Court must do is find that Plaintiffs have "come forward with seemingly realistic methodologies" to demonstrate class-wide injury. *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2006 WL 1530166, at *8 (N.D. Cal. June 5, 2006); *In re*

---

[56] *See also, e.g.*, *Castro*, 134 F. Supp. 3d at 845 ("Evidence concerning market power is common to the class."); *In re Apple iPod iTunes Antitrust Litig.*, 2008 WL 5574487, at *4 (N.D. Cal. Dec. 22, 2008) ("[W]hether an 'online music market exists'" is "complex factually inquir[y] that do[es] not depend in any way upon individualized proof" and whether defendant has market power is a "broad question[] that exist[s] independently of each individual Plaintiff"); *In re Mushroom Direct Purchaser Antitrust Litig.*, 319 F.R.D. 158, 197 (E.D. Pa. 2016) ("Whether or not Plaintiffs have correctly defined the relevant market is a question which applies to the claims of all class members.").

1   *Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 353 (N.D. Cal. 2005); *see also Olean,* 31 F.4th at 679

2   ("A lack of persuasiveness is not fatal at certification.").

3   At the threshold, and as this Court has already held, depriving class members of the opportunity

4   to participate in a competitive market, by itself, constitutes antitrust injury: "[a] plaintiff can show that

5   it was injured in fact by alleging that it was deprived of the opportunity to receive compensation it

6   otherwise would have received but for the challenged conduct." *House*, 545 F. Supp. 3d at 816.

7   Nonetheless, Plaintiffs will offer common expert and fact evidence at trial demonstrating three more

8   specific forms of class-wide injuries that Defendants caused by depriving class members of the

9   opportunity to market their NILs for broadcasts, video games, and other third-party NIL opportunities.

10  *See* Rascher ¶¶ 100-02, 105-06, 109.

11  ***Damages.***  The damages inquiry at class certification asks whether a proposed damages model

12  is consistent with plaintiffs' theory of liability and whether damages are capable of measurement on a

13  class-wide basis. *Comcast Corp. v. Behrend*, 569 U.S. 27, 29 (2013).  The Ninth Circuit has explained

14  that "'capable of measurement on a classwide basis'" means "in the sense that the whole class suffered

15  damages traceable to the same injurious course of conduct underlying plaintiffs' legal theory." *Just*

16  *Film*, 847 F.3d at 1120 (quoting *Comcast*, 569 U.S. at 29).

17  Importantly, because Plaintiffs will readily establish the element of *antitrust injury* to all the

18  members of each class through common evidence, Plaintiffs must merely show that their *damages*

19  methodology is not "so insubstantial as to amount to no method at all."  *Meijer, Inc. v. Abbott Lab'ys*,

20  2008 WL 4065839, at *8 (N.D. Cal. Aug. 27, 2008) (quoting *In re Potash Antitrust Litig.*, 159 F.R.D.

21  682, 697 (D. Minn. 1995)).  In antitrust cases, once the fact of injury is established, plaintiffs have a

22  "relaxed burden" of proving the amount of damages. Rule 23(b)(3)—Application of predominance

23  requirement to particular cases—Antitrust—Extent of damages, 1 McLaughlin on Class Actions §

24  5:37 (18th ed.); *Moore v. James H. Matthews & Co.*, 682 F.2d 830, 836 (9th Cir. 1982) ("[A]n antitrust

25  plaintiff is only obligated to provide the trier-of-fact with some basis from which to estimate

26  reasonably, and without undue speculation, the damages flowing from the antitrust violations."). This

27  relaxed burden for proving the amount of antitrust damages applies with equal force in the context of

28  proving class-wide damages. *In re DRAM Antitrust Litig.*, 2006 WL 1530166, at *10 (N.D. Cal. June

- 28 -

5, 2006) ("[A]t the certification stage of an antitrust class action, plaintiffs have a limited burden with respect to showing that individual damages issues do not predominate." (citation and internal quotation marks omitted)); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 615 (N.D. Cal. 2009) (Wilken, J.) (similar).

