Steve W. Berman (*pro hac vice*)
Emilee N. Sisco (*pro hac vice*)
Stephanie Verdoia (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
emilees@hbsslaw.com
stephaniev@hbsslaw.com

Benjamin J. Siegel (SBN 256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
bens@hbsslaw.com

*Counsel for Plaintiffs and the Proposed Classes*

Jeffrey L. Kessler (*pro hac vice*)
David G. Feher (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
Adam I. Dale (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4698
Facsimile: (212) 294-4700
jkessler@winston.com
dfeher@winston.com
dgreenspan@winston.com
aidale@winston.com

Jenifer E. Parsigian (SBN 289001)
101 California Street, 34th Floor
San Francisco, CA 94111
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
jparsigian@winston.com

*Counsel for Plaintiffs and the Proposed Classes*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | **Case No. 4:20-cv-03919 CW**<br><br>**DECLARATION OF STEVE W. BERMAN IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF HAGENS BERMAN SOBOL SHAPIRO LLP AS CO-LEAD CLASS COUNSEL**<br><br>**[PUBLIC VERSION]**<br><br>Date:       May 24, 2023<br>Time:      2:30 p.m.<br>Judge:     Hon. Judge Claudia Wilken<br>Courtroom: 2, 4th Floor |

1    I, STEVE W. BERMAN, declare as follows:

2    1.    I am an attorney duly licensed to practice law before this Court.  I am a member of the

3    Washington Bar, and I have been admitted to this Court *pro hac vice*.  I am the managing partner of

4    Hagens Berman Sobol Shapiro LLP and counsel for Plaintiffs Grant House, Sedona Prince, and

5    Tymir Oliver in this matter.  I am seeking to be appointed class counsel for the proposed classes.

6    2.    I submit this declaration in support of Plaintiffs' Motion for Class Certification.

7    Based on personal knowledge or discussions with counsel in my firm of the matters stated herein, if

8    called upon, I could and would competently testify thereto.

9    3.    Hagens Berman Sobol Shapiro's antitrust practice has extensive experience litigating

10   a wide array of antitrust actions, including numerous antitrust litigations involving college athletes'

11   rights.  I have significant experience going to trial or settling complex cases on behalf of athletes.

12   4.    For example, I served as co-lead class counsel for classes of collegiate athletes in

13   multiple instances before this Court.  In 2010, I was appointed co-lead class counsel in *O'Bannon v.*

14   *National Collegiate Athletic Association et al*, 7 F. Supp. 3d 955 (N.D. Cal. 2014) to represent

15   former and current football and men's basketball players in an antitrust action against EA and the

16   NCAA regarding players names, images, and likenesses, resulting in a substantial settlement.  More

17   recently, in *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F.

18   Supp. 3d 1058 (N.D. Cal. 2019), I was appointed co-lead class counsel.  The case resulted in a

19   settlement for impacted college athletes, as well as a widely recognized landmark antitrust ruling

20   establishing various restraints on player compensation by the NCAA violated antitrust law.

21   5.    I have experience and expertise in complex class actions and other litigation in the

22   areas of antitrust and players' rights.  As counsel in *Mehr v. Federation Internationale de Football*

23   *Association*, I represented athletes fighting Federation Internationale de Football Association (FIFA)

24   for better protections from head injuries.  This shed light on similar practices by the NCAA, which I

25   challenged as co-lead counsel in *In re National Collegiate Athletic Association Student-Athlete*

26   *Concussion Injury Litigation*, No. 13-C-9116, 2016 WL 205380 (N.D. Ill., E. Div. Jan. 26, 2016),

27

28

and obtained a settlement including medical monitoring, research, and permanent changes in concussion protocol for future college athletes.

6.      I have represented thousands of plaintiffs in large antitrust cases and have achieved favorable results for them. As co-lead counsel in *In re Visa Check/Mastercard Antitrust Litigation*, No. 96-cv-05238 (E.D.N.Y.), I obtained the then largest antitrust settlement in history for consumers while challenging alleged anti-competitive agreements among U.S. banks, Visa, and Mastercard, regarding ATM fees. I also represented consumers in *In re Optical Disk Drive Products Antitrust Litigation*, No. 10-md-2143-RS (N.D. Cal.), *In re Electronic Books Antitrust Litigation*, No. 11-md-02293 (DLC) (S.D.N.Y.), and *In re Lithium Ion Batteries Antitrust Litigation*, No. 13-md-02430 (N.D. Cal.), obtaining court-approved settlements for class members in all three cases. Recently, in May 2022, I was approved as co-lead counsel to represent a certified class of thousands of consumers in *In re Broiler Chicken Antitrust Litigation*, No. 1:16-cv-08637 (N.D. Ill. May 27, 2022), ECF No.5644. The court noted that after approving several class settlements, Hagens Berman "more than adequately represented the class and will continue to do so moving forward."[1] When I was appointed counsel in a large MDL, Judge Milton Shadur, stated:

> ". . . the track record of Hagens Berman and its lead partner Steve Berman is even more impressive, having racked up such accomplishments as a $1.6 billion settlement in the Toyota Unintended Acceleration Litigation and a substantial number of really outstanding big ticket results."[2]

7.      I, additionally, have extensive trial experience fighting for plaintiffs. Before this Court, I led the Hagens Berman trial team in the 10-day trial in *In re NCAA Grant-in-Aid Cap Antitrust Litigation* in September 2019. Previously, I was appointed the lead trial lawyer in *In re Pharmaceutical Industry Average Wholesale Price Litigation*, No. 01-cv-12257 (D. Mass.), a case

---

[1] *Id.* Memorandum Order at 6.

[2] Memorandum Order at 5, *In re Stericycle, Inc., Sterisafe Contract Litig.*, No. 13-cv-5795 (N.D. Ill. Oct. 11, 2013), ECF No. 56 (footnotes omitted).

successfully tried in front of the Honorable Patti B. Saris. I also successfully argued the appeal from the trial before the First Circuit. The court approved a total of $338 million in settlements.

8.      Hagens Berman Sobol Shapiro has the expertise and resources necessary to represent the proposed classes in this litigation.  Our firm was recently named in 2022 the "Elite Trial Lawyer – Litigation Firm of the Year" in the Antitrust Category by the National Law Journal, as well as being named "Practice Group of the Year – Antitrust" by Law360 for 2022, and honoree for "Outstanding Antitrust Litigation Achievement in Private Law Practice" by the American Antitrust Institute in 2021.  And more generally as a class-action firm, Hagens Berman has won "Practice Group of the Year – Class Action" from 2019-2022 by Law360, as well "MVP of the Year Award –Class Actions" from 2016-2020.

9.      Representing Plaintiffs with me in this class action will be Ben Siegel, Emilee Sisco, and Stephanie Verdoia.[3]

10.      Attached hereto are true and correct copies of the following Exhibits:

| Ex. | Description | Conf. Desig. |
|-----|-------------|--------------|
| 1 | Summary of NCAA Bylaws challenged by Plaintiffs | None |
| 2 | Excerpt from Brief for the National Collegiate Athletic Association, filed Nov. 14, 2014, Appeal Nos. 14-16601, 14-17068 (9th Cir.) | None |
| 3 | Excerpt from Reporters' Transcript of Proceedings, *O'Bannon v. National Collegiate Athletic Association*, June 19, 2014 (N.D. Cal.) | None |
| 4 | Article: *Mark Emmert: Fair Pay to Play An "Existential Threat" to NCAA Model*, sportsbusinessjournal.com, Sept. 26, 2019 | None |
| 5 | Article: *Jack Swarbrick Speaks Out on Paying Student Athletes*, herloyalsons.com, Dec. 11, 2014 | None |
| 6 | Article: *Oliver Luck brings own perspective to NCAA on O'Bannon name and likeness issue*, USA Today, Jan. 16, 2015 | None |

---

[3] Biographies of each appear in the Hagens Berman Sobol Shapiro LLP firm resume attached to this Declaration as Exhibit 56.

| Ex. | Description | Conf. Desig. |
|-----|-------------|--------------|
| 7 | Document Bates-numbered BIGTEN-NIL_00142305-307, produced in the above-captioned action by Defendant Big Ten Conference, Inc. and marked as Plaintiffs' Exhibit 20 | Highly Conf. |
| 8 | Document Bates-numbered BIG12-GIA_00126667-685, produced by Defendant Big 12 Conference, Inc. *In re Nat'l Collegiate Athletic Ass'n Grant-in-Aid Cap Antitrust Litig.*, No. 4:14-md-02541-CW (N.D. Cal.) and marked as Exhibit 1050 at the Deposition of Robert Bowlsby | Conf. |
| 9 | Article: *Former NCAA executive Mark Lewis supports college players earning money*, ESPN.com, Jan. 20, 2020 | None |
| 10 | Excerpts from 30(b)(6) Deposition Transcript of Mark A. Lewis, taken on Jan. 31, 2017, *In re Nat'l Collegiate Athletic Ass'n Grant-in-Aid Cap Antitrust Litig.*, No. 4:14-md-02541-CW (N.D. Cal.) | Network Strictly Confidential |
| 11 | Excerpts from Deposition Transcript of James Delany, taken in this action on Sept. 20, 2022 | Network Strictly Confidential |
| 12 | Document Bates-numbered NCAAHOUSE00179488, produced in the above-captioned action by Defendant NCAA | Conf. |
| 13 | Document Bates-numbered NCAAHOUSE00179489-490, produced in the above-captioned action by Defendant NCAA | Conf. |
| 14 | Document Bates-numbered BIGTEN-NIL_00109826-829, produced in the above-captioned action by Defendant Big Ten Conference, Inc. and marked as Plaintiffs' Exhibit 8 | None |
| 15 | Document Bates-numbered NCAAHOUSE0000513-543, produced in the above-captioned action by Defendant NCAA | None |
| 16 | Document entitled, "Interim NIL Policy" | None |
| 17 | Document Bates-numbered PLTFS000948-49, produced by Plaintiffs in the above-captioned action | None |
| 18 | Document Bates-numbered NCAAHOUSE00201234-37, produced in the above-captioned action by Defendant NCAA | Conf. |
| 19 | Plaintiffs' FRE 1006 Summary of Top Compensation Packages in College Sports | None |
| 20 | Article: *Jim Harbaugh wants Big Ten to share TV rights revenue with players*, mlive.com, July 26, 2022 | None |
| 21 | Article: *College football players group speaks with Big Ten commissioner Kevin Warren, demands include share of revenue*, CBSSports.com, July 23, 2022 | None |

| Ex. | Description | Conf. Desig. |
|---|---|---|
| 22 | Article: *Kevin Warrant to Bryant Gumbel: Paying players and expansion to 20 schools on Big Ten agenda | Jones*, pennlive.com, Aug. 19, 2022 | None |
| 23 | Excerpt from Reporters' Transcript of Proceedings, *O'Bannon v. National Collegiate Athletic Association*, June 18, 2014 (N.D. Cal.) | None |
| 24 | Excerpts from Deposition Transcript of Todd W. Sitrin, taken on Jan. 25, 2013, *In re NCAA Student-Athlete Name & Likeness Licensing Litigation*, No. 4:09-cv-1967 CW | Highly Conf. AEO |
| 25 | Document Bates-numbered EA_NIL00000149-150, produced in the above-captioned action by third party Electronic Arts, Inc. in response to Plaintiffs'' subpoena | Highly Conf. - Counsel Only |
| 26 | Document Bates-numbered NCAAHOUSE00179534-36, produced in the above-captioned action by Defendant NCAA | Conf. |
| 27 | Document Bates-numbered EA_NIL_00000125-28, produced in the above-captioned action by third party Electronic Arts, Inc. in response to Plaintiffs'' subpoena | Highly Conf. - Counsel Only |
| 28 | Document Bates-numbered EA_NIL_00000249-250, produced in the above-captioned action by third party Electronic Arts, Inc. in response to Plaintiffs'' subpoena | Highly Conf. - Counsel Only |
| 29 | Document Bates-numbered EA_NIL_00000972, produced in the above-captioned action by third party Electronic Arts, Inc. in response to Plaintiffs'' subpoena | Highly Conf. - Counsel Only |
| 30 | Article: *Nebraska First to Launch Program to Help Student Athletes Maximize the Value of Their Individual Brands*, Forbes.com, Mar. 10, 2020 | None |
| 31 | Article: *First year of NIL data shows trends favoring social media, football*, on3.com, July 4, 2022 | None |
| 32 | Article: *LSU gymnast Olivia Dunne inks NIL deal with activewear company*, foxbusiness.com, Sept. 16, 2021 | None |
| 33 | Article: *Zia Cooke, one of the highest paid college basketball players, talks about impact of sponsorship deals*, CBSnews.com, Apr. 17, 2022 | None |
| 34 | Article: *Cavinder Twins, Stars On TikTok And Basketball Court, Are Nearing $2 Million In NIL Deals, With More Ahead*, Forbes.com, July 1, 2022 | None |
| 35 | Publication: *N1L - One Year of Name, Image and Likeness*, Opendorse, June 30, 2022 | None |

| Ex. | Description | Conf. Desig. |
|---|---|---|
| 36 | Article: *Marketers Bullish On Monetization Opportunities For NCAA Athletes With NIL Rights*, Forbes.com, Nov. 25, 2019 | None |
| 37 | Document Bates-numbered UMC.001439-448, produced in the above-captioned action by non-party University of Missouri in response to Plaintiffs' subpoena | Highly Conf. |
| 38 | Document Bates-numbered NCAAHOUSE00179538-547, produced in the above-captioned action by Defendant NCAA | Conf. |
| 39 | Defendant NCAA's Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories to All Defendants, dated Aug. 2, 2022 | Conf. |
| 40 | Article: *March Madness Daily: The NCAA's Billion-Dollar Cash Cow*, Sportico.com, Mar. 26, 2022 | None |
| 41 | Article: *Big Ten officially agrees to new media deals with CBS, Fox, NBC*, sportsbusinessjournal.com, Aug. 18, 2022 | None |
| 42 | Article: *Big Bucks, Big Buyouts: Public universities shell out millions of dollars firing coaches who didn't win enough*, Arnolt Center for Investigative Journalism, Sept. 19, 2022 | None |
| 43 | Article: *Bob Bowlsby: The 'Sky Didn't Fall' on NIL Day on July 1*, heartlandcollegesports.com, July 14, 2021 | None |
| 44 | Article: *SBJ College: Stakeholders give their take on start to NIL*, sportsbusinessjournal.com, July 13, 2021 | None |
| 45 | Document Bates-numbered NCAAHOUSE00108026-8044, produced in the above-captioned action by Defendant NCAA | Conf. |
| 46 | Article: *NIL hasn't made a difference for most in enjoyment of college sports, poll finds*, washingtonpost.com, June 30, 2022 | None |
| 47 | Plaintiff Sedona Prince's Objections and Responses to Defendant NCAA's First Set of Interrogatories, dated July 27, 2022 | Conf. |
| 48 | Plaintiff Grant House's Objections and Responses to Defendant NCAA's First Set of Interrogatories, dated July 27, 2022 | Conf. |
| 49 | Plaintiff Tymir Oliver's Objections and Responses to Defendant NCAA's First Set of Interrogatories, dated July 27, 2022 | Conf. |
| 50 | Excerpts from the Deposition Transcript of Chad Hawley, taken in the above-captioned action on Oct. 7, 2022 | Network Strictly Confidential |
| 51 | Document Bates-numbered SEC-HOUSE0076657, produced in the above-captioned action by Defendant Southeastern Conference | Conf. |

| Ex. | Description | Conf. Desig. |
|-----|-------------|--------------|
| 52 | Declaration of Steven J. Scebelo in Response to Subpoena Duces Tecum, dated Sept. 26, 2022 (National Football League Players Association) | Highly Conf. |
| 53 | Declaration of Gary Arrick in Response to Subpoena Duces Tecum, dated Oct. 14, 2022 (National Basketball Players Association) | Highly Conf. |
| 54 | Document entitled, "Interim Name, Image and Likeness Policy Guidance Regarding Third Party Involvement | None |
| 55 | Plaintiffs' FRE 1006 Summary of Notable College Football Coach Severance Buyouts | None |
| 56 | Excerpts from the Firm Resume of Hagens Berman Sobol Shapiro LLP | None |

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 21st day of October, 2022 at Seattle, Washington.


_____
            */s/ Steve W. Berman*
            STEVE W. BERMAN

# EXHIBIT 1

## The Anticompetitive Rules Plaintiffs Challenge[1]

NCAA Bylaw 12.1.3 "Amateur Status if Professional in Another Sport"

NCAA Bylaw 12.4.1 "Criteria Governing Compensation to Student-Athletes"

NCAA Bylaw 12.4.1.1 "Athletics Reputation"

NCAA Bylaw 12.4.2.3 "Athletics Equipment Sales"

NCAA Bylaw 12.4.4 "Self-Employment"

NCAA Bylaw 12.5.2.1 "Advertisements and Promotions After Becoming a Student Athlete"

NCAA Bylaw 12.5.2.2 "Use of a Student-Athlete's Name or Picture Without Knowledge or Permission"

NCAA Bylaw 12.7.2 "Student-Athlete Statement"

NCAA Bylaw 14.01.3 "Compliance With Other NCAA and Conference Legislation"

NCAA Constitution, Article 1.3.2 "Obligations of Member Institutions"

NCAA Constitution, Article 2.8.1 "Responsibility of Institution"

NCAA Constitution, Article 2.8.3 "Penalty for Noncompliance"

NCAA Constitution, Article 3.1 "Eligibility for Membership"

NCAA Constitution, Article 3.01.4 "Termination or Suspension of Membership"

NCAA Constitution, Article 3.2.1.2 "Compliance with Association Rules"

NCAA Constitution, Article 3.2.4 "Conditions and Obligations of Membership"

NCAA Constitution, Article 3.2.4.4 "Certification of Eligibility/Declaration of Ineligibility"

NCAA Constitution, Article 3.2.4.11 "Discipline of Member"

NCAA Constitution, Article 3.2.5.1 "Termination or Suspension"

NCAA Constitution, Article 3.2.5.1.1 "Cessation of Rights and Privileges"

NCAA Constitution, Article 5.2.2 "Operating Bylaw"

Article 2 (B)(4) of the recently enacted NCAA constitution

**Conference rules that require compliance with NCAA bylaws:**

ACC Bylaw Article II, "NCAA Regulations"

Big Ten Bylaw 6.01.1, "Institutional Responsibility for Compliance"

Big 12 Bylaw 1.3.2, "Adherence to NCAA Rules"

Pac-12 Executive Regulation 4-1, "NCAA Rules"

Pac-12 Constitution and Bylaws Chapter 4, Section 2, "Application of NCAA Legislation"

SEC Constitution, Article 5.01.1, "Governance"

SEC Bylaws, Article 14.01.1, "Compliance with Other NCAA and Conference Legislation"

---

[1] Plaintiffs reserve the right to amend this list through the date of judgment in this matter

**12.1.3 Amateur Status if Professional in Another Sport.** A professional athlete in one sport may represent a member institution in a different sport and may receive institutional financial assistance in the second sport. *(Revised: 4/27/06 effective 8/1/06)*

**12.4.1 Criteria Governing Compensation to Student-Athletes.** Compensation may be paid to a student-athlete: *(Revised: 11/22/04, 4/19/19 for violations occurring on or after 4/19/19)*

(a)     Only for work actually performed; and

(b)     At a rate commensurate with the going rate in that locality for similar services.

**12.4.1.1 Athletics Reputation.** Such compensation may not include any remuneration for value or utility that the student-athlete may have for the employer because of the publicity, reputation, fame or personal following obtained because of athletics ability.

**12.4.2.3 Athletics Equipment Sales.** A student-athlete may not be employed to sell equipment related to the student-athlete's sport if the student-athlete's name, picture or athletics reputation is used to advertise or promote the product, the job or the employer. If the student-athlete's name, picture or athletics reputation is not used for advertising or promotion, the student-athlete may be employed in a legitimate sales position, provided the student-athlete is reimbursed at an hourly rate or set salary in the same manner as any nonathlete salesperson.

**12.4.4 Self-Employment.** A student-athlete may establish a business, provided the student-athlete's name, photograph, appearance or athletics reputation is not used to promote the business. *(Adopted: 12/12/06)*

**2.5.2.1 Advertisements and Promotions After Becoming a Student-Athlete.** After becoming a student-athlete, a student-athlete shall not be eligible for participation in intercollegiate athletics if the student-athlete:

(a)     Accepts any remuneration for or permits the use of the student-athlete's name or picture to advertise, recommend or promote directly the sale or use of a commercial product or service of any kind; or

(b)     Receives remuneration for endorsing a commercial product or service through the student-athlete's use of such product or service.

**12.5.2.2 Use of a Student-Athlete's Name or Picture Without Knowledge or Permission.** If a student-athlete's name or picture appears on commercial items (e.g., T-shirts, sweatshirts, serving trays, playing cards, posters) or is used to promote a commercial product sold by an individual or agency without the student-athlete's knowledge or permission, the student-athlete (or the institution acting on behalf of the student-athlete) is required to take steps to stop such an activity in order to retain eligibility for intercollegiate athletics. Such steps are not required in cases in which a student-athlete's photograph is

sold by an individual or agency (e.g., private photographer, news agency) for private use. *(Revised: 1/11/97, 5/12/05)*

**12.7.2 Student-Athlete Statement.**

**12.7.2.1 Content and Purpose.** Prior to participation in intercollegiate competition each academic year, a student-athlete shall sign a statement in a form prescribed by the Legislative Committee in which the student-athlete submits information related to eligibility, recruitment, financial aid, amateur status, previous positive-drug tests administered by any other athletics organization and involvement in organized gambling activities related to intercollegiate or professional athletics competition under the Association's governing legislation. Failure to complete and sign the statement shall result in the student-athlete's ineligibility for participation in all intercollegiate competition. Violations of this bylaw do not affect a student-athlete's eligibility if the violation occurred due to an institutional administrative error or oversight, and the student-athlete subsequently signs the form; however, the violation shall be considered an institutional violation per Bylaw 8.01.3. *(Revised: 1/10/92 effective 8/1/92, 1/14/97, 2/19/97, 4/24/03, 11/1/07 effective 8/1/08, 8/7/14, 10/4/17)*

**14.01.3 Compliance With Other NCAA and Conference Legislation.** To be eligible to represent an institution in intercollegiate athletics competition, a student-athlete shall be in compliance with all applicable provisions of the constitution and bylaws of the Association and all rules and regulations of the institution and the conference, if any, of which the institution is a member. A violation of this bylaw that relates only to a violation of a conference rule shall be considered an institutional violation per Bylaw 8.01.3; however, such a violation shall not affect the student-athlete's eligibility. *(Revised: 10/27/06, 5/29/08)*

**1.3.2 Obligations of Member Institutions.** [*] Legislation governing the conduct of intercollegiate athletics programs of member institutions shall apply to basic athletics issues such as admissions, financial aid, eligibility and recruiting. Member institutions shall be obligated to apply and enforce this legislation, and the infractions process of the Association shall be applied to an institution when it fails to fulfill this obligation. *(Revised: 7/31/14)*

**2.8.1 Responsibility of Institution.** [*] Each institution shall comply with all applicable rules and regulations of the Association in the conduct of its intercollegiate athletics programs. It shall monitor its programs to ensure compliance and to identify and report to the Association instances in which compliance has not been achieved. In any such instance, the institution shall cooperate fully with the Association and shall take appropriate corrective actions. Members of an institution's staff, student athletes, and other individuals and groups representing the institution's athletics interests shall comply with the applicable Association rules, and the member institution shall be responsible for such compliance.

**2.8.3 Penalty for Noncompliance.** [*] An institution found to have violated the Association's rules shall be subject to such disciplinary and corrective actions as may be determined by the Association.

**3.1 Eligibility for Membership.**

**3.1.1 General.** Membership is available to four-year colleges and universities that are accredited by one of the regional accrediting agencies and are located in the United States, its territories or possessions, and athletics conferences. Such institutions or organizations must accept and observe the principles set forth in the constitution and bylaws of the Association. *(Revised: 8/9/07, 11/1/07, 1/15/11 effective 8/1/11, 6/26/19 effective 8/1/19)*

**3.01.4 Termination or Suspension of Membership.** All rights and privileges of a member shall cease immediately upon termination or suspension of its membership.

**3.2.1.2 Compliance With Association Rules.** The institution shall administer its athletics programs in accordance with the constitution, bylaws and other legislation of the Association.

**3.2.4 Conditions and Obligations of Membership.**

**3.2.4.1 General.** An active member institution agrees to administer its athletics program in accordance with the constitution, bylaws and other legislation of the Association.

**3.2.4.4 Certification of Eligibility/Declaration of Ineligibility.** An active member is responsible for certifying the eligibility of student-athletes under the terms of the constitution, bylaws or other legislation of the Association before permitting a student-athlete to represent the institution in intercollegiate competition. Procedures for eligibility certification shall be approved by the president or chancellor, who may designate an individual on the institution's staff to administer proper certification of eligibility. The institution shall be obligated immediately to apply all applicable rules and withhold ineligible student-athletes from all intercollegiate competition (see Bylaw 12.11). See Bylaw 12.12 for procedures regarding restoration of eligibility. *(Revised: 3/8/06)*

**3.2.4.11 Discipline of Members.** Pursuant to directions of the Board of Directors or the annual Convention, an active member institution shall refrain from athletics competition with designated institutions as required under the provisions of the Association's infractions process (see Bylaw 19). *(Revised: 11/1/07 effective 8/1/08, 7/31/14)*

**3.2.5.1 Termination or Suspension.** The membership of any active member failing to maintain the academic or athletics standards required for such membership or failing to meet the conditions and obligations of membership may be suspended, terminated or otherwise disciplined by a vote of two-thirds of the delegates present and voting at an annual Convention. Membership shall not be suspended or terminated unless: *(Revised: 3/8/06)*

(a)     A notice of intention to suspend or terminate membership, stating the grounds on which such a motion will be based, is given in writing to the chair of the Board of Directors and to the

president or chancellor of the member institution on or before the first day of November prior to the Convention;

(b)      The Board of Directors approves the notification of intention to move for suspension or termination; and(c) Such notice is included in the Official Notice of the annual Convention.


**3.2.5.1.1 Cessation of Rights and Privileges.** All rights and privileges of the member shall cease upon any termination or suspension of active membership.


**5.2.2 Operating Bylaws.** [*] Each division may adopt legislation to be included in the operating bylaws of the Association, which provide rules and regulations not inconsistent with the provisions of the constitution and which shall include, but not be limited to, the following particulars: *(Revised: 1/9/96 effective 8/1/97)*

(a)      The administration of intercollegiate athletics by members of the Association;

(b)      The establishment and control of NCAA championships (games, matches, meets and tournaments) and other athletics events sponsored or sanctioned by the Association;

(c)      The procedures for administering and enforcing the provisions of the constitution and bylaws; and (d) The adoption of rules of play and competition in the various sports, and the delegation of authority in connection with such subjects to individuals, officers or committees.


## NEW NCAA CONSTITUTION:


### Article 2(B)(4).

Each division shall establish guidelines regarding student-athlete benefits, including commercialization of name, image or likeness and to prevent exploitation of student-athletes or abuses by individuals or organizations not subject to the authority of the student-athlete's school.


## CONFERENCE RULES:


**ACC Bylaw, Article 2.2, NCAA Regulations.** The Conference and each of its Members shall be members of Division I Football Bowl Subdivision of the NCAA. All Members are bound by NCAA rules and regulations, unless Conference rules are more restrictive, in which case, the Members shall be bound by the more restrictive Conference rule(s).


**Big Ten Bylaw 6.01.1, Institutional Responsibility for Compliance.** It shall be the responsibility of each member university:

A.      To adhere to and enforce all Conference Rules and Agreements, and the NCAA Constitution, Bylaws and Regulations and their respective interpretations.

B.      To inform its athletic staff, students, and representatives of its athletic interests of the Conference Rules and Agreements, and the NCAA Constitution and Bylaws and Regulations, the importance of compliance, the consequences of violations, and Conference compliance procedures. The Directors of Athletics shall have special responsibility to provide this information on an ongoing basis.

C.      To report in writing immediately to the Conference Commissioner any information concerning any violation or any possible violation of any Conference Rule or Agreement, or of the NCAA Constitution, Bylaw or Regulation, by any member university student, athletic department staff member or representative of its athletic interests.

D.      To take prompt and appropriate remedial action whenever it finds that it is more likely than not a violation has occurred.

E.      To withhold a student-athlete from further competition, pending further Conference action, when it has been determined that the athlete either is ineligible or competed while ineligible.

F.      To act in conformity with these fundamental principles:

    1.      Any member university which employs or retains on its athletic staff anyone who has violated, or who has been a party to a violation of applicable NCAA and Conference legislation on recruiting, or who encourages others to commit a violation, may be required to show cause why its membership in the Conference should not be suspended or terminated.

    2.      Any student who is the recipient of financial assistance other than as provided for in the Conference Rules of Eligibility and Financial Aid shall forfeit all eligibility for participation in intercollegiate athletics.

    3.      Any student who is induced to enroll in violation of Agreement 13 shall forfeit all eligibility for participation in intercollegiate athletics.

    4.      Any member university which employs or retains on its athletic staff anyone who, upon inquiry by the Commissioner, intentionally falsifies or deliberately fails to provide complete and accurate information to the best of the individual's knowledge, may be required to show cause why its membership in the Conference should not be suspended or terminated.

    5.      Any student or prospective student, who upon inquiry by the Commissioner, intentionally falsifies or deliberately fails to provide complete and accurate information, to the best of the student's knowledge, shall forfeit such eligibility for intercollegiate athletics as may be prescribed by the Commissioner.

    6.      Any student who intentionally falsifies or deliberately fails to provide complete and accurate information, to the best of the student's knowledge, in the statements required in Rule 14.9 shall forfeit such eligibility for intercollegiate athletics as may be prescribed by the Commissioner.

**Big 12 Bylaw 1.3.2, Adherence to NCAA Rules.** All Members of the Conference are committed to complying with NCAA rules and policies. Accordingly, Members shall demonstrate institutional control and ensure that authority for the intercollegiate athletics program is vested in the campus chief

executive officer of such Member. In addition, the conduct of Members shall be fully committed to compliance with the rules and regulations of the NCAA and of the Conference. Each Member accepts the primary responsibility for the administration of rules and regulations, for investigating known or alleged violations at that institution, and for taking prompt and effective corrective actions where violations have occurred. On a regular basis, the Conference, through its Commissioner and others designated by the Commissioner, shall provide information and instructions to institutional personnel to assist the Members in their efforts to administer and enforce NCAA rules and regulations.

**Pac-12 Executive Regulation 4-1, NCAA Rules.** The rules of the National Collegiate Athletic Association shall govern all matters of student-athlete eligibility except to the extent that such rules are modified for practice and competition in Conference sports by regulations adopted by the CEO Group.

**Pac-12 Constitution and Bylaws Chapter 4, Section 2, Application of NCAA Legislation.** The Conference is a member of the NCAA, therefore, all member institutions are bound by NCAA rules and regulations unless the Conference rules are more demanding.

**SEC Constitution, Article 5.01.1, Governance.** The Conference shall be governed by the Constitution, Bylaws, and other rules, regulations, and legislation of the Conference and the NCAA.

**SEC Bylaws, Article 14.01.1, Compliance with Other NCAA and Conference Legislation.** Each student-athlete of each member institution who competes in, or is on the roster of a team that competes in, intercollegiate varsity or junior varsity athletic competition must comply with the Constitution, Bylaws, and other rules, regulations, and legislation of the Conference and the NCAA applicable to his/her sport in order to be eligible for athletically-related aid, for practice, and for competition.

# EXHIBIT 2

**Nos. 14-16601, 14-17068**

═══════════════════════════════════════

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

───────────

EDWARD O'BANNON, JR.,
ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED,
*Plaintiff-Appellee*,

*v.*

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,
*Defendant-Appellant*,

*and*

ELECTRONIC ARTS, INC.; COLLEGIATE LICENSING COMPANY,
*Defendants*.

───────────

Appeals from the United States District Court for the Northern
District of California, No. 09-cv-03329 (Wilken, C.J.)

───────────

## BRIEF FOR THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

───────────

GLENN D. POMERANTZ
KELLY M. KLAUS
LUIS LI
ROHIT K. SINGLA
CAROLYN H. LUEDTKE
THANE REHN
JUSTIN P. RAPHAEL
JESLYN A. MILLER
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105-2907
(415) 512-4000

GREGORY L. CURTNER
ROBERT J. WIERENGA
KIMBERLY K. KEFALAS
SUZANNE L. WAHL
SCHIFF HARDIN LLP
350 Main Street, Suite 210
Ann Arbor, MI 48104
(734) 222-1500

SETH P. WAXMAN
LEON B. GREENFIELD
DANIEL S. VOLCHOK
DAVID M. LEHN
WEILI J. SHAW
MATTHEW J. TOKSON
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue N.W.
Washington, D.C. 20006
(202) 663-6000

November 14, 2014

The court's alternative—paying student-athletes thousands of dollars supposedly for use of their NILs—is also not virtually as effective in serving the legitimate objective of amateurism.  In fact, it is entirely inconsistent with that principle.  Contrary to the court's view, amateurism is not simply a matter of the amount of any payment.  Allowing student-athletes to receive compensation for specific commercial revenue generated via use of their NILs is no less anathema to amateurism than paying football players $100 per sack.  Indeed, out of dozens of amateur-sports organizations surveyed for this case, not one allows amateur athletes to be paid a share of commercial revenue for the use of their NILs.  ER316a-316b, ER515a-515*l*, ER631-32, ER634-38.

The district court tried to justify its alternative by asserting that "[t]he popularity of college sports would not suffer" as a form of entertainment if the court's alternative were permitted.  ER52-54.  But the court failed to appreciate that by "differentiat[ing] college [sports] from … professional sports," the NCAA's commitment to amateurism does not just enhance the viewership of collegiate athletics; it "widen[s] consumer choice" for both "sports fans" and "athletes."  *Board of Regents*, 468 U.S. at 101-102.  The court's alternative would blur the clear line between amateur college sports and their professional counterparts and thereby deprive athletes of a genuine choice between the two endeavors.  *See, e.g.*, *Agnew*, 683 F.3d at 343-345.  Thus, the court's "alternative is

# EXHIBIT 3

VOLUME 9

PAGES 1712 – 1937

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EDWARD O'BANNON, ET AL.,    )
    )
    )
          PLAINTIFFS,    )      NO. C-09-3329 CW
    )
  VS.    )      THURSDAY, JUNE 19, 2014
    )
NATIONAL COLLEGIATE    )      OAKLAND, CALIFORNIA
ATHLETIC ASSOCIATION,    )
ET AL.,    )
    )
          DEFENDANTS.    )      COURT TRIAL
_____)

**BEFORE THE HONORABLE CLAUDIA WILKEN, JUDGE**

**REPORTERS' TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFFS:**      HAUSFELD, LLP
                 1700 K STREET, NW, SUITE 650
                 WASHINGTON, DC 20006
           BY:  MICHAEL D. HAUSFELD, ESQUIRE
                 SATHYA GOSSELIN, ESQUIRE

                 BOIES, SCHILLER & FLEXNER, LLP
                 5301 WISCONSIN AVENUE, N.W.
                 WASHINGTON, D.C. 20015
           BY:  WILLIAM A. ISAACSON, ESQUIRE

(APPEARANCES CONTINUED)

**REPORTED BY:**      DIANE E. SKILLMAN, CSR 4909
                 RAYNEE H. MERCADO, CSR 8258
                 OFFICIAL COURT REPORTERS

TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

Case 4:20-cv-03919-CW Document 208-1 Filed 10/31/22 Page 22 of 321
Case 4:09-cv-03329-CW Document 241 Filed 06/23/14 Page 22 of 221   1738
EMMERT – DIRECT / POMERANTZ

1   FIND WAYS TO INDUCE A STUDENT TO ATTEND ONE SCHOOL OR LEAVE A

2   SCHOOL HAVE PROVIDED THOSE KINDS OF IMPERMISSIBLE BENEFITS,

3   AND SO THERE'S ALWAYS A CONSTANT ADJUSTMENT OF THE RULES TO

4   MODIFY AND MAINTAIN THE FUNDAMENTAL NOTION THAT -- THAT THE

5   AMATEURISM MODEL IS ABOUT NOT PAYING STUDENT ATHLETES FOR

6   PARTICIPATING IN SPORTING EVENTS.

7   **Q.**  AND DOES THE NCAA HAVE RULES THAT ADDRESS THE PAYMENTS TO

8   STUDENT ATHLETES FOR USE OF THEIR NAME, IMAGE AND LIKENESS FOR

9   COMMERCIAL PURPOSES?

10  **A.**  YES, IT DOES.

11  **Q.**  AND DO THOSE RULES RELATE TO THE CORE VALUE OF AMATEURISM?

12  **A.**  VERY MUCH SO.

13  **Q.**  HOW SO?

14  **A.**  WELL, PRETTY MUCH ALONG THE LINES I JUST DESCRIBED.

15      SO AS AMATEURISM IN THE NCAA IS DETERMINED AS NOT BEING

16  PROVIDED WITH BENEFITS ABOVE AND BEYOND THE COST OF BEING A

17  STUDENT, ANYTHING THAT -- REGARDLESS OF THE SOURCE, REGARDLESS

18  OF WHERE IT COMES FROM, REGARDLESS OF WHAT ITS A PROVISION

19  FOR, IF THAT IS A BENEFIT, FINANCIAL OR OTHERWISE, THAT'S

20  BEING PROVIDED TO SOMEONE BECAUSE THEY ARE UTILIZING THEIR

21  NAME, IMAGE AND LIKENESS, THEN THAT OBVIOUSLY STRIKES AT

22  THAT -- AT THAT VALUE.

23  **Q.**  NOW, SOME PEOPLE HAVE SAID, EVEN IN THIS COURTROOM, THAT

24  AN ATHLETIC SCHOLARSHIP IS INCONSISTENT WITH AMATEURISM.

25      DO YOU AGREE WITH THAT?

1

2

3                  **CERTIFICATE OF REPORTERS**

4

5       WE CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

6   FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

7   WE FURTHER CERTIFY THAT WE ARE NEITHER COUNSEL FOR, RELATED

8   TO, NOR EMPLOYED BY ANY OF THE PARTIES TO THE ACTION IN WHICH

9   THIS HEARING WAS TAKEN, AND FURTHER THAT WE ARE NOT

10  FINANCIALLY NOR OTHERWISE INTERESTED IN THE OUTCOME OF THE

11  ACTION.

12

13      _____

14           DIANE E. SKILLMAN, CSR, RPR, FCRR

15

16

17      _____

18      RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR

19              THURSDAY, JUNE 19, 2014

20

21

22

23

24

25

# EXHIBIT 4

**COLLEGES**

# Mark Emmert: Fair Pay To Play An "Existential Threat" To NCAA Model

9.26.2019



Emmert said the current debate over student-athletes' NIL rights has been single biggest issue in his tenure **GETTY IMAGES**

NCAA President Mark Emmert said granting college athletes the right to make money off their own name, image and likeness would be an "existential threat" to the collegiate model, according to Dennis Dodd of CBSSPORTS.com. While speaking to a group of D-I ADs on Tuesday, Emmert called the current debate over NIL rights the "single biggest issue" in his almost-decade on the job. California Gov. Gavin Newsom is "expected to sign into law the Fair Pay to Play Act," a bill that would grant athletes in that state the ability to profit off their NIL. The NCAA earlier this month sent a letter to California legislators expressing its opposition to the bill, and some of them have "responded sternly." California state Rep. Sydney Kamlager-Dove said, "NCAA, don't threaten California." However, Emmert said the "whole notion that our letter was threatening is ridiculous." Emmert: "We simply said, 'Here is one of the problems that will exist.' That wasn't a threat. It was, 'Look, folks, we can't have one state operating different rules than the others.'" If Newsom signs the bill, Emmert said that he "would like to see California officials 'tone down some of the rhetoric.'" Meanwhile, Emmert was asked if the NCAA "could become a partner with players in marketing" their NIL. He replied, "You've got 50 different states with 50 different labor law rules. If you move into what are, in essence, labor negotiations, you have to do that state-by-state. ... It just falls apart in its complexity" (_CBSSPORTS.com, 9/25_).

**NO PROBLEMS HERE**: In Orlando, David Whitley wrote he is "all for" the Fair Pay to Play Act because he is a "fan of capitalism and people being free to earn what the market says they're worth." If a booster "buys a pizza shop and pays a quarterback $25,000 to endorse pepperoni calzones, it won't be cheating." It will be the "free market at work." All Fair Pay to Play acts do is "give laborers the economic freedom everybody else enjoys" (*ORLANDO SENTINEL, 9/25*).

**MAKING HIS MARK**: In L.A., Nathan Fenno notes National College Players Association Exec Dir Ramogi Huma has taken a "two-and-a-half decade journey to become one of the leading advocates of reforming the multi-billion dollar college sports industry." Huma is now "on the verge of his biggest victory" after the California Legislature passed the Fair Pay to Play Act earlier this month. Huma said, "This bill is a freight train. Out of all the different avenues over all the years, I think this is the most promising" (*L.A. TIMES, 9/26*).

# EXHIBIT 5



Home > Notre Dame Football > Jack Swarbrick Speaks Out on Paying Student Athletes



*Notre Dame athletic director, Jack Swarbrick*

# JACK SWARBRICK SPEAKS OUT ON PAYING STUDENT ATHLETES

December 11, 2014    /    by Ryan Ritter

Yesterday, Jack Swarbrick had an interview with CBSSports.com's Jon Solomon after an IMG Sports Network panel and it is most definitely worth your time to read. In it, he supports of paying student-athletes for use of their image and likeness. Now, before this causes a freak-out moment in thinking that Swarbrick is about to lead college athletics into a downward spiral, it is important to note that he isn't suggesting student athletes should

become similar to minor league players, but rather putting them on the same level playing field as their fellow students.



Notre Dame athletic director, Jack Swarbrick

> "You've got to stay grounded in this analogy to other students," Swarbrick told CBSSports.com. "There are students on campus making a lot of money because they've launched a business. A classic example: Students are making great money in some internship, and I'm telling my football players they can't leave for the summer. Where's the equity there?"

...

But only Swarbrick cut through the usual rhetoric. Swarbrick's point: College sports brought this on itself with rules that differentiate athletes from the general student body, such as not allowing athletes to make money off their own name.

"If we could get ourselves more grounded in the notion we wouldn't have these problems," Swarbrick said during a panel. "If we're going to do something different than for the normal student, the bar for doing that ought to be really high. If we had that in place, we never would have had a limitation on the cost of attendance because a merit scholar doesn't have that limitation. We did that for athletic reasons."

"But if our standard had been what's the rule for other students, capturing name, image and likeness outside team activity, the musician at school doesn't have that limitation. I'm not sure why the student-athlete should, either. I don't find it inconsistent at all to say we need to get ourselves grounded back in that. I think it would contribute to reducing so many of the problems we have which really spring from this situation we created when we say they're not going to be the same as other students."

Swarbrick is absolutely correct. Many of the bylaws are more concerned with attempts to create a level playing field on the field rather than ensuring athletes retrain their amateur status.

Full cost of attendance, as an example isn't in place for student-athletes due to an idea that some schools can't afford to do so as easily as others or even at all. Therefore, schools that can afford to do so, would have an unfair recruiting advantage. In using this logic, however, student athletes are indeed being held to a different standard than a non-athlete. A student on merit scholarship can potentially receive a full cost of attendance, but if they turn down a school that doesn't offer it, no one cries foul there.

To give a different, non-financial example, I am not allowed to publicly comment on any potential student athlete during the recruiting cycle until they either enroll early or sign their letter of intent on signing day. The fear is that boosters, which I qualify as, could use such public comments as a means to recruit and entice players to go, or stay away from, a certain school. However, I can talk about any other "regular" high school student that isn't involved in any form of athletic recruiting if I wish.

Again, there is a line drawn between student athletes and students. Some of those lines, like my last example, are ridiculously blurry as well as seemingly almost every bylaw has exceptions and "gotchas" that are too numerous to fully explain here. Again though, it is important to note that these rules only pertain to those wishing to play sports for their school.

Swarbrick is getting to the heart of something that I wrote in the offseason. My main argument behind that piece was that the focus has shifted away from the actual education of the student-athlete. As soon as the focus shifts away from remembering that all of these athletes are indeed students, all kinds of problems emerge. Paying them simply for playing a sport is equivalent to trying to fix a major structural problem with duct tape. The divide between student and student-athlete grows, education is further deemphasized in the process, and the problems plaguing college athletics are never fixed.

Swarbrick is getting to the heart of this very problem, but in a much different way and in a different, post-O'Bannon world. Swarbrick isn't suggesting the duct tape solution, he is actually looking to solve the problem and from a Notre Dame mentality, it makes all kinds of sense.

The University prides itself on having their student-athletes living in dorms until their senior year. They are a part of the fabric of the student body who aren't secluded in a fancy, athletes-only dorm. They aren't steered towards academic paths solely in place to keep them eligible. Sure, being a student-athlete does allow for some benefits many students do not have access to, but the same could be said for any student on a merit scholarship or a student that applies for, and gets accepted, into certain programs that student athletes don't have the benefit of free time to do (like studying abroad).

That isn't the current climate of college sports. Swarbrick sums it up best at the end of the article:

> "It shocks me today when I'm at an athletic event and I hear students boo a fellow student. That never happened a decade ago. They view it like they're not our classmate. That's what we've got to get away from. If we're just going to be minor league sports, we should leave that to minor league sports."

That perfectly sums up the situation. The athletes aren't seen as classmates or future fellow alumni, but rather people expected to do a job on the field. The further ingrained this mindset becomes, the further college athletics will deteriorate.

The final thing I want to point out is how Swarbrick proposes to solve this issue of paying for image and likeness:

> Swarbrick said college sports could manage a group-licensing approach for athletes to be paid immediately, not through deferred payments as the O'Bannon ruling states.

> "You need a commercial validation of it," Swarbrick said. "It can't be us, it can't be Joe Fan who's going to say I'll pay you $50,000 for an autograph as long as you go to my school. You've got to avoid all of that. But you could have a group-licensing approach and said, OK, this group licensee can do a deal with EA Sports for student-athlete image and likeness, and we'll go to EA Sports and negotiate it for all of the student-athletes. Here's what it's

worth if you wear the jersey in the EA Sports video and here's what it's worth if you don't. You get a market read on it and you distribute it based on the way all group licenses work."

Swarbrick said he believes there's a misperception that college athletes have a lot of unrealized value. Most players possess value because of the university jersey they wear, but a market test would allow those figures to be determined, Swarbrick said.

Again, this isn't the "just pay them" and be done with it solution. This is a very level-headed, rational explanation of the issue and a valid solution to solve it. Further, Swarbrick makes two very clear distinctions that many "pay for play" proponents leave out.

Firstly, boosters and fans can't be allowed to have carte blanche to start putting athletes on a payroll. That's a Pandora's box that needs to remain closed or college sports will indeed just become a sort of minor league or semi-pro system.

Second, Swarbrick rightly states that a lot of the value these student athletes hold is due to the school they represent. The larger and more well-known the program, the greater their potential value. Think of it this way: a Notre Dame diploma speaks volumes in the professional world and holds some serious weight when compared to many other institutions. The same logic works with athletes.

For a football example, look no further than Joe Flacco. Flacco's college years came at the University of Delaware, a school in the FCS. He was drafted into the NFL largely unknown by even some of the most rabid college football fans. As best, they became aware of his name due to reporting leading up to draft day. After his 2012 Super Bowl MVP, Flacco signed, what was at the time, a record high contract for an NFL QB.

Flacco wasn't some kind of late-bloomer. This is a guy selected 18th overall in the NFL draft. Johnny Manziel was selected 22nd overall, four slots later, and he's been exhibit A in many arguments for the worth of college athletes. However, if "Johnny Football" doesn't wear the maroon of the Aggies and doesn't get to do battle with SEC powerhouse Alabama for a Heisman moment, and be a part of a team good enough to win that game, his potential market value plummets. There wasn't a soul concerned about highest drafted Blue Hen off all time who now has a full line of "is he elite?!" memes.

Overall, I'm happy that it is Jack Swarbrick breaking the ranks of the usual AD rhetoric here. If there is anyone that I would actually trust to navigate these tricky waters and not destroy college sports in the process, it's Savvy Jack.



Credit to @IDtheMike (aka MQ)

| Author | Recent Posts |



### Ryan Ritter    

**Editor-in-Chief**

*Texan by birth, Irish by choice.*

First-generation Domer and a former student manager, HLS podcast host, HLS Sim creator, Extra Life streamer, and technical problem haver. You can find more non-Notre Dame related writing on his Patreon.

Filed Under: Notre Dame Football
Tagged With: Jack Swarbrick

« HLS TV (Episode 14): Nashville Special

RECORDING: Friday Roundup – Episode 05 »

# COMMENTS



**JD**

December 12, 2014 at 5:42 pm

Fuckin' love me some Savvy Jack.



**jdthom1**

December 15, 2014 at 9:13 am

I agree that a market test would be useful but I'm not sure the definitions he intends to use would benefit the players. I am glad you posted this and very glad Swarbrick is taking the lead and, as you said, breaking ranks with usual ND rhetoric. Swarbrick has always struck me as someone who gathers a lot of information first before speaking out on something and my hope is he is doing the same with this.

Ultimately, the problem is not one the colleges, by themselves, can solve because the market value is not something the college is responsible for. I have used the example before: if a student on a musical scholarship starts offering piano lessons and plays in a local orchestra, she can receive compensation whether it's $5 or $5 million. Football and basketball players, in particular, are restricted by this. Within a few months of finishing his collegiate career at Kentucky, John Wall signed a $25 million reebok deal. Swarbrick seems to think that reebok deal was a result of his exposure from UK and that might be partially true but the question is, what would reebok have offered him regardless of his school? Or what would reebok have offered him before the season started? This is hard to determine but if this is what Swarbrick's proposed "market test" is intended to get it, then I am all for it.

As for making college sports a minor league, I'm afraid that is unavoidable and we are the reason. ESPN's viewership for college football (alone, not to mention basketball) nearly surpasses MLB as the #2 sport in america. You and Swarbrick are right that you can't just let Joe Fan pay $50k for an autograph conditional on attendance of a certain school. This is why unions and/or representation in some form are important. The question is, how involved should the NFL and NBA be in this? They have a vested interest and the more involved they are, the more likely college football and basketball end up resembling other college sports like college baseball.

LATEST PODCAST



**HLS Podcast Finale**

Her Loyal Sons: A Notre Dame
Football Podcast

Click here to support the pod!

RECENT POSTS



Epilogue



HLS Podcast Finale



The Final Fiesta: Notre Dame vs Oklahoma State NCAA '14 Sim



Penultimate Picks Pod



2021 Bowl Picks: Week 2

COPYRIGHT © 2022 · FOODIE PRO & THE GENESIS FRAMEWORK · LOGIN

# EXHIBIT 6

# Oliver Luck brings own perspective to NCAA on O'Bannon name and likeness issue

**Steve Berkowitz**
**USA TODAY Sports**



FORT WASHINGTON, Md. — Newly minted as one of the NCAA's top executives, Oliver Luck has long held a view on the use of college athletes' names, images and likenesses that is different from the one the association has been defending in the Ed O'Bannon antitrust lawsuit.

"I do believe that the name, image, likeness for an individual is a fundamental right — that any individual controls his or her name, image and likeness — and I don't believe that a student-athlete who accepts a grant-in-aid simply waives that right to his or her name, image, likeness," Luck said Friday in a news briefing at the NCAA Convention.

https://www.usatoday.com/story/sports/college/2015/01/16/ncaa-convention-oliver-luck-obannon-name-and-likeness-court-case/21873331/

"I like to use the analogy of Jodie Foster going to the Yale drama school. A very talented young lady, obviously. But Jodie didn't waive her right to go appear on Broadway or do shows or whatever."

It's not a perfect analogy, since Foster wouldn't have been wearing a Yale jersey while performing, but Luck makes his point.

Luck indicated there may some shifting on the name, image and likeness issue among schools — especially those in the five wealthiest conferences that now have greater autonomy in rules making.

In addition, he said, the issue is likely to come up within the Division I Council, a new group that will handle day-to-day matters for the roughly 350 schools in the association's top competitive classification. A majority of the Council's membership will be athletics directors.

Luck prefaced his comments Friday by saying, "I wouldn't want to prejudice any position that we've taken in the (O'Bannon) lawsuit," then went on to say: "I think within the NCAA office, within the autonomous group, within the Division I Council there will be a number of voices that speak up. Mine will be one of those voices, but there'll be a number of voices that I think speak up and eventually those voices will coalesce into a pathway to handling that issue — and handling it appropriately."

Luck, formerly West Virginia's athletics director, has become the NCAA executive vice president for regulatory affairs. It's a job in which he will oversee three huge units of the association's central office: its enforcement staff, its eligibility center, and its academic and membership affairs group.

In August, U.S. District Judge Claudia Wilken ruled against the NCAA in a lawsuit that challenged the NCAA's limits on what Bowl Subdivision football and Division I men's basketball players can receive for playing sports and for the use of the names, images and likenesses in in live television broadcasts, rebroadcasts of games and video games.

https://www.usatoday.com/story/sports/college/2015/01/16/ncaa-convention-oliver-luck-obannon-name-and-likeness-court-case/21873331/

In a ruling that the NCAA has appealed to the 9th U.S. Circuit Court of Appeals, Wilken said that the NCAA's current scholarship rules "unreasonably restrain trade" in violation of antitrust laws. In her ruling, injunction and a subsequent interpretation of the injunction, she said the NCAA will be able to cap the amount of new compensation that the football and men's basketball players can receive while they are in school, but that cap will not be allowed to be an amount that is less than the athletes' cost of attending school.

Wilken also decided to allow schools and conferences to deposit money in trust for football and men's basketball players that will become payable when they leave school or their eligibility expires.

"In Oliver Luck, the NCAA seems to have found at least one senior executive who appreciates the patent injustice in commercially licensing college athletes' names, images, and likenesses; making vast sums of money; and refusing to compensate college athletes for these uses," Sathya Gosselin, an attorney for the O'Bannon plaintiffs, said via e-mail. "Hopefully, others will take note."

Luck's views notwithstanding, there are influential members of the NCAA's leadership who seem in no mood to settle the O'Bannon litigation. Among that group is University of South Carolina president Harris Pastides, a member of the NCAA Division I Board of Directors who was a witness for the NCAA during the O'Bannon trial this past June.

During an interview with USA TODAY Sports earlier this week, Pastides was asked whether he wanted to see the NCAA pursue the O'Bannon case as vigorously and as far as possible.

"I do" he said, "because some of those who would prosecute through the courts are actually not seeking a general increase in the economic status of all student-athletes.

"They're seeking extraordinarily high compensation for an exceedingly small number of student-athletes — potentially those who would be of greatest

https://www.usatoday.com/story/sports/college/2015/01/16/ncaa-convention-oliver-luck-obannon-name-and-likeness-court-case/21873331/

interest to the private sector, let's say. And that is not something that I think is appropriate for the collegiate athletic model, so, of course, I would recommend that we continue to educate and voice our opinion and, as needed, fight in the courts to preserve that model."

Luck said that, although under appeal, Wilken's ruling "gave a pathway, if you will, to the organization and intercollegiate athletics in terms of how that issue could, should, will be handled — and there's a lot of discussion going on both within the NCAA offices as well as the conferences and across lots of campuses on the appropriate way to handle that.

"Obviously, I have respect for any judicial decision that gets handed down ... but I think we're beginning to see that this name, image, likeness issue is one that a student-athlete really does control because that's fundamental to that individual."

# EXHIBITS 7-8
# SUBMITTED UNDER SEAL

# EXHIBIT 9

# Former NCAA executive Mark Lewis supports college players earning money

Jan 21, 2020



**Dan Murphy**ESPN Staff Writer

The man who played a lead role in helping the NCAA earn its status as a billion-dollar organization says there is no longer a way to justify the current limits on how college athletes can make money.

From 2012 through 2016, Mark Lewis oversaw a division of the NCAA that organizes and stages 90 championship events each year. During his time in that role, Lewis increased corporate partnerships and completed a landmark $8.8 billion, eight-year extension to the contract that gives CBS and Turner the television rights to the annual men's basketball March Madness tournament. The proliferation of television contracts at the school and conference level, Lewis said, has been a driving force that has fundamentally changed college sports in the last several decades.

"The priority is to monetize the sport," Lewis told ESPN this past week. "That's taken precedent over everything else. If that's the model -- and there's nothing wrong with that -- then you can't expect the players to live by the same set of rules [as they did in the past]. To me, it's just a question of fairness."

ADVERTISEMENT

As NCAA leaders prepare to discuss the possibility of a more equitable future for athletes at their annual convention in Anaheim later this week, Lewis is attempting to effect change through a different avenue. The former executive recently joined an oversight board assembled by the National College Player Association -- an organization working to increase the compensation and voice of college athletes.

The NCPA and its founder, Ramogi Huma, have been battling the NCAA to try to provide more money and other benefits to college athletes for nearly two decades. That fight reached a major turning point in 2019 as added pressure from state and federal lawmakers pushed the NCAA to publicly acknowledge in late October that the status quo for athlete compensation is no longer enough. Three months after directing members to find a new solution, NCAA leaders expect this week's meetings in Anaheim will produce the first concrete proposals of how far schools are willing to go to change the rules.

Huma helped legislators in California create a new law that will make it illegal for universities to follow the NCAA rules that prohibit athletes from collecting endorsement money while playing college sports. That law, which does not go into effect until 2023, spurred nearly 20 other states

to consider similar bills and added more urgency to a Congressional effort to create a similar nationwide law.

NCAA president Mark Emmert said he has spent the majority of his time in the past several months meeting with members of Congress to push for a federal law that would allow the NCAA to set some "guardrails." Emmert and others at the NCAA say they want to place limits on how athletes can market their names, images and likenesses in order to avoid negative unintended consequences and preserve the "collegiate model" of sports.

Preliminary statements about what those parameters might look like have caused critics and lawmakers to accuse the NCAA of stalling without a genuine interest in creating change. Politicians at the state and federal levels have continued to push forward with legislation that could go into effect as early as this coming summer in some places, keeping pressure on the NCAA to act soon.

The NCPA published a white paper last week arguing that the NCAA and its member schools' track record and inherent conflicts of interest make them unfit to regulate a marketplace for college athletes. The report offers specific suggestions on how new rules should look, such as creating financial literacy programs for college athletes and allowing athletes to create and sell group licenses for use of their names, images and likenesses to third parties such as television networks or in video-game makers.

The NCPA believes it should represent athletes in future discussions about their group licensing rights and set up a certification process to agents who want to work with college athletes. Huma said the NCPA published its paper to show lawmakers and others that there were well-researched alternatives to what the NCAA will propose.

"We want to make sure the players have control over their rights as opposed to the NCAA or the colleges having that control," Huma said. "We set up the oversight board to inform players so they can make these decisions."

Huma assembled an 18-member volunteer board composed of lawyers, economists, sports executives and former college athletes to serve as experts making sure athletes are fairly represented if new opportunities to make money are created. Lewis, who worked on licensing deals for the Olympics before overseeing NCAA championships, said he doesn't have a specific role on the board but intends to help however he is needed.

"He's not trying to destroy college sports," Lewis said of Huma. "He's not trying to end what we all enjoy watching. He's just trying to say someone needs to be an advocate for the young men and women playing. No one else is in that role."

Lewis said the growing coffers of the NCAA didn't play a significant role in his decision to leave the organization. He now runs a small business in Montana. The former Georgia football player and son of a college coach said he witnessed the demands on student-athletes grow massively, though, as conferences added more games and commitments to fill the demand for television programming.

https://www.espn.com/college-sports/story/_/id/28530364/former-ncaa-executive-mark-lewis-supports-college-players-earning-money

He said he fought to keep from putting any more burden on athletes and provide added support for them and their families during his stint inside the organization. He said he "didn't see a lot of answers" coming from the college sports leaders trying to solve their current problem. Now, he's taking a different approach.

"If you go back 30 or 40 years to all the ways pro sports tried to be financially successful and compared that to college sports, you didn't check all those boxes. There were legitimately differences," Lewis said. "Then, you could say the focus was an academic-oriented situation. But in this drive for revenue now, the boxes line up the same. Colleges are doing everything that pro sports leagues are doing to make money. So how come you're treating the participants radically different? You can't justify it."

# EXHIBITS 10-13
# SUBMITTED UNDER SEAL

# EXHIBIT 14

| | |
|---|---|
| **Date:** | Tuesday, October 29 2019 07:39 PM |
| **Subject:** | Fwd: NCAA NIL Press Release and Q&A |
| **From:** | Mobile - Jim Delany |
| **To:** | Catherine Delany <kitdelany@comcast.net>; Newman Delany <ndelany@deloitte.com>; James Chancellor Delany <Jameschancellor11@Gmail.com>; |

Begin forwarded message:

**From:** Big Ten - Kerry Kenny <kkenny@bigten.org>
**Date:** October 29, 2019 at 12:50:01 PM CDT
**To:** Mobile - Jim Delany <jdelany2@bigten.org>, Big Ten - Kevin Warren <kfwarren@bigten.org>, Big Ten - Brad Traviolia <BTraviolia@bigten.org>, Big Ten - Diane Dietz <ddietz@bigten.org>, Big Ten - Julie Suderman <jsuderman@bigten.org>, Big Ten - Chad Hawley <CHawley@bigten.org>, Big Ten - Wendy Fallen <wfallen@bigten.org>, Big Ten - Mark Rudner <MRudner@bigten.org>, Big Ten - Mike McComiskey <mmccomiskey@bigten.org>, Big Ten - Rick Boyages <rboyages@bigten.org>, Big Ten - Gil Grimes <ggrimes@bigten.org>, Big Ten - Jason Yellin <jyellin@bigten.org>, Big Ten - Jessica Palermo <jpalermo@bigten.org>, Big Ten - Robin Jentes <rjentes@bigten.org>, Big Ten - Scott Chipman <SChipman@bigten.org>, Big Ten - Adam Augustine <aaugustine@bigten.org>, Jon Barrett <Jab@barrettlawpc.com>
**Subject: NCAA NIL Press Release and Q&A**

FYI on the press release and Q&A that was sent out by the NCAA this afternoon:

**Board of Governors starts process to enhance name, image and likeness opportunities**
*Each NCAA division directed to immediately consider modernization of bylaws and policies*
https://www.ncaa.org/about/resources/media- center/news/board-governors-starts-process-enhance-name-image-and-likeness-opportunities

In the Association's continuing efforts to support college athletes, the NCAA's top governing board voted unanimously to permit students participating in athletics the opportunity to benefit from the use of their name, image and likeness in a manner consistent with the collegiate model.

The Board of Governors' action directs each of the NCAA's three divisions to immediately consider updates to relevant bylaws and policies for the 21st century, said Michael V. Drake, chair of the board and president of The Ohio State University.

"We must embrace change to provide the best possible experience for college athletes," Drake said. "Additional flexibility in this area can and must continue to support college sports as a part of higher education. This modernization for the future is a natural extension of the numerous steps NCAA members have taken in recent years to improve support for student-athletes, including full cost of attendance and guaranteed scholarships."

Specifically, the board said modernization should occur within the following principles and guidelines:

- Assure student-athletes are treated similarly to non-athlete students unless a compelling reason exists to differentiate.
- Maintain the priorities of education and the collegiate experience to provide opportunities for student-athlete success.
- Ensure rules are transparent, focused and enforceable and facilitate fair and balanced competition.



EXHIBIT
8
9-20-22

BIGTEN-NIL_00109826

- Make clear the distinction between collegiate and professional opportunities.
- Make clear that compensation for athletics performance or participation is impermissible.
- Reaffirm that student-athletes are students first and not employees of the university.
- Enhance principles of diversity, inclusion and gender equity.
- Protect the recruiting environment and prohibit inducements to select, remain at, or transfer to a specific institution.

The board's action was based on comprehensive recommendations from the NCAA Board of Governors Federal and State Legislation Working Group, which includes presidents, commissioners, athletics directors, administrators and student-athletes. The group gathered input over the past several months from numerous stakeholders, including current and former student-athletes, coaches, presidents, faculty and commissioners across all three divisions. The board also directed continued and productive engagement with legislators.

The working group will continue to gather feedback through April on how best to respond to the state and federal legislative environment and to refine its recommendations on the principles and regulatory framework. The board asked each division to create any new rules beginning immediately, but no later than January 2021.

"As a national governing body, the NCAA is uniquely positioned to modify its rules to ensure fairness and a level playing field for student-athletes," NCAA President Mark Emmert said. "The board's action today creates a path to enhance opportunities for student-athletes while ensuring they compete against students and not professionals."


**Questions and Answers on Name, Image and Likeness**
Updated October 29, 2019
https://www.ncaa.org/questions- and-answers-name-image-and-likeness

**Why didn't the NCAA take immediate action on name, image and likeness rules?**
The Board of Governors took a very important step forward at its meeting Oct. 29 by modernizing NCAA policy. It further directed all 1,100 members to create a structure for future name, image and likeness opportunities for student-athletes that is consistent with the college environment in each NCAA division.

**Now that the NCAA Board of Governors Federal and State Legislation Working Group has provided its report to the board, what happens next?**
Member schools in each division will continue to examine the issue, provide feedback to the working group and prepare for future rules changes. The working group is expected to provide updated recommendations to the Board of Governors in April.

**Why was a working group formed to review this issue?**
As a voluntary member-led organization with 1,100 schools in three divisions, the NCAA develops rules that create fairness and a level playing field for campuses in all 50 states, plus Canada and Puerto Rico. To represent the diversity of the NCAA membership, the working group comprised presidents, athletics directors, commissioners, faculty and student-athletes from all three divisions.

**Why didn't the NCAA address this issue before now?**
NCAA members continually strive to improve the student-athlete experience, including paying thorough attention to the changing environment of the student body and within higher education. After improving academic support, providing cost of attendance, guaranteeing scholarships and strengthening health and safety, among many changes, the NCAA membership determined that exploring this issue was an important step to support student-athletes within the context of higher education. NCAA leadership also determined that the membership must come together to respond to federal and state legislative proposals that would be harmful to a national, uniform college athletics model.

BIGTEN-NIL_00109827

**Was the Olympic model considered and, if it was rejected, why?**
The working group reviewed extensive feedback and challenges and opportunities related to name, image and likeness benefits. It reviewed the Olympic model, which provides specific opportunities for athletes to secure endorsements and to accept money for athletic performance, in order to pay for training and coaching and to further their athletic careers. Although many Olympians are or were NCAA student-athletes, many other Olympians have chosen to professionalize and to compete as professionals. The recommendation from the working group, and the direction from the Board of Governors, is for NCAA members to consider future name, image and likeness opportunities for student-athletes consistent with the values of college sports within higher education. Elements of the Olympic model that are consistent with the college environment may be incorporated.

**Why doesn't the working group report mention specific name, image and likeness elements, such as autographs or jerseys?**
More discussion and examination by all three NCAA divisions is needed before deciding on specific approaches to future name, image and likeness opportunities for student-athletes.

**The working group says more feedback is needed. Didn't it already collect feedback?**
The working group collected extensive input over several months. But with three divisions, 1,100 member campuses and nearly 500,000 student-athletes, the issues are complex and challenging. Continued dialogue is necessary to determine the proper scope and implementation methods to include in additional recommendations.

**Are the three NCAA divisions going to develop separate approaches (versus one NCAA approach for all student-athletes)?**
There are many examples now where each NCAA division has differences in rules, including areas such as recruiting, financial aid, and playing and practice seasons. As a fundamental framework of the Association, member schools choose the division in which they compete and agree to follow the rules within that division. All three divisions will implement change consistent with the principles within the NCAA constitution and articulated by the Board of Governors. The working group provided overarching principles and framework that define Association-wide policy within this space.

**How does the uniqueness of the college sports recruiting environment affect this issue?**
Recruiting is one of the key principles that sets apart the college student model of sports from professional sports. Changes to name, image and likeness rules for student-athletes should support the integrity of the recruiting environment and not result in any undue influence on a student's choice of where to attend college.

**Why does the NCAA oppose newly enacted California Senate Bill 206 and other potential state or federal legislation on name, image and likeness of college athletes?**
It is critical that college sports are regulated at a national level. This ensures the uniformity of rules and a level playing field for student-athletes. The California law and other proposed measures ultimately would lead to pay for play and turn college athletes into employees. This directly contradicts the mission of college sports within higher education — that student-athletes are students first and choose to play a sport they love against other students while earning a degree.

**The NCAA said newly enacted California SB 206 may be unconstitutional. Is the NCAA challenging it in court?**
The action taken by California likely is unconstitutional, and the actions proposed by other states make clear the harmful impact of disparate sets of state laws. The NCAA is closely monitoring the approaches taken by state governments and the U.S. Congress and is considering all potential next steps.

BIGTEN-NIL_00109828

**KERRY B. KENNY**
**Assistant Commissioner, Public Affairs | <u>Big Ten Conference</u>**
900 Third Avenue | 36th Floor | New York, NY 10022
**O** 212.981.8562 | **C** 267.229.9792

BIGTEN-NIL_00109829

# EXHIBIT 15



### NCAA BOARD OF GOVERNORS
### FEDERAL AND STATE LEGISLATION WORKING GROUP
### FINAL REPORT AND RECOMMENDATIONS
### APRIL 17, 2020

*__Executive Summary.__*

The Federal and State Legislation Working Group was created by the NCAA Board of Governors in summer 2019 for the purpose of investigating possible responses to proposed state and federal legislation regarding the commercial use of student-athlete name, image or likeness ("NIL"). That proposed legislation, which has been passed in California and Colorado, could significantly limit the ability of the Association to manage the issue of student-athlete NIL commercialization in those states and perhaps others. It therefore poses a significant potential challenge to the Association's continuing ability to manage its affairs on a national, Association-wide level.

After receiving its charge from the Board, the working group solicited feedback from the NCAA membership and third parties regarding contemporary opportunities for NIL commercialization by college students, and whether existing divisional rules are adequate to address those opportunities. This feedback convinced the working group that current rules related to NIL commercialization are in need of modernization. The rise of social media and other digital distribution and monetization platforms has dramatically increased the opportunities for college students to make commercial use of their NIL. Current divisional rules on this subject were drafted long before most of these opportunities existed, and those rules can prevent student-athletes from engaging in NIL-related activities that their nonathlete peers on campus frequently pursue. Consistent with the Board's direction that student-athletes should be treated the same as students in general, unless a compelling reason to differentiate exists, the working group concluded that divisional rules on student-athlete NIL should be modernized to account for this new media and promotional landscape.

In October 2019, the working group made an interim report to the Board of Governors in which it recommended that the Board authorize changes to NCAA policy and bylaws to permit student-athletes to receive compensation related to their NIL, provided the compensation is consistent with NCAA values and principles and with legal precedent. The working group requested, and the Board agreed, that the working group's timeframe be extended through April 2020 so that it could continue to work with the membership and divisional legislative groups on modernized NIL bylaws and policy.

This report is the culmination of the working group's subsequent deliberations. After further consultation with student-athletes, the membership and divisional legislative bodies, the working group makes the following recommendations to the Board of Governors:

1.    The Board should stress to the divisions that any modernization of their NIL bylaws must be accompanied by guardrails sufficient to ensure that:

        a.    Any compensation received by student-athletes for NIL activities represents a genuine payment for use of their NIL, and is not simply a disguised form of pay for athletics participation;

        b.    Schools and conferences play no role in a student-athlete's NIL activities;

NCAAHOUSE00000513

Case 4:20-cv-03919-CW   Document 206-1   Filed 10/21/22   Page 55 of 321

---

    c.        Student-athletes are not being compensated for uses of their NIL in situations in which they have no legal right to demand such compensation;

    d.        Schools or boosters are not using NIL opportunities as a recruiting inducement;

    e.        The role of third parties in student-athlete NIL activities is regulated; and

    f.        Modernization of NIL rules does not interfere with NCAA members' efforts in the areas of diversity, inclusion or gender equity.

2.      Provided those guardrails are established, the Board should consider encouraging the divisions to permit student-athletes to be compensated for third-party endorsements, including social media "influencer" activity, in appropriate circumstances. If the divisions make these changes, however, they must take care to prohibit schools or conferences from: (a) Making endorsement payments themselves; (b) Playing any role in locating, arranging or facilitating endorsement opportunities; or (c) Using, or allowing boosters to use, such opportunities as a recruiting inducement or a means of paying for athletics participation.

3.      The Board should also consider encouraging the divisions to permit student-athletes to be compensated by third parties for use of the student-athlete's NIL in his or her own work product or other business activity, including social media content creation or distribution, provided that the use does not involve athletics participation or play. Again, if the divisions make these changes, they must take care to prohibit schools or conferences from: (a) Paying student-athletes for these activities; (b) Playing any role in locating, arranging or facilitating third parties to pay for these activities; or (c) Using, or allowing boosters to use, the possibility of such payments as a recruiting inducement or a means of paying for athletics participation.

4.      The Board should recommend a timeline for divisions to act so that legislative proposals are fully drafted not later than October 31, 2020; voted on not later than January 31, 2021; and effective not later than the start of the 2021-22 academic year.

It became apparent during the working group's deliberations that certain potential avenues for managing the NIL issue are complicated, or precluded altogether, by the potential application of state NIL laws and/or federal antitrust law to the Association's bylaws. The Presidential Subcommittee on Congressional Action was formed to study these issues in detail and provide guidance to the Board on what actions, if any, the Association should take to seek Congressional assistance in addressing these issues. The Presidential Subcommittee on Congressional Action has identified distinct legal impediments to the Association's ability to modernize its rules related to NIL and to maintain the model of intercollegiate athletes generally. Therefore, the subcommittee has put forward a number of recommendations for Board consideration in engaging with Congress, including to seek preemption of state NIL laws. In offering these recommendations, the subcommittee acknowledges that due to the evolving Congressional landscape, there may be a need for the Association to prioritize one or more of its recommendations in its engagement with Congress.

NCAAHOUSE00000514

The working group believes that its recommendations for modernizing the Association's rules related to student-athlete NIL are on track with the Associations general project for modernizing its bylaws. The Board's acceptance of this report signals the transfer of these efforts from the working group to each division, and the solutions that each of them will develop and ultimately approve on these topics. The working group is confident that, as the Association modernizes, it will continue to identify the appropriate guardrails to further support student-athletes within the context of college sports and higher education.

Finally, the working group is mindful of the COVID-19 pandemic as it delivers this report, and the impact the pandemic is having on higher education and college sports. The effects of the pandemic have caused enormous disruption to many, including student-athletes. Although the ultimate impact of the pandemic remains uncertain, this uncertainty must not hinder the efforts to modernize NIL rules intended to benefit student-athletes.

## *Section I - Background.*

1.      **Creation and charge.** The Federal and State Legislation Working Group was created by the Board of Governors May 14, 2019, in response to legislation introduced by federal and state legislators relating to student-athletes' ability to license and benefit from NIL during their period of participation in NCAA athletics. The Board acted, in part, because the proposed federal legislation threatened the tax-exempt status of the Association and its members, while the proposed state legislation threatened to create local differences that would make it impossible to host fair national championships and to alter materially the principles of intercollegiate athletics. The Board felt these legislative initiatives necessitated conversations and agreements about how the membership should respond to the legislative proposals.

The working group was composed of representatives from all three divisions, including three student-athletes:

- Val Ackerman, commissioner, Big East Conference (Division I) (co-chair)
- Jill Bodensteiner, director of athletics, Saint Joseph's University (Division I)
- Bob Bowlsby, commissioner, Big 12 Conference (Division I)
- Don Bruce, faculty athletics representative, University of Tennessee (Division I)
- Rita Cheng, president, Northern Arizona University (Division I)
- Mary Beth Cooper, president, Springfield College (Division III)
- Lauren Cox, student-athlete, Baylor University (Division I)
- John "Jack" DeGioia, president, Georgetown University (Division I)
- Jackson Erdmann, student-athlete, Saint John's University (Division III)
- Rick George, director of athletics, University of Colorado (Division I)
- Carolayne Henry, senior woman administrator, Mountain West Conference (Division I)
- Glen Jones, president, Henderson State University (Division II)
- Scott Larson, athletics compliance coordinator, Lubbock Christian University (Division II)

_____

- Brandon Lee, student-athlete, University of Missouri (Division I)
- Jacqie McWilliams, commissioner, Central Intercollegiate Athletic Association (Division II)
- Jere Morehead, president, University of Georgia (Division I)
- Darryl Sims, director of athletics, University of Wisconsin-Oshkosh (Division III)
- Gene Smith, director of athletics, The Ohio State University (Division I) (co-chair)
- Tim P. White, chancellor, California State University System (Divisions I and II)
- Carla Williams, director of athletics, University of Virginia (Division I)

The Board created the working group to study whether the Association should maintain its opposition to the proposed state and federal legislation, or whether it should work to develop a process whereby a student-athlete could be compensated for use of his or her NIL in a fashion that would be consistent with the NCAA's core values, mission and principles. Specifically, the working group was charged:

a.  To consider whether modifications to NCAA rules, policies and practices should be made to allow for NIL payments;

b.  To remain mindful that NIL payments must not be compensation for athletics participation; that paying students as employees for play is anathema to the NCAA mission focused on students competing against students; and that no legislation which permitted either of those outcomes should be considered;

c.  To assure that any proposed legislative solutions kept in mind that student-athlete benefits must be tethered to educational expenses or incidental to participation;

d.  To examine whether any modifications to allow for NIL payments, beyond what the U.S. Circuit Court of Appeals for the Ninth Circuit required in *O'Bannon* and other court rulings, would be achievable and enforceable without undermining the distinction between professional sports and collegiate sports; and

e.  To preserve the Association's ability to sponsor or host fair interstate competitions and national championships.

The Board of Governors asked the working group to produce a set of Association-wide principles to provide each division guidance in developing a consistent approach on legislation related to NIL payments. The working group was asked to provide an update to the Board of Governors and the NCAA president August 6, and to deliver an initial report by October 29, 2019.

2.  **Initial meetings and feedback.** The working group conducted three in-person meetings and four teleconferences between June and October 2019. During those meetings, the working group received input from a variety of stakeholders, including key representatives of NCAA

NCAAHOUSE00000516

Case 4:20-cv-03919-CW   Document 206-1   Filed 10/21/22   Page 58 of 321

members and membership organizations, as well as individuals with subject matter expertise.[1] The working group also received feedback from student-athletes, including members of the National Student-Athlete Advisory Committees for Divisions I, II and III and other student-athletes, in addition to the student-athlete members of the working group. These groups and individuals made presentations to the working group and provided supplemental written material for the working group's consideration.

The working group also invited individuals and representatives of organizations to submit written input, including ideas or concepts, related to the working group's charge. All written input was submitted through an online portal and shared with the working group through the feedback process.

a.     **Feedback from NCAA membership.** In July 2019, the working group requested feedback on potential NIL modernization from NCAA members and other interested parties. In this request, the working group asked the NCAA membership to address the following topics: (1) Challenges and opportunities posed by permitting student-athletes to be compensated for NIL; (2) Potential models for permitting NIL compensation; (3) Whether permitting NIL compensation might affect fair competition, and the possibility of mitigating such effects; (4) Whether it is possible to develop a measure of fair market value for student-athlete NIL; and (5) What steps the membership might take to prevent student-athletes from prioritizing NIL compensation over academic success and team commitment. The following were highlights of the feedback submitted in response to this survey:

(1)     **Support for rules modernization to accommodate contemporary NIL opportunities**. Several respondents noted that recent changes in technology, in particular the emergence of social media platforms and the marketing opportunities they provide, has opened up new opportunities for college students to engage in commercial activities involving their NIL. Respondents felt that NCAA rules needed to be updated to address this changed environment, and to give student-athletes the same opportunities that are available to nonathlete students. Some respondents also noted that current NCAA rules were complicated and hard to follow, and that both schools and student-athletes would benefit from deregulation that resulted in rules that were more clear and easier to follow.

There was a general desire that modernization not be overly focused on, or reactive to, the opportunities that it might provide to football or men's basketball student-athletes. In particular, some respondents noted that

---

[1] The working group would like to extend special thanks to the Knight Commission on Intercollegiate Athletics, the Collegiate Commissioners Association, LEAD1 and the Drake Group for their thoughtful input.

NCAAHOUSE00000517

Case 4:20-cv-03919-CW   Document 206-1   Filed 10/21/22   Page 59 of 321

permitting student-athletes in other sports, who often receive financial aid less than their cost of attendance, to pursue these opportunities could help them directly offset their educational costs without undermining the Association's model of intercollegiate athletics.

Several respondents raised gender equity concerns, particularly if rules were modified to allow schools to be involved in arranging or providing compensation to student-athletes for use of their NIL. It was noted that these concerns would be reduced if schools were prohibited from participating in these arrangements.

(2)　**No desire for changes to NIL rules that would undermine the Association's model of amateur intercollegiate athletics.** While there was significant desire to modernize the NCAA's rules related to student-athlete NIL, NCAA members overwhelmingly indicated that the Association should not make rules changes that would undermine, or fundamentally change, the NCAA's overall model of amateur intercollegiate athletics.

(3)　**Concern over effects on the recruiting process.** Several respondents expressed concern that modernizing rules related to NIL could cause changes to the recruiting process that would harm both schools (by exacerbating recruiting advantages already held by some schools) and student-athletes (by causing student-athletes to place too much emphasis on potential NIL opportunities, rather than academic or athletics opportunities, when choosing their schools).

Respondents also noted, however, that similar dynamics are already present in the recruiting process, and while concern over their exacerbation would justify increased regulation, it should not preclude otherwise beneficial modernization of the NIL rules.

(4)　**Concern over boosters.** Several respondents noted concern over the possible involvement of representatives of the institution's athletics interests ("boosters") in new commercial NIL arrangements that might be permitted by modernized NIL rules. Some respondents were concerned that boosters might make payments that were only nominally for legitimate use of student-athlete NIL, and were primarily motivated by a desire to pay student-athletes for their athletics participation or performance. Other respondents were concerned about the role that new rules might provide to boosters in the recruiting process if the prospect of lucrative endorsement opportunities offered by a school's boosters became a recruiting inducement. Some commentators suggested that booster activity could be limited by prohibiting student-athletes from commercializing their NIL during the playing season.

NCAAHOUSE00000518

_____

Others suggested adopting a regulatory system in which payments from third parties to student-athletes were compared, and perhaps limited, to a fair market value standard, while noting the difficulty in creating and maintaining such a system.

The working group found all of this feedback to be immensely useful when formulating its recommendations and has incorporated many of the ideas offered in this process in those recommendations.

b.  **Information from other sports organizations.**  The working group also received information regarding athlete NIL licensing programs used in Major League Baseball, NFL, NBA and the Olympics.  A focus of the working group's inquiry in this area was whether a group licensing approach to student-athlete NIL, similar to models used in several other sports settings, might be a viable path forward for rule modernization.

One of the critical lessons learned by the working group during its review of these materials was that the group licensing programs that currently exist in professional sports or the Olympics all benefit from legal structures not available to the NCAA or its member institutions, namely the presence of a player's association to serve as a bargaining unit for the athletes (in the case of the NFL and MLB group licensing plans) or the presence of federal legislation conferring antitrust immunity related to sports marketing (in the case of the United States Olympic Committee).  As is explained later in this report, the absence of similar legal structures in intercollegiate athletics greatly complicates the NCAA's ability to pursue a group licensing approach similar to the models used in the professional context.

3.  **The working group's October 2019 interim report.**  October 23, 2019, the working group provided an interim report to the Board of Governors.  In its interim report, the working group recommended that the Board adopt the following Association-wide principles:

a.  Payment to a student-athlete for use of his or her name, image or likeness should not be pay for athletics performance or participation; nor should the payment serve as an inducement to select a particular school.

b.  Regulation of a student-athlete's name, image or likeness use should be transparent, narrowly tailored and enforceable, and should facilitate the principle of fair competition among schools in a division, including the integrity of the recruiting process.

c.  A student-athlete should be able to use his or her name, image or likeness in a manner similar to college students who are not student-athletes, unless there is a compelling reason to differentiate.

NCAAHOUSE00000519

_____

Consistent with these principles, the working group recommended that the Board take the following steps:

(1) Authorize changes to NCAA policy and bylaws to permit student-athletes to receive compensation related to NIL, provided the compensation is consistent with NCAA values and principles, and with legal precedent;

(2) Reject any approach to NIL compensation that would make student-athletes employees of their schools, or would result in NIL payments being used as a substitute for compensation related to athletics participation or performance; and

(3) Reaffirm the integrity of the student-athlete recruitment process, so that the prospect of receiving NIL compensation does not exert undue influence on a student's choice of college.

The working group also requested that its timeframe be extended through April 2020 so that it could continue to gather feedback and work with student-athletes and the NCAA membership on the development and adoption of new NCAA legislation in accordance with the working group's recommendations.

4. **The Board of Governor's October 29 statement and the working group's continuing deliberations.** In response to the working group's recommendations, the Board of Governors issued a statement October 29, 2019, establishing the following principles and guidelines for modernization of rules relating to commercial licensing of NIL rights:

a. Assure student-athletes are treated similarly to nonathlete students unless a compelling reason exists to differentiate.

b. Maintain the priorities of education and the collegiate experience to provide opportunities for student-athlete success.

c. Ensure rules are transparent, focused and enforceable and facilitate fair and balanced competition.

d. Make clear the distinction between collegiate and professional opportunities.

e. Make clear that compensation for athletics performance or participation is impermissible.

f. Reaffirm that student-athletes are students first and not employees of the university.

g. Enhance principles of diversity, inclusion and gender equity.

NCAAHOUSE00000520

Case 4:20-cv-03919-CW   Document 206-1   Filed 10/31/22   Page 62 of 321

_____

> h.     Protect the recruiting environment and prohibit inducements to select, remain at, or transfer to a specific institution.

The Board of Governors asked the working group to continue to gather feedback through April 2020 on how best to respond to the state and federal legislative environment, to refine its recommendations on the above principles, and to work with student-athletes, the membership and divisional governance structures on the development and adoption of new NCAA legislation. The Board also asked each division to create new rules to be effective as soon as appropriate, and to be voted on not later than January 2021.

Consistent with the Board's October 29 statement, the working group continued its work in late 2019 and early 2020. The working group met again several times through the middle of April, and continued to consult with the Association's student-athletes, membership and the divisional legislative groups charged with modernizing divisional rules related to NIL. The results of these continuing consultations and deliberation by the working group are set forth below.

### *Section II - The Legal Framework for Student-Athlete Name, Image and Likeness Rights.*

Much of the recent discourse on the potential ability of student-athletes to commercialize their name, image or likeness has depended on the assumption that it is NCAA rules, rather than other legal impediments, that are primarily responsible for student-athletes' inability to do so. A point repeatedly made to the working group when it requested feedback regarding possible rules changes in this area – including feedback from legal scholars on both sides of the issue – is that the ability of athletes to insist on payment for the "use" of their NIL is far more circumscribed than many commentators assume. These respondents stressed – and the working group agrees – that any rules changes made in this area must be cognizant of what student-athlete NIL rights do, and do not, cover, because permitting student-athletes to receive payments for NIL "licenses" that are not legally necessary would be tantamount to permitting thinly veiled payments for nothing other than athletics participation. The remainder of this section explains further the legal parameters within which student-athlete requests for NIL compensation would be carried out.

1.     **The right of publicity.** The commercial value of a student-athlete's name, image or likeness is based in the right of publicity, a legal doctrine that requires third parties to obtain permission from an individual before making commercial use of that individual's NIL. The right of publicity is created by state law and therefore varies from state to state. In its most common form, the right of publicity allows individuals to prevent third parties from making unauthorized use of their NIL "for purposes of trade." Importantly, the concept of "purposes of trade" does ***not*** extend to the use of an individual's NIL in news reporting, commentary, entertainment, works of fiction or nonfiction, or in advertising that is incidental to such uses – even if those uses are undertaken for the purpose of making money. So, for example, there is no need to obtain permission to run a news report about a person, or to write an article about them, or to advertise either of those products. The First Amendment to the US Constitution, and the federal Copyright Act, can also preempt or displace the right of publicity in certain circumstances.

NCAAHOUSE00000521

_____

2.     **The right of publicity and sports broadcasting.**  For present purposes, one of the most important limitations on the right of publicity relates to sports broadcasts.  Courts have repeatedly held that neither broadcasting a sporting contest, nor advertising or promoting those broadcasts by using the participants' names or images, violates the publicity rights of the participants.[2]  They have similarly held that rebroadcasting clips from a sports contest, or rebroadcasting the entire contest itself, does not violate the right of publicity unless a clip is used in a manner that promotes or implies endorsement of a product or service other than the broadcast itself.[3]  And courts have held that a person who owns the copyright in a photograph of an athlete or athletics contest can sell that photo without violating the athlete's right of publicity, since in that circumstance the copyright owner's rights under the Copyright Act preempt the athlete's rights under state right of publicity laws.[4]

This means that student-athletes, like other participants in sporting contests, generally have no legal right to prohibit the broadcast or sale of images that are captured while they are playing their sports, or in many other situations associated with their athletics participation.  Unless those images are being used to promote an unrelated, third-party commercial product or service, the right of publicity simply does not apply in those situations.  Because the right of publicity does not apply to live broadcast, rebroadcasts, news accounts or many informational items or pictures, any "NIL" payments received by student-athletes supposedly in consideration for the creation or sale of those products could not be considered legitimate licensing or work product activity.  It would, instead, be little more than payment for participating in the sporting contest itself – literal pay for play.

3.     **The NCAA's use of student-athlete name, image and likeness.**  The NCAA has traditionally used student-athlete NIL in the course of promoting its own activities, primarily (but not only) its championships.  For many years, the NCAA requested that student-athletes sign a waiver granting it permission to use their NIL for these purposes; this waiver request was a standard part of the Student-Athlete Statement.  Importantly, the waiver requests made by the NCAA were never used in conjunction with the NCAA's sale of broadcast rights to its championships.  Consistent with the law as described above, the NCAA does not require permission from its student-athletes in order to license the right to broadcast its championships, and it has never sought such permission.  Similarly, the NCAA has never purported to convey the right to use student-athlete NIL to its broadcast partners or to any other third parties.  The NCAA has never attempted to make commercial use of student-athlete NIL, and has no intention of doing so in the future.

_____

[2]  *Marshall v. ESPN*, 111 F.Supp.3d 815 (M.D. Tenn. 2015), *aff'd*, 668 Fed. Appx. 155 (6th Cir. 2016); *Baltimore Orioles v. MLB Players Ass'n*, 805 F.2d 663 (7th Cir. 1986); *Dryer v. NFL*, 55 F. Supp. 3d 1181 (D. Minn. 2014), *aff'd*, 814 F.3d 938 (8th Cir. 2016).

[3]  *NFL v. Alley, Inc.*, 624 F. Supp. 6 (S.D. Fla. 1983); *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400 (2001); *Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536 (1993).

[4]  *Maloney v. T3Media*, 94 F.Supp.3d 1128 (C.D. Cal. 2015), aff'd, 853 F.3d 1004 (9th Cir. 2017)

NCAAHOUSE00000522

Case 4:20-cv-03919-CW   Document 206-1   Filed 10/31/22   Page 64 of 321

_____

4.     **The *Keller* and *O'Bannon* cases.**  In 2009, two lawsuits were filed against the NCAA related to student-athlete NIL.  One of these cases, *Keller v. Electronic Arts*, was concerned entirely with video games: it accused the NCAA of conspiring with Electronic Arts ("EA") and the Collegiate Licensing Company to make unlicensed use of student-athlete NIL in the NCAA Football and NCAA Basketball video games produced by EA.  The other case, *O'Bannon v. NCAA*, focused on the NIL waivers requested in the Student-Athlete Statement:  it accused the NCAA of using those waivers as "perpetual licenses" to exploit the name, image or likeness of former student-athletes in commercial products long after they had graduated.[5]  As the *O'Bannon* case progressed, it grew to incorporate the allegation that NCAA amateurism rules also unlawfully restrained current student-athletes from being paid for the commercial use of their NIL while they were in school, in products including sports broadcasts and video games.

One of the key legal questions in the *Keller* case was whether Electronic Arts had a First Amendment right to use student-athletes' NIL in its games regardless of whether it had obtained permission from the student-athletes.  The US Court of Appeals for the Ninth Circuit rejected EA's argument and held that the First Amendment did not protect EA from claims that its video games may have violated student-athletes' right of publicity.  The *Keller* case thus established that video games like the previously marketed NCAA Football and NCAA Basketball titles cannot be produced without obtaining permission from student-athletes to use their NIL (if those games indeed utilized student-athlete NIL, a factual question that was never resolved in *Keller*).[6]

Similarly, one of the legal questions in the *O'Bannon* case was whether, in the absence of NCAA amateurism rules, student-athletes would receive payments from schools and/or third parties for the use of their NIL in video games and sports broadcasts.  The trial court in *O'Bannon* said the answer to both questions was "yes."  On the question of whether sports broadcasters are required to obtain licenses from student-athletes, the trial court cited an interim decision of another trial court which had suggested that broadcasters of NFL football games might be required to obtain permission from NFL players in connection with "certain kinds of broadcast footage."[7]  According to the *O'Bannon* trial court, that decision indicated enough uncertainty over the underlying legal landscape to support the plaintiffs' claim that

_____

[5]  For much of their time in the courts, the *Keller* and *O'Bannon* cases were collectively known as *In re NCAA Student-Athlete Name & Likeness Licensing Litigation.*

[6]  The *Keller* case settled before the court decided whether EA Sports' digital avatars used in the NCAA Football and NCAA Basketball games actually violated student-athletes' right of publicity.

[7]  Specifically, the *O'Bannon* court relied on an interim order from the *Dryer* case involving NFL players. *See In re NCAA Student-Athlete Name & Likeness Licensing Litig., 37 F. Supp. 3d 1126, 1146 (N.D. Cal. 2014)* (citing *Dryer v. NFL*, 689 F. Supp. 2d 1113, 1123 (D. Minn. 2010)).  The *Dryer* trial court later issued an order clarifying that sports broadcasts do ***not*** violate the right of publicity. *See Dryer v. NFL*, 55 F. Supp. 3d at 1195-1200, a conclusion repeated by the District Court and U.S. Court of Appeals for the Sixth Circuit in the *Marshall v. ESPN* case, 111 F. Supp. 3d at 826-27; 668 F. App'x at 157

NCAAHOUSE00000523

Case 4:20-cv-03919-CW   Document 206-1   Filed 10/21/22   Page 65 of 321

current student-athletes could demand a share of the live broadcasting revenues associated with their games, if NCAA amateurism rules permitted them to do so. The *O'Bannon* court also found, however, that there was no evidence that the NCAA had used signed waiver forms to prevent former student-athletes from profiting from their name, image or likeness after they had graduated.

When the *O'Bannon* case was appealed to the US Court of Appeals for the Ninth Circuit, the Ninth Circuit expressly declined to address the question whether sports broadcasts could potentially violate the participants' right of publicity, noting that its holding in *Keller* that the right of publicity applies to video games made it unnecessary to address the "thornier questions of whether participants in live TV broadcasts of college sporting events have enforceable rights of publicity."[8]  The Ninth Circuit's decision in *O'Bannon* was therefore based entirely on the notion that video games require a license of student-athlete publicity rights (if, in fact, the video game utilizes their NIL), and that the NCAA's rules must therefore permit student-athletes to receive NIL licensing payments as long as those payments do not result in student-athletes receiving total financial aid that exceeds their cost of attendance.  The *O'Bannon* appellate court specifically rejected the plaintiffs' demand that the NCAA must permit student-athletes to receive NIL payments that exceed their cost of attendance.

5.       **The legal framework for student-athlete NIL after *Keller* and *O'Bannon*.**  Contrary to what some commentators claim, the *Keller* and *O'Bannon* cases did not cause a significant change in the scope of student-athlete NIL rights.  While *Keller* did hold that the First Amendment did not give Electronic Arts the right to make unlicensed use of student-athlete NIL in video games, its holding was limited to video games – a point that the Ninth Circuit itself recognized in 2017 when it declined to extend *Keller's* holding to a case involving the use of student-athlete NIL in photographs.[9]   Moreover, the NCAA had never authorized EA or any other third party to use student-athlete likenesses in video games.  *Keller's* holding thus did not prohibit any activity in which the NCAA had been engaging.

Although the trial court in *O'Bannon* suggested that student-athletes might have some publicity rights related to the broadcast of their games, the Ninth Circuit in *O'Bannon* specifically declined to adopt that part of the trial court's opinion, and relied instead on *Keller's* holding that the right of publicity protected the use of student-athlete NIL in video games.

Moreover, several cases that were decided after the trial court's decision in *O'Bannon* have rejected the notion that sports broadcasts require licenses from participants. One of these cases, *Marshall v. ESPN*, specifically addressed NCAA student-athletes and held that broadcasting NCAA sporting contests did not violate their right of publicity.

---

[8]  *O'Bannon v. NCAA*, 802 F.3d 1049, 1067 (9th Cir. 2015).

[9]  *Maloney v. T3Media, Inc.*, 853 F.3d 1004 (holding that the Copyright Act preempts student- athlete NIL rights in still photographs not used for unrelated promotional purposes).

NCAAHOUSE00000524

Case 4:20-cv-03919-CW  Document 206-1  Filed 10/01/22  Page 66 of 321

_____

All of this has led the working group to conclude that any payments made to student- athletes for use of their NIL must be limited to situations in which a NIL license is legally required. In practice, this means that student-athletes should not be permitted to receive NIL payments related to their appearance in a live sports broadcasts or rebroadcasts; photos or news accounts of those broadcasts; or in other situations in which the law does not require a NIL license. To permit student-athletes to receive "NIL licensing" payments in situations where no license is needed would be tantamount to permitting pay for athletics participation or performance, flatly inconsistent with the NCAA's model of amateur intercollegiate athletics.

### *Section III - The NCAA's Current Rules Relating to Student-Athlete NIL.*

The following is meant as a brief summary of the current rules related to student-athlete NIL, based on the unique characteristics of each Division, including the exceptions to those rules and the waiver process related to their application. For a more complete listing, please refer to Bylaw 12.5 (promotional activities) in the Division I, II and III Manuals.

1. **Prior to enrollment.**

   a. **Divisions I and III.** Before enrolling at a Division I or III school and becoming a student-athlete, an athlete may use his or her name, image or likeness to promote or endorse commercial products or services. However, the athlete may not receive any compensation for doing so (other than reimbursement of expenses) if he or she was chosen to participate based on athletics ability, participation or reputation.

   b. **Division II.** Before enrolling at a Division II school and becoming a student-athlete, an athlete may be compensated for the use of his or her name, image or likeness to promote a commercial product or service, with no restrictions, other than it is not permissible for an individual to sign with or receive benefits from an agent.

2. **After enrollment.**

   a. **Division I.** A current Division I student-athlete is not allowed to use his or her name, image or likeness to promote or endorse a commercial product or service. This is true even if the student-athlete is not compensated. This restriction also extends to a student-athlete creating his or her own business, regardless of whether the business is related to athletics.

   b. **Division II.** A current Division II student-athlete is not permitted to participate in promotional activities related to athletics, or promotional activities in which payment is based on their participation in athletics. Current Division II student-athletes may, however, participate in, and be paid for, promotional activities that are not related to athletics, including modeling and promoting commercial products or services, provided that payment is not based on athletics participation.

NCAAHOUSE00000525

_____

      **c.**      **Division III.**  A current Division III student-athlete may use his or her name, image or likeness in modeling and other promotional activities not related to athletics, as well as to promote his or her own business, provided the promotion does not use the student-athlete's status as a student-athlete.  Payment cannot be based on athletics ability, participation or reputation.

**3.**      **Common Exceptions.**  All three divisions have exceptions to these general rules that permit the use of student-athlete NIL in promotional activities.  These exceptions cover school promotions, tax-exempt or charitable promotions, media activities, National Governing Body promotions, camp and congratulatory advertisements.  Student-athletes usually cannot be compensated for participating in these activities, beyond reimbursement for expenses.

All three divisions also allow student-athletes to provide unsolicited opinions on commercial products or services, provided the student-athlete is not compensated (from any source) for doing so.

Finally, in Division I, a current student-athlete may be paid to continue participating in modeling or other nonathletically related promotional activities, if those activities began before college enrollment and the student-athlete became involved for reasons independent of athletics ability.  No reference may be made to the student-athlete's participation in intercollegiate athletics, and the student-athlete may not endorse a commercial product.

**4.**      **Waivers.**  Since 2015, an increasing number of legislative relief waivers have been submitted to the national office requesting relief to allow student-athletes to use their name, image and likeness to promote a business or product.  These waiver requests have generally been approved, provided the following conditions were met:

      a.      The student-athlete was using his or her name, image or likeness to promote his or her own business;

      b.      The student-athlete became involved in the business for reasons unrelated to athletics, and the vocation was not athletically related;

      c.      The student-athlete's institution did not have any involvement with promotional activities related to the business, unless it was part of a class project or program and that benefit is extended to all participating students in the class or program;

      d.      No reference was made to involvement in intercollegiate athletics; and

      e.      The student-athlete was compensated at a rate commensurate with his or her skills and experience related to the vocation, and compensation was not based in any way on his/her athletics ability or reputation.[10]

_____

[10] Over 200 of these waiver requests have been submitted since 2015, largely on behalf of Division I student-athletes. Since 2018, institutions have also had the flexibility locally to apply guidelines from a list of pre-approved waivers. It is not possible to accurately account for these local waivers, but they likely significantly exceed those allowed by the NCAA. Additionally, Division III legislation permits Division III student-athletes to engage in these types of NIL activities without seeking a waiver.

NCAAHOUSE00000526

Case 4:20-cv-03919-CW  Document 206-1  Filed 10/21/22  Page 68 of 321

_____

Student-athletes receiving these waivers were also required to obtain prior approval from the director of athletics, and their institution was required to maintain records of approvals of all such activities.

The following are examples of the circumstances in which this waiver process has allowed student-athletes to use their NIL to promote products or businesses:

a.  A student-athlete was allowed to use her name and picture on a website and social media accounts to promote a clothing business that she created;

b.  A student-athlete was allowed to use his name, image and likeness to promote a company that he created to provide personalized nutrition recommendations for clients; and

c.  A student-athlete was allowed to use her name and photograph on a website to promote a photography business that she had created (and which was named after her).

These current rules, including the recent waivers, form the backdrop for the working group's recommendations set forth in Section V, below.

### _Section IV - The Growth in Opportunities for College Students to Make Commercial Use of their NIL Rights._

As noted earlier, the Board of Governors was primarily motivated to form the working group and charge it with reviewing the NCAA's rules regarding student-athlete NIL by the proposals of state and federal legislation on the topic. As the working group engaged in its deliberations, however, it became obvious that the Board's action was timely for another reason. As several respondents pointed out, the last several years have seen a significant increase in the opportunities that college students – _all_ college students, not just student-athletes – have to make commercial use of their NIL. Most of these new opportunities are related to the rise of social media, which has created a demand for promotional activities by college students, and student- athletes, that simply did not exist when the NCAA's current rules on promotional activities were drafted. As a result, the NCAA's current rules preclude student-athletes from engaging in a wide range of promotional activities that are open to college students generally, a situation that is inconsistent with the NCAA's goal of treating student-athletes in the same manner as the student-body in general whenever possible. The working group believes that the prevalence of these new promotional activities justifies a significant modernization of current Bylaw 12.5 (promotional activities) and other NCAA rules that touch on this topic. The rest of this section provides a brief discussion of the primary forms that these new opportunities take.

1.  **Social media "influencer" marketing opportunities.** One of the important new commercialization opportunities for college students is to become a social media "influencer." An influencer is simply an individual who creates and shares content on social media platforms like Instagram, Youtube, TikTok or Snapchat. When an influencer acquires

NCAAHOUSE00000527

_____

a following on social media, it becomes possible for them to engage in influencer marketing – that is, modeling, using or promoting a product in their social media posts, in exchange for money or some other thing of value (like free samples of the products that they are promoting). Influencers are often prized as marketers because of the direct line of communication they can have with their followers, which allows them to be more effective than traditional means of advertising in driving engagement with brands. It is estimated that, globally, brands spend somewhere between 5 and 10 billion dollars a year on influencer marketing.

While the most successful influencers are typically celebrities in their own right and have social media audiences in the millions, commercial opportunities are not limited to influencers with large follower counts. In recent years brands have also become interested in so called micro-influencers, individuals with follower counts in the hundreds or thousands, not millions.

The smaller size of a micro-influencer's follower count can make their engagement with their followers more genuine and honest, which many brands feel adds to their appeal as a promoter. Micro-influencers can also be much less expensive for brands, with the influencers often being paid hundreds rather than thousands of dollars, or being paid only in terms of being allowed to keep the product that they are promoting. As brands have come to see micro-influencers as potentially more effective promoters – especially in niche areas, like specialty sports apparel or equipment – they have started to make significant marketing efforts in this area. This effort has extended to college students.

2. **Digital content creation and distribution.** The other significant new area of commercial opportunities for students, and student-athletes, is creating and sharing digital content: podcasts, videos, streams of video game sessions, and the like. There has been a revolution in this area over the last decade, with the barrier to entry lowered dramatically in terms of content creation, distribution and monetization. Virtually anyone with a smartphone or a modern computer can record a podcast, or a video, or capture themselves playing a video game. Similarly, modern digital content distributions systems like Apple Podcasts, YouTube, Twitch and Patreon have made it trivially easy both to distribute these digital media products to followers, and to monetize them either directly (i.e., by placing the content behind a paywall) or indirectly (by selling advertisements associated with the products). Like being an influencer, these opportunities are available to – and have been seized by – college students.

As these new means of engaging in promotional or commercial activities have become ubiquitous, student-athletes have frequently sought approval to engage in them through the waiver process. Waiver requests have ranged from circumstances involving student-athlete owned businesses to requests to promote third-party commercial entities as a model or spokesperson. In considering these waiver requests, the NCAA staff has not distinguished between the use of social media and traditional promotional activities in the waiver space, although social media and technology have presented additional considerations.

NCAAHOUSE00000528

Below are examples of waiver requests filed by student-athletes, or examples posed to staff through the interpretations process, related to the use of student-athletes' NIL on social media to promote products or business:

a. A field hockey student-athlete was the host of a profitable video series (i.e., vlog) about cooking and nutrition on an online video streaming service. The student-athlete was paid based on online ad revenue, consistent with other vloggers with similar-sized audiences. The student-athlete was a nutrition major seeking to become a professional chef.

b. A baseball student-athlete used a live streaming platform to broadcast himself playing video games. The student was paid based on online ad revenue, consistent with other gamers of comparable skill and viewership. The student-athlete wanted to use his name, image and likeness to promote his company (i.e., his channel on the gaming platform) and products he used while gaming (e.g., e-sports equipment manufacturers).

c. A football student-athlete was the host of a profitable vlog about his experiences as an NCAA student-athlete on an online video streaming service. The student-athlete included footage of institutional contests and practices in his vlog, as well as interviews with teammates. The student- athlete was a journalism major and aspires to be a sports broadcaster.

d. A volleyball student-athlete was a well-known influencer on Instagram. The student-athlete sought to receive the going rate for sponsored posts on behalf of clothing brands. The student-athlete was selected to promote the clothing brands based on the substantial following she had on Instagram, rather than on her athletics notoriety.

The working group believes the NCAA's rules on promotional activities should be modernized so that examples such as these are clearly addressed by the main text of the rules, rather than being dealt with through the waiver process. The working group's recommendations for how the rules could be modernized are set forth in the next section.

### *Section V - Additional Recommendations on Association-Wide Principles and Regulatory Framework.*

After gathering additional feedback from student-athletes and the membership, and actively participating in the divisional legislative process, the working group reaffirms its earlier recommendation and the Board of Governors' determination that member schools may permit student-athletes the opportunity to benefit from the use of their NIL in a manner consistent with the values and principles of intercollegiate athletics. More specifically, the working group has received feedback from all three divisions that illustrates allowing such compensation for some promotional or commercial activities can likely be accommodated in a manner consistent with the NCAA's model of amateur intercollegiate competition. This will likely be true even if those activities are associated in some way with a student's athletics talents or recognitions, provided that such compensation is not

NCAAHOUSE00000529

provided or arranged by the student's school, and does not amount to compensation for the student's athletics performance for, or association with, his or her school.  For this reason, the working group recommends that the Board of Governors enhance its policy to make clear that the divisions should significantly modernize the NCAA's current rules on promotional activities and commercial use of student-athlete NIL.

1.     **Why significant modernization is appropriate.**  There are several broad reasons for the working group's recommendation that the divisions should consistently modernize their rules on commercial and promotional use of student-athlete NIL.

    a.     **Current rules could prevent student-athletes from pursuing opportunities available to college students generally.**  As noted above, the rise of social media and internet distribution and monetization channels have resulted in a significant increase in the number and type of opportunities that college students have to engage in promotional activities or otherwise monetize their NIL.  The NCAA's current rules tend to prohibit student-athletes from engaging in these activities in a blanket manner, and while the waiver process has permitted some activities not addressed by the language of Bylaw 12.5 (promotional activities), the working group recommends that the rules be thoroughly reworked to address directly the modern NIL environment.  The working group also believes that the rules should generally permit student-athletes to pursue the same kind of promotional opportunities that are available to other students.  This is consistent with the Board of Governors' direction and initial divisional legislative direction that student-athletes should be treated similarly to other college students unless a compelling reason to differentiate exists.

    b.     **The historic distinction between permitted and prohibited promotional activities should be reexamined in light of modern commercialization opportunities.**  The working group also believes that the divisions should consider modernizing the manner in which their bylaws address "traditional" promotional activities, such as television commercials or in-person autograph signings.  The working group has received significant interest in and feedback on these types of activities; indeed, the divisional legislative bodies continue to grapple with these very issues as we provide our final report to the Board of Governors.  Based on the feedback we have received and the considerations of the divisional bodies, we believe that with the appropriate restrictions, a division could permit a student-athlete to be compensated for use of her NIL in a television endorsement of a product, or for signing an autograph.  Any such modernization pursued by the divisions must, however, be accompanied by regulation sufficient to ensure that the newly permitted activities remain consistent with divisional values and philosophies.

    c.     **Concerns about abuse of NIL commercialization are better addressed through proper regulation than prohibition.**  Rather than prohibit entire categories of promotional or commercial activities, the working group believes it is more

appropriate to address potential abuses through regulation and enforcement. Indeed, the most important check on potential abuse of NIL compensation, and one that the working group recommends maintaining in its entirety, is the current prohibition on NCAA members providing NIL compensation to student-athletes, or arranging for third parties to do so, unless such compensation is part of a total financial aid package that does not exceed cost of attendance.[11] Such payments would quickly threaten to become pay for play, which is why none of the working group's recommendations suggest creating an environment to facilitate them.

The working group studied the NCAA's rules, received feedback regarding them, and carefully considered how boosters should be treated by any new rules adopted by the divisions. Traditionally, the concern that boosters would circumvent rules against pay for play by making such payments in the school's stead has resulted in NCAA rules that treat boosters as identical to schools for rules purposes. Many in the membership recommended that this treatment of boosters continue in connection with the new NIL commercialization rules, which would have effectively prevented boosters from participating in the many of the new opportunities. While it is a difficult issue, the working group finds that an outright ban in all three divisions could be unnecessarily restrictive.

Instead, the working group suggests that the divisions study whether it is possible to adopt rules and enforcement techniques sufficient to ensure that any compensation paid by boosters purportedly for use of student-athlete NIL represents genuine compensation for use of those NIL rights, separate from athletics participation, rather than disguised payments for athletics participation. These new rules may require the divisions to draw new distinctions between types of boosters when evaluating their participation in student-athlete NIL activities, with some boosters being subjected to enhanced scrutiny due, for example, to their participation in the recruiting process or their long-standing association with an athletics department. Other categories of boosters – for example, someone who qualifies as a booster simply because they made a donation to obtain season tickets, or employed an enrolled student-athlete – may warrant less scrutiny when engaged in NIL activities. For the same reasons, the working group recommends that the Board of Governors encourage each division to adopt enforceable rules ensuring that schools and their boosters do not use the prospect of future NIL commercialization opportunities as an inducement to select, or transfer to, a specific school.

---

[11] The permanent injunction entered by the court in *O'Bannon v. NCAA* prevents the NCAA from prohibiting "the inclusion of compensation for the licensing or use of prospective, current, or former Division I men's basketball and FBS football players' names, images and likenesses in the award of a full grant-in-aid, up to the full cost of attending the respective NCAA member school." Nothing in the working group's recommendations is meant to suggest that schools should be prevented from providing this type of financial aid.

Case 4:20-cv-03919-CW   Document 206-1   Filed 10/21/22   Page 73 of 321

_____

2.  **Necessary regulation of newly permitted NIL activities.**   While the working group recommends significant modernization of the rules related to student-athlete NIL, it also believes that the divisions must adopt regulations designed to ensure that the newly permitted NIL activities do not undermine America's unique educational model of athletic competition conducted between students, rather than professionals.  In particular, the working group's recommendations to the Board of Governors that it encourage the divisions to significantly modernize their rules related to NIL is inextricably bound to the working group's strong further recommendation that the Board require the divisions to also adopt guardrails embedded in regulations sufficient to ensure the following:

a.   Institutions should encourage student-athletes to keep their academic commitments and not let NIL activities distract or interfere with their academic progress.  Student-athletes should abide by institution and athletics department policies with respect to missed class time and good academic standing;

b.   The compensation earned by student-athletes for NIL activities should represent genuine payments for use of their NIL independent of, rather than payment for, athletics participation or performance;

c.   Outside the context of providing financial aid up to cost of attendance as allowed by prevailing law, schools, conferences and the NCAA should play no role in arranging NIL activities or payments for student-athletes;

d.   Outside the context of providing financial aid up to cost of attendance as allowed by prevailing law, schools, conferences and the NCAA should play no role in student-athletes' NIL activities themselves, including by permitting student-athletes to use their facilities, uniforms, trademarks or other intellectual property;

e.   NIL activities must not be contingent on a prospective student-athlete's enrollment at a particular school or group of schools, nor otherwise used as an inducement by a school or booster;

f.   The use of agents, advisors and professional services by student-athletes in connection with the NIL activities must be regulated; and

g.   NIL activities must not interfere with NCAA member institutions' efforts in the areas of diversity, inclusion or gender equity.

The working group urges the Board to recommend that the divisions pay particular attention to potential recruiting issues created by the modernized NIL rules, and in particular to the possibility that NIL opportunities may be used as direct or indirect inducements during the recruiting process.  Unlike athletes in the professional leagues – whose ability to choose their teams is tightly constrained by mandatory drafts and contract terms, free agency rules, salary

NCAAHOUSE00000532

Case 4:20-cv-03919-CW   Document 206-1   Filed 10/21/22   Page 74 of 321

_____

caps and similar restraints – student-athletes have complete freedom when it comes to selecting which school they will attend.  The ability of students to freely choose the school that best fits their academic and athletics aspirations is one of the defining features of America's model of intercollegiate athletics.  But one result of this freedom is the possibility that students will place undue emphasis on potential NIL opportunities when selecting their schools, to the potential detriment of their academic and athletics careers, and to the potential detriment of fair competition between NCAA members.  Student-athletes may also be exploited by bad actors making false promises of NIL opportunities should they select a particular school, only to have those opportunities fail to materialize after enrollment.  The divisions should take care to adopt guardrails that will, to the extent possible, prevent the new NIL opportunities from distorting student school choice in this manner.

3.     **Specific recommendations.**  After considerable feedback and engagement with student-athletes and the divisional legislative process, the working group recommends that the Board of Governors encourage the divisions' continued consideration of appropriate revisions to their bylaws to permit the student-athlete NIL activities detailed in Section V.C.1, below.

Of course, the working group's endorsement of these activities to the Board of Governors is contingent on each of the divisional governance structures developing adequate measures to implement the guardrails previously established by the Board of Governors and refined above.  Because through our work we have gathered a deeper appreciation that the rules needed to accomplish these modifications may differ from division to division, the working group recommends that the Board of Governors appropriately leave to the divisions the final form of any rules changes.  The working group, however, suggests that the Board encourage the divisional governance structures to pay particular attention to certain potential issues as they develop appropriate guardrails around the newly permitted NIL activities; those are set forth in Section V.C.2.

Understanding the current legal landscape regarding promotional activity, the working group also stresses that it is not recommending that any changes be made to the rules permitting NCAA schools or conferences to make certain promotional uses of student-athlete NIL.  The working group does not intend any of these recommendations to suggest that such uses are no longer appropriate, or that schools or conferences must, should or may compensate student-athletes for those traditional uses.

Finally, the working group acknowledges that, as the divisions consider rules that will significantly expand the ability of student-athletes to engage in previously prohibited commercial activities while retaining NCAA eligibility, they will be in uncharted territory.  It is possible that some of the newly permitted activities will be exploited in unforeseen ways by third parties and damage NCAA values like fair competition, gender equity or the primacy of education over athletics.  The working group recommends that the Board of Governors urge each of the divisions to closely monitor the effect of these newly permitted activities and to be proactive in addressing abuses, including by potentially restricting some of these

NCAAHOUSE00000533

_____

activities if they prove impossible to permit without doing damage to NCAA values or impinge on divisional philosophies.

a.     **Recommended areas in which rules related to NIL should be modernized.** Based on broad feedback and the working group's understanding of the direction of the divisional bodies, the working group would recommend support for the following two categories of NIL commercial activity by student-athletes, provided that the divisions develop regulation to implement the Board of Governors' principles and guidelines described above.

    (1)    **Category One:  Compensation for third-party endorsements.** The divisions could permit student-athletes to receive compensation for use of their NIL in third-party endorsements or social media influencer activity, including certain activity or endorsements that may be related in some way to athletics. However, we recommend that the divisions take care to prohibit schools or conferences from making these kind of endorsement payments themselves, or having any involvement in student-athlete endorsement activity. These prohibitions on institutional involvement in student-athlete NIL activity should include, at a minimum, (a) A prohibition on institutions arranging, identifying, facilitating or having any other kind of participation (including by encouraging booster participation) in endorsement deals for their student-athletes; and (b) A prohibition on institutions permitting student-athletes to use the institution's intellectual property in student-athlete endorsements. For example:

        (a)    It could be permissible for a student-athlete at University A to be paid to endorse a commercial product in a television commercial or social media posting, provided that University A's uniform or marks do not appear in the commercial or posting and that the university did not play a role in arranging the opportunity; and

        (b)    It could be permissible for a student-athlete to post content to a YouTube channel (e.g., day-in-the-life) and be compensated for endorsement of a particular product (e.g., product placement in the videos) provided that University A did not aid in the production of the content and no university marks are used.

        (c)    It should be ***impermissible***, however, for University A to pay a student-athlete for appearing in one of University A's commercials.

    (2)    **Category Two:  Compensation for student-athlete work product or business activities.** The Board should also consider encouraging the divisions to permit student-athletes to receive compensation from third

NCAAHOUSE00000534

Case 4:20-cv-03919-CW   Document 206-1   Filed 10/31/22   Page 76 of 321

NCAA Board of Governors
  Federal and State Legislation Working Group
  Final Report and Recommendations April 17, 2020
Page No. 23
_____

parties, but not schools or conferences, for the use of NIL in their work product or business activities, including compensation for:

(a)     Social media content creation and distribution;

(b)     Promotion of student-athlete businesses (music, art, athletic lessons, etc.); and

(c)     Personal promotional activities (autograph signings, etc.).

Student-athletes could be permitted to be compensated for these activities even if they are related in some general way to fitness or athletics. The divisions should adopt rules, however, prohibiting schools or conferences from (1) Paying student-athletes for the activities; (2) Arranging, or having any involvement in these activities, or (3) Permitting their intellectual property to be used in these activities. For example:

(a)     It could be permissible for a student-athlete at University A to conduct an in-person or virtual sports camp and use his or her name, image and likeness to promote the camp, provided that University A's marks and facilities are not used;

(b)     It could be permissible for a student-athlete at University A to be paid for making personal appearances, provided that University A is not involved in arranging for the appearances and University A's marks are not used (e.g., the student-athlete is not permitted to appear in University A's jersey or golf shirt); and

(c)     It could be permissible for a student-athlete at University A to develop a line of clothing and use his or her name, image and likeness to promote the apparel, provided that University A's marks are not used in the promotion or actual apparel.

(d)     It should be *impermissible*, however, for that student-athlete to be paid for any appearance by or on behalf of University A.

The working group is not recommending any further modernization of bylaws beyond these two categories at this time. In particular, recognizing the current legal landscape, the working group is not recommending any changes to NCAA rules to permit student-athletes to be compensated for appearing in photographs, broadcasts, clips or other recordings of athletics contests or related activities. As explained earlier in this report, the right of publicity does not extend to such recordings, which means that any payments to

student-athletes associated with them would not represent legitimate NIL licensing activity by student-athletes. Even if the right of publicity did extend to some of these uses, moreover, the working group believes that any compensation for them would be inconsistent with the collegiate model, due to the tight nexus between athletics participation and NIL in these contexts.

At this time, the working group is also not recommending any changes to NCAA rules to permit group licenses of student-athlete NIL in what are characterized as group products (like video games). There are legal hurdles to such activity that preclude it as a realistic option for implementation at this time. The working group recommends that the NCAA continue to explore whether those legal hurdles can be overcome through efforts described in Section VI, so that this issue can be revisited in 2021 or later.

The working group appreciates that the market response to new opportunities permitted by these proposed rules changes may not be made available in a gender-equal manner. Because schools and conferences may be prohibited from having any direct or indirect involvement in these new opportunities, they will not be able to correct or offset this problem directly, by leveling any imbalance created by the market's offerings. The working group nonetheless encourages schools to make educational resources available to all student-athletes so that they are aware of how they might pursue NIL activities.

b.  **Recommended areas of regulation of newly permitted NIL activities.** As noted earlier, the working group's recommendations regarding the two categories of potentially permissible activities are contingent on each division creating rules to prevent these new activities from undermining the integrity of the collegiate model and the recruiting process. When considering those regulations, the working group recommends that the Board of Governors encourage the divisions to consider the following issues in particular:

(1)  Whether certain categories of promotional activities (e.g., alcohol, tobacco and sports gambling) should be precluded because they are inconsistent with the NCAA membership's values;

(2)  Whether certain categories of third-party businesses (e.g., athletics shoe and apparel companies) should be precluded from, or have limited participation in, the newly permitted activities, due to their history of encouraging or facilitating recruiting and other rules infractions;

(3)  What adjustments, if any, should be made to NCAA rules regarding promotional and other commercial activity by athletes prior to enrollment at an NCAA institution, including consideration of the disclosure and

NCAAHOUSE00000536

_____

enforcement mechanisms that might be required in connection with this issue. Discussion of this issue should explore whether disclosure or enforcement efforts in this area should utilize the assistance of third-party entities at the local, conference or Association-wide levels, in part to help relieve the burden that campus compliance personnel may face attempting to monitor the newly permitted activities;

(4)　How best to implement safeguards to ensure that newly permitted activities do not impose undue burdens on student-athlete time;

(5)　How best to implement safeguards to ensure that newly permitted activities are not utilized by boosters in a manner that circumvents the divisions' amateurism rules. This should include consideration of the disclosure and enforcement mechanisms that may be necessary to monitor the new NIL activities and payments;

(6)　Creating a framework to permit student-athletes to engage and consult with professional services providers in connection with their NIL and business activities (e.g., tax, legal, subject matter experts) consistent with existing federal and state laws; and

(7)　Creating resources on campus to educate student-athletes about the newly permitted activities and in a manner consistent with gender equity.

### *Section VI - Presidential Subcommittee on Congressional Action.*

### *Background.*

One topic that repeatedly came up during the deliberations of the working group was the possibility that the Association's attempts to modernize its rules relating to NIL could be frustrated by antitrust lawsuits, or by state laws that purport to override NCAA rules related to NIL issues. As the working group discussed possible reforms for consideration by the NCAA membership, it became apparent that the potential impediments posed by these outside legal factors could significantly undermine the Association's ability to take meaningful action in this area.

To address this issue, and in response to the introduction of federal NIL legislation and interest in NIL by Members of Congress, November 16, 2019, the Board of Governors Executive Committee directed that a subcommittee of the working group be formed. The purpose of the subcommittee was to provide input to the Board of Governors and the NCAA president on potential assistance that the Association should seek from Congress to support any efforts to modernize the rules in NCAA sports, while maintaining the latitude that the Association needs to further its mission to oversee and promote intercollegiate athletics on a national scale.

NCAAHOUSE00000537

_____

This Presidential Subcommittee on Congressional Action was composed of the presidential members of the working group as well as one independent member of the Board of Governors:

- Rita Cheng, president, Northern Arizona University (Division I)
- Mary Beth Cooper, president, Springfield College (Division III)
- John "Jack" DeGioia, president, Georgetown University (Division I) (chair)
- Michael Drake, president, The Ohio State University (Division I)
- Glen Jones, former vice chair, NCAA Board of Governors (Division II)
- Denis McDonough, The Markle Foundation
- Jere Morehead, president, University of Georgia (Division I)
- Tim P. White, chancellor, California State University System (Divisions I and II)

The Presidential Subcommittee conducted a total of seven meetings and teleconferences between December 16, 2019, and the date of this report. The subcommittee received reports from NCAA legal and legislative affairs staff regarding the potential legal impediments faced by the Association as it considers NIL modernization, as well the effect those impediments may have on the Association's ability to adopt and enforce its bylaws more generally.

For the past 114 years, the NCAA has served as the recognized authority and voice for the millions of student-athletes who have participated in intercollegiate athletics. A member- driven organization comprised of over 1,100 colleges and universities, the overarching purpose of the NCAA is to create a safe, fair and equitable environment that allows student-athletes to reach their full potential in academics, athletics and life. This ambitious ideal is achieved by providing student-athletes with transformational opportunities and experiences through the integration of athletics with academics.

Unfortunately, the evolving legal landscape surrounding NIL and related issues threatens to undermine the intercollegiate athletics model and significantly limit our ability to meet the needs of student-athletes moving forward. Specific modernization reforms that the working group believes are in the best interests of student-athletes and consistent with the collegiate model might prove infeasible as a practical matter due solely to the legal risk that they might create for the Association. While we are sensitive to the legal risks involved, we are more concerned about working in the best interests of our student-athletes to ensure that their voices continue to be heard and that their interests, current and future, are advanced and protected.

Further, the subcommittee believes that the NCAA is the most appropriate and experienced entity to oversee intercollegiate athletics given the uniqueness of the collegiate model of athletics, its member-driven nature and daily connection to student-athletes, the breadth and scope of its administrative operations, its willingness to respond to the evolving needs of student-athletes, and its long track record of providing remarkable opportunities for student-athletes to gain access to higher education.

Case 4:20-cv-03919-CW    Document 206-1    Filed 10/21/22    Page 80 of 321

_____

### _Recommendations._

In light of the above and driven by our desire to do what is best for our student-athletes, the Presidential Subcommittee urges the NCAA Board of Governors to:

1. Support the ongoing modernization effort of NCAA rules in areas of student-athlete well-being, including student-athlete experience, health and safety and academic success; and

2. Immediately engage Congress to accomplish the following:

   a. Ensure federal preemption over state name, image and likeness laws;

   b. Establish an antitrust exemption for the Association;

   c. Safeguard the nonemployment status of student-athletes;

   d. Maintain the distinction between students-athletes and professional athletes; and

   e. Uphold the NCAA's values including diversity, inclusion and gender equity.

In offering these recommendations, the subcommittee acknowledges that, due to the evolving Congressional landscape, there may be a need for the Association to prioritize one or more of the above recommendations in its engagement with Congress.

The reasons the Presidential Subcommittee believes these actions are necessary and appropriate are set out below.

1. **Why Congressional Action is Desirable.** The Presidential Subcommittee has identified two distinct legal impediments to the Association's ability to modernize its rules relating to NIL, and to maintain its model of amateur intercollegiate athletics more generally. Those two impediments are (a) The attempts by various state laws to override, in whole or in part, the NCAA's ability effectively to manage issues related to NIL; and (b) The threat of continuing antitrust litigation.

   a. **Impediments Posed by State NIL Legislation.** During its deliberations, the subcommittee reviewed the current movement among the states to adopt laws that purport to supplant, in whole or in part, the NCAA's ability to manage effectively in this area. As of the date of this report, 34 states have introduced bills addressing the topic of payments to college student-athletes for use of their NIL rights. Two of these bills have become law: one in California and one in Colorado. Both laws expressly prohibit the NCAA from adopting rules regarding student-athletes earning compensation as a result of the use of the student's name, image or likeness when that

NCAAHOUSE00000539

_____

compensation is paid by third parties.[12]  Other laws under consideration would erode the NCAA's ability to maintain the collegiate model even further.

New York, for example, is considering a law that would, among other things, require that colleges pay their student-athletes a share of ticket revenue earned from sporting events.   Not only would this law undermine the NCAA's model of amateur intercollegiate athletics; it would threaten to transform student-athletes into employees of their schools.

These state laws create two distinct, but related, impediments to the Association's ability to maintain its model of intercollegiate athletics in its current, national form. First, all of these laws contain provisions that are fundamentally incompatible with the NCAA's model of intercollegiate athletics, since they purport to completely remove the NCAA's ability to adopt or enforce rules related to third-party commercialization of student-athlete NIL.  These laws would thus strip the NCAA of the ability to ensure that third-party NIL commercialization was not being conducted in a manner that distorted the process by which student-athletes select which school to attend, or undermined student-athlete welfare, or amounted to the creation of a back- door scheme of pay for play.

Second, the fact that these laws are being considered or adopted by the states, rather than at the federal level, creates the very real possibility that NCAA members in different states will be governed by different rules related to NIL.  If the NCAA simply accepted that the California Fair Pay to Play Act overrode its rules in California, for example, it would mean that student-athletes attending California schools would be governed by very different rules on NIL than student-athletes attending schools in other states.  This would deal a serious blow to the NCAA's ability to sponsor sports and championships on a truly national level.  It would also gravely undermine the ability of the NCAA's members to achieve their shared goal of fair competition within their divisions.

_____

[12]   For example, the California law provides, in pertinent part:

(a)(1)  A postsecondary educational institution shall not uphold any rule, requirement, standard, or other limitation that prevents a student of that institution participating in intercollegiate athletics from earning compensation as a result of the use of the student's name, image, or likeness. Earning compensation from the use of a student's name, image, or likeness shall not affect the student's scholarship eligibility.

(2)  An athletic association, conference, or other group or organization with authority over intercollegiate athletics, including, but not limited to, the National Collegiate Athletic Association, shall not prevent a student of a postsecondary educational institution participating in intercollegiate athletics from earning compensation as a result of the use of the student's name, image, or likeness.

(3)  An athletic association, conference, or other group or organization with authority over intercollegiate athletics, including, but not limited to, the National Collegiate Athletic Association, shall not prevent a postsecondary educational institution from participating in intercollegiate athletics as a result of the compensation of a student athlete for the use of the student's name, image, or likeness.

NCAAHOUSE00000540

Case 4:20-cv-03919-CW  Document 206-1  Filed 10/31/22  Page 82 of 321

The subcommittee has therefore concluded that it is vital for Congress to step in and ensure that any laws pertaining to student-athlete NIL be enacted at the federal, rather than state, level. For this reason, the subcommittee believes it is appropriate and advisable for the Association to partner with Congress to enact a federal law that addresses the issue of compensation to student-athletes for use of name, image or likeness, and preempts state laws on that topic.

**b.** **Impediments Posed by Continuing Antitrust Litigation**. The subcommittee also reviewed the history of antitrust lawsuits brought against the Association over the last several decades. That review revealed that federal antitrust law has frequently been used by aggrieved parties as a tool to attempt to change or undermine the Association's rules. Several of these lawsuits have been brought by third-party business interests, not current or former student-athletes, and have typically attempted to force the Association to change its rules for the benefit of those business interests. While these lawsuits have, for the most part, been unsuccessful, the Association has been required to devote scarce and valuable resources to defending them, resources that could have been better spent on pursuing the Association's other goals.

The Association has also faced several antitrust challenges to its amateurism and eligibility rules brought by current or former student-athletes. The Association has, for the most part, been successful in defending these lawsuits. In response to a recent challenge to the Division I transfer rules, for example, the U.S. Court of Appeals for the Seventh Circuit held that such rules do not violate the antitrust laws because they are "clearly meant to help maintain the revered tradition of amateurism in college sports" and "the preservation of the student-athlete in higher education."[13] Similarly, the U.S. Court of Appeals for the Ninth Circuit recently held that the NCAA's amateurism rules benefit both students and consumers.[14]

The Association's attempts to defend its amateurism rules from antitrust attack have not always been successful, however. Even as it affirmed the beneficial effects of the NCAA's amateurism rules in general, the Ninth Circuit's *O'Bannon* decision endorsed the notion that plaintiffs can use federal antitrust law to attempt to "prove" that there are better ways of preserving amateurism than current NCAA rules. This has led to another round of litigation in which plaintiffs have attempted to use the antitrust laws as a vehicle to second guess the Division I membership on the details of the Division I financial aid rules. The subcommittee is concerned that these sorts of antitrust challenges will continue, and will interfere with the Association's ability to effectively and efficiently regulate intercollegiate athletics contests between its members.

---

[13] *Deppe v. NCAA*, 893 F.3d 498, 501-503 (7th Cir. 2018).

[14] *O'Bannon v. NCAA*, 802 F.3d 1049 (9th Cir. 2015).

NCAAHOUSE00000541

Case 4:20-cv-03919-CW Document 206-1 Filed 10/21/22 Page 83 of 321

The subcommittee's review of this litigation history has led it to conclude that the threat of antitrust lawsuits will continue to impinge on the membership's ability to investigate and adopt common and adequate solutions to pressing issues facing college athletics. For this reason, the subcommittee believes it is appropriate and advisable for the Association to seek an exemption from federal and state antitrust laws.

## *Section VII - Timeline and Phased Divisional Implementation.*

The working group has completed its work with the submission of this report to the Board of Governors. The report recognizes that there is a common, national framework to achieve name, image, and likeness opportunities for student-athletes in a manner that does not compromise the collegiate model. Yet, within that framework, the divisions will have to craft their legislative proposals to meet the needs of their own student-athletes and divisional philosophies. With this report, the divisions have the guidance necessary to complete their work. The divisions may act more quickly than the timeline contemplates but progress must continue and decisive measures should be taken. The divisions are asked to continue to provide periodic reports to the Board of Governors regarding their progress.

***By April 30, 2020.*** This report is delivered to the NCAA Board of Governors for its review. The Board of Governors issues its additional Association-wide guidance to the divisions.

***By August 30, 2020.*** The divisions should have drafted NIL legislative proposals for consideration and divisional governance bodies should have solicited additional membership suggestions regarding permissible activities and appropriate regulation. In particular, the working group recommends that all three divisions consider modifying their rules to permit those activities that have been permitted to date via the Division I waiver process, via rule in Division II or via interpretation in Division III. Further, the divisions should consider modifying their rules to permit commercial or promotional use of NIL by student-athletes related to their own businesses or work product, provided that work product is ***not*** related to athletics.

***By October 31, 2020.*** Divisional governance bodies should have revised NIL proposals and recommended legislation that meets the divisional needs of their student-athletes for commercial or promotional use of their NIL in situations that are ***related to athletics***, or that involve endorsements of commercial products or services. These rules changes will necessarily include the consideration and adoption of safeguards identified earlier, to prevent (among other abuses) NIL opportunities from being used as a recruiting inducement, or boosters using NIL opportunities as back-door pay-for-play. The divisions should also consider whether additional structures may be advisable for the purpose of monitoring athletics-related NIL commercial or promotional activities and whether those structures should exist within the divisions or Association-wide; to regulate the involvement of agents or other service providers in the newly permitted activities; to determine the extent to which any of the modifications should apply to individuals prior to their initial collegiate enrollment; and to address any gender equity concerns raised by the new activities.

NCAAHOUSE00000542

NCAA Board of Governors
  Federal and State Legislation Working Group
  Final Report and Recommendations April 17, 2020
Page No. 31

_____

**By January 31, 2021.** Divisions should have enacted all NIL legislative proposals appropriate for their divisions with effective dates not later than the start of the 2021-22 academic year.

**Future Considerations.** The divisions should continue to explore whether it is possible to support institutionally managed group licenses for athletically related activities. As noted earlier, there currently are significant legal impediments to the NCAA adopting this kind of licensing structure; further exploration of these concepts will require clarity from Congress of the NCAA's authority to enact rules or maintain oversight in this area.

NCAAHOUSE00000543

# EXHIBIT 16

NAME | IMAGE | LIKENESS

# Interim NIL Policy

The NCAA is committed to ensuring that its rules, and its enforcement of those rules, protect and enhance student-athlete well-being and maintain national standards for recruiting. Those goals are consistent with the NCAA's foundational prohibitions on pay-for-play and impermissible recruiting inducements, which remain essential to collegiate athletics.

As the NCAA continues to work with Congress to adopt federal legislation to support student-athlete use of NIL, it is necessary to take specific, short-term action with respect to applicable NCAA rules. Accordingly, effective July 1, 2021, and until such time that either federal legislation or new NCAA rules are adopted, member institutions and their student-athletes should adhere to the guidance below:

**1.** NCAA Bylaws, including prohibitions on pay-for-play and improper recruiting inducements, remain in effect, subject to the following:

- **For institutions in states without NIL laws or executive actions or with NIL laws or executive actions that have not yet taken effect**, if an individual elects to engage in an NIL activity, the individual's eligibility for intercollegiate athletics will not be impacted by application of Bylaw 12 (Amateurism and Athletics Eligibility).

- **For institutions in states with NIL laws or executive actions with the force of law in effect**, if an individual or member institution elects to engage in an NIL activity that is protected by law or executive order, the individual's eligibility for and/or the membership institution's full participation in NCAA athletics will not be impacted by application of NCAA Bylaws unless the state law is invalidated or rendered unenforceable by operation of law.

- Use of a professional services provider is also permissible for NIL activities, except as otherwise provided by a state law or executive action with the force of law that has not been invalidated or rendered unenforceable by operation of law.

**2.** The NCAA  will continue  its normal regulatory operations but will not monitor for compliance with state law.

**3.** Individuals should report NIL activities consistent with state law and/or institutional requirements.

NCAA is a trademark of the National Collegiate Athletic Association. July 2021

  

Name, Image and Likeness Policy

# Question and Answer

### 1.  What is a name, image and likeness activity?

It is an activity that involves the use of an individual's name, image and likeness for commercial or promotional purposes.

### 2.  What is the effective date of the interim NIL policy?

The effective date is July 1, 2021.

### 3.  How long will the interim NIL policy remain in effect?

Until such time that either federal legislation or new NCAA rules are adopted.

### 4.  What is the impact of the interim NIL policy on prospective student-athletes?

Prospective student-athletes may engage in the same types of NIL opportunities available to current student-athletes under the interim NIL policy without impacting their NCAA eligibility. NIL opportunities may not be used as a recruiting inducement or as a substitute for pay-for-play. Individuals are encouraged to consider state laws, if applicable, and the rules of any relevant amateur governing bodies.

### 5.  Will compensation for NIL activities jeopardize a prospective student-athlete's high school eligibility?

Given that rules vary by state, prospective student-athletes should consult their state high school athletics association regarding questions pertaining to high school eligibility.

### 6.  Who is a professional service provider?

A professional service provider is an individual who provides third-party services to a prospective or current student-athlete. It includes, but is not limited to, an agent, tax advisor, marketing consultant, attorney, brand management company or anyone who is employed or associated with such persons.

### 7.  Does the NIL interim policy permit individuals to use professional service providers in connection with their name, image and likeness activities?

Use of a professional services provider for NIL activities is permissible.

### 8.  Are institutions permitted to arrange NIL opportunities for student-athletes?

A number of factors are relevant when institutions consider their possible involvement in arranging NIL transactions. During the interim NIL policy, the expectation is that schools and student-athletes will not use NIL transactions to compensate for athletic participation or achievement or as an improper inducement. In addition, institutions should not dictate how student-athletes use their compensation (e.g., should not require student-athletes to use compensation for financial aid). Beyond NCAA principles related to pay-for-play and impermissible inducements, such involvement may also raise other issues–including potential claims for contractual non-performance, Title IX issues, and employment issues–as to which campus compliance, Title IX, and general counsel staff can be consulted.  Institutions should also be aware of and comply with all applicable state and federal laws, including gender equity requirements.  Finally, institutions may consider how their legal counsel should be involved with the negotiation, review, and storage of NIL documents.

NCAA is a trademark of the National Collegiate Athletic Association. Nov. 2021



Name, Image and Likeness Policy

# Question and Answer

### 9. May an individual enter into an agreement regarding NIL with a professional service provider prior to July 1, 2021?

No. If an individual enters into an agreement regarding NIL with a professional service provider prior to July 1, 2021, they will jeopardize their amateur status and eligibility for intercollegiate participation in a particular sport and will be subject to student-athlete reinstatement.

### 10. Which state law is applicable to prospective student-athletes prior to enrollment?

The NCAA cannot provide guidance on issues of state law. The state you live in and the states where a prospective student-athlete may wish to enroll may have NIL laws with which you will want to be familiar. A prospective student-athlete may consult a professional services provider, contact the athletics compliance office of NCAA schools they may choose to attend, or research state law compliance requirements where they may wish to enroll. NCAA schools may also have specific NIL policies that should be considered.

### 11. What is prohibited under the new policy?

Subject to state law, the following is prohibited under the new interim policy:

- NIL agreement without quid pro quo (e.g., compensation for work not performed). Student-athlete NIL agreements should include the expected NIL deliverables by a student-athlete in exchange for the agreed upon compensation and student-athletes must be compensated only for work actually performed.
- NIL compensation contingent upon enrollment at a particular school. For example, institutions should not use NIL arrangements to improperly induce matriculation (e.g., guaranteeing a particular NIL opportunity upon enrollment);
- Compensation for athletic participation or achievement. Athletic performance may enhance a student-athlete's NIL value, but athletic performance may not be the "consideration" for NIL compensation.
- Institutions providing compensation in exchange for the use of a student-athlete's name, image or likeness.

### 12. Can individuals enter into NIL agreements with boosters?

Yes, provided the activity is in accordance with state laws and school policy, is not an impermissible inducement and it does not constitute pay-for-play.

### 13. Do other sections of NCAA Bylaw 12 outside of NIL still apply under the interim policy?

Individuals and institutions in states with NIL laws or executive actions with the force of law in effect: NCAA rules, including prohibitions on pay-for-play and improper recruiting inducements, remain in effect, but NIL activities protected by state law will not impact eligibility.

Individuals where there is no state law or executive actions: If an individual chooses to engage in an NIL activity, eligibility will not be impacted by NCAA amateurism and athletics eligibility bylaws, but other NCAA rules, including prohibitions on pay-for-play and improper recruiting inducements remain in effect.



Name, Image and Likeness Policy

# Question and Answer

### 14. Will an individual be required to report name, image and likeness activities to their school?

The NCAA's interim policy does not address this issue, but state laws and institutional policies may impose reporting requirements.

### 15. Can international student-athletes benefit from name, image and likeness activities?

Yes. International individuals are covered by the interim NIL policy; however, they may consider consulting with the Designated School Official at the institution they are attending for guidance related to maintaining their immigration status and tax implications. Specifically, student-athletes, prospective student-athletes, schools or school officials who have questions may write to the U.S. Student and Exchange Visitor Program at **SEVP@ice.dhs.gov**.

### 16. How do I report NIL compensation for tax purposes?

Individuals should follow all applicable tax laws for reporting NIL compensation. Requirements may vary based on state and/or country.

### 17. How does the interim NIL policy impact a SAs athletic financial aid?

The interim NIL policy does not impact a student-athlete's financial aid. Compensation, including NIL compensation, remains excluded from NCAA financial aid limitations.

### 18. Where can I go for questions regarding a specific NIL activity?

General information regarding NIL can be found **here**. Prospective and current student-athletes with additional questions should consult with the athletics compliance department at the NCAA school they attend or plan to attend. NCAA member schools with additional questions should submit an interpretation request in Requests/Self-Reports Online. Note: NCAA prohibitions on pay-for-play and improper recruiting inducements remain in effect; however, the national office will not interpret state or federal laws or institutional policies.



# EXHIBIT 17

# NCAA adopts interim name, image and likeness policy

Interim policy goes into effect Thursday
*June 30, 2021 | Michelle Brutlag Hosick*

NCAA college athletes will have the opportunity to benefit from their name, image and likeness beginning Thursday. Governance bodies in all three divisions today adopted a uniform interim policy suspending NCAA name, image and likeness rules for all incoming and current student-athletes in all sports.

"This is an important day for college athletes since they all are now able to take advantage of name, image and likeness opportunities," NCAA President Mark Emmert said. "With the variety of state laws adopted across the country, we will continue to work with Congress to develop a solution that will provide clarity on a national level. The current environment — both legal and legislative — prevents us from providing a more permanent solution and the level of detail student-athletes deserve."

The policy provides the following guidance to college athletes, recruits, their families and member schools:

- Individuals can engage in NIL activities that are consistent with the law of the state where the school is located. Colleges and universities may be a resource for state law questions.
- College athletes who attend a school in a state without an NIL law can engage in this type of activity without violating NCAA rules related to name, image and likeness.
- Individuals can use a professional services provider for NIL activities.
- Student-athletes should report NIL activities consistent with state law or school and conference requirements to their school.

"Today, NCAA members voted to allow college athletes to benefit from name, image and likeness opportunities, no matter where their school is located," said Division I Board of Directors chair Denise Trauth, president at Texas State. "With this interim solution in place, we will continue to work with Congress to adopt federal legislation to support student-athletes."

While opening name, image and likeness opportunities to student-athletes, the policy in all three divisions preserves the commitment to avoid pay-for-play and improper inducements tied to choosing to attend a particular school. Those rules remain in effect.

"The new policy preserves the fact college sports are not pay-for-play," said Division II Presidents Council chair Sandra Jordan, chancellor at the University of South Carolina Aiken. "It also reinforces key principles of fairness and integrity across the NCAA and maintains rules prohibiting improper recruiting inducements. It's important any new rules maintain these principles."

Division III Presidents Council chair Fayneese Miller, president at Hamline, said the Association will continue to work with Congress to develop a national law that will help colleges and

https://www.ncaa.org/about/resources/media-center/news/ncaa-adopts-interim-name-image-and-likeness-policy

universities, student-athletes and their families better navigate the name, image and likeness landscape.

"The new interim policy provides college athletes and their families some sense of clarity around name, image and likeness, but we are committed to doing more," Miller said. "We need to continue working with Congress for a more permanent solution."

The temporary policy will remain in place until federal legislation or new NCAA rules are adopted. With the NIL interim policy, schools and conferences may choose to adopt their own additional policies. Click here to access educational materials.

**Media Contact**
Michelle Brutlag Hosick
Associate Director of Communications
mhosick@ncaa.org

https://www.ncaa.org/about/resources/media-center/news/ncaa-adopts-interim-name-image-and-likeness-policy

PLTFS000949

# EXHIBIT 18
# SUBMITTED UNDER SEAL

# EXHIBIT 19

**Plaintiffs' FRE 1006 Summary of Top Compensation Packages in College Sports**

| | | |
|---|---|---|
| **Mike Krzyzewski**<br> | **Former Duke University head men's basketball coach** | **$13.7 million in his final season at Duke in 2020[1]** |
| **Nick Saban**<br> | **University of Alabama head football coach** | **$11.7 million annual salary**<br><br>+<br><br>Country club membership paid by university<br>25 hrs. of personal flight time on private jet<br>2 vehicles for personal use<br>34 tickets to each home football game[2] |
| **Kirby Smart**<br> | **University of Georgia head football coach** | **$11.25 million annual salary**<br><br>+<br><br>Country club membership paid by university<br>50 hrs. of personal flight time on private jet<br>Paid travel and expenses for family to every game<br>25 box seats at every home game[3] |
| **Dabo Swinney**<br> | **Clemson head football coach** | **$10.5 million annual salary**<br>+<br>Country club membership paid by university<br>2 vehicles for personal use<br>22-seat suite and 20 tickets to home and away football games<br>40 tickets to post-season games |

---

[1] *Duke basketball's Mike Krzyzewski credited with $13.7M in compensation in 2020* (May 17, 2022) https://www.fayobserver.com/story/sports/2022/05/17/dukes-mike-krzyzewski-credited-13-7-m-compensation-2020/9804998002/.

[2] *Nick Saban Contract, Salary, & Buyout Breakdown* (Sept. 10, 2022) https://boardroom.tv/nick-saban-contract-salary-buyout-alabama/.

[3] *Georgia releases details on Kirby Smart's 10-year, $112.5 million contract* (Aug. 4, 2022) https://theathletic.com/3478720/2022/08/04/georgia-releases-details-on-kirby-smarts-10-year-112-5-million-contract/.

| | | |
|---|---|---|
| | | Condominium near campus in exchange for endorsing real estate developer |
| | | Home security system in exchange for endorsing security company |
| | | Discounted trips to resorts in CO and Bahamas[4] |
| **Jim Delany**  | **Former Big Ten Conference Commissioner** | **$10.3 million annual salary in 2019**[5] |
| **Bill Self**  | **University of Kansas head men's basketball coach** | **$10.2 million annual salary**[6] + Two country club memberships paid by university  2 vehicles for personal use  $4 million life insurance policy[7] |
| **Lincoln Riley**  | **USC head football coach** | **$10 million annual salary** + USC reportedly purchased $6 million home for Riley in Los Angeles  Unlimited use of private jet for Riley and family[8] |

[4] *Clemson's Dabo Swinney gets a different kind of perk* (Oct. 3, 2018)
https://www.greenvilleonline.com/story/sports/college/clemson/2018/10/03/clemson-football-dabo-swinney-contract-comes-long-list-perks/1513319002/.
[5] *Here's how much each Power 5 conference raked in last year* (July 10, 2020)
https://footballscoop.com/news/heres-how-much-each-power-5-conference-raked-in-last-year.
[6] *NCAA men's basketball highest-paid coaches for 2021-22 season* (Mar. 12, 2022)
https://www.usatoday.com/picture-gallery/sports/ncaab/2022/03/11/ncaa-mens-basketball-highest-paid-coaches-2021-22-season/9424310002/.
[7] *Details, salary, buyout for Bill Self's 'lifetime contract'* (Apr. 2, 2021)
https://247sports.com/college/kansas/Article/Details-salary-buyout-for-Bill-Selfs-lifetime-contract-with-KU-basketball-163538713/.
[8] *Lincoln Riley's rumored USC contract details: report* (Nov. 29, 2021) https://www.foxnews.com/sports/lincoln-riley-rumored-contract-details-report.

| | | |
|---|---|---|
| **Brian Kelly**<br> | **LSU**<br>**head football**<br>**coach** | **$9.5 million annual salary**<br>+<br><br>2 vehicles for personal use<br><br>$1.2 million interest-free home loan<br><br>50 hrs. of personal flight time on private jet[9] |
| **Mel Tucker**<br> | **Michigan State**<br>**head football**<br>**coach** | **$9.5 million annual salary**<br>+<br><br>Country club membership paid by university<br><br>2 vehicles for personal use<br><br>60 tickets including suite to every football game<br><br>50 hrs. of personal flight time on private jet[10] |
| **Ryan Day**<br> | **Ohio State**<br>**head football**<br>**coach** | **$9.5 million annual salary**<br>+<br><br>$1,200 monthly vehicle stipend<br><br>Country club membership paid by university<br><br>50 hrs. personal flight time on private jet[11] |
| **David Shaw**<br> | **Stanford**<br>**head football**<br>**coach** | **$8.925 million annual salary[12]** |

---

[9] *Brian Kelly's LSU contract: Six-figure bonuses, two cars, $1.2 million house loan; see details* (Nov. 30, 2021) https://www.theadvocate.com/baton_rouge/sports/lsu/article_e3209444-5247-11ec-9e32-ff8fe54a2db2.html.

[10] *Contract details from Mel Tucker's new 10-year, $95 million extension* (Nov. 29, 2021) https://247sports.com/college/michigan-state/LongFormArticle/Michigan-State-football-Mel-Tucker-contract-details-10-year-95-million-extension-176723474/#176723474_1.

[11] Ryan Day Head Coach Employment Agreement, available at: https://media.bizj.us/view/img/11501416/ryandaycontract-executed5-31-19-151677.pdf.

[12] *Stanford football coach David Shaw credited with more than $8.9 million in pay for 2019* (Aug. 4, 2021) https://www.usatoday.com/story/sports/ncaaf/pac12/2021/08/04/stanford-football-coach-david-shaw-2019-pay/5488869001/.

| John Calipari | University of Kentucky head men's basketball coach | **$8.6 million annual salary**<br>+<br>2 vehicles for personal use<br>Country club membership paid by university<br>20 premium tickets to every UK basketball game[13] |
| --- | --- | --- |
| Tom Izzo | Michigan State head men's basketball coach | **$8.3 million annual salary**<br>+<br>2 vehicles for personal use<br>Country club membership paid by university<br>24 hrs. personal flight time on private jet<br>$2 million life insurance policy<br>140 tickets to every home basketball game[14] |
| Mario Cristobal | University of Miami head football coach | **$8 million annual salary**[15] |
| Jimbo Fisher | Texas A&M head football coach | **$7.5 million annual salary**<br>+<br>Country club membership paid by university<br>2 luxury vehicles<br>Use of private jet up to $300,000 per year[16] |

[13] *Here's what John Calipari's $86 million 'lifetime' contract at Kentucky actually looks like* (June 13, 2019) https://www.yahoo.com/video/john-calipari-kentucky-lifetime-contract-233544416.html.

[14] *Michigan State basketball's Tom Izzo contract details, including post-coaching job* (Aug. 29, 2022) https://www.freep.com/story/sports/college/michigan-state/spartans/2022/08/29/michigan-state-basketballs-tom-izzo-contract-post-coaching-details/65462872007/.

[15] *Miami signs Oregon coach Mario Cristobal to 10-year, $80 million contract after firing Manny Diaz: Source* (Dec. 6, 2021) https://theathletic.com/news/miami-signs-oregon-coach-mario-cristobal-to-10-year-80-million-contract-after-firing-manny-diaz-source/HAhnsEtwVAL4/.

[16] *Jimbo Fisher Contract, Salary & Buyout Breakdown at Texas A&M* (Sept. 24, 2022) https://boardroom.tv/jimbo-fisher-salary-buyout-contract-texas-am/#:~:text=JIMBO%20FISHER'S%20EMPLOYMENT%20CONTRACT%20Benefits,season%20football%20%26%20men's%20basketball%20tickets.

| Lane Kiffin  | Ole Miss head football coach | $7.25 million annual salary[17] |
| James Franklin  | Penn State head football coach | **$7 million annual salary** + $10,000 annual vehicle allowance 55 hrs. personal flight time on private jet[19] |
| Jay Wright  | Villanova head men's basketball coach | $6.2 million annual salary[20] |

---

[17] *Sources: Lane Kiffin's Contract Details, Potential Bonuses Revealed* (Dec. 6, 2021) https://www.si.com/college/2021/12/06/lane-kiffin-contract-details-potential-bonuses.

[18] *Jim Harbaugh new Michigan contract details released* (Feb. 17, 2022) https://247sports.com/college/michigan/Article/Jim-Harbaugh-new-Michigan-football-contract-details-released-182999728/.

[19] James Franklin Financial Term Sheet, available at: https://gopsusports.com/documents/2021/11/23/Franklin_Contract_2021.pdf.

[20] *NCAA men's basketball highest-paid coaches for 2021-22 season* (Mar. 12, 2022) https://www.usatoday.com/picture-gallery/sports/ncaab/2022/03/11/ncaa-mens-basketball-highest-paid-coaches-2021-22-season/9424310002/.

| | | |
|---|---|---|
| **Pat Fitzgerald**<br> | **Northwestern head football coach** | **$5.748 million annual salary[21]** |
| **Chris Beard**<br> | **University of Texas head men's basketball coach** | **$5.25 million annual salary[22]** |
| **Larry Scott**<br> | **Pac-12 Conference Commissioner** | **$5.4 million annual salary[23]** |
| **Bob Bowlsby**<br> | **Big 12 Conference Commissioner** | **$4 million annual salary[24]** |
| **John Swofford** | **ACC Conference Commissioner** | **$3.8 million annual salary[25]** |

[21] *Ohio State football coach Ryan Day, MSU's Mel Tucker top paid Big Ten football coaches* (May 18, 2022) https://www.dispatch.com/story/sports/2022/05/18/big-ten-college-football-coach-salaries-ncaa-ryan-day-mel-tucker-jim-harbaugh-pat-fitzgerald/9825277002/.

[22] *NCAA men's basketball highest-paid coaches for 2021-22 season* (Mar. 12, 2022) https://www.usatoday.com/picture-gallery/sports/ncaab/2022/03/11/ncaa-mens-basketball-highest-paid-coaches-2021-22-season/9424310002/.

[23] *Here's how much each Power 5 conference raked in last year* (July 10, 2020) https://footballscoop.com/news/heres-how-much-each-power-5-conference-raked-in-last-year.

[24] *Here's how much each Power 5 conference raked in last year* (July 10, 2020) https://footballscoop.com/news/heres-how-much-each-power-5-conference-raked-in-last-year.

[25] *Here's how much each Power 5 conference raked in last year* (July 10, 2020) https://footballscoop.com/news/heres-how-much-each-power-5-conference-raked-in-last-year.

|  | | |
|---|---|---|
| **Jack Swarbrick**  | **Notre Dame Athletic Director** | **$3.05 million annual salary in 2018**[26] |
| **Geno Auriemma**  | **University of Connecticut head women's basketball coach** | **$2.9 million annual salary**[27] |
| **Dawn Staley**  | **University of South Carolina head women's basketball coach** | **$2.9 million annual salary**[28] |
| **Greg Sankey** | **SEC Conference Commissioner** | **$2.6 million annual salary**[29] |

[26] *The highest paid ADs in college sports are....* (May 14, 2018) https://footballscoop.com/news/the-highest-paid-ads-in-college-sports-are-athletic-directors-salary-database-jack-swarbrick.

[27] *Highest-paid women's college basketball coaches* (Mar. 11, 2022) https://www.usatoday.com/picture-gallery/sports/ncaaw/2022/03/11/highest-paid-womens-college-basketball-coaches-2021-22-season/9424678002/.

[28] *Cashin' in at South Carolina: Dawn Staley inks historic seven-year, $22.4 million contract* (Oct. 22, 2021) https://www.swishappeal.com/ncaa/2021/10/22/22734341/ncaaw-dawn-staley-south-carolina-gamecocks-contract-seven-year-22-4-million-geno-auriemma-kim-mulkey.

[29] *Here's how much each Power 5 conference raked in last year* (July 10, 2020) https://footballscoop.com/news/heres-how-much-each-power-5-conference-raked-in-last-year.

| | | |
|---|---|---|
| **Kim Mulkey**  | **LSU head women's basketball coach** | **$2.6 million annual salary[30]** |
| **Brent Venables**  | **Clemson Defensive Coordinator** | **$2.5 million annual salary in 2021[31]** |
| **Mike Elko**  | **Texas A&M Defensive Coordinator** | **$2.1 million annual salary[32]** |
| **Alex Grinch** | **University of Oklahoma Defensive Coordinator** | **$1.8 million annual salary[33]** |

---

[30] *Blockbuster contract for LSU women's coach Kim Mulkey - $23.6 million over 8 years* (Apr. 28, 2021) https://www.theadvertiser.com/story/sports/college/lsu/2021/04/28/lsu-womens-basketball-coach-kim-mulkey-making-23-6-million-through-2029/4875224001/.

[31] *Overpaid or worth it? Evaluating the 10 highest-paid assistant football coaches* (Dec. 9, 2021) https://www.usatoday.com/story/sports/ncaaf/2021/12/09/highest-paid-college-football-assistant-coaches/8889193002/.

[32] *Id.*

[33] *Id.*

| | | |
|---|---|---|
|  | | |
| **Vic Schaefer**  | **University of Texas head women's basketball coach** | **$1.8 million annual salary[34]** |
| **Gene Smith**  | **Ohio State Athletic Director** | **$1.58 million annual salary[35]** |

---

[34] *Texas giving women's basketball coach Vic Schaefer 7-year deal worth $13.8 million* (Aug. 17, 2020) https://www.espn.com/womens-college-basketball/story/_/id/29680476/texas-giving-coach-vic-schaefer-7-year-deal-worth-138-million.

[35] *Here's what's included in OSU athletics director's new multimillion-dollar contract* (May 19, 2021) https://www.bizjournals.com/columbus/news/2021/05/19/gene-smith-contract-extension.html#:~:text=Ohio%20State%20Athletics%20Director%20Gene,the%20OSU%20Board%20of%20Trustees

# EXHIBIT 20

Wolverines

# Jim Harbaugh wants Big Ten to share TV rights revenue with players

- Published: Jul. 26, 2022, 5:43 p.m.



Michigan head coach Jim Harbaugh talks to reporters during an NCAA college football news conference at the Big Ten Conference media days, at Lucas Oil Stadium, Tuesday, July 26, 2022, in Indianapolis. (AP Photo/Darron Cummings)AP

**By**

- **Aaron McMann | amcmann@mlive.com**

INDIANAPOLIS — In the wild, wild west that is Name, Image and Likeness in college athletics, Jim Harbaugh upped the ante on Tuesday.

During his 50-minute interview session with reporters at Big Ten Media Days, the Michigan head coach offered his endorsement of league-provided revenue sharing to players.

"You know me, I've always been for NIL," Harbaugh said on the field at Lucas Oil Stadium. "I believe players should have a share in the revenues, and I think that's something that's really possible at Michigan. I think that's where we're headed."

Asked to clarify his comments, Harbaugh pointed to the Big Ten — currently in negotiation for another multimedia rights deal, reportedly expected to top $1 billion — as having the financial resources to fund such a plan.

"They use their name, image and likeness on the TV broadcasts," Harbaugh said. "They're the ones signing the mega-TV deals. And a new one's coming in 2024. Why can't that be an NIL deal right from the Big Ten?

"Because that's who's negotiating the TV deals, and that's where the big money is."

**More:** Jim Harbaugh still mum on pending Michigan QB battle ahead of camp

Under such an arrangement, Michigan would be positioned nicely thanks to its massive popularity and TV ratings success. Harbaugh's team played in some of the most watched college football games of 2021, garnering massive, nationwide audiences.

Big Ten commissioner Kevin Warren, at the center of the exploding multimedia rights agreements, was asked Tuesday about the possibility of one day sharing revenue with players. While he didn't answer it directly, Warren said the conference is launching a student-athlete advocacy and advisory committee to discuss such topics, a process that is ongoing.

"I'm fortunate because (my wife) Greta and I are the parents of two former college student-athletes and one current student-athlete," Warren said. "So one of the discussions we're blessed to have around the dinner table center around what we can do to make sure that we're creating the best college athletic experience for our student-athletes."

It remains unclear how a revenue-sharing model would work, and it certainly wouldn't apply to other conferences, but big-name schools that attract massive audiences certainly have a leg up.

As for NIL itself, the rule passed on July 1, 2021, that allows student-athletes to profit off their name, image and likeness, previously disallowed by the

https://www.mlive.com/wolverines/2022/07/jim-harbaugh-wants-big-ten-to-share-tv-rights-revenue-with-players.html

NCAA, Warren called on Congress to pass federal legislation to supersede differing state laws.

Harbaugh wouldn't go as far, telling reporters he doesn't "know all the facts on how it's being administered at different places," but reiterated his support of players being able to make money.

In June, Ohio State football coach Ryan Day told a group of Columbus business leaders that he estimated his program would need $13 million to help keep his roster intact for another season, the first time a coach has acknowledged the arms race to pay high-profile players.

"I think we can do more," Harbaugh said. "I think maybe we can even double that at Michigan. I think that's possible. And I think it's going in a terrific direction in that way."

Still, Harbaugh has maintained a "transformative, not transactional" approach to NIL at Michigan, emphasizing a desire to create an attractive place to play — not inducing recruits through guaranteed payments.

"I don't think our players care (what others are making)," Harbaugh said. "They just want to get as good at football as they possibly can get. And they know that when they're doing really well (they'll get it), in terms of NIL.

"But that's it. I think they know it's all going to be good. Get really good at football; that's where their focus is."

# EXHIBIT 21

# College football players group speaks with Big Ten commissioner Kevin Warren, demands include share of revenue

Penn State QB Sean Clifford is part of a players group advocating for more benefits from the conference

 By **Dennis Dodd**

Jul 23, 2022 at 2:13 am ET•4 min read



USATSI

https://www.cbssports.com/college-football/news/the-six-pack-alabama-vs-tennessee-michigan-vs-penn-state-among-best-week-7-college-football-picks/

Sharing Big Ten Conference revenue with players is among a list of demands recently presented to the league by a college football players advocacy group, CBS Sports has learned.

Penn State quarterback Sean Clifford has met with Jason Stahl, executive director of the College Football Players Association. The CFBPA is a player advocacy organization formed in 2021. Stahl is a former faculty member at the University of Minnesota.

That meeting then led to sharing information with the Penn State team. Stahl said he met with Penn State players secretly on campus from July 7-14.

Eventually news of the discussions reached Big Ten commissioner Kevin Warren. Stahl provided the list of demands to CBS Sports that he said went to Warren. They included enhanced medical care and "a percentage of media rights revenue for the players."



CFBPA

Stahl said he and Warren spoke by phone for an hour on Thursday. In addition to players receiving a share of conference revenue from media rights, the demands include that players be allowed independent medical care separate from the school and post-eligibility "health protections".

https://www.cbssports.com/college-football/news/the-six-pack-alabama-vs-tennessee-michigan-vs-penn-state-among-best-week-7-college-football-picks/

"We talked about all three demands," Stahl told CBS Sports. "The first two of which, he seemed very open to movement toward our position. The third demand [regarding sharing revenue] I could tell it was going to be stickier, but it was going to be part of the conversation."

Clifford confirmed the discussions Friday.



"Those three things are just the base of what we'd like to do. In reality, we think there is more that could happen," Clifford told ESPN, which first reported a meeting between the two sides on Friday.



Stahl said he and Roxanne McCray, president of the CFBPA, have been invited to attend Big Ten Media Days next week in Indianapolis.

"The Big Ten Conference consistently communicates and collaborates with our student-athletes," Warren said in a statement. "We are in the process of formalizing a student-athlete advisory committee to seek input from our student-athletes about the changing landscape of college athletics. We continue to work with our member institutions to ensure our student-athletes have an outstanding and well-rounded experience, while promoting and safeguarding the mission of higher education, and prioritizing excellence and integrity in both academics and athletics."

With a new Big Ten television rights deal imminent, the thinking is there would not only be enough money to share with players but such an arrangement could even give the Big Ten a competitive advantage over other conferences.

"It's not about the Big Ten and it's not about Penn State – it's about the entirety of college athletics needing reform," Stahl said.

Stahl said his organization is not to be characterized as a union. It is a membership-based players association. However, Stahl added that if progress is not made with the Big Ten to voluntarily address the three demands, "we have the option of forming a union and attempting to unionize the entire Big Ten."

"We are not a union," Stahl stressed. "I had fantastic conversations with Kevin Warren that he was ready to talk with CFBPA about these three demands. We are going to exhaust that process before we consider other avenues."

The conference is close to announcing a new media rights deal that reportedly could top $1 billion annually shared by the 14 Big Ten schools. (Sixteen when USC and UCLA join in 2024.) At a time when money and power are coalescing around the Big Ten and SEC, such a move would not only be a game changer for the league but for all of college athletics.

Warren has long been an advocate for college athletes having played college basketball and with his experience as a former agent. His brother Morrison was one of Stanford's first Black football players.

https://www.cbssports.com/college-football/news/the-six-pack-alabama-vs-tennessee-michigan-vs-penn-state-among-best-week-7-college-football-picks/

Big Ten ADs have at least tangentially discussed the concept for at least six months according to a source. However, it's not clear how much Big Ten ADs were looped in on the specific prospect of revenue sharing.

The words "collective bargaining" weren't used in the list of demands but it is presumed that is what any revenue sharing discussion would have to include. Collective bargaining with players has long been discussed as unavoidable in college athletics in an era that includes NIL benefits and freedom to transfer.

"It's more about, is this inevitable and unlike anything any of us have done for the last 25-30 years? … Let's get ahead of it," said a source familiar with the discussions.

College athletes' scholarships are limited to room, books, board, tuition, cost of attendance and NIL benefits. Revenue sharing would bring athletes in the once-staunchly amateur NCAA closer to being considered "employees" than ever before.

No figures were available on what percentage of that Big Ten pot the CFBPA would demand. One source speculated that the Big Ten could avoid Title IX laws by distributing the money through the conference office instead of the schools. In that sense the conference office wouldn't be an educational entity receiving federal funds necessarily subject to Title IX.

"Why should we be sharing revenue with an athlete who is not creating it?" said one source familiar with the discussions.

With collective bargaining, the two sides could conceivably have conversations about other issues. The NCAA this week announced that athletes could transfer as many times as they desired. That piece could be discussed over a bargaining session in return for a greater commitment from the players.

https://www.cbssports.com/college-football/news/the-six-pack-alabama-vs-tennessee-michigan-vs-penn-state-among-best-week-7-college-football-picks/

# EXHIBIT 22

Penn State Football

# Kevin Warren to Bryant Gumbel: Paying players and expansion to 20 schools on Big Ten agenda | Jones

- Updated: Aug. 19, 2022, 5:05 p.m.|
- Published: Aug. 19, 2022, 1:10 p.m.



Big Ten Commissioner Kevin Warren talks to reporters during an NCAA college football news conference at the Big Ten Conference media days, at Lucas Oil Stadium, Tuesday, July 26, 2022, in Indianapolis. (AP Photo/Darron Cummings)AP

**By** David Jones | djones@pennlive.com

https://www.pennlive.com/pennstatefootball/2022/08/kevin-warren-to-bryant-gumbel-paying-players-and-expansion-to-20-schools-are-on-big-ten-table-jones.html#:~:text=Gumbel%3A%20Could%20you%20foresee%20paying,are%20paying%20their%20football%20players%3F

If a better series exists dealing with the issues of sports than *HBO RealSports*, I'm not familiar with it. I DVR it every month. My wife and son (when he's home) watch it with me. It never fails to deal head-on with the tough questions of the games we watch and why.

So, it makes sense that host Bryant Gumbel dealt some direct questions and remarkably got some straight answers from Big Ten commissioner Kevin Warren in an episode set for air Tuesday night (11:00 EDT).

Two main issues were isolated from the interview in a release posted by HBO on Friday:

• Considering the utter opulence the B1G finds itself in after Warren signed the TV rights deal with FOX, CBS and NBC worth a reported $8 billion over seven years (2023-30), are we finally headed for cutting the athletes in on a share of the wealth?

• Is the Big Ten finished expanding after the USC/UCLA addition lifted the membership to 16? Or are we headed for a bigger number still?

Here are those two exchanges as HBO transcribed them. First one first:

*Gumbel: You sit here today as the architect of deals that will enrich the Big Ten in ways that no one imagined.*

*Warren: Mm-hm.*

*Gumbel: Everybody's getting rich now off college sports, OK? The networks are getting rich from it, the administrators are getting rich, the schools are getting rich, the coaches get rich. You know who won't be getting rich off it? The athletes. When are you gonna start paying them?*

*Warren: One of the things I'm excited about is being able to have honest dialogue with our student-athletes. Have there been little changes that have been made? Yes. But we need to really sit down and start getting these issues on the table and start making some decisions.*

*Gumbel: Could you foresee paying your athletes?*

*Warren: Yes. Yeah.*

*Gumbel: So, could you foresee the day when Michigan, Michigan State, Indiana, Wisconsin are paying their football players? Paying their basketball players because they are in revenue-producing sports?*

*Warren: Those are the things that we have to resolve. We have to. So, I want to be part of this conversation, and will be part of this conversation of what we can do to make this better.*

Well. That's new. Even in the year since the Supreme Court, and Justice Brett Kavanaugh in particular, issued a strongly worded opinion in which it asserted college athletes are unquestionably employees, the power brokers of the business have largely balked. Previously when faced with a yes/no question about directly paying players, Warren had only responded with noncommittal word salad. Not this time.

Later, Gumbel dealt with further expansion and the prospect of super-conferences:

*Gumbel: Right now, we are having a major realignment in collegiate sports.*

https://www.pennlive.com/pennstatefootball/2022/08/kevin-warren-to-bryant-gumbel-paying-players-and-expansion-to-20-schools-are-on-big-ten-table-jones.html#:~:text=Gumbel%3A%20Could%20you%20foresee%20paying,are%20paying%20their%20football%20players%3F

**Warren:** *And I think during that period there's gonna be a lot of disruption. And that's OK. We need to embrace it if we want to make sure that we continually build college athletics in a position where it's here 100 and 200 years from now.*

**Gumbel:** *You're at 16 teams now. Could you foresee 20?*

**Warren:** *I could. Yeah. I could see perpetual and future growth.*

OK, then. What had only been implied and inferred to this point is right out there in the open. If Warren admits to conceiving it, you'd think further expansion is going to happen. And only one area of the country makes sense – the West and, specifically, more members of the Pac-12.

As I wrote yesterday, I'd make the targets certainly Oregon and Washington, then one or two of the following: Utah, Arizona State, Stanford and California.

If the Big Ten is concerned about the UC system of universities and California governor Gavin Newsom who were blindsided by the USC/UCLA move and are making noises about derailing UCLA's defection from the Pac-12, a welcoming of Cal would ease that tension. Stanford, a private institution, would add academic prestige and could be a partner of longtime ally Notre Dame should it come aboard.

If it's all about the revenue, major TV markets and football viability, Utah is in the mix with Arizona State and possibly Colorado as tangential options.

But four altogether makes a total of 20 in the B1G. I don't foresee Notre Dame as a near-term member. So, maybe all four from the Pac-12. Jon Wilner of *The San Jose Mercury News* and Brett McMurphy of ActionNetwork.com have been on top of this story. We'll see where it goes.

https://www.pennlive.com/pennstatefootball/2022/08/kevin-warren-to-bryant-gumbel-paying-players-and-expansion-to-20-schools-are-on-big-ten-table-jones.html#:~:text=Gumbel%3A%20Could%20you%20foresee%20paying,are%20paying%20their%20football%20players%3F

# EXHIBIT 23

VOLUME 8

PAGES 1489 – 1711

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| EDWARD O'BANNON, ET AL., | ) | |
| | ) | |
| | ) | |
| PLAINTIFFS, | ) | NO. C-09-3329 CW |
| | ) | |
| VS. | ) | WEDNESDAY, JUNE 18, 2014 |
| | ) | |
| NATIONAL COLLEGIATE | ) | OAKLAND, CALIFORNIA |
| ATHLETIC ASSOCIATION, | ) | |
| ET AL., | ) | |
| | ) | |
| DEFENDANTS. | ) | COURT TRIAL |
| _____ | ) | |

**BEFORE THE HONORABLE CLAUDIA WILKEN, JUDGE**

**REPORTERS' TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFFS:**     HAUSFELD, LLP
1700 K STREET, NW, SUITE 650
WASHINGTON, DC 20006
BY:  MICHAEL D. HAUSFELD, ESQUIRE
SATHYA GOSSELIN, ESQUIRE

BOIES, SCHILLER & FLEXNER, LLP
5301 WISCONSIN AVENUE, N.W.
WASHINGTON, D.C. 20015
BY:  WILLIAM A. ISAACSON, ESQUIRE

(APPEARANCES CONTINUED)

**REPORTED BY:**      DIANE E. SKILLMAN, CSR 4909
RAYNEE H. MERCADO, CSR 8258
OFFICIAL COURT REPORTERS

TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

Case 4:20-cv-03919-CW Document 298-1 Filed 10/21/22 Page 120 of 321
Case4:09-cv-03329-CW Document235 Filed06/22/14 Page178 of 224  1661
LINZNER – DIRECT / HAUSFELD

1    IT WAS 2009.

2    **Q.**  AND DURING THE TIME THAT EA SPORTS PUBLISHED THESE VIDEO

3    GAMES WITH REGARD TO COLLEGE BASKETBALL AND FOOTBALL, THEY

4    WERE ANNUAL TITLES?

5    **A.**  OUR COLLEGE FOOTBALL TITLE WAS RELEASED ANNUALLY, USUALLY

6    IN JULY OF A CALENDAR YEAR.

7        I BELIEVE OUR BASKETBALL TEAM ALSO WAS RELEASED ANNUALLY,

8    ALTHOUGH IT WASN'T CONSISTENTLY AT THE SAME POINT IN TIME.

9    **Q.**  AND WHY WAS IT IMPORTANT TO EA TO HAVE THESE GAMES

10   PUBLISHED ON AN ANNUAL BASIS?

11   **A.**  WELL, WE -- OUR BUSINESS, AS I SAID, IS TO DEVELOP AND

12   PUBLISH VIDEO GAMES.  ESPECIALLY WITH THE FOOTBALL GAME, THERE

13   WAS A DEMAND FOR AN ANNUAL GAME.  AND WE TRIED TO SATISFY THAT

14   DEMAND.

15       ON THE BASKETBALL SIDE, IT'S A GOOD QUESTION WHY WE

16   PUBLISHED IT ON AN ANNUAL BASIS, BECAUSE WE LOST MONEY ON THAT

17   GAME.

18   **Q.**  DID EA SPORTS EVER OBTAIN, IN ANY FORM OF A LICENSE, THE

19   RIGHT TO USE THE NAMES OF THE -- OR LIKENESS OF THE PLAYERS IN

20   THE COLLEGIATE FOOTBALL AND BASKETBALL?

21   **A.**  WE DID NOT LICENSE THE RIGHT TO USE THE NAME OR LIKENESS

22   OF COLLEGE ATHLETES IN OUR COLLEGE-THEMED VIDEO GAMES.

23   **Q.**  WHY NOT?

24   **A.**  WELL, THERE WAS A RULE, THE NCAA HAD A RULE OR BYLAW, I

25   DON'T KNOW WHAT THE CORRECT TERM IS, THAT PROHIBITED THE USE

Case 4:20-cv-03919-CW Document 298-1 Filed 10/21/22 Page 121 of 321
Case 4:09-cv-03329-CW Document 1235 Filed 06/22/14 Page 74 of 224    1662
LINZNER – DIRECT / HAUSFELD

```
 1    OF ATHLETE NAME OR LIKENESS IN VIDEO GAMES.

 2    Q.   AND SO WHY DIDN'T YOU JUST OBTAIN THE NAMES ON YOUR OWN?

 3    A.   WELL, AS I SAID, THE NCAA AND ITS SCHOOLS, TO BE MORE

 4    ACCURATE, HAD A --

 5    Q.   THAT'S WHAT I --

 6    A.   -- RULE OR BYLAW THAT PROHIBITED THE ATHLETE NAME OR

 7    LIKENESS IN VIDEO GAMES.  SO THERE WAS NO POINT IN TRYING TO

 8    OBTAIN THE NAMES IF WE COULDN'T USE THEM IN THE VIDEO GAMES

 9    PURSUANT TO THAT NCAA RULE.

10    Q.   WHAT DID YOU UNDERSTAND WOULD HAPPEN IF YOU DID USE THE

11    NAMES OF THE ATHLETES?

12    A.   WELL, WE WERE TOLD THAT THAT WOULD THREATEN THE

13    ELIGIBILITY OF THE STUDENT ATHLETES.

14    Q.   WHO TOLD YOU THAT?

15    A.   EXECUTIVES AT THE NCAA.

16    Q.   SO YOU UNDERSTOOD THAT YOU COULD NOT USE THE NAMES OF THE

17    ATHLETES OR ACQUIRE THE NAMES OF THE ATHLETES IN THE VIDEO

18    GAMES, AND IF YOU DID, IT WOULD THREATEN THE ELIGIBILITY OF

19    THE ATHLETES?

20    A.   THAT'S SEVERAL QUESTIONS.

21    Q.   OKAY.  TAKE THEM APART.

22    A.   WELL, AGAIN, WE, YOU KNOW, AS I'M SURE YOU'RE AWARE, WE

23    MADE A LONG-SUSTAINED EFFORT TO WORK WITH THE NCAA AND THE

24    SCHOOLS TO CHANGE THE RULES THAT -- SUCH THAT WOULD HAVE

25    ALLOWED EA, AND OTHER VIDEO GAMES COMPANIES FOR THAT MATTER,
```

Case 4:20-cv-03919-CW Document 208-1 Filed 10/21/22 Page 123 of 321
Case 4:09-cv-03329-CW Document 235 Filed 06/22/14 Page 75 of 224   1663
LINZNER – DIRECT / HAUSFELD

1    TO USE THE NAME AND LIKENESS OF THE ATHLETES IN VIDEO GAMES.

2    **Q.**  DID YOU UNDERSTAND --

3    **A.**  THAT EFFORT WAS NEVER SUCCESSFUL.

4    **Q.**  DID YOU UNDERSTAND THAT YOU WERE BOUND TO FOLLOW NCAA

5    RULES?

6    **A.**  AS PART OF OUR AGREEMENT WITH CLC, WHO WAS THE AGENT OF

7    THE NCAA AND THE SCHOOLS, I RECALL THAT ONE PROVISION IS THAT

8    WE WOULD FOLLOW THE NCAA RULES AND BYLAWS.

9    **Q.**  AND YOU UNDERSTOOD THAT IF YOU EITHER ACQUIRED OR USE THE

10   NAMES OF THOSE ATHLETES IN YOUR VIDEO GAME, THAT WOULD

11   THREATEN THE ELIGIBILITY OF THE ATHLETES?

12   **A.**  AGAIN, THAT'S TWO QUESTIONS.  I'M NOT SURE THAT ACQUIRING

13   THE NAMES WOULD HAVE THREATENED THE ELIGIBILITY, IT WOULD HAVE

14   BEEN THE USE OF THE NAMES AND LIKENESSES THAT COULD HAVE

15   THREATENED THE ELIGIBILITY OF THE ATHLETES.

16   **Q.**  YOU SAID YOU TRIED TO GET THE NAMES?

17   **A.**  YES, SIR.

18   **Q.**  CAN YOU TELL US WHEN YOU FIRST TRIED AND WHY?

19   **A.**  THE WHY, I WILL ANSWER THE WHY FIRST.

20      THE WHY IS WE WANTED TO MAKE OUR COLLEGE-THEMED VIDEO

21   GAMES AS AUTHENTIC AS POSSIBLE FOR THE REASONS I JUST

22   DESCRIBED.  THE NUMBER ONE REQUEST FROM -- FROM CONSUMERS OF

23   OUR COLLEGE GAMES WAS TO PUT THE NAMES AND LIKENESSES OF THE

24   ATHLETES IN THE COLLEGE GAMES MUCH AS WE DID IN OUR

25   PROFESSIONAL SPORTS GAMES.  SO THAT'S THE WHY.

Case 4:20-cv-03919-CW   Document 208-1   Filed 10/21/22   Page 123 of 321
Case 4:09-cv-03329-CW   Document 1235   Filed 08/22/14   Page 76 of 224          1664
LINZNER – DIRECT / HAUSFELD

1     THE WHEN, SINCE YOU ASKED TWO QUESTIONS, THE WHEN WAS, AS

2     I RECALL, THE FIRST CONCERTED EFFORT WAS ABOUT 2005 WHEN WE

3     ATTENDED A MEETING IN INDIANAPOLIS AND MADE A PRESENTATION TO

4     THE NCAA EXECUTIVES.

5          **MR. HAUSFELD:**  AND IF I COULD SHOW THE WITNESS,

6     PLEASE, EXHIBIT 2007, I HOPE.

7          (EXHIBIT DISPLAYED ON SCREEN.)

8     **BY MR. HAUSFELD:**

9     **Q.**  DOES THAT REFRESH YOUR RECOLLECTION AS TO THE

10    PRESENTATION -- AS TO WHEN THE PRESENTATION WAS MADE BY EA

11    SPORTS TO THE NCAA?

12    **A.**  WELL, IT SAYS APRIL 15, 2005.  AS I SAID, I RECALL IT

13    BEING 2005, SO THAT'S CONSISTENT.

14    **Q.**  AND TO WHOM WAS THE PRESENTATION MADE?

15    **A.**  THERE WERE SEVERAL NCAA EXECUTIVES AT THE MEETING.  CHIEF

16    AND -- AMONG THEM IN MY RECOLLECTION WAS MYLES BRAND WHO, AT

17    THE TIME, WAS THE PRESIDENT OF THE NCAA.  AND GREG SHAHEEN,

18    WHO I THINK WAS EXECUTIVE VICE PRESIDENT RESPONSIBLE FOR

19    VARIOUS BUSINESSES FOR THE NCAA.  THERE WERE SOME OTHER

20    EXECUTIVES THERE.  ONE, I THINK, WAS DAVID KNOPP, OR KNUPP

21    (PHONETIC) OR SOMETHING LIKE THAT.

22    **Q.**  WHAT WAS YOUR ROLE IN PREPARING THIS PRESENTATION?

23    **A.**  I DIDN'T PREPARE THE PRESENTATION.  I REVIEWED IT BEFORE

24    IT WAS PRESENTED AND I WAS PRESENT WHEN -- WHEN WE MADE A

25    PRESENTATION.  I DON'T KNOW IF THIS IS ACTUALLY THE

**CERTIFICATE OF REPORTERS**

        WE, DIANE E. SKILLMAN AND RAYNEE H. MERCADO, CERTIFY

THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF

PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.  WE FURTHER CERTIFY

THAT WE ARE NEITHER COUNSEL FOR, RELATED TO, NOR EMPLOYED BY

ANY OF THE PARTIES TO THE ACTION IN WHICH THIS HEARING WAS

TAKEN, AND FURTHER THAT WE ARE NOT FINANCIALLY NOR OTHERWISE

INTERESTED IN THE OUTCOME OF THE ACTION.

                       _Diane E. Skillman_

                  DIANE E. SKILLMAN, CSR, RPR, FCRR

                       _Raynee H. Mercado_

                RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR

                    THURSDAY,  JUNE 19, 2014

# EXHIBITS 24-29
# SUBMITTED UNDER SEAL

# EXHIBIT 30

**SPORTSMONEY**

# Nebraska First To Launch Program To Help Student Athletes Maximize The Value Of Their Individual Brands

**Kristi Dosh**
Contributor
*I cover the business of sports, with an emphasis on college sports, sport sponsorship, facilities and travel.*
Mar 10, 2020, 11:51am EDT



(Photo by Steven Branscombe/Getty Images)

GETTY IMAGES

The University of Nebraska announced today it is partnering with Opendorse, a social publishing platform, to launch the first-ever program designed to help individual student athletes build their personal brands. The program, being called Ready Now, will provide all 650-plus Nebraska the opportunity to

https://www.forbes.com/sites/kristidosh/2020/03/10/nebraska-first-to-launch-program-to-help-student-athletes-maximize-the-value-of-their-individual-brands/?sh=18dca82a6303

improve their personal brands on social media so they can maximize their earning potential once NIL legislation is ultimately enacted.

Opendorse currently works with more than 10,000 athletes around the world to publish content from partners including the PGA Tour, NHL, NFLPA, MLBPA, WNBPA, LPGA, over 100 professional and collegiate sports teams and hundreds of brands, such as Pepsi, Procter & Gamble and EA Sports. The company was founded by Nebraska football alumni Blake Lawrence and Adi Kunalic, making this first-of-its-kind partnership with University of Nebraska an easy match.

"We've been preparing for this moment for over seven years," said Lawrence, Opendorse's CEO. "Coach Frost and the Nebraska athletic administration understand the time is here to empower student-athletes to prepare their individual brands for future success.

"The Ready Now Program is here to help Nebraska student-athletes maximize the value of their brand with tools and services that have been proven at the highest levels of sports. As change inevitably comes, Opendorse is prepared to comply at scale—adapting our technology to ensure compliance just as we have for partners at dozens of players associations, leagues, and governing bodies."

The Ready Now program will offer each student athlete a current valuation of their brand, review and flag content that could have a negative impact on their brand and provide further insights to increase their value. The program will provide ongoing education for student athletes and provide them with performance benchmarks, content calendars and social media strategy sessions.

https://www.forbes.com/sites/kristidosh/2020/03/10/nebraska-first-to-launch-program-to-help-student-athletes-maximize-the-value-of-their-individual-brands/?sh=18dca82a6303

Lawrence says they'll start by looking at the health of each student athlete's social media channels, asking questions like: Is your handle easy to find? Is your recent content appropriate or is clean-up needed? What content best engages your audiences and leads to follower growth?

"In our work at the professional level, we know what marketers look for when partnering with athletes in NIL-related marketing campaigns," said Lawrence. "Ten years ago, the selection process was based on relationships with agents or marketers would select athletes based on a gut-feel. Today, every professional athlete endorsement starts with an analysis of the athlete's digital presence, and we expect the same to be true with student-athletes. "

Opendorse tracks and analyzes the social media posts of tens of thousands of athletes across the world, using proprietary technology to track the social media trends and the impact on the market rate of professional athlete endorsements.

"We use this same data to assess the current value of student-athlete's brand based on years of historical marketplace data, and develop a personalized plan to build that value throughout their time on campus. Each Nebraska student-athlete will receive continuous guidance with the Ready Now program, receive hands-on education and taking action to maximize the value of their name, image, and likeness."

Lawrence says social media is the obvious place for student athletes to start as NIL legislation is enacted.

"We believe the most immediate and significant opportunity with name, image and likeness monetization for student-athletes is through social media," said Lawrence. "Social is measurable, transparent, and with the right technology

partner, opportunities will not distract from the academic and athletic experience of student-athletes."

"Social media monetization puts more power in the student-athlete's hands. It levels the playing field, as any athlete-- from Heisman contenders to walk-ons--can build an audience that sponsors or advertisers value," Lawrence continued. "It may be easier for superstars, but every athlete will have the opportunity to leverage free, widely accessible technology platforms to grow and monetize their NIL."

"We believe social media is at the core of this next frontier for player development," Nebraska Head Coach Scott Frost said. "There's an opportunity for our players that transcends compensation today -- we as coaches and leaders can provide our student-athletes the tools to maximize their future value while they're competing for the University of Nebraska.

"Regardless of what change comes in NIL legislation, we want every Nebraska athlete to be prepared with the blueprint for success beyond the field. With Ready Now and the unrivaled passion of the Husker fanbase, I believe a current student-athlete's brand can be considerably more valuable at Nebraska."

Some experts have opined that an athletic department getting involved with how student athletes approach their NIL rights could open the department up to Title IX issues, such as claims that one sport is marketed differently than another sport. Asked if Nebraska considered the potential implications of launching this program, senior deputy athletic director for external operations Garrett Klassy says they were ready to move forward while NIL issues are still being sorted out.

https://www.forbes.com/sites/kristidosh/2020/03/10/nebraska-first-to-launch-program-to-help-student-athletes-maximize-the-value-of-their-individual-brands/?sh=18dca82a6303

"Partnering with Opendorse on this groundbreaking program is designed to allow Nebraska student-athletes to position and brand themselves in a positive way on social media platforms," said Klassy. "As our student-athletes build their individual brands it could be beneficial to them at some point in terms of NIL-related opportunities. But there are many details and issues related to NIL that will need to be sorted out as discussion and legislation evolves. This program is more about providing Nebraska student-athletes a resource that will help them as they move into whatever professional field they choose."

"It was important to our Athletic Director Bill Moos and our athletic department that we offered this opportunity to all student-athletes in each of our 24 varsity sports," said Klassy.

The Nebraska volleyball program has led the nation in attendance for the past seven years, so Nebraska is a school where the conversation around marketability of student athletes goes far behind football and basketball.

"I applaud our athletic administration for implementing this program for all student-athletes, not just those in football or men's basketball," Nebraska Head Volleyball Coach John Cook said. "Nebraska is one of only a few schools where a young woman has a great opportunity to build her brand locally, regionally and nationally while competing in college athletics. This partnership is the latest example of the University of Nebraska's commitment to provide student-athletes with all the needed resources to maximize their time in Lincoln."

Asked about the marketability of student athletes relative to professional athletes, Lawrence said it can vary greatly but that there are lots of

opportunities out there. He believes the monetization market will be focused heavily on local or regional opportunities.

"For every Zion and Joe Burrow, you have thousands without national name recognition. While most will not be national names, organizations in local markets stand to provide real opportunity and receive significant value by partnering with regional and local student-athletes upon changes to NIL regulation."

One concern that has been raised by college athletics administrators is that local and regional businesses might have less money to spend with athletic departments if they're partnering with student athletes. Asked if Nebraska shares these concerns, Klassy said, "No concern. We have the most passionate fan base and sponsors in the country and we fully expect them to continue to support Nebraska if NIL legislation changes."

Nebraska basketball coach Fred Hoiberg is completing his first season at Nebraska, but he was at the NBA level playing, coaching and in the front office for 19 years. He sees the new NIL era as a positive for both college athletics and for the student athletes as individuals.

"One of the reasons the NBA is so popular today is the work that players have done in building and marketing their personal brands," said Hoiberg. "I witnessed that first hand during my time in the league. This is a great resource that the University of Nebraska is providing for its student-athletes. The earlier we can help our young men and women understand the value of their personal brand, the better positioned they will be for whatever professional path they choose."

Follow me on *Twitter* or *LinkedIn*. Check out my *website* or some of my other work *here*.



**Kristi Dosh**

# EXHIBIT 31

# First year of NIL data shows trends favoring social media, football

Andy Wittry•07/04/22

Article written by  Andy Wittry
**AndyWittry**



Andy Lyons/Getty Images

Last Friday marked the start of the second year of the NIL era at the NCAA level, so there's now one year of data available in the emerging industry. Two of the leading NIL software and technology providers, **INFLCR** and **Opendorse**, recently released data from the first year of transactions on their respective platforms.

A number of factors prevent the compilation of an industry–wide data set of all NIL activities, including the presence of competing NIL

https://www.on3.com/nil/news/nil-data-opendorse-inflcr-college-football-mens-womens-basketball-baseball/

marketplaces, software and compliance companies that segment the market of NCAA member institutions and athletes. Plus, not every NIL activity is disclosed to a university or through the third-party platform.

The release of this type of data from major NIL service providers is probably the best glimpse of the market the public can receive at this point in time. The first-year trends show the majority of NIL activities include posting content on social media platforms, the significant market share that football players hold and the increasing investment in NIL by brands, fans and donors.

## Roughly two-thirds of NIL activities involve posting content on social media

INFLCR released its transaction data on a month-by-month basis. The top transaction type was social media each month, peaking in February at 72.8 percent of all transactions. Roughly two-thirds — 67.6 percent, to be exact — of the NIL activities facilitated or disclosed through Opendorse between July 1, 2021 and June 20, 2022 were classified as "posting content."

Since posting on social media is the most popular and among the least time-intensive NIL activities, athletes say they have to balance promotional posts with content that shows their authentic selves.

"I'd just say you don't want to overstrain yourself," Kentucky quarterback Will Levis told On3 at the NIL Summit. "You don't want to have your entire social media feed flooded with ads for companies. You need to be authentic. You need

https://www.on3.com/nil/news/nil-data-opendorse-inflcr-college-football-mens-womens-basketball-baseball/

show the actual authentic side of you. You can't just have an advertisement page for your social media."

Posting too many advertisements on social media could have a deleterious effect on an athlete's long-term earning potential.

"If your pages become too inundated with marketing things for other brands, people will start unfollowing you and brands will stop reaching out," Duke cross country and track and field runner Emily Cole said. "It's really important to be picky about which ones you work with."

# Football players reported roughly 30 percent of all activities, half of earnings

Football players earned roughly half of the compensation from NIL activities that were facilitated or disclosed on Opendorse. They earned roughly three times more than men's basketball players — 49.9 percent of all compensation compared to 17 percent, respectively. Of course, given the size of college football rosters, transaction data that compares individual sports should overwhelmingly favor football.

INFLCR said football was its top transaction sport in six of the last 12 months.

In terms of the total number of NIL activities, rather than total compensation, football still led the way on Opendorse at more than 29 percent. Norfolk State running back Rayquan Smith, who has earned the nickname of the "King of NIL," told On3 in June that he had already reached 60 to 70 NIL agreements.

https://www.on3.com/nil/news/nil-data-opendorse-inflcr-college-football-mens-womens-basketball-baseball/

When football players are excluded from Opendorse's data, women were involved in nearly 53 percent of all activities. As **Drew Butler**, the EVP – Collegiate of the NIL marketplace **Icon Source**, recently told On3, "We see female student-athletes crush it every single day."

INFLCR's data showed the seasonal effects of the NIL market. Men's basketball players were responsible for 50 percent of transactions in December and women's basketball players received 14 percent.

Volleyball held a 21-percent market share in both August and September. Softball reached 21 percent in January and 20 percent in May.

However, while brands and fans might shift their focus to specific athletes when their sport is in season, athletes might also deemphasize NIL while they're competing.

"It's just whenever I'm in the thick of competition season and competing, I'm saying no to a lot more brands and a lot more deals," said Cole, the Duke runner. "At that point, my focus is running. It's crazy the difference whenever I'm in-season versus out of season, being able to put more time aside to talk to brands."

## Opendorse projects the market spend to eclipse $1 billion in Year 2

In January, the seventh month of the NCAA's NIL era, the average compensation for NIL activities cracked the $2,000 mark for the first time, according to INFLCR's transaction data. It climbed from $1,040 in July 2021 to $2,370 in January. The average transaction peaked at

https://www.on3.com/nil/news/nil-data-opendorse-inflcr-college-football-mens-womens-basketball-baseball/

$2,730 in March, when men's and women's basketball players were responsible for roughly 42 percent of all transactions.

The median transaction almost doubled from July 2021 ($25.99) to June 2022 ($50), according to INFLCR.

Data from institutions that have signed agreements for the Opendorse Premium package — data the company says focuses "only on athletic departments who are 'all-in' on NIL" — shows trends in increasing investment in NIL from brands, fans and donors. Opendorse specifically cited the rise of NIL collectives for the latter.



▲ **DONOR**
late adopters, boomed with the birth of collectives

At schools that have at least 100 athletes who have reported at least one NIL activity, an Opendorse Premium subscription and at least one collective in their market, 76 percent of the athletes have received at least one NIL deal. This data shows that at schools with some combination of the most resources, fans and institutional buy-in, NIL

https://www.on3.com/nil/news/nil-data-opendorse-inflcr-college-football-mens-womens-basketball-baseball/

can benefit far more than only the top one or two percent of college athletes.

It shouldn't be a surprise then that Opendorse projects athletes in the Southeast, defined as the states of **Florida**, **Georgia**, **North Carolina** and **South Carolina**, to earn a combined $234.5 million in the second year of the NIL era. The company projects the total market spend to be more than $1.1 billion.

# EXHIBIT 32



Login    Watch TV

**COLLEGE SPORTS**  ·  Published September 16, 2021 7:08am EDT

# LSU gymnast Olivia Dunne inks NIL deal with activewear company

Dunne is one of most followed NCAA athletes on social media with more than 4M followers on TikTok



By **Ryan Gaydos** | **FOXBusiness**

**NCAA adopts interim policy allowing student athletes to cash in**

Sports attorney Dan Lust joins 'Kennedy' to discuss the changes coming to college athletics

LSU gymnast Olivia Dunne is one of the most followed NCAA athletes on social media and is racking up big name, image and likeness (NIL) deals in the new landscape that was created over the summer.

Dunne, who competes in the all-around for the Tigers, inked her latest deal with the activewear brand Vuori. With the partnership, the sophomore SEC gymnast will participate in a handful of marketing initiatives with the company over the next two years.

**CLICK HERE FOR MORE SPORTS COVERAGE ON FOXBUSINESS.COM**

Olivia Dunne partnered with Vuori for an NIL deal. (Vuori/Aaron Sisk)

"Fashion has always been a huge passion of mine," Dunne said in a news release. "Before college, my coach and I would design my own custom leotards for all my major competitions. I love expressing myself through my style and I fell in love with Vuori because I thought their clothes looked and felt amazing. I couldn't be more proud that my first brand partnership is with them."

Case 4:20-cv-03919-CW Document 308-1 Filed 10/21/22 Page 143 of 321

Dunne signed with WME Sports over the summer. She boasts more than 4.4 million followers on [TikTok](#), 1.3 million followers on [Instagram](#) and 17,400 followers on [Twitter](#).

## DEION SANDERS' SON INKS NIL DEAL WITH BEATS BY DRE

Olivia Dunne boasts more than 4.4 million followers on TikTok. (Vuori/Aaron Sisk)

"We are so excited to welcome Livvy to the Vuori family," Vuori's vice president of marketing Nikki Sakelliou said in a news release. "When we think about who we are as a brand, we frequently return to the notion of wanting to encourage our community to lead happy, well-rounded lives—that's what's at the core of 'The Rise. The Shine.', our brand mantra. From her astonishing talents and determination as a gymnast to the positivity she spreads on social media, Livvy is a wonderful representation of the mindset we at Vuori aim to inspire."

In 2021, Dunne earned All-America honors on the uneven bars. She averaged 9.844 on the uneven bars and a 9.90 at the NCAA Championships. She was also named to the First-Year SEC Academic Honor Roll.

## GET FOX BUSINESS ON THE GO BY CLICKING HERE

LSU's gymnastics season starts Jan .7 with a meet against West Virginia.

Quotes displayed in real-time or delayed by at least 15 minutes. Market data provided by **Factset**. Powered and implemented by **FactSet Digital Solutions**. **Legal Statement**. Mutual Fund and ETF data provided by **Refinitiv Lipper**.

This material may not be published, broadcast, rewritten, or redistributed. ©2022 FOX News Network, LLC. All rights reserved. **FAQ** - **New Privacy Policy**

# EXHIBIT 33

U.S.

# Zia Cooke, one of the highest paid college basketball players, talks about impact of sponsorship deals

**BY ARIANA FREEMAN**
**UPDATED ON: APRIL 17, 2022 / 6:00 PM / CBS NEWS**

College basketball made headlines last month for a reason beyond the NCAA March Madness tournament when Opendorse released underlined new data showing that women basketball players are the second highest paid college athletes. Zia Cooke — a junior guard and leading scorer for the University of South Carolina's women's basketball team, which won the tournament in March — was named one of the highest paid college basketball players in the Final Four, according to Bloomberg.

"It just shows that we can do a lot of things that a lot of people say we can't do," she told CBS News. "To see all the girls on there for the NIL and I think it was just one boy it shows that we can do literally everything they can do. It's a business and it's super effective for women and men."



Zia Cooke, #1 of the South Carolina Gamecocks, poses during media day at 2022 NCAA Women's Basketball Final Four at the Minneapolis Convention Center on March 30, 2022, in Minneapolis, Minnesota.C. MORGAN ENGEL/NCAA PHOTOS VIA GETTY IMAGES

Opendorse, which is based in Lincoln, Nebraska, tracks what sports agents call name, image and likeness, or NIL, deals, and found college football players are paid the most, while men's basketball players fall in a close third behind their female counterparts.

This comes after the U.S. Supreme Court ruled last year college athletes should be allowed to control their name, image and likeness, and make money off it. Now, you can catch your favorite college athletes sporting Puma gear, holding a Doordash bag with their personal discount code or even starring in a commercial.

Women basketball players have been able to cash in more than their male counterparts, due in part to their higher social media followings.

"I feel like a lot of people actually do love women's basketball. It's just hard for them to admit it, which I don't know why," Cooke said. "But I think that the paper shows it all, the stats. The stats show it all."

https://www.cbsnews.com/news/zia-cooke-university-of-south-carolina-womens-basketball-sponsorship-deals/

Cooke has over 228,000 followers on Instagram. And if you want this young star to shout out your product, her posts are valued at a potential $8,000 each, Bloomberg reported. She's the top potential earner on her team, and one of the top potential earners in collegiate basketball.

The point guard recently partnered with H&R Block in her biggest deal to date, and said working with the company was "super, super fun."

"It gave me a chance to show who I am for one minute," she said. "I've done DoorDash, which was also super fun. I did Bojangles deals and I've done Fenty Skin, Rihanna's line, so I have quite a bit and it's just the beginning. I'm excited for what else is in store."

What does a young 21-year-old do with so much money? For Cooke, she doesn't even look at her account.

"I really don't even want to know how much money I have," she said. "I haven't looked at the account since I've started. Now I'm just trying to stay focused on my best work….I want to save because once you see the prices, like you want to buy stuff like that."

https://www.cbsnews.com/news/zia-cooke-university-of-south-carolina-womens-basketball-sponsorship-deals/

# EXHIBIT 34

SPORTSMONEY • EDITORS' PICK

# Cavinder Twins, Stars On TikTok And Basketball Court, Are Nearing $2 Million In NIL Deals, With More Ahead

**Brett Knight**
Forbes Staff
*I cover the business of sports*
Jul 1, 2022,06:30am EDT



https://www.forbes.com/sites/brettknight/2022/07/01/haley-hanna-cavinder-twins-ncaa-nil/?sh=553e32415a41

Haley and Hanna Cavinder have signed endorsement deals with 31 brands since July 1, 2021, when the NCAA's new name, image and likeness policy went into effect.

One year ago, on July 1, Fresno State basketball stars Haley and Hanna Cavinder officially ushered in college sports' name, image and likeness era, inking sponsorships with Boost Mobile and Six Star Pro Nutrition at 12:01 a.m. Eastern—the first minute that active NCAA athletes had ever been permitted to sign endorsement deals.

Now, with 5 million followers on social media and a new home at the University of Miami after announcing in April that they were transferring, the Cavinder twins are still leading the way.

Over the last 12 months, the 21-year-old sisters have piled up partnerships with 31 brands, including Crocs, GoPuff and Venmo. Darren Heitner, a lawyer who works with the twins and is a former *Forbes* contributor, recently told the *New York Post* that they had already earned more than $1 million. *Forbes* estimates that the Cavinders have booked a total of $1.7 million in deals before taxes and agents' fees, including cash they have not yet collected.

That puts them near the top of the heap across all of college sports. Chase Garrett, the founder and CEO of Icon Source, an endorsement marketplace through which the Cavinders have struck a handful of their deals, says the twins rank among the ten highest-earning NCAA athletes on his platform, and all of their contracts on Icon Source have exceeded $10,000, well above the platform's average of $2,600.

"It's been a whirlwind, but I'm just super grateful for it," Haley Cavinder tells Forbes from Miami, where she and her sister are taking two kinesiology courses this summer ahead of their senior year. "We've learned so much in the year, and there's a lot more to come."

The chain of events that led the NCAA to loosen its rules on amateurism last summer began with California's passage of the Fair Pay to Play Act in 2019, which promised college athletes in the state that they would soon be able to maintain their playing eligibility while signing sponsorships. The Cavinders started their college careers that same year in Fresno, three hours southeast of San Francisco, but the legislation wasn't on their radar.

It wasn't until June 2021, when a landmark Supreme Court ruling in NCAA v. Alston challenged NCAA restrictions on athlete compensation, that the Cavinders began to hear the rumblings that college athletes might be able to profit from their name, image and likeness for the first time. On June 30, the NCAA announced an interim NIL policy allowing endorsement deals; it went into effect a day later.

For the Cavinders, the timing was fortuitous. Hanna Cavinder had begun posting content on TikTok as a way to pass the time during the pandemic, recruiting Haley to join her account. They quickly attracted thousands of followers with their videos featuring dances and their basketball skills, which made them ideal targets for brands suddenly circling the collegiate waters.



Hanna Cavinder @CavinderHanna · Follow

just messing around out here @FresnoStateWBB @CavinderHaley

Watch on Twitter

7:25 PM · Jul 28, 2021

482    Reply    Share

Read 6 replies

The twins' father, Tom, who himself had played college basketball at Nova Southeastern, had reached out to Garrett, who advised the twins to get their Icon Source profiles ready in case a rule change went through and brokered the connection with Boost Mobile. Tom Cavinder also connected with Heitner, who had helped Florida craft NIL legislation that passed in 2020 and who introduced the twins to Six Star. Contracts were drawn up and ready to go when the clock struck midnight on July 1.

The sisters planned to be in New York so they could ink the deals at the first possible moment, but when a storm grounded their flight in Pennsylvania, they had to sign through the airport's WiFi. They then piled into an Uber and arrived in New York just a couple of hours before their first shoot with Six Star

https://www.forbes.com/sites/brettknight/2022/07/01/haley-hanna-cavinder-twins-ncaa-nil/?sh=553e32415a41

at 6 a.m. for a social media ad. The same morning, the twins appeared on CBS, ESPN and ABC's *Good Morning America*, as well as a Times Square billboard that Icon Source rented out for its first batch of NCAA endorsers. They were stars.

Six Star, which had always used pro athletes to market its supplements and even signed a 2021 deal with cheerleaders who were not bound by the NCAA's restrictions on marketing deals at the time, had wanted to make a splash. The company initially wanted to sign Connecticut basketball star Paige Bueckers but knew she was unlikely to move fast enough for a July 1 deal as she hired an agent and weighed offers from major brands. So Six Star shifted its focus to the Cavinders, who had a sizable audience as well as on-court accolades: Haley was the 2020-21 Mountain West player of the year, and Hanna had made two all-conference teams. Plus, they came as a two-for-one package.

Jake Duhaime, who oversees influencer and athlete marketing at Six Star through his role as Iovate Health Sciences' communications lead, was also impressed by the sophistication of the Cavinders' offering to brands. Jeff Hoffman, the twins' agent at Everett Sports Marketing, notes that they can post videos to TikTok, where they now have 4 million followers on their joint account, or stream on TikTok Live. On Instagram, where they have nearly 900,000 followers across three accounts, they can also go live or post in their feeds, as a Story or as a Reel. On YouTube (72,000 subscribers), they can post longer videos or YouTube shorts. There's also Twitter, where the sisters have more than 22,000 followers between them.

https://www.forbes.com/sites/brettknight/2022/07/01/haley-hanna-cavinder-twins-ncaa-nil/?sh=553e32415a41



Haley Cavinder playing for Fresno State in March 2020.

ISAAC BREKKEN/ASSOCIATED PRESS

Each platform has a different price tag, opening up the twins to a variety of marketing budgets and contract lengths, from a single social media post to a two-year partnership, as in the case of retailer Champs Sports and pro-wrestling promotion WWE. There are also opportunities for TV ads, live appearances and speaking engagements.

"That cross-platform appeal is off the charts," says Duhaime.

Hoffman, who says deals have become more lucrative over the last year as more brands have poured into the space, is focused on locking in long-term deals in "tentpole" categories like sports water and athleticwear so the Cavinders can explore less traditional categories, like fashion. It's all about finding an authentic fit, Hanna Cavinder says.

https://www.forbes.com/sites/brettknight/2022/07/01/haley-hanna-cavinder-twins-ncaa-nil/?sh=553e32415a41

The twins are adamant that their move to Miami was all about basketball, and finding a program where they can make a deep NCAA tournament run, but it's easy to see how the bigger market and the media exposure of an Atlantic Coast Conference program could turbocharge their business. And basketball isn't necessarily the long-term goal. While both Cavinders say they wouldn't turn down an opportunity in the WNBA—no sure thing, either, given that they are 5-foot-6 guards—they now have other interests, including fitness and real estate.

For now, they're enjoying their experience as entrepreneurs, after they announced in January that they were becoming co-owners of a streetwear company called Baseline Team that sells basketball shorts featuring the logos of college teams. They also haven't touched the money they've made, investing all of it through their parents' financial advisors.

That doesn't mean they aren't enjoying making it, though.

"Female athletes deserve equity in their sport, and I think NIL has shown that in the past year, that we have the same opportunities," Hanna Cavinder told *Forbes* on Tuesday, less than a week after the 50th anniversary of Title IX, the watershed law that helped create new opportunities for women in collegiate sports. "So being able to be at the forefront of that is something that Haley and I take a lot of pride in."

*Follow me on Twitter or LinkedIn. Send me a secure tip.*



**Brett Knight**

https://www.forbes.com/sites/brettknight/2022/07/01/haley-hanna-cavinder-twins-ncaa-nil/?sh=553e32415a41

# EXHIBIT 35









# N1L

## ONE YEAR OF NAME, IMAGE AND LIKENESS







# CONTENTS

**OPEN LETTER FROM OUR FOUNDERS**     **3**

**THE NUMBERS**     **4**

**THE DEALS**     **11**

**THE ATHLETES**     **14**

**THE BRANDS**     **21**

**THE COLLECTIVES**     **25**

**THE SCHOOLS**     **28**

**THE POLITICS**     **32**

**THE MEDIA**     **37**

**THE FUTURE**     **39**

# OPEN LETTER
## FROM OUR FOUNDERS

When we founded Opendorse back in 2012, student-athletes could not monetize their Name, Image and Likeness (NIL). That was still nine years away.

As we built our company to support the biggest stars in professional sports, we did it with the understanding that every athlete – at every level – has a story. They are supported by fans. They all make an impact in their community. Over the years, we've seen the connection between student-athletes and schools at the college level as second-to-none. Still, these athletes with such close ties to their supporters did not yet have a right to earn compensation from brands, sponsors, fans, and donors. But we knew the day would come.

Each generation moved the ball farther down the field. The watershed moment came on October 6, 2020, when the National Association of Intercollegiate Athletics (NAIA) passed its NIL policy, later cemented on July 1, 2021, when new state legislation went into effect in several states after the National Collegiate Athletic Association (NCAA) adopted its interim NIL policy. Student-athletes could finally profit off their NIL. It happened thanks to the hard work of many trailblazers – athletes, administrators, legislators, and others – who believed, like us, that every athlete should have the right to make the most of their moment.

Opendorse began as a side-project to help one athlete – our friend and teammate Prince Amukamara – but we had moved closer than ever to our long-term vision to Help Every Athlete.

We have learned a ton over the past decade as we've built industry-leading athlete marketing and endorsement solutions. When the new legislation hit, we were grateful for our foundation of knowledge as we entered the NIL era of college sports. Our experience set us on a path for success as we scaled the business and took Opendorse to the next level – then each level after that. We love constantly learning, solving problems, pushing the boundaries, and investing in our incredible team as we build something great with people we care about. We are happy to share what we've learned with you.

There are challenges in the NIL industry, all of which come with great opportunities. There are ever-changing laws and policies. There is more noise and more distractions. We are all navigating things together in real time, but our focus at Opendorse has always remained the same: the athlete. Athletes have always, and will always, be at the center of what we do.

We're honored to help athletes understand, build, protect, and monetize their brand. We're proud to partner with so many schools who understand the importance working together for athlete opportunities, education and platform safety. We love how our platform fosters a deeper connection between fans, players, and the programs they support. We're thrilled brands understand the value our technology can bring them as they achieve their business goals. We are proud that Opendorse is the trusted source for NIL data, insights, software, compliance, education, athlete deals and more.

This project represents an important mile marker as we look back at one year of NIL in the college space. Student-athletes at every level – from NCAA Division I to NAIA, NJCAA, and even high school in some states – are taking advantage of life-changing opportunities. They're starting businesses. They're learning real-life lessons that aren't taught in the classroom. They're making a greater impact in their communities and supporting their families like they never could before. NIL is ahead of schedule in the impact it's making for athletes across the country.

We are excited to share the most in-depth collection of NIL data and insights ever compiled. But diving in, we want to thank the team members at Opendorse for the hard work they've put in to bring this document to life. This project touched everyone in the company in some way, from Product to Technology, Sales and Campaigns, Operations and Marketing. We hope you enjoy this comprehensive report detailing the first year of Name, Image and Likeness.

To see an entire industry pop up around our vision has been special, but the best is yet to come. Here's to year two of the NIL era. It's going to be big!

Adi Kunalic, Co-Founder/President          Blake Lawrence, Co-Founder/CEO

# THE NUMBERS

Opendorse owns the industry's largest data pool which tells the most comprehensive story of NIL. We've spent the last year looking at the numbers, including new data analysis which highlights some of the biggest questions and opportunities heading into year two of NIL.

## WHERE'S THE MONEY GOING?

### TOTAL COMPENSATION BY REGION
#### YEAR 2 PROJECTED MARKET SPEND

Student-athletes affiliated with institutions located in these regions are projected to earn the cumulative amount indicated, based on anonymized transactions facilitated or disclosed through Opendorse between July 1, 2021, and June 20, 2022.



**PACIFIC** (AK, CA, HI, OR, WA)
**$121.4M**

**MOUNTAIN** (AZ, CO, ID, MT, NM, NV, UT, WY)
**$60.7M**

**WEST NORTH CENTRAL** (IA, KS, MN, MO, ND, NE, SD)
**$91.3M**

**EAST NORTH CENTRAL** (IL, IN, MI, OH, WI)
**$137.1M**

**ATLANTIC** (DC, DE, MD, NJ, PA, VA)
**$135.3M**

**NORTHEAST** (CT, MA, ME, NH, NY, RI, VT)
**$111.8M**

**WEST SOUTH CENTRAL** (AR, LA, OK, TX)
**$153.3M**

**EAST SOUTH CENTRAL** (AL, KY, MS, TN, WV)
**$96.6M**

**SOUTHEAST** (FL, GA, NC, SC)
**$234.5M**

### TOTAL COMPENSATION BY STATE
#### YEAR 2 PROJECTED MARKET SPEND

1. Florida
2. Texas
3. California
4. Ohio
5. North Carolina
6. Kansas
7. New York
8. Pennsylvania
9. Virginia
10. Indiana
11. Illinois
12. Alabama
13. Massachusetts
14. South Carolina
15. Louisiana
16. Georgia
17. Kentucky
18. Utah
19. Connecticut
20. Iowa
21. Tennessee
22. Oklahoma
23. New Jersey
24. Washington
25. Mississippi

### UNITED STATES
# $1.14B
#### YEAR 2 PROJECTED MARKET SPEND

### POTENTIAL ANNUAL NIL COMPENSATION BY NCAA DIVISION AND OTHER ASSOCIATIONS (NAIA, NJCAA, ETC.) - PER ATHLETE
#### YEAR 2 PROJECTED MARKET SPEND

| DIVISION I - P5 | DIVISION I - G5 |
|---|---|
| $607.4M \| $16,074 | $148.6M \| $5,572 |

| DIVISION I | DIVISION II |
|---|---|
| $280.3M \| $3,195 | $35.5M \| $338 |

| DIVISION III | OTHER |
|---|---|
| $58.5M \| $362 | $11.8M \| $70 |

## N1L / THE NUMBERS

## WHO'S SPENDING?

### COMPENSATING PARTY BREAKDOWN ON OPENDORSE



▲ **BRAND**
showed highest engagement around major championships



▲ **FAN**
exhibited late growth with the development of marketplaces



▲ **DONOR**
late adopters, boomed with the birth of collectives



▲ **SPONSOR**
early adopters with steady activation

### NIL PENETRATION ON TOP CAMPUSES*

Of the student-athletes on each campus:

**74%**
have received an NIL deal
from a **BRAND**

**4%**
have received an NIL deal
from a **FAN**

**15%**
have received an NIL deal
from a **DONOR**

**76%**
have received
at least one NIL deal

### ANNUAL NIL COMPENSATION RANGE

Of the student-athletes who have received at least one NIL deal, the range of annual NIL Compensation Potential:

**$547-$4,566**
per year from **BRANDS**

**$27-$4,295**
per year from **FANS**

**$779-$45,067**
per year from **DONORS**

**$3,335-$53,258**
total per year from NIL deals



of all Division I NIL compensation comes from donors

# $1,012

is the average monthly NIL compensation from donors for Division I student-athletes

*All of the data on this page is from Opendorse Premium schools. Premium Schools Data focuses only on athletic departments who are 'all-in' on NIL, and as a result, gives Opendorse the clearest picture of what is possible in each market. They have an Opendorse Premium Subscription, have at least one NIL Collective in their market, have 100+ student-athletes with at least one NIL deal, and more than 500 total NIL deals facilitated or disclosed since July 1, 2021.

**N1L / THE NUMBERS**

## HOW DO MEN'S AND WOMEN'S SPORTS COMPARE?

**TOTAL ACTIVITIES BY GENDER**

**INCLUDING FOOTBALL**

**37.3%** FEMALE  **62.7%** MALE

**EXCLUDING FOOTBALL**

**52.8%** FEMALE  **47.2%** MALE



FOR WOMEN'S SPORTS ATHLETES

8% DONORS
1% FANS
91% BRANDS



FOR MEN'S SPORTS ATHLETES

41% DONORS
2% FANS
57% BRANDS

**62%** of brand compensation goes to men's sports athletes

**93%** of donor compensation goes to men's sports athletes

**72%** of fan compensation goes to men's sports athletes

| ACTIVITY | MEN'S SPORTS | WOMEN'S SPORTS | UNIT |
|---|---|---|---|
| Licensing Rights | $8,760 | $12,528 | per agreement |
| Providing Instruction | $1,222 | $1,176 | per camp |
| Interviews | $1,495 | $1,119 | per hour interview |
| Creating Content | $1,925 | $941 | per video or photo |
| Autographs | $2,268 | $511 | per autograph session |
| Appearances | $2,268 | $511 | per hour appearance |
| Selling Products | $467 | $358 | per month in sales |
| Other Activities | $976 | $172 | Various structures |
| Posting Content | $193 | $104 | per social post |

**N1L** / **THE NUMBERS**

## HOW ARE THEY EARNING?

### BY ACTIVITIES

**TOTAL COMPENSATION**

| | |
|---|---|
| 34.0% | Posting Content |
| 17.8% | Other Activities |
| 15.9% | Licensing Rights |
| 15.1% | Autographs |
| 9.7% | Creating Content |
| 4.8% | Appearances |
| 1.6% | Doing Interviews |
| 0.4% | Providing Instruction |
| 0.3% | Selling Products |
| 0.2% | Testing Products |
| 0.1% | Chatting with Someone |
| 0.1% | Supporting Causes |

**TOTAL ACTIVITIES**

| | |
|---|---|
| 67.6% | Posting Content |
| 25.2% | Other Activities |
| 1.7% | Licensing Rights |
| 1.5% | Signing Something |
| 1.4% | Creating Content |
| 1.4% | Appearing Somewhere |
| 0.5% | Doing Interviews |
| 0.3% | Providing Instruction |
| 0.2% | Selling Products |
| 0.1% | Testing Products |

### BY EXPERIENCE



17% · 29% · 36% · 19%

NIL EARNINGS

- Freshman
- Sophomore
- Junior
- Senior

Underclassmen earned
**1.2x MORE**
than upperclassmen

### BY SPORT

**TOTAL COMPENSATION**

| | |
|---|---|
| 49.9% | Football |
| 17.0% | Men's Basketball |
| 15.7% | Women's Basketball |
| 2.3% | Women's Volleyball |
| 2.1% | Softball |
| 1.8% | Women's Swimming and Diving |
| 1.7% | Baseball |
| 1.4% | Men's Swimming and Diving |
| 1.2% | Women's Track and Field |
| 1.0% | Men's Track and Field |
| 0.7% | Women's Soccer |
| 0.6% | Women's Gymnastics |
| 0.5% | Men's Golf |
| 0.4% | Women's Field Hockey |
| 0.4% | Men's Wrestling |
| 0.3% | Men's Tennis |
| 0.3% | Women's Tennis |
| 0.3% | Men's Soccer |
| 0.3% | Men's Gymnastics |
| 0.3% | Men's Lacrosse |
| 0.2% | Women's Lacrosse |
| 0.2% | Women's Golf |
| 0.2% | Women's Ice Hockey |
| 0.2% | Women's Cheer and Dance |
| 0.1% | Women's Rowing |

**TOTAL ACTIVITIES**

| | |
|---|---|
| 29.3% | Football |
| 8.0% | Baseball |
| 7.6% | Men's Basketball |
| 5.6% | Women's Track and Field |
| 5.5% | Women's Volleyball |
| 4.9% | Men's Track and Field |
| 4.8% | Women's Soccer |
| 4.5% | Women's Basketball |
| 4.2% | Softball |
| 2.7% | Men's Soccer |
| 2.4% | Women's Swimming and Diving |
| 1.9% | Women's Rowing |
| 1.7% | Men's Wrestling |
| 1.5% | Men's Swimming and Diving |
| 1.5% | Men's Golf |
| 1.4% | Women's Lacrosse |
| 1.3% | Women's Gymnastics |
| 1.3% | Men's Ice Hockey |
| 1.3% | Women's Tennis |
| 1.3% | Men's Tennis |
| 1.1% | Women's Cheer and Dance |
| 1.0% | Men's Lacrosse |
| 1.0% | Women's Golf |
| 0.7% | Women's Ice Hockey |
| 0.5% | Women's Field Hockey |

**N1L / THE NUMBERS**

## YEAR 1 EARNINGS & DEALS

### BY CONFERENCE

| | TOTAL COMPENSATION | | TOTAL ACTIVITIES |
|---|---|---|---|
| 1 | Big Ten | 1 | Big Ten |
| 2 | Big 12 | 2 | Big 12 |
| 3 | Big East | 3 | ACC |
| 4 | Pac-12 | 4 | SEC |
| 5 | SEC | 5 | Pac-12 |
| 6 | ACC | 6 | AAC |
| 7 | AAC | 7 | Mountain West |
| 8 | Mountain West | 8 | MAC |
| 9 | Sun Belt | 9 | Big East |
| 10 | C-USA | 10 | C-USA |
| 11 | MAC | 11 | Sun Belt |
| 12 | Southland | 12 | Northern Sun Intercollegiate Conference |
| 13 | Horizon League | 13 | American Southwest Conference |
| 14 | CAA | 14 | MAAC |
| 15 | Ivy League | 15 | Northeast Conference |
| 16 | Northeast Conference | 16 | WAC |
| 17 | Northern Sun Intercollegiate Conference | 17 | Southland |
| 18 | WCC | 18 | Horizon League |
| 19 | SWAC | 19 | WCC |
| 20 | St. Louis Intercollegiate Athletic Conference | 20 | Lone Star Conference |
| 21 | American Southwest Conference | 21 | Southern Conference |
| 22 | MAAC | 22 | ASUN |
| 23 | WAC | 23 | Big South |
| 24 | Pacific West Conference | 24 | Northwest Conference |
| 25 | Northwest Conference | 25 | Mid-America Intercollegiate Athletics Association |

Student-athletes affiliated with these conferences have earned the most compensation from NIL activities based on anonymized transactions facilitated or disclosed through Opendorse between July 1, 2021, and June 20, 2022.

**N1L / THE NUMBERS**

## WHICH POSITIONS EARN THE MOST PER ACTIVITY?*

Student-athletes affiliated with these sports and positions average the following compensation per NIL activity based on anonymized transactions facilitated or disclosed through Opendorse between July 1, 2021, and June 20, 2022.



**FOOTBALL** On average, if you were to offer every starter a deal, it would cost you **$17,647**.

**TIGHT END** $660/deal

**DEFENSIVE LINE** $758/deal

**OFFENSIVE LINE** $669/deal

**LINEBACKER** $612/deal

**QUARTERBACK** $2,128/deal

**RUNNING BACK** $1,864/deal

**DEFENSIVE BACK** $509/deal

**SPECIALIST** $403/deal

**RECEIEVER** $781/deal



**WOMEN'S BASKETBALL**
On average, if you were to offer every starter a deal, it would cost you **$4,165**.

**GUARD** $1,441/deal

**CENTER** $503/deal

**FORWARD** $390/deal

**MEN'S BASKETBALL**
On average, if you were to offer every starter a deal, it would cost you **$6,347**.

**GUARD** $736/deal

**CENTER** $1,763/deal

**FORWARD** $1,556/deal

*Dataset includes anonymized transaction data from student-athletes associated with DI, DII, DIII and NAIA institutions.

**N1L / THE NUMBERS**

## WHO HAS POTENTIAL?

While international student-athletes have more restrictions when monetizing their NIL due to student visa status, these 25 athletes stand out from the crowd as the most followed on social media (Twitter + Instagram).

| RANK | ATHLETE | SCHOOL/SPORT | COUNTRY | FOLLOWERS |
|------|---------|--------------|---------|-----------|
| 1 | Madiaw Niang | Radford · Basketball | | 185.5K |
| 2 | Kaila Novak | UCLA · Soccer | | 143.6K |
| 3 | Marina González | Iowa State ·  Gymnastics | | 142.6K |
| 4 | Oscar Tshiebwe | Kentucky · Basketball | | 112.3K |
| 5 | Michel Macedo | Middlebury · Ski | | 100.4K |
| 6 | Emmanuel Abolo Carré | FAU · Soccer | | 96.3K |
| 7 | Elijah Fisher | Texas Tech · Basketball | | 92.6K |
| 8 | Moussa Cissé | Oklahoma State · Basketball | | 91.3K |
| 9 | Dolita Awala-Shaw | BYU · Track & Field | | 87.1K |
| 10 | Keisei Tominaga | Nebraska · Basketball | | 66.3K |
| 11 | Jaz Shelley | Nebraska · Basketball | | 53K |
| 12 | Amelie Morgan | Utah · Gymnastics | | 46.4K |
| 13 | Dorka Juhász | UConn · Basketball | | 36K |
| 14 | Nika Mühl | UConn · Basketball | | 34.8K |
| 15 | Maggie Mac Neil | Cal · Swimming & Diving | | 33.5K |
| 16 | Laeticia Amihere | USC · Basketball | | 26.7K |
| 17 | Tyrese Proctor | Duke · Basketball | | 24.6K |
| 18 | Aaliyah Edwards | UConn · Basketball | | 21.5K |
| 19 | Zach Edey | Purdue · Basketball | | 18.9K |
| 20 | Sarah Fillier | Princeton · Ice Hockey | | 12.6K |
| 21 | Emma Maltais | Ohio State · Ice Hockey | | 11.4K |
| 22 | Azuolas Tubelis | Arizona · Basketball | | 9.1K |
| 23 | Bobi Klintman | Wake Forest · Basketball | | 8.5K |
| 24 | ND Okafor | Cal · Basketball | | 5.5K |
| 25 | Charlisse Leger-Walker | Washington State · Basketball | | 5.2K |

# THE DEALS

The NIL era has unlocked a new world of creative deals between athletes and brands. From hyperlocal partnerships to cause-based opportunities to name-centered endorsements and more, year one has demonstrated that marketers are thinking creatively about how to achieve their business goals by leveraging student-athletes.

 **Home**

🔍 Search Twitter



## What's happening?

**What were the most industry-shaking NIL partnerships over the past year?**

July 1 was a game-changer for student-athletes, brands, and fans. Deals were inked across the country, from the Cavinder Twins signing with Boost Mobile to Nebraska Volleyball star Lexi Sun releasing her own merchandise.

**Helping Every Athlete**

Creative deals hit the market in the weeks to follow. Gopuff aimed to help every athlete and offered student-athletes at every level their first deal. MaximBet broke ground as the first sports betting company to activate by offering a deal to every female student-athlete in the state of Colorado. Brands like Degree and Clearcover focused on sharing inspirational stories, using NIL as an outlet to humanize student-athletes.

**Not All Deals are Social Posts**

While many student-athletes were signing deals with their favorite brands, some focused on using their NIL to monetize hobbies and interests. Danielle Hart and Sydney McKinney started selling their own artwork. Others like Noah Berghammer, Ben Wiegman, and Margzetta Frazier have started promoting and monetizing their musical pursuits. Armando Bacot used his acting skills to make an appearance in Netflix's *Outer Banks*.

**Maximizing Entertainment Value**

Student-athletes are natural entertainers that are seen as icons in their respective communities. Atlantic Records connected with student-athletes like Jimmy Sotos, Rayquan Smith, and Jon Seaton to promote new music from artists like NBA YoungBoy. Professional sports teams and leagues jumped at the opportunity to utilize the student-athlete voice.

*Show more*

## N1L / THE DEALS



Fun to feed @GrahamMertz5 and the @UWBadgers O-Line before they begin Fall Camp..



8:00 AM · Aug 5, 2021 · Twitter for iPhone

**Darren Rovell** ✓
@darrenrovell

Delivery service @gopuff signed a name, image and likeness deal with UNC sophomore Puff Johnson. Deal, from start to finish, facilitated by @opendorse, took less than 24 hours.



7:04 PM · Apr 4, 2022 · Twitter for iPhone

The Florida Panthers and Atlanta Braves connected with college-athletes to serve as ambassadors, while leagues like the NHRA connected with local Indiana student-athletes to promote events in the area. Duke Men's Basketball's Paolo Banchero entered the gaming world with an appearance in NBA2K pursuits.

**Cashing In on Overnight Success**

Even before July 1, student-athletes would become overnight sensations for making big plays on the court and the field. NIL now allows them to maximize their fame. For example, merchandise company BreakingT has helped student-athletes like Bo Nix and Cassidy Cerny turn their big moments into a T-shirt that fans could purchase within hours. Velveeta turned to Cade York after he made several big plays. Doug Edert capitalized on his breakout March Madness performance with a Buffalo Wild Wings partnership and fan shoutouts through Cameo.

**There's No "I" in Team**

Student-athletes have locked in deals that give back to those who support them on and off the playing surface. Kenny Pickett teamed up with the Oaklander Hotel to treat his linemen to dinner before game days. Graham Mertz had a similar opportunity with Mission BBQ. Paige Bueckers signed a deal with StockX and took it a step further by gifting all of her teammates with shoes during the holiday season.

**Putting the Name in NIL**

Some student-athletes have really put the "name" in name, image, and likeness. With a play on words, Donovan "Puff" Johnson partnered with Gopuff to get a social media post out hours before the National Championship game. Ga'Quincy "Kool-Aid" McKinstry and Kool-Aid went all out with social media rebranding and a series of social posts. Jahvon Quinerly has been going by the nickname of "Jelly" and he collaborated with SLAM to create a jar of personalized jelly to sell to fans.

Show more

## N1L / THE DEALS



lexi sun
@lexiisun

ah hi friends!! so SO excited to introduce to you…THE SUNNY CREW.

ive been working on this fun / happy lil project for some time now & am stoked i get to share it w yall :)

shop ur new crew by going to renathletics.com ✨

SALES START TONIGHT @ 12 MIDNIGHT



8:10 PM · Jun 30, 2021 · Twitter for iPhone

Kenny Pickett ✔
@kennypickett10

For my first NIL deal, I want to make sure I can take care of the big guys who take care of me. I'm excited to announce my association with the Oaklander Hotel & their restaurant, Spirits & Tales, where I will be treating my linemen to our weekly Hog Dinners! #OaklanderPartner



10:24 AM · Jul 15, 2021 · Twitter for iPhone

### No Slowing Down

Big brands spent years focused on athlete-driven marketing in the professional sports space but have shifted their focus to college athletics. Gatorade has inked deals with athletes like Shedeur Sanders while Nike and Adidas both recently locked in deals with college golf's biggest stars. Nike connected with Stanford Women's golf star Rachel Heck while rival Adidas sealed the deals with Heck's Stanford teammate Rose Zhang.

Brands like Champs Sports and Foot Locker have focused campaigns around stories and causes, utilizing student-athletes to celebrate Women's History Month and Global Running Day.

### Who to follow


**Degree**
@degree
**Follow**


**Clearcover**
@clearcover
**Follow**


**Gopuff**
@gopuff
**Follow**


**Snapchat**
@Snapchat
**Follow**



# THE ATHLETES

## WHICH ATHLETES ULTIMATELY HELPED SHAPE THIS INDUSTRY INTO WHAT WE SEE TODAY?

As the athlete marketing space grew overnight, some athletes had extensive social media followings and a plan in place to immediately capitalize. Others wanted to play the "wait and see" game.

Here are five student-athletes with unique NIL experiences, each illuminating a different approach to the new era.

**N1L / THE ATHLETES**






# ADRIAN MARTINEZ
## THE DIVISION I QUARTERBACK EXPERIENCE

When NIL first took off, many fans and brands turned their attention to some of the biggest stars in college sports, Division I quarterbacks. Some athletes were more prepared than others, and many understood the value of being nationally recognized members of the community.

Former University of Nebraska and current Kansas State University quarterback, Adrian Martinez, shared his NIL experience, how being prepared and leaning into the community paid off big.

"I wasn't sure what to expect from NIL," Martinez said. "It's a little bit of the 'Wild, Wild West.' No one really knew what to expect, but luckily we have Opendorse in our backyard [at Nebraska]. We have a lot of people helping us athletes, and it's been filled with nothing but great opportunities."

Within the first few months, Martinez started a podcast, created merchandise, and partnered with brands on a local, regional and national level.

"[Opendorse has] allowed me to talk with people, meet people, that I would have never been able to before." he said. "Open some doors for me that weren't open before. That's what it's about. I'm going to have a career after football, but this gives me the opportunity to explore a lot of those avenues."

On the brand side, NIL changes have given businesses a chance to connect with athletes so they can play a role in their marketing strategy. While at Nebraska, Martinez tapped into the local community.

"Explore local," he said. "There are more local businesses than you'd know that are willing to help student-athletes out, willing to give them that opportunity to share on social media, to spread awareness about their business. There are so many opportunities out there, and definitely some that will be perfect."

Like all student-athletes, Martinez has a busy schedule, especially during football season. Using tools and resources to keep the NIL deals flowing has a been a game changer.

"It's hard to call [Opendorse] anything else besides a lifesaver," Martinez said. "It's been huge for me with all the stress of the football season and the countless things on my mind, including school. Opendorse has made NIL easy, which is huge for me. It makes things easy to post, makes it easy to interact with businesses. You can kind of gauge where you're at as far as market value, there's a lot of things that help me as a student-athlete. I don't know what I'd do without it."

**N1L / THE ATHLETES**

# LAUREN BURKE
## THE SOCIAL MEDIA SUPERSTAR EXPERIENCE

Many athletes sliding into the NIL era had been building their personal brand on social media for years. Posting on social media is something Texas softball star Lauren Burke has enjoyed doing throughout her time as a student-athlete. She has built an audience of 600,000+ followers between Instagram and TikTok.

Burke's first venture into TikTok is an example of the importance of an authentic approach. She and a teammate, Mary Iakopo, were in the baseball facility messing around with the different sounds and recording themselves.

"It took us, like, 100 takes — not exaggerating — and ended up getting over 1,000,000 views on my very first TikTok," she said. "That set the scene. I was like, 'Whoa, this is a thing. This is really cool to have this great reach, and also build the sport of softball. That is something that empowers me a lot: To grow the sport and give back to the game. That just encourages me to continue to share my life online."

Burke was thankful she wasn't in classes and wasn't in season in that moment. She had time to educate herself on what all the policy changes meant. She was supported by her institution, who provided quality education and resources.

"Texas does an amazing job of not only giving us resources but also educating us about how to go about it in the best ways," she explained.

With a large following, Burke saw the immediate value for herself, but she also recognized the value NIL has for every athlete and encourages her teammates and peers to continue building their brands as well.

She's all-in supporting her fellow student-athletes. "It's been so cool to see everyone taking advantage of [NIL]. Whenever I see another student-athlete post an ad, I always try to engage with it and boost those numbers for them [to help with] their future opportunities."

"There's a space for every single student-athlete to build their brand, to build a following for themselves, and also to incorporate your values in everything you do," she said. "It's just about getting out of your comfort zone. Posting even though you feel, maybe, a little bit of judgment — no one's judging. If anything, we're applauding the fact that everyone's taking advantage of an amazing opportunity."

Burke has inked deals with several brands, many of which are focused on cause-based marketing like Clean Cause Energy Drinks, H&R Block's educational resources, and celebrating women's sports with Champ Sports. With a quick glance at her feed, you may not recognize branded content right away because Burke makes her posts and partnerships blend in naturally with her personal brand. Her partnerships fit into her daily life as a student-athlete.





**N1L / THE ATHLETES**

# SARAH MORBITZER
## THE WALK-ON EXPERIENCE



As a Columbus, Ohio, native, Sarah Morbitzer has been a Buckeye fan since day one. Walking on to the Ohio State women's volleyball team was a dream come true. However, as a walk-on, Morbitzer has had to financially support herself throughout her college career. And she isn't alone. Only 57% of Division I student-athletes receive athletic financial aid, and most don't receive full scholarships.

As a sophomore with 2,700 followers on Instagram, Morbitzer didn't think much when NIL passed until members of the Opendorse team presented to her team on campus.

"I didn't think I would benefit at first at all. I don't have a big name in college athletics or college volleyball," Morbitzer said. "It wasn't until we met with Opendorse and there was one slide about training camps and running private sessions.

"I was like, 'Wait, I definitely can benefit from that. I can do that.' Since I did grow up in Columbus, I do have a name around here and relationships with a lot of coaches and younger players. I just use that to my benefit. Luckily my mother was my high school coach, so I use my old high school gym and I don't have to pay a court fee."

Morbitzer hosted her first sessions in July, shortly after NIL passed. She ran seven, one-hour sessions and opened it up to anyone to participate in. She went on to host more sessions with her teammate, Sydney Taylor, who's also from Columbus.

Taking learnings from her first camp, Morbitzer ran her summer break event differently.

"We ran three sessions each day and we divided it up into skill levels. We had advanced and skill development sessions, so definitely learned throughout that first week of how I should do things and then carried it over to the next time."

Adding a teammate also created a new dimension. Morbitzer noted, "It was a lot more fun and a little less awkward, too, because I was the only one talking in the summertime and having Sydney was amazing and perfect. Then we also just use a lot of the same ideas and drills that we use at Ohio State. So having someone to demo that drill as I'm talking was super helpful, or even just saying something to another girl while I'm talking to someone else."

Over time, Mortbitzer has also adjusted the rate for her sessions as there has been an increase in demand.

"Last summer, I put it at $25 an hour and people were coming to me saying, 'This needs to be higher. You play at Ohio State, this needs to be a higher cost,'" she said. "I was really glad they were honest with me. I did not have any expectations, so I was happy to hear this."

Most recently she hosted a skills-focused session with teammate, Emily Landot, and plans to run more this summer, as well as potentially run private lessons.

For Morbitzer, giving back to her local community is one of the biggest joys.

"Just being able to give back to a 12- or 13-year-old absolutely makes my day because I started there and I used to idolize the players at Ohio State," she said. "Now, I'm that role model for younger kids. It blows my mind every day, honestly."

When people think of NIL, most immediately think of social media deals, but there are many offline NIL opportunities.

"It's an unexpected route from an NIL perspective," Morbitzer admitted. "I don't think a lot of people even think about doing private lessons. It's more, 'What brand deal can I get? What can I post on my social media?'"

"But, someone like me in my position, I am a walk-on and I don't have a huge name, so I'm not going to get a brand deal that's offering me $1,000. That's where I was at and I'm like, 'Okay, well, how else can I benefit from this?' So, even if you don't have that big name, you can still benefit in this space."

Having a supportive athletic department that helps provide NIL resources can play a big role too. Education is key.

"I've learned so much from Opendorse and from Ohio State," she said. "That meeting last summer was huge for me and it was an eye-opener, listening just to the presentation from Opendorse. And then on the Ohio State side, it's been big that they want us to succeed in this space, and it's not all about money for them. It's truly about us and about our name, our image, and likeness. That just means a lot to the athletes here."

While she still leans on her parents for support, she's beginning to become financially independent, thanks to NIL.

**N1L / THE ATHLETES**



## GLORIA MUTIRI
### THE LIFE-CHANGING EXPERIENCE

Gloria Mutiri's family traveled the country during her youth. The Mutiri parents, Pepe and Chantal, established ministries, connected with churches, and performed service work alongside their four daughters: Faith, Gloria, Grace, and Victoria. Gloria remembers visiting 40 states during her childhood. They did it all together as a family.

Then, tragedy struck. Pepe and Chantal passed away in consecutive years due to serious health conditions. Devastated, the four Mutiri daughters had no choice but to pull even closer together. They moved into a group home as they navigated high school.

The Mutiri girls had each other. They also had a strong mindset and limitless talent. Gloria poured her energy into volleyball and emerged as one of the top recruits in the nation in her senior year. She committed to Kansas State, where she excelled for two seasons before transferring to Oregon. She has continued to grow in Eugene, becoming one of the top players in the country with the character to match.

"While coping with the passing of my parents at a young age, I continued to persevere and follow my dreams to honor their legacy," Gloria shared through her Degree #BreakingLimits partnership.

The Degree deal was one of Mutiri's first NIL opportunities. It was impactful right out of the NIL gate, along with Clearcover's "Inspired Underdogs" and others that allowed her to share her story with the world.

"I know I can conquer anything that comes my way because I've faced adversity head on and worked so hard to grow the strength to overcome it," Mutiri said.

The new era of college athletics can be a lot to juggle, but it can be navigated effectively with a proactive, organized approach.

"Opendorse has definitely helped me organize the opportunities that I have," she said. "I'm able to see the brand's background and contact them through the app. I'm able to see how much money I can make and what that would look for my social media, and my brand in general. I've worked with Degree and Clearcover; those have been some of my favorites."

Just like other social media platforms, Mutiri checks her Opendorse app daily to stay on top of new opportunities and continue communication with existing partners.

"Opendorse has eased the NIL process for me," she said. "Little dates sometimes escape me, or communicating and engaging with people on my phone. That's much harder for me, so it's nice to have everything in one app. I check it like I check Instagram or Twitter. It's part of my phone routine so I'm able to see if there's new deals or I need to communicate with a deal I already have."

Mutiri is also strategic about how she manages her earnings through Opendorse.

"There's money on the app that can stay there, or I can take it out and can talk about taxes," she explained. "It's so much easier than having to reach out through different emails and contacting somebody through text or someone calling you and having all this information to write down. It's so nice just having it all in one app."

To Mutiri, NIL isn't just about herself and her story. It's also about helping bring exposure to women's sports, growing the game of volleyball in various communities, and being a voice for Black women.

"I originally thought when NIL came out — and I think a lot of other female student-athletes thought this — that it wouldn't matter because I'm not playing basketball or football," she admitted. "NIL has really helped bring exposure to women's sports. Here at the University of Oregon, women's sports are already a big deal and people really prioritize them just as much as men's, but [that's not always the case]. I know a lot of opportunities have been handed to the female athletes here and it's brought in a lot of fans. A lot of people are more interested in the sports, finding more fandom."

After graduation, Mutiri plans to play professional volleyball. She's aware that the jersey will come off one day and plans to pursue a career as a sportscaster or TV personality with the goal of hosting her own show.

She is leaning into NIL to help her get there.

"NIL is a good start for preparing myself for my professional career as a volleyball player and my professional career as, hopefully, a TV personality [in] the entertainment business. The deals that I sign and the brand that I'm working with can hopefully reflect where I want to go and what I want to do with my life."



**N1L / THE ATHLETES**

## TREVOR BASSITT
## THE NON-DIVISION I EXPERIENCE

While Division I stars are securing flashy deals and national media coverage, NIL is making an impact for NCAA DII, DIII, and NAIA student-athletes. Men's track and field standout Trevor Bassitt from Ashland University has used his last year of eligibility to chase another national championship and capitalize on NIL opportunities.

With multiple national titles to his name and a run at the Olympic Trials, Trevor Bassitt was debating whether to turn professional or use his remaining NCAA eligibility. NIL played a role in his decision to return for his final college season and pursue his master's degree.

"Knowing I could come back to school and make money – whether it is through endorsement deals or launching my own merch line, knowing that those options were available to me now – made coming back to school to get my master's a no brainer."

His status as a Division II student-athlete wasn't something Bassitt ever saw as a barrier. He's leveraged his story of being a non-revenue athlete from a smaller school.

"I've been able to kind of use it to my advantage by making it part of my brand as an athlete," he explained. "I'm an elite athlete, but I often get overlooked because I'm DII or because I'm not in football or basketball. Using that to form this underdog brand that I'm rolling with here has been part of it. And it's given me more opportunities for the sponsors that I do currently have: I can put everything I have into all of those sponsorship deals to make sure they're getting the best out of me and out of the deal instead of with other athletes."

For Bassitt, the foundation for his personal brand included identifying what he is truly passionate about.

"Who I am and what I stand for is actually what my brand is," Bassitt said, "because if I try to be something I'm not, it's really hard to put that stuff online. If you're not authentic, people aren't going to listen to your message."

He added that being authentic makes fulfilling deals easier.

"One of my deals requires me to post either once a month on Instagram or do two Instagram Stories a month. That's super easy for me with the deal I have because I use their product. I value it. It's authentic for me. For me to post it, I just set up a camera two times a month. When I go to use the product and I record it. It's easy. It's just adding something to my routine."









**N1L / THE ATHLETES**

# MORE ATHLETES LEADING THE NIL ERA



**KATIE BEILER**
Louisville · Rowing



**AL BLADES, JR.**
Miami · Football

*Read the blog*



**PAIGE BUECKERS**
UConn · Basketball



**MEGAN CARNEY**
Syracuse · Lacrosse



**EMILY COLE**
Duke · Track/XC

*Read the blog*



**ASHLEY CORCORAN**
SNHU · Track/XC



**JT DANIELS**
WVU · Football



**OLIVIA DUNNE**
LSU · Gymnastics



**CALEB EAGANS**
ETBU · Football



**JAZMYN FOBERG**
Florida · Gymnastics



**CHASE GRIFFIN**
UCLA · Football

*Read the blog*



**NICKLIN HAMES**
Nebraska · Volleyball

*Read the blog*



**DANIELLE HART**
Wisconsin · Volleyball



**DESTANNI HENDERSON**
South Carolina · Basketball



**ANDREW JONES**
Texas · Basketball



**BROCK JONES**
Stanford · Baseball



**TUCKER LA BELLE**
Clarke University · Lacrosse

*Read the blog*



**CHARLOTTE NORTH**
Boston College · Lacrosse



**MITCHELL PEHLKE**
Ohio State · Lacrosse

*Read the blog*



**SEDONA PRINCE**
Oregon · Basketball



**SHEDEUR SANDERS**
Jackson State · Football



**CARA SIMPSON**
FAU · Track/XC



**RAYQUAN SMITH**
Norfolk State · Football/Track



**GABLE STEVESON**
Minnesota · Wrestling



**HAILEY VAN LITH**
Louisville · Basketball



# THE BRANDS

### A FIRST-EVER OPPORTUNITY

In the blink of an eye last July, student-athletes became eligible to earn compensation for NIL activities. For brands, a new door was opened. Advertisers now have access to a pool of nearly half a million of the most influential individuals on their college campuses, in their local markets and states, and in some cases, in all of sports.

Thousands of brands jumped at the opportunity in the year since. National and even global advertisers, local businesses and school athletics sponsors were all quick to join the movement, collectively supporting hundreds of thousands of college athletes while driving results for their organization.

The influencer marketing industry is estimated to reach $15 billion in 2022, according to Influencer Marketing Hub. Student-athletes stand to contribute a significant amount towards the growth of the industry, as most NIL activities contain an influencer marketing component. While year one has seen overwhelming interest from brands, NIL leaders expect the market to grow exponentially in year two. If NIL's initial phase was all about education and early adoption, the coming year will see a rise of industry experts, mass-scale activations, and enhanced buy-in from brand leaders that aren't simply looking for a one-day PR push, but who will instead build powerful long-term relationships.

Entering the 2021 college football season, there was one college football player with a national NIL endorsement campaign – Clemson quarterback DJ Uiagalelei with Dr. Pepper. As the 2022 season nears, it's reasonable to expect multiple players per Power 5 conference to unveil brand advertisements on a national scale.

## N1L / THE BRANDS

### ONE YEAR OF NIL: THE CURRENT LANDSCAPE

Brands of all shapes and sizes have tried their hand at NIL activities through the first year. Still, several industries have taken special interest. Trading cards, media companies, and e-commerce brands were among the most active through year one.

| | NATIONAL BRAND SPENDING BY INDUSTRY SEGMENT | | |
|---|---|---|---|
| **RANK** | **CATEGORY** | **% SPEND** | **EXAMPLES** |
| 1 | Trading Cards/NFTs | 17.9% | Panini, Candy Digital NFTs |
| 2 | Mobile Apps | 16.5% | Snapchat, TikTok |
| 3 | E-commerce | 7.7% | StockX, FanJoy |
| 4 | Financial | 7.5% | SoFi, Clearcover |
| 5 | Personal Care | 7.3% | Degree, DUDE Wipes |
| 6 | Entertainment | 7.3% | Barstool, ESPN |
| 7 | Auto | 6.7% | Shell, Mercedes-Benz |
| 8 | Fashion | 5.9% | Reebok, Rhoback |
| 9 | Nutrition | 4.4% | Gatorade, Bio Steel |
| 10 | Equipment | 4.0% | Speedo, Mizuno |
| 11 | Beverages | 3.4% | Dr. Pepper, Red Bull |
| 12 | Technology | 3.0% | Bose, Xfinity |
| 13 | Retail | 2.7% | Champs Sports, Dicks |
| 14 | Restaurants | 2.6% | Chipotle, Outback |
| 15 | Non-Profits | 1.2% | Gofundme, Boys & Girls Club |
| 16 | Real Estate | 0.9% | College Hunks Hauling Junk |
| 17 | Food | 0.9% | Barilla, GummiShot |
| 18 | Gaming | 0.4% | Epic Games, Twitch |

Totals may not add to 100% due to rounding

### APPROACH BY BRAND TYPE (NATIONAL, SMB, SPONSOR)

Breaking down the current distribution of NIL deals, we project that 64% of all NIL compensation will come from brands with an anticipated year two spend of $730.4 million. Local brands should account for 34.3% of the year two of NIL brand spend with an anticipated expenditure of $250.5 million.

Additionally, many active brands are eschewing one-off deals in favor of multi-activity endorsements. These extended agreements currently make up nearly 24.4% of athlete NIL compensation.

| | NIL COMPENSATION PER ACTIVITY | |
|---|---|---|
| **CATEGORY** | **% COMPENSATION** | **AVERAGE COMPENSATION** |
| Licensing Rights | 36.73% | $9,877/agreement |
| Posting Content | 34.19% | $156/social post |
| Other Activities | 9.02% | Various structures |
| Autographs | 7.25% | $2,121/autograph session |
| Creating Content | 6.10% | $1,475/video or photo |
| Appearances | 5.05% | $1,513/hour appearance |
| Interviews | 1.65% | $1,387/hour interview |

Totals may not add to 100% due to rounding

## N1L / THE BRANDS

### NATIONAL AND GLOBAL BRANDS

The world's largest brands reach consumers around the globe. By partnering with student-athletes, they can access the athletes' broad and localized audiences while leveraging the fan passion that is unique to college sports.

From insurance to apparel, these brands approach NIL partnerships to support many marketing initiatives including storytelling, awareness, innovation, capitalizing on big moments and more. In addition to traditional marketing outcomes,  the first year of NIL marketing led to significant PR wins for many of these trailblazing brands.

Below, we share several partnerships and campaigns that made waves in the past year.

### CHAMPS SPORTS – "RUN WITH US"
Champs Sports partnered with student-athletes to launch its "Run with Us" campaign in support of National Running Day.

The campaign featured NIL deals with athletes including Duke track and field's Emily Sloane.

### H&R BLOCK – A FAIR SHOT
Aligning with the timing of March Madness, H&R Block launched "A Fair Shot," a program aimed at providing $1 million in sponsorships and support for female student-athletes.

H&R Block CEO Jeff Jones said of the program, "When we saw the disparity already growing in college NIL sponsorships, we knew we had to help female college athletes get a fair shot. This commitment draws from our purpose to provide help and inspire confidence in our clients and communities everywhere. When we invest in female college athletes, we are helping to create a positive impact in society that's good for all of us."

The initiative kicked off with ambassador partnerships including 16 of the most influential athletes in women's college sports, including its first two ambassadors, South Carolina basketball's Zia Cooke and Iowa Basketball's Caitlin Clark.

### DEGREE – BREAKING LIMITS
Degree was among the first national brands to test the NIL waters. The "Breaking Limits" campaign launched with an initial roster 14 college athletes, each selected for their story of overcoming adversity and inspiring others to move beyond their limits with confidence. The company pledged $5 million over a five-year period to fund activities that inspire people to move more by partnering very closely with a number of non-governmental organizations while also providing mentorship for athletes.

The athletes take part in various programming, including social media campaigns, local community projects, content partnerships, a mentorship program with Unilever and more. The first year proved so successful, that Degree is expanding as it enters year two.



> " H&R Block is standing up for female student-athletes by not only supporting us financially, but making sure we're set up for long-term success. "
>
> — Zia Cooke



**N1L / THE BRANDS**




## LOCAL AND REGIONAL BRANDS

Local and regional brands are active players in the NIL landscape. These brands typically work with student-athletes for a return in the form of fan-based marketing. Generally targeting an audience in a select area or fans of a specific school, these brands are leaning into those athletes with influential voices in their respective communities. Below are several successful examples for how brands can activate NIL successfully on the local and regional level.

### CLEARCOVER – INSPIRED UNDERDOG

Clearcover was the first auto insurance company to support student-athletes in the NIL era. The Chicago-based brand kicked off its efforts with the "Inspired Underdog" campaign, offering $10,000 deals with student-athletes in select states with unique stories and journeys.

Said Clearcover CEO Kyle Nakatsuji, "While big insurance companies have been sponsoring professional athletes for years, Clearcover is an up-and-coming car insurance company that wants to sponsor student-athlete up-and-comers as official Clearcover athletes. So that's why we've decided to sponsor underdog or walk-on college athletes with great inspired underdog stories like Clearcover's."

After a successful first phase of the campaign, the company expanded its reach to now support dozens of underdogs, walk-ons and up-and-comers across the country.

### KUGLER VISION

While NIL can bring dollars directly to student-athletes, it can also open doors to new opportunities. In May of 2022, Kugler Vision, an Omaha-based Laser Vision Correction Surgery and LASIK provider, offered LASIK surgery to all qualifying Nebraska student-athletes. The athletes simply needed to complete a screening to

determine if they qualified. In return, the participating athletes would promote the business on social media.

"If we're going to make a difference, we can't just pick a star," Dr. Kugler said. "We have to be able to say we believe — and we really do believe — that visual performance is key to athletic success. This is a way to illustrate that and also support our team."

Less than a month after posting, more than 28 football players had applied for the roughly $6,000 procedure.

### LUXURY CAR DEALERSHIPS

High profile recruits being gifted vehicles has long been a part of pre-NIL recruiting lore. Now, dealerships can compliantly partner with student-athletes and receive promotion throughout their community and in social and traditional media in return.

## WHAT'S NEXT?

While the support in year one has been impressive, the future appears even brighter. Brands see the value of partnering with student-athletes and vice versa. The initial year was powered by brands becoming the "first of." The first to offer a team-wide deal, the first to launch a national advertising campaign, the first to add a college athlete to its roster, and so on. These "first of" opportunities helped brands and athletes extend their campaign's success with media buzz.

That media buzz is not going away any time soon, but the "first of" approach will soon shift. Expect the partnerships that drive press and public interest in year two to be "best of." Now, the deals that can prove success, scale, and impact beyond the press release will earn deserving praise and deliver results for both parties.

# THE COLLECTIVES

The most controversial and misunderstood part of NIL did not emerge until the weeks and months following July 1.

Third-party groups quickly began to emerge, pooling resources and funding. NIL Collectives were born. The original concept behind these early collectives was simple: increase the number of legitimate NIL deals for the student-athletes at the school they supported and make sure the student-athletes were educated (and protected) in any subsequent business deal.

A primary reason collectives began to form was due to state laws and/or school policies that prohibited direct institutional involvement in NIL deals for student-athletes. Many athletic departments interpreted the laws or self-induced policies to mean that even providing education around NIL deals was impermissible. While this may have reduced the risk for schools of being in violation of those laws/policies, their student-athletes were left to navigate this world without direction from some of their most-trusted resources.

Enter the collectives.

Many collectives were started and organized by former athletic department employees who recognized the necessity for both separation from the school and education for student-athletes. They could provide hands-on education surrounding financial literacy, taxes, and contracts in addition to offering a proactive way to find NIL deals using their expertise.

By early 2021, a handful of collectives had been established; but only a couple were fully operational in sending NIL deals. Most of the early objectives for these collectives involved working on setting up an internal structure and concept. A primary goal was organizing finances to fund the deals sent to student-athletes and, in some cases, contacting local companies to facilitate deals for the student-athletes.

Early on, common deals completed by student-athletes ranged from autographing memorabilia for members of the collective, to appearances at local events, and features on podcasts (some even being run by the collective itself). These were relatively easy deals for the student-athletes to complete while juggling their busy on-campus responsibilities. They also often involved the collective helping with tasks that may have been deemed impermissible for the school to help with such as contract negotiation, coordinating transportation, assistance with the execution of the activity to ensure quid pro quo, and more.

There is a difference between awareness and involvement when it comes to a school's relationship with collectives. In accordance with compliance, schools could not instruct a collective when it came to which student-athletes to coordinate NIL deals for or how much to compensate those student-athletes. However, there were no specific rules about being in compliant communication with the individual(s) running the collective to ensure deals were adhering to the main rules of NIL — deals must have a quid pro quo and they could not be tied to athletic performance/awards, commitment, or enrollment. In fact, compliance departments at institutions maintain a responsibility for their representatives of athletics interest, in other words "boosters" — so there is a very real need for clarity between the collective and the institution.

It did not take long for coaches to recognize the recruiting advantage of having a dedicated collective supporting the student-athletes of their respective school. The lines became blurred for some collectives. As high school recruits and student-athletes in the transfer portal were looking for a school to commit to, discussions around potential NIL earning capability began happening. This led to allegations that some collectives may have operated either with or without instruction from the school or a coach to promise guaranteed financial terms to these student-athletes, which would violate the aforementioned principles of NIL.

In May 2022, the NCAA released guidance that classified third-party collectives as boosters in an effort to prohibit collectives from being involved in the recruitment or enrollment of student-athletes. This clarification meant that collectives must adhere to the longstanding rules governing school supporters in that there could be no communication with a prospective student-athlete looking to commit to a school out of high school, junior college, or as part of the transfer process. Additionally, it meant that collectives could not use NIL deals to entice a currently enrolled student-athlete to remain at the institution.

Regardless of the impact to individual collectives, what remains clear is that the NCAA will be keeping an eye on them and their operations moving forward. Collectives will need to ensure that student-athletes are disclosing all deals to their school's compliance department who, in turn, will ensure that those deals are not in violation of the established rules of NIL.

Expect to hear about student-athletes completing NIL deals with a positive impact on a community or cause that will be organized by collectives. Many collectives are now working to receive 501(c)(3) status or are starting up a separate collective that will hold the non-profit status. These types of collectives would be able to receive tax-deductible donations and use the funds in a variety of ways to support charitable organizations. Student-athletes will be paid by the non-profit collective to autograph items that are then donated or to post on social media about local charities or to appear at events for local charities – taking the financial burden off the charity itself. However, the process of achieving that status can take several months – six to nine in some cases. In the meantime, other 501(c)(3) organizations are sponsoring these collectives in the short term to help their status and application.

Regardless of their setup, collectives are not going away. As Opendorse predicted back in December 2021, before college football kicks off in a couple of months, most Power 5 schools and many Group of 5 schools will have a third-party collective in place that is supporting their student-athletes. And markets with

## N1L / THE COLLECTIVES

collectives will be successful. With around 120 known collectives in existence or in the process of being formed across 37 states, that pace does not look far off.

Combining the number of known NIL collectives with data from CollegeFactual.com, there are approximately 57,000 student-athletes competing at schools with at least one collective established or in the process of forming.

As the next academic year inches closer, several collectives associated with the same institution have begun to merge. This trend will likely continue as these groups are realizing the power of being able to pool together more resources – and, most importantly, more funds. Multiple collectives that support Florida, Florida State, TCU and Kansas State have already merged. Most

importantly, schools must consider the compliant relationship that can exist between school and collective: there must be an element of trust between both parties.

Opendorse currently works with several collectives across the country to provide the ultimate compliance tool for NIL deals being sent to the student-athletes. Any deal an athlete receives via Opendorse can be automatically disclosed to and accessed by the compliance office of their respective university. This process has provided peace of mind for both collectives and athletic departments alike. Since the start of 2022, collectives have committed to send more than $35 million to student-athletes through Opendorse.



## N1L / THE COLLECTIVES

# POWER 5

Around **120 COLLECTIVES** are either known to be in existence or are in the process of forming

 **13 SCHOOLS** have at least one known collective of the 15 member schools (including Notre Dame)

 **ALL 10 SCHOOLS** have at least one known collective

 **13 SCHOOLS** have at least one known collective of the 14 member schools

 **NINE SCHOOLS** have at least one known collective of the 12 member schools

 **ALL 14 SCHOOLS** have at least one known collective

In total, of the **65 MEMBER SCHOOLS** within the Power 5 conferences, **92% HAVE AT LEAST ONE COLLECTIVE** established or in the process of forming.

# GROUP OF 5 + BIG EAST CONFERENCE

**OVER 20 COLLECTIVES** are either known to be in existence or in the process of forming

 **EIGHT SCHOOLS** have at least one known collective of the 11 member schools

 **FIVE SCHOOLS** have at least one known collective of the 11 member schools

 **FOUR SCHOOLS** have at least one known collective of the 11 member schools

 **FOUR SCHOOLS** have at least one known collective of the 11 member schools

 **TWO SCHOOLS** have at least one known collective of the 12 member schools

 **TWO SCHOOLS** have at least one known collective of the 10 member schools

In total, of the **66 MEMBER SCHOOLS** within the Group of 5 conferences and BIG EAST, **38% HAVE AT LEAST ONE COLLECTIVE** established or in the process of forming.

Of the known collectives or those in the process of forming…

**73%** are associated with Power 5 schools

**22%** Group of 5/BIG EAST schools

**5%** are a combination of other conferences, including HBCUs



Photo Credit: Getty Images

# THE SCHOOLS

The story of the first year of NIL cannot be told without the perspective of the schools. It started a couple years back.

Although there has been a longstanding debate over college athletes' ability to be paid, advocacy among athletic department administrators for such a change has been relatively new. In fact, when the State of California's Governor Gavin Newsom signed the Fair Pay to Play Act into law on Sept. 30, 2019, it was met with strong opposition from some of the most influential officials in the industry. The concept of collegiate athletes being compensated for their NIL was foreign. So much so that at the time, Ohio State Athletic Director Gene Smith, now a strong advocate for student-athlete NIL rights, went so far as to say his programs would not schedule games against California schools.

Less than two and a half years later, Smith's Buckeyes announced their student-athletes collected nearly $3M in NIL deals and the department was launching the NIL Edge Team to help create and foster best-in-class NIL opportunities. A seemingly 180-degree turn, Carey Hoyt, senior associate athletics director, articulated the reason why.

"Our guidelines were initially created to be restrictive, but now that we have a better understanding of NIL, it's clear that we can provide more assistance in connecting student-athletes with interested brands."

Ohio State is just one example. Many schools have switched from handcuffed to hands-on with the swift change of policy.

And as far as what can be done, a handful of decisions come back to the school. Though there are 29 states with NIL laws on the books, that only covers 65% of the NCAA's membership. Even for those with state laws, many legislators drafted them hand-in-hand with athletic department officials or have both worked to amend them since.

"It has been extremely valuable for Creighton, and our peer institutions in Nebraska, to have an open line of communication with our elected officials," said Bluejays Associate Athletic Director of Compliance Kyle Waterstone.

In July 2020, Nebraska became the fourth state to enact NIL legislation. A year and a half later, state legislators worked with school officials to amend the law and add further clarity to areas like institutional intellectual property use.

"The monetization of student-athletes' NIL is not going away." Waterstone added. "As a result, it behooves our athletic department to actively work to foster an environment where there is mutual benefit for both the student-athlete and the institution."

So, the question now comes down to what policy-related variables exist that the schools can maximize? With a few exceptions under federal law, state law, NCAA policy, and conference policy, schools have authority in five key areas: Category Prohibition, Intellectual Property Use, Disclosures, Education, and Fan Base Engagement.

## N1L / THE SCHOOLS

### CATEGORY PROHIBITION

Dating back to the NCAA's originally proposed legislation from the fall of 2020, category prohibitions were among the first places schools demonstrated autonomy. But, it wasn't until New Jersey legislators passed the nation's fifth NIL state law that direct prohibitions on categories such as alcohol, tobacco, controlled substances, and gambling were addressed. Though several states followed suit with prohibitions on vice industries, a continuity across both states and the NCAA's subsequent interim policy was that schools should set their own policies. In an environment where there was no tested result, nor a clear frontrunner, the process was easier for some than others.



On June 30, 2021, in the rush to respond to the NCAA's interim policy release, many schools chose the wait-and-see approach. In less than 24 hours, though, the catch-all Barstool Sports deal made many act quicker than they would have liked. Cited for noncompliance with policy prohibitions on entities related to sports wagering, institutions like Louisville directly advised their student-athletes to steer clear. Similarly, many institutions chose to craft policies in tandem with their institutional values, including Brigham Young University's Honor Code Standards which apply to student-athletes and non-athletes alike.

But not all that was originally thought to be barred was off the table. A place many institutions feared NIL would bleed into – the apparel and pouring rights contracts – came to fruition early among the biggest stars in sports. Though many policies have attempted to caution athletes away from engaging with competitors, examples like Rose Zhang's adidas contract (Stanford is a Nike school) and Paige Bueckers' Gatorade deal (UConn is a Coca-Cola school) were welcomed as the contracts are limited to an athlete's time outside of required team activities. Some school policies have even opened it up as far as to allow athletes like Florida Atlantic's N'Kosi Perry to work with alcohol vendors.



### INTELLECTUAL PROPERTY USE

Originally prohibited under the NCAA's first NIL proposals was the concept of student-athletes leveraging school intellectual property (IP) in their deals. Fear that athletes would be compensated for the name on the front of the jersey instead of the name on the back led legislators in Connecticut, Oklahoma, and Texas to outright prohibit it. (Connecticut's law has since been amended.) Countless schools followed suit in their policies, leading to unbranded activations such as former Gonzaga star Chet Holmgren's trading card deal with Topps.

As the ecosystem matured, there was an industry shift towards allowing athletes to utilize school marks. This growth has allowed athletes to create engaging content with a more organic feel. For example, Georgia Tech star Kevin Parada's paid partnership with Invesco QQQ, a corporate sponsor of the university, meets followers in a familiar spot – Russ Chandler Stadium. A symbiotic relationship between existing sponsors, the athletes, and schools, this evolution gave way to LEARFIELD and Opendorse's strategic relationship announced in April.

# N1L / THE SCHOOLS



> Educating about name, image, likeness and amplifying the opportunities for our student-athletes has been a priority at the University of Maryland since day one of NIL. Our relationship with Opendorse and the team headed up by Blake Lawrence has been tremendous for our student-athletes, coaches, and staff. They have provided resources and a platform for our MOMENTUM program that has helped Maryland become one of the national leaders in the NIL landscape. We have empowered our student-athletes to maximize their opportunities during their time at Maryland and build life skills to help them flourish after they graduate.

— Damon Evans, Maryland Athletic Director

## DISCLOSURES

Athough consistent across state laws and school policies, a disclosure requirement has been a challenge in practice. The uphill battle for all schools in the first year was capturing activity disclosures, oftentimes leading athletic staff members to comb social media to check for activations. Motivated by compliance, schools quickly found recruiting value in the details. Maryland athletic director Damon Evans went to Twitter to share the Terps NIL rankings after the first three months, showcasing their near doubling of the national average deal figures.

Recently, following Kansas men's basketball's national championship, data was released by *The Topeka Capital-Journal* showcasing the impact of a championship on a team's NIL income. Though it was gathered through a public records and presented in aggregate figures, Kansas is one of the few to willingly share as most others institutions have cited Family Educational Rights and Privacy Act (FERPA) to counter the inundation of Freedom of Information Act (FOIA) requests. Unsurprisingly, winning has an impact.

## EDUCATION

Arguably one controllable which brought a handful of schools to center stage in the first year of NIL started much earlier than twelve months ago. As rumblings grew into a reality, several schools created strategic plans internally and began partnering with third-party education providers as early as March of 2020. Following July 1, education became less of an option and more so a requirement. To truly have a leg up, education happened on two fronts: internal and external.

Internal education served as the metaphorical "tip of the iceberg" — nearly every school in the country launched an initiative for their student-athletes and staff to be equipped for the new landscape. While most looked contractually to third parties or created NIL subcommittees within their athletic departments, others chose to hire full-time staff - including San Diego State University which hired Michelle Meyer, founder of NIL Network, to lead the charge. "I'm really not sure how universities are managing without an NIL specific position," she said.

Meyer said the number one meeting request she receives is from athletes asking to chat about a specific opportunity. "I think the first few years of NIL is when we are going to see the most bad actors in the space," she said. "They (students) don't know who to trust, how to read a contract, or even how to vet an opportunity."

Meyer goes on to explain how connections in the space and campus resources have been incredible assets for her student-athletes, in areas such as personal branding. Building from traditional NIL education, other schools like Memphis chose to pair their NIL marketplace release with training on how student-athletes' profiles can be easily located. Coaches and student-athletes alike shared testimonials of their experience and avenues to support the Tigers.

# N1L / THE SCHOOLS

The University of Miami was a trailblazer in their initial donor-based education at the flip of the calendar, updating Hurricanes fans on the do's and don'ts of the new rule change.

"We knew that when NIL activities became permissible it was going to be a new space for everyone. Student-athletes, coaches, supporters, brands, and businesses were all walking into this new space together," said Craig Anderson, Miami's senior associate athletic director for compliance.

"We took a proactive approach with many of our supporters, student-athlete representatives, and local businesses and were here to answer questions." Anderson explained that Florida's NIL law restricts the department and its staff from causing compensation, so their interactions with external groups must be educational.

"However," he added, "the interactions we are permitted to engage in have been extremely positive. We've found that almost everyone we've interacted with is on the same page as the institution in that we want to be able to maximize the opportunities and experiences of our student-athletes while not impacting their eligibility."

As teams began taking the field, NIL education grew beyond booster emails and radio shows to paragraphs in media guides and in-venue promotions.

"When our student-athletes are performing well on and off the fields of play, they, in turn, become more marketable," Anderson noted. "When businesses and brands amplify those student-athletes, they each become more visible. When our supporters have positive experiences with our student-athletes it enhances our brand."

## FAN BASE ENGAGEMENT

Parlaying education into engagement has become the name of the game, even from the start. In August, BYU and corporate partner Built Brands, LLC announced a multiyear agreement to support Cougar football players. Co-founder Nick Greer made the announcement during a team meeting that walk-ons would be offered NIL deals to cover their tuition for the full academic year. Despite receiving an initial inquiry from the NCAA, this move proved to be the first of many instances of schools playing an immediate role in their athletes' deals.

Originating from a mix of the NCAA's initial proposals and a slew of state laws, following the interim policy release the NCAA's Q&A document only warns against arranging deals, leaving the door open for BYU and others to test the waters on the conception that schools could not be involved in the deal making process. This revelation spurred many athletic administrators to loosen up their policy or petition to their local legislators. To date, out of the thirty states which have passed NIL legislation, eleven have amended, are working towards amendments, have new NIL bills proposed, or have repealed their law.

"The State of Tennessee's amendment to its NIL legislation allows us to be more proactive in our external messaging and promotion of our NIL efforts on behalf of our student-athletes, fans and interested sponsors and donors," said Laird Veatch, University of Memphis vice president and director of intercollegiate athletics.

Veatch described how the release of Memphis' Marketplace could not have happened without the law change which freed the department to be more involved.

"Not only does our involvement in NIL help us share information and best practices with our student-athletes and programs, but it also allows us to more effectively continue to educate the general public on the do's and don'ts of NIL and the opportunities to support our student-athletes."

In addition to clearing the air, schools have even viewed this freedom as an avenue to create actual business interactions between buyers and athletes. Between Washington's NIL Power and Boston College's NIL Fair, life skills programming now has a natural intersection with local businesses, collectives, and the rest of the NIL realm.





Photo Credit: Drew Angerer/Getty Images

# THE POLITICS

"Patchwork of state laws."

"Federal intervention."

"The Wild West."

Choose your preferred refrain. After a full year of NIL for college student-athletes, the laws and policies surrounding NIL are still as fluid as ever.

NIL is new to college sports, but it's not new to sports. An individual's name, image and likeness are the three elements that make up the right of publicity. This legal principle gives an individual the exclusive right to license and use his or her identity for commercial promotion.  Athletes have been using their NIL for more than 150 years, dating back to professional baseball players partnering with brands in the production of trading cards.

More recently, the International Olympic Committee revised its guidelines to allow for Olympic and Paralympic athletes to be compensated for commercial purposes while maintaining their amateur status.

California State Senator Nancy Skinner, sponsor of California's avant-garde Senate Bill 206, proposed her bill stating, "This is a right that all the rest of us have, and Olympic athletes have. Imagine if in any other billion-dollar industry, like TV and movies, college students were the primary source of the talent that generated the revenue for that business and those college students were completely denied compensation. There would be a universal outcry. And yet we say it's OK for athletes."

California's impending NIL law was a culmination of a decades-long movement in support of athlete rights.

## N1L / THE POLITICS

Photo Credit: David Banks/Getty Images; EA Sports; Joshua Pacheco

### JUNE 27, 1984

*National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma*

This 7-2 decision declared that the NCAA's control of television rights violated both the Sherman and Clayton Antitrust Acts. It was the first Supreme Court loss for the NCAA, and as a result, member institutions were afforded more autonomy to negotiate broadcast rights agreements.

### JANUARY 29, 2014

*Kain Colter and Northwestern Football's Effort to Unionize*

Although ultimately rejected by the National Labor Relations Board (NLRB), the most notable effort to unionize included a demand to "eliminate restrictions on legitimate employment and players' ability to directly benefit from commercial opportunities." Despite the effort falling short, the industry was put on notice for the limitations on NIL monetization.



### AUGUST 8, 2014

*O'Bannon v. National Collegiate Athletic Association; Electronic Arts; and Collegiate Licensing Company*

Former UCLA Basketball player Ed O'Bannon headlined a class-action case involving numerous individuals who claimed their rights of publicity were violated by the inclusion of their likenesses in video games without compensation. The decision stated that the NCAA was in violation of antitrust law by restricting payment to student-athletes. This decision led to the NCAA changing scholarship restrictions to allow, for the first time, institutions to provide full cost of attendance scholarships, providing significantly more money from the institutions to most Division I scholarship athletes.



### SEPTEMBER 30, 2019

*California's Fair Pay to Play Act*

The State of California became the first state to pass legislation that would prohibit governing bodies (i.e., NCAA and Athletic Conferences) and institutions from punishing student-athletes that accept NIL endorsement money while in college. Despite strong lobbying against the bill, this watershed moment put pressure on the NCAA to act on growing pressure for NIL reform. Senate Bill 206 was signed by Governor Newsom with an effective date of July 1, 2023.

### OCTOBER 29, 2019

*NCAA Prepares for NIL*

Less than a month after the signing of California's Fair Pay to Play Act, the NCAA's Board of Governors agreed to reconsider amateurism policies across its three divisions. Potential rule changes were to be agreed upon by January 2021 allowing student-athletes to earn compensation for their NIL through promotions and endorsements.



### JUNE 12, 2020

*Florida's Intercollegiate Athlete Compensation and Rights Act*

Florida became the third state to pass a law addressing NIL for student-athletes. Senate Bill 646 was scheduled to go into effect on July 1, 2021, an aggressive timeline which set the precedent for all states to follow.

## N1L / THE POLITICS







Photo Credit: James Lang/US PRESSWIRE

### OCTOBER 6, 2020

*National Association of Intercollegiate Athletics Adopts NIL Policy*

The National Association of Intercollegiate Athletics (NAIA) became the first intercollegiate athletics governing body to pass legislation for NIL compensation. The NAIA is home to 252 institutions, 21 conferences, and 77,000 student-athletes competing in 27 sports.

### JANUARY 8, 2021

*Department of Justice Warns NCAA of Antitrust Concerns*

The Friday before the NCAA's highly anticipated vote on proposed NIL legislation at the 2021 Annual Convention, the Trump administration's assistant attorney general of the DOJ's antitrust division sent a letter to NCAA President Mark Emmert, expressing concern of the NIL proposals. For fear of antitrust violation and the weakening of their upcoming SCOTUS case, this ultimately led each of the NCAA's divisions to table their proposed legislation.

### MARCH 2021 - JUNE 2021

*Patchwork of State Laws Unfolds*

Following the NCAA's inaction at the 2021 Convention, 13 different states enacted unique NIL legislation of their own. With nearly two dozen state laws to adhere to, the NCAA's ability to create consistent NIL rules grew increasingly more difficult.

### JUNE 21, 2021

*National Collegiate Athletic Association v. Alston*

The United States Supreme Court ruled against the NCAA in a decision that stated the organization is not exempt from antitrust regulations simply because of its academic responsibilities. Though not directly related to NIL, Alston opened the door for academic-related compensation for student-athletes and signaled that the NCAA could face further legal consequences in the future. The concern became a catalyst behind the NCAA's ultimate decision to adopt its Interim NIL Policy.

### JUNE 30, 2021

*NCAA Adopts Interim NIL Policy*

All three NCAA divisions adopted uniform, temporary rule changes that permit NIL activity for its student-athletes. The association's working policy states student-athletes can engage in NIL activities so long as benefits are not received as pay-for-play or improper recruiting inducements. With no federal legislation, NIL shall be governed by state laws (if applicable) and/or individual school policies.

### JULY 1, 2021

*NIL Goes Live*

At 12:01, student-athletes began monetizing their NIL under the new NCAA Interim Policy and freshly enacted state laws.

### MAY 9, 2022

*NCAA Division I Board of Directors Adds Further Guidance*

DI Board of Directors issues name, image and likeness guidance to schools reinforcing the prohibition of recruiting inducements, citing longstanding legislation on booster involvement in recruiting.

# N1L / THE POLITICS



## THE FEDERAL LEVEL

At the federal level, ten unique bills related to NIL have been introduced in the past two years, accompanied by half a dozen committee hearings. There is a continued outcry from those within college athletics for federal intervention, leading to NCAA President Mark Emmert on several occasions and more recently SEC Commissioner Greg Sankey and Pac-12 Commissioner George Kliavkoff taking trips to The Hill. U.S. Senator Maria Cantwell (D-WA), recognized as the biggest potential playmaker for federal NIL intervention given her role as Chair of the Senate Committee on Commerce, Science, and Transportation, was active in nearly all NIL-related hearings and conversations, yet fell short of introducing the bill in her drafts.

Dialogue from both parties has brought collegiate sports to the nation's capital, but there are low expectations for NIL reform to happen.

"I suspect we're further away from a federal NIL bill," said Michael McCann, University of New Hampshire Law Professor, when referencing his testimony before the United States Senate in June 2021.

"At that time, there was an opportunity for Congress to act before state NIL statutes went into effect. That window has now closed. State NIL statutes are operational, NIL is available in states even without statutes and the NIL market has grown without federal intervention. Also, it's unlikely we'll see Congress take action in an election year. Many members will be back home campaigning over the next several months."

Of the different arguments that found their way to D.C., one consistency across the hearings has been a call for maintaining a level of competitive balance. The advent of school-specific collectives has only heightened this fear, as many are afraid NIL has become a way for the rich schools to get richer. Petitioning for further regulation on collectives for the sake of competitive equity, however, has no shortage of opposition.

"Because college sports has never had revenue sharing, large-market schools have historically invested heavily in coaching staffs, workout facilities, and locker rooms – all as a way to gain competitive advantage in recruiting top athletes," says Marc Edelman, tenured law professor and Director of Sports Ethics at Baruch College.

Edelman explained how a small segment of schools consistently appears in March Madness and the top bowl games, speaking to the inequity that already exists. "If anything, NIL might reduce this inequity by allowing a new group of schools to compete for elite athletes, as well as spread elite athletes more broadly across a wider range of teams."

## THE STATE LEVEL

30 states enacted NIL laws with 23 currently in effect. Nonetheless, many have shifted efforts toward amendment and repealing efforts, including Alabama's legislators who repealed their law in February and South Carolina's who suspended theirs in June. Though the consensus is that it is more advantageous to operate under the NCAA's Interim NIL Policy without a state law, five states and the District of Columbia have still introduced or passed NIL laws since last summer. There is a mixed reaction to this recent push.

"I think some states are continuing to pass NIL laws because the legislators don't fully understand where the NIL space is currently at," said Mit Winter, former William & Mary basketball player and attorney for the Kansas-based firm Kennyhertz Perry. "I believe some state legislators think they need a state law to ensure athletes in their state can monetize their NIL. But that's not the case. College athletes already have that right under state law and the NCAA isn't going to backtrack and change its rules to say college athletes can no longer monetize their NIL. So, the state laws just end up making things more complicated for schools, businesses, and athletes, which leads to fewer deals for the athletes."

In spite of this trend, many industry experts, including Drake Group attorney Julie Sommer, believe fewer NIL state laws will exist by the end of year two of NIL.

"Not surprisingly," she said, "many states have now repealed all or part of their initial NIL laws. Not only are these inconsistencies and patchwork policies incompatible with viable enforcement and governance, it's unsustainable. Both the patchwork of state laws and fear of litigation contribute to the NCAA's lack of enforcement, among other things."

Nonetheless, athlete agent state laws may be the next front for consideration.

"At present, most states have outdated sports agency law that serves to protect NCAA member colleges and prevent college athlete compensation," said Edelman. "However, new sports agency laws are needed to ensure that those individuals seeking to represent college athletes actually have the athletes' best interests in mind and are not exercising a conflict of interest or otherwise acting to the financial detriment of college athletes."

## N1L / THE POLITICS

To date, though all state NIL laws reference the ability for student-athletes to utilize professional service providers, only a couple of states, including Ohio, have had further discussions on what revisions to athlete/agent regulations could be.

### THE ASSOCIATION LEVEL

Despite receiving criticism in the months leading up to July 1, the bulk of the inaugural year was silent at the Association level. Keeping a keen eye on the activity in the industry, only moving on a few occasions in probing exercises, the Association's Division I Council Working Group on Name, Image and Likeness broke the silence in May. Ten months of industry evolution was redirected by additional guidelines on third-party involvement, namely collectives engaging with recruits.

Citing several longstanding bylaws to the effect of "per usual, boosters cannot be involved in recruiting," this elicited a mixed bag of responses as well. Reactions among the compliance community ranged from highly supportive of the added clarity to an underwhelming. "Okay, what else is new?" To be clear, the NCAA cannot and will not stop collectives from appropriately engaging in space. The existence of collectives is not the issue – the participation of collectives in the recruiting process is, the standard NCAA enforcement process of institutional self-reporting continues.

In a June 2022 memo to the Membership, NCAA VP of Enforcement Jon Duncan made one point clear. "The enforcement staff is not focused on the eligibility of current or prospective student-athletes. As always, the infractions process is primarily concerned with behaviors of institutional staff members and representatives." Nonetheless, there have been no reported instances of NIL-related infractions since the rule change.

### THE HIGH SCHOOL LEVEL

One of the most rapidly changing spaces over the past year, the high school landscape started in the same state as the collegiate movement. When the calendar flipped to July, one of the first questions to come through was, "What does this mean for high school student-athletes?"

California Interscholastic Federation's response? "This has been allowed in our rulebook since 2004," in part due to the television and film industry of the state.

July 1 did mean something in the State of California, though. Despite not having a dramatic enactment date, the changing of NCAA rules meant prospective student-athletes, including high school and transferring athletes, would not jeopardize their amateurism status by engaging in permissible NIL activities. The only direction from the NCAA on the matter of high school students is to defer to the governing body in which the prospective student-athlete competes under.

After the NCAA revised its policy, triggering questions across the country for high school associations, many directors reviewed

their amateurism guidelines. What several state associations found was that their most tenured principle was not written to consider modern developments, namely social media influencing.

"I think there is going to be a shift in how high school athletics are viewed for some students," said Dr. Robert Zayas, NYSPHSAA executive director. "The way that it's trending right now with social media, students are perceived differently than they were 10 or 15 years ago.

"And I think that's the difficulty right now is how you differentiate between capitalizing on your athletic fame and being a social media influencer. I don't think we can differentiate between the two any longer. And I think that's where it becomes problematic. If a student is a social media influencer, and they have 100,000 or 3 million followers, then I think it becomes very difficult as the state association to try to determine how those followers were generated. I think when we try to do that, we're putting ourselves in a really precarious position."

The sentiments shared are nearly identical to those within the NCAA in 2019 and 2020, but now these conversations are happening on a micro level. Unique, however, is the connection between the collegiate and high school realm, given the NCAA's further guidance on recruiting inducements. Businesses intending to engage with athletes at the high school level must carefully understand any relationships they may hold with a university, especially one the athlete is being recruited by, in order to ensure protection of the athlete's eligibility. To date, 12 state high school associations permit NIL activities with others in active consideration.

### THE CURRENT  HIGH SCHOOL LANDSCAPE



| | |
|---|---|
| ■ CONFIRMED PERMITTED | ■ NEEDS CLARITY** |
| ■ PERMITTED** | ■ CONFIRMED PROHIBITED |
| ■ UNDER MEMBERSHIP CONSIDERATION | *as of 6/24/2022 |

*As of 6/27/2022

**Under existing bylaws, these are preliminary reviews. Confirmation is needed from the high school association.



# THE MEDIA

## A NEW BEAT

Few topics have taken over the college sports media landscape like NIL from 2020 through 2021. It has commanded the attention of athletes, fans and everyone in-between during that span – and the media surrounding college sports has responded. NIL has become almost a beat of its own, with dedicated reporters at publishers of all sizes sharing the latest stories and speculations with the news-hungry college sports fan.

Opendorse spoke with several of the top reporters surrounding the NIL ecosystem to learn what surprised them in year one; what expectations they held for year two; and what advice they would give student-athletes who are about to step foot on a college campus.

**🔍 #NIL**

## REPORTERS INCLUDED

Matt Brown, Extra Points - @MattBrownEP
Ross Dellenger, Sports Illustrated - @RossDellenger
Kristi Dosh, Business of College Sports - @SportsBizMiss
David Hale, ESPN - @ADavidHaleJoint
Dan Murphy, ESPN - @DanMurphyESPN
Andy Wittry, On3 - @AndyWittry

## SURPRISES FROM YEAR ONE

 **David Hale**
@ADavidHaleJoint

Schools continue to lag behind in addressing athlete needs. Some are dragging their feet because they don't like NIL or can't afford to invest but many are just building a shiny new toy that doesn't actually *do* anything. Few are truly partnering with athletes to address key needs.

 **Kristi Dosh**
@SportsBizMiss

I'm impressed by how entrepreneurial athletes have been in year 1 of NIL. So many of them are being strategic and thinking long-term. I think both athletic and academic departments need to spend year two trying to figure out how best to support that.

 **Andy Wittry**
@AndyWittry

The rise of collectives and how much they can dominate conversations about NIL, even when some athletes involved in NIL have never heard of them or don't know much.

 **Ross Dellenger**
@RossDellenger

The extent of booster involvement. I think we all predicted that boosters would get involved with NIL, but I'm not sure many projected that they would collectively pool resources and create well-oiled entities to create NIL payments like they have.

## N1L / THE MEDIA

### EXPECTATIONS FOR YEAR TWO

 **Andy Wittry**
@AndyWittry

The consolidation of collectives (or similar services). That could take several forms, such as collectives merging, schools bringing more services in-house or players on a team launching their own.

 **David Hale**
@ADavidHaleJoint

Collectives are the elephant in every room. Some are great but... Pay-for-play casts a cloud over all NIL. Some schools ceding too much control to boosters. Collectives as 501(c)(3)s are inviting IRS scrutiny. The NCAA is mostly toothless but wants to make an example of someone.

 **Kristi Dosh**
@SportsBizMiss

Balancing power between athletic departments and collectives. There needs to be cooperation and transparency. Collectives can serve some important roles, but they shouldn't be putting the athletic department at risk in any way.

 **Matt Brown**
@MattBrownEP

I think the biggest challenge is going to be for schools, AND brands, to better engage ALL athletes in NIL. There are so many athletes on the sidelines right now, not sure how to get started. Schools and marketplaces need to do a much better job engaging their education efforts, not just checking a box.

 **Ross Dellenger**
@RossDellenger

I think you'll see these collectives get more and more sophisticated and be organized/managed by professional entities and agencies.

 **Dan Murphy**
@DanMurphyESPN

I expect to see more, if not all, schools get closely involved in solving problems for their athletes and making it easy for them to find opportunities. We'll also see increasingly empowered athletes continue to demand more from their schools.

### ADVICE FOR INCOMING FRESHMAN

 **Andy Wittry**
@AndyWittry

Find someone, or multiple people, who you trust to read any contract that you're presented and to help you with your taxes. Think about what you want from NIL and then create a set of specific, measurable goals for the school year. Hold yourself to them and track your progress.

 **Ross Dellenger**
@RossDellenger

Have attorneys review contracts before signing. Do not give away your NIL rights in perpetuity without adequate compensation!

 **David Hale**
@ADavidHaleJoint

My advice:

Be authentic & find brands that mirror your beliefs and interests.

Be prepared. I've heard stories of guys who didn't even have a checking account when they got NIL money. Build your foundation now.

Be social – on IG & TikTok, with media, with fans.

Get out and network!



# THE FUTURE
## NIL SEASON TWO

### WHAT WE CAN EXPECT IN THE SECOND YEAR OF NIL

In the fall of 2021, fans eagerly made their return to college campuses around the country. Stadiums and arenas were full once again with rowdy student sections, alumni and fans alike.

Except that season, game days wouldn't be the only time you could see your favorite athletes. Maybe you noticed Olivia Dunne promoting activewear on Instagram. Or you saw Iowa Men's basketball's Jordan Bohannon while buying fireworks. Maybe you ran into the Virginia Tech offensive line while eating at a local barbecue joint.

It was the first taste of NIL for most people. It was new, unknown, and a little intimidating. But headed into the 2022 fall sports season, like any sophomore with a year under their belt and ready to earn a starting job, NIL is no longer a new concept. Stakeholders in the game need to read the scouting report of what could be coming.

### YEAR 2 — TIME TO ACTIVATE

It would be naïve to navigate the NIL waters in 2022 the same way as 2021. The first year of NIL was a time of trial and error, learning, teaching, supporting student-athletes, and for some, sitting back and observing the market.

Now it's time to activate – for all parties involved.

Education and awareness of NIL has been fast-tracked in the last year. From student-athletes and schools, to brands, sponsors and donors, the value of the student-athlete voice has been recognized.

And the earning potential has been realized. The market can directly impact the success of NIL initiatives in their community.

So, where is the money coming from? Opendorse CEO and co-founder Blake Lawrence breaks it down.

Participants in NIL should double on both the buyer and student-athlete side in year two. Brands and sponsors see the value, and student-athletes are recognizing their earning potential.



**N1L / THE FUTURE**

## THE ATHLETE — PUTTING IN THE WORK

NIL is most impactful for athletes that put in the work. Education was a heavy focus in year one for the purpose of providing athletes with the tools needed to be successful. Now that they have those, it's time to put in the effort.

From the Power 5 All-American to the NAIA walk-on, student-athletes are proving the theory that if you engage in the process, it doesn't matter what sport you play or school you attend. That national exposure is nice, but deals don't depend on that.

In year one, there were examples of different ways and methods student-athletes could make money. Year two is about looking at what worked, what generated real value and applying it to life. The first movers in year one of NIL set the foundation and laid the groundwork that allows student-athletes, in year two, to navigate the way they want to. Year two will be about finding deals that fit them as athletes, students and people.

Year two brings more opportunity for athletes to bring out their entrepreneurial side. With the rise of player-led collectives, student-athletes want to show initiative in promoting and preserving their NIL involvement.

## FAN INVOLVEMENT — A PERSONALIZED EXPERIENCE

Athletic departments spent much of year one educating their athletes. Athlete education will continue to grow, shifting from "here is how you could make money," to "here is how you can make the most money," and "here is how you will make money." From the market side, it's about providing the biggest supporters, businesses, and individuals in each market with the rules they need to know and the tools they need to use to support the student-athletes in a compliant way.

And fans are a major part of that.

Fans have always wanted to support student-athletes. That's why they show up on game day, greet the team at the airport, attend camps, and follow athletes on social media.

And as it pertains to NIL, that's no different. They just need a place to go. Opendorse's vision is to give every fan a place to go to support any athlete they want. In year two of NIL, it will become clear that there is a place to go to start supporting student-athletes. Opendorse plans to roll out more than 75 school-specific marketplaces where fans can go to easily support student-athletes. How fans want to support student-athletes will continue to evolve.

It's easy to see a world where 10% of all fans in attendance at football games this fall are supporting student-athletes directly in some way. Through collectives, video shoutouts or buying merchandise, new methods of supporting athletes are popping up every week.

## BRANDS AND SPONSORS — A NEW APPROACH

### A BRAND NEW GAME

Year one of NIL was the "year of the firsts" for brands. The headline was enough of a return on investment to make most brands happy. There will always be more firsts, but expect brands to shift the focus to results in year two.

Nationwide campaigns are going to be more prevalent in 2022 because of the effectiveness of student-athletes as ambassadors. There was no data that could be shared with those brands prior to NIL. Now proven effective, the time and spend in the student-athlete market will increase.

The sponsor segment, which is largely controlled by multimedia rights holders like LEARFIELD, will be twice as active in year two. The typical sales season for sponsorship is in the spring. When NIL went into effect on July 1, 2021, sponsorship sales teams didn't spend the prior spring preparing for NIL. With a full year of NIL being a reality, sales teams have a full sales season to sell into the market.

### ALL EYES ON THEM

Similar to sponsors, national advertisers doing one-off, long-term deals with premium athletes will be more prevalent this fall. Clemson quarterback DJ Uiagalelei did a deal with Dr. Pepper, making him one of the first student-athletes to appear in a national brand advertising campaign. Maryland quarterback Taulia Tagovailoa and his brother, Miami Dolphins quarterback Tua Tagovailoa, have partnered with Muscle Milk in a national ad campaign. Shortly after winning a national championship with South Carolina, Aliyah Boston signed with Under Armour and this summer hosted a camp in her hometown of St. Thomas, Virgin Islands. With more of a runway to plan these activations out, expect more student-athletes featured in national campaigns.



Temple football alumnus Linwood Crump was one of the many student-athletes to sign their first NIL deal with Gopuff.

**N1L / THE FUTURE**

The bottom line is brands and sponsors need to know that student-athletes who want to do NIL will produce a quality return. Whether it's creating content or making an appearance, those athletes that have done their homework and put in the effort will produce high quality outcomes and likely at a much more cost-effective rate than any national advertiser ever used to pay anyone in the sports world.

## THE DONOR IMPACT — STAYING COMPLIANT

The biggest story to come out of the second half of year one of NIL is the emergence of NIL Collectives and the donor impact on NIL. The largest source of revenue in an athletic department is donations. And one year ago, donors had no idea they would even be able to play a role in NIL. In year two, if you're a donor to an athletic department and you still don't know how to support student-athletes then you haven't been paying attention. Through collectives, donors that leverage their passion and long-time support of programs to compensate athletes at their school is what will make – and keep – programs successful.

If there is one in your market, which there probably is, the number one source of NIL compensation will come from collectives in year two. Current college athletes — and especially recruits — will learn that if there's an educated collective in the market that's providing consistent and compliant NIL activities to student-athletes then that is where they want to be.

After staying mum on NIL for nearly a year, the NCAA has rung the bell on what NIL is and what it is not. While nothing has crashed and burned yet, the NCAA has made it clear there is a desire to learn about the NIL activities in certain markets and investigations into NIL activities to ensure compliance with the interim policy is likely coming.

## SCHOOLS — WINNING THE MARKET

So what does this mean for schools?

Every school will have a variation of a marketplace by year end to provide a framework to easily engage each market. With this, schools must further educate their market (fan base) through resources and opportunities to connect athletes and supporters and keep their athletic programs competitive.

In addition, schools need to have a software solution that documents eveything to ensure compliance.

Schools that have a log of every NIL activity that their student-athletes have participated in will rest easy. A log that includes the compensated party, contact info, terms of agreement and proof that the activities required of the athlete were completed for compensation.

Issues arise when schools fail to gather the relevant information that would help them prove that compensation is for work

performed and not in contention on enrollment or performance. Expect more schools to come under scrutiny to provide proof that they are making an effort to follow the NIL interim policy.

Finally, educating the student-athlete will remain a crucial piece to NIL. Just as sport is used as a vehicle to receive an education for a future career, it's also used to build life skills as these young adults prepare to enter the real world. As NIL becomes more of a centerpiece in athletic departments, expect schools to invest in more resources to ensure student-athletes are well-equipped to be successful.

## HERE TO STAY

In short, there is no stopping the growth of NIL and if you're not on board now you will get left behind.

For student-athletes, everyone needs to help - from education and compliance to financial literacy and deal support.

For schools, you can't lag behind. Getting a solution in place like Opendorse only protects you and helps maximize NIL opportunities for your student-athletes.

For donors, collectives, sponsors and fans, there are hundreds of thousands of athletes ready to engage with you and start their path to financial freedom.





www.opendorse.com



# EXHIBIT 36

**SPORTSMONEY**

# Marketers Bullish On Monetization Opportunities For NCAA Athletes With NIL Rights

**Kristi Dosh**
Contributor
*I cover the business of sports, with an emphasis on college sports, sport sponsorship, facilities and travel.*
Follow
Nov 25, 2019, 10:34am EST



TUSCALOOSA, ALABAMA - NOVEMBER 09: Tua Tagovailoa #13 of the Alabama Crimson Tide runs with the ball ... [+]

GETTY IMAGES

If and when—and it certainly seems like it's only a matter of *when*—NCAA athletes are able to begin monetizing their name, image and likeness, opportunities for social media marketing present the lowest-hanging fruit. But

https://www.forbes.com/sites/kristidosh/2019/11/25/marketers-bullish-on-monetization-opportunities-for-student-athletes-with-nil-rights/?sh=3846c5767aa4

what does that market really look like, and which student-athletes will have the greatest opportunities?

I spoke with senior executives from four leading influencer marketing companies to get an idea of the current landscape and how student-athletes will be able to take advantage of opportunities. They were all enthusiastic about the prospect of being able to work with student-athletes, and most were already putting people and strategies into place to begin as soon as the rules allow it.

The most important factors that will influence a student-athlete's ability to monetize their social media will be the size of their following, their engagement rate and the overall awareness of the student-athlete, which is likely to be influenced by the sport they play and the success of their program.

All of the marketers I spoke with emphasized Instagram and YouTube as the two platforms where student-athletes have the most potential for monetization.

"The minimum following may be similar across all platforms, but the earning potential would be highest on YouTube, then Instagram," says Stephanie Stabulis, vice president and senior strategy director of HireInfluence.

Mathew Micheli, co-founder and managing partner at Viral Nation, agrees that Instagram and YouTube are the most valuable platforms for monetization right now, but he wonders how feasible YouTube is for student-athletes.

"YouTube would be much more difficult for student-athletes to really focus on given the time needed to create long-form video content," says Micheli. "However, it produces more income given the value of the content."

Tyler Farnsworth, founder and chief growth officer at August United, says his agency would generally be looking to partner with student-athletes who have at least 10,000 followers on Instagram or average video views of at least 20,000 on YouTube. On Twitter, they look at average engagement quantity in terms of retweets and likes, and on TikTok they review overall profile and check for key areas of opportunity.

Most marketers I spoke with described a 10,000-follower minimum on Instagram, but Mae Karwowski, founder and chief executive officer of Obvious.ly, says they routinely work with nano-influencers with 1,000 to 10,000 followers, in addition to bigger influencers. On YouTube, she says, brands are looking for 50,000 or more subscribers.

"People love sports, and social media is a huge overdue opportunity for college athletes," says Karwowski. "Contract amounts go up with follower counts, but engagement is another important metric that brands look at. The athletes on our platform have an average of 6.5% engagement rate, which is way higher than the general average of about 2%."

The sport a student-athlete participates in will also likely impact their earning potential, according to most marketers.

"In most cases the more prominent sports will have athletes with greater social followings. We'd typically see this play out in football and basketball as they often benefit from the most outside media coverage," says Farnsworth. "With that said, we have seen various other individual athletes with great stories or those with Olympic participation, for example, reach a higher degree of awareness and thus have increased brand partnership value."

Karwowski agrees football and basketball athletes will have built-in advantages but says, "Influencers in lesser-known sports such as fencing or equestrian can build communities and find brand collaborations, too."

Student-athletes in sports outside of football and basketball will likely find opportunities in smaller niches or with regional brands, says Micheli. "Other sports are a little more difficult because of the lack of national exposure. On a micro-regional level, they might be popular, but how is someone who lives in New York supposed to know what happens with Oregon's soccer team?"

In addition to a student-athlete's sport playing a role, geography and strength of program may have an impact on monetization potential.

"Geography or affiliation doesn't dictate much in college. Popularity, size and conference play a much bigger role," says Micheli. "For example, the hottest name in college football is Joe Burrow, who plays QB for LSU, which is located in Baton Rouge, that has a population of a few hundred thousand people. Versus a school like Fordham, located in the Bronx, may never have a game televised and lacks a player who anyone would recognize on the street."

Stabulis says, "Athletes at D1 schools and larger state schools are more likely to have relevancy when it comes to endorsements just because they are more well known and have greater audiences—students and alumni—than your smaller schools."

Geography can still play a role, however, says Farnsworth. "For example, we have a grocery client that would be interested in working with student-athletes from USC or UCLA as they are relevant to the area in which they serve."

So we know the opportunities are there. But what can a student-athlete expect to make as an influencer?

https://www.forbes.com/sites/kristidosh/2019/11/25/marketers-bullish-on-monetization-opportunities-for-student-athletes-with-nil-rights/?sh=3846c5767aa4

Several of the marketers point to Alabama quarterback Tua Tagovailoa as an example of a current student-athlete with a great deal of earning potential as an influencer.

"Tua boasts nearly half a million followers on Instagram and maintains a mind-blowing 19% engagement rate on his posts," says Farnsworth. "He doesn't post very often, but his fans absolutely love him. A guy like Tua could easily earn $25,000 or more per branded partnership."

Micheli has a similar opinion of Tagovailoa. "Some of these athletes could arguably be more popular than their pro counterparts. For example, Tua Tagovailoa in college football if given the opportunity, would probably out-earn 90% of starting NFL quarterbacks if given the opportunity. I could almost guarantee that," he says.

I circled back with Farnsworth and Micheli after Tagovailoa's season-ending injury to ask how an occurrence like that would impact the demand and future earnings of a student athlete.

"There is still significant value in brand partnerships; however, a brand may be hesitant to sign a long-term commitment or may put contingencies in place," said Farnsworth. "In short, yes, a significant injury that takes the player out of the media spotlight could negatively impact the overall opportunity for brand deals. That's a sobering statement to make because the health of the athlete is what really matters but is likely a reality nonetheless."

Micheli had similar sentiments. "Currently, Tua's injury has taken him out of the endorsement spotlight until he's recovered. Especially, given the severity of the injury, he's going to put all his energy into recovery," he said.

"Severe injuries can damage both career longevity and the athlete's pockets because they're not the hot topic right now."

We also talked about how the market for a student-athlete might shift after their playing days are over and they're out in the working world doing something outside their sport.

"Should a collegiate athlete not move forward in the sport post-college, it is likely that their media attention will diminish," said Farnsworth. "This could result in a lower overall social profile and consumer or fan attention."

Once the college athlete's career is over and they don't go pro, their marketability essentially goes away," said Micheli. "Endorsements will most likely become non-existent. They become old news unless they go pro or go into another career that would require them to keep up a social presence. There could be some anomalies or outliers to this, but for the most part, all is lost for them, unfortunately."

However, Farnsworth says it doesn't have to be the end of the rainbow. "Many could use their collegiate time as a launchpad to other successful opportunities. We see this all the time as certain players transition from their life in pro sports.

"For example, former NFL wide receiver Eric Decker gained prominence during his time in the league but has continued growing his stature online, now commanding a significant presence. He has grown an audience that is incredibly engaged and interested in his now post-NFL family life. We have partnered with Eric and saw incredible success."

Regardless of their star status, Stabulis says there's money for influencers at every level while they're still student-athletes.

https://www.forbes.com/sites/kristidosh/2019/11/25/marketers-bullish-on-monetization-opportunities-for-student-athletes-with-nil-rights/?sh=3846c5767aa4

"Because it's a niche market, we can expect influencers to be able to make about $250 to $1,000 per post, at these lower beginning following ranges. That will escalate as the athlete can reach more people through their social media outlets. This is the price per post for a brand looking strictly at reaching audiences or as part of an influencer marketing campaign."

"For endorsement deals that rely on paying for an athlete's name, likeness and deeper partnership or ambassadorship, we anticipate this higher," says Stabulis. "This is also where star performers, bound for professional sports leagues, may be offered more opportunity and more potential earnings."

Karwowski puts the average right now for college-age sports influencers at $200 to $5,000 per post, "depending on their followers, engagement and quality of content."

Micheli says a student-athlete at a Power 5 program with a following of over 25,000 could earn $2,000 to $4,000 per month between digital advertisements and local sponsorships. "For athletes who produce video content, their earnings can easily be in the six-figure range annually to start."

The marketers all agree brands are salivating over the opportunity to work with student-athletes.

"We're already hearing from our brands," says Karwowski. "They're chomping at the bit. We're also ramping up our talent recruitment efforts to make sure that athletes have the best possible representation and contracts as they're entering this space."

Stabulis agrees. "In 2018-2019 alone, our company has developed strategies for at least four to five brands targeting student-athletes, and we have been restricted due to the NCAA regulations," she says. "The demand is already

there, so we see potential for brands to move quickly to work with student-athletes."

Micheli adds the caveat that it's not just about the sport a student-athlete competes in, or their following; the most successful student athletes are going to be the ones who can develop platforms focused on their own unique personality.

"Brands will be salivating to work with some of the higher-profile athletes, especially when looking to market to a younger generation," says Micheli. "One major factor is the athlete has to have personality to be successful. Success on the court or field doesn't mean everything."

Karwowski agrees and gives an example of a college-aged athlete doing well.

"Some of the most successful sports influencers we've seen so far are those who also show their own personalities in their feeds. For example, Moaci Lopes (@moacilopes) is a college-aged surfer and skater, but his account with more than 100,000 followers is really focused on his style."

A quick look at his account reveals far more posts focused on travel and style than highlighting him actively competing in sports.

https://www.forbes.com/sites/kristidosh/2019/11/25/marketers-bullish-on-monetization-opportunities-for-student-athletes-with-nil-rights/?sh=3846c5767aa4



Instagram feed of Moaci Lopes

SCREENSHOT

His feed is in stark contrast to current student-athletes like Tagovailoa and Oregon women's basketball player Sabrina Ionescu, whose feeds are far more focused on their sport and regularly feature them in uniforms and other school gear in posts.

https://www.forbes.com/sites/kristidosh/2019/11/25/marketers-bullish-on-monetization-opportunities-for-student-athletes-with-nil-rights/?sh=3846c5767aa4



Sabrina Ionescu's Instagram feed

SCREENSHOT

Some athletic administrators I've spoken with have indicated student-athletes may not be granted the rights to use university intellectual property in sponsored posts, which would mean no uniforms or other gear with school logos. Asked if that would make a difference in their ability to monetize, most

https://www.forbes.com/sites/kristidosh/2019/11/25/marketers-bullish-on-monetization-opportunities-for-student-athletes-with-nil-rights/?sh=3846c5767aa4

marketers agreed it could have an impact but probably isn't a deal-breaker for most brands.

For higher-profile student-athletes who already have made a name for themselves, "absolutely not," says Micheli. "They could be doing endorsements across the country for a plethora of different types of brands, and people would undoubtedly know who they are. With regards to less-high-profile athletes, this would pose difficulty given they haven't built a strong personal brand and would be less recognized by the average person."

Stabulis says, "Not in our experience looking strictly from an influencer marketing perspective—but it would really depend on client expectations and whether they are focused on reaching a particular audience through influencer marketing or they are simply looking for an endorsement from a next big sports star."

"When the focus is on audience, brands tend to want access to either a local audience or audiences with shared interest to what the student is posting about, such as sports or training," she continues. "When brands look for an endorsement, they rely on the popularity and affiliations to help elevate the athlete across brand-owned marketing channels and public outlets."

Micheli says all the what-ifs make this an interesting turning point for college sports.

"This ruling will make the sports go one way or the other. Athletes might get too caught up with making money, or it might incentivize higher levels of competition and increase interest in the specific sports."

In the meantime, the NCAA and its participating institutions have much to think about beyond the basic issue of whether student-athletes should be able to monetize their name, image and likeness.

For example, will collaborations with brands in certain industries, such as marijuana or gambling, be banned? What about conflicts with existing deals entered into by athletic departments or universities? Who will be responsible for monitoring it all?

When insurance policies are taken out for loss of future earnings for student-athletes who are injured, will that include any loss in marketing revenue? Should athletic departments be responsible for educating student-athletes on contractual and financial issues surrounding the new marketplace for their rights? These are only a few of the questions that still need to be answered before the marketplace opens to student-athletes.

It's an interesting time, indeed.

*Follow me on* Twitter *or* LinkedIn. *Check out my* website *or some of my other work* here.



**Kristi Dosh**

# EXHIBITS 37-39
# SUBMITTED UNDER SEAL

# EXHIBIT 40

- HOME
- LEAGUES
- COLLEGE SPORTS

# MARCH MADNESS DAILY: THE NCAA'S BILLION-DOLLAR CASH COW



**BY EBEN NOVY-WILLIAMS**

March 26, 2022 9:00am



ICON SPORTSWIRE VIA AP IMAGES

**March Madness** can make or break careers for college basketball players and coaches, but no one has more on the line in these three weeks than the **NCAA** itself.

The governing body controls neither the College Football Playoff, nor any FBS bowl games, which means the annual men's basketball tournament is the end-all-be-all financially for the NCAA. The association made a record $1.16 billion in 2021 and more than 85% of that came from March Madness.

The biggest driver is the NCAA's long-term TV deals with **CBS** and **Turner Sports**, which will pay the Indianapolis-based organization up to $19.6 billion over the 22-year term. Payments escalate each year, with the NCAA set to receive $870 million this year should it deliver every game.



That *if*, once an afterthought, has taken on new meaning in the COVID-19 pandemic. The NCAA canceled the tournament in 2020, and later said it lost more than **$800 million** in revenue because of the decision. Last year's tournament was held entirely in Indiana in front of limited fans, which restricted ticket revenue and some sponsorship.



Insurance has helped offset some of those losses. The NCAA collected $270 million from a loss of revenue policy in 2020, and another $81 million last year. Its annual financial report, released in February, said that insurance was no longer available "given the changes to the marketplace due to COVID-19."

The NCAA distributes about 60% of its annual revenue back to its member schools and conferences. It's a **complex web** of payments, but the three biggest buckets are: scholarship grants, payments based on March Madness performance, and championship expenses. Those distributions aren't critical for a $200 million athletic department like Ohio State's, but they matter a lot more for nearby Wright State.



# EXHIBIT 41

**MEDIA**

# Big Ten officially agrees to new media deals with CBS, Fox, NBC

BY MICHAEL SMITH 8.18.2022



The new deals will provide the Big Ten with nearly a three-times increase starting with the 2023-24 season through FY 2029-30 GETTY IMAGES

The Big Ten has finalized media rights contracts with **CBS**, Fox and NBC that will total more than $8 billion over seven years, making it the most lucrative conference rights deal in the history of college athletics. The three deals combined will pay the conference over $1.1 billion per year and put the Big Ten's schools well ahead of their peers in revenue.

The conference in its previous media rights deals with Fox and **ESPN** was making $440 million per year, meaning the new deals will provide the Big Ten with nearly a three-times increase starting with the 2023-24 season and going through the 2029-30 fiscal year.

Fox has the premier package with 30-plus football games, while CBS and NBC will have 15-16 games each.

The most notable absence in this set of deals is ESPN, which had a 40-year relationship with the Big Ten, but couldn't come to terms with the conference

during the most recent negotiations. ESPN's current rights with the Big Ten go through 2022-23, however sources indicated there's a possibility that talks could re-open to bring ESPN back to the table for a smaller package of games than what they originally negotiated.

Even without ESPN, the Big Ten's new set of partners will provide a powerhouse lineup of college football on Saturdays in the fall. It will start with Fox's "Big Noon Saturday" at noon ET, followed by CBS' 3:30 p.m. window and NBC's new "Big Ten Saturday Night" game in prime time.

The Fox-CBS-NBC triumvirate will provide the Big Ten with an **NFL**-like lineup of games on over-the-air TV.

"The goal was to own each of these windows," said Big Ten Commissioner Kevin Warren, the former Vikings COO who used the NFL as a model for the Big Ten's own rights negotiations. "To capture the hearts and minds and the fan avidity, I think you've got to make it very simple for your fans. So, I always had this visual, especially coming out of the NFL, that we'd have partners in each one of those windows. And then we'd have some special events, like two games on Black Friday."

FS1 and **Big Ten Network** also will carry a heavy dose of college football across its airwaves.

Big Ten schools will benefit financially from the rights fees increases, but not right away. The conference has paid out right around $50 million per school under its current terms. That per-school average is not expected to change much in 2022-2023, the final year of the current deal.

| Key Power Five conference media-rights deals | | | | | |
|---|---|---|---|---|---|
| PROPERTY | MEDIA PARTNER(S) | YEARS | EXPIRES | TOTAL | AVG. VALUE |
| Big Ten (starts 2023) | Fox/NBC/CBS | 7 | 2030 | $8.05B | $1.15B |
| SEC/SEC Network (starts 2024) | ESPN | 10 | 2034 | $7.1B | $710M |
| College Football Playoff | ESPN | 12 | 2025-26 | $7.3B | $608.33M |
| Pac-12 | Fox/ESPN | 12 | 2024 | $3.0B | $250M |
| ACC | ESPN | 20 | 2036 | $4.8B | $240M |
| Big Ten | Fox | 6 | 2023 | $1.44B | $240M |
| Big 12 | Fox/ESPN | 13 | 2025 | $2.6B | $200M |
| Big Ten | ESPN | 6 | 2023 | $1.14B | $190M |

| SEC | CBS | 15 | 2023 | $825M | $55M |
|---|---|---|---|---|---|
| Notre Dame (football) | NBC | 10 | 2025 | $150M | $15M |
| Big Ten (basketball) | CBS | 6 | 2023 | $60M | $10M |

The first few years of the new deal, which kicks in during the 2023-24 year, has a slight slope, meaning revenues will increase gradually. Like many media rights deals that are backloaded like this one, the more drastic increases are in the second half of the deal.

With annual revenue reaching more than $1.1 billion, divided by 16 schools, including new additions **USC** and **UCLA** in 2024, the per-school payouts could reach $70 million or more.

That's well ahead of the other member of the Power Two in college athletics, the **SEC**, which distributed $55 million per school in fiscal 2021. The SEC also has an extended rights deal with ESPN for $300 million a year that will begin after the 2023 football season.

In addition to the football lineup, Warren added some pieces to the deals, like putting the women's basketball tournament championship on CBS for the first time.

"That's big," Warren said.

NBCUniversal's direct-to-consumer product, Peacock, will be the conference's streaming home. NBC's Saturday night games will simul-stream on Peacock and the service will have its own selection of eight games as well.

The conference will conduct a draft among the three networks to determine who gets which games.

Among the other unique elements in these deals, NBC has committed to a $100,000 advertising budget with each conference school to promote their academic missions. Warren said it's similar to **Notre Dame**'s "What would you fight for?" two-minute video series that runs on NBC during the Fighting Irish's football games.

The chief complication the Big Ten had to work through with CBS was its contractual commitment to the SEC for 3:30 p.m. games during the 2022 and 2023 seasons, meaning there is a one-year of overlap for CBS between the two leagues in 2023.

CBS will fulfill its SEC contract in 2023 before shifting over to the Big Ten in that window in 2024.

"That 3:30 window is the best showcase in college football," **CBS Sports** Chair Sean McManus said.

That juggling will leave CBS with a reduced package of seven Big Ten games for the 2023 season, compared to 14-15 games in subsequent seasons.

Those Big Ten games on CBS mostly will be games early in the season before its SEC schedule begins.

CBS's presentation of Big Ten games will look and sound like its SEC games, from the announcers to the music and overall production. Warren said the long-term benefit of having CBS as a partner was easily worth navigating the short-term conflict.

"I made up my mind early on that I was not going to put CBS in a position where they had to say no because they had to break the SEC contract," Warren said. "That wasn't the right thing to do. So, we just had to get creative. You've got a partner you're excited about and you don't want to lose that, so they're going to have half of a package in that first year."

NBC's football inventory will be 16 games per season in prime time.



The Big Ten's negotiations began soon after Commissioner Kevin Warren arrived in 2019 GETTY IMAGES

Fox's package will range from 24-27 games in 2023 to 30-32 games through the 2029 season. The network is coming off a banner season in which its "Big Noon Saturday" time slot was the most-watched window in all of college football with an average audience of 5.7 million viewers.

Fox, which has a deeper relationship with the Big Ten than other networks, has been in business with the conference since 2007 when they teamed up to form the Big Ten Network. Fox owns 61% of BTN now and Fox will take the majority of the football and men's basketball inventory as part of their new agreement.

Each of the three networks will have a Big Ten football championship game -- Fox will have four, CBS two and NBC one.

NBC's lineup on linear TV will tout Notre Dame in a 3:30 p.m. window, followed by the Big Ten game on Saturday night, providing the network with a hefty 1-2 college football punch.

NBC's longstanding relationship with Notre Dame also could create more matchups between the Fighting Irish and Big Ten schools, like Michigan, which has fallen off Notre Dame's schedule in recent years. The two rivals have played just twice since 2014 and aren't scheduled to play again until

2033.

NBC might be in a better position to facilitate some of those games, depending on how aggressive the Irish want to schedule in the future.

"To be able to create this lineup of games on linear channels -- the word that comes to mind is home run," said former Fox Sports President Bob Thompson, who now runs a media consultancy. "It's like the anti-streamer package.

"This is huge for all of these local stations. Then you've got the ability to promote and cross-promote these games across the channels.

"When you think about who the competitors will be to bid on the College Football Playoff, it used to be just ESPN and Fox. Now, with NBC a player and CBS still involved, who knows if they might go shopping for something else."



Fox has been in business with the Big Ten Conference since 2007 when they partnered to form the Big Ten Network**GETTY IMAGES**

The Big Ten's negotiations, which began soon after Warren arrived in 2019, finally ran its course last week when the commissioner made his presentation

to the conference's presidents and chancellors and athletic directors. They voted to approve last Friday.

"We are proud to expand upon our long-standing partnership with the Big Ten and further bolster our position as the premier rights holder of the conference," said Fox Sports CEO Eric Shanks. "Commissioner Warren's leadership and vision have resulted in the growth and recent market expansion of the Big Ten. In an ever-evolving landscape, the Big Ten remains the most storied collegiate athletic conference in the country."

"Working with Kevin Warren and his team on this deal was rewarding on both a personal and professional level," said NBC Sports Chair Pete Bevacqua in a statement through the network. "We are all excited to be partners with Kevin and the **Big Ten Conference** for these upcoming seven years, and hopefully, well beyond."

Warren, whose background in the NFL exposed him to some pretty complicated deals, such as construction of U.S. Bank Stadium in Minneapolis, called the Big Ten's talks "the most complex I've ever worked on. It was a combination of working with multiple parties and just the marketplace we're in now, with everything going on in college athletics. Over the course of negotiations, the Big Ten had to put things on hold because USC and UCLA applied to become members.

"We had already put expansion in the term sheets when USC and UCLA came along," Warren said. "We had been talking about expansion since I was hired in 2019. … But it truly was seven, eight, nine, 10 dimensional chess at all times. It was demanding spiritually, emotionally, physically and mentally. Starting around the first of this year, there was something to do literally every day on this."

Unlike most other commissioners, Warren didn't use a traditional media consultant. Instead, he relied on his legal background and a team of internal experts: Senior Vice President, Television, Kerry Kenny; General Counsel Anil Gollahalli; Deputy General Counsel Adam Neuman; Deputy Commissioner Diana Sabau; and CFO Laura Anderson.

Warren was comfortable with the staff he has built in the Big Ten's front office, not to mention the hundreds of thousands, maybe more, the conference saved by not hiring a consultant.

Another media expert, Len DeLuca, the former CBS, IMG and ESPN executive who now teaches at New York University's Stern College of Business, said the Big Ten benefitted from three major factors: the evolution of these mega-deals in college athletics; the structure of the deals that put games on over-the-air TV; and perhaps most importantly, timing. NBC and CBS both found themselves with needs and resources at a time when college football is flourishing.

"This was inevitable," DeLuca said. "This is the evolutionary process of college football reaching its next level. … The surprising piece for me has been NBC and the fact that they've been this active."

While the Big Ten did not hire a media expert in the traditional sense, Warren did lean on two consultants at times in the negotiations -- Proskauer's Joe Leccese and Endeavor's Karen Brodkin and Hillary Mandel..

# EXHIBIT 42

ABOUT        CHARTER      AFFILIATED FACULTY      BOARD MEMBERS      APPLY      SUPPORT
SYMPOSIUM



# Big Bucks, Big Buyouts: Public universities shell out millions of dollars firing coaches who didn't win enough

Arnolt Center and Investigate TV
September 19, 2022







Jill Riepenhoff and Lee Zurik, InvestigateTV

LAWRENCE, Kansas (InvestigateTV) – For many college football coaches, it pays to get fired.

Gus Malzhan received more than $21 million after Auburn sent him packing at the end of the 2020-21 season.

Two years removed from its 2019 national championship, LSU fired coach Ed Orgeron and paid him more than $16.1 million.

Arizona paid coach Kevin Sumlin $7.5 million in 2020 to leave after the football team lost to rival Arizona State 70-7.

And then there's Kansas, which fired five coaches between 2011 and 2020 even as the university faced budget deficits and academic cuts. The school gave those coaches and their staffs more than $27.8 million in severance payments.

As the 2022-23 football season begins, public universities are on the hook this year for more than a $1 billion in severance payments if all of their coaches let go, according to an InvestigateTV analysis of more than 100 head football coaches' contracts.

The majority of those coaches are likely not to be dismissed by their schools. But some will, as happens every year.

Last year, 21 head coaches were either fired or resigned because of performance issues. And schools shelled out more than $63.2 million to end their tenures.

This year, Nebraska's Scott Frost is the first casualty. The university parted company with Frost on Sept. 11 and will give him a $15 million parting gift. During his time at Nebraska, Frost amassed a included almost twice as many losses as wins. But if officials had waited until Oct. 1, Frost's buyout would have been cut in half, per the terms of his contract.

Each year, the football stakes are that much higher.

The buyouts are big because the annual compensation paid to coaches continues to rise.

Take the Big 10 for example.

Eager to keep Mel Tucker on the sidelines at Michigan State, donors last year agreed to help fund a 10-year, $95 million contract for him.

11.19.2021
**'We kind of have to pick if we're going to heal, or if we're going to get justice': Does IU's sexual assault investigatory process keep survivors from coming forward?**

05.21.2021
**Dead snakes and mice, toxic sludge: How pathogens go unnoticed in America's water towers**

Penn State quickly followed, locking down football coach James Franklin with a 10-year, $70 million deal.

This spring, Ohio State extended Ryan Day's contract this spring to make his annual salary – $9.5 million – match Tucker's. The day after, Ohio State announced that it was raising tuition.

*READ MORE: Big Ten schools spend millions clearing coaching rosters.*

Yet none of those coaches has won a national championship for their universities. But all, if dismissed, would walk away with 100% of what they would have been paid if they remained on the sidelines through the end of the contract.

Across the football spectrum, university presidents and trustees are signing off on these massive contracts.

05.17.2021

**Secret Subsidies: Payments to farms allowed to stretch far beyond rural America**

## University Buyouts and Football Contract

(Contracts current as of Sept. 14, 2022)

Use the search box to find specific schools, coaches or conferences. Sort a column by clicking on the title of the column.

Search...

| School | Nickname | State | Conference | Total Amount of Buyouts | Total Amount of Football Buyouts | Percer of Buy Spent Footba |
|---|---|---|---|---|---|---|
| Akron | Zips | Ohio | MAC | $1,043,833 | $1,043,833 | 100% |
| Alabama | Crimson Tide | Alabama | SEC | $18,234,734 | $5,657,208 | 31% |
| Appalachian State | Mountaineers | North Carolina | Sun Belt | $622,515 | $18,539 | 3% |
| Arizona | Wildcats | Arizona | PAC-12 | $8,959,630 | $8,959,630 | 100% |
| Arizona State | Sun Devils | Arizona | PAC-12 | $26,643,258 | $16,645,047 | 62% |
| Arkansas | Razorbacks | Arkansas | SEC | $21,683,894 | $15,259,624 | 70% |
| Arkansas State | Red Wolves | Arkansas | Sun Belt | $0 | $0 | |

State

| Auburn | Tigers | Alabama | SEC | $47,993,786 | $38,108,278 | 79% |
| Ball State | Cardinals | Indiana | MAC | $1,114,967 | $711,901 | 64% |
| Boise State | Broncos | Idaho | Mountain West | $0 | $0 | |

◄                                                ►

‹    | 1 | / 11    ›

Source: NCAA and Individual University Records • To tabulate total severance payments and football buyouts, InvestigateTV analyzed 17 years
financial data collected and maintained by the Knight-Newhouse College Athletics Database at Syracuse University. To estimate the buyout o
individual coaches, InvestigateTV filed public records requests with the 106 largest public universities that are members of the Football Bowl
Division I athletics analyzed each of their contracts.
Arkansas, Georgia, Hawaii, Oklahoma, and Troy did not provide the public documents, as requested. Clemson and Mississippi State signed th
coaches to new contracts in September and did not make those immediately available. Nebraska terminated its coach on Sept. 11, 2022, and
of the contract is eligible to receive $15 million. For each coach, the buyout amount is based on a termination date of Dec. 31. The buyout am
an estimate because the actual payout depend on the date the coach was terminated. The amount shown in the data is the minimum
that would be paid. Data Visualization: Jamie Grey and Jalen Wade, InvestigateTV

☀ A Flourish data visualization

## Institutions are throwing money away'

InvestigateTV analyzed the Knight-Newhouse College
Athletics Database at Syracuse University for the 235 public
universities that play Division I athletics. The data comes from
financial data reported to the NCAA annually and collected by
Syracuse.

Since the fall of 2004, Division I public universities have paid
out more than $1.1 billion – or $1.3 billion in today's dollars
due to inflation – to hundreds of coaches in every sport who
were let go, largely, because their teams did not win enough.

"It's obvious that institutions are throwing money away that
could be used to, you know, enhance the education, health,
safety and well-being of student athletes," said Len Elmore, a
former star basketball player at the University of Maryland
and a member of the Knight Commission on Intercollegiate
Athletics, a group that tries to rein in spending on college
sports.

That $1.1 billion, for example, could pay for nearly every
undergraduate and graduate student enrolled at Auburn to

attend that school for a year for free.

And, a majority of that money – 75% of it – has gone into the pockets of football coaches who played in the Football Bowl Subdivision of Division I athletics. The FBS includes schools that make up the five power conferences – ACC, SEC, Big 10, Big 12 and the PAC-12; Notre Dame and schools that belong to the lower profile conferences, such as the MAC and Sun Belt.

Among those schools, athletics is big bucks, with expenses topping more than $133 billion, or $162.5 in today's dollars, over the last 17 years. That's enough to cover for a year the entire university budget for 102 schools with the highest academic expenses.

Most of those athletic departments rely on infusions of funding from the university itself and students to make ends meet.

"A lot of parents don't realize; they just see your tuition and fees," said B. David Ridpath, an Ohio University professor who teaches sports business and a member of The Drake Group, another group that is critical of big-time athletic spending. "Fees have increased, according to research I've done, at a rate almost 14% faster than tuition."

Other key takeaways from the Knight-Newhouse data include:

- That students through mandatory fees have paid more than $16.8 billion dollars – or $20.6 billion when adjusted for inflation – to their athletic departments. Of the 113 public FBS schools, only 17 – eight of which are members of the Big 10 – have never taken student fees for athletics.
- That the universities have contributed more than $17.8 billion – or $21.6 billion in today's dollars – to athletic department budgets. Only six universities have not kicked money into athletic departments: Georgia, LSU, Nebraska, North Carolina, Oklahoma, Penn State.
- That only three schools have never subsidized its athletic department budgets with student fees and university subsidies: LSU, Nebraska and Penn State.
- That among the FBS schools, only seven have never made a severance payment to a football coach – Arkansas State, Boise State, Northern Illinois, Ohio University, Oklahoma State, South Alabama, and Toledo. Arkansas State and Boise State are the only two FBS schools that haven't ever bought out a coach in any sport.

**The price of chasing championships isn't cheap**

The largest buyouts belong to the blue bloods of big-time athletics. They have a history – and an expectation – to win a lot.

But some also are quick to move to the next coach when losses mount.

Since 2004, the five largest total severance payments paid out for coaches in all sports belong to the following universities:

- Auburn: $48 million (actual), $56.6 million inflation adjusted
- Tennessee: $42.5 million (actual), $51.6 million inflation adjusted
- Nebraska: $39.8 million (actual), $47.2 million inflation adjusted
- Kansas $34.9 million (actual), $41.2 million inflation adjusted
- Texas: $32.8 million (actual), $37.1 million inflation adjusted

But Kansas stands out because 80% of those severance payments have gone to the five football coaches and their staffs who were fired over a 12-year-period.



Since 2010, the athletic department has paid out more than $27.8 million to part ways with Mark Mangino, Turner Gill, Charlie Weis, David Beatty and Les Miles.

"It's startling," said Shawn Leigh Alexander, an African American studies professor who has been at the university for 15 years and is a sports fan. "We have gone after these big names . . . and none of them have been here for more than two years. It's been a failure. It's been an absolute failure."

Kansas is chasing football glory despite the fact that the Jayhawks have finished in the AP top 25 only once since the 2000 season. It hasn't won a conference championship since 1968.

Kansas athletic director Travis Goff told the University Senate earlier this year that the school needs a successful football program.

According to a Feb. 3 article in KUsports.com, Goff said the likely reduction in conference revenue when Oklahoma and Texas defect to the SEC in 2023 makes it more critical than ever for KU to be successful both on the field and financially.

"It is not a surprise to anyone that we have been an underperforming program in the way of wins and losses, and certainly we have been an underperforming program as it relates to financial viability," Goff said. "To me the takeaway is exceptional opportunity. I really believe in the world of this level of intercollegiate athletics that the University of Kansas has more upside, certainly as much upside as anyone out there, because of the potential within that program."

In men's basketball, Kansas is a powerhouse, with six national championships. Its coach, Bill Self, has reigned on the Jayhawks court for 19 years.

But Kansas football generates far greater income – more than $40 million – than men's basketball, which brings in about $16 million.

In the meantime, on Kansas' academic side, the university has faced deficits and cuts.

After winning just three games in two years, Kansas sent away Les Miles with nearly a $2 million check. It came on the heels of an $11 million budget cut to the university.

"So morale at the university is already absolutely dismal," Alexander said. "And one person is getting paid ($2) million."

In addition, the athletic department has relied on more than $41 million in student fees and university subsidies as part of

its revenue stream since 2004.

"The image that we talk about, as we started with that the KU Athletics in the University of Kansas are two separate entities, but they're not. They're tied, sometimes by very loose strings, but they are tied," Alexander said.

**It's a revolving door of football coaches at some schools**

But it's not just Kansas chasing the football glory.

Since 2004, UCLA has had three top 25 finishes and seven coaches. The coaching carousel has cost the school more than $15.4 million.

Arizona State and South Carolina each have ended the past two decades of football with finishes in the top 25 only four times.

Both schools have had four different coaches. Arizona State has paid more than $16.6 million to its fired football coaches while South Carolina has paid more than $17.8

Auburn, Florida and Florida State are frequent residents of the top rankings – all own at least one national championship since 2000. But that hasn't been enough to keep their coaches on the sidelines.

Auburn and Florida State have had four coaching changes since 2000.

Florida has had six.

The price tag has been hefty. Auburn has spent $38.1 million on fired football coaches; Florida: $24.6 million and Florida State: $21.3 million.

"It's almost like a revolving door, you have some coaches who are collecting, you know, checks from two and three schools, simply because they believe that. . .these coaches were the Messiah," said Elmore, of the Knight Commission.

Gus Malzahn is an example. After receiving $21 million from Auburn, he now collects $2.3 million a year from Central Florida as its football coach.

At the big-name schools, coaches typically are paid a few hundred thousand dollars as a university employee. The

millions of dollars added to their total compensation come from media rights and apparel deals.

Alabama's Nick Saban signed a contract last month, that pays him this year $305,000 as a university employee and another $9.6 million from those outside sources.

He was the highest paid coach among the public FBS schools until Clemson gave Dabo Swinney a raise in early September, giving him $10.5 million a year, illustrating the arm's race.

With six national championships on his resume, it's highly unlikely that Alabama would fire Saban. His buyout clause is worth more than $46.3 million this year.

At least a dozen coaches have buyouts that exceed $25 million this year – outpacing the record amount given to Auburn's Malzahn – including:

- Texas A&M's Jimbo Fisher ($86 million)
- LSU's Brian Kelly ($77.4 million)
- Cincinnati's Luke Fickell ($35 million)

Since 2004, Central Michigan, Georgia Southern and Tennessee each have seen eight coaching changes, the highest turnover in the FBS.

But the amount they have paid in severance payments to football coaches shows the difference between the Haves – schools in the ACC, Big 10, Big 12, SEC and PAC-10 – and the Have Nots.

Central Michigan, a member of the MAC, has spent $1.3 million on buyouts.

Georgia Southern, which plays in the Sun Belt conference, has only paid out $210,000.

But Tennessee, which plays in the SEC, has written checks totaling $26.6 million.

**Change is needed to reform out-of-control spending**

Len Elmore, David Ridpath and Kansas professor Alexander all agree that reforms are necessary.

But each has a different take.

The Knight Commission, of which Elmore is a member, sees a benefit in separating the Haves and Have Nots, where the super-rich schools form a new division or alliance to play amongst themselves.

"The idea of super conferences and the realignment that we're seeing, you know, just further illustrates the need for those big conferences, super conferences, to kind of separate themselves from a football standpoint, so that they can find rules and legislation that applies to them, because of their unique situation," Elmore said. "This is not the first time that the NCAA could go through a transformation in that regard."

It happened before in the 1970s when the NCAA split athletics into three divisions. "Many of the reasons why that split occurred is to align institutions with the similar interests, align them together and allow them to legislate in ways that fit their needs," he said.

Ridpath agrees. Ohio University is never going to be on the same equal financial footing as Ohio State.

But he believes it's time for Congress to step in and mandate that the football coach may be paid only $1 more than the highest paid university employee.

But in a place like Ohio State, that means a coach still could be a multimillionaire because some doctors on the staff make millions, themselves., he said.

For example, if the highest paid Ohio State employee makes $3 million, then coach Ryan day would be paid $3,000,001.

Professor Alexander believes that athletic departments should be pushing their donors to also provide to the academic side when they are writing their checks for sports.

But as the debate continues, the buyout clauses in football coaches' contracts continue to grow.

Numerous coaches have been offered extensions over the past two years that have ballooned severance clauses.

Tom Allen at Indiana would receive $14.5 million if he were fired on or before Nov. 30 then $7.7 million after that date.

Bret Bielema at Illinois would receive $10.1 million and Dana Holgorsen at Houston would get $$18.8 million.

"Wow. . . you would hope that those buyouts would maybe dissuade somebody from firing a coach to be like, well, you don't want to pay this buyout, but it doesn't seem to hinder that at all," Ridpath said. "It's pretty crazy stuff."

Kansas, perhaps, learned that lesson. Coach Lance Leipold won only a single game last season. But earlier this month, his contract was extended until 2027.

And back at Auburn, fans are getting antsy. Malzahn's replacement, Bryan Harsin, only won six games last season. Should he be sidelined this year, Auburn will owe him $14.3 million.

It's big bucks for big buyouts in search of gridiron glory.

*Research and data collection contributors are InvestigateTV associate producers Conner Hendricks, Payton Romans and Jalen Wade, and students from the Arnolt Center for Investigative Journalism at Indiana University. They are: Carly Demas, Noah Harrison, Mary Claire Molloy, Logan Skirm, Mia Stewart, Kayan Tara, Mitchell Tiedman, Rachel Van Voorhis, Lucy West and Lauren Winnefeld.*



**Arnolt Center for Investigative Journalism** | The Media School at Indiana University



Accessibility | Privacy Notice | Copyright © 2022 The Trustees of Indiana University

# EXHIBIT 43

**BIG 12 NEWS**

# Bob Bowlsby: The 'Sky Didn't Fall' on NIL Day on July 1



By Matthew Postins

Posted on July 14, 2021



Big 12 Commissioner Bob Bowlsby was happy to let everyone know that the "sky didn't fall" when NCAA players were free to start selling their brand via NIL (name, image and likeness) on July 1.

During Wednesday's state of the conference discussion, Bowlsby ranked Name, Image and Likeness as one of the top three issues that he's dealing with from a competition standpoint. Fourteen days in, Bowlsby noted that while the ride has been a bit choppy, it's hasn't been as if the rug has been pulled out from under college sports, either.

https://www.heartlandcollegesports.com/2021/07/14/bob-bowlsby-the-sky-didnt-fall-on-nil-day-on-july-1/

"There was a commonly-held misperception that the sky was going to fall on July 1 and we would be in some sort of Armageddon scenario," Bowlsby said. "That hasn't happened. Some things have occurred that raised eyebrows. But by and large schools are managing it well."

Now that's part of the landscape, Bowlsby wants some consistency to how it will work across the country, though he knows that is going to take some time.

"We have to live with the confusion for a while," Bowlsby said. "I couldn't tell you what conduit we'll have to follow to resolve it, whether it be state, federal or NCAA (legislation). We'll get to something other than a 50-state patchwork eventually."

READ MORE: **Top Five Storylines to Watch at 2021 Big 12 Media Days**
READ MORE: **HCS Mailbag: Bijan Robinson Hype, Big 12 Statistical Leaders and Iowa State Fans Dreaming**

NIL is now a part of the college sports landscape, whether the NCAA, athletic directors and coaches like it or not. The final trigger was a Supreme Court ruling and concurrent opinion in June. **The Court ruled unanimously in the Alston vs. NCAA** case that colleges could no longer bar colleges from providing student-athletes with education-related benefits.

That same day, Supreme Court Justice Brett Kavanaugh wrote a concurrent opinion in which he blasted the NCAA's current model for NIL as it relates to student-athletes, **writing that the NCAA isn't 'above the law.'**

**NCAA president Mark Emmert** had been pushing somewhat tepidly for nationwide language on NIL by July 1, which was the date that several states had their own statewide NIL legislation that would take effect. Emmert even went to the U.S. Congress to lobby for legislation, and while there are bills under consideration, none are being imminently considered.

**On June 30, the NCAA Board of Governors** approved the suspension of the organization's rules surrounding athletes selling their NIL rights. Ordinarily, that would be

https://www.heartlandcollegesports.com/2021/07/14/bob-bowlsby-the-sky-didnt-fall-on-nil-day-on-july-1/

an NCAA violation. For now, student-athletes can sell their NIL rights the same way that a pro athlete can. Many college athletes have already been cashing in.

*You can find Matthew Postins on Twitter @PostinsPostcard.*

https://www.heartlandcollegesports.com/2021/07/14/bob-bowlsby-the-sky-didnt-fall-on-nil-day-on-july-1/

# EXHIBIT 44

# SBJ College: Stakeholders give their take on start to NIL

By Michael Smith
July 13, 2021

We're a dozen days into the name, image and likeness era and predictions of the college space turning into the Wild, Wild West seem overblown. Has it been perfectly orderly? No, but we're talking about the birth of a new college athletes' marketplace. It's not going to be perfect in the first two weeks.

## Outlook on start to NIL varies among some stakeholders

I asked three industry leaders to give me their take on the NIL era so far, now that deals are getting done and athletes are getting paid. Here's what they said:

**Dan Butterly, commissioner, Big West Conference**: "A lot of people were wondering if there was going to be mass chaos in the system. I don't think there's been any chaos at all. I think it's been really positive for the students. They've gone out and looked at their marketability and found what opportunities exist for them. Ultimately, this is going to improve the student-athlete experience."

**Casey Schwab, CEO, Altius Sports Partners**: "It's actually more important to see how this plays out over the next 6-12 months. The schools that have prepared in a long-term way will benefit. It's going to hurt the ones who were just trying to get to July 1 and survive."

**Ishveen Anand, CEO, OpenSponsorship**: "Very few athletes have a social media presence that justifies paying them in the thousands. On our platform, 833 athletes have a following that is 1 to 5,000 followers. I probably did not realize how small these athletes were, in terms of social. The value for brands is going to be in the scale, working with 20 or 30 athletes to get the kind of reach they're looking for."

# Best of the best from around the NIL world

Here are my three biggest takeaways now that we're almost two weeks into NIL:

**Biggest winner**: The easy answer is the <u>Cavinder twins from Fresno State</u>, but I would go deeper and say sports and entertainment attorney Darren Heitner. From the wee hours in the morning of July 1, Heitner looked like the most prepared and best educated among all of the NIL experts. Granted, he essentially wrote Florida's state law on NIL, but it was clear that he had a plan to win July 1 -- and he did.

**Most buzz**: College insiders are still talking about Miami booster Dan Lambert's <u>plan to pay 90 Hurricanes football players</u> $6,000 apiece. The most common reaction: How's it OK for him to pay every player on the team when state law forbids pay for play? But Lambert and his attorney have a plan to engage the players with appearances and social media outreach. By the way, Heitner is his attorney.

**Best campaign**: Degree deodorant's #BreakingLimits team is everything good about NIL. It <u>uses a diverse group of 14 male and female athletes</u> from a variety of sports. Kudos to the Unilever brand and its agency, Mindshare.

# Florida confirms it has cut ties with Opendorse

Following up on a story from a few days ago, Florida has severed its business relationship with Opendorse. The Gators were using Opendorse for its educational and brand-building expertise within the school's Gator Made NIL program.

The news <u>first broke on Forbes</u> that the Gators were parting ways with Opendorse, but the story also quoted Opendorse CEO Blake Lawrence as saying emphatically that the relationship with Florida was "alive and well." That turned out not to be the case. Florida officials confirmed to SBJ today that it was no longer in business with the agency.



# Speed reads

- A new partnership between JMI Sports and OpenSponsorship will provide existing corporate sponsors with an established marketplace where they can seek out athlete deals. Here's the story SBJ broke this afternoon.

- My colleague Bret McCormick this week went in-depth on sports architecture and identified some next-gen features being rolled into those venues. Among the buildings identified were Idaho Central Credit Union Arena, which is the Univ. of Idaho's $51 million basketball arena, practice facility and special events center opening this fall. The venue, designed by Opsis Architecture, is made of mass timber harvested from an experimental forest that's maintained by the school's College of Natural Resources.

- The Class AAA Lehigh Valley IronPigs have signed an endorsement deal with Lehigh Univ. softball player Carley Barjaktarovich, and the minor league ballclub says it is a first in pro sports since the NCAA's decision to allow college athletes to accept NIL deals, reports the Easton Express-Times. In addition to appearances, she'll work with the team on initiatives including social media and merchandise.

- Wallaroo Media founder Brandon Doyle tweeted that his paid ads/SEO services firm became the first official sponsor of the BYU football team

through a deal via Utah-based NIL agency Ohana Experience. Doyle:
"We donated $20,000 to the players (and now have over 100 signed)."

- USC has renewed its relationship with Paciolan to deliver mobile
  ticketing, marketing, fundraising and analytics solutions for university
  and athletics events.

- Israel-based automated video solutions provider Pixellot named former
  Learfield IMG College President & CEO Greg Brown to its board.
  Pixellot last week struck a deal with MLB to film, produce and broadcast
  games from the Appalachian League and newly created Draft League.
  The company also has deals with Real Madrid, ESPN, FC Barcelona
  and Bayern Munich.

- This week's SBJ editorial cartoon took a tongue-in-cheek look at the
  rollout of NIL in the college space.



# EXHIBIT 45
# SUBMITTED UNDER SEAL

# EXHIBIT 46

**College Sports**

# NIL hasn't made a difference for most in enjoyment of college sports, poll finds

By Emily Giambalvo, Scott Clement and Emily Guskin
June 30, 2022 at 10:00 a.m. EDT



A Washington Post-University of Maryland poll finds that of the Americans who have heard at all about NIL agreements, the majority (60 percent) say it "hasn't made a difference" in their enjoyment of college sports. (Brynn Anderson/AP)

Share

In this new landscape of college sports, Ohio State football coach Ryan Day told local business leaders his team needed $13 million to keep its talent-packed Big Ten roster intact. Two of his coaching peers in the mighty SEC, Texas A&M's Jimbo Fisher and Alabama's Nick Saban, engaged in a public spat after Saban accused the Aggies of effectively buying players. And the recruitment of stars has been at times cast as a bidding war between top donors from rival schools.

It's a new era for the NCAA and its member schools, which have long held on to the notion that college athletes are amateurs who should not be paid for their participation in sports or lured by financial incentives to certain programs. But since July 2021, when the NCAA started allowing athletes to make money through name, image and likeness (NIL) deals,

https://www.washingtonpost.com/sports/2022/06/30/nil-college-sports-fans-poll/

questions and controversies have abounded — mostly because large paychecks for a sliver of top athletes blur the line between what's permitted and prohibited under NCAA rules.

Inside athletic departments and among the most avid fans, high-profile NIL agreements have turned into eye-catching headlines that seem to indicate a dramatic shift in how college sports operate. Outside that insulated bubble on college campuses, however, the rule change has been met more with indifference, according to a Washington Post-University of Maryland poll.

### Miami's billionaire booster defends his big-dollar NIL deals

About half of Americans (48 percent) have heard "a lot" or "some" about the NCAA's decision last year to allow college athletes to be paid when their name or image is used commercially, such as in video games or to sell merchandise. Among those who have heard about these NIL agreements, the majority (60 percent) say it "hasn't made a difference" in their enjoyment of college sports. For those who say the rule change has made a difference, more than twice as many say it had a "positive impact" (28 percent) than a "negative impact" (11 percent).



**Few say paying college athletes for name and image usage has hurt their enjoyment of sports**

Q: Do you think paying college athletes when their names and images are used commercially has had a positive impact on your enjoyment of college sports, a negative impact, or hasn't it made a difference? (Among adults who heard a lot/some/not much about changes)

| | |
|---|---|
| Positive impact | 28% |
| Negative impact | 11 |
| **Hasn't made a difference** | **60** |

"No opinion" not shown

Source: May 4-17, 2022, Washington Post-UMD poll of 1,503 U.S. adults with an error margin of +/- 3 percentage points. Conducted with UMD's Center for Democracy and Civic Engagement and Shirley Povich Center for Sports Journalism.

SCOTT CLEMENT / THE WASHINGTON POST

The change is particularly popular among Black Americans who have heard about it, with 53 percent saying payments for athletes have had a positive impact on their enjoyment. The change is also relatively popular among Hispanic and younger adults who have heard about the change, with more than 4 in 10 of each group saying it has made college sports more enjoyable.

https://www.washingtonpost.com/sports/2022/06/30/nil-college-sports-fans-poll/



**Black, Hispanic and younger adults more likely to say athlete compensation has made college sports more enjoyable**

Percent who say paying college athletes when their names and images are used commercially has had a positive impact on their enjoyment of college sports (Among adults who heard a lot/some/not much about changes)

| | |
|---|---|
| Total | 28% |
| **Black** | 53 |
| **Hispanic** | 44 |
| White | 19 |
| **Age 18-39** | 42 |
| Age 40-64 | 24 |
| Age 65+ | 16 |

Source: Source: May 4-17, 2022, Washington Post-UMD poll of 1,503 U.S. adults with an error margin of +/- 3 percentage points; error margin is larger for subroups. Conducted with UMD's Center for Democracy and Civic Engagement and Shirley Povich Center for Sports Journalism.

SCOTT CLEMENT / THE WASHINGTON POST

*Read full Washington Post-University of Maryland poll results*

Athletic directors still worry, mostly because of the high-value deals that can appear to be recruiting inducements or pay-for-play agreements — a scene administrators would describe as chaotic and in need of uniform standards. States have uneven laws related to NIL deals for college athletes, including whether schools can be involved in the arrangements. The NCAA has a policy intended to guide athletes and schools, but the governing body has yet to firmly enforce those rules.

The NCAA is "asking questions. That's about it right now," said Tom McMillen, the president and chief executive of Lead1, an association that represents Football Bowl Subdivision athletic directors. "So if you're an AD, you're sitting there saying: 'How far do I push the envelope? If I don't push it enough, I'm going to fall behind. If I push it too far, I don't want to be the test case for enforcement here.' It's a dicey environment."

When the NCAA abandoned its long-standing belief that athletes should not profit off NIL deals, the organization announced a policy that sought to avoid a pay-for-play model and recruiting inducements. All deals needed to be a quid pro quo — the athlete provides a service for an entity and in return receives payment.

"I would say all three of those have been honored in the breach over the last year," said McMillen, a former congressman who played 11 years in the NBA after his college career at the University of Maryland. He compared the NCAA's rules to laws that prohibit jaywalking. "No one is prosecuting jaywalking," he said, "but it's occurring every day."

Why does this possible rule-breaking matter? McMillen said: "I do think that college sports has to have a vision, and the vision has to be that it has to be tied to the academy, to the university." Athletic directors "want to give athletes NIL," McMillen said, "but they do not want to turn into mirror images of the NFL and the NBA."

McMillen thinks fans would care about the long-term ramifications of a model that professionalizes college sports, which, he said, could include cutting other programs.



Oklahoma softball star Jocelyn Alo is one of many players who has benefited from name, image and likeness rules. (Sue Ogrocki/AP)

But one year into this NIL era, fans' enjoyment of college sports hasn't seemed to change. Even though Timothy Crawford, a 39-year-old in Dallas, believes college athletes should focus on their education rather than making money, the NIL rules haven't affected his perception of the games. He could envision that changing if money-focused athletes led to a worse product on the court, but that hasn't happened yet.

"It's not something I really think about," said 46-year-old Melissa Farenish, a self-described casual sports fan who lives in Central Pennsylvania and follows Bucknell basketball. "When

you go to a sports game or you're watching it on TV, you're watching it simply for the enjoyment of the game, so I don't really think about [NIL payments]."

Brett Zaniewski, a 25-year-old in New York City and avid sports fan, wrote an opinion essay during high school about how college athletes who generate millions of dollars for schools should receive more than scholarships in return.

"Now that there's at least some ability to capture what the market deems is fair for them to make, [it] helps me appreciate [college sports] a little bit more," said Zaniewski, a North Carolina basketball fan.

None of them mentioned the chaotic, unregulated scene that prompts worry among administrators. Lead1 surveyed FBS athletic directors and found that most are concerned that NIL payments from collectives — the third-party entities of donors who broker deals with athletes — are being used as improper recruiting inducements. But those deals can be hard to regulate because it's tricky to define the fair market value for a player's service.

McMillen envisions a future with what he describes as "Super NIL," which could allow athletes to earn some money off television rights agreements and through group licensing deals without them becoming employees.

"I think there's a way to give college athletes more money," he said, "but do it based upon their name, image and likeness."

### Most Americans support gender equity in sports scholarships, poll finds

A 2017 poll conducted by The Washington Post and the University of Massachusetts Lowell found 66 percent of Americans were in favor of college athletes profiting if their image or likeness is used through the sale of merchandise. Athletic directors are also happy with their athletes having this opportunity, McMillen said. Many NIL deals are in alignment with how the NCAA envisioned these new rules unfolding: Olympian Sunisa Lee, now competing at Auburn, appeared in a Gatorade commercial. A regional pizza chain featured standout Maryland wide receiver Dontay Demus Jr. in a social media advertisement.

College sports administrators want to rein in the deals on the extreme end of the spectrum. The NCAA issued guidance in May reiterating that NIL deals should adhere to the governing body's rules related to recruiting and pay-for-play, referencing those collectives and how boosters are not allowed to be involved in the recruiting process. But publicly reciting the policy doesn't guarantee sudden change.

"The cows are out of the barn here," McMillen said. "Trying to put them back in is pretty difficult."

The poll was conducted online May 4-17, 2022, among a random national sample of 1,503 adults by The Washington Post and the University of Maryland's Shirley Povich Center for Sports Journalism and Center for Democracy and Civic Engagement. The sample was drawn

through SSRS's Opinion Panel, an ongoing survey panel recruited through random sampling of U.S. households. Overall results have a margin of sampling error of plus- or minus-3 percentage points.

# EXHIBITS 47-53
# SUBMITTED UNDER SEAL

# EXHIBIT 54



**Interim Name, Image and Likeness Policy**
**Guidance Regarding Third Party Involvement**

<u>Background</u>.

Effective July 1, 2021, the National Collegiate Athletic Association (NCAA) adopted the Interim Name, Image and Likeness (NIL) Policy allowing NCAA student-athletes the opportunity to benefit from their NIL. The NCAA Division I Council Working Group on Name, Image and Likeness recognizes that many student-athletes are benefiting positively from NIL opportunities consistent with the Interim NIL Policy. The working group believes 10 months into the new NIL environment is an appropriate time to review the emerging NIL environment and whether NIL activities are impacting school choice and transfer, particularly relating to the involvement of individuals and entities that promote or support a specific institution.

As noted in the NCAA Division I Board of Directors' charge, the expectation of the membership and representatives of their athletics interests is that they are abiding by current NCAA rules regarding recruiting and pay-for-play. In order to reinforce key principles of fairness and integrity across the NCAA and maintain rules prohibiting improper recruiting inducements and pay-for-play, the working group offers the guidance below on how current NCAA legislation applies to the NIL environment, specifically to third parties involved in the recruiting process.

<u>Third Parties Defined as Boosters</u>.

As a starting point, it is important to understand how a representative of athletics interests (booster) is defined by NCAA legislation. A **booster** is, in part, defined as an individual, independent agency, corporate entity (e.g., apparel or equipment manufacturer) or other organization who is known (or who should have been known) by a member of the institution's executive or athletics administration to have participated in or to be a member of an agency or organization promoting the institution's intercollegiate athletics program or to assist or to have assisted in providing benefits to enrolled student-athletes or their family members.

**It appears that the overall mission of many, if not all, of the <u>above-referenced third party entities is to</u> promote and support a specific NCAA institution by making available NIL opportunities to prospective student-athletes (PSA) and student-athletes (SAs) of a particular institution, thereby <u>triggering the definition of a booster</u>.**

With this in mind, NCAA rules related to the involvement of boosters in recruiting activities remain relevant to the Interim NIL Policy. Specifically, NCAA rules preclude boosters from engaging in recruiting activities, including recruiting conversations, on behalf of a school. Further, NCAA recruiting rules preclude boosters from providing benefits to PSAs and preclude institutional staff members from being involved, directly or indirectly, with the provision of benefits to a PSA. Finally, it is important to note that existing NCAA prohibitions related to pay-for-play have not changed as a result of the Interim NIL Policy.

<u>Guidance Related to Prospective Student-Athletes</u>.

- Recruiting conversations between an individual or entity that has triggered booster status ("booster/NIL entity") and a PSA are **<u>not</u>** permissible.

Interim NIL Policy - Guidance Regarding
  Third Party Involvement
Page No. 2
_____

- Booster/NIL entity may **not** communicate (e.g., call, text, direct message) with a PSA, a PSA's family, or others affiliated with the PSA for a recruiting purpose or to encourage the PSA's enrollment at a particular institution.

- An NIL agreement between a PSA and a booster/NIL entity may **not** be guaranteed or promised contingent on initial or continuing enrollment at a particular institution.

- Institutional coaches and staff may **not** organize, facilitate or arrange a meeting between a booster/NIL entity and a PSA (e.g., *provide the individual or entity with a recruiting list or watch list, including the NCAA Transfer Portal*).

- Institutional coaches and staff may **not** communicate directly or indirectly with a PSA on behalf of a booster/NIL entity.

- *NIL agreements **must** be based on an independent, case-by-case analysis of the value that each athlete brings to an NIL agreement as opposed* to providing compensation or incentives for enrollment decisions (e.g., signing a letter of intent or transferring), athletic performance (e.g., points scored, minutes played, winning a contest), achievement (e.g., starting position, award winner) or membership on a team (e.g., being on roster).

**Guidance Related to Current Student-Athletes.**

- An NIL agreement between a SA and a booster/NIL entity may **not** be guaranteed or promised contingent on initial or continuing enrollment at a particular institution.

- *NIL agreements **must** be based on an independent, case-by-case analysis of the value that each athlete brings to an NIL agreement as opposed* to providing compensation or incentives for enrollment decisions (e.g., signing a letter of intent or transferring), athletic performance (e.g., points scored, minutes played, winning a contest), achievement (e.g., starting position, award winner) or membership on a team.

A nonexhaustive list of relevant NCAA Division I legislation is provided below.

**Applicable NCAA Division I Legislation.**

- Athletics department staff members are prohibited from representing a prospective student-athlete (PSA) or enrolled student-athlete (SA) in marketing their athletics ability or reputation. (NCAA Bylaw 11.1.3 – Representing Individuals in Marketing Athletics Ability/Reputation)

- Before a PSA signs a National Letter of Intent (NLI) or written offer of admission and/or financial aid or before the institution receives a financial deposit, an institution may comment publicly only to the extent of confirming its recruitment of the PSA. (Bylaw 13.10 – Publicity)

Interim NIL Policy - Guidance Regarding
  Third Party Involvement
Page No. 3
_____

- Boosters may not engage in recruiting activities, including recruiting conversations, on behalf of a school. (Bylaw 13.1.2.1 – Permissible Recruiters)

- Recruiting is defined as "any solicitation of a PSA or a PSA's family members by an institutional staff member or by a booster for the purpose of securing the PSA's enrollment and ultimate participation in the institution's intercollegiate athletics program." (Bylaw 13.02.14 – Definition of Recruiting)

- Boosters may not be involved in making arrangements for or giving or offering to give any financial aid or other benefits to a PSA. Receipt of a benefit by a PSA is not a violation if the same benefit is generally available to the institution's prospective students. (Bylaw 13.2.1 – Offers and Inducements)

- Athletics participation for pay and payment based on performance or given on an incentive basis are prohibited. (Bylaws 12.1.2, 12.1.2.1.4.1 and 12.1.2.1.5 – Athletics Eligibility)

- Institutions are held responsible for any impermissible recruiting activities engaged in by a representative of athletics interest. (NCAA Constitution 2.1.2 and 2.8.1, and Bylaw 13.01.2 – Institutional Responsibility)

*Disclaimer: This guidance is subject to state NIL laws or executive actions with the force of law in effect.

# EXHIBIT 55

**Top 10 Football Coach Severance Buyouts**

| | |
|---|---|
| **1.  Gus Malzahn**<br> | $21.45 million buyout after he was fired from Auburn in 2021[1] |
| **2.  Ed Orgeron**<br> | $16.949 million buyout after fired from LSU[2] |
| **3.  Scott Frost**<br> | $15 million buyout after fired from University of Nebraska[3] |
| **4.  Will Muschamp** | $12.9 million buyout after fired from University of South Carolina[4] |

---

[1] *Auburn paid nearly $75 million to move on from Gus Malzahn* (Mar. 15, 2021) https://fansided.com/2021/03/15/auburn-football-firing-gus-malzahn-cost/.

[2] *Ed Orgeron buyout: Official details of buyout payments for departing LSU head coach revealed* (Sept. 4, 2022) https://www.saturdaydownsouth.com/lsu-football/ed-orgeron-buyout-official-details-of-buyout-payments-for-departing-lsu-head-coach-revealed/.

[3] *Nebraska fires Scott Frost: Cornhuskers pay massive buyout to dismiss coach three games into fifth season* (Sept. 11, 2022) https://www.cbssports.com/college-football/news/2022-hot-seat-rankings-jimbo-fisher-makes-debut-with-bryan-harsin-scott-satterfield-among-coaches-heating-up/.

[4] *Will Muschamp agrees to $13M buyout settlement with South Carolina* (Jan. 22, 2021) https://www.yahoo.com/video/will-muschamp-agrees-to-13-m-buyout-settlement-with-south-carolina-021557865.html#:~:text=Will%20Muschamp%20received%20most%20of,sum%20payment%20of%20%2412.9%20million.

| | | |
|---|---|---|
|  | | |
| **5.  Todd Graham**<br> | | $12.8 million buyout after fired from Arizona State[5] |
| **6.  Paul Chryst**<br> | | $11 million buyout after fired from University of Wisconsin[6] |
| **7.  Kevin Sumlin**<br> | | $10.4 million buyout after fired from Texas A&M[7] |

---

[5] *Todd Graham is coaching football at Hawaii. Why is ASU still paying him millions?* (Jan. 28, 2020) https://www.azcentral.com/story/sports/college/asu/2020/01/28/todd-grahams-new-job-does-not-lessen-arizona-state-buyout-obligation/4591331002/.

[6] *Wisconsin to pay fired football coach Paul Chryst an $11 million buyout* (Oct. 4, 2022) https://www.espn.com/college-football/story/_/id/34721073/wisconsin-pay-fired-football-coach-paul-chryst-11-million-buyout.

[7] *Why Kevin Sumlin's $10.4 million Texas A&M buyout is even better (for him) than it sounds* (Nov. 26, 2017) https://www.sbnation.com/college-football/2017/11/26/16694462/kevin-sumlin-fired-buyout-texas-a-m-contract.

| | |
|---|---|
| **8.  Charlie Strong**<br> | $10.1 million buyout after fired from University of Texas[8] |
| **9.  Clay Helton**<br> | $10 million buyout after fired from USC[9] |
| **10.  Mark Helfrich**<br> | $8.1 million buyout after fired from University of Oregon[10] |

[8] *THE BOOM OF DEAD MONEY IN COLLEGE SPORTS* (Nov. 5, 2021)
https://www.espn.com/espn/feature/story/_/id/32355679/dead-money.
[9] *Clay Helton: USC football buyout cost sizable after firing* (Sept. 13, 2021) https://247sports.com/Article/Clay-Helton-USC-football-buyout-cost-sizable-after-firing-170906658/#:~:text=USC's%20decision%20to%20fire%20head,football%20insider%20Pete%20Thamel%20reports..
[10] *Mark Helfrich and Oregon Ducks reached $8 million lump-sum settlement in May* (Jan. 11, 2018)
https://www.oregonlive.com/ducks/2018/01/mark_helfrich_and_oregon_ducks.html.

# EXHIBIT 56




# HAGENS BERMAN






Hagens Berman is a leader in class-action litigation and an international law firm driven by a team of legal powerhouses. With a tenacious spirit, we are motivated to make a positive difference in people's lives.

HAGENS BERMAN SOBOL SHAPIRO LLP

**INTRODUCTION**

# The Firm

Hagens Berman Sobol Shapiro LLP was founded in 1993 with one purpose: to help victims with claims of fraud and negligence that adversely impact a broad group. The firm initially focused on class action and other types of complex, multi-party litigation, but we have always represented plaintiffs, victims and the underdog. As the firm grew, it expanded its scope while staying true to its mission of taking on important cases that implicate the public interest. The firm represents plaintiffs including investors, consumers, inventors, workers, the environment, governments, whistleblowers and others.

*We are one of the nation's leading class-action law firms and have earned an international reputation for excellence and innovation in ground-breaking litigation against large corporations.*

**OUR FOCUS.** Our focus is to represent plaintiffs/victims in product liability, tort, antitrust, consumer fraud, sexual harassment, securities and investment fraud, employment, whistleblower, intellectual property, environmental, and employee pension protection cases. Our firm is particularly skilled at managing multi-state and nationwide class actions through an organized, coordinated approach that implements an efficient and aggressive prosecutorial strategy to place maximum pressure on defendants.

**WE WIN.** We believe excellence stems from a commitment to try each case, vigorously represent the best interests of our clients, and obtain the maximum recovery. Our opponents know we are determined and tenacious and they respect our skills and recognize our track record of achieving top results.

**WHAT MAKES US DIFFERENT.** We are driven to return to the class every possible portion of its damages—our track record proves it. While many class action or individual plaintiff cases result in large legal fees and no meaningful result for the client or class, Hagens Berman finds ways to return real value to the victims of corporate fraud and/or malfeasance.

**AN INTERNATIONAL REACH.** The scope of our practice is truly nationwide. We have flourished through our network of offices in nine cities across the United States, including Seattle, Austin, Berkeley, Boston, Chicago, Los Angeles, New York, Phoenix and San Diego and one international office in London, and our eyes are always open to trends of fraud, negligence and wrongdoing that may be taking form anywhere in the world.  Our reach is not limited to the cities where we maintain offices. We have cases pending in courts across the country and have a vested interest in fighting global instances of oppression, wrongdoing and injustice.



INTRODUCTION

# Locations

**SEATTLE**

1301 Second Avenue, Suite 2000
Seattle, WA 98101
(206) 623-7292 phone
(206) 623-0594 fax

**BERKELEY**

715 Hearst Avenue, Suite 300
Berkeley, CA 94710
(510) 725-3000 phone
(510) 725-3001 fax

**BOSTON**

1 Faneuil Hall Sq., 5th Floor
Boston, MA 02109
(617) 482-3700 phone
(617) 482-3003 fax

**LONDON**

Hagens Berman EMEA LLP
22 Eastcheap
Billingsgate, London, EC3M 1EU
0203 150 1445 phone

**CHICAGO**

455 N. Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
(708) 628-4949 phone
(708) 628-4950 fax

**LOS ANGELES**

301 North Lake Avenue, Suite 920
Pasadena, CA 91101
(213) 330-7150 phone
(213) 330-7152 fax

**NEW YORK**

322 8th Avenue, Suite 802
New York, NY 10001
(212) 752-5455 phone
(917) 210-3980 fax

**PHOENIX**

11 West Jefferson Street, Suite 1000
Phoenix, AZ 85003
(602) 840-5900 phone
(602) 840-3012 fax

**SAN DIEGO**

533 F Street
Suite 207
San Diego, CA 92101
(619) 929-3340 phone

HAGENS BERMAN SOBOL SHAPIRO LLP

...the track record of Hagens Berman['s] **Steve Berman is… impressive**, having racked… a $1.6 billion settlement in the Toyota Unintended Acceleration Litigation and a substantial number of really outstanding big-ticket results.

— *Milton I. Shadur, Senior U.S. District Judge, naming Hagens Berman Interim Class Counsel in Stericycle Pricing MDL*

Class counsel has **consistently demonstrated extraordinary skill and effort.**

— *U.S. District Judge James Selna, Central District of California, In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices and Products Liability Litigation*

Berman is considered **one of the nation's top class-action lawyers**.

— *Associated Press*

## Elite Trial Lawyers
*The National Law Journal*

## The Plaintiffs' Hot List: The Year's Hottest Firms
*The National Law Journal*

## Most Feared Plaintiffs Firms
*Law360*

**Landmark consumer cases are business as usual** for Steve Berman.

— *The National Law Journal, naming Steve Berman one of the 100 most influential attorneys in the nation for the third time in a row*

[A] **clear choice** emerges. That choice is the Hagens Berman firm.

— *U.S. District Court for the Northern District of California, In re Optical Disk Drive Products Antitrust Litigation (appointing the firm lead counsel)*

All right, I think I can conclude on the basis with my five years with you all, watching this litigation progress and seeing it wind to a conclusion, that **the results are exceptional**… You did an exceptionally good job at organizing and managing the case…

— *U.S. District Court for the Northern District of California, In re Dynamic Random Access Memory Antitrust Litigation (Hagens Berman was co-lead counsel and helped achieve the $325 million class settlement)*

### VISA-MASTERCARD ANTITRUST LITIGATION

The firm served as co-lead counsel in what was then the largest antitrust settlement in history – valued at $**27 billion**.

### VOLKSWAGEN FRANCHISE DEALERS LITIGATION

The firm served as lead counsel representing VW franchise dealers in this suit related to the automaker's Dieselgate scandal. A **$1.6 billion** settlement was reached, and represents a result of nearly full damages for the class.

### VOLKSWAGEN EMISSIONS LITIGATION

Hagens Berman was named a member of the Plaintiffs' Steering Committee and part of the Settlement Negotiating team in this monumental case that culminated in the largest automotive settlement in history – **$17.4 billion**.

### TOYOTA UNINTENDED ACCELERATION LITIGATION

Hagens Berman obtained the then largest automotive settlement in history in this class action that recovered **$1.6 billion** for vehicle owners.

---

### STATE OF WASHINGTON, ET AL. V. PHILIP MORRIS, ET AL.

## Hagens Berman represented 13 states in the largest recovery in litigation history – **$260 billion**.

---

### E-BOOKS ANTITRUST LITIGATION

Hagens Berman served as co-lead counsel in this matter and secured a combined **$560 million** settlement on behalf of consumers against Apple and five of the nation's largest publishing companies.

### LCD ANTITRUST LITIGATION

Hagens Berman served as a member of the Executive Committee representing consumers against multiple defendants in multi-district litigation. The total settlements exceeded **$470 million**.

### MCKESSON DRUG LITIGATION

Hagens Berman was lead counsel in these racketeering cases against McKesson for drug pricing fraud that settled for more than **$444 million** on the eve of trials.

### DAVITA HEALTHCARE PERSONAL INJURY LITIGATION

A Denver jury awarded a monumental **$383.5 million** jury verdict against GranuFlo dialysis provider DaVita Inc. on June 27, 2018, to families of three patients who suffered cardiac arrests and died after receiving dialysis treatments at DaVita clinics.

### DRAM ANTITRUST LITIGATION

The firm was co-lead counsel, and the case settled for **$345 million** in favor of purchasers of dynamic random access memory chips (DRAM).

### AVERAGE WHOLESALE PRICE DRUG LITIGATION

Hagens Berman was co-lead counsel in this ground-breaking drug pricing case against the world's largest pharmaceutical companies, resulting in a victory at trial. The court approved a total of **$338 million** in settlements.

### ENRON ERISA LITIGATION

Hagens Berman was co-lead counsel in this ERISA litigation, which recovered in excess of **$250 million**, the largest ERISA settlement in history.

### CHARLES SCHWAB SECURITIES LITIGATION

The firm was lead counsel in this action alleging fraud in the management of the Schwab YieldPlus mutual fund; a **$235 million** class settlement was approved by the court.

Practice Areas

HAGENS BERMAN SOBOL SHAPIRO LLP

**PRACTICE AREAS**

# Anti-Terrorism

With a long track record of upholding the rights of the voiceless, Hagens Berman fights for justice on behalf of victims of international terrorism. Our anti-terrorism legal team builds on our robust history to forge innovative cases, bringing action against those that support terrorism.

Hagens Berman has always believed in fighting for the rights of those with no voice – those who are victims to tragic circumstances beyond their control. With our guiding principles driving our efforts, the firm has expanded its practice areas to include anti-terrorism litigation.

It's no secret that some businesses and individuals have pled guilty to violating United States laws that prohibit financial transactions with terrorist organizations and foreign states that support terrorism. We believe that the law is one of the most powerful tools to combat terrorism, and our renowned team of litigators brings a fresh perspective to the fight for victims' rights in this complex arena.

Through a deep understanding of both U.S. and international anti-terrorism laws, Hagens Berman builds on its foundation to investigate acts of terrorism and forge ironclad cases against anyone responsible, to help ensure that those at the mercy of the world's most egregious perpetrators of violence are represented with the utmost integrity and determination.

The firm's new practice area carries out our mission of building a safer world through novel applications of the law and steadfast dedication.

> **Chiquita Bananas**

Hagens Berman represents American citizens who were victims of terrorism in Colombia. The victims were harmed by Colombian terrorists that Chiquita Brands International Inc. paid so that it could grow bananas in Colombia in regions that were controlled by the terrorists. Chiquita is one of the world's largest producers and marketers of fruits and vegetables and admitted it paid Colombian terrorist organizations as part of a guilty plea to settle criminal charges brought by the U.S. Department of Justice

Chiquita was placed on corporate probation and paid a $25 million dollar fine because of its conduct in Colombia.

Plaintiffs have sued Chiquita under the U.S. Anti-Terrorism Act, which allows American victims of international terrorism to sue anyone responsible and to recover treble damages and attorney's fees. The claims are pending in the U.S. District Court for the Southern District of Florida as part of the consolidated multi-district litigation to resolve claims related to Chiquita's payments to Colombian terrorist organizations.

**PRACTICE AREAS**

# Antitrust

Hagens Berman works to preserve healthy marketplace competition and fair trade by protecting consumers and businesses that purchase goods and services from price fixing, market allocation agreements, monopolistic schemes and other trade restraints. The firm's lawyers have earned an enviable reputation as experts in this often confusing and combative area of commercial litigation. Our attorneys have a deep understanding of the legal and economic issues within the marketplace, allowing us to employ groundbreaking market theories that shed light on restrictive anti-competitive practices.

Hagens Berman represents millions of consumers in several high-profile class-action lawsuits, and takes on major antitrust litigation to improve market conditions for consumers, businesses and investors. We have represented plaintiffs in markets as diverse as debit and credit card services, personal computer components, electric and gas power, airlines, and internet services, and we have prevailed against some of the world's largest corporations.

The firm has also generated substantial recoveries on behalf of health plans and consumers in antitrust involving pharmaceutical companies abusing patent rights to block generic drugs from coming to market. Hagens Berman has served as lead or co-lead counsel in landmark litigation challenging anti-competitive practices, in the Paxil Direct Purchaser Litigation ($100 million), Relafen Antitrust Litigation ($75 million), Tricor Indirect Purchaser Antitrust Litigation ($65.7 million), and Augmentin Antitrust Litigation ($29 million). Representative antitrust successes on behalf of our clients include:

### › Visa/MasterCard

Helped lead this record-breaking antitrust case against credit card giants Visa and MasterCard that challenged charges imposed in connection with debit cards.

RESULT: $3.05 billion settlement and injunctive relief valued at more than $20 billion.

### › NCAA: Scholarships/Grants-In-Aid (GIAs)

In a first-of-its-kind antitrust action and potentially far-reaching case, Hagens Berman filed a class-action affecting approximately 40,000 Division I collegiate athletes who played men's or women's basketball, or FBS football, brought against the NCAA and its most powerful members, including the Pac-12, Big Ten, Big-12, SEC and ACC, claiming these entities violated federal antitrust laws by drastically reducing the number of scholarships and financial aid student-athletes receive to an amount below the actual cost of attendance and far below what the free market would bare.

The firm continues to fight on behalf of student-athletes to level the playing field and bring fairness to college sports and players.

RESULT: $208.9 million settlement, bringing an estimated average amount of $6,500 to each eligible class member who played his or her sport for four years.

### › Apple E-books

With state attorneys general, the firm secured a $166 million settlement with publishing companies that conspired with Apple to fix e-book prices. The firm then look on Apple for its part in the price-fixing conspiracy. In the final stage in the lawsuit, the Supreme Court denied appeal from Apple, bringing the consumer payback amount to more than twice the amount of losses suffered by the class of e-book purchasers. This represents one of the most successful recovery of damages in any antitrust lawsuit in the country.

RESULT: $560 million total settlements.

**PRACTICE AREAS**

# Antitrust

## > Animation Workers Antitrust

Hagens Berman represents a nationwide class of animators and other artistic workers in an antitrust class-action case filed against defendants Pixar, Lucasfilm and its division Industrial Light & Magic, DreamWorks Animation, The Walt Disney Company, Sony Pictures Animation, Sony Pictures Imageworks, Blue Sky Studios, ImageMovers LLC, ImageMovers Digital LLC and others.

RESULT: Total settlements have reached $168 million, resulting in a payment of more than $13,000 per class member.

## > TFT LCDs

Hagens Berman Sobol Shapiro filed a class-action lawsuit against several major manufacturers of TFT LCD products, claiming the companies engaged in a conspiracy to fix, raise, maintain and stabilize the price of televisions, desktop and notebook computer monitors, mobile phones, personal digital assistants (PDAs) and other devices. After years of representing consumers against multiple defendants in multi-district litigation, the case against Toshiba went to trial. Toshiba was found guilty of price-fixing in 2012, and settled.

RESULT: $470 million in total settlements.

## > DRAM

The suit claimed DRAM (Dynamic Random Access Memory) manufacturers secretly agreed to reduce the supply of DRAM, a necessary component in a wide variety of electronics which artificially raised prices. The class included equipment manufacturers, franchise distributors and purchasers.

RESULT: $375 million settlement.

## > Optical Disk Drives

Hagens Berman fought on behalf of consumers in a lawsuit filed against Philips, Pioneer and others for artificially inflating the price of ODDs for consumers.

RESULT: $180 million in total settlements reclaimed for consumers.

## > Lithium Ion Batteries

Hagens Berman filed a class-action lawsuit against some of the largest electronics manufacturers including Sony, Samsung and Panasonic for illegally fixing the price of lithium ion batteries, pushing costs higher for consumers. Defendants collectively controlled between 60 to 90 percent of the market for lithium-ion batteries between 2000 and 2011 and used that power to fix battery prices.

RESULT: $65 million in total settlements against multiple defendants.

## > AC Nielsen

Represented Information Resources, Inc. ("IRI"), in a suit claiming that AC Nielsen's anti-competitive practices caused IRI to suffer significant losses.

RESULT: $55 million settlement.

## > Dairy Products

The firm filed a class-action suit against several large players in the dairy industry, including the National Milk Producers Federation, Dairy Farmers of America, Land O'Lakes, Inc., Agri-Mark, Inc. and Cooperatives Working Together (CWT) that together produce nearly 70 percent of the milk consumed in the United States. The suit alleging that the groups conspired to fix the price of milk throughout the United States through an organized scheme to limit production, involving the needless and premature slaughtering of 500,000 cows.

RESULT: $52 million settlement on behalf of consumers in 15 states and the District of Columbia who purchased dairy products.

## > Toys "R" Us Baby Products

The firm brought this complaint on behalf of consumers claiming Toys "R" Us and several baby product manufacturers violated provisions of the Sherman Antitrust Act by conspiring to inflate prices of high-end baby products, including car seats, strollers, high chairs, crib bedding, breast pumps and infant carriers. The suit asked the court to end what it claims are anti-competitive activities and seeks damages caused by the company's actions.

RESULT: $35.5 million settlement.

HAGENS BERMAN SOBOL SHAPIRO LLP

**PRACTICE AREAS**

# Antitrust

› **EA Madden**

Class action claimed that video game giant Electronic Arts used exclusive licensing agreements with various football organizations to nearly double the price of several of its games.

RESULT: $27 million settlement and imposed limits on EA's ability to pursue exclusive licensing agreements.

› **Resistors Antitrust Litigation**

Hagens Berman is co-lead lead counsel, representing direct purchasers of linear resistors (a device in electronics used to limit electric current) against an alleged cartel of manufacturers who conspired to limit linear resistor price competition for nearly a decade.  The case is in its early stages and discovery is ongoing.

› **Nespresso**

Hagens Berman has assumed responsibility for a large antitrust case against Nespresso, a leading single-serve espresso and coffee maker, for its anticompetitive efforts to exclude environmentally friendly, biodegradable coffee capsules from the market.

In May 2010, our client Ethical Coffee Company ("ECC") sought to introduce an environmentally sound and more economical coffee capsule to be used in Nespresso's widely used coffee makers. It manufactured a single-use coffee capsule that did not contain harmful aluminum found in Nespresso's capsules. Nespresso knew that ECC posed a formidable challenge to its business model, which relied on captive consumers buying coffee capsules only from Nespresso. With a captive market, Nespresso could continue to charge consumers an inflated price, and continue to use the aluminum capsules that harm the environment.

The U.S. Court has already ruled that these claims can proceed to discovery. Hagens Berman anticipates damages associated with Nespresso's actions to be in the hundreds of millions of dollars.

PRACTICE AREAS

# Automotive - Non-Emissions Cases

In litigating cases we strive to make an impact for a large volume of consumers, especially those who fall victim to the gross negligence and oversight of some of the nation's largest entities: automakers. Hagens Berman's automotive litigation team has been named a 2016 Practice Group of the Year by Law360, highlighting its "eye toward landmark matters and general excellence," in this area of law.

The federal court overseeing the massive multi-district litigation against Toyota appointed the firm to co-lead one of the largest consolidations of class-action cases in U.S. history. The litigation combined more than 300 state and federal suits concerning acceleration defects tainting Toyota vehicles. Hagens Berman and its two co-lead firms were selected from more than 70 law firms applying for the role. Since then, the firm's automotive practice area has grown by leaps and bounds, pioneering new investigations into defects, false marketing and safety hazards affecting millions of drivers across the nation.

The firm was recently named to the National Law Journal's list of Elite Trial Lawyers for its work fighting corporate wrongdoing in the automotive industry. The firm's auto team members who worked on Toyota were also named finalists for Public Justice's Trial Lawyer of the Year award.

› **General Motors Ignition Switch Litigation**

Co-lead counsel in high-profile case on behalf of millions of owners of recalled GM vehicles affected by a safety defect linked to more than 120 fatalities. The suit alleges GM did not take appropriate measures, despite having prior knowledge of the defect. The case is pending, and most recently, the Supreme Court refused to hear GM's appeal regarding the pending suits when it claimed the cases were barred by its 2009 bankruptcy.

› **Toyota Sudden, Unintended Acceleration Litigation**

Co-lead counsel for the economic loss class in this lawsuit filed on behalf of Toyota owners alleging a defect causes vehicles to undergo sudden, unintended acceleration. In addition to safety risks, consumers suffered economic loss from decreased value of Toyota vehicles following media coverage of the alleged defect.

RESULT: Settlement package valued at up to $1.6 billion, which was at the time the largest automotive settlement in history.

› **MyFord Touch**

Hagens Berman represents owners of Ford vehicles equipped with MyFord Touch, an in-car communication and entertainment package, who claim that the system is flawed, putting drivers at risk of an accident while causing economic hardship for owners. The complaint cites internal Ford documents that purportedly show that 500 of every 1,000 vehicles have issues involving MyFord Touch due to software bugs, and failures of the software process and architecture. Owners report that Ford has been unable to fix the problem, even after repeated visits. A federal judge overseeing the case recently certified nine subclasses of owners of affected vehicles in various states.

› **Nissan Quest Accelerator Litigation**

Represented Nissan Quest minivan owners who alleged that their vehicles developed deposits in a part of the engine, causing drivers to apply increased pressure to push the accelerator down. RESULT: Settlement providing reimbursement for cleanings or replacements and applicable warranty coverage.

› **Hyundai Kia MPG**

Hagens Berman sued Hyundai and Kia on behalf of owners after the car manufacturers overstated the MPG fuel economy ratings on 900,000 of its cars. The suit seeks to give owners the ability to recover a lump-sum award for the lifetime extra fuel costs, rather than applying every year for that year's losses. RESULT: $255 million settlement. Lump-sum payment plan worth $400 million on a cash basis, and worth even more if owners opt for store credit (150 percent of cash award) or new car discount (200 percent of cash award) options.

HAGENS BERMAN SOBOL SHAPIRO LLP

PRACTICE AREAS

# Automotive - Non-Emissions Cases

## › BMW i3 REx

Hagens Berman is representing BMW owners in a national class-action lawsuit, following reports that BMW's i3 REx model electric cars contain a defect that causes them to suddenly and without warning lose speed and power mid-drive, putting drivers and passengers at risk of crash and injury.

## › Fiat Chrysler Gear Shifter Rollaway Defect

Hagens Berman has filed a national class-action lawsuit representing owners of Jeep Grand Cherokee, Chrysler 300 and Dodge Charger vehicles. The lawsuit states that Fiat Chrysler fraudulently concealed and failed to remedy a design defect in 811,000 vehicles that can cause cars to roll away after they are parked, causing injuries, accidents and other serious unintended consequences.

## › Ford Shelby GT350 Mustang Overheating

Hagens Berman represents owners of certain 2016 Shelby GT350 Mustang models in a case alleging that Ford has sold these vehicles as track cars built to reach and sustain high speeds, but failed to disclose that the absence of a transmission and differential coolers can greatly diminish the vehicle's reported track capabilities. Shelby owners are reporting that this defect causes the vehicle to overheat and go into limp mode, while in use, even when the car is not being tracked

## › Tesla AP2 Defect

The firm represents Tesla owners in a lawsuit against the automaker for knowingly selling nearly 50,000 cars with nonfunctional Enhanced Autopilot AP2.0 software that still has not met Tesla's promises, including inoperative Standard Safety Features on affected models sold in Q4 2016 and Q1 2017.

PRACTICE AREAS

# Automotive - Emissions Litigation

Having played a lead role in the record-breaking Volkswagen diesel emissions case, Hagens Berman knew the story wasn't over. Since the Dieselgate scandal began, the firm has uniquely dedicated resources to uncovering cheating devices used by other automakers. The firm has become a trailblazer in this highly specialized realm, outpacing federal agencies in unmasking fraud in emissions reporting.

When news broke in 2015 of Volkswagen's massive diesel emissions-cheating scandal, Hagens Berman was the first firm in the nation to file suit against the automaker for its egregious fraud, going on to represent thousands of owners in litigation and take a leading role on the Plaintiffs' Steering Committee that would finalize a $14.7 billion, record-breaking settlement for owners. Since this case emerged, Hagens Berman has been on the forefront of emissions litigation, relying on our legal team's steadfast and intensive investigative skills to unearth many other emissions-cheating schemes perpetrated by General Motors, Fiat Chrysler, Mercedes and other automakers, staying one step ahead of government regulators in our pursuit of car manufacturers that have violated emissions standards and regulations, as well as consumer confidence.

Hagens Berman's managing partner, Steve Berman, has dedicated the firm's resources to upholding the rights of consumers and the environment, becoming a one-man EPA. The firm is uniquely dedicated to this cause, and is the only firm that has purchased an emission testing machine to determine if other diesel car manufacturers install similar cheating devices, bringing new cases based on the firm's own research, time and testing.

### › Volkswagen Diesel Emissions Litigation

Hagens Berman was the first firm in the nation to file a lawsuit against Volkswagen for its emissions fraud, seeking swift remedies for consumers affected by Volkswagen's fraud and violation of state regulations. The firm was named to the Plaintiffs' Steering Committee leading the national fight against VW, Porsche and Audi on behalf of owners and lessors of affected vehicles, and also served as part of the Settlement Negotiating team.

RESULT: The largest automotive settlement in history, $14.7 billion.

### › Volkswagen Dealers Litigation

Hagens Berman served as lead counsel in a first-of-its-kind lawsuit brought by a franchise dealer. Three family-owned Volkswagen dealers filed a class action against VW stating that it intentionally defrauded dealers by installing so-called "defeat devices" in its diesel cars, and separately carried out a systematic, illegal pricing and allocation scheme that favored some dealers over others and illegally channeled financing business to VW affiliate, Volkswagen Credit, Inc. The settlement garnered nearly unanimous approval of dealers, with 99 percent participation in the settlement.

RESULT: $1.67 billion in benefits to Volkswagen dealers.

### › Mercedes BlueTEC Emissions Litigation

Judge Jose L. Linares appointed the firm as interim class counsel in this class-action case against Mercedes concerning emissions of its BlueTEC diesel vehicles. Hagens Berman currently represents thousands of vehicle owners who were told by Mercedes that their diesel cars were "the world's cleanest and most advanced diesel," when in fact testing at highway speeds, at low temperatures, and at variable speeds, indicate a systemic failure to meet emissions standards. Low temperature testing at highway speeds for example, produced emissions that were 8.1 to 19.7 times the highway emissions standard. The lawsuit adds that testing at low temperatures at variable speeds produced emissions as high as 30.8 times the standard.

HAGENS BERMAN SOBOL SHAPIRO LLP

PRACTICE AREAS

# Automotive - Emissions Litigation

## › Chevy Cruze Diesel Emissions Litigation

Hagens Berman filed a class-action lawsuit against Chevrolet (a division of General Motors) for installing emissions-cheating software in Cruze Clean Turbo Diesel cars, forcing consumers to pay high premiums for vehicles that pollute at illegal levels. While Chevy marketed these cars as a clean option, the firm's testing has revealed emissions released at up to 13 times the federal standard. In a recent ruling, U.S. District Judge Thomas L. Ludington upheld claims brought by owners.

## › Audi Emissions Litigation

Hagens Berman unearthed additional emissions-cheating by Audi, affecting its gasoline 3.0-liter vehicles. The firm's investigation shows that the newly discovered defeat device is installed in gasoline engines and changes how the transmission operates when testing is detected to lower CO2 emissions, but otherwise allows excessive CO2 emissions in normal, on-road driving.

## › Fiat Chrysler EcoDiesel Emissions Litigation

The firm is leading charges against Fiat Chrysler that it sold hundreds of thousands of EcoDiesel-branded vehicles that release illegally high levels of NOx emissions, despite explicitly selling these "Eco" diesels to consumers who wanted a more environmentally friendly vehicle. Hagens Berman was the first firm in the nation to uncover this scheme and file against Fiat Chrysler on behalf of owners of Dodge RAM 1500 and Jeep Grand Cherokee EcoDiesel vehicles. Following the firm's groundbreaking suit, the EPA took notice, filing formal accusations against Fiat Chrysler.

## › Dodge RAM 2500/3500 Diesel Emissions Litigation

According to the firm's investigation, Dodge has sold hundreds of thousands of Dodge RAM 2500 and 3500 trucks equipped with Cummins diesel engines that release illegally high levels of NOx emissions at up to 14 times the legal limit. This defect causes certain parts to wear out more quickly, potentially costing owners between $3,000 and 5,000 to fix. The firm is leading a national class action against Fiat Chrysler for knowingly inducing consumers to pay premium prices for vehicles that fail to comply with federal regulations, and ultimately lead to higher costs of repairs for purchasers.

## › General Motors Duramax Emissions Litigation

Hagens Berman recently pioneered another instance of diesel emissions fraud. The firm's independent testing revealed that GM had installed multiple emissions-masking defeat devices in its Duramax trucks, including Chevy Silverado and GMC Sierra models, in a cover-up akin to Volkswagen's Dieselgate concealment. In real world conditions the trucks emit 2 to 5 times the legal limit of deadly NOx pollutants, and the emissions cheating devices are installed in an estimated 705,000 affected vehicles.

PRACTICE AREAS

# Civil and Human Rights

Hagens Berman has represented individuals and organizations in difficult civil rights challenges that have arisen in the past two decades. In doing so, we have managed cases presenting complex legal and factual issues that are often related to highly charged political and historical events. Our clients have included such diverse communities as World War II prisoners of war, conscripted civilians and entire villages.

In this cutting-edge practice area, the firm vigilantly keeps abreast of new state and national legislation and case-law developments. We achieve positive precedents by zealously prosecuting in our clients' interests. Some examples of our work in this area include:

› **World Trade Organization Protests**

During the 1999 World Trade Organization (WTO) protests in Seattle, tens of thousands of Seattle citizens became targets after Seattle officials banned all forms of peaceful protest. Seattle police attacked anyone found in the designated "no protest" zones with rubber bullets and tear gas. Hundreds of peaceful protesters were arrested and incarcerated without probable cause for up to four days. The firm won a jury trial on liability and ultimately secured a settlement from Seattle officials after filing a class action alleging violations of the First and Fourth Amendments.

› **Hungarian Gold Train**

Following the firm's representation of former forced and enslaved laborers for German companies in the Nazi Slave Labor Litigation, Hagens Berman led a team of lawyers against the U.S. on behalf of Hungarian Holocaust survivors in the Hungarian Gold Train case. The suit claimed that, during the waning days of World War II, the Hungarian Nazi government loaded plaintiffs' valuable personal property onto a train, which the U.S. Army later seized, never returning the property to its owners and heirs.

› **Dole Bananas**

Hagens Berman filed suit against the Dole Food Company, alleging that it misled consumers about its environmental record. The complaint alleged that Dole purchased bananas from a grower in Guatemala that caused severe environmental damage and health risks to local residents. Dole ultimately agreed to take action to improve environmental conditions, collaborating with a non-profit group on a water filtration project for local communities.

PRACTICE AREAS

# Consumer Protection – General Class Litigation

Hagens Berman is a leader in protecting consumers, representing millions in large-scale cases that challenge unfair, deceptive and fraudulent practices.

We realize that consumers suffer the brunt of corporate wrongdoing and have little power to hold companies responsible or to change those tactics. We believe that when backed by a tenacious spirit and determination, class action cases have the ability to serve as a powerful line of defense in consumer protection.

Hagens Berman pursues class litigation on behalf of clients to confront fraudulent practices that consumers alone cannot effectively dispute. We make consumers' concerns a priority, collecting consumer complaints against suspected companies and exploring all avenues for prosecution.

Hagens Berman's legacy of protecting consumer rights reflects the wide spectrum of scams that occur in the marketplace. The cases that we have led have challenged a variety of practices such as:

> False, deceptive advertising of consumer products and services

> False billing and over-charging by credit card companies, banks, telecommunications providers, power companies, hospitals, insurance plans, shipping companies, airlines and Internet companies

> Deceptive practices in selling insurance and financial products and services such as life insurance and annuities

> Predatory and other unfair lending practices, and fraudulent activities related to home purchases

A few case examples are:

> **Expedia Hotel Taxes and Service Fees Litigation**
Hagens Berman led a nationwide class-action suit arising from bundled "taxes and service fees" that Expedia collects when its consumers book hotel reservations. Plaintiffs alleged that by collecting exorbitant fees as a flat percentage of the room rates, Expedia violated both the Washington Consumer Protection Act

and its contractual commitment to charge as service fees only "costs incurred in servicing" a given reservation.
RESULT: Summary judgment in the amount of $184 million. The case settled for cash and consumer credits totaling $123.4 million.

> **Stericycle**
The firm served as court-appointed lead counsel in a class-action lawsuit against Stericycle alleging that the company violated contracts and defrauded them by hundreds of millions of dollars through an automatic price-increasing scheme. In February of 2017, a federal judge certified a nationwide consumer class. The class had more than 246,000 class members, with damages estimated preliminarily at $608 million.
RESULT: $295 million settlement

> **Tenet Healthcare**
In a pioneering suit filed by Hagens Berman, plaintiffs alleged that Tenet Healthcare charged excessive prices to uninsured patients at 114 hospitals owned and operated by Tenet subsidiaries in 16 different states.
RESULT: Tenet settled and agreed to refund to class members amounts paid in excess of certain thresholds over a four-and-a-half year period.

HAGENS BERMAN SOBOL SHAPIRO LLP

**PRACTICE AREAS**

# Consumer Protection – General Class Litigation

## › Wells Fargo Force-Placed Insurance

Hagens Berman brought a case against Wells Fargo alleging it used "force-placed" insurance clauses in mortgage agreements, a practice that enables the bank to charge homeowners insurance premiums up to 10 times higher than normal rates. RESULT: Hagens Berman reached a settlement in this case, under which all class members will be sent checks for more than double the amount of commissions that Wells Fargo wrongfully extracted from the force placement of insurance on class members' properties.

## › Consumer Insurance Litigation

Hagens Berman has pioneered theories to ensure that in first- and third-party contexts consumers and health plans always receive the treatment and benefits to which they are entitled. Many of our cases have succeeded in expanding coverage owed and providing more benefits; recovering underpayments of benefits; and returning uninsured/underinsured premiums from the misleading tactics of the insurer.

PRACTICE AREAS

# Consumer Protection - Drug and Supplement Litigation

Hagens Berman aggressively pursues pharmaceutical industry litigation, fighting against waste, fraud and abuse in healthcare. For decades, pharmaceutical manufacturers have been among the most profitable companies in America. But while pharmaceutical companies become richer, consumers, health plans and insurers pay higher costs for prescription and over-the-counter drugs and supplements. We shine the light of public scrutiny on this industry's practices and represent individuals, direct and indirect purchasers, and the nation's most forward-thinking public-interest groups.

The firm's pharmaceutical and dietary supplement litigation practice is second to none in the nation in terms of expertise, commitment and landmark results. Hagens Berman's attorneys have argued suits against dozens of major drug companies and the firm's aggressive prosecution of pharmaceutical industry litigation has recovered more than $1 billion in gross settlement funds.

## RECENT ANTITRUST RESOLUTIONS

In the last few years, Hagens Berman – as lead or co-lead class counsel – has garnered significant settlements in several antitrust cases involving prescription drugs. In each case, the plaintiffs alleged that a manufacturer of a brand-name drug violated federal or state antitrust laws by delaying generic competitors from coming to market, forcing purchasers to buy the more expensive brand name version instead of the generic equivalent. Examples of our recent successes include:

### › Flonase Antitrust Litigation

Hagens Berman represented purchasers in this case alleging pharmaceutical giant GlaxoSmithKline filed petitions to prevent the emergence of generic competitors to its drug Flonase, all to overcharge consumers and purchasers of the drug, which would have been priced lower had a generic competitor been allowed to come to market.

RESULT: $150 million class settlement.

### › Prograf Antitrust Litigation

Hagens Berman represented purchasers who alleged Astellas Pharma US, Inc. unlawfully maintained its monopoly and prevented generic competition for Prograf, an immunosuppressant used to help prevent organ rejection in transplant patients, harming purchasers by forcing them to pay inflated brand name prices for longer than they should have absent the anticompetitive conduct.

RESULT: The parties' motion for final approval of the $98 million class settlement is under advisement with the court.

### › Relafen Antitrust Litigation

Hagens Berman filed a class-action lawsuit against GlaxoSmithKline, SmithKline Beecham Corporation, Beecham Group PLC and SmithKline Beecham PLC, on behalf of consumers and third-party payors who purchased the drug Relafen or its generic alternatives. The suit alleged that the companies who manufacture and sell Relafen unlawfully obtained a patent which allowed them to enforce a monopoly over Relafen and prevented competition by generic prescription drugs, causing consumers to pay inflated prices for the drug.

RESULT: Under the terms of the settlement, the defendants will pay damages of $75 million to those included in the class. Of the total settlement amount, $25 million will be allocated to consumers and $50 million will be used to pay the claims of insurers and other third-party payors.

PRACTICE AREAS

# Consumer Protection – Drug and Supplement Litigation

› **Skelaxin Antitrust Litigation**

The firm represented purchasers in this case alleging King Pharmaceuticals LLC and Mutual Pharmaceutical Company alleging conspired to suppress generic competition and preserve King's monopoly in the market for the brand name muscle relaxant Skelaxin.

RESULT: $73 million class settlement.

› **Tricor Antitrust**

In June 2005, Hagens Berman filed an antitrust lawsuit on behalf of a class of consumers and third party payors against pharmaceutical manufacturers Abbott Laboratories and Fournier Industries concerning the brand name cholesterol drug Tricor. HBSS was appointed co-lead class counsel by the Court.

RESULT: $65.7 million recovery for consumers and third party payers who sued Abbott Laboratories and Fournier Industies in an antitrust action concerning the cholesterol drug Tricor.

**FRAUDULENT DRUG PRICING RESOLUTIONS**

Hagens Berman has led many complex cases that take on fraud and inflated drug prices throughout the U.S. This includes sweeping manipulation of the average wholesale price benchmark used to set prices for prescription drugs nationwide, fraudulent marketing of prescription drugs and the rampant use of co-pay subsidy cards that drive up healthcare costs. These efforts have led to several significant settlements:

› **McKesson and First DataBank Drug Litigation**

The firm discovered a far-reaching fraud by McKesson and became lead counsel in this RICO case against McKesson and First DataBank, alleging the companies fraudulently inflated prices of more than 400 prescription drugs.

RESULT: $350 million settlement and a four percent rollback on the prices of 95 percent of the nation's retail branded drugs, the net impact of which could be in the billions of dollars. The states and federal government then used Hagens Berman's work to bring additional suits. Hagens Berman represented several states and obtained settlements three to seven times more than that of the Attorneys General. Almost $1 billion was recovered from the McKesson fraud.

› **Average Wholesale Price Drug Litigation**

Hagens Berman served as co-lead counsel and lead trial counsel in this sprawling litigation against most of the nation's largest pharma companies, which alleges defendants artificially inflated Average Wholesale Price.

RESULT: Approximately $338 million in class settlements. Hagens Berman's work in this area led to many state governments filing suit and hundreds of millions in additional recovery.

**FRAUDULENT MARKETING RESOLUTIONS**

Hagens Berman also litigates against drug companies that fraudulently promote drugs for uses not approved by the Food and Drug Administration (FDA), commonly known as "off-label" uses. We also litigate cases against dietary supplement manufacturers for making false claims about their products. Recent successes include:

› **Neurontin Third Party Payor Litigation**

Hagens Berman served as co-lead trial counsel in this case alleging that Pfizer fraudulently and unlawfully promoted the drug Neurontin for uses unapproved by the FDA.

RESULT: A jury returned a $47 million verdict in favor of a single third-party payor plaintiff, automatically trebled to $142 million, and the court recently approved a $325 million class settlement.

› **Lupron**

Hagens Berman prosecuted a lawsuit against TAP Pharmaceuticals Products, Inc. on behalf of a class of consumers and third-party payors who purchased the drug Lupron. The suit charged that TAP Pharmaceutical Products, Inc., Abbott Laboratories and Takeda Pharmaceutical Company Limited conspired to fraudulently market, sell and distribute Lupron, causing consumers to pay inflated prices for the drug.

RESULT: Judge Richard Stearns issued a preliminary approval of the proposed settlement between TAP Pharmaceuticals and the class. Under the terms of the settlement, $150 million will be paid by TAP on behalf of all defendants.

PRACTICE AREAS

# Consumer Protection – Drug and Supplement Litigation

› **Celebrex/Bextra**

Hagens Berman filed a class-action lawsuit against Pfizer on behalf of individual consumers and third-party payors who paid for the drug Bextra. The firm was praised by Judge Breyer for its "unstinting" efforts on behalf of the class, adding, "The attorneys on both sides were sophisticated, skilled, professional counsel whose object was to zealously pursue their clients' interest, but not at the cost of abandoning the appropriate litigation goals, which were to see, whether or not, based upon the merits of the cases, a settlement could be achieved."

RESULT: $89 million settlement.

› **Vioxx Third Party Payor Marketing and Sales Practices Litigation**

The firm served as lead counsel for third party payors in the Vioxx MDL, alleging that Merck & Co. misled physicians, consumers and health benefit providers when it touted Vioxx as a superior product to other non-steroidal anti-inflammatory drugs. According to the lawsuit,

The drug had no benefits over less expensive medications, but carried increased risk of causing cardiovascular events.

RESULT: $80 million settlement.

› **Serono Drug Litigation**

Hagens Berman served as lead counsel for a class of consumers and third party payors in a suit alleging that global biotechnology company Serono, Inc. schemed to substantially increase sales of the AIDS drug Serostim by duping patients diagnosed with HIV into believing they suffered from AIDS-wasting and needed the drug to treat that condition.

RESULT: $24 million settlement.

› **Bayer Combination Aspirin/Supplement Litigation**

Hagens Berman served as lead counsel on behalf of consumers in a suit alleging that Bayer Healthcare LLC deceptively marketed Bayer® Women's Low-Dose Aspirin + Calcium, an 81 mg aspirin pill combined with calcium, and  Bayer® Aspirin With Heart Advantage, an 81 mg aspirin pill combined with phytosterols. Plaintiffs alleged that Bayer overcharged consumers for these products or that these products should not have been sold, because these products were not FDA-approved, could not provide all advertised health benefits, and were inappropriate for long-term use.

RESULT: $15 million settlement.

OTHER LANDMARK CASES

› **New England Compounding Center Meningitis Outbreak**

In 2012, the Center for Disease Control confirmed that New England Compounding Center sold at least 17,000 potentially tainted steroid shots to 75 clinics in 23 states across the country, resulting in more than 64 deaths and 751 cases of fungal meningitis, stroke or paraspinal/peripheral joint infection. HBSS attorneys Thomas M. Sobol and Kristen A. Johnson serve as Court-appointed Lead Counsel for the Plaintiffs' Steering Committee on behalf of plaintiff-victims in MDL 2419 consolidated before The Honorable Ray W. Zobel in the United States District Court for the District of Massachusetts.

RESULT: $100 million settlement.

**PRACTICE AREAS**

# Employment Litigation

Hagens Berman takes special interest in protecting workers from exploitation or abuse. We take on race and gender discrimination, immigrant worker issues, wage and hour issues, on-the-job injury settlements and other crucial workplace issues.

Often, employees accept labor abuses or a curbing of their rights because they don't know the law, respect their superiors or fear for their jobs. We act on behalf of employees who may lack the individual power to bring about meaningful change in the workplace. We take a comprehensive approach to rooting out systemic employee abuses through in-depth investigation, knowledgeable experts and fervent exploration of prosecution strategies. Hagens Berman is a firm well-versed in taking on complicated employee policies and bringing about significant results. Representative cases include:

## › CB Richard Ellis Sexual Harassment Litigation

Filed a class action against CB Richard Ellis, Inc., on behalf of 16,000 current and former female employees who alleged that the company fostered a climate of severe sexual harassment and discriminated against female employees by subjecting them to a hostile, intimidating and offensive work environment, also resulting in emotional distress and other physical and economic injuries to the class.

RESULT: An innovative and unprecedented settlement requiring changes to human resources policies and procedures, as well as the potential for individual awards of up to $150,000 per class member. The company agreed to increase supervisor accountability, address sexually inappropriate conduct in the workplace, enhance record-keeping practices and conduct annual reviews of settlement compliance by a court appointed monitor.

## › Costco Wholesale Corporation Wage & Hour Litigation

Filed a class action against Costco Wholesale Corporation on behalf of 2,000 current and former ancillary department employees, alleging that the company misclassified them as "exempt" executives, denying these employees overtime compensation, meal breaks and other employment benefits.
RESULT: $15 million cash settlement on behalf of the class.

## › Washington State Ferry Workers Wage Litigation

Represented "on-call" seamen who alleged that they were not paid for being "on call" in violation of federal and state law.
RESULT: Better working conditions for the employees and rearrangement in work assignments and the "on-call" system.

## › SunDance Rehabilitation Corporation

Filed a class action against SunDance challenging illegal wage manipulation, inconsistent contracts and other compensation tricks used to force caregivers to work unpaid overtime.
RESULT: $3 million settlement of stock to be distributed out of the company's bankruptcy estate.

## › Schneider National Carriers - Regional Drivers

The firm represents a certified class of regional drivers in a suit filed against Schneider National Carriers, claiming that the company failed to pay its workers for all  of their on duty time devoted to a variety of work tasks, including vehicle inspections, fueling, and waiting on customers and assignments. The suit also claims that the company does not provide proper meal and rest breaks and the company is liable for substantial penalties under the California Labor Code.
RESULT: A $28 million settlement on behalf of drivers.

## › Schneider National Carriers - Mechanics

Hagens Berman filed a class-action lawsuit alleging that Schneider National Carriers failed to provide mechanics with proper overtime compensation, meal and rest break premiums, and accurate wage statements as required by California law.
RESULT: In March of 2013, the case was settled on terms mutually acceptable to the parties.

HAGENS BERMAN SOBOL SHAPIRO LLP

**PRACTICE AREAS**

# Employment Litigation

> **Swift Transportation Co. of Arizona LLC**

The firm represents a certified class of Washington-based truck drivers against Swift Transportation. The suit alleges that Swift failed to pay the drivers overtime and other earned wages in violation of Washington state law.

An agreement to settle the case was granted preliminary approval in October 2018. Final approval is pending.

PRACTICE AREAS

# Environmental Litigation

Since Hagens Berman's founding, the firm has sought to work toward one simple goal: work for the greater good. Hagens Berman has established a nationally recognized environmental litigation practice, having handled several landmark cases in the Northwest, the nation and internationally.

Hagens Berman believes that protecting and restoring our environment from damage caused by irresponsible and illegal corporate action is some of the most rewarding work a law firm can do. As our firm has grown, we have established an internationally recognized environmental litigation practice.

**SCIENCE AND THE LAW**

Hagens Berman's success in environmental litigation stems from a deep understanding of the medical and environmental science that measures potential hazards. That expertise is translated into the courtroom as our attorneys explain those hazards to a judge or jury in easily understood terms.

**ENVIRONMENTAL EXPERTS**

Our firm's fostered deep relationships with top-notch environmental experts result in resonating arguments and court victories, as well as thoroughly researched and vetted investigations.

**REAL IMPACTS**

Environmental law is a priority at our firm and we have taken an active role in expanding this practice area. In 2003, Steve Berman and his wife Kathy worked with the University of Washington to create the Kathy and Steve Berman Environmental Law Clinic, giving law students the training and opportunities needed to become hands-on advocates for the environment.

Hagens Berman's significant environmental cases include:

## › Exxon Valdez Oil Spill Litigation

Hagens Berman represented various classes of claimants, including fisherman and businesses located in Prince William Sound and other impacted areas who were damaged by one of the worst oil spills in United States history.

RESULT: A $5 billion judgment was awarded by a federal jury, and a $98 million settlement was achieved with Alyeska, the oil company consortium that owned the output of the pipeline.

## › Chinook Ferry Litigation

The firm represented a class of property owners who challenged Washington State Ferries' high-speed operation of a new generation of fast ferries in an environmentally sensitive area of Puget Sound. Two of the ferries at issue caused environmental havoc and property damage, compelling property owners to act. A SEPA study conducted in response to the suit confirmed the adverse environmental impacts of the fast ferry service

RESULT: A $4.4 million settlement resulted that is among the most favorable in the annals of class litigation in Washington state.

## › Grand Canyon Litigation

The firm represented the Sierra Club in a challenge to a Forest Service decision to allow commercial development on the southern edge of the Grand Canyon National Park.

RESULT: The trial court enjoined the project.

## › Kerr-McGee Radiation Case

The firm brought a class action on behalf of residents of West Chicago, Illinois who were exposed to radioactive uranium tailings from a rare earth facility operated by Kerr-McGee.

RESULT: A medical monitoring settlement valued in excess of $5 million

## › Skagit Valley Flood Litigation

Hagens Berman represented farmers, homeowners and businesses who claimed damages as a result of the 1990 flooding of this community. The case was in litigation for ten years and involved a jury trial of more than five months.

RESULT: Following the entry of 53 verdicts against Skagit County, the trial court entered judgments exceeding $6.3 million. Ultimately, the State Supreme Court reversed this judgment. Despite this reversal, the firm is proud of this representation and believes that the Supreme Court erred.

PRACTICE AREAS

# Environmental Litigation

> ## Idaho Grass Burning Case

In 2002, Hagens Berman brought a class-action lawsuit on behalf of Idaho residents who claimed grass-burning farmers released more than 785 tons of pollutants into the air, including concentrations of polycyclic aromatic hydrocarbons (PAHs), proven carcinogens. Burning the fields annually caused serious health problems, especially to those with respiratory ailments such as cystic fibrosis and asthma. The suit also asserted that Idaho's grass burning policies are far below the standards of other states such as neighboring Washington, where farmers use other techniques to remove grass residue from the fields.

RESULT: The lawsuit settled in 2006 under confidential terms.

> ## Dole Bananas Case

The firm took on Dole Food Company Inc. in a class-action lawsuit claiming the world's largest fruit and vegetable company lied to consumers about its environmental record and banana-growing practices. The suit alleged that Dole misrepresented its commitment to the environment in selling bananas from a Guatemalan banana plantation that did not comply with proper environmental practices.

RESULT: The suit culminated in 2013. Dole and non-profit organization Water and Sanitation Health, Inc. collaborated on a water filter project to assist local communities in Guatemala.

> ## Diesel Emissions Litigation

Second to none in uncovering emissions-cheating, the firm has dedicated its time and resources to breaking up the dirty diesel ring. After filing the first lawsuit in the country against Volkswagen, Audi and Porsche for its massive Dieselgate scandal in 2015, the firm went on to unmask emissions-cheating devices installed in vehicles made by Fiat Chrysler, Mercedes and General Motors and continues to investigate diesel cars for excessive, illegal and environmentally harmful levels of emissions.

RESULT: The firm's independently researched active cases have led to investigations by the EPA, DOJ and European authorities.

> ## San Francisco and Oakland Climate Change Litigation

Hagens Berman represents the cities of San Francisco and Oakland, Calif. in two lawsuits filed against BP, Chevron Corp., Exxon Mobil Corp., Royal Dutch Shell PLC and ConocoPhillips alleging that the Big Oil giants are responsible for the cities' costs of protecting themselves from global warming-induced sea level rise, including expenses to construct seawalls to protect the two cities' more than 5 million residents. The newly filed case

seek an order requiring defendants to abate the global warming-induced sea level rise by funding an abatement program to build sea walls and other infrastructure. Attorneys for the cities say this abatement fund will be in the billions.

> ## Florida Sugarcane Burning

Hagens Berman filed a class-action lawsuit against the sugar industry's largest entities on behalf of residents of various areas and townships of Florida that have long suffered from the corporations' wildly hazardous and damaging methods of harvesting sugarcane. The lawsuit states that this outdated method of harvesting has wreaked havoc on these Florida communities. The wildly archaic method of harvesting brings devastating toxic smoke and ash, often called "black snow," raining onto poor Florida communities for six months of the year. The lawsuit's defendants, commonly known as Big Sugar, farm sugarcane on approximately 400,000 acres in the area south and southeast of Lake Okeechobee.

> ## Kivalina Global Warming Litigation

A tiny impoverished Alaskan village of Inupiat Eskimos took action against some of the world's largest greenhouse gas offenders, claiming that contributions to global warming are leading to the destruction of their village and causing erosion to the land that will eventually put the entire community under water. Hagens Berman, along with five law firms and two non-profit legal organizations, filed a suit against nine oil companies and 14 electric power companies that emit large quantities of greenhouse gases into the atmosphere. The lawsuit alleged their actions resulted in the destruction of protective ice, exposing the village to severe storms that destroy the ground the village stands on. Relocating the village of Kivalina could cost between $95 and $400 million, an expense the community cannot afford.

> ## Cane Run Power Plant Coal Ash Case

In 2013, Hagens Berman filed a class-action lawsuit against Louisville Gas and Electric Company alleging it illegally dumped waste from a coal-fired power plant onto neighboring property and homes where thousands of Kentucky residents live. According to the complaint, Louisville Gas and Electric Company's Cane Run Power Plant is fueled by the burning of coal, which also produces coal combustion byproducts—primarily fly ash and bottom ash—that contain significant quantities of toxic materials, including arsenic, chromium and lead. The dust spewed by Cane Run contains known carcinogens, posing significant potential health hazards.

HAGENS BERMAN SOBOL SHAPIRO LLP

PRACTICE AREAS

# Governmental Representation

Hagens Berman has been selected by public officials to represent government agencies and bring civil law enforcement and damage recoupment actions designed to protect citizens and the treasury. We understand the needs of elected officials and the obligation to impartially and zealously represent the interests of the public, are often chosen after competitive bidding and have been hired by officials from across the political spectrum.

Hagens Berman has assisted governments in recovering billions of dollars in damages and penalties from corporate wrongdoers and, in the process, helped reform how some industries do business. In serving government, we are often able to leverage the firm's expertise and success in related private class-action litigation. Successes on behalf of government clients include:

### > Big Tobacco

We represented 13 states in landmark Medicaid-recoupment litigation against the country's major tobacco companies. Only two states took cases to trial – Washington and Minnesota. The firm served as trial counsel for the state of Washington, becoming only one of two private firms in the entire country to take a state case to trial.

Hagens Berman was instrumental in developing what came to be accepted as the predominant legal tactic to use against the tobacco industry: emphasizing traditional law enforcement claims such as state consumer protection, antitrust and racketeering laws. This approach proved to be nearly universally successful at the pleading stage, leaving the industry vulnerable to a profits-disgorgement remedy, penalties and double damages. The firm also focused state legal claims on the industry's deplorable practice of luring children to tobacco use.

RESULT: $260 billion for state programs, the largest settlement in the history of civil litigation in the U.S.

### > McKesson Average Wholesale Price Litigation

This litigation is yet another example of fraudulent drug price inflation impacting not just consumers and private health plans, but public health programs such as Medicaid and local government-sponsored plans as well.

RESULT: Hagens Berman has started the AWP class action, which resulted in many states filing cases. The firm represented several of those states in successful litigation.

### > McKesson Government Litigation

On the heels of Hagens Berman's class action against McKesson, the firm led lawsuits by states (Connecticut, Utah, Virginia, Montana, Arizona).

RESULT: These states obtained recoveries three to seven times larger than states settling in the multi-state Attorneys General settlement. In addition, the firm obtained $12.5 million for the City of San Francisco and $82 million for a nationwide class of public payors.

### > Zyprexa Marketing & Sales Practices Litigation - Connecticut

Hagens Berman served as outside counsel to then-Attorney General Richard Blumenthal in litigation alleging that Lilly engaged in unlawful off-label promotion of the atypical antipsychotic Zyprexa. The litigation also alleged that Lilly made significant misrepresentations about Zyprexa's safety and efficacy, resulting in millions of dollars in excess pharmaceutical costs borne by the State and its taxpayers.

RESULT: $25 million settlement.

### > General Motors Ignition Switch Litigation

Hagens Berman is pleased to be assisting the Arizona Attorney General in its law enforcement action versus GM, as well as the district attorney of Orange County, California who filed a consumer protection lawsuit against GM, claiming the automaker deliberately endangered motorists and the public by intentionally concealing widespread, serious safety defects.

HAGENS BERMAN SOBOL SHAPIRO LLP

PRACTICE AREAS

# Governmental Representation

## ⟩ State Opioid Litigation

Hagens Berman was hired to assist multiple municipalities in lawsuits brought against large pharmaceutical manufacturers including Purdue Pharma, Cephalon, Janssen Pharmaceuticals, Endo Health Solutions and Actavis charging that these companies and others deceived physicians and consumers about the dangers of prescription painkillers.

The firm was first hired by California governmental entities for the counties of Orange and Santa Clara. The state of Mississippi also retained the firm's counsel in its state suit brought against the manufacturer of opioids. The suit alleges that the pharma companies engaged in tactics to prolong use of opioids despite knowing that opioids were too addictive and debilitating for long-term use for chronic non-cancer pain.

In a third filing, Hagens Berman was retained as trial counsel for the state of Ohio. Filed on May 31, 2017, the firm is assisting the Ohio Attorney General's office in its case against five opioid makers. Ohio Attorney General Mike DeWine stated that "drug companies engaged in fraudulent marketing regarding the risks and benefits of prescription opioids which fueled Ohio's opioid epidemic," and that "these pharmaceutical companies purposely misled doctors about the dangers connected with pain meds that they produced, and that they did so for the purpose of increasing sales."

## ⟩ Municipal Lending

Hagens Berman represents the cities of Los Angeles and Miami in a series of lawsuits filed against the nation's largest banks, including CitiGroup, JP Morgan, Wells Fargo and Bank of America alleging that they engage in systematic discrimination against minority borrowers, resulting in reduced property tax receipts and other damages to the cities. The suits seek damages for the City, claiming that the banks' alleged discriminatory behavior resulted in foreclosures, causing a reduction of property tax revenues and increased municipal service costs.

**PRACTICE AREAS**

# Intellectual Property

The Hagens Berman intellectual property team has deep experience in all aspects of intellectual property litigation. We specialize in complex and significant damages cases against some of the world's largest corporations.

The firm is primarily engaged in patent infringement litigation at this time. We seek to represent intellectual property owners, including inventors, universities, non-practicing entities, and other groups whose patent portfolios represents a significant creative and capital investment.

Our current and recent engagements include the following:

> **Bombadier Inc.**

The firm represented Arctic Cat Inc. in patent infringement litigation against Bombardier Recreational Products and BRP U.S. Inc. The complaint alleges that Bombardier's Sea-Doo personal watercraft infringe Arctic Cat's patents covering temporary steerable thrust technology used when the rider turns in off-throttle situations.

RESULT: Florida U.S. District Judge Beth Bloom issued a final judgment of $46.7 million against defendants, trebling initial damages of $15.5 million awarded in a unanimous jury verdict.

> **Angry Birds**

Hagens Berman represented a Seattle artist who filed a lawsuit against Hartz Mountain Corporation – one of the nation's largest producers of pet-related products – claiming the company illegally sold the artist's trademarked Angry Birds pet toy line to video game giant Rovio Entertainment Ltd, robbing her of millions of dollars of royalty fees.

RESULT: The case settled under confidential terms, which the firm found to be extremely satisfactory for the plaintiff.

> **Samsung, LG, Apple**

The firm represents FlatWorld Interactives LLC in patent litigation against Samsung, LG and Apple. The complaints allege that the defendants' mobile handsets, tablets, media players and other devices infringe a FlatWorld patent covering the use of certain gestures to control touchscreen displays.

RESULT: The case settled.

> **Oracle**

The firm represents Thought Inc. against Oracle Corporation in a suit alleging infringement of seven patents covering various aspects of middleware systems providing application to database mapping, reading and persistence.

> **Salesforce**

The firm represents Applications in Internet Time LLC in patent litigation against Salesforce Inc. The suit alleges that our client's patents cover the core architecture of Salesforce's platform for developing, customizing, and updating cloud-based software applications.

> **Nintendo**

The firm represented Japan-based Shinsedai Company in patent infringement litigation against Nintendo. The suit alleged that our client's patents were infringed by various sports games for the Nintendo Wii.

*Unlike other intellectual property firms, Hagens Berman only represents plaintiffs. This reduces the risk of potential conflicts of interest which often create delays in deciding whether or not to take a case at larger firms.*

**PRACTICE AREAS**

# Intellectual Property

› **Electronic Arts**

Hagens Berman represents the original software developer of the Electronic Arts (EA) NFL Madden Football video game series in a suit alleging that he is owed royalties on EA Madden NFL titles as well as other derivative products. We prevailed in two trials against EA, and the verdicts were designated as the Top Verdict of the Year (2013) by The Daily Journal. The judgment is on appeal and if upheld will return for a final damages phase.

Hagens Berman is also skilled in other aspects of intellectual property law, including trademark, trade dress, trade secret and copyright litigation.

PRACTICE AREAS

# Investor Fraud – Individual and Class Action Litigation

Investing is a speculative business involving assessment of a variety of risks that can only be properly weighed with full disclosure of accurate information. No investor should suffer undue risk or incur losses due to misrepresentations related to their investment decisions.

Our attorneys work for institutional and individual investors defrauded by unscrupulous corporate insiders and mutual funds. The firm vigorously pursues fraud recovery litigation, forcing corporations and mutual funds to answer to deceived investors.

Hagens Berman is one of the country's leading securities litigation firms advising clients in both individual and class-action cases. The firm has experience, dedication and a team with the horsepower required to drive complex cases to exemplary outcomes. Our attorneys are authorities in an array of issues unique to federal and state securities statutes and related laws. We use a variety of highly experienced experts as an integral part of our prosecution team. Successes on behalf of our investor clients include:

## › Charles Schwab Securities Litigation

Lead counsel, alleging fraud in the management of the Schwab YieldPlus mutual fund.

RESULT: $235 million class settlement for investors.

## › Oppenheimer

Additional counsel for lead plaintiffs in class action alleging Oppenheimer misled investors regarding its Champion and Core Bond Funds.

RESULT: $100 million for the classes.

## › Tremont

Co-lead counsel in a case alleging Tremont Group Holdings breached its fiduciary duties by turning over $3.1 billion to Bernard Madoff. On Sept. 14, 2015, after nearly two years of negotiations and mediation, the court granted final approval of the plan of allocation and distribution of the funds which markets estimate could yield investors as much as $1.45 billion.

RESULT: $100 million settlement between investors, Tremont and its affiliates.

## › Boeing

Uncovered critical production problems with the 777 airliner documented internally by Boeing, but swept under the rug until a pending merger with McDonnell Douglas was completed.

RESULT: Record-breaking settlement of more than $92.5 million.

## › J.P. Morgan – Madoff

Case alleges that banking and investment giant J.P. Morgan was complicit in aiding Bernard Madoff's Ponzi scheme. Investors claim that J.P. Morgan operated as Bernard L. Madoff Investment Securities LLC's primary banker for more than 20 years.

RESULT: $218 million settlement amount for the class and a total of $2.2 billion paid from JPMorgan that will benefit victims of Madoff's Ponzi scheme.

## › Morrison Knudsen

Filed a shareholder class action, alleging that MK's senior officers concealed hundreds of millions in losses.

RESULT: More than $63 million for investors.

## › Raytheon/Washington Group

Charged Raytheon with deliberately misrepresenting the true financial condition of Raytheon Engineers & Constructors division in order to sell this division to the Washington Group at an artificially inflated price.

RESULT: $39 million settlement.

## › U.S. West

Represented shareholders of U.S. West New Vector in a challenge to the proposed buyout of minority shareholders by U.S. West.

RESULT: The proposed buyout was stayed, and a settlement was achieved, resulting in a $63 million increase in the price of the buyout.

**PRACTICE AREAS**

# Investor Fraud - Individual and Class Action Litigation

Our current casework includes:

### › Theranos Investor Litigation

Hagens Berman represents Theranos investors in a lawsuit that states that Theranos and its officers set in motion a publicity campaign to raise billions of dollars for Theranos and themselves, and to induce investors to invest in Theranos, all the while knowing that its "revolutionary" blood test technology was essentially a hoax. The suit filed against the company, its CEO Elizabeth Holmes and Ramesh Balwani, alleges that Theranos' statements to investors were built on false statements. At the crux of the court's recent decision to uphold the investor case against Theranos was a finding that while plaintiffs did not directly purchase their securities from defendants, claims made by Theranos, Holmes and Balwani constituted fraud.

### › Aequitas Investor Litigation

The firm represents a group of investors alleging that national law firm Sidley Austin LLP, Oregon law firm Tonkon Torp LLP and accounting firms Deloitte & Touche LLP and EisnerAmper LLP violated Oregon securities laws by participating or materially aiding in misrepresentations made by Aequitas Management LLC and contributing to a $350 million Ponzi scheme. Investors state, amongst other allegations, that in 2011 Aequitas began purchasing loan receivables from Corinthian College Inc. and had bought the rights to collect $444 million in loans. Investment managers hid the details of the transactions from investors, and deceived them when Corinthian's business was hit with regulatory challenges in 2014. When Corinth collapsed in May 2015, the investment group and its managers continued to sell securities and used the money to pay off other investors and fund a lavish lifestyle, until Aequitas ultimately imploded in 2017, the investors claim.

### › China MediaExpress

Hagens Berman represents investors in a case against China MediaExpress, which purported to be the owner of a network of advertising terminals on buses throughout China. The case alleges that the company and its auditor (Deloitte Touche Tohmatsu) participated in accounting fraud that ultimately led to the demise of the company. In early 2014, the court entered a default judgment in the amount of $535 million and certified a proposed class against China Media Express Holdings Inc. The case will proceed separately against Deloitte Touche Tohmatsu.
On May 6, 2015 Hagens Berman obtained a $12 million settlement from Deloitte Touche Tohmatsu, one of the largest settlements against an auditor in a Chinese "reverse merger" case which is now awaiting final approval from the court.

### › Altisource Asset Management Corporation

The firm was appointed lead counsel in this institutional investor lawsuit brought on behalf of purchasers of Altisource Asset Management Corporation (AAMC). The complaint alleges that AAMC misrepresented or outright concealed its relationship with these companies and the extent to which the interconnected entities engaged in conflicted transactions with themselves. Estimates of class-wide damages are in the hundreds of millions of dollars. The firm recently filed the consolidated complaint and motions to dismiss are pending before the U.S. District Court for the District of the Virgin Islands.

## WHISTLEBLOWERS

In an effort to curb Wall Street excesses, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act, which built vigorous whistleblower protections into the legislation known as the "Wall Street Tip-Off Law." The law empowers the U.S. Securities and Exchange Commission to award between 10 and 30 percent of any monetary sanctions recovered in excess of $1 million to whistleblowers who provide information leading to a successful SEC enforcement. It also provides similar rewards for whistleblowers reporting fraud in the commodities markets.

Hagens Berman represents whistleblowers with claims involving violations of the Securities Exchange Act and the Commodities Exchange Act. Unlike traditional whistleblower firms who have pivoted into this area, Hagens Berman has a strong background and history of success in securities, antitrust and other areas of fraud enforcement, making us an ideal partner for these cases. Our matters before the SEC/CFTC include a range of claims, including market manipulation and fraudulent financial statements.

HAGENS BERMAN SOBOL SHAPIRO LLP

PRACTICE AREAS

# Investor Fraud – Institutional Investor Portfolio Monitoring and Recovery Services

Hagens Berman is a leading provider of specialized securities litigation services to public, private and Taft-Hartley pension funds. We offer proprietary and unparalleled asset protection and recovery services to both foreign and domestic institutions. Our institutional services provide participants with the ability to identify, investigate and react to potential wrongdoing by companies in which the institution invests.

**PORTFOLIO MONITORING.** Timely information and analysis are the critical ingredients of a successful fraud recovery program. Institutions must receive quick, reliable determinations concerning the source and extent of their losses, the likelihood of recoupment and the best manner for pursuing it. Our Portfolio Monitoring Service provides these services at no cost to participating institutions. The Hagens Berman Portfolio Monitoring Service has three primary components:

**TRACKING.** Alerts clients of any significant portfolio losses due to suspected fraud.

**ANALYSIS.** Provide clients with necessary legal and factual analyses regarding possible recovery options, removing from the institution any burden connected with scrutinizing myriad instances of potential wrongdoing and attempt to decipher whether direct, recoverable injuries have resulted.

**REPORTING.** Attorneys and forensic accounting fraud experts deliver a concise monthly report that furnishes comprehensive answers to these inquiries. On a case-by-case basis, the report specifies each of the securities in which the client lost a significant amount of money, and matches those securities with an analysis of potential fraud likelihood, litigation options and an expert recommendation on how best to proceed for maximum recovery.

Our Portfolio Monitoring Service performs its functions with almost no inconvenience to participating institutions. A client's custodian bank provides us with records detailing the client's transactions from the prior several years and on a regular basis thereafter. Importantly, none of the institution's own personnel is required to share in this task, as we acquire the information directly from the custodian bank.

We provide our Portfolio Monitoring service with no strings attached and allow our clients to act without cost or commitment. In instances where a litigation opportunity arises, we believe our skills make us the ideal choice for such a role, although the client is free to choose others.

When a portfolio loses money because of corporate deception, our litigation services seek to recover a substantial percentage of those losses, thereby increasing a fund's performance metric. As fiduciaries, money managers may not have the ability or desire to risk funds on uncertain litigation using typical hourly-rate law firms. Hagens Berman seeks to minimize the burden on the money manager by pursuing cases on a contingent-fee basis.

HAGENS BERMAN SOBOL SHAPIRO LLP

PRACTICE AREAS

# Personal Injury and Abuse

For nearly two decades, Hagens Berman's blend of professional expertise and commitment to our clients has made our firm one of the most well-respected and successful mass tort and personal injury law firms in the nation. We deliver exceptional results for our clients by obtaining impressive verdicts and settlements in personal injury litigation.

Our attorneys have experience in wrongful death, brain injury and other catastrophic injury cases, as well as deep experience in social work negligence, medical malpractice, nursing home negligence and sexual abuse cases.

Hagens Berman also has unparalleled experience in very specific areas of abuse law, recovering damages on behalf of some of the most vulnerable people in our society.

**Sexual Abuse Litigation** Hagens Berman has represented a wide spectrum of individuals who have been victims of sexual abuse, including children and developmentally disabled adults. We treat each case individually, with compassion and attention to detail and have the expertise, resources and track record to stand up to the toughest opponents. In the area of sexual abuse, our attorneys have obtained record-breaking verdicts, including the largest personal injury verdict ever upheld by an appellate court in the state of Washington. More about Hagens Berman's sexual abuse practice ca be found on the following page.

**Nursing Home Negligence** Nursing home negligence is a growing problem throughout the nation. As our population ages, reports of elder abuse and nursing home negligence continue to rise. Today, elder abuse is one of the most rapidly escalating social problems in our society. Hagens Berman is uniquely qualified to represent victims of elder abuse and nursing home negligence. Our attorneys have secured outstanding settlements in this area of the law and have committed to holding nursing homes accountable for wrongdoing.

**Social Work Negligence** Social workers play a critical role in the daily lives of our nation's most vulnerable citizens. Social workers, assigned to protect children, the developmentally disabled and elderly adults, are responsible for critical aspects of the lives of tens of thousands of citizens who are unable to protect themselves. Many social workers do a fine job. Tragically, many do not. The results are often catastrophic when a social worker fails to monitor and protect his or her vulnerable client. All too often, the failure to protect a child or disabled citizen leads to injury or sexual victimization by predators. With more than $40 million in recoveries on behalf of vulnerable citizens who were neglected by social workers, Hagens Berman is the most experienced, successful and knowledgeable group of attorneys in this dynamic area of the law.

**Workplace Injury** While many workplace injury claims are precluded by workers compensation laws, many instances of workplace injury are caused by the negligence and dangerous oversight of third parties. In these instances, victims may have valid claims. Hagens Berman's personal injury legal team has successfully brought many workplace injury claims, holding third parties liable for our clients' serious bodily injuries.

**Medical Malpractice** Litigating a medical malpractice case takes acute specialization and knowledge of medical treatments and medicine. Notwithstanding these facts, Hagens Berman pursues meritorious medical malpractice claims in instances where clients have suffered life-altering personal injuries. Our firm's personal injury attorneys handle medical malpractice cases with the dedication and detail necessary to make victims whole. Hagens Berman is very selective in accepting medical malpractice cases and has been successful in recovering significant compensation for victims of medical error and negligence.

PRACTICE AREAS

# Sexual Abuse and Harassment

Hagens Berman's attorneys recently achieved a nationwide sexual harassment settlement on behalf of 16,000 women and also tried the first ever sexual harassment case in Washington state, and has represented women violated by Harvey Weinstein, as well as USC alumnae abused by the university's former gynecologist, Dr. George Tyndall. Our firm is committed to protecting and empowering individuals.

At Hagens Berman, we believe no one is above the law, and that no position of power should shield someone from being held accountable.

Right now, we are witnessing the silencing, belittling and abuse that women everywhere in this nation are subjected to. They are subjected to a system that does not respect them. The backlash against the brave survivors who have stepped forward to report sexual assault is unacceptable.

We believe survivors. Our firm's sexual harassment attorneys have protected their rights for decades throughout their legal careers, and we are dedicated to upholding the rights of the most vulnerable. Women should be heard, respected and protected from systemic abuse.

Sexual harassment is present and pervasive in many workplaces, industries and professional environments, and has damaged the lives and careers of countless individuals. It affects hundreds of thousands of women and men in the U.S., 51 percent of which are harassed by an authority figure, making it harder to come forward for fear of retaliation.

All too often, acts of sexual harassment and sexual misconduct are protected by systemic cover-ups by companies and organized agreements between those in power. Particular industries are more susceptible to these cover-ups including: entertainment and sports media, STEM, law enforcement, food service, politics, military, tech, finance, hospitality and transportation. But sexual harassment is pervasive in many other environments and is often obscured from view for years.

In these industries, victims are routinely subjected to widespread policies and practices that create an environment promoting quid pro quo arrangements in which victims feel pressured to take part in sexual acts and feel powerless against unwanted advancements. Victims are also often punished for not taking part.

The firm has represented women violated by Harvey Weinstein, as well as USC alumnae abused by the university's former gynecologist, Dr. George Tyndall, tried the first ever sexual harassment case in Washington state, and achieved a nationwide sexual harassment settlement on behalf of 16,000 women.

Representative sexual harassment successes and cases on behalf of our clients include:

› **USC, Dr. Tyndall Sexual Harassment**

In May of 2018, Hagens Berman filed a class-action lawsuit against the University of Southern California (USC) and Dr. George Tyndall, the full-time gynecologist at USC's student health clinic. Tyndall sexually harassed, violated and engaged in wildly inappropriate behavior with female students who sought his medical care, according to news outlets, which stated he saw tens of thousands of female patients during his time at USC.

Official complaints of Dr. Tyndall's behavior began to surface at USC in the 1990s, but despite the university's knowledge of Dr. Tyndall's behavior, it did not report him to the agency responsible for protecting the public from problem doctors. USC did nothing, for decades, as more and more female students were sent into Dr. Tyndall's office.

The settlement's three-tier structure allows class members to

PRACTICE AREAS

# Sexual Abuse and Harassment

choose how much they want to engage with the claims process. Those who do not want to revisit a private, traumatic event can simply keep the guaranteed Tier 1 payment of $2,500. Those who choose to provide additional information in a claim form about their experience with Tyndall and how it affected them are eligible for up to $20,000 and those who choose to provide an interview are eligible for up to $250,000. The special master and her team of experts will evaluate claims and allocate awards to Tier 2 and Tier 3 claimants. This focus on choice ensures that all class members receive compensation while giving each class member the autonomy to decide for herself how involved she wants to be in the settlement process.

The class-action settlement also goes beyond monetary compensation and forces USC to implement real changes to their policies and procedures to help ensure that what happened at USC does not happen again.

RESULT: $215 million settlement

## Harvey Weinstein Sexual Harassment

In a first-of-its-kind class-action lawsuit, Hagens Berman represented women on behalf of a class of all victims who were harassed or otherwise assaulted by Harvey Weinstein, seeking to hold him and his co-conspirators accountable for a years-long pattern of sexual harassment and cover-ups.

The lawsuit, filed Nov. 15, 2017, in the U.S. District Court for the Central District of California states that Miramax and The Weinstein Company (which Weinstein co-founded) facilitated Weinstein's organized pattern of predatory behavior, equating to an enterprise that violates the Racketeer Influenced and Corrupt Organizations Act, commonly referred to as the RICO Act, the same law brought against members of the Mafia for organized criminal behavior.

The lawsuit brought various charges against Weinstein and his companies for violating the RICO Act, mail and wire fraud, assault, civil battery, negligent supervision and retention, and intentional infliction of emotional distress.

RESULT: Settlement reached

## Fairfax Behavioral Health

Attorneys from Hagens Berman filed a class-action complaint on behalf of a proposed class of hundreds of patients that were arbitrarily strip-searched and video recorded while receiving treatment for mental illness at one of three Fairfax locations in Washington state.

The suit's named plaintiff recalls being ordered to undress for an invasive strip-search when she presented for inpatient admission, even after disclosing her history of sexual abuse to the staff member. She was not given a gown or towel to cover up during the search, and the staff member watched her undress and left the door open where other staff members could see her.

Video cameras were located in the hallway, the holding area outside bathroom, and the room where the strip search was conducted. The cameras recorded her undressing and the strip-search.

The complaint states that Fairfax's practices—and its failure to limit the discretion of its staff—means that a substantial number of its mental health patients do not have reasonable access to inpatient care for mental health disorders.

## CB Richard Ellis Sexual Harassment Litigation

Filed a class action against CB Richard Ellis, Inc., on behalf of 16,000 current and former female employees who alleged that the company fostered a climate of severe sexual harassment and discriminated against female employees by subjecting them to a hostile, intimidating and offensive work environment, also resulting in emotional distress and other physical and economic injuries to the class.

RESULT: An innovative and unprecedented settlement requiring changes to human resources policies and procedures, as well as the potential for individual awards of up to $150,000 per class member. The company agreed to increase supervisor accountability, address sexually inappropriate conduct in the workplace, enhance record-keeping practices and conduct annual reviews of settlement compliance by a court appointed monitor.

PRACTICE AREAS

# Sexual Abuse and Harassment

## › King County Child Sex Abuse

Hagens Berman represented the victim of eight years of sexual abuse as a minor, at the hands of her brother-in-law. The lawsuit states that from 2005 to 2012, the case's defendant repeatedly sexually abused Hagens Berman's client. She was only eleven years old when the abuse began and was a minor during the entire duration of the abuse. In 2013, the state of Washington charged Willis with three counts of child molestation, to which he pled guilty. Court documents state, "Joshua Blaine Willis used his position of trust, confidence, or fiduciary responsibility to facilitate the commission of the … offense[s]…"

Court documents in the civil case filed in June of 2017 detail Willis' highly disgusting and horrifying actions including groping and molestation, exposing himself and other highly sexual and inappropriate behavior.

Following the years of sexual abuse, Hagens Berman's client suffers from Post-Traumatic Stress Disorder and the court awarded damages for treatment of her condition and other emotional distress, as well as loss of earning capacity and other economic damages in her "struggle with consistency and stability."

RESULT: $4,031,000 judgment awarded in a King County Superior Court

## › State of Washington Sexual Assault, DSHS

Our client, a disabled Spokane, Wash. woman, was a patient at Eastern State Hospital. The hospital assigned a male nurse to provide one-on-one care and supervision for our client. The nurse trapped our client in a laundry room and raped her. Hagens Berman determined that the nurse, a state employee, had been reprimanded and accused on previous occasions of sexual assault of vulnerable patients. Hagens Berman initiated a negligence and civil rights lawsuit against the hospital and its administrators for failing to protect our client from a known sexual predator and for allowing that predator to remain on staff with the responsibility to care for vulnerable patients.

RESULT: $2.5 million settlement

## › Workplace Sexual Harassment & Other Investigations

Sexual harassment is present and pervasive in many workplaces. It affects hundreds of thousands of women and men in the U.S., 51 percent of which are harassed by a supervisor, making it harder to come forward for fear of retaliation.

All too often, sexual harassment in the workplace is protected by systemic cover-ups by companies and those in power. Particular industries are more susceptible to these cover-ups including: commercial real estate, law enforcement, politics, military, tech, entertainment, sports media, finance, restaurants and hospitality, advertising and trucking.

In these industries, employees are routinely subjected to widespread policies that create an environment promoting quid pro quo arrangements in which they feel pressured to take part in sexual acts and feel powerless against unwanted advancements. Employees are also often punished for not taking part.

Hagens Berman is also investigating sexual harassment and abuse in various specific areas of study, including STEM programs. The also maintains a keen watch over various work environments that are statistically prone to instances of misconduct. These include hospitality, college campuses and research labs, boarding schools and the entertainment industry, especially within the area of professional music.

The firm remains committed to uncovering instances of sexual harassment in the workplace, and within fields of study and areas prone to harboring misconduct and abusive behavior.

**PRACTICE AREAS**

# Sports Litigation

Hagens Berman has one of the nation's most highly regarded sports litigation law practices. Our attorneys are the vanguard of new and innovative legal approaches to protect the rights of professional and amateur athletes in cases against large, well-financed interests, including the National Collegiate Athletic Association (NCAA), the National Football League (NFL), the Fédération Internationale de Football Association (FIFA) and other sports governing institutions.

› **NCAA: Scholarships/Grants-In-Aid (GIAs)**

In a first-of-its-kind antitrust action and potentially far-reaching case, Hagens Berman filed a class-action affecting approximately 40,000 Division I collegiate athletes who played men's or women's basketball, or FBS football, brought against the NCAA and its most powerful members, including the Pac-12, Big Ten, Big-12, SEC and ACC, claiming they violated federal antitrust laws by drastically reducing the number of scholarships and financial aid student-athletes receive to an amount below the actual cost of attendance and far below what the free market would bare.

The case resulted in a $208.9 million settlement, bringing an estimated average amount of $6,500 to each eligible class member who played his or her sport for four years.

In March of 2019, the firm  as co-lead trial counsel  on the injunctive aspect of the case which resulted in a change of NCAA rules limiting the financial treatment of athletes, and in a unanimous 9-0 Supreme Court Victory, the injunctive portion of the case also resulted in a monumental victory for plaintiffs. The Court ruled that NCAA college athletes should legally be able to receive compensation from schools or conferences for athletic services other than cash compensation untethered to education-related expenses, prohibiting the NCAA from enforcing rules limiting those payments. The media called the firm's victory in the scholarships case against the NCAA a "major ruling" (ABC World News Tonight), that "will change the game" (ABC Good Morning America), "…the highest court left the NCAA unhoused and naked, with nothing left but its pretensions," (The Washington Post), it "delivered a heavy blow," (AP), and leaves the NCAA "more vulnerable than ever."

› **NCAA: Concussions**

Cases of particular nationwide interest for fans, athletes and the general public involve numerous cases filed by Hagens Berman against the NCAA. Recently, the firm took on the NCAA for its failure to prevent concussions and protect student-athletes who suffered concussions. Steve Berman served as lead counsel in multi-district litigation and led the firm to finalize a settlement bringing sweeping changes to the NCAA's approach to concussion treatment and prevention. The core settlement benefits include a 50-year medical monitoring program overseen by a medical science committee appointed by the court that will screen and track concussions, funded by a $70 million medical monitoring fund, paid by the NCAA and its insurers. Examinations include neurological and neurocognitive assessments to evaluate potential injuries.

The settlement also mandates significant changes to and enforcement of the NCAA's concussion management policies and return-to-play guidelines. All players will now receive a seasonal, baseline test to better assess concussions sustained during the season. All athletes who have sustained a concussion will now need to be cleared before returning to play. A medical professional trained in the diagnosis of concussions will be present at all games involving contact-sports. The settlement also creates reporting mandates for concussions and their treatment.

› **Player Name, Image & Likeness Rights in Videogames**

Hagens Berman attorneys represented student-athletes who claimed that the NCAA illegally used student-athletes' names, images and likenesses in Electronic Arts' popular NCAA Football, Basketball and March Madness video game series reached a

**PRACTICE AREAS**

# Sports Litigation

combined $60 million settlement with the NCAA and EA, marking the first time the NCAA has agreed to a settlement that pays student-athletes for acts related to their participation in athletics. Settlement checks were sent to about 15,000 players, with average amounts of $1,100 and some up to $7,600.

The firm began this case with the knowledge that the NCAA and member schools were resolute in keeping as much control over student-athletes as possible, and fought hard to ensure that plaintiffs would not be exploited for profit, especially by the organization that vowed to prevent the college athletes from exploitation.

The firm also represented NFL legend Jim Brown in litigation against EA for improperly using his likeness in its NFL video games, culminating in a $600,000 voluntary judgment offered by the video game manufacturer.

## › Continued NIL Litigation

Hagens Berman has continued efforts against the NCAA in an additional pending antitrust case regarding NIL rights. In June 2020, the firm filed its case against the NCAA claiming the institution had knowingly violated federal antitrust laws in abiding by a particular subset of NCAA amateurism rules that prohibit college-athletes from receiving anything of value in exchange for the commercial use of their name and likeness. The firm holds that the NCAA's regulations illegally limiting the compensation that Division I college athletes may receive for the use of their names, images, likenesses and athletic reputations.

In unanimously upholding the rights of NCAA athletes in Alston, Justice Gorsuch wrote the NCAA had sought "immunity from the normal operation of the antitrust laws," and Justice Kavanaugh stated, "The NCAA is not above the law." The firm looks forward to continuing to uphold that same sentiment in regard to NCAA athlete name, image and likeness rights.

In July 2021, following the firm's victory in the Alston case, the NCAA chose to temporarily lift rules restricting certain NIL deals in what the firm believes will be the first step in another massive change in college sports to support college athletes.

## › FIFA/U.S. Soccer: Concussions

Several soccer players filed a class action against U.S. soccer's governing bodies, which led to life-changing safety measures brought to millions of U.S. youth soccer players. Players represented by Hagens Berman alleged these groups failed to adopt effective policies to evaluate and manage concussions, leaving millions of players vulnerable to long-lasting brain injury.

The settlement against six of the largest youth soccer organizations completely eliminates heading for youth soccer's youngest players, greatly diminishing risks of concussions and traumatic head injuries. Prior to the settlement, no rule limited headers in children's soccer.

It also sets new benchmarks for concussion measurement and safety protocols, and highlights the importance of on-staff medical personnel at youth tournaments. Under the settlement, youth players who have sustained a concussion during practice or a game will need to follow certain return-to-play protocols before they are allowed to play again. Steve Berman, a youth soccer coach, has seen first-hand the settlement's impacts and life-changing effects every time young athletes take to the field.

## › NCAA: Transfer Antitrust

Hagens Berman has taken on the NCAA for several highly recruited college athletes whose scholarships were revoked after a coaching change, or after the student-athletes sought to transfer to another NCAA-member school. The suit claims the organization's limits and transfer regulations violate antitrust law.

The firm's case hinges on a destructive double-standard. While Non-student-athletes are free to transfer and are eligible for a new scholarship without waiting a year, and coaches often transfer to the tune of a hefty pay raise, student-athletes are penalized and forced to sit out a year before they can play elsewhere, making them much less sought after by other college athletic programs. Hagens Berman continues to fights for student-athletes' rights to be treated fairly and terminate the NCAA's anticompetitive practices and overbearing regulations that limit players' options and freedoms.

PRACTICE AREAS

# Sports Litigation

## › Pop Warner

Hagens Berman represented youth athletes who have suffered traumatic brain injuries due to gross negligence, and filed a lawsuit on behalf of former Pop Warner football player Donnovan Hill and his mother Crystal Dixon. The suit claims that the league insisted Hill use improper and dangerous tackling techniques which left the then 13-year-old paralyzed from the neck down.

Hagens Berman sought to hold Pop Warner, its affiliates, Hill's coaches and members of the Lakewood Pop Warner board of directors accountable for the coaches' repeated and incorrect instruction that Hill and his teammates tackle opposing players by leading with the head. In January of 2016, the firm reached a settlement on behalf of Donnovan and his mother, the details of which were not made public. Sadly, months later, 17-year-old Donnovan passed away. The firm believes that his case will continue to have a lasting impact on young athletes for generations and will help ensure safety in youth sports.

## › MLB Foul Ball Injuries

Hagens Berman filed a class-action lawsuit on behalf of baseball fans, seeking to extend safety netting to all major and minor league ballparks from foul pole to foul pole. The suit alleges that tens of millions attend an MLB game annually, and every year fans of all ages, but often children, suffer horrific and preventable injuries, such as blindness, skull fractures, severe concussions and brain hemorrhages when struck by a fast-moving ball or flying shrapnel from a shattered bat. The lawsuit was dismissed with the court ruling that the plaintiffs lacked standing because the chance of getting hit by a ball is remote.

In December of 2015, MLB's commissioner Rob Manfred issued a recommendation to all 30 MLB teams to implement extended safety measures, including additional safety netting at ballparks. While the firm commends the league for finally addressing the serious safety issue at stake, the firm continues to urge MLB and its commissioner to make these more than recommendations to help end senseless and avoidable injuries to baseball's biggest fans. We believe our case sparked the eventual move to netting. After one of the owners of the Mariners belittled Steve for having filed the case, the firm happily saw the addition of netting extended to the foul poles at T-Mobile Park in the firm's headquarters of Seattle.

## › Other Cases

In addition to its class actions, Hagens Berman has filed several individual cases to uphold the rights of athletes and ensure a fair and safe environment. The firm has filed multiple individual cases to address concussions and other traumatic head injuries among student-athletes at NCAA schools and in youth sports. Hagens Berman continues to represent the interests of athletes and find innovative and effective applications of the law to uphold players' rights.

The firm has also brought many concussions cases on behalf of individual athletes, challenging large universities and institutions for the rights those who have suffered irreversible damage due to gross negligence and lack of even the most basic concussion-management guidelines.

PRACTICE AREAS

# Whistleblower Litigation

Hagens Berman represents whistleblowers under various programs at both the state and federal levels. All of these whistleblower programs reward private citizens who blow the whistle on fraud. In many cases, whistleblowers report fraud committed against the government and may sue those individuals or companies responsible, helping the government recover losses.

Our depth and reach as a leading national plaintiffs' firm with significant success in varied litigation against industry leaders in finance, health care, consumer products, and other fields causes many whistleblowers to seek us to represent them in claims alleging fraud against the government.

Our firm also has several former prosecutors and other government attorneys in its ranks and has a long history of working with governments, including close working relationships with attorneys at the U.S. Department of Justice. The whistleblower programs under which Hagens Berman pursues cases include:

### FALSE CLAIMS ACT

Under the federal False Claims Act, and more than 30 similar state laws, a whistleblower reports fraud committed against the government, and under the law's *Qui Tam* provision, may file suit on its behalf to recover lost funds. False claims acts are one of the most effective tools in fighting Medicare and Medicaid fraud, defense contractor fraud, financial fraud, under-payment of royalties, fraud in general services contracts and other types of fraud perpetrated against governments.

The whistleblower initially files the case under seal, giving it only to the government and not to the defendant, which permits the government to investigate. After the investigation, the government may take over the whistleblower's suit, or it may decline. If the government declines, the whistleblower can proceed alone on his or her behalf. In successful suits, the whistleblower normally receives between 15 and 30 percent of the government's recovery as a reward.

Since 1986, federal and state false claims act recoveries have totaled more than $22 billion. Some examples of our cases brought under the False Claims Act include:

### › In U.S. ex rel. Lagow v. Bank of America

Represented former District Manager at Landsafe, Countrywide Financial's mortgage appraisal arm, who alleged systematic abuse of appraisal guidelines as a means of inflating mortgage values.

RESULT: The case was successful, ultimately triggering a settlement of $1 billion, and our client received a substantial reward.

### › In U.S. ex rel. Mackler v. Bank of America

Represented a whistleblower who alleged that Bank of America failed to satisfy material conditions of its government contract to provide homeowners mortgage relief under the HAMP program.

RESULT: The case succeeded and was settled as part of the 2012 global mortgage settlement, resulting in an award to our client.

### › In U.S. ex rel. Horwitz v. Amgen

Represented Dr. Marshall S. Horwitz, who played a key role in uncovering an illegal scheme to manipulate the scientific record regarding two of Amgen's blockbuster drugs.

RESULT: $762 million in criminal and civil penalties levied by the U.S. Department of Justice and an award to our client.

### › In U.S. ex rel. Thomas v. Sound Inpatient Physicians Inc. and Robert A. Bessler

Represented a former regional vice president of operations for Sound Physicians, who blew the whistle on Sound's alleged misconduct.

RESULT: Tacoma-based Sound Physicians agreed to pay the United States government $14.5 million.

### › In U.S. ex rel. Plaintiffs v. Center for Diagnostic Imaging Inc.

In May 2010, Hagens Berman joined as lead trial counsel a qui tam lawsuit on behalf of two whistleblowers against Center for

PRACTICE AREAS

# Whistleblower Litigation

Diagnostic Imaging, Inc. (CDI), alleging that CDI violated anti-kickback laws and defrauded federally funded health programs by presenting false claims for payment.

RESULT: In 2011, the government intervened in the claims, which the company settled for approximately $1.3 million. The government declined to intervene, however, in the no-written-orders and kickback claims, leaving those claims for the whistleblowers and their counsel to pursue on their own. The non-intervened claims settled for an additional $1.5 million payment to the government.

› **Medtronic**

On Feb. 19, 2008 the court unsealed a qui tam lawsuit brought by Hagens Berman against Medtronic, one of the world's largest medical technology companies, for fraudulent medical device applications to the FDA and off-label promotion of its biliary devices.

RESULT: The case settled in 2012 for an amount that remained under seal.

## SECURITIES AND EXCHANGE COMMISSION / COMMODITY FUTURES TRADING COMMISSION

Since implementation of the SEC/CFTC Dodd Frank whistleblower programs in 2011, Hagens Berman has naturally transitioned into representation of whistleblowers with claims involving violations of the Securities Exchange Act and the Commodities Exchange Act.

Unlike the False Claims Act, whistleblowers with these new programs do not initially file a sealed lawsuit. Instead, they provide information directly to the SEC or the CFTC regarding violations of the federal securities or commodities laws. If the whistleblower's information leads to an enforcement action, they may be entitled to between 10 and 30 percent of the recovery.

The firm currently represents HFT whistleblower and market expert, Haim Bodek, in an SEC fraud whistleblower case that prompted the U.S. Securities and Exchange Commission to bring record-breaking fines against two exchanges formerly owned

by Direct Edge Holdings (and since acquired by Bats Global Markets, the second-largest financial exchange in the country). The exchanges agreed to pay $14 million to settle charges that the exchanges failed to accurately and completely disclose how order types functioned on its exchanges and for selectively providing such information only to certain high-frequency trading firms.

Hagens Berman also represents an anonymous whistleblower who brought his concerns and original analysis related to the May 2, 2010 Flash Crash to the CFTC after hundreds of hours spent analyzing data and other information.

Both the U.S. Commodity Futures Trading Commission (CFTC) and the Department of Justice, in separate criminal and civil enforcement actions, brought charges of market manipulation and spoofing against Nav Sarao Futures Limited PLC (Sarao Futures) and Navinder Singh Sarao (Sarao) based on the whistleblower's information.

Hagens Berman has worked alongside government officials and regulators, establishing the credibility necessary to bring a case to the SEC or CFTC. When Hagens Berman brings a claim, we work hard to earn their respect and regulators pay attention.

A few of the firm's most recent whistleblower cases in this area include:

› **EDGA Exchange Inc. and EDGX Exchange Inc.**

Represented HFT whistleblower and market expert, Haim Bodek, in an SEC fraud whistleblower case against two exchanges formerly owned by Direct Edge Holdings and since acquired by Bats Global Markets, the second-largest financial exchange in the country for spoofing.

RESULT: The case prompted the U.S. Securities and Exchange Commission to bring record-breaking fine of $14 million against defendants, the largest ever brought against a financial exchange.

PRACTICE AREAS

# Whistleblower Litigation

### ⟩ Nav Sarao Futures Limited PLC

Hagens Berman represents an anonymous whistleblower who brought his concerns and original analysis to the CFTC after hundreds of hours spent analyzing data and other information. The claim brought about legal action against a market manipulator who profited more than $40 million from market fraud and contributed to the May 6, 2010 Flash Crash.

RESULT: Both the CFTC and the Department of Justice, in separate criminal and civil enforcement actions, brought charges of market manipulation and spoofing against Nav Sarao Futures Limited PLC and Navinder Singh Sarao based on the whistleblower's information. The case is still pending under seal.

### INTERNAL REVENUE SERVICE

Hagens Berman also represents whistleblowers under the IRS whistleblower program enacted with the Tax Relief and Health Care Act of 2006.

The IRS program offers rewards to those who come forward with information about persons, corporations or any other entity that cheats on its taxes. In the event of a successful recovery of government funds, a whistleblower can be rewarded with up to 30 percent of the overall amount collected in taxes, penalties and legal fees.

Hagens Berman helps IRS whistleblowers present specific, credible tax fraud information to the IRS. Unlike some traditional False Claims Act firms, Hagens Berman has experience representing governments facing lost tax revenue due to fraud,  making us well-positioned to prosecute these cases.

Appellate Victories

**APPELLATE VICTORIES**

# Strengthening Consumer Law

At Hagens Berman, we distinguish ourselves not merely by the results we obtain, but by how we obtain them. Few class-action firms have our firm's combination of resources and acumen to see a case through as long as needed to obtain a favorable outcome. Our attorneys were instrumental in obtaining these federal appellate decisions that have shaped consumer law and bolstered the rights of millions nationwide:

> **In Matter of Motors Liquidation Co.**, 829 F.3d 135 (2d Cir. 2016) (General Motors bankruptcy reorganization did not bar claims stemming from defective ignition switches)

> **George v. Urban Settlement Servs.**, 833 F.3d 1242 (10th Cir. 2016) (complaint adequately alleged Bank of America's mortgage modification program violated RICO)

> **In re Loestrin 24 Fe Antitrust Litig.**, 814 F.3d 538 (1st Cir. 2016) ("reverse payments" for antitrust purposes under **Actavis** are not limited to cash payments)

> **Osborn v. Visa Inc.**, 797 F.3d 1057 (D.C. Cir. 2015) (complaint adequately alleged Visa and MasterCard unlawfully agreed to restrain trade in setting ATM access fees)

> **Little v. Louisville Gas & Elec. Co.**, 805 F.3d 695 (6th Cir. 2015) (Clean Air Act did not preempt state nuisance claims against coal plant for polluting surrounding community)

> **City of Miami v. Citigroup Inc.**, 801 F.3d 1268 (11th Cir. 2015) (reversing dismissal of complaint alleging Citigroup violated Fair Housing Act by pattern of discriminatory lending)

> **Rajagopalan v. NoteWorld, LLC**, 718 F.3d 844 (9th Cir. 2013) (non-party could not invoke arbitration clause against plaintiff suing debt services provider)

> **In re Neurontin Mktg. & Sales Practices Litig.**, 712 F.3d 21 (1st Cir. 2013) (affirming $142 million verdict for injury suffered from RICO scheme by Neurontin manufacturer Pfizer)

> **In re NCAA Student-Athlete Name & Likeness Licensing Litig.**, 724 F.3d 1268 (9th Cir. 2013) (First Amendment did not shield video game developer's use of college athletes' likenesses)

> **Garcia v. Wachovia Corp.**, 699 F.3d 1273 (11th Cir. 2012) (Wells Fargo could not rely on **Concepcion** to evade waiver of right to compel arbitration)

> **Agnew v. Nat'l Collegiate Athletic Ass'n**, 683 F.3d 328 (7th Cir. 2012) (NCAA bylaws limiting scholarships per team and prohibiting multi-year scholarships are subject to antitrust scrutiny and do not receive pro-competitive justification at pleading stage)

> **In re Lupron Mktg. & Sales Practices Litig.**, 677 F.3d 21, 24 (1st Cir. 2012) (approving cy pres provision in $150 million settlement)

> **In re Pharm. Indus. Average Wholesale Price Litig.**, 582 F.3d 156 (1st Cir. 2009) (AstraZeneca illegally published inflated average wholesale drug prices, thereby giving windfall to physicians and injuring patients who paid inflated prices)

We set ourselves apart not only by getting results but by litigating every case through to finish – to trial and appeal, if necessary. This tenacious drive has led our firm to generate groundbreaking precedents in consumer law.

Hagens Berman has also been active in state courts nationwide. Notable examples of our victories include:

> **Garza v. Gama**, 379 P.3d 1004 (Ariz. Ct. App. 2016) (reinstating certified class in wage-and-hour action prosecuted by Hagens Berman since 2005)

> **In re Farm Raised Salmon Cases**, 42 Cal. 4th 1077 (Cal. 2008) (Federal Food, Drug and Cosmetic Act did not preempt state claims for deceptive marketing of food products)

> **Pickett v. Holland Am. Line-Westours, Inc.**, 35 P.3d 351 (Wash. 2001) (reversing state court of appeals and upholding class action settlement with cruise line)

U.S. Legal Team



**MANAGING PARTNER**

# Steve W. Berman

*Served as co-lead counsel against Big Tobacco, resulting in the largest settlement in world history, and at the time the largest automotive, antitrust, ERISA and securities settlements in U.S. history.*

**CONTACT**

1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 623-7292 office
(206) 623-0594 fax
steve@hbsslaw.com

**YEARS OF EXPERIENCE**
> 41

**PRACTICE AREAS**
> Antitrust/Trade Law
> Consumer Protection
> Governmental Representation
> Securities/Investment Fraud
> Whistleblower/**Qui Tam**
> Patent Litigation

**BAR ADMISSIONS**
> Washington
> Illinois Foreign
> Registered Attorney in
  England and Wales

**COURT ADMISSIONS**
> Supreme Court of the United
  States
> Supreme Court of Illinois
> Supreme Court of
  Washington
> U.S. District Court for the
  Eastern and Western Districts
  of Washington
> U.S. District Court for the
  Northern and Central Districts
  of Illinois
> U.S. District Court for the
  District of Colorado
> U.S. District Court for the
  Eastern District of Michigan
> First Circuit Court of Appeals

Steve Berman represents consumers, investors and employees in large, complex litigation held in state and federal courts. Steve's trial experience has earned him significant recognition and led The National Law Journal to name him one of the 100 most powerful lawyers in the nation, and to repeatedly name Hagens Berman one of the top 10 plaintiffs' firms in the country. Steve was named an MVP of the Year by Law360 in 2016 and 2017 for his class-action litigation and received the 2017 Plaintiffs' Trailblazer award. He was recognized for the third year in a row as an Elite Trial Lawyer by The National Law Journal.

Steve co-founded Hagens Berman in 1993 after his prior firm refused to represent several young children who consumed fast food contaminated with E. coli—Steve knew he had to help. In that case, Steve proved that the poisoning was the result of Jack in the Box's cost cutting measures along with gross negligence. He was further inspired to build a firm that vociferously fought for the rights of those unable to fight for themselves. Berman's innovative approach, tenacious conviction and impeccable track record have earned him an excellent reputation and numerous historic legal victories. He is considered one of the nation's most successful class-action attorneys, and has been praised for securing record-breaking settlements and tangible benefits for class members. Steve is particularly known for his tenacity in forging consumer settlements that return a high percentage of recovery to class members.

**CURRENT ROLE**
> Managing Partner, Hagens Berman Sobol Shapiro LLP

**RECENT CASES**
> **Emissions Litigation**
  Steve has pioneered pursuing car manufacturers who have been violating emissions standards, including: Mercedes BlueTEC vehicles, GM Chevy Cruze, Dodge Ram 2500 and 3500 trucks, Dodge Ram 1500 and Jeep Cherokee EcoDiesel vehicles, Chevy Silverado, GMC Sierra as well as other models made by Ford, Audi and BMW. Steve and the firm's unmatched work in emissions-cheating investigations is often ahead of the EPA and government regulators.

> **General Motors Ignition Switch Defect Litigation**
  Steve serves as lead counsel seeking to obtain compensation for the millions of GM car owners who overpaid for cars that had hidden safety defects.

> **Climate Change** – New York City, King County, Wash.
  Steve has always been a fighter for the rights of the environment. In 2017, he began the firm's latest endeavor to combat global climate change through novel applications of the law. Steve currently represents the city of New York and Washington state's King County in lawsuits filed against the world's largest producers of oil: BP, Chevron Corp., Exxon Mobil Corp., Royal Dutch Shell PLC and ConocoPhillips. The cases seek to hold the Big Oil titans accountable for their brazen impact on global warming-induced sea level rise and related expenses to protect the cities and their millions of residents.

> Second Circuit Court of Appeals
> Third Circuit Court of Appeals
> Fifth Circuit Court of Appeals
> Sixth Circuit Court of Appeals
> Seventh Circuit Court of Appeals
> Eighth Circuit Court of Appeals
> Ninth Circuit Court of Appeals
> Tenth Circuit Court of Appeals
> Eleventh Circuit Court of Appeals
> DC Circuit Court of Appeals
> Federal Circuit Court of Appeals
> U.S. Court of Federal Claims
> Foreign Registered Attorney in
  England and Wales

**EDUCATION**
> University of Chicago Law School,
  J.D., 1980
> University of Michigan, B.A., 1976

**MANAGING PARTNER**

# Steve W. Berman

> **Opioids** - Orange and Santa Clara County, Seattle
Steve has been retained by various municipalities, including the states of Ohio, Mississippi and Arkansas, Orange County, as well as the city of Seattle to serve as trial counsel in a recently filed state suit against five manufacturers of opioids seeking to recover public costs resulting from the opioid manufacturer's deceptive marketing.

> **Antitrust Litigation**
Corporate fraud has many faces, and Steve has taken on some of the largest perpetrators through antitrust law. Steve serves as co-lead counsel in Visa MasterCard ATM, Batteries, Optical Disc Drives and is in the leadership of a class-action lawsuit against Qualcomm for orchestrating a monopoly that led to purchasers paying significantly more for mobile devices. He serves as interim class counsel in a case against Tyson, Purdue and other chicken producers for conspiring to stabilize prices by reducing chicken production. Steve also filed a proposed class-action lawsuit against the world's largest manufacturers of Dynamic Random Access Memory (DRAM) for cornering the market and driving up DRAM prices. Most recently, Steve's antitrust case against the NCAA involving rights of college athletes to receive grant-in-aid scholarships saw a unanimous Supreme Court victory, in what media called a "major ruling" (ABC World News Tonight), that "will change the game" (ABC Good Morning America), and leaves the NCAA "more vulnerable than ever" (AP).

> **Consumer Protection**
Steve is a leader in protecting millions of consumers in large-scale cases that challenge unfair, deceptive and fraudulent practices. He leads a class action on behalf of owners of Ford vehicles equipped with MyFord Touch, an in-car entertainment system, who claim the system is flawed, putting drivers at risk of an accident while causing economic hardship. Steve recently filed a class-action lawsuit against Facebook for allowing personal data to be harvested for psychographic profiling.

## RECENT SUCCESS
> **Volkswagen Franchise Dealerships** - $1.6 billion
Lead counsel for VW franchise dealers suit, in which a settlement of $1.6 billion has received final approval, and represents a substantial recovery for the class.

> **Stericycle Sterisafe Contract Litigation** – $295 million
Hagens Berman's team, led by Steve Berman, filed a class-action lawsuit against Stericycle, a massive medical waste disposal company and achieved a sizable settlement for hundreds of thousands of its small business customers.

> **NCAA Grant-in-Aid Scholarships** – $208 million
Served as co-lead counsel in the Alston case that successfully challenged the NCAA's limitations on the benefits college athletes can receive as part of a scholarship, culminating in a $208 million settlement and injunction upheld by the Supreme Court. The recovery amounts to 100 percent of single damages in an exceptional result in an antitrust case. Steve also co-led the 2018 trial on the injunctive aspect of the case which resulted in a change of NCAA rules limiting the financial treatment of athletes.

The injunction, which was upheld in a unanimous Supreme Court decision in June 2021, prohibits the NCAA from enforcing any rules that fix or limit compensation provided to college athletes by schools or conferences in consideration for their athletic services other than cash compensation untethered to

MANAGING PARTNER

# Steve W. Berman

education-related expenses. According to the Ninth Circuit, the NCAA is "permanently restrained and enjoined from agreeing to fix or limit compensation or benefits related to education" that conferences may make available. In the Supreme Court's 9-0, Justice Kavanaugh stated, "The NCAA is not above the law."

> Dairy Price-Fixing – $52 million

This antitrust suit's filing unearthed a massive collusion between the biggest dairy producers in the country, responsible for almost 70 percent of the nation's milk. Not only was the price of milk artificially inflated, but this scheme ultimately also cost 500,000 young cows their lives.

## CAREER HIGHLIGHTS

> State Tobacco Litigation - $260 billion

Special assistant attorney general for the states of Washington, Arizona, Illinois, Indiana, New York, Alaska, Idaho, Ohio, Oregon, Nevada, Montana, Vermont and Rhode Island in prosecuting major actions against the tobacco industry. In November 1998, the initial proposed settlement led to a multi-state settlement requiring the tobacco companies to pay the states $260 billion and to submit to broad advertising and marketing restrictions – the largest civil settlement in history.

> Visa MasterCard ATM Antitrust Litigation - $27 billion

Co-lead counsel in what was then the largest antitrust settlement in history: a class-action lawsuit alleging that Visa and MasterCard, together with Bank of America, JP Morgan Chase and Wells Fargo, violated federal antitrust laws by establishing uniform agreements with U.S. banks, preventing ATM operators from setting ATM access fees below the level of the fees charged on Visa's and MasterCard's networks.

> Toyota Sudden, Unintended Acceleration - $1.6 billion

Hagens Berman was co-lead counsel in this massive MDL alleging that Toyota vehicles contained a defect causing sudden, unintended acceleration (SUA). It was the largest automotive settlement in history at the time, valued at up to $1.6 billion. The firm did not initially seek to lead the litigation, but was sought out by the judge for its wealth of experience in managing very complex class-action MDLs. Hagens Berman and managing partner Steve Berman agreed to take on the role of co-lead counsel for the economic loss class and head the plaintiffs' steering committee.

> Washington Public Power Supply System (WPPSS) - $700 million settlement

Represented bondholders and the bondholder trustee in a class-action lawsuit stemming from the failure of two WPPSS nuclear projects. The case was one of the most complex and lengthy securities fraud cases ever filed. The default was one of the largest municipal bond defaults in history. After years of litigation, plaintiffs were awarded a $700 million settlement agreement brought against more than 200 defendants.

> E-books Antitrust Litigation - $560 million settlement

Fought against Apple and five of the nation's top publishers for colluding to raise the price of e-books, resulting in recovery equal to twice consumers' actual damages. The firm recovered an initial settlement of more than $160 million with defendant publishing companies in conjunction with several states attorneys general. Steve then led the firm to pursue Apple for its involvement in the e-book price hike. Apple took the case to the Supreme Court, where it was ruled that Apple had conspired to raise prices, and the firm achieved an additional $450 million settlement for consumers.

HAGENS BERMAN SOBOL SHAPIRO LLP

**MANAGING PARTNER**

# Steve W. Berman

> **Enron Pension Protection Litigation** - $250 million settlement
> Led the class-action litigation on behalf of Enron employees and retirees alleging that Enron leadership, including CEO Ken Lay, had a responsibility to protect the interests of those invested in the 401(k) program, an obligation they abrogated. The court selected Steve to co-lead the case against Enron and the other defendants.

> **Charles Schwab Securities Litigation** - $235 million settlement
> Led the firm to file the first class-action lawsuit against Charles Schwab on Mar. 18, 2008, alleging that Schwab deceived investors about the underlying risk in its Schwab YieldPlus Funds Investor Shares and Schwab YieldPlus Funds Select Shares.

> **JP Morgan Madoff Lawsuit** - $218 million settlement
> Represented Bernard L. Madoff investors in a suit filed against JPMorgan Chase Bank, one of the largest banks in the world.

> **NCAA Grants-in-Aid Scholarships** - $208 million settlement, and permanent injunction upheld by the Supreme Court
> Led the firm's tenacious antitrust class action against the NCAA on behalf of college athletes, claiming that the NCAA had violated the law when it kept the class from being able to receive compensation provided by schools or conferences for athletic services other than cash compensation untethered to education-related expenses. The Supreme Court upheld the favorable opinion of the Ninth Circuit in a 9-0 ruling. Justice Kavanaugh's opinion further underscored the massive win for plaintiffs and the ruling's ongoing effects: "The NCAA couches its arguments for not paying student athletes in innocuous labels. But the labels cannot disguise the reality: The NCAA's business model would be flatly illegal in almost any other industry in America," pushing for further scrutiny of the NCAA's regulations.

> **Boeing Securities Litigation** - $92.5 million settlement
> Represented a class of tens of thousands of shareholders against Boeing, culminating in a proposed settlement that was the second-largest awarded in the Northwest.

> **NCAA Concussions** - $75 million settlement, and 50-year medical monitoring fund
> Led the firm's pioneering NCAA concussions suit that culminated in a proposed settlement that will provide a 50-year medical-monitoring program for student-athletes to screen for and track head injuries; make sweeping changes to the NCAA's approach to concussion treatment and prevention; and establish a $5 million fund for concussion research, preliminarily approved by the court.

> **US Youth Soccer Settlement**
> Revolutionary settlement that changed U.S. Soccer regulations and bought sweeping safety measures to the game. Steve spearheaded a lawsuit against soccer-governing bodies, achieving a settlement that ended heading of the ball for U.S. Soccer's youngest players and greatly diminished risk of concussions and traumatic brain injuries. Additionally, the settlement highlights the importance of on-staff medical personnel at youth tournaments, as well as ongoing concussion education for coaches.

**RECOGNITION**

> 2023 Best Lawyers in America in Litigation - Securities and Product Liability Litigation - Plaintiffs

> 2018, 2020, 2022 Titan of the Plaintiffs Bar, Law360

> 2022 Hall of Fame, Lawdragon

> 1999-2022 Washington Super Lawyers

> 2021 Sports & Entertainment Law Trailblazer, The National Law Journal

MANAGING PARTNER

# Steve W. Berman

> 2021, 2019, 2018 Honoree for Outstanding Antitrust Litigation Achievement in Private Law Practice, American Antitrust Institute

> 2016-2020 Class Action MVP of the Year, Law360

> 2014-2016, 2018-2019 Elite Trial Lawyers, The National Law Journal

> 2019-2020 Lawdragon 500 Leading Lawyers in America, Plaintiff Financial Lawyers

> 2014-2019 Lawdragon 500 Leading Lawyers in America

> 2018 State Executive Committee member, The National Trial Lawyers

> 2018 Top Attorney of the Year, International Association of Top Professionals

> 2017 Plaintiffs' Trailblazer, The National Law Journal

> 2017 Class Actions (Plaintiff) Law Firm of the Year in California, Global Law Experts

> 2014 Finalist for Trial Lawyer of the Year, Public Justice

> 2013 One of the 100 most influential attorneys in America, The National Law Journal

> 2000 Most powerful lawyer in the state of Washington, The National Law Journal

> One of the top 10 plaintiffs' firms in the country, The National Law Journal

## ACTIVITIES

> In April of 2021, the University of Michigan School for Environment and Sustainability (SEAS) launched the Kathy and Steve Berman Western Forest and Fire Initiative with a philanthropic gift from Steve (BS '76) and his wife, Kathy. The program will improve society's ability to manage western forests to mitigate the risks of large wildfires, revitalize human communities and adapt to climate change.

Steve studied at the School of Natural Resources (now SEAS) and volunteered as a firefighter due to his focus on environmental stewardship.

> In 2003, the University of Washington announced the establishment of the Kathy and Steve Berman Environmental Law Clinic. The Berman Environmental Law Clinic draws on UW's environmental law faculty and extensive cross-campus expertise in fields such as Zoology, Aquatic and Fishery Sciences, Forest Resources, Environmental Health and more. In addition to representing clients in court, the clinic has become a definitive information resource on contemporary environmental law and policy, with special focus on the Pacific Northwest.

## OTHER NOTABLE CASES

> **VW Emissions Litigation – $14.7 billion settlement**
Steve served as a member of the Plaintiffs Steering Committee representing owners of Volkswagen CleanDiesel vehicles that were installed with emissions-cheating software.

> **McKesson Drug Class Litigation – $350 million settlement**
Lead counsel in an action that led to a rollback of benchmark prices of hundreds of brand name drugs, and relief for third-party payers and insurers. His discovery of the McKesson scheme led to follow up lawsuits by governmental entities and recovery in total of over $600 million.

> **Average Wholesale Price Litigation – $338 million settlement**
Steve served as lead trial counsel, securing trial verdicts against three drug companies that paved the way for settlement.

> **DRAM Memory Antitrust – $345 million settlement**

HAGENS BERMAN SOBOL SHAPIRO LLP

**MANAGING PARTNER**

# Steve W. Berman

> Lumber Liquidators Flooring
Steve was court-appointed co-lead counsel in litigation against Lumber Liquidators representing consumers who unknowingly purchased flooring tainted with toxic levels of cancer-causing formaldehyde. The consumer settlement was confidential.

**PRESENTATIONS**

> Steve is a frequent public speaker and has been a guest lecturer at Stanford University, University of Washington, University of Michigan and Seattle University Law School.

**PERSONAL INSIGHT**

Steve was a high school and college soccer player and coach. Now that his daughter's soccer skills exceed his, he is relegated to being a certified soccer referee and spends weekends being yelled at by parents, players and coaches. Steve is also an avid cyclist and is heavily involved in working with young riders on the international Hagens Berman Axeon cycling team.



**OF COUNSEL**

# Benjamin J. Siegel

*Mr. Siegel is an experienced litigator with a focus on antitrust law who has represented clients in state and federal courts, on appeals, as well as before arbitrators and governmental agencies, and has achieved significant settlements.*

**CONTACT**
715 Hearst Ave.
Suite 300
Berkeley, CA 94710

(510) 725-3033 office
(510) 725-3001 fax
bens@hbsslaw.com

**YEARS OF EXPERIENCE**
› 14

**PRACTICE AREAS**
› Antitrust Litigation

**BAR ADMISSIONS**
› California

**COURT ADMISSIONS**
› U.S. District Court for the Northern District of California
› U.S. District Court for the Eastern District of California
› U.S. Court of Appeals
› Ninth Circuit

**CLERKSHIPS**
› Hon. Thomas M. Reavley, U.S. Court of Appeals for the Fifth Circuit

**EDUCATION**
› The University of Texas School of Law, The University of Texas LBJ School of Public Affairs, J.D., M.P.A., Order of the Coif, High Honors, 2007
› Articles Editor, Texas Law Review; Texas Law Review Best Litigation Note, Volume 85; Texas Law Public Interest Fellowship; LBJ Foundation Award, First in Class
› Yale University, B.A. Political Science, **cum laude**, Phi Beta Kappa, 2000

## CURRENT ROLE
› Of Counsel, Hagens Berman Sobol Shapiro LLP

## RECENT CASES
› *In re Optical Disk Drive Prods. Antitrust Litigation, No. 3:10-md-2143-RS (N.D. Cal.)*
› *In re NCAA Grant-In-Aid Antitrust Litigation, 4:14-md-02541-CW (N.D. Cal.)*
› *In re Resistors Antitrust Litigation, 5:15-cv-03820-JD (N.D. Cal.)*

## EXPERIENCE
› Following his work at Boies, Schiller & Flexner LLP in 2008-2009, Mr. Siegel has litigated cases on behalf of plaintiffs for the past seven years.

## LEGAL ACTIVITIES
› Alameda County Bar Association

## RECOGNITION
› Honoree for Outstanding Antitrust Litigation Achievement in Private Law Practice, American Antitrust Institute, 2021 Rising Stars
› Super Lawyers, 2018

## PUBLICATIONS
› Benjamin Siegel, Constitutional Rights and the Counter-Majoritarian Dilemma (May 15, 2007) (unpublished Master's thesis, University of Texas at Austin).
› Benjamin Siegel, Note, Applying a "Maturity Factor" Without Compromising the Goals of the Class Action, 85 Texas L. Rev. 741 (2007) (Texas Law Review Best Litigation Note, Volume 85).
› Benjamin Siegel et al., Beyond the Numbers: Improving Postsecondary Success through a Central Texas High School Data Center, LBJ School of Public Affairs, Policy Research Report No. 148 (2005).
› Benjamin Siegel, California Must Protect Health Care for Medi-Cal Children, 15 Youth L. News 1 (2004), available at http://www.youthlaw.org.
› Jenny Brodsky, Jack Habib & Benjamin Siegel, Lessons for Long-Term Care Policy, World Health Organization, Publication No: WHO/NMH7CCL/02.1 (2002).
› Jenny Brodsky, Jack Habib, Miriam Hirschfeld & Benjamin Siegel, Care of the Frail Elderly in Developed and Developing Countries: the Experience and the Challenges, 14 Aging Clinical & Experimental Research 279 (2002).

## PERSONAL INSIGHT
When not working to enforce the nation's antitrust laws, Mr. Siegel enjoys spending time with his wife and two young children in his hometown of Oakland, California. He also likes playing softball and pick-up basketball with his friends.

HAGENS BERMAN SOBOL SHAPIRO LLP



ASSOCIATE

# Emilee Sisco

*Ms. Sisco practices in the areas of sports litigation, antitrust and consumer protection. As a former Division I athlete, she has worked on the firm's cases against the NCAA, furthering the rights of college-athletes across the nation.*

CONTACT

1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 623-7292 office
(206) 623-0594 fax
emilees@hbsslaw.com

YEARS OF EXPERIENCE
> 6

PRACTICE AREAS
> Antitrust Litigation
> Consumer Rights
> Sports Litigation

BAR ADMISSIONS
> Washington

COURT ADMISSIONS
> U.S. District Court, Western District of Washington

EDUCATION
> Seattle University School of Law, J.D.
> University of Oregon, B.A.

### CURRENT ROLE
> Associate, Hagens Berman Sobol Shapiro LLP

### EXPERIENCE
> Law Clerk for Washington State Office of the Attorney General – Antitrust Division

### LEGAL ACTIVITIES
> During 2L and 3L years in law school, Ms. Sisco was a fulltime volunteer intern for the WSBA Moderate Means Program. She volunteered more than 250 hours of pro bono service during law school.

### RECOGNITION
> Honoree for Outstanding Antitrust Litigation Achievement in Private Law Practice, American Antitrust Institute, 2019, 2021

### RECENT CASES
> *Namoff v. Fleishman & Shapiro, P.C. et al*
> *In re: National Prescription Opiate Litigation*
> *In re: NCAA Athletic Grant-In-Aid Cap Antitrust Litigation*
> *In re: General Motors LLC Ignition Switch Litigation*

### LANGUAGES
> Latin

### PERSONAL INSIGHT

Ms. Sisco was a Division I volleyball athlete for the University of Oregon and University of Colorado. She was a member of the U.S. Women's Volleyball A3 team and was also a three-sport varsity athlete throughout high school, earning top 10 state finishes in two events at the WIAA Track & Field Championship.

HAGENS BERMAN SOBOL SHAPIRO LLP



**ASSOCIATE**

# Stephanie A. Verdoia

*Stephanie brings to the firm a deep knowledge of professional sports policies, protocols and governance to enrich Hagens Berman's robust sports law practice.*

**CONTACT**

1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 623-7292 office
(206) 623-0594 fax
stephaniev@hbsslaw.com

**PRACTICE AREAS**
> Sports Litigation

**INDUSTRY EXPERIENCE**
> Sports Governance
> Sports Policy and Protocols

**EDUCATION**
> University of Washington School of Law, J.D., 2021, Order of Barristers
> Seattle University, B.A. Political Science and Legal Studies, summa cum laude, 2015

## CURRENT ROLE

> Associate, Hagens Berman Sobol Shapiro LLP

> Ms. Verdoia's practice at the firm's Seattle office focuses primarily on sports litigation, where she applies her deep knowledge of sports governance, policies and protocols to bolster the firm's expansive work in this area of law.

## EXPERIENCE

> Prior to joining Hagens Berman, Ms. Verdoia interned at Seattle's Legal Voice, where she researched legal issues regarding gender equality by analyzing the interplay between constitutional principles, recently enacted state statutes and prevailing precedent.

> Ms. Verdoia also interned with the legal department at Seattle Sounders FC, where she provided legal research and solutions responding to the evolving developments of the COVID-19 pandemic.

## ACTIVITIES

> Her additional experience in professional sports lends itself to the firm's sports litigation practice area. Ms. Verdoia has years of experience in the realm of professional soccer as a midfielder in Norway's Toppserien top division soccer and with the National Women's Soccer League (NWSL) both for the Boston Breakers and most recently the OL Reign (formerly known as Seattle Reign FC).

> During her time in these roles, she trained with the top NWSL team to enhance squad development with the Reign; led Norway's Vålerenga Fotbal Damer to the national championship game; and was one of only 36 women nationally drafted into the professional female league when she began her professional sports career in 2015 with the Boston Breakers.

> Ms. Verdoia has also served as a league representative, helping to take a leadership role in the sport by conducting conversation with key league figures to further players' interests and advance gender equity in sport. She also implemented working standards to create a safer environment and established a framework for a future players association.

## PERSONAL INSIGHT

As a lifelong soccer player, Stephanie spends her free time coaching youth soccer teams at the OL Reign Academy. She also enjoys camping anywhere in the Pacific Northwest with her fiancé, Shane, and her dog, Stevie.