Jacob K. Danziger (SBN 278219)
**ARENTFOX SCHIFF LLP**
44 Montgomery Street, 38th Floor
San Francisco, CA 94104 United States.
Telephone: (734) 222-1516
Facsimile: (415) 757-5501
jacob.danziger@afslaw.com

Beth A. Wilkinson (*pro hac vice*)
Rakesh N. Kilaru (*pro hac vice*)
Kieran Gostin (*pro hac vice*)
Calanthe Cope-Kasten (*pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com
kgostin@wilkinsonstekloff.com
ccope-kasten@wilkinsonstekloff.com

Attorneys for Defendant
NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | Case No. 4:20-cv-03919-CW |
| | **DEFENDANTS' JOINT OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| | **[REDACTED PUBLIC VERSION]** |
| | Hearing Date: Sept. 21, 2023<br>Time:          2:30 PM<br>Trial Date:   Jan. 27, 2025<br>Judge:         Hon. Claudia Wilken |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

I.   BACKGROUND ............................................................................................... 4

   A.   The Post-*O'Bannon* NIL Landscape ........................................................ 4

   B.   Plaintiffs' Proposed Classes .................................................................... 5

   C.   Plaintiffs' Speculative And Unsupported Theory Of "Broadcast
        NIL" (BNIL) Injury And Damages ........................................................ 6

        1.   There Is Neither A Market For BNIL Rights Nor Any Basis
             To Value Such Rights At 10% Of Broadcast Revenue ..................... 7

        2.   Institutions Would Not Guarantee Payments To All
             Student-Athletes Up Front ............................................................... 9

        3.   There Is No Basis To Assume That Every Class Member
             Would Receive Equal Compensation For BNIL ............................. 12

        4.   The Conferences Have Never Made And Would Not Make
             Direct Payments To Student-Athletes ............................................ 13

        5.   There Is No Basis For A 75/15/5 Distribution Of
             "Broadcast" Revenues ................................................................... 14

        6.   Title IX And Gender Equity Considerations Make
             Plaintiffs' Postulated BNIL But-For World Impossible ................. 15

        7.   State Laws Preclude Conferences From Paying Student-
             Athletes .......................................................................................... 16

   D.   Substitution Effects Implicating Whether And To What Extent
        Class Members Are Impacted And Damaged Would Be Amplified
        In Rascher's BNIL But-For World .......................................................... 17

   E.   Plaintiffs' Theory Of Video Game NIL Injury And Damages ............... 18

   F.   Plaintiffs' Theory Of Third-Party NIL Injury And Damages ................ 20

II.  LEGAL STANDARD ....................................................................................... 20

III. ARGUMENT .................................................................................................... 21

   A.   Plaintiffs Cannot Satisfy Rule 23(b)(3) Because Neither Rascher
        Nor Desser Offers A Valid Impact And Damages Model Capable
        Of Withstanding Rigorous Scrutiny ....................................................... 21

   B.   Plaintiffs Fail To Satisfy Rule 23 As To Their Alleged Claims For
        "Lost Compensation From Broadcast NILs." .......................................... 23

        1.   Plaintiffs' BNIL Injury And Damages Theory Is Fatally
             Speculative And Contrary To The Record ...................................... 23

        2.   Plaintiffs' BNIL Model Does Not Match Their Theory Of
             Liability, Precluding Certification Under *Comcast* ..................... 24

3. Plaintiffs And Rascher Ignore The Substitution Effects That Would Render Determinations Of Individual Injury And Damages Unmanageable. ............................................... 25

4. Plaintiffs' BNIL Damages Theory Would Violate Title IX. ................... 28

5. The BNIL Methodology Creates Intra-Class Conflicts By Pitting Student-Athletes Against One Another For Shares Of A Fixed Sum. ............................................................ 29

6. Determining Which Student-Athletes Would Have Received Compensation For BNIL Requires Individual Inquiry. ....................................................................... 32

C. Plaintiffs Cannot Satisfy Rule 23(b)(3) As To Their Claims For "Lost Compensation From Video Game NILs." .................................. 33

D. Plaintiffs Cannot Satisfy Rule 23(b)(3) As To Their Claims For "Lost Compensation From Other Third-Party NIL Opportunities." ................... 34

E. Proof Of Individual Damages For The Members Of Each Proposed Class Would Involve Excessive Difficulty, Precluding Certification. ....................................................................... 36

F. Plaintiffs Cannot Circumvent The Requirement Of Proving Class-Wide Antitrust Injury By Relying On A Theory Of Lost Opportunity. ....................................................................... 37

G. Plaintiffs Also Fail To Establish Adequacy Because They Are Precluding Some Class Members From Raising Claims They Believe To Be Valid. ...................................................................... 38

H. There Is Insufficient Class Representation For Men's Basketball. ..................... 38

I. Plaintiffs' Unjust Enrichment Claims Are Not Appropriate For Class Certification. ........................................................ 39

IV. CONCLUSION ........................................................................ 39

1

# TABLE OF AUTHORITIES

2

Page(s)

**Cases**

3

*Am. Exp. Co. v. Italian Colors Rest.*,
4    570 U.S. 228 (2013) ............................................................................................ 20

5

*Am. Honda Motor Co. v. Allen*,
    600 F.3d 813 (7th Cir. 2010) ............................................................................ 23

6

*Amchem Prod., Inc. v. Windsor*,
7    521 U.S. 591 (1997) ..................................................................................... 29, 38

8

*Andren v. Alere, Inc.*, No. 16cv1255-GPC(AGS),
    2017 WL 6509550 (S.D. Cal. Dec. 20, 2017) ................................................. 38

9

*Bell Atl. Corp. v. AT&T Corp.*,
    339 F.3d 294 (5th Cir. 2003) ............................................................................ 36

10

*Blades v. Monsanto Co.*,
11    400 F.3d 562 (8th Cir. 2005) .................................................................. 22, 32, 37

12

*Bowerman v. Field Asset Servs., Inc.*,
    39 F.4th 652 (9th Cir. 2022) ....................................................................... 35, 36

13

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
14    155 F.3d 331 (4th Cir. 1998) ............................................................................ 36

15

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) ......................................................................................... 37

16

*Carrera v. Bayer Corp.*,
    727 F.3d 300 (3d Cir. 2013) ............................................................................ 22

17

*Comcast Corp. v. Behrend*,
18    569 U.S. 27 (2013) ..................................................................................... passim

19

*Conde v. Open Door Mktg., LLC*,
    223 F. Supp. 3d 949 (N.D. Cal. 2017) ............................................................ 38

20

*Curtis v. Extra Space Storage, Inc.*, No. C 13-00319 WHA,
21    2013 WL 6073448 (N.D. Cal. Nov. 18, 2013) ............................................... 36

22

*Drimmer v. WD-40 Co.*, No. 06-CV-900 W(AJB),
    2007 WL 2456003 (S.D. Cal. Aug. 24, 2007) ............................................... 37

23

*Fleischman v. Albany Med. Ctr.*, No. 1:06–CV–765,
    2008 WL 2945993 (N.D.N.Y. July 28, 2008) ............................................... 23

24

*Garcia v. Sun Pac. Farming Co-op, Inc.*,
25    359 F. App'x 724 (9th Cir. 2009) .................................................................... 38

26

*Glen Holly Entm't, Inc. v. Tektronix Inc.*,
    343 F.3d 1000 (9th Cir. 2003) ......................................................................... 37

27

*House v. NCAA*,
28    545 F. Supp. 3d 804 (N.D. Cal. 2021) ..................................................... 6, 9, 24

*In re Aluminum Warehousing Antitrust Litig.*,
336 F.R.D. 5 (S.D.N.Y. 2020) ................................................................................. 34

*In re Asacol Antitrust Litig.*,
907 F.3d 42 (1st Cir. 2018) .................................................................................... 37

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02–1486 PJH,
2006 WL 1530166 (N.D. Cal. June 5, 2006) ......................................................... 37

*In re High-Tech Emp. Antitrust Litig.*,
289 F.R.D. 555 (N.D. Cal. 2013) ........................................................................... 21

*In re Hotel Tel. Charges*,
500 F.2d 86 (9th Cir. 1974) .................................................................................... 21

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008) ............................................................................. 22, 23

*In re Lamictal Direct Purchaser Antitrust Litig.*,
957 F.3d 184 (3d Cir. 2020) ................................................................................... 32

*In re Modafinil Antitrust Litig.*,
837 F.3d 238 (3d Cir. 2016) ................................................................................... 32

*In re Namenda Indirect Purchaser Antitrust Litig.*,
338 F.R.D. 527 (S.D.N.Y. 2021) ............................................................................ 34

*In re NCAA I-A Walk-On Football Players Litigation*, No. C04–1254C,
2006 WL 1207915 (W.D. Wash. May 3, 2006) ............................................ 30, 32, 36

*In re NCAA Student-Athlete NIL Licensing Litig.*, No. C 09-1967 CW ("*O'Bannon*")
2013 WL 5979327 (N.D. Cal. Nov. 8, 2013) .................................................. passim

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
522 F.3d 6 (1st Cir. 2008) ................................................................................. 32, 33

*In re Nexium (Esomeprazole) Antitrust Litig.*,
842 F.3d 34 (1st Cir. 2016) .................................................................................... 37

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
725 F.3d 244 (D.C. Cir. 2013) ..................................................................... 22, 23, 37

*In re Rubber Chems. Antitrust Litig.*,
232 F.R.D. 346 (N.D. Cal. 2005) ........................................................................... 37

*Mazza v. Am. Honda Motor Co.*,
666 F.3d 581 (9th Cir. 2012) .................................................................................. 39

*McGlinchy v. Shell Chem. Co.*,
845 F.2d 802 (9th Cir. 1988) ........................................................................ 22, 23, 24

*McLaughlin v. Am. Tobacco Co.*,
522 F.3d 215 (2d Cir. 2008) .............................................................................. 23, 24

*O'Bannon v. NCAA*,
802 F.3d 1049 (9th Cir. 2015) ................................................................................ 37

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) ........................................................................ 21, 23, 37

*Ollier v. Sweetwater Union High Sch. Dist.*,
  768 F.3d 843 (9th Cir. 2014) ................................................................ 16

*Pulaski & Middleman, LLC v. Google, Inc.*,
  802 F.3d 979 (9th Cir. 2015) ................................................................ 21

*Rock v. NCAA*, No. 1:12-cv-01019-TWP-DKL,
  2016 WL 1270087 (S.D. Ind. Mar. 31, 2016) ..................................... 30

*Shady Grove Ortho. Assocs. v. Allstate Ins. Co.*,
  559 U.S. 393 (2010) .............................................................................. 35

*Shields v. FINA*, No. 18-cv-07393-JSC,
  2022 WL 425359 (N.D. Cal. Feb. 11, 2022) ....................... 3, 29, 30, 32

*Stitt v. Citibank*, No. 12-cv-03892- YGR,
  2015 WL 9177662 (N.D. Cal. Dec. 17, 2015) ..................................... 39

*Sueoka v. United States*,
  101 F. App'x 649 (9th Cir. 2004) ......................................................... 38

*Thompson v. Am. Tobacco Co.*,
  189 F.R.D. 544 (D. Minn. 1999) .......................................................... 38

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) ........................................... 3, 20, 21, 32, 33

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ......................................................... 20-21, 32-25

*Ward v. Apple Inc.*, No. 12-cv-05404-YGR,
  2018 WL 934544 (N.D. Cal. Feb. 16, 2018) ................................. 21, 22

*Ward v. Apple*,
  784 F. App'x 539 (9th Cir. 2019) ......................................................... 34

*West v. Prudential Sec. Inc.*,
  282 F.3d 935 (7th Cir. 2002) ............................................................... 23

*Windham v. Am. Brands, Inc.*,
  565 F.2d 59 (4th Cir. 1977) ................................................................. 21

**Statutes**

28 U.S.C. § 2072(b) .................................................................................. 32

Calif. Educ. Code § 67456 .......................................................................... 4

Colo. Rev. Stat. § 23-16-301(2)(c)(I) ........................................................ 4

Ga. Code Ann. § 20-3-681(f) ..................................................................... 4

Ill. Comp. Stat. Ann. § 190/15(e)(2) .......................................................... 4

Ky. Rev. Stat. § 164.6945(3)(a-b) .............................................................. 4

La. Stat. Ann. § 17:3703 (A)(2) .................................................................. 4

Miss. Code Ann. § 37-97-107(5) ................................................................ 4

Mo. Stat. Ann. § 173.280(4) ....................................................................... 4

Mont. Code Ann. § 20-1-232(4) ................................................................................................... 4

N.C. Exec. Order 223 ................................................................................................................... 5

N.J. Stat. Ann. § 18A:3B-87(a)(2) ............................................................................................... 5

Neb. Rev. Stat. § 48-3603(5)(c) ................................................................................................... 5

Nev. Rev. Stat. § 398.300(1)(c) ................................................................................................... 5

Okla. Stat. Ann. § 820.23(C) ....................................................................................................... 5

Tenn. Code Ann. § 49-7-2802(b)(1) ............................................................................................ 5

Tex. Educ. Code § 51.9246(g)(2)(B)(ii) ...................................................................................... 5

**<u>Rules & Regulations</u>**

34 C.F.R. § 106.37(a) ................................................................................................................. 16

34 C.F.R. § 106.37(c) ................................................................................................................. 16

**<u>Other Authorities</u>**

*Class Certification in the Age of Aggregate Proof,*
    84 N.Y.U. L. Rev. 97 (2009) ................................................................................................. 32

# INTRODUCTION

Plaintiffs seek billions of dollars on the theory that they can establish injury and damages to many thousands of student-athletes in three separate classes over a 7+ year period. But that theory depends on assuming commonality, ignoring the substantial differences in the value (if any) of the name, image, and likeness (NIL) rights of student-athletes, and substituting unsupported assertions for actual evidence. Plaintiffs' own motion confirms the need for individual inquiries by pursuing one class limited to *only* student-athletes who have actually entered into NIL agreements with third parties after July 1, 2021. The vast majority of claimed damages are based on the made-for-litigation fiction that one can determine a separate value for the alleged publicity rights of student-athletes in television broadcasts. And while Plaintiffs' motion is filled with lofty rhetoric about fairness for student-athletes, Plaintiffs seek an award related to those alleged publicity rights of $1.3 billion to male student-athletes (96% of the total alleged damages)—but just $50 million for female student-athletes (or 4%).

