# Declaration of Greg Sankey

## REDACTED VERSION OF DOCUMENT REQUESTED TO BE FILED UNDER SEAL

Mark J. Seifert (SBN 217054)
SEIFERT LAW FIRM
50 California Street, Suite 1500
San Francisco, California  94111
Tel.    (415) 999-0901
Fax     (415) 901-1123
mseifert@seifertfirm.com

Robert W. Fuller (*pro hac vice*)
Lawrence C. Moore, III (*pro hac vice*)
Pearlynn G. Houck (*pro hac vice*)
Amanda P. Nitto (*pro hac vice*)
ROBINSON, BRADSHAW & HINSON, P.A.
101 N. Tryon St., Suite 1900
Charlotte, NC 28246
Tel.    (704) 377-2536
Fax     (704) 378-4000
rfuller@robinsonbradshaw.com
lmoore@robinsonbradshaw.com
phouck@robinsonbradshaw.com
anitto@robinsonbradshaw.com

Attorneys for Defendant
SOUTHEASTERN CONFERENCE

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| In re College Athlete NIL Litigation | Case No. 4:20-cv-03919-CW |
|---|---|
| | **DECLARATION OF GREG SANKEY** |

### A.      Personal Background

1.      I am the Commissioner of the Southeastern Conference (the "SEC" or the "Conference"). I make this declaration of my own personal knowledge and, if called on to do so, could testify competently to the facts stated herein under oath.

2.      I received my undergraduate degree from the State University of New York at Cortland and earned my Masters' degree at Syracuse University in 1993. I began my career in athletics administration as Director of Intramural Sports at Utica College in upstate New York (1987-1989). After I left Utica College, I served as an athletics department intern (1989-90), as well as coach of the golf team at Northwestern State University in Natchitoches, LA, and then served as Director of Compliance and Academic Services at Northwestern State University (1990-92). I moved to the Southland Conference (an NCAA Division I Conference located in Texas) as an Assistant Commissioner in 1992. I advanced to Associate Commissioner and was eventually named the Commissioner of the Southland Conference. In 2002, I joined the SEC as Associate Commissioner for Governance, Enforcement and Compliance, a position I held until 2012, when I became the Executive Associate Commissioner and Chief Operating Officer. I held that position until I was named Commissioner of the SEC in March 2015. While at the SEC, I have served in a number of unpaid NCAA positions as an SEC representative.

### B.      The SEC

3.      The Conference is an Alabama unincorporated association that is tax exempt pursuant to Section 501(c)(3) of the Internal Revenue Code. The Conference was founded in 1933. The 2022-2023 Constitution and Bylaws of the SEC are attached to this Declaration as Exhibit A.

4.      As set forth in Section 1.2 of the Constitution, the Conference was formed to direct and organize interscholastic athletic competitions, conduct tournaments, and prescribe eligibility

rules for contestants. The Conference's mission is to achieve these goals in a way that maintains the highest standards of both academics and competitive sports.

5.    The Conference has fourteen (14) member institutions, thirteen (13) of which are state universities. The Conference's members are the University of Alabama, University of Arkansas, Auburn University, University of Florida, University of Georgia, University of Kentucky, Louisiana State University, University of Mississippi, Mississippi State University, University of Missouri, University of South Carolina, University of Tennessee, Texas A&M University, and Vanderbilt University. The University of Texas and University of Oklahoma are currently scheduled to join the Conference, effective as of the 2024 academic year.

6.    The Conference sponsors championship events in nine (9) men's sports and twelve (12) women's sports. These sports are baseball, basketball, cross country, football, golf, swimming, tennis, indoor track and field, and outdoor track and field (for men); and basketball, cross country, equestrian, golf, gymnastics, soccer, softball, swimming, tennis, indoor track and field, outdoor track and field, and volleyball (for women). Many Conference institutions field teams in one or more sports in which the Conference does not sponsor a championship, and in some instances those teams compete in other conferences solely in those sports (such as men's soccer, in which not enough SEC institutions compete for the SEC to sponsor a conference championship).

C.    **Governance and Control of the SEC; Role of the Conference Office**

7.    The Conference operates under the direction and control of the President or Chancellor of each of its member universities. (Some member institutions use the term "President" and some use the term "Chancellor.") Under Article 4 of the SEC Constitution, the Presidents/Chancellors serve as the "Chief Executive Officers" or "CEOs" of the Conference. The CEO nomenclature (dating back to 1933) is no longer in common use, even though it remains in

the Constitution and Bylaws. Under the Constitution, the CEO role of the Presidents and Chancellors is equivalent to the role of directors serving on a board of directors of a corporation. In addition, on a rotating basis, one of the Presidents or Chancellors serves as the "President" of the Conference (a position equivalent to the chairman of the board of a corporation).

8. I report to and serve at the pleasure of the Chief Executive Officers, who have "plenary power and authority with respect to all affairs of the Conference in any type of nature whatsoever, subject only to any specific provisions and restrictions imposed by the Constitution and Bylaws." Constitution, Articles 4.1.2 & 4.4.

9. Article 5 of the Constitution establishes the rules for Conference governance. The members of the Conference, acting through their respective Presidents or Chancellors (i.e., their CEOs), each have one vote on each matter that comes before the Conference for action. As set forth in the Constitution and Bylaws, before a Conference rule can be adopted, the proposed rule must garner at least a majority (and in some instances, as specified in the Constitution and Bylaws, a super-majority) of votes from the members of the Conference.

10. The Conference does not control its member institutions; to the contrary, the member institutions control the Conference and establish all policies and procedures of the Conference. The SEC member institutions, acting through their respective President or Chancellor, as CEOs of the Conference, define the role of the Conference office and determine the manner in which the Conference will be operated, providing direction to me and the Conference staff in fulfilling the roles and responsibilities assigned to the Conference, and make all final decisions concerning all material and fundamental Conference matters.

11. The Conference and the NCAA each establish rules delineating eligibility requirements for student-athletes to participate in Conference and NCAA competitions. The NCAA rules apply to all NCAA member institutions. The Conference rules supplement the

NCAA rules and apply only to the SEC member institutions. Other than setting eligibility requirements for participation in Conference and NCAA competition, the NCAA and the Conference have no involvement in recruiting or retaining student-athletes by SEC member institutions.

12.     SEC member institutions compete with each other and with institutions outside the Conference for the most talented high school students who will become collegiate student-athletes. In addition, our institutions at the SEC compete with each other and with institutions outside the Conference to recruit student-athletes who want to transfer from one college or university to another. Except for assisting a member institution to ensure compliance with eligibility rules, the Conference has no role in any of these recruiting activities. The SEC member institutions long ago decided that the Conference should not be involved in recruiting incoming or transfer student-athletes. As a result, involvement in recruiting student-athletes by the Conference office would be unacceptable in all respects.

13.     The way in which the Conference distributes revenues received by the Conference to its member institutions is determined by the Presidents and Chancellors of the SEC acting as the CEOs of the Conference. Except for expense reimbursement distributions and withholding of distributions based on rules violations, the Conference distributes its revenues equally to each member institution. The Conference does not dictate or prescribe the way in which those revenue distributions will be used by its member institutions. The Conference also does not have any input concerning which teams (in which sports) will be sponsored by a member institution, or which student-athletes will receive scholarships offers from a member institution. No SEC member, to my knowledge, has ever proposed that the Conference play a role or have involvement in these respects. The individual SEC member institutions each make their own independent decisions about which teams to sponsor (e.g., women's volleyball or women's soccer, or both) and which

prospective and current student-athletes will receive scholarships. The individual institutions also do not share institutionally-generated revenues (e.g., ticket sales to home games; institutional sponsorship revenues; alumni and booster contributions) and, provided that they fulfill their obligations as Conference and NCAA members (e.g., to field a minimum number of teams, provide teams to participate in scheduled competitions, etc.), they make their own decisions about how to expend funds on student-athlete support, coaches, facilities, and many other matters. Each SEC member institution has its own governance structure, with the President or Chancellor typically reporting to a Board of Trustees (or Board of Regents, Curators, or Supervisors). Many of the state institutions are also members of a state-wide university system (similar to the University of California system), and all state institutions are subject to oversight and control by their respective state legislatures.

### D.   Plaintiffs' Scenario

14.    I understand that the Plaintiffs' expert witnesses have opined that in the absence of NCAA rules preventing it, each conference defendant would have, at least since the fall semester of 2016, shared rights fees attributable to broadcasts and other distributions (internet, cable, satellite etc.) of games and events (all collectively referred to here as "broadcast rights revenues" or "broadcast rights fees") with student-athletes as follows:

a.   Each conference would determine the total of its broadcast rights fees received from its own license agreements with broadcasters (such as CBS, NBC, ABC/ESPN, and FOX) and also from the NCAA men's basketball tournament and the College Football Playoff.

b.   Each academic year, every football player enrolled at and receiving a scholarship from a member institution in such conference would be paid 10%, in equal shares, of the broadcast rights fees received by the conference that Plaintiffs contend are attributable to

football broadcasts (based in part on the opinion of the Plaintiffs' experts that 75% of any unsegregated broadcast rights fees received are attributable to football).

  c. Each academic year, every men's basketball player enrolled at and receiving a scholarship from a member institution in such conference would be paid 10%, in equal shares, of the broadcast rights fees received by the conference that Plaintiffs contend are attributable to men's basketball broadcasts (based in part on the opinion of the Plaintiffs' experts that 15% of any unsegregated broadcast rights fees received are attributable to men's basketball).

  d. Each academic year, every women's basketball player enrolled at and receiving a scholarship from a member institution in such conference would be paid 10%, in equal shares, of the broadcast rights fees received by the conference that Plaintiffs contend are attributable to women's basketball broadcasts (based in part on the opinion of the Plaintiffs' experts that 5% of any unsegregated broadcast rights fees received are attributable to women's basketball).

I further understand that Plaintiffs' experts assert or implicitly assume that 5% of the value of the unsegregated broadcast rights fees received by a conference are attributable to the remaining games and events, including (in the SEC) at least 13 other sports for every SEC member institution.

  15. My understanding of the Plaintiffs' numbers is that, as a matter of basic mathematics, at any level of assumed total broadcast rights fees, this would result in

  a. larger portions of the broadcast rights fees being provided to each student-athlete in conferences with fewer member schools,

  b. different amounts paid to student-athletes in different conferences based on the level of broadcast revenues received by each conference and the number of member

schools in each conference (or, more specifically, the number of football and basketball student-athletes in the conference),

    c.  the payments made to scholarship athletes who are starters being the same as payments made to scholarship student-athletes who rarely or never play in a game,

    d.  larger payments to men's basketball players than to football players attending the same school, and

    e.  much smaller payments to women's basketball players attending the same school as the men's basketball and football players.

16.    For illustration purposes and as an example only, I understand that, using the mathematical formulas of the Plaintiffs' experts, assuming a 14-team conference in which broadcast rights fees total $500 million in one year, and ignoring that certain broadcast revenue is allocated only to football and men's basketball:

    a.  1190 scholarship football players (85 scholarship players x 14 schools) would split $37.5 million per year ($31,513 per football player);

    b.  182 men's basketball players (13 scholarship players x 14 schools) would split $7.5 million per year ($41,209 per men's basketball player); and

    c.  210 women's basketball players (15 scholarship players x 14 schools) would split $2.5 million per year ($11,905 per women's basketball player).

17.    I also understand that the Plaintiffs' experts have concluded that these revenue sharing payments would either be made directly by each defendant conference to the student-athletes or would be distributed to the member institutions of each defendant conference in restricted form, earmarked for student-athletes to be paid by the schools as set forth above.

18.     For the following reasons, it is unrealistic to conclude or assume that the SEC would pay a share of broadcast revenues to SEC football and men's and women's basketball student-athletes as set forth and summarized above (herein referred to as "Plaintiffs' Scenario").

**E.     SEC Media Agreements Include Revenues From Multiple Sources**

19.     Each of the SEC's fourteen member institutions retains all revenues from ticket sales (to attend games and events), institutional sponsorships, and all sources other than licensing broadcast rights. The SEC member institutions have transferred the broadcast rights to their home games and events (i.e., athletic competitions each institution sponsors on its own campus or in its own venue) to the SEC to be licensed to networks as a package, along with the SEC's broadcast rights for athletic games and events sponsored by the SEC (such as conference tournaments and championships). The SEC member institutions have transferred these broadcast rights to the SEC for a number of practical and economic reasons.

20.     After joining the SEC and prior to becoming SEC Commissioner, I participated to a limited degree in discussions with SEC media consultants and in negotiations with networks concerning licensing of these distribution rights in connection with the SEC's media agreements with CBS (2008) and ESPN (2008 and 2013). After I became SEC Commissioner, I was the primary SEC representative, with support from media consultants, in negotiations with networks concerning modifications and (with ESPN) extensions of the SEC media agreements.

21.     The SEC has the following sources of revenue that include, in part, broadcast license revenues or royalties:

a.  *MMA*. Fixed royalty payments by ESPN under a multi-media rights agreement (the "MMA"), pursuant to which ESPN is permitted and required to broadcast and otherwise distribute, via internet, cable, satellite, and other forms of transmission, (collectively herein

"distribute") football, men's and women's basketball, and numerous other games and events on ABC, ESPN, ESPN2 and ESPNU. Under the MMA, ESPN has the right to distribute games and events in all SEC sports, not limited to football and basketball. In the MMA, the SEC also licenses trademark rights and certain data rights to ESPN in addition to distribution rights.

b. *CBS Agreement*. Fixed royalty payments by CBS, pursuant to a 2008 agreement (expiring after the 2023-24 academic year) that permits and requires CBS to distribute only football and men's basketball games.

c. *SEC Network Agreement.* Fixed and variable royalty payments by ESPN pursuant to the separate agreement authorizing and requiring ESPN to operate the SEC-ESPN Network (the "SEC Network Agreement"). The SEC Network Agreement permits and in certain respects requires ESPN to distribute games and events in all sports sponsored by the SEC. In addition to licensing the rights to distribute games and events to ESPN under the SEC Network Agreement, the SEC licenses trademark rights to ESPN, authorizes ESPN to operate a television network bearing the SEC name, and authorizes ESPN to operate the SEC's website (www.secsports.com).

d. *CFP.* Payments made by ESPN to an escrow account, a portion of which are paid to the SEC each year pursuant to a complex set of contracts with (and between and among) the SEC, nine other NCAA Division I conferences, and Notre Dame, which authorize ESPN to broadcast the college football playoff ("CFP"). The escrow account is funded by revenues from a number of sources, including broadcast rights, sponsorships, ticket sales, souvenir sales, and trademark licenses. The payments vary each year depending on a number of factors, including how many SEC teams play in CFP bowl games and in the CFP semifinal and final national championship games.

1        e.   *NCAA distributions*. Payments made to the SEC by the NCAA as a share of

2      NCAA revenues, which the SEC passes through to its member institutions. The NCAA's

3      primary source of revenues is its broadcast rights agreement with CBS and Turner for the

4      annual men's college basketball tournament, but the NCAA also receives revenues from

5      sponsorships, ticket sales, and other sources. All of these revenues together are the source

6      of distributions made to the SEC by the NCAA.

7        22.     With the possible exception of the CBS Agreement, payments made to the SEC by

8    ESPN, the NCAA, and from the CFP escrow are not solely attributable to licenses of broadcast

9    and other distribution rights, but include commingled (and inseparable) revenues from trademark

10   licenses, ticket sales (with respect to the CFP and NCAA payments), and other sources of

11   revenue. I know of no way to segregate rights fees payment from these other revenues.

12       **F.**      **No Value is Assigned to NIL of Student-Athletes in Broadcast Agreements**

13        23.     At no time during my participation in and direction of the SEC's negotiations with

14   networks did any consultant or any network indicate that there was any value, much less any

15   identifiable or segregable value attached to, attributable to, or realizable from any name, image,

16   or likeness ("NIL") rights of any student-athletes for use in effectuating broadcasts.  I have not

17   attached (nor had any network or consultant attempt to attach) any value to any such NIL rights of

18   student-athletes in broadcast rights contract negotiations.

19        24.     Some of the Conference's media agreements make no mention of NIL rights at all.

20   In other instances, broadcasters have included provisions contemplating that the Conference will

21   attempt to obtain permission from student-athletes for their name, image and likeness to be used

22   to promote the broadcasts and distribution of games. As a result, for over a decade, the

23   Conference has asked each of its member institutions to request (but not require) each of its

24   student-athletes to provide such permission, pursuant to the policy attached hereto as Exhibit B.

In instances when a student-athlete has declined to grant permission (i.e., declined to sign the form), the Conference has so informed the appropriate broadcast rights holder and indicated that the NIL of that student-athlete should not be used for promotional purposes. No network has declined to pay rights fees or altered its normal practices with respect to production and distribution of games in these instances.

25. Plaintiffs' Scenario is based on the incorrect premise that there is a method to value NIL rights of athletes in the broadcast of a game. There is not.

**G.      Broadcast Rights Fees are Not Comparable Among Conferences**

26. In negotiating college media rights agreements (such as the MMA, the CBS Agreement, and the SEC Network Agreement), a college conference has to balance various (and often inconsistent) goals and priorities that impact the rights fees paid by broadcasters and networks. For example, football and men's basketball have far higher ratings than any other sports and are far more attractive to broadcasters and networks. Similarly, the teams of some conference institutions are more popular and more attractive to broadcasters and networks than the teams of other conference institutions. Negotiating terms to ensure that every member institution receives comparable television exposure adversely impacts the broadcast rights fees that a network or broadcaster is willing to pay.

27. Similarly, despite concerted efforts by the SEC to promote women's sports, broadcasts and other distributions of women's sports over the course of a season, and for purposes of negotiating broadcast rights payments, have never been as popular with viewers and as attractive to broadcasters and networks as are football and men's basketball. The SEC has negotiated specific and detailed provisions in the MMA and the SEC Network Agreement to

Redacted - NSC

on the broadcast rights fees that ESPN is willing to pay. Some

1    women's and Olympic sports are growing in popularity over time, in part (in my opinion) as a

2    result of ▓Redacted - NSC▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

3    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Requiring a broadcaster or network to distribute more

4    games (particularly if the broadcaster or network has to incur the costs of producing the games)

5    can increase exposure for a conference and its student-athletes, but may decrease the rights fees

6    received. Different conferences balance these considerations in different ways in negotiations.

7        28.    A number of other factors can enhance or adversely impact the broadcast rights

8    fees that a broadcaster or network is willing to pay. For example:

9        a.    Game times and dates are important. The SEC does not play weekday football

10        games, except on limited occasions, but some other conferences play games on weekdays

11        to maximize broadcast rights fees (or in some instances, to find a time window when the

12        network is willing to distribute the game at all). Similarly, the SEC ▓Redacted - NSC▓▓▓▓

13        ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

14        ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

15        ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

16        b.    The number and permitted subject matter of commercial spots in a broadcast is

17        important, and negotiated as one of the terms of a broadcast rights agreement. More

18        commercials may increase rights fee opportunities, but frustrate fans, particularly those

19        watching games in person. ▓Redacted - NSC▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

20        ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

21        ▓▓▓▓▓▓▓▓▓▓▓Redacted - NSC▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

22        ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

23        c.    The costs of producing games (hiring announcers and camera operators; procuring

24        or furnishing a production truck or other production facilities, etc.) also impacts rights fees.

All other factors being equal, a conference can increase its broadcast rights fees and increase the number of games and events on television (or on substitute platforms, such as internet distribution) by producing the broadcasts itself or paying the costs of production (or by otherwise reducing the costs of production). The SEC has negotiated terms in this regard Redacted - NSC

Redacted - NSC

   d.   The availability of parking, access, seating, and amenities also impacts rights fees. Networks negotiate for space for cameras, and some broadcast rights agreements limit the number of "seat kills" (i.e., seats that are dedicated to camera placement for which tickets cannot be sold). Some broadcast rights agreements include provisions requiring institutions to furnish production facilities; other agreements do not include such requirements. And in the SEC, most of our institutions are not located in major metropolitan areas, which also impacts production costs for networks and broadcasters.

In my experience, all of the factors listed in this paragraph and in the prior paragraph, as well as countless other similar factors, are highly negotiated, vary from rights agreement to rights agreement, and materially impact the dollar amount of broadcast rights fees received by the Conference. Thus, the broadcast rights fees received by the SEC (or any conference) are not comparable on an "apples to apples" bases to the fees received by any other conference.

   29.   Even if student-athletes contributed 10% of the value of a broadcast as plaintiffs argue, unless rights fees were comparable on an "apples to apples" basis from conference to conference and institution to institution, it would not be possible or appropriate simply to

multiply all broadcast rights fees by 10% to determine the contribution of a student-athlete or a group of student-athletes. Similarly, it would not be possible or appropriate to allocate rights fees between and among various sports unless (i) rights fees of different conferences were comparable on an "apples to apples" basis, (ii) every conference required the same number of games in every sport (whether profitable or attractive to the broadcaster or network, or not) to be broadcast or distributed, (iii) the cost of producing broadcasts of games for every conference (no matter whether its schools were located in major metropolitan areas or rural areas) were the same, with the same allocation of production costs between the conference and its member institutions and the broadcaster or network, and (iv) all other unquantified factors increasing or decreasing the rights fees were the same for every conference. This would never happen.

**H.** **Broadcast Values of Sports Vary between Conferences and over Time**

30.     Because the popularity of sports and of various teams and events vary from year to year and school to school, and because CBS and ESPN do not share detailed revenue and cost information with the SEC that would permit the SEC to determine the relative contribution of each sport to the SEC's broadcast rights fees received, the SEC is unable to determine what portion of the overall broadcast rights fees received is attributable to any particular sport. With this said, based on my knowledge of SEC sports, broadcast agreements, and fan interest, I know of no basis to conclude that at least 75% of the broadcast revenues are attributable to football, at least 15% are attributable to men's basketball, as much as 5% could be attributable to women's basketball, and (necessarily) no more than 5% could be attributable to all other sports. For example, a number of sports, including men's baseball and women's softball, are more popular at SEC institutions and have much larger live television audiences on the SEC-ESPN Network than women's basketball.

