MAYER BROWN LLP
BRITT M. MILLER (*pro hac vice*)
bmiller@mayerbrown.com
DANIEL T. FENSKE (*pro hac vice*)
dfenske@mayerbrown.com
71 S. Wacker Dr.
Chicago, IL, 60606-4637
Telephone: (312) 782-0600
Facsimile: (312) 701-7711

CHRISTOPHER J. KELLY (SBN 276312)
cjkelly@mayerbrown.com
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA  94306-2112
Telephone: (650) 331-2000
Facsimile: (650) 331-2060

*Attorneys for Defendant The Big Ten Conference, Inc.*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION**

| In re College Athlete NIL Litigation | Case No. 4:20-cv-03919-CW |
|---|---|
| | **DECLARATION OF KERRY KENNY** |


A.   **Personal Background**

1.      I am Senior Vice President for Television, Media Analytics and Emerging Platforms for The Big Ten Conference, Inc. ("The Big Ten" or the "Conference"). I make this declaration of my own personal knowledge and, if called on to do so, could testify competently to the facts stated herein under oath.

2.      I received my undergraduate degree from Lafayette College in 2007 and began my career in athletics administration as an intern with the Patriot League in 2007. I have previously held a variety of positions at the Conference, including Assistant Director of Compliance, Associate Director or Compliance, Director of Compliance, and Assistant Commissioner of Public Affairs. In those roles, I had a variety of responsibilities with respect to rules compliance, sport administration, public affairs, and health and safety.

3.      I have held the title of Senior Vice President for Television, Media Analytics and Emerging Platforms since July 2021. In that role, I advise the Conference's Council of Presidents and Chancellors ("COP/C") on issues related to the Conference's media rights agreements, and am responsible for the oversight and administration of those agreements, working with network partners, Conference leadership, the COP/C, Athletic Directors, and other stakeholders. I personally participated in the strategy and negotiation of The Big Ten's broadcast rights agreements announced in August 2022.

B.   **The Big Ten Conference**

4.      The Big Ten Conference is a Division I collegiate athletic conference headquartered in Illinois. The Conference currently comprises fourteen (14) member institutions, thirteen (13) of which are state universities. The Conference's members are Indiana University, Michigan State University, Northwestern University, Ohio State University, Pennsylvania State University, Purdue University, Rutgers University, University of Illinois Urbana–Champaign, University of Iowa,

University of Maryland, University of Michigan, University of Minnesota, University of Nebraska–Lincoln, and University of Wisconsin–Madison. The University of California, Los Angeles and University of Southern California are currently scheduled to join the Conference, effective as of the 2024 academic year.

5. The Conference sponsors championship events in fourteen (14) men's sports and fourteen (14) women's sports. These sports are baseball (for men), basketball, cross country, field hockey (for women), football (for men), golf, gymnastics, ice hockey (for men), lacrosse, rowing (for women), soccer, softball (for women), swimming & diving, tennis, track and field (indoor), track and field (outdoor), volleyball (for women) and wrestling (for men). Most Conference institutions field teams in one or more sports in which the Conference does not sponsor a championship, and in some instances those teams compete in other Conferences solely in those sports (such as women's ice hockey, in which not enough institutions compete for The Big Ten to sponsor a conference championship).

### D. **Plaintiffs' Proposal**

6. I understand that the Plaintiffs' expert witnesses in this case have opined that in the absence of NCAA rules preventing conferences or schools from paying student-athletes for the use of their name, image and likeness ("NIL") rights in broadcasts of sporting events, each "A-5" conference and its member schools would have (since the fall semester of 2016) shared rights fees attributable to broadcasts and other distributions of games and events with student-athletes as follows (I refer to this as "Plaintiffs' Proposal" through this Declaration):

   a) Each conference would determine the total of its broadcast rights fees received from its own license agreements with broadcasters (such as such as FOX, ESPN, The Big Ten Network, etc.) and also from the NCAA men's basketball tournament and the College Football Playoff.

    b) Each academic year, every scholarship football player at a member institution in the conference would be paid 10%, in equal shares, of the broadcast rights fees received by the conference that Plaintiffs contend are attributable to football broadcasts (based in part on the opinion of the Plaintiffs' experts that 75% of any unsegregated broadcast rights fees received are attributable to football).

    c) Each academic year, every scholarship men's basketball player at a member institution in the conference would be paid 10%, in equal shares, of the broadcast rights fees received by the conference that Plaintiffs contend are attributable to men's basketball broadcasts (based in part on the opinion of the Plaintiffs' experts that 15% of any unsegregated broadcast rights fees received are attributable to men's basketball).

    d) Each academic year, every scholarship women's basketball player at a member institution in the conference would be paid 10%, in equal shares, of the broadcast rights fees received by the conference that Plaintiffs contend are attributable to women's basketball broadcasts (based in part on the opinion of the Plaintiffs' experts that 5% of any unsegregated broadcast rights fees received are attributable to women's basketball).

    e) I further understand that Plaintiffs' experts assert or implicitly assume that 5% of the value of the unsegregated broadcast rights fees received by a conference are attributable to the remaining games and events sponsored by that conference.

7. I also understand that Plaintiffs' experts have concluded that these revenue-sharing payments would either be made directly by each A-5 conference to the student-athletes or would be distributed to the member schools of each A-5 conference, who would then be required to distribute the funds to student-athletes as outlined above.

