# Declaration of George Kliavkoff

REDACTED VERSION OF DOCUMENT REQUESTED TO BE FILED UNDER SEAL

COOLEY LLP
WHITTY SOMVICHIAN (194463)
(wsomvichian@cooley.com)
KATHLEEN R. HARTNETT (314267)
(khartnett@cooley.com)
ASHLEY KEMPER CORKERY (301380)
(acorkery@cooley.com)
DAVID S. LOUK (304654)
(dlouk@cooley.com)
3 Embarcadero Center, 20th Floor
San Francisco, California 94111-4004
Telephone:    +1 415 693 2000
Facsimile:    +1 415 693 2222

MARK LAMBERT (197410)
(mlambert@cooley.com)
3175 Hanover Street
Palo Alto, California 94304-1130
Telephone:    +1 650 843-5000
Facsimile:    +1 650 849-7400

DEE BANSAL (1001754)
(dbansal@cooley.com)
1299 Pennsylvania Ave. NW, Suite 700
Washington, DC 20004-2400
Telephone:    +1 202 842 7800
Facsimile:    +1 202 842 7899

Attorneys for Defendant
PAC-12 Conference

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | Case No. 4:20-cv-03919-CW<br><br>**DECLARATION OF GEORGE KLIAVKOFF** |

1. Since July 1, 2021, I have been the Commissioner of the Pac-12 Conference (the "Pac-12" or the "Conference"). I make this declaration of my own personal knowledge and, if called on to do so, could testify competently to the facts stated herein under oath.

2. I graduated from the Boston University. I earned my Juris Doctorate degree from the University of Virginia School of Law.

3. Prior to joining the Pac-12, I served as President of Entertainment and Sports for MGM Resorts International (2018-2021). During my tenure at MGM Resorts International, I also served on a number of Boards, including the WNBA Board of Governors (2018-2021), Cirque du Soleil Entertainment Group (2020-2021), BetMGM (2020-2021), and Las Vegas Area Management (2020-2021). Prior to MGM, I served in a variety of executive roles in sports and media, including Chief Executive Officer of Jaunt XR (2016-2018), President of Hearst Ventures and Co-President of Hearst Entertainment & Syndication (2009-2016), Board Member of A+E Networks (2013-2016), Board Member and Interim CEO of Hulu (2007-2008), Chief Digital Officer of NBCUniversal Media (2006-2008) and Executive Vice President, Business at MLB Advanced Media (2003-2006).

4. The Pac-12 is a California unincorporated association that is tax exempt pursuant to Section 501(c)(3) of the Internal Revenue Code. The Pac-12 was founded in 1915. The Constitution and Bylaws of the Pac-12 are attached to this Declaration as Exhibit A (the "Pac-12 Constitution" or "Constitution").

5. As set forth in the Pac-12 Constitution, the Conference was formed to direct and organize interscholastic athletic competitions, conduct tournaments, and administer eligibility rules for student-athletes. The Conference's mission is to achieve these goals in a way that maintains the highest standards for both academics and competitive sports.

6.  The Conference is currently comprised of twelve (12) member institutions, ten (10) of which are public universities. The Conference's members are the University of California at Berkeley, Stanford University, the University of Washington, Washington State University, the University of Oregon, Oregon State University, the University of California at Los Angeles ("UCLA"), the University of Southern California ("USC"), the University of Arizona, Arizona State University, the University of Utah, and the University of Colorado. Effective as of the 2024-25 academic year, UCLA and USC will be leaving the Pac-12 Conference to join the Big Ten Conference.

7.  The Board of Directors ("Board") is the governing body of the Conference. Each member institution of the Conference has one representative on the Board which shall be the President of that member institution, except: (a) as to the University of California, Berkeley; UCLA; and the University of Colorado, Boulder, where the respective Chancellor shall be considered the member representative, and (b) as to USC and UCLA who were removed as Board representatives under the Constitution and Bylaws following their notice of withdrawal from the Pac-12.

8.  I report to and serve at the pleasure of the Board, which has "plenary power and authority with respect to all affairs of the Conference in any type of nature whatsoever, subject only to any specific provisions and restrictions imposed by the Constitution and Bylaws." Constitution, Article 5.1.

9.  Article 5 of the Constitution establishes the rules for Conference governance. The Board representatives of the Conference each have one vote on any matter that comes before the Conference for action. As set forth in the Constitution and Bylaws, before a Conference rule can be adopted, the proposed rule must garner at least a majority (and, in some instances, a super-majority) of votes from the Board representatives.

10. The Conference does not control its member institutions; to the contrary, the member institutions play a central role in setting the policies and procedures of the Conference. The member institutions, through their Board member representatives, establish the role of the Conference office and determine the manner in which the Conference will be operated, providing direction to me and the Conference staff in fulfilling the roles and responsibilities assigned to the Conference. The Pac-12 member institutions (acting through their respective Presidents or Chancellors) make Conference decisions concerning fundamental aspects of the Conference's operations, including the Conference's annual budget, the approval of media contracts, member composition, scheduling of Conference games and opponents, student-athlete well-being policies, and decisions regarding financial distributions, among others.

