Leane K. Capps (*pro hac vice*)
POLSINELLI PC
2950 N. Harwood, Suite 2100
Dallas, TX 75201
Telephone: (214) 397-0030
Facsimile: (214) 397-0033
Email: lcapps@polsinelli.com

Amy D. Fitts (*pro hac vice*)
Phil Zeeck (*pro hac vice*)
POLSINELLI PC
900 W. 48th Place
Kansas City, MO 64112
Telephone: (816) 753-1000
Facsimile: (816) 753-1536
Email: afitts@polsinelli.com
Email: pzeeck@polsinelli.com

Wesley D. Hurst (SBN 127564)
POLSINELLI LLP
2049 Century Park East
Suite 2300
Los Angeles, CA 90067
Telephone: (310) 556-1801
Fax: (310) 556-1802
Email: whurst@polsinelli.com

*Attorneys for Defendant The Big 12 Conference, Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| In re College Athlete NIL Litigation | Case No. 4:20-cv-03919-CW |
|---|---|
| | **DECLARATION OF CHAD WEIBERG** |

1. I make this declaration of my own personal knowledge and, if required, would testify competently and under oath to the facts stated herein.

2. I am the Vice President and Director of Athletics at Oklahoma State University ("OSU"), located in Stillwater, Oklahoma, and I have served in that position since July of 2021, after serving as OSU's Deputy Athletic Director from 2017 to 2021.

**DECLARATION OF CHAD WEIBERG (THE BIG 12 CONFERENCE, INC.) IN RE: COLLEGE ATHLETE NIL LITIGATION**, CASE NO. 4:20-CV-03919-CW

1

3. From 2004 to 2017, I worked in various fundraising roles at Kansas State University and was recognized as the National Fundraiser of the Year by the National Association of Athletic Development Directors in 2014. From 2015 to 2017, I served as the Deputy Director of Athletics at Texas Tech University until returning to OSU in 2017.

4. I graduated from OSU with a Bachelor of Business Administration degree in 1994. Thereafter, I served in various positions of increasing responsibility in OSU sports operations, in its offices of donor relations and alumni associations and as director of development for the OSU Foundation until 2004. I received a Master of Business Administration degree from OSU in 2002.

5. College athletics have played a large role in my life from an early age. My father, Mick, and my brother Brett were both college basketball head coaches, and my brother Jared played basketball at OSU. My uncle, Kevin, served as Commissioner of the Big 12 Conference.

6. OSU is a member of the Big 12 Conference (the "Big 12"), which is one of the "Autonomy 5" or "A-5" conferences. In my role as athletics director, I have personally advised our President on decisions about whether Big 12 member schools should adopt rules and regulations, and I understand the factors relating to the effect of any such rules and regulations that member schools consider in analyzing those decisions.

7. I understand that the Plaintiffs' expert witnesses in this case have opined that, in the absence of NCAA rules preventing it, each conference defendant would have, at least since the fall semester of 2016, paid certain student-athletes a portion of the rights fees paid to the conferences under contracts with the conferences' media partners (such as ESPN/ABC or FOX) as compensation for the use of the student-athletes name, image, and likeness ("NIL") in broadcasting games. Specifically, as I understand it, Plaintiffs' expert witnesses think that A-5 conferences, including the Big 12, would have shared rights fees with student-athletes as follows:

    a. Each conference would determine the total broadcast rights fees received from media partners, the College Football Playoff, and the NCAA men's basketball tournament.

**DECLARATION OF CHAD WEIBERG (THE BIG 12 CONFERENCE, INC.) IN RE: COLLEGE ATHLETE NIL LITIGATION**, CASE NO. 4:20-CV-03919-CW

  b. Each academic year, all scholarship football players at conference member institutions would be paid an equal share of 10% of the conference's broadcast rights fees that Plaintiffs contend are attributable to football, which is 75% of unsegregated rights fees, or 7.5% of the conference's total rights fees.

  c. Each academic year, all scholarship men's basketball players at conference member institutions would be paid an equal share of 10% of the conference's broadcast rights fees that Plaintiffs contend are attributable to men's basketball, which is 15% of unsegregated rights fees, or 1.5% of the conference's total rights fees.

  d. Each academic year, all scholarship women's basketball players at conference member institutions would be paid an equal share of 10% of the conference's broadcast rights fees that Plaintiffs contend are attributable to women's basketball, which is 5% of unsegregated rights fees, or 0.5% of the conference's total rights fees.

8. I also understand that Plaintiffs' expert witnesses assert or assume that 5% of the value of unsegregated broadcast rights fees a conference receives are attributable to the remaining games and events that the conference sponsors.

9. By way of example, under Plaintiffs' damages model (the "Model"), for a conference receiving $100 million in broadcast rights fees annually, Plaintiffs' expert witnesses opine that the conference would have attributed $10 million among scholarship student-athletes as follows: (1) $7.5 million divided in equal shares among all scholarship football players; (2) $1.5 million divided in equal shares among all scholarship men's basketball players; (3) $500,000.00 divided in equal shares among all scholarship women's basketball players.

