Leane K. Capps (*pro hac vice*)
POLSINELLI PC
2950 N. Harwood, Suite 2100
Dallas, TX 75201
Telephone: (214) 397-0030
Facsimile: (214) 397-0033
Email: lcapps@polsinelli.com

Amy D. Fitts (*pro hac vice*)
Phil Zeeck (*pro hac vice*)
POLSINELLI PC
900 W. 48th Place
Kansas City, MO 64112
Telephone: (816) 753-1000
Facsimile: (816) 753-1536
Email: afitts@polsinelli.com
Email: pzeeck@polsinelli.com

Wesley D. Hurst (SBN 127564)
POLSINELLI LLP
2049 Century Park East
Suite 2300
Los Angeles, CA 90067
Telephone: (310) 556-1801
Fax: (310) 556-1802
Email: whurst@polsinelli.com

*Attorneys for Defendant The Big 12 Conference, Inc.*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| In re College Athlete NIL Litigation | Case No. 4:20-cv-03919-CW |
|---|---|
| | **DECLARATION OF MACK RHOADES** |

1.  I make this declaration of my own personal knowledge and, if called on to do so, could testify competently and under oath to the facts stated herein.

2.  I have had the honor of leading four NCAA Football Bowl Subdivision intercollegiate athletic programs, including currently serving as the Vice President and Director of Intercollegiate Athletics at Baylor University, which is located in Waco, Texas.

3.  I have served in my current role at Baylor since July of 2016. Prior to coming to Baylor, I served as the Director of Athletics at the University of Missouri - Columbia, a member of

DECLARATION OF MACK RHOADES (THE BIG 12 CONFERENCE, INC.) IN RE: COLLEGE ATHLETE NIL LITIGATION, CASE NO. 4:20-CV-03919-CW

1

the Southeastern Conference. Before joining the University of Missouri in 2015, I served for over five years as the Vice President of Intercollegiate Athletics at the University of Houston (2009-2015) of the American Athletic Conference. During my time at Houston, I served as chair of the American Athletic Conference Athletics Directors Committee and in other conference leadership roles.

4. I spent 3 years as the Director of Intercollegiate Athletics at the University of Akron (2006-2009) of the Mid-American Conference and 9 years in the sports departments at the University of Texas – El Paso (1998-2006) and Marquette University (1997-98), after beginning my career at Yale (1996-1997).

5. I received a bachelor's degree in Health Sciences from the University of Arizona in 1993 and a Master of Science degree in Athletics Administration/Sports Management from Indiana University in 2002.

6. Baylor has been a member of The Big 12 Conference, Inc. (the "Big 12") since the Big 12 began athletic competition in 1996. In the 2020-2021 season, our men's basketball team won its first Big 12 regular season championship and went on to win its first ever NCAA National Championship. Academically, in 2020-21 Baylor student-athletes set a school record with an overall score of 94 in Graduation Success rate that led the Big 12 for the seventh-straight year and ranked 10th nationally among schools in the 5 largest collegiate sports conferences—the "Autonomy 5" or "A-5" conferences. In addition, in 2021 I was honored to be selected as sports Business Journal's Athletics Director of the Year and was chosen as the National Association of Collegiate Directors of Athletics Under Armour Athletics Director of the Year.

7. As Director of Intercollegiate Athletics, I am responsible for overseeing all aspects of Baylor's varsity sports programs. This year, Baylor sponsored teams in 19 sports.

