DocuSign Envelope ID: 1BF3C6F6-B3C8-454F-BEAE-11FD65570B08

Richard C. Smith
Sean Solomon
**LINKLATERS LLP**
601 Thirteenth Street NW
Suite 400 South
Washington, D.C. 20005
T: (202) 654-9200
F: (202) 654-9210
richard.smith@linklaters.com
sean.solomon@linklaters.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| In re College-Athlete NIL Litigation | Case No. 4:20-cv-03919-CW |
|---|---|
| | **SUPPLEMENTAL DECLARATION OF STEVEN J. SCEBELO** |

1.  On September 26, 2022, I provided a Declaration in response to Plaintiffs' third-party subpoena for the production of documents, dated December 2, 2021, addressed to the National Football League Players Association ("NFLPA"), in the above-caption action in my capacity as President at National Football League Players Incorporated, d/b/a NFL PLAYERS (hereinafter "PI"). This Supplemental Declaration provides additional detail and factual information regarding the subject-matter of my initial declaration. I have personal knowledge of each of the facts stated herein and, if required to testify, I could and would have testified to the following.

DocuSign Envelope ID: 1BF3C6F6-B3C8-454F-BEAF-11FD65570B08

2. As part of the collective bargaining process, the NFLPA, as the union for NFL players, negotiates a standard NFL Player Contract with the NFL. A copy of the current standard NFL Player Contract is attached as **Exhibit A**.[1] This standard form contract is signed by each player and the particular Club that they agree to play for.

3. Minimum salaries and salary caps are negotiated by the NFLPA pursuant to the collective bargaining process. The salaries of NFL players are negotiated on a player-by-player basis by and among the players, their agents (where applicable), and the particular Club they play for. The Club pays the player's salaries, not the NFL. The players are technically employees of the Club, not the NFL.

4. In section 4(a) of Exhibit A, the players grant the Club and the NFL the right and authority to use player NIL for the promotion of the NFL, sport, or any particular game. There is no separate payment (aside from each players' salary, benefits and related incentives) tied to that grant of rights.

5. Also in section 4(a), the form NFL Player Contract states that the signing player agrees to "not contest" the exclusive rights of the NFL to broadcast games or excerpts thereof. This language has been included in the form NFL Player Contract since at least 2006.

6. The NFLPA does not negotiate the agreements for the broadcast (or re-broadcast) of NFL games.

---

[1] This form contract is attached to the Collective Bargaining Agreement ("CBA") negotiated between the NFLPA and the League. A public copy of the most recent CBA can be found here: https://nflpaweb.blob.core.windows.net/website/PDFs/CBA/March-15-2020-NFL-NFLPA-Collective-Bargaining-Agreement-Final-Executed-Copy.pdf.

7. The NFLPA is not aware of any valuation performed by it or anyone else that separates out the value of a network using or licensing NFL players' (individually or as a group) NIL in the broadcast (or re-broadcast) of games.

8. Other than minimum salaries negotiated by the NFLPA in the collective bargaining process, NFL players do not receive the same salaries for playing their sport, which includes appearing in television broadcasts (and re-broadcasts) of NFL games. NFL Player salaries vary greatly. Individual NFL player salaries also vary over time depending on a number of factors.

9. As set forth in paragraph 23 of my initial declaration, revenues generated by the NFL in connection with the broadcast (and re-broadcast) of NFL games are included with other revenues, such as ticket and concession sales, for the calculation of various benefits for NFL players, such as the Salary Cap, Minimum Team Cash Spending, and other metrics that affect player compensation. These broadcast revenues, however, are not paid or shared directly with the NFL players separate from the player salaries. And, to the extent that those revenues are the source of players' salaries, they are not distributed to the players equally. Rather, players individually negotiate their salaries with each Club based on a number of factors.

10. Paragraphs 7-20 of my initial declaration set forth PI's engagement in group licensing on behalf of groups of six or more NFL players and the manner in which revenues generated from the group licensing program are distributed to NFL players: Group Licensing Revenue, "premium" royalties, and marketing/endorsement revenue. Of these three types of distributions to players, the Group Licensing Revenue and a portion of the "premium royalties" are shared equally by all qualifying players. The other revenue generated from the group licensing program—"premium royalties" and marketing/endorsement revenue—are generally distributed to the individual players based on the revenue generated by the use of specific player NIL.

11. For example, jersey sales are considered part of the "premium royalties" category. The majority of revenue generated from individual jersey sales are not shared equally among all qualifying players.

12. The amounts distributed to any individual player as a result of PI's engagement in group licensing are generally show on the NFLPA's LM-2 Labor Organization Annual Report, filed with the Department of Labor each year. The NFLPA's LM-2 for March 1, 2021 through February 28, 2022 can be found at https://olmsapps.dol.gov/query/orgReport.do?rptId=821749&rptForm=LM2Form. As indicated in the NFLPA's LM-2 for the 2020-21 NFL season, $19,640.00 was the base amount of revenue from the Group Licensing Pool distributed to all eligible NFL Players in 2021. Some players are distributed much more than this amount because of either premium royalties through the group licensing program, marketing/endorsement revenue, or other individual services they have provided to the NFLPA.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on __ April, 2023.

05 April 2023

_____
Steven J. Scebelo