**LATHAM & WATKINS LLP**
Christopher S. Yates (SBN 161273)
Aaron T. Chiu (SBN 287788)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
chris.yates@lw.com
aaron.chiu@lw.com

Anna M. Rathbun (SBN 273787)
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-1061
Facsimile: (202) 637-2201
anna.rathbun@lw.com

**FOX ROTHSCHILD LLP**
D. Erik Albright (*pro hac vice*)
Jonathan P. Heyl (*pro hac vice*)
Gregory G. Holland (*pro hac vice*)
230 North Elm Street, Suite 1200
Greensboro, NC 27401
Telephone: (336) 378-5200
Facsimile: (336) 378-5400
ealbright@foxrothschild.com
jheyl@foxrothschild.com
gholland@foxrothschild.com

Attorneys for Defendant
ATLANTIC COAST CONFERENCE

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | No. 4:20-cv-03919 CW<br><br>**DECLARATION OF BLAKE JAMES** |

A. **Personal Background**

1. I am the William V. Campbell Director of Athletics at Boston College ("BC"). BC is a member of the Atlantic Coast Conference (the "ACC" or the "Conference"). I make this declaration of my own personal knowledge and, if called on to do so, could testify competently to the facts stated herein under oath.

2. I graduated from Minnesota State University-Mankato with a degree in marketing. I earned a master's degree in sports administration from St. Thomas University.

3. Prior to joining BC, I served as director of athletics at the University of Maine, where I directed nineteen Division I sports. In 2013, I became the director of athletics at the University of Miami, where I managed 18 Division I sports, and served until 2021, during that period Miami won multiple NCAA and ACC championships across numerous sports. Miami is also a member of the ACC.

4. Over the course of my career, I have served on the NCAA Board of Directors (2017-2019), NCAA Board of Governors (2017-2019), the NCAA Football Oversight Committee (2015-2017), and held leadership roles on the NCAA Student Athlete Experience Committee (2019-2021). I also served as chair of the NCAA Division I Council, the group responsible for the day-to-day decision making for all Division I athletics. Within the ACC, I served on the Football Committee, the NIL Committee, and the Finance and Audit Committee, and was named chair of the conference's athletics directors. I was selected as one of four recipients of the Under Armour Athletic Director of the Year award by the National Association of Collegiate Directors of Athletics in 2016.

5. As William V. Campbell Director of Athletics at BC, I report directly to the school's President, William P. Leahy, S.J. At BC, our mission statement is to "provide our student-athletes with an exceptional experience fostering values, personal growth, and athletics excellence."

6. BC student-athletes compete in 29 NCAA sports. Over BC's athletics history, its student-athletes have won 6 NCAA team championships and 6 NCAA individual championships. During that time, BC teams have also won 37 conference team championships (regular season),

40 conference team championships (tournament), and have produced 65 conference individual champions. BC's most recent team championship was the ACC women's lacrosse championship (regular season) from this Spring.

7. In 2021-22, BC's student-athletes had an overall NCAA Graduation Success Rate of 96%. During the 2021–22 season, our student-athletes as a whole exceeded a 3.1 grade point average.

### B. Plaintiffs' Proposed Rules

8. I understand that the Plaintiffs' expert witnesses have offered the opinion that in the absence of NCAA rules preventing conferences or institutions from paying a share of broadcast rights fees to student-athletes, each of the five conferences named as defendants in this lawsuit (also referred to as the Autonomy-5 conferences ("A5")) would have, at least since the fall semester of 2016, shared rights fees attributable to broadcasts and other distributions (internet, cable, satellite etc.) of games and events (all collectively referred to here as "broadcast rights revenues" or "broadcast rights fees") with student-athletes as follows:

    a. Each conference would determine the total of its broadcast rights fees received from the NCAA, the College Football Playoff, and from its own license agreements with broadcasters (such as CBS, NBC, ABC/ESPN, and FOX).

    b. Each academic year, every football player enrolled at and receiving a scholarship from a member institution in such conference would be paid 10%, in equal shares, of the total broadcast rights fees received by the conference that Plaintiffs contend are attributable to football (based in part on the opinions of the Plaintiffs' experts that 75% of any unsegregated broadcast rights fees received are attributable to football).

    c. Each academic year, every men's basketball player enrolled at and receiving a scholarship from a member institution in such conference would be paid 10%, in equal shares, of the total broadcast rights fees received by the conference that Plaintiffs contend are attributable to men's basketball (based in part on the

opinions of the Plaintiffs' experts that 15% of any unsegregated broadcast rights fees received are attributable to men's basketball).

    d.    Each academic year, every women's basketball player enrolled at and receiving a scholarship from a member institution in such conference would be paid 10%, in equal shares, of the total broadcast rights fees received by the conference that Plaintiffs contend are attributable to women's basketball (based in part on the opinions of the Plaintiffs' experts that 5% of any unsegregated broadcast rights fees received are attributable to women's basketball).

