Mark J. Seifert (SBN 217054)
SEIFERT LAW FIRM
50 California Street, Suite 1500
San Francisco, California  94111
Tel.    (415) 999-0901
Fax    (415) 901-1123
mseifert@seifertfirm.com

Robert W. Fuller (*pro hac vice*)
Lawrence C. Moore, III (*pro hac vice*)
Amanda P. Nitto (*pro hac vice*)
Travis S. Hinman (*pro hac vice*)
ROBINSON, BRADSHAW & HINSON, P.A.
101 N. Tryon St., Suite 1900
Charlotte, NC 28246
Tel.    (704) 377-2536
Fax    (704) 378-4000
rfuller@robinsonbradshaw.com
lmoore@robinsonbradshaw.com
anitto@robinsonbradshaw.com
thinman@robinsonbradshaw.com

Attorneys for Defendant
SOUTHEASTERN CONFERENCE

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| In re College Athlete NIL Litigation | Case No. 4:20-cv-03919-CW <br><br> **DECLARATION OF RAY TANNER** |

1.    I am the Athletics Director at the University of South Carolina ("USC" or the "University"). I make this declaration of my own personal knowledge and, if called on to do so, could testify competently to the facts stated herein under oath.

2.    I received my undergraduate degree from North Carolina State University ("NCSU") in 1980, where I was a student-athlete on the baseball team. I started my career in college athletics as an assistant baseball coach at NCSU immediately after graduation, and I became the head baseball coach at NCSU in 1987. In 1997, I left NCSU to become the head baseball coach at USC. The USC men's baseball team won the NCAA championship, known as the College World Series, in 2010 and 2011. In July of 2012, I became the Athletic Director at USC.

3.    During my tenure as Athletic Director, USC student-athletes have won three national championships (2014 equestrian; 2017 & 2021 women's basketball), 17 SEC regular season and tournament championships, and have posted three of the top six finishes in the Learfield IMG College Directors' Cup All-Sports Standings. In addition, USC student-athletes have posted a cumulative 3.0 grade point average or better in 32 consecutive semesters, including an overall GPA of 3.700 in Spring 2020 that was a school record, topping the previous mark of 3.338 set in Spring 2019. USC student-athletes have also earned more SEC Academic Honor Roll honors than any other school.

4.    I understand that the Plaintiffs' expert witnesses have opined that in the absence of NCAA rules preventing it, each conference defendant would have, at least since the fall semester of 2016, shared broadcast rights fees with student-athletes under a structure where (a) every scholarship student-athlete who plays football, men's basketball, or women's basketball would receive the same amount as every other scholarship student-athlete in the same sport in the same

conference, but (b) the amount of the revenues shared would be different for scholarship student-athletes in different conferences. I further understand that, for the 2021 academic year, Plaintiffs' payment structure would result in the SEC providing the largest payment to football players, with the Big Ten a few thousand dollars lower on a per player basis, and the ACC, Big 12, and Pac-12 approximately $10,000 to $15,000 lower than the SEC and Big Ten on a per player basis. I understand that Plaintiffs' payment structure would result in a similar distribution of differential payments among conferences in men's basketball and women's basketball, with men's basketball players receiving almost twice as much as football players (by conference) and women's basketball players (by conference) receiving 25-35% of the amounts paid to football players and 12-19% of the amounts paid to men's basketball players.

5. I also understand that the Plaintiffs' experts have derived this payment structure by allocating 10% of what they regard as broadcast revenues received by each conference attributable to each sport to each scholarship athlete in that conference, so that, if the broadcast revenues stayed the same, a conference would be able to make larger payments per scholarship athlete by having fewer member institutions or by reducing the maximum number of scholarships in a sport for each team in the conference.

6. I also understand that the Plaintiffs' experts have asserted that the revenues available for each conference to share with student-athletes in all sports other than football and basketball would be limited to the total amount shared with women's basketball players in that conference, even though each Autonomy-5 institution sponsors at least a dozen other sports.

