Leane K. Capps (*pro hac vice*)
POLSINELLI PC
2950 N. Harwood, Suite 2100
Dallas, TX 75201
Telephone: (214) 397-0030
Facsimile: (214) 397-0033
Email: lcapps@polsinelli.com

Amy D. Fitts (*pro hac vice*)
Phil Zeeck (*pro hac vice*)
POLSINELLI PC
900 W. 48th Place
Kansas City, MO 64112
Telephone: (816) 753-1000
Facsimile: (816) 753-1536
Email: afitts@polsinelli.com
Email: pzeeck@polsinelli.com

Wesley D. Hurst (SBN 127564)
POLSINELLI LLP
2049 Century Park East
Suite 2300
Los Angeles, CA 90067
Telephone: (310) 556-1801
Fax: (310) 556-1802
Email: whurst@polsinelli.com

*Attorneys for Defendant The Big 12 Conference, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| In re College Athlete NIL Litigation | Case No.  4:20-cv-03919-CW |
| --- | --- |
| | **DECLARATION OF DAVID FLORES** |

1.      I currently serve as the Vice President – Governance for The Big 12 Conference, Inc. (the "Big 12"), located in Irving, Texas.  I make this declaration of my own personal knowledge and, if necessary, could testify competently under oath to the facts set forth herein.

2.      I have held my current position since September of 2022 after serving as Associate Commissioner for Compliance and Governance for the Big 12 beginning in October of 2019.  In this role, I oversee and coordinate all matters related to NCAA and Big 12 governance, serve as the

DECLARATION OF DAVID FLORES (THE BIG 12 CONFERENCE, INC.) IN RE: COLLEGE ATHLETE NIL LITIGATION

CASE NO. 4:20-CV-03919-CW

liaison to the Conference Faculty Athletics Representatives, directors of student-athlete support services, as well as leading all efforts regarding the Big 12's Student-Athlete Advisory Committee. I also oversee the Big 12 academic awards program.

3.    Before joining the Big 12, I served as the director of student-athlete support services for Texas State University and previously served as associate athletic director for compliance services at Kansas State University, compliance coordinator for the University of New Mexico, athletic academic advisor for football and men's basketball at Texas Tech University, and as the program coordinator for athletic academic services at the University of Texas – El Paso ("UTEP").

4.    I obtained my bachelor's degree from UTEP, and as an undergraduate, I played varsity football.

5.    The mission of the Big 12 as stated in Section 1.3.1 of its Bylaws is to:

    a.    Advance standards of scholarship, sportsmanship and equity consistent with the highest ideals of conference membership;

    b.    Support the development of national-championship caliber intercollegiate athletic programs;

    c.    Organize, promote, and administer intercollegiate athletics among its member institutions;

    d.    Optimize revenues and provide supporting services compatible with both academic and competitive excellence; and

    e.    Encourage collaborations in areas beyond athletics that builds good-will between institutions and promotes the overall missions of the universities.

6.    The Big 12 currently has 10 members, including Baylor University, Iowa State University, the University of Kansas, Kansas State University, the University of Oklahoma, Oklahoma State University, Texas Christian University, the University of Texas – Austin, Texas Tech University, and West Virginia University.

7.    The Bylaws and the Rules establish and define the roles of other governance groups that report directly or indirectly to the Board, including the Athletics Directors, the

**DECLARATION OF DAVID FLORES (THE BIG 12 CONFERENCE, INC.) IN RE: COLLEGE ATHLETE NIL LITIGATION**

CASE NO. 4:20-CV-03919-CW

1  Faculty Athletics Representatives, the Senior Women Administrators, and groups representing
2  other key constituencies.

3       8.    I understand that the Plaintiffs' expert witnesses in this case have opined that in the
4  absence of NCAA rules preventing it, each A-5 conference defendant would have, at least since the
5  fall semester of 2016, paid certain student-athletes a portion of the rights fees paid to the A-5
6  conferences under contracts with its media partners (such as ESPN/ABC or FOX) as compensation
7  for the use of the student-athletes' name, image, and likeness ("NIL") rights. Specifically, as I
8  understand it, Plaintiffs' expert witnesses think that A-5 conferences, including the Big 12, would
9  have made NIL payments to student-athletes as follows:

10      a.  Each conference would determine the total broadcast rights fees received from
11          media partners, the College Football Playoff, and the NCAA men's basketball
12          tournament.

