COOLEY LLP
WHITTY SOMVICHIAN (194463)
(wsomvichian@cooley.com)
KATHLEEN R. HARTNETT (314267)
(khartnett@cooley.com)
ASHLEY KEMPER CORKERY (301380)
(acorkery@cooley.com)
DAVID S. LOUK (304654)
(dlouk@cooley.com)
3 Embarcadero Center, 20th Floor
San Francisco, California 94111-4004
Telephone:    +1 415 693 2000
Facsimile:    +1 415 693 2222

MARK LAMBERT (197410)
(mlambert@cooley.com)
3175 Hanover Street
Palo Alto, California 94304-1130
Telephone:    +1 650 843-5000
Facsimile:    +1 650 849-7400

DEE BANSAL (1001754)
(dbansal@cooley.com)
1299 Pennsylvania Ave. NW, Suite 700
Washington, DC 20004-2400
Telephone:    +1 202 842 7800
Facsimile:    +1 202 842 7899

Attorneys for Defendant
PAC-12 Conference

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | Case No. 4:20-cv-03919-CW |
| | **DECLARATION OF MARK HARLAN** |

1.      I am Vice President and Director of Athletics at University of Utah ("Utah" or the "University"). Utah is a public research university and the flagship institution of the Utah System of Higher Education, as well as a member of the Pac-12 Conference (the "Pac-12" or the "Conference"). I make this declaration of my own personal knowledge and, if called on to do so, could testify competently to the facts stated herein under oath.

2.      I earned a bachelor's in political science and a master's in education from the University of Arizona.

3.      I have served as Director of Athletics at Utah since 2018. During my time at Utah, our athletics teams (the "Utes") have claimed three national championships and 10 total conference championships, including five Pac-12 titles. Further, during my tenure Utah student-athletes have posted the top four semester GPAs on record, including a program-best 3.57 GPA in Spring 2020, and have broken the previous year's full-year GPA in each of the past three years. Utah also recorded its fifth consecutive year at 93-percent or higher in the NCAA Graduation Success Rate (GSR) report for 2022, with its score tying for second among Pac-12 athletic departments. In my role, I have made numerous strategic hires (including at least 7 head coaches) and spearheaded numerous facility projects, including facility expansions and upgrades to Rice-Eccles Football Stadium, the Dumke Gymnastics Center, and the David S. Layton Golf Academy.

4.      I also have considerable experience working with the NCAA and the Pac-12 Conference. I currently serve on the NCAA Division I Baseball Committee, have served on the NCAA Division I Football Oversight Committee, have held a lead role in the Pac-12 Conference Football Working Group, and have served as the AD liaison to the league's football coaches in navigating the challenges of the COVID-19 pandemic. I have also previously served on the NCAA Division I Council Transfer Working Group and the NCAA Division I Competition Oversight Committee.

5.      I am very familiar with the business and operational dynamics of collegiate athletics, having served in multiple roles in college sports. I have previously served as Director of Athletics at the University of South Florida, Senior Associate Athletics Director for External Relations at UCLA, and Senior Vice President for Central Development at the University of Arizona Foundation. Prior to those positions, I served as Senior Associate Athletics Director for External Operations at San Jose State and Associate Athletics Director for External Operations at Northern Colorado, as well as in a number of roles in athletics at the University of Arizona over a dozen years.

6.      As Vice President and Director of Athletics at Utah, I report to University President Taylor R. Randall.

7.      Utah provides its student-athletes with numerous benefits to ensure a holistic and broad-based collegiate experience. These benefits are extended to full and partial scholarship athletes, as well as to student-athletes who do not receive grant-in-aid support. Such benefits are part of the University's commitment to academic and athletic excellence, and they ensure that student-athletes have the resources necessary to succeed both as students and in their careers after they graduate. These benefits include, but are not limited to, academic support (such as tutorial support and counseling), personal development, leadership, career development, and physical and mental health. Utah incurs significant costs in providing such benefits, in addition to costs associated with athletic scholarships.

8.      I understand that Plaintiffs' expert witnesses believe that in the absence of NCAA rules preventing it, each conference defendant would have, at least since the fall semester of 2016, shared rights fees and other revenues from broadcasts and other distributions (via internet, cable, etc.) of each conference's games and athletic events (which I collectively refer to here as

"broadcast rights revenues" or "broadcast rights fees") with student-athletes as follows ("Plaintiffs' Scenario"):

    a.  Each conference would determine the total revenue it receives in broadcast rights fees from its license agreements with broadcasters (such as ABC/ESPN, CBS, FOX, and NBC) and from operation of the NCAA men's basketball tournament and the College Football Playoff.

    b.  Each academic year, each conference would pay to student-athletes 10% of the broadcast rights revenue it receives (the "broadcast revenue share"), which would be allocated specifically as follows:

        i.  Scholarship football players collectively would be paid 75% of the broadcast revenue share, with all individual players receiving an equal payment.

        ii.  Scholarship men's basketball players collectively would be paid 15% of the broadcast revenue share, with all individual players receiving an equal payment.

        iii.  Scholarship women's basketball players collectively would be paid 5% of the broadcast revenue share, with all individual players receiving an equal payment.

    c.  The remaining 5% of the broadcast revenue share would then be paid to other student-athletes in other sports in some manner that Plaintiffs' experts do not specify.

