Mark J. Seifert (SBN 217054)
SEIFERT LAW FIRM
50 California Street, Suite 1500
San Francisco, California 94111
Tel.    (415) 999-0901
Fax    (415) 901-1123
mseifert@seifertfirm.com

Robert W. Fuller (*pro hac vice*)
Lawrence C. Moore, III (*pro hac vice*)
Pearlynn G. Houck (*pro hac vice*)
Amanda P. Nitto (*pro hac vice*)
ROBINSON, BRADSHAW & HINSON, P.A.
101 N. Tryon St., Suite 1900
Charlotte, NC 28246
Tel.    (704) 377-2536
Fax    (704) 378-4000
rfuller@robinsonbradshaw.com
lmoore@robinsonbradshaw.com
phouck@robinsonbradshaw.com
anitto@robinsonbradshaw.com

Attorneys for Defendant
SOUTHEASTERN CONFERENCE

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| In re College Athlete NIL Litigation | Case No. 4:20-cv-03919-CW |
| | **DECLARATION OF CANDICE STOREY LEE** |

1        1.     I am the Vice Chancellor for Athletics and University Affairs and Athletic

2    Director of Vanderbilt University ("Vanderbilt" or the "University"). Vanderbilt is a

3    member of the Southeastern Conference (the "SEC" or the "Conference"). I make this

4    declaration of my own personal knowledge and, if called on to do so, could testify

5    competently to the facts stated herein under oath.

6        2.     I graduated from Vanderbilt University with a Bachelor of Science degree in

7    Human and Organizational Development in 2000. I continued my education at Vanderbilt

8    to earn a Master's degree in Counseling in 2002, and I subsequently completed a Doctorate

9    program in Higher Education Administration in 2012.

10       3.     As an undergraduate, I was a student-athlete on the Vanderbilt women's

11   basketball team. I was a team captain, four-year letter winner, and was on the SEC

12   Academic Honor role on five occasions. Our team won the SEC women's basketball

13   tournament in 2002 in my final season of competition.

14       4.     I began my career in athletics administration at Vanderbilt in 2002. During

15   the early stages of my tenure, I served as an academic advisor and compliance director. In

16   2004, I was named the Athletic Department's Senior Woman Administrator, a position I

17   held until 2020. In 2016, I was named Deputy Athletic Director and assumed responsibility

18   for the day-to-day operations of the Athletic Department and served as the sports

19   administrator for football and women's basketball. I became the Athletic Director on May

20   21, 2020.

21       5.     As Vice Chancellor for Athletics and University Affairs and Athletic Director

22   of Vanderbilt University, I report to Chancellor Daniel Diermeier.

6.   In addition to my duties with Vanderbilt, I serve on the Southeastern Conference's Council on Racial Equity and Social Justice and the executive committee of Black Athletic Directors Alliance. Formerly, I served as a member of the NCAA Women's Basketball Rules Committee, Chair of the NCAA Division I Women's Lacrosse Committee and Chair of the SEC Senior Woman Administrators. Further, I have served in various capacities on the board of directors for the Tennessee Sports Hall of Fame, the Nashville Sports Council, the YWCA of Middle Tennessee and The Family Center.

7.   During my time at Vanderbilt, student-athletes have won two national championships in baseball, two national championships in bowling, and one national championship in women's tennis. Vanderbilt teams have also won more than 20 conference championships and tournament titles, including in baseball, men's and women's basketball, bowling, women's cross country, men's and women's golf, women's lacrosse, women's soccer and women's tennis. Our football team has played in six bowl games since breaking a 26-year bowl drought in 2008. Since 2002, our men's basketball team has played in the NCAA tournament eight times and our women's basketball team has played in the NCAA tournament thirteen times.

8.   In 2020-21, Vanderbilt's student-athletes had an overall NCAA Graduation Success Rate of 97%. During the 2021–22 season, our cumulative student-athlete grade-point average exceeded 3.0 for the 16th straight year.

9.   Vanderbilt student-athletes, whether full scholarship, partial scholarship, or no scholarship, are provided with a number of benefits to ensure a holistic and broad-based collegiate experience. These benefits are provided to all student-athletes to maintain

1  Vanderbilt's commitment to  academic and athletic excellence and integrity and ensure

2  student athletes have the resources necessary to sustain success. These benefits, which

3  include, but are not limited to, support for academics, personal development, leadership,

4  career development and physical and mental health are provided at a significant cost to

5  Vanderbilt, in addition to the costs associated with Vanderbilt's athletic scholarships.

6      10.    I understand that the Plaintiffs' expert witnesses have opined that in the

7  absence of NCAA rules preventing it, each conference defendant would have, at least since

