Jacob K. Danziger (SBD 278219)
**ARENTFOX SCHIFF LLP**
44 Montgomery Street, 38th Floor
San Francisco, CA 94104 United States
Telephone: (734) 222-1516
Facsimile: (415) 757-5501
jacob.danziger@afslaw.com

Beth A. Wilkinson (*pro hac vice*)
Rakesh N. Kilaru (*pro hac vice*)
Kieran Gostin (*pro hac vice*)
Calanthe Cope-Kasten (*pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com
kgostin@wilkinsonstekloff.com
ccope-kasten@wilkinsonstekloff.com

Attorneys for Defendant
NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

[Additional Counsel Listed on Signature Page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | Case No. 4:20-cv-03919-CW |
| | **DEFENDANTS' NOTICE OF MOTION, MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF TO EXCLUDE THE OPINIONS, REPORTS, AND TESTIMONY OF EDWIN DESSER AND DANIEL RASCHER** |
| | Hearing Date: Sept. 21, 2023 |
| | Time:          2:30 PM |
| | Trial Date:    Jan. 27, 2025 |
| | Judge:         Hon. Claudia Wilken |

**[REDACTED PUBLIC VERSION]**

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on September 21, 2023 at 2:30 PM or as soon thereafter as the matter may be heard by the Court, at the courtroom of the Honorable Claudia Wilken, Court-room 2, 4th Floor, United States District Court, 1301 Clay Street, Oakland, California, Defend-ants National Collegiate Athletic Association, the Atlantic Coast Conference, The Big Ten Con-ference, Inc., The Big 12 Conference, Inc., the Pac-12 Conference, and the Southeastern Confer-ence, will and hereby do move the Court for an order to exclude the opinions, reports, and testi-mony of Edwin S. Desser and Dr. Daniel A. Rascher.

This motion is made pursuant to Federal Rule of Evidence 702, as well as *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Defendants base their motion on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities and materials cited therein, the [Proposed] Order, any oral argument heard by the Court and such other matters as the Court deems proper.

1

**TABLE OF CONTENTS**

2

Page

3   TABLE OF AUTHORITIES ...................................................................................... ii

4   INTRODUCTION .............................................................................................. 1

5   BACKGROUND .............................................................................................. 2

6   LEGAL STANDARD ........................................................................................ 6

7   ARGUMENT ................................................................................................. 7

8      I.   Desser's Opinions Do Not Satisfy *Daubert* Or Rule 702. ................. 7

9            A.   Desser's Opinion That BNIL Represents 10% Of The Value Of
                   Broadcast Media Rights Should Be Excluded. ......................... 7
10
              B.   Desser's Opinion As To The Allocation Of Rights Payments
11                 Among Football And Men's And Women's Basketball Should Be
                   Excluded. ......................................................................... 11
12
13     II.  Rascher's Opinions Do Not Satisfy *Daubert* Or Rule 702. ............... 14

14           A.   Rascher's Broadcast NIL Model Relies On Speculative And
                   Unsupported Inputs ............................................................. 14

15           B.   Rascher Used No Economic Model—Much Less A Reliable
                   One—To Assess Broadcast NIL Injury And Damages. ........... 15
16
17           C.   Rascher's BNIL Damages Opinion Is Unreliable Because He Fails
                   To Consider Title IX And State Laws. .................................. 17

18           D.   Rascher's Third-Party NIL Damages Analysis Is Unreliable ........ 18

19   CONCLUSION ............................................................................................... 20

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*,
   135 F. Supp. 2d 1031 (N.D. Cal. 2001) ................................................................. 13

*Apotex, Inc. v. Cephalon, Inc.*,
   321 F.R.D. 220 (E.D. Pa. 2017) ............................................................................ 16

*Apple, Inc. v. Samsung Elecs. Co.,*,
   2014 WL 794328 (N.D. Cal. Feb. 25, 2014) .......................................................... 9

*Avendt v. Covidien Inc.*,
   262 F. Supp. 3d 493 (E.D. Mich. 2017) ............................................................... 17

*Bragdon v. Abbott*,
   524 U.S. 624 (1998) ................................................................................................ 7

*ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.*,
   890 F. Supp. 2d 912 (N.D. Ill. 2012) .................................................................. 17

*City of Pittsburgh v. W. Penn Power Co.*,
   147 F.3d 256 (3d. Cir. 1998) ............................................................................... 17

*Colony Holdings, Inc. v. Texaco Refining & Mktg., Inc.*,
   2001 WL 1398403 (C.D. Cal. Oct. 29, 2001) ...................................................... 18

*Concord Boat Corp. v. Brunswick Corp.*,
   207 F.3d 1039 (8th Cir. 2000) ............................................................................. 19

*Costco Wholesale Corp. v. Maleng*,
   522 F.3d 874 (9th Cir. 2008) ............................................................................... 18

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ....................................................................................... passim

*Digital Reg of Tex., LLC v. Adobe Sys., Inc.*,
   2014 WL 4090550 (N.D. Cal. Aug. 19, 2014) .................................................. 7, 8

*Dolphin Tours v. Pacifico Creative Serv., Inc.*,
   773 F.2d 1506 (9th Cir. 1985) ........................................................................ 15, 17

*Domingo ex rel. Domingo v. T.K.*,
   289 F.3d 600 (9th Cir. 2002) ............................................................................... 15

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ...................................................................................... 1, 7, 8

*Goodness Films, LLC v. TV One, LLC*,
   2014 WL 12780291 (C.D. Cal. May 19, 2014) ..................................................... 9

*GPNE Corp. v. Apple, Inc.*,
   2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ................................................................ 8, 11

*In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*,
   524 F. Supp. 2d 1166 (N.D. Cal. 2007) ...................................................... 2, 11, 13

*In re Live Concert Antitrust Litig.*,
   863 F. Supp. 2d 966 (C.D. Cal. 2012) ................................................................ 18, 20

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
   593 F. Supp. 2d 549 (S.D.N.Y. 2008) ................................................................ 17

*In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*,
   26 F. Supp. 3d 449 (E.D. Pa. 2014) ................................................................ 17

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ................................................................................ passim

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   694 F.3d 51 (Fed. Cir. 2012) ................................................................ 9

*Lawrence v. Raymond Corp.*,
   2011 WL 3418324 (N.D. Ohio Aug. 4, 2011) ................................................................ 8

*LinkCo, Inc. v. Fujitsu Ltd.*,
   2002 WL 1585551 (S.D.N.Y. July 16, 2002) ................................................................ 9

*Looksmart Grp., Inc. v. Microsoft Corp.*,
   2019 WL 4009263 (N.D. Cal. Aug. 5, 2019) ................................................................ 9

*Oculu, LLC v. Oculus VR, Inc.*,
   2015 WL 3619204 (C.D. Cal. June 8, 2015) ................................................................ 18

*Ollier v. Sweetwater Union High Sch. Dist.*,
   768 F.3d 843 (9th Cir. 2014) ................................................................ 6

*Open Text S.A. v. Box, Inc.*,
   2015 WL 349197 (N.D. Cal. Jan. 23, 2015) ................................................................ 8

*Rearden LLC v. Walt Disney Co.*,
   2021 WL 6882227 (N.D. Cal. July 12, 2021) ................................................................ 13

*Republican Party of New Mexico v. Balderas*,
   2021 WL 5578869 (D.N.M. Nov. 30, 2021) ................................................................ 13

