# EXHIBIT 1

## To the Declaration of Rakesh N. Kilaru

## REDACTED VERSION OF DOCUMENT REQUESTED TO BE FILED UNDER SEAL

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | Case No. 4:20-cv-03919 CW |

**EXPERT REPORT OF CATHERINE TUCKER, PH.D.**

**APRIL 28, 2023**

# TABLE OF CONTENTS

I.      INTRODUCTION.......................................................................................................1

        A.      Qualifications...............................................................................................1

        B.      Case Background ..........................................................................................2

        C.      Assignment ..................................................................................................9

II.     SUMMARY OF OPINIONS ..................................................................................10

        A.      The Rascher Report's Proposed Methodology Is Incapable of Reliably
                Assessing Class-Wide Injury and Damages ..............................................10

        B.      The Rascher Report Does Not Address the Complex Substitution Effects That
                Would Determine Whether Proposed Class Members Are Injured...........10

        C.      The Rascher Report's Proposed Broadcast-Related Approach Is Inconsistent
                with Economic Principles and Cannot Reliably Assess Class-Wide Injury or
                Damages .....................................................................................................13

        D.      The Rascher Report's Proposed Third-Party NIL Approach Does Not Address
                the Complexities of the Third-Party NIL Ecosystem That Preclude a
                Common Approach for Assessing Injury and Damages..............................17

        E.      The Rascher Report's Proposed Video Game-Related Damages Approach Is
                Speculative.................................................................................................19

        F.      The Rascher Report's Proposed Methodologies Introduce Class Conflicts ...............20

III.    THE BUT-FOR WORLD PROPOSED BY THE RASCHER REPORT WOULD
        CREATE SUBSTANTIAL SUBSTITUTION EFFECTS THAT WOULD
        DETERMINE WHETHER PROPOSED CLASS MEMBERS ARE INJURED ...............21

        A.      The Underlying Economics of Substitution Effects in Matching Environments ........22

        B.      The Rascher Report Neglects to Evaluate the Range of Possible Alternative
                Matches Between Student-Athletes and Schools .......................................26

        C.      The Rascher Report's But-For World Introduces Changes to Student-Athletes'
                Economic Incentives That Increase the Potential for Sizable Ripple Effects............44

        D.      The Rascher Report's Attempt to Preemptively Minimize the Potential
                Substitution Effects Is Inapt and Unsound ................................................63

IV.     THE RASCHER REPORT'S PROPOSED BUT-FOR WORLD FOR
        BROADCAST-RELATED PAYMENTS IS NOT CREDIBLE AND PROVIDES
        NO BASIS FOR RELIABLY ASSESSING INJURY OR DAMAGES TO
        MEMBERS OF THE PROPOSED CLASSES USING A COMMON
        METHODOLOGY ...................................................................................................78

        A.      Description of the Rascher Report's Proposed Methodology for Estimating
                Broadcast-Related Damages.......................................................................78

B.    The Rascher Report's Assertions of Equal Pay Across Full-Scholarship Student-Athletes Do Not Make Economic Sense ........................................81

C.    The Rascher Report's Arguments in Favor of Equal Payments Across Full-Scholarship Student-Athletes Are Flawed ................................................89

D.    The Rascher Report's Proposed But-For World Ignores Schools as Economic Actors Seeking to Make Optimal Decisions According to Individualized Priorities ........................................................................................100

E.    The Rascher Report's Proposed Conference-Level Competition Is Implausible and Is Not a Reliable Basis for Determining Injury and Damages Using a Common Methodology ................................................................................126

F.    The Rascher Report's But-For World Relies on Unfounded Assumptions About Rulemaking ................................................................................141

G.    The Rascher Report's Estimate of "the Value of the Broadcast NILs" of Student-Athletes Is Without Precedent and Based on Speculation ....................144

V.    THE RASCHER REPORT'S PROPOSED THIRD-PARTY NIL DAMAGES METHODOLOGY IS NOT A CREDIBLE APPROACH TO ASSESSING INJURY OR DAMAGES TO INDIVIDUAL STUDENT-ATHLETES OR ON A CLASS-WIDE BASIS ................................................................................150

A.    The Rascher Report's Proposed Third-Party NIL Damages Approach ....................151

B.    The Rascher Report Does Not Account for the Complex Nature of the Third-Party NIL Platforms and the Ecosystem Surrounding Them ..................................155

C.    The Rascher Report's Assumptions Are Contradicted by the Evolution of Interactions Across Platforms and Ecosystems over Time ......................................163

D.    The Rascher Report's Proposed Methodology Is Not Appropriate for Estimating Third-Party NIL Damages ......................................................................174

E.    The Rascher Report's Proposed Adjustments Are Insufficient for Estimating Third-Party NIL Damages ........................................................................189

F.    The Rascher Report Does Not Propose a Common Methodology for Reliably Estimating the Value of Third-Party NIL Deals ......................................................207

G.    The Rascher Report's Proposed Third-Party NIL Damages Approach Assumes Injury ........................................................................................225

H.    The Rascher Report Does Not Account for Substitution Effects Which Would Have Altered Third-Party NIL Opportunities for Student-Athletes ........................227

VI.    THE RASCHER REPORT'S ASSESSMENT OF VIDEO GAME-RELATED INJURY AND DAMAGES TO MEMBERS OF THE PROPOSED CLASSES IS SPECULATIVE ........................................................................................228

A.    Overview of the Rascher Report's Assumptions Regarding Video Game-Related Injury and Damages to Members of the Proposed Classes ........................228

B.    Economics of the Video Game Industry ................................................................229

C.   The Rascher Report's Assertions Regarding Collegiate Basketball Video Game-Related Injury and Damages Are Speculative ................................................. 238

D.   The Rascher Report's Assertions Regarding Collegiate Football Video Game-Related Injury and Damages Are Speculative .......................................................... 242

VII.   THE RASCHER REPORT'S PROPOSED DAMAGES METHODOLOGIES CREATE CONFLICTS WITHIN AND BETWEEN THE PROPOSED CLASSES ........ 243

A.   Class Conflicts Would Arise From any Class-Wide Approach to Resolve Athletic Departments' Revenue Shortfall Created by the Rascher Report's Proposed Broadcast-Related Damages Methodology ............................................... 243

B.   The Rascher Report's Proposed Broadcast-Related Damages Methodology Creates Additional Class Conflicts ............................................................................ 248

C.   The Rascher Report's Proposed Third-Party NIL Damages Methodology Creates Class Conflicts .............................................................................................. 252

## I.    INTRODUCTION

### A.  Qualifications

1.     I am the Sloan Distinguished Professor of Management Science and Professor of
Marketing at MIT Sloan at the Massachusetts Institute of Technology ("MIT") in
Cambridge, Massachusetts.  I received an undergraduate degree in Politics, Philosophy
and Economics from Oxford University in the United Kingdom.  I received a Ph.D. in
Economics from Stanford University in 2005.  I have been at MIT since completing my
Ph.D.

2.     As an academic, I study how digital technologies change the underlying economics of
marketing and communications in the digital era.  I lead the Digital Economics and
Economics of Artificial Intelligence initiative at the National Bureau of Economics
Research.  At MIT, I teach courses on Marketing Innovation, Pricing, and Platform
Strategy.  I have published multiple academic papers in leading scientific, economics,
marketing, management, and information systems journals, including *Science*, *Journal of
Political Economy*, *RAND Journal of Economics*, *Management Science*, and *Information
Systems Research*.

3.     I am a Senior Editor at *Marketing Science*, have previously been an Associate Editor at
*Management Science* and the *Journal of Marketing Research*, and a Co-Editor of the
*Journal of Quantitative Marketing and Economics*.  I received a National Science
Foundation CAREER Award, which is the National Science Foundation's most prestigious
award in support of junior faculty "who have the potential to serve as academic role
models in research and education and to lead advances in the mission of their department
or organization."[1]  I have also received the William F. O'Dell Award for most significant,

---

[1]    National Science Foundation, "Faculty Early Career Development Program (CAREER)," available at
https://beta nsf.gov/funding/opportunities/faculty-early-career-development-program-career, accessed on
March 13, 2023.

*Confidential*

long-term contribution to Marketing, and the INFORMS Society for Marketing Science Long Term Impact Award for long-run impact on marketing.

4.  I have testified twice before Congress on policy issues relating to new digital technologies and have presented my research to the Federal Trade Commission, the International Monetary Fund, the Federal Communications Commission, the European Commission, the U.K. Competition and Markets Authority, and the Organisation for Economic Co-operation and Development.

5.  Further details of my experience are in my curriculum vitae, which is attached as **Appendix A** to this report.  A list of other cases in which I have testified as an expert by trial or deposition in the last four years is included in **Appendix B** to this report.

6.  I am being compensated for my services in this matter at my customary hourly rate of $1,400.  In preparing this report, I have been assisted by certain employees of Analysis Group.  Analysis Group is being compensated for its time in this matter at an hourly rate ranging between $350 and $945 an hour.  As an expert affiliated with Analysis Group, I receive a proportion of its total billing.  Neither my compensation nor the compensation of Analysis Group is dependent on any outcome or opinions expressed in this case.

7.  Since my work on this matter and this litigation are ongoing, I may review additional materials produced subsequently to the issuance of this report or conduct further analysis.  I reserve the right to update, refine, or revise my opinions, or form additional opinions, including in response to plaintiffs' experts and any additional information I may receive.

8.  A list of the materials I have relied upon to date in developing my opinions contained in this report is attached as **Appendix C**.

### B.  Case Background

#### 1.  Defendants

9.  Defendants in this matter are the National Collegiate Athletic Association ("NCAA"), Atlantic Coast Conference ("ACC"), Big Ten Conference ("Big Ten"), Big Twelve

Conference ("Big 12"), Pac-12 Conference ("Pac-12"), and Southeastern Conference ("SEC").[2]

10. The NCAA is an organization of colleges and universities in the United States that governs college sports through regulations adopted by its member institutions.[3]  NCAA schools are organized into three divisions.  As of the 2022-2023 academic year, there are 352 Division I schools, 311 Division II schools, and 441 Division III schools.[4]  Schools within each division may also belong to athletic conferences or be independent; conference membership may also depend on the sport.

11. The ACC, Big Ten, Big 12, Pac-12, and SEC are athletic conferences with member institutions in the NCAA's Division I and are part of the NCAA's Football Bowl Subdivision ("FBS"), which represents the highest subdivision of Division I football.[5] These five conferences are collectively referred to as the "Autonomy Five" or "A5" conferences, because they "have autonomy to make rules in specified areas such as meals and nutrition and athletics personnel" without needing approval by the full NCAA.[6] These conferences are also referred to as the "Big 5" or "Power Five" in the press.[7]  As of the 2021-2022 academic year:

---

[2]   Consolidated Amended Complaint, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, July 26, 2021 ("Consolidated Amended Complaint"), ¶¶ 74-93.

[3]   Consolidated Amended Complaint, ¶¶ 74-75.

[4]   NCAA, "Membership Directory," available at https://www.ncaa.org/sports/2021/5/3/membership-directory.aspx, accessed on March 13, 2023.

[5]   NCAA, "Our Division I Members," available at https://www ncaa.org/sports/2021/5/11/our-division-i-members.aspx, accessed on March 24, 2023 (describing the football subdivisions).

[6]   NCAA, "How the NCAA Works: Division I," March 2023, available at https://ncaaorg.s3.amazonaws.com/champion-magazine/HowNCAAWorks/D1_HowNCAAWorks.pdf.

[7]   *See, for example,* Eder, Steve, "How New N.C.A.A. Rules Will Work," *The New York Times*, August 7, 2014, available at https://www nytimes.com/2014/08/08/sports/ncaafootball/how-new-ncaa-rules-will-work-or-not html ("The Big 5 conferences, with their lavish facilities and expansive stadiums, have long been a class apart, and Thursday's vote makes that top-tier status official."); Backus, Will, "College Football Predictions: Projecting Each Power Five Conference's Award Winners for 2023 Season," *247Sports*, January 28, 2023, available at https://247sports.com/LongFormArticle/College-football-predictions-Projecting-each-Power-Five-conferences-award-winners-for-2023-season-203709589/.

a.  The ACC is composed of 15 member schools: Boston College, Clemson University, Duke University, Florida State University, Georgia Institute of Technology ("Georgia Tech"), University of Miami, University of North Carolina – Chapel Hill, North Carolina State University, University of Pittsburgh, Syracuse University, University of Virginia, Virginia Polytechnic Institute and State University ("Virginia Tech"), Wake Forest University, and the University of Louisville.  Notre Dame is an ACC member school for all conference-sponsored sports, other than football, for which Notre Dame is independent.[8]

b.  The Big Ten is composed of 14 member schools: University of Illinois at Urbana-Champaign, Indiana University, University of Iowa, University of Michigan, Michigan State University, University of Minnesota, University of Nebraska – Lincoln, Northwestern University, Ohio State University, Pennsylvania State University, Purdue University, University of Wisconsin – Madison, University of Maryland, and Rutgers University.[9]

c.  The Big 12 is composed of 10 member schools: Baylor University, Iowa State University, University of Kansas, Kansas State University, University of Oklahoma, Oklahoma State University, University of Texas – Austin, Texas Christian University, Texas Tech University, and West Virginia University.[10]

d.  The Pac-12 is composed of 12 member schools: University of Arizona, Arizona State University, University of California – Berkeley, University of Colorado, University of Oregon, Oregon State University, Stanford University, University

---

[8]  Consolidated Amended Complaint, ¶ 91 ("Also, as the ACC stated in its 2012-13 annual report, the University of Notre Dame 'officially joined the ACC on July 1, 2013 … Notre Dame will compete as a full member in all conference sponsored sports with the exception of football, which will play five games annually against league programs.'").

[9]  Consolidated Amended Complaint, ¶ 82.

[10]  Consolidated Amended Complaint, ¶ 85.

of California, Los Angeles, University of Southern California, University of Utah, University of Washington, and Washington State University.[11]

    e.   The SEC is composed of 14 member schools: University of Florida, University of Georgia, University of Kentucky, University of Missouri, University of South Carolina, University of Tennessee, Vanderbilt University, University of Alabama, University of Arkansas, Auburn University, Louisiana State University, University of Mississippi, Mississippi State University, and Texas A&M University.[12]

### 2. Named Plaintiffs and Proposed Classes

12.   Named Plaintiff Grant House is a Division I, full-scholarship student-athlete on Arizona State University ("ASU") men's swimming and diving team (Pac-12).[13]  House enrolled at ASU in the fall of 2017 and competed on the men's swimming and diving team his first two years at ASU before taking a year off to train for the Olympics.[14]  House returned to compete on ASU's men's swimming and diving team for the 2021-2022 academic year[15] and elected to stay a fifth year to pursue a master's degree and continue swimming.[16]  Although he received a full scholarship each year other than his year off for Olympic

---

[11]   Consolidated Amended Complaint, ¶ 79.

[12]   Consolidated Amended Complaint, ¶ 88.

[13]   Consolidated Amended Complaint, ¶¶ 42, 44.

[14]   Consolidated Amended Complaint, ¶¶ 44-49.

[15]   Consolidated Amended Complaint, ¶ 50.

[16]   Video-Recorded Deposition of Grant House, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, February 10, 2023 ("House Deposition"), p. 204:16-19 ("Q. And then you decided to stay, I guess we'll call it a fifth year, right, to pursue a master's degree at ASU?  A. Yes. Correct.").

training,[17] House reduced his athletic scholarship to 80 percent and replaced the remaining 20 percent with an academic scholarship.[18]

13.    Named Plaintiff Sedona Prince is a Division I, full-scholarship student-athlete on the University of Oregon women's basketball team (Pac-12).[19]  Prince initially enrolled at the University of Texas – Austin (Big 12) in the fall of 2018, but she did not play in her first year due to an injury.[20]  Prince transferred to the University of Oregon (Pac-12) in the summer of 2019 and had to sit out for a year until the 2020-2021 season due to the NCAA transfer rules at the time, which required basketball student-athletes who transferred to sit out the first season at their new school.[21]  Prince will spend the 2023-2024 season with Texas Christian University after rescinding her decision to enter the 2023 WBNA draft and announcing her transfer in April 2023.[22]

---

[17]    House Deposition, pp. 200:23-201:17 ("Q.  What years did you not have a full financial aid package?  A.  2019 and '20.  Q.  Okay.  And in 2019 and 2020, what was your financial aid package?  A.  Myself and my family.  Q.  So in 2019 and 2020, you paid for your degree that year?  A.  I wasn't in college in the fall of 2019 to the spring of 2020.  Q.  Okay.  And was that the year that you red shirted for the Olympics?  A.  I took my Olympic waiver that year, correct.  Q.  When you took your Olympic waiver year, were you paying your own room and board?  A.  Yes.  Q.  Okay.  And did you still train at the ASU aquatic facility?  A.  I did.").

[18]    House Deposition, pp. 198:24-199:5 ("Q.  In what year did you start to take less on your scholarship?  A.  The first year. 20 percent academic; 80 percent athletic.  Q.  So you still had a full ride at 100 percent, but 20 percent of that was academic?  A.  Yes.").

[19]    Consolidated Amended Complaint, ¶¶ 54, 57.

[20]    Consolidated Amended Complaint, ¶¶ 57-58 ("Prince redshirted her freshman season with the Texas Longhorns after suffering a serious leg injury while representing Team USA at the U18 FIBA Americas Championship in Mexico City in the summer of 2018, where Team USA won the gold medal.").

[21]    Consolidated Amended Complaint, ¶ 60. *See also* Cobb, David, "NCAA Board of Directors Ratifies One-Time Transfer Legislation Allowing Athletes Immediate Eligibility," *CBS Sports*, April 28, 2021, available at https://www.cbssports.com/college-football/news/ncaa-board-of-directors-ratifies-one-time-transfer-legislation-allowing-athletes-immediate-eligibility/ ("The NCAA Division I Board of Directors ratified the adoption of a measure that will allow athletes in all sports to transfer once without sitting a season, the NCAA announced Wednesday. The NCAA Division I Council adopted the legislation back on April 14[, 2021].").

[22]    Merchant, Sabreena and The Athletic Staff, "Former Oregon Forward Sedona Prince Transferring to TCU: What it Means For the Horned Frogs," *The Athletic*, April 8, 2023, available at https://theathletic.com/4393079/2023/04/08/sedona-prince-tcu-transfer/ ("Former Oregon forward Sedona Prince is transferring to TCU, she announced on Instagram on Saturday. […] Prince rescinded her name from inclusion in the 2023 WNBA Draft pool, per a list released by the league Thursday, and entered the transfer portal.").

14. Named Plaintiff Tymir Oliver was a Division I, full-scholarship student-athlete on the University of Illinois men's football team (Big 10).[23]  Oliver enrolled at the University of Illinois in the fall of 2016 and played on the men's football team every year throughout his four-year collegiate career.[24]  Oliver pursued semi-professional football opportunities in hopes of reaching the National Football League ("NFL"), but has since stopped playing football.[25]

15. As full-scholarship (or grant-in-aid, "GIA") student-athletes, Named Plaintiffs received financial aid covering tuition and fees, room and board, and other expenses associated with school attendance.[26]  In contrast, student-athletes who walk on to a team participate in the sport but do not receive any athletic scholarship money ("walk-ons" or non-scholarship student-athletes).[27]

16. In addition to a proposed Injunctive Relief Class, Named Plaintiffs seek to represent three proposed damages classes:

   a. Football and Men's Basketball Class: "All current and former college athletes who have received full Grant-in-Aid (GIA) scholarships and compete on, or competed on, a Division I men's basketball team or an FBS football team, at a

---

[23]  Consolidated Amended Complaint, ¶¶ 68, 70.

[24]  Consolidated Amended Complaint, ¶¶ 70-71.

[25]  Videotaped Deposition of Tymir Oliver, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, January 23, 2023 ("Oliver Deposition"), p. 134:13-22 ("Q.  After you graduated from the University of Illinois, did you continue to play football for any other teams?  A.  I just played in the – not NCAA team. But, after that, I think it was called – what was it called? The Spring League, I think.  Q.  Was it a professional or semiprofessional team?  A.  Like professional, semiprofessional."); Oliver Deposition, p. 138:13-20 ("Q.  You may have just answered this question, but why would you agree to play for them if they weren't paying you?  A.  Well, yeah, that. Because I wanted one last go-around to see if I could make the NFL.  Q.  You wanted the exposure?  A.  Yes.").

[26]  NCAA, "2022-23 NCAA Division I Manual," September 14, 2022, available at https://www.ncaapublications.com/p-4657-2022-2023-ncaa-division-i-manual.aspx ("A full grant-in-aid is financial aid that consists of tuition and fees, room and board, books and other expenses related to attendance at the institution up to the cost of attendance established pursuant to Bylaws 15.02.2 and 15.02.2.1.").

[27]  NCSA College Recruiting, "What are the Different Types of Offers I Could Get?" available at https://www.ncsasports.org/recruiting/managing-recruiting-process/walk-on-vs-scholarship, accessed on March 24, 2023 ("A walk-on athlete is a player who chooses to try out for a college program with or without the coach's support. Walk-ons are not offered athletic aid, but a scholarship can be earned for future seasons.").

college or university that is a member of one of the Power Five Conferences (including Notre Dame), at any time between June 15, 2016 and the date of the class certification order in this matter."[28]

b. Women's Basketball Class: "All current and former college athletes who have received full GIA scholarships and compete on, or competed on, a Division I women's basketball team, at a college or university that is a member of one of the Power Five Conferences (including Notre Dame), at any time between June 15, 2016 and the date of the class certification order in this matter."[29]

c. Additional Sports Class: "Excluding members of the Football and Men's Basketball Class and members of the Women's Basketball Class, all current or former college athletes who competed on a Division I athletic team prior to July 1, 2021 and who received compensation while a Division I college athlete for use of their name, image, or likeness between July 1, 2021 and the date of the class certification order in this matter and who competed in the same Division I sport prior to July 1, 2021."[30]

### 3. Allegations

17. Prior to July 1, 2021, the NCAA prohibited "Division I athletes from receiving compensation for *any* use of their [Name, Image, and Likeness ("NIL")]."[31] On July 1, 2021, the NCAA adopted an interim NIL rule that permits student-athletes to receive NIL compensation from third parties, but Plaintiffs allege that "the NCAA has not suspended enforcement of critical aspects of its NIL restraints, including those restraints prohibiting NCAA institutions from compensating student-athletes for use of their NILs, as well as

---

[28] Plaintiffs' Notice of Motion and Motion for Class Certification, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919-CW, United States District Court, Northern District of California, Oakland Division, October 21, 2022 ("Plaintiffs' Motion for Class Certification"), p. v.

[29] Plaintiffs' Motion for Class Certification, p. v.

[30] Plaintiffs' Motion for Class Certification, p. v.

[31] Plaintiffs' Motion for Class Certification, p. 3.

restraints prohibiting NIL compensation from being contingent upon athletic participation or performance, or enrollment at a particular school."[32]

18.   Plaintiffs allege injury and damages to proposed class members due to "(1) lost NIL broadcast revenues; (2) lost NIL video game revenues; and (3) lost revenues from the third-party NIL deals that have been occurring since July 1, 2021 and would have been occurring since June 15, 2016 but for Defendant's Prior NIL Rules."[33]  However, "Plaintiffs do not contend that all members of each of the three proposed damages classes would have earned each of these types of NIL compensation in the 'but for' world."[34]

### C. Assignment

19.   I have been asked by counsel for Defendants to:

   a.   Review and assess the expert reports of Dr. Daniel Rascher (the "Rascher Report") and Mr. Edwin Desser (the "Desser Report") submitted on October 21, 2022.[35]

   b.   Analyze whether Plaintiffs' proposed methods for assessing injury and damages are reliable approaches and whether they can be applied formulaically for each of the three proposed damages classes or whether individualized inquiry would be necessary to determine whether and to what extent any class member suffered any injury or damages.

   c.   Assess the potential for class conflicts that could occur due to the Rascher Report's underlying assumptions and proposed damages methodologies.

---

[32]   Consolidated Amended Complaint, ¶ 5.

[33]   Plaintiffs' Motion for Class Certification, p. 8.

[34]   Plaintiffs' Motion for Class Certification, p. 8.

[35]   Expert Report of Daniel A. Rascher, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, October 21, 2022 ("Rascher Report"); Expert Report of Edwin S. Desser, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, October 21, 2022 ("Desser Report").

20.    I have not been asked to provide an assessment of Plaintiffs' proposed injunctive class.

## II.    SUMMARY OF OPINIONS

### A.    The Rascher Report's Proposed Methodology Is Incapable of Reliably Assessing Class-Wide Injury and Damages

21.    From an economic perspective, assessing class-wide injury and damages involves addressing two questions:

> i.    whether all class members suffered economic harm from the alleged conduct, or alternatively, whether some members of the proposed classes were unharmed;

> ii.    whether it is possible to identify the harmed class members and estimate the damages suffered by these class members using a common methodology.

22.    In terms of the first criterion, based on my expertise and analysis, I have reached the opinion that, for each of the three proposed classes in this matter, the Rascher Report has not demonstrated that all proposed class members suffered economic harm due to the alleged conduct.  Applying economic principles and accounting for individualized considerations indicates that there are proposed class members who are uninjured.

23.    In terms of the second criterion, based on my expertise and analysis, I have reached the conclusion that the Rascher Report does not offer a common class-wide methodology to identify harmed class members or to estimate their damages.

### B.    The Rascher Report Does Not Address the Complex Substitution Effects That Would Determine Whether Proposed Class Members Are Injured

24.    A key flaw of the Rascher Report is that it fails to contend with the movement of student-athletes that would result from its proposed payments to them in its but-for world—something referred to as substitution effects.  The broadcast-related payments that would be offered to A5 student-athletes in the Rascher Report's but-for world create financial incentives for student-athletes to substitute into A5 conferences from non-A5 conferences

10

and into the higher-paying A5 conferences from lower-paying A5 conferences.  The third-party NIL opportunities at A5 schools also create financial incentives for student-athletes to substitute into and within the A5 conferences.  The proposed class members who would be displaced to non-A5 schools would be precluded from at least two of the proposed classes in the but-for world.  They would therefore not suffer economic harm from the broadcast-related compensation proposed by the Rascher Report, nor would they have the same third-party NIL opportunities.  The Rascher Report has not proposed any methodology for determining which schools proposed class members would have attended in the but-for world, whether they would receive the Rascher Report's proposed compensation in the but-for world, and whether they would be better off, worse off, or the same in the but-for world.

a. Student-athletes and schools commit to each other in what economics refers to as a many-to-one matching environment with capacity constraints.  The capacity constraints in the collegiate athletics setting, including the size of the team, number of available starting positions, and number of playing minutes, mean that the decision by one student-athlete to attend a school shifts the potential matches available to other student-athletes, causing ripple effects.  These ripple effects are complicated by anticipated positive synergies and negative externalities that arise based on the interactions across student-athletes who match with the same school.  An example of a positive synergy is that student-athletes may prefer to play with a gifted and complementary fellow student-athlete on the same team.  An example of a negative externality is that the presence of one student-athlete may deny another student-athlete playing time.  See **Section III.A**.

b. Throughout a student-athlete's collegiate career, there are many opportunities for student-athletes and schools to match and re-match.  With new financial incentives in the Rascher Report's but-for world, student-athletes and schools would face new payoffs at each juncture, leading to new potential matches.  Evidence on the number of student-athlete transfers demonstrates that many student-athletes reevaluate their matches frequently, and transfers are increasingly common due to shifts in technology and regulations.  Evidence on

coaching changes and underlying reasons behind student-athlete transfer decisions demonstrate how capacity constraints, externalities, and synergies between student-athletes increase the prevalence of ripple effects.  See **Section III.B**.

c.   The Rascher Report ignores evidence demonstrating that student-athletes are changing their school choices based on differences in third-party NIL opportunities available at different schools.  Similarly, the proposed broadcast-related compensation and third-party NIL payments would induce more student-athletes to seek to attend A5 schools in the but-for world.  For example, a men's basketball student-athlete who attended a non-A5 school, such as Villanova, may instead in the but-for world choose to attend an A5 school, such as Redacted--NSC to benefit from the broadcast-related payments predicted by the Rascher Report, which could total $311,900 over a four-year collegiate career.  There are at least 2,630 football student-athletes and 601 men's basketball student-athletes who received a scholarship offer from an A5 school but chose to attend a non-A5 school.  Choices by these student-athletes to attend an A5 school would displace A5 student-athletes to non-A5 schools in the but-for world.  The Rascher Report does not assess which proposed class members would have attended non-A5 schools, thereby not being part of the proposed classes in the but-for world and not receiving the proposed broadcast-related compensation.  In addition, the Rascher Report does not demonstrate that displaced proposed class members would have had superior third-party NIL opportunities at a different school or that displaced proposed class members would be better off in the but-for world.  See **Section III.C**.

d.   The Rascher Report's preemptive responses to anticipated substitution effects arguments are not economically sound.  First, the Rascher Report, when pointing to Alston awards, fails to acknowledge that the size and limitations on the Alston-related awards render them uninformative for assessing substitution effects in a setting where the financial sums are larger and less constrained.  Second, the Rascher Report incorrectly asserts that student-athletes attending A5

12

schools would prefer the outcomes in the but-for world even if they were displaced to non-A5 schools, but fails to assess the differences in opportunities between A5 and non-A5 schools.  Third, the Rascher Report's proposed aggregate analysis of available scholarship spots is flawed because it does not focus on A5 schools, even though two of the three proposed classes are limited to A5 student-athletes.  The Rascher Report therefore fails to account for the magnitude of A5 student-athletes who could be displaced to non-A5 schools and for the school-specific factors that may prevent all A5 scholarship spots from being filled.  Fourth, the Rascher Report understates the number of student-athletes who would delay pursuing professional opportunities in the but-for world, thereby displacing A5 student-athletes from their school of choice and potentially to non-A5 schools.  See **Section III.D**.

### C. The Rascher Report's Proposed Broadcast-Related Approach Is Inconsistent with Economic Principles and Cannot Reliably Assess Class-Wide Injury or Damages

25.   Plaintiffs have alleged that schools seek to attract student-athletes in the relevant labor market, and the Rascher Report claims to model outcomes from competition in this labor market.  However, instead of acknowledging schools' individualized priorities in competing for student-athletes, the Rascher Report assumes that schools would cede all authority over broadcast-related payments to conferences, which do not compete in the labor market for student-athletes.  The Rascher Report's analysis therefore does not apply the economics of labor market competition to the decisions facing schools and student-athletes in the proposed but-for world.  Applying economic principles indicates that there are uninjured proposed class members.  The Rascher Report does not offer a reliable class-wide methodology to identify injured class members or to estimate their damages.  See **Section IV.A** for a description of the Rascher Report's proposed methodology.

  a.   The Rascher Report claims that it models payments for "broadcast NIL."  However, it also makes clear that these payments would be made in the context of a labor market for student-athletes.  The Rascher Report does not apply well-established principles from the economics of labor markets, thereby reaching

conclusions that are inconsistent with competition in a labor market. The Rascher Report claims that competition for student-athletes would result in equal payments to full-scholarship student-athletes playing the same sport in the same conference. In contrast, the economics of labor markets demonstrate that broadcast-related payments would accrue to the most talented full-scholarship student-athletes and would not necessarily result in all full-scholarship student-athletes receiving such compensation. The Rascher Report fails to provide a credible model that accounts for economics of superstars. Determining which student-athletes would receive compensation and how much compensation each of these student-athletes would receive, if any, cannot be done with a common methodology. See **Section IV.B**.

b.  The Rascher Report makes several flawed arguments in favor of equal payments across full-scholarship student-athletes playing the same sport in the same conference. For example, the Rascher Report's analogies to professional sports and references to football and basketball full scholarships are uninformative. The Rascher Report also offers the opinion that non-scholarship student-athletes would receive no broadcast-related compensation because they are less desirable in the labor market compared to full-scholarship student-athletes, playing the same sport in the same conference. Full-scholarship student-athletes similarly differ in their labor market desirability, which would lead to unequal broadcast-related payments among full-scholarship student-athletes. Under unequal payments, not all full-scholarship student-athletes would necessarily receive broadcast-related compensation. The Rascher Report ignores the extensive scouting and research conducted by college coaches and industry sources that provide schools with knowledge of student-athletes' differences in labor market desirability prior to being recruited. In the competition for superstars, it would be economically rational for individual schools or conferences to pay no broadcast-related compensation to non-superstar student-athletes on full scholarship. See **Section IV.C**.

c.  The Rascher Report incorrectly assumes that in the but-for world, schools would determine that the best way to compete for student-athletes in the labor market would be to cede all authority to their conference to make broadcast-related compensation decisions.  The Rascher Report ignores evidence showing that schools seek to pursue their individualized priorities where there are no regulations mandating equal financial distributions.  For example, schools within the same conference make different decisions with respect to the distribution of scholarships within equivalency sports and Student Assistance Fund payments, with some schools choosing to distribute scholarships and funds unequally, resulting in some student-athletes receiving no scholarship money or Student Assistance Fund payments.  Though Alston-related awards are limited and small relative to the broadcast-related payments contemplated in the Rascher Report, documented examples demonstrate that A5 schools within the same conference have distributed Alston-related awards differently to student-athletes, including by attaching various conditions to the receipt of payments that do not guarantee that all student-athletes would receive payments.  The Rascher Report ignores that schools would not want to allocate broadcast-related compensation between sports the same way, as indicated by the financial data on which the Rascher Report relies.  Schools are also responsible for complying with Title IX regulations and state laws, but the Rascher Report has not proposed a solution for schools to do so under its proposed damages approach.  Given these individualized and school-specific considerations, it is not possible to reliably address class-wide injury and damages via a common methodology.  See **Section IV.D**.

d.  Even accepting the Rascher Report's claim that conferences, not schools, would make broadcast-related payments to compete for student-athletes, the Rascher Report's proposed conference-based but-for world does not represent a competitive equilibrium.  The Rascher Report's proposed broadcast-related payments do not represent each conference's economically rational response to the actions of other conferences in a competition for talented student-athletes. The Rascher Report also does not account for schools' economically rational

response to shift conference membership in reaction to their conference's imposed broadcast-related payments.  Consequently, the Rascher Report's proposed conference-based but-for world would not lead to (i) payments to all full-scholarship student-athletes playing the same sport in the same conference because each conference would want to prioritize competition for the best student-athletes; (ii) equal payments to these student-athletes because compensation would be concentrated on superstar student-athletes, (iii) a uniform approach to allocating broadcast-related compensation among sports within a conference because each conference has its own priorities; or (iv) all conferences paying ten percent of their broadcast revenues to full-scholarship student-athletes because conferences could better tailor their competitive responses to other conferences.  See **Section IV.E**.

e.   The Rascher Report's but-for world assumes that the NCAA would impose an annual cap on each conference's aggregate broadcast-related payments to student-athletes, equal to 10 percent of the conference's revenues from media agreements.  The Rascher Report presents neither analysis nor evidence that NCAA members would accept an NCAA limit on payments that would persistently disadvantage conferences with lower broadcast revenues, such as the Redacted--NSC , while persistently advantaging conferences with higher broadcast revenues, such as the Redacted--NSC .  The Rascher Report accepts a speculative estimate of this annual cap that is not the result of empirical economic analysis, nor grounded in relevant real-world comparables.  See **Section IV.F**.

f.   The Rascher and Desser Reports' proposed 10 percent estimate of student-athletes' "broadcast NIL" value is without precedent and cannot be justified by reference to professional sports group licensing deals.  See **Section IV.G**.

**D.  The Rascher Report's Proposed Third-Party NIL Approach Does Not Address the Complexities of the Third-Party NIL Ecosystem That Preclude a Common Approach for Assessing Injury and Damages**

26.    The Rascher Report's proposed third-party NIL damages approach does not accord with economic principles and relies on a series of unimplemented adjustments that fail to reliably assess injury or estimate damages to individual student-athletes or on a class-wide basis.

a.    The Rascher Report's proposed methodology rests on flawed assumptions of stability and constancy in the economic environment in which third-party NIL deals are made.  See **Section V.A** for a description of the Rascher Report's proposed methodology, which involves assuming that the same third-party NIL deals would occur between 2016 and June 30, 2021 as occurred after July 1, 2021.

b.    The Rascher Report's proposed methodology does not grapple with the complex economic nature of the third-party NIL ecosystem.  Any analysis as to whether an individual third-party NIL deal observed at a particular point in time would have also occurred at a different point in time in the but-for world must take into account the specific setting that resulted in that deal.  See **Section V.B**.

c.    The Rascher Report's assumption of stability is flawed because third-party NIL digital platforms and collectives are inherently dynamic and not stable over time. The outcomes of the third-party NIL ecosystem at one point in time cannot be used as a benchmark for outcomes in another period.  See **Section V.C**.

d.    The Rascher Report does not account for changes in organizations' ability or willingness to engage in third-party NIL deals because, for example, they were less established earlier in the class period or they changed marketing strategies over time.  The Rascher Report also does not account for growth in social media influencing over time, idiosyncratic viral moments, and rare sporting achievements that allow certain student-athletes to be successful at monetizing

their NIL at specific points in time and that cannot be replicated at earlier points in time.  See **Section V.D**.

e.   The Rascher Report's proposed adjustments are insufficient for estimating third-party NIL damages.  The Rascher Report erroneously conflates supply of and demand for college athletics with supply of and demand for third-party NIL.  The Rascher Report's proposed adjustments fail to account for changes in an individual student-athlete's exposure and familiarity over time or location-specific third-party NIL opportunities.  The Rascher Report's proposed reliance on averages fails to capture the difference for individual student-athletes in third-party NIL opportunities between schools, as well as differences in the impact of Covid-19 on different U.S. regions and industries.  A common methodology cannot account for these individualized considerations.  See **Section V.E**.

f.   The Rascher Report's proposed approach for third-party NIL damages fails as a common methodology because it does not account for the role of social media engagement in driving third-party NIL value or the student-athlete effort required to secure and support third-party NIL deals over time.  The Rascher Report presents no common methodology for valuing contingency-based third-party NIL deals or in-kind third-party NIL deals.  The Rascher Report's third-party NIL transaction data is also unreliable because the presence of a reported deal in this data does not necessarily mean that the deal actually went through.  See **Section V.F**.

g.   The Rascher Report presents no evidence that any student-athlete who reported a third-party NIL deal in the after period could have secured any third-party NIL deals in the before period.  Of the eligible student-athletes that appear in the Rascher Report's third-party NIL transaction dataset, 57.6 percent report only one deal.  Determining if these student-athletes could have secured any additional third-party NIL deals in the before period and whether these student-athletes would be injured cannot be done using a common methodology.  See **Section V.F.6**.

h.  The Rascher Report has also not presented a common methodology to account for substitution effects that would alter student-athletes' school selection choices and their third-party NIL opportunities in the but-for world.  See **Section V.H**.

### E.  The Rascher Report's Proposed Video Game-Related Damages Approach Is Speculative

27.  The Rascher Report's proposed video game-related damages approach is not only speculative, but it fails to acknowledge the underlying economics of video game production.  See **Section VI.A** for a description of the Rascher Report's assumptions regarding video game-related injury and damages.

a.  The Rascher Report does not account for the economics of video game production.  Console video game developers are rational economic actors who must decide to which video game projects across diverse genres they should devote internal resources.  This includes weighing the substantial costs of console video game development and marketing against the anticipated financial success of the game, in the context of other priorities that the company could pursue.  The emergence of mobile and online games over the last 15 years has added to the complexity of determining business priorities and strategies.  See **Section VI.B**.

b.  The Rascher Report offers the opinion that in the but-for world, a college basketball game would have existed during the damages period.  This opinion is not based on economic principles or modeling; it is speculation that is unsupported by economic analysis or record evidence.  In making this assumption, the Rascher Report ignores the economics of college basketball video games.  The Rascher Report's methodology for assessing injury and damages to men's basketball student-athletes in the proposed classes is speculative.  See **Section VI.C**.

c.  The coming months leading to the Electronic Arts' college football video game's release will be informative for assessing the validity of the Rascher Report's assumptions regarding collegiate football video game-related damages.  At the

current moment, the Rascher Report's proposed methodology for assessing injury and damages to football student-athletes in the proposed classes is speculative.  See **Section VI.D**.

### F.  The Rascher Report's Proposed Methodologies Introduce Class Conflicts

28.   The Rascher Report's proposed methodologies for estimating broadcast-related damages and third-party NIL damages lead to conflicts within and across proposed classes.

a.   The Rascher Report's proposed broadcast-related compensation would divert a portion of athletic departments' revenues to make direct payments to student-athletes.  The Rascher Report does not address how schools would respond to such a decrease in net revenues, which are often used to cross-subsidize multiple collegiate sports teams.  The increased payments to members of the proposed Football and Men's Basketball Class and the proposed Women's Basketball Class could be to the detriment of the proposed Additional Sports Class members. Some schools could seek to eliminate teams in response to decreased revenues. Determining which sports would be eliminated results in conflicts within the Additional Sports Class, because class members of different sports within the same school would have an incentive to argue that their sport would not be eliminated at the expense of other sports.  Alternatively, schools could look to raise additional funds to cover the shortfall in revenues.  Determining each school's strategy and the degree of success of each strategy cannot be done using a common methodology.  See **Section VII.A**.

b.   The Rascher Report's proposed broadcast-related damages methodology relies on assumptions that would create class conflicts within the proposed Football and Men's Basketball Class and between all three proposed damages classes. Approximately 96 percent of the Rascher Report's broadcast-related damages would be awarded to male student-athletes due to the multisport allocation factor. The remaining 4 percent would be awarded to women's basketball student-athletes, and student-athletes playing other sports that are broadcast on television would receive nothing.  Football student-athletes, men's basketball student-

athletes, and women's basketball student-athletes are each incentivized to argue for a multisport allocation factor that best advantages their sport, at the expense of other sports. The Rascher Report's methodology further disadvantages student-athletes in conferences with lower broadcast revenues and creates an incentive for superstar student-athletes to advocate for a payment structure that recognizes their unique contributions to the success and marketing of a team. See **Section VII.B**.

c.  The Rascher Report's proposed third-party NIL damages methodology overcompensates certain student-athletes in the proposed classes while undercompensating others, leading to incentives for individual student-athletes to advocate for different assumptions. Student-athletes with greater athletic success and social media recognition after July 1, 2021 would benefit from the Rascher Report's methodology, while student-athletes with greater athletic success and social media recognition prior to July 1, 2021 would be disadvantaged. Furthermore, student-athletes with incomplete information in the Rascher Report's third-party NIL database due to underreporting or due to the Rascher Report's inability to estimate the value of a third-party NIL transaction would be disadvantaged. See **Section VII.C**.

## III.  THE BUT-FOR WORLD PROPOSED BY THE RASCHER REPORT WOULD CREATE SUBSTANTIAL SUBSTITUTION EFFECTS THAT WOULD DETERMINE WHETHER PROPOSED CLASS MEMBERS ARE INJURED

29.  A key flaw of the Rascher Report is that it fails to contend with the movement of student-athletes that would result from its proposed payments to them in its but-for world—something referred to as substitution effects. This section explains how the Rascher Report fails to account for the economic environment in which student-athletes and schools commit to each other, and how this creates the potential for sizeable substitution effects. The Rascher Report has not proposed any methodology for determining which schools proposed class members would have attended in the but-for world, whether they would receive the Rascher Report's proposed compensation in the but-for world, and whether they would be better off, worse off, or the same in the but-for world. Student-

athletes who would be displaced from A5 schools to non-A5 schools would be precluded from at least two of the proposed classes in the but-for world and would therefore not suffer economic harm from the broadcast-related compensation proposed by the Rascher Report, nor would they have the same third-party NIL opportunities.  Given these individualized considerations, it is not possible to reliably address class-wide injury and damages using a common methodology.

### A.  The Underlying Economics of Substitution Effects in Matching Environments

30.   Understanding the potential extent and nature of substitution effects in this context requires understanding how matching works.  Matching refers to the process whereby two separate entities embark on a relationship together which they think will be fruitful.  A match occurs only with the consent of both parties, and the benefits realized by those parties depend on how each party values the particular characteristics of the party with whom they match.[36]  In the matching process, each party tries to maximize the value they derive from the match.[37]  Matching reaches an equilibrium when there is stability in the expected payoffs of the match.[38]  A stable match occurs when there is "no pair of agents [who] would both prefer to be matched to each other than to their current partners."[39]

---

[36]   Roth, Alvin E., "The Economics of Matching: Stability and Incentives," *Mathematics of Operations Research*, Vol. 7, No. 4, 1982, pp. 617-628 ("Roth (1982)"), at 617 ("By *matching problems*, I refer to any of the pervasive class of problems which involve matching the members of one group of agents with one or more members of a second, disjoint group of agents, all of whom have preferences over the possible resulting matches.  […]  By *matching procedures*, I refer to […] institutional arrangements [that] may range from completely decentralized procedures, in which agents negotiate directly with one another (as in marriage in contemporary Western societies), all the way to completely centralized procedures, in which agents state their preferences for possible matches, which are then assigned according to some specified algorithm […].").

[37]   Roth (1982), p. 621 ("Since each agent alone knows his own preferences, any matching procedure which depends on agents' preferences can be thought of as consisting of two parts: a mechanism for eliciting the preferences of the agents, and a mechanism for aggregating these elicited preferences to determine an outcome.").

[38]   Sorensen, Morten, "How Smart Is Smart Money?  A Two-Sided Matching Model of Venture Capital," *The Journal of Finance*, Vol. LXII, No. 6, 2007, pp. 2725-2762, at 2732.

[39]   Roth (1982), p. 618, footnote 2. *See also* Gale, D. and L. S. Shapley, "College Admissions and the Stability of Marriage," *The American Mathematical Monthly*, Vol. 69, No. 1, 1962, pp. 9-15, at 10 ("An assignment of applicants to colleges will be called unstable if there are two applicants $\alpha$ and $\beta$ who are assigned to colleges $A$ and $B$, respectively, although $\beta$ prefers $A$ to $B$ and $A$ prefers $\beta$ to $\alpha$.  Suppose the situation described above did occur.  Applicant $\beta$ could indicate to college $A$ that he would like to transfer to it, and $A$ could respond by admitting $\beta$, letting $\alpha$ go to remain within its quota." Emphasis removed.).

*Confidential*

31.     Substitution effects are augmented in this context by ripple effects.  Ripple effects occur when new payoffs that lead to a new match disturb and change other matches between different entities.  For example, extensive ripple effects have been documented in the context of kidney transplants.[40]  Part of the difficulty in estimating the extent of substitution effects stems from the difficulty in predicting how other adjacent matches will change after one single new match is made, due to these ripple effects.

32.     The existence of capacity constraints, such as a limited number of spots on a team ("roster spots"), further complicates the analysis of substitution effects in matching environments.[41]  In a matching environment with capacity constraints, each decision made by one individual alters the remaining outcomes available to other individuals.  For example, in a housing market, the purchase of a house by one individual precludes another individual from buying the same house.[42]  This second individual must then seek to purchase a different house, which in turn precludes a third individual from buying that second house.  Similarly, in the New York City public high school lottery, there are a fixed number of seats in each school and only a limited number of top schools.[43]  Once all the seats at one top school are filled with students who indicated that this school was their

---

[40]   For example, a patient may have a loved one who wishes to donate their kidney but finds out that their kidney is not compatible with the patient. The patient can still receive a compatible kidney through a "kidney exchange." A kidney exchange involves "two donor-patient pairs such that each donor cannot give a kidney to the intended recipient because of immunological incompatibility, but each patient can receive a kidney from the other donor." *See* Roth, Alvin E., et al., "Kidney Exchange," *The Quarterly Journal of Economics*, Vol. 119, No. 2, 2004, pp. 457-488, at 457.

[41]   Goto, Masahiro, et al., "Designing Matching Mechanisms under General Distributional Constraints," *American Economic Journal: Microeconomics*, Vol. 9, No. 2, 2017, pp. 226-262, at 226 ("The theory of two-sided matching has been extensively developed, and it has been applied for designing clearinghouse mechanisms in various markets in practice. As the theory has been applied to increasingly diverse types of environments, however, researchers and practitioners have encountered various forms of distributional constraints.").

[42]   Shapley, Lloyd and Herbert Scarf, "On Cores and Indivisibility," *Journal of Mathematical Economics*, Vol. 1, 1974, pp. 23-37, at 24 ("Let there be *n* traders in the market, each with an indivisible good to offer in trade (e.g., a house). The goods are freely transferable, but we shall assume that a trader never has use for more than one item. There being no money or other medium of exchange, the only effect of the market activity is to redistribute the ownership of the indivisible goods, in accordance with the (purely ordinal) preferences of the traders.").

[43]   Abdulkadiroglu, Atila, Parag A. Pathak, and Alvin E. Roth, "The New York City High School Match," *American Economic Review*, Vol. 95, No. 2, 2005, pp. 364-367.

preferred choice, the next student who indicated a preference for this school is displaced and must be matched to a different school.

33.     When there are multiple people on one side that can match to only one entity on the other side, there is many-to-one matching.  For example, many workers can match with one company and many students match with one college.  In many-to-one matching environments, negative and positive interdependencies can arise based on the interactions of the many people who match to the same entity.  For example, the many patients who match with a single physician may impose congestion costs on each other by occupying appointment slots that other patients would prefer.[44]  This is an example of a negative externality in which the actions of one individual have a negative consequence on another individual.[45]  In a workplace, there is also the potential for positive synergies that arise when employees with complementary skills interact cohesively.[46]  These interdependencies can complicate the matching process because agents considering matching to a particular entity may have preferences regarding not just the entity with whom they match, but also the other agents who match with that same entity or with a competing entity.[47]

---

[44]   Pycia, Marek, "Stability and Preference Alignment in Matching and Coalition Formation," *Econometrica*, Vol. 80, No. 1, 2012, pp. 323-362 ("Pycia (2012)"), at 327 ("[This] paper applies its main results to analyze many-to-one matching with complementarities and peer effects. […] [T]he framework can be used to model a physician who wants to open a practice if there are enough patients who would choose him or her as a primary care provider; if there too few, however, the physician might choose not to treat any of them. […] In the model of matching between physicians and patients, we allow patients to care about the congestion in their physician's office.").

[45]   Mankiw, N. Gregory, "Chapter 10, Externalities," in *Principles of Economics*, Sixth Edition, South-Western Cengage Learning, 2012, pp. 195-216, at 196 ("An externality arises when a person engages in an activity that influences the well-being of a bystander but neither pays nor receives any compensation for that effect. If the impact on the bystander is adverse, it is called a negative externality." Emphasis removed.).

[46]   Pycia (2012), p. 327 ("[This] paper applies its main results to analyze many-to-one matching with complementarities and peer effects. In our framework, firms see workers as complementary when the complementarity is embedded in the profile of outputs. Workers then care who their peers are. […] By allowing peer effects, we allow workers to care about interactions in the workplace and allow the worker's workload to be influenced by their peers. […] [I]nterpreted in terms of schools and students whose preferences are determined by expected schooling outcomes, our framework allows schooling outcomes to be affected by peer effects.").

[47]   Baccara, Mariagiovanna, et al., "A Field Study on Matching with Network Externalities," *American Economic Review*, Vol. 102, No. 5, 2012, pp. 1773-1804, at 1773 ("Externalities are commonplace within assignment

34.   Student-athletes and schools commit to each other in a many-to-one matching environment with capacity constraints.  Given the scarcity of playing time, scholarship aid, and roster spots, a match between a particular student-athlete and a school could alter the value that another student-athlete places on that school or the value that the school places on another student-athlete.  Both student-athletes and schools have a high degree of agency to determine their matches.  Often in matching markets there are algorithms to simplify the matching process.  For example, medical students are matched to residency programs by algorithm.[48]  But in collegiate sports there is not a centralized clearinghouse, adding to the unpredictability of the process.  While certain platforms offer services to help student-athletes and NCAA coaches identify potential good fits,[49] student-athlete commitments to schools typically result from a decentralized process, in which student-athletes negotiate directly with coaches and schools, both at the point of initial enrollment and in the event they decide to transfer.[50]

---

processes: In the housing market, the value of a property depends on the demographics of neighboring homeowners. In an oligopolistic market, the returns from joining one firm depend on the composition of rivals. In universities, the desirability of a specific dorm room may depend on the peers in nearby rooms. In politics, the benefit from joining a particular party or coalition varies with the other political alliances formed. In team sports, the value of joining one team depends on the quality of other teams' players. And so on and so forth.").

[48]  *See, for example*, Roth (1982), p. 617 ("These institutional arrangements may range from completely decentralized procedures, in which agents negotiate directly with one another (as in marriage in contemporary Western societies), all the way to completely centralized procedures, in which all agents state their preferences for possible matches, which are then assigned according to some specified algorithm (as in the procedure by which graduating medical students in the United States are matched with the hospitals at which they complete their training.").

[49]  *See, for example,* NSR, "Welcome to National Scouting Report," available at https://www.nsr-inc.com, accessed on March 20, 2023; NCSA College Recruiting, "We are NCSA College Recruiting," available at https://www ncsasports.org, accessed on March 19, 2023.

[50]  *See, for example,* NCAA, "Recruiting - Eligibility Center," available at https://www.ncaa.org/sports/2014/10/8/recruiting.aspx, accessed on March 2, 2023 ("Recruiting happens when a college employee or representative invites a high school student-athlete to play sports for their college. Recruiting can occur in many ways, such as face-to-face contact, phone calls or text messaging, through mailed or emailed material or through social media."); Recruit Ref, "When Can College Coaches Make You An Offer?" available at https://www.recruitref.com/blog/when-can-college-coaches-make-you-an-offer, accessed on March 24, 2023 ("Your first instinct upon receiving an offer may be to immediately accept and move forward with the program. However, you may have some leverage to negotiate a better scholarship offer. It's crucial to achieve a healthy balance of getting the financial support you need to attend your top school, but not offending the coach."; "The more you participate in the recruiting process and the more tools you take advantage of, the better off you'll be. Stay in contact with college coaches to keep tabs on your chances of getting an offer.").

**B.  The Rascher Report Neglects to Evaluate the Range of Possible Alternative Matches Between Student-Athletes and Schools**

35.   The Rascher Report fails to account for what student-athletes and schools would do in a but-for world in which student-athletes receive the proposed broadcast-related compensation and third-party NIL compensation in such a capacity-constrained matching environment.  With these new financial incentives, student-athletes would substitute between schools in A5 and non-A5 conferences, such that student-athletes would be at different schools and teams in the but-for world.  These are relevant substitution effects to consider in this case.  However, the Rascher Report only touches upon student-athletes' decision to extend their collegiate career instead of pursuing professional careers and provides an incomplete evaluation of the magnitude of these decisions in the but-for world.[51]  A complete examination of the matches that take place between student-athletes and schools indicate that the substitution effects in the Rascher Report's but-for world would be substantial, and the Rascher Report has not proposed a common methodology to account for these individualized considerations.

**1.  The Complex Number of Choices Available to Student-Athletes Increases the Possibility of Substitution Effects**

36.   A match between a student-athlete and a school may occur at various stages in a student-athlete's career, such as immediately out of high school or by transferring at any point during their collegiate career.  Under NCAA guidelines, a student-athlete is eligible to compete on a collegiate team in four athletic seasons that can be spread over five years.[52]

---

[51]  Rascher Report, ¶ 227 ("The premise behind the so-called 'Substitution Effect' is that when athletes decide to stay in school because of the availability of more compensation while they are in school, they take up a scarce GIA slot, and in counter sports (where the NCAA restricts the number of GIAs a school may offer), a team may hit its hard limit of GIAs so that someone else will be displaced.").

[52]  NCAA, "2022-23 NCAA Division I Manual," September 14, 2022, available at https://www.ncaapublications.com/p-4657-2022-2023-ncaa-division-i-manual.aspx ("12.8 Seasons of Competition: Five-Year Rule. A student-athlete shall not engage in more than four seasons of intercollegiate competition in any one sport […] 12.8.1 Five-Year Rule. A student-athlete shall complete the student-athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution, with time spent in the armed services, on official religious missions or with recognized foreign aid services of the U.S. government being excepted.").

*Confidential*

During the COVID-19 pandemic, the NCAA granted student-athletes a one-time, one-year extension to this five-year eligibility period.[53]  **Figure 1** illustrates the many decisions that a given student-athlete, in this example, a men's basketball student-athlete, faces over their collegiate career, assuming that the student-athlete has five years to compete in four athletic seasons.  While student-athletes playing other sports face similar choices, the timing and number of professional opportunities differ.

**Figure 1. Overview of Potential Matching Opportunities During the Career of an NCAA Men's Basketball Student-Athlete**

| Pre-College | College | | | | |
|---|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
| | Remain at current school | Remain at current school | Remain at current school | Remain at current school | Remain at current school |
| Initial school selection | Transfer to new school | Transfer to new school | Transfer to new school | Transfer to new school | Transfer to new school |
| | Redshirt | Redshirt | Redshirt | Redshirt | Quit sport |
| | Quit sport | Quit sport | Quit sport | Quit sport | Play overseas |
| | | Play overseas | Play overseas | Play overseas | Declare for NBA draft |
| | | Declare for NBA draft | Declare for NBA draft | Declare for NBA draft | |

37.    In any given year of their collegiate career, a men's basketball student-athlete has a number of opportunities to match to their current school or another school:

---

[53]   NCAA, "Actions Related to Division I Regulations and Policies Impacted by COVID-19," July 30, 2021, available at https://ncaaorg.s3.amazonaws.com/compliance/d1/D1GOV_COVID-19ActionChart.pdf.

a. *Initial school selection*: Student-athletes are typically recruited by college coaches in high school, although some recruits may receive scholarship offers as early as middle school.[54] Coaches evaluate potential recruits by observing student-athletes' performance in games, recruiting camps, on film, and during official or unofficial campus visits.[55] Coaches extend offers to student-athletes. These may be scholarship offers or a walk-on offer, in which no scholarship is included.[56] Student-athletes then consider these offers and officially commit to a school through signing a National Letter of Intent.[57] There are many factors that contribute to a student-athlete's school selection choice, such as a school's facilities and amenities, geography, coaching staff and personal relationships, professional opportunities, and family circumstances.[58]

---

[54] *See, for example,* Oliver Deposition, pp. 63:21-64:2 ("Q. When did your college recruitment begin? When did – when did recruiters start talking to you about the possibility of playing for their school in college? A. I received my first scholarship offer from University of Pittsburgh, sophomore year in high school. So I was, like, 15."). *See also* Snyder, Audrey, "Julian Lewis and the Life of a 14-Year-Old Quarterback Recruit: Early Offers and the Fine Line of Growing up Quickly," *The Athletic*, February 1, 2022, available at https://theathletic.com/3104875/2022/02/01/julian-lewis-and-the-life-of-a-14-year-old-quarterback-recruit-early-offers-and-the-fine-line-of-growing-up-quickly/ ("Julian – or 'Ju Ju' as he goes by – is an eighth-grade quarterback who already holds Power 5 college scholarship offers.").

[55] NCSA College Recruiting, "College Recruiting Process: How Do Colleges Recruit Athletes?" available at https://www.ncsasports.org/recruiting/how-to-get-recruited/college-recruiting-process, accessed on March 2, 2023 ("[College coaches] may also travel to large tournaments or showcases where many of their recruits will be competing, or they will send athletes personalized invites to their own camps."). There are specific rules regarding the timing and type of contact between college coaches and recruited student-athletes. *See* NCAA, "Recruiting - Eligibility Center," available at https://www.ncaa.org/sports/2014/10/8/recruiting.aspx, accessed on March 2, 2023.

[56] NCSA College Recruiting, "What are the Different Types of Offers I Could Get?" available at https://www.ncsasports.org/recruiting/managing-recruiting-process/walk-on-vs-scholarship, accessed on March 24, 2023 ("Walk-on offers. Not all offers come with a monetary reward. Sometimes, the reward is simply a spot on the roster."; "A walk-on athlete is a player who chooses to try out for a college program with or without the coach's support. Walk-ons are not offered athletic aid, but a scholarship can be earned for future seasons.").

[57] NCAA, "Recruiting - Eligibility Center," available at https://www.ncaa.org/sports/2014/10/8/recruiting.aspx, accessed on March 2, 2023.

[58] *See, for example*, College Sports Scholarships, "Practice and Training Facilities for College Athletes," available at https://www.collegesportsscholarships.com/college-athletes-recruiting-training-facilities htm, accessed on April 5, 2023 ("College football players, look at the whole recruiting package, the home stadium, locker room and practice facilities. These facilities can be what gets a recruit to sign."); Bastie, Fred, "Recruiting Column: How to Pick the Right College," *USA Today*, July 5, 2017, available at https://usatodayhss.com/2017/recruiting-column-how-to-pick-the-right-college ("Do I like the coach? Does his/her coaching style match my playing style?"; "How far away from home is this school? Is the distance from home a deal-breaker? Is the location of

b. *Remain at his current school*: In every year after their initial enrollment, the student-athlete has the option to continue playing basketball at their originally chosen school, as long as the student-athlete maintains their eligibility by, for example, meeting academic requirements such as a minimum grade-point average ("GPA").[59]

c. *Transfer to a new school*: In every year after their initial enrollment, the student-athlete has the option to transfer to play basketball at a new school.  The decision to transfer and where to transfer is influenced by many of the same factors that go into the initial school selection choice, but the student-athlete's understanding of those factors and/or their personal or team-specific circumstances could have changed.  The student-athlete may transfer before graduating or as a graduate transfer in their fifth year.

d. *Redshirt*: In any year after their initial enrollment, the student-athlete may decide to redshirt, or opt out of, one basketball season over the course of their collegiate career without losing a year of eligibility.[60]

---

the campus in an urban or rural setting?"); Lopez, Ana-Marcela, "How to Choose a College as a Student Athlete," *Colleges of Distinction*, available at https://collegesofdistinction.com/advice/how-to-choose-college-student-athlete/, accessed on April 12, 2023 ("If your ultimate goal is to play professionally, your choice of school is going to reflect that."). *See also* Deposition of Daniel Rascher, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, January 10, 2023 ("Rascher Deposition"), pp. 69:14-70:3, 194:5-197:5.

[59]   NCSA College Recruiting, "NCAA Eligibility Requirements for Student-Athletes," available at https://www.ncsasports.org/ncaa-eligibility-center/eligibility-requirements, accessed April 22, 2023.

[60]   Student-athletes may also be granted an additional year of eligibility due to injury, which is considered medical redshirting. *See* Dellenger, Ross, "The NCAA's Redshirt Rule Change is a Major Win for Both Coaches and Players," *Sports Illustrated*, June 13, 2018, available at https://www.si.com/college/2018/06/13/ncaa-redshirt-rule-change-eligibility-reaction ("Medical redshirts are approved for players who meet strict criteria: They must have suffered the season-ending injury during the first half of the season, and they could not have played in more than three games before sustaining the injury."). In addition to redshirting, student-athletes may take up a roster spot, such as by blueshirting and grayshirting: blueshirting provides unrecruited student-athletes with scholarships but delays their play so that they count towards the next year's scholarship total, while grayshirting involves a team offering a player a scholarship at the start of the second semester. *See* Trahan, Kevin, "What are the Differences Between Redshirting, Grayshirting, Blueshirting and Greenshirting in College Football?" *SB Nation*, February 1, 2017, available at https://www.sbnation.com/college-football-recruiting/2016/1/28/10842688/ncaa-football-grayshirt-blueshirt-redshirt-rules.

29

e. *Quit the sport*: In any year after their initial enrollment, the student-athlete may decide to quit the sport altogether—for example, due to declining interest in the sport or due to medical retirement—thereby opening up a spot on the team and potential playing time or scholarship aid for a different student-athlete.

f. *Play Abroad*: In any year after their initial enrollment, the student-athlete could opt to play in a professional league overseas, such as in Spain's Liga ACB or the Turkish Basketball Super League,[61] potentially for development or income.

g. *Declare for the NBA draft*: In any year after their first full year of school, the student-athlete may seek to enter the NBA draft by declaring their eligibility for the draft and may leave school. Some student-athletes may declare for the draft and leave school without using all of their collegiate eligibility: for example, in 2019, 165 underclassmen declared for the draft before exhausting their NCAA eligibility, while 156 underclassmen declared early in 2020. In 2019, 86 of the 165 withdrew from the draft to return to school, leaving 79 underclassmen who entered the draft, while in 2020, 92 of the 156 underclassmen withdrew, leaving 64 underclassmen who entered the draft.[62]

38. The match between a student-athlete and a school reflects the student-athlete's revealed preferences for playing (or not playing) their sport at one school over another (or professionally), given the available options, constraints, and potential benefits that each student-athlete faced at the time of making their decisions. Similarly, the student-athletes admitted at a school reflect the school's revealed preferences for a combination of student-

---

[61] Fraschilla, Fran, "Top 12 Basketball Leagues in the World Outside the NBA," *ABC News*, January 17, 2017, available at https://abcnews.go.com/Sports/top-12-basketball-leagues-world-nba/story?id=44826666. While less popular, football players may also play abroad (including in Canada) in leagues such as the Canadian Football League and European League of Football. *See* Rookie Road, "Football Leagues List," available at https://www.rookieroad.com/football/leagues/, accessed on April 15, 2023 ("The NFL is the unrivaled most popular and successful football league in the world"; "The Canadian Football League is the second largest professional football league [after the NFL]"; "The European League of Football is the most popular professional American football league outside of North America, with 12 teams spanning across Europe").

[62] Katz, Andy, "25 of College Basketball's Most Important NBA Draft Withdrawals," *NCAA*, August 7, 2020, available at https://www.ncaa.com/news/basketball-men/article/2020-08-06/25-college-basketballs-most-important-nba-draft-withdrawals.

athletes, given the available talent pool, the coaches' preferences for individual student-athletes, and the limitations on the total number of student-athletes allowed on each team.

39.    In changing the potential benefits that student-athletes face in the but-for world—such as by introducing broadcast-related payments or third-party NIL payments—each student-athlete would need to reassess their payoffs and may end up making a different decision. With student-athletes making a different school selection decision either initially or by transferring during their collegiate career, schools would also face a changing set of available options that would alter the combination of student-athletes that they would recruit for their teams.

### 2.    Shifts in Technology and Regulations Have Increased the Ease of Changing Paths Once a Student-Athlete Is Recruited, Increasing the Possibility of Substitution Effects for Student-Athletes

40.    Student-athletes have the option to reevaluate their matches every year and can choose to transfer to a new school.  The ease of transferring increased in recent years due to the introduction of new digital technology and changes in NCAA regulations.[63]

41.    In October 2018, the NCAA launched the transfer portal to streamline the transfer process for both schools and student-athletes.[64]  My research has shown that digital technology decreases search costs and, in a matching environment, can facilitate more matches and improve the quality of those matches.[65]  Consistent with the economic literature, the

---

[63]    *See, for example,* On3 Staff Report, "What Is the NCAA Transfer Portal? Everything You Need to Know," *On3*, December 1, 2022, available at https://www.on3.com/transfer-portal/news/ncaa-transfer-portal-everything-you-need-to-know/ ("The NCAA transfer portal was introduced on October 15, 2018. Transfer portal activity increased considerably as the NCAA adopted legislation on April 14, 2021, allowing players to transfer once without having to sit out a year at their new school.").

[64]    On3 Staff Report, "What Is the NCAA Transfer Portal? Everything You Need to Know," *On3*, December 1, 2022, available at https://www.on3.com/transfer-portal/news/ncaa-transfer-portal-everything-you-need-to-know/ ("The NCAA transfer portal was introduced in October 2018 to help universities and college athletics' governing body organize the process, all while legislation making it easier for players to seek new opportunities came about.").

[65]    Goldfarb, Avi and Catherine Tucker, "Digital Economics," *Journal of Economic Literature*, Vol. 57, No. 1, 2019, pp. 3-43, at 6 ("The basic idea with respect to digital economic activity is that it is easier to find and compare information about potential economic transactions online than offline."); 9-10 ("Reduced search costs

NCAA transfer portal provided a more efficient mechanism for student-athletes to signal their interest in transferring to new schools and for coaches at other schools to quickly and efficiently contact these student-athletes to explore new opportunities.[66]

42.   At the same time that the NCAA launched the transfer portal, the NCAA also adopted a new transfer rule allowing student-athletes to transfer and receive a scholarship from a new school, without requiring permission from their current school.[67]  An additional transfer rule was adopted in April 2021, at which point undergraduate student-athletes across all sports could play immediately for their new school as long as this was their first transfer and they entered the transfer portal within the specified windows (instead of being required to sit out for one year after transferring unless they acquire a waiver to play immediately).[68]  Student-athletes who had already graduated continued to be eligible to play for their new school immediately after transferring.[69]

---

facilitate exchange more generally, often enabled by large digital platforms.”; “[L]ow search costs are likely to increase the quality of matches between buyers and sellers, firms and workers, etc.”).

[66]   Johnson, Greg, “What the NCAA Transfer Portal Is…and What It Isn’t,” *NCAA Champion Magazine*, Fall 2019, available at http://s3.amazonaws.com/static ncaa.org/static/champion/what-the-ncaa-transfer-portal-is/index html (“Student-athletes can provide an email address and a phone number where any interested coaches can contact them.  Or student-athletes can decide not to provide contact information and reach out to the schools they are interested in attending.  […]  For coaches, the portal is a place to see who is looking to transfer. Coaches can set up a watch list of the people they want to track, and they can see in real time when student-athletes have matriculated to another program or taken their name out of the portal altogether. This feature can cut down on wasted efforts to recruit someone who already has decided where to go to school.”).

[67]   Hosick, Michelle Brutlag, “New Transfer Rule Eliminates Permission-To-Contact Process,” *NCAA*, June 13, 2018, available at https://www.ncaa.org/news/2018/6/13/new-transfer-rule-eliminates-permission-to-contact-process.aspx (“Beginning in October, Division I student-athletes will have the ability to transfer to a different school and receive a scholarship without asking their current school for permission. The Division I Council adopted a proposal this week that creates a new ‘notification-of-transfer’ model. This new system allows a student to inform his or her current school of a desire to transfer, then requires that school to enter the student’s name into a national transfer database within two business days. Once the student-athlete’s name is in the database, other coaches are free to contact that individual.”).

[68]   The waiver requirement for football, men’s and women’s basketball, baseball, men’s ice hockey was lifted in April 2021; student-athletes on other teams had not been subject to this rule. *See* Cobb, David, “NCAA Board of Directors Ratifies One-Time Transfer Legislation Allowing Athletes Immediate Eligibility,” *CBS Sports*, April 28, 2021, available at https://www.cbssports.com/college-football/news/ncaa-board-of-directors-ratifies-one-time-transfer-legislation-allowing-athletes-immediate-eligibility/.

[69]   Associated Press, “NCAA 1-Time Transfer Rule Clears Last Step, Starts With 2021-22 Academic Year,” *ESPN*, April 28, 2021, available at https://www.espn.com/college-sports/story/_/id/31335578/ncaa-1-transfer-rule-clears-last-step-starts-2021-22-academic-year (“The one-time exception will count for athletes who transfer

43.   Many student-athletes across all sports have taken advantage of the ease of transferring between schools both as undergraduates and graduates.  **Table 1** summarizes NCAA data describing the school, sport, undergraduate/graduate status, and reported transfer outcome of every Division I student-athlete who entered the transfer portal between its creation in October 2018 and January 2023:  graduate and undergraduate student-athletes transferred in the 2019-2020 academic year, increasing to  transfers in the 2021-2022 academic year.

**Table 1. Transfers in the NCAA Transfer Portal**
**All Sports, Academic Years 2019-2020 to 2021-2022[70]**



### 3. The Presence of Capacity Constraints Means That Substitution Effects Increase in Importance as They Increase the Possibility of Ripple Effects

44.   As discussed in **Section III.A**, an important question when evaluating substitution effects in matching environments is the extent of capacity constraints.  Capacity constraints increase the prevalence of ripple effects in matching environments.  In the case of student-athletes and schools, there are a limited number of student-athletes that a school can admit and a student-athlete can only compete for one school in any given season.  The Rascher

---

after graduating. Previously, NCAA rules permitted athletes who had graduated to transfer and be immediately eligible.").

[70]   Backup materials to this report (NCAA Transfer Portal data as of January 25, 2023).

Report acknowledges that there is a limit on the number of scholarship spots available to student-athletes,[71] but fails to acknowledge other important team-specific constraints, which may include, depending on the sport that the student-athlete plays, the limited number of total spots on a team, the limited number of spots on a team dedicated to the student-athlete's specific position or role, and the limited number of playing minutes that can be played by student-athletes in a given season.

45. The series of coaching job changes between the 2021 and 2022 football seasons demonstrates the potential of ripple effects in the NCAA: the University of Southern California's firing of head football coach Clay Helton in the Pac-12 conference led to a Division III school needing a new receivers coach, along with almost 250 collegiate football job changes across multiple divisions around the country.[72]  Some coaches secured job promotions, such as from defensive coordinator to head coach, either at their same school or at a new school.  Others remained in the same position but moved to a new school.  Others left collegiate athletics altogether to avoid uprooting their families.[73]  In all

---

[71]  Rascher Report, ¶ 231 ("As shown in *Alston*, once data was made available, the average MAC and Sun Belt conference school has over 7 GIA slots in football that are not given to Full GIA athletes, sufficient to absorb over 150 these hypothesized longer-attending athletes."). *See also* Rascher Deposition, pp. 197:11-198:11 ("Q. So if a student athlete who went to the ACC in the but-for world instead decided to go to the Big 10, that would displace a student on the Big 10 roster; correct?  A.  It depends on how many slots are available. But it's possible that it could, if those rosters were full.  Q.  Yeah. If that student had to attend, as you say, perhaps that's – as in your analysis, that student, would attend a different Power Five school or they may attend the MAC or the Sun Belt; correct?  THE WITNESS:  Or the American. I mean, usually you would imagine that they would sort of go down the – the – that a student – you know, if the last student in the conference who couldn't find a school to go to because one more student decided to attend a school in that conference, that student can go to the ACC. If someone's coming to the Big 10, then there's an extra slot available in the ACC. So that – that might be where they end up." Objection omitted.).

[72]  Olson, Max and Andy Staples, "The Stanford-USC Game Butterfly Effect: How One Firing Sparked Nearly 250 Coaching Changes," *The Athletic*, May 16, 2022, available at https://theathletic.com/3313383/2022/05/16/usc-college-football-coaching-carousel-2021-2022/ ("And one move at a major program can affect hundreds of jobs. As of this writing, Helton's firing has resulted in close to 250 job changes at programs in all 10 FBS conferences as well as in the FCS, Division II and Division III.").

[73]  Olson, Max and Andy Staples, "The Stanford-USC Game Butterfly Effect: How One Firing Sparked Nearly 250 Coaching Changes," *The Athletic*, May 16, 2022, available at https://theathletic.com/3313383/2022/05/16/usc-college-football-coaching-carousel-2021-2022/ ("'[Former Georgia Southern defensive line coach Victor Cabral] found himself at a crossroads after 15 years of coaching collegiately. He had a few FCS opportunities but felt they weren't the right fit for his family. His wife, Erin, is a PE teacher at the local middle school. His kids, Zac and Lucy, have baseball and gymnastics and friends. He didn't want to uproot them from Statesboro or live far away from them, he said, just so he could keep calling himself 'Coach.'").

of these contexts, a change in one person's match leads to a cascade of new opportunities and alternatives that result in new matches for many different people across many different schools and conferences.

### 4. The Presence of Positive Synergies and Negative Externalities Across a Team Increase the Possibility of Ripple Effects and Increase the Importance of Substitution Effects

46.     The possibility of positive synergies and negative externalities across a team increases the potential for ripple effects in the matching of student-athletes to schools. For both student-athletes and schools, the expected benefit of matching is highly dependent on what matches the school has already made, or is likely to make, with other student-athletes.

47.     There can be negative externalities that influence ripple effects and substitution patterns. From the perspective of an individual student-athlete, matching with a given school is less desirable, all else equal, if that school has already matched or is likely to match with competing student-athletes who play the same position and may diminish the individual student-athlete's prospects of achieving a certain status. This status may include the amount of playing time. It may include the designation as a "starter" or securing the "starting position," which is a designation reserved to players recognized as among the most talented on the team and therefore start playing at the beginning of each game, in contrast to substitutes or bench players. This status may include the extent of accumulating impressive statistics and individual honors, the extent of winning and achieving team honors and the extent to which the student-athlete is likely to be viewed as a professional prospect. For example, a highly rated quarterback recruit given a four-star rating by an industry ranking website will find it less desirable to match with a school, all else equal, if that school has received a commitment from an even higher rated quarterback given a five-star rating by an industry ranking website.[74] Similar dynamics

---

[74]   For football and basketball recruits, industry ranking websites, such as 247Sports, Rivals, and ESPN, evaluate potential recruits using a team of evaluators and grading criteria. These industry websites publish a recruiting score (usually on a scale of two to five stars) and a ranking of each potential recruit among all potential recruits

are at play from the perspective of the school: receiving a commitment from a five-star quarterback, for example, may mean that the school becomes less interested in matching with a four-star quarterback recruit.

48.    There can be positive synergies that influence ripple effects and substitution patterns. Matching with a given school is more desirable, all else equal, if that school has already matched or is likely to match with complementary student-athletes who have the potential to improve the individual student-athlete's prospects of achieving a certain status.  For example, a four-star quarterback recruit will find it more desirable to match with a school, all else equal, if that school has received a commitment from a five-star wide receiver recruit.  The positive synergies from this matching can benefit both the student-athletes and the school by resulting in improved individual performances that translate into improved team success.

49.    In this way, the completion or dissolution of a match between a student-athlete and a school has ramifications for other potential matches by altering the expected benefits of those matches.  Student-athletes have been documented to respond to the actions of other student-athletes:

   a.    An example of ripple effects stemming from negative externalities occurred in the spring of 2022, when multiple University of Texas – Austin ("Texas" part of the Big 12) football student-athletes opted to transfer due to other incoming talented student-athletes who would play the same positions on the team.  Media

---

for the sport in the recruiting year, with higher recruiting interest from schools generally accruing to the higher rated or ranked student-athletes.  *See, for example,* NCSA College Recruiting, "Basketball Recruiting Rankings: The Ultimate Guide," available at https://www.ncsasports.org/articles-1/basketball-recruiting-rankings, accessed on March 17, 2023 ("For example, they tend to have dozens of analysts spread out across the country who take a look at top players any way that they can, including in person when possible as well as through film evaluation."; "Five-star prospects are the best of the best. Just a few dozen if that will receive this type of rating, and demand for them is high as those involved with UNC basketball recruiting, Michigan basketball recruiting, Kentucky basketball recruiting and recruiting efforts at other top schools tend to be highly interested. Players who are rated at five stars comprise roughly 1 percent of the basketball players who are at two stars and above."); NCSA College Recruiting, "Football Recruiting Rankings," available at https://www.ncsasports.org/articles-1/football-recruiting-rankings, accessed on March 13, 2023; 247Sports Staff, "247Sports Rating Explanation," 247Sports, July 20, 2012, available at https://247sports.com/Article/247Sports-Rating-Explanation-81574/.

reports speculated that the combination of current wide receivers (Xavier Worthy and Jordan Whittington), wide receivers returning from injury (Troy Omeire), and high-profile wide receivers transferring into Texas (Isaiah Neyor and Agiye Hall) led other current Texas wide receivers Marcus Washington, Kelvontay Dixon, and Dajon Harrison to leave Texas by entering the transfer portal.[75] Washington transferred to the University of Nebraska (part of the Big Ten);[76] Harrison transferred to the University of Connecticut (part of the Big East, a non-A5 conference);[77] and Dixon transferred to Southern Methodist University (part of the AAC, a non-A5 conference).[78]

b.  Another example of ripple effects stemming from negative externalities is given by JT Daniels, a collegiate quarterback who transferred multiple times after losing his role as the starting quarterback on the team to other student-athletes. Daniels was the starting quarterback for the University of Southern California (in the Pac-12) in 2018, but then transferred to the University of Georgia (SEC) after

---

[75] Eberts, Wescott, "Texas WR Marcus Washington Enters the NCAA Transfer Portal," *Burnt Orange Nation*, May 3, 2022, available at https://www.burntorangenation.com/2022/5/2/23053945/marcus-washington-enters-ncaa-transfer-portal-texas-longhorns ("During the offseason, however, Texas added Wyoming transfer Isaiah Neyor, who emerged as the likely starter opposite sophomore Xavier Worthy and junior Jordan Whittington in 11 personnel and caught a 62-yard touchdown pass on a post route in the Orange-White game. Head coach Steve Sarkisian also landed Alabama transfer wide Agiye Hall and Troy Omeire will return this fall from his second knee injury in as many years. So Washington's playing time was likely to decrease significantly this fall unless he's made major strides as a route runner and with his hands, which would explain why he's entered the portal."). *See also* Dimmitt, Zach, "Pair of Texas WRs Enter the Transfer Portal," *Sports Illustrated*, April 29, 2022, available at https://www.si.com/college/texas/football/longhorns-transfer-portal-kelvontay-dixon-dajon-harrison ("The Longhorns have now had five total players elect to enter the portal this week. Defensive lineman Jordan Thomas, linebacker/running back Jaden Hullaby, and defensive lineman Myron Warren all announced their intent to transfer.").

[76] McVeigh, Griffin, "Marcus Washington Announces Transfer Commitment to Nebraska," *On3*, May 24, 2022, available at https://www.on3.com/transfer-portal/news/former-texas-longhorns-wide-receiver-marcus-washington-transfer-portal-nebraska-cornhuskers/ ("Nebraska lost its two top threats to the 2022 NFL Draft. Wide receiver Samori Toure and tight end Austin Allen are off to the next level.").

[77] Nivison, Austin, "Texas Longhorns Football: Transfer WR Dajon Harrison Commits to UConn," *247Sports*, May 17, 2022, available at https://247sports.com/Article/Texas-Longhorns-football-Transfer-WR-Dajon-Harrison-commits-to-UConn-187664610.

[78] Mumme, CJ, "Former Texas WR Kelvontay Dixon Transfers to SMU," *Longhorns Wire*, May 8, 2022, available at https://longhornswire.usatoday.com/2022/05/08/texas-football-longhorns-kelvontay-dixon-smu-transfer-portal/.

losing his role as the starting quarterback to 2019 recruit Kedon Slovis.[79]
Daniels initially was the starting quarterback for Georgia in 2021, but transferred
to West Virginia University (in the Big 12) after Stetson Bennett replaced
Daniels as the starting quarterback.[80]  Daniels was named the starting
quarterback for West Virginia in 2022, but then entered the transfer portal after
Garrett Greene took over as the starting quarterback.[81]  Daniels committed to
Rice University (in CUSA, a non-A5 conference) in December 2022, where he is
expected to be the starting quarterback as the highest-rated recruit to play at
Rice.[82]

    c.    An example of ripple effects stemming from expected positive synergies
occurred in June 2022, when quarterback Arch Manning, the number one
football recruit in 2022, committed to Texas (Big 12).  Nine recruits verbally

---

[79]    Hodgkinson, Oliver, "Kedon Slovis vs. JT Daniels: How a 'Sliding Doors' Scenario at USC Led Both Quarterbacks to the Backyard Brawl," *Pro Football Network*, September 1, 2022, available at https://www.profootballnetwork.com/kedon-slovis-vs-jt-daniels-how-a-sliding-doors-scenario-at-usc-led-both-quarterbacks-to-the-backyard-brawl/ ("Yet that competition [between Slovis and Daniels] never really materialized, and Daniels never recovered his position at USC from [his injury] in August 2019. The son of California, who was meant to be the next big thing for USC at the quarterback position, entered the transfer portal in April 2020.").

[80]    Buhler, John, "JT Daniels Leaves West Virginia to Enter Transfer Portal for a Third Time," *FanSided*, December 6, 2022, available at https://fansided.com/2022/12/06/jt-daniels-west-virginia-transfer-portal/ ("After transferring to Georgia in spring of 2020, Daniels headed to West Virginia last offseason after losing his starting job due to injury in Athens. Stetson Bennett IV took over a third of the way through last season and never relinquished the starting job at Georgia.").

[81]    Thamel, Pete, "Sources: WVU QB JT Daniels Looks to Transfer to 4th School," *ESPN*, December 6, 2022, available at https://www.espn.com/college-football/story/_/id/35196186/sources-wvu-qb-jt-daniels-looks-transfer-4th-school ("That eventually led to a quarterback change after backup Garrett Greene came off the bench in place of Daniels and led WVU to an upset of Oklahoma in Week 10.").

[82]    Thamel, Pete, "Ex-West Virginia QB JT Daniels Transferring to Rice," *ESPN*, December 20, 2022, available at https://www.espn.com/college-football/story/_/id/35295207/ex-west-virginia-qb-jt-daniels-transferring-rice-fourth-school ("The move should be a boon to Rice, as Daniels will be the highest-rated recruit to play there since ESPN began recruiting rankings in 2006, according to ESPN Stats & Information research."). *See also* Fox 26 Digital, "Former 5-Star QB JT Daniels Takes Part in First Spring Practice With Rice Owls," *Fox Sports*, March 7, 2023, available at https://www.fox26houston.com/sports/former-5-star-qb-jt-daniels-takes-part-in-first-spring-practice-with-rice-owls ("Daniels hasn't been named the starter but he seems to be the favorite going into spring practice.").

committed to Texas the week following Manning's commitment.[83]  These commitments included four players on the offensive line, who were reportedly "sold on the vision" of a Texas team led by Manning.[84]

50.  Ripple effects stemming from positive synergies and negative externalities can also occur as a result of coaching changes.  For example:

   a.  During the winter of 2021-2022, three student-athletes (including quarterback Caleb Williams) followed Coach Lincoln Riley from the University of Oklahoma (Big 12) to the University of Southern California (in the Pac-12).[85]  With Coach Riley gone from Oklahoma, quarterback Spencer Rattler entered the transfer portal, eventually moving from Oklahoma to the University of South Carolina (in the SEC).[86]  Meanwhile, two University of Southern California quarterbacks, Kedon Slovis and Jaxson Dart, entered the transfer portal due to the coaching change and rumors that Caleb Williams would transfer to the University of Southern California and secure the starting quarterback role, at the expense of

---

[83]  Bromberg, Nick, "Texas Adds 9 Commitments from Recruits in the Days After Arch Manning's Decision," *Yahoo Sports*, June 29, 2022, available at https://sports.yahoo.com/texas-adds-8-commitments-from-recruits-in-the-days-after-arch-mannings-decision-194748235.html ("Steve Sarkisian and his Longhorns coaching staff have secured verbal commitments from nine players in the class of 2023 since Manning — the No. 1 player in the country — said he would be going to Texas on June 23."; "Six of the players Texas has gotten commitments from since Manning announced his decision have been on the offensive side of the ball.").

[84]  Bromberg, Nick, "Texas Adds 9 Commitments from Recruits in the Days After Arch Manning's Decision," *Yahoo Sports*, June 29, 2022, available at https://sports.yahoo.com/texas-adds-8-commitments-from-recruits-in-the-days-after-arch-mannings-decision-194748235.html ("The four offensive line commitments on Sunday reveal that the big men are sold on the vision, too. [Connor] Stroh mentioned to Orangebloods in the late spring that he was attracted to the idea of blocking for Manning in college.").

[85]  Polacek, Scott, "Lincoln Riley Defends USC's Transfer Moves: 'We Didn't Take Players from Oklahoma,'" *Bleacher Report*, February 8, 2022, available at https://bleacherreport.com/articles/10026297-lincoln-riley-defends-uscs-transfer-moves-we-didnt-take-players-from-oklahoma ("Quarterback Caleb Williams, wide receiver Mario Williams and cornerback Latrell McCutchin joined [Lincoln Riley] with Williams potentially in position to compete for the Heisman Trophy during his first season in the Pac-12.").

[86]  Rittenberg, Adam and Alex Scarborough, "CFB's Wildest Coach and QB Carousel Ever," *ESPN*, available at https://www.espn.com/espn/feature/story/_/id/34335776/charting-wildest-offseason-college-football-movement-ever, accessed on February 6, 2023 ("The day after USC introduced Riley as its head coach, Spencer Rattler, who began the 2021 season as Oklahoma's starting quarterback and the Heisman Trophy favorite, entered the transfer portal. The move was expected after Rattler, who thrived under Riley in 2020, lost the QB1 tag to Williams midway through the season. He would eventually land at South Carolina with coach Shane Beamer, a former Oklahoma assistant.").

Slovis and Dart.[87]  Four other University of Southern California student-athletes also entered the transfer portal and another declared for the NFL draft early shortly after the coaching change.[88]

b.  In December 2022, the University of Colorado (Pac-12) hired Deion Sanders as the head football coach, who explicitly encouraged existing football players to enter the transfer portal in light of anticipated transfers.[89]  Coach Sanders announced that his son would be transferring from Jackson State University (a non-A5 school) to the team and competing for the starting quarterback role; Colorado's current starting quarterback Owen McCown subsequently announced his decision to enter the transfer portal.[90]  Following Coach Sanders's hiring, Colorado also decommitted from several recruits; some of them were able to find scholarship spots at other A5 schools while others committed to non-A5 programs.[91]

---

[87]  Rittenberg, Adam and Alex Scarborough, "CFB's Wildest Coach and QB Carousel Ever," *ESPN*, available at https://www.espn.com/espn/feature/story/_/id/34335776/charting-wildest-offseason-college-football-movement-ever, accessed on February 6, 2023 ("Slovis wasn't the only USC quarterback looking to relocate. Jaxson Dart, who showed promise in relief of Slovis late last season, entered the portal Jan. 10, aware of Williams-to-USC transfer buzz that would build throughout the month.").

[88]  Kartje, Ryan, "Lincoln Riley Effect: Five Players and One Coach Announce They're Leaving USC," *Los Angeles Times*, December 6, 2021, available at https://www.latimes.com/sports/usc/story/2021-12-06/lincoln-riley-effect-usc-football-players-transfer-portal ("Edge rushers Hunter Echols and Juliano Falaniko, defensive tackle Jake Lichtenstein and kicker Alex Stadthaus all entered the NCAA transfer portal on Monday, while offensive tackle Jalen McKenzie announced he would forgo an extra season of eligibility to enter the NFL draft.").

[89]  In a speech to his team that has since been publicly circulated, Sanders said, "We got a few positions already taken care of because I'm bringing my luggage with me," and "So I want y'all to get ready to go ahead and jump in that Portal. Do whatever you're going to get. Because the more of you who jump in, the more room you make." *See* Brice, John, "Deion Sanders Bringing Baggage to Colorado," *Football Scoop*, December 4, 2022, available at https://footballscoop.com/news/deion-sanders-coach-prime-bringing-baggage-luggage-colorado.

[90]  Saunders, Patrick, "Deion Sanders Reaps Instant Awards as Colorado Changes Transfer Policy," *The Denver Post*, December 4, 2022, available at https://www.denverpost.com/2022/12/04/deion-sanders-instant-rewards-colorado-changes-transfer-policy/ ("CU's Owen McCown, a true freshman, was the Buff's most effective quarterback during their 1-11 season. Last week, he announced he was planning to put his name in the NCAA transfer portal and leave Colorado.").

[91]  Raynor, Grace and Manny Navarro, "Deion Sanders' Unwanted Colorado Commits Searching for a New Home," *The Athletic*, December 19, 2022, available at https://theathletic.com/4005958/2022/12/19/deion-sanders-colorado-commitments/ ("Former Class of 2023 Colorado commits" table). *See also* Rittenberg, Adam, "18 Players on Deion Sanders-Coached Buffaloes in Transfer Portal," *ESPN*, April 24, 2023, available at

*Confidential*

c. Kim Mulkey, former head coach at Baylor University (Big 12), was hired as the Louisiana State University ("LSU," in the SEC) head women's basketball coach in April 2021.[92]  Two Baylor student-athletes followed Coach Mulkey to LSU (Moon Ursin and Hannah Gusters),[93] while others transferred to other schools, like Chrislyn Carr who left for Syracuse University (in the ACC).[94]  Coach Mulkey's arrival at LSU similarly resulted in student-athletes transferring: one student-athlete transferred to the University of Southern Mississippi (Conference USA, non-A5 conference) after "[coming] to the realization that it wasn't going to work,"[95] while Ajae Petty transferred from LSU to the University of Kentucky (SEC) one year later due to the presence of other talented student-athletes that reduced Petty's playing time.[96]  Coach Mulkey's hire also led to high school

---

https://www.espn.com/college-football/story/_/id/36280712/montana-lemonious-craig-4-colorado-players-enter-portal ("Eighteen Colorado players entered the transfer portal Monday as part of a post-spring practice exodus, as new coach Deion Sanders continues to reshape the Buffaloes' roster."; "Since April 15, the Buffaloes have had 31 players enter the portal.").

92  Shapiro, Michael, "Kim Mulkey Reveals Why She Left Baylor for LSU," *Sports Illustrated*, November 10, 2021, available at https://www.si.com/college/2021/11/10/kim-mulkey-reveals-decision-leave-baylor-lsu ("LSU hired Mulkey as its coach in April, ending her 21-year run in Waco.").

93  Roser, Jerit, "LSU Adds Former Destrehan Star Cara 'Moon' Ursin in Transfer from Baylor," *LSU Rivals*, June 2, 2021, available at https://lsu rivals.com/news/lsu-adds-former-destrehan-star-cara-moon-ursin-in-transfer-from-baylor ("Another of Baylor's most productive players will follow coach Kim Mulkey to Baton Rouge.").

94  Cubit, Alexis, "How Winding Path Prepared Chrislyn Carr for Lone Year With Louisville Women's Basketball," *Courier Journal,* January 8, 2023, available at https://www.courier-journal.com/story/sports/college/louisville/2023/01/08/louisville-womens-basketballs-chrislyn-carr-seeks-strong-finish/69775771007/ ("Baylor head coach Kim Mulkey returned to her home state of Louisiana to become LSU's women's basketball coach, leaving Carr with another decision to make: stay or go. Carr transferred to Syracuse ahead of the 2021-22 season, though she admits now she would've given Lady Bears head coach Nicki Cullen a chance before leaving.").

95  Renard, Brady, "LSU Guard Domonique Davis Enters Transfer Portal," *KPLC News*, May 20, 2021, available at https://www.kplctv.com/2021/05/20/lsu-guard-domonique-davis-enters-transfer-portal/ ("Former DeRidder Lady Dragon Domonique Davis won't be a part of Kim Mulkey's rebuilding of the LSU women's basketball program as the sophomore guard announced her intent to transfer. Davis joins teammate Destini Lombard as Lady Tigers that entered the transfer portal on Wednesday. 'I had a conversation with Kim [Mulkey] and she kept it real and what she saw with her program and things like that,' said Davis. 'I came to the realization that it wasn't going to work for me and what I wanted to do with basketball.'"); Southern Miss, "Domonique Davis," available at https://southernmiss.com/sports/womens-basketball/roster/domonique--davis/8907, accessed on March 17, 2023.

96  Geoghegan, Zack, "Kentucky WBB Picks up Two SEC Transfers: Eniya Russell and Ajae Petty," *On3*, May 2, 2022, available at https://www.on3.com/teams/kentucky-wildcats/news/kentucky-wbb-picks-up-two-sec-

recruit Alisa Williams changing her pledged commitment from Texas Christian University (in the Big 12) to LSU.[97]

51.    Therefore, positive synergies and negative externalities can instigate a chain of ripple effects throughout the NCAA matching environment, rather than a new match affecting only that student-athlete.  **Figure 2** demonstrates how student-athletes seeking the starting quarterback position instead of serving as the backup quarterback could lead to a series of transfers both within the same year, in subsequent years, and across multiple conferences, including non-A5 schools.

---

transfers/ ("Both players were highly regarded out of high school and just happened to get stuck on deep, talented rosters. South Carolina went to the Final Four in 2020-21 and won the title in 2021-22. LSU took a significant leap in year one under Coach Mulkey this past season, finishing 26-6 on the season with a top 10 ranking.").

[97]    Rabalais, Scott, "LSU Women's Basketball Flips Alisa Williams From TCU to Tigers for 2022-23," *The Advocate,* June 1, 2021, available at https://www.theadvocate.com/baton_rouge/sports/lsu/lsu-womens-basketball-flips-alisa-williams-from-tcu-to-tigers-for-2022-23/article_76a37cbc-c2f2-11eb-b383-d7d634f255f3 html ("Kim Mulkey has redirected another women's basketball player to LSU. This time, it's 6-foot-2 swing player Alisa Williams of Aubrey Ray Braswell (Texas) High School. Williams was committed to TCU but flipped her pledge to LSU for the 2022-23 season.").

**Figure 2: The Ripple Effects of Justin Fields and D'Eriq King Entering the Transfer Portal[98]**



Legend:
- A5 school
- Non-A5 school
- Transfer initiated

### 5. The Rascher Report Fails to Model the But-For World in Light of the Potential for Substitution Effects

52.   The Rascher Report fails to seriously consider whether the 6,280 student-athletes in the proposed Football and Men's Basketball Class (including 5,477 football student-athletes and 803 men's basketball student-athletes), the 856 student-athletes in the proposed Women's Basketball Class, and the 7,384 student-athletes in the proposed Additional Sports Class would have made the same school selection choices or playing decisions in

---

[98]   *See* **Appendix D** for a list of sources.

the but-for world.[99]  Therefore, it is unsurprising the Rascher Report does not consider whether other student-athletes might have committed to A5 schools in the but-for world.[100]  Publicly available reports, however, indicate that student-athletes already seek to make new school selection decisions due to positive synergies or negative externalities, such as when they lose their starting position or face decreased playing time because of an incoming student-athlete to their team, or when they decide to move to a new team in the hopes of playing with talented peers or coaches.  As described in **Section III.C**, in the Rascher Report's but-for world, student-athletes would face a different set of economic incentives that would lead many of them to make different choices than they actually did.  These different choices have ripple effects on other student-athletes, who are displaced in the capacity-constrained collegiate sports environment.  The Rascher Report fails to grapple with these substitution and ripple effects in its construction of a but-for world.

### C. The Rascher Report's But-For World Introduces Changes to Student-Athletes' Economic Incentives That Increase the Potential for Sizable Ripple Effects

53.   The Rascher Report does not account for student-athletes who would change their school selection in the but-for world due to receiving new sources of compensation.[101]  This is in tension with the Rascher Report's proposed broadcast-related compensation, which would be paid to A5 student-athletes, and third-party NIL compensation, which would be paid to both A5 and non-A5 student-athletes, in the but-for world.  A complete evaluation of the Rascher Report's proposed payments demonstrates that the matching of student-athletes to conferences and schools would be radically different in the but-for world: (i) some

---

[99]   Rascher Report, ¶ 11.e.  The Rascher Report cites to Exhibit 11 for its count of 6,280 student-athletes in the proposed Football and Men's Basketball Class, which appears to be a sum of the highest annual number of eligible student-athletes in each sport (5,477 football student-athletes and 803 men's basketball student-athletes).  *See* Rascher Report, Exhibit 11.

[100]   Rascher Report, ¶ 11.e.

[101]   Redacted--NSC

student-athletes currently enrolled at a non-A5 school would be at an A5 school and some student-athletes currently enrolled at a A5 school would not be at an A5 school, which prevents the determination of class membership, and (ii) some student-athletes currently enrolled at an A5 school would be at a different school within the A5 conferences. Student-athletes who would be displaced from A5 schools to non-A5 schools would be precluded from at least two of the proposed classes in the but-for world. The Rascher Report does not present an approach that accounts for these substitution effects and that can reliably determine injury and damages through a common methodology.

### 1. The Rascher Report's Proposed Broadcast-Related Payments Would Lead to Many Student-Athletes Making Different School Selection Choices

54. In the Rascher Report's but-for world, A5 conferences have the ability to compete for student-athletes by offering broadcast-related payments.[102] However, by ignoring substitution effects, the Rascher Report fails to recognize the economic implications of using broadcast-related payments to compete for student-athletes in the labor market. Student-athletes would respond to these compensation offers by changing their school selection. These changes necessarily affect the options available to other student-athletes and to schools.

55. The Rascher Report offers the opinion that all A5 conferences would make broadcast-related payments to full-scholarship football and basketball student-athletes. Under this but-for world, student-athletes would have an increased preference for attending A5 schools in the but-for world. This logic applies to attracting student-athletes entering

---

[102] Rascher Report, ¶ 151 ("Based on my study of the discovery record, and my expertise as a sports economist, it is my opinion that, in the but-for world in which the Defendants' restrictions on conferences and schools paying for college player NILs are eliminated, but all other rules remain in place (including other NCAA rules related to restricting the compensation NCAA Division I athletes may receive from schools or conferences), competition would have compelled at least the Power Five Conferences to offer Broadcast NIL payments to their football and basketball players."). *See also* Rascher Report, ¶ 154 ("Consistent with their behavior after the Supreme Court decision in *Board of Regents*, schools in the Power Five Conferences would, in the but-for world, have likely chosen to band together to address NIL issues by forming conference-level group-licensing pools, and the Power Five Conferences would have rationally chosen to make Broadcast NIL payments to members of the Football and Men's Basketball Class, and to members of the Women's Basketball Class. Failure to do so would have allowed rival conferences to attract those college athletes that would add the most value through the use of their NIL to the conference's media rights agreements.").

collegiate athletics for the first time,[103] attracting student-athletes currently enrolled at schools in other conferences, and retaining student-athletes currently enrolled at schools within the conference who might consider transferring to a different conference. The Rascher Report fails to account for student-athletes' increased interest in attending A5 schools and therefore incorrectly minimizes the extent of substitution effects that would occur in the but-for world.

56. For example, Omari Spellman was a highly rated men's basketball player, who was recruited to Villanova in 2016, a non-A5 school.[104] At the time of recruitment, he had 16 other offers from non-A5 and A5 schools. In the Rascher Report's but-for world, Spellman would have had the opportunity to weigh the competing broadcast-related payments offered by each school into his school selection decision, as shown in **Table 2**. By the Rascher Report's logic, Redacted--NSC

Redacted--NSC[105]

Redacted--NSC[106] At the very least, Spellman could have sought to attend an A5 school as opposed to a non-A5 school in the Rascher Report's but-for world so that he could receive at least NSC in broadcast-related payments in the first year of enrollment.

---

[103] The Rascher Report recognizes that incoming student-athletes could "use the threat to attend another school" as a source of bargaining power to secure broadcast-related payments. Rascher Report, ¶ 160 ("For athletes, because Defendants take the position that they can use athletes' NILs without paying for it, the only way to ensure they are paid is to insist on a license prior to committing to the school, when they can use the threat to attend another school (and thus allow the other school's conference to use their Broadcast NILs) as their source of bargaining power.").

[104] 247Sports, "Omari Spellman," available at https://247sports.com/Player/Omari-Spellman-42970/high-school-123652/, accessed on March 13, 2023.

[105] Rascher Deposition, p. 194:5-17 Redacted--NSC
s I said, there are lots of elements that affect the choice of what school to attend and the amount that an athlete gets offered is part of that decision process. And an athlete very well could choose a different offer if they had one. If they decided to do that." Objection omitted.).

[106] Chris Fisher, a Recruiting Insider, and Jerry Meyer, 247Sport's Director of Basketball Scouting, both predicted that Spellman would commit to the University of Kentucky in the fall of 2014. 247Sports, "Crystal Ball for Omari Spellman-at-MacDuffie-School-123652/CurrentExpertPredictions/, accessed on January 30, 2023.

**Table 2. Recruiting Offers and Proposed Broadcast-Related Payments
Omari Spellman (Villanova), 2016[107]**

**Rascher Report's Broadcast-
Related Payments in 2016**



Redacted--NSC

57.  Had Spellman altered his school selection in the but-for world, he would have secured
playing time, a roster spot, and scholarship money that was actually secured by a different
student-athlete.[108]  Spellman's altered decision in the but-for world would have been to the
detriment of the other student-athlete, regardless of whether this student-athlete would
have stayed at the University of Kentucky, chosen to go to a different A5 school, or
chosen to go to a non-A5 school:

a.  In the event that a student-athlete was displaced to a non-A5 school in the but-for
world, the displaced student-athlete would no longer belong to the proposed

---

[107]  Rascher Report, Exhibit 12 and backup materials; 247Sports, "Omari Spellman Recruit Interests," available at
https://247sports.com/Recruitment/Omari-Spellman-45297/RecruitInterests/, accessed on March 21, 2023.

[108]  Rascher Deposition, p. 204:14-19 ("Q. Okay. And if – just going back a minute. You would agree with me that
it's possible that Omari Spellman instead choosing to attend the University of Kentucky could displace
someone in the class currently from the Power Five; correct?  A.  It is possible.").

47

Football and Men's Basketball Class in the but-for world, and they would not suffer economic harm from the proposed broadcast-related payments. The student-athlete would have also lost access to the school that they preferred and benefits unique to Kentucky.

b.  In the event that such a student-athlete decided to go to a different A5 school, the student-athlete would have lost access to the school they preferred, as revealed by their actual choice. They would have also lost access to benefits unique to Kentucky, such as access to its facility and coaching.

c.  In the event that a student-athlete stayed at Kentucky, their prominence on the team could have diminished if Spellman joined the team and secured more playing time and opportunities (such as scoring chances) at the expense of the other student-athlete.

58.  Any assessment of injury and damages would require determining, at minimum, (i) which student-athletes would make different decisions in the but-for world; (ii) which student-athletes would be displaced in the but-for world; (iii) which schools these displaced student-athletes would attend in the but-for world; (iv) whether these displaced student-athletes would not be worse off in the but-for world; and (v) whether any broadcast-related payments and/or third-party NIL payments available at their alternate school would be sufficient to compensate any worse-off student-athletes for the loss of benefits associated with attending a less preferred school in the but-for world. Given these individualized considerations, the Rascher Report cannot assess these potential ripple effects and determine student-athletes' school selection in the but-for world using a common methodology. For example, assuming that Omari Spellman would have attended the University of Kentucky in the but-for world, the determination of which student-athlete would have been displaced requires examination of each student-athlete's circumstances. Any prediction of where that student-athlete would be in the but-for world would be speculative. The 2016-2017 University of Kentucky men's basketball roster included seven other freshmen student-athletes, four of whom played the same position as

Spellman.[109]  All four had alternative offers from other A5 and non-A5 schools.[110]
University of Kentucky's signing of Spellman in the but-for world could have led any of
these four student-athletes to choose a different school (and potentially a non-A5 school)
so as to not sacrifice their playing time.  In the event that any of these student-athletes
chose to attend a non-A5 school, they would not be part of the proposed class in the but-
for world and would not have received the Rascher Report's proposed broadcast-related
payments.

59.   There are many non-A5 student-athletes who have had the opportunity to match with A5
schools despite Dr. Rascher's assertions at deposition.[111]  Data on football and men's
basketball student-athletes' collegiate offers are available from 247Sports, a CBS
Interactive company that tracks college sports recruiting and reports collegiate offers
received by football and men's basketball recruits.[112]  The publicly available data were
processed by Cirque Analytics and provided to me.  The 247Sports data include
information on student-athletes' collegiate scholarship and walk-on offers (in which a spot
on the team's roster is offered with no scholarship) collected through 247Sports' local and

---

[109]  Fisher, Chris, "Kentucky Releases Official 2016-17 Basketball Roster," *247Sports*, July 29, 2016, available at https://247sports.com/college/kentucky/Article/Kentucky-Wildcats-2016-17-basketball-roster-46487986/.

[110]  247Sports, "Sacha Killeya-Jones Recruit Interests," available at https://247sports.com/Recruitment/Sacha-Killeya-Jones-72480/RecruitInterests/, accessed on March 13, 2023; 247Sports, "Tai Wynyard Recruit Interests," available at https://247sports.com/Recruitment/Tai-Wynyard-81167/RecruitInterests/, accessed on March 13, 2023; 247Sports, "Bam Adebayo Recruit Interests," available at https://247sports.com/Recruitment/Bam-Adebayo-23273/RecruitInterests/, accessed on March 13, 2023; 247Sports, "Wenyen Gabriel Recruit Interests," available at https://247sports.com/Recruitment/Wenyen-Gabriel-73869/RecruitInterests/, accessed on March 13, 2023.

[111]  Rascher Deposition, pp. 214:11-215:1 ("Q.  And you'd agree you don't have any estimate of how many student athletes there are who received Power Five offers between 2016 and 2021, full scholarship offers in football, men's basketball, and women's basketball, and turned them down to go somewhere else. You don't have that number?  A.  So my analysis of that exact question in Alston and O'Bannon, so I must have looked at seven, eight years, nine years, maybe, of data where that it is not very common to turn down a Power Five offer in favor of a non-Power Five offer. Mostly the athletes who get Power Five offers accept those offers. And the athletes who are choosing schools outside of the Power Five are typically not getting a Power Five offer.").

[112]  247Sports, "About 247Sports," available at https://247sports.com/Article/About-247Sports-116092/, accessed on December 5, 2022.

national scouts, as well as student-athletes' self-reporting.[113,114]  Full-scholarship offers are denoted with a check mark associated with a school's offer, whereas walk-on offers are denoted with a dash and a symbol of a person walking.[115]  Not all prospective and enrolled collegiate student-athletes appear in the 247Sports data, such as student-athletes who did not participate in the recruiting process and instead walked on to their school's team.[116]  Consequently, the 247Sports data are more likely to capture higher profile student-athlete recruits who would attend an A5 school.  As shown in **Table 3**, between 2016 and 2021, 10,433 football recruits and 1,868 men's basketball recruits appearing in the 247Sports data received at least one scholarship offer from an A5 school.  Of these recruits with an A5 scholarship offer, 2,630 (25 percent) football recruits and 601 (32 percent) men's basketball recruits decided to attend a non-A5 school.  The same data are not available for women's basketball recruits.

---

[113]  *See, for example*, Adams, Kipp, "Everything You Need to Know about 247Sports Rating Process," *247Sports*, February 4, 2020, available at https://247sports.com/college/georgia/LongFormArticle/Georgia-Bulldogs-Recruiting-Everything-you-need-to-know-about-247Sports-Rating-Process-143324123/#143324123_1 (listing local and regional scout teams alongside a nationwide ranking council).

[114]  Dr. Rascher noted in deposition that he had previously used the same data source to analyze student-athletes' recruiting offers in the past. Rascher Deposition, pp. 190:8-191:3 ("Q.  Okay. Where is that analysis?  A.  Some of that is – so two places. Some of that would be the – depending on the timing of when I did it in the Alston case – because I don't remember exactly what those dates are. But secondly, I sometimes do an analysis of the recruiting – the correlation between recruiting seasons; right? I sort of show it in class sometimes. To look at the lack of competitive balance in college sports and how it's been increasing over time and you get correlations that are up over 90 percent. When you rank the schools by their recruiting classes, it's the same schools each year, you know, get into that. So that's an analysis of the offers that these athletes are getting from 24/7 sports and from the other source whose name's escaping me right now where you can get the information for the stars and sort of see which schools and which conferences – which schools in which conferences they're getting offers from.").

[115]  *See, for example*, the 247Sports recruiting page of Carson Proctor, a three-star quarterback from Florida, who opted to walk on at the University of Arkansas over offers from the University of Buffalo and the University of Southern Illinois. 247Sports, "Carson Proctor," available at https://247sports.com/Player/Carson-Proctor-80583/high-school-139709/, accessed on March 13, 2023.

[116]  For example, Andrew Kenny walked on to Boston College's men's basketball team and does not appear in the 247Sports recruiting data. *See* 247Sports, "2022 Boston College Eagles Basketball Roster," available at https://247sports.com/college/boston-college/Team/Boston-College-Eagles-Basketball-2/Roster/, accessed on April 7, 2023 (listing Andrew Kenny without a hyperlinked player page and no rating); Golen, Jimmy, "With Roster Thinned, BC Men's Basketball Has Turned to Walk-On 'Martians,'" *Boston.com*, February 12, 2021, available at https://www.boston.com/sports/college-sports/2021/02/12/bc-mens-basketball-roster-jim-christian/ ("Boston College forward Andrew Kenny (23), who joined the team as a walk-on, congratulates teammates during the second half of an NCAA college basketball game against Wake Forest, Wednesday, Feb. 10, 2021, in Boston.").

*Confidential*

**Table 3. Number of Football and Men's Basketball Recruits with A5 Scholarship Offers Reported by 247Sports[117]**

| Recruitment Year[1] | Student-Athletes with an A5 Offer | Student-Athletes with an A5 Offer Who Attended a Non-A5 School | Percent |
|---|---|---|---|
| **Men's Football** | | | |
| 2016 | 1,721 | 405 | 24% |
| 2017 | 1,747 | 397 | 23% |
| 2018 | 1,749 | 443 | 25% |
| 2019 | 1,767 | 452 | 26% |
| 2020 | 1,783 | 478 | 27% |
| 2021 | 1,676 | 455 | 27% |
| **Total** | **10,443** | **2,630** | **25%** |
| | | | |
| **Men's Basketball** | | | |
| 2016 | 298 | 95 | 32% |
| 2017 | 322 | 90 | 28% |
| 2018 | 331 | 110 | 33% |
| 2019 | 338 | 105 | 31% |
| 2020 | 320 | 100 | 31% |
| 2021 | 259 | 101 | 39% |
| **Total** | **1,868** | **601** | **32%** |

**Notes:**

[1] Recruitment Year represents the year in which student-athletes were recruited to schools, not the first year that they played for the school that recruited them.  Student-athletes who appear in multiple recruitment years are assigned to their latest recruitment year.

[2] Student-athletes who are recorded as having any walk-on offer are excluded from this analysis.  Student-athletes who are recorded in the data for both football and men's basketball are excluded from this analysis, as the data do not distinguish for which sport the student-athlete received offers from schools. Notre Dame is included as part of A5 in this analysis.

60.    The substitution effect and ripple effects illustrated by the Omari Spellman example are not limited to non-A5 student-athletes who held offers from A5 schools.  Given the financial incentives to attend an A5 school under the Rascher Report's but-for world, some student-athletes who did not receive an A5 offer would have focused more intensely on trying to receive an A5 offer in the but-for world.  For example, they might have

---

[117]   Backup materials to this report (247Sports recruitment data received from Cirque Analytics).

attended camps at A5 schools, picked A5 schools for one of their five official campus visits to Division I schools,[118] and sought more strenuously to engage the coaching staff at A5 schools.

61. Dr. Rascher attempted to minimize this example of substitution effects in deposition by claiming that non-A5 conferences would also offer broadcast-related payments in the but-for world.[119]  Neither the Rascher Report nor the Desser Report assess any broadcast-related payments that would be offered by non-A5 conferences in the but-for world.  Mr. Desser confirmed in deposition that he had not assessed the value of student-athlete NIL in non-A5 broadcast agreements,[120] and therefore the Desser Report's conclusions do not apply to non-A5 conferences, schools, or student-athletes.  An examination of publicly available information on conferences' television media deals demonstrates that non-A5 conferences have substantially lower broadcast revenues, calling into question the degree to which they could pay to compete for student-athletes in the Rascher Report's but-for world.  The Rascher Report has not proposed a common methodology to identify student-athletes who would be displaced from A5 schools to non-A5 schools and who would be unharmed from failing to receive the proposed broadcast-related payments.

---

[118]  NCSA College Recruiting, "Everything You Need to Know About Official Visits," available at https://www.ncsasports.org/ncaa-eligibility-center/recruiting-rules/official-visits, accessed April 22, 2023 ("The NCAA allows a recruit to make only five visits to Division I schools, limited to one per school.").

[119]  Rascher Deposition, pp. 202:20-203:6 ("Q.  And you would agree that if Omari Spellman accepted any one of those offers, that would displace a student from the Power Five?  A.  So it depends; right? Again, there – as I said, there are slots open in the Power Five; right? There's not 100 percent full for every school. So I – I disagree with that. And you're also missing sort of that he could have gotten payments from the Big East and from the AAC. I'm not measuring those in this lawsuit. I wasn't asked to measure those. But those are out there; right?").

[120]  Videotaped Deposition of Edwin Desser, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, January 12, 2023 ("Desser Deposition"), p. 29:3-14 ("Q.  My question is: Are you prepared to tell us... It's fine if you say you're not. It's fine if you say you are. I just don't know. Do the conclusions in your report apply to conferences outside the Power 5 and Notre Dame? They don't apply? Or you haven't thought about it and you can't tell me today, one way or the other?  A.  I wasn't asked to focus on the other conferences. I suspect that some of the conclusions would apply, but I have not studied them or considered how I might identify and allocate NIL values in those cases.").

**Table 4. Publicly Reported Television Media Deals for A5 and Non-A5 Conferences[121]**

| Conference | Annual Television Media Revenue (USD millions) | |
| | Per Conference | Per School |
| --- | --- | --- |
| **A5** | | |
| Big Ten | 440.0 | 31.4 |
| SEC | 300.0 | 40.0 |
| Pac-12 | 252.0 | 21.0 |
| ACC | 240.0 | 17.0 |
| Big 12 | 200.0 | 20.0 |
| | | |
| **Non-A5** | | |
| AAC | 83.3 | 7.0 |
| Mountain West | 48.0 | 4.0 |
| Big East | 41.7 | 3.8 |
| Mid-American | 8.0 | 0.6 |
| Conference USA | 5.5 | 0.5 |
| Sun Belt | 7.0 | 0.5 |

**Notes:**
[1] These publicly reported television revenues do not appear to include football bowl revenues, College Football Playoff distributions, or NCAA distributions.
[2] For the SEC, the On3 article reports a "Per Conference" figure of $300 million from an upcoming 2024 deal with ESPN. The "Per School" figure represents the expected distributions from the 2024 ESPN deal and existing television deals with CBS and ESPN. For the ACC, the On3 article reports 14 schools (not including Notre Dame).
[3] See backup to this table for additional details.

62.    As shown in **Table 4**, publicly available information suggests that the annual television revenues for A5 schools are at least two times as high as annual media revenues for non-A5 schools.  Under the Rascher Report's methodology, where broadcast-related payments to individual student-athletes are dependent on the size of the conference's overall media deal, it would be impossible for any non-A5 school to successfully compete with A5 schools using broadcast-related payments.  Given the relatively small size of their television media revenues, non-A5 schools, such as the Mid-American Conference,

---

[121] On3 Staff Report, "Here's a Look at All the Current Conference TV Deals," *On3*, August 2, 2021, available at https://www.on3.com/news/conference-tv-deals-current-status-college-football/; Sports Business Journal, "New Big East, Fox Sports Formally Ink 12-Year, $500M Deal; ESPN Signs Mountain West," March 21, 2013, available at https://www.sportsbusinessjournal.com/Daily/Issues/2013/03/21/Media/Big-East-MWC.aspx.

Conference USA, and the Sun Belt Conference, could choose to not make broadcast-related payments to student-athletes, particularly those in conferences with substantially smaller media deals. The Rascher Report has provided no economic analysis to ground the opinion that non-A5 schools would compete for student-athletes using broadcast-related payments in the but-for world.

63. Records of student-athletes' transfer decisions show that student-athletes frequently transfer between A5 and non-A5 schools, demonstrating that some A5 student-athletes seek opportunities at non-A5 schools and non-A5 student-athletes seek opportunities at A5 schools. As shown by NCAA Transfer Portal data summarized in **Figure 3**, Conf. football and basketball student-athletes transferred between A5 and non-A5 schools in a given year. Student-athletes' movements between A5 and non-A5 schools would be higher in the but-for world.

**Figure 3. Overview of Student-Athlete Transfers In and Out of the A5 for Football, Men's Basketball, and Women's Basketball Academic Years 2019-2020 to 2021-2022[122]**



Conf.

64.    The assessment of injury and damages is also complicated if student-athletes stay at schools within the A5 conferences but choose to attend different schools than they did. For example, under the Rascher Report's methodology, it would be necessary to determine in which conference or conferences a student-athlete would have played in the but-for world to assess damages because the Rascher Report proposes different broadcast-related

---

[122]   Backup materials to this report (NCAA Transfer Portal data as of January 25, 2023).

payments for each conference.  In the Rascher Report's but-for world, A5 student-athletes would have had a financial incentive to initially enroll in or transfer to schools in A5 conferences with larger broadcast deals throughout the proposed class period.  For example, in 2016, NSC would offer the highest amount in broadcast-related payments to football, men's basketball, and women's basketball student-athletes.[123]  A student-athlete's choice to attend a different A5 school in the but-for world could lead to a different student-athlete being displaced to a non-A5 school, as the documented examples discussed in **Section III.B** demonstrate.  Furthermore, an assessment of student-athlete welfare in the but-for world would also require accounting for the loss of benefits associated with attending a less preferred school in the but-for world or their decreased playing time or status.  However, as discussed in **Section IV**, it cannot be assumed that every student-athlete would have received broadcast-related payments even if they attended an A5 school.

65.  The Rascher Report fails to recognize that introducing broadcast-related payments ranging between $5,300 and $85,200 per student-athlete in a given year or between $26,400 and $311,900 per student-athlete over the course of four years could meaningfully alter student-athletes' school selection choices in the but-for world, leading A5 student-athletes to be displaced to non-A5 schools.[124]  The assumption that these school selection choices would remain unchanged contradicts the competition for student-athletes that the Rascher Report claims would occur.

### 2.  The Rascher Report's Proposed Third-Party NIL Payments Would Lead to Many Student-Athletes Making Different School Selection Choices

66.  The potential for third-party NIL deals and payments in the Rascher Report's but-for world adds a new consideration for student-athletes deciding with which school they should match.  While the third-party NIL ecosystem is complex and dynamic, as discussed in **Section V**, the role of collectives in facilitating third-party NIL deals highlights the

---

[123]  Rascher Report, Exhibit 12.

[124]  Rascher Report, Exhibit 12.

variation in opportunities that may be available at each school.  Collectives are organizations formed by a school's alumni and supporters looking to facilitate NIL deals for student-athletes, which may involve connecting student-athletes with local businesses and/or pooling funds from donors to pay student-athletes for marketing and promotional activities.[125]  Before the existence of third-party NIL deals, supporters of a particular school's sports teams did not have a means to strike deals that provide compensation to the student-athletes in those teams.  The ability to do so in the but-for world allows such supporters to help establish their favored school as a destination that can provide student-athletes with significant third-party NIL compensation.  Variation in the magnitude of such support across schools creates differentiation for student-athletes choosing among schools, a fact acknowledged by Dr. Rascher at deposition.[126]  This raises the prospect that student-athletes seeking to monetize their NIL through third-party NIL deals are likely to make different school selection choices in the Rascher Report's but-for world than they actually did.

67.   Documented deals between collectives and student-athletes demonstrate how student-athletes in the Rascher Report's but-for world may alter their school selection in response to the opportunities available at different schools, and how student-athletes in non-A5 schools could be more interested in attending A5 schools in the but-for world.  Collectives have taken differing approaches to compensate student-athletes.  While some collectives have been documented to offer different payment amounts to individual student-athletes,

---

[125]  Nakos, Pete, "What Are NIL Collectives and How Do They Operate?" *On3*, July 6, 2022, available at https://www.on3.com/nil/news/what-are-nil-collectives-and-how-do-they-operate/ ("Often founded by prominent alumni and influential supporters, school-specific collectives pool funds from a wide swath of donors to help create NIL opportunities for student-athletes through an array of activities.").

[126]  Rascher Deposition, p. 206:14-17 ("Q.  And they may have a reduced ability to monetize their NIL at a different school than Kentucky; correct?  A.  That's all possible, yes."). *See also* Rascher Deposition, pp. 210:8-211:2 ("Q.  And you would agree that this displaced student athlete may have less of an ability to monetize their NIL if they are at a different institution besides the Ohio State University and the Big 10; correct?  THE WITNESS: Less than – I mean, it depends where they end up.  BY MR. KILARU:  Q.  You have to assess where they ended up, right?  A.  To see if they – if they can monetize their NIL at a different school in a different amount? Q.  In the same way, yes.  A.  I don't see any reason to assess that, but if – if that were the question on the table, you'd have to figure out, you know, what is the value being at that other school." Objection omitted.).

others have announced equal payments to subsets of student-athletes based on certain criteria.  For example:

    a. University of Tennessee's collective, Spyre Sports Group, helps facilitate third-party NIL deals for student-athletes, allowing them to reportedly "earn anything from a free meal to $500,000 per year, depending on the athlete."[127]  Co-founder Hunter Baddour was explicit about the goals of Spyre Sports to help attract top talent to Tennessee, stating "[w]e want Tennessee to be the premier NIL destination in the country.  […]  We would like Tennessee to be year-after-year in the top three in recruiting in football."[128]

    b. John Ruiz, a Miami businessman announced in January 2022 that he was setting aside $10 million for NIL deals with Miami-based student-athletes.  As of early 2022, Ruiz had signed over 110 student-athletes to deals ranging from $2,500 per student-athlete to $800,000 per student-athlete (and a car).[129]

---

[127]  Simlot, Vinay, "Spyre Sports Brings More than $4 Million in NIL Deals for UT Athletes," *WBIR*, September 13, 2022, available at https://www.wbir.com/article/news/local/over-4-million-in-nil-deals-for-ut-athletes/51-4d47002d-706d-424e-a809-f96aeccc934a.

[128]  Ray, Matt, "Spyre Sports Group Announces NIL Totals," *Sports Illustrated*, June 22, 2022, available at https://www.si.com/college/tennessee/football/spyre-sports-group-announces-nil-totals ("'We want Tennessee to be the premier NIL destination in the country,' Baddour said of this in January. 'I understand if that sounds like coach speak, but if we are not shooting to be number one, then what are we doing? We would like Tennessee to be year-after-year in the top three in recruiting in football. Why the top three? Because depending on what website or ranking service you use, nobody is ever number one in all three. So if you are in the top three, I think it is fair to say you are a consensus number one. We also want to take care of all sports at Tennessee, and that includes Women's sports. There is definitely an opportunity for everybody to get in on and experience NIL in a positive way.'").

[129]  Dosh, Kristi, "Tracking LifeWallet's Mission to Sign $10 Million in NIL Deals," *Business of College Sports*, February 12, 2022, available at https://businessofcollegesports.com/name-image-likeness/tracking-lifewallets-mission-to-sign-10-million-in-nil-deals ("Miami businessman John Ruiz has been making headlines after announcing he intends to dedicate $10 million to NIL deals. So far, he's signed 54 Miami and FIU student athletes in football, baseball, volleyball, swimming and golf to $1.5 million in deals."; deals with student-athletes listed include a $2,500 deal with Miami football player Mason Napper and an "$800,000 plus car deal with Miami basketball player Nijel Pack). *See also* Crabtree, Jeremy, "On3's NIL Most Impactful Person: Miami Businessman John Ruiz," *On3*, December 28, 2022, available at https://www.on3.com/nil/news/on3-nil-most-impactful-person-2022-miami-businessman-john-ruiz/ ("All in all, Ruiz has worked to sign more than 110 active athletes from sports ranging from football to women's basketball to softball and baseball."; "John Ruiz caused the largest NIL stir of 2022 when he signed Nijel Pack – a former Kansas State basketball player who transferred to Miami – to a two-year $800,000 deal that includes the use of a car.").

    c.   Texas Tech's collective, the Matador Club, offered $25,000 deals to 85 full-scholarship and 20 non-scholarship football student-athletes in a one-year renewable contract that requires them to perform community service, serve as ambassadors for local charities, and appear at the collective's events.  The Matador Club indicated that they would aim to sign men's basketball and baseball players to a similar deal, before expanding to non-revenue generating sports.[130]

    d.   One of University of Texas – Austin's collectives, Horns with Heart, offered to pay every scholarship offensive lineman on the football team $50,000 annually for their NIL, as long as they remained eligible by staying on the team, in exchange for charitable appearances.[131]

68.    Media reports have inferred that student-athletes are making school selections with third-party NIL opportunities being at least one factor, if not a prominent factor, in those decisions.  For example:

    a.   Nijel Pack, a men's basketball student-athlete, transferred from Kansas State (Big 12) to the University of Miami (ACC).  On the same day as his transfer was announced, John Ruiz revealed a two-year deal between LifeWallet and Pack that would pay a total of $800,000 and include a car.[132]

---

[130]  Olson, Max, "Texas Tech Collective to Offer $25,000 NIL Deals to 100-Plus Football Players," *The Athletic*, July 19, 2022, available at https://theathletic.com/news/texas-tech-boosters-nil-deal-players/ncfXRrM0sTXr/ ("While the Matador Club raised enough funding through private donations to support more than 100 players, [a founding member of the Matador Club] believes they can raise 'two or three times more' if needed. They're planning to sign men's basketball and baseball players soon with the hopes of eventually also supporting non-revenue sports.").

[131]  Brown, Chip, "New NIL Initiative Aimed at Benefitting Texas Longhorns' Offensive Linemen," *247Sports*, December 6, 2021, available at https://247sports.com/college/texas/Article/Texas-Longhorns-football-Horns-with-Heart-NIL-initiative-offensive-linemen-177522419/.

[132]  Gonzalez, Isabel, "Nijel Pack Transfers to Miami: Former Kansas State Star to Earn $800,000 in NIL Deal with LifeWallet," *CBS Sports*, April 23, 2022, available at https://www.cbssports.com/college-basketball/news/nijel-pack-transfers-to-miami-former-kansas-state-star-to-earn-800000-in-nil-deal-with-lifewallet/ ("While this is hardly the first NIL deal to accompany a signing in college basketball, it's rare for the terms of the deal to be released at the time of signing.").

b. Ochuan Mathis, a football student-athlete, transferred from Texas Christian University (Big 12) to University of Nebraska (Big Ten).  Although Mathis's family stated that NIL was not a big factor in this decision, they noted the uniqueness of Nebraska's collective and its focus on student-athlete education around building credit, starting a business, and endorsement opportunities.[133]  It was reported that Mathis secured a "sizable NIL compensation believed to be in the mid-six figure range."[134]

c. University of Arkansas's collective, ONEArkansas NIL, announced that it re-signed third-party NIL deals with Arkansas football student-athletes KJ Jefferson and Raheim Sanders, which was perceived by media commentators to be an attempt to retain star student-athletes.[135]

d. Coaches have also commented publicly about the way in which third-party NIL deals has affected their ability to recruit student-athletes.  For example, University of Colorado's interim football coach, Mike Sanford, stated that they had lost recruits due to offers of $300,000 or $400,000 NIL deals from collectives affiliated with competing schools.[136]  University of Mississippi's

---

[133]  Bland, Evan, "TCU Transfer Ochaun Mathis Commits to Nebraska," *Omaha World Herald*, August 22, 2022, available at https://omaha.com/sports/huskers/football/tcu-transfer-ochaun-mathis-commits-to-nebraska/article_bf9a3644-baaa-11ec-8c19-0b0e2674cd75 html ("Mathis's mother, Ochana Daniels said NIL 'didn't play a big factor' in her son choosing Nebraska – 'It was more so the amount of support he's going to have mentally and physically,' she told The World-Herald. But the Huskers' NIL setup – specifically [their collective] and the collective's president, Gerrod Lambrecht – is different from Texas, she said. Help with establishing credit, starting his own business and endorsement opportunities set Lincoln apart.").

[134]  Pernell, Jeremy, "Exits and Additions Shake Up Husker Defensive Line," *Sports Illustrated*, July 25, 2022, available at https://www.si.com/college/nebraska/football/jeremy-pernell-exits-and-additions-shake-up-husker-defensive-line-ochaun-mathis ("A sizable NIL compensation package believed to be in the mid-six-figure range was also a factor.  Prior to his official visit, a representative from Nebraska visited Mathis and his family to discuss several aspects of the deal.").

[135]  Nakos, Pete, "KJ Jefferson, Raheim Sanders Re-Sign With ONEArkansas NIL," *On3*, January 20, 2023, available at https://www.on3.com/nil/news/kj-jefferson-raheim-sanders-re-sign-with-onearkansas-nil-arkansas-razorbacks-football/ ("Roster retention has become a driving theme at Power Five collectives, trying to hold off Transfer Portal suitors.").

[136]  Crabtree, Jeremy, "Athletic Officials Realize It's Time to Support NIL Collectives or Get Left Behind," *On3*, November 14, 2022, available at https://www.on3.com/nil/news/more-and-more-athletic-officials-throwing-support-behind-nil-collectives-tennessee-kansas-state-colorado-oregon-state-kentucky-wisconsin-oklahoma/

football coach, Lane Kiffin, and University of Alabama's football coach, Nick Saban, have also made public remarks suggesting that competing schools have attracted top talent as a result of affiliated collectives' NIL deals.[137]

69. Records of student-athletes' transfer decisions suggest higher transfer portal activity following the interim NIL rule change in July 2021.  I should note, however, that there were several other changes that occurred around the same time that also contributed to higher transfer portal activity—for example, in May 2020, the NCAA granted student-athletes an additional year of eligibility due to Covid-19, and in April 2021, all student-athletes could play immediately after transferring (rather than needing to sit out for a year).[138]  **Figure 4** below summarizes the number of FBS football student-athlete transfers over time, which increase in the academic year after the interim NIL rule change in July 2021.  In the 2020-2021 academic year, Confidential football student-athletes transferred to a new school, which increased to Confidential in the 2021-2022 academic year following the interim NIL rule.  While data for the 2022-2023 academic year is incomplete, the number of football student-athlete transfers in December of the 2022-2023 academic year Conf. is already higher than the December number of transfers in the 2020-2021 academic year Conf. .

---

('"We're in deep with a recruit, or a transfer, and even sometimes a personal connection to that transfer,' Sanford said. 'We're on the phone, everything's good, there's going to be an official visit and then all of a sudden it goes completely silent. You can't get a text back, you can't get any phone calls back.' Sanford said CU coaches have been beaten out time after time by 'literally $300,000 or $400,000' NIL deals on the recruiting trail.").

[137] *See, for example,* Dellenger, Ross, "The Other Side of the NIL Collective, College Sports' Fast-Rising Game Changer," *Sports Illustrated,* August 10, 2022, available at https://www.si.com/college/2022/08/10/nil-collectives-boosters-football-tennessee-daily-cover ('"It's totally changed recruiting,' Ole Miss coach Lane Kiffin says of NIL and collectives. 'I joke all the time about it: Go ahead and build facilities and these great weight rooms and training rooms, but you ain't gonna have any good players in them if you don't have NIL money.'"). *See also* Suttles, Aaron, "Why Did Nick Saban Rant About Texas A&M and NIL? Breaking Down the Fiery Comments," *The Athletic,* May 19, 2022, available at https://theathletic.com/3322292/2022/05/19/nick-saban-jimbo-fisher-texas-am/ ('"We were second in recruiting last year,' Saban said Wednesday night. 'A&M was first. A&M bought every player on their team. Made a deal for name, image, and likeness.'").

[138] NCAA, "Actions Related to Division I Regulations and Policies Impacted by COVID-19," July 30, 2021, available at https://ncaaorg.s3.amazonaws.com/compliance/d1/D1GOV_COVID-19ActionChart.pdf; On3 Staff Report, "What Is the NCAA Transfer Portal?  Everything You Need to Know," *On3*, December 1, 2022, available at https://www.on3.com/transfer-portal/news/ncaa-transfer-portal-everything-you-need-to-know/.

**Figure 4. Monthly Overview of FBS Football Student-Athlete Transfers
Academic Years 2019-2020 to 2022-2023[139]**



Confidential

70.     Named Plaintiffs have also discussed the role of third-party NIL in informing school

choices.  For example, Named Plaintiff Grant House discussed in his deposition the

interest expressed by new recruits about third-party NIL opportunities at Arizona State

University.[140]  Named Plaintiff Sedona Prince noted in her deposition that Division Street,

---

[139]   Backup materials to this report (NCAA Transfer Portal data as of January 25, 2023).

[140]   House Deposition, p. 189:9-19 ("Q.  Are you aware of any recruits that have asked about NIL specifically?  A.
        Swimming recruits that we've had on campus, yes.  Q.  And if you were to be asked by a swimming recruit

the University of Oregon's collective, is "very unique" in assisting student-athletes with securing the best third-party NIL deals, and in its connection to Nike.[141]  Prince also noted that third-party NIL opportunities through Division Street disappear when Oregon student-athletes leave for professional leagues.[142]

71.    The Rascher Report failed to consider the evidence demonstrating that student-athletes' school selection decisions are being influenced by third-party NIL payments.  This evidence indicates that student-athletes would make different school selection decisions in the Rascher Report's but-for world with broadcast-related payments and third-party NIL payments.  Determining which student-athletes would do so and where they would attend cannot be done with a common methodology.

### D.  The Rascher Report's Attempt to Preemptively Minimize the Potential Substitution Effects Is Inapt and Unsound

72.    The Rascher Report's preemptive responses to anticipated substitution effect arguments fail to address the extent to which substitution effects complicate class membership and assessment of injury and damages.

---

about NIL deals, what – what do you tell them?  A.  That ASU promotes NIL opportunities and compensations, and for athletes to reach out and connect with companies and sponsors that they would like to receive.").

[141]  Videotaped Deposition of Sedona Prince, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, January 19, 2023 ("Prince Deposition"), pp. 138:10-139:3 ("Q.  Do you agree that's a pretty prominent person to have involved Phil Knight in the collective?  THE WITNESS:  Phil Knight is, I mean, he owns Nike, so that answers the question. BY MR. SOMVICHIAN:  Q.  When you were still enrolled, Ms. Prince, were you aware of other collectives at other schools doing similar things?  A.  I was aware of other collectives, yes. I hear of them through my friends who played other sports and stuff. But not specifics. I just knew that they existed and like I've seen articles here and there. But Division Street was in my opinion very unique with Oregon.  Q.  How so?  A.  Instead of trying to profit off of players, they just tried to help." Objection omitted.) *See also* Prince Deposition, p. 139:19-23 ("Q.  And so based on that, you have at least some perception that Division Street is different than other collectives associated with other schools?  A.  Yes. Yeah, yeah. I believe so.").

[142]  Prince Deposition, pp. 248:8-14 ("Q.  Maybe I don't need to show you this one. You've already confirmed that your understanding of the Division Street agreement was that it was expressly tied to your status as a active college athlete, right?  A.  Yes. Division Street is – that's the purpose."). *See also* Prince Deposition, p. 249:18-22 ("Q.  Does that help you remember that in fact, your ability to participate in these Division Street transactions expired upon the expiration of your athletic eligibility?  A.  Yes.").

### 1. The Rascher Report Fails to Recognize That Alston Payments Do Not Support the Conclusion There Would Be No Substitution Effects

73.     First, the Rascher Report relies on evidence following the conclusion of the Alston litigation to claim that "there was no evidence of the threatened influx [of new talent] and the threatened cascade and ultimate expulsion of scholarship athletes."[143]  However, the Rascher Report fails to evaluate the differences between the Alston-related awards, and the payments proposed in the Rascher Report for this matter.  The Alston decision allowed schools to provide student-athletes with up to $5,980 each annually in education-related awards, unrelated to athletic performance,[144] which, in deposition, Dr. Rascher estimated to be worth between $40,000 and $50,000 over four years (combining cost of attendance stipends and Alston-related awards), in addition to internship opportunities.[145]  As Dr. Rascher acknowledged in deposition,[146] the Alston payments are of substantially lower magnitudes than the payments proposed by the Rascher Report, with an individual student-athlete being able to earn up to $311,900 over four years in broadcast-related

---

[143]   Rascher Report, ¶ 227.

[144]   Wittry, Andy, "The On3 Guide to Alston Awards—Education-Related Compensation," *On3*, September 20, 2022, available at https://www.on3.com/news/alston-awards-ncaa-v-alston-supreme-court-of-the-united-states-brett-kavanaugh/ ("Recently, NCAA athletes began to earn two new forms of compensation. One source is from NIL opportunities involving an athlete's name, image and likeness. The other is through Alston awards, which are education-related, financial awards provided directly by universities that can total roughly $24,000 during a four-year college career. Alston awards can provide athletes with up to $5,980 annually.").

[145]   Rascher Deposition, pp. 181:10-182:1 ("Q.  And that's – your understanding is that's generally true for a cost-of-attendance stipend as well, it's in the four-digit thousands or maybe the low five-digit thousands; correct?  A. So you add those together and you're now at five digits; right?  Q. Right. Okay.  A.  Okay. So 40-, $50,000, you know, for an athlete that wasn't available prior per – per their time there.  Q.  If you look at their time –  A. And the Alston benefits include, you know, the internship payments and the ability to get paid more money and for – for educational uses. So there's quite a bit of other benefits that the Alston case ended up allowing the schools to pay the athletes if they wanted to.").

[146]   Rascher Deposition,



payments alone.[147]  And as discussed in **Section III.C.2**, some third-party NIL deals have been reported to be $800,000 or higher, and third-party NIL opportunities vary based on the school and the affiliated collective.  Every school in every conference is also constrained by the same limit of Alston-related awards that a student-athlete can receive.  In contrast, in the Rascher Report's but-for world, schools in different conferences can pay student-athletes a different broadcast-related amount, and student-athletes can receive very different and potentially large payments as part of third-party NIL deals, which would lead student-athletes to make different decisions in the but-for world.

### 2.   The Rascher Report Fails to Examine Whether Proposed Class Members Who Attended A5 Schools Would Be Worse Off at Non-A5 Schools in the But-For World

74.    Two of the three damages classes only include A5 student-athletes—the proposed Football and Men's Basketball Class and the proposed Women's Basketball Class.[148]  The members of these two proposed classes are the A5 student-athletes that the Rascher Report claims would receive broadcast-related compensation in the but-for world.  However, the Rascher Report claims that, in the event that these proposed class members were displaced from A5 schools, they "would wind up at another highly regarded FBS football or Division I basketball program just outside of the [A5] Conference[s] and would still receive increased access to NIL money in the but-for world."[149]  While the Rascher Report claims that these displaced student-athletes would receive "increased access to NIL money in the but-for world," it does not establish that these student-athletes would be better off in the but-for world.  The Rascher Report also does not propose a methodology for identifying which proposed class members would have received the broadcast-related compensation

---

[147]   Rascher Report, Exhibit 12.

[148]   Rascher Report, ¶ 232 ("Moreover, in this case, two of the three damages classes only include athletes at schools in the Power Five Conferences (including Notre Dame football) and [] exclude any partial GIAs in 'Counter' sports.").

[149]   Rascher Report, ¶ 232 ("As a result, to the extent any class member is impacted by the Substitution Effect and begins to 'cascade' down the chain, he/she would wind up at another highly regarded FBS football or Division I basketball program just outside of the Power Five Conference and would still receive increased access to NIL money in the but-for world.").

that the Rascher Report proposes would be made to A5 student-athletes in the but-for world.

75.     For example, the Rascher Report presents no analysis of the different third-party NIL opportunities at A5 schools compared to non-A5 schools.  Although many schools are affiliated with collectives, industry participants acknowledge that A5 school collectives tend to have more funding for third-party NIL deals than non-A5 school collectives.[150]  As a result, for certain student-athletes, there would be less access to third-party NIL payments at non-A5 schools compared to an A5 school.  For example, **Table 5** summarizes third-party NIL deals reported by student-athletes to their schools, based on the data that the Rascher Report proposes to use for estimating third-party NIL damages. These data are self-reported and do not cover all third-party NIL deals,[151] and, as I discuss in **Section V.F**, do not provide a monetary value for all reported third-party NIL deals. However, taking the Rascher Report's third-party NIL transaction data as given, **Table 5** suggests that some student-athletes do not have the same opportunities for third-party NIL deals at non-A5 schools.[152]  On average, across all sports, approximately 5 student-athletes in a non-A5 school reported a third-party NIL deal, while approximately 7

---

[150] *See, for example,* Murray, Chris, "Nevada Football's NIL Collective Will Match Any Group of 5 Program, Coach Ken Wilson Says," *Nevada Sports Net*, December 2, 2022, available at https://nevadasportsnet.com/news/reporters/nevada-footballs-nil-collective-will-match-any-group-of-5-program-coach-ken-wilson-says ("There are probably some up there (at the Power 5) that obviously have a lot more, but at our level, we are starting an NIL collective that I feel like can match up with anybody on the West Coast and probably in the country, and our players will see the benefit of that starting in January."). *See also* Dellenger, Ross, "The Other Side of the NIL Collective, College Sports' Fast-Rising Game Changer," *Sports Illustrated*, August 10, 2022, available at https://www.si.com/college/2022/08/10/nil-collectives-boosters-football-tennessee-daily-cover ("Among the 65 Power 5–affiliated collectives, about half are deeply invested in using NIL and stand to raise more than $500 million in combined player funds by year's end, says Opendorse CEO Blake Lawrence.").

[151] *See, for example,* Prince Deposition, pp. 202:18-203:1 (Q. So there were deals that you did that for whatever reason weren't reported to the University? A. That's correct. Q. Was that just an omission, or did you decide not to report some, or how did that happen? A. It was just -- it was an accumulation of a few different factors, but yeah, just overwhelmed, just couldn't really figure out the system. It was complicated."); p. 207:9-19 ("Q. Okay. So you can put those away. Bottom line is that the Oregon materials aren't complete because for whatever reason or combination of reasons you didn't report every single deal to the school?  A. Yes, I fired my manager. Yeah, absolutely. My manager left my team so.  Q.  Okay. Tell me about that.  A.  I fired him.  Q. Why?  A.  He just wasn't very helpful.")

[152] As the Rascher Report notes, not all schools require student-athletes to report NIL transactions and school data on reported deals are only available through September 2022.  *See* Rascher Report, footnote 226 and backup materials (third-party NIL transaction data).

student-athletes in an A5 school reported a third-party NIL deal.  Some student-athletes on certain teams may also not have access to third-party NIL deals at non-A5 schools at all: for example, while student-athletes on A5 fencing and skiing teams reported third-party NIL deals, none of the student-athletes in these sports at non-A5 schools reported any deals.

**Table 5. Third-Party NIL Deals Reported by Schools and Student-Athletes
July 2021 to September 2022[153]**

| Sport | Number of Schools Reporting Third-Party NIL Deals | | Number of Student-Athletes Reporting Third-Party NIL Deals | | Average Number of Student-Athletes Reporting Third-Party NIL Deals per School | |
|---|---|---|---|---|---|---|
| | A5 | Non-A5 | A5 | Non-A5 | A5 | Non-A5 |

Redacted--Confidential

Notes on next page.

153                      Confidential

Redacted--Confidential

76.     The value of student-athlete third-party NIL earnings reported at non-A5 schools is also lower than those reported at A5 schools.  As shown in **Table 6,** Redacted--Confidential

**Table 6. Distribution of Reported Third-Party NIL Earnings Between A5 and Non-A5 Conferences**
**July 2021 to September 2022[154]**

| Conference | Student-Athletes Reporting at Least One Third-Party NIL Deal | Student-Athlete Third-Party NIL Earnings (USD) | | |
| --- | --- | --- | --- | --- |
| | | 25th Percentile | Median | 75th Percentile |

Redacted--Confidential

77.     Additionally, student-athletes who are displaced to different schools in the but-for world (either at non-A5 schools or other A5 schools) may be worse off due to non-monetary reasons that may offset any benefits associated with increased access to third-party NIL

---

[154]     Confidential

deals.  As Dr. Rascher recognized in his deposition, there are many factors that contribute to a student-athlete's school selection,[155] and an altered school selection in the but-for world could negatively affect student-athletes who had a third-party NIL deal but were displaced to a different school.

### 3.   The Rascher Report Fails to Recognize That an Aggregate Analysis of Available Scholarship Spots Does Not Adequately Capture Displacement Effects

78.   The Rascher Report claims that there "is far in excess of enough slack capacity to absorb the returners/newcomers and thus prevent any athletes from being pushed out of school because of this effect" without conducting a complete analysis of the changed economic incentives and assessing the magnitude of the substitution effects in the Rascher Report's but-for world.[156]  At deposition, Dr. Rascher stated that individualized inquiry would not be necessary to determine the extent of student-athlete displacement out of the A5 conferences because he would only need to assess whether "there's enough [full scholarship] slots versus are there not enough."[157]  These claims assume that, for example, if an A5 football team has 83 full-scholarship student-athletes, then this football team would have two extra spots before reaching the NCAA's mandated limit of 85 scholarships per team.  In the but-for world, the Rascher Report assumes that this team could absorb any substitution effect without displacing any existing full-scholarship student-athletes: in the but-for world, the team would provide full scholarships to the 83

---

[155]  *See, for example*, Rascher Deposition,                                    NSC

                                    ut the schools are competing on all sorts of dimensions: Cost of attendance; the school; the coach; the ability to turn pro; the training; the education; the location; the – you know, chance to play games in certain cities and home cities. I mean, there's so many elements and there's tons of research on this, as you may or may not know, showing how athletes make decisions in order to – to choose different schools. So this is just one element of – of those decisions that – that an athlete would use to make a decision.").

[156]  Rascher Report, ¶ 231.

[157]  Rascher Deposition, p. 179:9-22 ("Q.  Okay. You'd agree that you haven't tried to look on a sport-by-sport – on a sort of athlete-by-athlete basis within men's basketball or men's football or women's basketball to try to determine who those student athletes may be?  A.  I mean, I did this sort of analysis in the Alston case and there was not an issue, so to speak. It doesn't really require looking at which athlete would decide to stay or not. It's sort of a general, there's enough slots versus are there not enough. So I have not looked at each athlete in the NCAA to see if any of them are planning to stay or have stayed in the past.").

existing A5 student-athletes, one additional student-athlete who decided to stay one extra year instead of going to the NFL, and one additional non-A5 student-athlete who decided to accept their A5 scholarship offer instead.  However, the Rascher Report's claim that such an aggregate analysis would be sufficient is flawed.

79.   First, the Rascher Report did not focus its analysis on the available scholarship spots at A5 schools.  The Rascher Report references a previous analysis of available scholarship spots in non-A5 conferences, which found that "the average MAC and Sun Belt conference school has over 7 GIA slots in football that are not given to Full GIA athletes, sufficient to absorb over 150 of these hypothesized longer-attending athletes,"[158] as well as a "review of the recent Squad Lists produced in this matter […] for FBS football and for Division I basketball" that show "there are more than enough GIA slots available."[159]  However, an analysis of available scholarship spots at non-A5 schools is irrelevant to the question of whether student-athletes would be displaced out of A5 schools and would therefore not receive the Rascher Report's proposed broadcast-related payments.  Dr. Rascher only stated in his deposition that not all scholarship spots were filled at A5 schools, even though "it's quite high."[160]

80.   **Table 7** reports the average number of available scholarship spots using the NCAA Membership Financial Reporting System (MFRS) data used by the Rascher Report and following the same methodology as the Rascher Report.  The NCAA MFRS data contain financial information reported by each school's athletics department every year, and includes information related to each athletic department's revenues, expenses, and

---

[158]   Rascher Report, ¶ 231 ("As shown in *Alston*, once data was made available, the average MAC and Sun Belt conference school has over 7 GIA slots in football that are not given to Full GIA athletes, sufficient to absorb over 150 of these hypothesized longer-attending athletes.").

[159]   Rascher Report, ¶ 231 ("My review of the more recent Squad Lists produced in this matter shows the same situation to be true for FBS football and for Division I basketball, where there are more than enough GIA slots available.").

[160]   Rascher Deposition, pp. 182:21-183:6 ("Q.  Okay. Have you done any analysis of the utilization rate of scholarships per institution in the Power Five for football and men's basketball?  A.  Yes, I have. Historically it's quite high. But it's often, you know, 12 instead of 13 for men's basketball or 13 instead of 15 for women's basketball. Or 84, 83 sometimes instead – instead of 85. So I don't agree with you that it's 100 percent, but I will agree with you that it's a high number, yes.").

scholarships.[161]  The average available scholarships at an A5 school ranges between 0.9 and 3.4 for football, 0.2 to 1.3 for men's basketball, and 1.1 to 3.0 for women's basketball. The available scholarship spots at A5 schools are much lower than those at non-A5 MAC and Sun Belt Conference schools for football.

**Table 7. Average Number of Available Full-Scholarship Spots per A5 School[162]**

| Conference | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|
| **Average Available Football Spots per A5 School** | | | | | | |
| Redacted -- Counsel Only | 2.7 | 3.3 | 2.7 | 2.4 | 1.4 | 2.3 |
| | 2.1 | 1.9 | 2.1 | 1.1 | 1.3 | 0.9 |
| | 2.8 | 3.0 | 2.1 | 2.6 | 2.8 | 2.3 |
| | 2.1 | 3.4 | 2.3 | 2.1 | 3.4 | 1.9 |
| | 2.4 | 3.1 | 2.3 | 2.2 | 2.5 | 2.3 |
| **Average Available Spots per A5 School** | **2.4** | **3.0** | **2.3** | **2.0** | **2.2** | **1.9** |
| **Total Available Spots Across All A5 Schools** | **158.0** | **192.0** | **151.0** | **133.0** | **143.0** | **125.0** |
| **Average Available Men's Basketball Spots per A5 School** | | | | | | |
| Redacted--Counsel Only | 1.2 | 1.1 | 0.9 | 1.3 | 0.9 | 0.9 |
| | 0.9 | 0.6 | 1.0 | 0.7 | 0.8 | 0.9 |
| | 1.0 | 1.2 | 0.9 | 1.0 | 1.1 | 1.0 |
| | 1.3 | 1.3 | 0.8 | 1.1 | 0.5 | 0.8 |
| | 1.1 | 1.1 | 0.2 | 0.6 | 0.4 | 0.6 |
| **Average Available Spots per A5 School** | **1.1** | **1.0** | **0.8** | **0.9** | **0.7** | **0.8** |
| **Total Available Spots Across All A5 Schools** | **70.0** | **68.0** | **49.0** | **61.0** | **46.0** | **55.0** |
| **Average Available Women's Basketball Spots per A5 School** | | | | | | |
| Redacted--Counsel Only | 2.5 | 1.9 | 1.9 | 2.1 | 2.1 | 2.0 |
| | 2.1 | 1.5 | 2.5 | 2.1 | 1.4 | 1.7 |
| | 1.4 | 1.1 | 1.8 | 1.7 | 2.3 | 2.3 |
| | 2.2 | 1.8 | 2.0 | 2.5 | 2.2 | 2.1 |
| | 2.3 | 3.0 | 1.5 | 2.1 | 1.5 | 1.4 |
| **Average Available Spots per A5 School** | **2.1** | **1.9** | **2.0** | **2.1** | **1.9** | **1.9** |
| **Total Available Spots Across All A5 Schools** | **139.0** | **124.0** | **127.0** | **139.0** | **122.0** | **122.0** |

Notes on next page.

---

[161]  NCAA, "NCAA Membership Financial Reporting System," August 1, 2022, available at https://www.ncaa.org/sports/2013/11/21/ncaa-membership-financial-reporting-system.aspx ("Effective August 1, 2022: NCAA constitution, Article 2(D)(1)(c) states that all members of the NCAA must submit annually its financial data as determined by the division detailing operating revenues, expenses and capital relating to the intercollegiate athletics program."). *See also* Rascher Report, Appendix E.

[162]  Rascher Report backup materials (NCAA MFRS data).

Notes:

Redacted--Counsel Only

[2] Available full grant-in-aid scholarships are calculated as the total possible number of scholarships per conference per sport (i.e., the number of schools in the conference multiplied by the maximum allowed scholarships awarded for each sport) minus the calculated number of class members presented in Exhibit 11 of the Rascher Report. Available full grant-in-aid scholarships are divided by the number of schools in each conference or across the A5 conferences to estimate the average number of available scholarships. There are schools where the calculated number of available full grant-in-aid scholarships are negative (i.e., the Rascher Report calculates that there are more student-athletes receiving full scholarships than the sport's limit). In these instances, the number of available full scholarships is assumed to be zero.

81.    The number of student-athletes with an A5 offer but who attended non-A5 schools exceeds the total number of available scholarship spots available in the A5.  As shown in **Table 3** in **Section III.C.1,** the available 247Sports recruiting data documents that between 2016 and 2021, there were at least 2,630 football student-athletes and 601 men's basketball student-athletes who had an A5 offer but attended a non-A5 school.  In contrast, as shown in **Table 7**, there were a total of 902 available football scholarship spots and 349 available men's basketball scholarship spots between 2016 and 2021.[163]  This comparison is not perfect because the 247Sports data is based on the recruitment year (where a student-athlete could commit in 2016 to attend a school starting the 2017-2018 academic year) while the MFRS data reflects the academic year.  However, the magnitude of the difference between available scholarship spots and potential new A5 student-athletes in the but-for world disproves the Rascher Report's claim that all displaced A5 student-athletes could find another spot in the A5.  The same recruiting data for women's basketball was not available to make a similar comparison.

82.    Second, a simple analysis of open scholarship spots is not sufficient.  The Rascher Report fails to recognize that coaches may not be able to give out the full number of available scholarship spots in a given year, due to annual restrictions on the number of full-scholarship student-athletes that may be signed, or because they are looking to strategically save some spots for transfers.  For instance, prior to 2022, FBS football

---

[163]    Across 2016 to 2021, **Table 7** shows 902 open scholarships for football (158 + 192 + 151 + 133 + 143 + 125) and 349 open scholarship spots for men's basketball (70 + 68 + 49 + 61 + 46 + 55).

programs were limited to using a maximum of 25 scholarships per recruiting class.[164]
Schools may have fewer than 85 full-scholarship student-athletes on the roster at the end
of the academic year due to student-athletes graduating, quitting the sport, or leaving early
for professional opportunities.  For example, industry observers called 2020 "an
unprecedented year" for Louisiana State University ("LSU", part of the SEC), which saw
a higher than usual number of student-athlete departures from its football team:[165]  LSU
unexpectedly had 10 open scholarship spots at the beginning of the football season (due to
student-athletes entering the NFL draft despite having remaining collegiate eligibility),
which increased to 19 open scholarship spots by the end of the season (student-athletes
transferred, opted-out of playing during the Covid season, or were suspended from the
team).[166]  Furthermore, LSU faced a limit of 81 scholarship spots for the 2021 season, and
LSU's coach at the time, Ed Orgeron, stated that he was planning to hold some of the

---

[164]  Werner, Jeremy, "'I Think It's Huge': NCAA's Scholarship Limit Change Relieves Roster Crunch for Illini Football," *247Sports*, May 25, 2022, available at https://247sports.com/college/illinois/Article/Illinois-football-recruiting-Pat-Embleton-85-man-scholarship-class-limit-187915667/ ("See, the NCAA limits FBS programs to 85 scholarship players per year on its roster. But to get to that 85 number, the NCAA previously allowed teams to use a maximum of 25 initial scholarships per recruiting class. Previously, having 100 scholarships over four years worked just fine. The problem is that in college football's changing landscape, that math no longer works. Due to the transfer portal (more than a dozen scholarship players left Illinois this offseason), immediate eligibility for most transfers and a bottleneck of players due to the NCAA giving student-athletes an extra season of eligibility due to the pandemic, many teams, including Illinois, have been unable to get to 85 scholarships during the last few seasons – except by giving existing walk-ons scholarships.").

[165]  Miller, Brody, "LSU's Depleted Roster: How the Tigers Got Here and How They Can Build it Back Up," *The Athletic*, December 10, 2020, available at https://theathletic.com/2251267/2020/12/10/lsu-football-roster-management-recruiting-transfers/ ("His team has been losing, but that's one thing. But then you add in the transfers and the opt-outs and the suspensions, and the depth on this team continues thin."; "An unprecedented year put LSU in this depleted situation.").

[166]  Dixon, Shea, "LSU's Scholarship Numbers: The Present and Future," *247Sports*, December 8, 2020, available at https://247sports.com/college/lsu/LongFormArticle/LSU-Tigers-football-team-2020-scholarship-numbers-how-many-opt-outs-transfers-156419278/#156419278_1 ("The LSU football team was sitting around 75 scholarship players when fall camp began, a low number that head coach Ed Orgeron referenced multiple times this offseason given the attrition that came from the 2019 National Championship roster."; "With No. 6 Florida on tap for Saturday in Gainesville, and a home game against Ole Miss likely to follow, the Tigers enter the final stretch of the 2020 season with 66 scholarship players."; If the NCAA ruling were not in place, the Tigers would be down to 52 total scholarship players the moment the season ended. With the ability to only sign 25 new players to the team, LSU would be at a maximum of 77 players for the 2021 season – still four short of the scholarship limit in place. And that's if there was not a single underclassmen leave for the NFL draft, nobody transfers to another program and nobody is dismissed for the team before LSU kicks off the 2021 schedule.").

scholarships spots within the 25-spot annual limit for potential transfers.[167]  Assessing which A5 schools would be able to absorb displaced student-athletes given existing regulations while also evaluating which student-athletes would have changed their school selection in the but-for world cannot be done with a common methodology.

83.   Third, the Rascher Report conducted no analysis to quantify the potential substitution effects and ripple effects that would occur in its but-for world.  This analysis would be necessary to evaluate whether the available scholarship spots at A5 schools would be sufficient to prevent existing A5 student-athletes from being displaced to non-A5 schools in the but-for world due to the influx of non-A5 student-athletes into A5 schools and A5 student-athletes deferring professional opportunities.

### 4.  The Question of How Many Student-Athletes Would Defer Professional Careers Is More Complex than Suggested by the Rascher Report

84.   The Rascher Report offers only one example of student-athletes who could defer pursuing professional opportunities:  men's basketball student-athletes who could defer entry into the NBA.  The Rascher Report reasons, "[a]s an example, in the NBA, there are only 60 draft slots open each year, and commonly something on the order of 25 percent of those go to players from Europe, leaving around 45 for college draft choice."[168]  The Rascher Report further claims without support that "[m]any of these athletes are clearly leaving school in the year they choose" and claims that "[t]here simply aren't enough would-be overly optimistic second-round draft picks out there to return to college to overwhelm the number of excess scholarship slots scattered across the more than 350 Division I schools."[169]  Record evidence suggests that men's basketball student-athletes are changing their decisions to enter the NBA after factoring in third-party NIL opportunities.

---

[167]   Miller, Brody, "LSU's Depleted Roster: How the Tigers Got Here and How They Can Build it Back Up," *The Athletic*, December 10, 2020, available at https://theathletic.com/2251267/2020/12/10/lsu-football-roster-management-recruiting-transfers/ ("Orgeron: 'Obviously offensive line is a priority for us. We only have one commitment right now. Yes, there's a sense of urgency there. I do believe we're in on some big-time players. I believe we're going to have success on one or two. We may need a junior college player or maybe a graduate transfer in that area. I may have to hold a couple scholarships for graduate transfers.'").

[168]   Rascher Report, ¶ 228.

[169]   Rascher Report, ¶ 228.

Quantifying the magnitude of these changed decisions cannot be done with a common methodology, given each student-athlete's individualized circumstances.  For example:

a.  Oscar Tshiebwe, a men's basketball player at the University of Kentucky (SEC), was named SEC Player of the Year and the Associated Press Player of the Year in the 2021-2022 season.  Tshiebwe was reportedly "not satisfied with his NBA prospects at the time of the 2022 draft and realized he could make more money via NIL in college than in the NBA."[170]  Tshiebwe is reported to have earned a total of $2.75 million in NIL deals and returned to Kentucky for the 2022-2023 season.[171]

b.  Armando Bacot, a men's basketball player at the University of North Carolina (ACC), was unable to work out with NBA teams after suffering a late-season ankle injury.  Rather than risk going undrafted, Bacot decided to stay at North Carolina for his senior season, explaining that, "[t]here's not that big of a market in the NBA for a certain type of big man […], so being able to come back to college and make money is a really good option." He also indicated that he is making more in third-party NIL deals than he would have from an NBA contract this season.[172]

---

[170]  Williams, Madison, "Kentucky Star Oscar Tshiebwe to Make $500,000 in NIL Deals on Weeklong Bahamas Trip, per Report," *Sports Illustrated*, August 10, 2022, available at https://www.si.com/college/2022/08/10/oscar-tshiebwe-bahamas-nil-deals ("He averaged 17.4 points, 15.2 rebounds and 1.8 steals for the Wildcats, but was not satisfied with his NBA prospects at the time of the 2022 draft and realized he could make more money via NIL in college than in the NBA.").

[171]  Williams, Madison, "Kentucky Star Oscar Tshiebwe to Make $500,000 in NIL Deals on Weeklong Bahamas Trip, per Report," *Sports Illustrated*, August 10, 2022, available at https://www.si.com/college/2022/08/10/oscar-tshiebwe-bahamas-nil-deals ("During the seven days the team is in the Bahamas this week, Tshiebwe is expected to earn around $500,000, which brings his NIL total to $2.75 million, per sources close to The Athletic."). *See also* Adams, Griffin, "Boardroom NIL Report Card: Kentucky's Oscar Tshiebwe," *Boardroom*, March 16, 2023, available at https://boardroom.tv/oscar-tshiebwe-nil-money-deals-kentucky/ ("The 2022 Player of the Year returned to Kentucky for his senior season, and in turn, his wallet has grown.").

[172]  Eisenberg, Jeff, "Should I Stay or Should I Go? How NIL Is Making This the Year of the Big Man in College Basketball," *Yahoo*, November 10, 2022, available at https://sports.yahoo.com/should-i-stay-or-should-i-go-how-nil-is-making-this-the-year-of-the-big-man-in-college-basketball-131150873 html ("Asked how his NIL earnings so far compare to the maximum $508,891 he might have made on an NBA two-way contract this season, Bacot says by staying at North Carolina, he's making more.").

c. Hunter Dickinson, a men's basketball player at the University of Michigan (Big Ten), withdrew from the 2021 NBA draft and returned to Michigan for his sophomore season. The prospect of third-party NIL deals, particularly when associated with the Michigan brand, helped Dickinson decide to stay an extra year in college to improve his chances of being selected in the draft.[173]

85. The Rascher Report also ignores student-athletes in other sports are also making the decision to remain in school rather than pursuing professional careers due to third-party NIL opportunities. For example:

a. Bennett Williams, a football player at the University of Oregon (Pac-12), decided to not declare for the 2021 NFL draft. A combination of factors, including coaching hires, the opportunity to showcase his skills in more collegiate games, and third-party NIL deals and the particular NIL set-up at Oregon, led to Williams deciding to return to Oregon for a sixth year.[174]

b. Sports analysts and industry observers have noticed that the number of student-athletes entering into the NFL draft prior to exhausting their college eligibility ("early entrants") have decreased since student-athletes were able to benefit from third-party NIL deals: while an average of 126 student-athletes with remaining eligibility entered the NFL draft between 2019 and 2021, this number

---

[173] Givony, Jonathan, "Michigan Wolverines Center Hunter Dickinson Withdraws from NBA Draft," *ESPN*, July 6, 2021, available at https://www.espn.com/mens-college-basketball/story/_/id/31770352/michigan-wolverines-center-hunter-dickinson-withdraws-nba-draft ("I felt where teams had me going in the draft wasn't where I wanted to be,' Dickinson told ESPN via text on Tuesday."; "Dickinson said the ability for college athletes to profit off their name, image and likeness played a role in his decision to return to Michigan, which is one of the biggest brands in college sports. 'The NIL stuff had a factor into my decision,' he said. 'Being able to make a little extra money and not have to worry about my financial situation while at school is definitely a pro.'").

[174] Prehm, Matt, "Bennett Williams Details What Went into His Decision to Return to Oregon for 2022 Instead of Going to the NFL," *247Sports*, April 12, 2022, available at https://247sports.com/college/oregon/Article/Oregon-Ducks-Football-Bennett-Williams-186122550/ ("[Williams] said having the ability to earn some money while still getting better at the college level factored into his decision as well. '100 percent. NIL is going to change up the whole game, it already has been in recruiting. I think that did factor into it,' said Williams."; "Ultimately Williams says it felt right to return to Oregon based on who was coaching the Ducks, the chance to better his NFL draft stock and the vibe he had within the program from a player perspective.").

decreased to 100 early entrants in 2022 and 82 early entrants in 2023.[175]  The NFL alumni organization speculated that NIL compensation was "considered a major factor" in the decrease of early entrants.[176]

c.   Named Plaintiff Grant House, a swimmer at Arizona State University, opted to remain in school for a fifth year to pursue a master's degree rather than turn professional.  House cited the ability to monetize his NIL as one factor in his decision to extend his collegiate career.[177]

d.   Angel Reese, a woman's basketball player at Louisiana State University, has openly discussed the fact that she could make more money through third-party NIL deals as a student-athlete than if she were to enter the WNBA, and that she would consider the role of third-party NIL deals when deciding whether to enter the draft or extend her collegiate career.[178]

86.   Many more student-athletes could change their decision to enter professional sports with the availability of the proposed broadcast-related payments and additional third-party NIL payments.  The magnitude of student-athletes deferring professional careers would be

---

[175]  Tillery, Joe, "Name, Image, Likeness Resulting in Fewer NFL Draft Early Entries," *Heartland College Sports*, January 20, 2023, available at https://www.heartlandcollegesports.com/2023/01/20/name-image-likeness-resulting-in-fewer-nfl-draft-early-entries/.

[176]  Emily Coniglio, "New NIL Rules May Reduce Financial Need to Apply Early for NFL," *NFL Alumni*, January 25, 2023, available at https://www.nflalumni.org/news/new-nil-rules-may-reduce-financial-need-to-apply-early-for-nfl/ ("The reasons for the reduced numbers vary but new college and state rules regarding the ability of college athletes to earn income and be compensated for their name, image and likeness (NIL) is considered a major factor.").

[177]  House Deposition, p. 205:10-17 ("Q.  Okay.  And did the ability to still earn on your NIL play a role in your remaining another year as a grad student?  A.  There are many factors.  Q.  Was being able to still monetize on your NIL one factor of why you stayed in school another year?  A.  Yes."). *See also* House Deposition, p. 224:10-17 ("Q.  So college swimmers have an incentive to stay in school longer, as you did through grad school, the ability to monetize on their NIL?  A.  I know I've – I've found more benefit.").

[178]  Negley, Cassandra, "March Madness: How Angel Reese's 'Fresh Start' Turned into an NIL Windfall and a Final Four Trip with LSU," Yahoo! Sports, March 28, 2023, available at https://sports.yahoo.com/march-madness-how-angel-reeses-fresh-start-turned-into-an-nil-windfall-and-a-final-four-trip-with-lsu-164027703.html ("Where she won't show up anytime soon is the WNBA. The league restricts draftees to graduates and players who turn 22 the calendar year of the draft. And Reese has already declared she wants to stay in college as long as possible before continuing her legacy into the league. 'The amount of money I can make in college is way more than the amount I can make in the WNBA,' Reese said on the 'Outta Pocket' podcast this month. 'So I'm definitely going to be taking that into consideration [for sure].'").

much larger than what the Rascher Report suggests.  The Rascher Report ignored and failed to identify many of the substitution effects and ripple effects in the but-for world and its preemptive arguments seeking to minimize these potential effects are flawed.

## IV.   THE RASCHER REPORT'S PROPOSED BUT-FOR WORLD FOR BROADCAST-RELATED PAYMENTS IS NOT CREDIBLE AND PROVIDES NO BASIS FOR RELIABLY ASSESSING INJURY OR DAMAGES TO MEMBERS OF THE PROPOSED CLASSES USING A COMMON METHODOLOGY

87.   The Rascher Report asserts that "in the but-for world in which Defendants' restrictions on conferences and schools paying for college player NILs are eliminated […], competition would have compelled at least the [A5] Conferences to offer Broadcast NIL payments to their football and basketball players."[179]  This section discusses how the Rascher Report's but-for world relies on a series of unsupported assumptions and flawed economic reasoning to claim that competition for student-athletes in a labor market would lead conferences to make equal broadcast-related payments to all full-scholarship student-athletes playing the same sport within the same conference.  Accounting for the relevant economic principles demonstrates that the Rascher Report has not identified a common methodology for determining class-wide injury and damages.

### A.  Description of the Rascher Report's Proposed Methodology for Estimating Broadcast-Related Damages

88.   Although the Rascher Report claims that it models payments for "broadcast NIL,"[180] it makes clear that these payments would be made in the context of a labor market for

---

[179]  Rascher Report, ¶ 151 ("Based on my study of the discovery record, and my expertise as a sports economist, it is my opinion that, in the but-for world in which the Defendants' restrictions on conferences and schools paying for college player NILs are eliminated, but all other rules remain in place (including other NCAA rules related to restricting the compensation NCAA Division I athletes may receive from schools or conferences), competition would have compelled at least the Power Five Conferences to offer Broadcast NIL payments to their football and basketball players.").

[180]  Rascher Report, ¶ 163 ("Because the broadcast partners would want to have the certainty that they could use the NILs of all player-participants, and because the precise participation of a player in a particular game cannot be known in advance (especially given the possibility of injuries), I have constructed my damages model to embody an equal Broadcast NIL payment to each class member in each sport within each conference.").

student-athletes.[181]  Plaintiffs allege that schools seek to attract student-athletes in the relevant labor market,[182] but the Rascher Report does not focus on the role of schools and asserts that A5 conferences "would have competed to attract athletes by offering Broadcast NIL payments" and would have "rationally chosen" to enter into ex ante agreements with incoming full GIA football and men's and women's basketball student-athletes (including freshmen and transfers).[183]  The Rascher Report further claims that each conference would offer equal broadcast-related payments to full-scholarship student-athletes within each sport.[184]

89.    To estimate proposed broadcast-related damages per class member, the Rascher Report:

---

[181]   Rascher Report, ¶ 151 ("In the class-wide damages model I have formulated, competition among the Power Five Conferences and their schools for football and basketball players in the relevant labor markets leads organically to the Power Five Conferences, as the partners of the broadcast networks, entering into ex ante group-licensing deals with incoming full GIA recipients in football and men's and women's basketball (both freshmen and transfers) to compensate these college athletes for the use of their Broadcast NILs.").

[182]   Consolidated Amended Complaint, ¶ 110 ("Because Division I schools are the only [demanders] in these relevant labor markets, they have the power, when acting in concert through the NCAA and its conferences, to fix the price of labor.").

[183]   Rascher Report, ¶ 151 ("In the class-wide damages model I have formulated, competition among the Power Five Conferences and their schools for football and basketball players in the relevant labor markets leads organically to the Power Five Conferences, as the partners of the broadcast networks, entering into *ex ante* group-licensing deals with incoming full GIA recipients in football and men's and women's basketball (both freshmen and transfers) to compensate these college athletes for the use of their Broadcast NILs"); ¶ 153 ("(1) Power Five Conferences or their schools would have competed to attract athletes by offering Broadcast NIL payments); ¶ 154 ("Consistent with their behavior after the Supreme Court decision in Board of Regents, schools in the Power Five Conferences would, in the but-for world, have likely chosen to band together to address NIL issues by forming conference-level group-licensing pools, and the Power Five Conferences would have rationally chosen to make Broadcast NIL payments to members of the Football and Men's Basketball Class, and to members of the Women's Basketball Class.").

[184]   Rascher Report, ¶ 163 ("Because the broadcast partners would want to have the certainty that they could use the NILs of all player-participants, and because the precise participation of a player in a particular game cannot be known in advance (especially given the possibility of injuries), I have constructed my damages model to embody an equal Broadcast NIL payment to each class member in each sport within each conference. Such an equal sharing model would be similar to the equal sharing that takes place at the professional level of football and basketball for products and services that have group licenses. Moreover, the nature of conference-level competition makes equal sharing more likely than, say, tiered payments based on quality or individualized payments where a conference focuses its money on just a few superstars.").

a.   Aggregates the rights fees from various annual media agreements with the conference for each A5 conference and year.[185]  For example, in 2021, ▆▆NSC▆▆ conference's annual rights fees totaled $242 million.[186]

b.   Apportions the aggregated rights fees using the Desser Report's multisport allocation factor (75 percent football, 15 percent men's basketball, and 5 percent women's basketball) for each conference and year.[187]

c.   Adds in additional conference revenues for football (College Football Playoff distributions and agreements for individual football bowl games) and men's basketball (NCAA tournament distributions).[188]  For example, the Rascher



d.   Multiplies the resulting total conference revenues by the Desser Report's "value of the Broadcast NILs of the athletes" estimate of 10 percent,[190] for each sport, conference, and year, and then divides by the corresponding number of full GIA student-athletes (estimated using NCAA MFRS data) to calculate proposed broadcast-related damages per class member.[191]  For example, proposed

---

[185]   Rascher Report, ¶¶ 177-178 ("I then apportioned these rights fees to football, men's basketball, and women's basketball, using the Desser multisport allocation factor. For football, I added College Football Playoff distributions to conferences (and any other football-only game arrangements, such as Bowl games). For men's basketball, I added NCAA tournament distributions to conferences.").

[186]   Rascher Report, Appendix Exhibit C.6.

[187]   Rascher Report, ¶ 176 ("Based on his own expert analysis and decades of negotiating media agreements, Mr. Desser concludes that the split in value between football and men's and women's basketball in the media agreements with the Power Five Conference can be reasonably estimated as 75 per cent for football, 15 percent for men's basketball, and 5 percent for women's basketball."). *See also* Desser Report, §§ 17.1-17.4.

[188]   Rascher Report, ¶ 178. *See also* Rascher Report, Exhibit 10.

[189]   Rascher Report, Appendix Exhibit C.6.

[190]   Rascher Report, ¶ 170 ("Mr. Desser has studied these media agreements and has come to the conclusion, for the reasons described in his report, that the value of the Broadcast NILs of the athletes is equivalent to approximately 10 percent of the value of each of these media agreements"). *See also* Desser Report, § 14.5.

[191]   Rascher Report, ¶ 178. *See also* Rascher Report, Exhibit 11, Exhibit 12, Appendix E (summarizing the Rascher Report's use of the NCAA MFRS data).

broadcast-related damages per  NSC  class member in 2021 are estimated at $32,400 (football), $64,400 (men's basketball), and $9,500 (women's basketball).[192]

90.　As I discuss in this section, the Rascher Report's proposed methodology for estimating broadcast-related damages rests on fundamentally flawed assumptions and does not apply the economics of labor market competition.  Applying economic principles indicates that there are uninjured proposed class members and that the Rascher Report's proposed methodology is incapable of assessing injury or damages via a common methodology.

**B. The Rascher Report's Assertions of Equal Pay Across Full-Scholarship Student-Athletes Do Not Make Economic Sense**

91.　The NCAA rule envisioned in the Rascher Report would not limit the broadcast-related compensation that could be paid to an individual student-athlete and it would not require a conference to distribute its broadcast-related payments equally across its scholarship student-athletes, or across a subset of its scholarship student-athletes, such as those who play the same sport.[193]  However, despite there being no player-specific limit for broadcast-related compensation, the Rascher Report envisions a but-for world where all full-scholarship student-athletes playing football, men's basketball, or women's basketball in a given A5 conference receive the exact same broadcast-related compensation as others playing the same sport and where non-scholarship student-athletes do not receive any

---

[192]　Rascher Report, Exhibit 12.

[193]　Rascher Deposition, pp. 94:14-95:22 ("Q.  They're trying – a school that's trying to get a student athlete to come to their school versus other schools would like to be able to make the best offer possible; correct?  A.  But it has to fit within the NCAA rules.  Q.  Okay. But as we talked about earlier, the rules you're positing would prohibit compensation being distributed above 10 percent; correct?  THE WITNESS:  Above for the use for their NIL. And I'm using 10 percent as a reasonable estimate for the purposes of damages at this class certification stage. In a future world – right? – perhaps a school or a conference is petitioning to the NCAA trying to claim why it thinks it should be 11 percent. That may happen in the future. But I'm using 10 percent as a reasonable estimate for the past.  Q.  I understand that. But the 10 percent is a fixed amount for a school in a conference; correct? In your model. So for 2018, there's a fixed amount, 10 percent for the Big 10; correct?  A.  For the purposes of measuring damages, yes.  Q.  Yes. And that's the only measure you put in your report; correct?  A.  For broadcast?  Q.  For broadcast NIL, yes.  A.  I'm using 10 percent is the number I'm using in my report, yes." Objection omitted.); p. 120:11-17 ("Q.  Is there any other NCAA rule in your model that restricts how conferences can distribute that 10 percent of broadcast NIL to student athletes?  A.  NCAA rule?  Q.  Yes.  A.  No.").

broadcast-related compensation.[194]  In the Rascher Report's but-for world, for example, a full-scholarship football quarterback who is nationally recognized for their athletic performance, such as through receiving the Heisman trophy,[195] would accept and receive the exact same broadcast-related compensation as a full-scholarship defensive lineman with little to no playing time in the same conference.  Similarly, the Rascher Report assumes that a full-scholarship basketball student-athlete who is nationally recognized for their athletic performance, for example, being voted as an All-American,[196] would accept and receive the exact same broadcast-related compensation as a full-scholarship basketball student-athlete with little playing time in the same conference.  The Rascher Report's assertions of equal payments to full-scholarship student-athletes are inconsistent with the economics of competition for talent and the economics of superstars that are relevant in the context of broadcast-related payments.

### 1.  The Rascher Report Ignores the Economics of Superstars That Lead to Unequal Payments

92.  The economic literature is clear that competition for talent that attracts an audience does not lead to equal labor market payments.  Instead, such competition leads to a small subset of individuals, known as "superstars," earning substantially higher compensation than others due to their ability to effectively compete for consumers' scarce attention.[197]

---

[194]  Rascher Report, ¶ 169 ("My class-wide injury and damages model for the Broadcast NIL restrictions is thus based on my opinion that competition among the conferences in the but-for world would lead to all class members within a given conference receiving an equal Broadcast NIL payment, which would be collectively derived from the market value of the use of their Broadcast NILs.").

[195]  The Heisman trophy is a recognition given to college football's most outstanding player and is considered the most prestigious award in college football. *See* Athlon Sports, "A Breakdown of College Football's Awards," December 9, 2022, available at https://athlonsports.com/college-football/college-football-awards-breakdown-history-winners.

[196]  Wittry, Andy, "College Basketball Dictionary: 51 Terms Defined," *NCAA*, November 16, 2021, available at https://www.ncaa.com/news/basketball-men/article/2020-11-15/college-basketball-dictionary-51-terms-defined ("At the end of every college basketball season, the best players in the country will be voted as All-Americans by various media outlets, such as the Associated Press."; "The idea is that an All-America team represents an actual basketball team, so you're not going to see five point guards or five centers on an All-America team.").

[197]  Rosen, Sherwin, "The Economics of Superstars," *The American Economic Review*, Vol. 71, No. 5, 1981, pp. 845-858 ("Rosen (1981)"), at 845-846 ("The phenomenon of Superstars, wherein relatively small numbers of people earn enormous amounts of money and dominate the activities in which they engage, seems to be

Documented examples of superstars who earn extraordinary compensation for their ability to attract attention include comedians or other entertainers who appear on television and musicians, from full-time classical musical soloists to rock artists, both of which number in the low hundreds.[198]  The literature observes the existence of "[c]ountless other examples from the worlds of sports, arts and letters, and show business […]."[199,200]  The two key drivers of these unequal compensation patterns are (i) the superstar's "box office appeal," or ability to attract an audience, and (ii) technology that allows the superstar's performance to be consumed jointly at scale.[201]  In the case of collegiate athletics where events are viewed in a stadium or arena and televised, both of these conditions are readily satisfied.

---

increasingly important in the modern world."; "Countless other examples from the worlds of sports, arts and letters, and show business will be well known to readers. Still others can be found in several of the professions. There are two common elements in all of them: first, a close connection between personal reward and the size of one's own market; and second, a strong tendency for both market size and reward to be skewed toward the most talented people in the activity."; "The elusive quality of 'box office appeal,' the ability to attract an audience and generate a large volume of transactions, is the issue that must be confronted.").

[198]  Rosen (1981), p. 845; Krueger, Alan B., "The Economics of Real Superstars: The Market for Rock Concerts in the Material World," *Journal of Labor Economics*, Vol. 23, No. 1, 2005, pp. 1-30 ("Krueger (2005)"), at 6, 15 ("The top 5% of revenue generators took in 62% of concert revenue in 1982 and 84% in 2003. Surely, this is a superstar market if there ever was one." The analysis included 1,275 artists, implying that approximately 64 artists took in 84 percent of concert revenues in 2003.).  *See also* Koenig, Felix, "Technical Change and Superstar Effects: Evidence from the Rollout of Television," *IZA Institute of Labor Economics*, No. 14978, 2021, pp. 1-60, at 23-24 ("The launch of a TV station increased audiences of star entertainers and created high paid superstar entertainers. The income distribution skewed to the right, with escalating effects as we move up towards the top of the wage distribution. At the same time, the middle of the distribution is hollowed out as the share of entertainers with average incomes declines significantly, and many lesser stars lost their jobs.").

[199]  Rosen (1981), p. 845 ("Countless other examples from the worlds of sports, arts and letters, and show business will be well known to readers.").

[200]  Pitt, Ivan L., "Superstar Effects on Royalty Income in a Performing Rights Organization," *Journal of Cultural Economics*, Vol. 34, 2010, pp. 219-236, at 219 ("We found strong evidence of the so-called 'superstar effect' in which the average royalty payment made by a PRO is still dominated by extreme outcomes, and relatively few members earned a substantial share of royalty payments from blockbuster hits that have endured over time. There is little evidence of smaller niche members dominating or replacing the 'superstars.'"); 221 ("In a lengthy survey, Connolly and Krueger (2005) found that 'superstars' received the lion's share of live concert revenue. Walls (2005) found that the motion-picture market has a winner-take-all property where a small proportion of successful films earn the majority of box-office revenue."). *See also* Krueger (2005).

[201]  Rosen (1981), pp. 846-847 ("The elusive quality of 'box office appeal,' the ability to attract an audience and generate a large volume of transactions, is the issue that must be confronted."; "The implied scale economy of joint consumption allows relatively few sellers to service the entire market. And fewer are needed to serve it the more capable they are. When the joint consumption technology and imperfect substitution features of preferences are combined, the possibility for talented persons to command both very large markets and very large incomes is apparent.").

93.     The literature on compensation in sports has provided clear evidence of unequal payments based on the economics of superstars.  As explained in this literature, "[t]he stars attract the public and therefore also commercial exploitation.  […]  People want to see not only good basketball, but good basketball played by Michael Jordan."[202]  The resulting distribution of compensation in professional sports tends to cluster around star players.[203]  Several academic papers provide empirical measures of players' talent by estimating the marginal contribution of individual players to a team's revenues, and these estimates have varied greatly across players.[204]  These results are perhaps unsurprising, given that some of the groundbreaking economic literature in this field explained that in the competition for talent, a team "will be prepared to pay a Babe Ruth a fabulous salary, simply because there are no very good substitutes for him, and he is worth so much more to the team than any other player."[205]

94.     Consistent with this literature, documented examples of athlete compensation demonstrate unequal payments.  For example, the distribution of professional salaries between 2022 and 2025 on the NBA's Los Angeles Lakers shows that two players have signed contracts

---

[202]   Borghans, Lex and Loek Groot, "Superstardom and Monopolistic Power: Why Media Stars Earn More Than Their Marginal Contribution to Welfare," *Journal of Institutional and Theoretical Economics*, Vol. 154, No. 3, 1998, pp. 546-571 ("Borghans and Groot (1998)"), at 558 ("The stars attract the public and therefore also commercial exploitation. Superstars not only carry out their media task, they also become the symbol of the activity. People want to see not only good basketball, but good basketball played by Michael Jordan."). *See also* Borghans and Groot (1998), p. 558 ("Clubs are of course willing to pay a huge salary to lure a star into the team, and a star such as the soccer player Maradona is able to increase the income of his club enormously.").

[203]   *See, for example,* Lucifora, Claudio and Rob Simmons, "Superstar Effects in Sport: Evidence From Italian Soccer," *Journal of Sports Economics*, Vol. 4, No. 1, 2003, pp. 35-55, at 51 ("This article has shown how superstar effects on pay, along the lines proposed by Rosen (1981), can be specified and estimated in professional sport, even where detailed individual performance measures are largely absent."; "Our results are consistent with Rosen's (1981) theory of superstars, in which a relatively small number of performers dominate their industry and earn a disproportionate share of revenues.").

[204]   Scully, Gerald W., "Pay and Performance in Major League Baseball," *The American Economic Review*, Vol. 64, No. 6, 1974, pp. 915-930, at 922 ("The outstanding characteristics of these estimates are their sheer magnitude. Even mediocre players contribute in excess of $200,000 to team revenues, while star players have [Marginal Revenue Products] several times that amount."); Atkinson, Scott, et al., "Revenue Sharing as an Incentive in an Agency Problem: An Example from the National Football League," *RAND Journal of Economics*, Vol. 19, No. 1, 1988, pp. 27-43, at 39 ("Estimated marginal revenue products from gate receipts for the rushing units range from $46,139 to $152,660 with a mean of $104,890.").

[205]   Rottenberg, Simon, "The Baseball Players' Labor Market," *Journal of Political* Economy, Vol. 64, No. 3, 1956, pp. 242-258, at 253.

guaranteeing over $78 million in compensation, three players have signed contracts guaranteeing over $10 million, and the remaining team members have contracts guaranteeing between $1.6 million and $6.5 million.[206]  This pattern of unequal payments holds for first-year rookies in professional leagues as well.  In both the NBA and NFL, drafted players' starting salaries for a set number of years depend on a predetermined rookie wage scale, in which the top draft pick makes the most money, with each subsequent pick earning less.[207]  For example, in the 2022 NBA draft, Paolo Banchero was the number one pick in the first round and secured a first-year contract of $11.1 million.  In contrast, Mark Williams was the 15th pick in the first round and secured a first-year contract of $3.7 million, while Peyton Watson, the last pick in the first round, secured a first-year contract of $2.2 million.[208]

95.    The economics of superstars is key to media markets.  Consumers have a finite amount of time and attention to allocate between different activities and media,[209] and the proliferation of online content has intensified the competition for consumers' time and attention.[210]  In the Rascher Report's but-for world, broadcast-related payments are one

---

[206]    Basketball Reference, "Los Angeles Lakers Team Payroll," available at https://www.basketball-reference.com/contracts/LAL.html, accessed on March 15, 2023.

[207]    Dunn, Sam, "NBA Rookie Contracts & 2022-23 Salary Breakdown," *Boardroom*, July 10, 2022, available at https://boardroom.tv/nba-rookie-contracts-salary-scale-2022-23 ("With that in mind, from Paolo Banchero and Chet Holmgren to Jabari Smith and Keegan Murray and beyond, let's provide a full NBA rookie contracts breakdown for this year's first-round draft picks – including exact rookie scale salary numbers for each player's debut season."); Corry, Joel, "Agent's Take: 2022 NFL Rookie Contract Projections for Key Round 1 Picks, With a Rookie Wage Scale Explainer," *CBS Sports*, May 5, 2022, available at https://www.cbssports.com/nfl/news/agents-take-2022-nfl-rookie-contract-projections-for-key-round-1-picks-with-a-rookie-wage-scale-explainer/ ("There's a league wide limit on the total amount of compensation for rookies with specific salary parameters for each draft slot. Teams have maximum and minimum amounts that can be spent on their picks based on draft position.").

[208]    Spotrac, "NBA 2022 Draft Tracker," available at https://www.spotrac.com/nba/draft/, accessed on March 17, 2023.

[209]    Evans, David S., "The Economics of Attention Markets," 2020, pp. 1-41, at 18 ("Of course, consumers have a finite amount of time and must allocate it across competing uses.").

[210]    Falkinger, Josef, "Limited Attention as a Scarce Resource in Information-Rich Economies," *The Economic Journal*, Vol. 118, No. 532, 2008, pp. 1596-1620, at 1596 ("The paper shows that in an information-rich economy IT-progress, globalization or distribution of information through media channels increase the level of attention seeking activities and raise the minimal signal strength required to be attended by consumers.").

"currency" used in the competition for valuable student-athletes in the labor market.[211] Talented student-athletes enhance the value of media broadcasts because they can hold consumer attention, which, as a general principle, is scarce and difficult to capture.[212]  The Rascher Report agrees that talented student-athletes increase a conference's broadcast value because the "[f]ailure to [make broadcast-related payments to student-athletes] would have allowed rival conferences to attract those college athletes that would add the most value through the use of their NIL to the conference's media rights agreements."[213]

### 2. Competition for Student-Athletes Would Result in Unequal Broadcast-Related Payments, with Superstars Receiving a Disproportionate Share

96. In modeling equal payments to student-athletes, the Rascher Report ignores the economic principles of competition for talent in a labor market, when that talent is valued for its

---

[211] Rascher Deposition, pp. 22:11-23:3 ("Q.  So your assumption is that the other rules, besides the ones you've assessed in this case, remain unchanged; correct?  A.  So it's not just an assumption, though. If you look at the – the nature of competition for athletes, and we've seen this over the last, you know – what year – the last 15 years in these various lawsuits – actually, the last 20 – 20 years in these lawsuits – each time there's a change, right? There's competition up to those amounts. And so I'm – I'm looking at that when I'm doing the NIL analysis. I'm looking at the nature of competition for the athletes. And NIL is just one of the currencies that in the – in the athlete labor market that the athletes are allowed to be paid – or would be allowed to be paid in the but-for world.").

[212] Mintzer, Ally, "Paying Attention: The Attention Economy," *Berkeley Economic Review*, March 31, 2020, available at https://econreview.berkeley.edu/paying-attention-the-attention-economy/. *See also* Rascher Deposition, pp. 233:21-234:14 ("Q.  And those moments can occur within a season; right? Someone may start every game in college basketball and then hit a shot to win the NCAA tournament and they'll be much more popular after that shot as they were the rest of the year; correct?  A.  Yes. And those are necessarily rare, in the sense that – practically by definition – for something to sort of capture people's attention. Not everything can capture people's attention all at the same time. So the incidences of – of a particular situation where – where, you know, a gymnast gets a perfect 10 and people even hear it and notice it and perhaps watch a video of it are not very common practically by definition because other things are happening too in people's lives; right? So there's only so many things that can sort of rise up to become popular.").

[213] Rascher Report, ¶ 154.  *See also* Rascher Report, ¶ 66 ("[T]here would be sufficient competition for athletes' labor to cause the Power Five Conferences to share broadcast revenues with college athletes through NIL payments as a means of competing among themselves and against other FBS/Division I conferences to attract athletes to join their football and basketball broadcasts."); ¶ 157 ("The Power Five Conferences have an incentive to recruit watchable athletes to every one of their schools in order to produce the best media product."); ¶ 152 ("Even if there were no legal requirement to pay for [student-athlete NIL] tied to a specific IP right, payments would still be made by the Power Five Conferences to attract the athlete to choose one conference over a rival conference."); ¶ 154 ("As a result of having all high-demand athletes being drawn away, a Power Five Conference would risk putting on a low-quality television product and earning lower media revenues in the long run. The better option is to earn higher revenues by attracting more watchable talent by agreeing to share a portion of the higher revenues with that talent, rather than getting to keep 100 percent of a smaller pie.").

ability to attract an audience.  If there is competition in a labor market for superstars, both economic theory and empirical economic evidence demonstrate that broadcast-related payments to full-scholarship student-athletes playing the same sport within the same conference would not be equal and would not necessarily be made to all full-scholarship student-athletes.

97.   The Rascher Report's insistence that labor market competition in the but-for world "would have resulted in equal payments for the use of class members' Broadcast NILs within each conference/sport" is striking given that the Rascher Report recognizes the underlying competitive dynamics that would in fact lead to unequal payments.[214]  For example, the Rascher Report explains that the competition for student-athletes through broadcast-related payments derives from the potential of those student-athletes to improve the quality of the broadcast by increasing fan engagement and revenue.[215]  Further, the Rascher Report recognizes the incentive for "rival conferences to attract those college athletes that would add the most value through the use of their NIL to the conference's media rights agreements."[216]  Yet despite this recognition of the importance of student-athletes who add the "most value," the Rascher Report merely concludes that as a result of competition, A5 conferences would have "rationally chosen" to make broadcast-related payments to all full-scholarship student-athletes in the proposed classes.[217]  The failure of

---

[214]   *See* Rascher Report, § 7.2.2 ("*Ex ante* conference competition would have resulted in equal payments for the use of class members' Broadcast NILs within each conference/sport").

[215]   Rascher Report, ¶ 152 ("When conferences and schools expect that the NILs of athletes will improve the quality of the broadcasts (increasing fan engagement and revenue), there is an incentive to attract those athletes through Broadcast NIL payments.").

[216]   Rascher Report, ¶ 154 ("Failure to [make Broadcast NIL payments] would have allowed rival conferences to attract those college athletes that would add the most value through the use of their NIL to the conference's media rights agreements. As a result of having all high-demand athletes being drawn away, a Power Five Conference would risk putting on a low-quality television product and earning lower media revenues in the long run. The better option is to earn higher revenues by attracting more watchable talent by agreeing to share a portion of the higher revenues with that talent, rather than getting to keep 100 percent of a smaller pie.").

[217]   Rascher Report, ¶ 154 ("Consistent with their behavior after the Supreme Court decision in *Board of Regents*, schools in the Power Five Conferences would, in the but-for world, have likely chosen to band together to address NIL issues by forming conference-level group-licensing pools, and the Power Five Conferences would have rationally chosen to make Broadcast NIL payments to members of the Football and Men's Basketball Class, and to members of the Women's Basketball Class. Failure to do so would have allowed rival conferences

the Rascher Report to take the notion of competition to its logical conclusion of benefitting superstar full-scholarship student-athletes substantially more than non-superstar full-scholarship student-athletes demonstrates the contrived nature of the Rascher Report's conclusion of "equal payments."

98.   This flaw in the Rascher Report is surprising because literature cited in the Rascher Report suggest that there would be unequal payments, with more talented student-athletes being more highly compensated.[218]  This literature recognizes that talent is unequally distributed across professional athletes and that superstars embody greater "units of talent."[219]  Because wages paid to professional athletes are commensurate with units of talent,[220] superstars earn greater compensation than other athletes.  Similarly, Dr. Rascher's publication titled "A Model of a Professional Sports League" emphasizes the link between talent and compensation, referencing a "wage rate per unit of talent."[221]

---

to attract those college athletes that would add the most value through the use of their NIL to the conference's media rights agreements.").

[218]  *See* Rascher Report, footnote 156.

[219]  Andreff, Wladimir, "Some Comparative Economics of the Organization of Sports: Competition and Regulation in North American vs. European Professional Team Sports Leagues," *The European Journal of Comparative Economics*, Vol. 8, No. 1, 2011, pp. 3-27 ("Andreff (2011)"), at 10 ("It is assumed that a number of units of homogenous talent are embodied in each player, more in superstars than in other players.").

[220]  Fort, Rodney and James Quirk, "Cross-Subsidization, Incentives, and Outcomes in Professional Team Sports Leagues," *Journal of Economic Literature*, Vol. 33, No. 3, 1995, pp. 1265-1299, at 1271 ("Costs for the team are taken to be simply $ct^i$, where c is the per-unit price of talent determined in the labor market."); Peeters, Thomas, "Profit-Maximizing Gate Revenue Sharing in Sports Leagues," *Economic Inquiry*, Vol. 53, No. 2, 2015, pp. 1275-1291, at 1279 ("Talent is available at constant marginal cost."; "Clubs either make a high investment at cost h or a low investment at cost l. These talent investments translate into win probabilities given by a simple contest success function"); Andreff (2011), p. 11 ("In the team cost function, $s$ is the salary per unit of talent and $c_i^0$ represents a fixed cost (stadium, management). The equilibrium wage is provided by the invisible hand or a Walrasian auctioneer. Team $i$ augments its talent recruitment until marginal revenue of talent is equal to its marginal cost, the exogenous equilibrium unit wage."); El-Hodiri, Mohamed and James Quirk, "An Economic Model of a Professional Sports League," *Journal of Political Economy*, Vol. 79, No. 6, 1971, pp. 1302-1319 ("El-Hodiri and Quirk (1971)"), at 1306 (denoting a "wage rate per unit of playing skills per period paid by team i").

[221]  Rascher, Daniel A., "A Model of a Professional Sports League," *Advances in the Economics of Sport*, Vol. 2, 1997, pp. 27-76 ("Rascher (1997)"), at 35 ("There would be one wage per unit of talent where the market labor demand curve crossed the market labor supply curve."); 38 ("The wage rate per unit of talent will equal the total marginal revenue product of talent plus the weighted marginal winning product of talent realized by team *i*." Formula omitted.).

### C. The Rascher Report's Arguments in Favor of Equal Payments Across Full-Scholarship Student-Athletes Are Flawed

99.    The Rascher Report offers several arguments specific to the context of a television broadcast in an attempt to justify its conclusion of equal payments to all full-scholarship student-athletes playing the same sport in the same conference.  All of these arguments are flawed when accounting for the principles of labor market competition.

#### 1. The Rascher Report's Assertions about the Symmetry of Importance for All Team Members for Broadcasts Are Incorrect and Do Not Justify Equal Payments

100.    The Rascher Report reasons that "[f]or the purpose of producing a broadcast, or any other group-licensed activity where having the entire team is important, no specific athlete is the marginal athlete, or conversely, every athlete could be the last athlete into the pool."[222] But the relevant broadcast margin here is not which student-athlete is "marginal" to the existence of a game broadcast.  Rather, the relevant margin is the difference in viewership a conference broadcast can achieve when a given student-athlete chooses to attend one conference over a competing conference.  That is what drives differences in the value of the broadcast.  It is this margin that would lead to larger broadcast-related payments to certain student-athletes than to others.  Furthermore, the Rascher Report proposes zero payments to walk-on (non-scholarship) student-athletes, who could also be the "last athlete into the pool," contradicting the Rascher Report's reasoning related to the marginal student-athlete.

101.    The Rascher Report states that "[e]ven if the athletes are not playing in games, interviews will be needed and carefree moments will be caught on the bench […]."[223]  This may be so, but it does not mean that a conference has an incentive to compete with other conferences for highly substitutable backup players and to pay these highly substitutable

---

[222]    Rascher Report, ¶ 159.

[223]    Rascher Report, ¶ 161 ("Even if the athletes are not playing in games, interviews will be needed and carefree moments will be caught on the bench, and prior to the season or prior to the athlete enrolling at a school (when *ex ante* offers are made), no one knows for sure which athlete will have more or less playing time in a given season.").

backup players the same broadcast-related compensation as a superstar quarterback.  The Rascher Report further appears to agree that not all student-athletes would need to receive broadcast-related compensation to appear in interviews or carefree moments on the bench because walk-on (non-scholarship) student-athletes would not receive any such compensation in the Rascher Report's but-for world.  Therefore, there is no support for the Rascher Report's claim that this factor "further evens out the base NIL value of everyone in the pool […]."[224]  Dr. Rascher explained that this outcome "fits with the economics of walk-ons" because their "position in the labor market [is] less – you know, they're not able to get a scholarship."[225]  In doing so, Dr. Rascher drew a direct link between a student-athlete's desirability in the labor market and the magnitude of broadcast-related compensation that they would receive in the but-for world.  This link is appropriate and would also be relevant to the compensation of and competition for full-scholarship student-athletes.  Because the labor market desirability of certain full-scholarship student-athletes far exceeds that of other full-scholarship student-athletes playing the same sport in the same conference, any economically sensible rendering of competition for student-athletes will result in unequal broadcast-related payments to these student-athletes in the but-for world, with not all full-scholarship student-athletes necessarily receiving broadcast-related payments.

### 2. The Rascher Report's Assertions about the Unpredictability of Superstar Status Are Incorrect and Do Not Justify Equal Payments

102.    The Rascher Report suggests that a student-athlete's ability to reach superstar status is unpredictable ex ante.[226]  This is not the case.  Prior to initial collegiate enrollment, future

---

[224]   Rascher Report, ¶ 161 ("This further evens out the base NIL value of everyone in the pool and it explains why each conference's broadcast partner sees positive value from the conference acquiring the ability to use the Broadcast NILs of all class members.").

[225]   Rascher Deposition, p. 81:11-22 ("Q.  Is there a reason why you didn't use the roster method?  A.  I think – I don't have a – some of it is I think access to information in terms of who's – you know, how many people are on different rosters. But, no, I don't have a – this is, I think, a fair and reasonable way to do it and I think it fits with the economics of walk-ons, let's call them walk-ons, players who don't have a scholarship. Their sort of position in the labor market as being less – you know, they're not able to get a scholarship.").

[226]   Rascher Report, ¶ 161 ("Moreover, prior to the season or prior to the athlete enrolling at a school (when *ex ante* Broadcast NIL offers would be made), it is not certain which athlete will be the starter at each position,

student-athletes in football and basketball are rated and ranked in accordance with their prospects of success at the collegiate level.[227]  For example, Bronny James, son of NBA star LeBron James, has garnered extensive recruiting attention as he nears his collegiate commitment decision.[228]  James was extended two "standing offers" from Duke and the University of Kentucky at the age of 11,[229] and scouts are already expressing interest in

---

especially for future seasons, nor can injuries be predicted that may lead to an athlete for whom a redshirt year was planned, needing instead to step in and lead the team to victory."). *See also* Rascher Deposition, pp. 36:16-37:11 ("Q.  And is it your opinion that [the starting quarterback for Georgia, Stetson Bennett's] NIL is more valuable to the broadcaster than a fourth-string offensive lineman who sits on the bench?  A.  Well, the – the broadcaster needs – they don't know what's going to happen. So the broadcaster needs everyone's NIL. And certainly at the time that the school's recruiting an athlete – right? – it's – it's not known exactly which athletes are going to play more.  So we see this in the contracts between the broadcasters and the conferences. They – they want to make sure that everyone – that all the NILs are – are there and that the broadcaster's indemnified. And so essentially that uncertainty especially coming out of high school sort of leads to a situation where the – in the way that I've modeled it. I'm not disagreeing with you that someone might appear more on a television – in a game than someone else obviously.").

[227]  Dr. Rascher also referenced these ratings in his deposition. *See, for example*, Rascher Deposition, pp. 43:13-25 ("Q.  And they are not currently paying – they and the schools are not making any direct payments to the student athletes for that NIL; correct?  A.  The student athletes are all currently getting paid the same amount, as I talk about in my model, but it happens to be zero. And they get paid the same amount for their scholarships, sort of back to your point a little bit. You know, the five-star and the two-star, if they're both on full scholarship, are essentially getting the same amount.  And that's because there are rules that – that are in place that limit the amount that the schools can pay them."); 190:8-191:3 ("Q.  Okay. Where is that analysis?  A. Some of that is – so two places. Some of that would be the – depending on the timing of when I did it in the Alston case – because I don't remember exactly what those dates are. But secondly, I sometimes do an analysis of the recruiting – the correlation between recruiting seasons; right? I sort of show it in class sometimes. To look at the lack of competitive balance in college sports and how it's been increasing over time and you get correlations that are up over 90 percent. When you rank the schools by their recruiting classes, it's the same schools each year, you know, get into that. So that's an analysis of the offers that these athletes are getting from 24/7 sports and from the other source whose name's escaping me right now where you can get the information for the stars and sort of see which schools and which conferences – which schools in which conferences they're getting offers from.").

[228]  Boone, Kyle, "Bronny James Recruiting Updates: Tracking LeBron James' Oldest Son And Where He Will Be Playing in 2023-24," *CBS Sports*, February 14, 2023, available at https://www.cbssports.com/college-basketball/news/bronny-james-recruiting-updates-tracking-where-lebron-james-oldest-son-will-be-playing-in-2023-24/ ("It's been a long and winding recruitment for Bronny with uncertainty not only about where he will land in college but also if he would go to college at all – there was some speculation he would consider turning pro out of high school at one point – but his future is beginning to crystalize of late and he stands as the highest-rated uncommitted recruit still on the board for the 2023 cycle to add some flair to end his decision-making process.").

[229]  Zucker, Joseph, "LeBron James Jr. Reportedly Has Scholarship Offers From Duke, Kentucky," *Bleacher Report*, June 20, 2016, available at https://bleacherreport.com/articles/2647434-lebron-james-jr-reportedly-has-scholarship-offers-from-duke-kentucky ("LeBron James Jr. may be only 11 years old, but he's reportedly already receiving attention from some of the best college basketball programs in the country. ESPN.com's Dave McMenamin and Brian Windhorst reported Monday that LeBron Jr. has 'standing scholarship offers' from the Duke Blue Devils and Kentucky Wildcats.").

his younger brother, Bryce James.[230]  Similarly, Arch Manning, the number one football recruit in 2022 and the nephew of former NFL star quarterbacks Peyton Manning and Eli Manning,[231] received significant recruiting interest as a 15-year-old following an outstanding season at quarterback as a freshman in high school.[232]

103.    Highly touted prospects are also featured by broadcasters when marketing the upcoming season and games.  For example, Trevor Lawrence, the top ranked quarterback recruit in his class, committed to Clemson as a junior in high school.[233]  Prior to his first regular season game at Clemson, the ACC Digital Network touted Lawrence in videos, including the feature "Who Is Clemson Freshman QB Trevor Lawrence?" and a highlight in "Clemson Football 2018 Preview."[234]  Networks continued to promote Lawrence through the end of the season, such as through the front page article "Freshman Trevor Lawrence

---

[230]  Boone, Kyle, "Bronny James Recruiting Updates: Tracking LeBron James' Oldest Son And Where He Will Be Playing in 2023-24," *CBS Sports*, February 14, 2023, available at https://www.cbssports.com/college-basketball/news/bronny-james-recruiting-updates-tracking-where-lebron-james-oldest-son-will-be-playing-in-2023-24/ ("Bronny's younger brother, Bryce Maximus James, who is one of two of LeBron's sons and one of his three offspring, has emerged over the last year as a potentially interesting long-term prospect alongside Bronny.").

[231]  Khan Jr., Sam, "Inside the Texas Spending Blitz That Hooked Arch Manning and a No. 2 Recruiting Class," *The Athletic*, September 16, 2022, available at https://theathletic.com/3598484/2022/09/16/texas-football-recruiting-weekend-arch-manning/ ("The nation's No. 1 overall recruit and scion of the Manning family made three unofficial visits to the school in a nine-month span, but when he arrived in Austin the weekend of June 17, it was different.").

[232]  Kamrani, Christopher, "How to Land Arch Manning? Dig Into Peyton's and Eli's 1990s Recruitment," *The Athletic*, May 11, 2022, available at https://theathletic.com/3252703/2022/05/11/arch-manning-recruitment-peyton-manning-eli-manning/ ("As a 15-year-old starter, the first freshman to start at Newman in 40 years, he threw for 2,438 yards, 34 touchdowns and six interceptions and had a 65 percent completion rate. The college football world knew of Arch early, as videos of the Gen Z Manning version slinging the ball around took off on the internet when he was just a middle-schooler. In the matter of months, he'd be the most talked-about, tweeted-about, rumored-about high school player in the country for the next several years.").

[233]  Hamilton, Gerry, "Clemson Lands Trevor Lawrence, No. 1 QB Recruit of 2018," *ESPN*, December 16, 2016, available at https://www.espn.com/college-sports/recruiting/football/story/_/id/18291751/clemson-tigers-land-trevor-lawrence-no-1-qb-recruit-2018 ("On Thursday night, the Tigers secured a commitment from another star quarterback from the Peach State, landing the No. 3-ranked junior Trevor Lawrence. The nation's No. 1-ranked 2018 quarterback committed to Clemson over Georgia less than a week after leading Cartersville High to the Class 4A state championship.").

[234]  ACC Digital Network, "Who Is Clemson Freshman QB Trevor Lawrence," *YouTube*, May 3, 2018, available at https://www.youtube.com/watch?v=-UbUYiqhmxo; ACC Digital Network, "Clemson Football 2018 Preview," *YouTube*, July 23, 2018, available at https://www.youtube.com/watch?v=DIN9Laj4418. Lawrence was also featured after his first regular season appearance. *See also* ACC Digital Network, "Clemson QB Trevor Lawrence Throws 3 TD In Tigers' Debut," *YouTube*, September 1, 2018, available at https://www.youtube.com/watch?v=hk3oFJtkkaM.

*Confidential*

thrills" on the CBS Sports homepage on the day before the College Football Playoff National Championship.[235]

104. After enrollment, student-athletes accumulate achievements or disappointing performances that are indicative of their potential and success in achieving superstar status.  In college football, for instance, in addition to the Heisman trophy, which is given to the most outstanding player and is considered the most prestigious award in college football, awards are also given to top players by position and by other demographics, such as non-scholarship student-athletes or class year.[236]  For example, Lamar Jackson, the quarterback for Louisville from 2015 to 2017, won multiple awards recognizing him as the player of the year in 2016, including the Heisman Trophy, Maxwell Award, Walter Camp Award and Associated Press Player of the Year.[237]

105. As a result, at any stage where a student-athlete might consider joining one conference over another—either in initial enrollment or via transfer—they have knowledge of objective statistics, ratings, and achievements that indicate their potential for attracting marginal viewership to a conference broadcast.  The Rascher Report's but-for world assumes that conferences, schools, and student-athletes would fail to take advantage of this information, even though both have strong economic incentives to do so.[238]  For

---

[235]  CBS Sports, "NCAA FB," December 31, 2018, available via the Wayback Machine at https://web.archive.org/web/20181231061652/https://www.cbssports.com/college-football/. The homepage also features the article "It's Bama-Clemson IV for the title," which features Lawrence's image in a video at the beginning of the article. *See* Fornelli, Tom, "College Football Playoff National Championship: Alabama vs. Clemson IV Set for 2019 Title Game," *CBS Sports*, December 30, 2018, available via the Wayback Machine at https://web.archive.org/web/20181231102111/https://www.cbssports.com/college-football/news/college-football-playoff-national-championship-alabama-vs-clemson-iv-set-for-2019-title-game/.

[236]  Athlon Sports, "A Breakdown of College Football's Awards," December 9, 2022, available at https://athlonsports.com/college-football/college-football-awards-breakdown-history-winners.

[237]  Axson, Scooby, "Lamar Jackson Declares for NFL Draft," *Sports Illustrated*, January 5, 2018, available at https://www.si.com/college/2018/01/05/lamar-jackson-declares-nfl-draft ("Jackson burst on the college football scene in 2016, throwing for 3,543 yards and 30 touchdowns and adding 1,571 yards on the ground and 21 scores. He won the Reisman Trophy, Maxwell Award, Walter Camp Award and Associated Press Player of the Year during his record setting season.").

[238]  Rascher Deposition, p. 101:12-23 ("Q.  Right. But in your model, just using 2018, for example, you're a student athlete coming into a particular institution in that year, they're not asking for a different amount of broadcast NIL based on their own perceived value; correct?  THE WITNESS:  They're being offered the conference's

example, the fact that a top basketball recruit could suffer a career-ending injury in their first collegiate game does not imply that, ex ante, this player would be as equally valuable to a school or conference as a full-scholarship student-athlete who is expected to sit on the bench for the initial years of their collegiate career. Recognizing this, the top recruit has every incentive to try to procure a higher broadcast-related payment in the labor market. Therefore, there is no support for the Rascher Report's claim that the above uncertainties "further even[] out the base NIL value of everyone in the pool [...]."[239]

106.   The Rascher Report justifies the claim that ex ante talent is unpredictable by saying that "many players who enter college without much acclaim eventually go on to be stars" and provides some examples.[240]  Again, this does not change the fact that, from an ex ante perspective, some recruits and potential transfers are more valuable than others in their ability to attract viewer attention.  This does, however, explain why some student-athletes would not want to sign contracts at the outset of their collegiate careers that fix their broadcast-related compensation levels for the entirety of their collegiate careers, contrary to the Rascher Report's assumption that student-athletes would "sign the group license at the same time that they are doing paperwork for their full GIA and college entrance."[241] An unheralded recruit who is confident in their own ability to become a superstar but is offered little to no broadcast-related compensation would not want to be locked into a relatively low level of compensation for their entire collegiate career.  Yet even if an unheralded recruit did sign such a contract and, say, unexpectedly became a superstar in

---

offer and they're making decisions based on that and then, of course, all the other aspects we've talked about that they make decisions based on." Objection omitted.).

[239]   Rascher Report, ¶ 161 ("Even if the athletes are not playing in games, interviews will be needed and carefree moments will be caught on the bench, and prior to the season or prior to the athlete enrolling at a school (when *ex ante* offers are made), no one knows for sure which athlete will have more or less playing time in a given season. This further evens out the base NIL value of everyone in the pool and it explains why each conference's broadcast partner sees positive value from the conference acquiring the ability to use the Broadcast NILs of all class members.").

[240]   Rascher Report, ¶ 162.

[241]   Rascher Report, ¶ 158 ("My model also assumes that the Power Five Conferences would act rationally to enter into Broadcast NIL agreements at the time that college athletes commit to a school within a conference. This timing is likely to be driven by competition in recruiting, and it would limit transaction costs as the college athletes can sign the group license at the same time that they are doing paperwork for their full GIA and college entrance.").

their sophomore season, a different school in a different conference would have an incentive to attract that now-superstar to transfer.  Recognizing this, the school or conference that initially contracted with the student-athlete when they were an unheralded recruit would have an incentive to update that contract to retain the now-superstar by offering a more lucrative broadcast-related payment.  In this way, the Rascher Report's vision of how ex ante contracts would work is implausible in the context of conference competition for scarce talent.

### 3.  The Rascher Report's Analogies with Professional Sports Are Uninformative to Justify Equal Payments

107.   The Rascher Report states that "equal sharing […] takes place at the professional level of football and basketball for products and services that have group licenses."[242]  First, this is not universally the case.  For example, in professional football, unequal sharing takes place for certain products and services that have group licensing, such as jersey sales.[243]  In 2018, New England Patriots quarterback Tom Brady earned $2.35 million from the sale of jerseys, video games and trading cards, more than any other players in the National Football League. In contrast, Baltimore Ravens quarterback Lamar Jackson only earned $257,369 in royalty payments the same year.[244]  Second, this comparison to certain

---

[242]   Rascher Report, ¶ 163 ("Such an equal sharing model [i.e., the Rascher Report's proposed damages model] would be similar to the equal sharing that takes place at the professional level of football and basketball for products and services that have group licenses.").

[243]   Expert Report of Robert Thompson, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, April 28, 2023, ("Thompson Report"), p. 41 ("In some instances, the royalties from licenses entered into by the players' associations are shared equally among all union members, but the vast majority of the royalties are allocated to the specific players whose NIL is licensed.").

[244]   Kaplan, Daniel, "How Tom Brady is the King of Player Royalties and Why Odell Beckham Jr. is Also Known as 'Royalty Only'," *The Athletic*, June 17, 2019, available at https://theathletic.com/1020042/2019/06/17/analyzing-nflpas-annual-report-tom-brady-is-the-king-of-player-royalties-odell-beckham-jr-is-aka-royalty-only/ ("New England Patriots quarterback Tom Brady, the oldest position player in the NFL, earned more money than any other player in the last season from the sale of jerseys, video games and trading cards […] The report, hundreds of pages long, lists every player in the NFL and how much they earned from group licensing, which is when six or more players are used in the same deal. While there are some smaller group deals, most of the money comes in through the union from Electronic Arts, Nike and Panini (trading cards) and then is distributed to the players. Brady earned $2.35 million (so the figure does not include income from his solo endorsements, like those with UGG and Under Armour). […] The five first-

products and services associated with certain professional sports is not informative to collegiate broadcast-related compensation.  As discussed in **Section IV.G**, there are important differences between professional sports and collegiate sports as well as important differences between broadcasts and the products and services cited by the Rascher Report.  For example, in the Rascher Report's but-for world, an NCAA student-athlete superstar's ability to command a superior broadcast-related payment stems from multiple independent conferences competing to attract the superstar.  This is not the case for the professional athletes invoked by the Rascher Report, who receive group license payments negotiated by a players' union with a third-party entity, rather than through the competition of multiple independent entities.

108.   The Rascher Report also claims that the "absence of any separate identification of a specific payment for the use of Broadcast NILs at the professional level is consistent with the notion that the value provided by the players is essentially part of a joint pool, and is thus equal […]."[245]  The Rascher Report's reasoning is flawed and contradicted by the Desser Report.  The Desser Report acknowledges that "subdividing the overall payment in a media rights contract [between player performance and NIL] generally has no business purpose."[246]  For example, contracts of NFL and NBA players include language stating that the player will not contest the exclusive rights of the NFL or NBA to broadcast games, but do not include a separate payment for the right to use player NIL in a broadcast.[247]  This is consistent with the expert testimony given by Mr. Bob Thompson

---

round QBs last year: Baker Mayfield earned $1,156,124, Sam Darnold $1,040,720, Josh Allen $854,903, Josh Rosen $313,154 and Lamar Jackson $257,369.").

[245]   Rascher Report, ¶ 164 ("This absence of any separate identification of a specific payment for the use of Broadcast NILs at the professional level is consistent with the notion that the value provided by the players is essentially part of a joint pool, and is thus equal – broadcast partners desire the certainty of NIL usage of all players and it is not known which players will be shown in any given telecast.").

[246]   Desser Report, § 14.1 ("NIL is not customarily sold *separately* from the rights conveyed in media contracts, nor are specific values assigned to particular grants within an agreement. It is necessary here to break down the value of player performance and NIL in each contract, though subdividing the overall payment in a media rights contract generally has no business purpose.").

[247]   Supplemental Declaration of Gary Arrick, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, April 19, 2023, ¶ 4 ("The NBA Uniform Player Contract in paragraph 14(e) states that the signing player agrees to "not contest" the exclusive

(the "Thompson Report"), former President of Fox Sports Network and Fox Sports International, based on his experience in the broadcast industry negotiating "200 television rights agreements with collegiate conferences, professional sports teams, leagues, events and tours." [248] The Thompson Report describes the compensation structure in several professional sport leagues, including the NFL, the NBA, and the WNBA, and concludes "[t]here is no example where pro players are paid a specific amount for Broadcast NIL rights, much less in a structure based on a percentage of broadcast rights for each player." [249]  These examples show that both media companies and teams that sign players to contracts have an interest in a bundle of benefits provided by a player, of which performance is a key factor in driving both the success of the team and the value of the broadcast.  Furthermore, at deposition, Dr. Rascher confirmed that he is not offering an opinion that professional athletes are compensated equally for the use of their NIL in televised broadcasts. [250]  The absence of a separate identification of "Broadcast NIL" does not support the claim that different professional players provide equal value to a professional television broadcast.

---

rights of the NBA, all NBA-related entities, and the Teams to broadcast games or excerpt thereof"); Supplemental Declaration of Steven J. Scebelo, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, April 5, 2023, ¶ 5 ("Also in section 4(a), the form NFL Player Contract states that the signing player agrees to "not contest" the exclusive rights of the NFL to broadcast games or excerpts thereof."); Declaration of Gary Arrick, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, October 14, 2022, ¶ 17 ("Revenues generated by the NBA in connection with the broadcast or re-broadcast of NBA games are not paid directly to NBA players."); Declaration of Steven J. Scebelo, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, September 26, 2022, ¶ 23 ("Revenue generated by the NFL in connection with the broadcast (and re-broadcast) of NFL games is not paid directly to NFL players.").

[248]   Thompson Report, p. 1 ("Prior to forming Thompson Sports Group, LLC in August 2009, I served as President of Fox Sports Networks where I was responsible for oversight and day to day management of Fox's cable television sports networks. I simultaneously served as President of Fox Sports International overseeing all of Fox Sports' international activities. I have negotiated more than 200 television rights agreements with collegiate conferences, professional sports teams, leagues, events and tours.").

[249]   Thompson Report, p. 41.

[250]   Rascher Deposition, p. 165:2-13 ("Q.  So is it your testimony – I just want to understand it. Is it your testimony that professional football and basketball, every player receives the same compensation for the use of their NIL in live-game broadcasts?  THE WITNESS:  I don't – I don't really have an opinion right now on that. I mean, I'm thinking – I wasn't – that wasn't the focus of my – of the scope of my analysis in this case." Objection omitted.).

### 4. The Rascher Report's References to Full Scholarships to Justify Equal Payments Are Uninformative

109.   At deposition, Dr. Rascher appeared to suggest that all full-scholarship student-athletes would receive broadcast-related compensation in the but-for world because "they're not willing to play without compensation," namely, the compensation that comes in the form of a scholarship.[251]  This is a non sequitur.  That a student-athlete is on full scholarship does not mean that the student-athlete would refuse to play collegiate sports in a but-for world where they are on a full scholarship but receive zero broadcast-related payments.  Moreover, student-athletes' willingness to supply their labor in exchange for broadcast-related compensation represents only the supply side of the labor market.  Even if a student-athlete "required" broadcast-related compensation in the but-for world in order to secure their enrollment, this does not mean that a conference or school would actually offer that student-athlete broadcast-related compensation.[252]  That determination would be made according to the preferences of the school with respect to the individual student-athlete's attributes.

110.   At deposition, Dr. Rascher also appeared to suggest that two different student-athletes on the same team receiving the same compensation—namely, full scholarships—would, as a

---

[251]   Rascher Deposition, p. 82:10-19 ("Q. Isn't it true that in the current world, every student athlete has shown that they're willing to play without compensation for their broadcast NIL? A. But they're not willing to play without compensation. So there's athletes who are choosing among schools and some of those schools are offering them, say, scholarships – often full scholarships in the sports that we're talking about because they're [counter] sports; right?").

[252]   In his deposition, Dr. Rascher acknowledged student-athletes' incentives to negotiate for higher broadcast-related compensation. *See* Rascher Deposition, pp. 101:25-102:12 ("Q. And is it your view that a five-star quarterback would have no incentive to argue for more than their proportional share of 10 percent? A. If the conference has a rule, then that's the rule. I mean, of course, they're going to argue for more of the other payments too. They want a larger Alston award, you know. They want a higher cost of attendance payment. They want student athlete opportunity funds and SAF funds; right? And – you know, I mean, they're going to argue for what they're going to argue for. I'm not saying that that's going to change in the but-for world."). *See also* Rascher Deposition, p. 103:5-14 ("Q. Your model does not account for the possibility that [Caleb Williams, as a hypothetical] would hold out and say he's not going to give over his broadcast rights and wants more as a condition of transferring? A. So if the conference has a rule – right? – then that's what he's going to be paid. And it's my opinion that the conferences – it's the internal economics of the conference such that they would have a rule like that. Especially for the measurement of but-for world damages in the past.").

matter of economic competition, receive the same broadcast-related payments in the but-for world.[253]  This too makes no economic sense:

a. The economics of superstars does not apply to full scholarships because a single student-athlete cannot receive more than one full scholarship, no matter how skilled they are at their sport.  That is not true when it comes to broadcast-related payments in the but-for world, where every dollar spent on a non-superstar represents a dollar that could have been spent on a superstar.  In the face of this trade-off, the Rascher Report does not credibly establish that it would make economic sense for individual schools or conferences to pay broadcast-related compensation to every proposed class member in the but-for world, in addition to the full scholarship that they already receive.  In the competition for superstars, it would be economically rational for individual schools or conferences to pay no broadcast-related compensation to non-superstar student-athletes on full scholarship.

b. The allowance of broadcast-related payments in the but-for world represents the lifting of a "ceiling" on student-athlete compensation from the school.  As a matter of economics, the raising of a wage ceiling does not mean that all labor subject to that wage ceiling will receive a greater wage.  Firms will hire workers as long as the marginal benefit of doing so exceeds or meets the worker's marginal cost, in the form of wages.  Therefore, only workers who provide marginal benefits higher than the wage ceiling will see their wages increase from the lifting of the ceiling.  Workers who provide marginal benefits lower than or equal to the wage ceiling would not see their wages increase from the lifting of

---

[253]  Rascher Deposition, p. 40:8-19 ("Q.  Okay. Your model would say that in this last year, Stetson Bennett would receive the exact same payment as the fourth string offensive lineman, assuming the fourth-string offensive lineman was on scholarship; correct?  A.  Was on a full scholarship. Yeah, assuming – I'm just trying to make sure that they're on the team – both of them are on the team. They both have full scholarships, sort of regardless of – of what string they are, that I've modeled it – the competitive equilibrium, which is that they would receive the same payment.").

the ceiling.[254]  Accordingly, the Rascher Report does not demonstrate that the marginal benefit of every full-scholarship student-athlete justifies additional compensation above their full scholarship.

c.  Many full-scholarship student-athletes are not currently receiving compensation at the true "ceiling."  Institutions have various options to compensate student-athletes beyond full scholarships, including Alston-related awards (see **Section IV.D.3**) and SAF funds (see **Section IV.D.4**), yet not all scholarship student-athletes receive these additional funds and those that do are not all compensated equally.

### D.  The Rascher Report's Proposed But-For World Ignores Schools as Economic Actors Seeking to Make Optimal Decisions According to Individualized Priorities

111.  This section discusses why it makes no economic sense for individual schools to cede authority to their conference on how to allocate broadcast-related compensation across sports.  Given the substantial differences across schools, all or nearly all schools would be hindered by a conference-imposed mandate that does not reflect their individual priorities.  A credible but-for world would not involve schools voting to disadvantage themselves in this way.  The Rascher Report has no basis for assuming that schools would not differ in whether, how, and to whom to make broadcast-related payments.

---

[254]  Ashenfelter, Orley C., et al., "Labor Market Monopsony," *Journal of Labor Economics,* Vol. 28, No. 2, 2010, pp. 203-210, at 204 ("In the simplest case of a competitive labor market, the employer is a wage taker and chooses employment to maximize profits. The first-order condition for a maximum equates marginal revenue with marginal cost. An employer with monopsony power also maximizes profits by equating marginal revenue and marginal cost[.]" Formulas omitted.). *See also* El-Hodiri and Quirk (1971), p. 1304 ("These arguments about the reserve clause have been dealt with by Rottenberg, who points out that the possibility of buying and selling contracts among teams raises the same problem of acquisition of the best talent by the wealthiest team; however, *players will be added by any team only if the marginal revenue product of the player exceeds his cost*, so that the dependence of revenue on competition in playing strengths among teams makes it unprofitable for any one team to be "too" superior to other teams, whatever the wealth of the team." Emphasis added).

1. **Schools Would Not Cede to Their Conference All Authority over Broadcast-Related Payments to Student-Athletes**

112.    Schools, not conferences, are responsible for recruiting student-athletes for their teams: schools scout high school student-athletes, schools provide offers to student-athletes to enroll, and schools attempt to convince student-athletes to accept these offers through their specific mix of benefits and opportunities.[255]   The complaint similarly recognizes that schools seek to attract student-athletes in the labor market.[256]   However, the Rascher Report does not account for schools' economic incentives in labor market competition for student-athletes in the but-for world.[257]   In winning the competition for talented student-athletes, the school gains a student-athlete who may improve the performance of their team, boost attendance and ticket sales at the team's games, and increase alumni interest in and donations to the school.   Broadcast-related compensation, if controlled by the school, would serve as a tool to compete for the student-athletes who best fit the school's individualized priorities.   The Rascher Report ignores the importance of individualized

---

[255]   Desser Report, §§ 4.1-4.2.

[256]   Consolidated Amended Complaint, ¶ 110 ("Because Division I schools are the only [demanders] in these relevant labor markets, they have the power, when acting in concert through the NCAA and its conferences, to fix the price of labor.").

[257]   *See, for example*, Declaration of Candice Storey Lee, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, March 3, 2023 ("Lee Declaration"), ¶¶ 16-17 ("Vanderbilt competes fiercely with other institutions both within and outside the SEC to recruit student-athletes. Similarly, every A-5 institution competes for recruits against institutions both inside and outside its conference. The A-5 conferences receive greatly varying amounts, from conference to conference, in broadcast rights fees. […] By setting the share of revenues as 10% of broadcast rights fees allegedly attributable to each sport, institutions in conferences with lower total broadcast rights fees would be disadvantaged in recruiting."); Declaration of Chad Weiberg, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, April 28, 2023 ("Weiberg Declaration"), ¶¶ 14-15 ("Contrary to [Plaintiffs' damages model], athletic department at schools in lower revenue conferences might be pressured to supplement payments made to athletes under the Model by seeking increased support from their school, which could negatively impact academic and other opportunities for all students, in order to attract top talent and compete with schools in other A-5 conferences with higher revenues.   Likewise, [Plaintiffs' damages model] fails to account for the fact that Big 12 conference members compete with each other for student-athletes. I do not know of any reason that all schools within any conference would agree to the same percentage rate to be paid to student athletes because doing so would prevent each member from using payments to compete with other members."); Declaration of Mack Rhoades, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, April 25, 2023 ("Rhoades Declaration"), ¶ 15 ("And from a recruiting perspective, the Model would have a potentially devastating impact on the ability of schools in all but the richest conferences to recruit student-athletes out of high school or transfers from the transfer portal to come to play at their schools.").

school priorities by assuming that schools would opt for broadcast-related compensation decisions to be made at the level of the conference.

113. In the Rascher Report's but-for world, the NCAA rule limiting conferences' payments to student-athletes means that a school's athletic department can spend (but does not have to spend) approximately $3 million to $5 million on broadcast-related payments per year, as shown in **Table 8**. The relevant question is, what decision best serves the school's priorities, in the context of how other schools are spending these broadcast-related payments.

**Table 8. Maximum Proposed Broadcast-Related Payment in 2019
Using the Rascher Report's Methodology
(USD millions)[258]**



114. Due to the economics driving unequal broadcast-related payments to student-athletes in the but-for world, any assessment of injury from the NCAA's prohibition of these

---

[258]   Rascher Report, Exhibit 10.

payments would not be possible with a common methodology.  This is because each school would have its own valuation of the bundle of benefits derived from attracting a particular student-athlete.  This valuation would depend on that school's preferences given the existing and incoming talent on their teams and on the attributes of the student-athlete, including their expected performance.

115.    For example, Bruce Jordan-Swilling played for four years at Georgia Tech (ACC) as a linebacker and running back after committing to the school as a top recruit in August 2016.[259]  Jordan-Swilling's father, an All-American inducted into the College Football Hall of Fame in 2009, played at Georgia Tech from 1982-1985 alongside former Georgia Tech athletic director Todd Stansbury,[260] and two of Jordan-Swilling's uncles played football at Georgia Tech from 1988-1991.[261]  Jordan-Swilling's brother committed to Georgia Tech earlier in the same 2016 recruiting cycle.[262]  In light of this family legacy, it

---

[259]  Prasadh, Nishant, "Football: Meet the Recruits 2017 - Bruce Jordan-Swilling," *From the Rumble Seat*, February 17, 2017, available at https://www.fromtherumbleseat.com/2017/2/17/14638472/football-meet-the-recruits-2017-bruce-jordan-swilling ("Consensus four-star prospect Bruce Jordan-Swilling, a running back/linebacker from Brother Martin HS in New Orleans and (like Tre) the son of Tech linebacker legend Pat Swilling, announced his commitment to Tech on August 23, 2016, and became the 13th player in Tech's 2017 class. Jordan-Swilling, who stands at 6-foot-1 and 209 pounds, ended up being the top-rated recruit in the class on both Rivals (5.8 - tied with three others) and 247Sports (.9150)."); Georgia Tech, "#29 Bruce Jordan-Swilling," available at https://ramblinwreck.com/roster/bruce-jordan-swilling/, accessed on April 15, 2023 (showing Jordan-Swilling played for four years at Georgia Tech).

[260]  Todd Stansbury was the Georgia Tech Athletic Director from 2016 through 2022, which included the period that Jordan-Swilling was a student-athlete at Georgia Tech. *See* Lowe, Chris, "Georgia Tech Yellow Jackets Fire Athletic Director Todd Stansbury, Football Coach Geoff Collins," *ESPN*, September 26, 2022, available at https://www.espn.com/college-football/story/_/id/34670009/sources-georgia-tech-yellow-jackets-fire-ad-todd-stansbury-football-coach-geoff-collins ("Georgia Tech fired athletic director Todd Stansbury and head football coach Geoff Collins on Monday [in September 2022]."; "Stansbury had been Georgia Tech's athletic director since 2016."); *See also* Georgia Tech, "#29 Bruce Jordan-Swilling," available at https://ramblinwreck.com/roster/bruce-jordan-swilling/, accessed on April 15, 2023 (showing Jordan-Swilling at Georgia Tech between 2017 to 2020).

[261]  Georgia Tech, "#29 Bruce Jordan-Swilling," available at https://ramblinwreck.com/roster/bruce-jordan-swilling/, accessed on April 15, 2023 ("Father, Pat Swilling, played defensive line for Georgia Tech from 1982-85, was a first-team all-American in 1985, continues to hold Tech's all-time record with 15 single-season sacks ('85) and was inducted into the College Football Hall of Fame in 2009"; "Pat Swilling was teammates at Georgia Tech with current athletics director Todd Stansbury … Jordan-Swilling's uncles, Darrell and Ken Swilling, also played at Georgia Tech from 1988-91 and were members of the Yellow Jackets' 1990 national championship team.").

[262]  Prasadh, Nishant, "Football: Meet the Recruits 2017 - Bruce Jordan-Swilling," *From the Rumble Seat*, February 17, 2017, available at https://www.fromtherumbleseat.com/2017/2/17/14638472/football-meet-the-recruits-2017-bruce-jordan-swilling ("If securing Tre Swilling's commitment was a victory for the coaching staff,

is plausible that, in the but-for world, Georgia Tech may wish to compete intensely for Bruce Jordan-Swilling using broadcast-related payments. Yet in the Rascher Report's but-for world, Georgia Tech has ceded all authority over broadcast-related payments to their conference, and, consequently, Jordan-Swilling would receive greater broadcast-related compensation from other schools that recruited him—such as at Alabama or Louisiana State University in the SEC—than at Georgia Tech in the ACC.[263] The Rascher Report ignores these individualized considerations and asserts that the amount that a scholarship student-athlete would be paid is independent of that student-athlete's attributes. This makes no economic sense and is inconsistent with schools' actions in cases where there are no regulations mandating the distribution of scholarships and awards.

116. Schools currently have the independent authority to decide on the optimal allocation of their revenues and resources.[264] In the but-for world, schools would therefore not cede all authority to conferences, and schools would choose to distribute broadcast-related

---

landing his brother as well was an absolute coup. Consensus four-star prospect Bruce Jordan-Swilling, a running back/linebacker from Brother Martin HS in New Orleans and (like Tre) the son of Tech linebacker legend Pat Swilling, announced his commitment to Tech on August 23, 2016, and became the 13th player in Tech's 2017 class.").

[263] Prasadh, Nishant, "Football: Meet the Recruits 2017 - Bruce Jordan-Swilling," *From the Rumble Seat*, February 17, 2017, available at https://www.fromtherumbleseat.com/2017/2/17/14638472/football-meet-the-recruits-2017-bruce-jordan-swilling ("Jordan-Swilling chose Tech over a long list of reported offers from big-name schools, which included Alabama, Florida State, LSU, Michigan, Oklahoma, and USC."); Rascher Report, Exhibit 12.

[264] *See, for example*, Declaration of David Flores, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, April 24, 2023 ("Flores Declaration"), ¶ 15 ("[The Plaintiffs' damages model] would mandate uniformity on institutions that have historically had independent authority to decide for themselves how to best allocate their revenues and resources."); Lee Declaration, ¶ 22 ("In addition to the gender equity concerns, Vanderbilt and, in my experience, other SEC member institutions would also reject Plaintiffs' Scenario because it would restrict each institution's ability to direct resources as it sees fit. Vanderbilt has always been free to determine where to direct its financial resources between and among different sports programs."); Declaration of George Kliavkoff, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, April 24, 2023 ("Kliavkoff Declaration"), ¶ 16 ("Each Pac-12 member institution makes its own decisions about how to expend funds on coaches, facilities, student-athlete support, as well as numerous other matters."); Declaration of Greg Sankey, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, April 11, 2023 ("Sankey Declaration"), ¶ 13 ("The Conference does not dictate or prescribe the way in which those revenue distributions will be used by its member institutions. The Conference also does not have any input concerning which teams (in which sports) will be sponsored by a member institution, or which student-athletes will receive scholarships offers from a member institution.").

payments based on their own evaluations of each student-athlete and based on competition from other schools for student-athletes.  This is consistent with the Rascher Report's recognition that "it might be in the interest of a specific team within a conference to target Broadcast NIL money at a few student-athletes under a school-based model of competition."[265]

### 2. Schools Distribute Equivalency Scholarships According to Individualized Priorities

117.   Schools' choices in distributing athletic scholarships among student-athletes in equivalency sports demonstrate the results of these individualized evaluations.[266]  For equivalency sports, although the NCAA sets the limit for the total number of scholarships that may be given for each sport,[267] schools have discretion over how such scholarships are divided.  Schools do not distribute athletic scholarship money evenly across student-athletes within a team and do not provide athletic scholarship money to everyone on the team.  Cirque Analytics provided me with a dataset that compiled athletic scholarship data from university squad lists, including each student-athlete's total athletic scholarship amount and scholarship equivalency value.

---

[265]   Rascher Report, footnote 190 ("While it might be in the interest of a specific team within a conference to target Broadcast NIL money at a few athletes under a school-based model of competition, potentially paying very large amounts to some and little or none to others, this is not the case for an entire conference under a conference-level competition model. A conference is comprised of many schools that compete for talent both intraconference and interconference, but there are clear distinctions between the power schools within a conference and less dominant recruiters. For example, while the Big Ten's Ohio State football program commonly recruits multiple 5-star athletes every year and vies to be among the top five recruiting classes annually, the Big Ten's Rutgers football program does not. A conference needs to ensure that when Rutgers is competing with an ACC or SEC school for a 3-star player, that the Big Ten conference's Broadcast NIL offer for a 3-star is competitive with the other conferences. Focusing the conference's money on 5-stars would result in the bulk of its schools, those lower down the competitive pyramid, losing out on talent, while helping the elite of the conference to win more often.").

[266]   NCAA, "Simpler is Better," available at https://www.ncaa.org/sports/2016/7/20/simpler-is-better.aspx, accessed on March 20, 2023 ("Equivalency: A financial aid award that is equal to the value of a full grant-in-aid but is typically divided among multiple students. Each sport's financial aid is limited by the number of equivalencies a team is allowed to provide. Any student who is receiving any amount of athletics-related financial aid is referred to as a 'counter.'").

[267]   NCAA, "2022-23 NCAA Division I Manual," September 14, 2022, available at https://www.ncaapublications.com/p-4657-2022-2023-ncaa-division-i-manual.aspx, § 15.5.3 ("Equivalency Sports"); p. 201 ("There shall be a limit on the value (equivalency) of financial aid awards (per Bylaw 15.02.5.2) that an institution may provide in any academic year to counters in the following men's sports.").

118.   For example, as shown below in **Figure 5** in the 2021-2022 academic year, [Conf.]
distributed athletic scholarship money across 25 women's soccer student-athletes on the
team, with 3 student-athletes receiving a full scholarship and 7 student-athletes receiving
less than a third of a full scholarship.  Had [Conf.] opted to distribute its athletic
scholarship money equally across each scholarship student-athlete, every student-athlete
would have received 0.5 of a full scholarship.  Additionally, six student-athletes did not
receive any athletic scholarship money.

**Figure 5. Distribution of Athletic Scholarships for Women's Soccer Student-Athletes**

Redacted--Confidential

Notes on next page.

---

268     Conf.

**Notes:**

Conf.

119.    Schools within the same conference are free to pursue their own priorities towards the number and the amount of scholarship awards.  For example, as shown in **Figure 6**, two Conf. schools, Conf. and the Conf. , distributed scholarship awards to women's soccer student-athletes differently during the 2021-2022 season. Conf. provided scholarships to 19 women's soccer student-athletes in values ranging from 0.05 of a full scholarship to a full scholarship, and there were 11 student-athletes who did not receive any athletic scholarship money. Conf. opted to provide scholarships to 25 student-athletes ranging from 0.03 of a full scholarship to a full scholarship, and there were 6 student-athletes who did not receive any athletic scholarship money.



**Figure 6. Distribution of Athletic Scholarships for Women's Soccer Student-Athletes**, 2021-2022[269]

### 3.   Schools Take Different Approaches to Structuring Alston-Related Awards

120.    The Rascher Report did not examine the ways in which schools distribute Alston-related awards.  Doing so would reveal that schools structure payments to student-athletes differently and do not guarantee payments to every full-scholarship student-athlete.  As of

---

[269]        Conf.

August 2020, NCAA rules allowed schools to provide student-athletes with up to $5,980 annually in education-related awards, unrelated to athletic performance.[270]  The NCAA does not dictate how schools distribute Alston-related awards, allowing schools to make their own decisions, subject to their conference's policies, if any.[271]

121.  Schools within the same conference have demonstrated variation in their approaches to structuring Alston-related awards, such as in the qualification criteria for payments, the timing of the payments, and the conditions attached to the payments (including in some instances, not guaranteeing payment).  For example, the Big 12 allows each of its member institutions "the latitude to decide at the campus level the degree to which it provides education-related benefits and/or academic achievement awards or incentives[.]"[272] Within the Big 12, Iowa State University implemented the "Hawkeye Academic Advantage Program" beginning in the 2022-2023 academic year, which consists of two types of disbursements with varying eligibility requirements: (1) up to $1,495 per semester per student-athlete, depending on their scholarship status and academic standing, and (2) a cumulative deferred payment of $2,990 for each year the student-athlete is in school (up to four years, regardless of whether they receive a scholarship), payable upon a student-athlete's graduation with a bachelor's degree from Iowa State.[273]  In contrast,

---

[270]  Wittry, Andy, "The On3 Guide to Alston Awards—Education-Related Compensation," *On3*, September 20, 2022, available at https://www.on3.com/news/alston-awards-ncaa-v-alston-supreme-court-of-the-united-states-brett-kavanaugh/ ("Alston awards can provide athletes with up to $5,980 annually."; "Alston awards were allowed beginning in August 2020 after the Division I Council adopted emergency legislation, following a court injunction.").

[271]  Wittry, Andy, "The On3 Guide to Alston Awards—Education-Related Compensation," *On3*, September 20, 2022, available at https://www.on3.com/news/alston-awards-ncaa-v-alston-supreme-court-of-the-united-states-brett-kavanaugh/ ("Each institution can determine if, and how, it provides Alston awards. Decisions can also be made at the conference level, though.").

[272]  Big 12 Sports, "Big 12 Schools to Determine Educational Benefits & Academic Awards for Scholarship Student-Athletes," October 7, 2021, available at https://big12sports.com/news/2021/10/7/conference-big-12-schools-to-determine-educational-benefits-academic-awards-for-scholarship-student-athletes.aspx ("'Following the Court's decision in Alston, the Board wanted to take time to assess the national landscape before determining how best to activate in this space,' commented Commissioner Bob Bowlsby. 'Today's action allows each Big 12 member institution the latitude to decide at the campus level the degree to which it provides education-related benefits and/or academic achievement awards or incentives to its scholarship student-athletes.'").

[273]  Wittry, Andy, "Hawkeye Academic Advantage Program Details Iowa's Alston Awards," *On3*, August 16, 2022, available at https://www.on3.com/news/university-iowa-hawkeyes-college-football-alston-awards-

*Confidential*

Texas Tech University implemented the "Strive Program," in which eligible scholarship student-athletes receive $1,990 per semester and could qualify for an additional $1,000 per semester based on a GPA requirement and participation in student-athlete programming, both payable at the end of each semester.[274]  Similar variation exists within the Big Ten, which does not appear to have announced a conference-wide policy for the distribution of Alston-related awards.[275]  For example, the University of Wisconsin offers $490 payable each semester to academically eligible student-athletes, but awards up to $2,500 per semester (for up to ten semesters) payable upon a student-athlete's graduation with a bachelor's degree from Wisconsin.[276]  Indiana University grants payments

---

hawkeye-academic-advantage-program/ ("Starting this fall, full-scholarship athletes at Iowa will have the opportunity to earn up to $1,495 per semester as part of the university's disbursement of Alston awards for academic achievement. Iowa's Alston awards program is called the Hawkeye Academic Advantage Program and it's a different approach than how other universities plan to provide academic financial awards."; "Iowa's Alston awards are tied to athletes' scholarship equivalency status, as well as their ability to earn both their eligibility and retention points for their team's Academic Progress Rate (APR)."; "Iowa's Hawkeye Academic Advantage Program also provides deferred payments, such that half of the maximum allowable annual amount of $5,980 is withheld until an athlete earns his or her first bachelor's degree from Iowa. Iowa's Alston awards policy also notes that athletes can earn the deferred portion of their academic financial awards for a maximum of four years."; "In addition to walk-on athletes, there are other athletes who will only qualify for deferred payments but not the annual per-semester awards. Those athletes include athletes who are medically disqualified, whose sport was discontinued, who are on scholarship but no longer active participants in their sport, and who have exhausted their eligibility but are still advancing towards their first undergraduate degree.").

[274]   Texas Tech, "Texas Tech to Offer Academic Achievement Awards," March 2, 2022, available at https://texastech.com/news/2022/3/2/general-texas-tech-to-offer-academic-achievement-awards.aspx ("Texas Tech Athletics has announced it will now provide scholarship student-athletes with the opportunity for additional financial assistance beginning with the 2022 fall semester following recent changes in NCAA and Big 12 legislation related to the U.S. Supreme Court's decision in Alston vs. NCAA."; "As part of the Strive Program, Texas Tech will provide $1,990 per semester to scholarship student-athletes who are academically eligible, on course to graduate on schedule and remain a member in good standing with his or her respective sports program at the end of the semester. The additional $1,000 will be earned based on GPA requirements and participation in student-athlete programming led by the J.T. and Margaret Talkington Department of Student-Athlete Development.").

[275]   *See* Big Ten, "Big Ten Conference Statement on Monday's Supreme Court Ruling," *Big Ten*, June 22, 2021, available at https://bigten.org/news/2021/6/22/general-big-ten-conference-statement-on-mondays-supreme-court-ruling.aspx ("The Big Ten Conference and our member institutions are carefully reviewing the implications of yesterday's Supreme Court decision in the Alston case, including how they may relate to NIL, to determine the best path forward for our student-athletes and for Conference athletics generally.").

[276]   Wittry, Andy, "Wisconsin's Alston Awards Offer Up to $25,000 Upon Graduation," *On3*, September 19, 2022, available at https://www.on3.com/news/wisconsins-alston-awards-badgers-policy-academic-achievement-ncaa-supreme-court/ ("There are two categories of awards available for Wisconsin athletes who are undergraduate students. The 'undergraduate graduation award' is contingent upon completion of an undergraduate degree. Through this award, an athlete can earn up to $2,500 per semester, capped at 10 semesters."; "Athletes must be

proportional to each eligible student-athlete's percentage of scholarship funding (up to $2,990) during the fall and spring semesters.[277]

122.   These documented examples of schools offering Alston-related awards demonstrate that, when given discretion over payments to student-athletes, schools take a variety of approaches.  Schools do not uniformly guarantee payment ex ante; instead, they require student-athletes to meet certain criteria before receiving Alston-related awards.

### 4.  Schools Distribute Student Assistance Fund Payments According to Individualized Priorities and Circumstances

123.   Schools' choices in and policies for distributing the Student Assistance Fund ("SAF") to student-athletes demonstrate that schools vary in how distributions to student-athletes are structured, even within the same conference, and schools do not provide SAF payments to every full-scholarship student-athlete.

124.   Every year, the NCAA designates a portion of proceeds from the NCAA March Madness basketball tournament for the SAF.[278]  The SAF is a fund dedicated to "assist student-athletes in meeting financial needs" associated with participating in collegiate athletics or

---

academically eligible and remain on a 'UW-Madison NCAA squad list' each semester in order to qualify for the award."; "They can earn $490 per semester from Wisconsin's 'undergraduate academic award' by remaining academically eligible and on an active roster.").

[277]   Indiana University, "IU Athletics Establishes New Financial Academic Achievement Awards For Its Student-Athletes," June 23, 2022, available at https://iuhoosiers.com/news/2022/6/23/academic-services-iu-athletics-establishes-new-financial-academic-achievement-awards-for-its-student-athletes ("To be eligible for an academic achievement award, the student-athlete must be on either a full or partial athletic scholarship at Indiana University and earn the Academic Progress Rate (APR) retention point as well as the APR eligibility point for the applicable semester. They also must not be facing any university-related conduct issues as detailed in the IU Athletics Academic Achievement Award Policy. Awards will be given for the fall and spring semesters only and will be proportionate to the percentage of athletic scholarship funding that a student-athlete receives. The maximum that a full scholarship student-athlete is eligible to receive is $2,990.00 during both the fall and spring semesters.").

[278]   Libit, Daniel, "Alston Case Turns Spotlight Onto NCAA's Student Assistance Fund," *Sportico*, July 20, 2021, available at https://www.sportico.com/leagues/college-sports/2021/ncaa-student-assistance-fund-1234634735/ ("The fund's money comes mostly from NCAA March Madness revenues, which are then distributed to member institutions by way of their conferences.").

to "recognize academic achievement."[279]  The NCAA distributes SAF annually to conferences based on two different calculation methods, which take into account number of each institution's Pell grants, grant-in-aid equivalencies, and the number of sports sponsored.[280]

125.    The NCAA does not dictate how schools distribute SAF payments to student-athletes, but does provide guidelines and prohibitions on proper uses of SAF funds.  Schools cannot use the funds for tuition, books, private sports instruction fees, foreign travel expenses associated with athletic competitions, or general stipends for student-athletes.[281] Documented uses of the funds include clothing expenses, reimbursements for travel, or insurance premiums and policies.[282]  For example, in 2014, Florida State University used SAF funds to assist starting quarterback Jameis Winston with the purchase of a $10 million disability and loss of value insurance policy, to be collected if Winston

[279]  NCAA, "2022 Division I Revenue Distribution Plan," available at https://ncaaorg.s3.amazonaws.com/ncaa/finance/d1/2022D1Fin_RevenueDistributionPlan.pdf, p. 13 ("As a guiding principle, the Student Assistance Fund shall be used to assist student-athletes in meeting financial needs that arise in conjunction with participation in intercollegiate athletics, enrollment in an academic curriculum or to recognize academic achievement as determined by conference offices.").

[280]  NCAA, "2022 Division I Revenue Distribution Plan," available at https://ncaaorg.s3.amazonaws.com/ncaa/finance/d1/2021D1Fin_RevenueD1FinstributionPlan.pdf, p. 14 ("The SAF has three components to the calculation, as follows with the percentage of the fund allocated to each component noted in parentheses:  1. Prior academic year number of Pell grants by institution (70%). 2. Prior academic year number of grants-in-aid equivalencies by institution (15%). 3. Prior academic year number of sports sponsored by institution (15%)."; "The SAOF includes the imposed Division I Committee on Infractions (COI) fines collected in the previous fiscal year. […] Two-thirds of the fund are allocated based on the current year submission for Grants-in-Aid while the remaining one-third is allocated based on the current year submission for Sports Sponsorship.").

[281]  NCAA, "2022 Division I Revenue Distribution Plan," available at https://ncaaorg.s3.amazonaws.com/ncaa/finance/d1/2022D1Fin_RevenueDistributionPlan.pdf, p. 13 ("As a guiding principle, the Student Assistance Fund shall be used to assist student-athletes in meeting financial needs that arise in conjunction with participation in intercollegiate athletics, enrollment in an academic curriculum or to recognize academic achievement as determined by conference offices… Pursuant to NCAA Bylaw 15.01.6.1, member institutions and conferences shall not use Student Assistance Fund for the following: …b. Tuition, fees, room, board, and required course-related books during a regular term…f. Development opportunities, such as: i. Fees and other expenses associated with participation in a sports camp or clinic; ii. Fees and other expenses associated with private sports-related instruction; iii. Fees for other athletic development experiences (e.g., greens fees, batting cage rental); or iv. Expenses associated participation in a foreign tour.").

[282]  Libit, Daniel, "Alston Case Turns Spotlight Onto NCAA's Student Assistance Fund," *Sportico*, July 20, 2021, available at https://www.sportico.com/leagues/college-sports/2021/ncaa-student-assistance-fund-1234634735/.

experienced a career-ending injury or diminished NFL draft prospects.[283]  For any further definition of guidelines, the NCAA stipulates that "responsibility for oversight and administration of the fund, including interpretations, rests solely with the conferences."[284]

126.  Within conferences, school policies vary as to which student-athletes may receive SAF distributions and under what circumstances.  For example, the ACC outlines that schools "should ensure that all student-athletes have equal access to the fund," and that schools "should avoid use of the fund in a manner that could be construed as attempting to gain a recruiting advantage or disadvantage another institution."[285]  Within the ACC, the University of Virginia allows student-athletes to use SAF for reimbursements of expenses related to uncovered medical expenses, travel emergencies, clothing, and academic supplies, and student-athletes can apply for SAF funds regardless of scholarship or aid status.[286]  In contrast, the University of Miami restricts SAF use to Pell Grant-eligible students, and designates funds only to "help cover the costs of the University health insurance."[287]  Similar variation in policies is present within the Big Ten, which does not provide conference-level instructions to member schools regarding SAF use.  The only note regarding SAF is that it "shall be distributed [to member institutions] according to the

---

[283]  Shanker, Jared, "FSU Chips in on Winston's Insurance," *ESPN*, August 4, 2014, available at https://www.espn.com/college-football/story/_/id/11310051/jameis-winston-insurance-policy-paid-part-florida-state ("Sources told ESPN's Darren Rovell in July that the $10 million policy is split equally between a permanent disability policy, which Winston would collect if he were injured and could never play again, and a loss of value policy, which he would collect at least a percentage of if he fell in the draft.").

[284]  NCAA, "2022 Division I Revenue Distribution Plan," available at https://ncaaorg.s3.amazonaws.com/ncaa/finance/d1/2022D1Fin_RevenueDistributionPlan.pdf, p. 13.

[285]  Atlantic Coast Conference, "ACC Manual: 2020-2021", available at https://virginiatech.sportswar.com/wp-content/uploads/sites/15/2022/08/2020-21-ACC-Manual-2020-9-17-2.pdf, p. 151.

[286]  University of Virginia, "2017-18 Student Athlete Handbook," available at https://athletics.virginiasports.com/compliance/pdf/S-AHandbook2017-18.pdf, pp. 71-72 (listing forms and/or requests student-athletes must complete by scholarship and aid status; "Permissible uses of the fund are limited to:  Medical expenses not covered by your personal insurance and not subject to co-payment benefits by the Athletics Department; Travel expenses for parents or student-athletes related to family emergencies (prior approval required); Purchase of expendable academic course supplies (such as notebooks and pens) or rental of nonexpendable supplies (such as computer equipment or cameras) that are required for all students enrolled in the course; Articles of clothing and essential items.").

[287]  University of Miami, "Student-Athlete Handbook: 2022-2023," available at https://storage.googleapis.com/hurricanesports.com/2023/03/50891225-2022-23-sa-handbook-final-3.20.2023.pdf, p. 46 ("Student-athletes who are eligible for the Pell Grant may qualify to receive assistance from SAF to help cover the costs of the University health insurance.").

approved NCAA formula and agreed upon Conference procedures."[288]  Within the Big
Ten, Michigan State University restricts SAF access to student-athletes who have Pell
grants or demonstrate financial need, as determined by Office of Financial Aid.[289]  In
contrast, Penn State University allows all student-athletes to apply for assistance.[290]  Penn
State University does not specify what expenses qualify for SAF reimbursements, but
notes that "[u]niversities may establish specific criteria to determine who can access the
Student Assistance Fund and for what purposes" and that "[r]equests will be reviewed by
the Athletics Compliance Office."[291]

127.  Dr. Rascher provided an analysis of SAF distributions to individual student-athletes
during the 2015-2016 academic year at select NCAA Division I schools as part of his
expert reply report submitted in the Alston matter (the "Alston Rascher Reply").[292]
Dr. Rascher received distribution files specific to SAF funds, as well as complete cost of
attendance data for football, men's basketball, and women's basketball teams that included
SAF distribution information.  Data detailing SAF distributions by 12 A5 schools to
individual student-athletes were available.

---

[288]  Big Ten Conference, "Big Ten Conference Handbook: 2017-2018," available at
https://iuhoosiers.com/documents/2018/4/5//2017_18_Big_Ten_Conference_Handbook.pdf?id=27323, p. 112.

[289]  Michigan State University, "2021-2022 Student-Athlete Handbook and Planner," available at
https://www.sass.msu.edu/application/files/2116/2983/8922/Handbook_2021-22.pdf, p. 27 ("Student-athletes
must complete the Free Application for Federal Student Aid (FAFSA) (www.fafsa.ed.gov) each year in order
for the Office of Financial Aid to determine whether the student-athlete is eligible for clothing expenses through
the Special Assistance Fund. Pell-eligible student-athletes (except non-qualifiers in their initial year of
residence), student-athletes who have demonstrated financial need as determined by the Office of Financial Aid,
or an international student-athlete who has been certified by the Office of Financial Aid as having financial
need are eligible to apply for [SAF] funds.").

[290]  Penn State University, "2021-22 Penn State Student-Athlete Handbook," available at
https://gopsusports.com/documents/2021/12/22/2021_22_Student_Athlete_Handbook.pdf, p. 41 ("All student-
athletes are eligible to receive fund benefits regardless of their receipt of grant-in-aid or demonstrated financial
need, with the exception of non-qualifiers in their initial year of residence.").

[291]  Penn State University, "2021-22 Penn State Student-Athlete Handbook," available at
https://gopsusports.com/documents/2021/12/22/2021_22_Student_Athlete_Handbook.pdf, p. 41.

[292]  Expert Reply Report of Daniel A. Rascher on Economic Liability Issues for the Injunctive Classes, *In Re
National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust Litigation*, Case No. 4:14-md-
2541-CW and Case No. 4:14-cv-02758-CW, United States District Court, Northern District of California,
Oakland Division, June 21, 2017.

128.    Based on the same data used by the Alston Rascher Reply, **Figure 7** calculates the median
        student-athlete SAF distribution across the available A5 schools during the 2015-2016
        academic year.  **Figure 8** shows the share of football full-scholarship student-athletes
        receiving some form of SAF funds across these schools in that academic year.  While SAF
        funds are available to both scholarship and non-scholarship student-athletes, these
        analyses are limited to full-scholarship student-athletes, as these are the proposed class
        members in this matter.

**Figure 7: Median SAF Distribution to Full-Scholarship Football Student-Athletes at Select A5 Schools**
**2015-2016[293]**



Conf.

Note on next page.

---

[293]   Alston Rascher Reply backup materials.



**Figure 8: Share of Full-Scholarship Football Student-Athletes Receiving SAF Assistance at Select A5 Schools
2015-2016[294]**



---

[294]   Alston Rascher Reply backup materials.

129.   Within the ACC, different schools made different decisions related to the number of full-scholarship football student-athletes who received SAF funds and the average amount of SAF distributions made to a student-athlete.  For example, North Carolina State University ("NC State") made SAF distributions to ▨▨▨ Conf. ▨▨▨ of its full-scholarship football student-athletes, and student-athletes each received ▨▨ Conf. ▨▨ reimbursements, except for one student-athlete who ▨▨▨ Conf. ▨▨▨ Georgia Tech made ▨▨ Conf. ▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨ to student-athletes, and only reimbursed ▨▨ Conf. ▨▨ of its full-scholarship football student-athletes.  In contrast, the University of Miami ("Miami (FL)") made a median distribution of ▨▨▨▨ Conf. ▨▨▨▨ its full-scholarship football student-athletes received funds, while Virginia Tech made ▨▨▨ Conf. ▨▨▨ to its full-scholarship football student-athletes.

130.   The same data on SAF distributions also demonstrate that different schools do not distribute SAF funds the same way across sports.  This evidence further contradicts the Rascher Report's assumption of a uniform multisport allocation factor across schools and conferences.  **Figure 9** shows that schools do not equally distribute funds across sports, and that schools within the same conference may choose to emphasize different sports.  For example, the University of Kansas, ▨▨▨▨▨▨ Conf. ▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ Within the ACC, Miami, NC State, and the University of Virginia ▨▨▨▨ Conf. ▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ while Georgia Tech ▨▨▨ Conf. ▨▨▨ ▨▨▨▨▨▨▨▨▨.

---

[295]   Alston Rascher Reply backup materials.

[296]   ▨▨▨▨▨▨▨▨▨▨ Conf. ▨▨▨▨▨▨▨▨▨▨

**Figure 9: Proportion of Total SAF Funds Distributed to Football, Men's Basketball, and Women's Basketball at Select A5 Schools 2015-2016[297]**

Conf.



5.  **Schools Would Not Cede to Their Conference All Authority over the Allocation of Broadcast-Related Payments Across Sports**

131.   The Rascher Report assumes that, in absence of any NCAA mandate, conferences would dictate a 75 percent / 15 percent / 5 percent allocation of broadcast revenues (excluding sport-specific revenues, such as football bowl games, the College Football Playoff, and

---

[297]   Alston Rascher Reply backup materials.

NCAA March Madness basketball tournament revenues) across the sports of football, men's basketball, and women's basketball (the Rascher Report's "multisport allocation factor").[298]  However, the Rascher Report ignores that individual schools, which have their own particular preferences and constraints, would not be incentivized to delegate the authority of distributing broadcast revenues across sports to conferences.

132.  The Rascher Report primarily relies on the Desser Report for the multisport allocation factor, which Mr. Desser testified is intended to reflect an "overall" allocation, rather than a conference-specific or school-specific allocation.[299]  The Rascher Report attempts to "corroborate" the Desser Report's multisport allocation of broadcast revenues between football, men's basketball, and women's basketball through an analysis of NCAA MFRS data presented in Exhibit 8 of the Rascher Report.[300]  Based on this analysis, the Rascher Report concludes that "both booster donations and total revenues […] across [football, men's basketball, and women's basketball] are broadly consistent with Mr. Desser's allocations."[301]

133.  However, the Rascher Report's use of historical revenues to corroborate the Desser Report's multisport allocation factor is flawed.  Historical revenues are not a quantitative predictor of how individual schools would choose to allocate broadcast-related compensation across sports in the competition for talented student-athletes.

134.  Historical revenues are suggestive of the priorities of individual schools.  An implicit assumption in the Rascher Report's but-for world is that, in every A5 conference, schools would vote for their conference to adopt the Desser Report's multisport allocation.  The Rascher Report does not provide evidence in support of this assumption, but available

---

[298]  Rascher Report, ¶¶ 174-176; Rascher Deposition, p. 133:2-15.

[299]  Desser Deposition, p. 120:14-24 ("Q.  So the 75-15-5 allocation is as you just described it, but it doesn't necessarily apply for any particular conference, which could deviate from that allocation because of its own situation?  A.  The...The allocation is intended to be an overall amount. It is quite possible that the allocation might change a few percentage points one way or another for a particular conference. And, you know, at such time as we're able to get additional discovery, it would be something I would look at.").

[300]  Rascher Report, ¶ 176.

[301]  Rascher Report, ¶ 176.

evidence indicates that this assumption does not make economic sense.  Analysis of the MFRS data at the level of individual schools reveals substantial differences.  For example, as shown in **Figure 10**, there are substantial differences across individual schools in the Conf. in terms of each sport's share of historical revenues, suggesting differing priorities in how schools would approach competition for student-athletes in those sports.

**Figure 10. Proportion of Total Revenues Attributed to Football, Men's Basketball, and Women's Basketball at Conf. Schools 2016-2021[302]**



Note on next page.

---

[302]   Rascher Report backup materials (NCAA MFRS data).

Conf.

135.    These figures are indicative of differences across individual school success and priorities of certain sports.  For example,  Conf.  are traditionally highly ranked in men's basketball,[303] and these schools have the highest men's basketball shares of revenue within the  Conf.  exceeding 40 percent in each case.  Conf.  have the highest football shares of revenue within the  Conf.  exceeding 80 percent, and these schools are notable for their traditional priorities and success in that sport.[304]  Conf.  .  The Rascher Report provides no explanation of why it would be in the economic interest of schools with highly ranked men's basketball teams like  Conf.  to prioritize competition for student-athletes across sports in the same way as schools  Conf.  Understanding the priorities and economic interests of individual schools is a necessary step to assessing how competition among those schools would unfold in the but-for world.

Conf.

*Confidential*

### 6. The Rascher Report's But-For World Does Not Account for Individual Schools' Requirements to Abide by Title IX Regulations

136.   Approximately 96 percent of the Rascher Report's broadcast-related damages would be awarded to male student-athletes due to the Rascher Report's multisport allocation factor, which allocates 90 percent of the broadcast revenues to football and men's basketball, in addition to all revenues from relevant tournaments, bowls, and playoffs.[306]   The remaining 4 percent of the Rascher Report's broadcast-related damages would be awarded to women's basketball student-athletes, and all other female student-athletes would be excluded from receiving any broadcast-related damages.[307]   Expert testimony indicates that, due to Title IX considerations, this imbalance of broadcast-related payments across male and female student-athletes is another factor that renders the Rascher Report's but-for world infeasible.[308]   Passed in 1972, Title IX is a federal law that requires educational institutions receiving federal funds to provide men and women with equal opportunities and treatment, focusing on three areas: financial assistance, treatment and benefits, and participation opportunities.[309]   Dr. Rascher testified at deposition that he did not attempt to account for schools' requirements to abide by Title IX regulations.[310]   The Rascher Report

---

[306]   Rascher Report, Exhibit 10 ($1,040.1m for football student-athletes + $280.2m for men's basketball student-athletes = $1,320.3m in total damages for male student-athletes, divided by $1,370.1m in total damages = 96 percent); Rascher Report, ¶ 176 (The Rascher Report's multisport allocation factor allocates 75 percent of the value of broadcast media agreements to football and 15 percent to men's basketball).

[307]   Rascher Report, Exhibit 10.

[308]   Expert Report of Barbara Osborne, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, April 27, 2023 ("Osborne Report"), ¶ 1 ("I am a professor at the University of North Carolina at Chapel Hill with a joint appointment in the Department of Exercise and Sport Science and the School of Law."); ¶ 33 ("In sum, as structured by Plaintiffs, the contemplated broadcast revenue share payments are not compatible with Title IX, and in particular, Title IX's financial assistance provisions, equal opportunities provision, and equal treatment provision. Plaintiffs' Broadcast Model forces schools to treat male and female student-athletes differently and offer them vastly disparate benefits.").

[309]   Osborne Report, ¶ 43 ("OCR assesses compliance with Title IX in three primary areas within an athletics program: (1) financial assistance; (2) treatment and benefits; and (3) participation opportunities."); ¶ 64 ("Title IX prohibits sex discrimination in all education programs or activities at institutions that receive federal financial assistance."). *See also* Office for Civil Rights, "A Policy Interpretation: Title IX and Intercollegiate Athletics," *Federal Register*, Vol. 44, No. 239, 1979, available at https://www2.ed.gov/about/offices/list/ocr/docs/t9interp.html, §§ VII.A-B.

[310]   Rascher Deposition, p. 111:19-21 ("Q. Have you tried to account for Title IX in any of your damages models in this case? A. No.").

has not proposed a solution for schools to remain in compliance with Title IX while providing broadcast-related payments.

### 7. The Rascher Report's But-For World Does Not Account for Individual Schools' Requirements to Abide by State Laws

137. The Rascher Report fails to account for relevant state laws, which vary by state and prohibit schools and conferences from providing direct payments to current and/or prospective student-athletes. At deposition, Dr. Rascher claimed that he did not need to account for these laws because they did not go into effect until July 2021, and Dr. Rascher speculated that these laws "wouldn't have come up" in the but-for world.[311]  However, the Rascher Report does not account for the variation in when states enacted and revised NIL legislation.  For example:

   a. Kentucky governor Andy Beshear issued an executive order in June 2021, effective in July 2021, with prohibitions against direct payments to student-athletes from institutions and other athletic authorities.[312]  Kentucky later updated its legislation with a state law, passed and effective March 2022, but

---

[311] Rascher Deposition, pp. 112:19-113:12 ("Q.  Have you attempted to account for those laws in your model in any way? Your broadcast NIL damages model?  A.  Well, so – I mean, these laws didn't go into effect until July 1, 2021. And my damages models are all in the past before these laws went into effect. So they're not relevant to the past. I don't even think they would have gotten off the ground because they wouldn't have needed to. You know, the impetus was when my business partner, Andy Schwartz, gave a presentation to Nancy Skinner, a state senator. And then she decided to pass a California law, and then the other states followed.  But she wouldn't have even been – that wouldn't have been even necessarily something that she would have been interested in doing because if the NIL payments were already in existence in the but-for world, it just wouldn't have come up.").

[312] Kentucky Executive Order 2021-418, available at https://governor.ky.gov/attachments/20210624_Executive-Order_2021-418_Student-Athletes.pdf ("The postsecondary educational institutions located in the Commonwealth of Kentucky shall not prevent a student-athlete from earning compensation for the use of the name, image and likeness of the student-athlete while enrolled at a postsecondary institution or from obtaining a certified agent for any matter or activity relating to such compensation, except as outlined below: […] Compensation by, compensation arranged by, or compensation at the direction of the postsecondary educational institution, entities or organizations that support or benefit the postsecondary institution, or another athletic authority, or their officers, directors, employees, or agents for the use of a student-athlete's name, image or likeness.")

continues to prohibit schools and associations from paying student-athletes directly.[313]

b.  In New York, an NIL law was first proposed in the 2019-2020 legislative session, but a bill was not signed until November 2022 (effective January 2023), which prohibits school and conference NIL payments to prospective student-athletes.[314]

c.  In New Jersey, an NIL law was first proposed in 2019 and passed in 2020 (effective in 2025, the "fifth academic year" following enactment), which will prohibit school NIL payments to prospective and current student-athletes.[315]

138.  Other states have also enacted legislation preventing conferences and/or schools from directly compensating student-athletes for use of their NIL.[316]  For states that enacted or

---

[313]  Kentucky Revised Statutes Chapter 164.6945, available at https://apps.legislature.ky.gov/law/statutes/statute.aspx?id=52047 ("An institution, association, or affiliated organization shall not: (a) Give or promise compensation for the use of an athlete's name, image, or likeness; (b) Direct compensation to be given for the use of the athlete's name, image or likeness").

[314]  New York Senate Bill S5891F (matching Assembly Bill A5115), available at https://www.nysenate.gov/legislation/bills/2021/S5891 ("A college, athletic association, conference, or other group or organization with authority over intercollegiate athletics shall not provide a prospective student-athlete with compensation in relation to the student-athlete's name, image, or likeness." Emphasis removed.).

[315]  New Jersey Senate Bill 971, available at https://legiscan.com/NJ/bill/S971/2020; New Jersey Statute Title 18A Chapter 3B, available at https://pub.njleg.state.nj.us/Bills/2020/PL20/83_.PDF ("A four-year institution of higher education, an entity whose purpose includes supporting or benefitting the institution or its athletic programs, or any officer, director, or employee of the institution or entity, shall not compensate or cause compensation to be directed to a current or prospective student-athlete participating in intercollegiate athletics for use of the student's name, image, or likeness."; "This act shall take effect immediately and shall first be applicable in the fifth academic year following the date of enactment [in September 2020].").

[316]  *See, for example*, Colorado Revised Statute § 23-16-301, available at https://casetext.com/statute/colorado-revised-statutes/title-23-postsecondary-education/state-universities-and-colleges/general-and-administrative/article-16-limitation-on-athlete-agents/part-3-compensation-and-representation-of-student-athletes/section-23-16-301-compensation-and-representation-of-student-athletes-at-institutions-of-higher-education-prohibited-acts-contracts-definitions; D.C. Legislative Bill 24-455, available at https://legiscan.com/DC/text/B24-0455/id/2619057/Washington_D_C_-2021-B24-0455-Enrolled.pdf; Louisiana Statute Title § 17:3703, available at https://casetext.com/statute/louisiana-revised-statutes/revised-statutes/title-17-education/chapter-30-intercollegiate-athletes/section-173703-intercollegiate-athletes-compensation-and-rights-responsibilities-of-postsecondary-education-institutions; Mississippi Code Annotated § 37-97-107, available at http://billstatus.ls.state.ms.us/documents/2022/html/SB/2600-2699/SB2690IN htm; Montana Code Annotated § 20-1-232, available at https://leg.mt.gov/bills/mca/title_0200/chapter_0010/part_0020/section_0320/0200-0010-0020-0320 html; Nevada Revised Statute § 398.300, available at https://law.justia.com/codes/nevada/2022/chapter-398/statute-398-300/; North Carolina Executive Order 223, available at https://governor nc.gov/documents/files/executive-

revised their laws after July 2021 to prohibit institutions from making direct payments to student-athletes, it is unclear whether these states would have sought to enact these laws earlier in the but-for world.  The Rascher Report cannot predict these responses to its proposed broadcast-related compensation to student-athletes, and, at the very least, a state-by-state analysis would be required.

139.   Regardless of whether these state laws would have gone into effect in the but-for world, as with Title IX, each school is responsible for ensuring that they comply with relevant state legislation.  Because conferences include member institutions across multiple states, it would be in the school's interest to avoid ceding all authority over the distribution of broadcast-related payments to ensure compliance with relevant state laws.  For example, the Big Ten is comprised of 14 member schools, including institutions in Illinois, Indiana, and Michigan:[317]

   a.   Illinois state law (effective July 2021) prohibits schools, conferences, and athletic associations from compensating prospective or current student-athletes for their NIL.[318]

---

order-no-223/open; Oklahoma Statute Annotated § 820.23, available at https://casetext.com/statute/oklahoma-statutes/title-70-schools/chapter-9-sports-and-athletics/revised-uniform-athlete-agents-act/section-82023; Tennessee Code Annotated § 49-7-2802, available at https://casetext.com/statute/tennessee-code/title-49-education/chapter-7-postsecondary-and-higher-education-generally/part-28-intercollegiate-athletes-name-image-or-likeness/section-49-7-2802-compensation-for-use-of-intercollegiate-athletes-name-image-or-likeness; Texas Education Code § 51.9246, available at https://casetext.com/statute/texas-codes/education-code/title-3-higher-education/subtitle-a-higher-education-in-general/chapter-51-provisions-generally-applicable-to-higher-education/subchapter-z-miscellaneous-provisions/section-519246-compensation-and-professional-representation-of-student-athletes-participating-in-intercollegiate-athletic-programs.

[317]   Consolidated Amended Complaint, ¶ 82 (listing University of Illinois at Urbana-Champaign, Indiana University, University of Iowa, University of Michigan, Michigan State University, University of Minnesota, University of Nebraska – Lincoln, Northwestern University, Ohio State University, Pennsylvania State University, Purdue University, University of Wisconsin – Madison, University of Maryland, and Rutgers University).

[318]   110 Illinois Compiled Statutes 190, available at https://www.ilga.gov/legislation/ilcs/ilcs3.asp?ActID=4166&ChapterID=18 ("A postsecondary educational institution, athletic association, conference, or other group or organization with authority over intercollegiate athletics programs, including, but not limited to, the National Collegiate Athletic Association, the National Association of Intercollegiate Athletics, and the National Junior College Athletic Association, shall not directly or indirectly: (1) enter into, or offer to enter into, a publicity rights agreement with a prospective or current student-athlete; or (2) provide a prospective or current student-athlete or the student-athlete's family compensation in relation to the use of the student-athlete's name, image, likeness, or voice.").

    b.   Indiana does not appear to have considered or passed any NIL-related legislation.[319]

    c.   Michigan state law (effective January 2021) prohibits schools and conferences from directly compensating prospective student-athletes for their NIL, but not from directly compensating current student-athletes.[320]

### E. The Rascher Report's Proposed Conference-Level Competition Is Implausible and Is Not a Reliable Basis for Determining Injury and Damages Using a Common Methodology

140.   As explained in **Section IV.D**, schools would not cede authority over broadcast-related payments to conferences. Setting aside this flaw, the Rascher Report's conference-level but-for world nevertheless is flawed and fails to account for individual conferences' economic incentives.

#### 1. The Rascher Report's Conference-Based But-For World Does Not Lead to an Equilibrium

141.   The Rascher Report makes repeated use of the term "equilibrium" to describe its but-for world.[321] An equilibrium is a term that economics uses to describe the result of all

---

[319] *See, for example,* Keller, Braly, "NIL Incoming: Comparing State Laws and Proposed Legislation," *Opendorse*, January 31, 2023, available at https://biz.opendorse.com/blog/comparing-state-nil-laws-proposed-legislation (listing "no known activity" for Indiana.).

[320] Michigan Legislature 390.1733, available at http://www.legislature mi.gov/(S(3knjkho1zsbry3o1jv5ldttx))/mileg.aspx?page=getObject&objectName=mcl-390-1733 ("A postsecondary educational institution, athletic association, conference, or other group or organization with authority over intercollegiate athletics shall not do either of the following: (a) Provide a prospective college athlete who will attend a postsecondary educational institution with compensation in relation to the athlete's name, image, or likeness rights.").

[321] Rascher Report, ¶ 160 ("For conferences and schools, the desire might be to defer discussion of compensation until after the school decision, but this is not a non-collusive equilibrium because even if all-but-one conference insists on *ex post* contracting, it is not optimal for the last conference to mimic this behavior. Instead, by agreeing to *ex ante* deals, this conference can reap the benefit of landing almost any athlete it wants, given that athletes all know the *ex post* deal they will be offered could be zero. The result is that the only stable equilibrium is one where all schools show their commitment to the deal is sincere by putting it in writing prior to (or simultaneous with) the athlete committing to the school."); footnote 190 ("This would not be the outcome a conference would voluntarily choose in equilibrium."); ¶ 167 ("It is my expert opinion that the end result of these economic factors is a but-for world that will ultimately equilibrate with all Power Five Conferences competing in a similar fashion, making offers to athletes for the Broadcast NILs that involve participation in a

economic entities optimizing by making the best decisions that they can, subject to the incentives and constraints that they face and the actions of others.[322]  However, the Rascher Report fails to model an equilibrium because it does not model a credible competitive economic response by each conference.

142.    This lack of modeling of credible economic responses can be seen by looking at what the Rascher Report claims each A5 conference would make in broadcast-related payments in the proposed equilibrium.  The Rascher Report's Exhibit 12 shows that for every year from 2016 to 2021, the NSC would pay men's basketball student-athletes less than the NSC would pay men's basketball student-athletes.  This financial advantage would facilitate the NSC ability to attract better men's basketball recruits than the NSC Despite Dr. Rascher's claim in his deposition that this financial advantage reflects the "pecking order" between the NSC,[323] publicly documented evidence demonstrates that schools would have different economic incentives than those assumed by the Rascher Report.

143.    For example, the ACC has a tradition of being a top men's basketball conference: schools currently in the ACC won five of the ten men's basketball championships contested from 2010-2019, while schools currently in the SEC won one.[324]  Given its schools' past

---

sport-by-sport, conference-level, equally shared group-licensing pool."); ¶ 195 ("This ongoing natural experiment reveals that NIL compensation for class members, which was fixed at zero during the before period, was below competitive equilibrium; as a matter of economics, market participants will continue to make adjustments to increase NIL compensation to class members until such compensation reaches a competitive equilibrium.").

[322]  Myerson, Roger B., "Nash Equilibrium and the History of Economic Theory," *Journal of Economic Literature*, 1999, Vol. 37, No. 3, pp. 1067-1082, at 1069-1070 ("Nash [] formally defined an equilibrium of a noncooperative game to be a profile of strategies, one for each player in the game, such that each player's strategy maximizes his expected utility payoff against the given strategies of the other players.").

[323]



NSC

[324]  NCAA, "Men's Basketball Championship History," available at https://www.ncaa.com/history/basketball-men/d1, accessed on March 20, 2023.  Note that the University of Louisville, now part of the ACC, won the

success in basketball, the [NSC] would be incentivized to strategically react to this discrepancy by raising its men's basketball allocation to be competitive with the [NSC] The [NSC] in turn, has a tradition of being a top football conference: for example, schools currently in the [NSC]

[NSC] .[325]  The [NSC] may choose to increase its allocation to football so as [NSC] .  However, to the extent that this move by the [NSC] prioritize football comes at the expense of the men's basketball allocation, it may draw objections from [NSC] member school with a tradition of being a top basketball power.[326]  In the event that the SEC reduced the men's basketball allocation to levels that were no longer competitive with the [NSC] men's basketball allocation, this could harm [NSC] competitive aspirations in men's basketball.

144.   The Rascher Report's but-for world also does not consider whether conferences would be incentivized to compete for student-athletes who do not hold offers from multiple conferences.  Consider the case of Sean Ragan, a three-star recruit who was recruited to play football at Boston College in 2016.[327]  Ragan received two full-scholarship offers

---

2013 championship as part of the Big East, a title that has since been vacated by the NCAA's Committee on Infractions.  *See also* Consolidated Amended Complaint, ¶ 91.

NSC

NSC

from ACC schools, one from Boston College and one from the University of Miami.  In this case, the ACC would not face competitive pressure from other conferences to make a broadcast-related payment to Ragan.

### 2. The Rascher Report's But-For World Ignores Changes to Schools' Economic Incentives to Shift Conference Membership

145.    The Rascher Report's but-for world in which schools are required to accept broadcast-related payment levels dictated by their conference is not an equilibrium because it does not account for how schools' economic incentives regarding conference membership would change.  Schools have the incentive to provide higher payments to student-athletes, to better compete for student-athletes.  In a but-for world in which schools were required to accept payment levels dictated by their conference, individual schools would be economically incentivized to leave low-paying conferences to join high-paying conferences so that they can better recruit student-athletes for their teams.

146.    For example, in the Rascher Report's but-for world there are economic incentives for a school to seek to leave <span>NSC</span> where football student-athletes are only paid between $24,600 and $30,500 per student-athlete and year, and seek to join <span>NSC</span> where football student-athletes are paid between $24,500 and $46,000 per student-athlete and year.[328]  Schools' agency to switch conferences has been demonstrated with conference realignments and negotiations, and schools' motivations have often been financial.  For example:

   a.   In 2011, the University of Pittsburgh and Syracuse University announced that they were leaving the Big East (non-A5) to join the ACC (A5), which "signal[ed] to every remaining football-playing member that the time had come to forget



[328]    NSC

about conference loyalties and look out for itself."[329]  During television rights negotiations between the Big East and ESPN, disagreements between member institutions led to the conference turning down the ESPN offer in search of a more lucrative media deal.  Big East schools that disagreed with that decision made the choice to join other conferences: former Syracuse athletic director Daryl Gross explained, "We just had a TV deal fall through with the Big East, and the Big East is looking like a burning ship, and there's a cruise ship here to pick us up."[330]  The Big East reorganized to become a conference focused on basketball, while the remaining football-playing schools reorganized as the American Athletic Conference (non-A5).

b.  In 2019, Gonzaga University negotiated a deal with its conference, the West Coast Conference (non-A5), that would allow it to receive higher shares of the NCAA tournament conference distributions that are proportional to its wins. This arrangement was a departure from most conferences' approach, which is to evenly distribute NCAA distributions among its members.  Gonzaga used the Mountain West Conference's interest in recruiting Gonzaga as a member against the West Coast Conference's desire to keep Gonzaga in its conference to secure higher revenues.[331]

---

[329]  Adelson, Andrea, "Realignment Revisited – The Beginning of the End for Big East Football," *ESPN*, July 20, 2021, available at https://www.espn.com/college-football/story/_/id/31838915/realignment-revisited-beginning-end-big-east-football ("The elephant in the room, of course, was that Pitt and Syracuse had delivered a double gut punch that sent shock waves across the league, signaling to every remaining football-playing member that the time had come to forget about conference loyalties and look out for itself.").

[330]  Adelson, Andrea, "Realignment Revisited – The Beginning of the End for Big East Football," *ESPN*, July 20, 2021, available at https://www.espn.com/college-football/story/_/id/31838915/realignment-revisited-beginning-end-big-east-football.

[331]  Pells, Eddie, "Gonzaga Strikes a Deal to Get More Out of Tournament Success," *AP News*, March 26, 2019, available at https://apnews.com/article/275680042f9e4b5bb7b71a4fbca0ff10 ("When leaders at Gonzaga were looking to sweeten the pot for their basketball team in exchange for staying in the West Coast Conference, they knew exactly where the money might come from. NCAA Tournament payouts. With the perennially contending Zags being courted by the Mountain West, athletic director Mike Roth sought a way for WCC teams – namely, his team – to get paid for winning in the tournament, and to move away from the even split of tournament revenue that most conferences prefer, regardless of who wins. 'It was a unique situation,' Roth said. 'We had one conference that wanted us, and one conference that wanted to keep us. So, welcome to America.'").

    c.   In 2022, the University of Southern California and the University of California, Los Angeles, announced that they were leaving the Pac-12 (A5) to join the Big Ten (A5). This move increased the value of the Big Ten's media deal to almost $1 billion per season, allowing member institutions to make between $80-$100 million.[332]

147.   Schools also have the option to align individual sports teams with different conferences and could seek to do so in the Rascher Report's but-for world to maximize payments for student-athletes in different sports. For example:

    a.   Notre Dame is an independent football school, but its basketball teams play in the ACC (A5).[333]

    b.   The University of Connecticut is an independent football school, but its basketball teams rejoined the Big East (non-A5) in 2020 after a seven-year

---

[332] Farmer, Sam, "Big Ten's New Media-Rights Deal: Better Start Times, More National Exposure for UCLA, USC," *Los Angeles Times*, August 18, 2022, available at https://www.latimes.com/sports/story/2022-08-18/big-ten-reaches-tv-agreement ("The Big Ten, which officially adds USC and UCLA in 2024, announced the long-awaited media deal Thursday. The seven-year pact that begins in 2023 is worth more than $1 billion per season."). *See also* Gillenwater, Sam, "Report: USC, UCLA to Double Media Rights Deal with Big Ten Move," *On3*, June 30, 2022, available at https://www.on3.com/news/report-usc-ucla-to-double-media-rights-deal-with-big-ten-move-pac-12/ ("The monetary outlook of the move would heavily interest the Bruins and Trojans. The news of the realignment shot an estimation of the Big Ten's next TV deal up to nearly $1 billion. An agreement worth that much for conference members may have been too much for these teams to pass on."; "'And when you're talking about each school in that conference making upwards of $80-$100 million annually, of course there's going to be interest.'"); Strauss, Ben and Emily Giambalvo, "Big Ten Turns Away from ESPN to Sign Record $7 Billion Deal for TV Rights," *The Washington Post*, August 18, 2022, available at https://www.washingtonpost.com/sports/2022/08/18/big-ten-tv-rights/ ("Once synonymous with the Midwest, the Big Ten will soon have 16 teams spread from New Jersey to California, a newly minted national conference in a sporting realm once prized for its regional appeal. The conference recently announced the planned additions of USC and UCLA, which will give the conference a footprint in the lucrative Los Angeles media market and boosted the value of the agreements.").

[333] NBC Sports, "Notre Dame Joins ACC, Retains Football Independence," September 12, 2012, available at https://www.nbcsports.com/chicago/notre-dame-joins-acc-retains-football-independence ("Notre Dame has a new conference, but it's staying independent in football. The ACC accepted Notre Dame as its 15th member Wednesday morning, and the Irish will move all their non-football programs there from the Big East.").

absence during which UConn was part of the American Athletic Conference (non-A5).[334]

c. Villanova University's football team is part of the Colonial Athletic Association (non-A5), while the majority of its other teams, including men's basketball, are part of the Big East Conference (non-A5).[335]

148. Schools' economic incentives to realign with different conferences would be greater in the Rascher Report's but-for world, as schools seek to compete for higher broadcast revenues and better student-athletes. The Rascher Report's failure to consider these competitive dynamics results in a failure to model an equilibrium that incorporates schools' economic incentives.

### 3. The Rascher Report's Conference-Based But-For World Would Lead to Unequal Payments

149. In winning the competition for talented student-athletes in the Rascher Report's but-for world, a conference gains a student-athlete who may improve the performance of the conference's teams, and who may attract greater audience attention to the conference's broadcast and benefit the conference's ability to achieve more lucrative broadcast agreements with networks. Each conference is therefore incentivized to use its limited broadcast-related payments in the manner that best secures those benefits. Compensation would be concentrated on superstar full-scholarship student-athletes, such that broadcast-related payments would not necessarily be made to all full-scholarship student-athletes.

150. The notion of replaceability is key for understanding why the Rascher Report's assumption of conference-level competition for student-athletes would lead to unequal

---

[334]  Borzello, Jeff, "UConn Officially Rejoins Big East After Seven-Year Absence," *ESPN*, July 1, 2020, available at https://www.espn.com/college-sports/story/_/id/29392657/uconn-huskies-officially-back-big-east-conference ("The Huskies on Wednesday were readmitted to the league where they spent 34 years, from 1979 to 2013. The move was announced and authorized last summer, but it couldn't become official until July 1.").

[335]  Ryan, Matthew, "Three Schools Join Colonial Athletic Association," *The Villanovan*, January 26, 2022, available at https://villanovan.com/19097/sports/three-schools-join-colonial-athletic-association/ ("While the majority of Villanova's athletics play in the Big East, the Wildcats' football program is a member of the CAA, where they took home the regular season title in 2021.").

broadcast-related payments in the but-for world.  A5 conferences are able to negotiate multi-million-dollar contracts with broadcast networks because of consumer interest in viewing broadcasts of certain collegiate sporting events.[336]  In the Rascher Report's but-for world, an A5 conference's desire to attract a student-athlete would therefore be informed by the student-athlete's talent and marginal ability to attract viewers to the conference's broadcasted sporting events.  From an economic perspective, this marginal ability is defined by how substitutable the student-athlete is.  If removing the student-athlete from the conference's broadcast to be replaced by the next best substitute yields no change in viewership, then the student-athlete's marginal ability to attract viewers is zero.  In contrast, a student-athlete who can draw a much larger audience relative to the next best substitute is of high value to the conference's broadcast.  In a but-for world where conferences make broadcast-related payments, conferences have incentives to offer larger broadcast-related payments to more talented superstar student-athletes who the conference expects will have a larger marginal ability to attract viewers.  The opposite is true for student-athletes whose marginal talent and marginal ability to attract attention is de minimis because they are highly substitutable from the perspective of the conference.  It makes no economic sense to spend broadcast-related dollars on these student-athletes when those dollars could be used to attract superstar student-athletes who are expected to deliver superior marginal benefits.

151.   The Rascher Report is incorrect in its contention that "the nature of conference-level competition makes equal sharing more likely than, say, tiered payments based on quality or individualized payments where a conference focuses its money on just a few superstars."[337]  The Rascher Report attempts to support this contention by asserting that a conference would not "voluntarily choose in equilibrium" to "hurt the majority of its teams and […] weaken its internal competitive balance" by focusing the conference's

---

[336]   *See, for example*, Rascher (1997), p. 30 ("In sports, selling an additional million units of output only requires that a million people turn on the TV. Consumers will only purchase the highest quality product, because it won't cost significantly more than the lower quality ones; there is no room for second-tier talent in winner-take-all markets.").

[337]   Rascher Report, ¶ 163.

money on top talent that might enroll in "power schools" within the conference rather than "less dominant recruiters" in the conference.[338]  This reasoning is flawed for two reasons:

a.  All schools in the conference benefit from a more lucrative agreement with the broadcast networks, since those revenues are divided equally among the member schools.[339]  Continually attracting top talent is critical for the conference to negotiate lucrative media deals.  For example, Cristiano Ronaldo's signing with Saudi Arabia's professional soccer league, Saudi Pro League ("SPL"), benefited both the club with which he signed and the league overall.  The club, Al Nassr, secured a talented player that helped its prospects at winning the championship title and also increased its international profile, demonstrated by the increase in its Instagram followers from 860,000 before Ronaldo signed to over 11 million after the signing.[340]  All teams in the league also benefit, as Ronaldo's move to Saudi Arabia creates "a firm hope and expectation that Ronaldo's arrival will help to attract more high-profile players to Saudi Arabia over the coming

---

[338]  Rascher Report, footnote 190 ("A conference is comprised of many schools that compete for talent both intraconference and interconference, but there are clear distinctions between the power schools within a conference and less dominant recruiters."; "Focusing the conference's money on 5-stars would result in the bulk of its schools, those lower down the competitive pyramid, losing out on talent, while helping the elite of the conference to win more often. The result would be a conference intentionally choosing to hurt the majority of its teams and to weaken its internal competitive balance. This would not be the outcome a conference would voluntarily choose in equilibrium.").

[339]  *See, for example*, Rascher Deposition, p. 17:7-24 ("Q.  Yes. To the extent the schools are competing with each other in your model with broadcast NIL payments, they're doing so based on rules that are set by their conference?  A.  Yes. There's a – a determination that – that when – that the schools will make joint venture decisions within that conference, when they're allowed to do that, often. So they – it's exactly how they already deal with the broadcast. They already have this exact setup in place when they – when they get the broadcast deals and they distribute those revenues to the schools generally equally. So they're already doing that. That's a rule that they've all agreed to. And they compete with each other, right, for fans and everything and yet they're still under this rule that shares those revenues.").

[340]  Sheldon, Dan, et al., "Inside Cristiano Ronaldo's Move to Saudi Arabia's Al Nassr: Rejection, Revenge and Soft Power," *The Athletic*, January 11, 2023, available at https://theathletic.com/4077544/2023/01/11/cristiano-ronaldo-saudi-arabia-al-nassr/ ("As such, signing Ronaldo is seen as the ultimate revenge for Al Nassr, who, with the Portugal forward, will aim to deny Al Hilal a fourth consecutive SPL title."; "For the club's part, the benefits of signing one of the most recognisable figures in the world – with 532 million Instagram followers, more than anyone on the planet – are obvious. In the days before his move to Al Nassr was announced, the club had around 860,000 followers on Instagram. They now have more than 11 million.").

*Confidential*

years."[341]  Additional high-profile players in the league will help increase the level of competition, better capture consumer attention, and lead to more lucrative media deals in the future.  For example, ahead of Ronaldo's first game in Saudi Arabia, the SPL secured "several broadcast rights deals in major global markets."[342]  Similarly, David Beckham's 2007 move from Spain's Real Madrid to the professional soccer league in the United States (Major League Soccer, or "MLS") led to both the club he signed with (the L.A. Galaxy) and the MLS being able to secure higher value television broadcast contracts.[343]  Likewise, a school would see its own prosperity suffer to the extent that its conference falls behind other conferences in attracting superstar talent and therefore more lucrative media deals.  Media reports have speculated that schools in the SEC and Big Ten will benefit from the most recent conference media deals, which will increase their ability to secure the best coaches and invest in better facilities, leading to recruiting better student-athlete talent, while schools in other conferences may be "forever unable to keep up."[344]

---

[341]  Sheldon, Dan, et al., "Inside Cristiano Ronaldo's Move to Saudi Arabia's Al Nassr: Rejection, Revenge and Soft Power," *The Athletic*, January 11, 2023, available at https://theathletic.com/4077544/2023/01/11/cristiano-ronaldo-saudi-arabia-al-nassr/.

[342]  Saleh, Tariq, "IMG Lands Multiple Broadcast Deals for Saudi Pro League as Ronaldo Boosts Interests," *Sportcal*, January 23, 2023, available at https://www.sportcal.com/media/img-lands-multiple-broadcast-deals-for-saudi-pro-league-as-ronaldo-boosts-interest/ ("The Saudi Pro League (SPL), the country's top-tier men's soccer competition, secured several broadcast rights deals in major global markets ahead of Portuguese superstar Cristiano Ronaldo's debut yesterday (January 22).").

[343]  Firchau, Nick, "Beckham's Influence Huge on Galaxy's New TV Deal," *LA Galaxy*, November 19, 2011, available at https://www.lagalaxy.com/news/beckhams-influence-huge-galaxys-new-tv-deal ("While a host of people sat at the table to get the LA Galaxy's eye-popping 10-year television deal done, perhaps no single figure loomed larger in the negotiations than David Beckham."; "'Would we be sitting here with this kind of commitment [without Beckham]? No way,' [AEG president and CEO] Leiweke said. 'David took us to another level here.'"); Jones, Joshua, "David Beckham is Raking in the Cash Thanks to LA Galaxy Contract Clauses," *Fox Sports*, January 6, 2023, available at https://www.foxsports.com.au/football/david-beckham-is-raking-in-the-cash-thanks-to-la-galaxy-contract-clauses/news-story/044910159110f9a0596ca0ed44ca0135 ("The former England captain shocked world football in 2007 when he left the glitz and glamour of Real Madrid to move with his wife Victoria and their three sons to Los Angeles."; "However, Beckham's arrival sparked a major growth in the MLS with attendances up 40 per cent and the current $364m annual TV deal now worth 3,025 per cent of the $11.8m contract agreed in 2006. It also means the franchises are also worth more, averaging out at a whopping $852m in 2022 compared to $54.6m in 2008.")

[344]  Blinder, Alan, "Power 5? College Sports May Soon Be Dominated by a Mighty 2," *The New York Times*, July 1, 2022, available at https://www.nytimes.com/2022/07/01/sports/power-5-college-sports.html ("The Big Ten

b. A conference's structuring of broadcast-related compensation need not favor particular member schools over others. In the structure of "tiered payments based on quality" raised by the Rascher Report, a conference could specify large broadcast-related payments to superstars who meet objective criteria regardless of which school they enroll in within the conference, and no payments for others. For example, if �altext NSC ▒ offers its highest tier of broadcast-related compensation to five-star football recruits (the highest designation given by industry ranking websites)[345] regardless of which school they enroll in, this would benefit both ▒ NSC ▒ ability to attract five-star talent and ▒ NSC ▒ ability to attract five-star talent. Conferences with lower broadcast revenues, such as the ▒ NSC ▒ could specialize by offering competitive broadcast-related payments for certain positions or skills than others, such as quarterbacks on football teams or three-point shooters on basketball teams, while offering lower payments (or no payments) to other positions. Therefore, there is no basis

---

and SEC swagger in one tier. Not all of their members are championship contenders, but enough are. And plenty of seats are filled, and the television riches rain down. The future, enshrined in a contract the SEC has already signed and a rights package that the Big Ten is expected to announce soon, is lucrative on a scale unimaginable not all that long ago. The leagues' expansions are central to their ambitions."; "The second tier more clearly belongs, for now, to the A.C.C., the Big 12 and the Pac-12 – proud, often-successful leagues dented by exoduses, comparatively meager media deals, assorted sporting debacles or some combination of those woes. In addition to independent schools such as Notre Dame, a handful of lower-profile conferences round out the Football Bowl Subdivision. The fear of leagues like the A.C.C., the Big 12 and the Pac-12 is that they'll be relegated, even informally, toward the college sports muddle, leaving them forever unable to keep up with the conferences that distribute the largest payouts and use those dollars for best-in-class coaches and facilities that help them stay atop the ecosystem.").

[345] For football and basketball recruits, primary industry ranking websites, such as 247Sports, Rivals, and ESPN, evaluate potential recruits using a team of evaluators and grading criteria. These industry websites publish a recruiting score (usually on a scale of two to five stars) and a ranking of each potential recruit among all potential recruits for the sport in the recruiting year, with higher recruiting interest from schools generally accruing to the higher rated or ranked student-athletes. *See, for example,* NCSA College Recruiting, "Basketball Recruiting Rankings: The Ultimate Guide," available at https://www.ncsasports.org/articles-1/basketball-recruiting-rankings, accessed on March 17, 2023 ("For example, they tend to have dozens of analysts spread out across the country who take a look at top players any way that they can, including in person when possible as well as through film evaluation."; "Five-star prospects are the best of the best. Just a few dozen if that will receive this type of rating, and demand for them is high as those involved with UNC basketball recruiting, Michigan basketball recruiting, Kentucky basketball recruiting and recruiting efforts at other top schools tend to be highly interested. Players who are rated at five stars comprise roughly 1 percent of the basketball players who are at two stars and above.").

for the Rascher Report's contention that "the nature of conference-level competition makes equal sharing more likely […]."[346]

152.   The Rascher Report fails to account for these potential competitive responses and alternative payment structures that could arise under the proposed conference-level model of competition.  In the view of the Rascher Report, conferences with smaller media contracts would be content to compete less aggressively for the superstar student-athletes who would contribute toward making their sports teams more successful and their broadcasts more valuable.  This does not make economic sense.

### 4.   The Rascher Report's Conference-Based But-For World Would Not Result in a Single Multisport Allocation Factor

153.   An important consideration in how competition in the but-for world would unfold is how the priorities of individual conferences and schools inform the manner in which they would compete.  The Rascher Report attempts to accommodate this consideration by analyzing NCAA MFRS data on contributions and total revenues by sports within the A5.[347]  In doing so, the Rascher Report commits a conceptual error by assuming that historical revenue breakdowns are a numerical predictor of how broadcast-related payments would be allocated across sports in the but-for world.  In the Rascher Report's but-for world, these allocations are a competitive tool for attracting student-athletes, meaning that these allocations will be the result of strategic interactions and responses among the various schools and/or conferences seeking to behave optimally in response to others' decisions.  There is no reason to believe that the result of these strategic interactions and responses would happen to align with historical revenue and contribution estimates.  As a result, the Rascher Report fails to acknowledge that schools and/or conferences may decide to allocate broadcast-related compensation much differently than the proposed 75 percent / 15 percent / 5 percent allocation, depending on how the school

---

[346] Rascher Report, ¶ 163 ("Moreover, the nature of conference-level competition makes equal sharing more likely than, say, tiered payments based on quality or individualized payments where a conference focuses its money on just a few superstars.").

[347]              NSC

and/or conference prioritizes success in those sports in the face of allocations from competing conferences.

154.    Furthermore, the Rascher Report's Exhibit 8, which analyzes the MFRS data to corroborate the proposed multisport allocation factor, masks substantial differences in relative revenues and contributions of each sport across conferences. **Table 9** below shows the differences in each sport's relative share of total revenues and contributions across the A5 conferences between 2016 and 2021.  Not all of the individual conferences' reported revenues are "broadly consistent" with the multisport allocation factor that the Rascher Report adopts.  For instance, schools in the ▇ Conf. ▇ report much higher shares of total revenues and contributions to men's basketball ▇ Conf. ▇ ▇ than the 15 percent assumed in the Rascher Report.  Similarly, schools in ▇ Conf. ▇ ▇ report much higher shares of total revenues and contributions to football ▇ Conf. ▇ ▇ than the 75 percent assumed in the Rascher Report.  The shares of revenues reported in the MFRS data are also inconsistent with sport-specific allocations reported in media contracts, if they are reported at all: for example, ▇ Conf. ▇

▇ [8]

---

**Table 9. Proportion of Total Revenues and Contributions Attributed to Football, Men's Basketball, and Women's Basketball Across A5 Conferences, Using the Rascher Report's Methodology
2016-2021[349]**



Confidential

### 5.   The Rascher Report's Conference-Based But-For World Would Not Lead to Conferences Paying Student-Athletes 10 Percent of Broadcast Revenues

155.   Competition to attract student-athletes to one conference over another could lead conferences with larger broadcast revenues to pay student-athletes less than ten percent of their broadcast revenues, contrary to the Rascher Report's assertions.  For example, the SEC and Big Ten may observe that other conferences are paying student-athletes a substantially lower dollar amount, and therefore have the option of paying student-athletes marginally higher than the next highest-paying conference to win the labor market competition for student-athletes.  If a conference is viewed as a superior pathway to the

---

[349]   Confidential

professional leagues, that conference may be able to attract the best student-athletes even if it undercuts other conferences on broadcast-related payments. For example, as shown in **Figure 11**, in each of the five past NFL drafts, the SEC has had the highest number of players selected in the first round.[350]

**Figure 11. NFL Draft First Round Draft Picks by Conference
2018-2022[351]**



<hr />

[350] The SEC has had the highest number of players selected in the first round in 11 of the past 12 NFL drafts. *See* SEC Network, "SEC Leads Nation for 16th Consecutive Year in NFL Draft", April 29, 2022, available at https://www.secsports.com/article/33821910/sec-leads-nation-16th-consecutive-year-nfl-draft ("For the 11th time in the last 12 years, the SEC once again led the nation in First Round NFL Draft selections, as the league produced 12 opening-round draft picks, which tied for the second most in history.").

[351] Lombardi, Matt, "Here's How Each Conference Did in the First Round of the 2018 NFL Draft," *The Spun*, April 26, 2018, available at https://thespun.com/college-football/conference-breakdown-picks-2018-nfl-draft;

140

156.    In his deposition, Dr. Rascher pointed to other factors that contribute to a student-athlete's school choice to explain his reasoning for why the proposed broadcast-related payments are rational.[352]  However, in assuming that student-athletes' actual school choices would have remained constant in the but-for world, the Rascher Report fails to present a credible economic analysis of the competitive dynamics that allegedly would have led to broadcast-related payments in the first place.  The Rascher Report's but-for world therefore does not represent an equilibrium as it does not capture each conference's best competitive response to the altered incentives and constraints in this but-for world.

### F.  The Rascher Report's But-For World Relies on Unfounded Assumptions About Rulemaking

#### 1.  The Rascher Report Assumes without Evidence That NCAA Members Would Vote to Persistently Disadvantage Schools in Conferences with Lower Broadcast Revenues

157.    The Rascher Report imposes an assumption that the NCAA would seek to restrict payments for performance by imposing an annual cap on each conference's aggregate broadcast-related payments to student-athletes.[353]  Assuming the existence of an NCAA

---

Spencer, Adam, "SEC Leads All Conferences in First-Round Picks Once Again During 2019 NFL Draft," *Saturday Down South*, available at https://www.saturdaydownsouth.com/sec-football/sec-leads-all-conferences-in-first-round-picks-once-again-during-2019-nfl-draft/, accessed on March 20, 2023; Machlin, Tzvi, "SEC Dominates List of Most 2020 1st Round Picks by Conference," *The Spun*, April 24, 2020, available at https://thespun.com/sec/sec-dominates-list-of-most-2020-1st-round-picks-by-conference; Buhler, John, "NFL Draft First-Round Picks by Conference: SEC Wins the Night, Big 12 Shutout," *Fansided*, available at https://fansided.com/2021/04/30/nfl-draft-conference-bragging-rights/, accessed on March 20, 2023; Newton, Matt, "2022 NFL Draft: First Round Draft Picks by Conference," *Sports Illustrated*, April 28, 2022, available at https://www.si.com/college/virginia/football/nfl-draft-first-round-picks-by-conference.

352    Rascher Deposition, pp. 69:9-70:3                                           NSC

                    But the schools are competing on all sorts of dimensions: Cost of attendance; the school; the coach; the ability to turn pro; the training; the education; the location; the – you know, chance to play games in certain cities and home cities. I mean, there's so many elements and there's tons of research on this, as you may or may not know, showing how athletes make decisions in order to – to choose different schools.").

353    Rascher Report, ¶ 170 ("Absent the challenged NIL Rules' restrictions on schools and conferences compensating college athletes for use of their NILs, competition between the Power Five Conferences would lead to each conference compensating football and basketball players for the full value of the Broadcast NILs, which make up a portion of the media rights payments received by a conference in exchange for the rights to broadcast conference games."); ¶ 158 ("The amount of NIL compensation that the conferences could provide

rule is not the result of economic theory or economic analysis, and such a rule is inconsistent with the interests of NCAA member institutions that are responsible for adopting any such rules.

158.   Representatives from schools and conferences serve on a variety of NCAA committees that propose legislation for members to vote on and adopt.[354]  For example, the NCAA Division I Council "[r]ecommends nonacademic policies to the Board of Directors" and "votes on all conference-sponsored legislation."[355]  The Division I Council comprises of 41 members, 32 of whom are representatives from each Division I conference, 1 of whom is a representative from the Division I Committee on Academics, 4 of whom are conference commissioners, 2 of whom are faculty athletics representatives, and 2 of whom are student-athletes.[356]  The Rascher Report does not address why the majority of Division I conferences would recommend and then vote for an NCAA limit on payments that would persistently advantage conferences with the largest broadcast revenues (SEC and Big Ten),[357] and persistently disadvantage conferences with lower broadcast revenues. The Rascher Report's assumed NCAA limit therefore ignores the economic incentives of

---

would be no more than the value of the NIL because of the other NCAA rules limiting compensation."). *See also* Rascher Deposition, p. 119:14-19 ("Q.  As we talked about earlier, the NCAA rule that you believe would remain in place in the – one of the NCAA rules that would remain in place in the but-for [world] is the restriction on payment not for NIL; correct?  A.  Right."); p. 73:11-25                               NSC

                                                                                                                So if –
again, if 10 percent is a reasonable conservative estimate of – of the NIL portion, the value portion of the broadcast agreement, if it tried to pay more – if it tried to pay more, it would be violating – potentially violating the NCAA's rules on pay for performance. And so, again, 10 percent is a reasonable estimate of what that NIL value is worth. My assumption is those other rules are still in place and that a conference or a school can't go above those amounts or else they would be violating the NCAA's rules.").

[354]   NCAA, "How the NCAA Works: Division I," March 2023, available at https://ncaaorg.s3.amazonaws.com/champion-magazine/HowNCAAWorks/D1_HowNCAAWorks.pdf, p. 1 ("Representatives serve on NCAA committees that determine the division's direction and develop legislation. Members of the Division I Council vote on these proposals.").

[355]   NCAA, "How the NCAA Works: Division I," March 2023, available at https://ncaaorg.s3.amazonaws.com/champion-magazine/HowNCAAWorks/D1_HowNCAAWorks.pdf, p. 2.

[356]   NCAA, "How the NCAA Works: Division I," March 2023, available at https://ncaaorg.s3.amazonaws.com/champion-magazine/HowNCAAWorks/D1_HowNCAAWorks.pdf, p. 2.

[357]   Rascher Report, Exhibit 9.

the various Division I conferences whose approval would be necessary to adopt such a rule.

### 2. The Rascher Report Adopts an Unsupported Estimate for the Value of Student-Athlete NIL to a Sports Broadcast

159. The Rascher Report assumes that, if the NCAA's members were to adopt a limit on conferences' broadcast-related payments to student-athletes, then the NCAA would set this limit to be equal to the hypothetical value of student-athletes' broadcast NIL.[358]

160. The Rascher Report claims that a "reasonable" estimate of this hypothetical value is ten percent, which it takes from the Desser Report.[359] However, this ten percent estimate presented by the Desser Report is not the result of empirical economic analysis, nor is it grounded in relevant real-world examples. As the Desser Report acknowledges, there is no analogous situation where NIL rights in broadcast media contracts are sold separately from the overall contract or are valued independently by economic agents.[360] For example, Mr. Desser confirmed in his deposition that neither the NFL nor the NBA

---

[358] Rascher Report, ¶ 158 ("The amount of NIL compensation that the conferences could provide would be no more than the value of the NIL because of the other NCAA rules limiting compensation."); ¶ 170 ("Mr. Desser has studied these media agreements and has come to the conclusion, for the reasons described in his report, that the value of the Broadcast NILs of the athletes is equivalent to approximately 10 percent of the value of each of these media agreements.").

[359] Rascher Report, ¶ 170 ("I have reviewed the reasoning of the Desser report and believe that its analysis and conclusions are reasonable and reliable."). *See also* Rascher Deposition, pp. 94:14-95:22 ("Q. They're trying – a school that's trying to get a student athlete to come to their school versus other schools would like to be able to make the best offer possible; correct? A. But it has to fit within the NCAA rules. Q. Okay. But as we talked about earlier, the rules you're positing would prohibit compensation being distributed above 10 percent; correct? THE WITNESS: Above for the use for their NIL. And I'm using 10 percent as a reasonable estimate for the purposes of damages at this class certification stage. In a future world – right? – perhaps a school or a conference is petitioning to the NCAA trying to claim why it thinks it should be 11 percent. That may happen in the future. But I'm using 10 percent as a reasonable estimate for the past. Q. I understand that. But the 10% is a fixed amount for a school in a conference; correct? In your model. So for 2018, there's a fixed amount, 10 percent for the Big 10; correct? A. For the purposes of measuring damages, yes. Q. Yes. And that's the only measure you put in your report; correct? A. For broadcast? Q. For broadcast NIL, yes. A. I'm using 10 percent is the number I'm using in my report, yes." Objection omitted.).

[360] Desser Report, § 14.1 ("NIL is not customarily sold *separately* from the rights conveyed in media contracts, nor are specific values assigned to particular grants within an agreement. It is necessary here to break down the value of player performance and NIL in each contract, though subdividing the overall payment in a media rights contract generally has no business purpose.").

purchase NIL rights for the purposes of a broadcast separately.[361]  This is consistent with Mr. Bob Thompson's experience in the broadcast industry.[362]  Because there are no real world examples of identifying a separate value of NIL use in a broadcast and separate payments for such use, the Desser Report's ten percent estimate is an unsupported assumption.  Because the Rascher Report's common methodology rests on this flawed foundation, it cannot reliably assess class-wide injury and damages.

### G.  The Rascher Report's Estimate of "the Value of the Broadcast NILs" of Student-Athletes Is Without Precedent and Based on Speculation

161.  In the Rascher Report's but-for world, the NCAA would limit conferences' broadcast-related payments to student-athletes to the "value of the Broadcast NILs" of student-athletes.[363]  The Rascher Report claims that a reasonable and conservative estimate of this NCAA limit would be ten percent.[364]  However, the Rascher Report's adopted estimate of

---

[361]  Desser Deposition, p. 78:11-15 ("Q.  And the NIL rights in the broadcast are not bought or sold or transacted separately in either one of those leagues?  A.  No. To the best of my knowledge, they are not.").

[362]  Thompson Report, p. 38 ("In my many years in the broadcast industry, no one has ever suggested that compensation caps established in the NFLPA and NBPA collective bargaining agreements have any relationship the value of (or even existence of) NIL rights in broadcasts."); p. 41 ("[P]layer compensation structures in pro sports offer no support for Desser's 10% Opinion. In fact, the player compensation structures in pro sports are entirely inconsistent with his opinion. There is no example where pro players are paid a specific amount for Broadcast NIL rights, much less in a structure based on a percentage of broadcast rights for each player.").

[363]  Rascher Report, ¶ 170 ("Absent the challenged NIL Rules' restrictions on schools and conferences compensating college athletes for use of their NILs, competition between the Power Five Conferences would lead each conference compensating football and basketball players for the full value of the Broadcast NILs, which make up a portion of the media rights payments received by a conference in exchange for the rights to broadcast conference games."); Rascher Deposition, pp. 73:11-25                NSC

And so, again, 10 percent is a reasonable estimate of what that NIL value is worth. My assumption is those other rules are still in place and that a conference or a school can't go above those amounts or else they would be violating the NCAA's rules.").

[364]  Rascher Report, ¶ 170 ("Mr. Desser has studied these media agreements and has come to the conclusion, for the reasons described in his report, that the value of the Broadcast NILs of the athletes is equivalent to approximately 10 percent of the value of each of these media agreements. I have reviewed the reasoning of the Desser report and believe that its analysis and conclusions are reasonable and reliable."). *See also* Rascher Deposition, p. 61:10-21 ("Q.  Now, you, in your report, conclude that broadcast NIL constitutes 10 percent of the value of each of the contracts that the conference is signing for media distribution; correct?  THE WITNESS:  For the purposes of damages, I believe that a 10 percent royalty payment is reasonable, it's reliable,

student-athletes' NIL value is based on speculation from the Desser Report and is without precedent.  For example, neither Mr. Thompson nor college athletics directors have negotiated media agreements in which they separately sought to assign a value to student-athletes' NIL for use in a televised broadcast.[365]  In the professional athletics context, the Thompson Report explains that no compensation is provided separately and specifically for the use of professional athletes' NIL in televised broadcasts.[366]  Moreover, the Rascher Report's analogy to professional sports' group licensing deals is flawed and these group licensing deals do not provide a reliable basis for the Rascher Report's attempt to value student-athletes' NIL.

### 1. The Rascher Report's Reliance on Professional Athletes' Group Licensing Deals for Estimating the "Value of the Broadcast NILs" of Student-Athletes Is Flawed

162.    Dr. Rascher confirmed in his deposition that he is not offering an opinion that professional athletes' group licensing deals are an appropriate estimate of the compensation to professional athletes for use of their NIL in televised broadcasts.[367]  However, the Rascher Report and the Desser Report use royalty rates in select NFL, NBA, and WNBA group

---

the process is reliable' and it's a conservative estimate of – of the – of the value – of the value of that – of that NIL." Objection omitted.).

[365]  Thompson Report, pp. 36-37 ("I have never attempted, nor have I ever been asked, to separately value 'Broadcast NIL' when negotiating a media rights deal in college sports or for any other sports property. Also, no one from my team was ever asked or has done so either. To my knowledge, Desser is the first person to attempt to do so. Broadcast NIL is not a concept to which any network attaches value, and certainly not a concept to which a network attributes a separate value. The subject of compensation for NIL in broadcasts has never come up in a media rights negotiation I have been involved in; in fact, it has never been mentioned."); Kliavkoff Declaration, ¶ 27 ("To my knowledge, at no time during the negotiations with networks and distributors did any consultant or media company indicate that there was any identifiable or segregable value attached to, attributable to, or realizable from any name, image, or likeness ("NIL") rights of any Conference student-athletes."); Weiberg Declaration, ¶ 13 ("I have participated in many conference initiatives in which broadcast rights were discussed, and I have never heard anyone discuss the portion of broadcast rights attributable to student-athlete NIL, let alone assign it a value separate from the value of other broadcast rights.").

[366]  Thompson Report, p. 41 ("There is no example where pro players are paid a specific amount for Broadcast NIL rights, much less in a structure based on a percentage of broadcast rights for each player.").

[367]  Rascher Deposition, pp. 166:25-167:6 ("Q.  You're not looking at your yardstick at licensing for – at any – you're not looking as a yardstick for what – you're not using it as a yardstick for what professional football and basketball players get paid, if anything, for the use of their NIL in live-game broadcasts?  A.  I believe that's correct.").

licensing deals to validate the Desser Report's conclusion that "approximately 10% of the media broadcast revenue to the Power 5 conferences (and Notre Dame) for these sports is a reasonable and conservative estimate of the collective marketplace value of the NIL of college athletes."[368]  The group licensing deals for professional sports are not appropriate yardsticks because they are deals for different product categories and they represent outcomes arrived at through different negotiation mechanisms.

163.   The comparison of a hypothetical broadcast NIL to merchandise NIL is not credible because merchandise involves physical goods rather than media content, and broadcasters are competing for attention while merchandisers are trying to respond to underlying willingness to pay.  As Dr. Rascher pointed out in his deposition, "the value of someone's NIL depends on the market [...] product [...] that they're having an NIL used in."[369]  Neither the Rascher Report nor the Desser Report provide any analysis or reasoning to explain why a comparison between broadcasting and merchandise is appropriate.  Indeed, the Desser Report acknowledges that merchandise licenses are "used in somewhat different forms and in a completely passive manner."[370]  A few examples of the products involved in the merchandise group licensing deals cited by the Rascher and Desser Reports are shown below in **Figure 12** below.  While these products feature the players' names and the players' (at least partial) bodies, these products do not capture elements that the Desser Report claims are "essential to make the broadcast product realistic, exciting,

---

[368]   Desser Report, § 18.1. *See also* Rascher Report, ¶¶ 171-173; Desser Report, §§ 15, 18.

[369]   Rascher Deposition, pp. 114:20-115:13 ("Q.  Just generally speaking, football and basketball players are making different amounts of money in third-party NIL; correct?  A.  In third-party NIL. Yeah, I mean, different players are making different amounts, yes.  Q.  And does that suggest to you that different players have different NIL values?  A.  Well, that's – that's incomplete in the sense that the value of someone's NIL depends on the market – the product – right? – that they're having an NIL used in. Right? And endorsing a small company, the NIL value for that person might be smaller than if they were endorsing a large company which potentially has higher sales if they were able to sort of, you know, raise the bar in terms of the notoriety of that business. So the NIL values depend on all the other situations, not just person to person.").

[370]   Desser Report, § 15.3 ("Of greater relevance to this analysis, apparel and merchandise licenses that include players' names, images and/or likeness are more similar to the NIL contained in live game media rights agreements which we seek to estimate, though they are used in somewhat different forms and in a completely passive manner.").

and emotional, and make the fan experience far more similar to actually 'being there,'"[371] such as the "multiplier effect" of "the NIL of the college athletes, combined with their athletic performance and the contributions from the schools,"[372] and other elements of game telecasts.[373]

**Figure 12.  Select Examples of Merchandise Products in Group Licensing Products Cited by the Rascher and Desser Reports[374]**



Counsel Only

---

[371] Desser Report, § 7.3 ("Use of NILs in telecasts is essential to make the broadcast product realistic, exciting, and emotional, and make the fan experience far more similar to actually 'being there.'").

[372] Desser Report, § 7.6 ("There is also a multiplier effect, where the NIL of the college athletes, combined with their athletic performance and the contributions from the schools (e.g., school trademarked uniforms, etc.) creates additional value beyond that which any single element contributes.").

[373] Desser Report, § 8.2.

[374] 

Counsel Only

164.    The Desser and Rascher Reports further point to video game group license deals, which the Desser Report claims "are even closer to live game NIL [than merchandise products] insofar as they are for the video images and/or likenesses of players in a media-like form of a consumer product."[375]  Mr. Desser nevertheless acknowledged in his deposition that video games were not a perfect comparator to a televised broadcast.[376] Counsel Only

[377]  The wide range of royalty rates does not support the Desser Report's conclusion that 10 percent would be a conservative yardstick.

### 2.    The Rascher Report Ignores Important Differences between Professional Sports and Collegiate Sports

165.    In comparing professional sports' group license deals with the proposed broadcast-related payments for student-athletes, the Desser and Rascher Reports also ignore important structural differences in the negotiating mechanisms that would lead to different outcomes.  Group licensing deals in professional sports leagues are negotiated between two entities: the players' association (to whom professional athletes have assigned all group licensing rights) and a third party looking to produce licensed products.[378]  The

---

[375]   Desser Report, § 16. *See also* Desser Deposition, p. 88:1-6 ("Q. And what you're saying there is that you think that the video game licenses are more analogous to the licenses of broadcasts of NIL and broadcast than the product and other types of third party licenses that are in Section 15?  A.  Yes.").

[376]   Desser Deposition, pp. 88:22-89:9 ("Q. But the 10 percent that you're using there is 10 percent of a video game revenue stream, which is different than a broadcast revenue royalty stream. The video game manufacturer has different costs, different markets, different overhead structure and so forth. Is that correct?  A.  That may be correct. This was one of the closest parallels to the broadcast license utilization that I am studying, and therefore I believe it to be a very good analogy or maybe the closest analogy that exists. But it's clearly not the same exact thing, which is why it is an analogy.").

[377]   

[378]   Rascher Deposition, pp. 57:18-58:7 ("Q. The – just to use one of the examples you used, there's a group license for Topps, which is a player card company, with NFL players; correct?  A.  Yes.  Q.  And that contract is between the NFL players and Topps; correct?  A.  Yes.  Q.  The teams in the league are not parties to that

players' association holds bargaining power in that, if an agreement cannot be reached, then the third party is precluded from selling and profiting from the licensed product. In contrast, in the Rascher Report's proposed but-for world, five separate conferences would be setting broadcast-related payments in a competition to attract thousands of student-athletes in a labor market. In this proposed but-for world, individual student-athletes would not hold the same bargaining power as a professional players' association, because an individual's decision not to enroll in a conference does not mean that the conference cannot offer its broadcast; the conference will instead find a replacement student-athlete. This replaceability allows conferences to compete more aggressively for certain student-athletes than others, something that a third party does not do in a negotiation with a professional players' association that holds the rights to all players' NILs. The Rascher Report fails to explain why these two different settings would nevertheless produce a similar outcome despite these differences.

166. Although the Rascher Report acknowledges that the number of economic actors involved changes the nature of the competition and the resulting equilibrium point,[379] the Rascher Report fails to evaluate how the higher number of economic entities in the proposed but-for world would lead to different outcomes than those observed in professional sports leagues. As shown in **Table 10** below, the Rascher Report's but-for world involves many more economic entities making independent decisions about broadcast-related payments

---

contract?                                    Counsel Only

[379] Rascher Report, ¶ 155 ("By modeling this competition as being among the Power Five Conferences competing to acquire pooled group licenses for the use of the Broadcast NILs from class members, I have chosen a conservative method to estimate damages, because such a model results in a much more muted form of competition than would a system that assumes sixty-five independent Power Five competitors, some of which are part of the same Broadcast contract, each making offers against each other."); footnote 190 ("While it might be in the interest of a specific team within a conference to target Broadcast NIL money at a few athletes under a school-based model of competition, potentially paying very large amounts to some and little or none to others, this is not the case for an entire conference under a conference-level competition model.").

across multiple sports compared to professional sports leagues such as the NFL, NBA, and WNBA making decisions about a single sport.[380]

**Table 10. Comparison of Economic Entities in Professional Sports Leagues and the Rascher Report's Collegiate Sports But-For World[381]**

| | Professional Sports | | | Rascher Report But-for World |
|---|---|---|---|---|
| **NFL** | **NBA** | **WNBA** | | **A5 Conferences** |
| 1 League | 1 League | 1 League | | 5 Conferences |
| 32 Teams | 30 Teams | 12 Teams | | 65 Schools |
| 1 Sport | 1 Sport | 1 Sport | | 41 Sports |
| >2,000 Athletes | ~500 Athletes | ~150 Athletes | | >37,000 Student-Athletes |
| 1 Players' Assoc. | 1 Players' Assoc. | 1 Players' Assoc. | | 0 Players' Assoc. |

## V. THE RASCHER REPORT'S PROPOSED THIRD-PARTY NIL DAMAGES METHODOLOGY IS NOT A CREDIBLE APPROACH TO ASSESSING INJURY OR DAMAGES TO INDIVIDUAL STUDENT-ATHLETES OR ON A CLASS-WIDE BASIS

167. This section describes how the Rascher Report's proposed third-party NIL damages approach is based on a series of flawed assumptions, and the Rascher Report has not presented a complete common methodology. Individualized considerations dictate whether a student-athlete would have been able to secure third-party NIL deals in the

---

[380] Rascher Deposition, p. 159:4-11 ("Q. Let me ask you a slightly different question, Doctor, which is in your model, the same conference is deciding the payments for football and basketball players; correct? A. Yes. Q. That's not the case in professional sports; right? A. Correct.").

[381] NFL, "Teams," available at https://www.nfl.com/teams/, accessed on March 22, 2023 (listing 32 teams); NFLPA, Form LM-2, 2021, downloaded from https://olmsapps.dol.gov/query/orgReport.do?rptId=755825&rptForm=LM2Form, Schedule 13 (listing 2,106 "active player" members); NBA, "All Teams," available at https://www.nba.com/teams, accessed on April 10, 2023 (listing 30 teams); NBPA, Form LM-2, 2021, downloaded from https://olmsapps.dol.gov/query/orgReport.do?rptId=791969&rptForm=LM2Form, Schedule 13 (listing 507 "general" members); Stone, Larry, "Breanna Stewart and Other Stars Are Forming Super Teams, But Is That Good for the WNBA?" *The Seattle Times*, February 7, 2023, available at https://www.seattletimes.com/sports/storm/breanna-stewart-and-other-stars-are-forming-super-teams-but-is-that-good-for-the-wnba/ ("With just 12 [WNBA] teams and roughly 150 players in the league each year, there are more stars than teams."); Rutgers University Libraries, "Labor Organizations in the Sports Industry," available at https://libguides.rutgers.edu/c.php?g=336678&p=2267003, accessed on March 27, 2023 (listing Players Associations, including the NFLPA, NBPA, and WNBPA); Rascher Report, Exhibit 14 (listing 7,384 eligible student-athletes in the Autonomy Five); Consolidated Amended Complaint, ¶¶ 79, 82, 84, 88, 91 (listing the 65 Autonomy Five schools across five A5 conferences); NCAA MFRS data (for a count of the 41 sports in the A5 and over 37,000 A5 student-athletes).

before period and, if so, the value of the third-party NIL deals they would have been able to secure.  Therefore, a common methodology cannot assess injury and damages to proposed class members.

### A.    The Rascher Report's Proposed Third-Party NIL Damages Approach

#### 1.    Description of the Rascher Report's Proposed Third-Party NIL Damages Approach

168.    The Rascher Report assesses injury and damages to student-athletes who received at least one third-party NIL deal after July 1, 2021 (the "after" period).[382]  The Rascher Report asserts that these student-athletes would have received at least one additional third-party NIL deal between the beginning of the 2016-2017 academic year and June 30, 2021 (the "before" period), if they were an eligible Division I student-athlete playing the same sport during the damages time period.[383]  The Rascher Report assumes that the third-party NIL landscape in the before period has reached a stable and long-term equilibrium.[384]  To estimate damages to the proposed classes, the Rascher Report:

   a.  Identifies eligible class members who received a third-party NIL deal in the after period.[385]  The Rascher Report identifies Counsel Only eligible class members across 125 Division I schools based on the available data to date, which

---

[382]    Rascher Report, ¶ 180 ("It is my conclusion that such damages can be reasonably estimated for those class members who, under the Current NIL Rules, have been able to enter into one or more third-party NIL agreements and who have in fact done so prior to the date of class certification (and who were restrained by the Prior NIL Rules by virtue of being a Division I athlete prior to July 1, 2021)."); Rascher Report, ¶¶ 185-186.

[383]    Rascher Report, ¶ 183 ("[B]ut for the Prior NIL Rules, there is strong common evidence that eligible class members who received such deals as college athletes in the after period would have received similar deals as college athletes in the before period."). *See also* Rascher Report ¶ 190 ("I will only estimate damages if a class member with a third-party NIL agreement in the after period played in the same sport during the before period.").

[384]    Rascher Deposition, pp. 225:24-226:4 ("June 30, no one's allowed to be paid. And so the next day of course you're not going to be at equilibrium; it's going to take years to sort of get to that equilibrium. And so my presumption in the past is that we would already be at that equilibrium.").

[385]    Rascher Report, ¶ 184 ("[M]y methodology would first identify each eligible class member who received such a third-party NIL deal during the period since July 1, 2021, when such third-party NIL deals have been permitted.").

[Counsel Only].[386]  The Rascher Report "excludes any athletes who did not obtain compensation for NIL transactions even after such deals were allowed,"[387] but expresses a plan to "continue to add after-period deals to [the] damages model through the time of [the] merits report on damages and through trial, as permitted."[388]

b.  [Counsel Only]
    [Counsel Only][389]

c.  Proposes that individual class member damages will be calculated "based upon the after-period NIL compensation for each class member adjusted for changes between the after period and the before period."[390]  The Rascher Report proposes the following adjustments to class members' compensation: (i) whether a student-athlete transferred or did not play the same sport; (ii) changes in a student-athlete's role on a team; (iii) the impact of the Covid-19 pandemic and changes in the overall price levels.[391] The Rascher Report does not implement any of the adjustments proposed and does not present an estimate of class-wide or individual class member damages.

169.  The Rascher Report's proposed, but not implemented, methodology suggests that, to estimate the third-party NIL damages for a football student-athlete who was a senior in the 2021-2022 academic year and who secured a $500 third-party NIL deal in the after period, the Rascher Report would then determine whether the student-athlete played a different sport during the before period, whether they transferred schools or

---

[386]  Rascher Report, ¶¶ 196-198, [Counsel Only]

[387]  Rascher Report, ¶ 187.

[388]  Rascher Report, ¶ 193.

[389]  [Counsel Only]

[390]  Rascher Report, ¶ 194.

[391]  Rascher Report, ¶¶ 190-192.

conferences, and whether their role on the team changed between the before and after period.[392]  However, no details of a methodology for these potential adjustments are given.  Assuming that the Rascher Report determines that the student-athlete played football at the same school for three years in the before period and that their role on the team remained the same, then Dr. Rascher testified that he would estimate that the student-athlete would have received $500 in third-party NIL deals in every year they played football, for a total of $1,500.[393]  The Rascher Report then proposes to make an adjustment for the impact of Covid-19 in the 2019-2020 and 2020-2021 academic years to adjust the $500 down by 14.7 percent in the 2021 season and by 6.1 percent in the 2020 season, resulting in an adjusted total damages of $1,396.[394]

### 2. The Critical Assumption Underlying Rascher Report's Proposed Third-Party NIL Damages Approach

170.   The approach proposed by the Rascher Report involves estimating prices in the but-for world based on actual prices from a time period that is unaffected by the alleged

---

[392]   Rascher Report, ¶¶ 190-191 ("First, under my methodology, I will only estimate damages if a class member with a third-party NIL agreement in the after period played in the same sport during the before period. I will make an adjustment in the damages calculation if the class member transferred from a school in one conference during the before period to a different school or conference in the after period, but only if I find a different school or conference results in a statistically significant difference in demand for use of the transferred athlete's NIL. […] Second, the model will account for changes in an athlete's role on the squad that are substantial enough to affect compensation for use of the athlete's NIL.")

[393]   Rascher Deposition, pp. 220:9-221:10 ("Q.  So – I mean, I'm not using a specific example but just theoretically. If a student athlete in November of 2021 in their fourth year of eligibility earned $500 for third-party NIL, you would give them an additional $1,500 of backwards damages?  So just the $500 three years going back; that right?  THE WITNESS:  That's sort of the beginning stages of it.  That's sort of the general framework – right? – that the athlete shows their unique characteristics in value.  It's all captured in the fact that they did get paid when it became allowed and it got paid a certain amount.  And then going back, making adjustments for, you know, when they – when they started playing in college – right? – you know, potential other adjustments like conference changing or role on team, things like that.  But that's the base – sort of a starting point is what you said. Q.  Yeah, fair – we'll talk about the adjustments. But sort of other than the adjustments, is that a fair statement of the general methodology?  A.  Generally, yes." Objection omitted.). *See also* Rascher Report, ¶¶ 190-192.

[394]   Rascher Report, ¶ 208 ("My analysis of the NCAA MFRS data indicates a downward adjustment of 14.7 percent for the 2021 season and 6.1 percent for the 2020 academic year based on the deviation from forecast for net revenue excluding game revenue.").

behavior.[395]  Although such a before-and-after approach is used in damages methodology in antitrust litigation,[396] it cannot be used to estimate third-party NIL damages in this matter.  A before-and-after approach "assumes that prices from the benchmark period are a good approximation of long-run equilibrium prices.  It is important, however, to examine the economic conditions in the before and after periods […] that would indicate that the market had not reached long-run equilibrium," such as changes in demand, changes in costs, and the entry and exit of market players such as collectives.[397]  The Rascher Report provides no such examination, and the assumption is inappropriate in this matter.

171.    The Rascher Report's proposed third-party NIL damages approach rests on assumptions of stability and constancy in two ways:

    a.    First, the Rascher Report assumes that third-party NIL deals in the after period are representative of the but-for world where third-party NIL deals were agreed upon in the before period.

    b.    Second, the Rascher Report assumes that if third-party NIL deals in the after period are shifted to an earlier point in time in the before period, then

---

[395]  *See, for example,* McCrary, Justin and Daniel L. Rubinfeld, "Measuring Benchmark Damages in Antitrust Litigation," *Journal of Econometric Methods,* Vol. 3, No. 1, 2014, pp. 63-74 ("McCrary and Rubinfeld (2014)"), at 63 ("[T]he benchmark approach evaluates prices only in the market at issue, comparing prices in the impact period to available prices before and/or after the alleged period of impact (the 'control period')."). *See also* "Chapter 4, Quantifying Damages" in *Proving Antitrust Damages: Legal and Economic Issues,* Third Edition, American Bar Association, 2017, pp. 87-102, at 92-93 ("These models seek to isolate harm flowing from the challenged anticompetitive conduct by comparing the plaintiffs' experience in the same market before, or after, the misconduct with its experience during the time the conduct was ongoing, which is sometimes referred to as the 'damages period.'").

[396]  McCrary and Rubinfeld (2014), p. 63 ("The two most common approaches to evaluating damages involve the use of yardsticks and benchmarks.").

[397]  "Chapter 8, Overcharges" in *Proving Antitrust Damages: Legal and Economic Issues,* Third Edition, American Bar Association, 2017, pp. 221-273, at 228 ("First, the before-during-after model assumes that prices from the benchmark period are a good approximation of long-run equilibrium prices. It is important, however, to examine the economic conditions in the before and after periods for entry or exit, surpluses or shortages, or factors that would indicate that the market had not reached long-run equilibrium.").

third-party NIL deals in the after period would not have been different in the but-for world.

172. These assumptions in turn rest on the assumption of stability and constancy in the environment in which third-party NIL deals are formed.  However, as I explain in the rest of this section, the environment in which third-party NIL payments are made is not stable and is inherently dynamic.

173. Because the Rascher Report fails to establish this critical foundation of its methodology, the Rascher Report's proposed methodology fails in assessing injury or damages for the student-athletes who are in the proposed classes.  Instead, the Rascher Report's proposed methodology does not account for individualized considerations and leads to flawed and unreliable results.

### B. The Rascher Report Does Not Account for the Complex Nature of the Third-Party NIL Platforms and the Ecosystem Surrounding Them

174. The Rascher Report's proposed methodology does not grapple with the source of the third-party NIL payments it seeks to quantify.  The Rascher Report therefore does not recognize that the sources of these third-party NIL payments are inherently dynamic and its proposed methodology of using the after period to predict the before period is inappropriate.

175. Understanding the economics of third-party NIL transactions requires understanding the variety of institutions that facilitate student-athletes and external entities to connect with each other.  There are two separate types of interactions that are facilitated in the third-party NIL ecosystem as depicted in **Figure 13**.  The complexity of this ecosystem reflects the fact that fans and organizations may circumvent the platforms to directly engage with student-athletes.  **Figure 13** does not show the role of schools in facilitating third-party NIL deals, as the role of schools is dependent on state laws, which vary on multiple dimensions as discussed in **Section IV.D.7**.

**Figure 13. Economic Agents in the Third-Party NIL Ecosystem**



### 1. Third-Party NIL Interactions Between Organizations and Student-Athletes Are Complex

176. The first type of interaction in the third-party NIL ecosystem is where organizations try to capture scarce attention by featuring the image of a student-athlete in their promotional materials or by featuring a student-athlete's appearance at a promotional event. A variety of digital platforms have enabled these types of deals to occur, but there is also the possibility that an organization might directly approach a student-athlete.[398]

---

[398] Business of College Sports, "Tracker: NIL Marketplaces for Student Athletes," February 17, 2023, available at https://businessofcollegesports.com/tracker-nil-marketplaces-for-student-athletes/. *See also* Lodge, Jessica, "UT Heisman Hopeful Bijan Robinson Unveils Own Mustard Brand," *Houstonia*, August 26, 2022, available at https://www.houstoniamag.com/news-and-city-life/2022/08/bijan-robinson-launches-mustard-brand ("After being approached by CALLEN, Robinson began the work with the team to create a condiment completely

177. Brands may seek to partner with student-athletes to promote a new product, to market an existing product, or to generally raise their brand awareness. This partnership could involve the student-athlete posting on social media, appearing in commercials, or sharing a promotional code.[399] The type and length of a deal that brands may enter into with a student-athlete may depend on factors such as the brand's marketing budget, marketing strategy, financial situation, industry growth, and local economic conditions, among others, as discussed in **Section V.D**. Charities may seek to partner with student-athletes to promote a cause or to raise funds.[400] For example, a student-athlete may make appearances at events or help run sports clinics or summer camps. Student-athletes may also donate NIL compensation to charities of their choice.[401]

178. Digital platforms have emerged to help facilitate these third-party NIL transactions. These platforms connect student-athletes to businesses, brands, or charities that have registered and would like to enter into a third-party NIL deal.[402] Schools use these digital technology companies to facilitate reporting and payment processes, while also providing student-athletes with additional third-party NIL support, such as financial education.[403]

---

from scratch. The running back was paired with a local Austin consulting chef, Joe Gentempo, to create a rich, smooth, and spicy Dijon mustard made with high-quality ingredients.").

[399] *See* Table 11; Rascher Report backup materials (third-party NIL transaction data).

[400] Horns with Heart, "Our Mission," available at https://hornswithheart.org/#real-mission, accessed on April 7, 2023 ("Horns with Heart was founded with the goal of using the Name, Image, and Likeness of University of Texas student-athletes to help promote worth charitable causes and make positive contributions to our local communities […] Our governing board and their involvement is pro-bono. Our goal is to maximize the amount of exposure we can create for our selected charities and student-athletes who promote them.").

[401] Business of College Sports, "Tracker: NIL Marketplaces for Student Athletes," February 17, 2023, available at https://businessofcollegesports.com/tracker-nil-marketplaces-for-student-athletes/ ("CoachTube […] Coach/student athlete or a charity of their choice can keep 100% of the revenue[.]").

[402] Johnson, Richard, "Year 1 of NIL Brought Curveballs, Collectives and Chaos. Now What?" *Sports Illustrated*, July 12, 2022, available at https://www.si.com/college/2022/07/12/nil-name-image-likeness-collectives-one-year ("Marketplaces serve as a middle man connecting as many athletes to as many brands as have signed up to begin a conversation that will hopefully lead to a deal. Some marketplaces charge a small subscription price to either the businesses or the athletes, and marketplaces stake their reputation on vetting businesses themselves.").

[403] Columbia Lions, "Columbia Athletics Announces Name, Image and Likeness Marketplace Through Partnership with Opendorse," November 15, 2022, available at https://gocolumbialions.com/news/2022/11/15/general-columbia-athletics-announces-name-image-and-likeness-marketplace-through-partnership-with-opendorse.aspx

*Confidential*

179. Many collectives have partnered with digital technology companies to create third-party NIL marketplaces.[404]  In some instances, collective-sponsored third-party NIL marketplaces serve only to connect individual student-athletes with a local business, while in other instances collectives pool together money from a number of donors to sponsor a third-party transaction between the student-athletes and a charity.  For example, one of the University of Texas – Austin's collectives, Horns with Heart, seeks to maximize exposure for "selected charities and student-athletes who promote them" by organizing third-party NIL compensation for student-athletes who promote local charities,[405] while one of the University of Florida's collectives, MarketPryce Florida, provides a platform where University of Florida student-athletes and local businesses

---

("Columbia Athletics and Opendorse have partnered to launch the official name, image and likeness marketplace for Lions student-athletes. […] Every Columbia student-athlete also has the option to create their own Opendorse profiles, which allows them to review opportunities, accept deals and receive compensation all in one place. The platform also serves as the compliance mechanism by which student-athletes can report on all name, image and likeness activity."). *See also* NU Athletic Communication, "Nebraska to Launch Industry-Leading NIL Program: #NILbraska," *University of Nebraska*, June 3, 2021, available at https://huskers.com/news/2021/6/3/athletics-nebraska-to-launch-industry-leading-nil-program-nilbraska.aspx ("Nebraska launched the Ready Now program in March of 2020, making Nebraska the first school to embark on a program to prepare student-athletes for NIL. In conjunction with Lincoln-based Opendorse, the Ready Now program focuses on Education, Assessment and Performance, and best positions student-athletes to enhance their social media profiles."); On3, "INFLCR, On3 Announce Partnership to Provide Student-Athletes Market Valuation Tools, Educational Resources," July 11, 2022, available at https://www.on3.com/nil/news/inflcr-on3-announce-partnership-to-provide-student-athletes-market-valuation-tools educational-resources/ ("Terry said On3 is excited to provide educational resources both in the INFLCR app, and jointly deliver in-person strategy sessions at INFLCR partner schools. Centered around financial literacy, personal branding, and leadership strategy, the opportunity to educate student-athletes with substantive education has never been better.").

[404] Claybourn, Cole, "Name, Image, Likeness: What College Athletes Should Know About NCAA Rules," *U.S. News*, March 2, 2023, available at https://www.usnews.com/education/best-colleges/articles/name-image-likeness-what-college-athletes-should-know-about-ncaa-rules ("'Collectives are making up a great deal of the NIL transactions that are happening,' says Jim Cavale, founder and CEO of INFLCR, a third-party app that works with more than 200 colleges on NIL management and helping athletes find endorsement partnerships, according to the company website. Nearly 70% of the transactions on the INFLCR app come from collectives, he says. 'That's an important evolution. The question is, 'How sustainable is that?''").

[405] Horns with Heart, "Our Mission," available at https://hornswithheart.org/#real-mission, accessed on April 7, 2023 ("Horns with Heart was founded with the goal of using the Name, Image, and Likeness of University of Texas student-athletes to help promote worthy charitable causes and make positive contributions to our local communities… Our governing board and their involvement is pro-bono. Our goal is to maximize the amount of exposure we can create for our selected charities and student-athletes who promote them.").

sign up and participate in a raffle funded by alumni, where businesses receive free promotions by student-athletes.[406]

180.   In addition to using digital platforms, student-athletes can sign deals directly with companies, brands, and charities.  For example, Norfolk State former football and current track-and-field student-athlete Rayquan Smith emailed multiple companies to offer to promote their products in exchange for NIL compensation.[407]  University of Florida's football player Gervon Dexter prepared a series of self-branded t-shirts to be sold on a personal website.[408]  In August 2022, University of Texas – Austin running back Bijan Robinson launched his own brand of mustard, called "Bijan Mustardson," developed with help from a local chef after an Austin based advertising agency, CALLEN, approached him to begin a partnership.[409]  On July 1, 2021, Michigan State football player Matt Coghlin announced that brands could contact him directly for NIL

---

[406]  Business of College Sports, "Tracker: University-Specific NIL Collectives," March 21, 2023, available at https://businessofcollegesports.com/tracker-university-specific-nil-collectives/ ("University of Florida - MarketPryce Florida […] Student athletes sign up for free and get paid to promote local businesses, are included in a bi-weekly raffle, where you will receive an email to opt-in to promote local businesses across Gainesville. Businesses sign up for free to have their business get promoted by Gator student athletes and are included in the bi-weekly raffle, where one local business every two weeks will receive free promotion from Gator student athletes who sign up to participate, paid for by alumni. Those who donate money can win prizes like signed memorabilia, season tickets and exclusive player meet and greets, depending on how much they donate.").

[407]  Nakos, Pete, "Meet Rayquan Smith, the 'King of NIL,'" *On3*, June 7, 2022, available at https://www.on3.com/nil/news/rayquan-smith-king-of-nil-norfolk-state-spartans-football-track-eastbay-spikeball-name-image-likeness/ ("The Norfolk State football and track athlete remembers scrolling on Instagram and seeing athletes sign deals while he waited to hear back on the athletic training job. Instead of holding out, however, Rayquan Smith quickly hatched together a plan. Developing a pitch, he emailed company after company, even offering his services for free. Only three companies responded after the first round of emails. But as he continued to expand his list of companies, his list of deals grew.").

[408]  Taylor, G. Allan, "For Athletes Eager to Secure NIL Deals, It's Probably Better to Look Before They Leap into the 'Whirlwind'," *The Athletic*, July 12, 2021, available at https://theathletic.com/2700091/2021/07/12/for-athletes-eager-to-secure-nil-deals-its-probably-better-to-look-before-they-leap-into-the-whirlwind/  ("[Gervon Dexter, t]he five-star prospect, approaching his sophomore season with the Gators, had his new 'G9' logo and a series of self-branded T-shirts ready to sell on his personal website. Yet Dexter realized he needed representation to land larger endorsements.").

[409]  Lodge, Jessica, "UT Heisman Hopeful Bijan Robinson Unveils Own Mustard Brand," *Houstonia*, August 26, 2022, available at https://www.houstoniamag.com/news-and-city-life/2022/08/bijan-robinson-launches-mustard-brand ("After being approached by CALLEN, Robinson began the work to create a condiment completely from scratch. The running back was paired with a local Austin consulting chef, Joe Gentempo, to create a rich, smooth, and spicy Dijon mustard made with high-quality ingredients.").

opportunities with a tweet "Business is open… and business is BOOMING! DM me if you want to promote your brand!"[410]

181.   Student-athletes may hire agents to help them secure and negotiate the terms of third-party NIL deals.  For instance, an article from July 12, 2021 reports that sport agent Mark Bailey had talked with about 200 student-athletes seeking representation to secure third-party NIL deals since July 1, 2021.[411]  Bailey helped University of Florida's Gervon Dexter enter a deal with College H.U.N.K.S. Hauling Junk & Moving, a moving and junk removal service.  Student-athletes also used established marketing agencies; for example, University of Florida's Derek Wingo signed a marketing deal with agency Loyalty Above All.[412]

182.   Student-athletes may also rely on fellow students to act as their agents, as the NCAA only requires agents' certification for a subset of sports, and not all states currently have a law requiring that student-athletes' agents obtain a certification.[413]

---

[410]   Spenser, Davis, "Michigan State Kicker Goes Viral For Hilarious Paid Tweet on Day 1 of New NIL Rules," *Saturday Tradition*, 2021, available at https://saturdaytradition.com/michigan-state-football/michigan-state-kicker-goes-viral-for-hilarious-paid-tweet-on-day-1-of-new-nil-rules/.

[411]   Taylor, G. Allan, "For Athletes Eager to Secure NIL Deals, It's Probably Better to Look Before They Leap into the 'Whirlwind,'" *The Athletic*, July 12, 2021, available at https://theathletic.com/2700091/2021/07/12/for-athletes-eager-to-secure-nil-deals-its-probably-better-to-look-before-they-leap-into-the-whirlwind/ ("Sports agent Mark Bailey estimates talking with 200 college athletes since July 1, the benchmark moment when the name, image and likeness tsunami began washing over the NCAA.").

[412]   Taylor, G. Allan, "For Athletes Eager to Secure NIL Deals, It's Probably Better to Look Before They Leap into the 'Whirlwind'", *The Athletic*, July 12, 2021, available at https://theathletic.com/2700091/2021/07/12/for-athletes-eager-to-secure-nil-deals-its-probably-better-to-look-before-they-leap-into-the-whirlwind/ ("Sports agent Mark Bailey estimates talking with 200 college athletes since July 1, the benchmark moment when the name, image and likeness tsunami began washing over the NCAA. One of those conversations arose from an Instagram message sent by Florida defensive tackle Gervon Dexter. […] The move paid off within days, leading to Dexter's signing of a sponsorship agreement with College H.U.N.K.S., a moving and junk-removal service headquartered in Tampa. […] Dexter's linking up with Bailey's agency, 1stDownSports, led the first phase of Gators athletes jumping into the NIL promotional pool. Sophomore linebacker Derek Wingo signed a marketing deal with Loyalty Above All (LAA) of New York[.]").

[413]   Johnson, Richard, "Year 1 of NIL Brought Curveballs, Collectives and Chaos. Now What?" *Sports Illustrated*, July 12, 2022, available at https://www.si.com/college/2022/07/12/nil-name-image-likeness-collectives-one-year ("'There's a lot of students out there who are acting as agents on behalf of their friends and their classmates,' says Kristi Dosh, a former corporate attorney who now covers sports business. 'There are a couple I can think of who know what they're doing and some of it's somewhat horrifying. It's because they can, there's nobody who says they can't if they're in a state that doesn't have any sort of agent law or registration or

183.   All of these third-party NIL transactions, whether facilitated by a digital platform or not, require the student-athlete to exert effort and time to ensure that they are able to monetize their NIL in this manner.  The amount of time and effort they are willing and able to dedicate to pursuing third-party NIL opportunities can vary over time and can depend on a variety of factors, including the stage of their collegiate sports career, their status on the team, their academic load, and their family financial situation.

### 2.   Third-Party NIL Interactions Between Fans and Student-Athletes Are Complex

184.   The second type of interaction is between fans and student-athletes.  Similar to the interactions between organizations and student-athletes, many digital platforms have enabled deals between fans and student-athletes to occur.

185.   Digital platforms allow fans to search for student-athletes to pay them for autographs, merchandise, appearances, social media posts, or recorded videos.  For example, in August 2022, Opendorse launched an online marketplace where fans could purchase autographs, appearances and social media posts.[414]

186.   Collectives also connect individual student-athletes to fans.  For example, one of the University of Florida's collectives, the Gator Collective, provides fans with access to exclusive content, autographs, interviews, and personal appearances by student-

---

certification process and they're working with a gymnast who there's not a professional organization certifying them like you have in the NFL.'"). *See also* NCAA, "Agent Certification," January 24, 2019, available at https://www.ncaa.org/sports/2019/1/24/agent-certification.aspx ("In order to represent Division I men's basketball student-athletes as they weigh their professional prospects without negatively impacting the athlete's remaining eligibility, the agent must be NCAA certified by the Enforcement Certification and Approvals Group (ECAG).").

[414]   Russo, Ralph D., "New Online NIL Marketplace Connects Fans to College Athletes," *AP News*, August 1, 2022, available at https://apnews.com/article/college-football-sports-70842c5b8b188b71f95f62d5bf9d5611 ("Opendorse, a company that partners with dozens of schools to help initiate, track and monitor NIL deals, on Monday launched an online marketplace where fans can go directly to athletes to purchase their autographs, personal appearances and social media posts. At Opendorse.com, school-specific pages will be available for universities that partner with the company. Through those pages, users can access athletes' profiles with rates for various services.").

athletes, for a monthly fee ranging from $5.99 to $999.[415]  Similarly, fans who donate to another University of Florida collective, MarketPryce Florida, receive signed merchandise, season tickets, and meet-and-greets with student-athletes.[416]

187.    Third-party NIL deals between student-athletes and fans comprise a small fraction of total third-party NIL deals.  For example, Opendorse's analysis of third-party NIL activity on its platform after the first year of operating showed that only four percent of student-athletes had struck deals with fans, and the Opendorse CEO speculated that many fans may not know where to go for these deals with student-athletes.[417]

188.    As with entering third-party NIL deals with organizations, entering third-party NIL deals with fans requires student-athletes to exert effort and time, and the amount of effort and time they are able and willing to exert can vary over time.

---

[415] Dodd, Dennis, "Inside the World Of 'Collectives' Using Name, Image and Likeness to Pay College Athletes, Influence Programs," *CBS Sports*, January 26, 2022, available at https://www.cbssports.com/college-football/news/inside-the-world-of-collectives-using-name-image-and-likeness-to-pay-college-athletes-influence-programs/ ("To do his part in the NIL race, The Gator Collective has been established as a sort-of subscription service. Starting at $5.99 (up to $999.99) a month, Gators fans get exclusive autographs, interviews and even personal appearances.").

[416] Business of College Sports, "Tracker: University-Specific NIL Collectives," March 21, 2023, available at https://businessofcollegesports.com/tracker-university-specific-nil-collectives/ ("Those who donate money can win prizes like signed memorabilia, season tickets and exclusive player meet and greets, depending on how much they donate.").

[417] Russo, Ralph, "New Online NIL Marketplace Connects Fans to College Athletes," *AP News*, August 1, 2022, available at https://apnews.com/article/college-football-sports-70842c5b8b188b71f95f62d5bf9d5611 ("'Collectives have dominated conversations about NIL, but where are the fans in that conversation?' Opendorse CEO Blake Lawrence said. 'Most of them don't know where to go and what it costs.' [...] Lawrence said the company's data revealed that through the first year of college athletes being permitted to earn money from endorsements and sponsorships, only 4% of athletes have struck deals with fans.").

### C.  The Rascher Report's Assumptions Are Contradicted by the Evolution of Interactions Across Platforms and Ecosystems over Time

#### 1.  The Underlying Economics of Platforms Mean They Are Inherently Dynamic and Not Stable

189.    As an economist who studies and teaches about platforms, I study the consequences of different groups of users interacting across different platforms.[418]  The complex ecosystem for third-party NIL reflects the economics of platforms as a variety of ways of facilitating how organizations can approach student-athletes to use their NIL have emerged—both digital and physical.  This complex ecosystem is dynamic and unstable, which means the Rascher Report's assumption of stability and constancy is inappropriate.

190.    A challenge of the proposed methodology in the Rascher Report is that it assumes that the outcomes of the third-party NIL ecosystem are stable and therefore can be used to predict how third-party NIL deals will evolve over time.  However, this assumption is a major flaw of the Rascher Report's proposed methodology.  At the beginning, platforms are inherently unstable and dynamic.  In several of my papers, I have found that users can switch platforms rapidly and existing platforms can be threatened by new entrants, such that platforms must constantly innovate to remain competitive.[419]

---

[418]  MIT Management Executive Education, "Platform Strategy: Building And Thriving In A Vibrant Ecosystem," taught by Pierre Azoulay and Catherine Tucker, course available in 2023, available at https://executive.mit.edu/on/demandware.static/-/Sites-master-catalog-msee/default/dwc6b9d6db/brochures/Platform%20Strategy.pdf.

[419]  Tucker, Catherine and Alexander Marthews, "Social Networks, Advertising and Antitrust," *George Mason Law Review*, Vol. 19, No. 5, 2012, pp. 1211-1227, at 1221-1222 ("Economic theory posits that in any market where there are network effects and consumers can exit or enter easily, market dominance is incredibly unstable. […] Instead, network effects need to be linked with 'switching costs,' which prevent the easy entry and exit of consumers once they have adopted a network standard."); Tucker, Catherine, "Network Effects and Market Power: What Have We Learned in the Last Decade?" *Antitrust*, 2018 ("In my previous work, I discussed the instability that has been the hallmark of social networks. On the face of it, a social network should have strong network effects. […] However, the history of social networks has suggested anything but entrenchment. Launched in 2002, Friendster is often considered the first real social network. However, it was quickly replaced by MySpace. […] The subsequent decline of MySpace, and the speed with which users switched to Facebook, was also startling, and has attracted much academic inquiry.").

Platforms grow and collapse over time, and it is difficult to predict which platform would have been the prevailing platform in the before period.

191. Platform economists recognize that platforms initially need to "seed" their platform in order to overcome any inherent chicken-and-egg problem involved in coordinating interactions.[420]  These seeding activities mean that any initial phase of a platform is not predictive of how that platform will evolve.

192. In my research, I have also documented that platforms create value by "coring" interactions and adopting technologies, policies, and procedures to reduce users' search and transaction costs and otherwise increase the quality of users' experiences.[421] However, these coring activities evolve over time as platforms gain experience in how to best manage interactions.  These coring activities again add to the underlying dynamic nature of a platform.

193. The Rascher Report does not consider the fact that the online and offline platforms that facilitate these third-party NIL interactions are dynamic and therefore cannot be used to predict its but-for world.  This means the Rascher Report's proposed methodology is inadequate for assessing third-party NIL injury and damages for individual student-athletes.

## 2.   Third-Party NIL Digital Platforms Are Dynamic and Not Stable

194. The current third-party NIL landscape is fragmented across different platforms.  The Business of College Sports, a website dedicated to covering college sports business news, identified 24 third-party NIL digital platforms in July 2021, which grew to 47

---

[420] Church, Zach, "Platform Strategy, Explained," *MIT Sloan School of Management:  Ideas Made to Matter*, June 16, 2017, available at https://mitsloan.mit.edu/ideas-made-to-matter/platform-strategy-explained ("Seeding users is the most critical step to platform success. Tucker says she can tell right away that someone has a platform strategy if they have a plan to drive the first users to a platform 'when there is nothing there.'").

[421] Tucker, Catherine, "How Platforms Create Value through Coring and Implications for Market Definition," *Working Paper*, 2022, pp. 1-8, at 2-3 ("A platform acts as a 'core' for these interactions by adopting technology[,] policies, and procedures that facilitate the interaction taking place, build trust in the interactions, and provide incentives for interactions to stay on the platform. […] In terms of the underlying economics, usually coring activities by platforms are aimed at reducing search and transaction costs.").

different platforms in 2023.[422]  As discussed in **Section V.C.1**, platform economists have shown that digital platforms will evolve as they respond to new entrants, learn from competition, and seek to differentiate themselves.  It is not possible to predict which platforms would facilitate third-party NIL transactions in the but-for world based on the activity observed in the after period.  This has implications for the nature of third-party NIL deals that would be realized and indicates that third-party NIL deals in the after period are not representative of deals in the before period.

195.    Payments at the initial seeding stage of a platform are unlikely to be predictive of the types of interactions that would take place going forward.  Some platforms may partner with brands to offer one-time deals to attract student-athletes to that platform.  For example, in July 2021, Opendorse partnered with Gopuff, a food and consumer goods delivery company, to offer third-party NIL deals to student-athletes.  Gopuff offered each student-athlete "their first deal in the [NIL] era" through an "initial offer" to receive payments for promoting the brand on social media, with additional potential compensation opportunities for the remainder of 2021.[423]  As an early attempt to attract student-athletes to Opendorse, the deal was only available to student-athletes who signed up through the platform.[424]                    Counsel Only

---

[422]   Business of College Sports, "Tracker: NIL Marketplaces for Student Athletes," July 2, 2021, available via the Wayback Machine at https://web.archive.org/web/20210703122516/https://businessofcollegesports.com/tracker-nil-marketplaces-for-student-athletes/. *See also* Business of College Sports, "Tracker: NIL Marketplaces for Student Athletes," February 17, 2023, available at https://businessofcollegesports.com/tracker-nil-marketplaces-for-student-athletes/.

[423]   Business Wire, "Gopuff and Opendorse Partner to Pitch Every College Athlete Their First Deal in the NIL Era," June 30, 2021, available at https://www.businesswire.com/news/home/20210630005801/en/Gopuff-and-Opendorse-Partner-to-Pitch-Every-College-Athlete-Their-First-Deal-in-the-NIL-Era ("Through the Opendorse platform, Gopuff will pitch every student-athlete across the country their first deal in the Name, Image and Likeness era of collegiate sports beginning July 1.  As an initial offer, student-athletes will receive payment for promoting the brand on social media.  Student-athletes will then have additional opportunities for payment throughout the remainder of the year by promoting various Gopuff offers.").

[424]   Business Wire, "Gopuff and Opendorse Partner to Pitch Every College Athlete Their First Deal in the NIL Era," June 30, 2021, available at https://www.businesswire.com/news/home/20210630005801/en/Gopuff-and-Opendorse-Partner-to-Pitch-Every-College-Athlete-Their-First-Deal-in-the-NIL-Era ("The program will be available to student-athletes in any sport and will provide immediate, equal access to compliant payment opportunities for those who use Opendorse to receive their deal, sign up for Gopuff, and promote the brand to their followers on social media.").

[Counsel Only].[425]   The

Rascher Report's proposed methodology would assume that each of these promotional deals tied specifically to the lifting of the NCAA regulations on July 1, 2021 would have occurred every year in the before period. However, this before period in the Rascher Report's third-party NIL damages approach represents a long-term equilibrium,[426] in which platforms may not need to run these types of promotions.

196.   Additionally, prices at the initial seeding stage of a platform are unlikely to be predictive of how interactions would be priced going forward. Some platforms might subsidize some interactions in order to kickstart their platform, meaning that the price of such interactions will be higher in the future. For example, some platforms may allow brands to join and make third-party NIL deals at the seeding stage for free, but then increase fees in the future. Brands could react to this increase in fees by decreasing the number or altering the compensation structure of third-party NIL deals they enter with student-athletes. Therefore, the transactions that take place in the early stages of the third-party NIL platforms are not predictive of future transactions when platforms may adjust their pricing strategies. For example:

    a.   When Barstool Sports launched its own marketplace, TwoYay, brands were able to join the platform for free to connect to student-athletes and schools, but the platform announced that "it is possible that brands might have to pay in the future."[427]

---

[425]   [Counsel Only]

[426]   Rascher Deposition, pp. 225:18-226:4 ("Q. And that might represent that in certain years advertisers have either more or less of an appetite for getting endorsements from student athletes; is that fair to say? A. Generally, yes. I mean, in this case it's slightly different because we're sort of starting from scratch. June 30, no one's allowed to be paid. And so the next day of course you're not going to be at equilibrium; it's going to take years to sort of get to that equilibrium. And so my presumption in the past is that we would already be at that equilibrium.").

[427]   Jones, Rory, "Barstool Sports Launch TwoYay NIL platform," *Sports Pro*, September 15, 2022, available at https://www.sportspromedia.com/news/barstool-sports-twoyay-nil-deal-us-ncaa-college-athletes-2022-upfront/ ("Barstool Athlete members will be able to opt into NIL deal marketplace, while brands will also be able to

  b. Obsesh, a marketplace, was created in 2021. Initially, Obsesh did not charge a service fee to organizations purchasing student-athlete NIL and student-athletes kept 75 percent of revenues from each transaction that took place on the platform. In 2023, Obsesh charged organizations purchasing student-athlete NIL with a 10 to 20 percent platform service fee, while maintaining free access for student-athletes.[428]

197. Additionally, the third-party NIL digital platforms in the after period differ in payment structures for organizations and student-athletes. This has implications for the nature of third-party NIL deals facilitated on each platform and the user adoption rates for each platform. As a result, it is difficult to predict which types of platforms and third-party NIL deals would prevail in the before period. For example:

  a. Athletepreneur is a platform that facilitates brand partnerships. Athletepreneur requires brands to pay a platform fee rather than a per-deal fee, and student-athletes pay fees that depend on the platform's estimate of their NIL marketability.[429]

  b. Find My NIL is a platform that facilitates brand partnerships and builds online communities for student-athletes. Student-athletes and brands can

---

access the platform for free to connect with the user network, as well as the more than 400 associated colleges and city affiliates.[…] Barstool chief executive Erika Nardini told Sportico that while athletes would never see a cut of earnings taken it is possible that brands might have to pay in the future.").

[428] Business of College Sports, "Tracker: NIL Marketplaces for Student Athletes," July 2, 2021, available via the Wayback Machine at https://web.archive.org/web/20210703122516/https://businessofcollegesports.com/tracker-nil-marketplaces-for-student-athletes/ ("Obsesh. Student athlete keeps 75% of the booking."). *See also* Business of College Sports, "Tracker: NIL Marketplaces for Student Athletes," February 17, 2023, available at https://businessofcollegesports.com/tracker-nil-marketplaces-for-student-athletes/ ("Obsesh […] 10-20% platform service fee paid by buyer; Free for student athletes.").

[429] Business of College Sports, "Tracker: NIL Marketplaces for Student Athletes," February 17, 2023, available at https://businessofcollegesports.com/tracker-nil-marketplaces-for-student-athletes/ ("Athletepreneur. Brand partnerships. Brands are charged a platform fee instead of a per deal fee. Athlete's pay fees on a sliding scale based on their NIL Score (a proprietary ranking of the marketability of their NIL). If an athlete comes to them for other ancillary services, the fee may be reduced.").

sign up for a free three-month trial, but after this trial, student-athletes pay a $4.99 monthly fee while businesses pay a $99 monthly fee.[430]

c. Klout Machine is a platform that facilitates brand partnerships.  Klout Machine charges both brands and student-athletes a ten percent fee.[431]

d. MarketPryce is a platform that facilitates brand partnerships.  Student-athletes pay $8 per month to join MarketPryce.[432]  Brands do not need to pay a fixed fee to join the platform but pay 5 percent of every deal facilitated on the platform.[433]

198.   Brands and student-athletes will react to these different pricing strategies.  For example, student-athletes and brands will be more willing to register on multiple platforms if registration is free, rather than if they have to pay a fixed cost to register.  Brands will take into account the percentage of a deal value that they are required to pay to the platform when choosing a platform, deciding how many deals to purchase, and for what value.  A platform's user base may vary depending on the payment structure, which affects the types of third-party NIL deals that are facilitated on the platform: for example, smaller brands may join lower-priced platforms and offer smaller value deals.  Student-athletes may be more likely to stop using a platform that requires a subscription fee if they are unsuccessful on this platform, than they would on

---

[430]  Business of College Sports, "Tracker: NIL Marketplaces for Student Athletes," February 17, 2023, available at https://businessofcollegesports.com/tracker-nil-marketplaces-for-student-athletes/ ("Find My NIL. Brand partnerships and online community for student athletes. Student athletes and sponsors can sign up for a 3-month trial, thereafter it becomes $4.99/mo for athletes and $99/mo for businesses. Find My NIL does not take any percentage of completed deals.").

[431]  Business of College Sports, "Tracker: NIL Marketplaces for Student Athletes," February 17, 2023, available at https://businessofcollegesports.com/tracker-nil-marketplaces-for-student-athletes/ ("Klout Machine. Brand partnerships. 10% from the brand and 10% from the student athlete.")

[432]  Business of College Sports, "Tracker: NIL Marketplaces for Student Athletes," February 17, 2023, available at https://businessofcollegesports.com/tracker-nil-marketplaces-for-student-athletes/ ("MarketPryce. Brand partnerships. $8/month to join for student athletes but they get 100% of income they generate on the platform.").

[433]  MarketPryce, "Athlete Influencer Marketing Pricing," available at https://www.marketpryce.com/pricing, accessed on April 11, 2023 ("Brand. […] Free. One place for chats, proposals, and deals. It's that easy. Get the results you want on our free plan. […] 5% commission on cash deals").

free platforms. ░░░░░░░░░░░░░░ Counsel Only ░░░░░░░░░░░░░░

░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░

░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░

░░░░░░░░░░░ [434] As a result of this self-selection, platforms that require student-athletes to pay a subscription fee are likely to have a growing percentage of student-athletes who can secure many NIL deals.  This diversity in the payment structure and the instability of third-party NIL digital platforms means that the after period cannot be used to predict the before period.  The Rascher Report does not address these different payment structures and has not proposed a methodology to incorporate these different fees into its damage calculations to net them out from the valuation of third-party NIL deals.

199.  Some digital platforms further seek to facilitate a specific set of third-party NIL deals.  For example, Varsity Gems was announced in August 2022 as a marketplace that would allow fans to purchase Non-Fungible Tokens (NFTs) related to student-athletes.[435]  The same month, an existing NFT company launched a third-party NIL marketplace in partnership with Brigham Young University where fans could purchase BYU-related NFTs.[436]  CoachTube, a platform offering courses taught by high-profile coaches and

---

[434]  House Deposition, pp. 88:15–89:22 ░░░░░░░░░░░ Counsel Only ░░░░░░░░░░░

░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░

░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░

[435]  McFadyen Digital, "McFadyen Digital Launches Varsity Gems NFT Marketplace for NIL Incentive," *Globe Newswire*, August 24, 2022, available at https://www.globenewswire.com/en/news-release/2022/08/24/2503888/0/en/McFadyen-Digital-Launches-Varsity-Gems-NFT-Marketplace-for-NIL-Incentive.html ("McFadyen Digital, the leading global strategy and implementation agency for e-commerce marketplaces, announces Varsity Gems, the NFT NIL marketplace for Division I, Division II and Division III athletes, will go live on Friday. Varsity Gems allows collegiate student athletes to benefit from Name, Image, and Likeness (NIL) rules by allowing alumni, boosters, investors, and fans to buy Non-Fungible Tokens (NFTs) related to student-athletes.").

[436]  Reynolds, Kevin, "BYU launches potential $20 million NIL partnership, bringing NFTs into the name, image and likeness arms race," *The Salt Lake Tribune*, August 16, 2022, available at

athletes announced in August 2021 that it would offer courses taught by student-athletes.[437]  As discussed in **Section V.C.1**, platforms are unstable, dynamic and constantly adapting in reaction to the market conditions. It is therefore not clear if these differentiated platforms would continue to exist in a long-run equilibrium and whether these types of third-party NIL deals would be facilitated to the same degree without these platforms.

200.    Third-party NIL platforms also vet businesses seeking to reach deals on the platform,[438] provide campaign management services,[439] advise student-athletes on compliance,[440]

---

https://www.sltrib.com/sports/byu-cougars/2022/08/16/byu-launches-potential-20/ ("Cheney, the CEO of an online NFT company called Ocavu, had watched from the sidelines as NIL evolved into an arms race in recruiting. He knew BYU needed a larger presence in the space to be competitive, especially as it entered the Big 12. But he also recognized that any developments needed to fit the mold of the school. So, across from BYU's associate athletic director for NIL, Cheney laid out a plan to create a marketplace where people could buy and trade BYU-related NFTs. Each time the non-fungible tokens — essentially digital trading cards — were sold, players and the athletic department would receive a percentage of the money. On Aug. 16, the marketplace will launch as the latest NIL endeavor at BYU.").

[437]   CoachTube, "NCAA Athletes Partner with CoachTube to Earn Money from Name, Image, Likeness by Producing Original Training Courses," *PR Newswire*, August 25, 2021, available at https://www.prnewswire.com/news-releases/ncaa-athletes-partner-with-coachtube-to-earn-money-from-name-image-likeness-by-producing-original-training-courses-301362799 html ("CoachTube, the largest platform to teach and learn sports from the most notable names in coaching, today announced that it will now offer courses from top student athletes in a variety of sports. In turn, rising athletes finally have a lucrative way to earn money from their Name, Image, and Likeness (NIL) thanks to recent NCAA rule changes. College stars from powerhouse sports programs at Clemson, Oklahoma, Texas, Georgia, and Miami are already taking advantage of this NCAA shift.").

[438]   Johnson, Richard, "Year 1 of NIL Brought Curveballs, Collectives and Chaos. Now What?" *Sports Illustrated*, July 12, 2022, available at https://www.si.com/college/2022/07/12/nil-name-image-likeness-collectives-one-year ("Marketplaces serve as a middle man connecting as many athletes to as many brands as have signed up to begin a conversation that will hopefully lead to a deal. Some marketplaces charge a small subscription price to either the businesses or the athletes, and marketplaces stake their reputation on vetting businesses themselves.").

[439]   Opendorse, "NIL Brand Activations," available at https://biz.opendorse.com/brands/, accessed on April 5, 2023 ("End-to-End Campaign Management: (1) Pitch: Secure athletes with confidence. Work with our team to identify and connect with any of the 90,000+ athletes in the marketplace. (2) Execute: Breathe easy on launch day. We work hand-in-hand with athletes and their representation to ensure assets are delivered when and where you need them. (3) Complete: Simplify payments in one place. Manage negotiations, contracts and compensation in one place with our team of athlete marketing experts.")

[440]   Kutz, Chris, "NIL Compliance Reminders for 2022," *Opendorse*, January 12, 2022, available at https://biz.opendorse.com/blog/nil-compliance-reminders-for-2022/ ("NIL Compliance Reminders for 2022 […] Be careful using school trademarks and logos. […] Review and understand your contracts. […] Disclose all deals. […] Tax withholding.").

and facilitate the reporting of deals to schools.[441]  As these platforms learn more about the transactions on their platforms and observe their competitors' reactions, these platforms may further alter the nature of transactions that occur.  For example, if platforms track complaints specific to a business or student-athlete, these platforms may seek to reduce the prominence of these businesses or student-athletes by a rating system.  These businesses and student-athletes would be involved in fewer deals in the future, if any.

### 3.  Third-Party NIL Collectives Are Dynamic and Not Stable

201.   The fast-changing third-party NIL landscape has led several industry stakeholders to comment on the unpredictability of third-party NIL transactions.  For example, Penn State football coach James Franklin described the third-party NIL scene as having become "a little bit of the wild, wild west" in the absence of clear NIL guidelines.[442] Retired football player Archie Manning similarly expressed concerns about the chaotic nature of the NIL landscape.[443]  The emergence of collectives in the third-party NIL ecosystem is one of the more recent changes that have further disrupted the landscape.

---

[441]  Kutz, Chris, "NIL Compliance Reminders for 2022," *Opendorse*, January 12, 2022, available at https://biz.opendorse.com/blog/nil-compliance-reminders-for-2022/ ("Don't forget one of the most important steps: Disclose your NIL activities to your school's compliance office. Nearly every school requires athletes to submit details of an NIL deal. Each school will have its own process for athletes to send NIL disclosures. It may be an online form or a physical form that needs to be completed. If your school uses Opendorse Monitor™, you can easily report through your Opendorse app. And if you do your deals through Opendorse, you can auto-disclose details directly to your school.").

[442]  Wogenrich, Mark, "Penn State's James Franklin Calls NIL 'the Wild, Wild West,'" *Sports Illustrated*, December 26, 2022, available at https://www.si.com/college/pennstate/football/penn-state-football-james-franklin-nil-wild-wild-west ("Without clear NIL guidelines from a collegiate governing body like the NCAA, Franklin said the scene has become 'a little bit of the wild, wild west.' 'Some of the conversations that are happening are crazy, and they've gotten down to the 11th hour of this,' Franklin said. 'It got as crazy as I've seen in my 26 years [of coaching and recruiting]. That's important. We're going to have to come up with a solution for college athletics as a whole and we're going to come up with a solution specifically for football.'").

[443]  Jackson, Wilton, "Archie Manning Concerned About 'Wild West' NIL Landscape," *Sports Illustrated*, May 7, 2022, available at https://www.si.com/college/2022/05/07/archie-manning-concerned-about-wild-west-nil-landscape ("Archie Manning had the privilege of watching his sons, Peyton and Eli, have Super Bowl-winning NFL careers. Before watching his progeny, the two-time Pro Bowler played at Ole Miss in the late 1960s before playing with the Saints, Oilers and Vikings in the NFL. Nearly 40 years later, as he prepares to watch his grandson, Arch, navigate the college football landscape, he is worried about the current state of the game due to chaotic nature of name, image and likeness rules. During the first annual Nick Saban Legacy Award ceremony

202.     Although the number of schools affiliated with collectives have grown, an individual collective's growth depends on its ability to continue to secure donors' funding.[444]  The emergence of multiple collectives, some affiliated with the same schools, means that collectives can compete with each other for donor funds.  As a result, some collectives may merge to attract more funding while other collectives may shut down due to lack of funding.  For instance, the multiple collectives at the University of Central Florida, Oklahoma, and Ohio State consolidated to only have one collective affiliated with each university.[445]  In contrast, two collectives at the University of Southern California ceased operations.  In September 2022, Student Body Right, a donor-based collective, which had plans to pay every USC football player the equivalent of a base salary, shut

---

Monday in Birmingham, Manning said he is not 'crazy' about what NIL has done to alter the apparent. 'I wish they were a little more uniform in nature throughout the school,' Manning said.").

[444] Kirshner, Alex, "'Everything's on Fire': NIL Collectives Are the Latest Patchwork Solution for College Athlete Pay," *Global Sports Matters*, January 17, 2023, available at https://globalsportmatters.com/business/2023/01/17/nil-collectives-latest-patchwork-solution-college-athlete-pay/ ("Belzer[, the chief executive of Student Athlete NIL,] believes the collectives that don't run themselves like businesses will find it difficult to stay alive. 'What's going to end up happening is that many of these collectives were poorly operated. Probably most of them are not going to be functional in a couple of years once donors stop contributing,' he says. 'And so the universities that are in a poor place from that perspective are going to suffer the most. […] What happens if the team sucks and the donor has a falling out with the coach? […] What happens if the donor dies? What happens if we hit a horrible recession next year and that donor can't come in with the money? You're going to be in deep, and then even if you do, how are you going to manage that process?'). *See also* Dodd, Dennis, "Inside the World Of 'Collectives' Using Name, Image And Likeness to Pay College Athletes, Influence Programs," CBS Sports, January 26, 2022, available at https://www.cbssports.com/college-football/news/inside-the-world-of-collectives-using-name-image-and-likeness-to-pay-college-athletes-influence-programs/ ("Collectives have emerged as NIL brokers of varying levels of sophistication. They can be part of a larger company as a for-profit or non-profit entity").

[445] Crabtree, Jeremy, "UCF Collectives Mission Control, The Kingdom NIL Announce Merger," *On3*, March 20, 2023, available at https://www.on3.com/nil/news/ucf-knights-nil-collectives-mission-control-the-kingdom-nil-announce-merger/ ("One of the biggest focuses of Year 2 of NIL is the consolidation of collectives throughout the country. That trend continued Monday with the announcement that the top two collectives at UCF were merging."). *See also* Crabtree, Jeremy, "Oklahoma NIL Collectives Merge, More Consolidation on the Way," *On3*, December 8, 2022, available at https://www.on3.com/nil/news/oklahoma-sooners-nil-collectives-crimson-and-cream-strengthening-oklahoma-merge-more-consolidation-on-way/ ("Oklahoma's crowded NIL collective market got a little less congested on Thursday. Sooner-focused NIL collectives Crimson and Cream and Strengthening Oklahoma announced they have officially merged."); Biddle, Dave, "Ohio State NIL Collectives THE Foundation and The O Foundation Announce Merger," *247Sports*, February 9, 2023, available at https://247sports.com/college/ohio-state/Article/Ohio-State-Buckeyes-NIL-collectives-THE-foundation-and-The-O-Foundation-announce-merger-204482250/ ("Two NIL collectives representing Ohio State – THE Foundation and The O Foundation – announced on Thursday that they are merging.").

down due to the opposition of USC and the deteriorating health of its founder.[446]  In February 2023, BLVD, USC's official collective launched in collaboration with media house Stay Doubted, which had secured several high-profile third-party NIL deals for student-athletes, announced that it had shut down its day-to-day operations, after the relationship between USC and Stay Doubted deteriorated.[447]

203.    The third-party NIL marketplace is therefore still in a transition phase, characterized with instability and uncertainty, that renders the after period an inappropriate benchmark to use in damage calculations.

---

[446] Kartje, Ryan, "Student Body Right USC NIL Collective Shuts Down After Death Of Founder," *Los Angeles Times*, October 20, 2022, available at https://www.latimes.com/sports/usc/story/2022-10-20/student-body-right-usc-nil-collective-founder-dies ("USC and its in-house, NIL operation, BLVD, had made clear on many occasions that it viewed Student Body Right and its plan to pay every Trojans football player 'the equivalent of a base salary' as an existential threat. […] The open opposition from USC made matters difficult, Hadden admitted. Fundraising proved more of an uphill battle than anticipated. Several potential donors, Hadden said, expressed concerns to him about repercussions from the school if they supported Student Body Right. […] Rech was the one who'd willed Student Body Right into existence. He'd fought for weeks from his hospital bed to keep the collective alive, even offering at one point to front the first year himself. But now his own health was failing. Hadden asked if he was physically capable of carrying it any further. 'I don't think I am,' Rech admitted. Less than two months after it launched, they decided together to shut down Student Body Right").

[447] Nakos, Pete, "With BLVD Closed Down, USC's NIL Collective Market In Flux," *On3*, February 16, 2023, available at https://www.on3.com/nil/news/usc-trojans-football-nil-collective-market-tommy-group-blvd-llc-lincoln-riley-mike-bohn/ ("When USC announced its relationship with Stay Doubted in June, the move was heralded as the next iteration of the NIL collective. In a crowded, undeveloped marketplace, the Trojans looked to have figured it out after slow-playing the first year of NIL. The media house would provide athletes with a third-party option in searching for NIL opportunities through BLVD LLC. […] But a bit more than eight months after the initial announcement was posted on USC athletics' website, the web page is dead. BLVD, which defined itself as a 'collective+', has closed down day-to-day operations. The organization turned heads, signing Fletcher Jones Motorcars as the official luxury car dealer of the collective and providing more than 100 football players with a Ridel electric scooter. The organization also had plans to secure official partnerships for the Trojans student-athletes, with a goal of raising $75 million in five years. Two sources with direct knowledge of the situation indicated to On3 the root cause of BLVD's fall was a disconnect between USC and leaders of Stay Doubted.").

**D.    The Rascher Report's Proposed Methodology Is Not Appropriate for Estimating Third-Party NIL Damages**

**1.    It Cannot Be Assumed That Organizations That Sponsored Third-Party NIL in the After Period Would Have Sponsored Third-Party NIL Deals in the Before Period**

204.    Third-party NIL deals are signed by the student-athlete and a third-party organization. The Rascher Report does not propose a methodology to account for changes that a given organization experienced over time, which would affect the demand for third-party NIL.

205.    Organizations change their offerings over time, providing student-athletes with new opportunities to monetize their NIL.  For example, Snapchat was founded in 2011 but did not release "Spotlight," its first main source of monetization for influencers, until 2020.[448]          Counsel Only

.

206.    The Rascher Report has no methodology for accounting for organizations that signed deals with student-athletes during the after period but that did not exist for the entirety of the before period.  For example,          Counsel Only

However, Cameo was launched in

---

[448]  O'Connell, Brian, "History of Snapchat: Timeline and Facts," *TheStreet*, February 28, 2020, available at https://www.thestreet.com/technology/history-of-snapchat ("Snapchat was founded in 2011 by Evan Spiegel, Reggie Brown, and Bobby Murphy, all students at Stanford University."). *See also* Mangalindan, JP, "How to Make Money on Snapchat, According to Creators," *Business Insider*, December 24, 2022, available at https://www.businessinsider.com/how-to-make-money-on-snapchat-according-to-creators-spotlight-lenses ("Since launching its TikTok competitor Spotlight in November 2020, Snap has financially incentivized creators to post short-form videos to the app feature.").

[449]          Counsel Only

[450]          Counsel Only

2017 and its popularity spiked during the Covid-19 pandemic.[451]  Cameo would not have been able to enter into third-party NIL deals with student-athletes in 2016 before it was founded.  It is also not evident that Cameo would have signed the same number of deals or deals of the same magnitude within the first few years of being founded and before gaining popularity among users.

207.    The increased popularity of cryptocurrency has led to sponsorship opportunities from crypto entities that would not have been available in the before period.  Former University of California, Los Angeles basketball player [Counsel Only] received an NIL deal from "Crypto.com" in April 2022, for [Counsel Only].[452]  The Rascher Report's third-party NIL transaction data records 13 deals with student-athletes sponsored by Crypto.com for a total of about [Counsel Only][453]  Crypto.com has only seen a significant increase in popularity in the after period: as of July 2020, the site had roughly 3 million active users, and this figure passed 50 million users in May of 2022, around the time [Counsel Only] received his third-party NIL deal.[454]  It is not evident that Crypto.com would have signed the same number of deals or deals of the same magnitude before gaining popularity among users.

---

[451]   Kircher, Madison M., "Cameo Was Made for the Coronavirus," *Vulture*, April 16, 2020, available at https://www.vulture.com/2020/04/cameo-coronavirus-boom.html ("The last three weeks [March 26 – April 16] have been three of the company's top five since it launched in 2016."). *See also* Rice, Lynette, "How Cameo is Booming in the Pandemic Era," *Entertainment Weekly*, January 28, 2021, available at https://ew.com/celebrity/cameo-booming-pandemic-era/ ("Once dismissed as the place where celebrity dignity goes to die, Cameo is now a robust business in the middle of a pandemic boom. Revenue for the three-year-old Chicago-based operation – which allows fans to pay for personalized videos from more than 35,000 actors, athletes, and celebrities – spiked 400 percent in the first half of 2020 versus the same period in 2019.").

[452]   Counsel Only

[453]   Counsel Only

[454]   Primack, Dan, "Exclusive: Crypto.com Passes the 50 Million User Mark," *Axios*, May 6, 2022, available at https://www.axios.com/2022/05/06/exclusive-cryptocom-passes-the-50-million-user-mark ("Retail crypto exchange Crypto.com tells Axios that it now has over 50 million users. Why it matters: That's more than a fivefold increase from the last time Crypto.com disclosed its user stats, in late 2020."). *See also* Keoun, Bradley and Paddy Baker, "First Mover: Crypto.com Says User Growth Coming From Products, Not Token Speculation," *CoinDesk*, July 2, 2020, available at https://www.coindesk.com/markets/2020/07/02/first-mover-cryptocom-says-user-growth-coming-from-products-not-token-speculation/ ("Credit-card lender Crypto.com has boosted the number of total users by at least 50% in the past two months to 3 million, according to CEO Kris Marszalek.").

*Confidential*

208.    Similarly, FTX, a cryptocurrency trading platform, was founded in May 2019.[455]  FTX reached its peak number of users and became one of the top cryptocurrency exchanges by transaction volume in July 2021.[456]  FTX then went bankrupt in November 2022.[457] During its height of popularity, FTX signed several third-party NIL deals with student-athletes, including all the players on the University of Kentucky men's basketball team and most of the players on FSU's softball team.[458]  FTX would not have been able to enter into third-party NIL deals with student-athletes between 2016 and 2019, before it was founded.  It is also not evident that FTX would have signed the same number of deals or deals of the same magnitude within the first few years of being founded and before gaining popularity among users.

209.    Failing to take into account changes in the demand for third-party NIL would over-compensate student-athletes who signed deals with sponsors that did not exist in the before period or sponsors that would have valued a third-party NIL deal less in the before period than in the after period.  The Rascher Report has not proposed a methodology for these changes in demand for third-party NIL.  Given each sponsor's

---

[455]  Mack, Eric, "The Fall of FTX and Sam Bankman-Fried: A Timeline," *CNet*, February 24, 2023, available at https://www.cnet.com/personal-finance/crypto/the-fall-of-ftx-and-sam-bankman-fried-a-full-timeline-of-events/ ("In 2019, [Sam Bankman-Fried] co-founded FTX, which rode a bull market for crypto to an $18 billion valuation in July 2021, securing investments from the likes of Softbank and Sequoia Capital").

[456]  Ainsworth-Grace, Cassidy, Marion Laboure, and Paul Maley, "Crypto Assets: A Lesson From History," *Deutsche Bank*, January 31, 2023, available at https://flow.db.com/securities-services/crypto-assets-a-lesson-from-history ("Launched as recently as May 2019, FTX – an abbreviation of Futures Exchange – had attracted more than one million users and established itself as the third largest cryptocurrency exchange by volume by July 2021.").

[457]  John, Alun and Hannah Lang, "Crypto Exchange FTX Files for Bankruptcy as Wunderkind CEO Exits," *Reuters*, November 11, 2022, available at https://www.reuters.com/business/ftx-start-us-bankruptcy-proceedings-ceo-exit-2022-11-11/ ("Crypto exchange FTX filed for U.S. bankruptcy protection on Friday and its founder Sam Bankman-Fried resigned as chief executive, after the biggest blowup in the crypto industry drew calls for tighter regulation.").

[458]  Goldberg, Rob, "Kentucky Men's Basketball Team Signs Cryptocurrency Deal with FTX US Under NIL Rules," *Bleacher Report*, November 3, 2021, available at https://bleacherreport.com/articles/10017086-kentucky-mens-basketball-team-signs-cryptocurrency-deal-with-ftx-us-under-nil-rules ("Each player on the Kentucky men's basketball team will get paid monthly after signing an exclusive deal with FTX US[.]"). *See also* Roback, Jennifer, "UCLA Women's Basketball Partners with Cryptocurrency Company FTX," *Women In Sports*, December 9, 2021, available at https://www.womensinsports.com/post/ucla-womens-basketball-partners-ftx ("UCLA's women's basketball team is capitalizing on its popularity along with taking advantage of the NCAA's new image and likeness policy. On December 7, 2021, UCLA's Dominique Onu announced a partnership with FTX alongside her teammates.").

changing individualized circumstances over time, determining whether third-party NIL deals in the after period would exist or be the same in the before period cannot be done with a common methodology.

### 2. Marketing Activity Is Often Experimental and Brands Regularly Change Their Marketing Strategies

210.   The Rascher Report does not consider that for many advertisers, marketing and advertising activity is experimental.  Advertisers continually test whether consumers respond to particular branding and marketing activity, particularly when the format is new.[459]  As my research shows, a short period after the introduction of a new format serves as a poor predictor of activity in equilibrium because consumers become habituated to new formats over time.[460]  It is therefore an error in the Rascher Report's proposed methodology to assume that third-party NIL deals in the after period would be predictive of the before period.  Brands, which entered into the vast majority of NIL deals with student-athletes from July 2021 to February 2023,[461] frequently change their marketing strategies over time.  In a survey of over 600 media and content strategists

---

[459]   Kotler, Philip and Gary Armstrong, "Chapter 4, Managing Market Information to Gain Customer Insights," in *Principles of Marketing*, Seventeenth Edition, Pearson, 2017, pp. 122-155, at 130 ("Marketing research is the systematic design, collection, analysis, and reporting of data relevant to a specific marketing situation facing an organization. Companies use marketing research in a wide variety of situations. For example, marketing research gives marketers insights into customer motivations, purchase behavior, and satisfaction. It can help them to assess market potential and market share or measure the effectiveness of pricing, product, distribution, and promotion activities."). *See, for example,* Perez, Sarah, "Twitter to Begin Pilot Testing Fleet Ads Starting Today," *TechCrunch*, June 1, 2021, available at https://techcrunch.com/2021/06/01/twitter-to-begin-pilot-testing-fleet-ads-starting-today/ ("Ads are coming to Twitter's version of Stories, known as Fleets. The company announced today it will [begin] pilot testing Fleet ads in the U.S., which will bring full-screen, vertical format ads to Twitter for the first time […] Twitter says the pilot will help the company understand how well these types of ads perform on Twitter, which will inform the company not only how to better optimize Fleet ads going forward, but also other areas where it may launch full-screen ads further down the road. In addition, it wants to learn how people feel about and engage with full-screen ads, as the test continues.").

[460]   Goldfarb, Avi and Catherine Tucker, "Standardization and the Effectiveness of Online Advertising," *Management Science*, Vol. 61, No. 11, 2015, pp. 2707-2719, at 2709, 2715-2716.

[461]   According to Opendorse, a leading NIL technology company, 83 percent of third-party NIL deals from July 2021 to February 2023 were between student-athletes and a brand, while the remainder were deals with fans or donors. *See* Opendorse, "NIL Insights, July 1, 2021 – February 28, 2023," available at https://biz.opendorse.com/nil-insights/, accessed on March 13, 2023; Opendorse, "About," available at https://opendorse.com/about/, accessed on March 17, 2023 ("Opendorse is the leading athlete marketplace and NIL technology company. We serve the full lifecycle of supporting athletes: educating, assessing, planning, sharing, creating, measuring, tracking, disclosing, regulating, listing, browsing, booking, and more.").

conducted by HubSpot, over 80 percent plan their marketing strategies less than four months in advance.[462]

211. Brands shift their marketing strategy in reaction to unexpected changes in the market. For example, in 2022, in response to perceived uncertainty following Elon Musk's acquisition of Twitter, brands decreased their advertising spending on Twitter and switched to alternative advertising platforms such as Snapchat.[463] During the Covid-19 pandemic, the share of advertising budget spent on online channels increased in response to the lockdown restrictions, but it decreased again as the restrictions relaxed.[464] Brands may also shift their advertising strategy, by trying a new social media platform or focusing on a new feature such as Instagram Reels, to target a new consumer segment: the National Football League sought to renew younger viewers' interest in football by starting to advertise with TikTok.[465] These examples illustrate

---

[462] Iskiev, Maxwell, "The HubSpot Blog's 2023 Content & Media Strategy Report [Data]," *HubSpot*, April 12, 2022, available at https://blog.hubspot.com/marketing/content-and-media-strategy-report ("Over 80% of media planners formulate their strategies less than 4 months ahead of time.").

[463] Pintado, Amanda Pérez, "Half of Twitter's Top Advertisers Have Left the Platform Since Elon Musk's Takeover, Report Says," *USA Today*, November 28, 2022, available at https://www.usatoday.com/story/tech/2022/11/28/twitter-loses-advertisers-after-elon-musk/10790189002/ ("The majority of advertisers on the list, however, have stopped spending on the platform for a 'significant period of time following direct outreach, controversies, and warnings from media buyers,' according to a Media Matters analysis of data from ad analytics firm Pathmatics."). *See also* Scanlon, Krystal, "Where Exactly Are Twitter's Lost Ad Dollars Going?" *Digiday*, November 16, 2022, available at https://digiday.com/marketing/where-exactly-are-twitters-lost-ad-dollars-going/ ("As Twitter's money pots are dwindling fast, the question remains: Where are advertisers taking those dollars? In a word: everywhere. […] There have been some early (albeit speculative) signs that other platforms such as Snapchat have been benefiting from Twitter's declining ad spend. In October, while traffic to ads.twitter.com was down 19% year-over-year, traffic to ads.snapchat.com was up 47%, according to data from digital analytics firm Similarweb.").

[464] McIntyre, Ewan, "For Marketers, Budget-Related Stress Remains Low Despite Inflation Hitting a High," *Gartner*, May 23, 2022, available at https://blogs.gartner.com/ewan-mcintyre/marketing-budgets-2022/ ("In North America and Europe, customer journeys have recalibrated post-lockdown. Offline channels that were heavily impacted by cuts in 2021 and 2021 are bouncing back, as [Chief Marketing Officers] are switching away from a digital-first mindset into a hybrid, multichannel approach.").

[465] Graham, Megan, "The NFL, Facing Declining Interest Among Young Viewers, Just Struck a Deal With TikTok," *CNBC*, September 3, 2019, available at https://www.cnbc.com/2019/09/03/nfl-partners-with-tiktok-in-new-marketing-push.html ("The move comes as younger generations seem to be less interested in football. […] The NFL is hoping TikTok will help it score with young viewers. […] In a statement, NFL VP of Digital Media Business Development Blake Stuchin called TikTok a 'natural extension' of its media strategy because it reaches a 'fast-growing global audience of NFL fans and future fans.'"). *See also* Iskiev, Maxwell, "The HubSpot Blog's 2023 Content & Media Strategy Report [Data]," *HubSpot*, April 12, 2022, available at

the dynamic nature of advertising, especially as digital media continually evolve. According to Hubspot, over 50 percent of marketers changed their marketing strategy in 2021: surveyed media planners who reported having pivoted cited a wide range of reasons including reacting to the Covid-19 pandemic, "changes in competitor activit[ies]," and "changes in their industry," as well as to "keep up with trends" or to "reach a new audience."[466]

212.    Given that brands frequently shift and adapt their marketing strategies, determining whether brands that entered into third-party NIL deals in the after period would have entered into the same type or value of deals in the before period cannot be done with a common methodology.

### 3. The Value That Brands Assign to a Third-Party NIL Deal Changes Over Time

213.    Brands have reported finding it difficult to estimate the value of entering a deal with a student-athlete.[467]  As brands build knowledge about the value of a given student-athlete or knowledge of successful features of a marketing campaign using student-athlete NIL, they are more likely to renew a successful deal than an unsuccessful one.[468]  A brand's third-party NIL deal in the after period would not necessarily reflect

---

https://blog hubspot.com/marketing/content-and-media-strategy-report ("Of the media planners who have ever pivoted, over two-thirds did so to try a new social media platform, and 77% pivoted to try a new feature.")

[466]  Iskiev, Maxwell, "The HubSpot Blog's 2023 Marketing Strategy & Trends Report: Data from 1,200+ Global Marketers," *HubSpot*, October 31, 2022, available at https://blog hubspot.com/marketing/hubspot-blog-marketing-industry-trends-report ("Not only did over half of marketers pivot in 2021, 83% of those who pivoted changed course two to four times in one year."); Iskiev, Maxwell, "The HubSpot Blog's 2023 Content & Media Strategy Report [Data]," *HubSpot*, April 12, 2022, available at https://blog hubspot.com/marketing/content-and-media-strategy-report, Figure "Why Did Media Planners Pivot Their Content Plans?".

[467]  Coffee, Patrick, "More Big Brands Brave the Rocky Terrain of Endorsement Deals with College Athletes," *The Wall Street Journal*, March 4, 2023, available at https://www.wsj.com/articles/more-big-brands-brave-the-rocky-terrain-of-endorsement-deals-with-college-athletes-b70b24c5 ("Once brands connect with athletes, they often struggle to determine the value of a given individual's videos and social-media posts.").

[468]  Geyser, Werner, "The State of Influencer Marketing 2023: Benchmark Report," *Influencer Marketing Hub*, February 7, 2023, available at https://influencermarketinghub.com/influencer-marketing-benchmark-report ("The 4% increase in firms working with existing influencers probably indicates the natural increase in influencer-business relationships over time. The more successful an influencer campaign is, the greater the likelihood that the parties will want to work together on other campaigns.").

this learning and therefore would not be predictive of a brand's actions in a long-run equilibrium.

214.    Brands may also seek to alter the type of third-party NIL deal that they offer, depending on the product it is promoting.  For instance, when launching a new product, a brand may find that entering a third-party NIL deal with a student-athlete may be more valuable than when promoting a well-established product.[469]  Alternatively, a brand whose sales are flourishing because of a recently successful advertising campaign may find it less valuable to enter a third-party NIL deal than a brand that hopes to bolster sales of a product by promoting it to the followers of a student-athlete. Therefore, the value of a third-party NIL deal depends on the particular point in a brand's product lifecycle.  A third-party NIL deal in the after period tied to a specific product would not be representative of a deal for the same product in the before period.

215.    Brands may also adjust their approach to third-party NIL deals with student-athletes, as they gain more experience with the third-party NIL marketplace.  For example, Opendorse's CEO, Blake Lawrence, anticipates that third-party NIL contracts will be for a period of months instead of years, to account for the frequency of student-athletes transferring.[470]  If brands had more experience with third-party NIL deals in the before period, the third-party NIL deals that would have taken place would therefore have had shorter contracts.

216.    Incidents involving student-athletes have led some to call for morality clauses in third-party NIL contracts, increasing advertiser uncertainty regarding the sustainability of

---

[469]  *See, for example*, Warren, Jillian, "How to Plan a Product Launch on Social Media," *Later*, May 9, 2021, available at https://later.com/blog/product-launch-social-media/ ("When it comes to launching a new product on social media, an influencer marketing strategy can have a huge impact on your success. Consumers are often much more likely to try something if they can see how a real person uses it — and the benefits it brings.").

[470]  Dodd, Dennis, "Inside the World of 'Collectives' Using Name, Image and Likeness to Pay College Athletes, Influence Programs," *CBS Sports*, January 26, 2022, available at https://www.cbssports.com/college-football/news/inside-the-world-of-collectives-using-name-image-and-likeness-to-pay-college-athletes-influence-programs/ ("Opendorse's Lawrence believes these nascent days of NIL will make the market 'smarter'. NIL contracts will be offered for three months instead of three years. With the transfer portal looming in the background, that's all the staying power that can be counted on for an athlete at one school.").

some third-party NIL deals. For example, Florida quarterback Anthony Richardson was pulled over for speeding after signing a deal with Gainesville Dodge, prompting an industry leader to argue that dealerships might want to add a clause against reckless driving in the future.[471]

217.     All of the changes described in this subsection means that the underlying assumption of constant payments underlying the mirroring of the before and after period in the Rascher Report does not hold.

   **4.   The Growth of Social Media Influencers over Time Renders the After Period a Poor Predictor of Social Media-Related Third-Party NIL Deals in the Before Period**

218.     The Rascher Report ignores that many third-party NIL deals in the after period depend on social media usage.  As shown in **Table 11**, there were  Counsel Only  reported third-party NIL deals  Counsel  percent of all reported deals) which involved student-athletes promoting a brand on social media in exchange for NIL compensation, and it is incorrect to assume that these deals would have existed in the before period.[472]

---

[471]   Prisbell, Eric, "College Sports Business Notes: On Anthony Richardson's NIL Deal, Army's Star and Oliver Luck," *On3*, April 19, 2022, available at https://www.on3.com/nil/news/college-notes-florida-anthony-richardson-nil-army-andre-carter-oliver-luck/ ("If Richardson was indeed driving the vehicle that Gainesville Dodge provided him, this looms as one of the first high-profile cases in which a company becomes wrapped up in negative attention because of the actions of a student-athlete. Peter Schoental, CEO of Athliance, said Richardson's case specifically could prompt companies in the future to ensure they protect themselves from negative headlines when engaging in a NIL deal.").

Counsel Only

**Table 11. Types of Third-Party NIL Transactions Reported by Eligible Student-Athletes[473]**



Counsel Only

219.   According to Influencer Marketing Hub, a social media and marketing influencer research company, the estimated market size for influencer marketing grew from $1.7 billion in 2016 to $16.4 billion in 2022 and is expected to reach $21.1 billion in 2023.[474]   This growth in influencer marketing is consistent with the notion that both demand for and supply of influencers has increased over time, such that the third-party NIL deals in the after period are not indicative of the third-party NIL deals that would have been possible in the before period.   Not adjusting for the growth in influencer

---

[473]   Counsel Only

[474]   Geyser, Werner, "The State of Influencer Marketing 2023: Benchmark Report," *Influencer Marketing Hub*, February 7, 2023, available at https://influencermarketinghub.com/influencer-marketing-benchmark-report ("From a mere $1.7 billion at the time of this site's beginning in 2016, influencer marketing grew to have an estimated market size of $16.4 billion in 2022. Furthermore, this is expected to jump a further 29% to an estimated $21.1 billion in 2023."; "43% of the brands surveyed said they spend less than $10K annually on influencer marketing (higher than last year's 37% - these are probably newcomers dabbling with influencer marketing).").

marketing throughout the before period would overestimate the value and the number of third-party NIL deals related to social media in the before period.

220.  In addition, social media platforms are two-sided attention platforms that connect users to marketers that would like to advertise to them.[475]  Platforms with a large number of users are more valuable to marketers.[476]  Advertisers' willingness-to-pay for third-party NIL deals that involve posting on a social media platform will vary together with the number of active users that could be reached on that platform.  The value that a sponsor would have assigned to a third-party NIL deal requiring a student-athlete to post on a given social media platform in the before period is therefore unlikely to be the same as the value that the sponsor assigned to the same deal in the after period.

### 5.  Third-Party NIL Deals in the After Period Arising from Viral Moments or Rare Sporting Events Are Not Predictive of Third-Party NIL Deals in the Before Period

221.  A student-athlete's media exposure and familiarity can also change suddenly, due to viral moments or rare sporting events, such as success in national or international athletic competitions that do not occur every year.  In his deposition, Dr. Rascher grants that student-athletes who have notable successes in large events can expect an increase in popularity "certainly locally in their marketplace," and that this popularity will help in signing third-party NIL deals, but the Rascher Report does not propose to adjust for successes in large events.[477]  Third-party NIL deals that may have emerged from such

---

[475]  Evans, David S., "Attention Platforms, the Value of Content, and Public Policy," *Review of Industrial Organization*, Vol. 54, February 24, 2019, pp. 775-792, at 777 ("[Attention] platforms provide content that induces consumers to spend time on the platform. Attention platforms then sell advertisers the ability to reach those consumers by inserting ads on the platform interspersed with the content. Some consumers pay attention to the ads to the benefit of the advertiser. The content is often designed to attract consumers that advertisers particularly desire, so these platforms serve as matchmakers.").

[476]  Anderson, Simon P. and Bruno Jullien, "Chapter 2, The Advertising-Financed Business Model in Two-Sided Media Markets," in *Handbook of Media Economics*, Vol. 1A, Elsevier, 2015, pp. 42-90, at 43-44. ("Advertisers want an audience, the larger the better, so there is a positive network effect of consumer side size on advertiser benefits.").

[477]  Rascher Deposition, pp. 230:22-231:13 ("Q.  Let me give you a different example. Have you heard of a student-athlete named Doug Edert?  A.  No.  Q.  So I'll represent to you that he was a player on the Saint Peter's College basketball team that had a pretty deep run in the NCAA tournament that year. Are you familiar with at

viral moments in the after period are not predictive of third-party NIL deals that would have occurred in the before period.  In addition, identifying viral moments in the before period that a student-athlete could have used to secure third-party NIL deals cannot be done with a common methodology.

222.    Sporting success in competition can significantly increase a student-athlete's exposure and familiarity and help them secure third-party NIL deals they would not have been able to secure otherwise:

a.    The Oregon State University men's basketball team unexpectedly won the Pac-12 tournament in 2021 and went on to win three games in the NCAA tournament. Oregon State had not officially won an NCAA tournament game since 1975, and one report labeled them the "Cinderella we didn't see coming."[478]  Following this tournament success, Jarod Lucas, one of the team's leading scorers, found success in securing third-party NIL deals and selling personal memorabilia.[479]  In the Rascher Report's [Counsel Only] [redacted] [redacted] [redacted] .[480]

---

least the Saint Peter's experience?  A.  Yes.  Q.  Would you agree that the players at Saint Peter's have a greater popularity today than they did four years ago?  A.  I mean, again, I just haven't looked at that particular example. So it's – you know, I just don't know. I mean, I imagine certainly locally in their marketplace but not necessarily in a broader marketplace.").

[478]  Miller, Kerry, "Oregon State is the True NCAA Tournament Cinderella We Didn't See Coming," *Bleacher Report*, March 28, 2021, available at https://bleacherreport.com/articles/2938507-oregon-state-is-the-true-ncaa-tournament-cinderella-we-didnt-see-coming ("It's quite rare for a major-conference team to serve as a legitimate Cinderella story of the men's NCAA tournament, but that glass slipper fits beautifully on the Elite-Eight-bound and No. 12 seeded Oregon State Beavers… the program's most recent official tournament victory came in 1975.").

[479]  Daschel, Nick, "What Is a Jarod Lucas Game-Word Jersey Worth? With NIL Revenue Gates Open, Oregon State Guard Will Find Out," *Oregon Live*, July 1, 2021, available at https://www.oregonlive.com/beavers/2021/07/what-is-a-jarod-lucas-game-worn-jersey-worth-with-nil-revenue-gates-open-oregon-state-guard-will-find-out html ("Lucas became the first OSU athlete to take advantage of the new name, image and likeness ruling when he put his game-worn high school jersey on eBay. As of Thursday afternoon, there were 32 bids for the autographed jersey, with a high of $107.50.").

[480]  " [Counsel Only]

b.  Following the Louisiana State University ("LSU") victory over Iowa in the 2023 women's basketball championship, both LSU Angel Reese and Iowa Caitlin Clark experienced a large increase in their social media following, and subsequently of their NIL valuation, which is estimated by On3, a college sports research firm, based on various projections associated with a student-athlete's performance, social media presence, and exposure.[481] Angel Reese gained 1.3 million social media follower and her NIL valuation jumped $485,000 in a week, to $876,000.  Caitlin Clark's NIL valuation increased by $547,000 to $739,000.[482]  The increase in their NIL valuation suggests that their potential for more third-party NIL deals or more lucrative third-party NIL deals increased following their increased exposure and success during the women's basketball championship.

c.  Named Plaintiff Grant House hypothesized that his public exposure, and therefore ability to secure third-party NIL deals, increased when competing in the Pan American Games.[483]  The Pan American Games are international

---

[481]  Terry, Shannon, "About On3 NIL Valuation, Brand Value, Roster Value," *On3*, July 29, 2022, available at https://www.on3.com/nil/news/about-on3-nil-valuation-per-post-value/ ("Once Brand and Roster Value combine to create the overall NIL market, athletes participate in the marketplace based on their individual brand and roster values. For each athlete, the On3 NIL Valuation algorithm takes into account three primary factors: performance, influence and exposure to create their individual Roster Value and Brand Value, which together combine to create the athlete's On3 NIL Valuation. Performance: Performance is determined by how the athlete performs on the field. […] Influence: Influence is determined by the athlete's own social media authority. Social media followers, reach and engagement are the primary factors that determine influence.  Exposure: Exposure is determined by several factors including whether the athlete is in high school or college, which school the athlete attends and their position.").

[482]  Butler, Rhett, "Keep Hating On Caitlin Clark And Angel Reese. Their NIL Deals Thank You, As Both Are Taking Beef To The Bank," *The Shadow League*, April 5, 2023, available at https://theshadowleague.com/keep-hating-on-caitlin-clark-and-angel-reese-their-nil-deals-thank-you-as-both-are-taking-beef-to-the-bank/ ("Clark added more than 425,000 followers since last Friday's Final Four performance with 41 points against the Gamecocks, making her the first player in NCAA tournament history to record back-to-back 40-point games. Since then, Clark's On3 NIL Valuation has increased to $739,000, a $547,000 increase since last week. […] Reese already had partnerships with Coach, McDonald's, and Sparkling Ice, but her social following has gone up, and it's stuck, adding more than 1.3 million followers in the last week since Sunday's national title win. On Instagram alone, she has gained more than 500,000 new followers. Reese's On3 NIL Valuation is now $876,000, which is a $485,000 jump since last week.").

[483]  House Deposition, p. 226:5-22 ("Q.  And when you were competing in the Pan American Games in 2019, would you say your public exposure increased?  A.  Yes.  Q.  How so?  A.  We were broadcasted at one of the premiere international events in the entire world and for the swimming – for swimming – the sport of swimming

sporting competitions including all Olympic Sports and featuring national delegations from North America, South America, Central America, and the Caribbean.  They are held only once every four years—a student-athlete may only have one chance to compete in the games during their collegiate career.[484]

d.  On a larger scale, the Olympics also occur once every four years, and success in the Olympics may raise the profile of a student-athlete, allowing greater access to third-party NIL deals.  Gable Steveson, a wrestler for the University of Minnesota, won the gold medal in the 125kg weight class at the Tokyo Olympics in August 2021.[485]  One month later, he signed a lucrative NIL deal with WWE that will continue into full-time employment upon graduation.[486]  ███████ Counsel Only ███████

███████████████████████████

███████████████

---

specifically.  Q.  Do you think around the time of the Pan American Games, you would have received NIL deals had you been able to?  A.  Absolutely.  Q.  And do you think that you would have been able to secure more NIL deals when you were competing for the Pan American Games than in years when you weren't participating in those games?  A.  Absolutely.").

[484]  Team Canada, "FAQ: What Are the Pan American Games?" available at https://olympic.ca/faq-what-are-the-pan-american-games/, accessed on March 21, 2023 ("The Pan American Games are a continental multi-sport competition for the countries of North America, South America, Central America, and the Caribbean."; "The Pan American Games include all of the sports and disciplines featured on the summery Olympic program as well as some additional sports governed by international federations that are recognized by the [International Olympic Committee].").

[485]  ESPN, "American Gable Steveson Wins Wrestling Gold Medal in 125kg Class at Tokyo Olympics," August 6, 2021, available at https://www.espn.com/olympics/story/_/id/31971387/american-gable-steveson-wins-wrestling-gold-medal-125-kg-class-tokyo-olympics.

[486]  Taranto, Steven, "Olympic Gold Medalist Gable Steveson Signs Multi-Year Agreement With WWE but Will Return to Minnesota," *CBS Sports*, September 9, 2021, available at https://www.cbssports.com/wwe/news/olympic-gold-medalist-gable-steveson-signs-multi-year-agreement-with-wwe-but-will-return-to-minnesota/ ("According to Mike Coppinger of ESPN, Steveson will train at a remote training facility set up by WWE near the University of Minnesota's campus. He will work with WWE coaches while attending school for his senior year. Upon his graduation next May, Steveson's multi-year contract with WWE will begin, and he will join the company as a full-time performer.").

[487]  ███████ Counsel Only ███████

e.  Given that third-party NIL deals are often tied to a local marketplace, local sporting events may generate interest in a particular student-athlete that may lead to third-party NIL compensation.  Examples of such competitions include the Nastia Liukin Cup for gymnastics,[488] and the summer Texas Collegiate League in baseball,[489] and other collegiate leagues and competitions in sports such as water polo or swimming.  However, the affect these competitions may have on a student-athlete's third-party NIL opportunities depends on a student-athlete's opportunity to compete, perform well, and gain public exposure.  Determining which competitions are relevant and their effect on a student-athlete's third-party NIL opportunities cannot be accomplished with a common methodology.

223.  Idiosyncratic viral moments off-the-field can significantly increase a student-athlete's exposure and familiarity and help them secure third-party NIL deals they would not have been able to secure otherwise:

a.  Named Plaintiff Prince made headlines during the March 2021 NCAA basketball tournament after posting videos of the women's weight room to Twitter and TikTok.[490]  In her deposition, Prince described how these posts

---

[488]  Nastia Liukin Cup, "Event Information," available at https://nastialiukincup.com/info/, accessed on March 21, 2023.

[489]  Texas Collegiate League, "Overview," available at https://www.texascollegiateleague.com/about/overview/, accessed on March 21, 2023 ("The Texas Collegiate League exists to provide the best summer league experience for the best professional prospects from colleges throughout the country. The league will allow those players with eligibility remaining to showcase and improve their skills in a wholesome, minor league-type atmosphere using wooden bats. The league is committed to providing quality, inexpensive entertainment [] in a small-town, intimate atmosphere that is distinctly Texan, while helping promote the game of baseball in the communities involved.").

[490]  Fitzsimons, Tim, "Women at NCAA Tournament Allege Weight Room Disparities," *NBC News*, March 19, 2021, available at https://www.nbcnews.com/news/sports/women-ncaa-tournament-allege-weight-room-disparities-n1261600 ("But on Friday, Oregon player Sedona Prince disputed the claim that there was no space for the women to have an equitable weight room. 'This is our weight room,' Prince said in a TikTok video verified by NBC News, showing a small weight rack. 'This is the men's weight room,' she says, panning across a vast space with workout benches, racks and many more weights.").

led to national television appearances,[491] and that these posts had a dramatic increase in her social media following.[492]  As discussed in **Section V.F.1**, student-athletes with a large number of followers are typically able to secure significant third-party NIL deal compensation.  It is therefore plausible that the sudden exposure that Prince gained in the wake of her video posts has contributed to her success in securing third-party NIL deals.



Counsel Only

[493]

b.   During the 2021 season, University of Tennessee quarterback Hendon Hooker went viral when a fan threw a bottle of French's mustard onto the field following a disputed officiating decision.  The following year, French's signed Hooker to an NIL deal, including custom sneakers, advertisements, and further item giveaways.[494]

---

[491]  Prince Deposition, p. 103:4-25 ("Q. Tell me a little bit about the exposure in that time frame right after the viral post? A. A lot of media outlets wanted to hear what the firsthand experience of that was like. So what it was like walking into the weight room and seeing that. And that was just CNN and Good Morning America. And they just want to know the firsthand, like I guess experience of everything. Q. So you did an interview with CNN? A. Yes. Q. It was aired? A. Yes. Q. So it was available their website? A. I'm sorry. Q. Was it available on their website, the interview? A. Possibly. I don't know. Q. And you did an interview with Good Morning America? A. Yes. Q. And that was broadcast? A. Yes.").

[492]  Prince Deposition, p. 105:5-22 ("Q. Would you say that that moment in time was kind of the peak of your exposure in terms of national media? A. I would say that's fair to say. Q. And your TikTok is blowing up also in terms of followers as a result of this, right? A. Yes. Q. What was the number that you gave me just a minute ago in terms of increase in followers in some time period after this? A. I couldn't tell you exactly. But I had gone from 500,000 to I would say a million within a week. And then there was a second wave of 'This, yes.' People knowing my name. But then learning more about me, learning my story. And from there, every TikTok I posted also did well. But even my older TikToks had resurfaced and gone viral as well.").

[493]                                        Counsel Only



[494]  Wilson, Mike, "Hendon Hooker Signs NIL Deal with French's Year After Tennessee Fan Threw Mustard Bottle on Field," *USA Today*, November 4, 2022, available at https://www.usatoday.com/story/sports/ncaaf/sec/2022/11/04/hendon-hooker-nil-deal-frenchs/8270390001/ ("French's gave Hooker a pair of customer mustard-inspired sneakers as part of the deal. Hooker will use his social media accounts to advertise French's, while French's plans to roll out giveaways following the deal.").

c. In November 2021, Emily Cole, a member of Duke's track and field team, posted a request for a date to her formal on her TikTok account.[495]  During the next month, she went viral after attending the formal and posting content with someone who responded to her video, leading to her TikTok follower count to increase from 50,000 to 90,000.[496]  Cole shared that this also impacted her ability to receive third-party NIL deals,[497] Counsel Only

498 Counsel Only

## E. The Rascher Report's Proposed Adjustments Are Insufficient for Estimating Third-Party NIL Damages

224. As described in **Section V.A**, the Rascher Report proposes, but does not implement, several adjustments that could be applied to estimate class members' third-party NIL damages: (i) whether a student-athlete transferred or did not play the same sport; (ii)

---

[495] @eemilycolee, TikTok, accessed on April 24, 2023.

[496] Clemmons, Anna Katherine, "'A Whole Different Audience': College Athletes Are Now Online Influencers, Too," *Global Sport Matters*, February 8, 2023, available at https://globalsportmatters.com/business/2023/02/08/whole-different-audience-college-athletes-online-influencers-too/ ("Cole had around 10,000 Instagram followers when she entered Duke as a freshman. That number rose significantly in December 2021, after she made a TikTok post about needing a date to her formal that went viral. Mitchell Pehlke, a lacrosse player at Ohio State University, responded on social media. Then Cole responded to Pehlke, and the two had their first conversation on FaceTime, posting it to their social media accounts. Soon, more than 50,000 viewers were following their formal journey on TikTok (for Cole), YouTube (where Pehlke also posted) and Instagram (where both posted). Cole says that documenting their experience, including a follow-up trip to New York City together and a guest appearance on a Barstool Sports podcast, bumped her TikTok followers from 50,000 to 90,000 and her Instagram following from 13,000 to 20,000.").

[497] Clemmons, Anna Katherine, "'A Whole Different Audience': College Athletes Are Now Online Influencers, Too," *Global Sport Matters*, February 8, 2023, available at https://globalsportmatters.com/business/2023/02/08/whole-different-audience-college-athletes-online-influencers-too/ ("Cole also landed bigger NIL deals after her date with Pehlke.").



[498] Counsel Only

[499] Counsel Only

changes in a student-athlete's role on a team; (iii) the impact of the Covid-19 pandemic and changes in the overall price levels.[500]  The Rascher Report's proposed methodology is overly vague and the proposed adjustments are insufficient for remedying the flaws of applying the before-and-after methodology to this context.

### 1. Demand for and Supply of College Athletics Is Not Indicative of Demand for and Supply of Third-Party NIL

225.  The Rascher Report recognizes that a necessary condition for its proposed methodology to be valid is a "reliable apples-to-apples comparison" between the before and after periods.[501]  To identify any obstacles to this apples-to-apples comparison, the Rascher Report examines data related to demand for and supply of college athletics during the before and after periods.[502]  The proposed methodology is flawed because the relevant demand and supply are for third-party agreements involving student-athlete NIL, not for college athletics in general.

226.  First, the Rascher Report concludes that the supply of third-party NIL is comparable between the before and after period.  To do so, it uses participation in college sports as a proxy for the supply of third-party NIL.[503]  This assumption is wrong.  As I discuss in **Section V.F.2**, a given student-athlete's effort to secure and supply third-party NIL deals is not fixed and varies over time depending on factors such as the student-

---

[500]  Rascher Report, ¶¶ 190-192.

[501]  Rascher Report, ¶ 209 ("Apart from Covid, I find the before and after periods to be stable and thus comparable with respect to supply and demand and, thus, a reliable apples-to-apples comparison for purposes of my damages methodology.")

[502]  Rascher Report, ¶ 199 ("I first consider whether there were any changes in general economic conditions between the before and after periods that require an adjustment in my model. As I noted above, the only change in such conditions that I find require an adjustment in the model is the adverse impact of Covid on the demand for Division I college sports for part of the before period (and any change in overall price levels).")

[503]  Rascher Report, ¶ 200 ("I assume that athletes providing NIL would, absent the Prior NIL Rules or Current NIL Rules, be a consistent portion of all Division I athletes–this means there is a small and steady increase in the supply of college athletes who would obtain NIL compensation. A small and steady increase in the available capacity to supply NIL, without any other changes, would be consistent with stable quantities and prices. Growth into the 2021 school year was below average. Exhibit 15 shows the participation amounts annually and the trend over time. This factor thus indicates that the before and after period were comparable with respect to supply factors and these do not require any adjustment in my damages model.")

athlete's outside options or the amount of time the student-athlete has available. In addition, this assumption does not take into account the technological changes that have taken place since the start of the before period, such as the evolution of the social media landscape and the growth in the influencer marketing market.  As I discuss in **Section V.D.4**, these changes have made it easier for student-athletes to supply NIL in the after period than would have been possible for most of the before period. Therefore, assuming that the supply of third-party NIL is a constant fraction of the number of student-athletes enrolled in Division I sport is an unrealistic assumption.

227.   Second, the Rascher Report looks at the year-on-year evolution of athletic program revenues, donations, and sponsorship for A5 schools as well as ticket sales revenues, arguing that it captures the demand for student-athletes' NIL over time.  It concludes that the Covid-19 pandemic is the only factor that affected demand for student-athletes' NIL.[504]  Changes in college athletics' revenues are not an appropriate proxy of sponsors' and firms' demand for third-party NIL deals.  Firms' spending on advertising and marketing, including on third-party NIL deals, will fluctuate over time depending on factors such as their revenues, their expected revenue per customer, and their budget.[505]  These factors are not always correlated with athletic program revenues, donations, sponsorship, and ticket sales revenues.

---

[504] Rascher Report, ¶ 199 ("I first consider whether there were any changes in general economic conditions between the before and after periods that require an adjustment in my damages model. As I noted above, the only change in such conditions that I find require an adjustment in the model is the adverse impact of Covid on the demand for Division I college sports for part of the before period (and any change in overall price levels)."); ¶ 201 ("To evaluate the demand for college athlete NILs over time, I rely on proxies related to demand for college athletics in general. Using financial data from MFRS, I tabulate the following information for all Power Five schools: total athletic program revenue, and athletic program donations (contributions), total athletic program royalties / licenses /sponsorships.");. *See also* Rascher Report, ¶ 204 ("In addition, I added a fourth category, which is total revenue net of ticket sales and other related revenue (parking, concessions, etc.).").

[505] Keelher, John, "Three Ways To Determine Your Digital Marketing Budget," *Forbes,* September 11, 2020, available at https://www.forbes.com/sites/forbesagencycouncil/2020/09/11/three-ways-to-determine-your-digital-marketing-budget ("Setting a digital marketing budget can be tough. […] Here are three simple ways to establish a budget based on data. […]  Revenue Per Customer. This is my preferred way to look at advertising spending because it makes the conversation more about return on investment and your goals for customer acquisition. […] Percentage Of Your Total Revenue. Finally, looking at your marketing budget as a percentage of your total revenue tells you how much you should be spending based on your size. […] What You're Able to Afford. Ultimately, your advertising budget comes down to what you can afford.").

228.     Therefore, the Rascher Report's proposed methodology to proxy for changes in both sides of the third-party NIL market by documenting changes in the supply of college athletics and in college athletics' revenues is inappropriate.

### 2. Changes in an Individual Student-Athlete's Exposure and Familiarity over Time Cannot Be Determined With a Common Methodology

229.     Student-athletes often achieve greater exposure and familiarity in later years of their college career than in earlier years.  For instance, CBS Sports reports that most of the student-athletes on Creighton University, Xavier University, and the University of Connecticut (the three teams in the non-A5 Big East conference that made it the farthest during the 2023 men's basketball March Madness tournament) have several years of experience playing NCAA basketball.[506]  Similarly, college juniors and seniors make up the majority of ESPN's rankings of best quarterbacks; of the top 20 student-athletes, 9 are seniors, 9 are juniors, 2 are sophomores, and none are freshmen.[507] Student-athletes can also experience rapid increases in athletic exposure, such as when Stetson Bennett IV went from walking on to the team without a scholarship to winning Georgia's starting quarterback position and leading them to back-to-back national championships.[508]  It is not appropriate to look at a student-athlete's more successful

---

[506]  Pereles, Zachary, "March Madness 2023: With Trio of Sweet 16 Teams and New Coaches, Big East's Banner Week Previews Bright Future," *CBS Sports*, March 23, 2023, available at https://www.cbssports.com/college-basketball/news/march-madness-2023-with-trio-of-sweet-16-teams-and-new-coaches-big-easts-banner-week-previews-bright-future/ ("Four of Creighton's five starters are in at least their second year in the program, and the one who isn't – Scheierman – is a senior who led South Dakota State to the NCAA tournament last year. Six of UConn's nine rotation players are upperclassmen. All five of Xavier's starters are upperclassmen. It helps to get old and stay old, especially in an era when the transfer portal often saps teams of continuity. It's no surprise the three Big East teams still standing have plenty of experience on the court and on the sideline.").

[507]  ESPN, "College Football Total QBR – 2022 Season Leaders," available at https://www.espn.com/college-football/qbr/_/sort/schedAdjQBR/dir/desc, accessed on March 23, 2023. These players are ranked in descending order of ESPN's Adjusted Total Quarterback Rating, which is defined as valuing "the quarterback on all play types on a 0-100 scale adjusted for the strength of opposing defenses faced." Football rosters from each school were used to determine class year.

[508]  Peter, Josh, "Despite Success at Georgia, Quarterback Stetson Bennett Will Face Doubts about NFL Prospects," *USA Today*, January 10, 2023, available at https://www.usatoday.com/story/sports/ncaaf/2023/01/10/georgia-qb-stetson-bennett-nfl-draft-2023-questions/11021864002/ ("Georgia's quarterback led the Bulldogs to back-to-back championships for the first time since Alabama did it in 2011-12. […]  Remember, Bennett joined Georgia in 2017 as a walk-on. Because the doubters, including Georgia's coaching staff, didn't think he warranted a scholarship.").

later years and assume that exposure and familiarity in the earlier years could be estimated or assumed to be the same.

230. The Rascher Report's proposed methodology to adjust for changes in the student-athlete's role in the squad is therefore inadequate because it does not account for these changes in exposure and familiarity. Instead, the Rascher Report proposes to adjust for changes in a student-athlete's role or performance on the football or basketball squad if they are "substantial enough to affect compensation for use of the athlete's NIL."[509]

231. The Rascher Report suggests that it will use objective measures of performance, such as the number of plays for football or minutes played for basketball, to assess changes in a student-athlete's role within a squad.[510] These are not sufficient metrics for performance. First, if the Rascher Report were to rely on objective measures, there are an extensive list of statistics that could be considered. For instance, in ranking top football student-athletes, the NCAA considers 42 individual statistics related to different aspects of on-field performance, such as "Fumbles Recovered," "Points Responsible For," and "Rush Yards Per Carry."[511] However, even an exhaustive list of objective performance measures would not provide sufficient metrics for exposure and familiarity. For example, players who are not directly involved in scoring points may receive less exposure and familiarity than those more directly involved: the quarterback on the football team will receive more recognition for throwing a touchdown pass than the offensive lineman who blocked opposing players from tackling the quarterback,

---

[509] Rascher Report, ¶ 191 ("Second, the model will account for changes in an athlete's role on the squad that are substantial enough to affect compensation for use of the athlete's NIL").

[510] Rascher Report, ¶ 215 ("There are public sources of statistics on athlete performance in college sports which provide data to assess material changes in the athlete's role on the squad. For example, Pro Football Focus provides information on "Snaps" for each football athlete. Starters in a given position get more snaps (play more downs) relative to non-starters in the same position. Similarly, Sports Reference and Her Hoop Stats provide information on basketball players that includes minutes played."). *See also* Taglione, Jennifer, "Football's Bend-and-Snap and Other Key Terms," *Bleacher Report*, January 7, 2009, available at https://bleacherreport.com/articles/108065-footballs-bend-and-snap-and-other-key-terms ("The Snap: When the Center (the player in the middle of the bending lineup) passes the ball between his legs to the QB or player behind him to start off each play with a snap!").

[511] NCAA, "NCAA College Football FBS Stats," available at https://www.ncaa.com/stats/football/fbs, accessed on March 23, 2023.

while the basketball player who consistently makes three-point shots will receive more recognition than the basketball player whose primary contributions are defensive but plays the same amount of time.

232. Additionally, the Rascher Report does not describe the precise methodology that will be used to determine what constitutes a "substantial" change. The Rascher Report plans to "study this issue further before completing [the] merits report on damages,"[512] and will use "public sources of statistics on athlete performance in college sports."[513] In his deposition, Dr. Rascher suggests that he will do an interquartile comparison (for instance, comparing the top 25 percent of players based on their performance with the bottom 25 percent), but does not commit to a methodology.[514] This makes it impossible to assess the reliability of his proposed methodology. In addition, as explained in **Section V.E.4** with respect to the proposed adjustments for changes in school or conferences, average outcomes are not reflective of individual outcomes.

233. Without accounting for changes in exposure and familiarity, third-party NIL deals in the after period are not representative of what third-party NIL deals would be in the before period. The factors influencing exposure and familiarity would evolve

---

[512] Rascher Report, ¶ 217 ("In addition, for football and basketball, the two college sports with the largest television coverage, the athlete's role on the team can impact the athlete's visibility, particularly on television, and his or her Familiarity and Exposure and thus his or her NIL earnings. This television effect is specific for football and basketball – it would not be expected to exist for other Division I sports that do not receive substantial television coverage, which eliminates this reason why an athlete's role on their college squad would significantly impact their visibility or their NIL earnings.").

[513] Rascher Report, ¶ 215 ("There are public sources of statistics on athlete performance in college sports which provide data to assess material changes in the athlete's role on the squad. For example, Pro Football Focus provides information on 'Snaps' for each football athlete.").

[514] Rascher Deposition, pp. 241:18-242:23 ("Q. You talk about making an adjustment for role – A. Yes. Q. – in your report – A. Yes. Q. – in Section 7.3.4.1? A. Yes. Q. You'd agree. you don't describe the specific methodology you're going to use to make that analysis; correct? A. I talk about using quartiles, doing the sort of similar thing as I would for conference. And looking to see if there's a major difference in role. I mean, what's been really interesting and not surprising to me – and maybe not surprising to you guys – but in the data that we've seen is that [freshmen] and upperclassmen are getting paid quite a bit for their use of their name, image, and likeness, even if their role is not right away expected to be that prominent. And so there may not be an anal- -- you know, when you compare sort of upper and lower quartile or something like that in interquartile range, you might not get much of a difference. And so if you don't, then there's really no reason to do an adjustment. But if you do, then you can make that adjustment using sort of the average change. For – for a role, you know, you can do it by sport, you can do it by conference if you needed to. But essentially just sort of looking at the average change.").

differently across student-athletes, and accounting for changes in exposure and familiarity therefore cannot be done with a common methodology.

### 3. Comparing Average Third-Party NIL Outcomes across Two Schools Does Not Predict How an Individual Student-Athlete's Third-Party NIL Deals Would Be Affected by a Transfer

234.   The Rascher Report proposes to make an adjustment for student-athletes who transfer from a school to "a different school or conference [with] a statistically significant difference in demand for use of the transferred athlete's NIL."[515]  The Rascher Report does not clarify how it will determine whether school or conference changes have a substantial enough impact on third-party NIL payments to warrant an adjustment.  In his deposition, Dr. Rascher explained that he will conduct a "statistical analysis" as he receives more data to test whether such changes lead to a significant difference in demand for a student-athlete's NIL.[516]  However, he did not commit to a specific statistical method.[517]  This makes it impossible to assess the reliability of his proposed methodology.

---

[515]   Rascher Report, ¶ 190 ("I will make an adjustment in the damages calculation if the class member transferred from a school in one conference during the before period to a different school or conference in the after period, but only if I find a different school or conference results in a statistically significant difference in demand for use of the transferred athlete's NIL.").

[516]   Rascher Deposition, p. 240:3; pp. 238:14-239:1 ("Q.  In this paragraph you're talking about adjustment at the sport level for NIL compensation by conference; correct?  A. Yes.  Q.  And you say you'll test whether they are statistically significant differences across conferences within a given sport; right?  A. Yes.  Q.  Okay. You've not done that adjustment yet; correct?  A.  No. I mean, I – it's – it's as I'm getting more data, the adjustment becomes more feasible to do; right?"); pp. 241:18-242:6 (Q.  You talk about making an adjustment for role – A. Yes.  Q.  – in your report –  A.  Yes.  Q.  – in section 7.3.4.1?  A.  Yes.  Q.  You'd agree you don't describe the specific methodology you're going to use to make that analysis; correct?  A.  I talk about using quartiles, doing the sort of similar thing as I would for conference. And looking to see if there's a major difference in role."; p. 244:7-15 ("Q.  Okay. So why haven't you tried to do that analysis and demonstrate it to this date?  A.  Well, I was describing the process of doing that. It's really sort of straightforward. But as I said, I'm waiting to get more information so that I can do a more robust version of that. Instead of like doing it once and getting more information and doing it again. Sort of an efficiency reason to it.").

[517]   Rascher Deposition, p. 240:4-241:9 ("Q.  Yeah, will that assessment involve some kind of regression of those – of variables being – so it would be conference and the year? Or what would the variables be?  A.  So the variables would be sort of the payments that we see in the marketplace and then some control for which conference and sport they're playing. Potentially a control for position, especially for quarterback. That's sort of the one that often stands out, as you guys probably have seen in the data; right? But, anyway. It may just be a statistical – sort of a correlation analysis, like a t-test, two-sided t-test. It could definitely be – you could do it

235. For sports where a school or conference change is determined to result in statistically significant different payments, the Rascher Report proposes a transfer adjustment calculated as "the percentage difference between the average NIL payment for the two schools, for the given sport."[518]  However, the proposed adjustment does not properly account for changes in an individual student-athlete's third-party NIL value due to transferring between schools because average outcomes are not reflective of individual outcomes.

236. Comparing averages masks important differences between and within teams.  For example, two teams may have a similar average third-party NIL compensation, but all the players on one team may receive equal compensation, while the distribution of third-party NIL compensation in the other team may be more widespread, depending on factors such as players' roles in the squad.  The University of Tennessee and Texas Tech are both affiliated with active collectives. Tennessee's collective, Spyre Sports Group, has emerged as a leading collective that is vocal about using its funds to create a competitive advantage for the university.[519]  As of June 2022, the collective had secured $3.6 million for student-athletes, with student-athletes receiving $29,000 each on average.  This amount was distributed unequally across players, as Spyre Sports Group focuses on attracting top recruits.[520]  Meanwhile, Texas Tech's Matador Club

---

with a regression, although that becomes redundant if you're doing a single-variable t-test. So, you know, you can do it in a number of different ways, but it's all sort of using the same set of data in common economic ways. Q.  Do you know today what your methodology will be for doing that, what tool you will use?  A.  I think I mention in here; to do a – basically a test of differences by quartile, as an example.  Q.  Right. You give that as an example, but is that what you intend to do, or will you use a different methodology?  A.  Well, no, that's the methodology I intend to do at this stage. But as we move forward – right? – presumably we get more information, right?").

[518]  Rascher Report, ¶¶ 211-212.

[519]  Morrison, Dan, "Tennessee Volunteers NIL Collective: Spyre Sports Group," *On3*, May 10, 2022, available at https://www.on3.com/nil/news/tennessee-volunteers-nil-collective-spyre-sports-group/ ("In that respect, the Spyre Sports Group was born out of necessity. To stay competitive, Tennessee's fans and boosters saw that with the new rule change they could do something to help the program out, while they also got special access to student-athletes.").

[520]  On3 Staff Report, "On3's Top 20 Most Ambitious NIL Collectives," *On3*, August 4, 2022, available at https://www.on3.com/nil/news/on3s-top-20-most-ambitious-nil-collectives/ ("Spyre is also not shy about publicizing its grand vision, putting figures behind its ambition. Spyre president and co-founder Hunter Baddour said the collective is aiming to generate at least $25 million annually. The money would be put into the

signed 100 football players to a one-year $25,000 NIL contract, with all football players receiving the same amount, from quarterback to non-scholarship student-athletes.[521]  Considering the variation in how collectives approach distributing NIL funds, a uniform percentage adjustment for all players who transfer from Texas Tech to the Tennessee would overestimate the payments of players with low-earning potential and underestimate the payments of players with high-earning potential.

237.    In addition, under this methodology, a student-athlete's adjusted compensation would be unduly affected by the presence of outliers, such as a very high-earner.  For example, **Table 12** shows that the average third-party NIL compensation for a gymnast from ▮▮▮ Counsel Only ▮▮▮, which is driven by ▮▮▮▮▮▮▮▮ Counsel Only ▮▮▮▮▮▮▮▮

---

pockets of student-athletes (or recruits). In an ultra-competitive landscape in the SEC, this could help lure an increasing number of five-star prospects to Knoxville. Baddour didn't mince words to The Athletic: 'We realized being involved in recruiting was going to be a priority. Then we realized how much money we were going to need to be elite. And we're shooting to be No. 1.'"). *See also* Ray, Matt, "Spyre Sports Group Announces NIL Totals," *Sports Illustrated*, June 22, 2022, available at https://www.si.com/college/tennessee/football/spyre-sports-group-announces-nil-totals ("One hundred twenty-six student-athletes across all respective sports at Tennessee have earned $3.6 million dollars in less than one year's time. Sure some have earned more than others, but looking at it as an average, that has each student-athlete making roughly $29,000 dollars over the eleven-month period.").

[521] On3 Staff Report, "On3's Top 20 Most Ambitious NIL Collectives," *On3*, August 4, 2022, available at https://www.on3.com/nil/news/on3s-top-20-most-ambitious-nil-collectives/ ("Collective leader Cody Campbell said The Matador Club will offer each player the same $25,000 NIL contract. It's an annual deal that will be renewable. Campbell said the contract is the same for stars like quarterback Tyler Shough and walk-ons on the team. 'Collectives have done things a number of different ways,' Campbell told the Lubbock Avalanche-Journal. 'You see some of them paying large amounts to individual players. You see others doing different things. But what we want to do, really, is support the entire program.'").



Counsel Only

238.   The comparison of average outcomes across two schools would be further distorted by differing reporting requirements across schools.  For example, Named Plaintiff Sedona Prince explained in deposition that the process of reporting third-party NIL deals to the University of Oregon changed halfway through the year and that she did not report all of her deals to the school because the reporting system was too complicated.[523]  Prince also testified that she did not keep a close record of payments from her third-party NIL deals.[524]  Other student-athletes at Oregon may have experienced similar issues over

---

[522]   Counsel Only

[523]   Prince Deposition, p. 201:4-9 ("Q.  Which was an alternative way of reporting your deals to the University?  A. Yes.  I don't remember how the reporting all went, it was crazy and then we ended up switching the ways to do it.  Like halfway through the year.  So it was all kind of a mess."); pp. 202:18-203:1 ("Q. So there were deals that you did that for whatever reason weren't reported to the University? A. That's correct. Q. Was that just an omission, or did you decide not to report some, or how did that happen? A. It was just -- it was an accumulation of a few different factors, but yeah, just overwhelmed, just couldn't really figure out the system. It was complicated.").

[524]   Prince Deposition, p. 201:24-202:10 ("Q.  Do you keep your own tracking in some way of the NIL deals that you've done?  A.  I had not throughout the year. And then after I graduated and became not eligible anymore I

the same time period, and the third-party NIL deals reported at Oregon may be systematically lower due to under-reporting, such that the computed average for the Rascher Report's proposed adjustment is biased downward.

### 4. Third-Party NIL Deals Secured by an Individual Student-Athlete Post-Transfer Are Not Predictive of Deals That Would Have Been Secured Pre-Transfer

239.    For student-athletes who transferred but for whom the Rascher Report does not determine that there was "a statistically significant difference in demand for use of the transferred athlete's NIL,"[525] then the Rascher Report would not apply a transfer adjustment. In this case, the Rascher Report assumes that the player would have the same prospect for third-party NIL deals at the new school as at the old school. This assumption is contradicted by examples of third-party NIL deals that could only have occurred at the new school, such as with collectives specific to that school, or with local businesses. For example:

a.    The Rascher Report's ▮▮▮▮▮▮▮▮▮▮ Counsel Only ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[526]

---

went back and kind of counted them all up. Q. What did you look at to take inventory of your deals? A. Contracts. The contracts that I – Q. I see. It wasn't some separate tracking document that listed everything? A. No. No. It was just contracts that I'd gone through my DocuSign.").

[525] Rascher Report, ¶ 190 ("I will make an adjustment in the damages calculation if the class member transferred from a school in one conference during the before period to a different school or conference in the after period, but only if I find a different school or conference results in a statistically significant difference in demand for use of the transferred athlete's NIL.").

[526] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Counsel Only ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮;
Dosh, Kristi, "Oregon-Focused NIL Company Division Street Joins Forces With Opendorse," *Forbes*, November 18, 2021, available at https://www.forbes.com/sites/kristidosh/2021/11/18/oregon-focused-nil-company-division-street-joins-forces-with-opendorse ("Division Street, the University of Oregon-focused NIL company formed by Phil Knight and former Nike executives, is partnering with Opendorse to launch the Official NIL Marketplace of the Oregon Ducks. The first curated marketplace of its kind in college sports, it will enable Oregon athletes to connect with individuals and companies to facilitate NIL partnerships.").

b.          Counsel Only

.527

240. These deals would have been unavailable, pre-transfer, to student-athletes who were not yet enrolled at the University of Oregon or at the University of Miami.

241. Further, the Rascher Report has not proposed a methodology to separate the impact of school changes from the impact of factors such as experience and playing time on a student-athlete's third-party NIL compensation. For instance, Zach Charbonnet transferred from the University of Michigan to University of California, Los Angeles ("UCLA") ahead of the 2021 season.[528] At the time, Zach Charbonnet had already benefitted from two years of college experience. He transferred in order to increase playing time, and upon arriving at UCLA, was one of several high-profile student-athletes to join the Bruin Fan Alliance, a UCLA-specific NIL collective.[529] The Rascher Report fails to consider how to handle these simultaneous changes that student-athletes experience over the course of their collegiate career.

---

[527]  Counsel Only *See also* Braiterman, Cory, "American Top Team Makes $540,000 NIL Commitment to All Miami Hurricanes College Football Players," *SB Nation*, July 7, 2021, available at https://www.mmamania.com/2021/7/7/22566088/american-top-team-att-owner-sponsorship-miami-football-team-hurricanes-college-nil-payments ("The long-time staple of the mixed martial arts (MMA) scene in South Florida, Dan Lambert, will offer all 90 scholarship players for the Miami Hurricanes college football team $6,000 annual endorsement deals, according to an ESPN report. In exchange for the roughly $540,000 commitment that Lambert will be paying the athletes, they will promote his gym, American Top Team, on social media.").

[528]  Crawford, Brad, "Former Michigan RB Zach Charbonnet Transferring to UCLA," *247Sports*, January 30, 2021, available at https://247sports.com/Article/Zach-Charbonnet-transfer-UCLA-Bruins-Michigan-Wolverines-football-160197726/ ("It didn't take long for former Michigan running back and heralded recruit Zach Charbonnet to decide on a new school after entering the NCAA transfer portal earlier this month. Charbonnet announced on Saturday he will play for UCLA in 2021, becoming a potential featured option for Chip Kelly and the Bruins out West.").

[529]  Bolch, Ben, "All Together Now: New UCLA NIL Collective Led by Current and Former Bruins," *Los Angeles Times*, July 21, 2022, available at https://www.latimes.com/sports/ucla/story/2022-07-21/new-nil-collective-galvanize-ucla-sports-community-basketball ("Big names such as running back Zach Charbonnet, point guard Tyger Campbell and sprinter Shae Anderson are among the nearly 30 UCLA athletes from nine sports who have signed up, with scores more expected to join.").

### 5. The Effect of Covid-19 on Third-Party NIL Deals Cannot Be Determined with a Common Methodology

242.    The Rascher Report proposes to adjust for macroeconomic factors, such as the impact of the Covid-19 pandemic or changes in price levels.  However, the Rascher Report's proposed adjustments focus on adjusting for changes in the college athletics' revenues, which is not a measure of how Covid-19 would have affected sponsors' demand for third-party NIL deals and the value of these deals.  In addition, adjusting for the impact of these macroeconomic factors cannot be done with a common methodology.

**Table 13. Effect of the Covid-19 Pandemic on College Athletic Revenue Estimated Using Rascher Report's Methodology**
**A5 Conferences[530]**
Counsel Only



---

*Confidential*

243.    The proposed methodology assumes that Covid-19 had a similar impact on all the reported third-party NIL deals.  It ignores the fact that the impact of Covid-19 was different across industries and states and would have affected individual third-party NIL deals and schools differently. **Table 13** reproduces the Rascher Report's Exhibit 17 analysis to estimate the proposed Covid-19 adjustment, separately for each A5 conference.

Counsel Only

ven taking at face value the Rascher Report's methodology to estimate the Covid-19 adjustment, this illustrates that applying a unique adjustment across schools would be inappropriate.

244.    Adjusting for the impact of Covid-19 therefore requires a much more granular approach than what the Rascher Report proposes.  The Covid-19 pandemic affected different industries to varying degrees.  As a result, third-party NIL deals require different adjustments depending on the sponsor's industry and college athletic revenues is not a measure of the extent to which each industry was affected.  For example, industries that rely on movements of people and in-person contact experienced a large decline of activity in 2020 and 2021.  Employment in the leisure and hospitality industry decreased by about 20 percent between November 2019 and November 2020.[531]  By contrast, the fitness equipment industry and the streaming industry have grown during the pandemic.[532]  The Rascher Report's third-party NIL transaction data

---

[531]    Klein, Aaron and Ember Smith, "Explaining the Economic Impact of COVID-19: Core Industries and the Hispanic Workforce," *Brookings*, February 5, 2021, available at https://www.brookings.edu/research/explaining-the-economic-impact-of-covid-19-core-industries-and-the-hispanic-workforce, Figure 5.

[532]    Sharma, Sushma, "Industries Thriving During the Pandemic," *Forbes*, December 18, 2020, available at https://www.forbes.com/sites/forbestechcouncil/2020/12/18/industries-thriving-during-the-pandemic ("[S]ome industries have been doing well during the pandemic and will likely continue to do so after it's gone […] 6. Fitness Equipment Companies. With gyms across the country closing and not everyone having easy access to parks, backyards, sidewalks or trails, people need to keep up with their fitness regimens at home. […] 12. Tech

includes deals sponsored by industries which were affected differently by the pandemic. <span style="background:gray">Counsel Only</span>

<span style="background:gray">Counsel Only</span>[533]

<span style="background:gray">Counsel Only</span>

[34]  These deals are sponsored by industries that fared well during the pandemic—stability balls sales increased 67 percent between January and July 2020 compared to the previous years and Peacock's number of subscribers more than doubled between the second and third quarter of 2020.[535]  These deals would require a different adjustment from the third-party NIL deal signed by <span style="background:gray">Counsel Only</span>



[536] the restaurant industry in Pittsburgh was negatively affected by the pandemic, with the University of Pittsburgh documenting a 54 percent decrease in employment at local full-service restaurants between October 2019 and 2020.[537]  Marketing and advertising spending also varied differently across industries.  For

---

Companies. Working from home would be a lot harder without software that allows for videoconferencing and virtual project management and communication. Remote work software helps employees stay productive no matter their location. Furthermore, people are turning to technology for social interaction amid stay-at-home orders, using social media and virtual hangout systems. Video streaming services have also kept people entertained at home.").

[533]  "<span style="background:gray">Counsel Only</span>

[534]  <span style="background:gray">Counsel Only</span>.

[535]  Chang, Elizabeth, "Core Values; You Might Want to Rethink Using a Stability Ball as Your Desk Chair," *The Washington Post*, October 3, 2022, available at https://www.washingtonpost.com/lifestyle/wellness/stability-ball-balance-core-calories/2020/09/29/0b485c74-feb4-11ea-9ceb-061d646d9c67_story html ("Sales of balance balls grew 67 per cent from January through July 2020, compared with the previous year, according to figures gathered by the NPD Group, a market research company."). *See also* Bloom, David, "Peacock Preens With 22 Million Subscribers As Pandemic Hits Comcast Q3 Film, Park Revenues," *Forbes*, October 29, 2020, available at https://www.forbes.com/sites/dbloom/2020/10/29/peacock-preens-with-22-million-subscribers-as-pandemic-hits-comcast-q3-film-park-revenues/?sh=7307f5947959 ("Peacock, the ad-supported streaming service the company launched widely in July with both free and subscription tiers, reported nearly 22 million subscribers. That's up from 10 million subscribers last quarter (the service was available to all Comcast cable and Flex subscribers beginning in late spring). Importantly, Comcast said that Peacock was exceeding all the company's internal metrics").

[536]  <span style="background:gray">Counsel Only</span>

[537]  University of Pittsburgh, "Pandemic Impacts on Pittsburgh's Restaurant Industry," December 3, 2020, available at https://ucsur.pitt.edu/perspectives.php?b=2020121137254 3 ("Within food service industries, one of the worst-hit subsectors includes full-service restaurants where regional employment remains over 54% below year-ago levels.").

instance, the travel industry decreased its digital ads spending from $6 to $3 billion between 2019 and 2020, but the computing products and consumer electronics industry increased its digital ads spending from $9.8 to $12.8 billion during the same time period, according to data collected by eMarketer, a marketing research company.[538] Both industries are represented in the Rascher Report's third-party NIL transaction data:

| Counsel Only [539] | Counsel Only [540] | Confidential |
| | | |

| | [541] For each of these deals, adjusting for the impact of the Covid-19 pandemic requires a different adjustment.

245.   The terms of a given deal may play a role in determining the extent to which third-party NIL deals may have been affected by Covid-19.   As seen in **Table 11,** there are differences in the types of activities required by third-party NIL deals recorded in the Rascher Report's third-party NIL transaction data.[542] Counsel Only

These different activities would have been affected by Covid-19 to a different degree: in-person activities, including appearance, speaking engagement, or coaching, are unlikely to have taken place during lockdowns; but activities involving social media posts may have been less affected.   In fact, ad revenues per user on TikTok increased during the pandemic: from 4.87 dollars in 2019 to 11.66 and 24.31 in

---

[538]  eMarketer, "US Digital Ad Spending, by Industry, 2019-2023," *Insider Intelligence*, June 1, 2021, available at https://www.insiderintelligence.com/chart/249886/us-digital-ad-spending-by-industry-2019-2023-billions.

[539]  Counsel Only

[540]  Counsel Only

[541]  Confidential

[542]  The Rascher Report's third-party NIL database does not contain a column for student-athletes to report deal terms, so this information is either missing or inconsistently provided in the context of other columns.

2020 and 2021 respectively.[543]  In addition, the success of deals that are linked to a business venture or the sale of merchandise will depend on the extent to which the sponsoring industry was affected by Covid-19.

246.   In addition, states' industry compositions vary across states.  As a result, states' economies have been differently affected by Covid-19.  States whose economy relied heavily on tourism such as Hawaii or Nevada, also experienced larger negative spillover effects on supportive industries as unemployed workers reduced their consumption levels.[544]  The impact of Covid-19 on the local economy also depends on factors such as the duration and intensity of lockdowns and stay-at-home orders.[545] Many third-party NIL deals are sponsored by local businesses and brands,[546] and local

---

[543]   Goldman, Jeremy, "Tiktok Launches Ad Solution Aimed To Court Advertisers While Pleasing Creators," *Business Intelligence*, May 19, 2022, available at https://www.insiderintelligence.com/content/tiktok-launches-ad-solution-aimed-court-advertisers-while-pleasing-creators, graph "US TikTok Ad Revenue per TikTok User, 2019-2024."

[544]   Klein, Aaron and Ember Smith, "Explaining the Economic Impact of COVID-19: Core Industries and the Hispanic Workforce," *Brookings*, February 5, 2021, available at https://www.brookings.edu/research/explaining-the-economic-impact-of-covid-19-core-industries-and-the-hispanic-workforce ("Cities with core industries that have been negatively impacted by the COVID-19 recession have broader spillover effects (e.g., an unemployed casino worker in Las Vegas is less likely to buy new clothes). In the aggregate, the devastation of a core industry can mean the decline of others nearby, like with manufacturing in the Rust Belt in the second half of the twentieth century. As a result, metropolitan areas concentrated in hard-hit industries are likely to see negative ripple effects throughout their economy (lower tax revenue, less spending, etc.)."). *See also* McMinn, Sean and Liz Crampton, "Covid's Deadly Trade-Offs, By the Numbers: How Each State has Fared in the Pandemic," *Politico*, December 15, 2021, available at https://www.politico.com/interactives/2021/covid-by-the-numbers-how-each-state-fared-on-our-pandemic-scorecard/ ("States whose economies are heavily dependent on tourism suffered the most economically, with Hawaii and Nevada hit hardest.").

[545]   McMinn, Sean and Liz Crampton, "Covid's Deadly Trade-Offs, By the Numbers: How Each State Has Fared in the Pandemic," *Politico*, December 15, 2021, available at https://www.politico.com/interactives/2021/covid-by-the-numbers-how-each-state-fared-on-our-pandemic-scorecard/ ("The scorecard suggests states that had fewer shutdowns and more rural geography tended to fare better economically than more urban states that imposed more public health restrictions. States that shut down only briefly – or not at all – rebounded far quicker than those that remained closed. Many of the states that did not issue orders directing residents to refrain from participating in nonessential activities – including Arkansas, Iowa, Nebraska, South Dakota and Utah – had better-than-average economic outcomes on the scorecard.").

[546]   Post, John, "Small Business Owners See New Opportunities With NIL Era in College Athletics," *Talk Business*, September 1, 2021, available at https://talkbusiness.net/2021/09/small-business-owners-see-new-opportunities-with-nil-era-in-college-athletics/ ("The [NIL rule change] led to a scramble of local businesses securing endorsements with athletes. At the University of Arkansas, around 100 Razorback athletes have entered into NIL agreements, representing 16 of 19 sports and approximately 160 deals. The businesses endorsing athletes span the full breadth of commerce, from restaurants to nutrition shops, car dealerships, moped companies,

economic conditions are likely to determine the amount and type of third-party NIL deals available for local student-athletes.  Therefore, because Covid-19 affected local economies differently, it will also affect local student-athletes' earnings differently.

247. Finally, the Rascher Report's proposed methodology only proxies for consumer demand for college athletics and is not a measure of sponsors' demand for third-party NIL deals and its evolution during the pandemic.  The impact of Covid-19 on sponsors' demand for third-party NIL deals depends on a variety of factors such as the sponsors' industry, local economic conditions, or the specific requirements associated with a deal.  **Table 14** reproduces the Rascher Report's proposed adjustment for the five states that Politico ranked as faring the best during the pandemic, and those that Politico ranked as faring the worst, based on economic, public health, education, and social indicators.  The Rascher Report's methodology predicts that a much larger downward adjustment is required for states that Politico ranked as faring the best during the pandemic (13.8 percent in 2020 and 27.5 percent in 2021) than for states that fared the worst (7.0 percent in 2020 and 5.0 percent in 2021).  This illustrates that the Rascher Report's proposed methodology to adjust for the impact of the Covid-19 pandemic does not capture how the many factors that affect sponsors' demand for third-party NIL deals changed during the pandemic.  Determining the extent to which each factor will impact how each deal should be adjusted to account for the Covid-19 pandemic cannot be done with a common methodology.

---

insurance agencies and law firms. The 'flurry of activity' has begun to slow, and there's still plenty of uncertainty around what the endorsement landscape will look like ultimately. And while there are plenty of concerns as well, there's consensus about one thing: the endorsements mark a massive new marketing opportunity for local businesses – even if the ultimate return on investment has yet to be determined.").

**Table 14. Effect of the Covid-19 Pandemic on College Athletic Revenue Estimated Using Rascher Report's Methodology
Schools Located in States that Fared Comparatively Better or Worse During the Pandemic[547]**

| Forecasted Revenue (USD thousands) | 2016 | 2017F | 2018F | 2019F | 2020F | 2021F |
|---|---|---|---|---|---|---|
| Better | 649,737.07 | 697,706.71 | 749,217.91 | 804,532.16 | 863,930.21 | 927,713.58 |
| Worse | 669,530.83 | 701,633.04 | 735,274.48 | 770,528.92 | 807,473.73 | 846,189.94 |
| **Actual Revenue (USD thousands)** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** |
| Better | 649,737.07 | 703,752.90 | 759,521.38 | 804,532.16 | 744,633.80 | 672,296.80 |
| Worse | 669,530.83 | 710,566.87 | 730,328.89 | 770,528.92 | 751,233.30 | 803,800.59 |
| **Deviation from Forecast** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** |
| Better | Used to calculate forecasts | 0.9% | 1.4% | Used to calculate forecasts | -13.8% | -27.5% |
| Worse | | 1.3% | - 0.7% | | - 7.0% | - 5.0% |



Counsel Only

### F. The Rascher Report Does Not Propose a Common Methodology for Reliably Estimating the Value of Third-Party NIL Deals

248. By relying on the value of third-party NIL deals an individual student-athlete secures in the after period to determine their individual damages, the Rascher Report acknowledges that some extent of individualized inquiry is necessary. However, the Rascher Report's proposed methodology is not sufficient to predict the value of third-party NIL deals in the but-for world for any individual class member. This section identifies some of the factors that the Rascher Report ignores and that should be

---

[547]   Counsel Only    ; McMinn, Sean and Liz Crampton, "Covid's Deadly Trade-offs, By the Numbers: How Each State Has Fared in the Pandemic," *Politico*, December 5, 2021, available at https://www.politico.com/interactives/2021/covid-by-the-numbers-how-each-state-fared-on-our-pandemic-scorecard/.

considered when evaluating whether a third-party NIL deal that took place in the after period would have taken place in the before period, and for which value.

### 1. The Role of Social Media Engagement in Driving Third-Party NIL Value Must Be Accounted for

249.    The Rascher Report does not account for the effect of changes in the role of social media on the value of student-athletes' third-party NIL deals.  Cirque Analytics provided me with a dataset that combines the Rascher Report's third-party NIL transaction data with the produced Opendorse data on social media engagement, which included metrics such as followers, likes, and other metrics associated with student-athletes' accounts.  **Figure 14** plots the median value of the third-party NIL compensation reported by student-athletes by decile of Instagram followers.  The distribution of reported third-party NIL compensation is skewed in favor of student-athletes with many Instagram followers: while those in the bottom 10 percent in terms of number of Instagram followers have a median of $100 in reported third-party NIL compensation, those in the top 10 percent have a median of $8,550 in reported third-party NIL compensation.  A student-athlete's social media following can change over time, depending on factors such as the quality of the content they post, the regularity of their posts, their ability to use popular features, and the amount of effort they invest in their social media page.[548]

---

[548]   Airofin Blog, "How to Grow Your Instagram Profile as an Athlete," August 19, 2018, available at https://www.airofin.com/blogs/news/how-to-grow-your-instagram-as-an-athlete ("Produce High Quality Content – If you look at the majority of highly followed accounts they all have one thing in common. They have high quality images and videos. Simply uploading a selfie with low resolution just won't cut it anymore. People are stimulated by high quality and engaging images and short form videos that are inspiring or evoke a reaction. […] Regular Updated Posts – People go on Instagram to see what is going on and for an easy escape from the real world. If you are not consistently in their news feed then you will be more likely forgotten about. […] Utilise Instagram Stories – Instagram has overtaken snapchat in the short form content which erases itself after a period of time. […] Utilise Video – 80% of content by 2019 will apparently be video. […] Hard work and effort – It is not easy to generate extensive followers and engagement especially now. Instagram wants influencers and brands to pay to reach all of their audience. Remember if it was easy, everybody would have huge followings and would be being sponsored and paid to promote the biggest brands in the world. Unfortunately it takes hard work, dedication, patience and a lot of persistence.").

**Figure 14. Reported Value of Third-Party NIL Deals by Distribution of Instagram Followers[549]**



Notes:
[1]  ▨ Counsel Only ▨ third-party NIL transactions are limited to eligible student-athletes (sophomore or older in 2021-2022 NCAA rosters). Data are limited to student-athletes ▨ Counsel Only ▨ and who could be matched to Opendorse profiles. Student-athletes with a missing Instagram handle are excluded.
[2]  Median Third-Party NIL Compensation is the median of student-athletes' total third-party NIL earnings in each percentile group.

250.    However, even though social media following correlates with a student-athlete's ability to secure third-party NIL deals, not all student-athletes are equally able to use a large social media following to secure deals.  Several student-athletes with a high number of followers also report low third-party NIL earnings.  ▨ Counsel Only ▨

---

[549]  Backup materials to this report (social media data received from Cirque Analytics).

251.    The Rascher Report does not account for the changes in popularity of different social
        media platforms over time.  eMarketer, a market research company, documents that the
        time spent on Facebook by adults in the U.S., as a fraction of time spent on a selection
        of social media websites and apps decreased from 35.3 percent in 2019 to 25.7 percent
        in 2022.  In contrast, the share of time spent on TikTok by adult users in the U.S.
        increased from 4.5 percent to 16.7 percent from 2019 to 2022.[551]  In addition,
        engagement has changed differently across different social media sites: between 2018
        and 2023, engagement for Instagram accounts with more than a million followers
        decreased from 1.97 percent to 0.95 percent.  In contrast, TikTok's engagement for
        accounts with over one million followers reached 10.53 percent in early 2023.[552]
        Therefore, the success of a student-athlete on one social media platform in the after
        period is not indicative of whether that student-athlete would have similarly been
        successful on the same or on a different social media platform in the before period.  For
        example:

---

[550]   

[551]   Insider Intelligence, "Share of Time Spent on Select Social Platforms by US Adults, 2019, 2022, & 2024 (% of
        total)," April 1, 2022, available at https://www.insiderintelligence.com/chart/256516/Share-of-Time-Spent-on-
        Select-Social-Platforms-by-US-Adults-2019-2022-2024-of-total.

[552]   Geyser, Werner, "The State of Influencer Marketing 2023: Benchmark Report," *Influencer Marketing Hub*,
        February 7, 2023, available at https://influencermarketinghub.com/influencer-marketing-benchmark-report
        ("[E]ngagement [on Instagram] for accounts with over a million followers (0.95%) is now less than half what it
        was in 2018 (1.97%)."; "We have observed elsewhere in this Benchmark Report how TikTok has now become
        the platform of choice for influencer marketing. Not bad for a social channel that we lumped under 'Other' until
        a couple of years ago."; "TikTok's largest accounts with over 1M followers average 10.53% engagement.").

a.  As of November 2, 2022, the Cavinder twins had 4.1 million followers on their joint TikTok account, a total of one million followers across three Instagram accounts and 80,0000 subscribers to their YouTube channel.[553] They describe their success on TikTok as "sudden and accidental" and attribute it to a viral dribbling video they uploaded during the pandemic and which gathered 30 million views. [554]  The serendipity of their success on TikTok implies that it is not certain that they would have been similarly successful on YouTube or Instagram in the before period.

b.  

.",[555]

Holmes' first TikTok post was on January 15, 2021, and she has since accumulated over 41,000 followers.  Holmes has experienced varying success in terms of video engagement; for example, one popular video has 72,800 likes, but another post has 140 likes.[556]   She may not have been able to secure a TikTok deal of a similar value just as she started developing her TikTok presence, and whether she would have been able to secure the same deal on a different social media platform is uncertain.

---

[553]  Philippou, Alexa, "Cavinder Twins Take on Women's Basketball, Stereotypes and TikTok," *ESPN*, November 2, 2022, available at https://www.espn.com/womens-college-basketball/story/_/id/34924829/miami-cavinder-twins-take-women-basketball-tiktok ("[T]he Cavinders boast 4.1 million followers on their joint [TikTok] account. [...] With a total of 113 million likes on their shared TikTok account, nearly a combined million followers across three Instagram accounts and almost 80,000 subscribers to their YouTube channel, the pair believes people gravitate toward them because of the twin aspect, their status as Division I athletes, and their ability to connect with fans by showing both the similarities and differences of their personalities.").

[554]  Philippou, Alexa, "Cavinder Twins Take on Women's Basketball, Stereotypes and TikTok," *ESPN*, November 2, 2022, available at https://www.espn.com/womens-college-basketball/story/_/id/34924829/miami-cavinder-twins-take-women-basketball-tiktok ("They view their TikTok fame as sudden and accidental. The two were bored at home in Arizona during the pandemic summer of 2020, so Hanna prompted Haley to make dance videos with her. Their first viral video featured them doing synchronized dribbling to 'The Chicken Wing Beat,' and it remains one of their most popular videos, with nearly 30 million views.").

[555]  Counsel Only

[556]  @trackqueenlex, TikTok, accessed on March 31, 2023.

**Figure 15. Select Examples of Alexis Holmes' TikTok Posts[557]**



Alexis Holmes
TikTok Post on
May 5, 2021
(72,800 likes)



Alexis Holmes
Always-Sponsored
TikTok Post on
June 15, 2021
(709 likes)



Alexis Holmes
TikTok Post on
September 30, 2022
(140 likes)

c.  after posting two videos in July 2021 that each received over 100,000 views.[560]  These videos captured candid moments and jokes, and Reutschle may not have been able to replicate this same level of engagement at an earlier point in time.[561]  Considering that

---

[557] @trackqueenlex, TikTok, accessed on March 31, 2023.

[558] [Counsel Only]

[559] "[Confidential]".

[560] @tyruetschle, TikTok, accessed on March 24, 2023.

[561] @tyruetschle, TikTok, accessed on March 24, 2023.

Reutschle received these TikTok deals shortly after he received high video engagement, it is uncertain whether he would have been able to secure similar deals prior to July 2021.

### 2. Student-Athlete Effort to Secure and Support Third-Party NIL Deals in the After Period Cannot be Measured and Cannot Be Used to Predict Such Effort in the Before Period

252. The Rascher Report ignores that a student-athlete's third-party NIL compensation varies according to the student-athlete's effort in securing and supporting third-party NIL deals. Effort exerted to support third-party NIL deals in the after period cannot be measured and cannot be used to predict effort to support third-party NIL in the before period. A student-athlete's effort to secure third-party NIL deals would not only depend on their efforts' expected return, which may, for example, be lower in earlier years of a student-athlete's career when they are less established.

253. The student-athlete's effort may also depend on other factors that may have been different in the before period, including family circumstances, financial circumstances, and amount of time available. For example, Named Plaintiff Prince explained that the effort she put in developing her social media presence changed over time—such as when she had more time to dedicate to her social media activity due to an injury she sustained that prevented her from competing—and was directly related to the success of her posts.[562] Prince also explained that her family's financial situation changed over time.[563] Prince's circumstances demonstrate that any attempt to assess potential third-

---

[562] Prince Deposition, pp. 116:18-117:14 ("Q. And you mentioned that it – the level of that may have change[d] over time. Can you tell me more about that? A. Absolutely. When I mean – there's different factors over time. Like when my platform rose, I – when my platform did grow, I wanted to dedicate more time to do the best research that I could do about certain topics, especially because being an activist, that holds a lot of weight and making sure I'm 100 percent correct in everything that I say and the things that I stand for. So that kind of research, doing more content production. And then yeah. Q. At the break, you mentioned having a lot of time on your hands with your injury? A. Uh-huh. Q. Did having that time enable you to put in effort to grow your social media presence? A. Having free time because I couldn't play, it definitely allowed me to have different hobbies and creative outlets, yeah. Absolutely.").

[563] Prince Deposition, p. 36:9-16 ("Q. Were you and your family still in the same financial situation that you described to me with respect to Texas in that you may not have been able to afford all that out-of-pocket had

party NIL deals in the before period cannot be done with a common methodology, given each student-athlete's individualized circumstances. Several student-athletes, such as University of Arizona football player Jacob Cowing who had a son in 2019, expressed wanting to use third-party NIL opportunities to help support their families when they become parents.[564]

254.    Adjusting the value of third-party NIL deals in the after period to be representative of their potential value in the before period would require being able to predict student-athlete effort in the before period, as illustrated by the following examples:

a.    .[565]  The deal is assigned a \$0 monetary value in the after period.  Evaluating the value of this deal in the after period would require knowing the quantity of sales for her promotion.  The value of an analogous deal in the before period would also depend on the quantity of sales for her promotion, but this would be dependent upon her efforts to promote the company, which cannot be assumed to be the same in the before period as in the after period.  Other relevant factors include, for example, her social media following and the popularity of Fusion100 in the before period.

---

you not gotten the scholarship that you did?  A. Yeah. My parents were in a much different financial situation when I had transferred to University of Oregon.").

[564]  McAvoy, Steven, "Jacob Cowing's NIL Success Links Athletic Ability, Family and Fatherhood: 'A Great Blessing,'" *The NIL Deal*, February 14, 2023, available at https://www.nildealnow.com/jacob-cowing-nil-success-athletic-ability-family-fatherhood-great-blessing/ ("Chase Cowing, Jacob's then [in 2021] two-year-old son, was back home in Chandler, Arizona. […] 'Anyone who has a child knows that raising them is not cheap,' Cowing noted.  […] 'NIL has been able to allow me to provide for my son, whether it be food, diapers, clothes or anything else he needs. That security for me as a father, through NIL, has been a great blessing in my life[.]'").

[565]  Counsel Only

b. Counsel Only .[566] Counsel Only

c. Named Plaintiff Prince carefully describes the brand she tried to craft on her social media pages in order to generate interest.[567] She further emphasizes that the effort and "countless hours" she invested in developing her social media presence were important to developing a large following and securing third-party NIL deals.[568] These efforts to support her third-party NIL deals in the after period cannot be assumed to have been the same in the before period.

---

566 Counsel Only

567 Prince Deposition, p. 99:3-21 ("Q. It sounds like you were very intentional on what you were posting and how and everything else, right? A. Yes. Q. What was the brand that you were trying to build at this time? Q. How would you describe that? A. I would to – I wanted my brand Sedona Prince to be an Oregon athlete. To be accessible to the fans. To be someone of the community. Fun. And I wanted to relate – I want to bring people to women's basketball. And I want to tell my story off the court, help inspire and lead change. Tell my story of my broken leg. Of how I transferred and wasn't able to play. And my journey. Like I really wanted my TikTok to be my adventure through life." Objection omitted.).

568 Prince Deposition, pp. 115:23-116:17 ("Q. The investment of time that you've put into growing your social media platform has also contributed to your success obviously? A. I've put in countless hours. Q. How much time would you say you've spent, let's say a week, across all your social media platforms? THE WITNESS: It depends on what you're talking about and what time frame. But in growing my platform, I would spend maybe two to three voluntary hours a day, like things that I enjoyed of like growing content, like I said. Learning lighting. Discovering new ways to tell stories and teaching myself Photoshop. Those kind of things. So. Q. You've invested a lot of time and effort and thought and focus on it, right? A. Yeah, absolutely." Objection omitted.).

d.  Named Plaintiff House reports a time-intensive process of calling and emailing numerous businesses in seeking third-party NIL compensation.[569] He estimates that he secured around 10-20 deals as a direct result of these efforts.[570]  There is no evidence that these efforts to support his third-party NIL deals in the after period would have been the same in the before period, or that they would have continued the same across both periods.

255.  The Rascher Report's proposed methodology for calculating third-party NIL damages does not account for individualized considerations in assessing the time costs of a student-athlete's efforts to secure and promote third-party NIL deals.  An hour spent on securing a third-party NIL deal or on taking part in the activities required by the deal is an hour that the student-athlete could have spent training, working, or on leisure.  Student-athletes, like all individuals, will assign a value to this time.[571]  The value of time differs across individuals[572] and changes over time depending on factors such as the amount of time they have available or the expected return on time spent on training or in classes.  Therefore, if a given student-athlete values their time at the rate of $15 an hour and had to work 5 hours to obtain $200 from a given deal, then the net value of that deal to the student-athlete is

---

[569]  House Deposition, p. 93:16-21 ("Q.  Okay. So you would both call and follow up in an e-mail; is that right?  A. My typical process would be to DM on their most active social media channel, send an e-mail, a similar e-mail as well, and then also follow up with a call if they wanted to move forward.").

[570]  House Deposition, pp. 92:8-21, 94:6-17 ("Q.  How many businesses would you say you called to market NIL? A.  I don't know the exact number. I would say over 20, though.  Q.  And how many resulted in an NIL deal? A.  It's hard to say the exact number. Less than – less than 20, though.  Q.  Would it have been less than five? A.  No.  Q.  Less than seven?  A.  No.  Q.  Less than 10?  A.  I would say around 10 would be a good number."; "Q.  And roughly how many businesses did you e-mail?  A.  I would say towards 50.  Q.  And how many of those resulted in an NIL deal?  A.  I don't know the exact amount, but I would say around – some of them are crossover with the called businesses, but around 10 again.  Q.  So is it fair to say you had more success based on the percent of NIL deals that were secured when you had also called the business?  A.  Yes.").

[571]  For example, a recent paper estimates that on average, American adults value their time at about $20 an hour. *See* Goldszmidt, Ariel, et al., "The Value of Time in the United States: Estimates from Nationwide Natural Field Experiments," *NBER Working Paper*, No. 28208, 2020, pp. 1-58, at 4 ("The estimated price equivalent implied by these two elasticities yields an average VOT across the U.S. of $19.38 per hour (standard error of 1.39; all prices are in 2015 dollars).").

[572]  Buchholz, Nicholas et al., "The Value of Time: Evidence From Auctioned Cab Rides," *NBER Working Paper*, No. 27087, 2020, pp. 1-63, at 33 ("To summarize our results, we find large differences in the value of time across individuals and also large differences in differentially productive time use across locations. Most of the variation in the value of time comes from person-specific heterogeneity as opposed to location-specific heterogeneity.").

$125.  If another student-athlete had to work the same amount of time to obtain the same compensation but values their time at the rate of $25 an hour, then the net value of that deal to this student-athlete is $75.  Estimating the value of a deal in the before period solely based on the monetary compensation a student-athlete has received in the after period without accounting for the value of time spent to secure that compensation overestimates damages, and does so to a different extent across student-athletes, depending on the value they assign to their time and on the amount of time they would have spent on that deal in the before period.  Therefore, determining and accounting for how individual student-athletes value their time cannot be done with a common methodology.

### 3. The Value of Contingency-Based Third-Party NIL Deals in the After Period Cannot Be Determined With a Common Methodology

256.    To determine the value of third-party NIL deals in the after period, the Rascher Report relies on a third-party NIL transaction database.  This database includes deals self-reported by student-athletes to their schools, from July 1, 2021 to September 23, 2022.[573]  In this database, student-athletes had the option to, but did not always, report a simple dollar amount associated with a third-party NIL deal.  The Rascher Report includes manual entry instructions for how Dr. Rascher's support staff were to clean these data, including the instruction to "only record values in [the NIL dollar amount] field if the source document provides a simple dollar amount," such as "$50."[574]  The instructions do not specify how to determine the value of deals with more complex situations, such as payments that are contingent on certain requirements or outcomes.  Given these differences, it is impossible, without individual inquiry, to determine the value of many third-party NIL deals in the after period.

---

[573] Rascher Report, ¶¶ 196-197 ("Division I NCAA schools have provided records of third-party NIL transactions reported by athletes after July 1, 2021."; "This table relies on reports produced by schools through September 23, 2022. However, the processing of the data for compensation amounts and number of athletes is ongoing, and even where data processing is complete, the data provided by schools can substantially lag behind the pace of new deals. I expect to receive substantial information on additional NIL transactions prior to the close of discovery, all of which I will then incorporate into my damages model.").

[574] Rascher Backup Materials ("Manual Data Entry Instructions.docx," p. 3).

257.   The Rascher Report does not provide a methodology to accurately capture student-athlete compensation that is dependent on the outcome of the deal, such as the number of social media posts made by the student-athlete or the number of times a particular discount code is used.  Running a string search for the terms "%," "per," "discount," and "commission," in the reported third-party NIL transaction data to identify deal terms that are akin to a commission, ▆▆▆▆ of the reported transactions fit this description.[575]  Accurately determining each student-athlete's compensation under these types of deal terms cannot be done with a common methodology.  Rather than accounting for these individualized considerations, the Rascher Report uses deal values that have no support for their validity.  For example:



a. ▆▆▆▆▆▆▆▆▆▆▆▆▆ *Counsel Only* ▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆[576]  Making sure that this is the actual value that should be assigned to this deal would require counting the number of times ▆▆▆ posted about ▆▆▆▆ *Counsel Only* ▆▆▆▆ on social media; the Rascher Report provides no support that it conducted this exercise.

b. ▆▆▆▆▆▆▆▆▆▆▆▆▆ *Counsel Only* ▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆.[577]  Assigning a value to this deal should take into account the number of relevant social media posts, the number of times he used his discount code, the value of the branded

---

[575] ▆▆▆▆▆▆▆▆▆▆▆ *Counsel Only* ▆▆▆▆▆▆▆▆▆▆▆

[576] "▆▆▆▆▆▆▆▆▆▆▆ *Counsel Only* ▆▆▆▆▆▆▆▆▆▆▆.

[577] ▆▆▆▆▆▆▆▆▆▆▆ *Counsel Only* ▆▆▆▆▆▆▆▆▆▆▆.

apparel he received and the value of the [Conf.] subscriptions; the Rascher Report provides no support that it conducted this exercise.

c. 

.[578]  Assigning a value to this deal should take into account the frequency, quantity, and value of [Counsel Only] purchases at [Counsel Only] the Rascher Report provides no support that it conducted this exercise.

### 4. The Value of In-Kind Third-Party NIL Deals in the After Period Cannot Be Determined With a Common Methodology

258.  The Rascher Report does not provide a methodology to accurately capture a student-athlete's compensation for in-kind deals where the student-athlete does not provide a monetary amount.  These deals are associated with a monetary value of $0 in the NIL transaction data.  The Rascher Report has not proposed a common methodology to determine the true value of these deals in the "after" period.  Nor does the Rascher Report attempt to determine whether these deals provide a basis for concluding that the individual student-athletes who secured these deals would have secured similar deals in the "before" period in the but-for world.

259.  **Table 15** shows that out of [Counsel Only] student-athletes in the Rascher Report's third-party NIL transaction data, [Counsel Only] received only deals associated with a $0 monetary value, which can include deals with in-kind payments or with missing monetary value information. For example:

a. 

---



**Table 15. Student-Athletes with Only Non-Monetary or In-Kind Third-Party NIL Deals**[582]





### 5. The Presence of a Third-Party NIL Deal in the Available Transaction Data Does Not Necessarily Mean That the Deal Actually Went Through

260.   The Rascher Report's third-party NIL transaction data are based on deals self-reported by student-athletes to their schools.[583]  While the NCAA provides reporting guidelines to its member schools for certain information, for example, detailed financial information must be reported and audited by individual schools in accordance to agreed-upon procedures,[584] the NCAA does not have similar reporting requirements related to student-athletes' third-party NIL deals.[585]  Individual schools set their own processes and guidelines for student-athletes to report third-party NIL transactions.[586]

261.   These variations in reporting guidelines can lead the third-party NIL transaction data to include deals that did not actually go through.  Some schools, such as Clemson, require

---

[583]   Rascher Report, ¶¶ 196-197 ("Division I NCAA schools have provided records of third-party NIL transactions reported by athletes after July 1, 2021."; "This table relies on reports produced by schools through September 23, 2022. However, the processing of the data for compensation amounts and number of athletes is ongoing, and even where data processing is complete, the data provided by schools can substantially lag behind the pace of new deals. I expect to receive substantial information on additional NIL transactions prior to the close of discovery, all of which I will then incorporate into my damages model.").

[584]   NCAA, "NCAA Membership Financial Reporting Systems," August 1, 2022, available at https://www.ncaa.org/sports/2013/11/21/ncaa-membership-financial-reporting-system.aspx ("The NCAA requires that institutions submit revenues and expenses information for their athletic department as well as other general information online annually. This report is mandatory in Divisions I and II."; "The NCAA requires institutions to have an independent public accountant review their revenues and expenses according to the NCAA Agreed-Upon Procedures Guidelines.").

[585]   NCAA, "Name, Image and Likeness Policy, Question and Answer," February 2023, available at https://ncaaorg.s3.amazonaws.com/ncaa/NIL/NIL_QandA.pdf ("14. Will an individual be required to report name, image and likeness activities to their school?  The NCAA's interim policy does not address this issue, but state laws and institutional policies may impose reporting requirements.").

[586]   Lavigne, Paula and Dan Murphy, "Alabama Crimson Tide Among Schools to Not Disclose NIL Data," *ABC News*, October 7, 2022, available at https://abcnews.go.com/Sports/alabama-crimson-tide-schools-disclose-nil-data/story?id=91159752 ("No uniform NIL transparency or deal-disclosure rules exist, meaning the only way to get any kind of picture of what's happening in the marketplace is by cobbling together incomplete and unverifiable figures from public statements from athletes, the companies they endorse, and others."; "NCAA rules say schools must ensure deals aren't used as recruiting incentives, but the rules do not specifically require schools to track detailed information."). *See also* Durham, Meghan, "DI Board Approves Clarifications for Interim NIL Policy," *NCAA*, October 26, 2022, available at https://www.ncaa.org/news/2022/10/26/media-center-di-board-approves-clarifications-for-interim-nil-policy.aspx ("The board also noted that – when permitted by applicable state laws – schools can and should require student-athletes to report NIL activities to the athletics department.").

reporting deals before the student-athlete is permitted to enter into the agreement.[587] Other schools, such as the University of Florida, require reporting deals within a few days after entering into the agreement.[588]  Depending on the school's policy, therefore, a student-athlete's deal may be included in the data even if it never resulted in compensation to the student-athlete.  This could occur if the proposed agreement was never finalized, if the student-athlete did not follow through on the requirements of the deal,[589] or if the deal was found to be in violation of school or NCAA policies.  In his deposition, Dr. Rascher acknowledged that he does not know whether schools would have removed such deals from the third-party NIL transaction data.[590]  Therefore, a deal being present in the transaction data does not mean that the individual student-athlete associated with the deal actually received compensation for it, or would have received compensation for it in the "before" period in the but-for world.

---

[587]  Clemson University, "Name, Image and Likeness Information Page," June 30, 2021, available at https://clemsontigers.com/nilinfo/ ("A student-athlete must disclose to CUAD via INFLCR (i) a summary of any proposed NIL activities in advance of execution of an NIL agreement, and (ii) a copy of the executed NIL agreement. Individual NIL information disclosed via INFLCR will not be provided to coaches and staff. Agreements for proposed NIL activities should not be entered into prior to CUAD's completion of its review for compliance with this policy and NCAA rules.").

[588]  INFLCR, "Welcome to the Gators NIL Exchange," available at https://dash.inflcr.com/exchange/university-of-florida, accessed on March 10, 2023 ("Student-athletes must disclose within four days of any NIL agreements to the athletic department. This is not an approval process but a component of the Florida state law.").

[589]  Coffee, Patrick, "More Big Brands Brave the Rocky Terrain of Endorsement Deals with College Athletes," *The Wall Street Journal*, March 4, 2023, available at https://www.wsj.com/articles/more-big-brands-brave-the-rocky-terrain-of-endorsement-deals-with-college-athletes-b70b24c5 ("Access to athletes remains the largest hurdle for national advertisers, who have no clear road map like those established by professional players' unions, according to Casey Schwab, chief executive and founding partner at advisory firm Altius Sports Partners, which helps schools manage their athletes' promotional activities. 'What they're saying to us is… 'How do we get to the athletes, because they don't have agents? Do we call compliance at these schools? Do we call the parents? Do we DM them on Twitter?'' Mr. Schwab said. Once brands connect with athletes, they often struggle to determine the value of a given individual's videos and social-media posts. Communication can break down even after contracts are finalized, according to Mr. Schwab, who said his firm has seen several athletes fail to fulfill their responsibilities in time for campaigns to run as planned.").

[590]  Rascher Deposition, pp. 254:5-10 ("Q.  ... So if a student-athlete reported a transaction to their university and then became – and then had that transaction revoked, that would currently show up in your model; correct?  A. The university might have removed it also. I don't know.").

**6.   Understanding Impact and Injury for Third-Party NIL Deals Cannot Be Done Using a Common Methodology**

262.   Third-party NIL deals differ and vary on several dimensions including, among others: the sponsor's industry and location, the terms of the third-party NIL deal, the student-athlete's sport, school, position, athletic performance, social media following, exposure and visibility, effort put into securing third-party NIL deals, and luck.  The collection of factors that determine the terms of a third-party NIL deal are idiosyncratic and are not likely to be constant between the before and after period.

263.   Consequently, it is not possible to rely on the existence and value of third-party NIL deals that a student-athlete has secured in the after period to extrapolate whether they would have been the same in the but-for world, as illustrated by the following examples:

a.   Counsel Only

[591] Counsel Only

Evaluating whether this deal would have existed, and if so the value of this deal in the before period would require, among other factors, being able to estimate whether the deal would have taken place, whether Counsel Only would have received the same commission, the price of the product in the before period and how many times her personal promo code would have been used, which in turn depends on her social following, her ability to promote the company, and the popularity of Counsel Only at the time.

b.   Counsel Only

_____

[591] Confidential

223

███████████████████ Counsel Only ███████████████████

████████████████████████████████████████████████████

██████████████████████ did not report his earnings with this deal, but this

deal is assigned a value of $0 in the Rascher Report.[592]  Under the Rascher

Report's proposed methodology, █████████ Counsel Only ██████████████

████████████████████████████████████████████████████

██████████████████.[593]  Evaluating whether this deal would have existed and

if so what its value would have been in the before period would require,

among other factors, to be able to estimate the value of the commission

█Counsel█ would have been willing to pay in the before period, and how many

times █Counsel█ code would have been used, which in turn depends on his

popularity and the popularity of █Counsel█ products in the before period, his

social following, his ability and his efforts in promoting the company at the

time.

c.  ████████████████ Counsel Only ████████████████

████████████████████████████████████████████████████

████████████████████████████████████[594] █Counse█ did

not report his earnings with this deal, but this deal is assigned a value of $1

in the Rascher Report.  Evaluating whether this deal would have existed,

and if so the value of this deal in the before period would require, among

other factors, to be able to estimate the value of the commission █Counse█

would have been willing to pay in the before period and the number of

█Counsel Only█ that would have been sold, which in turn would depend on the

popularity of both ██████ Counsel Only ██████ at the time and on their efforts to

promote the █Counsel█

---

[592] ███████████████ Counsel Only ███████████████

[593] █████████████ Counsel Only █████████████

[594] ████████████████ Counsel Only ████████████████

### G. The Rascher Report's Proposed Third-Party NIL Damages Approach Assumes Injury

264.    The Rascher Report assumes that any student-athlete who had at least one third-party NIL transaction since July 1, 2021 was injured, claiming to focus on "class members who can be shown to be the most reasonably likely to have been able to earn compensation from NIL transactions."[595]  However, the Rascher Report does not prove that any student-athlete who reported a third-party NIL deal in the after period could have secured any more third-party NIL deals in the before period.  For example, certain student-athletes only reported one third-party NIL deal in the after period and they would not necessarily have been able to secure additional deals:



a.    [Counsel Only] .[596]  As described in **Section V.C.2**, [Counsel Only] has many reported third-party NIL deals because they partnered with [Counsel Only] to encourage student-athletes to sign up on a new platform.  It is unclear whether [Counsel Only] would have received any additional third-party NIL deals during the before period.

b.    [Counsel Only] .[597] [Counsel Only] as well as

---

[595] Rascher Report, ¶ 187 ("I use the lack of evidence of transactions in the after period as an indicator that such athletes might not have received deals even in the but-for world.  Thus, my methodology is conservative in limiting damages to those class members who can be shown to be the most reasonably likely to have been able to earn compensation from NIL transactions during the damages period.").

[596]    [Counsel Only]

[597]    [Counsel Only]



Since the movie release was a one-time event and specific to that time, it is unlikely

[601] Without a local location, would have been less likely to offer additional deals. Further,

265.   **Table 16** shows that [Counsel] percent of the eligible student-athletes that appear in the Rascher Report's third-party NIL transaction dataset report only one deal. Given individualized considerations, determining if these student-athletes could have secured

---



[601]  @crispycones, Instagram, accessed on April 12, 2023.

[602]  Wood, Trent, "6 Former Utah State Gymnasts, Among Them an All-American, Have Transferred to Clemson," *Deseret News*, May 24, 2022, available at https://www.deseret.com/2022/5/24/23139963/clemson-gymnastics-tigers-inaugural-signing-class-former-utah-state-aggies-brie-clark-rebecca-wells ("Following Clemson head coach Amy Smith from Logan, Utah, to Clemson, South Carolina – Smith was the head coach at Utah State for the last five years – are Molly Arnold, Trinity Brown, Brie Clark, Eve Jackson, Kielyn McCright, and Rebecca Wells.")

any additional third-party NIL deals in the before period and whether these student-athletes would be injured cannot be done with a common methodology.

**Table 16. Distribution of Student-Athletes by Number of Reported Third-Party NIL Deals[603]**



Counsel Only

### H. The Rascher Report Does Not Account for Substitution Effects Which Would Have Altered Third-Party NIL Opportunities for Student-Athletes

266.    As the Rascher Report acknowledges with the proposed transfer adjustment, a student-athlete can secure different third-party NIL earnings by going to a different school because they could have a different set of third-party NIL deals.  However, the Rascher Report does not account for transfers and changes in student-athletes' initial school selection choices that would have happened due to substitution effects, as I discuss in **Section III**.  In the but-for world, student-athletes would attend different schools, either due to deliberate attempts to transfer or due to being displaced by other student-athletes.  Due to these changed circumstances, these student-athletes could have different third-party NIL deals.  Student-athletes could be worse off in the but-for world if their third-party NIL compensation at the alternative school in the but-for world is lower than the third-party NIL compensation they could achieve at their current school.  It is not possible to propose a class-wide methodology to assess injury

---

603    Counsel Only

or damages to student-athletes who would have attended different schools in the but-for world, nor is it possible to account for the different economic incentives that would have taken place in the but-for world.

## VI.   THE RASCHER REPORT'S ASSESSMENT OF VIDEO GAME-RELATED INJURY AND DAMAGES TO MEMBERS OF THE PROPOSED CLASSES IS SPECULATIVE

### A.  Overview of the Rascher Report's Assumptions Regarding Video Game-Related Injury and Damages to Members of the Proposed Classes

267.   The Rascher Report asserts that in the but-for world, "all FBS football and Division I men's basketball players receiving a full GIA scholarship during the class period […] would have received compensation for use of their NILs in college football and basketball video games absent the challenged NIL rules."[604]   The Rascher Report concludes that all members of the Football and Men's Basketball Class as well as certain members of the Additional Sports Class—specifically, those who played football or men's basketball at non-A5 schools—suffered injury and damages.[605]

268.   The Rascher Report argues that in the but-for world, the college football and college men's basketball video games "would never have been cancelled" and "would have continued to exist" resulting in the availability of video games during the damages periods that included student-athletes' NIL.[606]   The Rascher Report assumes that during the damages period in the but-for world, student-athletes would opt to license their NIL for a video game in their respective sport and receive compensation in return.[607]

---

[604]   Rascher Report, ¶ 124.

[605]   Rascher Report, ¶ 124 ("All members of the Football and Men's Basketball Class – [Autonomy] Five Conference football and men's basketball players who received a full GIAs during the class period – were damaged. Further, because the Additional Sports Class includes FBS football and Division I men's basketball athletes who received a full GIA scholarship, those individuals suffered the same injury.").

[606]   Rascher Report, ¶ 136 ("In the but-for world in which the Prior NIL Rules did not exist, the previous iterations of the EA college football video game and basketball game (or the Take-Two video game) would have continued to exist, and the games would never have been cancelled because of the Prior NIL Rules preventing college football and basketball players from receiving payments for their video game NIL.").

[607]   Rascher Deposition, p. 276:9-21 (Q.  And your model assumes that every player on a roster starting in 2016 would actually – every player who has a scholarship or third-party NIL would actually take and participate in

269.    In calculating damages to members of the Football and Men's Basketball Class, the Rascher Report assumes that all full-scholarship A5 student-athletes present in the MFRS data would receive video game-related compensation in the but-for world.  In calculating damages to members of the Additional Sports Class, the Rascher Report assumes that all non-A5 FBS football and non-A5 Division I men's basketball student-athletes present in third-party NIL transaction data would receive video-game related compensation in the but-for world;[608] the Rascher Report does not discuss how many and which of these student-athletes identified in the data are full-scholarship recipients.

### B.  Economics of the Video Game Industry

270.    The past fifteen years have seen an economic transformation in the video game industry due to the emergence of mobile and online gaming.[609]  These games reflect the "many to many" paradigm, in which many independent developers publish games across many devices and distribution channels, including smartphones, tablets, web browsers, and social media platforms.[610]  This stands in contrast to the paradigm that prevailed into the late 2000s, in which a small number of large studios produced games compatible with the video game consoles produced by Nintendo, Sony, and Microsoft, as well as for the

---

the game; correct?  A.  My model assumes for measuring damages that the athletes – that there would have been a certain amount of payment based on sort of full 85 rosters for football – 85 athletes for football. And those payments would be based on that. In order to measure a payment for a particular athlete, it assumes that that athlete would have wanted to receive that payment and they would have opted in.").

[608]    Rascher Report, ¶¶ 148-149; footnote 167.

[609]    Rayna, Thierry and Ludmila Striukova, "'Few to Many': Change of Business Model Paradigm in the Video Game Industry," *Digiworld Economic Journal*, No. 94, 2014, pp. 61-81 ("Rayna and Striukova (2014)"), at 61 ("[A]fter 20 years of relative stability (in terms of market structure, players and business models), this industry has been significantly disrupted by the advent of mobile and online gaming. In just four years, the share of revenues absorbed by mobile games has increased from less than 6% to above 20%, while the share of console games has fallen from 71% to 62%.").

[610]    Rayna and Striukova (2014), p. 65 ("The new business model paradigm that emerged in the mid to late 2000s is radically different. It is a 'many to many' paradigm: many (independent) developers (nowadays 280,503 active publishers on the U.S. Apple App Store alone), many devices and distribution channels (e.g. online games, social media platforms, tablets, smartphones, PCs, connected TVs and set top boxes), very low prices (the average game price on the Apple App Store is $0.75) and, consequently, a massive number of users (in December 2013, in the U.S. alone, over 100 million games were downloaded on the Apple App Store).").

*Confidential*

personal computer operating systems produced by Microsoft and Apple.[611]  As an example of this economic transformation, from 2008 to 2012, console gaming's share of global revenues shrank from 72 percent to 61 percent, representing a decrease of approximately $5 billion, while mobile gaming's share increased from 6 percent to 20 percent.[612]  In 2020, mobile gaming accounted for approximately $80 billion in revenue, ahead of both console gaming at $45 billion and personal computer gaming at $37 billion.[613]  As of 2021, more than two billion people played games on their smartphones.[614]

271.   The video games contemplated by the Rascher Report were made for consoles.  The *College Hoops 2K8* basketball game made by the video game developer Take-Two Interactive ("Take-Two") was compatible with the Xbox 360, PlayStation 2, and PlayStation 3 consoles,[615] while the *NCAA Basketball 10* game made by Electronic Arts ("EA") was compatible with the Xbox 360 and PlayStation 3 consoles.[616]  The *NCAA*

---

[611]  Rayna and Striukova (2014), p. 65 ("The 'old' business model paradigm is the one that prevailed from the early 1980s to the late 2000s. Characterised by large studios producing games for consoles and PCs, this paradigm can be described as a 'few to few' model. … A few large studios, such as Activision Blizzard, Electronic Arts, Sega and Ubisoft produce games for three game console manufacturers (Microsoft, Nintendo, Sony) and (mainly) two Personal Computer operating systems (Microsoft Windows and Apple Mac OS X).").

[612]  Marchand, Andre and Thorsten Hennig-Thurau, "Value Creation in the Video Game Industry: Industry Economics, Consumer Benefits, and Research Opportunities," *Journal of Interactive Marketing*, Vol. 27, 2013, pp. 141-157 ("Marchand and Hennig-Thurau (2013)"), at 144, Figure 3.

[613]  Liao, Shannon, "Forget Next-Gen Consoles. The Biggest Gaming Platform Is Already In Your Pocket," *The Washington Post*, May 27, 2021, available at https://www.washingtonpost.com/video-games/2021/05/27/mobile-games-spending/ ("Mobile gaming brought in an estimated nearly $80 billion in 2020 revenue, compared with PC making almost $37 billion, and consoles — such as the Nintendo Switch, Sony's PlayStation and Microsoft's Xbox — totaling $45 billion, according to gaming analytics company NewZoo.").

[614]  Liao, Shannon, "Forget Next-Gen Consoles. The Biggest Gaming Platform Is Already In Your Pocket," *The Washington Post*, May 27, 2021, available at https://www.washingtonpost.com/video-games/2021/05/27/mobile-games-spending/ ("Today, over three billion people have smartphones and over two billion of them play games on those phones. Some of those mobile titles now even rival the quality of games traditionally enjoyed on consoles and expensive PCs.").

[615]  IGN, "College Hoops 2K8," available at https://www.ign.com/games/college-hoops-2k8, accessed on April 18, 2023.

[616]  IGN, "NCAA Basketball 10," available at https://www.ign.com/games/ncaa-basketball-10, accessed on April 18, 2023.

*Football 14* game made by EA was compatible with the Xbox 360 and PlayStation 3 consoles.[617]

272.  The development and production process for console games is notable for incurring substantial costs prior to game release.  The average cost of developing a console game has been in the tens of millions of dollars since at least the mid-2000s.[618]  These costs are driven in part by the preferences of the target market—serious gamers who pay for consoles[619]—for games with superior technological innovation, including image quality, animation, and 3D rendering.[620]  Console game makers also incur marketing costs prior to the release of the game.[621]  In contrast, mobile and online games are characterized by relatively small and quick initial production budgets in the hundreds of thousands of dollars that can be quickly recouped through in-game purchases or advertising revenues.[622]

---

[617]  IGN, "NCAA Football 14," available at https://www.ign.com/games/ncaa-football-14, accessed on April 18, 2023.

[618]  Rayna and Striukova (2014), p. 72 ("The old paradigm, still in use for PC/console games, is characterised by a very high cost of game development. Over the last decade, the average price of developing a console game rose from $14 million to around $20 million, whereas, the cost of developing mobile, web-based and indie games is significantly lower."); Take-Two Interactive Software, Inc., Form 10-K, 2009, downloaded from https://www.take2games.com/ir/sec-filings, p. 5 ("The cost to develop a frontline software product generally ranges from $10 million to $40 million, with our top titles exceeding these amounts.").

[619]  Rayna and Striukova (2014), p. 75 ("PC/console games have retained the same distribution channels and target market segment (serious gamers), while opening the door to online delivery of more casual content (most likely with the aim to help 'justifying the cost' of purchase within a household).").

[620]  Rayna and Striukova (2014), p. 68 ("Indeed, for PC/Console games, technological innovation has remained, to this day, the pinnacle of competitiveness. Better image quality, better animations, better 3D rendering, better controls typically lead to greater profits.")

[621]  Marchand and Hennig-Thurau (2013), p. 150 ("To hedge the high investments required for console titles, producers try to generate anticipation for a new game in advance of its release. Such buzz produces sales that are mainly influenced by producer information (i.e., prior to the release, consumers cannot share their quality evaluations through word of mouth), so that the success of the new game is less susceptible to its quality. To generate buzz, prerelease advertising has a critical role, and game producers devote a substantial portion of their advertising budget to the time prior to a new game's release. Fig. 6 lists the distribution of advertising budgets over time for console games released between 2005 and 2011; an average of 22.1% is spent prior to the release week, 17.8% during the release week, and 60.1% thereafter.")

[622]  *See, for example*, Rocket Brush Studio, "How Much Does It Cost to Develop a Game," May 6, 2022, available at https://rocketbrush.com/blog/how-much-does-it-cost-to-develop-a-game ("The cost of making a mobile game ranges from a few thousand dollars to $150-$200k, depending on its complexity. The price tag also changes depending on the extra functionalities you wish to integrate, such as administrative functions and payment

273.    Take-Two and EA are experienced console game developers that have published and
        marketed a broad portfolio of games across diverse genres, including sports, racing, first-
        person shooting, action, role-playing, and simulation.[623]  The business of console games
        is characterized by hit titles, where iterations of well-established video game franchises
        are the most financially successful games.[624]  Take-Two and EA have developed and
        published several well-known, hit titles: Take-Two develops *Grand Theft Auto*, *Red Dead
        Redemption*, and *NBA 2K*,[625] while EA develops *Apex Legends*, *The Sims*, *FIFA*, and
        *Madden NFL*.[626]

274.    In the pursuit of hit titles across diverse genres, Take-Two and EA dedicate substantial
        resources to both developing and marketing video games.[627]  As of 2022, Take-Two

---

systems. Such additional functions will cost you around 20% more for iOS than Android. But even a simple mobile game can easily require tens of thousands of dollars to develop. In addition, there are ongoing costs associated with running a mobile game, such as server maintenance and customer support. However, with a well-designed and exciting mobile game, you can quickly recoup these costs through in-app purchases and advertising revenue.").

[623]   Electronic Arts Inc., Form 10-K, 2022, downloaded from https://ir.ea.com/financial-information/sec-filings/default.aspx, p. 3 ("We develop and publish games and services across diverse genres, such as sports, racing, first-person shooter, action, role-playing and simulation."); Take-Two Interactive Software, Inc., Form 10-K, 2022, downloaded from https://www.take2games.com/ir/sec-filings, p. 2 ("We are a leading developer, publisher and marketer of interactive entertainment for consumers around the globe.").

[624]   Take-Two Interactive Software, Inc., Form 10-K, 2022, downloaded from https://www.take2games.com/ir/sec-filings, p. 6 ("Our business is driven by hit titles, which require increasing budgets for development and marketing."); Electronic Arts Inc., Form 10-K, 2022, downloaded from https://ir.ea.com/financial-information/sec-filings/default.aspx, p. 10 ("However, innovative and high-quality titles, even if highly-reviewed, may not meet our expectations or the expectations of our players. Many financially successful products and services within our industry are iterations of prior titles with large established consumer bases and significant brand recognition, which makes competing in certain categories challenging.  [...]  For example, we have historically derived a significant portion of our net revenue from sales related to our global football franchise, annualized versions of which are consistently one of the best-selling games in the marketplace.").

[625]   Take-Two Interactive Software, Inc., Form 10-K, 2022, downloaded from https://www.take2games.com/ir/sec-filings, pp. 3-4.

[626]   Electronic Arts Inc., Form 10-K, 2022, downloaded from https://ir.ea.com/financial-information/sec-filings/default.aspx, p. 3 ("Our portfolio includes brands that we either wholly own (such as Apex Legends, Battlefield, and The Sims) or license from others (such as Madden NFL, Star Wars, and the 300+ licenses within our global football ecosystem).").

[627]   Take-Two Interactive Software, Inc., Form 10-K, 2022, downloaded from https://www.take2games.com/ir/sec-filings, p. 11 ("The development cycle for new titles generally ranges from 12 months for annual sports releases, to multiple years for certain of our top-selling titles. Therefore, our development costs can be substantial."); Electronic Arts Inc., Form 10-K, 2022, downloaded from https://ir.ea.com/financial-information/sec-filings/default.aspx, p. 5 ("In order to remain successful, we are required to anticipate,

*Confidential*

employed 7,799 full-time employees globally, with 77 percent of its workforce focused on product development.[628]  In the same year, Take-Two's marketing expenses were equal to 14.7 percent of net revenues and research and development expenses were equal to 11.6 percent of net revenues.[629]  EA employed 12,900 employees globally in 2022, and incurred marketing expenses equal to 14 percent of its net revenue while research and development expenses equaled 31 percent of its net revenue.[630]

275.   In addition to the substantial costs incurred during the production process, other relevant costs that console game makers must consider include:

    a.   The release of new generations of consoles:  Console game developers incur higher development costs when new consoles are released, as they develop games for both the current and next generation console.[631]  Console

---

sometimes years in advance, the ways in which our products and services will compete in the market."); Elberse, Anita, *Blockbusters: Hit-Making, Risk-Taking, and the Big Business of Entertainment*, First Edition, Henry Holt and Company, 2013, at 3-4 ("The leading television networks, film studios, book publishers, music labels, video game publisher, and producers in other sectors of the entertainment industry thrive on making huge investments to acquire, develop, and market concepts with strong hit potential, and they bank on the sales of those to make up for the middling performance of their other content.").

[628]   Take-Two Interactive Software, Inc., Form 10-K, 2022, downloaded from https://www.take2games.com/ir/sec-filings, p. 7 ("With 7,799 full-time employees as of March 31, 2022, of which 3,812 were employed outside of the United States, we are constantly focused on our teams – their success, their structure and how best to support them given their particular needs and projects. 47% of our employees are located in North America, 37% in Europe, and 16% in the Asia-Pacific region; 77% of our employees are focused on product development.").

[629]   Take-Two Interactive Software, Inc., Form 10-K, 2022, downloaded from https://www.take2games.com/ir/sec-filings, p. 35.

[630]   Electronic Arts Inc., Form 10-K, 2022, downloaded from https://ir.ea.com/financial-information/sec-filings/default.aspx, p. 6 ("As of March 31, 2022, we employed approximately 12,900 people globally, with 64 percent located internationally."), pp. 34-35.

[631]   Electronic Arts Inc., Form 10-K, 2014, downloaded from https://ir.ea.com/financial-information/sec-filings/default.aspx, p. 4 ("Though industry sales of major games for Xbox 360 and PlayStation 3 declined significantly during our 2014 fiscal year, these legacy platforms maintain a sizeable user base and we expect to continue to develop and market products for each of them in the near term."); Take-Two Interactive Software, Inc., Form 10-K, 2013, downloaded from https://www.take2games.com/ir/sec-filings, p. 11 ("During any such transitional period, our success will depend on our ability to develop our products and services for these next-generation consoles. This transition may require significant costs and management resources."). *See also* Ristoff, Jared, "Industry Report NN003 Video Games in the US," *IBISWorld*, 2021 ("IBISWorld Report (2021)"), p. 45 ("However, game developers are often busy working in tandem with the console companies (which often double as game publishers) to ensure that there is a library of compatible games ready for release with the console.").

*Confidential*

manufacturers typically release new consoles every four to six years.[632]  For example, Sony released the PlayStation4 and Microsoft released the Xbox One in 2014,[633] and the next-generation versions of these consoles were released in November 2020, with Sony releasing the PlayStation 5 and Microsoft releasing the Xbox X.[634]

b. Additional costs associated with licensing:  Take-Two and EA develop both wholly-owned brands and licensed video games, such as sports titles.  For these licensed sports games, console game developers compete to obtain licenses from sports leagues and players' associations.[635]  Licenses increase game development costs: for example, in 2008, around the time that Take-Two cancelled their college basketball game,[636] Take-Two's public disclosure noted that internally-owned and developed video games "typically provide higher margins than licensed products."[637]

[632] Take-Two Interactive Software, Inc., Form 10-K, 2013, downloaded from https://www.take2games.com/ir/sec-filings, p. 11 ("Video game hardware platforms have historically had a life cycle of four to six years and we anticipate a transition to new console platforms in the near future.").

[633] IBISWorld Report (2021), p. 12 ("It took six years for the major console producers Nintendo Co. Ltd. (Nintendo), Microsoft and Sony to launch the most recent generation of gaming consoles. For example, Nintendo's Wii U was released in 2012, followed by Nintendo's subsequent release of the Nintendo Switch in March 2018. The release of the Nintendo Switch spurred substantial growth for Nintendo and revolutionized traditional gaming. Similarly, Sony's PlayStation 4 (PS4) and Microsoft's Xbox One (XB1) were released in 2014.").

[634] IBISWorld Report (2021), p. 12 ("Microsoft and Sony have both released their newest console generations, the XBOX Series X (XBOX X) and PlayStation 5 (PS5), respectively, in November 2020.").

[635] Electronic Arts Inc., Form 10-K, 2022, downloaded from https://ir.ea.com/financial-information/sec-filings/default.aspx, p. 14 ("For example, our EA Sports products include rights licensed from major sports leagues, teams and players' associations and our Star Wars products include rights licensed from Disney. Competition for these licenses and rights is intense.").

[636] GameSpot Staff, "College Hoops 2K9 Ejected," *GameSpot*, January 14, 2008, available at https://www.gamespot.com/articles/college-hoops-2k9-ejected/1100-6184658/ ("As initially reported by Kotaku, 2K Sports has canceled College Hoops 2K9, which was sketched in for November 2008. The call was reportedly made due to a standoff in licensing negotiations with the Collegiate Licensing Company (CLC), which holds the rights to college trademarks for more than 200 college and universities.").

[637] Take-Two Interactive Software, Inc., Form 10-K, 2008, downloaded from https://www.take2games.com/ir/sec-filings, p. 3 ("Our primary strategy is to publish a select number of high quality titles based on internally owned and developed intellectual property, which typically provide higher margins than licensed products.").

276.   The emergence of mobile and online games add complexity to the decision-making that console game developers face.[638]  Both EA and Take-Two have sought to expand their mobile and online game offerings over time.  For example, in 2012, EA noted that its "business is rapidly transforming" and that its "business has evolved from a traditional packaged goods business model to one where our games are played on a variety of platforms including mobile devices and social networking sites."[639]  EA subsequently "leveraged franchises historically associated with consoles and traditional PC gaming [...] to create mobile and PC free-to-download games [...]."[640]  In 2011, Take-Two noted that it "expect[ed] online delivery of games and game services to become an increasing part of our business over the long-term."[641]  By 2016, Take-Two noted that they offered "an expanding variety of titles for tablets and smartphones," with net revenue from digital online channels making up 49 percent of their net revenues.[642]

277.   In light of the diversity of types of games they may pursue as well as the substantial associated costs, console game developers need to prioritize and decide to which projects they will devote their development and marketing resources.  For example, Take Two has "a product investment review process to evaluate potential titles for investment" both for

---

638   Rayna and Striukova (2014), pp. 61-62 ("The new entrants on the market have put market incumbents in a challenging position, not because competition is new to them, but because the 'rules of the game' have changed. Before, leadership would be achieved through technological innovation: the better the game, the bigger the gains. Mobile and online gaming, however, relate to radically different gaming experience and expectations that make technological innovation less relevant (especially on a 4-5 inch screen) and require new strategies to gain competitiveness.")

639   Electronic Arts Inc., Form 10-K, 2012, downloaded from https://ir.ea.com/financial-information/sec-filings/default.aspx, pp. 3, 30.

640   Electronic Arts Inc., Form 10-K, 2017, downloaded from https://ir.ea.com/financial-information/sec-filings/default.aspx, p. 3 ("This digital transformation also is creating opportunities in platforms, content models and modalities of play. For example, we have leveraged franchises historically associated with consoles and traditional PC gaming, such as FIFA, Madden NFL, The Sims, SimCity, and Star Wars, to create mobile and PC free-to-download games that are monetized through a business model in which we sell incremental content and/or features in discrete transactions.").

641   Take-Two Interactive Software, Inc., Form 10-K, 2011, downloaded from https://www.take2games.com/ir/sec-filings, p. 30.

642   Take-Two Interactive Software, Inc., Form 10-K, 2016, downloaded from https://www.take2games.com/ir/sec-filings, p. 7.

internally-developed and licensed products.[643]  Both Take-Two and EA have sought to balance the breadth and depth of their game offerings based on their priorities.  Take-Two has consistently "focus[ed] on publishing a number of high-quality titles based on internally owned and developed intellectual properties," while "selectively develop[ing] titles based on licensed products, including sports leagues, and also publish[ing] externally developed titles."[644]  In the early 2010s, EA reduced the number of console games that it developed and published, with a focus on "building additional online features, content and services" around the remaining titles as well as expanding its mobile and online titles to "take advantage of the growth opportunities on those platforms."[645]

278.   The prioritization tradeoffs console game developers face are relevant for sports video games, as evidenced by the following examples:

    a.   Take-Two stopped producing a National Hockey League game after 2010.[646]

---

[643]   Take-Two Interactive Software, Inc., Form 10-K, 2022, downloaded from https://www.take2games.com/ir/sec-filings, p. 2 ("We use a product investment review process to evaluate potential titles for investment, to review existing titles in development, and to assess titles after release by measuring their performance in the market and the return on our investment. We apply this process to all of our products, whether internally or externally developed.").

[644]   Take-Two Interactive Software, Inc., Form 10-K, 2022, downloaded from https://www.take2games.com/ir/sec-filings, p. 2.  *See also* Take-Two Interactive Software, Inc., Form 10-K, 2009, downloaded from https://www.take2games.com/ir/sec-filings, p. 3.

[645]   Electronic Arts Inc., Form 10-K, 2013, downloaded from https://ir.ea.com/financial-information/sec-filings/default.aspx, p. 3 ("At the same time, we have aggressively reduced the number of significant titles releases that we launch each year. In fiscal year 2009, we published over 60 packaged goods products, each of which was primarily a stand-alone game with few or no online features, and in each fiscal year since, we have launched fewer titles on consoles, while building additional online features, content and services around each one of our titles. In fiscal year 2013, we published 13 titles on video game consoles and PCs (each with additional online features, content and/or services) and we offered more than 22 titles for mobile and Internet platforms to take advantage of the growth opportunities on those platforms."); Electronic Arts Inc., Form 10-K, 2014, downloaded from https://ir.ea.com/financial-information/sec-filings/default.aspx, p. 3 ("In recent years, we have narrowed our product portfolio to reduce costs and to focus on developing products with the potential to become hit products. For example, in fiscal year 2011, we published over 30 titles for console and PC, while in fiscal year 2014 we published 11; in fiscal year 2015, we expect to release 10 titles for console and PC.").

[646]   Take Two lists the *NHL 2K* series under its 2K Sports titles in its 2011 Form 10-K, but does not list the *NHL 2K* series under its 2K Sports tiles in its 2012 Form 10-K.  *See* Take-Two Interactive Software, Inc., Form 10-K, 2011, downloaded from https://www.take2games.com/ir/sec-filings, p. 5 ("We develop most of our 2K Sports software titles through our internal development studios including the *Major League Baseball 2K* series, *NBA 2K* series, *NHL 2K* series, and our *Top Spin* tennis series.").  *See also* Take-Two Interactive Software, Inc., Form 10-K, 2012, downloaded from https://www.take2games.com/ir/sec-filings, p. 5 ("2K Sports publishes

b.   Take-Two's MLB license expired in 2013 and it acquired a license to produce WWE games in the same year.[647]

c.   Take-Two released a WWE professional wrestling title every year until 2019, but took a two-year break before releasing a WWE title in 2022.[648]

d.   EA permanently cancelled its professional basketball video game in 2019 after having its annual installments cancelled in 2011, 2013, and 2017.[649]

279.   The economics of video games are a relevant consideration for any assessment of injury and damages related to collegiate basketball and football video games, because such injury and damages can only occur if these video games would have existed in the but-for world.  The Rascher Report's assumption that these video games would have existed in the but-for world is not rooted in economic analysis and does not account for the relevant economics of video games, as I explain in the following sections.

---

realistic sports simulation titles, including our flagship *NBA 2K* series, which has been the top-ranked NBA basketball video game for 11 years running, the *Major League Baseball 2K* series, and our *Top Spin* tennis series. We develop most of our 2K Sports software titles through our internal development studios. 2K Sports has secured long-term licensing agreements with the National Basketball Association ("NBA"). Our current licenses with Major League Baseball Properties, the Major League Baseball Players Association and Major League Baseball Advanced Media expire in fiscal 2013.").

[647]   Take-Two Interactive Software, Inc., Form 10-K, 2014, downloaded from https://www.take2games.com/ir/sec-filings, p. 5 ("In addition, in February 2013, 2K entered into an exclusive multi-year agreement with WWE to publish the WWE video game franchise worldwide. Our licenses with Major League Baseball Properties, the Major League Baseball Players Association and Major League Baseball Advanced Media expired in December 2013.").

[648]   Yuke's, "Game Releases," available at https://www.yukes.co.jp/en/service-en/games-en/works/, accessed on April 18, 2023 (listing annual releases of WWE titles); Colantonio, Giovanni, "WWE 2K23 Brings the Pain with John Cena, Cody Rhodes, and Bad Bunny," *Digital Trends*, January 23, 2023, available at https://www.digitaltrends.com/gaming/wwe-2k-23-reveal-release-date/ ("WWE 2K23 gets the wrestling series back into annualization mode after 2K Games took two years off between WWE 2K20 and 2K22.").

[649]   Good, Owen S., "NBA Live 20 Canceled as EA Sports Looks to Next-Gen Consoles," *Polygon*, October 29, 2019, available at https://www.polygon.com/2019/10/29/20938853/nba-live-20-canceled-ea-sports-ps4-xbox-one-ps5-scarlett ("For the fourth time this decade, Electronic Arts has, at the last moment, put its basketball franchise on ice."; "Industry watchers later speculated that, after missing the usual early September window, EA would try for a release around next year's NBA All-Star Game, which was the plan for the aborted *NBA Live 17*. The disastrous *NBA Elite 11* was officially described as delayed in late 2010, with its demise confirmed months later. EA Sports likewise announced a delay, then a cancellation, for *NBA Live 13*. There was no *NBA Live 12*, as the series was taken from EA Vancouver and sent to Florida for a thorough remaking.").

### C. The Rascher Report's Assertions Regarding Collegiate Basketball Video Game-Related Injury and Damages Are Speculative

280. Evidence indicates that the collegiate basketball games produced by Take-Two and EA were cancelled due to concerns about their prospects for commercial success:

   a. Take-Two attributed its cancellation decision in 2008 to the failure to agree to licensing terms with the Collegiate Licensing Company, which represented the NCAA and the schools and conferences that were featured in the game.[650] At the time, Take-Two's 2K Sports division issued a statement that "[w]e are committed to providing fans with high-quality, critically-acclaimed sports games, but given our disciplined approach to the business, we do not believe the current discussions would result in an acceptable outcome."[651]

   b. 

_____

[650] GameSpot Staff, "College Hoops 2K9 Ejected," GameSpot, January 14, 2008, available at https://www.gamespot.com/articles/college-hoops-2k9-ejected/1100-6184658/ ("The call was reportedly made due to a standoff in licensing negotiations with the Collegiate Licensing Company (CLC), which holds the rights to college trademarks for more than 200 college[s] and universities. '2K Sports has decided not to continue negotiations with the CLC for the license for its top-rated College Hoops franchise, which would have been released next in November 2008,' said 2K Sports in a statement. 'We are committed to providing fans with high-quality, critically acclaimed sports games, but given our disciplined approach to the business, we do not believe the current discussions would result in an acceptable outcome.'").

[651] GameSpot Staff, "College Hoops 2K9 Ejected," *GameSpot*, January 14, 2008, available at https://www.gamespot.com/articles/college-hoops-2k9-ejected/1100-6184658.

[652] Counsel Only.

[653] Thorsen, Tor, "EA: No NCAA Basketball in 2010," *GameSpot*, February 12, 2010, available at https://www.gamespot.com/articles/ea-no-ncaa-basketball-in-2010/1100-6250337/ ("After a four-day silence, EA today confirmed that the series is on indefinite hold. 'We do not have an NCAA Basketball game in development at this time, and we're currently reviewing the future of our NCAA Basketball business,' an EA Sports rep told GameSpot. 'This was a difficult decision, but we remain a committed partner to the NCAA and its member institutions.'").

[654] Counsel Only

281.   The Rascher Report asserts that in the but-for world, college basketball video games would have experienced greater commercial success such that they "would never have been cancelled" and "would have continued to exist […]."[655]  The Rascher Report's conceptual rationale for this assertion is that "commercializing NILs increase[s] commercial demand."[656]  Of course, commercializing NILs for a college basketball video game would also have resulted in additional licensing and development costs.

282.   The Rascher Report conducts no quantitative analysis and cites no quantitative evidence regarding how Take-Two, EA, or any other video game company would have weighed the tradeoffs of potentially increased commercial demand for a college basketball video game versus increased licensing and development costs in the context of other priorities to which they could devote their internal resources in the but-for world.  Instead, Confidential

[Confidential],[657] and (ii) Confidential



Counsel Only

---

[655]   Rascher Report, ¶ 136 ("In the but-for world in which the Prior NIL Rules did not exist, the previous iterations of the EA college football video game and basketball game (or the Take-Two video game) would have continued to exist, and the games would never have been cancelled because of the Prior NIL Rules preventing college football and basketball players from receiving payments for their video game NIL.").

[656]   Confidential

[657]   Confidential                                                       ascher Report, ¶ 133 ("For example, when EA was still actively working with CLC (prior to the filing of the *O'Bannon* case) to try to

[Confidential]

[Confidential].[658]   Neither of these constitutes an economic analysis demonstrating that the college basketball video games would never have been cancelled in the but-for world.   Similarly, the Rascher Report's contention that "basketball athlete NILs are especially important to any college video game produced […]" does not constitute an economic analysis.[659] [Confidential]

[Confidential]

[660] [Confidential]

[661] [Confidential]

283.   The damages period in this matter begins more than five years after EA announced the cancellation of its college basketball game.[662]   Even if Take-Two and EA did not cancel

---

convince the NCAA to expand the use of athlete NIL in video games, they reported the results of surveys of retailers. [Confidential].

[658]   [Confidential]

[659]   Rascher Report, ¶ 133 ("The economic evidence indicates that because basketball athlete NILs are especially important to any college video game produced, in the but-for world EA or another video game company would have offered to pay at least all 13 full-scholarship athletes on each Division I men's basketball team for the right to use their NILs in a video game.")

[660]   [Confidential]

[661]   [Confidential]

[662]   EA announced in February 2010 that they would not be renewing their college basketball game for another iteration, and the damages period begins in 2016.   *See* Thorsen, Tor, "EA: No NCAA Basketball in 2010," *GameSpot*, February 12, 2010, available at https://www.gamespot.com/articles/ea-no-ncaa-basketball-in-2010/1100-6250337/ ("After a four-day silence, EA today confirmed that the series is on indefinite hold. 'We do not have an NCAA Basketball game in development at this time, and we're currently reviewing the future of our NCAA Basketball business,' an EA Sports rep told GameSpot. 'This was a difficult decision, but we remain a committed partner to the NCAA and its member institutions.'"). [Confidential]

their college basketball games in the but-for world at the same time as they actually did, this does not mean that they or any other video game developer would have sold such a game during the damages period.

[content redacted — Counsel Only]

[663] [content redacted — Counsel Only]

[content redacted]

[664] [content redacted — Counsel Only]

[content redacted — Counsel Only]

[665]

---

[663] Rascher Report, ¶ 128 ("Moreover, documents produced in this litigation show EA has continually wanted to produce football and men's basketball games [content redacted — Confidential / Counsel Only]

[664] [content redacted — Counsel Only]

[665] [content redacted — Counsel Only]

284.   In reaching its conclusions of basketball video game-related injury and damages, the Rascher Report does not contend with the relevant economics of console video game development.  As I explain above in **Section VI.B**, console video game makers like Take-Two and EA make selective decisions about which priorities to pursue across the diverse genres and types of games that they produce.  The emergence of mobile and online gaming has introduced additional considerations for these companies, both of which have pursued mobile and online gaming projects as a means of diversifying their revenue streams.  It cannot be assumed without economic analysis, as the Rascher Report does, that a video game developer would choose to release a college basketball game in each year of the damages period.

285.   In sum, the Rascher Report's assertion that the collegiate basketball games would never have been cancelled in the but-for world and would have been produced during the damages period is not based on economic analysis or an understanding of the relevant industry; it is speculation that is unsupported by record evidence.

### D.  The Rascher Report's Assertions Regarding Collegiate Football Video Game-Related Injury and Damages Are Speculative

286.   EA has announced that it intends to bring back a college football video game in the summer of 2024, and an EA source has indicated that student-athletes who are included in the game will receive compensation.[666]

287.   It remains to be seen how many and which college football student-athletes will be included in the video game and will receive compensation in return for licensing their NIL.  The coming months leading to the EA football game's release will be informative for assessing the validity of the Rascher Report's assumptions that all football-playing members of the Football and Men's Basketball Class and the Additional Sports Class

---

[666]   Rothstein, Michael, "EA Sports to Release College Football Game in Summer 2024," *ESPN*, November 22, 2022, available at https://www.espn.com/college-football/story/_/id/35082744/ea-sports-release-college-football-game-summer-2024 ("The return of EA Sports' college football video game series now has a time of arrival: the summer of 2024.  […]  An EA source told ESPN that players will be compensated if they are in the game.").

would receive video game-related compensation.  As presented, however, the Rascher Report's assumptions regarding injury and damages to these class members are speculative.

## VII.   THE RASCHER REPORT'S PROPOSED DAMAGES METHODOLOGIES CREATE CONFLICTS WITHIN AND BETWEEN THE PROPOSED CLASSES

288.   The Rascher Report's proposed damages methodologies rely on specific assumptions that lead to some proposed class members receiving a higher damages award than others. These different subsets of proposed class members would have the incentive to advocate for different sets of assumptions that would maximize the amount of damages that they could claim.

### A.   Class Conflicts Would Arise From any Class-Wide Approach to Resolve Athletic Departments' Revenue Shortfall Created by the Rascher Report's Proposed Broadcast-Related Damages Methodology

289.   The Rascher Report's proposed broadcast-related payments to student-athletes would require schools' athletic departments to divert revenues used to cross-subsidize multiple sports.  Football and men's basketball are typically the only sports that generate revenue in excess of costs for a collegiate athletic department, with the remaining sports funded in large part from revenue generated by football and men's basketball.[667]  It is not unusual for college athletics departments to have expenses that exceed their revenues.[668] According to the NCAA MFRS data on which the Rascher Report relies, 110 (32 percent) of the 349 Division I schools reported total expenses exceeding total revenues over the

---

[667]   *See, for example*, Limbong, Andrew, "College Football is Back and Players Still Aren't Getting Paid," *NPR*, September 2, 2022, available at https://www npr.org/2022/09/02/1120610858/college-football-nil-big-ten ("Football and basketball take up a lot of the conversation around college sports because they bring in the money. Money that's used to subsidize other sports.").

[668]   Rascher Report backup materials (NCAA MFRS data).  *See also* Joyce, Tom, "In College Sports, Non-Athletes Suffer Just as Much as the Stars on the Field," *The Guardian*, October 16, 2019, available at https://www.theguardian.com/sport/2019/oct/16/college-sports-revenue-loss-making-programs-academics ("The notion that all college sports teams across the United States are generating millions of dollars for their respective schools and every NCAA athlete is being exploited is unfounded. Except for some elite football and men's basketball programs, expenses tend to outstrip revenues, and the burden is largely placed on non-athletes, driving up the cost of their degrees.").

period 2016 to 2021 and 233 (67 percent) of the 349 Division I schools reported at least one year in which their expenses exceeded revenues during this time period.[669]  The Rascher Report assumes that all schools would be able to make the proposed broadcast-related payments to student-athletes without impacting their operations.  However, the Rascher Report's proposed broadcast-related payments to football and basketball student-athletes would have an adverse effect on athletic departments' budgets, which could be to the detriment of members of the proposed Additional Sports Class and lead to class conflicts within the Additional Sports Class.

290.    For example, as shown in **Table 17**, according to the MFRS data used by the Rascher Report,

Counsel Only

---

[669]            Counsel Only

**Table 17. Reported Athletic Department Revenues and Expenses and the Rascher Report's Proposed Broadcast-Related Payments (USD millions)**

Counsel Only





Counsel Only

291.   The Rascher Report does not acknowledge this problem, nor does it offer a common methodology to resolve it.  At minimum, a school-by-school analysis is required to determine whether schools would face a shortfall in revenues resulting from the Rascher Report's proposed broadcast-related payments to student-athletes and how schools would react to any decrease in revenues.  Some schools could choose to eliminate non-revenue generating sports: **Table 17** shows that,                                    Counsel Only

For those schools that face shortfalls, they may opt to eliminate sports to make up the shortfall in revenues.  To the extent that Plaintiffs' but-for world requires such eliminations, conflicts would arise between members playing different sports at the same school in the Additional Sports Class.

Baseball student-athletes would have the opposite incentive.  Declarations by collegiate athletic department directors submitted in this case similarly raise concerns that the Rascher Report's proposed broadcast-related payments could lead to reduced resources for or elimination of certain athletic programs.[671]

---

[671] *See, for example*, Flores Declaration, ¶ 13 ("[The Plaintiffs' damages model] could place extreme pressure on members' budget, and it may result in the elimination of some programs."); Weiberg Declaration, ¶ 20 ("Finally, an additional concern is the [Plaintiffs' damages model's] potential financial impact on our athletic programs. Any payments to players would have to be funded by reducing other expenditures within OSU's Athletic Department. These would most likely come from reducing the level of services, benefits, and support provided to all student-athletes and to the extent that these are not sufficient to cover the increased cost, by

292. The likelihood that schools would address revenue shortfalls with program cuts is high. Schools have sought to cut teams in the face of financial shocks. For instance, Missouri State eliminated their field hockey program in 2017 after the new governor reduced state funding for the university,[672] while Eastern Michigan University and the University of New Mexico each cut four sports teams in 2018 to address persistent budget concerns.[673] The Covid-19 pandemic similarly led several schools to cut sports teams.[674]

---

reducing or eliminating Olympics sports programs that we currently sponsor."); Lee Declaration, ¶ 27 ("If broadcast rights fees were paid by the SEC to student-athletes as contemplated in the Plaintiffs' Scenario, Vanderbilt University would have to cut expenses. As the Athletic Director, I would have to make decisions on how to reduce expenses and, as a practical matter, would have to choose whether to (a) eliminate sports, (b) reduce the amount budgeted to support each sport, and/or (c) reduce the number of student-athletes on each team. For example, under Plaintiffs' Scenario, Vanderbilt would not have added women's volleyball."); Kliavkoff Declaration, ¶ 26 ("Based on my experience, including interactions with athletic directors at Pac-12 member institutions, it is my belief that member institutions would be reticent to give any student athlete more benefits if the provision of that benefit to one set of student athletes would restrict either the ability of the member institution to support non-profitable sports or restrict the number of scholarships they could provide to student-athletes who compete in non-profitable sports."); Rhoades Declaration, ¶ 19 ("The ultimate result of this proposed Model could lead to Baylor having to decide whether to eliminate sports program opportunities, which would disproportionately negatively impact Olympic sports and reduce opportunities for all of our student-athletes.").

[672] Connell, Jim, "Down to its 'Last Resort,' Missouri State Eliminates Field Hockey Program," *Springfield News-Leader*, April 3, 2017, available at https://www.news-leader.com/story/sports/college/msu/2017/04/03/live-msu-athletics-budget-press-conference/99983528/ ("Missouri State Director of Athletics Kyle Moats announced Monday the elimination of the school's field hockey program, pulling the plug on a program that includes 17 current and seven incoming student-athletes. It's just one of a series of cuts in expenses in the athletics department totaling more than $1 million – necessitated by a university work group formed to cut, at minimum, $750,000 in expenses. It comes in the wake of an $8 million state funding shortfall for the entire university, under new Gov. Eric Greitens.").

[673] Monacelli, Nick, "Eastern Michigan University to Cut 4 Sports Teams Following Spring Semester," *Click on Detroit*, March 20, 2018, available at https://www.clickondetroit.com/news/2018/03/20/eastern-michigan-university-to-cut-4-sports-teams-following-spring-semester/; ("Four sports teams at Eastern Michigan University will be cut following the 2018 spring season. The wrestling, women's softball, men's swimming and diving and women's tennis teams are all set to be cut as part of EMU's effort to restructure its overall budget."); ESPN, "New Mexico Board of Regents Votes to Cut Four Sports," July 19, 2018, available at https://www.espn.com/college-sports/story/_/id/24141701/new-mexico-board-regents-moves-forward-cutting-four-sports ("The board of regents at New Mexico's flagship university voted Thursday to eliminate four sports teams and make other changes to its troubled athletic department to address persistent budget problems and failures to meet federal gender equity requirements under Title IX.").

[674] *See, for example*, Lepesant, Anne, "Boise State Eliminates Women's Swimming & Diving Program in Cost-Cutting Move," *SwimSwam*, July 2, 2020, available at https://swimswam.com/boise-state-eliminates-womens-swimming-diving-program-in-cost-cutting-move/ ("The team cuts, combined with other cost-saving measures, are expected to reduce the overall departmental budget by $3 million. 'This is one of the hardest decisions athletic departments have to make, but it comes at a time when we are facing the most serious financial challenge we have ever seen,' [Boise State University athletic director] Apsey said."); Whitaker, Bill, "Some Colleges Axing 'Secondary Sports' Like Gymnastics and Tennis as Pandemic Continues," *CBS News*,

293.   Some schools might find ways to avoid these budget pressures by accessing additional revenue streams.  However, identifying which schools would pursue this path, and assessing whether and by how much those alternative sources of funds would be sufficient to make up any revenue shortfall would require individual rather than common evidence. For example, schools could look to raise additional funds from donors.  Funding from donors, however, is not guaranteed in a world where third-party NIL deals with student-athletes exist.  Some donors are using the same budget that they traditionally used to pay for school-specific sponsorships to pay student-athletes for third-party NIL deals,[675] leading to concerns that there are fewer sources of alternative funding for athletic departments.[676]  Other schools may be able to lobby policymakers at the state or federal level to make up shortfalls, but it is not clear whether these efforts would succeed.  It is not possible to resolve how schools would react to budgetary pressures in the Rascher Report's but-for world with a common methodology, given each school's circumstances at each point in time.

### B.  The Rascher Report's Proposed Broadcast-Related Damages Methodology Creates Additional Class Conflicts

294.   Key assumptions underlying the Rascher Report's proposed broadcast-related damages methodology pit class members within the proposed Football and Men's Basketball Class and the Women's Basketball Class against one another, while also creating tensions between the two proposed damages classes.

---

December 6, 2020, available at https://www.cbsnews.com/news/college-sports-cuts-gymnastics-swimming-pandemic-60-minutes-2020-12-06/ ("[Minnesota athletic director] Coyle said the covid pandemic had blown a multi-million dollar hole in the university's athletic budget. He said they were cutting salaries and costs wherever possible, but that cutting entire sports was necessary too.").

[675]   Schoenfeld, Bruce, "Student. Athlete. Mogul?" *The New York Times*, January 29, 2023, available at https://www.nytimes.com/2023/01/24/magazine/ncaa-nba-student-athlete.html ("Jackie Woodward, Bojangles's head of marketing, told me that the money paid to Howell [UNC's quarterback] was pulled from the same budget she had been using to buy sponsorships with various schools, including North Carolina.").

[676]   Schoenfeld, Bruce, "Student. Athlete. Mogul?" *The New York Times*, January 29, 2023, available at https://www.nytimes.com/2023/01/24/magazine/ncaa-nba-student-athlete.html ("Shelton [UNC's field hockey coach] has rooted hard for the university's football and men's basketball teams — because they wear the same sky blue uniforms, but also because their success would help generate revenue for the entire department.  Now, though, she worries that donations that previously helped fund the field hockey team will end up going to the collectives.").

295.    The Rascher Report's proposed damages methodology overwhelmingly steers damages towards Football and Men's Basketball Class members.  Approximately 96 percent of the Rascher Report's broadcast-related damages would be awarded to male student-athletes because football and men's basketball student-athletes benefit from the Rascher Report's multisport allocation factor, which allocates 90 percent of the broadcast revenues to these sports, in addition to all revenues from relevant tournaments, bowls and playoffs.[677]  The remaining 4 percent of the Rascher Report's broadcast-related damages would be awarded to women's basketball student-athletes.  The Rascher Report ignores student-athletes playing other broadcasted, Olympic sports, even though the Desser Report finds that these sports make up 5 percent of an A5 media broadcast value.[678]

296.    The Rascher Report's multisport allocation factor creates incentives for football student-athletes, men's basketball student-athletes, and women's basketball student-athletes to advocate for a higher percent of broadcast-related revenues to be allocated to their sport at the expense of the other sports.  Certain student-athletes could point to school-specific revenue allocations as a basis for different assumptions to be used in place of the Rascher Report's multisport allocation factor, which is uniform across schools and conferences.  For example, based on the data that the Rascher Report uses to corroborate the Desser Report's conclusion, **Figure 16** shows that:

   a.    

---

[677]  Rascher Report, Exhibit 10 ($1,040.1m for football student-athletes + $280.2m for men's basketball student-athletes = $1,320.3m in total damages for male student-athletes, divided by $1,370.1m in total damages = 96 percent.); Rascher Report, ¶ 176 (The Rascher Report's multisport allocation factor allocates 75 percent of the value of broadcast media agreements to football and 15 percent to men's basketball).

[678]  Desser Report, § 17.4 ("It is my opinion that the value for athletes in sports other than Power 5 FBS football and DI men's and women's basketball—i.e., the Olympic sports—collectively make up the remaining 5% of the value.").

*Confidential*

Counsel Only

b.      Counsel Only

c.      Counsel Only

**Figure 16. Proportion of Total Revenues Attributed to Football, Men's Basketball, and Women's Basketball at Select A5 Schools 2016-2021[679]**



Counsel Only

297.    The Rascher Report's assumption that the NCAA limit for student-athlete payments would be 10 percent disadvantages class members in conferences with lower broadcast revenues.

---

Counsel Only

[gray redaction bar] [680]

298.   The Rascher Report's assumption of equal broadcast-related payments to full-scholarship student-athletes playing the same sport in the same conference also creates an incentive for superstar student-athletes to advocate for a different payment structure that acknowledges their unique contributions to the success and marketing of a team.  As discussed in **Section IV**, the economics literature on superstars' compensation indicates that talented student-athletes would command higher payments than more substitutable student-athletes.  In contrast, student-athletes of less renown or talent and who have less playing time benefit from the Rascher Report's assumptions.

### C.  The Rascher Report's Proposed Third-Party NIL Damages Methodology Creates Class Conflicts

299.   The Rascher Report's proposed methodology for estimating third-party NIL damages overcompensates certain student-athletes in the proposed classes while undercompensating others.  Student-athletes are therefore incentivized to advocate for different parameters to the Rascher Report's proposed damages methodology.

300.   As described in **Section V**, the Rascher Report has failed to present a methodology that assesses damages to all student-athletes "who received compensation while a Division I college athlete for use of their name, image, or likeness between July 1, 2021 and the date of the class certification order in this matter and who competed in the same Division I sport prior to July 1, 2021."[681]  Third-party compensation for NIL can be monetary or in-kind goods or services.  Confidential

[gray redaction bar]

[gray redaction bar]

[gray redaction bar] .[682]

---

[680]   Counsel Only

[681]   Plaintiffs' Motion for Class Certification, p. v.

[682]   Confidential

Student-athletes who have a combination of third-party NIL deals with monetary and non-monetary payments would also be undercompensated under the Rascher Report's proposed methodology.

301.   The Rascher Report's third-party NIL damages methodology disadvantages student-athletes who had more recognition prior to July 1, 2021, relative to student-athletes who had more recognition after July 1, 2021.  Student-athletes who would benefit from an earlier time period for use as the benchmark period include:

    a.   Named Plaintiff Grant House has not competed in an international swimming event since his participation in the 2019 Pan American Games.[683]  House testified in his deposition that he would have expected to secure more third-party NIL deals while competing in the Pan American Games than in years when he did not compete in an international competition.[684]

    b.   Student-athletes who suffered injuries during or close to July 2021 may be similarly disadvantaged.  Women's basketball student-athlete Emily Bessoir, for example, featured as a "breakout role player[]" for University of California, Los Angeles in her freshman season before tearing her ACL in October 2021.  She did not play during the 2021-2022 season.[685]

    c.   Awards or viral moments occurring prior to July 2021 also may have attracted higher levels of recognition for certain student-athletes prior to the start of the

---

[683]   Swim Swam, "Grant House," available at https://swimswam.com/bio/grant-house/, accessed on March 16, 2023.

[684]   House Deposition, p. 226:14-22 ("Q. Do you think around the time of the Pan American Games, you would have received NIL deals had you been able to? A. Absolutely. Q. And do you think that you would have been able to secure more NIL deals when you were competing for the Pan American Games than in years when you weren't participating in those games? A. Absolutely.").

[685]   Royer, Benjamin, "Forward Emily Bessoir Tears ACL, to Miss Season for UCLA Women's Basketball," *Sports Illustrated*, October 8, 2021, available at https://www.si.com/college/ucla/womens-basketball/forward-emily-bessoir-tears-acl-to-miss-season-for-ucla-womens-basketball ("The Bruins will be without one of their breakout role players from a season ago. UCLA women's basketball forward Emily Bessoir announced via Instagram on Friday that she had torn her ACL and will have to sit out the entire 2021-2022 season. The injury occurred earlier this week during practice.").

benchmark period, such as for Syracuse softball teammates Angel Jasso and Paris Woods, whose diving catches featured on SportsCenter's "Top 10 Plays" in the same week in April 2021.[686]

302.  The Rascher Report's proposed adjustments would similarly create incentives for class members to argue for alternative assumptions.

   a.  The Rascher Report's proposal to apply a unique negative adjustment for the impact of the Covid-19 pandemic would disadvantage student-athletes who have signed deals in the after period with industries that were not negatively affected by the Covid-19 pandemic.

Confidential

[687] Netflix also prospered during the pandemic as consumers turned to its streaming programs for entertainment.[688] Applying a downward adjustment to these third-party NIL deals would disadvantage these student-athletes as these sponsors are unlikely to have faced financial constraints during the pandemic. By contrast, the Rascher Report's proposed unique Covid-19 adjustment for the impact of the pandemic advantages student-athletes that have third-party NIL deals sponsored by industries that were strongly hit during

---

[686] Sladek, Tommy, "'What a Catch!' SU Softball Featured on SportsCenter's 'Top 10 Plays' Twice in One Week," *CNY Central*, April 14, 2021, available at https://cnycentral.com/sports/college/what-a-catch-su-softball-featured-on-sportscenters-top-10-plays-twice-in-one-week ("Whether you play a sport for fun or professionally, every athlete dreams of making ESPN SportsCenter's Top 10 Plays of the day. Two Syracuse softball outfielders just lived out that dream...in the same week.").

[687] "                                    Confidential

[688] Nicolaou, Anna, "Prospering in the Pandemic: The Top 100 Companies," *The Financial Times*, June 19, 2020, available at https://www.ft.com/content/844ed28c-8074-4856-bde0-20f3bf4cd8f0 ("12. Netflix. $55.1 bn Market cap. added. [...] Netflix added twice as many subscribers as it had forecast in the first three months of the year, as the largest paid streaming service entertained global lockdown audiences with shows such as Tiger King, La Casa de Papel and Love is Blind.").

the pandemic, such as the restaurant and hospitality industry as I discuss in **Section V.E.5**.

b. The Rascher Report's proposal to adjust for the difference in average third-party NIL compensation when a student-athlete transfers between schools, provided that such differences are statistically significant, creates intra-class conflicts.  As I discuss in **Section V.E.3**, the average third-party NIL compensation at a school does not predict how an individual student-athlete's third-party NIL deals would be affected by a transfer.  This methodology disadvantages student-athletes whose third-party NIL earnings drive up the average third-party NIL earnings in their after-period school.

Confidential

Signed on the 28th day of April, 2023, at Belmont, Massachusetts.

Catherine Tucker

*Confidential*

# APPENDIX A

# CATHERINE TUCKER

MIT Sloan School of Management      Tel: (617) 252-1499

100 Main St, E62-536      cetucker@mit.edu

Cambridge MA 02142      http://mitmgmtfaculty.mit.edu/cetucker/

---

## EDUCATION

Stanford University, Ph.D. in Economics (Advisor: Tim Bresnahan), 2005

Oxford University, BA in Politics, Philosophy and Economics, 1999

---

## APPOINTMENTS

MIT Sloan, Faculty Chair EMBA Program, July 2022 –

MIT Sloan, Sloan Distinguished Professor of Management Science, September 2015 –

MIT Sloan, Chair MIT Sloan PhD Program, July 2015 -2022

MIT Sloan, Professor of Management Science, July 2015 –

MIT, Co-Founder of the MIT CryptoEconomics Lab, 2018 -

National Bureau of Economic Research (NBER), Research Associate, September 2012 –

MIT Sloan, Mark Hyman Jr. Career Development Professor (with tenure), July 2012 – September 2015

MIT Sloan, Associate Professor of Management Science, July 2011 – July 2015

National Bureau of Economic Research (NBER), Faculty Research Fellow, May 2011 – September 2012

MIT Sloan, Douglas Drane Career Development Chair in IT and Management, July 2006 –

MIT Sloan, Assistant Professor of Marketing, July 2005 – June 2011

---

*Confidential*

## HONORS AND AWARDS

| | |
|---|---|
| 2020 | CITI Fellowship (Columbia University Institute of TeleInformation) |
| 2020 | O'Dell Award |
| 2020 | TechSIG-Lazaridis Prize for Best Paper in Innovation, Technology and Interactivity for 2019 |
| 2018 | ISMS Long Term Impact Award |
| 2018 | O'Dell Award |
| 2018 | MSI Scholar |
| 2017 | Congressional Testimony on 'Algorithms: How Companies' Decisions About Data and Content Impact Consumers' |
| 2017 | Nominated for Teacher of the Year award (Also in 2012, 2010 and 2009) |
| 2015 | Erin Anderson Award |
| 2014 | Paul E. Green Award |
| 2013 | Teacher of the Year Award, MIT Sloan |
| 2013 | Jamieson Prize for Excellence in Teaching |
| 2012 | Garfield Economic Impact Award for Best Paper in Health Economics |
| 2011 | WHITE Award for best paper in the Economics of Healthcare IT |
| 2011 | Public Utility Research Prize for the best paper in regulatory economics |
| 2011 | NSF CAREER Award |
| 2011 | MSI Young Scholar |
| 2010 | Management Science Distinguished Service Award |
| 2004 | Koret Foundation Scholar, Stanford Institute for Economic Policy Research Fellowship |
| 2004 | Fourth Annual Claire and Ralph Landau Student Working Paper prize |

## PUBLISHED/ACCEPTED PAPERS

1. 'Identifying Formal and Informal Influence in Technology Adoption with Network Externalities', *Management Science*, Vol. 55 No. 12, December 2008, pp. 2024-2039

2. 'Privacy Protection and Technology Diffusion: The Case of Electronic Medical Records' with Amalia Miller, *Management Science (Lead Article)*, Vol. 55 No. 7, July 2009, pp.

1077-1093

- Republished as part of INFORMS 'Healthcare in the Age of Analytics' series

3. 'How Sales Taxes Affect Customer and Firm Behavior: The Role of Search on the Internet' with Eric Anderson, Nathan Fong and Duncan Simester, *Journal of Marketing Research*, Vol. 47 No. 2, April 2010, pp. 229-239

4. 'Growing Two-sided Networks by Advertising the User Base: A Field Experiment', with Juanjuan Zhang, *Marketing Science*, Vol. 29 No. 5, September-October 2010, pp. 805-814

5. 'Privacy Regulation and Online Advertising' with Avi Goldfarb, *Management Science*, Vol. 57 No. 1, January 2011, pp. 57-71

- Nominated for Long Term Impact Award 2020

6. 'Search Engine Advertising: Channel Substitution when Pricing Ads to Context', with Avi Goldfarb, *Management Science*, Vol. 57 No 3, March 2011, pp. 458-470

7. 'Stuck in the Adoption Funnel: The Effect of Interruptions in the Adoption Process on Usage' with Anja Lambrecht and Katja Seim, *Marketing Science*, Vol. 30 No. 2, March-April 2011, pp. 355-36

8. 'Advertising Bans and the Substitutability of Online and Offline Advertising', with Avi Goldfarb, *Journal of Marketing Research (Lead Article)*, Vol. 48 No. 2, April 2011, pp. 207-227

9. 'Can Healthcare Information Technology Save Babies?' with Amalia Miller, *Journal of Political Economy*, Vol. 119 No. 2, April 2011, pp. 289-324

10. 'How Does Popularity Information Affect Choices? A Field Experiment' with Juanjuan Zhang, *Management Science*, Vol. 57 No. 5, May 2011, pp. 828-842

11. 'Online Display Advertising: Targeting and Obtrusiveness' with Avi Goldfarb, *Marketing Science (Lead Article and Discussion Paper)*, Vol. 30 No. 3, May-June 2011, pp. 389-404

- 'Rejoinder - Implications of "Online Display Advertising: Targeting and Obtrusiveness' with Avi Goldfarb, *Marketing Science*, Vol. 30 No. 3, May-June 2011, pp. 413-415
- Nominated for John D. C. Little Award
- Nominated for Long Term Impact Award 2017

*Confidential*

- Long Term Impact Award 2018

12. 'Encryption and Data Security' with Amalia Miller, *Journal of Policy Analysis and Management*, Vol. 30 No. 3, Summer 2011, pp. 534-556

13. 'Paying With Money or With Effort: Pricing When Customers Anticipate Hassle' with Anja Lambrecht, *Journal of Marketing Research*, Vol. 49 No. 1, February 2012, pp. 66-82.

14. 'Heterogeneity and the Dynamics of Technology Adoption' with Stephen Ryan, *Quantitative Marketing and Economics*, Vol 10 No. 1, March 2012, pp 63-109

15. 'Shifts in Privacy Concerns', *American Economic Review: Papers and Proceedings* with Avi Goldfarb, Vol. 102 No. 3, May 2012, pp. 349-53

16. 'How does the Use of Trademarks by Intermediaries Affect Online Search?' with Lesley Chiou. *Marketing Science*, Vol 31 No. 5, September 2012, pp 819-837

17. 'Active Social Media Management: The Case of Health Care' with Amalia Miller. *Information Systems Research*, Vol. 24 No. 1, March 2013, pp. 52-70

- Republished as part of Informs 'Healthcare in the Age of Analytics' series

18. 'Paywalls and the Demand for News' with Lesley Chiou. *Information Economics and Policy*, Vol. 25 No. 2, June 2013, pp. 61-69

19. 'Days on Market and Home Sales' with Juanjuan Zhang and Ting Zhu. *RAND Journal of Economics*, Vol. 44 No. 2, Summer 2013, pp. 337-360,

20. 'When Does Retargeting Work? Timing Information Specificity' with Anja Lambrecht. *Journal of Marketing Research (Lead Article)* Vol. 50 No. 5, October 2013, pp. 561-576

- Paul E. Green Award for the 'Best article in the Journal of Marketing Research that demonstrates the greatest potential to contribute significantly to the practice of marketing research.'
- William O'Dell Award. This award award honors the JMR article published in 2013 that has made the most significant, long-term contribution to marketing theory, methodology, andor practice

21. 'Health Information Exchange, System Size and Information Silos' with Amalia Miller. *Journal of Health Economics*, Vol. 33 No. 2, January 2014: pp. 28-42

22. 'Electronic Discovery and the Adoption of Information Technology' with Amalia Miller. *Journal of Law, Economics, & Organization (Lead Article)*, Vol. 30. No. 2, May 2014, pp. 217-243

23. 'Social Networks, Personalized Advertising, and Privacy Controls.', *Journal of Marketing Research*, Vol. 51 No. 5, October 2014, pp. 546-562.

    - Citation of Excellence Award Emerald Publishing
    - Nominated for William O'Dell Award (2019)

24. 'Trademarks, Triggers, and Online Search' with Stefan Bechtold. *Journal of Empirical Legal Studies*, Vol. 11 No. 4, December 2014

25. 'The Reach and Persuasiveness of Viral Video Ads' *Marketing Science*, Vol. 34 No. 2, 2015, pp. 281-296

26. 'Privacy Regulation and Market Structure' with James Campbell and Avi Goldfarb. *Journal of Economics & Management Strategy*, Vol 24, No. 1, Spring 2015, pp. 47-73

27. 'Standardization and the Effectiveness of Online Advertising' with Avi Goldfarb. *Management Science*, Vol. 61 No. 11, 2015, pp. 2707-2719

28. 'Harbingers of Failure' with Eric Anderson, Song Lin and Duncan Simester. *Journal of Marketing Research (Lead Article)*, Vol. 52 No. 5, Oct 2015, pp. 580-592

    - William O'Dell Award. This award award honors the JMR article published in 2015 that has made the most significant, long-term contribution to marketing theory, methodology, andor practice

29. 'The Effect of Patent Litigation and Patent Assertion Entities on Entrepreneurial Activity' with Stephen Kiebzaka. and Greg Rafert. *Research Policy*, Vol. 45 No. 1, February 2016, pp. 218-231

30. 'When early adopters don't adopt' with Christian Catalini. *Science*, Vol. 357, Issue 6347, 2017 pp. 135-136

31. 'Network Stability, Network Externalities, and Technology Adoption' in *Advances in Strategic Management*, Vol. 37, 2017, pp.151 - 175

32. 'Digital Content Aggregation Platforms: The Case of the News Media.' with Lesley Chiou - *Journal of Economics & Management Strategy*, Vol. 26 No. 4, 2017, pp. 782-805

*Confidential*

33. 'Should You Target Early Trend Propagators? Evidence from Twitter' with Anja Lambrecht and Caroline Wiertz (Lead Article). *Marketing Science*, Vol. 37 No. 2, 2018, pp. 177-199

34. 'Privacy Protection, Personalized Medicine and Genetic Testing' with Amalia Miller. *Management Science*, Vol. 64 No. 10, 2018, pp. 4648-4668.

35. 'Digital Economics' with Avi Goldfarb, *Journal of Economic Literature*, Vol. 57 No. 1, 2019, pp. 3-43

36. Collusion by Algorithm: Does Better Demand Prediction Facilitate Coordination Between Sellers? with Jeanine Miklós-Thal *Management Science*, Vol. 65 No. 4, 2019, pp. 1552-1561

37. 'Algorithmic Bias? An Empirical Study into Apparent Gender-Based Discrimination in the Display of STEM Career Ads ' with Anja Lambrecht. *Management Science* 2019, Vol 65, No 7, pp. 2966-2981

    - TechSIG-Lazaridis Prize for Best Paper in Innovation, Technology and Interactivity for 2019

38. 'How Effective Is Black-Box Digital Consumer Profiling And Audience Delivery?: Evidence from Field Studies' with Nico Neumann and Tim Whitfield. *Marketing Science*, Dec, 2019, Vol 38, No 6, pp. 918-926 (Lead Article)

39. The Surprising Breadth of 'Harbingers of Failure' with Duncan Simester and Clair Yang. *Journal of Marketing Research* 2019 Vol 56, No. 6, pp 1034-1049

40. 'Consumer privacy and the future of data-based innovation and marketing.' with Alexander Bleier and Avi Goldfarb. *International Journal of Research in Marketing* Volume 37, Issue 3, September 2020, Pages 466-480

41. 'Informational Challenges in Omnichannel Marketing: Remedies and Future Research' with Tony Cui, Anindya Ghose, Hanna Halaburda, Raghuram Iyengar, Koen Powels, S. Siriam, and Sriraman Vankatarman. *Journal of Marketing* 2021, Vol. 85(1) 103-120

42. 'Product Quality and Performance in the Internet Age: Evidence from Creationist Friendly Curriculum' with Ananya Sen. *Journal of Marketing Research* 2022, Vol 59, No.1, pp :211-29

43. 'Conducting Research in Marketing with Quasi-Experiments' with Avi Goldfarb and Yanwen Wang, (Lead Article) *Journal of Marketing* 2022, Vol 86, No 3, pp 1-20.

A-6

44. 'How Do Restrictions on Advertising Affect Consumer Search?' with Lesley Chiou, *Management Science*, 2022, Vol. 68, No. 2, pp. 866-882.

45. 'Privacy Regulation and Barriers to Public Health' with Joe Buckman and Idris Adjerid. Forthcoming at *Management Science*, 2022

46. ' What Blockchain Can and Can't Do: Applications to Marketing and Privacy' with Alex Marthews. Forthcoming at *International Journal of Research in Marketing*

47. What Type of Digital Advertising is Most Effective for B2B Prospecting? The Case of IT Decision-Makers with Nico Neumann, Kumar Subramanyam and John Marshall Conditionally accepted at *Quantitative Marketing and Economics*

48. 'TV Advertising and Online Sales: The Role of Inter-Temporal Substitution' with Anja Lambrecht and Xu Zhang Conditionally accepted at *Journal of Marketing Research*

49. Data Deserts and Black Boxes: The Impact of Socio-Economic Status on Consumer Profiling with Nico Neumann, Levi Kaplan, Alan Mislove, and Piotr Sapieżyński. Conditionally accepted *Management Science*

---

## CHAPTERS IN EDITED VOLUMES AND SUMMARY PIECES

50. 'Modeling Social Interactions: Identification, Empirical Methods and Policy Implications' with Wes Hartmann, Puneet Manchanda, Harikesh Nair, Matt Bothner, Peter Dodds, David Godes and Karthik Hosanagar, *Marketing Letters*, Vol. 19 No. 3, December 2008, pp. 287-304

51. 'Search Engine Advertising - Examining a profitable side of the long tail of advertising that is not possible under the traditional broadcast advertising model' with Avi Goldfarb, *Communications of the ACM*, Vol. 51 No. 11, November 2008, pp. 22-24

52. 'Online Advertising', with Avi Goldfarb, *Advances in Computers*, Vol. 81, March 2011, Marvin Zelkowitz (Ed), Elsevier

53. 'Substitution between Online and Offline Advertising Markets', with Avi Goldfarb, *Journal of Competition Law and Economics*, Vol. 7 No. 1, March 2011, pp. 37-44

54. 'Online Advertising, Behavioral Targeting, and Privacy', with Avi Goldfarb, *Communications of the ACM*, Vol. 54 No. 5, May 2011, 25-27

55. 'Privacy and Innovation', *Innovation Policy and the Economy*, Vol. 11, 2012, Josh Lerner and Scott Stern (Eds), NBER

56. 'The Economics of Advertising and Privacy', *International Journal of Industrial Organization*, Vol. 30 No. 3, May 2012, pp. 326-329

57. 'Empirical Research on the Economic Effects of Privacy Regulation'. *Journal on Telecommunications and High Technology Law*, Vol. 10 No. 2, Summer 2012, pp. 265-272

58. 'Social Networks, Advertising and Antitrust', with Alex Marthews, *George Mason Law Review*, 2012, Vol 19 No 5., pp. 1211-1227.

59. 'Why Managing Customer Privacy Can Be an Opportunity' with Avi Goldfarb, *Spring 2013, Sloan Management Review*

60. 'The Implications of Improved Attribution and Measurability for Antitrust and Privacy in Online Advertising Markets', *George Mason Law Review*, Vol. 2 No. 2, pp. 1025-1054 (2013).

61. 'Patent Trolls and Technology Diffusion' Chapter in NBER book 'Standards, Patents and Innovations' (2014), Timothy Simcoe, Ajay K. Agrawal, and Stuart Graham

62. 'Privacy and the Internet' Chapter 11, *Handbook of Media Economics*, 2016, Edited by Simon Anderson and Joel Waldfogel

63. Frontiers of Health Policy: Digital Data and Personalized Medicine, *Innovation Policy and the Economy*, Vol. 15, 2016, Josh Lerner and Scott Stern (Eds), NBER

64. 'Impacts of Surveillance on Behavior' with Alex Marthews, in Gray, David C. and Henderson, Stephen (Editors), *The Cambridge Handbook of Surveillance Law* (2017).

65. 'On Storks and Babies: Correlation. Causality and Field Experiments, ' with Anja Lambrecht,  *GfK Marketing Intelligence Review*, Vol 8. No 2. 2016

66. 'Field Experiments in Marketing,' with Anja Lambrecht, *Handbook of Marketing Analytics*, Edited by Natalie Mizik and Dominique Hanssens, Edward Elgar Publishing, (2018)

67. 'Can Big Data Protect a Firm from Competition?', *CPI Chronicle*, January, 2017 with Anja Lambrecht

68. Network Effects and Market Power: What Have We Learned in the Last Decade? *Antitrust* Vol. 32 No 2., Spring 2018

69. 'Inequality, Privacy and Digital Market Design', with Avi Goldfarb, Chapter in *Fair by Design* edited by Scott Kominers and Alex Teytelboym, 2017, Oxford University Press

70. 'Digital Data, Platforms and the Usual [Antitrust] Suspects: Network Effects, Switching Costs, Essential Facility' *Review of Industrial Organization* Volume 54, pp 683–694 (2019)

71. 'Antitrust and Costless Verification: An optimistic and a pessimistic view of the implications of blockchain technology' with Christian Catalini, *Antitrust Law Journal* - Volume 82 Issue 3, 2019

72. Online Advertising and Antitrust: Network Effects, Switching Costs and Data as an Essential Facility. April 2019, *'Competition Policy International'*

73. Blockchain and Identity Persistence, with Alex Marthews, Chapter in *Cryptoassets: Legal, Regulatory, and Monetary Perspective*, edited by Chris Brummer, Oxford University Press, 2019.

74. 'Digital Marketing,' with Avi Goldfarb, in the *Handbook of the Economics of Marketing*, Volume 1, edited by JP-Dube and Peter Rossi, pp. 259-290, Elsevier

75. 'Privacy Policy and Competition', with Alex Marthews. *Brookings Papers*

76. Digital Infrastructure: Does the 'Coring' of Digital Platforms make them part of Digital Infrastructure?." (2020) in 'Economic Analysis and Infrastructure Investment' edited by Edward L. Glaeser and James M. Poterba, University of Chicago Press

77. Competition in the Digital Advertising Market, The Global Antitrust Report on the Digital Economy (2021)

78. How Platforms Create Value Through Coring and Implications for Market Definition, Competition Policy International (2022)

79. Digital Disruption in Schooling and the Pandemic: Documenting the Digital Infrastructure Divide Among School Children with Ananya Sen, Societal Experts Action (2022) Network

80. Algorithmic Exclusion, Brookings Paper, (2022)

---

## Books Edited

81. The Evolution of Antitrust in the Digital Era: Essays on Competition Policy, with David Evans and Alan Fels Ao. November 9, 2020

82. Blockchain: The Insights You Need from Harvard Business Review (HBR Insights Series), 2019

83. Economic Analysis of the Digital Economy, University of Chicago Press, 2015, with Avi Goldfarb and Shane Greenstein

84. The Economics of Digitization, Edward Elgar Publishing, 2013., with Avi Goldfarb and Shane Greenstein

## Policy Writing

85. OECD Roundtable on Privacy, Report on the 'Economic Value of Online Information', December 2010

86. Written Congressional Testimony on 'Internet Privacy: The Impact and Burden of European Regulation,' U.S. House Energy and Commerce Committee, September 2011

87. Written Congressional Testimony on 'Algorithms: How Companies' Decisions About Data and Content Impact Consumers,' U.S. House Energy and Commerce Committee, November 2017

## Papers under Review

88. 'Social Advertising: How Advertising that Explicitly Promotes Social Influence Can Backfire'. Revise and resubmit at *Management Science*

89. 'Patent Trolls and Technology Diffusion: The Case of Medical Imaging' Revise and resubmit at *RAND Journal of Economics*

90. 'Third-Party Certification: The Case of Medical Devices' with Cristina Nistor Revise and resubmit at *Management Science*

91. 'Tensile Promotions in Display Advertising' with Anja Lambrecht Revise and resubmit at *Quantitative Marketing and Economics*

92. Choosing to Discover the Unknown: The Effects of Choice on Users' Attention to Online Video Advertising" with Jack Jiang Zhenhui and Cheng Luo and Cheng Yi and Xiuping Li Revise and resubmit at *Management Science*

93. 'Guns, Privacy and Crime' with Alessandro Acquisti Revise and resubmit at *Information Systems Research*

94. 'Does IT Lead to More Equal or More Unequal Treatment? An Empirical Study of the Effect of Smartphone Use on Social Inequality in Employee-Customer interactions' with Shuyi Yu and Yifei Wang. Revise and Resubmit at *Information Systems Research*.

95. The Effect of Subsidizing Digital Educational Content: Evidence from a Field Experiment with Jingcun Cao and Yifei Wang. Revise and resubmit at *Management Science*

96. Algorithmic Influence: Empirical Evidence from Microlending with Jianfeng Guo, Xitong Li and Cathy Yang. Revise and Resubmit at *Information Systems Research*.

97. Scaling Smart Contracts via Layer-2 Technologies: Some Empirical Evidence. with Wiliam Cong, Xiang Hui, and Luofeng Zhou, Revise and Resubmit at *Management Science*.

98. 'Apparent Algorithmic Discrimination and Real-Time Algorithmic Learning with Anja Lambrecht

99. 'The Digital Privacy Paradox: Small Money, Small Costs, Small Talk' with Susan Athey and Christian Catalini, and Alex Moehring

100. 'Tradeoffs in Automated Political Advertising Regulation: Evidence from the COVID-19 Pandemic' with Grazia Cecere, Clara Jean, and Vincent Lefrere

101. 'Social Distancing, Internet Access and Inequality' with Leslie Chiou

102. 'The Shifters and Virality of Hate Speech Online' with Uttara Ananthakrishnan

103. Deplatforming and the Control of Misinformation: Evidence from Parler with Saharsh Agarwal and Uttara M Ananthakrishnan

104. The Role of Delayed Data in the COVID-19 Pandemic, with Yifei Wang

---

WORK IN PROGRESS

*Data Analysis*

105. 'Big Bad Data: The Case of For-Profit College Advertising' with Avinash Gannamaneni and Avi Goldfarb

106. 'Selection and Inequality in Big Data' with Amalia Miller

107. 'Spillovers from Product Failure' with Amalia Miller

108. 'Rules For a Nascent Domain: Technological Innovation and Regulatory Uncertainty' with Christian Catalini

*Data Collection*

109. 'Mergers and Big Data: Evidence from Healthcare' with Amalia Miller

110. 'Privacy Regulation and Education IT' with Amalia Miller and Avi Goldfarb

111. 'The Lack of Appeal of Cross-Partisan Appeals: Evidence from an Experiment on Facebook' with Christina KaChapelle

112. 'The Resilience of Franchise Business Models: Evidence from the Pandemic' with Avi Goldfarb and Verina Que

*Manuscripts*

113. 'Data Privacy and Children: An Empirical Study of Mobile Applications' with Grazia Cecere, Fabrice Le Guel, Vincent Lefrere, and Pai-Ling Yin

114. 'Government Surveillance and Internet Search Behavior' with Alex Marthews

115. 'A New Method of Measuring Online Media Advertising Effectiveness: Prospective Meta-Analysis in Marketing' with Gui Liberali, Glen L. Urban, Benedict G. Dellaert, Yakov C. Bart, and S. Stremersch.

116. **Empirically evaluating two-sided network effects: The case of electronic payments**

117. 'Personalizing mental fit for online shopping applications - How the success of recommendations depends on mental categorization and mental budgeting' with Oliver Emrich and Thomas Rudolph.

---

## INVITED SEMINARS

*Universities*
1. May 2023, University of Washington
2. May 2023, TOM Group, HBS
3. April 2023, Tilburg University

4. April 2023, Yale University
5. March 2023, Emory University
6. March 2023, University of Zurich, Cryptoeconomics group
7. February 2023, CBER Forum
8. February 2023, University of Arizona
9. February 2023, Columbia University, Marketing Group
10. February 2023, New York University, IS Group
11. November 2022, LSE, Marketing Group
12. September 2022, Advertising Research Group Amazon
13. March 2022, Marketing Group, Rotman, University of Toronto
14. March 2022, IT Group, Krannert School, Purdue University
15. November 2021, Tufts University, Economics Department
16. October 2021, McGill University, Marketing Group
17. September 2021, Stockholm Business School
18. May 2021, Safegraph Seminar
19. item April 2021, Marketing Science Institute
20. April 2021, George Mason University, Law and Economics Seminar
21. March 2021, Marketing Group, University of Michigan
22. March 2021, BIDT, Bavarian Academy of Sciences and Humanities
23. February 2021, University of Virginia, Law and Economics Seminar
24. January 2021, Marketing Group, Carnegie Mellon University
25. December 2020, Boston University, Boston Digital Leadership Forum
26. December 2020, Toulouse University, France
27. November 2020, Luohan Academy, Platform Economy and Market Dynamics, Virtual Seminar
28. November 2020, John Hopkins University
29. October 2020, Wharton, Marketing Group
30. October 2020, ITAM, Mexico City
31. September 2020, Econ, Stats and ML Team, Etsy
32. June 2020, CMU Seminar
33. April 2020, Virtual Digital Economy Seminar
34. March 2020, IS group, University of Minnesota
35. February 2020, Georgia Institute of Technology, GA
36. December 2019, HBS Field Experiments Seminar, Cambridge, MA
37. November 2019, Bank of Canada, Ottawa
38. May 2019, Joint-Economics Seminar, Autonomous University of Barcelona) and the IAE (Institute for Economic Analysis)
39. March 2019, LMU Center for Advanced Management Studies in Munich
40. February 2019, Berlin Applied Micro Seminar
41. January 2019, Marketing Group, University of Bologna
42. January 2019, Marketing Group, University College, London
43. January 2019, Marketing Group, London Business School
44. November 2018, Marketing Group, HEC Paris, France
45. November 2018, Management Group, Cass Business School, City University of London, UK

*Confidential*

46. November 2018, Marketing Group, SOAS University of London
47. November 2018, All Souls College, Oxford
48. November 2018, Economics Group, Paris Telecom
49. October 2018, Marketing Group, University of Amsterdam, Netherlands
50. October 2018, Marketing Group, King's Business School, King's College, London
51. September 2018, Marketing Group, University of Frankfurt, Germany
52. June 2018, Harbin Institute of Technology, China
53. February 2018, IS/OM Group, New York University, NY
54. November 2017, Marketing Group, Rochester University, NY
55. October 2017, Marketing Group, Maryland University, MD
56. May 2017, Marketing Group, Old Dominion University
57. April 2017, Marketing Group, University of Southern California
58. March 2017, Marketing Group, Arison School of Business, IDC, Israel
59. January 2017, Distinguished Speakers Series, McGill University, Canada
60. September 2016, Technology Group, Harvard Business School, MA
61. August 2016, Southern Jiatong University, Sichuan, China
62. May 2016, Chapman University, Marketing Group
63. April 2016, Carnegie Mellon University, Public Policy Group
64. April 2016, Harvard Business School, Entrepreneurial Management Group
65. March 2016, INSEAD, Marketing Group
66. March 2016, University of Paris-Sud, Privacy Research Group
67. March 2016, Vienna University of Economics and Business, Marketing Group
68. September 2015 University of Maryland, IS Group
69. June 2015, Marketing Group, University of Cambridge, UK
70. May 2015, Marketing Group, University of Texas at Dallas, TX
71. March 2015, Health Policy Group, Georgia State University, GA
72. March 2015, Marketing Group, University of Colorado, CO
73. February 2015, Strategy Group, University of North Carolina, NC
74. January 2015, Marketing Group, Emory University, GA
75. December 2014, OPIM, Wharton School of Management, PA
76. October 2014, Economics Department, Yale University, CT
77. September 2014, Marketing Group, Boston University, MA
78. March 2014, Technology Group, University of California at Berkeley, CA
79. January 2014, Marketing Department at Texas A&M
80. November 2013, Marketing Group, University of California at Berkeley, CA
81. October 2013, Marketing Group, Tulane University, LA
82. October 2013, Marketing Group, University of Houston, TX
83. May 2013, Tuck School of Management, Dartmouth University, NH
84. March 2013, Economics Department, University of Toulouse
85. March 2013, Marketing Group, Rotterdam University
86. March 2013, Economics Department, University of Zurich
87. March 2013, Marketing group, Georgia Tech
88. January 2013, Anderson School, UCLA
89. January 2013, Marketing Group, CMU
90. October 2012, Marketing Group, Stanford University

91. October 2012, Marketing Group, Columbia University
92. October 2012, Marketing Group, University of Texas at Austin
93. September 2012, Marketing Group, Harvard Business School
94. June 2012, Strategy Group, London Business School
95. March 2012, Marketing Group, Cornell
96. February 2012, IS Group, Indian School of Business
97. February 2012, Marketing Group, Wharton
98. January 2012, Marketing Group, UCLA
99. November 2011, Marketing Group, University of Rochester
100. October 2011, Marketing Group, University of Zurich
101. October 2011, Department of Law and Economics, Swiss Federal Institute of Technology, Zurich
102. May 2011, Marketing Group, National University of Singapore
103. May 2011, IS Group, National University of Singapore
104. May 2011, Strategy Group, LMU Munich
105. May 2011, Marketing Group, New York University
106. March 2011, Marketing Group, Florida University
107. February 2011, IS Group, New York University
108. November 2010, European School of Management and Technology
109. October 2010, Marketing Group, Yale University
110. October 2010, Networked Business Group, Harvard Business School
111. September 2010, TIES Group, MIT Sloan
112. July 2010, Department of Economics, University of Mannheim
113. March 2010, Marketing Group, Wharton School, University of Pennsylvania
114. January 2010, Marketing Group, University of Michigan
115. November 2009, Marketing Group, University of California at Berkeley
116. October 2009, Digital Business Seminar, MIT Sloan
117. December 2008, Marketing Group, MIT Sloan
118. November 2008, Marketing Group, Rady School of Business, UCSD
119. September 2008, Strategy Group, MIT Sloan
120. May 2008, Digital Strategy Group, Tuck School of Business, Dartmouth University
121. April 2008, Kellogg Management and Strategy Group, Northwestern University
122. March 2008, Marketing Group, Duke University
123. March 2008, Strategy Group, Chicago GSB
124. July 2007, Marketing Group, London Business School, London, UK
125. April 2007, Marketing Group, Chicago GSB
126. March 2007, Marketing Group, Rotman School, University of Toronto
127. November 2005, Economics Department, Harvard University
128. October 2004-February 2005 (Job Market): NYU Stern, University of Michigan, University of Arizona, University of British Columbia, Federal Reserve Board, Federal Reserve Bank of New York, Harvard Business School, Kellogg, MIT Sloan, Federal Reserve Bank of Chicago, Stanford Economics Department

*Other*
129. April 2021, American Enterprise Institute

*Confidential*

130. June 2020, EE Times- Privacy and Security during Covid-19
131. May 2020, The Digital Economy & The Coronavirus, Bertelsmann Foundation Seminar
132. April 2020, Technology Policy Institute
133. October 2018, Digital Competition Expert Panel, HM Treasury, UK
134. October 2018, Competition and Markets Authority, UK
135. January 2018, IMF
136. December 2017, Technology Policy Institute
137. October 2016, Federal Communications Commission
138. April 2015, Federal Communications Commission
139. November 2014, Office of Research at the Consumer Financial Protection Bureau
140. April 2014, Big Data Working Group, The White House.
141. February 2014, Main Street Patent Coalition, Panel hosted at the Senate by Senator Orrin Hatch
142. July 2013, Federal Communications Commission
143. August 2012, DG Competition, European Commission, Brussels
144. August 2012, Technology Policy Institute Conference, Aspen
145. December 2011, Havas Digital, New York
146. June 2011, Eneca
147. September 2010, Federal Trade Commission
148. September 2010, Google European Public Policy Unit, Paris
149. July 2009, Information Technology and Innovation Foundation, Washington DC

---

## PRESENTATIONS OF RESEARCH AT CONFERENCES

1. June 2023, Marketing Science, Miami, FL
2. June 2023, Doctoral Consortium, Miami, FL
3. April 2023, University College London, Competition Law and Policy in a Data-Driven Economy
4. December 2022, Keynote 'Conference on Artificial Intelligence, Machine Learning and Business Analytics, Harvard University
5. May 2022, Keynote ' AI and Analytics for Social Causes' conference, University of Maryland, College Park
6. December 2021, Keynote, 4th Research on Innovation, Science and Entrepreneurship Workshop, Max Planck Institute
7. November 2021, Keynote, Tokenomics, NYU
8. June 2021, Marketing Science
9. June 2021, OECD workshop on the Value of Data
10. June 2021, Chief Competition Economist ECN working group Annual Meeting
11. May 2021, International Finance Corporation, World Bank IFC Digital Jobs
12. May 2021, G20 Framework Working Group Seminar on Data Access and Availability
13. May 2021, Data and innovation: solutions and business models in the digital economy (Brazil)
14. March 2021, Digital Economics Seminar, Digital Tutorial

15. December 2020, Digital Economics Research Network Conference
16. December 2020, Conference on Artificial Intelligence, Machine Learning, and Business Analytics
17. December 2020, Health Systems Innovation Advisory Board Meeting
18. November 2020, 2nd Luohan Academy Frontier Dialogue - Platform Economy and Market Dynamics
19. October 2020, Policy Toolkit for a Better Europe, European Commission
20. September 2020, ICN Annual conference
21. June 2020, Marketing Science
22. June 2020, International Competition Network, ' Competition law enforcement at the intersection of Competition, Consumer Protection, and Privacy'
23. November 2019, ABA Fall Forum: The Tech Summit, Washington DC.
24. November 2019, Annual Challenges to Antitrust in a Changing Economy, Harvard Law School
25. October 2019, World Bank Platforms Summit, Washington DC.
26. September 2019, Economics of AI Doctoral Consortium, Toronto
27. July 2019, Quantitative Marketing and Structural Econometrics Workshop, Northwestern University
28. June 2019, Marketing Science, Rome
29. June 2019, Keynote Speaker, ZEW Conference on the Economics of Information and Communication Technologies, Mannheim
30. June 2019 Keynote Speaker, Munich Summer Institute, Munich
31. May 2019, Keynote Speaker, 3rd Doctoral Workshop on the Economics of Digitization, Brussels
32. November 2019, FTC Hearings on Big Data, Privacy, and Competition
33. October 2019, FTC Hearings on Platform Economics, George Mason University
34. June 2018, Antitrust and Big Data, Penn Wharton China Center Conference, Beijing
35. June 2018, Marketing Science
36. May 2018, Boston College Digital Innovation Workshop
37. December 2017, Mobile Marketing and Big Data Conference, NYU
38. September 2017, NBER Economics of AI Conference
39. July 2017, BU Platforms Conference
40. July 2017, NBER Digitization Meetings
41. June 2017, Marketing Science
42. June 2017, Regulation of Algorithms, Berlin
43. May 2017, Boston College Digital Innovation Workshop
44. November 2016, ICANN Public Meetings
45. October 2016, Conference on Digital Experimentation, Cambridge, MA
46. September 2016, FTC Consumer Protection Conference, Washington, DC
47. September 2016, George Washington roundtable on Platforms, Washington DC
48. May 2016, Competing with Big Data, Brugel, Brussels, Belgium
49. April 2016, NBER Innovation and Policy, Washington DC
50. April 2016, Financial Services Roundtable, NYC
51. March 2016, Digitization Tutorial, NBER
52. January 2016, PrivacyCon, FTC Conference, Washington, DC

*Confidential*

53. July 2015, NBER Law and Economics (co-author presented), Cambridge, MA
54. July 2015, NBER Economics of Digitization, Cambridge, MA
55. June 2015, 'The Future of Research in the Digital Society', French Ministry of Culture and Communication - Toulouse School of Economics, Paris, France
56. June 2015, Marketing Science, Baltimore, MD
57. June 2015, Doctoral Consortium, Baltimore, MD
58. March 2015, IP Leadership Conference, Washington, DC
59. February 2015, Patents in Theory and Practice, Washington, DC
60. June 2014, Marketing Science, Atlanta, GA
61. May 2014, Boston College Social Media Workshop, Boston, MA
62. January 2014, American Economic Association Meetings
63. July 2013, Marketing Science, Istanbul, Turkey
64. June 2013, Searle Center Conference on Internet Search and Innovation, Chicago, IL
65. April 2013, Brown University Mini-Networks Conference
66. February 2013, WSDM 2013 Conference (Keynote Speaker), Rome, Italy
67. January 2013, American Economic Association Meetings, San Diego, CA (Co-author presented)
68. December 2012, New York Computer Science and Economics Day
69. November 2012, Search and Competition Conference, Melbourne Australia
70. October 2012, Economics of Personal Data, (Keynote Speaker), Amsterdam
71. August 2012, Amsterdam Symposium on Behavioral and Experimental Economics
72. July 2012, Fudan University Marketing Research Symposium, China
73. June 2012, Searle Center Conference on Internet Search and Innovation, Chicago, IL
74. June 2012, Innovation, Intellectual Property and Competition Policy Conference, Tilburg, Netherlands
75. June 2012, Marketing Science, Boston, MA
76. June 2012, Social Media and Business Transformation, Baltimore, MD
77. May 2012, The Law and Economics of Search Engines and Online Advertising, George Mason University, Arlington, VA
78. February 2012, NBER Economics of Digitization (co-author presented), Cambridge, MA
79. January 2012, Symposium on Antitrust and High-Tech Industries, George Mason University, VA
80. January 2012, Patents, Standards and Innovation, Tucson, AZ
81. January 2012, Econometric Society Meetings, Chicago, IL
82. January 2012, AEA Meetings (2 papers), Chicago, IL
83. December 2011, Economics of Privacy Workshop, Boulder, CO
84. November 2011, Economics and Computation Day, Cambridge, MA
85. November 2011, HBS Strategy Research Conference, Boston, MA
86. November 2011, The Law and Economics of Internet Search and Online Advertising Roundtable, George Mason University, Arlington, VA
87. November 2011, Patents Statistics for Decision Makers, Alexandria, VA
88. October 2011, Workshop on Health IT and Economics, Washington, DC
89. October 2011, Innovation, Organizations and Society, University of Chicago, IL
90. October 2011, Direct Marketing Research Summit, Boston, MA
91. September 2011, Invited Session 'Economics and Marketing', EARIE, Stockholm, Sweden.

92. July 2011, NBER Economics of Digitization, Cambridge, MA
93. July 2011, SICS, Berkeley, CA
94. June 2011, The Law and Economics of Search Engines and Online Advertising, George Mason University, Arlington, VA
95. June 2011, Workshop on the Economics on Information Security, Washington, DC
96. June 2011, Marketing Science (3 papers), Houston, TX
97. June 2011, Searle Center Conference on Internet Search and Innovation, Chicago, IL
98. May 2011, Boston College Social Media Workshop, Boston, MA
99. May 2011, Technology Pricing Forum, Boston, MA
100. April 2011, NBER Innovation Policy and the Economy, Washington, DC
101. April 2011, International Industrial Organization Conference (3 papers), Boston, MA
102. March 2011, Technology Policy Institute, Washington, DC
103. February 2011, NBER Economics of Digitization (co-author presented), Palo Alto, CA
104. January 2011, Sixth bi-annual Conference on The Economics of Intellectual Property, Software and the Internet (2 papers, plenary speaker), Toulouse, France
105. January 2011, MSI Young Scholars Conference, Park City, UT
106. December 2010, Workshop on Information Systems and Economics, Washington University of St. Louis (co-author presented), St. Louis, MO
107. December 2010, OECD Economics of Privacy Roundtable, Paris, France
108. November 2010, Net Institute Conference, New York, NY
109. October 2010, Workshop on Media Economics and Public Policy (co-author presented), New York, NY
110. October 2010, Workshop on Health IT and Economics, Washington, DC
111. September 2010, ITIF and CAGW Privacy Working Group Meetings, Washington, DC
112. September 2010, Medical Malpractice Conference, Mohegan, CT
113. September 2010, Search and Web Advertising Strategies and Their Impacts on Consumer Workshop, Paris, France
114. July 2010, NBER Meetings (IT), Cambridge, MA
115. July 2010, NBER Meetings (Healthcare and IT), Cambridge, MA
116. July 2010, SICS, Berkeley, CA
117. July 2010, Keynote Speaker, 8th ZEW Conference on the Economics of Information and Communication Technologies, Mannheim, Germany
118. June 2010, American Society of Health Economists Conference, Cornell, NY
119. June 2010, Marketing Science (2 papers), Koeln, Germany
120. June 2010, Workshop on the Economics of Information Security (2 papers), Harvard, MA
121. January 2010, AEA Meetings, Atlanta, GA
122. December 2009, Workshop on Information Systems and Economics, Scottsdale, AZ
123. November 2009, WPP/Google Marketing Awards, Cambridge, MA
124. July 2009, NBER meetings (IT), Cambridge, MA
125. June 2009, IHIF Debate on Privacy, Washington, DC
126. June 2009, Marketing Science, Ann Arbor, MI
127. April 2009, International Industrial Organization Conference, Boston, MA
128. January 2009, Information Security Best Practices Conference, Philadelphia, PA
129. January 2009, Modeling Social Network Data Conference, Philadelphia, PA
130. July 2008, NBER Meetings (Productivity), Cambridge, MA

131. July 2008, SICS, Berkeley, CA
132. July 2008, Fourth Workshop on Ad Auctions, Chicago, MA
133. June 2008, Marketing Science, Vancouver, BC
134. May 2008, International Industrial Organization Conference, Richmond, VA
135. April 2008, Net Institute Conference, New York, NY
136. November 2007, NBER Health Meetings (Co-author presented), Boston, MA
137. July 2007, SICS, Berkeley, CA
138. June 2007, Workshop on the Economics of Information Security, Pittsburgh
139. June 2007, Choice Symposium, Philadelphia, PA
140. May 2007, eCommerce Research Symposium, Stamford, CT
141. April 2007, Net Institute Conference, New York, NY
142. April 2007, International Industrial Organization Conference, Savannah, GA
143. March 2007, Health Economics Conference, Tucson, AZ
144. February 2007, NBER Winter Meetings, Palo Alto, CA
145. January 2007, Economics of the Software and Internet Industries (2 Papers), Toulouse, France
146. October 2006, QME Conference, Stanford University, CA
147. June 2006, Marketing Science, Pittsburgh, PA
148. April 2006, International Industrial Organization Conference, Boston, MA
149. October 2005, NEMC Conference, Boston, MA
150. October 2005, TPRC Conference, Washington, DC
151. June 2005, CRES Industrial Organization Conference, Washington University in St. Louis, MO
152. July 2002, Payment Systems Conference, IDEI, Toulouse, France

---

## PROFESSIONAL SERVICE

- Senior Editor, Marketing Science
- Director of the program on the Economics of Digitization at The National Bureau of Economic Research.
- Co-Director of the program on the Artificial Intelligence at The National Bureau of Economic Research.
- **Vice President (Education)**, ISMS 2019-2021
- **Associate Editor:** Management Science, Marketing Science, Journal of Marketing Research, International Journal of Research in Marketing
- **Associate Editor:** Information Systems Research, Special Issue on Social Media and Business Transformation
- **Departmental Editor:** Quantitative Marketing and Economics
- **Editor:** The Economics of the Internet, Palgrave Dictionary of Economics
- **Co-Editor:** NBER: The Economics of Digitization - An Agenda
- **Co-Editor:** Information Economics and Policy, Special Issue on Economics of Digital Media Markets
- **Editorial Review Board:** Journal of Marketing, ISR Special Issue on Managing Digital Vulnerabilities, Journal of Economic Literature

*Confidential*

- **Conference Program Committees**
  - 2022 Co-organizer, NBER Conference on Digital Economics
  - 2022 Co-organizer, NBER Conference on the Economics of Artificial Intelligence
  - 2021 Co-organizer, NBER Conference on Digital Economics
  - 2021 Co-organizer, NBER Conference on the Economics of Artificial Intelligence
  - 2020 Co-organizer, NBER Conference on the Economics of Artificial Intelligence
  - 2020 Organizer, ISMS Doctoral Consortium
  - 2019 Co-organizer, NBER Conference on the Economics of Artificial Intelligence
  - 2019 Scientific Committee: ZEW Conference on the Economics of Information and Communication Technologies
  - 2019 Program Committee: Workshop on the Economics of Information Security
  - 2019 Scientific Committee: IP Statistics for Decision Makers
  - 2018 Co-organizer, NBER Conference on the Economics of Artificial Intelligence
  - 2017 Scientific Committee: IP Statistics for Decision Makers
  - 2017 Scientific Committee: ZEW Conference on the Economics of Information and Communication Technologies
  - 2017 Program Committee: Workshop on the Economics of Information Security
  - 2016 Program Committee: Workshop on the Economics of Information Security
  - 2016 Scientific Committee: ZEW Conference on the Economics of Information and Communication Technologies
  - 2015 Scientific Committee: Competition, Standardization and Innovation
  - 2015 Scientific Committee: Intellectual Property Statistics for Decision Makers
  - 2015 Associate Editor: ICIS 2015, Healthcare track
  - 2015 Scientific Committee: European Association for Research in Industrial Economics
  - 2015 Program Committee: ACM Conference on Economics and Computation
  - 2015 Program Committee: Workshop on the Economics of Information Security
  - 2015 Chief-Organizer: Quantitative Marketing and Economics Conference
  - 2015 Scientific Committee: ZEW Conference on the Economics of Information and Communication Technologies
  - 2014 Scientific Committee: European Association for Research in Industrial Economics
  - 2014 Scientific Committee: Conference on the Economics of Information and Communication Technologies
  - 2014 Program Committee: International Conference on Big Data and Analytics in Healthcare
  - 2013 Program Committee: Quantitative Marketing and Economics
  - 2013 Scientific Committee: European Association for Research in Industrial Economics Conference
  - 2013 Scientific Committee: Conference on the Economics of Information and Communication Technologies
  - 2013 Program Committee: Workshop on the Economics of Information Security
  - 2013 Associate Editor of Personal Data Markets Track: ECIS 2013
  - 2012 Program Committee: European Association for Research in Industrial Economics Conference
  - 2012 Program Committee (Conference Organizer) NBER: The Economics of Digitization Pre-Conference, June 2012

- 2012 Scientific Committee: Conference on the Economics of Information and Communication Technologies
- 2012 Senior Program Committee: 13th ACM Conference on Electronic Commerce
- 2012 Program Committee: Workshop on the Economics of Information Security
- 2011 Scientific Committee: European Association for Research in Industrial Economics Conference
- 2011 Scientific Committee: Conference on the Economics of Information and Communication Technologies
- 2011 Program Committee: Ad Auctions Workshop
- 2011 Program Committee: Workshop on the Economics of Information Security
- 2010 Program Committee: Workshop on IT and Economic Growth
- 2010 Program Committee: Conference on Health IT and Economics
- 2010 Program Committee: Workshop on the Economics of Information Security
- 2009 Program Committee: Workshop on the Economics of Information Security
- 2008 Program Committee: Workshop on the Economics of Information Security
- 2008 Program Committee: Ad Auctions Workshop

**External Affiliations**
- **Affiliate:** CESifo Research Network
- **Advisory Board:** Future of Privacy Forum
- **Advisory Board:** Academic Advisory Counsel, Brookings Center on Regulation and Markets

## MIT Service

- 2015- Faculty Chair, PhD program
- 2015- EMBA Committee
- 2015- ASB Committee
- 2014- MIT Sloan Gender Equity Committee
- 2013-2014 Group Head, Marketing Group
- 2013-2014 Chair, Marketing Faculty Search Committee
- 2013-2014 MIT Committee on Undergraduate Admissions and Financial Aid
- 2011 North East Marketing Conference Coordinator
- 2011 MIT Sloan Marketing Conference, Panel Moderator
- 2011 Sloan Women in Management Conference, Panel Moderator
- 2005, 2008, 2012 Marketing Faculty Search Committee

## Advising

- 2019: Shuyi Yu, PhD Thesis supervisor
- 2016: Abhishek Nagaraj, PhD Thesis advisor
- 2012: Cristina Nistor, PhD Thesis advisor
- 2010: Katherine Molina, Masters Thesis

- 2008: Dinesh Shenoy, Masters Thesis
- 2007: James Kelm, Masters Thesis

---

## GRANTS AND SUPPORT

*Academic Grants*

| | | |
|---|---|---|
| 2018 | Sloan Foundation Grant (2018-2021), 'NBER Project on the Economics of Artificial Intelligence' - Grant supporting series of NBER Economics of AI Conferences. (Joint with Ajay Agrawal, Joshua Gans and Avi Goldfarb) | $914,250 |
| 2017 | Net Institute Grant (Joint with Anuj Kapoor) | $3,000 |
| 2016 | Net Institute Grant (Joint with Christian Catalini) | $6,000 |
| 2013 | MSI research Grant 4-1840 (Joint with Anja Lambrecht) | $10,200 |
| 2011 | Tilburg Law and Economics Center (TILEC) IIPC grant | $21,000 |
| 2011 | Google Grant | $50,000 |
| 2011 | Junior Faculty Research Assistance Program | $30,000 |
| 2011 | Net Institute Grant | $6,000 |
| 2011 | NBER Digitization Grant | $20,000 |
| 2011 | NSF CAREER Award | $502,000 |
| 2010 | Time-Warner Research Program on Digital Communications | $20,000 |
| 2010 | Net Institute Grant | $6,000 |
| 2009 | Net Institute Grant | $6,000 |
| 2009 | The James H. Ferry, Jr. Fund for Innovation in Research Education | $50,000 |
| 2009 | Google/WPP Grant (Joint with Avi Goldfarb) | $55,000 |
| 2008 | Net Institute Grant | $15,000 |
| 2007 | Net Institute Grant | $8,000 |
| 2006 | Net Institute Grant (Joint with Stephen Ryan) | $8,000 |

*Industry Research Grants*

| | | |
|---|---|---|
| 2015 | CCIA Research: Research into Sustainable Competitive Advantage and Big Data (Joint with Anja Lambrecht) | $60,000 |
| 2015 | E-Logic: Research into Vertical Mergers and Patent Litigation | $60,000 |
| 2014 | CCIA Research: Research into Patent Litigation and Entrepreneurship | $100,000 |
| 2012 | Google Australia: Research into Measurement and Attribution | $50,000 |

---

## EXPERT TESTIMONY

- I have provided expert testimony for Accenture, Atlantic Recording Company, ADT, Bausch Health, Broadcast Music Inc, Capitol Records, Context Logic, Facebook, Google,

IAC, Lyft, Marriott, Match Group, Microsoft, Plaintiffs in Blue Cross Blue Shield Antitrust Litigation , Revizer, Reynolds Automotive, RDIC, Samsung, Sony, Sound Exchange, Verizon (Yahoo and AOL), United Health Group, US Debtors (Nortel Bankrupcy Proceedings), Walworth Investments and Warner Brothers.

---

TEACHING

- 15.818, Pricing (MBA Elective) 2006-
- 15.732, Marketing Management for Senior Executives 2012-
- 15.726, Pricing (EMBA Elective) 2012-
- 15.838, Doctoral Seminar, Spring 2006, Fall 2007, Fall 2013
- Marketing Management, Asian School of Business, 2016
- Guest Lecturer: HST.936: Health information systems to improve quality of care in resource-poor settings, 2014
- Executive Education: Blockchain Technologies: Business Innovation and Application, 2018-
- Executive Education: Marketing Innovation, 2016-
- Executive Education: Pricing 4dX, 2016-
- Executive Education: Strategic Marketing for the Technical Executive, 2012-2015
- Executive Education: Systematic Innovation of Products, Processes, and Services, 2013-
- Executive Education: Platform Strategy: Building and Thriving in a Vibrant Ecosystem, 2014-
- Executive Education: Global Executive Academy (multi-language), 2013, 2014
- Executive Education: Entrepreneurship Development Program, 2012-
- Faculty Coach, Takeda Leadership Academy, 2016-18

# APPENDIX B

## Catherine Tucker Expert Testimony

1. In Re: California Gasoline Spot Market Antitrust Litigation, Case No. 3:20-cv-03131-JSC, United States District Court for the Northern District of California, San Francisco Division
   - Expert Report (2023)

2. The People of the State of California v. Vitol, Inc.; SK Energy Americas, Inc.; SK Trading International Co. Ltd.; and Does 1-30, Case No. CGC-20-584456, Superior Court of the State of California County of San Francisco
   - Expert Report, Rebuttal Report, and Reply Report (2023)

3. In Re: Lyft Rideshare Cases, Case No. CJC-20-005061, Superior Court of the State of California County of San Francisco
   - Deposition (2023)

4. In Re: Google Play Store Antitrust Litigation, Case No. 3:21-md-2981, United States District Court for the Northern District of California
   - Expert Report (2022) and Deposition (2023)

5. Twitter, Inc., v. Elon R. Musk, X Holdings I, Inc., and X Holdings II, Inc., Civil Action No. 2022-0613-KSJM, In the Delaware Court of Chancery
   - Expert Report (2022)

6. United States of America et al. v. United Health Group Incorporated et al., Case No. 1:22-cv-00481, In the United States District Court for the District of Columbia
   - Expert Report, Deposition, and Trial (2022)

7. United States of America, et al., v. Google LLC, Case No.: 1:20-cv-03010-APM, and State of Colorado, et al., v. Google LLC, Case No.: 1:20-cv-03715-APM, In the United States District Court for the District of Columbia
   - Expert Report, Rebuttal Report, Reply Report, Surrebuttal Report, and Deposition (2022)

8. Mehdi Hassan, Andrew Zucarelli, Susan Wells and Keisha Stephenson v. Facebook, Inc. and Facebook Canada Ltd., Case No. CV-18-00608282-00CP, Ontario Superior Court of Justice.
   - Expert Report and Reply Report (2022)

9. Atlantic Recording Corporation, Laface Records LLC, Sony Music Entertainment, UMG Recordings, Inc., Warner Bros. Records Inc., Arista Music, Arista Records LLC, Bad Boy Records LLC, Capitol Records, LLC, Elektra Entertainment Group Inc., Roc-A-Fella Records, LLC, Sony Music Entertainment US Latin LLC, Zomba Recording LLC, v. Spinrilla, LLC and Jeffery Dylan Copeland, Civil Action No. 1:17-cv-00431, United States District Court for the Northern District of Georgia, Atlanta Division
   - Expert Report and Deposition (2022)

10. Broadcast Music, Inc. v. North American Concert Promoters Association., 18 Civ. 8749, Related to United States v. Broadcast Music, Inc., 64 Civ. 3787, United States District Court Southern District of New York
    - Expert Report, Deposition, and Trial (2022)

11. In Re: Marriott International Customer Data Breach Litigation, MDL No.: 19-md-2879, United States District Court for the District of Maryland
    - Expert Report and Deposition (2021) and Hearing (2022)

12. Cox Automotive, Inc.; Autotrader.com, Inc.; Dealer Dot Com, Inc.; Dealertrack, Inc.; Homenet, Inc.; Kelley Blue Book Co., Inc.; Vauto, Inc.; Vinsolutions, Inc.; and Xtime, Inc., v. The Reynolds and Reynolds Company, AAA Case No. 01-19-0000-4548, American Arbitration Association
    - Expert Report and Deposition (2021)

13. dotStrategy, Co., Individually and On Behalf of All Other Similarly Situated, v. Facebook, Inc., Case No. 20-cv-00170-WHA, United States District Court for the Northern District of California
    - Expert Report and Deposition (2021)

14. Deborah Louise Douez, v. Facebook, Inc., Case No. VLC-S-S-122316, Supreme Court of British Columbia, Vancouver Registry
    - Expert Report and Cross-Examination (2021)

15. Sean Rad, Plaintiff/Counterclaim-Defendant, Paul Cafardo, Gareth Johnson, Alexa Mateen, Justin Mateen, and Ryan Ogle, Plaintiffs, v. IAC/InteractiveCorp, Match Group, Inc., and Match Group, LLC, Defendants/Counterclaim-Plaintiffs. Index No. 654038/2018, Supreme Court of the State of New York, County of New York
    - Expert Report, Deposition, and Trial (2021)

16. TravelPass Group, LLC, Partner Fusion, Inc., Reservation Counter, LLC, v. Caesars Entertainment Corporation, Choice Hotels International, Inc., Hilton Domestic Operating Company Inc., Hyatt Hotels Corporation, Marriott International, Inc., Red Roof Inns, Inc., Six Continents Hotels, Inc., Wyndham Hotel Group, LLC., Case No. 5:18-cv-152-RWS-CMC, United States District Court, Eastern District of Texas, Texarkana Division
    - Expert Report, Deposition, and Trial (2021)

17. DZ Reserve, and Cain Maxwell (d/b/a Max Martialis) individually and on behalf of others similarly situated v. Facebook, Inc., Case No. 3:18-cv-04978, United States District Court, Northern District of California
    - Expert Report and Deposition (2021)

18. Integritymessageboard.com. LLC, v. Facebook, Inc., Case No. 4:18-cv-05286-PJH, United States District Court, Northern District of California
    - Expert Report and Deposition (2021)

19. In re: Blue Cross Blue Shield Antitrust Litigation (MDL No. 2406), Master File No. 2:13-CV-20000-RDP, United States District Court, Northern District of Alabama, Southern Division
    - Expert Report and Deposition (2021)

20. In Re: Glumetza Antitrust Litigation, Case No. 3:19-cv-05822-WHA, United States District Court for the Northern District of California
    - Expert Report and Deposition (2020)

21. In re Determination of Rates and Terms for Digital Performance of Sound Recordings and Making of Ephemeral Copies to Facilitate those Performances (Web V), CaseNo. 19-CRB-0005-WR (2021-2025), United States Copyright Royalty Judges, Washington, D.C.
    - Expert Reports (2019, 2020), Deposition (2020) and Hearing (2020)

22.   People v. Uber Technologies, Inc., et al., Case No. CGC-20-584402, Superior Court of the State of California, County of San Francisco
      – Declaration and Supplemental Declaration (2020)

23.   John Rogers, et al., v. Lyft, Inc., Case No. CGC-20-583685, Superior Court of the State of California, County of San Francisco
      – Declaration (2020)

24.   Melody Cunningham, et al., v. Lyft, Inc., et al., Case No. 1:19-cv-11974, United States District Court, District of Massachusetts
      – Declaration (2020)

25.   Stephen Adkins, et al., v. Facebook, Inc., Case No. 18-CV-05982-WHA, United States District Court, Northern District of California
      – Expert Report and Deposition (2019)

26.   Walworth Investments - LG, LLC vs Mu Sigma, Inc. and Dhiraj C. Rajaram, Defendant, Case No. 2016-L-002470, Circuit Court of Cook County, Illinois County Department - Law Division
      – Expert Report (2019)

27.   DealDash OYJ and DealDash Inc, Plaintiffs vs, Contextlogic Inc. d/b/a Wish, Defendant, Case No. 18-cv-02353-MMC, United States District Court for the Northern District of California
      – Expert Report and Deposition (2019)

28.   Tri-City, LLC; and Endor Car and Driver, LLC, Petitioners v. New York City Taxi and Limousine Commission, Supreme Court of the State of New York and County of New York
      – Expert Report (2019)

29.   In Re Disposable Contact Lens Antitrust Litigation. No. 3:15-md-2626-J-20JRK United States District Court, Middle District of Florida, Jacksonville Division
      – Expert Report and Deposition (2018, 2020)

*Confidential*

# APPENDIX C

# Materials Relied Upon

## Legal Documents

Consolidated Amended Complaint, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, July 26, 2021.

Plaintiffs' Notice of Motion and Motion for Class Certification, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919-CW, United States District Court, Northern District of California, Oakland Division, October 21, 2022.

## Plaintiff Expert Reports

Expert Report of Daniel A. Rascher, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, October 21, 2022, and associated backup.

Expert Report of Edwin S. Desser, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, October 21, 2022.

## Defendant Expert Reports

Expert Report of Barbara Osborne, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, April 27, 2023.

Expert Report of Robert Thompson, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, April 28, 2023.

## Fact Witness Declarations

Declaration of Candice Storey Lee, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, March 3, 2023.

Declaration of Chad Weiberg, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, April 28, 2023.

Declaration of David Flores, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, April 24, 2023.

Declaration of Gary Arrick, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, October 14, 2022.

Declaration of George Kliavkoff, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, April 24, 2023.

Declaration of Mack Rhoades, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, April 25, 2023.

Declaration of Greg Sankey, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, April 11, 2023.

Declaration of Steven J. Scebelo, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, September 26, 2022.

Supplemental Declaration of Gary Arrick, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, April 19, 2023.

Supplemental Declaration of Steven J. Scebelo, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, April 5, 2023.

**Plaintiff Expert Depositions**

Deposition of Daniel Rascher, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, January 10, 2023.

Videotaped Deposition of Edwin Desser, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, January 12, 2023.

**Named Plaintiff Depositions**

Video-Recorded Deposition of Grant House, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, February 10, 2023.

Videotaped Deposition of Sedona Prince, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, January 19, 2023.

Videotaped Deposition of Tymir Oliver, *In Re College Athlete NIL Litigation*, Case No. 4:20-cv-03919 CW, United States District Court, Northern District of California, Oakland Division, January 23, 2023.

**Documents from Related Matters**

Expert Reply Report of Daniel A. Rascher on Economic Liability Issues for the Injunctive Classes, *In Re National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust Litigation*, Case No. 4:14-md-2541-CW and Case No. 4:14-cv-02758-CW, United States District Court, Northern District of California, Oakland Division, June 21, 2017, and associated backup.

Videotaped Deposition of Joel Laurence Linzner, *In Re NCAA Student-Athlete Name & Likeness Licensing Litigation*, Case No. 4:09-cv-1967 CW, United States District Court, Northern District of California, December 18, 2012.

**Bates-Stamped Documents**

EA_NIL_00000268

EA_NIL_00000523

NCAAGIA02196312

NCAAPROD190585

**Data**

NCAA Transfer Portal data as of January 25, 2023.

247Sports recruitment data received from Cirque Analytics.

Social media data received from Cirque Analytics.

University Squad Lists, 2021-22 Academic Year, received from Cirque Analytics.

**Academic Literature**

Abdulkadiroglu, Atila, Parag A. Pathak, and Alvin E. Roth, "The New York City High School Match," *American Economic Review*, Vol. 95, No. 2, 2005, pp. 364-367.

Anderson, Simon P. and Bruno Jullien, "Chapter 2, The Advertising-Financed Business Model in Two-Sided Media Markets," in *Handbook of Media Economics*, Vol. 1A, Elsevier, 2015, pp. 42-90.

Andreff, Wladimir, "Some Comparative Economics of the Organization of Sports: Competition and Regulation in North American vs. European Professional Team Sports Leagues," *The European Journal of Comparative Economics*, Vol. 8, No. 1, 2011, pp. 3-27.

Ashenfelter, Orley C., et al., "Labor Market Monopsony," *Journal of Labor Economics*, Vol. 28, No. 2, 2010, pp. 203-210.

Atkinson, Scott, et al., "Revenue Sharing as an Incentive in an Agency Problem: An Example from the National Football League," *RAND Journal of Economics*, Vol. 19, No. 1, 1988, pp. 27-43.

Baccara, Mariagiovanna, et al., "A Field Study on Matching with Network Externalities," *American Economic Review*, Vol. 102, No. 5, 2012, pp. 1773-1804.

Borghans, Lex and Loek Groot, "Superstardom and Monopolistic Power: Why Media Stars Earn More Than Their Marginal Contribution to Welfare," *Journal of Institutional and Theoretical Economics*, Vol. 154, No. 3, 1998, pp. 546-571.

Buchholz, Nicholas et al., "The Value of Time: Evidence From Auctioned Cab Rides," *NBER Working Paper*, No. 27087, 2020, pp. i-63.

"Chapter 4, Quantifying Damages" in *Proving Antitrust Damages: Legal and Economic Issues*, Third Edition, American Bar Association, 2017, pp. 87-102.

"Chapter 8, Overcharges" in *Proving Antitrust Damages: Legal and Economic Issues*, Third Edition, American Bar Association, 2017, pp. 221-273.

Elberse, Anita, *Blockbusters: Hit-Making, Risk-Taking, and the Big Business of Entertainment*, First Edition, Henry Holt and Company, 2013.

El-Hodiri, Mohamed and James Quirk, "An Economic Model of a Professional Sports League," *Journal of Political Economy*, Vol. 79, No. 6, 1971, pp. 1302-1319.

Evans, David S., "Attention Platforms, the Value of Content, and Public Policy," *Review of Industrial Organization*, Vol. 54, February 24, 2019, pp. 775-792.

Evans, David S., "The Economics of Attention Markets," 2020, pp. 1-41.

Falkinger, Josef, "Limited Attention as a Scarce Resource in Information-Rich Economies," *The Economic Journal*, Vol. 118, No. 532, 2008, pp. 1596-1620.

Fort, Rodney and James Quirk, "Cross-Subsidization, Incentives, and Outcomes in Professional Team Sports Leagues," *Journal of Economic Literature*, Vol. 33, No. 3, 1995, pp. 1265-1299.

Gale, D. and L. S. Shapley, "College Admissions and the Stability of Marriage," *The American Mathematical Monthly*, Vol. 69, No. 1, 1962, pp. 9-15.

Goldfarb, Avi and Catherine Tucker, "Digital Economics," *Journal of Economic Literature*, Vol. 57, No. 1, 2019, pp. 3-43.

Goldfarb, Avi and Catherine Tucker, "Standardization and the Effectiveness of Online Advertising," *Management Science*, Vol. 61, No. 11, 2015, pp. 2707-2719.

Goldszmidt, Ariel, et al., "The Value of Time in the United States: Estimates from Nationwide Natural Field Experiments," *NBER Working Paper*, No. 28208, 2020, pp. i-58.

Goto, Masahiro, et al., "Designing Matching Mechanisms under General Distributional Constraints," *American Economic Journal: Microeconomics*, Vol. 9, No. 2, 2017, pp. 226-262.

Koenig, Felix, "Technical Change and Superstar Effects: Evidence from the Rollout of Television," *IZA Institute of Labor Economics*, No. 14978, 2021, pp. 1-60.

Kotler, Philip and Gary Armstrong, "Chapter 4, Managing Market Information to Gain Customer Insights," in *Principles of Marketing*, Seventeenth Edition, Pearson, 2017, pp. 122-155.

Krueger, Alan B., "The Economics of Real Superstars: The Market for Rock Concerts in the Material World," *Journal of Labor Economics*, Vol. 23, No. 1, 2005, pp. 1-30.

Lucifora, Claudio and Rob Simmons, "Superstar Effects in Sport: Evidence From Italian Soccer," *Journal of Sports Economics*, Vol. 4, No. 1, 2003, pp. 35-55.

Mankiw, N. Gregory, "Chapter 10, Externalities," in *Principles of Economics*, Sixth Edition, South-Western Cengage Learning, 2012, pp. 195-216.

Marchand, Andre and Thorsten Hennig-Thurau, "Value Creation in the Video Game Industry: Industry Economics, Consumer Benefits, and Research Opportunities," *Journal of Interactive Marketing*, Vol. 27, 2013, pp. 141-157.

McCrary, Justin and Daniel L. Rubinfeld, "Measuring Benchmark Damages in Antitrust Litigation," *Journal of Econometric Methods*, Vol. 3, No. 1, 2014, pp. 63-74.

Myerson, Roger B., "Nash Equilibrium and the History of Economic Theory," *Journal of Economic Literature*, 1999, Vol. 37, No. 3, pp. 1067-1082.

Peeters, Thomas, "Profit-Maximizing Gate Revenue Sharing in Sports Leagues," *Economic Inquiry*, Vol. 53, No. 2, 2015, pp. 1275-1291.

Pitt, Ivan L., "Superstar Effects on Royalty Income in a Performing Rights Organization," *Journal of Cultural Economics*, Vol. 34, 2010, pp. 219-236.

Pycia, Marek, "Stability and Preference Alignment in Matching and Coalition Formation," *Econometrica*, Vol. 80, No. 1, 2012, pp. 323-362.

Rascher, Daniel A., "A Model of a Professional Sports League," *Advances in the Economics of Sport*, Vol. 2, 1997, pp. 27-76.

Rayna, Thierry and Ludmila Striukova, "'Few to Many': Change of Business Model Paradigm in the Video Game Industry," *Digiworld Economic Journal*, No. 94, 2014, pp. 61-81.

Rosen, Sherwin, "The Economics of Superstars," *The American Economic Review*, Vol. 71, No. 5, 1981, pp. 845-858.

Roth, Alvin E., "The Economics of Matching: Stability and Incentives," *Mathematics of Operations Research*, Vol. 7, No. 4, 1982, pp. 617-628.

Roth, Alvin E., et al., "Kidney Exchange," *The Quarterly Journal of Economics*, Vol. 119, No. 2, 2004, pp. 457-488.

Rottenberg, Simon, "The Baseball Players' Labor Market," *Journal of Political* Economy, Vol. 64, No. 3, 1956, pp. 242-258.

Scully, Gerald W., "Pay and Performance in Major League Baseball," *The American Economic Review*, Vol. 64, No. 6, 1974, pp. 915-930.

Shapley, Lloyd and Herbert Scarf, "On Cores and Indivisibility," *Journal of Mathematical Economics*, Vol. 1, 1974, pp. 23-37.

Sorensen, Morten, "How Smart Is Smart Money? A Two-Sided Matching Model of Venture Capital," *The Journal of Finance*, Vol. LXII, No. 6, 2007, pp. 2725-2762.

Tucker, Catherine and Alexander Marthews, "Social Networks, Advertising and Antitrust," *George Mason Law Review*, Vol. 19, No. 5, 2012.

Tucker, Catherine, "How Platforms Create Value through Coring and Implications for Market Definition," *Working Paper*, 2022, pp. 1-8.

Tucker, Catherine, "Network Effects and Market Power: What Have We Learned in the Last Decade?" *Antitrust*, 2018.

**Regulatory Filings**

Electronic Arts Inc., Form 10-K, 2012, downloaded from https://ir.ea.com/financial-information/sec-filings/default.aspx.

Electronic Arts Inc., Form 10-K, 2013, downloaded from https://ir.ea.com/financial-information/sec-filings/default.aspx.

Electronic Arts Inc., Form 10-K, 2014, downloaded from https://ir.ea.com/financial-information/sec-filings/default.aspx.

Electronic Arts Inc., Form 10-K, 2017, downloaded from https://ir.ea.com/financial-information/sec-filings/default.aspx.

Electronic Arts Inc., Form 10-K, 2022, downloaded from https://ir.ea.com/financial-information/sec-filings/default.aspx.

NBPA, Form LM-2, 2021, downloaded from https://olmsapps.dol.gov/query/orgReport.do?rptId=791969&rptForm=LM2Form.

NFLPA, Form LM-2, 2021, downloaded from https://olmsapps.dol.gov/query/orgReport.do?rptId=755825&rptForm=LM2Form.

Take-Two Interactive Software, Inc., Form 10-K, 2008, downloaded from https://www.take2games.com/ir/sec-filings.

Take-Two Interactive Software, Inc., Form 10-K, 2009, downloaded from https://www.take2games.com/ir/sec-filings.

Take-Two Interactive Software, Inc., Form 10-K, 2011, downloaded from https://www.take2games.com/ir/sec-filings.

Take-Two Interactive Software, Inc., Form 10-K, 2012, downloaded from https://www.take2games.com/ir/sec-filings.

Take-Two Interactive Software, Inc., Form 10-K, 2013, downloaded from https://www.take2games.com/ir/sec-filings.

Take-Two Interactive Software, Inc., Form 10-K, 2014, downloaded from https://www.take2games.com/ir/sec-filings.

Take-Two Interactive Software, Inc., Form 10-K, 2016, downloaded from https://www.take2games.com/ir/sec-filings.

Take-Two Interactive Software, Inc., Form 10-K, 2022, downloaded from https://www.take2games.com/ir/sec-filings.

**Social Media**

@crispycones, Instagram, accessed on April 12, 2023.

@eemilycolee, TikTok, accessed on April 24, 2023.

@trackqueenlex, TikTok, accessed on March 31, 2023.

@tyruetschle, TikTok, accessed on March 24, 2023.

**Other Publicly Available Sources**

110 Illinois Compiled Statutes 190, available at https://www.ilga.gov/legislation/ilcs/ilcs3.asp?ActID=4166&ChapterID=18.

247Sports Staff, "247Sports Rating Explanation," 247Sports, July 20, 2012, available at https://247sports.com/Article/247Sports-Rating-Explanation-81574/.

247Sports, "2022 Boston College Eagles Basketball Roster," available at https://247sports.com/college/boston-college/Team/Boston-College-Eagles-Basketball-2/Roster/, accessed on April 7, 2023.

247Sports, "About 247Sports," available at https://247sports.com/Article/About-247Sports-116092/, accessed on December 5, 2022.

247Sports, "Bam Adebayo Recruit Interests," available at https://247sports.com/Recruitment/Bam-Adebayo-23273/RecruitInterests/, accessed on March 13, 2023.

247Sports, "Carson Proctor," available at https://247sports.com/Player/Carson-Proctor-80583/high-school-139709/, accessed on March 13, 2023.

247Sports, "Crystal Ball for Omari Spellman," available at https://247sports.com/PlayerInstitution/Omari-Spellman-at-MacDuffie-School-123652/CurrentExpertPredictions/, accessed on January 30, 2023.

247Sports, "Omari Spellman Recruit Interests," available at https://247sports.com/Recruitment/Omari-Spellman-45297/RecruitInterests/, accessed on March 21, 2023.

247Sports, "Omari Spellman," available at https://247sports.com/Player/Omari-Spellman-42970/high-school-123652/, accessed on March 13, 2023.

247Sports, "Sacha Killeya-Jones Recruit Interests," available at https://247sports.com/Recruitment/Sacha-Killeya-Jones-72480/RecruitInterests/, accessed on March 13, 2023

247Sports, "Sean Ragan," available at https://247sports.com/Player/Sean-Ragan-72186/high-school-125194/, accessed on March 21, 2023.

247Sports, "Tai Wynyard Recruit Interests," available at https://247sports.com/Recruitment/Tai-Wynyard-81167/RecruitInterests/, accessed on March 13, 2023.

247Sports, "Wenyen Gabriel Recruit Interests," available at https://247sports.com/Recruitment/Wenyen-Gabriel-73869/RecruitInterests/, accessed on March 13, 2023.

ACC Digital Network, "Clemson Football 2018 Preview," *YouTube*, July 23, 2018, available at https://www.youtube.com/watch?v=DIN9Laj4418.

ACC Digital Network, "Clemson QB Trevor Lawrence Throws 3 TD In Tigers' Debut," *YouTube*, September 1, 2018, available at https://www.youtube.com/watch?v=hk3oFJtkkaM.

ACC Digital Network, "Who Is Clemson Freshman QB Trevor Lawrence," *YouTube*, May 3, 2018, available at https://www.youtube.com/watch?v=-UbUYiqhmxo.

Adams, Griffin, "Boardroom NIL Report Card: Kentucky's Oscar Tshiebwe," *Boardroom*, March 16, 2023, available at https://boardroom.tv/oscar-tshiebwe-nil-money-deals-kentucky/.

Adams, Kipp, "Everything You Need to Know About 247Sports Rating Process," *247Sports*, February 4, 2020, available at https://247sports.com/college/georgia/LongFormArticle/Georgia-Bulldogs-Recruiting-Everything-you-need-to-know-about-247Sports-Rating-Process-143324123/#143324123_1.

Adelson, Andrea, "Realignment Revisited – The Beginning of the End for Big East Football," *ESPN*, July 20, 2021, available at https://www.espn.com/college-football/story/_/id/31838915/realignment-revisited-beginning-end-big-east-football.

Ainsworth-Grace, Cassidy, Marion Laboure, and Paul Maley, "Crypto Assets: A Lesson From History," *Deutsche Bank*, January 31, 2023, available at https://flow.db.com/securities-services/crypto-assets-a-lesson-from-history.

Airofin Blog, "How to Grow Your Instagram Profile as an Athlete," August 19, 2018, available at https://www.airofin.com/blogs/news/how-to-grow-your-instagram-as-an-athlete.

Associated Press, "NCAA 1-Time Transfer Rule Clears Last Step, Starts With 2021-22 Academic Year," *ESPN*, April 28, 2021, available at https://www.espn.com/college-sports/story/_/id/31353578/ncaa-1-transfer-rule-clears-last-step-starts-2021-22-academic-year.

Athlon Sports, "A Breakdown of College Football's Awards," December 9, 2022, available at https://athlonsports.com/college-football/college-football-awards-breakdown-history-winners.

Atlantic Coast Conference, "ACC Manual: 2020-2021", available at https://virginiatech.sportswar.com/wp-content/uploads/sites/15/2022/08/2020-21-ACC-Manual-2020-9-17-2.pdf.

Axson, Scooby, "Lamar Jackson Declares for NFL Draft," *Sports Illustrated*, January 5, 2018, available at https://www.si.com/college/2018/01/05/lamar-jackson-declares-nfl-draft.

Backus, Will, "College Football Predictions: Projecting Each Power Five Conference's Award Winners for 2023 Season," *247Sports*, January 28, 2023, available at https://247sports.com/LongFormArticle/College-football-predictions-Projecting-each-Power-Five-conferences-award-winners-for-2023-season-203709589/.

Baker, Matt and Mari Faiello, "USF Signs Two Quarterbacks, Including Former Miami Start Jarren Williams," *Tampa Bay Times*, December 16, 2020, available at https://www.tampabay.com/sports/bulls/2020/12/16/usf-signs-two-quarterbacks-including-former-miami-starter-jarren-williams/.

Basketball Reference, "Los Angeles Lakers Team Payroll," available at https://www.basketball-reference.com/contracts/LAL.html, accessed on March 15, 2023.

Bastie, Fred, "Recruiting Column: How to Pick the Right College," *USA Today*, July 5, 2017, available at https://usatodayhss.com/2017/recruiting-column-how-to-pick-the-right-college.

Biddle, Dave, "Ohio State NIL Collectives THE Foundation and The O Foundation Announce Merger," *247Sports*, February 9, 2023, available at https://247sports.com/college/ohio-state/Article/Ohio-State-Buckeyes-NIL-collectives-THE-foundation-and-The-O-Foundation-announce-merger-204482250/.

Big 12 Sports, "Big 12 Schools to Determine Educational Benefits & Academic Awards for Scholarship Student-Athletes," October 7, 2021, available at https://big12sports.com/news/2021/10/7/conference-big-12-schools-to-determine-educational-benefits-academic-awards-for-scholarship-student-athletes.aspx.

Big Ten Conference, "Big Ten Conference Handbook: 2017-2018," available at https://iuhoosiers.com/documents/2018/4/5//2017_18_Big_Ten_Conference_Handbook.pdf?id=27323.

Big Ten, "Big Ten Conference Statement on Monday's Supreme Court Ruling," *Big Ten*, June 22, 2021, available at https://bigten.org/news/2021/6/22/general-big-ten-conference-statement-on-mondays-supreme-court-ruling.aspx.

Bland, Evan, "TCU Transfer Ochaun Mathis Commits to Nebraska," *Omaha World Herald*, August 22, 2022, available at https://omaha.com/sports/huskers/football/tcu-transfer-ochaun-mathis-commits-to-nebraska/article_bf9a3644-baaa-11ec-8c19-0b0e2674cd75.html.

Blinder, Alan, "Power 5? College Sports May Soon Be Dominated by a Mighty 2," *The New York Times*, July 1, 2022, available at https://www.nytimes.com/2022/07/01/sports/power-5-college-sports.html.

Bloom, David, "Peacock Preens With 22 Million Subscribers As Pandemic Hits Comcast Q3 Film, Park Revenues," *Forbes*, October 29, 2020, available at https://www.forbes.com/sites/dbloom/2020/10/29/peacock-preens-with-22-million-subscribers-as-pandemic-hits-comcast-q3-film-park-revenues/?sh=7307f5947959.

Bolch, Ben, "All Together Now: New UCLA NIL Collective Led by Current and Former Bruins," *Los Angeles Times*, July 21, 2022, available at https://www.latimes.com/sports/ucla/story/2022-07-21/new-nil-collective-galvanize-ucla-sports-community-basketball.

Boone, Kyle, "Bronny James Recruiting Updates: Tracking LeBron James' Oldest Son And Where He Will Be Playing in 2023-24," *CBS Sports*, February 14, 2023, available at https://www.cbssports.com/college-basketball/news/bronny-james-recruiting-updates-tracking-where-lebron-james-oldest-son-will-be-playing-in-2023-24/.

Borzello, Jeff, "UConn Officially Rejoins Big East After Seven-Year Absence," *ESPN*, July 1, 2020, available at https://www.espn.com/college-sports/story/_/id/29392657/uconn-huskies-officially-back-big-east-conference.

Braiterman, Cory, "American Top Team Makes $540,000 NIL Commitment to All Miami Hurricanes College Football Players," *SB Nation*, July 7, 2021, available at https://www.mmamania.com/2021/7/7/22566088/american-top-team-att-owner-sponsorship-miami-football-team-hurricanes-college-nil-payments.

Brice, John, "Deion Sanders Bringing Baggage to Colorado," *Football Scoop*, December 4, 2022, available at https://footballscoop.com/news/deion-sanders-coach-prime-bringing-baggage-luggage-colorado.

Bromberg, Nick, "Texas Adds 9 Commitments from Recruits in the Days After Arch Manning's Decision," *Yahoo Sports*, June 29, 2022, available at https://sports.yahoo.com/texas-adds-8-commitments-from-recruits-in-the-days-after-arch-mannings-decision-194748235.html.

Brown, Chip, "New NIL Initiative Aimed at Benefitting Texas Longhorns' Offensive Linemen," *247Sports*, December 6, 2021, available at https://247sports.com/college/texas/Article/Texas-Longhorns-football-Horns-with-Heart-NIL-initiative-offensive-linemen-177522419/.

Buhler, John, "JT Daniels Leaves West Virginia to Enter Transfer Portal for a Third Time," *FanSided*, December 6, 2022, available at https://fansided.com/2022/12/06/jt-daniels-west-virginia-transfer-portal/.

Buhler, John, "NFL Draft First-Round Picks by Conference: SEC Wins the Night, Big 12 Shutout," *Fansided*, available at https://fansided.com/2021/04/30/nfl-draft-conference-bragging-rights/, accessed on March 20, 2023.

Business of College Sports, "Tracker: NIL Marketplaces for Student Athletes," July 2, 2021, available via the Wayback Machine at https://web.archive.org/web/20210703122516/https://businessofcollegesports.com/tracker-nil-marketplaces-for-student-athletes/.

Business of College Sports, "Tracker: NIL Marketplaces for Student Athletes," February 17, 2023, available at https://businessofcollegesports.com/tracker-nil-marketplaces-for-student-athletes/.

Business of College Sports, "Tracker: University-Specific NIL Collectives," March 21, 2023, available at https://businessofcollegesports.com/tracker-university-specific-nil-collectives/.

Business Wire, "Gopuff and Opendorse Partner to Pitch Every College Athlete Their First Deal in the NIL Era," June 30, 2021, available at https://www.businesswire.com/news/home/20210630005801/en/Gopuff-and-Opendorse-Partner-to-Pitch-Every-College-Athlete-Their-First-Deal-in-the-NIL-Era.

Butler, Rhett, "Keep Hating On Caitlin Clark And Angel Reese. Their NIL Deals Thank You, As Both Are Taking Beef To The Bank," *The Shadow League*, April 5, 2023, available at https://theshadowleague.com/keep-hating-on-caitlin-clark-and-angel-reese-their-nil-deals-thank-you-as-both-are-taking-beef-to-the-bank/.

CBS Sports, "NCAA FB," December 31, 2018, available via the Wayback Machine at https://web.archive.org/web/20181231061652/https://www.cbssports.com/college-football/.

Cecchini, Mike, "Suicide Squad 2 Cast, Release Date, Trailer, News, Story, and More Details," *Den of Geek*, November 25, 2020, available at https://www.denofgeek.com/movies/suicide-squad-2-cast-release-date-possibilities-story-news.

Chang, Elizabeth, "Core Values; You Might Want to Rethink Using a Stability Ball as Your Desk Chair," *The Washington Post*, October 3, 2022, available at https://www.washingtonpost.com/lifestyle/wellness/stability-ball-balance-core-calories/2020/09/29/0b485c74-feb4-11ea-9ceb-061d646d9c67_story.html.

Church, Zach, "Platform Strategy, Explained," *MIT Sloan School of Management: Ideas Made to Matter*, June 16, 2017, available at https://mitsloan.mit.edu/ideas-made-to-matter/platform-strategy-explained.

Claybourn, Cole, "Name, Image, Likeness: What College Athletes Should Know About NCAA Rules," *U.S. News*, March 2, 2023, available at https://www.usnews.com/education/best-colleges/articles/name-image-likeness-what-college-athletes-should-know-about-ncaa-rules.

Clemmons, Anna Katherine, "'A Whole Different Audience': College Athletes Are Now Online Influencers, Too," *Global Sport Matters*, February 8, 2023, available at https://globalsportmatters.com/business/2023/02/08/whole-different-audience-college-athletes-online-influencers-too/.

Clemson University, "Name, Image and Likeness Information Page," June 30, 2021, available at https://clemsontigers.com/nilinfo/.

CoachTube, "NCAA Athletes Partner with CoachTube to Earn Money from Name, Image, Likeness by Producing Original Training Courses," *PR Newswire*, August 25, 2021, available at https://www.prnewswire.com/news-releases/ncaa-athletes-partner-with-coachtube-to-earn-money-from-name-image-likeness-by-producing-original-training-courses-301362799.html.

Cobb, David, "NCAA Board of Directors Ratifies One-Time Transfer Legislation Allowing Athletes Immediate Eligibility," *CBS Sports*, April 28, 2021, available at https://www.cbssports.com/college-football/news/ncaa-board-of-directors-ratifies-one-time-transfer-legislation-allowing-athletes-immediate-eligibility/.

Coffee, Patrick, "More Big Brands Brave the Rocky Terrain of Endorsement Deals with College Athletes," *The Wall Street Journal*, March 4, 2023, available at https://www.wsj.com/articles/more-big-brands-brave-the-rocky-terrain-of-endorsement-deals-with-college-athletes-b70b24c5.

Colantonio, Giovanni, "WWE 2K23 Brings the Pain with John Cena, Cody Rhodes, and Bad Bunny," *Digital Trends*, January 23, 2023, available at https://www.digitaltrends.com/gaming/wwe-2k-23-reveal-release-date/.

College Sports Scholarships, "Practice and Training Facilities for College Athletes," available at https://www.collegesportsscholarships.com/college-athletes-recruiting-training-facilities.htm, accessed on April 5. 2023.

Colorado Revised Statute § 23-16-301, available at https://casetext.com/statute/colorado-revised-statutes/title-23-postsecondary-education/state-universities-and-colleges/general-and-administrative/article-16-limitation-on-athlete-agents/part-3-compensation-and-representation-of-student-athletes/section-23-16-301-compensation-and-representation-of-student-athletes-at-institutions-of-higher-education-prohibited-acts-contracts-definitions.

Columbia Lions, "Columbia Athletics Announces Name, Image and Likeness Marketplace Through Partnership with Opendorse," November 15, 2022, available at https://gocolumbialions.com/news/2022/11/15/general-columbia-athletics-announces-name-image-and-likeness-marketplace-through-partnership-with-opendorse.aspx.

Connell, Jim, "Down to its 'Last Resort,' Missouri State Eliminates Field Hockey Program," *Springfield News-Leader*, April 3, 2017, available at https://www.news-leader.com/story/sports/college/msu/2017/04/03/live-msu-athletics-budget-press-conference/99983528/.

Corry, Joel, "Agent's Take: 2022 NFL Rookie Contract Projections for Key Round 1 Picks, With a Rookie Wage Scale Explainer," *CBS Sports*, May 5, 2022, available at https://www.cbssports.com/nfl/news/agents-take-2022-nfl-rookie-contract-projections-for-key-round-1-picks-with-a-rookie-wage-scale-explainer/.

Crabtree, Jeremy, "Athletic Officials Realize It's Time to Support NIL Collectives or Get Left Behind," *On3*, November 14, 2022, available at https://www.on3.com/nil/news/more-and-more-athletic-officials-throwing-support-behind-nil-collectives-tennessee-kansas-state-colorado-oregon-state-kentucky-wisconsin-oklahoma/.

Crabtree, Jeremy, "Oklahoma NIL Collectives Merge, More Consolidation on the Way," *On3*, December 8, 2022, available at https://www.on3.com/nil/news/oklahoma-sooners-nil-collectives-crimson-and-cream-strengthening-oklahoma-merge-more-consolidation-on-way/.

Crabtree, Jeremy, "On3's NIL Most Impactful Person: Miami Businessman John Ruiz," *On3*, December 28, 2022, available at https://www.on3.com/nil/news/on3-nil-most-impactful-person-2022-miami-businessman-john-ruiz/.

Crabtree, Jeremy, "UCF Collectives Mission Control, The Kingdom NIL Announce Merger," *On3*, March 20, 2023, available at https://www.on3.com/nil/news/ucf-knights-nil-collectives-mission-control-the-kingdom-nil-announce-merger/.

Cracknell, Ryan, "2022 Panini XR Football Checklist, Team Set Lists and Details," *Beckett*, available at https://www.beckett.com/news/2022-panini-xr-football-cards/, accessed on March 20, 2023.

Crawford, Brad, "Former Michigan RB Zach Charbonnet Transferring to UCLA," *247Sports*, January 30, 2021, available at https://247sports.com/Article/Zach-Charbonnet-transfer-UCLA-Bruins-Michigan-Wolverines-football-160197726/.

*Confidential*

Crawford, Brad, "Ranking College Football's 25 Best Programs of All Time," *247Sports*, August 29, 2021, available at https://247sports.com/LongFormArticle/College-football-Top-25-rankings-best-programs-all-time-Ohio-State-Alabama-Michigan-Texas-Georgia-169817356/#169817356_1.

Cubit, Alexis, "How Winding Path Prepared Chrislyn Carr for Lone Year With Louisville Women's Basketball," *Courier Journal,* January 8, 2023, available at https://www.courier-journal.com/story/sports/college/louisville/2023/01/08/louisville-womens-basketballs-chrislyn-carr-seeks-strong-finish/69775771007/.

D.C. Legislative Bill 24-455, available at https://legiscan.com/DC/text/B24-0455/id/2619057/Washington_D_C_-2021-B24-0455-Enrolled.pdf.

Daschel, Nick, "What Is a Jarod Lucas Game-Word Jersey Worth? With NIL Revenue Gates Open, Oregon State Guard Will Find Out," *Oregon Live*, July 1, 2021, available at https://www.oregonlive.com/beavers/2021/07/what-is-a-jarod-lucas-game-worn-jersey-worth-with-nil-revenue-gates-open-oregon-state-guard-will-find-out.html.

Dellenger, Ross, "The NCAA's Redshirt Rule Change is a Major Win for Both Coaches and Players," *Sports Illustrated*, June 13, 2018, available at https://www.si.com/college/2018/06/13/ncaa-redshirt-rule-change-eligibility-reaction.

Dellenger, Ross, "The Other Side of the NIL Collective, College Sports' Fast-Rising Game Changer," *Sports Illustrated*, August 10, 2022, available at https://www.si.com/college/2022/08/10/nil-collectives-boosters-football-tennessee-daily-cover.

Dimmitt, Zach, "Pair of Texas WRs Enter the Transfer Portal," *Sports Illustrated*, April 29, 2022, available at https://www.si.com/college/texas/football/longhorns-transfer-portal-kelvontay-dixon-dajon-harrison.

Dixon, Shea, "LSU's Scholarship Numbers: The Present and Future," *247Sports*, December 8, 2020, available at https://247sports.com/college/lsu/LongFormArticle/LSU-Tigers-football-team-2020-scholarship-numbers-how-many-opt-outs-transfers-156419278/#156419278_1.

Dodd, Dennis, "Inside the World of 'Collectives' Using Name, Image and Likeness to Pay College Athletes, Influence Programs," *CBS Sports*, January 26, 2022, available at https://www.cbssports.com/college-football/news/inside-the-world-of-collectives-using-name-image-and-likeness-to-pay-college-athletes-influence-programs/.

Dosh, Kristi, "Oregon-Focused NIL Company Division Street Joins Forces With Opendorse," *Forbes*, November 18, 2021, available at https://www.forbes.com/sites/kristidosh/2021/11/18/oregon-focused-nil-company-division-street-joins-forces-with-opendorse.

Dosh, Kristi, "Tracking LifeWallet's Mission to Sign $10 Million in NIL Deals," *Business of College Sports*, February 12, 2022, available at https://businessofcollegesports.com/name-image-likeness/tracking-lifewallets-mission-to-sign-10-million-in-nil-deals.

Dunn, Sam, "NBA Rookie Contracts & 2022-23 Salary Breakdown," *Boardroom*, July 10, 2022, available at https://boardroom.tv/nba-rookie-contracts-salary-scale-2022-23.

Durham, Meghan, "DI Board Approves Clarifications for Interim NIL Policy," *NCAA*, October 26, 2022, available at https://www.ncaa.org/news/2022/10/26/media-center-di-board-approves-clarifications-for-interim-nil-policy.aspx.

Eberts, Wescott, "Texas WR Marcus Washington Enters the NCAA Transfer Portal," *Burnt Orange Nation*, May 3, 2022, available at https://www.burntorangenation.com/2022/5/2/23053945/marcus-washington-enters-ncaa-transfer-portal-texas-longhorns.

Eder, Steve, "How New N.C.A.A. Rules Will Work," *The New York Times*, August 7, 2014, available at https://www.nytimes.com/2014/08/08/sports/ncaafootball/how-new-ncaa-rules-will-work-or-not.html.

Eisenberg, Jeff, "Should I Stay or Should I Go? How NIL Is Making This the Year of the Big Man in College Basketball," *Yahoo*, November 10, 2022, available at https://sports.yahoo.com/should-i-stay-or-should-i-go-how-nil-is-making-this-the-year-of-the-big-man-in-college-basketball-131150873.html.

eMarketer, "US Digital Ad Spending, by Industry, 2019-2023," *Insider Intelligence*, June 1, 2021, available at https://www.insiderintelligence.com/chart/249886/us-digital-ad-spending-by-industry-2019-2023-billions.

Emily Coniglio, "New NIL Rules May Reduce Financial Need to Apply Early for NFL," *NFL Alumni*, January 25, 2023, available at https://www.nflalumni.org/news/new-nil-rules-may-reduce-financial-need-to-apply-early-for-nfl/.

ESPN, "American Gable Steveson Wins Wrestling Gold Medal in 125kg Class at Tokyo Olympics," August 6, 2021, available at https://www.espn.com/olympics/story/_/id/31971387/american-gable-steveson-wins-wrestling-gold-medal-125-kg-class-tokyo-olympics.

ESPN, "College Football Total QBR – 2022 Season Leaders," available at https://www.espn.com/college-football/qbr/_/sort/schedAdjQBR/dir/desc, accessed on March 23, 2023.

ESPN, "New Mexico Board of Regents Votes to Cut Four Sports," July 19, 2018, available at https://www.espn.com/college-sports/story/_/id/24141701/new-mexico-board-regents-moves-forward-cutting-four-sports.

Farmer, Sam, "Big Ten's New Media-Rights Deal: Better Start Times, More National Exposure for UCLA, USC," *Los Angeles Times*, August 18, 2022, available at https://www.latimes.com/sports/story/2022-08-18/big-ten-reaches-tv-agreement.

Firchau, Nick, "Beckham's Influence Huge on Galaxy's New TV Deal," *LA Galaxy*, November 19, 2011, available at https://www.lagalaxy.com/news/beckhams-influence-huge-galaxys-new-tv-deal.

Fisher, Chris, "Kentucky Releases Official 2016-17 Basketball Roster," *247Sports*, July 29, 2016, available at https://247sports.com/college/kentucky/Article/Kentucky-Wildcats-2016-17-basketball-roster-46487986/.

Fitzsimons, Tim, "Women at NCAA Tournament Allege Weight Room Disparities," *NBC News*, March 19, 2021, available at https://www.nbcnews.com/news/sports/women-ncaa-tournament-allege-weight-room-disparities-n1261600.

Fornelli, Tom, "College Football Playoff National Championship: Alabama vs. Clemson IV Set for 2019 Title Game," *CBS Sports*, December 30, 2018, available via the Wayback Machine at https://web.archive.org/web/20181231102111/https://www.cbssports.com/college-football/news/college-football-playoff-national-championship-alabama-vs-clemson-iv-set-for-2019-title-game/.

Fox 26 Digital, "Former 5-Star QB JT Daniels Takes Part in First Spring Practice With Rice Owls," *Fox Sports*, March 7, 2023, available at https://www.fox26houston.com/sports/former-5-star-qb-jt-daniels-takes-part-in-first-spring-practice-with-rice-owls.

Fraschilla, Fran, "Top 12 Basketball Leagues in the World Outside the NBA," *ABC News*, January 17, 2017, available at https://abcnews.go.com/Sports/top-12-basketball-leagues-world-nba/story?id=44826666.

Gaither, Steven J., "Ex-Miami, USF QB Jarren Williams Commits to AAMU," *HBCU Gameday*, December 13, 2021, available at https://hbcugameday.com/2021/12/13/ex-miami-usf-qb-jarren-williams-commits-to-aamu/.

GameSpot Staff, "College Hoops 2K9 Ejected," *GameSpot*, January 14, 2008, available at https://www.gamespot.com/articles/college-hoops-2k9-ejected/1100-6184658/.

Geisinger, Brian, "Report: Ex-Miami QB Jarren Williams Will Transfer to Garden City CC," *ACC Sports*, June 21, 2020, available at https://accsports.com/acc-news/headline-news/ex-miami-qb-jarren-williams-will-transfer-to-garden-city-cc/.

Geoghegan, Zack, "Kentucky WBB Picks up Two SEC Transfers: Eniya Russell and Ajae Petty," *On3*, May 2, 2022, available at https://www.on3.com/teams/kentucky-wildcats/news/kentucky-wbb-picks-up-two-sec-transfers/.

Georgia Tech, "#29 Bruce Jordan-Swilling," available at https://ramblinwreck.com/roster/bruce-jordan-swilling/, accessed on April 15, 2023.

Geyser, Werner, "The State of Influencer Marketing 2023: Benchmark Report," *Influencer Marketing Hub*, February 7, 2023, available at https://influencermarketinghub.com/influencer-marketing-benchmark-report.

Gillenwater, Sam, "Report: USC, UCLA to Double Media Rights Deal with Big Ten Move," *On3*, June 30, 2022, available at https://www.on3.com/news/report-usc-ucla-to-double-media-rights-deal-with-big-ten-move-pac-12/.

Givony, Jonathan, "Michigan Wolverines Center Hunter Dickinson Withdraws from NBA Draft," *ESPN*, July 6, 2021, available at https://www.espn.com/mens-college-basketball/story/_/id/31770352/michigan-wolverines-center-hunter-dickinson-withdraws-nba-draft.

Goldberg, Rob, "Kentucky Men's Basketball Team Signs Cryptocurrency Deal with FTX US Under NIL Rules," *Bleacher Report*, November 3, 2021, available at https://bleacherreport.com/articles/10017086-kentucky-mens-basketball-team-signs-cryptocurrency-deal-with-ftx-us-under-nil-rules.

Goldberg, Rob, "Miami QB Jarren Williams Enters Portal After D'Eriq King Transfer," *Bleacher Report*, January 23, 2020, available at https://bleacherreport.com/articles/2872890-report-miami-qb-jarren-williams-enters-portal-after-deriq-king-transfer.

Goldman, Jeremy, "Tiktok Launches Ad Solution Aimed To Court Advertisers While Pleasing Creators," *Business Intelligence*, May 19, 2022, available at https://www.insiderintelligence.com/content/tiktok-launches-ad-solution-aimed-court-advertisers-while-pleasing-creators.

Golen, Jimmy, "With Roster Thinned, BC Men's Basketball Has Turned to Walk-On 'Martians,'" *Boston.com*, February 12, 2021, available at https://www.boston.com/sports/college-sports/2021/02/12/bc-mens-basketball-roster-jim-christian/.

Gonzalez, Isabel, "Nijel Pack Transfers to Miami: Former Kansas State Star to Earn $800,000 in NIL Deal with LifeWallet," *CBS Sports*, April 23, 2022, available at https://www.cbssports.com/college-basketball/news/nijel-pack-transfers-to-miami-former-kansas-state-star-to-earn-800000-in-nil-deal-with-lifewallet/.

*Confidential*

Good, Owen S., "NBA Live 20 Canceled as EA Sports Looks to Next-Gen Consoles," *Polygon*, October 29, 2019, available at https://www.polygon.com/2019/10/29/20938853/nba-live-20-canceled-ea-sports-ps4-xbox-one-ps5-scarlett.

Graham, Megan, "The NFL, Facing Declining Interest Among Young Viewers, Just Struck a Deal With TikTok," *CNBC*, September 3, 2019, available at https://www.cnbc.com/2019/09/03/nfl-partners-with-tiktok-in-new-marketing-push.html.

Hamilton, Gerry, "Clemson Lands Trevor Lawrence, No. 1 QB Recruit of 2018," *ESPN*, December 16, 2016, available at https://www.espn.com/college-sports/recruiting/football/story/_/id/18291751/clemson-tigers-land-trevor-lawrence-no-1-qb-recruit-2018.

Hodgkinson, Oliver, "Kedon Slovis vs. JT Daniels: How a 'Sliding Doors' Scenario at USC Led Both Quarterbacks to the Backyard Brawl," *Pro Football Network*, September 1, 2022, available at https://www.profootballnetwork.com/kedon-slovis-vs-jt-daniels-how-a-sliding-doors-scenario-at-usc-led-both-quarterbacks-to-the-backyard-brawl/.

Horns with Heart, "Our Mission," available at https://hornswithheart.org/#real-mission, accessed on April 7, 2023.

Hosick, Michelle Brutlag, "New Transfer Rule Eliminates Permission-To-Contact Process," *NCAA*, June 13, 2018, available at https://www.ncaa.org/news/2018/6/13/new-transfer-rule-eliminates-permission-to-contact-process.aspx.

IGN, "College Hoops 2K8," available at https://www.ign.com/games/college-hoops-2k8, accessed on April 18, 2023.

IGN, "NCAA Basketball 10," available at https://www.ign.com/games/ncaa-basketball-10, accessed on April 18, 2023.

IGN, "NCAA Football 14," available at https://www.ign.com/games/ncaa-football-14, accessed on April 18, 2023.

Indiana University, "IU Athletics Establishes New Financial Academic Achievement Awards For Its Student-Athletes," June 23, 2022, available at https://iuhoosiers.com/news/2022/6/23/academic-services-iu-athletics-establishes-new-financial-academic-achievement-awards-for-its-student-athletes.

INFLCR, "Welcome to the Gators NIL Exchange," available at https://dash.inflcr.com/exchange/university-of-florida, accessed on March 10, 2023.

Insider Intelligence, "Share of Time Spent on Select Social Platforms by US Adults, 2019, 2022, & 2024 (% of total)," April 1, 2022, available at https://www.insiderintelligence.com/chart/256516/Share-of-Time-Spent-on-Select-Social-Platforms-by-US-Adults-2019-2022-2024-of-total.

Iskiev, Maxwell, "The HubSpot Blog's 2023 Content & Media Strategy Report [Data]," *HubSpot*, April 12, 2022, available at https://blog.hubspot.com/marketing/content-and-media-strategy-report.

Iskiev, Maxwell, "The HubSpot Blog's 2023 Marketing Strategy & Trends Report: Data from 1,200+ Global Marketers," *HubSpot*, October 31, 2022, available at https://blog.hubspot.com/marketing/hubspot-blog-marketing-industry-trends-report.

Jackson, Wilton, "Archie Manning Concerned About 'Wild West' NIL Landscape," *Sports Illustrated*, May 7, 2022, available at https://www.si.com/college/2022/05/07/archie-manning-concerned-about-wild-west-nil-landscape.

John, Alun and Hannah Lang, "Crypto Exchange FTX Files for Bankruptcy as Wunderkind CEO Exits," *Reuters*, November 11, 2022, available at https://www.reuters.com/business/ftx-start-us-bankruptcy-proceedings-ceo-exit-2022-11-11/.

Johnson, Greg, "What the NCAA Transfer Portal Is…and What It Isn't," *NCAA Champion Magazine*, Fall 2019, available at http://s3.amazonaws.com/static.ncaa.org/static/champion/what-the-ncaa-transfer-portal-is/index.html.

Johnson, Richard, "Year 1 of NIL Brought Curveballs, Collectives and Chaos. Now What?" *Sports Illustrated*, July 12, 2022, available at https://www.si.com/college/2022/07/12/nil-name-image-likeness-collectives-one-year.

Jones, Joshua, "David Beckham is Raking in the Cash Thanks to LA Galaxy Contract Clauses," *Fox Sports*, January 6, 2023, available at https://www.foxsports.com.au/football/david-beckham-is-raking-in-the-cash-thanks-to-la-galaxy-contract-clauses/news-story/044910159110f9a0596ca0ed44ca0135.

Jones, Rory, "Barstool Sports Launch TwoYay NIL platform," *Sports Pro*, September 15, 2022, available at https://www.sportspromedia.com/news/barstool-sports-twoyay-nil-deal-us-ncaa-college-athletes-2022-upfront/.

Joyce, Tom, "In College Sports, Non-Athletes Suffer Just as Much as the Stars on the Field," *The Guardian*, October 16, 2019, available at https://www.theguardian.com/sport/2019/oct/16/college-sports-revenue-loss-making-programs-academics.

Kamrani, Christopher, "How to Land Arch Manning? Dig Into Peyton's and Eli's 1990s Recruitment," *The Athletic*, May 11, 2022, available at https://theathletic.com/3252703/2022/05/11/arch-manning-recruitment-peyton-manning-eli-manning/.

Kaplan, Daniel, "How Tom Brady is the King of Player Royalties and Why Odell Beckham Jr. is Also Known as 'Royalty Only'," *The Athletic*, June 17, 2019, available at https://theathletic.com/1020042/2019/06/17/analyzing-nflpas-annual-report-tom-brady-is-the-king-of-player-royalties-odell-beckham-jr-is-aka-royalty-only/.

Kartje, Ryan, "Lincoln Riley Effect: Five Players and One Coach Announce They're Leaving USC," *Los Angeles Times*, December 6, 2021, available at https://www.latimes.com/sports/usc/story/2021-12-06/lincoln-riley-effect-usc-football-players-transfer-portal.

Kartje, Ryan, "Student Body Right USC NIL Collective Shuts Down After Death Of Founder," *Los Angeles Times*, October 20, 2022, available at https://www.latimes.com/sports/usc/story/2022-10-20/student-body-right-usc-nil-collective-founder-dies.

Katz, Andy, "25 of College Basketball's Most Important NBA Draft Withdrawals," *NCAA*, August 7, 2020, available at https://www.ncaa.com/news/basketball-men/article/2020-08-06/25-college-basketballs-most-important-nba-draft-withdrawals.

Keelher, John, "Three Ways To Determine Your Digital Marketing Budget," *Forbes,* September 11, 2020, available at https://www.forbes.com/sites/forbesagencycouncil/2020/09/11/three-ways-to-determine-your-digital-marketing-budget.

Keller, Braly, "NIL Incoming: Comparing State Laws and Proposed Legislation," *Opendorse*, January 31, 2023, available at https://biz.opendorse.com/blog/comparing-state-nil-laws-proposed-legislation.

Kentucky Executive Order 2021-418, available at https://governor.ky.gov/attachments/20210624_Executive-Order_2021-418_Student-Athletes.pdf.

Kentucky Revised Statutes Chapter 164.6945, available at https://apps.legislature.ky.gov/law/statutes/statute.aspx?id=52047.

Keoun, Bradley and Paddy Baker, "First Mover: Crypto.com Says User Growth Coming From Products, Not Token Speculation," *CoinDesk*, July 2, 2020, available at https://www.coindesk.com/markets/2020/07/02/first-mover-cryptocom-says-user-growth-coming-from-products-not-token-speculation/.

Khan Jr., Sam, "Houston QB D'Eriq King Announces He Has Entered the Transfer Portal," *ESPN*, January 13, 2020, available at https://www.espn.com/college-football/story/_/id/28480112/houston-qb-deriq-king-announces-entered-transfer-portal.

Khan Jr., Sam, "Inside the Texas Spending Blitz That Hooked Arch Manning and a No. 2 Recruiting Class," *The Athletic*, September 16, 2022, available at https://theathletic.com/3598484/2022/09/16/texas-football-recruiting-weekend-arch-manning/.

Kircher, Madison M., "Cameo Was Made for the Coronavirus," *Vulture*, April 16, 2020, available at https://www.vulture.com/2020/04/cameo-coronavirus-boom.html.

Kirshner, Alex, "'Everything's on Fire': NIL Collectives Are the Latest Patchwork Solution for College Athlete Pay," *Global Sports Matters*, January 17, 2023, available at https://globalsportmatters.com/business/2023/01/17/nil-collectives-latest-patchwork-solution-college-athlete-pay/.

Klein, Aaron and Ember Smith, "Explaining the Economic Impact of COVID-19: Core Industries and the Hispanic Workforce," *Brookings*, February 5, 2021, available at https://www.brookings.edu/research/explaining-the-economic-impact-of-covid-19-core-industries-and-the-hispanic-workforce.

KU Athletics, "Top-Ranked Jayhawks Begin NCAA Dance Thursday on TNT," March 15, 2016, available at https://kuathletics.com/mens-basketball-top-ranked-jayhawks-begin-ncaa-dance-thursday-on-tnt/.

Kutz, Chris, "NIL Compliance Reminders for 2022," *Opendorse*, January 12, 2022, available at https://biz.opendorse.com/blog/nil-compliance-reminders-for-2022/.

Lavigne, Paula and Dan Murphy, "Alabama Crimson Tide Among Schools to Not Disclose NIL Data," *ABC News*, October 7, 2022, available at https://abcnews.go.com/Sports/alabama-crimson-tide-schools-disclose-nil-data/story?id=91159752.

Lepesant, Anne, "Boise State Eliminates Women's Swimming & Diving Program in Cost-Cutting Move," *SwimSwam*, July 2, 2020, available at https://swimswam.com/boise-state-eliminates-womens-swimming-diving-program-in-cost-cutting-move/.

Liao, Shannon, "Forget Next-Gen Consoles. The Biggest Gaming Platform Is Already In Your Pocket," *The Washington Post*, May 27, 2021, available at https://www.washingtonpost.com/video-games/2021/05/27/mobile-games-spending/.

Libit, Daniel, "Alston Case Turns Spotlight Onto NCAA's Student Assistance Fund," *Sportico*, July 20, 2021, available at https://www.sportico.com/leagues/college-sports/2021/ncaa-student-assistance-fund-1234634735/.

Limbong, Andrew, "College Football is Back and Players Still Aren't Getting Paid," *NPR*, September 2, 2022, available at https://www.npr.org/2022/09/02/1120610858/college-football-nil-big-ten.

Lind, Andrew, "Former Ohio State, Miami Quarterback Tate Martell Reportedly Transferring to UNLV," *Sports Illustrated*, July 25, 2021, available at https://www.si.com/college/ohiostate/football/ohio-state-football-former-buckeyes-miami-hurricanes-quarterback-tate-martell-reportedly-transferring-to-unlv-rebels.

Litman, Laken, "Tate Martell Lived Both Sides of the Transfer Portal on His Way to Miami," *Sports Illustrated*, January 16, 2019, available at https://www.si.com/college/2019/01/16/tate-martell-miami-ohio-state-transfer-portal.

Lodge, Jessica, "UT Heisman Hopeful Bijan Robinson Unveils Own Mustard Brand," *Houstonia*, August 26, 2022, available at https://www.houstoniamag.com/news-and-city-life/2022/08/bijan-robinson-launches-mustard-brand.

Lombardi, Matt, "Here's How Each Conference Did in the First Round of the 2018 NFL Draft," *The Spun*, April 26, 2018, available at https://thespun.com/college-football/conference-breakdown-picks-2018-nfl-draft.

Lopez, Ana-Marcela, "How to Choose a College as a Student Athlete," *Colleges of Distinction*, available at https://collegesofdistinction.com/advice/how-to-choose-college-student-athlete/, accessed on April 12, 2023.

Louisiana Statute Title § 17:3703, available at https://casetext.com/statute/louisiana-revised-statutes/revised-statutes/title-17-education/chapter-30-intercollegiate-athletics/section-173703-intercollegiate-athletes-compensation-and-rights-responsibilities-of-postsecondary-education-institutions.

Lowe, Chris, "Georgia Tech Yellow Jackets Fire Athletic Director Todd Stansbury, Football Coach Geoff Collins," *ESPN*, September 26, 2022, available at https://www.espn.com/college-football/story/_/id/34670009/sources-georgia-tech-yellow-jackets-fire-ad-todd-stansbury-football-coach-geoff-collins.

Machlin, Tzvi, "SEC Dominates List of Most 2020 1 Round Picks by Conference," *The Spun*, April 24, 2020, available at https://thespun.com/sec/sec-dominates-list-of-most-2020-1st-round-picks-by-conference.

Mack, Eric, "The Fall of FTX and Sam Bankman-Fried: A Timeline," *CNet*, February 24, 2023, available at https://www.cnet.com/personal-finance/crypto/the-fall-of-ftx-and-sam-bankman-fried-a-full-timeline-of-events/.

Mangalindan, JP, "How to Make Money on Snapchat, According to Creators," *Business Insider*, December 24, 2022, available at https://www.businessinsider.com/how-to-make-money-on-snapchat-according-to-creators-spotlight-lenses.

MarketPryce, "Athlete Influencer Marketing Pricing," available at https://www.marketpryce.com/pricing, accessed on April 11, 2023.

McAvoy, Steven, "Jacob Cowing's NIL Success Links Athletic Ability, Family and Fatherhood: 'A Great Blessing,'" *The NIL Deal*, February 14, 2023, available at https://www.nildealnow.com/jacob-cowing-nil-success-athletic-ability-family-fatherhood-great-blessing/.

McFadyen Digital, "McFadyen Digital Launches Varsity Gems NFT Marketplace for NIL Incentive," *Globe Newswire*, August 24, 2022, available at https://www.globenewswire.com/en/news-release/2022/08/24/2503888/0/en/McFadyen-Digital-Launches-Varsity-Gems-NFT-Marketplace-for-NIL-Incentive.html.

McIntyre, Ewan, "For Marketers, Budget-Related Stress Remains Low Despite Inflation Hitting a High," *Gartner*, May 23, 2022, available at https://blogs.gartner.com/ewan-mcintyre/marketing-budgets-2022/.

McMinn, Sean and Liz Crampton, "Covid's Deadly Trade-Offs, By the Numbers: How Each State Has Fared in the Pandemic," *Politico*, December 15, 2021, available at https://www.politico.com/interactives/2021/covid-by-the-numbers-how-each-state-fared-on-our-pandemic-scorecard/.

McVeigh, Griffin, "Marcus Washington Announces Transfer Commitment to Nebraska," *On3*, May 24, 2022, available at https://www.on3.com/transfer-portal/news/former-texas-longhorns-wide-receiver-marcus-washington-transfer-portal-nebraska-cornhuskers/.

Medcalf, Myron, "John Calipari, a Crucial NCAA Tournament and the Pressures of Kentucky Basketball," *ESPN*, March 15, 2023, available at https://www.espn.com/mens-college-basketball/story/_/id/35862746/john-calipari-crucial-ncaa-tournament-pressures-kentucky-basketball.

Merchant, Sabreena and The Athletic Staff, "Former Oregon Forward Sedona Prince Transferring to TCU: What it Means For the Horned Frogs," *The Athletic*, April 8, 2023, available at https://theathletic.com/4393079/2023/04/08/sedona-prince-tcu-transfer/.

Michigan Legislature 390.1733, available at http://www.legislature.mi.gov/(S(3knjkho1zsbry3o1jv5ldttx))/mileg.aspx?page=getObject&objectName=mcl-390-1733.

Michigan State University, "2021-2022 Student-Athlete Handbook and Planner," available at https://www.sass.msu.edu/application/files/2116/2983/8922/Handbook_2021-22.pdf.

Miller, Brody, "LSU's Depleted Roster: How the Tigers Got Here and How They Can Build it Back Up," *The Athletic*, December 10, 2020, available at https://theathletic.com/2251267/2020/12/10/lsu-football-roster-management-recruiting-transfers/.

Miller, Kerry, "Oregon State is the True NCAA Tournament Cinderella We Didn't See Coming," *Bleacher Report*, March 28, 2021, available at https://bleacherreport.com/articles/2938507-oregon-state-is-the-true-ncaa-tournament-cinderella-we-didnt-see-coming.

Mintzer, Ally, "Paying Attention: The Attention Economy," *Berkeley Economic Review*, March 31, 2020, available at https://econreview.berkeley.edu/paying-attention-the-attention-economy/.

Mississippi Code Annotated § 37-97-107, available at http://billstatus.ls.state.ms.us/documents/2022/html/SB/2600-2699/SB2690IN.htm.

MIT Management Executive Education, "Platform Strategy: Building And Thriving In A Vibrant Ecosystem," taught by Pierre Azoulay and Catherine Tucker, course available in 2023, available at https://executive.mit.edu/on/demandware.static/-/Sites-master-catalog-msee/default/dwc6b9d6db/brochures/Platform%20Strategy.pdf.

Monacceli, Nick, "Eastern Michigan University to Cut 4 Sports Teams Following Spring Semester," *Click on Detroit*, March 20, 2018, available at https://www.clickondetroit.com/news/2018/03/20/eastern-michigan-university-to-cut-4-sports-teams-following-spring-semester/.

Montana Code Annotated § 20-1-232, available at https://leg.mt.gov/bills/mca/title_0200/chapter_0010/part_0020/section_0320/0200-0010-0020-0320.html.

Morrison, Dan, "Tennessee Volunteers NIL Collective: Spyre Sports Group," *On3*, May 10, 2022, available at https://www.on3.com/nil/news/tennessee-volunteers-nil-collective-spyre-sports-group/.

Mumme, CJ, "Former Texas WR Kelvontay Dixon Transfers to SMU," *Longhorns Wire*, May 8, 2022, available at https://longhornswire.usatoday.com/2022/05/08/texas-football-longhorns-kelvontay-dixon-smu-transfer-portal/.

Murray, Chris, "Nevada Football's NIL Collective Will Match Any Group of 5 Program, Coach Ken Wilson Says," *Nevada Sports Net*, December 2, 2022, available at https://nevadasportsnet.com/news/reporters/nevada-footballs-nil-collective-will-match-any-group-of-5-program-coach-ken-wilson-says.

Nagy, Zack, "LSU Transfer Target DL Justin Rogers Announces Commitment to SEC Foe," *Sports Illustrated*, January 12, 2023, available at https://www.si.com/college/lsu/football/lsu-transfer-target-dl-justin-rogers-announces-commitment-to-sec-foe.

Nakos, Pete, "KJ Jefferson, Raheim Sanders Re-Sign With ONEArkansas NIL," *On3*, January 20, 2023, available at https://www.on3.com/nil/news/kj-jefferson-raheim-sanders-re-sign-with-onearkansas-nil-arkansas-razorbacks-football/.

Nakos, Pete, "Meet Rayquan Smith, the 'King of NIL,'" *On3*, June 7, 2022, available at https://www.on3.com/nil/news/rayquan-smith-king-of-nil-norfolk-state-spartans-football-track-eastbay-spikeball-name-image-likeness/.

Nakos, Pete, "What Are NIL Collectives and How Do They Operate?" *On3*, July 6, 2022, available at https://www.on3.com/nil/news/what-are-nil-collectives-and-how-do-they-operate/.

Nakos, Pete, "With BLVD Closed Down, USC's NIL Collective Market In Flux," *On3*, February 16, 2023, available at https://www.on3.com/nil/news/usc-trojans-football-nil-collective-market-tommy-group-blvd-llc-lincoln-riley-mike-bohn/.

Nastia Liukin Cup, "Event Information," available at https://nastialiukincup.com/info/, accessed on March 21, 2023.

National Science Foundation, "Faculty Early Career Development Program (CAREER)," available at https://beta.nsf.gov/funding/opportunities/faculty-early-career-development-program-career, accessed on March 13, 2023.

NBA, "All Teams," available at https://www.nba.com/teams, accessed on April 10, 2023.

NBC Sports, "Notre Dame Joins ACC, Retains Football Independence," September 12, 2022, available at https://www.nbcsports.com/chicago/notre-dame-joins-acc-retains-football-independence.

NCAA, "2022 Division I Revenue Distribution Plan," available at https://ncaaorg.s3.amazonaws.com/ncaa/finance/d1/2022D1Fin_RevenueDistributionPlan.pdf.

NCAA, "2022-23 NCAA Division I Manual," September 14, 2022, available at https://www.ncaapublications.com/p-4657-2022-2023-ncaa-division-i-manual.aspx.

NCAA, "Actions Related to Division I Regulations and Policies Impacted by COVID-19," July 30, 2021, available at https://ncaaorg.s3.amazonaws.com/compliance/d1/D1GOV_COVID-19ActionChart.pdf.

NCAA, "Agent Certification," January 24, 2019, available at https://www.ncaa.org/sports/2019/1/24/agent-certification.aspx.

NCAA, "Football Championship History," available at https://www.ncaa.com/history/football/fbs, accessed on March 20, 2023.

NCAA, "How the NCAA Works: Division I," March 2023, available at https://ncaaorg.s3.amazonaws.com/champion-magazine/HowNCAAWorks/D1_HowNCAAWorks.pdf.

NCAA, "Membership Directory," available at https://www.ncaa.org/sports/2021/5/3/membership-directory.aspx, accessed on March 13, 2023.

NCAA, "Men's Basketball Championship History," available at https://www.ncaa.com/history/basketball-men/d1, accessed on March 20, 2023.

NCAA, "Name, Image and Likeness Policy, Question and Answer," February 2023, available at https://ncaaorg.s3.amazonaws.com/ncaa/NIL/NIL_QandA.pdf.

NCAA, "NCAA College Football FBS Stats," available at https://www.ncaa.com/stats/football/fbs, accessed on March 23, 2023.

NCAA, "NCAA Membership Financial Reporting System," August 1, 2022, available at https://www.ncaa.org/sports/2013/11/21/ncaa-membership-financial-reporting-system.aspx.

NCAA, "Our Division I Members," available at https://www.ncaa.org/sports/2021/5/11/our-division-i-members.aspx, accessed on March 24, 2023.

NCAA, "Recruiting - Eligibility Center," available at https://www.ncaa.org/sports/2014/10/8/recruiting.aspx, accessed on March 2, 2023.

NCAA, "Simpler is Better," available at https://www.ncaa.org/sports/2016/7/20/simpler-is-better.aspx, accessed on March 20, 2023.

NCSA College Recruiting, "Basketball Recruiting Rankings: The Ultimate Guide," available at https://www.ncsasports.org/articles-1/basketball-recruiting-rankings, accessed on March 17, 2023.

NCSA College Recruiting, "College Recruiting Process: How Do Colleges Recruit Athletes?" available at https://www.ncsasports.org/recruiting/how-to-get-recruited/college-recruiting-process, accessed on March 2, 2023.

NCSA College Recruiting, "Everything You Need to Know About Official Visits," available at https://www.ncsasports.org/ncaa-eligibility-center/recruiting-rules/official-visits, accessed April 22, 2023.

NCSA College Recruiting, "Football Recruiting Rankings," available at https://www.ncsasports.org/articles-1/football-recruiting-rankings, accessed on March 13, 2023.

NCSA College Recruiting, "NCAA Eligibility Requirements for Student-Athletes," available at https://www.ncsasports.org/ncaa-eligibility-center/eligibility-requirements, accessed April 22, 2023.

NCSA College Recruiting, "We are NCSA College Recruiting," available at https://www.ncsasports.org, accessed on March 19, 2023.

NCSA College Recruiting, "What are the Different Types of Offers I Could Get?" available at https://www.ncsasports.org/recruiting/managing-recruiting-process/walk-on-vs-scholarship, accessed on March 24, 2023.

Negley, Cassandra, "March Madness: How Angel Reese's 'Fresh Start' Turned into an NIL Windfall and a Final Four Trip with LSU," Yahoo! Sports, March 28, 2023, available at https://sports.yahoo.com/march-madness-how-angel-reeses-fresh-start-turned-into-an-nil-windfall-and-a-final-four-trip-with-lsu-164027703.html.

Nevada Revised Statute § 398.300, available at https://law.justia.com/codes/nevada/2022/chapter-398/statute-398-300/.

New Jersey Senate Bill 971, available at https://legiscan.com/NJ/bill/S971/2020.

New Jersey Statute Title 18A Chapter 3B, available at https://pub.njleg.state.nj.us/Bills/2020/PL20/83_.PDF.

New York Senate Bill S5891F (matching Assembly Bill A5115), available at https://www.nysenate.gov/legislation/bills/2021/S5891.

Newton, Matt, "2022 NFL Draft: First Round Draft Picks by Conference," *Sports Illustrated*, April 28, 2022, available at https://www.si.com/college/virginia/football/nfl-draft-first-round-picks-by-conference.

NFL, "Teams," available at https://www.nfl.com/teams/, accessed on March 22, 2023.

Nicolaou, Anna, "Prospering in the Pandemic: The Top 100 Companies," *The Financial Times*, June 19, 2020, available at https://www.ft.com/content/844ed28c-8074-4856-bde0-20f3bf4cd8f0.

Nivison, Austin, "Texas Longhorns Football: Transfer WR Dajon Harrison Commits to UConn," *247Sports*, May 17, 2022, available at https://247sports.com/Article/Texas-Longhorns-football-Transfer-WR-Dajon-Harrison-commits-to-UConn-187664610.

Norlander, Matt, "The Greatest College Basketball Programs Ever: Ranking the Top Teams of All Time," *CBS Sports*, November 19, 2020, available at https://www.cbssports.com/college-basketball/news/the-greatest-college-basketball-programs-ever-ranking-the-top-teams-of-all-time/.

North Carolina Executive Order 223, available at https://governor.nc.gov/documents/files/executive-order-no-223/open.

NSR, "Welcome to National Scouting Report," available at https://www.nsr-inc.com, accessed on March 20, 2023.

NU Athletic Communication, "Nebraska to Launch Industry-Leading NIL Program: #NILbraska," *University of Nebraska*, June 3, 2021, available at https://huskers.com/news/2021/6/3/athletics-nebraska-to-launch-industry-leading-nil-program-nilbraska.aspx.

O'Connell, Brian, "History of Snapchat: Timeline and Facts," *TheStreet*, February 28, 2020, available at https://www.thestreet.com/technology/history-of-snapchat.

Office for Civil Rights, "A Policy Interpretation: Title IX and Intercollegiate Athletics," *Federal Register*, Vol. 44, No. 239, 1979, available at https://www2.ed.gov/about/offices/list/ocr/docs/t9interp.html.

Oklahoma Statute Annotated § 820.23, available at https://casetext.com/statute/oklahoma-statutes/title-70-schools/chapter-9-sports-and-athletics/revised-uniform-athlete-agents-act/section-82023.

Olson, Max and Andy Staples, "The Stanford-USC Game Butterfly Effect: How One Firing Sparked Nearly 250 Coaching Changes," *The Athletic*, May 16, 2022, available at https://theathletic.com/3313383/2022/05/16/usc-college-football-coaching-carousel-2021-2022/.

Olson, Max, "Texas Tech Collective to Offer $25,000 NIL Deals to 100-Plus Football Players," *The Athletic*, July 19, 2022, available at https://theathletic.com/news/texas-tech-boosters-nil-deal-players/ncfXRrM0sTXr/.

On3 Staff Report, "Here's a Look at All the Current Conference TV Deals," *On3*, August 2, 2021, available at https://www.on3.com/news/conference-tv-deals-current-status-college-football/.

On3 Staff Report, "On3's Top 20 Most Ambitious NIL Collectives," *On3*, August 4, 2022, available at https://www.on3.com/nil/news/on3s-top-20-most-ambitious-nil-collectives/.

On3 Staff Report, "What Is the NCAA Transfer Portal? Everything You Need to Know," *On3*, December 1, 2022, available at https://www.on3.com/transfer-portal/news/ncaa-transfer-portal-everything-you-need-to-know/.

On3, "INFLCR, On3 Announce Partnership to Provide Student-Athletes Market Valuation Tools, Educational Resources," July 11, 2022, available at https://www.on3.com/nil/news/inflcr-on3-announce-partnership-to-provide-student-athletes-market-valuation-toolseducational-resources/.

Opendorse, "About," available at https://opendorse.com/about/, accessed on March 17, 2023.

Opendorse, "NIL Brand Activations," available at https://biz.opendorse.com/brands/, accessed on April 5, 2023.

Opendorse, "NIL Insights, July 1, 2021 – February 28, 2023," available at https://biz.opendorse.com/nil-insights/, accessed on March 13, 2023.

Panini, "2022 Panini Prizm WNBA Trading Card Box (Hobby)," available at https://www.paniniamerica.net/2022-panini-prizm-wnba-trading-card-box-hobby.html, accessed on March 20, 2023.

Papke, Grey, "Miami QB Tate Martell Once Again Enters Transfer Portal," *Larry Brown Sports*, January 27, 2021, available at https://larrybrownsports.com/college-football/tate-martell-transfer-portal-miami/572681.

Pells, Eddie, "Gonzaga Strikes a Deal to Get More Out of Tournament Success," *AP News*, March 26, 2019, available at https://apnews.com/article/275680042f9e4b5bb7b71a4fbca0ff10.

Penn State University, "2021-22 Penn State Student-Athlete Handbook," available at https://gopsusports.com/documents/2021/12/22/2021_22_Student_Athlete_Handbook.pdf.

*Confidential*

Pereles, Zachary, "March Madness 2023: With Trio of Sweet 16 Teams and New Coaches, Big East's Banner Week Previews Bright Future," *CBS Sports*, March 23, 2023, available at https://www.cbssports.com/college-basketball/news/march-madness-2023-with-trio-of-sweet-16-teams-and-new-coaches-big-easts-banner-week-previews-bright-future/.

Perez, Sarah, "Twitter to Begin Pilot Testing Fleet Ads Starting Today," *TechCrunch*, June 1, 2021, available at https://techcrunch.com/2021/06/01/twitter-to-begin-pilot-testing-fleet-ads-starting-today/.

Pernell, Jeremy, "Exits and Additions Shake Up Husker Defensive Line," *Sports Illustrated*, July 25, 2022, available at https://www.si.com/college/nebraska/football/jeremy-pernell-exits-and-additions-shake-up-husker-defensive-line-ochaun-mathis.

Peter, Josh, "Despite Success at Georgia, Quarterback Stetson Bennett Will Face Doubts about NFL Prospects," *USA Today*, January 10, 2023, available at https://www.usatoday.com/story/sports/ncaaf/2023/01/10/georgia-qb-stetson-bennett-nfl-draft-2023-questions/11021864002/.

Philippou, Alexa, "Cavinder Twins Take on Women's Basketball, Stereotypes and TikTok," *ESPN*, November 2, 2022, available at https://www.espn.com/womens-college-basketball/story/_/id/34924829/miami-cavinder-twins-take-women-basketball-tiktok.

Pintado, Amanda Pérez, "Half of Twitter's Top Advertisers Have Left the Platform Since Elon Musk's Takeover, Report Says," *USA Today*, November 28, 2022, available at https://www.usatoday.com/story/tech/2022/11/28/twitter-loses-advertisers-after-elon-musk/10790189002/.

Polacek, Scott, "Lincoln Riley Defends USC's Transfer Moves: 'We Didn't Take Players from Oklahoma,'" *Bleacher Report*, February 8, 2022, available at https://bleacherreport.com/articles/10026297-lincoln-riley-defends-uscs-transfer-moves-we-didnt-take-players-from-oklahoma.

Polacek, Scott, "QB Justin Fields Announces Transfer to Ohio State from Georgia," *Bleacher Report*, January 4, 2019, available at https://bleacherreport.com/articles/2811471-qb-justin-fields-reportedly-finalizing-transfer-from-georgia-to-ohio-state.

Post, John, "Small Business Owners See New Opportunities With NIL Era in College Athletics," *Talk Business*, September 1, 2021, available at https://talkbusiness.net/2021/09/small-business-owners-see-new-opportunities-with-nil-era-in-college-athletics/.

Prasadh, Nishant, "Football: Meet the Recruits 2017 - Bruce Jordan-Swilling," *From the Rumble Seat*, February 17, 2017, available at https://www.fromtherumbleseat.com/2017/2/17/14638472/football-meet-the-recruits-2017-bruce-jordan-swilling.

Prehm, Matt, "Bennett Williams Details What Went into His Decision to Return to Oregon for 2022 Instead of Going to the NFL," *247Sports*, April 12, 2022, available at https://247sports.com/college/oregon/Article/Oregon-Ducks-Football-Bennett-Williams-186122550/.

Primack, Dan, "Exclusive: Crypto.com Passes the 50 Million User Mark," *Axios*, May 6, 2022, available at https://www.axios.com/2022/05/06/exclusive-cryptocom-passes-the-50-million-user-mark.

Prisbell, Eric, "College Sports Business Notes: On Anthony Richardson's NIL Deal, Army's Star and Oliver Luck," *On3*, April 19, 2022, available at https://www.on3.com/nil/news/college-notes-florida-anthony-richardson-nil-army-andre-carter-oliver-luck/.

*Confidential*

Rabalais, Scott, "LSU Women's Basketball Flips Alisa Williams From TCU to Tigers for 2022-23," *The Advocate,* June 1, 2021, available at https://www.theadvocate.com/baton_rouge/sports/lsu/lsu-womens-basketball-flips-alisa-williams-from-tcu-to-tigers-for-2022-23/article_76a37cbc-c2f2-11eb-b383-d7d634f255f3.html.

Ray, Matt, "Spyre Sports Group Announces NIL Totals," *Sports Illustrated*, June 22, 2022, available at https://www.si.com/college/tennessee/football/spyre-sports-group-announces-nil-totals.

Raynor, Grace and Manny Navarro, "Deion Sanders' Unwanted Colorado Commits Searching for a New Home," *The Athletic*, December 19, 2022, available at https://theathletic.com/4005958/2022/12/19/deion-sanders-colorado-commitments/.

Recruit Ref, "When Can College Coaches Make You An Offer?" available at https://www.recruitref.com/blog/when-can-college-coaches-make-you-an-offer, accessed on March 24, 2023.

Renard, Brady, "LSU Guard Domonique Davis Enters Transfer Portal," *KPLC News*, May 20, 2021, available at https://www.kplctv.com/2021/05/20/lsu-guard-domonique-davis-enters-transfer-portal/.

Reynolds, Kevin, "BYU launches potential $20 million NIL partnership, bringing NFTs into the name, image and likeness arms race," *The Salt Lake Tribune*, August 16, 2022, available at https://www.sltrib.com/sports/byu-cougars/2022/08/16/byu-launches-potential-20/.

Rice, Lynette, "How Cameo is Booming in the Pandemic Era," *Entertainment Weekly*, January 28, 2021, available at https://ew.com/celebrity/cameo-booming-pandemic-era/.

Ristoff, Jared, "Industry Report NN003 Video Games in the US," *IBISWorld*, 2021.

Rittenberg, Adam and Alex Scarborough, "CFB's Wildest Coach and QB Carousel Ever," *ESPN*, available at https://www.espn.com/espn/feature/story/_/id/34335776/charting-wildest-offseason-college-football-movement-ever, accessed on February 6, 2023.

Rittenberg, Adam, "18 Players on Deion Sanders-Coached Buffaloes in Transfer Portal," *ESPN*, April 24, 2023, available at https://www.espn.com/college-football/story/_/id/36280712/montana-lemonious-craig-4-colorado-players-enter-portal.

Rittenberg, Adam, "Miami QB N'Kosi Perry Enters Transfer Portal," *ESPN*, January 7, 2021, available at https://www.espn.com/college-football/story/_/id/30669505/miami-qb-nkosi-perry-enters-transfer-portal.

Roback, Jennifer, "UCLA Women's Basketball Partners with Cryptocurrency Company FTX," *Women In Sports*, December 9, 2021, available at https://www.womensinsports.com/post/ucla-womens-basketball-partners-ftx.

Rocket Brush Studio, "How Much Does It Cost to Develop a Game," May 6, 2022, available at https://rocketbrush.com/blog/how-much-does-it-cost-to-develop-a-game.

Rookie Road, "Football Leagues List," available at https://www.rookieroad.com/football/leagues/, accessed on April 15, 2023.

Roser, Jerit, "LSU Adds Former Destrehan Star Cara 'Moon' Ursin in Transfer from Baylor," *LSU Rivals*, June 2, 2021, available at https://lsu.rivals.com/news/lsu-adds-former-destrehan-star-cara-moon-ursin-in-transfer-from-baylor.

Rothstein, Michael, "EA Sports to Release College Football Game in Summer 2024," *ESPN*, November 22, 2022, available at https://www.espn.com/college-football/story/_/id/35082744/ea-sports-release-college-football-game-summer-2024.

Royer, Benjamin, "Forward Emily Bessoir Tears ACL, to Miss Season for UCLA Women's Basketball," *Sports Illustrated*, October 8, 2021, available at https://www.si.com/college/ucla/womens-basketball/forward-emily-bessoir-tears-acl-to-miss-season-for-ucla-womens-basketball.

Russo, Ralph D., "New Online NIL Marketplace Connects Fans to College Athletes," *AP News*, August 1, 2022, available at https://apnews.com/article/college-football-sports-70842c5b8b188b71f95f62d5bf9d5611.

Rutgers University Libraries, "Labor Organizations in the Sports Industry," available at https://libguides.rutgers.edu/c.php?g=336678&p=2267003, accessed on March 27, 2023.

Ryan, Matthew, "Three Schools Join Colonial Athletic Association," *The Villanovan*, January 26, 2022, available at https://villanovan.com/19097/sports/three-schools-join-colonial-athletic-association/.

Saleh, Tariq, "IMG Lands Multiple Broadcast Deals for Saudi Pro League as Ronaldo Boosts Interests," *Sportcal*, January 23, 2023, available at https://www.sportcal.com/media/img-lands-multiple-broadcast-deals-for-saudi-pro-league-as-ronaldo-boosts-interest/.

Sallee, Barrett, "Ohio State QB Tate Martell Enters Into NCAA Transfer Portal in Wake of Justin Fields Joining Buckeyes," *CBS Sports*, available at https://www.cbssports.com/college-football/news/ohio-state-qb-tate-martell-enters-into-ncaa-transfer-portal-in-wake-of-justin-fields-joining-buckeyes/.

Saunders, Patrick, "Deion Sanders Reaps Instant Awards as Colorado Changes Transfer Policy," *The Denver Post*, December 4, 2022, available at https://www.denverpost.com/2022/12/04/deion-sanders-instant-rewards-colorado-changes-transfer-policy/.

Scanlon, Krystal, "Where Exactly Are Twitter's Lost Ad Dollars Going?" *Digiday*, November 16, 2022, available at https://digiday.com/marketing/where-exactly-are-twitters-lost-ad-dollars-going/.

Schoenfeld, Bruce, "Student. Athlete. Mogul?" *The New York Times*, January 29, 2023, available at https://www.nytimes.com/2023/01/24/magazine/ncaa-nba-student-athlete.html.

Schutte, Dustin, "How Every Power 5 Conference Fared with 4- and 5-Star Recruits in 2022 Class," *Saturday Tradition*, available at https://saturdaytradition.com/big-ten-football/how-every-power-5-conference-fared-with-4-and-5-star-recruits-in-2022-class/, accessed on March 20, 2023.

SEC Network, "SEC Leads Nation for 16 Consecutive Year in NFL Draft", April 29, 2022, available at https://www.secsports.com/article/33821910/sec-leads-nation-16th-consecutive-year-nfl-draft.

Shanker, Jared, "FSU Chips in on Winston's Insurance," *ESPN*, August 4, 2014, available at https://www.espn.com/college-football/story/_/id/11310051/jameis-winston-insurance-policy-paid-part-florida-state.

Shapiro, Michael, "Former Ohio State QB Matthew Baldwin Transfers to TCU, Will Apply for Immediate Eligibility," *Sports Illustrated*, May 7, 2019, available at https://www.si.com/college/2019/05/07/matthew-baldwin-transfer-tcu-ohio-state-quarterback-eligibility.

Shapiro, Michael, "Kim Mulkey Reveals Why She Left Baylor for LSU," *Sports Illustrated*, November 10, 2021, available at https://www.si.com/college/2021/11/10/kim-mulkey-reveals-decision-leave-baylor-lsu.

Sharma, Sushma, "Industries Thriving During the Pandemic," *Forbes*, December 18, 2020, available at https://www.forbes.com/sites/forbestechcouncil/2020/12/18/industries-thriving-during-the-pandemic.

Sheldon, Dan, et al., "Inside Cristiano Ronaldo's Move to Saudi Arabia's Al Nassr: Rejection, Revenge and Soft Power," *The Athletic*, January 11, 2023, available at https://theathletic.com/4077544/2023/01/11/cristiano-ronaldo-saudi-arabia-al-nassr/.

Simlot, Vinay, "Spyre Sports Brings More than $4 Million in NIL Deals for UT Athletes," *WBIR*, September 13, 2022, available at https://www.wbir.com/article/news/local/over-4-million-in-nil-deals-for-ut-athletes/51-4d47002d-706d-424e-a809-f96aeccc934a.

Sladek, Tommy, "'What a Catch!' SU Softball Featured on SportsCenter's 'Top 10 Plays' Twice in One Week," *CNY Central*, April 14, 2021, available at https://cnycentral.com/sports/college/what-a-catch-su-softball-featured-on-sportscenters-top-10-plays-twice-in-one-week.

Snyder, Audrey, "Julian Lewis and the Life of a 14-Year-Old Quarterback Recruit: Early Offers and the Fine Line of Growing up Quickly," *The Athletic*, February 1, 2022, available at https://theathletic.com/3104875/2022/02/01/julian-lewis-and-the-life-of-a-14-year-old-quarterback-recruit-early-offers-and-the-fine-line-of-growing-up-quickly/.

Sorare, "Chris Paul," available at https://sorare.com/nba/cards/chris-paul-19850506-2022-limited-741, accessed on March 20, 2023.

Southern Miss, "Domonique Davis," available at https://southernmiss.com/sports/womens-basketball/roster/domonique--davis/8907, accessed on March 17, 2023.

Spencer, Adam, "SEC Leads All Conferences in First-Round Picks Once Again During 2019 NFL Draft," *Saturday Down South*, available at https://www.saturdaydownsouth.com/sec-football/sec-leads-all-conferences-in-first-round-picks-once-again-during-2019-nfl-draft/, accessed on March 20, 2023.

Spenser, Davis, "Michigan State Kicker Goes Viral For Hilarious Paid Tweet on Day 1 of New NIL Rules," *Saturday Tradition*, 2021, available at https://saturdaytradition.com/michigan-state-football/michigan-state-kicker-goes-viral-for-hilarious-paid-tweet-on-day-1-of-new-nil-rules/.

Sports Business Journal, "New Big East, Fox Sports Formally Ink 12-Year, $500M Deal; ESPN Signs Mountain West," March 21, 2013, available at https://www.sportsbusinessjournal.com/Daily/Issues/2013/03/21/Media/Big-East-MWC.aspx.

Spotrac, "NBA 2022 Draft Tracker," available at https://www.spotrac.com/nba/draft/, accessed on March 17, 2023.

Stone, Larry, "Breanna Stewart and Other Stars Are Forming Super Teams, But Is That Good for the WNBA?" *The Seattle Times*, February 7, 2023, available at https://www.seattletimes.com/sports/storm/breanna-stewart-and-other-stars-are-forming-super-teams-but-is-that-good-for-the-wnba/.

Strauss, Ben and Emily Giambalvo, "Big Ten Turns Away from ESPN to Sign Record $7 Billion Deal for TV Rights," *The Washington Post*, August 18, 2022, available at https://www.washingtonpost.com/sports/2022/08/18/big-ten-tv-rights/.

Suitts, Phillip, "Former Miami Hurricanes Quarterback N'Kosi Perry is Transferring to Florida Atlantic," *The Palm Beach Post*, April 28, 2021, available at https://www.palmbeachpost.com/story/sports/college/owls/2021/04/28/nkosi-perry-transfers-miami-hurricanes-florida-atlantic-owls/4875177001/.

Suttles, Aaron, "Why Did Nick Saban Rant About Texas A&M and NIL? Breaking Down the Fiery Comments," *The Athletic*, May 19, 2022, available at https://theathletic.com/3322292/2022/05/19/nick-saban-jimbo-fisher-texas-am/.

Swim Swam, "Grant House," available at https://swimswam.com/bio/grant-house/, accessed on March 16, 2023.

Taglione, Jennifer, "Football's Bend-and-Snap and Other Key Terms," *Bleacher Report*, January 7, 2009, available at https://bleacherreport.com/articles/108065-footballs-bend-and-snap-and-other-key-terms.

Taranto, Steven, "Olympic Gold Medalist Gable Steveson Signs Multi-Year Agreement With WWE but Will Return to Minnesota," *CBS Sports*, September 9, 2021, available at https://www.cbssports.com/wwe/news/olympic-gold-medalist-gable-steveson-signs-multi-year-agreement-with-wwe-but-will-return-to-minnesota/.

Taylor, G. Allan, "For Athletes Eager to Secure NIL Deals, It's Probably Better to Look Before They Leap into the 'Whirlwind'," *The Athletic*, July 12, 2021, available at https://theathletic.com/2700091/2021/07/12/for-athletes-eager-to-secure-nil-deals-its-probably-better-to-look-before-they-leap-into-the-whirlwind/.

Team Canada, "FAQ: What Are the Pan American Games?" available at https://olympic.ca/faq-what-are-the-pan-american-games/, accessed on March 21, 2023.

Tennessee Code Annotated § 49-7-2802, available at https://casetext.com/statute/tennessee-code/title-49-education/chapter-7-postsecondary-and-higher-education-generally/part-28-intercollegiate-athletes-name-image-or-likeness/section-49-7-2802-compensation-for-use-of-intercollegiate-athletes-name-image-or-likeness.

Terry, Shannon, "About On3 NIL Valuation, Brand Value, Roster Value," *On3*, July 29, 2022, available at https://www.on3.com/nil/news/about-on3-nil-valuation-per-post-value/.

Texas Collegiate League, "Overview," available at https://www.texascollegiateleague.com/about/overview/, accessed on March 21, 2023.

Texas Education Code § 51.9246, available at https://casetext.com/statute/texas-codes/education-code/title-3-higher-education/subtitle-a-higher-education-in-general/chapter-51-provisions-generally-applicable-to-higher-education/subchapter-z-miscellaneous-provisions/section-519246-compensation-and-professional-representation-of-student-athletes-participating-in-intercollegiate-athletic-programs.

Texas Tech, "Texas Tech to Offer Academic Achievement Awards," March 2, 2022, available at https://texastech.com/news/2022/3/2/general-texas-tech-to-offer-academic-achievement-awards.aspx.

Thamel, Pete, "Ex-West Virginia QB JT Daniels Transferring to Rice," *ESPN*, December 20, 2022, available at https://www.espn.com/college-football/story/_/id/35295207/ex-west-virginia-qb-jt-daniels-transferring-rice-fourth-school.

Thamel, Pete, "Sources: WVU QB JT Daniels Looks to Transfer to 4 School," *ESPN*, December 6, 2022, available at https://www.espn.com/college-football/story/_/id/35196186/sources-wvu-qb-jt-daniels-looks-transfer-4th-school.

The Crispy Cones, "Find a Location Near You," available at https://thecrispycones.com/locations, accessed on April 12, 2023.

Thorsen, Tor, "EA: No NCAA Basketball in 2010," *GameSpot*, February 12, 2010, available at https://www.gamespot.com/articles/ea-no-ncaa-basketball-in-2010/1100-6250337/.

Tillery, Joe, "Name, Image, Likeness Resulting in Fewer NFL Draft Early Entries," *Heartland College Sports*, January 20, 2023, available at https://www.heartlandcollegesports.com/2023/01/20/name-image-likeness-resulting-in-fewer-nfl-draft-early-entries/.

Trahan, Kevin, "What are the Differences Between Redshirting, Grayshirting, Blueshirting and Greenshirting in College Football?" *SB Nation*, February 1, 2017, available at https://www.sbnation.com/college-football-recruiting/2016/1/28/10842688/ncaa-football-grayshirt-blueshirt-redshirt-rules.

University of Miami, "Student-Athlete Handbook: 2022-2023," available at https://storage.googleapis.com/hurricanesports-com/2023/03/50891225-2022-23-sa-handbook-final-3.20.2023.pdf.

University of Pittsburgh, "Pandemic Impacts on Pittsburgh's Restaurant Industry," December 3, 2020, available at https://ucsur.pitt.edu/perspectives.php?b=20201211372543.

University of Virginia, "2017-18 Student Athlete Handbook," available at https://athletics.virginiasports.com/compliance/pdf/S-AHandbook2017-18.pdf.

Warren, Jillian, "How to Plan a Product Launch on Social Media," *Later*, May 9, 2021, available at https://later.com/blog/product-launch-social-media/.

Wasserman, Ari, "Matthew Baldwin in the Transfer Portal: Why He's Leaving Ohio State and What's Next for the Buckeyes," *The Athletic*, April 18, 2019, available at https://theathletic.com/933118/2019/04/18/matthew-baldwin-ohio-state-transfer-portal/.

Webber, Dylan and Dean Legge, "Insider Look at the Georgia Bulldogs' 2018 Season: Jake Fromm & Justin Fields," *Dawg Post*, January 10, 2021, available at https://dawgpost.com/s/3130/insider-look-at-the-georgia-bulldogs-2018-season-jake-fromm-justin-fields.

Weinstein, Robbie, "UNLV QB Justin Rogers, Former 4-Star Recruit, Enters NCAA Transfer Portal," *247Sports*, January 24, 2022, available at https://247sports.com/Article/UNLV-QB-Justin-Rogers-former-4-star-recruit-enters-NCAA-Transfer-Portal-181344508/.

Werner, Jeremy, "'I Think It's Huge': NCAA's Scholarship Limit Change Relieves Roster Crunch for Illini Football," *247Sports*, May 25, 2022, available at https://247sports.com/college/illinois/Article/Illinois-football-recruiting-Pat-Embleton-85-man-scholarship-class-limit-187915667/.

West, Jenna, "Graduate Transfer QB D'Eriq King Picks Miami," *Sports Illustrated*, January 19, 2020, available at https://www.si.com/college/2020/01/19/deriq-king-miami-transfer-eligibility.

Whitaker, Bill, "Some Colleges Axing 'Secondary Sports' Like Gymnastics and Tennis as Pandemic Continues," *CBS News*, December 6, 2020, available at https://www.cbsnews.com/news/college-sports-cuts-gymnastics-swimming-pandemic-60-minutes-2020-12-06/.

Williams, Madison, "Kentucky Star Oscar Tshiebwe to Make $500,000 in NIL Deals on Weeklong Bahamas Trip, per Report," *Sports Illustrated*, August 10, 2022, available at https://www.si.com/college/2022/08/10/oscar-tshiebwe-bahamas-nil-deals.

Wilson, Mike, "Hendon Hooker Signs NIL Deal with French's Year After Tennessee Fan Threw Mustard Bottle on Field," *USA Today*, November 4, 2022, available at https://www.usatoday.com/story/sports/ncaaf/sec/2022/11/04/hendon-hooker-nil-deal-frenchs/8270390001/.

Wittry, Andy, "College Basketball Dictionary: 51 Terms Defined," *NCAA*, November 16, 2021, available at https://www.ncaa.com/news/basketball-men/article/2020-11-15/college-basketball-dictionary-51-terms-defined.

Wittry, Andy, "Hawkeye Academic Advantage Program Details Iowa's Alston Awards," *On3*, August 16, 2022, available at https://www.on3.com/news/university-iowa-hawkeyes-college-football-alston-awards-hawkeye-academic-advantage-program/.

Wittry, Andy, "The On3 Guide to Alston Awards—Education-Related Compensation," *On3*, September 20, 2022, available at https://www.on3.com/news/alston-awards-ncaa-v-alston-supreme-court-of-the-united-states-brett-kavanaugh/.

Wittry, Andy, "Wisconsin's Alston Awards Offer Up to $25,000 Upon Graduation," *On3*, September 19, 2022, available at https://www.on3.com/news/wisconsins-alston-awards-badgers-policy-academic-achievement-ncaa-supreme-court/.

Wogenrich, Mark, "Penn State's James Franklin Calls NIL 'the Wild, Wild West,'" *Sports Illustrated*, December 26, 2022, available at https://www.si.com/college/pennstate/football/penn-state-football-james-franklin-nil-wild-wild-west.

Wood, Trent, "6 Former Utah State Gymnasts, Among Them an All-American, Have Transferred to Clemson," *Deseret News*, May 24, 2022, available at https://www.deseret.com/2022/5/24/23139963/clemson-gymnastics-tigers-inaugural-signing-class-former-utah-state-aggies-brie-clark-rebecca-wells.

Yuke's, "Game Releases," available at https://www.yukes.co.jp/en/service-en/games-en/works/, accessed on April 18, 2023.

Zucker, Joseph, "LeBron James Jr. Reportedly Has Scholarship Offers From Duke, Kentucky," *Bleacher Report*, June 20, 2016, available at https://bleacherreport.com/articles/2647434-lebron-james-jr-reportedly-has-scholarship-offers-from-duke-kentucky.

# APPENDIX D

**The Ripple Effects of Justin Fields and D'Eriq King Entering the Transfer Portal**
**Sources to Report Figure 2**

| Event | Source |
|---|---|
| Fromm is designated as starting QB and Fields is designated as backup QB. | Webber, Dylan and Dean Legge, "Insider Look at the Georgia Bulldogs' 2018 Season: Jake Fromm & Justin Fields,"*Dawg Post,* January 10, 2021, available at https://dawgpost.com/s/3130/insider-look-at-the-georgia-bulldogs-2018-season-jake-fromm-justin-fields. |
| Transfer announced: Justin Fields, Georgia to Ohio State. | Polacek, Scott, "QB Justin Fields Announces Transfer to Ohio State from Georgia," *Bleacher Report,* January 4, 2019, available at https://bleacherreport.com/articles/2811471-qb-justin-fields-reportedly-finalizing-transfer-from-georgia-to-ohio-state. |
| Tate Martell enters transfer portal. | Sallee, Barrett, "Ohio State QB Tate Martell Enters Into NCAA Transfer Portal in Wake of Justin Fields Joining Buckeyes,"*CBS Sports,* available at https://www.cbssports.com/college-football/news/ohio-state-qb-tate-martell-enters-into-ncaa-transfer-portal-in-wake-of-justin-fields-joining-buckeyes/. |
| Transfer announced: Tate Martell, Ohio State to Miami. | Litman, Laken, "Tate Martell Lived Both Sides of the Transfer Portal on His Way to Miami," *Sports Illustrated,* January 16, 2019, available at https://www.si.com/college/2019/01/16/tate-martell-miami-ohio-state-transfer-portal. |
| Matthew Baldwin enters transfer portal. | Wasserman, Ari, "Matthew Baldwin in the Transfer Portal: Why He's Leaving Ohio State and What's Next for the Buckeyes,"*The Athletic,* April 18, 2019, available at https://theathletic.com/933118/2019/04/18/matthew-baldwin-ohio-state-transfer-portal/. |
| Transfer announced: Matthew Baldwin, Ohio State to TCU. | Shapiro, Michael, "Former Ohio State QB Matthew Baldwin Transfers to TCU, Will Apply for Immediate Eligibility,"*Sports Illustrated,* May 7, 2019, available at https://www.si.com/college/2019/05/07/matthew-baldwin-transfer-tcu-ohio-state-quarterback- |
| D'Eriq King enters the transfer portal. | Khan Jr., Sam, "Houston QB D'Eriq King Announces He Has Entered the Transfer Portal,"*ESPN,* January 13, 2020, available at https://www.espn.com/college-football/story/_/id/28480112/houston-qb-deriq-king-announces-entered-transfer-portal. |
| Transfer announced: D'Eriq King, Houston to Miami. | West, Jenna, "Graduate Transfer QB D'Eriq King Picks Miami," *Sports Illustrated,* January 19, 2020, available at https://www.si.com/college/2020/01/19/deriq-king-miami-transfer-eligibility. |
| Jarren Williams enters transfer portal. | Goldberg, Rob, "Miami QB Jarren Williams Enters Portal After D'Eriq King Transfer,"*Bleacher Report,* January 23, 2020, available at https://bleacherreport.com/articles/2872890-report-miami-qb-jarren-williams-enters-portal-after-deriq-king-transfer. |
| Transfer announced: Jarren William, Miami to Garden City Community College. | Geisinger, Brian, "Report: Ex-Miami QB Jarren Williams Will Transfer to Garden City CC,"*ACC Sports,* June 21, 2020, available at https://accsports.com/acc-news/headline-news/ex-miami-qb-jarren-williams-will-transfer-to-garden-city-cc/. |
| Transfer announced: Jarren Williams, Garden City Community College to USF. | Baker, Matt and Mari Faiello, "USF Signs Two Quarterbacks, Including Former Miami Start Jarren Williams,"*Tampa Bay Times,* December 16, 2020, available at https://www.tampabay.com/sports/bulls/2020/12/16/usf-signs-two-quarterbacks-including-former-miami-starter-jarren-williams/. |
| N'Kosi Perry enters transfer portal. | Rittenberg, Adam, "Miami QB N'Kosi Perry Enters Transfer Portal," *ESPN,* January 7, 2021, available at https://www.espn.com/college-football/story/_/id/30669505/miami-qb-nkosi-perry-enters-transfer-portal. |
| Transfer announced: N'Kosi Perry, Miami to Florida Atlantic. | Suitts, Phillip, "Former Miami Hurricanes Quarterback N'Kosi Perry is Transferring to Florida Atlantic,"*The Palm Beach Post,* April 28, 2021, available at https://www.palmbeachpost.com/story/sports/college/owls/2021/04/28/nkosi-perry-transfers-miami-hurricanes-florida-atlantic-owls/4875177001/. |
| Transfer announced: Jarren Williams, USF to Alabama A&M. | Gaither, Steven J , "Ex-Miami, USF QB Jarren Williams Commits to AAMU,"*HBCU Gameday,* December 13, 2021, available at https://hbcugameday.com/2021/12/13/ex-miami-usf-qb-jarren-williams-commits-to-aamu/. |
| Tate Martell enters transfer portal. | Papke, Grey, "Miami QB Tate Martell Once Again Enters Transfer Portal,"*Larry Brown Sports,* January 27, 2021, available at https://larrybrownsports.com/college-football/tate-martell-transfer-portal-miami/572681. |
| Transfer announced: Tate Martell, Miami to the University of Las Vegas. | Lind, Andrew, "Former Ohio State, Miami Quarterback Tate Martell Reportedly Transferring to UNLV,"*Sports Illustrated,* July 25, 2021, available at https://www.si.com/college/ohiostate/football/ohio-state-football-former-buckeyes-miami-hurricanes-quarterback-tate-martell-reportedly-transferring-to-unlv-rebels. |
| Justin Rogers enters transfer portal. | Weinstein, Robbie, "UNLV QB Justin Rogers, Former 4-Star Recruit, Enters NCAA Transfer Portal,"*247Sports,* January 24, 2022, available at https://247sports.com/Article/UNLV-QB-Justin-Rogers-former-4-star-recruit-enters-NCAA-Transfer-Portal-181344508/. |
| Transfer announced: Justin Rogers, from the University of Las Vegas to Auburn. | Nagy, Zack, "LSU Transfer Target DL Justin Rogers Announces Commitment to SEC Foe," Sports Illustrated  January 12, 2023, available at https://www.si.com/college/lsu/football/_/lsu-transfer-target-dl-justin-rogers-announces-commitment-to-sec-foe. |