# EXHIBIT 2

# To the Declaration of Rakesh N. Kilaru

# REDACTED VERSION OF DOCUMENT REQUESTED TO BE FILED UNDER SEAL

# Report of Bob Thompson

# **Thompson Sports Group, LLC**

## In Re: College Athlete NIL Litigation

## Case No. 4:20-cv-03919-CW

### April 28, 2023

# TABLE OF CONTENTS

**Page**

1.   SUMMARY OF ENGAGEMENT .............................................................1

   1.A.   Qualifications ..........................................................1
   1.B.   Scope of Engagement ...............................................3

2.   EXECUTIVE SUMMARY ......................................................................3

   2.A.   Summary of Selected Factors Refuting and Undermining Desser's 10% Opinion ....................................4
   2.B.   Summary of Selected Factors Refuting and Undermining Desser's Allocation Opinion .........................5

3.   HOW MEDIA RIGHTS AGREEMENTS ARE NEGOTIATED .............7

   3.A.   Broadcast Rights Belong to the Promoter of an Event ........7
   3.B.   Networks Contract for Broadcast Rights ..........................7
   3.C.   Various Structures for Licensing Broadcast Rights ...........8
   3.D.   In College Sports, Networks Often License Broadcast Rights to Multiple Sports ....................................10

4.   MEDIA RIGHTS AGREEMENTS TYPICALLY INCLUDE RIGHTS IN ADDITION TO BROADCAST RIGHTS ..........................13

   4.A.   Sponsorship Rights ...............................................14
   4.B.   Trademark Rights .................................................15
   4.C.   Data Rights .........................................................15
   4.D.   Websites .............................................................16
   4.E.   Additional Benefits ..............................................16

5.   HOW NETWORKS VALUE BROADCAST RIGHTS .........................17

6.   DESSER ADMITS HE HAS NO OPINION ABOUT INDIVIDUAL BROADCAST NIL VALUE, WHICH VARIES WIDELY AMONG STUDENT-ATHLETES ..........................................30

   6.A.   NIL Value Varies Widely Among Student-Athletes .........30
   6.B.   Appearing in Nationally Televised Games Creates Individual Endorsement NIL Value for Student-Athletes ..............................................................31

7.   DESSER'S 10% OPINION IS FUNDAMENTALLY FLAWED ...........35

   7.A.   There Is No Separate Market for Broadcast NIL .............35

**TABLE OF CONTENTS**
(continued)

**Page**

7.B.      Desser Has No Support for His 10% Estimate of
          Collective Broadcast NIL Value ........................................... 37

7.C.      It Is Not Possible (and Desser Is Incorrect in
          Attempting) to Draw Uniform Conclusions About the
          Relative Value of "Broadcast NIL" to the Total Rights
          Fee and Apply Those Conclusions to Every Media
          Rights Agreement ............................................................... 43

7.D.      Desser Acknowledges and Then Ignores the
          Distinction Between Use of NIL to Promote a
          Broadcast and the Use of NIL in a Broadcast ................... 45

8.    DESSER'S ALLOCATION OPINION IS FUNDAMENTALLY
      FLAWED .......................................................................................... 46

8.A.      Networks Pay a Single Fee to Broadcast Multiple
          Sports .................................................................................... 48

8.B.      Relative Valuation Generalizations Are Invalid .............. 48

8.C.      Desser Admits He Cannot Rely on Television Ratings .... 50

8.D.      Conference Media Agreements and Financial
          Statements Do Not Support His Allocation Opinion ........ 51

8.E.      Other Sports ........................................................................ 54

APPENDIX A ................................................................................................. 1

# 1.   SUMMARY OF ENGAGEMENT.

## 1.A. Qualifications.

My name is Bob Thompson. For more than 42 years I have been continuously involved in the television business and, more specifically, the sports television business. Prior to forming Thompson Sports Group, LLC in August 2009, I served as President of Fox Sports Networks where I was responsible for oversight and day-to-day management of Fox's cable television sports networks. I simultaneously served as President of Fox Sports International overseeing all of Fox Sports' international activities.

I have negotiated more than 200 television rights agreements with collegiate conferences, professional sports teams, leagues, events and tours. A number of those rights agreements conveyed television rights from the Atlantic Coast Conference (ACC), The Big Ten Conference, the Big 12 Conference, Pac-12 Conference, and the Southeastern Conference (SEC) to various Fox outlets. I have been directly involved in the launch of 18 regional and national sports television networks.

I began my career in 1981 selling cable television subscriptions for Storer Cable Communications in Aloha, Oregon, near my hometown of Portland. I remained with Storer until February 1989. While at Storer, I was promoted to the following positions: Oregon Area Marketing Manager (Portland), Corporate Sales Development Manager (Miami), Western Regional Sales and Marketing Manager (Phoenix), Vice President, Sales and Marketing, Southwestern Region (Houston) and Vice President/General Manager, Advertising Sales (Washington, D.C.).

I left Storer in 1989 to become the first Vice President/General Manager of Prime Sports Network (PSN) in Denver, Colorado. PSN served five states in the Rocky Mountain Region and it is now known as ATT SportsNet Rocky Mountain. During this time I also launched Prime Sports Utah, Prime Sports Midwest, and Prime Sports Upper Midwest.

In 1995, I was promoted to Senior Vice President of Regional Network Operations for Liberty Sports, the parent company of PSN. In this role, I was responsible for the company's nine regional sports networks. In 1996, Fox and Liberty Sports combined to create Fox/Liberty Networks and I was named Senior Vice President, Rights Acquisitions and Regional Network Operations. Within the year, I was promoted to Executive Vice President.

In 1998, after Fox had taken complete control of Fox/Liberty Networks, I was named to the additional post of Executive Vice President and Chief Operating Officer of Fox Sports International, expanding my responsibilities to include international operations. In June 1999, I was promoted to Chief Operating Officer, Fox Sports Networks. I was named to the position of President of both groups in July 2000.

I played a vital role in expanding Fox's regional sports networks to a total of 22 outlets. I also oversaw the development and management of a variety of Fox's national cable sports networks, including Fox Sports Net, SPEED, Fox Soccer Channel, Fox Sports en Español, FUEL TV, The Big Ten Network (BTN), and Fox College Sports, as well as its website, FoxSports.com.

Internationally, I was responsible for Fox Sports Latin America, Fox Sports Middle East, Fox Sports Europe, and Fox Sports International Syndication Sales. In 2008, I was awarded a national Sports Emmy Award for Executive Producing the FSN series "SportsScience."

I have served on the board of directors of The Golf Channel, SpeedVision, Rogers SportsNet in Canada, Outdoor Life Network, HDNet, Fox Pan American Sports, Mobile TV Group, and The Big Ten Network, and I was the FOX ownership representative to the Colorado Rockies Baseball Club.

I retired from Fox full-time in July 2009, but remained an advisor to the company through 2014. In August of 2009, I formed Thompson Sports Group to represent clients in a variety of industries in their dealings with sports television networks, program distributors, and professional teams, leagues, and collegiate conferences.

My clients have included Fox Sports Media Group, Montreal Canadiens NHL team, Colorado Rockies MLB team, Yankees Entertainment and Sports (YES), Fox Networks Group, Fenway Sports Group, DirecTV Sports, Washington Nationals MLB team, TPG Capital L.P., New Jersey Devils NHL team, Ares Capital Management, Navigate Research, The CW, and Mobile TV Group, L.P.

I have no publications in the past ten years. I have not testified as an expert at trial or by deposition in the past four years. The documents and materials I relied upon are listed in Appendix A.

## 1.B. Scope of Engagement.

The Defendants in *In re College Athlete NIL Litigation*, Case No.: 4:20-cv-03919-CW, which is pending in the United States District Court for the Northern District of California, engaged me to offer my expert opinion in response to Plaintiffs' expert Edwin S. Desser's testimony and report. Specifically, I have been retained to evaluate Desser's report and testimony and the materials he relied upon, and to determine whether he is correct in concluding that:

> "[A]pproximately 10% of the media broadcast revenue to the Power 5 [or "Autonomy 5" or "A5"] conferences (and Notre Dame) for [football and men's and women's basketball] is a reasonable and conservative estimate of the collective marketplace value of the NIL of college athletes provided via these media rights contracts."[1] (Desser's "10% Opinion").

> "Of the athlete NIL revenue in multi-sports agreements, 75% should be allocated to football, 15% to men's basketball, 5% to women's basketball and 5% to Olympic Sports."[2] (Desser's "Allocation Opinion").

For my work in this case, I am being compensated at my current standard hourly rate of $1,500.00, which is not dependent on the outcome of this litigation or the opinions I am offering. All of my opinions expressed in this report are my own.

This report addresses the Desser Report provided in connection with Plaintiffs' motion for class certification. I would like to reserve the right to update or supplement my opinions offered in this report based on subsequent reports, supplementations, or revisions to the Desser Report, including additional reports related to the merits. I also would like to reserve the right to update or supplement my opinions based on any additional documents or other information that is provided to me as a result of continued discovery in the case or any other information that arises as the case continues.

## 2.   EXECUTIVE SUMMARY.

My ultimate conclusions are that Desser's 10% Opinion and his Allocation Opinion are incorrect and do not accurately reflect either: (a) any NIL value

---

[1] Expert Report of Edwin S. Desser dated October 21, 2022 ("Desser Report"), p. 63, § 18.
[2] *Id.*

contributed by student-athletes who appear in game broadcasts; or (b) the relative values of the right to broadcast football, men's basketball, women's basketball games, and so called "Olympic" sports pursuant to a multi-sport broadcast agreement at any conference, much less at every A5 conference.

## 2.A. Summary of Selected Factors Refuting and Undermining Desser's 10% Opinion.

1.  Networks assign a value to media rights agreements based on a number of factors. Broadcast NIL is not one of those factors.[3] Network payments for broadcast rights are not based on the NIL value provided by the participants.[4]

2.  As Desser admits, no one has ever tried to assign a value to Broadcast NIL.[5]

3.  There is no market for Broadcast NIL.[6] There has never been a market where, as a separate component of a college sports broadcast, a broadcaster, network, promoter of an event, or rights holder separately calculates the value of the Broadcast NIL.[7] There is no price information for any Broadcast NIL on which a valuation can be based.[8]

4.  Media rights agreements are negotiated between networks and rights holders. Not every right and obligation included in these agreements is (and in many instances cannot be) assigned a quantifiable value, even if the right or obligation has a material impact on the amount of the rights fee.[9] In addition, each media agreement is unique, with a different combination of rights and obligations, all of which impact the rights fee.[10] Accordingly, it is not possible (and Desser is incorrect in attempting) to draw uniform conclusions about relative value components and apply those conclusions to every media rights agreement.[11]

---

[3] *See infra* Sections 4 and 5.
[4] *Id.*
[5] *See infra* Section 7.
[6] *Id. See also infra* Sections 4 and 5.
[7] *Id.*
[8] *See infra* Section 7.
[9] *See infra* Sections 4 and 5.
[10] *Id.*
[11] *Id.*

5.    None of the materials, documents, or examples Desser relies upon to support his 10% Opinion are comparable, related, or in any manner relevant in assessing the broadcast market for college sports or Broadcast NIL value.[12]

6.    Desser mixes up the individual value of NIL rights for endorsing a product or promoting a game with the value of any alleged Broadcast NIL. Yet he acknowledges there is a distinction between the use of NIL rights to promote a broadcast and the so-called use of NIL rights to broadcast a game.[13] He also acknowledges that for many athletes, appearing in broadcasts enhances individual player endorsement NIL value that would not otherwise exist without those appearances. Desser ignores these distinctions and their effects in his report and testimony.[14]

7.    Accordingly, assuming Broadcast NIL exists and is a valid concept (which I understand the Defendants do not concede), it is impossible to calculate for any single student-athlete or for a group of student-athletes, much less all student-athletes within any single A5 conference or all of them combined, the value of the alleged Broadcast NIL rights that are being conveyed to a network or broadcaster, either as a percentage of a media rights fee or otherwise.[15]

8.    For the above reasons, explained in more detail below, Desser's 10% Opinion is unsupported, speculative, and incorrect.

