# EXHIBIT 3

## To the Declaration of Rakesh N. Kilaru

## REDACTED VERSION OF DOCUMENT REQUESTED TO BE FILED UNDER SEAL

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | Case No. 4:20-cv-03919 CW |

**EXPERT REPORT OF BARBARA OSBORNE**

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ............................................................................................... 5

       A.    Qualifications ............................................................................................ 5

       B.    Assignment ................................................................................................ 7

       C.    Plaintiffs' But-For World Overview ......................................................... 8

             1.    Broadcast Model ............................................................................... 8

             2.    Broadcast Model Revenue Overview .................................................. 10

II.    SUMMARY OF OPINIONS ........................................................................... 13

III.   TITLE IX FUNDAMENTALS AND LEGISLATIVE HISTORY ................... 15

       A.    The Enactment of Title IX and Its Implementing Regulations ............................ 16

       B.    Title IX Fundamentals ............................................................................. 18

             1.    What Is Title IX? ............................................................................. 18

                   a.    Financial Assistance................................................................ 18

                   b.    Equivalent Treatment and Benefits............................................. 21

                   c.    Participation Opportunities ....................................................... 24

             2.    Who Is Subject to Title IX? .............................................................. 24

       C.    Attempts to Limit Title IX ....................................................................... 26

IV.    PLAINTIFFS' BROADCAST MODEL REQUIRES DISTRIBUTION OF
       REVENUES BY INSTITUTIONS, THEREBY REACHING ENTITIES
       SUBJECT TO TITLE IX ................................................................................. 29

       A.    The Conferences Act Through Their Member Institutions................................ 31

       B.    The Member Institutions Own Their Broadcast Rights and Grant or
             Transfer Them to the Conferences...................................................................... 32

       C.    Member Institutions Control the Distribution of Conference Broadcast
             Media Revenues by Operation of the Conference Bylaws ................................. 34

**TABLE OF CONTENTS**

**Page**

V. PLAINTIFFS' BROADCAST MODEL VIOLATES TITLE IX .................................... 39

    A. Plaintiffs' Broadcast Model Generally ............................................... 39

    B. Plaintiffs' Broadcast Model Creates New and Discriminatory Levels of
        Athletic Participation Opportunities ..................................................... 40

    C. The Broadcast Model Implicates the Financial Assistance Regulation ............... 42

        1. Financial Assistance .................................................................. 42

        2. Financial Aid ............................................................................. 43

    D. The Broadcast Model Directly Implicates the Equitable Treatment
        Provisions ....................................................................................... 47

    E. Plaintiffs' Broadcast Model Cannot Be Adjusted to Comply With Title IX ....... 50

VI. OTHER CONSIDERATIONS WITH PLAINTIFFS' BROADCAST MODEL ............ 55

    A. Plaintiffs' Broadcast Model Is Contrary to Title IX Equity Principles .............. 55

    B. Title IX Is Designed to Maximize Opportunities for Female Student-
        Athletes ........................................................................................... 56

VII. CONCLUSION ..................................................................................... 59

APPENDIX A : DOCUMENTS RELIED UPON ....................................................... 62

APPENDIX B : PLAINTIFFS' "BUT FOR WORLD" TOTAL BROADCAST
    PAYMENTS ..................................................................................... 67

APPENDIX C : TOTAL CLASS MEMBERS PER SPORT PER YEAR ................................. 68

APPENDIX D : RELEVANT CONFERENCE BYLAW CITATIONS ..................................... 69

APPENDIX E : BROAD-BASED SPORT OPPORTUNITIES FOR THE BENEFIT OF
    ALL STUDENT-ATHLETES FROM THE BEGINNING OF COLLEGE
    ATHLETICS ..................................................................................... 81

## TABLE OF CONTENTS

**Page**

APPENDIX F : A CHRONOLOGICAL NARRATIVE FOR THE HISTORY OF TITLE
IX ..................................................................................................................... 83

## I.   <u>INTRODUCTION</u>

### A.   **Qualifications**

1.      My name is Barbara Osborne.  I am a professor at the University of North Carolina at Chapel Hill with a joint appointment in the Department of Exercise and Sport Science and the School of Law.  In the Exercise and Sport Science department I direct the graduate program in Sport Administration, which was the first graduate program in the country to focus solely on preparing graduate students for careers in college athletics.  Additionally, I teach two graduate courses: Legal Issues in College Athletics and NCAA Governance and Compliance.  At the Law School, I teach courses in Amateur Sport Law and Professional Sport Law.  I also direct the dual degree (J.D./M.S.) program in Law and Sport Administration.  I have taught at University of North Carolina since 1998.

2.      I have a Masters' Degree in Sport Management from Boston University and a J.D. from Boston College Law School.  I have been a member of the Massachusetts Bar since 1997 and the North Carolina Bar since 2002.

3.      In addition to teaching, I conduct research and have written 33 book chapters for various sport law and sport management texts, published 44 articles in academic journals including 38 invited publications.  Many of the numerous articles and book chapters I have authored are related to Title IX, gender equity, and other legal issues in college athletics.  A complete copy of publications is detailed in the attached curriculum vitae, Exhibit A.

4.      I am a co-author of the leading sport law textbook used at law schools throughout the United States.  I am also the co-author of a popular undergraduate/graduate level sport law textbook.  For each of these textbooks, I am the principal author for the chapters on high school and college sports, Title IX, and gender equity.

5.    In addition to my educational work, I serve as an independent Title IX consultant, conducting Title IX programmatic reviews, audits, and/or evaluations for collegiate institutions, school systems, and athletics programs.  In this consulting capacity I conduct Title IX related training sessions for athletics departments at all levels.  I have also served as an expert witness on Title IX issues in litigation.

6.    As a result of my extensive expertise in Title IX and gender equity, I have been appointed by courts in Pennsylvania and Florida to provide Title IX education and training at defendant institutions as part of settlements.  More recently, I was appointed by the federal court in Connecticut to serve as an independent monitor of Title IX issues within the athletics department of a large university as part of the settlement of that case.  That appointment remains ongoing and requires a periodic assessment of the entire athletics program under the requirements of Title IX.

7.    Relevant to all my work, teaching, and publications is my past experience as a collegiate student-athlete and a university athletics administrator.  Shortly after the passage of Title IX, I was a collegiate athlete at the University of Wisconsin-Parkside participating in cross country and track.  I was able to experience firsthand the initial impact of Title IX and how differing treatment based on sex can impact the daily experience of a student-athlete.  After college, I became involved in the administration and oversight of collegiate athletics by working in a university's athletics department for 15 years.  During that time, I held different positions and eventually served as an Associate Athletics Director and Senior Woman Administrator ("SWA").  The SWA is the most senior woman administrator in the athletics department and often plays a key role in the oversight of the institution's compliance with Title IX.  As a result of my role in that position, I was able to be a contributing member of senior management within the athletics department and came to understand and appreciate the application of Title IX in the context of the

real-life operation of an athletics department.   In addition, I was able to see how decision making on issues that may not have appeared to be related to Title IX, nonetheless had Title IX impacts.

8.      Relevant previous employment includes serving Of Counsel for Ice Miller, LLP in its college sports practice group, working for a sport attorney/agent, and engaging in freelance assignments in sports broadcasting.

9.      I am being compensated at an hourly rate of $250 per hour for research- and analysis-related activities and $400 per hour for deposition and trial testimony, plus reimbursement of expenses.  I have no financial interest in the outcome of this matter.  I have not testified as an expert at deposition or trial within the last four years.  A list of all publications I have authored in the last ten years is available in **EXHIBIT A**.

10.     I reserve the right to amend or supplement this report, including but not limited to as new information on the subject matter of this report becomes available.

**B.     Assignment**

11.     I have been asked by counsel for Defendants the Pac-12 Conference (the "Pac-12"), the Big 12 Conference, Inc. (the "Big 12"), the Southeastern Conference (the "SEC"), the Atlantic Coast Conference (the "ACC"), and the Big Ten Conference, Inc. (the "Big Ten") (collectively, the "Conferences"), together with the National Collegiate Athletic Association (the "NCAA," and collectively with the Conferences, the "Defendants") to evaluate Plaintiffs' Motion for Class Certification and the accompanying expert reports of Dr. Daniel Rascher ("Rascher") and Mr. Edwin Desser ("Desser").

12.     More specifically, I have been asked to assess whether there are Title IX implications and/or gender equity concerns raised by Plaintiffs' proposed broadcast revenue share payment model ("Broadcast Model").  To perform this assignment, I used a methodology based on the one that I normally use in the other Title IX audits or reviews that I conduct but tailored to

the facts of this case.[1]  My approach in this regard included a comprehensive review of documents, a review of the depositions of the key individuals involved including Plaintiffs and Plaintiffs' expert witnesses, and then a final analysis with the requirements of Title IX in mind, and finally, the preparation of this report.  It was important to review the deposition transcripts identified above and the documents referenced below so that I could have a clear understanding of the relevant facts, issues and desired approach.

13.    Excerpted in **APPENDIX A** is a list of documents and information I consulted in reaching my opinions.

C.    **Plaintiffs' But-For World Overview**

14.    Having reviewed the information described above, the following is my understanding of Plaintiffs' but-for world.  Plaintiffs seek to certify a Football and Men's Basketball Class, a Women's Basketball Class, and an Additional Sports Class.  The first two proposed Classes are limited to student-athletes who receive full grant-in-aid ("GIA") scholarships and compete on a Division I men's or women's basketball team or an FBS football team at any Conference school.[2]  Plaintiffs have proposed three damages models in their Motion for Class Certification that contemplate what would have happened in the "but-for" world, dating back to 2016:

1.    **Broadcast Model**

15.    The Broadcast Model envisions that broadcast revenues would be shared with full GIA scholarship football and basketball players (the Football and Men's Basketball Class and

---

[1] While I may include a campus visit as part of an institutional Title IX review, given the nature of this case, a campus visit was not relevant.  In addition, while I often include a series of interviews with key individuals, in the course of litigation a review of the deposition transcripts of the relevant individuals as I have done here is more appropriate.
[2] *See* Pls.' Mot. for Class Cert., ECF No. 209, p. v.

Women's Basketball Class) participating at the Conferences' member schools and the University of Notre Dame.

(a)     The Broadcast Model asserts that each Conference would have paid 10% of its respective broadcast revenue to certain qualifying student-athletes (i.e., those in the Football and Men's Basketball Class and the Women's Basketball Class) from 2016 forward.[3]

(b)     Of the 10% of broadcast revenue paid directly to student-athletes in the Football and Men's Basketball Class and in the Women's Basketball Class, the Broadcast Model would allocate at least 75% to football, at least 15% to men's basketball, and no more than 5% to women's basketball.[4]  (Some of the broadcast revenues are received under single-sport contracts for broadcast rights to football games, and some are received under single-sport contracts for broadcast rights to men's basketball games.  Plaintiffs allocate the 10% revenue share from those single-sport contracts in full to football and men's basketball student-athletes respectively. Plaintiffs apply their allocation percentages only to broadcast revenues received under multi-sport agreements).

(c)     The Broadcast Model envisions that the broadcast revenue shares allocated to football, men's basketball, and women's basketball by each Conference would be distributed by each Conference in equal payments to full GIA scholarship student-athletes who play each sport within the relevant classes.[5]

16.     Plaintiffs seek to obtain a share of broadcast revenues, including past revenues, based on their Broadcast Model.

17.     The Broadcast Model envisions that the overwhelming majority of broadcast

---

[3] *Id.*, pp. v, 30.
[4] Expert Report of Daniel A. Rascher, dated Oct. 21, 2022 ("Rascher Rep.") ¶ 176.  Plaintiffs' experts do not allocate the remaining share of broadcast revenues.
[5] *Id.* ¶ 163.

revenues paid to student-athletes in the past would have benefitted male student-athletes.

18.     This report will focus on the Broadcast Model, which poses significant Title IX issues.

### 2.     Broadcast Model Revenue Overview

19.     The total amount of broadcast revenue payments Plaintiffs seek through the Broadcast Model is over $4.1 billion (when trebled).  Plaintiffs reserve their right to increase the claim.

20.     Of the roughly 113 total student-athletes at each institution who would receive a revenue share under the Broadcast Model in each year of the class period, at least 86.7% are male student-athletes.

(a)     For reference, there are up to 98 male student-athletes (the maximum number of full GIA scholarship student-athletes for football and men's basketball combined) and only 15 female student-athletes (the maximum number of full GIA scholarship student-athletes for women's basketball) at each member institution who would receive payments each year under the Broadcast Model.[6]

(b)     The gender disparity inherent in the Broadcast Model is even more significant over the entire class period.  The Football and Men's Basketball Class includes an average of 6,170 members, making up on average 88% of the total student-athletes per year who would receive payments under the Broadcast Model.  Meanwhile, the Women's Basketball Class includes only 849 members per year on average, comprising an average of just 12% of the total

---

[6] NCAA rules permit each institution to offer full GIA scholarships to a maximum total of 85 football players, 13 men's basketball players, and 15 women's basketball players.  *See* 2022-23 NCAA Division I Manual, Bylaw 15.5 Maximum Institutional Grant-in-Aid Limitations by Sport: Bylaw 15.5.5.1 Men's Basketball; Bylaw 15.5.5.2 Women's Basketball; Bylaw 15.5.6.1 Football (NCAAHOUSE00250045-57).

student-athletes who would receive payments per year under the Broadcast Model.[7]

21.     Plaintiffs assert that each class would have received the following total amount of broadcast revenue payments in the but-for world:

| CLASS | BROADCAST PAYMENT |
|---|---|
| Football and Men's Basketball Class | $ 1,320,300,000.00 |
| Women's Basketball Class | $ 49,800,000.00 |
| **Total Payments (before trebling)** | **$ 1,370,100,000.00** |
| **Percent of Broadcast Payments to Football/Men's Basketball Class** | **96%** |

22.     Of the $1,370,100,000 in total payments that Plaintiffs seek through the Broadcast Model, **at least 96% of total payments ($1,320,300,000) are allocated to male student-athletes** in the Football and Men's Basketball Class.

23.     A chart outlining the total payments Rascher calculates in the but-for world is excerpted in **APPENDIX B**.

24.     The allocations in the above chart can be further depicted as follows, with Plaintiffs' Broadcast Model allocating overwhelmingly disproportionate revenue share payments to men's sports:



---

[7] Rascher Rep., p. 93, Ex. 11.  *See also* **APPENDIX C**, which contains a chart depicting the total number of student-athlete class members per sport per year according to Rascher's Exhibit 11.  This chart demonstrates that, each year, around 88% of the total student-athletes to receive broadcast payments are male, while only 12% are female.

25.    The payments from the Conferences to male and female student-athletes contemplated by the Broadcast Model can be summarily presented as follows:

| Redacted - NSC | |
|---|---|
| **Sport Allocated Broadcast Revenue** | **Range from 2016-2021, per player each year** |
| **Men's** Football | **$24,600 to $30,500** |
| **Men's** Basketball | **$36,000 to $57,700** |
| **Women's** Basketball | **$7,000 to $8,900** |
| Redacted - NSC | |
| **Sport Allocated Broadcast Revenue** | **Range from 2016-2021, per player each year** |
| **Men's** Football | **$23,500 to $34,700** |
| **Men's** Basketball | **$43,700 to $64,400** |
| **Women's** Basketball | **$5,300 to $9,600** |
| Redacted - NSC | |
| **Sport Allocated Broadcast Revenue** | **Range from 2016-2021, per player each year** |
| **Men's** Football | **$36,000 to $42,500** |
| **Men's** Basketball | **$52,600 to $74,000** |
| **Women's** Basketball | **$12,400 to $14,100** |
| Redacted - NSC | |
| **Sport Allocated Broadcast Revenue** | **Range from 2016-2021, per player each year** |
| **Men's** Football | **$23,100 to $28,000** |
| **Men's** Basketball | **$33,300 to $57,200** |
| **Women's** Basketball | **$6,000 to $7,300** |
| Redacted - NSC | |
| **Sport Allocated Broadcast Revenue** | **Range from 2016-2021, per player each year** |
| **Men's** Football | **$24,500 to $46,000** |
| **Men's** Basketball | **$63,700 to $85,200** |
| **Women's** Basketball | **$7,400 to $16,000** |

26.    As these summary charts demonstrate, Plaintiffs' Broadcast Model disproportionately benefits male student-athletes.

---

[8] Rascher Rep., p. 94, Ex. 12.

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

## II.   **SUMMARY OF OPINIONS**

27.     Title IX prohibits educational institutions from discriminating on the basis of sex in the operation of their intercollegiate athletics programs.  Title IX's implementing regulations specify that institutions cannot provide financial assistance in a discriminatory manner and must make available athletic scholarships to student-athletes of both genders in an aggregate amount proportional to their athletic participation rates.  The regulations also require that the treatment and benefits institutions provide to or for the men's athletic program be equivalent to those provided to or for the women's athletics program.  Agency guidance published by the Office of Civil Rights explains these and other requirements in detail as they apply to intercollegiate athletics.

28.     Here, Plaintiffs' Broadcast Model seeks to overwhelmingly compensate male student-athletes in the two primary "revenue-generating" sports (football and men's basketball) at a rate of 98 players per school.  It then includes a token number of women (15) in the form of the women's basketball team, but intentionally excludes all other female student-athletes.  The Model also ignores the deliberate balancing of support provided throughout athletic departments to the men's and women's athletic programs, as required by Title IX.  Instead, as described below, Plaintiffs' Broadcast Model attempts to remove Title IX's prohibitions in the but-for world by providing a disparate level of financial assistance and treatment and benefits that disproportionately benefits football and men's basketball teams and their male student-athletes.  If I were conducting a Title IX audit of an institution that provided or facilitated the payments proposed by Plaintiffs' Broadcast Model, I would advise that providing benefits to select teams in such a lopsided manner along sex-based lines would violate Title IX.

29.     Congress expressly and repeatedly rejected efforts to exclude net-revenue-generating sports (such as football and men's basketball) from the requirements of Title IX.  Plaintiffs' Broadcast Model would require the Court to disregard clear legislative history and

13

rewrite established Title IX law.  Practically, such a decision would eviscerate this core requirement of Title IX, which could in turn mean that not only broadcast revenue would be excluded from Title IX's coverage but also other revenue, including private donations to institutions.  Permitting private institutional funding to benefit select student-athletes and teams without regard for gender equity concerns would eliminate Title IX's equivalence standard for financial assistance, athletic scholarships, treatment, and benefits within intercollegiate athletics.

30.     Institutional Title IX obligations apply to the broadcast revenue the Conferences distribute to their member schools.  Indeed, a broadcast revenue sharing model (supposedly based on individual student-athletes' "NIL") necessarily requires (i) payments arising from broadcast rights that belong to and/or are controlled by educational institutions (the Conferences' individual member institutions) and (ii) disbursements to student-athletes authorized by those institutions. The direct institutional involvement necessary to make such payments implicates Title IX, which requires educational institutions to distribute financial and other resources and benefits to student-athletes in a nondiscriminatory manner.

31.     If I were conducting a Title IX audit, I would flag Plaintiffs' Broadcast Model as a violation of the Title IX regulations and Policy Interpretation sections governing the provision of financial assistance.  The regulatory provision on financial assistance is broader in scope than the provision on the award of athletic scholarships and would prohibit the disparate payments posited in Plaintiffs' Broadcast Model, even if those payments were made by the Conferences. Specifically, the regulation prohibits the award of financial assistance on a discriminatory basis (such as contemplated by Plaintiffs' Broadcast Model).  Plaintiffs' broadcast payments overwhelmingly benefit male student-athletes which, in my opinion, is inconsistent with awarding financial assistance equitably based on sex.

14

32.     Plaintiffs' proposed payments also create a significant disparity in the relative equivalence of treatment and benefits among the men's and women's athletic programs overall to such an extent that I would flag the payment scheme as a violation of Title IX if I were conducting an audit.   Similarly, the payments would deny female student-athletes equal opportunity with respect to their treatment and participation in intercollegiate athletics.

33.     In sum, as structured by Plaintiffs, the contemplated broadcast revenue share payments are not compatible with Title IX, and in particular, Title IX's financial assistance provisions, equal opportunities provision, and equal treatment provision.   Plaintiffs' Broadcast Model forces schools to treat male and female student-athletes differently and offer them vastly disparate benefits.   Title IX is a nondiscrimination law that was designed in part to prevent this very scenario.

### III.     TITLE IX FUNDAMENTALS AND LEGISLATIVE HISTORY

34.     Understanding whether a course of action implicates Title IX requires familiarity with Title IX's goals, legislative history and intent, and historic application.   Reviewing those areas is critical to identifying and evaluating the potential Title IX implications of Plaintiffs' Broadcast Model.   I am familiar with the history and purpose of Title IX from my experiences as a student-athlete, athletics administrator, teacher, scholar, and consultant.

35.     As described in detail below, Congress expressly rejected efforts to amend Title IX to exempt revenue generated by specific sports teams from the law's coverage.   Such an exemption would have allowed institutions and athletics departments to use revenue to benefit only the teams responsible for the revenue generation.   Despite repeated legislative attempts to create this type of carve-out for revenue-generating sports, Title IX has always prohibited universities from treating revenue-producing and non-revenue-producing sports differently.

A.    **The Enactment of Title IX and Its Implementing Regulations**

36.    Title IX of the Education Amendments of 1972 states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."[13]

37.    Congress enacted Title IX to address the significant educational inequalities for girls and women that existed before its passage.[14]

(a)    At the college and university level, many institutions were male-only.  The limited number of institutions that admitted women often did so only insofar as necessary to meet small quotas for women's admission.  These institutions also typically required women applicants to exceed admissions requirements for men by demonstrating higher grades and test scores than their male counterparts.[15]

(b)    For those women admitted to co-educational institutions, scholarships and curricular options were limited.  Women were directed toward teacher education programs and sometimes prohibited from professional schools such as engineering, medicine, and law.  Boys and men were also gender stereotyped in their academic choices, as boys were not allowed to take home economics classes and men were typically prohibited from nursing schools.[16]

(c)    Athletics opportunities for women were also limited (and, in many schools, nonexistent) before Title IX's enactment.[17]  Female participants in college athletics were first

---

[13] 20 U.S.C. § 1681(a).

[14] *See generally Equal Access to Education: Forty Years of Title IX*, U.S. Dept. of Justice (June 23, 2012), https://www.justice.gov/sites/default/files/crt/legacy/2012/06/20/titleixreport.pdf.

[15] *Id.* at 2.

[16] *Id.* at 2, n.7.

[17] Jocelyn Samuels & Kristen Galles, *In Defense of Title IX: Why Current Policies Are Required to Ensure Equality of Opportunity*, 14 Marq. Sports L. Rev. 11, 18–19 (2003) ("Samuels & Galles").

counted in the 1966-67 academic year.  At that time, there were 10 times as many male student-athletes as female student-athletes.[18]  By the time Congress passed Title IX, there were approximately 31,852 women participating in college sports, compared to 172,447 men.[19]

38.    President Richard Nixon signed Title IX into law on June 23, 1972.[20]

39.    The Department of Health, Education, and Welfare[21] soon promulgated regulations implementing Title IX.  President Gerald R. Ford signed the Department of Health, Education, and Welfare's Title IX regulations on May 27, 1975 (the "Regulations").  The Regulations addressed Title IX's application to every aspect of sex discrimination in education, including athletics.[22]

40.    Four months after the Regulations became effective, the Department of Education's Office for Civil Rights ("OCR")[23] issued its first "Dear Colleague Letter"[24] regarding Title IX.[25]  This Letter (and other subsequent OCR guidance materials) clarified numerous aspects of the Regulations.[26]

---

[18] In the 1966-67 school year there were 15,182 women versus 151,198 men participating in college athletics.  *NCAA Sports Sponsorship and Participation Rates Report (1956-57 through 2020-21)*, p. 129 (Oct. 27, 2022), https://ncaa org.s3.amazonaws.com/research/sportpart/2022RES_SportsSponsorshipParticipationRatesReport.pdf.

[19] Samuels & Galles, *supra*, at 18–19.  For a more detailed history of college sports, *see* **APPENDIX E**.

[20] *Legislative Path to Title IX. Title IX of the Education Amendments of 1972:  Resources from the Law Library*, Library of Congress, https://guides.loc.gov/title-IX-law-library-resources/legislative-path.

[21] Congress redesignated the Department of Health, Education and Welfare as the Department of Health and Human Services in 1979.  At the same time, Congress established the Department of Education and transferred the Department of Health, Education and Welfare's education-related responsibilities, including Title IX administration and enforcement, to the newly formed Department of Education.  *See* Pub. L. No. 96-88, 93 Stat. 668 (Oct. 17, 1979).

[22] The Regulations included provisions regarding the admissions process (34 C.F.R. § 106.21 (1975)); housing (34 C.F.R. § 106.32 (1975)); financial aid (34 C.F.R. § 106.37 (1975)); student marital and parental status (34 C.F.R. § 106.40 (1975)); employment (34 C.F.R. § 106.51 (1975)); and athletics (34 C.F.R. § 106.41 (1975)).

[23] The Office for Civil Rights is the federal agency charged with enforcing Title IX.  *Title IX and Sex Discrimination*, U.S. Dep't of Educ. (Aug. 2021), https://www2.ed.gov/about/offices/list/ocr/docs/tix_dis.html.

[24] Dear Colleague Letters are guidance documents issued by the Office for Civil Rights to advise educational institutions and others on the implementation of certain federal legislation within the education field.

[25] Peter E. Holmes, *Letter to Chief State School Officers, Title IX Obligations in Athletics*, U.S. Dep't of Educ., Off. of Civ. Rts. (Nov. 11, 1975), https://www2.ed.gov/about/offices/list/ocr/docs/holmes.html ("Holmes Letter").

[26] *Id.*

41.     On December 11, 1979, OCR published *A Policy Interpretation: Title IX and Intercollegiate Athletics* (the "Policy Interpretation") which provides substantive direction on how compliance with Title IX is assessed within collegiate athletics.[27]

**B.     Title IX Fundamentals**

**1.     What Is Title IX?**

42.     Title IX, as applied to athletics, was designed to ensure that female student-athletes have equal opportunities and receive equal treatment.  It places equal participation and opportunity at the core of college athletics.[28]

43.     OCR assesses compliance with Title IX in three primary areas within an athletics program: (1) financial assistance; (2) treatment and benefits; and (3) participation opportunities.[29]

44.     This section briefly addresses these three main components of Title IX.  Later sections explain how, if I were conducting an audit, I would flag Plaintiffs' Broadcast Model as a violation of Title IX's requirements in each regard.

**a.     Financial Assistance**

45.     The Title IX financial assistance regulations[30] broadly prohibit providing different amounts or types of financial assistance based on sex.

46.     The Regulations provide:

> [I]n providing financial assistance to any of its students, a recipient [of federal funding] shall not: (1) On the basis of sex, **provide different amount or types of such assistance**, **limit eligibility for such assistance which is of any particular type or source, apply different criteria**, or otherwise discriminate; [or] (2) Through solicitation, listing, **approval**, provision of facilities or other services, **assist any foundation, trust, agency, organization, or person which provides assistance to any of**

---

[27] Policy Interpretation: Title IX and Intercollegiate Athletics, 44 Fed. Reg. 71,413-23 (1979), https://www2.ed.gov/about/offices/list/ocr/docs/t9interp.html ("Policy Interpretation").
[28] 34 C.F.R. § 106.41 (1975); *see also* Policy Interpretation § IV.
[29] Policy Interpretation §§ VII.A.-B.
[30] 34 C.F.R. § 106.37.

**such recipient's students in a manner which discriminates on the basis of sex**[.][31]

47.    "Financial assistance" is broad enough to include any financial assistance offered to student-athletes by an entity subject to Title IX.[32]

48.    This subsection of the Regulations prohibits institutions that receive federal funds from distributing or aiding in the distribution of any form of financial assistance in a way that discriminates on the basis of sex.

49.    The Regulations also include expectations regarding the distribution of athletic financial assistance which is generally viewed as consisting of athletic scholarships or GIA (collectively, "financial aid"), a narrower subset of financial assistance.[33]  This subsection of the Regulations states that, "[t]o the extent that a recipient awards athletic scholarships or grants-in-aid, it must provide reasonable opportunities for such awards for members of each sex in proportion to the number of students of each sex participating in . . . intercollegiate athletics."[34]

50.    The Regulations' provision on athletic scholarships requires considering whether athletic scholarships are provided "in proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics."[35]

51.    Compliance in this context requires institutions to demonstrate that the total amount of financial aid available to student-athletes of each sex is substantially proportionate to their participation rates in the institution's athletics program.  An institution will be found in compliance if the proportion of all athletics aid that the institution provides to student-athletes of each sex is

---

[31] 34 C.F.R. § 106.37(a) (emphasis added).
[32] 34 C.F.R. § 106.37.  Throughout the general provisions, the Regulations refer to "other forms of financial assistance" four separate times.
[33] 34 C.F.R. § 106.37(c).
[34] 34 C.F.R. § 106.37(c)(1).
[35] *Id*.

within 1% of the proportion of all student-athletes at the institution that are male or female, respectively, or if any disparity can be explained based on legitimate, nondiscriminatory factors.[36] An unexplained disparity of more than 1% in the financial aid budget for student-athletes of either sex gives rise to a strong presumption of a violation of Title IX's "substantially proportionate" financial aid requirement.[37]

52.     The gender breakdown of the distribution of financial aid that satisfies the proportionality requirement varies based on the gender breakdown of student-athletes at each institution.  As a result, the ratio of financial aid distribution that satisfies the proportionality requirement at one institution may not satisfy the requirement at another institution.[38]

(a)     For example, if University 1's student-athlete population is 60% women and 40% men, the general expectation is that the women's financial aid budget must be between 59% and 61% of the total financial aid budget for all student-athletes.

(b)     By contrast, if University 2's student-athlete population is 54% men and 46% women, University 2 would need to distribute between 53% and 55% of its financial aid budget to male student-athletes to trigger a presumption of compliance with the financial aid requirement.  University 2 would not be presumptively in compliance with Title IX if it awarded 60% of its total financial aid to female student-athletes (absent a legitimate nondiscriminatory justification).

---

[36] Policy Interpretation § VII.A.2; *see also* Order Granting in Part and Denying in Part Defendants' Motion to Dismiss Counts I and III of Plaintiffs' Second Amended Complaint (ECF No. 49), *Fisk v. Bd. of Trs. of Cal. State Univ.*, No. 22-CV-173 TWR (MSB) (S.D. Cal. Apr. 12, 2023) ("Fisk Order") (permitting putative class action alleging violation of Title IX's financial aid provisions to proceed in part based on allegations of disproportionate availability of athletic scholarships by sex).

[37] Dr. Mary Frances O'Shea, *Dear Colleague Letter: Bowling Green State University*, U.S. Dep't of Educ., Off. for Civ. Rts. (July 23, 1998), https://www2.ed.gov/about/offices/list/ocr/docs/bowlgrn.html ("O'Shea Letter").

[38] *Id.*; *see also* Fisk Order, pp. 37-38 (finding that factual allegations detailing defendant university's historical provision of athletic scholarship dollars to student-athletes by sex were sufficient to state a claim for disparate financial aid under Title IX).

### b.      Equivalent Treatment and Benefits

53.      Title IX and the Regulations broadly require that men and women be treated in an equitable manner in the context of intercollegiate athletics.  Determining compliance with this requirement under Title IX requires examining the availability, quality and kinds of benefits, opportunities, and treatment for student-athletes across a "laundry list" of athletics program components.[39]

54.      The non-exhaustive program components included in the laundry list are: (1) provision and maintenance of equipment and supplies; (2) scheduling of games and practice times; (3) travel and per diem allowances; (4) opportunity to receive coaching and academic tutoring; (5) assignment and compensation of coaches and tutors; (6) provision of locker rooms, practice and competitive facilities; (7) provision of medical and training facilities and services; (8) provision of housing and dining services and facilities; (9) publicity; (10) recruitment; and (11) support services.[40]

55.      Each program component must be considered separately.  Any disparities identified within a program component are examined to determine if they are unjustified and/or substantial enough to result in inequitable treatment of student-athletes by sex.[41]   For each program component in the laundry list, Title IX compares the men's athletics program as a whole to the women's athletics program as a whole and then an overall assessment is made of the men's program as compared to the women's program.[42]  Whether the men's and women's basketball (or soccer or swimming, etc.) teams are treated equally is not a relevant comparison; the focus is on

---

[39] Policy Interpretation § VII.B.2.
[40] 34 C.F.R. § 106.41(c).  Recruitment and support services are not included in the text of the laundry list set forth in 34 C.F.R. § 106.41(c).  That list, however, is by its own terms non-exclusive.  And OCR added these components to the laundry list in the Policy Interpretation.  Policy Interpretation § VII.B.1.
[41] Policy Interpretation § VII.B.5.
[42] Holmes Letter, *supra*; Policy Interpretation § VII.B.5.b.

whether male and female student-athletes are treated in an equitable manner across the totality of the athletics programs.[43]

56.     Specifically, the totality of the men's program as a whole is compared to the women's program as a whole across all program components to determine:

(a)     Whether policies are discriminatory on their face or as applied; or

(b)     If disparities are substantial and unjustified; or

(c)     If disparities are substantial enough to deny equality of athletics opportunity.[44]

57.     A disparity in one program component can alone constitute a Title IX violation if it is substantial enough to deny equality of athletic opportunity to students of one sex.[45]

58.     While the Policy Interpretation states that the benefits and resources an institution provides to male and female student-athletes need not be identical to satisfy the equivalent treatment test, they must be equal or equal in effect.  Specifically, the Policy Interpretation states that the overall effect of any differences in the benefits, opportunities and treatment afforded to student-athletes of each sex should be negligible.[46]

59.     Providing equitable treatment and benefits requires funding, and whether the funding is provided by the institution or through private sources earmarked for a particular team or program is irrelevant.  Private funds are not exempt from Title IX's requirements.  One of OCR's early Dear Colleague Letters provides clear direction in this regard: "the fact that a particular segment of an athletic program is supported by funds received from various other sources (such as student fees, general revenues, gate receipts, alumni donations, booster clubs, and

---

[43] Policy Interpretation § VII.B.5.b.
[44] Policy Interpretation §§ VII.B.5.a-c.
[45] Policy Interpretation, § VII.B.5.c.
[46] Policy Interpretation § VII.B.2.

non-profit foundations) does not remove it from the reach of the statute and hence of the regulatory requirements."[47]   This is consistent with Congress's intent that institutions use all sources of institutional revenue to treat all teams of both genders fairly, not just to favor those teams that generate institutional funding.

(a)   OCR again addressed this principle in a 1995 letter, writing that recipients of federal funding have "a responsibility under Title IX to ensure that boys' and girls' programs are provided with equivalent benefits, treatment, services or opportunities regardless of their source" and that private funds "are considered in combination with all benefits, services or opportunities."[48]   OCR went on to explain that "private funds . . . , although neutral in principle, are likely to be subject to the same historical patterns that Title IX was enacted to address" and that "[i]f all benefits are not considered in examining interscholastic athletics, the purpose and effect of Title IX requirements could be routinely undermined by the provision of unequal benefits through private financial assistance."[49]   OCR reiterated this principle as recently as 2014.[50]

(b)   The Eighth Circuit has applied this analysis, explaining that institutions cannot avoid Title IX by using outside funding: "Once a university receives a monetary donation, the funds become public money, subject to Title IX's legal obligations in their disbursement . . . outside funding is not a defense for a university which provides more than substantially proportionate athletic opportunity to one gender in violation of Title IX."[51]

---

[47] Holmes Letter, *supra*.

[48] John E. Palomino, *Letter to Jurupa Unified Sch. Dist.*, OCR File No. 09-91-1222, U.S. Dep't of Educ., Off. for Civ. Rts. (Feb. 7, 1995), https://www2.ed.gov/about/offices/list/ocr/letters/jurupa.html ("Palomino Letter").

[49] *Id.*

[50] Adele Rapport, *Letter to Indianapolis Public Schools*, U.S. Dep't of Educ., Off. for Civ. Rts. (Feb. 26, 2014), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/05105002-a.pdf, p.7 ("Rapport Letter") ("School districts have a responsibility under Title IX to ensure that equivalent benefits and services are provided to members of both sexes in its athletics programs, regardless of their funding source(s) for these benefits and services.").

[51] *Chalenor v. Univ. of North Dakota*, 291 F.3d 1042, 1048 (8th Cir. 2002) (quoting *Chalenor v. Univ. of North Dakota*, 142 F. Supp. 2d 1154, 1159 (D.N.D. 2000)) (internal quotation marks omitted).

