# EXHIBIT 5

# To the Declaration of Rakesh N. Kilaru

1          UNITED STATES DISTRICT COURT

2       FOR THE NORTHERN DISTRICT OF CALIFORNIA

3               OAKLAND DIVISION

4

5  IN RE: COLLEGE ATHLETE NIL
   LITIGATION
6                              No. 4:20-cv-03919 CW
   _____/
7

8

9

10

11

12

13

14       ** TRANSCRIPT MARKED CONFIDENTIAL **

15       VIDEOTAPED DEPOSITION OF SEDONA PRINCE

16            Thursday, January 19, 2023

17

18

19

20

21

22

23  Reported By:

24  LINDA VACCAREZZA, RPR, CLR, CRP, CSR. NO. 10201

25  JOB NO. 220887

Confidential

1           THE VIDEOGRAPHER:  This is the start of

2   Media labeled Number 1 of the video recorded

3   deposition of Sedona Prince in the matter In re:

4   College Athlete NIL litigation in the United States

5   District Court for the Northern District of

6   California, Oakland Division.  Case number is

7   4:20-CV 03919-CW.  This deposition is being held at

8   715 Hearst Avenue in Berkeley, California on

9   January 19th, 2023 at approximately 9:03 a.m.

10          My name is Joseph Blea.  I'm the legal

11  video specialist from TSG Reporting, Inc.

12  headquartered at 228 East 45th Street, Suite 810,

13  New York, New York 10017.  The court reporter today

14  is Linda Vaccarezza in association with TSG

15  Reporting.

16          Counsel, would you please introduce

17  yourselves starting with the questioning attorney.

18          MR. SOMVICHIAN:  Yeah.  Woody Somvichian

19  with Cooley representing the PAC-12.

20          MR. YASMEH:  Joshua yasmeh from Cooley

21  representing the PAC-12.

22          MR. LAIRD:  Robert Laird with Wilkinson

23  Stekloff for the NCAA.

24          MS. HOUCK:  Pearlynn Houck with Robinson &

25  Bradshaw for the Southeastern Conference.

Confidential

1          MS. SISCO:  Emilee Sisco with Hagens

2  Berman Sobol Shapiro for the plaintiffs.

3          THE VIDEOGRAPHER:  And also with you today

4  --

5          MS. SISCO:  There's Jennifer Preston-

6  Gambler, Winston Stawn, also for the plaintiffs.

7          THE VIDEOGRAPHER:  Thank you.

8          Will the court reporter please swear in

9  the witness.

10                    SEDONA PRINCE,

11         Having been duly sworn by the Certified

12 Shorthand Reporter, was examined and testified as

13 follows.

14                    EXAMINATION

15 BY MR. SOMVICHIAN:

16     Q.  Good morning, Ms. Prince.  I just

17 introduced myself a few minutes ago.  So again, I

18 represent the PAC-12 and I'm going to ask you some

19 questions today about this litigation that you're

20 involved in.

21         You understand you're here in connection

22 with a litigation against several defendant?

23     A.  Yes.

24     Q.  Involving name image and likeness and

25 other issues?

Confidential

1       A.   Yes.

2       Q.   Have you ever been deposed before?

3       A.   No?

4       Q.   So we'll just go through some quick ground

5   rules so that we have an organized day today.

6            You were just administered an oath.  You

7   understand that you're obligated to give truthful

8   and accurate responses to the best of your ability?

9       A.   Yes.

10      Q.   Is there any reason you can't do that

11  today?

12      A.   No.

13      Q.   If I ask a question and you don't

14  understand, feel free to ask me to rephrase.  I'll

15  try to do my best to ask a better question.  If I

16  ask a question you don't ask for clarification and

17  respond, we'll assume that you understood the

18  question.  Is that fair?

19      A.   Yes.

20      Q.   We can take breaks during the day.  We can

21  figure out a schedule.  I just ask that we don't

22  take breaks while a question is pending.  Okay?

23      A.   (Witness nods head up and down.)

24      Q.   Your counsel might object to certain

25  questions throughout the course of the day.  Unless

1   might have considered at the time?

2       A.   At the time, it would have been Baylor,

3   Notre Dame.  They had just won a championship.

4   Louisville was talented.  University of Texas was

5   growing.  And -- yeah.  That was six years ago so

6   that's all I can remember.

7       Q.   And so tell me about the process by which

8   you narrowed the choices and ultimately selected

9   University of Texas?

10      A.   Well, I -- process was very long and they

11  come to your home and I go on visits.  But

12  ultimately, I chose University of Texas because

13  it's 30 minutes from where I grew up in Austin.

14      Q.   So the location and proximity of the

15  family ultimately was more important than going to

16  the most prestigious school like Uconn for you?

