# EXHIBIT 6

## To the Declaration of Rakesh N. Kilaru

## REDACTED VERSION OF DOCUMENT REQUESTED TO BE FILED UNDER SEAL

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  OAKLAND DIVISION

4

5    IN RE COLLEGE ATHLETE NIL        )
     LITIGATION                       )
6                                     )   Case No.:
                                      )   4:20-cv-03919-CW
7    _____)

8

9

10

11

12        Videotaped Deposition of Edwin Desser

13             Los Angeles, California

14            Thursday, January 12, 2023

15

16

17

18

19

20

21

22

23
     REPORTED BY:
24   KIMBERLY WILDISH
     CSR NO.:  8078
25   JOB NO:  220886

1                         9:06 A.M.

2

3       Videotaped Deposition of Edwin Desser, conducted

4   by Robinson Bradshaw & Hinson, P.A., held at 333 S.

5   Grand Avenue, Los Angeles, California, 90071; before

6   Kimberly Wildish, CSR NO. 8078, pursuant to Notice.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        A P P E A R A N C E S:

 2

 3

 4   WINSTON & STRAWN LLP
     Attorneys for Plaintiffs and the Proposed Class
 5        200 Park Avenue
          New York, New York 10166
 6   By:  David Greenspan, Esq.
          Jeannifer Parsigian, Esq.
 7        David Feher, Esq.
          Scott Sherman, Esq.
 8        TELECONFERENCE APPEARANCE

 9
     -AND-
10

11   HAGENS BERMAN SOBOL SHAPIRO LLP
          715 Hearst Avenue
          Berkeley, California 94710
12   By:  Benjamin Siegel, Esq.
          Emilee Sisco, Esq.
13        Stephanie Verdoia, Esq.
          Steve Berman, Esq.
14        TELECONFERENCE APPEARANCE

15

16   ROBINSON BRADSHAW & HINSON PA
     Attorneys for Defendant Southeastern Conference
          101 North Tryon Street
17        Charlotte, North Carolina 28246
     By:  Robert Fuller, Esq.
18        Amanda Nitto, Esq.

19

20   WILKINSON STEKLOFF LLP
     Attorneys for Defendant National Collegiate
     Athletic Association
21        2001 M Street NW
          Washington, DC 20036
22   By:  Calanthe Cope-Kasten, Esq.
          Clayton Wiggins, Esq.
23        TELECONFERENCE APPEARANCE

24

25
```

```
 1              A P P E A R A N C E S (CONTINUED):

 2

 3

 4          COOLEY LLP
            Attorneys for Defendant PAC-12 Conference
 5              3 Embarcadero Center
                San Francisco, California 94111
 6          By:  David Louk, Esq.

 7

            MAYER BROWN LLP
 8          Attorneys for Defendant The Big Ten
            Conference, Inc.
 9              71 South Wacker Drive
                Chicago, Illinois 60606
10          By:  Daniel Fenske, Esq.

11

            POLSINELLI PC
12          Attorneys for Defendant The Big 12
            Conference, Inc.
13              900 W. 48th Place
                Kansas City, Missouri 64112
14          By:  Phillip Zeeck, Esq.

15

16

17

18   ALSO PRESENT via TELECONFERENCE

19          Juliana Santana - Operator

20

21   ALSO PRESENT

22          Travis Simmons - Videographer
            TSG Reporting, Inc.
23          Robert Laird, Esq.

24

25
```

```
 1                    I N D E X

 2

 3    WITNESS:                 EXAMINATION         PAGE

 4    Edwin Desser             Mr. Fuller           9

 5                                                 114

 6

 7

 8

 9                  E X H I B I T S

10    Deposition Exhibits

11    Exhibit 12 -   Expert Report of              10
                     Edwin S. Desser
12                   in the Matter of
                     House et al. v. NCAA et al.
13
      Exhibit 13 -   Condensed Deposition          48
14                   Transcript of Edwin Desser
                     Friday, November 22, 2013
15
      Exhibit 14 -   Reporter's Transcript of      60
16                   Proceedings - June 12, 2014
                     O'Bannon vs. National Collegiate
17                   Athletic Association, et al.

18    Exhibit 15 -   Declaration of Steven J.      68
                     Scebelo in Response to
19                   Subpoena Duces Tecum
                     NFLPA_000001 - NFLPA_000009
20
      Exhibit 16 -   KPMG Profitability and        82
21                   Royalty Rates Across
                     Industries:  Some Preliminary
22                   Evidence - 2012

23    Exhibit 17 -   "Just How Much Are            90
                     Halftime Performers Paid
24                   For the Super Bowl"

25
```

```
 1                  E X H I B I T S (CONTINUED)

 2

 3   Deposition Exhibits

 4   Exhibit 18 -  Southeastern Conference          95
                   Financial Statements
 5                 August 31, 2018 and 2017
                   SEC-HOUSE0047791 - SEC-HOUSE0047840
 6
     Exhibit 19 -  PGA TOUR Player Handbook        102
 7                 & Tournament Regulations
                   2019 - 2020
 8
     Exhibit 20 -  "How Long Will The PGA          108
 9                 Handicap Its Golfers?"

10   Exhibit 21 -  Term Sheet                      109
                   CBSC/C-USA Rights Agreement
11                 Extension   June 2, 2010
                   CUSA-GIA_00000509 thru
12                 CUSA-GIA_00000520

13   Exhibit 22 -  Persons 2+AA                    124
                   Spreadsheet
14

15

16

17

18                      E X H I B I T S

19   Previously Marked

20   Exhibit 3  -  Southeastern Conference
                   Financial Statements
21                 August 31, 2020 and 2019
                   SEC-HOUSE0047887 - SEC-HOUSE0047931
22

23

24

25
```

1          I N D E X (CONTINUED)

2

3

4          INFORMATION REQUESTED

5                (NONE)

6

7

8

9     QUESTIONS INSTRUCTED NOT TO ANSWER

10                (NONE)

11

12

13

14          UNANSWERED QUESTIONS

15                (NONE)

16

17

18

19     MARKED AT REQUEST OF COUNSEL

20                (NONE)

21

22

23

24

25

1      LOS ANGELES, CALIFORNIA; THURSDAY, JANUARY 12, 2023

2                         9:06 A.M.

3

4

5           THE VIDEOGRAPHER:  Good morning.  This is the

6     start of media labeled No. 1 of the video recorded

7     deposition of Edwin Desser, being taken in matter of

8     College Athlete NIL Litigation.  Taken in the United

9     States District Court.  For the Northern District of

10    California.  Case Number 4:20-cv-03919-CW.

11              This deposition is being held at 333 S.

12    Grand Avenue, in Los Angeles, California, on January 12,

13    2023, at approximately 9:06 A.M.

14              My name is Travis Simmons.  I am the

15    legal video specialist from TSG Reporting, Incorporated,

16    headquartered in New York, New York.  The court reporter

17    today is Kimberly Wildish, in association with TSG

18    Reporting.

19              Counsel, please introduce yourselves.

20         MR. FULLER:  You want to go first, David, or do

21    you want me to...

22         MR. GREENSPAN:  Sure.  My name is David Greenspan

23    from Winston & Strawn, for the Plaintiffs.

24         MS. PARSIGIAN:  Jennifer Parsigian, from Winston

25    & Strawn, for the Plaintiffs.

1          MR. FULLER:  Robert Fuller and Amanda Nitto from

2    Defendant Southeastern Conference for the Defendants.

3    I'm from Robinson Bradshaw & Hinson.

4               Go ahead.

5          MS. COPE-KASTEN:  Cali Cope-Kasten from Wilkinson

6    Stekloff on behalf of the NCAA.

7          MR. ZEECK:  Phil Zeeck, of Polsinelli, on behalf

8    of the Big 12 Conference.

9          MR. FULLER:  And I think we stipulated that at a

10   break the people on Zoom will announce themselves to the

11   court reporter.  Is that correct, David?

12         MR. GREENSPAN:  Agreed.  Yes.

13         THE VIDEOGRAPHER:  Thank you.

14              Will the court reporter please administer

15   the oath.

16

17                    EDWIN DESSER,

18         HAVING BEEN FIRST DULY SWORN, WAS

19         EXAMINED AND TESTIFIED AS FOLLOWS:

20

21                    EXAMINATION

22

23   BY MR. FULLER:

24         Q.    Mr. Desser, you've been deposed before

25   and you've testified before; correct?

1          A.       Yes.

2          Q.       So you're familiar with the process?

3          A.       Yes.

4          Q.       If I ask you a question and you don't

5     understand it, please ask me to repeat it and I'll be

6     glad to do that.

7                   Okay?

8          A.       Okay.

9          Q.       If you will articulate your answers

10    verbally for the court reporter, I'm sure she'll

11    appreciate that.

12                  Is there any reason that you're not in a

13    position to give truthful testimony today?  Are you

14    recovering from Covid?  Taking any kind of drugs?  I'm

15    assuming you're in good shape to proceed.

16                  Is that correct?

17         A.       Ready to proceed.

18         MR. FULLER:  We've marked as Exhibit 12, picking

19    up from Dr. Rascher's deposition, the report that you

20    prepared in this case, and I'll put that in front of

21    you.

22                  (THE DOCUMENT REFERRED TO WAS

23                  IDENTIFIED AND WAS MARKED AS

24                  EXHIBIT 12 TO THE DEPOSITION)

25         THE WITNESS:  Thank you.

1   BY MR. FULLER:

2        Q.        That is in fact your report, is it not,

3   Mr. Desser?

4        A.        It appears to be.

5        MR. FULLER:  I'll represent to you that we have

6   not altered it.

7        Q.        And does that report contain the summary

8   of your relevant experience, and of the facts and data

9   that you're relying on to give your opinions in this

10  case?

11       A.        Yes.

12       Q.        And are you...  There is nothing that's

13  not in the report, at least in reference, that you're

14  planning to testify about; right?

15       A.        Well, the report has been submitted for

16  purposes of class certification purposes.  It is

17  possible that down the line there may be other reports

18  or changes or additions with respect to merits.

19       MR. FULLER:  So I'll rephrase my question.

20       Q.        Excluding any future merits report, the

21  report that is marked as Exhibit 12 summarizes and

22  contains everything you're prepared to testify about and

23  that you've been asked to testify about with respect to

24  class certification; is that correct?

25       A.        I believe so.  Yes.

1      Q.      Let me refer you to Page 63 of the

2 report.  Section 18 where it says "SUMMING UP."

3              Do you have that in front of you, sir?

4      A.      Yes, I do.

5      Q.      It sums up with two opinions there, which

6 I won't read for you.

7              Are those the ultimate opinions that you

8 are providing in this action with respect to class

9 certification?  The bottom line?

10     A.      That is the bottom line.  The rest of the

11 report leads one to that point, but those are the key

12 points of my report.

13     Q.      So the rest of the report is support, and

14 these are the ultimate points here on Section 18?

15     A.      I think these are the... are two of the

16 key points.  There are a number of points made

17 throughout the document, and they all represent part of

18 the report.

19              MR. FULLER:  I understand that.

20     Q.      What I'm trying to make sure I understand

21 is what's the scope of your testimony.

22              You're not planning to testify about any

23 topics that are not addressed in the report, in one way

24 or the other; is that correct?

25              MR. GREENSPAN:  Object to the form.

1                    Go ahead.

2           THE WITNESS:  I don't currently have any plans to

3    testify beyond the realm that is represented by the

4    report.  But I wouldn't limit the testimony to just the

5    two points that are in the summation section.

6           MR. FULLER:  I respect that.

7           Q.      With respect to your expertise, does your

8    report contain a summary of the expertise that you have

9    that you believe is relevant that you bring to this

10   matter to base your opinions on?

11          A.      Yes, it does.

12          Q.      And is there anything left out of the

13   report in that regard, that you would intend to bring up

14   in this case?

15          A.      I...  I believe that the CV that is

16   contained in the report is reasonably up to date.  I

17   cannot tell you that it includes each and every thing

18   that I've done throughout my career.

19                  So, you know, it is necessarily more

20   brief but does contain the categories of work and a

21   variety of clients for which I have performed work.  So

22   I believe it is generally inclusive but it is not

23   exhaustive.

24          Q.      In preparing for this deposition,

25   there's...  What I'm getting at is there is nothing that

1  you realized that you left out, that you wished you had

2  put in the report in terms of your experience or support

3  for your opinions; is that correct?

4        A.      There isn't anything that has come to

5  mind since, but I don't want to exclude the possibility

6  that I may realize there is something missing.

7        Q.      But nothing that you know of now;

8  correct?

9        A.      Not that I can think of right now.

10       Q.      Your expertise is in media rights; is

11  that correct, generally speaking?

12       A.      Yes.

13       Q.      And you're not an economist; correct?

14       A.      I am not.

15       Q.      So to exclude one area or not exclude it

16  as the case may be, are you here to testify in any

17  respect about labor markets?

18       MR. GREENSPAN:  Object to the form.

19       THE WITNESS:  Can you be more specific?

20  BY MR. FULLER:

21       Q.      Well, I assume if you were an economist

22  to testify about labor markets, you would know that you

23  were going to testify about them.

24              That's not a subject you've been asked to

25  testify about; right?

1        A.        I mean, except to the extent that the

2   case is ultimately about labor markets, and I'm...  You

3   know, as a layperson I understand that.  But I'm not

4   here to give you economic testimony or to act as an

5   economist, which I am not.

6        Q.        So to be clear, the opinion that you're

7   giving here, Number 1 on Page 63, is that... to quote

8   your report:

9                  Approximately 10 percent of

10                 the media broadcast revenue to the

11                 Power 5 conferences (and Notre Dame)

12                 for these sports --

13                 Which refer to football and men's and

14  women's basketball.

15                 -- is a reasonable and conservative

16                 estimate of the marketplace value of the

17                 NIL of college athletes provided via the

18                 media rights contracts.

19                 Do you see that?

20       A.        Yes.

21       Q.        So you're here to testify about the value

22  that the broadcast rights holders are providing to the

23  networks, the media companies, in the form of NIL

24  component; is that correct?

25       A.        The testimony is about the sub set of

1  rights fees that are fairly allocable to the provision

2  of NIL to the broadcasters.

3          Q.       In the media agreements that are assigned

4  by the broadcast rights holders and the networks or

5  broadcaster; correct?

6          A.       Yes.  Right.

7          Q.       On Page 39...  If you'll turn to Page 39

8  of Exhibit 12.

9          A.       I am on Page 39.

10         Q.       You see the second bullet point from the

11 top:

12                  "I do not attempt to value many

13          additional non-broadcast uses in the

14          context of ticket sales, game presentation,

15          team promotional appearances, and for

16          institutional marketing and promotion

17          of the school/conference (players,

18          student, faculty recruitment)/NCAA,

19          which are also typically negotiated and

20          licensed."

21                  Do you see that?

22         A.       Yes.

23         Q.       So I take it from this that your focus

24 here is purely on the broadcast rights and the NIL

25 component that you assert as part of those broadcast

1    rights; is that right?

2          A.      That is generally correct.

3          Q.      So I don't need to ask you about

4    sponsorships, trademarks, other types of marketing and

5    promotions here; because you're not... those are not

6    subjects about which you've testifying?

7          A.      Well, there are uses of trademarks and

8    uses of NIL in the context of promotion that would fall

9    into the overall category of what I'm focused on in the

10   report.

11         Q.      The opinion that you're giving has to do

12   with the component that you say is NIL in the broadcast

13   rights conveyance; right?

14         A.      Yes.

15         Q.      So you're taking the broadcast rights

16   payments and attempting to excise the NIL value that is

17   in those payments, in your opinion; correct?

18         A.      I don't know if I would use the term

19   "excise."

20         Q.      What term would you use?

21         A.      I am focused on identifying and

22   approximating the portion of the overall rights

23   conveyance that is appropriately allocable to the

24   conveyance of NIL.

25         Q.      And when you say "the portion of the

1    overall rights conveyance" you mean the broadcast rights

2    conveyance; is that correct?

3          A.      The media rights conveyance.  Yes.  These

4    agreements do provide for more than just broadcast.

5          Q.      You have an opinion that we'll go into in

6    more detail, that the bottom line is...  I'll refer to

7    it as "the 10 percent opinion."

8                  That 10 percent of certain rights is

9    attributable to NIL value.  You know what I'm talking

10   about there?  It's the first item on the last page of

11   your report?

12         A.      Yes.

13         Q.      Okay.  And in terms of 10 percent of what

14   is 10 percent of broadcast rights is what I'm trying to

15   get at.  That's what I'm trying to understand.

16         A.      The broadcast and media rights value that

17   is contained in the various agreements that the

18   defendants have with broadcasters.

19         Q.      So would that include any trademark

20   licensing rights that are also conveyed as part of a

21   broadcast rights agreement?

22         A.      "Would that..."  And by "that" do you

23   mean the 10 percent?

24         Q.      Do you...  When you're multiplying

25   something by 10 percent, do you include the value of the

1    trademark rights if any are transferred?

2         A.      Well, they would be included in the

3    denominator.  Not in the numerator.

4         Q.      I was thinking about it as a

5    multiplication by 10 percent.

6                 So if you're multiplying 10 percent by

7    something, do the trademark rights get included in what

8    you're multiplying by 10 percent or dividing by .1?

9                 Because the denominator would be .1;

10   right?

11        A.      No.

12        Q.      Okay.  Tell me how to think about this

13   then.

14        A.      So 100 percent...  So let's just use some

15   round numbers.

16                Say that the contract is for

17   $100 million.  The 10 percent would be 10 percent of

18   $100 million, which in this example would be

19   $10 million.

20                The trademark, and if we're talking here

21   about trademark for the universities or for the

22   conferences, those would be in the remaining 90 percent

23   to the extent that they have been conveyed by the

24   agreement.

25        Q.      If there is a separate agreement

1    concerning sponsorship rights, you would not include

2    those in the 90 percent; is that correct?

3          A.        Well, often there are certain sponsorship

4    rights conveyed in the agreements.  And it is part of

5    the consideration that the network is paying for.

6                    So certain sponsorship rights could very

7    well be in the 100 percent but they're not in the

8    10 percent.

9          Q.        But if you have a separate sponsorship

10   rights agreement, you don't include those; correct?

11                   So if AT&T is the official sponsor of the

12   NCAA, you don't include that in the 90 percent, do you?

13         A.        There are agreements that extend beyond

14   simply the ability of a broadcaster to show the games

15   and sell advertising in the games and produce the games

16   and promote the games.

17                   And in those agreements, there are...

18   there may be separate provisions, whether they're part

19   of a separate agreement or not, which convey sponsorship

20   rights.

21                   Typically, for purposes of my analysis, I

22   would exclude the sponsorship rights from that from the

23   denominator.  Because if we're just talking about the

24   broadcast rights themselves, sponsorship rights are

25   something separate.

1                    Having said that, there is a...  There is

2  usually some modest amount of sponsorship opportunity

3  that gets transferred in media rights agreements beyond

4  the right to sell advertising.

5                    And those are typically de minimis but

6  they would not necessarily be all excluded across the...

7  across the board.  They would...  They would fall.  Any

8  kind of remnant amount of sponsorship that's in one of

9  those agreements would fall into the 90 percent side of

10 the equation.

11     Q.     Do you remember when Host Communications

12 used to sign up agreements with schools/conferences to

13 market sponsorship rights?

14                    You know, you're familiar with that?

15     A.     I'm generally familiar.  I'm aware of

16 Host Communications.  I know they do or did syndication

17 and sponsorship sales work.

18     Q.     What I'm getting at is how do you decide

19 whether to draw the line?  If it's a modest amount of

20 sponsorship rights that are part of the broadcast

21 agreement then you would include that in the

22 denominator, but if it's a separate sponsorship deal

23 then you don't?

24                    Is that...  Is that...  Can you give me

25 what the rule of thumb is or what valuation you're using

1    here?

2             A.       It is important to look at the totality

3    of what is in a broadcast agreement.  There are a number

4    of elements that are typically included, and then there

5    are some, for example, things like sponsorship rights or

6    the ability to say that AT&T is the official

7    telecommunications provider of the NCAA or the

8    conference.

9             It would be my intention in doing such an

10   analysis to include a -- to exclude -- excuse me -- any

11   material amount of sponsorship rights sale from the

12   corpus of the media rights exchange.

13            But I want to hasten to add that a media

14   rights agreement is a big bucket of rights that are all

15   designed to work together to complement one another to

16   create value.

17       MR. FULLER:  I'm going to get to that in a

18   minute.  I don't want to cut you off.  But we're going

19   to go down that road for quite a while.

20            I think you've answered my question.  But

21   if you have more to add, please feel free to do so.

22       THE WITNESS:  If you're satisfied, then we can

23   move on.

24   BY MR. FULLER:

25            Q.       Look at Page 7 of Exhibit 12, please.  At

1    the bottom of the page, the next-to-the-last line you

2    say:

3                    "To be conservative, I have

4              determined that the lower end of the

5              range in my analysis - 10 percent - is

6              a reasonable estimate of the collective

7              value of the class members' NILs used

8              in broadcasts of Power 5 football and

9              men's and women's basketball games

10             (including Notre Dame)."

11                   I read that correctly, did I not?

12   A.      Yes.

13   Q.      You reference "the collective value."  So

14   I want to understand what this 10 percent is.

15                   Is it...  Are you saying that every

16   student athlete that's in the class that plays

17   basketball or football is provided... that the value of

18   the NIL rights that are provided in the broadcast

19   agreement is 10 percent?  Or does it vary from student

20   athlete to student athlete, so that 10 percent is a

21   reasonable average?

22                   Tell me what you're seeing here.

23   A.      I was asked to estimate the entire class'

24   allocable monetary value from these contracts as a

25   group.  As it says in the document, it is the collective

1    value.  I did not do anything with respect to individual

2    athletes whatsoever.

3            Q.      So your 10 percent might or might not be

4    the value that is attributable to any single athlete;

5    you just aren't here to testify about that, either way?

6            A.      My 10 percent estimate is with respect to

7    the entirety of the NIL being conveyed for all of the

8    athletes.

9            Q.      And not a single athlete individually;

10   correct?

11           A.      Correct.

12           Q.      You're also not here to testify about the

13   relationship between the school and the athlete, and on

14   what terms the school would pay the athlete or not pay

15   the athlete.  That's Dr. Rascher's area; correct?

16           A.      I can't tell you whether that's

17   Dr. Rascher's area or not.  I haven't read his report.

18                   What I'm here to talk about is the

19   broadcast agreements in their entirety, and an

20   appropriate amount that those agreements represent with

21   respect to the NIL conveyance.

22           Q.      The value conveyed to the network or the

23   broadcaster.

24           A.      The portion of the overall value, which

25   is reasonably attributable to the NIL.

1      Q.      In that broadcast agreement conveyance;

2  correct?

3      A.      Yes.  Not any individual contract either.

4  It's the sum of all of the contracts collectively.

5      Q.      So you're here to testify about the

6  transaction and the value elements in the transaction

7  between the broadcast rights holder and the broadcaster.

8              You're not here to testify about the

9  relationship between the student athlete and the team or

10  the conference -- is that right -- in terms of any value

11  that's transferred there from the conference to the

12  student athlete or vice versa?

13      A.      Um, can you rephrase the question,

14  please?

15      MR. FULLER:  Yeah.  That wasn't a very good

16  question.  Let me come back to that in a little bit.

17      Q.      With respect to the reference on Page 7

18  and 8 that we just read, it speaks to class members.

19              Do you understand that "class members" is

20  a term that includes only the scholarship football and

21  basketball student athletes?

22      A.      That's my understanding.

23      Q.      Is it your testimony that the --

24      A.      Excuse me.  No.

25              Come to think of it, I think there is

1   also a class that is for those who have sold NILs since

2   the rules changed.  So I think in that respect it's more

3   than just the basketball and football players.

4          MR. FULLER:  That's an appropriate observation.

5          Q.     But with respect to the broadcast

6   licensing class, it only includes the scholarship

7   football and basketball student athletes, is your

8   understanding, or, no?

9          A.     That is my understanding.  Yes.

10         Q.     And you're here to testify about the

11  broadcast licensing part of this case, as summarized in

12  your report; correct?

13         A.     Generally speaking, yes.

14         Q.     Okay.  Is it your... Do you have a view

15  as to whether the non-scholarship athletes...  Let me

16  strike that.

17                In this conveyance of NIL value that's

18  the subject of your report, where a conference or the

19  NCAA or a school enters into a broadcast rights

20  agreement with a network, do you have an opinion as to

21  whether there is any NIL value transferred there with

22  respect to non-scholarship basketball and football

23  players?

24         MR. GREENSPAN:  Object to the form.

25  ///

