# EXHIBIT 7

## To the Declaration of Rakesh N. Kilaru

## REDACTED VERSION OF DOCUMENT REQUESTED TO BE FILED UNDER SEAL

1        IN THE UNITED STATES DISTRICT COURT

2       FOR THE NORTHERN DISTRICT OF CALIFORNIA

3              OAKLAND DIVISION

4

5

6   IN RE COLLEGE ATHLETE NIL    )  Case No.
                                 )  4:20-cv-03919 CW
7   LITIGATION                   )
    _____)

8

9

10

11

12

13         DEPOSITION OF DANIEL RASCHER

14          Tuesday, January 10, 2023

15

16

17

18

19

20

21

22   JOB NO. 220885

23   REPORTED BY:

24   HEIDI BELTON, CSR, RMR, CRR, CCRR, CRC

25   CSR No. 12885

1          January 10, 2023

2            9:26 a.m.

3

4

5  Videotaped deposition of Daniel Rascher,

6  held at the offices of Winston & Strawn,

7  LLP, 101 California Street, San

8  Francisco, California 94111, before Heidi

9  Belton, a Certified Shorthand Reporter,

10 Registered Merit Reporter, Certified

11 Realtime Reporter, California Certified

12 Realtime Reporter, Certified Realtime

13 Captioner.

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    APPEARANCES:

 2    For the Plaintiffs:

 3        HAGENS BERMAN SOBOL SHAPIRO LLP
          715 Hearst Avenue
 4        Berkeley, California 94710
          By:  Benjamin Siegel, Esq.
 5             Steve Berman, Esq.
               Stephanie Verdoia, Esq. (remote)
 6

 7

 8

 9

10

11        WINSTON & STRAWN LLP
          101 California Street
12        San Francisco, California 94111
          By:  Jeanifer Parsigian, Esq.
13             Drew Washington, Esq.
               Emilee Sisco, Esq. (remote)
14             David Feher, Esq. (remote)
               Sarah Viebrock, Esq. (remote)
15             Joseph Blake, Esq. (remote)

16

17

18

19

20

21

22

23

24

25
```

```
 1    APPEARANCES (continued)

 2    For the Defendant National Collegiate Athletic
      Association:
 3
              WILKINSON STEKLOFF
 4            2001 M Street NW
              Washington, DC 20036
 5            By:  Rakesh Kilaru, Esq.
                   Max Warren, Esq.
 6                 Clayton Wiggins, Esq. (remote)

 7


 8


 9


10    For the Defendant PAC-12 Conference:

11            COOLEY, LLP
              3 Embarcadero Center
12            San Francisco, California 94111
              By:  David Louk, Esq.
13


14


15    For the Defendant The Big Ten Conference, Inc.:

16            MAYER BROWN LLP
              71 South Wacker Drive
17            Chicago, Illinois 60606
              By:  Jessica Maurer, Esq. (remote)
18


19


20    For the Defendant The Big 12 Conference:

21            POLSINELLI, PC
              2950 N. Harwood Street
22            Dallas, Texas 75201
              By:  Leane Capps, Esq. (remote)
23


24


25
```

```
 1   APPEARANCES (Continued)

 2              POLSINELLI, PC
                900 West 48th Place
 3              Kansas City, Missouri 64112
                By:  Phillip Zeeck, Esq. (remote)
 4                   Amy Fitts (pro hac vice) (remote)

 5

 6

 7

 8

 9   For the Defendant Southeastern Conference:

10              ROBINSON BRADSHAW & HINSON PA
                101 North Tryon Street
11              Charlotte, North Carolina 28246
                By:  Robert Fuller, III, Esq.
12                   Lawrence Moore, III, Esq.

13

14

15   Also Present:  Frank Quirarte, videographer; Scott
     Couser, AV technician, Winston & Strawn (remote);
16   Tim Falk, CLVS, TSG Reporting (remote), Robert Laird, Esq.

17

18

19                      ---oOo---

20

21

22

23

24

25
```

1                INDEX OF EXAMINATION

2    WITNESS:  DANIEL RASCHER

3

4    EXAMINATION                                PAGE

5    BY MR. KILARU                                9

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXHIBITS

 2                     DANIEL RASCHER

 3    EXHIBIT              DESCRIPTION            PAGE

 4

 5    Exhibit 1    Document titled "Expert Report    13
                   of Daniel A. Rascher"
 6                 (confidential)

 7    Exhibit 2    On3 article re Alston award at    96
                   Wisconsin
 8
      Exhibit 3    Document titled "Southeastern    135
 9                 Conference Financial
                   Statements, August 31, 2020
10                 and 2019," Bates stamped
                   SEC-HOUSE0047887 -
11                 SEC-HOUSE0047931
                   (confidential)
12
      Exhibit 4    Document titled "Term Sheet,     139
13                 CBSC/C-USA, Rights Agreement
                   Extension," Bates stamped
14                 CUSA_NCAA00000509 -
                   CUSA_NCAA00000520
15                 (confidential)

16    Exhibit 5    Document titled "Proportions     142
                   of Total Revenues and
17                 Contributions Attributed to
                   Football, Men's Basketball,
18                 Women's Basketball, and All
                   Other Sports Across Power Five
19                 Conferences"

20    Exhibit 6    Document titled "Proportions     143
                   of Total Revenues and
21                 Contributions Attributed to
                   Football, Men's Basketball,
22                 Women's Basketball, and All
                   Other Sports Across Power Five
23                 Conferences, 2016-2021,"
                   (split out by conference)
24

25
```

Page 8

1                    INDEX OF EXHIBITS (continued)

2                                                          PAGE

3     Exhibit 7      Document titled "Percent        147
                     Distribution of Total Revenues
4                    Among Three Sports By Power
                     Five School, 2016-2021"
5
      Exhibit 8      Spreadsheet of offers received   200
6                    by Omari Spellman
                     (confidential)
7
      Exhibit 9      Spreadsheet of offers received   206
8                    by Maxwell Lorca-Lloyd
                     (confidential)
9
      Exhibit 10     Spreadsheet of offers received   211
10                   by Troy Warner (confidential)

11    Exhibit 11     E-mail string Bates stamped      270
                     EA_NIL_00000268 –
12                   EA_NIL_00000271

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1      TUESDAY, JANUARY 10, 2023              9:25 A.M.

2                    P R O C E E D I N G S

3           THE VIDEOGRAPHER:  All right.  Good

4    morning, ladies and gentlemen.  We're on video

5    record in the deposition of Dr. Daniel Rascher.

6    It's in the matter of In re College Athlete NIL

7    Litigation.  It's being held in the United States

8    District Court, District of California, Oakland

9    Division.  Case number 4:20-CV-03919-CW.

10          This deposition is being held at 101

11   California Street, in San Francisco, California on

12   January 10, 2023 at approximately 9:26 a.m.  My name

13   is Frank Quirarte; I'm your legal video specialist.

14   I'm here from TSG Reporting, Inc.  We're

15   headquartered at 228 East 45th Street, Suite 810,

16   New York, New York 10017.  Our court reporter today

17   is Heidi Belton, also in association with TSG

18   Reporting.

19          Madam Court Reporter, will you please

20   swear in the witness.

21       (Whereupon, the witness, DANIEL RASCHER,

22     having been duly sworn, testified as follows:)

