# EXHIBIT 8

## To the Declaration of Rakesh N. Kilaru

Dear Colleague Letter: Bowling Green State University -- Pingtext



# U.S. Department of Education

🖶 Print                                                                                    ✖ Close Window

# Dear Colleague Letter: Bowling Green State University

[OCR-00019]

OFFICE FOR CIVIL RIGHTS
THE ASSISTANT SECRETARY

July 23, 1998

Dear Colleague:

The Office for Civil Rights (OCR) of the U.S. Department of Education is currently investigating twenty-five complaints which allege discrimination in the awarding of athletic scholarships in intercollegiate athletics programs. Your institution is among these complaints.

OCR is investigating these complaints under the jurisdiction of Title IX of the Education Amendments of 1972 (Title IX) which prohibits discrimination on the basis of sex in any education program or activity, including the athletic program, which receives Federal funds. Regarding the award of intercollegiate athletics scholarships, Title IX requires that such scholarships be made available to the separate men's and women's athletic programs in a manner which is "substantially proportionate" to the participation rates of male and female athletes.

In response to a specific request for guidance on this matter, our office recently issued a written response to the General Counsel of Bowling Green State University. I am forwarding a copy of this letter for your reference. This letter clarifies the coverage of Title IX and its regulations as they apply to both academic and athletic programs and discusses specifically the 1979 Intercollegiate Athletics Policy Interpretation of the "substantially proportionate" provision of Title IX as it relates to the funding of athletic scholarships for men's and women's intercollegiate athletics programs.

If OCR staff may be of further assistance, please do not hesitate to contact Dr. Mary Frances O'Shea, national Coordinator for Title IX Athletics, at (312)886-8434, or your local OCR office. We look forward to working cooperatively with you. Sincerely, /s/ Norma V. Cantú Assistant Secretary Office for Civil Rights Enclosure

-------------------------------------------------------------------------------

[OCR-00020]

UNITED STATES DEPARTMENT OF EDUCATION
WASHINGTON, D.C. 20202-
July 23, 1998

Ms. Nancy S. Footer
General Counsel
Bowling Green State University
308 McFall Center
Bowling Green, Ohio 43403-0010

Dear Ms. Footer:

This is in response to your letter requesting guidance in meeting the requirements of Title IX, specifically as it relates to the equitable apportionment of athletic financial aid. Please accept my apology for the delay in responding. As you know, the Office for Civil Rights (OCR) enforces Title IX of the Education Amendments of 1972, 20 U.S.C. ? 1682, which prohibits

discrimination on the basis of sex in education programs and activities.

The regulation implementing Title IX and the Department's Intercollegiate Athletics Policy Interpretation published in 1979 -- both of which followed publication for notice and the receipt, review, and consideration of extensive comments -- specifically address intercollegiate athletics. You have asked us to provide clarification regarding how educational institutions can provide intercollegiate athletes with nondiscriminatory opportunities to receive athletic financial aid. Under the Policy Interpretation, the equitable apportioning of a college's intercollegiate athletics scholarship fund for the separate budgets of its men's and women's programs -- which Title IX permits to be segregated -- requires that the total amounts of scholarship aid made available to the two budgets are "substantially proportionate" to the participation rates of male and female athletes. 44 Fed. Reg. 71413, 71415 (1979)).

In responding, I wish (1) to clarify the coverage of Title IX and its regulations as they apply to both academic and athletic programs, and (2) to provide specific guidance about the existing standards that have guided the enforcement of Title IX in the area of athletic financial aid, particularly the Policy Interpretation's "substantially proportionate" provision as it relates to a college's funding of the athletic scholarships budgets for its men's and women's teams. At the outset, I want to clarify that, wholly apart from any obligation with respect to scholarships, an institution with an intercollegiate athletics program has an independent Title IX obligation to provide its students with nondiscriminatory athletic participation opportunities. The scope of that separate obligation is not addressed in this letter, but was addressed in a Clarification issued on January 16, 1996.

Title IX Coverage: Athletics versus Academic Programs

Title IX is an anti-discrimination statute that prohibits discrimination on the basis of sex in any education program or activity receiving federal financial assistance, including athletic programs. Thus, in both academics and athletics, Title IX guarantees that all students, regardless of gender, have equitable opportunities to participate in the education program. This guarantee does not impose quotas based on gender, either in classrooms or in athletic programs. Indeed, the imposition of any such strict numerical requirement concerning students would be inconsistent with Title IX itself, which is designed to protect the rights of all students and to provide equitable opportunities for all students.

