# EXHIBIT 9

## To the Declaration of Rakesh N. Kilaru

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                  OAKLAND DIVISION

4

  IN RE COLLEGE ATHLETE          )
5 NIL LITIGATION                 )
                                 ) Case No.:
6                                ) 4:20-cv-03919-CW

7

8

9

10

11

          VIDEO-RECORDED DEPOSITION OF GRANT HOUSE
12

13

14

                    Phoenix, Arizona
15                 February 10, 2023
                      9:00 a.m.
16

17

18

19

20

21

22

23  REPORTED BY:
    Kristy A. Ceton, RPR, CRR
24  AZ Certified Court Reporter No. 50200

25  Job #: 220890

```
 1          VIDEO-RECORDED DEPOSITION OF GRANT HOUSE

 2   commenced at 9:00 a.m., on February 10, 2023, at

 3   Polsinelli, P.C., 1 East Washington, Suite 1200,

 4   Phoenix, Arizona, before Kristy A. Ceton, RPR, CRR,

 5   Arizona Certified Court Reporter No. 50200.

 6

 7                        * * *

 8

 9   APPEARANCES:

10       For the Plaintiffs:

11           HAGENS BERMAN SOBOL SHAPIRO
             By:  Emilee Sisco, Esq.
12           1301 Second Avenue
             Seattle, Washington 98101
13

14       For the Defendant Pac-12 Conference:

15           COOLEY
             By:  Ashley Corkery, Esq.
16           3 Embarcadero Center
             San Francisco, California 94111
17

18       For the Defendant National Collegiate
         Athletic Association:
19
             WILKINSON STEKLOFF
20           By:  Robert Laird, Esq.
                  Clayton Wiggins, Esq.
21           2001 M Street NW
             Washington, District of Columbia 20036
22

23

24

25
```

```
 1                                    Phoenix, Arizona
                                      February 10, 2023
 2                                    9:00 a.m.

 3                    TRANSCRIPT OF PROCEEDINGS

 4              THE VIDEOGRAPHER:  Good morning,

 5   Counselors.  This is the start of the video-recorded

 6   deposition of Grant House, In Re College Athlete NIL

 7   Litigation being heard in the United States District

 8   Court for the Northern District of California,

 9   Oakland Division.  Case No. 4:20-cv-03919-CW.

10              This deposition is being held at 1 East

11   Washington Street, Suite 1200, Phoenix, Arizona, on

12   February 10th, 2023, at approximately 9:01 a.m.

13              My name is Michael Pham.  I am the legal

14   video specialist from TSG Reporting, Inc.,

15   headquartered at 228 East 45th Street, Suite 810, New

16   York, New York.  The court reporter is Kristy Ceton,

17   also in association with TSG Reporting.

18              Counsel, would you please introduce

19   yourselves.

20              MS. SISCO:  Emilee Sisco from Hagens

21   Berman Sobol Shapiro for the plaintiffs.

22              MS. CORKERY:  Ashley Corkery from Cooley,

23   LLP.  Counsel for the Pac-12.

24              MR. LAIRD:  Robert Laird for the NCAA.

25              MS. HOUCK:  Pearlynn --
```

1   social media.

2          Q.   Okay.  And were you recently cited in

3   SwimSwam with a big victory a couple weeks ago?

4          A.   I'm unsure.  I don't follow their social

5   media.  Just ASU media.

6          Q.   Okay.  And why is that?

7          A.   Less noise and less distraction as we

8   approach championships and season.

9          Q.   Okay.  And the title, you'll see this

10  article in the red block states, "Boise State

11  Eliminates Women's Swimming and Diving Program in

12  Cost Cutting Move."

13             Do you see that?

14         A.   Yes.

15         Q.   And do you see where it starts, the first

16  paragraph, by stating, "Boise State University

17  athletic director Curt Apsey announced today the

18  elimination of the baseball and swimming and diving

19  teams."

20         A.   Yes.  That's what I'm reading.

21         Q.   Okay.  And the end of the paragraph then

22  notes that "Elimination of baseball and the women's

23  swimming and diving would reduce the overall budget

24  by three million," right?

25         A.   That's what I'm reading.

1            Q.    Okay.  And if we turn to the next page,

2    just above where it appears to be a YouTube clip, it

3    states, "Other schools that have had to cut swimming

4    and diving programs this summer are."  And by way of

5    example, it lists U Mass Dartmouth, UConn, East

6    Carolina, Tiffin.

7            Do you see those listed there?

8            A.    Yeah.  I see the six schools listed

9    there.

10            Q.    Okay.  So is it fair to say that a number

11    of universities have had to cut their swimming

12    program due to budgetary measures?

13            MS. SISCO:  Objection.  Lack of

14    foundation.

15            THE WITNESS:  I'd say -- I'd say it's

16    fair to say that these six have that are in front of

17    us.

18            Q.    BY MS. CORKERY:  As well as Boise State

19    women's swimming and diving?

20            A.    Yeah, as well as the headline.

21            Q.    And even ASU lost its swimming program in

22    the past, didn't it?

23            MS. SISCO:  Objection.  Lack of

24    foundation.

25            THE WITNESS:  In 2008, correct.

1          Q.   BY MS. CORKERY:  So you do recall that in

2     2008, ASU had lost its swimming and diving program?

3          A.   Yes.  And the alumni of the program

4     funded and supported to bring the program back.

5          Q.   Okay.  Do you know how much the alumni

6     had to fund to bring back the ASU men's swimming and

7     diving program?

8               MS. SISCO:  Objection.  Lack of

9     foundation.

10              THE WITNESS:  I'm unfamiliar on the exact

11    amount or financial requirement.

12         Q.   BY MS. CORKERY:  Okay.  Would it sound

13    right if fundraising over a million dollars from

14    alumni was needed to bring the program back?

15              MS. SISCO:  Objection.  Lack of

16    foundation.

17              THE WITNESS:  I'm not an expert on the

18    exact financial necessities that were needed.

19         Q.   BY MS. CORKERY:  Okay.  Is it hard for

20    you to see colleges cutting swimming and diving

21    programs when the athletic department can't come up

22    with a million dollars needed?

23              MS. SISCO:  Objection.  Lack of

24    foundation.

25              THE WITNESS:  It's not my call to know

1   what each university decides.

2        Q.   BY MS. CORKERY:  Well, swimming has been

3   a big part of your life, wouldn't you say?

4        A.   Yeah.  I would say it's been a large part

5   of my life.

6        Q.   It's more than a hobby.  Would you say

7   it's your life?

8        A.   It's the sport I play the most.

9        Q.   Okay.  And it means a lot to you.  You

10  really enjoy being able to swim as well as being a

11  college student athlete, right?

12       A.   Correct.

13       Q.   Okay.  And would you want to see colleges

14  keep swimming and diving programs around?

15       A.   Absolutely.

16       Q.   And you want to -- you wouldn't want to

17  see a program fold at ASU again, like it did in 2008,

18  as you noted, right?

19       A.   I wouldn't want to see any program across

20  any school in the country fold.

21       Q.   So you wouldn't want to see soccer fold,

22  tennis fold, baseball fold?  You would like to see

23  those opportunities remain; is that right?

24       A.   Correct.

25       Q.   And do you think it's an important part

1    Q.   Do you recall what the monthly

2  subscription fee was that you paid?

3    A.   I believe it was 12- to $15.

4    Q.   Okay.  And when did you first start using

5  MarketPryce?

6    A.   In 2022.

7    Q.   And when did you stop?

8    A.   At the -- approximately the summer of

9  2022.  I wasn't seeing much success with the company.

10   Q.   So MarketPryce was not that helpful for

11  facilitating partnerships?

