Steve W. Berman (*pro hac vice*)
Emilee N. Sisco (*pro hac vice*)
Stephanie Verdoia (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
emilees@hbsslaw.com
stephaniev@hbsslaw.com

Benjamin J. Siegel (SBN 256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
bens@hbsslaw.com

*Counsel for Plaintiffs and the Proposed Classes*

[Additional counsel on signature page]

Jeffrey L. Kessler (*pro hac vice*)
David G. Feher (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
Adam I. Dale (*pro hac vice*)
Sarah L. Viebrock (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4698
Facsimile: (212) 294-4700
jkessler@winston.com
dfeher@winston.com
dgreenspan@winston.com
aidale@winston.com
sviebrock@winston.com

Jeanifer E. Parsigian (SBN 289001)
WINSTON & STRAWN LLP
101 California Street, 34th Floor
San Francisco, CA 94111
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
jparsigian@winston.com

*Counsel for Plaintiffs and the Proposed Classes*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | Case No. 4:20-cv-03919-CW |
| | **PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** |
| | **[PUBLIC REDACTED VERSION]** |
| | Date:      Sept. 21, 2023 |
| | Time:      2:30 p.m. |
| | Judge:     Hon. Judge Claudia Wilken |
| | Courtroom: 2, 4th Floor |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................ 1

II.    ARGUMENT ............................................................................................. 3

    A.    Defendants' Opposition and Expert Reports Reinforce That Plaintiffs Have Shown That Common Evidence Can Prove Class-Wide Injury and Damages ................................................................. 3

        1.    All Class Members Were Injured by Their Lost Opportunity to Sell Their NIL ....................................................... 5

        2.    Broadcast NIL ...................................................................... 5

            a.    Class-Wide Injury from Lost BNIL Compensation ........................... 5

            b.    Class-Wide Damages from Lost BNIL Compensation ...................................................... 7

        3.    Video Game NIL ................................................................ 10

            a.    Class-Wide Injury from Lost Video Game Compensation ...................................................... 10

            b.    Class-Wide Damages from Lost Video Game Compensation ...................................................... 11

        4.    Lost Compensation from Third-Party NIL Opportunities ............................. 12

            a.    Class-Wide Injury from Lost Third-Party NIL Compensation ...................................................... 12

            b.    Class-Wide Damages for Lost Third-Party NIL Compensation ...................................................... 12

    B.    Defendants' "Substitution Effects" Challenge Fails as a Matter of Law and Fact ........................................................................... 13

    C.    There are No Intra-Class Conflicts That Preclude Class Certification .......................................................................... 16

    D.    Defendants' Title IX Argument is a Red Herring ................................ 18

    E.    Defendants' State Laws Argument is Another Red Herring ..................... 19

    F.    Plaintiffs Satisfy the Rule 23(a) Adequacy Requirements ..................... 19

        1.    Plaintiffs Seek the Most Viable Remedies for All Class

PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION
No. 4:20-cv-03919-CW

010912-11/2315603 V1

Members. .................................................................................................. 19

    2.    Tymir Oliver is an Adequate Representative for the
Football and Men's Basketball Class. ................................................. 20

III.    CONCLUSION .................................................................................................. 20

PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION
No. 4:20-cv-03919-CW

010912-11/2315603 V1

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abboud v. I.N.S.*,
  140 F.3d 843 (9th Cir. 1998) .................................................5

*Achzinger v. IDS Prop. Cas. Ins. Co.*,
  772 Fed. App'x 416 (9th Cir. 2019) ..................................8

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997)........................................................20

*Amgen, Inc. v. Conn. Ret. Plans and Tr. Funds*,
  568 U.S. 455 (2013).........................................................6

*Andren v. Alere, Inc.*,
  2017 WL 6509550 (S.D. Cal. Dec. 20, 2017) ...................20

*In re Apple Inc. Device Performance Litigation*,
  50 F.4th 769 (9th Cir. 2022) ...........................................20

*Berrien v. New Raintree Resorts Int'l, LLC*,
  276 F.R.D. 355 (N.D. Cal. 2011).....................................18

*Briseno v. Conagra Foods, Inc.*,
  844 F.3d 1121 (9th Cir. 2017) .........................................14

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  2020 WL 1873554 (N.D. Cal. Mar. 11, 2020)...................18

*CC Distributors, Inc. v. United States*,
  883 F.2d 146 (D.C. Cir. 1989) ...........................................5

*In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.*,
  795 F.3d 380 (3d Cir. 2015).............................................18

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)................................................8, 10, 13

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
  2006 WL 1530166 (N.D. Cal. June 5, 2006) ....................6, 8

*Grant House v. Nat'l Collegiate Athletic Ass'n*,
  545 F. Supp. 3d 804 (N.D. Cal. 2021) ...............................5

*In re Glumetza Antitrust Litig.*,
  336 F.R.D. 468 (N.D. Cal. 2020)......................................15

*In re High-Tech Emp. Antitrust Litig.*,
  985 F. Supp. 2d 1167 (N.D. Cal. 2015) .................................................................15

*Just Film, Inc v. Buono*,
  847 F.3d 1108 (9th Cir. 2017) .................................................................................8

*Kennedy v. Jackson Nat. Life Ins. Co.*,
  2010 WL 2524360 (N.D. Cal. June 23, 2010) ........................................................19

*In re Lidoderm Antitrust Litig.*,
  2017 WL 679367 (N.D. Cal. Feb. 21, 2017) ............................................................8

*Linney v. Cellular Alaska P'ship*,
  151 F.3d 1234 (9th Cir. 1998) ...............................................................................18

*In re Live Concert Antitrust Litig.*,
  247 F.R.D. 98 (C.D. Cal. 2007) ..............................................................................12

*Meijer, Inc. v. Abbott Lab'ys*,
  2008 WL 4065839 (N.D. Cal. Aug. 27, 2008) .........................................................8

*Mendell v. Am. Medical Response, Inc.*,
  2021 WL 1102423 (S.D. Cal. 2021) ........................................................................17

*Moore v. Apple Inc.*,
  309 F.R.D. 532 (N.D. Cal. 2015) ..............................................................................3

*Moore v. James H. Matthews & Co.*,
  682 F.2d 830 (9th Cir. 1982) ...................................................................................8

*Morgan v. United States Soccer Fed'n, Inc.*,
  2019 WL 7166978 (C.D. Cal. Nov. 8, 2019) ...........................................................17

*In re Nat'l Collegiate Athletic Ass'n Grant-in-Aid Cap Antitrust Litig.*,
  375 F. Supp. 3d 1058 (N.D. Cal. 2019) ....................................................................3

*In re Nat'l Collegiate Athletic Ass'n Grant-In-Aid Cap Antitrust Litig.*,
  311 F.R.D. 532 (N.D. Cal. 2015) ..............................................................16, 17, 18

*In re Nat'l Collegiate Athletic Ass'n Student-Athlete Name & Likeness Licensing Litig.*,
  2013 WL 5979327 (N.D. Cal. Nov. 8, 2013) ...........................................13, 16, 17

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
  2023 WL 1813530 (C.D. Cal. Feb. 7, 2023) ...........................................................15

*In re NCAA I-A Walk-On Football Players Litig.*,
  2006 WL 1207915 (W.D. Wash. May 3, 2006) .......................................................17

*O'Bannon v. NCAA*,
   802 F.3d 1049 (9th Cir. 2015) ..................................................................... *passim*

*O'Connor v. Uber Techs., Inc.*,
   311 F.R.D. 547 (N.D. Cal. 2015)) ...................................................................19

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) ...................................................................3, 6, 14

*In re Online DVD-Rental Antitrust Litig.*,
   779 F.3d 934 (9th Cir. 2015) ...........................................................................16

*Parrish v. NFLPA*,
   2008 WL 1925208 (N.D. Cal. Apr. 29, 2008) ..................................................17