Indeed, even if the Court were to conclude that any individualized damages calculations may be necessary, that conclusion would not defeat class certification where common issues relating to antitrust liability predominate. *See e.g.*, *Pulaski*, 802 F.3d at 986-88 (reaffirming that this proposition from "*Yokoyama* [*v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010)] remains the law of this court, even after *Comcast*"); *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016) ("Under *Tyson Foods* and our precedent, therefore, the rule is clear: the need for individual damages calculations does not, alone, defeat class certification."); *accord In re Lidoderm Antitrust Litig.*, 2017 WL 679367, at *11 (N.D. Cal. Feb. 21, 2017); *see also Achzinger v. IDS Prop. Cas. Ins. Co.*, 772 Fed. App'x 416, 418 (9th Cir. 2019) ("district court abused its discretion" in denying class certification "by giving more weight to potential individual damages disputes than common questions of liability").

\*   \*   \*

Below, Plaintiffs describe the common economic evidence that they will present at trial to demonstrate three forms class-wide injury and damages in addition to the more general antitrust injury that all class members have suffered by being denied competition for their NILs (discussed *supra*). Specifically, common economic evidence will be introduced at trial to prove class-wide injury and damages from (1) the lost opportunity to receive compensation for NILs used in college football and men's and women's basketball broadcasts (which injured the Football and Men's Basketball Class and the Women's Basketball Class); (2) the lost opportunity to receive compensation for NILs used in college football and men's basketball video games (which injured the Football and Men's Basketball Class and many members of the Additional Sports Class); and (3) the lost opportunity under the Prior NIL Rules to receive compensation from entering into the same types of third-party NIL deals that have been permitted since July 1, 2021, when the Prior NIL Rules were suspended (which injured the

Additional Sports Class, plus many members of the Football and Men's Basketball Class and the Women's Basketball Class).

### (1)     Lost Compensation from Broadcast NILs

Common economic evidence can be used at trial to prove that, absent the challenged NIL restraints, every member of the Football and Men's Basketball Class and the Women's Basketball Class would have received compensation for the use of their NILs in either football or basketball broadcasts. These two damages classes are limited to athletes who played for members of the Power Five Conferences and Notre Dame.

***Class-wide antitrust injury.***  Sports broadcasting industry expert Desser will provide common evidence about the significant economic value of these class members' NIL rights to football and basketball telecasts.   Desser §§ 17-17.3.  ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Desser § 7.2. ████████████████████████████████████████████████████████████████████████████. Desser §§ 6.7, 8, 9; *see also* Rascher ¶¶ 163-164 (reaching same conclusion).  Mr. Desser will then provide his expert opinion that Power Five college players' NILs for FBS football and men's and women's basketball broadcast agreements are worth—conservatively—████ of the consideration paid to the NCAA and the Power Five Conferences to broadcast their football and men's and women's basketball games.  Desser § 14.5. He bases that opinion on his decades of experience negotiating sports broadcasting contracts for both broadcasters and rights holders, as well as his study of ████████████████████████████████████████████████████████████████████████████████████ Desser §§ 14 -15.4.

Next, Dr. Rascher will provide common class-wide evidence that absent NIL rules preventing the Power Five Conferences and schools (including Notre Dame) from competing with each other to compensate college athletes for their broadcast NIL rights, the Power Five Conferences and Notre

Dame would have been compelled by labor market competition to pay all Football and Men's Basketball Class and Women's Basketball Class members the full value of their NILs.  Dr. Rascher also will provide class-wide evidence through an economic model of the but-for world to show how the Power Five Conferences and Notre Dame would pay for such rights, in equal shares, through a group license negotiation prior to or at the same time that a class member commits to the school. Rascher ¶ 163.  As Dr. Rascher explains, "In the class-wide damages model I have formulated, competition among the Power Five conferences and their schools for football and basketball players in the relevant labor markets leads organically to the Power Five conferences, or their schools, as the partners of the broadcast networks, entering into *ex ante* group-licensing deals with incoming GIA recipients in football and men's and women's basketball (both freshmen and transfers) to compensate these college athletes for the use of their Broadcast NILs."  Rascher ¶ 151 (footnote omitted).