As these examples show, Plaintiffs' bid for class certification fails because it assumes away all individual issues (and defendants' right to present them) and ignores legal roadblocks. Plaintiffs' motion claims that:

- Each defendant (A5) conference would pay 10% of its broadcast revenues to every full scholarship football and basketball player on every team in the conference, with every scholarship player on a team receiving the same amount regardless of talent. Men's basketball players would be paid more than football players, and both would be paid significantly more than women's basketball players—with wide disparities in amounts paid from conference-to-conference and year-to-year ("BNIL damages").[1]

- Full scholarship football and men's basketball players in A5 conferences, some non-scholarship players on those teams, and some members of the Additional Sports Class, would receive equal revenue share payments for participation in hypothetical videogames ("Video Game NIL damages").

- Any Division I student-athlete, in any sport, who signed a NIL agreement with a third party after July 1, 2021, would receive essentially the same compensation for every year of athletic eligibility prior to that date ("Third-Party NIL damages").

These are just assertions, unsupported by evidence, economics, or even common sense.

---

[1] The A5 conferences are the Conference Defendants here: the Atlantic Coast Conference (ACC), Big Ten Conference (Big Ten), Big 12 Conference (Big 12), Pac-12 Conference (Pac-12), and Southeastern Conference (SEC).

The foundation for Plaintiffs' massive BNIL damages claim is the contention by a media consultant, Ed Desser, that 10% of the collective value of the A5 conference broadcast contracts is attributable to BNIL. Desser admits that *no one* has ever tried to value BNIL before and that there is no separate value for BNIL in broadcast contracts—confirming that the concept is made for litigation. While Desser disclaims any opinion as to the BNIL value of any individual athlete, Daniel Rascher uses the fabricated 10%, and other baseless assertions by Desser, to contend that the scholarship football and basketball players on each team would all be paid the same amount (but with material differences between sports and among conferences), based on simple arithmetic designed to award positive damages to all members of the class.

None of this involves a valid and working *economic model*. But that is what Rule 23 requires. An expert cannot just present math formulas based on an assumption of common impact. There must be a valid economic model that allows the court to discharge its duty to rigorously analyze the proposed common proof. Plaintiffs do not meet that burden for any of their classes.

Beyond these fundamental defects, Plaintiffs fail multiple other Rule 23 requirements, each of which independently precludes certification.

*First*, Plaintiffs ignore the fact that if student-athletes within the A5 were eligible to receive over $1 billion in NIL compensation in the but-for world, substitution effects would make it impossible to determine the identity of class members. Many existing A5 student-athletes would choose to remain in school rather than pursue professional opportunities; the record confirms they are doing so in droves since the NCAA began allowing student-athletes to receive NIL compensation from third parties. A significant number of student-athletes who turned down A5 scholarships for a non-A5 school in the real world would have a clear financial incentive to choose an A5 athletic scholarship instead. And under Plaintiffs' "model," conferences would have incentives to add and drop members, and to reduce the size of team rosters—all to provide larger payments (for alleged BNIL value) to each player. Similar substitution effects were fatal to certification of broadcast and video game damages claims in *O'Bannon*. These displacement effects would be only greater here, yet Plaintiffs' expert offers no method for solving for them. Ignoring this issue does not satisfy Plaintiffs' Rule 23 burden.

*Second*, Plaintiffs' speculative impact and damages theories fail Rule 23 because they violate the law. As noted above, Plaintiffs' BNIL methodology awards 96% of damages to men and just 4% to women. That disparity would violate Title IX, and there is no reason to believe that schools or student-athletes would accept such an inequitable and unlawful but-for world. In addition, many states have laws prohibiting exactly the payments that Plaintiffs use as the basis for their BNIL damages claim. Plaintiffs' payment theory thus could not exist in the real world.

*Third*, Plaintiffs' impact and damages methodologies violate Supreme Court precedent. Plaintiffs allege there is a *labor* market for student-athlete services in which *universities* within the A5 compete. Plaintiffs' motion for certification, however, claims that *conferences* would make equal BNIL payments to student-athletes, even though (i) they offer no basis for correlating labor-market compensation with the broadcast revenues the conferences receive, and (ii) conferences do not compete in any labor market for student-athlete services. This mixing and matching of claimed labor and broadcast markets, topped by the baseless proposition that conferences would make the payments, is impermissible under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).

Plaintiffs' equal-payment approach also fails under *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016), and ignores basic labor economics, which teaches that compensation is not uniform in labor markets—and especially not in sports. A starting quarterback and third string lineman in the same conference would receive the same amount, while the most famous women's basketball players would receive less than lesser-known backup football players.   This is nonsensical and certainly not what a star player would argue is appropriate in an individual lawsuit.

*Fourth*, Plaintiffs' damages classes raise substantial adequacy problems under Rule 23(a)(4). Plaintiffs' BNIL methodology distributes a fixed pot of money (10% of broadcast contracts) to a fixed pool of athletes (scholarship football and basketball players). As another Court in this District found when confronted with a similar methodology offered by the same Plaintiffs' counsel and economist here, this approach renders Plaintiffs inadequate because "each class member's interest in maximizing her own damages is antagonistic to the same interest on the part of other class members." *Shields v. FINA*, No. 18-cv-07393-JSC, 2022 WL 425359, at *7 (N.D. Cal. Feb. 11, 2022).

1      *Fifth*, the notion that athletes who entered into NIL agreements with third parties after July

2   1, 2021, would receive essentially the same payments before then is nothing more than a simplistic

3   proposal to ignore the real world and economics. Any NIL value varies tremendously over time

4   depending upon individual and team performance, market demand, and innumerable other factors.

5   Simply determining who is actually in the class would require individual inquiry.

6      Together, these flaws and others highlight the broader deficiencies in Plaintiffs' case.

7   Plaintiffs' lofty rhetoric masks a relentless push to bring professional-style revenue sharing to

8   college football and basketball, regardless of the consequences, including for student-athletes who

9   play sports other than football and basketball. Plaintiffs have not met their burden of *proving* that

10  certification of three damages classes is appropriate. The Court should deny Plaintiffs' motion for

11  certification of three Rule 23(b)(3) classes.[2]

12  **I.      BACKGROUND**

13          **A.      The Post-*O'Bannon* NIL Landscape.**

14      In 2019, following *O'Bannon*, California adopted a law prohibiting state universities from

15  restricting NIL compensation to student-athletes and barring the NCAA from declaring current

16  student-athletes ineligible based on receipt of NIL compensation. Calif. Educ. Code § 67456.

17  Thirty-one states and the District of Columbia enacted similar laws permitting NIL compensation

18  in some form.[3] The state laws are irreconcilable. Although the legislation continues to evolve, at

19  least fifteen states and D.C. specifically prohibit an institution and/or a conference from providing

20  compensation to a current and/or prospective student-athlete.[4]

---

21  [2] In support of their motions, Defendants submit three expert reports, from Dr. Catherine Tucker

22  (an economist at MIT), *see* Kilaru Decl. Ex. 1 (Expert Report of Catherine Tucker) ("Tucker
    Rpt."); Bob Thompson (a media rights expert), *see* Kilaru Decl. Ex. 2 (Expert Report of Bob

23  Thompson) ("Thompson Rpt."); and Professor Barbara Osborne (a Title IX expert), *see* Kilaru
    Decl. Ex. 3 (Expert Report of Barbara Osborne) ("Osborne Rpt.").

24  [3] Those states included Alabama, Arkansas, Arizona, Connecticut, California, Colorado, Florida,

25  Georgia, Illinois, Kentucky, Louisiana, Maine, Maryland, Michigan, Mississippi, Missouri,
    Montana, Nebraska, New Jersey, New York, New Mexico, Nevada, Oklahoma, Ohio, Oregon,

26  Pennsylvania, South Carolina, Tennessee, Texas, and Virginia. North Carolina's Governor issued
    an Executive Order. Alabama and South Carolina have repealed or suspended their laws.

27  [4] Colo. Rev. Stat. § 23-16-301(2)(c)(I); D.C. Legislative Bill 455 § 215(6)(e)(1) (2022); Ill. Comp.
    Stat. Ann. § 190/15(e)(2); Ky. Rev. Stat. § 164.6945(3)(a-b); La. Stat. Ann. § 17:3703 (A)(2);

28  Miss. Code Ann. § 37-97-107(5); Mo. Stat. Ann. § 173.280(4); Mont. Code Ann. § 20-1-232(4);

1    In response to the burgeoning state legislation, the NCAA announced an "Interim NIL

2    Policy" effective on July 1, 2021 (when the first state laws became effective) to be in force "until

3    such time that either federal legislation or new NCAA rules are adopted." *NCAA Interim NIL*

4    *Policy*, at 1, https://perma.cc/E9HE-98AA. Subject to state law, the policy permits current and

5    prospective student-athletes to license their NIL to, and receive payments from, third parties, but

6    prohibits the use of NIL payments for recruiting inducements and prohibits academic institutions

7    from providing NIL payments. *Id.*; Kilaru Decl. Ex. 4 (NCAAHOUSE00196365 ¶ 4) ("Name,

8    Image and Likeness Policy Question and Answer"). Numerous athletes—but certainly not all or

9    even nearly all Division I or A5 athletes, as confirmed by Plaintiffs' definition of their third-party

10   NIL damages class—took advantage of emerging platforms and social media outlets by entering

11   into agreements with third parties to monetize their NIL. *See, e.g.*, Kilaru Decl. Ex. 5 (Transcript

12   of Deposition of Sedona Prince 87:13–21; 91:16–17) ("Prince Tr.").

13       **B.     Plaintiffs' Proposed Classes.**

14       Plaintiffs filed this lawsuit on June 15, 2020. Plaintiffs challenge the current NCAA rules

15   to the extent they prohibit BNIL payments by schools and conferences, and assert that the prior

16   limitations on third-party NIL payments were unlawful. Plaintiffs' Motion ISO Class Certification,

17   ECF No. 209, at 8 ("Mot."). They seek to certify an injunctive relief class consisting of all Division

18   I college athletes from June 15, 2020, to the date of judgment, and three damages classes: (1) a

19   Football and Men's Basketball Class of A5 scholarship athletes (though no current or former men's

20   basketball player is a named plaintiff); (2) a Women's Basketball Class of A5 scholarship athletes;

21   and (3) an Additional Sports Class for *all* Division I athletes, in any sport, who monetized their

22   NIL since July 1, 2021. Plaintiffs pursue three categories of damages, all dating back to 2016:

23       **BNIL Damages.** Plaintiffs seek damages on behalf of the Football and Men's Basketball

24   Class and the Women's Basketball Class for alleged lost "compensation for NILs used in college

25   football and men's and women's basketball broadcasts." Mot. at 29. Their theory is that absent the

---

26   Neb. Rev. Stat. § 48-3603(5)(c); Nev. Rev. Stat. § 398.300(1)(c); N.C. Exec. Order 223(1)(A)(iii);
27   N.J. Stat. Ann. § 18A:3B-87(a)(2); Okla. Stat. Ann. § 820.23(C); Tenn. Code Ann. § 49-7-
     2802(b)(1); Tex. Educ. Code § 51.9246(g)(2)(B)(ii). Georgia's law, which contained such a
28   prohibition, apparently sunset when the NCAA adopted its interim policy. Ga. Code Ann. § 20-3-
     681(f).

NCAA's rules prohibiting NIL payments by schools and conferences, these athletes all would have been paid a share of the broadcast revenues of each conference because the broadcast itself constitutes a use of NIL rights, i.e., BNIL.

**Video Game NIL Damages.** Plaintiffs also seek damages on behalf of the Football and Men's Basketball classes, and some members of the Additional Sports Class, for lost payments for the use of their NILs in college football and men's basketball video games that Electronic Arts (EA), or another video game developer, supposedly would have made absent the NCAA's rules.

**Third-Party NIL Damages.** Plaintiffs seek damages for lost NIL compensation from third parties prior to July 1, 2021. Plaintiffs assert that anyone who received such compensation since July 1, 2021, would have received essentially the same compensation before July 1, 2021. Plaintiffs pursue this claim on behalf of the Additional Sports Class, and certain athletes in the other classes.

*       *       *

Plaintiffs' motion depends on Desser and Rascher's opinions. As explained below, neither offers any *economic analysis* of the inherently individualized issues and structural factors affecting whether and to what extent individual class members were in fact injured (or by how much).

## C. Plaintiffs' Speculative And Unsupported Theory Of "Broadcast NIL" (BNIL) Injury And Damages.

What Plaintiffs call a model for BNIL is just a series of simple math formulas plucked out of thin air. According to Desser, 10% of the broadcast revenue received by each conference is attributable to collective student-athlete NIL.[5] Expert Report of Edwin S. Desser, ECF No. 209-03 at 63 ("Desser Rpt."). For any broadcast agreement covering multiple sports, "75% should be allocated to football, 15% to men's basketball, 5% to women's basketball and 5% to Olympic

---

[5] Defendants argued in their Rule 12 motion that there are no NIL or publicity rights in broadcasts (and preserve that issue here, by reference to the Rule 12 briefing). The Court held that even if such rights did not exist, schools would nevertheless pay student-athletes in a labor market to compete for recruits. *House v. NCAA*, 545 F. Supp. 3d 804, 816 (N.D. Cal. 2021). That was a Rule 12 decision and Plaintiffs must now establish their certification bid with evidence—and specifically evidence related to compensation in the alleged labor market.