31.    I understand that Plaintiffs' experts in this action have offered the opinion that 75% of the SEC's CBS and ESPN (MMA and SEC Network Agreement) broadcast rights revenues are derived from football games, 15% from men's basketball, 5% from women's basketball, and 5% from broadcasts and other distributions of games in other sports, based in part on allocations set forth in the SEC's annual financial statements showing that the SEC:

a.  Has allocated the rights fees received from CBS NSC to football and NSC to men's basketball (CBS only distributes football and men's basketball games; it does not distribute contests in any other sport, including women's basketball);

b.  Has allocated the portion of the rights fees received by the SEC received pursuant to its MMA NSC to football, NSC to men's basketball (the percentage varies from year to year) and NSC to women's basketball (again, varying from year to year).  (The references to NSC in the financials are NSC unless otherwise specified.)

c.  Has not allocated over NSC in rights fees received every year from ESPN (pursuant to the SEC Network Agreement), under which ESPN broadcasts and otherwise distributes contests in football, men's basketball, women's basketball, and in all other sports sponsored by the Conference.

32.    Plaintiffs have selectively focused only on the allocation of revenues from the MMA and ignored the revenues from the other agreements and sources listed in the prior paragraph. Plaintiffs' experts have not asked the SEC how to interpret the financial statements and apparently failed to recognize that all references to NSC are to NSC and that a substantial portion of the SEC media rights fees NSC are not allocated. The allocations proposed by the Plaintiffs' consultants are not accurate and are not supported by the SEC's financial statements.

33.     Neither the MMA nor the CBS Agreement delineate which revenues or royalties are attributable to basketball, football, or any other sport—and similarly include no allocation of rights fees. The SEC Network Agreement similarly has no such revenue or royalty delineations or allocations. The limited allocations in the SEC financial statements with respect to the MMA revenues and CBS Agreement revenues are for management purposes only, and are always presented to our Presidents and Chancellors in that context, with the disclaimer that the allocations are not based on any quantified or detailed analysis. In fact, the limited allocations included in the SEC's financial statements were first established decades ago well before I joined the SEC, and the SEC staff is careful to explain that we have chosen to use the same allocations to facilitate year over year comparison of revenues but that the allocations are not currently accurate or verified in light of numerous changes in the broadcast rights and general college sports markets in the past several decades.

34.     The SEC does not attempt to allocate broadcast rights revenues or royalties from all sources between and among football, men's basketball, women's basketball, and other sports because it would be impossible to do so. The revenues and royalties are commingled with revenues from sources other than broadcast rights licenses, are not contractually allocated to any particular sport or sport, and vary from year to year.

35.     Plaintiffs' generalized allocations (75%-15%-5%-5%) also do not reflect the varying interest in, popularity of, and success of different teams and different conferences in various sports. Men's baseball is quite popular in the SEC but less popular (and sometimes not even a sponsored sport) in the colder climates of the Midwest and Northeast (where schools in other defendant conferences are located). SEC football is exceedingly popular. ACC basketball has historically been quite popular with fans.

36.     It is important to recognize that the values of different sports from a broadcast rights perspective can change over time. The SEC negotiates provisions in its media rights agreements Redacted - NSC

in order to enhance and grow the value and popularity of sports that historically have not been "on television," including in particular women's sports. As a result, the popularity of SEC women's sports (softball being but one example) has grown over time, and ESPN has adjusted its programming schedules and priorities accordingly.

37.     Plaintiffs' Scenario implicitly assumes that the relative broadcast values of different sports are not only determinable, but are static and unchanging over time, and from conference to conference. None of these assumptions are factually accurate.

I.      **Plaintiffs' Scenario Presents Significant Enforcement Issues**

38.     I have served in a number of roles at the NCAA and in my conference employment that provide me with experience and insight into the practical challenges of enforcing rules of a sports organization. Based on my experience, the Plaintiffs' Scenario would be impossible to implement, as a practical matter.

39.     Because broadcast rights fee payments are intermingled with and inseparable from other sources of revenue, cannot be allocated among sports with any level of precision or consistency, and are not comparable from conference to conference, any attempt to segregate the portion of any conference's revenues attributable to broadcast rights would require assumptions and be subject to criticism. Such attempts would also provide ample opportunities for manipulation as institutions and conferences attempted to obtain a competitive advantage by increasing the funds available to pay student-athletes. For the same reasons, compliance and enforcement would be expensive, if possible at all.

40.     Even if these obstacles could be overcome (they could not), the broadcast rights agreements of each conference and the NCAA and the CFP have confidentiality provisions, prohibiting the sharing of payment amounts or other terms with student-athletes or other third parties. It is not conceivable that the SEC, or any other defendant conference, would adopt rules that would require sharing of information in breach of confidentiality provisions in broadcast rights agreements—or that the NCAA or other conferences would simply "take the word" of a conference as to the amount of its broadcast rights fees.

41.     The broadcast rights fees from the SEC Network Agreement are based on a revenue share, so those fees cannot be determined until well after any given academic year ends – making it impossible to distribute a share of revenue in a timely manner, much less provide any student-athlete certainty before a season begins as to the final amount of any revenue that would be paid to the student-athlete.

**J.      The NCAA and SEC Would Not Adopt the Model Plaintiff Proposes**

42.     For broadcast licensing revenues to be paid to scholarship football and basketball student-athletes as described in "Plaintiffs' Scenario," the NCAA (which is made up of conferences and their member institutions) would have to pass or re-interpret a NCAA rule to allow up to (but not more than) 10% of the broadcast rights revenues to be paid to student-athletes. Then, each of the defendant conferences and their member institutions would have to independently decide to pay 10% of the broadcast rights revenues to student athletes *and* allocate revenues only to basketball and football in the way Plaintiffs assert would be appropriate (with 75% of unsegregated revenues allocated to football, and so forth). In other words, the SEC would have to adopt rules that would implement and mandate the revenue distribution structure outlined in Plaintiffs' Scenario. These rules would have to require that the SEC pay (or distribute funds to member institutions to pay) each scholarship football, men's basketball, and women's basketball

student-athlete at every SEC member institution the same dollar amount of shared broadcast revenues as every other scholarship student-athlete playing the same sport at every SEC member institution. The rules would also have to require that every scholarship student-athlete be paid his or her full 10% share of their respective sport's allocated revenues.

### (i).     NCAA Rules

43.     Plaintiff's Scenario is not currently permitted by NCAA rules or any possible re-interpretation of NCAA rules. NCAA rules prohibit institutions from paying student-athletes from any source, including broadcast revenues, and do not recognize any distinction between revenues from broadcasts, from any use of student-athlete NIL rights, or from any other source. In order for such broadcast revenue sharing payments to be made as set forth in Plaintiffs' Scenario, NCAA rules would have to be amended or reinterpreted.

44.     The NCAA rules are made by its members.  For Division I, any amendment to NCAA rules of the type necessary to implement Plaintiffs' Scenario would have to be supported by a majority of NCAA Division I member institutions. I know of no instance where a majority of NCAA Division I members have voted for a rule that would create a competitive advantage for one conference, which would be the result if the Plaintiffs' Scenario were adopted. In my experience, the NCAA's membership would not support or vote for rules that put their institutions and conferences at a competitive disadvantage.

### (ii).     SEC Rules

45.     The SEC decision-making process is collaborative and collective. When the Conference considers changes to its rules concerning student-athlete eligibility and benefits or concerning distribution of funds to member institutions, the Conference office solicits input on proposals from the Athletics Directors (and, if their input would be relevant to consideration of the proposal, the Faculty Athletics Representatives, Senior Woman Administrators, and Coaches)

at each member institution. Based on this input, each member institution (acting through their respective President or Chancellor, as a CEO of the Conference) votes on every proposal. This would be the process for considering any proposal to adopt the revenue-sharing structure Plaintiffs have posited.

46.     I oversee and have extensive experience with this SEC decision-making process and understand the considerations that the various member institutions take into account when voting on proposals. Based on my background and experience, even if NCAA rules prohibiting payment of broadcast revenues to student-athletes were repealed, altered or invalidated, the SEC would not distribute broadcast revenues in the way that Plaintiffs propose in the Plaintiffs' Scenario.

47.     Before the SEC could implement any payment structure involving broadcast revenue, including the Plaintiffs' Scenario, the structure would have to be approved by an affirmative vote of a majority of the SEC member institutions. As Commissioner of the Conference, I would not recommend that the members vote in favor of the Plaintiffs' Scenario. Even aside from any recommendation I would make, based on my knowledge and experience of the SEC membership, there are numerous reasons why our member institutions would find Plaintiffs' Scenario unacceptable. These reasons, and the reasons why I would not recommend the Plaintiffs' Scenario, include the following:

    a.   *Gender equity and Title IX*. SEC member institutions are required to comply with Title IX. Plaintiffs' Scenario would require SEC member institutions to pay over 90% of broadcast revenues to male athletes (because CFP revenue distributions, for football, exceed NCAA revenue distributions, which plaintiffs assign to men's basketball – and 90% all other broadcast revenues would be designated for sharing with male student-athletes). Even putting aside any legal issues this would create under Title IX, gender equity

concerns would be omnipresent and a fatal impediment to adoption of the Plaintiffs'

Scenario. Put simply, gender equity is important to the SEC and its member institutions.

And even if that were not the case for all other conferences, based on my experience and

knowledge of the experience of other sports leagues (including professional leagues), the

negative public response to a structure that provides unequal pay to men and women

athletes would be significant, as is illustrated by the public reaction to the pay structures for

the U.S. National Men's and Women's Soccer teams.

b. *Collegiate athletics mission*. One goal of the SEC and its member institutions is to

provide athletic opportunities to a broad number of student-athletes. SEC member

institutions have budgets with which to accomplish this goal. If 10% of broadcast revenues

were redistributed to student-athletes, with disproportionate shares to football and men's

basketball programs, it would result in budgetary pressures on the member schools. As

explained more fully in paragraph 53, these budgetary pressures would incentivize

institutions to reduce the size of rosters and to eliminate sports other than football and

men's basketball, most of which require subsidization because they do not generate enough

revenue to cover the cost of the sport, and (in general) reduce the number of scholarship

student-athletes.

c. *Competitive equity concerns*.  Based on the implausible assumption that all

conferences would adopt Plaintiffs' Scenario, if and to the extent that any other conference

had more broadcast revenue than the SEC, SEC member institutions would be placed at a

recruiting and competitive disadvantage they would not accept or tolerate. It is my

experience that at least some SEC member institutions would find ways, consistent with

Title IX and gender equity concerns and requirements, to compete with all other

conferences by providing payments that equaled or exceeded payments made by any other conference.

d. *Budgeting prudence*. Conversely, to the extent the SEC has higher broadcast revenues (as indicated by public reports) than other conferences, it would be unnecessary for the SEC member institutions to provide a 10% share of broadcast revenues (allocated by sport) to every scholarship student-athlete, when a smaller percentage would also put the SEC member institutions at a competitive advantage to universities in other conferences.

e. *Enforceability, administrative feasibility, and practicality*. As is explained above, Plaintiffs' proposed allocations of broadcast revenues are without support, and the NCAA rules necessary for implementation of the Scenario would be unenforceable. These considerations would weigh heavily against the SEC member institutions' adoption of the rules necessary to implement Plaintiffs' Scenario.

f. *Member school autonomy*. Subject to Title IX and any other applicable legal requirements, SEC member institutions currently have full autonomy to determine how and in what ways to expend their resources. The Plaintiffs' Scenario removes the ability of institutions to prioritize their sports inventory in the way they see fit and, to the contrary, forces member institutions to prioritize football and men's and women's basketball over all other sports, even though baseball, gymnastics, track and field, and various other sports are more popular than women's basketball at certain member institutions. For example, under the allocation of rights fees in Plaintiffs' Scenario, an institution could not distribute more revenue to softball and baseball student-athletes than to women's basketball student-athletes, even if softball and baseball are more popular and generate larger broadcast revenues.

In short, for all of the reasons set forth in paragraphs above, the SEC would not adopt Plaintiffs' Scenario.

### K.     *Market Incentives Do Not Support Plaintiffs' Scenario*

48.     Plaintiffs' Scenario also ignores several additional market incentives that suggest the NCAA, SEC, and member institutions would not behave in the way that Plaintiffs propose.

49.     Under Plaintiffs' Scenario, every scholarship football, men's basketball, and women's basketball student-athlete would receive the same payment as their teammates, regardless of their ability or contribution to the team, whether that student-athlete was/is a highly ranked and highly coveted recruit or a less-coveted recruit unlikely to compete in games or receive much if any "playing time." This is unrealistic. In competing for student-athletes (including with institutions in the SEC and institutions in other conferences), SEC member institutions generally seek the most talented players who meet appropriate academic eligibility standards and otherwise have the attributes that the particular SEC member institution, athletics department, or coach values in a student-athlete.

50.     Under current NCAA rules, each institution can provide each football and basketball player a cost-of-attendance scholarship and provide academic and graduation awards and incentives, but cannot divide a scholarship among one or more players on a football or basketball team. In contrast, in "equivalency sports" such as baseball and track/field, NCAA rules permit institutions to divide scholarships among different players (e.g., a 10% scholarship, 25% scholarship, etc., up to a full scholarship). In equivalency sports, all SEC member institutions and (to my knowledge) all other NCAA Division I institutions routinely provide different scholarships to different recruits based on a variety of factors, including the individual players' talent, the needs of the team, the needs and desires of a particular athlete, and many additional individualized and unpredictable factors. For example, in equivalency sports, some athletes

negotiate additional scholarship percentage points based on their offers from other institutions (within the SEC and outside the SEC) and their level of talent.

51.     As illustrated by the equivalency scholarship example above, absent limits set in or equal treatment requirements established by NCAA rules, SEC member institutions do not always provide the same payments and benefits to all scholarship student-athletes on a team. Under Plaintiffs' Scenario, in which broadcast rights fees are paid to student-athletes, institutions would have strong economic and competitive incentives to pay larger shares of those fees to the more talented recruits and student-athletes. All institutions would have to consider those economic and competitive incentives when determining the proper share of broadcast rights fees that should be paid to each student-athlete.

52.     I also know of no reason to assume or conclude that the more talented and coveted student-athletes would agree to enroll, compete on a team, and/or release or transfer their NIL rights for the same amounts as those paid to less coveted or talented players. Currently, now that NCAA rules have been modified to permit student-athletes to license their NIL rights to third parties, student-athletes are choosing different schools and conferences based, at least in part, on NIL opportunities. Boosters of some institutions have formed "collectives" that license NIL rights from student-athletes for large payments to incentivize the student-athletes to enroll or remain at the institution supported by the boosters. Public reports confirm that the payments these student-athletes receive are often correlated with athletic ability, i.e., larger for more talented athletes. The Plaintiffs' Scenario would create incentives for high school prospects and transfer students to demand payments consistent with their talent and ability and to choose institutions offering higher payments. It is not realistic to conclude that every student-athlete would sign off on receiving a share of broadcast rights fees equal to the share of all others on his or her team.

53.    To gain an advantage in recruiting incoming and transfer scholarship student-athletes, and in retaining enrolled scholarship student-athletes, the SEC and its member institutions would also have strong incentives to reduce the number of players on every football and basketball team to the minimum number of scholarships required by NCAA rules (to increase each player's share of revenue). It would also raise the possibility of reducing the minimum number of scholarships. This would reduce the opportunities for student-athletes to play sports in the SEC and at our member institutions. It would also displace student-athletes from SEC member institutions, with a ripple effect at other institutions, eventually displacing some student-athletes from Autonomy-5 institutions altogether. The diversion of revenues from support for sports teams that must be subsidized would also create economic incentives for SEC member institutions to reduce the number of number of sports teams sponsored by each institution.

54.    Stated simply, the revenue distribution scheme that is fundamental to Plaintiffs' Scenario would create market incentives and disincentives that are of concern to me and that, based on my experience, would make Plaintiffs' Scenario untenable.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on April 11, 2023, in Birmingham, Alabama.

Greg Sankey

# Exhibit A

# CONSTITUTION AND BYLAWS

# 2022-2023





# 2022-2023

# SOUTHEASTERN CONFERENCE CONSTITUTION & BYLAWS

CONSTITUTION
OPERATING BYLAWS
ADMINISTRATIVE BYLAWS

*2201 Richard Arrington Boulevard North - Birmingham, Alabama 35203-1103*
*Phone (205) 458-3000*
*Fax (205) 458-3031*
*www.secsports.com*

# Foreword

This Southeastern Conference Manual was revised during the 1989-90 academic year and approved by the Conference at its May 1990 Annual Meeting.  The revised format was first implemented into the 1990-91 SEC Manual and is organized, as the NCAA Manual is, into three major sections as follows:  Constitution - Articles 1 through 6; Operating Bylaws - Articles 10 through 23, and Administrative Bylaws - Articles 30 through 32.

The subsections of Articles 1-6 in the Constitution of the SEC Manual do not necessarily have any relation to the correspondingly numbered subsections in the NCAA Manual.  In the Operating Bylaws and Administrative Bylaws of the SEC Manual, subparagraphs are numbered so that similar provisions are addressed in each manual.  A particular subparagraph will appear in the SEC Manual only if the corresponding SEC provision is more restrictive than the NCAA.  Thus, if no correspondingly numbered subparagraph is found in the SEC Manual, the reader should interpret the SEC provision to be identical to the NCAA.  In those instances where the NCAA does not have a provision comparable to the SEC, the subparagraph is numbered considerably higher than the highest numbered subparagraph in the appropriate section of the NCAA Manual.  This system will allow the NCAA to add subparagraphs in that same subsection without the SEC having to renumber all of its paragraphs in the same subsection.

The rules and regulations of the NCAA constitute the base for SEC requirements.  In some instances, the rules and regulations of the SEC are more restrictive than those of the NCAA, but in no case is the SEC less restrictive than the NCAA.  Therefore, in determining rule interpretations, member institutions should first read the applicable Article(s) in the NCAA Manual and then the corresponding Article(s) in the SEC Manual.

Provisions in the manual, which require a two-thirds vote for amendment and a unanimous vote for suspension, are called dominant provisions and are denoted in the margin by an asterisk (*).  All others require a majority vote for amendment and a two-thirds vote for suspension.  The amendment and suspension procedures are covered in Article 5.3 of the SEC Constitution.

Supplementary information about policies and procedures for coordination of officiating and administration of championships, meets and tournaments may be found in the Commissioner's Regulations.  The Commissioner's Regulations shall be amended by the following procedure:  Sport and/or officials committees forward the proposed changes to the Athletics Directors for final action.  No revision shall become effective until approved by the Athletics Directors.

This manual applies to both men's and women's athletics, except where NCAA waivers exist for women.



## *History of the*
# SOUTHEASTERN CONFERENCE

A pioneer in the integration of higher education and athletic competition, the Southeastern Conference is a leader on the national landscape for intercollegiate athletics in the 21st century.

Since its formation in 1933, the SEC has achieved stature and stability by designating governing/voting power to the presidents of the member institutions. These university leaders determine the policies of the conference and through the years this involvement has been the principal source of strength in the evolution of the SEC. Throughout its 82-year history, the SEC has provided leadership on the vital issues facing intercollegiate competition.

**Alabama**, **Auburn**, **Florida**, **Georgia**, **Kentucky**, **LSU**, **Mississippi**, **Mississippi State**, **Tennessee** and **Vanderbilt** have been in the SEC since its formation in 1933. The league has expanded twice, adding **Arkansas** and **South Carolina** in 1991, then **Missouri** and **Texas A&M** in 2012.

## Organization, Contraction and Expansion

SEC schools began athletic competition with one another more than 100 years ago as members of the Southern Intercollegiate Athletic Association. Seven institutions (Alabama, Auburn, Georgia, Georgia Tech, North Carolina, Sewanee and Vanderbilt) attended the SIAA organizational meeting of faculty representatives, called by Dr. William L. Dudley of Vanderbilt, in Atlanta Dec. 22, 1894.

Student teams from the schools began meeting in various sports with little pattern to their contests. The American adaptation of the English game rugby, called "football," was drifting down from the East and Midwest. Southerners were quickly attracted to this sport formalized in 1869.

The first football game in the Southeast was played April 9, 1880, on the ground now called Old Stoll Field at the University of Kentucky. Kentucky A&M (now UK) organized a team and in November 1881, played Transylvania College in a three-game series. By 1895, 11 current SEC members were playing football.

Basketball moved quickly to the South as Vanderbilt was playing at the Nashville YMCA in 1893, just two years after Dr. James Naismith originated the game at Springfield (Mass.) College.

Track was organized on a conference level at the 1895 SIAA meeting presided over by President Dudley who served until his death in 1914. The first championship meet was held at Vanderbilt May 15, 1896. By 1900, eight of the 13 charter SEC members were participating.

The seven-member SIAA expanded to 19 institutions in 1895 (Alabama, Auburn, Central, Clemson, Cumberland, Georgia, Georgia Tech, Kentucky, LSU, Mercer, Mississippi State, Nashville, North Carolina, Sewanee, Southwestern Presbyterian, Tennessee, Texas, Tulane and Vanderbilt) and by 1920 there were 30 members.

The larger schools reorganized as the Southern Conference at a meeting in Gainesville Dec. 12-13, 1920. Professor S.V. Sanford of Georgia called the meeting and served as the first president. Charter members of the Southern Conference included: Alabama, Auburn, Clemson, Georgia, Georgia Tech, Kentucky, Maryland, Mississippi State, North Carolina, North Carolina State, Tennessee, Virginia, Virginia Tech and Washington & Lee.

Despite an original limit of 16, the membership grew to 23 by 1928. In 1922 Florida, Louisiana State, Mississippi, South Carolina, Tulane, Vanderbilt and Virginia Military joined, while Sewanee and Duke became members in 1923 and 1928 respectively. At one time or another, the SIAA and the SC included most of the Southern colleges from Virginia to Texas.