**F.     Big Ten Media Agreements and Revenue Sources**

8.     The Big Ten's member institutions have assigned their telecast and related rights to the Conference. Accordingly, the Conference can and does package those rights together for purposes of negotiating and entering broadcast rights agreements with media partners on behalf of the Conference as a whole.

9.     Since 2017, I have participated in discussions with Big Ten media consultants and staff regarding media rights, and have participated in negotiations with networks concerning licensing of these distribution rights since 2021 in my role as Senior Vice President for Television, Media Analytics and Emerging Platforms. In 2017, the Conference entered agreements with the following broadcast partners, which are set to expire on June 30, 2023:

  a. *Big Ten Network.* The Conference receives fixed royalty payments in exchange for the Big Ten Network broadcasting games in all Conference-sponsored sports and certain varsity sports sponsored at the institution level.

  b. *Fox.* The Conference receives fixed royalty payments in exchange for Fox broadcasting football and men's basketball games. Fox also has the right, but no obligation, to broadcast women's basketball games and Olympic sports games.

  c. *ESPN.* The Conference receives fixed royalty payments in exchange for ESPN broadcasting football, men's basketball, women's basketball, and Olympic sports games.

  d. *CBS.* The Conference receives fixed royalty payments in exchange for CBS broadcasting men's basketball games.

10.     In addition, the Conference has the following sources of revenue that derive, in part, from broadcast licensing:

  a. *College Football Playoff.* A portion of rights fees related to the College Football Playoff are paid to the Conference each year pursuant to a set of contracts among The Big

Ten, nine other Division I conferences, and Notre Dame. The payments incorporate funding from a number of sources, including broadcast rights, sponsorships, ticket sales, souvenir sales, and trademark licenses. The payments vary annually depending on various factors, including how many Big Ten teams participate in the College Football Playoff.

b. *NCAA distributions.* The Conference receives a share of NCAA revenues, which are passed through to its member institutions. The NCAA's primary source of revenues is its "March Madness" broadcast rights agreement with CBS and Turner for the annual men's college basketball playoff, but the NCAA also receives substantial revenues from sponsorships, ticket sales, and other sources. All of these revenues together are the source of distributions made to the Conference by the NCAA.

11. As noted above, I had a substantial, personal role in the negotiation of The Big Ten's 2022 broadcast rights package, which will be effective starting in July 2023.

**H.      One Cannot Isolate the "Broadcast NIL" Value In Any Media Rights Deal**

12. As noted above, I understand that Plaintiffs' Proposal concludes that student-athletes have NIL rights with respect to broadcasts and that those "rights" have certain value. I have no opinion on whether, as a legal matter, student-athletes actually have such NIL rights.

13. Regardless, I am aware of no support for the assumption in Plaintiffs' Proposal that student-athlete NIL rights (assuming such rights exist) would be worth 10% of broadcast revenues. At no time during my participation in the Conference's negotiations with networks—or at any other time—has any network representative or anyone else stated that they believe there was any particular value associated with the NIL rights of any student-athletes in connection with the broadcast of any sporting events. I am further aware of no time when anyone, other than in Plaintiffs' Proposal, has ever tried to assign any monetary value to supposed student-athlete NIL rights in broadcasts.

14. Further, Plaintiffs' Proposal is based on the incorrect premise that the value of any broadcast NIL rights would be static and unchanging over time. The Proposal also assumes that the value of such rights would be the same from conference to conference and without regard to the individual member institutions whose games would be broadcast under any given agreement. These premises are baseless. Rather, certain sports and member institutions within a Conference are perceived as having more or less value than others in connection with media rights agreements. This is because, among other things, certain conferences, teams, and even individual student-athletes are more attractive to viewers, which causes viewership (and the associated economic value of an individual broadcast) to vary substantially. Further, individualized factors like the game times and dates, the number of commercial spots, the cost of producing games, and other factors all impact the value of a given broadcast. There is thus no support for any conclusion—even if one assumes that student-athlete broadcast NIL has *any* identifiable value in a broadcast agreement (which it does not)—that the value of such broadcast NIL would be the same in each media rights agreement. It would vary from agreement to agreement and conference to conference and over time.

15. I am also unaware of any support for Plaintiffs' Proposal's attempt to allocate revenues from multi-sport broadcast agreements to particular sports. I understand that Plaintiffs' expert witnesses conclude that 75% of each conference's multi-sport broadcast rights revenues are derived from football games, 15% from men's basketball, 5% from women's basketball, and 5% from other sports. To my knowledge, the Conference and its network partners have not allocated any portion of a multi-sport media rights agreement to any individual sport within any agreement.

16. Further, the same variability that makes Plaintiffs' Proposal's 10%-value assumption unfounded (discussed in ¶ 14 above) makes the Proposal's allocation among sports unrealistic, because those same variables would impact the relative "value" of individual sports in

individual agreements. Consider, for example, the recent success of the Iowa Hawkeyes women's basketball team, which made it the 2023 NCAA Championship game and received substantial publicity associated with its perceived "star" player. There is no question that this success would impact the "relative" value of any rights package including the Iowa women's basketball team compared to a package that includes no comparable team. Yet Plaintiffs' Proposal would conclude that woman's basketball provides exactly the same value in a package including Iowa as one including no remotely comparable team. In my view, Plaintiffs' Proposal does not reflect the reality that different schools, teams, or student-athletes would have different "broadcast NIL" value.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on April 27, 2023, in Chicago, Illinois.

_____
Kerry Kenny