11. The Conference sponsors championship events in eleven (11) men's sports and thirteen (13) women's sports. These sports are baseball, basketball, cross country, football, golf, rowing, soccer, swimming & diving, tennis, outdoor track & field, and wrestling (for men); and basketball, cross country, golf, gymnastics, lacrosse, rowing, beach volleyball, soccer, softball, swimming & diving, tennis, outdoor track & field, and volleyball (for women).

12. The NCAA establishes certain rules delineating eligibility requirements for student athletes to participate in Conference and NCAA competitions, and the Conference administers such rules. The NCAA and the Conference otherwise have no involvement in the recruitment, retention, and day-to-day administration of student-athletes who attend Pac-12 member institutions. Pac-12 member institutions compete fiercely with each other, as well as with institutions outside the Conference, for the most talented high school students who will become student athletes on their athletic teams. In addition, Pac-12 member institutions compete with each other, and with institutions outside the Conference, to recruit student athletes who want to transfer

from one college or university to another. Except for assisting an institution in compliance with eligibility rules, the Conference has no role in any of these recruiting activities.

13. Conference revenues are distributed between Pac-12 member institutions based on rules voted on and agreed to by the Pac-12 Board. The Conference follows the Rules established by the Board in distributing all revenue. (*See* Pac-12 Executive Regulations, Article 1.)

14. The Pac-12 member institutions make their own individual decisions about which teams to sponsor (*e.g.*, five (5) Pac-12 member institutions have men's soccer teams, while nine (9) have women's softball teams), and which prospective and current student-athletes will receive scholarships. The Conference has never played a role in deciding which sports or teams any member institution should sponsor. The Conference has also never played a role in deciding which student athletes should receive a scholarship offer from any member institution.

15. The individual Pac-12 member institutions also retain and do not share non-conference revenues (*e.g.*, ticket sales to home games; institutional sponsorship revenues; alumni and booster contributions).

16. Each Pac-12 member institution makes its own decisions about how to expend funds on coaches, facilities, student-athlete support, as well as numerous other matters.

17. Each Pac-12 member institution has its own governance structure, with the President or Chancellor typically reporting to a Board of Trustees or Directors. Many of the state institutions are also members of a state-wide university system (e.g., the University of California system), and all state institutions are subject to oversight and control by their respective state legislatures.

18. Each of the Pac-12's twelve member institutions have transferred the broadcast rights to their home games and events (*i.e.*, athletic competitions each institution sponsors on its own campus or in its own venues) to the Pac-12 to be licensed to television networks as a package.

Those games, along with the broadcast rights to athletic games and events sponsored by the Pac-12 (such as conference tournaments and championships), are licensed by the Conference to television distribution networks (e.g., ESPN or Fox Sports). Some of the Pac-12 games and events licensed by the member institutions to the Conference are broadcast on the Pac-12 Networks, the Conference's wholly owned cable channels.

19. I understand that Plaintiffs assert that on an aggregate basis, roughly 75% of the broadcast rights revenues of each "Autonomy-5" conference (which plaintiffs refer to as the "Power-5") are derived from football games, 15% from men's basketball, 5% from women's basketball, and 5% from broadcasts and distributions of contests in other sports, based in part on allocations set forth in financial statements and term sheets from other conferences purporting to allocate rights fees received from broadcast partners. The Plaintiffs have not asked whether the Pac-12 allocates revenues to certain sports, or whether the allocation estimates reflected in the non-Pac-12 documents accurately reflect how the Pac-12 allocates and derives revenue. In fact, it is impossible to develop such estimates, for the reasons explained below.

20. The Pac-12 has the following sources of revenue that include, in part, broadcast license revenues or royalties:

a. Redacted - Network Strictly Confidential
Redacted - Network Strictly Confidential
Redacted - Network Strictly Confidential
Redacted - Network Strictly Confidential
Redacted - Network Strictly Confidential

b. Redacted - Network Strictly Confidential
Redacted - Network Strictly Confidential
Redacted - Network Strictly Confidential
Redacted - Network Strictly Confidential

    c. Redacted - Network Strictly Confidential

    Redacted - Network Strictly Confidential

    Redacted - Network Strictly Confidential

    Redacted - Network Strictly Confidential

    d. Payments made by ESPN to an escrow account, a portion of which are paid to the Pac-12 each year pursuant to a complex set of contracts with (and between and among) the Pac-12 and nine other Division I conferences, and Notre Dame, which authorize ESPN to broadcast the college football playoff ("CFP"). The escrow account is funded by revenues from several sources, including broadcast rights, sponsorships, ticket sales, souvenir sales, and trademark licenses. The payments vary each year depending on several factors, including how many Pac-12 teams play in CFP bowl games and in the CFP semifinal and final national championship games.

    e. Payments made to the Conference by the NCAA as a share of NCAA revenues, which the Conference passes through to its member institutions. The NCAA's primary source of revenues is its "March Madness" broadcast rights agreement with CBS and Turner for the annual men's college basketball tournament, but the NCAA also receives substantial revenues from sponsorships, ticket sales, and other sources. These combined revenues are the source of distributions made to the Conference by the NCAA.

    f. Payments made to the Conference by the NCAA based on the performance of Pac-12 teams in the NCAA Men's Basketball Tournament, and commonly referred to as men's basketball "units."

   g. Payments made to the Conference by various bowl games pursuant to several bi-lateral or tri-lateral agreements under which Pac-12 football teams may play in various bowl games.

   h. Revenue generated directly by the Conference from the sale of tickets to championship events, sponsorships, and merchandise.