10. I further understand that, under the Model and as a matter of mathematics:

  a. Larger portions of the broadcast rights revenues are attributable to each student-athlete in conferences with fewer members;

  b. Larger amounts of the broadcast rights revenues are attributable to each student-athlete in conferences with higher broadcast rights revenues;

**DECLARATION OF CHAD WEIBERG (THE BIG 12 CONFERENCE, INC.) IN RE: COLLEGE ATHLETE NIL LITIGATION**, CASE NO. 4:20-CV-03919-CW

3

    c. Equal portions of broadcast rights revenues are attributable to athletes who are high-performing starters and low-performing athletes who rarely or ever play in a game;

    d. Larger amounts of broadcast rights revenues are attributable to each scholarship men's basketball player than each scholarship football player at a conference member as a result of the difference in the number of scholarships available in football and men's basketball; and

    e. Much smaller amounts of broadcast rights revenues are attributable to each scholarship women's basketball player than either each scholarship men's basketball player or each football player school or university.

11. I also understand that Plaintiffs' expert witnesses believe that, in the absence of NCAA rules to the contrary, the conferences would have made payments consistent with the Model to all qualifying student-athletes since 2016—or distribute such funds to their members, who would then be required to distribute them to student-athletes as described in the Model—and the NCAA and/or the A-5 conferences would have adopted rules allocating these values and authorizing payments consistent with them.

12. For the reasons set forth below, among others, I do not believe that OSU would support or vote in favor of the rules or interpretations necessary to implement the Model at the NCAA or A-5 conference level.

13. For one thing, even if student-athletes have NIL rights in broadcasted games, which I understand is disputed in this case, the assumption that student-athletes' NIL value is 10% of the broadcast's total value has no basis in any fact of which I am aware. I have participated in many conference initiatives in which broadcast rights were discussed, and I have never heard anyone discuss the portion of broadcast rights attributable to student-athlete NIL, let alone assign it a value separate from the value of other broadcast rights.

14. The Model fails to account for the fact that schools in A-5 conferences compete for talented student-athletes. I do not know of any reason why the A-5 conferences would agree to pay the same percentage to all scholarship student-athletes as all other A-5 conferences as set forth in

**DECLARATION OF CHAD WEIBERG (THE BIG 12 CONFERENCE, INC.) IN RE: COLLEGE ATHLETE NIL LITIGATION**, CASE NO. 4:20-CV-03919-CW

4

the Model. It is my understanding that broadcast revenues vary greatly by A-5 conference. Contrary to the Model, athletic departments at schools in lower revenue conferences might be pressured to supplement payments made to student-athletes under the Model by seeking increased support from their school, which could negatively impact academic and other opportunities for all students, in order to attract top talent and compete with schools in other A-5 conferences with higher revenues.

15. Likewise, the Model fails to account for the fact that Big 12 conference members compete with each other for student-athletes. I do not know of any reason that all schools within any conference would agree to the same percentage rate to be paid to student-athletes because doing so would prevent each member from using payments to compete with other members.

16. The Model also fails to account for the relative priority value certain sports have on certain campuses, particularly among non-revenue sports enjoying greater regional and local popularity. On the OSU campus, for example, our women's softball program is very successful, and as a result, it is very popular and receives significant media coverage and public attention. The Model puts this popular program on equal footing with all other non-revenue sports without any explained reason.

17. Other disparities the Model assumes are also concerning. I would be very concerned if adopting this Model created divisions on our campus, between our athletic programs, and among our student-athletes by requiring OSU to make payments in different amounts to student-athletes in different sports.

18. I would also be very concerned about the equal amounts that the Model requires be paid to each student-athlete in each sport. Student-athletes are typically extremely competitive individuals, and these equal payments risk causing conflicts within a team that could seriously damage the culture, collegiality, mutual support, and positive school spirit that is critical to the success of our athletic department.

**DECLARATION OF CHAD WEIBERG (THE BIG 12 CONFERENCE, INC.) IN RE: COLLEGE ATHLETE NIL LITIGATION**, CASE NO. 4:20-CV-03919-CW

19. I would also be concerned about the disparity between the so-called "NIL Payment" that would be paid to women student-athletes under the Model as compared with the amount that would be paid to football and men's basketball players.

20. Finally, an additional concern is the Model's potential financial impact on our athletic programs. Any payments to players would have to be funded by reducing other expenditures within OSU's Athletic Department. These would most likely come from reducing the level of services, benefits, and support provided to all student-athletes and to the extent that these are not sufficient to cover the increased cost, by reducing or eliminating Olympics sports programs that we currently sponsor.

21. I understand that Plaintiffs' expert witnesses opined that the Big 12 might make payments under the Model directly to our student-athletes. For several reasons, I do not believe that would or should occur. First, the Big 12's broadcast revenues are paid by the media partners in exchange for the media rights that each Big 12 member grants to the Big 12. That is, OSU's share of the Big 12's broadcast rights revenues are distributed according to the Big 12's Bylaws. Second, there could be situations in which a student-athlete becomes ineligible to receive the payments under the Model because he or she becomes competitively ineligible, leaves school or the team or violates any conduct requirements. OSU, not the Big 12, would be responsible for that determination.

22. In conclusion, for many reasons, including all of those noted above, I do not know how I could support a proposal to adopt the Model, knowing the negative impact that it would have on our student-athletes, the disparities it would create between various classes of student-athletes, and the likelihood OSU would be forced to cut a significant number of sports we sponsor.

_Chad Weiberg_
Chad Weiberg
Signed April 28, 2023

**DECLARATION OF CHAD WEIBERG (THE BIG 12 CONFERENCE, INC.) IN RE: COLLEGE ATHLETE NIL LITIGATION**, CASE NO. 4:20-CV-03919-CW