8. I understand that the Plaintiffs' expert witnesses in this case have opined that in the absence of NCAA rules preventing it, each A-5 conference defendant would have, at least since the fall semester of 2016, paid certain student-athletes a portion of the rights fees paid to the A-5 conferences under contracts with its media partners (such as ESPN/ABC or FOX) as compensation

DECLARATION OF MACK RHOADES (THE BIG 12 CONFERENCE, INC.) IN RE: COLLEGE ATHLETE NIL LITIGATION, CASE NO. 4:20-CV-03919-CW

2

for the use of the student-athletes name, image, and likeness ("NIL") rights. Specifically, as I understand it, Plaintiffs' expert witnesses think that A-5 conferences, including the Big 12, would have made NIL payments to student-athletes as follows:

    a. Each conference would determine the total broadcast rights fees received from media partners, the College Football Playoff, and the NCAA men's basketball tournament.

    b. Each academic year, all scholarship football players at conference member institutions would be paid an equal share of 10% of the conference's broadcast rights fees that Plaintiffs contend are attributable to football, which is 75% of unsegregated rights fees, or 7.5% of the conference's total rights fees.

    c. Each academic year, all scholarship men's basketball players at conference member institutions would be paid an equal share of 10% of the conference's broadcast rights fees that Plaintiffs contend are attributable to men's basketball, which is 15% of unsegregated rights fees, or 1.5% of the conference's total rights fees.

    d. Each academic year, all scholarship women's basketball players at conference member institutions would be paid an equal share of 10% of the conference's broadcast rights fees that Plaintiffs contend are attributable to women's basketball, which is 5% of unsegregated rights fees, or 0.5% of the conference's total rights fees.

9. I also understand that Plaintiffs' expert witnesses assume that 5% of the value of unsegregated broadcast rights fees a conference receives are attributable to the remaining games and events that the conference sponsors.

10. As an example, under Plaintiffs' damages model (the "Model"), for an A-5 conference receiving $100 million in broadcast rights fees annually, Plaintiffs' expert witnesses suppose that the A-5 conference would have attributed $10 million among scholarship student-athletes as follows: (1) $7.5 million divided in equal shares among all football players; (2) $1.5

DECLARATION OF MACK RHOADES (THE BIG 12 CONFERENCE, INC.) IN RE: COLLEGE ATHLETE NIL LITIGATION, CASE NO. 4:20-CV-03919-CW

3

million divided in equal shares among all men's basketball players; (3) $500,000.00 divided in equal shares among all women's basketball players.

11. I further understand that, under the expert witnesses' Model and as a matter of mathematics:

   a. Larger portions of the broadcast rights revenues are attributable to each student-athlete in conferences with fewer members;

   b. Larger amounts of the broadcast rights revenues are attributable to each student-athlete in conferences with higher broadcast rights revenues;

   c. Equal portions of broadcast rights revenues are attributable to athletes who are high-performing starters and low-performing athletes who rarely or ever play in a game;

   d. Larger amounts of broadcast rights revenues are attributable to each men's basketball player than each football player at a conference member as a result of the difference in the number of scholarships available in football and men's basketball; and

   e. Much smaller amounts of broadcast rights revenues are attributable to each women's basketball player than either each men's basketball player or each football player at a conference member.

12. Baylor would not support or vote in favor of any rules or interpretations necessary to implement the Model at the NCAA or A-5 conference level.

13. The assumption that the value of student-athlete NIL in a broadcast is 10% of the broadcast's total value seems to me to be completely arbitrary. In my over 25 years of experience in intercollegiate sports, I have never heard of a media partner, member school, or conference discuss the value of a game or contest in two such parts—the value of the performance on the field and the value of the student-athlete NIL.

14. In addition, I do not know any reason that all A-5 conferences would agree to pay the same percentages to all scholarship student-athletes as the Model proposes. Public reports indicate that the A-5 conferences' revenues differ greatly. A low-revenue conference would

DECLARATION OF MACK RHOADES (THE BIG 12 CONFERENCE, INC.) IN RE: COLLEGE ATHLETE NIL LITIGATION, CASE NO. 4:20-CV-03919-CW

4

1  therefore have every incentive to pay its student-athletes a greater percentage than competing conferences to attract the best high-school and transfer athletes.