I further understand that Plaintiffs' experts assert or implicitly assume that 5% of the value of the unsegregated broadcast rights fees received by a conference are attributable to the remaining games and events, including numerous other sports at ACC member institutions.

    9.    If my understanding of Plaintiffs' experts' methodology is correct, then different amounts would be paid to student-athletes in the same sports in different conferences due to the differences in the level of broadcast revenues received by each conference. Starters would be paid the same amount as athletes who rarely or never play in a game; men's basketball players would receive higher payments than the payments provided to football players attending the same institution; women's basketball players would receive smaller payments than those provided to men's basketball and football players attending the same institution; no payments would be given to team members who are non-scholarship or "walk-on" players regardless of whether their contribution in any game – and/or visibility in any broadcast of such game – is greater than or equal to any players who are receiving scholarships; and some student-athletes on scholarship would be paid, even though they did not participate in broadcasted games.

    10.    I also understand that the Plaintiffs' experts have concluded that each of the A5 conferences would make these payments to student-athletes directly or would distribute payments to the member institutions of each A5 conference in restricted form, earmarked for student-athletes to be paid by the institutions as set forth above.

-4-

DECLARATION OF BLAKE JAMES
(Case No. 4:20-cv-03919-CW)

### C. BC Would Not Adopt Plaintiffs' Proposed Rules

11.    For broadcast licensing revenues to be shared with scholarship football and basketball student-athletes as set forth and summarized above (herein referred to as "Plaintiffs' Proposed Rules"), NCAA rules would have to be interpreted, revised, or adopted to permit and require 10% (but not more than 10%) of each conference's broadcast licensing revenues (as allocated between football, men's and women's basketball, and other sports) to be shared with student-athletes. In addition, the ACC would have to adopt rules that would implement and mandate the revenue distribution structure outlined in Plaintiffs' Proposed Rules. These rules would require that the ACC pay (or distribute funds to member institutions to pay) each scholarship football, men's basketball, and women's basketball student-athlete at each member institution the same dollar amount of shared broadcast. The rules would also require that every scholarship student-athlete be paid his or her share of the 10% of allocated revenues.

12.    BC would not support or vote in favor of such rules or interpretations (at the NCAA or ACC level) necessary to implement Plaintiffs' Proposed Rules.  Based on my personal experience as an athletics administrator, and my knowledge of the competitive forces and dynamics and considerations that lead to the adoption and rejection of rules in college athletics, it is unrealistic to conclude or assume that Plaintiffs' Proposed Rules would ever be implemented. Plaintiffs' Proposed Rules are simply not plausible.

13.    Under Plaintiffs' Proposed Rules, each of the A5 conferences and their member institutions would have to agree to interpret or implement NCAA rules requiring that each scholarship football, men's basketball, and women's basketball player be paid, per capita and in equal dollar amounts within each sport, exactly 10% of broadcast rights revenues purportedly attributable to each sport (75% to football, 15% to men's basketball, and 5% to women's basketball). Based on my knowledge of and experience with the decision-making process in the ACC and in the NCAA, and competition in recruiting student-athletes, it is highly unlikely that the A5 conferences and their member institutions would agree to interpret or implement NCAA rules to get this result.

14. The A5 conferences receive greatly varying amounts, from conference to conference, in broadcast rights fees. (This has been widely reported in the media, for example at https://awfulannouncing.com/ncaa/navigate-big-ten-ACC-payouts-power-five.html.)

15. By setting the share of revenues as 10% of broadcast rights fees allegedly attributable to each sport, institutions in conferences with lower total broadcast rights fees would be disadvantaged in recruiting. Under Plaintiffs' Proposed Rules, BC and the ACC would be disadvantaged in recruiting if any other conference had higher broadcast rights fees, thereby resulting in a larger distribution of revenues to each student-athletes than would be the case in the ACC. Based on my experience in the ACC and with the ACC decision-making process, and on competition for recruiting student-athletes, this is not a distribution structure that BC or any other ACC member institution would agree to implement.