7. I also understand that the Plaintiffs' experts have concluded that these revenue sharing payments would either be made directly by each Autonomy-5 conference to the student-athletes or would be distributed to the member institutions of each Autonomy-5 conference in restricted form, earmarked for student-athletes to be paid by the schools as set forth above.

8. I would oppose this structure and, in my opinion, it would not be adopted or implemented by the Autonomy-5 Conferences or by NCAA member institutions in the Autonomy-5 Conferences, either as NCAA or conference rules, or as NCAA or conference rules interpretations or practices. It is not realistic or even conceivable that conferences with relatively lower levels of broadcast revenues (and institutions within those conferences) would support or permit interpretation or enforcement of NCAA rules in the manner necessary for this distribution structure to become reality. It is well known that broadcast revenues vary from conference to conference. The Plaintiffs' distribution structure would place every institution in four of the five Autonomy conferences at a recruiting disadvantage. If an institution in a conference with lower broadcast revenues were limited to distributing a share of those revenues to student-athletes, the institution would have to pay more talented athletes a larger share (or all) of the revenues (not an equal amount to every scholarship athlete) to be competitive. I know of no instance where any of these conferences, or institutions in these conferences, have adopted rules that would put institutions (much less an overwhelming majority of institutions) at this kind of competitive disadvantage.

9. The SEC member institutions compete fiercely with other SEC member institutions, and institutions in other conferences, to recruit student-athletes. It is not realistic or plausible that SEC member institutions would decide that revenue share payments would be made by the SEC in the manner described above. SEC member institutions have always retained authority to determine which sports to sponsor and support. If rules prohibiting sharing of

broadcast rights revenues with student-athletes were repealed or invalidated, it is not realistic to conclude that SEC member institutions would agree to have the Conference provide much larger payments to men's basketball student-athletes than to football or women's basketball student-athletes – or that the SEC member institutions would agree to share the overwhelming bulk of the available revenues with student-athletes in only these three sports. The gender equity issues with the distribution structure are obvious and would not be acceptable. In addition, apart from the obvious gender equity considerations, this payment structure would deprive each member institution of the autonomy to determine where to direct its financial resources between and among different sports programs.

10. Most if not all sports require subsidization at every institution; only football and men's basketball produce positive net revenues—and then only at some institutions. At USC, we have been quite successful on the court in women's basketball and in baseball. Other institutions have been successful in different non-revenue sports and have different priorities. If broadcast revenues were to be shared with student-athletes, with an inevitable effect and influence on decision-making by student-athletes about where to enroll and whether (and where) to transfer, it would be important that USC be able to allocate the revenues to recruiting student-athletes in sports that are priorities for USC based on fan interest, financial performance, gender equity considerations, and any other relevant factors.

11. If broadcast rights fees were paid by the SEC to student-athletes as outlined above, USC would have to cut expenses. As the Athletic Director, I would have to make decisions on how to reduce expenses and, as a practical matter, would have to choose whether to (a) eliminate sports, (b) reduce the budget and staff to support each sport, and/or (c) reduce the number of student-athletes on each team. Each of these choices would disadvantage student-athletes in one way or another.

12. The Plaintiffs' revenue distribution scheme would create other economic incentives and disincentives that would also be very disruptive to college sports and disadvantage many student-athletes. To gain an advantage in recruiting incoming and transfer student-athletes, and in retaining enrolled student-athletes, conferences and institutions would have strong incentives to (a) reduce the number of players on the conference's teams (to increase each player's share of revenue), (b) reduce the number of teams sponsored by each institution, and (c) restructure conferences to reduce the number of institutions in a conference to eliminate institutions with athletic programs with relatively lower value from a broadcast rights perspective (to increase each institution's share of revenue). In the implausible event that the revenue distribution structure above were to be implemented, these economic incentives and disincentives would, in my experience, result in reduced opportunities for student-athletes (fewer teams, fewer roster spots)—a result I would not favor or support.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on April 25, 2023, in Columbia, South Carolina.

_Ray Tanner_ (signature)
Ray Tanner