13      b.  Each academic year, all scholarship football players at conference member
14          institutions would be paid an equal share of 10% of the conference's broadcast rights
15          fees that Plaintiffs contend are attributable to football, which is 75% of unsegregated
16          rights fees, or 7.5% of the conference's total rights fees.

17      c.  Each academic year, all scholarship men's basketball players at conference member
18          institutions would be paid an equal share of 10% of the conference's broadcast rights
19          fees that Plaintiffs contend are attributable to men's basketball, which is 15% of
20          unsegregated rights fees, or 1.5% of the conference's total rights fees.

21      d.  Each academic year, all scholarship women's basketball players at conference
22          member institutions would be paid an equal share of 10% of the conference's
23          broadcast rights fees that Plaintiffs contend are attributable to women's basketball,
24          which is 5% of unsegregated rights fees, or 0.5% of the conference's total rights
25          fees.

26

27

28

**DECLARATION OF DAVID FLORES (THE BIG 12 CONFERENCE, INC.) IN RE: COLLEGE ATHLETE NIL LITIGATION**

CASE NO. 4:20-CV-03919-CW

9. I also understand that Plaintiffs' expert witnesses assume that 5% of the value of unsegregated broadcast rights fees a conference receives are attributable to the remaining games and events that the conference sponsors.

10. As an example, under Plaintiffs' damages model (the Model), for an A-5 conference receiving $100 million in broadcast rights fees annually, Plaintiffs' expert witnesses suppose that the A-5 conference would have attributed $10 million among scholarship student-athletes as follows: (1) $7.5 million divided in equal shares among all football players; (2) $1.5 million divided in equal shares among all men's basketball players; (3) $500,000.00 divided in equal shares among all women's basketball players.

11. I further understand that, under the expert witnesses' Model and as a matter of mathematics:

    a. Larger portions of the broadcast rights revenues are attributable to each student-athlete in conferences with fewer members;

    b. Larger amounts of the broadcast rights revenues are attributable to each student-athlete in conferences with higher broadcast rights revenues;

    c. Equal portions of broadcast rights revenues are attributable to athletes who are high-performing starters and low-performing athletes who rarely or ever play in a game;

    d. Larger amounts of broadcast rights revenues are attributable to each men's basketball player than each football player at a conference member as a result of the difference in the number of scholarships available in football and men's basketball; and

    e. Much smaller amounts of broadcast rights revenues are attributable to each women's basketball player than either each men's basketball player or each football player at a conference member.

12. Based on my experience, if payments like those proposed in the Model were permitted, I would not support such a proposal. In addition, I do not believe that the Big 12 would adopt such a proposal.

---

**DECLARATION OF DAVID FLORES (THE BIG 12 CONFERENCE, INC.) IN RE: COLLEGE ATHLETE NIL LITIGATION**

CASE NO. 4:20-CV-03919-CW

13.     A critical goal of the Big 12 is providing opportunities for student-athletes to participate in college sports.  Conference members work with limited resources to maximize those opportunities.  The Model proposes that a significant portion of members' resources be redirected to a small percentage of our student-athletes, but it does not identify any supplemental revenues to offset lost resources.  The Model could place extreme pressure on members' budgets, and it may result in the elimination of some programs.

14.     The Model would also put the Big 12 at a substantial disadvantage in attracting the most talented student-athletes.  Based on publicly-reported information, the Big 12's broadcast revenues are somewhat less than some other A-5 conferences with which Big 12 member institutions compete for top athletic talent.  The Model requires each A-5 conference to provide the same percentage of its broadcast revenues to student-athletes; because the Big 12's revenues are lower, the payments it can offer student-athletes would be lower.

15.     The Model could also place additional financial pressures on Big 12 members to, for example, reduce the number of players per team, reduce the number of teams per member, and reduce conference membership. Perhaps most important, the Model would mandate uniformity on institutions that have historically had independent authority to determine for themselves how to best allocate their revenues and resources.

16.     Finally, the Model causes me substantial concerns about disparate treatment that would negatively impact women's sports.  The Model requires over 90% of revenues to be paid to male student-athletes.  This is incompatible with the Big 12's gender equity values.


David Flores
Signed April 24, 2023

**DECLARATION OF DAVID FLORES (THE BIG 12 CONFERENCE, INC.) IN RE: COLLEGE ATHLETE NIL LITIGATION**

CASE NO. 4:20-CV-03919-CW