9.  My understanding of the Plaintiffs' Scenario is that it would result in:

a. student-athletes in conferences with fewer member schools receiving a larger portion of the conference's broadcast revenue share (because the 10% broadcast revenue share would be shared among fewer student-athletes);

b. individual men's basketball players receiving larger payments than individual football players (because the 15% of broadcast revenue share allocated to men's basketball players would be split among fewer players as compared to the 75% of broadcast revenue share split among a greater number of football players); and

c. significantly smaller payments to women's basketball players than to men's basketball and football players, regardless of the institution they attend.

10.     I also understand that Plaintiffs' experts have concluded that these revenue sharing payments would be made either directly, by each Autonomy-5 ("A5") conference to student-athletes, or otherwise would be paid to the member institutions of each A5 conference, earmarked for student-athletes and to be distributed by the schools as described above.

11.     For Plaintiffs' Scenario to be possible, the NCAA would have had to pass or interpret an NCAA rule allowing a conference's scholarship football, men's basketball, and women's basketball players, collectively, to be paid up to 10% (but not more than 10%) of that conference's broadcast rights revenues.

12.     Then, the Pac-12—and, to my understanding, all A5 conferences—and every member institution, would have had to independently agree to pay 10% of broadcast rights revenues to student-athletes and to allocate that broadcast revenue share amount specifically as set forth above. To do so, each conference would have had to adopt rules that would implement and mandate the specific allocations of payments in Plaintiffs' Scenario.

13.     Pursuant to the Conference's Constitution and Bylaws, each member institution (acting through its President or Chancellor) has one vote on certain Conference decisions or actions

that rise to the level of a Board of Directors vote. Voting on such decisions and actions usually involves a proposal developed by the Conference, or presented to the Conference by one or more member institutions. When the Conference presents or considers proposals to change its rules concerning student-athlete eligibility and benefits, or concerning distribution of funds to member institutions, the Conference office generally solicits input on such proposals through the Athletics Directors at each member institution. To complete this process, each member institution generally has a voice in every proposal through votes by its president or chancellor. This would be the process for considering any proposal to adopt Plaintiffs' Scenario.

14.     Based on my personal experience as an athletics administrator at Utah, I believe it is unrealistic to conclude or assume that Plaintiffs' Scenario would ever have been or would ever be implemented, or that revenue share payments would ever be made in the way outlined in Plaintiffs' Scenario.

15.     Utah competes fiercely to recruit student-athletes against member institutions in the Pac-12 and against institutions in other conferences, including but not limited to other A5 conferences. Indeed, every Pac-12 member institution competes vigorously for recruits, against institutions both inside and outside the Conference.

16.     Based on public reports, and as explained in Plaintiffs' experts' reports as I understand them, each conference defendant receives greatly different amounts in broadcast rights fees. By fixing each conference's broadcast revenue share at 10% of the conference's broadcast rights fees, institutions in conferences with lower total broadcast rights fees would be disadvantaged in recruiting, all other things equal. And even if another conference had the same amount of broadcast revenues as the Pac-12, member institutions in the Pac-12 would be at a disadvantage if that other conference had fewer member institutions, and therefore fewer scholarship football and basketball players, resulting in larger payouts per student. For these

reasons, based on my experience with the Pac-12's decision-making process, as well as the intense recruiting competition for student-athletes among institutions, Plaintiffs' Scenario is not a distribution structure that Utah or the Pac-12 would ever have voluntarily implemented.

17.     Further, within the Pac-12, the member institutions' financial incentives and concerns vary. Some member institutions are private universities with large endowments, while other member institutions, including Utah, are public universities that constitute only one campus of a larger statewide university system. Similar to many institutions, a significant share of the University's Athletic Department budget comes from revenue generated by the Pac-12's broadcast agreements. Any decrease in the distribution of revenue from Pac-12 broadcast agreements would significantly impact our ability to financially support Utah's 7 men's, 11 women's, and 1 co-ed NCAA D1 sports. Of these 19 NCAA D1 sports programs, the majority of them operate at a cost that exceeds the revenue they generate, or that they could reasonably be expected to generate. Over 500 student-athletes participate in these sports at Utah.

18.     Utah also would not support, implement, or engage in the revenue sharing structure set forth in Plaintiffs' Scenario, because it would result in substantially more and greater payments to male athletes as compared to female athletes. Specifically, the allocations of payments in Plaintiffs' Scenario assume that (1) football and men's basketball players should collectively receive an amount that is approximately <u>eighteen times</u> greater than what would be paid collectively to women's basketball players, and (2) individual men's basketball players should collectively receive <u>three times</u> more than individual women's basketball players. These disparities in payments would not be consistent with Utah's strong commitment to equity and inclusion, including both the policy goals and legal obligations under Title IX.