8  the fall semester of 2016, shared rights fees attributable to broadcasts and other distributions

9  (internet, cable, satellite etc.) of games and events (all collectively referred to here as

10  "broadcast rights revenues" or "broadcast rights fees") with student-athletes as follows:

    a)  Each conference would determine the total of its broadcast rights fees received from its own license agreements with broadcasters (such as CBS, NBC, ABC/ESPN, and FOX) and also from the NCAA men's basketball tournament and the College Football Playoff.

    b)  Each academic year, every football player enrolled at and receiving a scholarship from a member institution in such conference would be paid 10%, in equal shares, of the broadcast rights fees received by the conference that Plaintiffs contend are attributable to football broadcasts (based in part on the opinion of the Plaintiffs' experts that 75% of any unsegregated broadcast rights fees received are attributable to football).

    c)  Each academic year, every men's basketball player enrolled at and receiving a scholarship from a member institution in such conference would be paid

10%, in equal shares, of the broadcast rights fees received by the conference that Plaintiffs contend are attributable to men's basketball broadcasts (based in part on the opinion of the Plaintiffs' experts that 15% of any unsegregated broadcast rights fees received are attributable to men's basketball).

    d) Each academic year, every women's basketball player enrolled at and receiving a scholarship from a member institution in such conference would be paid 10%, in equal shares, of the broadcast rights fees received by the conference that Plaintiffs contend are attributable to women's basketball broadcasts (based in part on the opinion of the Plaintiffs' experts that 5% of any unsegregated broadcast rights fees received are attributable to women's basketball).

I further understand that Plaintiffs' experts assert or implicitly assume that 5% of the value of the unsegregated broadcast rights fees received by a conference are attributable to the remaining games and events, including (in the SEC) at least 13 other sports for every SEC member institution.

11.    My understanding of the Plaintiffs' numbers is that, as a matter of basic mathematics, at any level of assumed total broadcast rights fees, this would result in

    a) larger portions of the broadcast rights fees being provided to each student-athlete in conferences with fewer member schools,

    b)  different amounts paid to student-athletes in different conferences based on the level of broadcast revenues received by each conference and the number

1  of member schools in each conference (or, more specifically, the number of

2  football and basketball student-athletes in the conference),

3  c) the same payments to scholarship athletes who are starters as to scholarship

4  student-athletes who rarely or never play in a game,

5  d) larger payments to men's basketball players than to football players attending

6  the same school, and

7  e) much smaller payments to women's basketball players attending the same

8  school as the men's basketball and football players.

9  12.    I also understand that the Plaintiffs' experts have concluded that these revenue

10  sharing payments would either be made directly by each Autonomy-5 conference to the

11  student-athletes or would be distributed to the member institutions of each Autonomy-5

12  conference in restricted form, earmarked for student-athletes to be paid by the schools as

13  set forth above.

14  13.    For broadcast licensing revenues to be paid to scholarship football and

15  basketball student-athletes as set forth and summarized above (herein referred to as

16  "Plaintiffs' Scenario"), the NCAA (which is made up of conferences and their member

17  institutions) would have to pass or interpret a NCAA rule to allow scholarship football,

18  men's basketball, and women's basketball players be paid up to 10% (but not more than

19  10%) of the broadcast rights revenues. Then, each of the conference defendants (the "A-5

20  conferences") and their member institutions would have to independently agree to pay 10%

21  of the broadcast rights revenues to student athletes *and* allocate revenues only to basketball

22  and football as set forth above. In other words, the SEC would have to adopt rules that

1    would implement and mandate the revenue distribution structure outlined in Plaintiffs'

2    Scenario. These rules would require that the SEC pay (or distribute funds to member

3    institutions to pay) each scholarship football, men's basketball, and women's basketball

4    student-athlete at every SEC member institution the same dollar amount of shared broadcast

5    revenues as every other scholarship student-athlete playing the same sport at every SEC

6    member institution. The rules would also require that every scholarship student-athlete be

7    paid his or her full 10% share of allocated revenues.

8        14.   In the SEC, each member institution (acting through the President or

9    Chancellor of the institution) has one vote on every Conference decision or action. The SEC

10   decision-making process is collaborative and collective. When the Conference considers

11   changes to its rules concerning student-athlete eligibility and benefits or concerning

12   distribution of funds to member institutions, the Conference office solicits input on

13   proposals from the Athletics Directors (and, if their input would be relevant to consideration

14   of the proposal, the Faculty Athletics Representatives, Senior Woman Administrators, and

15   Coaches) at each member institution. Based on this input, each member institution votes on

16   every proposal. This would be the process for considering any proposal to adopt the

17   revenue-sharing structure Plaintiffs have posited. I am a participant in and have extensive

18   experience with this SEC decision-making process and understand the considerations that

19   the various member institutions take into account when voting on proposals.