*ResQNet.com, Inc. v. Lansa, Inc.*,
   594 F.3d 860 (Fed. Cir. 2010) ................................................................ 10, 11

*Toscano v. PGA Tour, Inc.*,
   201 F. Supp. 2d 1106 (E.D. Cal. 2002) ................................................................ 18

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011) ................................................................ 9, 10

*United States v. Valencia-Lopez*,
    971 F.3d 891 (9th Cir. 2020) ................................................................................................. 8

*Valente v. Textron*,
    931 F. Supp. 2d 409 (E.D.N.Y. 2013) .............................................................................. 2, 17

*Wendell v. GlaxoSmithKline LLC*,
    858 F.3d 1227 (9th Cir. 2017) ...................................................................................... 2, 7, 17

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
    395 F.3d 416 (7th Cir. 2005) .................................................................................................. 8

**Other Authorities**

D. Rascher, A MODEL OF A PROFESSIONAL SPORTS LEAGUE,
    *International Advances in the Economic Research* (1997).................................................... 16

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of
    Antitrust Principles & Their Application* (4th ed. 2016) ........................................... 15, 17, 18

Simon Rottenberg, *The Baseball Players' Labor Market*,
    64 J. Pol. Econ. 242 (1956).................................................................................................. 16

**Rules**

Fed. R. Evid. 702, 2000 Adv. Comm. Note.................................................................................. 8

1

## INTRODUCTION

The foundation for Plaintiffs' motion to certify classes seeking over $1.4 billion in damages for harm allegedly caused by NCAA rules limiting name, image, and likeness ("NIL") payments is the opinions of Edwin S. Desser and Dr. Daniel A. Rascher. Media consultant Desser claims the "collective" value of NIL used in a sports broadcast ("BNIL") is 10% of total broadcast revenue for each conference and concludes that this BNIL value for multi-sport media deals can be attributed 75% to football, 15% to men's basketball, and 5% to women's basketball. Rascher opines that in the market for student-athlete labor the NCAA would adopt Desser's 10% valuation, and each conference would allocate that portion of its revenue to football and basketball players according to Desser's proposed breakdown, making equal payments to student-athletes in each sport (resulting in significant differences between conference payments in each sport).

These opinions have no more substance than a house of cards. Desser's opinion that student-athlete NIL constitutes 10% of the "value" of the media rights in broadcast agreements is simply made up. Desser points to no real world market data to support his proposed BNIL value— because there is none. He admits there is no real-world market for BNIL rights, nor any contract that places a value on it. He has never negotiated any BNIL amount. His 10% number is pure speculation, and should be excluded. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.") (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Desser's opinion "allocating" non-existent BNIL value among football, men's basketball, and women's basketball is also rank speculation. Broadcast agreements neither allocate revenue among sports nor provide any basis to do so. Desser cherry-picks isolated mentions of possible allocations, ignoring their context and evidence in those same documents (and innumerable others) contradicting his allocation. His allocation opinion is inadmissible. *See In re Bextra & Celebrex*

*Mktg. Sales Pracs. & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176, 1184 (N.D. Cal. 2007) (excluding testimony of expert who "cherry-pick[ed] observational studies that support his conclusion and reject[ed] or ignor[ed] the great weight of the evidence that contradicts his conclusions").

Rascher's BNIL methodology should be excluded because it rises or falls based on Desser's purely speculative inputs. But regardless of how the Court rules as to Desser, Rascher's opinion that there are common methods for estimating antitrust impact and damages is independently without substance. Desser offers no opinion as to the alleged BNIL value of any individual student-athlete; in fact, he admits that these values would vary greatly. Kilaru Decl. Ex. 6 (Desser Tr. 54:5-55:7, 93:1-94:7). As explained below, Rascher has no basis for asserting that every scholarship athlete would receive a payment and ignores (and fails to analyze) evidence to the contrary. He then blithely asserts that competition in the market for student-athlete labor would result in all scholarship players receiving exactly the same broadcast revenue payment, regardless of talent or any other individual characteristic. That contradicts a basic principle of sports economics in general, and *his own academic work* in particular, which teaches that teams pay more for more-talented players. *See Valente v. Textron*, 931 F. Supp. 2d 409, 429 (E.D.N.Y. 2013) (excluding opinion that contradicted expert's own peer-reviewed article). His contrary opinion given for this litigation, in defiance of the consensus in his field, is inadmissible. *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (courts may "consider whether experts are testifying 'about matters growing naturally' out of their own independent research, or if 'they have developed their opinions expressly for purposes of testifying'").

Rascher's methodology for calculating third-party NIL damages is similarly flawed. It makes speculative assumptions about student-athlete compensation without accounting for significant factors relevant to third-party NIL monetization that undermine his model's reliability. Rascher's opinion on third-party NIL damages is unreliable, and should be excluded.

## BACKGROUND

Desser and Rascher offer the following opinions. None withstand *Daubert* scrutiny.

*Broadcast NIL.* Desser purports to rely on his "experience negotiating sports broadcasting agreements" to conclude that the collective value of student-athlete BNIL is 10% of a conference's total broadcast revenue. Expert Report of Edwin S. Desser, ECF No. 209-03, at 54 ("Desser Rpt."). Desser has never negotiated a college sports media agreement. Desser Tr. 31:25-32:20. Nor has he separately valued NIL rights in a broadcast; it is a concept fabricated for this litigation. *Id.* 33:11-34:17. No one else has attempted to "segregate the NIL value from the value of the broadcast rights package as a whole" either. *Id.* 34:8-17. Indeed, in the real world, "subdividing the overall payment to be made in a media rights contract generally would serve no business purpose," Desser Rpt. 6-7, and "[t]here is no separate place where the NIL rights in broadcast are bought and sold separate from the player contracts themselves," Desser Tr. 77:6-78:15. *See also* Expert Report of Bob Thompson, at 35 ("Thompson Rpt."). This is consistent with the conferences' experience: "At no time during my participation in and direction of the SEC's negotiations with networks did any consultant or any network indicate that there was any value" to the "[BNIL] rights of any student-athletes." Sankey Decl. ¶23 (SEC Commissioner).[1] It is also consistent with the use of NIL in professional sports, for which broadcast agreements do not contemplate or result in any payment to players that directly relates to or can be traced to the use of any player's NIL in broadcasts. *See* Suppl. Scebelo Decl. ¶4; Suppl. Arrick Decl. ¶4. In the NFL and NBA, there is no "separate portion of salary delineated in the player agreements for NIL as opposed to performance on the field." Desser Tr. 75:18-76:7, 76:16-19, 78:8-15. Further, as explained below, Desser offers no opinion about the value of any given student-athlete's BNIL, or about whether each scholarship student-athlete would be paid in a labor market—and thus provides no support for Rascher's opinion that every student-athlete on a team would receive any, much less the same, payment. Desser Tr. 15:6-17:24, 23:23-24:25. His 10% opinion has no basis.

---

[1] *See also* Kenny Decl. ¶13 (Big 10 Senior Vice President for Television, Media Analytics and Emerging Platforms); Kliavkoff Decl. ¶27 (Pac-12 Commissioner); Weiberg Decl. ¶13 (Senior Vice President and Director of Athletics at Oklahoma State University); Rhoades Decl. ¶13 (Vice President and Director of Intercollegiate Athletics at Baylor University); Tario Decl. ¶28 (Deputy Commissioner/Chief Financial Officer, Business and Administration of the Atlantic Coast Conference).