## 2.B. Summary of Selected Factors Refuting and Undermining Desser's Allocation Opinion.

1.    Except for the NCAA Men's Basketball Tournament and the College Football Playoff ("CFP"), almost every college sports media rights agreement, including the agreements that create conference networks, convey to networks the right to broadcast games and events in a variety of sports. Multi-sport media rights

---

[12] *See infra* Section 7.
[13] *Id.*
[14] *Id.*
[15] *See infra* Sections 4-7.

agreements do not segregate the value of the rights payments attributable to any single sport.[16]

2.   Given that there is no specific value assigned to any single sport, it is impossible to determine the relative values of broadcast rights fees (i.e., the percentage of the rights fees attributable to football, men's basketball or women's basketball) paid to any conference or group of conferences pursuant to a multi-sport rights agreement in which the rights fees are not segregated by sport.[17]

3.   From conference to conference, multi-sport rights agreements include varying "packages" of games (e.g., some multi-sport agreements include only football and men's basketball, while others include dozens of sports). It is thus illogical for Desser to conclude that in every multi-sport agreement, 75% of the rights value should be allocated to football, 15% to men's basketball, 5% to women's basketball and 5% to Olympic sports.[18]

4.   The relative value of a license to broadcast events in one sport as compared to another sport varies from school to school, from conference to conference, from school to school within the same conference, from network to network, and from year to year.[19]

5.   There is no logical or commercially valid basis for concluding that the proper allocation of the relative value of broadcast rights payments received by any one or more A5 conferences pursuant to multi-sport broadcast agreements is 75% for football, 15% for men's basketball, 5% for women's basketball, and 5% for all other sports.[20]

6.   The documents and other materials Desser relies upon to reach his Allocation Opinion are incomplete, do not support his opinion, and in multiple instances, contradict his opinion.[21]

---

[16] *See infra* Sections 3-5, and 8.
[17] *Id.*
[18] To the extent that the pandemic resulted in cancellation of games in some sports, the rights fees adjustments do not reflect such percentages either.
[19] *See infra* Sections 3-5, and 8.
[20] *See infra* Section 8.
[21] *Id.*

# 3.   HOW MEDIA RIGHTS AGREEMENTS ARE NEGOTIATED.

## 3.A. Broadcast Rights Belong to the Promoter of an Event.

In the sports media business, the organizer of the event is referred to as the "producer" or "promoter" of the event. In college sports, the promoter of college sports events could be a single member institution, a conference, the NCAA, or a group of conferences and/or schools, like the CFP. In the world of college sports, the promoter of home games is the university or college hosting the game. For conference championships, the promoter is the conference. For NCAA championships, the NCAA is the promoter, and for the national football playoffs and championship games, it is a group of conferences or an organization of conferences. Some other college games and events are sponsored by a bowl organization or a particular network.

Although media outlets and spectators are granted access to the event, through media/press credentials and tickets, both entry methods carry restrictions. Both parties agree to respect the exclusivity of the broadcast rights held by the promoter of the event.

Desser agrees that the promoter of the event owns the broadcast rights.[22]

It should be noted that a distribution of the combined video and audio of a game – commonly referred to as a broadcast – can be distributed on a number of different platforms, including over-the-air television (OTA, such as ABC or FOX), cable (through a cable company such as Comcast, Charter or Cox), via satellite (such as Direct TV and Dish Network), streaming on the internet or through various "apps" such as Amazon Prime, AppleTV+, ESPN+ or Peacock. The platform(s) on which the games will ultimately be distributed is a subject of negotiation in all broadcast rights agreements. For simplicity and clarity, this report often refers to all forms of distribution as a "broadcast."

## 3.B. Networks Contract for Broadcast Rights.

Networks rely on the promoter (or the entity(s) to which broadcast rights are transferred or assigned by the promoter) to obtain all rights necessary for the

---

[22] Trial Testimony of Edwin Desser in *O'Bannon, et al. v. NCAA, et al.*, Case No. C-09-3329-CW (June 12, 2014) ("*O'Bannon* Testimony") at 675:20-676:10. Desser's *O'Bannon* Testimony is Ex. 14 to Desser's Deposition Testimony in this case.

broadcast to occur. Typically, networks will obtain representations and warranties from the licensor[23] and related indemnification protections[24] in this regard.

Networks have very limited interaction with players or any of the game participants in the broadcast. Networks do not obtain consents, waivers, or permissions from any game participant appearing in the broadcast, whether the participant is a student-athlete, coach, cheerleader, band member, referee, or spectator. Further, networks do not pay players or other game participants for the broadcast rights or any related rights conveyed in a media rights agreement.

It is expected and understood within the broadcast industry that individual participants do not own or control any broadcast rights in sports events. It would be inherently impractical for individual participants to own or control broadcast rights in a sports event because any single participant could withhold those rights and prevent the broadcast from occurring.

A network that is licensing broadcast rights from the promoter of the event relies on the promoter to ensure that any necessary clearances or permissions are obtained from the site owner, participants, and any other third parties with respect to the content furnished by the promoter to the network. The network typically retains responsibility for obtaining any necessary clearances or permissions from its own talent and for all other creative elements, music, and other content furnished by the network.

### 3.C. Various Structures for Licensing Broadcast Rights.

Member institutions in a college sports conference typically grant the broadcast rights to some or all of their home games to the conference to be bundled together and licensed in one or more packages. Member institutions may do this to maximize their potential revenue, delegate negotiation of media agreements to the conference, and create uniformity and cohesiveness for broadcasts between and among conference members.

A conference will often license the rights to its member institutions' home games in combination with rights to tournaments and competitions for which

---

[23] Redacted - NSC

[24] Redacted - NSC

the broadcast rights are owned or controlled by the conference. In the college sports context, for example, a network may contract with a single conference for the right to broadcast all or selected home games of the conference's member institutions and/or to broadcast all or a portion of the conference's tournament games.

At the conference level, a traditional media rights agreement authorizes (and often requires) a network to distribute specific games, often to be determined under a selection procedure, at specific times on a specific platform. Outside of those specific times, or "windows" as they are known, the networks also distribute sports news, games and events of various licensors, including pro sports (e.g., ESPN, FS1) or on a platform that distributes a wide variety of content, including general news and entertainment programming (e.g., CBS, NBC, FOX, ABC, Turner, USA, etc.).

The ACC, Big Ten, and SEC have entered into broadcast rights agreements that Redacted - NSC

Those networks are commonly known as the ACC Network, The Big Ten Network, and the SEC Network. The ACC's and SEC's separate agreements with ESPN NSC Redacted - NSC

The agreements also address and include numerous other obligations and rights of the respective conference and ESPN, and provide for payments by ESPN to the conferences.[25]

The Big Ten and FOX collaborated to create a comparable network product – the Big Ten Network. Redacted - NSC

The NCAA owns and controls the rights to NCAA championship games and events, and currently licenses those rights to CBS and Turner (NSC

---

[25] For simplicity, I use the term "network" throughout this report to include all entities that license broadcast rights. The Pac-12 operates its own network. In the context of the other three conference networks, the licensors and entities that pay for the broadcast rights and other rights licensed are ESPN and FOX/Big Ten LLC. These three agreements authorize and require ESPN and FOX/Big Ten LLC Redacted - NSC .



Redacted - NSC
Redacted - NSC ) and to ESPN ([NSC]

. The rights to certain NCAA golf championships have been licensed or sublicensed to the Golf Channel.

The College Football Playoff ("CFP") broadcast licensing structure is different because the games are played in various locations of existing post-season events, commonly known as bowl games. These games are typically owned and controlled by local civic organizations or local municipality organizing committees. Through a complex series of contracts, Notre Dame and the ten conferences in the NCAA's Football Bowl Subdivision ("FBS") (which includes the A5 conferences) Redacted - NSC

Participation in the CFP games and the ultimate distribution of revenues generated by the CFP semi-final and championship games, as well as associated non-CFP bowl games, are governed by a myriad of other agreements related to the staging of the games.

### 3.D. In College Sports, Networks Often License Broadcast Rights to Multiple Sports.

Rarely do conference-level collegiate sports media rights agreements convey the broadcast rights of a single sport. The notable single-sports agreements are those relating to the NCAA's Men's Basketball Tournament (CBS and Turner), the CFP (ESPN), Notre Dame's football broadcast rights agreement (NBC),[26] and various agreements concerning broadcasts of bowl games and tournaments (such as the Great Alaska Shootout and other early season men's basketball tournaments). Absent an assignment or transfer of broadcast rights, the sponsor of the bowl game or tournament owns and controls the broadcast rights to those tournaments and events.

Thus, most, if not all, other college conference media rights agreements convey rights to multiple events in multiple sports. Typically, conferences will license the majority (and in some cases, all) of the rights to their member institutions' home games and events in multiple sports to one or two networks. For example:

---

[26] Notre Dame is an independent institution for football, has its own broadcast rights agreement with NBC, and is a participant in the CFP along with the ten FBS conferences.

1.  **ACC**: Redacted - NSC



.28

2.  **Big 12**: Redacted - NSC

30

3.  **Big Ten**: Redacted - NSC



---

[27] Redacted - NSC
[28] Redacted - NSC
[29] Redacted - NSC
[30] Redacted - NSC
[31] Redacted - NSC
[32] NSC
[33] Redacted - NSC
[34] Redacted - NSC

Redacted - NSC

<sup>35</sup>

4.   **Pac-12**: Redacted - NSC

<sup>37</sup>

5.   **SEC**: Redacted - NSC

<sup>35</sup> Redacted - NSC
<sup>36</sup> Redacted - NSC

<sup>37</sup> Pac-12 Networks PR, *Pac-12 Networks Announces Addition of Free Streaming Channel Pac-12 Insider to Newly-Launched "Sports on Tubi" Lineup*, Pᴀᴄ-12.ᴄᴏᴍ, Aug. 24, 2021, https://pac-12.com/article/2021/08/24/pac-12-networks-announces-addition-free-streaming-channel-pac-12-insider-newly.
<sup>38</sup> Redacted - NSC
<sup>39</sup> Redacted - NSC
<sup>40</sup> Redacted - NSC

Redacted - NSC

The multi-sport rights agreements therefore convey broadcast rights to varying numbers and combinations of games in varying sports and across different networks. Some of the rights agreements permit and require broadcasts of widely viewed championship games in football and men's basketball, but others do not include these championship games at all.

The NCAA also licenses the rights to all of its championships, other than the men's basketball championship, under a single agreement with ESPN. Under the terms of that agreement, Redacted - NSC

[41]

None of the conference or NCAA multisport agreements specify the portion of the license fee attributable to any specific sport or group of sports. Put another way, each of these agreements have license fee payments not segregated by sport.

## 4. MEDIA RIGHTS AGREEMENTS TYPICALLY INCLUDE RIGHTS IN ADDITION TO BROADCAST RIGHTS.

The media rights agreements entered into by the defendant conferences, the NCAA, the CFP, and other promoters vary widely from agreement to agreement. One thing that is uniformly consistent, however, is that the media rights agreements typically convey a number of bundled rights in addition to broadcast rights – but without specific rights fees attached to each individual element of the bundle. The rights fees are in no way segregated, and instead represent the total compensation to the rights holder for all of the rights licensed in the agreements.

---

[41] Redacted - NSC

Some examples of these bundled rights include:

## 4.A. Sponsorship Rights.

Media agreements or documents related to these type of agreements often authorize networks to procure corporate sponsors for the organization or event. These are commonly known as "official sponsors." For example, NSC Redacted - NSC [43] Pfizer, Allstate, and Academy Sports + Outdoors are examples of corporate sponsors of the SEC.[44] Redacted - NSC [45] Ally Bank was recently announced as the title sponsor for the ACC Women's Basketball Tournament and Women's Soccer Championship.[46] Redacted - NSC [47]

These sponsorship deals may or may not also include commercial time (the right to show ads) during a game broadcast. In many instances, the media rights agreements also permit the network to provide corporate sponsors with a package of fulfillment rights. These fulfillment rights can and often do include commercial time on a conference network, access to conference events, tickets, parking passes, fan event space, product placement and sampling opportunities, along with various other forms of marketing and hospitality elements.

[42] Redacted - NSC ; *NCAA Corporate Champions and Partners*, NCAA.COM, Mar. 10, 2023, https://www.ncaa.com/news/ncaa/article/2011-02-25/corporate-champions-and-partners.

[43] Redacted - NSC .

[44] *Official SEC Corporate Sponsors*, SECSPORTS.COM (last visited Apr. 13, 2023), https://www.secsports.com/article/11055657/official-sec-corporate-sponsors.

[45] Redacted - NSC

[46] *Ally Becomes Official ACC Sponsor*, THEACC.COM, Feb. 20, 2023, https://theacc.com/news/2023/2/20/general-ally-becomes-official-acc-sponsor.aspx.

[47] Redacted - NSC

## 4.B. Trademark Rights.

Networks typically obtain the right to use the name, marks, and taglines of a league, conference, and/or its member institutions. In some instances, media rights agreements even grant the network the right to create and use a new jointly owned mark for promotion of particular events or broadcasts,[48] for example:



Trademark rights are different than the broadcast rights conveyed in the media rights agreements. They are also distinct from the sponsorship rights described above.