60.     Thus, under Title IX, the source of the funding is irrelevant.  The institution is obligated to use all revenue from all sources to provide equitable opportunities and treatment for male and female student-athletes.[52]

### c.      Participation Opportunities

61.     In assessing the relative level of equity in the athletic participation opportunities that are offered at each institution, the test for compliance is "[w]hether the selection of sports and levels of competition **effectively accommodate** the interests and abilities of members of both sexes."[53]

62.     Section C of the Policy Interpretation addresses this test, which requires the accommodation of all student-athletes' interests and abilities by mandating equal opportunity in the selection of sports and **levels of competition** available to each sex.[54]

63.     Relevant to this case, the Policy Interpretation also prohibits classifying or subgrouping sports in a manner that disproportionately offers benefits or opportunities to members of one sex.[55]

### 2.      Who Is Subject to Title IX?

64.     Title IX prohibits sex discrimination in all education programs or activities at institutions that receive federal financial assistance.[56]

65.     Title IX applies to the institutions that make up the Conferences and the NCAA and not to the Conferences and NCAA themselves.[57]  As explained in greater detail below, although

---

[52] *See* Holmes Letter, *supra*.
[53] 45 C.F.R. § 86.41(c)(1).
[54] Policy Interpretation § VII.C.  While the Policy Interpretation contains a detailed three-part test to assess compliance in this area, that test is not relevant to the issues at hand and therefore discussion of it has been omitted from this report.
[55] Policy Interpretation, Appendix B, Response to Comment 7, at 71422.
[56] Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28 (Mar. 22, 1988).
[57] *Nat'l Collegiate Athletic Ass'n*, 525 U.S. 459, 468 (1999).

the Conferences and the NCAA are not subject to Title IX, the Broadcast Model payments Plaintiffs propose are still subject to Title IX because of a combination of factors, including that the proposed payments (i) are generated from broadcast rights payments owned or controlled by each Conference's member institutions which are subject to Title IX; (ii) decisions concerning allocation of those revenues between and among student-athletes must be made by the member institutions, which, to repeat, are subject to Title IX; and (iii) funds are not exempt from Title IX merely because they come from an outside source.

66.     In 1984, the Supreme Court limited the scope of Title IX to only those educational programs and activities that directly received federal funding.[58]  The Court's opinion was short-lived.

67.     Congress quickly reacted negatively to the Supreme Court's narrow, program-specific application of Title IX.  To overturn the Supreme Court's ruling, Congress passed the Civil Rights Restoration Act on March 22, 1988.[59]  This legislation adopted an institution-wide approach, specifying that all programs and activities at educational institutions that receive federal funding directed to any part of the institution must comply with Title IX, regardless of whether the specific program or activity at issue directly receives federal funds.[60]

68.     The plain language of Title IX and its implementing Regulations, combined with Congress' reaffirmed intent demonstrated in the Civil Rights Restoration Act, makes clear that Title IX reaches intercollegiate athletics and requires educational institutions to ensure that the benefits, opportunities, and treatment available to male and female student-athletes are equivalent.[61]

---

[58]*See generally Grove City Coll. v. Bell*, 465 U.S. 555 (1984).
[59] Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28.
[60] *Id.*
[61] *See* Samuels & Galles, *supra*, at 18.

69.     Every institution affiliated with the Conferences is a "recipient of federal financial assistance" under Title IX because each one receives funds from the federal government directly (generally, for research or facilities) or indirectly (at minimum, through grants and loans made to students enrolled at each institution).[62]  The University of Notre Dame, which is affiliated with the ACC for purposes of sports other than football and ice hockey, likewise receives federal funds.[63] Thus, each of the Conferences' member institutions and Notre Dame are subject to Title IX.

70.     Recipients of federal funding that are not in compliance with Title IX risk the loss of all federal funding to the institution or may face payment of damages in private lawsuits or other penalties assessed by OCR.[64]

**C.      Attempts to Limit Title IX[65]**

71.     Throughout the legislative and administrative process resulting in Title IX and its Regulations, lawmakers who opposed Title IX proposed numerous amendments to limit the reach of the legislation and the Regulations.  The intent behind these amendments was to exempt athletics from the scope of Title IX's non-discrimination mandate entirely or, alternatively, to allow revenue-generating sports to retain their own revenue and not be required to contribute to (i.e., subsidize) athletic opportunities for female student-athletes.[66]

72.     Congress rejected every single one of these attempts to limit Title IX:

- In 1974, Senator John Tower's "Tower Amendment" would have exempted from Title IX intercollegiate athletic activity insofar as such activity provides

---

[62] The U.S. Department of Education provides a Federal School Code List which identifies all schools participating in Title IV federal student aid programs.  Each of the institutional members of the Conferences has been verified to receive federal funding according to this database.  *2023-24 Federal School Code List of Participating Schools*, U.S. Dep't of Educ. (Feb. 2023), https://fsapartners.ed.gov/knowledge-center/library/federal-school-code-lists/2023-02-01/2023-24-federal-school-code-list-participating-schools-february-2023.

[63] *Id*.

[64] 20 U.S.C. §§ 1681 *et seq*.

[65] For a more detailed discussion of the legislative history of Title IX, see **APPENDIX F**.

[66] Samuels & Galles, *supra*, at 19–23.

to the institution gross receipts or donations required by such institution to support that activity.[67]

- In 1975, Senator Tower again proposed his amendment while Congress debated the Regulations.[68]  In voicing opposition to the Tower Amendment, Title IX's authoring Senator stated that the amendment was "based upon a misunderstanding" of the Title IX regulations and the "true implications of the Tower proposal."[69]

- In June 1975, Senator Jesse Helms[70] and Representative James G. Martin[71] proposed twin bills that disapproved of the Regulations in their entirety, and alternatively disapproved those sections of the Regulations applicable to athletics programs and scholarships.

- On July 8, 1975, Representative James G. O'Hara proposed two amendments disapproving of the Regulations.[72]  The goal of his amendments was to allow athletics departments to "make expenditures for a sport or team from revenues derived from that sport or team" and to prohibit the use of funds provided by revenue-generating sports to subsidize non-revenue producing sports, including women's sports.[73]

- On July 15, 1975, Senators Tower, Bartlett, and Hruska again proposed excluding revenue-producing sports from Title IX's coverage.[74]

---

[67] *Id.*

[68] S. 2106 Summary, 94th Cong. (1975), https://www.congress.gov/bill/94th-congress/senate-bill/2106.

[69] *Prohibition of Sex Discrimination, 1975: Hearings Before the Subcomm. on Educ. of the Comm. on Labor & Public Welfare on S. 2016*, 94th Cong. 46-47 (1975) (statement of Sen. Birch Bayh), https://files.eric.ed.gov/fulltext/ED136136.pdf.

[70] S. Con. Res. 46 Summary, 94th Cong. (1975), www.congress.gov/bill/94th-congress/senate-concurrent-resolution/46.

[71] H. Con. Res. 310 Summary, 94th Cong. (1975), www.congress.gov/bill/94th-congress/house-concurrent-resolution/310; H. Con Res. 311 Summary, 94th Cong. (1975), www.congress.gov/bill/94th-congress/house-concurrent-resolution/311.

[72] H. Con. Res. 330 Summary, https://www.congress.gov/bill/94th-congress/house-concurrent-resolution/330; H.R. 8394 Summary, www.congress.gov/bill/94th-congress/house-bill/8394.

[73] H. Con. Res. 330 Summary, https://www.congress.gov/bill/94th-congress/house-concurrent-resolution/330; H.R. 8395 Summary, www.congress.gov/bill/94th-congress/house-bill/8395.

[74] S. 2106, 94th Cong., 1st Sess., 121 Cong. Rec. 22,775-22,778 (1975).

- On July 16, 1975, Senator Paul D. Laxalt proposed the Laxalt Resolution, which claimed that the Title IX athletics regulations exceeded the scope of the statute's authority.[75]
- On July 21, 1975, Senators Jesse Helms and James A. McClure attempted to (i) limit Title IX to programs and activities that directly receive federal financial assistance and (ii) prohibit any government agencies from setting or enforcing rules for "voluntary athletic programs."[76]
- In January 1977, Senator Helms made another attempt to exclude athletics from Title IX.[77]

73.    In defeating each of these attempts, Congress has repeatedly affirmed that there is no exception to Title IX allowing athletics programs to make benefits or opportunities available to certain teams on the basis that those teams generate net revenue.  This is true regardless of how significant a team's revenue may be to the athletics program or institution as a whole.  Simply put, Congress has rejected the proposition "that sex discrimination is acceptable when someone profits from it and that moneymaking propositions should be given congressional absolution from Title IX."[78]

74.    The federal agencies responsible for enforcing Title IX have also rejected attempts to exclude revenue-producing sports from Title IX's coverage.  The Policy Interpretation references the failed legislative efforts to exclude revenue-producing teams and the revenue they generate from Title IX.  While it recognized a football program's unique ability to generate revenue, the Policy Interpretation concluded that institutions must comply with the prohibition

---

[75] S. Con. Res. 52, 94th Cong., 121 Cong. Rec. 22,940 (1975), www.congress.gov/bill/94th-congress/senate-concurrent-resolution/52; *see also* James H. Brooks, *Measuring the Reach of Title IX: Defining Program and Recipient in Higher Education*, 17 Akron L. Rev. 335, 342 nn.53, 55 (1984) ("Brooks").

[76] S. 2146 Summary, 94th Cong. (1975), www.congress.gov/bill/94th-congress/senate-bill/2146.

[77] S. 535 Summary, 95th Cong., 1st Sess. (1977), www.congress.gov/bill/95th-congress/senate-bill/535.

[78] Samuels & Galles, *supra*, at 21.

against sex discrimination in the administration of every revenue-producing sport—and that there is no Title IX exclusion for football programs or football revenues.[79]   In so doing, the Policy Interpretation reinforced the fundamental Title IX principle that all revenues, regardless of their source, must be distributed across all programs to achieve equitable treatment of male and female student-athletes.  This clear directive has guided the OCR and institutions since then.

75.     The legislative history outlined above makes clear that Title IX covers all revenue generated by all sports teams and does not permit revenue to be used solely to benefit the team that generated the revenue if that use would create inequalities between male and female student-athletes at the institution.[80]   Those familiar with Title IX in the context of intercollegiate athletics consider this fundamental principle to be well-settled law to apply without exception.

## IV.   PLAINTIFFS' BROADCAST MODEL REQUIRES DISTRIBUTION OF REVENUES BY INSTITUTIONS, THEREBY REACHING ENTITIES SUBJECT TO TITLE IX

76.     Plaintiffs' Broadcast Model claims that the Conferences would voluntarily decide to distribute portions of their broadcast revenue directly to certain student-athletes.[81]

77.     Specifically, Plaintiffs' Broadcast Model would distribute a portion of broadcast revenue to just the members of the teams that Plaintiffs' experts say "generated" that revenue.[82] However, I cannot envision a scenario in which the approval and implementation of this structure

---

[79] *Id*.

[80] Holmes Letter, *supra*; Palomino Letter, *supra*; Rapport Letter, *supra* ("School districts have a responsibility under Title IX to ensure that equivalent benefits and services are provided to members of both sexes in its athletics programs, regardless of their funding source(s) for these benefits and services.").

[81] Pls.' Mot. for Class Cert., ECF No. 209, at 9.

[82] That the payments would go to individual student-athletes rather than the team as a whole is a distinction without a difference.  Title IX evaluates the men's program as a whole as compared to the women's program as a whole, and in the "but-for" world 98 male athletes would benefit in a disproportionate and discriminatory manner that is so significant in amount and impact that I would flag this as a violation Title IX if I were conducting an audit.

would be viewed as compliant with Title IX, the Regulations, the Policy Interpretation, and years of application of the law to educational institutions.[83]

78.    Although Plaintiffs propose that the Conferences—which are not subject to Title IX—make payments to student-athletes, the Broadcast Model still implicates Title IX compliance because:

(a)    Conferences are governed and controlled by a board of directors, which is composed of representatives (usually Presidents and Chancellors) of their member institutions;

(b)    Member institutions own the broadcast rights to their events and merely grant or transfer those rights to the Conferences for purposes of negotiating favorable, Conference-wide broadcast agreements;

(c)    Member institutions control the distribution of broadcast revenues generated by Conference-organized and NCAA-promoted events (e.g., tournaments and championships);

(d)    Conference bylaws, which are adopted or amended by each Conference's board of directors, dictate the distribution of broadcast revenue to the member institutions; and

(e)    Funds are not exempt from Title IX merely because they come from an outside source.

79.    In light of this combination of factors, each of which is addressed in more detail below, Plaintiffs' Broadcast Model requires member institutions' substantial involvement and approval.  This substantial institutional involvement and approval implicates Title IX.[84]

---

[83] In my opinion, any direct or indirect judicial invalidation of the core Title IX principle that all institutional funds must be used to provide equitable treatment and benefits to male and female student-athletes could have serious ramifications on the years of progress for women's sports that thus far have been achieved because of Title IX.
[84] *See* 34 C.F.R. § 106.37(a)(1)(2).

## A.    The Conferences Act Through Their Member Institutions

80.    The Conferences are made up of their member institutions.    At least one representative from each member institution sits on each Conference's board of directors (or equivalent governing body under another title, all referred to herein as a "board of directors").

81.    In this system of governance, the Conferences do not make decisions independent of their members.  Instead, the Conferences' member institutions, through their representatives on each Conference's board of directors, make decisions for the Conferences.[85]

(a)    This decision-making authority and framework is evident in each of the Conference's bylaws:

i.    In the Big 12, each member institution must have one representative on that Conference's board of directors.  This representative must be the "most senior campus executive officer" for each member institution.[86]

ii.    The ACC requires that its "Board [] be composed of a representative of each Member [institution][.]"[87]

iii.    The Big Ten "Council consists of the chancellor or president of each member university[.]"[88]

iv.    In the Pac-12, "[e]ach member of the Conference shall have one representative on the Board which shall be the President" or Chancellor of the member institution.[89]

---

[85] *See* Declaration of Greg Sankey ¶¶ 7-10; Declaration of Chad Hawley ¶¶ 7-11; Declaration of George Kliavkoff ¶¶ 7-10; Declaration of Ben Tario ¶¶ 8–9, 18; Big 12 Conference 2022-23 Handbook, Bylaws § 1.5.2, pp. 3–4 (NCAAHOUSE00250308-09).

[86] Big 12 Conference 2022-23 Handbook, Bylaws § 1.5.3, pp. 5–6, and Rules § 5.1.1, p. 22 (NCAAHOUSE00250310-11, NCAAHOUSE00250327).

[87] ACC 2020-21 Manual, Constitution § 1.5.1.2, p. 13 (ACC-HOUSE0000594).

[88] Big Ten Conference Handbook 2021-2022, Rule 4.1.1, p. 27 (BIGTEN-NIL_00256648).

[89] Pac-12 2021-22 Handbook, Constitution and Bylaws, ch. 5, § 2, p. 11 (NCAAHOUSE00250363).

v.      In the SEC, "[t]he President or Chancellor of each member shall be a Chief Executive Officer [the equivalent of a director] of the Conference."[90]

## B.      The Member Institutions Own Their Broadcast Rights and Grant or Transfer Them to the Conferences

82.      Each member institution owns the broadcast rights to its own home games as the promoter of those games.[91]

83.      Each member institution grants or transfers those rights to its respective Conference for the purpose of allowing the Conference to bundle the member institutions' broadcast rights and negotiate broadcast network agreements for the Conference as a whole.  These grants or transfers of rights are effectuated through Conference bylaws or agreements between the member institutions and their respective Conference.

(a)      The Pac-12's member institutions effectuate their transfer and assignment of rights through the Conference bylaws, which state:

> Effective July 1, 2012, each member hereby transfers and assigns to the Conference any and all of its rights to the commercial exploitation of all audio and all video transmission or dissemination by any and all means (including without limitation internet transmission or dissemination), now known or hereafter existing, of all member competitions for all Conference sanctioned sports involving member teams as to all intra-Conference events and those inter-Conference events where the participating member controls audio and video rights.[92]

(b)      The SEC's bylaws reference its member institutions' transfers of rights in separate member agreements.  The bylaws commit each member to:

---

[90] SEC Constitution and Bylaws 2022-2023, Constitution § 4.1.1, p. 5 (NCAAHOUSE00249794).

[91] Judicial decisions and state statutes recognize that the right to broadcast an event belongs exclusively to the event producer.  *See Wisc. Interscholastic Athletic Ass'n v. Gannett Co.*, 658 F.3d 614, 624-28 (7th Cir. 2011); *Pittsburgh Athletic Co. v. KQV Broad. Co.*, 24 F. Supp. 490, 492-93 (W.D. Pa. 1938); *Twentieth Century Sporting Club, Inc. v. Transradio Press Serv., Inc.*, 165 Misc. 71, 73 (N.Y. Sup. Ct. 1937); *Sw. Broad. Co. v. Oil Ctr. Broad. Co.*, 210 S.W.2d 230, 232 (Tex. Civ. App. 1947); *Okla. Sports Props., Inc. v. Indep. Sch. Dist. No. 11 of Tulsa Cnty., Okla.*, 957 P.2d 137, 139 (Okla. Civ. App. 1998); *Post Newsweek Stations-Conn., Inc. v. Travelers Ins. Co.*, 510 F. Supp. 81, 85-86 (D. Conn. 1981).

[92] Pac-12 2021-22 Handbook, Constitution and Bylaws, ch. 3, § 2, p. 9 (NCAAHOUSE00250361).

include provisions in each of its television, media, internet and digital rights agreements specifying that the member's agreements are subject and subordinate to all past, present, and future television, media, internet and digital rights agreements to which the Conference is or becomes a party, and further specifying that if any provision in the member's agreement is inconsistent or conflicts with any Conference agreement, the Conference agreement shall supersede the provision in the member's agreement, such that the superseded provision shall be of no effect to the extent of any such inconsistency or conflict.[93]

(c)     The ACC's bylaws acknowledge a standalone Grant of Rights Agreement, stating: "The Members have granted to the Conference the right to exploit certain media and related rights of the Members (such rights, the 'Media Rights'; and the agreement pursuant to which the Members granted such rights, the 'Grant of Rights')."[94]   The Grant of Rights Agreement states that each member institution "is required to, and desires to, irrevocably grant to the Conference, and the Conference desires to accept from each of the Member Institutions," the broadcast rights identified in the Grant of Rights Agreement.[95]

(d)     The Big 12's bylaws also acknowledge a standalone Grant of Rights Agreement, which binds even withdrawing member institutions to comply with its terms.[96]   The Big 12's Grant of Rights Agreement also states that each member institution "is required to, and desires to, irrevocably grant to the Conference, and the Conference desires to accept from each of the Member Institutions" the broadcast rights identified in the Grant of Rights Agreement.[97]

(e)     The Big Ten's member institutions assign their telecast and related rights to the Big Ten Conference, which has the sole authority to package those rights together for purposes

---

[93] SEC Constitution and Bylaws 2022-2023, Bylaws § 22.1.1, p. 31 (NCAAHOUSE00249820).

[94] ACC 2020-21 Manual, Bylaws § 2.10.1, p. 40 (ACC-HOUSE0000621).

[95] Atlantic Coast Conference Grant of Rights Agreement, p. 1, https://cdn.theathletic.com/app/uploads/2022/07/0118 5531/ACC-Grant-of-Rights-1.pdf.

[96] *See* Big 12 Conference 2022-23 Handbook, Bylaws § 3.1, p. 17 (NCAAHOUSE00250322).

[97] Big 12 Conference Amended and Restated Grant of Rights Agreement, p. 1, https://cdn.theathletic.com/app/upl oads/2022/07/01185303/Big-12-Grant-of-Rights-1.pdf.

of negotiating and entering broadcast rights agreements with media rights partners on behalf of the Conference as a whole.[98]

### C.   Member Institutions Control the Distribution of Conference Broadcast Media Revenues by Operation of the Conference Bylaws

84.   In addition to owning the broadcast rights they convey to their respective Conferences, the member institutions control how the revenues generated by NCAA and Conference broadcast agreements are distributed, including revenues arising from broadcast rights to tournaments and events organized or produced by the NCAA and by the Conferences.

85.   Through each Conference's bylaws, which are voted and agreed upon by each Conference's member institutions, the member institutions dictate how each Conference may use the broadcast revenues received by the Conference.

(a)   The Big 12's bylaws state that the Conference must first use broadcast revenue to pay for "the operating and other expenses incurred or fund reserves established by the Board of Directors of the Conference."[99]  Only the Board of Directors has the authority to establish and fund Conference reserves.[100]  The remaining net distributable revenues must be used to pay member subsidies and member-designated revenues, and then the revenue must be equally distributed among the members.[101]  The Board must approve the distribution of all Conference revenues, assets, and reserves.[102]

---

[98] *See* Declaration of Kerry Kenny, ¶ 8.
[99] Big 12 Conference 2022-23 Handbook, Bylaws § 2.3, pp. 15–16 (NCAAHOUSE00250320-21).
[100] *Id.* § 2.5, p. 16 (NCAAHOUSE00250321).
[101] *Id.* § 2.3, pp. 15–16 (NCAAHOUSE00250320-21).
[102] *Id.* § 2.5, p. 16 (NCAAHOUSE00250321).

(b)    The ACC's bylaws provide that the Conference will pay its reserves and then divide the remaining revenue equally among its member institutions.[103]  Revenues derived from the ACC-ESPN agreement are divided equally among the ACC's member schools.[104]

(c)    The Big Ten's Conference Handbook requires the Conference to divide the net receipts from Conference television revenue equally to its member institutions.[105]

(d)    The Pac-12's Executive Regulations dictate that "[a]ll media rights net revenue generated by the Conference shall be distributed equally among all members."[106]

(e)    The SEC's bylaws provide that Conference revenues must first be used to pay any outstanding debts of the Conference[107] and to reimburse certain expenses incurred disproportionally by certain members but that are for the benefit of all members.[108]  After any such payments are made, revenue generated by all sports is distributed evenly among the SEC's member institutions.[109]

86.    Any changes to these or related bylaws require an affirmative act by the Conferences' member schools.[110]

---

[103] ACC 2020-21 Manual, Bylaws § 2.5.2, p. 34 (ACC-HOUSE0000615).

[104] *Id.* § 2.10.9, p. 41 (ACC-HOUSE0000622).  The University of Notre Dame is excluded from the distribution of ACC revenues attributable to football media or broadcast rights. *Id.* § 2.12, pp. 45-46 (ACC-HOUSE0000626-27).

[105] Big Ten Conference Handbook 2021-2022, pp. 106–07, 110–11.

[106] Pac-12 2021-22 Handbook, Executive Regulations, ch. 1, § 1, p. 22 (NCAAHOUSE00250374).

[107] SEC Constitution and Bylaws 2022-2023, Bylaws § 31.10.1, p. 36 (NCAAHOUSE00249825).

[108] *Id.* §§ 31.20, 31.21, 31.22, pp. 36-38 (NCAAHOUSE00249825-27).

[109] *Id.*, art. 31, pp. 36–39 (NCAAHOUSE00249825-28).

[110] *See* ACC 2020-21 Manual, Constitution § 1.6.2, pp. 21-22 (ACC-HOUSE0000602-03) (requiring vote of 2/3 or 3/4 of Directors to amend relevant bylaw provisions); Big 12 Conference 2022-23 Handbook, Bylaws § 1.5.2, pp. 3-5 (NCAAHOUSE00250308-10) (requiring vote of supermajority or 75% of disinterested directors to amend relevant bylaw provisions); Big Ten Conference Handbook 2021-22, Rule 4.1.3, pp. 27-29 (BIGTEN-NIL_00256648-50) (requiring vote of 60% of Council to amend bylaws); Pac-12 2021-22 Handbook, Constitution and Bylaws, ch. 7, § 4, p. 14 (NCAAHOUSE00250366), ch. 13, § 1, p. 20 (NCAAHOUSE00250372), and Executive Regulations, ch. 1, § 10, p. 26  (NCAAHOUSE00250 378) (requiring vote of 2/3 or 3/4 of Board to amend relevant bylaw provisions and Executive Regulations); SEC Constitution and Bylaws 2022-2023 Foreword and Bylaws § 5.3.1.3, p. 9 (NCAAHOUSE00249784, NCAAHOUSE00249798) (requiring 2/3 or majority vote to amend relevant bylaw provisions).

87.     Under their existing bylaws, no Conference could distribute broadcast revenue to student-athletes without permission from its member schools.  The distribution of revenue that Plaintiffs' Broadcast Model contemplates would require amendments to the Conferences' bylaws and, therefore, the affirmative vote of the Conferences' member institutions to distribute revenue to student-athletes that would otherwise be paid to the member institutions.

88.     Although the Conferences' member institutions own the broadcast rights to their own home events, the Conferences own the broadcast rights to Conference-hosted events, including Conference tournaments and Conference championships.  The NCAA similarly owns the broadcast rights for its own events, like the NCAA Tournament.

89.     However, it is important to note that a Conference's member institutions control the distribution of **all** broadcast revenues received by a Conference, whether those revenues are attributable to broadcast rights transferred to the Conference by a member institution or not.  Put another way, the member institutions control the distribution of the revenues generated by Conference-hosted events pursuant to the bylaws outlined above.

90.     In fact, some Conferences' bylaws specifically dictate the manner in which revenue from Conference-hosted events is distributed.

(a)     For example, the Pac-12's Executive Regulations provide that "[t]he Conference shall retain all revenues generated by the Conference Football Championship Game and related activities and shall distribute all net revenues equally among the member institutions after payment of game-related expenses."[111]  The Pac-12's Executive Regulations also state that gross revenues from the Conference's men's and women's basketball tournaments, minus

---

[111] Pac-12 2021-22 Handbook, Executive Regulations, ch. 1, § 2, p. 22 (NCAAHOUSE00250374).

36

approved expenses for participants in the tournaments, "shall be distributed by the Conference office equally to the Conference's member institutions."[112]

      (b)      The SEC's Bylaws include similar provisions in Article 31.[113]

91.      The same control provisions govern distribution of broadcast revenues generated by NCAA-hosted events, bowl games, and the College Football Playoff.

      (a)      For example, the ACC's bylaws provide that the Conference's receipts from the NCAA men's basketball tournament are divided equally among all member schools after the schools that participated in the tournament receive cost reimbursement as set forth in the bylaws.[114] The ACC's bylaws also provide that bowl revenues, including revenues resulting from the College Football Playoff, are divided equally among member schools after participating schools receive an expense allotment established by the bylaws.[115]

      (b)      The Pac-12 similarly retains "all revenue generated through bowl games," provides expense allowances for participants, and "distribute[s] the remaining revenue equally among the members."[116]

92.      As discussed above (and further detailed in **APPENDIX D**), any changes to Conference bylaws governing the distribution of broadcast revenue would require an affirmative act by the Conferences' member schools to amend the relevant bylaws.

93.      Because of this unique confluence of factors—namely, the member institutions' ownership of the broadcast rights and control over the distribution of Conference broadcast revenues—Plaintiffs' Broadcast Model implicates Title IX even though it contemplates that the

---

[112] *Id.*, ch. 1, § 5, p. 25 (NCAAHOUSE00250377).

[113] SEC Constitution and Bylaws 2022-2023, art. 31, pp. 36-39 (NCAAHOUSE00249825-28).

[114] ACC 2020-21 Manual, Bylaws § 2.5.7, p. 35 (ACC-HOUSE0000616).

[115] *Id.* § 2.5.10, pp. 35-36 (ACC-HOUSE0000616-17).

[116] Pac-12 2021-22 Handbook, Executive Regulations, ch. 1, § 3, p. 22 (NCAAHOUSE00250374).

Conferences,[117] and not their member institutions, would "make" the broadcast revenue payments to student-athletes.  If this were not the case, institutions could easily circumvent Title IX by using the Conferences or other third-parties formed or governed by the institutions themselves intentionally to distribute benefits, opportunities, and payments to student-athletes in a way that discriminated based on sex.  Title IX guidance and the Eighth Circuit have rejected this type of end-run around the requirements of Title IX through the use of outside or third-party funding.[118]

94.    Moreover, even if the Conference bylaws could somehow be amended to permit Conferences to distribute broadcast revenue without member institutions' direct involvement, the Broadcast Model revenue payments still would implicate Title IX even if they are not made by the schools directly.    Under the Broadcast Model, the Conferences would need their member institutions to provide names, contact information, and participation and financial aid records for all student-athletes claiming to be class members.    This information is necessary for the Conferences to make the payments Plaintiffs posit.    Section 106.31(b)(6) of the Title IX Regulations prohibits educational institutions from perpetuating discrimination by providing significant assistance to an entity that discriminates on the basis of sex in the course of providing any financial assistance to students.    In my opinion, providing personal information for student-athletes to facilitate the disparate payments Plaintiffs propose constitutes "significant assistance,"

---

[117] In the case of Notre Dame, Rascher conjectures that the institution itself would pay certain football student-athletes some portion of the broadcast media revenue attributable to its football program (which is not affiliated with any Conference and for which Notre Dame retains broadcast media rights) and that the ACC (of which Notre Dame is a member for purposes of all sports except football and ice hockey) would pay certain student-athletes some portion of its basketball broadcast media revenue.  For the reasons set forth above, any payment to student-athletes by the ACC would require Notre Dame's involvement.  As for the hypothetical direct payment from Notre Dame to certain football student-athletes, this disbursement of funds from Notre Dame—an educational institution that is a recipient of federal funds subject to Title IX—implicates Title IX because it would be a direct payment by the institution of institutional funds to student-athletes.

[118] See *Chalenor*, 291 F.3d at 1048; *see also* Holmes Letter, *supra*.

and I would advise any institution for which I was conducting an audit that such facilitation of disproportionate financial assistance along gender lines would be at odds with Title IX.[119]

## V.    PLAINTIFFS' BROADCAST MODEL VIOLATES TITLE IX

95.    Based on my experience, my opinion is that Plaintiffs' Broadcast Model violates Title IX by creating a significant disparity in the financial support provided to student-athletes based on sex.  The Broadcast Model predominantly provides broadcast revenue share payments to football and men's basketball student-athletes.   Women's basketball student-athletes receive significantly smaller revenue share payments.   Plaintiffs' characterization of the significant broadcast revenue share payments for men's basketball and football student-athletes as payments for "NIL" does not change this analysis.[120]

96.    Whether Plaintiffs intend the Broadcast Model to violate Title IX is irrelevant.  The critical inquiry is whether an institution treats student-athletes of one sex in a discriminatory manner.[121]  In this regard, it is undisputed that Plaintiffs' Broadcast Model directs almost all of the Broadcast Model payments to men.  For that reason, if I were conducting an audit, I would have to conclude that the Broadcast Model violates Title IX.

### A.    Plaintiffs' Broadcast Model Generally

97.    Plaintiffs claim that, in the but-for world, the Conferences would have sought licenses for the supposed broadcast NIL rights[122] of all full GIA scholarship football and basketball players at their member schools and that the Conferences would have paid 10% of the total revenue

---

[119] 34 C.F.R. § 106.31(b)(6).

[120] There is no practical distinction between the payments contemplated by Plaintiffs' Broadcast Model and earmarked payments made to institutions by private donors for equipment, uniforms, travel gear, spring training trips, and foreign trips for tournaments and competitions.  Both the broadcast revenue share and earmarked payments are payments from external sources designed to benefit specific teams and both are captured by the requirements of Title IX.  As explained elsewhere, there are no exceptions to this requirement.

[121] *Pederson v. La. State Univ.*, 213 F.3d 858, 881 (5th Cir. 2000).

[122] Courts have found that student-athletes have no right of publicity or NIL rights in live broadcasts.  *See generally Marshall v. ESPN Inc.*, 111 F. Supp. 3d 815 (M.D. Tenn. 2015); *Dryer v. NFL*, 814 F.3d 938 (8th Cir. 2016).

from their broadcast agreements to those student-athletes.[123]  Plaintiffs claim that the Conferences would allocate the broadcast revenue payments by providing over 75% of the revenue-share to football, over 15% of the revenue-share to men's basketball, and no more than 5% of the revenue-share to women's basketball.[124]

98.    Despite the substantial disparity of broadcast revenue payments directed to men compared to women, neither of Plaintiffs' experts considered Title IX in developing their models or opinions.  Rascher admitted that he did not consider Title IX in his revenue share model, or any other but-for world model.[125]  Desser similarly testified that he had not considered Title IX.[126]

**B.    Plaintiffs' Broadcast Model Creates New and Discriminatory Levels of Athletic Participation Opportunities**

99.    Plaintiffs' Broadcast Model creates new and different levels of athletic participation opportunities based on sex that, if I were conducting an audit, I would flag as a violation of Title IX because they offer vastly disproportionate benefits at each level.

100.    Specifically, Plaintiffs' Broadcast Model provides significant financial benefits to the Football and Men's Basketball Class and a much smaller benefit to a much smaller Women's Basketball Class, essentially creating a separate class or **level of opportunity** for these student-athletes that is disproportionate based on sex in violation of Title IX.[127]  Worse still, the Broadcast

---

[123]*See* Pls.' Mot. for Class Cert., ECF No. 209, at 9.

[124] Rascher Rep. ¶ 176.  Plaintiffs' broadcast industry expert, Edwin Desser, determined that other sports—namely, Olympic sports—make up the remaining 5% of the pool.  *See* Expert Report of Edwin S. Desser, dated Oct. 21, 2022 § 17.4.  Rascher does not explain how the remaining 5% of the pool would be allocated.

[125] Rascher Dep. Tr. at 111:19-21 ("Q. Have you tried to account for Title IX in any of your damages models in this case? A. No.").

[126] Desser Dep. Tr. at 64:12-19 ("Q. Have you given any consideration to Title [IX] in your preparation of this report? A. That's not within the scope of what I was assigned to work on. Q. So the answer is: 'No' you have not given any consideration to it, because you weren't asked to do that? A. No, I have not.").

[127] *See Cohen v. Brown Univ.*, 991 F.2d 888, 905-06 (1st Cir. 1993), *aff'd*, 101 F.3d 155 (1st Cir. 1996).  Brown University "cut" sports by moving them from fully funded status down to donor-funded status, changing the level of athletics opportunity for the affected student-athletes, which violated Title IX because it resulted in a failure to provide equitable participation opportunities.  While the Broadcast Model does the opposite of the action in *Cohen* by elevating some teams to a higher level of treatment to the exclusion of all others, the result is the same—unequal participation opportunities based on sex for approximately 98 male athletes and only 15 female athletes per institution.

Model permits no benefits for female student-athletes outside the Women's Basketball Class, with over 95% of broadcast revenues set aside for sharing with football and men's and women's basketball players.

101.    To illustrate, the Broadcast Model seeks compensation on a yearly basis for 85 full-GIA scholarship football student-athletes, 13 full-GIA scholarship men's basketball student-athletes, and 15 full-GIA scholarship women's basketball student-athletes at each of the Conferences' member institutions.  This means that the Broadcast Model provides this compensation opportunity to 86.73% men and only 13.27% women each year—a huge disparity in the participation opportunities offered to female student-athletes.  This percentage is worse when looking at the average total number of putative class members per year who would benefit from this Model, as the Football and Men's Basketball Class includes an average of 6,170 members, making up on average 88% of the total student-athlete class members, while the Women's Basketball Class includes only 849 members on average per year, comprising just 12% of the total student-athletes who would receive Broadcast Model payments per year.[128]

102.    The Broadcast Model further creates a subgrouping of three major sports and all other minor sports.  The Policy Interpretation flatly rejected this type of classification system:

> [N]o subgrouping of male or female students (such as a team) may be used in such a way as to diminish the protection of the larger class of males and females in their rights to equal participation in educational benefits or opportunities.  Use of the 'major/minor' classification does not meet this test where large participation sports (e.g., football) are compared to smaller ones (e.g., women's volleyball) in such a manner as to have the effect of disproportionately providing benefits or opportunities to the members of one sex.[129]

---

[128] Rascher Rep., p. 93, Ex. 11; *see also* **APPENDIX C**.
[129] Policy Interpretation App'x B, Resp. to Cmt. 7, at 71.422.

103.    Further, the Broadcast Model excludes non-scholarship student-athletes (walk-ons) from participating in broadcast revenue sharing—even though these student-athletes engage in the same activities as scholarship athletes on their respective teams and their "NIL" would likely appear in televised broadcasts alongside their full-scholarship teammates.[130]   This creates confounding Title IX difficulties, given that walk-ons must be counted as "participants" for purposes of determining Title IX compliance.[131]

### C.    The Broadcast Model Implicates the Financial Assistance Regulation

104.    The Broadcast Model also implicates (1) the financial assistance requirements[132] and (2) the financial aid requirements of Title IX's financial assistance regulations.[133]

#### 1.    Financial Assistance

105.    Plaintiffs' Broadcast Model requires Conference member institutions to provide inequitable financial assistance to male and female student-athletes, which I would flag as a violation of Title IX's financial assistance requirements if I were conducting an audit.[134]

106.    The Broadcast Model provides $1.32 billion to Football and Men's Basketball student-athletes and only $49.8 million to Women's Basketball student-athletes, creating a disproportionate payout based on sex: 96.37% of the funds going to males and only 3.63% of the funds awarded to females.[135]   The Broadcast Model payments are in direct contravention of the

---

[130] Oliver Dep. Tr. at 125:17-127:1 (testifying that "walk-ons should be treated as equal, important members of [a] team, just like the teammates who were on scholarship," and that walk-on players at times made greater in-game contributions than scholarship players); *id.* at 277:16-278:10 (testifying that walk-ons and other student-athletes who do not play during a season should receive equal portions of broadcast revenue "[b]ecause they are part of the team").
[131] Policy Interpretation § VII.A.
[132] 34 C.F.R. § 106.37(a).
[133] 34 C.F.R. § 106.37(b).
[134] 34 C.F.R. § 106.37(a).
[135] Rascher Rep., p. 92, Ex. 10.

Regulations' prohibition on discriminatory financial assistance because they clearly favor members of one sex over the other.