17      A.   That's correct.

18      Q.   And every athlete makes their own

19  decisions and makes their decisions differently.

20  Agreed?

21          MS. SISCO:  Objection.  Calls for

22  speculation.

23          MR. SOMVICHIAN:  I'm sorry.  I didn't get

24  your answer.

25          THE WITNESS:  I would agree that a lot of

Confidential

1  different factors go into each college athlete's

2  decision.

3  BY MR. SOMVICHIAN:

4      Q.  You were obviously a full scholarship

5  player at Texas, right?

6      A.  Yes.  I was.

7      Q.  Do you know what the amount of the full

8  grant and aid was for you?

9      A.  No, I do not.

10     Q.  Could you estimate?

11     A.  No, I could not.

12     Q.  Would you and your family have been able

13 to afford tuition and cost and expenses at

14 University of Texas without the scholarship and

15 grant and aid from the university?

16     A.  At that time, I don't think so.  No.

17     Q.  So obviously a benefit to you then to get

18 a scholarship and have the university pay those all

19 expenses?

20     A.  It definitely was something that I worked

21 towards as a young female athlete to receive a full

22 scholarship and get a college degree for free.

23 Absolutely.

24     Q.  And that's true for probably several

25 teammates that you've had along the way; is that

Confidential

1  right?

2          MS. SISCO:  Objection.  Calls for

3  speculation.  Sorry.

4  BY MR. SOMVICHIAN:

5      Q.  The scholarship was something that enabled

6  them to get college education that they otherwise

7  could not have been able to afford?

8          MS. SISCO:  Same objection.

9          THE WITNESS:  I would say every college

10 athlete's experience is different.  So I'm sure

11 that some student athletes did -- it did help them

12 a lot to put them in a potion to be successful in

13 life.

14 BY MR. SOMVICHIAN:

15     Q.  Did you know other specific teammates

16 where the scholarship they got for playing

17 basketball was essential for them to be able to go

18 to college?

19     A.  Not off the top of my head.  But I'm sure

20 I have friends and former athletes that have

21 absolutely benefited from that, yes.

22     Q.  You actually didn't play at Texas, right?

23     A.  No, I did not.

24     Q.  So tell me about the circumstances that

25 led you not to be able to play?

1        A.   So I was playing for the USA U-18 team.

2   And I had -- in my second semester of my first

3   summer at the University of Texas, I had broken my

4   leg in a a game against Puerto Rico.  And I

5   required a tibia and fibular repair.

6        Q.   Was that in the summer before starting at

7   Texas?

8        A.   Yes, it was.

9        Q.   And you had an issue with getting from

10   your perspective adequate support for the rehab

11   process and the expenses associated with that,

12   correct?

13        A.   Yes.  I didn't feel that that -- I didn't

14   feel very safe, that's correct.  I didn't feel like

15   I was getting support that I needed.

16        Q.   Tell me more about that.

17        A.    I was receiving a lot of medical bills

18   that me or my family could not pay at the time.

19   And neither USA Basketball or the University of

20   Texas would pay them.  And so they gathered in

21   collections over the years.

22            And then I also was not -- I was

23   prescribed a physical therapist from my doctor but

24   never received one.  And was working with a trainer

25   for six months that had never worked with a broken

1      Q.   They have your name in the left column?

2      A.   Yeah.  Yeah, that's me.

3      Q.   And then there are other columns here for

4  transaction type, cost, payment type, and vendor

5  name.  Do you see that?

6      A.   Yes.

7      Q.   Okay.  So we understood this to be the

8  University of Oregon's tracking of student athletes

9  NIL deals, does that seem correct to you in looking

10  at this document?

11      A.   This is what I reported to the University

12  of Oregon that is correct.

13      Q.   So the entries here that are highlighted

14  that bear your name in the left column are things

15  that you would have reported to the University in

16  that process that we talked about earlier today?

17      A.   Myself or my manager at the time.

18      Q.   Okay.  Same thing with the other document

19  that has also has a few entries that are

20  highlighted with your name?

21      A.   Yes.  Yes.  This is through Open Doors.  I

22  think it is.

23      Q.   So in looking -- I'm sorry, what is your

24  understanding of this version?

25      A.   This is Open Doors.  So this is what -- I

1 reported this to them through maybe Influencer.

2 And this just came straight through the Open Doors

3 app.

4    Q.  Which was an alternative way of reporting

5 your deals to the University?

6    A.  Yes.  I don't remember how the reporting

7 all went, it was crazy and then we ended up

8 switching the ways to do it.  Like halfway through

9 the year.  So it was all kind of a mess.

10    Q.  Okay.  So if you look at the combination

11 of the first two documents with the highlighted

12 entries with your name, is it apparent to you that

13 there are some deals that you've done that are not

14 included?