```
 1   BY MR. FULLER:
 2         Q.      Do you understand my question?
 3         A.      What...  Why don't you take it in a
 4   couple of pieces, and I'll do my best to respond to each
 5   piece.
 6         Q.      Why do you limit your opinion only to the
 7   scholarship players?  What's the difference between any
 8   NIL value attributable to the scholarship players versus
 9   the non-scholarship players, is what I'm trying to get
10   at.
11         MR. GREENSPAN:  Object to the form.
12         THE WITNESS:  My assignment was to focus on the
13   players in the class as it was defined.  I didn't have
14   anything to do with determining what the class should be
15   or shouldn't be.
16   BY MR. FULLER:
17         Q.      So were you instructed not to offer an
18   opinion with respect to the non-scholarship players that
19   are basketball and football players?
20         MR. GREENSPAN:  Object to the form.
21               And obviously, don't disclose any
22   communications with counsel.  You can discuss your
23   assignment but...
24         MR. FULLER:  I'm not looking for communications
25   with counsel.
```

1         Q.      I'm trying to figure out if there is a

2    reason other than an assumption you made or an

3    instruction you were given as to the scope of your

4    engagement, which I think is a fair inquiry, that you

5    did not provide an opinion as to NIL value for

6    non-scholarship football and basketball players.

7         A.      That was beyond the scope of my

8    assignment.

9         Q.      So you're not here to testify about that

10   because it was beyond the scope of your assignment; is

11   that correct?

12        A.      That's correct.

13        Q.      Do you have any opinions that you're

14   prepared to offer with respect to the topics that are

15   included in your report with respect to conferences and

16   schools outside the Power 5?

17               In other words, the Atlantic Sun.  The

18   MAC.  The WAC.  Any other conference.  Does your report

19   apply to those conferences, or is it limited only to the

20   Power 5 conferences and Notre Dame?

21        A.      The thrust of the report focuses on the

22   Power 5 conferences.  Obviously there are a number of

23   other Division 1 conferences that are similarly

24   situated.

25               For the most part, their athletes, as I

1  understand it, are not in the class and therefore are

2  outside of the scope of what I've done.

3         Q.      My question is:  Are you prepared to tell

4  us...  It's fine if you say you're not.  It's fine if

5  you say you are.  I just don't know.

6                Do the conclusions in your report apply

7  to conferences outside the Power 5 and Notre Dame?  They

8  don't apply?  Or you haven't thought about it and you

9  can't tell me today, one way or the other?

10        A.      I wasn't asked to focus on the other

11 conferences.  I suspect that some of the conclusions

12 would apply, but I have not studied them or considered

13 how I might identify and allocate NIL values in those

14 cases.

15        Q.      And so you're not prepared to testify

16 about whether or in what way the conclusions in your

17 report would apply outside the Power 5 and Notre Dame

18 because that has not been what you've been engaged

19 about?  Is that what you're saying?

20        A.      Yes, that's correct.

21        Q.      Now, you're not an attorney; is that

22 right, Mr. Desser?

23        A.      I am not.

24        Q.      And have you ever negotiated a college

25 broadcast rights agreement?

1          A.        Yes.

2          Q.        For who?

3          A.        The AAC.  Also I've done work for a

4    number of other conferences.

5          Q.        I'm not talking about doing consulting.

6    I'm talking about actually negotiating the agreement as

7    a representative of a college sports broadcast rights

8    holder.

9          A.        Well, maybe you can be more specific as

10   to what you mean by negotiated.

11              I've absolutely consulted for several

12   other conferences in the context of valuing their

13   agreements, determining strategy for negotiations,

14   dealing with deal points and all the other things that

15   are involved in negotiation of a media rights agreement.

16         Q.        Have you sat down across the table from

17   Burke Magnus at ESPN or Sean McManus at CBS or any of

18   their contemporaries at other networks and actually

19   hammered out the terms of a rights agreement?

20         A.        You said "terms of a rights agreement."

21         Q.        For college sports.

22         A.        Well, I clearly have negotiated with many

23   of those individuals over my career.  I cannot think at

24   this time of a negotiation with the individuals that you

25   mentioned with respect to a college conference package.

1          Q.     Or any other college sports package with

2     those individuals or their peers at other networks?

3          MR. GREENSPAN:  Object to the form.

4          THE WITNESS:  I've had a wide range of

5     assignments.  I've done a number of assignments for

6     college sports properties.  Those assignments have not

7     as of yet involved the particular kind of negotiation

8     that you describe where I was necessarily in the room at

9     the time.

10              I've done plenty of negotiations in the

11    room on behalf of a variety of other products.

12    BY MR. FULLER:

13         Q.     Such as pro sports products?

14         A.     Among them, pro sports products.

15         Q.     But with respect to my question, you

16    haven't sat down and negotiated with those... with the

17    networks about the college sports products in the way

18    that I ask it in my question?

19         MR. GREENSPAN:  Just to be clear, the "sit across

20    the table"?

21         MR. FULLER:  Right.  Right.

22         THE WITNESS:  I have advised college conferences

23    in connection with their negotiations.  So in...

24    BY MR. FULLER:

25         Q.     But you haven't done the negotiations

1   yourself; is that right?

2           MR. GREENSPAN:  Object to the form.

3           MR. FULLER:  I think you've already answered

4   this.  I'm just trying to make it clear on the record.

5           THE WITNESS:  So if we're talking about me going

6   to ESPN and sitting in a room with Burke Magnus and

7   negotiating a deal by myself on behalf of a college

8   conference, the answer is No.

9   BY MR. FULLER:

10          Q.     And that would also include negotiating

11  with others in the room.  Usually more than one person

12  is in the room when you do these negotiations; right?

13          A.     Well, as your question seems to indicate,

14  I'm familiar with those sorts of negotiations and the

15  number of people who are typically in the room.  And I

16  have done dozens of negotiations of that kind with

17  respect to a wide range of products.

18          Q.     But for college sports negotiations you

19  haven't been in the room, so to speak?

20          A.     No.

21          MR. FULLER:  Okay.  Let's move on to something

22  else.

23          Q.     Are you providing any opinion as to

24  whether there is name, image and likeness value that is

25  a component of broadcast rights for cheerleaders,

1    referees, band members, sports trainers, fans?  Is that

2    part of your report?

3          A.      Can you give me a little bit more

4    specificity as to what you're asking.

5          Q.      Do you have a view as to whether when the

6    camera shows the coach on the sideline or the referee

7    announcing the results of a call, whether that's a use

8    of that person's name, image and likeness?

9          A.      I believe that is a use of their name,

10   image and likeness.

11         Q.      If we look at Page 7 of your report,

12   Exhibit 12, you say that:

13              "A principal part of my analysis

14              is to isolate the value of NIL from the

15              value of athletic performance on the

16              field or court (among other things)."

17              Do you see that?

18         A.      Yes.

19         Q.      Now, I want to focus on that particular

20   part of your analysis for the next few questions.

21         A.      Okay.

22         Q.      Do you know of any other situation where

23   anyone has tried to isolate the value of the NIL from

24   the value of the athletic performance as you've posited

25   right here?  Are you the first person to try to do this?

1          MR. GREENSPAN:  Object to the form.

2   BY MR. FULLER:

3          Q.     Have you ever done this yourself

4   previously?  Is this the first engagement where you've

5   been asked to do that?

6          A.     This is the first engagement that focused

7   on isolating NIL value.

8          Q.     Okay.  And in your experience with

9   broadcast agreements, have you ever known a situation

10  where anyone else has tried to segregate the NIL value

11  from the value of the broadcast rights package as a

12  whole?

13         A.     I'm not aware of that taking place

14  before.  It's typically not necessary, and therefore

15  there is not a particular business purpose for the

16  parties involved in the contracts to go through the

17  process of creating that allocation.

18         Q.     I think you said that it's a holistic

19  portion of the value in your report; correct?  It's part

20  and parcel of the value?

21         A.     You said "it's" ...

22         Q.     The NIL portion.  Sorry.

23         A.     NIL is part of the bucket of rights that

24  are being conveyed to broadcasters that include a

25  variety of rights and opportunities inclusive of the

Page 35

1    opportunity to utilize NIL.

2            Q.      If we look at the bottom of Page 6 of

3    your report, you see there where you say:

4                    "NIL is not customarily (if

5            ever) sold separately from the other

6            elements conveyed in the contract, with

7            separate contractual value assigned.

8            Almost always, the package in a sports

9            media contract is paid for with an

10           aggregate payment that does not break

11           down the value of each component granted

12           in the contract - indeed, subdividing

13           the overall payment to be made in a media

14           rights contract generally would serve no

15           business purpose."

16                   Do you see that?  Correct?

17           A.      I'm not finding the line but it is

18   familiar.  Can you refer me to a particular paragraph?

19           Q.      It's at the bottom of Page 6.

20           A.      Okay.  I'm sorry.

21           MR. FULLER:  Take your time.

22           MR. GREENSPAN:  He started reading here

23   (INDICATING).

24           THE WITNESS:  Yes, I believe that is what I was

25   referring to in my previous answer.

1  BY MR. FULLER:

2       Q.      And there is a portion of your report

3  where you show pictures of participants in broadcast

4  with their faces covered up; right?  Their faces?

5       A.      Yes.  I think that's Section 9, if I

6  remember correctly.

7       Q.      It's on Page 43.

8       A.      It starts on 41.

9       Q.      If you showed the faces of the players in

10  the broadcast but you didn't include the game action, it

11  wouldn't be a broadcast either; correct?  You've got to

12  have both.

13      A.      I agree.

14      Q.      Let's talk for a moment about factors

15  that can affect the value of broadcast rights.

16              In some broadcast rights agreements the

17  rights granted an entity gets commercial spots and other

18  promotional value; is that correct?

19      A.      Sometimes.

20      Q.      But not in every agreement?

21      A.      Not in every agreement.

22      Q.      And that is a factor that goes to the

23  value of the contract; right?

24              If ESPN is providing ACME Conference with

25  free promotional spots as part of the package, then ESPN

1    can't sell those commercial spots to some other third

2    party; correct?

3          A.      Um, I'm not trying to be flippant, but I

4    don't think there is an ACME Conference.

5          MR. FULLER:  I was using it as a generic term.

REDACTED - NSC

13          Q.      Another thing that can affect the price

14   of the rights has to do with the objectives of the

15   rights holder; right?

16              For example, I think you testified in a

17   prior case that the Rose Bowl Parade's objective is to

18   publicize the Rose Bowl as opposed to maximizing the

19   revenue.  Do you remember that?

20          A.      (NO AUDIBLE RESPONSE)

21          Q.      I've got it.  We can pull it out.

22          A.      I mean, I don't specifically remember the

23   testimony.  If you want me to answer questions on that

24   to any deep extent, I would need to look at the

25   document.

1          MR. FULLER:  You want to pull that out.

2               I was using it as an example mostly so

3     that you would understand the nature of what I was

4     asking you about, Mr. Desser.

5          Q.     And what I'm asking you about is that

6     rights holders often have various different motivations,

7     and maximizing revenue is not the sole motivation; is

8     that correct?

9          A.     It depends on the rights holder.

10         Q.     It varies from circumstance to

11    circumstance?

12         A.     It varies in various circumstances.  But

13    I would point out that your example of the Rose Bowl

14    Parade is not a sports event.

15         MR. FULLER:  I was simply using it for an

16    illustration.

17         Q.     So you've looked at the media agreements

18    that have been produced in this case; is that right?

19         A.     I've looked at a large number of redacted

20    or partially redacted media agreements.

21         THE VIDEOGRAPHER:  Excuse me, Counsel.  Can you

22    move to your...

23         MR. FULLER:  Oh, sorry.  Apparently I'm not a TV

24    guy.  I'm blocking the camera.

25         Q.     Have you noticed that many of those

1    agreements have requirements as to the number of games

2    to be broadcast or distributed in various --

3            A.       Number of which agreements?

REDACTED - NSC

9            A.       Generally speaking, it is commonplace for

10   a license agreement to set forth the minimal amount of

11   usage of particular platforms.

12           Q.       Because there's a value to the SEC in

13   exposing, for example, its women's basketball, its

14   volleyball, its soccer to more viewers; correct?

15           A.       Generally speaking, there is a value to

16   the conference, to the schools, to exposing their

17   properties.  And there's typically a balancing act that

18   is done between maximizing exposure and maximizing

19   revenue.

20           Q.       And is that a balancing act that can be

21   quantified?  Have you ever seen anybody put a price on

22   the value of the additional exposure?

23           MR. GREENSPAN:  Object to the form.

24           THE WITNESS:  I've certainly seen estimates of

25   promotional value that are part of agreements.  So it is

1    something that can be done.

2    BY MR. FULLER:

3         Q.      Did you do any such estimates in your

4    work in this case?

5         A.      And here we're talking about the

6    promotional value of commercial time in telecasts, or

7    something else?

8         Q.      The topics that we've just been

9    discussing, did you do any analysis of the type we just

10   discussed in preparing Exhibit 12?

11        MR. GREENSPAN:  Object to the form.

12        THE WITNESS:  That...  That would have been

13   outside the scope of what I was asked to do.

14   BY MR. FULLER:

15        Q.      So the answer is you did not do that

16   analysis in connection with your report here; --

17        MR. GREENSPAN:  Same objection.

18   BY MR. FULLER:

19        Q.      -- because you weren't asked to do it?

20        A.      I will stipulate that there is

21   promotional value to media rights agreements and that it

22   is an important part of the value that is exchanged.

23   But that was not something that I was asked to focus on

24   as a core of this project.

25        Q.      And there's no analysis in any of the

1    materials that have been provided to us that attempts to

2    say:  Well, there's a value that's being provided to the

3    rights holder here because they're guaranteed wider

4    distribution than other rights holders in other

5    contracts.

6                     That's just not an element of the

7    analysis that you did?

8         A.        (NO AUDIBLE RESPONSE)

9         Q.        I think you've already answered that

10   "Yes," I just want to make sure.

11        A.        That is something which is often done in

12   the context of valuing agreements prior to negotiations.

13   It's not something that was requested in this particular

14   project.

15        Q.        So you did not do it here; correct?

16        A.        I can't think of anything which is

17   directly on point in this report.

18        Q.        So my statement is correct; you did not

19   do that.  You would know whether you did the analysis;

20   right?

21        A.        Well, I did analysis.  I mean, I do

22   reference promotional value.  I do reference various

23   elements of agreements.  So I don't want to be exclusive

24   in terms of saying that I didn't do anything with

25   respect to promotional value.

1            Because there is... there are elements of

2    promotional value that are covered.  But this is not a

3    report about promotional value.

4        Q.        And you didn't try to quantify whether

5    one conference has obtained more promotional value than

6    another conference in its various media agreements.

7            There is no quantification in any of the

8    documents that have been provided to us -- right -- of

9    that nature?

10       A.        I can't say as to whether something has

11   been provided to you or not.  I can tell you that that

12   was not part of my assignment here.

13       Q.        So nothing you're aware of anyway?

14       A.        Correct.

15       MR. FULLER:  Now, another...  Why don't we see if

16   we can move along efficiently here.

17       Q.        I'm going to give you a list of things

18   that I think might or might not be relevant to

19   determining the value being exchanged in a broadcast

20   rights agreement, and you tell me whether you agree or

21   disagree that these are relevant to determining the

22   value being provided and received by the rights holder

23   and the network.

24            Fair enough?

25       A.        Can you repeat the question?

1              MR. FULLER:  Can you read that back to me,

2    please.

3              (THE RECORD WAS READ AS FOLLOWS:

4              Q.   I'm going to give you a list

5              of things that I think might or

6              might not be relevant to determining

7              the value being exchanged in a broadcast

8              rights agreement, and you tell me

9              whether you agree or disagree that

10             these are relevant to determining the

11             value being provided and received by

12             the rights holder and the network.

13                 Fair enough?)

14             MR. GREENSPAN:  And I'll object to the form.

15             MR. FULLER:  I wanted her to read it back.