23                       EXAMINATION

24   BY MR. KILARU:

25       Q.  Good morning, Dr. Rascher.
```

1        A.    Good morning.

2        Q.    I happen to know it's not your first time

3    being deposed so I'll skip many of the procedural

4    questions and just ask before we start:  Are you

5    able to give truthful testimony today?

6        A.    Yes.

7        Q.    Can you think of any reason why that

8    wouldn't be the case?

9        A.    No.

10       Q.    Okay.  You're here as an expert witness in

11   the lawsuit titled College Athlete NIL Litigation;

12   right?

13       A.    Yes.

14       Q.    Okay.  And you recently provided testimony

15   in a case called Shields versus FINA; is that right?

16       A.    Yes.  I think that was the name of the

17   case.

18       Q.    About swimming and swimming compensation?

19   I'm probably getting that wrong.

20       A.    Yes.

21       Q.    And obviously you are an expert in the

22   previous cases and in this litigation also; is that

23   right?

24       A.    Yes.

25       Q.    Are there any other sports antitrust cases

1  that you've submitted reports in in the last two

2  years, that you're aware of?

3       A.   Well, the NFL Sunday Ticket case that --

4       Q.   I should have known that one.  Yes.

5       A.   I don't believe so.  I would have to look

6  at my CV, I guess.  But I think that's it.

7       Q.   Okay.

8       A.   Sports antitrust.  I think so.

9       Q.   When were you first retained as an expert

10  by the plaintiffs in this case?

11       A.   I don't -- I don't know.  I don't

12  remember.

13       Q.   Was it within the last year?  Two years?

14       A.   I think it was before within the -- I

15  think it was beyond the last -- what are we in?

16  January.

17            Yeah, I feel like it -- I'm sort of -- I

18  know you don't want me to speculate, but I believe

19  it's more than a year ago.  I'm pretty sure.  But I

20  don't -- I really don't remember when.

21       Q.   Do you recall how you came to be retained?

22       A.   I don't.

23       Q.   Did you call the plaintiffs?  Did the

24  plaintiffs call you?

25       A.   I don't think I called the plaintiffs; I

1    think they called me.

2        Q.   And when did you start working on the

3    expert report that you've submitted in this case?

4        A.   I -- I would say sort of the spring of

5    last year.

6        Q.   The spring of 2022?

7        A.   Yeah.

8        Q.   Okay.  Do you have a sense of how many

9    hours you've spent working on the report?

10       A.   I don't.

11       Q.   Have you spoken -- do you know who

12   Mr. Desser is?

13       A.   Yes.

14       Q.   Have you spoken with him in connection

15   with this case?

16       A.   Yes.

17       Q.   How often have you spoken with him?

18       A.   Once or twice.  I think once or twice.

19       Q.   Did you rely on those conversations with

20   him in any way in forming your conclusions in this

21   case?

22       A.   No, I don't believe so.

23            MR. KILARU:  I'd like to turn your

24   attention to your report in this case, which we will

25   have as Exhibit 1.

1          Can you give him a copy of that?

2                    (Exhibit 1 marked.)

3  BY MR. KILARU:

4      Q.   Dr. Rascher, what we've just handed you as

5  Exhibit 1 appears to be your expert report in this

6  case; right?

7      A.   (Witness reviews document.)

8          Yes.

9      Q.   And I'll represent to you that it's a full

10 copy; every page is in there.

11         You're aware that your report needs to

12 contain a complete statement of all the opinions

13 that you intend to express at this stage of the

14 litigation; is that right?

15         MR. SIEGEL:  Objection to the extent that

16 calls for a legal conclusion.

17         But you can answer.

18         THE WITNESS:  Yeah, I --

19 BY MR. KILARU:

20     Q.   Is that your understanding?

21     A.   -- I -- I don't know that.

22     Q.   Okay.  Well, sitting here today, do you

23 have any opinions related to this case that you

24 formed that are not contained in that report?

25     A.   Not that I can think of.

1      Q.   Okay.  Do you have any economic models

2  that you intend to offer that are not contained in

3  the report that's sitting in front of you?

4      A.   I mean, to the extent that the report

5  discusses sort of the ongoing nature of this lit- --

6  of this case, I think I talk in the report a little

7  bit about, you know, doing this and doing that and

8  sort of describing those processes.

9           So if -- you know, if this case goes

10  forward, if I'm to continue in the case, then I -- I

11  plan to do some of the things that I talk about in

12  the report.

13      Q.   So let me give you an example.

14           Could you turn to paragraph 155 of your

15  report on page 76.

16      A.   I see that.

17      Q.   So the first sentence of that paragraph

18  talks about how you have modeled competition for

19  broadcast NIL group licenses at the Power Five

20  conference level as opposed to at the individual

21  school level.  Is that fair?

22      A.   I just have to read it.

23      Q.   Sure.

24      A.   (Witness reviews document.)

25           Okay.  Yes.

1          Q.    Is that correct?

2          A.    That I've modeled -- done a modeling

3     competition between conferences as opposed to

4     between the schools directly?

5          Q.    Yes.

6          A.    Yes.

7          Q.    You haven't done any modeling of

8     school-level compensation decisions; right?

9          A.    In terms of the broadcast and NIL?

10         Q.    Yes.

11         A.    No, I don't believe so.

12         Q.    Okay.  Why haven't you done that to date?

13         A.    I mean, I haven't -- my analysis was

14    looking at for -- for broadcast, it's looking at the

15    broadcast contracts that the -- that the -- that the

16    conferences have.  And so I'm looking at -- at how

17    those contracts could lead to NIL payments to the

18    athletes.

19         Q.    So just to be clear, it's your opinion

20    that in the but-for world regarding broadcast NIL,

21    the conferences would be competing with each other

22    for student athlete labor services; correct?

23         A.    I believe that the conferences, the

24    members of the conference are the schools.  And they

25    set rules at the conference level.

1          A similar rule that they set as an example

2     is that they're going to share those revenues from

3     the broadcast contracts.  They generally share them

4     equally; right?

5          And so I'm modeling them setting another

6     set of rules about how they would share the name,

7     image and likeness payments to the athletes.

8          Q.   Right.  So your model assumes that the

9     competition for providing these payments to student

10    athletes is occurring at the conference level, not

11    the school level; correct?

12          MR. SIEGEL:  Objection; vague and

13    ambiguous as to "assume."

14          THE WITNESS:  So the schools are competing

15    for the athletes.  But within the rules that are set

16    by the conferences -- and obviously other rules that

17    are set by the NCAA and others.

18          So the schools are competing in the labor

19    market for the athletes.  But under a set of rules

20    that are -- that are determined at the conference

21    level.  And so the conferences compete with each

22    other also.  The schools within the conferences as

23    members are competing for athletes, they're

24    competing for sponsors, they're competing for media

25    deals and so forth.

1    BY MR. KILARU:

2         Q.    But to the extent the schools are

3    competing with each other, in your model, they're

4    doing so based on rules that are set by their

5    conference regarding compensation; correct?

6         A.    Can you say that again?

7         Q.    Yes.  To the extent the schools are

8    competing with each other in your model with

9    broadcast NIL payments, they're doing so based on

10   rules that are set by their conference?

11        A.    Yes.  There's a -- a determination that --

12   that when -- that the schools will make joint

13   venture decisions within that conference, when

14   they're allowed to do that, often.

15             So they -- it's exactly how they already

16   deal with the broadcast.  They already have this

17   exact setup in place when they -- when they get the

18   broadcast deals and they distribute those revenues

19   to the schools generally equally.

20             So they're already doing that.  That's a

21   rule that they've all agreed to.  And they compete

22   with each other, right, for fans and everything and

23   yet they're still under this rule that shares those

24   revenues.

25        Q.    Right.  So I want to make sure we agree on

1    this point, which I think is a simple one.  In your

2    model, to the extent the schools are competing -- a

3    school in the Big 10 is competing with a school in

4    the ACC for a student athlete, the Big 10 school can

5    only make payments up to the Big 10 limit that's set

6    in your Big 10 amount that's set forth in your

7    report; and the school in the ACC can only make

8    broadcast NIL payments up to the amount that's

9    listed in your report?

10         MR. SIEGEL:  Objection; asked and answered

11   and compound.

12         THE WITNESS:  So there's -- can only make.

13   So in the future -- right? -- I'm -- I'm looking at

14   with respect to damages in the past and coming up

15   with a reasonable estimate of damages in the past.

16   Right?

17   BY MR. KILARU:

18      Q.   Let me ask a better question.

19         Looking backwards for your damages model,

20   the school in the Big 10 would offer the amount

21   that's listed in your report that's set for the

22   Big 10; correct?

23      A.   Through -- it -- based on my analysis

24   through competition, a school in the Big 10 would

25   offer an amount -- yeah, that's -- I list an

1   example.  I mean, this is a class cert report, so

2   this is an example of how it would go.  And then a

3   school in a different conference would com- -- would

4   be competing and offer an amount up -- up to that

5   amount that's agreed upon in its conference.

6        Q.   Okay.  Stepping back for a minute.

7             You're attempting, broadly speaking, to

8   model but-for worlds in which there are no NCAA

9   regulations restricting athletes from

10  commercializing their name, image and likeness; is

11  that correct?

12       A.   For damages?

13       Q.   Yes, for damages.

14       A.   So I'm modeling obviously some of those.

15       Q.   Right.

16       A.   So it's -- right.  It's a but-for world in

17  which the -- the ability of the athletes to monetize

18  their NIL is not restricted by the NCAA and -- and

19  I'm looking at damages obviously for some of those

20  areas that they might be able to do that in.

21       Q.   As you say in your report, you are

22  assuming in the damages but-for world that all other

23  NCAA rules remain as they are today; correct?

24            MR. SIEGEL:  I would just object.  I think

25  probably the best statements to that are in the

1   report itself.  To the extent that mischaracterizes

2   the report, I think maybe you should refer to the

3   report.

4           MR. KILARU:  What's the objection?  What's

5   the grounds for the objection?

6           MR. SIEGEL:  That it mischaracterizes the

7   report because the report doesn't exactly say that.

8           MR. KILARU:  Okay.

9       Q.  Do you model any other changes -- any

10  changes to NCAA rules that do not relate to NIL?

11      A.  So I think -- so as you under- -- as you

12  know, the NCAA has its manual -- right? -- and it

13  has a set of rules in the manual.  And then it has

14  its interim rules and its updates related to NIL.

15  Right?

16          So sort of -- that broad set of rules

17  coming from different places, I'm modeling as if

18  they change the NIL-related rules but not, for

19  instance, the rules on pay for performance as an

20  example, if that's --

21      Q.  Yeah.  So -- and you would agree with me

22  you haven't done any analysis of whether changes to

23  the NIL rules, as you just mentioned them, would

24  prompt any other rules changes in the NCAA manual?

25          MR. SIEGEL:  I object to that.  That's

1    beyond the scope of his opinion.

2            THE WITNESS:  So for the damages analysis,

3    I'm trying to come up with reasonable -- with

4    reasonable, reliable estimates of damages based on

5    essentially not -- you know, making a but-for world

6    that's -- that's least different from the actual

7    world or else there's many other variables involved.

8            So I'm trying to minimize the changes,

9    just the ones that are focused in the scope of -- of

10   what I've been asked to focus on.

11           And in terms of the injunction, it's

12   essentially the same thing --

13   BY MR. KILARU:

14       Q.   So just to be --

15       A.   -- in terms of -- in terms of me trying to

16   model or think about what -- what rules will be

17   going away versus which rules are staying.

18       Q.   So just to use your example, you haven't

19   modeled, for example, if changes to the NIL rules

20   would have effects on the rules regarding, as you

21   said, pay for -- pay for performance; right?

22           MR. SIEGEL:  Object, again, as beyond the

23   scope of the opinion.

24           But you can answer, Dr. Rascher.

25           THE WITNESS:  I modeled sort of what we

1   see today, which is payments for NIL from third

2   parties.  And then an additional set of payments

3   from third parties for video games, as you know, and

4   then an additional set of payments through the

5   conferences from the broadcasters for the use of

6   their NIL.

7           And purposefully I'm assuming that the

8   other NCAA rules are in place and that they would

9   continue to enforce those rules.

10  BY MR. KILARU:

11      Q.   All right.  So your assumption is that the

12  other rules, besides the ones you've assessed in

13  this case, remain unchanged; correct?

14      A.   So it's not just an assumption, though.

15  If you look at the -- the nature of competition for

16  athletes, and we've seen this over the last, you

17  know -- what year -- the last 15 years in these

18  various lawsuits -- actually, the last 20 --

19  20 years in these lawsuits -- each time there's a

20  change, right?  There's competition up to those

21  amounts.

22          And so I'm -- I'm looking at that when I'm

23  doing the NIL analysis.  I'm looking at the nature

24  of competition for the athletes.  And NIL is just

25  one of the currencies that in the -- in the athlete

1  labor market that the athletes are allowed to be

2  paid -- or would be allowed to be paid in the

3  but-for world.

4        Q.   So I want to make sure I fully understand

5  that.

6             Are you offering the opinion that no other

7  rules would change in the but-for world besides

8  the -- the NIL rules?  Or are you assuming for

9  purposes of your analysis that no other rules change

10 besides the NIL rules?

11       A.   Neither of those.  I'm -- I'm assuming for

12 my -- for purposes of damages analysis that no other

13 rules would change.  But I'm also assessing that

14 assumption based on basically what we've seen in the

15 past.

16       Q.   Okay.  And do you believe that assumption

17 is valid or not, based on what you've seen in the

18 past?

19       A.   From what I've seen, yes, I -- I think

20 that assumption is valid.

21       Q.   Okay.

22       A.   And that's also within the scope of sort

23 of what I'm -- what -- this case is about a

24 particular rule and so we're -- or a particular set

25 of rules so I'm looking at what happens when those

1  set of rules change.

2      Q.   Could you turn to page 5, paragraph 9 of

3  your -- or paragraph 9 of your report.  The

4  paragraph actually starts on page 4, but I was going

5  to focus on page 5.

6      A.   Okay.

7      Q.   And what I wanted to do is just briefly

8  review the three damages classes just to make sure

9  we're on the same page when we discuss them today.

10          So the first class that you've modeled

11  damages for is listed here in 9B and that's the

12  football and men's basketball class; is that right?

13     A.   Yes.

14     Q.   Okay.  And that class encompasses all full

15  grant and aid scholarship recipients on a Division I

16  men's basketball team or an FBS football team at a

17  college or university that's a member of one of the

18  Power Five conferences plus Notre Dame starting on

19  June 15 of 2016; is that right?

20          MR. SIEGEL:  Just object.  That's not the

21  complete definition, but --

22          MR. KILARU:  He's free to correct it if

23  he'd like.

24          THE WITNESS:  I mean, the definition's

25  there.  It's that -- it's those two sentences.

1   BY MR. KILARU:

2        Q.   Okay.  So the class --

3        A.   The three sentences.

4        Q.   The class is limited to athletes in the

5   Power Five; is that correct?

6        A.   Yes.

7        Q.   And when we say "Power Five," we're

8   referring to the Atlantic Coast conference, the

9   Big 10, the Big 12, the PAC-12 and the Southeastern

10  Conference; right?

11       A.   Yes.

12       Q.   Okay.  And you're limiting -- this class

13  is limited to recipients of full grant and aid

14  scholarships; correct?

15       A.   Yes.

16       Q.   So, for example, a walk-on player who does

17  not have a scholarship is not included in the class?

18       A.   Correct.

19       Q.   Okay.  And on behalf of this class, you

20  modeled damages for what you call video game name,

21  image and likeness, right -- damages; correct?

22       A.   Yes.

23       Q.   And that's based on -- and we'll talk

24  about this in more detail -- but a share of -- of

25  some license payment for participation in video

1   games regarding college -- college football and

2   college basketball; right?

3       A.   A share of a license payment for the use

4   of their NIL in -- in video games, yes.

5       Q.   You model for people who post July 1 of

6   2021 have a name,, image, and likeness deal damages

7   for them in the past; correct?

8       A.   Yes.

9       Q.   If someone -- if a Power Five athlete --

10  Power Five men's basketball athlete -- just to use

11  one example -- has no third-party name, image, and

12  likeness deals today, you would not assess any

13  damages for them in terms of third-party NIL;

14  correct?

15          MR. SIEGEL:  Objection; misstates the

16  report.  Are we talking about for class

17  certification?  The merits?

18          THE WITNESS:  The -- so I have a set of

19  data and so that's who I'm -- who I'm showing how to

20  measure damages in a class certification, presumably

21  that -- that would happen in merits.

22          And so to the extent there's an athlete

23  who has received an NIL payment today, but I haven't

24  yet received information on them, then I wouldn't be

25  measuring their analysis in my example here; right?

1          But the -- the members of this class could

2    also receive damages payments if they have been paid

3    since July 1 of 2021 for the use of their NIL.

4    BY MR. KILARU:

5         Q.   So sitting here today, if there's a

6    student athlete who has not reported to their

7    institution any name, image, or likeness payment

8    from a third party, that athlete would have no

9    damages in your current model; correct?  For

10   third-party NIL.

11        A.   Well, you're saying "reported" to their

12   school.  I mean, that's currently the method that

13   I've used to -- just to begin the analysis of this

14   for class certification purposes.

15             I don't know if there would be another

16   method of them reporting this information to some

17   other source that then I could use that information

18   and start to apply a model to it.

19        Q.   But sitting here today, you've only looked

20   at the reports to institutions of third-party

21   transactions; correct?

22        A.   I believe that is -- I'm trying to think

23   if something came from a conference.  But I believe

24   all of them came from institutions, as you're

25   saying.

1      Q.   Okay.  The last category of damages for

2  people in the football and men's -- for members of

3  the football and men's basketball class, are damages

4  for broadcast NIL; is that correct?

5      A.   Yes.

6      Q.   And how would you characterize the

7  payments that would be made for broadcast NIL to

8  this group of -- to this group of class members?

9      A.   I don't -- what do you mean by

10  "characterize"?

11      Q.   What are the payments?

12      A.   So the payments are for the use of their

13  NIL in broadcast events, basically coming --

14  stemming from competition across the conferences.

15      Q.   Okay.

16      A.   Yeah.

17      Q.   The next class listed here is the women's

18  basketball class; correct?

19      A.   Yes.

20      Q.   And that class is, again, limited to

21  individuals in the Power Five conferences, including

22  Notre Dame; right?

23      A.   Yes.

24      Q.   Okay.  And for this group, you have

25  assessed -- you have modeled damages for broadcast

1  NIL, as we just discussed; right?

2      A.   Yes.

3      Q.   Using the same methods as for the football

4  and men's basketball class?

5      A.   Yes.

6      Q.   And you've also modeled third-party NIL,

7  again, using the same constructs we just discussed;

8  correct?

9      A.   Yes.

10      Q.   Okay.  And then the last class is what's

11  called the additional sports class; right?

12      A.   Yes.

13      Q.   Okay.  So I want to make sure I fully

14  understand who is part of this class.

15           This would in- -- this class includes

16  football, men's basketball, and women's basketball.

17           This class could include -- let me start

18  the question again -- men -- men's basketball,

19  women's basketball, and football student athletes

20  who do not have a full scholarship; right?

21      A.   Football, men's basketball, women's

22  basketball, athletes in Division I.  Yes.  It's

23  regardless of their -- of their scholarship level.

24  It's -- it's defined if -- you know, if they have

25  shown that they have value in the NIL market.

1          Q.   And then it also includes any other

2     Division I athletes who have, as you said, shown

3     that they have NIL value in the third-party market;

4     correct?

5          A.   Yes.

6          Q.   Okay.  You do not model any video game

7     damages for men's basketball or football athletes

8     who have not monetized their NIL in the third-party

9     market since July 1, 2021; correct?

10         A.   Correct.  They -- the analysis

11    incorporates them in terms of the way that the

12    analysis is done.  But then since they're not part

13    of -- if they're not part of these three classes

14    because -- you were sort of general in that -- but

15    if they don't fit within class -- the football men's

16    basketball class, women's basketball class or

17    additional sports class, then I'm not sort of

18    assigning a -- a damage to them.

19              They are harmed in a -- you know, in a

20    similar fashion, but they're not in these three

21    classes.

22         Q.   Can you think of any economic reason why

23    they are not part of these three classes?

24         A.   I mean, I -- I didn't define the classes.

25              When you say -- so an economic reason.

1  But that -- but, I mean, defining a class -- I don't

2  understand how you apply economics to defining a

3  class.  I mean, like what do you mean by that

4  question?

5       Q.   I'm just asking you if you can think of

6  any reason based on economics why they're not part

7  of the class definitions in this case?

8       A.   No.

9            MR. SIEGEL:  Just object to vague and --

10 vague and ambiguous as to "economic reason."

11           THE WITNESS:  No.  I mean, the classes are

12 defined as they're defined.  I -- you know, I

13 didn't -- I didn't define them.

14 BY MR. KILARU:

15      Q.   Do you know who the three named plaintiffs

16 are in this case?

17      A.   Yes.

18      Q.   Okay.  And this is not a memory test.  One

19 is them is Grant House, one of them is Sedona

20 Prince, one of them is Tymer Oliver; right?

21      A.   Yeah -- yes.

22      Q.   Have you spoken to any of them about the

23 damages models that you've prepared in this case?

24      A.   No.

25      Q.   Okay.  You would agree with me there's no

1    named plaintiff who plays men's basketball; right?

2         A.   Correct.

3         Q.   Okay.  I'd actually like to talk about the

4    three damages models in a little bit more detail.

5    Just some kind of basic principles upfront.

6              You'd agree that your but-for worlds, as

7    we call them, first assume that the market

8    participants are engaging in rational economic

9    behavior; right?

10        A.   The -- the various participants?  Yes.

11        Q.   Okay.  You would agree that you -- your

12   but-for worlds account -- need to account for the

13   law of supply and demand?

14        A.   I mean, generally when it applies.  I

15   mean, I haven't -- I'm not thinking about it in that

16   way, so I'd have to go and think about each topic

17   and I'm not -- not going to do that right here.

18        Q.   And you -- on broadcast NIL, in

19   particular, you model damages for years going back

20   to 2016 for each of the class members; correct?

21        A.   Yes.

22        Q.   For example, you say that there's an

23   amount that a Big 10 men's basketball player would

24   have made in 2016, just to give one example.

25        A.   Right.  I believe that's -- I have that in

1  my -- in one of my appendices.

2      Q.   And is it your opinion that the prices you

3  list -- or excuse me -- the damages you list in

4  those appendices represent an equilibrium price for

5  what that student athlete would receive?

6      A.   I think as an estimate of a reasonable and

7  reliable damage, I think that it's a conservative

8  estimate of an equilibrium price.

9      Q.   Let's talk about the broadcast NIL group

10 for damages, in the but-for world in particular, and

11 it may not surprise you to learn we'll spend a lot

12 of time talking about that today.

13         Can I turn your attention to paragraph 153

14 of your report.  I think it's on page 75.

15     A.   Yeah, can I read it first, or do you want

16 to just ask me?

17     Q.   No, please go ahead.

18     A.   Okay.

19     Q.   And I think I gave you the wrong

20 paragraph.  I apologize.  It's actually 154.

21     A.   Oh.

22         (Witness reviews document.)

23         Okay.

24     Q.   Okay.  In terms of the broadcast NIL

25 damages, you would agree you're modeling payments in

1  a labor market; correct?

2      A.   Yes.

3      Q.   You'd agree that, as you conclude in this

4  paragraph, I believe -- let me make sure I have the

5  paragraph -- the payments for broadcast NIL are

6  being made in a labor market; correct?

7      A.   Yes.

8      Q.   And I think it's in paragraph 153 -- which

9  is where I directed you initially, you say that "In

10 the but-for world, Power Five conferences or their

11 schools would have competed to attract athletes by

12 offering broadcast NIL payments"; correct?

13     A.   Yes.

14     Q.   Okay.  And so the schools in this market

15 are competing with each other for the labor of

16 student athletes, as you've modeled the market;

17 right?

18     A.   Yes.

19     Q.   Okay.  Now, you'd agree that the basic

20 unit of labor traded in a labor market is what you

21 would call a "unit of talent"; correct?

22     A.   Okay.  So can you say that again?

23     Q.   Sure.  In previous work, you've concluded

24 that the unit of currency traded in a labor market

25 is what you call a "unit of talent"; correct?

1      A.   Well, that's from the -- that's from the
2  athlete side.  So the trade involves two sides;
3  right?
4      Q.   Okay.
5      A.   Something going one direction and
6  something going the other direction.
7           So the athlete's providing their athletic
8  services and then the other side of the market's
9  providing whatever different types of currency
10 that -- that it might be providing --
11     Q.   Um --
12     A.   -- in opportunities and things like that.
13     Q.   In this market -- in the market -- in your
14 analysis of broadcast NIL, are you assuming that the
15 students are also providing their -- their NILs for
16 the institutions for use?
17     A.   Yes.  They already do that.  And that they
18 would continue to do that.  They would just be paid
19 through competition.
20     Q.   So is it your opinion that -- would you
21 agree that some athletes have more marketable NILs
22 than others?
23     A.   It depends on the situation.  But -- but,
24 yeah, we see athletes out in the marketplace selling
25 their NIL in certain -- you know, it depends on the

1   product and -- and the -- the use of those -- of

2   those NILs.

3        Q.   Okay.  So just to use last night's

4   national championship game as an example, the

5   quarterback for the Georgia team, his name is

6   Stetson Bennett; correct?  The starting quarterback?

7        A.   Yeah, I think it's Stetson Bennett IV,

8   maybe.

9        Q.   Probably right.

10            He, in the broadcast, is on the screen

11  pretty frequently; it's fair to say?

12       A.   Yes.

13       Q.   He may or may not get interviewed in a

14  particular game depending on his performance?

15       A.   Yes.

16       Q.   And is it your opinion that his NIL is

17  more valuable to the broadcaster than a

18  fourth-string offensive lineman who sits on the

19  bench?

20       A.   Well, the -- the broadcaster needs -- they

21  don't know what's going to happen.  So the

22  broadcaster needs everyone's NIL.  And certainly at

23  the time that the school's recruiting an athlete --

24  right? -- it's -- it's not known exactly which

25  athletes are going to play more.

1            So we see this in the contracts between

2   the broadcasters and the conferences.  They -- they

3   want to make sure that everyone -- that all the NILs

4   are -- are there and that the broadcaster's

5   indemnified.

6            And so essentially that uncertainty

7   especially coming out of high school sort of leads

8   to a situation where the -- in the way that I've

9   modeled it.  I'm not disagreeing with you that

10  someone might appear more on a television -- in a

11  game than someone else obviously.

12       Q.   So just so I understand it.  From your

13  point of view -- from your -- it's your conclusion

14  that from the broadcaster's point of view, the value

15  of Stetson Bennett's NIL is the same as the value of

16  a fourth-string offensive lineman's NIL.

17            MR. SIEGEL:  Objection; misstates

18  testimony.

19            THE WITNESS:  I'm -- yeah, exactly.  It

20  misstates my testimony.

21            I'm modeling a competitive equilibrium

22  that's reasonable and reliable as a way of measuring

23  damages in the past; right?  And so you can have a

24  competitive outcome, which two different people are

25  essentially being paid the same amount, even if they

1  have -- even if one of them appears more on the show

2  because who -- who would have known that that was

3  going to happen, for instance.

4  BY MR. KILARU:

5      Q.   So it's your testimony that going into a

6  broadcast, the broadcaster wouldn't know if

7  Stetson Bennett was more likely to get air time than

8  the fourth string offensive lineman?

9      A.   No, but that's not when these sort of

10  licenses are -- are put in place.  If you look at

11  the dozens of -- really hundreds of licenses we see

12  that are -- you know, that have some analogous

13  situations to this -- right?  You see those signed

14  up ahead of time and then products are created,

15  whether they're digital video products or not.

16          We see those athletes, I mean, again,

17  hundreds of these.  Those athletes getting paid the

18  same amount sort of regardless of -- of how those

19  athletes are being used in those different products.

20  And so this is a similar example to those.

21      Q.   So is it your opinion that the broadcaster

22  values the NIL of Stetson Bennett the same as the

23  fourth-string offensive lineman on the Georgia team?

24      A.   I don't have -- no, I don't have that

25  opinion, no.

1      Q.   Okay.  Do you believe the broadcaster

2   values Stetson Bennett's NIL more than the

3   fourth-string offensive lineman on the Georgia team?

4           MR. SIEGEL:  Objection; vague and

5   ambiguous as to time.

6           THE WITNESS:  My opinion is around what

7   happens in the labor market.  What is the outcome of

8   the labor market.  Not -- what does that particular

9   broadcaster for that particular event think is going

10  to happen and -- and hope that they have the rights

11  to the people that they think are going to appear.

12  They take care of all that ahead of time.

13  BY MR. KILARU:

14     Q.   Okay.  But --

15     A.   Often years ahead of time.

16     Q.   We'll talk about the labor market in a

17  minute.

18           But at the start of the season, is it your

19  view that the broadcasters had believed that

20  Stetson Bennett had the same NIL value as a

21  fourth-string offensive lineman on Georgia's team?

22  I'm just asking about the broadcasters for now;

23  we'll get to the labor market.

24     A.   I mean, I don't have an opinion on what

25  the broadcasters believe.  You'll have to ask hem.

1        Q.    Turning to the school's position.  Is it

2   your position that Georgia values the NIL --

3   University of Georgia -- values the NIL of

4   Stetson Bennett the same as the value of a

5   fourth-string offensive lineman?

6        A.    I mean, again, I don't have -- I don't

7   have that opinion, no.

8        Q.    Okay.  Your model would say that in this

9   last year, Stetson Bennett would receive the exact

10  same payment as the fourth string offensive lineman,

11  assuming the fourth-string offensive lineman was on

12  scholarship; correct?

13       A.    Was on a full scholarship.  Yeah,

14  assuming -- I'm just trying to make sure that

15  they're on the team -- both of them are on the team.

16  They both have full scholarships, sort of regardless

17  of -- of what string they are, that I've modeled

18  it -- the competitive equilibrium, which is that

19  they would receive the same payment.

20       Q.    Okay.  And --

21       A.    As we see in group licenses, as I had

22  mentioned hundreds of -- of group licenses.

23       Q.    And at the time of recruiting -- I'm just

24  going to use a hypothetical example -- in 2018,

25  Georgia would make the same offer to a five-star

1  quarterback as a three-star offensive lineman who

2  was projected to be a backup.

3           MR. SIEGEL:  Objection; vague and

4  ambiguous as to "offer."

5           THE WITNESS:  So the conference would have

6  a set of rules -- and again, in the past, I'm

7  modeling what reasonable -- reasonable and reliable

8  measure of damages; right?  But it's based on the

9  idea that the conference would have a set of rules

10 in terms of -- of how much that payment would be.

11          And that's based on the internal dynamics

12 of how a conference operates.  They want to mute

13 that competition somewhat amongst themselves; right?

14 At the same time, they want to compete with other

15 conferences; right?

16          They have to -- they have to -- you know,

17 the way voting works, the -- the sort of bottom

18 members of the conference -- right? -- aren't going

19 to vote to allow Georgia to -- to sort of get all

20 the best athletes and make it hard for those schools

21 to be able to compete with other schools in other

22 conferences in order to get the three stars and the

23 two stars, for instance.

24          So it is my opinion that -- that, again,

25 we see this analogous in other situations partly

1  because of the -- the uncertainty of coming out of

2  high school, how the broadcasters need everyone's

3  NILs, and other reasons that I've listed in my

4  report, that they would come -- come to a situation

5  where they would have essentially equally shared

6  royalty payments.

7          And so Georgia would -- would be only able

8  to offer up to that amount.  If they tried to offer

9  more than that amount; right? -- and they -- it's --

10  and they're offering sort of pay for performance,

11  then the NCAA's rules kick in.

12          (Reporter clarification.)

13          THE WITNESS:  The NCAA's rules kick in.

14  BY MR. KILARU:

15      Q.   Okay.  There's a lot there that we will

16  discuss, I think, at various points today.  But I

17  just want to start by going back to the question I

18  asked you, which is:  Your model would assign the

19  same damages in 2018, for example, to a five-star

20  quarterback, as to a two-star offensive lineman

21  projected to be a backup at the same institution;

22  correct?

23      A.   Right.  I answered that, but yes.

24      Q.   Yes.  Okay.  I just want to make sure.

25          Okay.  You'd agree that currently the

1  conferences receive the NIL rights, to the extent

2  these NIL rights exist, currently the conferences

3  are already getting them; correct?  For their

4  players -- for their players?

5          MR. SIEGEL:  Objection; vague and

6  ambiguous.

7          THE WITNESS:  So -- right.  The

8  conferences -- the broadcasters are basically

9  saying, hey, you've got those rights.  The

10 conferences are making sure that they get them from

11 the schools.

12 BY MR. KILARU:

13   Q.   And they are not currently paying -- they

14 and the schools are not making any direct payments

15 to the student athletes for that NIL; correct?

16   A.   The student athletes are all currently

17 getting paid the same amount, as I talk about in my

18 model, but it happens to be zero.  And they get paid

19 the same amount for their scholarships, sort of back

20 to your point a little bit.

21          You know, the five-star and the two-star,

22 if they're both on full scholarship, are essentially

23 getting the same amount.  And that's because there

24 are rules that -- that are in place that limit the

25 amount that the schools can pay them.

1       Q.   In your model, you would agree with me

2   that the conferences are not paying -- Power Five

3   conferences are not making payments to all student

4   athletes that appear in a broadcast; correct?

5       A.   What do you mean?  I mean, that's -- any

6   payments at all?

7       Q.   They're not making -- I'll ask a better

8   question.

9            You'd agree with me that you don't model

10  any broadcast NIL payments -- you don't model

11  broadcast NIL payments to every student athlete who

12  appears in a broadcast; correct?

13      A.   Correct.

14      Q.   Okay.  So there are -- for example,

15  non-scholarship players who may appear in a

16  broadcast; correct?

17      A.   Yes.

18      Q.   So, for example, the kicker of a team may

19  not have a scholarship; right?

20      A.   I mean, some -- that's possibly true, yes.

21      Q.   Okay.  A kicker who doesn't have a

22  scholarship may well appear in the broadcast;

23  correct?

24      A.   Yes.

25      Q.   It's pretty likely they'll appear in the

1    broadcast in an average football game; correct?

2              MR. SIEGEL:  Well, objection; calls for

3    speculation.

4              THE WITNESS:  I mean, I'm not agreeing

5    with you that kickers don't have scholarships.

6    But -- but to the extent that there's a kicker on a

7    team that doesn't have a scholarship and they happen

8    to be first-string or they happen to be called into

9    the game for some reason, then yeah, they might

10   appear in the broadcast.

11   BY MR. KILARU:

12        Q.   And right now, for example, conferences --

13   some teams in conferences play non-conference

14   opponents during their schedule; correct?

15        A.   Yes.

16        Q.   So, for example -- I don't know why -- I

17   guess because it's timely, Georgia may play a team

18   that's not in the SEC; correct?

19        A.   Yes.

20        Q.   And whoever is paying Georgia for the

21   broadcast rights to that game, they don't have the

22   name, image, and likeness rights to the team that's

23   not in the broadcast, do they?

24        A.   So I don't know -- I mean, that's -- my

25   model isn't really about the rights for name, image,

1  and likeness, it's the competition that pays the

2  athletes up to a point where the NCAA says this is

3  not a payment for NIL rights, whether they exist or

4  not.  You know, you see this in -- in basketball --

5  pro basketball, and pro football; right?

6          So presumably those athletes are

7  getting -- if -- if their conferences are doing the

8  same thing, are getting paid for those -- for the

9  use of their NIL by -- by their own conference.

10    Q.   But today, based on your analysis to date,

11 you don't know if, for example, Georgia plays a team

12 that's not in the Southeastern Conference, the

13 broadcaster of the game has secured whatever rights

14 may exist in the players who are not on the Georgia

15 team.

16          You don't know that, do you?

17          MR. SIEGEL:  Objection; beyond the scope

18 of the opinion and calls for speculation.

19          THE WITNESS:  I don't know what mechanism

20 they've determined allows them to show the game with

21 those other athletes right?  But, again, my model is

22 based on a model of economic competition, not a

23 model of NIL -- right of publicity and all that.

24 It -- it doesn't require any of that.

25 BY MR. KILARU:

1      Q.   You'd agree with me that the broadcast

2  NIL -- your modeling of broadcast NIL model, you're

3  not using a before-and-after analysis; right?

4      A.   I mean, there are certain -- there are

5  elements that are before and after in that.

6      Q.   What are those?

7      A.   I mean, I'm looking at prior years' media

8  rights and media contracts.

9      Q.   Okay.  So you say in the third -- section

10  of your report regarding third-party NIL that you're

11  applying a before-and-after analysis; correct?

12      A.   Correct.

13      Q.   Okay.  Do you believe you're using the

14  same form of analysis in the Broadcast NIL section?

15      A.   It's not that same form of analysis.  We

16  have this natural experiment in the individual NIL

17  payment analysis because it's been allowed and it's

18  happening in front of us.  And so we're using that

19  information to -- to think about what would have

20  happened in the past.

21          For the broadcast NIL, I'm using other

22  information to think about what would have happened

23  in the past.

24      Q.   So can I turn your attention to page --

25  give me a minute, please -- 180 -- or paragraph 180

1   on page 95.

2          Actually, can I turn your attention to

3   paragraph 185 on page 97?  Sorry about that.

4       A.   That's all right.

5          Yes.  I see it.

6       Q.   So you say here, "My common methodology

7   for measuring these class-wide damages" -- and

8   you're referring here to third-party NIL -- "is then

9   based on the well-established before-and-after

10  approach."

11         Do you see that?

12      A.   Yes.

13      Q.   Okay.  You would not say that you were

14  applying that well-established before-and-after

15  approach to the broadcast NIL class -- damages, are

16  you; is that correct?

17      A.   So the broadcast class is using what some

18  people call yardsticks or benchmarks; right?

19  Sometimes they have elements of before and after.

20  And sometimes you can have both at the same time.

21      Q.   Okay.  So -- but you would describe the

22  broadcast -- your broadcast methodology as a

23  yardstick methodology; correct?

24      A.   Generally, yes.

25      Q.   Okay.  And what is the yardstick that

1   you're using?

2        A.   So I'm looking at -- at other uses of NIL

3   licenses.  I'm relying on another expert, Ed Desser,

4   and his analysis.  I'm relying on the -- the