Additionally, Title IX recognizes the uniqueness of intercollegiate athletics by permitting a college or university to have separate athletic programs, and teams, for men and women. This allows colleges and universities to allocate athletic opportunities and benefits on the basis of sex. Because of this unique circumstance, arguments that OCR's athletics compliance standards create quotas are misplaced. In contrast to other antidiscrimination statutes, Title IX compliance cannot be determined simply on the basis of whether an institution makes sex-specific decisions, because invariably they do. Accordingly, the statute instead requires institutions to provide equitable opportunities to both male and female athletes in all aspects of its two separate athletic programs. As the court in the Brown University case stated, "[i]n this unique context, Title IX operates to ensure that the gender-segregated allocation of athletic opportunities does not disadvantage either gender. Rather than create a quota or preference, this unavoidable gender-conscious comparison merely provides for the allocation of athletic resources and participation opportunities between the sexes in a non-discriminatory manner." Cohen v. Brown University, 101 F.3d 155, 177 (1st Cir. 1996), cert. denied, 117 S. Ct. 1469 (1997). The remainder of this letter addresses the application of Title IX only to athletic scholarships.

Athletics: Scholarship Requirements

With regard to athletic financial assistance, the regulations promulgated under Title IX provide that, when a college or university awards athletic scholarships, these scholarship awards must be granted to "members of each sex in proportion to the number of students of each sex participating in... intercollegiate athletics." 34 C.F.R. 106.37(c). Since 1979, OCR has interpreted this regulation in conformity with its published "Policy Interpretation: Title IX and Intercollegiate Athletics," 44 Fed. Reg. 71413 (December 11, 1979). The Policy Interpretation does not require colleges to grant the same number of scholarships to men and women, nor does it require that individual scholarships be of equal value. What it does require is that, at a particular college or university, "the total amount of scholarship aid made available to men and women must be substantially proportionate to their [overall] participation rates" at that institution. Id. at 71415. It is important to note that the Policy Interpretation only applies to teams that regularly compete in varsity competition. Id. at 71413 and n. 1.

Under the Policy Interpretation, OCR conducts a "financial comparison to determine whether proportionately equal amounts of financial assistance (scholarship aid) are available to men's and women's athletic programs." Id. The Policy Interpretation goes on to state that "[i]nstitutions may be found in compliance if this comparison results in substantially equal amounts or if a

disparity can be explained by adjustments to take into account legitimate nondiscriminatory factors." Id.

A "disparity" in awarding athletic financial assistance refers to the difference between the aggregate amount of money athletes of one sex received in one year, and the amount they would have received if their share of the entire annual budget for athletic scholarships had been awarded in proportion to their participation rates. Thus, for example, if men account for 60% of a school's intercollegiate athletes, the Policy Interpretation presumes that -- absent legitimate nondiscriminatory factors that may cause a disparity -- the men's athletic program will receive approximately 60% of the entire annual scholarship budget and the women's athletic program will receive approximately 40% of those funds. This presumption reflects the fact that colleges typically allocate scholarship funds among their athletic teams, and that such teams are expressly segregated by sex. Colleges' allocation of the scholarship budget among teams, therefore, is invariably sex-based, in the sense that an allocation to a particular team necessarily benefits one sex to the exclusion of the other. See Brown, 101 F.3d at 177. Where, as here, disparate treatment is inevitable and a college's allocation of scholarship funds is "at the discretion of the institution," Brown, 101 F.3d at 177, the statute's nondiscrimination requirement obliges colleges to ensure that men's and women's separate activities receive equitable treatment. Cf. United States v. Virginia, 518 U.S. 515, 554 (1996).

Nevertheless, in keeping with the Policy Interpretation's allowance for disparities from "substantially proportionate" awards to the men's and women's programs based on legitimate nondiscriminatory factors, OCR judges each matter on a case-by-case basis with due regard for the unique factual situation presented by each case. For example, OCR recognizes that disparities may be explained by actions taken to promote athletic program development, and by differences between in-state and out-of-state tuition at public colleges. 44 Fed. Reg. at 71415. Disparities might also be explained, for example, by legitimate efforts undertaken to comply with Title IX requirements, such as participation requirements. See, e.g., Gonyo v. Drake Univ., 879 F. Supp. 1000, 1005-06 (S.D. Iowa 1995). Similarly, disparities may be explained by unexpected fluctuations in the participation rates of males and females. For example, a disparity may be explained if an athlete who had accepted an athletic scholarship decided at the last minute to enroll at another school. It is important to note that it is not enough for a college or university merely to assert a nondiscriminatory justification. Instead, it will be required to demonstrate that its asserted rationale is in fact reasonable and does not reflect underlying discrimination. For instance, if a college consistently awards a greater number of out-of-state scholarships to men, it may be required to demonstrate that this does not reflect discriminatory recruitment practices. Similarly, if a university asserts the phase-in of scholarships for a new team as a justification for a disparity, the university may be required to demonstrate that the time frame for phasing-in of scholarships is reasonable in light of college sports practices to aggressively recruit athletes to build start-up teams quickly.