12   A.   For me.  There was several athletes they

13  could see were getting deals, but I wasn't meeting

14  the standards of what they needed apparently.

15   Q.   Why do you think other athletes were

16  getting deals and you were not on MarketPryce?

17        MS. SISCO:  Objection.  Calls for

18  speculation.

19        THE WITNESS:  I'm unsure.  I was only

20  worrying about my process and my progression with it

21  and how it was being useful for me because I was

22  paying for it.

23   Q.   BY MS. CORKERY:  Okay.  And you have no

24  understanding as to why, when you were paying for it,

25  it wasn't working out for you?

1          A.    No.  Because I was -- I talked with one

2    of the workers at MarketPryce and they were

3    indicating it would be pretty lucrative.  I just

4    wasn't seeing much success on the marketplace.

5          Q.    You next state you "worked with the

6    Postgame to develop content, increase multiplatform

7    distribution, and improve digital strategy."

8                Do you see that there?

9          A.    Yes.  On line 20 and 21.

10         Q.    And you previously testified just a

11   moment ago that you had declined Postgame on

12   Opendorse; is that right?

13         A.    Yes, there was a $1,000 campaign offer,

14   but I misunderstood it, so it wasn't initially, just

15   like a straight up 1,000.  It was if you won the

16   contest that they were having you enter in.  So I

17   never received that, but I disclosed it to maintain

18   transparency with my school.

19         Q.    So you disclosed the Postgame, but it was

20   contingent on you having won some sort of contest?

21         A.    Yeah.  It was a campaign for several

22   athletes promoting content for them.  And, I guess,

23   based on a selection afterwards, they would nominate

24   you randomly through a draw.

25         Q.    So for that Postgame, it wasn't

1    guaranteed.  You had to actually campaign and then be

2    selected for it; is that right?

3         A.   Create a posting for the company at the

4    time, which was Adidas through ASU.  They partnered

5    with several university schools, and to promote their

6    products on social media.

7         Q.   And did you pay for the Postgame service?

8         A.   No.  It was a platform, a free platform

9    presented to athletes at ASU.

10        Q.   Do you feel you improved your digital

11   strategy through the Postgame at all?

12        A.   I feel like it helped me understand

13   dynamics of social media as being an athlete.

14        Q.   Do you have any quantifiable benchmarks

15   you could identify as to your own content improvement

16   through the Postgame?

17        A.   On Postgame itself, it has the number of

18   followers for each social media, so if you, again,

19   going back to Exhibit 62, like we took -- there was a

20   picture taken apparently on January 5th.  If you take

21   a picture of Postgame at that date or earlier and

22   took a picture today, it would have -- it would show

23   the increased audience reach of each platform as it

24   does in the top left corner of Opendorse with

25   Facebook, Twitter, Instagram, and -- well, LinkedIn

1   and TikTok aren't stated there.  But on Opendorse and

2   Postgame, it would.

3          Q.   Let's turn back to your interrogatories,

4   the next two bullets after the Postgame.  You'll see

5   that you identify that you called and e-mailed

6   businesses and brands to market NIL; is that right?

7          A.   Yes.  On -- on line 22.

8          Q.   How many businesses would you say you

9   called to market NIL?

10         A.   I don't know the exact number.  I would

11  say over 20, though.

12         Q.   And how many resulted in an NIL deal?

13         A.   It's hard to say the exact number.  Less

14  than -- less than 20, though.

15         Q.   Would it have been less than five?

16         A.   No.

17         Q.   Less than seven?

18         A.   No.

19         Q.   Less than 10?

20         A.   I would say around 10 would be a good

21  number.

22         Q.   So in calling businesses, roughly 20

23  businesses, you secured roughly 50 percent of that

24  that would result in an NIL deal?

25         A.   Yes.  Based on that ratio.

1          Q.   Why don't you name the ones you know?

2          A.   Coach's Oats, HumanN, RXBAR, Bobo's Oats,

3     Suja.  And I believe that's what I can recall for

4     right now.  Oh, and HumanN, as well, if I didn't

5     already say that.

6          Q.   Okay.  Do you track your NIL deals any

7     place?

8          A.   Yes.  As best I can on a Google -- Google

9     Docs sheet.

10         Q.   And how many deal -- NIL deals do you

11    have tracked on that Google Docs sheet?

12         A.   The exact amount, I don't know.  I just

13    update it as they come about and identify which ones

14    have ended, which ones have started, are in the

15    process, or which ones never got off the ground.

16              There's also another company I just

17    remembered.  Allbirds has just been product.

18         Q.   Okay.  And when did you last access that

19    Google drive document to update it?

20         A.   Last year.

21         Q.   And when you say "last year," what month

22    was that?

23         A.   Approximately the fall of 2022.

24         Q.   Do you recall in the fall of 2022 when

25    you would have updated it?

1          A.   Not the exact month.

2          Q.   So have you had no NIL deals since the

3   fall of 2022?

4          A.   I have.  I just haven't been -- I haven't

5   updated it.

6          Q.   Okay.  So where are you tracking the ones

7   that you didn't update over the last couple of

8   months?

9          A.   I'm sorry.  Can you repeat that?

10         Q.   Where are you tracking the ones that you

11  did not update after fall 2022?

12         A.   Through Opendorse disclosures.

13         Q.   Would you say the vast majority of your

14  NIL deals are in-kind, meaning product-based?

15         A.   Yes.

16         Q.   Okay.  And roughly, what percent would

17  you say that is?

18         A.   I would say 90 percent, because the only

19  one in -- I currently have is Beine Wellness for

20  monetary amount.

21         Q.   And you're not seeking monetary damages

22  in this litigation for in-kind NIL deals, are you?

23         A.   I don't have an answer for that.

24         Q.   Are you seeking monetary damages in this

25  litigation for in-kind NIL deals?

1        A.   For NIL compensation in regards to all

2   opportunities.

3        Q.   Not sure that responds to my question.

4             You said, "for NIL compensation in

5   regards to all opportunities."  What do you mean by

6   that?

7        A.   From NIL product, services, and

8   commission for financial opportunities.

9        Q.   So you're seeking the value of in-kind

10  products as part of damages you would want?

11       A.   If that's a possibility, then yeah.

12       Q.   What would need to be done to make it a

13  possibility?

14            MS. SISCO:  Objection.  Calls for a legal

15  conclusion.

16            THE WITNESS:  That's yet to be decided

17  for legal -- legal aspects and experts.

18       Q.   BY MS. CORKERY:  I'm asking you, not as a

19  legal conclusion, in your own personal opinion, what

20  would need to be done to be able to place a value on

21  in-kind products?

22            MS. SISCO:  Objection.  Calls for an

23  expert opinion.

24            THE WITNESS:  I don't have an answer

25  right now.

1        Q.   BY MS. CORKERY:  Have you thought about

2   trying to value the product you've received?

3        A.   No.  Because that's a relative question

4   to each individual.

5        Q.   And when you say it's a "relative

6   question to each individual," it's because it's

7   difficult to quantify the value of certain products

8   and cases, right?

9             MS. SISCO:  Objection.  Calls for expert

10  opinion.

11            THE WITNESS:  Because certain companies

12  will have certain products that are more beneficial

13  to other athletes and sports.

14       Q.   BY MS. CORKERY:  Is there any systemized

15  way that you could arrive at the value of a product?

16            MS. SISCO:  Objection.  Calls for expert

17  opinion.

18            THE WITNESS:  I'm sure professionals and

19  experts have a method of analyzing that data.

20       Q.   BY MS. CORKERY:  Well, I'm not asking an

21  expert right now.  I'm asking you in your own

22  personal opinion, how would you go about valuing, for

23  example, the Suja Juice that you received?