*Pulaski v. Middleman, LLC*,
   802 F.3d 979 (9th Cir. 2015) .............................................................................8

*Purple Mountain Tr. v. Wells Fargo & Co.*,
   2022 WL 3357835 (N.D. Cal. Aug. 15, 2022) ...................................................3

*Regents of Univ. of California v. Bakke*,
   438 U.S. 265 (1978).............................................................................................5

*Serrato v. Clark*,
   486 F.3d 560 (9th Cir. 2007) .............................................................................5

*Shields v. FINA*,
   2022 WL 425359 (N.D. Cal. Feb. 11, 2023) ....................................................17

*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*,
   947 F. Supp. 2d 88 (D.D.C. 2013) ......................................................................5

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
   264 F.R.D. 603 (N.D. Cal. 2009)........................................................................8

*Todd v. Tempur-Sealy Int. Inc.*,
   2016 WL 5746364 (N.D. Cal. Sep. 30, 2016) ..................................................19

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016)........................................................................................3, 4

*Vaquero v. Ashley Furniture Indus., Inc.*,
   824 F.3d 1150 (9th Cir. 2016) ...........................................................................8

*Whiteway v. FedEx Kinko's Off. & Print Servs., Inc.*,
   2006 WL 2642528 (N.D. Cal. Sept. 14, 2006) ..................................................4

- iii -

**STATUTES**

Sherman Act...................................................................................................................................3, 17

**FEDERAL RULES**

Federal Rule of Civil Procedure 23 ......................................................................................... *passim*

PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION
No. 4:20-cv-03919-CW

010912-11/2315603 V1

# GLOSSARY OF DEFINED TERMS

| TERM | DEFINITION |
|---|---|
| **Motion or Class Certification Motion** | Plaintiffs' Notice of Motion and Motion for Class Certification, Oct. 21, 2022 (ECF 209 (Sealed)) |
| **Rascher Report** | Expert Report of Daniel A. Rascher, Oct. 21, 2022 (ECF 209-2 (Sealed)) |
| **Desser Report** | Expert Report of Edwin S. Desser, Oct. 21, 2022 (ECF 209-3 (Sealed)) |
| **Opp.** | Defendants' Joint Opposition to Plaintiffs' Motion for Class Certification, Apr. 28, 2023 (ECF 252 (Sealed)) |
| **Tucker Report** | Defendants' Expert Report of Catherine Tucker, Apr. 28, 2023 (ECF 254-1 (Sealed)) |
| **Thompson Report** | Defendants' Expert Report of Bob Thompson, Apr. 28, 2023 (ECF 254-2 (Sealed)) |
| **Rascher Reply** | Expert Reply Report of Daniel A. Rascher, July 21, 2023, concurrently filed herewith |
| **Desser Reply** | Expert Reply Report of Edwin S. Desser, July 21, 2023, concurrently filed herewith |
| **Berman Decl.** | Steve W. Berman Declaration in Further Support of Plaintiffs' Motion for Class Certification, concurrently filed herewith |
| **Ex.** | Exhibits to Berman Declaration |
| **Pl. *Daubert* Opp.** | Plaintiffs' Opposition to Defendants' Motion to Exclude the Opinions, Reports, and Testimony of Edwin Desser and Daniel Rascher, concurrently filed herewith |
| **Pl. *Daubert* Mot.** | Plaintiffs' Motion to Exclude the Opinions of Defendants' Expert Dr. Barbara Osborne, concurrently filed herewith |
| **Tucker Tr.** | Official Transcript of Defendants' Expert Catherine Tucker on May 31, 2023, Ex. 57 to Berman Decl. |
| **Thompson Tr.** | Official Transcript of Defendants' Expert Bob Thompson on June 8, 2023, Ex. 58 to Berman Decl. |
| **Oliver Tr.** | Official Transcript of Plaintiff Tymir Oliver on Jan. 23, 2023, Ex. 64 to Berman Decl. |

### MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Defendants' Opposition to Plaintiffs' Motion for Class Certification confirms that the proposed classes should be certified. Defendants do not oppose certifying the Injunctive Relief Class. And their arguments against certifying the three proposed damages classes—the Football and Men's Basketball Class, the Women's Basketball Class, and the Additional Sports Class—consist largely of merits-based arguments that reinforce why Plaintiffs' damages claims are ripe for resolution on a class-wide basis. Big picture, Defendants' innumerable criticisms of Plaintiffs' economic expert (Dr. Daniel Rascher) and sports broadcast expert (Mr. Edwin Desser) all go to their bottom-line conclusions, not their *methodologies*, which is what matters at class certification.[1]

In fact, Defendants do not dispute that common evidence will determine the majority of issues critical to this case, including: the existence of a conspiracy affecting interstate commerce; Defendants' market power in the relevant labor markets; the anticompetitive effects of Defendants' restraints; and Defendants' putative procompetitive justifications. These common issues alone establish predominance under Rule 23(b)(3). Yet Plaintiffs have further established that each of the damages classes suffered at least one form of common injury, including at a minimum, the lost opportunity to participate in a competitive labor market in which they could monetize their NILs. As for the damages owed to each class member, Ninth Circuit law is clear that class certification is appropriate regardless of whether individualized damages determinations may be necessary. Still, Dr. Rascher supplies a class-wide damages model that is consistent with Plaintiffs' theory of liability and shows that damages are capable of measurement on a class-wide basis.

Against this backdrop, Defendants' arguments against class certification are unpersuasive. Starting with the Football and Men's Basketball Class's and Women's Basketball Class's damages claims to share in broadcast revenue, Defendants' economist (Catherine Tucker) argues that in the but-for world without NIL-compensation restraints, payments for the use of NILs in broadcasts ("BNIL") would not "necessarily" have been made to all class members. But Plaintiffs' experts have

---

[1] Plaintiffs show in their Opposition to Defendants' *Daubert* Motion, concurrently filed herewith, that their experts are well-qualified, and their opinions are relevant and based on reliable methodologies and considerable evidence.

shown that, in the but-for world, the intense competition for class members would have compelled Defendants to compensate them for selling their BNILs to networks in multibillion-dollar broadcast deals. ████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████.

As for the video game damages sought by the Football and Men's Basketball Class, Defendants again respond with merits arguments. Specifically, they argue that there may not have been college sports video games in the but-for world. But that argument has nothing to do with whether injury (or damages) relating to video games would have been class wide. In any event, Defendants ignore the overwhelming evidence that video game companies have been clamoring to use college athletes' NILs for years, and that █████████████████████████████████████████████████████████

████████████████████████████████████████████.

Similarly, with respect to the Additional Sports Class's claims for the lost opportunity to pursue third-party NIL deals, Defendants again respond with merits challenges that are common to the class. Dr. Rascher reliably applied the well-accepted before-and-after methodology to show class-wide injuries. And, while Defendants try to obfuscate the critical distinction between class-wide injury (or common impact) and damages, almost all of Defendants' arguments concern Dr. Rascher's methodology for allocating individual damages, which is not a basis to deny class certification.

Defendants' laundry list of remaining arguments likewise fail. For example, Defendants, hoping to shoehorn the *O'Bannon* result here, contend that "substitution effects" make the classes unmanageable to identify injured class members. But unlike *O'Bannon*, here it is a "virtually mechanical task" to identify the class members who have been injured by Defendants' conduct. There are no predominance or manageability problems at all as injury is class wide. Moreover, Dr. Rascher's empirical analysis shows that the hypothesized displacement theory that underpins Defendants' substitution effects argument is contrary to the evidence, both in terms of the number of college athletes who would have made different choices (*e.g.*, staying in school or switching schools), and the number of athletes (if any) who would have been displaced by losing scholarships. Further still, the Ninth Circuit recently made clear that a damages class can be certified even if there are a material

PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION
No. 4:20-cv-03919-CW

number of class members who may not have been injured in the but-for world.[2]

Defendants also argue that Title IX is an obstacle to class certification. But they rely almost exclusively on the inadmissible and erroneous legal conclusions of Professor Barbara Osborne. *See* Pl. *Daubert* Mot. at 5-12. Even if Dr. Osborne's opinions were admissible, they raise only common issues that are irrelevant to whether the classes should be certified.