***Class-wide damages.***  Dr. Rascher has also constructed a common methodology for estimating the class-wide amounts of broadcast NIL damages, and a methodology for allocating those damages to individual class members within the Football and Men's Basketball and Women's Basketball Classes.  Relying on Mr. Desser's opinion that ███ of the value of Power Five broadcast contracts is a conservative estimate of the value of the athletes' broadcast NILs, as well as Mr. Desser's opinion about how the value of multi-sport broadcasts contracts with the Power Five Conferences and the NCAA should be allocated among the sports, Dr. Rascher applies a common methodology to estimate the amount of damages suffered on a class-wide basis, and by each class member in the form of lost equal-share broadcast NIL payments.  Rascher ¶¶ 163-64, 173-78.  Far more than a damages methodology that is not "so insubstantial as to amount to no method at all," *Meijer*, 2008 WL 4065839, at *8, Dr. Rascher's common methodology is a reasonable and reliable means for calculating class-wide damages.

### (2)   Lost Compensation from Video Game NILs

Common evidence can also be produced at trial to prove that all members of the Football and Men's Basketball Class, and many members of the Additional Sports Class (specifically, FBS football or Division I men's basketball athletes outside of the Power Five Conferences), suffered injury and damages because they would have received compensation for use of their NILs in college football or

men's basketball video games absent Defendants' Prior NIL Rules.

**Class-wide antitrust injury.**  Popular college football and men's basketball video games existed for years.  *See* Section II.C.2, *supra*; Rascher ¶¶ 55-56.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[57]  Now that player NILs may be included—and athletes compensated for their NILs—in college video games, the game publishers are working to bring football and men's basketball video games back to market.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Rascher ¶ 59.  And, previously, EA's men's college basketball video game included virtually all Division I men's basketball schools.  Rascher ¶ 126.  As Dr. Rascher opines, the common evidence at trial will show that all of these class members who would have been included in video games but for the Prior NIL Rules suffered antitrust injury.  *See* Rascher ¶ 148 (summarizing evidence).

**Class-wide damages.**  Monetary damages for all these injured class members can be measured through common, class-wide proof.  Dr. Rascher has created a model that utilizes real-world revenues for NBA and NFL video games to project the revenues for FBS football and men's Division I basketball video games in the but-for world.  Rascher ¶ 145.  He then shows that he can apply a conservative ▮▮▮ royalty percentage—▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮—to measure on a class-wide basis the video game NIL damages for the Football and Men's Basketball Class, as well as damages for FBS football and men's basketball players in the Additional Sports Class.  Rascher ¶ 146.  Finally, Dr. Rascher's model allocates those class-wide damages to individual class members using ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Rascher ¶¶ 129, 137.  This is another reasonable and reliable methodology for measuring damages on both a class-wide and individual class member basis.

---

[57] *See*, Ex. 25; *see also* Ex. 51 (Document Bates-labeled SEC-HOUSE0076657)▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Exs. 52, 53 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

### (3)   Lost Compensation From Other Third-Party NIL Opportunities Banned by The Prior NIL Rules

The Additional Sports Class includes all Division I athletes—except for those in another Class—who received an NIL deal between July 1, 2021 and the date of class certification, and who also played on a Division I team in earlier seasons in the same sport during the damages period.  As such, the Additional Sports Class includes Division I athletes whose NILs have economic value and who were deprived earlier in their college careers from earning similar deals because of the Prior NIL Rules. For example, Plaintiff House, a Division I swimmer at Arizona State University, has received NIL compensation from third parties since the Interim NIL Policy became effective on July 1, 2021; before that date he was a record-breaking swimmer, but the Prior NIL Rules prohibited him from receiving such NIL compensation.  Because members of the Additional Sports Class have received NIL compensation since July 1, 2021 but were prevented from doing so while playing the same Division I sport prior to that date, all, or virtually all, of them can be shown to have suffered measurable damages through Dr. Rascher's methodology. In addition, many, but not all, members of the Football and Men's Basketball Class and Women's Basketball Class meet these criteria and can be shown to have suffered measurable damages.  Accordingly, the common evidence that will be produced at trial to demonstrate lost NIL opportunity injury and damages to class members will apply to the entire Additional Sports Class and many members of the other two damages Classes.