Sports." *Id.* This "multi-sport allocation factor" is based entirely on Desser's say-so, unsupported by real-world facts or any economic analysis. *See generally id.*

Desser explicitly stated that he has no conclusions about a labor market and no opinions on the value of individual NIL. Kilaru Decl. Ex. 6 (Transcript of Deposition of Edwin S. Desser 14:15–16:6; 54:5–55:7; 93:1–94:7) ("Desser Tr."). Nevertheless, relying on Desser, Rascher contends that if BNIL payments were allowed, competition in the student-athlete labor market would "lead[] organically to" the A5 conferences guaranteeing equal compensation to all "incoming full GIA recipients." Expert Report of Daniel A. Rascher, ECF No. 209-02 ¶ 151 ("Rascher Rpt."). Specifically, each conference would supposedly set aside 10% of their broadcast revenues and provide "an equal Broadcast NIL payment to each class member in each sport within each conference," generally following Desser's multi-sport allocation factor. *Id.* ¶ 163.[6] Per-student-athlete BNIL payments for the 2021 academic year would be as follows:

|  | NSC | NSC | NSC | NSC | NSC |
|---|---|---|---|---|---|
| Football | $32,400 | $26,000 | $42,500 | $37,200 | $29,800 |
| Men's BB | $64,400 | $57,200 | $74,000 | $77,400 | $55,000 |
| Women's BB | $9,500 | $6,800 | $14,100 | $12,600 | $8,900 |

*Id.* ¶ 178, Ex. 12.[7] As explained next, this formula depends on layers of unsupported speculation.

1.  <u>There Is Neither A Market For BNIL Rights Nor Any Basis To Value Such Rights At 10% Of Broadcast Revenue.</u>

One essential assumption underlying Plaintiffs' BNIL damages theory is that the value of those alleged rights can be measured as 10% of overall broadcast revenues. Desser Rpt. at 53–54.

---

[6] For single-sport broadcast agreements, Rascher allocates the full 10% of revenues to the respective sport, further tilting the distribution toward men. Rascher Rpt. ¶¶ 177–178. For example, he allocates 10% of the revenues under the CBS/Turner agreement to men's basketball players. *Id.*

[7] It is not possible to derive network strictly confidential information from the Plaintiffs' per player payment structure above, but out of an abundance of caution, the names of the A5 conferences are not provided above. Implementing and enforcing the rules necessary to the model would require disclosure of rights fees, which would put each conference in violation of confidentiality provisions in its media agreements and is yet another respect in which the Plaintiffs' model is unworkable. Declaration of Greg Sankey (SEC) ¶ 24 ("Sankey Decl.").

This assumption depends entirely on Desser. But by Desser's own admission, BNIL rights and the value Desser allocates to them are fabricated for this litigation: "It's typically not necessary, and therefore there is not a particular business purpose for the parties involved in the contracts to go through the process of creating that allocation." Desser Tr. 34:14–17; *accord id.* 77:6–78:3 (agreeing "[t]here is no separate place where the NIL rights in broadcast are bought and sold separate from the player contracts themselves"); *id.* 33:22–34:14 ("I'm not aware of that taking place before."). Desser further acknowledges that nobody has tried to "segregate the NIL value from the value of the broadcast rights package as a whole." *Id.* 34:8–14. Thompson confirms the point: "[T]here is no instance when any person or entity ever paid, or was paid, for Broadcast NIL rights only. There is no price information for any Broadcast NIL on which a valuation can be based." Thompson Rpt. at 35; *accord id.* at 17–28, 35–37. These observations are also consistent with the experience of the conferences.[8]

There is no support in the professional sports context either. While Desser and Rascher initially claimed that their approach is consistent with the NFL and NBA, they admitted the opposite in depositions. Desser admitted that, in the NFL and NBA, there is no "separate portion of salary delineated in the player agreements for NIL as opposed to performance on the field." Desser Tr. 75:18–76:7; 76:16–19 (NFL); 78:8–15 (NBA). Rascher also disclaimed any reliance on NFL or NBA compensation structures. Kilaru Decl. Ex. 7 (Transcript of Deposition of Daniel A. Rascher 166:25–167:6 ("Rascher Tr.") ("not using [the NFL or NBA] as a yardstick").[9] These concessions are for good reason. In these sports, every player's contract contains a provision promising not to contest the rights of the team and the league to broadcast games, and another provision allowing the player's NIL rights to be used to promote the game and the broadcasts. *See* Supplemental Declaration of Steven J. Scebelo (NFLPA) ¶¶ 4–5 ("Scebelo Supp. Decl.");

---

[8] Sankey Decl. ¶ 23; Declaration of Kerry Kenny (Big Ten) ¶ 13 ("Kenny Decl."); Declaration of George Kliavkoff (Pac-12) ¶ 27 ("Kliavkoff Decl."); Declaration of Chad Weiberg (Okla. St. Univ.) ¶ 13 ("Weiberg Decl."); Declaration of Mack Rhoades (Baylor Univ.) ¶ 13 ("Rhoades Decl."); Declaration of Ben Tario (ACC) ¶ 28 ("Tario Decl.").

[9] Examples outside the NFL and NBA further undermine Desser's hypothesis. Athletes in the PGA Tour and the WNBA acknowledge contractually that the leagues control and can monetize all broadcast rights, but currently receive *no payments* in return. Thompson Rpt. at 39–41.

Supplemental Declaration of Gary Arrick (NBPA) ¶ 4 ("Arrick Supp. Decl."). The consideration for these provisions is the player's individually negotiated salary, not 10% of broadcast rights, and it is not split equally among any subset of players. Thompson Rpt. at 38–39.

Desser's 10% figure for BNIL also finds no basis in royalty rates for *promotional and endorsement* NIL licenses. As Rascher admitted, such licenses have nothing to do with BNIL. Rascher Tr. 51:3–15. Thompson's report explains, in detail, why Desser's 10% opinion is invalid and unsupported. *See* Thompson Rpt. at 35–46. Moreover, Desser's opinions as to "collective" (but not individual) BNIL value do not support the two conclusions essential to Plaintiffs' class certification motion: that all class members have been injured or that all scholarship players on a team would be paid equal amounts—as described further below.

2.  Institutions Would Not Guarantee Payments To All Student-Athletes Up Front.

To avoid individualized inquiries into whether and to what extent members of the Football and Men's and Women's Basketball classes would receive BNIL payments, Rascher speculates that the *conferences* would *guarantee* payments out of Desser's 10% to each BNIL class member *before* enrollment for the entire period of a player's college eligibility. Rascher Rpt. ¶ 161.

This introduces another issue because in doing so Rascher conflates concepts in distinct markets involving different sets of competitors. Plaintiffs' allegations focus on restraints in a market where the A5 universities compete for the labor services of student-athletes. *House v. NCAA*, 545 F. Supp. 3d 804, 809 (N.D. Cal. 2021). Conferences do not compete in that market. *See* Sankey Decl. ¶ 12; *accord* Kliavkoff Decl. ¶ 12; Tario Decl. ¶ 10; Declaration of Chad Hawley (Big Ten) ¶ 13 ("Hawley Decl."). In addition, Desser's 10% hypothesis, which is incorporated into this but-for world, has nothing to do with a labor market or individual NIL. Desser Tr. 14:15–16:6. There is no basis for this conflation of markets. *See* Tucker Rpt. ¶ 23. And even ignoring these fatal market disconnects, there is no evidence to support this claim; indeed, the record belies Rascher's speculative justifications.

With no support from Desser for his assertion that every scholarship student-athlete on a football or basketball team would be paid, Rascher reverts to economic theory, but his conclusions are inconsistent with basic economics. Tucker Rpt. ¶ 90. Rascher admits that he needs to "assume

that the market participants are engaging in rational economic behavior." Rascher Tr. 32:6–10. But he offers no economic theory supporting his conclusory assertion that every scholarship student-athlete would receive BNIL revenue payments on top of their scholarships. On the contrary, Rascher refused to opine that the schools value all student-athletes equally. Rascher Tr. 43:13–25; *see* Tucker Rpt. ¶¶ 92–93. He likewise admitted that walk-ons—who appear in broadcasts—have a "position in the labor market" where "they're not able to get a scholarship," and therefore would not receive BNIL payments. Rascher Tr. 81:11–22. And he specifically acknowledges that no NCAA rule would require uniform payments to scholarship athletes. Rascher Tr. 120:11–17. In the face of these admissions, he offers nothing but speculation that all scholarship athletes on a team could command BNIL payments on top of a scholarship in the labor market, reducing the payments available to entice stars to enroll. *See* Tucker Rpt. ¶¶ 92–98.

These admissions are fatal. NCAA rules permit two types of scholarships. In "head count" sports, like football and basketball, every scholarship athlete receives a full grant-in-aid. Sankey Decl. ¶ 50. And in "equivalency sports," teams are limited to a number of scholarships, but are free to allocate those scholarships among multiple players in different percentages. *Id.* In these equivalency sports, schools provide widely varying scholarship amounts to athletes on the same team and provide no scholarships at all to many players, after taking talent and other individual factors into account. Sankey Decl. ¶ 50; Tario Decl. ¶ 23. For example, 36% of women's soccer players ⟦Redacted – Confidential⟧ received *no scholarships* in the 2021–22 season, and the remaining players received scholarships ranging from 5% to 100% of a full scholarship. Tucker Rpt. ¶ 119. In light of Rascher's acknowledgement that there would similarly be no NCAA rule mandating equal BNIL payments to all scholarship student-athletes and a pool of up to 10% of broadcast revenues available for distribution, there is no economic reason to conclude that all scholarship football and basketball players would receive BNIL payments in this but-for world. *See* Tucker Rpt. ¶¶ 92–98.

The NCAA's Student Assistance Fund (SAF) provides further confirmation. Distributions from that fund are discretionary; as Plaintiffs pointed out in prior cases, schools use the funds to purchase loss of value insurance to enable star athletes to remain in school and otherwise prioritize

the funds for competitive purposes. *See* Direct Testimony of Daniel A. Rascher ¶¶ 78–82, *In re NCAA GIA Cap Antitrust Litig.*, 14-cv-02758-CW (N.D. Cal. July 3, 2018), ECF No. 994.[10] Not every scholarship athlete at every A5 school receives a payment from the fund. *Id.* As Tucker explains, schools vary considerably in whether, to whom, and to which sports they offer payments out of the SAF. Tucker Rpt. ¶¶ 123–130. But the critical point is that not all scholarship student-athletes receive payments.

Similarly, this Court's ruling in *Alston* permitted schools to make additional payments to student-athletes in the same labor market claimed here. Nothing in the injunction prohibits institutions from guaranteeing such payments upon enrollment in the way Rascher suggests. But schools are *not* taking that step, and are instead conditioning *Alston* payments on individual characteristics that cannot be determined at or before enrollment, including staying out of the transfer portal.[11] Moreover, some schools distribute incentives only upon graduation, while others distribute per semester dependent upon academic progress.[12] Rascher provides no basis to assume that schools would treat claimed BNIL payments differently, when numerous criteria could be attached to such payments. *See* Declaration of Kris Richardson ¶¶ 7–8 ("Richardson Decl.") (listing reasons why student-athletes might not receive BNIL payments, including entering the transfer portal).

---

[10] *Accord* Adam Wells, *Texas A&M Purchases Insurance Policy for OL Cedric Ogbuehi*, Bleacher Report (July 17, 2014), https://perma.cc/W6DB-EC2G.

[11] Don Williams, *Tech athletes in portal before Dec. 14 barred from first Alston award checks*, Lubbock Avalanche-Journal (Dec. 7, 2022 5:46 p.m. C.T.), https://perma.cc/GN7U-VRSG; *accord* Andy Wittry, *Wisconsin's Alston awards offer up to $25,000 upon graduation*, On3 (Sept. 19, 2022), https://perma.cc/BK76-5V64.

[12] For instance, Iowa State distributes awards at graduation. Iowa State University, *ISU Announces Student-Athlete Academic Incentive Plan*, cyclones.com (Oct. 11, 2021), https://perma.cc/8TPZ-HFCQ. On the other hand, the University of Wisconsin distributes a fraction of the awards earlier, but withholds most of the award until graduation. Wittry, *Wisconsin's Alston awards offer up to $25,000 upon graduation*, https://perma.cc/BK76-5V64. The University of Texas, in contrast, distributes awards per semester "after review and confirmation of academic progress and program engagement." Texas Athletics, *Texas student-athletes set to receive additional financial support*, texassports.com (Nov. 24, 2021), https://perma.cc/JGB2-Q9TS.

3.   <u>There Is No Basis To Assume That Every Class Member Would Receive Equal Compensation For BNIL.</u>

To try to conform Plaintiffs' BNIL damages theory into something that can be adjudicated on a class-wide basis, Rascher posits that in the but-for world, the 10% alleged BNIL value would be paid in equal shares, through labor market competition for incoming players. Rascher Tr. 42:18–22. Although Rascher calls his approach an equilibrium, Rascher Tr. 33:6–8—meaning the "price" a rationally functioning market would yield—it would actually require irrational behavior.

*First*, Plaintiffs' premise—that labor market competition amongst the conferences would lead to athletes in each conference receiving equal BNIL payments—is unfounded. Even accepting Rascher's premise of conference-made payments, he admits that in the but-for world, there would be no NCAA rule requiring equal payments, and conferences could divide BNIL payments amongst players as they saw fit. Rascher Tr. 120:11–17; *accord* Weiberg Decl. ¶ 15; Tario Decl. ¶¶ 23–24; James Decl. ¶¶ 24–26; Kenny Decl. ¶¶ 14, 16. There is no reason to conclude that the institutions, which compete fiercely for players (against both conference and non-conference schools) would permit or support paying highly sought-after recruits the same amounts as less talented players. Hawley Decl. ¶ 13; Weiberg Decl. ¶ 21; Tario Decl. ¶ 23; Tucker Rpt. ¶¶ 92–98; Declaration of Ray Tanner (Univ. of S.C.) ¶ 8 ("Tanner Decl."); Declaration of David Flores (Big 12) ¶¶ 12, 14 ("Flores Decl."). The same is true from the student-athlete side; the notion that the most talented student-athlete would accept the same amount, up front, as the least talented recruit, defies economics. *See* Tucker Rpt. ¶¶ 92–98;Tario Decl. ¶ 24; Weiberg Decl. ¶ 18.