The 13 members west and south of the Appalachian Mountains reorganized as the Southeastern Conference at the annual SC meeting of Dec. 8-9, 1932, in Knoxville. The 10 coast members remained in the Southern Conference. Dr. Frank L. McVey of Kentucky was elected president of the new conference whose charter members were: Alabama, Auburn, Florida, Georgia, Georgia Tech, Kentucky, Louisiana State, Mississippi, Mississippi State, Sewanee, Tennessee, Tulane and Vanderbilt. (Sewanee withdrew Dec. 13, 1940, Georgia Tech on June 1, 1964 and Tulane on June 1, 1966). McVey held an informal meeting of the school presidents in Birmingham Feb. 16, 1933, then the first full meeting in Atlanta Feb. 27.

Faced with the task of conference realignment after competing with 10 members since 1966, the SEC welcomed the University of Arkansas on Aug. 1, 1990, and the University of South Carolina on Sept. 25, 1990. Both joined the SEC on July 1, 1991.

Fully incorporated into conference competition by 1992, Arkansas and South Carolina participated in SEC championships for all sports except football during the 1991-92 academic year. The SEC was again at the forefront, introducing football, basketball and baseball divisional play and the nation's first-ever Division I football championship game.

The conference welcomed Texas A&M University on Sept. 25, 2011, and University of Missouri on Nov. 6, 2011, in the only other expansion in SEC history. Both joined the SEC on July 1, 2012 and competed in their first year in all conference sports in 2012-13.

## Office of The Commissioner

The office of the commissioner was formed in 1940 in Jackson due to the great amount of detail work developing, especially in recruiting and eligibility.

**Martin S. Conner**, former governor of the state of Mississippi, took office as Commissioner Aug. 21, 1940. Conner later became ill and the secretary of the conference, Dean N.W. Dougherty of Tennessee, served as Acting Commissioner during the fall of 1946.

**Bernie H. Moore** became the second full-time Commissioner on Feb. 21, 1948, when the office moved to Birmingham. Moore, a former LSU coach, guided the SEC to national respect in his 18-year tenure.

**A.M. (Tonto) Coleman** succeeded Moore as Commissioner upon his retirement April 1, 1966. The Alabama native, who was experienced in athletic coaching and administration, served six and a half years.

**Dr. H. Boyd McWhorter**, then Dean of Arts and Sciences at Georgia and secretary of the league since 1967, accepted the position of Commissioner upon the retirement of Coleman Aug. 1, 1972. Under his leadership the SEC experienced unparalleled growth. In McWhorter's first year the SEC distributed $1.57 million and 14 years later, his final year as Commissioner in 1986, the league distributed $15 million in revenue to the member institutions.

**Dr. Harvey W. Schiller**, an Air Force colonel and faculty chair at the U.S. Air Force Academy, followed McWhorter upon his retirement, taking office as Commissioner on Sept. 15, 1986. Under his guidance the SEC established itself as a leader in the areas of athletic scholarship and marketing.

**Roy F. Kramer** succeeded Schiller on Jan. 10, 1990. Kramer, who served on numerous NCAA committees, joined the league office after spending 12 years as athletic director at Vanderbilt. Kramer was Commissioner for more than 12 years before retiring in 2002. The SEC expanded by two schools during his tenure, he created the ultra-successful SEC Football Championship Game and was instrumental in the creation of the Bowl Championship Series.

**Michael L. Slive**, who served as Commissioner of Conference USA for seven years, was appointed the seventh Commissioner of the Southeastern Conference on July 2, 2002. Serving in the position for 13 years, he created a new culture of NCAA compliance in the league, oversaw the expansion of the SEC by two schools, negotiated landmark television agreements and engineered the birth of the SEC Network in a partnership with ESPN. He also played a key role in the development of the College Football Playoff.

**Gregory A. Sankey**, a former Commissioner of the Southland Conference and 13-year veteran of the SEC Office, became the eighth commissioner of the Southeastern Conference on June 1, 2015. Sankey served under Slive as Associate Commissioner for Compliance and then Executive Associate Commissioner and Chief Operating Officer, playing a central role in crafting the new Autonomy structure of the NCAA that was adopted in January 2015.

## Sport Sponsorship

The first SEC champions were crowned in 1933 in baseball, basketball, football and outdoor track. The league's inaugural championship event was a basketball tournament in Atlanta, Feb. 24-28, 1933. Records show the first men's team title for cross country was awarded in 1935, while golf and swimming were added in 1937. The league later began hosting championships in tennis (1938) and indoor track (1957).

In the 1979-80 academic year SEC championships for women were recognized in basketball, tennis and volleyball. The following year golf, gymnastics, swimming and track & field were added. Soccer was added in 1993 and softball began SEC play in 1997. The administration of women's athletics officially came under the auspices of the conference office on Sept. 1, 1984.

In 1993, the member institutions adopted The Principles of Gender Equity. Committed to increasing the quantity and quality of women's athletic opportunities, each school provides at least two more women's intercollegiate programs than the number of men's teams on each campus.

The conference approved equestrian as its 21st sponsored sport for the 2012-13 academic year.

The SEC currently regulates nine men's sports and 12 women's sports:

| MEN'S SPORTS | WOMEN'S SPORTS |
|---|---|
| **Baseball** | **Basketball** |
| **Basketball** | **Cross Country** |
| **Cross Country** | **Equestrian** |
| **Football** | **Golf** |
| **Golf** | **Gymnastics** |
| **Swimming** | **Soccer** |
| **Tennis** | **Softball** |
| **Track & Field (Indoor)** | **Swimming** |
| **Track & Field (Outdoor)** | **Tennis** |
| | **Track & Field (Indoor)** |
| | **Track & Field (Outdoor)** |
| | **Volleyball** |

# Table of Contents

PAGE

**CONSTITUTION, ARTICLE 1: Name, Purposes and Fundamental Policy**......................... 1
1.1 NAME.............................................................................................................................. 1
1.2 PURPOSES...................................................................................................................... 1

**CONSTITUTION, ARTICLE 2: Principles for the Conduct of Intercollegiate Athletics** ....... 2

**CONSTITUTION, ARTICLE 3: SEC Membership** ............................................................. 3
3.0 GENERAL PRINCIPLE.................................................................................................. 3
3.1 MEMBERSHIP, TERMINATION, SUSPENSION........................................................ 3
3.2 WITHDRAWAL FEE......................................................................................................4

**CONSTITUTION, ARTICLE 4: Organization** ................................................................... 5
4.1 CHIEF EXECUTIVE OFFICERS................................................................................... 5
4.2 CONFERENCE OFFICERS............................................................................................ 5
4.3 COMMITTEES................................................................................................................ 6
4.4 COMMISSIONER ........................................................................................................... 6

**CONSTITUTION, ARTICLE 5: Legislative Authority and Process** .................................... 8
5.0 GENERAL PRINCIPLE.................................................................................................. 8
5.1 MEETINGS OF THE CONFERENCE ........................................................................... 8
5.2 MEETINGS OF THE EXECUTIVE COMMITTEE ...................................................... 8
5.3 AMENDMENT AND SUSPENSION............................................................................. 9

**CONSTITUTION, ARTICLE 6: Institutional Control and Responsibility**.......................... 10
6.1 INSTITUTIONAL RESPONSIBILITY ........................................................................ 10

**BYLAW, ARTICLE 10: Ethical Conduct** ...................................................................... 11
10.1 STATEMENT OF PURPOSE ...................................................................................... 11
10.2 RECRUITING .............................................................................................................. 11
10.3 ACADEMIC INTEGRITY ........................................................................................... 11
10.4 GAME MANAGEMENT .............................................................................................. 12
10.5 SPORTSMANSHIP ...................................................................................................... 12

**BYLAW, ARTICLE 12: Amateurism** ............................................................................ 13
12.3 INTERACTION WITH SPORTS AGENTS................................................................. 13

**BYLAW, ARTICLE 13: Recruiting**............................................................................... 14
13.6 OFFICIAL VISITS ........................................................................................................14
13.7 UNOFFICIAL VISITS...................................................................................................14
13.9 LETTER OF INTENT PROGRAMS, FINANCIAL AID AGREEMENTS ........................14
13.11 TRYOUTS ...................................................................................................................14

**BYLAW, ARTICLE 14: Eligibility** ................................................................................ 15

14.01  GENERAL PRINCIPLES ...................................................................................... 15
14.1  GENERAL ELIGIBILITY REQUIREMENTS ................................................... 15
14.2  SEASONS OF COMPETITION: FIVE-YEAR RULE ...................................... 18
14.3  FRESHMAN ACADEMIC REQUIREMENTS  .................................................. 18
14.4  PROGRESS-TOWARD-DEGREE REQUIREMENTS ........................................19
14.5  TRANSFER REGULATIONS ................................................................................ 20
14.10  CERTIFICATION OF ELIGIBILITY ................................................................. 21

**BYLAW, ARTICLE 15: Financial Aid** ....................................................................... 22
15.01  GENERAL PRINCIPLES ...................................................................................... 22
15.2  ELEMENTS OF FINANCIAL AID ...................................................................... 22
15.5  MAXIMUM INSTITUTIONAL GRANT-IN-AID LIMITATIONS BY SPORT ............. 23

**BYLAW, ARTICLE 16: Awards, Benefits, and Expenses for Enrolled Student-Athletes** ...... 24
16.2  COMPLIMENTARY ADMISSIONS AND TICKET BENEFITS .................................... 24

**BYLAW, ARTICLE 17: Playing and Practice Seasons** ........................................... 25
17.1  GENERAL PLAYING-SEASON REGULATIONS .......................................... 25
17.30  PLAYING RULES ..................................................................................................25

**BYLAW, ARTICLE 18: Championships and Tournaments** ................................................. 26
18.8  SOUTHEASTERN CONFERENCE CHAMPIONSHIPS AND TOURNAMENTS ......... 26

**BYLAW, ARTICLE 19: Compliance and Enforcement** .............................................. 27
19.8  SOUTHEASTERN CONFERENCE COMPLIANCE PROGRAM ................................... 27

**BYLAW, ARTICLE 21: Committees, Meetings, and Other Events** ................................... 30
21.8  COACHES' MEETINGS AND OTHER EVENTS ..............................................30
21.9  SPORTS COMMITTEES  ....................................................................................... 30

**BYLAW, ARTICLE 22: Media and Related Agreements** ...................................... 31
22.1  MEDIA AND RELATED AGREEMENTS .............................................................31

**BYLAW, ARTICLE 23: Diversity, Equity, and Inclusion Initiatives** ................... 32
23.1  DIVERSITY, EQUITY, AND INCLUSION INITIATIVES .................................32

**ADMINISTRATIVE BYLAW, ARTICLE 30: Administrative Regulations** ...................... 33
30.20  OFFICIATING ...................................................................................................... 33
30.22  PROVISIONS AND STANDARDS FOR CONFERENCE SPORTS ........................... 33

**ADMINISTRATIVE BYLAW, ARTICLE 31: Executive Regulations** .................................. 36
31.10  PAYMENT OF DEBT SERVICE .........................................................................36
31.20  REVENUE DISTRIBUTION - BASKETBALL .................................................... 36
31.21  REVENUE DISTRIBUTION - FOOTBALL ....................................................... 37
31.22  REVENUE DISTRIBUTION - BASEBALL ......................................................... 38
31.23  REVENUE DISTRIBUTION - ALL OTHER SPORTS ........................................ 38
31.24  DISTRIBUTION OF NCAA SPORT SPONSORSHIP AND GRANTS-IN-AID FUNDS ...38

31.25   DISTRIBUTION OF NCAA ACADEMIC VALUES-BASED REVENUE FUNDS ........... 38
31.26 AUTOMATIC RESTRICTION AGAINST PARTICIPATION IN DISTRIBUTION
          OF CONFERENCE FUNDS ............................................................................................ 38

**ADMINISTRATIVE BYLAW, ARTICLE 32: Enforcement Policies and Procedures** ....... 40

**APPENDIX A: Conference Penalties for Violations of Specified NCAA Bylaws** ................. 41

**APPENDIX B: Conference Minimum Expectations for Due Diligence Inquiries** ................ 44

CONSTITUTION, ARTICLE 1

# Name, Purposes and Fundamental Policy

| 1.1 | Name | 1 |
| 1.2 | Purposes | 1 |

## *1.1  NAME

The name of this association shall be the Southeastern Conference.

## *1.2  PURPOSES

The purpose and mission of the Southeastern Conference is educational within the meaning of Section 501(c)(3) of the Internal Revenue Code.  Intercollegiate athletics programs provide fundamental lessons in leadership and teamwork, and about winning and losing that have an irreplaceable role in the greater world of business, government, military, and academic pursuits.  In no event shall the Conference engage in any activity or take any action inconsistent with its educational purpose and mission, and nothing in this Constitution, or in the Bylaws or Regulations, shall authorize any such activity or action.

To further its educational purpose and mission, the Conference shall direct and organize interscholastic athletic competitions, conduct tournaments, and prescribe eligibility rules for contestants.  The Conference shall also facilitate and assist its member institutions in maintaining intercollegiate athletic programs compatible with the highest standards of education and competitive sports.  Through the orderly enactment and enforcement of legislation, the Conference aims:

(a)  To encourage sound academic practices for student-athletes;

(b)  To foster strong competition among the teams of its member institutions in a broad spectrum of amateur sports and championships;

(c)  To assure proper emphasis on the funding of athletic activities;

(d)  To stimulate good sportsmanship;

(e)  To provide leadership and a voice in the development of public attitudes toward intercollegiate sports generally; and

(f)  To address the future needs of athletics in a spirit of cooperation and mutual benefit of the member institutions and their student-athletes. [*Adopted: 6/15/06*]

CONSTITUTION, ARTICLE 2

# Principles for the Conduct of Intercollegiate Athletics

The Southeastern Conference subscribes to the principles for the conduct of intercollegiate athletics set forth in the NCAA Constitution and assists its member institutions in promoting these principles.

CONSTITUTION, ARTICLE 3

# SEC Membership

3.0      General Principle ................................................................................................................................................................ 3
3.1      Membership, Termination, Suspension and Dues ............................................................................................................... 3

## 3.0  GENERAL PRINCIPLE

The SEC is both a competitive body and a legislative body, as defined in Articles 3.02.1 and 3.02.2 of the NCAA Constitution.

## 3.1  MEMBERSHIP, TERMINATION, SUSPENSION

**\*3.1.1  Number of Members.**  The number of members of the Conference shall be set by the Chief Executive Officers. [*Revised: 5/30/91*]

**\*3.1.2  Granting of Membership.**  Membership may be granted by invitation of the Conference at a meeting of the Chief Executive Officers.  A vote of at least three-fourths of the members is required to extend an invitation for membership.  [*Revised: 5/30/91*] [*Clarified/Conformed: 6/1/11*]

**\*3.1.3  Suspension of Membership.**  Membership may be suspended at a meeting of the Chief Executive Officers.   A member may be suspended at any time by a vote of at least two-thirds of the members, either indefinitely or for a stated period, for any conduct deemed to be incompatible with membership.  [*Clarified/Conformed: 6/1/11*]

**\*3.1.4  Withdrawal from Membership.**  A member may only withdraw from membership in the Conference after providing written notice to the President and the Commissioner of the date of its withdrawal at least two years prior to the date on which the withdrawal will be effective. The withdrawal notice must specify a withdrawal date of July 15 in the year in which the withdrawal will be effective. [*Adopted: 1/14/21*]

(a)  A member shall be deemed to have withdrawn from the Conference if and when the member either (i) fails or refuses, or renounces its obligation, to field a team to compete in Conference football competition or basketball competition, or (ii) fails or refuses to fulfill or renounces its obligations to field teams and participate in Conference sports competitions and championships, including but not limited to its obligations under SEC Bylaws 22.1.1 or 22.1.2, as such SEC Bylaws may be renumbered or amended from time to time, or NCAA Bylaw 20.9.6, as such NCAA Bylaw may be renumbered or amended from time to time. Any determination that a deemed withdrawal has occurred shall be made by the Commissioner and shall specify the effective date of such deemed withdrawal (which date may be prior to the date of determination by the Commissioner).

(b)  In the event that, upon request of the member deemed to have withdrawn pursuant to Section 3.1.4(a), the Commissioner determines that a failure of the member to fulfill its obligations is attributable to and caused by circumstances or events beyond the reasonable control of the member, the member shall not be deemed to have withdrawn from the Conference under Section 3.1.4(a) and the prior determination of withdrawal shall be deemed rescinded, provided that the member comes into full compliance with such obligations at such time as the Commissioner determines that the circumstances or events no longer prevent fulfillment of such obligations.

(c)  Any member may appeal any determination of the Commissioner under this Section 3.1.4 to the Chief Executive Officers. A quorum of the Chief Executive Officers may, by a vote of a majority of all the Chief Executive Officers, reverse or modify any determination of the Commissioner. The Chief Executive Officer of a member that has failed, refused, or renounced its obligations shall be eligible to vote.

**\*3.1.5  Termination of Membership.**  Membership of a member may be terminated involuntarily at a meeting of the Chief Executive Officers. A vote of at least two-thirds of all the Chief Executive Officers is required to terminate membership. Any motion to terminate membership shall specify the effective date of the proposed termination. [*Revised: 1/14/21*]

**\*3.1.6  Effect of Withdrawal from or Termination of Membership.**  As of the effective date of the termination, withdrawal, or deemed withdrawal of a member of the Conference, such member shall not have a right to receive and will not be paid any distributions of revenue from the Conference, including but not limited to distributions pursuant to Bylaw 31. [*Adopted: 1/14/21*]

## 3.2  WITHDRAWAL FEE

*3.2.1  **Obligation to Pay Withdrawal Fee.** A member that provides notice of withdrawal from the Conference as required by Section 3.1.4 shall pay a withdrawal fee to the Conference of $30 million on or before the effective date of the withdrawal. [*Adopted: 1/14/21*]

*3.2.2  **Additional Withdrawal Fee.** A member that withdraws from the Conference without providing notice of withdrawal as required by Section 3.1.4 shall pay a withdrawal fee of $40 million to the Conference immediately upon providing notice of withdrawal (or if no notice is provided, as of the effective date of such withdrawal). [*Adopted: 1/14/21*]

*3.2.3  **Withdrawal Fee—Member Deemed to Have Withdrawn.** A member deemed to have withdrawn from the Conference shall pay a withdrawal fee of $45 million to the Conference immediately upon being informed that the Commissioner has determined that the member is deemed to have withdrawn. [*Adopted: 1/14/21*]

*3.2.4  **Reduction of Distributions to Withdrawing Member.** The Commissioner may, at any time (including prior to the effective date of any withdrawal or deemed withdrawal), reduce any distributions otherwise payable to a member that has provided notice of withdrawal or who has been deemed to have withdrawn, including but not limited to distributions otherwise provided for in Bylaw 31, and apply such distributions to the withdrawal fee payable by the member to the Conference. [*Adopted: 1/14/21*]

CONSTITUTION, ARTICLE 4

# Organization

4.1     Chief Executive Officers ................................................................................................................... 5
4.2     Conference Officers ......................................................................................................................... 5
4.3     Committees ...................................................................................................................................... 6
4.4     Commissioner .................................................................................................................................. 6

## 4.1   CHIEF EXECUTIVE OFFICERS

**\*4.1.1   Chief Executive Officers.**   The President or Chancellor of each member shall be a Chief Executive Officer of the Conference.  Accordingly, there shall be one Chief Executive Officer for each member.  The Chief Executive Officers shall act at the regular annual meeting of the Conference or at specially called meetings of the Conference, as set forth in Article 5. [*Clarified/Conformed/Renumbered 6/1/11*]

**\*4.1.2   Powers and Duties.**   The Chief Executive Officers shall have plenary power and authority with respect to all affairs of the Conference of any type or nature whatsoever, subject only to any specific provisions and restrictions imposed by the Constitution and Bylaws.  Without limitation, the Chief Executive Officers may: [*Revised/Clarified/Conformed/Renumbered 6/1/11*]

(a)   Take all actions specified and contemplated in Article 3, in their sole discretion.

(b)   Place on probation until the next regular annual meeting of the Conference any member that violates any provision of the Constitution, Bylaws, or other rules, regulations, legislation or policies of the Conference or of the NCAA (which probation shall be on such terms, conditions, restrictions, and pursuant to such other parameters as may be deemed appropriate under the circumstances);

(c)   Prohibit any member's team from being recognized as Conference champion;

(d)   Prohibit any member's team from participating in Conference sponsored games, events, meets or tournaments;

(e)   Prohibit any member's team from participating in pre-season or post-season athletic events, including Conference championships;

(f)   Prohibit any institution from participating in the distribution of Conference funds (including funds from bowls, television or tournaments);

(g)   Impose any other penalty which they consider appropriate; and

(h)   Hear and decide appeals from decisions and actions of the Commissioner and the Executive Committee in disciplinary and enforcement matters under procedures specified in the Bylaws.

## 4.2   CONFERENCE OFFICERS

**4.2.1   Composition.**   The three officers of the Conference shall be a President and a Vice-President, who shall be selected from the Chief Executive Officers, and a Secretary, who shall be a Faculty Athletics Representative.  [*Clarified/Conformed 6/1/11*]

**\*4.2.2   Election/Term of Office.**   The three officers shall be elected by the Chief Executive Officers at each regular annual meeting of the Conference, to take office immediately.  They shall be elected to serve for a period of one year, and the President and Vice-President shall not be eligible to serve for more than two terms in succession. The Secretary shall serve unlimited terms if so elected. Each officer shall be elected from a different member institution.  *[Revised: 5/30/91*] [*Clarified/Conformed 6/1/11*]

**4.2.3   Powers and Duties.** [*Clarified/Conformed 6/1/11*]

**4.2.3.1   President.**   The President shall preside at all meetings of the Conference and the Executive Committee, may call a meeting of the Conference or of the Executive Committee, shall be the official representative of the Conference in all its business and other relations with persons or organizations concerning intercollegiate athletics, and, in conjunction with the Commissioner, shall take such other actions and have such other authority as shall be directed/conferred by the Conference or the Executive Committee.