21. It would be an incomplete and flawed analysis of Conference economics to ignore the fact that Redacted - Network Strictly Confidential

Redacted - Network Strictly Confidential

Redacted - Network Strictly Confidential

Redacted - Network Strictly Confidential

22. None of the agreements described in paragraph 20 above Redacted - Network Strictly Confidential

Redacted - Network Strictly Confidential

Redacted - Network Strictly Confidential

Redacted - Network Strictly Confidential

Redacted - Network Strictly Confidential.

23. The Conference does not attempt to allocate broadcast rights revenues or royalties from all sources (including the Pac-12 Networks, NCAA, and CFP) between and among football, men's basketball, women's basketball, and other sports, because it would be unrealistic to do so.

Redacted - Network Strictly Confidential

Redacted - Network Strictly Confidential

Redacted - Network Strictly Confidential
Redacted - Network Strictly Confidential
Redacted - Network Strictly Confidential

24. In negotiating the Conference's media rights agreements and Pac-12 Networks' agreements with distribution partners, the Conference must balance numerous and sometimes conflicting priorities and objectives that influence the amounts broadcasters will pay for broadcast

rights and the fees that distribution partners will pay to carry the Pac-12 Networks. For example, the Conference may seek to limit certain industries from serving as sponsors or commercial advertisers during Conference telecasts, and it may obtain a minimum number of guaranteed Conference promotional announcements per game, which may affect the value of its media rights agreements. Requiring a broadcaster or network to distribute more games can increase exposure for a conference and its student-athletes but may decrease the rights fees received depending on the viewership and popularity of the sport (particularly if the broadcaster or network has to incur the costs of producing the games). Some Pac-12 member institutions' teams in particular sports are more popular and more attractive to broadcasters and networks than the same sports teams of other Pac-12 member institutions. Negotiating terms to try to ensure that every member institution and every member's sports teams receive adequate television exposure may at times adversely impact the broadcast rights fees that a network or broadcaster is willing to pay, as well as the viewership for the Pac-12 Networks.

25. I also understand that the Plaintiffs assert that in the absence of NCAA rules preventing conferences or member institutions from paying a share of broadcast rights fees to student-athletes, each "Autonomy-5" conference and its member institutions would have, at least since the fall semester of 2016, shared rights fees attributable to broadcasts and other distributions (internet, cable, satellite, etc.) of games and events primarily with student-athletes who participate in football and men's and women's basketball, and at a fixed royalty rate by sport consistent with the 75/15/5 split referenced in Paragraph 19 above. I believe it is unrealistic to conclude or assume that a fixed share of broadcast revenues would have been, or would ever be, voluntarily paid to Pac-12 football and men's and women's basketball student-athletes in the manner advanced by Plaintiffs, based on the lack of any such allocation in the Pac-12's broadcast revenue streams (as discussed above), the impact that such payments would have on non-football and basketball sports

programs (as discussed below), gender equity and Title IX concerns that would arise from Plaintiffs' proposed allocation, and other issues.

26. All Pac-12 member institutions support teams in sports that do not generate a profit (i.e., teams that generate less revenue than the cost to operate such team). The athletic department budgets for all Pac-12 member institutions rely on the use of proceeds from more profitable sports to cover the costs of sports that do not generate a profit. Based on my experience, including interactions with athletic directors at Pac-12 member institutions, it is my belief that member institutions would be reticent to give any student athlete more benefits if the provision of that benefit to one set of student athletes would restrict either the ability of the member institution to support non-profitable sports or restrict the number of scholarships they could provide to student-athletes who compete in non-profitable sports.

27. To my knowledge, at no time during the negotiations with networks and distributors did any consultant or media company indicate that there was any identifiable or segregable value attached to, attributable to, or realizable from any name, image, or likeness ("NIL") rights of any Conference student-athletes.

28. My understanding is that individual member institutions have varied policies concerning getting student-athletes to acknowledge that their NIL will be used in television broadcasts, but the Pac-12 has no Conference-wide policy or requirement. No network has declined to pay rights fees or altered its normal practices with respect to production and distribution of games— *i.e.*, broadcast on television or other forms of distribution, such as by cable, satellite, and/or by streaming video—in the absence of a Conference-wide policy.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on April 24, 2023, in Las Vegas, Nevada.

1
2  _____
3  George Kliavkoff
   Pac-12 Commissioner
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28