15. And from a recruiting perspective, the Model would have a potentially devastating impact on the ability of schools in all but the richest conferences to recruit student-athletes out of high school or transfers from the transfer portal to come to play at their schools. The Model bases the amount that can be paid to student-athletes in each conference on a percentage of conference's broadcast rights revenues. Therefore, the conference with the highest amount of revenues can provide its student athletes with the highest payments. Although schools like Baylor offer student-athletes the same or similar levels of other benefits as other universities, this level of differentiation would absolutely put the schools in lower-revenue conferences at a significant economic disadvantage in recruiting highly ranked prospects, which could well further negatively impact the competitive balance between the schools in the highest- and in the lowest-resourced A-5 conferences, which would negatively impact college sports on the whole.

16. The Model also fails to take into account the individual needs of the schools and universities that are within any particular A-5 conference. The revenues that the Big 12 receives from its media rights partners are generated from a grant of rights from each member of the conference to the Big 12 and therefore, in part, belong to the members also, even if they first flow through the Big 12 before being distributed to the members of the Big 12 according to the Big 12 Bylaws. At Baylor, we use these revenues to fund all of the athletic department programs, not just football and men's and women's basketball, and only Baylor can allocate them to achieve our institution's unique priorities and to benefit all student-athletes in the athletic department.

17. Moreover, from my experience, it makes no logical sense for the Model to only include payments for scholarship athletes. "Walk on" student-athletes often play a very valuable role in the success of their team, and their NIL is just as much a part of a broadcast as the most visible scholarship athletes. The Model also does not account for a student-athlete who leaves the team or school during a season for personal reasons, loses his or her scholarship for any reason, or is a walk on and then is awarded scholarship status during a season.

DECLARATION OF MACK RHOADES (THE BIG 12 CONFERENCE, INC.) IN RE: COLLEGE ATHLETE NIL LITIGATION, CASE NO. 4:20-CV-03919-CW

5

18. I am also concerned about the extra costs the Model would impose on Baylor's sports programs. At Baylor, the Athletic Department strives to be financially self-sufficient, as any subsidies it may receive from the University will adversely impact the University's overall budget. The Model's increased expenses do not come with any additional incremental revenue to the Athletic Department, so they would have to be funded with reductions in other Athletic Department expenses like travel, academic services, mental and physical health, physical conditioning support, character formation and our spiritual growth and mission programs, or by increased subsidies from the University.

19. The ultimate result of this proposed Model could lead to Baylor having to decide whether to eliminate sports program opportunities, which would disproportionately negatively impact Olympic sports and reduce opportunities for all of our student-athletes. As noted above, the resulting reduction in the athletic opportunities we offer to student-athletes in Olympics sports, which have for decades been extremely important to Baylor athletics and the lifeblood of United States Olympic teams, could have an overall negative effect on collegiate sports.

20. Opportunities for high school student-athletes also could be reduced if we adopted the Model. Certain student-athletes will have an incentive to stay in school and extend their eligibility to collect the additional payments for which the Model provides. This may delay or deny high school players the opportunity to participate in certain sports at the collegiate level.

21. Finally, a key overriding tenet of Baylor's athletic program is that we believe we have a duty to treat all our student-athletes fairly, so that they feel valued by their team, by our broader sports enterprise and on our campus, from walk on to star player, no matter the sport. We operate to provide personal, academic, and athletic opportunities. Reducing opportunities for our student-athletes or changing how we care for our student-athletes would conflict with the cultural, philosophical, and moral bedrocks of our athletics programs and of our University as a faith-based institution.

DECLARATION OF MACK RHOADES (THE BIG 12 CONFERENCE, INC.) IN RE: COLLEGE ATHLETE NIL LITIGATION, CASE NO. 4:20-CV-03919-CW

6

_signature_

Mack B. Rhoades IV
Signed April 25, 2023

DECLARATION OF MACK RHOADES (THE BIG 12 CONFERENCE, INC.) IN RE: COLLEGE ATHLETE NIL LITIGATION, CASE NO. 4:20-CV-03919-CW

7