16. I am a participant in and have extensive experience with the ACC's decision-making process and understand the considerations that the various member institutions take into account when voting on proposals. In the ACC, each member institution has one vote on every decision or action. The ACC decision-making process is collaborative and collective. When the ACC considers changes to its rules concerning student-athlete eligibility and benefits or concerning distribution of funds to member institutions, the ACC solicits input on proposals from the Athletics Directors and others at each member institution. Each member institution votes on every proposal based on this input. This would be the process for considering any proposal to adopt the revenue-sharing structure Plaintiffs have posited.

**D. Plaintiffs' Proposed Rules Are Inconsistent With BC's Commitment to Fairness**

17. BC could not support, implement or engage in the revenue sharing structure set forth in Plaintiffs' Proposed Rules, because it would result in substantially larger and more payments to football and men's basketball players than to women's basketball players. BC is strongly committed to fairness and equality, see https://bceagles.com/sports/2021/11/10/DiversityStatement.aspx, and to both the policy goals and the legal requirements of Title IX. Both as a matter of policy and legal compliance, BC strives to ensure that benefits are provided to male and female student-athletes in proportion to their

representation in the student population (which at BC is approximately 47% male and 53% female, and at many state universities is also more than 50% female).

18. Plaintiffs' Proposed Rules assume that 98 male players (the total scholarship limit for football and basketball combined) and just 15 female players (which is the total scholarship limit for women's basketball) would receive revenue sharing payments. Plaintiffs' Proposed Rules also attribute only 5% of the value of broadcast rights fees to all other sports, so it would be mathematically impossible to balance the payments between male and female student-athletes in a proportional way, as I understand is required by Title IX.

19. Regardless, whether the Plaintiffs' Proposed Rules would create a structure for distribution of revenues to student-athletes which would violate Title IX or not, fairness and equality goals and policies that are important to BC would prevent BC from agreeing to Plaintiffs' Proposed Rules. Simply stated, for fairness and equality reasons alone, the distribution model in Plaintiffs' Proposed Rules would not be implemented at BC.

20. BC would not be the only ACC member institution with this negative judgment. In my experience and opinion, every institution of every defendant conference would consider the Title IX and fairness and equality concerns inherent in Plaintiffs' Proposed Rules. These concerns alone would make it exceedingly difficult, and in my opinion impossible, for either NCAA or ACC rules to be interpreted or implemented in a manner consistent with Plaintiffs' Proposed Rules.

E. **Plaintiffs' Proposed Rules Would Be Unfair to Many BC Student-Athletes**

21. In addition to fairness and equality concerns, BC and, I believe, other ACC member institutions would also reject Plaintiffs' Proposed Rules because they would restrict each institution's ability to direct resources as it sees fit. BC has always been free to determine where to direct its financial resources between and among different sports programs. I know of no basis for allocating 75% of the revenues to football players, 15% to men's basketball players, and 5% to women's basketball players, which is what would occur under Plaintiffs' Proposed Rules.

22. At BC, football and men's basketball are the only two programs that generate more revenues than expenses. BC subsidizes all of its other sports programs, including BC's women's basketball program, because the expenses of the programs exceed the revenues of the programs.

However, some of our other sports such as hockey and women's lacrosse are popular with our fans, have experienced considerable competitive success, and require less of a subsidy than women's basketball. It would be unfair for a share of 5% of broadcast rights fees to be distributed to women's basketball players, with only 5% remaining to be shared among at least 26 other sports programs, some of which are more popular and require less of a subsidy than women's basketball.

23. I also know of no reason to assume that ACC member institutions (or any other A5 conferences or institutions) would decide to pay each scholarship men's basketball player more total dollars than each scholarship football player.

24. BC and other A5 member institutions do not distribute scholarships and other benefits based on the revenues from athletic programs. Within limitations imposed by the NCAA rules, institutions fund scholarships, teams, and athletic programs based on numerous considerations (including fairness and equality) that are individualized to each institution. That is certainly true at BC.

25. Recruiting competition (both among ACC member institutions and with institutions outside the ACC) is intense in *all* sports. If broadcast revenue is to be shared with student-athletes, it will inevitably influence student-athlete's decisions about where to enroll and whether to (and where to) transfer. It would be important that BC be able to allocate revenues toward recruiting student-athletes in sports that are priorities for BC, based on fan interest, financial performance, fairness and equality considerations, and any and all other relevant factors. Based on my experience, I believe all other ACC member institutions (and all other A5 member institutions) would share these same concerns.