19.     Under Plaintiffs' Scenario, I believe it would be mathematically impossible to balance the payments between male and female student-athletes in a proportional way. In any

event, gender equity goals and policies are important to Utah, and this would prevent the University from adopting Plaintiffs' Scenario.

20.    In my experience, Utah would not be the only Pac-12 member institution with this concern. In my experience, every member institution in a defendant conference would have to consider gender equity concerns inherent in Plaintiffs' Scenario. These concerns alone would make it exceedingly difficult, and in my experience likely impossible, for either NCAA or Pac-12 rules to be interpreted or implemented in a manner consistent with Plaintiffs' Scenario.

21.    In addition to the gender equity concerns, Plaintiffs' Scenario would also restrict each institution's ability to direct resources as it sees fit. Utah has always been free to determine where to direct its financial resources between and among different sports programs, subject to applicable law, such as Title IX. In general, the University directs such resources in a broad-based manner that supports all student-athletes, regardless of the revenue brought in by the sport they play. I know of no basis for Utah to agree to allocate broadcast revenues in a manner that directs 75% to football players, 15% to men's basketball players, 5% to women's basketball players, and no more than 5% to the remainder of Utah's student-athletes, as Plaintiffs' Scenario requires.

22.    As briefly mentioned above in paragraph 19, few of Utah's athletic programs generate positive net revenues (more revenues than expenses), including the women's basketball program. However, as Direct of Athletics at Utah, I would not readily advocate for a system that distributes 5% of broadcast rights revenue to women's basketball players while distributing no more than 5% to the other 16 NCAA D1 sports programs, some of which already require less funding to subsidize than women's basketball.

23.    The decisions that member institutions like Utah make in deciding how to fund scholarships, teams, and athletic programs are based on numerous considerations, including priorities such as gender equity, fair opportunity for competition and a complete student-athlete

experience. I know of no reason to assume or conclude that any Pac-12 member institution would decide to pay each scholarship men's basketball player more total dollars than each scholarship football player. To the best of my knowledge, football generates more revenue (or has fewer losses) than all other sports at most conference defendant member institutions.

24.     The majority of the University's athletics revenues result from (a) distributions from the Pac-12 (from broadcast rights license fees received by the Pac-12, Pac-12 championships ticket sales, Pac-12 sponsorships, and from NCAA distributions to the Pac-12 of a share of NCAA broadcast rights, sponsorship, and ticket sales revenue); (b) revenues from sales of tickets to regular season Utah home sports competitions; (c) revenues from sponsors of Utah athletics; and (d) donations from alumni and other supporters of Utah athletics. Utah athletics also receives institutional support from its endowment. All expenses for each athletic program, other than nominal reimbursements from the NCAA and conference for postseason championships, are incurred at the institutional level (for facilities, coaches, scholarships, travel, and other direct and indirect expenses of an athletic program) and not by the NCAA or the Conference. Under my direction, the Utah Athletics Department operates under the non-profit status of the University, and therefore does not seek to generate a surplus. We optimize our revenue to cover all necessary operating expenses. If a surplus is realized, we reinvest it in facilities and other capital projects to improve the quality of our programs.

25.     If broadcast rights fees were paid by the Pac-12 to student-athletes as contemplated in the Plaintiffs' Scenario, Utah would have to cut expenses significantly. As the Vice President and Director of Athletics, I would have to make decisions on how to reduce expenses while remaining competitive and, as a practical matter, would have to choose whether to (a) eliminate sports, (b) reduce the amount budgeted to support each sport, and/or (c) reduce the number of student-athletes (including the number of scholarships) on each team.

26.     The revenue distribution scheme at the heart of Plaintiffs' Scenario would create other economic incentives and disincentives that concern me and would make it untenable for Utah (or, in my opinion, other Pac-12 member institutions) to support, agree to, or implement Plaintiffs' Scenario of revenue distribution. To gain an advantage in recruiting incoming and transferring student-athletes, and in retaining enrolled student-athletes, conferences and institutions would have strong incentives to (a) reduce the number of players on the conference's teams (to increase each player's share of revenue), (b) reduce the number of teams sponsored by each institution, and (c) restructure conferences to reduce the number of institutions in a conference to eliminate institutions with athletic programs with relatively lower value from a broadcast rights perspective (to increase each institution's share of revenue). If Plaintiffs' Scenario were implemented, these resulting economic incentives and disincentives would, in my experience, result in reduced opportunities for student-athletes (fewer teams, fewer roster spots)—a result I would not favor or support. Nor, in my experience, would any member institution in the Pac-12.

27.     In short, I would not promote, endorse, or support the Plaintiffs' Scenario.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on April 26, 2023, in Salt Lake City, Utah.

Mark Harlan
Vice President and Director of Athletics
University of Utah