20       15.   For the reasons outlined below, Vanderbilt would not support or vote in favor

21   of the rules or interpretations (at the NCAA or SEC level) necessary to implement the

22   Plaintiffs' Scenario. Based on my personal experience as a student-athlete and athletics

1  administrator, and my knowledge of the competitive forces, dynamics and considerations

2  that lead to the adoption and rejection of rules in college athletes, it is unrealistic to conclude

3  or assume that Plaintiffs' Scenario would ever have been or would ever be implemented or

4  that revenue share payments would ever be made in the way outlined in Plaintiffs' Scenario.

5      16.    Vanderbilt competes fiercely with other institutions both within and outside

6  the SEC to recruit student-athletes. Similarly, every A-5 institution competes for recruits

7  against institutions both inside and outside its conference. The A-5 conferences receive

8  greatly varying amounts, from conference to conference, in broadcast rights fees. (This has

9  been       widely       reported       in       the       media,       for       example       at

10  https://awfulannouncing.com/ncaa/navigate-big-ten-sec-payouts-power-five.html.)

11      17.    By setting the share of revenues as 10% of broadcast rights fees allegedly

12  attributable to each sport, institutions in conferences with lower total broadcast rights fees

13  would be disadvantaged in recruiting. For example, because the SEC has more broadcast

14  revenue than several other conferences, those conferences would likely be at a recruiting

15  disadvantage to Vanderbilt. Similarly, under Plaintiffs' Scenario, Vanderbilt and the SEC

16  would be disadvantaged in recruiting if any other conference had higher broadcast rights

17  that resulted in a larger distribution of revenues to each student-athletes than would be the

18  case in the SEC. Even if another conference had the same amount of broadcast revenues,

19  the SEC would be at a disadvantage if that conference had fewer scholarship football and

20  basketball players. Based on my experience in the SEC and with the SEC decision-making

21  process, and on the intense competition for recruiting student-athletes, this is not a

22  distribution structure that Vanderbilt or the SEC would ever implement.

1    18.    Even within the SEC, the member institutions' financial incentives and

2    concerns vary. For example, unlike some of the other SEC member institutions, the

3    distributions that Vanderbilt receives from the SEC account for the majority of Vanderbilt's

4    athletics revenue. Moreover, of all SEC institutions (and based in part on the cost of

5    attendance at Vanderbilt, a private university), Vanderbilt is spending the most money per

6    student-athlete of any SEC institution. As a result, any decrease in the distributions from

7    the SEC would impact Vanderbilt differently than other schools in the SEC, and likely

8    disproportionately disadvantage Vanderbilt. For this reason as well I would not support

9    Plaintiffs' Scenario.

10    19.    Vanderbilt also could not support, implement or engage in the revenue

11    sharing structure set forth in Plaintiffs' Scenario because that Scenario would result in

12    substantially more payments and substantially larger payments to football and men's

13    basketball players than to women's basketball players. Vanderbilt is strongly committed to

14    equity and inclusion, see https://vucommodores.com/edi/, and to both the policy goals and

15    the legal requirements of Title IX.

16    20.    Plaintiffs' Scenario assumes that 98 male players (the total scholarship limit

17    for football and men's basketball combined) and just 15 female players (which is the total

18    scholarship limit for women's basketball) receive revenue sharing payments. Plaintiffs'

19    Scenario also attributes no more than 5% of the value of broadcast rights fees to all other

20    sports. As a result, it would be mathematically impossible to balance the payments between

21    male and female student-athletes in a proportional way. In any event, gender equity goals

22

1  and policies that are important to Vanderbilt would prevent Vanderbilt from agreeing to

2  Plaintiffs' Scenario.

3       21.    Vanderbilt would not be the only SEC member institution with this concern.