Desser also purports to rely on royalty rates for NIL licenses in the promotional and en-dorsement contexts, but these have nothing to do with BNIL. Desser compares apples to oranges: the alleged value of BNIL, on one hand, and royalty payments in the non-broadcast professional sports context, including in patent, apparel, digital collectible, trading card, and video game mar-kets, on the other. *See* Desser Rpt. 55-56. As Rascher admitted, such licenses have nothing to do with BNIL. Kilaru Decl. Ex. 7 (Rascher Tr. 51:3-20).

Desser also lacks real-world support for his opinion that conferences would allocate the 10% share of their broadcast revenues among the sports, with at least 75% going to football, at least 15% to men's basketball, and no more than 5% to women's basketball. Desser Rpt. 63. He admits that broadcasters do not allocate rights fees by sport in multi-sport agreements. Desser Tr. 121:9-18. Instead, "the vast majority of the Media Rights agreements are for a combination of different sports," and "[i]n general, there is no delineation in conference or NCAA deal contracts for specific amounts to be paid to particular schools, or for particular sports or games—just a to-tal annual amount of cash to be split by the various licensors, usually in a manner of their choos-ing." Desser Rpt. 49, 60 (footnote omitted). Nor do the conferences have that information; broad-casters "do not share detailed revenue and cost information" necessary to "determine the relative contribution of each sport," nor do they include any "allocation of rights fees." Sankey Decl. ¶¶30, 33. Despite "spen[ding] a lot of time looking," Desser found very little evidence in the rec-ord of multi-sport allocations. Desser Tr. 110:22-112:2.

The three documents Desser relies on to support his allocation opinion do not move the needle. The first, an SEC financial statement, contradicts the allocation Desser proposes. *See* Desser Ex. 18 at 806-10. The document allocated NSC of broadcast revenues from a CBS agree-ment to football and NSC to men's basketball, and did not allocate at all over NSC in revenues from a separate agreement with ESPN related to the SEC Network. *Id.*; Sankey Decl. ¶¶31(c), 32. Desser acknowledged that this cherry-picking makes his analysis mathematically in-valid. Desser Tr. 118:23-119:12 (admitting Redacted - NSC "). It is also limited to a single A5 conference—and there is no basis to believe that any allocations the SEC might

make would hold across all A5 conferences. The second, a term sheet from a Conference USA deal in 2010, does not involve a Defendant conference and contains an incomplete allocation that Desser did not know how to interpret. *Id.* 112:3-113:4. There is no basis to believe that it reflects an allocation applicable to any A5 conference, much less all of them. The third, a 2011 agreement between the NCAA and ESPN, does not even propose an allocation for the sports at issue—football, men's basketball, and women's basketball. Desser Rpt. 62. Desser says only that the agreement is "consistent with my view that, at least to date, most Olympic Sports should receive a very small allocation of the media revenues in college media rights deals." *Id.* Put simply, there is no basis for Desser's allocation.

*Rascher's BNIL Analysis.* Rascher asserts that the relevant market is a labor market for student-athletes and concludes that, if NCAA rules permitted payments for NIL rights, every scholarship football and basketball player on every team in every A5 conference would have been paid for BNIL. Rascher ultimately contends that if BNIL payments were allowed, each conference would provide "an equal Broadcast NIL payment to each class member [i.e., every scholarship football and basketball player] in each sport within each conference." Rascher Rpt. ¶163.

Desser affords no basis for Rascher to conclude that every scholarship athlete would be paid, or that they would be paid equal amounts, because Desser offers no opinion on these topics. Rascher admits he is not assuming that any conference or NCAA rule would require such payments. Rascher Tr. 120:7-17. Rascher bases these crucial conclusions in his BNIL model solely on his own conclusion that market forces would produce this outcome. He disclaimed any reliance on NFL or NBA compensation structures. Rascher Tr. 166:25-167:6. He also does not explain why the NCAA would limit amounts to be paid in the labor market based on Desser's theoretical value of BNIL media rights in an unrelated market. Rascher Rpt. ¶¶159-67.

*Third-Party NIL.* To predict what income student-athletes would have made in third-party NIL deals before July 1, 2021, Rascher sketches out a "before and after" approach that uses a student-athlete's *current* and *self-reported* performance in the NIL market to predict performance in prior years. *Id.* ¶¶185-87, 196-97. Rascher assumes that student-athletes who reported

third-party NIL compensation after July 1, 2021 would have made the same amount in each year during the period before June 30, 2021, subject to adjustments based on (i) reduced demand for college athletics during the pandemic; (ii) transfers; (iii) playing time changes; and (iv) changes to a student-athlete's role (*e.g.*, starter status, position). *See, e.g.*, *id.* ¶¶180-92; Rascher Tr. 219:18-221:4, 236:19-238:10. Rascher has not detailed how those adjustments would apply, run them, or explained why he has not attempted to run them. Rascher Tr. 238:11-243:15.

Rascher's model fails to account for any other factors that he concedes are relevant to NIL monetization, including an athlete's marketability, changes in technology, and "viral moments" that spike interest in a student-athlete. *Id.* 233:12-235:2; Kilaru Decl. Ex. 1 (Tucker Rpt. ¶¶205-23). He does not account for the fact that many reported NIL deals ultimately result in no (or little) compensation paid to the student-athlete. *See* Kilaru Decl. Ex. 9 (House Tr. 90:5-91:6, 120:14-122:4, 178:17-21); Rascher Tr. 253:19-256:15. And while it is undisputed that an NIL transaction involves both a seller (the athlete) and a buyer (the endorser), he has done nothing to model or even consider the endorser side of the market. *See* Tucker Rpt. ¶¶210-15. Instead, he assumes that endorsers' behavior in the first two pandemic years of a new market would persist for a much longer period of time in the but-for world. *Id.* ¶¶211, 242-47.

## LEGAL STANDARD

*Daubert* assigns courts an important "gatekeeping" role to exclude irrelevant, unreliable or unqualified evidence. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). An expert's opinion should be excluded where, as here, it is "based on mere 'subjective belief or unsupported speculation'" or "inherently unreliable and unsupported by the facts." *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014) (quoting *Daubert*, 509 U.S. at 590).

An expert may only testify about issues within his expertise and experience. *Kumho*, 526 U.S. at 149. Where an expert invokes their "expertise" in lieu of real-world data, the Court may "consider whether [they] are testifying 'about matters growing naturally' out of their own independent research, or if 'they have developed their opinions expressly for purposes of testifying.'"

*Wendell*, 858 F.3d at 1232. An expert opinion that relies on "vague, undisclosed general experience" unsupported by the record or real-world data should be excluded. *Digital Reg of Tex., LLC v. Adobe Sys., Inc.*, 2014 WL 4090550, at *2 (N.D. Cal. Aug. 19, 2014). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho*, 526 U.S. at 157 (1999) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

# ARGUMENT

## I.   Desser's Opinions Do Not Satisfy *Daubert* Or Rule 702.

Despite having never negotiated a college sports media agreement or attempted to value BNIL in any media agreement, Desser Tr. 31:25-34:17, Desser proposes two key inputs regarding the value and allocation of student-athlete BNIL for Rascher's BNIL methodology. Both opinions are unreliable, speculative, and lack real-world support.