## 4.C. Data Rights.

Conferences and leagues will often license certain data rights to networks.[49] Those data rights include information on player statistics, box scores, as well as the data needed to operate the ticker which is often seen during a sports broadcast at the bottom of the screen. A typical data rights provision will state that the conference or league will provide the network with the nonexclusive right to access all available and accessible conference institution data feeds from games distributed by other networks, with reciprocity,

---

[48] Redacted - NSC

[49] Redacted - NSC

provided that the data is not sold, licensed, used, or marketed as a substitute for television or video coverage.

### 4.D. Websites.

The SEC licenses the right to operate its conference website ([www.secsports.com](www.secsports.com)) to ESPN.[50]

### 4.E. Additional Benefits.

In addition to the media rights fee, the conference or other entity licensing broadcast rights to an athletic event often receives additional benefits. Those benefits could include such elements as commercial spots that can be sold by the licensor or public interest commercial spots furnished by the licensee to promote the participating schools or the conference.[51] In addition, in many agreements, a conference will negotiate for and obtain provisions requiring the network to broadcast games that are not necessarily profitable to the network.[52] Conferences negotiate these provisions to increase the exposure of their schools and student-athletes.



For example, the SEC's two media agreements with ESPN Redacted - NSC

[53] Similarly, the Pac-12's media agreement with ESPN Redacted - NSC

---

[50] SEC-HOUSE0113308 at 0113315, 317-318 (Redacted - NSC .

[51] Redacted - NSC

[52] Redacted - NSC

[53] *See supra*, Section 3.D.

NSC [54] Another example is the NCAA's multimedia agreement with ESPN
Redacted - NSC



[56]

## 5.   HOW NETWORKS VALUE BROADCAST RIGHTS.

Each media rights agreement is unique. The value a network assigns to the total package of rights conveyed under a media rights agreement varies based on a number of different factors and considerations. Accordingly, it is not possible to draw uniform conclusions about relative value components and apply those conclusions to every media rights agreement. Desser's attempt to do this is incorrect and completely speculative.

In this regard, as described in Section 4, media rights agreements include a combination of potential rights and benefits—all of which impact the total rights fee to be paid by the network.

Further, a variety of additional factors not addressed in Section 4 impact the price or total value of the rights bundle. Stated differently, how much a network is willing to pay for the bundle of rights in a media agreement is impacted by numerous factors, many of which are negotiated terms in a broadcast rights agreement.

As is apparent from a review of Section 4 and this Section 5, Broadcast NIL is not one of the factors that impacts or affects the value of the rights fee.

Neither the rights and benefits described in Section 4 nor any of the factors in this Section 5 are assigned a separate monetary value, either during the negotiation of the media rights agreement or with respect to the payment of the rights fees.

---

[54] Redacted - NSC
[55] Redacted - NSC
[56] Redacted - NSC

The various factors impacting the amount a network is willing to pay for the bundle of rights in a media agreement include, but are not limited to:

- **Games included in the package of rights.** Some broadcast rights agreements include only football and men's basketball games.[57] Many conference agreements include rights to broadcast games in multiple sports, but the number of games and the sports included vary from agreement to agreement. In addition, the mix and the total number of games in various sports that are bundled and conveyed under each conference media rights agreement varies from conference to conference.

  The relative value of a license to broadcast events in one sport as compared to another sport often varies from conference to conference, from school to school within the same conference, from network to network, and from year to year. In fact, broadcasting games in a sport in which broadcasts are not widely available may, over time, attract more viewers and increase the value of the broadcast rights, creating an additional valuation complication when a network enters into a multi-year broadcast rights agreement.

- **Whether the network is provided an exclusive license for certain games, events, or sports.** The extent that the license is considered exclusive is important for networks. Non-exclusive licenses would allow another entity to come in and basically take a game away or air a competing game from the same conference at the same time. This serves to devalue the rights.

- **Game selection process.** If multiple networks broadcast games of a single rights holder, then the game selection process is an important component affecting value. For example, NSC both CBS and ESPN own rights to broadcast SEC football games on Saturdays.[58] The process for picking games is of tremendous value and highly negotiated. CBS has first pick of its allotted games.[59] Redacted - NSC

---

[57] Redacted - NSC

[58] Redacted - NSC

[59] N *See also*, Lewis, Jon, *SEC, CBS, Extend Deal for Fifteen Years*, SᴘᴏʀᴛsᴍᴇᴅɪᴀWᴀᴛᴄʜ.ᴄᴏᴍ, 2008, https://www.sportsmediawatch.com/2008/08/sec-cbs-extend-deal-for-fifteen-years ("CBS will

Redacted - NSC

[60] In other conferences that have multiple network partners (Big Ten, Pac-12, Big 12) Redacted - NSC

[61]

- **Projected advertising revenues which are related, in part, to projected television ratings.** Networks will project what advertising revenues will likely be generated based on the projection of how many viewers will watch each game. The higher the viewership, the more the networks and their affiliates can charge for the commercials that air in those games. Likewise, lower viewership for a specific game or package of games would result in less total advertising revenue.

- **Projected production costs for the particular games and competitions licensed.** Production costs include paying announcers, camera crews, and other technicians, procurement of remote production trucks or other production facilities, licensing or paying for the production of music and game related promotions, teases, drop ins, bumps, opens, closes, billboards and many other related, but not insignificant, expenses. These production costs can vary significantly based on the location of a particular event, the size of and importance of an event, and the expectations of the client, along with other factors. In many instances, the rights holders can and do agree to produce (or pay for the costs of producing) broadcasts (or have member institutions produce the broadcasts) to obtain more exposure for student-athletes, enhance recruiting, and make games a network will not otherwise broadcast available to fans and viewers.[62]



Redacted - NSC

[60] Redacted - NSC                    Scarborough, Alex, *SEC, ESPN Strike 10-year Deal for College Football, Basketball Starting in 2024*, ESPN.COM, Dec. 10, 2020, https://www.espn.com/college-football/story/_/id/30492065/sec-espn-strike-10-year-deal-college-football-basketball-starting-2024.

[61] Redacted - NSC

[62] Redacted - NSC

- **Projected subscriber fees.** Except for OTA networks, most networks charge cable and satellite companies monthly fees to "carry" their programming, and (with a markup) the cable and satellite companies pass through these charges in the form of monthly subscriber fees. Customers who view content on providers such as Comcast, Charter, DirecTV, YouTube TV, Hulu + Live TV, Sling TV, and many other platforms pay subscriber fees. Because games and events in certain conferences are more widely watched by viewers, and drive viewers to subscribe to a cable or satellite package, the broadcast rights of some conferences are more valuable than the broadcast rights of other conferences, even within the A5 conferences.

- **Retransmission consent payments.** Local television stations, many of which are affiliates of and distribute OTA, such as CBS, NBC, FOX, and ABC, are entitled to be compensated by cable companies, satellite companies, and other multichannel video program distributors (MVPD) for the rights to retransmit those signals. This compensation, known as retransmission consent, is partially passed on to the networks in consideration of the programming—including sports—that the networks deliver. In many large markets, the networks also own the affiliates and therefore retain 100% of any retransmission payments.

- **The number of commercial spots to be aired during a broadcast.** An agreement permitting more commercial spots might increase revenues and rights fees, but licensors are cautious about how many spots they permit, in order to avoid frustration from fans watching the broadcast and attending the live event. The college conference media rights agreements I have reviewed in this case identify a variety of formats which permit varying numbers of commercials.[63]



Redacted - NSC

[63] Redacted - NSC

- **Permitted subject matter of commercial spots during a broadcast.** Media rights agreements often limit the subject of commercials that can be shown to reflect the priorities and reputation of the league or schools. For example, some agreements prohibit hard liquor commercials, limit beer commercials, and/or prohibit commercials for certain controversial and inappropriate products and services.[64] All other things equal, such restrictions may reduce the value of broadcast rights by limiting the pool of potential advertisers.

- **Other obligations imposed on the network, as negotiated by the rights holder.** Some examples include the obligation to produce and/or broadcast games and events that are not profitable to the network because a conference wants to promote particular Olympic sports or enhance and publicize women's sports that have historically been underexposed on television.[65] Similarly, an agreement may require a network to produce and/or broadcast appearances for a specified number of games and events from less popular institutions in a conference thereby ensuring equitable exposure among conference members.[66] Other obligations include, for example, requirements for the network to fund a certain number of scholarships or to provide internship positions to students at a conference's member institutions.[67]

- **Conference network start-up costs.** Specific contractual provisions concerning whether the network or the conference will incur the start-up costs in the hundreds of millions of dollars, and recurring annual costs for facilities, personnel, and equipment to produce and broadcast



Redacted - NSC

[64] Redacted - NSC

[65] *See infra* Section 3.D.
[66] Redacted - NSC

[67] Redacted - NSC

games and other content 24 hours a day, 7 days a week, 365 days a year.

- **Availability of content for shoulder programming.** Shoulder programming precedes and follows many live sporting events, such as ESPN's College Game Day (pregame) or SportsCenter (both pregame and postgame content). Shoulder programming often contains predictions and previews (pregame) or replays of key moments, interviews with players and coaches, analysis of the game by sport commentators, trophy presentations, and previews of upcoming games (postgame). Shoulder programming is important for the networks because it expands the time of viewership of a live event and, as a result, expands revenue opportunities generated through additional commercial time.[68]

- **Times and days ("windows") when games and events are available for broadcast.** The specific days of the week and times of the day that the games are available to be played and therefore aired by a network are extremely important to a network's ability to maximize its revenues. Networks look at what other competition might be airing in those same windows and how the licensed programming is likely to compare. For example, games in a prime-time window can be particularly valuable whereas a mid-morning game is not nearly as valuable.[69] Another example would be for a licensor to allow a game to



[68] Redacted - NSC

[69] Redacted - NSC

be played on a Thursday or holiday where it can create added value because it may be the only game on at that time.[70]

- **Network input (or not) on game scheduling.** Regular season games are scheduled either by the conferences or, for non-conference games, the member schools. Tournament games are scheduled by either the conferences (for conference tournaments) or the NCAA (for national championships) or another third party, such as the CFP (for FBS football). Some rights agreements afford networks little or no input on scheduling while others cede substantial control to a network.[71] In addition to input on scheduling, the other important aspect is at what point the networks have to select their games. In most cases certain games are selected prior to the season and are considered "set" at that point. For many games, however, it is important to see how the season plays out so that the best games are selected for any given window. In many cases flexibility is provided such that games are selected either "12 days" or "6 days" prior to the actual start time.[72]

- **Length of term.** The term of a television rights agreement is extremely important. Most broadcast agreements in college sports are for a fixed yearly rights fee, except for those agreements ▮NSC▮ ▮Redacted - NSC▮ where the rights fees are based on a percentage of adjusted gross revenues. In a multi-year, fixed fee

---

[70] Redacted - NSC

[71] Redacted - NSC

[72] Redacted - NSC

arrangement, a shorter term agreement is more favorable to the rights holder if broadcast rights values increase (all other things being equal), while a longer term agreement may be more favorable to the rights holders if there is a sustained economic downturn. Some conferences are now in long term contracts with less favorable terms,[73] while others have benefited from being able to take advantage of the shorter term nature of their agreements.[74]

- **Additional revenue opportunities.** In certain broadcast rights agreements, the structure of the arrangement includes an opportunity to create synergistic value with corporate sponsorships. For example,

Redacted - NSC

[75]

- **Client entertainment opportunities.** The inclusion of seats, suites, parking and other hospitality options during the games for use by the network for its own business development and customer entertainment is an important element.[76] Hospitality opportunities are included in virtually every rights agreement.

- **Preferential back-end or renewal rights.** These are provisions that give the current broadcaster certain rights at or towards the end of the contract (back-end rights). A period of exclusive negotiation between the parties, a right of first refusal for a new or extended rights

---

[73] Baker, Matt, *FSU Fires Warning Shot to ACC: 'Something has to Change'*, TAMPA BAY TIMES, Feb. 24, 2023, https://www.tampabay.com/sports/seminoles/2023/02/24/fsu-football-florida-state-acc-conference-realignment/.

[74]  Redacted - NSC

[75] Desser agrees this factor is an important determination of value of a rights fees package, and it would be his "intention in doing such an analysis . . . to exclude . . . any material amount of sponsorship rights sale from the corpus of the media rights exchange." Desser Dep. at 20:9-22:12; 125:21-126:25. Desser further emphasized that sponsorships impact the value of media rights fees by stating "the design of sponsorship sales rights and the media rights" with respect to the NCAA's women's basketball tournament were "misaligned such that the women's basketball sponsorship rights had just a 1/10 of 1% allocation compared with the men's rights" which "substantially undervalued" the women's basketball championship rights. Desser Report, p. 68, § 19.1.