107.     Importantly, the fact that football and men's basketball generate more broadcast revenue than women's basketball (or other women's teams) is not a permissible basis for providing football and men's basketball student-athletes with a discriminatory, disproportionate share of the total available financial assistance.[136]   As Congress directed time and time again, revenue-generating sports are not exempt from Title IX,[137] and all sources of institutional revenues, including from third-party sources, must be used to treat all teams of both genders fairly, not just to favor teams that generate external, private funding.[138]

108.     The Broadcast Model unmistakably requires institutions to "assist" in disproportionately distributing broadcast revenue based on sex.  I would advise schools for which I was conducting a Title IX audit that engaging in this behavior would violate Title IX's financial assistance provisions.[139]

### 2.     Financial Aid

109.     Plaintiffs' Broadcast Model also requires Conference member institutions to provide inequitable financial aid for male and female student-athletes without regard to the institutions' obligations under Title IX.  As explained above, Title IX's Regulations separately address[140] athletic scholarships and GIA, dictating that a recipient that awards athletic scholarships or GIA "must provide reasonable opportunities for such awards for members of each sex in

---

[136] 34 C.F.R. § 106.37(a)(1).
[137] *See supra* Section III.C.
[138] Holmes Letter, *supra*.
[139] *See supra* Section V.(C).
[140] The Regulations' provisions on these athletic scholarships constituting "financial aid" are distinct from the Regulations' provisions on general "financial assistance."

proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics."[141]

110.    The Regulations' provisions on athletic scholarships are distinct from the Regulations' provisions on general "financial assistance" but are instructive as to how Title IX compliance would be measured for the Broadcast Model payments.

111.    Compliance with the athletic scholarships component under Title IX requires an institution receiving federal funds to show that the total amounts of scholarship aid it makes available to male and female student-athletes is substantially proportionate to the participation rates of male and female student-athletes participating in athletics at the institution.[142]   Applying this framework, I would conclude in a Title IX audit that the proposed Broadcast Model payments run afoul of Title IX's substantial proportionality requirement because Plaintiffs propose allocating the payments almost entirely to male football and basketball student-athletes, with a vanishingly small proportion of the payments directed to women's basketball student-athletes and no payments made available to other female student-athletes.

112.    Under Plaintiffs' Broadcast Model, female student-athletes would receive less than 5% of the total pool of available broadcast revenue.   But female student-athletes make up much more than 5% of every institution's athletics program.[143]   No mathematical calculation is needed to grasp this obvious proportionality issue under Title IX's financial aid test.

---

[141] 34 C.F.R. § 106.37(c).

[142] *See* O'Shea Letter, *supra*; *see also* Fisk Order at 37.

[143] Financial aid data was collected using the Equity in Athletics Data Analysis Cutting Tool provided by the Office of Postsecondary Education of the U.S. Department of Education available at https://ope.ed.gov/athletics/#/.   The database consists of athletics data submitted annually by all co-educational postsecondary institutions that receive Title IV funding for federal student aid programs and have an intercollegiate athletics program as required by the Equity in Athletics Disclosure Act (EADA).   Although the definitions and assessments under Title IX differ from those under the EADA, the selected information is being used solely for illustrative purposes to demonstrate the potential impact of the Broadcast Model payments based on a common set of publicly available financial aid data for all institutions.   *See also* Fisk Order, p. 5, n.8 (explaining why EADA data may be referenced at the early stages of litigation).

113.    Beyond this straightforward percentage split, in looking at the underlying numbers and allocations to determine whether implementing Plaintiffs' Broadcast Model would violate Title IX, the Court would have to conduct an institution-by-institution analysis.  The differing numbers and proportions of male and female student-athletes participating in athletics at each institution and the differing total amounts of financial aid offered to student-athletes at each institution necessitate separate calculations to determine each institution's compliance with the financial assistance regulations.  Neither Plaintiffs nor Plaintiffs' experts have considered these complications on a university-by-university basis or a year-by-year basis, as Title IX requires.

114.    The following bar chart provides a visual representation of the 2021 financial aid distributions for male and female student-athletes at six randomly selected institutions from the Autonomy 5 Conferences:[144]



---

[144] *See supra* n.143.

115.    Notwithstanding the institution-specific nature of the analysis, it is difficult to imagine a scenario in which the grossly disproportionate distribution of broadcast revenue share that Plaintiffs propose would satisfy Title IX's financial-assistance requirements for any member institution in the Conferences.

116.    The following bar chart provides a visual representation of the impact the proposed Broadcast Model payments would have on the same institutions' ability to provide equitable financial assistance in compliance with Title IX:[145]



117.    Once a share of over 96% of earmarked broadcast revenues is allocated to male student-athletes, achieving substantial proportionality in financial assistance as required by Title IX[146] becomes impossible.

---

[145] The 2021 Broadcast Model payment as proposed in Rascher's report, Appendix C was added to the 2021 financial aid data collected from the EADA cutting tool provided by the Office of Postsecondary Education of the U.S. Department of Education and available at https://ope.ed.gov/athletics/#/.

[146] 34 C.F.R. § 106.37(c)(1).

### D.     The Broadcast Model Directly Implicates the Equitable Treatment Provisions

118.    The disproportionate payments in Plaintiffs' Broadcast Model create a significant disparity in the treatment afforded to men's athletics programs overall as compared to women's programs overall.  I would flag these disproportionate payments as a violation of Title IX's equitable treatment provisions if I were conducting an audit.

119.    Title IX's implementing regulations require all recipients that "operate[ ] or sponsor[ ] . . . intercollegiate . . . athletics [to] provide equal athletic opportunity for members of both sexes."[147]  OCR determines overall compliance with the equal treatment requirement by considering, among other factors, the "laundry list" of benefits and opportunities the institution affords to male and female student-athletes.

120.    Although "identical benefits, opportunities, or treatment are not required," any "overall effect[s] of any differences [must be] negligible" to satisfy Title IX when comparing the men's program as a whole to the women's program as a whole.[148]  A disparity in one program component alone can constitute a Title IX violation if it is substantial enough to deny equality of athletic opportunities to students of one sex.[149]  The fundamental question is therefore whether male and female student-athletes have equal access to equivalent "quality and kinds of benefits, opportunities, and treatment[.]"[150]

121.    Equitable treatment claims "can be based on a program-wide imbalance in the allocation of benefits between sexes, or alternatively, 'substantial' disparities in the treatment

---

[147] 34 C.F.R. § 106.41(c).

[148] Policy Interpretation § VII.B.2.

[149] *Id.* § VII.C.6.c (stating that the overall determination of compliance with Title IX's equal opportunity provisions involves considering "[w]hether disparities in individual segments of the program with respect to benefits, treatment, services, or opportunities are substantial enough in and of themselves to deny equality of athletic opportunity").

[150] *Id.* § VII.B.2.

afforded to comparable male and female teams."[151]

122.    Given the vastly disproportionate distribution of broadcast revenue to men's sports that Plaintiffs' Broadcast Model contemplates, I would advise any school for which I was conducting a Title IX audit that the distribution of those broadcast revenue benefits under the Broadcast Model is substantial enough on its own to result in a Title IX violation.

123.    Indeed, in comparing the overall men's and women's athletics programs as required under Title IX, I cannot find a justification for the disparity between the total amount of resources provided under Plaintiffs' Broadcast Model to male versus female student-athletes.    The intentional and discriminatory nature of Plaintiffs' approach is highlighted by the fact that the "NIL" payments contemplated by Plaintiffs' Broadcast Model would be made to all full-scholarship members of the football and men's basketball teams regardless of whether their individual name, image, or likeness ever appeared on or was referenced in the broadcast.  In other words, there is no direct relation between any alleged "NIL" and the payments.  Instead, Plaintiffs propose distributing certain proportions of broadcast revenue based solely on team membership—which is, by nature, discriminatory treatment based on sex.  That the broadcast revenue Plaintiffs propose to distribute is allegedly generated primarily by male football and basketball student-athletes is irrelevant under Title IX, as all institutional revenue sources must be used to support the equitable distribution of benefits and opportunities to all student-athletes.[152]

124.    Furthermore, the decision to devote a substantial portion of each institution's total broadcast revenue solely to supposed broadcast "NIL" payments diverts funding ordinarily available to the athletics department as a whole in favor of benefitting only a few teams.  This means that the financial resources that athletics departments otherwise could use to provide

---

[151] *Anders v. Cal. State Univ., Fresno*, No. 1:21-cv-00179, 2021 WL 3115867, at *14 (E.D. Cal. July 22, 2021).
[152] *See* Holmes Letter, *supra*.

equitable opportunities and treatment for both male and female student-athletes would overwhelmingly go to provide additional financial assistance to male student-athletes in revenue-generating sports, without consideration for the vast majority of female student-athletes.

125.    In short, Plaintiffs' Broadcast Model looks exactly like the model Congress rejected eight times over the course of five years.[153]  The Model would compensate certain male student-athletes more because of the revenue generated by their sport.  This is not consistent with Title IX. Congress made clear from the beginning that there is a need to protect female student-athletes by ensuring that benefits are not disproportionately awarded to male athletes even if men's sports have greater revenue-generating capacity.[154]

126.    Similarly, Plaintiffs' Broadcast Model would also lead to inequitable treatment in individual program components such as recruiting.

(a)    For example, Rascher contends that, in the but-for world, the Conferences would have competed to attract—in other words, recruit—Football and Men's and Women's Basketball players by offering broadcast revenue payments as inducements.[155]  If schools offered financial recruiting inducements in the form of Plaintiffs' proposed Broadcast Model payments, schools would need to provide an equitable amount of inducements for men's and women's programs.[156]  Similarly, using Broadcast Model payments as recruiting inducements would create inequitable financial resources for recruiting in violation of Title IX.[157]

---

[153] *See supra* Section III.C.
[154] *See supra* Sections III.A.–C.
[155] Rascher Rep. § 7.2.1.
[156] Policy Interpretation § VII.B.4.a.1.  The proposed model would provide recruiting inducements for a significantly disproportionate number of recruits—a minimum of 25-30 male football and basketball recruits as compared to about 4 female basketball recruits (based on the assumption that coaches sign approximately 20-25% of their total roster numbers each year).
[157] *Id.* § VII.B.4.a.2.  Under Plaintiffs' Broadcast Model, football and men's basketball recruits would receive approximately 96% of the broadcast revenue payments while women's basketball recruits would receive approximately 4%.

127.    The bottom line is that grossly disproportionate broadcast revenue payments to football and men's basketball student-athletes create a huge disparity in benefits available to male and female student-athletes that are not offset by the miniscule amount provided to women's basketball players.

128.    This outcome contradicts Title IX and its underlying goals, which focus on increasing athletics participation opportunities for the underrepresented sex (typically women) and leveling the playing field for all student-athletes, regardless of their gender or the capacity of their selected sport to generate self-sustaining revenue.

**E.     Plaintiffs' Broadcast Model Cannot Be Adjusted to Comply With Title IX**

129.    The numerous Title IX concerns outlined herein cannot be cured by adjusting the proposed Broadcast Model.  For example, an attempt to restructure the Broadcast Model to reach Title IX compliance by simply splitting the broadcast revenue 50-50 between men's and women's sports would still require a proportionality test for each campus under Title IX's financial aid regulations.  In this regard, Plaintiffs would face at least two logistical challenges.

130.    First, Title IX does not require that equal dollars be spent on men's and women's sports; rather, Title IX requires that financial aid be provided proportional to participation and financial assistance of all types be distributed in a nondiscriminatory manner.  Determining compliance with these requirements necessitates a highly individualized inquiry based on the percentage of men and women participants in athletics at each member institution.[158]

(a)     Even if Plaintiffs attempted to revise their Broadcast Model to allocate revenue share payments per school on a proportional basis, the historical numbers and

---

[158] *See* Policy Interpretation § VII.A.1.  Indeed, OCR has expressly recognized that the financial aid analysis is tailored to and dependent upon the facts and circumstances present at each individual institution: "OCR judges each matter on a case-by-case basis with due regard for the unique factual situation presented by each case."  O'Shea Letter, *supra*.

corresponding split would be difficult (if not impossible) to deduce on a class-wide basis because of the separate analysis that would still need to be performed every year at each school. In other words, the resulting percentage-based differences in the allocation of financial assistance (inclusive of the Broadcast Model Payments) would differ from institution to institution and from year to year. Because of that, there is no uniform formula for aid allocations that could be applied in an across-the-board manner to all institutions.

(b)     As an added layer of challenge, differences in the total amount of financial aid distributed to male and female student-athletes may be explained by various non-discriminatory factors such as: the amount paid by each school for in-state and out-of-state scholarships or for tuition for international students; a decision to spread out the award of aid over a period of years to help in the steady development of a particular team; an athletics department decision to infuse additional aid into selected teams to generate an increase in the number of participants on those teams in order to move toward compliance with Title IX's accommodation of interests requirement; and unexpected fluctuations in the participation rates of males and females based on, for example, a decision by an athlete who had accepted an athletic scholarship to enroll at another school at the last minute and/or the unexpected and unplanned decisions of existing student-athletes to join the transfer portal and the resulting inability to replace them in a timely manner with newly recruited high school student-athletes and/or incoming student-athlete transfers.[159]

(c)     The presence of these factors varies at each institution and must be considered in any financial aid analysis under Title IX. The resulting school-specific financial aid compliance calculations are inevitably complex and necessarily change from year-to-year. Given

---

[159] *See* O'Shea Letter, *supra.*

the constantly changing and individualized nature of the factors associated with performing such a calculation, a uniform percentage-based allocation of the Broadcast Model payments to all institutions is both impractical and unworkable given Title IX's financial aid and assistance requirements. Instead, the calculations would need to be made for each of the institutions annually, on both a retrospective basis and a prospective basis.

131. Second, even assuming Plaintiffs could overcome complex proportionality calculations to ensure Title IX compliance with percentage-based disbursements, the sheer amount of broadcast revenue that would be redirected toward student-athlete payments would require massive overhauls to athletics programs.

(a) It is well known that most schools do not profit from college sports; their general student body financially supports the athletics department rather than the other way around.[160] Indeed, football and men's basketball are typically the only two net-revenue generating sports at most Conference schools.[161]

132. Neither Plaintiffs' experts nor the named Plaintiffs account for these considerations. For example, Rascher testified that he neither accounted for Title IX nor attempted to model any effects of the Broadcast Model on any other student-athletes at the Conferences' member institutions.[162]

133. Plaintiffs may attempt to claim that revenue to fund other men's sports can be earmarked or secured from additional sources—but this prospect runs headlong into established

---

[160] Mark J. Drozdowski, *Do Colleges Make Money from Athletics?*, Best Colleges (updated Aug. 24, 2022), https://www.bestcolleges.com/news/analysis/2020/11/20/do-college-sports-make-money/.

[161] NCAA, *Finances of Intercollegiate Athletics Database, Net Generated Revenue: 2012-2021*, https://www.ncaa.org/sports/2019/11/12/finances-of-intercollegiate-athletics-database.aspx (noting that in 2021 nine Division I FBS Autonomy schools have a positive net generated revenue while 56 have a negative net generated revenue).

[162] Rascher Dep. Tr. at 111:19-21, 130:20-24.

realities. It would be virtually impossible to locate sufficient additional funds to ensure some form of compensation for female student-athletes proportional to the significant amounts that Plaintiffs contemplate for male student-athletes under the Broadcast Model. And in any event, Rascher claims that the value of the Broadcast Model payments is based on the value of student-athletes' NILs.[163] Any offsetting payments to female student-athletes would not be based on payments for the value of their NILs, but rather outright payments to equalize financial assistance; by definition, having devoted over 90% of broadcast revenues to compensation for male student-athletes, there would not be sufficient broadcast revenue to provide equitable compensation to female student-athletes. Thus, those additional payments to female student-athletes would amount to prohibited pay-for-play.

134. Under Plaintiffs' Broadcast Model, institutions would need to find an equivalent amount of funding to provide equitable financial support for women's athletics programs in order to comply with Title IX.[164] Athletics departments have fixed budgets, so difficult business decisions would need to be made about the continuation of various aspects of each athletics program.[165] History tells us that this process would likely lead to the elimination of participation opportunities for men (and possibly even women) in non-revenue-generating sports.[166] This type of budgetary adjustment would then free up the money that could be reallocated to the women's program to even out the financial playing field created by Plaintiffs' Broadcast Model and the

---

[163] Rascher Rep. ¶¶ 64–68.

[164] 34 C.F.R. § 106.37.

[165] *See generally* John Patrick Marsh, Jeffrey C. Petersen & Barbara Osborne, *Sport Discontinuation: An Assessment of Goal Achievement via Empirical Measures*, 2 J. of Amateur Sport, Special Issue: Political Economy (2016).

[166] *See Neal v. Bd. of Trs.*, 198 F.3d 763, 769-70 (9th Cir. 1999) (compiling cases that discuss the economic reality of Title IX compliance may include the elimination of teams); *see also Intercollegiate Athletics – Four-Year Colleges' Experiences Adding and Discontinuing Teams*, U.S. General Accounting Office, No. 01-297 (Mar. 2001), www.gao.gov/assets/gao-01-297.pdf. More recently, more than 300 teams were eliminated due to financial hardship caused by COVID-19. AB Staff, *Cutting Sports in the Context of Title IX, COVID-19*, Athletic Business (May 6, 2021), https://www.athleticbusiness.com/operations/legal/article/15161296/cutting-sports-in-the-context-of-title-ix-covid-19.

requirements of Title IX.

(a)    By way of example, consider a member institution of the SEC.  Using Rascher's broadcast revenue share calculations, the SEC would owe the following to the Football and Men's Basketball Class and the Women's Basketball class:[167]

| Plaintiffs' Calculation of SEC Broadcast Revenue:  2016-2021 | | |
|---|---|---|
| Sport | Total Revenue | Total Athlete Share (10% of Total Revenue) |
| Football | Redacted - NSC | Redacted - NSC |
| Men's Basketball | | |
| Women's Basketball | | |
| Total | | |

(b)    There are 14 member institutions of the SEC.  Assuming the revenue is split evenly, student-athletes at each institution would receive a total of about [NSC] in broadcast revenue.  [NSC] would be allocated to men, while only [NSC] would be allocated to women.  To comply with Title IX, each university would need to adjust its overall athletics spending to make up for this additional expenditure on male student-athletes and ensure proportional financial assistance is provided to female student-athletes.  Assuming an even 50% split for male and female student-athletes, the member institution would need to either (a) find roughly [NSC] to provide additional financial assistance for female athletes or (b) reduce financial assistance to other male athletes [NSC].  Achieving Title IX compliance with Plaintiffs' Broadcast Model could thus have a sizable impact on the viability of athletics programs overall (both men's and women's sports)—a reality that Plaintiffs' experts have not considered.[168]

135.    Furthermore, if schools were forced to eliminate men's participation opportunities to provide equitable financial assistance, this could create a domino effect on other Title IX

---

[167] *See* Rascher Rep., p. 130, App'x Ex. C.8.
[168] Rascher Dep. Tr. at 111:19-21; Desser Dep. Tr. at 64:12-19.

compliance areas such as equitable participation opportunities, which commonly requires athletics schools to provide opportunities in proportion to the gender composition of the undergraduate student body.[169]

136.    In light of these realities, and based on my experience, Plaintiffs' Broadcast Model would likely result in a reduction of overall participation opportunities in college sports, which could harm certain class members in the Additional Sports Class, among others.  These concerns make any attempt to achieve Title IX compliance unrealistic and unworkable in the real world.

## VI.    OTHER CONSIDERATIONS WITH PLAINTIFFS' BROADCAST MODEL

### A.    Plaintiffs' Broadcast Model Is Contrary to Title IX Equity Principles

137.    Given its disproportional allocation of funds between men's and women's sports, the Broadcast Model also runs afoul of the gender equity principles underlying Title IX, which the NCAA has incorporated into its own governing documents.

138.    Although the Supreme Court has held that the NCAA is not subject to Title IX,[170] the NCAA is committed to gender equity.  In 1992, the NCAA created a Gender Equity Study and Task Force, which adopted a definition for gender equity to guide member institutions: "[a]n athletics program can be considered gender equitable when the participants in both the men's and women's sports programs would accept as fair and equitable the overall program of the other gender."[171]  The Principle of Gender Equity (NCAA Constitution, Article 2.3) was added to the

---

[169] Policy Interpretation § VII.C.  Although compliance can generally be demonstrated under any one of three tests, the first of which is referenced above, if as a result of team eliminations or caps on team rosters in the men's program, men may become the underrepresented sex in terms of athletics participation if their numbers are not substantially proportionate to their undergraduate enrollment percentages, resulting in a failure to provide equitable participation opportunities in compliance with Title IX.  In order to come into compliance, reductions will then be necessary within the women's program in order to "equalize" the relative participation numbers to the undergraduate enrollment on both sides, which would then result in disparities in equitable financial assistance.

[170] *Nat'l Collegiate Athletic Ass'n*, 525 U.S. at 468.

[171] *Inclusion, Gender Equity and Title IX*, NCAA, https://www.ncaa.org/sports/2016/3/2/gender-equity-and-title-ix.aspx.

NCAA Constitution on January 11, 1994. Also in 1994, the NCAA adopted a certification program requiring each member institution to establish a gender equity plan.

139. On December 14, 2021, the NCAA released its new Constitution. The Association states its commitment to gender equity in Article 1.G:

> Gender Equity. The Association is committed to gender equity. Activities of the Association, its divisions, conferences and member institutions shall be conducted in a manner free of gender [bias]. Division, conferences and member institutions shall commit to preventing gender bias in athletics activities and events, hiring practices, professional and coaching relationships, leadership and advancement opportunities.[172]

140. As these provisions make clear, although the NCAA is not required to comply with Title IX, NCAA members (including the Conferences' member institutions) are expected to adhere to these constitutional principles.[173]

141. So, even though the NCAA is not required to comply directly with Title IX, Plaintiffs' Broadcast Model runs afoul of NCAA principles on and commitment to gender equity where, as here, the outcome is payments that overwhelmingly support male student-athletes.

**B.   Title IX Is Designed to Maximize Opportunities for Female Student-Athletes**

142. Title IX is designed to maximize opportunities for women's sports. After Title IX's enactment, institutions were required to treat women's sports equitably. No longer could they cite the lack of revenue generated by women's sports as an excuse not to offer, support, or promote women's sports. Instead, after Title IX, many institutions used their football and men's basketball revenue (along with many other sources) to ensure equal opportunities and treatment for women's

---

[172] 2022-23 NCAA Division I Manual, p. 2 (NCAAHOUSE00249849).

[173] Some Conferences have also made independent commitments to gender equity and diversity, equity, and inclusion principles. *See, e.g.*, Big Ten Conference Handbook 2020-2021, App'x E, Gender Equity Action Policy Plans, pp. 121-25 (BIGTEN-NIL_00036382-86); Pac-12 2021-22 Handbook, Constitution and Bylaws, ch. 3, § 4, p. 10 (NCAAHOUSE00250362); Big 12 Conference 2020-21 Handbook, App'x II, Policy on Gender Equity, p. 51 (BIG12_HOUSE00000526); SEC Constitution and Bylaws 2022-2023, Bylaws § 23.1, p. 32 (NCAAHOUSE00249821).

sports.  This shift in the revenue-distribution paradigm played an indispensable role in the expansion of women's sports in the wake of Title IX's implementation.[174]

143.    Under Title IX, college athletics programs strive to maximize participation opportunities for both male and female athletes across all sports.[175]  This approach, especially for female athletes, is the reason that thousands of members of the Women's Basketball and Additional Sports Class, male and female alike, are able to participate in college athletics at all. Plaintiffs' Broadcast Model would undermine these principles by creating a level of participation opportunity for many more male student-athletes than female student-athletes.

### C.    Broad-Based Participation Opportunities Benefit All Student-Athletes

144.    Providing broad-based athletics participation opportunities provides significant benefits to all student-athletes.  From the 1990s to the present, research shows that college athletics participation has a positive effect in the following ways:

(a)    Growth of interpersonal skills, relationships with peers, and leadership development;[176]

(b)    Increase in student-athletes' personal, psychological, and social well-being;[177]

---

[174] *Neal*, 198 F.3d at 773 ("Title IX has enhanced, and will continue to enhance, women's opportunities to enjoy the thrill of victory, the agony of defeat, and the many tangible benefits that flow from just being given a chance to participate in intercollegiate athletics."); *Cohen*, 101 F.3d at 188 ("There can be no doubt that Title IX has changed the face of women's sports as well as our society's interest in and attitude toward women athletes and women's sports. . . . What stimulated this remarkable change in the quality of women's athletic competition was not a sudden, anomalous upsurge in women's interest in sports, but the enforcement of Title IX's mandate of gender equity in sports.").

[175] U.S. Dep't of Educ., Off. for Civ. Rts., *Further Clarification of Intercollegiate Athletics Policy Guidance Regarding Title IX Compliance* (July 11, 2003), www2.ed.gov/about/offices/list/ocr/title9guidanceFinal.html (stating "that the elimination of teams is a disfavored practice.").

[176] Alexander W. Astin, *What matters in college? Four critical years revisited* (Jossey-Bass 1997); Mary Robeson Plunkett et al., *The Value of Intercollegiate Athletics Participation from the Perspective of Former ACC Athletes*, 17 Int'l J. of Sport Mgmt. 1-12 (2016); Frank J. Ryan, *Participation in Intercollegiate Athletics: Affective Outcomes*, 30 J. of Coll. Student Dev. 122–128 (1989).

[177] Erianne A. Weight et al., *Quantifying the psychological benefits of intercollegiate athletics participation: Implications for higher education policy and practice*, 7 J. of Issues in Intercollegiate Athletics 390-409 (2014).

    (c)      Increase in students' commitment to their academic institution;[178]

    (d)      Student-athletes fare better[179] or just as well[180] academically as their non-athlete peers; and

    (e)      Male student-athletes had improved interpersonal and leadership skills and were more motivated to complete a degree than their non-athlete peers.[181]

145.    Two studies also show that participation in college athletics benefits student-athletes tangibly through increased marketability and salary compared to non-athlete peers.[182]  A longitudinal study found significant differences between athletes and non-athletes, with former student-athletes having higher salary, total work engagement, dedication, vigor, job satisfaction, and promotion than their non-athlete peers over three measured time periods in their careers post-graduation.  This study also found no significant difference between Olympic sport athletes and revenue-generating sport athletes in these outcomes, contradicting previous research suggesting that revenue-generating sport athletes perform poorly compared to Olympic sport athletes.[183]

146.    Participation in a broad range of college sports therefore provides benefits to student-athletes on and off the field.  Title IX is designed to ensure that institutions do not discriminate on the basis of sex in providing athletic opportunities to student-athletes.  This notion

---

[178] Alexander W. Astin, *What matters in college? Four critical years revisited* (Jossey-Bass 1997); Elizabeth Aries et al., *A Comparison of Athletes and Non-Athletes at Highly Selective Colleges: Academic Performance and Personal Development*, 45 Research in Higher Education 577-602 (2004).

[179] Elizabeth Aries et al., *A Comparison of Athletes and Non-Athletes at Highly Selective Colleges: Academic Performance and Personal Development*, 45 Research in Higher Education 577-602 (2004).

[180] *Id.*; Ernest T. Pascarella & John C. Smart, *Impact of intercollegiate athletic participation for African American and Caucasian men: Some further evidence*, 32 J. of Coll. Student Dev. 123-130 (1991).

[181] Ernest T. Pascarella & John C. Smart, *Impact of intercollegiate athletic participation for African American and Caucasian men: Some further evidence*, 32 J. of Coll. Student Dev. 123-130 (1991).

[182] William G. Bowen & Sarah A. Levin, *Reclaiming the Game: College Sports and Educational Values* (Princeton University Press 2003); James Shulman & William G. Bowen, *The Game of Life: College Sports and Educational Values* (Princeton University Press 2002); Peter Chalfin, et al., *The Value of Intercollegiate Athletics Participation from the Perspective of Employers who Target Athletes*, 8 J. of Issues in Intercollegiate Athletics 1-27 (2015).

[183] Erianne Weight et al., *Occupational measures of former NCAA athletes and traditional* students, 19 Int'l J. of Sport Mgmt. 1-26 (2018).

of equal participation and opportunity is at the core of college athletics,[184] yet Plaintiffs' Broadcast Model would go against this central principle of Title IX.

## VII.   <u>CONCLUSION</u>

147.    While Plaintiffs' Broadcast Model presents a novel payment scheme for college football and basketball players, the application of such a model is something Title IX was designed to prohibit.

148.    Congress already considered—in rejecting numerous proposed amendments to exempt revenue producing sports from Title IX—the import of a scheme like Plaintiffs' Broadcast Model that would allow different treatment for football and men's basketball as net revenue-producing sports.  In short, Plaintiffs' Broadcast Model is as inconsistent with the application of Title IX as the many amendments that were rejected.

149.    Plaintiffs' proposal to direct broadcast revenue share payments overwhelmingly to male student-athletes solely based on team membership (instead of the actual use of any particular team member's name, image and likeness) attempts to use the cover of student-athletes' purported "NIL" to sidestep Title IX's requirements and the law's prohibitions against sex-based discrimination.  But longstanding Title IX principles prohibit this seemingly novel approach.

150.    Plaintiffs' Broadcast Model fails to account for the financial aid and assistance requirements set forth in the Regulation and Policy Interpretation requiring that they be awarded in a manner that is substantially proportionate to the athletics participation percentages of each

---

[184] The OCR continues to actively ensure equal participation in college sports today.  As recently as April 6, 2023, in the preamble to its proposed changes to Title IX regulations to address the participation of transgender students, the Department of Education stated: "Participation in school athletics is an important component of education and provides valuable physical, social, academic, and mental health benefits to students. The proposed rule affirms that students benefit from the chance to join a school sports team to learn about teamwork, leadership, and physical fitness."  *See* U.S. Dep't of Educ., *FACT SHEET: U.S. Department of Education's Proposed Change to its Title IX Regulations on Students' Eligibility for Athletic Teams* (Apr. 6, 2023), https://www.ed.gov/news/press-releases/fact-sheet-us-department-educations-proposed-change-its-title-ix-regulations-students-eligibility-athletic-teams.

sex.  The award of payments is so disproportionately discriminatory on the basis of sex under Plaintiffs' Broadcast model that the implementation of the Model is impractical if not impossible given the requirements of Title IX.

151.    Plaintiffs' Broadcast Model also fails to consider the significant imbalance in treatment and benefits that it would create between the male and female athletics programs as a whole.  The significance of the resulting disparity is so great that it would be difficult to conclude that Plaintiffs' Broadcast Model was anything other than a violation of Title IX's equitable treatment requirements.

152.    Plaintiffs' proposal that the Conferences make the revenue share payments that the Broadcast Model contemplates does not allow the Model to evade Title IX.  The Conferences' member institutions own and/or control the broadcast revenue Plaintiffs seek to redistribute and they would have to be integrally involved in facilitating the revenue share payments under the Model; Title IX applies in these circumstances.  Further, funds are not exempt from Title IX merely because they come from an outside source.  Because the payments contemplated by Plaintiffs' Broadcast Model are wholly inconsistent with Title IX's requirements, if I were conducting an audit, I would find that institutions that implement Plaintiffs' broadcast revenue share payments are in violation of Title IX.

153.    In sum, Title IX was enacted to ensure equal opportunities for female athletes in college sports.  While progress has certainly been made in this regard, the efforts to achieve Title IX's goals remain ongoing.

154.    In my view, Plaintiffs' Broadcast Model would reflect a reversal of those efforts. By requiring the compensation of men's sports at such a disparate level, Plaintiffs' Broadcast Model could invite a new era of discriminatory treatment of female student-athletes, open the door

to creative ways to reallocate revenue and funds for the benefit of men's revenue-generating teams, and undermine the years of advancement and increasing support for women's sports since Title IX's enactment.

Date: 4/27/2023

*Barbara Osborne*
Barbara Osborne, J.D., M.S.