15    A.  Yes, that's correct.

16    Q.  Any jump out just looking at it?  I'm not

17 trying to get a complete list, but I am just trying

18 to establish that there are other deals that you've

19 done that are not reflected in either of these two

20 documents?

21    A.  I couldn't tell you which ones are not

22 included in this, but I know that there are some

23 that are not.

24    Q.  Do you keep your own tracking in some way

25 of the NIL deals that you've done?

Confidential

1      A.  I had not throughout the year.  And then

2  after I graduated and became not eligible anymore I

3  went back and kind of counted them all up.

4      Q.  What did you look at to take inventory of

5  your deals?

6      A.  Contracts.  The contracts that I --

7      Q.  I see.  It wasn't some separate tracking

8  document that listed everything?

9      A.  No.  No.  It was just contracts that I'd

10  gone through my DocuSign.

11      Q.  I see.  And you couldn't have relied on

12  the materials that the University of Oregon tracked

13  because those looked to be incomplete?

14      A.  That's correct.

15      Q.  All right.  Do you know why they don't

16  include some of the deals that you've done?

17      A.  Because they were not disclosed.

18      Q.  So there were deals that you did that for

19  whatever reason weren't reported to the University?

20      A.  That's correct.

21      Q.  Was that just an omission, or did you

22  decide not to report some, or how did that happen?

23      A.  It was just -- it was an accumulation of a

24  few different factors, but yeah, just overwhelmed,

25  just couldn't really figure out the system.  It was

Confidential

1  you could participate in these division street

2  transactions like that NFT deal?

3       A.  I didn't really think about that.  I

4  didn't really care about that.

5       Q.  Have you talked to other student athletes

6  that have gone through a similar decision on should

7  I go pro, should I stay another year and talk to

8  them about their decision-making process?

9       A.  No.

10       Q.  Have any of your teammates been through

11  that process?

12       A.  No.

13       Q.  Anybody that you know on the men's team?

14       A.  Not when I was there.  No.

15       Q.  Do you have a current expectation on the

16  WNBA draft where you might be positioned and what

17  that might entail for compensation?

18       A.  No, I have no idea.  It's all up in the

19  air.

20       Q.  Okay.  Is that something that you talked

21  with the Wasserman team about?

22       A.  Briefly.  Here and there mostly about the

23  injury though and about how that would affect it.

24       Q.  Would you expect that they would be

25  involved in representing you as you pursued your

Confidential

Page 237

1   pro career?

2        A.   If I decide to reassign them as my pro

3   agents.

4        Q.   You haven't made that decision yet?

5        A.   No.

6        Q.   Do you know what the range of a WNBA

7   salary is roughly?

8        A.   60 thousand to 100 and 20,000, roughly.

9        Q.   You are making more than that in the NIL

10  deals or were at the time that you were actively

11  pursuing them, right?

12       A.   That's correct.

13       Q.   Have you stopped entirely doing any kind

14  of transactions related to the NIL?

15       A.   Yes.

16       Q.   Since when?

17       A.   Last deal I did was Buick, so it's been

18  about a month.  Month and a half.

19       Q.   Okay.  so recently?

20       A.   Yes.

21       Q.   Do you have an expectation on how long

22  you're going to keep that on ice and focus on

23  rehab?

24       A.   No, I have no idea.

25       Q.   At some point, do you expect to get back

Confidential

1  into and pursue NIL deals again?

2      A.  Possibly.

3      Q.  You haven't made up your mind?

4      A.  No.

5      Q.  How much do you think you made in 2022 on

6  NIL deals?

7      A.  From July 1st to 2021 to July 1st, 2022?

8  Is that what you're asking?  That fiscal year?

9      Q.  Yeah.  We can do that slice of time?

10     A.  Since I've been a college athlete, I've

11 made roughly about $500,000.

12     Q.  And that would have started at the time in

13 sometime after July of 2021 up to when you left.

14     A.  From when I signed that contract with

15 Paridy to a month and a half ago, yeah.

16     Q.  Buick?

17     A.  Yeah, Buick.

18     Q.  So Paridy was the first deal.  Buick was

19 the last one?

20     A.  That's correct.

21     Q.  Do you know if the Paridy deal was

22 specific to your status as a college athlete?

23     A.  In what sense?

24     Q.  Meaning would they -- would that

25 opportunity have been available to you if you

1 weren't a college athlete?

2          MS. SISCO:  Objection.  Calls for

3 speculation.

4          THE WITNESS:  I don't know.  All I know is

5 that I was the first college althelete.

6 BY MR. SOMVICHIAN:

7     Q.  And certainly the Division Street deals

8 are only for current athletes at the university,

9 right?