16                  Do you understand the question?  If not,

17   I'm glad to rephrase it.

18             THE WITNESS:  I would prefer that you rephrased

19   it because it seemed to be somewhat compound.

20             MR. FULLER:  You've learned about the objections

21   to questions in your testimony experience:  Compound.

22   Leading.

23             THE WITNESS:  I was just having trouble

24   understanding exactly what you wanted me to say.

25             MR. FULLER:  No, that's fair.  I'm not being

1  critical.  It was a very long question.  I have no

2  problem rephrasing.

3            Why don't we go at this a different way

4  that may make it simple.

5       Q.     Are you familiar with the concept of

6  different tiers of rights?  First Tier rights, Second

7  Tier rights, Third Tier rights, in the context of

8  college sports media rights agreements?

9       A.     Yes, generally.

10      Q.     Tell me what you understand those to mean

11  so we can make sure we're on the same page and then

12  we'll go from there.

13      A.     The tiers generally refer to a

14  combination of sort of quality of product and platform

15  utilized.  It's a bit antiquated today.

16            It refers to a time when there were

17  broadcast rights, national television broadcast rights

18  sold separately from syndication rights or cable rights.

19            And then there were various rights

20  sometimes retained by individual schools and sort of

21  colloquially those are the traditional three tiers.

22            However, as the industry has evolved, the

23  term is not really always applicable.  For example, the

24  SEC recently did a deal that you're probably aware of

25  with ESPN and they have many tiers included in the

Page 45

1    single agreement.

2          Q.      So let's use the SEC for an example.

3    You're generally familiar with the SEC's media rights

4    structure; is that correct, Mr. Desser?

5          A.      I'm generally familiar, but if you are

6    going to ask me about a particular detail of an

7    agreement, I'm going to need to see the agreement.

8          MR. FULLER:  That's fair enough.  I'm using this

9    only for illustrative purposes.

REDACTED - NSC

REDACTED - NSC

15          So what I'm trying to get at is that's

16   sort of the historical rights structure with these

17   different rights to different pick order, different

18   games, different platforms of distribution.

19          You're generally familiar with that;

20   correct?

21     A.     I'm generally familiar with what you

22   described, and that is consistent with my understanding

23   of that period of time.  So, go ahead.

24     Q.     And in more recent times, there have been

25   other forms of distribution:  Internet, YouTube TV, Hulu

1    TV, Amazon.  Some conferences have created networks with

2    broadcast networks.

3              So the media landscape has evolved, I

4    think is the way you put it before.  You would agree

5    with that?

6         A.     Yes.

7         Q.     And I believe that you have testified in

8    the past that the...  Let me find my notes and make sure

9    I get this correct.

10             Sometimes a particular event will get

11   better ratings and more viewership on one network than

12   another because of the composition of the viewing

13   audience, the promotional activities of the network.

14             So different platforms for distribution,

15   different networks are not all the same; right?  I mean,

16   they bring different values and benefits to the rights

17   equation?

18        MR. GREENSPAN:  Object to the form.  I'm not sure

19   where his prior testimony begins and ends in your

20   question, and the question is about the prior testimony.

21        MR. FULLER:  Let me see the O'Bannon deposition.

22             I don't know, do you want to mark this or

23   you want to just let him refresh himself?

24        MR. GREENSPAN:  Why don't we mark it so we have

25   it.

1        MR. FULLER:  Okay.  This will be Exhibit

2  Number 13.

3             (THE DOCUMENT REFERRED TO WAS

4             IDENTIFIED AND WAS MARKED AS

5             EXHIBIT 13 TO THE DEPOSITION)

6        MR. GREENSPAN:  This was across the street.

7        THE WITNESS:  I thought I remember it being in

8  this neighborhood.

9        MR. FULLER:  There is a type-o in my notes.  We

10  shall come back to this when I get my notes sorted out

11  after the next break.  There's no reason to delay here.

12        Q.    Would you agree with me that the ability

13  to do beer and liquor advertising affects the value of a

14  rights agreement?

15        A.    (NO AUDIBLE RESPONSE)

16        Q.    In other words, if the agreement prevents

17  the network from running liquor ads or beer ads or

18  limits the number of ads, that affects the value of what

19  the network is receiving; correct?

20        A.    As a general matter, a restriction on

21  categories could have a negative value.  It could

22  present a negative situation with respect to maximizing

23  value.

24        Q.    And you've seen that there is... that's a

25  negotiated term in many of these college agreements,

1  what type of advertising can occur, including the

2  availability, if any, of beer and liquor advertising?

3       A.       Yes.

4       Q.       Another factor that impacts the value of

5  rights is the cost of producing the event; right?

6       A.       That is a material element that goes into

7  considering what broadcaster will bid.

8       Q.       And that varies from broadcast property

9  to broadcast property depending on the location of the

10 games, the number of games, the accessibility of the

11 event, any number of factors that are unique to each

12 property that's being addressed; correct?

13      A.       Yes.  There are quite a number of

14 variations as to the type of product, location, setup in

15 an arena or a stadium.

16      Q.       And did you do any analysis of the cost

17 of producing games under any of these agreements, as

18 part of your work here?

19      A.       It is something that is addressed but is

20 not a focal point of the report.

21      Q.       In what way is it addressed?

22      A.       The...  The...  As an example, the notion

23 of producing a telecast and excluding NIL from that

24 telecast, what that would do to the nature of what was

25 being presented and, you know, that would require

Page 50

1   certain production techniques to be employed.

2          MR. FULLER:  That's not the type of production

3   costs that I was actually intending to refer to.  So let

4   me see if I can clarify my question so we can get on the

5   same page.

REDACTED - NSC

12                  Did you do any comparison of the terms of

13   various conferences' media agreements from the

14   perspective of whether the network, the conference or

15   the schools bears the production cost?

16          A.      There is no separate section in the

17   report about production costs specifically.

18                  It is typical that particularly for

19   Tier 1 and Tier 2 events, as you previously referred to

20   them, that the network buying the rights is usually

21   responsible for that production.  And in effect, the

22   rights fees reflect the fact that they have that job to

23   do.

24          Q.      But you haven't done any analysis to

25   determine how the production cost obligations are

1    allocated in the agreements of The Big Ten versus The

2    Big 12 versus the PAC-12 versus the ACC versus the SEC,

3    and whether particular events are more or less costly in

4    some of those conferences than others to produce?

5         A.      I have not gone to that level of detail

6    at this point.

7         Q.      The value of rights also is dependent at

8    least in part on the projected demographics of the

9    audience; would you agree with that?  Of the viewership

10   audience?

11        A.      Well, demographics are part of the

12   valuation equation as is audience size, which is

13   probably just as important.

14        Q.      I've often heard in the broadcast world

15   that the AFC package of NFL games is more valuable than

16   the NFC package of NFL games.

17               Is that correct?

18        A.      There isn't really the AFC and NFC

19   package like there used to be.

20        Q.      And the reason for that is because they

21   were trying to switch the games around to equalize the

22   value of the packages; is that correct?

23        MR. GREENSPAN:  Object to the form.

24        MR. FULLER:  I think he knows what I'm talking

25   about.  But if he doesn't, he can tell me and we'll

1  clarify.

2        THE WITNESS:  I believe what the NFL has done is

3  I think they're trying to maximize their overall

4  ratings.  And the previous rigid structure of dividing

5  games between NFC and AFC packages was not the optimal

6  way to do that.

7  BY MR. FULLER:

8        Q.     And they also found that when they were

9  putting those packages out to bid, segregated between

10  AFC and NFC, that they were getting more money for the

11  AFC package than they were for the NFC package.

12              I mean, with your expertise, you're aware

13  of that.  You know that's part of the industry.

14        MR. GREENSPAN:  Objection.

15        THE WITNESS:  That has not always been the case,

16  actually.

17  BY MR. FULLER:

18        Q.     So the packages vary in value depending

19  on which team's games are in which package?

20        A.     So we're talking about the NFL and the

21  Sunday afternoon packages that are currently shown on

22  CBS and Fox Networks.

23              The value of those packages is naturally

24  a function of the games that ultimately are placed in

25  those packages.

1          Q.       Because some games, some teams, have more

2     value than others.  So when you move games around within

3     packages, you change the value of the package; is that

4     what you're saying?  I just want to make sure I

5     understand.

6          A.       Well, let's be clear.  When these deals

7     are negotiated years and years ahead of time, we don't

8     know which games are going to be more valuable or less

9     valuable.

10          Q.       But you try to forecast to determine

11     which will be more valuable and what the value will be.

12     That's part of the process of bidding on rights;

13     correct?

14          A.       There is a lot that goes in to the

15     bidding for rights.

16          Q.       But that's one of the things that goes in

17     to it, is trying to forecast the attractiveness of the

18     package of games that you're buying, if you're a

19     broadcaster?

20          A.       Well, let me put it this way.  If you had

21     a package that, all things being equal, had the Super

22     Bowl and another package that didn't have the Super

23     Bowl, I believe that the package with the Super Bowl

24     would be more valuable.

25          Q.       If you had a package that had the Dallas

1   Cowboys every week and you took out the Dallas Cowboys

2   and you had Tampa Bay every week, the package would go

3   down in value; correct?

4           A.      (NO AUDIBLE RESPONSE)

5           Q.      There's some teams that have more

6   broadcast value historically than others?

7           A.      Well, I suppose it depends whether Tom

8   Brady is playing or not.

9           Q.      Because the individual participants drive

10  part of the value of these TV packages; correct?

11          A.      I think that's the core of my report, is

12  focusing on just how important the people are that

13  appear in these telecasts.

14          Q.      And by the example that you just gave,

15  Tampa Bay is much more valuable with Brady than without

16  Brady; is that right?

17          A.      Generally speaking, Tampa Bay with Brady

18  is more valuable.  It may not always be the case if

19  they've been eliminated from playoff contention or any

20  one of many other circumstances that probably don't pay

21  to speculate about.

22          Q.      Do you remember who the quarterback at

23  Tampa Bay was before Brady got there?

24          A.      I do not.

25          MR. FULLER:  Neither do I.

1          Q.      So the point I'm getting at is that
2   different players have different values that they bring
3   to the broadcast.  That's what you're saying; correct?
4          MR. GREENSPAN:  Object to the form.
5          THE WITNESS:  That may be the case.  It can be
6   the case.  It...  There are many other things that also
7   bear on the value of a particular game's value.
8   BY MR. FULLER:
9          Q.      Another thing that affects the value of a
10  package is the timing of the broadcast.  In other words,
11  is it Sunday afternoon?  Is it Saturday afternoon?  Is
12  it Thursday night?  Is it Wednesday night?
13              Because that goes to how many viewers can
14  be expected and other...  It has various affects on the
15  value of the package of rights; is that correct?
16         A.      Schedule is one of the variables in a
17  media rights agreement that is quite common.
18         Q.      That affects value?
19         A.      It can frequently affect value.
20         Q.      Did you examine any of the agreements
21  that are produced in this case, to determine how much
22  scheduling flexibility was retained by the rights
23  holders versus how much was ceded to the broadcasters,
24  and compared one to the other?
25         A.      That's really beyond the scope of what I

1  was asked to do.

2          Q.      So the answer is:  "No" you did not do

3  that?

4          A.      I focused on the allocable value of NIL

5  rights as part --

6          MR. FULLER:  I know.

7          Q.      I don't want to know what you did.  I

8  just want to know if this is something that you did not

9  do.

10              And I think you said you did not do what

11  I just talked about.

12          A.      I did not do that particular analysis in

13  this project because that was beyond the scope.

14          Q.      Another factor that can create value or

15  diminish value has to do with back end rights; correct?

16          A.      Yes.

17          Q.      Whether or not a contract has a provision

18  in it that gives the current broadcaster a right of

19  first negotiation for a new deal and/or a right of first

20  refusal, that dramatically affects value; correct?

21          A.      It can, depending on the circumstances.

22          Q.      Because it can impede getting to the open

23  market to put your rights out to bid if you have to

24  navigate through a first negotiation and first refusal

25  with your current broadcast counter-party; correct?

1          A.          That...  That can indeed occur.

2          Q.          And that...  So what I said is correct,

3     it can impact the value; correct?

4          A.          We need to parse it a little bit.

5     Because where you're going to see that value impacted

6     will be in the subsequent agreement.

7          Q.          So whether it's in the current agreement,

8     the subsequent agreement or a series of agreements, that

9     term has a value impact; correct?

10          A.          There are many kinds of back end rights

11     structured in different ways.  They're different

12     processes.

13                    As a general matter, they have an impact

14     on the process that takes place at the end of an

15     agreement and can impact what happens at the end of a

16     renegotiation process with respect to a subsequent

17     agreement.

18          Q.          Did you do any analysis of the

19     different... of the differences or similarities, if any,

20     of the back end rights provisions in the various

21     conference and NCAA agreements in this case?

22          A.          I would have liked to look at that.  But

23     those terms were generally redacted, over my objection.

24          Q.          So you did not do the analysis because

25     you could not access the terms?

1        A.        I did not do that analysis.  I wanted to

2   understand those points, but I was foreclosed from

3   having that opportunity.

4        Q.        With respect to name, image and likeness,

5   there are different ways in which name, image and

6   likeness rights are used; correct?

7                  For example, you say that they are part

8   of the broadcast.  They can be used to promote the

9   broadcast.  They can be used to promote products and

10  goods unrelated to broadcast.

11                 There's a variety of ways in which name,

12  image and likeness rights are licensed, many of which

13  are covered in your report; correct?

14       A.        Yes.  That's correct.

15       Q.        And I believe that you draw a distinction

16  between the use of name, image and likeness rights in a

17  broadcast and the use of name, image and likeness rights

18  to promote a broadcast?  Is that correct?

19       A.        Those are different ways that NIL are

20  used, both in the context of broadcast agreements and

21  the opportunity to do both.  And in fact, the obligation

22  to do both is typically included in those agreements.

23       Q.        If you look at Page 41 of Exhibit 13...

24                 They're little.  There's four pages on

25  each page.

1        A.        Okay.  What page are we looking for?

2        Q.        41.

3        A.        Okay.  I have Page 41 in front of me.

4        MR. FULLER:  This is your deposition in the

5    O'Bannon case, Mr. Desser.

6        Q.        You're asked:

7                  "So the rights to use the player's

8        likeness in an endorsement is different

9        from the right" --

10       THE REPORTER:  Slower.  Slower.  Slower, please.

11       MR. FULLER:  Sorry.

12       Q.        "So the rights to use the player's

13       likeness in an endorsement is different

14       from the right to use it in the live

15       broadcast itself?"

16                 And your answer is:  "Those two

17       uses are treated differently in the

18       agreements."

19                 And then you can keep on reading it, if

20    you want to.  But that's what I'm referring to.

21                      (DOCUMENT IS REVIEWED)

22       MR. FULLER:  Let's mark this Exhibit 14.  This is

23    his trial testimony in O'Bannon.

24    ///

25    ///

1                    (THE DOCUMENT REFERRED TO WAS

2                    IDENTIFIED AND WAS MARKED AS

3                    EXHIBIT 14 TO THE DEPOSITION)

4    BY MR. FULLER:

5        Q.    Have you had a chance to read what's on

6    Page 41 of Exhibit Number 13?

7        MR. GREENSPAN:  Exhibit 13 is the deposition

8    testimony, and you are asking just about the one Q and A

9    on Page 41?

10       MR. FULLER:  That's right.  I wanted him to read

11   that.

12       Q.    Now look at Page 685 of Exhibit 14.

13             If you look at the top...

14       MR. GREENSPAN:  I apologize.  What page are we on

15   in the trial testimony?

16       MR. FULLER:  685.

17       MR. GREENSPAN:  Thanks.

18       MR. FULLER:  Line 1.

19       Q.    Kelly Klaus asked you:

20             "And it is your understanding, sir,

21             in the broadcast industry, it is

22             generally understood that promoting or

23             publicizing a broadcast is not the same

24             thing as the actual broadcast?

25             "Is that your understanding?"

1                  And you said:  "That's correct."

2                  Do you see that?

3        A.        I see that.