5   economics of competition at the school and -- and

6   conference level and the nature of a football

7   broadcast from one conference to the next, the -- an

8   understanding of college athlete labor market in

9   terms of when -- when recruiting occurs out of high

10  school.

11             There's others that are listed in here;

12  I'm not remembering every single piece, but --

13       Q.   But in terms of the yardsticks to which

14  you're drawing a comparison, would you agree with me

15  that those are group licensing deals involving the

16  NFL and the NBA?

17       A.   So that --

18             MR. SIEGEL:  Objection; asked and

19  answered.

20             THE WITNESS:  So that's some of the

21  information, yes.

22  BY MR. KILARU:

23       Q.   Okay.  Would you call Mr. Desser's report

24  a yardstick?

25       A.   No, but it's a piece of information that

1  applies in the same way that one might apply a

2  yardstick.

3      Q.   Understood.

4           Would you describe your understanding of

5  the economics of competition as a yardstick?

6      A.   Yes.  In terms of seeing how competition

7  has played out in college sports over the years when

8  certain rules have changed; right?  You see that

9  same competition and you can apply it, oh, well,

10  here's another currency used in the athlete --

11  potentially used in the athlete labor market.

12          And so relying on those other -- those --

13  that other historical yardsticks or -- yeah, they're

14  not benchmarks.  They're yardsticks.  I know those

15  phrases get mixed up.  So if you need me to clarify

16  them, I will.

17      Q.   No, that's fine.

18          When you say "other forms of currency,"

19  are you referring to cost-of-attendance stipends as

20  one example?

21      A.   That's one example, yes.

22      Q.   Are there any others?

23      A.   That's sort of the main one.

24      Q.   Okay.  And you'd agree with me that

25  cost-of-attendance stipends do not involve a group

1   license?

2        A.   Correct.

3        Q.   Okay.  And the other -- the NI- -- the

4   other group licensing contracts that you've looked

5   at or agreements you've looked at from professional

6   football and basketball, you'd agree that none of

7   those involve media rights; correct?

8        A.   Would you define "media rights" that

9   you're using?

10       Q.   They don't involve compensation related to

11  participation in a broadcast; correct?

12       A.   Some of them have digital media elements

13  of them, but they're not -- a lot of those licenses

14  are -- I mean, they're not for the use of their NIL

15  in a -- let's say a live broadcast.

16       Q.   Right.  So none of those group licenses --

17  group licensing agreements you look at involve

18  payments related to the use of NIL in a live

19  telecast of a sporting event; correct?

20       A.   I believe so, yeah.

21       Q.   Okay.  When you're calculating damages for

22  the men's basketball, women's basketball, and

23  football classes, you are calculating damages based

24  on a group license for the use of NIL in a live

25  telecast of a sporting event; correct?

Page 52

1          A.    Yes.

2          Q.    As -- as we've discussed, the group

3     licensing contracts you look at are based on

4     professional sports; correct?  They're from

5     professional sports, I should say.

6          A.    The -- the licensing agreements?  Yeah.

7     Like listed in Exhibits 578 or 567 or whatever.

8     Yes, those are from three different professional

9     sports.  The same sports.

10         Q.    Professional football, professional

11    basketball, men's basketball, and what else?

12         A.    I think there's women's -- there may be

13    some women's basketball information.

14         Q.    Okay.  You'd agree with me that

15    professional athletes are employees; correct?

16         A.    Yes.

17         Q.    To your knowledge, there's been no

18    finding -- no school or conference in the -- in

19    college sports has concluded that student athletes

20    are employees?

21              MR. SIEGEL:  Objection; calls for a legal

22    conclusion.

23              THE WITNESS:  I mean, there's been

24    findings related to that, but -- but to my

25    knowledge, I don't think any of the universities --

1   other than the military academies -- treat their

2   athletes as employees.  The military academies do.

3   They treat them as employees.  They are employees.

4   They play sports.  They get paid.  People like to

5   watch.

6   BY MR. KILARU:

7       Q.   To your knowledge, are any institutions in

8   the Power Five or any of the Power Five conferences

9   treating student athletes as employees?

10           MR. SIEGEL:  Objection; calls for a legal

11  conclusion.

12           THE WITNESS:  To my knowledge, not as

13  employees of their school based on their athletics.

14  Some of them may be employees at other aspects of

15  the school.

16  BY MR. KILARU:

17      Q.   Based on like a work study job, for

18  example or something -- or some other employment,

19  but not related to athletics; right?

20      A.   And I'm sort of curious, I'm -- I'm

21  thinking about when they have summer camps.  I don't

22  know -- see, I don't know if they consider them

23  employees in that case or they pay them as

24  contractors.  I'm not actually sure.

25           I know that some of them get paid for that

1  summer camp work.  And that's athletics, but it's

2  not the performance on the team.

3       Q.   You're not aware of any institution in the

4  Power Five that is treating student athletes as

5  employees based on their participation in live

6  football telecasts -- or live sports telecasts;

7  correct?

8       A.   I think that's true.

9       Q.   You'd agree that professional athletes

10  in -- well, can you -- professional athletes are

11  paid salaries that vary based on athletic talent;

12  correct?

13       A.   I mean, within a set of rules, but, yes.

14  Those salaries can vary.

15       Q.   Are you aware of any professional sports

16  labor market in which every participant is paid the

17  same amount?

18       A.   Well, look at the college athletes for the

19  use of their NIL.  They're all paid the same amount.

20  Zero.

21            Look at the college athletes, they're all

22  paid -- the ones who are on scholarship -- take 85

23  at a Power Five school; right -- they're all paid

24  essentially the same amount.  It's tuition, room and

25  board, books, miscellaneous, and expenses.

1        Q.    Right.  My question was whether you were

2   aware of any professional sports labor market in

3   which every participant is paid the same amount.

4        A.    And you're defining "professional sports"

5   as what?

6        Q.    Well, how would you define it?

7        A.    I mean, these athletes in college get

8   paid; right?  Some people call them professional

9   sports.  So if you're defining "professional sports"

10  as not college sports and not other amateur sports,

11  but as an example, NFL, NBA, et cetera, that they

12  get paid the same amount?

13            As I sit here, I can't think of a case for

14  them getting paid the same amount for their athletic

15  performances, but of course, this case is not about

16  athletic performances.

17       Q.    You'd agree with me that in the NFL, in

18  the NBA, and in the WNBA, the players are

19  represented by players associations?

20       A.    And -- and agents.  There are players

21  associations in those leagues, yes.

22       Q.    And the players associations bargain

23  collectively with the leagues and the teams under

24  the Federal Labor Relations Act?

25            (Interruption in proceedings.)

1          MR. KILARU:  Let's go off the record.

2          THE VIDEOGRAPHER:  The time is 10:28 a.m.

3      (Recess taken from 10:28 a.m. to 10:42 a.m.)

4          THE VIDEOGRAPHER:  All right.  We're back

5  on the record.  The time is 10:42 a.m.

6  BY MR. KILARU:

7      Q.   Dr. Rascher, a few minutes ago you stated

8  that one of the -- one of the yardsticks you used in

9  this case were group licensing payments involving

10  professional sports, professional football,

11  basketball, and women's basketball?

12     A.   Yes.

13     Q.   Okay.  Do you believe that those group

14  licensing payments are being made in a labor market?

15     A.   Since they're not -- I'd have to think

16  more about that.

17     Q.   They're not, are they?

18         MR. SIEGEL:  Objection; asked and

19  answered.

20         THE WITNESS:  I would just have to think

21  more about the relationship between those contracts

22  and any -- any set of rules that -- that the NFL --

23  which is where -- you know, that the NFL and the

24  players association have agreed upon and that's

25  where the labor market is.

1  BY MR. KILARU:

2      Q.   The labor market is between -- to use the

3  professional football example -- the NFL and the

4  players; correct?

5      A.   It's sort of a -- it's sort of joint in

6  the sense that it's between the teams and the

7  players and the league and the players.

8      Q.   But it doesn't involve, for example,

9  Topps?

10     A.   Right.  Just the way the -- the -- again,

11 I have to think more about it, but just the way the

12 rules are established; and in our case, are slightly

13 different than in that case.

14          MS. PARSIGIAN:  Pardon me.  I meant to

15 mention this at a break.  Counsel, will you speak

16 louder?

17          MR. KILARU:  Yeah.

18     Q.   The -- just to use one of the examples you

19 used, there's a group license for Topps, which is a

20 player card company, with NFL players; correct?

21     A.   Yes.

22     Q.   And that contract is between the NFL

23 players and Topps; correct?

24     A.   Yes.

25     Q.   The teams in the league are not parties to

1   that contract?

REDACTED - Highly Confidential – Counsel Only

22        A.    So it's not that simple.

23        Q.    So what's your opinion?

24        A.    It's -- it's not that simple.   That's my

25   opinion.

1       Q.   Your opinion is it's not that simple, you

2   have no other explanation?

3       A.   Well, no, you didn't ask for another

4   explanation.

5       Q.   Okay.  What's your opinion as to what

6   you -- how you would characterize those payments;

7   are they in a labor market or not?

8       A.   The -- the whole collective bargaining

9   sets up a situation and that's -- that's a labor

10  market -- or that's part of -- you know, that's

11  within the labor market to where the athletes in

12  football in the NFL, for instance, have agreed to,

13  say, have a group license.  And that's all part of

14  that context.  And then they can go out and market

15  that license.

16          So I'm saying it's not quite as simple as

17  you're making it.  And I'm saying for college

18  sports, there's a -- there's a -- a slight

19  difference in the way that college sports is -- is

20  administered by the colleges and conferences in the

21  NCAA.

REDACTED - Highly Confidential – Counsel Only

25      A.   I would say not in the traditional way we

1  think of as "labor," no.

2       Q.   Is it -- are they purchasing labor in any

3  way that would make it a labor market?

4            MR. SIEGEL:  Objection; compound.

5            THE WITNESS:  So it depends on the

6  product.  If everyone has to show up and they have

7  to spend a day taking photographs or something like

8  that, you know, that's providing some sort of labor

9  service.

10 BY MR. KILARU:

11      Q.   It's a different form of labor service

12 than participating in an athletic contest; correct?

13      A.   Yes.

14      Q.   Okay.  To your knowledge, the only

15 compensation for participating in a professional

16 sports contest, in the actual professional sports

17 game, comes through the salary that's paid from the

18 league, from the team to the player; correct?

19      A.   Can you repeat the beginning of that?

20      Q.   Yeah, sure.

21           The only compensation for participation in

22 an athletic contest is the salary that a player gets

23 from their team?  In the NFL, for example.

24      A.    That is true, with the caveat that there

25 may be players who get paid for appearances and how

1  often they appear in a game through some endorsement

2  they have or something like that.

3        So playing in that game, they get paid

4  from their team, their salary.  That's primarily

5  what's happening.  There may be payments that some

6  receive from, you know, some sort of licensee who's

7  decided they're having them endorse a product and it

8  requires them to play in a certain number of games

9  and all that.

10       Q.   Okay.  Now, you, in your report, conclude

11  that broadcast NIL constitutes 10 percent of the

12  value of each of the contracts that the conference

13  is signing for media distribution; correct?

14            MR. SIEGEL:  Objection; misstates the

15  report.

16            THE WITNESS:  For the purposes of damages,

17  I believe that a 10 percent royalty payment is

18  reasonable, it's reliable, the process is reliable;

19  and it's a conservative estimate of -- of the -- of

20  the value -- of the value of that -- of that NIL.

21  BY MR. KILARU:

22       Q.   You'd agree that 10 percent figure is not

23  in the contracts itself; correct?

24       A.   Which contracts?

25       Q.   The broadcast contracts.

Page 62

1      A.    Correct.

2      Q.    Okay.  What is your basis for coming to

3  the 10 percent figure?

4      A.    Well, some of it is the expertise of

5  Ed Desser, who, you know, spent some time and has an

6  entire report on -- and that's one of the topics in

7  his report, you know, with his background.

8            Another is the -- as I mentioned, the

9  dozens of uses of digital and -- and media, but then

10  hundreds of -- of contracts for the use of NIL in

11  the NFL and the NBA, and the -- and WNBA.

12            So that's -- I think those are the main

13  sources of -- of that 10 percent reasonable royalty.

14      Q.    Okay.  So one is from -- just to recap

15  what you said.  One source is Mr. Desser's report;

16  right?

17      A.    Yes.

18      Q.    Okay.  And another source are the group

19  licensing contracts we discussed that do not involve

20  payments related to participation in live football

21  telecasts; correct?

22            MR. SIEGEL:  Objection; compound.

23            THE WITNESS:  They're the contracts that

24  some of them use media and they pay the athletes for

25  the use of that media at a 10 percent royalty rate.

1    BY MR. KILARU:

2        Q.   I just want to take you back to my

3    question.

4             The other source you relied on are group

5    licensing contracts that do not involve payments

6    tied to participation in live football telecasts;

7    correct?

8        A.   In live football telecasts; correct.

9        Q.   Okay.  A few minutes ago, you said -- let

10   me make sure I understand this -- the payments that

11   you model in the broadcast NIL damages are from the

12   conferences to student athletes; correct?

13       A.   Correct.

14       Q.   Okay.  Are you aware of any other form of

15   compensation provided to student athletes that comes

16   directly from the conference?

17       A.   So there are forms of payment and I don't

18   know like when you go to a tournament, the

19   conference tournament and the athletes get per diems

20   and that's sort of set -- often set at the

21   conference level -- I don't know physically if the

22   conference person is giving them -- paying the money

23   or how they -- or do they just give it to the school

24   and the school, you know, basically is just the --

25   the conduit.

1            But, you know, a lot of the revenues that

2    come from conferences to the schools -- right? --

3    then the schools, you know, use some of that revenue

4    to -- to give to the athletes.

5            Or when you go to a bowl game and you get

6    access to -- you know, who is running the bowl game?

7    Is it -- you know, is it -- or is it a conference

8    championship game and you have the ability to -- to

9    earn some sort of -- not prize money, I shouldn't --

10   but some sort of payment for, you know, being at

11   that game that the conferences are allowed to give.

12           I don't know, again, is the conference

13   directly doing it, or is it just more convenient

14   to -- to give that money to the athlete through

15   their school?

16      Q.   Okay.  Just going back to my question.  In

17   your model, the payments for broadcast NIL come

18   directly from, for example, the SEC to an athlete at

19   the University of Georgia; correct?

20           MR. SIEGEL:  Objection; vague and

21   ambiguous as to "come directly."

22           THE WITNESS:  The -- so the broadcast

23   contracts are between the conference and the media

24   company.  And the conferences essentially bring the

25   NILs of the athletes along with those contracts to

1   the media companies so they're aware that the

2   media -- so they're able to sort of indemnify the

3   media companies.

4           And so that's where the -- that's where

5   the sort of contract takes place.  And since a

6   portion of that contract would be going to the

7   athletes, then it would go from the conferences to

8   the athletes.

9   BY MR. KILARU:

10      Q.   Okay.  Just turning -- can I turn your

11   attention to paragraph 156 of your report.

12      A    (Witness complies.)

13      Q.   So the second sentence of that paragraph

14   reads, "I adopt a model of competition in which the

15   Power Five conferences who enter into the broadcast

16   agreements that provide for NIL rights to the

17   network compete with each other and make the

18   broadcast NIL payments to class members."

19           Did I read that right?

20      A.   Yes.

21      Q.   And you agree with that statement;

22   correct?

23      A.   Yes.

24      Q.   Okay.  And sitting here today, you do not

25   know of any other payment that is made from the

1  conference directly to a student athlete?

2          MR. SIEGEL:  Objection; asked and

3  answered.

4          THE WITNESS:  So as I said, there are

5  payments stemming from the conferences that go to

6  the athletes.  I don't know if they pass through the

7  hands of the -- of the schools or not.

8  BY MR. KILARU:

9      Q.   Okay.  Other than the two examples you

10 gave, any other examples you can -- come to mind of

11 payments that may be made from a conference to a

12 student athlete?

13     A.   Not as I sit here, no.

14     Q.   Okay.  Can I turn your attention to

15 Exhibit 12 in your report, which is on page 94?

16     A    (Witness complies.)

17     Q.   And I should put on the record that I

18 believe this is Network Strictly Confidential, but

19 we discussed before the deposition and because no

20 one is participating in this deposition who has an

21 NSC restriction, we are just sort of moving forward

22 for purposes of the deposition.

23          But, Dr. Rascher, let's just look, for

24 example, at -- so Exhibit 12 is the conference

25 broadcast damages per class member; correct?

1        A.    Yes.

REDACTED - NSC

10        Q.    Okay.  And these amounts represent a purse

11    scholarship recipient share of the 10 percent -- let

12    me take a step back at how you got here.

13              First, you multiply the broadcast revenues

14    for each of the ACC and the SEC by 10 percent;

15    correct?

16        A.    So that's part of it.

17        Q.    I'm not saying that's the full thing.

18        A.    So there's other --

19        Q.    Right.  The first step is you multiply the

20    broadcast revenues for the ACC and SEC by

21    10 percent; right?

22        A.    Correct.

23        Q.    Then you multiply whatever comes out of

24    that by 75 percent, because your model says that

25    75 percent of those revenues are tied to football;

1    correct?

2        A.    Yes.

3        Q.    Okay.  And then you divide that by the

4    number of scholarship recipients in that conference

5    in a given year; correct?

6        A.    Yes.

REDACTED - NSC

14       A.    The SEC -- its schools are competing to

15   get football athletes.  And they would want to be

16   able to compete with these other conferences --

17       Q.    Okay, but let's just --

18       A.    -- in order to be able to get those

19   football athletes.

20       Q.    Let's go through the table.

REDACTED - NSC

REDACTED - NSC

17        A.   But the schools are competing on all sorts

18   of dimensions:  Cost of attendance; the school; the

19   coach; the ability to turn pro; the training; the

20   education; the location; the -- you know, chance to

21   play games in certain cities and home cities.

22             I mean, there's so many elements and

23   there's tons of research on this, as you may or may

24   not know, showing how athletes make decisions in

25   order to -- to choose different schools.

1            So this is just one element of -- of those

2    decisions that -- that an athlete would use to make

3    a decision.

4         Q.   Okay.  Your model doesn't assign a value

5    to cost of attendance for each conference, does it?

6         A.   In this report?

7         Q.   In your model.  In this case, yes.

8         A.   No.

9         Q.   Okay.  Your model doesn't assign any value

10   to one school versus another, does it?

11        A.   I don't know what that means.

12        Q.   You don't assign sort of amount of benefit

13   that a student athlete gets from one particular

14   school versus another; correct?

15            MR. SIEGEL:  Objection; vague and

16   ambiguous as to "amount of benefit."

17            THE WITNESS:  I don't really know what

18   you're saying, but --

19   BY MR. KILARU:

20        Q.   A few minutes ago, you said that one of

21   the factors that goes into how athletes make

22   decisions about which schools to go to are the

23   school.

24        A.   Yes.

25        Q.   Okay.  So you don't assign in your model

1   any economic value to what you described as "the

2   school"; correct?

3        A.   Correct.

4        Q.   Okay.  You don't assign any economic value

5   to the ability to turn pro?

6        A.   Correct.

7        Q.   You don't assign any economic value to the

8   training?

9        A.   So implicit in all of this is that the

10  conferences are competing as they do now.  So all of

11  those values are part of the athlete labor market.

12  They already exist.  To measure damages in the past

13  in the but-for world, that athlete labor market is

14  assuming to exist similarly other than this one

15  change in rules.

16            So those values are all baked into the

17  athlete labor market.  And the decisions they choose

18  and, you know, which schools are -- you know, which

19  conferences and schools are recruiting at a higher

20  level than the others, that's all built into this

21  model.  I'm not changing any of that.

22       Q.   Right.

23       A.   So -- so it's built in regardless of what

24  an individual school's value is to a particular

25  athlete.

1      Q.   But you haven't assigned a specific value

2  to training; correct?  In your model?

3      A.   Correct.

4      Q.   You haven't assigned a specific value to

5  education?

6      A.   Correct.  But as I said, they're in --

7  those are in -- they're in the model of competition.

8  They're part of the labor market.

9      Q.   Just going through your list here.

10          You haven't assigned an economic value to

11 location?

12     A.   No.

13     Q.   Or the chance to play games in certain

14 cities and home cities; right?

15     A.   Correct.

16     Q.   Okay.  So just looking at broadcast NIL

17 standing alone, you agree with me that in 2016 for

REDACTED - NSC

REDACTED - NSC

14      A.   So if -- again, if 10 percent is a

15 reasonable conservative estimate of -- of the NIL

16 portion, the value portion of the broadcast

17 agreement, if it tried to pay more -- if it tried to

18 pay more, it would be violating -- potentially

19 violating the NCAA's rules on pay for performance.

20           And so, again, 10 percent is a reasonable

21 estimate of what that NIL value is worth.  My

22 assumption is those other rules are still in place

23 and that a conference or a school can't go above

24 those amounts or else they would be violating the

25 NCAA's rules.

1        Q.   So your report -- your opinion is that in

2   the but-for world, the NCAA would have a rule

3   prohibiting any payment for broadcast NIL above

4   10 percent of a conference's media revenues?

5        A.   In the but-for world?

6        Q.   Yes.

7        A.   No, I -- I've measured a reasonable

8   estimate of what those NIL values are.  I think the

9   rules would be -- what we've talked about earlier,

10  which was there wouldn't be rules on -- on limiting

11  payments for the use of NIL, but there are rules

12  on the -- on payments, say, above NIL, which seems

13  to be what you're -- you're talking about.

14       Q.   You believe payment -- there would still

15  be a rule on any payment that is not -- prohibiting

16  any payment that is not tied to NIL?

17       A.   Yes.

18       Q.   Okay.  And you said a few times that

19  10 percent is a reasonable estimate.

20            Do you have any other number that you've

21  calculated in your report besides 10 percent?

22       A.   I'd have to look at my report, but I don't

23  think so.  I know I talk about sort of 10 to

24  15 percent being -- being what Ed Desser, I think,

25  is finding as being reasonable.  And so I'm being

Page 75

1  conservative, right, in choosing 10 percent.

2       Q.   But you don't have any analysis that ties

3  to any number besides -- I'll even grant you for

4  purposes of this 10 to 15 percent?

5       A.   A different number than that?

6       Q.   Yes.

7       A.   For broadcast NIL?

8       Q.   For broadcast NIL.

9       A.   I don't think I have a different number,

10  no.  I mean, that's the reasonable royalty that I'm

11  using.

12       Q.   And you have not offered an opinion that

13  any number above 15 percent would be a reasonable

14  estimate; correct?

15       A.   So what I'm saying is it's a conservative

16  estimate.  You know, 10 to -- 10 percent, 10 to

17  15 percent is a reasonable conservative estimate.

18  I'm not using a different number than that.  I'm

19  not -- I don't -- yeah, that's -- that's the

20  analysis -- I think that's a fair comp to -- to use

21  in this case.

22       Q.   Right.  But I just want to make sure I get

23  an answer to the question I asked, which is:  You

24  have not offered an opinion that any percentage

25  above 15 percent would be a reasonable estimate of

1    NIL -- broadcast NIL value; correct?

2             MR. SIEGEL:  Asked and answered.

3             THE WITNESS:  Correct.  Based on the

4    analysis in this case and the knowledge and facts

5    and everything, 10 to 15 percent is a reasonable

6    estimate, yes.

7    BY MR. KILARU:

8        Q.   And not a number above 15 percent;

9    correct?

10       A.   Correct.

11       Q.   Okay.  And my understanding -- and you

12   should correct me if I'm wrong -- is that you

13   haven't run any models at any number besides

14   10 percent?

15            So, for example, you haven't created

16   Exhibit 12 based on a 15 percent number; correct?

17       A.   Correct.

18       Q.   Could we turn to paragraph 160 of your

19   report.  It's on page -- it starts on page 78.

20            MR. SIEGEL:  160?  Is that -- paragraph

21   160?

22            MR. KILARU:  Yes.

23            THE WITNESS:  (Witness complies.)

24   BY MR. KILARU:

25       Q.   Okay.  The first sentence there reads,

1    "Under competitive conditions, neither side of the

2    transaction has a compelling interest in ex-post

3    contracting"; correct?

4         A.   Yes.

5              MR. SIEGEL:  Mr. Kilaru, did you want to

6    give him time to read the full paragraph or just

7    start answering?

8              MR. KILARU:  I'm asking him about the

9    sentence.  But if he would like to read the full

10   paragraph, he can tell me.

11             THE WITNESS:  That's fine.  That -- that

12   is the first sentence.

13   BY MR. KILARU:

14        Q.   Okay.  And what you're getting at there is

15   that -- as I understand it -- players in your

16   opinion -- student athletes do not have an interest

17   in having NIL payments decided after enrollment;

18   correct?

19        A.   Let me read the rest of it --

20        Q.   Sure.

21        A.   -- because I think that's teeing up the

22   rest of the paragraph.

23             (Witness reviews document.)

24             Okay.  So what was your question?

25        Q.   Sure.  I think -- the two sides you refer

1  to there are student athletes and the conferences;

2  correct?

3      A.   Well, the student athlete and the school

4  that they're trying to attend.

5      Q.   Well, the payment's being made by the

6  conference; right?

7      A.   Right.  But what we see now is when the

8  student athletes sign away their NIL rights, they're

9  doing that typically through a -- a document

10 that's -- at least historically at the school level.

11         Now, I know some schools now are

12 requiring -- I know that's sort of changed, but --

13 at the school level.

14         So they're sort of -- they're in the

15 athlete labor market trying to choose a school;

16 right?  And then there's, you know, a sort of sign

17 here and this is -- you know, your scholarship and

18 da, da, da, da, da, da, and here, sign this other

19 document and this puts you into the group license

20 for the -- you know, for the broadcast agreement.

21     Q.   Right.  So let me break that down for a

22 second.

23         Today, the student athlete signs -- may or

24 may not sign an agreement with their institution

25 regarding an assignment of NIL rights; correct?

1        A.    I believe that's true, yes.

2        Q.    In your model, the conference is paying

3    the student athlete in relation to the NIL right in

4    a live telecast; correct?

5        A.    Yes.

6        Q.    Okay.  So in this section -- in this

7    paragraph of your report, it appears that you're

8    saying student athletes don't have an interest in

9    having their broadcast NIL payment be determined

10   after enrollment; correct?

11       A.    Yes.

12       Q.    And you're saying the conferences don't

13   have an interest in having broadcast payments be

14   determined after enrollment; correct?

15       A.    Yes.

16       Q.    Okay.  And I believe you say that's

17   because the school won't know in advance -- or the

18   conference, I should say, won't know in advance who

19   will earn certain amounts; correct?  Based on how

20   the season unfolds.

21       A.    It -- it creates sort of ex-post

22   contracting problems.  It creates hold-up --

23   potentially hold-up problems if it all happens

24   afterward.

25             So it's an equilibrium and since there's

1  competition across the conferences and equilibrium

2  is, hey, sign with us and you know what you're going

3  to get even if you get hurt or even if you don't

4  play much; right?

5          And so after the fact, if all of a sudden

6  players started appearing in games and the -- they

7  don't have the NIL rights yet, the broadcaster

8  doesn't, then that may create a problem for the

9  broadcaster.

10     Q.   Okay.  So from the conference's point of

11  view, they need to have every scholarship athlete

12  upfront; correct?

13     A.   Essentially anyone who's going to appear.

14     Q.   Well, in your model, you don't have any

15  broadcast NIL damages for certain people who appear

16  in the telecast.

17          We established that earlier; right?

18     A.   You mean for people who are not on full

19  scholarship?

20     Q.   Yes.

21     A.   So they're also giving up their NIL rights

22  now for zero; right?  They're often giving up their

23  athletic services rights for zero, right, if they

24  don't get a scholarship.

25     Q.   And in your model, they're also getting

1   zero, correct, for broadcast NIL?

2        A.   Well, I'm only measuring damages for the

3   class members.  So one way to do that is in the

4   model, they get zero, like they have already agreed

5   to now.  You know, they've already proven -- shown

6   that they're willing to -- to play without any sort

7   of scholarship or anything.

8             Or one could do a model where you used the

9   roster instead of the sort of 85 scholarship members

10  and do it exactly the same way.

11       Q.   Is there a reason why you didn't use the

12  roster method?

13       A.   I think -- I don't have a -- some of it is

14  I think access to information in terms of who's --

15  you know, how many people are on different rosters.

16            But, no, I don't have a -- this is, I

17  think, a fair and reasonable way to do it and I

18  think it fits with the economics of walk-ons, let's

19  call them walk-ons, players who don't have a

20  scholarship.  Their sort of position in the labor

21  market as being less -- you know, they're not able

22  to get a scholarship.

23       Q.   So if a kicker in your model in 2018 is

24  not on scholarship, why would they agree to give the

25  broadcaster their NIL for zero when they are going

Page 82

1    to appear in a game?

2        A.   So first of all, they already do agree to

3    that.

4        Q.   But I'm talking about in your but-for

5    world.

6        A.   Right.  But they've already -- they --

7    they've shown that they're willing to essentially

8    play for -- without compensation.  So that's --

9    that's one reason.

10        Q.   Isn't it true that in the current world,

11    every student athlete has shown that they're willing

12    to play without compensation for their broadcast

13    NIL?

14        A.   But they're not willing to play without

15    compensation.  So there's athletes who are choosing

16    among schools and some of those schools are offering

17    them, say, scholarships -- often full scholarships

18    in the sports that we're talking about because

19    they're encounter sports; right?

20        Q.   Let me make sure I understand this.

21             On the football team -- let's just take

22    two players.  A quarterback in 2018 who is starting

23    and a kicker in 2018 who has no scholarship but

24    plays in games.  Okay?  That's my hypothetical.

25    Correct?

1            Are you with me on that?

2       A.   Yes.

3       Q.   Okay.  Today, the quarterback is agreeing

4  to get paid zero for their broadcast NIL; correct?

5       A.   Right, but not for their athletic

6  services.

7       Q.   Understood.  But I'm just asking you about

8  broadcast NIL.

9       A.   But in the labor market, they're --

10  they're combined -- or they're -- they're, you know,

11  affiliated with each other.  It's all part of that

12  decision process.

13       Q.   Okay.

14       A.   So you're separating it out, which is

15  fine.  But I'm telling you that isn't the decision

16  that the athlete's making.

17       Q.   I'm just trying to understand why the

18  kicker is not demanding some share -- my kicker in

19  my hypothetical is not demanding or getting some

20  share of broadcast NIL if they're going to appear in

21  the broadcast and the broadcaster needs to be able

22  to show them.

23            MR. SIEGEL:  Objection; asked and

24  answered.

25            THE WITNESS:  So they're already showing

1  they're willing to play without sort of any

2  payment -- you know, without a scholarship or

3  anything.

4  BY MR. KILARU:

5      Q.   So it's your opinion that they would agree

6  to give their right in the broadcast to the

7  broadcaster for zero as opposed to holding out?

8      A.   I mean, they already do that.  And if my

9  model -- or in this model for class certification

10  purposes, they're also agreeing to do that.  One

11  could construct a model that looks at the rosters

12  instead and does some sort of, you know, adjustment

13  for that.

14     Q.   You haven't done that; right?

15     A.   No.

16     Q.   Okay.  Going back a minute just to the way

17  this sort of construct works.  Is it my

18  understanding that the NCAA rules that would remain

19  in place in the but-for world would permit a

20  different amount of broadcast NIL payment for each

21  conference?

22     A.    In the but-for world, different payments

23  could go to different athletes in different

24  conferences.  Just like in the exhibit.

25     Q.   Right.

1      A.   Is that --

2      Q.   So the NCAA rules would permit different

3 payments for student athletes depending on the

4 conference that they're in?

5      A.   Well, the NCAA -- if they lose this case,

6 they don't -- they can't control -- I mean, we see

7 that now.  I mean, look at the individual NIL

8 payments that athletes are getting.  It varies by

9 conference; right?

10           In some conferences, athletes are getting

11 more than in other conferences.  So it's sort of

12 consistent with how they're already treating the NIL

13 rules.

14      Q.   Is it your opinion that there's a

15 measurable variance in NIL payments in the current

16 market based on conferences?

17      A.   I don't know what you mean by that.

18      Q.   Well, you just said:  Right now we see

19 variances among conferences in third-party NIL

20 payments that are getting received.

21           I'm just asking:  Is it your opinion that

22 there's a significant variance by conference as

23 opposed to by school in the current market for

24 third-party NIL?

25           MR. SIEGEL:  Objection; compound and

1  misstates testimony.

2        THE WITNESS:  What I'm saying -- you asked

3  me about a rule in the but-for world.  And I'm

4  telling you the rule we have in the current world

5  allows for different payments across conferences.

6  BY MR. KILARU:

7        Q.   And across schools?

8        A.   Yes.

9        Q.   Okay.  You -- in your model, you would

10  agree that you've fully assigned out the 10 percent

11  of NIL value in -- per to each conference; correct?

12        A.   What do you mean "fully assigned out"?

13        Q.   If you haven't saved -- like every dollar

14  of the 10 percent is being allocated to class

15  members in your formula; correct?

16        A.   Yes.

17        Q.   That would include student athletes who

18  had a season-ending injury before a season in which

19  they played -- were slated to play; correct?

20        A.   Sorry.  This fell off.

21             It's not sticking very well.

22             I'm sorry.  Could you ask that again?

23        Q.   Of course.

24             That includes -- so you -- your model

25  assigns damages to student athletes who had a

1  season-ending injury before their first competition;

2  correct?

3       A.   If -- I mean, if they have a full

4  scholarship, yes.

5       Q.   Okay.  It assigns damages to a student

6  athlete on a full scholarship who was academically

7  ineligible for a season?

8       A.   If -- yeah, if they're part of the

9  roster -- if they're part of the roster and have a

10 full scholarship.

11      Q.   Okay.  It assigns damages to a student

12 athlete on full scholarship who transferred and had

13 to sit out a year before playing; correct?

14           MR. SIEGEL:  Objection; compound.

15 Incomplete hypothetical.

16           THE WITNESS:  I think if they're on a

17 roster and they have a scholarship, yes.

18 BY MR. KILARU:

19      Q.   So prior to 2021, you're aware that NCAA

20 rules required a -- just to give one example -- a

21 men's football player to sit out for a year after

22 transferring to a different institution; right?

23      A.   I don't know the exact year.  I know

24 that's sort of been the tradition.

25      Q.   Well, I'll just represent to you that in

1   2018, that was the rule.

2          So if a player transferred from Georgia to

3   Ohio State in that year, your model would calculate

4   them as getting damages for payments from Ohio State

5   even though they didn't play in the game; correct?

6          MR. SIEGEL:  Objection; incomplete

7   hypothetical.

8          THE WITNESS:  Wait.  They transferred from

9   which school to which school?

10  BY MR. KILARU:

11     Q.   Georgia to Ohio State.

12     A.   Okay.  Well, some -- as you know, some

13  athletes petition and they're allowed to play.  But

14  you're talking about an athlete who is not allowed

15  to play.

16          Yes, currently for purposes of class

17  certification to show that this model can work, that

18  player is -- is -- if they're in the class getting

19  assigned a payment for the use of their NIL.

20     Q.   Your model would assign -- assigns damages

21  to an individual on full scholarship who was

22  suspended for a year for failing a drug test, for

23  example?

24     A.   Again, as long as they meet the terms

25  of -- you know, they're on the roster, they're a

1  class -- they're a full GIA recipient during the

2  class, then, yes.

3      Q.   Okay.  So just to be clear, these four

4  scenarios that we've discussed, your model concludes

5  that the conference would make a payment to these

6  players even though they may not appear in a single

7  game or in a single telecast; correct?

8      A.   I mean, that -- for them and also for

9  someone else who just gets -- doesn't appear in a

10  telecast, but they happen -- for all sorts of

11  reasons, that they do get injured -- you know, for

12  whatever reason -- they don't end up -- so they

13  wouldn't be the only -- you know, some other

14  students, because they sign up ahead of time with an

15  expectation to play, and the school has an

16  expectation that they're going to play, that's why

17  they're -- that's why they receive the payment.

18      Q.   Now, in the competition that you're

19  modeling, you'd agree that the conferences would

20  like to be able to pay more to student athletes that

21  they want to recruit to the conference; correct?

22          MR. SIEGEL:  Objection; misstates

23  testimony.

24          But you can answer it.

25          THE WITNESS:  So the conferences want to

1  pay more or the schools?

2  BY MR. KILARU:

3      Q.   Well, you've modeled conference-level

4  competition; correct?

5      A.   Right.  But it's within the context of

6  schools competing for athletes.

7      Q.   You agree that the schools would want to

8  pay more for the athletes that they're recruiting;

9  correct?  Than other schools; correct?

10          MR. SIEGEL:  Objection; misstates

11  testimony.  Incomplete hypothetical.

12          THE WITNESS:  In general, the schools that

13  are at the maximum number of scholarships and

14  amount -- dollar amounts of scholarships, yeah,

15  they -- they've indicated based on their actions

16  that they want to pay the athletes more than they're

17  currently paying them.

18  BY MR. KILARU:

19      Q.   You'd agree that these schools or

20  conferences could pay more for the student athletes

21  who actually appear in a broadcast if they weren't

22  making payments to all the people we've just

23  discussed?

24      A.   What now?  They could pay more?  What --

25      Q.   Yes.

1        A.    The schools or the conferences?

2        Q.    Well, your model is about the conferences;

3   correct?

4        A.    I know, but it has the school competition

5   as part of it.

6        Q.    But the schools within a conference could

7   pay more to, for example, a five-star quarterback if

8   they were not making payments to a student athlete

9   who sat out for a drug test or an injury or academic

10   ineligibility who was on full scholarship; correct?

11            MR. SIEGEL:   Objection; beyond the scope

12   of his opinion.   Vague and ambiguous.

13            THE WITNESS:   I mean, I don't -- I think

14   the conferences would -- the way that the voting and

15   the membership works is that they wouldn't want one

16   of their schools to be able to pay a bunch more to

17   some athletes than the other schools.   And so...

18   BY MR. KILARU:

19        Q.    Can I turn your attention to Exhibit 12?

20        A     (Witness complies.)

21        Q.    This is the chart that we were talking

22   about a few minutes ago.   It's on page 94.

REDACTED - NSC

REDACTED - NSC