In order to ensure equity for athletes of both sexes, the test for determining whether the two scholarship budgets are "substantially proportionate" to the respective participation rates of athletes of each sex necessarily has a high threshold. The Policy Interpretation does not, however, require colleges to achieve exact proportionality down to the last dollar. The "substantially proportionate" test permits a small variance from exact proportionality. OCR recognizes that, in practice, some leeway is necessary to avoid requiring colleges to unreasonably fine-tune their scholarship budgets.

When evaluating each scholarship program on a case-by-case basis, OCR's first step will be to adjust any disparity to take into account all the legitimate nondiscriminatory reasons provided by the college, such as the extra costs for out-of-state tuition discussed earlier. If any unexplained disparity in the scholarship budget for athletes of either gender is 1% or less for the entire budget for athletic scholarships, there will be a strong presumption that such a disparity is reasonable and based on legitimate and nondiscriminatory factors. Conversely, there will be a strong presumption that an unexplained disparity of more than 1% is in violation of the "substantially proportionate" requirement.

Thus, for example, if men are 60% of the athletes, OCR would expect that the men's athletic scholarship budget would be within 59%-61% of the total budget for athletic scholarships for all athletes, after accounting for legitimate nondiscriminatory reasons for any larger disparity. Of course, OCR will continue to judge each case in terms of its particular facts. For example, at those colleges where 1% of the entire athletic scholarship budget is less than the value of one full scholarship, OCR will presume that a disparity of up to the value of one full scholarship is equitable and nondiscriminatory. On the other hand, even if an institution consistently has less than a 1% disparity, the presumption of compliance with Title IX might still be rebutted if, for example, there is direct evidence of discriminatory intent.

OCR recognizes that there has been some confusion in the past with respect to the Title IX compliance standards for scholarships. OCR's 1990 Title IX Investigator's Manual correctly stated that one would expect proportionality in the awarding of scholarships, absent a legitimate, nondiscriminatory justification. But that Manual also indicated that compliance with the

"substantially proportionate" test could depend, in part, upon certain statistical tests. In some cases, application of such a statistical test would result in a determination of compliance despite the existence of a disparity as large as 3-5%.

We would like to clarify that use of such statistical tests is not appropriate in these circumstances. Those tests, which are used in some other discrimination contexts to determine whether the disparities in the allocation of benefits to different groups are the result of chance, are inapposite in the athletic scholarship context because a college has direct control over its allocation of financial aid to men's and women's teams, and because such decisions necessarily are sex-based in the sense that an allocation to a particular team will affect only one sex. See Brown, 101 F.3d at 176-78 (explaining why college athletics "presents a distinctly different situation from admissions and employment," and why athletics requires a different analysis than that used in such other contexts "in order to determine the existence vel non of discrimination"). In the typical case where aid is expressly allocated among sex-segregated teams, chance simply is not a possible explanation for disproportionate aid to one sex. Where a college does not make a substantially proportionate allocation to sex-segregated teams, the burden should be on the college to provide legitimate, nondiscriminatory reasons for the disproportionate allocation. Therefore, the use of statistical tests will not be helpful in determining whether a disparity in the allocations for the two separate athletic scholarship budgets is nondiscriminatory.

While a statistical test is not relevant in determining discrimination, the confusion caused by the manual's inclusion of a statistical test resulted in misunderstandings. Therefore, OCR is providing this clarification regarding the substantial proportionality provision found in the 1979 Policy Interpretation to confirm the substance of a longstanding standard. In order to ensure full understanding, OCR will apply the presumptions and case-by-case analysis described in this letter for the 1998-99 academic year. OCR strongly encourages recipients to award athletic financial assistance to women athletes in the 1997-98 academic year consistent with this policy clarification, both as a matter of fairness and in order to ensure that they are moving towards the policy clarification stated in this letter.

I trust that this letter responds to the questions the University has regarding the "substantially proportionate" provision of the Policy Interpretation in the context of the funding for an institution's two separate athletic scholarship budgets for male and female athletes. I am sending a copy of this letter as technical assistance to the complainants and the other 24 recipients also currently involved with OCR on the issue of awarding athletic financial assistance. We will be in contact with you shortly to continue to work with the University regarding this matter and to discuss other points raised in your letter. If you have any questions regarding this letter, please contact me at (312) 886-8387.

Sincerely yours,
/s/
Dr. Mary Frances O'Shea
National Coordinator for Title IX Athletics

Top

Print                                                                                                    ✖ Close Window

Last Modified: 08/26/2020