24       A.   I don't have an answer for that.

25       Q.   Sitting here today, you can't think of

1   any way you would put a value on Suja Juice?

2              MS. SISCO:  Objection.  Vague.

3              THE WITNESS:  I don't have an answer for

4   that.

5        Q.   BY MS. CORKERY:  Okay.  Would you go by

6   the wholesale price or the upper-end store price,

7   lower-end store price?  You have no way to value that

8   product?

9              MS. SISCO:  Objection.  Calls for expert

10  opinion.

11             THE WITNESS:  There's several ways.

12       Q.   BY MS. CORKERY:  So there are several

13  ways to value the products you've received, correct?

14             MS. SISCO:  Objection.  Lack of

15  foundation.

16             THE WITNESS:  Correct.

17       Q.   BY MS. CORKERY:  And it would be an ad

18  hoc determination to try to value the in-kind goods

19  you received?

20             MS. SISCO:  Objection.  Lack of

21  foundation.

22             THE WITNESS:  I'm sorry.  I'm not

23  familiar with ad hoc, what ad hoc means.

24       Q.   BY MS. CORKERY:  It would be an

25  individualized process for you to try to value

1    in-kind goods, right?

2              MS. SISCO:  Objection.  Lack of

3    foundation.  Calls for expert opinion.

4              THE WITNESS:  It would -- again, there's

5    several, several -- several reasons why, several ways

6    it can be priced.

7         Q.  BY MS. CORKERY:  Okay.  What percent of

8    your NIL deals have a formal signed agreement?

9         A.  All of them.

10        Q.  Every NIL deal you have has a formal

11   signed agreement?

12        A.  A disclosure agreement of the -- of the

13   contract or agreement, yeah.

14        Q.  Okay.  For Wyman's, do you have a formal

15   signed agreement with them?

16        A.  I actually have --  Well, I don't have

17   anymore.  It was a contractual limit.  But I actually

18   have two, yes.

19        Q.  So you have four formal signed agreements

20   with Wyman's?

21        A.  No.  The 2,600 includes both of those

22   contracts combined over two contracts.

23        Q.  And that's memorialized in a signed

24   agreement?

25        A.  In two signed agreements, yes.

1          MS. CORKERY:  I'm going to give you what

2    we will next mark as Exhibit 63.

3          (Exhibit 63 was marked for identification.)

4          Q.   BY MS. CORKERY:  And what I just handed

5    you, Mr. House, you will see is a January 16th, 2023,

6    e-mail between your counsel Emilee Sisco and myself.

7    And I'm going to refer you to page 3.

8               The last paragraph you will see, in black

9    text, I wrote, "For Grant House, we still do not have

10   the NIL deal agreement for Wyman's fruit products as

11   identified in interrogatory No. 7."

12              The red text is your counsel's response,

13   which says, "Mr. House does not have a formal

14   contract for his agreement, and plaintiffs have

15   already produced e-mails showing Mr. House was

16   dealing with Wyman's on an informal basis."

17              You just testified that you had two

18   agreements with them?

19         A.   Okay.

20         Q.   Have you provided those to your counsel?

21         A.   I provided all of the content and

22   material that I was able to access.

23         Q.   So you no longer have access to the

24   signed agreement that you had with Wyman's?

25         A.   I provided everything, all the details

1          Q.    And there's no requirement that they

2    reach back out to confirm the input information?

3          A.    No.  No.  It will follow up with just a

4    review notification of this has been confirmed.

5          Q.    Okay.  How did you adjust the TYR

6    agreement and they reached back out?

7          A.    I just put Marcus and Michael in contact

8    to better understand because other schools had had

9    perfectly fine success with it, and Michael didn't

10   understand why.  So they adjusted the contract based

11   on what ASU needed at the time.

12         Q.    What specifically did Michael not

13   understand that he wanted to address the contract

14   for?

15         A.    Just why ASU or athletes were having

16   difficulties with submitting this exact company and

17   the contract.  There was -- there's another female on

18   my team also sponsored by TYR.

19         Q.    But there weren't any questions when they

20   reached back out as to the amount of the deal or the

21   terms of the deal?

22         A.    No.  No.  It was just handled by Marcus

23   and Michael in regards to that, and I trusted both of

24   them to figure it out because they both wanted me to

25   see success with this.  Just to had to be worded a

1    different way for whatever reason in the compliance.

2          Q.   And you trusted both of them that it

3    would be input accurately?

4          A.   Yeah.  Yes.

5          Q.   Okay.  And, in the future, there's no

6    requirement for you to confirm the deal as input in

7    ASU tracking system, correct?

8          A.   To my knowledge, just disclosing the

9    contract is what they require from us as of right now

10   with Opendorse.

11         Q.   And with Opendorse, right now, there's no

12   mechanism for you to go back in and make changes

13   yourself?

14         A.   Not fully.  I don't fully know if I can

15   or can't.  I know I can resubmit something as well.

16         Q.   And if you resubmit something, is there a

17   chance it's input a second time?

18         A.   Yes.  Yes.  And I can text Marcus

19   Williams and talk to him as well.

20         Q.   Okay.  You had also testified as to this

21   TYR agreement that once you had the TYR NIL deal, you

22   could no longer promote FINNER Sport because of a

23   noncompete; is that right?

24         A.   Yes.  Correct.

25         Q.   Can you explain what that noncompete is?

1          A.    With any -- basically TYR is a -- was

2   originally a swimsuit company, and now they're

3   stretching into fitness apparel and the fitness

4   realm, such as CrossFit, and so there's now crossover

5   into athleisure or athletic wear that FINNER promotes

6   as well with T-shirts, shorts, that TYR now creates

7   as well, not just swimsuits.

8          So they don't want to have me showing or

9   doing activities with another brand while in athletic

10  environments or athletic activities.

11         Q.    So while you have this TYR NIL deal, you

12  cannot then secure the FINNER Sport deal again; is

13  that accurate?

14         A.    Yes.  That's -- that's accurate.

15         Q.    Okay.  And I want to walk through a

16  couple other potential companies to see if you had an

17  NIL deal with them that we haven't discussed as of

18  yet.

19         Lagoon, did you enter into an NIL deal

20  with Lagoon?

21         A.    Yes.  They sent me product for promotion.

22  Lagoon Sleep.  They sent me one pillow to use me --

23  myself.  And then a couple other pillows for content.

24         Q.    And were you given any commission on

25  this?

1          Q.   And have you attempted to value that NIL

2    deal at all?

3          A.   No.

4          Q.   Okay.  Do you have an NIL deal with Seed

5    probiotics?

6          A.   I did.  Yes.

7          Q.   Okay.  And when did you have that deal?

8          A.   Fall of 2022.

9          Q.   And that's a deal you no longer have

10   today?

11         A.   No.

12         Q.   And what were the terms?

13         A.   Social media promotion on my story in

14   exchange for product.  There was also an affiliate

15   link, which I don't think anyone utilized as well.

16         Q.   Okay.  So you didn't receive any revenue

17   from the affiliate link?

18         A.   I have not.

19         Q.   Okay.  Did you attempt to value that

20   product at all from Seed probiotics?

21         A.   No.

22         Q.   Did you have an NIL deal with Thorne

23   supplements?

24         A.   I currently do, yes.

25         Q.   And what is that current arrangement?

1          A.   It's an affiliate arrangement, and I get

2     the wholesale price off of Thorne supplements and

3     products.  And also, I'm able to give a discount

4     percentage that I decide from -- 5 to -- well, 0 to

5     20 percent, but I chose 20 percent to benefit more

6     people and my teammates around me and athletes around

7     me.  And then there's also an affiliate link

8     commission off of that as well.