Finally, Defendants argue that there are conflicts between and among the classes because different amounts of damages are estimated for different class members. Yet Defendants' own expert has admitted that a "soundly based" damages methodology—as Dr. Rascher's is here—does not create a conflict, "even though it might affect class members differently." Ex. 57 (Tucker Tr.) 204:3-205:3.

## II.   ARGUMENT

### A.   Defendants' Opposition and Expert Reports Reinforce That Plaintiffs Have Shown That Common Evidence Can Prove Class-Wide Injury and Damages

"To establish a claim under Section 1 of the Sherman Act, Plaintiffs must show 1) that there was a contract, combination, or conspiracy; 2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and 3) that the restraint affected interstate commerce."[3] As in *Alston*, only issue two is in dispute.

Defendants primarily challenge class certification under the predominance requirement of Rule 23(b)(3). To establish predominance, "[e]ach element of a claim need not be susceptible to classwide proof."[4] But even focusing on the one disputed element here, "the inquiry is a holistic one, in which the Court considers whether overall, considering the issues to be litigated, common issues will predominate."[5] Where "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though

---

[2] *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 (9th Cir. 2022).

[3] *In re Nat'l Collegiate Athletic Ass'n Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1091 (N.D. Cal. 2019).

[4] *Purple Mountain Tr. v. Wells Fargo & Co.*, 2022 WL 3357835, at *2 (N.D. Cal. Aug. 15, 2022); *see also* Motion at 25-26 (explaining how common evidence will show the existence of a conspiracy).

[5] *Moore v. Apple Inc.*, 309 F.R.D. 532, 544 (N.D. Cal. 2015); *see Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) ("[t]he predominance inquiry 'asks whether the common, aggregation enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating individual issues'" (quoting 2 NEWBERG ON CLASS ACTIONS § 4:49, pp. 195-96 (5th ed. 2012)).

other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members."[6]

Defendants do not deny that several core elements of proving or defending a rule-of-reason claim here are common to all class members. Defendants do not dispute that common evidence will be used to establish the relevant markets or Defendants' market power. Nor do they dispute that evidence common to the classes will be used to determine the existence of anticompetitive effects. And they do not dispute that assessing any procompetitive justifications or less restrictive alternatives will all be common issues to be resolved on a class-wide basis.[7] "Where . . . common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain."[8] Defendants' concession that these fundamental elements of Plaintiffs' rule-of-reason claim rest on common issues is, on its own, sufficient for the Court to find that Plaintiffs have satisfied Rule 23's predominance requirement.

Defendants instead focus their opposition on their contention that Plaintiffs' alleged injury and damages present predominantly individualized issues. Not so. Common evidence will establish that Defendants' NIL rules deprived all class members of an opportunity to participate in a competitive labor market for monetizing their NILs, which is a cognizable antitrust injury. And common expert evidence will be used to show class-wide injury and damages from three additional categories of antitrust injuries: (1) the lost opportunity to receive BNIL (which injured the Football and Men's Basketball Class and the Women's Basketball Class); (2) the lost opportunity to receive compensation for use of NILs in college football and men's basketball video games (which injured the Football and Men's Basketball Class and some members of the Additional Sports Class); and (3) the lost opportunity to receive NIL compensation from third-parties under the Prior NIL Rules (which injured the entire Additional Sports Class, plus many members of the Football and Men's Basketball Class and the Women's Basketball Class).

---

[6] *Tyson*, 136 S. Ct. at 1045.

[7] *See* Motion at 26-27 (discussing these common issues).

[8] *Whiteway v. FedEx Kinko's Off. & Print Servs., Inc.*, 2006 WL 2642528, at *10 (N.D. Cal. Sept. 14, 2006) (citing *Smilow v. Sw. Bell Mobile Sys.*, 323 F.3d 32, 40 (1st Cir. 2003)).

- 4 -

**1.      All Class Members Were Injured by Their Lost Opportunity to Sell Their NIL**

All members of all Plaintiffs' damages classes suffered common antitrust injury as a result of Defendants' prohibiting their opportunity to earn NIL compensation. Mot. at 28. As the Court held: "[a] plaintiff can show that it was injured in fact by alleging that it was deprived of the opportunity to receive compensation it otherwise would have received but for the challenged conduct."[9]

Defendants assert that lost NIL opportunities are not a cognizable form of antitrust injury for purposes of class certification. Defendants cite exactly zero cases for this proposition. And their experts do not dispute that *all* class members were deprived of the opportunity to monetize their NIL. This, in turn, caused economic harm to each class member. *See* Rascher Reply ¶¶ 21, 25-30.

Defendants cite the Ninth Circuit's decision in *O'Bannon* (Opp. at 37), but ignore that the Court held there that "plaintiffs have shown that they are injured in fact as a result of the NCAA's rules having *foreclosed the market for their NILs* in video games."[10] The Ninth Circuit went on to hold that "the NCAA's rules deny plaintiffs all opportunity to receive this compensation," and based on that lost opportunity, the athlete-plaintiffs had shown "injury in fact, and by extension the requirement of antitrust injury."[11] Other cases in a variety of contexts have reached similar conclusions.[12]

**2.      Broadcast NIL**

**a.      Class-Wide Injury from Lost BNIL Compensation**

Plaintiffs rely on the expert opinions of Dr. Rascher and Mr. Desser to establish Broadcast NIL

---

[9] *Grant House v. Nat'l Collegiate Athletic Ass'n*, 545 F. Supp. 3d 804, 816 (N.D. Cal. 2021) (citing 13A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3531.4 (3d ed. 1998) ("Loss of opportunity may constitute injury, even though it is not certain that any benefit would have been realized if the opportunity had been accorded." (collecting cases)).

[10] *O'Bannon v. NCAA*, 802 F.3d 1049, 1067 (9th Cir. 2015) (emphasis added).

[11] *Id.* at 1069; *see also Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88, 107 (D.D.C. 2013) (lost opportunity to participate in a competitive market constitutes injury in fact).

[12] *See, e.g.*, *Serrato v. Clark*, 486 F.3d 560, 566 (9th Cir. 2007) (plaintiff, in a case alleging violations of the APA, "suffered cognizable injury for standing purposes" where defendant's conduct denied plaintiff the "ability to be *considered* for a program," regardless of whether plaintiff may have ultimately ended up in that program (emphasis in original)); *Abboud v. I.N.S.*, 140 F.3d 843, 847 (9th Cir. 1998) (where plaintiff "lost a significant opportunity . . .[the] lost opportunity represents a concrete injury"); *CC Distributors, Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989) ("loss of an *opportunity to pursue a benefit*" was cognizable "even though the plaintiff may not be able to show that it was certain to receive that benefit had it been accorded the lost opportunity") (emphasis in original); *see also Regents of Univ. of California v. Bakke*, 438 U.S. 265, 281 n.14 (1978) (lost opportunity to compete for a place in a University class was sufficient to establish injury).

class-wide injury and damages. Attacking their opinions on the merits, Defendants contend that Plaintiffs' "BNIL injury and damages theory is fatally speculative and contrary to the record." *See* Opp. at 23-24. But even if these assertions had merit (they do not), Defendants ignore the law. The Ninth Circuit's *en banc* decision in *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC* recently reaffirmed that at class certification, "a district court is limited to resolving whether the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial."[13] This is consistent with the Supreme Court's holding in *Amgen* that putative classes are only required to "show[] that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class."[14] As *Olean* explained: "A lack of persuasiveness is not fatal at class certification."[15] Rather, Plaintiffs' need only "come forward with seemingly realistic methodologies" to demonstrate class-wide injury.[16]

Plaintiffs easily meet this requirement. Mr. Desser—based on, among other things, his extensive industry experience and analysis of Defendants' broadcast agreements and analogous real-world data—will be able to provide common evidence about the economic value of class members' BNIL for football and basketball telecasts. As Mr. Desser explained, and as Defendants' broadcast expert (Thompson) confirmed, because no one knows in advance which players will be shown on the field or on the bench, ██████████████████████████████████████████ ██████████████████████████████. Desser Report, p. 37; Ex. 58 (Thompson Tr.) 52:7-53:8, 49:16-50:2. Dr. Rascher also relies on common economic evidence and economic theory to show that, in the but-for world, competition among the Power Five Conferences would have compelled them to provide BNIL payments to *all* full scholarship football and basketball players, *i.e.*, *all* members of the Football and Men's Basketball Class and Women's Basketball Class. Rascher Report ¶¶ 105-167.