***Class-wide antitrust injury.***  Dr. Rascher first creates a common methodology which he can use at trial to demonstrate why it is economically sound to conclude that all of the members of the Additional Sports Class (and Football and Men's Basketball Class, and Women Basketball Class who fit the criteria described above) suffered antitrust injury in the form of lost third-party NIL compensation banned by the Prior NIL Rules.  *See* Rascher ¶¶ 179-194 Specifically, because each such class member has been paid for use of her or his NIL since July 1, 2021, Dr. Rascher opines that it is reasonable to employ a before-and-after period methodology to predict that those individuals—to the extent they were also playing the same sport under the Prior NIL Rules—would have received similar NIL deals in the but for world. *Id.*, ¶ 198 Ex. 14 (After-period Reported NIL Compensation for Eligible Class Members). Once it is established that any Division I athlete has value in his or her

1   NIL—which is readily accomplished by the simple fact of earning an NIL deal under the Interim NIL

2   Rules—Dr. Rascher concludes that the athlete suffered antitrust injury by virtue of the prohibition on

3   earning any NIL compensation under the Prior NIL rules.  For the Additional Sports Class, this

4   testimony will establish antitrust injury on a class-wide basis.  *See* Rascher ¶ 180.

5       ***Class-wide damages.***  Dr. Rascher also has created a common methodology which he can use

6   at trial to measure damages both on a class-wide basis and for each impacted class member.  He

7   conservatively opines that a class member who received third-party NIL compensation after July 1,

8   2021 would have at least received a similar amount of third-party NIL compensation during each year

9   of the damages period in which the class member was on a Division I team in the same sport, subject

10  to certain adjustments to make sure that the before-and-after periods would be an "apples-to-apples"

11  comparison.  *See* Rascher ¶¶ 194-95; *see also In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 145

12  (C.D. Cal. 2007) (collecting cases for the proposition that the "before-and-after methodology has been

13  accepted by numerous courts" as a way of determining impact and damages on a class-wide basis).

14  As Dr. Rascher explains, this methodology is conservative because it does not account for the growth

15  the college athlete NIL market would have experienced in the but-for world before July 1, 2021, had

16  the Prior NIL Rules not existed, nor does it account for the actual growth that will take place in the

17  future as the NIL market continues to develop.  Rascher ¶ 195.

18      Dr. Rascher will be able to use this common methodology of before-and-after analysis at trial,

19  adjusted to take account of material differences in the before and after periods, to conservatively

20  measure the class-wide damages from these lost NIL opportunities for the Additional Sports Class

21  members, as well as for those members of the Football and Men's Basketball Class and the Women's

22  Basketball Class who meet the same criteria.  *See* Rascher ¶¶ 194-95.

23                              *       *       *

24      In sum, for each of the three damages classes, Plaintiffs have met their burden at the class

25  certification stage by presenting "realistic methodologies'" to demonstrate class-wide injury (*DRAM*,

26  2006 WL 1530166, at *8 (quoting *Rubber Chems.*, 232 F.R.D. at 353)) and damages models that are

27  consistent with their theory of liability and demonstrate how damages are capable of class-wide

28  measurement.  *See Comcast*, 569 U.S. at 29; *Just Film, Inc.*, 847 F.3d at 1120.

1        **b.**     **A Class Action is Superior to Other Available Methods of Adjudication**

2        Certification is appropriate under Rule 23(b)(3) if class treatment "is superior to other available

3 methods for fairly and efficiently adjudicating the controversy." The relevant superiority factors to

4 consider are (1) "the class members' interests in individually controlling the prosecution or defense of

5 separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun

6 by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of

7 the claims in the particular forum"; and (4) "the likely difficulties of managing a class action." Fed.

8 R. Civ. P. 23(b)(3).

9        All four superiority factors favor class treatment here. Application of factors one and three to

10 this case favors litigating these claims in a single forum. Although the amount of damages sustained

11 by each class member will vary, the measure of damages sustained by thousands of individual class

12 members are likely to be too low to incentivize class members to litigate their claims individually.