*Second*, there is no economic basis for Rascher's proposition that conferences would accept a perpetually disadvantaged position in recruiting, which would be an unavoidable outcome. *See* Tucker Rpt. ¶ 142; Flores Decl. ¶ 14; Tanner Decl. ¶ 8; Declaration of Mark Harlan (Univ. of Utah) ¶ 16 ("Harlan Decl."). In 2021, for example, Rascher posits that a NSC men's basketball player would have been paid $77,400, but a NSC men's basketball player would have been paid $55,000; with similarly disparate payments to football players ($42,500 vs. $26,000) and women's basketball players ($14,400 vs. $6,800). Rascher Rpt. ¶ 178, Ex. 12. These disparities result from corresponding differences in the size of the current media agreements for the conferences. Rascher

offered no reason the NSC would go along with this approach, versus concentrating payments on particular players. Nor could he explain why the NSC would elect to pay $77,400 when it could beat the competition by paying much less. *See* Rascher Tr. 72:16–73:25; Sankey Decl. ¶ 44 ("[T]he NCAA's membership would not support or vote for rules that put their institutions and conferences at a competitive disadvantage").

*Third*, there is no market or sports league in which the existence of competitive market forces for labor have ever resulted in *equal* payments made to each player on a team. That notion itself defies the basic economics of labor competition, as Rascher knows. Outside of litigation, his own published work recognizes that compensation varies based on talent: "There would be one wage per *unit of talent* where the market labor demand curve crossed the market labor supply curve." Daniel A. Rascher, *A Model of a Professional Sports League*, INTERNATIONAL ADVANCES IN THE ECONOMIC RESEARCH, 14 (1997); *see also* Tucker Rpt. ¶¶ 96–98 (wages based on talent); *id.* ¶¶ 94–95 (no example of equal payments). Real-world examples bear that out. In the NFL and NBA, each team may pay up to a specified percentage of league revenue in salaries to players on a team, but the salaries vary widely among players. Thompson Rpt. at 38–39.

*Fourth,* the record also contradicts Rascher's speculation that conferences would make equal payments to scholarship athletes because broadcasters "need to secure the NIL rights of all players on a given team, whether or not a particular player's NIL is actually shown on television or included in the video game." Mot. at 37. Rascher acknowledges that *non-scholarship* athletes do appear in broadcasts, Rascher Tr. 44:9–17, yet his model assigns them no BNIL damages.

    4.    <u>The Conferences Have Never Made And Would Not Make Direct Payments To Student-Athletes.</u>

Though Rascher posits that BNIL payments would be made directly by conferences themselves, there is nothing to support such a payment model. Schools, not conferences, compete with each other in recruiting, and schools, not conferences, decide what amount of scholarship aid to give to individual students. Hawley Decl. ¶ 13; Weiberg Decl. ¶ 21; Tario Decl. ¶¶ 10–11; Kliavkoff Decl. ¶¶ 12, 14. As explained in the prior section, basic economics confirms that schools would have disincentives to prejudice themselves in recruiting, both vis-à-vis other schools in their

1  conference and against non-conference competition. There is no sports league where the league

2  sets the compensation for players on each team. *See, e.g.*, Scebelo Supp. Decl. ¶ 3; Arrick Supp.

3  Decl. ¶ 3.

4      Institutions would also lose autonomy under Plaintiffs' scenario. In the SEC, "member

5  institutions long ago decided that the Conference should not be involved in recruiting incoming or

6  transfer student-athletes." Sankey Decl. ¶ 12; *accord* Kliavkoff Decl. ¶ 12; Tario Decl. ¶ 10;

7  Hawley Decl. ¶ 13. Schools also would not cede to their conferences control over "which

8  prospective and current student-athletes will receive scholarships." *Id.* ¶ 13; *see also* Declaration

9  of Candice Storey Lee ¶ 22 ("Lee Decl.") ("SEC member institutions would also reject Plaintiffs'

10  Scenario because it would restrict each institution's ability to direct resources as it sees fit.");

11  Sankey Decl. ¶ 47(f) (approach would "force[] member institutions to prioritize football and men's

12  and women's basketball over all other sports"); Kliavkoff Decl. ¶ 26; Hawley Decl. ¶ 16(d).

13      5.    <u>There Is No Basis For A 75/15/5 Distribution Of "Broadcast" Revenues.</u>

14      Plaintiffs' formula for distributing the claimed 10% share of conference broadcast revenues

15  with 75% to football, 15% to men's basketball, and 5% to women's basketball is also lacking in

16  any support. As Desser himself acknowledges, in multi-sport rights agreements, broadcasters *do*

17  *not allocate rights fees by sport*. Desser Tr. 121:9–18; *see also* Kliavkoff Decl. ¶¶ 22–23 (none of

18  the Pac-12's rights agreements " ⬚ Redacted – NSC ⬚

19  ⬚ " and it would be "unrealistic" to

20  "attempt to allocate broadcast rights revenues"); Kenny Decl. ¶ 15 ("To my knowledge, the

21  Conference and its network partners have not allocated any portion of a multi-sport media rights

22  agreement to any individual sport within any agreement."); Sankey Decl. ¶¶ 32–34. Indeed,

23  conferences have differing priorities in their media agreements that resist common categorization.

24  Some conferences focus on securing broadcasts for a relatively larger proportion of football and

25  men's basketball games; others require networks to produce and broadcast unprofitable games to

26  maximize exposure for student-athletes in other sports. *See* Thompson Rpt. at 18, 21; Desser Tr.

27  37:6–12, 38:5–12, 49:4–15, 51:7–13; 55:9–19; 56:14–21; Tario Decl. ¶ 31 ( ⬚ Redacted – NSC ⬚

28  ⬚

1    Redacted – NSC ); Sankey Decl. ¶¶ 35–37; Weiberg Decl. ¶ 16; Kliavkoff Decl. ¶ 24.

2        Desser also arrives at his formula based on cherry-picked evidence. For example, he

3    focuses on a note in a SEC financial statement attributing an amount to football equal to NSC of

4    certain rights fees received under one of the SEC's three media agreements. Desser Rpt. at 60. But

5    the same financial statement allocated NSC of broadcast revenues from a NSC nt to

6    football and the rest to men's basketball, and did not allocate at all over NSC in revenues

7    from a separate agreement with Redacted – NSC . *See* Desser Ex. 18 at 806–10;

8    Sankey Decl. ¶¶ 31–32. Desser admitted this obvious flaw in his approach in his deposition. Desser

9    Tr. 119:10–13. Similarly, Desser relies on a 2010 term sheet from a non-A5 conference that he

10    admitted he does not know how to interpret, and a 2011 agreement between Redacted – NSC

11    that has no allocations at all. Desser Rpt. at 62.[13] Given the variability among conferences, it is

12    illogical for Desser to extrapolate a common allocation based on such flimsy data points, all over

13    a decade old, which are not even probative for the SEC, much less the other four A5 conferences

14    for which he offers no supporting data. *See* Thompson Rpt. at 51–53.

15        Rascher offers no improvement to this record. He reviews self-reported data (MFRS data)

16    that purportedly shows how institutions internally allocate all sources of revenue. *See* Rascher Rpt.

17    ¶ 175. But Rascher admits this data is incomplete, and that many institutions allocate revenues

18    inconsistently with his formula. Rascher Tr. 144:2–146:6.

19        6.   <u>Title IX And Gender Equity Considerations Make Plaintiffs' Postulated BNIL</u>

20            <u>But-For World Impossible.</u>

21        Plaintiffs' BNIL injury and damages methodology also entirely ignores obligations under

22    Title IX. In postulating a but-for world in which nearly 96% of BNIL payments would be made to

23    male student-athletes and 4% to female athletes, Rascher Rpt. ¶ 234(h), neither Desser nor Rascher

24    considered Title IX. *See* Desser Tr. 64:12–19 (Title IX considerations are not "within the scope of

25

26

---

27    [13] Desser's own prior work is inconsistent with his opinion as well; his own research paper valued
the NCAA women's basketball tournament rights at 10% of the value of the rights to the men's
28    basketball tournament—not at 33% of the value, which would be consistent with his litigation
opinion. Thompson Rpt. at 53–54; Desser Tr. 129:1–130:19.

1   what [he] was assigned to work on"); Rascher Tr. 111:19–21 (he has not "tried to account for Title

2   IX in any of [his] damages models in this case").

3          Title IX cannot be ignored in assessing any compensation scheme in the but-for world, as

4   it requires that a member institution awarding athletics-based financial assistance must distribute

5   it "in proportion to the number of students of each sex participating in . . . intercollegiate athletics."

6   34 C.F.R. § 106.37(c). Title IX prohibits disproportionate distribution of benefits, opportunities,

7   resources, and treatment to student-athletes based on sex. *Id.* § 106.41(c); Osborne Rpt. ¶¶ 42–43,

8   53–63; James Decl. ¶ 18. Title IX also (separately) prohibits institutions from providing different

9   amounts or types of financial assistance, limiting eligibility for financial assistance, or otherwise

10   discriminating in the provision of financial assistance on the basis of sex. 34 C.F.R. § 106.37(a);

11   Osborne Rpt. ¶¶ 45–52. The gaping disparity yielded by Plaintiffs' BNIL injury and damages

12   formula violates Title IX—and does so in a way that cannot be solved. *See* Osborne Rpt. ¶¶ 106,

13   129–136; *see e.g.*, *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 856 (9th Cir. 2014);

14   Kilaru Decl. Ex. 8 (OCR-00020) (Office of Civil Rights July 23, 1998 Letter); *infra* at 29.

15          Further, there is no evidence that conferences or institutions would agree to such a

16   dramatically skewed distribution of revenue, notwithstanding Title IX. As former student-athlete

17   and current Vanderbilt Athletics Director Candice Lee explains, Vanderbilt's support for equity

18   and inclusion means the school "could not support, implement or engage in the revenue sharing

19   structure set forth in Plaintiffs' Scenario." Lee Decl. ¶ 19; *accord* Kliavkoff Decl. ¶ 25; Sankey

20   Decl. ¶ 47(a); James Decl. ¶ 19; Hawley Decl. ¶ 16(a); Flores Decl. ¶ 16; Tanner Decl. ¶ 9.

21          7.   <u>State Laws Preclude Conferences From Paying Student-Athletes.</u>

22          Plaintiffs also fail to account for as many as 15 state laws that forbid conferences and

23   member institutions from making direct payments to student-athletes. *See supra* nn.3–4. Plaintiffs

24   cannot evade these impediments by claiming that these laws only went into effect on July 1, 2021.

25   There has never been a time where state laws and NIL opportunities for student-athletes did not

26   overlap temporally. If NIL opportunities were permitted earlier, as Plaintiffs urge, the real-world

27   evidence is that state laws would have sprung into effect earlier too.

28

### D. Substitution Effects Implicating Whether And To What Extent Class Members Are Impacted And Damaged Would Be Amplified In Rascher's BNIL But-For World.

Nothing in Rascher's methodology accounts for the substitution effects that would inevitably arise in a but-for world in which the Football and Men's and Women's Basketball Classes receive nearly $1.3 billion in additional compensation. The *theoretical* concern the Court identified in *O'Bannon*—that student-athletes would stay in school longer if they could receive additional compensation, *see* 2013 WL 5979327, at *8–9—is now supported by *real-world* evidence, in every relevant sport, since the NCAA adopted the Interim NIL Policy on July 1, 2021.

Angel Reese—the star of the LSU team that just won the NCAA women's basketball national championship—is "in no rush to go to the [WNBA]" because "[t]he money [she's] making is more than some of the people that are in the league that might be top players."[14] Paige Bueckers, a star player at the University of Connecticut, recently passed up the WNBA draft to play another year, where she will "make more money from name, image and likeness opportunities in college than she would earn in the W.N.B.A."[15] Named Plaintiff Sedona Prince recently withdrew from the WNBA Draft and entered the transfer portal to play basketball at Texas Christian University.[16]

In men's basketball, many student-athletes have made similar pronouncements. *See, e.g.*, Tucker Rpt. ¶ 84(a) (Oscar Tschiewbe, at the University of Kentucky (SEC), returned to college for 2022–23, in part because he "realized he could make more money via NIL in college than in the NBA"), ¶ 84(b) (same for Armando Bacot, at the University of North Carolina (ACC) who returned to school for both his senior year and a fifth year).

In football, there is aggregate and individual evidence. The number of players entering the NFL Draft early with remaining college eligibility has decreased since July 1, 2021. *See* Tucker Rpt. ¶ 85(b) (average number of early entrants has dropped from an average of 126 from 2019–21 to 100 in 2022 and 82 in 2023). Individual student-athletes credit their decision to stay in school

---

[14] Tyler Nettuno, *Angel Reese 'in no rush' to get to WNBA after winning championship at LSU*, Yahoo! Sports (Apr. 5, 2023), https://perma.cc/MR89-TYD7.

[15] Adam Zagoria, *Bueckers Says She'll Stay in School. (That's Where the Money Is.)*, The New York Times (Sept. 2, 2022), https://perma.cc/JYE9-PCA9.

[16] Sabreena Merchant, *Former Oregon forward Sedona Prince transferring to TCU: What it means for the Horned Frogs*, The Athletic (Apr. 8, 2023), https://perma.cc/96R6-8QGP.

longer to the NIL compensation they are receiving. *See id.* ¶ 85(a) (Bennett Williams, a football player at the University of Oregon (Pac-12), decided to not declare for the 2021 NFL draft, based in part on "third-party NIL deals and the particular NIL set-up at Oregon").

This case also implicates new substitution effects. Plaintiffs' approach postulates that student-athletes *in the A5* would receive nearly $1.3 billion in additional compensation. Thousands of student-athletes who turned down A5 scholarship offers in the real world would have had a significant economic incentive to accept them in the but-for world. The class representatives admitted that compensation is a critical factor in an athlete's school choice. Kilaru Decl. Ex. 9 (Transcript of Deposition of Grant House 193:5–6, 198:13–19) ("House Tr."); Kilaru Decl. Ex. 10 (Transcript of Deposition of Tymir Oliver 67:6–18) ("Oliver Tr."); Prince Tr. 18:4–19:13, 252:18–253:1. Rascher likewise admitted that multiple student-athletes who declined an A5 scholarship in the real world would have had an economic incentive to accept that scholarship in the but-for world, displacing a class member. *See* Rascher Tr. 200:16–204:19 (Omari Spellman played basketball at Villanova (Big East) in 2016 despite receiving offers from schools in every A5 Conference); *id.* 206:23–208:20 (Maxwell Lorca-Lloyd played basketball at the University of Pennsylvania (Ivy) rather than schools in the Big Ten, Big 12, Pac 12, and SEC). These are not isolated examples. At least 3,231 football and men's basketball players in the class period received offers from A5 schools, but chose to play at non-A5 schools. Tucker Rpt. ¶ 59, Tbl. 3.