**4.2.3.2  Vice-President.**  The Vice-President shall perform the duties of the President in the latter's absence or disability and shall assist the President in the performance of Conference business when called upon to do so.

**4.2.3.3  Secretary.**  The Secretary shall keep the minutes of all meetings of the Conference and the Executive Committee.

## 4.3  COMMITTEES

**4.3.1  Executive Committee.**  There shall be an Executive Committee of the Conference.  The members of the Executive Committee shall be the three officers of the Conference and four individuals elected at the regular annual meeting of the Conference.  The four elected members shall be from different institutions and from institutions other than those of the three officers.  The four elected members shall serve staggered terms of no more than three years, as determined by the Conference, with at least one member rotating off each year.  One and only one of the elected members shall be a Chief Executive Officer who is not an officer of the Conference.  One and only one of the elected members shall be a Director of Athletics.  One and only one of the elected members shall be a Senior Woman Administrator or shall have primary responsibility for the administration of women's athletics.  One and only one of the elected members shall be a Faculty Representative.  [*Clarified/Conformed/Revised: 6/1/11*]

**4.3.1.1  Powers and Duties.**  The powers and duties of the Executive Committee shall be as follows: [*Clarified/Conformed: 6/1/11*]

(a)  It shall meet at the regular annual meeting of the Conference and at other times on the call of the President or the Commissioner;

(b)  It shall fix the times and the places of the regular annual meeting of the Conference;

(c)  It shall hear and decide appeals from Adverse Actions of the Commissioner in disciplinary and enforcement matters as is provided in Bylaw 19;

(d)  Between regular annual meetings, it shall fill any vacancy which may occur in any of the three officer positions or in its own membership;

(e)  Unless the Constitution or Bylaws require action by the Chief Executive Officers, and unless a meeting of the Chief Executive Officers is called, it shall, as necessary or appropriate, approve all contracts and agreements of the Conference, authorize or ratify actions of the Commissioner and otherwise determine and direct the policy of the Conference on any matter which may arise between regular annual meetings, if such matter cannot be disposed of satisfactorily by an existing rule or precedent;

(f)  It shall approve the annual operating budget of the Conference, and shall oversee all financial and fiscal affairs of the Conference as administered by the Commissioner; and

(g)  It shall take such other actions and make such other decisions as may be specified in other provisions in the Constitution, Bylaws, and Commissioner's Regulations.

**\*4.3.3 Special Committees.**  The Conference may create other regular or special committees from time to time. [*Clarified/Conformed/Renumbered: 6/1/11*]

## \*4.4  COMMISSIONER

**4.4.1  Election.**  The Commissioner shall be elected by a majority vote of the Chief Executive Officers at a regular or called meeting for a term not to exceed six years.  [*Revised: 5/30/91*] [*Clarified/Conformed: 6/1/11*]

**4.4.2  Authority, Duties and Responsibilities.** [*Revised/Clarified/Conformed: 6/1/11*]

(a)  The Commissioner shall be responsible for and have authority for the administration and operations of the Conference;

(b)  The Commissioner shall be charged with the duty of implementing, administering and enforcing the Constitution, Bylaws, and other rules, regulations, and legislation of the Conference and the NCAA, and shall be vested with broad discretionary authority to carry out the duties of the position, including the authority to assess penalties and sanctions as contemplated and authorized in the Constitution and Bylaws;

(c)  The Commissioner shall have authority to determine whether any student-athlete is eligible for intercollegiate athletic competition, athletically-related aid, and for practice in each sport in which a member institution sponsors a varsity or junior varsity team (whether the Conference declares a Champion in that sport or not), which authority shall include the power to declare a student-athlete ineligible as a result of a violation of any of the provisions of the Constitution, Bylaws, and other

rules, regulations, and legislation of the Conference and the NCAA, as well as the power and discretion to restore the eligibility of a student-athlete;

(d)  When it comes to the attention of the Commissioner that a student-athlete may be guilty of committing a flagrant, disqualifying foul on the field of play or at a contest site, or may be guilty of any unsportsmanlike act, the Commissioner may rule the student-athlete ineligible permanently or for a fixed period, or the Commissioner may, with or without publicity, warn the student-athlete and the student-athlete's coach and member institution that, if there is a repetition of such conduct, the student-athlete could be ruled ineligible permanently;

(e)  The Commissioner is the official Conference interpreter of Constitution, Bylaws, Commissioner's Regulations, and other rules, regulations, legislation and policies of the Conference and the NCAA;

(f)  The Commissioner shall present an operating budget to the Executive Committee each year for approval and shall act as custodian of all Conference funds;

(g)  The Commissioner shall furnish each member with copies of the Constitution and Bylaws annually and shall provide to all members copies of the minutes of all meetings of the Conference and Executive Committee as soon after the meetings as may be practicable;

(h)  The Commissioner shall arrange suitable accommodations for all in-person meetings of the Conference and the Executive Committee, and attend to such other details with reference thereto as may be necessary;

(i)  With the approval of the Executive Committee, the Commissioner may appoint and employ such personnel as may be necessary to the performance of the functions of the Conference office;

(j)  The Commissioner may call meetings of the Executive Committee or, after consultation with the President, of the Conference;

(k)  The Commissioner may enter into contracts and agreements on behalf of and to bind the Conference, either in specific instances as authorized by, or pursuant to authority generally granted by, the Chief Executive Officers or the Executive Committee; and

(l)  The Commissioner shall have authority to issue such interpretations, rules, regulations, memoranda, instructions, forms and procedures as may be necessary or appropriate in the performance of these duties, and in standardizing practices of the Conference, including memoranda or guidance to provide direction and information concerning the enforcement of the Constitution, Bylaws, and rules and regulations of the Conference and of the NCAA.

**4.4.3  Penalties and Sanctions.**  Without limitation, the Commissioner shall have the following powers and authority with respect to penalties and sanctions: [*Revised/Clarified/Conformed: 6/1/11*]

(a)  The Commissioner may impose a fine or other penalties or sanctions appropriate under the circumstances, in his or her discretion, against any member institution that violates any of the provisions of the Constitution, Bylaws, or other rules, regulations, or legislation of the Conference or the NCAA.

(b)  The Commissioner may impose a fine or other penalties or sanctions appropriate under the circumstances, in his or her discretion, against any Athletic Director, coach, or other member of the athletics department of a member institution who violates any of the provisions of the Constitution, Bylaws, or other rules, regulations, or legislation of the Conference or the NCAA.  The penalties that the Commissioner may impose include but are not limited to, singly or in combination:

  (1)  Suspension from contests or other athletically related activities;

  (2)  Limiting coaching duties, including those related to recruiting; and

  (3)  Public or private reprimands.

(c)  The Commissioner may declare ineligible, either permanently or for such shorter period as the Commissioner in his or her discretion may determine to be appropriate, any student-athlete or prospective student-athlete who violates (or who was actively involved in a violation of) any of the provisions of the provisions of the Constitution, Bylaws, or other rules, regulations, or legislation of the Conference or the NCAA.

(d)  The Commissioner shall impose a fine or other penalties or sanctions appropriate under the circumstances, in his or her discretion, against any staff member, sport program, or member institution who is found by the NCAA to have had impermissible recruiting contact with a student-athlete at another Conference institution. [*Adopted: 6/3/21*]

(e)  The Commissioner shall not impose the penalties/sanctions or take the actions contemplated or specified in Article 3 or in Article 4.1.2 (b) – (e), with respect to which authority is specifically reserved to the Chief Executive Officers.

CONSTITUTION, ARTICLE 5

# Legislative Authority and Process

5.0    General Principles..................................................................................................................8
5.1    Meetings of the Conference...................................................................................................8
5.2    Meetings of the Executive Committee...................................................................................9
5.3    Amendment and Suspension..................................................................................................9

## *5.0 GENERAL PRINCIPLES

**5.01.1  Governance.**  The Conference shall be governed by the Constitution, Bylaws, and other rules, regulations, and legislation of the Conference and the NCAA.

**5.01.2  Legislative Authority.**  All sports sponsored by members of the Conference shall be subject to the applicable academic provisions of the Conference's Constitution and Bylaws, including those sports in which the Conference does not sponsor a championship. [*Revised: 5/30/03 effective for student-athletes first entering a member institution on or after August 1, 2003*]

## 5.1  MEETINGS OF THE CONFERENCE [*Article 5.1 -- Revised/Clarified/Conformed 6/1/11*]

**5.1.1  Voting.**  Each member of the Conference shall be entitled to one vote at meetings of the Conference; provided, however, that a member may not vote if the member is not in good standing.  A vote of a majority of the members present and voting at a duly convened meeting at which a quorum is present shall constitute action of the Conference unless a supermajority vote is otherwise required by the Constitution or Bylaws.  A member shall not be in good standing if the member has been suspended from membership or if a vote has been taken at which its membership has been terminated.  The vote of each member shall be cast by the Chief Executive Officer who is the President or Chancellor of the member; provided, however, that a Chief Executive Officer may designate another representative of the member to attend and participate in meetings of the Conference and vote on behalf of the member.  References in the Constitution and Bylaws to action or a vote of the "Conference" indicates that an action or vote of the Chief Executive Officers, or their designees, is contemplated and required.  References in the Constitution and Bylaws to action being taken by the Conference indicate that action has been or shall be taken by the Chief Executive Officers, or their designees.

**5.1.2  Regular Annual Meeting.**  The Conference shall hold one regular annual meeting each calendar year.  This meeting shall be held in conjunction with the spring meeting of the Directors of Athletics.  The exact time and place shall be determined by the Executive Committee.

**5.1.3  Special Meetings.**  Special meetings of the Conference may be held from time to time, as necessary or appropriate.  Special meetings may be conducted/attended in person, by telephone/conference call, or by use of video-conferencing services if such services are arranged by the Commissioner.

**5.1.4  Authority to Call Special Meetings.**  The President or the Commissioner (acting in consultation with the President) may call a special meeting of the Conference.  In addition, upon the request of the Executive Committee or upon written request of at least a majority of the Chief Executive Officers of the Conference, the Commissioner shall call a special meeting of the Conference.

**5.1.5  Notice of Special Meetings.**  The President or Commissioner, as the case may be, shall provide notice of each special meeting that is reasonable under the circumstances giving rise to the meeting.  The notice shall, to the extent practicable, specify the nature of the matters to be considered at the meeting.

**5.1.6  Quorum.**  A majority of the members entitled to vote shall constitute a quorum at any meeting of the Conference.

**5.1.7  Parliamentary Procedure.**  Upon request, the parliamentary procedure of the Conference shall be governed by Robert's Rules of Order, Newly Revised.

**5.1.8  Order of Business.**  The usual order of business at regular annual meetings of the Conference shall be determined by the President in consultation with the Commissioner.

**5.1.9  Nature of all Meetings.**  All meetings of the Conference shall be transacted in executive session.

## 5.2  MEETINGS OF THE EXECUTIVE COMMITTEE [*Clarified/Conformed/Renumbered 6/1/11*]

**5.2.1   Meetings of the Executive Committee.**   The President or the Commissioner may call a meeting of the Executive Committee. Any member of the Committee employed by a member directly interested in any matter submitted to the Committee or under consideration by it shall be disqualified to participate in consideration of or vote with respect to the matter, and it shall be the duty of the presiding officer to appoint a disinterested representative to act in place of the party disqualified.

**5.2.2   Nature of Meetings of the Executive Committee.**   Open meetings of the Executive Committee may be held with the approval of a majority of the members of the Executive Committee, but all business of the Executive Committee shall be transacted in executive session.

**5.2.3   Quorum.**   A quorum of the Executive Committee shall consist of not less than four members, provided that one of the members must be a Chief Executive Officer.   Each member of the Committee shall be entitled to one vote.   The Executive Committee shall act in accordance with votes of a majority of its members unless a greater vote is otherwise required by the Constitution or Bylaws.

**5.2.4   Notice of Meetings of the Executive Committee.**   The President or Commissioner, as the case may be, shall provide notice of each Executive Committee meeting that is reasonable under the circumstances giving rise to the meeting.   The notice shall, to the extent practicable, specify the nature of the matters to be considered at the meeting.

## 5.3   AMENDMENT AND SUSPENSION   [*Clarified/Conformed/Renumbered/Revised: 6/1/11*]

**5.3.1   Amendment Process.**

**\*5.3.1.1   Amendment.** The provisions of the Constitution and Bylaws may be amended only at a meeting of the Conference. All proposed amendments to the Constitution or Bylaws must be submitted to all members in writing by the Commissioner not less than 21 calendar days prior to the meeting.

**\*5.3.1.2   Amendment to Amendment.**   A proposed amendment to a provision of the Constitution or Bylaws may be amended at any meeting.

**\*5.3.1.3   Voting Requirements.**   An amendment (or amendment to amendment) of a dominant provision (denoted by an asterisk in the margin of the provision) requires a two-thirds vote of all of the members of the Conference in good standing, whether all of the members of the Conference are present at or participating in the meeting or not.   All other amendments require a vote of a majority of all members of the Conference in good standing, whether all the members of the Conference are present at or participating in the meeting or not.

**\*5.3.1.4   Effective Date.**   All amendments shall become effective immediately unless a different date is specified.

CONSTITUTION, ARTICLE 6

# Institutional Control and Responsibility

6.1      Institutional Responsibility ................................................................................................................................... 10

## *6.1 INSTITUTIONAL RESPONSIBILITY

The Chief Executive Officer of each member of the Conference is charged with full responsibility for enforcing the Constitution, Bylaws, and other rules, regulations, and legislation of the Conference and the NCAA at his or her respective member institution.

BYLAW, ARTICLE 10

# Ethical Conduct

10.1   Statement of Purpose .................................................................................................. 11
10.2   Recruiting .................................................................................................................. 11
10.3   Academic Integrity .................................................................................................... 11
10.4   Game Management ..................................................................................................... 12
10.5   Sportsmanship ........................................................................................................... 12

The Southeastern Conference embraces the principles of ethical conduct stated in the NCAA Manual.

## 10.1  STATEMENT OF PURPOSE

The members of the Southeastern Conference subscribe to the principle that intercollegiate athletics is a legitimate and important part of higher education, is regarded as a significant part of the university culture, and shall be administered and conducted in a manner consistent with the institution's educational policies.  It is the function of the Conference to encourage intercollegiate athletics on an amateur basis with effective institutional control and to establish and promote standards of personal conduct for all those who administer and participate in Conference events.

Therefore, the Conference sets forth this code to maintain intercollegiate athletics in harmony with the essential educational purposes of the institution.  A spirit of mutual trust and cooperation is fundamental to the successful application of the rules of the Conference and this code of ethical behavior.

## 10.2  RECRUITING

**10.2.1**   Coaches shall comply with and promote compliance with all rules and regulations of the Conference and the NCAA and are accountable for the highest standards of honesty and integrity in order to provide a fair and equitable opportunity for each prospective student-athlete to make an informed and properly-considered commitment to the university of his/her choice. [*Clarified/Conformed 6/1/11*]

**10.2.2**   The right of a prospective student-athlete to obtain accurate information to aid in the decision process must be respected. Thus, no coach shall provide false or misleading information, or offer inducements that are violations of the rules or regulations of their member institution, the Conference, or the NCAA. [*Clarified/Conformed 6/1/11*]

**10.2.3**   Coaches and other member personnel shall advocate the positive advantages and attributes of their university and its intercollegiate athletics program and shall avoid making any derogatory statements concerning another member institution's athletics program, facilities or educational opportunities.

**10.2.4**   Coaches shall strictly adhere to all applicable rules related to the involvement of alumni and boosters in the recruiting of prospective student-athletes.

**10.2.5**   A request by a prospective student-athlete to be subjected to no further recruitment shall be respected.

## 10.3  ACADEMIC INTEGRITY

**10.3.1**   Coaches shall only recruit prospective student-athletes who have the necessary academic background to succeed as students at his/her member institution.  [*Clarified/Conformed 6/1/11*]

**10.3.2**   In determining a prospective student-athlete's initial eligibility status, each member institution shall be responsible for making every effort to assure that credentials utilized to determine eligibility are accurate and authentic.  [*Clarified/Conformed 6/1/11*]

**10.3.3**   Each member institution shall provide student-athletes access to sufficient academic support services and counseling to meet their academic needs.  [*Clarified/Conformed 6/1/11*]

**10.3.4**   Each member institution shall ensure that its coaches provide student-athletes the necessary time and resources to succeed academically in a meaningful degree program.  [*Clarified/Conformed 6/1/11*]

**10.3.5**   Each coach, in conjunction with the appropriate academic authorities, shall monitor each student-athlete's academic performance to ensure satisfactory progress and timely graduation with a meaningful college degree. [*Clarified/Conformed 6/1/11*]

## 10.4  GAME MANAGEMENT

**10.4.1**   Each contest shall be played and administered according to the prescribed rules set forth by the Conference and the NCAA.

**10.4.2**   The host member institution shall ensure that the visiting team has an equal opportunity to compete successfully.  The host member institution is solely responsible for providing adequate and appropriate crowd control, bench safety, access for communication and locker room security.  [*Clarified/Conformed 6/1/11*]

## 10.5  SPORTSMANSHIP

**10.5.1**   All institutional staff members and student-athletes of a member institution, shall conduct themselves with honesty and good sportsmanship.  Their behavior shall at all times reflect the standards of honor and dignity that characterize participation in the collegiate setting.  For intercollegiate athletics to promote the character development of participants, to enhance the integrity of higher education and to promote civility in society, coaches, student-athletes and all others associated with these athletics programs and events should adhere to such fundamental values as honor, respect, fairness, civility, honesty and responsibility.  These values should be manifest not only in athletics participation but also in the broad spectrum of activities affecting the athletics program.

It is the responsibility of each member institution to establish policies for sportsmanship and ethical conduct in intercollegiate athletics consistent with the educational mission and goals of the institution.  Furthermore, member institutions are responsible for educating all constituencies about these policies on a continuing basis.  [*Adopted: 6/4/0; effective 8/1/04, Revised: 6/1/18*]

**10.5.2**   Coaches and administrators shall refrain from public criticism of other member institutions, their staffs or players.  Coaches and administrators shall also refrain from making public statements and accusations with regard to infractions concerning member institutions and their personnel.  In response to questions by the media, it is appropriate to state that infractions are reported, investigated and addressed in accordance with established Conference and NCAA procedures.  [*Clarified/Conformed 6/1/11*]

**10.5.3**   Coaches, players and support personnel shall refrain from all public criticism of officials, which shall include making public any specific communications with the Conference office and/or officiating coordinators related to officiating.  [*Revised: 6/1/07*]

**10.5.4**   Coaches and support personnel shall provide favorable examples in appearance, conduct, language, and sportsmanship and shall refrain from personal conduct that may incite spectators.  [*Revised: 6/2/94*]

BYLAW, ARTICLE 12

# Amateurism

12.3     Interaction with Sports Agents .................................................................................................................................... 13

## 12.3  INTERACTION WITH SPORTS AGENTS

**12.3.1   Limitation on Access**.  A member institution shall not issue to a sports agent regular season or postseason game credentials in any sport that provide the individual with access to the sideline, locker rooms, or any area where contact with student-athletes may be possible.  [*Adopted: 6/4/04; effective 8/1/04*]

BYLAW, ARTICLE 13

# Recruiting

| | | |
|---|---|---|
| 13.6 | Official Visits | 14 |
| 13.7 | Unofficial Visits | 14 |
| 13.9 | Letter of Intent Programs, Financial Aid Agreements | 14 |
| 13.11 | Tryouts | 14 |

In general, the Conference rules and regulations governing recruiting shall be the rules and regulations of the NCAA as set forth in the NCAA Manual and official interpretations thereof.

## 13.01  ETHICAL CONDUCT IN RECRUITING [See SEC Bylaw 10.2]

## 13.1  REQUIREMENTS TO RECRUIT

**13.1 Requirements to Recruit – Rules Education.** An institutional staff member shall not engage in on or off-campus recruiting activities until the staff member has received rules education covering applicable NCAA and SEC legislation relating to the recruitment and eligibility of prospective student-athletes.  Continuing rules education must occur on an annual basis. [*Adopted: 6/3/22*]

## 13.6  OFFICIAL VISITS

**13.6.7.5 Student Host.** An individual used to host a prospective student-athlete during an official visit must be a full-time institutional staff member, a graduate assistant coach, or a current student-athlete in the prospective student-athlete's sport. [*Adopted: 10/8/18; effective 8/1/19*]

**13.6.7.5.1 Exception – Football.** A student designated in a manner consistent with the institution's policy for providing campus visits or tours to prospective students in general may be used to host a football prospective student-athlete at an institution's football stadium immediately prior to, during, and immediately following an institution's football contest. [*Adopted: 5/31/19; effective 8/1/19*]

## 13.7  UNOFFICIAL VISITS

**13.7.3.1.8 Student Host.** An individual used to host a prospective student-athlete during an unofficial visit arranged by or involving the athletics department (e.g., contact with athletics department staff, athletics-specific tour, complimentary admission) must be a full-time institutional staff member, a graduate assistant coach, or a current student-athlete in the prospective student-athlete's sport. [*Adopted: 10/8/18; effective 8/1/19*]

**13.7.3.1.8.1 Exception – Football.** A student designated in a manner consistent with the institution's policy for providing campus visits or tours to prospective students in general may be used to host a football prospective student-athlete at an institution's football stadium immediately prior to, during, and immediately following an institution's football contest. [*Adopted: 5/31/19; effective 8/1/19*]

## 13.11  TRYOUTS

**13.11.1.8  Non-Scholastic Football Events.** A member institution may not host, sponsor, or conduct non-scholastic football events (e.g., 7-on-7 football events) at any location, on or off campus.  [*Adopted: 6/3/11; effective 8/1/11*]

BYLAW, ARTICLE 14

# Eligibility: Academic and General Requirements

| | | |
|---|---|---|
| 14.01 | General Principles | 15 |
| 14.1 | General Eligibility Requirements | 15 |
| 14.2 | Seasons of Competition:  Five-Year Rule | 18 |
| 14.3 | Freshman Academic Requirements | 18 |
| 14.4 | Progress-Toward-Degree Requirements | 20 |
| 14.5 | Transfer Regulations | 20 |
| 14.10 | Certification of Eligibility | 21 |

## 14.01 GENERAL PRINCIPLES

**14.01.1  Compliance With Other NCAA and Conference Legislation.**  Each student-athlete of each member institution who competes in, or is on the roster of a team that competes in, intercollegiate varsity or junior varsity athletic competition must comply with the Constitution, Bylaws, and other rules, regulations, and legislation of the Conference and the NCAA applicable to his/her sport in order to be eligible for athletically-related aid, practice, or competition.   [*Renumbered/Clarified/Conformed 6/1/11*]

## 14.1 GENERAL ELIGIBILITY REQUIREMENTS

**14.1.1  Regular-Season and Postseason Competition.**  Unless otherwise specified in these Bylaws, regular-season and postseason eligibility rules for the Southeastern Conference are the same as the eligibility rules for NCAA championships.