26. To the extent Plaintiffs are contending that each ACC or A5 member institution would voluntarily provide (or agree to pass or support rules requiring) the maximum payment to each scholarship student-athlete playing football, men's basketball, or women's basketball, that contention also does not comport with reality. Many student-athletes would enroll at BC, and at other institutions, without requiring or expecting any share of revenues. It would make no sense to require revenues to be shared with those student-athletes or to interpret (or adopt) NCAA or ACC

rules requiring such mandatory payments, with unjustified budgetary ramifications and adverse impacts on other sports.

**F. Plaintiffs' Proposed Rules Would Negatively Affect BC's Athletics Budget, Potentially Leading to Fewer Opportunities for Student-Athletes**

27. BC generates athletics revenues from the following:

   a. distributions from the ACC (from broadcast rights license fees received by the ACC, ACC championships ticket sales, ACC sponsorships, and from NCAA distributions to the ACC of a share of NCAA broadcast rights, sponsorship, and ticket sales revenue),

   b. revenues from sales of tickets to regular season BC home sports competitions,

   c. revenues from game day concessions, merchandise sales, licensees, and from sponsors of BC athletics, and

   d. donations from alumni and other supporters of BC athletics.

28. Most of the expenses of BC's athletic program are incurred at the institutional level (for facilities, coaches, scholarships, travel, and other direct and indirect expenses of an athletic program) and not by the NCAA or ACC. Under my direction, BC budgets its revenues and expenses with the goal of meeting institutional expectations for a balanced budget. Plaintiffs' Proposed Rules would make the financial challenges associated with having a balanced budget – while also trying to support BC's teams to the full extent permitted by the NCAA rules – insurmountable.

29. Plaintiffs' Proposed Rules would lead to devastating results for BC's budget and for BC's ability to support all of its current sports programs and student-athletes.

30. BC is an efficiently managed athletics program, with no options for materially reducing expenses other than eliminating sports, reducing financial support for current sports programs, or reducing the number of scholarship athletes. If the ACC distributed broadcast rights fees to student-athletes as contemplated by Plaintiffs' Proposed Rules, BC would have to cut expenses to keep the athletics program financially afloat. In such event, I would have to make decisions on how to reduce expenses and, as a practical matter, would have to choose whether to

(a) eliminate certain sports programs, (b) reduce the amount budgeted to support each sports program, (c) reduce the number of student-athletes on each team, and/or (d) some combination of all of the above. If Plaintiffs' Proposed Rules were implemented, I cannot envision a scenario where BC would not have to drop multiple sports. In other words, if Plaintiffs' Proposed Rules were implemented, BC would have to eliminate some sports, thus leading to reduced overall opportunities for student-athletes at BC. That is a result I would not favor or support.

31. The revenue distribution scheme fundamental to Plaintiffs' Proposed Rules would create other incentives and disincentives that are of concern to me and that would make it untenable for BC (or, in my opinion, other ACC member institutions) to support, agree to, or implement Plaintiffs' Proposed Rules. To gain an advantage in recruiting incoming and transfer student-athletes, and in retaining enrolled student-athletes, conferences and institutions would have strong incentives to reduce the number of players on a team (to increase each player's share of revenue) and to reduce the number of teams sponsored by each institution.

32. Based on my years of experience as an athletic director at the NCAA Division 1 level, Plaintiffs' Proposed Rules enhance the economic incentives for institutions to leave or restructure conferences. Thus, even apart from the likely adverse effects on opportunities for student-athletes, it would also not be in college athletics' best interest to support a structure that would create a substantial risk of conference restructuring and reorganization.

33. I also know of no reason to assume that the more talented and coveted student-athletes would agree to enroll, compete on a team, and/or release or transfer any NIL rights for the same amounts paid to less talented players. Currently, now that NCAA rules have been modified to permit student-athletes to license their NIL rights to third parties, many student-athletes have agents and are appropriately attentive to the value they bring to their sports competition. It is not realistic to conclude that every student-athlete would agree to accept a share of broadcast rights fees equal to the share of all others on his or her team.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on April 27 2023 in Boston.

1
2   _____
    BLAKE JAMES
3
4
...
28

-11-
DECLARATION OF BLAKE JAMES
(CASE NO. 4:20-CV-03919-CW)