4  In my experience, every member institution of every defendant conference would have to

5  consider gender equity concerns inherent in Plaintiffs' Scenario. These concerns alone

6  would make it exceedingly difficult, and in my experience impossible, for either NCAA or

7  SEC rules to be interpreted or implemented in a manner consistent with Plaintiffs' Scenario.

8       22.    In addition to the gender equity concerns, Vanderbilt and, in my experience,

9  other SEC member institutions would also reject Plaintiffs' Scenario because it would

10  restrict each institution's ability to direct resources as it sees fit. Vanderbilt has always been

11  free to determine where to direct its financial resources between and among different sports

12  programs. In general, Vanderbilt does so in a way that provides broad-based support for

13  student-athletes regardless of the sport they play. For example, all of Vanderbilt's student

14  athletes are eligible for the benefits Vanderbilt provides as a result of the *Alston* decision. I

15  know of no basis for Vanderbilt to agree to allocate broadcast rights fees revenues 75% to

16  football players, 15% to men's basketball players, and 5% to women's basketball players,

17  and no more than 5% to the remainder of Vanderbilt's student-athletes, as Plaintiffs'

18  Scenario requires.

19       23.    At Vanderbilt, no athletic programs generate positive net revenues (more

20  revenues than expenses). Along with every other sport, our women's basketball program

21  requires subsidization because the expenses of the program exceed the revenues of the

22  program. In addition, several of our other sports (such as baseball and men's golf)  have

1    experienced considerable competitive success. It would be unacceptable to me, as the

2    Athletic Director at Vanderbilt, for a share of no more than 5% of broadcast rights fees to

3    be distributed to women's basketball players, with no more than 5% remaining to be shared

4    among at least 13 other sports programs, some of which require less subsidization than

5    women's basketball.

6          24.     Within limitations imposed by NCAA rules, universities fund scholarships,

7    teams and athletic programs based on numerous considerations (not limited to gender

8    equity) that are individualized to each institution. That is certainly true at Vanderbilt. I also

9    know of no reason to assume or conclude that every SEC member institution would decide

10   to pay each scholarship men's basketball player more total dollars than each scholarship

11   football player. To the best of my knowledge, football generates more revenue (or has less

12   losses) than all other sports at most A5 institutions, as is confirmed by NCAA surveys

13   available at:

14   https://ncaaorg.s3.amazonaws.com/research/Finances/2021RES_D1-RevExpReport.pdf

15         25.     The majority of Vanderbilt University athletics revenues result from (a)

16   distributions from the SEC (from broadcast rights license fees received by the SEC, SEC

17   championships ticket sales, SEC sponsorships, and from NCAA distributions to the SEC of

18   a share of NCAA broadcast rights, sponsorship, and ticket sales revenue), (b) revenues from

19   sales of tickets to regular season Vanderbilt home sports competitions, (c) revenues from

20   sponsors of Vanderbilt athletics, and (d) donations from alumni and other supporters of

21   Vanderbilt athletics. Vanderbilt athletics also receive institutional support from Vanderbilt

22   University and its endowment. All of the expenses of any collegiate athletic program, other

than nominal reimbursements from the NCAA and conference for postseason championships, etc. are incurred at the institutional level (for facilities, coaches, scholarships, travel, and other direct and indirect expenses of an athletic program) and not by the NCAA or conference. Under my direction, Vanderbilt Athletics operates under the non-profit status of the University and therefore does not seek to generate a surplus. We optimize our revenue to cover our necessary operating expenses. If a surplus is realized, it is reinvested in facilities and other capital items.

26.     Vanderbilt University has, until recently, sponsored competition in 16 (10 women's and 6 men's) sports. In April 2022, we announced that Vanderbilt University would add women's volleyball as a sport.

27.     If broadcast rights fees were paid by the SEC to student-athletes as contemplated in the Plaintiffs' Scenario, Vanderbilt University would have to cut expenses. As the Athletic Director, I would have to make decisions on how to reduce expenses and, as a practical matter, would have to choose whether to (a) eliminate sports, (b) reduce the amount budgeted to support each sport, and/or (c) reduce the number of student-athletes on each team. For example, under Plaintiffs' Scenario, Vanderbilt would not have added women's volleyball.

28.     The revenue distribution scheme that is fundamental to Plaintiffs' Scenario would create other economic incentives and disincentives that are of concern to me and that would make it untenable for Vanderbilt (or, in my opinion, other SEC member institutions) to support, agree to, or implement Plaintiffs' Scenario of revenue distribution. To gain an advantage in recruiting incoming and transfer student-athletes, and in retaining enrolled

student-athletes, conferences and institutions would have strong incentives to (a) reduce the number of players on the conference's teams (to increase each player's share of revenue), (b) reduce the number of teams sponsored by each institution, and (c) restructure conferences to reduce the number of institutions in a conference to eliminate institutions with athletic programs with relatively lower value from a broadcast rights perspective (to increase each institution's share of revenue). In the implausible event that Plaintiffs' Scenario were to be implemented, these economic incentives and disincentives would, in my experience, result in reduced opportunities for student-athletes (fewer teams, fewer roster spots)—a result I would not favor or support.

29.     I would not promote, endorse, or support the Plaintiffs' Scenario.


I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on March _3_, 2023, in Nashville, Tennessee.

Candice Storey Lee