### A.   Desser's Opinion That BNIL Represents 10% Of The Value Of Broadcast Media Rights Should Be Excluded.

All expert testimony must have a "traceable, analytical basis in objective fact." *Bragdon v. Abbott*, 524 U.S. 624, 653 (1998). The fundamental defect in Desser's opinion is that there is no such factual basis, because there is no real-world market for standalone BNIL. Plaintiffs cannot identify anyone who has ever valued BNIL in the real world. Opp. 7-9, 23-24. Desser even admits that there is "not a particular business purpose" to do so. Desser Tr. 34:13-17; *see also* Desser Rpt. 6-7. Where athlete NIL rights are addressed in other contexts, such as professional sports contracts where players agree not to contest the use of their image, they are addressed contractually in a labor market that compensates the athlete not for NIL, but for athletic services in amounts varying widely by player. *See* Desser Tr. 62:1-14, 63:5-10; Rascher Tr. 83:3-12. Desser offers no real-world examples of BNIL value that led him to pick 10% instead of 5%, 40%, 0% or some other number for valuing the "athlete value of NIL" in a broadcast agreement. The proposed 10% valuation is pure *ipse dixit.*

Although nobody—including Desser—does or would value BNIL outside of this litigation, Desser claims his "experience" provides a sufficient basis for his opinion. *See* Desser Rpt. 53-54.

But an expert does not satisfy Rule 702 by picking a number based on "experience" and asking the Court to take his word for it. An expert witness who "is relying solely or primarily on experience . . . must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702, 2000 Adv. Comm. Note. Desser does none of this.

"[R]eliability becomes more, not less, important when the 'experience-based' expert opinion is perhaps not subject to routine testing, error rate, or peer review type analysis." *United States v. Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir. 2020). Courts have not hesitated to exclude "experiential" opinions untethered to a reliable methodology. In one case, an expert employed reasoning almost identical to Desser in asserting that a reasonable royalty for certain technology was $1 per unit. *GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247, at *4 (N.D. Cal. Apr. 16, 2014) (relying on "30 years of experience in the licensing world and the valuation of intellectual property and [his] hundreds of transactions" but conceding that "there's no specific math"). Judge Koh deemed this opinion an "impermissible black box" without "sound economic and factual predicates." *Id*. at *4-5. As she explained, "30 years of experience" cannot be tested or "subjected to peer review and publication" and there was no "known or potential rate of error" in the analysis, so the "analytical gap" between the data and the royalty figure was "simply too great." *Id*. (quoting *Joiner*, 522 U.S. at 146). In a similar case, the expert's opinion was excluded when he "decided to adopt a fifty-percent starting point" for a reasonable royalty rate "based on his vague, undisclosed general experience." *Digital Reg*, 2014 WL 4090550, at *2.[2] The same principles apply here.

---

[2] *See also, e.g.*, *Open Text S.A. v. Box, Inc.*, 2015 WL 349197, at *6 (N.D. Cal. Jan. 23, 2015) ("Rather than spelling out the steps she took to go from the data to the royalty rate opinion, Holt cites her 'experience'—an abstraction not visible to the eyes of the Court, the jury, and opposing counsel, or testable in the crucible of cross-examination."); *Lawrence v. Raymond Corp.*, 2011 WL 3418324, at *7 (N.D. Ohio Aug. 4, 2011) (excluding an expert's method because it is a "black box into which data is fed at one end and from which an answer emerges at the other"), *aff'd*, 501 F. App'x 515 (6th Cir. 2012); *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 418 (7th Cir. 2005) (projections based on "industry expertise" or "awareness" show that the expert "either had no method or could not describe one. He was relying on intuition, which won't do.").

Nor can Desser excuse his failure to provide any parameters under which his BNIL valuation may be tested, verified, or meaningfully examined by declaring that his assumptions in applying his "experience" are "conservative." *Looksmart Grp., Inc. v. Microsoft Corp.*, 2019 WL 4009263, at *5 (N.D. Cal. Aug. 5, 2019); *see also LinkCo, Inc. v. Fujitsu Ltd.*, 2002 WL 1585551, at *4 (S.D.N.Y. July 16, 2002) (excluding opinion when expert asserted, without explanation, that he was using a "very conservative view").

Desser also cannot save his opinions by saying that Rascher's analysis "confirms [Desser's] opinion that 10% is a conservative and reasonable estimate of [BNIL] value." Desser Rpt. 54. As Desser admitted at his deposition, he never even read Rascher's report. Desser Tr. 24:12-17. In any event, Rascher's report states that Rascher is relying on *Desser* to determine "the value of the Broadcast NILs of the athletes"—not the other way around. Rascher Rpt. ¶170.

Desser also lacks credibility in claiming that his 10% valuation is supported by patent licenses and agreements with professional leagues or players' associations for *licensed merchandise*, each with widely varying rates. Desser Rpt. 55-56. He does not explain why royalties for physical goods like a jersey with a team and player name, or patent licenses from various industries, are the same or even comparable to a royalty for student-athlete NIL in a television broadcast. When an expert analogizes to existing license agreements to estimate a hypothetical royalty rate, "there must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011); *see also Goodness Films, LLC v. TV One, LLC*, 2014 WL 12780291, at *2 (C.D. Cal. May 19, 2014) (excluding expert opinion based on "experience in the movie business" where expert did not "identif[y] relevant, similar comparisons on which to base his screen credit valuation").[3] The expert "must provide a jury enough information to 'evaluat[e] the probative value of those agreements,' lest the jury be given 'little more than a recitation of royalty numbers.'" *Apple, Inc. v. Samsung Elecs. Co.*, 2014 WL 794328, at *8 (N.D. Cal. Feb. 25, 2014).

---

[3] *See also LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012) ("When relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice.").

Actual negotiations for commercial use of NIL in *non*-broadcast products cannot be likened to non-existent BNIL negotiations. As Desser admits, the licensing agreements he cites are for fundamentally different rights and products than a television sports broadcast: apparel, digital collectible, trading card, video games, and a variety of patents. Desser Rpt. 55-59. They are not sufficiently comparable to provide a reliable basis for estimating a "broadcast NIL" license that has never existed, s*ee Uniloc*, 632 F.3d at 1317, especially given Desser's admission that broadcast agreements, in contrast to his comparators, never include amounts dedicated as "payment for NIL." Opp. 2, 8-9.

In addition, the professional contracts Desser relies on provide no support for his opinion. *See* Desser Rep. 52. The NFL and NBA collective bargaining agreements and form player contracts negotiated by professional athlete unions state that the players do not contest the right of the leagues to broadcast games. Suppl. Scebelo Decl. ¶¶2-3, Ex. A; Suppl. Arrick Decl. ¶¶2-4, Ex. A. These agreements establish compensation limits for all players based on shares of various sources of revenue, but players negotiate their own individual salaries, which vary widely in amounts. *Id.* Nothing in this structure supports Desser's 10% valuation. The unions, through collective bargaining, also have authority to enter into NIL endorsement deals for products on behalf of groups of players, with the vast majority of the proceeds allocated to individual players, *e.g.*, Suppl. Scebelo Decl. ¶¶10-12, but products have no relationship to broadcast rights, so these deals offer no support to Desser either. Professional athletic apparel and collectible royalties are not meaningful comparators. *See Uniloc*, 632 F.3d at 1316-17 ("[T]he district court must consider licenses that are commensurate with what the defendant has appropriated. If not, a prevailing plaintiff would be free to inflate the reasonable royalty analysis with conveniently selected licenses[.]") (quoting *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010)) (cleaned up).