Redacted - NSC

agreement, or a right to match other offers for those same rights, is typical in many contracts. These are but a few of the other potentially valuable back-end rights used in these types of agreements.[77]

- **Maximizing revenue versus exposure.** The decision by the licensor to maximize revenue or exposure is an important consideration in the rights process. For example, the SEC's media agreements with ESPN require ESPN Redacted - NSC

  .[78] The Pac-12 agreements call for FOX and ABC/ESPN to Redacted - NSC

  [79] The Big 12 agreements call for distribution Redacted - NSC, Redacted - NSC [81] The ACC

  agreement calls for distribution Redacted - NSC [82] The Big Ten similarly requires distribution of its events on Redacted - NSC

  [83] Maximizing exposure can adversely impact network revenues and therefore reduce the rights fee a network is willing to pay.

- **Production accommodations.** The availability of parking, remote truck location, transmission capabilities, arena or stadium access, seating, and amenities at the location of the broadcast are also taken into consideration. This factor can include negotiations for camera space, "seat kills" (seats dedicated to camera placement which cannot be sold), and set up and strike times. Set up and strike times often vary based on whether the games take place in major metropolitan areas or more remote locations which can ultimately impact the production cost of events.

---

[77] Desser notes in his report that back-end rights are "not mere boilerplate, but have material value, particularly to the licensee, which competes with other similarly situated entities and speaks to the value that comes with incumbency." Desser Report, p. 30, § 6.13.
[78] Redacted - NSC
[79] Redacted - NSC
[80] Redacted - NSC
[81] Redacted - NSC

[82] Redacted - NSC
[83] Redacted - NSC

- **Distribution platform and method.** The form and manner of distribution of the broadcast, including whether it is OTA television, cable, satellite, over-the-top (OTT) media service, or pay-per-view television are all considered in the rights agreement and what is paid for those rights. For OTA networks such as FOX and ABC, significant research is done on the value that the conference rights agreement brings for potential advertising revenue as well as increased retransmission consent fee opportunities. For cable, satellite, and other types of MVPD distribution by ESPN or FS1, similar projections are made for advertising and the potential impact of increased subscription fees and increased numbers of subscribers that might be realized. In the case of conference specific networks (SEC Network, Big Ten Network, ACC Network, and Pac-12 Networks) the number of subscribers within a conference's geographical footprint (vs. the number outside of the footprint) drive value because subscriber fees (and resulting revenues to the network) are significantly higher for in-footprint subscribers.[84]

  Certain rights holders may prioritize OTA distribution (e.g., with CBS, NBC, ABC, FOX) because more viewers are able to access the broadcast with "rabbit ears" or other traditional antennas without charge, which typically provides a broader reach for the telecast. Other rights holders may prefer a network that charges or benefits from subscriber fees, because the network receiving subscriber fees might be willing to pay a higher rights fee even though its distribution of games (and availability to viewers) may be more limited.[85]

- **Distribution requirements.** The scope of distribution of the broadcasts affects how rights fees are calculated. Certain agreements require a network to ensure distribution of games in certain designated market areas (DMAs). Agreements may provide for, permit, or require

---

[84] Graham, Andrew, *Former ESPN President John Skipper Makes Case for ACC to Merge with Pac-12*, On3, Mar. 7, 2023, https://www.on3.com/news/former-espn-president-john-skipper-makes-case-for-acc-to-merge-with-pac-12/ ("'I think that the ACC should expand, or should merge with the Pac 12, which now has 10 teams. I would take eight of those teams, change my footprint, have a 24-team conference with a western division and their *ACC Network* footprint would expand to the West Coast,' Skipper said. 'You could probably force a renegotiation with *ESPN* for a new deal and you could solve both problems. The ACC would get more money, expand its footprint, could compete with the SEC and the Big 10.'").

[85] Redacted - NSC

national distribution (i.e., the subject game is the only game available on a network throughout the United States), split national distribution (one of two games available, split among various states), or regional distribution (multiple games available on the network, with different games in the same time slot provided to viewers in different locations).

- **Ancillary elements.** Other aspects of the "package" of games and events being licensed include considerations such as: (a) the composition of a conference, including how many of the institutions field highly watched teams, (b) the size of the alumni of each member institution, (c) the population of the geographic area that the viewership for each member institution is located, (d) whether the viewership is concentrated in a geographic area with a greater relative interest in pro sports or college sports, (e) the number of members of the general public (non-alumni) who follow and watch games, (f) whether there are other college teams that will compete for viewership and fans, (g) the type of rivalries that may exist within the conference or outside the conference, and (h) the value the individual school "brands" bring on a regional or national level. For example, some conferences have institutions located in larger media markets than others, and/or in geographic areas where college sports is relatively more popular (the Mid-West and the South) than in other areas (such as the Northeast and some parts of the West). Another example is where alumni might be dispersed across the country and how closely they follow their former school.

Each of these topics, and many others, must be addressed, negotiated, and documented in a broadcast rights agreement.

In his deposition, Desser acknowledged that factors of the type listed in this Section 5 impact (increasing or decreasing) the rights fees a network is willing to pay under a media rights agreement. *See, e.g.*, Desser 36:14-19, 37:6-12 (free promotional spots); 38:5-14 (motivations of the rights holders differ), 48:16-49:3 (restrictions on beer and liquor advertising affects value); 49:4-15 (cost of producing event, including location, accessibility and number of games, vary); 51:7-13 ("demographics are part of the valuation equation as is audience size, which is probably just as important"); 54:5-55:7 (some teams have more broadcast value and that value changes over time); 55:9-19 (scheduling is a variable that "can frequently affect value"); 56:14-21 (back-

end rights). Desser's report notes but fails to account for some of these factors.[86]

As is more fully addressed in Section 7 below, however, Broadcast NIL is not one of the factors that impacts the value of a media rights agreement. In fact, as Desser acknowledged in his deposition, no one has ever tried to assign a value to Broadcast NIL.[87] But even if Broadcast NIL were valued, each of the other factors articulated above varies from contract to contract. It is impossible to assign a set, specific percentage for any single factor, such as Broadcast NIL, and apply that value uniformly across all media rights agreements.

---

[86] Desser Report, p. 14-21, § 5 (stating exclusivity, audience composition, distribution types, and scarcity are some of the factors that add value to live sports broadcasts).

[87] Desser Dep. at 34:3-17.

> Q. Have you ever done this yourself previously?  Is this the first engagement where you've been asked to do that?
>
> A. This is the first engagement that focused on isolating NIL value.
>
> Q. Okay.  And in your experience with broadcast agreements, have you ever known a situation where anyone else has tried to segregate the NIL value from the value of the broadcast rights package as a whole?
>
> A. I'm not aware of that taking place before.  It's typically not necessary, and therefore there is not a particular business purpose for the parties involved in the contracts to go through the process of creating that allocation.

A visual representation of some of these factors is set forth below.



**Various Questions and Factors a Network Evaluates When Calculating a Media Rights Fee**

# 6.   DESSER ADMITS HE HAS NO OPINION ABOUT INDIVIDUAL BROADCAST NIL VALUE, WHICH VARIES WIDELY AMONG STUDENT-ATHLETES.

## 6.A. NIL Value Varies Widely Among Student-Athletes.

The NIL marketplace for promoting and endorsing products demonstrates that some college athletes have tremendous NIL endorsement value and others have little or no NIL endorsement value.[88] Setting aside the legal issue whether there are NIL rights in broadcasts, which I do not address, it is indisputable that the value of NIL rights for promoting or endorsement of a product vary widely from person to person. If Broadcast NIL rights exist *and* have a value that can be quantified, it follows logically that any Broadcast NIL value would vary widely from student-athlete to student-athlete, with some student-athletes having no Broadcast NIL value at all.

In his deposition, Desser acknowledged this point when he disclaimed any opinion about whether every student-athlete contributes the same Broadcast NIL value:

> Q.   So your 10 percent might or might not be the value that is attributable to any single athlete; you just aren't here to testify about that, either way?
>
> A.   My 10 percent estimate is with respect to the entirety of the NIL being conveyed for all of the athletes.
>
> Q.   And not a single athlete individually; correct?
>
> A.   Correct.[89]

---

[88] Blinder, Alan, *The Smaller, Everyday Deals for College Athletes Under New Rules*, THE NEW YORK TIMES, Dec. 9, 2021, https://www.nytimes.com/2021/12/09/sports/ncaafootball/college-athletes-nil-deals.html ("What is similarly clear, according to companies that have helped to broker or administer agreements for tens of thousands of athletes, is that many participating players are not even making $1,000 each."); Dosh, Kristi, *All the Stats for Year 1 of NIL*, BUSINESS OF COLLEGE SPORTS, July 15, 2022, https://businessofcollegesports.com/name-image-likeness/all-the-stats-for-year-1-of-nil/ (reporting the average value of "Power NIL deals" was $2,144 while twin women's basketball players from Fresno State, who are transferred to Miami in 2022, have earned nearly $2 million based NIL endorsement deals with more than 30 brands).
[89] Desser Dep. at 24:3-11.

## 6.B. Appearing in Nationally Televised Games Creates Individual Endorsement NIL Value for Student-Athletes.

In many instances, appearing in a television broadcast can enhance an individual student-athlete's promotional and endorsement NIL value. High school sports, and the athletes that play those sports, are not widely televised or publicized. Many college players are virtually unknown to the audience and fans before appearing in a game broadcast. As the players appear in the broadcast, viewers see their athletic performance and begin to associate their athletic performance with the name on their jersey or their number. Week after week, as the athlete continues to appear in televised games, viewers learn more about the player and begin to associate the player's performance with their NIL.

For example, as Ohio State's quarterback appears in a television broadcast week after week, fans and viewers may refer to the athlete as C.J. Stroud instead of "Ohio State's quarterback" because they have watched him perform on multiple occasions.

As another example, the University of Georgia won the College Football Playoff national championship in January 2022 and January 2023. Stetson Bennett, who was the quarterback for Georgia in both games, was originally a little-known, walk-on player at Georgia, who later emerged (after a diversion to junior college for a year) as a star and one of the four finalists for the Heisman Trophy award.[90]

In his deposition, Desser acknowledges that Bennett's individual NIL promotional and endorsement value likely increased after he appeared in the 2022 and 2023 national championship games, testifying that he "wouldn't doubt that winning two national titles in a row benefits his overall market value."[91]

Desser also conceded in his deposition that publicity from appearing on television provides similar benefits in Olympic sports:

---

[90] Ervin, Phil, *Stetson Bennett's Story is the Stuff of Hollywood to Everyone Except Stetson Bennett*, SATURDAYDOWNSOUTH.COM https://www.saturdaydownsouth.com/georgia-football/stetson-bennetts-story-is-the-stuff-of-hollywood-to-everyone-except-stetson-bennett/ (last visited Apr. 13, 2023); *Stetson Bennett*, NFLDRAFTBUZZ.COM https://www.nfldraftbuzz.com/Player/Stetson-Bennett-QB-Georgia (last visited Apr. 13, 2023).

[91] Desser Dep. at 93:1-3.

Q.     And in sports like the Olympics, would you agree
       with me that there can be star performers in the
       sport whose NIL value is greatly affected by how they
       perform in the Olympics, because the Olympics are
       widely televised and many of their other competitions
       in things like swimming and track are not widely
       televised?

A.     I would agree with you that there is an outsized
       benefit from doing well in the Olympics in
       comparison to some minor events.

Q.     And that's because the Olympics are so much more
       widely viewed and the subject of public viewing?

A.     Not exclusively because it's widely viewed. But that's
       one of the benefits.

Q.     That's part of it.

A.     Yes.[92]

For example, during the 2016 Summer Olympics, Americans cheered for
Katie Ledecky as she competed for and won four gold medals and a silver
medal for the United States' women's swim team.[93]



---

[92] Desser Dep. at 93:5-20.
[93] *Katie Ledecky,* OLYMPICS.COM, https://olympics.com/en/athletes/katie-ledecky (last visited Apr. 12, 2023).

Prior to 2016, Ledecky had won a gold medal during the 2012 summer Olympics and several world championships.[94] But in 2016, Ledecky's individualized NIL promotional and endorsement value increased rapidly as she appeared in the internationally televised Olympic Games, followed by appearances on many daytime and late night television shows and nightly news interviews. Ledecky quickly became a household name based on her widely televised Olympic performance, which allowed Ledecky to license her NIL rights and receive multiple endorsement deals.[95] Those deals included brands like TYR Sports, Inc., Ralph Lauren, Adidas, American Girl, and others.[96]

Similarly, named plaintiff Grant House testified that he believed he would have been able to secure more NIL deals when he was competing in the 2019 Pan-American swim competition because the competition was broadcast, which increased his public exposure.[97] ESPN broadcast this swimming competition internationally from Lima, Peru across multiple platforms including ESPN2, ESPNU, ESPN Deportes, ESPN3 and the ESPN App.[98] House won a silver medal in a team event, and the combination of his team's performance and the international distribution of the broadcast likely temporarily increased his individual NIL endorsement value.