### APPENDIX A: DOCUMENTS RELIED UPON

**Pleadings/Court Documents:**
- Plaintiffs' Motion for Class Certification, ECF No. 209
- Declaration of Greg Sankey
- Declaration of Chad Hawley
- Declaration of George Kliavkoff
- Declaration of Kerry Kenny
- Declaration of Ben Tario
- Order Granting in Part and Denying in Part Defendants' Motion to Dismiss Counts I and III of Plaintiffs' Second Amended Complaint (ECF No. 49), *Fisk v. Bd. of Trs. of Cal. State Univ.*, No. 22-CV-173 TWR (MSB) (S.D. Cal. Apr. 12, 2023)

**Deposition Transcripts:**
- Deposition Transcript of Edwin Desser, Jan. 12, 2023
- Deposition Transcript of Tymir Oliver, Jan. 23, 2023
- Deposition Transcript of Daniel Rascher, Jan. 10, 2023

**Expert Reports:**
- Expert Report of Daniel A. Rascher, dated Oct. 21, 2022
- Expert Report of Edwin S. Desser, dated Oct. 21, 2022

**Congressional Materials/Regulations:**
- 34 C.F.R. § 106.4
- 34 C.F.R. § 106.8
- 34 C.F.R. § 106.21
- 34 C.F.R. § 106.31
- 34 C.F.R. § 106.32
- 34 C.F.R. § 106.37
- 34 C.F.R. § 106.40
- 34 C.F.R. § 106.41
- 34 C.F.R. § 106.51
- 45 C.F.R. § 86.41
- Pub. L. No. 93-380, 88 Stat. 484 (1974)
- Pub. L. No. 96-88, 93 Stat. 668 (1979)
- Pub. L. No. 100-259, 102 Stat. 28 (1988)
- Pub. L. No. 103-382, 108 Stat. 3518 (1994)
- 122 Cong. Rec. 28,136 (1976)
- S. 2106, 94th Cong., 1st Sess. (1975), 121 Cong. Rec. 22,775-22,778 (1975)
- Fair Play for Women Act, S. 5307; 117th Congress H.R. 9615 (2021-2022)
- S. Con. Res. 46 Summary, 94th Cong. (1975), www.congress.gov/bill/94th-congress/senate-concurrent-resolution/46
- S. Con. Res. 52, 94th Cong., 121 Cong. Rec. 22,940 (1975), /www.congress.gov/bill/94th-congress/senate-concurrent-resolution/52

- S. 535 Summary, 95th Cong., 1st Sess. (1977), www.congress.gov/bill/95th-congress/senate-bill/535
- S. 2106 Summary, 94th Cong. (1975), https://www.congress.gov/bill/94th-congress/senate-bill/2106
- S. 2146 Summary, 94th Cong. (1975), www.congress.gov/bill/94th-congress/senate-bill/2146
- H. Con. Res. 310 Summary, 94th Cong. (1975), www.congress.gov/bill/94th-congress/house-concurrent-resolution/310
- H. Con. Res. 311 Summary, 94th Cong. (1975), www.congress.gov/bill/94th-congress/house-concurrent-resolution/311
- H. Con. Res. 330 Summary, https://www.congress.gov/bill/94th-congress/house-concurrent-resolution/330
- H.R. 921 Summary, 103rd Cong. (1993), https://www.congress.gov/bill/103rd-congress/house-bill/921
- H.R. 8394 Summary, www.congress.gov/bill/94th-congress/house-bill/8394
- H.R. 8395 Summary, www.congress.gov/bill/94th-congress/house-bill/8395
- Prohibition of Sex Discrimination, 1975: Hearings Before the Subcomm. on Educ. of the Comm. on Labor & Public Welfare on S. 2016, 94th Cong. 46-47 (1975) (statement of Sen. Birch Bayh), https://files.eric.ed.gov/fulltext/ED136136.pdf
- Policy Interpretation, 44 Fed. Reg. 71,413-23 (1979), https://www2.ed.gov/about/offices/list/ocr/docs/t9interp.html

**Articles, Journals and Websites:**
- *AB Staff, Cutting Sports in the Context of Title IX, COVID-19*, Athletic Business (May 6, 2021), https://www.athleticbusiness.com/operations/legal/article/15161296/cutting-sports-in-the-context-of-title-ix-covid-19
- Andy Staples, Staples*: How would a school challenge a grant of rights? We asked a lawyer (who happens to have ACC, Big 12, Pac-12 copies)*, The Athletic (July 1, 2022), https://theathletic.com/3396108/2022/07/01/acc-grant-of-rights-staples/
- Elizabeth Aries et al*., A Comparison of Athletes and Non-Athletes at Highly Selective Colleges: Academic Performance and Personal Development*, 45 Research in Higher Education 577-602 (2004)
- Erianne A. Weight et al., *Quantifying the psychological benefits of intercollegiate athletics participation: Implications for higher education policy and practice*, 7 J. of Issues in Intercollegiate Athletics 390-409 (2014)
- Erianne Weight et al., *Occupational measures of former NCAA athletes and traditional students*, 19 Int'l J. of Sport Mgmt. 1-26 (2018)
- Ernest T. Pascarella & John C. Smart, *Impact of intercollegiate athletic participation for African American and Caucasian men: Some further evidence*, 32 J. of Coll. Student Dev. 123-130 (1991)
- Frank J. Ryan, *Participation in Intercollegiate Athletics: Affective Outcomes*, 30 J. of Coll. Student Dev. 122-128 (1989)
- Guy Lewis, *The Beginning of Organized Collegiate Sport*, 22 Am. Quarterly 222-229 (Summer 1970), https://history.msu.edu/hst329/files/2015/05/LewisGuy-TheBeginning.pdf

- James H. Brooks, *Measuring the Reach of Title IX: Defining Program and Recipient in Higher Education*, 17 Akron L. Rev. 335 (2015)
- James Shulman & William G. Bowen, *The Game of Life: College Sports and Educational Values* (Princeton University Press 2002)
- Jocelyn Samuels & Kristen Galles, *In Defense of Title IX: Why Current Policies Are Required to Ensure Equality of Opportunity*, 14 Marq. Sports L. Rev. 11 (2003)
- John Patrick Marsh, Jeffrey C. Petersen & Barbara Osborne, *Sport Discontinuation: An Assessment of Goal Achievement via Empirical Measures*, 2 J. of Amateur Sport, Special Issue: Political Economy (2016)
- Justin Whitaker, *Looking back at the first women's champions in NCAA history*, NCAA (Mar. 10, 2023), https://www.ncaa.org/news/2023/3/10/media-center-looking-back-at-the-first-womens-champions-in-ncaa-history.aspx
- Margaret Wood, *Happy Belated Birthday, Title IX*, Library of Congress, Blogs (Nov. 27, 2012), https://blogs.loc.gov/law/2012/11/happy-belated-birthday-title-ix
- Mark J. Drozdowski, *Do Colleges Make Money from Athletics?*, Best Colleges (updated Aug. 24, 2022), https://www.bestcolleges.com/news/analysis/2020/11/20/do-college-sports-make-money/
- Mary Robeson Plunkett et al., *The Value of Intercollegiate Athletics Participation from the Perspective of Former ACC Athletes*, 17 Int'l J. of Sport Mgmt. 1-12 (2016)
- Peter Chalfin, et al., *The Value of Intercollegiate Athletics Participation from the Perspective of Employers who Target Athletes*, 8 J. of Issues in Intercollegiate Athletics 1-27 (2015)
- T. Jesse Wilde, *Gender Equity in Athletics: Coming of Age in the 90's*, 4 Marq. Sports L. J. 217 (1994), http://scholarship.law.marquette.edu/sportslaw/vol4/iss2/3
- Alexander W. Astin, *What matters in college? Four critical years revisited* (Jossey-Bass 1997)
- Ronald A. Smith, *Pay for Play: A History of Big-Time College Athletic Reform*, Univ. of Ill. Press (2010)
- William G. Bowen & Sarah A. Levin, *Reclaiming the Game: College Sports and Educational Values* (Princeton University Press 2003)
- Atlantic Coast Conference Grant of Rights Agreement, https://cdn.theathletic.com/app/uploads/2022/07/01185531/ACC-Grant-of-Rights-1.pdf
- Big 12 Conference Amended and Restated Grant of Rights Agreement, https://cdn.theathletic.com/app/uploads/2022/07/01185303/Big-12-Grant-of-Rights-1.pdf
- *Equal Access to Education: Forty Years of Title IX*, U.S. Dept. of Justice (June 23, 2012), https://www.justice.gov/sites/default/files/crt/legacy/2012/06/20/titleixreport.pdf
- *Equity in Athletics Data Analysis Cutting Tool*, Office of Postsecondary Educ., https://ope.ed.gov/athletics/#/
- *History, The Living Law*, Title IX, http://www.titleix.info/history/the-living-law.aspx
- *Inclusion, Gender Equity and Title IX*, NCAA, https://www.ncaa.org/sports/2016/3/2/gender-equity-and-title-ix.aspx
- *Intercollegiate Athletics – Four-Year Colleges' Experiences Adding and Discontinuing Teams*, U.S. General Accounting Office, No. 01-297 (Mar. 2001), www.gao.gov/assets/gao-01-297.pdf

- *Legislative Path to Title IX. Title IX of the Education Amendments of 1972: Resources from the Law Library*, Library of Congress, https://guides.loc.gov/title-IX-law-library-resources/legislative-path
- NCAA, *Finances of Intercollegiate Athletics Database, Net Generated Revenue: 2012-2021*, https://www.ncaa.org/sports/2019/11/12/finances-of-intercollegiate-athletics-database.aspx
- *NCAA Sports Sponsorship and Participation Rates Report (1956-57 through 2020-21)* (Oct. 27, 2022), https://ncaaorg.s3.amazonaws.com/research/sportpart/2022RES_SportsSponsorshipParticipationRatesReport.pdf
- *Title IX and Sex Discrimination*, U.S. Dep't of Educ. (Aug. 2021), https://www2.ed.gov/about/offices/list/ocr/docs/tix_dis.html
- U.S. Dep't of Educ., 2023-24 Federal School Code List of Participating Schools, https://fsapartners.ed.gov/knowledge-center/library/federal-school-code-lists/2023-02-01/2023-24-federal-school-code-list-participating-schools-february-2023
- U.S. Dep't of Educ., *FACT SHEET: U.S. Department of Education's Proposed Change to its Title IX Regulations on Students' Eligibility for Athletic Teams* (Apr. 6, 2023), https://www.ed.gov/news/press-releases/fact-sheet-us-department-educations-proposed-change-its-title-ix-regulations-students-eligibility-athletic-teams
- U.S. Dep't of Educ., Off. for Civ. Rts., *Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test* (Jan. 16, 1996), http://www.ed.gov/about/offices/list/ocr/docs/clarific.html
- U.S. Dep't of Educ., Off. for Civ. Rts., *Further Clarification of Intercollegiate Athletics Policy Guidance Regarding Title IX Compliance* (July 11, 2003), https://www2.ed.gov/about/offices/list/ocr/title9guidanceFinal.html
- John E. Palomino*, Letter to Jurupa Unified Sch. Dist.*, OCR File No. 09-91-1222, U.S. Dep't of Educ., Off. for Civ. Rts. (Feb. 7, 1995), https://www2.ed.gov/about/offices/list/ocr/letters/jurupa.html
- Adele Rapport, *Letter to Indianapolis Public Schools*, U.S. Dep't of Educ., Off. for Civ. Rts (Feb. 26, 2014), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/05105002-a.pdf
- Peter E. Holmes*, Letter to Chief State School Officers, Title IX Obligations in Athletics*, U.S. Dep't of Educ., Off. for Civ. Rts. (Nov. 11, 1975), https://www2.ed.gov/about/offices/list/ocr/docs/holmes.html
- *Dear Colleague Letter: Bowling Green State University*, U.S. Dep't of Educ., Off. for Civ. Rts. (July 23, 1998), https://www2.ed.gov/about/offices/list/ocr/docs/bowlgrn.html

## Conference Handbooks, Bylaws & Constitutions

- 2022-23 NCAA Division I Manual,  NCAAHOUSE00249835-50299
- ACC 2020-21 Manual, ACC-HOUSE0000582-744
- Big 12 Conference 2020-21 Handbook, BIG12_HOUSE00000470-539
- Big 12 Conference 2022-23 Handbook, NCAAHOUSE00250300-352
- Big Ten Conference Handbook 2020-2021, BIGTEN-NIL_00036257-386
- Big Ten Conference Handbook 2021-2022, BIGTEN-NIL_00256617-749
- Pac-12 2021-22 Handbook, NCAAHOUSE00250353-591

- SEC Constitution and Bylaws 2022-2023, NCAAHOUSE00249782-834

APPENDIX B: PLAINTIFFS' "BUT FOR WORLD" TOTAL BROADCAST PAYMENTS

| TOTAL BUT FOR WORLD PAYMENTS | | |
|---|---|---|
| **Football and Men's Basketball Class** | $ | Redacted - Counsel Only |
| Video Game | $ | |
| Broadcast | $ | 1,320,300,000.00[186] |
| Other Lost NIL | $ | 21,200,000.00[187] |
| | | |
| **Women's Basketball Class*** | **$** | **50,900,000.00** |
| Broadcast | $ | 49,800,000.00[188] |
| Other Lost NIL | $ | 1,100,000.00[189] |
| | | |
| **Additional Sports Class** | $ | Redacted - Counsel Only |
| Video Game | $ | |
| Other Lost NIL | $ | 10,700,000.00[191] |
| | | |
| **TOTAL BUT FOR WORLD PAYMENTS** | $ | Redacted - Counsel Only |
| **Payment Percentage to Football and Men's Basketball Class** | | **96%** |

\* Rascher apparently miscalculated women's basketball at $50.1M

| TOTAL BUT FOR WORLD BROADCAST PAYMENTS | |
|---|---|
| **Football and Men's Basketball Class Broadcast Payments** | **$** **1,320,300,000.00**[192] |
| **Women's Basketball Class Broadcast Payments** | **$** **49,800,000.00**[193] |
| | |
| **TOTAL BUT FOR WORLD BROADCAST PAYMENTS** | **$** **1,370,100,000.00** |
| | |
| **Broadcast Percentage to Football and Men's Basketball Class** | **96%** |

---

[185] Rascher Rep., pp. 72-73, Exs. 3 and 4.

[186] *Id.*, p. 92, Ex. 10.

[187] *Id.*, p. 104, Ex. 14

[188] *Id.*, p. 92, Ex. 10.

[189] *Id.*, p. 104, Ex. 14.

[190] *Id.* ¶ 11(e).

[191] *Id.*, p. 104, Ex. 14.

[192] *Id.*, p. 92, Ex. 10.

[193] *Id.*, p. 92, Ex. 10.

**APPENDIX C: TOTAL CLASS MEMBERS PER SPORT PER YEAR**

| | Total Class Members per Sport | | | Total Class Members per Year | Percentage Male S-As | Percentage Female S-As |
|---|---|---|---|---|---|---|
| Year | Men's Football[194] | Men's Basketball[195] | Women's Basketball[196] | | | |
| **2016** | 5338 | 764 | 840 | 6942 | **87.90%** | **12.10%** |
| **2017** | 5312 | 778 | 853 | 6943 | **87.71%** | **12.29%** |
| **2018** | 5357 | 803 | 849 | 7009 | **87.89%** | **12.11%** |
| **2019** | 5396 | 789 | 839 | 7024 | **88.06%** | **11.94%** |
| **2020** | 5410 | 803 | 856 | 7069 | **87.89%** | **12.11%** |
| **2021** | 5477 | 791 | 855 | 7123 | **88.00%** | **12.00%** |
| **Average** | **5382** | **788** | **849** | **7018** | **87.91%** | **12.09%** |

---

[194] Rascher Rep., p. 93, Ex. 11.
[195] *Id.*
[196] *Id.*

## APPENDIX D: RELEVANT CONFERENCE BYLAW CITATIONS

The following principles and corresponding Conference bylaw citations are relevant to the Title IX analysis of Plaintiffs' Broadcast Model:

The Conferences are made up of their member institutions, with at least one representative from each institution on the boards of directors.

- o **Big 12**: Each member institution has one representative on the Board of Directors, which is the "most senior campus executive officer" and explains the "special relationship of the Directors to the Members."[197]

- o **ACC**: "The Board shall be composed of a representative of each Member[.]"[198]

- o **Big Ten**: "The Council consists of the chancellor or president of each member university[.]"[199]

- o **Pac-12**: "Each member of the Conference shall have one representative on the Board which shall be the President of the member ("Chief Executive Officer"), except as to the University of California, Berkeley; the University of California, Los Angeles; and the University of Colorado, Boulder, the respective Chancellor shall be considered the Chief Executive Officer."[200]

- o **SEC**: "The President or Chancellor of each member shall be a Chief Executive Officer of the Conference. Accordingly, there shall be one Chief Executive Officer for each member."[201]

Each Conference's member institutions grant or transfer the rights to negotiate, enter into, and receive payments related to broadcast deals to the Conference.[202]

---

[197] Big 12 Conference 2022-23 Handbook, Bylaws § 1.5.3, pp. 5–6, and Rules p. 22 (NCAAHOUSE00250310-11, NCAAHOUSE00250327).

[198] ACC 2020-21 Manual, Constitution § 1.5.1.2, p. 13 (ACC-HOUSE0000594).

[199] Big Ten Conference Handbook 2021-2022, Rule 4.1.1, p. 27 (BIGTEN-NIL_00256648).

[200] Pac-12 2021-22 Handbook, Constitution and Bylaws, ch. 5, § 2, p. 11 (NCAAHOUSE00250363).

[201] SEC Constitution and Bylaws 2022-2023, Constitution § 4.1.1, p. 5 (NCAAHOUSE00249794).

[202] The Big 12 and the ACC have separate contracts signed by the members granting the rights rather than granting the rights through the Bylaws. These contracts were made public in an article published by The Athletic. Andy Staples, *Staples: How would a school challenge a grant of rights? We asked a lawyer (who happens to have ACC, Big 12, Pac-12 copies)*, The Athletic (July 1, 2022), https://theathletic.com/3396108/2022/07/01/acc-grant-of-rights-

o **ACC**: "The Members have granted to the Conference the right to exploit certain media and related rights of the Members (such rights, the 'Media Rights'; and the agreement pursuant to which the Members granted such rights, the 'Grant of Rights')."[203]  "Unless otherwise determined by the Board, all revenues from the sale, licensing, distribution and other exploitation of the Media Rights shall be deposited with the Conference."[204]  "The Commissioner shall negotiate all contracts and agreements for the sale, licensing, distribution and other exploitation of the Media Rights on behalf of the Conference . . . provided that any Material Media Rights Agreement shall require the approval of two-thirds (2/3) of the Directors and all other Media Rights agreements shall be subject to approval by the Executive Committee."[205]  "Notwithstanding Section 2.10.3, but only to the extent permitted by the Conference's Media Rights agreements, each Member shall retain such rights that are expressly retained by the Members under the Grant of Rights and any other rights that the Board may from time to time determine may be exploited by the Members."[206]  "Unless otherwise determined by the Board, all revenues derived from the exploitation by any Member of its football games and basketball games that are not included in or selected for distribution as part of any Conference Media Rights agreement . . . shall be deposited with the Conference."[207] Note that the University of Notre Dame retains "all media and broadcast rights and revenues associated with its football and ice hockey teams, including rights and revenues related to its participation in Postseason Football Games."[208]

o **Pac-12**: "Effective July 1, 2012, each member hereby transfers and assigns to the Conference any and all of its rights to the commercial exploitation of all audio and all video transmission or dissemination by any and all means (including without limitation internet transmission or dissemination), now known or hereafter existing,

---

staples/.  The SEC's member schools also convey their rights through member and letter agreements with the Conference. These member agreements are not publicly available.

[203] ACC 2020-21 Manual, Bylaws § 2.10.1, p. 40 (ACC-HOUSE0000621).

[204] *Id.* § 2.10.2, p. 40 (ACC-HOUSE0000621).

[205] *Id.* § 2.10.3, p. 41 (ACC-HOUSE0000622).

[206] *Id.* § 2.10.5, p. 41 (ACC-HOUSE0000622).

[207] *Id.* § 2.10.6, p. 41 (ACC-HOUSE0000622).

[208] *Id.* § 2.12.b, p. 45 (ACC-HOUSE0000626).

of all member competitions for all Conference sanctioned sports involving member teams as to all intra-Conference events and those inter-Conference events where the participating member controls audio and video rights."[209]

o **SEC**: The SEC's member schools transfer their rights through separate agreements with the Conference. The Conference's bylaws also state that "[e]ach member shall include provisions in each of its television, media, internet and digital rights agreements specifying that the member's agreements are subject and subordinate to all past, present, and future television, media, internet and digital rights agreements to which the Conference is or becomes a party, and further specifying that if any provision in the member's agreement is inconsistent or conflicts with any Conference agreement, the Conference agreement shall supersede the provision in the member's agreement, such that the superseded provision shall be of no effect to the extent of any such inconsistency or conflict."[210] The Bylaws also state that members "must fully conform to and comply with all current broadcast guidelines and broadcast agreements of the Conference."[211]

o **Big Ten**: The Big Ten's member institutions assign their telecast and related rights to the Big Ten Conference, which has the sole authority to package those rights together for purposes of negotiating and entering broadcast rights agreements with media rights partners on behalf of the Conference as a whole.[212]

The Conferences' use and distribution of revenue from broadcast deals is established by the bylaws. In general, the Conferences must disburse the funds to their member institutions, with limited exceptions for Conference operating expenses, reserve funds, and other uses authorized by the member schools through the Conferences' bylaws.[213] There are also limited exceptions to the requirement to disburse broadcast revenue to member schools based on misconduct, sanctions, withdrawal, and the like.

---

[209] Pac-12 2021-22 Handbook, Constitution and Bylaws, ch. 3, § 2, p. 9 (NCAAHOUSE00250361).

[210] SEC Constitution and Bylaws 2022-2023, Bylaws § 22.1.1, p. 31 (NCAAHOUSE00249820).

[211] *Id.*

[212] *See* Declaration of Kerry Kenny ¶ 8.

[213] There are sometimes reserves set and money is withheld from a member (e.g., Baylor Investigation/Withdrawal or Buyout Amount). But this is also pursuant to the bylaws and cannot change without board approval.

o **ACC**: The Conference should pay its reserves and then divide the net revenue equally.[214]  Reserves are established by the Conference's Board.[215]  Receipts from the NCAA Men's Basketball Championship are also divided equally among all member schools after making certain payments (for participation cost reimbursement) to the member schools that participate in the Tournament.[216]  Receipts from the NCAA Women's Basketball Championship and any NIT tournaments are distributed to participating teams only.[217]  The Conference shares all bowl revenues (including CFP revenues) equally among members, with participating member schools receiving an expense allotment.[218]  Revenues derived from the ACC-ESPN agreement are also divided equally among member schools.[219]  The University of Notre Dame is excluded from the distribution of Conference revenues attributable to football media or broadcast rights.[220]  Member institutions that are sanctioned may be prohibited from sharing in the distribution of Conference funds under certain circumstances.[221]

o **Big 12**: The Conference must first use revenue to pay for "the operating and other expenses incurred or fund reserves established by the Board of Directors of the Conference[.]"  The remaining net distributable revenues must be used to pay member subsidies and member-designated revenues, and then the revenue must be equally distributed among the members.[222]  The Board of Directors has the authority to establish reserves for the Conference and to fund those reserves from Conference revenues, and the Board must approve the distribution of all revenues, assets, and reserves.[223]  There is an exception to distributions for withdrawing members, who are deemed to agree to forfeit all distributions they were otherwise

---

[214] ACC 2020-21 Manual, Bylaws § 2.5.2, p. 34 (ACC-HOUSE0000615).

[215] *Id.* § 2.5.3, p. 34 (ACC-HOUSE0000615).

[216] *Id.* § 2.5.7, p. 35 (ACC-HOUSE0000616).

[217] *Id.* § 2.5.8, p. 35 (ACC-HOUSE0000616); *id.* § 2.5.9, p. 35 (ACC-HOUSE0000616).

[218] *Id.* § 2.5.10, pp. 35-36 (ACC-HOUSE0000616-17).

[219] *Id.* § 2.10.9, p. 41 (ACC-HOUSE0000622).

[220] *Id.* § 2.12.e, p. 46 (ACC-HOUSE0000627).

[221] *Id.*, App'x 2-5, p. 58 (ACC-HOUSE0000639).

[222] Big 12 Conference 2022-23 Handbook, Bylaws § 2.3, pp. 15–16 (NCAAHOUSE00250320-21).

[223] *Id.* § 2.5, p. 16 (NCAAHOUSE00250321).

owed under the Bylaws.[224]   There is also an exception for member institutions sanctioned by the Conference with restrictions on revenue distributions.[225] Separately, member institutions that televise football games outside of the Conference's Media Rights Agreement have their distribution amounts reduced as set forth in the Bylaws.[226]

o **Big Ten**: The Conference must divide equally the net receipts from television revenue, football and basketball gate receipts, bowl payouts, receipts from men's basketball conference tournament, and receipts from the football championship game, with participating teams receiving authorized "participating team shares."[227] Member institutions that are sanctioned may be prohibited from sharing in the distribution of Conference income from television and bowl games under certain circumstances.[228]

o **Pac-12**: "All media rights net revenue generated by the Conference shall be distributed equally among all members."[229]   Additionally, "[t]he Conference shall retain all revenues generated by the Conference Football Championship Game and related activities and shall distribute all net revenues equally among the member institutions after payment of game-related expenses."[230]   The Conference also retains "all revenue generated through bowl games," provides expense allowances for participants, and "distribute[s] the remaining revenue equally among the members."[231]   Gross revenues from the Conference men's and women's basketball tournaments, minus approved expenses for participants in the tournaments, "shall be distributed by the Conference office equally to the Conference's member institutions."[232]

---

[224] *Id.* § 3.4 p. 18 (NCAAHOUSE00250323).

[225] *Id.* § 3.6 p. 19 (NCAAHOUSE00250324).

[226] *Id.* § 2.4 p. 16 (NCAAHOUSE00250321).

[227] Big Ten Conference Handbook 2021-2022, pp. 106–07, 110–11; *id.*, Agreements 18.7 and 31, pp. 99-111 (BIGTEN-NIL_00256720-32).

[228] *Id.*, Rule 19.5, pp. 64-65 (BIGTEN-NIL_00256685-86).

[229] Pac-12 2021-22 Handbook, Executive Regulations, ch. 1, § 1, p. 22 (NCAAHOUSE00250374).

[230] *Id.*, ch. 1, § 2, p. 22 (NCAAHOUSE00250374).

[231] *Id.*, ch. 1, § 3, p. 22 (NCAAHOUSE00250374).

[232] *Id.*, ch. 1, § 5, p. 25 (NCAAHOUSE00250377).

     o  **SEC**: Before any Conference revenues are distributed, the Conference must make provision for payment of any outstanding debts. "The Conference shall make provision for such debt service amounts first from the revenues received by the Conference under its media agreements (allocated among the media agreements and sports as determined by the Commissioner), and if the revenues from the media agreements are not sufficient, from other revenues of the Conference determined by the Commissioner."[233] The Bylaws provide clear instructions for evenly dividing revenue generated through basketball, football, and baseball among the member institutions and the Conference after making payments to specific members (who have incurred individual member expenses associated with generating the revenue) from each source of revenue.[234] Revenue from all other sports is distributed in equal shares to the Conference office and to those "institutions which sponsor teams in th[e] particular sport" with which the net revenues are associated.[235] There are exceptions to member distributions for withdrawing members, who must pay an established fee for withdrawal.[236] There are also exceptions to distributions for member institutions prohibited from participating in postseason men's basketball and football events that generate revenues for the Conference.[237] The Chief Executive Officers of the Conference have the authority to prohibit any member institution from participating in the distribution of Conference funds, as set forth in the Constitution.[238]

The Conferences require that their directors (representatives of the member schools) vote on amendments to the bylaws governing distributions of Conference funds to the member institutions.

     o  **ACC**: Certain matters (including amendment to Article 2.5 of the Bylaws (finances) and entering into or amending Material Media Rights Agreements) require the vote of "two-thirds (2/3) of all the Directors of the Board, even if one

---

[233] SEC Constitution and Bylaws 2022-2023, Bylaws § 31.10.1, p. 36 (NCAAHOUSE00249825).

[234] *Id.* §§ 31.20 (basketball), 31.21 (football), 31.22 (baseball), pp. 36–38 (NCAAHOUSE00249825-27).

[235] *Id.* § 31.23.1 (all other sports), p. 38 (NCAAHOUSE00249827).

[236] *Id.*, Constitution §§ 3.1, 3.2, pp. 3–4 (NCAAHOUSE00249792-93).

[237] *Id.*, Bylaws § 31.26, pp. 38-39 (NCAAHOUSE00249827-28).

[238] *Id.*, Constitution § 4.1.2, p. 5 (NCAAHOUSE00249794).

or more of such Directors is not present for such vote[.]"[239]   Certain matters (including admission of new members; expulsion, suspension or probation of members; amendments to Constitution; amendments to Bylaws other than Section 2.5 (Finances)) require the vote of "three-fourths (3/4) of all the Directors of the Board, even if one or more of such Directors is not present for such vote[.]"[240]

o **Big 12**:  Certain actions, including "[a]mendments and modifications to the role and authority of the Board of Directors and the Advisory Committees" and "[a]pproval or modification of: (i) Section 2 . . . or any other policies and procedures relating to the revenue distribution to the Members; and (ii) the establishment and funding of, terms or, maintenance of, and release or dissolution of, any reserves funded with Conference assets or revenues pursuant to Section 2.5," require a supermajority vote of the Directors.[241]  The Conference Bylaws "may be altered, amended or repealed and new Bylaws may be approved by the Board of Directors at any Annual Meeting, Regular Meeting or Special Meeting called for that purpose only by the affirmative vote of seventy-five percent (75%) or more [of] the Disinterested Directors Entitled to Vote on such issue, except for the provisions of Section 1.5.2 above and bylaws relating to matters for which a greater affirmative vote is required pursuant to Section 1.5.2, which may be amended only by the affirmative vote of the number of Directors that would be required to take the action provided for in such bylaw."[242]

o **Big Ten**:  Amending or repealing any Conference Bylaws can occur "only upon the vote of not less than sixty percent (60%) of the entire Council."[243]

o **Pac-12**: "A vote of at least three-fourths vote of the entire Board shall be required to amend the Constitution and Bylaws and Executive Regulations 1 through 7. A vote of at least two-thirds of the entire Board shall be required to amend Executive Regulations 8 and 9."[244]  "Amendment to this Constitution and Bylaws shall be

---

[239] ACC 2020-21 Manual, Constitution § 1.6.2, pp. 21–22 (ACC-HOUSE0000602-03).

[240] *Id*.

[241] Big 12 Conference 2022-23 Handbook, Bylaws § 1.5.2, pp. 3–5 (NCAAHOUSE00250308-10).

[242] *Id.* § 1.10, pp. 13–14 (NCAAHOUSE00250318-19).

[243] Big Ten Conference Handbook 2021-22, Rule 4.1.3, pp. 27-29 (BIGTEN-NIL_00256648-50).

[244] Pac-12 2021-22 Handbook, Constitution and Bylaws, ch. 7, § 4, p. 14 (NCAAHOUSE00250366).

approved by three-fourths vote of the entire Board. Proposals for amendments may be made by the Board, the Commissioner or the Council. All proposed amendments must be presented to the Board in writing."[245] "Amendments to [Executive Regulation 1 regarding financial distributions] shall be approved by three-fourths vote of the entire Board. Proposals for amendments may be made by the Board, the Commissioner, or the Council. All proposed amendments must be presented to the Board in writing."[246]

o **SEC**: "Provisions in the manual, which require a two-thirds vote for amendment and a unanimous vote for suspension, are called dominant provisions and are denoted in the margin by an asterisk (*). All others require a majority vote for amendment and a two-thirds vote for suspension."[247] "An amendment (or amendment to amendment) of a dominant provision (denoted by an asterisk in the margin of the provision) requires a two-thirds vote of all of the members of the Conference in good standing, whether all of the members of the Conference are present at or participating in the meeting or not. All other amendments require a vote of a majority of all the members of the Conference in good standing, whether all the members of the Conference are present at or participating in the meeting or not."[248] Sections 3.1.6 (Effect of Withdrawal from or Termination of Membership), 3.2.4 (Reduction of Distributions to Withdrawing Member), 22.1 (Media and Related Agreements) and 31.10 (Payment of Debt Service) to the Bylaws require a two-thirds vote for amendment.[249] Sections 31.20 (Revenue Distribution – Basketball), 31.21 (Revenue Distribution – Football), 31.22 (Revenue Distribution – Baseball), and 31.23 (Revenue Distribution – All Other Sports) require a majority vote for amendment.[250]

---

[245] *Id.*, ch. 13, § 1, p. 20 (NCAAHOUSE00250372).

[246] *Id.*, Executive Regulations, ch. 1, § 10, p. 26 (NCAAHOUSE00250378).

[247] SEC Constitution and Bylaws 2022-2023, Foreword (NCAAHOUSE00249784).

[248] *Id.*, Constitution § 5.3.1.3, p. 9 (NCAAHOUSE00249798).

[249] *Id.*, Constitution § 3.1.6, p. 3, § 3.2.4, p. 4 (NCAAHOUSE00249793); *id.*, Bylaws § 22.1.1, p. 31 (NCAAHOUSE00249820); *id.* § 31.10.1, p. 36 (NCAAHOUSE00249825).

[250] *Id.*, Bylaws §§ 31.20 (basketball), 31.21 (football), 31.22 (baseball), 31.23 (other sports), pp. 36-38 (NCAAHOUSE00249825-27).

The funds the Conferences would be distributing to student-athletes are technically funds belonging to the member schools, implicating Title IX.

- o **ACC**: "[A]ll of the powers of the Conference shall be . . . managed by or under the direction, and subject to the oversight, of the Board in accordance with th[e] Constitution and the Bylaws. . . . [T]he Board shall have the right to take any action or any vote on behalf of the Conference, and each Director shall have the right to take any action or any vote on behalf of the Member it represents, even if such right could be taken or exercised by another committee or person if the Board or such Director did not choose to exercise such right."[251] "The Board shall be composed of a representative of each Member (each a '<u>Director</u>'), provided that each Director must be the most senior executive officer of such Member, whether such position is characterized as president, chancellor, chief executive officer or otherwise."[252] "Each Director shall be entitled to one vote each. . . . [I]f a quorum is present when a vote of the Directors is taken, the affirmative vote of a majority of all Directors present for such vote shall be an act of the Board."[253] The Conference's Board controls the participation of any new members in the distribution of Conference revenues.[254] The Board considers and approves the Conference's operating budget and must approve any changes to the approved budget.[255]

- o **Big 12**: The Conference's members are its member institutions.[256] The Chief Executive Officer of each member institution is automatically appointed as a Director on the Conference's Board of Directors, and each member institution receives distributions of Conference revenue as provided by the bylaws and rules.[257] The Director for each member institution must "be the most senior campus executive officer (President or Chancellor)" of each member institution.[258] "[A]ll

---

[251] ACC 2020-21 Manual, Constitution § 1.5.1.1, pp. 12-13 (ACC-HOUSE0000593-94).

[252] *Id.*, Constitution. § 1.5.1.2, p. 13 (ACC-HOUSE0000594).

[253] *Id.*, Constitution § 1.6.2, pp. 21-22 (ACC-HOUSE0000602-03).

[254] *Id.*, Constitution § 1.4.3, p. 11 (ACC-HOUSE0000592).

[255] *Id.*, Bylaws § 2.5.1.2, p. 34 (ACC-HOUSE0000615).

[256] Big 12 Conference 2022-23 Handbook, Bylaws § 1.2.2, p. 1 (NCAAHOUSE00250306).

[257] *Id.* § 1.4.1, p. 3 (NCAAHOUSE00250308).

[258] *Id.* § 1.5.3, pp. 5-6 (NCAAHOUSE00250310-11); Rules § 5.1, p. 22 (NCAAHOUSE00250327); § 5.2, p. 24 (NCAAHOUSE00250329).

corporate powers shall be exercised by or under the authority of, and the business and affairs of the Conference shall be managed by the Board of Directors in accordance with the[ ] Bylaws."[259]  The Board may take action by unanimous written consent of all disinterested directors or the affirmative vote of a majority of disinterested directors entitled to vote who are present at a duly called meeting at which a quorum is present.[260]  The vote of a majority of disinterested directors is required for numerous actions, including the "[a]pproval of any contract of the Conference that can be expected to involve more than ten percent (10%) of the income or expenditures of the Conference for a fiscal year" and "[a]pproval of the operating budget of the Conference for each fiscal year[.]"[261]  The vote of a supermajority of disinterested directors is required for some actions, including "[a]mendments or modifications to the role and authority of the Board of Directors and the Advisory Committees[.]"[262]  The Board authorizes officers and agents to enter contracts in the name of and on behalf of the Conference.[263]  "All checks, drafts and other orders for payment of money, notes or other evidences of indebtedness issued in the name of the Conference, shall be signed by such Officer or Officers, agent or agents of the Conference and in such manner as shall from time to time be determined by the Board of Directors."[264]  The Board also approves the Conference operating budget, "including the amount of revenue to be distributed.  Distribution of revenue in excess of the annual budgeted distributable net revenue from additional sources (e.g., second BCS bowl appearance) shall be determined by the Board of Directors[.]"[265]

- o **Big Ten**: "[T]he ultimate authority and responsibility in Big Ten Conference governance is vested in the Council of Presidents/Chancellors.  All policy will be decided at the Council of Presidents/Chancellors level.  This includes the annual budget for the Conference office and all other Conference financial matters

---

[259] Big 12 Conference 2022-23 Handbook, Bylaws § 1.5.1, p. 3 (NCAAHOUSE00250308).

[260] *Id.* § 1.5.1.1, p. 3 (NCAAHOUSE00250308).

[261] *Id.* § 1.5.2, pp. 3-4 (NCAAHOUSE00250308-09).

[262] *Id.*

[263] *Id.* § 1.8.1, p. 13 (NCAAHOUSE00250318).

[264] *Id.*

[265] *Id.* § 2.1, p. 15 (NCAAHOUSE00250320).

including budgetary guidelines that may be promulgated for campus athletics programs."[266]  Similarly, "[t]he Conference is governed by the Board of Directors (also known as the Council of Presidents/Chancellors, hereafter referred to as the Council), subject to its Certificate of Incorporation, its Bylaws and this Handbook. It is fundamental that the ultimate authority in the Conference resides in the Council.  The affairs and business of the Conference are managed and conducted by its Council, unless the Council properly delegates any such affairs and business to others."[267]  "The Council consists of the chancellor or president of each member university, constituted for the purposes set forth in the Certificate of Incorporation and the Bylaws."[268]  The Council has control over policy matters including preparing and approving the Conference budget and all other financial matters; enforcing any Conference rules, agreements, or bylaws that would reduce the revenue received by any member; enter into contracts involving telecast rights agreements for football and basketball, football bowl contracts, or any other contracts requiring the Conference to spend more than $1 million; amending or repealing any bylaws; amending or deferring publication of the Conference Handbook.[269]

o   **Pac-12**: The Conference's members are its member schools.[270]  "[T]he business and affairs of the Conference shall be managed by or under the direction of the Board.  The Board shall be the governing body of the Conference."[271]  "Each member of the Conference shall have one representative on the Board which shall be the President [or Chancellor] of the member."[272]  "Except as otherwise provided by law or in this Constitution and Bylaws, the act of the Board, the Council or committee . . . by vote of a majority of the members present at the time of the vote,

---

[266] Big Ten Conference Handbook, 2021-22, Delegation and Communications Guidelines, p. 19 (BIGTEN-NIL00036280).

[267] *Id.*, Rule 1.3, p. 24 (BIGTEN-NIL_00036285).

[268] *Id.*, Rule 4.1.1, p. 27 (BIGTEN-NIL_00036288).

[269] *Id.*, Rule 4.1.3, pp. 27-29 (BIGTEN-NIL_00036288-90).

[270] Pac-12 2021-22 Handbook, Constitution and Bylaws, ch. 2, § 1, p. 7 (NCAAHOUSE00250359).

[271] *Id.*, ch. 5, § 1, p. 11 (NCAAHOUSE00250363).

[272] *Id.*, ch. 5, § 2, p. 11 (NCAAHOUSE00250363).

if a quorum is present at such time."[273]   The Board approves the annual budget for the Conference.[274]

- o **SEC**: "The President or Chancellor of each member shall be a Chief Executive Officer of the Conference. Accordingly, there shall be one Chief Executive Officer for each member."[275]  "The Chief Executive Officers shall have plenary power and authority with respect to all affairs of the Conference of any type or nature whatsoever, subject only to any specific provisions and restrictions imposed by the Constitution and Bylaws," including prohibiting any member institution from participating in the distribution of Conference funds.[276]   Member school representatives on the Executive Committee approve the Conference's annual operating budget and oversees all "financial and fiscal affairs of the Conference[.]"[277]  Member schools are entitled to vote at Conference meetings, unless the member is not in good standing.[278]  "A vote of a majority of the members present and voting at a duly convened meeting at which a quorum is present shall constitute action of the Conference unless a supermajority vote is otherwise required by the Constitution or Bylaws. . . . The vote of each member shall be cast by the [CEO] who is the President or Chancellor of the member; provided, however, that a [CEO] may designate another representative of the member to attend . . . and vote[.]"[279]  Certain votes require a supermajority of members entitled to vote.[280]

---

[273] *Id.*, ch. 7, § 1, p. 14 (NCAAHOUSE00250366).

[274] *Id.*, ch. 12, § 1, p. 20 (NCAAHOUSE00250372).

[275] SEC Constitution and Bylaws, 2022-2023, Bylaws § 4.1.1, p. 5 (NCAAHOUSE00249794).

[276] *Id.* § 4.1.2, p. 5 (NCAAHOUSE00249794).

[277] *Id.* § 4.3.1.1(f), p. 6; § 4.4.2(f), p. 7 (NCAAHOUSE00249795-96).

[278] *Id.* § 5.1.1, p. 8 (NCAAHOUSE00249797).

[279] *Id.*

[280] *Id.*, Foreword and Bylaws § 5.3.1.3, p. 9 (NCAAHOUSE00249784, NCAAHOUSE00249798).