10     A.  Yes.

11     Q.  Do you believe that in some circumstances

12 college athletes can make more on the NIL deals

13 than they could by going pro?

14          MS. SISCO:  Objection.  Calls for

15 speculation and her opinion.

16          THE WITNESS:  I wouldn't know in every

17 case.  But I know that in mine, I made more than

18 WMBA salary, but not overseas or professional

19 contracts in any sense.  So I wouldn't agree with

20 that.

21 BY MR. SOMVICHIAN:

22     Q.  And in your instance, it's pretty clear

23 you have made more than the most that you could

24 make in the first couple of years based on a WMBA

25 salary, right?

1  affect anything when I was in high school.

2  BY MR. SOMVICHIAN:

3     Q.  If you knew that you could earn some

4  specific amount at one school and a significantly

5  greater amount at a different school, would that

6  have been at least one relevant consideration that

7  you would have given thought to in terms of where

8  you might prefer to go?

9         MS. SISCO:  Objection.  Asked and

10 answered.  And this question has been asked

11 numerous times.  I think she's answered it to the

12 best of her ability.

13        MR. SOMVICHIAN:  That was a different

14 subject.

15    Q.  But go ahead.

16    A.  Yeah.  I don't know.  There's no saying.

17    Q.  I think earlier, you testified that when

18 you opted to go to Texas, that had it not been for

19 the availability of a full scholarship, it wasn't

20 clear whether your patients would be able to afford

21 the full cost of your tuition and everything else;

22 is that right?

23    A.  I mean, at that time, I wouldn't know.

24 But I had been recruited and committed eighth grade

25 so.  I would assume that I would have had full

Confidential

1  scholarships.

2      Q.  Do you know any teammates that you've

3  played with over the years for whom getting five,

4  ten, $12,000 would have been significant benefit to

5  them?

6          MS. SISCO:  Objection.  That calls for

7  speculation.  Vague.

8          THE WITNESS:  I have no idea.  I can't

9  speak on other athletes' behalf.

10 BY MR. SOMVICHIAN:

11     Q.  Isn't that what you're doing in this case,

12 Ms. Prince?

13         MS. SISCO:  She's representing --

14         THE WITNESS:  Yes.  Representing other

15 athletes but not speaking for them in their own

16 financial circumstances.

17 BY MR. SOMVICHIAN:

18     Q.  Yeah.  I'm just asking whether you've ever

19 had a conversation or otherwise came to know of any

20 of your teammates having financial circumstances

21 where it would have benefited them to receive ten,

22 $12,000, where it might make a difference to them.

23     A.  I've had -- I mean, I can't remember if

24 I've had those certain conversations.  But I have

25 had teammates in the past that have struggled

Page 253

1  financially and their families have as well.

2      Q.  Who do you have in mind when you say that?

3      A.  My old teammate Phillipina Shea.  She's a

4  college student athlete from -- she was from Ghana

5  and she had to go to Canada to the Cambridge

6  school.

7      Q.  You've had teammates over the years that

8  you knew could not have afforded college if they

9  didn't have that scholarship, right?

10         MS. SISCO:  Objection.  Calls for

11  speculation.  And you are here representing other

12  athletes in this lawsuit.  But you are not -- your

13  role is not to speculate about other athletes'

14  situations if you don't know.

15         THE WITNESS:  Yeah.  I don't know

16  personally.  And I don't know about their financial

17  circumstances.

18          MR. SOMVICHIAN:  Counsel, your role is not

19  to make speaking objections, so.

20      Q.  If in your circumstances, Ms. Prince, if

21  you knew at one school, you could make $5,000 from

22  a revenue share and a different school, you could

23  make $12,000, would that have been something you

24  would have considered at least as part of your

25  decision making process?

1          MS. SISCO:  Objection.  Asked and

2   answered.

3          THE WITNESS:  The answer is no.

4   BY MR. SOMVICHIAN:

5      Q.  Why not?

6      A.  Because I'm -- because college for me was

7   about the experience and being safe and feeling

8   like I could grow and learn the best for my life

9   and not money.

10     Q.  I understand there were other important

11  factors to you.  But don't you think you would have

12  at least considered one relevant consideration?

13         MS. SISCO:  Objection.  Asked and

14  answered.  She's answered this question.

15         MR. SOMVICHIAN:  A difference in the

16  amount that you could have made at a particular

17  school?

18         MS. SISCO:  Objection.  Asked and

19  answered.

20         THE WITNESS:  I wouldn't know.  I couldn't

21  guess.

22  BY MR. SOMVICHIAN:

23     Q.  If you were looking at two options that

24  you were both comfortable with from the standpoint

25  of your other priorities, wouldn't a difference in