4        Q.        Do you still agree with that testimony?

5   Was that...  Is that testimony correct now?

6        A.        I'm going to need to understand what the

7   context is.  So I'm going to have to read a little bit

8   back, so if you can give me a moment.

9        MR. FULLER:  Sure.

10                 (DOCUMENT IS REVIEWED)

11       MR. FULLER:  Mr. Desser, let us know when you're

12   done.  Take your time.

13       THE WITNESS:  All right.  I think I'm ready, but

14   depending on where your questions go I may need to look

15   at some more.

16       MR. FULLER:  I guess my question is simple.

17       Q.        Your testimony in the O'Bannon case that

18   you just read, is there any reason now that you've

19   studied it in context that you believe that testimony is

20   incorrect?  The testimony at the top of Page 685,

21   Lines 1 through 6?

22       A.        The trial testimony.

23       Q.        The trial testimony.  Exhibit Number 14.

24       A.        I stand by the testimony in the context

25   in which it was provided.

1          Q.       My question to you is:  With respect to

2     the NIL components that you say are part of the

3     broadcast themselves, because they're an integrated part

4     of the broadcast there's no market for those components

5     to be bought or sold separately; right?

6                    You can't buy the NIL component of the

7     broadcast without buying the rights to broadcast the

8     game.  In your view, you can't buy the rights to

9     broadcast the game without buying the NIL component.

10                    Is that correct?

11          A.       Well, your summary is, I think, a little

12     broader.  But directionally those two things are

13     integrated, and I'm not aware of a broadcast market

14     where they're sold separately.

15                    I do focus later in my report on things

16     like video games, where in a video context those

17     opportunities are transacted.

18          MR. FULLER:  I'm focused solely on the broadcast

19     rights right now.

20          Q.       And in the broadcast rights transfer, in

21     your view you cannot broadcast the game without the NIL

22     rights.  And having the NIL rights in the broadcast has

23     no value unless you have the rights to effectuate the

24     broadcast itself, the other 90 percent that you talk

25     about.

1        A.      I don't think it's fair to say that there

2   is no value to the NIL rights separately.  The fact is

3   that they are customarily and almost exclusively

4   packaged when they are sold.

5        Q.      And you don't know of any situation where

6   the NIL rights in a broadcast have been sold separately

7   from the broadcast rights, because they're an integrated

8   part of the whole.  I think that's the whole focus of

9   your report; correct?

10       A.      Yes.

11       MR. FULLER:  Okay.

12       Q.      With respect to the promotion of the

13  broadcast, did you assign any difference in value to the

14  NIL rights to promote the broadcast as opposed to the

15  NIL rights to actually effectuate the broadcast?  Is

16  that a distinction that's drawn anywhere in your report?

17       A.      No.  Typically those things are also

18  bundled.

19       Q.      You're familiar with the opening of

20  Monday Night Football where they often have a musician

21  singing about Monday Night Football, promoting the

22  broadcast; right?  I can't remember the woman's name.

23  It used to be Hank Williams, Junior.

24       A.      Hank Williams.

25       Q.      You know what I'm talking about; right?

1          A.          Well, I wouldn't call that a promotion of

2     the broadcast.  That's the opening of the broadcast.

3          MR. FULLER:  All right.  We'll come back to that

4     a little later.

5          Q.          Have you talked to any student athletes

6     in connection with your work in preparing this report?

7     Obtained any input from any student athletes?

8          A.          No.

9          Q.          Have you considered...  Do you know what

10    Title 9 is?

11         A.          I've heard of it.

12         Q.          Have you given any consideration to

13    Title 9 in your preparation of this report?

14         A.          That's not within the scope of what I was

15    assigned to work on.

16         Q.          So the answer is:  "No" you have not

17    given any consideration to it, because you weren't asked

18    to do that?

19         A.          No, I have not.

20         Q.          Did you know that there are laws in some

21    states that prohibit universities, colleges and

22    conferences from paying student athletes for NIL rights?

23         A.          I am not an expert in state laws.

24         Q.          I just want to know whether you knew that

25    those laws existed?

1          A.       Only in a very general way.  I couldn't

2    tell you where they exist or what their impact is.

3          Q.       In any event, you did not give any

4    consideration to those laws in preparing your report?

5          A.       Well, I didn't give consideration to

6    specific state laws, but I gave consideration to the

7    fact that...

8          MR. FULLER:  Let me stop you, because I think

9    you're headed in a direction that I'm not going, and

10   we'll go there later.

11               I'm not talking about the laws that

12   address whether or not there is an NIL right in the

13   broadcast.

14         Q.       I'm talking about a different set of laws

15   that affirmatively state that in a certain state that it

16   is prohibited for conferences or schools, colleges and

17   universities, to pay student athletes for NIL rights.

18               I can show you an example, if that will

19   help.

20         MR. GREENSPAN:  Sorry.  The question is if he's

21   aware of...

22   BY MR. FULLER:

23         Q.       I want to know if you were aware of those

24   laws; and if so, if you took them into account, in any

25   respect, in preparing your report?

1          A.          I have heard of various law-making in

2    particular jurisdictions, without specificity, having to

3    do with the general topics here going in various

4    directions.

5               I don't claim at all to be an expert or

6    be particularly knowledgeable about any of the details.

7          Q.          I'll represent to you that there are some

8    states' laws that on their face prohibit schools and

9    conferences, universities and conferences, from paying

10   for NIL rights.  And that in other states, there are

11   laws that invalidate the rules in the NCAA that prohibit

12   schools and conferences from paying for NIL rights.

13              California is an example of the latter.

14   Somewhere in my notes, I've got several examples of the

15   former.

16              My question is simple.  Whatever those

17   laws may say, they are not something you've considered

18   in connection with preparing your report?

19         A.          As I said, I'm not a lawyer.  I don't

20   specialize in particular state laws.  And that would be

21   beyond the scope of what I was asked to do.

22         Q.          So you have not considered those in

23   connection with preparation of your report.  For

24   whatever reason, the answer is they haven't been part of

25   your analysis.

1    A.        Except with respect to the issue that
2  differing state laws, notwithstanding a broadcaster that
3  operates on a national basis, needs to have clearances
4  that cover the entire country and potentially the entire
5  world.
6        MR. FULLER:  I understand you've considered that.
7  That's in your report.  But that's a different set of
8  laws.
9    Q.        I'm talking about the laws that deal with
10 whether NCAA rules that prohibit schools from paying for
11 NIL rights are invalidated, and the polar opposite.  In
12 some states there are laws that state that the school
13 and conference cannot pay for NIL rights.
14           You understand what I'm saying?  Whether
15 you're familiar --
16    A.        I understand what you're saying, and I do
17 not claim expertise on the subject, and it is beyond the
18 scope of my report.
19    Q.        So you didn't consider it, in preparing
20 your report, because it's beyond the scope of your
21 report?
22    A.        Correct.
23        MR. FULLER:  Okay.  I think this might be a good
24 time for a break.
25        MR. GREENSPAN:  Okay.

1            THE VIDEOGRAPHER:  We are off the record at

2    10:42.  This is the end of Disk 1.

3                  (WHEREUPON A RECESS WAS HELD

4                  FROM 10:43 A.M. TO 11:02 A.M.)

5            THE VIDEOGRAPHER:  Back on the record at 11:02.

6    This is the beginning of Disk 2.

7            MR. FULLER:  Mr. Desser, I have shown you a

8    document marked as Exhibit 15.

9                     (THE DOCUMENT REFERRED TO WAS

10                    IDENTIFIED AND WAS MARKED AS

11                    EXHIBIT 15 TO THE DEPOSITION)

12   BY MR. FULLER:

13           Q.     Have you ever seen that before?

14           A.     I may have, but I'm not certain.

15           Q.     I'll represent to you that it's a

16   declaration that was filed by the Plaintiffs in this

17   case, from the NFL Players Association's president, as

18   shown on the first page.  If you look in Paragraph 1.

19           A.     Yeah, it's looking familiar.

20           Q.     Let's look at...  Well, let me ask you

21   this.  One of the things that you rely on in your report

22   are the group licenses that are entered into by the NFL

23   and NBA players associations?

24           MR. GREENSPAN:  Object to the form.

25           THE WITNESS:  That's correct.

1    BY MR. FULLER:

2         Q.      Let's look at Exhibit Number 15.

3    Paragraph 8 quotes from the individual player contracts

4    with the NFL clubs and reflects an assignment to the

5    players association of the group license that's

6    applicable when five or more NFL player rights are

7    involved.

8                 Is that correct?

9         A.      I see Paragraph 8, and I do see the

10   reference to five NFL player Rights.

11        Q.      And those are the group licenses that

12   you're referring to in your report?  At least one of the

13   group licenses; correct?

14        A.      Give me a moment so that I can answer

15   your question.

16                 (DOCUMENT IS REVIEWED)

17        A.      Can you repeat the question, please?

18        MR. FULLER:  I'll ask it a different way.

19        Q.      Paragraphs 8 and 9 of Exhibit 15 refer to

20   group licenses.  I didn't refer to Paragraph 9 before,

21   but just to call your attention to it.

22                 Are you aware of any other group licenses

23   at the NFL players association level other than the two

24   that are referred to here in Paragraphs 8 and 9?

25        MR. GREENSPAN:  Object to the form.

1                    Could you read back the question.

2         (THE RECORD WAS READ AS FOLLOWS:

3         Q.   Are you aware of any other group

4         licenses of the NFL players association

5         level other than the two that are referenced

6         here in Paragraphs 8 and 9?)

7         THE WITNESS:  I am generally aware of the NFL

8    group licenses.  I'm not an expert on NFL group

9    licenses.

10                   There may or may not be other licenses.

11   I can't tell you whether this is exhaustive or not.

12   BY MR. FULLER:

13        Q.     You don't know of any others.  There may

14   be, you just don't know?

15        A.     I do not know.

16        MR. GREENSPAN:  Object to the form.

17   BY MR. FULLER:

18        Q.     Paragraph 11 of Exhibit Number 15 states

19   that PI...  Which stands for the players association.

20             "PI's licensing portfolio consists

21         of four main categories: apparel, non-apparel

22         (or hardlines), digital gaming, and

23         sponsorship."

24             And then it gives examples that include

25   jerseys, trading cards, and so forth.

Page 71

1              Do you see that?

2      A.      Yes.

3      Q.      If you go over to Paragraph 22 of

4  Exhibit 15, it excerpts Paragraph 4(a) of the standard

5  NFL player contract.

6              Do you see that?

7      A.      I see Paragraph 22 and the inserted

8  language from a Paragraph 4.

9      Q.      And if you look at Exhibit Number 12,

10  that's the same language that you quoted on Page 27,

11  under Section 6.8, in your report.

12             Is that correct?

13     A.      I'm sorry.  What was the citation from

14  the report?

15     MR. FULLER:  Page 27.

16     Q.      You've put in an ellipses but it's the

17  same language, I believe.  Take your time and confirm

18  that.

19     A.      If you're asking me to double-check that

20  it's all the same language, it's going to take me a few

21  minutes.

22     MR. FULLER:  Take your time.

23     MR. GREENSPAN:  Do you want to just represent

24  they're the same or...

25     MR. FULLER:  I'm glad to represent that, as long

1  as you're willing to accept that, David.  I just don't

2  want him to feel...

3          MR. GREENSPAN:  Yes.  Yeah.

4          MR. FULLER:  They are the same.

5          THE WITNESS:  Okay.

6  BY MR. FULLER:

7          Q.      The NFL player contracts include the

8  compensation to the player for playing in the games;

9  right?  You understand that?

10         A.      To the best of my knowledge.

11         Q.      "Yes."

12         A.      Yes.

13         Q.      And some NFL players make as much as

14 $50 million a year.  Did you know that?

15         A.      I don't know that I could quote a

16 particular amount.

17         Q.      Did you know that the NFL minimum is

18 $660,000?  I think that's in the affidavit or

19 declaration that's marked as Exhibit 15 somewhere.

20         A.      I don't know that for a fact.

21         Q.      But you would agree with me that NFL

22 players' salaries and compensation under the player

23 contracts can be vastly different.

24              Tom Brady makes a whole lot more money

25 than someone who doesn't play very much on the Tampa Bay

1  Buccaneers.  I mean, we all know that to be the case;

2  right?

3          A.      I don't know what we all know.  I can

4  just speak for myself.

5                  I'm aware that there is a variety of

6  different salaries paid to NFL layers.  Although I'm not

7  an expert on NFL salaries.

8          Q.      You would agree with me that the

9  provisions in the NFL player contracts that deal with

10  publicity rights in broadcast are excerpted in

11  Section 6.8 of your report, on Page 27 of Exhibit 12,

12  and are also reproduced here in Paragraph 22 of

13  Exhibit 15.

14                  The point of my question being:  These

15  are the provisions relevant to NIL rights in broadcast;

16  correct?

17          MR. GREENSPAN:  Object to the form.

18          THE WITNESS:  I can't speak to what is in the

19  declaration, Exhibit 15, to...

20                  It is my understanding that the language

21  that I excerpted in my report, which was provided for me

22  by counsel, is the language from the applicable

23  agreements.

24  BY MR. FULLER:

25          Q.      The player contracts?  I believe that's

1    what it says.

2            A.      Yes.

3            Q.      And it says in here that the player...

4    And I'm reading in the last paragraph on Page 27:

5                    The Player and National Football League

6    Players Association and its affiliates confirm the...

7    And I'm paraphrasing here, so you tell me if I'm

8    omitting something that you think is important.

9                    ... confirm the exclusive rights of the

10   league and the club to broadcast the games.  And it also

11   goes so far as to say that the player will not contest

12   those rights.

13                   Is that correct?

14           MR. GREENSPAN:  Object to the form.

15           THE WITNESS:  The language says what it says.

16   I'm not in a position to opine on the details of NFL

17   player contracts.

18   BY MR. FULLER:

19           Q.      You do rely on those contracts in your

20   report, though; right?

21           A.      Well, I don't rely on the individual

22   contracts.  I rely on the language that was excerpted

23   from those contracts that is, as I understand it,

24   standard language.

25           Q.      And do you understand that the language

1  that deals with NIL rights in broadcast for NFL players

2  is in the standard player contract, pursuant to which

3  players receive different levels of compensation.

4             Is that right?

5       A.    Yes.  That's correct.

6       Q.    And you also understand that the terms of

7  these player contracts are negotiated holistically;

8  there is no separate negotiation for the NIL value in

9  the broadcast from the performance value in the

10 broadcast; correct?

11      MR. GREENSPAN:  Object to the form.

12 BY MR. FULLER:

13      Q.    In other words, the NIL rights in the

14 broadcast and the performance of the player in the games

15 is bundled together in one contract for which a single

16 price is negotiated by the team; is that right?

17      MR. GREENSPAN:  Same objection.

18      THE WITNESS:  If I understand your question,

19 there is no... You're asking me if there is a separate

20 price, a separate portion of salary delineated in the

21 player agreements for NIL as opposed to performance on

22 the field.

23      MR. FULLER:  Correct.

24      Q.    And the answer is:  There is not;

25 correct?

1          A.          You're doing a very good job of doing my

2     deposition.

3          MR. FULLER:  No.  I want to make sure I'm stating

4     that correctly.

5          Q.          That is correct; correct?

6          A.          To the best of my knowledge, that is

7     correct; yes.

8          Q.          So there is no separate market for buying

9     and selling the NIL element of the broadcast, with

10    respect to the players?

11         MR. GREENSPAN:  Object to the form.

12    BY MR. FULLER:

13         Q.          It's a bundled market with the

14    performance obligations in the player contract?

15         MR. GREENSPAN:  Same objection.

16         THE WITNESS:  The performance of the players and

17    the NIL of the players, as it relates to playing in the

18    games, are both included as aspects of the services that

19    the players are providing to their teams.

20    BY MR. FULLER:

21         Q.          And there is no separate market for the

22    NIL value in the broadcast?

23         MR. GREENSPAN:  Objection.

24    BY MR. FULLER:

25         Q.          I mean, that follows from what you just

1  said.  I just want to make sure that I'm not missing

2  some quirk in what you're saying.

3          MR. GREENSPAN:  I'm objecting, as to vague as to

4  "market."

5  BY MR. FULLER:

6          Q.      There is no separate place where the NIL

7  rights in broadcast are bought and sold separate from

8  the player contracts themselves.

9          A.      (NO AUDIBLE RESPONSE)

10         Q.      Your counsel seems happy with the

11 question.

12         A.      And here we're excluding from your

13 definition of the market use in a video game, for

14 example?

15         Q.      Correct.

16         A.      So it's just the use in the broadcast and

17 for playing in the game and the other things the players

18 do as part of being on an NFL team.

19         Q.      In the game.  Yeah.  And the broadcast.