```
 9        A.    As the model is currently described for

10   the class certification purposes, yes.

11        Q.    Okay.

12        A.    But all of those are -- are amenable to --

13   if it would need be, amenable to adjustments to a

14   class-wide basis.

15        Q.    Do you sitting here today know how you'd

16   do that?  Do you have a methodology for doing that?

17        A.    I think the squad list note who is

18   eligible.  But as I sit here, I would have to look

19   at the information.  But it is a -- it is known --

20   it is knowable -- I don't want to be Don Rumsfeld.

21   It is knowable that you can determine which athletes

22   are eligible to a particular team or not.  The

23   school knows that.  The coaches know that.  The

24   athletes know that.  Right?  Typically, the

25   conferences know that.
```

Page 93

1           And so it's something that if it were to

2    be an issue, if it were important, it's something

3    that's -- you know, that's notable.

REDACTED - NSC

16        A.    I would have to think more about that.   I

17   feel like that doesn't fit sort of within the use of

18   the NIL.

19        Q.    Why is that?

20        A.    Because it's sort of implying that the

21   other athletes' NIL usage all of a sudden goes up a

22   little bit.  Like it doesn't feel like that's -- all

23   of a sudden it's going up above some threshold that

24   makes it look like it's pay for performance.

25            So I haven't thought -- I -- I don't

1   really have an answer, as I sit here, for your

2   hypothetical.

REDACTED - NSC

6           MR. SIEGEL:  Objection; incomplete

7   hypothetical.  Calls for speculation.

8           THE WITNESS:  I mean, if -- if in the --

9   if 10 percent is a reasonable estimate and it's not

10  conservative, in other words, it's right on, then in

11  this case, they wouldn't necessarily want to.  They

12  would be competing up to that spot.

13  BY MR. KILARU:

14      Q.   They're trying -- a school that's trying

15  to get a student athlete to come to their school

16  versus other schools would like to be able to make

17  the best offer possible; correct?

18      A.   But it has to fit within the NCAA rules.

19      Q.   Okay.  But as we talked about earlier, the

20  rules you're positing would prohibit compensation

21  being distributed above 10 percent; correct?

22          MR. SIEGEL:  Objection; misstates

23  testimony.

24          THE WITNESS:  Above for the use for their

25  NIL.  And I'm using 10 percent as a reasonable

1    estimate for the purposes of damages at this class

2    certification stage.

3              In a future world -- right? -- perhaps a

4    school or a conference is petitioning to the NCAA

5    trying to claim why it thinks it should be

6    11 percent.  That may happen in the future.  But I'm

7    using 10 percent as a reasonable estimate for the

8    past.

9    BY MR. KILARU:

10        Q.   I understand that.

11             But the 10 percent is a fixed amount for a

12   school in a conference; correct?  In your model.

13             So for 2018, there's a fixed amount,

14   10 percent for the Big 10; correct?

15        A.   For the purposes of measuring damages,

16   yes.

17        Q.   Yes.  And that's the only measure you put

18   in your report; correct?

19        A.   For broadcast?

20        Q.   For broadcast NIL, yes.

21        A.   I'm using 10 percent is the number I'm

22   using in my report, yes.

23        Q.   Okay.  Let me ask you about something

24   slightly different, which is you'd agree that an

25   alternative possibility would be for conferences to

1  enter into agreements that condition access to

2  broadcast NIL on certain benchmarks that a student

3  athlete has to achieve?

4       A.   I'm not following.  I'm sorry.

5       Q.   So, for example, the -- well, let me ask

6  you about a very specific example.

7            Could we give him Exhibit -- Tab 12.  This

8  will be Exhibit 2.

9                      (Exhibit 2 marked.)

10 BY MR. KILARU:

11      Q.   I'll give you a minute to read it, Doctor.

12 Let me know when you're ready.

13      A.   (Witness reviews document.)

14           I see.  Okay.

15      Q.   Okay.  Doctor, I take it you're familiar

16 with the Alston payment?

17      A.   Yeah.

18      Q.   A payment that can be made of up to $5,980

19 per semester?

20      A.   Yes.

21      Q.   Are you aware of any restriction that

22 precludes schools from making that payment to every

23 student athlete on a football roster?

24           MR. SIEGEL:  Objection; calls for a legal

25 conclusion.

1            THE WITNESS:  I'm not aware of that, no.

2    BY MR. KILARU:

3       Q.   Same question with basketball and women's

4    basketball, are you -- and men's basketball and

5    women's basketball, are you aware of any restriction

6    that would prevent a school from just making the

7    payment to everyone?

8            MR. SIEGEL:  Same objections.

9            THE WITNESS:  No, I'm not aware of that.

10   BY MR. KILARU:

11      Q.   This article that I think you've had a

12   chance to read, talks about how Wisconsin is

13   implementing that payment.

14           Would you agree with that?

15      A.   It describes an example of how it works in

16   Wisconsin, yes.

17      Q.   So if you look at the second page, the

18   article mentions that "The undergraduate graduation

19   award" -- this is in the third full paragraph -- "is

20   contingent upon completion of an undergraduate

21   degree.  Through this award, an athlete can earn up

22   to $2,500 per semester capped at 10 semesters."

23           Correct?

24      A.   I see that.

25      Q.   So assuming that that's a correct

1   statement of the policy, Wisconsin is only paying

2   that 25,000 -- that $2,500 a semester to student

3   athletes who complete their degree; correct?

4       A.   That's what it looks like here, yes.

5       Q.   Okay.  If you look at the next page,

6   there's a discussion about how student athletes can

7   earn $490 per semester by remaining academically

8   eligible and on an active roster; correct?

9       A.   I see that, yes.

10      Q.   But in order to get that payment --

11  assuming this is a correct statement of the

12  policy -- the student athlete has to both remain

13  eligible and on a roster for -- for the season;

14  correct?

15      A.   I see that.

16      Q.   Okay.  And you would agree with me that

17  you have not done any assessment of how institutions

18  are implementing the Alston payment; correct?

19          MR. SIEGEL:  Objection.

20          THE WITNESS:  I'm aware --

21          MR. SIEGEL:  Beyond the scope of his

22  opinions offered in this case.

23          THE WITNESS:  I'm aware that many schools

24  are doing it and they're doing it in ways similar to

25  this and that some are doing it differently.

Page 99

1   BY MR. KILARU:

2        Q.   Okay.  But have you done any assessment of

3   how the schools are actually doing it?

4             MR. SIEGEL:  Same objections; beyond the

5   scope of the opinions offered in this case.

6   BY MR. KILARU:

7        Q.   Doctor, do you believe that's beyond the

8   scope of your opinions in this case?

9        A.   I do.

10       Q.   Okay.  You haven't done any assessment of

11  that; correct?  Of how individual institutions are

12  providing the Alston payment to student athletes;

13  correct?

14       A.   Again, other than being aware that

15  different schools are doing it differently, I don't

16  know that you would determine that as an assessment

17  or not, but -- and sort of looking at the adoption

18  periods and things like that.

19       Q.   And to your knowledge, no -- none of --

20  those payments are not being made by conferences;

21  correct?

22       A.   Correct.  To my knowledge.

23       Q.   Okay.  I want to talk about the student

24  athlete side of this.

25            So you'd agree that --

1         MR. SIEGEL:  So this same document?

2         MR. KILARU:  No, no.  We're done with the

3    document.  You can set that aside.  Thank you.

4    Q.   You mentioned -- you mention in your

5    report that student athletes do not have any

6    incentive to try to get a different amount of

7    broadcast NIL prior to enrollment; correct?

8         MR. SIEGEL:  Objection; misstates

9    testimony.

10        THE WITNESS:  I don't know what you mean

11   by that.

12   BY MR. KILARU:

13   Q.   Okay.  So is it -- in your report -- or in

14   your analysis, do you believe that a five-star

15   quarterback recruit has the same incentive to argue

16   for an amount of broadcast NIL as a backup offensive

17   lineman going into the recruiting process?

18        MR. SIEGEL:  Vague and ambiguous as to

19   "incentive."

20        THE WITNESS:  I mean, they have similar

21   incentives that they have now, which is, hey, I'd

22   like a bigger scholarship, but that seems to be what

23   the offer is.  That seems to be the rules, you know,

24   at the conference level, if it's certain things or

25   at the NCAA level and at the school level.

1           MR. KILARU:  Right.

2           THE WITNESS:  So, of course, athletes are

3    trying to get the best deal for themselves not just

4    financially, though, for all the other pieces of

5    what the labor market's about.  So I think, you

6    know, these athletes all have incentives to try to

7    push for more money, sure.

8    BY MR. KILARU:

9        Q.   In your model --

10       A.   And some of them are doing that outside

11   of, you know, using individual NIL payments.

12       Q.   Right.  But in your model, just using

13   2018, for example, you're a student athlete coming

14   into a particular institution in that year, they're

15   not asking for a different amount of broadcast NIL

16   based on their own perceived value; correct?

17           MR. SIEGEL:  Objection; misstates the

18   report.  Misstates testimony.

19           THE WITNESS:  They're being offered the

20   conference's offer and they're making decisions

21   based on that and then, of course, all the other

22   aspects we've talked about that they make decisions

23   based on.

24   BY MR. KILARU:

25       Q.   And is it your view that a five-star

1    quarterback would have no incentive to argue for

2    more than their proportional share of 10 percent?

3         A.   If the conference has a rule, then that's

4    the rule.  I mean, of course, they're going to argue

5    for more of the other payments too.  They want a

6    larger Alston award, you know.  They want a higher

7    cost of attendance payment.  They want student

8    athlete opportunity funds and SAF funds; right?

9              And -- you know, I mean, they're going to

10   argue for what they're going to argue for.  I'm not

11   saying that that's going to change in the but-for

12   world.

13        Q.   If a student athlete transfers to a

14   different institution -- so let me give you an

15   example.

16             Are you familiar with a student athlete

17   named Caleb Williams?

18        A.   Yes.

19        Q.   He just won the Heisman trophy; right?

20        A.   Yes.

21        Q.   And he transferred from Oklahoma to the

22   University of Southern California before this last

23   season; right?

24        A.   Correct.

25        Q.   Now, in your model, Caleb Williams would

1  go to USC and he would just get his share of the

2  10 percent of NIL for the PAC 12's broadcast rights;

3  correct?

4      A.   Yes.

5      Q.   Your model does not account for the

6  possibility that he would hold out and say he's not

7  going to give over his broadcast rights and wants

8  more as a condition of transferring?

9      A.   So if the conference has a rule --

10  right? -- then that's what he's going to be paid.

11  And it's my opinion that the conferences -- it's the

12  internal economics of the conference such that they

13  would have a rule like that.  Especially for the

14  measurement of but-for world damages in the past.

15      Q.   Would you agree with me that

16  conferences -- the Power -- the conferences for whom

17  you've modeled damages could pay more to individual

18  student athletes if they had fewer teams?

19          MR. SIEGEL:  Objection; incomplete

20  hypothetical.

21          THE WITNESS:  I mean, it depends on their

22  broadcast agreements and those depend on various

23  things, including the number of teams and who the

24  teams are.

25          So it just -- I mean, all that depends

1   on -- the broadcast agreements are what they are.

2   So it doesn't matter whether -- you know, they're

3   fixed.

4           MR. SIEGEL:  Rakesh, after this line of

5   questioning, can we take a break?

6           MR. KILARU:  Yeah, I was just about to.

7           MS. PARSIGIAN:  I think lunch is coming at

8   noon, so if we wanted to --

9           MR. KILARU:  Could we just finish this up

10  and then take lunch?  Does that work?

11          MR. SIEGEL:  I'm fine.

12          MR. KILARU:  I'm not going to go -- I have

13  a reasonably short set of questions and then we can

14  take a break.

15      Q.   Just going back to my question:  You'd

16  agree with me that assuming the broadcast contracts

17  remain as they are, a conference could pay more to

18  individual student athletes if it had fewer teams;

19  correct?

20      A.   I guess that's just incomplete because

21  these contracts sometimes have contingencies on how

22  many teams are in the -- in the -- you know, in the

23  league.  So -- I mean, imagine, right, you have a

24  contract that pays a certain amount and it says,

25  well, if you lose two teams, then we're going to pay

1   less.

2          And so it just depends on -- on sort of

3   what's -- you know, what's the nature of that

4   contract.  So, I mean, your -- your example, I

5   think, is incomplete in that sense.

6      Q.   Okay.  Well, you'd agree with me that a

7   conference may be able to negotiate higher rights

8   fees if it has higher-profile teams within the

9   conference; correct?

10     A.   Yes.

11     Q.   Okay.  Your model does not account for any

12  shifts in conference membership in the but-for

13  world; correct?

14     A.   I don't think that's true because I'm

15  counting up the number of athletes each year in the

16  conference and that includes the number of schools

17  that are in the conference in that given year.

18          So if a team -- if a school left a

19  conference in the but-for world, I believe I'm

20  accounting for the fact that they left and moved to

21  a different conference.

22     Q.   All right.  Let me ask a slightly

23  different question or a slightly different version

24  of the question.

25          Your model does not account for any -- the

1   possibility that in the but-for world, conference

2   membership would be different than it actually is in

3   the actual world -- for that in the actual world;

4   correct?

5         A.   So in the but-for world, I use the same

6   actual conference membership that existed that's

7   been driven a lot by media contracts that existed in

8   the past.  And so those media contracts already

9   existed in the past and I'm essentially assuming

10  that they would be the same contracts with the same

11  set of schools in the same conferences.

12        Q.   Understood.  You'd agree with me that --

13  I'm just covering points we've talked about -- in

14  this but-for world, the conferences are now allowed

15  to pay and recruit student athletes with a share of

16  their broadcast agreements; correct?

17        A.   Some of the conferences are allowed to pay

18  the student athletes on behalf of their membership

19  who are recruiting the student athletes.

20        Q.   Right.  Based on the revenue from their

21  broadcast agreements; correct?

22        A.   Yes.

23        Q.   And as you said a minute ago, having more

24  attractive schools in your conference might give you

25  more revenue to be distributed to student athletes;

Page 107

1   correct?

2          A.    I mean, it -- it -- it could.   It sort of

3   depends:   Are some schools leaving that conference?

4   So there's fewer schools to divide the media

5   contract across?

6                You know, it sort of depends on the nature

7   of the bargain between the media companies and the

8   conferences.   But in general, we have the -- you

9   know, the contracts that we have.

10         Q.    Can I turn your attention to Exhibit 10 in

11   your report for a moment.

12                It's on page 92, I believe.

13         A.    Yes.

REDACTED - NSC

REDACTED - NSC

REDACTED - NSC

1        A.    Correct.

2        Q.    And that's something that you believe the

3   conferences would vote to implement and would have

4   adopted and those are the damages; correct?

5        A.    So as I say, these are a reasonable

6   estimate of the share of the broadcast revenues that

7   go to the various sports and then the royalty is

8   applied to those shares.  So as a reasonable measure

9   of damages in the past.

10        Q.    Right.  So just to go back to my question.

11   Your model says that these are the payments that the

12   conferences would have made between 2016 and 2021;

13   correct?

14        A.    Yes.

15             MR. KILARU:  Actually, that's a reasonable

16   place to break if you want to -- and it sounds like

17   we can do lunch.

18             THE VIDEOGRAPHER:  We're going off the

19   record.  The time is 11:52 a.m.

20        (Recess taken from 11:52 a.m. to 12:35 p.m.)

21             THE VIDEOGRAPHER:  Okay.  We're back on

22   the record.  The time is 12:35 p.m.

23   BY MR. KILARU:

24        Q.    Good afternoon, Doctor.

25        A.    Good afternoon.

1      Q.   Where we left off, we were discussing your

2  Exhibit 12 and the calculated damages for the

3  different classes in this case.

4           Are you familiar with Title IX?

5      A.   Yes.

6      Q.   Do you have an opinion on what it requires

7  institutions to do in terms of payments to student

8  athletes?

9      A.   Not specifically, but generally.

10     Q.   Okay.  What's that general opinion?

11     A.   That they have to offer -- they have to

12  have sort of fair offerings to women's sports if

13  they happen to be, you know, spending more on men's

14  sports.

15          MR. SIEGEL:  I'm going to object to the

16  extent it calls for a legal conclusion.  I didn't

17  get it in before, but --

18  BY MR. KILARU:

19     Q.   Have you tried to account for Title IX in

20  any of your damages models in this case?

21     A.   No.

22     Q.   Are you aware that there are state laws

23  governing -- some states have enacted laws governing

24  the use of name, image, and likeness by both

25  athletes and institutions?

1      A.   Yes.

2      Q.   Have you attempted to undertake any study

3  of those state laws?

4      A.   I'm generally aware of -- of them.  Some

5  states have them and some don't.  And there's a

6  decent amount of overlap in the different states,

7  but they're not always exactly the same.  Some

8  states have backed off of them since July 1 of 2021.

9           So, you know, I have a general

10  understanding of them in that sense.

11      Q.   Are you aware of whether any state laws

12  prohibit institutions from making broadcast NIL

13  payments to students?

14      A.   I am aware that some of the state laws

15  prohibit the -- the institutions from making

16  statements to the athletes.  So that would include,

17  I presume, but, again, I'm not a lawyer, so I don't

18  know how I would interpret those laws, but...

19      Q.   Have you attempted to account for those

20  laws in your model in any way?  Your broadcast NIL

21  damages model?

22      A.   Well, so -- I mean, these laws didn't go

23  into effect until July 1, 2021.  And my damages

24  models are all in the past before these laws went

25  into effect.

1          So they're not relevant to the past.  I

2   don't even think they would have gotten off the

3   ground because they wouldn't have needed to.  You

4   know, the impetus was when my business partner, Andy

5   Schwartz, gave a presentation to Nancy Skinner, a

6   state senator.  And then she decided to pass a

7   California law, and then the other states followed.

8          But she wouldn't have even been -- that

9   wouldn't have been even necessarily something that

10  she would have been interested in doing because if

11  the NIL payments were already in existence in the

12  but-for world, it just wouldn't have come up.

13      Q.   These laws, generally speaking, took

14  effect in 2021; correct?

15      A.   Yes.

16      Q.   Okay.  In your video game model, you

17  project what a video game would have looked like in

18  the past that did not -- that does not currently

19  exist; correct?  You project the revenues, for

20  example, for a college football game and a college

21  basketball game for years in which it did not exist;

22  correct?

23      A.   Yes.

24      Q.   Okay.  You have not attempted to account

25  for how if at all, state laws would have changed if

1    starting in 2016, institutions were permitted to

2    make broadcast NIL payments to student athletes;

3    correct?

4         A.   Video game?  You were just --

5         Q.   Broadcast NIL payments to --

6         A.   Okay.

7         Q.   -- student athletes.

8         A.   So I just stated my model accounts for

9    that because my assumption based on the evidence is

10   that I don't think those state laws would have been

11   in effect in 2016.

12        Q.   As I think you said in the -- one of the

13   earlier sessions, you would agree that student

14   athletes even within the -- the football and

15   basketball class are making different amounts of

16   money for their third -- in third-party NIL

17   transactions; correct?  From each other.

18        A.   You mean like a football player in the

19   same school as a basketball player?

20        Q.   Just generally speaking, football and

21   basketball players are making different amounts of

22   money in third-party NIL; correct?

23        A.   In third-party NIL.  Yeah, I mean,

24   different players are making different amounts, yes.

25        Q.   And does that suggest to you that

1  different players have different NIL values?

2      A.   Well, that's -- that's incomplete in the

3  sense that the value of someone's NIL depends on the

4  market -- the product -- right? -- that they're

5  having an NIL used in.  Right?

6           And endorsing a small company, the NIL

7  value for that person might be smaller than if they

8  were endorsing a large company which potentially has

9  higher sales if they were able to sort of, you know,

10  raise the bar in terms of the notoriety of that

11  business.

12           So the NIL values depend on all the other

13  situations, not just person to person.

14      Q.   Okay.  You -- your model does assume for

15  broadcast NIL that all scholarship athletes have the

16  same ability to get paid in the labor market;

17  correct?

18           MR. SIEGEL:  Objection; misstates

19  testimony.

20           THE WITNESS:  The same ability?  Is that

21  what you said?

22  BY MR. KILARU:

23      Q.   Yes.

24      A.   What do you mean by that?

25      Q.   How do you understand the question,

1    Doctor?  Every -- you assigned every student athlete

2    in the class a certain amount of damages going

3    backwards; correct?

4         A.   In the -- in the past.

5         Q.   Correct?

6         A.   Yes.

7         Q.   And so you assume, for example, that all

8    student athletes in the ACC have the same ability to

9    get paid in a given year in a given sport?

10        A.   For broadcast payments?

11        Q.   Yes.

12        A.   I mean, I'm just -- just the way you're

13   phrasing it is weird.  Let me just tell you what I

14   did and you can ask me if it's answering your

15   question or not -- or you can tell me if it's

16   answering your question.

17             The athletes on full scholarship in the

18   ACC for a given sport would be offering an NIL

19   royalty if they were to choose to play at a school

20   in that conference.  And that royalty would

21   be -- you know, it's administered, but it's also --

22   that rule about that is put in place by the

23   conference, subject to the NCAA's rules.

24             So two different athletes would get the

25   same payment if they have the same sport and they're

1  full scholarship and so forth.

2        You say same ability and I just don't know

3  what you mean by "ability."

4        Q.   In -- in your broadcast NIL model, the

5  starting quarterback at Ohio State would make the

6  same amount as the third-string offensive lineman at

7  Ohio State; correct?  In 2018, just to give --

8        A.   Assuming they have -- they're in the class

9  and so forth.

10        Q.   Is it your opinion that those two

11  individuals have the same value in the third-party

12  NIL market?

13        MR. SIEGEL:  Objection; calls for

14  speculation.  Incomplete hypothetical.

15        THE WITNESS:  So as I said, their value

16  in -- in third-party uses vary -- it varies

17  depending on how many of those uses they -- they get

18  involved with.

19        So in that sense, yes, they -- they would

20  have -- they would get different payments, I would

21  presume.  And we've seen that in the actual data

22  from third parties.

23  BY MR. KILARU:

24        Q.   Okay.  You'd agree that in the broadcast

25  NIL model, you are only looking at revenues from

1  broadcast contracts for live telecasts; correct?

2       A.   It's the -- it's from the broadcast

3  contracts that exist at the conference level.  To

4  the extent that those -- those are -- you know,

5  about live broadcasts.  But to the extent that

6  there's maybe a piece in there that says, we might

7  use clips and do various things, you know, to

8  promote various things, that's also built into that

9  that -- that -- that 10 percent payment.

10            Does that make sense?  So you were saying

11  live broadcast, but I mean, to the extent those

12  contracts include other pieces that aren't live

13  necessarily, those are built into that 10 percent

14  royalty.

15       Q.   Okay.  Do you believe those payments for

16  the use of a clip is a payment in the labor

17  market -- is part of the labor market?

18       A.   Well, this is the currency that the labor

19  market is using, just as if I'm a college athlete,

20  there's a certain amount -- you know, I'm allowed to

21  get paid or reimbursed for the cost of books; right?

22  But that's in the athlete labor market.  It's not in

23  the book market.

24            Or the -- you know, food is being covered

25  by the university as part of the process in the

1   athlete labor market.  We're not talking about the

2   food market; right?

3          So these are all just different forms of

4   currency that the labor market in college sports is

5   controlling.  College sports is controlling that

6   market; right?  That's the market.  But the currency

7   they use are different things like tuition or

8   internship payments or we saw with Wisconsin, you

9   know, Alston payments, for instance.

10     Q.   Could we turn to Exhibit 12 for a minute.

11  We were there before; just going back there.

12     A.   (Witness complies.)

13     Q.   You got there before me.

14          As we talked about earlier, the NCAA rule

15  that you believe would remain in place in the -- one

16  of the NCAA rules that would remain in place in the

17  but-for rule is the restriction on payment not for

18  NIL; correct?

19     A.   Right.

20     Q.   In other words, the 10 percent amount

21  is -- as you talked about earlier -- assuming it's

22  10 percent, as your analysis does -- you used that

23  amount because that's the amount of these contracts

24  that you believe is for NIL as opposed to for

25  something else; correct?

1        A.    Yes, 10 percent is a reasonable

2   conservative estimate of the use of the NIL in those

3   contracts --

4        Q.    Okay.

5        A.    -- and what would occur in a -- in a

6   competitive athlete labor market.

7        Q.    You do not model any NCAA rule that

8   further restricts how that 10 percent of broadcast

9   NIL revenue can be distributed; correct?

10        A.    Can you clarify that?

11        Q.    Yes.  Is there any other NCAA rule in your

12   model that restricts how conferences can distribute

13   that 10 percent of broadcast NIL to student

14   athletes?

15        A.    NCAA rule?

16        Q.    Yes.

17        A.    No.

18        Q.    Okay.  So in your model from the NCAA's

19   perspective, it would be okay if the PAC-12 decided

20   to have 60 scholarships and pay each of those

21   scholarship athletes 60 scholarships in football and

22   pay each of them more; correct?

23        A.    I don't -- I mean, I haven't thought of

24   that particular issue; that's why I am sort of

25   pausing to think about it.

1            Yes, I mean, my model to look into the

2   past for a reasonable estimate of damages for the

3   issues that are at question in this case that are

4   being challenged -- right?  I'm trying to change the

5   minimal number of -- of in the but-for world, but

6   similar to the actual world as possible.

7            And so, no, I have not tried to do a

8   separate calculation if the NCAA had that rule.  But

9   that doesn't change -- that doesn't change my

10  analysis.

11       Q.   Okay.  But just so I understand it, for

12  purposes of your model from the NCAA's perspective,

13  it would be permissible if a conference decided to

14  institute the rule I just mentioned for their

15  student athletes; correct?

16       A.   So the challenge is -- I'm just having to

17  walk through this.

18            The challenge is to the NIL rules.  And if

19  those rules are not in place, then the NCAA -- I

20  mean, I don't know what they're fine with -- that

21  doesn't violate the other NCAA rules.

22            Now, you can't offer 60 scholarships in

23  the PAC-12, as an example.  There's a minimum number

24  you have to offer.  And I think it's 76, but...

25       Q.   Let's use 76, then.

1          A.    If you can ask your question at 76, yes.

2          Q.    Yeah.

3          A.    So then -- and one reason they have these

4    sort of rules is to sort of maintain that -- that

5    investment that the -- that they expect the schools

6    to make in -- in the sport to be an individual one,

7    for instance, or at least to be in FBS football.

8          Q.    But that minimum is below the number that

9    you used in your report of, I believe, 85 for

10   football; correct?

11         A.    Right.  Because of the extreme competition

12   we see in the athlete labor market, right, the

13   schools are hitting up at the maximum.  They've not

14   hitting at the 76 in -- in the Power Five; right?   I

15   mean, you've seen that where all the schools are

16   really trying to use all those 85 scholarships

17   because they've competing to get, you know, as many

18   good athletes as they can.

19         Q.    Well, let's look at 2020 just to use one

20   example for men's football in your chart.  Okay?

REDACTED - NSC

REDACTED - NSC

12   haven't -- we don't have this updated information

13   about.

14            The COVID response and the differences in

15   those numbers might not be as large.  Just -- just

16   pointing that out as a side -- as a side note.

17            But -- so it sort of depends.  In the

18   current model, if I'm using all full scholarship

19   athletes, and if there are fewer of them, then that

20   10 percent number could be spread over more of them.

21            But in a -- in a model of the -- using the

22   full roster size, it wouldn't matter how many were

23   on scholarship or not.  So imagine there's a hundred

24   people on the roster.  You divide that out.  Whether

25   77 of them are in a class and they're getting paid,

Page 124

```
1    it's the same dollar amount whether there's 85 of

2    them.

3         Q.   How about let's just use a different year

4    to take out the COVID piece.
```

REDACTED - NSC

REDACTED - NSC

Page 126

REDACTED - NSC

```
 5        A.    So in the past, though, the number -- the

 6   athletes are there.   They have those scholarships.

 7   Like you're -- I don't know.   You're sort of

 8   changing the past.   The past already happened.

 9        Q.    You're also changing the past --

10        A.    Right.

11        Q.    -- in the damages amount.   So I'm trying

12   to understand.

13        A.    I'm changing -- I'm changing the one

14   amount that they could be paid for the use of their

15   NIL.
```

REDACTED - NSC

```
21        A.    So as I said before, if under the model I

22   propose in this class certification using evidence

23   that's common to the class, when you divide by the

24   number of -- of scholarship athletes, if there were

25   fewer of them in the denominator, then the number
```

1    overall grows.  That's just a mathematical outcome.

2        Q.    Right.

3        A.    If you decide to use just the full

4    roster -- saying, okay, the full roster, any of

5    those athletes who are eligible to play might end up

6    on television -- so then we sort of spread the

7    payment across them; we have a fixed payment -- it

8    doesn't matter how many athletes are -- are on

9    scholarship.

10            So either way, you know, are both

11   feasible --

12       Q.    Right.  Your model does not --

13       A.    -- methods of damages.

14       Q.    You did not do that.

15            Sorry.  Go ahead.

16       A.    No, I didn't do the latter one.

17       Q.    Okay.

18       A.    But I'm showing there are ways that you

19   could do that.

REDACTED - NSC

25       A.    Well, so here's -- this is what I was

1  talking about before.  They might want to pay, let's

2  say, 12 percent and then it becomes a question so in

3  the future, they may say, hey, NCAA, we think that

4  this is still the use of NIL, it's not paid for

5  performance, and who knows what would happen with

6  that; right?

7          But in the past, I'm assuming that -- that

8  any -- any amount above a reasonable estimate of the

9  use of NIL -- which is 10 percent in this case --

10  any amount above that would be -- would be payment

11  for athletic performance.  And so they wouldn't be

12  allowed to do that.

13      Q.   Right.  So going back to my question.

14          Your model concludes that leaving those

15  NCAA rules you mentioned hypothetically in place,

REDACTED - NSC

20          MR. SIEGEL:  Objection; asked and

21  answered.

22          THE WITNESS:  You're saying that they vote

23  like they're voting on the distribution method.  And

24  the -- the dollar amounts that they're able to vote

25  across are smaller.  Like, that they're able to sort

1    of allocate.

2           So it's not the fact that they're voting

3    on that that causes that.  It's the fact that a

4    reasonable estimate of their usage of NIL is

5    10 percent and another school -- another conference

6    happens to have higher broadcast dollars.

7    BY MR. KILARU:

8           Q.   Right.  You're --

9           A.   But they're not voting that the other

10   conference has higher broadcast dollars.  That's

11   just happening.  They're voting on -- on how they're

12   going to allocate it.

13          Q.   So -- but they are voting for a system in

14   which they make equal payments to every full

15   scholarship recipient; correct?

16          A.   Right.  And that's not what you said.  You

17   said that they vote on a payment that has them pay

REDACTED - NSC

21          So that's -- the average is still the

22   same.

23          Q.   In your model -- the -- I think we talked

24   about this earlier -- 10 percent of the revenue at

25   the conference level -- 10 percent of the revenues

1  that the current conference -- the conference

2  currently gets are being distributed through the

3  mechanism that you list out in Exhibit 12; correct?

4       A.   Yes.

5       Q.   So that means that there's 90 percent of

6  the current revenue system -- current revenue stream

7  that's available to these conferences; correct?  For

8  other purposes?

9       A.   Yeah, I mean, they distribute them right

10 now to the schools, you know, generally; right?

11 They may cover their conference costs and things

12 like that.

13           But they generally distribute to make way

14 to all the existing schools.  And so all that would

15 change is they would just carve out 10 percent of

16 that and distribute it to the athletes.

17      Q.   To the football and basketball athletes;

18 correct?

19      A.   Yes.

20      Q.   Okay.  You haven't attempted to model what

21 effects there would be on other athletes at these

22 institutions as a result of that 10 percent

23 reduction; correct?

24      A.   No.

25      Q.   Can I turn your attention to -- give me a

1    second to catch up to myself.

2           Paragraph 166 of your report.

3       A.   166?

4       Q.   Yes.  Give you a second to read that

5    paragraph.

6       A.   (Witness reviews document.)

7            Okay.

8       Q.   Okay.  You say here that you have reviewed

9    Mr. Desser's report and, quote, "understand he

REDACTED - NSC

15      A.   Yes.

16      Q.   Okay.  You -- you have not done any

17   independent work to verify that particular

18   statement, have you?

REDACTED - NSC

23           So I'm -- you know, I'm not interpreting

24   what they're saying.  But -- but I have -- I mean,

25   this is something that I've known, you know, is

1   typically the case -- or is sometimes the case.

2       Q.   Are you relying on him for that -- are you

3   relying on Mr. Desser's report for the statement I

4   read aloud?

5       A.   Yes, generally.

6       Q.   Okay.  Do you believe you would be able to

7   offer that same opinion if Mr. Desser had not

8   submitted a report in this case?

9            MR. SIEGEL:  Objection; calls for

10  speculation.

11           But you can answer.

12           THE WITNESS:  Not at this stage.  I would

13  have to do some more to form -- you know, to put

14  more meat on that opinion, if that's a way to say

15  it.

16  BY MR. KILARU:

17      Q.   So one thing we haven't spent a lot of

18  time talking about today is what you called the

19  multisport allocation factor --

20      A.   Right.

21      Q.   -- is that correct?

22           Okay.  And that's the split in how you --

23  in how that 10 percent of broadcast NIL money goes

24  to men's basketball, women's basketball, and

25  football student athletes; correct?

1          A.    Yes.

2          Q.    What are the bases for coming to that --

3     what are your bases for coming to that 75/15/5

4     split?

5          A.    So one basis, piece of evidence is

6     Mr. Desser himself and his expertise in his analysis

7     that he performed.

REDACTED - NSC

11              But then also looking at the financial

12    data that we see at the conference level and school

13    level, sort of how those revenues are generated by

14    those different sports and then also some on how

15    those revenues are spent on some of the inputs.

REDACTED - NSC

18              Can we get that one.  It's Tab 16.  And

19    before I do, let me ask your understanding that what

20    you're including in the math is money -- is revenues

21    for live and delayed broadcast revenues; correct?

22              So when I say "live," I mean a live

23    telecast and delayed clips of that game, for

24    example, or a rebroadcast; correct?

25          A.    It's really whatever is in those contracts

1    as they currently exist.  So, I mean, some of

2    them -- I know they're all live.  I don't know if

3    every single one of them has something about the

4    rebroadcast of it.  But they tend to.  Because that

5    tends to be part of the -- part of the ecosystem

6    nowadays.

7         Q.   Do you believe there's anything besides

8    the rebroadcast that would be counted in the

9    revenues you were trying to distribute out?

10        A.   I can't think of anything as I sit here,

11   no.

REDACTED - NSC

20        Q.   Okay.

21        A.   I'm trying to find the page that I

22   reference it.  I think that would probably help me

23   answer your question better.

24             MR. KILARU:  Yeah.  Let me try and find

25   that as well.

1              All right.  Let me give you Exhibit 3.

2                          (Exhibit 3 marked.)

3    BY MR. KILARU:

4        Q.   So for a moment, let me ask you to set

5    this document aside and can you just look at

6    paragraph 175 of your report?

7        A.   Okay.

8        Q.   You say -- you list the three sources, you

REDACTED - NSC

REDACTED - NSC

REDACTED - NSC

REDACTED - NSC

REDACTED - NSC

16   BY MR. KILARU:

REDACTED - NSC

Page 140

REDACTED - NSC

 9        Q.    You can set that aside.

10              So now I'd like to talk about the

11    financial data you mentioned.  I think this would

12    be -- Exhibit 8 in your report on page 89 for a

13    minute.

14        A.    Okay.

15        Q.    So you looked at data that's called the --

REDACTED - Highly Confidential – Counsel Only

REDACTED - Highly Confidential – Counsel Only

14        Q.    And then in your modeling, you assign

15   men's football 75 percent; correct?

16        A.    Well, there's a -- it's 75/15/5 -- and 5.

17   So it's 80 percent of the 75, 15, and 5.

18              Does that make sense?

19        Q.    Right.   So the bottom-line number you used

20   is 75 percent of the revenues for men's football;

21   correct?

22        A.    And that's -- if I -- if you do Exhibit 8A

23   and you put in "other," then you get close to 75.

24              MR. KILARU:  Well, you read my mind.   I

25   think we have that.   Can we do Exhibit 5.

1            I'm sorry.  It will be Exhibit 5.  But you

2      know what I'm saying.  That one, yes.  That's this

3      one.

4                          (Exhibit 5 marked.)

5      BY MR. KILARU:

6          Q.   Okay.  So Exhibit 5 is -- I'll represent

7      to you that it follows your methodology and what we

REDACTED - Highly Confidential – Counsel Only



REDACTED - Highly Confidential – Counsel Only

19      Q.   Okay.  You apply the 75 -- in your model,

20   you apply -- the 75/15/5 split applies in every one

21   of the conferences; correct?

22      A.   Yes.

23           MR. KILARU:  I'm going to hand you

24   Exhibit 6.

25                          (Exhibit 6 marked.)

1   BY MR. KILARU:

REDACTED - Highly Confidential – Counsel Only

23        Q.   Okay.  What was your basis for concluding

24   that all of these conferences will come to the same

25   revenue split in the but-for world between the three

1    sports?

2         A.   So as I said before, this -- this

3    information is very helpful, but it's not

4    dispositive because it's not exactly broadcast

5    revenues; right?  So it's a useful input into that.

6              And then Mr. Desser and the other

7    contracts help provide more context because those

8    are directly related to broadcast revenue.

9              So, again, I think a 75/15/5 split is

10   entirely reasonable.  One could still do the

11   calculations using evidence common to the class with

12   a different split in a different conference.  But

13   I'm trying to estimate a reasonable measure of

14   damages in the past in a but-for world in a world

15   that's never going to happen because it's in the

16   past; right?

17             So I'm just trying to get to a reasonable

18   and reliable estimate.  And so I think the 75/15/5

19   split is both reasonable and reliable.

20        Q.   Okay.  But you're trying to model what the

21   conferences would have paid in the but-for world;

22   correct?

23        A.   Yes.

REDACTED - Highly Confidential – Counsel Only

REDACTED - Highly Confidential – Counsel Only

```
 7        Q.    And other than the --
 8        A.    Like another expert, Mr. Desser, who is
 9    literally a media expert who is focused on -- on
10    this sort of topic.
11        Q.    And other than Mr. Desser, your only
12    source that involves the defendant conferences is
```

REDACTED - NSC

1    earlier; correct?

2        A.   And the MFRS data.

3        Q.   Right.  Okay.

4             You'd agree with me that the policies for

5    a conference are set by a vote by the conference's

6    membership right?

7        A.   Generally, yes.

8        Q.   So without getting into the specifics --

9    because it may vary in the SEC, for example, all the

10   schools in the SEC would have to vote and whatever

11   came out of that process would be the conference

12   rule; correct?

13       A.   Again, that's generally how big -- big

14   changes occur in these conferences.

15            MR. KILARU:  Okay.  I'd like to present

16   you with one last cut of the MFRS data, which

17   involves looking by school as opposed to by

18   conference.

19            So I guess this will be Exhibit 7.

20                      (Exhibit 7 marked.)

21   BY MR. KILARU:

REDACTED - Highly Confidential – Counsel Only

REDACTED - Highly Confidential – Counsel Only

```
 7              If you look at -- in your model, each of

 8   the conference's members are ultimately going to

 9   vote on this -- would have voted for the same

10   policy, which is to distribute their revenues, their

11   10 percent of broadcast revenue equally to men's

12   football, basketball -- let me try that again.