9          Q.   And have you received any revenue from

10    the affiliate commission link?

11         A.   Yes.

12         Q.   How much?

13         A.   I believe it was $80.

14         Q.   Okay.  Have you attempted to value the

15    Thorne supplement product you received?

16         A.   No.

17         Q.   And for the $80 for Thorne supplement,

18    because that's commission based, you don't consider

19    that a revenue-based deal that you would have

20    disclosed in your interrogatory No. 7 response,

21    right?

22         A.   I don't --  Yeah.  I don't believe so.  I

23    just got it three days ago as well in the mail.  I

24    just found out that I got commission three days ago.

25         Q.   Did you have an NIL deal with Coach's

1   Oats?

2        A.   Yes.

3        Q.   What's the terms of that deal?

4        A.   The terms are posting on my social media

5   platform stories in exchange for product of three

6   three-pound bags of oats and several travel packets

7   as well.  And some various items like -- included

8   wristbands, a hat, and a journal as well.

9        Q.   Okay.  Have you attempted to value that

10  deal?

11       A.   No.

12       Q.   Okay.  So you haven't attempted to value

13  the several travel packs or the pounds of bags and

14  the various items like wristbands?

15       A.   No.

16       Q.   Okay.  And you previously mentioned

17  Allbirds?

18       A.   Uh-huh.

19       Q.   What's that NIL deal?

20       A.   It was an affiliate link for promotion of

21  product, again on social media platforms.  A static

22  permanent post on my Instagram account in exchange

23  for product, free product.

24       Q.   And how much free product did you get?

25       A.   One pair of shoes.

1        Q.   And did you attempt to value those shoes?

2        A.   Other than looking on the website, no.

3        Q.   Okay.  And for the affiliate link, did

4   you receive any commission off of that?

5        A.   There is a commission percentage, but I

6   haven't seen any financial revenue from that.

7        Q.   Are you expected to receive financial

8   revenue on that?

9        A.   Based on what I've encountered from other

10  people, not this far.

11       Q.   Did you have an NIL deal with True

12  Wandrer?

13       A.   Yes, I did.

14       Q.   Okay.  And what were the terms of that

15  deal?

16       A.   Social media promotion in exchange for,

17  again, a static post on my Instagram account in

18  exchange for product.  And there was also an

19  affiliate commission link, and discounted -- discount

20  on the site as well.  The retail wholesale price.

21       Q.   Okay.  And what product did you receive?

22       A.   I enjoy the outdoors a lot, so it was a

23  -- stuff for camping, swim trunks, and a pocket

24  knife.

25       Q.   Did you attempt to value that?

1          A.    No, I did not.

2          Q.    Okay.  Did you pay money to purchase

3    product from them?

4          A.    Yes, I did.

5          Q.    And then you received a discount code; is

6    that correct?

7          A.    Correct.

8          Q.    When you state that you got product from

9    them, was that product you purchased at a discount,

10   or they gave you free product?

11         A.    Product at a discount.  But the discount,

12   they gave to me.

13         Q.    Okay.  So you didn't receive any product

14   that you hadn't at least purchased in part?

15         A.    Yes.  Correct.

16         Q.    And we spoke about Suja Juice.  I recall

17   you identifying that.  What are the terms of that NIL

18   deal?

19         A.    A monthly shipment of varying amounts in

20   exchange for social media promotion on any platform

21   in any way, and just tagging them along the way.

22         Q.    And have you attempted to value that NIL

23   deal?

24         A.    No.  It's different every time.

25   Typically, with varying amounts of bottles or size of

1  bottles.

2          Q.    Okay.  So it would vary based on their

3  sending you different sizes, different types?

4          A.    Yeah.  They have, like, different

5  seasonal aspects of what boxes they want to send for

6  health benefits of in the winter sickness, fall

7  sickness, energy, recovery, it varies every care

8  package.

9          Q.    Okay.  And so it would never be a set

10 price value on the Suja Juice box that you would

11 receive, correct?

12         A.    To my knowledge, yeah.

13         Q.    Okay.  And did you enter into an NIL deal

14 with You Need This snack?

15         A.    I did.

16         Q.    Okay.  Have you recently posted about

17 that deal?

18         A.    I have.  This week.

19         Q.    What are the terms of that NIL deal?

20         A.    Two social media postings.  One I did in

21 the fall, I believe December of 2022; and then the

22 second one, this week.  Both included a -- two story

23 postings, and the first one was a static post.  And

24 then the most recent one was a reel for social media

25 promotion of myself on their platforms and product as

1    well.

2          Q.   And when you do the static and the reel

3    posts, are you getting product in exchange for that?

4          A.   Yes.

5          Q.   Are you getting any revenue in exchange

6    for that?

7          A.   Yes.  For that one, I did.

8          Q.   And what was the revenue you received?

9          A.   I haven't received it at this point

10   because it's still processing.  But it's supposed to

11   be approximately, I believe, $800.

12         Q.   And did you attempt to value the product

13   that you received?

14         A.   No.  Each care package was a different

15   amount of snack bags.

16         Q.   And when they send you a box, it varies

17   how many they send you?

18         A.   Yeah.  The first time, it was about 20

19   bags; and the second time, it was about 40 bags.

20         Q.   Okay.  And Berry Divine, you, I believe,

21   had mentioned a deal with them.  Do you have an NIL

22   deal with them?

23         A.   I did at the time.  Yes.

24         Q.   And is that Berry Divine Acai Bowls.  Is

25   that the full name?

Page 160

1        A.    Yeah.

2        Q.    What was -- what were the terms of that?

3        A.    It was a $50 gift card in exchange for

4    two story postings on my social media, and we

5    couldn't do any further because they hadn't been

6    established in the NIL marketplace yet due to the

7    recency of the rules changing.

8              But they look forward to in the future

9    hopefully evolving something and changing, but they

10   hadn't had enough time to generate anything and that

11   was all they could think of at the time when I

12   approached them.

13       Q.    And when was that NIL deal when you

14   approached them?

15       A.    I -- I believe early 2022.

16       Q.    Okay.  And they hadn't had time from when

17   the rules changed in July 2021, to when you

18   approached them in 2022, to be prepared for more than

19   the $50 gift card?

20       A.    Based on the e-mails I had with Scott,

21   that was what he communicated to me.

22       Q.    Did you provide those e-mails to your

23   counsel?

24       A.    I gave my counsel access to my entire

25   e-mail database.

1  access to watching that movie would be?

2       A.   No.  I didn't even check the ticketing

3  prices of it.

4       Q.   Under that same profile section, there's

5  a reference to Alfred.  It's pretty small.  It's

6  below MANSCAPED.

7       A.   Yeah.  I -- I definitely see it.  I don't

8  know what that's in relation to, though.

9       Q.   So you have no idea what that icon refers

10  to?

11       A.   No.  Not that I can affirmatively say.

12  No idea.

13       Q.   And if we look in the right-hand corner

14  under "United States," I guess it's right-hand, sort

15  of a quarter down the page, it says "398 estimated

16  price," e-s-t.

17       A.   I see that.

18       Q.   What is that in reference to?

19       A.   Uncertain on what that would indicate.

20       Q.   Okay.  Thanks.  We can put that exhibit

21  down now.

22            So I know we've walked through a long

23  list of some NIL deals with the vast majority being

24  product based.  How many of your deals today would

25  you say are still ongoing?

1        A.    Say about half of them.  About five.

2        Q.    And which five are still on going today?

3        A.    Currently the ones I can recall are TYR,

4    Erica Beine Wellness, Lagoon Sleep, Resync, and

5    Coach's Oats, as well as Allbirds.  So I believe

6    that's six.