Defendants' attacks on these expert opinions go to the merits and, regardless, present common

---

[13] 31 F.4th 651, 666-67 (9th Cir. 2022).

[14] *Amgen, Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 459 (2013) (emphasis in original).

[15] *Olean*, 31 F.4th at 679. At this stage, Plaintiffs are not required to actually prove antitrust injury to each class member and need only demonstrate that impact may be established through class-wide evidence. *Id.*

[16] *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2006 WL 1530166, at *8 (N.D. Cal. June 5, 2006); *accord Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 353 (N.D. Cal. 2005).

1    issues. The arguments thus support, rather than undermine, Plaintiffs' motion for class certification.

2    For example, Defendants argue that "nothing supports the existence of an independent market for

3    BNIL rights." Opp. at 24. But that argument rises or falls for every class member. *See* Rascher Report

4    ¶¶ 151-153; Rascher Reply ¶ 18.

5    Next, Defendants argue that this case is analogous to *O'Bannon* because ascertaining who

6    would get BNIL payments purportedly creates the "impossibility of 'determining which student-

7    athletes were actually depicted' in game footage 'during the relevant class period,' and thus allegedly

8    entitled to compensation." Opp. at 32 (quoting *O'Bannon*, 2013 WL 5979327, at *9). That is not true

9    because, in this case, the combination of Mr. Desser's industry expertise and Dr. Rascher's

10   methodology leads to the conclusion that *all* full-COA Power Five football and basketball players

11   would have received BNIL compensation, *i.e.*, regardless of whether they actually appear in telecasts.

12   Rascher Report ¶ 163; Rascher Reply ¶¶ 94-96; Desser Report p. 40. Defendants may dispute the

13   *merits* of that opinion, but unlike in *O'Bannon*, there is no need to make individualized inquiries about

14   who appeared in telecasts.

15   Defendants go on to contest Dr. Rascher's methodology of how BNIL payments would have

16   been distributed in the but-for world. But this is a *merits*-based argument about *damages* allocations.

17   And it is a class-wide argument anyway. For example, Defendants argue that schools (not conferences,

18   as Dr. Rascher opines) would make BNIL payments. *See* Opp. at 24. Dr. Rascher explains, however,

19   that conference-based payments are economically rational because conferences are the ones that

20   aggregate school broadcasting rights, enter broadcast deals with the networks, and distribute the

21   revenues to member schools. Rascher Report ¶¶ 151, 156; Rascher Reply ¶¶ 85-86. Resolution of this

22   debate is immaterial to class certification.

23                    **b.    Class-Wide Damages from Lost BNIL Compensation**

24   Defendants again advance a merits argument common to the class in contending that Plaintiffs'

25   model for measuring class-wide BNIL damages does not reflect what Defendants would have done in

26   the but-for world. But the Supreme Court in *Comcast* explained that the only damages inquiry at class

27   certification is whether the proposed model is consistent with plaintiffs' theory of liability and whether

28

damages are "capable of measurement on a class-wide basis."[17] The Ninth Circuit further has held that "'capable of measurement on a classwide basis'" means "in the sense that the whole class suffered damages traceable to the same injurious course of conduct underlying plaintiffs' legal theory."[18] As set forth below, Plaintiffs easily satisfy these standards.

Plaintiffs must merely show that their class-wide damages methodology is not "so insubstantial as to amount to no method at all."[19] In antitrust cases in particular, once the fact of injury is established, plaintiffs have a "relaxed burden" of proving the amount of damages.[20] This relaxed burden applies with equal force in the context of proving class-wide damages.[21] And even if the Court were to conclude that some individualized damages calculations are necessary, that would not defeat class certification where, as here, common issues relating to antitrust liability predominate.[22]

Defendants also argue that valuing BNIL rights at 10% of Defendants' broadcast agreement revenues is "speculative" and solely "for litigation." *See, e.g.*, Opp. at 7-8, 23-24. This too has nothing to do with predominance; it is a merits critique. That said, Defendants ignore the fact that separately valuing BNIL rights is not required in other sports leagues (like the NFL, NBA, and WNBA) because athletes are permitted to be paid for their NIL *plus* athletic services in a single compensation package.

---

[17] *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).
[18] *Just Film, Inc v. Buono*, 847 F.3d 1108, 1120 (9th Cir. 2017) (quoting *Comcast*, 569 U.S. at 34).
[19] *Meijer, Inc. v. Abbott Lab'ys*, 2008 WL 4065839, at *10 (N.D. Cal. Aug. 27, 2008) (quoting *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 697 (D. Minn. 1995)).
[20] Rule 23(b)(3)—Application of predominance requirement to particular cases—Antitrust—Extent of damages, 1 McLaughlin on Class Actions § 5:37 (18th ed.); *Moore v. James H. Matthews & Co.*, 682 F.2d 830, 836 (9th Cir. 1982) ("[A]n antitrust plaintiff is only obligated to provide the trier-of-fact with some basis from which to estimate reasonably, and without undue speculation, the damages flowing from the antitrust violations.").
[21] *DRAM*, 2006 WL 1530166, at *10 ("[A]t the certification stage of an antitrust class action, plaintiffs have a limited burden with respect to showing that individual damages issues do not predominate." (citation and internal quotation marks omitted)); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 615 (N.D. Cal. 2009) (Wilken, J.) (similar).
[22] *See e.g.*, *Pulaski v. Middleman, LLC*, 802 F.3d 979, 986-88 (9th Cir. 2015) (reaffirming that this proposition from "*Yokoyama* [*v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010)] remains the law of this court, even after *Comcast*"); *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016) ("Under *Tyson Foods* and our precedent, therefore, the rule is clear: the need for individual damages calculations does not, alone, defeat class certification."); *accord In re Lidoderm Antitrust Litig.*, 2017 WL 679367, at *11 (N.D. Cal. Feb. 21, 2017); *see also Achzinger v. IDS Prop. Cas. Ins. Co.*, 772 Fed. App'x 416, 418 (9th Cir. 2019) ("district court abused its discretion" in denying class certification "by giving more weight to potential individual damages disputes than common questions of liability"); *see also* Motion at 29.

- 8 -

1    Other sports leagues thus have no reason to isolate the value players provide through their BNIL, like

2    Plaintiffs must do here, because Plaintiffs do not challenge Defendants' prohibition on pay-for-

3    performance. Rascher Report ¶ 164; Desser Report at 27-28. Nor do broadcasters who are similarly

4    purchasing a package of different rights, including BNIL and many others, for a single price. Mr.