13 Rascher Fn. 232 (showing low NIL deal values); *see Loc. Joint Exec. Bd. of Culinary/Bartender Tr.*

14 *Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001) (first Rule 23 superiority factor

15 supports class treatment when there are class members for whom it would be "uneconomical to litigate

16 individually").[58] This is especially true given how expensive it would be for individual plaintiffs to

17 marshal the evidence they need to prevail in complex antitrust litigation against well-funded,

18 sophisticated defendants like the NCAA and Conference Defendants. *See In re ConAgra Foods, Inc.*,

19 90 F.Supp.3d 919, 1033 (C.D. Cal. 2015) ("The funds required to marshal the type of evidence,

20 including expert testimony, that is necessary to pursue such a claim against a well-represented

21

22     [58] Indeed, "[t]he policy at the very core of the class action mechanism is to overcome the problem
that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting

23 his or her rights." *Amchem*, 521 U.S. at 617. Even if a portion of the class suffered significant
damages, they would be the exception to the rule. And "[t]he mere fact that some class members may

24 have suffered significant damages does not detract from the overall efficiency and economy of
resolving the claims of the entire class in a single action." *Brice Yingling v. eBay, Inc.*, 2010 WL

25 11575128, at *6 (N.D. Cal. July 16, 2010); *see also Hanlon*, 150 F.3d at 1023 (superiority met where
"most cases" would be negative-value); *In re Washington Mut. Mortg.-Backed Sec. Litig.*, 276 F.R.D.

26 658, 668 (W.D. Wash. 2011) (superiority met even though "some of the absent members may
have large claims or are sophisticated investors"); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297,

27 325 (E.D. Mich. 2001) ("[T]he presence of large claimants in a proposed antitrust class and the
possibility that some of them might proceed on their own does not militate against class

28 certification.").

corporate defendant would discourage individual class members from filing suit when the expected return is so small.").

Factor two—the extent and nature of similar litigation—also favors class certification. Plaintiffs are not aware of any other litigation in the country involving similar antitrust claims challenging the NCAA's or Conference Defendants' NIL rules. Factor three also favors litigating the case in this forum, where the Court has managed related class actions involving similar, complex issues of fact and law with the same parties, and already has resolved a contested motion to dismiss in this case. *See Morelock Enters., Inc. v. Weyerhaeuser Co.*, 2004 WL 2997526, at *5 (D. Or. Dec. 16, 2004) ("It also is desirable to concentrate this litigation in the District of Oregon, where several related cases have been adjudicated.").

With respect to the fourth factor, this class action would be no more difficult to manage through trial than *Alston*. Moreover, the manageability concerns that led the Court to deny certification of the proposed damages classes in *O'Bannon* are not present here. In that case, the Court was concerned that a so-called "substitution effect" would make identification of which class members were harmed by Defendants' conduct infeasible. *See O'Bannon*, 2013 WL 5979327, at *7-*9. But as Dr. Rascher shows, that is not a concern for the damages classes in this case. To begin with, the evidence since *O'Bannon* shows that the factual predicate for the claimed substitution effect—college athletes being displaced by others due to increased benefits from schools—has not actually materialized when such additional benefits have been provided (after the *O'Bannon* and *Alston* decisions, respectively). Thus, as Dr. Rasher concludes, the empirical evidence demonstrates that the so-called substitution effect is not a real-world barrier to identifying injured class members. Moreover, because the Football and Men's Basketball Class and the Women's Basketball Class are limited to only full-GIA recipients at Power Five schools, any potential "cascade" down effect would still have left these athletes better off without the challenged NIL restraints. *See* Rascher ¶¶ 226-33. As for the Additional Sports Class, as Dr. Rascher explains, there is no substitution effect concern. Lucrative opportunities in professional sports are few and far between for college athletes outside of the Power Five Conferences and Notre Dame, so the very premise of the substitution effect theory does not apply to almost all of the athletes in the Additional Sports Class. But even if it did, most of these sports do not have any limit on the

number of athletes who may receive scholarships (they are so-called "non-counter sports"). Thus, if an athlete in a non-counter sport were to decide to stay in school for an extra year rather than play professionally, that decision would not displace any other athlete from the team. Rascher ¶ 232-33. There is thus no substitution effect barrier to class certification here.