### E.    Plaintiffs' Theory Of Video Game NIL Injury And Damages.

In modeling Video Game NIL, Rascher simply assumes that in the but-for world, a video game manufacturer like EA would have produced and sold college football and men's basketball video games in every year of the class period, paid out 5% of revenue as NIL royalties, and distributed those royalties in equal payments to every full-scholarship FBS football and Division I men's basketball student-athlete. Rascher Rpt. ¶¶ 144–146. Rascher's damages model depends on comparisons to professional sports video games to reach these conclusions. *Id.* ¶¶ 139–141.

The evidence, however, confirms that ⟨Redacted – Counsel Only⟩ and ⟨Redacted – Counsel Only⟩ ⟨Redacted – Counsel Only⟩. Kilaru Decl.

1    Ex. 11 (EA_NIL_00001875); Kilaru Decl. Ex. 12 (EA_NIL_00001243). ▒▒▒▒ Redacted – Counsel Only

2    ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

3    ▒▒▒▒▒▒▒▒▒▒▒ as well as the ▒▒▒▒▒▒ Redacted – Counsel Only ▒▒▒▒▒▒

4    ▒▒▒▒ Kilaru Decl. Ex. 13 (EA_NIL_00006067).

5        Further, in the nearly two years since the NCAA enacted the Interim Rule, EA has not

6    released either a college football or college basketball game. It has delayed its planned college

7    football game to at least the "summer of 2024,"[17] and views a college basketball game as ▒Redacted –

8    ▒▒▒▒ Redacted – Counsel Only ▒▒▒▒ Kilaru Decl. Ex. 14 (EA_NIL_00000268); *see also* Kilaru

9    Decl. Ex. 15 (EA_NIL_00005410). Indeed, EA ▒▒▒▒ Redacted – Counsel Only ▒▒▒▒

10    ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒. EA_NIL_00006067.

11    Further, EA supplied a Declaration ▒▒▒▒ Redacted – Counsel Only ▒▒▒▒

12    ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒. *See* Declaration of Paul Cairns (EA) ¶ 6 ("Cairns

13    Decl.").

14        Nor do EA's *potential* plans to compensate student-athletes resemble anything like

15    Rascher's model. ▒▒▒▒ Redacted – Counsel Only ▒▒▒▒

16    ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

17    ▒▒▒▒▒▒▒▒▒▒▒▒▒▒. Kilaru Decl. Ex. 16 (EA_NIL_00000149); Kilaru Decl. Ex. 17

18    (EA_NIL_00001462); Kilaru Decl. Ex. 18 (EA_NIL_00000121); Kilaru Decl. Ex. 19

19    (EA_NIL_00000158); Kilaru Decl. Ex. 20 (EA_NIL_00001239). ▒▒▒▒ Redacted – Counsel Only

20    ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

21    ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒, *see e.g.*, Rascher Rpt. ¶ 149, Ex. 4, ▒Redacted –

22    ▒▒▒▒ Redacted – Counsel Only ▒▒▒▒. Kilaru Decl. Ex. 21

23    (EA_NIL_00006071–72); Kilaru Decl. Ex. 22 (EA_NIL_00005288–89).[18] There is accordingly

24    no support for Rascher's speculation about Plaintiffs' alleged injury and sought-after damages.

25



26    [17] Michael Rothstein, *EA Sports to release college football game in summer 2024*, ESPN (Nov.

27    22, 2022), https://perma.cc/DM4F-WC2W.

       [18] ▒▒▒▒ Redacted – Counsel Only ▒▒▒▒

28    EA_NIL_0006067, ▒▒▒▒ Redacted – Counsel Only ▒▒▒▒.

1          **F.      Plaintiffs' Theory Of Third-Party NIL Injury And Damages.**

2          To predict what income student-athletes would have made in third-party NIL deals prior to

3   the July 1, 2021 Interim NIL Rules, Rascher offers a "before and after" approach that uses a

4   student-athlete's current self-reported performance in the NIL market as a baseline to predict

5   performance in prior years. Rascher Rpt. ¶ 185. For those student-athletes who monetized NIL

6   after July 1, 2021, Rascher would apply essentially the same amount to each of the athlete's prior

7   years of eligibility. *See* Rascher Tr. 220:5–8. As an initial matter, defining this class as just student-

8   athletes who monetized their NIL after July 1, 2021, is a concession that not every athlete has NIL

9   value—undermining the premise of Plaintiffs' BNIL and video game claims.

10         Rascher has not done much more than provide the above description. While Plaintiffs seek

11  lost Third-Party NIL damages dating back to 2016, Rascher's limited test of his approach runs

12  back to 2020 only. Rascher Tr. 248:23–252:5. He claims he will perform adjustments for transfers,

13  changes to a player's role, and lower demand for college sports during COVID-19, but has not

14  specified what those adjustments are, run them, or explained why he has not attempted to apply

15  them. Rascher Tr. 236:19–238:10; Rascher Rpt. ¶¶ 180–192.

16         Rascher also indisputably fails to account for other factors relevant to NIL monetization,

17  such as variance in an athlete's marketability based on her sport, the competitiveness of her team,

18  her focus and effort on marketing, or any off-field controversies or eligibility issues. Tucker Rpt.

19  ¶¶ 183, 188. He likewise does not account for "viral moments" that might spike interest in a

20  student-athlete, Rascher Tr. 233:12–235:2; Tucker Rpt. ¶¶ 221–223; variable demand from third-

21  party endorsers over the class period, Tucker Rpt. ¶¶ 204–209; or whether deals reported to

22  institutions were actually consummated, Rascher Tr: 253:19–25.

23  **II.    LEGAL STANDARD**

24         "The class action is an exception to the usual rule that litigation is conducted by and on

25  behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348

26  (2011) (simplified). Class certification is neither automatic nor presumed; rather, "Rule [23]

27  imposes stringent requirements for certification that in practice exclude most claims." *Am. Exp.*

28  *Co. v. Italian Colors Rest.*, 570 U.S. 228, 229 (2013). Class-wide litigation must be able to

"resolve" (not just raise) common issues, and for everyone—all class members and defendants—without altering anyone's burdens under the law and, critically, without prejudicing a defendant's right to advance individualized defenses. *See Wal-Mart*, 564 U.S. at 366; *Tyson*, 577 U.S. at 459.

Rule 23 is not a "mere pleading standard"; a plaintiff must establish that the rule's requirements are "in fact" satisfied. *Comcast*, 569 U.S. at 33. The district court must conduct a "rigorous analysis" that invariably "will entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart*, 564 U.S. at 351; *accord Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022). Simply generating a formula is not enough; the proposed aggregate proof must permit a full and fair adjudication of the issues reliably, without sacrificing substantive rights. *Tyson*, 577 U.S. at 458; *Olean*, 31 F.4th at 665.

## III.   ARGUMENT

### A.   Plaintiffs Cannot Satisfy Rule 23(b)(3) Because Neither Rascher Nor Desser Offers A Valid Impact And Damages Model Capable Of Withstanding Rigorous Scrutiny.

Class certification in antitrust cases has always focused on whether the element of individual injury can be established using common proof, and decisions dating back decades hold that if individualized injury issues predominate, class certification must be denied. *See, e.g.*, *In re Hotel Tel. Charges*, 500 F.2d 86, 89 (9th Cir. 1974); *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 68–69 (4th Cir. 1977). More recently, in several decisions culminating in *Wal-Mart* and *Comcast*, the Supreme Court ended the era when plaintiffs could obtain class certification based on mere proposals that individual injury can be established with aggregate proof. *See Comcast*, 569 U.S. at 32, 35 (reversing certification given failure to assess whether the damages calculations in plaintiffs' model were "a just and reasonable inference or speculative").

Today, antitrust plaintiffs must present valid economic models that can be rigorously scrutinized by the court. *See Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 987–88 (9th Cir. 2015); *see also Ward v. Apple Inc.*, No. 12-cv-05404-YGR, 2018 WL 934544, at *3 (N.D. Cal. Feb. 16, 2018) *aff'd* 784 F. App'x 539, 540 (9th Cir. 2019) (experts' "failure to provide 'properly analyzed, reliable evidence that a common method of proof exists to prove impact on a class-wide basis' is fatal" (simplified)); *In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555,

570 (N.D. Cal. 2013) ( "[T]heory is not sufficient to satisfy Rule 23(b)(3)'s requirements[.]"). That is because Rule 23 "not only authorizes a hard look at the soundness of statistical models that purport to show predominance," but "commands it." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 255 (D.C. Cir. 2013).

An antitrust plaintiff who does not advance such an economic model unquestionably fails Rule 23. This was Judge Gonzalez-Rogers' conclusion in *Ward*, 2018 WL 934544, at *3, and is consistent with other recent class certification decisions in antitrust cases. In *In re Hydrogen Peroxide Antitrust Litig.*, for example, the Third Circuit reversed a grant of class certification where the plaintiff's expert had "not completed any benchmark or regression analyses" or shown that it "would work." 552 F.3d 305, 315 (3d Cir. 2008). Likewise, in *Carrera v. Bayer Corp.*, the Third Circuit held that a plaintiff cannot satisfy Rule 23 by proposing a method "without any evidentiary support that the method will be successful." 727 F.3d 300, 306 (3d Cir. 2013). A district court must be able to "see the model in action" instead of operating solely on "plaintiff's assurances [that] it will be effective." *Id.* at 311; *see also Blades v. Monsanto Co.*, 400 F.3d 562, 571 (8th Cir. 2005) ("assumptions," "presumptions," and "conclusions" are not enough.).

Neither of Plaintiffs' experts offers valid economic models for proving class-wide injury and damages. Despite their lengthy reports, their opinions boil down to a mere proposal for proving BNIL, video game, and third-party NIL injury and damages using basic arithmetic. *See supra* at 2, 5–6. There is no regression or other economic analysis that purports to control for the myriad, undisputed issues affecting whether and to what extent the crude allocations of damages Rascher proposes could actually work as aggregate proof of individual injury. Instead, Rascher merely assumes any individual or structural issues that might preclude certification do not exist— including the variations in individual NIL value (from zero to large numbers) that he acknowledges. Rascher Tr. 38:21–25; 234:18–235:2. Such a speculative proposal for proving class-wide impact and damages cannot satisfy Rule 23. *See, e.g.*, *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807 (9th Cir. 1988) (a model that rests on a series of "unsupported assumptions and unsound extrapolation" cannot support certification).

These infirmities present various independent bases for denying certification, but at the

threshold they represent an abject failure by Plaintiffs to provide a testable economic injury and damages model capable of being rigorously scrutinized. A set of basic math formulas for divvying up damages amongst the proposed class is not a valid economic model demonstrating class-wide injury and damages. *West v. Prudential Sec. Inc.*, 282 F.3d 935, 938 (7th Cir. 2002) (rejecting effort to "obtain class certification just by hiring a competent expert"); *accord Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010); *Hydrogen Peroxide*, 552 F.3d at 323. Plaintiffs' failure to actually set forth a workable model at class certification is fatal. *See Rail Freight*, 725 F.3d at 253 ("No damages model, no predominance, no class certification.").

## B.   Plaintiffs Fail To Satisfy Rule 23 As To Their Alleged Claims For "Lost Compensation From Broadcast NILs."

### 1.   Plaintiffs' BNIL Injury And Damages Theory Is Fatally Speculative And Contrary To The Record.

Plaintiffs' BNIL damages methodology cannot survive Rule 23(b)(3) because it is built upon a host of unsupportable assumptions.[19] Such assumptions provide no basis for deducing whether the estimated class-wide impact and damages are "the certain result of the wrong." *Comcast*, 569 U.S. at 37. Courts deny certification where, like here, a plaintiff's common proof of class-wide impact and damages rests upon speculation. *See, e.g.*, *McGlinchy*, 845 F.2d at 807 (model that rests on "unsupported assumptions and unsound extrapolation" cannot support certification); *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 230 (2d Cir. 2008) (decertifying class where plaintiffs' class-wide "price impact model" would require "engag[ing] in a series of speculative calculations to ascertain whether, and in what amount, plaintiffs suffered a loss"); *Fleischman v. Albany Med. Ctr.*, No. 1:06–CV–765, 2008 WL 2945993, at *6 (N.D.N.Y. July 28, 2008) (same).

It is not an overstatement to say that *every* assumption underlying Plaintiffs' BNIL injury and damages theory is made-up, speculative, illegal, and/or contrary to the record:

---

[19] Defendants filed motions to exclude the opinions of Desser and Rascher under Rule 702 of the Federal Rules of Evidence given the numerous unfounded and unsupported assertions in their reports. However, as the *Olean* court made clear, even admissible expert testimony is often incapable of sustaining an antitrust plaintiff's Rule 23 burden. *Olean*, 31 F.4th at 666 n.9 (collecting cases denying certification where, among other things, experts relied on unsupported assumptions and economic models generating nonsensical results).

- Nothing supports the existence of an independent market for BNIL rights, or that such rights would universally constitute 10% of broadcast revenues, other than the unsupported say-so of Desser.

- There is no basis to conclude that all A5 conferences (or even one) would allocate revenues 75% to football, 15% to men's basketball, and 5% to women's basketball.

- There is no basis to believe that every conference would make a BNIL payment to each student-athlete, much less in the *same amount* for each athlete on a team.

- There is no basis for concluding that conferences, not institutions, would control and determine whether to make BNIL payments, and in what amount.

- There is no basis to ignore Title IX requirements, gender equity considerations, or multiple state laws which outright prohibit conferences (and institutions) from making BNIL payments to student-athletes.