**14.1.2.2  Validity of Academic Credentials.**  Each member institution bears primary responsibility for reviewing and ensuring the validity of the NCAA Eligibility Center certification of initial eligibility and the institution's certification of transfer eligibility for each prospective student-athlete ("PSA") who has been offered an athletics scholarship in accordance with this Bylaw 14.1.2.2.  [*Revised: 6/5/99; Revised: 6/2/06; Revised 6/1/2007; Revised 5/31/2013; effective August 1, 2013; for student-athletes initially enrolling full-time at a collegiate institution on or after August 1, 2013; Revised 6/3/16; Revised 6/2/17; effective 8/1/17*]

(a)  Each member institution must review and ensure that all academic credentials (including but not limited to transcripts and standardized test scores) (herein the "Credentials") supplied by a PSA to the NCAA Eligibility Center for initial eligibility certification, or to the institution for transfer eligibility certification are valid, accurate, and fairly reflect the academic abilities and qualifications of the PSA, whether the NCAA Eligibility Center challenges or specially reviews those Credentials or not.  [*Revised: 6/1/11; Revised: 6/2/17 effective 8/1/17*]

(b)  Each member institution shall establish and maintain its own process for the review of Credentials required by subsection (a) of this Bylaw 14.1.2.2.  The guidelines and policies governing such process shall be reduced to writing, and periodically revised and updated as appropriate.  A copy thereof shall be provided annually (on or about July 1) by each member institution's President or Chancellor to the Commissioner.

(c)  For PSAs who enroll at a member institution as an entering freshman with no previous full-time collegiate enrollment, even if a member institution has admitted a PSA and determined in accordance with its own process that the NCAA Eligibility Center certification of eligibility is based upon valid and accurate Credentials that fairly reflect the academic abilities and qualifications of the PSA, the member institution shall provide a special written report (the "Special Report") to the Commissioner, in accordance with subsections (d) and (e) of this Bylaw 14.1.2.2, concerning such PSA if: [*Revised: 6/2/17 effective 8/1/17, Revised: 6/1/18*]

(1)  Any one or more of the PSA's college entrance examination scores or subscores earned after September 1 of the PSA's junior year in high school varied (higher or lower) from any other college entrance examination score earned after September 1 of the PSA's junior year in high school in an amount equal to or greater than the Southeastern Conference Test Score Review Standard;

     (i)   The Southeastern Conference Test Score Review Standard is: A composite or subscore variance of one-sixth or more of the maximum possible score for that test. An institution may establish a more restrictive test score variance review standard at its discretion. [*Revised: 6/3/16*]

     (ii)   An institution is not required to provide a Special Report to the Commissioner for a PSA due to Bylaw 14.1.2.2 (c) (1) if:

        a.   The PSA is a qualifier without the use of the examination score (or subscore) that triggers Bylaw 14.1.2.2 (c)(1);

        b.   The PSA is an Early Academic Qualifier, pursuant to NCAA legislation or NCAA Eligibility Center policies; or

        c.   The variance between the PSA's highest triggering examination score (or subscore) and the PSA's next highest corresponding score (or subscore) is less than the Southeastern Conference Test Score Review Standard.

(2)   The PSA transfers or withdraws from high school in his or her senior year;

(3)   Core courses have been taken out of sequence by the PSA;

(4)   Revisions (other than to correct clerical errors) are made to the PSA's transcript that raise the PSA's grade in one or more core courses; or

(5)   The PSA has completed more than one core course through nontraditional means (e.g., virtual high school or a correspondence course) after his or her junior year of high school. [*Revised: 6/1/18*]

     (i)   An institution is not required to provide a Special Report to the Commissioner due to Bylaw 14.1.2.2 (c)(5) if the PSA is an Early Academic Qualifier, pursuant to NCAA legislation or NCAA Eligibility Center policies.

(d)  Each Special Report to be submitted to the Commissioner as required by subsection (c) of this Bylaw 14.1.2.2 shall:

(1)   Specify which of the numbered subparagraphs of subsection (c) of this Bylaw 14.1.2.2 triggered the requirement for a Special Report;

(2)   Attach complete and correct copies of all of the PSA's Credentials supplied to the NCAA Eligibility Center and to the SEC member institution;

(3)   Set forth in detail the review made by the member institution to determine whether the Credentials are valid, accurate, and fairly reflect the academic abilities and qualifications of the PSA;

(4)   Include such supporting material as is reasonably necessary and appropriate under the circumstances to establish that the PSA's Credentials are valid, accurate, and fairly reflect the academic abilities and qualifications of the PSA;

(5)   Be submitted no later than August 15 prior to the PSA's initial full time enrollment in a fall academic term, or not later than February 1 immediately following the PSA's initial full time enrollment in a spring academic term, or prior to the PSA's initial participation in intercollegiate competition, whichever is earlier. Waiver of this deadline may be granted by the Commissioner based on extenuating circumstances that prevent the report from being submitted in accordance with the deadline; [*Revised: 5/29/2009; Effective 8/1/2009*]

(6)   Include a certification by the President or Chancellor of the member institution affirming that he or she has personally reviewed and approved the Special Report and the decision made by the member institution concerning the admission of and eligibility of the PSA; and

(7)   The current street address and telephone number of the PSA.

(e)  The supporting material required by subparagraph (4) of subsection (d) of this Bylaw 14.1.2.2 shall include the following, to the extent applicable:

(1)   If, but only if, the requirement for a Special Report is triggered in whole or in part by numbered subparagraph (1) of subsection (c) of this Bylaw 14.1.2.2, the Special Report shall include verification of college entrance examination scores from the testing authority (i.e., College Board or the ACT, Inc.);

(2)   If, but only if, the requirement for a Special Report is triggered in whole or in part by numbered subparagraph (2) of subsection (c) of this Bylaw 14.1.2.2, the Special Report shall include a full and complete explanation of the

circumstances and cause for the withdrawal or transfer, and verification that the transfer was not for the purpose of avoiding inadequate grades in core course(s) or for the purpose of securing adequate grades in core course(s) without actually meeting the academic requirements of such course(s); and

(3)  If, but only if, the requirement for a Special Report is triggered in whole or in part by any of numbered subparagraphs (3) – (7) of subsection (c) of this Bylaw 14.1.2.2, the Special Report shall include verification that the PSA in fact properly completed and satisfied the academic requirements of all core courses and that the PSA's grades in those courses are valid, accurate, and fairly reflect the academic abilities and qualifications of the PSA.

The member institution may also include in the Special Report such additional information and materials as may be of assistance to the Commissioner in making the determination required under subsection (h) of this Bylaw 14.1.2.2.

(f)  The Special Report shall specifically call to the attention of the Commissioner and provide full and complete information concerning any known disabilities identified by the PSA that might bear on the validity of the Credentials of the PSA, or on the PSA's academic abilities and qualifications.  Prospective student-athletes with disabilities are subject to and must comply with the standards and procedures set forth in this Bylaw 14.1.2.2; provided, however, that (i) in satisfying such standards, such students may take advantage of any applicable NCAA or SEC Bylaws that have the purpose or effect of providing reasonable accommodation to disabled individuals, and (ii) the Commissioner may waive or modify the standards in this Bylaw 14.1.2.2, in his or her sole discretion, if and as necessary or appropriate to comply with applicable laws or regulations.  [*Revised: 6/1/08; effective 8/1/2008*]

(g)  Prior to the Commissioner determining pursuant to subsection (h) of this Bylaw 14.1.2.2 that a PSA is not eligible for intercollegiate athletic competition at a member institution, the Conference shall provide the PSA with a copy of the Special Report by overnight courier service (to the address of the PSA specified in the Report), along with a copy of this Bylaw 14.1.2.2.  The PSA may then submit any and all reasonable materials to the Commissioner that the PSA wants the Commissioner to consider, provided that the PSA's submission must be received by the Conference office within fifteen (15) calendar days after the Special Report is deposited with the overnight courier service for delivery to the PSA.  If the PSA submits materials to the Commissioner, the PSA shall simultaneously provide a copy of the entire submission to the SEC member institution at which the PSA proposes to participate in intercollegiate athletics.  In such event, the institution may, at its option, provide a supplemental submission of its own to Commissioner addressing any matter in the PSA's submission; provided that such supplemental submission must be furnished to the Commissioner, with a copy to the PSA at the address specified in the Report (or such other address as may be specified in the PSA's submission), within thirty (30) calendar days after the Special Report is deposited with the overnight courier service for delivery to the PSA.

(h)  As expeditiously as is reasonably feasible after receiving the Special Report and any submissions pursuant to subsection (g) of this Bylaw 14.1.2.2., the Commissioner shall issue a determination of the PSA's eligibility to compete in intercollegiate athletic competition, based on the following criteria:

(1)  The burden of demonstrating to the reasonable satisfaction of the Commissioner that the PSA's Credentials are valid, accurate, and fairly reflect the academic abilities and qualifications of the PSA shall be on the SEC member institution. If the SEC member institution fails to meet that burden, the Commissioner shall determine the PSA is ineligible.

(2)  The Commissioner shall not conduct an independent review, but shall base his or her determination on the Special Report and on any submission the PSA may choose to make pursuant to subsection (g) of this Bylaw 14.1.2.2.

(3)  The Special Report must adequately address and resolve all material factual issues concerning the validity and accuracy of the Credentials, or concerning whether those Credentials fairly reflect the academic abilities and qualifications of the PSA.

(4)  The Commissioner shall take into account and comply with any applicable legal requirements concerning the rights of persons with disabilities in making his or her determination.

The Commissioner's determination shall be final and not subject to appeal or review.

(i)  A PSA for whom a Special Report is required to be submitted pursuant to subsection (c) of this Bylaw 14.1.2.2 shall not be eligible to participate in intercollegiate athletic competition at a member institution unless and until the Commissioner has determined that the PSA is eligible as contemplated by subsection (h).

**14.1.16  Class Attendance Policies.**  Conference athletics departments shall establish class attendance policies for student-athletes. Each athletics department has discretion as to the nature and scope of the policy. Each athletics department shall provide a reasonable means for supervision and enforcement. These policies shall provide appropriate sanctions when the policy is violated.

The applicable athletic sanctions shall include suspension from competition. The policy shall annually be filed with the Conference office by October 1. [*Adopted: 6/1/2007 effective 8/1/2007*]

**14.1.17  Disciplinary Standards.**  Each member institution bears primary responsibility for monitoring the behavior of its current and prospective student-athletes and for establishing appropriate disciplinary standards in accordance with this bylaw. [*Adopted: 5/29/2015*]

(a)  Each member institution shall establish and maintain policies and procedures for monitoring student conduct issues.

(b)  Each member institution shall establish and maintain appropriate disciplinary standards for current student-athletes involved in student conduct issues.

**14.1.18  Serious Misconduct.**  A prospective student-athlete, including a transfer, who has been convicted of or pled guilty or no contest to a felony involving serious misconduct, or has been subject to official school disciplinary action at any time during enrollment at any previous educational institution (excluding limited discipline applied by a sports team or temporary disciplinary action during an investigation) due to serious misconduct (as defined herein) shall not be eligible for athletically-related financial aid, practice or competition at a member institution. An institution shall conduct an appropriate inquiry into a prospective student-athlete's background that at least satisfies the Conference's minimum due diligence expectations (see <u>Appendix B</u>) prior to providing the prospective student-athlete athletically-related financial aid or allowing him/her to participate or compete. Incidents of serious misconduct involving an enrolled student-athlete shall not be subject to these provisions.

For purposes of this provision, "serious misconduct" is defined as sexual assault, domestic violence, other forms of sexual violence, dating violence or stalking; or conduct of a nature that creates serious concerns about the safety of others. [*Adopted: 5/29/2015, Revised: 6/3/16, Revised: 6/1/18 effective 10/15/18*]

## 14.2  SEASONS OF COMPETITION: FIVE-YEAR RULE

**14.2.4  Hardship Waiver**.  In accordance with NCAA Bylaw 12.8.4, upon application to the Commissioner by a member institution, a student-athlete may be granted an additional year of varsity competition in accordance with the NCAA hardship rule. An application for hardship must be endorsed by the team physician, trainer and the Director of Athletics (or by a person acting for the Director of Athletics as his or her designee).

## 14.3  FRESHMAN ACADEMIC REQUIREMENTS

### 14.3.2  Eligibility for Financial Aid, Practice and Competition.

#### 14.3.2.1  Non-Qualifiers [*Revised: 6/1/95; Revised: 6/1/2008; effective 8/1/2008*]

(a)  A non-qualifier (as defined by NCAA Bylaw 14.3.2.1) who enrolls at a member institution shall not be eligible for athletically-related financial aid, or for practice or competition during his or her first year in residence. Such a student shall be eligible for non-athletics institutional financial aid that is not from an athletics source and is based on financial need only, consistent with institutional regulations. [*Revised: 6/1/95; Revised: 6/1/08; effective 8/1/08*]

(b)  A limited number (see limits in subsection 14.3.2.1(c) below) of student-athletes who enroll at a member institution as freshmen or as 4-4 transfer students and who are non-qualifiers (or were non-qualifiers at the time of their original enrollment in college) may become eligible for athletically-related financial aid, practice, and competition after their freshman year. Student-athletes who enroll at a member institution as freshman may become eligible for athletically related financial aid, practice, and competition after their freshman year, provided that (i) each such student presents an average high school GPA of at least 2.0 (as confirmed and certified by the NCAA Eligibility Center) in at least twelve core courses, and (ii) the Commissioner issues a favorable determination with respect to such student in accordance with the procedures set forth in subsection 14.3.2.1(g) below. Even though such non-qualifier may not receive athletically-related financial aid, the non-qualifier shall count in the institution's overall team financial aid limits. In equivalency sports, such non-qualifier shall count as one-half of a full athletic grant-in-aid the first year; in subsequent years, the actual grant-in-aid value shall count. 4-4 transfer students who were non-qualifiers at the time of their original enrollment in college may become eligible for athletically related financial aid, practice, and competition after their freshman year, provided that each such student meets the requirements of SEC Bylaw 14.5.5.6. [*Revised: 6/1/96 effective June 1, 1997 for those student-athletes first entering a member institution on or after Fall semester/quarter, 1997; Revised: 6/1/08; effective 8/1/2008*]

(c)  There shall be an annual limit on the number of student-athletes who are non-qualifiers and who may become eligible after their freshman year for athletically-related financial aid, practice, and competition, whether such student-athletes are enrolled as freshmen or as 4-4 transfer students. (These limits do not apply to two-year college transfer students, see

Bylaw 14.5.4.2.)  The limits, which are applied on an annual basis with no carry-over of unused numbers to following years, are set forth as follows:  [*Adopted: 6/5/99; Revised: 5/30/03; Revised: 6/1/08; effective 8/1/2008*]

For men's sports a total of four non-qualifiers enrolled in a particular academic year (either as first year students or 4-4 transfers) may become eligible to receive athletically-related financial aid, or for practice or competition.  Of these four, no more than two are permitted to become eligible in football, and no more than one may become eligible in any other sport.

For women's sports, a total of four non-qualifiers enrolled in a particular academic year (either as first year students or 4-4 transfers) may become eligible to receive athletically-related financial aid, or for practice or competition.  Of these four, no more than one may become eligible in any one sport.  [*Revised: 5/30/03 effective 8/1/2003*]

(d)  The annual limits set forth in subsection 14.3.2.1 (c) shall not apply to any student-athlete who has been certified by the NCAA as learning disabled and who is otherwise eligible hereunder. [*Adopted: 6/5/99*]

(e)  In the event that a member institution enrolls a  student-athlete as a freshman who is a non-qualifier and who does not present an average high school GPA of at least 2.0 (as confirmed and certified by the NCAA Eligibility Center) in at least twelve core courses, or in the event that the Commissioner issues an unfavorable determination with respect to any such student in accordance with the procedures set forth in subsection 14.3.2.1(g) below, such student may never become eligible for athletically-related financial aid, or for practice or competition, at such institution.  Before enrolling a student who may be affected by this Bylaw 14.3.2.1(e), the member institution should inform the student that SEC Bylaw 14.5 may afford the student a path to possible eligibility, in the event, for example, that the student chooses to attend a two year college.  If and to the extent otherwise allowed by NCAA Bylaws, a transfer student from a two year college may be eligible for athletically-related financial aid, practice, and competition for up to four years. [*Adopted: 6/1/08*]

(f)  Prospective student-athletes with disabilities are subject to and must satisfy the eligibility standards set forth in this Bylaw 14.3.2.1; provided, however, that (i) in satisfying such standards, such students may take advantage of NCAA Bylaws 14.3.1.2.1.2 and 14.3.1.2.5, and any other applicable NCAA or SEC Bylaws that have the purpose or effect of providing reasonable accommodation to disabled individuals, and (ii) the Commissioner may waive or modify the standards in this Bylaw 14.3.2.1, in his or her sole discretion, if and as necessary or appropriate to comply with applicable laws or regulations.  [*Adopted: 6/1/08; effective 8/1/2008*]

(g)  For each non-qualifier admitted pursuant to subsection 14.3.2.1(b) above other than 4-4 transfer students, at or before the time of the non-qualifier's enrollment, the member institution must submit a Special Report to the Commissioner with all of the information, data, and documentation listed in subsections (d)(2) - (d)(4) and (d)(6) - (d)(7) of Bylaw 14.1.2.2 (except that the President or Chancellor need make no certification concerning eligibility as is contemplated by the last phrase in subsection 14.1.2.2(d)(7)), as well as all of the information, data, and documentation listed in subsections 14.1.2.2(e)(2) and (3) if and to the extent applicable.  The Special Report shall also include the information described in subsection 14.1.2.2(f) if applicable.  The Commissioner shall review such Special Report under the standards and procedures set forth in subsection 14.1.2.2(g) and (h), and shall issue a determination whether the non-qualifier shall be allowed to become eligible for athletically-related financial aid, practice, and competition after completion of his or her freshman year in the event that the non-qualifier meets or exceeds all applicable academic performance requirements (and all other requirements) for eligibility [*Adopted: 6/1/0; effective 8/1/2008*]

(h)  The June 1, 2008 amendments to Article 14 (primarily including but not limited to the amendments to this Bylaw 14.3.2.1) shall be effective immediately for all prospective and current students; provided, however, that any requirements, conditions, or standards newly imposed by such amendments shall be waived by the Commissioner if and to the extent that the application of such new requirements, conditions, or standards would adversely affect the current or future eligibility (for athletically-related aid, practice or competition) of any student enrolled at a member institution as of September 15, 2007.  [*Adopted: 6/1/08; effective 8/1/2008*]

## 14.4   PROGRESS-TOWARD-DEGREE REQUIREMENTS

**14.4.10  Nontraditional Courses from Another Institution.**  A total of not more than nine semester or 12 quarter hours of nontraditional course work (e.g., distance-learning, correspondence, extension, Internet/visual courses, independent study or any other course or credit that is not earned in a face-to-face classroom environment with regular interaction between the instructor and the student) that is completed at another institution within an academic year (as defined by the certifying institution's official academic calendar) period may be used to fulfill the minimum satisfactory-progress requirements.  (See NCAA Bylaw 14.4.3.5.3) [*Revised: 6/2/17 effective 8/1/17; Revised: 6/3/21*]

## 14.5   TRANSFER REGULATIONS

### 14.5.4   Two-Year College Transfers.

**14.5.4.2 Non-qualifiers.** A non-qualifier, who initially enrolls at a two-year college and transfers to a member institution, shall not be eligible for competition during the individual's initial academic year in residence unless each of the following requirements have been met: [*Revised: 6/3/93; Revised: 6/1/08; Revised: 6/1/12, Revised: 6/3/21*]

(a) Attended the two-year college that granted the Associate or equivalent degree as a full-time student for the last three semesters or four quarters immediately prior to graduation from the institution granting the two-year degree (excluding summer terms); [*Revised: 6/1/02*]

(b) Correspondence, extension and distance learning courses used to fulfill the transferable English, Math and/or Science (when applicable) requirements of NCAA Bylaw 14.5.4.2, may only be completed at a two-year college where the individual is enrolled as a full-time student in pursuit of an Associate or equivalent degree.

### 14.5.5   Four-Year College Transfers.   See NCAA Bylaw 14.5.5.

**14.5.5.1   Transferring within the Southeastern Conference**. A transfer student from a member institution may be eligible for intercollegiate competition during the individual's initial academic year in residence at another member institution provided the student provides written notification of transfer to the institution by the following dates: [*Revised: 6/2/00; effective 8/1/2001; Revised: 6/1/08; Revised 6/3/21, effective 10/1/21*]

(a) Fall sports: February 1.

(b) Winter sports: May 1.

(c) Spring sports: July 1.

**14.5.5.6   Non-qualifiers.** A non-qualifier who initially enrolls at any other four-year institution and transfers to a member institution, shall not be eligible for competition during the individual's initial academic year in residence unless each of the following requirements have been met: [*Adopted: 6/3/93; Revised: 5/29/97 effective 8/1/1997; Revised: 6/1/08; Revised: 6/1/12; Revised 6/3/21*]

(a) The student must be in good academic standing at an accredited institution;

(b) The student must have either completed satisfactorily a minimum of 48 semester or 72 quarter hours with a cumulative grade point average of 2.00 of transferable degree credit accepted toward any baccalaureate degree program at the certifying institution, or earned a baccalaureate degree from the previous institution;

(c) The student must have attended the four-year institution for at least three semesters or four quarters (excluding summer terms) as a full-time student; and

(d) The student must have at least two seasons of competition remaining.