Desser's opinion is inadmissible for the independent reason that he does not use these other royalty rates as inputs into a reliable model to estimate an appropriate rate. Nor does he disclose the weight (if any) he gave particular agreements, or why. Desser offers no opinion on the value of any individual person's alleged BNIL value, Desser Tr. at 22:25-24:11 (confirming that he is

providing an overall collective estimate applicable to no individual), and reports only `Counsel Only` `Counsel Only` for the licenses he relies on, masking a considerable degree of variation, *see, e.g.*, Rascher Rpt. ¶172. In other words, Desser looks at widely varying royalty rates and simply declares that they support his opinion that, in his "experience," a 10% rate is appropriate. That is plainly insufficient. *See ResQNet.com*, 594 F.3d at 870 (rejecting expert who recommended a rate for his hypothetical negotiation "somewhere in the middle" of the rates he relied on); *Bextra*, 524 F. Supp. 2d at 1176 (excluding expert who "reache[d] his opinion by first identifying his conclusion . . . and then cherry-picking observational studies that support his conclusion").

Desser's opinion should be excluded under *Daubert* and its progeny.

**B.      Desser's Opinion As To The Allocation Of Rights Payments Among Football And Men's And Women's Basketball Should Be Excluded.**

Desser's opinions on how to allocate his 10% figure among sports should also be excluded. Here, he again relies on his "experience," without explaining how to weigh the variables he identifies or why he picked a 75/15/5 split. As Judge Koh put it in *GPNE*, a valuation that "appears to have been plucked out of thin air based on vague qualitative notions of the relative importance" of certain inputs does not satisfy *Daubert* and should be excluded. 2014 WL 1494247, at *6. Desser also acknowledged that he does not rely on ratings information to support his conclusions because of insufficient data. Desser Tr. 122:24-123:13.

The evidence shows that broadcast revenue is almost never allocated among sports, let alone in a consistent ratio across conferences. Desser's "experience" agrees:  he concedes that "the vast majority of the Media Rights agreements are for a combination of different sports" and that "[i]n general, there is no delineation in conference or NCAA deal contracts for specific amounts to be paid to particular schools, or for particular sports or games—just a total annual amount of cash to be split by the various licensors, usually in a manner of their choosing." Desser Rpt. 49, 60.

Likewise, the evidence shows that any allocations would have to be conference specific and revised annually. The popularity of sports varies from school to school and conference to

conference. Tucker Rpt. ¶¶154, 296; Kenny Decl. ¶14. Some conferences have agreements authorizing broadcasts of a relatively larger proportion of football and men's basketball games. Thompson Rpt. 18. Others prioritize sports disregarded by Rascher's allocation. College hockey, for example, is popular in the North; four colleges in Boston compete annually in the Beanpot tournament broadcast from a sold-out professional arena, while most Division 1 schools do not have varsity hockey teams at all.[4] Some conferences negotiate agreements requiring networks to incur the cost to produce and broadcast less popular games to maximize exposure for student-athletes who participate in sports that are unprofitable to broadcast. *Id.* 16-17, 48-49; Tario Decl. ¶30 ("[C]onferences may accept lower fees or other concessions to ensure that less popular Members and sports receive television exposure."); Sankey Decl. ¶¶26-27. This variance in structure across the conferences' broadcast contracts leaves no basis to infer that *every conference* would identically allocate 10% of broadcast revenues 75%-15%-5% amongst the Football, Men's and Women's Basketball Classes respectively.

Indeed, Desser's proposed allocation rests on a precarious foundation. Only one even relates to an A5 conference (the SEC), and the other two are over a decade old. *See supra* at 4-5. Given the variability among conferences, it is illogical for Desser to extrapolate a common allocation based on these flimsy data points, which are not even probative for the SEC, much less the other A5 conferences for which he offers no supporting data. Moreover, in the past ten years, the relative popularity of sports school to school and conference to conference has changed, especially for women's sports. Efforts by conferences to fashion media rights agreements in a manner that enhances and grows the popularity of women's sports have resulted in increased popularity for women's sports, causing broadcasters to adjust their programming schedules and priorities accordingly. *See* Sankey Decl. ¶27; *accord* Tario Decl. ¶31. Desser fails to account for these changes, rendering his proposed allocation unreliable.

[4] *See* Joshua Seguin, *Beanpot Shootout: How Did We Get Here*, College Hockey News (Feb. 14, 2023), https://www.collegehockeynews.com/news/2023/02/14_Beanpot-Shootout-How-Did.php; *Division I Teams and Conferences*, College Hockey Inc., https://collegehockeyinc.com/teams-and-conferences.php (last visited Apr. 25, 2023).

Moreover, in the process of cherry-picking isolated numbers from those documents, Desser ignores evidence that contradicts his proposed 75/15/5 allocation. For example, Desser focuses on a note in an SEC financial statement attributing an amount equal to [NSC] of certain rights fees received under one of the SEC's three media agreements to football. Desser Rpt. 60; Desser Ex. 18 at 807. But the same financial statement allocated [NSC] of broadcast revenues from a CBS agreement to football and [NSC] to men's basketball, and did not allocate at all over [NSC] in revenues from a separate agreement with ESPN related to the SEC Network. *See id.* at SEC-HOUSE0047806-10; Sankey Decl. ¶31(a), (c). When asked about the additional [NSC] in unallocated revenue he overlooked, Desser agreed that the amount could [Redacted - NSC] [NSC] depending on how it was distributed. Desser Tr. 118:23-119:12. Put simply, Desser ignored two separate data points in the same document that are fatally inconsistent with his opinion. Desser's cherry-picking of selective figures from the SEC financial statement makes his opinions unreliable. *See Bextra*, 524 F. Supp. 2d at 1176 (excluding expert for "cherry-picking observational studies that support his conclusion and rejecting or ignoring the great weight of the evidence that contradicts his conclusion"); *Rearden LLC v. Walt Disney Co.*, 2021 WL 6882227, at *7 (N.D. Cal. July 12, 2021) (excluding expert who only selected data "that she believed supported the conclusion she wanted to reach"); *Republican Party of New Mexico v. Balderas*, 2021 WL 5578869, at *3 (D.N.M. Nov. 30, 2021) (an expert "cannot 'cherry pick[ ]' favorable data . . . but ignore[ ] a significant quantity of other important facts"); *Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1041 (N.D. Cal. 2001) (excluding damages model that "contain[ed] entirely too many assumptions and simplifications that are not supported by real-world evidence").

## II.       Rascher's Opinions Do Not Satisfy *Daubert* Or Rule 702.

Rascher purports to show that Plaintiffs can establish antitrust impact and damages through common evidence, using models that lack factual support and fail to comport with rational economic behavior. The Court should strike Rascher's opinions.[5]

### A.       Rascher's Broadcast NIL Model Relies On Speculative And Unsupported Inputs

At the threshold, Rascher's BNIL model fails because, as Rascher admits, it relies on Desser's speculative and unsupported conclusion that the collective value of the athletes' BNIL is approximately 10% of the value of the conferences' respective media agreements. Rascher Rpt. ¶170. Further, Desser's testimony would not support Rascher's ultimate conclusion even if it were admissible; Desser provides no support for Rascher's conclusions that every scholarship football and basketball player on every A5 team would have been paid—and would have been paid the same amount as every other scholarship athlete on the team in the labor market. Rascher's ultimate opinions are based on Desser's inadmissible ***and*** irrelevant testimony, which Rascher cannot save.