That NIL values vary widely among individual athletes also is illustrated in the licensing process for sports video games. Electronic Arts Inc.'s ("EA") Chief Business Officer Paul Cairns provided a declaration in this case stating that Redacted - Counsel Only

[99]

In this regard, the benefits of appearing in a broadcast are substantial. In certain circumstances, some celebrities and performers will appear in a broadcast without being paid simply to increase their individual NIL endorsement value and to promote their products. For example, Rihanna

---

[94] *Id.*; *Katie Ledecky Bio*, SWIMSWAM.COM, https://swimswam.com/bio/katie-ledecky/ (last visited Apr. 12, 2023).

[95] Maese, Rick, *Good as Gold: How Katie Ledecky is Turning Her Medals into Money*, THE WASHINGTON POST, July 29, 2021, https://www.washingtonpost.com/sports/olympics/2021/07/29/katie-ledecky-endorsement-deals/.

[96] *Id.*

[97] Deposition of Grant House at 225:19-227:10.

[98] Anderson, Jared, *How to Watch the 2019 Pan American Games*, SWIMSWAM.COM, Aug. 5, 2019, https://swimswam.com/how-to-watch-the-2019-pan-american-games/.

[99] Redacted - Counsel Only .

recently performed during the Super Bowl halftime show.[100] Like most of the Super Bowl halftime performers that preceded her, Rihanna performed for free and used the opportunity to promote her music along with her other businesses, including her fashion and makeup lines.[101] To directly promote her make-up line, Rihanna stopped mid-performance during the Super Bowl halftime show to apply makeup from a compact.[102]



Similar to professional singers and celebrities that perform during the Super Bowl halftime show, appearing in a nationally televised sports broadcast can materially impact a student-athlete's individual endorsement NIL value.

Appearing in broadcasts helps student-athletes gain national exposure to wide audiences, which in turn, increases their ability to obtain endorsement deals for which they are compensated.

These benefits attributable to appearing in televised games are not limited to student-athletes in high-profile sports. When a college conference negotiates terms in a multi-sport broadcast rights agreement that adversely impact rights fees by requiring a network to produce and distribute comparatively unprofitable broadcasts of games in sports that have not historically been widely televised, the conference confers a substantial potential benefit to the student-athletes participating in those games.

---

[100] Dellatto, Marisa, *Why Rihanna Won't Get Paid For Her Super Bowl Halftime Show*, FORBES, Feb. 10, 2023, https://www.forbes.com/sites/marisadellatto/2023/02/10/why-rihanna-wont-get-paid-for-her-super-bowl-halftime-show/?sh=b4dfeb56226f.

[101] *Id.* at 2-3, 5.

[102] Phillips, Zoe, *Pregnant Rihanna Touches Up With Fenty Beauty Compact During Super Bowl Halftime Performance*, ET, Feb. 12, 2023, https://www.etonline.com/pregnant-rihanna-touches-up-with-fenty-beauty-compact-during-super-bowl-halftime-performance-199031.

# 7.   DESSER'S 10% OPINION IS FUNDAMENTALLY FLAWED.

Desser claims "approximately 10% of the media broadcast revenue to the Power 5 conferences (and Notre Dame) for [football and men's and women's basketball] is a reasonable and conservative estimate of the collective marketplace value of the NIL of college athletes provided via these media rights contracts."[103]

As I explained in part in Sections 3 through 6 above, Desser's 10% Opinion is deficient and fundamentally flawed. It is also flawed for the following reasons, addressed in more detail below:

1.   There is no separate market for Broadcast NIL rights, and there is no instance when any person or entity ever paid, or was paid, for Broadcast NIL rights only. There is no price information for any Broadcast NIL on which a valuation can be based. Desser's 10% Opinion thus has no foundation based on any real world examples or markets.

2.   None of the materials or examples Desser relies upon support his 10% Opinion, and, in many instances, those materials contradict it.

3.   Desser implicitly and incorrectly assumes that a media rights fee reflects a valuation of the same set of rights conveyed in every agreement by every conference. This is not correct, and, even if Broadcast NIL were a factor in determining the rights fee, it fatally undermines his conclusion that 10% of the value of those rights is attributable to Broadcast NIL.

## 7.A. There Is No Separate Market for Broadcast NIL.

It is undisputed that there is no separate market for Broadcast NIL rights. Desser states in his report that "NIL is not customarily (if ever) sold separately from the other elements conveyed in the contract, with a separate contractual value assigned. Almost always, the package in a sports media contract is paid for with an aggregate payment that does not break down the

---

[103] Desser Report, p. 63, § 18.

value of each component granted in the contract – indeed, subdividing the overall payment to be made in a media rights contract generally would serve no business purpose."[104]  Desser also testified:

> Q.   Do you know of any other situation where anyone has tried to isolate the value of the NIL from the value of the athletic performance as you've posited right here? Are you the first person to try to do this?

> MR. GREENSPAN:  Object to the form.
> BY MR. FULLER:

> Q.   Have you ever done this yourself previously?  Is this the first engagement where you've been asked to do that?

> A.   This is the first engagement that focused on isolating NIL value.

> Q.   Okay. And in your experience with broadcast agreements, have you ever known a situation where anyone else has tried to segregate the NIL value from the value of the broadcast rights package as a whole?

> A.   I'm not aware of that taking place before. It's typically not necessary, and therefore there is not a particular business purpose for the parties involved in the contracts to go through the process of creating that allocation.[105]

I have never attempted, nor have I ever been asked, to separately value "Broadcast NIL" when negotiating a media rights deal in college sports or for any other sports property. Also, no one from my team was ever asked or has done so either. To my knowledge, Desser is the first person to attempt to do so.

Broadcast NIL is not a concept to which any network attaches value, and certainly not a concept to which a network attributes a separate value. The subject of compensation for NIL in broadcasts has never come up in a media

---

[104] Desser Report, p. 6-7, § 2.
[105] Desser Dep. at 33:22-34:17.

rights negotiation I have been involved in; in fact, it has never been mentioned.

Desser acknowledged this point in his deposition, confirming (with respect to NIL rights in broadcasts) that he does not know "of any situation where the NIL rights in a broadcast have been sold separately from the broadcast rights. . . ."[106]

Simply put, Desser attempts to attach a value to a concept that is not recognized as a source of value in media negotiations.

Broadcast rights are valued by networks as summarized in Section 5, not on the basis of any evaluation of Broadcast NIL value. Although network payments for broadcast rights may provide funds to compensate participants in games, including games broadcast on television and other platforms, those payments are not related to the NIL value provided by the participants.

## 7.B. Desser Has No Support for His 10% Estimate of Collective Broadcast NIL Value.

To reach his 10% Opinion, Desser relies on:

1. The collective bargaining agreements negotiated by professional athlete unions, even though the share of broadcast revenues reserved for the salary compensation pools in pro sports are paid to players in vastly different amounts, which are not at all consistent with Desser's 10% Opinion.[107]

2. Group licenses for apparel, trading cards, video games, other non-apparel hardline goods entered into (as applicable) by the National Football League Players Association ("NFLPA"), National Basketball Players Association ("NBPA"), and Women's National Basketball Players Association ("WNBPA").[108] These group licenses are negotiated in collective bargaining agreements and represent a very small portion of the compensation received by many, if not most, professional athletes.

---

[106] Desser Dep. at 63:5-10.
[107] Desser Report, p. 54, § 14.5.
[108] Desser Report, p. 56-59, §§ 15.3 & 16.0.

3.     Average patent royalty payments as reflected in a KPMG report from 2012, even though there is no apparent correlation between patent royalties and NIL values.[109]

4.     Professional sports league trademark licensing royalties for apparel and non-apparel goods, even though there is no apparent correlation between trademark licensing royalties and the NIL rights about which he offers an opinion.[110] None of these are comparable or remotely related to the broadcast market for college sports.

### 1.     Collective Bargaining in Professional Sports.

In professional sports, player compensation is individually negotiated within parameters set by collective bargaining agreements.

Desser generally references the "broadcast revenues" shared by professional leagues with professional athletes.[111] Desser apparently refers to (but does not cite) the collective bargaining agreements of the NFLPA[112] and the NBPA[113], which set a cap on player compensation based on a share of total league revenues, including but not limited to broadcast rights revenues.

In my many years in the broadcast industry, no one has ever suggested that the compensation caps established in the NFLPA and NBPA collective bargaining agreements have any relationship to the value of (or even existence of) NIL rights in broadcasts. The collective bargaining agreements serve to establish a total cap on all players' salaries, but permit widely varying salaries to individual players, as reflected in the standard player contracts (also collectively bargained).[114]

---

[109] Dessert Report, p. 55-56, § 15.1.

[110] Desser Report, p. 56, § 15.2.

[111] Desser Report p. 54, § 14.5.

[112] Declaration of Steven J. Scebelo, ECF No. 208-1, Ex. 52, Sept. 26, 2022 ("Scebelo Dec.") Counsel Only. A copy of the March 15, 2020 CBA Redacted - Counsely Only can be found at https://nflpaweb.blob.core.windows.net/media/Default/NFLPA/CBA2020/NFL-NFLPA_CBA_March_5_2020.pdf.

[113] Declaration of Gary Arrick, ECF No. 208-1, Ex. 53, Oct. 14, 2022 ("Arrick Dec.") Counsel Only. A copy of the July 1, 2017 CBA Redacted - Counsel Only can be found at https://cosmic-s3.imgix.net/3c7a0a50-8e11-11e9-875d-3d44e94ae33f-2017-NBA-NBPA-Collective-Bargaining-Agreement.pdf.

[114] Supplemental Declaration of Steven J. Scebelo, Apr. 5, 2023 ("Supp. Scebelo Dec.") at ¶¶ 2-3, Ex. A; Supplemental Declaration of Gary Arrick, Apr. 19, 2023 ("Supp. Arrick Dec.") at ¶¶ 2-3, Ex. A.

For example, the NFL standard Player Contract includes a provision that authorizes the team (or "Club") and the NFL to use the player's name, image and likeness for certain specified and limited promotional purposes.[115] The Player Contract also includes a separate provision confirming the player and the NFLPA will not contest the exclusive rights of the NFL and its Clubs to broadcast NFL games.[116] Some NFL player salaries are $45 million or more per year.[117] The minimum salary in the NFL for the most recent 2022 season was $705,000 per year.[118] The NFL's broadcast rights payments are in excess of $10 billion per season.[119]

Nothing in this structure suggests that any NFL player's compensation includes a payment for Broadcast NIL value – or that any Broadcast NIL value can be determined as a percentage of broadcast rights payments.

The same holds true for the NBA, where the structure of compensation and the provisions of the standard player contracts are not materially different from the NFL example.[120]

Other professional sports examples offer no support for Desser's 10% Opinion, either.

For example, the WNBPA negotiated a collective bargaining agreement with the WNBA in 2020.[121] Under that agreement, the players association "agrees" that the WNBA "shall have the exclusive right to use, distribute, or license" the broadcast or telecast of player performance, including in games.[122] All WNBA players agree that the WNBA and/or WNBA Enterprises has the right to use or license in a group of three or more players "the Player Attributes of all such players" to promote the WNBA, games, and teams, and for "any

---

[115] Supp. Scebelo Dec., Ex. A, NFLPA Player Contract, § 4(a).
[116] *Id*.
[117] *NFL Contracts*, SPOTRAC.COM https://www.spotrac.com/nfl/contracts// (last visited Apr. 25, 2023) (reflecting annual salaries of Jalen Hurts, Aaron Rodgers, Russell Wilson, Kyler Murray, Deshaun Watson, and Patrick Mahomes as being $45 million or more).
[118] *NFL CBA: Minimum Salaries*, SPOTRAC.COM, https://www.spotrac.com/nfl/cba/minimum/ (last visited Apr. 12, 2023).
[119] Belson, Ken and Kevin Draper, *N.F.L. Signs Media Deals Worth Over $100 Billion*, THE NEW YORK TIMES, Mar. 18, 2021, https://www.nytimes.com/2021/03/18/sports/football/nfl-tv-contracts.html ("The N.F.L. signed new media rights agreements with CBS, NBC, Fox, ESPN, and Amazon collectively worth about $110 billion over 11 years, nearly doubling the value of its previous contracts.").
[120] Supp. Arrick Dec. at ¶¶ 2-3, Ex. A.
[121] A copy of the WNBA's CBA is publicly available at: https://wnbpa.com/wp-content/uploads/2020/01/WNBA-WNBPA-CBA-2020-2027.pdf.
[122] WNBA CBA, Article XXVII, p. 202.

telecast or broadcast of such game or competition."[123] In exchange for recognizing this right, the players receive no specific compensation.