**APPENDIX E: BROAD-BASED SPORT OPPORTUNITIES FOR THE BENEFIT OF ALL STUDENT-ATHLETES FROM THE BEGINNING OF COLLEGE ATHLETICS**

While college students were playing a variety of games on college campuses in the 1840's, college sport did not become popular until schools began to organize and compete against one another.[281] The very first intercollegiate competition was a regatta between Harvard and Yale in 1852. As schools began to schedule competition in a variety of sports, the Intercollegiate Association of Amateur Athletes of America ("IAAAA") was created in 1875 to create uniform rules and championships. Track and field was the first IAAAA national championship in 1876; the Intercollegiate Football Association was created that same year. While baseball was already popular on campuses in the 1850s, the Intercollegiate Baseball League was not created until 1879. Sport participation led the transition from colleges being places where students focused only on their academic and moral development to institutions that embraced physical prowess for the benefit of the participants but also for the contribution to student life.[282]

The NCAA was formed in December 1905 as colleges debated whether to reform or abolish football.[283] For the first half of the twentieth century, the NCAA was primarily an opportunity for faculty athletics representatives to debate the appropriate role of athletics within the academy.[284] Broad-based participation was generally favored for the positive impact on participants, the campus community, and alumni engagement.

---

[281] Guy Lewis, *The Beginning of Organized Collegiate Sport*, 22 Am. Quarterly 222-229 (Summer 1970), https://history.msu.edu/hst329/files/2015/05/LewisGuy-TheBeginning.pdf.
[282] *Id*. at 229 ("[T]he outcome of events was considered 'sacredly connected with the glory of Alma Mater herself.'").
[283] Ronald A. Smith, *Pay for Play: A History of Big-Time College Athletic Reform*, Univ. of Ill. Press (2010), pp. 48-50.
[284] *Id*.

The NCAA began tracking sport participation in the 1956-57 academic year in five-year intervals.[285]

Men's participation in 1957 was 105,613.  The first female participants were counted in the 1966-67 academic year; that year there were 15,182 women and 151,918 men participating in college athletics.  Women's athletics continued to grow, initially as club sport programs and then as full varsity programs though membership in the Association of Intercollegiate Athletics for Women ("AIAW").[286]  The NCAA added women's championships beginning in the 1981-82 academic year.[287]  Table 1 shows the number of male and female participants in that year, and in the last year recorded, 2020-2021.

Table 1.  NCAA Men's and Women's Participation

| 1981-1982 | 169,800 men | 75,491 Men Division I | 23 sports |
| | 74,239 women | 31,686 Women Division I | 23 sports |
| 2020-2021 | 275,769 men | 98,198 Men Division I | 19 Championship sports |
| | 215,486 women | 86,024 Women Division I | 21 Championship sports |

NCAA Sports Sponsorship and Participation Rates Report (1956-57 through 2020-21), pp. 7-8, 85-86.

---

[285] *NCAA Sports Sponsorship and Participation Rates Report (1956-57 through 2020-21)*, https://ncaaorg.s3.amazonaws.com/research/sportpart/2022RES_SportsSponsorshipParticipationRatesReport.pdf.

[286] Ronald A. Smith, *Pay for Play: A History of Big-Time College Athletic Reform*, Univ. of Ill. Press (2011), pp. 144-149.

[287] Justin Whitaker, *Looking back at the first women's champions in NCAA history*, NCAA (Mar. 10, 2023), https://www.ncaa.org/news/2023/3/10/media-center-looking-back-at-the-first-womens-champions-in-ncaa-history.aspx.

**APPENDIX F**: **A CHRONOLOGICAL NARRATIVE FOR THE HISTORY OF TITLE IX**

The purpose of this appendix is to provide a more complete narrative of the history and development of Title IX as relevant for a better understanding of the application of the principles addressed in the expert report.

## A.   The Need for Title IX

Title IX of the Education Amendments of 1972 was signed into law on June 23, 1972.  The legislation states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]"[288]

Title IX was necessary because of significant educational inequalities for girls and women prior to its enactment.[289]  Girls had limited access to various academic courses, such as higher level math and science courses as well as vocational track classes such as wood shop, auto mechanics, or metal shop.  At the college and university level, many institutions were male-only and others set small quotas for allowing women's admission, and required those women to be exceptional, with higher grades and test scores.  For those women admitted to a co-educational institution, scholarships were limited as well as curricular options.  Women were directed toward teacher education programs and sometimes prohibited from professional schools such as engineering, medicine, and law.  Boys and men were also gender stereotyped in their academic choices as boys were not allowed to take home economics classes and men were typically prohibited from nursing schools.[290]

---

[288] 20 U.S.C. § 1681.

[289] *Equal Access to Education:  Forty Years of Title IX*, U.S. Dept. of Justice (June 23, 2012), https://www.justice.gov/sites/default/files/crt/legacy/2012/06/20/titleixreport.pdf.

[290] *Id*., p. 2 n.7.

Backed up by volumes of data identifying and analyzing the gender-based inequities, Congresswoman Edith Green, who was chair of the House Education Committee, and Congresswoman Patsy Mink quietly shepherded Title IX through the House as an amendment to the broader Education Act.  Senator Birch Bayh wrote the final version and brought it to the Senate.[291]

Even before the statute was enacted, athletics leaders were concerned that teams would be required to be co-ed (117 Cong. Rec. 30,406-407, 1971).  Once Title IX was signed into law, Senator John G. Tower of Texas and four other senators proposed an amendment exempting revenue producing sports from Title IX:

> Provides that title IX of the Education Amendments of 1972, relating to discrimination, shall not apply to an intercollegiate athletic activity insofar as such activity provides to the institution gross receipts or donations required by such institution to support that activity.[292]

The proposed Tower Amendment was passed by the Senate, but was eliminated in the Senate-House conference, which approved the Javits Amendment instead.[293]  Senator Jacob Javits of New York simply proposed that the Department of Health, Education and Welfare should determine how Title IX would be implemented.  The Javits Amendment stated:

> The Secretary shall prepare and publish, not later than 30 days after the date of enactment of this Act, proposed regulations implementing the provisions of title IX of the Education Amendments of 1972 relating to the prohibition of sex discrimination in federally assisted education programs which shall include with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports.[294]

---

[291] Margaret Wood, *Happy Belated Birthday, Title IX*, Library of Congress, Blogs (Nov. 27, 2012), https://blogs.loc.gov/law/2012/11/happy-belated-birthday-title-ix.

[292] S. 2106 Summary, 94th Cong. (1975), https://www.congress.gov/bill/94th-congress/senate-bill/2106.

[293] *History, The Living Law*, TitleIX, http://www.titleix.info/history/the-living-law.aspx.

[294] Educ. Amendments of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974).  Introduced as H.R. 69 in the 93rd Congress on January 3, 1973, available at https://www.govinfo.gov/content/pkg/STATUTE-88/pdf/STATUTE-88-Pg484.pdf.

**B.      The Regulations (1975)**

On May 27, 1975, the Title IX regulations were signed by President Gerald R. Ford.  Every aspect of sex discrimination in education was addressed in the Regulations: the admissions process (34 C.F.R. § 106.21, 1975); housing (34 C.F.R. § 106.32, 1975); financial aid (34 C.F.R. § 106.37, 1975); marital and parental status of students (34 C.F.R. § 106.40, 1975); employment (34 C.F.R. § 106.51, 1975); and athletics (34 C.F.R. § 106.41, 1975).

The athletics regulations allowed for separate teams by sex, and if a team was not offered for a member of the underrepresented sex, the participant must be allowed to try out for that team if it is a non-contact sport (34. C.F.R. § 106.41(b), 1975).  Ten factors were to be considered in providing "equal opportunity" in athletics:

(1)      Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;

(2)      The provision of equipment and supplies;

(3)      Scheduling of games and practice time;

(4)      Travel and per diem allowance;

(5)      Opportunity to receive coaching and academic tutoring;

(6)      Assignment and compensation of coaches and tutors;

(7)      Provision of locker rooms, practice and competitive facilities;

(8)      Provision of medical and training facilities and services;

(9)      Provision of housing and dining facilities and services; and

(10)      Publicity (34 C.F.R. § 106.41(c), 1975).

**C.      Objections to the Proposed Regulations**

As required by the General Education Provisions Act, the regulations were then submitted to Congress for review, resulting in several more attempts to change the athletics regulations.  All attempts were rejected.  Senator John Tower once again attempted to exempt revenue-generating sports from Title IX.[295]  At the congressional hearings pertaining primarily to the proposed Tower Amendment, Senator Birch Bayh specifically stated:

> As the Senate author of title IX . . . I am opposed to the Tower bill, not because I am oblivious to the economic concerns of those members of the NCAA opposing title IX, but because I think their concern is based upon a misunderstanding of both what is required under the title IX regulations and the true implications of the Tower proposal.[296]

Others proposed legislation to eliminate the Regulations, eliminate the section related to athletics, or make alterations to the regulations related to athletics.

- Twin bills proposed by Senator Jesse Helms[297] on June 5, 1975 and Representative James G. Martin[298] on June 17, 1975 disapproved of the Regulations in their entirety, and alternatively disapproved the specific sections of the regulations applicable to athletics programs and grants.[299]

- Rep. James G. O'Hara proposed two amendments, H.R. 8394 and 8395, on July 8, 1975.  H.R. 8394 claimed that the Regulations related to athletics should be

---

[295] S. 2106 Summary, 94th Cong. (1975), https://www.congress.gov/bill/94th-congress/senate-bill/2106 ("Provides that title IX of the Education Amendments of 1972, relating to discrimination, shall not apply to an intercollegiate athletic activity insofar as such activity provides to the institution gross receipts or donations required by such institution to support that activity.").

[296] *Prohibition of Sex Discrimination, 1975: Hearings Before the Subcomm. on Educ. of the Comm. on Labor & Public Welfare on S. 2106*, 94th Cong. 46-47 (1975) (statement of Sen. Birch Bayh), https://files.eric.ed.gov/fulltext/ED136136.pdf.

[297] S. Con. Res. 46 Summary, 94th Cong. (1975), https://www.congress.gov/bill/94th-congress/senate-concurrent-resolution/46.

[298] H. Con. Res. 310 Summary, 94th Cong. (1975), www.congress.gov/bill/94th-congress/house-concurrent-resolution/310; H. Con. Res. 311 Summary, 94th Cong. (1975), www.congress.gov/bill/94th-congress/house-concurrent-resolution/311.

[299] Samuels & Galles, *supra*, at 41.

disapproved because they were inconsistent with the Education Amendments of 1972 upon which they derived their authority.[300]  H.R. 8395 would have allowed athletics departments to "make expenditures for a sport or team from revenues derived from that sport or team" essentially exempting these sports or teams from "the provisions of the Education Amendments of 1972 prohibiting sex discrimination."[301]

- The Laxalt resolution, proposed by Senator Paul D. Laxalt on July 16, 1975 also claimed that the Title IX athletics regulations exceeded the scope of the statute's authority as "they seek to regulate athletic programs and activities which receive no Federal financial assistance."[302]

- Senator Jesse Helms made a second attempt to limit the Title IX regulations by proposing "that the provisions of the Education Amendments relating to nondiscrimination on the basis of sex shall apply only to education programs and activities which directly receive financial assistance from the Federal Government."[303]

All proposals were rejected.  Representative Mink described the resolutions as implying "that sex discrimination is acceptable when someone profits from it and that moneymaking propositions should be given congressional absolution from Title IX."[304]

---

[300] H. Con. Res. 330 Summary, https://www.congress.gov/bill/94th-congress/house-concurrent-resolution/330; H.R. 8394 Summary, www.congress.gov/bill/94th-congress/house-bill/8394.

[301] H. Con. Res. 330 Summary, https://www.congress.gov/bill/94th-congress/house-concurrent-resolution/330; H.R. 8395 Summary, www.congress.gov/bill/94th-congress/house-bill/8395.

[302] S. Con. Res. 52 Summary, 94th Cong.; 121 Cong. Rec. 22940 (1975), https://www.congress.gov/bill/94th-congress/senate-concurrent-resolution/52; *see also* Brooks, *supra*, at 342, nn. 52, 55.

[303] S. 2146 Summary, 94th Cong. (1975), https://www.congress.gov/bill/94th-congress/senate-bill/2146.

[304] Samuels & Galles, *supra*, at 21.

### D.  The Regulations become Law

Congress was clear in its intent that Title IX's prohibition on sex discrimination in educational programs or activities was applicable to athletics programs regardless of their revenue generating ability and that all programs or activities at educational institutions that received federal funding were subject to Title IX.  The Title IX regulations were approved by Congress and became effective on July 21, 1975.[305]

### E.  The First "Dear Colleague Letter"

Just four months after the Regulations became effective, the Office of Civil Rights issued their first "Dear Colleague Letter."  This memorandum clarified that each of the line items in the program component list of the Title IX Regulations is considered separately, and each segment must comply with Title IX "whether or not that segment is the subject of direct financial support through the Department."[306]  For each segment, the boys' program as a whole is compared to the girls' program as a whole and disparities are noted.  The focus is on the totality of the athletics program instead of a sport-by-sport comparison.  A disparity in one program component can alone constitute a Title IX violation if it is substantial enough to deny equality of athletic opportunity to students of one sex.  Identical programming is not required, and differences in treatment due to the application of gender-neutral rules are permissible, as long as the application does not create a discriminatory disparity.  Similarly, the needs of various sports may differ and therefore equal spending for each team is not required.  However, if lack of funding creates differences in the

---

[305] As stated in the statute, all educational institutions that receive federal funding are prohibited from discriminating on the basis of sex, and the Regulations provided an adjustment period of up to three years to comply, which meant that all institutions would be in compliance no later than 1978 (34 C.F.R. § 106.41(d) (1975)).  Educational institutions receiving federal funds are also required to provide assurance of compliance with the statute or indicate they are taking remedial measures to comply (34 C.F.R § 106.4 (1975)).  Other broad policy rules include the requirements to designate a Title IX coordinator, disseminate a non-discrimination policy, and adopt grievance procedures (34 C.F.R. § 106.8 (1975)).

[306] Holmes Letter, *supra*.

quality of the student-athlete's experience based on sex, the educational institution would be in violation.  Finally, institutions were reminded that separate sources of funding for athletics programs do not remove the program from Title IX compliance.[307]

## F.    More Attempts to Amend Title IX

While the Department of Health, Education and Welfare was strengthening Title IX by providing additional direction to all schools that received federal funding so that they could comply, lawmakers who opposed Title IX continued to propose amendments to limit its reach within athletics.[308]  Senator James A. McClure of Idaho proposed an amendment to S.2657 of the Education Amendments of 1976 to limit the meaning of "education program or activity" in the Title IX statute to the "curriculum or graduation requirements of the institutions."[309]  This amendment would have eliminated all extracurricular activities from Title IX's reach.  Senator Birch Bayh opposed the amendment, and it was rejected on its first day.[310]

Senator Jesse Helms made a third attempt, on January 31, 1977, to limit Title IX's applicability to only those educational programs or activities that directly received federal financial assistance and to exempt educational programs or activities that are integral to the required curriculum.[311]  The amendment further specified that athletics was not a required part of the curriculum, and again tried to prohibit any "regulations, rules or orders" related to the "actual or potential marital or parental status" of applicants or students at institutions that receive federal funding.[312]  Throwing in everything but the kitchen sink, Helms mandated that Title IX could not require classes to be offered in "mixed groups of both sexes" and prohibited any Federal

---

[307] *Id*.

[308] Samuels & Galles, *supra*, at 19–23.

[309] 122 Cong. Rec. 28,136 (1976).

[310] Brooks, *supra*, at 359.

[311] S. 535 Summary, 95th Cong., 1st Sess. (1977), www.congress.gov/bill/95th-congress/senate-bill/535.

[312] *Id*.

department or agency from requiring affirmative action programs or imposing quotas.[313]  While this third attempt by Helms was his most comprehensive effort to nullify Title IX, it died on the Senate floor like each of his previous attempts.[314]

On July 15, 1977, Senators Tower, Bartlett, and Hruska introduced Senate Bill (S. 2106), once again proposing to exclude revenue-producing sports from Title IX coverage.  Like its predecessor, the bill died in committee before reaching the Senate floor.[315]

## G.      The 1979 Policy Interpretation and the Three-Part Test

On December 11, 1979, the Office for Civil Rights (OCR) of the newly created U.S. Department of Education published *A Policy Interpretation: Title IX and Intercollegiate Athletics* to provide additional guidance for colleges and universities to comply with Title IX by providing specific factors to examine and tests to apply.  The Policy Interpretation includes a detailed explanation of how OCR will determine compliance in intercollegiate athletics programs, provides a process to evaluate the program components in the Regulations and adds two new components to evaluate (recruiting and support services), and provides tests for compliance with scholarships and participation opportunities.

> **Financial Aid.** Section A of the Policy Interpretation addresses equity in athletics-related financial aid/athletic scholarships.  The test for compliance requires institutions to determine whether the total amount of financial assistance provided to each sex is proportionately equal to the number of male and female participants in the athletics program.  Disparities based on legitimate, non-discriminatory factors such as the difference between in-state and out-of-state tuition will be taken into consideration.[316]

---

[313] *Id.*
[314] Samuels & Galles, *supra*, at 43.
[315] S. 2106, 94th Cong., 1st Sess., 121 Cong. Rec. 22,775-22,778 (1975).
[316] Policy Interpretation § VII.A.2.a.

**The "Laundry List".**  Section B provides a four-factor process to evaluate program components two through ten listed in §106.41 of the 1975 Regulations, plus the new components of recruiting and support services.  Schools are expected to:

(1)     Examine the availability, quality and kinds of benefits, opportunities, and treatment for student-athletes of both sexes and disparities for each component and identify disparities;

(2)     Determine whether the disparity can be justified by non-discriminatory factors (such as the unique needs of a particular sport);

(3)     Apply the individual criteria in the Policy Interpretation specific to that program component; and

(4)     Compare the men's program as a whole to the women's program as a whole to determine:

    (a)     Whether policies are discriminatory on their face or as applied, or

    (b)     If disparities are substantial and unjustified; or

    (c)     If disparities are substantial enough to deny equality of athletics opportunity.[317]

**Effective Accommodation.**  Section C addresses the accommodation of student-athletes' interests and abilities by providing equal opportunity in the selection of sports and levels of competition available to members of both sexes.  The Three-Part Test was introduced to provide three alternative ways to determine compliance:

(1)     Substantial proportionality measured by comparing the percentage of undergraduates enrolled to the percentage of student-athletes by sex; or

---

[317] Policy Interpretation §§ VII.B.3-5.

(2)     History and continuing practice of program expansion which is responsive to the developing interest and abilities of the underrepresented sex; or

(3)     Demonstrate that the interest and abilities of the members of the underrepresented sex have been fully and effectively accommodated by the present program.[318]

Additional measures for compliance in this section include determining whether proportionately similar numbers of male and female athletes have equivalent competitive schedules on a program-wide basis or if there is a history and continuing practice of upgrading competitive opportunities as abilities of the underrepresented sex develop.[319]

The Title IX statute, the Regulations and the Policy Interpretation provide the foundational regulatory framework applied to determine whether an educational institution that receives federal funding provides equal opportunity in college athletics.  Litigation and more legislation in the 1980s would continue to shape the impact of Title IX.

## H.     Program-specific Versus Institution-wide Approach

One of the earliest Title IX cases was a complaint made by women athletes at Temple University who claimed they did not receive equal opportunities in intercollegiate athletics.[320] Because the athletics department at Temple did not receive federal funding, the issue was whether the federal funding provision in Title IX was program-specific or institution-wide.  The district court ruled using the institution-wide approach and required the athletics department to be Title IX compliant.  The Third Circuit Court of Appeals upheld the ruling.[321]

However, in 1984, the Supreme Court succeeded in doing what the Title IX opponents in Congress could not—it limited the scope of Title IX to only those educational programs or

---

[318] *Id*. § VII(C)(5)(a).
[319] *Id*. § VII(C)(5)(b).
[320] *Haffer v. Temple Univ.*, 688 F.2d 14 (3d Cir. 1982).
[321] *Id*.

activities that directly received federal funding.[322]  In *Grove City College v. Bell*, Grove City College was a private institution that received federal funding for its students through the federal Basic Educational Opportunity Grants (BEOG).  As a recipient of federal funding, the school was required to complete an "Assurance of Compliance" form for Title IX.  The college refused and sued the US Department of Education, claiming that Title IX did not apply to the BEOGs.  The Supreme Court found that the college was subject to Title IX, but took a program-specific approach —the application of Title IX was limited to the school's financial aid program rather than the entire institution.[323]  For the next three years, Title IX's prohibition of sex discrimination only applied to educational programs and activities that directly received federal funding, effectively eliminating Title IX protections in athletics programs.

Congress disagreed with the Supreme Court's narrow application of Title IX to specific educational programs and activities that directly received federal funding and passed the Civil Rights Restoration Act on March 22, 1988 over President Ronald Reagan's veto.[324]  This legislation clearly specifies that all programs and activities at educational institutions that receive any federal funding must comply with Title IX.  This is known as the institution-wide approach and applies for all civil rights spending-clause legislation.

While college athletics was not openly contemplated when Title IX was proposed, it is clear that athletics programs at educational institutions that receive federal funding are educational programs and activities that are included in Title IX.[325]

---

[322]*Grove City Coll. v. Bell*, 465 U.S. 555 (1984).

[323] *Id.*

[324] Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28.

[325] *See* Samuels & Galles, *supra*, at 19.

I.        **Courts Give Deference to the Policy Interpretation and the Three-Part Test**

Economic challenges in the United States had a dramatic impact on school budgets through the 1980s and 90s. While girls were still filing lawsuits to gain access to athletics opportunities, schools were decreasing budgets and cutting sports. The economic realities of the 1990s forced many colleges and universities to eliminate athletics teams to cut costs.[326] However, women whose teams were eliminated were now using the courts to fight back.

Perhaps the most famous lawsuit against a school for cutting women's teams was *Cohen v. Brown University* (1996).[327] Brown University had been a single-sex men's institution until 1971 when it's sister school, Pembroke College was subsumed by the university. Over the years, Brown increased its women's sports. In 1991, Brown offered 16 sports for men and 15 sports for women.[328] In a stated effort to contain costs, Brown demoted four teams (women's volleyball and gymnastics and men's golf and water polo) from varsity to unfunded status.[329] Gymnast Amy Cohen and other members of the gymnastics and volleyball teams filed a class action lawsuit claiming that the university was not in compliance with Title IX and asked for an injunction to reinstate the women's teams.[330]

The district court conducted a thorough examination of the factual and legal context the case presented, providing a road map for analysis of Title IX compliance in providing participation opportunities and giving significant deference to the Title IX regulations and Policy Interpretation.[331] The plaintiffs proved that Brown was not in compliance with the Three-Part Test: the proportionality requirement was not met because Brown's student body was

---

[326] T. Jesse Wilde, *Gender Equity in Athletics: Coming of Age in the 90's*, 4 Marq. Sports L.J. 217 (1994), http://scholarship.law.marquette.edu/sportslaw/vol4/iss2/3.
[327] *Cohen v. Brown Univ.*, 101 F.3d. 155 (1st Cir. 1996).
[328] *Cohen v. Brown Univ.*, 809 F. Supp. 978, 980 (R.I. Dist. Ct. 1992).
[329] *Id*. at 981.
[330] *Id*. at 980.
[331] *Id*. at 981–84.

approximately 51.8% men and 48.2% women, but athletics opportunities were 63.4% men and 36.6% women resulting in a disparity of 11.%.[332]  As women were clearly the underrepresented sex, demoting women's sports was the opposite of showing a continuing practice of program expansion.[333]  Similarly, the school was fully accommodating the interests and abilities of the underrepresented sex when there was interest and ability on the teams that were being demoted to club sport status.[334]

Brown argued that it was effectively accommodating the interests and abilities of its students as the athletics program consisted of a wide variety of opportunities from physical education classes, intramural sports, club sports, intercollegiate club sports, and junior varsity and varsity sports.[335]  The university further argued that changing the status of the team from varsity to intercollegiate club was "not legally significant" because it was merely a shift in funding status.[336]  The district court found the university did not meet any of the three parts of the test, and then addressed the question of levels of opportunity.[337]  Finding that "intercollegiate club status is not equivalent to varsity status" the district court recognized that demotion to fundraising status put the burden on the student-athletes to survive as a team.[338]  Brown appealed and the First Circuit affirmed, clearly signaling that the Regulations were controlling and that the Policy Interpretation warranted substantial deference.[339]  The preliminary injunction to prevent Brown from demoting the women's gymnastics and volleyball teams was upheld and the case was remanded back to the

---

[332] *Id.* at 991.
[333] *Id.*
[334] *Id.* at 991–93.
[335] *Id.* at 988.
[336] *Id.*
[337] *Id.* at 991–92.
[338] *Id.* at 992.
[339] *See generally Cohen v. Brown Univ.*, 991 F.2d 888 (1st Cir. 1993).

district court for further proceedings.[340]   The case continued through another appeal to the First

Circuit[341] which was upheld in favor of the plaintiffs and the Supreme Court denied certiorari.[342]

## J.        The Equity in Athletics Disclosure Act 1994

The Equity in Athletics Disclosure Act was enacted as an amendment to the Higher

Education Act of 1965.[343]   The legislation would require institutions of higher education to

disclose participation rates, and program support expenditures in college athletics programs.

Taking a consumer protection approach, the amendment was intended to provide prospective

student-athletes with a snapshot of colleges and universities commitment in providing equitable

opportunities and treatment for its male and female student-athletes.   Each college or university

that receives federal funding and sponsors an athletics program must submit data regarding

enrollment and number of student-athletes by sex as well as spending on men's and women's

sports.[344]   This data is available to the general public through the U.S. Department of Education

*Equity in Athletics Data Analysis Cutting Tool*.[345]

## K.        Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (1996)

In response to a growing number of inquiries, complaints and cases, OCR issued a

*Clarification of Intercollegiate Athletics Policy Guidance:  The Three-Part Test* on January 16,

1996.[346]   The purpose for the *Clarification* was to provide more detailed guidance and examples

---

[340] *Id.* at 907.

[341] *Cohen v. Brown Univ.*, 101 F.3d 155 (1st Cir. 1996).

[342] *Brown Univ. v. Cohen*, 520 U.S. 1186 (1997).

[343] H.R. 921 Summary, 103rd Cong. (1993), available at  https://www.congress.gov/bill/103rd-congress/house-bill/921; 20 U.S.C. § 1092 n.(b)(3), §1092 n.(b)(7)-(8), § 1092 (g) (1994).

[344] Pub. L. No. 103–382, 108 Stat. 3518, § 360B, Disclosure of Athletic Program Participation Rates and Financial Support Data (1994).

[345] *The Equity in Athletics Data Analysis Cutting Tool*, Office of Postsecondary Educ., http://ope.ed.gov/athletics/.

[346] U.S. Dep't of Educ., Off. for Civ. Rts., *Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test* (Jan. 16, 1996), http://www.ed.gov/about/offices/list/ocr/docs/clarific.html.

for schools to be compliant.  OCR emphasized that any of the three options was a viable route in proving compliance.

**L.**     **OCR Guidance Financial Aid (1998)**

Although a significant amount of litigation and OCR complaints had focused on participation opportunities and compliance with the Three-Part Test, schools needed to be reminded that they were still responsible for meeting all of the equity requirements in the Title IX regulations.  A "technical assistance letter" was issued by the Office of Civil Rights to 25 NCAA members named in a complaint filed by the National Women's Law Center stating that there will be a strong presumption of non-compliance if a school's allocation of athletic scholarship money is not within 1% of the ratio of the genders in the population of student-athletes at the school.[347] The guidance explained OCR's process for determining compliance with the financial aid regulation, which requires each institution to be investigated on a case-by-case basis.  Once the actual amount spent for each sex is determined, then all legitimate nondiscriminatory reasons for a disparity are considered.  Examples of justifiable reasons were previously provided in the 1979 Policy Interpretation such as differences in in-state versus out-of-state tuition, unexpected fluctuations in student-athlete participation or undergraduate student enrollment by sex, and other factors such as gradually increasing the number of scholarships for a new team.

**M.**     **The NCAA Is Not Subject to Title IX**

As the Civil Rights Restoration Act clarified, all educational institutions that receive federal funding for any program or activity within the institution must comply with Title IX. However, the Supreme Court held in *National Collegiate Athletic Association v. Smith* that the

---

[347] O'Shea Letter, *supra*.

NCAA is not a recipient of federal funding, and therefore is not subject to comply with Title IX.[348] In 2003, OCR issued *Further Clarification of Intercollegiate Athletics Policy Guidance Regarding Title IX Compliance* to address the issue of courts referring to the proportionality test as a "safe harbor."[349]  The *Clarification* reiterated that all three parts of the Three-Part test were equally viable to prove compliance and emphasized that cutting or reduction of teams in order to comply with Title IX is disfavored practice.[350]

## N.    Conclusion

Congress' commitment to equal opportunity and treatment in college athletics has been consistent since the inception of Title IX.  The law's application to college athletics has continued to evolve through various regulations, interpretations, and clarifications as well as numerous lawsuits brought by individuals and groups who have felt discriminated against within these educational programs and activities.  These regulations, interpretations, clarifications and lawsuits have then determined the extent of the application of Title IX to athletics and contributed to the understanding and development of the law.  Congress' commitment to Title IX is still apparent in recent proposed legislation: on December 20, 2022, the Fair Play for Women Act of 2022 was proposed by Senator Chris Murphy (D-Conn.) and Representative Alma Adams (D-N.C.-12) to strengthen Title IX.  If passed, this legislation will subject the NCAA as a governing body to Title IX compliance.[351]

---

[348] *Nat'l Collegiate Athletic Ass'n*, 525 U.S. at 468.
[349] U.S. Dep't of Educ., Off. for Civ. Rts., *Further Clarification of Intercollegiate Athletics Policy Guidance Regarding Title IX Compliance* (July 11, 2003), https://www2.ed.gov/about/offices/list/ocr/title9guidanceFinal.html.
[350] *Id*.
[351] Fair Play for Women Act, S. 5307; 117th Congress H.R. 9615 (2021-2022).

# Exhibit A

**BARBARA OSBORNE, Esq.**

| | |
|---|---|
| Exercise and Sport Science | 102 Northcote Drive |
| University of North Carolina | Cary, NC 27519 |
| CB# 3700, 309 Woollen | |
| Chapel Hill, NC 27599 | |
| Phone: (919) 962-5173 | C: (919)225-3330 |
| Email: sportlaw@unc.edu | osbornesportlaw@outlook.com |

## EDUCATION

J.D., Boston College Law School, Newton, MA, 1997.
  *North Carolina State Bar, admitted to practice 12/03/2002*
  *Massachusetts State Bar, admitted to practice 5/22/1998*

M.Ed., Human Movement (Sport Management Concentration), Boston University, Boston, MA, May 21, 1989.

B.A., cum laude, Communication, University of Wisconsin-Parkside, Kenosha, WI, 1982.

## PROFESSIONAL EXPERIENCE

**University of North Carolina, Chapel Hill, NC**

| | |
|---|---|
| *Professor* | July 2017 - present |
| *Associate Professor with tenure* | July 2004 – June 2017 |
| *Assistant Professor* | July 1998 – June 2004 |

Teach undergraduate and graduate courses in the department of Exercise and Sport Science. Directed graduate program and undergraduate program in sport administration. Co-direct dual degree program in law and sport administration. Created undergraduate and dual degree programs. Advise students, direct independent study and honors research for undergraduate, graduate and law students. Research focuses on legal issues in intercollegiate athletics, gender discrimination in sport, and sport medicine liability.

*Professor, School of Law*                                    January 2007 -  present
Teach two sports law courses at the law school. Faculty advisor for the Sport and Entertainment Law Society student organization. Direct independent study. Identify and facilitate sports related externship experiences. Joint appointment approved in 2015.

**Ice Miller, LLP, Indianapolis, IN**                    September 2009 – June 2012
*Of Counsel*
Consultant with the College Sports Practice, providing legal representation and advise for colleges and universities relative to NCAA governance, compliance, infractions, and gender equity issues.

**Brandeis University, Waltham, MA**
*Associate Director of Athletics*                                    August 1990 -  July 1998
Coordinate business operations, scheduling, team travel, facilities, special events, student/athlete support programs, and fundraising. Administer $2.6 million budget.  Liaison for construction of $25 million sports and recreation complex.  Supervise facilities, equipment, and athletic training personnel.  Liaison with Boston Celtics and New England Revolution professional franchises.

*Assistant Director of Athletics*                                    August 1987- July 1990
Managed budget, scheduling, and compliance.  Coordinated athletic team travel, meals and accommodations.  Supervised office personnel and student employment payroll.  Planned special events and student programs.

*Assistant to the Athletic Director*                                 October 1983 -  July 1985
Office management, travel coordination, scheduling, bookkeeping, and secretarial duties.

**Prime Network, ESPN**
*Television Analyst*                                                  1984 – 1995
Freelance color commentator for running races such as the Red Lobster 10K, Old Reliable Run and the international broadcast of the Boston Marathon.

**Needham High School, Needham, MA**
*Head Coach, Boys and Girls Track and Field*                         1985-1987
Full coaching responsibilities including organization of practice, home meet management, equipment issue and inventory, and fundraising.

**Massachusetts RacePlace, Wellesley, MA**
*Publisher and Editor*                                               1985 - 1987
Created, edited and published a newspaper for the running community.

**Bob Woolf Associates, Inc., Boston, MA**
*Public Relations Coordinator*                                       February 1983 – October 1983
Arranged interviews, appearances, and promotions for sports attorney Bob Woolf and sport and entertainment celebrity clients including Larry Bird, Carl Yastrzemski, and over one hundred other athletes.

## HONORS

Honorary Inductee, University of Wisconsin-Parkside Athletics Hall of Fame, October 2022.

Distinguished Alumni Award, University of Wisconsin-Parkside, May 2021.

Distinguished Educator Award, North American Society for Sport Management, May 2020.

 J. Carlyle Sitterson Teaching Award, University of North Carolina, February 2015.

Betty van der Smissen Leadership Award, Sport and Recreation Law Association, March 2014.

Research Fellow, Sport and Recreation Law Association, March 2012.

Bradford High School Alumni Association Distinguished Alumnae Award, June 2011.

University of Wisconsin-Parkside Athletics Hall of Fame, October 2010.

Edward Kidder Graham Outstanding Faculty Award, University of North Carolina, May 2005.

Kenosha Sports Hall of Fame, Inducted April 24, 1999.

MAIAW Rowlands Award for Outstanding Achievement in Women's Sports, May 8, 1998.

# BIBLIOGRAPHY

## Books

1. Jensen, J., Weight, E., and Osborne, B. (eds) (2021). *The Globalization of College Sport: The U.S. and Beyond* (pp. 1). London: Routledge. **ISBN:** 978-0-367-71100-9

2. Mitten, M.J., Davis, T., Osborne, B. & Duru, J. (2020). *Sports Law: Governance, and Regulation (*3rd ed.) (pp. 1-549). New York, NY: Wolters Kluwer.

3. Mitten, M.J., Davis, T., Duru, J., & Osborne, B. (2020). *Sports Law & Regulation: Cases, Materials and Problems* (5th Ed.). (pp. 1-1098). New York, NY: Wolters Kluwer.

4. Mitten, M.J., Davis, T., Shropshire, K., Osborne, B. & Smith, R.K. (2016). *Sports Law: Governance, and Regulation (*2nd ed.) (pp. 1- 512). New York, NY: Wolters Kluwer.

5. Mitten, M.J., Davis, T., Shropshire, K., Osborne, B. & Smith, R.K. (2016). *Sports Law: Governance, and Regulation Teacher's Manual* (2nd ed.) (pp. 1-238). New York, NY: Wolters Kluwer.

6. Mitten, M.J., Davis, T., Shropshire, K., Osborne, B. & Smith, R.K. (2013). *Sports Law: Governance, and Regulation* (pp. 1-486). New York, NY: Wolters Kluwer.

7. Mitten, M.J., Davis, T., Shropshire, K., Osborne, B. & Smith, R.K. (2013). *Sports Law: Governance, and Regulation Teacher's Manual* (pp. 1-227). New York, NY: Wolters Kluwer.

## Book Chapters

1. Osborne, B., Weight, E.A. (in press). Governing Bodies. In Weight, E.A. & Zullo, R. (Eds.), *Administration of Intercollegiate Athletics 2nd Ed.* (pp. xxx), Champaign, IL: Human Kinetics.

2. Cooper, J.N., Harry, M.P., Weight, E,A, & Osborne, B. (in press). Diversity, Equity, Inclusion and Accessibility. In Weight, E.A. & Zullo, R. (Eds.), *Administration of Intercollegiate Athletics 2nd Ed.* (pp. xxx), Champaign, IL: Human Kinetics.

3. Osborne, B. & Zonder, E.J. (2021). Sexual Harassment. In D. Cotton & J. Wolohan (eds.), *Law for Recreation and Sport Managers* (8th ed.) (pp. 441-453). Dubuque, IA: Kendall Hunt Publishing Company.

4. Osborne, B. (2021).   Title IX. In D. Cotton & J. Wolohan (eds.), *Law for Recreation and Sport Managers* (8th ed.) (pp. 412-426).  Dubuque, IA:  Kendall Hunt Publishing Company.

5. Osborne, B. (2021).  Legal Issues in Sport Communication.  In Petersen, P., Laucella, P., Kian, T., and Guerin. A. (Eds.), *Strategic Sport Communications* (3rd ed.) (pp. 377-400).  Champaign, IL:  Human Kinetics.