20         A.      Well, it's more than just in the game.

21         Q.      It's all their performance.  The

22 practice...

23         A.      It's practice.  It's travel.  It's all

24 the other things they do.

25         Q.      So my characterization is correct; there

1   is not a separate transaction?

2        A.      That is correct.  To the best of my

3   knowledge, that is correct.

4        MR. FULLER:  Okay.

5        Q.      And is the same also true with respect to

6   the NBA contracts that you rely on?  So I don't have to

7   repeat all the same questions?

8        A.      In the NBA and the NFL, it is my

9   understanding that the rights for playing and for NIL

10  are bundled as part of the uniform player contract.

11       Q.      And the NIL rights in the broadcast are

12  not bought or sold or transacted separately in either

13  one of those leagues?

14       A.      No.  To the best of my knowledge, they

15  are not.

16       Q.      Now, let's look at your report, where you

17  talk on Page 55 about analogous industry royalty rights.

18              Do you see that?

19       A.      Yes.

20       Q.      The royalty rights that you're dealing

21  with here...  And we can pull out the exhibits to your

22  report if you want to see them.

23              But my understanding is that the royalty

24  rates that you're looking at are royalties that have to

25  do with products, apparel, video games; situations where

1  the NIL rights are licensed directly to a licensee as

2  opposed to passed through the team and the league to the

3  broadcaster.

4              Is that correct?

5      A.      I'm not sure that the chain of title, for

6  lack of a better term, is as you've stated.

7              I believe, it's at least my

8  understanding, that the rights in -- you know -- in the

9  NIL that are utilized in those royalty agreements flow

10 through players associations, and come from players to

11 teams to the PAs and then to the licensees.

12             And I can't tell you for 100 percent

13 certain that that's exactly the way it works, but that's

14 my general understanding.

15     Q.      My understanding was that for individual

16 endorsements at the NFL and NBA level, the player enters

17 into his own endorsement contract.  So famously, Steph

18 Curry appeared on a Super Bowl ad and touted a now

19 bankrupt Crypto Currency company, as I recall.

20             Those are individually negotiated between

21 the player and the licensee, with maybe the player's

22 agents involved.  And they have nothing to do with the

23 team, the league, or the player association.

24             Is that correct?

25     A.      They may not have anything to do with

1   those entities.  But it's possible that those entities

2   also provide a license for other aspects that might go

3   into the commercial that you mentioned.

4              As a practical matter, an individual

5   endorsement by a player is a separate transaction from a

6   group license.

7        Q.    And the individual player receives -- the

8   player -- the revenue from the individual endorsement

9   usage; correct?

10       A.    (NO AUDIBLE RESPONSE)

11       Q.    So FTX paid Steph directly.

12       A.    I can't tell you for certain that they

13  paid him directly or indirectly.

14             I'm saying as a general rule...

15       Q.    That's the way it works?

16       A.    That's what I would expect to happen.  It

17  probably flowed through the agent and the agent

18  permitted it, but I don't know for a fact.

19       Q.    But that's typically the way it would

20  work for these individual endorsement by pro players?

21       MR. GREENSPAN:  Object to the form.

22       THE WITNESS:  Individual endorsements are not

23  group license.

24  BY MR. FULLER:

25       Q.    They're not part of the arrangement.

1    They're not part of the group deals.

2            A.       (NO AUDIBLE RESPONSE)

3            Q.       They're separate.

4            A.       Correct.

5            Q.       The same is true in college, now that

6    some college players can license their NIL rights to

7    third parties; correct?

8                     Do you have knowledge of that market?

9            A.       You mean the same...  There are different

10   organizations.  I don't know that the players all have

11   agents like they do in the pros.

12                   At least at one time, that was against

13   NCAA rules.  So I don't know specifically what is

14   happening within the transaction.

15           Q.       But you do know that individual players

16   in college can now license their NIL rights for

17   endorsements of various products; correct?

18           A.       For third party products that don't

19   involve the conference or school or team.

20           Q.       Right.

21           A.       That's my understanding.

22           Q.       And the licenses that you're referring to

23   in your report as analogous industry royalty rates,

24   those are all licenses for third party products as well;

25   correct?

1          A.          Generally speaking, I believe that is the

2     case.

3          Q.          And they're separate transactions from

4     the player contract license of NIL rights in broadcast?

5          A.          Could you repeat the question?  Or

6     rephrase the question?

7          MR. FULLER:  I'll withdraw it for a moment.  I

8     want advice from my guidance counselor here to the left

9     as to how to ask the question.  You think about that and

10    I'll ask something else.

11               Give me exhibit...  Why don't we go off

12    the record for just a moment while I find these.

13         THE VIDEOGRAPHER:  Off the record at 11:27.

14               (WHEREUPON A RECESS WAS HELD

15               FROM 11:27 A.M. TO 11:30 A.M.)

16         THE VIDEOGRAPHER:  We are back on the record at

17    11:30.

18         MR. FULLER:  Let me...  I believe the court

19    reporter has showed you Exhibit 16.

20               (THE DOCUMENT REFERRED TO WAS

21               IDENTIFIED AND WAS MARKED AS

22               EXHIBIT 16 TO THE DEPOSITION)

23         THE WITNESS:  Yes, I have it.

24    BY MR. FULLER:

25         Q.          This is a report that you cite in your

1   report.  16 is a KPMG report that you cite in a footnote

2   on Page 55 of Exhibit 12; correct?

3           A.      It appears to be.

4           Q.      If you will, look at Page 2 of the KPMG

5   report that is marked as Exhibit 16.

6           A.      The "Foreward"?

7           Q.      You see it's "Introduction."  Do you see

8   that?

9           A.      I see "Introduction" but I'm not seeing

10  page numbers.

11          Q.      It's up at the top right.

12          A.      Oh, I'm sorry.

13                  Yes.  Okay.  I've got it.

14          Q.      If you look in the...  There are three

15  columns here with language in them.  If you look in the

16  middle column, the second sentence in the first full

17  paragraph says:  "We will answer two questions in patent

18  licensing."

19                  Do you see that?

20          A.      Yes.

21          Q.      It's my understanding from reading this

22  report that it deals with patent licenses.

23                  Is that your understanding as well?

24          A.      Among other things.

25          Q.      Do you see any indication that it

1   focuses, in any respect, on NIL licenses as opposed to

2   licenses for patents and know-how technology?

3           A.      Yes.

4                   If you turn to Page 12, you can see that

5   there are royalty rates stated for a variety of

6   different kinds of products.  And towards the middle of

7   the graph on Page 12, that's called CHART 2, you can see

8   "Media."

9           Q.      Do you know what type of licenses are

10  being addressed in this report?  The Introduction says

11  that it's patent licenses.  And the media license is

12  patent.

13          A.      If you turn to Page 4, the middle column,

14  second full paragraph talks about for software and

15  content licensing.

16                  It's been several months since I looked

17  at this.  So if you're going to ask a lot more

18  questions, I'm going to need to just take the time to

19  read this thing, to refresh my recollection.

20          Q.      Do you know what type of content

21  licensing KPMG was referring to in this amazingly vague

22  report?

23          A.      I know that they have a data point for

24  media.  And I was focusing on the fact that it's talking

25  about content licensing and media.

1        Q.        But you don't know anything about the
2   background of details.  I mean, this is a general report
3   on licensing across a wide spectrum of different uses
4   and applications; correct?
5        A.        It is a, you know, research paper
6   produced by a major accounting firm that I referred to
7   in my report as additional support for the broad nature
8   of licensing matters.
9        Q.        And it never refers to the terms "name,
10  image and likeness" or "publicity rights," to my
11  knowledge.
12       A.        I'm not aware that it does.  And I don't
13  believe that I purported to say that it did.
14       Q.        Do you remember when Peyton Manning used
15  to do commercials for Buick?
16       A.        Not specifically.
17       Q.        He does commercials now for Nationwide, I
18  thin, with some country music singer.  Have you seen
19  those?
20       A.        May have.  I mean, I don't have a
21  specific recollection.
22       Q.        There's some pro players that do a lot of
23  commercials, a lot of endorsements for different
24  products.  You agree with that; right?
25       A.        Sure.

1          Q.      Those pro players are often paid a flat

2     fee and not a percentage; correct?

3               I mean, I can't imagine that Buick or

4     Nationwide is paying Peyton Manning a percentage of

5     their sales or their revenues or their profits.

6          MR. GREENSPAN:  Object to the form.

7          MR. FULLER:  I just want to know whether he

8     knows, one way or the other, how those contracts are

9     structured.

10         THE WITNESS:  As a general matter, and I'm

11    not...  I don't, as part of my business, get involved in

12    negotiations of those sorts of endorsement deals.  But

13    it would be my expectation that Buick is not paying him

14    a percentage of the sale of Buicks.

15              But having said that, I wouldn't be at

16    all surprised if certain endorsers don't get a, you

17    know, percentage of increased sales or some other value

18    associated with recoupment of sales of the particular

19    product that they might endorse.

20    BY MR. FULLER:

21         Q.      Is it generally true that part of your

22    business is not representing or engaging in negotiations

23    about endorsement contracts?  Is that correct?

24              I think that's what you just said.  I

25    want to make sure I didn't misunderstand it.

1         A.        Endorsement and negotiation in

2    endorsement contracts by athletes is not a core part of

3    my business.  In fact, the only times I can remember

4    being involved in those sorts of endorsements would have

5    gone back to my days at the NBA.

6         Q.        Which would have been how many years ago?

7         A.        Eighteen.

8         Q.        So it's not an area in which you have

9    deep expertise or really any expertise?

10        A.        I don't claim to be an expert in

11   endorsement contracts by athletes.

12        Q.        Let's look at Page 58 of your report,

13   Exhibit 12.  You're referring there to video game

14   licensing?

15        A.        In Paragraph 16?

16        Q.        Correct.

17        A.        Yes.

18        Q.        The second sentence says:

19                  "These rights are even closer

20             to live game NIL insofar as they are

21             for video images and/or likenesses of

22             players in a media-like form of a consumer

23             product."

24                  Do you see that?

25        A.        Yes.

1          Q.        And what you're saying there is that you

2    think that the video game licenses are more analogous to

3    the licenses of broadcasts of NIL and broadcast than the

4    product and other types of third party licenses that are

5    in Section 15?

6          A.        Yes.

7          Q.        Now, for the video games, there is a

8    difference in that once the player licenses their rights

9    to EA Sports or whoever is doing the video games, EA

10   does all the work.

11                   The player doesn't have to show up for

12   practice.  They don't have to perform in the video game.

13   They don't have to show up for spring training.  They

14   don't have to do any of the numerous things that are

15   performance obligations in any arrangement that involves

16   playing on a team; right?

17         A.        That's one of the benefits of using this

18   as a data point in the analysis.  Because they isolate

19   the NIL conveyance as a free-standing matter and don't

20   engage in the performance part of the business deal that

21   would be involved with the player contract.

22         Q.        But the 10 percent that you're using

23   there is 10 percent of a video game revenue stream,

24   which is different than a broadcast revenue royalty

25   stream.

1               The video game manufacturer has different

2    costs, different markets, different overhead structure

3    and so forth.  Is that correct?

4         A.       That may be correct.

5               This was one of the closest parallels to

6    the broadcast license utilization that I am studying,

7    and therefore I believe it to be a very good analogy or

8    maybe the closest analogy that exists.  But it's clearly

9    not the same exact thing, which is why it is an analogy.

10        Q.       With respect to performances at the Super

11   Bowl, do you have an understanding of whether the

12   performers in the halftime shows of the Super Bowl enter

13   into a license that includes a license of their name,

14   image and likeness rights?

15        A.       I haven't studied that.

16        Q.       It would be something you would expect to

17   be included; that the performer at the halftime would

18   provide NIL rights to the NFL to promote the Super Bowl;

19   to promote the broadcast?

20        A.       I would expect that the performer signed

21   an agreement with the production company that then had

22   an agreement with some NFL entity that results in the

23   NFL being able to convey that to its broadcasters.

24        Q.       And by that you mean the NIL rights of

25   the performer?

1          A.     Yes.

2          Q.     Do you have an understanding as to

3    whether Super Bowl halftime performers are paid?

4          A.     I don't have a specific understanding.

5          MR. FULLER:  How about I grab another exhibit.

6               While she's looking for that exhibit,

7    I'll ask you another series of questions and then maybe

8    we can move this along.  Well, she's got it.

9               (WHEREUPON A DISCUSSION WAS

10               HELD OFF THE WRITTEN RECORD)

11         THE WITNESS:  Before we get to this, I just want

12   to amend the last answer.

13              I'm recalling that there is... there have

14   been circumstances where at least some performances --

15   ah -- performers did donate their performance for the

16   Super Bowl.  But I don't remember the details.

17         MR. FULLER:  Look at Exhibit 17 and take a minute

18   to read that.

19               (THE DOCUMENT REFERRED TO WAS

20               IDENTIFIED AND WAS MARKED AS

21               EXHIBIT 17 TO THE DEPOSITION)

22         MR. FULLER:  Tell me when you've had a chance to

23   look at that.

24         THE WITNESS:  I have reviewed Exhibit 17.

25   ///

1  BY MR. FULLER:

2        Q.       As I understand Exhibit 17, it's

3  basically stating that halftime performers at the Super

4  Bowl often/perhaps always perform without compensation

5  because of the enhancement to their personal value and

6  the publicity.

7              Is that your understanding of what it

8  says?

9        A.       I read this article.  I don't...  I can't

10  vouch for anything that is in it.  But that is the

11  thrust of what it's suggesting at least with respect to

12  certain stars.  And I think it also does mention some of

13  the fillers.

14        Q.       The backup or the performers who are also

15  on stage is what you mean by "fillers"?

16        A.       No.  I mean the people who jump up and

17  down in the audience.

18        MR. FULLER:  I see.

19        Q.       Did you consider the situations where

20  certain individuals choose to perform without charge

21  because of the enhancement to their personal value from

22  the publicity, when you prepared your report?

23        A.       I didn't have any reason to.

24        Q.       So the answer is:  "No" you did not

25  consider that?

1          A.          No.

2          Q.          And you said in your report at

3     Section 7.6 that the NIL value of a student athlete is

4     enhanced and influenced by what school the athlete goes

5     to.

6                    Feel free to reference that, if you want.

7          A.          I'm sorry.  Were you referencing 7.6?

8          MR. FULLER:  Yeah.

9          Q.          My understanding of 7.6 was that you were

10    saying that there is a synergistic effect that it

11    enhances the value of the player's NIL to be on a

12    broadly distributed network, sort of a virtuous circle

13    if you will, that the exposure platform benefits the

14    player.

15                   Perhaps I'm reading too much in to that.

16    So why don't you just let me ask you this.

17                   Do you agree with what I just said,

18    regardless of whether it's stated in your report, that

19    the personal value, the NIL value of players can be

20    enhanced by being on better teams?

21                   For example, Stetson Bennett just won the

22    national championship.  Did being on ESPN with a

23    nationwide audience and shellacking TCU enhance Stetson

24    Bennett's NIL value?

25         MR. GREENSPAN:  Object to the form.

1          THE WITNESS:  I haven't studied that.  But I

2    wouldn't doubt that winning two national titles in a row

3    benefits his overall market value.

4    BY MR. FULLER:

5          Q.     And in sports like the Olympics, would

6    you agree with me that there can be star performers in

7    the sport whose NIL value is greatly affected by how

8    they perform in the Olympics, because the Olympics are

9    widely televised and many of their other competitions in

10   things like swimming and track are not widely televised?

11         A.     I would agree with you that there is an

12   outsized benefit from doing well in the Olympics in

13   comparison to some minor events.

14         Q.     And that's because the Olympics are so

15   much more widely viewed and the subject of public

16   viewing?

17         A.     Not exclusively because it's widely

18   viewed.  But that's one of the benefits.

19         Q.     That's part of it.

20         A.     Yes.

21         Q.     So would you agree with me that a high

22   school player who comes to college has their NIL value

23   greatly enhanced by being on television and playing in

24   widely televised and widely viewed games?

25         MR. GREENSPAN:  Object to the form.

Page 94