13              In your model, each of the five

14   conferences would have agreed to vote on the --

15   basically the exact same distribution formula;

16   correct?

17        A.   I think that's a reasonable estimate, yes.

18        Q.   Okay.  So they would each start with

19   10 percent and they would allocate 75 percent of

20   that to football; correct?

21        A.   Yes.

22        Q.   And distribute that equally to the

23   football scholarship athletes; correct?

24        A.   Yes.  Again, this is an estimate of the

25   past for damages purposes, yes.
```

REDACTED - Highly Confidential – Counsel Only

REDACTED - Highly Confidential – Counsel Only

13       Q.    Okay.  And you have not reviewed the ACC's

14  contracts to determine how those contracts -- or any

15  of ACC's financial statements to determine if the

16  conference has any different view of how revenues

17  are allocated per sport?

18       A.    Not during that time period.  I recall

19  earlier ACC media con- -- the documents that they

20  put out because they're non-profits.  I forgot the

21  names of those documents.

22            But some of those -- for the ACC, broke

23  out some more information than most of the other

24  conferences did.  But for the purposes of the

25  analysis that I did, no, I did not go back and

1    review that information.

2         Q.   Okay.  You can set that to the side,

3    Doctor.

4              Turning back to the split in

5    Exhibit 12 -- so let's go back to page 94.

6         A    (Witness complies.)

7         Q.   You've allocated 75 percent of the

8    revenues to football; correct?

9         A.   Yes.

10        Q.   Okay.  Do you believe that a certain --

11   that a student athlete in an institution that

12   derives 90 percent of its revenues from football

13   would have an incentive to argue that their damages

14   should actually be 90 percent of the contract for a

15   given year?

16        A.   I mean, I don't know what their -- I don't

17   have an opinion on their incentive to argue

18   something.  Like it doesn't -- my model doesn't

19   require me to understand their incentive to argue

20   for something.

21        Q.   So you haven't considered whether what the

22   incentives would be for men's football players to --

23   what share they would argue for of these -- of these

24   revenues, what their incentives would be to argue

25   for?

Page 152

1      A.   Again, I don't have an opinion on their

2   incentives to argue.

3      Q.   Okay.

4      A.   In a but-for world that's in the past that

5   doesn't actually -- that won't -- you know, that

6   doesn't exist.  We're just trying to estimate.

7      Q.   Right.  But the class consists of all

8   men's football players who received a full

9   scholarship at least between 2016 and 2021; correct?

10     A.   Yes.

11     Q.   And you're assigning to every single one

12  of those class members a 75-percent split; correct?

13     A.   Of the broadcast revenue, yes.

14     Q.   You're assigning to every single one of

15  the men's basketball players in the class a

16  15-percent split; correct?

17     A.   Yes.  Again, as I said, as an entirely

18  reasonable estimate of how the -- those media

19  contracts are sort of using their NIL and generating

20  value from their NIL.

21     Q.   And is it your opinion that if you took

22  all the men's football athletes together, they would

23  believe that 75 percent is the right number?

24          MR. SIEGEL:  Objection; calls for

25  speculation.

1             THE WITNESS:  I mean, again, I'm -- I

2    don't know what they would believe.  It's just in

3    this case, they're all injured and they're all

4    better off receiving 75 percent than nothing.

5             And that's sort of the alternative --

6    right? -- is nothing.  I mean, someone could build

7    this same model and use 76 percent and 14 percent

8    and that would also be a reasonable estimate using

9    evidence that's common to the class.

10   BY MR. KILARU:

11        Q.   But in your view, the only models you

12   would construct would involve the fixed percentage

13   of revenues for all of the football players;

14   correct?  Whether it was 75, 76, or something else.

15        A.   I mean, as I sit here today in this --

16   beginnings of a class certification stage, yes, I

17   think that's an entirely reasonable model.  It

18   doesn't mean that there aren't other reasonable

19   models that people might be able to put forward.

20        Q.   Okay.  But you haven't offered any other

21   models; correct?

22        A.   No.

23        Q.   And sitting here today, is it your opinion

24   that any other model would be reasonable?

25             MR. SIEGEL:  Objection; vague and

1  ambiguous.

2          THE WITNESS:  I don't know.  I would have

3  to see what that is.  But I think this is -- is a

4  very reasonable estimate of but-for damages.

5  BY MR. KILARU:

6      Q.   Do you have an opinion on whether every

7  men's basketball player in the class would agree

8  that 15 percent is the right amount of the damages

9  that they should be receiving?

10         MR. SIEGEL:  Objection; calls for

11  speculation.

12         THE WITNESS:  I do not have an opinion on

13  that.

14  BY MR. KILARU:

15     Q.   Do you have an opinion on whether every

16  women's basketball player in the class would agree

17  that 5 percent is the right amount of damages they

18  should be receiving?

19         MR. SIEGEL:  Same objection.

20         THE WITNESS:  I do not have an opinion on

21  that.

22  BY MR. KILARU:

23     Q.   And do you have an opinion on whether

24  every other student athlete would agree that

25  5 percent is the right notional allocation for their

1   group?

2       A.   I don't.

3           MR. SIEGEL:  Same objection and outside

4   the scope of his testimony.

5           THE WITNESS:  I don't have an opinion on

6   that.

7   BY MR. KILARU:

8       Q.   And you haven't attempted to calculate

9   broadcast damages for any other sport; correct?

10      A.   Outside of football and men's and women's

11  basketball?

12      Q.   Yes.

13      A.   Correct.

14      Q.   Now, in your model, there's a 5 percent

15  that's allocated to every other sport; correct?

16      A.   Yes.

17      Q.   Can you think of any economic reason why

18  it's -- why you haven't modeled that 5 percent?  And

19  how it will be allocated to the other sports?

20          MR. SIEGEL:  Objection; vague and

21  ambiguous.  Outside the scope of his opinion.

22          THE WITNESS:  I don't have an opinion

23  on -- an economic reason why someone could or

24  couldn't create a model for the -- for the other

25  sports.

1   BY MR. KILARU:

REDACTED - NSC

REDACTED - NSC

REDACTED - NSC

 2  players -- there's fewer of them, they make more

 3  money on average than an NFL player because there's

 4  more of them.  It's just the nature of the sport

 5  itself.

 6        Q.   So you --

 7        A.   So when they sign group license agreements

 8  in the NBA, in the NFL, there's fewer athletes that

 9  think 450 is going out and marketing when they get

10  these group licensing deals.

11             And so a typical payment to an NBA player

12  from its union through these group licenses is

13  higher than -- than even what a typical payment in

14  the NFL players association would get, even a, you

15  know, future Hall-Of-Fame player in the NFL.

16             So this is entirely consistent with what

17  we see in the -- in the analogous situations.

18        Q.   Right.  But just to be clear, in the NFL,

19  it's the NFL players who are -- the NFL players

20  association is negotiating with the NFL; correct?

21        A.   For some things, yes.

22        Q.   And the -- for compensation; correct?

23        A.   Yes, but not --

24        Q.   In the --

25             MR. SIEGEL:  Let me object.  Vague and

Page 159

1    ambiguous.   Salary -- in terms of what you mean by

2    "salary," vague and ambiguous.

3    BY MR. KILARU:

4        Q.    Let me ask you a slightly different

5    question, Doctor, which is in your model, the same

6    conference is deciding the payments for football and

7    basketball players; correct?

8        A.    Yes.

9        Q.    That's not the case in professional

10   sports; right?

11       A.    Correct.

REDACTED - NSC

REDACTED - NSC

13              MR. KILARU:  Okay.

14              How long have we been going?

15              MR. WARREN:  Exactly an hour.

16              MR. KILARU:  Okay.  This is sort of a

17       natural stopping point so I think we'll take a

18       break.

19              THE VIDEOGRAPHER:  We're going off the

20       record.  The time is 1:38 p.m.

21          (Recess taken from 1:18 p.m. to 2:00 p.m.)

22              THE VIDEOGRAPHER:  Okay.  We're back on

23       the record.  The time is 2:00 p.m.

24       BY MR. KILARU:

25          Q.   All right.  Doctor, I just wanted to

1   follow up on a few things regarding the broadcast

2   group and then I think we'll move on from that.

3           First, you mentioned earlier that in pro

4   sports, the NBA players make more money on average

5   than an NFL player because there's more of them.

6           You said that?

7       A.   More NFL players.

8       Q.   Right.  So the NBA players, I'm just

9   trying to read from the real time, there's fewer of

10  them, they make more money on average than an NFL

11  player, I guess, because there is more of them --

12  more NFL players; correct?

13      A.   Yes.

14      Q.   Okay.  You would agree with me, though,

15  that for some of the examples I used, Patrick

16  Mahomes is making more today than the 12th man on a

17  random professional basketball team in Texas; right?

18      A.   Yeah, but he wasn't at Texas Tech.  He was

19  making the same; right?

20      Q.   Right.  Your model would have him make

21  less, though, right, for just broadcast NIL?

22      A.   Right.

23      Q.   Just to fully understand what you did in

24  the damages calculation, you're modeling what the

25  competitive response would be of the conferences if

1    there were no NIL rules starting in 2016; correct?

2         A.   The model begins in 2016, yeah, under the

3    assumption that -- that, you know, the plaintiffs

4    win their claims or -- that -- right.  There

5    wouldn't have been NIL rules in 2016, yeah.

6         Q.   So Exhibit 12, for example, that's the

7    result of what the conferences would have voted on

8    in the but-for -- what the rules the conferences

9    would have voted on in the but-for world --

10        A.   Right.

11        Q.   -- between 2016 and 2021; correct?

12        A.   Yes.

13        Q.   Is it your belief -- I think it may be

14   based on your conclusions here -- that all

15   scholarship players in football in a given

16   conference have the same value in the labor market?

17        A.   So you keep saying "value," but that's --

18   I'm looking at what an equilibrium price would be;

19   right?

20             And so all of the scholarship players in a

21   given conference -- right? -- we see when they go

22   out into the individual NIL market, they're able

23   to -- to basically come up with different payments;

24   right?  Sometimes the payments are the same.  I

25   mean, you see lots of these sort of group licenses

1   that pay every tight end, you know, $10,000 or all

2   the linemen on this team a certain amount.

3           But I'm talking about what happens in a --

4   in a -- the broadcaster video game market that's --

5   that's a group license.  So the player's individual

6   value is not the outcome of an -- of the

7   equilibrium -- of the equilibrium competitive

8   market.

9   Q.   So you believe that the equilibrium price

10  does not correspond to the individual value of each

11  players [sic]?

12          MR. SIEGEL:  Individual -- vague and

13  ambiguous.  Asked and answered.  The term

14  "individual value."

15          THE WITNESS:  I'm saying the price

16  corresponds to what the marketplace would pay

17  because of all of the reasons that I have listed in

18  the report and we have talked about, the uncertainty

19  of the athletes coming out of high school; the

20  analogies to NFL and NBA license agreements, which

21  again, have different players in the NFL and

22  different players in the NBA; right?

23          There's a Patrick Mahomes in the NFL and

24  there's a third string lineman and they're in a

25  group licensing deal that uses media and pays him

1   the same amount.

2   BY MR. KILARU:

3       Q.   But just to go back on something you said

4   earlier, I just want to make clear I have it.

5           You said that the player's individual

6   value is not the outcome of the equilibrium

7   competitive market; correct?

8       A.   I'm saying you're asking me a different

9   question than the modeling of the broadcast -- the

10  results in the athlete labor market from the

11  broadcast NIL and from the video game NIL as an

12  example.

13      Q.   Is it your understanding that in

14  professional football and basketball, the -- every

15  player gets the same amount for their NIL and live

16  game broadcasts?

17      A.   I mean, it's part of their collective

18  bargaining -- it's part of the AR, the all revenue

19  that they use to -- to essentially collectively

20  negotiate with the NBA.

21      Q.   Well, the AR is not distributed evenly to

22  all players; correct?

23      A.   Different players in the NBA get different

24  salaries, yes.

25      Q.   Same in the NFL; right?

1      A.   Yes.

2      Q.   So is it your testimony -- I just want to

3  understand it.

4           Is it your testimony that professional

5  football and basketball, every player receives the

6  same compensation for the use of their NIL in

7  live-game broadcasts?

8           MR. SIEGEL:  Objection; asked and

9  answered.

10          THE WITNESS:  I don't -- I don't really

11  have an opinion right now on that.  I mean, I'm

12  thinking -- I wasn't -- that wasn't the focus of

13  my -- of the scope of my analysis in this case.

14  BY MR. KILARU:

15      Q.   Right.  But you're -- one of the

16  yardsticks you're using here are professional

17  football and basketball group licenses; correct?

18      A.   Group licenses, yes.

19      Q.   Okay.  And what I'm asking you about are

20  the group licenses that professional football and

21  basketball players grant for the use of their NIL

22  and live-game broadcasts.

23          You agree that has to be a part of your

24  yardstick; correct?

25      A.   Well, I'm looking at the --

1          MR. SIEGEL:  Objection; compound.  I think

2     that was two different questions you asked.

3          THE WITNESS:  The -- I'm looking at the

4     group licenses that are not part of the negotiation

5     with the NBA, which looks at a share of ticket sales

6     and sponsorship revenue.  And all -- and that's not

7     a group license; that's a collective bargaining

8     outcome.

9          So I'm looking at the group licenses, you

10    know, for -- for video games and for video clips,

11    you know, special DVDs with, you know, highlights

12    and things like that.

13    BY MR. KILARU:

14    Q.   So you're not looking at your yardstick at

15    the group license for live-game broadcast

16    participation; correct?

17          MR. SIEGEL:  Assumes facts not in evidence

18    that there is such a group license under the

19    understanding of any of us.

20          THE WITNESS:  Would you ask the question

21    again.

22    BY MR. KILARU:

23    Q.   Yes.  I'll actually ask a different

24    question.

25          You're not looking at your yardstick at

1  any licensing for -- at any -- you're not looking as

2  a yardstick for what -- you're not using it as a

3  yardstick what professional football and basketball

4  players get paid, if anything, for the use of their

5  NIL in live-game broadcasts?

6       A.   I believe that's correct.

7       Q.   And do you have an opinion as to whether

8  or not the value of every professional football

9  player's NIL is -- in a live-game broadcast is the

10 same?

11      A.   I mean, I just haven't thought about that

12 for this -- like within the scope of this.  So I

13 guess I don't have an opinion on that.

14      Q.   Okay.  Would you agree with me that you --

15 a team will not know -- a school will not know what

16 the revenues are for a given sport until -- let's

17 just talk about football and basketball for a

18 minute.

19           Would you agree that a team cannot know --

20 or a conference cannot know what the revenues are

21 for that sport until the end of the season at the

22 earliest?

23      A.   All the revenues?

24      Q.   Yes.

25      A.   Some of them, they'll have a better sense

1   of and they'll have forecasts that are fairly

2   accurate.  But, yes, they don't know how many

3   tickets they're going to sell or sponsorships

4   they're going to sell, for instance.

5       Q.   You'd also agree that part of the amounts

6   that get paid for broadcast are an amount for every

7   game your conference appears in in the NCAA

8   tournament, for example; right?

9       A.   So those payments are lagged typically and

10  you sort of earn points over a fairly decent

11  period -- I don't want to guess how many years --

12  but it's four years, five years, something like

13  that.  And those points add up and so you know sort

14  of what points you've already earned in the past.

15          But -- so that's -- yeah, you don't know

16  how well your team's going to play when you get into

17  the tournament and how many points you earned for

18  the year.  But the points are spread out over time.

19      Q.   Same with football.  You don't know how

20  much revenue you're going to get until you know

21  whether you're going to be in a particular bowl game

22  or the college football playoff; correct?

23      A.   Generally, yes, although, again, the

24  conferences often have contracts with certain bowl

25  games and things like that so they're sort of

1    guaranteed certain amounts of revenue.  It's more

2    predictable than, I think, maybe either you think or

3    than you're sort of characterizing.

4        Q.   Okay.  But going into the 2018 season, for

5    example, a conference would not know what the total

6    revenues are going to be for 2018 for broadcast?

7        A.   For broadcast?

8        Q.   Yes.

9        A.   Well, for their main source of revenue for

10   a major conference, they should know essentially

11   what they're going to get from their broadcast

12   contract for the conference regular season elements.

13       Q.   I'm just trying to --

14       A.   But then, of course, as you said, if

15   there's football playoffs and basketball playoffs,

16   right, that could change some of those amounts.

17            But, you know, the bulk of their contracts

18   are often with their conference broadcast partners

19   and those are -- those are spelled out, you know,

20   ahead of time.  They sign these contracts ahead of

21   time.

22       Q.   I'm just trying to understand how this --

23   this model would work in practice.

24            So you'd agree with me that under your

25   model at the beginning of each season, at the

1   beginning of each recruiting cycle, the conferences

2   are going to have a number that they want to

3   promise -- that they want their schools to be able

4   to promise to a student athlete; correct?

5        A.   Like a -- what do you mean by "a number"?

6   Give me an example.

7        Q.   I mean, using your chart, Exhibit 12,

8   going into the 2018 season, the number would be

9   whatever is listed for 2018 football; correct?

10       A.   Well, I think what you see -- think about

11  what happens with -- with video games; right?  The

12  athletes -- say we already have this happening in

13  the pros; right?  The athletes receive -- the union

14  receives those payments from the video game

15  companies usually quarterly, but after the -- after

16  the fact.  The sales have already been made.

17            The athletes are making a deal on a

18  certain percentage.  Sometimes there's a -- you

19  know, there's a guaranteed payment; right?

20            And so one can imagine a school saying,

21  look, this is what the payout was last year.  You

22  guys get a certain percentage.  You know, we expect

23  it to be similar, probably larger because most of

24  these contracts have escalations in them.

25            So I would think that -- that that's one

1  practical way that it could happen in the -- again,

2  the but-for world is the past.  So it doesn't

3  matter.  If the plaintiffs win this case, then

4  checks are made or whatever.  You know, that doesn't

5  matter.

6          In the future-future, in the real world,

7  right? -- they could be offering that -- that

8  percentage and then the athletes would -- you know,

9  it's -- okay, I'll sign onto that.  And then they

10  sort of get the payment once the amount is known.

11     Q.   Okay.  So the offer to a student athlete

12  would be just the percentage without a -- rather

13  than a specific amount?

14     A.   That's one way you could do it.  Again, in

15  the -- not -- not the past, but in the future, one

16  could imagine, you know, a dollar amount being on

17  the table in a sense and making sure that, hey, it's

18  the same as last year.  So we know it doesn't

19  violate NCAA rules on pay for performance so here's

20  an amount, but there might be more.

21          You know, one can imagine different ways

22  if the athlete was sort of like, well, what's that

23  number going to look like?  Well, you tell him,

24  well, here's what we got last year; right?

25     Q.   All of these offers are tied to the

Page 172

1    broadcast contracts for a conference; correct?

2          A.    And other -- other broadcast contracts,

3    but, yes.

4          Q.    Right.  And are you aware of whether those

5    contracts have confidentiality provisions?

6          A.    On the dollar amounts?

7          Q.    Yes.

8          A.    I think generally they do, yes.

9          Q.    Okay.  So -- and are you aware of whether

10   those contracts prohibit disclosure to anyone

11   besides the parties to the contract?

12         A.    I'm -- now you're getting into the weeds

13   in the legal part.  I don't know.

14         Q.    Well, I'll represent to you that's the

15   case that the contracts prohibit disclosure of the

16   terms to anyone who is not a party to the contract.

17         A.    Okay.

18         Q.    So if that is the case, how are schools

19   going to make offers to student athletes in the

20   but-for world if they cannot disclose the terms of

21   the broadcast contracts that lead to the payments

22   that the student athlete is supposed to receive?

23         A.    So just what I said.  It's 10 percent

24   divided by a number of athletes; right?  So it's

25   some percentage of the contract.  And this is what

1    the payout was last year.  Here's your offer.

2              The escalation within the contracts?

3    That's sort of everybody knows that.  I don't know

4    that that's --

5         Q.   Don't you --

6         A.   You know, the media companies report that.

7    Even media numbers report that are they correct and

8    that's a different question.  But they say, look --

9    you know, most contracts have -- they're not going

10   up and down like this typically; right?

11        Q.   You'd agree that the student athlete would

12   want to know the answer to the question:  10 percent

13   of what; right?

14             MR. SIEGEL:  Objection; calls for

15   speculation.

16             THE WITNESS:  And as I said, they can say,

17   this is what you got last -- this is what the

18   athletes got last year.  And I -- and you're asking

19   me a really specific question:  Could the person

20   then say, and the contract should be larger this

21   year, or we think it's going to go up this year;

22   right?

23             So that -- that's a -- I don't know

24   legally if they can say that, if that person even

25   sitting there even knows that if they're even

1   supposed to be able to know the size of the

2   contract.

3           But, you know, the schools know how much

4   revenue they get in.  And so anyone who's recruiting

5   would know how much that revenue was the year

6   before.  There are likely to be forecasts of the

7   financials, I've seen them, of -- of the athletic

8   department's revenues that include the expectations

9   of those payments.  And those, to my knowledge, are

10  not confidential in the same way.

11  BY MR. KILARU:

12      Q.   Right.  You would agree your model depends

13  on the school -- the schools in the conferences

14  being able to disclose an amount to the student

15  athlete that represents something about -- something

16  approximating what they will receive if they come to

17  the institution; correct?

18      A.   Again, this is not what we see with all of

19  these contracts in the NFL and the NBA; right?  The

20  athletes sign up.  They get a certain percentage.

21  It says it's equally shared.  And they go on.

22      Q.   But --

23      A.   And then -- then they get payments based

24  on those amounts.

25      Q.   You would agree with me that the athlete

1   would need to know or would want to know whether

2   it's a past number or a future number what that

3   10 percent is going to consist of; correct?

4           MR. SIEGEL:  Objection; calls for

5   speculation.

6           THE WITNESS:  I agree with you that the

7   schools would be able to provide enough information

8   to the athletes to help the athletes make decisions.

9   BY MR. KILARU:

10      Q.   That's not my question because I'm not

11  sure we agree on that.

12          Your model depends on the schools being

13  able to provide information to the student athletes

14  about what their compensation would be; correct?

15      A.   And I've already answered this, that --

16  that they can say, this is what the payments were

17  last year; right?  And you get the certain

18  percentage.  That's the same as it was last year.

19  And we expect, you know, traditionally these numbers

20  have gone up over the years by, you know, a certain

21  percentage.  I mean, they can even tell them that;

22  typically grows by 3 percent a year and this was the

23  number last year.

24      Q.   And your assumption or understanding --

25  just so I have it right, is that the past year's

1  number would not be confidential.  That's your

2  understanding?

3            MR. SIEGEL:  Objection; calls for a legal

4  conclusion.

5            THE WITNESS:  That the amount that a

6  hundred athletes received on campus for the year

7  before would be confidential based on a contract --

8  a broadcast contract signed with a conference?

9            MR. KILARU:  Correct.

10            THE WITNESS:  That those athletes weren't

11  allowed to talk about how much they got paid from

12  the school?  That's what you're telling me?

13  BY MR. KILARU:

14      Q.   I'm asking for your understanding.

15      A.   I --

16            MR. SIEGEL:  Calls for a legal conclusion

17  and outside the scope of his opinion.

18            THE WITNESS:  Yeah, I don't agree with you

19  on that.

20  BY MR. KILARU:

21      Q.   Okay.  I'd like to switch gears now and

22  turn to paragraph 227 of your report.  This is the

23  section that refers to the substitution effect.

24            Are you with me?

25      A.   Yes.

1      Q.   In paragraph 227, you say, "The premise

2  behind the so-called substitution effect is that

3  when athletes decide to stay in school because of

4  the availability of more compensation while they're

5  in school, they take up a scarce GIA slot in

6  encounter sports where the NCAA restricts the number

7  of GIAs a school may offer, a team may hit its hard

8  limit of GIAs so that someone else will be

9  displaced."

10          Do you see that?

11     A.   Yes.

12     Q.   And you agree with that statement, I take

13  it?

14     A.   Yes.

15     Q.   So your understanding of the substitution

16  effect is that it involves a situation where a

17  player remains in school rather than going to play

18  professional sports?

19     A.   Generally that's -- that's the claim when

20  it was originally brought up.

21     Q.   Okay.  Is there any other claim you

22  address in your report?

23     A.   Well, they might not go on to play

24  professional sports.  They might be going on for

25  some other reason.

1        Q.   But your understanding of the substitution

2   effect involves someone not playing a sport

3   anymore -- or continuing to play a sport and thus

4   taking a spot away from someone else?

5        A.   Yes.

6        Q.   Okay.  You agree that there are some

7   examples of this occurring post July 1, 2021;

8   correct?

9        A.   To my knowledge, it's a -- I think there's

10  a couple players who have said something about

11  staying in school because they can make some NIL

12  money, but I think it's very -- very de minimis.

13       Q.   And -- but my question was just:  You

14  agree there are some examples of this occurring

15  after July 1 of 2021; right?

16       A.   Yes.

17       Q.   So, for example, an example that will make

18  people in the room happy.  Yesterday a player named

19  Blake Corum in Michigan decided he was going to

20  return to play college football for another year;

21  correct?

22       A.   I don't know that.

23       Q.   Well, I'll represent to you that that's

24  correct.

25                 And I'll represent to you that he was

1  projected to have the ability to get drafted in the

2  NFL if he came back.

3        And you're aware that there are some

4  examples like that; correct?

5  A.   Well, I mean, I -- I don't know about that

6  example.  I don't know where he would be drafted.  I

7  don't know why he decided to stay.  Like I just

8  don't have the information in front of me.

9  Q.   Okay.  You'd agree that you haven't tried

10  to look on a sport-by-sport -- on a sort of

11  athlete-by-athlete basis within men's basketball or

12  men's football or women's basketball to try to

13  determine who those student athletes may be?

14  A.   I mean, I did this sort of analysis in the

15  Alston case and there was not an issue, so to speak.

16  It doesn't really require looking at which athlete

17  would decide to stay or not.  It's sort of a

18  general, there's enough slots versus are there not

19  enough.

20        So I have not looked at each athlete in

21  the NCAA to see if any of them are planning to stay

22  or have stayed in the past.

23  Q.   You'd agree that when you looked at this

24  issue in Alston, the potential additional payment

25  was the payment for cost of attendance that this

1   person would receive from staying in school;

2   correct?

3        A.   I mean, I don't remember the context, if

4   there was other -- I mean, because that isn't where

5   that case started, you know what I mean?  It didn't

6   start as a cost-of-attendance case.

7        Q.   What --

8        A.   Or a $5,980 Alston payments case.  It

9   obviously didn't start at that point.  So I don't

10  know -- I can't recall the context of which I was

11  doing that.

12       Q.   Just looking at paragraph 227, you talk

13  about examples that you say disprove the

14  substitution effect.  And the ones you give are the

15  COA stipends that were enjoined by O'Bannon, and the

16  Alston benefits that became available in 2021.

17            Would you agree with that.

18       A.   That that's what I say in paragraph 227?

19       Q.   Yes.

20       A.   Let me just finish reading it.

21            (Witness reviews document.)

22            Yes.

23       Q.   Okay.  You'd agree that those payments

24  were amounts in the sort of single-digit thousands

25  per semester; correct?

1        A.    Which payments?

2        Q.    So the Alston payment is -- could be up to

3    $5,980 per semester; correct?

4        A.    I think it's per year.

5        Q.    Okay.

6        A.    But -- if I'm correct.   But -- yeah,

7    it's -- it's four digits of thousands of dollars per

8    some time frame, if it's per year, per semester,

9    but...

10       Q.    And that's -- your understanding is that's

11   generally true for a cost-of-attendance stipend as

12   well, it's in the four-digit thousands or maybe the

13   low five-digit thousands; correct?

14       A.    So you add those together and you're now

15   at five digits; right?

16       Q.    Right.   Okay.

17       A.    Okay.   So 40-, $50,000, you know, for an

18   athlete that wasn't available prior per -- per their

19   time there.

20       Q.    If you look at their time --

21       A.    And the Alston benefits include, you know,

22   the internship payments and the ability to get paid

23   more money and for -- for educational uses.

24             So there's quite a bit of other benefits

25   that the Alston case ended up allowing the schools

1    to pay the athletes if they wanted to.

2         Q.   And another sort of piece of your analysis

3    here as you describe in paragraph 230 is that anyone

4    displaced would have another home within FBS

5    football or Division I basketball; correct?

6         A.   That's one -- that's one aspect of it,

7    yes.

8         Q.   Okay.  Now, two of the classes here -- the

9    broadcast class -- two of your -- of the damages --

10   yes, two of the classes here -- the men's basketball

11   and football class and the women's basketball class,

12   those are limited to the so-called autonomy five or

13   Power Five; correct?

14        A.   Yes.

15        Q.   And you would agree with me that

16   100 percent of scholarships are used in at least

17   football and basketball in the Power Five; correct?

18        A.   100 percent?

19        Q.   Yes.

20        A.   I wouldn't say it's 100 percent.

21        Q.   Okay.  Have you done any analysis of the

22   utilization rate of scholarships per institution in

23   the Power Five for football and men's basketball?

24        A.   Yes, I have.  Historically it's quite

25   high.  But it's often, you know, 12 instead of 13

1    for men's basketball or 13 instead of 15 for women's

2    basketball.  Or 84, 83 sometimes instead -- instead

3    of 85.

4           So I don't agree with you that it's

5    100 percent, but I will agree with you that it's a

6    high number, yes.

7    Q.   Have you done an analysis in this case of

8    that utilization rate?

9    A.   I did some analysis -- so you're probably

10   aware that in the past with the squad list, it

11   was -- it was easier for us to count those up and

12   there were new laws about that, we're not allowed to

13   do that anymore.

REDACTED - Highly Confidential – Counsel Only

22   Q.   Okay.  Have you done an analysis in this

23   case of whether the Power Five schools are using

24   100 percent of their scholarships in men's football

25   or men's basketball?

REDACTED - Highly Confidential – Counsel Only

4      Q.    Okay.  Where is that assessment in your

5   report of the percentage of scholarship use?

6      A.    It's probably in the backup.  But it's

7   there to help me calculate the number of full

8   scholarship athletes that are in the -- in the

9   various -- the various schools for the calculation

10  of damages.

11     Q.    Okay.  I'd ask you to point us to that

12  table at a break, but we don't have to get into that

13  now.

14     A.    It's not -- it's in the backup, so it's on

15  a computer somewhere.

16     Q.    That's fine.  I'll ask for where it is in

17  that backup on a break, but we don't have to deal

18  with that now.

19     A.    Okay.

20     Q.    Have you done any analysis of whether

21  the -- setting aside NIL broadcast -- potential NIL

22  broadcast damages, the -- how the amount of

23  compensation offered by Power Five schools compared

24  to non-Power Five schools for football and

25  basketball?

1      A.    So you said setting aside broadcast?

2      Q.    Yeah.

3      A.    So for individual athletes and for video

4  games?

5      Q.    No, just for -- taking all your damages

6  assessments in this case aside, have you done an

7  assessment of whether as of July 1, 2020 -- just to

8  give an example that's prior to July 1, 2021 --

9  actually, strike that.

10          As of today, have you done an assessment

11  of how the amounts paid to student athletes by Power

12  Five institutions compare to amounts paid to student

13  athletes by non-Power Five institutions?

14      A.    So in the past, I have looked at that.

15  I've looked at -- yeah, group of five

16  institutions -- right?  So the football-playing

17  schools that are in the NCS that are not in the

18  Power Five -- and the scholarships -- you know,

19  basically what they provide the athletes, you know,

20  how -- you know, is it a full scholarship?  Yes.

21          Does did include all the basic elements of

22  a scholarship?  Yes.

23          Tuition, room and board, and books.

24          Are they paying cost-of-attendance

25  payments; yes or no.  Right?

1           So -- so I've done that analysis in the

2    past for non-Power Five conferences.  I haven't done

3    an updated analysis of that as of like current data,

4    like as of today, no.

5        Q.   When you say "in the past," you're

6    referring to, I believe, reports that were submitted

7    in 2016, 2017 in Alston?  Is that what you're

8    referring to?

9        A.   Those -- that would be a time when I've

10   done that.

11       Q.   Okay.

12       A.   There may be other times.

13       Q.   Since then -- let me ask a better

14   question.

15       A.   And I'm trying to think.  Since then --

16   let me just think about it for a second.

17           I can't think as I sit here if I've done

18   it since then.

19       Q.   In this case, you have not submitted an

20   analysis of how the payments to student athletes in

21   the Power Five from institutions compare to the

22   payments in non-Power Five institutions; correct?

23   In this case.

24       A.   Other than noting that there hasn't been a

25   major change in the other conferences.  But, no, I

```
 1   haven't done sort of a per school, per athlete

 2   assessment, but I haven't seen any evidence that

 3   there's been a major change in the other conferences

 4   that are outside of the Power Five.