7        Q.    So you have roughly six currently

8    ongoing, and for other ones we discussed, there was

9    Wyman's, Lagoon, MANSCAPED, Jelly House, FINNER

10   Sport, Atlas bars, Seed probiotics, Thorne

11   Supplement, Coach Oats, True Wandrer, Berry Divine

12   Acai Bowls.  So it would be a little less than half

13   that are continuing?

14       A.    Yes.  I mentioned Coach's Oats, but I did

15   forget one of those other ones.  Thorne.  Thorne, and

16   I think there's a second one.  So that would be eight

17   total based on the full list we discussed thus far.

18       Q.    So is each NIL deal you get, many of them

19   are still -- many of them don't continue to the next

20   year; is that correct?

21       A.    Thus far, no.  Like for the Berry Divine

22   one, it was a $50 gift card.  So once I used that, so

23   I think it took me four trips, then it was completed

24   at that point once I fulfilled my two story postings.

25       Q.    And for the three cash deals that we

1  discussed in interrogatory No. 7, and so that would

2  have been the Wyman's fruit products at 2,600; the

3  525 in Beine Wellness, and the $400 in HBO, how many

4  of those three are still cash deals today where you

5  receive cash?

6      A.   Can -- can you rephrase the question,

7  please?

8      Q.   For the three revenue-based deals that we

9  discussed, Wyman's, Beine Wellness, and HBO, of those

10  three, how many of them do you still receive cash

11  today?

12      A.   The Wyman's is completed.  The HBO is

13  completed.  And still with the Erica Beine Wellness.

14      Q.   For the one of three revenue-based deals

15  you still have today, what are the terms of the deal

16  today?

17      A.   A one-year contract of social media

18  promotion.  I paid full -- I paid price for the

19  product, which is a DNA test kit.  And then based off

20  that, I receive referral discounts -- or, referral

21  commissions.  And I'm able to give discounts to

22  anyone interested in purchasing the DNA test kit from

23  the company.

24      Q.   So for Beine Wellness, your current

25  contractual agreement is that you buy the product,

1    Grant sent them or they saw from Grant.

2         Q.    And when you say "Erica," are you

3    referring to Erica Beine, who founded the Beine --

4         A.    I am.  I am referring to her.

5         Q.    And so she will reach out to you to let

6    you know each time you're getting a referral based?

7         A.    Once the client has paid in full and that

8    they're setting up a scheduled meeting, yes.

9         Q.    Okay.  And separately for the in-kind

10   deals that we've discussed, which is the vast

11   majority of the deals, how many of those are ongoing

12   today?

13        A.    For the in-kinds, the Resync, Coach's

14   Oats, are the only ones I'm -- and Suja are the ones

15   that I'm receiving product for.

16        Q.    So you no longer receive product, for

17   example, from Bobo's?

18        A.    No longer receive anything from Bobo's,

19   correct.

20        Q.    And do you no longer receive product from

21   Atlas bars?

22        A.    No.

23        Q.    And you no longer receive product from

24   Jelly House?

25        A.    I haven't received product from them in

1  several months.

2       Q.   Okay.  And you no longer receive product

3  from MANSCAPED?

4       A.   Correct.

5       Q.   Okay.  And True Wandrer, you had

6  identified as you would buy product and just get a

7  discount code.  But are you receiving any product

8  from True Wandrer?

9       A.   No.  I purchased three items, and that

10 was it.  That was my only experience with the

11 company.

12      Q.   And you're no longer receiving the Berry

13 Divine bowls, correct?

14      A.   Correct.

15      Q.   Okay.  Are there NIL deals --  Sorry.

16 Strike that from the record.

17           We did discuss briefly a Snapchat deal

18 that you had.  What are the terms of that?

19      A.   The terms that Snapchat communicated to

20 me were posting on their new platform or network

21 through the app for a type of social media platform.

22 And they just wanted me to post to my story, make a

23 public account as often and as much as possible.

24 They had no regulation on amount or aspect, but they

25 wanted to have us submit a certain -- a certain

1  amount each month that they requested.

2      Q.   And in exchange for you doing those

3  posts, what do you receive?

4      A.   Per month, I received $1,000.

5      Q.   And for how many months did you do that?

6      A.   Three months was when I was able to get

7  contract agreement with them.

8      Q.   So you have a three-month agreement, and

9  you've received $3,000 from Snapchat?

10     A.   Correct.

11     Q.   And when did you receive that?

12     A.   At the end of December was the final

13 payment through Opendorse.

14          MS. CORKERY:  And again on that, for the

15 record, per our January 2023, that those two were

16 missing from the interrogatory response and

17 production.

18          MS. SISCO:  I just wanted to state for

19 the record, too, it's plaintiff's position that we

20 have complied with all of our discovery

21 responsibilities, including production of documents,

22 but we will follow up after the deposition and

23 confirm if there are still things missing.

24          MS. CORKERY:  Okay.  Thank you.

25     Q.   BY MS. CORKERY:  Mr. House, are there any

1    see in the top corner here, the date stamp is January

2    20th, 2023?

3              A.    Yes.

4              Q.    And we are going to look again at the

5    second page of the NIL activity disclosure section.

6                    And do you see that "This updated policy

7    indicates that student athletes disclose the

8    pertinent details of their NIL activities within 10

9    business days of any NIL agreement with a similar

10   10-day requirement to supplement those disclosures

11   when NIL agreements are modified."

12                   Do you see that?

13             A.    Yes.

14             Q.    And have you abided by the same policy

15   throughout the time?

16             A.    Yes.

17             Q.    And it further clarifies that disclosures

18   will now be submitted through Opendorse, correct?

19             A.    Yeah.  Opendorse has been much -- a much

20   easier process to submit through.

21             Q.    And how has Opendorse been a simpler or

22   easier process?

23             A.    It has less steps to submit our -- and

24   disclose our contracts or deals, as well as it's just

25   a more efficient process and software.

1          Q.    And when you say it has fewer steps, what

2    fewer steps does Opendorse have as compared to the

3    ARMS software?

4          A.    The ARMS software would be various login

5    credentials, finding the file, finding the category

6    that it needs to fit in for that compliance label.

7                And Opendorse, it just has four sections,

8    four or five sections and kind of walks you through

9    it of what the deal is, what type, how much, product,

10   price, and just an efficient step-by-step process

11   rather than figuring it out on your own.

12         Q.    And for Opendorse currently, you put that

13   information in yourself?

14         A.    Yes.  And it goes to be reviewed and

15   confirmed or declined by ASU compliance and

16   specifically, Marcus Williams.

17         Q.    And when the majority of your NIL deals

18   are product based, you list only the product and not

19   a price?

20         A.    Yes, that's what product in-kind is one

21   of the categories in selection.

22         Q.    And do you receive reminder newsletters

23   from ASU to disclose your NIL activity?

24         A.    Yes.  Very frequently, from Samantha

25   Bowie.

1          Q.    And do you feel that being able to

2    monetize on your NIL has helped you learn financial

3    management?

4          A.    Yes.  Especially much more and to take

5    more consideration to it.

6          Q.    And would you say that it's included

7    learning proper financial reporting skills as well?

8          A.    I would say I've learned more of those

9    skills since NIL started.

10         Q.    Is the money you've earned through NIL

11   taxed?

12         A.    It will be.  Yeah.

13         Q.    Okay.  For the money you earned for the

14   year of 2021, did you pay taxes on that?

15         A.    I didn't receive enough financial

16   compensation in that year.

17         Q.    And what's the threshold of financial

18   compensation before taxes are implicated?