5    Desser's ███████████ is not only conservative and reliable, but also is common to the class, as would

6    be any different percentage value for BNIL (which Defendants have not even proffered).[23]

7          Defendants similarly argue that it is "speculative" for Mr. Desser to opine that in Defendants'

8    multisport broadcast contracts, ████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████████████████████

10   ████████████████████████████████." Desser Report at 61-62; *see* Opp. at 6-8, 23-24. This is

11   yet another merits dispute that is irrelevant to class certification. It is also a frivolous position given

12   the admissions of Defendants' broadcast industry expert that, prior to being retained by Defendants,

13   he repeatedly offered a virtually identical allocation opinion. Ex. 58 (Thompson Tr.) 149:2-170:21.[24]

14         Next, Defendants contend that because superstar football and basketball players have greater

15   NIL values, Dr. Rascher's opinion is "speculative" that conferences would provide BNIL payments in

16   equal shares. *See* Opp. at 23-24; Tucker Report ¶¶ 92-98. This is more of the same: a merits argument

17   that is common to the classes and directed to the allocation of damages. It is also wrong. Defendants'

18   experts admit, and Dr. Rascher explains, that broadcasters need the BNIL for *all* players well in

19   advance of a broadcast, regardless of any individual athlete's expected performance status, and that

20   equal share payments are the typical market outcome when large groups of athletes' NILs are licensed

21   for the same product. Ex. 58 (Thompson Tr.) 44:21-45:17; Rascher Reply ¶¶ 94-101; *see also* Ex. 57

22   (Tucker Tr.) 143:11-146:2; 147:12-148:17 (not refuting the foregoing). ████████████████████

23   ████████████████████████████████████████████████████████████████████████████████

24   ████████████       Ex. 58 (Thompson Tr.) 132:17-20. And, as a practical matter, it would be

25

26   ――――――――――――――
     [23] *See also* Pl. *Daubert* Opp. at 10-14.

27   [24] *See* Ex. 58 (Thompson Tr.) 170:1-6, 161:17-163:18; *see also* Ex. 59 (Thompson Dep. Ex. 84)
     ("We'll put 80 percent [of the Big Ten's multisport media agreement] or $280m against the football.");
     Ex. 60 (Thompson Dep. Ex. 83) ("I assume MBK [men's basketball] represents around 20-25% of the
28   value of the [Big 12's multisport broadcast rights agreement].").

administratively infeasible to conduct player-by-player BNIL valuations. For all these reasons, Dr. Rascher's equal-sharing damages model is not only plausible but persuasive.

Finally, Defendants argue that "Plaintiffs' BNIL model does not match [their] theory of liability, precluding certification under *Comcast*." *See* Opp. at 24. This makes no sense. Plaintiffs allege that absent the NIL Rules, competition would have led to payments to Power Five football and basketball players for their BNILs. Defendants argue that Dr. Rascher's damages model is inconsistent with Plaintiffs' liability theory because he opines that BNIL payments would likely have come from the conferences, whereas Defendants contend that the payments would have come from the schools. Opp. at 24. But that is a merits debate, not a *Comcast* issue: Dr. Rascher's methodology is perfectly consistent with plaintiffs' liability theory. He opines that part of the way schools compete with one another in the relevant labor market is to form conferences, which offer benefits to members, and by extension, athletes. Conferences aggregate schools' broadcast rights, negotiate conference-wide broadcast agreements, affirmatively convey athletes' BNILs to broadcasters (or indemnify broadcasters for using athletes' BNILs), and distribute broadcast revenues to their member schools. In the but-for world, therefore, Dr. Rascher opines that it is the conferences that would have offered class members payments for their BNILs through a group license. Rascher Report ¶¶ 154-158; Rascher Reply ¶¶ 85-86, 93-94. There is no mismatch between Plaintiffs' liability theory and Dr. Rascher's BNIL damages model.

### 3.   Video Game NIL

#### a.   Class-Wide Injury from Lost Video Game Compensation

Defendants' short section arguing that the Football and Men's Basketball Class does not satisfy Rule 23(b)(3) for injuries and damages based on lost video games NIL payments is merits-based and unpersuasive. *See* Opp. at 33-34. Defendants first argue that Plaintiffs have "put forth no argument that any video game company would have made a men's college basketball game at any point 'during the class period . . . .'" Opp. at 33 (quoting Mot. at 10). For starters, this is not an argument against predominance because it applies equally to all class members. The argument is also demonstrably wrong. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

1  ████████████████████████████████████████████████████

2  ███████████. *See* Mot. at 9-10.[25] During the damages period, EA wrote to the NCAA stating

3  that ██████████████████████████," citing the millions of units previously sold

4  of ████████████████████████████████████████████████

5  and proclaiming that ██████████████████████████████████████

6  ████████████████████████████." Mot. at 10 (quoting statement). It

7  was thus reasonable for Dr. Rascher to model a but-for world in which a college basketball video game

8  including players' NILs would exist. Rascher Report ¶¶ 55-63, 125-132; Rascher Reply ¶¶ 63, 73-75.

9  　　Defendants also suggest that it is speculative for Dr. Rascher to model that there would have

10  been a college football video game in the but-for world because it has been "nearly two years since

11  the NCAA enacted its Interim NIL Policy," and "no games appear imminent." Opp. at 33-34. Putting

12  aside that this is yet another class-wide merits dispute irrelevant to class certification, the facts cited

13  by Dr. Rascher overwhelmingly demonstrate that EA would have produced a football video game

14  throughout the damages period if it could have obtained player NIL. ██████████████████

15  █████████████████████████████████████████████████

16  ██████  Rascher Reply ¶¶ 76-78.

17  　　　　　**b.**　　**Class-Wide Damages from Lost Video Game Compensation**

18  　　Defendants assert that "[Dr.] Rascher puts forward no evidence to support his proposed [video

19  game] damages model." Opp. at 34. In reality, Defendants merely dispute the merits of the evidence

20  and facts Dr. Rascher relied upon. Dr. Rascher sets forth the basis for his video game damages model

21  at length. Rascher Report ¶¶ 125-149. And Defendants' expert, Professor Tucker, does not even try to

22  challenge his methodology. Rascher Reply ¶ 62.

23

24

25

26  [25] ███████████████████████████████████████████. *See*

27  Rascher Report ¶ 132. ████████████████████████████████

28  ████████████████████████████████████████████ *Id.*

**4.      Lost Compensation from Third-Party NIL Opportunities**

      **a.      Class-Wide Injury from Lost Third-Party NIL Compensation**

Dr. Rascher's before-and-after methodology shows that all Additional Sports Class members, and many members of the other classes, were injured by being deprived of NIL compensation from third parties. This methodology is widely accepted by courts—particularly in antitrust class actions.[26] Here, Dr. Rascher applies his model to those athletes who: (i) secured at least one third-party NIL deal in the "after" period (demonstrating that they have NIL value to third parties); and (ii) participated in their sport for at least one year during the "before" period (and thus, were precluded from realizing their third party NIL value during that time).

Defendants contend that individualized differences between the before and after periods preclude using this methodology. *See* Opp. at 34-36. But the before-after-approach is particularly apt in a case like this when the real-world after period permits third-party NIL compensation, and the before period did not. Rascher Report ¶ 186. As for Defendants' contention that there are material differences between the before and after periods, Dr. Rascher addressed this by developing adjustments to his methodology to provide a common way to account for material differences in supply and demand. Rascher Reply ¶¶ 129-49. Defendants may dispute how to apply Dr. Rascher's adjustments—or which adjustments should be made—but those are merits disputes for trial.

      **b.      Class-Wide Damages for Lost Third-Party NIL Compensation**

Defendants contend that Dr. Rascher has insufficiently described his damages methodology and that its implementation would involve "excessive difficulty." Opp. at 35-36. Purported "difficulty" in a class-wide methodology is not a ground to oppose class certification—especially when it comes to damages allocations. Dr. Rascher detailed his methodology and adjustments that could be made at the merits stage in his opening report, and his reply report demonstrates how his adjustments would account for differences in the before and after periods by applying them to a sample of class members.