Finally, Plaintiffs recognize that in *O'Bannon* this Court held that the classes claiming "broadcast" and "video game" damages were unmanageable because they were defined by those who actually appeared in game footage or video games, and plaintiffs did not propose a feasible way to identify them. *See O'Bannon*, 2013 WL 5979327, at *9. There is no such concern in this case. As Dr. Rascher and Mr. Desser explain, broadcasters and video game publishers need to secure the NIL rights of all players on a given team, whether or not a particular player's NIL is actually shown on television or included in the video game. Rascher ¶ 148 (video games), 163 (broadcast); Desser § 9. Accordingly, the damages methodologies constructed by Dr. Rascher for broadcast and videos game NILs in this case do not require identifying which class members would have appeared in a specific broadcast or game.

## V.  THE COURT SHOULD APPOINT HAGENS BERMAN AND WINSTON & STRAWN AS CLASS COUNSEL

"An order that certifies a class action . . . must appoint class counsel under Rule 23(g)." Fed. R. Civ. P. 23(c)(1)(B). Rule 23(g) provides that, "[i]n appointing class counsel, the court [] must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). Hagens Berman and Winston & Strawn seek to be appointed as Co-lead Class Counsel. Both firms have vigorously litigated this case and have extensive experience in handling, and devoting the resources necessary to support, complex class actions, including antitrust class actions involving athletes, and specifically class actions for athletes against the NCAA. *See* Berman Decl., Ex. 56 (firm resume); Kessler Decl., Appendices A-D. They also have achieved great success for athlete classes they have represented against the NCAA. *See Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141 (2021).

1

## VI.   CONCLUSION

2   For all of the foregoing reasons, Plaintiffs respectfully request that the Court certify each of

3 the proposed classes under Rules 23(a) and (b)(2) and (3).

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
No. 4:20-cv-03919-CW

1

Dated: October 21, 2022

Respectfully submitted,

2

HAGENS BERMAN SOBOL SHAPIRO LLP

WINSTON & STRAWN LLP

3

By:  */s/ Steve W. Berman*

By:  */s/ Jeffrey L. Kessler*

4

    Steve W. Berman (*pro hac vice*)
Emilee N. Sisco (*pro hac vice*)

    Jeffrey L. Kessler (*pro hac vice*)
David G. Feher (*pro hac vice*)

5

Stephanie Verdoia (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP

David L. Greenspan (*pro hac vice*)
Adam I. Dale (*pro hac vice*)

6

1301 Second Avenue, Suite 2000
Seattle, WA 98101

WINSTON & STRAWN LLP
200 Park Avenue

7

Telephone: (206) 623-7292
Facsimile: (206) 623-0594

New York, NY 10166-4193
Telephone: (212) 294-4698

8

steve@hbsslaw.com
emilees@hbsslaw.com

Facsimile: (212) 294-4700
jkessler@winston.com

9

stephaniev@hbsslaw.com

dfeher@winston.com
dgreenspan@winston.com

10

Benjamin J. Siegel (SBN 256260)

aidale@winston.com

11

HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202

Jeanifer E. Parsigian (SBN 289001)

12

Berkeley, CA 94710
Telephone: (510) 725-3000

WINSTON & STRAWN LLP
101 California Street, 34th Floor

13

Facsimile: (510) 725-3001
bens@hbsslaw.com

San Francisco, CA 94111
Telephone: (415) 591-1000

14

Jeffrey L. Kodroff

Facsimile: (415) 591-1400
jparsigian@winston.com

15

SPECTOR ROSEMAN & KODROFF PC

16

Two Commerce Square
2001 Market Street, Suite 3420

*Counsel for Plaintiffs and the Proposed Classes*

17

Philadelphia, PA 19103
Telephone: (215) 496 0300

18

Facsimile: (215) 496 6611
jkodroff@srkattorneys.com

19

20

*Counsel for Plaintiffs and the Proposed Classes*

21

22

23

24

25

26

27

28

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)

Pursuant to Civil Local Rule 5-1(i)(3), the filer of this document attests that concurrence in the filing of this document has been obtained from the signatories above.

/s/ *Steve W. Berman*
STEVE W. BERMAN