*See supra* 7–16. Desser and Rascher's countless assumptions fall short of what is required to certify a damages class. *See Comcast*, 569 U.S. at 36 (rejecting the "logic [that] . . . any method of measurement is acceptable so long as it can be applied class[-]wide, no matter how arbitrary the measurements may be"); *McGlinchy*, 845 F.2d at 807; *McLaughlin*, 522 F.3d at 229.

### 2.   Plaintiffs' BNIL Model Does Not Match Their Theory Of Liability, Precluding Certification Under *Comcast*.

In *Comcast*, the Supreme Court reversed certification of a class where the plaintiffs' damages model was inconsistent with their underlying liability theory. 569 U.S. at 35. Plaintiffs have the same problem here.

Plaintiffs now argue that labor market competition would cause *conferences* to provide equal BNIL payments to student-athletes within a given sport. But as Plaintiffs have previously argued, including in this case, it is the schools that compete in a labor market for student-athletes. *House*, 545 F. Supp. 3d at 817; *O'Bannon*, 2013 WL 5979327, at *9; *see also* Rascher Tr. 16:14–25; Hawley Decl. ¶ 13; Weiberg Decl. ¶ 21; Tario Decl. ¶¶ 10–11.

Moreover, the Court allowed Plaintiffs' BNIL claim to proceed past the motion to dismiss stage on the theory Plaintiffs were pursuing alleged injury in a *labor market*. *House*, 545 F. Supp. 3d at 816–18. But the inputs for Rascher's BNIL methodology come from Desser, who admits that his opinions regarding BNIL have nothing to do with a labor market, Desser Tr. 14:15–16:6, and are applicable only to "collective" BNIL value of all players, *id.* 24:6–11. As Rascher knows, it is

a fundamental tenet of labor economics that pay is ordinarily stratified, with star performers earning far more. *See* Tucker Rpt. ¶¶ 92–93 (collecting established economic literature to the same effect). This phenomenon is only accentuated in sports, where star athletes receive far more compensation that average performers. *See generally id.*; *see also* Rascher, *A Model of a Professional Sports League,* at 14 (wages in a labor market would be "per unit of talent," not per athlete). In short, Plaintiffs' equal-payment model is without any basis in the market they alleged.

*Comcast* and other cases confirm that such mismatches between the merits theory and the claimed class damages theory are fatal to certification: "[A]ny model supporting a 'plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation.'" 569 U.S. at 35.

> 3. Plaintiffs And Rascher Ignore The Substitution Effects That Would Render Determinations Of Individual Injury And Damages Unmanageable.

Plaintiffs' BNIL but-for world distributes over a billion dollars of additional compensation to members of the Football and Men's and Women's Basketball classes. This approach greatly alters the financial incentives affecting (i) which universities student-athletes decide to attend and (ii) how long they choose to remain in school. That in turn creates intractable difficulties in determining whether existing class members were in fact injured, or whether, in the but-for world, they would fall out of the class.

In *O'Bannon*, this Court denied certification of a damages class because the plaintiffs' expert failed to offer any method for solving the substitution of student-athletes in and out of the proposed class if the challenged restrictions on student-athlete pay were lifted. 2013 WL 5979327, at *8–9. "[B]ecause student-athletes are often motivated by financial concerns when choosing whether and where to attend college, the expected effect of the ban on student-athlete pay is to change the identities of the students who accept an athletic scholarship." *Id.* at *8 (internal quotations and punctuation omitted). Individuals who would decide to "stay[] in college" because of increased compensation due to the elimination of "the alleged restraints on competition" would "displace[] other student-athletes on their respective teams." *Id.* These displaced athletes, who were members of the putative class, "would not have suffered injuries" because "they would never

[have] been able to play for those teams in the absence of the challenged restraint." *Id.* In fact, the displaced athletes "may have even *benefited* from the challenged restraints by earning roster spots that would have otherwise gone to more talented student-athletes." *Id.* (emphasis in original).

The Court was thus confronted with a proposed damages class with many members who would be *worse off* in the but-for world because their ability to participate in Division I football and basketball was due in no small part to the restrictions the plaintiffs were challenging. Yet the plaintiffs had "not proposed any method for addressing this substitution effect . . . among Division I schools." *Id.* at *9. This failure "contribute[d] to the impossibility of determining which class members were actually injured by the NCAA's alleged restraints on competition, and as such, preclude[d] certification under Rule 23(b)(3)." *Id.*

Plaintiffs and Rascher attempt to wave away the substitution effect rather than solve for it in a working economic model. *See* Mot. at 36 ("[T]he factual predicate for the claimed substitution effect—college athletes being displaced by others due to increased benefits from schools—has not actually materialized"); Rascher Rpt. ¶ 227 (same). But not confronting this problem does not make it go away. On the contrary, Plaintiffs' theories *exacerbate* it.

There is substantial evidence of student-athletes staying in school longer based on the third-party NIL compensation that is currently permitted. *See supra* at 16–18. Dr. Rascher's model compounds this issue by positing a but-for world in which members of A5 football and basketball teams obtain far greater sums of money each year they remain in school. Per Rascher, a football player ~~Redacted – NSC~~ would have received an extra $29,800—on top of potential third-party NIL compensation—by staying in school rather than entering the 2021 NFL draft. Rascher Rpt. Ex. C.7. A men's basketball player ~~Redacted – NSC~~ would have made an additional $109,000—again on top of potential third-party NIL compensation—for staying in school in both 2018 and 2019. Rascher Rpt. Ex. C.4. Rascher's BNIL but-for world creates even *greater* financial "motivat[ion]" for student-athletes to remain in college, "chang[ing] the identities of the students who accept an athletic scholarship." *O'Bannon,* 2013 WL 5979327, at *8.

The way Plaintiffs define their class amplifies substitution effects. In *O'Bannon*, the putative damages class consisted of *all* NCAA Division I football and men's basketball players, so the substitution effect applied only to student-athletes who would have been displaced from Division I schools entirely. *See id.* Here, by contrast, Plaintiffs limit their request for alleged BNIL damages to football and basketball player scholarship recipients in the A5—excluding thousands of student-athletes who declined A5 scholarships but would have a substantial incentive to make a different choice in the but-for world. *See supra* at 18. Under Plaintiffs' approach, there would be mass substitution between non-A5 Division I schools and A5 schools, as football and basketball players have much greater incentive to play at an A5 school in the but-for world. That makes it impossible to determine which student-athletes are in Plaintiffs' defined classes.

Rascher does not dispute this point; he acknowledges that his approach dramatically increases the attractiveness of attending schools in the A5 conferences versus other Division I schools. *See* Rascher Rpt. ¶ 152 (payments are designed "to attract the athlete to choose one conference over a rival conference"); *accord* Tucker Rpt. ¶ 55. Yet he inexplicably claims the substitution effect is relevant "[only] when a player is displaced from a team in the hypothetical world" and has "nowhere else within *FBS football or Division I basketball* . . . to go." Rascher Rpt. ¶ 230 (emphasis added). The relevant question is whether a student-athlete would be displaced *from the class*, thereby giving rise to manageability and ascertainability issues as to who even belongs in the class and is potentially injured. *See O'Bannon*, 2013 WL 5979327, at *9 (focusing on determining "which members of the *Damages Subclass* would have . . . suffered the injuries alleged here") (emphasis added); *see also id.* (noting "impossibility of determining which *class members* were actually injured") (emphasis added). Displacements would be common here, given that the classes are limited to football and basketball scholarship athletes on A5 teams.

Rascher's other excuse for ignoring this problem—that there are enough empty football and basketball scholarships *within the A5* to accommodate the additional "athletes who hypothetically might now take up a GIA slot," Rascher Rpt. ¶ 231, is unsupported by evidence. There are 0.9 to 3.4 available scholarships for each of the 65 A5 football teams, 0.2 to 1.3 for the men's basketball teams, and 1.1 to 3.0 for the women's basketball teams. Tucker Rpt. ¶ 80, Tbl.

7. And in each year covered by the class period, somewhere from 691 to 1,334 football and basketball players transferred between A5 and non-A5 schools, even prior to the Interim NIL Policy. *Id.* ¶ 63. These statistics confirm A5 schools would be overwhelmed with more demand in Plaintiffs' but-for world, further enhancing a substitution effect that Rascher does not solve for.

On a broader level, Rasher also ignores the economic incentives for conferences to restructure and for team rosters to shrink, which are likely (if not inevitable) outcomes in his but-for world. Hawley Decl. ¶¶ 16(b), (e) ("Plaintiffs' Proposal would incentivize certain financial changes, including: (a) reducing the number of players on every team, (b) reducing the number of teams sponsored by each institution, and (c) restructuring conferences to reduce the number of institutions in a conference to eliminate institutions with athletic programs with relatively lower value from a broadcast rights perspective."); Kliavkoff Decl. ¶ 26; Sankey Decl. ¶ 53; Flores Decl. ¶ 15; Tucker Rpt. ¶ 292. These steps would allow schools to provide more attractive compensation packages, by providing access to a greater pool of rights fees and letting them spread money to a smaller group. Such changes would, in turn, make it even more infeasible to identify which student-athletes were injured or benefitted.

Predicting the choices student-athletes would make in the but-for world—and who would be displaced from the A5 schools and be worse off as a result—is once again an "impossibility [that] precludes certification under Rule 23(b)(3)." *O'Bannon*, 2013 WL 5979327, at *9.[20]

4.   Plaintiffs' BNIL Damages Theory Would Violate Title IX.

Plaintiffs' BNIL methodology also cannot support certification unless the Court concludes that the methodology complies with Title IX. A but-for world designed to eliminate an alleged legal violation cannot be a legal violation of its own.

---

[20] Plaintiffs cannot solve this deficiency by relying on Rascher's belief that class members displaced from the A5 "would wind up at another highly regarded FBS football or Division I basketball program just outside of the Power Five Conference [sic] and would still receive increased access to NIL money in the but-for world." Rascher Rpt. ¶ 232. Such displaced class members would not have suffered "the injuries alleged here," as the BNIL damages are limited to athletes in A5 schools. And Plaintiffs and Rascher do nothing to try to prove that other Division I conferences could or would provide "increased access to NIL money."

1    As demonstrated above and in Osborne's report, Title IX obligations would outright

2  preclude the sort of pay disparity proposed by Rascher's BNIL formula, under which 96% (or $1.3

3  billion) of BNIL payments from 2016–2021 go to male student-athletes, leaving only 4% (or $50

4  million) to women. *See supra* at 15–16. Plaintiffs cannot fix this problem. First, Plaintiffs' claim

5  that they are pursuing BNIL, rather than pay for play, depends on limiting themselves to the alleged

6  10% of broadcast revenue attributable to NIL. Rascher Tr. 73:11–74:17 (paying more than 10%

7  would "potentially violat[e] the NCAA's rules on pay for play" and disclaiming any challenge to

8  "pay for play" rules in this action). But Plaintiffs allocate almost all available broadcast revenue

9  to men's sports, providing no way to balance payments between men and women without

10 exceeding the 10% threshold. Osborne Rpt. ¶¶ 77, 129–136. Second, a Title IX assessment

11 operates on the school level, taking into account how payments are balanced at the institution and

12 other individualized factors unique to each institution. *Id.* ¶¶ 64–70, App. F, §§ G–H. Such

13 assessments cannot be implemented on a class-wide basis through common proof.

14    Moreover, even if their approach complied with Title IX, the record is replete with

15 testimony confirming that, for gender equity reasons, institutions and conferences would not adopt

16 it. *See supra* at 16. Plaintiffs' BNIL methodology fails because it postulates a but-for world that

17 cannot be implemented.

18    5.    <u>The BNIL Methodology Creates Intra-Class Conflicts By Pitting Student-Athletes
        Against One Another For Shares Of A Fixed Sum.</u>

19

20    Plaintiffs also cannot satisfy the adequacy requirement because their BNIL claim creates

21 "conflicts of interest between named parties and the class they seek to represent." *Amchem Prods.,*

22 *Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *accord Shields*, 2022 WL 425359, at *5–10. Judge

23 Corley's recent ruling in *Shields*—which involved the same counsel and expert (Rascher) here—

24 underscores why Plaintiffs cannot satisfy adequacy. 2022 WL 425359. There, the plaintiffs sought

25 to certify a damages class consisting of elite swimmers who claimed that the international

26 federation for aquatic sport violated the antitrust laws by threatening to ban swimmers from the

27 Olympics if they participated in events staged by an upstart professional swimming league. The

28 plaintiffs' injury and damages theory was that in the but-for world, the upstart league would have

put on additional swim meets from 2019 through 2022 where class members would have earned additional compensation. Using a strikingly similar approach, Rascher proposed divvying up damages amongst class members in pro-rata shares based on what they had earned in prior events. The court denied certification, finding the named plaintiffs inadequate because the class "suffer[ed]" from "structurally antagonistic interests." *Id.* at *7. Because the injury and damages methodology involved the class members all "compet[ing] for shares of a fixed pot" in the but-for world, each individual class swimmer's proof of damages "would necessarily involve arguing that other swimmers in her club would not have been selected to swim, that she would have beaten the swimmers she raced against, and that other clubs would not have performed as well as her club over the course of the season." *Id.* For that reason, "[e]ach class member's interest in maximizing her own damages is antagonistic to the same interest on the part of other class members." *Id.*

Judge Corley relied on *In re NCAA I-A Walk-On Football Players Litigation*, No. C04–1254C, 2006 WL 1207915 (W.D. Wash. May 3, 2006), which denied certification of a damages class of walk-on football players in light of similar concerns. *Id.* at *8–9. Likewise, in *Rock v. NCAA*, No. 1:12-cv-01019-TWP-DKL, 2016 WL 1270087 at *14 (S.D. Ind. Mar. 31, 2016), the court denied certification of a class of athletes challenging limits on the number and duration of athletic scholarships where "anti-trust [sic] injury as to each member of the class cannot be proven without considering the facts surrounding each class member, including whether each member would have actually received a multi-year GIA." The court in *Rock* specifically rejected Rascher's testimony as "unsubstantiated." *Id.*

Rascher has again failed to "offer[] a method to determine . . . individual damages in a way that is fair to all class members," *Shields,* 2022 WL 425359, at *7, precluding certification. The structurally antagonistic interests presented by the proposed BNIL classes here are more pervasive than in *Shields*, *Walk-On*, or *Rock*, and render the named Plaintiffs inadequate:

*First*, there is conflict between the *groups of players pursuing BNIL damages*. Rascher allocates a fixed pot of BNIL money to each sport: 75% to football, 15% to men's basketball, and 5% to women's basketball. This approach creates a zero-sum game that necessarily pits each sport against each other. Absent class members from each of those sports would be incentivized to argue

that the percentages are unfavorable to them. And in their own individual trials they could and would optimize for their own recovery at the expense of others in the proposed class. Each class member would be aided in that effort by the fact that the schools themselves report different allocations of revenues across sports. *See, e.g.*, Tucker Rpt. ¶ 134, Fig. 10.