**14.5.5.6.1 Annual Limits.** A non-qualifier who initially enrolls at any other four-year institution and transfers to an SEC member institution shall be counted in the annual limits of non-qualifiers as specified in SEC Bylaw 14.3.2.1 [*Revised: 8/1/97; Revised: 6/1/08*]

**14.5.5.6.1.1 Graduated Student Exception.** A student-athlete who has earned a baccalaureate degree shall be exempt from the annual limits in SEC Bylaw 14.3.2.1 (c). [*Adopted: 6/1/2007; effective 8/1/2007 for student-athletes first enrolling at a member institution on or after 8/1/2007*]

**14.5.6 "4-2-4" College Transfers–Non-qualifiers.** A non-qualifier, regardless of sport, who initially enrolls at a non-Conference four-year institution, transfers to a junior college and then transfers to a member institution, shall not be eligible for competition during the individual's initial academic year in residence unless the junior college transfer requirements listed in SEC Bylaw 14.5.4 have been met. [*Revised: 6/3/93, Revised 6/3/21*]

**14.5.7 Waivers.** Prospective student-athletes with education impacting disabilities are subject to and must satisfy the eligibility standards set forth in this Bylaw 14.5; provided, however, that (i) in satisfying such standards, such students may take advantage of any applicable NCAA or SEC Bylaws that have the purpose or effect of providing reasonable accommodation to disabled individuals, and (ii) the Commissioner may waive or modify the standards in this Bylaw 14.5, in his or her sole discretion, if and as necessary or appropriate to comply with applicable laws or regulations. [*Adopted: 6/1/08; effective 8/1/2008*] [*Renumbered 6/1/11*]

## 14.10   CERTIFICATION OF ELIGIBILITY

### 14.10.1  Institutional Responsibility for Eligibility Certification.

**14.10.1.2  Certification of Eligibility Form**.  Before a student-athlete may compete in any intercollegiate contest, his/her eligibility must be certified to the Commissioner via a squad list form.  The appropriate institutional official shall certify the student-athlete's initial eligibility (freshman academic requirements or transfer requirements), continuing eligibility (progress toward degree), and financial aid. In addition, the process for confirming and certifying eligibility shall be approved by the Athletic Director and the Faculty Athletics Representative.  [*Revised: 6/1/11*]

**14.10.1.3  Certification of Eligibility Deadline.**  Each student-athlete must be initially certified prior to his/her first contest each academic year, whether or not this contest occurs prior to the academic term designated as the regular season for that sport.

**14.10.1.4  Certification of Continuing Eligibility in Additional Terms.**  The Commissioner shall be advised by the institution of the continuing eligibility of each student-athlete who will participate in sports during additional terms of the academic year after the initial annual certification.

BYLAW, ARTICLE 15

# Financial Aid

15.01    General Principles...................................................................................................................... 22
15.2     Elements of Financial Aid ........................................................................................................ 22
15.5     Maximum Institutional Grant-In-Aid Limitations by Sport ..................................................... 23

## 15.01  GENERAL PRINCIPLES

**15.01.1  Institutional Financial Aid Permitted.**  Any scholarship or financial aid to a student-athlete must be awarded in accordance with all NCAA and Conference regulations.  Full records detailing the source and distribution of all financial aid awarded to student-athletes participating in intercollegiate athletics shall be kept for a minimum of seven years.

**15.01.2  Eligibility of Student-Athletes for Institutional Financial Aid.**  Each member institution must have student-athletes receiving athletic aid execute either the official Conference Financial Aid Agreement, as provided by the Conference office, or an institutional financial aid form that provides full and complete disclosure of the terms pursuant to which the aid shall be awarded to ensure each student-athlete is fully and properly informed of the terms of the grant-in-aid.  A student-athlete who has signed an SEC Financial Aid Agreement with a member institution and is eligible to receive the athletic scholarship on the institution's first day of classes of the academic year specified on the financial aid agreement, but who does not enter that institution or who does enter and withdraws from that institution before fully completing his/her first semester or quarter (except when the recipient of an athletic scholarship award enters military service before enrolling in the awarding institution and remains in military service for a period of eighteen months or more), shall not be eligible to receive an athletics grant-in-aid during the student-athlete's first two years in residence at the second Conference institution.  [*Revised: 6/2/06; effective 8/1/2006*]

**15.01.2.1  Release from SEC Financial Aid Agreement.**  An individual who has requested and received a release from a signed SEC Financial Aid Agreement as approved by the Director of Athletics at the signing Conference institution shall no longer be subject to the terms of Bylaw 15.01.2 or the SEC Financial Aid Agreement. [*Adopted: 6/1/18*]

## 15.2  ELEMENTS OF FINANCIAL AID

**15.2.1  Summer Financial Aid**  A prospective student-athlete must be certified as a qualifier by the NCAA Eligibility Center prior to being awarded financial aid by a member institution for the summer term preceding initial collegiate enrollment at such member institution.  The student-athlete awarded the aid must have also been awarded aid for the upcoming fall term by the member institution.  The aid award must be to allow the student-athlete to become acclimated to the university setting and to advance academically prior to initial full-time enrollment at the certifying member institution.  The student-athlete must enroll in a minimum of three hours of academic course work (other than physical education activity courses) that is acceptable degree credit toward any of the member institution's degree programs.  Remedial, tutorial and noncredit courses may be used to satisfy the minimum three-hour requirement, provided the courses are considered by the member institution to be prerequisites for specific courses acceptable for any degree program and are given the same academic weight as other courses offered by the institution. [*Portions 6/3/05; Revised: 6/3/05; Revised: 6/1/11; Revised: 6/3/22*]

**15.2.2  Waivers.**  Notwithstanding the provisions of Bylaw 15.2.1, a prospective student-athlete not certified by the NCAA Eligibility Center may be provided with financial aid for the summer term preceding initial collegiate enrollment at the certifying member institution if the prospective student-athlete has:

(a)  Graduated from high school;

(b)  Successfully completed the required minimum number of core courses as required by NCAA Bylaw 14.3.1.1 or 14.3.1.2, and reported on the prospective student-athlete's high school transcript;

(c)  Achieved a high school core grade point average and standardized test score for a qualifier as required by NCAA Bylaw 14.3.1.1.2 or 14.3.1.2.1, and reported on the prospective student-athlete's high school transcript or testing agency score report;

(d)  Registered with the NCAA Eligibility Center;

(e)  Presented these credentials to the certifying institution prior to enrollment in the summer term; and

(f)   The certifying institution submits a written report to the Conference office by August 1 that lists all student-athletes receiving this waiver and the date the student-athlete was officially certified by the NCAA Eligibility Center.

## 15.5  MAXIMUM INSTITUTIONAL GRANT-IN-AID LIMITATIONS BY SPORT

**15.5.1.3  Counter Who Becomes Injured or Ill.**   In accordance with NCAA Bylaw 15.5.1.2, upon application to the Commissioner by a member institution, the exemption of an athletic scholarship counter from team limits may be granted by the Commissioner.  An application for hardship must be endorsed by the team physician, trainer and the Director of Athletics (or by a person acting for the Director of Athletics as his or her designee). [*Adopted: 6/3/11*]

BYLAW, ARTICLE 16

# Awards, Benefits, and Expenses for Enrolled Student-Athletes

16.2    Complimentary Admissions and Ticket Benefits ................................................................................................... 24

## 16.2    COMPLIMENTARY ADMISSIONS AND TICKET BENEFITS

### 16.2.1  Permissible Procedures.

#### 16.2.1.1 Institutional Events in the Student-Athlete's Sport.

##### 16.2.1.1.2    Exceptions – SEC Championships, NCAA Championships and Bowl Games.  Complimentary admissions for an SEC Championship, NCAA Championship or Bowl Game shall be provided only through a pass list for individuals designated by the student-athlete. Member institutions may provide six complimentary admissions to each individual listed as a member of the official traveling squad for an SEC Championship, NCAA Championship or Bowl Game.  No more than two admissions may be provided to non-traveling members of the squad.  [*Revised: 5/30/03; effective August 1, 2003; Revised: 6/4/2010; effective 8/1/2010*]

BYLAW, ARTICLE 17

# Playing and Practice Seasons

17.1     General Playing-Season Regulations................................................................................................................. 25
17.30    Playing Rules..................................................................................................................................................... 25

## 17.1   GENERAL PLAYING-SEASON REGULATIONS

**17.1.9  Southeastern Conference Limitation on Practice, Playing Season, Number of Contests and Squad Sizes.**  Practice, playing seasons, number of contests and squad sizes are governed by the following: [*Revised: 5/31/2013; effective 8/1/2013*]

(a)  In sports regulated by the Conference, limitations on practice, playing seasons, maximum contests, championships and tournaments, and squad sizes shall be governed by the Commissioner's Regulations and any modifications to such limitations shall be reported at the next regular meeting of the Chief Executive Officers; [*Revised: 5/29/15*]

(b)  An institution shall not schedule contests of any kind during a period beginning with the first scheduled final exam through the last scheduled final exam.  This bylaw does not apply to games scheduled by the Conference; [*Adopted: 6/4/04*]

(c)  In the sport of football, all practices, including intra-squad games, must be held on campus, or in the immediate campus community, except that this restriction does not apply to: (1) practices held in conjunction with postseason games or regular in-season games to be played away from home; or (2) spring practices and spring games held in a facility used at least twice during the applicable academic year for regular season home competition. In all other sports, the site of practice, including squad games, will be in accordance with NCAA rules; and

(d)  When regular season competition is conducted by divisional play, the divisions shall be as follows:

| EASTERN | WESTERN |
| --- | --- |
| Florida | Alabama |
| Georgia | Arkansas |
| Kentucky | Auburn |
| Missouri | LSU |
| South Carolina | Ole Miss |
| Tennessee | Mississippi State |
| Vanderbilt | Texas A&M |

BYLAW, ARTICLE 18

# Championships and Tournaments

18.8     Southeastern Conference Championships and Tournaments .................................................................................................... 26

## 18.8     SOUTHEASTERN CONFERENCE CHAMPIONSHIPS AND TOURNAMENTS

**18.8.1  General Regulations.**  Conference championships and tournaments are subject to the following:

(a)  Unless otherwise specified in the sections dealing with individual sports, Conference championships and tournaments shall be held in accordance with the Commissioner's Regulations for each sport;

(b)  Institutions participating shall assume full financial responsibilities;

(c)  It shall be the duty of the Conference member or members to which championships or tournaments are awarded to make all local arrangements for conducting the championships or tournaments.  The host institution shall keep a complete record of the contest and report to the Conference office;

(d)  All Conference championships and tournaments shall be open to only Conference teams;

(e)  In the sports of football, baseball, men's and women's basketball, gymnastics and soccer, a detailed financial report shall be made to the Conference office.  In all other championships and tournaments that are administered by a member institution, the host institution will assume full financial responsibilities and file a financial report with the Conference office; *[Revised: 6/3/93]*

(f)  The Conference office will provide trophies and awards for all sports in accordance with the Commissioner's Regulations governing each sport;

(g)  All Conference championships shall be scheduled during a time period that does not conflict with the final examination periods of any member institution.  A waiver of this bylaw shall be granted only upon the majority approval of the Executive Committee; and *[Revised: 6/1/96]*

(h)  All rules regarding selection of participants and seeding for the Conference championships shall be included in the Commissioner's Regulations for each sport. *[Adopted: 6/1/02] [Clarified 6/1/11]*

BYLAW, ARTICLE 19

# Compliance and Enforcement

19.8    Southeastern Conference Compliance Program ................................................................................................................ 27

## 19.8    SOUTHEASTERN CONFERENCE COMPLIANCE PROGRAM

### 19.8.1    General Provisions

**19.8.1.1 General Principles.**  The primary objective of the Conference compliance program is to help member institutions achieve compliance with the Constitution, Bylaws, and other rules, regulations, and legislation of the Conference and the NCAA (referred to collectively in this Article 19 as the "Rules") primarily through the exercise of educational programs and monitoring procedures.  Although a compliance program provides no guarantees of avoiding violations, it can help to ensure that problems that arise remain limited in scope and place the member institution in a better position to take appropriate self-corrective measures.

It is the goal of the Conference compliance program to eradicate willful violations of the Rules and to reduce, as much as possible, inadvertent violations of the Rules.  To achieve that end, the Conference will provide support services as appropriate to assist institutional staff members at member institutions in achieving a working knowledge of the Rules.  The Conference will also define standards of expected conduct and consequences for failure to comply with the Rules.  It should be emphasized that the provision of technical support and other resources by the Conference office does not relieve the member institutions from responsibility for Rules enforcement and compliance.  It is the obligation of each member institution to enforce and comply with the Rules.

Absent Conference approval to make a submission directly to the NCAA, member institutions shall submit all requests for interpretations of NCAA rules and regulations to the NCAA through the Commissioner's office.

**19.8.1.2 Hiring Practices.**  Member institutions shall exercise best efforts to hire individuals committed to rules compliance. In connection with this requirement, member institutions shall thoroughly evaluate an individual's record of rules compliance prior to offering employment for any coaching position or noncoaching position with sport-specific responsibilities.  While each member institution makes its own hiring decisions, member institutions shall, at a minimum, request specific information from each candidate concerning his/her rules compliance record and communicate with NCAA enforcement and the Conference office regarding the same prior to offering employment to any candidate.

In addition, where a member institution considers hiring an individual who has engaged in unethical conduct as defined under NCAA Bylaws or who has participated in activity that resulted, or may result, in a Level I, Level II or major infraction, the President or Chancellor of that member institution is expected to consult directly with the Commissioner prior to offering employment to the individual.

Each member institution must include in each contract with every athletic director, coach, senior woman administrator, and other employee of its athletic department a specific provision obligating the employee to comply with the Rules and specifying that the employee agrees to be bound by and will comply with the enforcement, penalty, and other disciplinary provisions and procedures of the NCAA and of the Conference, including but not limited to the provisions of Article 4 of the Constitution and of this Bylaw 19.8. [*Revised: 6/2/17*]

### 19.8.2    Enforcement and Compliance Procedures

#### 19.8.2.1    Reports of Alleged Violations.

(a)    Each member institution, and all employees of the member institution, shall comply with procedures developed and published by the Commissioner, with approval of the Chief Executive Officers, as such procedures shall be revised from time to time, concerning reporting violations and alleged violations of the Rules to the Conference.  In compliance with and if required to do so by such procedures, a member institution associated with any violation or alleged violation of the Rules must furnish report(s), including a full and complete final report, concerning such violation or alleged violation (and of any required investigation relating thereto) to the Commissioner.

(b)    Each member institution shall comply with procedures developed and published by the Commissioner, with approval of the Chief Executive Officers, as such procedures shall be revised from time to time, concerning reporting violations and alleged violations of the Rules to the NCAA.

(c) The Conference office shall not conduct its own investigations but may recommend, among other options, outside resources to work with a member institution in developing necessary information.

**19.8.2.2   Action by the Commissioner.**

(a) Upon receipt of the final report required by Bylaw 19.8.2.1(a), the Commissioner shall determine:

    (1) If the member institution conducted a thorough investigation;

    (2) If the determination made by the member institution is consistent with the information developed in its review of the allegations;

    (3) If the information substantiates that a violation of the Rules has occurred; and,

    (4) What, if any, penalties or sanctions should be imposed by the Conference, and whether any student-athlete should be suspended or ruled ineligible.

(b) If the Commissioner determines that penalties or sanctions should be imposed or that a student-athlete should be suspended or ruled ineligible, the Commissioner shall proceed to impose the penalties or sanctions, or issue notice that the student-athlete is suspended or ineligible, as authorized by and provided in Article 4 of the Constitution.

(c) The Commissioner, in his or her discretion, may postpone or decline to take action pending or subsequent to completion of an NCAA investigation and/or pending a decision by the NCAA concerning imposition of penalties or sanctions or determination of eligibility.

**19.8.2.3   Reinstatement of Eligibility.**

(a) A student-athlete, or the member at which a student-athlete is enrolled, may petition the Commissioner to reinstate the student-athlete's eligibility.

(b) The Commissioner may, in his or her discretion, restore a student-athlete's eligibility if, under all the facts and circumstances, the Commissioner concludes that reinstatement is appropriate.

**19.8.2.4   Appeals.**

**19.8.2.4.1**  Unless the Commissioner in his or her discretion stays or delays the effective date, all penalties, sanctions, eligibility determinations, and other enforcement or eligibility decisions or actions of the Commissioner shall become effective immediately upon notification to (i) the Athletic Director and the Chief Executive Officer of the member institution involved, and (ii) any student-athlete, coach, or other athletic department representative or employee affected thereby.

**19.8.2.4.2**  A member institution and any student-athlete, coach, or other athletic department representative or employee affected by a penalty, sanction, adverse eligibility determination, reinstatement determination, or other adverse enforcement or eligibility decision or action (all referred to collectively in the Constitution and Bylaws as an "Adverse Action") has the right to appeal the decision of the Commissioner to the Executive Committee and to further appeal any decision of the Executive Committee to the Conference (*i.e.*, to the Chief Executive Officers).

**19.8.2.4.3**  To appeal from an Adverse Action of the Commissioner as provided in Bylaw 19.8.2.4.2, the member institution or individual pursuing the appeal must:

(a) Submit a written notice of intent to appeal to the Commissioner within five calendar days after the date on which the Commissioner notifies the appellant of the Adverse Action; and

(b) Submit to the Commissioner (for distribution to the Executive Committee), within ten calendar days after submission of the written notice of intent to appeal, any written statements, documents, or other evidence or materials that the appellant wants the Executive Committee to consider.

    Unless good cause exists for denying or limiting an extension, the Commissioner, upon request, may extend, for no more than twenty calendar days, the time for submission of any written statements, documents, or other evidence or materials that the appellant wants the Executive Committee to consider.

**19.8.2.4.4**  To appeal from a decision of the Executive Committee as provided in Bylaw 19.8.2.4.2, the member institution or individual pursuing the appeal must:

(a) Submit a written notice of intent to appeal to the Commissioner within five calendar days after the date on which the appellant receives the decision of the Executive Committee; and

(b) Submit to the Commissioner (for distribution to the Chief Executive Officers), within ten calendar days after submission of the written notice of intent to appeal the decision of the Executive Committee, any written statements, documents, or other evidence or materials that the appellant wants the Chief Executive Officers to consider.

Unless good cause exists for denying or limiting an extension, the Commissioner, upon request, may extend, for no more than twenty calendar days, the time for submission of any written statements, documents, or other evidence or materials that the appellant wants the Executive Committee to consider.

**19.8.2.4.5** The Executive Committee and the Chief Executive Officers shall resolve appeals after considering the submissions of the appellant and after considering any submissions or information provided by the Commissioner, either upon his or her own initiative or upon request.

**19.8.2.4.6**   Unless the Commissioner in his or her discretion stays or delays the effective date after receiving notice of an appeal, any penalty, sanction, adverse eligibility determination, or other adverse enforcement or eligibility decision or action shall continue in effect pending appeals.

**19.8.2.5   Compliance Reviews and Legislative Services.**

(a) The Conference office may conduct compliance reviews of member institutions.  Each member institution must file a written response with the Conference office following receipt and review of a compliance review report. This written response shall address the issues identified in the report and will be required for submission to the Commissioner within 90 calendar days of receiving the report.

(b) The Conference office will provide legislative services, including but not limited to:

(1) Rules interpretations;

(2) Distribution of written legislative interpretation updates as well as other rules education materials;

(3) On-campus educational presentations to coaches and administrators; and

(4) Education seminars and programs, as necessary.

Member institutions should be aware that Conference office interpretations of the NCAA's Bylaws, and other rules, regulations, and legislation of the NCAA, are not binding upon the NCAA.

[*Article 19 was substantially revised on 6/1/11 to conform to practices and procedures previously adopted by the Conference.*]

BYLAW, ARTICLE 21

# Committees, Meetings, Events

21.8     Coaches' Meetings and Other Events ........................................................................................................................ 30
21.9     Sports Committees ........................................................................................................................................................ 30

## 21.8   COACHES' MEETINGS AND OTHER EVENTS

**21.8.1   Attendance.**  Each head coach in the Southeastern Conference is required to attend the following to the extent applicable to their sport:

(a)  Annual Coaches' Meeting;

(b)  Winter Meeting of Head Football Coaches;

(c)  Press Conferences at Conference Championships;

(d)  Coaches Luncheon at SEC Football Championship; and

(e)  Conference Media Day Event.