Rascher claims to have verified that the reasoning underlying Desser's report is "reasonable and reliable." *Id.* However, Rascher does not justify that conclusion. The minimal analysis Rascher does here suffers from the same flaws as Desser. Rascher too attempts to defend the 10% valuation in reliance on licensing agreements with players' associations for licensed merchandise such as ░░░░░░░░░░░░░░░░░░░░░ *Id.* ¶¶171-73. By Rascher's own admission, those licenses are not for BNIL, Rascher Tr. 51:3-15, and therefore are not only improper comparators to student-athlete BNIL, *see supra* Section I.A, but they also demonstrate a wide degree of variance—from ░░░░░ percent, Rascher Rpt. ¶172. This confirms that Desser's 10% valuation is nothing more than *ipse dixit*, *see Kumho*, 526 U.S. at 157, and Rascher's reliance on it is improper.

Likewise, Rascher purports to confirm Desser's allocation among the sports by analyzing unrelated information: NCAA MFRS data about booster donations and total revenues for football and basketball at the aggregate level for all A5 conference schools. Rascher Rpt. ¶176. This data

---

[5] Defendants' class certification brief demonstrates why, regardless of whether the Court excludes Rascher's opinions under Rule 702, those opinions are insufficient under Rule 23. *See* Opp. 21-37.

says nothing about the proper allocation of any conference's broadcast revenue among sports. And in any event, it does not support a 75/15/5 allocation of *any* revenue for *any* conference, instead showing widely varying results from school to school and conference to conference. *Id.* Ex. 8.

Because Desser's opinions are speculative, and in any event do not provide a sufficient foundation for Rascher's conclusions, all of Rascher's BNIL opinions are also inadmissible.

### B. Rascher Used No Economic Model—Much Less A Reliable One—To Assess Broadcast NIL Injury And Damages.

Expert evidence is reliable "if the principles and methodology used by the expert proffering it are grounded in the methods of science." *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002). Thus, an "economic expert should employ economic theory that has been subject to peer review and is generally accepted within the field of economics." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles & Their Application* ¶399 (4th ed. 2016). If an economist does not meet these standards, his opinions should be "deemed inadmissible." *Id.*

With no support from Desser for his assertion that every scholarship student-athlete on a football or basketball team would be paid, much less equally, Rascher reverts to economic theory. But his opinion is inconsistent with economic theory—including his own. An economic expert must assume "the existence of rational economic behavior in the hypothetical free market." *Dolphin Tours v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1511-12 (9th Cir. 1985). Rascher admits that he needs to "assume that the market participants are engaging in rational economic behavior." Rascher Tr. 32:6-10. But he offers no support for his conclusory assertion that the least talented scholarship athletes would receive BNIL revenue payments on top of their scholarships. Rascher admits that walk-ons have a "position in the labor market as being" one where "they're not able to get a scholarship," and therefore would not receive BNIL payments either, despite appearing on broadcasts. *Id.* 80:14-81:22. There is no reason to assume all scholarship athletes have sufficient value in the labor market to receive BNIL payments—every dollar of which reduces the BNIL available to pay star athletes. Tucker Rpt. ¶¶91-110. Nor is there support for Rascher's contention that conferences would make *equal* BNIL payments to all scholarship student-athletes in a sport,

despite wide variation in talent and marketability. Opp. 9-14, 24-25, 31-33; Tucker Rpt. ¶¶91-110. His conclusions are not only unsupported, they presume *irrational* economic behavior. As a result, Rascher's opinion is unreliable and should be excluded. *Apotex, Inc. v. Cephalon, Inc.*, 321 F.R.D. 220, 237 (E.D. Pa. 2017) (excluding expert's damages model which "require[d] assuming away rational economic behavior by competitors").

That is particularly so because it is well accepted in sports labor economics that payments vary based on talent and are distributed unequally.[6] In economic terms, there is an equilibrium price per unit of talent, not per athlete. Rascher has offered this exact opinion in his academic work. *See* D. Rascher, A MODEL OF A PROFESSIONAL SPORTS LEAGUE, *International Advances in the Economic Research*, at 14 (1997) ("There would be one wage per unit of talent where the market labor demand curve crossed the market labor supply curve."). The other works Rascher cites in his report do so as well. *See* Rascher Rpt. ¶141 n.156; Tucker Rpt. ¶98. Real-world evidence reflects these market dynamics: where they are permitted to do so—that is, in equivalency sports—schools *already* provide partial scholarships in varying amounts based on talent. *E.g.*, Tucker Rpt. ¶119 (noting that North Carolina State University provided no scholarships to ▒Conf.▒ of its women's soccer players, with the rest of the players receiving widely varying amounts, from ▒Confidential▒ of a full grant-in-aid). Rascher recognizes a similar phenomenon with walk-ons, who are "not able to get a scholarship" at all. Rascher Tr. 81:18-22.

Rascher's assumption that each conference will independently decide to pay 10% of its broadcast revenue to recruit student-athletes also departs sharply from economic rationality. Broadcast revenue is not equal across conferences. Thus, Rascher's methodology implies that conferences would pay drastically different amounts to student-athletes in the same sport. For instance, Rascher concludes that in 2020 ▒NSC▒ would have paid each football player $25,700, while the ▒NSC▒ would have paid $46,000. Rascher Rpt. Ex. 12. This proposal would put ▒NSC▒ at a

---

[6] For example, the seminal article in sports economics, cited by Dr. Rascher himself, dealt with baseball and explained that in a free market for players, all teams would "bid for talent"; a team "will be prepared to pay a Babe Ruth a fabulous salary, simply because there are no very good substitutes for him, and he is worth so much more to the team than any other player." Simon Rottenberg, *The Baseball Players' Labor Market*, 64 J. Pol. Econ. 242, 252 (1956).

significant recruiting disadvantage. Setting prices without considering the amounts competitors pay is not rational economic behavior, rendering Rascher's model inadmissible. *Cf. Dolphin Tours*, 773 F.2d at 1511 (economic model must include "rational price differential").