Under the WNBA's collective bargaining agreement, basketball players do not participate in revenue sharing unless the league hits its cumulative revenue target goals.[124] The WNBA has not hit its revenue goals to date; therefore, the players do not share in broadcast revenue.[125]

As another example, professional golfers earn money through prizes and individual endorsement deals.[126] As they play in weekly PGA Tour events, they earn prize money based on their final position in the event.[127] Golfers are independent contractors, and they pay their own expenses, including travel and entry fees.[128] In the PGA Tour Player Handbook, which governs players' appearances in PGA Tour events, players assign all broadcast rights to the PGA Tour and receive no specific payments or revenue share in exchange.[129]

> 1. **Media Rights**
>    a. The television, digital, radio, motion picture and all other media rights of all players participating in PGA TOUR cosponsored and coordinated tournaments, pro-ams or any other golf event conducted in conjunction with PGA TOUR cosponsored and coordinated tournaments (e.g., clinics, long-drive contests), or any portion thereof, are hereby granted and assigned to PGA TOUR. Based upon this grant and assignment, all such rights shall be the property of and expressly reserved by and to PGA TOUR, and any use thereof without the express written consent of PGA TOUR shall be forbidden.

The PGA Tour broadcast revenue is not directly or indirectly (like through a salary cap in the NFL and NBA) shared with individual professional golf players.

---

[123] WNBA CBA, Article XXVI, § 1, p. 193-94.

[124] WNBA CBA, Article XII, § 1, p. 106.

[125] Mox, Jacob, *WBNA Revenue Sharing Explained*, THE HER HOOP STATS NEWSLETTER, Apr. 28, 2022, https://herhoopstats.substack.com/p/wnba-revenue-sharing-rules-tv-contract. *See also* Jacob Mox, *The WNBA's Revenue Sharing is Huge for Players, But Just How Much Can Players Make?*, THE HER HOOP STATS NEWSLETTER, Apr. 29, 2022, https://herhoopstats.substack.com/p/wnba-revenue-sharing-estimates-tv-deal.

[126] Brannon, Ike, *How Long Will The PGA Handicap Its Golfers?*, FORBES, Feb. 2, 2022, https://www.forbes.com/sites/ikebrannon/2022/02/02/how-long-will-the-pga-handicap-its-golfers/?sh=3609bf40784c.

[127] *Id.*

[128] *Id.*

[129] PGA Tour Handbook, Article V, § B(1)(a). A copy of the PGA Tour Handbook is publicly available at: https://qualifying.pgatourhq.com/static-assets/uploads/2019-2020-pga-tour-handbook--regs-09_10_19.pdf.

As is apparent from these examples, player compensation structures in pro sports offer no support for Desser's 10% Opinion. In fact, the player compensation structures in pro sports are entirely inconsistent with his opinion. There is no example where pro players are paid a specific amount for Broadcast NIL rights, much less in a structure based on a percentage of broadcast rights for each player.

### 2.   Group Licenses in Professional Sports.

In the collective bargaining agreements of some professional sports, the players' association (i.e., the players union) is granted limited rights to enter into licensing agreements for groups of players. In some instances, the royalties from licenses entered into by the players' associations are shared equally among all union members,[130] but the vast majority of the royalties under these group licenses are allocated to the specific players whose NIL is licensed.[131] In addition, Redacted - Counsel Only
Redacted [132]

None of these provisions, which Desser refers to as group licensing provisions, are in any way related to broadcast rights. Instead, when applicable, they authorize the players association to license NIL rights for other uses. Desser notes that the NFLPA, NBPA, and WNBPA can enter into licenses for apparel, trading cards, video games, and other non-apparel hardline goods.[133]

The products licensed by the NFLPA include video games. Specifically, NFLPA and NFL Players Inc. ("NFLPI") on behalf of OneTeam Partners, LLC Redacted - Counsel Only [134] Desser cites the relevant term sheet in his report.[135] Pursuant to this agreement, Counsel Only Redacted - Counsel Only
Redacted [137]

The NBA and its related player entities have an agreement with Take-Two Interactive Software, Inc. ("Take-Two") Redacted - Counsel Only

---

[130] Supp. Scebelo Dec. ¶¶ 10-12. *See also* Counsel Only Redacted
[131] Supp. Scebelo Dec. ¶¶ 10-12.
[132] *See e.g.*, Counsel Only Redacted
[133] Desser Report, p. 56-59, §§ 15.3, 16.
[134] Redacted - Counsel Only
[135] Desser Report, p. 58, § 16.
[136] Redacted - Counsel Only .
[137] Redacted - Counsel Only

Redacted - Counsel Only

[138] Pursuant to their agreement, Redacted - Counsel Only

[139]

These group licensing arrangements have no relationship to any Broadcast NIL rights, or to the value of those rights. The group licenses are for products, not broadcasts. They are negotiated in a marketplace that actually exists (unlike the non-existent marketplace for Broadcast NIL) and in which the value of the licensed rights is determined based on the value of the NIL in promoting sales of the various products.[140]

The value of promoting these products has absolutely no relationship to the factors in Section 5 that determine the value of broadcast rights and of any components included in broadcast rights.

### 3.     Patent Royalties.

Desser also relies on a KPMG report from 2012 concerning patent royalty valuations.[141] In his deposition, Desser could not explain how patent royalty valuations are related in any respect to the value of broadcast rights, or any component of broadcast rights.[142] Patent royalty valuations are set in a different market based on factors and considerations wholly unrelated to the factors in Section 5 that determine the value of broadcast rights and of any components included in broadcast rights.

### 4.     Trademark Royalties.

Finally, Desser relies on "professional league" "licensing arrangements . . . for the team and league trademarks only."[143] Citing no specific trademark licensing deal and instead relying on his "personal experience," Desser claims that "most such licenses have royalties of 8-12%, not including any athlete NIL, depending on the product category and other aspects of the

---

[138] Counsel Only
[139] Counsel Only
[140] These group licensing arrangements do not result in every player in a professional union receiving the same licensing fee. Instead, in many instances, the licensing fees are apportioned to the player whose NIL is used to promote a particular product or service. For example, Counsel Only
Redacted - Counsel Only
[141] Desser Report, p. 55-56, § 15.1.
[142] Desser Dep. at 83:14-85:13.
[143] Desser Report, p. 56, § 15.2.

transaction."[144] Professional sports league licensing deals in apparel and non-apparel goods also give Desser no support.

Trademark royalty valuations (when trademarks are licensed separately from broadcast rights) are set in a different market based on factors and considerations wholly unrelated to the factors in Section 5 that determine the value of broadcast rights and of any components included in broadcast rights.

Desser ignores trademark licenses bundled into broadcast rights agreements as part of the rights licensed. In my experience, every broadcast rights agreement includes a trademark license, at both the college and professional level. As explained in Section 4, networks do not value the trademark license separately or segregate the trademark license fee from the entire rights fee.

Desser does not attempt to segregate the value of the trademark license from the value of other rights licensed in a collegiate sports media rights deal.

### 7.C. It Is Not Possible (and Desser Is Incorrect in Attempting) to Draw Uniform Conclusions About the Relative Value of "Broadcast NIL" to the Total Rights Fee and Apply Those Conclusions to Every Media Rights Agreement.

Desser testified that his 10% Opinion is not reflective of a specific media rights agreement from a specific conference as compared to another media rights agreement from another conference.[145] As explained above, Desser does not offer an opinion about the NIL value of any individual student-athlete, acknowledges that there is no market for "Broadcast NIL" and attempts to support his opinion by referencing payment structures that are not comparable or supportive. Desser also acknowledged in his deposition that he was offering his view about "the broadcast agreements in their entirety" or the "sum of all the contracts collectively," not "any individual contract."[146]

Setting aside these deficiencies and shortcomings in his analysis and conclusions, for 10% of the broadcast rights royalty payments received by each conference to reflect the NIL value provided by student-athletes, the broadcast rights royalty payments received by each conference would also

---

[144] *Id.*

[145] Desser Dep. at 23:13-24:11; 24:18-25:4.

[146] Desser Dep. at 24-25.

necessarily have to be comparable on an apples-to-apples basis. They are not comparable.

Put another way, Desser implicitly assumes the "media broadcast revenue" for every "Power 5 conference (and Notre Dame)" does not vary from conference to conference as a result of the factors listed in Sections 4 and 5, all of which impact the amount a network is willing to pay in broadcast rights fees. That assumption is incorrect.

Desser's deposition testimony acknowledges that conferences take different approaches and make different decisions when balancing the goal of increased rights fees against other goals that reduce the rights fee payable.[147] As Desser also testified in *O'Bannon*:

> A.    NIL are being granted, the use of NIL are being granted in these contracts along with a wide range of other things.
>
> A – A television sports agreement is a bundle of rights and responsibility that are all interrelated and that, you know, create value, provide comfort, and are – are integrated into the agreement. And the vast majority of those things don't have particular price tags attached to them, but rather they are part of the holistic value of the agreement.[148]

The factors listed in Sections 4 and 5 vary from rights holder to rights holder, and these factors vary over time. Although some media rights agreements refer to the amount paid from the network as the "broadcast rights fee," the fee actually reflects the bundle of rights the network obtains (which includes more than just the right to broadcast games) and the value of the other components of the entire agreement. Many of those "other" components are not assigned a specific dollar value. Rather, it is the entire package evaluated as a whole that makes up the "broadcast rights fee."

A conference may choose to maximize revenue in its broadcast rights agreements, licensing rights only to the most valuable games featuring marquee institutions and star players in popular sports. Another conference (or the same conference) may choose to negotiate broadcast rights agreements that maximize exposure for less popular sports and unknown players, even

---

[147] Desser Dep. at 38:25-39:19; 48:12-49:3; 49:4-51:6; 55:9-56:13.
[148] *O'Bannon* Testimony, 658:8-19

though doing so reduces the broadcast rights fee because, in part, the network has to produce broadcasts of games that, on a net basis, produce less revenue than the cost of production. It makes no sense to assert that any Broadcast NIL contributes 10% of the value in both of these examples.

### 7.D. Desser Acknowledges and Then Ignores the Distinction Between Use of NIL to Promote a Broadcast and the Use of NIL in a Broadcast.

Desser has acknowledged there is a difference between the NIL rights used to promote a broadcast as compared to the alleged NIL rights used in the broadcast of a game. In *O'Bannon*, Desser testified:

> Q. And it is your understanding, sir, in the broadcast industry, it is generally understood that promoting or publicizing a broadcast is not the same thing as the actual broadcast.
>
> Is that your understanding?
>
> A. That's correct.
>
> Q. They are different things, right?
>
> A. Well, they related to one another, but they are, in fact, different things, yes.[149]

Desser also testified to the distinctions between promotional NIL rights and broadcast NIL rights in his deposition, stating:

> Q. With respect to name, image and likeness, there are different ways in which name, image and likeness rights are used; correct?
>
> For example, you say that they are part of the broadcast. They can be used to promote the broadcast. They can be used to promote products and goods unrelated to the broadcast.

---

[149] *O'Bannon* Testimony, 685:1-9.

> There's a variety in ways in which name, image and likeness rights are licensed, many of which are covered in your report; correct?
>
> A.   Yes. That's correct.
>
> Q.   And I believe that you draw a distinction between the use of name, image and likeness rights in a broadcast and the use of name, image and likeness rights to promote a broadcast? Is that correct?
>
> A.   Those are different ways that NIL are used, both in the context of broadcast agreements and the opportunity to do both. And in fact, the obligation to do both is typically included in those agreements.[150]

Thus, Desser recognizes that student-athlete NIL rights are used in different ways – to promote a broadcast, to endorse a product, and in his opinion, to effectuate the broadcast.[151] It is important to note, however, that the NIL of only a handful of student-athletes is ever used to promote a broadcast. Desser offers no analysis or data concerning whether student-athlete NILs are used to promote all broadcasts, or some broadcasts, or only a few broadcasts.

He nevertheless ignores these individualized differences, and the acknowledged distinction between promotional NIL and Broadcast NIL, "lumping" both values together in his 10% Opinion, without explicitly acknowledging that he is doing so.