6. Osborne, B. & Weight, E. (2020).  Governance of Intercollegiate Athletics.  In D. Shilbury (ed.), *Handbook of Sport Governance* (pp. 213-225).  London:  Routledge Publishing Company.

7. Osborne, B. (2017).  Gender Equity – Coaching and Administration.  In D. Cotton & J. Wolohan (eds.), *Law for Recreation and Sport Managers* (7th ed.) (pp.532-542).  Dubuque, IA:  Kendall Hunt Publishing Company.

8. Osborne, B. (2017).  Sexual Harassment.  In D. Cotton & J. Wolohan (eds.), *Law for Recreation and Sport Managers* (7th ed.) (pp. 556-568).  Dubuque, IA:  Kendall Hunt Publishing Company.

9. Osborne, B. (2016).  Legal Issues in Sport Communication.  In Petersen, P., Laucella, P., Kian, T., and Guerin. A. (Eds.), *Strategic Sport Communications* (2nd ed.) (pp. 341-361).  Champaign, IL:  Human Kinetics.

10. Osborne, B. (2015).  Gender Discrimination.  In Appenzeller, H. & Appenzeller, T. (Eds.), *Sports and the Courts* (2nd ed.) (pp. 70-77).  Durham, NC:  Carolina Academic Press.

11. Osborne, B. (2015).  Title IX compliance issues in intercollegiate athletics.  In Comeaux, E. (Ed.), *Introduction to Intercollegiate Athletics in American Higher Education* (pp.259-271).  Baltimore, MD: Johns Hopkins University Press.

12. Osborne, B., Weight, E.A. (2015). Governing Bodies. In Weight, E.A. & Zullo, R. (Eds.), *Administration of Intercollegiate Athletics* (pp. 21-41), Champaign, IL: Human Kinetics.

13. Osborne, B. (2012).  Violent acts within the context of the game:  On field occurrences and prosecution.  In J. Lee & J. Lee (eds.), *Sport and Criminal Behavior (*2nd ed.) (pp. 83-103).  Durham, NC: Carolina Academic Press.

14. Osborne, B. (2012).  Gender Equity – Coaching and Administration.  In D. Cotton & J. Wolohan (eds.), *Law for Recreation and Sport Managers* (6th ed.) (pp.535-545).  Dubuque, IA:  Kendall Hunt Publishing Company.

15. Osborne, B. (2012).  Sexual Harassment.  In D. Cotton & J. Wolohan (eds.), *Law for Recreation and Sport Managers* (6th ed.) (pp. 559-571).  Dubuque, IA:  Kendall Hunt Publishing Company.

16. Osborne, B.  (2012). Title IX Fundamentals. In H. Appenzeller (ed.), *Risk Management in Sport:  Issues and Strategies* (3rd ed.) (pp. 371-380).  Durham, NC:  Carolina Academic Press.

17. Osborne, B. (2011).  Legal Issues in Sport and Recreation.  In G.S. McClellan, C. King, & D. Rockey (eds.), *Handbook of College Athletics and Recreation Administration* (pp. 83-106).  San Francisco, CA:  Josey-Bass.

18. Osborne, B. (2010).  Sport-Related Crimes. In D. Cotton & J. Wolohan (eds.), *Law for Recreation and Sport Managers* (5th ed.) (pp. 250-263).  Dubuque, IA:  Kendall Hunt Publishing Company.

19. Osborne, B. (2010).  Gender Equity – Coaching and Administration.  In D. Cotton & J. Wolohan (eds.), *Law for Recreation and Sport Managers* (5th ed.) (pp.548-558).  Dubuque, IA:  Kendall Hunt Publishing Company.

20. Osborne, B. (2010). Sexual Harassment.  In D. Cotton & J. Wolohan (eds.), *Law for Recreation and Sport Managers* (5th ed.) (pp. 573-586).  Dubuque, IA:  Kendall Hunt Publishing Company.

21. Osborne, B. (2010). Title IX Backlash and Intercollegiate Athletics.  In A. Cummings (ed.), *Reversing Field:  Examining Commercialization, Labor & Race in 21st Century Sports Law* (pp. 216-234).  Morgantown, WV:  West Virginia University Press.

22. Osborne, B. (2009).  Violent acts within the context of the game:  On field occurrences and prosecution.  In  J. Lee & J. Lee (eds.), *Sport and Criminal Behavior* (pp. 83-103).  Durham, NC: Carolina Academic Press.

23. Osborne, B. (2007).  Sexual Harassment.  In D. Cotten & J. Wolohan (eds.), Law *for Recreation and Sport Managers* (4th ed.) (pp. 566-576).  Dubuque, IA:  Kendall Hunt Publishing Company.

24. Osborne, B. (2007).  Criminal Liability for Violence in Sports.  In D. Cotten & J. Wolohan. (eds.), Law *for Recreation and Sport Managers* (4th ed.) (pp. 230-238).  Dubuque, IA: Kendall Hunt Publishing Company.

25. Osborne, B. & Pittman, A. (2007).  Sport Related Crimes:  Gambling, Ticket Scalping and Wire and Mail Fraud.  In D. Cotten & J. Wolohan. (eds.), Law *for Recreation and Sport Managers* (4th ed.) (pp. 261-272).  Dubuque, IA: Kendall Hunt Publishing Company.

26. Osborne, B. & Yarbrough, M. (2005).  Pay Equity for Coaches and Athletic Administrators:  An Element of Title IX?  In M.J. Cozzillio, M.J. & R.L. Hayman (eds.), Sports *and Inequality*, (pp. 631-640).  Durham, NC:  Carolina Academic Press.

27. Osborne, B.  (2005). Title IX Fundamentals. In H. Appenzeller (ed.), *Risk Management in Sport:  Issues and Strategies* (2nd ed.) (p. 379-388).  Durham, NC:  Carolina Academic Press.

28. Osborne, B. (2003).  Criminal Liability for Violence in Sports.  In D. Cotton & J. Wolohan (eds.), Law *for Recreation and Sport Managers* (3rd ed.) (pp. 230-239).  Dubuque, IA:  Kendall Hunt Publishing Company.

29. Osborne, B. & Pittman, A. (2003).  Sport Related Crimes:  Gambling, Ticket Scalping and Wire and Mail Fraud.  In D. Cotton & J. Wolohan (eds.), Law *for Recreation and Sport Managers* (3rd ed.) (pp. 271-281).  Dubuque, IA:  Kendall Hunt Publishing Company.

30. Osborne, B. (2001).  The Revolution of Women in Sport.  In J.M. Silva & D.E. Stevens (eds.), *Psychological Foundations of Sport* (pp. 396-410).  Boston, MA:  Allyn Bacon.

31. Stevens, D.E., Osborne, B, & Robbins, J.  (2001). Psychosocial Issues and the Female Athlete.  In J.M. Silva & D.E. Stevens (eds.), *Psychological Foundations of Sport* (pp. 411-427).  Boston, MA:  Allyn Bacon.

32. Osborne, B.  (2001). Coaching the Female Athlete.  In J.M. Silva & D.E. Stevens (eds.), *Psychological Foundations of Sport* (pp. 428-437).  Boston, MA:  Allyn Bacon.

33. Osborne, B. (2001).  Issues Related to the NCAA.   In *Sports and Entertainment Law: Keys to Representing Athletes, Musicians and Teams* (pp. IX-1-IX-108).  Cary, NC: North Carolina Bar Association Foundation.

34. Bickford, B.  (1991). Definitions, Symptoms, and Risk Factors for Eating Disorders. *AAPHERD Handbook for Coaches on Eating Disorders and Athletes* (pp.11-22). Dubuque, IA: Kendall/Hunt.

35. Bickford, B., Daly, J.A., Abood, D.A., Cleveland, M.E. & Moriarty D. (1991). Strategies for Prevention/Intervention, AAPHERD *Handbook for Coaches on Eating Disorders and Athletes,* (pp. 11-22).  Dubuque, IA:  Kendall/Hunt.

## Refereed Papers and Articles

1. *Bain, C.G., Powell, E., Smith, D., Osborne, B., & Kucera, K. (*in review*). College news media and press release coverage of student-athlete suicides.

2. *Lane, M. & Osborne, B. (2022*).  Touchdown Jesus:  Analyzing Establishment Clause Concerns in Public University Football. *Journal of Legal Aspects of Sport,* 32(2), 214-237.

3. *Rush, C., & Osborne, B. (2022).  Benefits and concerns abound, regulations lack in collegiate athlete biometric data collection. *Journal of Legal Aspects of Sport*, 32(1), 62-94.

4. Dodds, M. & Osborne, B. (Fall 2021).  Using the law to combat sport business corruption.  *Marquette Sports Law Review,* 32(1), 229-239.

5. Popp, N., *Bane, A., Howell, S. M., & Osborne, B. (2020). To serve and protect: Examining the relationship between selling alcohol in college football stadia and negative fan behavior. *Journal of Applied Sport Management 12*(1), 73-82*.*

6. Dodds, M., Heisy, K., Osborne, B. & Cebula, K. (2020).  Impact of NCAA Corruption on the Adidas Brand. *Journal of Global Sport Management Choregia, 16*(1), 1-9.

7. Weight, E.A. Jensen, J.A., Osborne, B. (2020). The Globalization of Intercollegiate Athletics: Challenges, opportunities, and advice for those seeking to emulate the US model of college sport. *Journal of Global Sport Management*, 5(1), pp. 1-12, DOI: 10.1080/24704067.20119.1672081

8. Osborne, B., Jensen, J.A., Weight, E.A. (2020). Intercollegiate Athletics: A Unique Segment of the Sport Industry. *Journal of Global Sport Management*, 5(1), pp. 13-33, DOI: 10.1080/24704067.2019.1669067

9. Epstein, A. & Osborne, B. (2019).  Teaching ethics with sports. *Marquette Sports Law Review,* 28(2), p.

10. Weight, E., *Bonfiglio, A., Defreese, J.D., & Osborne, B. (2018).  Occupational measures of former NCAA athletes and traditional students.  *International Journal of Sport Management*, 19, p. 1-26.

11. Osborne, B. & *Cunningham J. (2018). Legal and ethical implications of athletes' biometric data collection in professional sport.  *Marquette Sports Law Review*, 28(1), p. 37-84.

12. Osborne, B. (2017).  Failing to fund fairly:  Title IX athletics scholarships compliance. *Tennessee Journal of Race, Gender, & Social Justice,* Vol. 6, p. 83-104.

13. Osborne, B. (2017).  Vikings defense beats Wells Fargo offense in contract dispute over signage. *Sport Marketing Quarterly,* 26(1), p. 55-57.

14. Osborne, B. (2016). Athletes' right of publicity in game performances and sports broadcasting.  *Sport Marketing Quarterly,* 25(4), p. 260-262.

15. *Marsh, J.P., Petersen, J.C.  & Osborne, B. (2016).  Sport discontinuation: An assessment of goal achievement via empirical measures.  *Journal of Amateur Sport*, 164-187.

16. Moorman, A.J. & Osborne, B. (2016).  Are institutions of higher education failing to protect students?: An analysis of Title IX's sexual violence protections and college athletics. *Marquette Sports Law Review,* 26(2), 545-582.

17. Pauline, G., Osborne, B., & Miller, J.  (2016). Do entry form waivers properly inform triathlon participants of the dangers of the sport? *Journal of Legal Aspects of Sport, 26*, 106-126.

18. *Plunkett, M.R., Weight, E.A., Osborne, B., & Lancaster, E. (2016). The value of intercollegiate athletics participation from the perspective of former ACC athletes. *International Journal of Sport Management,* 17(1), 1-21.

19. *Chalfin, P., Weight, E., Osborne, B., Johnson, S. (2015)*. The value of intercollegiate athletics participation from the perspective of employers who target athletes. *Journal of Issues in Intercollegiate Athletics. 8,* 1-27.

20. Weight, E., *Lutz, N., & Osborne, B. (2015).  Administrator perspectives on search firm use in NCAA Division I intercollegiate athletics.  *International Journal of Sport Management,* 16(3), 1-19.

21. Osborne, B. (2014).  The myth of the exploited student-athlete.  *Journal of Intercollegiate Sport,* 7(2), 143-152.

*22.* Cooper, C.G., *Gaynor, D., Shields, E. & Osborne, B. (2014).  An investigation of financial spending and distributive justice principles in NCAA Division I athletic departments.  *Journal for the Study of Sports and Athletes in Education,* 8(1), 47-64.

23. *Lewinter, G., Weight, E., Osborne, B., & Brunner, J. (2013). A polarizing issue: Faculty and staff perceptions of intercollegiate athletic academics, governance and finance post-NCAA investigation. *Journal of Applied Sport Management*, 5(4), 73-100.

24. Osborne, B. (2013).  Eliminating sexual violence in schools:  implications for athletics administrators in the United States.  *The International Sports Law Journal,* 13(1), 9-17.

25. Weight, E., Osborne, B., Turner, R. (2012). A new collegiate model: Intra-collegiate athletics at BYU-Idaho. *Case Studies in Sport Management,* 1(11), 1-9.

26. Osborne, B. & Batista, P. (2012).  Time Out! Federal court decision clarifies ownership of broadcast rights in high school sports events.  *Sports Marketing Quarterly,* 21(1), 115-117.

27. Yiamiouyannis, A. & Osborne, B. (2012).  Addressing gender inequities in collegiate sport: examining female leadership representation within NCAA sport governance. *SAGE Open* (p. 1-13).

28. *Griffin, B. & Osborne, B. (2009).  The legality of charity poker in North Carolina. *Journal of Legal Aspects of Sports,* 19(1), 7-34.

29. Pedersen, P., Osborne, B., Whisenant, W., & Lim, C.H. (2009).  An examination of the perceptions of sexual harassment by newspaper sports journalists. *Journal of Sport Management*, 23(3), 335-360.

30. Lough, N., Tiell, B. & Osborne, B. (2008).  Work-life conflict comparisons among NCAA Divisions:  Perceptions of athletic directors and Senior Woman Administrators. *Journal of Contemporary Athletics*, 3(4), 327-347.

31. Dixon, M., Tiell, B., Lough, N., Sweeney, K., Osborne, B., & Bruening, J. (2008).  The work/life interface in intercollegiate athletics: An examination of policies, programs, and institutional climate.  *Journal for the Study of Sports & Athletes in Education,* 2(2), 137-160.

32. *Tharrington, A., & Osborne, B. (2008).  An analysis of the presence and perception of the Juris Doctorate degree in Division I college athletics administration.  *Journal of Legal Aspects of Sports,* 18(2), 309-341.  Reprinted for Continuing Legal Education credit by the Georgetown University Law Center for their 10th Annual Sports and Entertainment Law Symposium on February 3, 2017, Washington, D.C.

33. Osborne, B. & Ammon, R. (2008).  Eliminating women's teams:  a comparative analysis of *Favia v. Indiana University of PA (1992), Barrett v. West Chester University (2003),* and *Choike v. Slippery Rock University (2006)*. *Journal of Legal Aspects of Sport*, 18 (1), 39-66.

34. Anderson, P. & Osborne, B. (2008).  A Historical Review of Title IX Litigation. *Journal of Legal Aspects of Sport*, 18(1), 127-168.

35. Bruening, J.,  Dixon, M., Tiell, B., Osborne, B., Lough, N. & Sweeney, K.(2008).  Work-life culture of collegiate athletics:  perceptions of supervisors.  *International Journal of Sport Management*, 9(3), p. 250-272.

36. Osborne, B. (2007).  *Facenda v. N.F.L. Films, Inc.* Case Brief.  *International Journal of Sport Communication*, 1, p. 103-107.

37. Osborne, B.  (2007).  "No drinking, no drugs, no lesbians" —Sexual orientation discrimination in intercollegiate athletics.  *Marquette Sports Law Review*, 17(2), 481-501.

38. Osborne, B.  (2006).  Gender, employment, and sexual harassment issues in the golf industry. *Journal of Legal Aspects of Sport*,  16(1), p. 25-84.

39. Osborne, B. & Duffy, C.* (2005).  Title IX, sexual harassment, and policies at NCAA Division IA athletics departments. *Journal of Legal Aspects of Sport,* 15(1), p. 59–94.

40. Osborne, B. (2003). Title IX in the 21st Century. *Marquette Sports Law Review*,  14(1), p. 141-162.

41. *Laucella, P. & Osborne, B. (2002).  Libel and college coaches.  *Journal of Legal Aspects of Sport*, 12(2) p. 183-204.

42. Osborne, B. (2001).  Principles of liability for athletic trainers:  managing sport-related concussion.  *Journal of Athletic Training,* 36(3):316-321.

43. Osborne Bickford, B. & Yarbrough, M.V. (2001).  Pay equity for coaches and administrators in college athletics:  an element of Title IX?  *University of Michigan Journal of Law Reform*, 34(1) p. 231-251.

44. Bickford, B.  (1999). The legal duty of a college athletics department to athletes with eating disorders: a risk management perspective.  *Marquette Sports Law Journal*, 10(1) p 87-116.

## Refereed Published Abstracts

1. Yeargin SW, Meyer CM, Winkelmann ZK, Scarneo-Miller SE, Bockwinkel B, Bolno AL, Johnson SD, Kingsley AM, Ulshafer SA, McCool CR, McCullough GA, Osborne B, Kucera KL. (2022). *Prevalence of Legal Proceedings in Exertional/Medical Causes of Sport-related Sudden Death*. Abstract published in *J Athl Train* (2022) 57 (6s): S-53. DOI: https://doi.org/10.4085/1938-162X-57.6s.S-1

2. Meyer CM, Yeargin SW, Winkelmann ZK, Scarneo-Miller SE, Bockwinkel B, Bolno AL, Johnson SD, Kingsley AM, Ulshafer SA, McCool CR, McCullough GA, Osborne B, Kucera KL. (2022). *Prevalence of Legal Proceedings following Traumatic Injury Sudden Death in Athletes.* Abstract published in *J Athl Train* (2022) 57 (6s): S-54. DOI: https://doi.org/10.4085/1938-162X-57.6s.S-1

3. Osborne, B. (2019).  Legal solutions for the gender pay gap in professional sport. *The World Voice of Sport Management Book of Abstracts,* p. 15.  Santiago, Chile: Lithuanian Sports University Press.  eISBN 978-609-8200-24-9

4. Osborne, B. & Wolohan, J. (2019).  Hyperandrogenism and the IAAF gender verification regulation.  *The World Voice of Sport Management Book of Abstracts,* p. 31.  Santiago, Chile: Lithuanian Sports University Press.  eISBN 978-609-8200-24-9

## Refereed Unpublished Oral Presentations

1. Cottingham, M., Osborne, B., Biskynis, S. & Hu, T. (Feb. 2023). *NCAA Disability Sport Inclusion and its Impact on Title IX.* Presented at the Sport and Recreation Law Association annual conference, Las Vegas, NV.

2. *Schwam, I. & Osborne, B. (Feb. 2023). *Expanding the Rights of College Athletes? How the Collee Athletes Bill of Rights Could Alter Title IX.* Presented at the Sport and Recreation Law Association annual conference, Las Vegas, NV.

3. *Rapisarda, L. & Osborne, B. (Feb. 2023). *Student-athletes as Employees and Title IX Compliance.* Presented at the Sport and Recreation Law Association annual conference, Las Vegas, NV

4. Zonder, E., Houghton, E. & Osborne, B. (Feb. 2023). *Title IX Retaliation: Expanding Student-athlete Protections for Gender Equity Complaints.* Presented at the Sport and Recreation Law Association annual conference, Las Vegas, NV

5. Osborne, B., Dodds, M. & Greene, D. (Feb. 2023). *NIL, Collectives and Corruption*. Presented at the Sport and Recreation Law Association annual conference, Las Vegas, NV.

6. Yeargin SW, Meyer CM, Winkelmann ZK, Scarneo-Miller SE, Bockwinkel B, Bolno AL, Johnson SD, Kingsley AM, Ulshafer SA, McCool CR, McCullough GA, Osborne B, Kucera KL. (2022, June). *Prevalence of Legal Proceedings in Exertional/Medical Causes of Sport-related Sudden Death*. Abstract presented at the National Athletic Trainers Association (NATA) Annual Meeting and Symposia, Philadelphia, PA.

7. Meyer CM, Yeargin SW, Winkelmann ZK, Scarneo-Miller SE, Bockwinkel B, Bolno AL, Johnson SD, Kingsley AM, Ulshafer SA, McCool CR, McCullough GA, Osborne B, Kucera KL. (2022, June). I Abstract presented at the National Athletic Trainers Association (NATA) Annual Meeting and Symposia, Philadelphia, PA.

8. *Bermudez, J., Weight, E., Osborne, B., & Bates, B. (2022, March). *Fostering student success: Academic experiences of Division I, Power 5 football student-athletes.* Presented at the College Sport Research Association annual conference, Columbia, SC.

9. Osborne, B. (2022, February). *When did working out become work?* Presented at the Sport and Recreation Law Association annual conference, Atlanta, GA.

10. Osborne, B. & Ingersoll, M. (2022, February). *The NIL Market is Open: What Attorneys Need to Know.* Presented at the Festival of Legal Learning annual conference, Chapel Hill, NC.

11. *Timpton, S. & Osborne, B. (2021, June). *Experiences of Black Athletes with White Fandom.* Presented at the North American Society for Sport Management annual conference, Minneapolis, MN.

12. *Nottage, G. & Osborne, B. (2021, June). *Experiences of Black Women Athletics Administrators in the NCAA Division I Workplace.* Presented at the North American Society for Sport Management annual conference, Minneapolis, MN.

13. *Rush, C. & Osborne, B. (2021, Feb.). *Benefits and Concerns Abound, Regulations Lack in Collegiate Athlete Biometric Data Collection.* Presented at the Sport and Recreation Law Association annual conference, Atlanta, GA.

14. Osborne, B. (2021, Feb.). *The Evolution of Name, Image and Likeness Rights in Collegiate Sport.* Presented at the Sport and Recreation Law Association annual conference, Atlanta, GA.

15. Grady, J., Osborne, B., & Schoepfer, K. (2021, Feb.). *Signs of the Pandemic: A Law and Risk Management Analysis.* Presented at the Sport and Recreation Law Association annual conference, Atlanta, GA.

16. Osborne, B. (2021, Feb.). *The Complicated Legal Realm of the NCAA and Student-athlete Name, Image and Likeness Rights*. Presented at the Festival of Legal Learning annual conference, Chapel Hill, NC.

17. *Kantor, K., Osborne, B., & Weight, E. (2020, May). *A Data-Driven Approach to NCAA Scholarships Distribution Limits.* Presented at the North American Society for Sport Management annual conference, San Diego, CA.

18. Osborne, B. (2020, May). *Semenya v. IAAF: Targeted Discrimination or Necessary for Fair Competition?* Presented at the North American Society for Sport Management annual conference, San Diego, CA.

19. Cebula, K., Dodds, M., & Osborne, B. (2020, March). *As the College Basketball Bounces: Part III.* Presented at the Sport and Recreation Law Association annual conference, Louisville, KY.

20. Rose, R. & Osborne, B. (2020, March). *Apparel Brand Contracts in Collegiate Athletics: The Title IX Implications*. Presented at the Sport and Recreation Law Association annual conference, Louisville, KY.

21. *Lennon, K. & Osborne, B. (2020, March). *Trademark Protection and the 2%.* Presented at the Sport and Recreation Law Association annual conference, Louisville, KY.

22. *Haroldson, M. & Osborne, B. (2020, March). *Continued Abuse: Are Colleges and Universities Hiding Behind Legal Regulations at the Expense of Collegiate Athletes?* Presented at the Sport and Recreation Law Association annual conference, Louisville, KY.

23. *Kavanaugh, A. & Osborne, B. (2020, March). *Protecting Student-Athlete Free Speech Rights in Athletics Department Social Media Policies.* Presented at the Sport and Recreation Law Association annual conference, Louisville, KY.

24. *Martensson, A. & Osborne, B. (2020, March). *The Legality of Symptom Reporting in Student-Athletes with Concussions. I* Presented at the Sport and Recreation Law Association annual conference, Louisville, KY.

25. *Bermudez, J.R. & Osborne, B. (Advisor) (2020, March). Presented at the Sport and Recreation Law Association annual conference, Louisville, KY.

26. Osborne, B., Dodds, M., & Cebula, K. (2019, March). *The Power of the Courts to Enforce NCAA Rules: The NCAA Basketball Corruption Trials*. Presented at the Sport and Recreation Law Association annual conference, Philadelphia, PA.

27. Osborne, B. (2020, Feb.). *Gender Games: Discrimination in Women's Sport*. Presented at the Festival of Legal Learning, Chapel Hill, NC.

28. Osborne, B. & Drayer, J. (2019, Feb.). *The Status of Daily Fantasy Sports Post* Murphy v. NCAA: *A Modest Proposal.* Presented at the Sport and Recreation Law Association annual conference, Philadelphia, PA.

29. Osborne, B. (2019, Feb.). *NCAA Basketball Corruption Scandal: Are Violations of NCAA Rules Federal Crimes?* Presented at the Festival of Legal Learning, Chapel Hill, NC.

30. Dodds, M., Heisey, K., Osborne, B., & Cebula, K. (2018, September*). Impact Of NCAA Corruption on the Adidas Brand.* Presented at the European Association for Sport Management annual conference, Malmo, Sweden.

31. Osborne, B., Dodds, M., & Cebula, K. (2018, Sept.). *Honest Services Fraud: How a Little Known U.S. Statute is Battling Sport Corruption.* Presented at the European Association for Sport Management annual conference, Malmo, Sweden.

32. Morton, J., Hanna, C., Jensen, J.A., & Osborne, B. (2018, May). *Impact of Prior Practical Experience on Sport Management Professors' Research and Teaching.* Presented at the North American Society for Sport Management annual conference, Halifax, Nova Scotia, Canada.

33. Osborne, B., Dodds, M. & Cebula, K. (2018, March). *As the college basketball bounces: Bribery, fraud and NCAA violations?* Presented at the Sport and Recreation Law Association annual conference, San Antonio, TX.

34. *Mascarella, C. & Osborne, B. (2018, March). *The status of Title IX in 2017.* Presented at the Sport and Recreation Law Association annual conference, San Antonio, TX.

35. *Wayland, E. & Osborne, B. (2018, March). *Gambling and bribery and conspiracy, oh my! A historical review of point shaving in college sport.* Presented at the Sport and Recreation Law Association annual conference, San Antonio, TX.

36. Osborne, B. (2018, Feb.). *Biometric Data Collection and Privacy in Sports.* Presented at the 2018 Festival of Legal Learning, Chapel Hill, NC.

37. Osborne, B. & Jensen, J.A. (2017, Nov). *Using legal cases in sport marketing case studies.* Presented at the Sport Marketing Association annual conference, Boston, MA.

38. Ammon, R., Osborne, B., and Eichkorn, A. (2017, June). *An analysis of concussion legislation in the United States: Is anyone paying attention?* Presented at the North American Society for Sport Management annual conference, Denver, CO.

39. Osborne, B. and *Cunningham, J. (2017, April). *Legal and ethical issues related to use of athletes' biodata in professional sport.* Presented at the Law, Ethics and Big Data Colloquium, hosted by the Wharton School, University of Pennsylvania, Philadelphia, PA.

40. Osborne, B. (2017, March).  *Unequal scholarships opportunities in collegiate sport.*  Presented at the Title IX:  Presented at the Title IX:  History, Legacy, and Controversy conference, Knoxville, TN.

41. Cottingham, M., Moorman, A.J., & Osborne, B. (2017, March).  *Does Title IX handicap advancement of disability sports?*  Presented at the Sport and Recreation law Association annual conference, Las Vegas, NV.

42. McArdle, D., & Osborne, B. (2016, September*).  Pregnancy discrimination, Title IX, and the unintended pregnancy consequences in United States College Sports.*  Presented at the Society of Legal Scholars annual conference, Oxford, England.

43. Moorman, A. & Osborne, B. (2016, May). S*exual violence and college athletics: an examination of how higher education institutions are managing sexual violence and sexual misconduct investigations*.  Presented at the North American Society for Sport Management annual conference, Orlando, FL.

44. McArdle, D. & Osborne, B. (2016, April). *Pregnancy Discrimination, Governance Feminism and the US Model of College Sports.*  Presented at the Socio-Legal Studies Association annual conference, Lancaster, England.

45. Moorman, A., Osborne, B., & Dodds, M. (2016, February).  *Sexual assault and college athletics:  What is being done?*  Presented at the Sport and Recreation Law Association annual conference, New Orleans, LA.

46. *Hegarty, E. & Osborne, B. (2016, February). *The role of the NCAA in medical care of student-athletes*. Presented at the Sport and Recreation Law Association annual conference, New Orleans, LA.

47. *Leeke, R. & Osborne, B. (2016, February).  *Leveling the playing field:  legal ramifications of transgender student-athlete participation in intercollegiate athletics.*  Presented at the Sport and Recreation Law Association annual conference, New Orleans, LA.

48. *McCollum, E. & Osborne, B. (2016, February).  *Title IX financial aid compliance and full cost of attendance stipends:  can they coexist?*  Presented at the Sport and Recreation Law Association annual conference, New Orleans, LA.

49. *Lievense, E. & Osborne, B. (2016, February).  *The protection assumed by loss of value contracts and the rights of the student-athlete.*  Presented at the Sport and Recreation Law Association annual conference, New Orleans, LA.

50. *Isom, J. & Osborne, B. (2016, February).  *An inquiry into the legal ramifications of religious practices in college athletics*.  Presented at the Sport and Recreation Law Association annual conference, New Orleans, LA.

51. Osborne, B. & Hammer, K. (2016, February). *Student-athletes and the right of publicity*. Presented at the Festival of Legal Learning sponsored by the University of North Carolina Law School, Chapel Hill, NC.

52. Osborne, B. (2015, September). Anti-trust or Anti-NCAA? Presented at the European Association of Sport Management annual conference, Dublin, Ireland.

53. Osborne, B. (2015, March). *Sexism, sport and the Fair Labor Standards Act.* Presented at the Sport and Recreation Law Association annual conference, Charlotte, NC.

54. Moorman, A.M. & Osborne, B. (2015, March). *Sexual assault and college athletics: Why are institutions of higher education failing to protect students?* Presented at the Sport and Recreation Law Association annual conference, Charlotte, NC.

55. *Herzog, C. & Osborne, B. (2015, March). *Heads up: The duty of the NCAA to protect its student-athletes.* Presented at the Sport and Recreation Law Association annual conference, Charlotte, NC.

56. *Richards, J. & Osborne, B. (2015, March). *Are student-athletes the only ones who pay for their head injuries?* Presented at the Sport and Recreation Law Association annual conference, Charlotte, NC.

57. *Rankin, C.A. & Osborne, B. (2015, March). *All pay for no play: Title IX implications of full cost of attendance scholarships.* Presented at the Sport and Recreation Law Association annual conference, Charlotte, NC.

58. Osborne, B. & Batista, P. (2015, February). *Four Lawsuits and the NCAA Apocalypse.* Presented at the Festival of Legal Learning sponsored by the University of North Carolina Law School, Chapel Hill, NC.

59. Osborne, B., & Lough, N. (2014, October). *An innovative perspective of marketing implications in college sport.* Presented at the Sport Marketing Association annual conference, Philadelphia, PA.

60. Osborne, B. (2014, October). *Title IX and sexual assault: the strengths and weaknesses of the sexual violence policy.* Presented at the World Association of Sport Management bi-annual conference, Madrid, Spain.

61. Sartore-Baldwin, M., Osborne, B., McCullough, B., Vermillion, M., & Quatman-Yates, C. (2014, May). *Social connection and shared responsibility in sport: Locating sport management's role in issues of exploitation and social justice.* Symposium presented at the North American Society for Sport Management annual conference, Pittsburgh, PA.

62. Weight, E., Osborne, B., & *Chalfin, P. (2014, April). *The value of intercollegiate athletic participation from the perspective of employers.* Paper presented at the College Sport Research Institute annual conference, Columbia, SC.

63. *Hunter, C.J. & Osborne, B. (2014, February). *Go ahead and sign.* Paper presented at the Sport and Recreation Law Association annual conference, Orlando, FL.

64. Pauline, G., & Osborne, B. (2014, February). *Participate at your own risk.* Paper presented at the Sport and Recreation Law Association annual conference, Orlando, FL.

65. *Ketterer, M. & Osborne, B. (2014, February). *Could Sideline 1 be sidelined by antitrust?* Paper presented at the Sport and Recreation Law Association annual conference, Orlando, FL.

66. Osborne, B. (2013, May). *Is the OCR sexual violence liability standard "reasonable"?* Paper presented at the North American Society for Sport Management, Austin, TX.

67. Osborne, B., *Mitchell, C. & *Chalfin, P. (2013, April). *New Criminal Adjudication in Athletics:  Did the NCAA properly punish Penn State?* Paper presented at the Scholarly Conference on College Sport, Chapel Hill, NC.

68. *Sawyer, K. & Osborne, B. (2013, April). *The NCAA's authority to ban post-season bowl participation.* Paper presented at the Scholarly Conference on College Sport, Chapel Hill, NC.

69. Osborne, B. (2013, February). *Sex, Violence, and Student-Athletes: Penn State and Beyond.* Paper presented at the Festival of Legal Learning sponsored by the University of North Carolina Law School, Chapel Hill, NC.

70. Osborne, B. (2013, January). *Cost of attendance and scholarship equity.* Paper presented at the Scholarly Colloquium on Intercollegiate Sports sponsored by the National Collegiate Athletic Association, Grapevine, TX.

71. Osborne, B. & Altman, S. (2012, November). *If you build it, they will have to go: Eminent domain and sports facilities.* Paper presented at the Sports and Entertainment Venues Today annual conference, Columbia, SC.

72. Osborne, B. & Ammon, R. (2012, May). *Heading off traumatic brain injury:  An analysis of concussion legislation in the United States.* Paper presented at the annual meeting of the North American Society for Sport Management, Seattle, WA.

73. *Howell, S. & Osborne, B. (2012, April). *A spike in female participation: A study on the viability of sand volleyball sponsorship at the NCAA Division I level.* Paper presented at the Scholarly Conference on College Sport, Chapel Hill, NC.

74. *Lutz, N. & Osborne, B. (2012, April). *Engaging search firms in the hiring process in Division I athletic departments.* Paper presented at the Scholarly Conference on College Sport, Chapel Hill, NC.

75. Osborne, B. & Davis, T. (2012, March). *Using the Case Note Method to Teach Sports Law to Undergraduate and Graduate Students.* Paper presented at the annual meeting of the Sports and Recreation Law Association, Greensboro, NC.

76. *Lewinter, G. & Osborne, B. (2012, March).  *Don't Ask, Don't Tell?  Coaches' Restriction on Intra-team Dating.*  Paper presented at the annual meeting of the Sports and Recreation Law Association, Greensboro, NC.

77. *Washington, E. & Osborne, B. (2012, March).  *To Separate from the Schools or Not: Examining the Legal Organizational Structures of Athletics Departments*.  Paper presented at the annual meeting of the Sports and Recreation Law Association, Greensboro, NC.

78. Osborne, B. (2011, November).  *Legal Rights of Student-athletes.*  Paper presented at the annual meeting of Sports and Entertainment Venues Today, Columbia, SC.

79. Osborne, B. (2011, July).  *Hot Topics in Women's Sports.*  Paper presented at the annual conference of the Southeastern Association of Law Schools, Hilton Head, SC.

80. Osborne, B. (2011, June).  *Cheerleading and Title IX:  A legal feminist analysis.*  Paper presented at the annual meeting of the North American Society for Sport Management, London, Ontario, Canada.

81. Osborne, B., & Anderson, P. (2011, March).  *Scholarship Equity:  A new look at an old requirement.*  Paper presented at the annual meeting of the Sport and Recreation Law Association, Savannah, GA.

82. *Howell, S., & Osborne, B., (2011, March).  *The impact of Biediger v. Quinnipiac on the NCAA emerging sport of sand volleyball.*  Paper presented at the annual meeting of the Sport and Recreation Law Association, Savannah, GA.

83. Ammon, R., & Osborne, B. (2010, November).  *Balancing act: Advances in stadium security vs. privacy.*  Paper presented at the Sport and Entertainment Venues Today conference, Columbia, SC.

84. Armentrout, S., Bruening, J., Dixon, M., Massengale, D., Mechels, B., Miller, L., & Osborne, B. (2010, June).  *Balancing careers and motherhood:  Experiences of female professors in Sport Management.*  Paper presented at the annual meeting of the North American Society for Sport Management, Tampa, FL.

85. Ammon, R., Hall, S., & Osborne, B. (2010, June).  *Anti-terrorism strategies at sport venues:  A legal analysis of personal rights.*  Paper presented at the annual meeting of the North American Society for Sport Management, Tampa, FL.

86. 43.  Osborne, B. (2010, March). *Women only need apply.*  Paper presented at the annual meeting of the Sport and Recreation Law Association, Albuquerque, NM.

87. Anderson, P. & Osborne, B. (2010, March).  *Title IX:  The 2000s and Beyond*.  Paper presented at the annual meeting of the Sport and Recreation Law Association, Albuquerque, NM.

88. *Lancaster, E. & Osborne, B.  (2010, March).  *Does Congress have the power to force the NCAA/BCS into a post-season playoff?*  Paper presented at the annual meeting of the Sport and Recreation Law Association, Albuquerque, NM.