```
 1   BY MR. FULLER:

 2        Q.      Or can be enhanced in that way?  Maybe

 3   not every player, but some players?

 4        A.      I believe that a high school player

 5   coming in to college and being... performing well and

 6   being widely viewed can often enhance that player's

 7   value.

 8        MR. FULLER:  Let's look at what was marked as

 9   Exhibit 3 in Dr. Rascher's deposition, which is also

10   something you referenced.  But in an effort not to have

11   duplicative exhibits, we're going to show you the same

12   document.

13              And, David, I'll represent to you that I

14   wrote down a three on it when they gave it to me

15   yesterday.

16        MR. GREENSPAN:  Sure.

17        MR. FULLER:  So it's the same document.

18                  (WHEREUPON A DISCUSSION WAS

19                  HELD OFF THE WRITTEN RECORD)

20        MR. FULLER:  I'll represent to you, Mr. Desser,

21   that this is a financial statement that's cited in your

22   report.  And Ms. Nitto is going to give us the footnote

23   here in just a moment.

24                  Let me amend that.
```

REDACTED - NSC

REDACTED - NSC

```
13                 Why don't you give me one of these.

14                 I see that you and Dr. Rascher cited

15   different financial statements, so I'll give you the one

16   that you cited.  They all track.  Let's mark this as the

17   next exhibit.

18                      (THE DOCUMENT REFERRED TO WAS

19                      IDENTIFIED AND WAS MARKED AS

20                      EXHIBIT 18 TO THE DEPOSITION)

21   BY MR. FULLER:

22        Q.     Have you had a chance to familiarize

23   yourself with what you're looking at?  There in your

24   report, at Page 60, you cite SEC-HOUSE47791 at 807.

25                 Do you see that?
```

1        A.        Yes.  I'm looking at that page.

2                  (DOCUMENT IS REVIEWED)

3        MR. FULLER:  Tell me when you're comfortable that

4   you have re-familiarized yourself with your report and

5   the document that has been marked as Exhibit 18.

6                  And I'll represent to you that the page

7   that you cite in your report is Page 17 of Exhibit 18,

8   which has the Bates number ending in 47807.

9        THE WITNESS:  Yes.

10       MR. FULLER:  Are you with me?

11       THE WITNESS:  I'm with you.

12   BY MR. FULLER:

REDACTED - NSC

17                  Is that correct?  Tell me if I'm

18   misstating something.

19       A.        That is consistent with my recollection.

20       Q.        So that's correct.  That's what you're

21   citing it for?

22       A.        If we're going to do a math exercise, I

23   can get out a calculator.

24       MR. FULLER:  I have one.

25       Q.        I just want to establish that you're

```
 1   citing the...  I don't think you need a math exercise to
 2   know what you say in your report.
```

REDACTED - NSC

```
 6        A.      Yes.
 7                MR. FULLER:  Okay.
 8        Q.      Do you understand that the SEC football
 9   games are on CBS, ESPN, ESPN 2, sometimes ESPNU, and the
10   SEC Network?
11        A.      That is my general understanding.
12        Q.      And the CBS contract, the ESPN multimedia
13   agreement and the network agreement are three different
14   agreements.  You understand that; right?
15        A.      Yes.
16                And by "network agreement," just to
17   clarify, you're talking about the SEC Network.
18        Q.      Correct.
19        A.      Not the ESPN Network.
20        Q.      I'm talking about the...  Yes.  It's
21   commonly called the SEC Network.  I think technically
22   it's the SEC ESPN Network but it's a separate agreement.
23                You understand that?
24        A.      Yes.
```

REDACTED - NSC

REDACTED - NSC

REDACTED - NSC

18               I'll loan you my calculator.  Tell us the

19     percentages in the allocation that are at the bottom of

20     Page 17, as you calculate them, if you don't mind.

21               I calculated them for Dr. Rascher's

22     agreement but I didn't -- I mean exhibit -- but I did

23     not realize that you guys were citing separate

24     documents.

REDACTED - NSC

REDACTED - NSC

```
 3              Are you looking at the... at Page 17?

 4        A.       Yes.

 5        MR. FULLER:  Okay.
```

REDACTED - NSC

```
11              But you should do the math yourself

12   because I did it for a separate set of financials.

13              (DOCUMENT IS REVIEWED)

14        MR. FULLER:  If your counsel will entertain this

15   suggestion, to move things along, I will tell you what I

16   understand these statements to show.

17              At lunch you can take the statements, do

18   the math, and come back and tell me if you agree with

19   me.  That would be much more efficient, if that is

20   acceptable.

21        MR. GREENSPAN:  Let's hear what the homework exam

22   is for lunch.