 5        Q.   Have you tried to do that analysis?

 6        A.   No.

 7        Q.   Looking at your Exhibit 12 --

 8        A.   I forgot what page that's on.

 9        Q.   It's on page 94.

10        A.   Thanks.

11        Q.   You'd agree that for -- take a random

12   other example.
```

REDACTED - NSC

REDACTED - NSC

REDACTED - NSC

16        A.    Yes.

17        Q.    Have you done any assessment of the

18   recruiting offers that student athletes received in

19   men's basketball or men's football in each of these

20   years, 2016 through 2021?

21        A.    When you say "the recruiting offers," what

22   do you mean?  Like --

23        Q.    Offers of enrollment and offer, too, I'll

24   say it better, to attend that institution and play

25   sports there --

1          A.    Okay.

2          Q.    -- for scholarship.

3          A.    I'm trying to see if I've done any

4     updated -- I've done those analyses in the past and

5     you can do them with evidence that's common to the

6     class.  I don't know if I've done it for these

7     years.  Maybe 2016.  But I'll say not 2020 or 2019.

8          Q.    Okay.  Where is that analysis?

9          A.    Some of that is -- so two places.  Some of

10    that would be the -- depending on the timing of when

11    I did it in the Alston case -- because I don't

12    remember exactly what those dates are.

13              But secondly, I sometimes do an analysis

14    of the recruiting -- the correlation between

15    recruiting seasons; right?  I sort of show it in

16    class sometimes.  To look at the lack of competitive

17    balance in college sports and how it's been

18    increasing over time and you get correlations that

19    are up over 90 percent.

20              When you rank the schools by their

21    recruiting classes, it's the same schools each year,

22    you know, get into that.  So that's an analysis of

23    the offers that these athletes are getting from 24/7

24    sports and from the other source whose name's

25    escaping me right now where you can get the

1    information for the stars and sort of see which

2    schools and which conferences -- which schools in

3    which conferences they're getting offers from.

4         Q.    You haven't offered any of that analysis

5    in this case; correct?

6         A.    No.   It was outside of the scope of -- of

7    what I needed to do to offer a class certification

8    report.   But it's certainly feasible to do with data

9    that's common to the class.

REDACTED - NSC

24        A.    In the past?

25        Q.    Yes.

1          A.    I mean -- so in the past, they made the

2     decision they made -- we're trying to measure sort

3     of what the damage was.  By not paying them or not

4     allowing the schools to pay them for the use of

5     their NIL.

6               In the future, an athlete may choose a

7     different school or conference.  But in the past,

8     they can't.  I mean, they're choosing -- they chose

9     the school that they chose.

10         Q.    Right.  But you're trying to model what

11    their damages would have been in the past in a

12    different set of rules; correct?

13         A.    Yes.

REDACTED - NSC

19               MR. SIEGEL:  Objection --

20    BY MR. KILARU:

21         Q.    In 2018?

22               MR. SIEGEL:  -- calls for speculation.

23               THE WITNESS:  So, I mean, of course you

24    can say it's possible that a person would make a

25    different decision.  But I've talked about in this

1    case and others -- and we've talked a little bit

2    about today -- that those decisions on where to

3    attend involve a lot of different elements.

4              It doesn't mean that someone with -- with

5    this sort of offer in front of them might have made

6    a different choice; right?  But the damages are sort

7    of what did happen.  What choices did they make.

8    What products did they buy and how much were they

9    overcharged?

10             Sort of a normal -- more typical, I should

11   say, antitrust case.  It's not, oh, under a

12   different -- under a different regime, perhaps other

13   people would have tried to buy the product and it

14   wouldn't have been available to that person and so

15   oh, my gosh, they wouldn't have been able to do that

16   and so they're not going to get damages.

17             That isn't typically how I've seen

18   economics applied to the question of damages.  It's

19   sort of:  What did happen and is there an overcharge

20   or, in this case, an undercharge.

21   BY MR. KILARU:

22       Q.   I think, indeed, we may be talking about a

23   different case, but let's set that aside.

REDACTED - NSC

REDACTED - NSC

10          MR. SIEGEL:  Objection; calls for

11   speculation.  Asked and answered.

12          THE WITNESS:  As I said, there are lots of

13   elements that affect the choice of what school to

14   attend and the amount that an athlete gets offered

15   is part of that decision process.  And an athlete

16   very well could choose a different offer if they had

17   one.  If they decided to do that.

18   BY MR. KILARU:

19      Q.   All right.  Well, let me ask you two

20   questions to follow up on that.  First, assuming

21   everything else is equal, the facilities, the

22   location, et cetera, you'd agree with me that if a

REDACTED - NSC

REDACTED - NSC

```
 7              I mean, there are reasons an athlete --
 8    even a non-athlete student.  I mean, I have these
 9    conversations all the time; students are choosing
10    schools based on all sorts of different things.
11    It's not just what is the financial aid they're
12    going to get or what is the -- you know, what is the
13    scholarship that they're getting.
```

REDACTED - NSC

```
23         A.   No, I'm saying that -- that that's --
24    because they're trying to get the best athletes that
25    they can get.  And so they have to come up with an
```

1   offer that is competitive that doesn't exceed the

2   use of the NIL so they're not violating NCAA rules;

3   right?

4            And so they would choose that -- they

5   would choose an amount that allows them to -- to

6   compete.

7            And you're trying to equilibrate just this

8   one portion of all the big decisions that an athlete

9   makes when they choose a school.  You're sort of

10  saying:  Well, if the dollar amounts were the same,

11  then that's a competitive market.  But the athlete

12  market is competitive because of all the other

13  elements also.  All of it is combined in how they

14  make their decision.

15       Q.   Okay.

16       A.   So this is an amount that's a fair

17  representation of in the past, the damages to this

18  athlete for the use of their NIL.

19       Q.   Do you think -- I just want to understand

20  your opinions.

REDACTED - NSC

25  additional money did not change a single player's

```
 1   decision-making process?

 2             MR. SIEGEL:  Objection; misstates

 3   testimony.

 4             THE WITNESS:  Yeah, I'm not saying it

 5   wouldn't change a single student's decision process.

 6   BY MR. KILARU:

 7        Q.   Okay.  So you agree that that additional

 8   money could affect a student athlete's decisional

 9   process about where to attend school?

10        A.   No, I said that like 10 minutes ago.

11        Q.   Okay.  It seems like you were debating it,

12   but that's fine.  If you said that, then we have an

13   agreement on that point.
```

REDACTED - NSC

```
18        A.   It depends on how many slots are

19   available.  But it's possible that it could, if

20   those rosters were full.

21        Q.   Yeah.  If that student had to attend, as

22   you say, perhaps that's -- as in your analysis, that

23   student would attend a different Power Five school

24   or they may attend the MAC or the Sun Belt; correct?

25             MR. SIEGEL:  Objection; incomplete
```

1  hypothetical.  Calls for speculation.

2          THE WITNESS:  Or the American.  I mean,

3  usually you would imagine that they would sort of go

4  down the -- the -- that a student -- you know, if

5  the last student in the conference who couldn't find

6  a school to go to because one more student decided

7  to attend a school in that conference, that student

8  can go to the ACC.

9          If someone's coming to the Big 10, then

10  there's an extra slot available in the ACC.  So

11  that -- that might be where they end up.

12  BY MR. KILARU:

13      Q.  Ultimately, you'd agree someone would get

14  displaced out of the Power Five; correct?

15      A.  If what happened?

16      Q.  If the ACC student athlete goes to the

17  Big 10.

18          MR. SIEGEL:  Objection; incomplete

19  hypothetical.

20          THE WITNESS:  No, those are both in the

21  Power Five.  So it doesn't mean someone will be

22  displaced out of the Power Five.

23  BY MR. KILARU:

24      Q.  Okay.  You do agree, though, that schools

25  within the big -- schools within the Power Five

1  differ in terms of the quality of facilities they

2  offer; correct?

3      A.   Yes.

4      Q.   They differ in terms of the amounts of

5  cost-of-attendance stipends a student athlete may

6  receive?

7      A.   Yes.

8      Q.   They may differ in terms of the NIL

9  opportunities a student athlete would have?

10     A.   Yes.

11     Q.   That may differ in terms of the playing

12 time and the exposure a student athlete could get on

13 television; correct?

14     A.   Across different schools?

15     Q.   Yeah.

16     A.   Yes.

17     Q.   And generally speaking, you'd expect that

18 a student athlete would have lower exposure at, for

19 example, in the Sun Belt than they would in the

20 Power Five; correct?

21     A.   Yes.  In general.  Although I'm not saying

22 that a student who switched from Ohio State -- from

23 Duke to Ohio State is displacing a student into the

24 Sun Belt.  I'm just not agreeing with you on that.

25     Q.   Have you done any assessment in this case

1    of how many student athletes in men's basketball, in

2    men's football, and in women's basketball received

3    an offer from a Power Five institution and chose to

4    instead go to a non-Power Five school?

5         A.   In this case?

6         Q.   Yes.

7         A.   No.  I've done that in the past with data

8    that's -- that's, you know, common to the class and

9    it's pretty straightforward, yeah.

10             MR. KILARU:  Could we use Tab 65, Max.

11             So I have a couple of examples I want to

12   walk through with you, Dr. Rascher.  I think this is

13   Exhibit 8?

14                           (Exhibit 8 marked.)

15   BY MR. KILARU:

16        Q.   So what we've summarized here are the

17   offers that a basketball player named Omari Spellman

18   received.  And I'll represent to you -- you may know

19   this, you may not -- that Omari Spellman played

20   college basketball in Villanova, which is in the Big

21   East Conference, which is not a Power Five

22   institution.

23             So are you with me on that?

24        A.   Yes.

25        Q.   And I'll represent to you that all of the

1    schools listed on here are schools that made Omari

2    Spellman an offer; right?

3            Are you with me on that?

4        A.   So you're saying these are all -- he got

5    offers from these schools?

6        Q.   Yes.

7        A.   Okay.

8        Q.   And so then what we've done here is we put

9    in -- so he was recruited going into the 2016 season

10   and what we've put in here are the proposed -- what

11   your model would say are the broadcast NIL payments

12   a student athlete would receive for 2016 in the

13   various conferences.  Okay?

14           Do you see that?  They're just taken right

15   from Exhibit 12.

16       A.   Okay.

REDACTED - NSC

REDACTED - NSC

19      A.   Yes.

20      Q.   Okay.  And you would agree that if Omari

21   Spellman accepted any one of those offers, that

22   would displace a student from the Power Five?

23      A.   So it depends; right?  Again, there -- as

24   I said, there are slots open in the Power Five;

25   right?  There's not 100 percent full for every

1  school.  So I -- I disagree with that.

2              And you're also missing sort of that he

3  could have gotten payments from the Big East and

4  from the AAC.  I'm not measuring those in this

5  lawsuit.  I wasn't asked to measure those.  But

6  those are out there; right?

7          Q.  You haven't modeled --

8          A.  So those numbers are missing sort of -- if

9  he stayed in Villanova the whole time, to my

10  knowledge, he's not even in our class; right?

11          Q.  What was that?

12          A.  If he stayed in Villanova the whole time

13  in college --

14          Q.  Right.

15          A.  -- because I don't know, he's not in our

16  class; right?

17          Q.  Yes.

18          A.  Unless he is in the additional sports

19  class because he got a deal and he stayed an extra

20  year, so after July 1 of 2021, because he got six

21  years of eligibility -- and I mean, I don't know his

22  full story so you're sort of giving me a guy that I

23  don't know much about.

24              But I'm telling you in the past, he could

25  have gotten paid through a Big East or an AAC

1    contract also; I'm just not measuring those.

2         Q.   Okay.  But you haven't done any type of

3    calculation for arguable broadcast damages for

4    conferences other than the Power Five conferences;

5    correct?

6         A.   Correct.

7         Q.   Do you have an opinion on what your

8    methodology would be if you were asked to calculate

9    those damages?

10              MR. SIEGEL:  Objection; outside the scope

11   of his opinion.

12              THE WITNESS:  I don't.

13   BY MR. KILARU:

14        Q.   Okay.  And if -- just going back a minute.

15              You would agree with me that it's possible

16   that Omari Spellman instead choosing to attend the

17   University of Kentucky could displace someone in the

18   class currently from the Power Five; correct?

19        A.   It is possible.

20        Q.   Okay.  And that displaced student would

21   not have access to the University of Kentucky's

22   basketball facilities; correct?  If we're using

23   Kentucky as an example?

24        A.   Correct.

25        Q.   They would not have access to University

1    of Kentucky's coaching; correct?

2         A.    Correct.

3         Q.    They might receive a different financial

4    package from their institution in terms of cost of

5    attendance and scholarship aid; correct?

6         A.    I mean, every -- every athlete chooses a

7    different -- I mean, gets a different package if you

8    define it as a different dollar amount.

9              But typically these athletes are going to

10   be getting a full -- like their tuition is covered.

11   So that's sort of equal across the schools.

12             You know what I mean?  It's a different

13   dollar amount, but they're all getting full tuition.

14   Maybe they're all getting full COA and the dollar

15   amount might be different from that.

16             So I'm just trying to characterize what

17   you're saying as a different package.  It's sort of

18   the same package often; right?  It's just the way

19   that the dollars are measured for tuition is sort of

20   immaterial to the athlete in some sense; right?

21             It's money goes from this side of the

22   school or that side of the school.  Athletic

23   department sends money over to the registrar's

24   office for tuition.  The athlete -- it's sort of

25   immaterial to the athlete.

1          So what I'm saying is the packages are

2     more similar than I think you're characterizing

3     them.

4          Q.    The amount of money that displaced student

5     athlete might receive from a different school could

6     be lower than the amount of cost of attendance that

7     they're getting from Kentucky; correct?

8          A.    Yes.

9          Q.    They might receive fewer other benefits

10    from their new school as opposed to Kentucky's, some

11    of these Alston-like benefits you were referring to;

12    correct?

13         A.    That's possible.

14         Q.    And they may have a reduced ability to

15    monetize their NIL at a different school than

16    Kentucky; correct?

17         A.    That's all possible, yes.

18              MR. KILARU:  Okay.  Let give you a

19    different example.  We can set that one to the side.

20              This is Exhibit 9.

21                        (Exhibit 9 marked.)

22    BY MR. KILARU:

23         Q.    So I've handed you a very similar chart.

24    This is a chart for a student athlete named Maxwell

25    Lorca-Lloyd, who played men's basketball starting in

```
 1    2019 at the University of Pennsylvania in the Ivy
 2    League.
 3              Are you with me on that?
 4        A.   I see that.
 5        Q.   Okay.  So, again, I'll represent to you
 6    these are the offers that he received.  He received
 7    an offer from two Big 10 schools, one SEC school,
 8    one Big 12 school, and one PAC-12 school.
 9              Do you see that?
10        A.   I see that.
```

REDACTED - NSC