19         A.    I'm not exactly sure on the specific

20   threshold, but I know I didn't earn enough at that

21   point.

22         Q.    And how do you know you hadn't earned

23   enough to pay taxes on them?

24         A.    ASU compliance hadn't communicated that

25   to me, and I also hadn't received any information via

1    must have.

2            Q.   And would you have filled out these

3    fields?

4            A.   Yes.

5            Q.   Okay.  And we previously discussed that

6    ASU is now using Opendorse where you'll send an

7    agreement and somebody else will enter that; is that

8    correct?

9            A.   The athlete still enters these -- some of

10   these various fields.  I don't exactly know what

11   differentiates the exact categories, but it just gets

12   reviewed still by the compliance.

13           Q.   Okay.  And when compliance does a review

14   under the current Opendorse system, what are they

15   reviewing from the entry, if you know?

16           A.   I'm unsure on the exact details of what

17   -- what the specifics they're reviewing.  I just know

18   we're supposed to disclose them, and I abide by the

19   rules from ASU.

20           MS. CORKERY:  And we're going to pull up

21   one more related to this, but you can put this larger

22   exhibit aside.  And this will go in parallel.  It's

23   Exhibit No. 70.

24       (Exhibit 70 was marked for identification.)

25           Q.   BY MS. CORKERY:  And it was produced by

1   plaintiffs, PLTFS002076.  And this is an e-mail from

2   ASU, Marcus Williams, who we have been discussing on

3   the record, regarding NIL disclosures.

4            Do you recognize this e-mail, Mr. House?

5       A.   Yes.

6       Q.   And this e-mail from Marcus Williams

7   states that JD asked him to send you, meaning Grant

8   House, what he sees for your disclosures in ARMS; is

9   that correct?

10      A.   Yes.  JD Sullinger is our head of

11  compliance that oversees the swimming program.

12      Q.   And why did you ask that he send over

13  your NIL disclosures at this time?

14      A.   I don't recall exactly.

15      Q.   And this e-mail was sent on October 20th,

16  '21; is that right?

17      A.   Yes.

18      Q.   So by October 20th, '21, you had reported

19  FINNER Sport, Bobo's, Atlas bars, and MANSCAPED; is

20  that right?

21      A.   It appears so, yes.

22           MS. CORKERY:  We're going to mark as

23  Exhibit 71 a document that was produced by plaintiffs

24  again.  So the Bates stamp for this is PLTFS002097.

25           (Exhibit 71 was marked for identification.)

1          Q.   BY MS. CORKERY:   And this is an October
2     5th, 2021, Jelly House, LLC, and Grant House NIL
3     agreement?
4          A.   Yes.
5          Q.   And it states that the contract's in
6     effect beginning October 5th, 2021?
7          A.   Yes.
8          Q.   Okay.   And the terms are for you to
9     promote official merchandise through social media
10    posts on Instagram, and you'll get two pieces of
11    Jelly House merchandise every month for 12 months; is
12    that right?
13         A.   Correct.
14         Q.   And this NIL agreement went through,
15    correct?
16         A.   Yes.
17         Q.   Okay.   And it was in effect as of October
18    5th, 2021?
19         A.   I believe so.   It appears so.
20         Q.   So this is an example of an NIL deal
21    where under ASU's policy, you had 10 days to report
22    it.   So by October 15th, 2021?
23         A.   Yes.   That would -- that would make sense
24    with the timeline.
25         Q.   Is there a reason on the e-mail that we

1  just reviewed that this was not in the system by that

2  time?

3          A.   I'm unsure as to -- to why.

4          Q.   So as of October 20th, 2021, if Marcus

5  Williams reported to JD a list of all NIL agreements

6  you had as of that date, but this deal that happened

7  more than 10 days earlier wasn't on there, was this

8  reported late?

9          A.   I'm unsure exactly.  It possibly could

10 have been these four that were on the ARMS account

11 also didn't transfer over to Opendorse, so there

12 could have been a system issue with the transferring

13 of the company's disclosures.

14         Q.   Do you recall when you reported Jelly

15 House?

16         A.   I can't recall the exact date.

17         Q.   Do you recall whether you reported it

18 through ARMS or Opendorse?

19         A.   I can't recall the exact -- which company

20 I -- or, which software reported it through.

21         Q.   Okay.  But you did report this deal at

22 some point in time?

23         A.   Yes.

24         Q.   Okay.  We can put that exhibit aside as

25 well.

1           Are you aware of any ASU collectives?

2      A.   Yes.

3      Q.   What ASU collectives are you aware of?

4      A.   There's two.  There's the Tempe

5  Collective.  And then I believe to be the Sun Devil

6  or the ASU Collective is the name.

7      Q.   Is the Sun Devil Collective sometimes

8  called the Sun Angel Collective?

9      A.   Yes.  That is correct.  My mistake.

10      Q.   So it's Sun Angel?

11      A.   Sun Angel.

12      Q.   Okay.  And have you participated in

13  either of those selectives?

14      A.   No. I've discussed them in class for my

15  graduate master's program in the fall, but I haven't

16  engaged with any of them.

17      Q.   And why have you not engaged with any of

18  them?

19      A.   I haven't gotten a response, and ASU

20  can't have direct contact between -- to my

21  understanding, between boosters or donors and the

22  athlete.  It has to be through a third-party entity.

23      Q.   So have you reached out to these two

24  collectives and not heard back?

25      A.   Not to the Tempe Collective.  But to the

1  that I don't know the specifics of, but there's

2  certain websites that have rankings.

3       Q.   And I believe in your complaint, you

4  alleged you were the No. 4 swim recruit?

5       A.   Yeah.  We had five -- five No. 1 recruits

6  that year.

7       Q.   So it was a tie for first place, and then

8  there's second, third, fourth recruits?

9       A.   Based on how they ranked the swimmers,

10 yes.

11      Q.   And in addition to the schools you said

12 reached out to you, did you reach out to schools that

13 hadn't contacted you?

14      A.   I filled out maybe one or two

15 questionnaires, but I didn't have to worry about

16 contacting the schools.

17      Q.   Because schools were reaching out to you?

18      A.   Yes.

19      Q.   What factors were important to you in the

20 decisionmaking process?

21      A.   There were various factors.

22      Q.   Of the various factors, what factors did

23 you take into account?

24      A.   I don't recall at the time all the

25 factors that I considered.

1        Q.   Was quality of education important?

2        A.   Yes.

3        Q.   Were the coaches important?

4        A.   Yes.

5        Q.   Was the amount of scholarship important?

6        A.   Yes.

7        Q.   Was the prestige of the team important?

8        A.   Considering the team that I went to was

9   cut in 2008, no.

10       Q.   Okay.  So that one was not, but quality

11  of education, scholarships, and coaches were?

12       A.   One of several reasons.

13       Q.   Okay.  Can you think of any other

14  reasons?

15       A.   Where I felt I would achieve my goals and

16  aspirations of becoming an Olympic gold medalist.

17       Q.   Is your goal today still to be an Olympic

18  gold medalist?

19       A.   Absolutely.

20       Q.   For the coaching that you identified was

21  important to you, does ASU have good swim coaches?

22       A.   Yes.

23       Q.   Would you say they're really good?

24       A.   I would say they're the best in the

25  world.

1        Q.   Okay.  And who do you train with?

2        A.   The specific coach that I train with?

3        Q.   Yes.

4        A.   Specifically, now, Herbert Behm.

5        Q.   Okay.  And do you also train with Bob

6   Bowman?

7        A.   He is the head coach of our program.  I

8   don't specifically train with him any longer.  My

9   first three years, I did, though, specifically.