---

[26] *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 145 (C.D. Cal. 2007) (collecting cases for the proposition that the "before-and-after methodology has been accepted by numerous courts" as a way of determining impact and damages on a class-wide basis); *see also* Ex. 57 (Tucker Tr.) 140:9–142:2 (explaining her use of the before-and-after methodology in a prior litigation); *id.* at 52:3–53:7 (admitting that ABA treatise discussing the before-and-after approach "certainly seemed solid").

1    Rascher Report ¶¶ 179-220; Rascher Reply ¶¶ 129-49. This is more than enough under *Comcast* and

2    Ninth Circuit law to support class certification.

3        *Ward v. Apple Inc.* is inapt. *See* Opp. at 22 (citing 784 F. App'x 539, 540 (9th Cir. Nov. 13,

4    2019) (mem. op.)). There, plaintiffs' expert "merely asserted that he would be able to develop a model

5    at some point in the future." *Id.* at 541. Here, Dr. Rascher *presented* a model with Plaintiffs' class

6    certification motion, described it and potential adjustments to it in detail, and has now illustrated how

7    those adjustments would be applied at trial. Rascher Report ¶¶ 179-220; Rascher Reply ¶¶ 129-49.

8    **B.    Defendants' "Substitution Effects" Challenge Fails as a Matter of Law and Fact**

9        Defendants seek to revive the "substitution effects" argument which they previously advanced

10   in *O'Bannon.* Defendants argue that in the but-for world some talented scholarship athletes at Power

11   Five schools would have remained in school longer and some athletes would have accepted a Power

12   Five offer instead of a non-Power Five offer because Broadcast NIL payments would have been

13   available, thereby displacing some Football and Men's Basketball and Women's Basketball class

14   members who obtained Power Five scholarships in the actual world. According to Defendants, these

15   displaced class members would be "worse off" in the but-for world, and are therefore uninjured,

16   purportedly providing grounds to deny class certification. Defendants are wrong on both the law and

17   the facts.

18       *First*, this Court's ruling in *O'Bannon* is of no help to Defendants here. The *O'Bannon*

19   damages class was rejected because the Court was persuaded that it would be unmanageable to identify

20   class members by reviewing hours of old broadcasts and video games to determine which athletes

21   appeared.[27] Here, by contrast, the members of the Football and Men's Basketball Class, and Women's

22   Basketball Class, are easily identified because the classes consist of *all* full scholarship athletes on

23   Power Five football and basketball teams, regardless of whether the players actually appeared in

24   particular broadcasts. Moreover, the Ninth Circuit has altered the law on manageability under Rule 23

25   since *O'Bannon*, holding that identifying class members need not be "administratively feasible."[28]

26

27       [27] *In re Nat'l Collegiate Athletic Ass'n Student-Athlete Name & Likeness Licensing Litig.*, 2013
     WL 5979327, at *3, *8-*10 (N.D. Cal. Nov. 8, 2013) ("*O'Bannon*").

28       [28] *Briseno v. Conagra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017).

- 13 -

1   Instead, the Ninth Circuit now applies a "presumption that courts should not refuse to certify a class

2   merely on the basis of manageability concerns."[29]

3   *Second*, even if Defendants' purported substitution effects could lead to some uninjured class

4   members, it would not be grounds to deny class certification. The Ninth Circuit's *en banc* decision in

5   *Olean* made clear that the presence of even a significant number of uninjured class members does not

6   defeat class certification.[30] There, a grant of class certification was upheld even though defendants'

7   expert opined that up to 28% of the putative class could have been uninjured, and here Tucker does

8   not even estimate how many uninjured class members she claims are present. Tucker Rep. ¶¶ 22, 90.

9   *Third*, Dr. Rascher uses empirical data to demonstrate that any substitution effect would not

10  have any material impact on the proposed classes. To begin with, the data show that college athletes'

11  receipt of additional compensation (full-COA scholarships, *Alston* payments, and other enhanced

12  benefits) has not resulted in a marked increase in the number of athletes choosing to stay in school

13  rather than turn professional. Rascher Report ¶¶ 227-33; *see also* Rascher Reply ¶ 164. Nor could

14  BNIL compensation because of the few slots available in the professional league drafts. Rascher

15  Report ¶ 228; Rascher Reply ¶ 157, 164. Further, the data show that Power Five schools had sufficient

16  open scholarship slots to absorb athletes who stayed in school without displacing a material number

17  of class members to non-Power Five schools. Rascher Report ¶¶ 119-20; Rascher Reply ¶¶ 156, 164.

18  *Fourth*, Defendants' substitution effect argument rests on the false premise that some

19  purportedly displaced class members were not injured by the challenged NIL rules because they were

20  better off in the actual world where they received a Power Five scholarship. But such displaced class

21  members would still be injured because, as Dr. Rascher shows, all Division I athletes—irrespective of

22  the conference they play in—have been deprived of the ability to monetize their Broadcast NIL.

23  Rascher Reply ¶¶ 153, 159. While Plaintiffs are not seeking BNIL damages for non-Power Five

24  athletes, that does not change the fact that the challenged NIL Rules applied to all Division I athletes

25  with equal force. Moreover, even if a class member would not have secured a scholarship and benefits

26  from a Power Five school in the but for world, Rascher opines that he or she would have received a

27

28
_____

[29] *Id.* at 1128 (quoting *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 663 (7th Cir. 2015).
[30] *Olean*, 31 F.4th at 669.

- 14 -

1    comparable full scholarship and benefits from a school in a non-Power Five conference and would

2    therefore, be no "worse off" in the but-for world than in the real world. Rascher Reply ¶ 170.

3        Moreover, there is no factual support for Tucker's so-called "ripple effect" in which class

4    members would be displaced from a Power Five conference school because Broadcast NIL payments

5    would cause some athletes, who in the actual world chose a school in a non-Power Five conference

6    over a school in a Power Five conference, to make a different choice in the but-for world. In his Reply

7    Report, Dr. Rascher shows that Tucker's purported empirical analysis of this ripple effect was based

8    on a fundamental misunderstanding of the data that she used. Specifically, as she admitted at her

9    deposition, Tucker did not realize that the self-reported data she relied upon listed far more scholarship

10   offers from Power Five schools than it was possible for those schools to honor under NCAA rules. Ex.

11   57 (Tucker Tr.) 57:9-18. There is thus no reliable evidence to support Tucker's speculation that a

12   material number of athletes who enrolled at a non-Power Five school could have instead chosen a

13   school in a Power Five conference in the but for world. Rascher Reply ¶¶ 179-88.

14       In any event, the law is clear that class certification cannot be denied based on Defendants'

15   speculation about how "class members would face different effects, including harm, [in] the but-for

16   world based on each member's unique preferences."[31] Where, as here, "Defendants' market-wide

17   anticompetitive conduct" impacts the "baseline price to class members," the predominance

18   requirement is satisfied without the need to hypothesize about whether individual class members

19   would have been displaced in the but-for world.[32]

20       Finally, because, as Dr. Rascher opines, all full-scholarship FBS football and Division I men's

21   basketball players would have received compensation in the but-for for the use of their NIL in video

22   games, there can be no dispute that, regardless of any claimed substitution effects related to BNIL, all

23
    [31] *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 2023 WL 1813530, at *12 (C.D.
24   Cal. Feb. 7, 2023); *see also In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 479 (N.D. Cal. 2020)
     ("[T]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation
25   would have been in the absence of the defendant's antitrust violation. . . . . Plainly, we can't know
     exactly what would have happened in that but-for world; defendants saw to that." (internal quotation
26   marks omitted)).
     [32] *See also In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1192-93 (N.D. Cal. 2015)
27   (in certifying a labor market class subject to a competition restraint, the court found no need to consider
     whether higher wages in the but-for world would have caused the workers who held those jobs in the
28   actual world to be replaced).