*Second*, there is conflict between *individual class members in a given sport in the BNIL class*. Star players would have obvious incentives in their individual cases to argue that they are entitled to more than the equal payments Rascher claims all athletes would get. For example, LSU basketball star Angel Reese, whose NIL deals have netted her an estimated $1.4 million annually,[21] would argue that she is entitled to far more than the damages amount Rascher assigns to every women's basketball player in the SEC (NSC). In *O'Bannon*, this Court concluded that inter-class conflicts did not defeat adequacy because "Plaintiffs seek compensation only for losses suffered in the group licensing market." 2013 WL 5979327, at *6. But Plaintiffs here are pursuing claims in a labor market, where there is no presumption of group conduct. Labor economics teaches that star players will have every incentive to argue that certain other scholarship players (e.g., a back-up kicker) have no plausible claim. Tucker Rpt. ¶¶ 92–98.

*Third*, there is conflict between *class members who play revenue-generating sports (primarily football and men's basketball) and class members who play non-revenue-generating sports (the non-football and basketball members of the Third-Party NIL class, and at many schools, women's basketball players)*. Plaintiffs' but-for world requires a substantial amount of the money generated by football and men's basketball to be earmarked for those athletes, even though in the real world, that same money helps fund non-revenue sports. *See, e.g.*, Sankey Decl. ¶ 53; Flores Decl. ¶ 13. Here, the zero-sum game is created by the athletic department's budget, and the interests of football and basketball players stand at odds with, for example, the swimmers who want to keep their teams. *See, e.g.*, Rhoades Decl. ¶ 19; Weiberg Decl. ¶ 20. As House himself conceded, schools already routinely cut programs that do not generate revenue. House Tr. 36:1–

---

[21] *See* Megan Saur, *NCAA star Angel Reese says playing at LSU is more lucrative than the WNBA—and she wants to splurge on a Mercedes-Benz*, CNBC (Apr. 11, 2023 7:30 p.m. E.T.), https://perma.cc/DEM5-L4MF; *Angel Reese – On3 NIL Valuation*, On3 (last visited Apr. 25, 2023 8:13 p.m. E.T.), https://perma.cc/FUC6-DDJ2.

DEFS' JOINT OPP'N TO
PLFTS' MOTION FOR CLASS CERT
Case No. 4:20-cv-03919-CW

37:4, 193:8–9, 284:21–285:6.[22]

Certifying the proposed classes would deprive individual plaintiffs of the ability to argue for an increased portion of any claimed broadcast damages and would deprive defendants of the ability to argue against any particular athlete's injury claim, all in violation of the Rules Enabling Act and its "instruction that use of the class device cannot 'abridge . . . any substantive right.'" *Tyson*, 577 U.S. at 455 (quoting 28 U.S.C. § 2072(b)). These inherent class conflicts—which are a direct result of Rascher's BNIL methodology—preclude Plaintiffs from satisfying the adequacy requirement. *See Shields*, 2022 WL 425359, at *10; *Walk-On*, 2006 WL 1207915, at *9.

6.  Determining Which Student-Athletes Would Have Received Compensation For BNIL Requires Individual Inquiry.

Certification is improper under Rule 23(b)(3) if the court would have to resolve "individualized questions regarding which [class] members . . . suffered an injury." *Olean*, 31 F.4th at 681. The fact of injury, otherwise known as antitrust impact, "often is critically important for the purposes of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof." *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 262 (3d Cir. 2016). As the Court recognized in *O'Bannon*, cases involving NIL compensation in broadcasts involve such individualized inquiry because of the impossibility of "determining which student-athletes were actually depicted" in game footage "during the relevant class period," and thus allegedly entitled to compensation. 2013 WL 5979327, at *9.

Plaintiffs' effort to evade that ruling fails. Plaintiffs' primary response is the newfound assertion that conferences will guarantee equal payments to all scholarship student-athletes at enrollment rather than basing compensation on individualized factors. Mot. at 31 (citing Rascher Rpt. ¶ 151). But that is a baseless and flawed assertion, *see supra* at 11–13. It is also precisely the sort of circular reasoning designed to avoid the requirement that a plaintiff's model be capable of demonstrating individual injuries, class-wide. *See, e.g., In re Lamictal Direct Purchaser Antitrust*

---

[22] *See also* Emilia Martinez, *An Inside Look From College Swimmers on the Impact of a Closing Program,* Swimming World (Nov. 8, 2022), https://perma.cc/R5NP-REB3; Liz Clarke, *Can men's college gymnastics be saved? Minnesota is trying, even on its way out.*, The Washington Post (Apr. 16, 2021), https://perma.cc/5HVM-BECN.

1    *Litig.*, 957 F.3d 184, 191 (3d Cir. 2020); *In re New Motor Vehicles Canadian Export Antitrust*

2    *Litig.*, 522 F.3d 6, 29 (1st Cir. 2008); *Blades*, 400 F.3d at 572, 575; *see also* Richard Nagareda,

3    *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 104 (2009) ("[T]he real

4    concern about aggregate proof in class certification lies in its threat 'to conform the law to the

5    proof.'"). Plaintiffs must prove, not just posit, that such an assumption in fact holds. *See Comcast*,

6    569 U.S. at 33; *Wal-Mart*, 564 U.S. at 350–51. They cannot do so.

7         Moreover, the class action device cannot be deployed to deprive defendants of "the right

8    to raise any individual [] defenses [they] may have." *Wal-Mart*, 564 U.S. at 367. A class member

9    can only recover what she can recover in an individual action. *See Comcast*, 569 U.S. at 35; *Tyson*

10   *Foods*, 577 U.S. at 458. Here, Defendants would have the right to argue at trial that individual

11   student-athletes are not injured for the reasons set forth above. There is no way to present this

12   highly individualized evidence without overwhelming a class trial with individual inquiries.

13   Plaintiffs' claims for alleged lost BNIL compensation therefore cannot survive Rule 23(b).

14
15        **C.    Plaintiffs Cannot Satisfy Rule 23(b)(3) As To Their Claims For "Lost Compensation From Video Game NILs."**

16        There is no basis for certification as to Video Game NIL, because Plaintiffs' ability to show

17   class-wide injury depends on speculative premises for which they have no proof.

18        Plaintiffs assert college football and basketball games would have been created in every

19   year back to 2016. Yet it has been nearly two years since the NCAA enacted its Interim NIL Policy

20   on July 1, 2021, allowing EA and other game makers to pay student-athletes for their NIL in video

21   games—[Redacted – Counsel Only]. *See supra* at 18–19. Plaintiffs have put forward no

22   evidence that any video game company would have made a men's college basketball game at *any*

23   point "during the class period," *see* Mot. at 10, Rascher Rpt. ¶¶ 133, 136—let alone every year of

24   it. EA last released a college basketball game in 2009, Mot. at 10, and Plaintiffs can point to no

25   statements from EA or any other video game manufacturer indicating an intention to make a

26   college basketball video game now or in the foreseeable future. In fact, EA canceled its pro

27   basketball title NBA Live in 2019, and the series has been on indefinite hiatus since. Tucker Rpt.

28

¶ 278(d).[23] The but-for world Rascher postulates is thus speculative at best for football, and entirely baseless for basketball. *See* Tucker Rpt. ¶¶ 280–287 (describing economic challenges for console sports video game development).

In addition, Rascher puts forward no evidence to support his proposed damages model, which assumes that a "common payment would be determined based on a fixed annual percentage royalty," in reference to how EA licenses for its pro football Madden games. Rascher Rpt. ¶ 136. But <span>Redacted – Counsel Only</span>. *See* EA_NIL_00006071–6072; EA_NIL_00005288–5289. EA <span>Redacted – Counsel Only</span> <span>Redacted – Counsel Only</span>. EA_NIL_00006067. EA has <span>Redacted – Counsel Only</span> <span>Redacted – Counsel Only</span> *Id.* <span>Redacted – Counsel Only</span> <span>Redacted – Counsel Only</span>. *See* Cairns Decl. ¶ 6.

A model with this many shortcomings is not acceptable. *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 49 (S.D.N.Y. 2020) (Predominance is not satisfied by a "model [that] measures harm not attributable to the conspiracy, yields false positives, masks uninjured class members by using an 'averaging' mechanism to allocate injury across the class, or otherwise fails to demonstrate with scientific rigor that class-wide impact can be established through common proof.") (internal citations omitted) (collecting cases). There is no basis for certifying Plaintiffs' proposed classes seeking Video Game NIL damages. *See Wal-Mart,* 564 U.S. at 350.

### D.   Plaintiffs Cannot Satisfy Rule 23(b)(3) As To Their Claims For "Lost Compensation From Other Third-Party NIL Opportunities."

Plaintiffs' Third-Party NIL claim suffers from an independent set of flaws—including determining who is even in the class.

First, there is no valid and workable model that can be tested. Plaintiffs' claim is for lost Third-Party NIL damages dating back to *2016*. But as noted above, all Rascher has done is posit that any NIL deals reported after July 1, 2021, would have carried back to *2020* (just one year),

---

[23] Michael Straw, *Has NBA Live Come To An End?*, Sports Gamers Online (Aug. 17, 2022), https://perma.cc/NHA4-48TQ.

and described some adjustments he claims he will run in the future. Rascher Tr. 248:4–251:18.

The law requires Plaintiffs to demonstrate a model that works for the class period, not merely say

what one might look like. *See, e.g.*, *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D.

527, 553–55 (S.D.N.Y. 2021); *Ward*, 784 F. App'x at 540 (affirming denial of class certification

where "Plaintiffs' expert did not provide a workable method for class-wide determination of the

impact of the alleged antitrust violation," but "[i]nstead, . . . merely asserted that he would be able

to develop a model at some point in the future").

Second, Rascher outright ignores a series of factors clearly relevant to the Third-Party NIL

opportunities a student-athlete would have, and whether post-2021 opportunities are representative

of past lost opportunities. These include:

- Daily to yearly variance in an athlete's marketability based on the athlete's sport and the competitiveness of her team, Tucker Rpt. ¶¶ 221–222;

- Daily to yearly variance in marketability, based on qualities like the effort the student-athlete puts into marketing, *see* Prince Tr. 237:13–238:4 (Prince often disengaged from social media during post-season, before big games, or during rehab); House Tr. 256:4–14 (variance based on training regimen); Jeremy Crabtree, *Riley Moss passes on NIL opportunity with Iowa players-led collective*, On3 (July 14, 2022), https://perma.cc/B6RE-PTK3;

- Daily to yearly variance in marketability based on off-field controversy or eligibility issues, Tucker Rpt. ¶ 216, Jenna Lemoncelli, *Oklahoma State wrestler, WWE NIL signee A.J. Ferrari off the team after sexual assault allegation*, New York Post (July 14, 2022), https://perma.cc/N6KB-M2EA;

- The presence of a "viral moment" that unexpectedly spikes interest in a student-athlete such as a gymnast's perfect-10 routine or a quarterback's game-winning Hail Mary pass. Rascher Tr. 233:12–235:2 (acknowledging no effort to control for this); Tucker Rpt. ¶ 221; Pete Volk, *Georgia v. Auburn 2013 final score: Tigers ruin comeback with impossible play, win 44-38*, SB Nation (Nov. 16, 2013), https://perma.cc/EY3P-CH47;

- Each third-party endorser's willingness to engage in NIL activity with college athletes, given that the market is currently still evolving and thus might be oversaturated with experimental approaches, *see* Tucker Rpt. ¶¶ 210–212; and

- Whether deals signed and reported after July 1, 2021, actually resulted in compensation to the student-athlete that can be projected backward in time, House Tr. 149:2–15, 185:6–187:23 (ASU does not require House to verify any inputs or allow him to change them); Prince Tr. 201:6–9 (calling Oregon's system "kind of a mess").

Each of these factors implicates highly individualized evidence that Defendants would have a right

to present at trial. *Wal-Mart*, 564 U.S. at 366–67; *Shady Grove Ortho. Assocs. v. Allstate Ins. Co.*,

559 U.S. 393 at 407–08 (2010). Plaintiffs cannot satisfy Rule 23 by merely assuming that these indisputable individualized issues would not implicate their ability to prove impact and damages class-wide.

**E.    Proof Of Individual Damages For The Members Of Each Proposed Class Would Involve Excessive Difficulty, Precluding Certification.**

As the Ninth Circuit recently made clear in a post-*Olean* decision, certification of damages classes is inappropriate where ascertaining damages would involve "excessive difficulty." *Bowerman v. Field Asset Servs., Inc.*, 39 F.4th 652, 663 (9th Cir. 2022); *see also, e.g., Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003) ("[W]here the issue of damages does not lend itself to . . . mechanical calculation, but requires separate mini-trial[s] of an overwhelmingly large number of individual claims, the need to calculate individual damages will defeat predominance.") (cleaned up); *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 342–43 (4th Cir. 1998) (if claims of a putative antitrust class are "inherently individualized," "the need for individual proof of damages" will bar certification); *Curtis v. Extra Space Storage, Inc.*, No. C 13-00319 WHA, 2013 WL 6073448, at *4 (N.D. Cal. Nov. 18, 2013) (denying certification where plaintiff failed "to demonstrate a reliable method to compute damages class-wide"); *Walk-On*, 2006 WL 1207915, at *14 (denying certification where "issues of antitrust injury and damages will be intertwined to such a degree that individual issues are not simply about damages.").