**21.8.2   Penalty.**  Should a coach not attend any of the events listed above, without the prior approval of the Commissioner, his or her member institution shall pay a $10,000 fine to the Conference.  [*Adopted: 6/4/04; Revised: 5/29/09; effective 8/1/2009; Renumbered, Relocated and Clarified 6/1/11*]

## 21.9   SPORTS COMMITTEES

**21.9.20  Southeastern Conference Sports Committees.**  Men's and women's sports committees are subject to the following:

(a)  There shall be a sports committee for each men's and each women's sport sponsored by the Conference.  The committee shall be composed of the head coaches of each institution sponsoring the sport.  The chair of the committee will be selected pursuant to the policies outlined in the Commissioner's Regulations for each sport. [*Revised: 6/1/95*]

(b)  The sports committees make recommendations to the Athletic Directors and/or Senior Woman Administrators on all aspects of their sport; and

(c)  The format and site of all coaches' meetings are to be determined by the Conference office, and each institution shall be represented by only the head coach. No alternative representation shall be permitted absent prior approval of the Commissioner. In track where there are two coaches, one representing men's teams and one representing women's teams, each institution shall be represented by at least one head coach.  Additionally, in swimming, the diving coach of the host institution for the subsequent year's championship may attend the meeting. [*Revised: 6/5/99*]

BYLAW, ARTICLE 22

# Media and Related Agreements

22.1     Media and Related Agreements ................................................................................................................................ 31

## 22.1  MEDIA AND RELATED AGREEMENTS

**\*22.1.1  Conference Agreements Govern**.  Each member shall include provisions in each of its television, media, internet and digital rights agreements specifying that the member's agreements are subject and subordinate to all past, present, and future television, media, internet and digital rights agreements to which the Conference is or becomes a party, and further specifying that if any provision in the member's agreement is inconsistent or conflicts with any Conference agreement, the Conference agreement shall supersede the provision in the member's agreement, such that the superseded provision shall be of no effect to the extent of any such inconsistency or conflict.  [*Clarified 6/1/11, Revised; 1/14/21*]

**\*22.1.2  Games and Telecasts.**   Each member must fully conform to and comply with all current broadcast guidelines and broadcast agreements of the Conference.  [*Moved and Clarified 6/1/11, Revised; 1/14/21*]

**\*22.1.3  Football Video.**  No member of the Conference shall make video recordings of football teams of other members except in games in which the member's team is participating.  [*Moved and Clarified 6/1/11, Revised; 1/14/21*]

BYLAW, ARTICLE 23

# DIVERSITY, EQUITY, AND INCLUSION INTIATIVES

23.1    Diversity, Equity, and Inclusion Initiatives ................................................................................................................ 32

## 23.1  DIVERSITY, EQUITY, AND INCLUSION INITIATIVES

**23.1.1    Athletics Leadership Roles at Member Institutions.** It is the expectation of the Conference for its member institutions to increase diversity and representation of historically underrepresented minority groups in leadership positions within their athletics departments, including by providing opportunities for historically underrepresented minorities to become athletics directors, head coaches and senior woman administrators (SWAs). In furtherance of this policy, member institutions must proactively evaluate their recruiting and employment processes to determine whether appropriate attention and focus is being directed toward identifying candidates from historically underrepresented minority groups, for the positions of athletics directors, head coaches, and SWAs, and in positions that prepare and position individuals for eventual employment in the role of athletics director, head coach, and SWA ("pipeline positions"). Member institutions must employ intentional efforts to identify and consider candidates from historically underrepresented minority groups who may be outside the professional, social, and societal networks of those frequently making hiring decisions on behalf of member institutions. [*Adopted: 6/3/21*]

**23.1.2    Consultation with Commissioner.** Although employment decisions for member institutions will not be and should not be made by the Conference office, in order to further and ensure appropriate attention to the policies and goals set forth explicitly and implicitly in this Bylaw Article 23, prior to commencing a search for candidates to be considered for the positions of athletics director, head coach, and SWA, each member institution shall contact the Commissioner (or, if the Commissioner so directs, a specified Associate Commissioner with respect to head coach positions) to discuss and address the efforts employed and results obtained by the member institution in (a) identifying candidates from historically underrepresented minority groups for the specific position under consideration and (b) more generally in identifying, recruiting, and placing candidates from historically underrepresented minority groups in pipeline positions. [*Adopted: 6/3/21*]

**23.1.3    Annual DE&I Training and Education.** The Commissioner shall develop and implement an annual training and education program for the athletics directors and senior staff of member institutions concerning and addressing diversity, equity, and inclusion in athletics, such as best practices for improving diversity in hiring and retention of talent, advancing workplace equity, and addressing implicit bias. The Commissioner shall, as appropriate, identify and retain consultants to provide guidance concerning such program and to provide training and education and shall provide updates to the Chief Executive Officers, on at least a quarterly basis, concerning the consultants retained and the implementation of the training and education program. [*Adopted: 6/3/21*]

**23.1.4    Leadership Development Program.** The Commissioner shall develop and implement a leadership development program for historically underrepresented minorities specifically focused on providing participants with networking and mentoring opportunities, and other developmental opportunities, in order to facilitate the creation of a larger pool of candidates to strengthen the pipeline for future leadership roles in the athletics department at member institutions. [*Adopted: 6/3/21*]

**23.1.5    Annual Certification and Compliance.** Each member institution shall provide written certification to the Commissioner on an annual basis of its compliance with requirements of this Bylaw in the substance and form reasonably requested by the Commissioner. Failure by a member institution to comply in good faith with the requirements of Section 23.1.2 will subject the member institution and its athletics director to imposition of penalties and sanctions as permitted under Section 4.4.3(a) and (b) of the Constitution. [*Adopted: 6/3/21*]

**23.1.6    Other Initiatives.** The Commissioner may implement other initiatives and measures to promote diversity, equity, and inclusion in athletics and across all sports at Conference member institutions under the direction of the Chief Executive Officers. [*Adopted: 6/3/21*]

ADMINISTRATIVE BYLAW, ARTICLE 30

# Administrative Regulations

| | | |
|---|---|---|
| 30.20 | Officiating | 33 |
| 30.22 | Provisions and Standards for Conference Sports | 33 |

## 30.20 OFFICIATING

### 30.20.1 Baseball, Basketball, Football, Soccer, Softball and Volleyball Officiating.

**30.20.1.1 Compensation of Officials for Baseball, Basketball, Football, Soccer, Softball and Volleyball.** The Athletic Directors will set the travel expenses and the maximum fees for officials for Conference varsity baseball, basketball, soccer, and softball and volleyball games and for regular-season football games. [*Revised: 6/1/01*]

**30.20.1.2 Approval, Evaluation and Assignment of Officials.** The retention and assignment of baseball, basketball, football, soccer, softball and volleyball officials shall be under the control of the Commissioner. The official records, assignments, and all reports on officiating and officials shall be kept in the Conference office. The coordinators of baseball, basketball, football, soccer, softball and volleyball officials shall be appointed by and under the direction of the Commissioner. The coordinators shall provide information concerning rule interpretations and mechanics of officiating; and approve, assign and evaluate officials for these sports. [*Revised: 6/1/01*]

**30.20.1.3 Commissioner's Regulations for Baseball, Basketball, Football, Soccer, Softball and Volleyball Officiating.** The Commissioner shall publish and keep current the Commissioner's Regulations for baseball, men's and women's basketball, football, soccer, softball and volleyball officiating in the Southeastern Conference. After approval by the Athletic Directors, these regulations shall establish the procedures for officiating the aforementioned sports. Recommendations for revisions shall be received by the Commissioner from the officials, the coaches and other institutional representatives. No substantive revisions, however, shall become effective until approved by the Athletic Directors. [*Revised: 6/1/01*]

### 30.20.2 Officiating for Sports Other than Baseball, Basketball, Football, Soccer, Softball and Volleyball.

**30.20.2.1 Regular-Season Competition.** The approval and assignment of officials for regular-season competition of all sports, other than baseball, basketball, football, soccer, softball and volleyball shall be the responsibility of the host institution. [*Revised: 6/1/01*]

**30.20.2.2 Conference Championships.** The approval and assignment of officials for Conference championships and tournaments shall be coordinated between the responsible coaches' committee and the host institution. Final approval for the assignment and selection of the officials for these championships and tournaments must be received from the Commissioner's office.

## 30.22 PROVISIONS AND STANDARDS FOR CONFERENCE SPORTS

### 30.22.1 General Information.

**30.22.1.1 Regulated Sports.** At least one-fourth (25%) of the member institutions of the Conference must sponsor teams in a sport for that sport to be regulated by the Conference and for a Conference champion to be declared. The sports currently regulated by the Conference are: Men's sports--baseball, basketball, cross country, football, golf, indoor track, outdoor track, swimming and tennis; Women's sports--basketball, cross country, equestrian, golf, gymnastics, indoor track, outdoor track, soccer, softball, swimming, tennis and volleyball. [*Revised: 6/1/12*]

**30.22.1.2 Varsity and Junior-Varsity Sports.** Varsity and junior-varsity sports must satisfy the following:

(a) Varsity and junior-varsity teams in all sports may be composed of freshmen and/or upper-classmen;

(b) A student-athlete who participates on a team of one classification may not participate on a team of a different classification on the same day; and

(c) An institution shall organize no more than one freshman or junior varsity team in any given sport.

**30.22.1.3 Conference Championships.** Conference championships are subject to the following:

(a) A Conference champion shall be determined annually in each of the sports listed in Bylaw 30.22.1.1. The method of determining the Conference champion for each of these sports shall be provided for in the Commissioner's Regulations of

each sport. When two institutions tie for a championship and no championship play-off is held, these institutions shall be declared co-champions; and

(b) A member institution's team or teams, prohibited by the Conference or the NCAA from participating in postseason competition in a given sport, shall not be eligible for a Conference championship and participation in a Conference season-ending event (e.g., game, tournament, meet) in that sport for the duration of this prohibition. [*Revised: 6/1/12*]

### 30.22.1.4 Athletes-of-the-Year, Scholar-Athletes-of-the-Year and Community Service Leaders of the Year.

(a) **Male and Female, Roy F. Kramer Athlete-of-the-Year Awards**. There shall be an award for the SEC Male and Female Athlete-of-the-Year. Each institution's Athletic Director will submit one nomination for each award. Each Athletic Director will receive one ballot for the male and one ballot for the female athlete-of-the-year. Each institution will cast one ballot for the male and one ballot for the female and will not be allowed to vote for its own nominee. The Conference shall pay travel expenses for each Roy F. Kramer Athlete-of-the-Year award recipient and two members of each award recipient's family to attend the award presentation held in conjunction with the SEC Football Championship. [*Revised: 6/3/05*]

(b) **Male and Female, H. Boyd McWhorter Scholar Athlete-of-the-Year**. There shall be a postgraduate scholarship award for the SEC Male and Female Scholar-Athlete-of-the-Year. Each institution shall nominate one male and one female student-athlete for the award, with the ultimate selection of the two winners being made by the Faculty Athletics Representative Selection Committee. Twenty-six additional awards, entitled SEC Postgraduate Scholarship Awards, shall be given each academic year to the institutional nominees not selected as the SEC Male and Female Scholar-Athlete-of-the-Year. The SEC Male and Female Scholar-Athlete-of-the-Year shall each be awarded a $20,000 scholarship. The SEC Postgraduate Scholarship Award recipients shall each receive a $10,000 scholarship. The Conference shall pay travel expenses for each H. Boyd McWhorter Scholar Athlete-of-the-Year award recipient and two members of each award recipient's family to attend the award presentation held in conjunction with the Conference annual meetings. [*Revised: 6/3/05; Revised: 5/29/98 effective June 1, 1998; Revised 6/2/17*]

(c) **Male and Female, Brad Davis Community Service Leaders of the Year**. There shall be a postgraduate scholarship award for the SEC Male and Female Community Service Leaders of the Year who demonstrate the most outstanding and meritorious community service achievements during their entire college careers. Each institution shall nominate one male and one female student-athlete for the award, with the ultimate selection of the two winners being made by the Faculty Athletics Representatives Selection Committee. Twenty-six additional awards shall be given each academic year to the institutional nominees not selected as the SEC Brad Davis Community Service Leaders of the Year. The Male and Female SEC Brad Davis Community Service Leaders of the Year shall each receive a $15,000 scholarship. The Community Service Scholarship recipients shall each receive a $7,500 scholarship. The Conference shall pay travel expenses for each Brad Davis Community Service Leader of the Year award recipient and two members of each award recipient's family to attend the award presentation held in conjunction with the Conference annual meetings. [*Revised: 6/1/01; Revised: 6/3/05; Revised: 6/3/11; effective 8/1/11; Revised: 6/3/22*]

(d) **Michael L. Slive Distinguished Service Award.** Awarded on special occasions when an outstanding candidate(s) emerges, the Michael L. Slive Distinguished Service Award will be recognized as one of the Conference's most prestigious honors. The recipient, a former student-athlete, coach, graduate or administrator of a member institution or the Conference office, must be a person of exemplary character and outstanding accomplishment who has maintained a lifetime of interest in college athletics and who, over a significant period of time, has exhibited superior leadership qualities and made a significant impact to the betterment of the mission of the Southeastern Conference. Administrative groups associated with the Conference, such as Presidents and Chancellors, Faculty Athletics Representatives, Athletics Directors, and Senior Woman Administrators, as well as individuals, such as former recipients, coaches, administrators, and other campus leaders may provide nominations to the Commissioner. Selection of the recipient shall be made by unanimous approval of a special five-member committee appointed by the Commissioner. The award shall be presented to deserving candidates at the Conference annual meetings. [*Revised: 12/13/16*]

### 30.22.1.5 Playing Conditions. Playing conditions at Conference contests are governed by the SEC Game Management Manual and by the following:

(a) The host institution is charged with the responsibility of providing satisfactory playing conditions, providing the best possible protection for the public and officials, and using its facilities for producing an atmosphere of good sportsmanship. The Commissioner will periodically distribute information regarding crowd-control procedures;

(b) Contests televised under Conference television contracts shall have game times established in accordance with those contracts. For all other contests, except as noted in the Commissioner's Regulations, the host institution shall set the starting times of contests and so notify the visiting team well in advance;

(c) At football games, artificial noise makers shall not be brought into or used in any sports venue during games between member institutions, other than contests played on the campus of an institution with a traditional institutional noise maker. Each institution should have statements printed on tickets and notices to the effect that such noisemakers will not be permitted inside its competition areas. Penalties for violations of this provision are set forth in the Commissioner's Regulations; [*Revised: 6/1/02; Revised: 6/4/2010; Effective 6/4/2010; Revised: 6/1/12; Revised: 5/29/15*]

(d) At football games the use of amplifiers, microphones, and megaphones shall be restricted to the cheerleaders of the institutions participating, directed only toward the stands and shall not be used from the time the offensive center puts a hand on the football until the football has been snapped.  Additionally, the use of institutionally controlled computerized sound systems (including music), institutionally controlled artificial noisemakers and any traditional institutional noise maker shall not play from the time the offensive center puts a hand on the football until the officials whistle the play dead. Bands shall not play from the time the offensive center puts a hand on the football until the football has been snapped.  In no case may music be played which may be construed to be derogatory toward the visiting team or the game officials. Physical distractions (e.g., artificial noisemakers, portable amplifiers or the main stadium public address) shall not be used by cheerleaders while either team is on the field (warm-ups or competition). An institution shall submit to the Commissioner an annual use plan explaining how traditional institutional noise makers shall be governed to ensure compliance with SEC Bylaw 30.22.1.5 (d). Penalties for use of traditional institutional noise makers in violation of this provision or failure to adhere to the institution's management plan for traditional institutional noise makers shall be set forth in the Commissioner's Regulations governing the sport of football; and [*Revised: 6/4/2010 effective 6/4/2010, Revised: 6/1/12, Revised: 5/30/14 effective 8/1/14, Revised: 6/1/18*]

(e) In sports other than football, the use of artificial noisemakers shall be governed by the Commissioner's Regulations for each sport.  Penalties for violations of this provision are also set forth in the Commissioner's Regulations for each sport. [*Revised: 5/29/15*]

ADMINISTRATIVE BYLAW, ARTICLE 31

# Executive Regulations

| | | |
|---|---|---|
| 31.10 | Payment of Debt Service | 36 |
| 31.20 | Revenue Distribution - Basketball | 36 |
| 31.21 | Revenue Distribution - Football | 37 |
| 31.22 | Revenue Distribution - Baseball | 38 |
| 31.23 | Revenue Distribution - All Other Sports | 38 |
| 31.24 | Distribution of NCAA Sport Sponsorship and Grants-in-Aid Funds | 38 |
| 31.25 | Distribution of NCAA Academic Values-Based Revenue Funds | 38 |
| 31.26 | Automatic Restriction against Participation in Distribution of Conference Funds | 38 |

The Southeastern Conference Executive Committee has issued the following policy statement relative to these revenues:  All basketball and football revenues received by the member institutions which are to be sent to the Conference office for further distribution should be received in the Conference office within 40 calendar days of receipt by the institution or by April 1 whichever is earlier.  Any such revenue received after April 1 shall be remitted within 10 calendar days after receipt by the institution.

## *31.10 PAYMENT OF DEBT SERVICE

**31.10.1  Payment of Debt Service.**  Before any revenues of the Conference are allocated and distributed as otherwise provided in this Bylaw, the Commissioner shall make provision for payment of principal, interest, fees and any other amounts payable with respect to any outstanding indebtedness of the Conference when and as such amounts become due.  The Conference shall make provision for such debt service amounts first from the revenues received by the Conference under its media agreements (allocated among the media agreements and sports as determined by the Commissioner), and if the revenues from the media agreements are not sufficient, from other revenues of the Conference as determined by the Commissioner. [*Adopted: 1/14/21*]

## 31.20 REVENUE DISTRIBUTION - BASKETBALL

**31.20.1  Distribution of Revenue Generated by Basketball.**  The following basketball revenue received by the Conference office for distribution each year shall be divided into 15 equal shares with one share being retained by the Conference office and one share being distributed to each member institution.

(a) Basketball Television - All revenue derived from national network and national cable basketball telecasts will be divided by the following formula:  [*Revised: 6/1/95*]

All revenue shall be divided into 15 equal shares, with one share being distributed to each member institution and one share being distributed to the Conference.  [*Revised: 6/1/995*; *Revised: 5/29/09; effective 8/1/2009*]

(b) NCAA Men's Championship Basketball Tournament - Each member institution shall receive $45 per mile one-way from its campus to the competition site for each round of the tournament in which they participate.  In addition, each member institution shall receive one payment of $100,000 for appearing in the Preliminary, First, and/or Second Round, an additional one payment of $125,000 for appearing in the Regional Semifinals and/or Regional Finals, and an additional one payment of $300,000 for appearing in the Final Four.  Funds from the participation pool of the Men's NCAA Basketball Tournament shall be used to provide these payments.  All remaining revenue from the NCAA Basketball Tournament from the participation pool, shall be divided into 15 equal shares with one share to each member institution and one share to the Conference office.  [*Revised: 5/29/98 effective June 1, 1998; Revised: 6/2/00; Revised: 5/30/03; Revised: 6/1/11; Revised: 10/3/14; Revised: 6/3/16; Revised: 6/2/17*]

(c) Southeastern Conference Men's Basketball Tournament.  Revenues received by the Conference office each year for the Men's Basketball Tournament shall be divided as follows: [*Revised: 5/29/98; effective 6/1/1998*]

Any revenue above full expenses of the participating teams as set forth in the Commissioner's Regulations shall be divided into 15 equal shares, with one share to each member institution and one share to the Conference.

(d) Southeastern Conference Women's Basketball Tournament.  Revenues received by the Conference office each year for Women's Basketball shall be divided as follows: [*Revised: 6/1/98*]

Any revenue above full expenses of the participating teams as set forth in the Commissioner's Regulations shall be divided into 15 equal shares, with one share to each member institution and one share to the Conference.

## 31.21 REVENUE DISTRIBUTION - FOOTBALL

**31.21.1  Distribution of Bowl Game Receipts.**  Distribution of revenue (after allowable deductions) generated from member institutions participating in bowl games shall be reviewed on an annual basis and determined as follows:  [*Revised: 6/1/95; Revised: 6/2/06; effective 8/1/2006; Revised: 5/31/2013; effective 8/1/2013; Revised: 6/2/17*]

(a)  For bowl games providing receipts which result in a balance of less than $1,500,000, the participating institution shall retain $1,050,000, plus a travel allowance as determined by the SEC Executive Committee.  The remainder shall be remitted to the Commissioner and shall be divided into 15 equal shares with one share to the Conference and one share to each member institution. [*Revised: 6/1/02; Revised: 6/2/06; effective 8/1/2006; Revised: 5/29/09; effective 8/1/2009; Revised: 5/31/2013; effective 8/1/2013; Revised: 5/30/14; effective 8/1/2014; Revised: 6/3/16; effective 8/1/2016, Revised: 6/1/18*]

(b)  For bowl games providing receipts which result in a balance between $1,500,000 and $3,999,999, the participating institution shall retain $1,325,000, plus a travel allowance as determined by the SEC Executive Committee. The remainder shall be remitted to the Commissioner and shall be divided into 15 equal shares, with one share to the Conference and one share to each member institution.  [*Revised: 6/1/02; Revised: 6/2/06; effective 8/1/2006; Revised: 5/29/09; effective 8/1/2009; Revised: 5/31/2013; effective 8/1/2013; Revised: 5/30/2014; effective 8/1/2014; Revised: 6/3/16; effective 8/1/2016, Revised: 6/1/18*]

(c)  For bowl games providing receipts which result in a balance between $4,000,000 and $5,999,999, the participating institution shall retain $1,525,000, plus a travel allowance as determined by the SEC Executive Committee. The remainder shall be remitted to the Commissioner and shall be divided into 15 equal shares, with one share to the Conference and one share to each member institution.  [*Revised: 6/1/02; Revised: 6/2/06; effective 8/1/2006; Revised: 5/29/09; effective 8/1/2009; Revised: 5/31/2013; effective 8/1/2013; Revised: 5/30/2014; effective 8/1/2014; Revised: 6/3/16; effective 8/1/2016, Revised: 6/1/18*]

(d)  For bowl games providing receipts which result in a balance of $6,000,000 or more and all College Football Playoff games, the participating institution shall receive $2,050,000 ($2,050,000 if the SEC team is a participant in the College Football Playoff semi-finals game; an additional $2,150,000 if the SEC team is also a participant in the College Football Playoff championship game, which determines the National Champion), plus a travel allowance as determined by the SEC Executive Committee. Institutions participating in a College Football Playoff game may also request additional travel expenses, which may be granted to such institution at the Commissioner's discretion. The remainder shall be remitted to the Commissioner and shall be divided into 15 equal shares, with one share to the Conference and one share to each member institution.  [*Revised: 6/1/02; Revised: 6/2/06; effective 8/1/2006; Revised: 5/29/09; effective 8/1/2009; Revised: 5/31/2013; effective 8/1/2013; Revised: 5/30/2014; effective 8/1/2014; Revised: 6/3/16; effective 8/1/2016, Revised: 6/1/18*]

(e)  Bowl Revenue Protection Insurance shall be deducted prior to Conference distribution. [*Adopted: 6/1/02; Revised: and Effective 6/4/2010; Revised: 5/31/2013; effective 8/1/2013; Revised: 5/30/2014; effective 8/1/2014; Revised: 6/3/16; effective 8/1/2016*]

(f)  The cost of unused tickets up to the contractually guaranteed ticket purchase number shall be deducted prior to Conference distribution for all bowl games providing receipts of $6 million or more. For bowl games providing receipts of less than $6 million, the participating institution shall be fully responsible for the contractually guaranteed ticket purchase number. [*Adopted: 6/2/17; Revised: 5/28/20*]

(g)  For bowl games in which a member institution participates as an "alternate" (*e.g.*, 5-7 team) under NCAA Postseason Bowl Game requirements, the participating institution shall retain all revenue distributed by the bowl. The participating institution shall not receive a base retainage or travel allowance as set forth in subsections (a) through (d) above.  The participating institution shall also be fully responsible for the contractually guaranteed ticket purchase number and any other expenses associated with participation in the bowl. [*Adopted: 6/2/17*]

**31.21.2  Distribution of Football Television Receipts**.  Distribution of revenue generated from football television shall be as follows: [*Revised: 6/1/96*]

(a)  A member institution appearing in a non-conference home game or a conference vs. conference game played on a non-traditional playing date to meet contractual commitments or to accommodate a request by the Conference office shall receive an appearance fee of $300,000 as the home team; and [*Revised: 6/4/04; Revised: 6/1/2007; Revised: 5/29/09; effective 8/1/2009; Revised: 6/3/11; effective 8/1/11*]

(b)  All remaining revenue shall be divided into 15 equal shares with one share being distributed to each member institution and one share being distributed to the Conference.