Rascher's opinion that all student-athletes in a given sport and conference would receive equal payments in the amounts he predicts does not "grow[ ] naturally out of [his] independent research," but contradicts it and other sports economics literature. *Wendell*, 858 F.3d at 1232. His opinion is therefore inadmissible. *See id.*; *Kumho*, 526 U.S. at 152 (*Daubert*'s purpose is to ensure that "an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.").[7]

### C.   Rascher's BNIL Damages Opinion Is Unreliable Because He Fails To Consider Title IX And State Laws.

As discussed in the Class Certification Opposition Brief, Rascher's assumption that universities and conferences would not take Title IX and diversity and equity concerns into account in providing NIL payments make his but-for world impossible. Opp. 3, 15-16, 28-29. An economic analysis cannot ignore laws that affect the marketplace. *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 267-68 (3d. Cir. 1998). Similarly, he failed to take into account state laws that prohibit conferences and institutions from paying student-athletes for their NIL rights. Rascher Tr. 111:22-112:25; Areeda & Hovenkamp ¶338(b) ("[A] plaintiff cannot be injured in fact by private conduct excluding it from the market when a statute prevents the plaintiff from

---

[7] *See also In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 593 F. Supp. 2d 549, 563 (S.D.N.Y. 2008) (an expert must be "as careful as he would be in his regular professional work outside of paid litigation consulting"); *Valente*, 931 F. Supp. 2d at 429 (excluding expert testimony because the expert's opinion was contradicted by his own peer reviewed article); *Avendt v. Covidien Inc.*, 262 F. Supp. 3d 493, 522-24 (E.D. Mich. 2017) (excluding an expert's opinion where the expert repeatedly expressed a contrary view in a number of peer-reviewed articles and opinions); *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 26 F. Supp. 3d 449, 460-61, 465 (E.D. Pa. 2014) (excluding expert whose testimony contradicted her own peer-reviewed publications, finding that her change of opinion was "not grounded in generally accepted scientific methods"); *ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.*, 890 F. Supp. 2d 912, 948, 949 (N.D. Ill. 2012) (excluding sports economist's market definition contradicted by his own book).

entering that market in any event."). Institutions following these state laws have state action immunity to antitrust law. *Costco Wholesale Corp. v. Maleng*, 522 F.3d 874 (9th Cir. 2008) ("[O]nce we determine that a restraint is unilaterally imposed by the state as sovereign, *Parker* immunity applies without further inquiry."). It is true that, in the period prior to July 1, 2021, the state laws did not exist—but neither did the NCAA interim policy permitting third-party NIL payments to student-athletes, to which the state laws were a direct response. An economist "may not ignore . . . likely changes in the market" that would result from the response of others to the change being modeled. *Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1125 (E.D. Cal. 2002) (cannot ignore entry of other athletes and reaction of sponsors to change in eligibility rules).

### D.   Rascher's Third-Party NIL Damages Analysis Is Unreliable

The Court should exclude Rascher's third-party NIL damages predictions. Rascher has not developed a model for these damages, but rather simply assumes the annual value of an athlete's NIL deals in the period before June 30, 2021 would equal the annual value of deals they entered into after July 1, 2021, and speculates about a few adjustments he might make. Those few adjustments are an oversimplification of the myriad factors relevant to third-party NIL monetization. As discussed in detail in the Class Certification Opposition Brief (Opp. 20, 34-36), Rascher fails to consider significant factors that may differ between the before and after periods and that vary by sport, conference, and student-athlete. Instead, he assumes that NIL value in the marketplace is the same every year, such that post-July 1, 2021 reported NIL deal value is perfectly predictive of the NIL deal value every student-athlete would have achieved in the before period. In so doing, Rascher impermissibly fails to "take into account nonconspiratorial factors that would have caused prices to be different in the conspiracy period even if there had been no conspiracy." *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 974 (C.D. Cal. 2012) (quoting Areeda & Hovenkamp ¶399c, p. 446).[8]

---

[8] *See also Oculu, LLC v. Oculus VR, Inc.*, 2015 WL 3619204, at *21 (C.D. Cal. June 8, 2015) (excluding expert opinion that failed to analyze alternative causes of harm); *Colony Holdings, Inc. v. Texaco Refining & Mktg., Inc.*, 2001 WL 1398403, at *4 (C.D. Cal. Oct. 29, 2001) (explaining that a "report's failure to address other potential causes of the [damage] raises questions

For example, Rascher fails to account for how the variability of student-athlete popularity over time affects third-party NIL compensation. This oversight leads to absurd results. Grant House testified that his public exposure increased significantly during the Pan American Games in 2019 and that he "would have received NIL deals" during that period had NCAA rules permitted them. House Tr. 226:1-227:15. Yet Rascher's methodology would not reflect such a bump in NIL value based on House's temporarily increased exposure in 2019. Individual athletes would make varying claims for compensation in individual cases based on their own unique circumstances. Rascher simply assumes that post-July 1, 2021 reported NIL deal value is perfectly predictive of the before period, despite admitting that public attention is scarce and that capturing public attention—thereby generating NIL value—is rare. Rascher Tr. 233:12-234:6.

Second, Rascher's methodology fails to account for the effect of variability in an athlete's overall performance over time. Stetson Bennett, for example, was a walk-on at Georgia and did not play in 2017.[9] He transferred to junior college in 2018, returned and won the starting QB job in 2021[10] and led Georgia to national championship wins in 2022 and 2023.[11] Bennett's NIL value undoubtedly increased over time. But because of Rascher's methodology, Bennett would secure damages during the before period, when he was largely unknown. Members of the 2017-18 Loyola University men's basketball team, on the other hand, would not benefit from the heightened NIL value they would have achieved based on their Cinderella run in the 2018 NCAA Tournament.[12]

---

regarding the thoroughness and objectivity of the process"); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000) (excluding expert's model that rested on theory, "ignored inconvenient evidence" and "failed to account for market events that both sides agreed were not related to any anticompetitive conduct").

[9] Mark Schlabach, *How Georgia's Stetson Bennett Went from Walk-On to College Football Playoff National Championship*, ESPN (Jan. 8, 2022), https://www.espn.com/college-football/story/_/id/33016492/how-georgia-stetson-bennett-went-walk-college-football-playoff-national-championship.

[10] *Id.*

[11] William E. Ricks, *Georgia Becomes Latest Team To Win Consecutive College Football National Championships*, ESPN (Jan. 10, 2023), https://www.espn.com/college-football/story/_/id/35393996/college-football-teams-consecutive-national-titles.

[12] Chip Patterson, *March Madness 2018: Loyola-Chicago's Cinderella Run Continues On to the Final Four*, CBS Sports (Mar. 24, 2018), https://www.cbssports.com/college-basketball/news/march-madness-2018-loyola-chicagos-cinderella-run-continues-on-to-the-final-four/.

Rascher's methodology would compensate them for third-party NIL deals in later years, when they did not garner significant national attention. Rascher Tr. 259:22-261:8.

Third, Rascher also fails to consider differences in the buyer side of the market pre- and post-July 1, 2021 at all. For example, he fails to account for how changes in technology have affected third-party NIL compensation. In their Consolidated Amended Complaint, Plaintiffs note that "[h]undreds of student-athletes" currently receive third-party NIL compensation through the video-service platform Cameo and that "more than 4,000 student-athletes" are compensated by "Yoke Gaming, an app . . . that allows fans to pay to play video games with college and professional athletes." Am. Compl. ¶25. Per Rascher, athletes who made money off of Cameo during the after period would be provided the same compensation as far back as 2016, despite the fact that (1) Cameo was founded in 2017 and (2) Cameo's popularity—and therefore its viability as a source of revenue for SAs—did  not spike until the Covid-19 pandemic. Tucker Rpt. ¶206. Rascher would also provide the same compensation as far back as 2016 to athletes who made money off of Yoke Gaming, even though Yoke was not launched until 2020.[13] Rascher does not control for these obvious factors that would affect student-athletes' third-party NIL compensation. *See Live Concert*, 863 F. Supp. 2d at 980 (excluding expert who failed to account for "the emergence of digitally-available music on the Internet" in his analysis of ticket prices).