## 8.   DESSER'S ALLOCATION OPINION IS FUNDAMENTALLY FLAWED.

Desser's Allocation Opinion is that "[o]f the athlete NIL revenue in multi-sports agreements, 75% should be allocated to football, 15% to men's basketball, 5% to women's basketball and 5% to Olympic sports."[152] Desser confirmed in his deposition that the allocation percentages are "an overall allocation for all of the rights for all of the conferences collectively," but asserted that "a particular conference might vary a slight amount."[153]

---

[150] Desser Dep. at 58:4-22.
[151] Desser Dep. at 58:4-22. *See also O'Bannon* Testimony at 685:1-9.
[152] *Id.*
[153] Desser Dep. at 119:20 – 120:13.

Desser's Allocation Opinion therefore does not apply to any specific conference and, in any event, is unsupported and incorrect. It is not possible to determine the relative value of broadcast rights payments a conference receives in a multi-sports agreement that are attributable to football, men's basketball, women's basketball, or any single sport, much less to determine a relative value applicable to all defendant conferences.

As explained in Sections 3 through 5 above, the broadcast rights agreements have widely varying terms, including the relative numbers of football, basketball, and other games licensed for broadcast.

Desser concludes in his Allocation Opinion that football and men's basketball are the most valuable games from a broadcast rights perspective. Based on his own Opinion, it is therefore mathematically illogical to conclude that the value of the rights licensed under a multi-sport rights agreements of one conference, which includes a higher percentage of football and men's basketball games,  and value of the rights licensed under a multi-sport rights agreements of another conference, which includes relatively lower percentage of those games, should both be allocated 75% to men's football, 15% to men's basketball, and 5% to women's basketball.

To elaborate, the various multi-sport broadcast rights agreements of the conference defendants do not uniformly grant rights the same relative numbers of games. The SEC has chosen to grant rights to CBS for first-selection football games and a handful of men's basketball games, to include a specific package of games in multiple sports in the Multi-Media Rights Agreement, and to include a different package of games in multiple sports in the SEC Network Agreement. No other conference's broadcast agreements contain the same packages as the SEC's agreements (or the same packages as any other conference) – either by numbers or relative percentages. As a matter of basic math alone, it cannot be correct to conclude that the relative value of rights fees under each conference's agreements is precisely, or even roughly, consistent with the percentages in Desser's Allocation Opinion.

Even if every conference in all of its individual media rights agreements collectively licensed the right to broadcast exactly the same number of football, men's basketball, and women's basketball games (which they do not), other factors impacting valuation of rights, including those listed in Sections 3 through 5 above, make these allocations invalid. There is certainly no basis for Desser's assertion that the allocations vary only slightly.

## 8.A. Networks Pay a Single Fee to Broadcast Multiple Sports.

As explained above, except for the NCAA Men's Basketball Tournament, the CFP, Notre Dame football, and some bowl or tournament games, most college sports media rights agreements are not for a single sport. Instead, collegiate sports media agreements convey to networks the right to broadcast games and events for a variety of sports. None of the multi-sport college broadcast rights media agreements segregate the media rights fee between and among different sports. Instead, networks pay a single fee for *all* games and events conveyed under the agreement for *all* sports. Redacted - NSC

## 8.B. Relative Valuation Generalizations Are Invalid.

Media rights agreements cannot be compared from conference to conference for several reasons. First, the terms that positively and negatively affect the rights fee that a network is willing to pay vary from conference to conference, and within the same conference, from network to network, as explained in Sections 4 and 5.

Some conferences place a high priority on exposure of women's and Olympic sports and negotiate extensive obligations for networks to produce and broadcast games and events in those sports. For example, pursuant to its Big Ten media agreements, Redacted - NSC

155

Other conferences have similar priorities, but less negotiating power, resulting in fewer women's and Olympic sports being broadcast (and often in the conference absorbing the production costs to increase the exposure). These priorities, negotiating positions, and leverage result in very different terms in broadcast rights agreements, making it impossible to apply the same percentage allocations to different agreements in various conferences.

---

154 Redacted - NSC
155 Redacted - NSC .

Every one of the terms to be negotiated, as listed in Sections 4 and 5, impacts the rights fee the network is willing to pay. It is not possible to evaluate and determine the monetary value associated with each of the terms that must be negotiated and that impact the rights fee a network will pay to a conference.

In addition, the relative value of a license to broadcast events in one sport as compared to another sport varies from school to school, conference to conference, and year to year.

For example, the value of broadcasting college men's basketball varies greatly among conferences. ACC college men's basketball broadcast rights may have more value than the rights in other conferences because of the ACC's tradition of competition, long-standing rivalries, and school-specific traditions (such as the "Cameron Crazies" at Duke University).

The ACC illustrates another shortcoming in Desser's analysis. Although the ACC is traditionally known for men's basketball, the 2022-23 academic year was a down period for the ACC. It had fewer teams highly ranked as compared to previous years and fewer teams were extended invitations to the NCAA men's basketball tournament as compared to the Big Ten, SEC, and Big 12, and as compared to the invitations extended to ACC schools in prior years.

Similarly, the value of broadcast rights attributable to a specific sport at a specific school varies over time. If a team is more successful on the field or on the court, then the broadcast value increases.

Other external forces also affect the value of broadcast rights attributable to a particular school. Again, Duke affords a convenient example. In 2022, Duke's basketball coach, Mike Krzyzewski, retired after 42 years as the head coach. The broadcast value of his last season of games, and in particular his last game against Duke's long-standing rival the University of North Carolina, were significantly higher based on the publicity associated with Coach K's retirement.[156]

---

[156] On March 5, 2022, the Duke men's basketball team played the University of North Carolina's men's basketball team which was Coach Krzyzewski's last Duke-UNC rival game. The game attracted 3.980 million viewers, the highest rated regular season college basketball game in 2022. In 2023, viewership for the Duke–UNC men's basketball game was down by 31% to 2.63 million viewers on ESPN. *See* Lewis, Jon, *Big Turnout for Coach K's Final Home Game*, SPORTSMEDIAWATCH, Mar. 2022, https://www.sportsmediawatch.com/2022/03/duke-unc-ratings-coach-k-finale-most-watched-game-college-basketball-season/; Lewis, Jon, *Another Strong Outing for Duke-UNC*,

The value of the rights to broadcast a specific sport also varies from school to school within the same conference. For example, in the ACC, Clemson is known for football, while Duke and UNC are known for men's basketball. Similarly, in the SEC, the University of Kentucky is known for men's basketball, but a number of other SEC teams are known for football. Even that example demonstrates the fallacy of attempting to assign uniform percentage allocations to broadcast rights values because the University of Alabama (a consensus national football powerhouse) was ranked number one in the country and received the top seed in the NCAA men's basketball tournament this year.

Accordingly, Desser's blanket allocation of 75% to football, 15% to men's basketball, 5% to women's basketball and 5% to all other sports would not be consistent in the SEC versus the ACC, or within the ACC, as between Clemson and Duke. Even simply as applied to the right to broadcast Duke's men's basketball games, the relative allocation would not be the same year over year.

Of course, when a network negotiates a broadcast rights agreement, the network must forecast the value of the rights it is acquiring, but the values attributable to specific sports vary from conference to conference. No uniform rule of thumb or typical percentage (i.e., Desser's Allocation Opinion) reflects the relative value of rights in any single conference, much less in all conferences.

## 8.C. Desser Admits He Cannot Rely on Television Ratings.

Although cited throughout his report in support of his Allocation Opinion, Desser acknowledged in his deposition that he does not rely on television ratings or viewership data to support his conclusions because there is no source for reliable, comprehensive televisions ratings that can be used for purposes of litigation.[157]

---

SPORTSMEDIAWATCH, Mar. 2023, https://www.sportsmediawatch.com/2023/03/duke-unc-ratings-near-season-high-mens-womens-college-hoops/.

[157] Desser Dep. at 122:24-123:18.

    Q. You use ratings as one source of reference for your allocation between and among sports?

    A. . . . We don't rely upon that to come to the conclusion.

    Q. So the ratings are not something that you're relying on here for that conclusion?

## 8.D. Conference Media Agreements and Financial Statements Do Not Support His Allocation Opinion.

Desser cites SEC financial statements and a Conference USA Term Sheet from 2010,[158] but a closer review of these materials shows they do not support his Allocation Opinion.

### 1. SEC Audited Financial Statements.

The SEC receives rights fees pursuant to three media agreements – a CBS Agreement, its Multi-Media Rights Agreement with ESPN, and the SEC Network Agreement with ESPN. In each of the agreements, the SEC licenses broadcasts of games in more than one sport. In the two ESPN Agreements, the SEC licenses broadcasts of games in all sports sponsored by the SEC. None of the agreements attribute any specific portion of the rights fee to any sport.

In its financial statements, the SEC: (a) allocates NSC of the rights fees from CBS to football. and NSC of the rights fees from CBS to men's basketball, and (b) allocates NSC of the rights fees received under the ESPN Multi-Media Rights Agreement to football, approximately NSC to men's basketball, and a NSC to the women's basketball tournament.

The SEC does not allocate NSC in rights fees received under the SEC Network Agreement, which represent NSC of the SEC's broadcast rights fees.

Desser cites the SEC's allocation of NSC of the rights fees received under the Multi-Media Rights Agreement to football to support his Allocation Opinion, but ignores the NSC of Multi-Media Rights Agreement rights fees to women's basketball. the allocations of rights fees under the CBS agreement, and the NSC of rights fees that the SEC does not attempt to allocate at all.

I understand that the limited allocations in the SEC financial statements with respect to the Multi-Media Rights Agreement revenues and CBS Agreement revenues are for management purposes only, were first established decades ago, and are included to facilitate year over year

---

A. I did not.

[158] Desser Report, p. 60, 62, §§ 17.1, 17.4.

comparison of revenues without representation that the allocations are currently accurate.[159]

In light of the mismatch between the SEC's allocations of rights fees in its financials and the SEC's decision not to allocate NSC of its rights fees at all, the SEC's financial statements do not support Desser's Allocation Opinion with respect to the SEC's media rights alone.

In addition, as explained in the introduction to this Section 8 (and in more detail in Sections 3 to 5), because the SEC's media rights packages (either collectively or in any single rights agreement) differ from the rights packages of other conferences, any allocation of rights values for the SEC has no bearing on the allocation of rights values for any other conference.

### 2.    Conference USA Term Sheet.

Desser also relies on a 2010 Term Sheet between Conference USA and CBS College Sports Network ("CBS College") to reach his Allocation Opinion.[160] Presumably pursuant to an agreement that followed the Term Sheet,



Redacted - NSC

[162]

Redacted - NSC

[163]

The term sheet is not a final agreement. Desser does not cite or have access to the final agreement between Conference USA and CBS College, if in fact it was finalized.

---

[159] Declaration of Greg Sankey, Apr. 11, 2023 ¶¶ 31-33.
[160] Desser Report p. 62, § 17.4.
[161] Redacted - NSC
[162] Redacted - NSC
[163] Redacted - NSC

Desser acknowledged in his deposition that CUSA is not a defendant in this litigation and that he does not know whether the reference to Redacted - NSC

Redacted - NSC [164]

The C-USA Term Sheet does not offer any basis for Desser's Allocation Opinion. All of my observations in subsection 1 above with respect to the SEC apply with equal force to the C-USA term sheet. The allocations in the C-USA Term Sheet do not align with Desser's Allocation Opinion for C-USA and offer no basis for reaching conclusions about allocations for other conferences. In addition, the C-USA Term Sheet is quite dated, and C-USA is not and has never been an Autonomy Conference.

The C-USA allocation also applies in only a limited set of circumstances, if a

Redacted - NSC

It does not represent a "true" reflection of the relative value of broadcast rights for football and basketball.

### 3.   Desser's Sources and His Own Opinions Illustrate the Flaws in the Allocation Opinion.

The SEC financial statements and the Conference USA Term Sheet illustrate why the Allocation Opinion is arbitrary and not reflective of the value of rights fees of any conference.

Only one of the allocations Redacted - NSC

Redacted - NSC matches the Allocation Opinion. All of the other allocations – Redacted - NSC – are inconsistent with the Allocation Opinion.

In fact, Desser's own work contradicts his allocation of 5% of the value of rights fees to women's basketball games. On August 2, 2021, Desser, along with Kaplan Hecker & Fink LLP, published an article based on research he

---

[164] Desser Dep. at 112:3-113:4.
[165] Redacted - NSC

conducted on the NCAA's women's basketball tournament.[166] He asserted that the Division I Women's Basketball Championship should command rights fees of between $81 and $112 Million annually beginning in 2025 (a conclusion widely considered to be incorrectly high by many informed observers).[167] Desser acknowledges that the NCAA Division I Men's Basketball Championship media rights agreement generates approximately $1.1 Billion in annual rights fees.[168] If Desser's Allocation Opinion were reliable, the ratio of rights fees for the men's tournament and women's tournament would be 3 to 1 (15% to 5%). Even using the maximum value of the rights fees Desser assigns to the women's tournament in his article, the ratio is not quite 10 to 1 ($1.1 billion to $112 million).