89. *Daly, J. & Osborne, B. (2010, March).  *Is the National Letter of Intent legally enforceable in North Carolina?*  Paper presented at the annual meeting of the Sport and Recreation Law Association, Albuquerque, NM.

90. *Zullo, R. & Osborne, B. (2010, January).  *Outsourced marketing professionals' perceptions on women's sports.*  Paper presented at the NCAA Scholarly Colloquium "College Sports in Recessionary Times:  Assessing Challenges and Opportunities" at the annual meeting of the National Collegiate Athletic Association, Atlanta, GA.

91. Osborne, B., (2010, January).  *To tax or not to tax?*  Paper presented at the NCAA Scholarly Colloquium "College Sports in Recessionary Times:  Assessing Challenges and Opportunities" at the annual meeting of the National Collegiate Athletic Association, Atlanta, GA.

92. Osborne, B., & Ammon, R. (2009, November).  *Ladies night:  Promotion or discrimination?*  Paper presented as the Featured Legal Research Presentation at the annual meeting of Sports and Entertainment Venues Today, Columbia, SC.

93. Osborne, B., & *Jaco, L. (2009, May).  *Pregnancy:  An exploratory study of student-athlete knowledge and decision making.*  Paper presented at the annual meeting of the North American Society for Sport Management, Columbia, SC.

94. Pedersen, P.M., Osborne, B., Whisenant, W., & Lim, C. (2009, May).  *Professionals' perceptions of sexual harassment:  An analysis of journalists in the sport industry.*  Paper presented at the annual meeting of the North American Society for Sport Management, Columbia, SC.

95. Osborne, B. & Anderson, P. (2009, March).  *Is Title IX an exclusive remedy?*  Paper presented at the annual meeting of the Sport and Recreation Law Association, San Antonio, TX.

96. Anderson, P. & Osborne, B. (2009, March).  *An analysis of litigation involving collegiate coaches in the new millennium.*  Paper presented at the annual meeting of the Sport and Recreation Law Association, San Antonio, TX.

97. *Maddux, B. & Osborne, B. (2009, March).  *"I'll take the buyout to go":  Contract termination and college coaches.*  Paper presented at the annual meeting of the Sport and Recreation Law Association, San Antonio, TX.

98. Osborne, B. (2008, November). *Employer liability for sexual harassment.*  Paper presented at the Sport, Entertainment, and Venues Tomorrow international conference, Columbia, SC.

99. Osborne, B. (2008, May).  *Choose life or scholarship:  the pregnant student-athlete dilemma.*   Paper presented at the annual meeting of the North American Society for Sport Management, Toronto, Ontario, Canada.

100.        Lough, N., Osborne, B., & Tiell, B. (2008, May).  *Perceptions of NCAA athletics directors and senior woman administrators towards work-life conflict:  a divisional comparison.*  Paper presented at the annual meeting of the North American Society for Sport Management, Toronto, Ontario, Canada.

101.        Osborne, B. (2008, April).  *Drafting and enforcing a student-athlete code of conduct.*  Paper presented at the meeting of the College Sport Research Institute, Memphis, TN.

102.        *Meissen, K. & Osborne, B. (2008, March).  *Does APR create a contractual right to an education for student-athletes?*  Paper presented at the annual meeting of the Sport and Recreation Law Association, Myrtle Beach, SC..

103.        Osborne, B. (2008, February).  *University liability for sexual assaults by student-athletes.* Paper presented at the annual meeting of the Sport and Recreation Law Association, Myrtle Beach, SC.

104.        *Cooper, J. & Osborne, B. (2008, February).  *Illegal gambling:  How does the enforcement of illegal gambling impact intercollegiate athletics?* Paper presented at the annual meeting of the  Sport and Recreation Law Association, Myrtle Beach, SC.

105.        Osborne, B. & Pittman, A. (2008, February).  *I've been scalped*!  Paper presented at the annual meeting of the Sport and Recreation Law Association, Myrtle Beach, SC.

106.        *Jaco, L. & Osborne, B. (2008, February).  *Protecting pregnant student-athletes' rights.*  Paper presented at the annual meeting of the Sport and Recreation Law Association, Myrtle Beach, SC.

107.        Osborne, B. (2008, February).  *Regulating the off-field behavior of student-athletes.*  Paper presented at the Festival of Legal Learning, Chapel Hill, NC.

108.        Osborne, B. & Ammon, R. (2007, November).  *Marketing intercollegiate sports: What's Title IX got to do with it?*  Paper presented at the annual meeting of the Sport Marketing Association, Pittsburgh, PA.

109.        Ammon, R. & Osborne, B. (2007, June).  *Title IX compliance past & present:  A comparative analysis of Favia v. Indiana University of Pennsylvania (1992), Barrett v. West Chester University (2003), and Choike v. Slippery Rock University (2006).*  Paper presented at the annual meeting of the North American Society for Sport Management, Fort Lauderdale, FL.

110.     Osborne, B. (2007, April).  *Research on the 'Front Porch':  Scholarship and practice in intercollegiate athletics*.  Paper presented at the annual meeting of the American Educational Research Association, Chicago, IL.

111.     Osborne, B. (2007, March). *"No Lesbians":  Sexual orientation discrimination in sport and Title IX*.  Paper presented at the Girls and Women Rock:  Celebrating 35 Years of Sport & Title IX Academic and Legal Conference, Cleveland, OH.

112.     Tiell, B., Lough, N. & Osborne, B. (2007, March).  *Influence of gender on policy development for life and work balance*.  Paper presented at the Girls and Women Rock:  Celebrating 35 Years of Sport & Title IX Academic and Legal Conference, Cleveland, OH.

113.     *Sorensen, D. & Osborne, B. (2007, March).  *Offensive impact of the "catalyst" bat on Division I collegiate softball programs*.  Paper presented at the annual meeting of the American Alliance for Health, Physical Education, Recreation, and Dance, Baltimore, MD.

114.     *Gale, D. & Osborne, B. (2007, March).  *How much due process does the NCAA actually provide?* Paper presented at the annual meeting of the Sport and Recreation Law Association, Chapel Hill, NC.

115.     *Jones, R. & Osborne, B. (2007, March).  *Third party interaction with current or future student-athletes*.  Paper presented at the annual meeting of the Sport and Recreation Law Association, Chapel Hill, NC.

116.     Anderson, P. & Osborne, B. (2007, March).  *A historical review of Title IX litigation*.  Paper presented at the annual meeting of the Sport and Recreation Law Association, Chapel Hill, NC.

117.     *Stoute, S. & Osborne, B. (2007, March).  *An analysis of intercollegiate athletics coaches salaries at state institutions in North Carolina*.  Paper presented at the annual meeting of the Sport and Recreation Law Association, Chapel Hill, NC.

118.     Osborne, B.  (2007, February).  *Applying Title IX to cases of sexual orientation discrimination in intercollegiate athletics*.  Paper presented at the Festival of Legal Learning, Chapel Hill, NC.

119.     Osborne, B. (2006, June).  *Work-life balance and the law*.  In *Work-Life Balance in the Sport Industry*.  Symposium conducted at the meeting of the North American Society for Sport Management, Kansas City, MO.

120.     Pittman, A. & Osborne, B. (2006, March).  *Naughty or Tice:  Ticket scalping issues in college and professional sports*.  Paper presented at the annual meeting of the Sport and Recreation Law Association, Albuquerque, NM.

121.     Pittman, A. & Osborne, B. (2005, March).  *Lord of the Rings:  The selling of the rings – U.S. v. Welch*. Paper presented at the annual meeting of the Sport and Recreation Law Association, Virginia Beach, VA.

122.     Osborne, B. (2005, March).  *Sexual harassment policies of NCAA-I athletics departments*.  Paper presented at the annual meeting of the Sport and Recreation Law Association, Virginia Beach, VA..

123.     Osborne, B. & Tomasini, N.  (2004, June).  *Adding non-performance values to the NCAA revenue distribution scheme*. Paper presented at the annual meeting of the North American Society for Sport Management, Atlanta, GA.

124.     Osborne, B. (2004, April).  *The role of the Senior Woman Administrator*.  Paper presented at the annual meeting of the American Alliance of Health, Physical Education, and Dance, Atlanta, GA.

125.     Pittman, A. & Osborne, B. (2004, March).  *Legislating gambling:  A risk worth taking?*  Paper presented at the annual meeting of the Sport and Recreation Law Association, Las Vegas, NV.

126.     Osborne, B. (2004, March).  *Handicapping Title IX:  The Heather Sue Mercer case*.  Paper presented at the annual meeting of the Sport and Recreation Law Association, Las Vegas, NV.

127.     *Brunner, J. & Osborne, B. (2003, May).  *Using the SportsBusiness Journal in graduate courses*.  Paper presented at the annual meeting of the North American Society for Sport Management, Ithaca, NY.

128.     Osborne, B.  (2003, March).  *Title IX in the 21st Century*.  Paper presented at the annual meeting of the Society for the Study of the Legal Aspects of Sport and Physical Activity, Atlanta, GA.

*\* denotes graduate student*

## Unreferreed Works

### *Invited Presentations and Engaged Scholarship*

1.  Speaker (October, 2022).  *Title IX Impact in Women's Sports: A Personal Account.* SMP Title IX 50th Anniversary Celebration, UW-Parkside, Kenosha, WI.

2.  Speaker (October, 2022).  *Transgender Participation at the Intersection of Law and Science,* National Sport Law Institute Fall Symposium, Marquette School of Law, Milwaukee, WI.

3.  Speaker (2022, August).  *Title IX.* The SERMA (Sports and Entertainment Risk Management Association) Podcast.  Available at

4.  Osborne, B. & Myers, J. (2022, June).  *Legal Concerns Associate with Wearable Devices and Sport.*  Presentation at the National Athletic Trainers Association (NATA) annual convention, Philadelphia, PA.

5.  Speaker (2022, April). *Title IX.*  Panel presented at UW-Parkside Sport Management Conference, Kenosha, WI.

6.  Speaker (2022, April).  *Transgender athlete hormones and performance: Understanding the law and the medicine.*  EXSS graduate seminar, Chapel Hill, NC.

7.  Speaker and facilitator (2022, April).  *What do you want to know about Name, Image and Likeness?*  Hosted by Sport and Entertainment Law Association, NC School of Law, Chapel Hill, NC.

8.  Guest expert (2022, April). *Name, Image and Likeness Regulation.* WUNCPolitics Podcast.

9.  Guest expert (2022, February).  *Student-athletes, Name, Image and Likeness, and the NCAA.*  WCHL Radio, Who's Talking with D.G. Martin. https://chapelboro.com/category/wchl/weekend-shows/whos-talking

10. Moderator and speaker (2021, Nov.).  *Title IX Athletics Requirements, Myths and Cases.*  Sport Lawyers Association "Nine for IX" Title IX Celebration Seminar Series, Zoom.

11. Guest speaker (2021, Oct.).  *NLRB, Labor Laws and Impact on NCAA Athletes.* Womble Bond Dickenson podcast, Charlotte, NC.

12. Speaker (2021, Oct.).  *Legal and Ethical Issues Related to Athlete Biometric Data.* United States Olympic and Paralympic Committee (USOPC) Data Summit, Colorado Springs, CO.

13. Speaker (2021, Sept.).  *Contracts 101 for Student-Athletes*, Name, Image and Likeness Education Seminar, University of North Carolina, Chapel Hill, NC.

14. Panelist (2021, April).  *Current Issues for Intercollegiate Athletes*, Sport Management Symposium, UW-Parkside, Kenosha, WI.

15. Featured speaker (2021, March).  *Everything you need to know about Name, Image and Likeness and the NCAA*, Sport and Entertainment Law Student Association Lunch and Learn, University of North Carolina School of Law, Chapel Hill, NC.

16. Speaker (2020, Dec.).  *Student-athlete Rights and College Athletics*, Sport Law Speaker Series sponsored by the UNC School of Law Development Program, Chapel Hill, NC.

17. Featured speaker (2020, Sept.).  *The NCAA, Amateurism, and Name, Image and Likeness:  It's Complicated*, Legal and Ethical Issues in Sports and Entertainment Law symposium, National Sport Law Institute, Marquette University School of Law, Milwaukee, WI.

18. Guest speaker (2020, Sept.)  *Conducting Legal Research in Sport Management,* IDST 194:  Modes of Inquiry, University of North Carolina at Chapel Hill, NC.

19. Panelist (2020, March). *Hot Topics in Sport Law.* Brandeis School of Law, University of Louisville, Louisville, KY.

20. Moderator (2019, Oct.).  *The Caster Semenya case*.  UNC Sport and Entertainment Law Student Association Lunch and Learn program, Chapel Hill, NC.

21. Expert commentator (2019, Oct.).  *Should students athletes get compensated for use of their likeness?*  The State of Things, WUNC 91.5, Durham, NC.

22. Speaker (2019, Oct.).  *Creating Opportunity:  Gender Discrimination and Title IX.* U.S. State Department Sport Diplomacy Program/Zimbabwe Delegation, Chapel Hill, NC.

23. Keynote Speaker (2019, April).  *Legal and Ethical Issues Related to Biometric and Activity Data Tracking for Athletes at all Levels.*  American Medical Society for Sports Medicine annual conference, Houston, TX.

24. Panelist (2019, April).  *Medical Retirement vs. Return to Sports with Multiple Head Injuries?*  Neurology panel at American Medical Society for Sports Medicine annual conference, Houston, TX.

25. Featured Speaker (2019, March). *Adidas, Fraud and How the College Basketball Bounces.*  Cardozo Society monthly luncheon speaker, Raleigh, NC.

26. Panelist (2019, Feb.).  *The Future of Biometrics in the Sport and Entertainment Industry.*  Commercial Sport and Entertainment Safety and Security Summit (NCS4).  Durham, NC.

27. Speaker (2019, Jan.).  *Legal and Ethical Issues for Biometric Data Use in Sport*. US Lacrosse Sports Medicine Symposium, Philadelphia, PA.

28. Speaker (2018, Nov.).  *Women's Leadership in Male Dominated Professions.* Piedmont International University Women's Leadership Forum, Winston-Salem.

29. Expert commentator (August 2018).  *The Adventures of Janet Guthrie,* documentary film presented nationally on Fox Sports 1, NASCAR Race Hub.

30. Panelist (2018, April).  *Impact of the #MeToo Movement on the Sport and Entertainment Industries.*  Sponsored by the Sports and Entertainment Law Society and Women in Law at Wake Forest Law School.

31. Panelist (2017, Oct.).  *Intersex and Transgender Issues in Sports.*  2017 National Sports Law Institute annual symposium, Marquette Law School, Milwaukee, WI.

32. Panelist (2017, Oct.).  *Athletes' Rights.*  2017 National Sports Law Institute annual symposium, Marquette Law School, Milwaukee, WI.

33. Speaker (2017, June).  *Athletes, Biometrics and Ethical Implications.*  Legal and Ethical Issues in Sport and Entertainment Ethics CLE, Marquette Law School, Milwaukee, WI.

34. Speaker (2017, April).  *Who Owns Biometric Data for Sports Teams?*  2017 Intellectual Property Law and Sports & Entertainment Law Sections Joint Annual Meeting, Wilmington, NC.

35. Panelist (2017, April).  *Top Ten Cases:  Year in Review.*  2017 Intellectual Property Law and Sports & Entertainment Law Sections Joint Annual Meeting, Wilmington, NC.

36. Featured speaker (2017, February).  *Women and the Global Sports Industry.*  Dunlevie Honors Colloquium, University of North Carolina at Chapel Hill, NC.

37. Speaker (2016, December).  *Legislative Efforts and Federal Regulatory Framework of Daily Fantasy Sports.*   The Rise and Current Status of Daily Fantasy Sports Leagues conference hosted by Wake Forest School of Law, Winston-Salem, NC.

38. Panelist. (2016, October). *Gender Issues in Collegiate Athletics.* The Changing Landscape of Collegiate Athletics: Legal and Business Issues conference hosted by the National Sports Law Institute and Marquette School of Law, Milwaukee, WI.

39. Lecture. (2016, April). *Title IX: Past, Present and Future Issues*.  UNC-Charlotte School of Law, Charlotte, NC.

40. Panelist.  (2016, April).  *Athletes and Right of Publicity*.  UNC Sport and Entertainment Law Spring Symposium, Chapel Hill, NC.

41. Speaker. (2016, February). *Feminism and Title IX.*  Lecture at Duke University Cultural Anthropology department, Durham, NC.

42. Speaker.  (2015, October).  *Gender issues in athletics.*  Campbell University Law School, Raleigh, NC.

43. Panelist. (2015, October). *Sexual harassment and collegiate athletics*.  Maintaining Fairness, Integrity and Safety in Sports symposium hosted by the National Sport Law Institute, Marquette University Law School, Milwaukee, WI.

44. Panelist. (2015, June).  *Academic survival tips for new student-athletes*.  UNC Student-Athlete Academic Support Center, Chapel Hill, NC.

45. Guest speaker (2015, June).  *Current Title IX litigation*.  NACWAA Title IX Circle.

46. Panelist (2015, March*).  Crime in sports.*  UNC Sports and Entertainment Law Association Spring Sports Symposium, Chapel Hill, NC.

47. Speaker (2014, November).  *Student-athletes and sexual assault: understanding institutional obligations*.  Carolina Meadows lecture series, Chapel Hill, NC.

48. Faculty/Presenter (2014, November).  *The (r)evolution of women in sport.* Sports in American Society program sponsored by the UNC Humanities and Human Values Program, UNC Center for School Leadership Development, Chapel Hill, NC.

49. Panelist (2014, November).  *The Future of Football.*  Wake Forest School of Law, Winston-Salem, NC.

50. Symposium Panelist (2014, October).  *Through the looking glass:  a year in the life of an academic*.  Sport Marketing Association annual conference, Philadelphia, PA.

51. Panelist (2014, August).  *Is it time for a Uniform Bullying Statute?*  Southeastern Association of Law Schools Annual Conference, Amelia Island, FL.

52. Panelist (2014, May).  *Celebrating and understanding Title IX*.  Women's Leadership Symposium, Charlotte, NC.

53. Panelist (2014, April).  *Non-traditional careers.*  Outside the Box with Sports and Entertainment conference sponsored by the North Carolina Central University Sports and Entertainment Law Society, Durham, NC.

54. Panelist (2014, April).  *Minority representation.*  Outside the Box with Sports and Entertainment conference sponsored by the North Carolina Central University Sports and Entertainment Law Society, Durham, NC.

55. Panelist.  (2014, March).  *O'Bannon and NCAA Litigation.* Legal Issues in College Athletics symposium sponsored by the UNC Sports & Entertainment Law Association, Chapel Hill, NC.

56. Panelist.  (2013, November).  *What does it take to get students to come to class prepared?* Center for Faculty Excellence 4th Annual Faculty Showcase, University of North Carolina, Chapel Hill, NC.

57. Guest Speaker (2013, July).  *Title IX at 41*.  UNC-Charlotte School of Law, Charlotte, NC.

58. Panelist (2013, March). *Penalties for Athletes.* Vice and Morality in Sports Symposium sponsored by the University of Virginia Sports and Entertainment Law Journal, Charlottesville, VA.

59. Panelist (2013, March). *Legal and Practical Issues for Women in Sports and the Sports Law Industry.* Vice and Morality in Sports Symposium sponsored by the University of Virginia Sports and Entertainment Law Journal, Charlottesville, VA.

60. Panelist (2013, March). *Dual Degree and Non-Traditional Jobs in Sports.* University of North Carolina Sports and Entertainment Law Symposium presented by the Sports and Entertainment Law Student Association, Chapel Hill, NC.

61. Lecturer (2012, November). *Careers in Sports.* Durham Academy Sports Administration class.

62. Featured Speaker (2012, October). *Title IX at 40: Past, Present and Future.* Presentation sponsored by the Duke University Sports and Entertainment Law Society, Women Law Student Association and the American Constitution Society, Durham, NC.

63. Panelist (2012, October). *NASCAR-Live Nation Mock Negotiation.* Sports and Entertainment Law School Symposium sponsored by the North Carolina Bar Association Sports and Entertainment Law Section, Raleigh, NC.

64. Lecturer (2012, October). *Title IX – Global Implications.* Sports and Globalization program sponsored by UNC Global Studies, Chapel Hill, NC.

65. Panelist (2012, October). *Why Can't We Tweet? The First Amendment, UNC Athletes and Social Media.* First Amendment Day panel discussion sponsored by the UNC Center for Media Law and Policy, Chapel Hill, NC.

66. Lecturer (2012, August). *The Legacy and International Impact of Title IX on Women's Sports.* Invited lecture for study abroad students from Keele University, England.

67. Panelist (2012, May). *Title IX: 40 Years Later.* Plenary Panel at the Sports Lawyers Association annual conference, San Diego, CA.

68. Speaker (2012, May). *Teaching Sports Law.* Two breakout sessions at the Sports Lawyers Association annual conference, San Diego, CA.

69. Panelist (2012, April). *Wrestling with Title IX: A Discussion of the Historic Legislation on its 40th Anniversary.* Scholarly Conference on College Sport, Chapel Hill, NC.

70. Speaker (2011, October). *Sexual Assault and Sexual Violence: The OCR Dear Colleague Letter.* National Sports Law Institute annual symposium, Milwaukee, WI.

71. Speaker (2011, October).  *The Emerging Sports Debate.*  National Association of Collegiate Women Athletics Administrators annual convention, Pittsburgh, PA.

72. Speaker (2011, September).  *Examining the NCAA's Collegiate Model:  The Line between Professionalism and Amateurism in Intercollegiate Athletics.*  Parr Center for Ethics Lunch and Learn Program, University of North Carolina, Chapel Hill, NC.

73. Speaker (2011, August).  *Title IX Compliance and Interscholastic Athletics Programs.* Training for the Orange County Public Schools, Hillsborough, NC.

74. Panelist (2011, June).  *Beyond Participation Opportunities:  What should I know about Title IX...Now?*  CLE Panel discussion at the National Association for Athletics Compliance annual convention, Orlando, FL.

75. Panelist (2011, June).  Interview/discussion on CBC Public Radio.

76. Moderator/Panelist (2011, May).  *Emerging Sports*.  Panel discussion at the NCAA Gender Equity and Issues Forum, Bethesda, MD.

77. Moderator (2011, March).  *An incipient crisis of legitimacy:  Doping, the WADA Code and US sports.*  Panel discussion at the annual meeting of the Sport and Recreation Law Association, Savannah, GA.

78. Speaker (2010, September).  *Everything you really need to know about Title IX.* Presented at Slippery Rock University, Slippery Rock, PA.

79. Speaker (2010, August).  *Title IX Issues in High School Athletics*.  Presented at the Florida High School Athletics Association Compliance Seminar, Boca Raton, FL (repeated in Ocala, FL).

80. Speaker (2010, April).  *Institutional Liability for Athlete Abuse.*  Presented at the NCAA Gender Equity and Issues Forum, Chicago, IL.

81. Panelist (2009, November).  *Equity, Employment and Title IX.*  Presented at the Title IX:  Beyond Sports to the Fair Pay Act and Salary Negotiation sponsored by the University of North Carolina Office of the Provost, Graduate and Professional Student Federation, Student Government, Association of Women and Faculty Professionals, Diversity and Multicultural Affairs, American Association of University Women and the Carolina Women's Center, Chapel Hill, NC.

82. Panelist (2009, October). *Examining Drug Testing & Drug Education.*  Presented at the annual meeting of the National Association for Collegiate Women Athletics Administrators, Denver, CO.

83. Speaker (2009, October).  *It's all fun and games until someone gets hurt.*  Presented at Hot Topics in the Sports and Entertainment Industries, North Carolina Bar Association, Winston-Salem, NC.

84. Speaker (2009, September).  *Sexual harassment.*  Presented at the Title IX Symposium sponsored by Wake Forest Law School, Winston-Salem, NC.

85. Speaker (2009, April).  *Conducting legal research in sport management.* Presented at doctoral seminar lecture series, Texas A&M University, College Station, TX.

86. Panelist (2009, March).  *Sex and sexual orientation discrimination.*  Presented at the Sport, Sexuality and Culture International Conference, Ithaca, NY.

87. Speaker (2009, March).  *Women and sport:  Contemporary issues.*  Presented at the W.E.L.L. lecture series, University of North Carolina, Chapel Hill, NC.

88. Speaker (2008, October).  *Negotiating contracts*.  Presented at the annual meeting of the National Association for Collegiate Women Athletics Administrators, Atlanta, GA.

89. Speaker (2008, October).  *Managing game environments.*  Presented at the annual meeting of the National Association for Collegiate Women Athletics Administrators, Atlanta, GA.

90. Moderator (2008, February).  Moderated academic seminar on C*urrent issues in collegiate conference administration featuring Jim Delany, Commissioner of the Big 10*  sponsored by the UNC Law School Alumni Speaker Series.

91. Speaker (2008, February).  *Contemporary Title IX Issues in High School Athletics*. Presented at the bi-annual meeting of the  North Carolina High School Athletics Association City/County Athletics Directors, Chapel Hill, NC.

92. Speaker (2007, November). *Conducting Legal Research in Sport Management*. Presented at a doctoral seminar in Sport Management, Indiana University, Bloomington, IN.

93. Panelist (2007, October).  *Finding Equal Footing:  Gender Issues in Sports*. Presented at Reversing Field:  Examining Commercialization, Labor & Race in 21st Century Sports Law Conference sponsored by the West Virginia University College of Law, Morgantown, WV.

94. Panelist (2007, May).  *Regulation of Athlete Conduct*. Presented at the annual meeting of the Sports Lawyers Association, Cambridge, MA.

95. Panelist (2007, February). *Gender and Sexual Orientation Discrimination in College Athletics*. Presented at the Association for Applied Sport Psychology Southeast Regional Conference, Greensboro, NC.

96. Featured Speaker (2007, January).  *Title IX Issues in Intercollegiate Athletics.* Presented at the  Northern Illinois University Sport Management Colloquium, Dekalb, IL.

97. Lecture (2007, January).  *Athletics Department Responsibility and Control Over Student-Athlete Conduct.*   Presented for students, faculty, and athletics department staff  Northern Illinois University, Dekalb, IL.

98. Panelist (2006, December).  *Athletic Department Culture and the Influence on Student-Athlete Behavior.*  Presented at the annual Intercollegiate Athletics Forum sponsored by SportsBusiness Journal, New York, NY.

99. Speaker (2006, October).  *Gender Discrimination and Sexual Harassment in the Golf Industry.*  Presented at the Individual Performer Sports:  Emerging Legal and Business Issues Annual Symposium of the  National Sports Law Institute, Milwaukee, WI.

100.   Panelist (2006, March). *Writers Wanted – What's the Process?*  Presented at the annual meeting of the Sport and Recreation Law Association, Albuquerque, NM.

101.   Speaker (2005, September). *Gender, Employment and Sexual Harassment Issues.* Presented at the Sport and Entertainment Law section annual meeting sponsored by the North Carolina Bar Association, Greensboro, NC.

102.   Facilitator (2005, May). S*how Me the Money.  Presented at the Women's* Leadership Symposium on Intercollegiate Athletics, Indianapolis, IN.

103.   Facilitator (2005, May).  *Can I be a Mom, Too?* Presented at the Women's Leadership Symposium on Intercollegiate Athletics, Indianapolis, IN.

104.   Speaker (2004, October). *Title IX and Sexual Orientation Discrimination in Intercollegiate Athletics.*  Presented at the Evolving Nature of High School, College and Olympic Sports in the 21st Century Symposium by the National Sports Law Institute, Milwaukee, WI.

105.   Panelist  (2004, September). *Are Youth Sports Too Competitive?*  Presented at the University of North Carolina School of Journalism and Mass Communications, Chapel Hill, NC.

106.   Speaker (2003, July). *What is a SWA?*  Presented to the Committee on Women's Athletics of the National Collegiate Athletics Association, Sante Fe, New Mexico.

107.   Speaker (2003, April). *Title IX 101.*  Presented at the NCAA Compliance Seminar, Charlotte, NC.

108.    Panelist (2002, February).  *Issues in College Athletics*.  Presented at the North Carolina State Bar Association Young Lawyer's Division, Arts, Entertainment and Sports Law Symposium,  Chapel Hill, NC.

109.    Speaker (2001, October).  *Issues Related to the NCAA*.  Presented at the annual meeting of the   Sports and Entertainment Law section sponsored by the North Carolina Bar Association Foundation, Southern Pines, NC.

110.    Panelist (2001, March).  *Getting a Jump on the Game:  Current Issues and Opportunities in College Athletics*.  Presented at the North Carolina State Bar Association Young Lawyer's Division, Arts, Entertainment and Sports Law Symposium, Chapel Hill, NC.

111.    Panelist (2000, June).  *Economics of Women's Sports*.  Presented at *Show Me the Money:  the Business of Sports* seminar sponsored by the University of North Carolina School of Journalism and Mass Communication, Chapel Hill, NC.

112.    Panelist (2000, April).  *Issues in College Athletics*.  Presented at the North Carolina State Bar Association Young Lawyer's Division, Arts, Entertainment and Sports Law Symposium, Chapel Hill, NC.

113.    Panelist (2000, February).  *Enforcement Mechanisms and Title IX*.  Presented at the *Competing in the 21st Century:  Title IX, Gender Equity, and Athletics* symposium sponsored by the University of Michigan Journal of Law Reform, Ann Arbor, MI.  February 4-5, 2000.

114.    Panelist (1999, March).  *Marketing and the Popularity of Women's Basketball*.  Presented on *The State of Things*  WUNC radio,  Chapel Hill, NC.

115.    Expert guest (1999, February).  *Equal Pay Act and Gender Equity in Athletics Employment*.  Presented at a Sport Management seminar at UW-Parkside, Kenosha, WI.

116.    Interview (1999, February).  *Title IX*.  Interviewed on *The State of Things*, WUNC radio, Chapel Hill, NC.

117.    Panelist (1998, June).  *Risk Management for Division III Athletics*.  Presented at the annual meeting of the National Association of Collegiate Directors of Athletics, Marco Island, FL.

### *Invited Publications and Engaged Scholarship*

1.  Dodds, M. & Osborne, B. (2021).  Law.  *Encyclopedia of Sport Management* (Paul M. Pedersen, ed.).  Cheltenham, UK: Edward Elgar Publishing, p. 250-253. **ISBN:** 978 1 80088 327

2.  Kantor, M.K., Weight, E.A., Osborne, B. (2019).  NCAA Scholarship Model History Report.  Chapel Hill, NC:  Center for Research in Intercollegiate Athletics.

3.  Kantor, M.K., Osborne, B., Weight, E.A. (2019). NCAA Financial Aid Proposal Database (1971-2019). Chapel Hill, NC: Center for Research in Intercollegiate Athletics.

4.  Osborne, B. (2018).  Student-athlete protests, free speech and political retaliation. *Legal Issues in Collegiate Athletics*.

*5.*  Osborne, B. (2016). Hey! Hey! Can we pray?  Cheerleader case won't go away.  *Sport Litigation Alert,* 13(6) n.p. April 1, 2016.

6.  Osborne, B. (2015).  NCAA Concussion lawsuits a plea for strict liability.  *Concussion Litigation Alert,* (June 12, 2015), n.p.  Reprinted in *Legal Issues in Collegiate Athletics*, 16(9), p.9.

7.  Osborne, B. (2014).  Learn to recognize and minimize risks and liabilities.  *College Athletics and the Law*, (January 2014), p. 4.

8.  Osborne, B. (2014).  Case involving cheerleaders and free speech turns on mootness doctrine.   *Sports Litigation Alert,* 11(15), p. 3-5.  Reprinted in *Legal Issues in High School Athletics*, Sept-Oct 2014, pp. 5-7.

9.  Osborne, B. (2013).  "Rawlings Panel" provides recommendations for athletics reform. *Legal Issues in College Athletics,* 14(12), p. 12.

10. Osborne, B. (2012).  Concussion legislation:  Worth the paper it's written on? *Concussion Litigation Reporter*, 1(3).  Reposted on *Concussion Policy and the Law* blog at concussionpolicyandthelaw.com.

11. Osborne, B. (2011).  Heading off traumatic brain injury.  *North Carolina Bar Association Sports and Entertainment Law* Newsletter, 12(1), p. 1-3.

12. Osborne, B. (2011).  Title IX:  A bump on the road to pay-for-play.  *Sports Litigation Alert*, (August 26, 2011) n.p.  Reprinted in *Legal Issues in College Athletics,* 12(11), p. 5-6.

13. Osborne, B. (2011).  Varsity Cheer: Proceed with caution.  *Legal Issues in College Athletics,*12(8), 5-6.

14. Osborne, B. (2011).  Scholarships Equity:  Have you reviewed your athletics related financial aid ratios? *Legal Issues in College Athletics,* 12(5), 5, 11.

15. Osborne, B., & Jones, M. (2011).  Reflecting on the Past and Planning for the Future. *Legal Issues in College Athletics*, 12(3), p. 3.

16. Osborne, B. (2010).  "Welcome Back – Please Behave!" Regulating the Off-Field Behavior of Student-Athletes**.** *Legal Issues in College Athletics,* 11(11), p. 5.

17. Tiell, B., Dixon, M., Sweeney, K., Lough, N., Osborne, B. and Bruening, J. (2006). Stopping the Pull. *Athletic Management,* XVIII (5), 63-67.

18. Osborne, B. (2006). Sexual Orientation Discrimination in Intercollegiate Athletics. *Sports and Entertainment,* 6(4), 1, 3-4.

19. Osborne, B. (2006). Ask the Expert. *From the Gym to the Jury*, 16(5), 11.

20. Osborne, B. (2005). Gender, Employment and Sexual Harassment Issues in the Golf Industry. *North Carolina Bar Foundation Continuing Legal Education*, IV, 1-39.

21. Osborne, B. (2001). Ensuring Equity. *Training and Conditioning*, XI(3), 23-27.

22. Bickford, B.(2000). Risk Management: Is Your Program Safe? *The Tiger's Tale II*, 2(2), 4.

**23.** Bickford, B. (1999). Sweatshirts and Sweatshops. *Directing Athletics*, 2(2), 8-11.

24. Bickford, B. (1999). In the Long Run: Setting up a Department Wide Plan for Detecting Eating Disorders. *Athletic Management*, XI(4), 26 - 29.

25. Bickford, B. (1994). Trouble in the Long Run? *Training and Conditioning*, IV(3), 14-19.

26. Bickford, B. (1994). Creatine Supplements: A Tough Pill to Swallow. *Training and Conditioning*, IV(2), 52-56.

27. Bickford, B. (1993). Dropping the Scale, *Training and Conditioning*, III(4), 35-39.

28. Bickford, B. (1993). Trouble in the Long Run? *Athletic Management*, V(5), 23-26.

29. Bickford, B. (1993). Edible Energy. *Training and Conditioning*, III(2), 29-35.

30. Bickford, B. (1992). Screening the Choices. *Training and Conditioning*, II(4), 15-19.

31. Bickford, B. (1992). Appropriate Measures. *Athletic Management*, IV(5), 21-26.

32. Bickford, B. (1992). A Deadly Image. *Training and Conditioning*, II(2), 11-15.

33. Bickford, B. (1991). A Deadly Image. *College Athletic Management*, III(4), 14-17.

34. Bickford, B. (1991). The Nutritional Edge. *College Athletic Management*, III(2), 19-21.

35. Bickford, B. (1990). Fitting the Pieces. *College Athletic Management*, II(5), 56-57.

36. Bickford, B. (1990). Eating Disorders, Part 3: Treatment and Prevention. *Scholastic Coach*, 59(8), 86-88.

37. Bickford, B.  (1990).  Eating Disorders, Part 2:  Anorexia and Bulimia.  *Scholastic Coach*, 59(6), 124-127.

38. Bickford, B.  (1989).  Eating Disorders, Part 1.  *Scholastic Coach*, 59(5), 76-77, 88.

## <u>Book Reviews</u>

*Sports Law and Regulation:  Cases, Materials and Problems (Second Ed.),* by Matthew J. Mitten, Timothy Davis, Rodney K. Smith, and Robert C. Berry.  Aspen Publishers, 2009.

*Sport Law:  A Managerial Approach*, by Linda Sharp, Anita Moorman, and Cathy Claussen, Holcomb Hathaway, Publishers, 2004.

*Management of Physical Education and Sport*, 11th edition by Charles A. Bucher and March L. Krottee, McGraw Hill, 2003.