23        MR. FULLER:  Here's what I believe these

24   statements show.  And I'll have some more questions

25   about them, but I'll tell you what I think the math
```

```
 1   shows.
```

REDACTED - NSC

```
14              Now, if it's okay with Mr. Feher, I'll
15   let you take the calculator at lunch and confirm that.
16              I'm sorry.  Greenspan.  I'm sorry.
17              If it's okay with David, I will allow you
18   to take the calculator at lunch and confirm that, and
19   then we'll ask you some more questions.
```

REDACTED - NSC

```
23        MR. GREENSPAN:  Okay.
24        MR. FULLER:  Do you want to do it that way?  I
25   that okay, David?
```

1          MR. GREENSPAN:  If you're comfortable with us

2     going together at lunch, then fine.

3          MR. FULLER:  It's just math.  I don't want to sit

4     here on the record and have you...

5          MR. GREENSPAN:  Fine.

6          MS. PARSIGIAN:  But you brought a calculator.

7          MR. FULLER:  I brought a calculator, yes.

8               All right.  Let's go to a couple other

9     things that I think we can nail down fairly quickly, and

10    then we'll break for lunch.

11              Mr. Desser, I'm going to show you a

12    document that's been marked as Exhibit 21, which I will

13    represent to you is the PGA Tour Players Handbook with

14    Rules.

15         THE REPORTER:  Previously marked 21 or we're

16    marking 21?

17         MR. FULLER:  Mark it here.

18              I'm sorry.  19.

19              (THE DOCUMENT REFERRED TO WAS

20              IDENTIFIED AND WAS MARKED AS

21              EXHIBIT 19 TO THE DEPOSITION)

22    BY MR. FULLER:

23         Q.    My question is going to be simple.  If

24    you look at Page 125 at the bottom, it indicates that

25    all players in the PGA Tour transfer their individual

1   rights to the PGA Tour for use in publicizing the tour

2   and for broadcast related thereto.

3                   I'll let you read it for yourself.  But I

4   interpret this to be a transfer or assignment of NIL

5   rights to the PGA tour by the players.

6                   See if you agree with that.

7        A.        I'm not finding the...  You said 125?

8        Q.        Yeah.

9        A.        Bottom of 125?

10       Q.        Yeah.  The one that starts out:  All

11  players in the PGA Tour co-sponsor --

12       A.        Co-sponsor.  Yes.

13       Q.        Okay.  Keep reading that.  It's typical

14  convoluted legal language but you'll figure it out.

15       A.        You want me to read the rest of that

16  section?

17       Q.        No.  I just want to confirm --

18       A.        Just that paragraph.

19       Q.        Do you agree with me that this is a

20  provision where the players assign to the PGA tour

21  whatever rights are needed to effectuate the broadcast

22  of the tournaments, including their NIL rights?

23       A.        You're asking me to look at a 150-page

24  document that I'm not familiar with and tell you what

25  one paragraph is in the context of the entire agreement?

1           MR. FULLER:  Let's try this a different way.

2           Q.      Are you familiar with the PGA Tour's

3   structure with respect to transferring the NIL rights of

4   players onto broadcasters?  Is that something you

5   studied?

6           A.      I have not studied that particular

7   transference process with respect to the PGA Tour.

8           Q.      But you'd expect that there would be some

9   type of an NIL rights transaction or assignment, based

10  on your understanding of how media rights agreements

11  were in general?  That's consistent with your opinion?

12          A.      Well, the PGA tour is an unusual

13  enterprise insofar as it acts as both the league and the

14  players association.

15              So I don't know how analogous it may be,

16  but I'm not surprised to see language like this in a

17  document that purports to be their manual.

18          Q.      Under your view of NIL rights and

19  broadcast, you would expect the broadcasters of PGA tour

20  events to secure those rights of the players; correct?

21          A.      At least for purposes of broadcasting and

22  promoting those particular events that they are licensed

23  to carry.

24          Q.      Do you know whether the PGA players are

25  paid for licensing their NIL rights in that regard?

1        A.        My general understanding, and I don't

2    claim to be an expert in this, but I believe they

3    receive prize money and they get a share of a pool which

4    is intended to provide some compensation for their

5    marketability.  And there may as well be other forms of

6    consideration they get.  And again, of course they do

7    also have their own sponsor.  Their sponsor

8    arrangements.

9        Q.        They keep their own personal endorsement

10   rights?

11       A.        That's my understanding.

12       Q.        And the pool you're talking about is a

13   pool that is divided among the top ten/top fifteen

14   players based on the value that they bring to the tour?

15   Is that the one you're talking about?

16       A.        I don't know how many players receive the

17   proceeds of the pool.  But it's my understanding that it

18   involves a measurement of the amount of social media

19   usage that they get and other metrics that the tour have

20   promulgated.

21       Q.        So that payment doesn't go to everyone on

22   the tour; it only goes to the...  It's intended to

23   compensate those who are bringing the most value.

24                 That's my understanding.  Is that

25   correct?

Page 106

1         A.        I don't know exactly what the intention

2   of the pool is.  I do know that a pool of that sort does

3   exist.

4         Q.        Do you understand that payments from the

5   pool do not go to every PGA Tour cardholder who competes

6   in a tournament?

7         A.        I don't know which players receive

8   payments from that pool.

9         Q.        You do know that there are many players

10  who play in tournaments who receive no prize money from

11  the tournament because they don't finish high enough?

12  They don't make the cut?

13        A.        That's my understanding.

14        Q.        As a matter of fact, the PGA tour is well

15  known for being a structure where you have to win to

16  make the tour economically viable or at least do well in

17  tournaments; correct?  Because it's prize money based.

18  That's the primary compensation that comes out of the

19  PGA tour.

20        MR. GREENSPAN:  I'm gonna object to the form.

21        MR. FULLER:  I mean, he may know this.  If he

22  doesn't know, he can tell me.

23        THE WITNESS:  I know that they receive prize

24  money.  I also know that they receive sponsorship

25  consideration.  I don't know the relative ratio of those

1   things for particular players.

2   BY MR. FULLER:

3        Q.    And by "sponsorship consideration" you

4   mean personal endorsements?

5        A.    Personal endorsements, wearing of, you

6   know, someone's hat or someone's logo on their golf

7   shirt, shoes, balls, et cetera.

8        Q.    So if Tiger Woods is the person we're

9   talking about, he gets paid by Nike because he wears

10  Nike clothes.  That's the kind of thing you're talking

11  about in terms of personal endorsements.  Not

12  exclusively, but that's an example.

13       A.    That would be an example.  Though I think

14  using Tiger Woods as an example is probably... he's a

15  bit of an outlier.

16       Q.    Well, there are other players that get

17  paid but probably don't get paid as much but they wear

18  certain clothes, play with certain clubs, and so forth.

19             Right?

20       A.    That's my general understanding.

21       MR. FULLER:  Okay.

22             Take a look at...  What's the next

23  exhibit?

24       THE REPORTER:  20.

25  ///

```
 1                    (THE DOCUMENT REFERRED TO WAS

 2                    IDENTIFIED AND WAS MARKED AS

 3                    EXHIBIT 20 TO THE DEPOSITION)

 4         MR. FULLER:  My question for you with respect to

 5    Exhibit 20...

 6                    I want you to read Exhibit 20 and tell me

 7    if you have any basis to say whether the information in

 8    Exhibit 20 is correct or incorrect?

 9                    (DOCUMENT IS REVIEWED)

10         A.     All right.  I've read the document.

11         Q.     And the question is:  Do you have any

12    basis to tell me whether any of the information in that

13    document is correct or incorrect from your personal

14    knowledge or your research for this case?

15         A.     I have heard of Curt Flood and the

16    reserve clause in baseball.

17         Q.     I'll tell you what.  I'll narrow it.  I'm

18    really interested in the representations about how PGA

19    Tour players are paid.

20                    Do you have any basis to agree or

21    disagree or doubt the information in there about how PGA

22    Tour players are paid or how they are compensated?

23         A.     I think this is consistent with my prior

24    testimony, that they receive prize money and have

25    sponsorship agreements.
```

1           Q.      And they don't get paid a specific

2    amount, or if they don't succeed in tournaments, any

3    amount, for assigning their NIL rights to the PGA Tour?

4           A.      I'm not aware that they have a specific

5    payment for NIL rights.

6           Q.      And because of the nature of the PGA tour

7    structure they might not get paid at all?  If they enter

8    tournaments and never make the cut, they can go home

9    with nothing?

10          A.      I think that's correct.

11          MR. FULLER:  Let's look at Exhibit 20.

12          THE WITNESS:  That was Exhibit 20.

13          MR. FULLER:  I'm sorry.  Exhibit 21.

14                  (THE DOCUMENT REFERRED TO WAS

15                  IDENTIFIED AND WAS MARKED AS

16                  EXHIBIT 21 TO THE DEPOSITION)

17   BY MR. FULLER:

18          Q.      Mr. Desser, Exhibit 21 is another

19   contract or, in this case, term sheet that you cite in

20   your report in support of your allocation of rights

21   between and among football, basketball and women's

22   basketball.  I believe it's cited on Page 62 of your

23   report, and it's CUSA-GIA ending in 509 for the Bates

24   numbers.

25          A.      I have Exhibit 21.

REDACTED - NSC

16      A.      Give me the page number again, please.

17      Q.      Page 62, Footnote 78.

18              (DOCUMENT IS REVIEWED)

19      Q.      Have you had a chance to look at that,

20   Mr. Desser?

21      A.      Yes.

22      Q.      And that is in fact what you cite as

23   support or as partial support for your allocations on

24   Page 62 of your report?

25      A.      Yes.  It's an example of one of the few

1  places that we were able to find an allocation between

2  sports and any of the documents in the record.

3          Q.      Because generally there is no allocation

4  in these agreements anymore; right?

5          A.      Except in the case of a... something like

6  a, you know, football championship, which would be

7  100 percent football.  Most of the agreements are multi

8  sport.

9          Q.      And without allocations as to which

10 sports the rights fees are being paid in respect of?

11         A.      The networks don't particularly care how

12 the conferences choose to allocate or not allocate.

13 They pay a sum of money for a bucket of games and they

14 have the rights, and it can be allocated as the parties

15 wish.

16         Q.      And so as a result, you were only able to

17 find the Conference USA agreement marked as Exhibit 21

18 and the references in the SEC financial statements to

19 reflect any allocation between and among football,

20 basketball and women's basketball, as I understand it

21 from your report; is that correct?

22         A.      I'm not sure that those were the only

23 ones.  I think that they probably were.  We spent a lot

24 of time looking, but...

25         Q.      You can't identify any others for me,

1   sitting here today?

2        A.      Not as I'm sitting here today.

3        Q.      Okay.  With respect to Exhibit 21, you

4   would agree with me that Conference USA is not a Power 5

5   conference; right?

6        A.      Not only would I agree with that, but it

7   is stated on Page 62 of my report.

REDACTED - NSC

REDACTED - NSC

```
 5          MR. FULLER:  I think this might be a good time to
 6     break for lunch.
 7          MR. GREENSPAN:  Okay.
 8          THE VIDEOGRAPHER:  We are off the record at
 9     12:38.  This is the end of Disk 2.
10               (AT THE HOUR OF 12:39 P.M. A LUNCH RECESS
11     WAS TAKEN.  THE DEPOSITION RESUMED AT 1:36 P.M. WITH THE
12     SAME PERSONS BEING PRESENT)
13     ///
14     ///
15     ///
16
17
18
19
20
21
22
23
24
25
```

```
1        LOS ANGELES, CALIFORNIA; THURSDAY, JANUARY 12, 2023

2                        1:36 P.M.

3

4

5        THE VIDEOGRAPHER:  We are back on the record at

6    1:36.  This is the beginning of Disk 3.

7

8                    EXAMINATION (RESUMED)

9

10   BY MR. FULLER:

11       Q.      Mr. Desser, before lunch you took a

12   calculator and some financial statements.
```

REDACTED - NSC

REDACTED - NSC

REDACTED - NSC

REDACTED - NSC

REDACTED - CONFIDENTIAL

REDACTED - NSC

REDACTED - NSC

REDACTED - NSC