```
23        Q.   Okay.  And I take it you haven't done any
24    analysis of what the -- of whether there would be a
25    broadcast NIL payment for the University of
```

1   Pennsylvania and the Ivy League?

2       A.   I have not done that analysis.

3       Q.   Okay.

4       A.   And is it -- did this player stay at Penn

5   the whole time?

6       Q.   Yes.

7       A.   Are they still there presumably, as far as

8   you know?

9       Q.   Yes, as far as I know.

10      A.   Okay.  So they're not in the class; right?

11      Q.   That's right.  But if this student athlete

12  decided to go to one of those schools, they could

13  potentially displace a student athlete in the

14  Big 10; correct?

15      A.   Again, it depends on which school and

16  whether there was an open slot at -- at that school.

17  But potentially, yes, if there aren't open slots,

18  then they could -- they would have potentially

19  displaced someone.  Again, this didn't happen in the

20  past.

21      Q.   Okay.  And I can run through them again,

22  but the same set of questions:  The displaced

23  student athlete, they will lose access to

24  facilities, potentially different cost-of-attendance

25  stipend, that set of questions, you would agree that

Case 4:20-cv-03919-CW   Document 251-7   Filed 04/28/23   Page 210 of 294

Page 209

1  would apply just as well to this new displaced

2  student; correct?

3      A.   I mean, of course.  Now, if they end up

4  somewhere else, right, then they get the value of

5  all those facilities and training and education and

6  so forth.

7          It's not -- again, it's not like -- you're

8  characterizing like they get all this stuff and then

9  it's gone.  But they get something else.

10      Q.   You would agree that if that displaced

11  student athlete went, for example, to the Ivy

12  League, they would not receive any athletic space

13  financially?

14      A.   But likely receive financial aid.

15      Q.   Correct.

16      A.   The Ivy League schools sometimes

17  out-recruit -- Stanford, I've been told many times

18  by my former students who work there -- because the

19  Ivy League offer -- it can offer more than Stanford

20  could offer because of the athletic scholarship

21  limitations that don't exist for need-based and

22  merit-based limitations in the Ivy Leagues.

23      Q.   Right.  But just going back to my

24  question, the student athlete would not be eligible

25  to receive athletic space financial aid?

TSG Reporting - Worldwide    877-702-9580

1        A.   And I'm answering that saying:  That's

2   fine.  You can call it that.  But it's other

3   financial aid that has -- it's still dollar amounts.

4   It's still tuition coverages; right?

5            So you call it "athletic financial aid," I

6   call it merit- or needs-based aid.  It's still doing

7   the same work.

8        Q.   And you would agree that this displaced

9   student athlete may have less of an ability to

10  monetize their NIL if they are at a different

11  institution besides the Ohio State University and

12  the Big 10; correct?

13           MR. SIEGEL:  Objection; calls for

14  speculation.  Incomplete hypothetical.

15           THE WITNESS:  Less than -- I mean, it

16  depends where they end up.

17  BY MR. KILARU:

18       Q.   You have to assess where they ended up;

19  right?

20       A.   To see if they -- if they can monetize

21  their NIL at a different school in a different

22  amount?

23       Q.   In the same way, yes.

24       A.   I don't see any reason to assess that, but

25  if -- if that were the question on the table, then

1  you'd have to figure out, you know, what is the

2  value being at that other school.

3            MR. KILARU:  Just one more.

4            Could you -- number 66, actually.  Thanks.

5                      (Exhibit 10 marked.)

6  BY MR. KILARU:

7       Q.   So the last one of these we'll do is

8  similar analysis for a student athlete named Troy

9  Warner, who played men's football starting in 2016

10 at BYU.

11           Do you see that?

12      A.   I see that.

13      Q.   Okay.  Based on this chart, again, these

14 are just the offers received, Mr. Warner received

15 seven offers to go to schools in the PAC-12.

16           Do you see that?

17      A.   I see that.

18      Q.   And one offer to receive -- one offer to

19 play in the ACC.

20           Do you see that as well?

21      A.   Yes.

22      Q.   Okay.  And if Mr. Warner had accepted any

23 of those offers, he could theoretically -- he could

24 possibly have displaced a student athlete in the

25 PAC-12; correct?

1       A.   I have a clarification question on these.

2       Q.   Yes.

3       A.   Do you know that -- were all of these

4    offers for full scholarships, full COA?  Like you --

5    you know that yourself?

6       Q.   Yes.  I mean, they're football offers.

7            Are you aware of student athletes getting

8    below full cost-of-attendance football offers?

9       A.   Yeah, walk-ons.

10      Q.   Do you believe walk-on offers are

11   represented on 24/7, for example?

12      A.   Yes.

13      Q.   Okay.  Well, I'll represent to you that

14   these are not walk-on offers, but these are full

15   scholarship offers.

16      A.   Okay.

17           MR. SIEGEL:  Well, I'm just going to

18   object to all of these as lack foundation and

19   assumes facts that are not in evidence.

20           But he can answer them based on your

21   representations.

22           THE WITNESS:  I'm treating them as

23   hypotheticals.

24           MR. KILARU:  Sure.

25           THE WITNESS:  Okay.

1    BY MR. KILARU:

2        Q.   So in this hypothetical, if Mr. Warner had

3    attended the University of California Berkeley, he

4    could have displaced a student athlete in the class

5    who attended the University of Berkeley and played

6    football there; correct?

7        A.   That's -- I have the same answer:  That it

8    depends on how many scholarships were being used at

9    those schools at the time; right?  Because we saw

10   the incident to allow more scholarships during

11   COVID.  They sort of realized that that -- the

12   artificialness of the 85, and the 13 and 15 caps and

13   they let more scholarships in, just as an example of

14   the flexibility of the scholarship caps.

15       Q.   You'd agree if schools offered more

16   scholarships, that would reduce the NIL --

17            (Reporter asks for repetition.)

18            If schools offered more scholarships, that

19   would reduce the broadcast NIL payment to each

20   student athlete; correct?

21       A.   Other than the fact that they didn't in

22   the past.  But if in the future, they -- they were

23   to offer more scholarships then and they would do a

24   similar calculation; right?  Those per-athlete

25   amounts would be -- would be slightly smaller.

1        Q.   Okay.  Any of your answers to the

2   questions about facilities, ability to monetize NIL,

3   and so on different for this student athlete as

4   opposed to the previous examples we discussed?

5        A.   No.  You know, I think my one answer for

6   all of these folks is that I don't know -- we don't

7   know the circumstances that led them to choose

8   these -- these schools.  What we do know is they

9   chose them; right?  We have some facts about what

10  happened in the past.

11       Q.   And you'd agree you don't have any

12  estimate of how many student athletes there are who

13  received Power Five offers between 2016 and 2021,

14  full scholarship offers in football, men's

15  basketball, and women's basketball, and turned them

16  down to go somewhere else.

17            You don't have that number?

18       A.   So my analysis of that exact question in

19  Alston and O'Bannon, so I must have looked at seven,

20  eight years, nine years, maybe, of data where that

21  it is not very common to turn down a Power Five

22  offer in favor of a non-Power Five offer.

23            Mostly the athletes who get Power Five

24  offers accept those offers.  And the athletes who

25  are choosing schools outside of the Power Five are

1    typically not getting a Power Five offer.

2        Q.   Okay.  So just going back to my question.

3    You have not -- you don't have any estimate of how

4    many student athletes there are who received

5    Power Five offers between 2016 and 2021 that turned

6    them down to go somewhere else that you're offering

7    in this case; is that right?

8        A.   So I haven't seen any evidence that that

9    has changed that much, that being what I just talked

10   about; right?  I didn't do a particular analysis in

11   this case, but based on my experience having done

12   this sort of work, of course, using evidence that's

13   common to the class, that one can do in a

14   straightforward manner.

15           I haven't seen any evidence that that has

16   changed, that all of a sudden you have a bunch of

17   athletes choosing Group of 5 schools, Ivy League

18   schools that weren't doing it in the past.

19       Q.   And just to circle back on one other thing

20   we discussed earlier.  I just want to make sure I

21   have a clear answer for this.

22           Do you have an opinion on whether

23   disclosing payments to student athletes based on --

24   for broadcast NIL based on past years of a broadcast

25   contract would breach the confidentiality provisions

1  in those contracts?

2        Do you have an opinion on that?

3        MR. SIEGEL:  Objection; calls for a legal

4  conclusion.

5        THE WITNESS:  I don't know what it --

6  what -- I don't know how, you know, to interpret the

7  contract in a way that would say someone's breaching

8  a confidentiality agreement or not.

9        MR. KILARU:  Okay.  I think that's another

10  natural stopping point for a break.

11        THE WITNESS:  Okay.

12        THE VIDEOGRAPHER:  We're off the record.

13  The time is 3:02 p.m.

14     (Recess taken from 3:02 p.m. to 3:20 p.m.)

15        THE VIDEOGRAPHER:  Okay.  We're back on

16  the record.  The time is 3:20 p.m.

17  BY MR. KILARU:

18     Q.  Dr. Rascher, just -- I think one more

19  question on the substitution effect piece and then

20  we'll move on to a different topic.

21        Based on your answers I think you agree

22  with this, but I want to make sure.  You haven't

23  tried to model how, if at all, behavior of student

24  athletes would have changed between 2016 and 2021

25  based on the additional broadcast NIL payments that

1  you include in the report; is that right?

2            MR. SIEGEL:  Objection; misstates report.

3            THE WITNESS:  Model their behavior?  Um --

4  BY MR. KILARU:

5       Q.   How -- let me ask the question just so you

6  have it.  How, if at all, the behavior of student

7  athletes would have changed.

8       A.   So there's -- in the marketplace there are

9  sort of pecking orders for football and basketball.

10  And my analysis -- and that tends to be correlated

11  with the revenues in those -- in those conferences.

12  And we see that even with -- when the payments

13  for -- you know, for coaching; right?  Coaching

14  staffs get paid a certain amount, and those are even

15  correlated with the revenues.  And so in that

16  sense -- so I'm -- I'm not modeling individual

17  athlete behavioral decisions that may have changed

18  but sort of in general that competitive nature and

19  the way that competition plays out I've assumed, but

20  based on evidence, that -- that that wouldn't change

21  substantially in -- in -- wouldn't have changed,

22  rather substantially in the but-for world.

23       Q.   I just want to make sure I fully

24  understand that.

25            You do agree, based on what you just said,

1  you haven't modeled how if at all any individual

2  athletes's decisions would have changed in the

3  damages period; correct?

4       A.   Correct.

5       Q.   You have modeled how conference

6  competition would have occurred in the damages

7  period; is that what you were getting at with the

8  kind of point about aggregates?

9            MR. SIEGEL:  Objection; misstates

10 testimony.  And I think he answered this question,

11 but...

12           THE WITNESS:  Yes, conference competition,

13 but -- but sort of the -- the -- the way that

14 athletes allocate themselves -- right? -- as a

15 group.  So you may have one athlete, like you said,

16 who might switch from Duke to Ohio State, but then

17 another athlete is sort of filling that Duke spot

18 that's of a similar quality and so forth.

19 BY MR. KILARU:

20      Q.   I'd like to turn now to the third-party

21 NIL damages.  As we discussed a few -- well,

22 probably a few hours ago at this point, you applied

23 what you called the before- and after-methodology to

24 determine damages for this class?

25      A.   Yes.

1        Q.    Or for this -- this type of damages, I

2   should say?

3        A.    Yes.

4        Q.    And these damages apply to all members of

5   the additional sports -- well, who is eligible for

6   damages -- for -- under your analysis, who is

7   eligible for third-party NIL damages?

8        A.    Any athlete in the men's basketball and

9   football class, the women's basketball class, and

10   the additional sports class who received payments

11   post-July 1, 2021 subject to the definitions of, you

12   know, full scholarships and all those sorts of

13   things.

14        Q.    Okay.  Looking at your report, paragraph

15   179, if we could.  I think we'll get to the same

16   point.  Page 94.

17        A.    Yes.

18        Q.    You say your methodology applies to any

19   athlete in any class who receives compensation for

20   the use of their NIL after July 1, 2021, excluding

21   damages relating to video games or broadcasts;

22   correct?

23        A.    Yes.

24        Q.    So is it fair to say if a member of the

25   proposed classes received some kind of third-party

1    payment for NIL after July 1, 2021 that's in your

2    data, you would model damages for them in the past;

3    correct?

4         A.   Yes.

5         Q.   Okay.  And would you take that number from

6    post-2021 and apply it to each of their year's

7    eligibility in the past?

8         A.   Yes.

9         Q.   So -- I mean, I'm not using a specific

10   example but just theoretically.  If a student

11   athlete in November of 2021 in their fourth year of

12   eligibility earned $500 for third-party NIL, you

13   would give them an additional $1,500 of backwards

14   damages?  So just the $500 three years going back;

15   is that right?

16             MR. SIEGEL:  Objection; misstates report,

17   but I'm sure he'll explain.

18             THE WITNESS:  That's sort of the beginning

19   stages of it.  That's sort of the general

20   framework -- right? -- that the athlete shows their

21   unique characteristics in value.  It's all captured

22   in the fact that they did get paid when it became

23   allowed and it got paid a certain amount.  And then

24   going back, making adjustments for, you know, when

25   they -- when they started playing in college --

1   right? -- you know, potential other adjustments like

2   conference changing or role on team, things like

3   that.  But that's the base -- sort of a starting

4   point is what you said.

5   BY MR. KILARU:

6        Q.   Yeah, fair -- we'll talk about the

7   adjustments.  But sort of other than the

8   adjustments, is that a fair statement of the general

9   methodology?

10        A.   Generally, yes.

11        Q.   Okay.  The before-period would be from the

12   beginning of the 2016 to '17 school year and it

13   would end on July 1, 2021; is that right?

14        A.   Yes.

15        Q.   Maybe not for a specific athlete but for

16   the class as a whole; is that right?

17        A.   Yeah, yes.

18        Q.   And then the after-period would start from

19   July 1, 2021 and run to the date any class is

20   certified in this case; correct?

21        A.   Yes.

22        Q.   Okay.  Now I'll represent to you that the

23   class certification hearing is scheduled for

24   July 2023.  So is it fair to say that you would have

25   roughly two years' worth of data in the after-period

1    if a decision follows shortly after that?

2         A.   It sort of depends on the nature of

3    discovery and all that stuff, subpoenas and

4    everything.  But theoretically -- again, giving time

5    constraints -- that's two years after the payments

6    were first allowed.  So that's two years, yes.

7         Q.   The relevant transactions would occur

8    between July 1 of 2021 -- for the after-period --

9    July 1, 2021 and whatever date of certification;

10   correct?

11        A.   Yes, I believe so.  And then to the

12   extent -- I mean, if the case continues from there,

13   then I think typically you sort of measure damages

14   up to trial.  I mean, I believe so.  At least I've

15   done that in the past in other cases.  Like, it

16   doesn't stop at the class certification hearing

17   necessarily.

18        Q.   Okay.  All right.  Assuming that the model

19   is for -- is based on data from July 1, 2021 to,

20   say, August 1 of 2023, that will be about two

21   years of transactions; is that fair to say?

22        A.   Yes.

23        Q.   Okay.  And if the court's evaluating the

24   model on July 20 of 2023, there would be again

25   around two years' worth of transactions in the model

1  that's being presented to the court; is that

2  correct?

3      A.   Well, as I said, it depends on -- I mean,

4  the subpoena discovery time frame has lagged for

5  whatever reasons.  I mean, I think in every case it

6  sort of happens.  So it all depends on whatever data

7  is available to me at the time I'm preparing the

8  analysis if in fact I end up doing that that then is

9  presented at a class hearing or -- I don't know if

10  there's a report I write or -- whatever the process

11  is, I don't know.

12          But you understand what I'm saying?  Like,

13  it all depends on sort of the timing of when I have

14  access to the data and how long it takes me to wrap

15  my arms around it.

16      Q.   Do you have any other examples of cases

17  where the after-period has been around two years'

18  worth of data?

19      A.   I mean, I had a -- I've had a couple of

20  breach-of-contract cases where things sort of got

21  fixed up and then time moved forward and then the

22  lawsuit sort of kicked in and so you had sort of an

23  after-period that was multiple years.  I can think

24  of one that pops into my head right now and another

25  one that I'm pretty sure that that's what happened.

1      Q.   Okay.

2      A.   But -- so, yeah.

3      Q.   Did those, to the extent you can say,

4  involve more than two years or less than two years

5  of data?

6      A.   Um --

7      Q.   If you can't say because of a protective

8  order I'm not asking you --

9      A.   I don't think so.

10     Q.   -- I just want you to -- I don't want you

11  to get into any trouble.

12     A.   No, I understand.

13          I feel like one of them had three years

14  and one was around two years; you know, portions,

15  not just exact round numbers, but two- to three-year

16  range.

17     Q.   You'd agree that the marketplaces -- you'd

18  agree that the total amount of NIL earnings

19  available to student athletes might vary from year

20  to year based on economic conditions affecting the

21  potential purchasers of NIL rights; is that fair to

22  say?

23     A.   It might depend on what of the...?

24     Q.   Do you believe that the market for NIL

25  rights is the same in terms of size every single

1  year?  For third-party NIL transactions, it's the

2  same every single year?

3       A.   No.  Oh, and I thought of -- so there's

4  some non-sports cases, antitrust class -- class

5  actions that have -- sort of the collusion period

6  ended and the cases take a while and so you have

7  sort of a clean period before and after.  It was

8  like a -- I think the contact lens case was like

9  that, if I remember.

10          Anyway.  Sorry.  That was the previous

11  question.

12       Q.   No, that's fine.

13       A.   The -- the mark- -- the dollar amounts

14  going to college athletes for individual name,

15  image, and likeness from year to year are not going

16  to be exactly the same amount; that would be just

17  sort of luck if that were the case.

18       Q.   And that might represent that in certain

19  years advertisers have either more or less of an

20  appetite for getting endorsements from student

21  athletes; is that fair to say?

22       A.   Generally yes.  I mean, in this case it's

23  slightly different because we're sort of starting

24  from scratch.  June 30, no one's allowed to be paid.

25  And so the next day of course you're not going to be

1  at equilibrium; it's going to take years to sort of

2  get to that equilibrium.  And so my presumption in

3  the past is that we would already be at that

4  equilibrium.

5           Now, again, being at an equilibrium does

6  not imply that from year to year the total dollar

7  amounts in the market are exactly the same, no.

8      Q.   Did you attempt to collect data or did you

9  attempt to obtain data for third-party NIL

10  transactions involving professional athletes over

11  the last, say, three, four, five years?

12     A.   No, not in the scope of this case, no.

13     Q.   So in the scope of this case you didn't

14  attempt to, for example, determine if there is some

15  kind of year-over-year difference between the amount

16  of money that's being spent on third-party NIL

17  advertisements?

18     A.   So in general I have looked at pro athlete

19  endorsement earnings over time to see sort of what

20  those markets look like.  But I don't think I

21  included any of that in this report.  But it's

22  something -- it's sort of my general knowledge of

23  the -- of -- of that market.

24     Q.   But you haven't done any kind of

25  regression of those numbers in this case to

1   determine the relationship between a year and NIL

2   endorsements; is that right?

3       A.   No, I have not.

4       Q.   If a student athlete signed an NIL deal

5   on, say, July 2, 2021, would you think that that

6   would suggest they had a high probability of

7   securing that deal before July 1, 2021?

8       A.   Yes.

9       Q.   Okay.  If they signed their first NIL deal

10  on July 30, 2022, do you think that would in any way

11  affect their likelihood of getting -- reflect on

12  their likelihood of getting a deal before July 1 of

13  2021?

14      A.   It sorts of depends.  You know, were they

15  in college in the earlier year?  Were they in a

16  different conference, for instance?

17          You know, as you mention, the marketplace

18  takes time to reach an equilibrium.  And so a deal

19  in that second year still might be an indication of

20  their value; it sort of depends on just other common

21  information around that.

22      Q.   Can you turn to paragraph 218 of your

23  report.  It's on page 115.

24      A.   Yes.

25      Q.   And here you're talking about something

1    called a Q Score.  Do you see that?

2         A.   Yes.

3         Q.   Would you agree that a Q Score is sort of

4    a popularity rating for a person based on their

5    recognition and personal characteristics?

6         A.   That's a -- that's an okay way to describe

7    it, sure.

8         Q.   Okay.  You say that you believe a

9    Q Score -- you do not include any adjustments for

10   Q Score in your model; correct?  Or you haven't

11   proposed to do any adjustments for that in your

12   model; correct?

13        A.   Correct.

14        Q.   Okay.  Let's talk about someone we've

15   mentioned earlier today.  Stetson Bennett IV.  Your

16   understanding is that he was a walk-on when he

17   arrived at Georgia; is that correct?

18        A.   I don't know that for sure.  But...

19        Q.   Do you know that he's sort of -- wasn't

20   that prominent and now is obviously a very famous

21   college athlete?

22        A.   Yes.

23        Q.   Okay.  Is it your view that his Q Score

24   was the same when he started his collegiate career

25   as it is today?

1           MR. SIEGEL:  Objection; calls for

2    speculation.

3           THE WITNESS:  I mean, I don't know that he

4    has a Q Score, in terms of a source of information.

5    Like, a -- you know, Q Scores are sort of a term

6    from the Q Score company that they use.  So I don't

7    know if they tracked him or not.

8    BY MR. KILARU:

9       Q.   Well, as you said a few minutes ago, you'

10   agree that it's a measure of a person's popularity;

11   correct?  You're -- it's trying to measure a

12   person's popularity; correct?

13      A.   It's trying to; correct.

14      Q.   And how popular a student athlete is would

15   have an effect on how likely they are to obtain

16   endorsements; correct?

17      A.   It certainly could be a factor.  And in

18   this case I think that's why this actual experiment

19   is so rare.  Sort of like you said; you know,

20   it's -- how often do you have cased that move into

21   the future?  You've got an after-period; right?  We

22   have -- we're lucky in this case in the sense, from

23   an economics perspective, that we happen to have an

24   actual natural experiment.

25           And so the individual payments for someone

1   like a Stetson Bennett that they receive begin to --

2   to off- -- to sort of come up with that Q Score of

3   those unique characteristics for that athlete.  My

4   analysis of Q Scores in other cases are that they

5   typically haven't changed that much over time unless

6   some major event occurs.

7        Q.   Okay.  Well, do you believe that Stetson

8   Bennett has the same level of popularity today that

9   he did when he started playing college football?

10       A.   I mean, I -- he just won a national

11  championship, so that's sort of unique.

12       Q.   So is that a no, you don't believe he has

13  the same level of popularity today than he did when

14  he started playing college football?

15       A.   I mean, I just haven't looked at him in

16  particular so I don't really have an opinion on that

17  because you're sort of representing to me -- I

18  didn't know that he started as a walk-on, as an

19  example.

20       Q.   Okay.

21       A.   I didn't remember that.  So...

22       Q.   Let me give you a different example.  Have

23  you heard of a student athlete named Doug Edert?

24       A.   No.

25       Q.   Okay.  So I'll represent to you that he

1   was a player on the Saint Peter's College basketball

2   team that had a pretty deep run in the NCAA

3   tournament that year.  Are you familiar with at

4   least the Saint Peter's experience?

5       A.   Yes.

6       Q.   Would you agree that the players at Saint

7   Peter's have a greater popularity today than they

8   did four years ago?

9       A.   I mean, again, I just haven't looked at

10  that particular example.  So it's -- you know, I

11  just don't know.  I mean, I imagine certainly

12  locally in their marketplace but not necessarily in

13  a broader marketplace.

14      Q.   Well, if Doug Edert has obtained NIL deals

15  post-NCAA tournament, his information would be part

16  of your damages analysis; correct?

17      A.   Yes.

18      Q.   You'd be calculating damages for him over

19  either the last two, three, or four years depending

20  on when he started playing; correct?

21      A.   Yes.

22      Q.   And so you don't have an opinion, though,

23  as to whether his popularity is the same after last

24  year's NCAA tournament as opposed to before?

25      A.   I mean, if before he didn't play as

1  often -- right? -- then I have an assessment of sort

2  of the role on the team that might show that, oh, he

3  didn't play as much when he was a freshman or a

4  sophomore and so there's an adjustment to be made

5  for that.  And that's likely to be correlated with

6  his popularity assuming that he was a -- one of the

7  reasons why Saint Peter's went far in the

8  tournament.

9       Q.   There's two separates points there I want

10  to follow up on.  First, is it your view that a

11  player's playing time is necessarily correlated with

12  popularity?

13      A.   Not necessarily but it's likely to be

14  correlated with popularity.  It's sort of hard to

15  become popular if they're not -- if a person's not

16  playing.

17      Q.   But assuming he played the same amount

18  before the NCAA tournament as after -- for example,

19  assume he played the same amount in the regular

20  season games preceding the NCAA tournament in that

21  given season versus after -- your model has no way

22  to account for that difference in popularity;

23  correct?

24      A.   Within the same season?

25      Q.   Yes.

1      A.   I think it would treat him in a similar

2  fashion of -- you know, because I'm doing it sort of

3  year to year.  I'm not doing it month to month;

4  right?  My analysis is year to year.

5           So, like, if he were paid after the

6  tournament and that's part of the same year, then

7  that's just sort of a single assessment of what his

8  value was that year or what he's -- you know, what

9  he earned that year.  So it sort of combines the --

10  whatever happened in the regular season and whatever

11  happened in the postseason.

12      Q.   Right.  Would you agree that particular

13  moments in sporting events may have -- may affect an

14  individual student athlete's popularity?

15      A.   Yes.

16      Q.   For example, a gymnast might have a

17  perfect-10 routine and then become much more popular

18  than she was before she had that perfect 10;

19  correct?

20      A.   Yes.

21      Q.   And those moments can occur within a

22  season; right?  Someone may start every game in

23  college basketball and then hit a shot to win the

24  NCAA tournament and they'll be much more popular

25  after that shot as they were the rest of the year;

1   correct?

2        A.   Yes.   And those are necessarily rare, in

3   the sense that -- practically by definition -- for

4   something to sort of capture people's attention.

5   Not everything can capture people's attention all at

6   the same time.

7             So the incidences of -- of a particular

8   situation where -- where, you know, a gymnast gets a

9   perfect 10 and people even hear it and notice it and

10  perhaps watch a video of it are not very common

11  practically by definition because other things are

12  happening too in people's lives; right?  So there's

13  only so many things that can sort of rise up to

14  become popular.

15       Q.   But you'd agree you have no way to predict

16  when those moments will occur; right?

17       A.   From a sports perspective, no, right.

18       Q.   And your model does not account for the

19  differences that may occur for a student athlete

20  before and after those events as long as they occur

21  within a single season; correct?

22       A.   Right.  So I'm -- if it occurs within a

23  single season, then my model's sort of treating that

24  as the whole season, like whatever -- whatever the

25  payment was for that season.  So it treats it sort

1  of as a single -- you know, a unit of entry for me

2  is a single season for -- for a particular athlete.

3       Q.   One more example.  If a student athlete

4  after the national championship game gets a paid

5  trip to Disneyland, after July 1, 2021 your model

6  would essentially give that same number for the last

7  two or three years depending on how long they

8  played; correct?  Subject to adjustments for year.

9       A.   Well, role on the team, conference, any

10  changes for COVID, things like that.  So there are

11  adjustments for those sorts of things.  But if

12  there's an athlete who received a payment -- and why

13  did they receive it?  Because they won a national

14  championship?

15       Q.   That's one example why.

16       A.   Yeah, the model doesn't -- other than the

17  idea that the athlete was already, you know, playing

18  a lot, playing on a major team, I mean, that's

19  what's really -- that's what this is capturing, is

20  those payments capture so much about the athlete,

21  the school that they choose to go to -- right? --

22  compared -- you know, a major Power Five school

23  compared to a group of five.  And the sport they're

24  playing -- right? -- that drives a lot of the

25  payments that these athletes are receiving.

1            So there's a whole lot that's built into

2   using what the natural experiment of watching what

3   the athletes got paid.

4            And so, you know, winning a national

5   championship and getting a free trip to Disneyland

6   is, you know, potentially correlated with playing on

7   a major program, playing on a popular sport that

8   gets a lot of media coverage; getting playing time

9   that they may not have gotten when they were a

10  freshman, for instance.

11           So -- and I do think that a lot of that

12  information is captured by the unique

13  characteristics of the situation we're in, which is

14  an athlete being on a particular team at a

15  particular school and then getting this payment;

16  right?  They've proven that they've got value in the

17  NIL market.  So I just think a lot of that is

18  captured -- capturing what you're talking about.

19       Q.   Just so I'm clear, though, the only

20  adjustments you propose to make in your report

21  are -- I'm going to list them one at a time so -- I

22  know you'll say there's others, if I just give you

23  one, but I'm going to give you what I think are the

24  fullest.

25           COVID in 2020 is one of them; correct?

1      A.    Correct.

2      Q.    Changes in school; correct?

3      A.    And COVID can be for two years, but --

4      Q.    Right.

5      A.    -- that's fine.

6      Q.    For COVID, generally speaking, is one

7  adjustment?

8      A.    Yes.

9      Q.    Otherwise you don't have year-over-year

10  adjustments, do you?

11      A.    Don't have what?

12      Q.    Otherwise you have no other year-over-year

13  adjustments; correct?

14      A.    I talk about if needed, although I don't

15  see good evidence for it, it's sort of an

16  inflationary adjustment, but it wouldn't be very

17  big.

18      Q.    So COVID is one.  Changes in school is

19  another; correct?

20      A.    Yes.

21      Q.    Participation level in sport is another;

22  correct?

23      A.    Yes.

24      Q.    And changes in role on squad are one as

25  well; correct?

1          A.    Yes.

2          Q.    And those are the only adjustments;

3     correct?

4          A.    Yes, based on the analysis that I've done

5     looking at the sort factors that would drive

6     potentially big changes in these numbers, those

7     capture the -- the bulk of that.  Because as I said

8     before, what they actually get paid is really --

9     captures a whole lot of unique characteristics of

10    that person.

11         Q.    Can I turn your attention to paragraph 237

12    of your report.

13         A.    Okay.

14         Q.    In this paragraph you're talking about

15    adjustment at the sport level for NIL compensation

16    by conference; correct?

17         A.    Yes.

18         Q.    And you say you'll test whether they are

19    statistically significant differences across

20    conferences within a given sport; right?

21         A.    Yes.

22         Q.    Okay.  You've not done that adjustment

23    yet; correct?

24         A.    No.  I mean, I -- it's -- it's as I'm

25    getting more data, the adjustment becomes more

1  feasible to do; right?  You can do it with the data

2  I have, but the more data you have, you get a better

3  analysis; right?  Because you get a more -- more

4  statistical certainty.

5      Q.   So you say that if there is a

6  statistically significant difference in demand for

7  the use of a transferred athlete's NIL, you'll make

8  an adjustment in the damages calculation; right?

9      A.   Yes.

10      Q.   Okay.  How will you make that adjustment?

11      A.   So, again, part of that will be to see

12  what it looks like.  But generally I will make an

13  adjustment that is sort of the typical percent

14  change in that -- for that sport and for that

15  conference; right?  Sort of like okay, here -- and

16  particularly for a school.  And I mention that.  But

17  imagine it just at the conference level; right?

18  You're going from a Sun Belt, as you mentioned

19  earlier, to an SEC school.  And sort of does that,

20  you know, change their marketability in some way

21  playing the same sport; right?  And so there would

22  be sort of an adjustment for that.  Sort of like you

23  would do an inflation adjustment; right?  It's an

24  average adjustment across a bunch of people or a

25  bunch of industries.  And this will be sort of an

1  adjustment from -- from conference to conference.

2      Q.   Is that --

3      A.   It's just statistical analysis.

4      Q.   Yeah, will that assessment involve some

5  kind of regression of those -- of variables being --

6  so it would be conference and the year?  Or what

7  would the variables be?

8      A.   So the variables would be sort of the

9  payments that we see in the marketplace and then

10  some control for which conference and sport they're

11  playing.  Potentially a control for position,

12  especially for quarterback.  That's sort of the one

13  that often stands out, as you guys probably have

14  seen in the data; right?

15          But, anyway.  It may just be a

16  statistical -- sort of a correlation analysis, like

17  a t-test, two-sided t-test.  It could definitely

18  be -- you could do it with a regression, although

19  that becomes redundant if you're doing a

20  single-variable t-test.

21          So, you know, you can do it in a number of

22  different ways, but it's all sort of using the same

23  set of data in common economic ways.

24      Q.   Do you know today what your methodology

25  will be for doing that, what tool you will use?

1        A.    I think I mention in here; to do a --

2   basically a test of differences by quartile, as an

3   example.

4        Q.    Right.  You give that as an example, but

5   is that what you intend to do, or will you use a

6   different methodology?

7        A.    Well, no, that's the methodology I intend

8   to do at this stage.  But as we move forward --

9   right? -- presumably we get more information; right?

10   Your experts may come up with something that's

11  interesting and it's like, okay, that's an

12  interesting idea, let me look at that; right?

13  That's sort of the point of as we march towards

14  justice; right?  And so then I might take that and

15  adjust it.  But as I sit here today I have a

16  reliable and reasonable model and method to measure

17  damages for the individual NIL plaintiffs.

18        Q.    You talk about making an adjustment for

19  role --

20        A.    Yes.

21        Q.    -- in your report --

22        A.    Yes.

23        Q.    -- in Section 7.3.4.1?

24        A.    Yes.

25        Q.    You'd agree you don't describe the

1   specific methodology you're going to use to make

2   that analysis; correct?

3        A.   I talk about using quartiles, doing the

4   sort of similar thing as I would for conference.

5   And looking to see if there's a major difference in

6   role.  I mean, what's been really interesting and

7   not surprising to me -- and maybe not surprising to

8   you guys -- but in the data that we've seen is that

9   freshman and underclassmen are getting paid quite a

10  bit for their use of their name, image, and

11  likeness, even if their role is not right away

12  expected to be that prominent.

13            And so there may not be an anal- -- you

14  know, when you compare sort of upper and lower

15  quartile or something like that in interquartile

16  range, you might not get much of a difference.  And

17  so if you don't, then there's really no reason to do

18  an adjustment.  But if you do, then you can make

19  that adjustment using sort of the average change.

20  For -- for a role, you know, you can do it by sport,

21  you can do it by conference if you needed to.  But

22  essentially just sort of looking at the average

23  change.

24       Q.   Have you decided what data you're going to

25  use?

1          A.    Yeah, I talk about it in here.   There's

2     data -- there's -- pro football, there's sort of

3     snaps played, you know, like basically how often is

4     someone playing; and then there's also -- for

5     basketball there's minutes played; right?   Those are

6     good assessments of sort of the role of the player

7     on the team; right?   Those have been used in tons of

8     other studies.

9          Q.    Right.   But have you personally looked at

10    that data and concluded that you can make a valid

11    adjustment based on that data?

12         A.    Yes.

13         Q.    Okay.   But you haven't performed that

14    analysis yet?

15         A.    No.

16         Q.    Any reason why not?

17         A.    As I said, I'm waiting to get more

18    information to make it more robust, like more --

19    subpoenas; you know, more discovery information;

20    right?   A lot of our information is just from the

21    early parts of this -- of the NIL period, of the

22    after-period.

23         Q.    You have a set of third-party NIL

24    information; correctly -- correct; right?

25         A.    Yes.

1        Q.    Okay.  And the data about snaps on Pro

2   Football Focus or the stats you mention on Sports

3   Reference and Her Hoop, those are already out

4   there -- correct? -- for the years in which you're

5   assessing damages?

6        A.    Yes.

7        Q.    Okay.  So why haven't you tried to do that

8   analysis and demonstrate it to this date?

9        A.    Well, I was describing the process of

10   doing that.  It's really sort of straightforward.

11   But as I said, I'm waiting to get more information

12   so that I can do a more robust version of that.

13   Instead of like doing it once and getting more

14   information and doing it again.  Sort of an

15   efficiency reason for it.

16        Q.    When do you intend to do that second

17   analysis?

18        A.    Likely over -- well, sort of I'll check in

19   to see where we're at on discovery and subpoenas but

20   likely over the next few months.

21        Q.    And are you planning to just add that as

22   an addendum to your existing report, or what's your

23   plan for actually giving us the results of this

24   methodology?

25        A.    I don't know.  I think there's a reply

1    report on the calendar somewhere.

2         Q.   Okay.  So you could perform this analysis

3    based on the data you have to date; is that fair to

4    say?

5         A.   So the problem is you sort of need a

6    sufficient number of data points to make it -- to

7    make it as usable as you'd like it to be, as I'd

8    like it to be.  And so I'm sort of waiting for more

9    data points.

10        Q.   Is your opinion that a model -- if you use

11   the methodology you have today described in this

12   report as applied to the data you have today, it

13   would not be a usable model?

14        A.   No, you can use it.  It just wouldn't be

15   as good a model as it would be if you had more data.

16        Q.   Do you believe that if you used the data

17   you have today and the methodology you list in this

18   report, you'd have an economically reliable model?

19             MR. SIEGEL:  I'll object; vague and

20   ambiguous in terms of the reliability.  Asking about

21   it currently?  Asking a period before?  Or --

22             MR. KILARU:  Yeah, I mean, you can object

23   to vague and ambiguous but I'll get there.

24             MR. SIEGEL:  Yeah, I'm just --

25             MR. KILARU:  But he can answer the

1  question.  So...

2          MR. SIEGEL:  To the extent you understand

3  it.

4          THE WITNESS:  So are you saying -- will

5  you just ask it again?

6  BY MR. KILARU:

7      Q.  Sure.  Do you believe that if you used the

8  data you have today and the methodology you list in

9  this report for third-party NIL, you would have an

10  economically reliable model?

11     A.  Yes.  It's an economically reliable method

12  that you -- yes.

13     Q.  Okay.  So why have you not included that

14  analysis in this report when you have included the

15  results of, for example, your modeling for broadcast

16  NIL damages?

17     A.  Well, because that includes all of the

18  class members.  I mean, there's really -- I'm not

19  waiting around for more information on broadcast or

20  on video games; right?  I mean, there may be more

21  information that comes and there may be some

22  relevant information, but I can do, you know, the

23  bulk of showing it -- again, at the class cert stage

24  if there's a method that's reliable and reasonable,

25  I can do that quite straightforward with the

1  broadcast data and the video game data.  With the

2  individual NIL data, I'm waiting -- I know that

3  there's more data coming and so I'm sort of waiting

4  to get a more robust set of information to provide a

5  more economically reliable model to the court.

6      Q.   Have you actually performed the model

7  independent of whether you've disclosed it in this

8  report?  Have you tried to build it and run it?

9      A.   Yes.  We have looked at different

10  conference effects.  I don't recall if we've done

11  the -- the role on the team.  I feel like they

12  started to do a sample version of that.

13      Q.   Okay.  Again, I'm -- if you've started to

14  do it already, I'm curious as to why it doesn't

15  appear in your report.

16      A.   Well, I mean, at the time I did the report

17  I only had data through whatever -- you know,

18  August or whatever it was.  I mean, it wasn't --

19  there wasn't -- it wasn't that robust of a set of

20  data.  And then we continue to get more data in.

21      Q.   So when you submitted the report, had you

22  run your third-party NIL model with the adjustments

23  on the data that was available?

24      A.   No.

25      Q.   Okay.  So your opinion is that the model

1   was reliable without having run it?

2       A.   Well, because it's standard economics --

3   it's very standard economics.

4       Q.   Understood.  But just to be clear, your

5   opinion is that the model you lay out in this report

6   was reliable as applied to the data you had without

7   your having actually run it; correct?

8       A.   I'm saying it's a reliable methodology

9   to -- it's a reliable methodology.  You're literally

10  measuring whether or not something is statistically

11  significant.  If it is you, apply it.  If it's not,

12  then there's no application.  There's no -- there's

13  nothing more to it than that.

14      Q.   Okay.  But you didn't include any of that

15  analysis in the report that you submitted in this

16  case thus far; correct?

17          MR. SIEGEL:  Objection; misstates

18  testimony.  Misstates the report.

19          THE WITNESS:  I don't -- yeah, I didn't

20  include any of those -- any of those sorts of

21  adjustments in here, no.

22  BY MR. KILARU:

23      Q.   Okay.  So you say -- if you look at

24  paragraph 122 of your -- sorry -- excuse me -- page

25  122 of your report, paragraph H -- you say that

1   there's damages of at least $21.2 million for other

2   lost NIL opportunity damages for the football and

3   men's basketball class; right?

4        A.   I see that.

5        Q.   You say there's damages of at least

6   $1.1 million for other lost opportunity damages for

7   the women's basketball class?

8        A.   Yes.

9        Q.   And you say that there's $11.3 million in

10  damages for the additional sports class; correct?

11  Or, sorry, I should take that back.  $10.7 million

12  for lost opportunity damages for the additional

13  sports class; correct?

14       A.   I see that, yes.

15       Q.   And that's based on -- that does not

16  involve you using any of the adjustments you measure

17  in the model?

18       A.   Um --

19       Q.   You describe in your report, I should say.

20  Not actually the model.

21       A.   Correct.  Yeah, this is sort of that first

22  step.

23            The reason that it's "at least as" is

24  because I know how much more -- like, I know that

25  there are a lot of other NIL payments that I just

1    haven't received yet.  And so I know based on the

2    size of that that this is a lower bound of what

3    those numbers will eventually tell us.  Because not

4    everybody can go from a small conference to a big

5    conference; right?  Some of the athletes -- some of

6    the athletes, you know, might go from a big

7    conference to a small conference.  So sort of

8    understanding the economics of how this NIL market

9    is playing out.

10         Q.   The numbers that we just discussed that

11    you put in this report are based solely on taking

12    post-July 1 transactions that you have and taking

13    them back for however many years the student athlete

14    had eligibility; correct?

15         A.   I think these are just for the one -- I'd

16    have to look.  I think these are just for the one

17    year.  So this isn't even including all the previous

18    years.  That's why it's "at least."

19         Q.   Right.  So -- well, I'll ask a slightly

20    different question.

21              The numbers that we just discussed are

22    based on your taking the data you had as of the date

23    of your report on transactions and supporting that

24    back for how many years the individual student

25    athlete had eligibility?

Page 251

1        A.   I don't know.  I think this is just -- I

2   would have to look at my report.

3        Q.   Please do.

4        A.   (Witness reviews document.)

5             So -- no, this is just reporting a single

6   year's worth of damages assuming no adjustments, but

7   not all the previous years prior to that, and then

8   not including all of the other data that's going to

9   come in presumably through discovery and subpoenas.

10       Q.   So you took the data you had for the 2021

11  year and just assumed that those transactions would

12  have existed in the 2020 year; correct?

13       A.   I adjusted for the eligibility of the

14  athletes.  Because some of the data we have coming

15  in, they're freshman.  So they weren't eligible in

16  prior years.  So I have to account for that.  And

17  then I'm not assuming this is just for 2020.  I'm

18  just saying this is one number.

19            So Exhibit 14 sort of shows -- I think it

20  adds up to the same number that you get.  Yeah.

21  That -- that we get in paragraph 234.  So I'm just

22  reporting essentially in paragraph 234 what's

23  reported in Exhibit 14.

24       Q.   Got it.

25       A.   So but it's only -- it would only be one

1  year's worth of damages and it wouldn't even include

2  all of the other potential folks that are out there

3  that -- whose data we're going to receive or we

4  already have received since the cutoff date in this

5  report, back in the late summer.

6      Q.   Right.  So it's one year of

7  transactions --

8      A.   Yes.

9      Q.   -- is the estimate that you have in here;

10 correct?

11     A.   I believe so, yes.

12     Q.   With none of the adjustments --

13     A.   Yes.

14     Q.   -- other than the one you just mentioned.

15 Okay.

16          You don't have a calculation of damages

17 for any of the named class members in this case as

18 to -- well, I'll strike that.

19          You don't have an estimation of damages

20 for Grant House; correct?

21     A.   I mean, I didn't take the model and apply

22 it to him in particular as a named plaintiff, no.

23     Q.   You don't have a calculation of damages

24 for Sedona Prince --

25     A.   No.

1          Q.    -- for third-party NIL; correct?

2          A.    I just have a method on how that would be

3     applied, yes.

4          Q.    And for the two of them, their only

5     damages would be for third-party NIL; correct?

6               MR. SIEGEL:  Objection; misstates report.

7               THE WITNESS:  She -- Sedona Prince might

8     get broadcast damages.

9     BY MR. KILARU:

10         Q.    Let me do that separately.  Fair point.

11              For House the only damage would be

12    third-party NIL; correct?

13         A.    Yes, I believe so.

14         Q.    Okay.  And for Prince you've calculated

15    the broadcast NIL damages but not the third-party

16    NIL damages; correct?

17         A.    I mean, I've shown the method to do that,

18    but, yes.

19         Q.    Okay.  You'd agree that the information

20    that you used were NIL transactions that were

21    reported to institutions; correct?

22         A.    Yes.

23         Q.    Okay.  Do you know whether those deals

24    were actually consummated and paid out?

25         A.    No.

1        Q.    Could we do Tab 26, what I think is

2    Tab 26.

3               Never mind.  Never mind.  I take that

4    back.

5               So if a student athlete reported a

6    transaction to their university and then became --

7    and then had that transaction revoked, that would

8    currently show up in your model; correct?

9        A.    The university might have removed it also.

10   I don't know.

11       Q.    You don't know one way or another?

12       A.    I mean, we're receiving information that I

13   believe the universities are relying upon themselves

14   to make their decisions and to comply with

15   whatever -- whoever they're complying with, whether

16   it's the school, the NCAA, the conference, or if

17   it's a state law or something like that.

18       Q.    So let me just give you a sort of specific

19   hypothetical example.  If a student athlete signed

20   an endorsement deal for, say, $5,000 for NIL and

21   reported that to the university -- that's step 1 --

22   after July 1, 2021 -- right?  So are you with me on

23   that?

24       A.    Yes.

25       Q.    Okay.  And then they lost that deal

1  because of some off-the-field conduct, they didn't

2  report that to the university -- are you still with

3  me?

4       A.   Yes.

5       Q.   -- your model would still say include that

6  $5,000 in the damages calculation; correct?

7            MR. SIEGEL:  Objection; incomplete

8  hypothetical.

9            THE WITNESS:  Yeah, I just don't know -- I

10 don't know what the university would do with that

11 information.  Presumably they would know that the

12 person had some off-field conduct that caused an

13 issue.  I mean, they might know that.  They might

14 check in with that student and say, hey, are you

15 still doing this deal or not.  Or if the deal

16 was even -- if it was publicly known that they

17 didn't get the deal, the university might make an

18 adjustment.  But I don't know if that happened in a

19 particular case or if that happened in your

20 hypothetical.

21 BY MR. KILARU:

22      Q.   You don't know if the university would

23 take out the deal from their reporting in that

24 circumstance; correct?

25           MR. SIEGEL:  Objection; calls for -- go

1  ahead.  You can answer.

2          THE WITNESS:  Yeah, I don't know what the

3  university would do in that case.

4  BY MR. KILARU:

5      Q.    If it did not take that deal out, it would

6  be reported as damages in your model currently;

7  correct?

8          MR. SIEGEL:  Objection; incomplete

9  hypothetical.  Calls for speculation.

10          THE WITNESS:  Again, it depends on the

11  situation.  Is the person a freshman or not; you

12  know, are they even in the model; are they in the

13  class.  All those different things.  But -- but,

14  yeah, the methodology would calculate what those

15  damages are.

16          MR. KILARU:  Okay.

17          THE WITNESS:  I don't know if in some

18  future class determination people would have to

19  prove or disprove anything.  I've -- you know, I've

20  seen cases like that where you have to sort of prove

21  you were harmed and you sort of show up with proof

22  or resubmit proof.  I mean, you -- I see those

23  securities cases all the time; right?  Submit your

24  proof that you bought the stock and you sold the

25  stock and what your losses were.

Page 257