10        Q.   So in your first three years, you trained

11   with Bob Bowman.  And since then, you're now with

12   Herbie?

13        A.   Yes.

14        Q.   Okay.  And why did you switch from Bob

15   Bowman to Herbie?

16        A.   To change training stimulus.

17        Q.   And what does that mean "to change

18   training stimulus"?

19        A.   Try to improve at a faster rate.

20        Q.   And how has Herbie been able to have you

21   improve at a faster rate?

22        A.   There's a multitude of reasons.  The main

23   is it's a different higher intensity, lower volume

24   style of training.

25        Q.   Okay.  And has this coaching that you've

1          Q.   When you say from "every school," what do
2    you mean?
3          A.   Every school that had contacted me.  I
4    don't know the exact number.
5          Q.   Okay.  Can you give a ballpark?  Was it
6    roughly 20 schools?
7          A.   It was roughly over 50 schools.
8          Q.   So you had scholarship offers from over
9    50 schools?
10         A.   Yes.
11         Q.   Okay.  And you had scholarship offers
12   from the University of Texas and UC Berkeley, right?
13         A.   Yes.
14         Q.   And those are top-rated swim programs in
15   the country, aren't they?
16         A.   Historically, yes.
17         Q.   And by "historically," those two schools
18   have won every national championship from 2014 to
19   2022, right?
20         A.   So far, yes.
21         Q.   Why did you choose ASU, then?
22         A.   There's a lot of reasons, but it gave me
23   the greatest opportunity for growth as a person.
24         Q.   Okay.  And when you say "greatest
25   opportunity for growth," what do you mean?

1        A.    To become the best young adult and young

2   man I can be.

3        Q.    And why did you think ASU would give you

4   the opportunity to be the best young adult and young

5   man you could be as opposed to University of Texas

6   and UC Berkeley?

7        A.    The openness of growth to develop the

8   program at ASU since Cal Berkeley and Texas were

9   already at the top.

10        Q.    And was it a result of you talking to Bob

11   Bowman that convinced you of that as well?

12        A.    One of several factors, yeah.

13        Q.    Okay.  Were you offered a higher

14   scholarship package from ASU than University of Texas

15   and Berkeley?

16        A.    Yes.

17        Q.    Okay.  And did that play a role in your

18   decision as well?

19        A.    One of several factors, yes.

20        Q.    For the higher scholarship package that

21   you received from ASU, was that a full scholarship?

22        A.    It was, and then I wanted to take less so

23   I could have a better team around me.

24        Q.    In what year did you start to take less

25   on your scholarship?

1          A.   The first year.  20 percent academic; 80

2   percent athletic.

3          Q.   So you still had a full ride at 100

4   percent, but 20 percent of that was academic?

5          A.   Yes.  It's a full -- full scholarship due

6   to my academic success in high school and athletic

7   success.

8          Q.   And in your sophomore year, did you also

9   have a full scholarship when you combined athletic

10  and -- academic success and athletic success?

11         A.   Yes.

12         Q.   Okay.  And is the same true for your

13  junior year?

14         A.   Yes.

15         Q.   And your senior year, though I know there

16  were some red shirt years in there?

17         A.   Yes.

18         Q.   Okay.  So throughout --  Strike that.

19               How long have you been at ASU for?

20         A.   I first stepped onto campus in the fall

21  of 2017.

22         Q.   And so including your graduate year, this

23  year, you've been there for a total of six years.

24  Would that be right?

25         A.   Yes.

1    more when you can monetize on your name, image, and

2    likeness, right?

3              A.   Yes.

4              Q.   So college swimmers would have an

5    incentive to stay --

6                   THE COURT REPORTER:  College?  I'm sorry.

7    College?

8                   MS. CORKERY:  Apologies.  I will speak

9    slower.

10             Q.   BY MS. CORKERY:  So college swimmers have

11   an incentive to stay in school longer, as you did

12   through grad school, the ability to monetize on their

13   NIL?

14                  MS. SISCO:  Objection.  Calls for

15   speculation.

16                  THE WITNESS:  I know I've -- I found more

17   benefit.

18             Q.   BY MS. CORKERY:  Okay.  And you found

19   more benefit being able to monetize on your NIL, and

20   so you stayed in school longer?

21             A.   I stayed in school to better improve our

22   team ranking and our team status.

23             Q.   Have you at any point received funds from

24   USA Swimming in the past?

25             A.   Compensation for qualifying for teams and

1  prize winnings.

2         Q.   Okay.  And did you keep those prize

3  earnings?

4         A.   I never tangibly saw any.  It was just to

5  cover travel fees, lodging, and competition entry

6  fees.

7         Q.   So you broke even based on USA Swimming

8  covering travel fees, lodging, and the entry fees?

9  Is that how you would describe that?

10        A.   I wouldn't say I broke even over my

11 career.

12        Q.   But it covered a portion you otherwise

13 would have to pay out of pocket?

14        A.   Yes.  Due to my success in the sport.

15        Q.   Okay.  I want to take a step back because

16 we discussed your college years sort of in groups.

17             What year were you a freshman?

18        A.   The fall of 2017.

19        Q.   Okay.  And you swam for the Sun Devils

20 then?

21        A.   Yes.  I've only swam and competed for

22 Arizona State University in college.

23        Q.   And then, was the next year 2018 to 2019

24 season, were you a sophomore?

25        A.   That was my sophomore, second year.

1          Q.   And at the end of that year, did you go

2     to the Pan American Games in Peru?

3          A.   It was in the middle of the summer in

4     July and August, yes.

5          Q.   And when you were competing in the Pan

6     American Games in 2019, would you say your public

7     exposure increased?

8          A.   Yes.

9          Q.   How so?

10         A.   We were broadcasted at one of the

11    premiere international events in the entire world and

12    for the swimming -- for swimming -- the sport of

13    swimming specifically.

14         Q.   Do you think around the time of the Pan

15    American Games, you would have received NIL deals had

16    you been able to?

17         A.   Absolutely.

18         Q.   And do you think that you would have been

19    able to secure more NIL deals when you were competing

20    for the Pan American Games than in years when you

21    weren't participating in those games?

22         A.   Absolutely.  And a year before, because I

23    posted top 25 time in the world in the summer of

24    2018.  And I believe now, I currently would be able

25    to expand upon the NIL benefits we have had the

1    market been able to develop further.

2          Q.   So during the Pan American Games in the

3    summer of 2019, you believe your NIL deal value could

4    have been more before July of 2021 when you were

5    allowed to monetize on your name, image, and

6    likeness?

7               MS. SISCO:   Objection.   Mischaracterizes

8    testimony and calls for speculation.

9               THE WITNESS:   Potentially, I'm not

10   exactly sure on the exact amounts.

11         Q.   BY MS. CORKERY:   But you do believe your

12   public exposure would have been higher in summer of

13   2019 at the Pan American Games?

14         A.   If the market had more time to develop,

15   yes.

16         Q.   And the next year after your sophomore

17   year, 2019 to 2020, did you stay at ASU to compete as

18   a swimmer?

19         A.   Yes, I did.

20         Q.   Okay.   And that would have then been your

21   junior year?

22         A.   It would have, yes.

23         Q.   Okay.   And the year from 2020 to 2021,

24   did you stay at ASU to compete as a swimmer?

25         A.   Yes.   The fall of 2020, I went back to

Page 228

1   school academically, but our coaching staff decided

2   to red shirt our team athletically due to COVID and

3   the loss of eligibility in the spring of 2020.

4          Q.   So in the year 2020 to 2021, you were an

5   ASU student, but the entire team was red shirted due

6   to the COVID pandemic?