1    members of the Football and Men's Basketball Class (which is limited to the most elite FBS football

2    and Division I men's basketball programs) would still be injured based on lost video game

3    compensation. Similarly, there is no substitution effects issue for Additional Sports Class members,

4    as all of these class members lost third-party NIL opportunities regardless of the school they attended.

5    **C.   There are No Intra-Class Conflicts That Preclude Class Certification**

6    Defendants speculate about a non-existent conflict between class members seeking BNIL

7    damages. They falsely assert that Plaintiffs seek a "fixed sum" of compensation in a manner that is

8    "structurally antagonistic." Opp. at 29-30. Their argument, however, boils down to the fact that Dr.

9    Rascher's damages methodologies will lead to some class members receiving more in damages than

10   others—an unremarkable reality of virtually all damages classes (antitrust or otherwise).

11   Ninth Circuit precedent, and this Court's previous decisions, make clear that such hypothetical

12   and speculative "conflicts" are not a basis for denying class certification.[33] And even Defendants'

13   economist admitted that a "soundly based" damages methodology does not create a conflict "even

14   though it might affect class members differently." Ex. 57 (Tucker Tr.) 204:3-205:3.

15   Contrary to precedent and their own expert, Defendants nonetheless argue that individual class

16   members and the classes as a whole are in conflict because of disparate preferences for models that

17   would provide each with more damages at the expense of other classes and class members. Opp. at

18   30-31. But, as this Court held in *O'Bannon*, conflicts over the *allocation* of damages are not a basis

19   for denying class certification and do not alter each class member's common and predominant interest

20   in establishing that Defendants violated the Sherman Act.[34]

21   Speculation over whether absent class members here *may* want to "optimize their own

22   recovery" is distinct from the situation in *Shields v. FINA* and *In re NCAA I-A Walk-On Football*

---

[33] *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 942 (9th Cir. 2015) ("we do not 'favor denial of class certification on the basis of speculative conflicts'"); *O'Bannon*, 2013 WL 5979327, at *6 ("Even if Plaintiffs' method of allocating damages did create such a conflict, this would not be sufficient to prevent class certification."); *In re Nat'l Collegiate Athletic Ass'n Grant-In-Aid Cap Antitrust Litig.*, 311 F.R.D. 532, 541 (N.D. Cal. 2015).

[34] *O'Bannon*, 2013 WL 5979327, at *6; *C.f. Parrish v. NFLPA*, 2008 WL 1925208 (N.D. Cal. Apr. 29, 2008) ("the overwhelming majority of putative class members have received nothing at all under the [group licensing agreements]" and therefore concluded that "[i]t is in the interest of each GLA class member to determine if they are entitled to anything at all beyond the whim and discretion of defendants.").

*Players Litigation* (Opp. at 29-31) where the courts found that athletes would have been *required* to prove injury by demonstrating that they—and not another class member—would have shared in a fixed prize pool or a scholarship instead of another class member.[35] Here, Dr. Rascher opines that *all* members of the relevant classes (Football and Men's Basketball and Women's Basketball) would have been paid for BNIL (Rascher Report ¶ 150); there is thus no issue of one class member asserting that she would have been paid for her BNIL but another class member would not have been.

The Court held Defendants' other asserted conflict to be "illusory" twice, in both *Alston* and *O'Bannon*.[36] As the recycled argument goes, Defendants speculate that Dr. Rascher's BNIL damages methodology will lead to lower revenue teams being cut because an "athletic department's budget" creates a "zero-sum game" for non-revenue-generating sports. Opp. at 30-31. But there is no reliable evidence to show that Defendants' latest "doomsday" scenario is a non-speculative outcome, let alone one that creates a concrete conflict.[37] Defendants cite self-serving and familiar declarations making conclusory claims that BNIL payments would lead to the termination of certain teams.[38] The Court may recall similar doomsday testimony by Wisconsin's Chancellor during the *Alston* trial, testimony

---

[35] *Shields v. FINA*, 2022 WL 425359, at *7 (N.D. Cal. Feb. 11, 2023) (each individual class swimmer's proof of damages "would necessarily involve arguing that other swimmers in her club would not have been selected to swim, that she would have beaten the swimmers she raced against, and that other clubs would not have performed as well as her club over the course of the season"); *In re NCAA I-A Walk-On Football Players Litig*., 2006 WL 1207915, at *8 (W.D. Wash. May 3, 2006) ("each class member will have to offer proof that necessarily will involve arguing that a threshold number of other players would not have gotten that same [remedy].").

[36] *In re Nat'l Collegiate Athletic Ass'n Grant-In-Aid Cap Antitrust Litig.*, 311 F.R.D. at 544; *O'Bannon*, 2013 WL 5979327, at *6.

[37] *Mendell v. Am. Medical Response, Inc.*, 2021 WL 1102423, at *3 (S.D. Cal. 2021) (citing Newberg on Class Actions) ("Courts generally decline to find that the class fails to meet the adequacy requirement under Rule 23(a)(4) unless a party presents concrete evidence of a conflict of interest."); *Morgan v. United States Soccer Fed'n, Inc.*, 2019 WL 7166978, at *8 (C.D. Cal. Nov. 8, 2019) ("Without some evidence of an actual conflict, the Court presumes that that the representation is adequate.") (citing *Californians for Disability Rights v. California Dept. of Transp*., 249 F.R.D. 334, 349 (N.D. Cal. 2008) ("Adequate representation is usually presumed in the absence of contrary evidence.")); *Berrien v. New Raintree Resorts Int'l, LLC*, 276 F.R.D. 355, 359 (N.D. Cal. 2011) (Wilken, J.) ("[T]he mere potential for a conflict of interest is not sufficient to defeat class certification; the conflict must be actual, not hypothetical.")

[38] *See In re Nat'l Collegiate Athletic Ass'n Grant-In-Aid Cap Antitrust Litig.*, 311 F.R.D. at 541, 544 ("[d]efendants fail[ed] to recognize their own role" when "speculating about intra-class conflicts" and the conflicts depended on the "assumption that schools could not afford to spend more money compensating all student-athletes rather than cutting payments to some").

that was recanted less than 24 hours later.[39] Dr. Rasher has examined the *actual* history of increases in compensation to athletes and found no correlation to any decline in non-revenue sports. Rascher Reply ¶¶ 36-38.

As this Court has previously held, Defendants' claimed conflicts are either illusory or not fundamental to proving Defendants' liability. And in the unlikely event they do arise at the damages allocation stage, they can and should be managed at that time.[40]

## D.   Defendants' Title IX Argument is a Red Herring

Defendants argue that Dr. Rascher's BNIL damages model would violate Title IX because it results in more damages for male athletes than female athletes. Opp. at 28-29. This is just another argument that goes to the ultimate merits and is totally unrelated to class certification. Although nothing more need be said at this time, the dearth of support for Defendants' argument bears emphasis.

They cite no case law—because there is none—that Title IX applies to damages awards. So, Defendants instead hired an "expert" to offer an unsupported legal opinion. As set forth in Plaintiffs' *Daubert* Motion, Osborne's opinions are both inadmissible and contrary to precedent. On top of the fact that Title IX does not apply to damages awards, Osborne admitted that Title IX does not apply to conferences (which do not receive federal money) either.[41]

Further, the undisputed reason that Dr. Rascher's damages methodology estimates more BNIL damages for male athletes than female athletes is because in the actual world, *Defendants* receive far more broadcast revenues from football/men's basketball than women's basketball. For example, the recent independent Gender Equity Study commissioned by the NCAA concluded that there is "a culture within the NCAA in which men's basketball is not required to abide by the same budgetary

---

[39] Ex. 73 (Nick Bromberg, *Wisconsin: 'No plans to stop offering athletics' in wake of chancellor's testimony in player-compensation trial*, Yahoo! (Sept. 18, 2018).