Here, as in *Bowerman*, "the class members [have not] shown that damages can be determined without excessive difficulty." 39 F.4th at 663. For example, plaintiffs' model incentivizes a domino effect of transitions as players search for greater compensation. They posit that in 2019, NSC schools would have paid football players $44,000, whereas NSC schools would have paid $28,000, Rascher Rpt. Ex. C.4–C.5, prompting NSC players to transfer and be replaced, with concomitant domino effects, as Rascher conceded. Rascher Tr. 197:14–20.

In the Third-Party context, many NIL deals, including some of plaintiff House's, were for intangible compensation, such as in-kind compensation, discount codes, or affiliate links (where the student-athlete earns a commission for products purchased through the link), *see* House Tr. 169:5–11, 154:25–155:8, 157: 16–21, 165:21–24, 159:2–7. House has not attempted to value these

deals, *see, e.g.*, House Tr. 155:9–11, but acknowledged that their value would vary by individual, House Tr. 122:1–124:6. In *Bowerman*, the Ninth Circuit was perturbed that it took "eight days to determine damages for only eleven of the 156 class members." 39 F.4th at 663. This case would implicate an impossibly taxing process for the many *thousands* of class members.

### F. Plaintiffs Cannot Circumvent The Requirement Of Proving Class-Wide Antitrust Injury By Relying On A Theory Of Lost Opportunity.

Perhaps recognizing the flimsiness of their methodologies, Plaintiffs attempt to change the law, arguing they can clear Rule 23(b)(3) simply by offering class-wide proof of lost "opportunity to participate in a competitive market." Mot. at 28. Plaintiffs are wrong.

If class-wide antitrust impact could be established with simple proof of lost opportunity to participate in a competitive market, classes would be certified in all antitrust cases. The reason plaintiffs uniformly come in with a model of purported economic loss—including the Plaintiffs in *O'Bannon* and *Alston*—is that the law requires it. "To satisfy the antitrust-injury requirement, a plaintiff must show 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *O'Bannon v. NCAA*, 802 F.3d 1049, 1067 (9th Cir. 2015) (quoting *Glen Holly Entm't, Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1007–08 (9th Cir. 2003) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977))). In the class context, this requires a demonstrating class-wide injury, i.e., *fact of damage*, as the Clayton Act requires proof of injury to business or property. *See In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 60 (1st Cir. 2016); *Blades*, 400 F.3d at 569.

It is for this reason that none of the cases Plaintiffs cite includes a claim that a mere lost opportunity constitutes injury. *Olean*, 31 F.4th at 673 (price fixing of commodity product led to a uniform and "substantial price impact"); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02–1486 PJH, 2006 WL 1530166, at *2 (N.D. Cal. June 5, 2006) (direct microchip purchasers alleged injury "because they were forced to pay artificially inflated prices"); *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 349 (N.D. Cal. 2005) (direct purchasers of rubber chemicals alleged price fixing conspiracy caused overpayment). Plaintiffs cannot bypass showing that "all class members were *in fact injured* by" Defendant's conduct, *Rail Freight*, 725

1   F.3d at 252 (emphasis added), by theorizing generalized market-wide harm in the form of lost

2   opportunity.[24]

3         **G.    Plaintiffs Also Fail To Establish Adequacy Because They Are Precluding**

4              **Some Class Members From Raising Claims They Believe To Be Valid.**

5         Plaintiffs independently cannot show adequacy because they are abandoning "particular

6   remedies to the detriment of the class." *Drimmer v. WD-40 Co.*, No. 06-CV-900 W(AJB), 2007

7   WL 2456003, at *3 (S.D. Cal. Aug. 24, 2007), *aff'd*, 343 F. App'x 219 (9th Cir. 2009) (citing

8   *Thompson v. Am. Tobacco Co.*, 189 F.R.D. 544, 550 (D. Minn. 1999)). This approach is

9   problematic because "general principles of res judicata" may preclude subsequent litigation of

10  abandoned claims. *Andren v. Alere, Inc.*, No. 16cv1255-GPC(AGS), 2017 WL 6509550, at *7

11  (S.D. Cal. Dec. 20, 2017); *accord Conde v. Open Door Mktg., LLC*, 223 F. Supp. 3d 949, 961–63

12  (N.D. Cal. 2017).

13        Here, Plaintiffs' counsel abandoned claims by members of the Additional Sports Class that

14  under their logic would be meritorious, including BNIL claims for walk-ons, for players in sports

15  other than football and basketball, and for players not in the A5 but who are members of the

16  Additional Sports Class. These claims could have been brought here, because Plaintiffs have

17  brought them for other class members, and originally pled them for broader groups. *See* Class

18  Action Compl., ECF No. 1 ¶ 80 (raising licensing claim on behalf of all A5 student-athletes); *id.*

19  ¶ 79 (raising "lost opportunities" claim on behalf of all former Division I student-athletes).

20        **H.    There Is Insufficient Class Representation For Men's Basketball.**

21        There is no named plaintiff who could represent the putative class members who played

22  men's basketball. Where class plaintiffs seek to pursue claims on behalf of different groups of

23  plaintiffs, courts require a suitable representative for each type of plaintiff. *See Amchem*, 521 U.S.

24  at 625–26; *Sueoka v. United States*, 101 F. App'x 649, 654 (9th Cir. 2004). Tymir Oliver—the

25  only representative for the football and men's basketball class—cannot adequately represent

26  basketball players. He did not interact regularly with student-athletes outside of the football team

27

28    [24] For all the reasons set forth in §§ III.A–E, Plaintiffs cannot satisfy the elements of superiority
  (Rule 23(b)(3)) or commonality (Rule 23(a)(2)) as to their damages classes. *See In re Asacol
  Antitrust Litig.*, 907 F.3d 42, 58 (1st Cir. 2018) (enumerating requirements Plaintiffs have ignored).

1  while in college. Oliver Tr. 102:18–103:8. He does not even watch college basketball. Oliver Tr.

2  263:23. And he is "not sure" that he knows "all [he] need[s] to know to be able to represent current

3  and former men's basketball players." Oliver Tr. 198:6–13.

**I.     Plaintiffs' Unjust Enrichment Claims Are Not Appropriate For Class Certification.**

6  Although Plaintiffs plead an unjust enrichment claim, *see* ECF No. 1 ¶¶ 345–47, they do

7  not even mention it in their motion. They have therefore abandoned certification on that claim. *See*

8  *Garcia v. Sun Pac. Farming Co-op, Inc.*, 359 F. App'x 724, 726 (9th Cir. 2009). Nor could

9  Plaintiffs have carried their burden under Rule 23 if they tried.

10  "No court in this Circuit has certified a nationwide unjust enrichment class since *Mazza*

11  and Plaintiffs have failed to show how this Court could manage a nationwide class where fifty

12  varying states' laws would apply, as required under Rule 23(b)(3)." *Stitt v. Citibank*, No. 12-cv-

13  03892-YGR, 2015 WL 9177662, at *4 n.4 (N.D. Cal. Dec. 17, 2015). "[T]he elements necessary

14  to establish a claim for unjust enrichment also vary materially from state to state." *Mazza v. Am.*

15  *Honda Motor Co.*, 666 F.3d 581, 591 (9th Cir. 2012), *overruled on other grounds by Olean*, 31

16  F.4th 651 (9th Cir. 2022). The way in which conferences and schools interact with student-athletes

17  also varies widely. *E.g.*, Sankey Decl. ¶¶ 50–53. Here, the same individual issues that defeat

18  certification of the antitrust damages claims compel denying certification of the unjust enrichment

19  claims.

20  **IV.     CONCLUSION**

21  The Court should deny certification of Plaintiffs' proposed damages classes.

1   Dated: April 28, 2023                    Respectfully Submitted,

2

3   **WILKINSON STEKLOFF LLP**              **COOLEY LLP**

4   By: /s/ Rakesh N. Kilaru                 By: /s/ Whitty Somvichian
    Beth A. Wilkinson (*pro hac vice*)       Whitty Somvichian (SBN 194463)

5   Rakesh N. Kilaru (*pro hac vice*)        Kathleen R. Hartnett (SBN 314267)
    Kieran Gostin (*pro hac vice*)           Ashley Kemper Corkery (SBN 301380)

6   Calanthe Cope-Kasten (*pro hac vice*)    David S. Louk (SBN 304654)

7   2001 M Street NW, 10th Floor             3 Embarcadero Center, 20th Floor
    Washington, DC 20036                     San Francisco, California 94111-4004

8   Telephone:  (202) 847-4000               Telephone:  (415) 693 2000
    Facsimile:  (202) 847-4005               Facsimile:  (415) 693 2222

9   bwilkinson@wilkinsonstekloff.com         wsomvichian@cooley.com
    rkilaru@wilkinsonstekloff.com            khartnett@cooley.com

10  kgostin@wilkinsonstekloff.com            acorkery@cooley.com
    ccope-kasten@wilkinsonstekloff.com       dlouk@cooley.com

11

12  Jacob K. Danziger (SBN 278219)           Mark Lambert (SBN 197410)
    ARENTFOX SCHIFF LLP                      3175 Hanover Street

13  44 Montgomery Street, 38th Floor         Palo Alto, CA  94304-1130
    San Francisco, CA 94104                  Telephone:  (650) 843-5000

14  Telephone: (734) 222-1516                Facsimile:  (650) 849-7400
    Facsimile: (415) 757-5501                mlambert@cooley.com

15  jacob.danziger@afslaw.com

16                                           Dee Bansal (*pro hac vice*)
    Attorneys for Defendant                  1299 Pennsylvania Ave. NW, Suite 700

17  NATIONAL COLLEGIATE                      Washington, DC 20004-2400
    ATHLETIC ASSOCIATION                     Telephone:  (202) 842 7800

18                                           Facsimile:  (202) 842 7899
                                             dbansal@cooley.com

19

20                                           Attorneys for Defendant
                                             PAC-12 CONFERENCE

21

22

23

24

25

26

27

28

DEFS' JOINT OPP'N TO
PLFTS' MOTION FOR CLASS CERT
Case No. 4:20-cv-03919-CW

1 **MAYER BROWN LLP**                    **POLSINELLI PC**

2 By: /s/ Britt M. Miller               By: /s/ Leane K. Capps

3 Britt M. Miller (*pro hac vice*)      Leane K. Capps (*pro hac vice*)
  Daniel T. Fenske (*pro hac vice*)     2950 N. Harwood Street
4 71 South Wacker Drive                 Suite 2100
  Chicago, IL 60606                     Dallas, TX 75201
5 Telephone:  (312) 782-0600            Telephone:  (214) 397-0030
  Facsimile:  (312) 701-7711            lcapps@polsinelli.com
6 bmiller@mayerbrown.com
7 dfenske@mayerbrown.com                Phillip Zeeck (*pro hac vice*)
                                        Amy D. Fitts (*pro hac vice*)
8 Christopher J. Kelly (SBN 276312)     120 W. 12th Street
  Two Palo Alto Square, Suite 300       Kansas City, MO 64105
9 3000 El Camino Real                   Telephone: (816) 218-1255
  Palo Alto, CA 94306                   pzeeck@polsinelli.com
10 Telephone: (650) 331-2000            afitts@polsinelli.com
   Facsimile: (650) 331-2060
11 cjkelly@mayerbrown.com               Wesley D. Hurst (SBN 127564)
                                        2049 Century Park East, Suite 2300
12                                      Los Angeles, CA 90067
   Attorneys for Defendant              Telephone:  (310) 556-1801
13 THE BIG TEN CONFERENCE, INC.         whurst@polsinelli.com

14

15                                      Attorneys for Defendant
                                        THE BIG 12 CONFERENCE, INC.
16

17

18

19

20

21

22

23

24

25

26

27

28

**ROBINSON, BRADSHAW &
HINSON, P.A.**

By: /s/ Robert W. Fuller
Robert W. Fuller, III (*pro hac vice*)
Lawrence C. Moore, III (*pro hac vice*)
Amanda P. Nitto (*pro hac vice*)
Travis S. Hinman (*pro hac vice*)
101 N. Tryon St., Suite 1900
Charlotte, NC 28246
Telephone:  (704) 377-2536
Facsimile:  (704) 378-4000
rfuller@robinsonbradshaw.com
lmoore@robinsonbradshaw.com
anitto@robinsonbradshaw.com
thinman@robinsonbradshaw.com

Mark J. Seifert (SBN 217054)
SEIFERT ZUROMSKI LLP
One Market Street, 36th Floor
San Francisco, California 941105
Telephone:  (415) 999-0901
Facsimile:  (415) 901-1123
mseifert@szllp.com

Attorneys for Defendant
SOUTHEASTERN CONFERENCE

**LATHAM & WATKINS LLP**

By: /s/ Christopher S. Yates
Christopher S. Yates (SBN 161273)
Aaron T. Chiu (SBN 287788)
505 Montgomery Street, Suite 2000
San Francisco, CA  94111
Telephone:  (415) 391-0600
Facsimile:  (415) 395-8095
chris.yates@lw.com
aaron.chiu@lw.com

Anna M. Rathbun (SBN 273787)
555 Eleventh Street, NW, Suite 1000
Washington, DC  20004
Telephone:  (202) 637-1061
Facsimile:  (202) 637-2201
anna.rathbun@lw.com

**FOX ROTHSCHILD LLP**

By: /s/ D. Erik Albright
D. Erik Albright (*pro hac vice*)
Jonathan P. Heyl (*pro hac vice*)
Gregory G. Holland (*pro hac vice*)
230 North Elm Street, Suite 1200
Greensboro, NC 27401
Telephone:  (336) 378-5368
Facsimile:  (336) 378-5400
ealbright@foxrothschild.com
jheyl@foxrothschild.com
gholland@foxrothschild.com

Attorneys for Defendant
THE ATLANTIC COAST CONFERENCE

1

## **FILER'S ATTESTATION**

I, Rakesh N. Kilaru, am the ECF user whose identification and password are being used to file DEFENDANTS' JOINT OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION. In compliance with Local Rule 5-1(h)(3), I hereby attest that all signatories hereto concur in this filing.

*/s/ Rakesh N. Kilaru*
Rakesh N. Kilaru