**31.21.3  Football Championship Game Revenue.**  All revenue remaining from the championship game after expenses of planning and conducting the event have been deducted shall be divided as follows:  [*Revised: 6/3/93*]

(a) Each participating institution shall be reimbursed for the actual cost of transporting an official party of 150 (including student-athletes, coaches, administrators, cheerleaders, bands, etc.) to the site (air or bus travel from campus to the site; local transportation is not included). This amount shall be approved in advance by the Conference office and must be supported by actual invoices. In addition, each participating institution shall receive $275,000 to cover all costs associated with institutional lodging, meals, local transportation and all other expenses related to the championship. Each participating institution will be financially responsible for payment for 150 rooms for two nights at the designated team headquarters hotel; [*Revised: 6/1/95; Revised: 6/1/96; Revised: 6/3/05; Revised: 6/1/12*]

(b) Each participating institution shall receive a band/cheerleader travel allowance of $50 per mile, one-way from its campus to the site (according to Rand-McNally Mileage Chart).  Each institution shall be financially responsible for 100 rooms for two nights at its designated band hotel; [*Revised: 6/1/95; Revised: 6/1/96; Revised: 6/1/07*]

(c) Each participating institution shall be reimbursed for the actual cost of all player/guest admissions actually used by student-athletes (up to six per student-athlete) listed on the institution's official Championship traveling squad; [*Adopted: 6/3/16; effective 8/1/16*]

(d) All remaining revenue shall be divided into 15 equal shares, with one share distributed to each member institution and one share to the Conference office; and

(e) Institutions may petition to the Executive Committee prior to the game for an increase in the travel allowance only in   the event actual expenses exceed the designated amount.

## 31.22 REVENUE DISTRIBUTION - BASEBALL

**31.22.1  Distribution of Revenue Generated by Baseball.**  Revenues received by the Conference office each year for baseball shall be divided as follows:

SEC Baseball Tournament - All guaranteed revenues shall be divided as follows:

(a) Each participating institution will be provided a per diem of $75 per day for up to 30 individuals for each day the institution plays a game.  The per diem revenue will be paid on a percentage basis of available funds;

(b) Each participating institution shall receive a travel allowance of $30 per mile one-way.  The travel allowance will be paid on a percentage basis of available funds; and

(c) Any revenue above full expenses of the participating teams shall be divided into 15 equal shares, with one share to each member institution and one share to the Conference.

## 31.23 REVENUE DISTRIBUTION - ALL OTHER SPORTS

**31.23.1  Distribution of Revenue Generated by Other Sports.**  Revenues received by the Conference office each year for all other sports shall be divided as follows:

SEC – Net Revenues from SEC championships (other than football, men's and women's basketball, and baseball) either bid, or held at a neutral or off-campus site, shall be divided as follows:  one share to the Conference office, remaining revenue shall be divided evenly among institutions which sponsor teams in that particular sport.

## 31.24 DISTRIBUTION OF NCAA SPORT SPONSORSHIP AND GRANTS-IN-AID FUNDS

**31.24.1  Distribution of NCAA Sport Sponsorship and Grants-in-aid Funds.**  NCAA Sports Sponsorship and Grants-in-Aid funds shall be sent by the NCAA to the Conference office.  The funds shall then be divided into 15 equal shares with one share to each member institution and one share to the Conference office. [*Adopted: 6/3/16; effective 8/1/16*]

## 31.25 DISTRIBUTION OF NCAA ACADEMIC VALUES-BASED REVENUE FUNDS

**31.25.1  Distribution of NCAA Academic Values-Based Revenue Funds.** NCAA Academic-Values Based Revenue funds shall be sent by the NCAA to the Conference office. The funds shall then be divided into 15 equal shares with one share to each member institution and one share to the Conference office. [*Adopted: 5/31/19*]

## 31.26 AUTOMATIC RESTRICTION AGAINST PARTICIPATION IN DISTRIBUTION OF CONFERENCE FUNDS

**31.26.1   Restriction Against Participating in Distribution of Conference Funds due to Postseason Ban.** If, in football or men's basketball, a member institution is prohibited by the NCAA or Conference from participating in postseason games and events that

generate revenues for the Conference (a "Postseason Ban"), the institution's share of revenue from the Conference derived from such sources shall be reduced as follows:

**31.26.1.1 Postseason Ban.** For each fiscal year in which an institution is subject to a Postseason Ban in football or men's basketball, the institution's distribution shall be reduced by an amount equal to 50% of the postseason media and competition/events revenues generated by the Conference in the fiscal year attributable to the respective sport. The withheld 50% of revenues that would have otherwise been distributable to the institution shall be distributed equally to all other member institutions in the Conference that are not subject to a Postseason Ban in football or men's basketball. [*6/1/96; Revised: 6/3/05, 6/3/21*]

**31.26.2   Repeat Violations.** If a member institution receives another Postseason Ban from the NCAA or Conference in either football or men's basketball during the five fiscal years immediately following the fiscal year in which the institution's revenue was first reduced by application of Bylaw 31.26.1, the institution's distributions attributable to postseason revenues in the respective sport shall be reduced as set forth in Bylaw 31.26.1, but the percentage of withholding shall be 100% instead of 50%. [*6/1/96; Revised: 6/3/05, 6/3/21*]

**31.26.3   Determination of Postseason Revenues.** Postseason revenues generated in a fiscal year by the Conference attributable to football and men's basketball shall be determined by the Commissioner based on the consistent application of the accounting and revenue recognition practices generally followed by the Conference for purposes of reporting and distributing revenues to its member institutions, subject to adjustments in such practices from year-to-year unrelated and not attributable to the application of this Bylaw 31.26 and to any amendments to this Article 31; provided that (i) the amount by which any revenue distribution is reduced shall be calculated after allocation of gross Conference revenues to any payment of debt service pursuant to Bylaw 31.10 (and after allocation of gross Conference revenues to any other extraordinary payments by the Conference) and (ii) a member institution's surplus distribution (from the Conference's 1/15th share of various revenues as provided in this Article 31) shall not be reduced by application of this Bylaw 31.26. The Commissioner's determination of Postseason revenues generated in a fiscal year by the Conference shall be final and dispositive. [*Revised: 6/3/21*]

ADMINISTRATIVE BYLAW, ARTICLE 32

# Enforcement Policies and Procedures

The Southeastern Conference adheres to the enforcement policies and procedures specified in this bylaw of the NCAA Manual.

## Southeastern Conference Penalties for Violations of Specified NCAA Bylaws

**Impermissible activity by noncoaching staff member (NCAA Bylaw 11.7.1.1 and 11.7.6)**
The involved institutional staff member shall be prohibited from attending all countable and required athletically related activities involving student-athletes (e.g. practice, competition, and team meetings involving student-athletes) for a seven-day period following discovery of the violation.

**Contact with a prospect during either an evaluation or quiet period. (NCAA Bylaws 13.02.5.2 and 13.02.5.4)**
The involved institutional staff member(s) shall not be permitted to participate in any off-campus recruiting activity for the 30 calendar days immediately following discovery of the violation. Further in-person contact (on or off campus) with the prospective student-athlete involved in the violation shall be prohibited until 30 days following the discovery of the violation or the first permissible date for in-person off-campus contact with the prospect, as deemed appropriate. In sports that permit off-campus contact prior to the prospect's senior year, the institution shall be permitted to have no more than one additional off-campus contact with the involved prospect during his/her junior year and no more than one additional off-campus contact during the prospect's senior year. In sports that do not permit off-campus contact prior to the prospect's senior year, the institution shall be permitted to have no more than one additional off-campus contact with the involved prospect.

**Contact with a prospect during a dead period. (NCAA Bylaw 13.02.5.5)**
The involved institutional staff member(s) shall not be permitted to participate in any off-campus recruiting activity for the 90 calendar days immediately following discovery of the violation. Further in-person contact (on or off campus) with the prospective student-athlete involved in the violation shall be prohibited for six calendar months. Further telephone calls and electronic correspondence between any institutional staff member ~~to~~ and the prospective student-athlete involved in the violation shall be prohibited for the 60 days following discovery of the violation (or the first permissible date for telephone calls/electronic correspondence with the prospect).

**Impermissible evaluation of a prospect during a quiet or dead period. (NCAA Bylaw 13.02.5.4 and 13.02.5.5)**
The involved institutional staff member(s) shall not be permitted to participate in any off-campus recruiting activity for the 60 calendar days immediately following discovery of the violation.

**Contact with a prospect prior to the permissible time period. (NCAA Bylaw 13.1.1.1)**
The involved institutional staff member(s) shall not be permitted to participate in any off-campus recruiting for the 30 calendar days immediately following discovery of the violation. Further in-person contact (on or off campus) with the prospective student-athlete involved in the violation shall be prohibited until 30 days following the first permissible date for in-person off-campus contact. The institution shall be permitted to have no more than one additional off-campus contact with the involved prospect.

**Impermissible off-campus contacts with prospective student-athletes by an impermissible recruiter. (NCAA Bylaw 13.1.2.1)**
The involved institutional staff member(s) shall not be permitted to participate in any recruiting activity (on or off-campus) for the 14 calendar days immediately following discovery of the violation.  The involved institutional staff member(s) shall also not be permitted to make or receive telephone calls or send electronic correspondence to any prospective student-athlete for the 14 calendar days immediately following discovery of the violation. Further in-person contact (on or off campus) with the prospective student-athlete involved in the violation shall be prohibited for 30 days following discovery of the violation or the first permissible date for in-person off-campus contact, as deemed appropriate. Further telephone calls and electronic correspondence between any institutional staff member and the prospective student-athlete involved in the violation shall be prohibited for the 30 days following the date of discovery of the violation (or the first date for permissible phone calls/electronic correspondence with the prospect). In sports that permit off-campus contact prior to the prospect's senior year, the institution shall be permitted to have no more than one additional off-campus contact with the involved prospect during his/her junior year and no more than one additional off-campus contact during the prospect's senior year. In sports that do not permit off-campus contact prior to the prospect's senior year, the institution shall be permitted to have no more than one additional off-campus contact with the involved prospect.

**Impermissible on-campus contacts with prospective student-athletes by an impermissible recruiter. (Applicable to situations in which the institution fails to demonstrate that it took appropriate steps to prevent such contact or where an institution has a history of similar violations) (NCAA Bylaw 13.1.2.1).**
In-person contact (on or off campus) with the prospective student-athlete involved in the violation shall be prohibited for 14 days following discovery of the violation or the first permissible date for in-person off-campus contact, as deemed appropriate. Further telephone calls and electronic correspondence between any institutional staff member and the prospective student-athlete involved in the violation shall be prohibited for the 14 days following discovery of the violation (or the first date for permissible phone calls/electronic correspondence with the prospect).

**Telephone calls to prospective student-athletes. (NCAA Bylaw 13.1.3.1)**
If a coach telephones a prospective student-athlete prior to the first permissible time period, the involved institutional staff member(s) shall not be permitted to make or receive telephone calls or send electronic correspondence to any prospective student-athlete for the 14 calendar days immediately following discovery of the violation. Further telephone calls and electronic correspondence between any institutional staff member and the prospective student-athlete involved in the violation shall be prohibited for the next 30 days following the first date for permissible phone calls.  If a coach or coaching staff telephones a prospective student-athlete twice within a period where it is otherwise permissible to call once, the coaching staff is prohibited from making or receiving calls and sending electronic correspondence to the involved prospective student-athlete for a two week period.

**Impermissible contact with a prospect on the day of competition. (NCAA Bylaw 13.1.6.2)**
The involved institutional staff member(s) shall not be permitted to participate in any off-campus recruiting for the 30 calendar days immediately following discovery of the violation. The institution shall be prohibited for 30 days from visiting the educational institution or attending any contests involving a team on which the prospective student-athlete involved in the violation participates. Further telephone calls from any institutional staff member to the prospective student-athlete involved in the violation shall be prohibited for the 30 calendar days immediately following discovery of the violation.

**Provision of impermissible benefits to a prospective student-athlete.  (NCAA Bylaw 13.2.1)**
The involved institutional staff member(s) shall not be permitted to participate in any off-campus recruiting for the 30 calendar days immediately following discovery of the violation. Further in-person contact (on or off campus) with the prospective student-athlete involved in the violation shall be prohibited until 90 days following discovery of the violation or the first permissible date for in-person off-campus contact, as deemed appropriate. In sports that permit off-campus contact prior to the prospect's senior year, the institution shall be permitted to have no more than one additional off-campus contact with the involved prospect during his/her junior year and no more than one additional off-campus contact during the prospect's senior year. In sports that do not permit off-campus contact prior to the prospect's senior year, the institution shall be permitted to have no more than one additional off-campus contact with the involved prospect.

**Provision of recruiting materials (including electronic correspondence) to a prospect prior to the permissible date. (NCAA Bylaw 13.4.1)**
The institution shall be prohibited from providing additional recruiting materials (including questionnaires and general correspondence, but not including a camp brochure) to the prospective student-athlete involved in the violation until 60 days following the first permissible date for distributing recruiting materials.

**Provision of impermissible recruiting materials to a prospective student-athlete.  (NCAA Bylaw 13.4.1.4)**
Telephone calls or electronic correspondence between any institutional staff member and the prospective student-athlete involved in the violation shall be prohibited for the 60 days following the discovery of the violation (or the first permissible date for phone calls/electronic correspondence with the prospect).

**Impermissible electronic transmissions/social media communication. (NCAA Bylaw 13.4.1.5 and 13.10.2)**
The involved institutional staff member(s) shall not be permitted to make telephone contact with any prospective student-athlete for the 14 calendar days immediately following discovery of the violation. The institution shall not be permitted to make telephone contact, send recruiting materials (per NCAA Bylaw 13.4.1), or send permissible electronic transmissions (per NCAA Bylaw 13.4.1.5) to the prospective student-athlete involved in the violation for the 30 calendar days immediately following discovery of the violation (or the first permissible date for phone calls/electronic correspondence with the prospect).

41

**Provision of impermissible entertainment to a prospective student-athlete or a person associated with a prospective student-athlete.  (NCAA Bylaws 13.6.7, 13.7.2 and 13.8)**
The involved institutional staff member(s) shall not be permitted to participate in any off-campus recruiting for the 30 calendar days immediately following discovery of the violation. Further in-person contact (on or off campus) with the prospective student-athlete involved in the violation shall be prohibited until 90 days following discovery of the violation or the first permissible date for in-person off-campus contact, as deemed appropriate. In sports that permit off-campus contact prior to the prospect's senior year, the institution shall be permitted to have no more than one additional off-campus contact with the involved prospect during his/her junior year and no more than one additional off-campus contact during the prospect's senior year. In sports that do not permit off-campus contact prior to the prospect's senior year, the institution shall be permitted to have no more than one additional off-campus contact with the involved prospect.

**Impermissible public comments made regarding a prospective student-athlete.  (NCAA Bylaw 13.10.2)**
The involved institutional staff member(s) shall not be permitted to participate in any off-campus recruiting for the 30 calendar days immediately following discovery of the violation. Further in-person contact (on or off campus) with the prospective student-athlete involved in the violation shall be prohibited until 90 days following discovery of the violation or the first permissible date for in-person off-campus contact, as deemed appropriate. The institution shall be permitted to have no more than one additional off-campus contact with the involved prospect.

## Application of the Minimum Penalty
The institution shall apply the minimum penalty upon discovery of the violation and shall report the violations to the Conference in a timely manner.  The minimum penalty may be increased at the Commissioner's discretion.  In the event that a minimum penalty cannot be fully applied prior to the involved prospective student-athlete's written commitment to the institution, the Commissioner shall impose such other penalties to address the competitive or recruiting advantage gained by the institution (*e.g.,* prohibiting the issuance of a financial aid agreement, restrictions on recruiting activities, etc.).

## Relief of the Minimum Penalty
Prior to application of the minimum penalty, the involved institution may request relief from the minimum penalty if the institution establishes that: 1) the violation was clearly attributable to extenuating circumstances; and 2) the violation did not produce a recruiting or competitive advantage.  If an institution that commits a violation seeks relief from the minimum penalty and there is a reasonable basis for consideration of the relief request, the penalty is stayed pending the Commissioner's determination.

## Southeastern Conference Minimum Expectations for Due Diligence Inquiries

SEC member institutions are required to use diligent efforts to gather pertinent information regarding the prior conduct of any prospective student-athlete, including a transfer, who seeks to enroll and participate in intercollegiate athletics at an SEC institution. While institutions should use their discretion in doing so based upon the particular circumstances of each situation, at a minimum, SEC institutions shall ask the following questions of each prospective student-athlete prior to the individual practicing, competing, or receiving institutional financial aid:

1. Do you have criminal charges pending against you?

2. Have you been convicted of, pled guilty to, or pled no contest to any crime involving:

    1. Acts of a violent or sexual nature in the past?

    2. Possession or use of a firearm?

    3. Dating violence?

    4. Stalking?

    5. Other felony crime?

3. Have you been disciplined, suspended or placed on probation for any reason (excluding limited discipline applied by a sports team) at any previous educational institution?  If yes, please explain.

4. At the time you left your previous educational institution, were you the subject of a pending proceeding of any sort that could have resulted in disciplinary measures, suspension, expulsion or probation?  Are you currently the subject of this kind of proceeding at any previous educational institution?

These questions are intended to be a minimum to be asked where an institution has no independent reason to suspect that a prospective student-athlete might have engaged in conduct that triggered application of either SEC Bylaw 14.1.15.1 or Bylaw 14.1.19.  Where an institution has such an independent reason to inquire into a prospective student-athlete's prior conduct, the institution is expected to conduct a thorough inquiry designed to gather all information needed to assess the situation. The institution is expected to ask the prospective student-athlete and others who might possess pertinent information to provide any such information, and where appropriate, to request authorization from such persons to obtain pertinent documents and information from third parties.  Where a question exists whether the prospective student-athlete has triggered the application of SEC Bylaw 14.1.15.1 or Bylaw 14.1.19, the institution is expected to notify the Conference prior to providing aid or allowing the prospective student-athlete to practice or compete. [*Adopted: 6/3/16, Revised; 6/1/18*]

# Exhibit B

**SOUTHEASTERN CONFERENCE POLICY**

**STUDENT-ATHLETE CONSENT FORM &**
**CREDENTIALS, TICKET RESTRICTIONS, AND AGREEMENTS**

It is the policy of the Southeastern Conference ("SEC") for each of its member institutions to request that each of its student-athletes provide a written consent, worded as follows, each season:

> I hereby grant permission for all sports contests, practices, news conferences, and related sports events in which I participate or for which I am present as a student-athlete of [University] (collectively referred to as "Events") to be broadcast, rebroadcast or otherwise transmitted and distributed, in whole or in part, on television, by the internet, and by any other means (collectively referred to as "Broadcasts"). I acknowledge and agree that the copyright to each Broadcast will initially vest in the broadcaster of each such Event, and that each broadcaster and its assignees and licensees will have and enjoy the non-exclusive, transferable, perpetual right to use (and to license and sub-license, without limitation) any such Broadcasts. I also acknowledge and agree that [University], the Southeastern Conference, the NCAA, and each broadcaster may use my picture and name to promote and publicize the [University], the Conference, the NCAA and their various sports contests, practices, news conferences, and related sports events (including in programs, media guides, television spots, and other media) and for other news and informational purposes.

This written consent shall be retained by each SEC member institution and made available to the SEC upon request. The member institution should inform the SEC promptly if a student-athlete declines to execute the consent form.

While certain NCAA-required forms must be executed as a condition of participation, execution of the above-quoted consent form is not required to participate in an SEC sport, but if a student-athlete declines to execute the consent form: (1) the student-athlete should not appear in media guides or other promotional materials (absent separate consent), and (2) the student-athlete should be informed, in writing, that if he or she participates in sports contests and other functions or events, those contests, functions and events may be televised or otherwise distributed (on the internet, and by other means), but that neither the member-institution nor the SEC will authorize the use of any portion of these broadcasts in a way (such as for endorsement or promotional purposes) that would require a publicity rights consent or release executed by the student-athlete.

The SEC has developed language for its media credentials, non-media credentials, and tickets that includes appropriate protections for student-athletes and has distributed such language to its member institutions for use, as appropriate.

The SEC has also included provisions in its agreements concerning media and sponsorship rights that protect student-athletes and that require compliance with applicable NCAA rules and regulations.

3223012v1