Rascher's third-party damages methodology does not account for factors likely to create meaningful differences in NIL value in the before and after periods. His model is inconsistent with economic reality and thus inadmissible under Rule 702 and *Daubert*. *See id.* at 974.

## CONCLUSION

For the foregoing reasons, both Desser and Rascher's opinions should be excluded.

Dated: April 28, 2023

---

[13] Yoke Gaming, *About*, https://www.yoketeam.com/about-us (last visited Apr. 25, 2023).

1

### FILER'S ATTESTATION

2

3       I, Rakesh Kilaru, am the ECF user whose identification and password are being used to

4 file DEFENDANTS' NOTICE OF MOTION, MOTION AND MEMORANDUM OF POINTS

5 AND AUTHORITIES IN SUPPORT THEREOF TO EXCLUDE THE OPINIONS, REPORTS,

6 AND TESTIMONY OF EDWIN DESSER AND DANIEL RASCHER. In compliance with Lo-

7 cal Rule 5-1(h)(3), I hereby attest that all signatories hereto concur in this filing.

8                                                          /s/ Rakesh Kilaru

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Dated:  April 28, 2023           Respectfully Submitted,

2

3    **WILKINSON STEKLOFF LLP**        **COOLEY LLP**

4    By: /s/ Rakesh N. Kilaru          By: /s/ Whitty Somvichian
    Beth A. Wilkinson (*pro hac vice*)    Whitty Somvichian (SBN 194463)

5    Rakesh N. Kilaru (*pro hac vice*)    Kathleen R. Hartnett (SBN 314267)
    Kieran Gostin (*pro hac vice*)     Ashley Kemper Corkery (SBN 301380)

6    Calanthe Cope-Kasten (*pro hac vice*)  David S. Louk (SBN 304654)
    2001 M Street NW, 10th Floor    3 Embarcadero Center, 20th Floor

7    Washington, DC 20036        San Francisco, California 94111-4004
    Telephone:  (202) 847-4000     Telephone:  (415) 693 2000

8    Facsimile:  (202) 847-4005     Facsimile:  (415) 693 2222
    bwilkinson@wilkinsonstekloff.com  wsomvichian@cooley.com

9    rkilaru@wilkinsonstekloff.com    khartnett@cooley.com
    kgostin@wilkinsonstekloff.com    acorkery@cooley.com

10   ccope-kasten@wilkinsonstekloff.com  dlouk@cooley.com

11

12   Jacob K. Danziger (SBN 278219)    Mark Lambert (SBN 197410)
    ARENTFOX SCHIFF LLP       3175 Hanover Street

13   44 Montgomery Street, 38th Floor   Palo Alto, CA  94304-1130
    San Francisco, CA 94104      Telephone:  (650) 843-5000

14   Telephone: (734) 222-1516     Facsimile:  (650) 849-7400
    Facsimile: (415) 757-5501      mlambert@cooley.com

15   jacob.danziger@afslaw.com

16   Attorneys for Defendant      Dee Bansal (*pro hac vice*)
    NATIONAL COLLEGIATE ATH-  1299 Pennsylvania Ave. NW, Suite 700

17   LETIC ASSOCIATION       Washington, DC 20004-2400
                              Telephone:  (202) 842 7800

18                           Facsimile:  (202) 842 7899
                              dbansal@cooley.com

19

20                              Attorneys for Defendant
                              PAC-12 CONFERENCE

21

22

23

24

25

26

27

28

1

**MAYER BROWN LLP**                          **POLSINELLI PC**

2

By: /s/ Britt M. Miller                              By: /s/ Leane K. Capps

3

Britt M. Miller (*pro hac vice*)                  Leane K. Capps (*pro hac vice*)
Daniel T. Fenske (*pro hac vice*)              2950 N. Harwood Street

4

71 South Wacker Drive                            Suite 2100
Chicago, IL 60606                                   Dallas, TX 75201

5

Telephone:  (312) 782-0600                     Telephone:  (214) 397-0030
Facsimile:  (312) 701-7711                       lcapps@polsinelli.com

6

bmiller@mayerbrown.com

7

dfenske@mayerbrown.com                       Phillip Zeeck (*pro hac vice*)
                                                           Amy D. Fitts (*pro hac vice*)

8

Christopher J. Kelly (SBN 276312)           120 W. 12th Street
Two Palo Alto Square, Suite 300              Kansas City, MO 64105

9

3000 El Camino Real                               Telephone: (816) 218-1255
Palo Alto, CA 94306                               pzeeck@polsinelli.com

10

Telephone: (650) 331-2000                      afitts@polsinelli.com
Facsimile: (650) 331-2060

11

cjkelly@mayerbrown.com                         Wesley D. Hurst (SBN 127564)
                                                           2049 Century Park East, Suite 2300

12

Attorneys for Defendant                         Los Angeles, CA 90067
THE BIG TEN CONFERENCE, INC.            Telephone:  (310) 556-1801

13

                                                           whurst@polsinelli.com

14

15

                                                           Attorneys for Defendant
                                                           THE BIG 12 CONFERENCE, INC.

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**ROBINSON, BRADSHAW &**
2 **HINSON, P.A.**

3 By: /s/ Robert W. Fuller
Robert W. Fuller, III (*pro hac vice*)
4 Lawrence C. Moore, III (*pro hac vice*)
Amanda P. Nitto (*pro hac vice*)
5 Travis S. Hinman (*pro hac vice*)
101 N. Tryon St., Suite 1900
6 Charlotte, NC 28246
Telephone:  (704) 377-2536
7 Facsimile:  (704) 378-4000
rfuller@robinsonbradshaw.com
8 lmoore@robinsonbradshaw.com
anitto@robinsonbradshaw.com
9 thinman@robinsonbradshaw.com

10
Mark J. Seifert (SBN 217054)
11 SEIFERT ZUROMSKI LLP
One Market Street, 36th Floor
12 San Francisco, California 941105
Telephone:  (415) 999-0901
13 Facsimile:  (415) 901-1123
mseifert@szllp.com
14

15
Attorneys for Defendant
16 SOUTHEASTERN CONFERENCE

17

18

19

20

21

22

23

24

25

26

27

28

**LATHAM & WATKINS LLP**

By: /s/ Christopher S. Yates
Christopher S. Yates (SBN 161273)
Aaron T. Chiu (SBN 287788)
505 Montgomery Street, Suite 2000
San Francisco, CA  94111
Telephone:  (415) 391-0600
Facsimile:  (415) 395-8095
chris.yates@lw.com
aaron.chiu@lw.com

Anna M. Rathbun (SBN 273787)
555 Eleventh Street, NW, Suite 1000
Washington, DC  20004
Telephone:  (202) 637-1061
Facsimile:  (202) 637-2201
anna.rathbun@lw.com

**FOX ROTHSCHILD LLP**

By: /s/ D. Erik Albright
D. Erik Albright (*pro hac vice*)
Jonathan P. Heyl (*pro hac vice*)
Gregory G. Holland (*pro hac vice*)
230 North Elm Street, Suite 1200
Greensboro, NC 27401
Telephone:  (336) 378-5368
Facsimile:  (336) 378-5400
ealbright@foxrothschild.com
jheyl@foxrothschild.com
gholland@foxrothschild.com

Attorneys for Defendant
THE ATLANTIC COAST CONFERENCE