## 8.E. Other Sports.

Each conference has particular sports of the "Olympic" type that tend to resonate at a higher level than in other conferences – but Desser's Allocation Opinion reserves only 5% of the rights value for all of these sports combined. For instance, women's volleyball is very popular in the Big Ten, as is men's hockey and wrestling.[169] In the ACC, men's and women's lacrosse, women's field hockey, women's soccer, and men's and women's golf are popular. In the Big 12 men's baseball and women's softball, as well as men's and women's golf are followed closely. In the Pac 12, men's volleyball, men's baseball, women's softball, and men's and women's golf and track and field are popular. And in the SEC, women's softball, women's gymnastics, and men's baseball are more popular than other "Olympic" type sports. At times, some of these Olympic sports attract more viewers than women's basketball. Desser fails to account for these variations at all.

It is not possible, for all of the reasons addressed in this report, to determine the relative value of rights fees in each conference, much less conclude that the relative values are the same in all conferences.

---

[166] Kaplan Hecker & Fink LLP and Desser Sports Media, Inc., *NCAA Gender Equity Review*, Aug. 2. 2021.  A copy of this article is publicly available at https://kaplanhecker.app.box.com/s/6fpd51gxk9ki78f8vbhqcqh0b0o95oxq.

[167] *Id*. at 3.

[168] Lewis, Jon, *CBS, Turner Extend NCAA Deal Through '32; No Changes to Final Four*, 2016, https://www.sportsmediawatch.com/2016/04/cbs-turner-ncaa-march-madness-eight-year-extension-final-four-cable-2032/ ("the eight additional years of the contract are worth $8.8 billion").

[169] Deposition of Jim Delaney at 138:11-15 ("So I would say the Big Ten football and basketball are – are central to the monetization and distribution, but I would also say, but for the Olympic sports, women's basketball, volleyball, hockey, wrestling, there's no Big Ten Network.").

I hereby certify that this report is a complete and accurate statement of all my opinions and the basis and reasons for them to which I will testify under oath.

Bob Thompson
Principal, Thompson Sports Group, LLC
April 28, 2023

# APPENDIX A

## DOCUMENTS I RELIED UPON

A. <u>Case Filings and Related Documents</u>

Consolidated Amended Complaint

Declaration of Gary Arrick, Oct. 14, 2022

Declaration of Greg Sankey, Apr. 11, 2023

Declaration of Steven Scebelo, Sept. 26, 2022

Deposition of Edwin Desser, Jan. 12, 2023

Deposition of Grant House, Feb. 10, 2023

Deposition of James Delany, Sept. 20, 2022

Expert Report of Edwin Desser

Supplemental Declaration of Gary Arrick, Apr. 19, 2023

Supplemental Declaration of Steven Scebelo, Apr. 5, 2023

Trial Testimony of Edwin Desser in *O'Bannon v. NCAA*, June 14, 2014

B. <u>Produced Documents</u>

ACC-GIA131142

ACC-GIA131185

ACC-HOUSE0124223

ACC-HOUSE0227822

ACC-HOUSE0227974

ACC-HOUSE0228041

ACC-HOUSE0228053

ACC-HOUSE0228078

ACC-HOUSE0228205

ACC-HOUSE0228220

ACC-HOUSE0228278

ACC-HOUSE0228382

BIG12_HOUSE00033695

BIG12_HOUSE00033708

BIG12_HOUSE00033710

BIG12_HOUSE00033712

BIG12_HOUSE00033867

BIG12_HOUSE00039427

BIG12_HOUSE00039440

BIG12_HOUSE00039595

BIG12_HOUSE00039603

BIG12_HOUSE00039677

BIG12_HOUSE00039754

BIG12_HOUSE00039756

BIG12_HOUSE00039760

BIG12_HOUSE00039830

BIG12-GIA_00273107

BIG12-GIA_00273536

BIGTEN-GIA 253098

BIGTEN-NIL_00143749

BIGTEN-NIL_00143751

BIGTEN-NIL_00143755

BIGTEN-NIL_00143844

BIGTEN-NIL_00143938

BIGTEN-NIL_00143940

BIGTEN-NIL_00149856

BIGTEN-NIL_00149995

BIGTEN-NIL_00263444

BIGTEN-NIL_00263517

BIGTEN-NIL_00263584

BIGTEN-NIL_00263686

BIGTEN-NIL_00263737

BIGTEN-NIL_00263751

BIGTEN-NIL_00263761

BIGTEN-NIL_00263703

CUSA-GIA_00000509

EA_NIL_00000103

EA_NIL_10000001

NBPA_000056

NCAAGIA00663691

NCAAGIA00722989

NCAAHOUSE00196552

NCAAHOUSE00196553

NCAAHOUSE00196554

NCAAHOUSE00196555

NCAAHOUSE00196559

NCAAHOUSE00249333

NCAAHOUSE00249427

NCAAHOUSE00249517

NCAAHOUSE00249521

ND004692

PAC12HOUSE_00134707

PAC12HOUSE_00134715

PAC12HOUSE_00134761

PAC12HOUSE_00134770

PAC12HOUSE_00134795

PAC12HOUSE_00134920

PAC12HOUSE_00163474

PAC12HOUSE_00163503

SEC00309558

SEC00310338

SEC-HOUSE0033056

SEC-HOUSE0047791

SEC-HOUSE0047887

SEC-HOUSE0113215

SEC-HOUSE0113221

SEC-HOUSE0113223

SEC-HOUSE0113238

SEC-HOUSE0113254

SEC-HOUSE0113267

SEC-HOUSE0113271

SEC-HOUSE0113308

SEC-HOUSE0113362

SEC-HOUSE0113462

C.   Publicly Available Sources, Articles, and Publications

*Ally Becomes Official ACC Sponsor*, THEACC.COM, Feb. 20, 2023,
https://theacc.com/news/2023/2/20/general-ally-becomes-official-acc-sponsor.aspx

Anderson, Jared, *How to Watch the 2019 Pan American Games*, SWIMSWAM.COM, Aug. 5,
2019, https://swimswam.com/how-to-watch-the-2019-pan-american-games/.

Baker, Matt, *FSU Fires Warning Shot to ACC: 'Something has to Change'*, TAMPA BAY
TIMES, Feb. 24, 2023, https://www.tampabay.com/sports/seminoles/2023/02/24/fsu-football-
florida-state-acc-conference-realignment/

Belson, Ken and Kevin Draper, *N.F.L. Signs Media Deals Worth Over $100 Billion*, THE NEW
YORK TIMES, Mar. 18, 2021, https://www.nytimes.com/2021/03/18/sports/football/nfl-tv-
contracts.html

Blinder, Alan, *The Smaller, Everyday Deals for College Athletes Under New Rules*, THE NEW YORK TIMES, Dec. 9, 2021, https://www.nytimes.com/2021/12/09/sports/ncaafootball/college-athletes-nil-deals.html

Brannon, Ike, *How Long Will The PGA Handicap Its Golfers?*, FORBES, Feb. 2, 2022, https://www.forbes.com/sites/ikebrannon/2022/02/02/how-long-will-the-pga-handicap-its-golfers/?sh=3609bf40784c.

Dellatto, Marisa, *Why Rihanna Won't Get Paid For Her Super Bowl Halftime Show*, FORBES, Feb. 10, 2023, https://www.forbes.com/sites/marisadellatto/2023/02/10/why-rihanna-wont-get-paid-for-her-super-bowl-halftime-show/?sh=b4dfeb56226f

Dosh, Kristi, *All the Stats for Year 1 of NIL*, BUSINESS OF COLLEGE SPORTS, July 15, 2022, https://businessofcollegesports.com/name-image-likeness/all-the-stats-for-year-1-of-nil/

Ervin, Phil, *Stetson Bennett's Story is the Stuff of Hollywood to Everyone Except Stetson Bennett*, SATURDAYDOWNSOUTH.COM, https://www.saturdaydownsouth.com/georgia-football/stetson-bennetts-story-is-the-stuff-of-hollywood-to-everyone-except-stetson-bennett/

Graham, Andrew, *Former ESPN President John Skipper Makes Case for ACC to Merge with Pac-12*, On3, Mar. 7, 2023, https://www.on3.com/news/former-espn-president-john-skipper-makes-case-for-acc-to-merge-with-pac-12/

Kaplan Hecker & Fink LLP and Desser Sports Media, Inc., *NCAA Gender Equity Review*, Aug. 2, 2021

*Katie Ledecky Bio*, SWIMSWAM.COM, https://swimswam.com/bio/katie-ledecky/

*Katie Ledecky*, OLYMPICS.COM, https://olympics.com/en/athletes/katie-ledecky

Lewis, Jon, *Another Strong Outing for Duke-UNC*, SPORTSMEDIAWATCH, Mar. 2023, https://www.sportsmediawatch.com/2023/03/duke-unc-ratings-near-season-high-mens-womens-college-hoops/

Lewis, Jon, *Big Turnout for Coach K's Final Home Game*, SPORTSMEDIAWATCH, Mar. 2022, https://www.sportsmediawatch.com/2022/03/duke-unc-ratings-coach-k-finale-most-watched-game-college-basketball-season/

Lewis, Jon, *SEC, CBS, Extend Deal for Fifteen Years*, SPORTSMEDIAWATCH.COM, 2008, https://www.sportsmediawatch.com/2008/05/sec-cbs-extend-deal-for-fifteen-years

Maese, Rick, *Good as Gold: How Katie Ledecky is Turning Her Medals into Money*, THE WASHINGTON POST, July 29, 2021, https://www.washingtonpost.com/sports/olympics/2021/07/29/katie-ledecky-endorsement-deals/

Mox, Jacob, *The WNBA's Revenue Sharing is Huge for Players, But Just How Much Can Players Make?*, THE HER HOOP STATS NEWSLETTER, Apr. 29, 2022, https://herhoopstats.substack.com/p/wnba-revenue-sharing-estimates-tv-deal

Mox, Jacob, *WBNA Revenue Sharing Explained*, THE HER HOOP STATS NEWSLETTER, Apr. 28, 2022, https://herhoopstats.substack.com/p/wnba-revenue-sharing-rules-tv-contract

Mox, Jacob, *WBNA Revenue Sharing Explained*, THE HER HOOP STATS NEWSLETTER, Apr. 28, 2022, https://herhoopstats.substack.com/p/wnba-revenue-sharing-rules-tv-contract

*NCAA Corporate Champions and Partners*, NCAA.COM, Mar. 10, 2023, https://www.ncaa.com/news/ncaa/article/2011-02-25/corporate-champions-and-partners

*NFL CBA: Minimum Salaries*, SPOTRAC.COM, https://www.spotrac.com/nfl/cba/minimum/

*NFL Contracts*, SPOTRAC.COM https://www.spotrac.com/nfl/contracts//

*Official SEC Corporate Sponsors*, SECSPORTS.COM https://www.secsports.com/article/11055657/official-sec-corporate-sponsors

Pac-12 Networks PR, *Pac-12 Networks Announces Addition of Free Streaming Channel Pac-12 Insider to Newly-Launched "Sports on Tubi" Lineup*, PAC-12.COM, Aug. 24, 2021, https://pac-12.com/article/2021/08/24/pac-12-networks-announces-addition-free-streaming-channel-pac-12-insider-newly.

Phillips, Zoe, *Pregnant Rihanna Touches Up With Fenty Beauty Compact During Super Bowl Halftime Performance*, ET, Feb. 12, 2023, https://www.etonline.com/pregnant-rihanna-touches-up-with-fenty-beauty-compact-during-super-bowl-halftime-performance-199031.

Rasmussen, Karl, *ESPN Reveals Record-Setting Ratings for Women's Final Four*, Apr. 1, 2023, https://www.si.com/college/2023/04/01/espn-reveals-womens-final-four-viewership-numbers

Scarborough, Alex, *SEC, ESPN Strike 10-year Deal for College Football, Basketball Starting in 2024*, ESPN.COM, Dec. 10, 2020, https://www.espn.com/college-football/story/_/id/30492065/sec-espn-strike-10-year-deal-college-football-basketball-starting-2024.

*Stetson Bennett*, NFLDRAFTBUZZ.COM, https://www.nfldraftbuzz.com/Player/Stetson-Bennett-QB-Georgia

NBA Collective Bargaining Agreement and Uniform Player Contract

NFL Collective Bargaining Agreement and Form Player Contract

PGA Tour Handbook

WNBA Collective Bargaining Agreement