**TEACHING RECORD**

**Teaching Assignments for Past 5 Years**

| Semester | Course Name | Number of Students |
|---|---|---|
| Spring 2023 | EXSS 326 Legal Aspects of Sport | 117 |
| | EXSS 749 | 12 |
| Fall 2022 | EXSS 748 Legal Issues in Collegiate Athletics | 10 |
| | LAW 506 Amateur Sport Law | 25 |
| | EXSS 395 Independent Research | 1 |
| | LAW 399 Research | 1 |
| Summer 2022 | EXSS 326 Legal Aspects of Sport | 35 |
| Fall 2021 | EXSS 748 Legal Issues in Collegiate Athletics | 13 |
| | LAW 200 Professional Sport Law | 30 |
| | EXSS 395 Independent Research | 1 |
| Summer 2021 | EXSS 326 Legal Aspects of Sport | 29 |
| Spring 2021 | EXSS 326 Legal Aspects of Sport | 103 |
| | EXSS 749 NCAA Governance and Compliance | 13 |
| Fall 2020 | EXSS 748 Legal Issues in Collegiate Athletics | 13 |
| | LAW 506 Amateur Sport Law | 24 |
| Summer 2020 | EXSS 326 Legal Aspects of Sport | 47 |
| Spring 2020 | EXSS 326 Legal Aspects of Sport | 104 |
| | EXSS 395 Independent Research | 1 |
| | EXSS 749 NCAA Governance and Compliance | 11 |
| Fall 2019 | EXSS 748 Legal Issues in Collegiate Sport | 11 |
| | LAW 200 Professional Sport Law | 30 |
| Summer 2019 | EXSS/WGST Women and Sport | 43 |
| | EXSS 326 Legal Aspects of Sport | 31 |
| | EXSS 223 International Sport Management | 20 |
| Spring 2019 | EXSS 326 Legal Aspects of Sport | 102 |
| | EXSS 395 Independent Research | 21 |
| | EXSS 749  NCAA Governance and Compliance | 11 |
| Fall 2018 | LAW 506 Amateur Sports Law | 37 |

EXSS 748 Legal Issues in Collegiate Sport                          11

## **All Courses Taught**

EXSS 050  Discrimination and Sport (First Year Seminar), 2009 - 2014

EXSS 260  Women in Sport, undergraduate course, 1998 - 2019

EXSS 221  Introduction to Sport Administration, undergraduate course, 1998 – 2008, 2013

EXSS 223  International Sport Management, undergraduate course, 2019

EXSS 326  Legal Aspects of Sport, undergraduate course, 2004 - present

EXSS 244  Legal Issues in Collegiate Sport, graduate course, 1998 - present

EXSS 246  Organizational and Financial Management of Sport, graduate course, 2002 – 2003

EXSS 249  Practicum in Sport Administration, graduate course, 2002 - 2006

EXSS 248  Collegiate Sports Marketing, graduate course, 1998 – 2002

EXSS 395  Independent Research, 2019 – present

EXSS 749  NCAA Governance and Compliance, graduate course,  2007 - present

EXSS 750  Sport Administration Leadership Seminar I, graduate course,  2005 – 2008, 2012

EXSS 751  Sport Administration Leadership Seminar II, graduate course,  2006 - 2008

LAW 200   Professional Sports Law, 2007, 2011, 2013, 2015, 2017, 2019, 2021

LAW 506   Amateur Sports Law, 2016, 2018, 2020

## **Additional Instruction**

### *Doctoral Committee*

2011 -2012
Andrew Westney, School of Journalism and Mass Communication, *Barbarians' gate: Inside the business of mixed martial arts.*

2002 – 2005
Pamela Laucella, School of Journalism and Mass Communication, *Sonya Henie and Jesse Owens:  A Case Study of Press Coverage on Both 1936 Olympic Games in Garmisch-Partenkirchen and Berlin.*

### *Master's Theses Directed*

2021-2022
Grayson Atkins, *Performance under pressure: an analysis of field goal attempts in pressure situations*

Joshua Gupton, *Student-athlete opinions on aspects of the NCAA Name, Image, and Likeness Policy*
Kerrigan Miller, *The grad transfer experience: Challenges, well-being, and institutional support systems for graduate transfer student athletes at ACC institutions*
Camille Wilson, *Lack of Participation by Black Male Student-Athletes in Academic and Life Skills Programming*


2020-2021
Kelsey Grambeau, *Student-athlete Perceptions of Name, Image, and Likeness Compensation*

Tim Kubel, *A Successful Athletic Talent Development Environment - A Holistic Ecological Case Study of an Elite College Soccer Program*

Kelly Lennon

Annika Martensson, *Collegiate Coaches' Knowledge of Disordered Eating Behaviors: A replica study of Joanne C. Turk's "Collegiate Coaches' Knowledge of Eating Disorders" (1999)*

2019-2020
Nicole Alexander, *Reported versus Perceived Workload of College Coaches and Athletic Trainers*

Brett LeClair, *The Lassiter Rank II: A Renewed Ranking System and Analyis of Division I Athletic Department Success*

Gabrielle Nottage, *Raise Up: An Analysis of the Experience of Black Women Senior Level Administrators in College Athletics*

Saadia Timpton, *Looking Into the Stands- An Analysis of the Relationship Between the White Fan and the Black Athlete*

2018-2019
Olivia Dwyer, *Coaches Perceptions of Gender Bias in Collegiate Sport*

Courtney Mascarella, *Gender Bias in Collegiate Sport Social Media Posts*

Sarah Sessoms, *A History of Women's Athletics at the University of North Carolina at Chapel Hill, 1920 – 1970.*

2017-2018
Katherine L. Burger, *The Alchemy of Competitive Success: An Analysis of Division I Women's Rowing Resources*

Simon Carcagno, *Assessing the Effect of Collegiate Head Coach's Gender on Female Athlete Outcomes*

Clay Pfeiffler, *An Analysis of Student-Athlete-Centric Expenses In NCAA Power 5 Athletic Departments*

2016-2017
Shinann Featherston, *Building an alternative NCAA Division I competition model*

Ethan Lievense, *Adaptive sports: Assessing the inaugural year of the ECAA and adaptive sport NCAA championships*

M. Emilee McCollum, *The impact of the NCAA emerging sports program for women on Title IX compliance: A 10-year longitudinal study.*

2015-2016
Kate Kantor, *Title IX compliance vs. NCAA scholarship limits.*

Tori Krause, *Investigating the handling of sexual assaults involving collegiate student-athletes.*

2014-2015
Mark Ketterer, *Analysis of university mission statements and the missions and strategic plans of athletics departments.*

C.J. Hunter, *Side Out:  The effects of early recruiting on NCAA Division I volleyball student-athlete retention.*

Jessica Rippey, *An analysis of NCAA Division I institution and conference Senior Woman Administrators' self-perception and career intentions*

2013-2014
Allison Bass, *Recent Graduate Donor Motivations*

John Dougherty, *An Empirical Analysis of Correlation between Incentive Clauses and Performance  among Coaches at NCAA Football Bowl Series Public Institutions*

Brie Farley, *An analysis of the NCAA appeals process and the new "Abuse of Discretion" standard for appealing a penalty*

Grant Leiendecker, *Examining relationships between athletic department finances, athletic success, and academic success among NCAA Division I FBS institutions*

Catherine Mitchell, *The prevalence of legal issues in NCAA Division I college athletics and how departments manage these issues*

2012-2013
Justin Freeman, *Examining the Relationship between Athletics Spending and Directors' Cup Standings*

Patrick Marsh, *An Analysis of Equity in Athletics Disclosure Act Data at NCAA Division I Institutions that have Discontinued Sports*

Ernie Washington, *An Analytical and Empirical Study of the Legal Entity Structures of Football Bowl Subdivision Athletic Departments*

Brandon Yeargan, *Athletics Administrators Motivations for Starting Intercollegiate Football Programs*

<u>2011-2012</u>
Scott Howell, *A Spike in Female Participation: A Study on the Viability of Sand Volleyball Sponsorship at the NCAA Division I Level*

Natalie Lutz, *Engaging Search Firms in the Hiring Process in Division I Athletic Departments*

<u>2010-11</u>
Elizabeth Lancaster, *Content Analysis of Violent Incidents in College Sports by Gender*

Erin Lindsey, *Head Coaching Intentions of NCAA Division I Assistant Women's Volleyball Coaches*

Jordan Skolnick, *Trimming Teams:  An Examination of Decision Making Processes in Intercollegiate Athletic Departments when Multiple Varsity Sport Programs are Eliminated*

<u>2009-10</u>
Emily Cozart, *The Relationship between the Online Secondary Ticket Market and College Athletics.*

Meeghan Ford, *Perceived Effectiveness of the NACWAA/HERS Institute for Administrative Advancement.*

Brandon Maddux, *Where did the handshake go?  A Legal Analysis of College Coaching Contract Litigation.*

Che Mock, *Policies and Procedures: An Analysis of the UNC Rams Club's Decision Making Process*

Brett Smith, *Should the NCAA be above the law?:  An examination of the NCAA's Antitrust Status.*

<u>2008-09</u>
Brandon Fanney, *The effect of one-and-done players on Division I men's college basketball programs.*

Blake Griffin, *An examination of division level and player position ont he preferred leadership behaviors of NCAA men's soccer athletes.*

Sarah Humphries, *An examination of the relationship between end of season conference rankings and the bowl game selection process in the Atlantic Coast Conference.*

Lindsey Jaco, *Pregnancy prevalence, outcomes and knowledge of rights for NCAA Division I female student-athletes.*

Kristina Meissen, *A critical analysis of the Carolina Leadership Academy's CREED Program at the University of North Carolina-Chapel Hill.*

Jacklin Wallgren, *An Examination of Criminal Arrests and Convictions of Football Student-Athletes at Atlantic Coast Conference Institutions as Reported by the Media*

2007-08
Lauren Bifulco, *Justifications and Perceived Effectiveness of Leadership Academies Within Collegiate Athletics.*

Amanda Cooley, *The Atlantic Coast Conference:  A Pre- and Post-Expansion Analysis.*

Kristian Graves, *An Examination of the Potential for Expansion of Outsourced Marketing into NCAA Division I-AA.*

Shelly Green, *A Profile of the Ineligible and Not-Retained (0/2) Student-Athletes of the Atlantic Coast Conference.*

Ryan Jones, *Motivations behind financial philanthropy from former athletes to the University of North Carolina.*

Robert Ockenfuss, *An Analysis of Decision-Making by Non-Revenue Sports Student-Athletes in Choosing the University of North Carolina at Chapel Hill*

Anna Tharrington, *An Analysis of the Presence and Perception of the Juris Doctorate Degree in Division I College Athletics.*

2006-07
Shoshanna Engel, *A Case Study of Vanderbilt University's New Model of Intercollegiate Athletics Administration.*

Trevor Gorman, *An Examination of the NCAA Men's Soccer College Cup.*

Amy Howe, *A Study of the Financial and Participatory Opportunities Afforded to Women's Athletics by North Carolina NCAA Member Institutions*

Steve Stoute, *A Cross Sectional Study of Intercollegiate Basketball and Soccer coaches Salaries at State Institutions in North Carolina.*

Andre Williams, *An Examination of the National Collegiate Athletic Association's Transfer Rule and its Effect on Academic Success at a Division I-A Institution.*

2005-2006
Mary Ball, *A Comparison of Gender Equity at Institutions with a Female Athletic Director versus Institutions with a Male Athletic Director*

Shelley Johnson, *The Effects of Gender, Source of Evaluation and Sport on Perceived Leadership Ability of Student-Athletes on Olympic sports at the University of North Carolina at Chapel Hill.*

Dana Sorensen, *The Statistical Impact of the Louisville Slugger "Catalyst" Bat on the 2005 Division I Collegiate Softball Season*

2004 – 2005
Ronald Brewer, *Analysis of the Relationship Between College Football Student-Athlete's Hometown Environment and their Athletic and Academic Success*

Aimee Carpenter, *Analysis of the Relationship between Institutional Factors and NCAA Major Violations*

Sandra Duncan, *Factors Affecting Institutional Funding of NCAA Division I Athletics Programs*

Malaika Underwood, *Student-Athlete Resource Program: A Curriculum Designed to Provide Recruiting and Academic Resources to Underprivileged College-Bound Student-Athletes*

2003-2004
Clare Duffy, *Analysis of NCAA Division IA Athletics Department Sexual Harassment Policies and Procedures*

Vanessa Fuchs, *A Comparison of the Career Paths of NCAA Division I, II and III Female Directors of Athletics and Senior Woman Administrators*

Panos Manologlou, *Achieving UEFA Licensing for the Greek Football Federation: A Case Study*

Daniel Satter, *An Empirical Analysis of the Final Four Teams in the NCAA Division I Men's Basketball Tournament, 1987-2003*

Cobey Shoji, *Identification and Career Paths of Minority Senior Level Athletic Administrators in NCAA Division I-A*

Colleen Wrenn, *An Examination of Administrative Support Factors to Improve Olympic Sport Coaches Job Satisfaction*

Sean Wright, *An Examination of Athletic Spending and Relationship to Success in NCAA Division III Athletics*

2002-2003

John Brunner, *Women and Minority Recruitment and Retention Policies and Procedures of Graduate Sport Management and Related Educational Programs*

Christyn Chambers, *NCAA Division I-A Graduation Rates and NACDA Directors' Cup Points System*

Richie Grimsley, *Factors Associated with the Changes in Football and Men's Basketball Season Ticket Prices in the ACC and Southeastern Conference from 1997-2001.*

Nicole A. Hudson, *The History and Significance of the Women's Central Intercollegiate Athletic Association Basketball Tournament*

Wilson Lloyd, *Contemporary Athletics Directors:  Traditional vs. Business Models*

2001-2002
Kyle Johnson, *Multi-Media Rights Analysis in Major College Athletics*

Jacqueline Schuman, *An Evaluation of the NCAA CHAMPS/Life Skills Program.*

Cara Turano, *A Qualitative Analysis of Fund Raising in Women's Intercollegiate Athletics.*

Stacy Warner, *Analysis of Recruiting Expenses and Coaching Salaries and their Relationship to Conference Success for Female Athletic Programs at all NCAA Divisional Levels.*

2000-2001
Samantha Baggett, *The Most Desired Characteristics of an Intercollegiate Women's Soccer Team Head Coach from the Student-athlete's Perspective.*

Rachel Melchiorre, *A Comparison of Gender Equity at Universities with Separate versus Merged Men's and Women's Athletic Departments.*

Amy Schaeperkoetter, *The Development of a Compliance Manual for the University of North Carolina  Athletic Department.*

Suzette Thweatt, *Collegiate Licensing at the University of North Carolina.*

1999-2000
Thomas Stepp, *An Analysis of NCAA Division I-A Football Sports Information Directors' Experiences with Independent Internet Sites.*

Cheryl Wah, *A Comparison Between the Levels of Satisfaction with Collegiate Experience Between NCAA Division I and Division III Softball Players*

1998-1999
Amanda Braun, *Twenty Five Years of Women's Varsity Intercollegiate Basketball at Duke University*

## *Master's Theses Committee Member*

41

2021-2022
Araad Fisher, *A false promise? Evaluating intercollegiate athletics as a tool for socioeconomic uplift*

Elizabeth Roberts, *The value of experience: Analyzing experience as a predictor for success in the NCAA women's basketball tournament*

2020-2021
Carrigan Bain, *NCAA Suicides:  An Examination of Crisis Communication Around Student-Athlete Suicides*

Jordan Bermudez

2019-2020
Kerren Kollock, *Tackling the Exploration of Football Player Disc Profiles*

2018-2019
Cameron Johnson, *Analyzing the Graduate Transfer Rules in NCAA Division I Men's Basketball*

2017-2018
Jordan Fieulleteau, *Portrayal of White and Black NFL Athletes with Regards to Violence Against Women:  A Comparative Content Analysis*

Alexander Kimura, *The Impact of Search Firm Use in Athletic Director Hires Based on Athletic, Academic, And Financial Measures of Division I Power Five Institutions*

2015-2016
Archer Bane, *To serve and protect: does selling alcohol at intercollegiate football stadiums equate to higher criminal activity?*

Amy Bonfiglio, *Occupational Measures of Former NCAA Athletes and Traditional Students.*

Jonathan Teich,  A*n analysis of coach perspectives on intercollegiate athletics  scholarship models.*

2014-2015
Stephen Ianotta, *An analysis of current practices for NCAA Division I-FBS  student-athlete exit interviews.*

Ross Schwarzber, *Indirect Effects Of Reclassification From The Football Championship Subdivision To The Football Bowl Subdivision*

2013-2014
Peter Chalfin, *The Value of Intercollegiate Athletics Participation from the Perspective of Employers*

Caroline Dressler, *Student-athlete educational outcomes: A retrospective evaluation*.

2012-2013
Brian Day, *Athletic Director Leadership and Success in NCAA Division III Athletic Departments*

Greg Lewinter, *Employee Satisfaction with Academics (Standards, Performance, and Integrity) Governance, and Finance of Intercollegiate Athletics at the University of North Carolina at Chapel Hill (UNC-CH)*

Mary Rob Plunkett, *The Value of Intercollegiate Athletics Participation from the Perspective of Former Athletes*

2011-2012
Patricia Early, *An Investigation of the Relationship Between Junior Girl's Golf Ratings and NCAA Division I Women's Golf Ratings*

2010-2011
Danielle Gaynor, *A Financial Analysis of Revenue and Expenditure Trends within Division IA Athletic Departments.*

2009-2010
Gerry Fisk, *An Examination of Associated Costs with Reclassification for a Private Christian College in the Northeast*

Blythe Worley*, The Organizational Culture of Learfield Sports Properties*

2007-2008
Jason Howell, *A Comparative Study Examining the Difference Between the Offensive Production of the -5 Length to Weight Collegiate Baseball Bat and the -3 Length to Weight Collegiate Baseball Bat.*

2005-2006
Sam Albert, *An Analysis of the Relationship between Athletic Expenditures and Success of Olympic Sports Teams at NCAA Division I Institutions*

Ward Gibson, *A Comparison of Sponsorship Recognition Ability Among UNC Student Men's Basketball Fans*

Andy Pogach, *A Study of the Opinions of Ivy League Men's Basketball Student-Athletes and coaches on a Potential Post-Season Conference Tournament*

2004 – 2005
Kevin Gailey, *Permanent Corporate Signage at the University of North Carolina at Chapel Hill: A Survey of Student and Faculty Opinions*

Carrie Havel, *The NCAA Division I Women's Basketball Championship: An Analysis of First and Second Rounds and the Change to Predetermined Sites*

Seth Reeves, *Financial Impacts of the Bowl Championship Series in Division IA College Football*

2003-2004
Neilia Bliss, *Relationship between Obesity, Physical Activity and Diet in Youth*

John Erck, *The Academic and Economic Effects of Conference Expansion on Schools that Change Affiliation*

Lance Markos, *A Study of the Relationship between a Successful Career in the NFL and the Quality of University Attended*

2002-2003
Katherine V. Brown, *An Analysis of the 2002 NCAA Men's Basketball Championship Bracketing Procedures*

Nick Conway, *An Analysis of the 2002 Carolina Field Hockey Season and System*

Jacob Hepp, *The Relationship between Draft Position and Success in the NBA*

2001-2002
Lisa Barringer, *A Comparison of the Perceptions of Athletic Directors, Head Coaches, and Student-Athletes Regarding Recruited Foreign Student-Athletes in the Atlantic Coast Conference.*

Brian Frerking, *Analysis of Factors Influencing College Selection by prospective Elite High School Basketball Players*

Zack Lassiter, *The Lassiter Rank:  A New Ranking and Analysis of Division IA Athletic Department Success.*

2000-2001
John Mark Adkison, *Expectations for Institutions Deciding whether to Terminate NAIA Membership and Join the NCAA.*

Heather Deaner, *An Exploratory Factor Analysis of Collegiate Athletes' Perceptions of Psychological Adjustment to Sport Disengagement*

Elizabeth Freeland, *Perceptions of Collegiate Coaches on Coach Education and Certification in the United States*

Keith Howard, *Desegregation of College Football in the Southeast.*

Nyaka Nii Lampti, *An Assessment of Fear of Failure as Related to Gender, Athletic participation, Level of Athletic Competition and Sport Type.*

Jonathan Metzler, *The Relationship Between Fear of Failure and Persistence on a Motor Task.*

Melissa Perry, *An Analysis of NCAA Major Violation Penalties and On-the-Field Success.*

Eric Roedl, *An Analysis of the Opinions of Athletic Directors and Athletic Academic Support Directors Regarding Freshman Eligibility.*

Daniella Rubin, *Insulin Response to Moderate-intensity 30-minute Swim in Healthy, Active Individuals.*

1999-2000
Kevin Hendrick, *A History of the North Carolina Governor's Council on Physical Fitness and Health*

Kelly Mieszkalski, *Perceptions of Sexual Harassment: Collegiate Female Athletes and Non-Athletes.*

Nicole Saunches, *Analysis of Exit Survey of Student-Athletes at the University of North Carolina at Chapel Hill from 1994 to 1999.*

Robert Zullo, *A Study of the Level of Satisfaction with Outsourcing Marketing Groups at NCAA Division I-A Schools*


## Undergraduate Honors Thesis

2013-2014
Beth Sherling, *Club rugby players perceptions of the viability of elevating women's rugby from club to varsity status*


## Independent Study Advisor

2020-2021
Chelsea Rush, *Legal Issues Related to Collection and Use of Student-Athlete Biometric Data*

2016-2017
Jennie Cunningham, *Use of athlete biometric data in sport: Legal considerations*

Antwan Alexander, *The NCAA's Focus on the Student in Student-Athlete*

2015-2016
Josephine Kim, *Contemporary issues in entertainment law*

Stacy Kelly, *Gender and sexuality discrimination in international sport*

2014-2015
Danielle Eustace, *Title IX inequities in marketing women's collegiate sport*

2013-2014
Jenifer Polera, *Title IX's contact sport exception:  Clinging to stereotypes to the detriment of everyone.*

2012-2013
Ryan Eletto, *The NBA's Single entity Argument After* American Needle:  *Close but no cigar.*
Ellyn Henderson, *Contemporary Athletic Conference Realignment and the Law*

2011-2012
Michael Coletta, *Is the BCS system a violation of anti-trust law?*

2010-2011
Stephanie Delgado, *Time Out: A Legal, Economic, and Policy Analysis of the Current NBA One-and-Done Rule*

2008-2009
Jaime Gilbert, internship
Darren Hill, internship
Nick Hutchins, *The Role of Agents in Professional Sports*
Derrick Pitts, internship
Jennifer Redman, internship
Chris Weatherly, internship

2007-2008
Sean Alford, *The Art of Negotiating an NFL Rookie Contract*

2006-2007
Brad Darby, *Steroids: The New Era in Sports; Testing, Federal Investigations, and Today's Top Athletes*
Julie Gladchuk, *Managing Special Events*
Nicole Jhabvala, *Sports Law and the Media*
Jennifer Jones, *The Arbitrary Punishment of Professional Athletes for "Immoral" Behavior by Professional Sports Leagues, Commissioners, Teams, and Corporate Sponsors*

2005-2006
Lindsay Tarpley, *Title IX and the Growth of Women's Soccer*
Christopher Wood, *Anti-Trust:  Maurice Clarett and the NFL Initial Eligibility Rule*

2004-2005
Cheryl Wah, *The Red Sox, Doug Mientkiewicz, and "The Ball"*

2002- 2003
Sean Wright, *Profiling Senior Woman Administrators*
Christopher Roberts, *Full Scholarships and NCAA Division I Football*
Rebecca Post, *The Future of Female Athletes:  Will Title IX Fail Them?*
Brian Smouse, *Commercialization in College Athletics:  Businesses or Educational Organizations?*

<u>2000-2001</u>
Melissa Coyne, *Issues in Intercollegiate Sport Administration*
Amy Whittier, *Legal Issues Related to Red-Shirting and Medical Eligibility*

<u>1999-2000</u>
Siri Mullinx, *Coaching Female Athletes.*
Erin Berg, *Commercialism in Athletics*
Chase Martin, *The Amateur'$ World:  Professionalization of College Sport.*

## **Independent Research Advisor**

<u>Spring 2022</u>
- 1 student:  examination of best practices for black football student-athlete success programming

<u>Spring 2021</u>
- 2 students:  examination of NCAA major infractions cases, 2003 to present

<u>Spring 2020</u>
- 1 student:  sex discrimination and pay inequity in women's sport

<u>Spring 2019</u>
- 6 students:  archival research on history of women's athletics at the University of North Carolina
- 10 students:  quantitative study on gender bias in college social media accounts

## **GRANTS**

## **Funded**

| | |
|---|---|
| 2022 | Summer Legal Research Assistance Grant (PI-100%)<br>Funded by the UNC School of Law ($5,460). |
| 2021 | Miller, K. (PI), Osborne, B. (PI), Pauline, G. (Co-I), & Hancock, M. (Co-I). *Experiences of Graduate-Transfer Student-Athletes.*  ACC Innovation Grant ($1,200). |
| 2021 | Summer Legal Research Assistance Grant, (PI-100%)<br>Funded by the UNC School of Law ($3,500). |

| | | |
|---|---|---|
| 2020 | Weight, E. (PI), Popp, N. (Co-I), Osborne, B. (Co-I), Jensen, J. (Co-I), Bates, B. (Co-I), Malekoff, R. (Co-I), Smith, D. (Co-I). *Leading the Industry in Data-Driven Decision Making: The ACC Innovation Initiative.* Atlantic Coast Conference. ($30,000). | |
| 2020 | Weaver, K. (PI), Weight, E. (Co-I), Haagen, P. (Co-I), Broome, L. (Co-I), Osborne, B. (Co-I), Bates, B. (Co-I), Cooper, J. (Co-I), Schmalbeck (Co-I). *"Reform" Review to Inform New Governance Structure Modelling Proposal.* The Knight Commission on Intercollegiate Athletics ($30,000). | |
| 2018 | Summer Legal Research Assistance Grant, (PI-100%) Funded by the UNC School of Law | $3,990 |
| 2017 | Weight, E. (PI), Harry, M. (Co-I), Lewis, M. (Co-I), Jensen, J. (Co-I) Popp, N. (Co-I), Osborne, B. (Co-I) (2017). *The educational impact of physical activity: The Walking Institute program evaluation.* The Oak Foundation **($50,000).** | |
| 2017 | Summer Legal Research Assistance Grant, (PI-100%) Funded by the UNC School of Law | $3,990 |
| 2016 | *Durham Bulls Market Research Grant.* Popp, N. (PI), Weight, E., Jensen, J., & Osborne, B. (15%) Funded by Durham Bulls Baseball Club. | $2,200 |
| 2016 | Summer Legal Research Assistance Grant, (PI-100%) Funded by the UNC School of Law | $3,990 |
| 2015 | Summer Legal Research Assistance Grant, (PI-100%) Funded by the UNC School of Law | $3,458 |
| 2014 | Exploring a Division I conference model federated by sport. Weight, E., (P.I.) Malekoff, R., Cooper, C., Osborne, B. (10%) Popp, N. Funded by The Knight Commission on Intercollegiate Athletics | $15,000 |
| 2014 | Summer Legal Research Assistance Grant, (PI-100%) Funded by the UNC School of Law | $3,458 |
| 2013 | Summer Legal Research Assistance Grant, (PI-100%) Funded by the UNC School of Law | $1,500 |
| 2012 | Summer Legal Research Assistance Grant, (PI-100%) Funded by the UNC School of Law | $3,420 |
| 2012 | Student-Athlete Exit Survey Project, (PI-100%) Funded by the UNC Department of Athletics | $400 |
| 2009 | *What I See at UNC*, (teaching grant, 100%) | $500 |

Funded by the Office of Undergraduate Education and the
Johnston Center for Undergraduate Excellence

2008          Cobey Course Development Grant (teaching grant, 100%)          $3,500
              First Year Seminar – Discrimination and Sport

Fall 2004     *Evaluation of Conference Expansion and Women's Championships* $ 400
              (PI-100%).  Funded by the Atlantic Coast Conference.

2002-2003     *What is a SWA?* (PI-100%).          $3,325
              Funded by NCAA Education and Outreach.

1998 – 1999   *Women's Leadership in Intercollegiate Sport* (PI-100%)          $500
              Funded by the Program for Public Policy and Sport

## Non-Funded

2020          Wolohan, J. (PI) & Osborne, B. (Co-I) (2020).  *Recruitment of International
              Athletes: A comparison of social networks vs. agency.*  ACC Innovation
              Initiative Research Grant Program ($4,800).

2019          Weight, E. (PI), Popp, N. (Co-I), Osborne, B. (Co-I), Jensen, J. (Co-I),
              Malekoff, R. (Co-I), Smith, D. (Co-I), (2019). *Leading the Industry in Data-
              Driven Decision Making: The ACC Innovation Initiative.* Atlantic Coast
              Conference. ($500,000).

2018          *ACC Academic Consortium Athletics in Higher Education Research &
              Collaboration Initiative.* Investigators:  Weight, E**.** Popp, N., Osborne, B.,
              Malekoff, R., Renner, J., Broome, L. (2018). Submitted to Atlantic Coast
              Conference Academic Consortium. ($410,000).

2015          Proposal submitted to the Knight Commission on Intercollegiate Athletics.
              Principal investigators Weight, E.A. & Malekoff, R.; co-investigators Popp, N.,
              Osborne, B., Warner, S. Ridinger, L., Shapiro, S., Dwyer, B.
              *Creating an Alternative Division I Competition Structure Model.*    $20,000

2014          Proposal submitted to Guilford County Schools School District     $60,000
              *Title IX compliance and administrative education*

2013          Proposal submitted to Sport, Health and Activity Research and
              Policy Center for Women and Girls (SHARP).  *Evaluating Title IX
              Scholarships Compliance*          $12,500

2012          Proposal submitted to Arts and Sciences Grants for Interdisciplinary Initiatives.
              Principal investigator:  Weight, E.A. Co-investigators:  Smith, A, Boxill, J,
              Reznick, S., Groff, D., and Osborne, B.          $10,000

2011          Proposal submitted to Arts and Science Grants for          $10,000

Interdisciplinary Initiatives

| | | |
|---|---|---|
| 2010 | Proposal submitted to Arts and Sciences Grants for Interdisciplinary Initiatives | $15,000 |
| 2008 | Application submitted for the Institute for the Arts and Humanities Academic Leadership Program (ALP) for 2009-2010. | $7,000 |
| 2007-2008 | Pre-proposal submitted to the National Operating Committee on Standards for Athletic Equipment; Joseph Myers, principle investigator. | |
| 2007-2008 | Carolina Women's Center Faculty Scholar proposal | |
| 2006-2007 | Robertson Scholars Grant proposal | |
| 2005-2006 | Proposal to Knight Commission on Athletics for funding to develop a center for the study of intercollegiate athletics | |
| 2002-2003 | University Research Council grant | |
| 2000-2001 | University Research Council grant | |

## PROFESSIONAL SERVICE

### <u>To Discipline – Sport Management</u>

College Sport Research Institute, research affiliate, 2007 – 2013

European Association for Sport Management
      Annual conference, Law and Ethics Section Chair, 2019 – present

European Sport Management Quarterly
      Reviewer, 2015 - present

Journal of Applied Sport Management
      Manuscript reviewer, 2018 – present

Journal of Contemporary Athletics
      Editorial Review Board, 2008 – present

Journal of Global Sport Management
      Guest editor with Erianne Weight and Jonathan Jensen for special issue *Beyond the US: The Globalization of Intercollegiate Athletics*

Journal of Intercollegiate Sport
      Editorial Board, 2012 - present
      Manuscript reviewer, 2012 – present

Journal of Issues in Intercollegiate Athletics
      Manuscript reviewer, 2018 – present

Journal of Sport
      Manuscript reviewer, 2019 - present

Journal of Sport History
      Manuscript reviewer, 2012 – present

Sports Management and Marketing, 2020 – present
      Review Editor, Editorial Board, 2020 - present

National Collegiate Athletic Association
      Board of Directors, Forum for the Scholarly Study of Intercollegiate Athletics in Higher Education, 2012 - 2015
      Chair, Credentials Committee 1993-94
      Credentials Committee, 1991- 1994

North American Society for Sport Management, member, 1998 – present
      Strategic Planning Committee, 2012 – 2015
      Women in NASSM (WIN) section member, 2006 – present
      Journal of Sport Management reviewer, 2009 – present

NASSM Annual Conference Abstract Section Head, 2012 - present

National Association of Collegiate Women Athletic Administrators
     General Counsel, 2009 - 2012
     Title IX Advocacy Committee, 2002 – present
     Research Cluster, 1991 - present
     Fall Forum, Boston Organizing Committee, 1992-93

Sport Management Review
     Reviewer, 2014 – present

The Collective, member, 2020 - present

Women's Sports Foundation, member, 1990 – present
     Dorothy Harris Scholarship committee, March 2008

Women's Sport and Physical Activity Journal
     Editorial Board, 2012 – present
     Reviewer, 2011 – present

World Association for Sport Management (WASM)
     Scientific Review Committee, 2019 - present

Eastern Collegiate Athletic Conference
     Award of Valor Committee, 1992 - present,  Chair 1994-95
     Baseball Tournament Selection committee, 1992 - 1994
     Women's Basketball Awards Committee, 1991 - 1994, Chair 1993-94

Governor's Committee for Women's Health and Fitness (Massachusetts), 1991 – 1993

United States Olympic Committee Athlete Education Mentoring Network, 1990 – 1998

## To Discipline – Law

American Bar Association, member 1997 – present
     Sport and Entertainment Law section, member 1997 – present

National Women's Law Center
     Title IX Leaders Network, 2005 – present

North Carolina Bar Association
     Member, Sport and Entertainment Law Section
          --Past Chair, 2009 - 2010
          --Chair, 2008 - 2009
          --Vice Chair, 2007 - 2008
          --Section Council, 2006 – 2009, 2012 – 2015
          --Executive Committee, 2007 – 2010, 2012 – present
          --Pro Bono Committee chair, 2021 – present

--CLE Committee member, 2004 – present
--Program Planner, 2008, 2009, 2015
--Amateur Sports Committee member, 2004 – present
--Lawyers in the Schools (pro bono):  February 2, 2008; October 3, 2007.

Rocky Mountain Law Journal, Editorial Board, 2015 – present

Sport and Recreation Law Association, member, 1998 – present
Board of Directors, Member at Large, 2005 – 2007
Host, 20th Annual Conference on Sport, Physical Activity, Recreation and Law, 2007
*Journal of Legal Aspects of Sport* Editorial Board, 2005 – present
--Co-Editor, Special Issue on Legal Issues in College Athletics, 2023
Marketing Committee, 2005 – 2012; Chair, 2005-2007.

Sports Lawyers Association, member 2001 – present
CLE Committee Member, 2007 – present

## To UNC-Chapel Hill

College of Arts and Sciences Administrative Review Board, 2020- present

College of Arts and Sciences Diversity Liaison for EXSS, 2021 - present

Academic Support Program for Student-Athletes (ASPSA) Advisory Board, 2019 – 2020

Title IX Compliance Review Committee, Spring 2016 – Spring 2018

Search Committee, Title IX Coordinator, Fall 2013

Administrative Review for Donna Bickford, Director Carolina Women's Center, 2011

Carolina Women's Center, Gender Equity Committee, 2008 – 2012

Faculty Athletics Committee (faculty elected position), 2008 – 2014

Faculty Committee on the Status of Women, 2005 – 2011
Chair, 2008 - 2010

Faculty Nominating Committee, Spring 2009

Student Recreation Center Board of Directors, 2002 – 2004

Study Abroad EXSS liaison, 2020 - present

UNC Advance Team, Internal Advisory Committee, 2009 – 2010

## To Department of Exercise and Sport Science

Diversity Committee, 2017 – present;  Chair, 2020-21

Departmental Faculty Executive Committee, 2015 – present

Curriculum Committee, Fall 1999 – Fall 2018, Fall 2022- present

Lifetime Fitness Program Review committee – Fall 2018

Undergraduate Sport Administration Track Coordinator, Fall 2007 – Spring 2013

Graduate Sport Administration Specialization Coordinator, Fall 2000-Spring 2008;
  Fall 2015 – Spring 2020; Fall 2022- present

Blyth Lecture committee
  Spring 2008: Travis Tygart, Chief Executive Officer USADA
  Fall 2006:  Hodding Carter, University of North Carolina at Chapel Hill
  Spring 2006: Len Kravitz, University of New Mexico and Michael Clark, NASM
  Spring 2004: Jamie Pollard, CFO, University of Wisconsin Athletics
  Spring 2001: Robin Green,  Deputy Director NCAA Division I
  Spring 1999: James Delany, Commissioner Big 10 Conference

Search Committee
  For Teaching Assistant Professor, EXSS experiential education and DEI, 2023
  For fixed term Sport Psychology position, 2016
  For Lecturer/Advisor in Sport Administration, 2013; 2017
  for Assistant Professor in Sport Administration, 2010-2011 (Co-chair)
  for Visiting Lecturer in Exercise Physiology, 2008
  for Assistant Professor in Sport Administration, 2008-2009
  for Lecturer in Sport Administration, 2008-2009
  for Associate Professor in Sport Administration, 2006-2007; 2007-2008
  for Assistant Professor in Sport Administration, 2002-2003  (Chair)
  for Assistant Professor in Athletic Training, 2000 - 2001
  for Woollen Office Staff , 1999-2000; 2001-2002; 2002-2003

EXSS Earey Award Committee, Spring 2014, Spring 2017

EXSS Faculty Awards Nominating Committee, Fall 2015

EXSS Scholar Athlete Committee, Spring 2014

EXSS Strategic Plan Committee, 2004 – 2006; 2015

EXSS Tenure and Promotion Documents Committee, Fall 2012

Lifetime Fitness Program Evaluation Committee, Chair, 2010

Nominating Committee for Department Chair
  Chair, 1999 – 2000
  Member, 2009 – 2010

Program for Public Policy in Sports
  Secretary/Treasurer, 1999-2004
  Ad hoc committee member, 1998 - 1999