```
20        Q.        With respect to the allocations that you
21   make -- 75 percent football, 15 percent men's
22   basketball, 5 percent women's basketball, and then
23   there's 5 percent left for the other sports -- I want to
24   make sure I understand exactly what you're saying there.
25              Are you saying that these are
```

1   representative allocations for a typical conference, or

2   are you saying that these are the allocations for every

3   one of the conferences that's a defendant here?

4               I'm trying to figure out with what level

5   of precision you're offering these percentages.

6        A.      As I believe the report says, this is an

7   overall allocation for all of the rights for all of the

8   conferences collectively.

9               I would anticipate that a particular

10  conference might vary a slight amount.  If in the case

11  of say the SEC, football is a bigger deal.  Or in the

12  case of say the ACC, basketball is a bit of a bigger

13  deal.  And there is a reference to that in the report.

14       Q.      So the 75-15-5 allocation is as you just

15  described it, but it doesn't necessarily apply for any

16  particular conference, which could deviate from that

17  allocation because of its own situation?

18       A.      The...  The allocation is intended to be

19  an overall amount.  It is quite possible that the

20  allocation might change a few percentage points one way

21  or another for a particular conference.

22               And, you know, at such time as we're able

23  to get additional discovery, it would be something I

24  would look at.

25       Q.      Do you have any anticipation as to how

1 many percentage points?  Could the ACC be as much as 40

2 or 50 percent of its rights fees attributable to

3 basketball?

4         A.      I wouldn't expect that it would be, on an

5 overall basis, that much.

6                 The...  Football is the driver of

7 revenue, as you well know, in college sports,

8 particularly for the Power 5 conferences.

9         Q.      But it varies from conference to

10 conference how much revenue is received with respect to

11 the broadcast rights for each different sport; right?

12         A.      Well, the broadcast rights are generally

13 in multi sport agreements.  And the amounts of those

14 contracts vary from conference to conference.

15                 But the agreements do not typically

16 contain an allocation, and so we have provided an

17 estimate that we think is collective, a collective

18 allocation, that we think is useful in this case.

19         Q.      But you would agree that if we could

20 somehow get the internal numbers at ESPN or Fox or one

21 of the other networks, that the allocation of rights

22 fees between and among sports would differ from

23 conference to conference.

24                 Because some sports are more popular in

25 one conference and other sports are more popular in

Page 122

1    another conference; with basketball in the ACC and

2    football in the SEC being examples of that divergence

3    among conferences.

4                    Correct?

5            MR. GREENSPAN:  Object to the form.

6            THE WITNESS:  The amounts that a network might

7    attribute could be different from the amounts that the

8    conference might attribute.

9                    As a practical matter, it isn't necessary

10   for the most part for them to attribute them, because

11   they have a substantially similar membership across

12   thriving sports.

13   BY MR. FULLER:

14       Q.     So the percentages could be different

15   from different perspectives, and people could reasonably

16   disagree about what the percentages are?

17           MR. GREENSPAN:  Object to the form.

18           THE WITNESS:  The differences, if there are any,

19   are going to be small.  Single digit percentages across

20   the range of Power 5 conferences --

21   BY MR. FULLER:

22       Q.     Now --

23       A.     -- in my estimation.

24       Q.     You use ratings as one source of

25   reference for your allocation between and among sports?

1          A.          We looked at ratings because it's an

2     additional marketplace value that supports allocations,

3     you know, to the various sports.  But we just provide

4     that as an additional data point.  We don't rely upon

5     that to come to the conclusion.

6          Q.          So the ratings are not something that

7     you're relying on here for that conclusion?

8          A.          I did not.  I was not able to obtain at

9     this stage in the process enough detail in order to use

10    that as a primary support for my conclusions.

11               So the data that we were able to obtain

12    is presented but with clear limitations on the

13    conclusions one can draw from it.

14         Q.          Is that because it's very hard to get

15    ratings data beyond the top 100 rated programs that you

16    pulled out from a public source?

17         A.          The principal problem is that Neilsen

18    does not allow its data to be used in litigation.

19         MR. FULLER:  I was getting to that.  I've run in

20    to that before in other cases that didn't involve media

21    rights.

22         Q.          So the data is not available from

23    Neilsen.  And so what you had to rely on was the...

24               We should mark this as an exhibit so

25    we'll know what we're talking about.

1                    (THE DOCUMENT REFERRED TO WAS

2                    IDENTIFIED AND WAS MARKED AS

3                    EXHIBIT 22 TO THE DEPOSITION)

4    BY MR. FULLER:

5         Q.    Is Exhibit 22 the ratings data that you

6    attached to your report that we've just been discussing?

7              I believe it to be, but tell me if we're

8    missing something.

9         A.    I'm looking at Exhibit 22 and eyeballing

10   the first page of it.  And those numbers look to be

11   similar to and may be even the same ones that are

12   referenced in the report.

13             The detail behind it is not something

14   that I can be sure is from the same source.  It's...

15        MR. FULLER:  We received from counsel for the

16   plaintiffs a spreadsheet called Desser Backup TV

17   Ratings.PDF.  Oh, it was an Excel sheet.  Oh, I see.

18             And I'll represent to you that that's

19   what's behind there.

20        Q.    So these are the ratings that you have

21   been referring to previously.  Is that correct?

22        A.    Well, previously we were talking about

23   broader ratings.  Neilsen.

24        Q.    Right.

25        A.    You know, Neilsen ratings that aren't

1   available for litigation.

2              So these were a snapshot of ratings that

3   were publicly available but limited in terms of the

4   scope.  Because it is, as you mentioned, top hundred

5   programs of the week and necessarily that will omit some

6   of the lower rated programs.

7        Q.    So you just don't have the whole universe

8   in order to examine the totality of the ratings data

9   because of the Neilsen limitation?

10       A.    I don't have it yet.  I'm holding out

11  hope.

12       Q.    You are familiar with the NCAA's contract

13  with CBS and Turner for broadcast and distribution of

14  the men's basketball tournament March Madness?

15       A.    Yes.

16       Q.    And roughly speaking, it generates about

17  a billion dollars of revenue for the NCAA every year

18  solely attributable to men's basketball?

19       A.    No.  Not solely attributable to men's

20  basketball.  Primarily attributable to men's basketball.

21       Q.    What else is in that contract?

22       A.    You recall earlier today we were talking

23  about sponsorship rights.

24       Q.    That's right.  You've opined in the past

25  that 80-some percent of that contract is attributable to

1   broadcast rights and the balance is attributable to the

2   sponsorship.  Is that correct?  I seem to remember

3   seeing that somewhere.

4          A.     I don't believe that we ever published a

5   percentage that was attributable to the men's basketball

6   portion.  Though I'd have to refresh my recollection, if

7   you want me to look at some documents.

8                 I can certainly recall that a substantial

9   portion of the consideration is paid for sponsorship

10  rights, which pertain not only to men's basketball but

11  to the other NCAA championships, including women's

12  basketball and softball, et cetera.

13         Q.     And that would not be properly allocable

14  to men's basketball; is that right?

15         A.     "That" meaning the sponsorship portion?

16         Q.     The sponsorship portion of the contract.

17  Yes.

18         A.     A portion of the sponsorship portion is

19  fairly allocable to men's basketball but for men's

20  basketball sponsorships.

21         Q.     But not the remaining sponsorship

22  revenues under that contract, because they were

23  attributable to something other than men's basketball?

24         A.     Correct.  They're attributable, if I

25  recall, to sponsorship of the NCAA on an overall basis.

 1                    (WHEREUPON A DISCUSSION WAS

 2                    HELD OFF THE WRITTEN RECORD)

 3     BY MR. FULLER:

 4          Q.        Inherent in your allocation of 75, 15,

 5     and 5 percent of royalties to football, men's basketball

 6     and women's basketball respectively, is a relationship

 7     of three-to-one between the men's basketball value and

 8     the women's basketball royalty value; right?  15 is

 9     three times five; correct?

10          A.        Yes.

11          Q.        The...  You wrote a report that opined as

12     to what the rights fees for women's basketball should be

13     if the NCAA had handled women's basketball differently

14     than they actually handled it.  Is that correct?

15          A.        That was one conclusion, though to be

16     clear, that dealt with the women's basketball

17     championship and not women's basketball in toto as it

18     relates to regular season.

19          Q.        Yeah, I stand corrected.  Because the

20     NCAA only holds the rights to the championships.  They

21     don't hold rights to regular season games; correct?

22          A.        That's my understanding.

23          Q.        Because the regular season games are...

24     the rights belong to the sponsor of the game, which is

25     typically the school in most cases, and they are

1  assigned to the conference to be licensed as a package?

2         MR. GREENSPAN:  Object to the form.

3         THE WITNESS:  You probably know better than I

4  exactly what the relationship is between the conferences

5  and the schools.  I haven't read those agreements but

6  presumably they exist as part of the body of files of

7  the SEC office.

8  BY MR. FULLER:

9         Q.     Well, you do agree with me that the

10  broadcast rights belong to the sponsor of the event.  I

11  think you've testified about that before.

12         A.     I...  "The sponsor of the event" is a

13  little bit... isn't a phrase I would use.  I mean, but

14  to the extent that...

15                You know, I would probably use, you know,

16  "the home team" as a better phrase.  But I recognize

17  sometimes there are home teams and away games, so it's a

18  little bit of an imprecise usage.

19         MR. FULLER:  The reason I use "the sponsor" is

20  that for the NCAA tournament the NCAA sets it up,

21  invites the teams, and they hold the broadcast rights.

22  So, just so you'll understand why I use the term.

23         Q.     What did you conclude in your...  I've

24  got it here if you want to reference it, but I'd hate to

25  burden our court reporter with another fat exhibit.

1                    I think you concluded that you believe

2    that the NCAA women's basketball championship media

3    rights should be worth between 81 million and 112

4    million.  Is that right?

5          A.      That's my recollection.

6          Q.      And that is not a ratio of one-to-three

7    with the portion of the men's basketball tournament

8    media rights.  It's a much higher ratio or lower ratio.

9    It's more like one-to-seven, one-to-eight and

10   one-to-nine; correct?

11         MR. GREENSPAN:  Object to the form.

12         THE WITNESS:  The fraction is whatever it is.

13   But that wasn't what I was measuring with 75, 15, 5.

14   That's the overall allocation inclusive of regular

15   season, whereas your example was only the championships.

16   BY MR. FULLER:

17         Q.      But the championships are part of the

18   math; right?

19         A.      What do you mean?

20         Q.      I mean, you were trying to do an overall

21   allocation including the regular season and the

22   championships, and I focused on only the championships;

23   correct?

24         MR. GREENSPAN:  Object to the form.

25         THE WITNESS:  Your question comparing the... our

1  estimate of the NCAA women's basketball championship to

2  men's basketball championship agreement, that ratio you

3  were using is strictly for the championship events.

4          MR. FULLER:  Correct.

5          THE WITNESS:  There's no football in there, for

6  example.

7          MR. FULLER:  No.  I understand that.

8          Q.      But the ratio is not one-to-three if

9  you're comparing those events.  The men's basketball

10  rights and the women's basketball rights as you believe

11  they should be, not as they actually are.

12              It's far greater than one-to-three or

13  less, depending on how you look at it.  The denominator

14  gets larger than three; right?

15          MR. GREENSPAN:  Object to the form.

16          THE WITNESS:  I recognize that the men's

17  basketball tournament has been able to get paid, you

18  know, more than three times as much as the women's

19  basketball tournament.

20  BY MR. FULLER:

21          Q.      When you look at the ratings data is it

22  correct that championships and post season events like

23  championships, the CFP, March Madness, tend to have

24  higher ratings than the regular season, or is there any

25  pattern that you've seen, or is the data so incomplete

1  you can't draw conclusions?

2       A.       If you're asking me on a general basis

3  are playoff ratings higher on the whole than regular

4  season ratings on the whole, the answer is Yes, they

5  are.  But there are exceptions to every rule.

6                You know, the Georgia-Clemson football

7  game is going to get a very high rating even if it's a

8  regular season game.  The Duke-North Carolina basketball

9  game will get a good rating as well.  And it may in fact

10  outrate particular events in the respective

11  championships, though not so likely in football.

12       Q.       Do you have an understanding of how the

13  media revenues attributable to the NCAA's media

14  contracts are distributed?

15                And in particular, do you understand that

16  the amount of the distribution that a conference gets

17  every year is attributable to the success of teams from

18  the conference in the tournament over a course of a

19  number of years?

20       A.       I am generally aware of the distribution.

21  And in fact, I believe that one of the criticisms that

22  the Kaplan report references is that the distributions

23  are solely based on the men's results and not the

24  women's results.

25       Q.       My understanding is that for each game in

1    which a conference team appears in the men's basketball

2    tournament, the conference earns one unit, with the

3    exception of maybe the final game, so that a...  And

4    that the units determine how the NCAA's revenues are

5    distributed in part, and that therefore a conference

6    that has more units, all other things being equal, will

7    get more revenues.

8               Is that correct, as you understand it?

9          MR. GREENSPAN:  Object to the form.

10         THE WITNESS:  Um, that sounds consistent with my

11   understanding, but I cannot tell you for certain that

12   that is all there is to it.

13   BY MR. FULLER:

14         Q.    Do you understand that the NCAA also

15   makes certain distributions that are earmarked for

16   certain types of uses on student assistance funds,

17   distributions that are based on certain academic

18   progress criteria?  Do you have any understanding of

19   that?

20         A.    I've heard things like that.  That

21   doesn't come as a surprise to me.  But I can't tell you

22   in any detail the application of those allocation

23   criteria.

24         Q.    You haven't accounted for any of these

25   allocation variances or variables over the course of

1  time in your report and calculating the 75 percent,

2  15 percent, 5 percent; is that right?

3       A.     We're...  We strictly looked at the

4  period that is covered by the case, which I believe goes

5  back to the middle of 2016.

6       Q.     And during that period, if the

7  distributions to each conference varied because of

8  varying success in the basketball tournament or

9  variances in other factors that may drive the

10 distribution, you haven't taken that into account in

11 your calculations; is that correct?

12      MR. GREENSPAN:  Object to the form.

13      MR. FULLER:  Yeah, I don't think he has.

14      THE WITNESS:  As I said before, the percentages

15 are an overall percentage, and so it would tend to wash

16 out over a number of years.  But I've not studied that

17 particular aspect.

18 BY MR. FULLER:

19      Q.     And you understand that the CFP

20 distributions...

21           By "CFP" we mean college football

22 playoffs.  You understand that?

23      A.     Yes.

24      Q.     ... are also dependent in part upon

25 success in getting teams in to the college football

1  playoff; is that correct?

2       A.     I will tell you that I have tried

3  mightily to really understand the whole CFP

4  distribution.  And I have not been able to directly

5  connect it to any particular data that I'm aware of.

6              So I can only conclude that it is a

7  negotiated amount between all of the parties involved in

8  college football.  But that is merely my assumption and

9  not a statement of fact.

10      Q.     In any event, however it's done, if there

11 is a variance from year to year your answer would be the

12 same as with respect to the NCAA distributions?

13             You've looked at a collective value and

14 you haven't tried to allocate for differences from year

15 to year?

16      A.     For purposes of our analysis at this

17 point for class certification purposes, we've come up

18 with what we believe to be a reliable approach for

19 allocating as between sports on an overall basis.

20             I can imagine going further in the future

21 to fine tune that, but I don't imagine it will make a

22 huge material difference.

23      MR. FULLER:  I suppose that I should move to

24 strike, but I don't believe we'll get the court reporter

25 to rule on that one in this case.

1          Q.        So my question was:  Have you included

2     that in your analysis?  And I take it your answer is:

3     "No," you have not?

4          A.        And the "that" in this case is the way

5     the CFP money is divvied up?

6          Q.        And it differs from year to year.  Yes.

7          A.        No, we haven't taken into account that

8     variation from year to year.  That was not part of our

9     assignment.

10          Q.        You have an example in your report that

11     has to do with a car.  Do you remember that?

12          A.        Yes.

13          Q.        And with a car, you buy the car, but the

14     price of the car varies depending on what attributes the

15     car has.  Whether it has air conditioning.  Whether it

16     has power steering.  Whether it has heads-up speed in

17     the windshield.

18                    Those are all different options that you

19     can pay more or less for; correct?

20          A.        There are options that one can pay for or

21     not pay for in a car.  But typically there wouldn't be

22     an option to get the car without its wheels or without

23     its body.

24          Q.        But if you're like me and you ran into a

25     curve in Charlotte in the dark and destroyed your wheel,

1   you can buy another wheel for the car; right?

2         A.      I've not tried to buy a wheel in

3   Charlotte for a car, but I presume that it would be

4   doable.

5         Q.      Because individual car parts are sold

6   separately.  As a matter of fact, Napa has made a

7   national business out of selling car parts, as have

8   various manufacturing companies of different types;

9   right?

10        A.      I'm not an expert in the car parts

11  market.

12        Q.      I'm just asking you because you included

13  the example in your report, so I thought I should delve

14  in to it.

15        A.      There are a large number of elements of

16  cars that are not options.  And, yes, you can buy a

17  bunch of smaller parts as replacement parts.  I suspect

18  they'll end up costing quite a bit more than the car

19  does as a single unit.

20        Q.      But there is a separate market for the

21  individual parts if you need to buy them; correct?

22        MR. GREENSPAN:  Object to the form.

23  BY MR. FULLER:

24        Q.      If you want to buy them?  Somebody buys

25  them?  There is a separate market you can go on the

1    internet and find out what it costs to buy a wheel or

2    even an engine; right?

3         A.       You can buy lots of things on the

4    internet.

5         Q.       Including separate car parts.

6         A.       The analogy in the report was not

7    intended to exclude the possibility of there being

8    replacement parts.

9              It was rather to make the point that when

10   you buy the car, you get a sum total of the parts

11   delivered, putting aside the issue of options.

12        MR. FULLER:  Why don't we take a short break

13   here.  We're close to being done.

14        THE VIDEOGRAPHER:  We are off the record at 2:16.

15              (WHEREUPON A RECESS WAS HELD

16              FROM 2:16 P.M. TO 2:23 P.M.)

17        THE VIDEOGRAPHER:  Back on the record at 2:23.

18        MR. FULLER:  Mr. Desser, I have no further

19   questions at this time.

20        MR. GREENSPAN:  I don't have any examination.

21        MR. FULLER:  So we're done.

22        THE VIDEOGRAPHER:  We are off the record at 2:24.

23   This concludes today's deposition.

24              (AT THE HOUR OF 2:24 P.M.

25              THE DEPOSITION WAS ADJOURNED)

1                        *    *    *

2

3

4

5    I, declare under penalty of perjury that the foregoing

6    is an accurate transcription of my testimony under the

7    laws of the State of California, executed on the _____

8    day of _____ ,_____.

9

10

11              _____

12                              Edwin Desser

13

14

15

16

17

18

19

20

21

22

23

24

25

1              Reporter's Certificate

2                       of

3            Certified Shorthand Reporter

4

5                 * * * * * * *

6

7

8    I, the undersigned Certified Shorthand Reporter, in

9    and for the State of California, do hereby certify:

10   That the foregoing proceedings were taken before me

11   at the time and place therein set forth, at which time

12   the witness was put under oath by me; that the testimony

13   of the witness and all objections at the time of the

14   proceedings were recorded stenographically by me and

15   were thereafter transcribed under my direction; that

16   the foregoing is a true record of the testimony and

17   of all objections made at the time of the proceedings.

18

19   In witness whereof, I have subscribed my name on:

20

DATE:  January 13th, 2023
21

22   _____

23            KIMBERLY WILDISH, CSR NO. 8078

24

25

1                    ERRATA SHEET

2   Case Name:

3   Deposition Date:

4   Deponent:

5   Pg.  No. Now Reads      Should Read  Reason

6   ____  ____ _____    _____   _____

7   ____  ____ _____    _____   _____

8   ____  ____ _____    _____   _____

9   ____  ____ _____    _____   _____

10   ____  ____ _____    _____   _____

11   ____  ____ _____    _____   _____

12   ____  ____ _____    _____   _____

13   ____  ____ _____    _____   _____

14   ____  ____ _____    _____   _____

15   ____  ____ _____    _____   _____

16   ____  ____ _____    _____   _____

17   ____  ____ _____    _____   _____

18   ____  ____ _____    _____   _____

19   ____  ____ _____    _____   _____

20                            _____

                              Signature of Deponent

21

22   SUBSCRIBED AND SWORN BEFORE ME

23   THIS ____ DAY OF _____, 2023.

24   _____

25   (Notary Public)   MY COMMISSION EXPIRES:_____