```
1              MR. KILARU:  Just a couple more things and

2    then I think we'll take a break.
```

REDACTED - Highly Confidential – Counsel Only

```
25    collectives that are bundling money from donors and
```

1  providing them to student athletes?  Are you aware

2  of this?

3       A.   I'm aware of collectives.  I wouldn't

4  characterize it exactly the way you said, but, yes.

5       Q.   How would you characterize them?

6       A.   Well, they're -- they're gathering

7  finances or infor- -- money from various sources.

8  You call them donors.  But, I mean, whether they

9  donate to the school prior to that or not, I don't

10  know the answer to that.

11       Q.   I just meant to the collective.  I --

12       A.   Okay, donors to the collective.  Yes.

13       Q.   Do you have an opinion as to whether the

14  payments they are making to student athletes are for

15  NIL?

16            MR. SIEGEL:  Objection; overbroad.

17            THE WITNESS:  In general my presumption is

18  that the NCAA is enforcing its rules.  And I haven't

19  heard of any of those collectives' payments being

20  reversed.  So I presume that those payments are for

21  the use of the athletes' NIL.

22  BY MR. KILARU:

23       Q.   Other than that presumption, have you done

24  any -- do you have an opinion as to whether they're

25  for NIL or not?

1           MR. SIEGEL:  Objection; calls for a legal

2    conclusion.

3           THE WITNESS:  I mean, I'm just looking at

4    the marketplace and I'm noticing payments taking

5    place.  And I'm not -- I haven't heard of any

6    enforcement that has happened with the NCAA.

7           I mean, I'm aware that the NCAA has -- is

8    aware of the collectives and may potentially look

9    into some of them, but I haven't seen any evidence

10   that these collectives are being challenged or have

11   had to reverse any payments.  So that's my

12   presumption as I looked at the marketplace.

13   BY MR. KILARU:

14      Q.   I think this is my last question on this

15   topic and then -- or last set of questions on this

16   topic and then we can take a break.

17           But you'd agree that you're applying the

18   before- and after-method from the period from -- we

19   talked about starting in 2016 and then going to

20   whatever date it is in the future; correct?

21      A.   Yes.

22      Q.   Okay.  You'd agree that that model

23   benefits student athletes who optimize their

24   earnings in the after-period; correct?

25      A.   Well, I mean, it depends; their role on

1  the team and the conference affiliation.  Those

2  things may change.

3       Q.   Just to go back --

4       A.   Um --

5       Q.   Oh, please go ahead.

6       A.   So the school they chose, the sport they

7  play; right?  So, I mean, I don't -- I don't agree

8  with the way that you're basically characterizing

9  it.

10      Q.   Well, let me give you sort of a specific

11 example.  We talked earlier about the Saint Peter's

12 example where after the rules change, student

13 athletes at Saint Peter's made a run in the

14 tournament and may or may not have been able to

15 monetize their NIL as a result of that; right?

16 That's an example we talked about?

17      A.   Yes.

18      Q.   You're aware that in 2019 in the

19 before-period Loyola Chicago, a similarly not

20 high-profile school, made its Cinderella run in the

21 NCAA tournament; correct?  Are you aware of that?

22      A.   Yes.  With Sister Jean, yes.

23      Q.   Correct.  And the earnings for those

24 student athletes would be measured based -- the

25 damages for any of those student athletes would only

1  involve deals that they've struck since 2021;

2  correct?

3       A.   As opposed to -- what do you mean?  Deals

4  they struck before 2021?

5       Q.   I'm just asking the damages would be for

6  deals they were able to strike after July 1 of 2021;

7  right?

8       A.   Yes.

9            MR. KILARU:  Okay.  I think this is a good

10  place to take the break.  I'm hoping the next

11  session will be the last one.

12            THE VIDEOGRAPHER:  We're going off the

13  record.  The time is 6:15 p.m.  Sorry.  4:16 p.m.

14       (Recess taken from 4:15 p.m. to 4:32 p.m.)

15            THE VIDEOGRAPHER:  Okay.  We're back on

16  the record.  The time is 4:32 p.m.

17  BY MR. KILARU:

18       Q.   Doctor, I'd like to talk to you about

19  video games now, which is the last set of damages

20  that I believe you've modeled.

21       A.   Okay.

22       Q.   You calculate damages for the men's

23  football group based on, is it -- am I right -- is

24  it fair to say using the Madden game as a yardstick

25  for college football?

REDACTED - Highly Confidential – Counsel Only

REDACTED - Highly Confidential – Counsel Only

20      A.   Yeah, that's the -- I would say that's the

21  bulk of what I'm using those games for, as

22  comparables or as yardsticks.

23      Q.   Okay.  Starting with football, you'd agree

24  that the Madden game has fewer teams and fewer

25  players than any college football game; correct?

1        A.    You mean, any college football video game?

2        Q.    Yes.

REDACTED - Highly Confidential – Counsel Only

7        Q.    But when you're talking about a video

8    game, you're talking about a game that includes more

9    athletes than the Madden game; correct?

10       A.    Yes.

11       Q.    Okay.  You'd agree that the Madden game

12   for several years -- because there was no college

13   football game, the Madden game was one of the

14   primary games a consumer could play if they wanted

15   to sort of simulate playing football on a video

16   game; is that fair to say?

17       A.    I mean, the Madden game is for NFL, not

18   college football.  There's other games out there for

19   sure.  The Madden game's I think the most popular

20   historically.

21       Q.    You think it's the most comparable to

22   college football game.  Presumably why you used it

23   as a yardstick; right?

24       A.    Well, I sort of show it as comparable and

25   then I use it as a yardstick, yes.

Page 265

REDACTED - Highly Confidential – Counsel Only

```
 5        A.    I mean, right.  The fact is there wasn't a
 6    college football game.  Um -- right.
```

REDACTED - Highly Confidential – Counsel Only

```
22        A.    Correct.
23        Q.    Okay.  Turning to basketball.  And
24    basketball, too, you'd agree that there are fewer
25    teams and fewer players in the basketball games;
```

1   correct?

2       A.   In the pro basketball games?

3       Q.   In the pro basketball game, yes, than any

4   college game you've modeled.

5       A.   Yes.

6       Q.   Okay.  You would agree -- are you aware

7   that Take-Two discontinued its college basketball

8   game in 2008?

9       A.   Yes.

10      Q.   And EA discontinued its college basketball

11  game in 2010; right?

12      A.   Yes, that sounds right.

13      Q.   Okay.  And I'll represent to you that the

14  O'Bannon lawsuit was filed in July of 2009.  I'll

15  just represent to you.

16      A.   I think I remember that, yes.

17      Q.   Okay.  Do you have any analysis -- have

18  you done any analysis of why Take-Two discontinued

19  its NBA game in 2008?

REDACTED - Highly Confidential – Counsel Only

Page 267

REDACTED - Highly Confidential – Counsel Only

3      Q.   Right.  But my question was about

4    Take-Two.

5      A.   Well, you also asked about EA.

6      Q.   Right.  But the last question I asked -- I

7    mean, just so we're on the same page, the last

8    question I asked was do you have any analysis of why

9    Take-Two discontinued its NCAA game in 2008?

10     A.   I don't recall as I sit here the specifics

11   of that, no.

REDACTED - Highly Confidential – Counsel Only

17     Q.   And EA had actually discontinued its NBA

18   game, NBA Live, since 2019; right?

19     A.   Which is one of the reasons why I used

20   Take-Two, as sort of the -- they sort of seemed to

21   have won out in the NBA space and EA seems to have

22   won out in the NFL space.  It doesn't mean that they

23   aren't viable.  You know, we see lots of other

24   versions of video games too.  But the ones that are

25   sort of the comprehensive if it's in the game it's

1   in the game sort of style -- right? -- where you're

2   trying to mimic the actual game, there seems to be

3   sort of the Take-Two for the NBA and the -- the EA

4   for -- for the NFL.

5        Q.   Yeah, but you'd agree that EA discontinued

6   its NBA game, NBA Live, in 2019; right?

7        A.   I don't have -- I don't know the date.  So

8   you're giving me a year and I'm --

9        Q.   I'll represent to you that it was -- NBA

10  Live 2019 was the last version.

11       A.   Was the last version; right.

12       Q.   Have you done any analysis of whether

13  basketball games are a riskier investment or less

14  popular for companies like EA than football games?

15       A.   I mean, there is analysis -- some of the

16  information that I looked at points to -- well, you

REDACTED - Highly Confidential – Counsel Only

22  or done a particular risk analysis to see the

23  likelihood of success for a particular game.

24       Q.   You do model damages for a college

25  basketball game; correct?

1      A.   Yes.

2      Q.   Okay.  And the last college basketball

3  game that existed was the EA game in 2010.  I'll

4  just represent that to you.  Okay.

5           Any reason to doubt that?

6      A.   I'm trying to recall if there were mobile

7  games.  But from what I'm -- the type of damages

8  that I'm looking at are not typically mobile games,

9  although those are now popular.

10          So I don't know for sure that there hasn't

11 been some sort of college game.  But as I sit here

12 I'm not modeling -- as I sit here I'm relying on

13 information that was used for the EA and the

14 Take-Two college games.

15     Q.   Which were both discontinued well before

16 the college football game; right?

17     A.   Yes.

REDACTED - Highly Confidential – Counsel Only

REDACTED - Highly Confidential – Counsel Only

```
10          MR. KILARU:  Okay.  Could we get Tab 38.

11          I'm going to hand you a document that I

12  believe you relied on that's produced in the case.

13  I'm going to give you a second to read it.

14          MR. SIEGEL:  What exhibit number is this?

15          MR. FULLER:  11.

16          THE REPORTER:  Yeah.

17                  (Exhibit 11 marked.)

18          THE WITNESS:  So I -- the redacted, I --

19          MR. KILARU:  Yeah, I'm not going to ask

20  you about any of that.

21          THE WITNESS:  Okay.

22  BY MR. KILARU:
```

REDACTED - Highly Confidential – Counsel Only

REDACTED - Highly Confidential – Counsel Only

```
 1          Q.    Okay.  We're done with this exhibit.
 2    Thanks.
 3          You'd agree, I think you say in your
 4    report -- I'll direct you to the paragraph -- page
 5    65, paragraph 135 -- you say that developing a
 6    top-of-the-line video game will take time.  And I'll
 7    wait until you get there.
 8          A.    Just which sentence, or where is it?
 9          Q.    Sorry.  I'll read the first sentence to
10    you.  It's page 65.  It's the second sentence.  "The
11    physical" -- "Similarly, the physical process of
12    developing a top-of-the-line video game once it has
13    been discontinued for many years can take time."
14          You agree with that statement; right?
15          A.    Yes.
```

REDACTED - Highly Confidential – Counsel Only

REDACTED - Highly Confidential – Counsel Only

REDACTED - Highly Confidential – Counsel Only

13       Q.   Okay.  You'd agree that as a -- in the

14   economic literature, opt-in systems typically

15   feature less participation than opt-out systems; is

16   that fair to say?

17            MR. SIEGEL:  Objection; overbroad.

18            THE WITNESS:  I mean, that's -- certainly

19   can be the case.  There is literature that says that

20   there's probably -- there possibly could be

21   counter-literature.  I haven't looked at that

22   particular question in this case so I really don't

23   have an opinion on it.

24   BY MR. KILARU:

REDACTED - Highly Confidential – Counsel Only

REDACTED - Highly Confidential – Counsel Only

REDACTED - Highly Confidential – Counsel Only

 9        Q.    And your model assumes that every player

10   on a roster starting in 2016 would actually -- every

11   player who has a scholarship or third-party NIL

12   would actually take and participate in the game;

13   correct?

14        A.    My model assumes for measuring damages

15   that the athletes -- that there would have been a

16   certain amount of payment based on sort of full 85

17   rosters for football -- 85 athletes for football.

18   And those payments would be based on that.  In order

19   to measure a payment for a particular athlete, it

20   assumes that that athlete would have wanted to

21   receive that payment and they would have opted in.

22        Q.    Right.  So you assumed that every -- let's

23   do these separately.  We'll start.  So, first, every

24   member -- every person who was on a men's football

25   or a men's basketball roster on a full scholarship

1  in 2016 to 2021, your model assumes they would have

2  opted in; correct?

3            MR. SIEGEL:  Objection; misstates

4  testimony.  Asked and answered.

5            THE WITNESS:  So the dollar amount

6  doesn't -- doesn't assume that.  So a particular

7  athlete who does opt in is not affected by whether

8  another athlete chooses to opt in or not; right?

9  But assigning a damage amount to each athlete is

10 assuming that -- that 85 athletes opt in for

11 football and, say, 13 for men's basketball.

12 BY MR. KILARU:

13     Q.   I get that you calculate a per- -- I

14 understand you calculate a per- -- you agree with me

15 you calculation a per-student-athlete number;

16 correct?

17     A.   Correct.

18     Q.   And then you figure out how many people --

19 in calculating a total number of damages, you

20 multiply that by the number of scholarship players;

21 correct?

22            MR. SIEGEL:  Objection; misstates

23 testimony.  Misstates report.  Asked and answered.

24            THE WITNESS:  Yeah, I do a per-athlete

25 calculation.

1    BY MR. KILARU:

2        Q.   Let's look at the chart in your report on

3    that.  So can we go to page -- give me a minute.

4             Okay.  So let's look at Exhibit 3 on page

5    72.

6        A.   All right.  Let me get to that.

7             Okay.

8        Q.   Okay.  So just walking through this.  You

9    calculate a per-athlete royalty for all Division I

10   basketball athletes; correct?  That's the third

11   column?

12       A.   Yes.

13       Q.   Okay.  And then you figure out -- you have

14   here the number of Power Five basketball class

15   members; correct?

16       A.   Yes.

17       Q.   Okay.  And then you have per-class-member

18   damages which are the same number as the royalty;

19   right?

20       A.   Yes.

21       Q.   Okay.  And then the total class member

22   damages multiplies the per-class-member damages by

23   the number of Power Five basketball class members;

24   correct?

25       A.   Yes.

1      Q.   So your model includes every single member

2   of the Power Five basketball class opting in?

3      A.   Yes.  The total damages does.  The

4   per-class-member damages doesn't -- doesn't require

5   that.

6      Q.   Right.  But the total number assumes

7   everyone opting in; correct?

8      A.   Yes.

9           MR. SIEGEL:  Objection; misstates -- that

10  misstates report --

11          Let me get my objection in.

12          Misstates report; misstates the testimony.

13          THE WITNESS:  Yes, it multiplies the Power

14  Five basketball class members times the

15  per-class-member damages.

16  BY MR. KILARU:

17     Q.   Okay.  So just turning to the next page.

18  The football methodology is the same; correct?

19     A.   Yes.

20     Q.   So the calculation of the total class

21  member damages involves every member of the Power

22  Five football class opting into the video game?

23          MR. SIEGEL:  Objection; misstates report.

24          THE WITNESS:  I'm just looking.  It's --

25  it's assuming 85 per team.  So it's essentially

Page 280

1    every Power Five full-scholarship athlete, yeah.

2    BY MR. KILARU:

REDACTED - Highly Confidential – Counsel Only

7        A.   No, I don't.  I mean, it's -- it's sort of

8    like what we see in other class actions where an

9    amount is determined -- we see in some other class

10   actions where an amount is determined for damages

11   and then people, like I mentioned before, opt in,

12   oh, here's my stock information for some securities,

13   you know, class action.  And if somebody doesn't opt

14   in, then they don't get that amount.

15        So it doesn't -- it's sort of -- it

16   doesn't impact the sort of per-class-member damages.

17   It just impacts -- you know, it's just the total

18   number of -- of estimated damages on a class-wide

19   basis.

20        Q.   All right.  Okay.

REDACTED - Highly Confidential – Counsel Only

REDACTED - Highly Confidential – Counsel Only

REDACTED - Highly Confidential – Counsel Only

10      Q.   Okay.  You -- your model includes -- for

11  the football game for a minute -- every one of the

12  85 athletes on a roster -- every one of the 85

13  scholarship athletes on a roster; correct?

14      A.   For football?

15      Q.   Yes.

16      A.   Correct, yes.

17      Q.   Are you aware of whether -- so the NCAA

18  football game last existed in 2013.  I'll represent

19  that to you.  And are you aware of the roster size

20  of each team in that game?

21      A.   I don't -- no, I don't recall as I sit

22  here.

23      Q.   I'll represent to you that it had 68

24  players in the game per team instead of 85.  Okay?

25  I'll just represent that to you.

Page 283

1          A.     Okay.

2          Q.     Your knowledge -- to your knowledge that

3    would be -- 68 would be lower than the scholarship

4    number in 2013; right?

REDACTED - Highly Confidential – Counsel Only

20          Q.     Right.  I'm just asking you about the -- I

21    think the benchmark you used which is the last

22    football game.  You'd agree that there were only 68

23    players on a roster then; right?

24          A.     I jut -- as I said, I don't remember how

25    many were on the roster --

1      Q.   Well, I'll tell you --

2      A.   -- in 2013.

3      Q.   Assuming it's 68.  You don't know how they

4  decided which 68 to use; right?

5      A.   In the past?

6      Q.   Yes.

7           MR. SIEGEL:  Objection; calls for

8  speculation.  Assumes facts not in evidence.

9           THE WITNESS:  I mean, I remember seeing

10  rosters with the names of, you know, actual

11  athletes.  I'm trying to remember if there was -- I

12  just don't recall if they had a system for choosing

13  those 68.  I just don't recall as I sit here.  But I

14  do remember seeing the names of the athletes.

15  BY MR. KILARU:

16      Q.   Your model also assumes that video game

17  companies would provide the royalty only to

18  scholarship athletes; correct?

19      A.   That's how I've calculated it.  Yes.

20      Q.   Um --

REDACTED - Highly Confidential – Counsel Only

REDACTED - Highly Confidential – Counsel Only

```
 8        Q.    Right.   But I'm asking about your model,
 9   which is the 85; right?
10        A.    Right.
11        Q.    So in your model there would be no royalty
12   allocated to a punter who is not on scholarship;
13   right?
14        A.    No, not in the way I've done this
15   calculation for -- for class cert --
16        Q.    Even though --
17        A.    -- purposes.
18        Q.    -- assuming the game play is similar to
19   how it was in the past, the punter would be someone
20   you would manipulate as part of the game and have
21   them punt to a corner of the field or what have you?
22        A.    You're saying the punter doesn't have a
23   scholarship.  But I'm assuming --
24        Q.    In the hypothetical the punter doesn't
25   have a scholarship.
```

1       A.    That's -- in your hypothetical, yeah.

2             Yeah, if they don't have a scholarship,

3    then I'm not calculating a damage for them.  At the

4    same time, you know, it's certainly possible to do

5    that if for some reason EA decided to come out with

6    a game that had a hundred athletes, then it would be

7    possible to calculate damages, you know, for --

8    based on a hundred athletes.

9       Q.    Okay.  You're aware that today video games

10   often involve rosters that update live?  So you can

11   get a new roster pushed to your console daily,

12   weekly, monthly?

13      A.    I'm aware of that.

14      Q.    Okay.  Is it your opinion that in the

15   but-for world, video game companies would provide a

16   royalty to student athletes who are disqualified

17   from a team after the season starts?

18      A.    So in my model -- again, looking in the

19   past -- I'm measuring a reasonable estimate of

20   damages for 85 scholarship athletes.  If one of them

21   is ineligible for some reason after the season

22   starts -- I think that's how you characterize it --

23   I'm still measuring a damages calculation for them

24   in the past.

25      Q.    The same would be true for a student

1    athlete who stopped playing a couple of games into

2    the season, just decided they didn't want to play

3    the sport anymore?

4            MR. SIEGEL:  Objection; incomplete

5    hypothetical.

6            THE WITNESS:  I mean, it sort of depends

7    when the game comes out and they're in the game;

8    like, their name, image, and likeness is being used

9    in the game.  Whether or not they're still on the

10   team, their NIL is still being used in the game.

11   And so I -- I think it's perfectly reasonable to

12   calculate a -- a damages estimate for them.  They're

13   still being used in the game.  It's not like as if

14   the game pulls them out.

15   BY MR. KILARU:

16       Q.   Could you turn to Appendix Exhibit C2 in

17   your report.  It's at page 124.

18       A.   Okay.

REDACTED - Highly Confidential – Counsel Only

REDACTED - Highly Confidential – Counsel Only

REDACTED - Highly Confidential – Counsel Only

8    BY MR. KILARU:

9         Q.    In your model you use the same royalty

10   rate for the extra content in the full game; right?

11        A.    Yes.

12        Q.    And just turning to the next page -- I

13   don't want to ask all the same questions to belabor

14   the point -- the same points are true for the

15   football game; right?

16        A.    Yes.

17             MR. KILARU:  Okay.  We should take a

18   break.  I'm reasonably sure I'm done, but I just

19   want to take a couple of minutes to make sure.

20   Thanks.

21             THE VIDEOGRAPHER:  We're going off the

22   record.  The time is 5:07 p.m.

23        (Recess taken from 5:07 p.m. to 5:18 p.m.)

24             THE VIDEOGRAPHER:  We're back on the

25   record.  The time is 5:18 p.m.

Page 290

1              MR. KILARU:  We have no further questions

2     at this time.  Thanks, Doctor.

3              THE WITNESS:  Thank you.

4              THE VIDEOGRAPHER:  This concludes today's

5     deposition of Dr. Daniel Rascher.  Master media of

6     today's deposition will remain in the custody of

7     TSG.  The time is 5:18 p.m.  We are now off the

8     record.

9              (Proceedings adjourned at 5:18 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF REPORTER

2          I, HEIDI BELTON, a Certified Shorthand

3   Reporter, hereby certify that the witness in the

4   foregoing deposition was by me duly sworn to tell

5   the truth, the whole truth, and nothing but the

6   truth in the within-entitled cause;

7          That said deposition was taken down in

8   shorthand by me, a disinterested person, at the time

9   and place therein stated, and that the testimony of

10  the said witness was thereafter reduced to

11  typewriting, by computer, under my direction and

12  supervision;

13         That before completion of the deposition

14  review of the transcript was not requested.

15         I further certify that I am not of counsel

16  or attorney for either or any of the parties to the

17  said deposition, nor in any way interested in the

18  event of this cause, and that I am not related to

19  any of the parties thereto.

20  DATED:  January 11, 2023

21  _____

22          HEIDI BELTON, CSR, RMR, CRR, CCRR, CRC

23          CSR NO. 12885

24

25

ERRATA SHEET

Case Name: *In re College Athlete NIL Litigation*

Deposition Date: January 10, 2023

Deponent: Daniel Rascher

| Pg. | No. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| 32 | 25 | "believe that's -- I have that in my -- in" | "believe I have that in" | Clarification |
| 33 | 6 | "a reasonable and reliable damage" | "reasonable and reliable damages" | Clarification |
| 36 | 1 | "and -- and the -- the use of those -- of those NILs" | "and the use of those NILs" | Clarification |
| 39 | 25 | "hem" | "them" | Transcription Error |
| 50 | 12 | "those other -- those -- that other historical" | "those other historical" | Clarification |
| 52 | 7 | "578 or 567" | "5, 6, 7" | Transcription error; Clarification |
| 61 | 19 | "of -- of the -- of the value -- of the value of that -- of that NIL" | "of the value of that NIL" | Clarification |
| 81 | 9 | "instead of the sort of" | "instead of the" | Clarification |
| 82 | 19 | "encounter" | "counter" | Transcription Error |
| 92 | 13 | "to a class-wide basis" | "on a class-wide basis" | Clarification |
| 93 | 3 | "notable" | "knowable" | Transcription error |
| 112 | 16 | "statements" | "payments" | Transcription error |
| 113 | 5 | "Schwartz" | "Schwarz" | Clarification |
| 116 | 18 | "offering" | "offered" | Clarification |
| 128 | 4 | "paid" | "pay" | Transcription error |
| 130 | 13 | "to make way" | "equally" | Transcription error |
| 158 | 9 | "think 450" | "Think 450" | Transcription error |
| 163 | 4 | "broadcaster" | "broadcast or" | Transcription error |

| 177 | 6 | "encounter" | "counter" | Transcription error |
|-----|-----|-------------|-----------|---------------------|
| 185 | 17 | "NCS" | "FCS" | Transcription error |
| 185 | 21 | "did" | "it" | Transcription error |
| 205 | 22 | "or" | "to" | Transcription error |
| 235 | 23 | "group of five" | "Group of Five" | Transcription error |
| 238 | 5 | "sort factors" | "sort of factors" | Transcription error |

Signature of Deponent, Daniel Rascher