7          A.   Correct.  Yeah.  We were in -- I was in

8   school.  I was a junior, but still not competing

9   athletically.

10         Q.   Okay.  And did you still receive your

11  room and board covered that year?

12         A.   Yes.

13         Q.   And your degree that year was covered?

14         A.   Yes.

15         Q.   Okay.  And then the next year, 2021 to

16  2022, would that be a red shirt senior year?

17         A.   Yes.

18         Q.   Okay.  And did you swim for the Sun

19  Devils then?

20         A.   Yes.

21         Q.   And you remained in school?

22         A.   Correct.

23         Q.   Okay.  And then, you now -- for the year

24  2022 to 2023, is that when you've been a grad

25  student?

1    invested vary or differ year to year as well?

2           A.   Yes.

3           Q.   Okay.  If you invested more time in

4    personal social media branding, do you think your NIL

5    value would be higher?

6                MS. SISCO:  Objection.  Calls for

7    speculation.

8                THE WITNESS:  An unknown variable.

9           Q.   BY MS. CORKERY:  How many hours do you

10   spend on social media per day on average right now?

11          A.   Specific number changes week to week.

12          Q.   What is on the lower end of how many

13   hours you spend per day?

14          A.   Per day?

15          Q.   Yes.

16          A.   I'm unsure about the per-day amount.

17          Q.   Okay.  Do you have a general sense per

18   day of sort of what would be a low number of hours

19   you've spent this year and what would be a high

20   number of hours you've spent per day this year on

21   social media?

22          A.   Per -- I have a better understanding of

23   per week.  It would be approximately five to six

24   hours average.

25          Q.   Okay.  So you spend roughly five to six

1   hours per week on average on social media this year?

2        A.   Again, it varies week to week, but

3   potentially.

4        Q.   In 2022, so last year, how much, on

5   average, did you spend per week on social media?

6        A.   It's hard to recall what the average

7   would have been every week.

8        Q.   Okay.  Do you have a general sense?

9        A.   It fluctuates at different points in the

10   year based on different training frequencies.

11        Q.   And so throughout the year, the amount of

12   time you're on social media can vary pretty widely

13   based on what else you have going on?

14        A.   For myself, yes.

15        Q.   Okay.  And in the year before that, if we

16   take 2021, do you have any idea on average how many

17   hours you invested per week?

18        A.   I can't recall the exact amounts.

19        Q.   Okay.  And in 2019, can you recall on

20   average how many hours you invested per week?

21        A.   No.  Not the exact amount.

22        Q.   Okay.  So you have no idea in 2019 how

23   many hours you were on social media?

24        A.   I can't recall the exact amounts.

25        Q.   Okay.  Has your amount of time you spent

1    on social media grown over the last three years?

2          A.   I would say yes.

3          Q.   With each year, would you say from 2019

4    to 2020, to 2021, to 2022, each year on average,

5    you're spending more time on social media?

6          A.   Again, it depends.  I've taken weeks

7    breaks in between all those years.

8          Q.   Okay.  And there could be some earlier

9    years where you would have spent more time on social

10   media?

11         A.   Not able to recall the exact amounts.

12         Q.   How do you decide what content to create

13   and post on social media?

14         A.   Whatever I feel is authentic to the

15   truest version of myself and what I want to

16   positively project into the world.

17         Q.   And you personally decide that content to

18   post?  Nobody else dictates what you post?

19         A.   Correct.

20         Q.   What's the main purpose of your social

21   media use?  Would you say it's friends and family,

22   NIL monetization, swimmers?  What would you, when you

23   look at your social media profile, say is the main

24   purpose?

25         A.   I'd say to project a positive influence

1          Q.    And over the summer, have you had any

2    paying jobs during your college years?

3          A.    No.

4          Q.    And how have you financially supported

5    yourself over the summer?

6          A.    My family, and any compensation for

7    travel expenses and meet entries that I've been able

8    to acquire through success in swimming.

9          Q.    And would some of that help for travel

10   expenses and meet entries have been secured from USA

11   Swimming?

12         A.    Yes.

13         Q.    Okay.  Any others?

14         A.    No.

15         Q.    And during the school year, then, you

16   haven't had a paying job as you've been able to have

17   a full scholarship at ASU, correct?

18         A.    The time requirements between training

19   adequately to become -- to reach the level in

20   swimming that I want to and to maintain the standard

21   of academic excellence that I aim to, aims -- ends up

22   being over 40 hours a week, so time to get another

23   job is very minimal.

24         Q.    Okay.  And you've enjoyed having that

25   swimming opportunity and education opportunity at

1    ASU?

2         A.   Yes.

3         Q.   Okay.  And you would be harmed if ASU cut

4    its swim program, right?

5         A.   Yes.

6         Q.   Okay.  And you have no basis to say that

7    if a Pac-12 school were to pay out 2.5 million each

8    year directly to football and men's basketball

9    players, that your sport of swimming wouldn't be cut;

10   is that right?

11              MS. SISCO:  Objection.  Calls for

12   speculation.  Expert opinion.

13              THE WITNESS:  It's an unknown scenario

14   thus far.

15        Q.   BY MS. CORKERY:  But there's at least

16   that possibility?

17              MS. SISCO:  Objection.  Calls for expert

18   opinion.

19              THE WITNESS:  The event hasn't happened,

20   so it's unknown.

21        Q.   BY MS. CORKERY:  But it happened in the

22   past, 2007 to 2008, right?

23        A.   That exact reason, I don't know.  But the

24   program was cut, yes.

25        Q.   And the program was cut to save a little

1    over $1 million from the athletic department budget,

2    right?

3                  MS. SISCO:  Objection.  Lack of

4    foundation.  Calls for speculation.

5                  THE WITNESS:  I'm not sure on the exact

6    financial amount.

7         Q.   BY MS. CORKERY:  Okay.  Let's pull up

8    what has been marked as Exhibit 58, I believe it

9    should say in the corner.

10                 MS. SISCO:  I might be able to help.

11                 MR. LAIRD:  It looks like this.

12                 MS. SISCO:  Oh, a little blue one.

13        Q.   BY MS. CORKERY:  Exhibit 58.

14        A.   This?  Yeah.  There we go.

15        Q.   All right.  And we'll turn back to page

16   3, which we were discussing this morning.  And we're

17   also going to look at page 4.  I will give you a

18   second to review that, which has "ASU Tempe Net

19   Profit/Loss by Women's Sport."

20                 Do you see that?

21        A.   Yes, I see that graph.

22        Q.   Okay.  And do you see where it shows all

23   women's sports at ASU operate at a net loss?

24        A.   That seems to be what the graph depicts.

25        Q.   And what does the graph depict as to the

1    female sport that loses the most money?

2            A.    Women's basketball.

3            Q.    And is it a little over three million, at

4    least according to this graph?

5            A.    Based on the numbers on the graph, yes.

6            Q.    Are you aware that your experts allocate

7    five percent of their broadcast damages to women's

8    basketball?

9            A.    Could you repeat the question?

10           Q.    Are you aware that your experts allocate

11   five percent of their broadcast damages to women's

12   basketball?

13           A.    Not on the specific percentage or amount.

14           Q.    Okay.  If I represented to you that of

15   the broadcast revenue damages model, five percent of

16   that is allocated to women's basketball, would that

17   surprise you?

18           MS. SISCO:  Objection.  Calls for expert

19   opinion.

20           Q.    BY MS. CORKERY:  I'm just asking whether

21   it surprises you, not for any sort of expert opinion.

22   We're talking about you.

23           A.    And -- can you repeat the question, then?

24           Q.    If I represented to you that of the

25   broadcast revenue damages model, five percent of that