[40] *See e.g.*, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2020 WL 1873554, at *7 (N.D. Cal. Mar. 11, 2020) (appointment of separate counsel in amended settlement "eliminated concerns" of new conflict of interest); *In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.*, 795 F.3d 380, 394 (3d Cir. 2015) (recognizing ability "to appoint separate counsel to represent newly divergent interests" in the future); *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998) ("addition of new and impartial counsel can cure a conflict of interest").

[41] *See* Ex. 61 (Osborne Tr.) at 49:12–20.

constraints as women's basketball."[42] All Dr. Rascher and Mr. Desser did was opine on how BNIL money damages would be allocated according to *Defendants*' real-world conduct.

### E.   Defendants' State Laws Argument is Another Red Herring

Defendants speculate that a handful of state laws, which at one point or another after July 2021 precluded direct NIL payments from conferences to athletes, would have "sprung into effect earlier," preventing the BNIL payments modeled by Dr. Rascher in the but for world. Opp. at 16. One is left again to wonder what this argument has to do with class certification. It is also rank speculation and counterfactual. No state NIL law was in effect before July 2021, when Defendants temporarily eliminated some NIL Rules. Furthermore, states enacted such laws to force Defendants to *permit* NIL compensation, not to limit it.[43] Accordingly, if Defendants had permitted NIL compensation sooner, there is no reason to believe that states would have enacted NIL laws at all. Rascher Reply ¶ 41.

### F.   Plaintiffs Satisfy the Rule 23(a) Adequacy Requirements

#### 1.   Plaintiffs Seek the Most Viable Remedies for All Class Members.

Plaintiffs are pursuing the most viable remedies on behalf of the classes they seek to represent. Defendants incorrectly assert that Plaintiffs are inadequate representatives because they are abandoning certain remedies to the detriment of some class members. Opp. at 38. Adequacy does not—and could not—require plaintiffs to pursue every conceivable theory of recovery.[44] As this Court has previously ruled, Plaintiffs may pursue those theories that "afford the greatest likelihood of success on behalf of the class."[45] Courts thus distinguish defendants showing that the "named plaintiff is advancing his or her own interests at the expense of the class" from "the mere fact that a named plaintiff elects not to pursue one particular claim."[46] There is no evidence whatsoever that Plaintiffs

---

[42] Ex. 62 at 58 (Kaplan Hecker & Fink, *NCAA External Gender Equity Review Phase I: Basketball Championships*, (August 2, 2021).

[43] Ex. 63 (Dan Murphy, *California Defies NCAA as Gov. Gavin Newsom Signs Into Law Fair Pay to Play Act*, ESPN.com (Sept. 30, 2019).

[44] *See Todd v. Tempur-Sealy Int. Inc.*, 2016 WL 5746364, at *5 (N.D. Cal. Sep. 30, 2016) ("A strategic decision to pursue those claims a plaintiff believes to be most viable does not render her inadequate as a class representative.").

[45] *Kennedy v. Jackson Nat. Life Ins. Co.*, 2010 WL 2524360, at *5 (N.D. Cal. June 23, 2010) (Wilken, J.).

[46] *See O'Connor v. Uber Techs., Inc.*, 311 F.R.D. 547, 565 (N.D. Cal. Dec. 9, 2015), *rev'd and remanded on other grounds*, 904 F.3d 1087 (9th Cir. 2018), (citing *In re Universal Service Fund Tel. Billing Practices Litig.*, 219 F.R.D. 661, 669 (D. Kan. 2004)).

fall into the former category. And, as Defendants' own cases recognize, if absent class members wish to pursue other damages remedies, they may opt-out.[47]

### 2. Tymir Oliver is an Adequate Representative for the Football and Men's Basketball Class.

Defendants attack the adequacy of Tymir Oliver, a former Division I football player at a Power Five Conference school, as the Football and Basketball Class representative, asserting there must be a basketball player class representative. They are incorrect. To be adequate, a class representative "must be part of the class and possess the same interest and suffer the same injury as the class members."[48]

Contrary to Defendants' bizarre suggestion, Mr. Oliver is not required to have been friends with basketball players while in college, nor to watch college basketball now. Opp. at 38-39. Mr. Oliver possesses the same interest as basketball players in proving class-wide injury and Defendants' antitrust liability. Moreover, Football and Men's Basketball Class members all suffered the same types of injuries—lost BNIL and video game compensation, and lost opportunities for third-party NIL deals—during the same time frame.[49] As Mr. Oliver testified, football and men's basketball players "put the same time in, same hours, everything like that," and were subject to the same NIL restraints. Ex. 64 (Oliver Tr.) 197:19-198:4, 199:4-6.

Although Mr. Oliver is more than an adequate class representative for the Football and Men's Basketball Class, if the Court were to find otherwise, it should certify the proposed classes conditioned on the addition of a basketball player as another class representative.

### III. CONCLUSION

Plaintiffs respectfully request that the Court certify each of the proposed classes.

---

[47] *See Andren v. Alere, Inc.*, 2017 WL 6509550, *8 (S.D. Cal. Dec. 20, 2017) (citing *Slade v. Progressive Sec. Ins. Co*., 856 F.3d 408, 413 (5th Cir. 2017) ("Courts have noted that any risk of preclusion can be mitigated through the opt-out provision under Rule 23(b)(3).")).

[48] *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997).

[49] *See supra*, Section II.A (describing these injuries); *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 781 (9th Cir. 2022) (certifying a settlement class and finding no conflict where all class members "experienced injury during the same time frame and in the same manner").

Dated: July 21, 2023                    Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP          WINSTON & STRAWN LLP

By:  */s/ Steve W. Berman*                By:   */s/ Jeffrey L. Kessler*
     Steve W. Berman (*pro hac vice*)           Jeffrey L. Kessler (*pro hac vice*)
Emilee N. Sisco (*pro hac vice*)          David G. Feher (*pro hac vice*)
Stephanie Verdoia (*pro hac vice*)        David L. Greenspan (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP          Adam I. Dale (*pro hac vice*)
1301 Second Avenue, Suite 2000           Sarah L. Viebrock (*pro hac vice*)
Seattle, WA 98101                        WINSTON & STRAWN LLP
Telephone: (206) 623-7292                200 Park Avenue
Facsimile: (206) 623-0594                New York, NY 10166-4193
steve@hbsslaw.com                        Telephone: (212) 294-4698
emilees@hbsslaw.com                      Facsimile: (212) 294-4700
stephaniev@hbsslaw.com                   jkessler@winston.com
                                         dfeher@winston.com
Benjamin J. Siegel (SBN 256260)          dgreenspan@winston.com
HAGENS BERMAN SOBOL SHAPIRO LLP          aidale@winston.com
715 Hearst Avenue, Suite 202             sviebrock@winston.com
Berkeley, CA 94710
Telephone: (510) 725-3000                Jeanifer E. Parsigian (SBN 289001)
Facsimile: (510) 725-3001                WINSTON & STRAWN LLP
bens@hbsslaw.com                         101 California Street, 34th Floor
                                         San Francisco, CA 94111
Jeffrey L. Kodroff                       Telephone: (415) 591-1000
SPECTOR ROSEMAN & KODROFF PC             Facsimile: (415) 591-1400
Two Commerce Square                      jparsigian@winston.com
2001 Market Street, Suite 3420
Philadelphia, PA 19103                   *Counsel for Plaintiffs and the Proposed Classes*
Telephone: (215) 496 0300
Facsimile: (215) 496 6611
jkodroff@srkattorneys.com

*Counsel for Plaintiffs and the Proposed Classes*

PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION
No. 4:20-cv-03919-CW
010912-11/2315603 V1

1

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)

2

Pursuant to Civil Local Rule 5-1(i)(3), the filer of this document attests that concurrence in the

3

filing of this document has been obtained from the signatories above.

4

5

/s/ *Steve W. Berman*
STEVE W. BERMAN

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION
No. 4:20-cv-03919-CW

010912-11/2315603 V1