Steve W. Berman (*pro hac vice*)
Emilee N. Sisco (*pro hac vice*)
Stephanie Verdoia (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
emilees@hbsslaw.com
stephaniev@hbsslaw.com

Benjamin J. Siegel (SBN 256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
bens@hbsslaw.com

*Counsel for Plaintiffs and the Proposed Classes*

Jeffrey L. Kessler (*pro hac vice*)
David G. Feher (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
Adam I. Dale (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4698
Facsimile: (212) 294-4700
jkessler@winston.com
dfeher@winston.com
dgreenspan@winston.com
aidale@winston.com

Jenifer E. Parsigian (SBN 289001)
101 California Street, 34th Floor
San Francisco, CA 94111
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
jparsigian@winston.com

*Counsel for Plaintiffs and the Proposed Classes*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | **Case No. 4:20-cv-03919 CW**<br><br>**DECLARATION OF STEVE W. BERMAN IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF HAGENS BERMAN SOBOL SHAPIRO LLP AS CO-LEAD CLASS COUNSEL**<br><br>**[PUBLIC VERSION]**<br><br>Date: September 21, 2023<br>Time: 2:30 p.m.<br>Judge: Hon. Judge Claudia Wilken<br>Courtroom: 2, 4th Floor |

I, STEVE W. BERMAN, declare as follows:

1.     I am an attorney duly licensed to practice law before this Court.  I am a member of the Washington Bar, and I have been admitted to this Court *pro hac vice*.  I am the managing partner of Hagens Berman Sobol Shapiro LLP ("Hagens Berman") and counsel for Plaintiffs Grant House, Sedona Prince, and Tymir Oliver ("Plaintiffs") in this matter. I and my firm are deeply and enthusiastically committed to prosecuting this case, and I am seeking to be appointed class counsel for the proposed classes.

2.     I submit this declaration in further support of Plaintiffs' Motion for Class Certification. Based on personal knowledge or discussions with counsel in my firm of the matters stated herein, if called upon, I could and would competently testify thereto.

3.     Attached hereto are true and correct copies of the following Exhibits:

| Ex. | Description | Conf. Desig. |
|-----|-------------|--------------|
| 57 | Excerpts from the Deposition Transcript of Catherine Tucker, Ph.D., taken in the above action on May 31, 2023 | None |
| 58 | Excerpts from the Deposition Transcript of Bob Thompson, taken in the above action on June 8, 2023 | Partially NSC |
| 59 | Document containing messages and marked as Exhibit 84 at the June 8, 2023 deposition of Bob Thompson | None |
| 60 | Document containing messages and marked as Exhibit 83 at the June 8, 2023 deposition of Bob Thompson | None |
| 61 | Excerpts from the Deposition Transcript of Barbara Osborne, Ph.D., taken in the above action on June 15, 2023 | Partially NSC |
| 62 | Document entitled, "NCAA External Gender Equity Review – Phase I: Basketball Championships," dated August 2, 2021 | None |
| 63 | Article entitled, "California defies NCAA as Gov. Gavin Newsom signs into law Fair Pay to Play Act," dated Sept. 30, 2019 | None |
| 64 | Excerpts from the Deposition Transcript of Tymir Oliver, taken in the above action on Jan. 23, 2023 | None |
| 65 | Publication entitled, "50 Years of Title IX: We're Not Done Yet," dated May 2022 | None |

| Ex. | Description | Conf. Desig. |
|-----|-------------|--------------|
| 66 | Article entitled, "Hundreds of Colleges May Be Out of Compliance With Title IX. Here's Why," dated Oct. 23, 2019 | None |
| 67 | Article entitled, "Title IX: Falling Short at 50: Female athletes stiffed on scholarships at some of the biggest colleges in the country," dated Aug. 17, 2022 | None |
| 68 | Excerpts from the NCAA 2022-2023 Division I Manual, Effective August 1, 2022 | None |
| 69 | Document Bates-numbered CUSA-GIA_00000509-520, marked as Exhibit 80 at the June 8, 2023 deposition of Bob Thompson | NSC |
| 70 | Excerpts from the Deposition Transcript of Daniel Rascher, taken in the above action on January 10, 2023 | None |
| 71 | Article entitled, "A Model of a Professional Sports League," dated Sept. 1, 1996 | None |
| 72 | Article entitled, "N.C.A.A. Chief, Pressured by State Laws, Pushes to Let Athletes Cash In," dated May 8, 2021 | None |
| 73 | Article entitled, "Wisconsin: 'No plans to stop offering athletics' in wake of chancellor's testimony in player-compensation trial," dated Sept. 18, 2018 | None |

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 21st day of July, 2023 at Seattle, Washington.

                                        /s/ Steve W. Berman
                                    STEVE W. BERMAN

# EXHIBIT 57

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                    OAKLAND DIVISION

4

5   GRANT HOUSE and SEDONA PRINCE,   )

6   on behalf of themselves and all )

7   others similarly situated,       )

8          Plaintiffs,               ) Civil Action No.

9   v.                               ) 4:20-cv-03919-CW

10  NATIONAL COLLEGIATE ATHLETIC     )

11  ASSOCIATION; PAC-12 CONFERENCE;  )

12  THE Big Ten CONFERENCE, INC.;    )

13  THE BIG TWELVE CONFERENCE, INC.; )

14  SOUTHEASTERN CONFERENCE; and     )

15  ATLANTIC COAST CONFERENCE,       )

16          Defendants.              )

17  _____

18

19       VIDEO DEPOSITION of CATHERINE TUCKER, Ph.D.
                      May 31, 2023
20                   9:00 a.m. EDT
                    Latham & Watkins
21               200 Clarendon Street
                  Boston, MA  02116
22

23
    Reported by: Dana Welch, CSR, RPR, CRR, CRC
24
    Job No.: J9703135
25



1    Q.   Okay.  Have you ever done any prior

2  economic study of labor markets in sports?

3         MR. KILARU:  Object to the form, calls

4  for a legal conclusion.

5    A.   In labor markets in sports?

6    Q.   Yes.

7    A.   No.  I have not done a study of labor

8  markets in sports.

9    Q.   Have you ever done any prior economic

10  study of labor markets in another industry?

11    A.   Yes, I have.

12    Q.   And what was that?

13    A.   So I have looked at labor markets in the

14  context of the question of whether or not

15  riders -- sorry -- drivers in ride sharing

16  platforms should be considered users of the

17  platforms or workers who are supplying labor.

18    Q.   Okay.  Other than that case, have you

19  done any other studies of labor markets in any

20  industry?

21         MR. KILARU:  Object to the form.

22    A.   So that would be -- I just want to say

23  that was -- that's actually -- that's one case

24  but as sort of a general theme of what have been

25  three or four cases.



 1  male or female; is that correct?

 2          MR. KILARU:  Object to the form.

 3      A.   So you mean in terms of the actual

 4  broadcast -- the broadcast payments?

 5      Q.   Yes.  Dollars.

 6      A.   So, yes, no, that is the case, that there

 7  is the considerable edge I -- I show you in

 8  Figure 10.

 9      Q.   And would that suggest to you as an

10  economist that the consumer demand for FBS male

11  football is greater than the consumer demand for

12  other college sports, including female college

13  sports?

14          MR. KILARU:  Object to the form.

15      A.   So in terms -- you know, again, we're

16  talking on averages, and I think one of the

17  points in my report is that schools such as Duke

18  have different answers.  But on average, I think

19  definitely it's the case that college football

20  attracts more eyeballs than, for example, a

21  women's basketball competition would.

22      Q.   Do you agree that the order of attracting

23  eyeballs in broadcasting is that FBS football is

24  number one, men's basketball is number two, and

25  women's basketball is number three; is that the



1  correct economic order?

2          MR. KILARU:  Object to the form.

3      A.    I think probably if we think about in

4  terms of attracting eyeballs, that is correct on

5  average, though, of course, as I say in my

6  report, I note that there are exceptions at the

7  school level.

8      Q.    But on average, that's the correct order,

9  correct?

10     A.    So yes, on average, college football

11 attracts more eyeballs than female basketball.

12     Q.    Right.

13          And more eyeballs generates a higher

14 economic value, as an economist, right?

15          MR. KILARU:  Object to the form.

16     A.    So certainly, in general, there's a

17 positive correlation between the number of

18 eyeballs and the value of the share.

19     Q.    And you don't think that's a Title IX

20 violation, right?

21          MR. KILARU:  Objection, calls for a legal

22 conclusion.

23     A.    So it's certainly not the case -- I'm not

24 a lawyer, I'm not offering an opinion.  I'm just

25 saying that if you're going to have a model which



1  Back on the record.

2  BY MR. KESSLER:

3      Q.   If you take a look, Dr. Tucker, on

4  Appendix C of your report, this is a list of the

5  materials you relied upon in your report; is that

6  correct?

7      A.   Yes, that's right.

8      Q.   Okay.  If you look at page C-3, there are

9  two chapters listed from the book of the American

10  Bar Association called "Proving Antitrust

11  Damages, Legal and Economic Issues, Third

12  Edition."

13           Do you see that?

14      A.   Um --

15      Q.   In the bottom third --

16      A.   Yes.  I do, yes.

17      Q.   Okay.  And is that a source you relied

18  upon for your work in this case?

19      A.   So, certainly, it's something I refer to

20  when I'm talking about some of these economic

21  issues.  I wouldn't go so far as to say I relied

22  on the entire book, but I found it a useful

23  source when I used it in my footnotes.

24      Q.   Did you agree that this is a reliable

25  source for discussing issues or quantifying



1  damages in antitrust cases?

2      A.   So, certainly, for the chapters I read

3  and seeing what I read was economically sound, I

4  didn't -- I can't say I read the entire book, so

5  I can't comment on that, but those -- the

6  passages that I was citing certainly seemed

7  solid.

8      Q.   Did you recall anything in the two

9  chapters you read, Chapter 4 and Chapter 8, that

10 you disagreed with, as an economist?

11         MR. KILARU:  Object to the form.

12     A.   So I'm afraid at this distance I couldn't

13 recall.  I'm sorry.

14     Q.   But nothing comes to your mind as

15 something that you specifically disagreed with in

16 those chapters?

17         MR. KILARU:  Object to the form.

18     A.   So no, but I -- you know, I must admit I

19 was skimming through them to find support for

20 these references.

21     Q.   Okay.  You only skimmed these chapters?

22 You didn't actually like read and digest them?

23     A.   So in that I was looking for support when

24 I was trying to explain the economic principles

25 as I understood it, to prepare for damages, I was



1  the case that we saw anything worrying.

2      Q.   Did you determine whether in looking at

3  the data whether that the scholarship offers

4  attributed to individual schools for a particular

5  team exceeded the number of scholarships that

6  team was allowed to actually provide under NCAA

7  rules?

8          MR. KILARU:  Object to the form.

9      A.   So, again, I have not done that check,

10  and I think, you know, that's honestly a

11  difficult thing to think about, because, as I

12  explain when I talk about the transfer portal and

13  the way it affects scholarship offers, you know,

14  one of things we know is that lots of scholarship

15  spots are kept open in a way which sort of makes

16  this kind of math hard.  But no, I can't remember

17  doing that precise spot check, is my answer to

18  your question.

19      Q.   Do you know the NCAA has rules --

20          MR. KILARU:  Let her finish, please.

21          MR. KESSLER:  Okay.  Sorry.

22      Q.   Do you know that the NCAA has rules that

23  limit the number of scholarships each team can

24  offer in a particular year?

25      A.   Yes, I do.



1  interim policy came into effect in 2021, do you
2  understand?
3      A.   I'm so sorry, that was a bit long.  Could
4  we break it down a bit?
5      Q.   Okay.  Good.
6           I'm going to ask you questions about what
7  I'm going to call the prior NIL rules, and by
8  that, I'm referring to the rules that existed
9  during the damages period before the NCAA adopted
10 an interim policy which suspended most of those
11 rules.  Okay?  Is that understandable by you?
12     A.   Yes, it is.  Thank you.
13     Q.   Okay.  So using that definition of prior
14 NIL rules, do you agree that those rules applied
15 in the identical way to all the athletes in these
16 different classes?  In other words, there weren't
17 different rules for different class members.
18 They were -- the rules applied the same to all of
19 the class members; is that correct?
20          MR. KILARU:  Object to form.
21     A.   So, you know, I'm -- I'm not a lawyer,
22 but my understanding is that they applied to
23 student-athletes uniformly.  There -- you know,
24 there's, of course, some exceptions such as
25 clothing lines and so on, but my understanding is



1  that those exceptions also applied equally to all

2  athletes.

3      Q.   Right.

4           And is it correct that under the prior

5  rules, athletes in all the classes could not

6  offer their NIL rights to third parties for

7  compensation?

8           MR. KILARU:  Object to the form.

9      A.   Again, I'm not a lawyer.  My

10  understanding is there were rules restricting

11  commercialization of name, image, and likeness,

12  with some exceptions, as I said, such as clothing

13  lines.

14      Q.   Do you agree that that is an economic

15  injury?  If you are deprived of the ability to

16  try to commercialize some rights that you have,

17  is that an economic injury, in your view?

18           MR. KILARU:  Object to the form.

19      A.   So the answer would be it depends on

20  whether or not I had any expected value from my

21  name, image, and likeness.

22      Q.   If your expected economic value was 50

23  cents in your name, image, and likeness, and

24  you're deprived of the right to earn that 50

25  cents, is that an economic injury in your expert



1  were deprived of the opportunity and they could

2  have passed the test were suffering an economic

3  injury because they weren't permitted to take the

4  test?

5          MR. KILARU:  Object to the form.

6      A.   So I would say that if it's the case that

7  in the but-for world the woman would have

8  received the position of fire person without the

9  rule being in place, then yes, they would have

10  suffered an economic opportunity.

11     Q.   And that would be true even if the women

12  could not demonstrate that they previously were

13  accepted as a fire person in that department, but

14  it's the law, the rules prevented them from

15  demonstrating that they could do that, correct?

16          MR. KILARU:  Object to the form.

17     A.   So I think what you would need is you

18  would need to show that without this world as

19  a -- as a woman, I would have wanted to apply for

20  this opportunity, and I would have received it.

21  I think that's the nature of an economic -- a

22  sort of loss of economic opportunity here.

23     Q.   Okay.  Have you done anything to measure

24  yourself -- oh, I'm sorry.  Have you done

25  anything yourself to propose a methodology for



1  measuring class-wide damages in this case?

2       A.   So no, it's not the case that I provided

3  an affirmative methodology.  Instead, I focused

4  on looking at the methodology put forth by

5  Dr. Rascher.

6       Q.   Right.

7            And you have not in this case taken

8  Dr. Rascher's methodology and made suggestions to

9  modify it, as you testified you did in another

10 case, and say if you make these changes, this

11 would be an appropriate methodology, correct?

12 You haven't offered any opinion like that, right?

13      A.   No, I haven't.  And I'm not a lawyer, but

14 my understanding is that usually happens after

15 the class is certified.

16      Q.   Is it your opinion that it is impossible

17 to have a methodology for measuring class-wide

18 damages in this case because there's too many

19 uncertainties?

20           MR. KILARU:  Object to the form.

21      A.   You know, so I'm an optimist.  I never

22 like to say anything is impossible.  All I'd say

23 is having looked at the methodology put forward

24 by Dr. Rascher, it really emphasized how

25 problematic and difficult it will be.



1   Dr. Rascher's but-for world.  And all I'm saying

2   is that in his report he said -- you know, he

3   justified the 10 percent in one way, and then in

4   his deposition he seemed to think there might be

5   more rules or not, it was all very unclear.  And

6   so I think it just shows the muddiness of really

7   the but-for world.  We're doing it when we're

8   imagining highly speculative rules.

9        Q.   Okay.  Well, the rules he imagined were

10  the same rules the NCAA has now.  If you were

11  asked to model the but-for world, would you model

12  any NCAA rules at all, or would your model have

13  no NCAA rules --

14           MR. KILARU:  Object to the form.

15       Q.   -- if you were asked to do this damages

16  study?

17           MR. KILARU:  Object to the form, lacks

18  foundation.

19       A.   So if I was going to model the but-for

20  world, and this is not something I've been asked

21  to do, I would be very cautious about assuming

22  rules which in essence gave my results before I

23  started.

24       Q.   Would you have any NCAA rules at all in

25  your but-for world, and what would they be?



 1          MR. KILARU:  Object to the form, beyond
 2  the scope.
 3      A.   So, again, it's not something I've
 4  analyzed.  I think if I was to independently
 5  analyze a but-for world in any antitrust case as
 6  an affirmative opinion, you know, I would try to
 7  make sure it matches institutional details.
 8      Q.   Have you ever modeled a but-for world in
 9  an antitrust case where some rules were being
10  challenged but not other rules?
11      A.   So -- so yes, the answer is yes.
12      Q.   What case was that?
13      A.   I'm thinking about the contact lens case
14  where there are some rules that give market power
15  to prescribing opticians just by nature of trying
16  to ensure patient eye safety.  But those weren't
17  the challenge rules.  So yes, I have monitored --
18  I have measured that.
19      Q.   And in that but-for world for that case,
20  did you imagine that the rules not being
21  challenged would continue in effect?
22      A.   So in essence, in that case, because I
23  was looking -- basically using a before and after
24  methodology at a time series, yes, the but-for
25  world I was examining was one where the only --



 1  in some sense you're trying to isolate out the

 2  effect of the challenge content.

 3              MR. KESSLER:  Okay.  This a good point to

 4  take our lunch break.  Can we just do a half

 5  hour?

 6              MR. KILARU:  Yes.

 7              THE VIDEOGRAPHER:  The time is 12:32 p.m.

 8  We're off the record.

 9              (Proceedings interrupted at 12:33 p.m. and

10      reconvened at1:06 p.m.)

11              THE VIDEOGRAPHER:  The time is 1:06 p.m.

12  Back on the record.

13  BY MR. KESSLER:

14      Q.   I want to discuss with you, Dr. Tucker,

15  the issue of equal payments being used or not

16  used for athlete NIL rights.

17              MR. KILARU:  Does anyone here this like

18  clomping noise?  Is that on the Zoom?

19              If you're on the Zoom, can you please go

20  on mute.

21              MR. KESSLER:  Thank you.  That's helpful.

22  BY MR. KESSLER:

23      Q.   So I want to discuss the issue of whether

24  or not NIL payments for broadcast would be equal

25  or not equal or for other types of NIL.  Okay?



1          You are aware, are you not, that there

2   are a number of real world examples where

3   athletes are paid the same amount for their NIL

4   value regardless of their position on the team or

5   their performance on the team; is that correct?

6          MR. KILARU:  Object to the form.

7     A.   So I am aware of examples where that

8   occurs.  I'm also aware that, you know, for

9   example, even in jersey sales, that's not quite

10  true.

11    Q.   Okay.  So let's talk about that.

12         In the NBA and the NFL, to appear in a

13  video game, all athletes get an equal payment; is

14  that correct?

15    A.   So I haven't studied those precise

16  contracts, but I'm happy to take that

17  hypothetical, yes.

18    Q.   It's not a hypothetical.

19         Do you have any reason to disagree with

20  that?

21    A.   So no, I haven't.  I'm just saying I

22  haven't studied those precise contexts.

23    Q.   Okay.  Have you studied whether or not

24  the NHL and Major League Baseball Players

25  Association also provide equal distribution to



1   athletes for appearances in video games?

2           MR. KILARU:  Object to the form.

3       A.   So I don't think I've studied those

4   examples apart from to say that I think one of

5   those games may have been canceled.

6       Q.   So do you have any opinion as an

7   economist as to why a superstar like Tom Brady in

8   the NFL -- you know who Tom Brady is?

9       A.   Yes, I do.

10      Q.   Okay.  A superstar like Tom Brady in the

11  NFL would receive the same video game payment as

12  the 53rd person on the roster of his team, do you

13  have as an economist any explanation as to why

14  that money would be distributed that way, despite

15  their vast difference in performance and

16  notoriety?

17      A.   So I think I only allude to this when I

18  talk about the differences in just the number of

19  people and the structure and how negotiation is

20  done in professional sports.  It's not the case

21  I've got a separate opinion on that.

22      Q.   Okay.  In college sports, if you would

23  have a video game, like EA having a video game

24  for football, okay, what difference in economics

25  would there be between an EA college football



1  video game and an EA NFL video game with respect

2  to the motivations for how to distribute payments

3  to athletes for just appearing in the game?

4        And I want to be clear, I'm not talking

5  about an athlete appearing on the cover of the

6  game or maybe a commercial for the game, which is

7  something else, but just for appearing in the

8  game, what would be the difference in economics

9  that you can discern between EA doing a college

10 football game, video game, and doing an NFL video

11 game with respect to those rights?  Any?

12       MR. KILARU:  Object to form.

13  A.   So it's not the case, I think, that I

14 have a large opinion on this apart from the table

15 in my report where I just point out that we're

16 dealing with a sort of different set of

17 negotiating entities.

18  Q.   Other than that, do you have anything to

19 add on that subject?

20  A.   Just to say that -- I'm just trying to

21 find it.  It's the table where I show just, you

22 know, the fact you have a player's union and so

23 on.

24       You know, apart from saying the different

25 Wagner units and general economics that leads to



1  different outcomes, I don't really have a
2  separate opinion on that.
3      Q.   Have you read that -- at the time of your
4  report, EA had not yet done a deal for college
5  athletes, but there have been developments since
6  then.  Are you familiar with those developments?
7      A.   I've certainly read some popular
8  reporting about those developments, yes.
9      Q.   Yes.  And do you know that under the new
10  game, that each athlete is going to receive the
11  same payment equally from EA when this new
12  college football game goes forward?
13     A.   So that's not the way I read that
14  reporting.  I think that was mentioned as a
15  fallback option and a potential outcome, but that
16  they're also considering other outcomes.
17     Q.   That's your understanding, that there's
18  going to be other outcomes besides equal
19  distribution?
20     A.   I'm just saying in the news reporting
21  that I read, it described equal payments as a
22  fallback option, but it hasn't been finalized.
23     Q.   What news report did you read?
24     A.   I'd have to look at this, but this was a
25  quote from one of the, I think the EA



 1  representatives.

 2      Q.    Now, in a video game, there's a need for

 3  the game maker to have all the athletes on the

 4  team in the game, correct?

 5           MR. KILARU:  Objection.

 6      Q.    Whether you're a starter or not a

 7  starter, correct?

 8           MR. KILARU:  Object to the form.

 9      A.    I think there's certainly a desire to,

10  though there's workarounds if you don't manage to

11  get that.

12      Q.    And is it also true that in broadcast

13  NIL, there's a need for the broadcaster to have

14  the rights to all the athletes on the team

15  because you don't know, for example, whether --

16  which players are going to start or not, who's

17  going to be hurt, who's going to be in the game,

18  so you really need the entire roster; is that

19  correct?

20           MR. KILARU:  Object to the form and calls

21  for a legal opinion.

22      A.    Again, I'm not the person who sort of

23  negotiates these publicity rights.  I certainly

24  think there's a convenience factor to having,

25  shall we say, an ex-ante license to cover those



1  things, but I'm not quite sure what alternatives

2  there are.

3      Q.   You're not offering any expert opinion

4  that that wouldn't be required, correct?

5      A.   So certainly I'm not offering any legal

6  opinion about what would be required or not.

7      Q.   Any expert opinion as an economist that a

8  broadcaster wouldn't need to have all the rights

9  of the athletes -- not to ask you a legal

10  opinion, but as to what they would desire in a

11  negotiation, you're not offering any opinion

12  that's not true, correct?

13          MR. KILARU:  Object to the form.

14      A.   So it's not the case that I'm offering I

15  think any definitive -- I'm not offering an

16  opinion on the ex-ante value of a sort of

17  indemnification.

18      Q.   Okay.  Are you aware of the fact that --

19  I think you give some examples that a number of

20  schools distribute SAF payments in equal amounts

21  to all the athletes on a team?

22      A.   Yes.  Sometimes SAF payments are

23  distributed equally, and then as I share in my

24  analysis, sometimes they're not.

25      Q.   Right.



1        And is it correct that collectives

2  sometimes pay NIL payments to athletes, all the

3  athletes on a team, regardless of whether they're

4  a star or not or what position they play?

5        MR. KILARU:  Object to form.

6     A.   So I think in my report I gave the

7  example where they gave the offense, not

8  distinguishing between whether you're a

9  quarterback or some other position, equal

10 payments.

11       But, you know, I think Dr. Rascher

12 himself points to examples where a collective has

13 decided to say give everyone, you know, a certain

14 like set of sportswear or sneakers or something

15 else that young people might like.

16    Q.   Look, for example, on paragraph 236 of

17 your report, page 196.  It's the last sentence on

18 236, you give this example, meanwhile, Texas --

19 I'll wait till you get there.

20    A.   Yes, that's correct.

21    Q.   And there's an example on the bottom of

22 236 on page 196, "meanwhile Texas Tech's Matador

23 Club signed 100 football players to a one

24 year 25,000 NIL contract with all football

25 players receiving the same amount from



1    quarterback to non-scholarship athletes."

2         Do you see that?

3    A.   Yes, I do.

4    Q.   So as an economist, have you studied why

5    these payments would be paid out equally to all

6    the athletes on the team regardless as to whether

7    they're a starting quarterback to a

8    non-scholarship student-athlete?

9    A.   You know, so what my analysis shows and

10   what these paragraphs you're pointing to show is

11   just a huge disparity in what collectives decide

12   to do.  Some collectives have decided to focus

13   payments on one star athlete, some collectives,

14   as in the case of Texas Tech, have even expanded

15   beyond scholarship athletes to include

16   non-scholarship athletes.

17        I think my point is there's a wide

18   variety of motivations in the collectives, which

19   is what Dr. Rascher is not thinking about.

20   Q.   You agree there are a number of

21   situations in which the market outcome are equal

22   payments for NIL rights, correct, among the

23   athletes?

24        MR. KILARU:  Object to the form, vague.

25   A.   So we've gone through video games where



1  in some instances, there are equal payments, and

2  I agree in some instances, collectives give equal

3  payments, but often collectives don't.

4     Q.   And SAF, there are situations where

5  schools get equal payments in SAF, right, like

6  they give everyone on the team a computer or

7  something like that, correct?

8     A.   Yeah.  Some schools decide to give

9  everyone a computer, some schools decide to focus

10 SAF payments on star athletes.

11    Q.   For trading cards, you're familiar with

12 the trading card business?

13    A.   So I'm not a trading card collector, but

14 it is part of my analysis in this case.

15    Q.   And it's correct, is it not, that for

16 trading cards, the NFL, the NBA, Major League

17 Baseball, National Hockey League, Major League

18 Soccer, in all those sports, athletes are paid

19 equal amount for appearing in trading cards, just

20 for appearing, as all other athletes, whether

21 they're a star or not a star, correct?

22         MR. KILARU:  Object to form.

23    A.   So, again, I haven't studied those

24 contracts and I'm not sure quite how -- if it's

25 the same as jersey sales, which I do mention,



1  conflicts, I would agree, but I think it goes

2  back to the flaws in the methodology.

3      Q.   So in your analysis, if you do a good

4  damage methodology that is soundly based, that

5  doesn't create a conflict even though it might

6  affect class members differently.  It's only if

7  you do a poor damages methodology that in your

8  view doesn't reflect the but-for world, then the

9  class conflicts are created; is that your

10  opinion?

11          MR. KILARU:  Object to the form.

12      A.   So if you go to my Section C, which

13  starts on 252, I think that is precisely my

14  opinion.  And also to be fair to be in the

15  broadcast related damages methodology, I think A

16  is a slightly different opinion, but certainly I

17  think it is Rascher's proposed methodologies

18  which are creating these class conflicts in this

19  case, the class conflicts I describe in

20  Section VII.B and VII.C.

21      Q.   So, again, just so I understand your

22  view, the conflict is not inherent in the class

23  itself, it arises because of what you view as the

24  poor methodology choice made by Dr. Rascher?

25      A.   The class conflicts I describe in



1  section VII.B. and VII.C. are a result of

2  Dr. Rascher's methodology in both broadcast and

3  third-party NIL.

4      Q.   Okay.  Now, you mentioned the ability of

5  athletes to go from P5 to non-P5, back and forth,

6  on the transfer rules.

7          Do you recall that part of your report?

8      A.   I'm so sorry.  Can you repeat the first

9  part of the question?

10     Q.   You talk about one of the ways the

11 substitution effect could occur is by virtue of

12 transfers.  Do you recall that?

13     A.   Yes, I do.

14     Q.   As one possibility, it's a recruitment

15 coming out of high school and the other that it's

16 through transfers, correct?

17     A.   Yes, that's correct.

18     Q.   Okay.  With respect to transfers, okay,

19 isn't it correct that until 2018, so the first

20 two years of the damage period is '16 and '17,

21 okay, that during those first two years, you

22 couldn't transfer without sitting out a year;

23 isn't that true?

24     A.   So I recollect a shift like that, but I

25 can't remember the particulars of the timing.



CATHERINE TUCKER PH.D.                                    May 31, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION                          232

1                          CERTIFICATE

2    Commonwealth of Massachusetts

3    Suffolk, ss.

4         I, Dana Welch, Registered Professional

5    Reporter, Certified Realtime Reporter, do hereby

6    certify that CATHERINE TUCKER, Ph.D., the witness

7    whose deposition is hereinbefore set forth, was

8    duly sworn by me before the commencement of

9    such deposition, and that such deposition was taken

10   before me and is a true record of the testimony

11   given by such witness.

12        I further certify that the adverse party was

13   represented by counsel at the deposition.  I

14   further certify that I have no disqualifying

15   interests, personal or financial, in any party in

16   this action.

17        I further certify that the deposition of

18   Catherine Tucker, Ph.D., occurred in person on May

19   31, 2023 in Boston, Massachusetts, commencing at

20   9:05 a.m. and concluding at 3:23 p.m.

21        _____
          Dana Welch, CSR, RPR, CRR
22        Notary Public
          My Commission Expires:
23        September 13, 2024

24

25



# EXHIBIT 58

# REDACTED VERSION

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

GRANT HOUSE and SEDONA PRINCE, on    Civil Action No.

behalf of themselves and all         4:20-cv-03919-CW

others similarly situated,

       Plaintiffs,

v.

NATIONAL COLLEGIATE ATHLETIC

ASSOCIATION; PAC-12 CONFERENCE;

THE BIG TEN CONFERENCE, INC.; THE

BIG TWELVE CONFERENCE, INC.;

SOUTHEASTERN CONFERENCE; and

ATLANTIC COAST CONFERENCE,

       Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


VIDEO-RECORDED DEPOSITION OF BOB THOMPSON

June 8, 2023

9:29 a.m.

Polsinelli
One East Washington Avenue
Suite 1200
Phoenix, Arizona

Reported by Eve K. Burton, RPR, CRR,
Arizona CR Certificate No. 50261, California CSR No. 12527

Job No. J9703138

BOB THOMPSON                                          June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 44

1      A.    What I have in my head.

2      Q.    Fair.  Fair enough.

3            Documents.  Any documents --

4      A.    No.

5      Q.    -- you looked at that aren't identified?

6      A.    Not that I -- not that I know of.

7      Q.    Did you -- there are a number of college media

8  agreements that are listed in this appendix, correct?

9      A.    Correct.

10     Q.    The copies that you have, were they all -- did

11 they all contain redactions, provisions blacked out?

12     A.    Yes.

13     Q.    Okay.  You don't recall looking at any media

14 agreements where there were no redactions.

15     A.    No, I did not.

16     Q.    Okay.  All right.  If you want to go -- now I'm

17 going to ask you some more questions -- pages 7 and 8.

18 It's where we were before.

19     A.    Okay.

20     Q.    Oh, I'm always losing my place.

21            It's your testimony that the networks rely

22 on the promoter or event producer to obtain all rights

23 necessary for the broadcast to occur.

24     A.    That's correct.

25     Q.    Okay.  And do you agree that those rights are --

Page 45

1  they need to be obtained in advance of the broadcast?

2      A.   That's the preference.

3      Q.   Yeah, and I imagine the preference is as long in

4  advance of the broadcast as possible.

5      A.   We look for it to be represented in the -- in the

6  agreement that they have been obtained.

7      Q.   Okay.  And so -- and that's my next question, if

8  you could confirm your testimony that typically networks

9  will obtain representations and warranties from the

10 licensor and related indemnification protections in this

11 regard.

12     A.   Correct.

13     Q.   Okay.  And that includes the right to show the

14 name, image, and likeness of all the participants in the

15 event.

16              MR. FULLER:  Objection.

17              THE WITNESS:  That's correct.

18 BY MR. GREENSPAN:

19     Q.   Okay.  Do you recall, during your time at Fox,

20 whether Fox agreed to any media agreement that did not

21 either expressly convey the right to use the name, image,

22 and likeness of the participants or at least protect Fox

23 for its showing of the names, image, and likeness of the

24 participants?

25              MR. FULLER:  Objection.

BOB THOMPSON                                                      June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION



Page 49

22        A.    That's correct.

23        Q.    Okay.  And that's consistent with your opinion

24   that it's the promoter/the rights holder's

25   responsibility -- in this case, the conference -- to

BOB THOMPSON                                          June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 50

1    secure all of the necessary clearances.

2        A.    That's correct.

3        Q.    Okay.  In substance, if not in words, this is a

4    standard provision?

5        A.    Yes.  I mean, many are even stronger.

6        Q.    Okay.

7        A.    And it may be stronger.  It's just not in here.

8        Q.    When a network enters into a college media rights

9    agreement, is it fair to say that the network just sort of

10   takes as a given that it will have rights or protections

11   for the use of the name, image, and likeness of the

12   college athletes?

13                   MR. FULLER:  Objection.

14                   THE WITNESS:  I take nothing as a given in

15   the sports world.

16   BY MR. GREENSPAN:

17       Q.    And that's why it's in the agreements.

18       A.    Correct.

19       Q.    Okay.

20       A.    You done with that one?

21       Q.    Yeah.

22                   As a former network executive, would a

23   network ever sign a -- in your opinion, sign a college

24   media rights agreement without either an express

25   conveyance or protection for using the name, image, and

BOB THOMPSON                                                    June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

                                                              Page 51

 1   likeness of the college athletes?

 2                   MR. FULLER:  Objection.

 3                   THE WITNESS:  I want to separate -- there's

 4   like name, image, and likeness, the -- kind of the new

 5   thing now, right?  You know, where people are getting paid

 6   for promotional aspects and pay-to-play and entering the

 7   transfer portal and all those type of things, versus what

 8   I look at as name and likeness, which is just the

 9   representations that we can show their faces during the

10   games, right?

11                   And I would not enter into an agreement, and

12   I would assume that people in my position at other places

13   would not enter in that situation, without the express,

14   you know, representation and warranties from the different

15   conferences that they would provide those warranties.

16   BY MR. GREENSPAN:

17       Q.   Do you believe that college athletes are now

18   being paid for performance?

19       A.   I believe they can be.

20       Q.   Do you believe they are?

21                   MR. FULLER:  Objection.

22                   THE WITNESS:  I believe they're paid for

23   other things than performance.  I believe they're paid to

24   endorse products.  I believe they're being paid to attend

25   specific institutions.  I believe they're being paid to

BOB THOMPSON                                            June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

                                                      Page 52

 1    transfer from one institution to another institution.  And

 2    I believe that -- I think that's about it.

 3              As far as for an actual performance, like,

 4    "I'm going to -- you scored five touchdowns.  I'm going to

 5    give you 50 grand," no, I don't believe that happens.

 6    BY MR. GREENSPAN:

 7       Q.  Okay.  It's your -- can you confirm it's your

 8    opinion that "It would be inherently impractical for

 9    individual participants to own or control broadcast rights

10    in a sports event because any single participant could

11    withhold those rights and prevent the broadcast from

12    occurring"?

13       A.  Could you say that again.

14       Q.  If you want, it's on page -- I'm reading from --

15       A.  Oh.

16       Q.  -- page 8 of your report.

17       A.  Okay.  Third paragraph?

18       Q.  Yeah, the last sentence of the third paragraph.

19       A.  That's correct.

20       Q.  Okay.  And I want to focus -- that holds true for

21    any single participant could hold up a broadcast if that

22    participant controlled the -- controlled the right to use

23    their name, image, or likeness.

24              MR. FULLER:  Objection.

25              THE WITNESS:  And if it wasn't something

BOB THOMPSON                                           June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

                                                         Page 53

1    that the conference could warrant that they could provide,

2    yes.

3    BY MR. GREENSPAN:

4         Q.    Okay.  And it wouldn't matter if the participant

5    is the quarterback or the punter; that's the problem that

6    you are addressing in this sentence in your report,

7    correct?

8         A.    That's correct.

9         Q.    Okay.  And again, I think we've already

10   established this, but you're not offering the legal

11   opinion on the legal issue of whether an athlete owns the

12   right to his or her name, image, and likeness in a

13   broadcast.

14        A.    That's correct.

15        Q.    Okay.  Mr. Thompson, I'm going to do this a lot,

16   where I have quotes in my notes from your report that I'm

17   going to ask you about.  If ever you want to know where it

18   is in your report so you can find it and look in context,

19   just let me know.

20        A.    That would be great.

21        Q.    Okay.  Can you confirm your opinion that the NIL

22   marketplace for promoting and endorsing products

23   demonstrates that some college athletes have tremendous

24   NIL endorsement value and others have little or no NIL

25   endorsement value?

BOB THOMPSON                                           June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 70

1   depending on what they are, can have different values, I

2   imagine that it's more valuable to have the back-end

3   rights circle than to not have it at all, from the

4   perspective of the network.  Is that right?

5               MR. FULLER:  Objection, I guess.

6               Answer the question.

7               THE WITNESS:  Not necessarily.  It would

8   depend on how much you have to pay for that right.

9   BY MR. GREENSPAN:

10      Q.   Okay.  Let's put aside what you have to pay for

11  it, but in terms of it's more valuable to a network to

12  have back-end rights than to have none, correct?

13      A.   All things being equal, if the price was the

14  thing whether you had the right or not had the right, yes,

15  it's more valuable to have them.

16      Q.   Okay.  Now let's get to your point about it

17  depends what you have to pay for them.  Back-end rights --

18  I think we discussed this before:  There is no separate

19  market for back-end rights, correct?

20               MR. FULLER:  Objection.

21               THE WITNESS:  Not that I'm aware of.

22  BY MR. GREENSPAN:

23      Q.   Okay.  And back-end rights -- there's no separate

24  price for back-end rights within a media agreement,

25  correct?

BOB THOMPSON                                                June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 71

1      A.   Not in my experience, no.

2      Q.   Okay.  So how would a network -- how did you at

3   Fox?  How would you do it now at Thompson consulting?  How

4   would you go about figuring out what is the price worth

5   paying to get the back-end rights?

6      A.   It's almost not what it's worth paying.  It's

7   worth -- it's what -- it's about what you're not prepared

8   to pay to not have an advantage in a renewal.

9           Back-end rights are all about renewals.

10   Back-end rights aren't about the current agreement.  It's

11   all about what happens next.

12           And so, you know, some back-end rights I

13   would want very strong if I felt very strongly about the

14   product, and I'd want a right to match, flat out.  Others,

15   I'd -- you know, I might want to take a look at it, and

16   I'd be prepared to walk if I don't think it's something --

17   you know, if I think it's on the margins.

18           So you can't -- you can't look at them and

19   just lump them all in the same circle here and say they're

20   all worth the same amount going forward.

21      Q.   So let's go with the product that you like very

22   much and you want the right to match, and the seller --

23   let's say it's a conference -- says to you, "Mr. Thompson,

24   here's an agreement with the very strong right to match

25   that you want.  Here's an agreement with no right to

BOB THOMPSON                                          June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 72

1    match."

2              How would you go about determining what the

3    price is worth paying for those two options?

4              MR. FULLER:  Objection.

5              THE WITNESS:  Well, I'd look at the various

6    other circles that are affected by either having these

7    rights or not having these rights, and then I would make

8    some sort of a determination based on that as to whether

9    or not I wanted the back-end rights or I didn't care if I

10   had back-end rights.

11   BY MR. GREENSPAN:

12      Q.   But in my hypothetical, we've established you

13   want the back-end rights; you want the right to match;

14   it's the product you really want.

15             So my question is, all else equal, one --

16   two draft media agreements are put in front of you.

17   Everything is the same.  We're talking about the product;

18   you really like it.  You really want the right to match.

19   One contract has the right to match.  One doesn't.  How

20   would you, as the buyer, determine "What is the difference

21   in price that I am willing to pay for Option 1 versus

22   Option 2?"

23             MR. FULLER:  Objection.

24             THE WITNESS:  I think I just said that.  I

25   said we'd look at the other circles here that are affected

BOB THOMPSON                                                    June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 73

1   by back-end rights and keeping the product going forward

2   and be able to come up with some sort of a figure that

3   would give me a clue as to whether or not we should pay

4   the fee -- or pay the deal that has the back-end rights or

5   accept, which I probably wouldn't do, the one that

6   doesn't.

7               Each of these are dependent on not only

8   within the current term of the agreement, but many of

9   these things extend beyond the term of this agreement,

10  things like retransmission consent fees, things like cable

11  subscriber fees.

12              This might be a three-year deal or a

13  four-year deal, and my distribution agreements might be

14  seven-year deals.  And so if I lose this product at some

15  point during the term of my distribution deals, then I

16  have to get into a situation where I have to figure out,

17  "Am I going to have to give money back?  Or what am I

18  going to replace it with, and what's that going to cost?"

19              And so that's why it's just not that

20  clear-cut of a -- I mean, you look at the elements, and

21  then you make the determination as to the value of the

22  back-end rights.

23  BY MR. GREENSPAN:

24      Q.   But you would be able to make that determination.

25  I understand it's not clear, but as a network or a

BOB THOMPSON                                                    June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

                                                                  Page 74

1    consultant for a network, you would be able to assess the

2    relative value between Contract, you know, 1 that has the

3    back-end rights and Contract 2 that doesn't.

4                    MR. FULLER:  Objection.

5                    THE WITNESS:  Yeah, because these things --

6    these are all things that exist in the real world.  I

7    mean, affiliate fees are affiliate fees.  I can look at a

8    contract and tell you what that is and tell you what

9    happens if I don't have those rights.  I can look at

10   advertising revenues and advertising packages and say, "If

11   I don't have this product, this is what I'm going to

12   have."

13                   So these are all very quantifiable things.

14   They exist.  They're traded on daily.  But they're not

15   things that are unquantifiable because they don't exist in

16   the real world right now.

17   BY MR. GREENSPAN:

18       Q.   Okay.  Well, I mean, I take it, you're alluding

19   to broadcast NIL.

20       A.   Correct.

21       Q.   Okay.  But men's basketball, women's basketball,

22   FBS football, these are property rights that exist in the

23   real world, yeah?

24       A.   Yes.

25       Q.   Okay.  And you would be able to -- so let's say

BOB THOMPSON                                                June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 75

1    one -- again, let's put back-end rights aside.  We've got

2    two contracts.  All else is equal.  One contains some

3    women's basketball, and one doesn't.  You would be able to

4    assess the relative value between those two contracts,

5    what you're willing to pay for the contract that includes

6    women's basketball and the contract that doesn't.

7         A.   I could assess and I could also go with what I

8    consider the value to be going forward, and that might be

9    purely a -- you know, my gut.

10             So it's not -- it's not all 100 percent

11   black-and-white, but I mean, these are very quantifiable

12   things, so yeah, I can -- I can get to a number.  Whether

13   or not I want to accept that number or not, that's a

14   totally different thing.

15        Q.   But to get to that number, you'd rely on your

16   experience.

17        A.   Partially.

18        Q.   Okay.

19        A.   But also math, because these are quantifiable

20   things.

21        Q.   Well, you didn't do any math in this case.

22        A.   No.  I wasn't -- I wasn't asked to.

23        Q.   Is it fair to say that when networks or

24   conferences negotiate media agreements and they make

25   valuations, they are, in part, relying on, as you put it,

Page 76

1    their gut or their experience in the industry?

2       A.   I like to call it more experience than gut, but

3    yes, you're correct.   I mean, that's just another element

4    of what you do when you purchase rights.   You know, it's

5    kind of like buying a car.   You go, "Do I feel good about

6    this car?   You know, does it -- you know, sure, the car

7    costs X, and the warranty is worth Y, and it gets Z for

8    gas mileage, but does my gut tell me that this is a good

9    deal?"

10      Q.   Okay.   All right.   Let's talk about Mr. Desser's

11   10 percent opinion.

12      A.   Okay.

13      Q.   It's your opinion that --

14           This is on page 35, if you want to keep up

15   with me.

16           There is no separate market for broadcast

17   NIL rights, and there is no instance when any person or

18   entity ever paid or was paid for broadcast NIL rights

19   only.   That's your opinion, correct?

20      A.   That's correct.

21      Q.   Okay.   And just to try to unpackage it, here -- I

22   know you have other opinions, too.   Here you're just

23   saying, the way Mr. Desser has offered an opinion about

24   the value of broadcast NIL standing alone, here what

25   you're saying is, that broadcast NIL standing alone has

BOB THOMPSON                                           June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

                                                         Page 81

 1   scheduling, not selection, is what we call special dates.

 2   Those are Sunday of Labor Day before the NFL starts, Labor

 3   Day, any Thursday or Friday games early in the season,

 4   Thanksgiving, Black Friday, and what are called rivalry

 5   days, which is usually the last week before the conference

 6   championship games, Thanksgiving, more or less, or the

 7   week after.

 8               So each of those windows, is what we call

 9   them, carries a certain value.  There's, you know, some

10   windows that are more valuable than others.  Some networks

11   prefer to be in prime time.  Some prefer to do daytime

12   because they have other obligations.

13               Fox likes the 12:00 noon window because, for

14   a lot of the -- a lot of the college football season, they

15   have MLB playoffs and the World Series that they have to

16   air on prime time, so they don't want prime time games.

17               So each network has different desires and

18   ways to fill their programming schedule, and that

19   determines -- that really drives what kind of schedule

20   they want and what kind of windows they want.

21               Long answer, but . . .

22   Q.   Educational for me.

23               Do you agree with Mr. Desser that watching

24   the sports broadcasts without athlete NIL would be an

25   absurd exercise?  And what I mean, putting aside what he

BOB THOMPSON                                              June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 82

1   meant, is with no names and faces in the broadcasts.

2                   MR. FULLER:  Objection.

3                   THE WITNESS:  It kind of goes against the

4   whole idea of televising sports, yes.

5   BY MR. GREENSPAN:

6       Q.   Okay.  And it's fair that, in the history of

7   televised sports -- and I won't even limit it to

8   college -- there's never been a televised game that

9   doesn't show -- that blurs out the faces and doesn't

10  identify the names of the athletes participating.

11      A.   I'm trying to think if that happened during the

12  pandemic at all.  It was just the fans.  They blurred out

13  the fans.  So no, not that I'm aware of.

14      Q.   You understand that the NCAA, in its rules, has

15  made a distinction between compensation for performance

16  and compensation for name, image, and likenesses.

17                  MR. FULLER:  Objection.  We have not asked

18  him to get into that issue.

19                  THE WITNESS:  Yeah, I have not -- I mean,

20  I'm not sure -- it's such a moving target.  I don't really

21  know what they have and have not.  I really don't.  I

22  mean --

23  BY MR. GREENSPAN:

24      Q.   I'll keep it super high-level.  To a degree,

25  college athletes are permitted to sell their name, image,

BOB THOMPSON                                          June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 85

1   how -- is this a way" --

2               I was trying to make sure it wasn't a way to

3   circumvent the salary cap.

4        Q.   Is the -- is the Fox content that we're talking

5   about -- was it the broadcast of an NBA game?

6        A.   No.  They wanted them to appear in a movie.

7        Q.   And so the question was, whether Fox paid the

8   player to be in the movie, would it circumvent the salary

9   cap in the NBA?

10       A.   Correct.

11       Q.   Okay.  And so that conversation had nothing to do

12  with the broadcast of NBA games.

13       A.   We televised the rights to that NBA team.

14       Q.   But the conversation was about the ability of the

15  player to appear in a movie, not an NBA game, without

16  violating the NBPA collective bargaining agreement.

17       A.   That's correct.

18       Q.   Okay.  It wasn't about the relationship between

19  appearing in NBA games and the salary cap.

20       A.   No.

21       Q.   Okay.  You acknowledge that the NFL player

22  contract includes a separate provision agreeing not to

23  contest the NFL's right to put the name, image, and

24  likeness of players in NFL broadcasts?

25               MR. FULLER:  Objection.

BOB THOMPSON                                                     June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

                                                             Page 86

 1                  THE WITNESS:  That's my understanding, yes.

 2    BY MR. GREENSPAN:

 3        Q.    Okay.  To -- which means that's something that

 4    the NFL bargained with the NFLPA to obtain.

 5                  MR. FULLER:  Objection.

 6                  THE WITNESS:  I would assume that, through

 7    the collective bargaining process, that's a right they

 8    obtained, yes.

 9    BY MR. GREENSPAN:

10        Q.    Okay.  And you don't disagree with Mr. Scebelo --

11    he's from NFL Players Inc., their licensing arm.  I can

12    show you his declaration, if you'd like.

██              ███████████████████████████████████████████

██    █████████████████████████████████████████████████████

██    █████████████████████████████████

16        A.    I don't know how they -- the structure of those

17    agreements.

18        Q.    Okay.  So you have no basis to disagree with him.

19        A.    No.

20        Q.    By the way, you agree, as a broadcast expert,

21    that the broadcast rights of NFL teams vary?

22                  MR. FULLER:  You mean, the value varies?

23                  MR. GREENSPAN:  Yeah.

24    BY MR. GREENSPAN:

25        Q.    So, for example --

BOB THOMPSON                                                      June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 87

 1      A.   So one team is worth more than another?

 2      Q.   So that the -- you know, the value of a -- sorry

 3  to pick on them, but the value of an Arizona Cardinals

 4  game in the upcoming season will not be as valuable to a

 5  broadcaster as the value of a Kansas City Chiefs game.

 6      A.   That's correct.

 7      Q.   Okay.  And you know that the NFL teams all share

 8  equally in the NFL's broadcast revenue.

 9      A.   That's my understanding, yes.

10      Q.   Okay.  For the NBA, you agree that the NBA player

11  contract contains a limited grant of publicity rights to

12  the NBA and to the individual player's team that address

13  the use of NBA players in NBA game broadcasts.

14      A.   That's correct.

15      Q.   Okay.  And that's a provision or a right that the

16  NBA collectively bargained to obtain.

17      A.   Yes.

18      Q.   And you don't disagree with -- this is now

19  Mr. Arrick from the NBA players' association -- when he

■ ████████████████████████████████████████████

■ ███████████████████████████████████

■              █████████████████████

■              ████████████████████████████████

■ █████████████████████████████████████████████

■ ████████████████████████████████████

BOB THOMPSON                                                    June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 88

███  ███████████

2       A.   Given the fact that there is a revenue-share

3    component, that would be my understanding, yes.

4       Q.   Okay.  Similar to my question about NFL teams, do

5    you agree that the value of broadcast rights may vary from

6    one NBA team to another?

7            So, for example -- and here I'm going to

8    gift you one -- there is more value to a broadcast of a

9    Phoenix Suns game right now than there would be to an

10   Orlando Magic game.

11      A.   I would agree with that.

12      Q.   Okay.  And you agree not just with the

13   Suns-to-Magic comparison, but in general, there is

14   variance among the value of the broadcast rights of

15   different NBA teams.

16      A.   I mean, it's a -- I guess it depends where you're

17   sitting.  You know, there's probably people in Orlando who

18   think their games are more valuable than the Phoenix Suns.

19   But from a 30,000-foot level, yes, there's different

20   values, and those values alternate all the time.  Teams

21   are good, and then teams are bad.

22      Q.   Yeah.

23      A.   I mean, years ago, you couldn't give away a

24   Kansas City Chiefs game.  Well, you know, now everybo- --

25   you know, they want them on every Saturday in the

BOB THOMPSON                                                    June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 89

1    4 o'clock window.

2              So, yeah, it varies, but at any moment in

3    time, there's going to be better teams and less better

4    teams.

5       Q.   And NBA teams share equally in national broadcast

6    revenue.

7       A.   Mostly.  There is a provision whereby some former

8    ABA teams don't receive a full share because there were

9    some very smart people in St. Louis who said, "We will not

10   continue on in the league, but we want a percentage of you

11   teams -- ABA teams who did stay in the league, we want a

12   percentage of your rights fees going forward."

13             And I think it was just recently redone, but

14   they've, for years -- years and years and years, they got

15   one-sixth of the ABA teams' rights, national television

16   rights, so the former ABA teams always got less money than

17   the original NBA teams.

18      Q.   So to the extent national television revenue in

19   the NBA is not shared equally, it's based on those teams'

20   history with the ABA.

21      A.   Correct.

22      Q.   It's not based on the relative value of the right

23   to broadcast one team's games versus another.

24      A.   Correct.

25      Q.   The WNBA; you agree that the WNBA shall have the

Page 120

1    Challenge.

2        Q.   Do you have any understanding as to -- and we'll

3    talk about the history of it, but how the SEC came up with

▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉

5        A.   Well, my understanding, from reading Mr. Sankey's

6    declaration, is that was primarily for a internal review

7    and comparison from a year-to-year basis and something

8    that supposedly they've been doing for decades so that

9    they can kind of get a snapshot consistently, because the

10   multi-sport packages --

11              You know, there probably was a time where it

12   wasn't multi-sport.  It was probably just basketball and

13   football.  And so in order to track the potential growth

14   and how much growth they're seeing over the years, my

▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

16   and that way they were able to compare on a year-to-year

17   basis how much those two properties -- even though there

18   are other pieces involved, but how much those two

19   properties -- under the estimation that those two

20   properties make up the bulk of the multi-sport contract,

21   which I don't dispute, how much that is -- growth is shown

22   going forward on a year-to-year basis.

23       Q.   Did you have an opportunity to talk to

24   Mr. Sankey?

25       A.   No.

BOB THOMPSON                                                    June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 121

1    Q.   Okay.  Going with your understanding, or maybe

2    it's an educated assumption, that this goes back to a time

3    when it was a men's-basketball-and-football-only contract,

▮    ████████████████████████████████████████

5              MR. FULLER:  Objection.

6              THE WITNESS:  Again, without knowing if that

7    was actually the case every year, I can't really say.  I

8    mean, it seems to be that's something they've assigned to

9    these events, but without knowing the specific makeups

10   each year of what's in that package, I really can't say.

11   BY MR. GREENSPAN:

12   Q.   You think it's -- do you have any basis to

13   disagree with the premise that when the SEC made this

14   initial benchmark, this allocation, it was based on their

15   best estimate of the relative value of football and

16   basketball?

17   A.   I would assume that the SEC and the individuals

18   involved there had some rationale for coming up with that

19   split.

20   Q.   Right.  And it hasn't changed in decades.

21              MR. FULLER:  Objection.

22              THE WITNESS:  No, but as I mentioned, as

23   Mr. Sankey stated, that is because they want to use it as

24   a comparative basis and have an apples-to-apples each year

25   as it goes forward to see how it grows.

BOB THOMPSON                                              June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 122

1    BY MR. GREENSPAN:

2        Q.   I know Mr. Sankey said that this was for

3    management purposes.  Did he say where it's apples to

4    apples for each year?  I just don't remember that.

5        A.   I don't recall either.  I mean, we could look.  I

6    don't --

7        Q.   If you want his declaration --

8        A.   I've got it right here.

9        Q.   Yeah.  I mean --

10       A.   I don't --

11              MR. FULLER:  Do you remember the paragraph

12   number where he's talking about the --

13              MR. GREENSPAN:  33 is at least in the

14   neighborhood.

15              MR. FULLER:  Yeah, I think it's generally 31

16   through 37, or something.

17              THE WITNESS:  Yeah, but there's one place

18   where he talks specifically about the --

19   BY MR. GREENSPAN:

20       Q.   It's in 33 when he talks about "for management

21   purposes only," and then he does go on to say -- he says,

22   "to facilitate year over year comparison."

23              That's what you're interpreting --

24       A.   That's --

25       Q.   -- as apples to apples?

BOB THOMPSON                                          June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 123

1      A.   Yes.

2      Q.   Got it.  Now, but to -- I think you answered my

3  last question, but this allocation has not changed for

4  decades, right?

5      A.   Otherwise, it wouldn't be apples to apples.

6      Q.   And in your report, you talk about sometimes a

7  conference football can have an up year or a down year;

8  basketball can have an up year or down year, correct?

9      A.   Correct.

10     Q.   And across -- and the SEC has had up and down

11  years for football over decades; is that right?

12     A.   Absolutely.

13     Q.   And SEC basketball, up and down years over

14  decades?

15     A.   Correct.

16     Q.   In fact, the composition of the SEC has changed

17  over decades.  Schools have come and gone, correct?

18     A.   Mostly come.

██    ██   ███   ███   █████████████████

██    ███████████████████████████████████████████

██    ██████████████████████████████████████████

██    ██████████████████

23     A.   That's hard to say.  I mean, in the new gender

24  era, it -- maybe they -- it's just basketball.

25          MR. FULLER:  I think that's in the

BOB THOMPSON                                              June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 132

 1   coming or going.

 2       Q.   Right.

 3            It's probably a good segue to ask you --

 4   let's talk about the SEC and Notre Dame.

 5       A.   Okay.

 6       Q.   ACC.

 7       A.   Okay.

 8            MR. FULLER:  Unless you have news the rest

 9   of us were unaware of.

10            MR. GREENSPAN:  I wish.

11   BY MR. GREENSPAN:

12       Q.   What is the nature of Notre Dame's affiliation

13   with the ACC?

14       A.   My understanding is they're kind of an affiliate

15   member for all sports but football.

16       Q.   All sports but football.

17            In general, conferences share their

18   television broadcast revenues equally, correct?  Power

19   Five conferences.

20       A.   For the most part, yes.

21       Q.   Okay.

22       A.   There have been outliers, but --

23       Q.   Do you know how it works with the ACC and

24   Notre Dame, considering that Notre Dame's football

25   broadcast rights are not bundled with the rest of the ACC?

BOB THOMPSON                                                    June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 137

1   every agreement.

2        A.   But I think you're missing a point, and that is,

3   what is --

4        Q.   Well, could you --

5             MR. FULLER:  Let him finish his answer.

6             THE WITNESS:  -- in that you're not taking

7   into account what Notre Dame is receiving for their

8   football rights.

9             MR. GREENSPAN:  Okay.  So I'll move to

10  strike the answer as completely nonresponsive to the

11  question I asked.

12  BY MR. GREENSPAN:

13       Q.   My question is, do you see anything in the bylaws

14  that I've shown you or do you have any independent

15  knowledge to suggest that the allocation 80 percent for

16  football, 20 percent for everything else with the ACC is

17  applied the same for all of their media agreements or

18  differently, depending on the media agreements?

19       A.   As it relates to University of Notre Dame and the

20  ACC, it appears to be the same.

21       Q.   Okay.  And it's the same when Notre Dame joined

22  in 2013 as it is today.

23       A.   If that's what it appears to be, yes.

24       Q.   And you use an example that for 2022-'23, the ACC

25  had a down basketball season.

Page 138

1    A.   Relatively speaking, yes.

2    Q.   Okay.  But we don't see it change in the

3  allocation in their bylaws, that, you know, juice up

4  football and reduce everything else because basketball had

5  a down season.

6    A.   No, because typically that's not how conferences

7  operate.

8    Q.   Well, you don't know how the ACC operates with

9  respect to the allocation to Notre Dame.

10   A.   No, but I know how conferences typically operate,

11  and they don't alter those type of a payment.  You sign

12  up; it's for the term, right?  It's 80/20 year one.  And

13  the deal is ten years.  It's 80/20 in year ten.

14   Q.   Right.  It's the same allocation.

15   A.   Right.

16   Q.   It's not feasible to change it year over year.

17   A.   Correct.

18   Q.   So we just talked about this allocation in the

19  ACC bylaws.  Are you familiar with any other conference

20  bylaws or an NCAA agreement that allocates revenue between

21  sports?

22   A.   Well, the NCAA men's basketball agreement is

23  strictly just one sport.  I don't think the NCAA

24  multi-sport championship agreement allocates between

25  sports, if I recall, so no, I don't know --

BOB THOMPSON                                          June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 143

1    "uniformity and cohesiveness" in this context?

2        A.   Everybody gets the same amount of money,

3    everybody basically gets the same amount of exposure,

4    which is the two things that conference schools are

5    looking for from their conference:  money and exposure.

6        Q.   So that uniformity and cohesiveness is something

7    that the schools and the conference value.

8        A.   Correct.  And the schools grant it to the

9    conferences as part of their grant rights.

10       Q.   Now, it's your opinion that from the perspective

11   of the network, when the network is buying a conference

12   package, it's evaluating all the schools as a whole,

13   correct?

14       A.   Yes.

15       Q.   Network doesn't look school by school.

16       A.   There are certain schools I give less credence to

17   in their ability to create value, but I know I can't

18   exclude them.

19       Q.   Right.  So when a network buys an entire package

20   of rights, it doesn't look at the rights school by school.

21       A.   No.

22       Q.   You agree that broadcast rights fees need to be

23   agreed to before the broadcast?

24       A.   I've found that to be a good policy.

25       Q.   And again, I guess much like we were talking

BOB THOMPSON                                              June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 144

1    about obtaining necessary consents and waivers --

2                   Let me take that back.  It's different, so

3    withdrawn.

4                   The rights fees are fixed -- annual rights

5    fees in a media agreement, they're fixed before the

6    seasons are played.

7        A.   Yes.

8        Q.   And is it correct that all media agreements in

9    the Power Five --

10                  And maybe it will exclude the joint venture

11   networks.  You'll tell me if they need to be cut out.

12                  -- that all of the media agreements in

13   the -- for Power Five football and basketball fix their

14   rights fees in advance and the rights fees do not move

15   depending on the success or lack of success of the teams

16   in the conference in a particular sport or particular

17   year?

18       A.   There are certain agreements, primarily related

19   to the conference network agreements, the multi-sport

20   conference network agreements, that have a profit sharing

21   or a revenue share type basis, so those can -- those could

22   vary.

23       Q.   And that's -- the profit sharing or revenue

24   sharing is based on the fact that the conference and a

25   network -- I understand there's differences -- they're in

BOB THOMPSON                                          June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

                                                     Page 149

1              MR. GREENSPAN:  I'm bad at both.

2              (Exhibit 83 was marked for identification.)

3   BY MR. GREENSPAN:

4       Q.   So this is -- Exhibit 83, this is a tweet,

5   Mr. Thompson.  I'll ask you to confirm.  That's a nice --

6   that's a nice picture --

7       A.   Thank you.

8       Q.   -- of you, and that's your Twitter handle.  Is

9   that what I say?

10      A.   It's something like that.  I'm kind of new at

11  this.

12      Q.   All right.  And for the record, someone is asking

13  you, "Does this mean adding Gonzaga as basketball only

14  would be dilutive?"

15              If I'm following this correctly,

16  Mr. Thompson, you respond, "First of all, it's not P5, so

17  it doesn't have an automatic entry for the pro rata.

18  Then, it's basketball only.  I assume MBK represents

19  around 20 to 25 percent of the value of the deal.  So that

20  would be a payment to Gonzaga of 8 million a year.  Ten

21  years of Texas/Ohio -- Oklahoma University departure fees!

22  BYU travel partner."

23              So number one, the guy with the nice pink

24  polo and the hat, that's you?

25      A.   That's me.

Page 150

1    Q.   All right.  This is your Twitter account.

2              "MBK," that refers to men's basketball?

3    A.   Yes.

4    Q.   All right.  Take a step back.  Can you -- I think

5    I know what the question and answer concern, but as best

6    you recall or as you understand it, sitting here today?

7    A.   Yeah, so there was -- the commissioner of the Big

8    Twelve has a desire to expand the conference.  He also has

9    a desire to expand the conference potentially in the -- in

10   strictly the basketball arena.

11             So what he's looking for potentially,

12   besides maybe additional schools in additional time zones,

13   he's looking for school- -- certain schools that might

14   have a high basketball profile.  Amongst those that are

15   commonly mentioned are Gonzaga and UCONN, University of

16   Connecticut.  Both have -- you know, UCONN won this year.

17   Gonzaga has been to the Sweet 16 like nine years in a row,

18   eight or nine years in a row.

19             And so what I'm saying here is, 20 to

20   25 percent of the value of the deal, but what I'm talking

21   about is the fact that Gonzaga has a preferential deal

22   with the West Coast Conference, and so he's going to have

23   to pay Gonzaga a higher -- a higher percentage than he

24   would have to pay, say, another school, who he wanted as

25   basketball only.

Page 151

1     Q.   The 20 to 25 percent is what the Big Twelve would

2     pay as a share of its media revenues for Gonzaga to join?

3     A.   As share of the total -- as a share of the total.

4     So each school in the Big Twelve in the new deal is going

5     to get about $31.6 million.  20 to 25 percent of that he's

6     going to have to pay to entice Gonzaga, because --

7                   I don't think that basketball is necessarily

8     worth 25 percent for the --

9                   You know, Gonzaga is a good entry, but it's

10    a small market, and they have a preferential deal with the

11    West Coast Conference that they're not going to be able to

12    replicate in the Big Twelve, so I think he's going to have

13    to go deeper and pay more to get Gonzaga to agree to that,

14    and that's what I'm implying here.

15    Q.   So is this -- understanding this is a forecast,

16    as opposed to what's already in place.  Is this sort of

17    analogous to what we looked at, Notre Dame in the ACC?

18    Apparently it cost the ACC 20 percent of their total

19    revenue to get Notre Dame's sports other than football?

20                   MR. FULLER:  Objection to the form.  I think

21    you actually just misstated that, but he can answer.

22                   THE WITNESS:  Is it exactly the same?  No,

23    because it's not a football/basketball split.  This is

24    basketball only.  And I also don't know what they're going

25    to do with the other sports.  Gonzaga may not bring their

BOB THOMPSON                                          June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 152

1    other sports along, and so, you know, that might actually

2    be a benefit to the conference.

3    BY MR. GREENSPAN:

4        Q.   But if -- let's -- if Gonzaga -- I mean, here

5    you're talking about men's basketball.

6        A.   Correct.

7        Q.   If men's basketball is all Gonzaga brings to

8    the Big Twelve, your estimate here is that the Big Twelve

9    would have to pay 20 to 25 percent of its total revenues

10   to Gonzaga.

11       A.   20 to 25 percent of the typical school's revenue,

12   but not the total revenue.  They're going to be -- they'd

13   be 1 of 13 teams, so they're not going to get 25 percent

14   total.

15       Q.   Understood.  Understood.  They --

16       A.   So each individual school gets 31.6 in the first

17   year of the new deal.  20 to 25 percent would be the

18   payment that would have to go to Gonzaga, which is about

19   $8 million, if I -- I think I said it here, $8 million.

20            So if you -- if you change that name to

21   Boise State, I might say, 10 percent.

22            I mean, and I say Gonzaga is 20 to

23   25 percent because you're looking at a single school with

24   a single snapshot in this point in time, and it's a very

25   good picture, right?

BOB THOMPSON                                          June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 153

1          And in order to entice them from what's a

2  sweetheart deal, although not the greatest competition in

3  the West Coast Conference, you're going to have to step up

4  or they're not going to go.  In fact, rumor is, they won't

5  go for less than 12 or 15.  So . . .

6      Q.   And so in other words, the 20 to 25 percent range

7  is higher than what you think Gonzaga men's basketball

8  would contribute to the Big Twelve, but the Big Twelve

9  would have to overpay a little bit to get Gonzaga men's

10  basketball.

11      A.   Correct.

12      Q.   And we -- as you said it before, if a agreement

13  like this were to happen, it would have to be a long-term

14  arrangement, that the percentage of revenue that Gonzaga

15  would earn wouldn't float.  There would just be an

16  agreement.  Your prediction, it's in the 20 to 25 percent

17  range.

18      A.   I would assume they would have to sign a typical

19  grant of rights that all the other conference members did,

20  which I guess would -- I think it's six years.  I don't

21  know -- I don't even think they've completed their renewal

22  agreement, but --

23      Q.   Did you do any, like, empirical analysis to come

24  up with this 20 to 25 percent?  Or it's just based on your

25  experience in the industry?

BOB THOMPSON                                              June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 154

1      A.   I don't do much analysis for Twitter.  Just

2   experience.

3      Q.   Okay.  All right.  I'm going to mark as

4   Exhibit 84 --

5      A.   More tweets?

6      Q.   -- another tweet.

7                (Exhibit 84 was marked for identification.)

8   BY MR. GREENSPAN:

9      Q.   This is a tweet from August 19, 2022.

10               And I'll read for the record and also for

11   the benefit of people listening.  There is a tweet to

12   Mr. Thompson.  It says, "Okay, but realistically, in your

13   expert opinion, how much would those seven ND games be

14   worth?  Would they really be worth enough to NBC to keep

15   ND independent?  Would NBC really pay north of $50 million

16   a year for seven," and then it cuts off.

17               And then Mr. Thompson responds, "Let's do a

18   little math here.  CBS is paying" -- I think it's "Big Ten

19   $350 million a year, average, for 15 games and a

20   smattering of basketball.  We'll put 80 percent or

21   280 million against the football.  That is 18.7 million

22   per game.  Value of seven games at 18.7 million is

23   131 million.  Pretty good deal for NBC even if they have

24   to go to 70 million per year."

25               I read that correctly, Mr. Thompson?

BOB THOMPSON                                         June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 155

1      A.   Yes, you did.

2      Q.   And that is your back-and-forth with good ol'

3   52ndstreet.

4      A.   52ndstreet --

5      Q.   That's 52ndstreet?

6      A.   -- yes.  This is -- yeah, this was a hypothetical

7   proposed to me about, you know, is the Big Ten going to

8   scoop up Notre Dame?

9            If you've never been on Twitter, one of the

10  hottest topics is conference realignment, and so that's

11  what this is about.  And so as opposed to going to a

12  conference, would NBC step up to the plate and sign

13  Notre Dame up for a renewal?

14           And so basically I'm just comparing it to

15  what my estimation, back of the envelope, was for the CBS

16  deal.  I don't know that that was the final number that

17  they're paying or what.  That's just -- this is what was

18  rumored.

19     Q.   And your back-of-the-envelope estimation is that

20  80 percent of that CBS deal would be allocable to

21  football.

22     A.   Based on what CBS is getting, because they're not

23  really getting anything else.  They're -- they've lost a

24  lot of the rest of the Big Ten package that they used --

25  that they used to have.

Page 156

1    Q.   Okay.  But for this particular contract, your

2    estimation is 80 percent of the --

3              Well, let me ask this:  We're talking about

4    a multi-sport contract here, correct?

5    A.   I believe they have some basketball, yes.

6    Q.   Yeah.

7    A.   Yeah.

8    Q.   That's what you write in the tweet.

9    A.   Right.

10   Q.   And in the multi-sport contract, your

11   back-of-the-envelope estimation is that 80 percent of the

12   value is attributable to football.

13   A.   Yeah, I've never disputed that football drives

14   the train.

15   Q.   Okay.  That, the 80 percent, is the same value

16   that the ACC put to football.

17   A.   It's a commonly used number.

18   Q.   Oh, it is commonly used?

19   A.   Uh-huh.  But that doesn't mean it's used

20   everywhere and used for things that, you know, aren't

21   available to buy and sell and trade, like broadcast NIL.

22   Q.   In your industry, is -- 80 percent for football,

23   is that sort of a conventional wisdom?

24   A.   Depends on the conference.

25   Q.   Well, ACC, 80 percent --

BOB THOMPSON                                              June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 157

1            MR. FULLER:  Objection.

2    BY MR. GREENSPAN:

3       Q.   -- correct?

4            MR. FULLER:  Objection.

5    BY MR. GREENSPAN:

6       Q.   It's what's in their bylaws.

7            MR. FULLER:  Objection.

8            THE WITNESS:  No.  Just to the extent as it

9    relates to Notre Dame.  That's the value that -- and I

10   mentioned this earlier:  That's the value they put against

11   the Notre Dame piece.  It doesn't say that this represents

12   the value for all ACC college football.

13   BY MR. GREENSPAN:

14      Q.   There's no other allocation in the bylaws,

15   correct?

16           MR. FULLER:  Objection.

17           THE WITNESS:  But the allocation is only

18   strictly to Notre Dame.

19   BY MR. GREENSPAN:

20      Q.   Okay.  Here we have the same allocation.

21      A.   No.  You have -- here you have a

22   back-of-the-napkin estimate.  It's not an allocation

23   that's in any contract or anything.  This is Bob tweeting.

24      Q.   Right.  You didn't say it was impossible to

25   answer @52ndstreet's question.

BOB THOMPSON                                              June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 158

1    A.    No.

2    Q.    And -- well, we were talking about Gonzaga and

3    the possibility of going to the Big Twelve.  Now we're

4    talking about another conference, right?

5    A.    Correct.

6    Q.    Okay.  And I gather that in a tweet about Gonzaga

7    and they'd have to pay 20 to 25 percent for basketball,

8    the balance of that is 75 to 80 percent, which, as I

9    understand your opinion, would be football.

10            MR. FULLER:  Objection.

11            THE WITNESS:  No.  That's not my -- there is

12   a variety of other sports within the Big Twelve that

13   Gonzaga is not necessarily bringing to the party.  The

14   expectation is, if they move, they won't bring in all

15   their other sports.

16   BY MR. GREENSPAN:

17   Q.    I thought that your -- I don't remember if you

18   said working assumption, but is that women's basketball

19   and other Olympic sports cost more to produce than the

20   revenue they generate and so they're generally a zero.

21   A.    They're not significant profit-makers.

22   Q.    Okay.  So in the Gonzaga-Big Twelve, 20,

23   25 percent, can we at least agree that the overwhelming

24   majority of the balance of revenue is driven by football?

25   A.    But Gonzaga doesn't have football.

BOB THOMPSON                                          June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 159

1              MR. FULLER:  Objection to the

2    characterization.

3    BY MR. GREENSPAN:

4        Q.   Well, the revenue that the Big Twelve wouldn't be

5    sharing with Gonzaga.

6              MR. FULLER:  Objection.

7              THE WITNESS:  Is -- if that's the number

8    they end up getting, 20 to 25 percent, you could apply the

9    remainder against the football.

10   BY MR. GREENSPAN:

11       Q.   All right.  We're going to play some audio.

12   We're not going to make this an exhibit.

13             So this is -- for the record, this is a

14   podcast called -- I guess the name of the podcast is

15   "Trustees and Presidents:  Managing Intercollegiate

16   Athletics," hosted by Dr. Karen Weaver, September 5th,

17   2022.  And the title of the podcast is, "What College

18   Presidents Need to Know About the Billion Dollar Media

19   Landscape."

20             Do you recall participating in this podcast?

21       A.   Yes.

22       Q.   Okay.  Oh, and we're playing an excerpt from

23   around the 16:38 mark.

24             (Audio file played as follows:

25             "MR. THOMPSON:  -- it's more easier than it

BOB THOMPSON                                          June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 160

1    used to be.

2         "DR. WEAVER:  So let's talk money a little

3    bit.  When a Fox --

4         "MR. THOMPSON:  Okay.

5         "DR. WEAVER:  -- network like Fox makes a

6    value determination on how much they are willing

7    to pay a conference like the Big Ten or the

8    Pac-12 or maybe even the Big Twelve, what

9    factors go into that?  What should presidents be

10   looking for on the list of things they should be

11   covering?

12        "MR. THOMPSON:  You know, our list isn't

13   significantly different than the list that a

14   conference may look at if they're considering

15   realignment.

16        "You know, ours, more or less, starts with

17   numbers.  How many households are in the

18   markets?  How many households are in the state

19   that the institution is located in?  Because

20   most of these -- you know, a lot of these

21   college towns are small, small town.  They're

22   not, you know, top 25 DMAs.  So we look, you

23   know, beyond just the conference's home state.

24        "And then we also look at things such as

25   rivalries with -- either within the conference

BOB THOMPSON                                                    June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 161

1   that they currently have or what other rivalries

2   they might have outside of the conference, and

3   should we own the rights to that other

4   conference?  You know, what kind of games can we

5   put together between two co- -- two rivals in

6   different conferences?  Say, Texas and Texas

7   A&M, that type of a situation, different

8   conferences, but, you know, they -- they are

9   going to start playing each other again, which I

10  think is great.  So we look at those things.

11      "We look at certainly brand awareness.  You

12  know, how does the brand resonate across the

13  country?

14      "We look at what the fan -- or the fan

15  appeal, you know, with the following of the

16  institution.

17      "You know, success in both football and

18  basketball.  You know, and normally, at the --

19  football gets all the -- all of the credit for

20  these deals, but, you know, in my mind,

21  basketball is always worth 20 to 25 percent of

22  the total value.

23      "It doesn't -- the numbers don't click quite

24  as much as football does, but the bulk of the

25  games play at the time of year where networks

BOB THOMPSON                                                    June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

                                                             Page 162

1            need product.  Think January, February.  No

2            football.  Baseball hasn't started.  Got some --

3            you know, you've got hockey and NBA.  Other than

4            that, it's a --

5                 "You know, and they play multiple nights, so

6            it's a tonnage factor.  It provides a lot of

7            programming, and especially for a 24-hour-a-day,

8            7-day-a-week cable network.  It's -- you know,

9            they never quit eating.  You have to continue to

10           feed them, so --

11                "DR. WEAVER:  Yeah."

12                (Audio file stopped.)

13   BY MR. GREENSPAN:

14     Q.   All right.  I played a longer cut just because,

15   in fairness, I wanted you to hear the question and full

16   answer, but unsurprisingly, my questions will focus on a

17   very specific statement.

18                So number one, I just want to make sure I've

19   got this right.  What you said was, "normally football

20   gets all of the credit for these deals, but in my mind,

21   basketball is always worth 20 to 25 percent of the total

22   value."  That's what you said, correct?

23     A.   That's what I said.

24     Q.   And this is a general statement that's not

25   applicable to any particular conference or team, correct?

BOB THOMPSON                                            June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 163

1      A.   It's a general statement applicable to collegiate

2   sports in general as to how I assign the value, which is:

3   Significant portion for college football, secondary

4   position for men's basketball.  Everything else has value

5   but not significant value.  It's got value to the extent

6   it's what populates the conference channels, and those

7   conference channels can generate some pretty significant

8   dollars.

9      Q.   But just to be clear, what we're talking about

10  here is not significant value.  It's a percentage.  We're

11  talking about 75 to 80 percent is football and 20 to

12  25 percent is basketball.  That's what you said in the

13  podcast.

14     A.   That's what I said, yes.

15     Q.   Is it fair to assume that you have, in words or

16  substance, said that before this particular podcast?  You

17  didn't make it up on the fly on the podcast?

18     A.   That's highly unlikely that I did.

19     Q.   Do you recall when and how many times you've

20  assigned those types of percentages to football and

21  basketball as a relative value proposition --

22     A.   No.

23     Q.   -- for college sports?

24          Do you have any recollection as to how long

25  you've been saying that, as a general manner for college

BOB THOMPSON                                          June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 164

1   sports, 75 to 80 percent football, 20 to 25 percent

2   basketball?

3       A.   No.

4       Q.   When you said the 20 to 25 percent, were you

5   including women's basketball, or is what you meant men's

6   basketball?

7       A.   I probably was just speaking of men's.

8       Q.   Have you heard others -- and I don't mean the

9   Twitterverse, but media experts like you, network

10  employees, conference or college or NCAA executives, in

11  words or substance, offer a similar view?

12      A.   No.  I don't really associate with a lot of those

13  people anymore.

14      Q.   All right.

15           MR. FULLER:  Are you pretty close?  I'm

16  going to need a personal break here.  I've been trying to

17  be patient, because I thought you --

18           MR. GREENSPAN:  We are pretty close, but why

19  don't we just take a five-minute break.

20           MR. FULLER:  Okay.  Are you -- are you

21  pretty much -- think you're close to being done?

22           MR. GREENSPAN:  15 minutes.  Yeah.

23           MR. FULLER:  That's not close.

24           MR. GREENSPAN:  Fine.  Okay.  For your

25  purposes, understood.

BOB THOMPSON                                               June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 165

1          THE VIDEOGRAPHER:  Time is 2:15 p.m.  Off
2     the record.

3          (Recess taken.)

4          THE VIDEOGRAPHER:  The time is 2:27 p.m.
5     Back on the record.

6     BY MR. GREENSPAN:

7     Q.   Mr. Thompson, did you discuss your testimony with
8     counsel at the break?

9     A.   No, sir.

10    Q.   Okay.  All right.  Let me mark as Exhibit 85 --

11         MR. DALE:  Yep.

12         MR. GREENSPAN:  Yes.

13         (Exhibit 85 was marked for identification.)

14    BY MR. GREENSPAN:

15    Q.   Exhibit 85, this is just a screen shot.  I'm
16    going to play for you in a moment, Mr. Thompson, some
17    comments that you made during a webinar, but I just
18    thought it would be -- might be useful to show you the
19    screen shot to orient you.

20         And both for you and for the record, this is
21    a screen shot of the webpage where we got the video.
22    Lead1 Association put on a webinar called the "State of
23    the College Sports Media Rights Marketplace," in which you
24    participated.  Do you recall that?

25    A.   Yes.

Page 166

1      Q.    Okay.  And what's Lead1 Association?

2      A.    Lead1 is the -- basically the association of

3   Division I athletic directors.  The head is Tom McMillen,

4   the former basketball player and congressman for Maryland.

5      Q.    These individuals who you participated on the

6   panel with, do you have some -- did you have some prior

7   experience or engagements with them before the webinar?

8      A.    I knew them all prior, except for Nathanson.

9      Q.    Okay.  And let's take the two Sports Business

10  Journal reporters out of the mix.  So it's -- I guess it's

11  Mr. Berke, Mr. --

12            "Maestas"?

13     A.    "Maestas."

14     Q.    -- Maestas, yourself, and then Mr. Nathanson.

15  Are these -- are these all experts in the college -- and I

16  don't -- I don't mean expert in the sense that in a

17  litigation, you know, one needs to be qualified as an

18  expert.  I'm just asking in a more colloquial sense if

19  these are -- are these people that you respect in college

20  sports media landscape?

21     A.    The only individual here besides myself that

22  really works in the college sports landscape is A.J.

23  Maestas, and he is a -- not -- in fact, I actually do some

24  work for A.J., because his -- television rights aren't his

25  forte.  He's basically a research firm.

BOB THOMPSON                                          June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 167

1              And so for instance, he's representing --

2     well, word is, he's representing Gonzaga in their attempts

3     to move.  And so he's actually based here for part of the

4     year, and he works on -- you know, he's really -- he's a

5     numbers wonk, you know, and way down in the deep, deep

6     grass, so, like, the complete opposite of me.

7              So Lee -- and, you know, Nathanson is

8     basically an investment banker, a financial analyst, but

9     follows the media.

10       Q.   Nathanson is the --

11       A.   Yeah.

12       Q.   -- investment banker.

13       A.   Right.

14       Q.   And how about Lee Berke?

15       A.   Lee Berke has been in the business.  Primarily,

16    he was at Madison Square Garden for quite a while.  Smart

17    guy, but he doesn't have a lot of experience in college.

18    Mostly professional.

19       Q.   Okay.  So I'm not calling everybody in this group

20    an expert on college sports, but we're not engaging with

21    the Twitterverse either in this --

22       A.   Probably a shade higher than these two clowns.

23       Q.   Do you -- do you view participating in these

24    webinars as, among other things, an opportunity to promote

25    yourself and your consulting group?

BOB THOMPSON                                              June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 168

1      A.    That's part of it.  I can't recall exactly when

2    this one was.  Do you -- do you know?

3      Q.    August 30th, 2022.

4      A.    I was lying in a lounge chair recovering from

5    rotator cuff surgery, so I had nothing else to do, so I

6    did a bunch of this stuff then.

7      Q.    I've heard about it.  I also dislocated my biceps

8    tendon --

9      A.    I did the same thing.

10     Q.    -- and I escaped surgery --

11     A.    I had both done at the same time --

12     Q.    -- so I feel for you.

13     A.    -- so I was doing this kind of stuff, and you'll

14   see a lot of this tweet -- Twitter stuff is at around the

15   same timeframe, because I was rather bored.

16     Q.    All right.  So with that context, again, I

17   have -- I'm going to ask you a few questions about -- it's

18   a short sentence, but we're going to play a little more

19   just so you can hear the full Q and A.

20           (Audio file played as follows:

21           "MR. OURAND:  -- it's clear you see a top

22       two, the Big Ten and then the SEC.

23           "MR. THOMPSON:  Mm-hmm.

24           "MR. OURAND:  Then you see a step down to

25       how many conferences?  You mentioned three.

BOB THOMPSON                                          June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 169

1          Could the American join that?  Could the Big

2          East potentially, even though they have no

3          football, join in that?  Like, that next

4          grouping, is that really just the three?  Is it

5          still the Power Five, you know, but with two

6          that have stepped up?  Or more?

7               "MR. THOMPSON:  No.  I think it's still the

8          Power Five.  I think you could see some scenario

9          where AAC, Mountain West, depending on who gets

10         picked off to go to the Power Two, could fill in

11         some holes for the other members of the Power

12         Five.

13              "So, you know, and then Big East, you know,

14         just, it's a great basketball conference, but as

15         anyone will tell you, you know, the value in

16         these rights deals is usually ascribed 75,

17         80 percent to football and the rest to the

18         basketball product.

19              "So, you know, I think they'll be still, you

20         know, five powerful conferences.  There's just

21         going to be two more powerful than the rest."

22              (Audio file stopped.)

23    BY MR. GREENSPAN:

24       Q.   So my first question, just so the record is

25    clear, confirming your words:  "Big East is a great

BOB THOMPSON                                              June 08, 2023
IN RE: COLLEGE ATHLETE NIL LITIGATION

Page 170

1   basketball conference, but as anybody will tell you, the

2   value in these rights deals is usually ascribed 75,

3   80 percent to football and the rest to the basketball

4   product."

5            Have I got that right?

6       A.   Yes, you do.

7       Q.   Okay.  And the Big East -- Big East is a

8   conference that fields basketball teams but not football

9   teams, or maybe it's not FBS football teams?

10      A.   Yeah, it's a mishmash, but primarily from the

11  Division I level, they're basketball only; although, UCONN

12  does play football, but not very well.

13      Q.   And the point here is that because the Big East

14  is only supplying effectively basketball rights and not

15  football, they're only going to be able to earn the

16  balance of the 75 to 80 percent that is usually ascribed

17  to football rights.

18      A.   Correct.

19      Q.   Did anyone on the panel disagree with your

20  statement?

21      A.   Not that I recall.

22           MR. GREENSPAN:  Okay.  Subject to any

23  re-examination, I don't have any further questions.

24           MR. FULLER:  Okay.  Let us just take a short

25  break, and we'll talk about whether we have any.

```
 1                    REPORTER'S CERTIFICATION

 2             I, Eve K. Burton, Registered Professional

 3    Reporter, Certified Realtime Reporter, Certified Reporter

 4    in and for the State of Arizona, and Certified Shorthand

 5    Reporter in and for the State of California, do hereby

 6    certify:

 7             That the foregoing witness was by me duly

 8    sworn; that the deposition was then taken before me at the

 9    time and place herein set forth; that the testimony and

10    proceedings were reported stenographically by me and later

11    transcribed into typewriting under my direction, all to

12    the best of my skill and ability; that the foregoing is a

13    true record of the testimony and proceedings taken at that

14    time; that the witness has requested a review pursuant to

15    Rule 30(e)(2); that I am a disinterested person to said

16    action.

17

18             IN WITNESS WHEREOF, I have subscribed my

19    name this 12th day of June, 2023.

20

21    _____

22    Eve K. Burton, RPR, CRR,
      AZ Certified Reporter No. 50261
23    CA CSR No. 12527

24

25
```



# EXHIBIT 59



 **Bob Thompson** ✔ @rltsports · 8/19/22   •••

Let's do a little math here. CBS is paying B1G $350m/year avg for 15 games and a smattering of basketball. We'll put 80% or $280m against the football. That is $18.7m per game. Value of 7 games at $18.7m is $131m. Pretty good deal for NBC even if they have to go to $70m per year.

 **52ndstreet** @52ndstreet · 8/19/22

Replying to @rltsports

Ok, but realistically, in your expert opinion, how much would those 7 ND games be worth? Would they really be worth enough to NBC to keep ND independent? Would NBC really pay north of $50M/year for 7...

 7        6       ♡ 23              ⬆



**Bob Thompson** ✓ @rltsports · Aug 19, 2022                              ...
Pretend you're NBC. Wouldn't you want to renew ND so that you have 7
games guaranteed?  If you don't pay them enough to remain independent,
they go to B1G and  into the selection pool. At most you're going to get
them 3 or 4 times in that prime time window. twitter.com/RealCesAlzod/s...

This Tweet was deleted by the Tweet author. Learn more

◯ 12          ⇄ 5          ♡ 30          ॥।          ⬆

**52ndstreet**                                                            ...
@52ndstreet

Ok, but realistically, in your expert opinion, how much would those 7 ND
games be worth? Would they really be worth enough to NBC to keep ND
independent? Would NBC really pay north of $50M/year for 7 games?

2:05 PM · Aug 19, 2022

# EXHIBIT 60

EXHIBIT 83
Bob Thompson
1/25/2019
Reported by: Eve Burton, RPR, CRR
AZ CSR No. 50261, CA CSR No. 12527

1:13

## Bob Thompson
1,911 Tweets

**Follow**

| Tweets | **Replies** | Media | Likes |
|---|---|---|---|

💬 7      ↻ 5      ♡ 41      ılı      ⬆

 **Bob Thompson** ✓ @rltsports · 11/2/22   ···

first of all, it's not P5 so it doesn't have an automatic entry for the pro rata. Then, it's basketball only.  I assume MBK represents around 20-25% of the value of the deal. So that would be a payment to Gonzaga of $8m/ yr.  10 yrs of TX/OU departure fees! BYU travel partner.

 **Justin "Couz" Walker** @co... · 11/2/22

@rltsports does this mean adding Gonzaga as basketball only would be dilutive? twitter.com/SPickles13/sta...

💬 4      ↻ 3      ♡ 20      ılı      ⬆

@rltsports does this mean adding Gonzaga as basketball only would be dilutive?

Sgt. Pickles @SPickles13 · Nov 2, 2022

@GoldandBlueDude @TJAltimore @rtide18Roll @couz206 This is from Canzano's recent article where he spoke to Bob Thompson. Basically looks like B12 expansion even to add P5 teams is low probability if they are only guaranteed 63% additional per school revenue.

There's something interesting in the Big 12's new media deal, however. The pro-rata clause for expansion was only agreed upon by ESPN, which holds 63 percent of the new contract. Fox, which owns the other 37 percent, declined to include it. The clause also only allows for the addition of a Power Five member, per media insiders.

I bounced that tidbit off Bob Thompson, the retired president of Fox Sports Networks. He said: "Networks hate those clauses. Basically, the Big 12 doesn't get any guaranteed extra money for adding San Diego State. It's not automatic. And if they add a Power Five member, they'd only get 63 percent. The current members would have to take a haircut. That helps the Pac-12."

8:58 PM · Nov 2, 2022

# EXHIBIT 61

# REDACTED VERSION

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION


GRANT HOUSE and SEDONA PRICE,   )

on behalf of themselves and    )

all others similarly situated, )

       Plaintiffs,             ) Civil Action No.

  v.                            ) 4:20-cv-03919-CW

NATIONAL COLLEGIATE ATHLETIC    )

ASSOCIATION; PAC-12 CONFERENCE;)

THE BIG TEN CONFERENCE, INC.;  )

THE BIG TWELVE CONFERENCE,      )

INC.; SOUTHEASTERN CONFERENCE; )

and ATLANTIC COAST CONFERENCE, )

      Defendants.             )

_____ )

    ** NETWORK STRICTLY CONFIDENTIAL **


VIDEO DEPOSITION OF BARBARA OSBORNE

June 15, 2023, 9:41 a.m. CST

150 North Riverside Plaza

Chicago, Illinois 60606


Job No. J9780979

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 20

1   question is:

2          You don't teach any courses in the

3   economics department, do you?

4       A  No, I do not.

5       Q  Okay.  So staying on page 1 to 2 of your

6   résumé, this shows your professional experience

7   going back to -- let's see, it goes back even

8   longer than I thought.  Sorry.  It goes back to

9   19 -- 1983; is that correct?

10      A  Correct.

11      Q  Okay.  And on page 2, it shows that you

12  worked for several years at Brandeis University in

13  Waltham, Massachusetts --

14      A  Yes.

15      Q  -- is that correct?

16      A  Yes.

17      Q  Okay.  Like I said, my mom went there, as

18  did my first cousin, so very familiar with the

19  school.  Great school.

20          Brandeis University competes in NCAA

21  athletics at the Division III level, correct?

22      A  Yes, it does.

23      Q  Okay.  And that's lower than Division I

24  and lower than Division II, correct?

25      A  Yes.

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 30

1     Q   Okay.  Thank you.  Thank you for when you

2   remembered today --

3     A   Yeah.

4     Q   -- volunteering that.

5         Just to go back, where was -- I was asking

6   about different types of expert analysis or

7   testimony you've given.

8         So this is the first time you're analyzing

9   an expert's proposed model for measuring past

10  damages; is that correct?

11        MS. CAPPS:  Objection, form.

12        THE WITNESS:  Yes, it is.

13  BY MR. SIEGEL:

14    Q   Okay.  Prior to this case, have you ever

15  been employed in a permanent or contracting

16  position by any of the defendants in this case?

17        MS. CAPPS:  Objection, form.

18        THE WITNESS:  No.

19  BY MR. SIEGEL:

20    Q   Okay.  So you've never worked for the NCAA

21  before?

22    A   No.

23    Q   Or any of the Power Five conferences?

24    A   No.

25    Q   And just to be clear, you understand that

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 47

```
 1    BY MR. SIEGEL:

 2       Q   Sure.  I'm just -- so you -- so

 3    in -- generally, your conclusion as you're

 4    expressing in this paragraph, is that

 5    Professor Rascher's broadcast NIL model implicates

 6    the Title IX obligations of the Power Five member

 7    schools; is that right?

 8            MS. CAPPS:  Objection, form.

 9            THE WITNESS:  Yes, in this paragraph, it

10    describes the reasons why these payments would be

11    implicated by Title IX.

12    BY MR. SIEGEL:

13       Q   Right, these payments implicate -- I think

14    specifically -- I'm not -- I'm really trying to

15    get down exactly what your opinion is.

16            So based on these facts --

17       A   Mm-hmm.

18       Q   -- and your assessment of Dr. Rascher's

19    model, you believe that the broadcast NIL model

20    that he proposes implicates the Title IX

21    obligations of the schools, correct?

22            MS. CAPPS:  Objection, form.

23            THE WITNESS:  Actually, it says that it

24    applies to the broadcast revenue that the

25    conferences distribute to their member schools.
```

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 48

1    BY MR. SIEGEL:

2        Q  Right.  I -- yes, that aspect of his

3    model, that's a part of his model, right?

4        A  Correct.

5        Q  But you're saying -- I guess all I'm

6    trying to say is you believe that that aspect of

7    his model, when you look at the facts including

8    the relationship between the schools and the

9    conferences, you believe that that aspect of his

10   model implicates the Title IX obligations of the

11   schools?

12           MS. CAPPS:  Objection, form.

13           THE WITNESS:  Yes.

14   BY MR. SIEGEL:

15       Q  Okay.  Obligates, implicates, I'm not

16   trying -- I'm not trying to use the wrong word.

17   I'm just -- you know, okay.

18           I mean, I guess, this is another way to

19   say it, is that, you know, based on your review of

20   the statute, and I believe the regulations, and

21   you're looking at the relationship between the

22   schools and the conferences, again, you believe

23   that the model implicates the schools' Title IX

24   obligations; is that right?

25           MS. CAPPS:  Objection, form.

BARBARA OSBORNE   Network Strictly Confidential                     June 15, 2023
HOUSE AND PRICE vs NCAA

Page 49

```
 1          THE WITNESS:  So this is about -- the

 2    model is about the conference payments --

 3    BY MR. SIEGEL:

 4       Q  Uh-huh.

 5       A  -- and so because of how all of this works

 6    together and because of the institutional

 7    involvement, it -- Title IX is implicated in this

 8    conference scheme.

 9       Q  Right, but Title IX obligations of the

10    schools?

11       A  Schools do have Title IX obligation.

12       Q  Right.  So we're going to get to this

13    later but I think -- and I'm really just trying to

14    understand your opinion, because you -- we'll get

15    to this later, but you agree that the conferences

16    are not subject to Title IX?

17          MS. CAPPS:  Objection, form.

18    BY MR. SIEGEL:

19       Q  Is that true?

20       A  Yes.

21       Q  Okay.  And, however, because of the way

22    you understand this model to work and the

23    relationship between the conferences and the

24    schools, you believe that how the model works

25    would implicate the Title IX obligations of the
```

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 50

1   schools?

2          MS. CAPPS:  Objection, form.

3          THE WITNESS:  I believe that the way the

4   model works that Title IX would be applied to this

5   model.

6   BY MR. SIEGEL:

7      Q  Okay.  Applied to the schools'

8   responsibilities under the model?

9          MS. CAPPS:  Objection, form.

10         THE WITNESS:  The schools' involvement

11  under the model is part of what implicates

12  Title IX.

13  BY MR. SIEGEL:

14     Q  Part of what implicates the schools'

15  obligation under Title IX, right?  The schools are

16  the ones that have the obligations under Title IX,

17  right?

18     A  Schools --

19         MS. CAPPS:  Objection, form.

20         THE WITNESS:  Sorry.

21         Schools always have the obligation under

22  Title IX.

23  BY MR. SIEGEL:

24     Q  Okay.  And what you're saying is the way

25  this model work, some would argue, you know, that

Page 51

1    the schools -- the schools' Title IX obligations

2    are not implicated by the model, but you're

3    concluding that their obligations are implicated

4    by the way this model works, correct?

5           MS. CAPPS:  Objection, form.

6           THE WITNESS:  So, again, because of the

7    schools' involvement with the conferences, so the

8    plaintiffs' model is a model that requires direct

9    payments from the conferences to the

10   student-athletes.  Whereas the conferences in

11   general might not be or would not be subject to

12   Title IX because of the deep involvement of the

13   member institutions with the conferences.  I do

14   believe that this model and these transactions

15   would be subject to Title IX.

16   BY MR. SIEGEL:

17     Q  Right.  And, therefore, the schools'

18   responsibilities under Title IX would be

19   implicated?

20     A  I don't make that conclusion.

21     Q  So you don't make that -- so your -- I

22   guess I'm -- I guess I'm a little confused here,

23   because really I thought the whole -- the

24   whole -- the point of -- the point of this part of

25   your opinion was that Title IX obligations would

Page 52

1    be implicated, and the schools would have to be

2    concerned about that because they're the ones that

3    have to comply with Title IX.

4         MS. CAPPS:  Objection, form.

5         THE WITNESS:  Yes, that is true, that the

6    schools would have to be concerned about this, and

7    it would, if applied.

8    BY MR. SIEGEL:

9      Q  And it would implicate their own Title IX

10   responsibilities, correct?

11     A  It has a dramatic impact on their own

12   Title IX responsibilities, yes.

13     Q  Okay.  It implicates them.  You don't like

14   the word "implicate"?  I mean, I'm --

15     A  Yes.

16     Q  Okay.  I don't think it's controversial.

17   It's part of your opinion.  But anyway...

18         MS. CAPPS:  Objection, form.

19   BY MR. SIEGEL:

20     Q  That was the hardest paragraph, I have to

21   admit, to discuss with you.  So I'm glad we got

22   through it.

23         MS. CAPPS:  Objection, form.

24   BY MR. SIEGEL:

25     Q  In paragraph 31, please, if you look at

Page 57

1    reviewed the model and the facts and the

2    depositions under Title IX, which is your primary

3    area of research, your conclusion was that it

4    violated Title IX, right?

5           MS. CAPPS:  Objection, form, assumes facts

6    not in evidence, misstates her testimony and

7    misstates the report.

8           THE WITNESS:  So I believe I've answered

9    that question several times.  I'm not providing a

10   legal conclusion.  I'm providing my opinion about

11   how I would apply the law.

12   BY MR. SIEGEL:

13      Q  How you would apply the law to -- to the

14   model and the facts, right?

15          MS. CAPPS:  Objection, form.

16          THE WITNESS:  Yes.

17   BY MR. SIEGEL:

18      Q  And after you applied the model to the law

19   and the facts, you come to this conclusion that

20   the payment scheme is a violation of Title IX,

21   right?

22          MS. CAPPS:  Objection, form, misstates her

23   testimony and the report.

24          You can answer the question.

25          THE WITNESS:  Yes.

BARBARA OSBORNE  Network Strictly Confidential                June 15, 2023
HOUSE AND PRICE vs NCAA

Page 68

1   your opinion is that Title IX does not -- your

2   opinion, as you sit here today, is that Title IX

3   does not apply to the conference or the --

4   conferences or the NCAA?

5       A   Yes.

6       Q   Okay.  And you cite for that proposition,

7   footnote 57, which says:

8           National Collegiate Athletic Association,

9   it gives a Supreme Court cite but it's actually --

10      A   Smith.

11      Q   -- Smith.  NCAA vs Smith?

12      A   Right.

13      Q   Okay.  I make those mistakes in my briefs

14  all the time.

15          MS. CAPPS:  Objection, form.

16  BY MR. SIEGEL:

17      Q   So you rely on the Supreme Court's

18  decision in NCAA vs Smith for your conclusion that

19  the conferences are not subject to Title IX,

20  correct?

21      A   Yes.  Based on the Court's analysis in

22  that particular case, they conclude that the NCAA

23  is not subject to Title IX; and because

24  conferences are voluntary membership institutions

25  similar to the NCAA, I also assume that the

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 69

1    conferences are not as well.

2        Q   You -- you assume or is that -- is that

3    your analysis?

4        A   I state.

5        Q   Is that your anal- -- is your analysis

6    that based on the Supreme Court's decision in

7    Smith, the conferences are also not subject to

8    Title IX under -- under the holding of Smith?

9        A   Yes.

10       Q   Okay.  Besides what you've already stated,

11   can you further elaborate on why the conferences

12   are not subject to Title IX under Smith?

13          MS. CAPPS:  Objection, form.

14          THE WITNESS:  Beyond what I already

15   stated, no.

16   BY MR. SIEGEL:

17       Q   Okay.  Can you restate that again, because

18   I just -- I think I might have missed that?

19          MS. CAPPS:  Objection, form.  There's no

20   question.

21   BY MR. SIEGEL:

22       Q   Can you restate your reasoning for why you

23   believe the Supreme Court's decision in NCAA vs

24   Smith would lead to the conclusion that the

25   conferences are also not subject to Title IX?

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 98

1  is one of your expert opinions that you're

2  expressing in this report that if -- the broadcast

3  model implicates the Title IX obligations of the

4  member schools of the conferences?

5          MS. CAPPS:  Objection, form.

6          THE WITNESS:  It has an impact on the

7  schools, absolutely, so implicates their

8  obligations, yes.

9  BY MR. SIEGEL:

10     Q  That is one of the expert opinions in your

11  report?

12     A  Yes.

13     Q  Okay.  Is -- is -- is it an expert opinion

14  in your report that the broadcast NIL model

15  implicates Title IX obligations for the

16  conferences?

17          MS. CAPPS:  Objection, form, asked and

18  answered.

19          THE WITNESS:  No.

20  BY MR. SIEGEL:

21     Q  Okay.  Okay.  In your report, did you

22  identify any case that found a school liable under

23  Title IX because of the actions of the conferences

24  of which it was a member?

25     A  No.

BARBARA OSBORNE  Network Strictly Confidential                        June 15, 2023
HOUSE AND PRICE vs NCAA

Page 99

1     Q   Has any U.S. body with legal authority

2   ever found a school liable under Title IX because

3   of the actions of the conferences under which it

4   was a member?

5     A   Not to the best of my knowledge.

6     Q   Okay.  Yet this is one of your opinions,

7   as you just stated, based on your application of

8   your view of the facts in this case as applied to

9   Title IX statute, its governing regulations --

10        MS. CAPPS:  Objection, form.

11  BY MR. SIEGEL:

12    Q   -- that -- guidance letters and other

13  administrative guidance, correct?

14        MS. CAPPS:  Objection, form, asked and

15  answered.

16        THE WITNESS:  Yes, I conclude that this

17  model would be implicated by Title IX that I --

18  I'm not aware of anything else because that model

19  that is proposed by Mr. Rascher did not exist

20  until he created it.

21  BY MR. SIEGEL:

22    Q   Okay.

23    A   So --

24    Q   But there hasn't been any case that's ever

25  found a school --

Page 102

1    detail on page 31, Section A.

2        A  Okay.

3        Q  Okay.  You say that one -- one factor for

4    this conclusion that we just discussed is that

5    conferences are governed and controlled, in your

6    opinion, by a board of directors and composed of

7    representatives of member institutions.  Correct?

8        A  Yes.

9        Q  Okay.  And, again, you didn't cite any

10   legal authority holding that this makes schools

11   liable for the actions of conferences, did you?

12          MS. CAPPS:  Objection, form.

13          THE WITNESS:  No.

14   BY MR. SIEGEL:

15       Q  Okay.  Are you an expert in entity law?

16       A  Can you tell me what entity law is?

17       Q  Like corporations law.

18       A  Oh, I -- no, I'm not an expert in

19   corporate law, no.

20       Q  Are you an expert in piercing the

21   corporate veil?

22       A  I'm not an expert in that area, no.

23       Q  Okay.  And for factual support for this

24   proposition, you cite only the declarations of

25   conference and school officials and the conference

Page 103

1   bylaws and the handbooks, correct?  And you can

2   look at your citations if you want.

3       A  Could you repeat the question?

4       Q  Sure.

5          On page 31 and 32, when you're discussing

6   that prong -- that factor of your analysis, you

7   cite only the declarations of conference officials

8   in various conference bylaws, handbooks and

9   constitutions.

10      A  Yes.

11      Q  Okay.  You don't cite anything else?

12      A  No, because this is just showing how the

13  conferences are made up of their member

14  institutions and how they operate.  So those would

15  be the appropriate documents to rely on in my

16  opinion.

17      Q  Okay.  But, again, you don't cite any case

18  law to support the position of this supposed

19  control of the schools, of the conferences,

20  subject schools to Title IX liability for the

21  actions of the conferences, right?

22      A  No.

23      Q  So I'm going to go through that, I'm going

24  to go through that list on 78 but -- so I want to

25  talk about the second bullet point, which I think

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 123

1      Q  -- generally these provisions on financial

2  assistance apply to scholarship aid.  That's

3  generally what's at issue?

4          MS. CAPPS:  Objection to form.

5          THE WITNESS:  No, that's not correct.

6  Scholarship aid is included --

7  BY MR. SIEGEL:

8      Q  Okay.

9      A  -- but in financial assistance, it talks

10  about assisting anyone that provides any type of

11  assistance, not just --

12      Q  Okay.

13      A  -- aid.

14      Q  Yeah, I understand that.

15          What I'm saying is:  Are you aware of any

16  court cases that have addressed the question of

17  whether the regulations, provisions on financial

18  assistance apply to nonscholarship aid?  Any

19  courts that have interpreted that?

20      A  I am not aware of any cases.

21      Q  Okay.  Are you aware of any policy

22  interpretation or letter produced by the U.S.

23  Department of Education that has answered that

24  question?

25          MS. CAPPS:  Objection, form.

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 137

1    summing up -- the -- what the broadcast model will

2    do is the opposite of what happened in Cohen,

3    correct?  Why don't I just read you what you said.

4        A  Yes.  It says:

5            While the broadcast model does the

6    opposite of the action in Cohen -- and by that I

7    meant it doesn't demote teams, it elevates teams.

8    It says:

9            By elevating some teams to a higher level

10   of treatment to the exclusion of all others.

11           So, in essence, you're doing the same

12   thing.  You have unequal participation

13   opportunities based on sex, whether you're

14   demoting or elevating.

15       Q  Okay.  And again, you're not aware of any

16   legal authority that's analogous to the set of

17   facts here, as opposed to being the opposite, that

18   supports your conclusion that plaintiffs'

19   broadcast model would violate the participation

20   opportunities found with Title IX, correct?

21       A  No, I'm not aware of any.

22       Q  Okay.  So this is a novel conclusion based

23   on your legal analysis of that case law, correct?

24           MS. CAPPS:  Objection, form.

25           THE WITNESS:  It is, because I think it's

Page 138

1    the appropriate application of the law.  But this

2    is a novel broadcast model that's never been

3    looked at before.

4    BY MR. SIEGEL:

5        Q   Okay.  And you've acknowledged

6    in -- you've acknowledged in the past that through

7    its bylaws, the NCAA controls the number of roster

8    spots and corresponding number of scholarships

9    that schools may provide, correct?

10       A   Yes, the NCAA does that.

11       Q   Okay.  And this -- this

12   interpretation -- whether you're right -- whether

13   you're right or wrong or not, whether or not this

14   opposite situation violates Title IX is another

15   example of an issue that -- whose answer would not

16   vary depending on the identity of the plaintiff,

17   correct?

18       A   No.  It depends on the situation, not the

19   identity of a party.

20       Q   Right.  But I'm saying whether or not

21   the -- the elevation of a team, meaning, you know,

22   the broadcast model versus -- your claimed

23   elevation of a team, I'm not agreeing with that,

24   but as opposed to the demotion of a team, whether

25   or not that is a corresponding situation that

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 144

 1  things.

 2      Q  I'm saying as a legal -- I'm not saying as

 3  a practical matter.  I'm saying as a legal matter.

 4          MS. CAPPS:  Objection.

 5  BY MR. SIEGEL:

 6      Q  Are you -- are you saying that --

 7          MS. CAPPS:  Form.

 8  BY MR. SIEGEL:

 9      Q  -- if -- are you saying that if a certain

10  amount of compensation is given to male athletes

11  and is held to be subject to Title IX, that you

12  cannot provide an equal amount of compensation to

13  female athletes to resolve any Title IX issues?

14          MS. CAPPS:  Object to form.

15          THE WITNESS:  Okay.  So you're saying

16  hypothetically --

17  BY MR. SIEGEL:

18      Q  Yes.

19      A  -- right?  Or are you saying specifically?

20      Q  I'm saying hypothetically.

21      A  Okay.  So hypothetically, if institutions

22  were providing unequal aid that they could -- that

23  they -- or if there was a source of -- so your

24  hypothetical is if there's a source that's coming

25  in to provide a benefit aid-wise to one sex --

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 145

```
 1      Q   Mm-hmm.

 2      A   -- the institution can just fix that by

 3   providing an equal amount on the other side.

 4      Q   Could they?

 5          MS. CAPPS:  Objection, form.

 6   BY MR. SIEGEL:

 7      Q   Hypothetically?

 8      A   Hypothetically, it's possible.

 9      Q   There's no legal -- I'm saying it's not --

10   it wouldn't be -- it wouldn't be -- it wouldn't be

11   illegal to do that?

12          MS. CAPPS:  Objection, form, calls for a

13   legal conclusion.

14          THE WITNESS:  It would not be a violation

15   or it wouldn't be illegal as far as I know.  But

16   that's not Rascher's model.

17   BY MR. SIEGEL:

18      Q   Okay.  Does Rascher's model say anything

19   about what schools or conferences can or cannot

20   provide outside of what his model provides?

21      A   No.  Rascher's model says what needs to be

22   provided, and his model provides an enormous

23   amount of benefit to men and a teeny-tiny little

24   benefit to women.

25      Q   Well, it's not what needs to be provided.
```

Page 158

1          THE WITNESS:  I understand that the

2   defendants have filed a motion in opposition of

3   the class action, and -- but other than that, I'm

4   not aware of any of the other legal proceedings --

5   BY MR. SIEGEL:

6      Q  Yeah, that --

7      A  -- in this case.

8      Q  Sorry.  You read plaintiffs' motion for

9   class certification, correct?

10     A  Yes.

11     Q  So you understand that plaintiffs have

12  moved to certify their damages classes?

13     A  Yes.

14     Q  And they have moved to certify an

15  injunctive relief class?

16     A  Yes.

17     Q  Okay.  And the claim that you've been

18  focused on is the claim in the absence of the NIL

19  rules.  There would have been compensation paid

20  to, at a minimum, Power Five full scholarship

21  football and men's and women's basketball players

22  for use of their NILs in broadcast?

23     A  I think you threw me off at the beginning

24  of that sentence.

25     Q  Sure.  I was saying one of their claims,

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 165

1          MS. CAPPS:  Objection, form.

2          THE WITNESS:  I -- yes, I looked at the

3    broadcast model and applied Title IX, and so I

4    offered my opinion as whether or not Title IX

5    would be implicated by that model.

6    BY MR. SIEGEL:

7      Q  Okay.  And again, you're opining about

8    Dr. Rascher's class-wide methodology for awarding

9    past damages to Power Five Conference football and

10   men's and women's basketball players, right?

11     A  Yes.

12     Q  Okay.  And, again, if you look at -- if

13   you look at your table of contents, Part V, one

14   conclusion is that plaintiffs' broadcast model

15   violates Title IX?

16     A  Yes.  I was going for a punchy headline.

17     Q  And you succeeded.

18         And, again, you understand that

19   Dr. Rascher's broadcast NIL damages model, in his

20   class certification report, is designed to explain

21   to the Court, among other things, how plaintiffs

22   can prove past class-wide impact and measure past

23   damages to award damages to members of the Power

24   Five men's football and basketball class and

25   women's basketball class?

Page 176

1      Q   Okay.  And you also understand that your

2   report is not intended to be an expert report on

3   the merits, correct?

4      A   Of the case?

5      Q   The merits of the case, correct?

6      A   No.

7      Q   It's an -- opposing plaintiffs' motion for

8   class certification?

9      A   It is an expert report on how Title IX is

10  implicated by the plaintiffs' broadcast model.

11     Q   But it's intended to be an expert report

12  in support of defendants' opposition to

13  certification of plaintiffs' past damages

14  broadcast NIL class?

15     A   Yes.

16        MR. SIEGEL:  Okay.  It's fine for a break

17  now.

18        THE VIDEOGRAPHER:  We are going off the

19  record at 1:40.

20        (Recess taken.)

21        THE VIDEOGRAPHER:  We are back on the

22  record at 2:00 p.m.

23  BY MR. SIEGEL:

24     Q   Professor Osborne, you agreed at the

25  beginning of this deposition you don't have a

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 177

 1   master's, Ph.D., or other advanced degree in

 2   economics, right?

 3       A  I do not.

 4       Q  Okay.  And you don't teach any economics

 5   courses, do you?

 6       A  I do not.

 7       Q  Okay.  And you're not offering an expert

 8   economic opinion in your report?

 9       A  Absolutely am not.

10       Q  And you've never been an administrator at

11   a school with a D1 athletic program, correct?

12       A  I have not.

13       Q  Or an administrator, permanent position,

14   at a school with a football team?

15       A  No.

16       Q  Okay.  And the last time you were part of

17   an athletic department's permanent staff was 1998,

18   correct?

19       A  Yes.

20       Q  Okay.  Can you turn to page 52 of your

21   report.

22          Are you there?

23       A  Um-hmm.

24       Q  Okay.  I just want to read to you

25   paragraph 131:

BARBARA OSBORNE   Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 179

1     A   Okay.

2     Q   I'll just take your word for it there.

3         Did you conduct any independent studies

4   for this case of what the impact of Rascher's

5   damages model would have been on Power Five

6   athletic programs during the class period?

7     A   No.

8     Q   So you didn't do any empirical work on

9   this point, correct?

10     A   No, I did not.

11     Q   And certainly nothing -- no independent

12   studies to show that it -- that it would require a

13   massive overhaul of any NCAA athletic programs?

14     A   What do you mean by "no independent

15   studies"?

16     Q   You didn't do any empirical independent

17   work to determine whether or not it would have

18   required a massive overhaul of any NCAA athletic

19   programs?

20     A   No.  I looked at past research that had

21   been done relative to Title IX.

22     Q   But none of the academic studies or

23   analyses that you cited was anything close to an

24   analysis of Rascher's damages proposal to support

25   the contention that a massive overhaul would have

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 180

 1   been required, right?

 2        MS. CAPPS:  Objection, form.

 3        THE WITNESS:  No.  None of those other

 4   studies involved the amount that Rascher's model

 5   would have.  And again, Rascher's model is brand

 6   new, so nobody else could have studied it or

 7   implications of it.

 8   BY MR. SIEGEL:

 9      Q  But an economist or someone with the

10   proper credentials could have done an empirical

11   analysis to determine whether or not spending the

12   amount of money implicated by Dr. Rascher's model

13   would have required a massive overhaul of

14   Division I programs during the class period,

15   correct?

16      A  As I said, I'm not an economist, and I've

17   never studied that, so I can't give an opinion

18   about that.

19      Q  You certainly didn't do one?

20      A  I didn't do any economic studies relative

21   to this, no.

22      Q  And none of these studies that are -- that

23   you cited are of any circumstance closely

24   analogous to what you believe to be the

25   consequences of Rascher's damages model, correct?

Page 183

 1    payments would require massive overhauls to

 2    athletic programs.

 3        A  Yes.

 4        Q  So that necessarily would require looking

 5    at the budgets and expenditures and resources of

 6    athletic programs during the class period?

 7        A  Yes.  And in doing a Title IX audit, you

 8    regularly look at budgets and figures and all of

 9    those things, but it is not an economic analysis.

10        Q  You don't cite any of those Title IX

11    audits or any other analyses that you or anyone

12    else has done that comes remotely close to

13    supporting what you're saying, do you?

14           MS. CAPPS:  Objection form.

15           THE WITNESS:  No, I'm just applying the

16    regulations, et cetera, and showing that impact,

17    but this is my conclusion, yes.

18    BY MR. SIEGEL:

19        Q  Okay.  Page 53, at the top you write:

20           It would be virtually impossible to locate

21    sufficient additional funds to ensure some form of

22    compensation for female student-athletes

23    proportional to the significant amount that

24    plaintiffs contemplate for male studies -- for

25    student-athletes under the broadcast model.

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 184

1          Is that -- is that one of your expert

2    opinions in this report?

3       A  It is.

4       Q  Okay.  Again, you did no independent

5    studies to actually support that opinion --

6          MS. CAPPS:  Objection, form.

7    BY MR. SIEGEL:

8       Q  -- did you?

9       A  No, because --

10         MS. CAPPS:  Same objection.

11         THE WITNESS:  -- an independent study is

12   not necessary when you just look at the amounts

13   that are involved and how that impacts an

14   athletics department.

15         MR. SIEGEL:  I'll strike that as

16   nonresponsive.

17   BY MR. SIEGEL:

18      Q  In addition to no independent studies,

19   again, none of the secondary sources you cite are

20   doing any kind of analysis that would be relevant

21   to -- strike that.

22         None of the secondary sources you cite are

23   analyses of how many -- how much additional funds

24   would be needed to compensate female

25   student-athletes proportional to the amounts that

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 185

1   plaintiffs contemplate for male student-athletes

2   under the broadcast model --

3          MS. CAPPS:  Objection, form.

4   BY MR. SIEGEL:

5      Q  -- correct?

6          MS. CAPPS:  Same objection, form.

7          THE WITNESS:  Can you repeat that, please?

8   BY MR. SIEGEL:

9      Q  Yeah.  I'm just asking if any of these

10  secondary sources are examining the amount of

11  additional funds that are necessary to compensate

12  female student-athletes for certain levels of

13  expenditures for male student-athletes?

14         MS. CAPPS:  Object to form.

15         THE WITNESS:  No, none of those -- I've

16  repeated this several times, that none of those

17  studies can contemplate something that was just

18  created.

19         But on the very next page, it explains how

20  we -- you know, that from Rascher's model, there

21  are these numbers.  And those numbers, I think,

22  speak for themselves in what kind of an impact

23  they would have on an athletics department.

24  BY MR. SIEGEL:

25     Q  Okay.  You looked at -- you looked at the

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 186

1  spending on average in one conference.

2       Is that -- is that what you've done here?

3    A  To provide an example, yes.

4    Q  Okay.  But you don't look at the budget of

5  the schools in that conference to determine

6  whether or not a massive overhaul of the

7  expenditures would be necessary to compensate for

8  the expenditures you identify on page 54, do you?

9    A  I do not do that because a Title IX

10  analysis would have to be unique to each

11  institution, and it would take a while to do all

12  of that.  And it wasn't necessary to do that

13  for --

14    Q  Okay.

15    A  -- this report, because, again, these

16  numbers speak for themselves.

17    Q  Like, for example, you didn't look at --

18  at how conferences spend -- if -- if 10 percent of

19  the broadcast NIL money was provided to college

20  athletes, did you look -- did you do a careful

21  study of how the conferences spend the other

22  90 percent of their revenues --

23       MS. CAPPS:  Objection, form.

24  BY MR. SIEGEL:

25    Q  -- of -- from the broadcast agreements?

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 187

1      A   I didn't do an economic analysis of that,

2   no.



10      A   Yes, because this huge number here

11   reflects 10 percent.

12      Q   Right.  So the amount that's -- the

13   90 percent that would have been kept in this

14   but-for world is nine times that?

15      A   Yes, 90 percent is nine times that, yes,

16   math.

17      Q   Math --

18      A   Good.

19      Q   -- right?

20          Okay.  So you didn't -- and you didn't

21   look at, like, for example, how much the

22   conferences spend on their athletic -- on the

23   conference commissioners or how much the schools

24   spend on athletic directors, football coaches,

25   basketball coaches, assistant basketball coaches,

Page 188

1    or any of the other extremely high expenditures on

2    certain personnel --

3          MS. CAPPS:  Objection, form.

4    BY MR. SIEGEL:

5      Q  -- at their athletic department?

6          MS. CAPPS:  Same objection, form.

7          THE WITNESS:  I did not look at any of

8    those things specifically, no, because my job was

9    not to fix this model.  It was to show what the

10   Title IX implications of it would be.

11   BY MR. SIEGEL:

12     Q  I understand that.

13         But you're offering opinions on how

14   many -- the types of expenditures that would be

15   required to not -- the massive overall that would

16   be required of athletic department budgets or that

17   it would be virtually impossible to locate

18   additional funds.  I mean, that's going beyond

19   Title IX.  That's offering an opinion about

20   whether or not financially this is something that

21   would be feasible?

22     A  Right.  It's whether -- whether an

23   institution would be able to comply with Title IX

24   if this spending was required.

25     Q  And you're look -- and you're offering

                                                          Page 189

1   opinions on whether or not this financially

2   economically would be feasible?

3        A   That's correct.

4        Q   But you're not an economist.

5        A   No, but this is math.  Doesn't require --

6        Q   Please answer my question:

7            Are you an economist?

8        A   I have already answered that, that I am

9   not.

10       Q   And you've done no empirical studies to

11  support --

12           MS. CAPPS:  Please let her finish her --

13  BY MR. SIEGEL:

14       Q   -- these conclusions?

15           MS. CAPPS:  -- her answers.  You're

16  interrupting each other.

17           MR. SIEGEL:  Sorry.

18  BY MR. SIEGEL:

19       Q   And you've done no empirical studies to

20  support these conclusions?

21       A   No, I'm not an economist.

22       Q   Okay.  And I want you to look at

23  paragraph -- excuse me.

24           On page 53, the middle of page 53, and the

25  last sentence, "Any offsetting payments."

1    CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

2         I, Cynthia J. Conforti, Certified

3    Shorthand Reporter No. 084-003064, CSR, CRR, and a

4    Notary Public in and for the County of Cook, State

5    of Illinois, the officer before whom the

6    foregoing deposition was taken, do hereby certify

7    that the foregoing transcript is a true and

8    correct record of the testimony given; that said

9    testimony was taken by me stenographically and

10   thereafter reduced to typewriting under my

11   direction; that reading and signing was requested;

12   and that I am neither counsel for, related to, nor

13   employed by any of the parties to this case and

14   have no interest, financial or otherwise, in its

15   outcome.

16   IN WITNESS WHEREOF, I have hereunto set my

17   hand and affixed my notarial seal this 19th day of

18   June, 2023.

19

20   My commission expires: October 30, 2023

21

22   _Cynthia J. Conforti_

23   _____

24   Notary Public in and for the

25   State of Illinois



# EXHIBIT 62

# NCAA EXTERNAL GENDER EQUITY REVIEW

Phase I: Basketball Championships

August 2, 2021

KAPLAN HECKER & FINK LLP

350 Fifth Avenue | 63rd Floor
New York, New York 10118
www.kaplanhecker.com

# TABLE OF CONTENTS

**EXECUTIVE SUMMARY** ........................................................................ 1

   1.  Review Process & Scope ................................................................ 4

   2.  Summary of Findings .................................................................... 7

   3.  Summary of Recommendations .................................................. 11

**WHAT HAPPENED AT THE 2021 NCAA BASKETBALL CHAMPIONSHIPS** ............. 14

   1.  Announcement & Planning .......................................................... 14

   2.  Weight Rooms ............................................................................. 17

   3.  COVID-19 Protocols .................................................................... 22

   4.  Food, Meeting Space & Recreation ............................................ 27

   5.  Gifts & Mementos ....................................................................... 34

   6.  Use of "March Madness" ............................................................ 37

   7.  Signage & Championship Atmosphere ...................................... 40

   8.  Fan Festivals & Other Events/Meetings .................................... 45

   9.  Press Conference Transcripts & Photo Posting ........................ 47

**THE NCAA'S ORGANIZATIONAL STRUCTURE & CULTURE** ........................ 49

   1.  Division I Basketball Organizational Structure .......................... 50

   2.  Staff Size & External Support .................................................... 53

   3.  Communication/Coordination Between Men's & Women's Staffs ............... 54

   4.  Men's & Women's Basketball & Basketball Oversight Committees .............. 55

   5.  The Budget & the Budget Process ............................................. 57

   6.  Internal Gender Equity Controls ............................................... 60

   7.  Recommendations ...................................................................... 61

**THE NCAA'S LONG-TERM MEDIA AGREEMENTS** ................................... 67

   1.  The History & Structure of the Media Agreements .................... 67

   2.  Effects on Gender Equity ........................................................... 70

   3.  The True Value of the Division I Women's Basketball Championship Is Not Reflected in the Contracts ............................................................ 75

   4.  Recommendations ...................................................................... 78

**WHAT SHOULD BE DONE WITH RESPECT TO THE DIVISION I MEN'S & WOMEN'S BASKETBALL CHAMPIONSHIPS** ................................................ **85**

   1.  The Student-Athlete Experience ................................................ 85

   2.  Recommendations ................................................ 86

**THE NCAA'S REVENUE DISTRIBUTION MODEL** ................................................ **91**

   1.  The Current Model ................................................ 91

   2.  Recommendation ................................................ 93

**DISPARITIES IN PARTICIPATION OPPORTUNITIES** ................................................ **96**

   1.  Unequal Size of the Division I Tournaments ................................................ 96

   2.  National Invitation Tournaments ................................................ 97

   3.  College Basketball Academy ................................................ 98

   4.  Other Differences in Participation Opportunities ................................................ 98

   5.  Recommendation ................................................ 99

**DIVISIONS II & III'S INFRASTRUCTURE FOR ADDRESSING GENDER EQUITY** ................................................ **101**

   1.  Background ................................................ 101

   2.  Gender Equity Infrastructure ................................................ 102

   3.  Gender Disparities ................................................ 103

   4.  Recommendations ................................................ 105

**ENSURING PROGRESS ON GENDER EQUITY** ................................................ **107**

**LIST OF RECOMMENDATIONS** ................................................ **108**

**EXHIBIT A: SCOPE OF REVIEW** ................................................ **110**

**EXHIBIT B: ANALYSIS OF BASKETBALL FUND DISTRIBUTION** ................................................ **113**

NCAA External Gender Equity Review
Phase I: Basketball Championships

# EXECUTIVE SUMMARY

On the night of March 18, 2021, University of Oregon basketball player Sedona Prince posted a video on social media contrasting the spacious room full of assorted barbells and other weightlifting equipment provided to the men's NCAA championship participants with the small, single tower of hand weights provided to the women's NCAA championship participants at the start of the NCAA Division I Men's and Women's Basketball Tournaments.[1] Like the contemporary equivalent of "the shot heard round the world," that video immediately went viral, and issues of gender equity at the NCAA took center stage in the news and the public consciousness. While the differences between the experiences of male and female players have been significant for years, seeing the student-athletes play in parallel COVID-19 "bubbles" at the same time this year shined an unprecedented light on those differences for the world to see.

Indeed, as a result of the Sedona Prince TikTok video, even before the tip-off of the first women's game, student-athletes, coaches, and the media began a very public, often photographic comparison on social media and elsewhere of the men's and women's tournaments in Indianapolis and San Antonio, respectively.[2] Nearly every time, the women's tournament fell short. As NCAA President Mark Emmert later acknowledged, "When you lay the men's and women's [Division I basketball] championships side by side, as has been made clear over the past weeks, it is pretty self-evident that we dropped the ball in supporting our women's athletes, and we can't do that."[3]

Although the disparities at this year's Division I Men's and Women's Basketball Championships sparked a wide-ranging public discourse about gender equity within the NCAA, college sports, and sports in general, gender disparity is not something new to any of these areas. The NCAA, for example, did not sponsor a championship for women's basketball, or any other women's sport, until 1982—more than 75 years after the association was founded. And even then, it opposed (ultimately unsuccessfully) the application of Title IX—the federal law prohibiting gender discrimination in educational programs and activities receiving federal funds—to college

---

[1] Sedona Prince (@sedonerrr), TikTok (Mar. 18, 2021), https://www.tiktok.com/@sedonerrr/video/6941180880127888646.

[2] *See, e.g.*, Jason Gay, *A TikTok Video Says It All About the NCAA Tournaments*, Wall Street Journal (Mar. 21, 2021), https://www.wsj.com/articles/ncaa-tournament-womens-basketball-mens-basketball-11616344310; Mike Brehm, *South Carolina Women's Basketball Coach Dawn Staley Criticizes NCAA's Mark Emmert Over Disparities Between Tournaments*, USA Today Sports (Mar. 20, 2021), https://www.msn.com/en-us/sports/ncaabk/south-carolina-womens-basketball-coach-dawn-staley-criticizes-ncaas-mark-emmert-over-disparities-between-tournaments/ar-BB1eLXwG; Joseph Salvador, *Tara VanDerveer on Inequality in College Sports: 'I Feel Betrayed by the NCAA*,' Sports Illustrated (Mar. 20, 2021), https://www.si.com/college/2021/03/21/tara-vanderveer-calls-out-ncaa-blatant-sexism-tournament-disparities; Juliet Macur and Alan Blinder, *Anger Erupts Over Disparities at N.C.A.A. Tournaments*, N.Y. Times (Mar. 19, 2021), https://www.nytimes.com/2021/03/19/sports/ncaabasketball/women-ncaa-tournament-weight-room.html; Scott McDonald, *Stanford Coach Exposes Huge Disparity in Men's, Women's Workout Gyms at NCAA Tournaments*, Newsweek (Mar. 18, 2021), https://www.newsweek.com/stanford-coach-exposes-huge-disparity-mens-womens-workout-gyms-ncaa-tournaments-1577254.

[3] Heather Dinich, *NCAA President Mark Emmert Admits Inequality But Wants Women's Basketball Leaders To Push Progress*, ESPN (Mar. 31, 2021), https://www.espn.com/womens-college-basketball/story/_/id/31172132/ncaa-president-mark-emmert-admits-inequality-wants-women-basketball-leaders-push-progress.

sports.[4] The NCAA also to date has successfully resisted the application of Title IX to the NCAA itself.[5]

At various points throughout its history, there have been those within the NCAA who have engaged in concerted, salutary efforts to address inequities in women's college basketball (and college athletics generally) including, but not limited to: the creation of a Women's Basketball Discussion Group by former NCAA President Myles Brand in 2006, the hiring of a marketing consultant to advise the NCAA on improving the marketing of women's basketball in 2007, the retention of now-Big East Conference Commissioner Val Ackerman to complete a White Paper on women's basketball in 2013, as well as ongoing internal efforts to achieve gender equity with respect to women's basketball by the NCAA Committee on Women's Athletics, the Gender Equity Task Force, the Women's Basketball Committee, the Women's Basketball Oversight Committee, and the women's basketball staff. But while it is true that some progress has been made, all too often, the proposed reforms that came out of these efforts ended up doing no more than sitting on a shelf. With respect to women's basketball, the NCAA has not lived up to its stated commitment to "diversity, inclusion and gender equity among its student-athletes, coaches and administrators."[6]

The primary reason, we believe, is that the gender inequities at the NCAA—and specifically within the NCAA Division I basketball championships—stem from the structure and systems of the NCAA itself, which are designed to maximize the value of and support to the Division I Men's Basketball Championship as the primary source of funding for the NCAA and its membership. The NCAA's broadcast agreements, corporate sponsorship contracts, distribution of revenue, organizational structure, and culture all prioritize Division I men's basketball over everything else in ways that create, normalize, and perpetuate gender inequities. At the same time, the NCAA does not have structures or systems in place to identify, prevent, or address those inequities. The results have been cumulative, not only fostering skepticism and distrust about the sincerity of the NCAA's commitment to gender equity, but also limiting the growth of women's basketball and perpetuating a mistaken narrative that women's basketball is destined to be a "money loser" year after year.

Nothing could be further from the truth. The future for women's sports in general, and women's basketball in particular, is bright. Television viewership for this year's Division I women's tournament was the highest it has been since 2014. This year, for the first time ever, ESPN nationally televised all 63 games of the women's tournament. And many Division I women's basketball players now have huge followings on social media that are unrivaled by their male counterparts.[7]

[4] Ellen J. Staurowsky, Title IX and College Sport: The Long Painful Path to Compliance and Reform, 14 Marq. Sports L. Rev. 95, 100-04 (2003).

[5] See NCAA v. Smith, 525 U.S. 459, 469 (1999).

[6] NCAA Inclusion Statement (as amended by the NCAA Board of Governors April 2017), https://www.ncaa.org/about/resources/inclusion/ncaa-inclusion-statement.

[7] See, e.g., Hanna & Haley Cavinder (@cavindertwins), TikTok (last visited July 23, 2021), https://www.tiktok.com/@cavindertwins (approxately 3.4 million followers); Sedona Prince (@sedonerrr), TikTok (last visited July 23, 2021),

As part of this review, and with the full support of the NCAA, Kaplan Hecker & Fink LLP ("KHF") engaged an independent media expert, Ed Desser, to assess the true value of women's Division I basketball. Desser and his team estimate that the annual broadcast rights for women's basketball will be worth between $81 and $112 million in 2025—a figure multiples higher than what ESPN currently pays for an entire annual broadcast package that includes Division I women's basketball *as well as* 28 other NCAA championships. Even if the NCAA were able to realize only a portion of that estimate as the result of future negotiations, those funds would make a significant difference in the money available to support NCAA championships and the NCAA membership. Further, Desser's expert analysis shows that pursuing gender equity is not only the right thing to do, but also has real and significant long-term financial value—and therefore strategic importance—to the NCAA overall.

Although the gender inequities at this year's Division I basketball tournaments were serious, many student-athletes, coaches, and administrators have expressed their deep gratitude to the NCAA for the opportunity to compete in the tournaments during an unprecedented global pandemic. Hundreds of NCAA staff and volunteers worked long and hard over the months before and during the 2021 men's and women's tournaments, planning the events and working to manage the significant health risks so that thousands of student-athletes could compete on college basketball's biggest stage. Millions of fans were treated to game after exciting game. The Stanford University women's team won the national championship in a showdown with the University of Arizona, and co-Freshman of the Year recipients Paige Bueckers and Caitlin Clark faced off in the women's Sweet Sixteen. Baylor University won the men's championship for the first time, and Gonzaga University's buzzer-beater defeat of UCLA in the men's semi-finals will be replayed for years to come.

While there is near universal support for treating student-athletes equitably, there unfortunately is also deep distrust in the NCAA's willingness and ability to make the necessary changes to achieve that goal. We believe, however, that now is the time. Our investigation has revealed broad consensus within the NCAA—from the operational staff to the most senior leadership, from the committees responsible for planning and overseeing basketball championships to the Board of Governors—that it is time for change. The NCAA has already started having important conversations around several of the gender equity issues discussed in this report. Others will require significant work and commitment over the coming years by the NCAA leadership, Board of Governors, committees, membership, staff, and broadcast and corporate partners.

This report provides concrete recommendations on how the NCAA can address these gender equity issues, with a focus on sustainable, systemic improvements that will enable the NCAA to ensure an equitable student-athlete experience in the future.

---

https://www.tiktok.com/@sedonerrr (approximately 2.5 million followers); Paige Bueckers (@paigebueckers), Instagram (last visited July 30 2021), https://www.instagram.com/paigebueckers/ (approximately 900,000 followers); *see also* Kendall Baker, *Eight of the 10 Most-Followed NCAA Elite 8 Basketball Players Are Women*, Axios (Mar. 29, 2021), https://www.axios.com/ncaa-basketball-social-media-followings-a98b2f21-e907-4276-b860-32565654d64a.html.

# 1. Review Process & Scope

As the 2021 Division I Women's Basketball Championship was still being played in San Antonio, the NCAA announced that it had retained KHF to investigate disparities identified between this year's men's and women's tournaments. Our firm's mandate was to conduct a comprehensive and thorough review of gender equity issues in connection with the NCAA, focusing on the NCAA championships, to assess the causes of any gender disparities, and to make recommendations for how the NCAA should address those disparities going forward. The initial focus of our review has been on men's and women's basketball, including Divisions I, II, and III, which will be followed by a second phase that will address the many other NCAA-sponsored sports.

The NCAA guaranteed KHF complete independence in its work and agreed that the firm could gather whatever information we believed necessary. The NCAA fulfilled that promise, cooperating fully in our fact-gathering efforts by providing documents and information requested, making well over a hundred NCAA executives, employees, and committee members available to us, and facilitating as appropriate our interviews with more than a hundred external stakeholders. The NCAA further committed to respect the confidentiality of our communications with, and the anonymity of, any sources who asked not to be identified to the public or the NCAA. The NCAA announced that KHF's independent findings and recommendations would be made public.[8] While NCAA staff were given an opportunity to confirm the accuracy of certain facts (*e.g.*, budgetary numbers), the NCAA did not approve this report or change any of its recommendations before it was issued.

Although intended to be broad, the scope of KHF's review was not unlimited. We did not address every possible disparity that might relate to basketball. KHF did not, for example, examine differences in rules between the men's and women's games, disparities in campus resources dedicated to men's and women's basketball, or the salaries of coaches or referees. Instead, KHF focused on the ways in which the NCAA's policies, practices, and culture impact the student-athlete experience, primarily through the NCAA's administration of the championships.

While the United States Supreme Court has suggested that Title IX does not apply to the NCAA,[9] Title IX, which does apply to the vast majority of the NCAA's members, requires schools to look at whether an institution "provide[s] equal athletics opportunities for members of both sexes."[10] That guidance has provided us with a helpful lens for assessing the gender equity of the NCAA's championships. A similarly useful guide has been the NCAA Gender Equity Task Force's 1992 definition of gender equity: "An athletics program can be considered gender equitable when the participants in both the men's and women's sports programs would accept as

---

[8] Report of the NCAA Board of Governors (Apr. 27, 2021), https://ncaaorg.s3.amazonaws.com/committees/ncaa/exec_boardgov/APR2021BOG_REPORT.pdf ("The board reaffirmed its expectation created at the outset of the review that Kaplan's final conclusions and recommendations will be transparent to the membership and public.").

[9] *See NCAA v. Smith*, 525 U.S. 459, 469 (1999).

[10] 34 C.F.R. § 106.41(c).

fair and equitable the overall program of the other gender."[11] This definition aptly frames the inquiry at the heart of our review: Would the student-athletes participating in the women's basketball championship accept as fair and equitable their championship as compared to the championship that the NCAA currently administers for the men?

As explained further below, the answer to that question is clearly "no." It is important to note, however, that "equitable" does not mean "identical," and the goal of our review was not to eliminate all possible differences between men's and women's basketball. Both men's and women's basketball should be permitted to make decisions that enhance the unique nature of their own sport, and those differences should be accepted so long as they exist for non-discriminatory, neutral reasons and their impact on the student-athlete experience has been taken into account.

Not surprisingly given the above, Phase I of our review was a significant undertaking, involving the review of thousands of documents and interviews with hundreds of stakeholders. Exhibit A to this report contains a detailed summary of our work, which included the following:

- ***External stakeholders.*** An essential component of this review was hearing directly from key stakeholders about their experiences, insights, and concerns with respect to gender equity in connection with the NCAA and the NCAA championships. As an initial step, KHF conducted listening sessions with constituency groups and individual stakeholders, including, but not limited to, current and former student-athletes, parents, coaches, athletic directors, senior woman administrators ("SWAs"), college and university presidents, conference commissioners, academics and experts, and representative athletics groups. These discussions helped KHF identify and understand the relevant issues and informed our review, analysis, and recommendations.

  As part of that effort, the firm reached out to all 64 NCAA Division I women's basketball teams that participated in the 2021 tournament through their schools, and held listening forums for the student-athletes, coaches, athletic directors, senior woman administrators, and parents of student-athletes at those schools. KHF also held additional forums with key student-athlete groups, including some team-specific forums with schools that participated in this year's Division I tournament and the students-athletes on the NCAA Division I Women's Basketball Student-Athlete Engagement Group. The firm also met with representatives of all Division I conferences, including 31 Division I conference commissioners. In addition, KHF met with several key stakeholders from Division II and Division III conferences and member institutions. In total, KHF conducted 110 stakeholder interviews and 21 discussion forums.

  In addition, KHF created a website, ncaagenderquityreview.com, where anyone could submit comments and provide information for consideration in this review. As of the date

---

[11] Gender Equity and Title IX, NCAA (last visited July 21, 2021), https://www.ncaa.org/about/resources/inclusion/gender-equity-and-title-ix.

of this report, that website has received 12,125 unique visitors and more than 1,750 submissions from student-athletes, parents, coaches, fans, NCAA staff, and others.

- *NCAA.* KHF requested, received, and reviewed thousands of pages of internal documents from the NCAA, including from NCAA committees, the Board of Governors, the Division I Board of Directors, the Division I Council, and relevant NCAA staff.[12] These documents covered a range of topics, including the planning and execution of the basketball championships in 2021 and previous years; NCAA finances; broadcast, corporate sponsorship, and branding agreements; and prior gender equity reviews and initiatives.

  In addition to receiving documents from the NCAA, KHF also conducted nearly 150 interviews with NCAA committees, executives, and staff from all three divisions, as well as with local organizing committees and third-party contractors who help run the basketball championships. These interviews included staff who manage finance and accounting, broadcast services, branding and fan experience, media services, corporate champions and partners, ticketing and marketing, and logistics involved in the basketball championships.

  KHF's interviews covered members of NCAA senior management, including the NCAA's President, Chief Operating Officer, Senior Vice President ("SVP") of Basketball, Vice President of Women's Basketball, Chief Financial Officer, and many others. KHF spoke with members of the Division I Women's and Men's Basketball and Basketball Oversight Committees, among others, and met weekly with representatives from the Women's Basketball and Basketball Oversight Committees throughout the process. KHF also engaged with the NCAA's equity and inclusion committees, including the Board of Governors Committee to Promote Cultural Diversity and Equity, the Committee on Women's Athletics, the Gender Equity Task Force, and the Minority Opportunities and Interests Committee.

- *Expert analysis and valuation.* To determine the true value of the media rights associated with the Division I Women's Basketball Championship, KHF, with the full support of the NCAA, engaged a team of independent media experts led by Ed Desser, the founder and president of Desser Sports Media, Inc. and a former senior media executive in the Commissioner's Office of the National Basketball Association. Desser's valuation team included John Kosner, president of Kosner Media and former head of digital media at ESPN for more than two decades, and Neil McDonald, who has more than three decades of experience in sports media and has helped broker dozens of sports media deals. Desser and his team were tasked with identifying issues with the NCAA's media partnerships, making recommendations about how to improve those relationships, and assigning an

---

[12] While the NCAA was not able to provide KHF with all the requested documentation, it is our view that the NCAA made a good-faith effort to substantially comply with the requests for documents, that KHF has sufficient information to assess the issues and make recommendations, and that obtaining additional documents would be unlikely to substantially change the report or its recommendations.

accurate estimated value to the media rights for Division I women's basketball. The team was provided large volumes of documents and data at their request and met with KHF on a regular basis. Desser's report is attached to this report as an Addendum.

To seize on the momentum created by the gender inequities exposed at this year's Division I Men's and Women's Basketball Championships, and to begin making progress in advance of next year's championships, KHF committed to completing this phase of its review and issuing a final report before an NCAA Board of Governors meeting in early August 2021. KHF has already begun the second phase of its review, focusing on the other NCAA championships, which we currently anticipate will be completed this fall.

## 2. Summary of Findings

It is beyond dispute that there were significant disparities between the 2021 Division I Men's and Women's Basketball Championships. As highlighted on social media, there were differences in the goods, services, and resources provided to the women's basketball players, including their weight training facilities, COVID-19 tests, food, recreational opportunities, and gifts and mementos. In addition, there have been significant—and longstanding—disparities in the production and operation of the championships, including, among other things, differences in the quality and quantity of branding and signage at the arenas and host cities; in the use of the "March Madness" trademark; and in the sponsorship of the fan festivals, etc. In all of these areas and more, the experience of the women's tournament participants was markedly different from and inferior to that of the men's tournament participants.

The unique logistical challenges presented by the coronavirus pandemic impacted the 2021 championships in many ways. Perhaps most significantly for purposes of gender equity, the pandemic gave rise to a view on the part of tournament organizers that, after the NCAA was forced to cancel the 2020 tournament, a failure to hold the 2021 men's championship would have had a disastrous financial impact on the NCAA going forward. That attitude resulted in a prioritization of men's basketball that shaped every facet of the 2021 championships, starting with the public announcement of the host cities and continuing through the planning process and into the tournaments themselves. But this prioritization of men's basketball existed well before the pandemic. Indeed, as discussed below, there are underlying, systemic gender equity issues at the NCAA which must be remediated if the goal of equitable treatment of student-athletes is to be achieved.

***The NCAA's organizational structure and culture prioritizes men's basketball, contributing to gender inequity.*** As a not-for-profit, member-led organization, the work of the NCAA is conducted by internal staff and member committees. In both areas, men's basketball is prioritized over women's basketball.

With respect to the Division I basketball staff, many stakeholders report that, in both practice and perception, women's basketball essentially reports to and is subordinate to men's basketball. The SVP of Basketball, although tasked with managing both men's and women's

basketball, focuses the majority of his time and energy on men's basketball, in large part because the vast majority of the NCAA's current revenue comes from men's basketball. In addition, leaders of the NCAA's chief revenue functions, such as broadcast services and corporate relations, report directly to the SVP of Basketball and, in some cases, the Managing Director of Men's Basketball. With respect to the committees, the men's basketball committees are comprised of more senior leaders within the NCAA membership than the women's basketball committees, which negatively impacts the women's committees' ability to effectuate change.

Moreover, the resources allocated to men's and women's basketball differ significantly, even taking into account the differences in the size of the tournaments. Men's basketball has substantially more full-time staff and contractor support to plan their championship. There are sizeable disparities between the budgets for the men's and women's tournaments; in 2019, the last year for which there are finalized financials, the difference in spending was approximately $35 million. In some respects, these disparities are justifiable in that they result from objective differences in the tournaments themselves, including, for example, the tournaments' respective fan attendance, media attention, and use of neutral sites. But the differences in the tournaments do not fully account for the differences in spending. And the impact of these disparities on the student-athlete experience is exacerbated by the lack of communication and coordination between the men's and women's basketball staffs and committees. The staffs and committees for men's and women's basketball operate largely in "silos," independently from each other, with little strategic coordination or common purpose. This "silo-ing" of operations impedes the NCAA's ability to provide equitable championship experiences for student-athletes.

Finally, the NCAA lacks the infrastructure necessary to effectively review budgets, staffing, or any other aspect of the Division I Men's and Women's Basketball Championships to monitor and assess gender equity. There is currently no individual—or group—within the NCAA responsible for that task.

***The structure of the NCAA's media agreements perpetuates gender inequity.*** The NCAA has divided the rights and obligations to broadcast and sell sponsorships of its championships across two media partners, with whom it has long-term, lucrative contracts.

With CBS Broadcasting Inc. and Turner Broadcasting System, Inc. (together, "CBS/Turner"),[13] the NCAA is party to several contracts that require CBS/Turner to broadcast the Division I Men's Basketball Championship and to market and sell the NCAA's corporate sponsor program (the "Corporate Partner Program"), which supports all 90 NCAA championships. In exchange, CBS/Turner will pay the NCAA an average of nearly $1.1 billion annually as part of the most recent contract, which sets rights fees for the 2024-32 period.[14]

With ESPN, Inc. and ESPN Enterprises, Inc. (together, "ESPN"), the NCAA exchanges the right to broadcast 29 NCAA championships, including Division I women's basketball, for a

---

[13] WarnerMedia, LLC now owns Turner Broadcasting System, Inc., but because the NCAA and its media partners still refer to the relationship and the accompanying agreement as "CBS/Turner," this report does the same.

[14] Under the contract that sets rights fees for the 2010-24 period, CBS/Turner pays the NCAA an average of $771.4 million annually.

substantially lower fee of, on average, $34 million per year, or approximately 4.5% of the total rights fee that the NCAA receives from CBS/Turner over the same time period. But based on an independent analysis by expert Ed Desser, the Division I Women's Basketball Championship *alone* is worth much more—between $81 and $112 million annually in 2025. This significant undervaluation is the result of the growing popularity of women's basketball, a changing media landscape, and the fact that the championship's media rights have not been up for competitive bid in nearly two decades.

In addition to significantly undervaluing women's basketball as an asset, the structure of these contracts prioritizes support for men's basketball to the exclusion of women's basketball (and other sports). Because CBS/Turner controls the sponsorship rights for *all* NCAA championships, but the broadcast rights for men's basketball only, CBS/Turner is incentivized to create and encourage sponsorship opportunities for men's basketball above all other sports. And because CBS/Turner requires its Corporate Champions and Partners to purchase the sponsorship rights to all 90 championships *and* the media rights to the men's championship in order to participate as a sponsor, the cost of supporting the women's championship is prohibitively expensive for many companies, shutting out sponsors who might otherwise be interested in supporting women's basketball, but cannot afford the more costly sponsorship of men's basketball. Further, the structure of the contracts imposes a significant set of hurdles even for an existing NCAA sponsor to support other championships: to air advertisements during the women's basketball championship while reaping the benefits of the NCAA's brand, for example, a corporate sponsor must first buy into the expensive CBS/Turner Corporate Partner Program, and then turn to ESPN and separately negotiate and pay for airtime during the women's basketball championship.

As a result, the structure of these contracts has a direct and inequitable impact on the student-athlete experience of women players. Because CBS/Turner has the incentive to build up men's basketball at the expense of all other sports, the men's tournament has a different look and feel—drawing leading artists who perform at a concert during the Final Four, television advertisements that feature famous athletes and public figures, and programming that airs during the broadcast of the tournament covering players, their stories, and their families. Further highlighting men's basketball, the CBS/Turner relationship also includes the broadcaster's obligation to develop and maintain the March Madness Live mobile app, which, by design, only covers men's basketball; the women's basketball app, which is operated by the NCAA itself, has a smaller staff and budget at its disposal and cannot livestream games, leading to a less-functional product. Together, these features make the men's tournament feel like a professional sporting event, while the women's championship lags far behind.

Further, the NCAA's treatment of revenue from these contracts skews the conversation about which sports purportedly make and lose money for the NCAA and its members. The NCAA allocates all of the incredibly lucrative CBS/Turner rights fee—this year, $850 million—as revenue from men's basketball only, notwithstanding the fact that the agreement includes selling CBS/Turner the management of the Corporate Partner Program, which covers the right to use and profit off of the NCAA's brand and logo in connection with *all* 90 championships, not just men's

basketball. This revenue allocation impacts the internal NCAA narrative, which has been repeated in the press, that women's basketball is a revenue loser and, therefore, not as worthy of investment.

*The NCAA's revenue distribution model prioritizes and rewards investment in men's basketball.* One of the NCAA's fundamental tenets is that it distributes the majority of its revenue back to its membership—most of which goes to the Division I conferences and schools to fund their athletic programs. The largest slice of the pie is distributed through what is known as the "Basketball Fund," which allocates revenue among conferences based *solely* on the participation of a conference's automatic qualifying team in, and a conference's overall performance at, the Division I Men's Basketball Championship. In other words, the further a school's team makes it in the men's tournament, the more revenue that school's conference is given. As a result, institutions are incentivized to invest in their men's basketball programs in the hopes of progressing as far as possible in the men's tournament to gain as much revenue as possible. There is no analogous financial reward for participation in or performance at the Division I Women's Basketball Championship. This sends a very clear and loud message to student-athletes, conferences, and schools about which sports matter and which sports do not.

*The disparity in participation opportunities for men's and women's basketball further impacts the student-athlete experience.* Not only is there a disparity between the student-athlete experience at the Division I Men's and Women's Basketball Championships, but there are also more participation opportunities provided by the NCAA to men's basketball players than to women's basketball players. Those increased participation opportunities result from, among other things, the larger bracket size for the Division I men's championship (68 teams in the men's versus only 64 in the women's); the NCAA's ownership and operation of only the men's National Invitation Tournament ("NIT") and not the Women's National Invitation Tournament ("WNIT"), post-season tournaments for top Division I basketball teams not selected for the Division I championships; and the NCAA's operation of the College Basketball Academy, a developmental academy for high school boys without an equivalent for high school girls.

*Fewer disparities exist in Division II and Division III men's and women's basketball.* Our review showed that Division II and III basketball have managed to avoid many of the systemic gender equity issues that are present in Division I basketball. This is attributable to the fact that neither men's nor women's basketball in these divisions brings in any real revenue for the NCAA, so there is no financial incentive to prioritize one gender over the other. In addition, the governance structure for these divisions better facilitates conversations between men's and women's basketball, and the leadership and staff focus on and prioritize gender equity. Disparities still exist, however, particularly with respect to the size and quality of venues. There is also no formal requirement that NCAA staff members or the relevant basketball committees coordinate on individual championship planning decisions, which can result in small disparities occurring each year between the championships.

# 3. Summary of Recommendations

Although the systemic issues summarized above are significant, we believe that there are concrete steps that the NCAA can and should take that will make the student-athlete experience far more equitable from the perspective of gender. This report's recommendations—all of which are discussed in detail below—fall into the following seven categories:

First, the NCAA should **provide structural support for gender equity** in connection with the Division I Men's and Women's Basketball Championships. In order to address the organizational, staffing, and budgetary disparities identified in this review, the NCAA should:

- 1.1: Change the leadership structure of Division I basketball to prioritize gender equity and coordination between the men's and women's tournaments.

- 1.2: Before the next budget cycle, conduct a "zero-based" budget for Division I men's and women's basketball to ensure that any gender differences are necessary, appropriate, and equitable.

- 1.3: Develop equity in staffing for Division I men's and women's basketball.

- 1.4: Establish regular communications between the Division I Men's and Women's Basketball Committees and Basketball Oversight Committees that focus on coordinating on strategic decisions and achieving gender equity in the student-athlete experience.

The NCAA should also take steps to **improve transparency and accountability around gender equity**. Specifically, the NCAA should:

- 1.5: Perform a real-time gender equity audit of the Division I Men's and Women's Basketball Championships as they are being planned and executed each year.

- 1.6: Prepare an annual report on the results of the real-time gender equity audit, including issues identified, how those issues were resolved, and lessons learned.

- 1.7: Conduct an external gender equity assessment of the Division I Men's and Women's Basketball Championships in five years.

- 1.8: Complete a gender equity impact statement in connection with significant actions taken outside of the annual championship planning process.

- 1.9: Evaluate and reward performance for contributions to gender equity.

- 1.10: Increase NCAA staff with expertise in Title IX and gender equity.

Second, the NCAA should take steps to **maximize value through gender equity in marketing, promotion, and sponsorships**. Many of the gender inequities identified in this review

stem from the view that men's basketball is and will continue to be the primary source of funding for the NCAA and its membership. Taking steps to maximize the value of women's basketball—and other sports—will promote gender equity while at the same time increasing and diversifying the NCAA's revenue streams. Specifically, the NCAA should:

- 2.1: Market the rights to the Division I Women's Basketball Championship as a stand-alone property.

- 2.2: Use "March Madness" for both the Division I Men's and Women's Basketball Championships.

- 2.3: Negotiate for a new tier of corporate sponsors for the Division I Women's Basketball Championship (and other NCAA championships).

- 2.4: Create a new senior position of Chief Business Officer to implement a strategy in the marketing, promotion, and sponsorship of the championships that both prioritizes gender equity and ensures the long-term sustainability of the NCAA.

- 2.5: Implement an overall strategy to realize the value of the Division I Women's Basketball Championship (and other championships across the NCAA).

- 2.6: Establish a system for tracking sponsorship activations across the Division I Men's and Women's Basketball Championships (and all other championships across the NCAA).

- 2.7: Pursue marketing and promotional opportunities that will benefit both the Men's and Women's Division I Basketball Championships.

- 2.8: Increase cross-promotion of the Division I Men's and Women's Basketball Championships.

Third, the NCAA should take steps to **improve gender equity at future championships**. To address the disparities in the student-athlete experience that marred the 2021 championships and reduce the likelihood that such disparities will recur, the NCAA should:

- 3.1: Hold the men's and women's Final Fours together in one city.

- 3.2: Ensure that items impacting the student-athlete experience at the Division I Men's and Women's Basketball Championships are gender-equitable.

Particularly in light of the long-term nature of the CBS/Turner contract, it is our view that combining the Final Fours in a single location is, practically speaking, the best possible way to ensure that male and female players have similar, if not the same, experiences at the championships with respect to sponsorship, gifts, signage, etc.

Fourth, the NCAA should **recognize gender equity in revenue distribution**. The existing revenue distribution model rewards performance in only the men's championship, not the women's. This sends a very strong message to women's basketball players that their contributions and achievements do not matter. Over time, and in a way that minimizes immediate disruption to the membership and their budgets, the NCAA should take thoughtful and calibrated steps to:

- 4: Apply gender equity values to revenue distribution.

Fifth, the NCAA should take steps to **ensure gender equity in participation opportunities**. The NCAA should address the differences in the overall number of participation opportunities made available by the NCAA to both current and prospective women's basketball players and:

- 5: Provide an equitable number of participation opportunities.

Sixth, the NCAA should take steps to **enhance gender equity in Division II and III basketball**. Although KHF's review showed that Divisions II and III basketball have managed to avoid many of the systemic gender equity issues that are present in Division I, disparities still exist. In order to address them, the NCAA should:

- 6.1: Establish regular communications between the Division II and III Men's and Women's Basketball Committees that focus on coordinating on strategic decisions and achieving gender equity in the student-athlete experience.

- 6.2: Ensure that items impacting the student-athlete experience at the Division II and III Men's and Women's Basketball Championships are gender-equitable.

Seventh, the NCAA should **ensure progress on gender equity** by requiring there to be transparency and accountability. Many of the issues identified in this review—and some of the recommendations put forward—are not new. Efforts to resolve gender equity issues in the NCAA have percolated at various times over the past 20 years or more. To make the most of this opportunity to improve the experiences of thousands of student-athletes, and to ensure that this latest effort does not simply "sit on a shelf," the NCAA should:

- 7: For the next five years, conduct an annual public assessment of the NCAA's progress in implementing the recommendations set forth in this report.

# WHAT HAPPENED AT THE 2021
# NCAA BASKETBALL CHAMPIONSHIPS

The 2021 Division I basketball championships were unique in many ways. Looming over everything, of course, is the fact that planning for the tournaments took place amidst an unprecedented global pandemic, which presented significant logistical challenges. Indeed, the lengthy uncertainty about whether the tournaments would be able to go forward at all shortened the timeframe to prepare. At the same time, because of the massive financial loss the NCAA sustained as a result of the cancellation of the basketball championships the year before, the NCAA was engaged in a number of belt-tightening measures that impacted the staffing resources available for tournament preparation.

Due to COVID-19, the NCAA held both the men's and women's tournaments in a controlled environment at a single site for all rounds—*i.e.*, a "bubble"—requiring significant changes to the structure of both tournaments. Because these tournament bubbles meant that the men and the women were, for the first time, each playing all of their tournament rounds in a single location, the two tournaments were more alike than ever before. By the same token, however, the bubbles enabled a side-by-side, real-time comparison that revealed critical gender equity issues and garnered significant public attention.

It should be noted that hundreds of NCAA staff and volunteers worked incredibly long hours over a period of months to safely conduct the 2021 college basketball championships despite the pandemic. While they achieved that goal, many of them were devastated by the gender inequities that marred the student-athlete experience and ultimately overshadowed the women's tournament. Many student-athletes and coaches expressed deep gratitude for the opportunity to compete in the tournament, but similarly felt that their experience had been tarnished by the inequities they experienced firsthand.

Those gender inequities were baked into the very fabric of the tournaments and how the tournaments were viewed by the NCAA. It was clear to tournament organizers that after the NCAA was forced to cancel the 2020 men's tournament due to the pandemic, failure to hold the 2021 men's championship would have a potentially catastrophic impact on the NCAA's financial position moving forward. As one senior NCAA official explained, "We knew if we failed with the men, the NCAA was doomed. We'd be nothing. . . . There wasn't the same sense of angst with the women."

## 1. Announcement & Planning

This fundamental difference in perspective about the relative importance of the 2021 men's and women's championships led to gender disparities from the very outset of the planning process. The first decision the NCAA faced was whether to hold the tournaments at all and, if so, whether to host each tournament in a single location or "bubble" because of COVID-19. Making those decisions, and making them public, was the essential prerequisite to tournament planning. Men's

basketball announced their plans for going forward with the tournament in one location on November 16, 2020, but women's basketball was not permitted to make their announcement until a month later on December 14, 2020.[15] This ultimately left women's basketball almost a full month behind in the planning process. While the timing of the men's basketball decision and announcement was driven specifically by the NCAA's need to release hotel rooms for the preliminary rounds of the tournament in order to avoid being on the hook for upwards of $2 million under the applicable contracts, that rationale fails to explain why women's basketball was not permitted to proceed on a similar timeline.

Women's basketball was not told about the men's announcement with sufficient time to decide to make a similar announcement on November 16, but they quickly mobilized and informed the SVP of Basketball just days later that they were prepared to make a parallel announcement on November 23. The women's basketball staff and leadership of the Women's Basketball Committee raised concerns about both the optics of men's basketball making its announcement first and separately from women's basketball, as well as about the impact of the delay on the women's planning. As one leader explained, the "main concern was the delay. The longer the delay, the more difficult it was going to be. Every day that goes by makes it more difficult."

Ultimately, the NCAA did not permit the women's basketball announcement to go forward in November 2020. Instead, women's basketball was instructed that they would first have to conduct a financial review to determine, and then get approval for, the significant additional pandemic-related costs so that the NCAA could decide whether to follow the men's plan and hold all rounds of the women's championship in one location. This direction came from NCAA senior leadership, including the SVP of Basketball, the Chief Operating Officer, and the Chief Financial Officer. Men's basketball did not have to undergo the same financial analysis and approval process. As senior NCAA leaders made clear, because the men's tournament generated nearly a billion dollars in revenue, the NCAA "need[ed] to expend the resources to make [the men's tournament] happen."

After extensive meetings and financial analysis, the NCAA Division I Board of Directors Finance Committee approved the proposed budget for the women's tournament on December 7, noting the importance of holding the women's tournament despite the additional expense as part of their commitment to gender equity.[16] The Division I Women's Basketball Committee approved the decision to hold the tournament in one geographic location on December 10.[17] The PowerPoint presented to the Women's Basketball Committee emphasized "the importance of conducting the championship in a manageable geographic area that limits travel and provides a safe and controlled

---

[15] The NCAA accompanied these announcements with releases on the NCAA website. *See* David Warlock, *NCAA Relocating 2021 Division I Men's Basketball Championship Sites*, NCAA (Nov. 16, 2020), https://www.ncaa.org/about/resources/media-center/news/ncaa-relocating-2021-division-i-men-s-basketball-championship-sites; Rick Nixon, *San Antonio Region Viewed as Potential Host for 2021 DI Women's Basketball Championship*, NCAA (Dec. 14, 2020), https://www.ncaa.org/about/resources/media-center/news/san-antonio-region-viewed-potential-host-2021-di-women-s-basketball-championship.

[16] Report of the NCAA Division I Board of Directors Finance Committee (Jan. 12, 2021).

[17] Division I Women's Basketball Committee PowerPoint Presentation (Dec. 10, 2020).

environment with competition and practice venues, medical resources and lodging for teams and officials all within proximity of one another."[18] As a result, the NCAA did not publicly announce that the women's tournament would be held in a single city until December 14, 2020—just three months before the student-athletes were scheduled to arrive.[19]

Even after the December 14 announcement, however, planning for the women's event still continued to lag behind planning for the men's tournament. The NCAA announced on January 4, 2021 that the men's tournament would take place in Indianapolis;[20] the NCAA did not announce that the women's tournament would take place in San Antonio until a month later, on February 5.[21] The women's staff made their first site visit to San Antonio on January 25-28 and then worked to try to solidify hotel and facility contracts, as well as coronavirus protocols, in the days leading up to the February 5 announcement.[22]

The men's and women's teams began arriving at their bubbles on March 13 and 16, respectively. Even before the first women's game took place, the issue of gender equity took over the news, when, as discussed above, University of Oregon player Sedona Prince posted a video on social media depicting differences between the men's and women's weight rooms.



*Sedona Prince's TikTok Video from March 18, 2021*[23]

[18] *Id.*

[19] *See* Rick Nixon, *San Antonio Region Viewed as Potential Host for 2021 DI Women's Basketball Championship*, NCAA (Dec. 14, 2020), https://www.ncaa.org/about/resources/media-center/news/san-antonio-region-viewed-potential-host-2021-di-women-s-basketball-championship.

[20] David Warlock, *NCAA Announces Further Details for 2021 Division I Men's Basketball Championship*, NCAA (Jan. 4, 2021), https://www.ncaa.org/about/resources/media-center/news/ncaa-announces-further-details-2021-division-i-men-s-basketball-championship.

[21] Meghan Durham, *San Antonio Region to Host 2021 Division I Women's Basketball Championship*, NCAA (Feb. 5, 2021), https://www.ncaa.org/about/resources/media-center/news/san-antonio-region-host-2021-division-i-women-s-basketball-championship.

[22] 2021 Women's Basketball Championship Planning Timeline by Women's Basketball Staff.

[23] Sedona Prince (@sedonerrr), TikTok (Mar. 18, 2021), https://www.tiktok.com/@sedonerrr/video/6941180880127888646.

That video was quickly picked up and shared by professional athletes and thousands of other basketball fans.[24] Other reports quickly followed, raising questions about everything from disparities in COVID-19 testing and food, to the NCAA's unequal promotion of the men's and women's events.[25]

The unique challenges created by the pandemic and the compressed planning timeline for the women's tournament certainly contributed to the inequities in the student-athlete experience at this year's Division I championships. But it would be a mistake to conclude that disparities between the men's and women's tournaments were limited to this year or to look at this year's tournaments out of context. As discussed below, many of the disparities that received public attention this past spring stem from systemic issues that contribute to and exacerbate gender inequities in the NCAA basketball championships.

## 2. Weight Rooms

The first issue to garner significant public attention at this year's tournament was the differences in the weightlifting facilities provided to the men and women as a result of Sedona Prince's March 18 TikTok video.[26] That video highlighted for the public the fact that the NCAA had provided the men a large, central weight room divided into six weightlifting areas, which was available to all 68 men's teams as soon as they cleared their two-day quarantine upon arrival in Indianapolis.[27] In addition, the NCAA set up a small pyramid of dumbbells in the holding room adjacent to the practice courts, where the student-athletes would stretch and wait while the court and courtside areas were sanitized and cleaned.

By contrast, the NCAA did not plan to set up any weight room for the women at all until the Sweet Sixteen, when they planned to have three private weightlifting areas available.[28] For the first two rounds of the women's tournament, the student-athletes were intended to have access

---

[24] *See, e.g.*, Courtney Connley, *Steph Curry, A'ja Wilson and Other Athletes Call Out NCAA for Unequal Treatment of Men and Women Basketball Players*, CNBC (Mar. 19, 2021), https://www.cnbc.com/2021/03/19/steph-curry-other-athletes-call-out-ncaas-treatment-of-women-players.html.

[25] *See, e.g.*, Juliet Macur and Alan Blinder, *Anger Erupts Over Disparities at N.C.A.A. Tournaments*, N.Y. Times (Mar. 19, 2021), https://www.nytimes.com/2021/03/19/sports/ncaabasketball/women-ncaa-tournament-weight-room.html; Molly Hensley-Clancy, *NCAA Vows to Improve Conditions at Women's Basketball Tournament, as Outcry Continues*, Wash. Post (Mar. 19, 2021), https://www.washingtonpost.com/sports/2021/03/19/ncaa-women-basketball-weight-room/; Becky Sullivan, *Under Fire, The NCAA Apologizes And Unveils New Weight Room For Women's Tournament*, NPR (Mar. 20, 2021), https://www.npr.org/2021/03/20/979596524/under-fire-the-ncaa-apologizes-and-unveils-new-weight-room-for-womens-tournament; Scott McDonald, *NCAA Gender Inequity Cuts Deeper Than Just Weight Room Issues at Tournament*, Newsweek (Mar. 20, 2021), https://www.newsweek.com/ncaa-gender-inequity-cuts-deeper-just-weight-room-issues-tournament-1577617; Gabriella Levine, *NCAA March Madness drops the ball for women's basketball with sexism outrage*, NBC News (Mar. 23, 2021), https://www.nbcnews.com/think/opinion/ncaa-march-madness-drops-ball-women-s-basketball-sexism-outrage-ncna1261775; Molly Hensley-Clancy, *Pressure Mounts on NCAA as House Democrats Demand Answers Over Tournament Disparities*, Wash. Post (Mar. 24, 2021), https://www.washingtonpost.com/sports/2021/03/24/ncaa-tournament-house-democrats-megan-rapinoe/.

[26] *See* Sedona Prince (@sedonerrr), TikTok (Mar. 18, 2021), https://www.tiktok.com/@sedonerrr/video/6941180880127888646.

[27] 2021 Men's Basketball Participant Manual at 84.

[28] 2021 Women's Basketball Participant Manual at 4-5.

NCAA External Gender Equity Review
Phase I: Basketball Championships

only to a small set of dumbbells, a stationary bike, and yoga mats placed in the women's holding room, similar to the holding room that had been set up for the men.[29]

 

*Pictures Shared on Social Media of Men's Full Weight Room and Women's
Holding Room Weights at the Start of the Tournaments*[30]

The decision to provide a full weight room for the duration of the men's tournament was made by the NCAA men's staff after consulting with the NBA about the bubble set up for the 2020 NBA Playoffs. On February 17, the NCAA men's staff sent the women's staff a draft manual for tournament participants,[31] which noted the then-current plans for private weight rooms next to each practice court.[32] The following week, on February 26, the men's staff sent athletic directors and conference commissioners a PowerPoint—one of a series of weekly PowerPoints that provided real-time updates on coronavirus protocols and other championship logistics—that contained details about equipment available at the men's tournament. The February 26 PowerPoint made clear that a weight room would be available through the entirety of the men's tournament, and even listed the specific equipment that would be included:

---

[29] *See* Workout and Weights Facts & Plans (Mar. 18, 2021); *see also* 2021 Women's Basketball Participant Manual at 5.

[30] Ali Kershner (@kershner.ali), Instagram (Mar. 18, 2021), https://www.instagram.com/p/CMkRJ2LswFp. Ali Kershner is the performance coach for the Stanford women's basketball team.

[31] Participant manuals are created each year to provide teams with detailed logistical information for the upcoming tournament.

[32] *See* Email from Men's Basketball Staff to Women's Basketball Staff re: MBB Team Manual (Feb. 17, 2021); *see also* 2021 Indianapolis All-Team Manual Draft ("This time will include weight training, which will be available on each court, should any individuals wish to utilize this equipment.")

NCAA External Gender Equity Review
Phase I: Basketball Championships



*Slide from February 26, 2021 Men's Basketball PowerPoint[33]*

Although this PowerPoint was forwarded to the women's staff that same day,[34] the volunteer helping the women's staff to review the men's weekly PowerPoints for updates relating to coronavirus protocols did not scrutinize the slides in order to identify potential disparities between the two tournaments. The same was true with respect to the participant manuals. As one NCAA women's basketball staff member explained, "We never put those manuals side by side. We didn't have time to do this. We just tried to get our information into the manual as soon as possible."

Neither the first nor second draft participant manual that the women's staff shared with the men's staff included any reference to a weight room at the women's tournament.[35] The final version of the women's manual, circulated on March 15, was the first time that the women's staff shared detailed information about their weight room plans, which they highlighted in green, and which explained that other than "access to a stationary bike and free weight pyramid within the holding areas and/or team practice locations" there would not be workout facilities in the first and

---

[33] *See* 2021 DI Men's Basketball Tournament Update #4 (Feb. 26, 2021).

[34] *See* Email from Men's Basketball Staff to Women's Basketball Staff re: MBB Tournament Update #4 (Feb. 26, 2021).

[35] *See* 2021 First Edition – WBB Participant Manual (Mar. 5, 2021); 2021 Second Edition – WBB Participant Manual (Mar. 10, 2021).

second rounds "due to limited space, movement of teams, number of individuals within each property and sizes of workout facilities with COVID-19 capacity restrictions."[36]

> **Weight & Workout Facilities / Outdoor Spaces** -
> **1st and 2nd Rounds.**  Each team will have access to a stationary bike and free weight pyramid within holding areas and/or team practice locations.  No hotel or other workout facilities will be available due to limited space, movement of teams, number of individuals within each property and sizes of workout facilities with COVID-19 capacity restrictions.
> **Sweet 16/Elite Eight.**  Starting on Wednesday, March 25th, a workout/weight facility (up to 90 minutes per day per team) will be made available at the Convention Center as part of the team coordinated schedule of events. A list of expected equipment is provided below.
> **Women's Final Four.** A workout/weight facility (up to 90 minutes per day per team) will be made available at the Convention Center as part of the team coordinated schedule of events.   A list of expected equipment is provided below.

*Excerpt of March 15, 2021 Final Edition of Participant Manual for Women's Basketball Championship[37]*

Even shortly before the tournaments began, details for the weight rooms intended for the women's Sweet Sixteen and beyond were still being sorted out. On March 13, for example, one women's basketball staff member emailed another a screenshot of the men's participant manual section on the weight room, noting that the men's plans could be used as a basis to decide what equipment they would need: "FYI – a snapshot from MBB manual on weight room usage and set-up. Again, this list is FAR too heavy for WBB needs, yet a good start for review."[38] The women's basketball staff member later explained that March 13 was the first time she learned that the men were providing a full weight room for the duration of the tournament. And the night before Sedona Prince posted the weight room photos, on March 17, women's basketball received a $100,000 estimate for their planned Sweet Sixteen weight rooms.[39]

The public outcry unleashed by Sedona Prince's video caused the NCAA to quickly pivot from its original plan. After discussions with women's coaches and NCAA basketball leadership, the women's staff worked with an outside contractor to construct a weight room virtually overnight.[40] To do so, the NCAA provided the contractor with what essentially amounted to a

---

[36] 2021 Women's Basketball Participant Manual at 4-5.

[37] *Id.* at 4.

[38] Emails between Women's Basketball Staff re: Weight Details (Mar. 13, 2021).

[39] *See* Email from MKTG to Women's Basketball Staff re: Weight Room Estimate (Mar. 17, 2021).

[40] *See* Teamworks Message from NCAA to Women's Basketball Teams re: New Weight Room and Enhanced Courtside Workout Spaces (Mar. 20, 2021). This semi-private weight room could accommodate two teams simultaneously and was constructed despite the NCAA's initial statement that the planned disparity in weight rooms was "due to the limited space." Statement from Vice President of Women's Basketball, NCAA Women's Basketball (@ncaawbb), Twitter (Mar. 18, 2021), https://twitter.com/ncaawbb/status/1372676389208477696; *see also* Gabriel Fernandez, *2021 Women's NCAA Tournament: NCAA Says Women Got Smaller Gym Than Men Because There Wasn't Enough Space*, CBS Sports (Mar. 19, 2021), https://www.cbssports.com/college-basketball/news/2021-womens-ncaa-tournament-ncaa-says-women-got-smaller-gym-than-men-because-there-wasnt-enough-space/.

blank check. In an initial estimate on March 19, the contractor informed the NCAA that it might cost anywhere between $400,000 and $500,000 to complete the weight room in the requested timeframe; the NCAA responded that "while mindful of budget, [the] first priority is to make it happen."[41] The NCAA ultimately paid $370,139 to set up the new women's weight room.[42]



*Picture of the New Weight Room Set Up at the Women's Tournament on March 20, 2021*[43]

That weight room opened on March 20 and was divided into two separate areas, allowing two women's teams to work out at once.[44] The NCAA also set up spaces next to the practice courts that included workout benches, workout bikes, rowing machines, and treadmills. Both the enhanced courtside spaces and the weightlifting areas saw significant use in the days after they were set up.[45] For the Sweet Sixteen and beyond, starting on March 25, the NCAA replaced the temporary weight room with the three private weight rooms that had originally been planned, containing equipment similar to that used for the men.[46]

Some members of the women's staff, senior NCAA leadership, and the Women's Basketball Oversight Committee described being shocked when the Sedona Prince video began circulating online and they saw the disparities in the weightlifting facilities. The video also made the contrast starker for those NCAA staff who had been aware of the difference for a few days.

---

[41] *See* Email from Women's Basketball Staff to MKTG re: APPROVAL NEEDED - Weight Room Budget (Mar. 19, 2021).

[42] *See* NCAA Women's Overnight & Extended Weight Room Final Budget.

[43] Image from the NCAA.

[44] *See* Teamworks Message from NCAA to Women's Basketball Teams re: New Weight Room and Enhanced Courtside Workout Spaces (Mar. 20, 2021); Email from NCAA Women's Basketball Staff to NCAA Communications Staff re: New Offerings for Women's Teams (Mar. 29, 2021).

[45] *See* Email from Women's Basketball Staff to Vice President of Women's Basketball re: Convention Center Room Metrics (Mar. 30, 2021).

[46] *See* Teamworks Message from NCAA to Women's Basketball Teams re: New Weight Room and Enhanced Courtside Workout Spaces (Mar. 20, 2021). *Compare* 2021 Men's Basketball Participant Manual at 84 (detailing equipment in men's weight room), *with* 2021 Women's Basketball Participant Manual at 5-6 (detailing equipment in women's weight room).

For example, one women's basketball staff member noted, "When we learned about the video, I'll be frank, a lot of us went white in the face. And rightfully so; we didn't have a big weight room."

## 3. COVID-19 Protocols

Soon after the weight room issue came to light, public attention turned to differences in COVID-19 protocols for tournament participants. While everyone who entered the tournament bubbles had to undergo seven consecutive days of negative COVID-19 tests (including at least one polymerase chain reaction ("PCR") test) before arrival and a two-day quarantine upon arrival, teams at the men's tournament received daily PCR tests, whereas teams at the women's tournament instead received daily antigen tests, with only one PCR test per week.[47]

As with the rest of championship planning, the men's staff was several weeks ahead of the women's staff in developing COVID-19 protocols.[48] Men's basketball and the NCAA's Chief Medical Officer partnered early with Indiana University ("IU") Health and with the Marion County Public Health Department to develop safety and testing protocols. The Marion County Public Health Department required daily PCR testing that would not interfere with the local community's ability to obtain testing. IU Health had a sophisticated lab that was able to run large batches of tests to fulfill those requirements.

On December 22, 2020, the Director of the Marion County Public Health Department approved the following plan of daily PCR testing for the men's championship:

**DRAFT**

**DAILY COVID-19 PCR TESTING:** Daily PCR testing (witnessed and self-administered PCR nasal swab) will take place throughout the entire tournament for Tier 1 individuals who remain in the tournament. All COVID-19 testing will take place in designated locations in hotels in Marion County.

*Men's Tournament Medical Protocol from December 22, 2020*[49]

---

[47] *See* 2021 Women's Basketball Participant Manual at 12, 18-19; 2021 Men's Basketball Participant Manual at 25-26, 32. The physical distancing guidelines, mask policies, movement restrictions inside and outside hotels, and in-room quarantine policies were similar between the men's and women's championships. *Compare* 2021 Women's Basketball Participant Manual at 10-32 (COVID-19 protocols), *with* 2021 Men's Basketball Participant Manual at 20-42 (COVID-19 protocols).

[48] For example, men's basketball executed their agreement with Stratoscope—a contractor who assisted with reviewing the medical and testing plans, implementing testing schedules and protocols, managing the collection of necessary health data pre-tournament, and providing onsite support—on February 15, 2021. The women's staff did not execute a similar agreement until March 5, 2021. *See* Master Services Agreement and Scope of Work Agreement between the NCAA and Stratoscope Consulting, LLC. In fact, the women's staff did not execute the agreement with Stratoscope until NCAA leadership recognized that the women's tournament did not have the appropriate infrastructure for COVID-19 testing and connected the women's staff with Stratoscope two weeks before the start of the tournament.

[49] 2021 NCAA Division I Men's Basketball Tournament Medical Protocol Draft at 2 (Dec. 22, 2020).

Men's basketball confirmed this plan with the Health Department Director by letter on January 1, 2021,[50] and announced the partnership with IU Health on January 6, 2021.[51]

Meanwhile, the NCAA was working out a larger plan for COVID-19 testing across all the other NCAA championships. On January 1, 2021, the NCAA entered into an agreement with Diamond Health to "plan for, schedule, implement, manage and oversee all on-site COVID-19 testing activities" for the NCAA championships.[52] On January 11, the NCAA announced that Diamond Health would be the testing provider for all championships other than Division I men's and women's basketball.[53] The testing procured through Diamond Health was daily antigen testing, with rapid PCR tests for confirmatory or inconclusive tests.[54]

Over the following weeks, the NCAA worked to determine whether Diamond Health could provide testing for the women's championship and what the local health authorities in San Antonio would require. In the earliest drafts of the scope of service for the women's championship, the NCAA noted a plan in December 2020 to "secure/source PCR tests for daily testing during March."[55]



*Draft of 2021 Division I Women's Basketball Championship Health Care Provider –*
*Scope of Services as of January 24, 2021*[56]

---

[50] *See* Letter from NCAA to Director of Marion County Public Health Department (Jan. 1, 2021) ("I am pleased that we have reached consensus and agreement with the [Marion County Public Health Department] on the protocols discussed, which are reflected in the attached document. As you know, the NCAA's ability to move forward with planning the 2021 Division I Men's Basketball Championship exclusively in Marion County is reliant upon shared agreement with the protocols.").

[51] *NCAA Announces Health and Safety Protocols for DI Men's Basketball Championship*, NCAA (Jan. 6, 2021), https://www.ncaa.org/about/resources/media-center/news/ncaa-announces-health-and-safety-protocols-di-men-s-basketball-championship.

[52] *See* Amended & Restated Services Agreement between the NCAA and Diamond Health, Inc. (Jan. 1, 2021), Ex. A.

[53] Mark Bedics, *NCAA Announces Health and Safety Plans for All Other Winter Championships*, NCAA (Jan. 11, 2021), https://www.ncaa.org/about/resources/media-center/news/ncaa-announces-health-and-safety-plans-all-other-winter-championships ("The NCAA will work with IU Health to provide health related support including the administration of daily PCR tests for Tier 1 individuals upon arrival and throughout the tournament.").

[54] *See* Amended & Restated Services Agreement between the NCAA and Diamond Health, Inc. (Jan. 1, 2021), Ex. B.

[55] 2021 Division I Women's Basketball Championship Health Care Provider – Scope of Services Draft (Jan. 24, 2021).

[56] *Id.*

But the draft medical protocols circulated ahead of an introductory call with the San Antonio regional medical contacts on January 25, 2021, instead proposed daily antigen testing for the women's championship.[57]

> NCAA DI WBB Championship: Medical Protocol
> January 25, 2021
> Page 2
>
> **DRAFT – WORKING DEVELOPMENT OF POLICIES**
>
> **DAILY COVID-19 ANTIGEN TESTING:**  Daily antigen testing (administered antigen nasal swab) will take place throughout the entire tournament for Tier 1 individuals who remain in the tournament.  All COVID-19 testing will take place in designated locations in hotels in Bexar County.

*Draft of NCAA Women's Basketball Medical Protocol from January 25, 2021*[58]

On this January 25 call, the San Antonio health authorities indicated that they would like to add PCR testing to the proposed medical protocol of daily antigen testing.[59] The local health authorities did not specify whether they required daily PCR testing or a combination of PCR and antigen testing. In an email following that meeting, the women's basketball staff noted: "Yes, they said they wanted PCR, but it also seemed that they may be comfortable with a combination of antigen and PCR. We need them to tell us exactly what they'll support."[60]

On February 1, 2021, the NCAA had a follow-up meeting with the Director of the San Antonio Metropolitan Health District, who informed the NCAA that she would require at least

---

[57] Memories around the decision to use antigen testing for the women's tournament differed. This report therefore relies on the timeline as established by contemporaneous documents. For example, one senior NCAA staff member recalled that the reason why the NCAA proposed daily antigen tests in San Antonio was that the local health officials in San Antonio were concerned about the availability of PCR tests in the community and that a local health provider, a contractor for Methodist Health, informed them that they would be unable to perform testing. The local health authorities did not recall such a concern at that time, and the contractor for Methodist Health recalled that he was told that he was not needed to provide testing and shared an email from the NCAA staff to him stating that the NCAA was: "likely using a testing partner who will be responsible for securing and administering the tests to meet our required COVID testing protocols." Email from Women's Basketball Staff to Methodist Health re: 2021 DI WBB Championship - Health Care Provider (Feb. 2, 2021). While memories differed on the reason why the NCAA proposed daily antigen testing to the San Antonio health authorities, both the NCAA and the San Antonio health authorities expressed confidence that the testing protocol used at the women's tournament protected the health and safety of the student-athletes and others in the tournament bubble.

[58] NCAA Division I Women's Basketball Tournament – Medical Protocols Draft (Jan. 25, 2021).

[59] *See* Email from Women's Basketball Staff to Diamond Health re: Meeting with San Antonio Health Authorities (Jan. 28, 2021).

[60] *Id.*



NCAA External Gender Equity Review
Phase I: Basketball Championships

once-a-week PCR testing to supplement the antigen testing.[61] The NCAA then updated the language in its proposed medical protocol to account for this change.

<table>
<tr><td>

NCAA DI WBB Championship: Medical Protocol
February 1, 2021
Page 2

**DRAFT – WORKING DEVELOPMENT OF POLICIES**

**DAILY COVID-19 ~~ANTIGEN~~ TESTING:**  Daily ~~antigen~~ testing ~~(administered antigen nasal swab)~~ will take place throughout the entire tournament for Tier 1 individuals who remain in the tournament.  Daily testing will be primarily antigen (administered antigen nasal swab) with one PCR test per week.   All COVID-19 testing will take place in designated locations ~~in hotels~~ in Bexar County.

</td></tr>
</table>

*NCAA Women's Basketball Medical Protocol Redline as of February 1, 2021,*
*after Meeting with San Antonio Health Department[62]*

Once Diamond Health confirmed they could provide both the once-per-week PCR and daily antigen tests, and the San Antonio health authorities gave their sign off, the NCAA moved forward with Diamond Health as the testing provider for the women's championship.[63]

Student-athletes, coaches, and others raised concerns that the women were receiving lesser quality tests because they considered PCR tests to be the gold standard in COVID-19 testing. As one student-athlete noted, "It's not about the gifts, whatever it may be. But something like our health, the weight room, how we were getting tested . . . we want to be treated equally in that aspect of our lives." Another student-athlete felt the difference in COVID-19 tests "was really telling about how [the NCAA] felt about us as people, like we weren't important enough to have good testing for [COVID-19] which is life-threatening."

There is no evidence to suggest that the difference in testing caused disparities in health outcomes for the men's and women's tournament participants, and the NCAA's Medical Advisory Group—made up of team physicians, public policy experts, and infectious disease experts—provided guidance that either PCR or antigen testing performed with a regular cadence could be used to manage risks associated with COVID-19.[64] Nevertheless, antigen tests have lower

---

[61] *See* Email from Women's Basketball Staff to San Antonio Health Authorities re: Draft Medical Protocol (Feb. 1, 2021).

[62] *See* NCAA Division I Women's Basketball Championship: Medical Protocol Draft (Feb. 1, 2021).

[63] The NCAA used the Mesa Biotech Accula SARS-CoV-2 test for the rapid PCR testing and the Quidel Sophia point of care antigen test for the daily antigen testing. *See* Amended & Restated Services Agreement between the NCAA and Diamond Health, Inc. (Jan. 1, 2021); *see also* Emails between Women's Basketball Staff re: PCR testing for Women's BB (Feb. 2, 2021).

[64] *See* COVID-19 Guidance on Multiple Teams in the Same Location, NCAA (last visited July 21, 2021), https://www.ncaa.org/sport-science-institute/covid-19-guidance-multiple-teams-same-location;  COVID-19 Medical Advisory

specificity than PCR tests and thus create a higher likelihood of false positive or inconclusive results.[65] The NCAA itself recognized in coronavirus guidelines that "[p]oint-of-care antigen testing has a specificity of about 98%, meaning that the test may produce a false-positive result in about two cases for every 100 tests performed. Although this may seem low, it means that there is the potential for athletes to be assumed infectious when in fact they are not."[66]

The dramatically higher number of false positives from antigen tests did end up having a negative impact on the student-athlete experience at the women's tournament. As one women's basketball player noted, "Every day there were at least two or three people who had to stay back because of a false positive or the test was inconclusive." This took a toll on mental health and preparedness, with some players receiving false positive tests on the day of competition and being told they might have to sit out the game. The false positives also impacted the staff and support crew. For example, the University of Arizona's women's basketball team was excluded from a video about the women's Final Four teams in part because a false positive antigen test prevented the individuals responsible for putting together the video from attending and photographing the Arizona practice. As Arizona coach Adia Barnes observed, "Those are things that get missed, sometimes, and shouldn't be. Because there are four teams that have worked really hard to get here. Stuff like that shouldn't happen."[67]

---

Group, NCAA (last visited July 29, 2021), https://www.ncaa.org/sport-science-institute/covid-19-medical-advisory-group. As the NCAA's Resocialization Guide indicated: "For the purposes of this document, based on current evidence and standards, PCR testing, or antigen testing that is performed with a regular cadence, should be considered the standard testing methods for both baseline and ongoing surveillance testing. Testing strategies are always contingent on the availability of ample testing supplies, laboratory capacity and the adequacy of turnaround time and access to testing." NCAA, *Resocialization of Collegiate Sport: Developing Standards for Practice and Competition* at 16 (2d ed., first update Dec. 15, 2020), https://ncaaorg.s3.amazonaws.com/ssi/COVID/SSI_ResocializationDevelopingStandardsSecondEdition.pdf. After the differences in testing were reported in the media, the NCAA released a statement that the Medical Advisory Group had "advised that either daily PCR or daily antigen testing were equally effective models for basketball championships, as they recommended adopting the testing approach that worked best with the provider and local health officials." *NCAA Testing Protocols for Basketball Championships*, NCAA (Mar. 20, 2021), https://www.ncaa.org/about/resources/media-center/news/ncaa-testing-protocols-basketball-championships.

[65] *See, e.g., Potential for False Positive Results with Antigen Tests for Rapid Detection of SARS-CoV-2 - Letter to Clinical Laboratory Staff and Health Care Providers*, U.S. Food & Drug Administration (Nov. 3, 2020), https://www.fda.gov/medical-devices/letters-health-care-providers/potential-false-positive-results-antigen-tests-rapid-detection-sars-cov-2-letter-clinical-laboratory ("Laboratories should expect some false positive results to occur even when very accurate tests are used for screening large populations with a low prevalence of infection. Health care providers and clinical laboratory staff can help ensure accurate reporting of test results by following the authorized instructions for use of a test and key steps in the testing process as recommended by the Centers for Disease Control and Prevention (CDC), including routine follow-up testing (reflex testing) with a molecular assay when appropriate, and by considering the expected occurrence of false positive results when interpreting test results in their patient populations."); *see also Interim Guidance for Antigen Testing for SARS-CoV-2*, Centers for Disease Control and Prevention (updated June 14, 2021), https://www.cdc.gov/coronavirus/2019-ncov/lab/resources/antigen-tests-guidelines.html ("Despite the high specificity of antigen tests, false positive results will occur, especially when used in communities where the prevalence of infection is low – a circumstance that is true for all in vitro diagnostic tests. In general, for all diagnostic tests, the lower the prevalence of infection in the community, the higher the proportion of false positive test results.").

[66] *See* NCAA, *Resocialization of Collegiate Sport: Developing Standards for Practice and Competition* at 16 (2d ed., first update Dec. 15, 2020) https://ncaaorg.s3.amazonaws.com/ssi/COVID/SSI_ResocializationDevelopingStandardsSecondEdition.pdf.

[67] *See* Mechelle Voepel, *Arizona Wildcats Irked After Omission from NCAA Women's Final Four Promotional Video*, ESPN (Apr. 1, 2021), https://www.espn.com/womens-college-basketball/story/_/id/31180290/arizona-wildcats-irked-omission-ncaa-women-final-four-promotional-video.

It should be noted that while issues of false positives were not the same, the PCR testing used at the men's tournament also had a negative impact on the players. The men's teams often had to undergo testing at early morning hours. They also faced delays in practices and team meetings as they waited for results because lab-based PCR tests require a longer wait time for results than do rapid antigen tests.

Overall, the men's tournament conducted almost 20,000 PCR tests of Tier 1[68] individuals, with only seven positive tests detected. The women's championship conducted almost 18,000 tests of Tier 1 individuals (15,597 antigen and 2,342 PCR), with 226 positive antigen tests, but only two positive PCR tests.[69] There was no evidence of any spread of COVID-19 from team to team, and no evidence of an increase in community spread either.[70] Both the NCAA and the San Antonio health authorities strongly believe that the testing protocol used at the women's tournament protected the health and safety of the student-athletes and others in the tournament bubbles.

## 4. Food, Meeting Space & Recreation

***Hotel food.*** Women's basketball players and coaches raised the following four main concerns about the food served during their NCAA championship tournament: quantity, quality, lack of flexibility/choice, and lack of variety. These disparities in food were concerning given the obvious importance of nutrition to the competing student-athletes, and may have been based on unfounded assumptions at the hotels about what, and how much, women eat as compared to men. As one student-athlete noted, "They gave us little portions. It wasn't warm and wasn't good." Another recalled, "It was really [a] little amount of food and not good food." Yet another stated, "Food was our biggest thing. We were on our feet so much of the day. So not having good meals was frustrating." A coach attending the tournament reported, "The portions originally were very small. I didn't ask the men's team about the food. I saw a buffet on Twitter. . . . I would love to be in a buffet situation." Because the food provided was of such poor quality and meager proportions, many schools (who could afford it) paid out of their own pockets to supplement the packaged meals by ordering in groceries, snacks, and restaurant meals for their women's basketball players. Several coaches and athletic directors explained to us that they found themselves "struggl[ing]" to purchase food to ensure their team had sufficient "fuel" to play basketball.

Our investigation confirmed that the food served at the women's tournament was, in fact, quite different from the food served at the men's tournament. After serving pre-packaged meals

---

[68] The NCAA implemented a tiered system for testing and for the controlled environment in the bubbles. All individuals in a team's official travel party were considered Tier 1 and had to adhere to strict COVID-19 guidelines. *See* 2021 Men's Basketball Participant Manual at 22; 2021 Women's Basketball Participant Manual at 27.

[69] *See* Division I Basketball COVID-19 Testing Results PowerPoint.

[70] *See, e.g.*, City of San Antonio Metropolitan Health District, *COVID-19 Monthly Epidemiological Report March 2021* (Apr. 22, 2021), https://covid19.sanantonio.gov/files/assets/public/health/epidemiological-reports/epireport-202103.pdf; City of San Antonio Metropolitan Health District, *COVID-19 Monthly Epidemiological Report April 2021* (May 27, 2021), https://covid19.sanantonio.gov/files/assets/public/health/epidemiological-reports/epireport-202104.pdf; Shari Rudavsky, *As Indianapolis Sees Small Surge in COVID-19 Cases, Officials Urge Vaccination*, IndyStar (April 22, 2021) ("Contact tracing found that less than 1% of the cases confirmed since [the NCAA men's basketball tournament] stemmed from the tournament.").

NCAA External Gender Equity Review
Phase I: Basketball Championships

during the two-day arrival quarantine in the Indianapolis bubble, the hotels provided the men's teams with curated, self-service buffets for the remainder of the tournament.[71] The women's teams faced a similar two-day quarantine period in San Antonio with pre-packaged food—but then continued to receive pre-packaged meals thereafter.[72] As a result, the women received less food, and of a lower quality and variety, than the men. By way of example, below are two lunch menus that two different Marriott hotels provided for men's and women's teams on the very same day:




*Women's Lunch Menu (Left) and Men's Lunch Menu (Right)*[73]

---

[71] There was significant confusion within the NCAA about whether the men were provided buffets, even after the championships ended. For example, weeks after the championships ended, a women's basketball staff member said, "I was still confused if the men's had buffets. Senior management said they didn't have buffets. I really don't know what actually occurred." Senior management confirmed their view that the men's championship did not use buffets. But multiple interviews with the NCAA men's basketball staff and local organizing committee in Indianapolis, as well as photographic and documentary evidence, revealed that the men's championship had self-service buffets, which hotel staff would set up in team meeting rooms. *See, e.g.*, 2021 Men's Basketball Championship Hotel Food Menus (describing "Quarantine/Isolation Meals" and "Buffet menus").

[72] *See* 2021 Women's Basketball Championship Hotel Food Menus.

[73] Women's Lunch Menu, Marriott San Antonio Rivercenter (Mar. 19, 2021); Men's Food Menu, Marriott Indy Place (Mar. 19, 2021).

NCAA External Gender Equity Review
Phase I: Basketball Championships



*Pictures Shared on Social Media of Food Served at the 2021 Basketball Championships*[74]

Not surprisingly, women's teams raised concerns about the hotel food almost immediately upon arrival in San Antonio. In response, the women's basketball staff called all seven hotels that the NCAA was using for the women's tournament in order to increase the quantity of food being served. But the hotels continued to serve pre-packaged meals, which the women's staff understood to be the only approved method for food service under applicable coronavirus protocols. Later, after the media began reporting on food disparities between the two tournaments, the NCAA made alternative arrangements with respect to the format of food service, allowing Final Four participants at the women's tournament to have self-service buffets similar to those already provided to the men in Indianapolis.[75] To do this, the NCAA coordinated with the local health officials in San Antonio—just as it had done with Indianapolis officials weeks earlier—to receive approval for self-service buffets.

In our view, the disparity in food offerings between the tournaments was largely the result of coordination and communication failures during the tournament planning process. The NCAA's Chief Medical Officer provided guidance to both the men's and the women's staff on "a safe way to provide meals with physical distancing and no shared utensils"; boxed meals were required for the initial quarantine period and were identified as a safe way to provide food. The men's staff

---

[74] AJ McCord (@AJ_McCord), Twitter (Mar. 18, 2021), https://twitter.com/aj_mccord/status/1372759106121912320. AJ McCord is a sports reporter and anchor for the CBS affiliate in Portland, Oregon, and the co-host of an ESPN podcast.

[75] *See* Marriott Rivercenter Final Four Buffet Menus.

decided that they wanted to provide more than boxed meals to the student-athletes, so they worked with the local organizing committee and the Marion County Public Health Department over the course of weeks and multiple site-visits to develop a plan for self-service buffets. The women's staff, on the other hand, understood the guidance from the NCAA's Chief Medical Officer to require boxed meals for the duration of the tournament, and presented a plan for boxed meals to the San Antonio health authorities, which San Antonio approved. Because the men's and women's staffs did not coordinate their meal planning, they did not consider the potential effect that the disparate plans would have on student-athletes.

***Corporate sponsor food.*** The disparities in hotel food provided to the student-athletes were exacerbated by the fact that the men's tournament participants had greater access to food from NCAA corporate sponsors. The NCAA men's staff, anticipating that the hotel food alone would be inadequate and insufficient, worked with corporate sponsors—including Pizza Hut, Wendy's, and Buffalo Wild Wings—to provide free, supplemental food at the men's tournament. Some of these corporate partners offered similar opportunities for the women's tournament, but they were not accepted, at least in part because the offers came very close to the start of the tournament, and the women's staff—already operating with reduced time to prepare—simply did not have the bandwidth to coordinate the necessary logistics. The NCAA women's staff also did not anticipate the inadequacies with the hotel food options.[76]

For example, on March 5, 2021, the NCAA's corporate relations team told the women's staff that Wendy's could provide a food truck near the Convention Center for service from March 23 to March 30. The women's staff declined the offer because they thought it was too late in the process to obtain the necessary permits: "Unfortunately, due to the San Antonio historic district, there are limitations on locations for food trucks downtown along with city clean zone restrictions for any non-tenant marketing. . . . Therefore, we are unlikely to make this activation happen. [The San Antonio Local Organizing Committee] usually works with [corporate partners] on these to work through nuisances, yet any exceptions to the San Antonio historical council review requires much advance planning."[77]

After the disparities between the two championships gained public attention, the women's staff and the NCAA corporate relations team worked quickly with San Antonio officials to secure permission for a Wendy's food truck to park outside the Marriott Rivercenter (where all of the women's teams were staying starting with the Sweet Sixteen), from March 21 to March 30.[78] This effort was led primarily by the NCAA's corporate relations team, not the women's basketball staff. The NCAA also made plans with Buffalo Wild Wings to serve food from March 22 to 24, and with Pizza Hut to serve food for one night on March 26.[79]

---

[76] *See* Email from Women's Basketball Staff to NCAA Corporate Staff re: Wendy's – Food to SA's – Food trucks comp (Mar. 8, 2021).

[77] *Id.*

[78] *See* 2021 Women's Basketball Inventory – Final.

[79] *Id.*

The NCAA women's staff rejected other last-minute offers of food because of concerns about conflicts with existing corporate sponsor relationships and "ambush" marketing.[80] For example, on March 20, H-E-B, the Texas-based grocery store chain, dropped off bins of food to the hotels where the women's teams were staying.[81] The NCAA women's basketball staff was surprised by the delivery and determined that they were required to send the bins back because the bins contained products that were competitors of the NCAA's Corporate Champions and Partners. The women's staff eventually worked with H-E-B to deliver a second set of gift baskets that contained items from the NCAA's corporate partners, and those baskets were delivered to teams later in the tournament.[82]

*Recreation space and student-athlete lounges*. There was also a significant discrepancy in the outdoor space available to student-athletes at the men's and women's tournaments. As one student-athlete at the tournament observed, "Early on we weren't allowed to leave the hotel except for going to the gym or testing. . . . It was a poor set up for the mental health of players." Another noted, "The guys had opportunities to go outside and do things to get out of the hotel room for mental health, not being stuck inside. But for us, it took a couple of days before we were allowed to do something outside with the team. . . . Mental health is real and if you're stuck in a hotel room, it was pretty tough." A coach at the tournament similarly shared, "An outdoor area would have made a world of difference."

Due to the pandemic, both the men's and women's teams were in a controlled environment where their movements both inside and outside of their hotels were understandably strictly limited due to COVID-19.[83] Except for a few planned outings, teams were unable to explore their respective cities and were allowed to travel only to practices, games, and other settings within the controlled environment.[84]

The men, however, had access to outdoor space from the beginning of the tournament at Victory Field, a minor-league baseball stadium located across from the Convention Center in Indianapolis.[85] There, the NCAA constructed a recreation area where the men could play

---

[80] "Ambush" marketing occurs when a company attempts to associate its products with an event that already has official sponsors.

[81] *See* Email from NCAA Corporate Staff to Local Organizing Committee re: Virtual Hosts/HEB Basketball (Mar. 21, 2021) ("A lot of the hotels received the baskets from HEB with food yesterday. The women's basketball staff have declined this going to the teams.").

[82] *See* Email from Women's Basketball Staff to NCAA Corporate Champions and Partners Team re: HEB Gift Basket Offerings (Mar. 24, 2021) (listing "recommended offerings of NCAA CCP product in the HEB gift baskets"). Alongside the baskets were notes for the women's teams written by a local youth group, which the women's basketball staff did not expect. Those notes read, for example: "What you are doing is important, equal rights for everyone are important. This was an act of sexism [sic], yet you pulled through and got your own weight room. I hope you can change more, and keep fighting for future players." The staff made a decision not to distribute those notes because they considered them to be "obviously not appropriate" and "were afraid of creating another viral moment."

[83] *See* 2021 Women's Basketball Participant Manual at 21 (describing controlled environment); *see* 2021 Men's Basketball Participant Manual at 35 (describing controlled environment).

[84] *Id.*

[85] *See* 2021 Big Dance Final Tournament Update #6 at 14.

badminton, pickleball, cornhole, soccer, and football. The women, by contrast, were not intended to have any outdoor space—except for the path from the hotel to the Convention Center in San Antonio—until the Sweet Sixteen.[86] From the Sweet Sixteen on, the women were scheduled to have access to an outdoor green space, Civic Park, adjacent to the Convention Center.[87]

Once again, little if any consideration was given pre-tournament to the disparities in outdoor recreation space. Men's basketball did not develop its plan to use Victory Field until shortly before the tournament began.[88] Even so, there was nothing similar to Victory Field available in San Antonio, and the women's basketball staff did not plan on opening access to the local park earlier because of challenges in getting approval to do so and perceived difficulties in managing the logistics of 64 teams using the park.

In the wake of reporting on gender equity at the tournaments, the women's staff worked to set up additional outdoor spaces at the Convention Center. As one senior NCAA official noted: "We had had [Civic Park] that was fenced in that we were going to use originally, because it was COVID-safe. But we were concerned about the aesthetics of the men at Victory Field in a minor league baseball stadium, and the women basically in a dilapidated city park. We just didn't think that would work." The NCAA ended up cancelling the plan to use Civic Park and instead set up two alternative outdoor spaces which they believed created less of a direct contrast with Victory Field—a balcony and an outdoor patio at the Convention Center.[89] From March 29, 2021, through the remainder of the tournament, women's teams could sign up to use those new spaces in 60-minute increments.[90]

---

[86] *See* 2021 Women's Basketball Participant Manual at 6 (describing outdoor space).

[87] *Id.*

[88] *See* Email from Men's Basketball Staff to Women's Basketball Staff re: 2021 DI Men's Basketball Tournament Update – FINAL Updates (Mar. 12, 2021) (noting the availability of Victory Field).

[89] *See* Email from NCAA Women's Basketball Staff to NCAA Communications Staff re: New Offerings for Women's Teams (Mar. 29, 2021); *see also* Email from NCAA Women's Basketball Staff to NCAA Men's Basketball Staff re: Questions from Today (Mar. 27, 2021).

[90] *See* Email from NCAA Women's Basketball Staff to NCAA Communications Staff about New Offerings for Women's Teams (Mar. 29, 2021); *see also* Email from NCAA Women's Basketball Staff to NCAA Men's Basketball Staff re: Questions from Today (Mar. 27, 2021).

 

*Outdoor Patio Space at the Convention Center in San Antonio (Left) and Men's Victory Field in Indianapolis (Right)* [91]

The women's basketball staff also made a last-minute fix when they identified a disparity in the lounges available to the student-athletes who reached the Final Four. For the men, the NCAA had planned to provide four student-athlete lounges at the Indiana Convention Center starting March 31, located next to each Final Four team's meeting room. The lounges included gaming stations, TVs, ping pong, etc.[92] For the women, the NCAA initially discussed one student-athlete lounge for the teams to share at a cost of $20,000, then considered four smaller lounge areas with fewer amenities within the hotel meeting rooms for each of the Final Four teams. After the gender disparities between the championships gained public attention, the NCAA created separate student-athlete lounges at the Convention Center in San Antonio for each of the women's Final Four teams, "using the [men's basketball] outline" for what those lounges would contain.[93] These new lounges cost the NCAA almost $100,000 to set up on short notice.[94]

The disparities this year between the men's and women's lounges were not new. At the 2019 men's tournament, for example, the NCAA created one lounge each for the Final Four teams, and one lounge each for the families of the Final Four teams, spending $67,575 on the four student-athlete lounges and $2,971 on the four family lounges.[95] In contrast, at the 2019 women's tournament, the NCAA provided only one student-athlete lounge that the Final Four teams shared, and no family lounges; the cost of that single student-athlete lounge was $10,500.[96]

---

[91] Images from the NCAA.

[92] *See* 2021 Men's Basketball Final Four Manual at 8.

[93] *See* Email from Women's Basketball Staff to Men's Basketball Staff re: SA lounges (Mar. 25, 2021).

[94] *See* NCAA Lounge & Movie Budget (Mar. 25, 2021).

[95] *See* 2019 Final Four Lounges Invoices.

[96] *See* 2019 Student-Athlete Mementos Comparison Spreadsheet.

## 5. Gifts & Mementos

***Student-athlete gifts.*** The gifts that the men's and women's teams received at their respective tournaments differed significantly. As with the differences between weight rooms, social media posts illustrating the discrepancies were quick to grab the public's attention.

 

*Pictures Shared on Social Media of Gifts at Men's Tournament (Left) and Gifts at Women's Tournament (Right)* [97]

One student-athlete who attended the women's tournament noted that the women players saw photos on social media and realized that the "men got nicer quality stuff, and a little bit more," while the women received only "a little drawstring bag that had some stuff in it." Another reported that "our stuff fit in a gift bag," whereas "the men's swag bag was laid out on their beds in their hotel rooms" because of the sheer number of items.

There were indeed disparities between the gifts that the NCAA provided to men's and women's tournament participants. For the first and second rounds, the NCAA spent $125.55 per player on gifts and mementos distributed at the men's tournament, whereas it spent only $60.42 per player—or less than half as much—on gifts and mementos distributed at the women's tournament.[98] Men's basketball dedicated part of its additional budget to purchasing more items

---

[97] AJ McCord (@AJ_McCord), Twitter (Mar. 18, 2021), https://twitter.com/aj_mccord/status/1372759106121912320.

[98] *See* MBB Memento-SA Experience-Covid Kit Breakdown and WBB 2021 Budget Spreadsheet. In the first and second round, both men and women received a hat, game socks, a game towel, a cinch bag, a Fossil watch, and a puzzle. In addition, the men received a hooded shirt, a March Madness-branded box, a book, two bag tags, three Unilever products, a notebook and pen, a blanket, two pillowcases, two postcards, two lapel pins, a duffle bag, a flag, and two form core logo decals. The women received a t-shirt, a white gift bag, access to a virtual library, one bag tag, one Unilever product, a scrunchie, a COVID-19 patient card, an umbrella, access to the "Tourney Town Connect" online platform (containing free games, yoga instruction, and speakers), a welcome card, Powerade water bottles, and a fiesta serape pouch. The figures above do not include the cost of Tourney Town

and items of higher quality as compared to the women. For instance, the men received a March Madness hooded t-shirt that cost approximately $16.25, whereas the women received a t-shirt with the hashtag #NCAAW, but no championship-specific branding, that cost $8.28.[99]

  

*March Madness Branded Hoodie T-Shirt, Gift Box, and Socks for the Men's Teams*[100]

  

*Women's Basketball-Branded T-Shirt, Puzzle, and Cinch Bag for the Women's Teams*[101]

In addition to the money spent on men's gifts and mementos, the NCAA spent $70,539 on kits that contained supplies and other accessories—*e.g.*, disinfectant wipes, bathroom air fresheners, and sneaker deodorizer balls—that the 68 men's teams, but none of the women's teams, received.[102]

---

Connect ($17,000 for the entire tournament), nor do they include the cost of the Fossil watch provided to both the men and the women, which have not been finalized for 2021. In 2019, the total watch cost was $164,864 for the men's tournament and $140,613 for the women's.

[99] *Compare* MBB Memento-SA Experience-Covid Kit Breakdown, *with* WBB 2021 Budget Spreadsheet.

[100] Images from the NCAA.

[101] Images from the NCAA.

[102] *See* MBB Memento-SA Experience-Covid Kit Breakdown; *see also* 2021 MBB – COVID Kit.

As gender equity issues surrounding the tournaments gained national attention, the NCAA sought to correct for these disparities in the later rounds of the tournaments. For example, in the Sweet Sixteen, the men's staff chose not to distribute additional items that had been purchased only for the men's teams including a March Madness robe ($32) and March Madness beach towel ($15.25).[103] The women's staff, for its part, added a hooded blanket ($35.75). Accordingly, as the tournaments progressed, gifts were more evenly distributed to the men's and women's teams. For the Sweet Sixteen and Elite Eight, before the NCAA removed men's gifts and added women's gifts, the NCAA planned to spend $77.68 per male student-athlete and $39.96 per female student-athlete. After removing the men's robe and beach towel and adding the women's hooded blanket, the NCAA ultimately spent $30.43 per male student-athlete and $67.21 per female student-athlete.[104] In the Final Four, the NCAA spent $139.82 per player on gifts distributed to the men and $168.68 per player on gifts distributed to the women.[105] It is worth nothing that the gifting opportunities provided by corporate sponsors this year—including a Nintendo Switch, HyperX headphones, portable chargers, a duffle bag, and a laptop desk—were identical between the men's and women's championships, although men's basketball declined a gift from Powerade that women's basketball accepted.[106]

The NCAA's unequal gifting budget this year is consistent with previous years. In 2019, for example, the NCAA spent $560,130 on men's basketball gifts—$241,494 for the first and second rounds, $55,724 for the Sweet Sixteen and Elite Eight, and $262,912 for the Final Four. That same year, the NCAA spent only $395,150, or about 30% less, on women's basketball gifts—$193,054 for the first and second rounds, $50,036 for the Sweet Sixteen and Elite Eight, and $152,062 for the Final Four.[107] Following the 2019 tournament, the women's basketball staff requested a $75,000 budget increase that would, in part, have allowed women's basketball to provide gifts in 2020 that only men had received in 2019 (*e.g.*, game towels, hangers, and bag tags). In the budget request, the women's staff wrote:

> Each year we continue to hear from women's championship teams/conferences and committee members whose counterparts, either at their school or within their

---

[103] *See* MBB Memento-SA Experience-Covid Kit Breakdown.

[104] *Compare* WBB 2021 Budget Spreadsheet, *with* MBB Memento-SA Experience-Covid Kit Breakdown. Note: the women also removed a "Nail Polish Kit" from distribution.

[105] *Compare* WBB 2021 Budget Spreadsheet, *with* MBB Memento-SA Experience-Covid Kit Breakdown. These figures exclude the costs of championship rings provided during the later tournament rounds. They also exclude the costs of certain "backpack stuffers" that were provided to the men's and women's teams, including water bottles and notebooks.

[106] *See* Powerade Student-Athlete Gifting Summary; Coke-Wendy's Gifting Summary.

[107] *See* 2019 Student-Athlete Mementos Comparison Spreadsheet. This trend continues for previous years. For example, in 2018 the NCAA spent $633,115 on gifts and mementos for the men's tournament and $305,477 on gifts and mementos for the women's tournament. Similarly, in 2017, the NCAA spent $773,010 for the men's tournament and $485,237 for the women's tournament. *See* DI Basketball Pivoted Expenses FY 2016-17, 2017-18 (Apr. 2021). These amounts only include money spent by the NCAA and exclude any money fundraised and spent by the local organizing committees on gifts and mementos. Some of the difference in this total spending on gifts is attributable to the fact that the men's championship provides a larger total number of gifts, as they order gifts for additional guests and staff—*e.g.*, corporate sponsors, security personnel, and CBS/Turner Productions. *See, e.g.*, 2021 MBB – Miscellaneous Mementos.

conference, have attended the men's championship and received an increased level of experience. Due to recent emphasis on providing similar experiences for both men's and women's basketball teams during the tournaments, the additional requested dollars would make a visible and memorable impact on the student-athlete experience that is comparable to what is already being done in men's basketball. Women's Basketball currently spends $365K on student-athlete mementos, which is inclusive of all rounds.[108]

*Online gifting suites.* Apart from the predetermined gifts and mementos distributed at the tournaments, the NCAA also provides participating student-athletes with access to gifting suites where the student-athletes can select from an array of higher priced items. This year, as in other recent years, the NCAA operated an online gifting suite for players at the Sweet Sixteen and again at the Final Four. The suites were identical for the men's and women's championships. Student-athletes received a certain amount of money to spend on the online platform, which included items ranging from a beach chair and popcorn popper to Apple AirPods Pro and a 50-inch television.[109]

Equity in these gifting suites, however, came only after another previous public backlash. The NCAA first offered a gifting suite to student-athletes at the 2016 tournament—and, in that year, only to the men. The NCAA women's basketball staff had to scramble after the media reported on the men's gifting suite. In hopes of providing something of comparable value to the women's Final Four teams, the head of women's basketball got approval from the NCAA to make a last-minute order of GoPro cameras for overnight delivery. In fact, a member of the NCAA basketball staff had to put approximately $20,000 on a personal credit card as they tried to "create a gifting suite on the fly." After the 2016 championship ended, women's basketball requested, and the NCAA approved, funding to set up gifting suites at both the men's and women's events.[110] Those gifting suites have been comparable in price and items ever since.

## 6.  Use of "March Madness"

There are material differences in the way that the NCAA markets and brands the men's and women's tournaments. The most prominent difference is the use of the "March Madness" trademark and branding for the men's—but not the women's—tournament. Student-athletes explained that when they arrived at this year's tournament, they expected to see the arenas, their mementos, and the courts marked with the instantly recognizable March Madness logo. But that branding was completely missing from the women's tournament.

---

[108] *See* Division I Women's Basketball: FY2019-20 Budget Requests at 3. The $50,000 in funding for additional gifts and mementos was approved, while $25,000 in funds requested for student-athlete lounges was not approved.

[109] *See* 2021 Catalog of 2-Tier and 7-Tier Gifting Suites.

[110] Meghan Durham, *Division I Men's and Women's Basketball Student-Athletes to Receive Championships Gifts*, NCAA (Mar. 3, 2017), https://www.ncaa.org/about/resources/media-center/news/division-i-men-s-and-women-s-basketball-student-athletes-receive-championships-gifts.

 

*Photographs of Women's (Left) and Men's (Right) 2021 Tournament Courts*[111]

The student-athletes we interviewed expressed near universal disappointment about this situation. One player explained, "My biggest thing is that people were saying men's is the only one that's March Madness. . . . I don't understand that because everyone said we were going to March Madness." Another emphasized, "We strive for March Madness. To have no affiliation with it is a bummer."

From the perspective of many stakeholders—including student-athletes, coaches, NCAA staff, committee members, and others—using March Madness in connection with the women's basketball tournament would be a huge advantage. As our independent media expert observed, using the popular March Madness mark "would raise the perception of the [Division I Women's Basketball Championship] as a major championship for many in the media, marketers and among sports fans."[112] Another branding expert said to the Wall Street Journal, "There is no question in my mind that the value of the women's tournament would go up pretty dramatically if [the women's teams] were able to have the halo of the March Madness branding as well."[113]

The NCAA adopted the term "March Madness" from the Illinois High School Association decades ago.[114] The logo that now accompanies the March Madness trademark was created within the last 10 years and quickly became synonymous with the men's tournament. Indeed, the formal document in which the NCAA sets forth the bid specifications for upcoming men's tournaments states that March Madness is "inextricably connected with the NCAA's Division I Men's Basketball Championship."[115] Similarly, the NCAA's own online "March Madness history – The

---

[111] Images from the NCAA.

[112] Desser Report § 4.1.

[113] Rachel Bachman, et al., *NCAA Withheld Use of Powerful 'March Madness' Brand From Women's Basketball*, Wall Street Journal (Mar. 22, 2021), https://www.wsj.com/articles/march-madness-ncaa-tournament-womens-basketball-11616428776.

[114] A Brief History of March Madness, Illinois High School Association (last visited July 21, 2021), https://www.ihsa.org/Sports-Activities/March-Madness-Experience/March-Madness-History.

[115] NCAA Division I Men's Basketball Championship 2023, 2024, 2025 & 2026 Preliminary Round Sport-Specific Bid Specifications.

ultimate guide" recounts the history of the men's tournament only.[116] But there are no trademark limitations on the use of March Madness for women's basketball, and the NCAA's contracts with CBS/Turner, ESPN, and various corporate sponsors do not contain such a limitation either—in fact, they specifically note that March Madness may be used for "Division I men's or women's basketball only."[117] The NCAA's legal department has told us that they agree with this conclusion.

There is some dispute as to why the women's tournament does not use March Madness branding. Certain NCAA executives and staff, as well as external stakeholders, have suggested that women's basketball has deliberately chosen not to use the March Madness mark and logo out of a desire to pursue unique branding for the women's tournament. For example, one NCAA executive recalled that the women's staff opted against using the March Madness logo on their courts, in favor of the phrase and logo "Four It All." This year, after the media began reporting on the absence of March Madness branding at the women's tournament, the NCAA issued a public statement: "When the current version of the March Madness logos and branding were developed five years ago, women's basketball leadership at that time chose to pursue their own brand identity."[118]

But the NCAA retracted that statement one day later, citing it as "inaccurate."[119] And interviews with the NCAA staff members who purportedly declined to use March Madness in the past explained that they had never communicated or intended to communicate that women's basketball was not interested in using March Madness. To the contrary, NCAA staff who have been involved in planning this and prior years' tournaments recounted that women's basketball had repeatedly asked to use the March Madness branding, but were repeatedly rebuffed. These staff members were told that the mark was "off limits" to women's basketball; some were told that this was because of the NCAA's relationship with CBS/Turner and CBS/Turner's use of the mark for their programming. Significantly, no one at the NCAA was able to identify any instance in which CBS/Turner itself suggested that the women's tournament could not use March Madness— or even an instance in which the NCAA asked the broadcaster for its position on the issue.

To give one illustration, after the NCAA first introduced the March Madness logo, the women's staff created several gifts for student-athletes containing the logo, including a laptop sleeve and a bracelet. They described being reprimanded for doing so and being told to stop using the logo. Again around 2018, a senior member of the women's basketball staff asked members of the corporate relations team whether the March Madness mark could be used in connection with the women's tournament and was told that the mark was "off limits" because of obstacles with the

---

[116] Daniel Wilco, *March Madness History – The Ultimate Guide* (Mar. 18, 2021), https://www.ncaa.com/news/basketball-men/article/2021-03-14/march-madness-history-ultimate-guide.

[117] *See, e.g.*, Corporate Partner Agreement between CBS/Turner and General Motors LLC (Jan. 31, 2020), Ex. C; ESPN-NCAA Multi-Media Agreement (Jan. 25, 2011), Ex. B.

[118] Rachel Bachman, et al., *NCAA Withheld Use of Powerful 'March Madness' Brand From Women's Basketball*, Wall Street Journal, Mar. 22, 2021, https://www.wsj.com/articles/march-madness-ncaa-tournament-womens-basketball-11616428776.

[119] *Id.* ("Over the weekend, the NCAA initially assigned responsibility for that decision to its women's basketball leaders before reversing course to say that was inaccurate.").

CBS/Turner contract. This year, the women's staff sought to use face masks labeled "Mask Madness" at the San Antonio games similar to those that were to be distributed by the State of Indiana and the City of Indianapolis at the men's tournament. The head of women's basketball was told no by the SVP of Basketball, who explained that while he was supportive of the idea, "Mask Madness" was not "consistent with the branding of the women's championship," because it had been used only in connection with the men's tournament.

In June 2021, the NCAA publicly announced that women's basketball may use the March Madness brand moving forward.[120] The Women's Basketball Oversight Committee has said that it will work with the Men's Basketball Oversight Committee to review the potential use of March Madness in connection with both the men's and women's tournaments.[121]

## 7. Signage & Championship Atmosphere

The men's and women's tournaments have historically been very different in their look and feel, and this year was no exception. One student-athlete who played in San Antonio noted that it "didn't feel like it was the big tournament," while parents of student-athletes in this year's women's tournament noted that local residents "didn't even know the tournament was going on." Indeed, as the New York Times reported, "The banners, at least ones this large, are unique to Indianapolis. . . . In fact, the signs that are omnipresent here — covering pedestrian bridges, lampposts and the sides of buildings — are absent in San Antonio."[122]

Our investigation confirmed these observations. Even after taking into account the requirements associated with the men's larger venue, there were significant disparities in the signage and branding in Indianapolis and San Antonio, both inside and outside the tournament venues. This was the result of the NCAA spending approximately $2,416,000 on signage for the men's tournament and only $783,000 on signage for the women's tournament.[123] And this budget disparity is what existed *after* the women's tournament added significant signage in an effort to "provide a more equitable signage plan" once the gender equity issues first came to light.[124] It goes without saying that with over a million dollars more to spend, men's basketball was able to do far

---

[120] Bob Williams, *NCAA Women's Basketball Tournament Could Be Finally Given 'March Madness' Branding*, SportBusiness (June 8, 2021), https://www.sportbusiness.com/news/ncaa-womens-basketball-tournament-could-be-finally-given-march-madness-branding/.

[121] Meghan Durham, *Women's Basketball Oversight Committee Sets Priorities Amid Gender Equity Review*, NCAA (June 8, 2021), https://www.ncaa.org/about/resources/media-center/news/women-s-basketball-oversight-committee-sets-priorities-amid-gender-equity-review.

[122] *See* Billy Witz, *In Indianapolis, Checking the Bracket Means Looking Up*, N.Y. Times (Mar. 25, 2021), https://www.nytimes.com/2021/03/25/sports/ncaabasketball/biggest-ncaa-bracket-indianapolis.html.

[123] *Compare* 2021 Men's Signage Budget, *with* 2021 Women's Signage Budget. The men's Final Four is held in a bigger venue—*i.e.*, a football stadium instead of a basketball stadium—which impacts some, but not all, of the signage budget.

[124] *See* Email from NCAA Signage and Branding Staff to Women's Basketball Staff re: Additional Signage – Regional Rounds and FF (Mar. 23, 2021).

more to dress up arenas and promote the tournament in hotels, on public walkways, and around Indianapolis.

One prominent example was the giant tournament bracket that men's basketball displayed this year on the side of the JW Marriot in Indianapolis.



*JW Marriot Bracket Display*[125]

The NCAA spent more than $100,000 on this display. There was no equivalent display in San Antonio for women's basketball.[126] Instead, San Antonio had the women's Final Four logo projected on windows on the side of the Alamodome, something the men's tournament had as well.

---

[125] Image from the NCAA.

[126] *See* 2021 Men's Signage Budget.

NCAA External Gender Equity Review
Phase I: Basketball Championships

 

*Lucas Oil Stadium in Indianapolis (Left) and Henry B. González Convention Center in San Antonio (Right)*[127]

Indianapolis also had extensive signage in the local airport and on major roads throughout the city. Signage in San Antonio was present, but far more limited, consisting mainly of streetlamp banners and localized displays near or on the Alamodome.

 

*Signage at the Men's Tournament in Indianapolis*[128]

 

*Signage at the Women's Tournament in San Antonio*[129]

---

[127] Images from the NCAA.

[128] Images from the NCAA.

[129] Images from the NCAA.

While the fact that San Antonio's downtown is a historic district did have some impact on the types and amount of signage permitted in some areas,[130] those restrictions were not responsible for many of the significant signage discrepancies.

For example, the NCAA spent approximately $27,000 on the men's championship's airport signage and $61,300 on street pole banners, while the NCAA spent nothing on airport signage in San Antonio and only approximately $8,700 on street pole banners.[131] This difference was noticed by those attending the championships. One athletic director who attended both the men's and women's tournaments this year noted that "in Indy, it felt like you were at an NCAA championship anywhere you arrive in the city. In San Antonio, there was nothing when you arrive at that venue. [Indianapolis] had street signs for a mile . . . nothing like that in Austin. So the branding piece, you never felt like you were at a women's NCAA championship event."

Signage was similarly different at the venues where the student-athletes played. On the "Inner Bowl" of the venues, the NCAA spent approximately $169,000 on the men's tournament and $35,300 on the women's; on the "Player Hallways and Tunnels" the NCAA spent approximately $288,000 on the men's tournament and $30,400 on the women's; and on locker rooms, the NCAA spent approximately $188,000 on the men's tournament and $46,200 on the women's.[132] Overall, the NCAA spent less than a quarter on these signage and décor items at the women's tournament than it did at the men's tournament.[133]

This disparity permeated the rest of the signage budgets, from where the student-athletes stayed to how they traveled. The NCAA spent approximately $59,000 for the men on signage at the hotels while spending only $26,400 on the women. The NCAA spent approximately $71,000 decorating 12 buses for the men while spending only $27,200 decorating the same number of buses for the women.[134]

Like many other tournament elements discussed in this report, these disparities in signage between the men's and women's 2021 tournaments were not new. While there have been years in which participants in the women's tournament have been more satisfied with their signage than they were this past year, the men's tournament has spent significantly more on signage year over year, and the circumstances in previous years did not facilitate the same kind of detailed comparison of signage at the separate tournaments that happened this year. In 2019, the NCAA

---

[130] *See* City of San Antonio, Historic Districts (last visited July 21, 2021), https://www.sanantonio.gov/historic/scoutsa/HistoricDistricts.

[131] *Compare* 2021 Men's Signage Budget, *with* 2021 Women's Signage Budget.

[132] *Compare* 2021 Men's Signage Budget, *with* 2021 Women's Signage Budget.

[133] As explained above, the men's Final Four's larger arena increases the necessary signage budget for the "Inner Bowl" and for the venue generally. The NCAA prioritizes signage and décor in the following order: (1) inner bowl; (2) locker rooms; (3) player hallways and tunnels; (4) stadium exterior; (5) concourses; (6) hotels; (7) street pole banners; and (8) airport. *See* Kaplan NCAA – Budget Numbers (July 20, 2021).

[134] *Compare* 2021 Men's Signage Budget, *with* 2021 Women's Signage Budget.

spent $1,524,471 on signage for the men's tournament, and only $87,760 on the women's.[135] Part of that difference—approximately $875,000 of the $1,436,711—stemmed from the fact that the men played at neutral sites for the first and second rounds, whereas the women played on campuses which received only small décor kits so that hosts could add some NCAA tournament branding to their arenas.[136] But the remaining difference—approximately $560,000—relates to the Sweet Sixteen, Elite Eight, and Final Four, all of which are played at neutral sites for both the men's and women's tournaments. An even greater difference was seen in 2018, when the NCAA spent more than $1.1 million more on men's signage and décor for the Final Four alone—a gap that is only partially explained by the greater size of the men's Final Four venue.[137] Similarly, in 2017, the men's signage and décor spending totaled $2,289,721, whereas the women's spending was $212,643.[138] These are significant discrepancies, even after taking into account that the size of the men's Final Four venue requires more signage.

These figures do not account for the additional funds that the NCAA spends on March Madness branded basketball courts for the men as compared to the women. In a normal year, the men's first and second rounds take place at neutral sites, and the NCAA owns nine courts that it uses for these early round games. It pays approximately $180,000 every year for storage, transportation, and installation of these courts.[139] The women's first and second rounds take place at campus sites and are played on the home floors of those host institutions. As one senior NCAA staff member explained, "Generally, these home sites have significant logos and branding of their own that make any covering or rebranding challenging, unrealistic, or would not be aesthetically pleasing to cover, especially in a 2-3 day window to execute." As a result, the only branding for the first and second rounds of the women's tournament is an "NCAA" decal that is placed on the floor, which costs the NCAA approximately $38.75 per decal, with three sent to every host site (two for the floors and one back-up).[140] A large number of the women's basketball players who

---

[135] *See* Financial Outcome on Parity: Basketball Championships PowerPoint Presentation for NCAA Board of Governors from NCAA Chief Financial Officer (Apr. 27, 2021). The spending figures provided for signage and décor in this report include only the amount spent by the NCAA and not any amount fundraised or spent by the local organizing committee. For example, in 2019, the local organizing committee spent approximately $656,000 on signage and décor at the men's Final Four and only $190,000 at the women's Final Four. See Kaplan NCAA – Budget Numbers (July 20, 2021).

[136] *See* Financial Outcome on Parity: Basketball Championships PowerPoint Presentation for NCAA Board of Governors from NCAA Chief Financial Officer (Apr. 27, 2021).

[137] *Compare* 2018 Men's Signage Budget ($1,477,496), *with* 2018 Women's Signage Budget ($373,167). The detailed budget breakdown shows that the men's championship spent significantly more money for signage at the airport ($10,908 versus $5,000) and hotels ($182,567 versus $59,830).

[138] *See* 2017 Women's Signage Budget; 2017 Men's Signage Budget.

[139] *See* Agreement between NCAA and Connor Sports Court, International (Sept. 1, 2020); *see also* Financial Outcome on Parity: Basketball Championships PowerPoint Presentation for NCAA Board of Governors from NCAA Chief Financial Officer (Apr. 27, 2021).

[140] After the first and second rounds, both the men's and women's tournaments use courts owned by Connor Sports Court, with the NCAA paying only for their installation. Connor Sports Court also pays to stain and paint the floors with logos and branding up to a certain price per square foot, with the NCAA covering any cost over that limit. *See* Agreement between NCAA and Connor Sports Court, International § 3.7 (Sept. 1, 2020).

attended the 2021 tournament with whom we spoke expressed disappointment over the way the women's basketball courts looked, particularly as compared to the courts used by the men.

## 8. Fan Festivals & Other Events/Meetings

Even in a year when most of the non-competition events were cancelled due to the pandemic, the men's tournament managed to significantly outshine the women's tournament with respect to promotion, hosting a made-for-TV virtual concert by Miley Cyrus that took place between the Final Four games on April 3, 2021. The concert gave the men's Final Four the feel of a professional sports event, while there was nothing comparable at the women's Final Four. The men's concert was sponsored by the NCAA's Corporate Champions—AT&T, Coca-Cola, and Capital One—and cost the NCAA almost $5 million, through a contribution required by a contract between the NCAA and CBS/Turner.[141]



*Stage of the Grammy Award-Winning Singer, Songwriter, and Actress
Miley Cyrus Performing at the 2021 NCAA Men's Final Four*[142]

One month before the women's championship, NCAA sponsor AT&T offered to do a virtual concert for the women's championship, but the women's basketball staff declined out of concern that only a couple hundred people would tune in and that it would not be worth the $150,000 it would cost the NCAA to support. The 90-minute intermission between the women's

---

[141] *See* Comparison of Men's to Women's Division I Basketball, FY 2021 Projections (Apr. 27, 2021).

[142] Drew Quinones, *4Wall Provides Lighting & Rigging for the Capital One Tournament Central at the 2021 NCAA Men's Final Four*, 4Wall (May 12, 2021), https://www.4wall.com/about/press/4wall-provides-lighting-rigging-for-the-capital-one-tournament-central-at-the-2021-ncaa-men-s-final-four.

Final Four games was instead filled by studio dialogue. Women's basketball had also considered a drive-in concert at the Alamodome, but that fell through because of space and timing issues, especially once the city of San Antonio set up a large COVID-19 vaccination site in the Alamodome parking lot.

In a typical year, the differences between the side events at the men's and women's championships—fan festivals, exhibition basketball games, concerts, and youth basketball events—are even more pronounced. At the men's Final Four, the NCAA's corporate partners typically sponsor a multi-day music festival that features several A-list musicians, ranging from Rihanna to Bruce Springsteen.[143] The women's Final Four, by contrast, does not consistently have a fan concert and, when it does, the concert has been headlined by lesser-known acts. For example, in 2019, AT&T agreed to sponsor a one-night concert at the women's tournament headlined by Gavin DeGraw.[144] That same year, the 2019 March Madness Music Series at the men's tournament, sponsored by AT&T, Coca-Cola, and Capital One, featured musical performances by Katy Perry, the Jonas Brothers, and the Chainsmokers.[145]

Similarly, while multi-day fan festivals are held near the competition venues at both the men's and women's Final Fours,[146] these fan festivals have an entirely different look and feel, largely due to differing levels of investment by the NCAA's corporate sponsors. The total cost of fan events (including the concerts) at the 2019 men's tournament—which was largely paid for by corporate sponsors—was approximately $7 million.[147] By contrast, the total cost of fan events at the 2019 women's tournament was a little over $300,000—with approximately $200,000 paid for by a single corporate sponsor.[148]

Further contributing to the general feeling that the men's tournament is the "priority event" is the fact that many more NCAA governance meetings, networking events, and business meetings take place at the men's Final Four than at the women's. The NCAA senior leadership hosts an annual dinner with the NCAA's broadcasting partners at the men's Final Four, and in 2019, there was a dinner and meeting of the Board of Governors Executive Committee at the men's Final Four

---

[143] March Madness Music Festival, NCAA (last visited July 21, 2021), https://www.ncaa.com/final-four/ncaa-march-madness-music-festival.

[144] NCAA Women's Final Four Super Saturday Concert with Street Laced, Street Laced Marketing & Promotions (last visited July 21, 2021), https://www.streetlaced.com/ncaa-womens-final-four-super-saturday-concert-with-street-laced/.

[145] 2019 NCAA March Madness Music Series Will Feature Headline Performance by GRAMMY® Award-Nominated Multiplatinum Powerhouse Trio, Jonas Brothers, Presented by Coca-Cola on April 6, NCAA (Mar. 21, 2019), https://www.ncaa.com/news/ncaa/2019-03-21/2019-ncaa-march-madness-music-series-will-feature-headline-performance-grammyr; Additional Final Four® Resources, City of Minneapolis (last visited July 21, 2021), https://www.minneapolis.org/other-resources/.

[146] 2017-20 Division I Men's Basketball Championship Final Four Bid Specifications; 2017-20 Division I Women's Basketball Championship Final Four Bid Specifications.

[147] Comparison of Men's to Women's Division I Basketball, FY 2019 and 2021 Actuals and Budget (Apr. 26, 2021).

[148] *Id.*

as well.[149] The NCAA Executive Office also hosts an event honoring the spouses and partners of the Men's Basketball Committee members, but hosts no similar event for spouses and partners of the Women's Basketball Committee members. It is not surprising, based on all of these networking opportunities, that key stakeholders, including conference commissioners and college athletic directors and presidents, spend more time at the men's championship each year than they do at the women's—assuming they even attend the women's championship at all. This matches the travel pattern of the NCAA's own senior leadership, who generally spend far more time at the men's tournament than the women's.[150]

## 9. Press Conference Transcripts & Photo Posting

On March 22, 2021, a reporter publicized the fact that no pictures from the women's championship were available in the NCAA's Photo Hub, an online portal used this year for the first time to make tournament photographs available for free download.



*Tweet About NCAA Photo Hub from March 22, 2021*[151]

Hundreds of high-resolution photographs from the early rounds of the men's tournament were available to the media, fans, student-athletes, and their families, but the Photo Hub was

---

[149] *See* 2019 NCAA Division I Men's & Women's Final Four Executive Schedule; 2017 NCAA Division I Men's & Women's Final Four Executive Schedule.

[150] *See* 2019 NCAA Division I Men's & Women's Final Four Executive Schedule; 2017 NCAA Division I Men's & Women's Final Four Executive Schedule.

[151] AJ McCord (@AJ_McCord), Twitter (Mar. 22, 2021), https://twitter.com/AJ_McCord/status/1373849223347765249.

devoid of any equivalent photographs from the women's tournament. As one women's coach noted: "Even from a marketing/promotion standpoint, if you went in as media to do a story on the women's tournament pre-Sweet Sixteen, there were not many photos on the website or anything for them to grab. So that 'afterthought' process echoes throughout."

On-site photographers and transcriptions of post-game press conferences and interviews are two expenses that this year, as in years past, the NCAA budgeted for the entirety of the men's tournament, but only for the Sweet Sixteen and later rounds of the women's tournament.[152] Transcripts and photographs are fundamental tools that facilitate media coverage of the tournaments, especially for offsite or local media who are unable to attend the events in person— a circumstance that was exacerbated this year by the pandemic. The COVID-limited audiences made providing these services all the more important this year and caused the NCAA to decide for the first time to make its online photo portal accessible to the public, which made the lack of photography at the women's tournament far more noticeable.

After the news broke about the lack of photographs from the women's tournament on the NCAA Photo Hub, the NCAA scrambled to get a photographer onsite for the first two rounds of the women's championship. One NCAA staff member got a call requesting that she get "photographers in San Antonio, now," for a game starting just two hours later. That staff member called the contractor who fortunately already had a photographer at the game taking pictures. It ultimately cost the NCAA more than $40,000 for the additional services in the first and second rounds—a higher figure than the NCAA would have had to pay had it planned ahead.[153] NCAA photographers were quickly hired to be on-site and were deployed on March 22, 2021 (the second day of the first round).[154]

<p style="text-align:center">*       *       *</p>

The disparities between the 2021 men's and women's tournaments bring into sharp contrast a fundamental difference in attitude that led to gender disparities from the outset of the planning process this year, as well as underlying gender equity issues at the NCAA. When these issues were compounded by the unique challenge of planning and executing a championship amidst a global pandemic, the world took notice. We next address what we believe to be the root causes of the problem—systemic issues in the NCAA's organizational structure, its contracts with media partners, its revenue distribution, and its participation opportunities for student-athletes. We also provide specific recommendations for how the NCAA leadership, staff, membership, and partners can work to ensure an equitable student-athlete experience for women's basketball.

---

[152] The NCAA spent $16,380 for transcripts at the women's tournament as compared to $65,232—or four times more—at the men's. *Compare* ASAP 2021 MBB Invoice, *with* ASAP 2021 WBB Invoice.

[153] *See* WBB 2021 Invoice from Clarkson Creative (noting "last minute fees for coverage of the 2021 NCAA Women's Basketball Tournament").

[154] Even then, however, since the photographers were local photographers (as opposed to the typical photographers the NCAA's contractor uses for NCAA events), the NCAA elected to wait until the Sweet Sixteen to place earlier round photos on the online public photo portal. The NCAA did make the first and second round photos available on the NCAA Digital Media Hub for media and member institutions.

# THE NCAA'S ORGANIZATIONAL STRUCTURE & CULTURE

The NCAA, a not-for-profit, member-led organization, is operated by two groups: (1) NCAA employees; and (2) the NCAA membership, which includes colleges, universities, and athletic conferences.[155] The NCAA employees (*i.e.*, leadership and staff) are largely responsible for the day-to-day operation of the NCAA, which includes regulating the athletics programs of its members; planning, running and promoting the NCAA championships; supporting the work of the NCAA committees (see below); managing the NCAA's relationships with corporate and media partners; and providing financial and programmatic support to its members. Representatives from the membership—*e.g.*, college presidents, athletic directors, coaches, and student-athletes—sit on and work through committees to determine the rules and policies that govern the NCAA and college athletics generally for NCAA sports. The NCAA committees are the key decision-making bodies of the organization and make decisions on a wide range of issues, from how NCAA revenue is distributed to whether individual sport brackets should be expanded.

The membership's heavy reliance on the monies it receives from the NCAA has had a significant impact on the structure and culture of the NCAA. The NCAA and its members have a stated commitment to certain values, including diversity, inclusion, and gender equity.[156] They also have a commitment to provide superior athletic programming for their student-athletes. As many academic institutions are operating under incredible financial strain, particularly in light of the pressures put on college and university budgets due to COVID-19, NCAA member institutions are dependent now more than ever on the financial support they receive from the NCAA. That, in turn, puts pressure on the NCAA to maximize revenue—a goal that can conflict, or at least be perceived to conflict, with some of the organization's other objectives and values, like gender equity. These tensions and skewed incentives are embedded in the NCAA's organizational structure, staffing, budgeting, and culture.

---

[155] What Is the NCAA, NCAA (last visited July 21, 2021), https://www.ncaa.org/about/resources/media-center/ncaa-101/what-ncaa.

[156] *See, e.g.*, NCAA Constitution, Article 2.2.2 (adopted Jan. 10, 1995) ("It is the responsibility of each member institution to establish and maintain an environment that values cultural diversity and gender equity among its student-athletes and intercollegiate athletics department staff."); NCAA Constitution, Article 2.3.3 (adopted Jan. 11, 1994) ("The activities of the Association should be conducted in a manner free of gender bias."); NCAA Inclusion Statement (adopted Apr. 2010, and amended Apr. 2017) ("As a core value, the NCAA believes in and is committed to diversity, inclusion and gender equity among its student-athletes, coaches and administrators."); NCAA Presidential Pledge (adopted by the NCAA Board of Governors in 2016, and signed by 980 member institutions as of Sept. 2020) ("Consistent with our mission and values, our institution, a member of the National Collegiate Athletic Association, pledges to specifically commit to establishing initiatives for achieving ethnic and racial diversity, gender equity and inclusion, with a focus and emphasis on hiring practices in intercollegiate athletics, to reflect the diversity of our membership and our nation."); Gender Equity and Title IX, NCAA (last visited July 20, 2021), https://www.ncaa.org/about/resources/inclusion/gender-equity-and-title-ix ("One of the NCAA's principles of conduct for intercollegiate athletics focuses on gender equity. The office of inclusion is committed to supporting the membership as it strives to comply with federal and state laws regarding gender equity, to adopting legislation that augments gender equity and to establishing an environment that is free of gender bias.").

# 1. Division I Basketball Organizational Structure

The SVP of Basketball, a position currently occupied by Dan Gavitt, oversees all of basketball at the NCAA. Until recently, the SVP of Basketball reported to the Chief Operating Officer/Chief Legal Officer, but at present reports to the President, because the Chief Operating Officer/Chief Legal Officer position is not currently filled. The SVP of Basketball also sits on the President's Senior Management Team ("SMT").[157]



Senior NCAA Leadership at the Time of the 2021 Championship

The SMT includes all SVPs and Executive Vice Presidents at the NCAA and is described as a group of the NCAA President's "closest advisors."[158] The SMT is tasked with helping the NCAA President make strategic decisions for the organization and with providing guidance to key leaders at the NCAA member institutions. The SVP of Basketball stated that if he wants to bring an issue to the President's attention, he primarily does that at an SMT meeting. These meetings are generally held twice a week.

Currently, the SVP of Basketball's primary responsibilities are to manage the men's and women's Division I, Division II, and Division III tournaments and the men's NIT at a macro level, to manage the NCAA's broadcast relationships for all NCAA sports, and to oversee the corporate sponsorship program for all NCAA sports. The following all report directly to the SVP of Basketball: the head of women's basketball, Lynn Holzman (a Vice President); the head of men's

---

[157] National Office Leadership Team, NCAA (last visited July 21, 2021), https://www.ncaa.org/about/who-we-are/office-president/ncaa-leadership-team.

[158] *Id.*



basketball, JoAn Scott (a Managing Director); and the Director who administers the NCAA's broadcasting contracts with CBS/Turner and ESPN, Julie Kimmons (the Director of Championships & Alliances, Broadcast Services). The Director who oversees the NCAA's corporate relationships and other marketing and branding efforts across all sports, Ellen Lucey (the Director of Championships & Alliances, Corporate Relations, Marketing and Branding), reports directly to the Managing Director of Men's Basketball.

**Current Reporting Lines to the SVP of Basketball**



Although this structure, on its face, should not necessarily disadvantage Division I women's basketball,[159] many stakeholders report that, in both practice and perception, women's basketball essentially reports, and is subordinate, to Division I men's basketball. This view results, at least in part, from the fact that Gavitt himself was formerly the Vice President of Men's Basketball at the NCAA. At that time, he and then-Vice President of Women's Basketball Anucha Browne reported to the Executive Vice President for Championships and Alliances, Mark Lewis. After Lewis left the NCAA in 2016, Gavitt became the SVP of Basketball, with responsibilities for both men's and women's basketball, and no longer reported up to a head of all championships.[160]

The perception that women's basketball effectively reports up through men's basketball also stems from the fact that although the SVP of Basketball is tasked with managing both women's and men's basketball, he spends most of his time on men's Division I basketball.[161] The current SVP of Basketball explained to us that his work is "[d]efinitely more tilted toward men's

---

[159] In fact, the head of women's basketball currently holds a more senior title than the head of men's basketball.

[160] *NCAA Promotes Gavitt to New Position to Oversee Basketball*, AP (Dec. 14, 2016), https://apnews.com/article/ea7a39922e2f4b2c8d4e8fbb83a91c9f.

[161] For example, when the NCAA was asked to present on men's and women's basketball at meetings involving all Division I conference commissioners in the months leading up to the 2021 championships, the SVP of Basketball dedicated his presentation to men's basketball, and the Vice President of Women's Basketball discussed women's basketball.

basketball." One NCAA senior staff member noted that the SVP of Basketball is not "engaged in strategic thinking and initiatives" for women's basketball; another NCAA executive noted that the SVP of Basketball expects the Vice President of Women's Basketball to largely run women's basketball autonomously. Tellingly, a significant number of leaders in the women's basketball community describe and understand the current SVP of Basketball to be the head of *men's* basketball only, not the head of *all* of basketball at the NCAA.[162]

The SVP of Basketball's focus on Division I men's basketball is unsurprising. No one questions that men's basketball currently brings in the vast majority of the NCAA's current revenue. As President Emmert put it, men's basketball is "just economically way more important. We can have problems in any of our championships but that one. It's just a fact. Everyone in the membership knows that."

The SVP of Basketball's primary focus on Division I men's basketball, however, creates significant challenges for women's basketball. It means that women's basketball is not fully represented in important discussions within the NCAA and important information does not always flow to women's basketball. The Vice President of Women's Basketball does not sit on the SMT (which is limited to only SVPs and higher),[163] and does not attend the NCAA's quarterly meetings with CBS/Turner or ESPN regarding broadcast agreements and corporate sponsors. Thus, the Vice President of Women's Basketball was not in the room during discussions among senior NCAA management on whether or not to cancel the basketball tournaments in 2020, or for early meetings on COVID-19 protocols for the 2020-21 season. Accordingly, the Vice President of Women's Basketball was often wholly reliant on the SVP of Basketball to relay to her any information pertinent to women's basketball and to advocate for women's basketball with NCAA senior leadership.

Another challenge with the current leadership structure is that it aligns the NCAA's chief revenue-generating departments with basketball, and often specifically with men's basketball, as described above. As a result, the NCAA's broadcasting relationships and corporate sponsorship program are set up in a way that largely benefits men's basketball—to the exclusion of all other championships, including women's basketball, as detailed further below. If the staff of these departments continue to report to basketball or, even more specifically, to men's basketball, it seems unlikely that they will shift attention to supporting and benefitting women's basketball and the other championships.

---

[162] In fact, his NCAA website biography does not mention women's basketball at all: "In his current role, Gavitt oversees the day-to-day operations of the NCAA Division I men's basketball championship, as well as the NCAA's 11-year, $10.6 billion contracts with broadcast partners CBS and Turner Broadcasting. He also supervises the Postseason NIT and NCAA Division II and III Men's Basketball Championships and serves as the staff's day-to-day contact to the Division I Men's Basketball Committee and the Men's Basketball Oversight Committee." National Office Leadership Team, NCAA (last visited July 21, 2021), https://www.ncaa.org/about/who-we-are/office-president/ncaa-leadership-team.

[163] *Id.*



## 2. Staff Size & External Support

Disparities in staffing complicate matters further. Excluding the SVP of Basketball, there are currently 11 full-time men's basketball staff (including the Managing Director of Men's Basketball), and only seven full-time women's basketball staff (including the Vice President of Women's Basketball and her executive assistant).[164] Taking into account the time that other NCAA employees (in departments such as ticketing, corporate alliances, and statistics) allocate to support the Division I Men's and Women's Basketball Championships, men's basketball has the equivalent of 21.86 full time employees, while women's basketball has only 13.92.[165]

To some extent, different levels of staffing are understandably attributable to the differences between men's and women's Division I basketball. For example, one of the men's basketball staff members largely manages the NIT; there is no similar staffing on the women's side because the NCAA does not own the WNIT and therefore plays no role in that non-NCAA event. Additional staffing is also needed for the men's tournament because the first and second rounds are played at neutral sites (unlike the women, whose first and second rounds are hosted at member campuses), and because of the significantly larger scale of the men's tournament.

This reasoning goes only so far, however, as a single women's basketball staff member often shoulders all of the same responsibilities as several colleagues on the men's side. For example, for the 2021 championships, the person responsible for mementos and gifts for the women's tournament had approximately 20 other responsibilities and seven counterparts in men's basketball.[166] The person responsible for gifts and mementos for the men's tournament had approximately three other responsibilities (although one was running the Division III Men's Basketball Championship) and only three counterparts in women's basketball.[167]

This disparity in staff size is exacerbated by the fact that men's basketball employs more external contractors to help run the tournament than women's basketball does. In particular, the NCAA engages Populous to help with logistics like directional signage, scheduling, coordinating with media partners, and coordination of NCAA-related construction projects for the men's Final Four.[168] In 2021, Populous dedicated eight workers to those tasks.[169] The NCAA paid Populous consulting fees of $942,668 in 2019 and $733,037 in 2021 (through July 1, 2021). Although the NCAA paid $211,200 as compensation for outside contractor assistance with operations and

---

[164] Men's and Women's Basketball Championships Roster (as of Mar. 1, 2020); 2020-21 Women's Basketball Organizational Chart.

[165] Championships and Alliances Staffing Allocation (Apr. 15, 2021).

[166] This women's basketball staff member's additional responsibilities included coordinating all volunteers, planning hotels and lodging, dealing with space assignments, and planning the Salute presentation for all of the women's Final Four teams. *See* Men's and Women's Basketball Buddy List (2020-21).

[167] *Id.*

[168] NCAA and Populous Master Service Agreement (2021-26); Populous 2021 Final Four, Indianapolis, Indiana, Work Order Assignment Number: 1.

[169] Populous 2021 Final Four, Indianapolis, Indiana, Work Order Assignment Number: 1 § 6.5.

logistics in connection with the 2021 women's tournament,[170] it does not typically do so, and the NCAA women's basketball staff tend to bear many of the responsibilities outsourced to contractors for men's basketball.

Even with respect to those external contractors that the NCAA uses on a regular basis for both men's and women's basketball, the contractor's responsibilities are usually greater for men's basketball than for women's. For example, both women's and men's basketball use Anthony Travel to help arrange travel to and from the men's and women's tournaments and to manage hotel reservations for the tournaments. But while Anthony Travel was required under the travel-related services contract in effect from 2016 to 2021 to arrange all "travel to and from airports" for selected hotels for the men's Final Four, the contract noted that the women's Final Four "will utilize existing airport transportation when it is feasible."[171] In addition, Anthony Travel is required under the hotel management agreement in effect from 2018 to 2023 to perform a host of additional responsibilities at the men's basketball tournament such as hotel reservations management for media, staff, committees, and fans; NCAA staff members must perform these responsibilities for the women's tournament.[172] Finally, men's basketball has historically had two employees from Anthony Travel on site at their tournament to help with hotel arrangements. Women's basketball has had no similar employee from Anthony Travel on site until this year, when they were—after multiple requests—able to ensure that one Anthony Travel employee was on the ground in San Antonio.

A final difference in staffing between the men's and women's tournaments is the number of unpaid volunteers. The larger-scale Division I Men's Basketball Championship has many more unpaid volunteers that assist with the tournament each year. For example, in 2019, the total number of unpaid volunteers that helped out at the women's tournament was 912, whereas the total number of unpaid volunteers at the men's tournament each year is approximately 2,200 to 2,500.

## 3. Communication/Coordination Between Men's & Women's Staffs

Despite having a common SVP, the men's and women's basketball staffs operate largely independently of one another, with limited strategic communication or coordination. At present, there are no joint strategic meetings involving the SVP of Basketball, the Vice President of Women's Basketball, and the Managing Director of Men's Basketball to discuss an overall strategy for basketball or to jointly determine budget priorities. The Vice President of Women's Basketball and the Managing Director of Men's Basketball do not regularly communicate or meet with each other either. Although the entire men's and women's basketball staffs meet jointly on a monthly basis, the meetings have been described to us as ineffective, and they did not occur during the months immediately preceding this year's tournaments. One NCAA staff member, for

---

[170] NCAA and MKTG, Inc. Master Services Agreement (Oct. 14, 2020); MKTG Scope of Work (Feb. 22, 2021).

[171] NCAA and Anthony Travel LLC Transportation Management Agreement at 12 (Sept. 2016).

[172] *See* NCAA and Anthony Travel LLC Hotel Management Agreement (2018).

example, relayed that some of the men's basketball staff do not consider it their responsibility to help the women's basketball staff plan their tournament.

Coordination between the two staffs largely occurs on an individual staffer-by-staffer basis and depends on how well staff members with parallel responsibilities communicate with each other. Although some men's and women's basketball staff members report a positive working relationship, others do not. Attempts have been made to improve information-sharing between the two staffs, including the creation of a "buddy list" in the fall of 2020.[173] The buddy list detailed the responsibilities of each staff member, with the goal of facilitating communications between men's and women's staff members with similar responsibilities. But many staff members reported that the buddy list was not successful, in large part because the distribution of responsibilities for the men's basketball staff does not correlate well to the distribution of responsibilities for the women's basketball staff. For example, the women's basketball staff member responsible for credentials, game operations, and approximately 30 other tasks had approximately eight men's basketball counterparts with whom she was in theory supposed to coordinate.[174]

Overall, the men's and women's basketball staffs operate in separate silos, and with one of those silos—men's basketball—institutionally prioritized over the other. This results in a dynamic where men's basketball makes decisions, women's basketball finds out about those decisions, and women's basketball must then choose whether to follow suit. As one NCAA leader put it, there is not much "let's sit together and talk about what we should do." This dynamic explains how significant disparities often go unnoticed within the NCAA—or at least until they become public at the tournaments, as was the case this past March.

## 4. Men's & Women's Basketball & Basketball Oversight Committees

The NCAA committees responsible for men's and women's Division I basketball have some of the same communication and coordination issues. There are four key committees responsible for Division I basketball: the Division I Men's and Women's Basketball Committees administer the national championships, and the Division I Men's and Women's Basketball Oversight Committees review recommendations from the Basketball Committees and are responsible for strategic matters relating to both regular-season and post-season basketball.[175]

Similar to the men's and women's basketball staffs, there is little communication between the Men's and Women's Basketball Committees, and no apparent sense of joint purpose. As one member of the Women's Basketball Committee, for example, explained: "In terms of formal or

---

[173] Men's and Women's Basketball Buddy List (2020-21).

[174] *Id.*

[175] Division I Women's Basketball Oversight Committee, NCAA (last visited July 21, 2021), https://www.ncaa.org/governance/committees/division-i-women-s-basketball-oversight-committee; Division I Men's Basketball Oversight Committee, NCAA (last visited July 21, 2021), https://www.ncaa.org/governance/committees/division-i-men-s-basketball-oversight-committee.

informal collaboration, there is none." This was echoed by a member of the Men's Basketball Committee, who similarly noted that "there's zero communication with the Women's Basketball Committee." An NCAA staff member confirmed that communication is "nonexistent" between the Men's and Women's Basketball Committees.

There is more communication between the Men's and Women's Basketball Oversight Committees. In the months leading up to this year's championships, the two committees met jointly approximately 10 times in order to discuss the unique circumstances of holding tournaments during a pandemic.[176] In the past, the two committees have had joint meetings when discrete issues arose that touched on both sports (*e.g.*, recruiting rules or credentialing coaches).[177] The two committees do not, however, have regular discussions to coordinate on strategic matters to ensure gender equity between men's and women's basketball generally.

The dynamic between and the relative effectiveness of the men's and women's committees are also influenced by the composition of each committee. The Men's Basketball Committee and Basketball Oversight Committee are largely composed of conference commissioners and athletic directors, whereas the Women's Basketball Committee and Basketball Oversight Committee have a greater proportion of associate commissioners, assistant athletic directors, and/or SWAs.[178] For example, as of July 2021, 10 members of the Men's Basketball Committee were either commissioners or athletic directors, in contrast to only three of the 10 members of the Women's Basketball Committee; similarly, eight of the 15 members of the Men's Basketball Oversight Committee were either commissioners or athletic directors, in contrast to only five of the 15 current members of the Women's Basketball Oversight Committee.[179] This difference in committee membership may be contributing to the lesser stature of women's basketball within the NCAA, as

---

[176] Joint Report of the Division I Men's and Women's Basketball Oversight Committees (Mar. 3, 2021); Joint Report of the Division I Men's and Women's Basketball Oversight Committees (Jan. 25, 2021); Joint Report of the Division I Men's and Women's Basketball Oversight Committees (Dec. 14, 2020); Joint Report of the Division I Men's and Women's Basketball Oversight Committees (Nov. 16, 2020); Joint Report of the Division I Men's and Women's Basketball Oversight Committees (Nov. 19, 2020); Joint Report of the Division I Men's and Women's Basketball Oversight Committees (Oct. 29, 2020); Joint Report of the Division I Men's and Women's Basketball Oversight Committees (Oct. 23, 2020); Joint Report of the Division I Men's and Women's Basketball Oversight Committees (Oct. 5, 2020); Joint Report of the Division I Men's and Women's Basketball Oversight Committees (Sept. 11, 2020); Joint Report of the Division I Men's and Women's Basketball Oversight Committees (Sept. 1, 2020).

[177] *See, e.g.*, Agenda of Joint Meeting of the NCAA Division I Men's and Women's Basketball Oversight Committees (Apr. 17, 2019); Agenda of Joint Meeting of the NCAA Division I Men's and Women's Basketball Oversight Committees (Oct. 1, 2018); Agenda of Joint Meeting of the NCAA Division I Men's and Women's Basketball Oversight Committees (Apr. 16, 2018).

[178] A Senior Woman Administrator, or SWA, is the highest-ranking woman in an athletics department or conference office. The SWA designation was created 40 years ago, in 1981, the year the NCAA added women's championships, to "promote meaningful representation of women in the leadership and management of college sports." Senior Woman Administrators, NCAA (last visited July 21, 2021), https://www.ncaa.org/about/resources/inclusion/senior-woman-administrators. Some stakeholders expressed the view that it may be time to re-examine this designation.

[179] Division I Men's Basketball Committee, NCAA (last visited July 21, 2021), https://web1.ncaa.org/committees/committees_roster.jsp?CommitteeName=1MBB; Division I Women's Basketball Committee, NCAA (last visited July 21, 2021), https://web1.ncaa.org/committees/committees_roster.jsp?CommitteeName=1WBB; Division I Men's Basketball Oversight Committee Roster, NCAA (last visited July 21, 2021), https://web1.ncaa.org/committees/committees_roster.jsp?CommitteeName=1MBBOVERSIGH; Division I Women's Basketball Oversight Committee Roster, NCAA (last visited July 21, 2021), https://web1.ncaa.org/committees/committees_roster.jsp?CommitteeName=1WBBOVERSIGH.

the people with the most influence in college athletics are not necessarily the ones behind the strategic discussions and decisions that affect women's basketball. As one interviewee aptly put it, due to the lack of athletic directors and commissioners on the committees, women's basketball has "no juice to make change" within the Division I Council and the Board of Governors; when the committees try to "request changes, growth, and solutions," they often "fall flat."

In certain ways, the disparity in committee membership is self-perpetuating. Potential committee members are drawn to the men's basketball committees because of their greater prestige, and filling the committees with athletic directors and conferences commissioners maintains that prestige for future rounds of nominations. Indeed, the disparate compositions of the men's and women's committees have not gone unnoticed by the NCAA, which is now taking steps to rectify it. More specifically, during an April 2021 meeting regarding vacancies on the Men's Basketball Committee, the Council Coordination Committee formally recommended that "changes should be made to help ensure that the composition of committees for men's and women's sports (e.g., men's basketball and women's basketball) are similar in terms of the positions and responsibilities."[180] In addition, during a meeting of Division I conference commissioners in June 2021, the NCAA asked the conferences to prioritize nominating athletic directors and commissioners to the Women's Basketball Committee.

## 5. The Budget & the Budget Process

As discussed above, many of the differences experienced and observed at the championships stem from significant disparities between the men's and women's tournament budgets and spending. In 2019—the last year for which the NCAA held basketball championships and has final spending figures—the men's basketball tournament cost $53.2 million, and the women's basketball tournament cost $17.9 million.[181] The 2019 unaudited financials break down as follows:[182]

---

[180] NCAA Division I Council Coordination Committee: Summary of Actions and Key Informational Items (Apr. 15, 2021). When there is a vacancy on an NCAA committee, conferences are tasked with nominating individuals to fill the spot, and the NCAA Division I Nominating Committee then reviews the list of names and makes recommendations to the Council Coordination Committee who has final approval over an appointment.

[181] Comparison of Men's to Women's DI Basketball, FY 2019 and 2021 Actuals and Budget (Apr. 27, 2021); DI Basketball Pivoted Expenses (2017-18).

[182] Comparison of Men's to Women's DI Basketball, FY 2019 and 2021 Actuals and Budget (Apr. 27, 2021).

NCAA External Gender Equity Review
Phase I: Basketball Championships

| | Actuals - FY 2019 | | |
| --- | --- | --- | --- |
| | Men | Women | Difference |
| **Basketball Direct Game Expense** | | | |
| Facilities | $ 6,130,414 | $ 700,076 | $ 5,430,338 |
| Ticket taxes/fees and credentials | $ 3,116,118 | $ 48,638 | $ 3,067,480 |
| Honorariums and hosting settlements | $ 2,757,194 | $ 421,398 | $ 2,335,795 |
| Personnel (includes contractors and consultants) | $ 3,360,150 | $ 1,284,147 | $ 2,076,002 |
| Signage | $ 1,524,471 | $ 87,760 | $ 1,436,711 |
| Equipment | $ 1,659,911 | $ 311,726 | $ 1,348,185 |
| Media production, technology, and telecomm | $ 1,713,688 | $ 488,910 | $ 1,224,777 |
| Other travel (includes staff travel) | $ 974,815 | $ 111,274 | $ 863,541 |
| Hospitality and catering | $ 783,063 | $ 244,289 | $ 538,775 |
| Apparel | $ 316,733 | $ 59,342 | $ 257,391 |
| Officials | $ 750,454 | $ 510,300 | $ 240,154 |
| Awards/mementos | $ 629,464 | $ 406,828 | $ 222,637 |
| Promotion | $ 338,380 | $ 374,402 | $ (36,022) |
| Office and professional services | $ 27,483 | $ 124,821 | $ (97,338) |
| Game Expense Total | $ 24,082,339 | $ 5,173,911 | $ 18,908,428 |

| | Actuals - FY 2019 | | |
| --- | --- | --- | --- |
| | Men | Women | Difference |
| **Basketball Other Direct Expense** | | | |
| Team travel | $ 9,404,705 | $ 6,446,785 | $ 2,957,919 |
| Per diem and lodging costs | $ 6,189,663 | $ 4,107,888 | $ 2,081,775 |
| Committee expense | $ 427,184 | $ 262,264 | $ 164,920 |
| **Total Direct Expenses** | **$ 40,103,890** | **$ 15,990,848** | **$ 24,113,042** |
| **Basketball Support Expense** | | | |
| Fan Events, Promotion, and Presentation | $ 8,496,045 | $ 949,777 | $ 7,546,268 |
| NCAA Marketing and Ticketing Expense | $ 651,759 | $ 162,723 | $ 489,035 |
| Credit Card Fees | $ 707,218 | $ 67,419 | $ 639,799 |
| NCAA Champs Functional Group Expenses | $ 714,833 | $ 319,797 | $ 395,036 |
| Playing Rules and Officiating Improvement | $ 487,773 | $ 417,367 | $ 70,406 |
| Insurance | $ 2,025,211 | $ - | $ 2,025,211 |
| **Total Support Expenses** | **$ 13,082,838** | **$ 1,917,083** | **$ 11,165,755** |
| **TOTAL DISBURSEMENTS** | **$ 53,186,729** | **$ 17,907,931** | **$ 35,278,798** |

In 2021, the men's tournament costs are projected to be around $20 to $25 million more than the women's tournament.[183]

To be sure, gender equity does not require equal budgets, as a tournament with greater fan attendance, corporate sponsorship, and media attention, and one with all rounds hosted at neutral sites, naturally commands additional resources and support. However, the view that men's basketball is highly profitable and therefore worthy of increased investment has cultivated a culture within the NCAA in which men's basketball is not required to abide by many of the same budgetary constraints as women's basketball (or other sports). For example, the women's basketball staff and the Women's Basketball Oversight Committee have previously been tasked

---

[183] *See id.* These financial figures were presented to the Board of Governors in April 2021, following this year's Division I basketball championships. They include expenses that the NCAA paid itself, as well as those that host institutions paid to various vendors. Figures for the 2021 championships are projections, as the NCAA continues to collect invoices and make payments in connection with the tournaments. The 2021 financials will not be final until after the end of the fiscal year on August 31, 2021.

with making significant cuts to the women's basketball budget, decreasing the funding for Division I women's tournament travel, fan festivals, and operational costs. As one committee member noted, "The mandate was we need to cut a couple million dollars out of the women's basketball budget. . . . Someone asked is the men's championship doing a similar exercise. And [the answer] was of course not because they're making so much money." Another stakeholder explained that a couple of years ago, a group met within the NCAA with the goal of cutting championship expenses, and that NCAA senior leadership said that the Division I Men's Basketball Championship was "off the table" with respect to such cuts.

In general, the NCAA does not actively consider or monitor whether the differences between the men's and women's basketball budgets or spending are equitable. Rather, the championship budgets remain relatively stagnant from year to year, with championship staff having the opportunity either to request additional funds that would be allocated from an annual inflation-based increase or to move funds from one line item in the championship budget (*e.g.*, photography) to another (*e.g.*, mementos).[184] For both men's and women's basketball, the SVP of Basketball has the final approval of the yearly championship budgets, for which he consults with a member of the finance staff.[185] The SVP of Basketball has approved budget requests for both men's and women's basketball operations, but has also denied multiple requests from the women's basketball staff to increase the amount spent on Tourney Town (the fan festival at the women's tournament), and the concert during the Final Four weekend, even though prior budget cuts had already reduced the NCAA's spend on these two student-athlete and fan-facing events by more than $1 million.[186]

Because the NCAA's general practice is to maintain similar line items as compared to prior years (*e.g.*, allocating a similar amount for gifts and mementos as the year before), differences in particular line items can grow unchecked for many years. And while the SVP of Basketball has the authority to move funds between budget categories and between men's and women's basketball as he deems appropriate, the SVP has rarely done so.

---

[184] The NCAA's budget for all championships is based on a 10-year model for Division I set forth by the Chief Financial Officer, as approved by NCAA senior leadership. This 10-year plan provides high-level projections for Division I Distributions, Division I Championships and Programs, allocations and revenues for Divisions II and III, and association-wide expenses. Based on these 10-year projections, each year, the Board of Governors approves a proposed business plan, reviewed by several executive staff and committees, which determines how much each championship is allocated for that year. Based on this business plan, the annual budget for each championship covers all regular and anticipated expenses to plan and put on the championships and is subject to an annual growth rate based on inflation.

[185] If the SVP of Basketball decides not to grant a request for additional funds in the championship budget, he may instead submit a request for additional funds from a small "association-wide allocation." The association-wide allocation is a distinct budget allocation of which each championship and staff group can apply for a portion. In basketball, the championship staff may make a request to the SVP of Basketball for specific budgetary items, which may be funded through part of the association-wide allocation. The SVP, in turn, may elevate a request that he chooses not to fund through the championship budget to senior leadership, including the Chief Financial Officer and President, who, along with certain committees, conduct budget hearings and have the discretion to approve or deny the request. These association-wide requests are less frequent and issued more sparingly. In 2019, the NCAA awarded the women's basketball staff funds from the association-wide allocation to implement their Strategic Plan. 2019-20 Basketball Business Unit – Budget Submission Summary (2019).

[186] 2019-20 Basketball Business Unit – Budget Submission Summary (2019).

Overall, the NCAA does not have appropriate measures in place for monitoring gender equity in the budget and spending process. The men's and women's basketball staffs do not coordinate on planning the budget or on what their total expenses are for each line item, and the SVP of Basketball does not share—or discuss—the budgets for men's and women's basketball between the two staffs.[187] As a result, the basketball staffs cannot plan to have similar spending, or identify issues created from differences in spending, while they are planning the men's and women's championships. Although aware of both budgets, the SVP of Basketball historically has not run a comparison between them or focused on the disparities between the men's and women's basketball budgets until the NCAA ran comparisons following the 2021 tournaments.

In 2019, the NCAA formed the Division I Championships Finance Review Working Group, which was tasked with reviewing legislation and policy governing championship resources.[188] The NCAA Board of Directors, with input from the Division I Council, approved seven guiding principles for the review, including one on gender equity: "NCAA championships will reflect the NCAA's commitment to diversity and inclusion and student-athlete gender equity."[189] As a result, many of the Working Group's recommendations focused on policies that strengthen gender equity among student-athletes, including express directives that the NCAA adopt gender equity principles when considering the administration and funding of the championships.[190] The Division I Finance Committee adopted the Working Group's recommendations incorporating gender equity as a key consideration for certain decisions, such as on bracket and field size, and those recommendations are planned to be adopted in August 2021. As part of this process, the NCAA also began to develop a numerical formula intended to assist in prioritizing spending requests across the championships, but that process has been put on hold pending this external gender equity review. While the formula under consideration considers gender equity as an express element, if the NCAA chooses to move forward with such a formula, the gender equity factor would need to be appropriately weighted to ensure meaningful changes in NCAA practice.[191]

## 6. Internal Gender Equity Controls

As evidenced by the above discussions of inequities in NCAA staffing and budgets, no one at the NCAA is currently tasked with regularly reviewing budgets, staffing, or any particular aspects of the Division I Men's and Women's Basketball Championships to ensure that they are equitable from a gender perspective. To be sure, the NCAA has various offices and committees

---

[187] While the NCAA's budget software system does permit men's and women's basketball to review each other's materials, those materials only show a dollar amount associated with a general spending category, and staff are not instructed to review those materials or to coordinate spending with each other.

[188] Report of the NCAA Division I Championships Finance Review Working Group at 4 (Oct. 7, 2020).

[189] *Id.* at 5.

[190] *Id.* at 12, 18-19.

[191] Championships Investment Evaluation and Prioritization Act II Presentation (2021).

tasked with working on issues of diversity and inclusion. However, each is largely focused on promoting diversity and inclusion externally—that is, within the NCAA membership institutions—rather than internally. For example, the NCAA Office of Inclusion is tasked with educating the membership on Title IX and other diversity, equity, and inclusion matters; planning diversity and inclusion programming for the membership, including an annual NCAA Inclusion Forum; and helping to manage the NCAA's diversity and inclusion committees and task forces.[192] The Office has only six full-time staff members, but serves more than 1,100 colleges, universities, and conferences.[193] The NCAA also has four committees that focus on diversity and inclusion, but none is tasked with ensuring that there is gender equity in NCAA championships or Division I basketball specifically. As one NCAA staff member put it, "Who is really responsible for [gender equity]? That's an overall point that needs to be addressed in a meaningful way."[194]

# 7. Recommendations

## Recommendation 1.1

Change the leadership structure of Division I basketball to prioritize gender equity and coordination between the men's and women's tournaments.

The leadership of men's and women's basketball should be at equivalent levels of seniority within the organization and should be tasked with working together to coordinate a joint strategy to maximize the value of both championships while ensuring gender equity in the student-athlete experience. The leadership of men's basketball should no longer have responsibility for the broadcast or corporate partnership arrangements for all sports, as explained in Recommendation 2.4.

Both men's and women's basketball and the leadership of other championships should report up to a Head of Championships who is responsible for ensuring gender equity across championships. In particular, the Head of Championships would be responsible for reviewing budgets and participation opportunities for gender disparities, and for ensuring that items that impact the student-athlete experience, which are detailed in Recommendation 3.2, are equitable.

---

[192] Office of Inclusion, NCAA (last visited July 21, 2021), https://www.ncaa.org/about/resources/inclusion; Gender Equity and Title IX, NCAA (last visited July 21, 2021), https://www.ncaa.org/about/resources/inclusion/gender-equity-and-title-ix; 2021 Inclusion Forum, NCAA (last visited July 21, 2021), https://www.ncaa.org/about/resources/events/2021-ncaa-inclusion-forum.

[193] Office of Inclusion, NCAA (last visited July 21, 2021), https://www.ncaa.org/about/resources/inclusion.

[194] In late March 2021, the NCAA was asked by members of the U.S. House of Representatives to describe the processes that the NCAA has in place to ensure championship competitions adhere to the gender equity principles of Title IX. The NCAA responded that it required those bidding for NCAA championships to provide assurances that anyone associated with an NCAA event will be treated with fairness and respect, but was otherwise unable to identify processes in place to ensure that the women's and men's championships are equitable. *See* Letter from President Mark Emmert to Honorable Mikie Sherrill, et al., U.S. House of Representatives (Apr. 2, 2021).

When selecting a Head of Championships, a key qualification for the position should be a demonstrated commitment to gender equity.

These changes are designed to improve coordination and communication between the heads of men's and women's basketball, eliminate the current perception that women's basketball reports up through men's basketball, and ensure the regular consideration of gender equity across NCAA championships, with equity in the student-athlete experience as the guidepost. Separating out the business functions from the championship management structure will also help ensure that managers of championships are maintaining a primary focus on how to provide the best student-athlete experience possible. *See* Recommendation 2.4 below, concerning the creation of a new senior position of Chief Business Officer.

## Recommendation 1.2

Before the next budget cycle, conduct a "zero-based" budget for Division I men's and women's basketball to ensure that any gender differences are necessary, appropriate, and equitable.

To reset the budgets for men's and women's basketball based on a detailed assessment of whether discrepancies in the budgets are justifiable and appropriate in light of differences in the structure of the championships, the NCAA should create a "zero-based" budget before the next budget cycle. This process involves starting from a "zero base" and adding back each budget line item for men's and women's basketball, as opposed to the annual NCAA process of adopting the previous year's budget as a base. This will enable the NCAA leadership of championships, men's and women's basketball, and the financial office to work together not only on ensuring equitable budgets, but in creating efficiencies across budgets and maximizing the impact of spending.

After this "zero-based" budget has been created, the heads of men's and women's basketball, under the oversight of the Head of Championships, should each year work together to confirm that those line item expenses that touch on the student-athlete experience are equitable and that any disparities in budgetary line items continue to be reasonable. This process will require men's and women's basketball to openly share budgetary information with one another and to collaborate on the strategic and efficient use of basketball funds.

## Recommendation 1.3

Develop equity in staffing for Division I men's and women's basketball.

In order to enable the women's basketball staff to provide female student-athletes with a championship experience that is equitable to their male counterparts, the NCAA should make changes to ensure that the staffing for the tournaments is equitable. The NCAA could adjust staffing in one of two ways. First, the NCAA could increase the total number of staff and/or

contractors in women's basketball to ensure that equitable time is able to be spent on those tasks that impact the student-athlete experience, as outlined in Recommendation 3.2. Alternatively, the NCAA could require the same individuals to handle specific roles for both men's and women's basketball. For example, the NCAA could choose to have a single employee order swag and gifts for both the men's and women's tournaments. Not only is having the same employee perform certain roles for both women's and men's basketball likely to be more efficient; it may also help to avoid unintended disparities between the tournaments. Moreover, some overlap in the two staffs is likely to promote a feeling of joint purpose and a sense that they are a unified team. Variables such as the fact that staff members often have multiple responsibilities that do not always match up with their counterparts on the other staff, that the size and structure of the men's tournament currently add certain responsibilities for the men's staff, and that contractors often supplement full-time staff, should be considered when analyzing how best to make the staffs more equitable.

## Recommendation 1.4

Establish regular communications between the Division I Men's and Women's Basketball Committees and Basketball Oversight Committees that focus on coordinating on strategic decisions and achieving gender equity in the student-athlete experience.

To facilitate joint decision making and management and ensure gender equity in the Division I basketball tournaments, the chairs of the Division I Men's and Women's Basketball Committees and Basketball Oversight Committees should regularly communicate with their counterparts in order to coordinate on broader strategic decisions made by the Committees. Each Committee separately, and the Men's and Women's Committees together, should regularly consider and discuss how best to ensure that the student-athletes have equitable championship experiences.

To further facilitate coordination, the NCAA should also consider some cross-pollination between the members of the Division I Men's and Women's Basketball and Basketball Oversight Committees. For example, the NCAA could require that at least one seat on the Men's Basketball and Basketball Oversight Committees be occupied by a sitting member of the Women's Basketball and Basketball Oversight Committees, and vice versa. Having individuals who know about the planning of both championships will be particularly vital if the men's and women's Final Four events are held in one city, as outlined in Recommendation 3.1. Alternatively, there could be joint committee meetings held on a more regular basis.

KHF also supports recent efforts by the NCAA to request that conferences put forward candidates of equal seniority for openings on both the Men's and Women's Basketball and Basketball Oversight Committees, thereby striving to make the composition of the Committees roughly similar in seniority.

Finally, the same four Committees should coordinate on their Committee budgets to ensure that their own spending is equitable and that any differences are reasonable and appropriate.

## Recommendation 1.5

Perform a real-time gender equity audit of the Division I Men's and Women's Basketball Championships as they are being planned and executed each year.

Starting with the 2022 championships, the NCAA should develop and implement a real-time gender equity review protocol for the Division I Men's and Women's Basketball Championships, starting from the earliest possible point in the planning process and continuing through the entire planning cycle (including the budget process) and execution of the championships. The review protocol should include a specific process for resolving in real-time any gender equity issues that are identified as part of the review, including how and to whom issues will be elevated for resolution. The review protocol should be developed and implemented by NCAA staff with expertise in Title IX and gender equity issues generally, *see* Recommendation 1.10 below, in consultation with staff responsible for the men's and women's basketball championships.

## Recommendation 1.6

Prepare an annual report on the results of the real-time gender equity audit, including issues identified, how those issues were resolved, and lessons learned.

Each year, directly following the championships, the NCAA should prepare a standardized report of the results of the real-time gender equity review for the Division I Men's and Women's Basketball Championships that took place that year. The report should be prepared by the staff with expertise in Title IX and gender equity issues who performed the review. The report should go to the Board of Governors, the Board of Governors Committee to Promote Cultural Diversity and Equity, the Gender Equity Task Force, the Committee on Women's Athletics, the Division I Board of Directors, the Men's and Women's Basketball and Basketball Oversight Committees, and the NCAA President and Senior Management Team.

## Recommendation 1.7

### Conduct an external gender equity assessment of the Division I Men's and Women's Basketball Championships in five years.

To ensure that gender equity is being achieved, and similar to the periodic assessments in which the Division I member institutions regularly engage, the NCAA should conduct a gender equity assessment of the Division I Men's and Women's Basketball Championships in five years. That assessment should be led by an external auditor with expertise in Title IX compliance in collegiate athletics and gender equity issues generally. The external auditor should provide its report to the Board of Governors, the Board of Governors Committee to Promote Cultural Diversity and Equity, the Gender Equity Task Force, the Committee on Women's Athletics, the Division I Board of Directors, the Men's and Women's Basketball and Basketball Oversight Committees, and the NCAA President and Senior Management Team, and an executive summary should be made publicly available on the NCAA's website. The external audit should include an assessment of the efficacy of the measures prescribed in Recommendations 1.5, 1.6, and 1.8, and a recommendation for their continuation or alteration as appropriate. Depending on the results of this five-year external audit, another external audit should be conducted periodically thereafter.

## Recommendation 1.8

### Complete a gender equity impact statement in connection with significant actions taken outside of the annual championship planning process.

Beginning no later than fall 2022, the NCAA should:

- Develop a gender equity impact statement template;

- Identify those actions being taken within the NCAA that are connected to the Division I Men's and Women's Basketball Championships, but not part of the general annual planning process for those championships that are to be reviewed as part of the real-time audit process in Recommendation 1.5 (such as negotiating broadcast and media rights contracts, corporate partnership changes, and legislative changes), that would require the submission of a gender equity impact statement; and

- Establish a process for the submission, review, and sign-off of gender equity impact statements, including a specific process for how and to whom gender equity impacts that are identified, if any, will be elevated for resolution.

The gender equity impact statement and associated protocol should be developed, and the statements themselves reviewed, by NCAA staff with expertise in Title IX and gender equity issues. *See* Recommendation 1.10 below. Used in a variety of other settings, gender equity impact

statements seek to ensure that decisionmakers identify possible negative consequences of a proposed action on gender equity and preemptively develop mitigation strategies.

## Recommendation 1.9

### Evaluate and reward performance for contributions to gender equity.

While protocols should be put into place to help ensure that there is gender equity in the student-athlete championship experience, *see* Recommendations 1.5-1.8 above and Recommendation 3.2 below, actually achieving that gender equity goal should be considered part of everyone's job at the NCAA. Achieving gender equity is the responsibility of the NCAA leadership, and working towards gender equity goals is something that should be expected, evaluated, and rewarded as part of the NCAA's internal performance review process for all NCAA leadership and staff.

## Recommendation 1.10

### Increase NCAA staff with expertise in Title IX and gender equity.

To implement the recommendations contained in this report, additional full-time employees should be added (including in the Office of Inclusion) to assist with performing these tasks. These individuals should have experience with Title IX compliance as it relates to collegiate athletics and expertise in gender equity issues generally.

# THE NCAA'S LONG-TERM MEDIA AGREEMENTS

The NCAA has decades-long relationships with two media partners: (1) CBS/Turner; and (2) ESPN. Both are valued partners who, among other things, help generate financial stability for the NCAA and its membership. The NCAA has entered into several long-term agreements with CBS/Turner, pursuant to which CBS/Turner pays the NCAA billions of dollars over time in exchange for the exclusive right to broadcast the Division I Men's Basketball Championship in the United States and sell and manage the NCAA's marketing rights as part of the NCAA's Corporate Partner Program.[195] ESPN pays a substantially lower fee to the NCAA for the broadcast rights to 29 other championships, including Division I women's basketball.[196]

The NCAA's goal has long been to maximize the revenue produced by the CBS/Turner contract to ensure the long-term sustainability of the NCAA and the predictable and significant distribution of funds to its membership to help support their athletic programs. To achieve this goal, the NCAA has entered into agreements structured to generate corporate sponsorship of, and produce substantial revenue in connection with, Division I men's basketball alone—without regard for the significant hurdles that those same agreements put in place with respect to the sponsorship of other NCAA championships, including women's basketball. The result is a system that devalues women's basketball (and other NCAA sports) within the NCAA and significantly undervalues and underutilizes the Division I Women's Basketball Championship (and likely other NCAA championships) as a revenue-producing property. This, in turn, has had a negative impact both on the student-athlete experience and on the growth of women's basketball.

## 1. The History & Structure of the Media Agreements

The NCAA's broadcasting relationships with ESPN and CBS/Turner are made up of multiple agreements governing the media and marketing rights to all 90 NCAA championships.

***CBS/Turner.*** Since 1982, CBS and later CBS/Turner have contracted with the NCAA to broadcast the Division I Men's Basketball Championship. The NCAA most recently extended its relationship with CBS/Turner in 2016, entering into a new Multi-Media Agreement, which is set to expire in August 2032.[197] Pursuant to the Multi-Media Agreement, CBS/Turner must pay the

---

[195] *See generally* Multi-Media Agreement between CBS, Turner, and the NCAA (Mar. 14, 2016) ("2016 CBS/Turner Multi-Media Agreement"); Multi-Media Agreement between CBS, Turner, and the NCAA (Apr. 22, 2010) ("2010 CBS/Turner Multi-Media Agreement").

[196] *See generally* Multi-Media Agreement between ESPN, Inc. and the NCAA (Dec. 15, 2011) ("ESPN Multi-Media Agreement"). While the ESPN Multi-Media Agreement signed in 2011 only covered the broadcast rights for 24 championships, ESPN has since agreed to air an additional 5 championships through supplemental agreements with the NCAA.

[197] 2016 CBS/Turner Multi-Media Agreement § 1(eee) & Ex. B.

NCAA a yearly, fixed rights fee, which currently sits at $850 million and increases each year, with the contract reaching a rights fee of $1.165 billion by 2032.[198]

In exchange for that annual payment, CBS/Turner has the obligation to broadcast all 67 games of the Division I Men's Basketball Championship in the United States, and to manage, solicit, and contract with corporate sponsors through the Corporate Partner Program.[199] While the earliest iteration of the contract gave CBS the non-exclusive right to sell sponsorship opportunities for the men's tournament, the most recent Multi-Media Agreement, like its immediate predecessors, grants CBS/Turner the exclusive right to sell sponsorship opportunities for all 90 championships, including women's basketball. Through the Corporate Partner Program, CBS/Turner may contract with corporate sponsors and grant them both marketing and media rights to the NCAA championships.[200] The marketing rights give the sponsor the exclusive right, within its particular product category,[201] to use the NCAA's brand, including trademarks, taglines, tickets, and other marketing rights for all 90 championships.[202] The media rights, which are included in every sponsorship agreement, give sponsors the right to air advertising and programming on the CBS/Turner networks that air the men's—but not the women's—tournament games.

The NCAA and CBS/Turner have agreed to keep the Corporate Partner Program small. Today, there are just 18 sponsors that occupy two distinct tiers, and CBS/Turner may engage at most 30 sponsors total.[203] The first tier—called "Champions"—contains only three sponsors: AT&T, Capital One, and Coca-Cola. It requires a significantly higher buy-in and includes substantial rights in connection with various NCAA championships. The second tier—called "Partners"—contains 15 sponsors: Aflac, General Motors-Buick, Buffalo Wild Wings, Geico, Great Clips, Hershey's/Reese's, Invesco, Lowe's, Marriott Bonvoy, Mondelez/Nabisco, Nissan, Pizza Hut, Uber/UberEats, Unilever, and Wendy's.[204] The second tier similarly requires payment of a substantial (although not as substantial as the Champions) annual fee to CBS/Turner in exchange for marketing rights to the NCAA and its 90 championships and media rights to the

---

[198] The royalty fees through August 31, 2024, are set by the 2010 Multi-Media Agreement, while the royalty fees from September 1, 2024, to August 31, 2032, are governed by the 2016 Multi-Media Agreement. *See* 2010 CBS/Turner Multi-Media Agreement, Ex. B; 2016 CBS/Turner Multi-Media Agreement, Ex. B. The royalties for the former timeframe are supplemented by small additional pre-term payments pursuant to the 2016 Multi-Media Agreement. *See* 2016 CBS/Turner Multi-Media Agreement, Ex. B. In the 2026-27 contract year, CBS/Turner and the NCAA will meet to discuss opportunities to increase revenue in the contractual relationship. *See* 2016 CBS/Turner Multi-Media Agreement § 16.1(d).

[199] 2010 CBS/Turner Multi-Media Agreement §§ 1(c), 5.1, 10; 2016 CBS/Turner Multi-Media Agreement §§ 1(c), 5.1, 10.

[200] 2010 CBS/Turner Multi-Media Agreement § 10; 2016 CBS/Turner Multi-Media Agreement § 10.

[201] The product category refers to the type of product the sponsor sells. No two Corporate Partners can occupy the same product category. For example, Lowe's has the exclusive marketing rights for the NCAA in the "home improvement" category, while Marriott has the exclusive marketing rights for the NCAA in the "lodging and accommodation for the general public for any type of travel" category.

[202] 2016 CBS/Turner Multi-Media Agreement § 10; *see also, e.g.*, NCAA Corporate Champion Agreement between AT&T Services, Inc., Turner, and CBS § 1.47.1 (Sept. 1, 2017).

[203] 2016 CBS/Turner Multi-Media Agreement § 10.2(b).

[204] NCAA Corporate Champions and Partners, NCAA (Feb. 12, 2021), https://www.ncaa.com/news/ncaa/article/2011-02-25/corporate-champions-and-partners; *see also* Corporate Champion and Partners Agreements with CBS/Turner.

Division I Men's Basketball Championship. While Corporate Champions and Partners purchase the exclusive right to market their products at all championships, they must separately decide whether to pay to run advertisements at each championship beyond Division I men's basketball. The NCAA maintains a list of potential ways a sponsor can support the NCAA's championships while simultaneously promoting the company's brand, known as "activations" (*e.g.*, Unilever providing its products for student-athletes in the locker rooms),[205] but it does not internally track the annual activations in which its Champions and Partners have engaged. As a result, there is currently no precise way to measure or compare the degree of sponsor activation at the men's and women's tournaments.

In addition to the Multi-Media Agreement, the NCAA and CBS/Turner are parties to two other agreements with notable implications for the men's and women's basketball tournaments. First, the NCAA contracts with CBS/Turner to operate the fan festival at the Division I Men's Basketball Championship and a few other NCAA championships, including by selecting vendors, hiring event staff, making financial and operational decisions, and designing and developing the events.[206] Although that agreement does not require CBS/Turner to provide the same services at the fan festival at the women's basketball tournament, it does grant CBS/Turner the sponsorship and media rights at *both* the men's and women's basketball fan festivals.[207]

Second, the NCAA and CBS/Turner have entered into a Digital Rights Agreement pursuant to which CBS/Turner creates and maintains several digital media platforms for the NCAA, including (1) NCAA.com, which covers all 90 championships, and (2) the March Madness Live app, which covers only Division I men's basketball.[208]

***ESPN.*** Since 1996, ESPN has agreed to broadcast the Division I Women's Basketball Championship, along with, at present, 28 other NCAA championships. The current broadcast agreement grants ESPN and its subsidiary and sister networks (ESPN1, ESPN2, ESPN+, ESPNU, and/or ABC) the right to air these 29 championships, as well as broadcast rights to the Division I men's basketball NIT and the international broadcast rights for the Division I Men's Basketball Championship.[209]

---

[205] NCAA Corporate Champions and Partners Activation Opportunity Playbooks, 2018-20; Spreadsheet from Corporate Relations Staff Member of Champions and Partners Activations from 2018-19.

[206] *See* Letter Agreement between CBS/Turner and the NCAA regarding the NCAA Fan Festivals (Mar. 14, 2016).

[207] *Id.* § 2(A).

[208] *See generally* Digital Rights Agreement between Turner and the NCAA (Aug. 23, 2010) ("Digital Rights Agreement"); Amendment to Digital Rights Agreement (Mar. 14, 2016).

[209] ESPN Multi-Media Agreement §§ 1(e), 2.1, 3.1, 4.1. The championships that ESPN agrees to broadcast are: Division I FCS football; Division II football; Division III football; Division I women's volleyball; Division I men's soccer; Division I women's soccer; Division I women's basketball; Division I men's and women's indoor track and field; Division I men's and women's outdoor track and field; Division I women's swimming and diving; Division I men's swimming and diving; Division I wrestling; Division I men's ice hockey; women's ice hockey; women's gymnastics; men's and women's fencing; men's volleyball; Division I men's lacrosse; Division I women's lacrosse; Division I men's and women's cross country; Division I softball; Division I baseball; field hockey; beach volleyball; and women's bowling. *See id.*, Ex. A; Agreements between ESPN and the NCAA regarding Women's Ice Hockey, Field Hockey, Beach Volleyball, and Men's and Women's Cross Country.

The current ESPN Multi-Media Agreement was entered into in 2011 and is now set to expire in 2024. Pursuant to this Agreement, ESPN pays the NCAA an annual rights fee of approximately $34 million (on average) over the life of the contract in exchange for the broadcast rights—or about 4.5% of the value of the rights fee that the NCAA receives from CBS/Turner over the same time period; in 2021, ESPN is set to pay the NCAA approximately $41.8 million.[210] Unlike CBS/Turner, ESPN does not have the right to sell any corporate sponsorships, does not play a role in creating or managing the fan festivals, and is not required to promote on ESPN's networks or its digital platforms the men's tournament aired on CBS/Turner.

## 2. Effects on Gender Equity

Although it is undoubtedly true that the NCAA's broadcast relationships have been highly lucrative for the NCAA, the way in which these relationships are structured has disadvantaged the women's basketball tournament in the past and is not geared toward growing the women's basketball tournament in the future.

***The contracts prioritize support for men's basketball to the exclusion of women's basketball (and other sports).*** The CBS/Turner Multi-Media Agreement prioritizes support for men's basketball in two key and very basic ways. First, while CBS/Turner controls the sponsorship rights for all NCAA championships (including women's basketball), it has the broadcast rights only for the Division I Men's Basketball Championship, with limited obligations to "cross-promote" the women's tournament.[211] CBS/Turner is therefore incentivized to focus its efforts on developing sponsorships for men's basketball, not for women's basketball (or any other sport, for that matter), so as to bring in the greatest amount of money possible for CBS/Turner.[212] This is borne out in the NCAA Corporate Champion and Partner contracts, each of which is between the corporate sponsor and CBS/Turner (as approved by the NCAA), and each of which requires a corporate partner to spend a significant percentage of its total contract fee on advertisements and programming during the men's tournament broadcast on CBS/Turner's networks and mobile apps.[213] As independent media expert Ed Desser explains in his accompanying report, CBS/Turner wants to maximize the spending of the Champions and Partners on programming within CBS/Turner's control: "they don't actually want those sponsors to *spend anything* on the ESPN presentation of the" women's tournament "if it results in any decrease in buying [the men's basketball] inventory or other CBS/Turner-owned inventory."[214] Directing corporate sponsor support and advertising buys to the men's tournament in this way leaves the women's basketball

---

[210] ESPN Multi-Media Agreement § 6.1.

[211] 2016 CBS/Turner Multi-Media Agreement § 9.5(g).

[212] Desser Report § 6(4).

[213] *See, e.g.*, NCAA Corporate Partner Agreement between CBS/Turner and Geico (Jan. 1, 2019).

[214] Desser Report § 6(4) (emphasis in original).

tournament (and other NCAA championships) without the sponsorship support it might otherwise garner if the media contracts were structured differently.

Second, and equally as important, because the marketing rights for men's basketball are, for the foreseeable future, significantly more costly than the marketing rights for other NCAA championships, and because each of the Champion and Partner agreements include both marketing and certain media rights for men's basketball, bundling the marketing rights for all sports together with the media rights for men's basketball (as the CBS/Turner Multi-Media Agreement does) makes sponsorship of any NCAA championship prohibitively expensive to many, if not most, potential corporate partners.[215] Put another way, at present, a sponsor must either go "all-in" on *all* NCAA championships—including the costly sponsorship of, and media rights to, the Division I Men's Basketball Tournament—or not participate at all. There is no space for sponsors who might be interested in sponsoring women's basketball, but who do not want or cannot afford to buy the required advertising time to support men's basketball. As Desser has observed, the substantial cost of buy-in to the NCAA Corporate Partner Program "places a very high practical financial hurdle in front of those that might be interested in supporting" the women's tournament or other championships "because of the significant mandated advertising spend CBS/Turner insist upon to support the" men's tournament.[216]

In addition, even corporate sponsors who do buy into the Corporate Partner Program must separately purchase airtime on ESPN if they want to run advertisements as an NCAA sponsor during the women's basketball tournament. And, as explained above, CBS/Turner has no reason to encourage them to do so. Requiring a corporate sponsor to negotiate with—and pay—both CBS/Turner and ESPN to provide similar support to the women's championship as to the men's significantly disincentivizes the sponsors from doing so, even where they are interested in supporting the championships in equitable ways.[217]

This structure unnecessarily places women's basketball at a distinct disadvantage from a marketing and sponsorship perspective, which in turn perpetuates the view that women's basketball is a less appealing investment. By depriving women's basketball of sponsorship opportunities it might otherwise have if these agreements were structured differently, the CBS/Turner Multi-Media Agreement contributes to the narrative that women's basketball is a supposed revenue loser, and that men's basketball needs to be prioritized so that it can maximize revenue for the benefit of all NCAA sports. This narrative has long been used by many in the NCAA and its membership to justify unequal investment in men's basketball as compared to women's basketball, leaving the growth potential of women's basketball untapped.

---

[215] *Id.* § 6(2).

[216] *Id.*

[217] As noted above, because the NCAA does not track the activations in which its sponsors have engaged, there is no complete record demonstrating which Champions and Partners engage at the men's basketball tournament as compared to the women's tournament or other championships, and at what level. This makes it impossible as a practical matter to compare sponsorship activations between the men's and women's basketball championships, disincentivizing both the NCAA and its sponsors from promoting gender equity.

***The contracts have a direct and inequitable impact on the student-athlete experience.*** The involvement of corporate sponsors and the synergy between the corporate sponsors and CBS/Turner make a significant difference in the look and feel of the championships, including the production quality of the events and their television broadcasts, the size and production quality of the fan festivals and other public-facing events, and advertising both in-person at the venues and during the television broadcasts. For example, CBS/Turner, as well as the NCAA's Champions and Partners, fund a massive and expensive concert at the men's tournament (this year, Miley Cyrus, which was aired on CBS, and in past years, drawing names such as Katy Perry, Rihanna, and Bruce Springsteen),[218] whereas the women's tournament has historically attracted fewer headline performers, if any, at a concert that is substantially smaller in size and budget.

Student-athletes and their families and fans notice these differences. The men's tournament comes across as "so exciting and so big," appearing as if men's basketball is "the *real* basketball," whereas the women's tournament broadcast is all about "calling plays and commenting on the game itself." Student-athletes commented that when they found out that the men's tournament had a Miley Cyrus concert, "[i]t was extremely upsetting," even though they were familiar with the fact that the corporate sponsors disproportionately supported the men's tournament as compared to the women's tournament. One student-athlete explained that "there should be some sort of way to ask these big corporations to give money to the women's tournament as well." Other stakeholders who have long-term experience attending both tournaments recognized the impact of the CBS/Turner relationship and its skewed incentives on the student-athlete experience at the women's tournament. One commissioner explained that under the current structure, when sponsors "buy rights to all championships and only choose to activate at the men's [tournament], everyone else is screwed."

What's more, as CBS/Turner broadcasts the men's games, it promotes the other events that it manages, including the fan festival and the concert. Because ESPN does not manage the women's fan festival or other fan events, it is not similarly incentivized to promote these events. For student-athletes and fans watching the tournaments on television, they see on CBS a coherent, coordinated broadcast, with expensive ads often featuring celebrities and famous athletes (Capital One with Samuel L. Jackson, Spike Lee, and Charles Barkley),[219] and with programming highlighting the student-athletes playing in the men's tournament. On ESPN, by contrast, the advertising content is often more typical of any sports broadcast, with some of the same ads playing, as one student-athlete put it, "over and over from day one." Our media expert has described this disparity in the relevant advertising as "discordant."[220]

***The NCAA's treatment of revenue from these contracts skews the conversation about which sports generate revenue.*** Within the NCAA, no portion of the significant CBS/Turner rights

---

[218] Daniel Kreps, *Watch Miley Cyrus Cover Queen Classics at NCAA Final Four Concert*, Rolling Stone (Apr. 4, 2021), https://www.rollingstone.com/music/music-news/miley-cyrus-cover-queen-ncaa-final-four-concert-1150947/.

[219] Desser Report § 6(2).

[220] *Id.*

fee is credited to any other championship besides Division I men's basketball. The NCAA's website itself, in explaining to the public "Where Does The Money Go," credits "Division I Men's Basketball Championship television and marketing rights" with bringing in $867.5 million for fiscal year 2018-19—approximately the rights fee from the CBS/Turner Multi-Media Agreement.[221] This treatment ignores the fact that the Corporate Partner Program in the Multi-Media Agreement sells the exclusive right to use and profit off of the NCAA's brand and logo in connection with *all* 90 championships, not just men's basketball. While the amount that Champions and Partners spend at championships other than men's basketball is admittedly small,[222] the presumption that all of the revenue from the CBS/Turner agreement is attributable to the Division I men's tournament feeds into the narrative that women's basketball is not and can never be revenue-generating.

The NCAA uses the hefty rights fee from CBS/Turner and the presumption that men's basketball is solely responsible for all of that revenue to justify treating men's basketball inequitably. For example, shortly after this year's championship, the NCAA released background information to the press that ultimately shaped news reporting around the differences between the two championships' spending. That background information furthered the narrative that women's basketball "lost $2.8 million" in 2019, which it described as the "largest loss of any NCAA championship" that year.[223] The supposed $2.8 million loss, however, appears to be based on a calculation of revenue that attributed all revenue from the CBS/Turner contract to men's basketball alone.[224]

***CBS/Turner owns and operates the March Madness Live app, which does not include coverage or information about women's basketball.*** Pursuant to the CBS/Turner Multi-Media Agreement and the Digital Rights Agreement, CBS/Turner has developed and maintains the March Madness Live app, which tracks coverage of the Division I Men's Basketball Championship only.[225] The app, presented by NCAA Corporate Champions Coca-Cola and CapitalOne and NCAA Corporate Partner Buick, is well-developed and includes, among other things, stories about the teams, clips from the games, scores, and the ability to enter into the March Madness Bracket Challenge (sponsored by NCAA Corporate Champion Capital One) and to track the Official Bracket (a different feature, presented by NCAA Corporate Partner Reese's).

---

[221] Where Does The Money Go, NCAA (last visited July 21, 2021), https://www.ncaa.org/about/where-does-money-go.

[222] Desser Report § 6(5). While Desser considered the amounts "earmarked for an NCAA Championship other than the" Division I Men's Basketball Championship, *id.*, Champions and Partners may—and often do—spend additional activation dollars for other promotions on top of those described in their contracts with CBS/Turner.

[223] *See, e.g.*, Heather Dinich, *NCAA Budget for Men's Basketball Tournament Almost Twice as Much as Women's Budget*, ESPN (Mar. 26, 2021), https://www.espn.com/mens-college-basketball/story/_/id/31141363/ncaa-budget-men-basketball-tournament-almost-twice-much-women-budget.

[224] *Id.*

[225] 2016 CBS/Turner Multi-Media Agreement § 5.5; Digital Rights Agreement § 2.

NCAA External Gender Equity Review
Phase I: Basketball Championships

  

*March Madness Live App*[226]

That women's basketball is not covered on the March Madness Live app reinforces the primacy of men's basketball; women's basketball players reported feeling confused and upset to find that the ostensibly gender-less March Madness Live app excluded them. In addition, there is no equivalent digital coverage for the women's championship. The only mobile app for the women's tournament is the NCAA DI WBB app, which is developed and managed by the NCAA digital team and is meant to be a digital fan guide. The app, which has no corporate sponsor, has limited clips of the games and no news articles. Rather, it is designed to enhance the fan experience for those attending the event, informing fans where certain events are being held on site, how to purchase merchandise and tickets, and about health and safety information.

  

*NCAA DI WBB App*[227]

---

[226] Screenshots of March Madness Live App.

[227] Screenshots of NCAA DI WBB App.

The NCAA DI WBB app is not tied to the broadcaster of the Division I Women's Basketball Championship, and thus it cannot stream games live unless redirected to an ESPN app (to which it links on a sub-page of the mobile app). Moreover, unlike the dozens of CBS/Turner employees who work on the March Madness Live app and other digital platforms, the NCAA digital staff includes at most four full-time employees, three contractors, and one full-time post graduate intern who work on a total of six apps and all social media accounts, four of whom work on the NCAA DI WBB app.

ESPN does not close the gap in digital coverage of women's basketball. While ESPN distributes the championship games that it broadcasts on its digital platforms (*i.e.*, ESPN's website and ESPN's mobile app), it does not (and is not required to) maintain a separate NCAA website like www.NCAA.com (which is developed and managed by CBS/Turner) and does not create or manage any mobile apps specific to women's basketball like March Madness Live. Instead, fans can access individual pages and information for each NCAA championship to which ESPN has rights on ESPN's general mobile app (called simply "ESPN") or through the main page of ESPN's website (www.ESPN.com).

In addition to the mobile apps that fans can download, the NCAA maintains social media accounts for each of its championships; Division I women's basketball is @ncaawbb on Twitter, for example. These social media accounts on Twitter, Facebook, Instagram, SnapChat, YouTube, and TikTok do not currently contain advertisements from Champions or Partners.

## 3. The True Value of the Division I Women's Basketball Championship Is Not Reflected in the Contracts

The Division I Women's Basketball Championship is "one of the most valuable U.S. sports media properties" around, according to the team of sports media and marketing experts led by Ed Desser.[228] Yet, under the current ESPN Multi-Media Agreement, ESPN pays the NCAA an annual rights fee for an "'all in one' package"—including women's basketball and 28 other sports—which amounts to an average of $34 million per year over the life of the contract.[229] The original decision to grant ESPN, the "Worldwide Leader in Sports," the right to broadcast the women's championship packaged with then-20 other NCAA championships was made in 2001, before the launch of several national sports networks.[230] Accordingly, the ESPN Multi-Media Agreement— now two decades since it was last put to bid—does not accurately reflect the value of women's basketball in today's market or sports media landscape, which has changed in important and significant ways since 2001.[231] Based on his own independent analysis, Desser estimates that the

---

[228] *See* Desser Report §§ 1.1, 2. In 2021, ESPN is set to pay the NCAA approximately $41.8 million. ESPN Multi-Media Agreement § 6.1.

[229] Desser Report §§ 1.10, 3.2; ESPN Multi-Media Agreement § 6.1.

[230] Desser Report § 3.2.

[231] *Id.* § 3.1.

Division I Women's Basketball Championship is worth between $81 and $112 million annually beginning in 2025.[232]

There are multiple reasons why the broadcasting rights to the women's basketball championship are significantly more valuable than is reflected in the current ESPN contract:

**First**, as Desser explains, the Division I Women's Basketball Championship has matured into an increasingly popular "tentpole" event.[233] After years of steadily increasing ticket sales, viewership, and ratings of the women's tournament, the 2021 women's Final Four had an average of more than 2.9 million viewers—a 14% increase from 2019.[234] This year, for the very first time, ESPN nationally broadcast all 63 games of the women's tournament on its television networks— a recognition of the tournament's growing popularity.[235] The 2021 women's championship game saw its highest viewership since 2014, averaging 4.1 million viewers.[236]

Indeed, as Desser concludes, the women's Final Four "generally outdraws the TV viewership for all sporting events taking place in its event window except for" the men's tournament.[237] It "ranks among ESPN's highest-rated programs, other than NFL games and the College Football Playoff," and it is one of few championships that ESPN broadcasts during March and April, "filling a hole after football season and before the NBA and NHL Playoffs, both attracting subscribers to ESPN and, crucially, keeping them from dropping ESPN."[238] In fact, as depicted in the graphic below developed by Desser, the women's tournament delivers an audience on par with NBA playoff conference finals, college football conference championship games and regular-season college football games, Major League Baseball Wild Card Playoffs, Men's and Women's Tennis Grand Slam Finals, and more than four times the Duke v. UNC regular-season rivalry games:[239]

---

[232] *Id.* § 7.7.

[233] *Id.* § 2.

[234] *Id.* § 2.1. Like its increasing television viewership, ticket sales for the Division I Women's Basketball Tournament have been steadily increasing for the past several years. In 2019, the women's tournament had the most ticket sales in nearly two decades. *See* Attendance History – Division I Women's Basketball Championship, NCAA (1982-2019).

[235] Desser Report § 2.8.

[236] *Id.* § 2.1.

[237] *Id.* § 1.2.

[238] *Id.*

[239] *Id.* § 2.2, Figure 2.2.

**Desser Figure 2.2: Marquee ESPN Properties (excl. NFL & CFP)**



Moreover, the women's tournament is a national championship with a far-reaching audience, aired during a time of year when few other professional athletic competitions air, which further increases its value.[240] It features many well-known American universities with substantial fan bases and compelling single-elimination playoff games.[241] And because the WNBA does not accept players until they are twenty-two years old, many of the student-athletes playing women's basketball are able to draw fandom for several consecutive years.[242] Combined with the advent and ubiquity of social media, this repeat fandom has made women's basketball even more popular. University of Connecticut player Paige Bueckers, for example—the first freshman to ever win the Associated Press National Player of the Year—has 900,000 followers on Instagram.[243] That is more than the twenty 2021 men's Final Four starters combined.[244]

Overall, when viewed over the life of the tournaments—the men's tournament has occurred for 83 years, and the women's for just 40—the women's tournament is on a similar growth

---

[240] *Id.* §§ 2.3, 2.4.

[241] *Id.* § 2.9(1)-(2).

[242] *Id.* § 2.9(3).

[243] Paige Bueckers (@paigebueckers), Instagram (last visited July 30, 2021), https://www.instagram.com/paigebueckers/.

[244] Desser Report § 2.9(3).

trajectory as the men's, "benefiting from a virtuous cycle of increasing viewership and broadening exposure."[245]

**Second**, as Desser explains, the marketplace for sports rights has "changed dramatically in the decade since the NCAA renewed its" contract with ESPN; it now has more potential bidders for high-quality live sports than ever before.[246] As this media landscape has grown and begun to morph from linear paid television services like Comcast, DirecTV, Spectrum, etc., which air channels such as ESPN, CBS, and Fox, to streaming platforms (ESPN+, Paramount+, etc.), so has the value of digital rights, which were not as prevalent when the ESPN agreement was last negotiated in 2011.[247]

**Third**, the current ESPN contract likely does not reflect the true value of the women's basketball championship broadcast rights because NCAA has not put the women's championship to competitive bid since 2001, when it first entered into the ESPN Multi-Media Agreement, thus foregoing "the single most important negotiating tactic the NCAA could have used in order to assure that it was receiving fair market value" for the tournament.[248]

## 4. Recommendations

### Recommendation 2.1

Market the rights to the Division I Women's Basketball Championship as a stand-alone property.

The NCAA should market the Division I Women's Basketball Championship as a stand-alone property when it is next up for bid, which our independent media expert has determined would "unlock considerable value and attract far more bidders than keeping it combined with 28 other NCAA Championships."[249] The women's tournament has achieved a level of popularity that translates into a unique and highly desirable programming opportunity for any number of broadcasting partners. Moreover, as the ESPN contract is up for renewal in just a few years (in 2024), the NCAA will have the opportunity to take full advantage of all of the changes in media and broadcasting that have occurred since the ESPN contract was signed back in 2001 and renewed in 2011. And during the 10 years since the existing ESPN contract was signed, other NCAA championships have similarly grown in stature such that our independent media expert believes that separating out the Division I Women's Basketball Championship "will not negatively impact

---

[245] *Id.* § 1.3.

[246] *Id.* § 1.4; *see also id.* § 3.1.1.

[247] *Id.* § 3.1.2.

[248] *Id.* § 3.2.

[249] *Id.* § 1.10.

the value, attention and opportunities the Other Championships will receive prospectively."[250] Combined, all of these factors will allow the NCAA to realize the significant untapped monetary potential of the Division I Women's Basketball Championship as a stand-alone property.

## Recommendation 2.2

### Use "March Madness" for both the Division I Men's and Women's Basketball Championships.

The NCAA owns one of the most popular brands in sports—March Madness—and should use it in the marketing and presentation for both the Division I Men's and Women's Basketball Championships. For example, the NCAA's @MarchMadness Twitter and Instagram accounts have a combined 2.3 million followers, but they are used only to promote the men's tournament.[251] Nothing in the CBS/Turner or ESPN Multi-Media Agreements (or any other agreement, including the Champion and Partner agreements) limits use of the mark in this way.[252] Moreover, as detailed above, there is significant value that could be realized from the women's tournament using the mark. *See* pp. 37-40.[253] The NCAA could generate branded, cross-promotional marketing for both championships, which will become even more important and practical if there is a combined men's and women's Final Four, *see* Recommendation 3.1.[254]

Similarly, there should be no differentiation between the men's and women's championships by using gender modifiers in front of only the women's tournament, *i.e.* "Final Four" to describe the Division I Men's Basketball Championship finals and "Women's Final Four" to describe the Division I Women's Basketball Championship finals. Instead, to the extent necessary, the championships can be distinguished by referring to the location (*e.g.*, "San Antonio

---

[250] *Id.* This is one of a number of recommendations made by Desser that are designed to create new and increased sources of revenue for the NCAA and its media partners while simultaneously strengthening the marketing clout of the Division I Women's Basketball Championship and other NCAA tournaments. Desser has also provided more specific and sensitive suggestions for navigating these negotiations to the NCAA under private cover in order to protect the NCAA's ability to succeed in those negotiations.

[251] *See* NCAA March Madness (@marchmadness), Twitter (last visited July 21, 2021), https://twitter.com/marchmadness (tagline states "The official NCAA March Madness destination for all things Division I NCAA Men's Basketball. #MarchMadness"); NCAA March Madness (@marchmadness), Instagram (last visited July 21, 2021), https://www.instagram.com/marchmadness/ (tagline states "Official Instagram account for all things #marchmadness & D1 Men's Basketball.").

[252] *See, e.g.*, NCAA Corporate Champion Agreement between AT&T Services, Inc., Turner, and CBS (Sept. 1, 2017), Ex. B ("**March Madness®** - *Division I men's or women's basketball only* **March Mayhem™**- *Division I men's or women's basketball only* **Midnight Madness®** - *Division I men's or women's basketball only* . . . **The Big Dance®** - *Division I basketball only* **The Final Four®** - *Division I men's or women's basketball only*.").

[253] Desser Report § 4.1 (describing significant benefits of using March Madness for Division I Women's Basketball Championship, without taking anything away from Division I Men's Basketball Championship).

[254] While the Division I Finance Committee's branding and marketing study is exploring how the NCAA can best capitalize on using its trademarks (including March Madness and Final Four) outside of Division I men's basketball, that should not delay the NCAA's use of the March Madness mark and branding at both the 2022 Division I Men's and Women's Basketball Championships.

Final Four" and "Indianapolis Final Four") or by using "Men's Final Four" along with "Women's Final Four."

## Recommendation 2.3

Negotiate for a new tier of corporate sponsors for the Division I Women's Basketball Championship (and other NCAA championships).

The way in which the existing broadcast and sponsorship agreements are currently structured does not encourage, and in fact makes it exceedingly difficult (if not impossible) for sponsors to activate at events other than the Division I Men's Basketball Championship. The NCAA should therefore encourage CBS/Turner to permit the sale of a new tier of non-conflicting corporate sponsorships, which would include marketing rights to Division I women's basketball (or another agreed-upon event or series of events) that are more limited than those available to Champions and Partners. This new non-conflicting sponsorship tier should permit flexible formats and customized sponsorship opportunities (*e.g.*, creating an opportunity for a women's basketball-specific product at the Division I Women's Basketball Championship or a swimming-specific product at the swimming championships).[255]

## Recommendation 2.4

Create a new senior position of Chief Business Officer to implement a strategy in the marketing, promotion, and sponsorship of the championships that both prioritizes gender equity and ensures the long-term sustainability of the NCAA.

The NCAA should create a new senior position of Chief Business Officer ("CBO") responsible for implementing a strategy designed to maximize value across all NCAA championships while promoting gender equity. That leader would oversee the NCAA's media partner relationships with CBS/Turner and ESPN, the Corporate Partner Program, and branding and marketing for all championships, specifically by having reporting responsibility over the Directors for each of those programs. The CBO should report directly to the President or Chief Operating Officer of the NCAA, and would be responsible for implementing many of the recommendations within this report, *see* Recommendations 2.1-2.3 and 2.5-2.8, and made by our independent media expert.

One of the CBO's key responsibilities would be to implement a strategy, working with the NCAA's media partners and within the current broadcast contracts, to find ways to increase gender

---

[255] Desser Report § 6(5).

equity through flexibility and modest accommodations. Ultimately, the CBO would be responsible for negotiating future contracts that are structured to maximize benefits throughout the NCAA championships.

There would be several benefits to this newly created CBO position and structure, which also was recommended by Desser.[256] First, removing responsibility for broadcasting, Champions and Partners, marketing, and branding out from under the leadership of basketball would help to ensure that the broadcasting agreements and the Corporate Partner Program maximize the value of all championships, not just men's basketball. Second, putting these departments (which currently report up through different leaders at the NCAA) under a single individual will make it easier for these groups to work in concert and to think creatively and cohesively about maximizing value and how to grow a diverse set of revenue producing championships, including women's basketball. In addition, this reporting structure acknowledges the substantial responsibilities of the newly created CBO and Head of Championships, each of whom will have responsibility for ensuring gender equity if the recommendations in this report are implemented.

## Recommendation 2.5

Implement an overall strategy to realize the value of the Division I Women's Basketball Championship (and other championships across the NCAA).

Working in conjunction with its media and corporate partners, and based on the advice, analysis, and recommendations of our independent media expert, *see* Desser Report, the NCAA, led by its new CBO, should implement a strategy to realize the significant value of Division I women's basketball (and other sports) by (1) working within the current broadcast contracts to seek increased flexibility and accommodations in order to increase gender equity, and (2) ultimately negotiating future contracts that are structured to maximize benefits across the NCAA championships.

As our independent media expert has explained, "While the NCAA's media agreements are locked in for three (ESPN) and 11 (CBS/Turner) more years, there is nothing stopping the NCAA and its media partners from exploring changes to the current agreements now that can create more value for everyone involved going forward. And, as the NCAA's media partners, CBS/Turner and ESPN should all be open to adjustments as the current gender equity issues that have surfaced provide ample justification for changes to the status quo. Here, the combined efforts of the NCAA and its media partners would protect the premium value of the [Division I Men's Basketball Championship] and the continued development of the [Division I Women's Basketball Championship] and the NCAA's Other Championships."[257]

---

[256] *Id.* §§ 1.8, 5.2.

[257] *Id.* § 5.2

## Recommendation 2.6

Establish a system for tracking sponsorship activations across the Division I Men's and Women's Basketball Championships (and all other championships across the NCAA).

To be able to work strategically to maximize sponsorships and sponsor activation at the Division I Men's and Women's Basketball Championships (and across all NCAA championships), the NCAA should establish a system for tracking where and how the NCAA's corporate sponsors have been and are activating, both historically and in real time. Such a system should be established no later than 2022 and will allow the NCAA to better track sources of revenue and evaluate opportunities on an ongoing basis.

## Recommendation 2.7

Pursue marketing and promotional opportunities that will benefit both the Men's and Women's Division I Basketball Championships.

The NCAA can and should make changes now, working within the parameters of the existing broadcast agreements, so as to maximize the value of the Division I Women's Basketball Championship. Ideally, each of these changes should be implemented before the 2022 Division I Men's and Women's Basketball Championships so that the NCAA can begin obtaining data and feedback prior to, and best equip itself to take full advantage of, combined Division I Final Fours, *see* Recommendation 3.1:

- *Televise the women's Final Four on ABC.* The NCAA should encourage ESPN to exercise its contractual right to air the women's Final Four, or at the very least the championship game, on ABC, and ideally during the best time slot in prime time (9-11 pm ET). According to our independent media expert, airing these games on ABC would carry the Division I Women's Basketball Championship to a broader audience who may not have access to ESPN through a cable or streaming subscription.[258]

- *Optimize mobile apps.* To optimize gender equity and maximize the championships' value, our independent media expert has recommended that the March Madness Live mobile app become the go-to location for all basketball fans to follow both the men's and women's tournaments, including news, information, scores, schedules and live streaming.[259] This would require changes to the existing contracts, because the current March Madness Live

---

[258] *See* ESPN Multi-Media Agreement § 5.3; Desser Report § 3.6(1).

[259] Desser Report §§ 1.9(2), 4.1.

app is run and owned exclusively by CBS/Turner and yet the rights to broadcast the live women's tournament are exclusive to ESPN. Under the existing contracts, it is also unlikely that ESPN would have any incentive to develop an app for the Division I Women's Basketball Championship that is of similar quality to the March Madness Live app, because ESPN benefits from the live streaming of the women's tournaments on its current ESPN app. Within the existing media agreements, however, the NCAA could: (1) encourage CBS/Turner to include the Division I Women's Basketball Championship bracket, and feature players and stories from Division I women's basketball, on its March Madness Live app, within legal limits; and (2) enhance the NCAA-run Division I women's basketball app (titled "DI WBB"), including by posting features on players, games, and the tournament bracket. To the extent CBS/Turner is unwilling to include women's basketball content on the app, CBS/Turner should be encouraged to change the name of the March Madness Live app to the "Men's March Madness Live app" to ensure that consumers understand that the app is covering only the men's tournament.

- ***Monetize social media accounts.*** The NCAA should create a plan for developing and monetizing the NCAA's social media accounts for the Division I Men's and Women's Basketball Championships.

These examples are by no means exhaustive, and the NCAA should explore opportunities to implement other such arrangements with its broadcast and corporate partners.

## Recommendation 2.8

### Increase cross-promotion of the Division I Men's and Women's Basketball Championships.

There are some additional steps that the NCAA can and should take immediately to encourage cross-promotion of the men's and women's championships that may require modest tweaks to its contractual agreements with its media partners. As our independent media expert has explained, "More aggressive cross-promotion of the [Division I Men's Basketball Championship] and [Division I Women's Basketball Championship] can help to lift each other" by driving up viewership and the value of media rights.[260] By way of example only:

- CBS/Turner and ESPN could hold combined or successive, and cross-promoted, selection show(s) in which the networks reveal both the men's and women's tournament brackets, instead of holding the selection shows separately on different days and on different networks (as is the current practice).

---

[260] *Id.* § 4.3.

- Throughout the year, ESPN and CBS/Turner could run combined highlights of both the men's and women's championships (and even other championships) in vignette packages.[261]

These examples are by no means exhaustive, and the NCAA should explore opportunities to implement other such cross-promotion arrangements with its broadcast and corporate partners.

---

[261] *Id.* § 6(5).

# WHAT SHOULD BE DONE WITH RESPECT TO THE DIVISION I MEN'S & WOMEN'S BASKETBALL CHAMPIONSHIPS

## 1. The Student-Athlete Experience

Given the above, there can be no serious dispute that the student-athlete experience is not the same at the NCAA women's and men's basketball tournaments. For all the reasons discussed herein, the two championships are materially different events. The involvement of corporate sponsors at the men's tournament, and the synergies between the corporate sponsors and CBS/Turner, mean that the men's championship has a meaningfully different look and feel, with professional quality events, venues, and broadcasts, all of which is lacking at the women's championship. *See* pp. 40-47, 70-75. Relatedly, the disparate financial investment made by both sponsors and the NCAA in everything from signage and branding to gifts and mementos means that NCAA women's basketball players do not currently have the same championship experience as their male counterparts. *See* pp. 34-47, 57-60, 70-75.

Achieving gender equity at the Division I Men's and Women's Basketball Tournaments, however, does not mean that the championships need to be identical. As a group of Division I commissioners acknowledged, "the need for equitable treatment . . . does not necessarily require identical or equal characteristics in all circumstances."[262] The key inquiry, as distilled down by the Women's Basketball Oversight Committee and the Women's Basketball Coaches Association, among others, is which aspects of women's and men's basketball must be equal, which should be comparable, and which are and should be "different for a reason."[263]

There is a general consensus among stakeholders that those elements of the men's and women's tournaments directly impacting the student-athlete experience must be the same, or at least comparable. As the SVP of Basketball explained, the "baseline has to be making sure that the experience of the student-athletes, if not exactly the same, is close to it." This does not mean that "every part of the [Women's Basketball] NCAA Championship must follow the men's structure."[264] It does mean, however, that, to the extent they are not already, tournament elements like branding, the size of the brackets, student-athlete amenities (*i.e.*, food, swag bags, weight rooms, etc.), and transportation and lodging, among other things, should be roughly the same or comparable.[265]

---

[262] Letter from Select NCAA Division I Commissioners to Kaplan Hecker & Fink LLP (May 14, 2021).

[263] Women's Basketball Oversight Committee, Game Plan for Gender Equity in Basketball (May 27, 2021); *see also* Our Fair Shot, WBCA (last visited July 21, 2021), https://ourfairshot.com/.

[264] Letter from Division I Commissioner to Kaplan Hecker & Fink LLP (Apr. 20, 2021).

[265] Letter from Select NCAA Division I Commissioners to Kaplan Hecker & Fink LLP (May 14, 2021) ("[V]isible presentation . . . of all NCAA championships (e.g., signage, décor, branding) in the game facility including back of the house (e.g., locker rooms, media rooms)," "[g]ifts provided to student-athletes" and "[e]vent production" should be equitable, recognizing that in some

# 2. Recommendations

## Recommendation 3.1

### Hold the men's and women's Final Fours together in one city.

One way to ensure that the student-athlete experience at the men's and women's championships is more equitable is to have a single, combined event—in this case, a combined Final Four over the same weekend in the same city. Having the men and women participate in a single, combined event would require careful and thoughtful planning, with meticulous attention to detail to ensure an equitable student-athlete experience. In light of the structure of the NCAA's existing broadcast and sponsorship contracts, however, there is no realistic way to obtain the same level of corporate sponsorship and promotional synergies at a separate women's championship in a separate city. Put simply, without combining the Final Fours, the women's championship will continue to have a different look and feel from the men's championship, at least until the CBS/Turner Multi-Media Agreement expires in 2032. Indeed, our independent media expert, Ed Desser, has strongly recommended combining the Final Fours because, in his view, doing so would "enhance both the [Division I Women's Basketball Championship] and the [Division I Men's Basketball Championship] too—through improved promotion" and a myriad of other benefits.[266]

According to Desser, combined Final Fours would create a more compelling weekend schedule in the host city that the media partners could aggressively cross promote; provide additional ticketing demand for the women's Final Four because of the large fan pool in the city, many of whom cannot acquire the higher-demand men's basketball tickets; help facilitate and expand corporate partner involvement in the women's Final Four due to sponsor proximity; and enhance press and electronic media coverage and social media activation such as ESPN bringing "SportsCenter" to the host city and social media companies establishing home bases in the city.[267] Combined Final Fours could also be an amazing (and lucrative) fan-building event—serving as a premier basketball showcase that would create increased interest and support from corporate sponsors, broadcasters, and other NCAA partners. As discussed in the previous section, because of the way in which the NCAA's contracts are structured, there is no way to compel the NCAA's sponsors to "activate" at the women's tournament, especially if the women's Final Four is held in another city at the same time as the men's Final Four.[268]

To be successful, however, the transition to combined Final Fours cannot be made half-heartedly. While the first combined Final Fours may not be perfect, it is important that the NCAA

---

instances, the "scope and scale" of the events may "warrant different deliverables."). Some policies at the NCAA are already the same for men and women, such as the per diem policy.

[266] Desser Report §§ 1.7, 4.

[267] *Id.* §§ 1.8, 4.2.

[268] *Id.* § 4.2(4).

and its partners work diligently and put in the necessary effort and attention to ensure that combined Final Fours are as successful as possible—both in terms of the student-athlete experience and as a revenue driver for the NCAA. Combining the men's and women's Final Fours will require a lot of thoughtful planning and promotion. For example, efforts will need to be undertaken to achieve the goal that every sponsor that chooses to "activate" at the men's Final Four does the same for the women's Final Four. Any concert by Miley Cyrus or anyone else that is open to the male student-athletes and their fans will obviously have to be available to the female student-athletes and their fans on the same terms. In other words, each and every detail will need to be considered, and decisions will need to be made carefully and with intent to ensure that the student-athlete experience is gender-equitable.

There is also no question that planning and promoting combined Final Fours, rather than two separate events, would create significant efficiencies and cost-savings for the NCAA, its membership, and its partners. These cost savings would be even more significant if the NCAA chose to also hold the Final Fours in the same venue. There would similarly be an advantage from a monitoring perspective since it would be a lot easier to determine whether hotel rooms, food, locker and weight room facilities, or signage are comparable if they are all in the same city.

Of course, combining the Final Fours in one city is not a new idea—current Big East Commissioner Val Ackerman recommended combining Final Fours almost a decade ago in her 2013 White Paper.[269] Others have encouraged the NCAA to consider the idea by pointing to the world of professional tennis. Billie Jean King, winner of 39 Grand Slam tournament titles and renowned gender equity advocate, has always preferred combined men's and women's events, even when she broke away from the United States National Lawn Tennis Association in 1970 over gender pay disparities to found the women's-only Virginia Slims Circuit in 1971.[270] As she explained to us, "Virginia Slims was Plan B. Plan A was always to have the men and women together. Men and women together create much more value, and that's what we want the world to look like." A Division I conference commissioner similarly attributed the growth and success of women's tennis to the fact that it is "side by side with the men in its most important moments. It's a unified product, and that brings eyeballs and popularity and brand value to the women's."

Even many of those who are skeptical about the idea of combining the Final Fours because of the not-irrational fear that the women's games will be "drowned out," have expressed an openness to trying it to see if it works. Perhaps most importantly, however, the overwhelming majority of women's basketball players whom we asked about this possible solution during our review were in favor of attempting to combine the Final Fours to grow the profile of the women's tournament and provide a more comparable experience to the men's tournament. And we and our

---

[269] Val Ackerman, Division I Women's Basketball White Paper at 43 (June 15, 2013), https://wbca.org/sites/default/files/061513-ackerman-white-paper.pdf ("Ackerman White Paper").

[270] Melissa Murphy, *Original 9 Trailblazers Stood for Tennis Equality in 1970*, AP (Sept. 23, 2020), https://apnews.com/article/new-york-billie-jean-king-virginia-us-open-tennis-championships-wimbledon-ec4f2a1684a5efd286cbfb31a7611764.

independent media expert believe that women's basketball now has the maturity, the fanbase, and the positive momentum to carry it to the "next level."

Accordingly, we recommend that the men's and women's Final Four events should be combined as soon as possible—preferably no later than the 2022-23 season (*i.e.*, spring 2023) so as to continue building on this positive momentum. While there certainly would be a more limited number of cities in the United States capable of hosting combined Final Fours, both Houston and Dallas, which are scheduled to host the 2023 men's and women's Final Fours, respectively, are capable of hosting such a combined event.[271] Moreover, our independent media expert has strongly recommended implementation of this recommendation by the 2023 championship, because it would "generate significant incremental value for the [Division I Women's Basketball Championship] immediately and thus provide the NCAA with a tremendous strategic advantage heading into its ESPN renewal discussion."[272] In our view, combined Final Fours should be held in this manner for at least three or four years to give the NCAA time to fine tune the combined event and assess its full impact.

We do not make this recommendation lightly. We understand that the NCAA has made commitments to host cities for multiple years, and this recommendation will require the NCAA to work with those host cities to make changes to their plans based on the serious and shared value of promoting gender equity. We also appreciate the understandable reluctance of many longstanding members of the women's basketball community to do a combined event given the long, unfortunate history of discrimination against women's sports, including women's basketball. It is critical, however, to make this change and to do so quickly to take advantage of the current momentum, to demonstrate the NCAA's significant commitment to change, to garner the significant benefits to the women's Final Four described above, and to capture the strategic value that combined Final Fours could yield for future contract negotiations.

Indeed, the primary objection we have heard with respect to combining the men's and women's Final Fours was the fear that the women would be overshadowed by and treated as "second-class" to the men. Many suggested that regardless of how carefully the NCAA plans such an event, disparities will remain and the presence of the tournaments simultaneously in the same location will only sharpen the focus on those disparities, making for an inferior student-athlete experience. While such concerns are certainly not unfounded, a combined Final Four, if thoughtfully and intentionally planned and implemented, is the best potential solution to existing tournament gender inequities given the NCAA's current long-term contracts, especially the 2016 CBS/Turner Multi-Media Agreement. After all, the men's and women's tournaments already

---

[271] Indeed, Dallas has previously bid on both the men's and women's tournament for the same year and conveyed to the NCAA its ability to hold both tournaments together. Other possible cities for a combined Final Four other than Dallas and Houston include Indianapolis, New Orleans, Las Vegas, Atlanta, Los Angeles, and St. Louis, among others. *See* Desser Report § 4.2. All of these cities have two separate venues capable of hosting the men's and women's tournaments. Although women's basketball intends to hold a large Title IX 50th anniversary celebration at the 2023 championship, this presents an ideal opportunity to combine the Final Fours, highlight the strength and value of both men's and women's basketball, and emphasize how much women's basketball has grown in the 50 years since Title IX was enacted.

[272] Desser Report § 5.2.

reflect numerous disparities that can be, and now have been, brought to the attention of the wider public in a manner that dampened the student-athlete experience. The mere possibility that some disparities *could* remain despite careful planning, and that those disparities would be noticed by student-athletes, would leave the tournament no worse off than it is now.

Although many stakeholders we contacted would favor combining the men's and women's Final Fours at least on a trial basis, others proposed alternative changes such as (1) maintaining separate men's and women's Final Four events, but holding them on different weekends so as to minimize competition for fans,[273] and (2) maintaining separate tournaments, but holding the women's Final Four (and potentially earlier rounds) in the same location for several years in a row (or possibly permanently) in order to grow a local following and establish event planning infrastructure. For all of the reasons discussed above, and particularly in light of the incentives and limitations created by the CBS/Turner contract, KHF believes that a combined Final Four is the best available means to grow women's basketball and create equity between the men's and women's championship experience.

## Recommendation 3.2

### Ensure that items impacting the student-athlete experience at the Division I Men's and Women's Basketball Championships are gender-equitable.

The NCAA should develop, preferably in conjunction with the real-time gender equity review of the men's and women's basketball championships in Recommendation 1.5, a defined set of items directly impacting the student-athlete championship experience that should be substantially the same at all basketball championships going forward, starting with the 2022 championships. This list of items should be developed by NCAA staff with expertise in Title IX and gender equity, in consultation with staff responsible for the men's and women's basketball championships. "Substantially the same" means that any differences in quality and/or quantity of the items should be reasonable based on the structure of the championship, the size of the audience, and the location of the events. Obviously, as noted above, it will be easier for the NCAA to ensure gender equity with respect to many if not all of these items if the men's and women's Final Fours are held together in one city, as opposed to two separate, simultaneous championships being held hundreds of miles apart. At a minimum, however, the following principles should apply:

- *Health and safety.* Anything that falls within the broad category of health and safety should be substantially the same.

---

[273] Although various stakeholders and NCAA staff members highlighted scheduling conflicts with other major sporting events as one barrier to holding the men's and women's tournaments at separate times, this barrier could potentially be overcome with careful planning.

- ***Practice facilities and locker rooms.*** Understanding that there may be some differences based on the particular location of an event, the size, quality, and proximity of practice facilities and locker rooms should be substantially the same.

- ***Travel and accommodations.*** The type (bus versus plane, charter versus commercial, etc.) and quality of transportation to the championships should be substantially the same, as should the degree to which travel considerations are permitted to impact the brackets. Once at the championships, transportation should also be of a substantially similar quality, including escorts to facilitate travel to and from game venues. Hotels should be of the same quality with substantially similar amenities and located a similar distance from playing venues. To the extent feasible, travel and accommodations should be booked at the same time for both championships, and efforts should otherwise be made to ensure that the men and the women have similar access to limited travel and hotel options so that the best options can be maximized for all teams going to the championships. The food provided at the championships should also be of a substantially similar quality, quantity, and variety.

- ***Gifts, mementos, and other amenities.*** Any gifts, mementos, "swag," or amenities given to student-athletes or their families at the men's and women's tournaments should be substantially the same.

- ***Signage, marketing, promotional efforts, and branding.*** The quality and quantity of signage, marketing, promotional efforts, and branding should be substantially the same. This should include the same opportunity for signage and branding on any team buses and in game facilities, locker rooms, hotels, and public spaces throughout the tournament locale.

- ***Entertainment.*** Any entertainment or other recreational activities made available to student-athletes, their families, and their fans should be substantially the same.

Once developed, the list should be reviewed and updated regularly in order to reflect the current state of the championships.

# THE NCAA'S REVENUE DISTRIBUTION MODEL

## 1. The Current Model

Since the 1970s, the NCAA has distributed approximately 60% of its revenue back to its Division I conferences and schools to fund their Division I athletics and academic-support programs.[274] In 2021, the total amount distributed pursuant to the Division I Revenue Distribution Plan was more than $613 million.[275] The NCAA employs a complex formula to distribute this revenue through nine separate "funds."[276] The largest amount of revenue is distributed through two funds—the Basketball Performance Fund and the Equal Conference Fund—which allocate revenue to conferences based on their participation in, and success at, the Division I Men's Basketball Championship.[277] There is currently no equivalent fund for participation in, or success at, the Division I Women's Basketball Championship.



---

[274] Distributions, NCAA (last visited July 21, 2021), http://www.ncaa.org/about/resources/finances/distributions.

[275] *See* Where the Money Goes Presentation, NCAA Budget FY 2020-21. Division II and Division III each get a set percentage of the NCAA's annual revenue. In 2019, $53.3 million (or 4.37%) went to Division II conferences and institutions, and $35.2 million (or 3.23%) to Division III; in 2021, Division II is set to receive approximately $45 million, and Division III $33 million. *Id.* All three divisions received significantly less revenue in 2020 due to the canceled 2020 championships and a decreased rights fee received from CBS/Turner. 2020 NCAA Financial FAQs, NCAA (last visited July 21, 2021), https://www.ncaa.org/about/resources/finances/2020-ncaa-financial-faqs.

[276] *See generally* NCAA 2021 Division I Revenue Distribution Plan, https://ncaaorg.s3.amazonaws.com/ncaa/finance/d1/2021D1Fin_RevenueD1FinstributionPlan.pdf.

[277] *Id.* at 7, 12.

In total, revenue distributed based on participation in and performance at the men's basketball tournament accounts for more than a third of the distribution to the Division I membership.[278] The Equal Conference Fund distributes revenue equally to all of the Division I conferences that automatically qualify for the men's basketball tournament—that is, all active Division I basketball-playing conferences, of which there are currently 32.[279] As reflected in the above pie chart, 9% of the total funds distributed to Division I conferences goes into this Equal Conference Fund. In 2021, that 9% was close to $54 million, or approximately $1,685,700 per conference.

In addition, the Basketball Performance Fund rewards conferences based on their relative performance at the Division I Men's Basketball Tournament by awarding each conference "units" based on how far its member schools progress at that tournament.[280] Funds are then allocated to the conferences based on the number of units earned by each conference over the prior six-year period.[281] The longstanding justification for the Basketball Performance Fund, which has existed in some form since at least the 1980s, is that because men's basketball generates most of the NCAA's annual revenue through the CBS/Turner contract, the NCAA should reward and incentivize those conferences that support men's basketball and create competitive, successful men's basketball programs. As reflected in the above pie chart, 28% of the total funds distributed to Division I conferences comes from this Basketball Performance Fund. In 2021, over $168 million was distributed to Division I conferences through the Basketball Performance Fund, with conferences receiving distributions ranging from $0 to $33.7 million.

In our view, a model that distributes funds in this way, based only on the performance of men and not women, does not reflect or advance the value of gender equity. To the contrary, it sends a clear and disturbing message to female student-athletes that they are not as valuable as their male counterparts—quite literally, in monetary terms that can translate into millions of dollars. And it has a concrete impact on the experience of women's basketball players: as currently structured, the Basketball Performance Fund incentivizes member institutions and conferences to put more support and resources toward men's basketball, over women's basketball and other sports, in an effort to reap "rewards" from the Fund. Without a similar system to benefit or reward investment in women's basketball, the Basketball Performance Fund perpetuates and exacerbates existing gender inequities and disincentives schools from investing in and developing their women's basketball programs.

---

[278] *Id.* at 3.

[279] *Id.* at 12.

[280] One unit is awarded to each school participating in each game; units are not awarded for the first round for schools that were automatic qualifiers for their particular conference, and are not awarded for the championship game. *See Id.* at 7; Division I Revenue Distribution Governance Policy.

[281] For example, in 2019, the Basketball Performance Fund awarded funds based on units earned at the men's tournament from 2013 to 2018. *See* NCAA 2021 Division I Revenue Distribution Plan at 7, https://ncaaorg.s3.amazonaws.com/ncaa/finance/d1/2021D1Fin_RevenueD1FinstributionPlan.pdf.

No one disputes, and the NCAA community acknowledges and appreciates, that the Division I Men's Basketball Championship is currently the most significant revenue generator for the NCAA. But it is inconsistent with Title IX principles,[282] and with the NCAA's own stated commitment to gender equity, for the NCAA and its membership to reward the success of men's basketball through its revenue distribution model, without providing comparable opportunities and benefits to women's basketball. After all, the NCAA is a not-for-profit membership organization, not an "eat what you kill" business enterprise.

## 2. Recommendation

### Recommendation 4

Apply gender equity values to revenue distribution.

On its face, distributing funds for (or effectively rewarding) performance in the Division I Men's Basketball Championship, but not the women's, is not consistent with fundamental gender equity principles. At the same time, we understand the significant degree to which the NCAA's member institutions rely upon their NCAA funding distributions—and the accompanying budget certainty—in operating their athletics programs, and that the Basketball Performance Fund accounts for a substantial portion of those distributions. Accordingly, any alteration to the Division I revenue distribution model to account for gender equity must be balanced against the membership's need for advanced planning in order to run their athletics programs smoothly and effectively.

We think that this can best be accomplished by phasing in any change over time in a way that will minimize any immediate, deleterious impact. For example, with respect to the Basketball Performance Fund, one way to achieve gender equity would be to reallocate 5% of that Fund every year for the next 10 years (thereby reaching an equitable 50:50 split in year 10) and to distribute that reallocated amount based on performance in the NCAA women's basketball tournament. Phasing in this modification over 10 years would minimize any drastic change in the amount of funds any one conference or school might receive from year to year, giving member conferences and schools time to adjust accordingly.

In addition, including women's basketball in the calculation of Basketball Performance Fund payouts would incentivize member institutions to develop and support their women's basketball programs since schools and conferences that do so successfully would be financially rewarded. The end result would be greater investment in women's basketball, increased parity and competitiveness in the sport, and the potential for conferences and schools not already in the

---

[282] By way of illustration, it would almost certainly violate Title IX if a co-ed NCAA member institution agreed to accept a large sum of money from an alumnus-donor to build a new state-of-the-art gymnasium and the donor sought to condition payment of the funds on only male athletes having access to the gym. *See* 34 C.F.R. § 6.41(c)(7) (requiring under Title IX the "equal athletic opportunity for members of both sexes" in the "[p]rovision of locker rooms, practice and competitive facilities").

picture to gain financially. Most importantly, changing the funding model in this way would send the strong message to student-athletes and the broader NCAA community that women's basketball is valued and treated equitably.

Exhibit B to this report contains a table for illustration purposes only that demonstrates what a hypothetical revised distribution might look like. The projections in Exhibit B are based on the performance of the Division I conferences from 2013 to 2018, and assume that performance remains constant over the proposed 10-year implementation period (as there is no way to accurately predict future performance).[283] The calculations used the following methodology: KHF received the NCAA's calculation for revenue distribution from the Basketball Performance Fund for 2019, which is based on performance at the men's tournament from 2013 to 2018 (the "Men's Distribution"). KHF then used the same formula that the NCAA employs to calculate units allocated to each conference based on performance in the men's tournament to calculate the units that would have been allocated to each conference in 2019 based on performance in the women's tournament from 2013 to 2018 (the "Women's Distribution").[284] Thus, for Year 1, 95% of the total funds available would be distributed among the conferences using the Men's Distribution, and 5% would be distributed using the Women's Distribution. For Year 2, 90% of the total funds available would be distributed among the conferences using the Men's Distribution, and 10% would be distributed using the Women's Distribution, and so on through Year 10.

These calculations show that, based on the above assumptions, nine conferences stand to gain revenue by accounting for women's performance in the Division I championship: the American Athletic Conference, the Atlantic Coast Conference, the Big 12 Conference, the Colonial Athletic Association, the Metro Atlantic Athletic Conference, the Mid-American Conference, the Pacific-12 Conference, the Southeastern Conference, and the Summit League. Five conferences would see no change at all, earning no units for either men's or women's basketball. The remainder would see decreases in their Basketball Performance Fund distribution due to historical success at the men's tournament, but fewer wins at past women's tournaments. Yet, for each year, at most 10 out of 32 conferences would experience a loss of more than 5% of their distribution from the prior year, and no conference would ever experience a loss of more than 9.1% from the prior year. With the incremental 5% per year allocated to women's performance, the median change per year never exceeds a 2.3% loss. This all assumes no future change in performance at either tournament, which is highly unlikely. Indeed, if the conferences that have historically had few schools participate or progress in the women's tournament increase their focus on and improve the performance of their women's basketball programs, then these numbers could

---

[283] The 2013-18 period was used for our analysis because pandemic-related budgetary shortfalls significantly impacted the total distributions made based on performance in the 2014-19 period, and because the pandemic-driven cancellation of the 2020 championships render the 2015-20 period an atypical one.

[284] In other words, KHF assigned one unit per member institution for each round a women's basketball team played in, excluding the automatic qualifiers and the final game. In so doing, KHF did not discount the units or the value thereof based on the fact that the women's tournament currently only has 64 teams, whereas the men's tournament has 68 teams.

change significantly, and those conferences would stand to gain additional revenue under this revised model.

Of course, a 5% phase-in over 10 years is just one possible approach to adjusting the Basketball Performance Fund consistent with gender equity principles; there are certainly other ways to achieve the same end, with potentially different costs and benefits. For example, another option would be to do away with the practice of rewarding performance in any one sport altogether, and to instead distribute these funds in a way that adheres to the principle of gender equity and also satisfies other NCAA goals and values.

Finally in this regard, taking participation in the women's championship into account should in no way change the financial distribution of the Equal Conference Fund. For purposes of advancing the value of gender equity, however, the NCAA should no longer describe the Fund as based solely on having an automatic qualifier in the men's basketball tournament, but should make it clear that the Fund is based on qualifying for both the Division I Men's and Women's Basketball Tournaments.

# DISPARITIES IN PARTICIPATION OPPORTUNITIES

In addition to the disparities that women's basketball players experience when they attend the Division I tournament, there are also differences in the overall number of participation opportunities made available by the NCAA to both current and prospective student-athletes. Put simply, male student-athletes are afforded more opportunities to play competitive basketball by the NCAA than are female student-athletes. These are objective differences in the student-athlete experience that can be readily discerned and fixed.

## 1. Unequal Size of the Division I Tournaments

Although there are roughly the same number of men's and women's Division I basketball teams,[285] only 64 teams participate in the women's tournament, compared to the 68 teams that participate in the men's. The additional four teams on the men's side compete in a series of "play-in" games, known as the First Four, which take place prior to the first and second rounds.[286]

The decision to expand the men's basketball bracket to 68 teams occurred in 2010, the same year that the NCAA entered into the 2010 CBS/Turner Multi-Media Agreement.[287] The expansion of the men's bracket was influenced, in part, by a desire to maximize the value of the men's broadcasting rights, and the CBS/Turner contract specifically provides for the broadcast of the First Four games.[288]

That the women's tournament did not also expand to a 68-team bracket appears to be, in part, a function of the silos in which men's and women's basketball have operated, as discussed above. The NCAA decided to expand the men's basketball bracket in parallel with its negotiation of the 2010 CBS/Turner contract, while discussions about whether to expand the women's basketball bracket remained separate and ongoing.[289] Moreover, there has been no historical consensus among stakeholders on whether expanding the bracket would be good for the game of women's basketball, due to concern that the lack of parity among Division I women's basketball

---

[285] Composition and Sport Sponsorship of the NCAA Membership, NCAA (Sept. 1, 2020) https://www.ncaa.org/about/who-we-are/membership/composition-and-sport-sponsorship-ncaa-membership.

[286] Daniel Wilco, *The First Four of The NCAA Tournament, Explained*, NCAA (Mar. 19, 2021), https://www.ncaa.com/news/basketball-men/bracketiq/2021-02-25/first-four-ncaa-tournament-ultimate-guide.

[287] 2010 CBS/Turner Multi-Media Agreement; Ben Klayman, *NCAA Signs $10.8 Billion Basketball Tourney TV Deal*, Reuters (Apr. 22, 2010), https://www.reuters.com/article/us-basketball-ncaa-cbsturner/ncaa-signs-10-8-billion-basketball-tourney-tv-deal-idUSTRE63L4FP20100422.

[288] 2010 CBS/Turner Multi-Media Agreement § 5.3(d).

[289] *CBS, Turner Win TV Rights to Tourney*, ESPN (Apr. 22, 2010), https://www.espn.com/mens-college-basketball/news/story?id=5125307 ("[T]he Division I Men's Basketball Committee unanimously passed the proposal [to expand the bracket] and it will be reviewed by the Board of Directors next Thursday. . . . Another NCAA committee is looking at whether to expand the women's tournament or keep it in the current format.").

teams would make an expanded women's tournament less competitive overall.[290] At present, however, the women's basketball community appears to largely favor moving to a 68-team bracket for women's basketball for reasons of gender equity.[291]

## 2. National Invitation Tournaments

The men's NIT is a 32-team post-season tournament comprised of the top Division I men's basketball teams that are not selected for the Division I Men's Basketball Championship. The NIT was founded in 1938, but the NCAA did not begin running the NIT until 2005, when it purchased the NIT as part of a $56.5 million settlement of a lawsuit.[292]

While a similar post-season event exists for women's basketball—the 64-team WNIT— the WNIT is owned by Triple Crown Sports, Inc., not the NCAA. The NCAA therefore provides no financial support for the WNIT or the teams competing in it. Triple Crown Sports, for example, requires teams to pay the first $12,000 in travel expenses (including air, hotel, bus, and food) for the entire tournament for a travel party of up to 20, and all travel expenses for any additional travel party members.[293] This means that either a team's school needs to provide funding for participation in the WNIT, or the team needs to raise the money itself in order to be able to participate. The NCAA, by contrast, covers all travel expenses—including air and bus travel—and provides a per diem to cover lodging and meals for travel parties of up to 25 for those teams participating in the NIT.

---

[290] In fact, Val Ackerman noted in her 2013 White Paper that some stakeholders actually favored reducing the number of women's basketball teams in the tournament due to the "gap in program quality between the top and bottom halves of the championship bracket and the prevalence of lopsided games in the early rounds." Ackerman White Paper at 42-43.

[291] *See, e.g.*, Meghan Durham, *Women's Basketball Oversight Committee Sets Priorities Amid Gender Equity Review*, NCAA (June 8, 2021), https://www.ncaa.org/about/resources/media-center/news/women-s-basketball-oversight-committee-sets-priorities-amid-gender-equity-review (noting that the Women's Basketball Oversight Committee plans to evaluate "the expansion of the tournament field to 68 teams"); Letter from Commissioner Richard J. Ensor, Metro Atlantic Athletic Conference, to Kaplan Hecker & Fink LLP (June 3, 2021) (recommending "[e]xpansion to 68 teams for the women's tournament bracket"); Letter from Commissioner James J. Phillips, Atlantic Coast Conference, to Kaplan Hecker & Fink LLP (May 28, 2021) ("For several years, women's basketball coaches and administrators believe the interest surrounding the NCAA Division I Women's Basketball Tournament more than justifies increasing the field from 64 to 68 teams."); Letter from Select NCAA Division I Commissioners to Kaplan Hecker & Fink LLP (May 14, 2021) ("Opportunities for participation in NCAA championships must be equitable, including other postseason opportunities the NCAA controls."); Andrea Adelson, *WBCA to Discuss Inequities Between Men's and Women's Tournament with NCAA*, ESPN (Apr. 12, 2021), https://www.espn.com/womens-college-basketball/story/_/id/31244763/wbca-discuss-inequities-men-women-tournament-ncaa (noting that WBCA requested the Division I Women's Basketball Oversight Committee consider "[e]xpand[ing] the women's championship field from 64 to 68 teams to match the current men's tournament format"); Steve Berkowitz, Lindsay Schnell, & Dan Wolken, *'I Assumed They Were Treating Us Fairly:' Why Can't NCAA Get Women's Basketball Right*, USA Today: Sports (Mar. 27, 2021), https://www.usatoday.com/in-depth/sports/ncaaw/2021/03/27/march-madness-why-cant-ncaa-get-womens-basketball-right/7012017002/ ("West Coast Conference commissioner Gloria Nevarez said: 'It's not just event management. The tournament has quite a few visual issues, but at a bigger level we have 68 teams on men's side, 64 on women's.'").

[292] Frank Litsky, *NCAA Buys NIT for $56.5 Million*, N.Y. Times (Aug. 18, 2005), https://www.nytimes.com/2005/08/18/sports/ncaabasketball/ncaa-buys-nit-for-565-million.html.

[293] There are also costs associated with hosting part of the tournament.

In addition, those schools whose teams participate in the men's NIT receive a financial distribution from the NCAA for participating in the NIT—similar to the distribution from the Basketball Performance Fund discussed above. Just as with the Basketball Performance Fund, monetary "units" are awarded to universities and colleges based on the number of NIT rounds in which their men's Division I basketball teams play in the tournament. The value of individual units is determined based on the financial performance of the event. In 2019, each unit was worth $5,220 for a total distribution to schools of about $330,000.[294] No such monetary units are awarded to the teams playing in the WNIT.

## 3. College Basketball Academy

The NCAA College Basketball Academy is a developmental academy for prospective men's basketball student-athletes. In 2019, the NCAA created the College Basketball Academy when implementing recommendations from the Commission on College Basketball.[295] In response to a federal investigation into college basketball recruiting, the Commission on College Basketball recommended that "the NCAA work with USA Basketball, the NBA and the NBPA and others to establish and administer new youth basketball programs."[296] The NCAA does not run a similar program for prospective women's basketball student-athletes.

The College Basketball Academy is administered and funded by the NCAA—including travel, expenses, and apparel. The College Basketball Academy has run once, in 2019, and was cancelled in 2020 and 2021 due to the pandemic.[297] The program is currently under review—both for financial reasons and gender equity reasons—at the request of the Division I conference commissioners.

## 4. Other Differences in Participation Opportunities

The NCAA also provides support for events like all-star games that are organized and largely sponsored by non-NCAA entities, but that further widen the gap between the number of competitive playing opportunities available in Division I men's and women's basketball. The NCAA's support often includes promoting the event and providing the venue, in-game support such as refereeing and game equipment, and funding to the National Association of Basketball Coaches ("NABC") that helps support the event.

---

[294] 2019 NIT Distribution Listing. By way of comparison, in 2019, Basketball Performance Fund units were worth $280,367.45.

[295] What Is the NCAA College Basketball Academy?, NCAA (last visited July 21, 2021), https://www.ncaa.com/collegebasketballacademy/about.

[296] Commission on College Basketball, Report and Recommendations to Address the Issues Facing Collegiate Basketball (Apr. 2018).

[297] Greg Johnson, *NCAA Cancels College Basketball Academy*, NCAA (May 12, 2020), https://www.ncaa.org/about/resources/media-center/news/ncaa-cancels-college-basketball-academy; NCAA College Basketball Academy (last visited July 19, 2021), https://thecbbacademy.com/. The NCAA spent approximately $5 million in 2019 on NCAA College Basketball Academy events.

For example, men's basketball has the Reese's College All-Star Game, which features the top senior student-athletes from Division I men's teams that do not make it to the Final Four.[298] The game, originally operated by the NABC without corporate sponsorship, has been held during the Final Four weekend since 1978; it was played on the Final Four floor for the first time at the Alamodome in San Antonio in 2008.[299] The game is typically played as part of Final Four Friday, when the men's Final Four teams have open practices. The event is free to the general public.[300] There is no similar all-star game for women's basketball.

Next year, there will also be an additional men's all-star game for student-athletes from historically Black colleges and universities. The game will take place during the Final Four in New Orleans and will be broadcast on CBS.[301] There is currently no similar women's all-star game scheduled.

## 5. Recommendation

### Recommendation 5

Provide an equitable number of participation opportunities.

The NCAA should increase the bracket for the Division I Women's Basketball Championship from 64 teams to 68 teams. In light of the approximately equal number of men's and women's basketball teams in Division I,[302] there is no justification for the disparity in tournament participation opportunities. Going forward, the relevant committees should discuss any future bracket expansion with a view toward equal participation opportunities in the men's and women's tournaments.

As is mentioned above, at this time the women's basketball community appears to largely favor moving to a 68-team bracket for women's basketball for reasons of gender equity. However, some stakeholders were either indifferent to or opposed to expanding the women's tournament to include 68 teams. The primary reason for this opposition was a concern that there is a larger gap between the top and bottom teams at the women's tournament as compared to the men's and, therefore, adding four more women's basketball teams would have an outsized negative impact on

---

[298] Reese's College All-Star Game, NABC (last visited July 21, 2021), https://www.nabc.com/events/college_all-star_game.

[299] Key Dates in NABC History, NABC (last visited July 21, 2021), https://www.nabc.com/about/history/index.

[300] Reese's College All-Star Game, NABC (last visited July 21, 2021), https://www.nabc.com/events/college_all-star_game.

[301] HBCU All-Star Game (last visited July 21, 2021), https://hbcuallstargame.com; Chris Bengel, *CBS Sports Announces Multi-Year Agreement to Broadcast HBCU All-Star Game*, CBS (Mar. 4, 2021), https://www.cbssports.com/college-basketball/news/cbs-sports-announces-multi-year-agreement-to-broadcast-hbcu-all-star-game/.

[302] There are just over 350 teams in both Division I men's and women's basketball. *See* Your Complete List of Men's Division I Basketball Colleges, NCSA (last visited July 21, 2021), https://www.ncsasports.org/mens-basketball/division-1-colleges; Your Complete List of Women's Division I Basketball Colleges, NCSA (last visited July 21, 2021), https://www.ncsasports.org/womens-basketball/division-1-colleges.

the competitiveness of the women's tournament. Even if that were true, looking at this issue through a Title IX lens, the number of participation opportunities for men and women should be substantially proportionate. Moreover, if the NCAA implements Recommendation 4 above and begins distributing revenue based on performance in both the men's and women's tournaments, then there is even more reason to make the number of teams in each of the tournaments the same, so as to make equivalent the opportunity for women's teams to "win" revenue for their conferences.

There is an additional disparity in participation opportunities in connection with the NIT as compared with the WNIT. While our recommendation prioritizes the NCAA Division I championships, the difference between the NIT and the WNIT is a gender disparity that the NCAA should also remedy, including through the possible award of a grant or stipend to schools to help offset the cost of participating in the WNIT. Similarly, if the NCAA decides to continue with the College Basketball Academy, then there should be academies for both girls and boys. The NCAA should also ensure that when it is offered opportunities to support events sponsored by third parties (*e.g.*, all-star games), it strives to offer financial, promotional, and other support for such opportunities on an equitable basis.

# DIVISIONS II & III'S INFRASTRUCTURE
# FOR ADDRESSING GENDER EQUITY

Divisions II and III have managed to avoid many of the systemic problems facing Division I basketball, in large part due to the absence of the financial dynamic that exists in Division I, as discussed above. Since neither men's nor women's basketball in Divisions II and III is viewed as revenue-generating, neither receives any different or preferential treatment.[303] In addition, Divisions II and III plan their championships through a different organizational structure than Division I, and there is an explicit prioritization of gender equity at multiple levels of Division II and III leadership.

## 1. Background

Division II and III institutions are, for the most part, smaller schools that devote fewer financial resources to their athletic programs than their Division I counterparts.[304] The Division II and III men's and women's basketball championships fall under the oversight of both the SVP of Basketball and SVP of Championships at the NCAA. Although there is overlap in their responsibilities, the SVP of Basketball (or, through delegation, the Vice President of Women's Basketball or the Managing Director of Men's Basketball) is generally in charge of play-related matters such as rule changes and court markings, whereas the SVP of Championships oversees everything else, including budgets and the divisional policies and procedures for the championships.

Each of these four championships is managed and run by a championships staff member. Running the Division II and III basketball championships is only a fraction of each of these staffers' jobs, as each has responsibility for planning other NCAA championships. As in Division I, the four championships are also planned by the Division II and III Men's and Women's Basketball Committees. Unlike Division I, however, the Division II and III Men's and Women's Basketball Committees each report to the Division II or III Championships Committee.[305] Each Championships Committee has responsibility for all of the division's championships, and oversees the budget and conduct of these championships.[306]

---

[303] NCAA Comparison of Game Expense for Division III Men's and Women's Basketball 2017 to 2019; NCAA Comparison of Game Expense for Division II Men's and Women's Basketball 2017 to 2019; NCAA Revenue Analysis of Division III Men's and Women's Basketball 2015 to 2019; NCAA Revenue Analysis of Division II Men's and Women's Basketball 2015 to 2019.

[304] About NCAA Division II, NCAA (last visited July 21, 2021), https://www.ncaa.org/about?division=d2; About Division III, NCAA (last visited July 21, 2021), https://www.ncaa.org/about?division=d3.

[305] Division II Championships Committee, NCAA (last visited July 21, 2021), https://www.ncaa.org/governance/committees/division-ii-championships-committee; Division III Championships Committee, NCAA (last visited July 21, 2021), https://www.ncaa.org/governance/committees/division-iii-championships-committee.

[306] *Id.*

The Division II and III championships take place every March (although both were cancelled in 2020, and the Division III championships were also cancelled in 2021).[307] The budgets for these championships are significantly less than the budgets for the Division I basketball tournaments. In 2019, the Division II Men's and Women's Basketball Championship budgets were approximately $1.6 million and $1.9 million, respectively, and the Division III Men's and Women's Basketball Championship budgets were both approximately $1.2 million and $1.3 million, respectively.[308] The Division II and III championships also generate significantly less revenue than the Division I basketball championships. In 2019, NCAA revenue from the Division II men's and women's basketball championships was approximately $110,000 and $60,000, respectively, and approximately $125,000 and $30,000 from the Division III men's and women's basketball championships, respectively.[309]

## 2. Gender Equity Infrastructure

For the most part, the gender disparities in Division I exist to a far lesser extent, if at all, in Divisions II and III. Unlike Division I, budgets and participation opportunities are roughly the same for Division II and III men's and women's basketball. In fact, in certain years, team travel expenses make the women's budgets slightly higher than the men's.[310] Moreover, the bracket sizes for the men's and women's basketball championships in both divisions are identical.

This is attributable in large part to the fact that a central Championships Committee in Division II and III oversees both men's and women's basketball and serves as an important check on gender inequity. The chairs of these committees said they view it as their responsibility to ensure that gender equity is considered when decisions are being made—from how they spend their budgets to whether a specific sport can expand its bracket. The committees consider gender equity within each sport and across the divisions generally.

Because there is a single committee overseeing both the men's and women's basketball championships—*i.e.*, the Division II or III Championships Committee—that committee can and does actively facilitate coordination between the men's and women's championships by ensuring that requests made on the men's side are also considered for the women, and vice versa. For example, in 2019, Division III men's basketball requested a new video replay review system. The

[307] Jeremy Villanueva, *Division III Cancels 2021 Winter Championships*, NCAA (Feb. 3, 2021), https://www.ncaa.com/news/ncaa/article/2021-02-03/division-iii-cancels-2021-winter-championships; *NCAA Cancels Remaining Winter and Spring Championships* (Mar. 12, 2020), https://www.ncaa.org/about/resources/media-center/news/ncaa-cancels-remaining-winter-and-spring-championships.

[308] NCAA Comparison of Game Expense for Division III Men's and Women's Basketball 2017 to 2019; NCAA Comparison of Game Expense for Division II Men's and Women's Basketball 2017 to 2019.

[309] NCAA Revenue Analysis of Division III Men's and Women's Basketball 2015 to 2019; NCAA Revenue Analysis of Division II Men's and Women's Basketball 2015 to 2019.

[310] *See* Division III 2018-19 Facts and Figures, NCAA (last visited July 21, 2013) https://ncaaorg.s3.amazonaws.com/about/d3/2018-19D3_FactandFigures.pdf; NCAA Comparison of Game Expense for Division III Men's and Women's Basketball 2017 to 2019; NCAA Comparison of Game Expense for Division II Men's and Women's Basketball 2017 to 2019.

Championships Committee flagged this request for the championships staff member for Division III women's basketball, who had been unaware that men's basketball was planning to request the technology. The staff member noted that women's basketball would likely support the request if the technology was considered for both women's and men's basketball. Ultimately, the request was denied, but the structural check worked effectively to ensure that the men and women had the same opportunities.

The Division II and III Championships Committees also regularly run participation numbers across like sports as well as all sports in each division to ensure that opportunities are equal for male and female student-athletes and that any differences in participation opportunities correspond to differences in the number of schools sponsoring a particular sport. As one Division II leader explained, Division II takes pride in working to ensure that the participation opportunities across men's and women's sports are 50-50.

Divisions II and III's commitment to gender equity is also embodied by the Divisions' leadership. Committee members and NCAA staff stated that the NCAA leadership and staff in these Divisions, including SVP of Championships Joni Comstock, Vice President of Division II Terri Gronau, and interim Vice President of Division III, Louise McCleary, focus on gender equity and take steps to correct any disparities of which they become aware. For example, when CBS/Turner contracted to broadcast only the Division II men's championship game on CBS or a CBS-affiliated channel,[311] the NCAA paid CBS approximately $150,000 to broadcast the women's semifinals and championship game, as well as $84,000 to broadcast the men's semifinals, on CBS Sports Network.

## 3. Gender Disparities

Despite these commendable efforts to actively address gender equity, there are still some gender disparities in connection with the Division II and III basketball championships. One notable disparity concerns competition venues. The venues used for the Division II and III women's tournaments are consistently smaller, and of a lesser caliber, than the men's venues. Men's basketball often uses larger, off-campus facilities with more amenities, whereas women's basketball, particularly in Division III, often relies on campus facilities. In addition, men's basketball in Divisions II and III more often uses the same venues for several years in a row, which helps to grow the fan base and ensure that an already proven venue is hosting the championship.[312]

The differences between the men's and women's venues were particularly pronounced at this year's Division II basketball championships. While the men's championship took place at the Ford Center in Evansville, Indiana (where the final rounds of the tournament were held in 2014, 2015, and 2019), the women's basketball championship took place at the Greater Columbus

---

[311] 2016 CBS/Turner Multi-Media Agreement § 7.4(d).

[312] Division II Gender Equity Championship Data (2021); Division III Gender Equity Championship Data (2021).

Convention Center in Columbus, Ohio.[313] Shortly before the event, the original venue for this year's Division II women's basketball championship decided against hosting the tournament due to the pandemic. The Greater Columbus Sports Commission, who was cosponsoring the tournament, worked with the NCAA to help them stay in Columbus at the Convention Center.[314] Due to space and public safety restrictions at the Convention Center, however, only approximately 72 family members of the women's basketball players were permitted to attend each game, and no tickets were available to the public.[315] The Convention Center also is not a basketball arena, and while a basketball court was set up, it did not have the look and feel of an NCAA championship.[316] By comparison, the Ford Center, where the men's championship was held, is a large venue and able to seat thousands of fans, even with public safety restrictions on crowd size.[317]

While this year's venue issues were due in part to the pandemic, they were by no means unique. In fact, even the women's original venue would have been smaller and of lesser quality than the men's. Venue selection is driven to a large degree by who bids on the tournament; while the Division II and III Men's and Women's Basketball Committees ultimately choose the venues, they can only pick among the bids that have been submitted. And hosting a men's tournament may have greater appeal to potential host sites due to the greater revenue from ticket sales that has historically been received from Division II and III men's basketball.[318]

Although these external factors contribute to venue disparities, the Division II and III Women's and Men's Basketball Committees do not take steps to coordinate with one another on venue selection to strive for greater equity. Moreover, differences in priorities between the men's and women's committees can also enhance disparities in venue size and quality. For example, one Division III Women's Basketball Committee member noted that their committee focuses on

---

[313] Wayne Cayadi, *DII Men's Basketball Championship: How to Watch the DII Men's Elite Eight*, NCAA (Mar. 29, 2019), https://www.ncaa.com/news/basketball-men/article/2019-03-28/dii-mens-basketball-championship-how-watch-dii-mens-elite; Hendrix Magley, *NCAA D2 Men's Basketball Elite Eight, Other Postseason Events Staying in Evansville*, Courier & Press (Oct. 15, 2020), https://www.courierpress.com/story/sports/college/2020/10/15/ncaa-division-ii-mens-basketball-elite-eight-return-evansville-2024/3654751001/; Jacob Myers, *How Columbus Will Host NCAA Division II Women's Basketball Championship During a Pandemic*, Dispatch (Mar. 23, 2021), https://www.dispatch.com/story/sports/2021/03/23/how-columbus-host-ncaa-d-2-womens-basketball-title-during-pandemic/4769478001/.

[314] Jacob Myers, *How Columbus Will Host NCAA Division II Women's Basketball Championship During a Pandemic*, Dispatch (Mar. 23, 2021), https://www.dispatch.com/story/sports/2021/03/23/how-columbus-host-ncaa-d-2-womens-basketball-title-during-pandemic/4769478001/.

[315] *Id.*

[316] Sarah Wynn, *Preparations Underway in Columbus for NCAA Division II Women's Basketball Tournament*, ABC 6 (Mar. 10, 2021), https://abc6onyourside.com/sports/content/preparations-underway-in-columbus-for-ncaa-division-ii-womens-basketball-tournament.

[317] *Safety Protocols of NCAA Basketball Championships at Ford Center*, City County Observer (Mar. 3, 3021), https://city-countyobserver.com/safety-protocols-of-ncaa-basketball-championships-at-ford-center/ ("Spectator seating for the events will be limited to 2,500 fans and will be divided into socially-distanced pods.").

[318] NCAA Revenue Analysis of Division III Men's and Women's Basketball 2015 to 2019; NCAA Revenue Analysis of Division II Men's and Women's Basketball 2015 to 2019.

finding a venue that fits the expected crowd size, whereas the men's committee often purposefully chooses larger venues.

Divisions II and III risk other small disparities occurring at the men's and women's championships because, as in Division I, there is no formal system for ensuring staff communication and coordination while planning the tournaments. Individual staff members have discretion in decision-making, which can result in disparities between the tournaments if the staff members do not coordinate. The fact that budgets are modest and largely the same helps to minimize any unintentional disparities, but does not prevent such disparities entirely. Small differences can also result from amenities being provided by host institutions and localities.[319]

## 4. Recommendations

### Recommendation 6.1

**Establish regular communications between the Division II and III Men's and Women's Basketball Committees that focus on coordinating on strategic decisions and achieving gender equity in the student-athlete experience.**

While Divisions II and III largely do not have the same gender equity issues as Division I, those gender equity issues that do arise—such as issues related to venues and site selection—largely stem from lack of coordination and communication between the basketball staff and committees. Accordingly, consistent with Recommendation 1.4 above, the Division II and III Men's and Women's Basketball Committees should regularly communicate, with a focus on coordinating strategic decisions and achieving gender equity in the student-athlete experience.

This enhanced communication and coordination should include site selection and the quality of venues, including coordinating on the timing of selecting venues and developing a considered list of priorities for site selection. While differences in the quality of venues is largely dependent on who bids to host the tournaments, the lack of coordination on site selection and differing priorities between the Division II and III Men's and Women's Basketball Committees has led to an inability to identify and address these venue-related issues during the site selection process. For example, if the timing for site selection were coordinated and the venues bidding for the women's events happened to be disparate from the men's, the Basketball Committees could consider combining the tournaments in one location or making other changes to improve venue options.

---

[319] Division II Gender Equity Championship Data (2021).

NCAA External Gender Equity Review
Phase I: Basketball Championships

## Recommendation 6.2

Ensure that items impacting the student-athlete experience at the Division II and III Men's and Women's Basketball Championships are gender-equitable.

      The championships staff for Division II and III men's and women's basketball should coordinate with one another to ensure that those items that impact the student-athlete experience (as detailed in Recommendation 3.2 above) are substantially the same.

# ENSURING PROGRESS ON GENDER EQUITY

Many of the recommendations made in this report are not new. Indeed, some will be all too familiar to those who have been involved with women's collegiate basketball over the last 30 years or more. But the events that occurred at this year's NCAA Division I Men's and Women's Basketball Championships—and which led to this review—have provided the NCAA, its membership, and its corporate and media partners with a unique opportunity to work together to implement these recommendations now, effectuating real change to achieve gender equity and improve the student-athlete experience at the championships going forward. Having spoken to literally hundreds of conference commissioners, athletic directors, SWAs, coaches, student-athletes, sports groups and institutes, and many, many others, we are confident that the college sports community and its supporters are ready, willing, and able to help improve gender equity at the NCAA championships; in fact, they expect nothing less.

## Recommendation 7

For the next five years, conduct an annual public assessment of the NCAA's progress in implementing the recommendations set forth in this report.

To keep the collegiate sports community informed and engaged in this process, and to ensure that the best possible use is made of this opportunity to make change at the NCAA, there should be an annual assessment of the NCAA's progress in implementing this report's recommendations. The assessment should be made public on the NCAA website, and also provided to the Board of Governors, the Board of Governors Committee to Promote Cultural Diversity and Equity, the Gender Equity Task Force, the Committee on Women's Athletics, the Division I Board of Directors, the Division II and III Presidents Councils, the Division II and III Championships Committees, and the Men's and Women's Basketball and Basketball Oversight Committees for all divisions.

# LIST OF RECOMMENDATIONS

The gender equity challenges that the NCAA faces are significant and systemic. But there are concrete steps that the NCAA can take to address them. The recommendations outlined above, and listed again below, provide a comprehensive roadmap for advancing the gender equity principles to which the NCAA and its members have committed.

***Providing Structural Support for and Improving Transparency and Accountability Around Gender Equity* (see pp. 61-66 for details)**

Recommendation 1.1: Change the leadership structure of Division I basketball to prioritize gender equity and coordination between the men's and women's tournaments.

Recommendation 1.2: Before the next budget cycle, conduct a "zero-based" budget for Division I men's and women's basketball to ensure that any gender differences are necessary, appropriate, and equitable.

Recommendation 1.3: Develop equity in staffing for Division I men's and women's basketball.

Recommendation 1.4: Establish regular communications between the Division I Men's and Women's Basketball Committees and Basketball Oversight Committees that focus on coordinating on strategic decisions and achieving gender equity in the student-athlete experience.

Recommendation 1.5: Perform a real-time gender equity audit of the Division I Men's and Women's Basketball Championships as they are being planned and executed each year.

Recommendation 1.6: Prepare an annual report on the results of the real-time gender equity audit, including issues identified, how those issues were resolved, and lessons learned.

Recommendation 1.7: Conduct an external gender equity assessment of the Division I Men's and Women's Basketball Championships in five years.

Recommendation 1.8: Complete a gender equity impact statement in connection with significant actions taken outside of the annual championship planning process.

Recommendation 1.9: Evaluate and reward performance for contributions to gender equity.

Recommendation 1.10: Increase NCAA staff with expertise in Title IX and gender equity.

***Maximizing Value Through Gender Equity in Marketing, Promotion, and Sponsorships* (see pp. 78-84 for details)**

Recommendation 2.1: Market the rights to the Division I Women's Basketball Championship as a stand-alone property.

Recommendation 2.2: Use "March Madness" for both the Division I Men's and Women's Basketball Championships.

Recommendation 2.3: Negotiate for a new tier of corporate sponsors for the Division I Women's Basketball Championship (and other NCAA championships).

Recommendation 2.4: Create a new senior position of Chief Business Officer to implement a strategy in the marketing, promotion, and sponsorship of the championships that both prioritizes gender equity and ensures the long-term sustainability of the NCAA.

Recommendation 2.5: Implement an overall strategy to realize the value of the Division I Women's Basketball Championship (and other championships across the NCAA).

Recommendation 2.6: Establish a system for tracking sponsorship activations across the Division I Men's and Women's Basketball Championships (and all other championships across the NCAA).

Recommendation 2.7: Pursue marketing and promotional opportunities that will benefit both the Men's and Women's Division I Basketball Championships.

Recommendation 2.8: Increase cross-promotion of the Division I Men's and Women's Basketball Championships.

### Improving Gender Equity at Future Championships (see pp. 86-90 for details)

Recommendation 3.1: Hold the men's and women's Final Fours together in one city.

Recommendation 3.2: Ensure that items impacting the student-athlete experience at the Division I Men's and Women's Basketball Championships are gender-equitable.

### Recognizing Gender Equity in Revenue Distribution (see pp. 93-95 for details)

Recommendation 4: Apply gender equity values to revenue distribution.

### Ensuring Gender Equity in Participation Opportunities (see pp. 99-100 for details)

Recommendation 5: Provide an equitable number of participation opportunities.

### Enhancing Gender Equity in Division II and III Basketball (see p. 105-06 for details)

Recommendation 6.1: Establish regular communications between the Division II and III Men's and Women's Basketball Committees that focus on coordinating on strategic decisions and achieving gender equity in the student-athlete experience.

Recommendation 6.2: Ensure that items impacting the student-athlete experience at the Division II and III Men's and Women's Basketball Championships are gender-equitable.

### Ensuring Progress on Gender Equity (see p. 107 for details)

Recommendation 7: For the next five years, conduct an annual public assessment of the NCAA's progress in implementing the recommendations set forth in this report.

# EXHIBIT A: SCOPE OF REVIEW

| EXTERNAL STAKEHOLDER CONNECTIONS | |
|---|---|
| **Stakeholder Interviews** | 110 |
| **Discussion Forums** | 21 |
| **BREAKDOWN OF EXTERNAL STAKEHOLDERS BY ROLE** | |
| **Student-Athletes** | 78 |
| **Commissioners** | 37 |
| **Coaches** | 66 |
| **Athletic Directors** | 25 |
| **SWAs** | 27 |
| **Sports Organizations and Institutes** | 17 |
| **Other** | 30 |
| **TOTAL** | 280 |
| **KHF GENDER EQUITY WEBSITE**[320] | |
| **Unique Visitors** | 12,125 |
| **Submissions** | 1,762 |

---

[320] As of August 2, 2021.

NCAA External Gender Equity Review
Phase I: Basketball Championships

| NCAA INTERVIEWS | |
|---|---|
| **NCAA Staff** | 75 |
| **NCAA Committee Members** | 63 |
| **Contractors, Local Organizing Committees, and Others** | 6 |
| **TOTAL** | 144 |
| **KEY NCAA INTERVIEWEES** | |
| **NCAA Senior Leadership** | ▪ President Mark Emmert<br>▪ Former Chief Operating Officer/Chief Legal Officer Donald Remy<br>▪ Executive Vice President of Regulatory Affairs Stan Wilcox<br>▪ SVP of Basketball Dan Gavitt<br>▪ Vice President of Women's Basketball Lynn Holzman<br>▪ SVP of Administration and Chief Financial Officer Kathleen McNeely<br>▪ SVP and Chief Medical Officer Dr. Brian Hainline<br>▪ SVP of Communications Bob Williams<br>▪ Interim SVP of Legal Affairs and General Counsel Scott Bearby<br>▪ SVP of Championships Dr. Joni Comstock<br>▪ Interim SVP of Policy and Governance Chief of Staff Cari Van Senus<br>▪ Vice President of Division I Kevin Lennon<br>▪ Vice President of Enforcement Jon Duncan<br>▪ Vice President of Division II Terri Steeb Gronau |

NCAA External Gender Equity Review
Phase I: Basketball Championships

| | |
|---|---|
| | <ul><li>Interim Vice President of Division III Louise McCreary</li><li>Vice President of Academic and Membership Affairs Dave Schnase</li><li>Managing Director of Inclusion Amy Wilson</li></ul> |
| **Members of NCAA Committees** | <ul><li>Division I Women's Basketball Committee</li><li>Division I Women's Basketball Oversight Committee</li><li>Division I Men's Basketball Committee</li><li>Division I Men's Basketball Oversight Committee</li><li>Division II Women's Basketball Committee</li><li>Division II Men's Basketball Committee</li><li>Division III Women's Basketball Committee</li><li>Division III Men's Basketball Committee</li><li>Division I Board of Directors Finance Committee</li><li>Division II Planning and Finance Committee</li><li>Division II Championships Committee</li><li>Division III Championships Committee</li><li>Division II Management Council</li><li>Division III Management Council</li><li>Division III Administrative Committee</li><li>Board of Governors Committee to Promote Cultural Diversity and Equity</li><li>Committee on Women's Athletics</li><li>Minority Opportunities and Interests Committee</li><li>Gender Equity Task Force</li></ul> |
| **DOCUMENTS** | |
| **Documents from the NCAA** | 4,086 |

NCAA External Gender Equity Review
Phase I: Basketball Championships

# EXHIBIT B: ANALYSIS OF BASKETBALL PERFORMANCE FUND DISTRIBUTION

| Conference | Men's-Only Payment | Year 1: 95/5 | Year 2: 90/10 | Year 3: 85/15 | Year 4: 80/20 | Year 5: 75/25 | Year 6: 70/30 | Year 7: 65/35 | Year 8: 60/40 | Year 9: 55/45 | Year 10: 50/50 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| America East Conference | $560,734 | $547,932 | $535,131 | $522,329 | $509,528 | $496,726 | $483,925 | $471,123 | $458,322 | $445,520 | $432,719 |
| American Athletic Conference | $11,214,696 | $11,446,189 | $11,677,683 | $11,909,176 | $12,140,669 | $12,372,162 | $12,603,656 | $12,835,149 | $13,066,642 | $13,298,135 | $13,529,629 |
| Atlantic Sun Conference | $1,121,469 | $1,095,866 | $1,070,263 | $1,044,660 | $1,019,056 | $993,453 | $967,850 | $942,247 | $916,644 | $891,041 | $865,438 |
| Atlantic 10 Conference | $9,812,859 | $9,535,508 | $9,258,157 | $8,980,807 | $8,703,456 | $8,426,105 | $8,148,754 | $7,871,404 | $7,594,053 | $7,316,702 | $7,039,351 |
| Atlantic Coast Conference | $28,317,111 | $28,531,417 | $28,745,723 | $28,960,029 | $29,174,335 | $29,388,641 | $29,602,947 | $29,817,253 | $30,031,559 | $30,245,865 | $30,460,172 |
| Big 12 Conference | $21,588,293 | $21,590,574 | $21,592,856 | $21,595,137 | $21,597,418 | $21,599,700 | $21,601,981 | $21,604,263 | $21,606,544 | $21,608,825 | $21,611,107 |
| Big East Conference | $14,018,371 | $13,637,391 | $13,256,410 | $12,875,430 | $12,494,450 | $12,113,470 | $11,732,489 | $11,351,509 | $10,970,529 | $10,589,548 | $10,208,568 |
| Big Sky Conference | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Big South Conference | $280,367 | $266,349 | $252,330 | $238,312 | $224,294 | $210,275 | $196,257 | $182,239 | $168,220 | $154,202 | $140,184 |
| Big Ten Conference | $25,233,070 | $24,915,996 | $24,598,922 | $24,281,848 | $23,964,774 | $23,647,701 | $23,330,627 | $23,013,553 | $22,696,479 | $22,379,405 | $22,062,331 |
| Big West Conference | $841,101 | $799,046 | $756,991 | $714,936 | $672,881 | $630,826 | $588,771 | $546,716 | $504,661 | $462,606 | $420,551 |
| Colonial Athletic Association | $280,367 | $312,054 | $343,741 | $375,428 | $407,115 | $438,803 | $470,490 | $502,177 | $533,864 | $565,551 | $597,238 |
| Conference USA | $1,401,836 | $1,331,744 | $1,261,652 | $1,191,561 | $1,121,469 | $1,051,377 | $981,285 | $911,193 | $841,102 | $771,010 | $700,918 |
| Horizon League | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Metro Atlantic Athletic Conference | $0 | $45,705 | $91,411 | $137,116 | $182,822 | $228,527 | $274,233 | $319,938 | $365,644 | $411,349 | $457,055 |

**NCAA External Gender Equity Review**
Phase I: Basketball Championships

| Conference | Men's-Only Payment | Year 1: 95/5 | Year 2: 90/10 | Year 3: 85/15 | Year 4: 80/20 | Year 5: 75/25 | Year 6: 70/30 | Year 7: 65/35 | Year 8: 60/40 | Year 9: 55/45 | Year 10: 50/50 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Mid-American Conference | $280,367 | $342,524 | $404,682 | $466,839 | $528,997 | $591,154 | $653,312 | $715,469 | $777,626 | $839,784 | $901,941 |
| Mid-Eastern Athletic Conference | $560,734 | $532,697 | $504,661 | $476,624 | $448,587 | $420,551 | $392,514 | $364,477 | $336,440 | $308,404 | $280,367 |
| Missouri Valley Conference | $5,607,349 | $5,372,687 | $5,138,025 | $4,903,363 | $4,668,701 | $4,434,039 | $4,199,377 | $3,964,715 | $3,730,053 | $3,495,391 | $3,260,729 |
| Mountain West Conference | $4,205,511 | $3,995,235 | $3,784,960 | $3,574,684 | $3,364,409 | $3,154,133 | $2,943,858 | $2,733,582 | $2,523,307 | $2,313,031 | $2,102,756 |
| Northeast Conference | $560,734 | $532,697 | $504,661 | $476,624 | $448,587 | $420,551 | $392,514 | $364,477 | $336,440 | $308,404 | $280,367 |
| Ohio Valley Conference | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Pacific-12 Conference | $16,261,310 | $16,773,703 | $17,286,096 | $17,798,489 | $18,310,882 | $18,823,275 | $19,335,668 | $19,848,061 | $20,360,454 | $20,872,847 | $21,385,240 |
| Patriot League | $280,367 | $266,349 | $252,330 | $238,312 | $224,294 | $210,275 | $196,257 | $182,239 | $168,220 | $154,202 | $140,184 |
| Southeastern Conference | $17,943,516 | $18,737,442 | $19,531,369 | $20,325,295 | $21,119,222 | $21,913,148 | $22,707,075 | $23,501,001 | $24,294,927 | $25,088,854 | $25,882,780 |
| Southern Conference | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Southland Conference | $560,735 | $532,698 | $504,662 | $476,625 | $448,588 | $420,551 | $392,515 | $364,478 | $336,441 | $308,404 | $280,368 |
| Southwestern Athletic Conference | $280,367 | $266,349 | $252,330 | $238,312 | $224,294 | $210,275 | $196,257 | $182,239 | $168,220 | $154,202 | $140,184 |
| Sun Belt Conference | $841,101 | $814,281 | $787,461 | $760,641 | $733,821 | $707,002 | $680,182 | $653,362 | $626,542 | $599,722 | $572,902 |
| The Ivy League | $841,102 | $829,517 | $817,932 | $806,348 | $794,763 | $783,178 | $771,593 | $760,008 | $748,424 | $736,839 | $725,254 |
| The Summit League | $280,367 | $281,584 | $282,801 | $284,017 | $285,234 | $286,451 | $287,668 | $288,885 | $290,101 | $291,318 | $292,535 |
| West Coast Conference | $5,326,982 | $5,167,279 | $5,007,576 | $4,847,873 | $4,688,170 | $4,528,467 | $4,368,764 | $4,209,061 | $4,049,358 | $3,889,655 | $3,729,952 |
| Western Athletic Conference | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |



KAPLAN HECKER & FINK LLP

350 Fifth Avenue | 63rd Floor
New York, New York 10118
www.kaplanhecker.com

# EXHIBIT 63

Case 4:20-cv-03919-CW Document 289-1 Filed 07/21/23 Page 249 of 457

 **ESPN.com:** NCAA

[Print without images] 

**Monday, September 30, 2019**
**Updated: October 1, 8:14 PM ET**

## California defies NCAA as Gov. Gavin Newsom signs into law Fair Pay to Play Act

By Dan Murphy
ESPN

One of the current core tenets of the NCAA's identity and business model will be illegal in the state of California starting in 2023.

Gov. Gavin Newsom has signed into law the Fair Pay to Play Act, which says colleges in California cannot punish their athletes for collecting endorsement money.

7/19/23, 1:12 PM
ESPN.com California's NCAA's Gov. Gavin Newsom signs into law Fair Play to Pay Act
Case 4:20-cv-03919-CW Document 289-1 Filed 07/21/23 Page 249 of 457



The signing was hosted Monday morning by NBA superstar LeBron James and his multimedia platform The Uninterrupted. James tweeted that the bill will "change the lives of countless athletes who deserve it!"

The NCAA, in response to Newsom's signing of the bill, said it would continue its effort to make "adjustments" to its rules "that are both realistic in modern society and tied to higher education."

"We will consider next steps in California while our members move forward with ongoing efforts to make adjustments to NCAA name, image and likeness rules that are both realistic in modern society and tied to higher education," the NCAA said in a statement. "As more states consider their own specific legislation related to this topic, it is clear that a patchwork of

7/19/23, 1:12 PM                    ESPN.com: California's 'Fair Pay to Play Act' signed into law by Gov. Gavin Newsom, sets up challenge to NCAA amateur model

Case 4:20-cv-03919-CW   Document 289-1   Filed 07/21/23   Page 250 of 457

different laws from different states will make unattainable the goal of providing a fair and level playing field for 1,100 campuses and nearly half a million student-athletes nationwide."

Advocates of the law say Newsom's approval marks a significant step in a decades-long battle to create new compensation options for NCAA student-athletes. The law, which is scheduled to go into effect in January 2023, does not require schools to pay athletes directly as employees. Instead, it makes it illegal for schools to prevent an athlete from earning money by selling the rights to his or her name, image or likeness to outside bidders.

The law also allows college athletes to hire a licensed agent to represent them. The bill was amended several times, including a recent provision that prevents athletes from signing endorsement deals that conflict with their team's sponsors. For example, a basketball player could not wear Nike products during team events if he or she plays for a school that is sponsored by Under Armour.

Current NCAA rules do not allow a player to accept any compensation related to his or her status as a college athlete from outside sources. The organization's board of governors and its president, Mark Emmert, both sent letters to California lawmakers earlier this year asking them not to pass the bill. Emmert called the bill an "existential threat" to the college sports model in a recent interview with CBS Sports.

NCAA board of governors chair Michael Drake told ESPN that the NCAA wants to "evolve" and "modernize" its approach to name, image and likeness rights, but it fears that California's bill has the potential to blur an important distinction between professional leagues and amateur college sports.

"We're not the association of the 20th century," Drake said. "We need to make sure we have 21st-century rules. We want to continue to change appropriately for the future."

The NCAA assembled a group of university presidents, athletic directors and conference commissioners earlier this year to examine ways it might update its policies. That group is expected to report its findings to the board of governors at some point in October. Drake, who spoke to ESPN before Newsom signed the bill, said the NCAA preferred that California give the association time to adjust its rules to avoid a situation in which schools in different states are operating with different rules.

State Senator Nancy Skinner, who introduced the Fair Pay to Play Act in February, said she is hoping change will occur on a national scale. She said the NCAA has had decades to update its rules and needs legislative pressure to be spurred into action. The NCAA has formed committees in the past, one in 1998, to review its compensation rules.

Skinner believes others will follow California's lead and said the law's authors delayed its implementation for three years to give others a chance to catch up. She said lawmakers from several states have contacted her office in recent months to ask about her proposal. Politicians in Florida, New York, Washington state, Colorado, Maryland, North Carolina and South Carolina have publicly supported the idea of creating similar laws in their states.

Rep. Mark Walker, R-N.C., has proposed a change to federal tax code that would force the NCAA to choose between giving athletes the rights to their names, images and likenesses or risking the loss of their tax-exempt nonprofit status. A representative from Walker's office said the California law has added momentum to the proposal, which is currently in the House Committee on Ways and Means in the early stages of the legislative process.

Arizona State football coach Herm Edwards told ESPN in August that he isn't certain how he feels about the concept of college athletes making money in general, but he hopes other states will act to make sure California doesn't have a different set of rules. Edwards, who competes against four California universities in the Pac-12 Conference, said the ability of athletes to make money would create a major recruiting advantage for schools in the Golden State.

"I would think that they would have to give it to the [entire] Pac-12," Edwards said. "You would hope it's not just the state of California with that policy."

The Pac-12 said in a statement Monday that it is "disappointed" by the passage of the bill because the conference believes it "will have very significant negative consequences for our student-athletes and broader universities in California."

"This legislation will lead to the professionalization of college sports and many unintended consequences related to this professionalism, imposes a state law that conflicts with national rules, will blur the lines for how California universities recruit student-athletes and compete nationally, and will likely reduce resources and opportunities for student-athletes in Olympic sports and have a negative disparate impact on female student-athletes," the Pac-12 said in its statement.

"Our universities have led important student-athlete reform over the past years, but firmly believe all reforms must treat our student-athletes as students pursuing an education, and not as professional athletes. We will work with our universities to

7/19/23, 1:12 PM
Case 4:20-cv-03919-CW   Document 289-1   Filed 07/21/23   Page 251 of 457
California law sets up a showdown with the NCAA over paying college athletes - Fair Pay to Play Act

determine next steps and ensure continuing support for our student-athletes."

Skinner said she heard unanimous feedback in favor of the law from female college athletes who contacted her office in the past several months to ask how they could help get it passed.

"For women, [college sports] might be the only time they can make any money," Skinner said. "If women can market themselves, we have the opportunity to bust through and finally get the type of recognition and viewership that is deserved."

Some athletic directors in California are concerned that the law will actually put their schools at a recruiting disadvantage. If rules don't change nationally before 2023, the NCAA says California teams would be banned from taking part in NCAA competitions. San Diego State athletic director John David Wicker said he's concerned that no out-of-state schools will be willing to schedule games with his teams.

Wicker said that if forced to choose between abiding by the state's law and following NCAA rules, he would likely follow NCAA rules.

"We are the NCAA, and so if we have rules that dictate that you can't monetize your name, image, and likeness based on the sport, and those student-athletes do that, then they're going to be barred from competition until whatever is adjudicated," Wicker told ESPN in August. "...[T]he state of California doesn't regulate the NCAA in that sense."

In other words, if California and the NCAA remain at odds in 2023, the Fair Pay to Play Act will likely lead to lawsuits that will require a judge to decide how it can be enforced. The NCAA contends that the new law is unconstitutional because it violates rules that protect interstate commerce.

Skinner said, however, that multiple legal experts have assured her that the bill is constitutional. Furthermore, she said the NCAA's assertion that it will ban California schools from future competition would violate federal antitrust laws.

"The NCAA has repeatedly lost antitrust cases in courts throughout the nation," Skinner said. "As a result, threats are their primary weapon."

A series of lawsuits, many of them filed in California courthouses, have chipped away at the NCAA's compensation rules over the past decade. Former UCLA basketball player Ed O'Bannon filed a lawsuit in 2009 that eventually prompted the NCAA to allow schools to pay athletes "cost of attendance" stipends -- typically between $3,000 and $5,000 based on the school -- to offset the price of some education-related items not covered by scholarships.

More recently, a judge ruled in March of this year that the NCAA couldn't place any cap on the benefits schools could provide to athletes as long as the benefits are related to education. The federal judge in that case said that includes paying for items such as computers, science equipment and musical instruments.

The Fair Pay to Play Act breaks new ground by guaranteeing college athletes a chance to earn cash in an open-market system. Skinner says the law creates a variety of opportunities for athletes who want to take advantage of it. Star players might be able to make money from apparel contracts, autograph signings and television commercial appearances. Less prominent athletes, she said, could benefit from things such as being able to advertise their connection to their university team while teaching lessons to youth athletes or collect revenue from selling advertisements on social media accounts.

In the weeks preceding Newsom's decision, several high-profile public figures voiced their support for the law. James and Draymond Green both touted the change as "overdue" and a potential game-changer for college athletes. Democratic presidential candidate Bernie Sanders responded to James on Twitter by saying, "College athletes are workers. Pay them."

James said later Monday that even though he didn't attend college, the issue is personal for him because "I was one of those underprivileged kids."

"Obviously I was fortunate enough and talented enough to be able to skip college," James said. "But for sure, I would have been one of those kids if I would have went off to Ohio State or if I would have went off to any one of these big-time colleges where pretty much that 23 jersey would have got sold all over the place -- without my name on the back, but everybody would have known the likeness. My body would have been on the NCAA basketball game 2004, and the Schottenstein Center would have been sold out every single night if I was there.

"And coming from just me and my mom, we didn't have anything, and we wouldn't have been able to benefit at all from it, and the university would have been able to capitalize on everything that I would have been there for that year or two or whatever. So I understand what those kids are going through. I feel for those kids that have been going through it for so long."

Green, who played four seasons for [Michigan State](#) before going on to star for the [Warriors](#) in the NBA, told reporters on Monday that college athletes spend so much of their time broke while the schools make "a ton of money off your likeness."

Green said the law will help college athletes who "have no voice" and added that he is "tired of seeing people get ripped off." He also criticized Emmert, saying the law will force him to "speak up" on the issue.

Others, including Heisman Trophy winner Tim Tebow and Washington State coach Mike Leach, have spoken out against the bill. Tebow, currently an ESPN analyst, said players making money would add to a selfish culture and take away from what is special about college sports. Leach suggested that California and its legislators had more pressing issues that should be occupying their time.

"California leads. That's what we do," Skinner said. "By restoring student-athletes' rights, we've sent a clear message to the NCAA, our colleges and the entire sports industry: Equity must be the overriding value."

*The Associated Press contributed to this report.*

---

# EXHIBIT 64

1      UNITED STATES DISTRICT COURT

2   NORTHERN DISTRICT OF CALIFORNIA

3          OAKLAND DIVISION

4   --------------------------------

5   IN RE: COLLEGE ATHLETE NIL LITIGATION

6   No. 4:20-cv-03919 CW

7

8          Videotaped Deposition of

9            Tymir Oliver

10          January 23, 2023

11            9:00 a.m.

12

13

14

15

16

17

18

19

20

21

22

23

24   Reported by Jennifer Miller, RMR, CRR, CCR-NJ

25   JOB NO. 220889

1    positioned or better equipped to represent the

2    proposed class than other potential class

3    representatives?

4                    MR. KODROFF:  Objection.  Vague.

5                    THE WITNESS:  No.  I'm not sure.

6        Like...

7    BY MR. ALBRIGHT:

8        Q.   Do you think you're a -- strike that.

9                    Do you think you were better

10   positioned or better equipped to represent

11   current and former men's basketball players

12   than an actual men's basketball player would

13   be?

14                   MR. KODROFF:  Objection.  Vague.

15                   THE WITNESS:  I'm not sure, to

16       be honest.  You know, when it comes to

17       that, I'm really not sure.

18   BY MR. ALBRIGHT:

19       Q.   You don't know whether or not a men's

20   basketball player might be in a better position

21   to represent other current former men's

22   basketball players than you would be?

23                   MR. KODROFF:  Objection.  Vague.

24       Calls for a legal conclusion.

25                   THE WITNESS:  I'm not sure, to

1          be honest.  I know that they -- from just

2          what I've seen on university, we put the

3          same time in, same hours, everything like

4          that in, from my understanding.

5     BY MR. ALBRIGHT:

6          Q.   And based on your understanding that

7     you put the same time and the same hours in, do

8     you believe that that's all you need to know to

9     be able to represent current and former men's

10    basketball players?

11                    MR. KODROFF:  Objection.  Vague.

12         Calls for a legal conclusion.

13                    THE WITNESS:  I'm not sure.

14    BY MR. ALBRIGHT:

15         Q.   You're not aware of anything else you

16    would need to know other than those two things?

17         A.   Yeah, I'm really -- to represent

18    what's fair?  I hope not.  I'm not sure.

19         Q.   So you don't need to actually have a

20    men's -- current or former men's basketball

21    player serve as a class representative to

22    decide for them what's fair?

23                    MR. KODROFF:  Objection.  Calls

24         for a legal conclusion.

25                    THE WITNESS:  No.  I'm not sure.

1   BY MR. ALBRIGHT:

2       Q.   As long as you're treating everybody

3   the same, that's enough?

4       A.   Well, technically, everybody I'm

5   representing is part of Power Five.  They're

6   athletes.  They played Division I level.

7                So we're equal, technically.

8   Like, we all signed the same deal, so we're all

9   equal, yes.  Since y'all -- NCAA views us as

10  equal, technically, when we sign our papers.

11      Q.   So as long as everybody's interests

12  are treated equally in this litigation, then

13  you feel that you're fulfilling your role as a

14  class representative?

15      A.   Yes.

16      Q.   And would that also apply to the

17  amount of compensation that each person would

18  get?

19                MR. KODROFF:  Objection.  Calls

20      for a legal conclusion.

21                THE WITNESS:  Yes.

22  BY MR. ALBRIGHT:

23      Q.   Are you expecting to be compensated

24  for being a class representative in this

25  lawsuit?

Page 340

1                    CERTIFICATE

2           I HEREBY CERTIFY that the

3   proceedings, evidence and objections are

4   contained fully and accurately in the

5   stenographic notes taken by me upon the

6   deposition of Tymir Oliver, taken on

7   January 23, 2023 and that this is

8   a true and correct transcript of same.

9

10

11              *Jennifer Billstein-Miller*

12         _____

13              Jennifer Miller, RMR, CCR, CRR

14              and Notary Public

15

16

17

18

19

20

21           (The foregoing certification of

22   this transcript does not apply to any

23   reproduction of the same by any means

24   unless under the direct control and/or

25   supervision of the certifying reporter.)

# EXHIBIT 65

# 50 Years of Title IX:

## We're Not Done Yet

*A Women's Sports Foundation Research Report, May 2022*



"No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

# Letter from the CEO

This year, the Women's Sports Foundation, and many others around the nation, will mark the 50th anniversary of the passage of Title IX – the landmark legislation that guarantees girls and women equal access and treatment under the law in all areas of education. Even as we celebrate this essential legislation and the incredible progress made over the last 50 years, we know that the full promise of Title IX remains unfulfilled for many girls and women across our nation.

Passed in 1972, Title IX was enacted to ensure all girls and women would have equal access and every opportunity to thrive. And yet, as transformational as Title IX has been, five decades later there is still a great deal of work to be done to achieve true equity in sports, in education and in the workplace.

The WSF's latest report, *50 Years of Title IX: We're Not Done Yet*, celebrates progress made since the law's passage and identifies inequities yet to be addressed. As the following pages illuminate, unfortunately, there are still far too many students being denied equal opportunities and resources, including girls and women of color, with disabilities, and from low socioeconomic households, as well as LGBTQ, trans, and non-binary youth.

An exponential increase in girls' and women's participation in sports is perhaps Title IX's most notable achievement and one of the law's most lasting legacies. Sports participation is vital to the development of girls and women. The benefits are far-reaching and lifelong, including improved physical, social, and emotional health; enhanced confidence; academic success; leadership opportunities; and so much more. Progress over the last 50 years is impressive, and yet it is not enough. The playing field is not yet level — it's not even close.

With all eyes on Title IX during this pivotal year, it's imperative for all of us, across society, to sound the alarm that nothing short of transparency and action, fairness and justice, will suffice. We must do better.

As we work to further accelerate the pace of change for the next 50 years, this important report lays out policy and practice recommendations to guide how everyone can make sport and our nation more equitable for all girls and women. While we continue to celebrate Title IX and the myriad trailblazers who persisted in the fight to spur the creation of the law and help integrate it into society over the last 50 years, let's all commit to fulfilling its full promise by ensuring that opportunities for girls and women — on and off the field — are limitless.

All girls. All women. All sports.®

Danette Leighton, CEO



# Foreword and Acknowledgments

First, the Women's Sports Foundation is indebted to the study principal investigator, Ellen Stauroswky, Ph.D., Co-Lead Courtney Flowers, Ph.D., and contributing authors Erin Buzuvis, J.D., Lindsey Darvin, Ph.D., and Natalie Welch, Ph.D., whose research excellence brought this project to fruition. We are grateful for the leadership provided by Karen Issokson-Silver, MPH, Vice President, Research and Evaluation, Women's Sports Foundation, who directed the project. A special note of thanks to Ellen Stauroswky, whose unwavering passion and scholarship around Title IX is unmatched. We are deeply grateful for your leadership.

We gratefully acknowledge Elizabeth Sharrow, Ph.D., Associate Professor in the School of Public Policy and the Department of History, University of Massachusetts, for developing the relevant evidence-based policy recommendations for this report to help shape future planning, research, and action.

The panel of scholars and practitioners who reviewed the findings provided invaluable feedback and improved the content and clarity of the final report immensely. We greatly appreciate their consultative energy and scholarly insights.

Sarah Axelson, *VP, Advocacy, Women's Sports Foundation*

Akilah Carter-Francique, Ph.D., *Associate Professor in African American Studies & Executive Director for the Study of Sport, Society and Social Change, San Jose State University*

Tomika Ferguson, Ph.D., *Assistant Dean, Student Affairs and Inclusive Excellence, Assistant Professor, Educational Leadership, Virginia Commonwealth University*

Amanda Kaufman, *Intern, Women's Sports Foundation, Bates College*

Yannick Kluch, Ph.D., *Assistant Professor, Sport Leadership & Director of Outreach and Inclusive Excellence at the Center for Sport Leadership, Virginia Commonwealth University*

Deborah Slaner Larkin, *Advocacy Committee, Women's Sports Foundation*

Anita Moorman, J.D., *Professor, Department of Health & Sport Sciences, University of Louisville*

Ajhanai Newton-Keaton, Ph.D., *Assistant Professor, Department of Health & Sport Sciences, University of Louisville*

Diana Parente, *Ph.D. candidate, University of Southern California Roosier School of Education, Director of Athletics Friends Academy*

Amanda Perkins-Ball, Ph.D., *Assistant Professor in Kinesiology & Sports Medicine Advisor, Rice University*

Moneque Walker Pickett, J.D., Ph.D., *Professor and Associate Chair of the Department of Criminal Justice, Saint Leo University*

Morgan Powell, *Senior Manager, Advocacy, Women's Sports Foundation*

Don Sabo, Ph.D., *Sport and Health Policy Advisor, Women's Sports Foundation*

Elizabeth Sharrow, Ph.D., *Associate Professor in the School of Public Policy and the Department of History, University of Massachusetts*

Martha Saavedra, Ph.D., *Associate Director, Center for African Studies, University of California Berkeley*

Marjorie Snyder, Ph.D., *Senior Research Advisor, Women's Sports Foundation*

Judy Sweet, *Advocacy Committee, Women's Sports Foundation*

Kim Turner, J.D., *Director of the Gender Equity Initiative, Coaching Corps*

Chris Voelz, *Advocacy Committee, Women's Sports Foundation*

Amy Wilson, Ph.D., *Managing Director of Inclusion, NCAA*

Eli Wolff, *Director, Power of Sport Lab*

Erianne Weight, Ph.D., *Associate Professor, Department of Exercise and Sport Science, Co-Director, Center for Research in Intercollegiate Athletics, University of North Carolina*

Erica Zonder, J.D., *Undergraduate Program Coordinator and Associate Professor, Health Promotion and Human Performance, Eastern Michigan University*

A special note of acknowledgement and appreciation is extended, as well, to Deana Monahan for her editorial and graphic skills.



## About The Women's Sports Foundation

The Women's Sports Foundation exists to enable girls and women to reach their potential in sport and life. We are an ally, an advocate and a catalyst. Founded by Billie Jean King in 1974, we strengthen and expand participation and leadership opportunities through research, advocacy, community programming and a wide variety of collaborative partnerships. The Women's Sports Foundation has positively shaped the lives of millions of youth, high school and collegiate student-athletes, elite athletes and coaches. We're building a future where every girl and woman can #KeepPlaying and unlock the lifelong benefits of sport participation. All girls. All women. All sports®. To learn more about the Women's Sports Foundation, please visit us at www.WomensSportsFoundation.org or follow us on Twitter at @WomensSportsFdn and Instagram/Facebook at @WomensSportsFoundation.

Contact us at info@WomensSportsFoundation.org or toll-free at 800.227.3988.

This report may be downloaded from www.WomensSportsFoundation.org. This report may be reproduced and distributed only in its entirety. Any material taken from this report and published or transmitted in any form, electronic or mechanical, must be properly attributed to *50 Years of Title IX: We're Not Done Yet* published by the Women's Sports Foundation.

Preferred Citation: Staurowsky, E. J., Flowers, C. L., Busuvis, E., Darvin, L., & Welch, N. (2022). *50 Years of Title IX: We're Not Done Yet.* Women's Sports Foundation.

© 2022, Women's Sports Foundation, All Rights Reserved.



# Table of Contents

Executive Summary ...................................................................................................................................................7

Method and Design ................................................................................................................................................14

Part I. Introduction: Title IX's Broad Impact on U.S. Society..............................................................................15

Part II. Brief History of Title IX and Its Impact on the Nation's Schools ...........................................................19

Part III. A Brief Overview of Title IX's Legislative History as It Pertain to Athletics ........................................21

Part IV. Title IX and Athletics: The Legacy of the "Separate but Equal" Standard in Athletics Programs.........24

Part V. Title IX Athletics Compliance, Education and Enforcement ...................................................................25

    The Roles and Responsibilities of Title IX Coordinators ............................................................................25

Part VI. Title IX's Two Key Athletics Areas: Equal Access to Participation & Equitable Treatment ................28

Part VII. Title IX's Three Athletic Compliance Areas: Athletic Participation, Athletic Scholarships, and Operational Support ......................29

    Title IX's Three-Part Test of Athletic Participation ....................................................................................29

    The Current State of Title IX and Athletics Participation Opportunities ..................................................30

    Title IX and the Allocation of Athletic Scholarship Dollars .......................................................................37

    Title IX and Equitable Treatment — Program Benefits ..............................................................................39

Part VIII. Title IX, Marketing, and Promotion of Female Sports ........................................................................45

    Availability and Quality of Sports Information and Marketing Personnel...................................................46

    Access to Other Publicity Resources for Men's and Women's Programs ....................................................46

    Quantity and Quality of Publications and Other Promotional Devices Featuring Men's and Women's Programs ...................................47

    Title IX, Female Athletes and Name, Image, and Likeness (NIL) Laws ....................................................49

Part IX. Title IX and Intersectionality...................................................................................................................52

    Title IX, Gender, and Race Intersectionality ...............................................................................................52

    Title IX and Transgender Athletes ..............................................................................................................55

    Title IX and Female Athletes with Disabilities............................................................................................57

    Title IX and Economically Disadvantaged Students and Students from Urban and Rural Communities....58

Part X. Title IX and Other Areas of Review .........................................................................................................60

    Title IX and Pregnant/Parenting Athletes ...................................................................................................60

    Title IX and Esports .....................................................................................................................................60

Moving Forward into the Next 50 Years of Title IX.............................................................................................63

Policy and Practice Recommendations .................................................................................................................64

References...............................................................................................................................................................74

# Executive Summary

On the 50th anniversary of Title IX's passage, there is much to celebrate. A federal civil rights law that has been credited with profoundly changing education in the United States by barring sex discrimination in the nation's schools, Title IX, along with other equity laws, helped to unlock access to educational and athletic opportunities, paving the way for inroads into historically male-dominated professions. The work of five decades of Title IX's impact is writ large in every sector of American society.

As Title IX's anniversary year unfolds, women are among the highest-ranking and most powerful government officials in the country, including U.S. Vice President Kamala Harris (the nation's first female vice president as well as the first African American and Asian American to serve in the role) and U.S. Speaker of the House Nancy Pelosi, who is serving her fourth term in that position. U.S. Secretary of the Interior Deb Haaland, member of the Laguna Pueblo, made history as the first Native American to serve as a cabinet secretary. Pathways once closed or significantly inaccessible to women have opened as Title IX created greater access to academic pursuits leading to careers in an array of occupations for women, including but not limited to astronauts, athletes, carpenters, chief executive officers, construction workers, doctors, engineers, entrepreneurs, farmers, filmmakers, firefighters, football coaches, investors, journalists, lawyers, musicians, police officers, military personnel, rock stars, Supreme Court justices, and television news anchors.

For girls and women playing, competing, and working in sport, times have changed dramatically from the days when girl and women athletes were viewed as novelties. Since Title IX's passage in 1972, generations of U.S. citizens as well as students at recipient institutions regardless of national origin, immigration status, or citizenship status (S. B. Goldberg, 2021; Lhamon, 2014) have witnessed the ascension of women's sport, inspired by the consistent excellence of U.S. female athletes on the international stage. Women of Team USA who competed in the Tokyo 2020 Olympic Games earned a total of 66 medals. If the U.S. women were their own country, their collective performance would have fallen third behind only the Russian Olympic Committee and China (Planos, 2021).

For all the progress made in helping girls and women in the United States realize their promise and potential as athletes and leaders in sport, those gains have been made without a full commitment to Title IX's mandate of equitable and fair treatment and more general principles of gender equity throughout the sport system. Just months before U.S. women won their seventh Olympic gold medal in women's basketball, obvious gender disparities that female athletes were subjected to at the NCAA Division I women's basketball championship in

2021 garnered national attention, leading to an external review of their practices. Findings revealed that:

> The NCAA's broadcast agreements, corporate sponsorship contracts, distribution of revenue, organizational structure, and culture all prioritize Division I men's basketball over everything else in ways that create, normalize, and perpetuate gender inequities. At the same time, the NCAA does not have structures or systems in place to identify, prevent, or address those inequities (Kaplan Hecker & Fink, 2021a, p. 2).[1]

Through the lens of the past 50 years, the full power of Title IX will not be realized without recognizing that not all girls and women, as well as individuals whose gender identity does not conform to Title IX's implicit and explicit gender binary, have benefitted from the legislation or been well-served by it.

- Asian, Black, Indigenous, Latinx, and other girls and women of color participate in sport at lower levels, face greater barriers to participation, and are historically excluded in sport leadership.

- Providing safe spaces for lesbian, gay, bisexual, transgender, and queer (LGBTQ+) athletes and sport leaders remains an urgent consideration.

- Female athletes with disabilities continue to receive fewer opportunities to pursue their athletic dreams.

- Access to sport opportunities varies greatly based on economic status and location (urban, suburban, or rural).

Title IX can play a critical role in contributing to a more inclusive sport environment for girls and women as they enter high school and college. However, for that kind of transformation to occur, there needs to be an end to gender discrimination in the nation's high school and college athletic departments. In this report, we seek to achieve three things. First, we acknowledge what has

---

*1    While the NCAA received relief from the reach of Title IX in a narrow ruling in National Collegiate Athletic Association v. Smith (1999), U.S. Representative Jackie Speier (D-NJ), along with 16 cosponsors, introduced a resolution in June of 2021 affirming that the NCAA is subject to Title IX and is expected to prevent sex discrimination in the programs and activities that it runs. The fact that the premier college sport governing body in the world, with more than 1,200 college and university members, was found by external reviewers to have engaged in systemic gender discrimination for decades raises questions about the entire college sport system's commitment to gender equity and Title IX compliance. If NCAA member schools were so comfortable with the gender inequities within the NCAA, which they appear to be given the reports on the conduct of women's championships across all three divisions, what is happening on their own campuses?*



changed since the passage of Title IX and the successes that have been realized. Second, we note what has not changed and the issues that remain to be addressed. Third, and most importantly, we focus on the next 50 years of Title IX, what needs to change, and initiatives undertaken in order to realize Title IX's promise of gender equitable treatment. Ultimately, we contemplate an approach to Title IX's next 50 years where persistent barriers to gender equity and fair treatment are addressed and where the U.S. sport system is recast to fully embrace a vision of inclusive excellence.

Our findings, based on a rigorous literature review and original research using publicly available data sets, reveal that there is much work to be done. The focus of our work was primarily on the enforcement of Title IX in athletics and the three major areas that should be reviewed in ongoing and regular Title IX audits: athletic participation opportunities, allocation of athletic scholarship funding, and allocation of resources in operational areas (recruiting, operating expenditures, coaches' salaries, as examples). There is a greater focus in the report on trends occurring in college sport because less research has been done on the high school sector as there is no national database that lends itself to comprehensive analysis.

The authors are keenly aware that another critical area of Title IX enforcement is sexual assault, harassment, and violence as well as the intersections with sport. Because of the magnitude of issues that have arisen during the past decade, we believe this warrants an entirely separate report, thus it is not addressed in this report.

Some of the key findings of this report are presented below.

**1.    Title IX's Impact: Girl/Women Athletes Participating in Near-Record Numbers**

Title IX has played a critical role in the evolution of sport for girls and women in the United States. Title IX's enactment served as a catalyst for the growth of sport participation opportunities for girls and women at the high school and college levels.

- At the high school level, dramatic increases have been seen in participation opportunities, rising from 294,015 in 1972 to 3,402,733 in 2018–19 (the most recent reporting year). Girls comprised 7% of high school athletes participating on varsity teams in 1972; in 2018–19, that figure rose to 43%.

- At the college level, we have come quite a distance from 1971–72 when female athletes numbered 29,977 to the 215,486 who were competing on teams sponsored by NCAA institutions in 2020–21. The percentage of women athletes competing on college teams has risen from 15% in 1972 to 44% during the 2020–21 academic year.

While the disruption caused by the coronavirus (COVID-19) pandemic impacted all sports at every level, it is difficult to assess the specific impact the coronavirus had on girls and women participating in varsity athletics. NCAA data for the 2020–21 academic year shows that there was a 2.66 percentage-point decline in female athletes playing with a 2.42 percentage-point decline in male athletes. The high school participation numbers have not been reported out after 2018–19, thus this is an area to watch and monitor into the future.

---

## Title IX's Three-Part Test of Gender Equity in Athletic Participation Opportunities

Under Title IX regulations, schools are presented with three ways that they can demonstrate that they are providing athletic opportunities that fully and effectively accommodate the interests of girl/women and boy/men athletes. Schools need meet only one of the three parts of the test to be in compliance.

**Part 1. Substantial Proportionality:** Girl/women athletes have opportunities that are proportional to their enrollment. In theory, if 50% of the student body is girls/women, 50% of athletic participation opportunities should be provided for girl/women athletes. Even a small gap between the enrollment of girls/women and athletic opportunities available to girl/women athletes (1%–3%) could represent a gap large enough to provide a viable athletic team for girl/women athletes, so schools need to be aware that "coming close" to substantial proportionality may not be close enough. In the absence of substantially proportional athletic opportunities, schools may rely on the second or third part of the test.

**Part 2. History and Continuing Practice of Program Expansion:** If disproportionally more athletic opportunities are offered to boy/men athletes than girl/women athletes, a school needs to demonstrate that it has been adding teams and athletic opportunities over time to address the shortfall for girl/women athletes. If a school does not offer substantially proportionate athletic opportunities to girl/women athletes and it cannot demonstrate a history and continuing practice of program expansion, the school can turn to the third part of the test.

**Part 3. Full and Effective Accommodation:** Under this test, schools need to demonstrate that they are providing teams to satisfy existing interest and those teams operate at a sufficiently competitive level. In assessing existing interest, administrators need to turn to existing club and intramural sport participation, expressed interest in specific sports, geographic location, national trends, and conference and league sport offerings.

---



Women's Sports Foundation
WomensSportsFoundation.org



©iStock by Getty Images

### 2. Shortfalls After 50 Years: Inequities in Athletic Departments Persist

A study conducted by the Women's Sports Foundation (Staurowsky et al., 2020), an investigative report by Wesley Jenkins (2019) with the Chronicle of Higher Education, and an external review of the NCAA's approach to women's championships (Kaplan Hecker & Fink, 2021a, 2021b) revealed gross gender inequities across all college divisions, including disproportionately more athletic opportunities provided to men athletes and a shortfall in the investment of resources in women's athletic programs such as dollars allocated for athletic scholarships, recruiting, and coach compensation. There was cause for concern about widespread Title IX noncompliance in high school and college and university athletic programs before the COVID-19 pandemic began, and women's sports programs were clearly vulnerable to cuts during the pandemic. In 2020 alone, female and male athlete plaintiffs successfully challenged cuts to their programs at Brown University, William and Mary, University of North Carolina at Pembroke, East Carolina University, Dartmouth University, Clemson University, University of St. Thomas, LaSalle University, and Dickinson College under Title IX (Bailey Glasser, 2021).

Although it is more difficult to get a complete picture of what is happening at the high school level because less research has been done on that sector, similar concerns appear to exist at the high school level.

- Based on an analysis of athletic participation opportunities available to athletes in 15,000 high school programs using data from the National Center for Education Statistics (NCES) and the Civil Rights Data Collection (CRDC), only seven states offered athletic opportunities to female athletes proportional to the enrollment of female students in their schools (Webster, 2020).

- In an investigative series of Title IX athletics compliance at the high school level published by the Shirley Povich Center for Sports Journalism and the Howard Center for Investigative Journalism at the University of Maryland, girls are dramatically underserved at the high school level.  Through public records requests, journalists found that data gathered by the U.S. Education Department Office for Civil Rights are incomplete and underestimates the extent to which girl athletes do not have access to athletic opportunities proportional to their enrollment (Newhouse, 2022a).

- In a report from the U.S. Department of Education Office for Civil Rights (OCR) focusing on protecting the civil rights of students in the nation's schools, 3,609 complaints were filed with the OCR seeking relief under Title IX for gender inequities in high school athletic programs ranging from shortfalls in athletic participation opportunities to inequitable facilities to shortages in quality and quantity of coaching to an array of other benefits (Lhamon, 2015a).





*Sierra Brooks of the University of Michigan*

In retrospect, for Title IX protections against sex discrimination to remain unreachable for so many girls and women and/or so tenuous after five decades raises a question regarding how compliance and enforcement is framed and discussed. While Title IX compliance is determined on a case-by-case basis, patterns and trends in the research are highly suggestive that there are many institutions not in compliance with Title IX's expectations in the athletic area.

### 3.   The Clock Has Run Out: 50 Years Is Long Enough to Comply

At the time Title IX was enacted in 1972 and the policy interpretation for athletics was issued in 1979, high schools and colleges were afforded grace periods to come into compliance and even further latitude under a standard of what has been called "a reasonable period of time." In effect, a school could make the argument that they were out of compliance but, in order to comply, they needed more time to add opportunities, resources, facilities, and coaching staff (Stewart & Harris, 1979). The timeline for each institution was different given circumstances. These timelines were also changing as a result of an influx of female students at the college level after Title IX opened the door to academic opportunities that had previously been closed to girls and women (National Center for Education Statistics, 2022). As we enter the next half century of Title IX, many of those initial start-up considerations are no longer valid. Schools that have been slow off the mark in providing female athletes equal access to athletic opportunities can no longer claim that they did not have time to plan or to devise a way to accommodate female athletes. A record of long-term non-compliance and/or serial non-compliance is inherently unreasonable, and school administrators should take note of this.

### 4.   Title IX and Gender Equity: Greater Education is Needed

Since Title IX's passage, school administrators have been reminded by federal officials working at the U.S. Department of Education Office for Civil Rights about their obligations under Title IX. Those include providing Title IX oversight and creating internal avenues to educate stakeholders, monitoring and assessing Title IX compliance, documenting efforts to remedy sex discrimination and discouraging its perpetuation, and providing the resources needed to conduct investigations when necessary (Marcus, 2004; Matthews & McCune, 1977, 1987; Lhamon, 2015b). One of the consequences of the lack of a unified approach to Title IX compliance within schools is the persistent lack of knowledge among educators about what Title IX is and how it should advise their work (Nash et al., 2007). The accumulated effects of this slow, uneven, and at times neglectful attention to Title IX compliance infrastructure within institutions and athletic departments is reflected in research findings and concerns expressed by practitioners.

- In 2011, the Association of Title IX Administrators (ATIXA) was formed to "...create a venue for professional exchange between coordinators and other administrators with Title IX responsibilities, to finally and meaningfully wrap our heads around the Coordinator role, other Title IX-based administrative responsibilities, and best practices for institutional Title IX compliance" (ATIXA, 2020, para. 5).

- In 2013, the National Women's Law Center filed a complaint with the OCR alleging Title IX violations in the District of Columbia Public School athletic departments. They noted in the complaint that the district failed to provide the name and contact information for the Title IX coordinator. This led to the passage of the Title IX Equity Act in the District of Columbia in 2015.

- In 2015, OCR sent out a reminder to school administrators that "A critical responsibility for schools under Title IX is to designate a well-qualified, well-trained Title IX coordinator and to give that coordinator the authority and support necessary to do the job" (New, 2015).

- A series of studies assessing Title IX knowledge among athletics administrators, coaches, staff members, and college athletes revealed a general lack of knowledge about Title IX (Staurowsky & Weight, 2011, 2013; Staurowsky et al., 2017; Rodkey et al., 2019).

- In a poll of 506 children (aged 12–17) and 1,008 parents, conducted by the Shirley Povich Center for Sports Journalism and the Howard Center for Investigative Journalism at the University of Maryland and Ipsos, 71% of children aged 12–17 and 58% of parents knew nothing about Title IX (Newhouse, 2022b).

Five decades after the passage of Title IX, the roles, responsibilities, baseline expectations about the credentials and experience, and reporting lines remain loosely defined and vary greatly across the education landscape (Pappas, 2021). That variability translates into a similarly chaotic compliance



and enforcement environment when it comes to Title IX and athletic departments. In one of the few studies examining the experiences of Title IX athletics coordinators, findings revealed a general lack of clarity regarding who in athletic departments is supposed to handle Title IX oversight (Staurowsky & Rhoads, 2020).

### 5. Red Flags are Flying: Title IX in College and High School Sports

The Equity in Athletics Disclosure Act (EADA) passed in 1994 is a federal law requiring colleges and universities to publicly report gender equity information about their athletic programs, including athletic participation opportunities, revenues and expenses, money distributed in athletic scholarships, recruiting expenses, and number of coaches and coach salaries. Although EADA data is not designed to determine Title IX compliance, and Title IX compliance is determined on a case-by-case basis, analysis of EADA resource allocation trends reveal signs that institutions continue to engage in gender discrimination.

Some factors that signal widespread concern is revealed in an analysis of EADA data for 2019–20 that we conducted as part of this report:

- Fifty years after Title IX was enacted, 86% of NCAA institutions across all divisions offered higher rates of athletic opportunities to male athletes disproportionate to their enrollment. For the 2019–20 academic year, that gap favoring male athletes represented 58,913 missed opportunities for female athletes.

- That pattern of inequity extends beyond NCAA institutions into NAIA institutions as well as junior colleges. Combined, in 2019–20, female athletes had more than 80,000 fewer opportunities to play and compete than if their athletic programs had offered them opportunities proportional to their enrollment.

- In 2019–20, of the $241,40,778 spent on recruiting athletic talent to compete at the college level (in both two-year and four-year institutions), 30% was spent on recruiting female athletes ($75,290,142).

- In 2019–20, male athletes received $252 million more in athletic scholarships than female athletes received. If athletic departments offered athletic opportunities to female athletes proportional to enrollment, they would have had to award an additional $750 million in athletic scholarship assistance.

- In 2019–20, on average, coaches of women's teams received a much smaller percentage of salary compared to coaches of men's teams, ranging from 19% in NCAA Football Bowl Subdivision (FBS, formerly known as Division I-A) to 49% in NJCAA Division I.

- What the existing research reveals about gender equitable treatment in marketing and media within college athletic departments is two-fold: female athletes continue to be underserved in terms of promotional efforts, and that pattern within athletic departments appears to align with

the larger pattern of limited coverage of women's sports. At the high school level, so little research has been done that there is no basis to report what is happening in this sector.

Although it is more difficult to get a complete picture of what is happening at the high school level because less research has been done on that sector, similar concerns appear to exist. Based on an analysis of data reported by the National Federation of State High School Associations for the academic year 2018–19, high school girls in every state were provided proportionately less access to athletic participation opportunities compared to boys relative to enrollment. On average, high school girls were afforded 42% of athletic opportunities at the high school level despite the fact that girls made up 48.5% of full-time students enrolled. In order to remedy that 6.5% proportionality gap, high schools nationally would need to offer 1.1 million more opportunities for girls to play varsity sports. In a report from the OCR focusing on protecting the civil rights of students in the nation's schools, 3,609 complaints were filed with the OCR seeking relief under Title IX for gender inequities in high school athletic programs (Lhamon, 2015b).

### 6. At the Intersection: Race and Gender Under Title IX

There is a need to examine the intersectionality of race, gender, and Title IX to understand the overall impact of this educational law on women in sports. Using an intersectional approach provides an avenue to understand the meaning and challenges of multiple intersecting identities on a person's life (Crenshaw, 1989; McDowell & Carter-Francique, 2017).

Since the enactment of Title IX, Black, Indigenous, and People of Color (BIPOC) women athletes have experienced an increase in sport participation opportunities (Butler & Lopiano, 2003; Flowers, 2015; McDowell & Carter-Francique, 2017; Cooper & Newton, 2021), yet the "single axis" lens and racial clustering have distorted these statistics and obscure participation barriers that exist for these athletes.

As instrumental as Title IX has been in expanding opportunities for girls and women throughout U.S. society, feminists and critical race theorists point out that as is the case with any "single axis" law, meaning any law that focuses on one category of bias in addressing discrimination, it does not take into account how sex discrimination intersects with other forms of bias. In her book, *Getting in the Game: Title IX and the Women's Sports Revolution*, legal scholar Deborah Brake (2010) wrote that for all the progress made under Title IX, "...women have not shared equally in many of the post-Title IX gains" (p. 113). As Doris Corbett, Professor Emerita and administrator at both Howard University and the University of Northern Iowa, who played a key role in creating intercollegiate athletic opportunities at Howard and served as their first women's basketball coach (1973–74) wrote (2001), "Women of color experience a form of double jeopardy — racism and sexism. Because they are overlooked by society in general, their struggles in both sport and other aspects of life are compounded" (p. 307). As such, Title IX does not provide legal protection on the basis of race and, as a single-axis law, it solely focuses on gender, which has provided



barriers for Black females in sport (Flowers, 2015; Mathewson 2012). Further, Dees (2008) argues that *Brown v. Board* had a greater impact on Black women's sport participation than Title IX did due to expansion of access.

Similarly, Crenshaw (1989) argues that conventional antidiscrimination law employs a single-axis model that prohibits discrimination on the basis of race or gender, separately, but does not prohibit discrimination based on race and gender acting in concert. However, when examining the double jeopardy of race and gender felt by Black women, "A black woman who has been discriminated against has difficulty proving the requisite inequality. It may be difficult to prove that she was discriminated against on the basis of race, because blacks have not suffered as a group since black men do not share the injury" (Mathewson, 2012). Additionally, Mathewson (2012) reported a Black woman "may have faced obstacles proving that she was discriminated against on the basis of gender because women as a group have not suffered since white women do not share the injury". As such Pickett et al. (2012) suggested, "A focus on both race and gender equity in access and participation in interscholastic athletics is needed to ensure that Title IX addresses gender equity, while recognizing the double jeopardy status faced by women of color."

Racial clustering has also created barriers for BIPOC women in sports. Racial clustering can be attributed to economic inequalities and institutional disadvantages that exist in many communities of color and limited resource school districts (Sabo & Veliz, 2008; Zarrett et al., 2020). Racial clustering can be used to justify the increased numbers of Black women in basketball and track and field (Corbett & Johnson, 2000; Cooper & Newton, 2021) Further, Black women's participation in sports has been historically limited to track & field and women's basketball due to limited access to resources, which will be discussed later in this report, and being unjustly deemed unfit to participate in "country club sports" (i.e., tennis, golf, swimming) (Corbett & Johnson, 2000; Cooper & Newton, 2021; Carter-Francique & Flowers, 2013). Johnson (2008) offers another view of this notion by stating people of color face bias that centers on a perception that they "can only function in a team component with a designated role." As a result, racial and gender disparities continue to fuel participation obstacles for BIPOC women in college sports (Flowers, 2015; Corbett & Johnson, 2000; Cooper & Newton, 2021). This notion could explain the low numbers of BIPOC women in college sports. For example, white women represent the largest population of women athletes in NCAA Divisions I, II, and III conferences combined at 68%. Black women represent 11%, followed by Hispanic women (6%), International women (5%), women identifying with Two or More Races (5%), and Asian women (2%) (National Collegiate Athletic Association [NCAA], 2021a). The percentages of American Indian/Alaska Native and Native Hawaiian/Pacific Islander women registered at .05% although combined they accounted for 1,687 female athletes competing on teams competing under the umbrella of the NCAA (see Table 13 on page 52). Further, there is a need to examine the impact of Title IX on sports participation at historically Black colleges and universities (HBCUs) and, since HBCUs are not monolithic, there is also a need to explore the

impact of Title IX on HBCU sport participation at two- and four-year institutions outside of the NCAA (i.e., NAIA).

Overall, race and gender tremendously impact a woman's ability to holistically receive and benefit from Title IX. For example, in a study of data gathered through the CRDC for the academic year 2011–12, several important findings illustrate the influence of race and gender on access to educational and sport opportunities (National Women's Law Center [NWLC] & Poverty & Race Research Action Council [PRRAC], 2015). Some of those findings included the following:

- Over 40% of the nation's high schools are either heavily white (90% white) or heavily minority (white enrollment is 10% or less).

- Far fewer athletic opportunities are available to students in heavily minority schools compared to heavily white schools. In a typical heavily minority school, there are only 25 spots available on sports teams for every 100 students; in a typical heavily white school, there are 58 spots available on sports teams for every 100 students.

- Gender disparities in athletic opportunities were pervasive across schools; however, the gender disparities were greater in heavily minority schools.

- In a typical heavily white high school, girls had 82% of the athletic opportunities that boys had.

- In a typical heavily minority school, girls had only 67% of the opportunities to play sports compared to opportunities provided for boys.

### 7. Right to Play: Title IX and Transgender and Gender Nonconforming Athletes

Title IX is poised to play an important role in securing the legal rights of transgender students to compete on athletic teams according to their gender identity. Emerging case law in other contexts, such as employment nondiscrimination and access to school bathrooms, suggests that the likely interpretation of the statute is that it supports inclusion and conflicts with the laws and policies in some states that prohibit transgender girls from competing in girls' sport. The current administration has signaled its intention to enforce Title IX in a way that maximizes protection for transgender rights. At the same time, state legislatures are working to restrict transgender rights, including rights to participate in sports. Another important actor in this space is the NCAA, which has recently revised its own transgender participation policy to defer to the standards set by sports' national governing bodies (NGBs). Unlike the NCAA, NGBs have not created those policies with educational objectives or Title IX in mind. Advocates must remain vigilant to ensure that this development does not effectively exclude transgender women from accessing the opportunity to participate in college athletics. It also is imperative that Title IX advocates support the ability of gender nonconforming athletes to play and compete. Expanding opportunities for students to participate without restrictions and expectations imposed by gender labels (e.g., addition of new, inclusive sports models) can also create more pathways for inclusion.



### 8. Fostering Participation: Title IX and Athletes with Disabilities

Examinations of Title IX often overlook the gender gaps among students with disabilities. According to the National Center for Education Statistics, there are nearly 7 million students with disabilities attending the nation's public schools (Schaeffer, 2020). Students with disabilities may comprise as much as 14% of total enrollment within public schools (National Center for Education Statistics, 2021). Of that group, approximately 33% or 2.3 million are girls (Schaeffer, 2020).

- According to Brittain (2009), 90% of women with disabilities are not active in sport.

- In a report from the U.S. Government Accountability Office in 2010, boys with disabilities consistently participate in sport at higher rates than girls with disabilities.

- Boys in grades 1 through 7 participated on a school or community-based sports team at a rate of 45% compared to 31% of girls with disabilities (U.S. Government Accountability Office, 2010).

- Among athletes with disabilities participating on school- or community-based sports teams offered for grades 7 through 12, 37% were boys and 23% were girls (U.S. Government Accountability Office, 2010).

- According to the NFHS (2019), of the 15,571 high school students who participated in adaptive sport activities during the 2018–19 academic year, 44% were female students (6,960).

Christophel (2020) cites Title IX as a model to use in arguing for the need for the creation of separate sport championships and leagues for athletes with disabilities. There is also a strong argument that more attention should be paid to the accumulated effects of multiple forms of discrimination that might occur against a female parasport athlete should she also be a racial minority.

### 9. New Era in College Sports: Title IX and Name, Image, and Likeness

For decades, NCAA rules prevented college athletes from entering into endorsement contracts and making money from the use of their names, images, and likenesses (NILs). At the risk of losing their eligibility to compete in their sports, NCAA Division I college athletes, in particular, for decades could not appear in advertisements, participate in promotional activities, sign autographs, run their own sports camps, or publish under their own names and get paid.

After the state of California passed the Fair Pay to Play Act in 2019, which provided for college athletes to profit off their NILs and to have access to representatives, 26 other states passed similar laws with many taking effect in July of 2021 and some earlier. Faced with such a wave of opposition to its rules, the NCAA suspended its rules in the summer of 2021, ushering in what some have referred to as the NIL era of college sports. In the immediate aftermath of college athletes' access to their NIL rights, stories abounded about college athletes promoting



©iStock by Getty Images

all manner of ventures from restaurants to car dealerships to professional sport franchises to fitness products. The value of those endorsements ranged from the receipt of in-kind merchandise such as t-shirts and hats to the occasional six-figure deal.

- Olivia Dunne, an LSU gymnast, who has 5.7 million followers on social media is expected to reach over $1 million in endorsements after her first year. Among the companies she has deals with are Vuori (an active wear company) and PlantFuel (a wellness company) (Chen, 2021).

- La'Quanza Glover, a basketball player for Edward Waters University, is believed to be the first HBCU female athlete to sign an endorsement deal with Global Freight & Commerce (Bell, 2022).

- Linktree Partners, a linking platform, signed Marghzetta Frazier, UCLA gymnast, and Alana Walker, University of Virginia volleyball player, to "create and share content that showcases who they are on and off the court, using Linktree to connect their audiences to their content, brand deals, causes, playlists, communities and NIL ventures" (Dosh, 2021c).

In this evolving landscape, where 60%–64% of endorsement deals to college athletes are going to men (Associated Press, 2022), there is a need for ongoing vigilance to assess whether women athletes are being promoted in equitable ways and the avenues to access endorsement deals are being made available to them.



# Method and Design

This report draws upon publicly available data from sources such as the Equity in Athletics Disclosure Analysis Cutting Tool provided by the Office of Postsecondary Education of the United States Department of Education; the National Collegiate Athletic Association, the National Federation of State High School Associations as well as peer-reviewed research articles, law review articles, federal regulations, letters of guidance, and other reference material.

## A Research Note About Terminology:

**Sex v. Gender:** In scholarly literature as well as in mainstream reports, the terms "sex" and "gender" are often used interchangeably. As noted in introduction, the statute was passed at a time when those faced with discrimination were finding the words to express the harms done and the barriers that needed to be overcome (Sandler, 2000; Ware, 2011). In point of fact, feminist psychologist Rhoda Unger (1979), among others, was exploring a more nuanced understanding of determinants of behavior just as the conversation about Title IX's application to education was unfolding in 1979. She pointed out a need to differentiate the terms "sex" and "gender," with sex more narrowly referring to what she called "biological mechanisms" and gender taking into account the sociocultural factors that contribute to sex differences. Mindful of the need for inclusive language, we try, when possible, to use "gender."



**Racial and Ethnic Categories:** The racial and ethnic categories used in NCAA data sets are defined as follows:

**American Indian/Alaska Native:** A person having origins from North America and who maintains cultural identification through tribal affiliation or community recognition.

**Asian:** A person having origins from the Far East, Southeast Asia, or the Indian subcontinent.

**Black:** A person having origins in any of the Black racial groups of Africa (except those of Hispanic origin).

**Hispanic/Latino:** A person of Cuban, Puerto Rican, Central or South America or other Spanish culture or origins.

**International:** A person who is not a citizen or national of the United States and who is in this country on a visa or temporary basis.

**Native Hawaiian/Pacific Islander:** A person having origins in any of the original peoples of Hawaii, Guam, Samoa, or the Pacific Islands.

**Two or More Races:** A person identifying with more than one race/ethnicity category.

**Unknown:** A person whose race/ethnicity is unknown.

**White:** A person having origins from Europe, North Africa, or the Middle East (except those of Hispanic origin).





# Part I. Introduction: Title IX's Broad Impact on U.S. Society

Since the passage of Title IX, girls' and women's participation and access in sport has been remarkable. Each generation has pushed and expanded the boundaries of what girls and women can achieve in the sport system as athletes, coaches, administrators, executives, producers, marketers, and creators of content, writing an ever-evolving women's sport story that is a part of the American story. They have transformed the impossible into the possible and the possible into the wondrous. Along the way sporting organizations and associations have expanded advocacy efforts and provided financial resources to support women's sports.

Title IX has been a key contributor to the continuous growth of women's sports. Millions of girls and women have been positively impacted due to this legislation. For example, prior to 1972, sports opportunities were overwhelmingly offered to boys. The need for Title IX's prohibition against sex discrimination is directly tied not just to opportunity but also to keeping girls in sport to realize the benefits that flow from them. The stakes are high:

- Girls' retention in sports greatly impacts their future growth outside of sports. Explicitly, girls build personal quality traits like team leadership, collaboration, and self-confidence through sports participation and learn pertinent professional skills that lead to their success in careers after college as well as support their personal growth throughout life (Staurowsky et al., 2015; Staurowsky, 2016b; Staurowsky et al., 2020b).

- Sports participation increases girls' chances at living healthy lifestyles and benefitting from positive self-identity. As such, young girls active in sports competition are 20% less likely to get breast cancer later in life (Staurowsky et al., 2015).

- High school girls who compete in sports are more likely to have positive body images than non-athletes. Therefore, participation in sports confers both immediate and long-term benefits for girls who compete. Hence, sports participation directly impacts girls' quality of life and supports immediate and long-term benefits (Sabo & Veliz, 2008; Staurowsky et al., 2015; Staurowsky, 2016b; Staurowsky et al., 2020).

- Girls' sports participation has also been linked to higher levels of family satisfaction (quality of family member interaction, closeness, communication). Sabo and Veliz (2008) reported higher family satisfaction, in both single-parent and dual-parent families when girls participate in sports. Girls' sports participation is linked to the futures of women leaders.

- In a survey of 400 women executives, 94% reported having competed as athletes. Among women C-suite executives, 52% played college sports while 39% of the women working at the management level played college sports (Ernst & Young, 2014).

Female athletes have made tremendous contributions to the success of U.S. teams in international competition. Their positive impact continued during the Tokyo 2020 Olympic Games.

- American athletes broke a record by earning 66 medals in women's events, the most ever for the women of any country. The women took home 23 gold medals, which helped the United States rank number one in the gold-medal count (Planos, 2021).

- According to (Staurowsky et al., 2020) women's team sports have dominated the Olympic Games for the past 30 years. Further, the United States has dominated the women's team sports in track and field, basketball, soccer, and softball. Also worth celebrating, the U.S. women's volleyball team claimed its first gold medal at the Tokyo Games (Associated Press, 2021a).

- Additionally, BIPOC women athletes were represented and celebrated at the Tokyo Games. Tamyra Mensah-Stock became the first U.S. African American woman to win an Olympic gold medal in wrestling (Associated Press, 2021a). Further, Allyson Felix became the most decorated Olympic woman in track and field by winning her 10th Olympic medal (Minsberg, 2021).



*Tamyra Mensah-Stock*



- At the Tokyo Games, 186 out LGBTQ+ athletes from 30 countries competed. The United States had the largest number of out LBGTQ+ athletes with 36 (Outsports, 2021).

- U.S. Paralympians Breanna Clark and Susanna Scaroni both won gold in the 400 meters–T20 and 5,000 meters T-54 events respectively in Tokyo. Kendall Gretsch, also a Nordic skiing gold medalist, won gold in the women's PTWC triathlon (Reinert, 2021).

The benefits provided by sport participation supports the need to advocate for and fuel the growth of participation and development of access opportunities for all girls and women across all levels of sports. Title IX has served to encourage the growth of girls and women's sport opportunities since 1972.

- For example, Girls on the Run, a national nonprofit with more than 12,000 locations across North America, focuses on teaching young girls life skills through running. Sports 4 Life, co-founded by the Women's Sports Foundation and espnW, is a national initiative designed to increase participation and retention of African American, Hispanic, and Native American girls in youth development.

- The need for more programs like Girls on the Run and Sports 4 Life is evidenced in data regarding sports access to girls attending low-income schools or to those with limited financial access to sports. Veliz et al. (2019) reported "during the 2015–16 school year, 15.4% of low-poverty schools indicated offering no interscholastic sports compared to 33.6% of high poverty schools". Additionally, it was reported that when high-poverty schools offer sports, they offer a third fewer sports and sports teams than other schools (Veliz et al., 2019). This trend is similarly seen in limited resource colleges as well (Hearn et al., 2018).

As doors for women in sport have opened since the passage of Title IX, the need for advocacy and support has led to the formation of organizations like the Women's Sports Foundation, Women Leaders in College Sports, Black Women in Sports Foundation, Women in Sports and Events, Association of Women in Sports Media, Wasserman's The Collective, WeCOACH, espnW: Women + Sports Summit, and other national and regional women's sport marketing, media, and coaching associations that work vigorously to provide access and a voice for women in sports.

- Title IX has assisted in paving the way for some historical hirings in professional sports. In 2020, Kim Ng shattered the glass ceiling and broke down racial barriers by becoming the first woman and first person of East Asian descent to lead the front office of an MLB franchise by becoming the first female General Manager for the Miami Marlins (Brassil & Draper, 2021).

- MLB continued this trend in 2020 when Alyssa Nakken was hired to the San Francisco Giants' coaching staff and became the first woman to serve in an on-field capacity during an MLB game (Adler & Simon, 2020). Before Alyssa Nakken, there was Rachel Balkovec, who opened the MLB doors to women in 2019 by becoming the first woman to be hired full-time for an MLB team (Brassil & Draper, 2021).

- Latina women have accomplished several significant firsts in the sport of baseball, including Linda Alvarado, who became the first woman to bid to buy a major league franchise and then served as the first Hispanic team owner with the Colorado Rockies in the 1990s. Jessica Mendoza, a highly decorated Olympic softball player, became the first woman baseball commentator on ESPN in 2015 (Smithsonian Staff, 2021).

- In 2017, the staff of *USA Today* named Dr. Justine Siegal as one of the "100 Most Powerful People in MLB." She was hired by the Oakland Athletics in 2015 as the first woman coach in MLB history (Siegal, 2020). She founded "Baseball For All," an organization that focuses on empowering girls to explore their love for the game of baseball (Baseball for All, 2021).

- In 2021, there were four Native American women athletes who competed in the NCAA Division I women's basketball tournament: Arkansas's Chelsea Dungee (Cherokee Nation), Missouri State's Brice Calip (Muckogee [Creek] Nation), Oklahoma State's Lexy Keys (Cherokee Nation), and South Dakota's Aspen Williston (Chocktaw Nation) (NDNSports Staff, 2021).

In 2021, as name, image, and likeness legislation passed by 27 states started to go into effect, causing the NCAA to relax its former prohibition against college athletes earning money from endorsements, new horizons opened up for female athletes. The ability to enter into NIL deals is a game changer for the women who stand to profit and for the sport system overall. In the age of social media, the opportunity for female athletes to generate as much if not more endorsement revenue than their college male counterparts is not only within reach but here (Darvin, 2021b).

- According to a study that evaluated endorsement deal potential, 13 out of 25 college athletes who were ranked



*Alyssa Nakken of the San Francisco Giants*



with the greatest endorsement deal potential were women. Additionally, the annual endorsement deal potential noted was between a low of $14,000 to a high of $476,000 for select female and male college athletes (Maestas & Belzer, 2020).

- The earning potential of the UCLA women's gymnastics team was estimated at $1,250,000 (Maestas & Belzer, 2020).

- Inequities currently exist in the marketplace with companies like INFLCR reporting that 59% of the NIL deals (n=70,000) they tracked were signed by men athletes while another company, Opendorse, which handles NIL endorsements for NCAA Division I athletes reported that men received 64.7% of the available compensation (Hunzinger, 2022).

Given that we are only in the first few months of this era of college athlete endorsements, this is an area to monitor in terms of Title IX compliance and gender equity in college athletic departments, not only in terms of NIL trends and how those are unfolding, but also in terms of obligations under Title IX to provide equitable support to women athletes and programs in marketing, promotions, and publicity.

Racial and gendered barriers continue to fall as women like Michele Roberts, the first woman to serve as the Executive Director of the National Basketball Players Association, became the first woman ever to head a major professional sports union in North America, are hired. After serving in that role since 2014, Roberts was succeeded by Tamika Tremaglio in 2022 (Golliver, 2022).

- In 2018, Cynthia Marshall became the first African American CEO in the history of the NBA when she was hired by the Dallas Mavericks.

- The NFL made similar strides in gender equity as the San Francisco 49er's hired Katie Sowers, the first openly gay and first woman to coach in Super Bowl history. In 2021, there were 12 women coaching in the NFL (Ayala, 2021).

- In 2020, Jennifer King became the first African American woman to become a full-time coach in the NFL. Further, in 2021, Maia Chaka made history by becoming the first African American woman to officiate an NFL game, making her the second woman behind Sarah Thomas, who was the first woman hired as a full-time referee. Sarah Thomas later became the first woman to referee a Super Bowl (Farrington, 2021).

Undoubtedly, these women stand on the backs of the unsung sheroes who faced gender and racial discrimination to break down the barriers in their respective sports: Women like Janet Guthrie, who became the first woman to compete in NASCAR's Winston Cup Series in 1976; or like Toni Stone, who signed with the Indianapolis Clowns of the Negro American League in 1953, making her the first female professional baseball player in a top-tier men's league (Stezano, 2018).

Additionally, African American women have achieved some major victories, with golf being just one example. Renee Powell,



*Renee Powell accepts the Charlie Sifford Award at the 2022 World Golf Hall of Fame Induction*

who stands as a beacon and voice for African American women in golf, became the second African American woman in 1967 to compete on the LPGA Tour, the first being Althea Gibson (Adler, 2018). In 2016, for the first time, four Black women competed on the Ladies Professional Golf Association (LPGA) Tour at the same time. Mariah Stackhouse, Sadena Parks, Cheyenne Woods, and Ginger Howard joined Shasta Averyhardt, the first African American woman from a HBCU (Jackson State University) to earn a LPGA Tour card, and LaRee Sugg in carrying on the path set by Alethea Gibson and Renee Powell in opening doors for Black women in golf (Cook, 2016). Further, Renee Powell continues to break through the glass ceiling in golf. In 2021, Powell became the first woman to be awarded the PGA Golf Professional of the Year Award (Cook, 2021). A few months later, Powell was honored as the first recipient of the Charlie Sifford Award at the World Golf Hall of Fame (PGA Staff, 2022).

Title IX has forged a bridge for women, including BIPOC women, to career positions in sports. Although more work needs to be done before the celebration begins, it's undeniable the impact Title IX has had in shining a spotlight on the importance of women leaders in the sport system and the talent they bring to their respective roles (Carpenter, & Acosta, 2005; Flowers, 2015; McDowell & Carter-Francique, 2017; Cooper & Newton, 2021; Pickett et al., 2012). With so many outstanding achievements and signs of progress, the reality remains that Black women have been marginalized in athletic coaching and administration positions (McDowell & Carter-Francique, 2017). Specifically, Black women reported having their qualifications and abilities questioned, having resentment expressed towards them holding key positions, and being perceived as incapable of successfully performing their jobs (McDowell & Carter-Francique, 2017). It was further noted that Black women experience "pressure to prove themselves on a consistent basis, to know their job well with minimal or no help or guidance, to avoid making mistakes, and to take on countless tasks and roles to prove their worth"



(McDowell & Carter-Francique, 2017). The majority of research highlights sports participation of Black women and not athletic career positions (McDowell & Carter-Francique, 2017; Pickett et al., 2012); therefore, there is a need to expand research in this area to further examine the marginalization of Black women in athletic administration and coaching positions.

For all of the progress that has taken place and continues to occur, much work remains. The hosting of the 2022 NCAA Women's Division I Basketball Final Four in Minneapolis, which took place on the original homeland of the Dakota and Ojibwe people, became a focal point around consciousness raising that Native athletes are significantly underrepresented in NCAA sponsored sports. As Native lawyer and former Wisconsin women's basketball player, Stomski Seim, commented, "There has been an issue for a long time – there is barely 1% of all NCAA student-athletes [who] are Native Americans.  It is not because of talent. It's not because of lack of love of competition in sport. It's really a lack of access to those opportunities" (Hallman, 2022).

During the 2021 NCAA Division I women's basketball tournament, discrepancies in weight rooms, food, media coverage, and venues drove gender equity debates. An outcry for more equitable facilities and treatment was fueled by social media posts by women's basketball tournament participants and media covering the tournaments. External reviews of not just the NCAA women's basketball but all women's championships across all divisions revealed systemic discrimination (Kaplan Hecker & Fink, 2021a, 2021b). These issues in women's college basketball can be found in virtually every other college women's sport program, in girls' sports from K–12, and in women's Olympic and professional sport as well.

An increase in the number of athletes speaking up against inequitable resources has also sparked further discussion around discrimination, gender equality, racial justice, as well as mental health.

- The U.S. National Women's Soccer Team's (USWNT) legal battle with the U.S. Soccer Federation over equal pay shed light for many on the severity of the gender pay gap in professional sports. In February of 2022, the USWNT and U.S. Soccer Federation reached a $24 million settlement agreement regarding equal pay claims (Goodman, 2022). While compensation for women has improved over the past decade, the gap still exists. For broad context, while compensation for women has improved over the past decade, the pay gap still exists and has remained relatively stable in the United States over the past 15 years or so. In 2020, women earned 84% of what men earned, according to a Pew Research Center analysis of median hourly earnings of both full- and part-time workers (Barroso & Brown, 2021). Women of color experience an even more significant wage gap, closer to 64% for Black women (Bleiweis et al., 2021)

- Tennis legends Venus and Serena Williams were vocal advocates for pay equality in tennis. According to ESPN, the U.S. Open was the first of four major tennis tournaments to award equal prize money to men and women (Bodo, 2017). As advisory board members for the Billie Jean King Leadership Initiative (BJKLI), the Williams sisters continue to promote equality in pay in professional sports. BJKLI stands as a leader in advocating for equal pay for equal work through promoting equality, access, and inclusion (Associated Press, 2018)

Just as heroic, members of the WNBA stood in solidarity against racial discrimination and injustice. To bring awareness to racial discrimination and gun violence the teams wore shirts that read, *"Change Starts With Us: Justice & Accountability,"* which honored Philando Castile and Alton Sterling, who were both victims of racial violence.

- Additionally, members of the Indiana Fever took a knee in protest over the police shootings of Alton Sterling and Philando Castile before their playoff game against the Phoenix Mercury. The player's activism also included bringing awareness to voting rights and sexism (Tsuji, 2016).

- As a result, the WNBA announced their 2020 season would be dedicated to social justice and launched The Justice Movement. The goal of The Justice Movement is to continue the conversations about race, voting rights, LGBTQ+, and gun control. They also dedicated the 2020 season to Breanna Taylor and launched the #SayHerName Campaign (WNBA, 2020).

As we enter the next 50 years of Title IX, we celebrate the progress but acknowledge that the women's sport story that is being written is not as inclusive as it could be, that the gender binary that forms the basis for the foundation of the sport system in the United States has, in many ways, greatly benefitted girls and women, but not equally (for marginalized girls and BIPOC girls and women far less) and not for those who do not easily fit within the confines of a gender binary that insists on separating human beings into an either/or category of female/male. Beyond gender, sport is a human experience. Within it, there should be a place for everyone to experience its joys and benefits.



# Part II. Brief History of Title IX and Its Impact on the Nation's Schools

Within a sport culture where U.S. women are leaping, racing, sprinting, throwing, and vaulting into their futures with a fierceness and flare that captures the attention of global audiences, inspiring awe and admiration, it hardly seems possible that such performances emerge directly from a time when strength in a woman was an indictment of her character and femininity. And yet, as we approach the 50th anniversary of Title IX, it was that accusation of "coming on too strong for a woman" that fueled the work of Dr. Bernice (Bunny) Sandler in the late 1960s to document the ways in which girls and women were being held back by sexist stereotypes in the nation's schools.

As a professor with a newly minted doctoral degree in counseling and personnel services from the University of Maryland, Dr. Sandler found it puzzling that she applied for, and was turned down for seven tenure-eligible positions in her home department after establishing a reputation as a good professor among the undergraduates she taught there. Seeking an explanation, she learned from a male colleague that the department viewed her as "too strong for a woman" (Sandler, 2000), a term reflective of stereotypical attitudes that women were less qualified intellectually and temperamentally for careers in professions in academia, business, law, medicine, military, politics, and sports, for example.

Confronting that reality at a time when there were few reports on how women were treated in the workplace and at a time when "phrases like sexism and sexual harassment were not even in common usage" (Ware, 2011, p. 46), the initial rejection Dr. Sandler encountered as a professor and researcher fueled her collaboration with the Women's Equity Action League (WEAL). After combing through federal legislation in an attempt to find something to challenge "an industry-wide pattern" of sex discrimination and finding it in an executive order issued by President Lyndon B. Johnson, she worked with WEAL to file complaints against 250 colleges and universities (Griggs, 2019; Rose, 2015, 2018). Sandler's work became the foundation for seven days of hearings conducted in 1970 under the auspices of the House Committee on Education and Labor, where Representative Edith Green (D-OR) served as chair of the special subcommittee on education. The outcome of those hearings was a two-volume, 1,300-page report documenting the depths of the unfair treatment women faced in U.S. colleges and universities (Sandler, 2000). It would take that level of documentation to overcome the denials from school officials about the second-class status women were subjected to within higher education.

An overarching mindset that afforded preferential treatment to men and limited opportunity for women was reflected in the 1960s and 1970s in the routine policies and practices that governed life on college and university campuses. Emblematic of the times:

- Twenty-one thousand female students were denied admission to state universities in Virginia in the early 1960s at a time when not a single male student was denied admission (Sandler, 2007).

- At the University of North Carolina, separate admission policies requiring female applicants to be "especially well-qualified" (a standard not in place for male applicants) resulted in the 1970 freshman class being composed of nearly 1,900 men and only 426 women (Blumenthal, 2005; McMillen, 1997).

- When more qualified female applicants sought admission to the University of Michigan, requirements were adjusted to ensure that there would not be an "over-balance" of women (Sandler, 2007).

- Many medical and law schools used quotas to limit the number of women per class. Those quotas accounted for the fact that at the end of the 1960s women made up 7% of the doctors in the United States (Blumenthal, 2005; Sandler, 2007).

Those hearings laid the groundwork for the enactment of Title IX two years later, championed by Green along with U.S. Senator Birch Bayh (D-IN) and Representative Patsy Mink (D-HI). Considered the "Mother of Title IX", Mink's advocacy on behalf of women in education emanated from her own experiences. When she was denied admission to medical school, she sought admission to law school. After earning her degree in law, she was denied employment as a lawyer because she had a child. When those doors closed, she found a way, working tirelessly as the first Asian American and woman of color to serve in the United States Congress. For her advocacy and life of service, Title IX was eventually renamed the Patsy Matsu Takemoto Mink Equal Opportunity in Education Act. Reflecting on the influence that both the legislation and Mink have had, U.S. Senator Mazie Horono (D-HI) stated, "Patsy's legacy lives on in every female student and athlete in America who's been given a fair shot to compete in the classroom and on the playing field" (Wang, 2014, para. 6).[2]

---

2    *A book on Patsy Mink's life and legacy entitled* Fierce and Fearless: Patsy Takemoto Mink, First Women of Color in Congress, *authored by Judy Tzu-Chun Wu and Gwendolyn Mink is expected to be published by NYU Press in May of 2022.*



**Table 1. Impact of Title IX on Representation of Girls and Women in Athletic Programs and Education**

| Program or Setting | Gender of Participants | Participation by Year | |
|---|---|---|---|
| | | 1972–72 | 2018–19 |
| High school varsity sports participation | Boys | 3,666,917 | 4,534,758 |
| | Girls | 294,015 | 3,402,733 |
| NCAA varsity sports participation | Men | 170,384 | 278,988 |
| | Women | 29,977 | 219,177 |
| Receiving bachelor's degrees | Men | 500,590 | 857,545 |
| | Women | 386,683 | 1,155,309 |
| Entering medical school | Men | 10,435 | 10,864 |
| | Women | 1,653 | 11,611 |
| Attending law school | Men | 85,554 | 52,555 |
| | Women | 8,914 | 60,175 |

*Data for this table were drawn from: National Federation of State High School Associations (2019); National Collegiate Athletic Association (2020); Digest of Educational Statistics (2021); Association of American Medical Colleges (2019); and American Bar Association (ABA) Profile of the Profession (2020).*



*Sarah Davis of the Minnesota Golden Gophers scores during the 2014 NCAA Women's Ice Hockey Championship.*



Women's Sports Foundation
WomensSportsFoundation.org

50 Years of Title IX:
We're Not Done Yet

# Part III. A Brief Overview of Title IX's Legislative History as It Pertain to Athletics

As a federal civil rights law, it is important to understand that Title IX is modeled after Title VI of the Civil Rights Act of 1964, which bars discrimination on the basis of race, color, or national origin in programs or activities that received federal financial assistance. In his introduction of the bill in February of 1972, U.S. Senator Birch Bayh explained that Title IX was designed to recognize that sex discrimination rendered girls and women second-class citizens and the appropriate remedy to address this issue was to ensure that "...our national policy prohibits sex discrimination at all levels of education" (Bayh, 1972, p. 5807).

Known for its succinct 37-word mandate, Title IX reads as follows:

> No person in the United States shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance (Education Amendments Act of 1972, 2018, Section 1681(a)).

At the time Title IX was passed, men's and women's athletic departments at the college level largely operated in separate spheres. The Association for Intercollegiate Athletics for Women (AIAW), founded in 1971, played a key role in educating public policy makers about the state of women's sport on college campuses. As the implications of Title IX's mandate for fair and equitable treatment began to take hold, college sport power brokers representing men's athletic interests started to mobilize resistance. Working through the National Collegiate Athletic Association (NCAA), which at the time was an all-male institution, they lobbied for athletics to be exempted from the reach of Title IX. Amendments authored by Republican senator from Texas, John Tower, initially sought to remove athletics entirely from Title IX's application. When that effort failed, there were subsequent efforts to insulate the revenue-producing sports of football and men's basketball from an analysis under Title IX. Those efforts failed as well (Staurowsky, 2016a; Suggs, 2005).

Fears that bringing fair and equitable treatment to female athletes in athletics would damage or destroy men's athletics were powerful talking points that held sway over members of Congress and the American public. Those fears were somewhat assuaged with the passage of the Javits Amendment, which clarified that athletic departments would not be compelled to invest the exact same amount of money in men's and women's sports but would need to provide the same quality of experience for male and female athletes. In effect, the determination of quality would be anchored in the nature of the sport, avoiding a hard and fast rule that for every dollar spent on a male athlete there must be a dollar spent on a female athlete. Thus, if it cost more money to equip a football team compared to a field hockey team, it was acceptable to spend more money on the football team (Staurowsky, 2016a).



©iStock by Getty Images

As is the case with all federal legislation, each branch of government (legislative, judicial, and executive) plays a role in effectuating the intent of Title IX and ensuring its enforcement. The U.S. Congress not only enacted Title IX but also has entertained amendments to clarify its scope; the executive branch, through the appropriate governmental agency (initially the U.S. Department of Health, Education, and Welfare (HEW) and now the U.S. Department of Education), provides oversight in terms of education and compliance; and the nation's courts have served as an avenue for disputes regarding sex discrimination to be remedied under Title IX (Staurowsky, 2016a).

When officials with HEW set about circulating regulations to clarify Title IX's application to school in 1974, it became clear that the idea of providing fair and equitable treatment to female athletes had struck a nerve with educational administrators. Of the nearly 10,000 responses submitted by various stakeholders (lobbyists, athletic directors, teachers, parents) in response to HEW's call for comments, 90% of them addressed concerns about athletics despite the fact that athletics is only one of myriad educational opportunities offered by schools (Carpenter & Acosta, 2005; Samuels and Galles, 2003). Appearing before a U.S. House education subcommittee in June of 1975 after the regulations were released, then Secretary of HEW, Casper Weinberger, quipped that he "...had not realized until the comment period that athletics is the single most important thing in the United States" (Associated Press, 1975). He also noted in his remarks that the NCAA's characterization of title IX as something that would "bankrupt" college athletic departments was simply, in his words, wrong.



Despite Weinberger's attempts to offer assurances that Title IX did not threaten men's sports, efforts continued to derail Title IX's application to athletic departments, surfacing in a lawsuit brought by Grove City College against the government, arguing that since it did not directly receive federal financial assistance it was not obligated to comply with Title IX. In *Grove City v. Bell* in 1984, while the U.S. Supreme Court disagreed, noting that students at Grove City were recipients of federally funded loan programs, the Court did narrow the scope of Title IX's application only to the financial aid office. For a time, the NCAA and representatives of men's college sport interests seemed to have won the day in getting athletic departments exempted from the equitable treatment requirements of Title IX. Due to the impact of the ruling not just on Title IX's application but also its adverse effect on the application of other civil rights laws, Congress intervened to pass the Civil Rights Restoration Act in 1987, making clear that Title IX applied to the institutional, not just programmatic level (Sack & Staurowsky, 1998).[3]

Two decades after Title IX was passed, vast gender inequities and continuing resistance to providing equitable treatment to female athletes endured as did the hesitancy of presidential administrations to deal with Title IX athletics regulations. President Gerald R. Ford (1974–77) wavered on the release of the regulation itself while President Jimmy Carter (1977–81) did the same with the "Policy Interpretation." During President Ronald Reagan's administration, delays occurred as his administration entertained the idea that Title IX should not apply at all to athletics, a consideration that paralleled the Grove City case. Even after the passage of the Civil Rights Restoration Act, which restored enforcement authority to apply Title IX to athletics, presidential administrations under George H. W. Bush (1989–93) and in the early years of Bill Clinton (1993–2001) remained less than aggressive about ensuring that female athletes competing in the nation's schools were protected from sex discrimination. "As a result, the public's perception of Title IX's constitutional legitimacy was seriously eroded. A statute that was out of sight was also, to the public, out of mind" (Orleans, 1996, p. 137). In point of fact, the impetus for school administrators to pay attention to Title IX enforcement occurred as a result of a U.S. Supreme Court decision providing for students to receive injunctive relief from the sex discrimination

---

[3]  "An initial challenge to the breadth of Title IX in Grove City narrowed the scope of Title IX to only those educational programs directly receiving financial assistance, which raised the question whether athletic departments which did not directly receive federal financial assistance would be beyond the reach of the statute. In applying Grove City in an athletics context, one federal court held athletic scholarships were outside the coverage of Title IX (See Bennett v. West Texas State University, 1986) and another rejected such a narrow interpretation of Title IX's applicability to athletic financial aid (See Haffer v. Temple University, 1987). This uncertainty further delayed implementation of Title IX in athletics. Consequently, it was not until 1988 (more than 15 years after the enactment of Title IX), that Congress passed the CRRA in 1998 restoring the broad scope of coverage of Title IX and mandating institutional compliance across all programs within an educational institution. As Sack and Staurowsky (1998) document, the NCAA was looking for a case like this to achieve what it had been unable to do with the proposed Tower Amendments, and that was to exempt athletics from the reach of Title IX."

they were experiencing and receive monetary damages (punitive and compensatory) when schools failed to address sex discriminatory behaviors and practices (Orleans, 1996).

In 1993, research conducted by the NCAA's Gender Equity Task Force was released. Findings revealed that the college sport system had changed slowly to include women, with a disproportionately high 70% of athletic opportunities continuing to be made available to male athletes. Similar trends were found in the allocation of financial resources to support men's teams, including nearly 77% of operating budgets, 70% of athletic scholarship funds, and 83% of recruiting dollars (Hosick, 2007).

Female athletes sought relief in the courts from the pervasive mindset among administrators that women's athletics was just not as important as men's sport and that women had not earned the right to be treated fairly and equitably. In the landmark case of Cohen v. Brown University, that mindset would continue to be challenged. Significantly, Cohen reaffirmed that it was "well-settled that Title IX applies to all of an institution's programs if any part of an educational institution receives federal funds." Cohen also confirmed that the Department of Education's Title IX regulations and policy interpretations were entitled to substantial deference when interpreting the scope and application of Title IX. And lastly, Cohen interpreted the phrase "substantially proportionate" as used in the DOE regulations related to participation opportunities to be properly found only where the institution's "actual" participation opportunities in its intercollegiate athletic program mirrors the student enrollment as closely as possible.

In an effort at creating some transparency around how schools were responding to Title IX's mandate that female athletes receive equal access and equal treatment in athletics at the college and university level, the Equity in Athletics Disclosure Act (EADA) was passed in 1994. Yet a similar law still does not exist for K–12 athletic programs, meaning accountability and transparency is often quite lacking.

Over time, the federal agencies charged with overseeing enforcement of civil rights laws in educational settings, first HEW and then the U.S. Department of Education Office for Civil Rights, continued to develop resources to support school administrators in their compliance efforts. The publication of Title IX's regulations would be followed up four years later with the Intercollegiate Athletics Policy Interpretation in December of 1979 and the Title IX Athletics Investigators Manual in 1990.

Additional policy guidance has been provided in the form of memorandums and letters of clarification issued by the OCR are listed below. When the law was first passed in 1972, schools were given grace periods, or a reasonable period of time to comply with Title IX's requirements.

- 1975 Letter to Chief State School Officers, Title IX Obligations in Athletics emphasized that the adjustment period allowed for schools to achieve compliance was not a waiting period. Schools were to move expeditiously, but no later than July 21, 1978, to fully implement a plan to fully and effectively accommodate the athletic interests and abilities of both sexes (Holmes, 1975).



- Intercollegiate Athletics Policy Interpretation in December of 1979.

- 1990 Title IX Athletics Investigator Manual (Bonnette & Daniel, 1990).

- 1996 Dear Colleague Letter and Clarification of Intercollegiate Athletics Policy: Three Part Test, which responded to the need for additional guidance regarding "whether students of both sexes are provided nondiscriminatory opportunities to participate in athletics" (Cantu, 1996).

- 1997 Dear Colleague Letter: Bowling Green State University and Letter from Mary Francis O'Shea, National Coordinator for Title IX Athletics, which noted that the Office of Civil Rights of the U.S. Department of Education was investigating 25 complaints about the way in which athletic scholarships were allocated in intercollegiate athletic programs, clarifying that those allocations needed to be substantially proportionate to the participation rates of female and male athletes.

- 2002 Guidelines on Current Title IX Requirements Related to Single-Sex Classes and Schools, which clarified that students were not to be segregated on the basis of sex in courses or activities in physical education and that students were to be grouped according to objective standards of physical performance. However, exceptions were permitted for sports involving bodily contact (Paige, 2002).

- 2003 Dear Colleague Letter with Further Clarification of Intercollegiate Athletics Policy Guidance Regarding Title IX Compliance, emphasizing the flexibility of the three-part test used to assess whether a school is offering equal athletic opportunities to female and male students. It further notes that "nothing in Title IX requires the cutting or reduction of teams in order to demonstrate compliance with Title IX, and that the elimination of teams is a disfavored practice" (Reynolds, 2003).

- 2005 Dear Colleague Letter with Additional Clarification of Intercollegiate Athletics Policy: Three-Part Test – Part Three. Information issued in this clarification that allowed for the use of a single survey to assess interest in participating in athletics and a user's guide offering a "model survey" was later found by the OCR to be "inconsistent with the nondiscriminatory methods of assessment set forth in the 1979 Policy Interpretation and the 1996 Clarification and do not provide the appropriate and necessary clarity regarding nondiscriminatory assessment methods, including surveys" (see clarification from 2010).[Withdrawn]

- 2007 Guidance on Nondiscriminatory Treatment of Pregnant Students in Athletic Scholarships, which cautioned schools that taking an athletic scholarship away from an athlete because she is pregnant violates Title IX (Monroe, 2007).

- 2008 Dear Colleague Letter with Guidance on Determining which Athletic Activities Can be Counted for Purposes of Title IX Compliance reviewed the factors that are considered when determining which athletic activities offered by a school are counted under Title IX (Monroe, 2008).

- 2008 Dear Colleague Letter, which reaffirmed the U.S. Department of Education's position regarding the three-part test and its application to high school interscholastic athletic programs in terms of assessing student interests and abilities (Spellings, 2008).

- 2010 Dear Colleague Letter with Guidance on Accommodating Students' Athletic Interests and Abilities: Standards for Part Three of the "Three-Part Test," which, as noted above, withdrew the 2005 Dear Colleague Letter and model survey (Ali, 2010).

- 2013 Dear Colleague Letter with Guidance on the Prohibition Against Retaliation Under Federal Civil Rights Laws including Title VI, Title IX, ADA Title II Section 504, which addressed the importance of protecting individuals coming forward to report discrimination from retaliation (Galanter, 2013b). 2013 Dear Colleague Letter with Guidance on Supporting the Academic Success of Pregnant and Parenting Students, which included a pamphlet that explained Title IX's requirements as they pertain to pregnant and parenting students (Galanter, 2013c).

- 2015 Title IX Resource Guide. While this document was rescinded during the Trump Administration, it remains on the U.S. Department of Education website as a historical reference (Lhamon, 2015c).

- 2015 Guidance on Voluntary Youth Service Organizations. This document provides guidance regarding under what circumstances a school district may offer single-sex programming under Title IX (Lhamon, 2015d).

- 2017 Dear Colleague Letter, which rescinded the 2015 and 2016 U.S. Department of Education and U.S. Department of Justice's position regarding discrimination on the basis of gender identity as constituting sex discrimination under Title IX. As of August of 2021, this letter is under review (Battle & Wheeler, 2017).

- In 2020, the Office for Civil Rights issued assistance to schools regarding expectations for meeting obligations under Title VI, Title IX, and ADA Title II/Section 504 during the COVID-19 pandemic, noting that schools could not adopt a blanket policy of putting off investigations or proceedings during this time.

For school administrators in 2022 to continue to be unaware of Title IX standards and how they apply to athletic departments 50 years after the law was enacted strains the concept of reasonableness and can be seen as an act of evasion. The Higher Education Opportunity Act (2008) requires that institutions each year attest that they are complying with federal law.

While the Office for Civil Rights has the power to withhold federal funding from schools that fail to comply with federal law, in Title IX's first five decades no school has been punished with that penalty.



**Women's Sports Foundation**
WomensSportsFoundation.org

50 Years of Title IX:
We're Not Done Yet

# Part IV. Title IX and Athletics: The Legacy of the "Separate but Equal" Standard in Athletics Programs

The expanse of Title IX's reach in terms of athletic programs sponsored by federally funded educational institutions includes intercollegiate and interscholastic athletic programs (varsity, junior varsity, and sub-varsity programs), intramural programs, and club sports. Because funding and administration models for these programs are different, meaning intercollegiate and interscholastic programs typically have more resources and support provided by institutions with intramural and club sports operating from student initiatives and student-led leadership models, there are nuances that come into play in determining Title IX compliance within each of those areas.

One of the authors of Title IX's athletics regulations, Jeff Orleans (1996), explained that the law's application to federally funded educational institutions points to both the constitutional and moral jurisdiction of Title IX. Offering a window into the governmental interest in ensuring that citizens attend schools free of sex discrimination, Orleans (1996) wrote, "...federal support means that discrimination in an activity is not merely an institutional error but amounts to biased action by the government itself" (p. 134). The linchpin here is the purpose to which taxpayer dollars are dedicated as they circulate through school systems and colleges and universities. As Orleans (1996) helpfully points out, taxpayers ought not be excluded from programs that they financially support, nor should the government be subsidizing programs that arbitrarily exclude citizens from participating in them (p. 134).

In recognition of what has historically been a central organizing principle for athletic programs, Title IX's regulations provide for boys and girls and men and women to have separate athletic programs, justified on the basis of perceived social, philosophical, and biological reasons. As a consequence, from its earliest beginnings, the regulatory framework that established a school's obligations under Title IX in the athletic area allowed for sex-segregated athletic programs arranged around the concept of a gender binary. The embrace of sex segregation in Title IX's application to athletics puts it at odds with other civil rights statutes that require sex integration (Buzuvis, 2020).





# Part V. Title IX Athletics Compliance, Education and Enforcement

After Title IX's passage, there was an expectation that compliance would be achieved in elementary schools by 1976; high schools and colleges and universities by 1978 (Bauer, 2001)). According to scholars Linda Carpenter and Vivian Acosta (2005), there are three ways in which Title IX can be enforced: voluntary and ongoing reviews and audits conducted internally within schools, lawsuits, and reviews conducted by the U.S. Department of Education Office for Civil Rights triggered by citizen complaints. State departments of education do audits as well, and many states have their own versions of Title IX on the state level.

While Title IX has had a demonstrable effect on the nation's schools, the path to compliance and enforcement has been marked by delays, detours and derailments (Staurowsky, 2016a; Staurowsky et al., 2020; Staurowsky & Rhoads, 2020). In 2019, only 27% of U.S. women high school sport leaders (n=877) and 44% of college sport leaders (n=1,155) reported a belief that institutions had a strong or very strong record of Title IX compliance (Staurowsky et al., 2020).

A study conducted by the Women's Sports Foundation (Staurowsky et al., 2020); an investigative report by Wesley Jenkins (2019) with the Chronicle of Higher Education, and the external review of the NCAA's approach to women's championships revealed gross gender inequities across all divisions (Kaplan Hecker & Fink, 2021a, 2021b), there is ample support for a conclusion that cause for concern about widespread Title IX noncompliance in college and university athletic programs existed before the COVID-19 pandemic began and women's sports programs were clearly vulnerable to cuts during the pandemic. In 2020–21 alone, female and male athlete plaintiffs successfully challenged cuts to their programs at Brown University, William and Mary, University of North Carolina at Pembroke, East Carolina University, Dartmouth University, Clemson University, University of St. Thomas, LaSalle University, and Dickinson College under Title IX (Bailey Glasser, 2021).

Although it is more difficult to get a complete picture of what is happening at the high school level because less research has been done on that sector, similar concerns appear to exist at the high school level.

- Based on an analysis of athletic participation opportunities available to female and male athletes in 15,000 high school programs using data from the National Center for Education Statistics (NCES) and the Civil Rights Data Collection (CRDC), only seven states offered athletic opportunities to female athletes proportional to the enrollment of female students in their schools (Webster, 2020).

- In a report from the OCR focusing on protecting the civil rights of students in the nation's schools, 3,609 complaints were filed with the OCR seeking relief under Title IX for gender inequities in high school athletic programs (Lhamon, 2015b).

- According to U.S. Department of Education's Report on Pending Cases Currently Under Investigation at Elementary-Secondary and Post-Secondary Schools as of February 2, 2022, Title IX athletics complaints had been filed against 71 high schools and school districts in 27 states and the District of Columbia.

## The Roles and Responsibilities of Title IX Coordinators

In retrospect, for Title IX protections against sex discrimination to remain unreachable and/or so tenuous for female athletes after five decades raises questions about how compliance and enforcement are framed and discussed. A key aspect of Title IX compliance as conceived by HEW in the early 1970s was the creation of an avenue within schools where stakeholders could be educated about Title IX and monitoring systems could be put into place to assess compliance and remedy sex discrimination as it was occurring and to ensure that there was a way for those harmed by sex discrimination to have that discrimination remedied and their rights to unfettered access to education protected. Schools were thus required to designate a Title IX coordinator to take on those roles and responsibilities.

Widespread failure to appoint Title IX coordinators, publicize who they were, or provide training and support to them has slowed compliance and enforcement efforts in the spaces where those experiencing sex discrimination need it most: on the ground in the classroom, on the athletic field, in the locker room, on the court, on the track, and in the arena. Describing the attitude of school administrators to their obligation to appoint a Title IX coordinator in the first two and half decades after the passage of Title IX, Carpenter and Acosta (2005) noted, "Other than posting a name and title on the back-corridor bulletin board, many schools did little to disseminate to the campus community information about the requirements of Title IX" (p. 8). This problem persisted into the third decade. In a Title IX compliance review of selected institutions conducted in 2004 by acting assistant secretary for Civil Rights Kenneth Marcus, failure to inform school communities about the identity of their Title IX coordinator and how to contact them was the most frequently identified problem (Marcus, 2004).

Since Title IX's passage, federal officials with the Office for Civil Rights have reminded school administrators about their obligations to provide Title IX oversight: create internal



avenues to educate stakeholders, monitor and assess Title IX compliance, document efforts to remedy sex discrimination and discourage its perpetuation, and provide the resources needed to conduct investigations when necessary (Marcus, 2004; Matthews & McCune, 1977, 1987; Lhamon, 2015a, Staurowsky & Rhoads, 2020).

- In 2011, the Association of Title IX Administrators (ATIXA) was formed to "...create a venue for professional exchange between coordinators and other administrators with Title IX responsibilities, to finally and meaningfully wrap our heads around the Coordinator role, other Title IX–based administrative responsibilities, and best practices for institutional Title IX compliance" (ATIXA, 2020, para. 5).

- In a 2012 survey of secondary athletic administrators in the state of North Dakota, they reported a perception that there was a lack of contact/education with the Office for Civil Rights and a lack of sample policies and research on Title IX compliance and the high school sector. They also noted that when policies are implemented, there is not enough high school representation to take into account issues high school athletic directors face at the local level (Dahl, 2012).

- In 2013, the National Women's Law Center filed a complaint with the Office for Civil Rights alleging Title IX violations in the District of Columbia Public School athletic departments. They noted in the complaint that the District failed to provide the name and contact information for the Title IX coordinator. This case led to the passage of the Title IX Equity Act in the District of Columbia in 2015.

- In 2015, the Office for Civil Rights sent out a reminder to school administrators that "A critical responsibility for schools under Title IX is to designate a well-qualified, well-trained Title IX coordinator and to give that coordinator the authority and support necessary to do the job" (New, 2015).

- Knowing the identity of the Title IX coordinator is critical. In a study of nearly 1,100 college and university coaches, just over 30% were aware of who their Title IX coordinator was, and 42.8% were not sure (Staurowsky & Weight, 2013).

- According to the Feminist Majority Foundation, difficulty in finding information about Title IX coordinators was particularly pronounced in local district and school levels (Klein, 2016).

- In a project examining the availability of information to the general public about Title IX coordinators, including contact information and how to file a complaint, 37% of 51 school districts in two Michigan counties did not mention Title IX on their websites or provide any information, 26% provided information, and 36% mentioned some but not all of the information (Klein, 2016).

- A study of high school athletic administrators conducted by the U.S. Government Accountability Office (GAO) in 2017 revealed an estimated 51% were either unaware of who their Title IX coordinator was or felt unsupported by their Title IX coordinator (Nowicki, 2018).



©iStock by Getty Images

- The U.S. Government Accountability Office reported that OCR officials were not aware of how closely Title IX coordinators worked with high school athletic administrators on Title IX compliance. Officials of an association that conducts Title IX trainings expressed a belief that Title IX coordinators' working in the high school sector had low familiarity with regulations pertaining to athletics (Nowicki, 2018).

- A series of studies assessing Title IX knowledge among athletics administrators, coaches, staff members, and college athletes revealed a general lack of knowledge about Title IX (Staurowsky & Weight, 2011, 2013; Staurowsky et al., 2017; Rodkey et al., 2019).

The lack of a unified approach to Title IX compliance has been credited with fostering a persistent lack of knowledge among educators about what Title IX is and how they need to take it into account when doing their work (Nash et al., 2007). The accumulated effects of this slow, uneven, and at times neglectful attention to Title IX compliance infrastructure within institutions and athletic departments is reflected in research findings and concerns expressed by practitioners.

- Half (50%) of NCAA Division I head coach respondents indicated that their department did not have a Gender Equity Committee (Weight & Staurowsky, 2014).

- Despite Title IX's admonition that administrators refrain from retaliating against coaches when they bring forward concerns about Title IX compliance, in Staurowsky and Weight (2013), 12% of college coach respondents indicated that they felt they might lose their job if they advocated for Title IX. Further, nearly 20% of female coaches felt they might lose their job if they advocated for Title IX, and 35% of coach respondents were either hesitant or believed it was too risky to bring up Title IX issues in their athletic department.



- In a study of athletics administrators, coaches, and staff within NCAA Division II schools (Rodkey et al., 2019), 17% of respondents (N=157) did not know who their Title IX coordinator was, 23% were not aware that students should know who the Title IX coordinator was, and 25% were not aware of Title IX's whistleblower protections.

- According to Staurowsky and Weight (2013), 83% of college coaches (N=1,093) reported that they never received any formal training about Title IX as part of preparation for their jobs.

- When asked whether they agreed or disagreed that they had received adequate Title IX education and training, more than a third of NCAA Division I athletic department personnel indicated that they disagreed (Rodkey et al., 2019).

Five decades after the passage of Title IX, the roles, responsibilities, even baseline expectations about the credentials and experience of Title IX coordinators, and reporting lines remain loosely defined and vary greatly across the education landscape generally (Pappas, 2021). That variability translates into a similarly chaotic compliance and enforcement environment when it comes to Title IX and athletic departments. In one of the few studies examining the experiences of Title IX athletics coordinators, findings from The Title IX Athletics Compliance Officers: Who Are They and What Are Their Challenges Survey (n=90 NCAA Division I administrators with responsibility for Title IX oversight) revealed a general lack of clarity regarding who in athletic departments are supposed to handle Title IX oversight (Staurowsky & Rhoads, 2020). While some schools had a secondary Title IX athletics coordinator designated in the athletic department, the responsibility for Title IX compliance in the athletic department was often unclear. Additional findings include the following:

- 75% of respondents also held the title of Senior Woman Administrator

- 60% reported that overseeing Title IX compliance in athletics was a default assignment because they were a woman administrator, and only a third had specific training in Title IX prior to taking on the role.

Although a large majority of respondents indicated a commitment level to gender equity and Title IX compliance in their athletic department was good to excellent, the level of support to fulfill such a commitment was not evident as reflected in:

- 51% indicating that funding support for Title IX education efforts was fair to poor

- 45% indicating that funding support to attend trainings was fair to poor

- 49% indicating that workload allocations to do the job was fair to poor

- 49% reporting that Title IX resources were not available to athletes on the athletics website

- 2–3% of respondents reporting that they taught athletes and coaches how to read an EADA report (Staurowsky & Rhoads, 2020).

For girl/women athletes and those working in athletic departments, the path to finding out who handles Title IX complaints and how to file them is often unmarked or difficult to find. Less than half of the Title IX athletics compliance officers who responded to the Staurowsky and Rhoads (2020) survey indicated that Title IX educational resources were made available on their athletic department websites. Further, the reporting structures for those assigned roles as Title IX athletics coordinators vary widely from institution to institution. Some are wholly contained within the athletic department, others have informal reporting relationships with the institution's Title IX Office (57%), and less than 20% had a dotted line reporting relationship with the Title IX Office.

Inconsistency in reporting structure between athletic departments and institutional Title IX offices creates vulnerabilities for those assigned responsibility to oversee Title IX compliance and enforcement efforts. The independence needed to conduct objective evaluations can be compromised when circumstances place Title IX compliance officers at odds with the people who have the power to promote them and/or extend their contracts. As Staurowsky and Rhoads (2020) found:

- For 64% of Title IX athletics coordinators, institutional Title IX compliance officers played no role in their job performance evaluation, which has implications for those willing to take on the role and their effectiveness in it.

- The fact that a large majority of Title IX athletics coordinators working in athletic departments are not evaluated by an institutional Title IX coordinator "potentially sheds light on the 19 percent of respondents who reported they had been retaliated against or thought they might have been retaliated against; the 28 percent who indicated that they were or might have been pressured to remain silent about a Title IX issue; and the 17 percent who felt they could or might lose their jobs by engaging in the advocacy necessary to fulfill their roles relative to Title IX. The chilling effect of such threats mirrors findings from other studies…" (Staurowsky & Rhoads, 2020, p. 399).

As an agenda is set for the next 50 years of Title IX, the structures and processes that support Title IX education, monitoring, and enforcement effort will be key. As legal scholar Catherine Stimpson notes: "legal remedies for sex discrimination are necessary but not sufficient" (p. 262).



# Part VI. Title IX's Two Key Athletics Areas: Equal Access to Participation & Equitable Treatment

Title IX's application to athletic programs hones in on two key areas that logically connect, beginning with an equal opportunity for female athletes to participate in sports that they have an interest in and aptitude for. A companion to this is the issue of equitable treatment, meaning that once female athletes have an equal opportunity to participate, they will then be treated equitably when compared to male athletes. In effect, it is expected that female athletes will be afforded the same opportunity as male athletes to participate in athletics while the supports they are given are equitable, taking into account that different supports may be necessary to create equal access. Therefore, Title IX provides for assessing the allocation of resources across the athletic department and in the aggregate and does NOT require:

- The same funding to the overall women's and men's programs.

- The same funding to women's and men's teams in the same sports.

- The same benefits to female and male athletes in the same sports.

- The same numbers of teams offered to male and female athletes.

- The same sports for women and men.

- That schools compete at a specific level (Bonnette & Von Euler, 2004, p. 7).



*Scout Bassett*



# Part VII. Title IX's Three Athletic Compliance Areas: Athletic Participation, Athletic Scholarships, and Operational Support

In assessing whether an athletic program is in compliance with Title IX requirements, three broad areas are considered: equal accommodation (participation opportunities), equal treatment (benefits that comprise operational support), and athletic scholarships for schools that offer them (Staurowsky et al., 2020). In the sections to follow, how each of the areas is reviewed under Title IX will be explained along with a snapshot of trends.

## Title IX's Three-Part Test of Athletic Participation

The standard of measurement used to determine if athletes are receiving an equal opportunity to participate is the three-part test. The test gives school administrators the chance to explain how they are complying with the law and offers flexibility because of its design. Schools need only to demonstrate that the athletic opportunities they offer satisfy one of the three parts of the test. School administrators, however, are cautioned that a lack of financial resources is not a defense or a justification for operating athletic programs that are not gender equitable (Staurowsky et al., 2020). An explanation of the three-part test and factors used in assessing each is outlined below.

### Part 1. Substantial Proportionality

In response to this first part of the test, school administrators need to provide an analysis of the proportional distribution of athletic participation opportunities for girl/women and boy/men athletes in relationship to their proportional representation in the undergraduate or high school population. A program might be regarded as satisfying this part of the test if the number of athletic opportunities it would take to achieve proportionality would not sustain a viable athletic team. If a school's athletic program does not meet the substantial proportionality standard, they may still comply with Title IX's requirements by satisfying one of the other two parts of the test.

### Part 2. History and Continuing Practice of Program Expansion

This part of the test acknowledges that athletic opportunities for the underrepresented sex are not proportional to enrollment, however the institution demonstrates that it is progressively addressing shortfalls for the underrepresented sex and is responding to their developing interests and abilities. Institutions can demonstrate that they have a **history** of program expansion by providing:

- A timeline that shows new varsity teams have been added or club teams have been elevated to varsity status;

- A record that shows the number of athletic opportunities for the underrepresented sex has occurred over time; and/or

- Documentation that the institution responded affirmatively when requests were made to add teams or elevate sports by students or others (a gender equity committee, for example).

Institutions are cautioned that adding a sport by itself is not sufficient to meet this standard, there must also be a demonstrable effort to address the needs of the underrepresented sex on a **continuing basis**. Thus, administrators are also called upon to show that there is a plan in place, that action has been taken on the plan, policies for how to request the elevation or addition of teams has been communicated to students, and that gender equitable policies that guide decision making exist and are used. It is not sufficient to have a plan; it must be one that currently is being implemented and is responsive to addressing interests and abilities. Failing to meet either of the first two parts of the test (athletic opportunities are not proportional to enrollment and no history and continuing practice of program expansion), administrators still have the option of making their case with the third part of the test.

### Part 3. Full and Effective Accommodation of Interests and Abilities

Under this part of the test, an argument is made that the athletic opportunities offered reflect the genuine interest and abilities of the athletes in a school system or higher education institution. In effect, the school has done what it can to offer athletic opportunities proportional to enrollment but fail to meet that standard for one of the following reasons:

- There are just not enough athletes of the underrepresented sex to support a viable team.

- Even if there are athletes who have an interest in playing a particular sport, they may not have the ability to do so.

- Even if a team were offered, there are no reasonable avenues of competition available.

Among the factors considered in evaluating whether there are athletes whose needs have not been met within the athletic department, reviews should consider:

- Requests by students and admitted students that a particular sport be added.



- Requests that an existing club sport be elevated to intercollegiate team status.

- Participation in particular club or intramural sports.

- Interviews with students, admitted students, coaches, administrators and others regarding interest in particular sports.

- Results of questionnaires of students and admitted students regarding interests in particular sports and participation in particular interscholastic sports by admitted students.

- Participation rates in sports as reported by high school athletic associations and in communities where a particular institution draws students.

In assessing the viability of a sport, administrators should rely on records documenting participation in club and intramural sports; the opinions of athletics department stakeholders (coaches, administrators, and athletes); and the competitive strength of existing club sports (Cantu, 1996).

## The Current State of Title IX and Athletics Participation Opportunities

### High School Athletic Participation Opportunities

A major accomplishment of Title IX can be seen in the millions of girls playing high school sports. The National Federation of State High School Associations (NFHS) cited the growth in girls' sports as a key contributing factor in registering increases in high school sports participation for the 29th consecutive year (NFHS, 2018). That said, there has historically been less research done on high school athletic programs and compliance with Title IX, in part due to the lack of publicly available information and/or information that is difficult to access without initiating public records requests. Unlike the college and university level, the high school level does not have an equivalent federal law like the Equity in Athletics Disclosure Act that results in the creation of a central, national database with information regarding each high school in the country, participation opportunities and allocation of resources.

There are some states and a territory that do have laws requiring high schools to report on athletic participation opportunities as allocated by gender. Some of these include:

- District of Columbia passed the Title IX Equity Act in 2015. Athletics administrators in the District are required to complete Title IX education. The Act also requires public and public charter schools in the District to submit detailed information about athletic participation opportunities and allocation of resources to men's and women's programs (Randolph & Ray, 2018).

- According to the California Education Code (EDC § 33353), the California Interscholastic Federation will report to the Legislature and the Governor about its activities on or before 2023. As part of that report, they are required to report on "Gender equity in interscholastic athletics,

including, but not limited to, the number of male and female pupils participating in interscholastic athletics in secondary schools, and action taken by the California Interscholastic Federation in order to ensure compliance with Title IX of the federal Education Amendments of 1972."

- In the Commonwealth of Pennsylvania, an amendment to the state's public school code passed in 2012 requires disclosure of interscholastic athletic opportunities and other athletic resource allocations. While money coming from outside of schools (such as booster money) is not disclosed in terms of revenue, it is tracked in terms of expenditures. This act requires disclosure for public schools, grades 7–12 (PA Department of Education, 2022).

Broad general trends are available through the National Federation of State High School Associations. As reflected in Figure 1 (on following page), opportunities for girls to participate in high school sports have increased dramatically from 294,015 in 1972 to 3,402,733 in the academic year 2018–19 (the most recent year for which data was reported as of this writing), an increase of 1,057% over time.

Below are some of the key findings from our search for information regarding gender trends occurring in the high school sector. The NFHS is missing reports in 2019–20 and 2020–21 because of the pandemic. Thus, the most recent reporting year for athletic participation opportunities as of this writing is 2018–19.

- In 2018–19, boy athletes received 57% of participation opportunities compared to 43% for girl athletes. Given that girls nationwide made up 51% of the overall student high school population (Baumann & Craney, 2020), it would take 952,498 athletic opportunities to close the gap for females.

- The NFHS reported that girls accounted for 3,400,297 of the 7,963,535 total of NFHS athletes during the 2018–19 athletic season. This was a 75,971 increase from the previous year and the largest one-year girls' participation increase since the 2000–01 athletic season.

- The popularity of competitive spirit contributed to the rise of girls' participation as it had an increase of 18,712 girls that participated in this sport. This brought competitive spirit in at number nine of the 10 most popular girls' programs.

- Ranked number one was outdoor track and field. Additionally, volleyball (8,470), soccer (6,810), and lacrosse (5, 423) showed significant increases in girls' participation as well.

- According to a survey of North Carolina High School Athletic Association (NCSHAA) athletic directors conducted by High School OT in May of 2021 examining the impact of the COVID–19 pandemic on the dropping of varsity and junior varsity teams, girls' sports have been impacted more negatively. In 2020–21, with 333 girls' teams were dropped, compared to 317 boys' teams (Stevens, 2021).





**Figure 1. U.S. High School Athletic Participation Opportunities by Gender, 1971–72 through 2018–19**

Data Source: National Federation of State High School Associations Athletics Participation Survey, 2019

- NCSHAA athletic directors reported that during the 2020–21 academic year, girls' participation on existing teams declined more than boys' participation. "In track & field, the sport with the most participation from female athletes in high school, 67% of girls' teams report declining participation, compared to 61.5% of boys' teams. In basketball, 69% of girls' teams reported declining participation this year, compared to 41% of boys' teams. Data also shows 57.1% of softball teams have seen a drop in participation this year, compared to 41% of baseball teams" (Stevens, 2021).

While comprehensive reports on Title IX compliance within high schools is lacking, news accounts and studies undertaken within individual states reveals broad concerns. Those concerns are amplified for schools with larger minority populations.

- In a 2013 complaint filed with the Office for Civil Rights, the National Women's Law Center alleged that the District of Columbia Public Schools offered male athletes disproportionally more athletic opportunities to compete on varsity athletic teams, a situation that would have required adding 688 opportunities to remedy the lack of access for female athletes. They also asserted that schools in the District were unable to demonstrate a history of continuing practice of program expansion and that girls in the District had expressed overwhelming interest in playing sports.

- The National Women's Law Center, in the OCR complaint they filed on behalf of female high school athletes in the District of Columbia argued that the sex discrimination female athletes were experiencing was systemic in the District. As a consequence, one school's failure to provide proportional opportunities was affecting the ability of other schools to offer viable programs that female athletes would benefit from.

- In a study of data gathered through the CRDC for the academic year 2011–12, several important findings illustrate the influence of race and gender on access to educational and sport opportunities (NWLC & PRRAC, 2015). Some of those findings included the following:

  - Over 40% of the nation's high schools are either heavily white (90% white) or heavily minority (white enrollment is 10% or less).

  - Far fewer athletic opportunities are available to students in heavily minority schools than to students in heavily white schools. In a typical heavily minority school, there are only 25 spots available on sports teams for every 100 students; in a typical heavily white school, there are 58 spots available on sports teams for every 100 students.

  - Gender disparities in athletic opportunities were pervasive across schools; however, the gender disparities were greater in heavily minority schools.



**Women's Sports Foundation**
WomensSportsFoundation.org

50 Years of Title IX:
We're Not Done Yet

- In a typical heavily white high school, girls had 82% of the athletic opportunities compared to boys.
- In a typical heavily minority school, girls had only 67% of the opportunities to play sports compared to opportunities provided for boys.

An examination of the growth areas for girls' high school sports reveals that there has slowly been an expansion of opportunities in the variety of sports offered to girls. Notably that growth, and the pace of growth, is linked to budget considerations.

- During the 2018–19 season volleyball increased by 6,225 participants from the previous year for a total of 452,808. Over the decade between 2008–09 and 2018–19, volleyball added 48,823 participants and was ranked as the number-two sport for girls behind outdoor track and field, which had 488,267 participants (NFSH, 2019).

- Girls' participation in high school sports continued to grow not only in numbers but also in the variety of sports played. According to the NFHS most girls participated in basketball in the '70s. The '80s realized an increase in cross country and softball participation, and the '90s introduced interest in soccer, which grew from 700 girls to 210,000 in 25 years (Perry, 2021). Also, the NFHS reported in 2018–19 there were 400,000 girls playing high school soccer, which is a 56,200–percent increase in 50 years.

- The increase in girls' participation in high school sports also can be attributed to the adoption of team competitive sports like lacrosse, competitive spirit, ice hockey, sand volleyball, and flag football. For example, girls' flag football is currently sponsored by five NFHS member associations: Alabama, Alaska, Georgia, Florida, and Nevada. The cost-effective nature of sports can be used as a catalyst in understanding its rise in popularity and its growth potential (NFSH, 2019).



©iStock by Getty Images

- Further, expensive equipment and overall cost to facilitate a sport can be a challenge for some schools. This can limit opportunities and access for girls in sports. Therefore, funding, sponsorship, and donations to high school sports can increase access by providing more opportunities for girls to participate. At the same time, there is an equity issue if the investment in girls' sports is based on a cheaper model of funding compared to boys' sports.

- The funding opportunities for girls' sports are few and limited, but in 2021, Nike and the NFL announced a $5 million partnership, offering one-time $100,00 payments to any state association seeking to set up a flag football pilot program (Perry, 2021).

- To ensure the growth of sports opportunities for women and girls, external funding outside of athletic agencies is needed. Although these funding opportunities are currently limited, they continue to grow. One example can be seen in high school flag football. Organizations like RCX Sports, the official operating partner of NFL FLAG, Arthur M. Blank Family Foundation, and several NFL organizations are stepping up to support and promote sports for girls and women (Perry, 2021).

- As stated previously sports participation can lead to an improvement of mental health and self-esteem in girls, and, therefore, involvement in sports can become vital to their development (Burtka, 2019). Therefore, organizations that use sports to teach life skills and promote diversity and inclusion are a pivotal component in the health and development of young girls.

- Further safety and school climate are also impactful to participation rates in high school sports. According to a study conducted by GLSEN (2019), "59.1% of LGBTQ students felt unsafe at school because of their sexual orientation, 42.5% because of their gender expression, and 37.4% because of their gender." Further the study found 77.6% of LGBTQ students avoided school functions, 71.8% avoided extracurricular activities, and 25.15 avoided school athletic fields or facilities because they felt unsafe or uncomfortable (GLSEN, 2019).

An area that is covered by Title IX but requires scrutiny is recreational sports, club sports, and intramurals at both the high school and college level.

- In 2014, researchers at George Mason University requested final investigation letters from the Office for Civil Rights for complaints pertaining to collegiate club sports, recreation, and intramural programs for the years 2004 through 2010. They were told there were none (McDowell et al., 2016).

- While this may reflect that these areas are run gender equitably, there is so little systematic information available that this cannot be assumed.

## College and University Athletic Participation Opportunities

As a general overview, athletic participation opportunities for girls and women in high schools and colleges have dramatically increased from the 1970s to the present. At the college level, there has been a 618% increase in athletic opportunities for female undergraduates in the five decades since the passage of Title IX. We have come a distance from the academic year 1971–72 when just 29,977 female athletes competed in collegiate sports, compared to the 215,486 female athletes who competed on teams sponsored by NCAA institutions in 2020–21 (see data below for other athletic associations). As Figure 2 however illustrates, despite that progress, opportunities for female athletes to participate in varsity sports at the college level continue to lag behind opportunities for male athletes, and the opportunities that are available are not proportional to the representation of female students in the full-time undergraduate population.

- According to EADA data filed for the 2019–20 academic year by two- and four-year institutions, female undergraduates made up 54.5% of the undergraduate population (4.6M+ out of 8.6M+) within the 2,074 institutions reporting. On average, female athletes received 43% of athletic opportunities (290,749 out of 678,245), representing a gap that falls short of enrollment by nearly 12 percentage points. In order to close that gap, schools would need to add 81,389 athletic opportunities for females (U.S. Department of Education, 2021a).

- In an analysis of EADA data filed for the 2019–20 academic years, only 94 of the 1,083 NCAA (8.6%) schools reporting met the proportionality standard for participation under the three-part test, offering males and females athletic opportunities proportional to enrollment, while 55 (5%) institutions provided athletic opportunities to female athletes at rates beyond their representation in the student body. The vast majority of institutions across all three divisions (86% or 933) offered higher rates of athletic opportunities to male athletes disproportionate to their enrollment (U.S. Department of Education, 2021a). In order to close that gap, schools would need to add 49,359 athletic opportunities for females (U.S. Department of Education, 2021a).

- In 2019–20, only 18.8% of NCAA Division I institutions (66 of 350) offered athletic opportunities to female athletes proportional to their enrollment. More than seventy percent (74%) of NCAA Division I schools (260 of 350) offered disproportionately higher numbers of athletic participation opportunities to male athletes, ranging from 2% to 37% above the ratio of male enrollment (U.S. Department of Education, 2021a).

- In NCAA Division II institutions, 57% of undergraduates were female in 2019–20. Female athletes at those schools were offered 42% of the available athletic opportunities. Division II institutions would need to add an additional 18,585 athletic opportunities for women to close that 15-percentage-point gap (U.S. Department of Education, 2021a).

### Figure 2. NCAA Athletic Participation Opportunities Across All Divisions by Gender, 1971–72 through 2020–21



Data Source:  NCAA Sports Sponsorship and Participation Rates Report, 2021



- Among NCAA Division II institutions in 2019-20, only 5.7% offered female athletic opportunities proportional to enrollment (18 of 312). The vast majority of Division II schools – 92% or 287 of 312 – offered male athletic opportunities at rates that exceeded the percent of males enrolled in the undergraduate population. Gaps favoring males ranged from 2% to 37% (U.S. Department of Education, 2021a).

- At the NCAA Division III level, women composed 55% of undergraduate enrollment while they were offered 42% of athletic opportunities. Division III schools would need to add 24,640 new athletic opportunities to adjust for this 13 percentage-point gap (U.S. Department of Education, 2021a).

- Among NCAA Division III institutions, only 3% of schools (14 of 427) offered female athletes participation opportunities proportional to enrollment. Similar to schools in Division II, 91% of Division III schools (390 of 427) offered athletic opportunities to male students at rates higher than their enrollment in the undergraduate population. Gaps favoring males ranged from 2% to 37% (U.S. Department of Education, 2021a).

In an analysis of athletic participation opportunities offered by NCAA institutions in 2002-03, 2009-10, 2018-19, and 2019-20 (see Table 2 on following page), there is a general trend across all college sport governing bodies and divisions within those governing bodies that shows the gap between female athletes' athletic opportunities and women's enrollment is slowly closing. While the gap is closing, the number of opportunities to achieve proportionality for female athletes continues to grow as well. Although this may appear counterintuitive, there are two things operating here that contribute to such a result. The first is that female enrollment has gone up and female athletic opportunities have not kept pace with it. And second, opportunities for male athletes have continued to rise as well.

Given the substantial proportionality standard in place since the late 1970s and millions of girls have competed in varsity sports at the high school level, these patterns raise questions about the persistence in this trend, now 50 years in the making, that female athletes continue to have disproportionately fewer athletic opportunities compared to male athletes across the board. The pipeline of potential female high school varsity athletes is far more populated — not just by thousands but by millions — than it was in 1972. It seems reasonable, at least based on the numbers, that there would be female athletes who could compete if opportunities were offered at a proportional level.

As shown in Table 2, because athletic participation opportunities are not proportional for female athletes, they miss the opportunity to play and compete on college and university teams in large numbers. In 2002-03, female athletes lost out on 52,965 participation opportunities. By 2019-20, that figure is estimated to be more than 80,000.

While EADA athletics participation data attest to a finding that male athletes continue to benefit from more athletic opportunities than female athletes do, this general pattern is confirmed in other data sets.

- According to the NCAA Sports Sponsorship and Participation Report published in December of 2021, there was a drop in NCAA championship sport participation for both female and male athletes during the 2020-21 academic year for the first time in nearly 20 years. In terms of the net loss, it was somewhat greater for male athletes, with female athletes losing 5,726 opportunities and male athletes losing 6,642. However, because women receive fewer athletic opportunities in the aggregate and are disproportionate to their enrollment in the general student body, the change had a slightly greater negative impact on female athletes with a -2.66% change compared to a -2.42% change for men.

- Colleges also struggle to build funding opportunities for women's sports, but in 2020, the National Association of Intercollegiate Athletics (NAIA) partnered with the NFL to bring collegiate women's flag football to their member institutions (NAIA, 2020).

- Although there has been a public perception that Title IX has negatively impacted men's sports participation, an analysis of NCAA sports participation data between 2011-12 and 2020-21 shows that NCAA men's participation in sports rose from 27% to 35% whereas women's participation increased 12 to 18% during that same time frame (Hearn et al., 2018).

- In a report from the Council on Independent Colleges (CIC), "Growth in women's participation has been even more dramatic in non-NCAA institutions: The change from 14 to 22 percent represents a jump of over 50 percent in just 12 years" (Hearn et al., 2018).

- Between 1988-2016, there was a net gain in the number of teams offered in NCAA schools, with 594 added in Division II and 751 added in Division III. There was, however, a net loss of 330 men's teams in Division I (Wilson, 2017).

- According to the U.S. Government Accountability Office, of the 948 colleges that added women's teams, 72% of them did so without cutting other men's or women's teams (Sabo & Snyder, 2013).

## HBCU participation and access rates

Historically Black Colleges and Universities (HBCUs) provide a unique opportunity to explore race and gender experiences of women in sports as these institutions were founded to provide educational opportunities for Black men and women. HBCUs were built on a cultural fabric that promotes academic excellence through nurturing self-esteem and confidence and supporting the holistic growth of students, faculty, and staff of various cultural and ethnic backgrounds. HBCUs also promote cultural awareness, provide a rich history, and actively support first-generation and low-income students.

 **Women's Sports Foundation** WomensSportsFoundation.org

50 Years of Title IX: We're Not Done Yet

**Table 2. Percentage of Proportionality Gap and Number of Missed Opportunities by College Sport Governing Body and Division**

|  | 2003 | | 2010 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|---|---|
|  | Percent of Gap | # of Missed Opp. | Percent of Gap | # of Missed Opp. | Percent of Gap | # of Missed Opp. | Percent of Gap | # of Missed Opp. |
| CCCAA | 20.6% | 5,080 | 17% | 4,386 | 15.6% | 4,079 | 15.6% | 4,079 |
| NAIA DI | 20% | 3,171 | 18% | 3,914 | 15.9% | 5,590 | 15.9% | 5,596 |
| NAIA D II | 18.3% | 3,689 | 16.7% | 4,634 | 15.3% | 7,250 | 15.4% | 7,125 |
| NCAA DI w/o football | 6.4% | 1,744 | 5% | 1,595 | 4.4% | 1,673 | 4.4% | 1,521 |
| NCAA DIFBS | 7.6% | 5,084 | 4.4% | 3,158 | 4.5% | 3,420 | 4.5% | 3,420 |
| NCAA DI–FCS | 12.4% | 2,970 | 10.8% | 6,442 | 11.6% | 7,501 | 11.1% | 7,599 |
| NCAA DII | 6.5% | 1,744 | 18% | 11,345 | 17.4% | 5,176 | 17.3% | 13,407 |
| NCAA DII w/o football | 12% | 3,083 | 10.3% | 3,350 | 10.7% | 4,922 | 10.2% | 4,903 |
| NCAA DIII | 15.8% | 15,930 | 15.3% | 17,772 | 14.6% | 19,081 | 14.6% | 19,081 |
| NCAA DIII w/o football | 9.3% | 3,270 | 9.3% | 4,278 | 8.9% | 4,941 | 8.9% | 4,941 |
| NCCAA DI | No data | No data | 27.0% | 230 | 18.9% | 116 | 17% | 104 |
| NCCAA DII | 6.3% | 88 | 6.8% | 126 | 5.7% | 131 | 6.1% | 171 |
| NJCAA DI | 20.1% | 4,193 | 18.4% | 4,467 | 17.3% | 5,370 | 17.4% | 5,331 |
| NJCAA DII | 16.2% | 1,588 | 15% | 1,817 | 13.0% | 1,857 | 13% | 1,849 |
| NWCA | 7.8% | 233 | 6.5% | 226 | 9.1% | 361 | 9 % | 361 |
| Other | 15.9% | 1,026 | 13.4% | 1,068 | 9.5% | 856 | 9.3% | 824 |
| USCAA | 8.4% | 72 | 7.3% | 552 | 10.5% | 470 | 10.0% | 453 |
| **Total Missed Opportunities** | **13%** | **52,965** | **13%** | **69,160** | **12.6%** | **72,794** | **11.9%** | **80,765** |

*Data drawn from the Equity in Athletics Cutting Tool.*

*CCCAA = California Community College Athletic Conference, NAIA = National Association of Intercollegiate Athletics, NCAA = National Collegiate Athletic Association, NCCAA = National Christian Collegiate Athletic Association, NWAC = Northwest Athletic Conference, USCAA = United States Collegiate Athletic Association*

According to the National Center for Educational Statistics (2020) in 2020, there were 101 HBCUs located in 19 states, plus the District of Columbia and the U.S. Virgin Islands, and, of those institutions, 52 were public institutions and 49 were private nonprofit institutions. Further enrollment of women at HBCUs "has been higher than male enrollment in every year since 1976. The percentage of female enrollment at HBCUs increased from 53 percent in 1976 to 64 percent in 2020" (National Center for Educational Statistics, 2020).

Unfortunately, there is an extreme lack of research regarding sport participation at HBCUs (Cooper & Newton, 2021; Hawkins, 2010; Cooper et al., 2017; Cooper et al., 2014) and even less research that examines the sporting experience of HBCU Black women athletes (Flowers, 2015; Cooper & Newton, 2021; Carter–Francique & Richardson, 2015; McDowell & Carter–Francique, 2017). Moreover, most research that examines HBCU women athletes has reported breaking gendered and racial sports barriers, celebrated historic milestones in sports competition (Carter–Francique & Richardson, 2015) or debated the complexities of the participation of non–Black athletes on HBCU athletic rosters (Flowers, 2015).





©Jeff Golden/Getty Images

Contrary to popular belief, HBCUs serve more than Black, Christian, and heterosexual students (Flowers, 2018; Palmer et al., 2015). According to the National Center Education Statistics (2020), "In 2019, non-Black students made up 24 percent of enrollment at HBCUs, compared with 15 percent in 1976." Further Palmer et al. (2015) reported, "White student enrollment at four-year HBCUs has not increased at all since 1987 and, in fact, has decreased and Latino/a enrollment at HBCUs has increased by 90% since 2000."

HBCUs are relevant and should further be explored as they provide a unique academic experience for Black women athletes. For example, Carter-Francique & Richardson (2015) reported HBCUs provide a safe environment for Black women athletes due to the cultural and familial sense of belonging.

HBCU athletic departments face several obstacles that have greatly impacted sporting opportunities for women at these institutions (Hawkins, 2010; Reynolds et al., 2012). Specifically, HBCUs face systemic racism, economic deprivation, limited power, and disproportionate budget cuts (Cooper et al., 2014; Reynolds et al., 2012). Explicitly, "More specifically, consistent with the historical racial hierarchy in the U.S., the White-controlled government continues to hold the power to determine which institutions have the right to federal support" (Cooper et al., 2014, p. 313).

- According to EADA data for 2018–19, among the 47 institutions in the four HBCU conferences (Central Intercollegiate Athletic Conference, Mid-Eastern Athletic Conference, Southern Intercollegiate Athletic Conference, and Southwestern Athletic Conference), nearly 63% of undergraduate students were women (90,743 out of 144,067) while 40% of athletes are women (5,786 out of 14,541) (U.S. Department of Education, 2021a).

- The average gap between undergraduate women student enrollment compared to the proportion of athletic opportunities available to women athletes at HBCUs in 2018–19 was 23%, with a range of 6% to 37% (U.S. Department of Education, 2021a). This represents 3,344 missed athletic opportunities for female athletes.

- It is not surprising that African American women lead white women in representation at HBUCs across all divisions. NCAA (2021) reported 4,854 African American women participated in HBCU sports, whereas 549 white women and 683 women who identified as other participated in HBCU sports. Yet, African American men drastically outnumbered African American women with 8,337 participants in 2020.



- Further, African American women in HBCU sports produce higher graduation rates compared with their Black male counterparts (Cooper et al., 2017). This academic prowess can be attributed to HBCUs providing spaces that fuel gender equity in sports (Carter-Francique & Richardson, 2015).

- Although similar to predominantly white institutions (PWIs) the numbers for men in HBCU sports surpass women. Specifically, 9,895 men are currently participating in all three NCAA divisions combined and women only represent 6,086 (NCAA, 2020).

- Additionally, women competing at HBCUs are also greatly impacted by the lack of financial resources at their institutions. For example, Oregon, a top revenue-generating athletic program reporting $196.2 million in 2014–15 made more than all of the top 10 revenue-generating HBCUs combined at $113.2 million (Bolling, 2006). Furthermore, the Aggies' three-year average football revenue of $57.9 million is currently larger than any HBCU athletic program budget (Gaines, 2016).

- The lack of funding opportunities has greatly impacted HBCUs' ability to expand and retain women's sports opportunities. Further, as minority-serving institutions, the financial hardships of HBCUs also impact the overall participation and access rates of women of color in college sports.

Even with the challenges that need to be addressed, these institutions provide a cultural and gender-based support system, which makes the HBCU athletic experience unique for women athletes. For example, HBCUs provide an opportunity for women of color to experience racial uplifting, explore ethnic traditions, and be immersed in an environment that provides women of color support through racial empowerment (Carter-Francique & Richardson, 2015; Cooper et al., 2017; Cooper et al., 2014)

## Title IX and the Allocation of Athletic Scholarship Dollars

Title IX regulations require athletic departments that award athletic scholarships to distribute those scholarship dollars to athletes proportionate to the percentage of athletes of each sex. For example, if 55% of a school's athletes are female, they should receive 55% of the athletic financial aid. If those percentages are not the same (within one percentage point), that difference must be justified by a non-discriminatory factor, such as men's teams having more students receiving financial aid awards based on out-of-state rather than in-state tuition, or a normal fluctuation in enrollment or participation. As is noted in a 1998 letter to Nancy Footer, general counsel at Bowling Green State University, from Mary Francis O'Shea, the U.S. Department of Education's National Coordinator for Title IX Athletics notes, "...at those colleges where 1% of the entire athletic scholarship budget is less than the value of one full scholarship, OCR will presume that a disparity of up to the value of one full scholarship is equitable and nondiscriminatory."

In addition, athletic financial aid policies as a whole must treat men and women fairly. For example, if most of the financial aid awarded to athletes of one sex consists of grants, and the other sex receives mostly loans and work-study opportunities, that would violate Title IX even if the overall amount of financial aid is distributed proportionate to gender (Osborne, 2017; Staurowsky, 2016a).

Rates and patterns of compliance with Title IX's scholarship regulations vary widely by division. Fifty-eight percent of schools in the Division I Football Bowl Subdivision favor male athletes in the distribution of athletic financial aid, while 21% of them are in compliance (within one percentage point) with Title IX's scholarship regulations. The remaining 22% favor female athletes in the allocation of athletic financial aid (see Table 3).

**Table 3: Athletic Financial Aid Regulation Compliance Patterns by NCAA Division in 2019–20**

| | In compliance, within 1% | Not in compliance, men favored | Not in compliance, women favored |
|---|---|---|---|
| Division I FBS (126 schools) | 26 schools (21%) | 73 schools (58%) | 28 schools (22%) |
| Division I FCS (119 schools) | 22 schools (18%) | 31 schools (26%) | 66 schools (55%) |
| Division I no football (96 schools) | 2 schools (2%) | 11 schools (11%) | 83 schools (86%) |
| Division II with football (162 schools) | 31 schools (31%) | 26 schools (16%) | 105 schools (65%) |
| Division II no football (146 schools) | 10 schools (10%) | 26 schools (18%) | 107 schools (73%) |
| Total (649 schools) | 91 schools (14%) | 167 schools (26%) | 389 schools (60%) |



Outside of Division I FBS, it is more likely that female athletes receive a greater share of athletic scholarship dollars than their rate of participation (see Table 1 on page 19). In fact, 86% Division I schools without football, as well as 73% Division II schools without football, favor women athletes in the distribution of athletic financial aid. This trend holds in terms of HBCU Division I and II institutions as well, where 70% of institutions favor female athletes in their allocation of athletically related financial aid. However, because the test for compliance compares the scholarship dollars to the rate of participation, a compliance analysis actually obscures the extent to which female athletes' advantage in the scholarship dollar distribution is caused by schools' failure to provide female students with equitable athletic opportunities in the first place.[4] If the present distribution of athletic financial aid was compared to the hypothetical rate of participation that would exist if schools distributed athletic opportunities proportionate to the gender breakdown of their undergraduates, the vast majority of schools (85%) would be short-changing female athletes. This is because male students receive a greater share of athletic opportunities than warranted by the percentage of the student population that is male. The gender disparity in opportunity is a violation of a separate regulatory provision, one discussed elsewhere in this Report (see the above section), but one that also costs female students in ways that do not appear in the compliance analysis of the athletic scholarship regulation and are thus worth noting here.

Another way to recognize the impact of schools' failure to proportionally allocate athletic opportunities is to consider the dollar amount difference that it makes for female students as a whole. In 2019–20, schools awarding athletic financial aid (AFA) distributed a total of $3.5 billion to male and female athletes. Male athletes received $1.9 billion of that amount, $252 million more than female athletes received. All NCAA divisions with football provided more athletic financial aid to men than to women and by much larger disparities than those that favored women at non-football schools. See Table 4.

Moreover, all divisions favor men if we calculate the disparity based on the amount that women would receive if they had equitable athletic opportunities. In other words, if schools actually distributed athletic opportunities in proportion to women's percentage of enrolled undergraduates, and then distributed scholarship dollars proportionate to that distribution ratio, female students would receive an additional $741 million. Table 2 shows the opportunity gap breakdown by NCAA division.

In sum, even though describing "compliance" paints a mixed picture where women come out ahead in most divisions and behind in only Division I FBS, this conclusion must be considered in context with the fact that women's athletic opportunities are themselves suppressed. Accounting for that, we can see that women have far less opportunity than men to subsidize their education by playing sport. See also Yiamouyiannis and Hawes (2015).

### Table 4. Allocations of Athletic Financial Aid (AFA) by Gender in NCAA Divisions 2019–20

| NCAA Division | Total AFA to men | Total AFA to women | Difference: how much more AFA men receive than women | Additional AFA that would be required if women had athletic opportunities proportionate to enrollment |
|---|---|---|---|---|
| DI FBS | $839,983,491 | $657,502,106 | $182,481,385 | $284,552,079 |
| DI FCS | $422,314,174 | $349,213,356 | $73,100,818 | $224,652,440 |
| DI NFB | $231,014,366 | $300,692,948 | $(69,678,582) | $5,538,821 |
| DII FB | $251,481,948 | $167,914,951 | $83,566,997 | $156,897,563 |
| DII NFB | $154,367,066 | $171,752,269 | $(17,385,203) | $69,420,621 |
| **Total** | **$1,899,161,045** | **$1,647,075,630** | **$252,085,415** | **$741,061,525** |

---

4   *This calculation provides a sense of how much women are being short-changed but is not entirely precise for two reasons. First, schools can comply with Title IX's requirement to equitably distribute athletic opportunities by fully satisfying the interests and abilities of the underrepresented sex, which may result in compliance even though women are underrepresented in athletic opportunities. However, most schools are not actively assessing women's athletic interest (Staurowsky et al., 2020), and if they were there, they would likely discover that interest exceeds opportunity because there are so many more high school athletic opportunities for girls than there are at the collegiate level.*

*The second reason why this calculation produces only an estimate of the scholarship dollar amount women lose by schools' failure to comply with Title IX's requirement to equitably distribute athletic opportunities is compliance with the scholarship regulation is measured by comparing the athletic financial aid ratios for each sex to the ratio of student-athletes of each sex, not opportunities for each sex. Thus, if a school has more multi-sport athletes who are female than male, it may comply with the scholarship regulation even if it distributes AFA at a ratio less than the ratio of opportunities.*



This context is important for courts and regulators to consider when evaluating institutions' compliance with Title IX. Schools who are technically out of compliance with the AFA regulation in women's favor, because women receive an inequitable share of athletic opportunities, should not have to shrink women's share of the AFA budget. This recommendation actually reflects what seems to be OCR's operating procedure. Enforcement actions that it has taken in the last several years involving schools who are out of compliance with the scholarship regulation because they are favoring women in the distribution of AFA, but short-changing women in the distribution of opportunities, have shown that those schools had the opportunity to argue that that "program expansion" for women is the reason for noncompliance. However, the fact that the OCR has not publicized this widely, such as in a Dear Colleague Letter or other regulatory guidance, risks the possibility that schools do not understand that favoring female athletes under the scholarship regulation may be defensible when female students receive a disproportionately low share of athletic opportunities.

## Title IX and Equitable Treatment — Program Benefits

As the third key area of assessing Title IX compliance within athletic departments, the distribution of resources (e.g., money, facilities, staffing) to support equal access to sport participation covers the array of operational items that are needed to support sport participation. Historically referred to as the "laundry list," the areas covered under benefits include the following: equipment, uniforms, and supplies; access to tutoring/academic support; medical training facilities and staff; support services; scheduling of games and practice times; assigned coaches; publicity; travel and daily per diem allowances; locker rooms, practice, and competitive facilities; and recruitment.

Whether revenue is generated through television contracts, student fees, merchandising, donations from boosters, ticket sales, or other sources, the focus of a Title IX analysis is on the quality of the experience that results from the revenue, not the source. A persistent area of misunderstanding over the years in terms of Title IX is how money from loyal donors is handled. A typical scenario involves a greater willingness on the part of donors to contribute to men's athletic teams. In circumstances where men's teams are benefitting from additional financial resources, funding needs to be found to provide similar benefits to women's teams.

It was documented inequities in these areas that received so much attention during March Madness in the spring of 2021. A tweet from then Stanford women's basketball strength and conditioning coach Ali Kershner and followed with the release of a Tik Tok video by University of Oregon women's basketball player Sedona Prince showed that female athletes at the women's tournament were given a stack of weights to use while athletes at the men's tournament were provided a full weight room. The video itself went viral, receiving more than 7 million views (Amis, 2021, Johnson, 2021). The routine nature of the inequities as shown in side-by-side comparisons prompted the kinds of questions that are expected to be raised under Title IX.

Why was a stack of weights for the women considered to be acceptable while the men had a full weight room to work out in? Why were the women given food of poorer quality and variety? Why were the men tested for COVID with a more reliable test?

In an external report commissioned by the NCAA to investigate gender equity in the running of its own championships in the aftermath of the release of that video, the outside law firm who conducted the review reported that

> ...there were differences in the goods, services, and resources provided to the women's basketball players, including their weight training facilities, COVID-19 tests, food, recreational opportunities, and gifts and mementos. In addition, there have been significant—and longstanding— disparities in the production and operation of the championships, including, among other things, differences in the quality and quantity of branding and signage at the arenas and host cities; in the use of the "March Madness" trademark; and in the sponsorship of the fan festivals, etc. In all of these areas and more, the experience of the women's tournament participants was markedly different from and inferior to that of the men's tournament participants (Kaplan Hecker & Fink, 2021a, p. 7).[5]

In 2018, 1,615 college athletes completed a survey from the Big Ten about their views on Title IX and its equity mandate (Druckman et al., 2018). Results indicated that there was widespread support for what the researchers called "the spirit of the policy." However, there was still a sizable and important population that believed that there was an inequitable distribution of resources and opportunities between men's and women's programs and that there was a need for a redistribution of resources. The athlete respondents were also inclined to take action to resolve gender inequities in the college sport system (Druckman et al., 2018). This study demonstrates that athletes (both male and female) were aware of inequities in their athletic departments before the pandemic of 2020.

Researchers, Title IX advocates, and athletic department insiders have known this as well. There has been a long history of girls receiving inferior treatment and access to the support they need to compete on equal terms with boys. As one example, in a lawsuit filed on behalf of girl athletes in the Red Bluff Joint Union High School District in 2017, shortfalls were identified in almost all operational support areas, including practice facilities, locker rooms and team rooms, uniform quantity and quality, equipment room storage capacity, and a host of other issues. The school district settled and agreed to create a plan to remedy the problems identified. However, an attorney Jane Brunner from Siegel, Lee, and Brunner found that in the course of working on the case that "almost all high schools are out of compliance with Title IX" (Brunner & Turner, 2017).

---

5    Following the controversy, the NCAA expanded the women's tournament bracket from 64 to 68 teams, (Jackson, 2021); permission was given for the women's tournament to use the trademarked marketing term "March Madness" (Ariail, 2021); and in 2023, the Sweet 16/Elite 8 will be held at two sites (NCAA, 2022). The NCAA's steps to address issues raised can be found here: https://www.ncaa.org/sports/2021/9/27/genderequityupdates.aspx



Some sense of the dimension of the issue of gender inequity within college and university athletic departments can be gleaned from how resources are allocated within athletic departments documented in annual EADA reports. However, the expense categories are broad, capturing operating expenses by team, total operating expenses, recruiting, and athletic scholarship allocations as well as a large category labeled **non-gender-specific allocations**. As a result, refined analyses according to line items (e.g., hotel, meal, and travel costs) are difficult to find and conduct (see Table 5 below).

- Of the more than $14 billion spent on athletic programs at the NCAA Division I level in 2018–19, 46% was spent on men's programs ($6.5 billion+), 22% on women's programs ($3 billion +), less than 1% on coed programs ($5 million +), and 32% ($4.5 billion+) to non-gender-specific allocations. Expenditures in men's programs are more than twice what they are for women's programs (U.S. Department of Education, 2022a).

- At the NCAA Division II level, schools spent over $2 billion to support athletic programs in 2018–19, with 42% supporting men's programs ($843 million+), 34% supporting women's programs ($677 million+), less than 1% on coed programs ($4 million+), and 24% being allocated to expenses not designated for either gender ($488 million+) (U.S. Department of Education, 2022a).

- In 2018–19, NCAA Division III institutions spent more than $1.2 billion on varsity sports. Of that, men's sports received 38% ($485 million+), women's sports received 28% ($363 million+), coed programs received less than 1% ($4 million+), and 33% ($439 million+) was allocated to non-gender-specific expenses (U.S. Department of Education, 2022a).

- Across all three divisions, over a third of budget allocations are reported in the "non-gender specific allocations" category. In the absence of more specifics about what is included in this category, it is difficult to assess publicly who benefits from this area of allocation.

- In an analysis of data furnished through the NCAA Financial Reporting System, the largest gaps in expenditures between male and female programs, including total expenses, recruiting, scholarships, head coach compensation, and assistant coach compensation, occur in NCAA Division I FBS institutions (Wilson, 2017).

As reflected in Table 6 (on following page), by percentage, women's sport programs across all divisions and subdivisions received between 18% and 38% of budget expended. Women's programs in NCAA Division I-FBS receive the smallest percentage of budget expended at 18%. Non-football divisions expend a higher percentage of their budgets on women's sports, although in NCAA Division III non-football, they also report the highest percentage of expenditures in the not allocated by gender category.

### Financial Resources Spent on Recruiting Female Athletes to Play at the College Level

In terms of expenditures on recruiting, based on 2019–20 EADA data:

- Of the more than $241 million spent on recruiting athletes to play at the two-year, junior college, and four-year college levels in 2019–20, 31% was spent on recruiting female athlete talent (see Table 7 below) (U.S. Department of Education, 2021a).

- Among the 351 NCAA Division I institutions, total spending on recruiting amounted to $196,472,185. Of that amount, 29% ($ 57,871,962) was allocated to recruiting female athletes (U.S. Department of Education, 2021a).

- The most equitable spending on recruitment of female athletes was found in non-football playing institutions, with NCAA Division III non-football devoting nearly half of available recruiting resources (49%) to female athletes. The category with the least equitable allocation of recruiting resources was NCAA Division I Football Bowl Subdivision (FBS) institutions, in which 27% of recruiting dollars went to female athletes (U.S. Department of Education, 2021a) (see Table 7 on following page).

### Table 5. Amount and Percentage of Total Expenditures by Gender in NCAA College Athletic Departments by Affiliation and Division, 2018–19

| NCAA Division | Expenses–Men | % Men | Expenses–Women | % Women | Expenses–Coed | % Coed | Not Allocated | % NA | Total |
|---|---|---|---|---|---|---|---|---|---|
| DI | $6,466,322,961 | 46% | $3,067,580,553 | 22% | $5,974,187 | 0% | $4,539,254,384 | 32% | $14,079,132,085 |
| DII | $843,737,853 | 42% | $677,733,663 | 34% | $4,193,650 | 0% | $488,734,943 | 24% | $2,014,400,109 |
| DIII | $485,972,174 | 38% | $363,248,607 | 28% | $4,175,870 | 0% | $439,448,264 | 34% | $1,292,844,915 |
| **Total** | **$7,796,032,988** | **45%** | **$4,108,562,823** | **24%** | **$14,343,707** | **0%** | **$5,467,437,591** | **31%** | **$17,386,377,109** |

 Women's Sports Foundation
WomensSportsFoundation.org

50 Years of Title IX:
We're Not Done Yet

**Table 6. Amount and Percentage of Total Expenditures by Gender in NCAA College Athletic Departments by Affiliation, Division, and Subdivision, 2018–19**

| NCAA Division | Expenses – Men | % Men | Expenses – Women | % Women | Expenses – Coed | % Coed | Not Allocated | % NA | Total |
|---|---|---|---|---|---|---|---|---|---|
| FBS | $4,663,337,146 | 48% | $1,753,750,806 | 18% | $3,795,389 | 0% | $3,308,175,944 | 34% | $9,729,059,285 |
| FCS | $1,129,488,360 | 44% | $722,642,791 | 28% | $1,857,624 | 0% | $728,881,112 | 28% | $2,582,869,887 |
| DINF | $673,497,455 | 38% | $591,186,956 | 33% | $321,174 | 0% | $502,197,328 | 28% | $1,767,202,913 |
| **Subtotal** | **$6,466,322,961** | **46%** | **$3,067,580,553** | **22%** | **$5,974,187** | **0%** | **$4,539,254,384** | **32%** | **$14,079,132,085** |
| DIIFB | $538,012,389 | 46% | $355,247,365 | 30% | $2,225,724 | 0% | $271,566,260 | 23% | $1,167,051,738 |
| DIINFB | $305,725,464 | 36% | $322,486,298 | 38% | $1,967,926 | 0% | $217,168,683 | 26% | $847,348,371 |
| **Subtotal** | **$843,737,853** | **42%** | **$677,733,663** | **34%** | **$4,193,650** | **0%** | **$488,734,943** | **24%** | **$2,014,400,109** |
| DIIIF | $365,802,874 | 40% | $243,898,039 | 27% | $2,678,100 | 0% | $292,007,309 | 32% | $904,386,322 |
| DIIINF | $120,169,300 | 31% | $119,350,568 | 31% | $1,497,770 | 0% | $147,440,955 | 38% | $388,458,593 |
| **Subtotal** | **$485,972,174** | **38%** | **$363,248,607** | **28%** | **$4,175,870** | **0%** | **$439,448,264** | **34%** | **$1,292,844,915** |

**Table 7. Amount and Percentage of Allocation of Recruiting Dollars by Gender, 2019–20**

| College Sport Governing Body | Recruit $ – Male | % of Recruit $ – Male | Recruit $ – Female | % of Recruit $ – Female | Recruit $ – Coed | % of Recruit $ – Coed | Total |
|---|---|---|---|---|---|---|---|
| NCAA DI | $138,528,155 | 71% | $57,871,962 | 29% | $72,068 | 0% | $196,472,185 |
| NCAA FBS | $103,741,429 | 73% | $37,721,499 | 27% | $45,680 | 0% | $141,508,608 |
| NCAA FCS | $22,825,727 | 66% | $11,530,694 | 34% | $13,526 | 0% | $34,369,947 |
| NCAA W/O FB | $11,916,328 | 58% | $8,584,457 | 42% | $- | 0% | $20,500,785 |
| NCAA DII FB | $6,587,830 | 68% | $3,086,849 | 32% | $22,008 | 0% | $9,696,687 |
| NCAA DII w/o FB | $2,564,151 | 52% | $2,325,660 | 32% | $16,891 | 0% | $4,906,702 |
| NCAA DIII FB | $8,747,589 | 66% | $4,569,787 | 34% | $35,240 | 0% | $13,352,616 |
| NCAA DIII w/o FB | $2,150,547 | 51% | $2,045,585 | 49% | $12,771 | 0% | $4,208,903 |
| NAIA DI | $1,292,042 | 59% | $868,969 | 40% | $33,589 | 2% | $2,194,600 |
| NAIA DII | $1,781,674 | 59% | $1,201,513 | 40% | $34,926 | 1% | $3,018,113 |
| CCCAA | $62,652 | 48% | $68,836 | 52% | $- | 0% | $131,488 |
| NJCAA | $1,992,087 | 56% | $1,528,621 | 43% | $18,644 | 1% | $3,539,352 |
| NJCAA DI | $1,581,538 | 56% | $1,205,762 | 43% | $16,873 | 1% | $2,804,173 |
| NJCAA DII | $316,893 | 56% | $248,450 | 44% | $1,771 | 0% | $567,114 |
| NJCAA DIII | $93,656 | 56% | $74,409 | 44% | $- | 0% | $168,065 |
| USCAA | $82,232 | 57% | $60,147 | 41% | $3,152 | 2% | $145,531 |
| NCCAA | $101,847 | 53% | $88,680 | 47% | $- | 0% | $190,527 |
| NWAC | $67,343 | 46% | $80,224 | 54% | $- | 0% | $147,567 |
| **Total** | **$165,905,565** | **69%** | **$75,290,142** | **31%** | **$327,139** | **0%** | **$241,450,778** |



Although Title IX regulations do not require equal spending on men's and women's sports, there is an expectation that athletes will be afforded equitable treatment across the entire athletic program and equal access to benefits from expenditures. As a consequence, if male athletes receive access to top-of-the-line facilities, equipment, coaching, and support, there is an expectation that female athletes will also have access to a similar caliber of resources.

## Allocation in the Quality and Quantity of Coaches

The interest in the quality and quantity of coaches under Title IX flows from a concern about how coaches shape and impact the experience of athletes. Thus, if girls' and women's programs have fewer and less qualified coaches compared to boys' and men's teams, female athletes are denied access to a critical part of the athletic experience. Parsing out what is going on within an athletic department relative to recruitment, hiring, and retention of coaches for girls' and women's teams can be challenging.

Importantly, the climate within which coaches of women's teams operate affects the attractiveness of the profession and the ability of coaches to do their jobs. If women's programs are starved for resources or if coaches are called upon to regularly fight battles for basic fair and equitable treatment on behalf of female athletes, the requirements of their positions are different than for those coaching men's sports. Retaliation claims were recognized by the U.S. Supreme Court in 2005 as a form of intentional discrimination on the basis of sex under Title IX in *Jackson v. Birmingham Board of Education* (2005). The Court held where retaliation occurs because one speaks out about sex discrimination, the "on the basis of sex" requirement is met regardless of if the person was the target of the discrimination or a member of the underrepresented sex subject to the discrimination. In other words, a male coach of a female sports team could sue under Title IX for actions taken by the university in retaliation against him for reporting Title IX violations. The



©iStock by Getty Images

Court further noted that "reporting incidents of discrimination in integral to Title IX enforcement and would be discouraged if retaliating against those who report went unpunished. Indeed, if retaliation were not prohibited, Title IX enforcement scheme would unravel" (*Jackson v. Birmingham Board of Education*, at p. 11). However, despite these legal protections, coaches and administrators feel pressure that they could lose their jobs if they speak up or remain silent because of fear of retribution. This kind of threat has a chilling effect on achieving the goal of eliminating sex discrimination, creating more inclusive environments within athletic departments, ultimately impacting the lives of female athletes as they attempt to gain equal access to opportunities to compete and thrive in their athletic endeavors in a manner similar to that of male athletes.

In a Women's Sports Foundation study of how coaches of women's teams (both female and male coaches) experienced gender bias in college athletic departments, Sabo et al. (2016) found the following:

- Men coaches had more professional advantages, as two-thirds (65%) of current coaches felt that it was easier for men to get top-level coaching jobs, while three-quarters (75%) said men had an easier time negotiating salary increases. More than half (54%) believed that men were more likely to be promoted, to secure a multi-year contract upon hiring (52%), and to be rewarded with salary increases for successful performance (53%).

- Thirty-three percent of female coaches indicated that they were vulnerable to potential retaliation if they ask for help with a gender bias situation.

- More than 40% of female coaches said they were "discriminated against because of their gender," compared to 28% of their male colleagues.

- Almost half (48%) of the female coaches and just over a quarter (27%) of the male coaches in the study reported "being paid less for doing the same job as other coaches." Twice as many female coaches as male coaches felt their performance was evaluated differently because of gender (15% versus 6%).

In terms of compensation, while many factors affect pay equity, there has been a long-standing and persistent pattern of gender differences in the compensation of coaches of men's and women's programs at the college and university level. In 2019–20, on average, coaches of women's teams received a much smaller percent of salary compared to coaches of men's teams, ranging from 19% in NCAA FBS to 49% in NJCAA Division I (see Table 8 on following page).

At the assistant and associate coach levels, average salaries for coaches of women's teams range from 25% to 48% of the average spent (see Table 9 on following page).

The gendered dynamics within an athletic department is unlike almost any other in that men's programs are run primarily by men. During the past 50 years, only 2–3% of coaches of men's teams are women. Conversely, as a matter of historical record, after Title IX's enactment, women lost ground in leadership



## Table 8. Average Head Coach Salary by Division and Gender of Team, 2019–20

| Sport Governing Body | Men's Teams | % Men's Teams | Women's Teams | % Women's Teams | Total |
|---|---|---|---|---|---|
| NCAA FBS | $773,085 | 81% | $179,309 | 19% | $952,394 |
| NCAA FCS | $142,995 | 66% | $73,685 | 34% | $216,680 |
| NCAA No FB | $168,975 | 67% | $84,959 | 33% | $253,934 |
| NCAA DII FB | $59,639 | 58% | $43,598 | 42% | $103,237 |
| NCAA DII NFB | $47,144 | 53% | $42,225 | 47% | $89,369 |
| NCAA DIII FB | $42,057 | 61% | $26,787 | 39% | $68,844 |
| NAIA DI | $35,110 | 53% | $30,784 | 47% | $65,894 |
| NAIA DII | $16,412 | 55% | $13,167 | 45% | $29,579 |
| NJCAA DI | $34,789 | 53% | $30,631 | 47% | $65,420 |
| NJCAA DII | $14,040 | 51% | $13,250 | 49% | $27,290 |
| NJCAA DIII | $12,165 | 52% | $11,153 | 48% | $23,318 |

## Table 9. Average Assistant/Associate Coach Salary by Division and Gender of Team, 2019–20

| Sport Governing Body | Men's Teams | % Men's Teams | Women's Teams | % Women's Teams | Total |
|---|---|---|---|---|---|
| NCAA FBS | $104,630.00 | 69% | $47,056.00 | 31% | $151,686.00 |
| NCAA FCS | $195,281.00 | 75% | $65,333.00 | 25% | $260,614.00 |
| NCAA No FB | $51,052.00 | 59% | $35,023.00 | 41% | $86,075.00 |
| NCAA DII FB | $56,562.00 | 59% | $39,217.00 | 41% | $95,779.00 |
| NCAA DII NFB | $26,796.00 | 60% | $17,687.00 | 40% | $44,483.00 |
| NCAA DIII FB | $17,130.00 | 52% | $15,630.00 | 48% | $32,760.00 |
| NAIA DI | $15,308.00 | 52% | $13,989.00 | 48% | $29,297.00 |
| NAIA DII | $4,833.00 | 52% | $4,379.00 | 48% | $9,212.00 |
| NJCAA DI | $3,695.00 | 52% | $3,396.00 | 48% | $7,091.00 |
| NJCAA DII | $13,294.00 | 61% | $8,639.00 | 39% | $21,933.00 |
| NJCAA DIII | $6,318.00 | 53% | $5,546.00 | 47% | $11,864.00 |



positions in athletics administration and coaching. Dropping from a high of 95% of women running women's athletics in 1972, athletic department reorganizations in the 1970s resulted in women college sport leaders being demoted or their positions eliminated along with separate athletic programs for women. Numerous factors contributed to this decline, including but not limited to gender bias in recruiting, hiring, and retention; double standards; pay inequities; and retaliation against women who advocated for gender equity (Sabo et al., 2016). It has taken 50 years for women to make progress in regaining ground lost following those changes. Women coaches as well have been underrepresented in athletic departments, comprising less than half of the head coaches of women's teams. During the 2020–21 academic year, women's representation in athletic department, based on NCAA data, was as follows:

- One quarter (25%) of NCAA athletic directors were women (n=270.1106).

- Women comprised 36% of associate athletic directors (n=1,010/3,091) and assistant athletic directors (n=1,050/2,916).

- One quarter (25%)  of head coaches were women (n=4,988/20,111).

- Within the assistant coaching ranks, 28% were women (n=12,474/44,807).

- Among strength coaches, 18% were women (n=424/2,711).

In ongoing longitudinal studies of the status of women in college coaching, LaVoi and Boucher. (2020) noted that the representation of women coaches of women's teams had largely remained stagnant. In a comprehensive report of NCAA Division I institutions (Boucher et al., 2021), female coaches of women's teams comprised 42.7% of the coaching ranks. When gender and race are considered, the inequities are even more stark.

- The NCAA Race and Gender Demographics Database reveals that in the 2020-21 academic year, 3% of athletic directors were Black women; 2% of head coaches were Black women, with another 2% identifying as Native American/Alaska Native, Asian, Pacific Islander, Hispanic, or two or more races (NCAA, 2021b).

- The percentage of Black women serving as associate directors of athletics rose slightly to 4% and those identifying in another racial or ethnic category was 2% (NCAA, 2021b). The pattern is largely the same for assistant athletic directors with a slight increase to 3% for women identifying in another non-white racial or ethnic category.

- According to the Racial and Gender Report Card (Lapchick, 2022), which provides statistics on hiring practices of women and BIPOC people in college sport, disparities still exist in racial and gender representation and hiring practices.

- In 2010–11 women held 39.5% of the head coaching positions for women's teams and in 2020-21, they held only 41% across all three divisions in NCAA women's teams (Lapchick, 2021). Lapchick (2022) also reported declines

in racial hiring in the NCAA. Yet, there were also some monumental hires.

- Prior to the hiring of Nina King by Duke University, Carla Williams by the University of Virginia, and Candice Story Lee by Vanderbilt University in 2020 there had never been an African American women athletic director in the NCAA Power Five conferences (Davis, 2021). The visibility of these African American women breaking both gender and racial barriers in college athletics displays the gross historical exclusion of women of color in leadership positions in college sports.

- However, just as disturbing, a study found that Asian and Latinx women also made gains but combined only account for 3% of leaders holding athletic director positions (Hruby, 2021). The lack of women of color in college leadership positions is not surprising as 76.3% of administrators at the NCAA headquarters are white and 86.7% of conference commissioners are white in Division I (Lapchick, 2020, 2021).

- Adding to the obstacles facing women of color in 2011 African Americans held 8.5% of athletic director positions and in 2020–21 they held only 9% (Lapchick, 2021). However, these numbers exclude the leadership positions held by African American women at Historically Black Colleges and Universities (HBCUs).

- From 2010 to 2018 HBCUs hired 36% of African American women athletic directors (Davis, 2021). Hence for African American women seeking leadership positions in sports HBCUs are a vital component to their career growth and provide accessibility to leadership roles.

- However, HBCUs also face systemic racism which has greatly hindered their growth potential (Cooper et al., 2014; Cooper & Newton, 2201; Hawkins, 2010) they also face economic deprivation which could vitally impede the future of African American women, and especially women of color, in college athletic leadership positions (Hawkins et al., 2015).



# Part VIII. Title IX, Marketing, and Promotion of Female Sports

According to the Policy Interpretation adopted in 1979, compliance in the area of publicity is assessed considering several factors, among them the availability and quality of sports information personnel, access to other publicity resources for men's and women's programs, and the quantity and quality of publications and other promotional devices featuring men's and women's programs.

Marketing and promotions also fall under this broad category of publicity. In the Women's Sports Foundation's guide, *Play Fair: A Title IX Playbook for Victory*, questions to consider when assessing whether an athletic program was providing equitable treatment to female athletes in the area of publicity and promotions include the following:

- What is the availability and quality of sports information personnel?

- Is there balanced access to other publicity resources for men's and women's programs?

- Are the publicized images and realities of students' sport experiences fueling negative gender stereotypes—the men's photos are actively engaged, the women are standing and posing?

- Do teams have a comparable quantity and quality of publications and other promotional devices featuring men's and women's programs?

- Are cheerleaders, pep bands, and school administrators present at sports events in a manner that demonstrates their support for all teams? (Lerner & Lakowski, 2009, p. 14).

In an effort to clarify an institution's obligations in this area in terms of media coverage, Title IX consultant Janet Judge (2011) wrote, "While no athletics department can guarantee coverage of women's teams in those papers, radio or television programs that the institution does not control, the school can guarantee that equivalent efforts to publicize and promote the women's programs are in effect. Title IX requires that departments strive to meet the overall goal of equivalent publicity for men's and women's sports overall" (p. 12).

Although Title IX's reach does not extend to the independent choices of media outlets to cover sporting events that they consider newsworthy, the issue of coverage of women's sports is a more complicated matter. The marketing and promotion of women's sport is one that has often been boiled down to a "chicken or egg" debate. The question being, what comes first, more coverage of women's sports to promote? Or more money put into promotion and, therefore, more demand for women's sports coverage? (Guaglione, 2021). As Dr. Lindsay Darvin (2021b) has noted, preferences do not develop in isolation. It

is highly difficult for consumers to become fans of something they are rarely, if ever, exposed to. Broadcast networks argue that women's sports do not produce "good" ratings, but without promotion and more coverage, there is little opportunity for women's sports viewership to grow.

At the time when the regulations were written in the 1970s, sports information offices served largely in a media services role, focusing on the technical delivery of information to support members of the media covering their teams and working with coaches and athletes. Contrary to the multi-billion-dollar television contracts, conference networks, 24/7 sports coverage, the availability of digital platforms, and social media, college sport media coverage was anchored more in local and regional outlets. Further, there were no units focusing on marketing within athletic departments at that time. In 1980, it was highly unusual that people working in a college or university athletic department had a position title with the term "marketing" in it. By the mid-1990s, 66% of administrators responding to a survey about marketing efforts in their athletic departments reported that someone on their staff was expressly assigned responsibility for it and within that group, only 63% of those assigned marketing responsibilities were full-time (Stevens et al., 1995).

The organizational arrangements within college and university athletic departments in terms of marketing and media have expanded dramatically since then. Thus, even the terms "sports information" and "publicity" in the regulations may be too narrow to capture the efforts undertaken in 21st century athletic departments to market and promote programs. This is recognized in the *Title IX Investigators Manual,* published





in 1990, where terms like marketing and promotion are added to the lexicon (Bonnette & Daniel, 1990). As Dittmore (2016) noted, "Athletic departments have become increasingly more sophisticated in production over the past five or so years to the point where it is often difficult to distinguish between content on the evening news, and content on a department website." In some athletic departments, simple classifications of athletic communications and marketing do not capture the complexity of these units that may include, or be housed in, other units such as video production, social media content and strategy, and fan engagement.

Because of the lack of specificity in the EADA's broad revenue and expense categories, that public disclosure report does not provide a breakdown in terms of how marketing resources are allocated. Additionally, because of the way in which television contracts are bundled at the conference and national levels (NCAA), there has been little scrutiny of those agreements. Further, athletic department partnerships with third parties such as Learfield, a media and technology services company that provides support in all areas of media (publishing, audio, digital, and social), remain largely under the radar in terms of Title IX scrutiny.

### Availability and Quality of Sports Information and Marketing Personnel

In assessing this area, the total number of people working in sports information should be considered, including full-time, part-time, graduate assistant, and undergraduate student workers. This is a potentially vulnerable area in terms of Title IX violations if more experienced staff are assigned to men's sports and less experienced staff are assigned to women's sports. There is little research on the national patterns of investment in this area in terms of personnel and their assignments.

From a gendered perspective, sports information offices within college and university athletic departments have historically been male dominated. In a 2020 survey conducted by the College Sports Information Directors Association (CoSIDA) (n=1,300), 81% of respondents were male and 18% female, 91% were white, and 8% were non-white. As NCAA data for 2020–21 reveals, sports information and marketing director roles within athletic departments continue to be male dominated (see Table 10). That said, these data are limited because the NCAA's survey does not capture all the people working in marketing and media within college and university athletic departments.[6]

---

[6]   The College Sports Information Directors Association (CoSIDA) and the Knight Commission on Intercollegiate Athletics launched a fellowship program on February 7, 2022, that is "designed to encourage a greater understanding of how those in athletics communications offices at all levels can become effective champions for diversity, equity and inclusion in college athletics". https://cosida.com/news/2022/2/7/general-cosida-introduces-diversity-inclusion-fellowship-program-in-partnership-with-the-knight-commission-on-intercollegiate-athletics.aspx

### Table 10. Marketing and Media Personnel in NCAA Colleges and Universities, 2020–21

| Title | Male | Female | Total |
|---|---|---|---|
| Promotions/ Marketing Mgr. | 826 (61%) | 522 (39%) | 1,348 |
| Sports Information Dir. | 1,068 (87%) | 161 (13%) | 1,229 |
| SID (Ass't/Assoc) | 1,195 (76%) | 374 (24%) | 1,570 |

*Source of Data: NCAA Gender & Race Demographic Database*

As a case in point, an analysis of staffing allocations in the marketing area among the top 10 revenue-generating programs in NCAA Division I revealed more than six times as many sport-specific marketing roles were assigned to men's sport teams than women's sport teams (Jessop & Sabin, 2021).

### Access to Other Publicity Resources for Men's and Women's Programs

The broad category of publicity resources could include posters, digital advertising, schedule cards, print advertising, radio advertising, and television (Zullo, 2018). There is very little research that breaks down how athletic departments allocate resources to men's and women's sport programs in this area. There are questions that can be raised about whether athletic department personnel approach marketing and promoting men's and women's programs from a gender-equitable perspective.

As an example, when the University of Notre Dame football program unveiled what they called a recruiting campaign in May of 2021 featuring high-profile players from the team on billboards in their hometowns or within the states they come from, the question of whether the promotional effort was in line with Title IX expectations arose (Clark, 2021; Dosh, 2021a). This is the kind of area where questions should be raised in terms of how the institution is promoting women's sports and whether the investment of time, personnel, and resources in the creation of campaigns is being allocated equitably between both men's and women's programs. Further, this type of campaign also illustrated, from a Title IX compliance perspective, that there are intersections across functions within athletic departments that mutually support one another, meaning that even if an argument is made that this was an investment in recruiting, it contributes to the stature of the brand. A primary target of the campaign may be getting the attention of recruits, but the ultimate goal is revenue generation. Given that they were using individual players, the effort was also enhancing the individual brands of those players, thus there is an additional Title IX question as to whether the achievements of female athletes at Notre Dame were similarly recognized in such a high-profile fashion. While Title IX does not require identical



spending, how a school justifies an amplified media platform for a men's program and male athletes needs to have some kind of reasonable answer in terms of what they are doing to promote women's programs and female athletes.

In the only study we are aware of that looked at Title IX in relationship to the marketing of college and university athletic departments, key results were discussed within the context of their Title IX implications (Barr et al., 1999). As a benchmark, their key findings largely portended the problems that emerged regarding the gender inequalities found in women's college sport in 2021. Among the key findings were the following:

- In 1999, nearly 63% of marketing budgets were allocated to men's programs and 37% allocated to women's programs. This was self-reported data from the participants in the study.

- The two criteria most often cited by athletics administrators in determining marketing support for programs were revenue and attendance, a situation that creates a self-fulfilling cycle in that men's programs that are more established, have larger existing audiences, and have cultivated revenue streams get more support.

- Then as now, there is no systematic way readily in place to assess how marketing resources and support are allocated within athletic departments. However, Barr et al. (1999) found that athletics administrators reported that marketing staff support devoted to women's programs was low.

- Statistically significant differences were found in the practices used in merchandising programs, sponsor-appreciation activities, golf tournaments, and other fundraisers between men's and women's programs.

In assessing the Title IX implications of those findings, Barr et al. (1999) noted that:

- If marketing practices are driven by revenue and attendance leading to most or all marketing resources going to men's sports, there is a potential Title IX violation.

- It is important when allocating marketing resources under Title IX to consider not just existing revenue generation and attendance but also potential for revenue generation and attendance.

- Television contracts designed for women's program should be developed with those specific markets in mind.

- Among the factors that should be considered in the marketing area in terms of Title IX compliance is the availability and quality of personnel involved in marketing efforts for women's programs.

## Quantity and Quality of Publications and Other Promotional Devices Featuring Men's and Women's Programs

As a general trend, women's college sport media coverage aligns with general trends in the overall media coverage

of women's sports, meaning that while women's college sports have benefitted from the age of streaming and many schools do stream women's and men's games on their athletic department websites, women's college sport in general receives very little media attention. The array of media materials that schools create in support of their athletic programs (game programs, media guides, websites, blogs, coaches' podcasts or shows) warrants reviews in terms of Title IX's standard of equitable treatment.

- In a 26-year longitudinal study of NCAA Division I media guides from 1989–2017, Buysse and Wolter (2019) document how Title IX's equity standards influenced an increase in the publication of media guides for women's programs. They further show that the representation of female athletes in media guides reflected positive changes during the first 14 years of their review, meaning they were being shown as competent athletes in their uniforms, in athletic settings, and in action shots. In the last year of their review, however, this trend reversed, when there was a return to a greater emphasis on representing female athletes in traditionally feminine frames (hair, dress, makeup) instead of in their athletic uniform.

- In a content analysis of articles on NCAA Division I athletic department websites (n=30), mixed results were found in the coverage of female athletes. In terms of good news, coverage of female athletes was similar to that of male athletes, meaning "Both genders were portrayed in photographs primarily as true athletes and written about in articles mostly concerning factual information directly related to their athletics" (Malik, 2016, p. 57).

- At the same time, only 36.6% of articles and 33.1% of photographs represented female athletes, ranging from 10.3% to 6.8% below their actual participation numbers (Malik, 2016, p. 58).

- Women were represented in 33.5% (n=59) of the total article sample, while articles that represented men's athletics made up 58% (n=102) of the total sample. Females and males were represented equally in 4% of the articles, and biological sex indeterminate articles made up the remaining 4.5% of the sample (Malik, 2016, p. 58).

- In a longitudinal study of quantitative coverage of women's sport in televised sports news and highlight shows conducted by Cooky et al. (2021) over the past three decades, the percentage of women's sports news constituted between 5.7% to 5.85% of all sports coverage, an increase from the low point for women's sports coverage, which was under 2%. Still, coverage within the 5% range is still less than what it was in 1999 and only slightly above what it was in 1989.

- "The proportion of coverage devoted to women's sports in our sample of daily online newsletters (8.7%) and Twitter (10.2%) was higher than in TV news and SportsCenter, however markedly lower than for men's sports" (Cooky et al., 2021).





©iStock by Getty Images

- In a content analysis of tweets posted by NCAA Division I female and male basketball players (n=88) between the dates of February 1, 2020, and February 1, 2021, female players on average posted somewhat more frequently than male players (434 tweets compared to 383 tweets, respectively) (Savatovic-Hathorn, 2021)

- In that same study, Savatovic-Hathorn (2021) wrote, "The highest number of followers on the men's side had 58,700 followers, while on the women's side had 18,700 followers" (p. 29). "Males had on average three times more followers or 6,676 compared to females who had 1,844" (p. 46).

- For both females and males in the study, 95% of their original posts covered three themes: diversion (personal life, music, social justice), content (athletes posted photos, videos), and interactivity (they engaged with others). When broken down by gender, female athletes tweeted more diversion and content; male athletes were more interactive, dealing with fanship and information (Savatovic-Hathorn, 2021).

- A content analysis of female and male athletes depicted in Snapchat and Instagram accounts run by ESPN, CBSSports, Fox Sports, and NBC Sports between October 2017–February 2018 revealed far fewer representations of female athletes: only 25% of Instagram images and 7% of Snap images posted (Sheffer, 2020).

- In the content analysis mentioned above, "female athletes were significantly shown in more aesthetic (16%) or neutral sports (37%) more often than male athletes (0.9% and 11%, respectively)" (Sheffer, 2020, p. 40). Female athletes were also shown more frequently with family and friends when compared to male athletes. "Instagram images showed female athletes with family or friends 63% of the time compared with only 10% of the Snapchat images, while only 12% of Instagram and 3% of Snapchat images of male athletes were shown with family or friends" (p. 40).

- An analysis of media coverage of men's and women's sports on 10 NCAA Division I conference Facebook sites (five FBS, five FCS) revealed that 53% of photos were devoted to men's sports and 41% to women's sports. Out of 1,145 photographs that included game schedules and special news, 58.6% were promoting men's sports, 26.2% were promoting women's sports, and less than 3% included both men's and women's sports in the same photograph (Jang, 2017).

- In a 2004 study of campus media's coverage of women's sports, "College newspapers in the study covered male athletes and events in 72.7% of their sports stories, and college television operations devoted 81.5% of their sports stories to males. The overall amount of time or space devoted to comments from female or male participants or observers mirrored the discrepancy in the number of stories devoted to male versus female athletes. However, when college sports media did cover female athletes, the quality of the coverage was equivalent to that given to men. There was no significant difference in the average number of words per print story or the average number of seconds per broadcast story, nor was there a difference in the way the stories were presented based on the sex of the athletes. However, the huge disparity in the quantity of coverage indicates that campus media mirror professional media in regard to gender equity in their coverage of sports" (Huffman et al., 2004).

What the existing research reveals about gender equitable treatment in marketing and media within college athletic departments is two-fold: female athletes continue to be underserved in terms of promotional efforts and that patterns within athletic departments appear to align with the larger pattern of limited coverage of women's sports. At the high school level, there is so little research that has been done, there is no basis to report what is happening in this sector.

With that said, there are both troubling and hopeful signs that have emerged in the last year about the gender inequalities that exist in the treatment of female athletes by the nation's premier college sport governing body, that being the NCAA. As was widely documented in the news in March of 2021, women's college basketball players were treated as second-class citizens in what is supposed to be their national showcase. The infamous "tweet heard round the world" showed that a stack of weights was provided for the women's tournament while a fully equipped weight room was available to the men; the stark differences in food (pre-packaged meals versus full buffets), the investment in different COVID tests, with the more expensive and accurate tests made available to male athletes; gift bags for the women that were markedly less generous than those for the men; and other issues. In the external investigation requested by the NCAA that followed, findings revealed that women's college basketball and other women's sports have much greater value than existing contracts indicate (Kaplan Hecker & Fink, 2021a). Among the findings:

- The NCAA Division I men's basketball tournament is marketed as a single property, with a contract worth $1 billion in revenue per year with CBS Sports and Turner.



- The NCAA Division I women's basketball tournament has been bundled along with 29 other NCAA championships; the entire bundle is valued at $34 million per year.

- The NCAA's deal with CBS Sports and Turner has a provision that sponsorships for all NCAA championships, including women's basketball, are controlled by CBS Sports and Turner.

- The value of the NCAA Division I women's basketball tournament is estimated to have been undervalued and is projected to be worth between $84 and $112 million.

As the fog lifts on beliefs that women's college sport is not attractive to audiences and sponsors, there are ample indicators that there is value to be pursued in the women's college sport space.

- As has been the case for many years, ESPN's broadcast of the Women's College World Series regularly attracts audiences that compete favorably with professional sport audiences. In 2021, the WCWS three-game championship series featuring Oklahoma and Florida State drew an average of 1.84 million viewers, a 15% increase from what it was in 2019 (Anzidei, 2021).

- The average viewership for the WCWS outpaced that of the men's event, the College World Series (CWS), which averaged 775,000 viewers per game. The WCWS also had the most viewed game with 2.1 million viewers, compared to the CWS, whose most watched game drew 1.7 million viewers (Brennan, 2021).

- The 2021 WCWS drew an audience that was larger than the one for Game 2 of the NHL playoffs featuring the New York Islands and the Boston Bruins aired on the NBC Sports Network on the same day (Anzidei, 2021).

- According to Sports Media Watch, in 2021, the NCAA Women's Gymnastics Championships was the most-watched gymnastics telecast in 10 years. The event drew a .52 rating with an audience of 808,000, an increase of 519% from 2019 (Paulsen, 2021).

- In December of 2021, NCAA women's volleyball drew record ratings, with 1.9 million viewers tuning in to the championship match between Wisconsin and Nebraska (Christovich, 2021b). The ratings were up 71% from the spring season and 119% up from 2019 (Christovich, 2021b). Compared to the women's volleyball ratings, ratings for men's volleyball have been on the decline. In 2018, the NCAA Men's Volleyball Championship drew 190,000 viewers (Keith, 2018).

## Title IX, Female Athletes and Name, Image, and Likeness (NIL) Laws

For decades, NCAA rules prevented college athletes from entering into endorsements contracts and to make money from the use of their names, images, and likenesses (NILs). At the risk of losing their eligibility to compete in their sports, NCAA Division I college athletes, in particular, for decades could not appear

in advertisements, participate in promotional activities, sign autographs, run their own sports camps, or publish under their own names and get paid.

After the state of California passed the Fair Pay to Play Act in 2019, which provided for college athletes to profit off their NILs and to have access to representatives, 26 other states passed similar laws with many taking effect in July of 2021 and some earlier. Faced with such a wave of opposition to its rules, the NCAA suspended its rules in the summer of 2021, ushering in what some have referred to as the NIL era of college sports. In the immediate aftermath of college athletes' access to their NIL rights, stories abounded about college athletes promoting all manner of ventures from restaurants to car dealerships to professional sport franchises to fitness products. The value of those endorsements ranged from the receipt of in-kind merchandise, such as t-shirts and hats, to the occasional six-figure deal.

Referred to as a significant reform in the college sport space, at times being represented as a game changer, opportunities to enter into endorsement deals simply restores a right to college athletes they have long been denied as a result of NCAA rules (Staurowsky, 2021). As the market continues to evolve, it is difficult to predict how lucrative it might be for all athletes, and for women athletes specifically. According to Blake Lawrence, CEO of Opendorse, a company that provides services to educate athletes about how to build their brands, the average compensation for college athletes who landed NIL deals within the first five months was $1,256 or $250 per month. Breaking down the numbers further, "The median for all Division I athletes between July 1 and November 30 [2021] was $6 per month" (Associated Press, 2021, para. 13).

The opening market for female athletes to pursue opportunities to build their brands has been heralded as an important development that has the potential not only to benefit individual female college athletes whose value has long been suppressed by restrictive NCAA rules but also help to elevate women's college sport programs in general. As sport lawyer, Marc Edelman (2022) noted in *Forbes*,

> For years, the NCAA's leadership had proclaimed that state-mandated NIL reform would lead to a worsening of the gender divide of college sports. However, in reality, women's college athletes have been some of the biggest beneficiaries of college sports' 2021 economic reform (para. 1).

In July of 2021, Opendorse announced a partnership with GoPuff, who markets their delivery service for food, drinks, and school supplies to college students, to facilitate NIL deals with college athletes (Zboraj, 2021). Athletes receive payments by promoting GoPuff on their social media platforms. Female athletes to sign on with GoPuff included Mia Raffael (University of Miami track and field), Kathleen Jones (Ohio State tennis), and Hannah Preissler (University of Nebraska track and field) (Chen, 2021).

Creating a campaign in line with the NIL era, Degree Deodorant launched the #BreakingLimits campaign, which was designed



to celebrate athletes who had overcome adversity. Athletes included in that campaign included Charlotte Teeter (Texas Tech soccer), Dana Rettke (University of Wisconsin volleyball), Gloria Mutiri (University of Oregon volleyball), Asikia O'Neal (University of Texas volleyball), Bailey Moody (University of Alabama wheelchair basketball), Chayla Edwards (University of Wisconsin ice hockey), Emma Hoffart (Missouri Western State University softball), Jazmyn Foberg (University of Florida gymnastics), Jhenna Gabriel (University of Texas volleyball), Lawrence Sapp (University of Cincinnati para-swimming), and Logan Eggleston (University of Texas volleyball) (Chen, 2021).

Examples of individual deals that female college athletes have struck include the following:

- Paige Bueckers, University of Connecticut point guard, signed two major endorsement deals in 2021. She became the first NCAA athlete to enter into an agreement with Gatorade that is reported to be worth an estimated $1 million. She also became a brand ambassador for StockX, an apparel and footwear brand (Edelman, 2021; Powell, 2021).

- The Cavinder twins, Haley and Hannah, who play basketball for Fresno State, have agreements with Boost Mobile and Six Star Pro Nutrition. With a joint Tik Tok account that has drawn a half-million followers and Instagram accounts where each has a following of 250,000, their earning power as influencers is believed to be substantial. One projection estimates that they have the capability of generating $45,000 per year from their social media accounts and another $520,000 from their Tik Tok accounts (Mauss, 2021).

- Lexi Sun, a Nebraska volleyball player, created a jewelry collection for Borsheims and a custom sweatshirt for REN (Chen, 2021).



*Paige Bueckers, University of Connecticut point guard*

- University of South Carolina basketball player Aliyah Boston entered into a deal with the regional fast-food chicken chain, Bojangles (Chen, 2021).

- Azzi Fudd, a basketball player with the University of Connecticut, is an ambassador with Chipotle (Chen, 2021).

- A softball player for the University of Georgia, Jaiden Fields, is also a brand ambassador with Chipotle (Chen, 2021).

- Olivia Dunne, an LSU gymnast, who has 5.7 million followers on social media, is expected to reach over $1 million in endorsements after her first year. Among the companies she has deals with are Vuori (an active wear company) and PlantFuel (a wellness company) (Chen, 2021).

- La'Quanza Glover, a basketball player for Edward Waters University, is believed to be the first HBCU female athlete to sign an endorsement deal, which she did with Global Freight & Commerce (Bell, 2022).

- Linktree Partners, a linking platform, signed Marghzetta Frazier, UCLA gymnast, and Alana Walker, University of Virginia volleyball player, to "create and share content that showcases who they are on and off the court, using Linktree to connect their audiences to their content, brand deals, causes, playlists, communities and NIL ventures" (Dosh, 2021c).

High school female athletes have also drawn attention from sponsors as well. Jada Williams, who was ranked 21 nationally in the 2023 HoopGurlz Ranking-Super 60 by ESPN, signed with Spalding in February of 2022. As an ambassador for the brand, "She'll work on marketing campaigns, event to promote women's youth basketball, and collaborate on a 'limited edition' basketball series" (Christovich, 2021a).

Some of the deals that athletes have landed have been extended to groups and/or are group licensing deals.

- As a case in point, the University of North Carolina–Chapel Hill entered into a partnership with The Brandr Group (TBG), to allow athletes in their program to profit from the use of UNC-Chapel Hill official trademarks and logos. Athletes can participate in this voluntarily, and under the terms, in group licensing opportunities that will be developed by TBG in the apparel and non-apparel space and well as co-branded sponsorships (The Athletic Staff, 2021).

- Tech company SmartyStreets, whose CEO Jonathan Oliver is a Brigham Young University (BYU) graduate, made a commitment to pay every female athlete at BYU (whether they are on scholarship or are walk-ons) $6,000 for representing the company. Athletes are expected to promote the company on their social media platforms, attend company events, allow their images to be used in the company's promotional materials, and wear SmartyStreets apparel (C. Turner, 2021).

- Other teams to receive deals include Alabama women's gymnastics with CrowdPush and UCLA's women's



basketball and Florida State softball with FTX, a cryptocurrency exchange. In the FSU softball deal, if the athletes complete all of the items they have been asked to do as part of the agreement, they will make $80,000 as a group (Dosh, 2021b). For a roster that carries 27, in theory, that would amount to less than $3,000 per player.

Third-party entities like Division Street, a company formed by billionaire and chair emeritus of Nike Phil Knight and former Nike executives to support athletes at the University of Oregon to develop their brands and increase their marketability, has drawn attention for potentially violating NCAA rules that still prevent athletes from being paid for their athletic performances, bar schools from providing benefits to athletes that are not available to other students, and prevent schools from offering monetary inducements to persuade a recruit to sign with them. Lopiano et al. (2021) in a position statement on NILs and Title IX cautioned that institutional obligations extended to businesses such as Division Street.

In a new market, the endorsement deals are varied from exclusive interviews or speaking engagements to autograph signings to memorabilia to appearances to social media influencers. Other kinds of initiatives that have targeted men's teams have drawn scrutiny in terms of Title IX compliance. Some collectives have been formed to fund specific teams and specific roles on those teams. For example, The Clark Field Collective at Texas has offered $50,000 to each of the offensive lineman on the Longhorns team. While the Clark Field Collective website stated that it is organizing committees for all teams and has a special interest in promoting the interests of women athletes, the offer to University of Texas offensive lineman has raised concerns about fairness and equity, and whether, even as a structured third-party operating outside of the institution and athletic department, Title IX has been violated because only men athletes have benefited financially (Dodds, 2022).

Depending on the nature of the agreements that athletes are entering into, their origins, and specifics, and depending on what college and university athletic programs are doing in engaging athletes around the NIL opportunity, there may be Title IX implications. Male athletes who receive more marketing from athletic departments will be positioned to build their brands and reap the benefits more than female athletes. Thus, increased scrutiny of what athletic departments are doing to promote female athletes and women's sports and meeting obligations under Title IX (see above section) is needed. As renowned civil rights attorneys Arthur Bryant and Cary Joshi (2021) note, there is the potential for a college or university athletic department to run afoul of Title IX. They offer several scenarios that athletic department personnel should be mindful about:

- The university trains its men's basketball team on how to navigate the world of contracts and agents but does not similarly train any women's team.

- The university allows the football team members to use its trademarked logo in an ad for a sports apparel brand but does not allow any women's team members to do so.

- The women's swimming and diving team coach holds meetings with various vendors to feature her team members on their website, but no men's team coaches hold similar meetings.

- The men's baseball team members are paid by the university's apparel partner to have jerseys sold with their names on the back, but no female athletes are offered similar deals.

While women athletes and women's programs have not been promoted fairly and equitably over the years, it should not be assumed that women athletes need wait on athletic departments to comply with Title IX in order to realize benefits from endorsement deals. As Jessop and Sabin (2021), point out, the U.S. Women's National Soccer Team (USWNT) negotiated for a return of their group licensing rights from U.S. Soccer in 2017 as part of their collective bargaining process. The USWNT in turn assigned those rights to R.E.P., the licensing arm of the National Football Players Association. Within two years, the USWNT earned more than $1 million in revenue from group licensing deals (Jessop & Sabin, 2021).

The implications of this are two-fold. First, women athletes are demonstrating that they have value in the market and the restoration of rights to college athletes to pursue endorsement deals creates opportunities for female athletes to benefit. At the same time, there is no question that high school and college women athletes would be better positioned to reap the benefits of endorsements if institutions had been more closely monitored in terms of the marketing and promotion of girls/women sports. These developments should signal a concern within institutions to examine their allocation of personnel and resources in the marketing and promotion of girls/women athletes and girls/women sports. As Bryant and Joshi (2021) note, this is an area of Title IX vulnerability for high school and college athletic departments.



*Giselle Juarez of the Oklahoma Sooners pitches during the 2021 Women's College World Series Championship.*



# Part IX. Title IX and Intersectionality

## Title IX, Gender, and Race Intersectionality

As instrumental as Title IX has been in expanding opportunities for girls and women throughout American society, feminists and critical race theorists point out that — as is the case with any "single axis" law, meaning any law that focuses on one category of bias in addressing discrimination — it by itself does not take into account how sex discrimination intersects with other forms of bias. In her book *Getting in the Game: Title IX and the Women's Sports Revolution*, legal scholar Deborah Brake (2010) wrote that for all of the progress made under Title IX, "...women have not shared equally in many of the post-Title IX gains" (p. 113). As Doris Corbett, Professor Emerita and administrator at both Howard University and the University of Northern Iowa, who played a key role in creating intercollegiate athletic opportunities at Howard and served as their first women's basketball coach (1973–74), wrote, "Women of color experience a form of double jeopardy — racism and sexism. Because they are overlooked by society in general, their struggles in both sport and other aspects of life are compounded" (Corbett, 2001, p. 307).

In the Women's Sports Foundation's report on *Title IX and Race in Intercollegiate Sport*, Butler and Lopiano (2003) noted that, "Race and gender inequalities are intertwined by their very natures. When female athletes face discrimination because of their gender, female athletes of color are similarly affected. When students of color face discrimination based on their race, female athletes of color are similarly affected. Thus, female athletes of color are in double jeopardy, facing the effects of gender and race discrimination" (p. 7). See Table 11 for the breakdown of athletic opportunities for male and female athletes by race, ethnicity, and gender within the NCAA between 2012 and 2021.

Controversially, Dees (2004), argues *Brown v. Board of Education* and anti-discrimination laws that use a single-axis lens have also assisted in increasing in athletic participation opportunities for African American women in intercollegiate athletics. Others have reported the single-axis lens limited or restricted African American women's access to intercollegiate competition (Mathewson, 2012; Flowers, 2015). Specifically, Title IX as a single-axis legislation that provides remediation for gender discrimination simultaneously ignores racial discrimination against African American women (Mathewson, 2012; Flowers, 2015).

- Also, Mathewson (2012), argues Title IX seeks to benefit white women athletes more than African American women as "Title IX was designed to target discrimination and promote equality along the single-axis of gender." Therefore single-axis-based anti-discrimination laws like Title IX have not provided remedies for African American women's and girls' participation in athletics.

- Crenshaw (2002), in recognizing the intersectionality between multiple forms of inequality and identity, illustrates the limits of Title IX as a single-axis law focusing on gender. The concept of intersectionality broadens the analysis to consider the intersections between race, class, and gender.

- Moreover, (Mathewson, 2012) cited, "A black woman who has been discriminated against has difficulty proving the requisite inequality. It may be difficult to prove that she was discriminated against on the basis of race, because blacks have not suffered as a group since black men do not share the injury."

According to the Postsecondary National Policy Institute (PNPI) (2020), between 12% to 13% of the undergraduate populations at four-year public and private non-profit colleges and universities were Black. As shown below (Table 11), the percent of Black female athletes falls well short of those percentages.

### Table 11. Percentage of NCAA Athletes by Race, Ethnicity, and Gender, 2012–21

|  | Male White | Male Black | Male Other | Female White | Female Black | Female Other |
|---|---|---|---|---|---|---|
| 2021 | 33 | 11 | 11 | 30 | 5 | 9 |
| 2020 | 33 | 11 | 11 | 30 | 5 | 9 |
| 2019 | 34 | 11 | 11 | 30 | 5 | 9 |
| 2018 | 34 | 11 | 10 | 30 | 5 | 9 |
| 2017 | 35 | 11 | 10 | 31 | 5 | 8 |
| 2016 | 35 | 11 | 10 | 31 | 5 | 8 |
| 2015 | 36 | 11 | 9 | 31 | 5 | 8 |
| 2014 | 37 | 11 | 9 | 32 | 5 | 7 |
| 2013 | 37 | 11 | 9 | 32 | 5 | 7 |
| 2012 | 38 | 11 | 8 | 32 | 5 | 6 |

*Note: The "Other" category may include international athletes, athletes who identify as two or more races, Asian, Native American/Hawaiian, Alaskan and Pacific Islander, and unknown.*



When the number and percentage of women athletes competing on teams sponsored by NCAA member institutions are considered over the span of 10 years between 2012–21, the majority are white. Having said that, a shift has been occurring with the percentage of white women athletes slowly declining over time from a high of 74% in 2012 to 68% in 2021. There is an impression, based on the way that race and ethnicity data are reported that the "Other" women athlete category is growing in terms of representation, with an increase from 15% in 2012 to 21% in 2021; with the representation of Black women athletes remaining constant over a 10-year period at 11% (see Table 12 below).

As a result, racial disparities continue to create obstacles for BIPOC women in college sports. For example, white women represent the largest population of women athletes in NCAA Division I, II, and III conferences combined at 68%. Black women represent 11%, followed by Hispanic women at 6%, international women at 5%, women identifying with two or more races at 5%, and Asian women at 2% (NCAA, 2021b). The percentage of American Indian/Alaska Native and Native Hawaiian/Pacific Islander women registered at 0.05% although combined they accounted for 1,687 female athletes competing on teams competing under the umbrella of the NCAA (see Table 13).

### Table 13. NCAA Female Athletes by Race/Ethnicity, 2020–21

| | NCAA Women Athletes | Percentage |
|---|---|---|
| American Indian/Alaska Native | 932 | <1% |
| Asian | 5,182 | 2% |
| Black | 23,489 | 11% |
| Hispanic/Latino | 13,487 | 6% |
| Native Hawaiian/Pacific Islander | 755 | <1% |
| International | 9,860 | 5% |
| Two or More Races | 10,498 | 5% |
| Unknown | 5,839 | 3% |
| White | 147,879 | 68% |
| **Total** | **217,921** | **100%** |

An examination of NCAA data across all divisions in 26 sports for the 2020–21 academic year revealed the highest representation of female athletes of color (American Indian/Alaska Native, Asian, Black, Native Hawaiian/Pacific Islander, and individuals who identified with two or more races) were participating in these sports: women's basketball (39%), women's fencing (36%), women's indoor track (27%), women's outdoor track (28%), and women's rugby (27%).

### Table 12. NCAA Female Athletes by Race/Ethnicity, 2012–21

| | Female White | % Female White | Female Black | % Female Black | Female Other | % Female Other | Total |
|---|---|---|---|---|---|---|---|
| 2021 | 148,036 | 68% | 23,495 | 11% | 46,591 | 21% | 218,122 |
| 2020 | 151,650 | 68% | 24,452 | 11% | 46,910 | 21% | 223,012 |
| 2019 | 150,206 | 68% | 24,456 | 11% | 44,834 | 20% | 219,496 |
| 2018 | 149,980 | 69% | 24,422 | 11% | 42,373 | 20% | 216,775 |
| 2017 | 150,181 | 70% | 23,930 | 11% | 40,106 | 19% | 214,217 |
| 2016 | 149,099 | 71% | 23,487 | 11% | 37,759 | 18% | 210,345 |
| 2015 | 148,606 | 71% | 23,226 | 11% | 36,151 | 18% | 207,983 |
| 2014 | 147,600 | 72% | 22,407 | 11% | 33,633 | 17% | 203,640 |
| 2013 | 144,963 | 73% | 21,971 | 11% | 31,642 | 16% | 198,576 |
| 2012 | 142,916 | 74% | 21,588 | 11% | 28,468 | 15% | 192,972 |

*Note: The "Other" category may include international athletes, athletes who identify as two or more races, Asian, Native American/Hawaiian, Alaskan and Pacific Islander, and unknown.*



- Of the 26 sports, only two — women's wrestling (45%) and women's fencing (43%) — have fewer white female athletes than female athletes from other racial and ethnic groups and countries of origin other than the United States.

- The five least racially diverse sports with large majorities of white female athletes were women's equestrian (88%), women's field hockey (83%), women's ice hockey (79%), women's lacrosse (84%), and women's rifle (84%).

- Asian female athletes comprise 25% of those competing in the sport of women's fencing, while the three sports where Hispanic/Latina athletes have greatest representation were women's wrestling (28%), women's water polo (13%), and women's softball (10%).

Further, college athletic access and participation opportunities for women are unevenly distributed along racial lines (Carter-Francique & Flowers, 2013; Flowers, 2015; Butler & Lopiano, 2003). One of the factors contributing to that distribution is racial clustering.

- Racial clustering is evident in the steering of racial minority women into specific sports, in particular basketball and track (Dees, 2008; Flowers, 2018). Consequently, African American women are highly populated in women's basketball and track and field and disproportionate in NCAA emerging sports.

- Yet, racial clustering in women's basketball and track and field have provided skewed rates of African American women in college and high school sports.

- Based on a recommendation made by the Gender Equity Task Force in 1994 the NCAA adopted the Emerging Sports program as a resource to increase women's participation opportunities in sports. Current NCAA emerging sports are tumbling, equestrian, rugby, triathlon, and women's wrestling (NCAA, 2022). These sports represent extremely low numbers of African American and racial minority women participants. Therefore, Title IX has not provided gender equity for all women in sports. Moreover, African American and racial minority women athletes face both racial and gender burdens while attempting to gain access to sports.

- McDowell & Carter-Francique (2016) reported "racial clustering and low representation of women of color in nontraditional sports at the college level is also correlated to limited opportunities for girls of color to participate in these sports at the youth and high school levels."

- However, McDowell & Carter-Francique (2016) also offer another catalyst to the increased numbers of African American women in basketball: cultural significance to the African American community. Specifically, the cultural connection of basketball and track and field to the African American community through family, schools, and community socialization may contribute to the majority representation of African American in interscholastic and intercollegiate basketball and track & field competition.



©iStock by Getty Images

- Shifrer et al. (2015) investigated the college-going benefits of high school sports participation from a race/gender perspective. They concluded that, "Across the last three decades, diverse students, with the exception of Black girls, have reaped the college-going benefits of high school sports participation." (p. 314). They associate this with decreased athletic opportunities at the high school level, social/economic/financial challenges, and cultural influences.

Further, cultural conversations surrounding African American women athletes must also include socioeconomic status. Women of color from lower socioeconomic backgrounds have limited access to emerging sports like lacrosse, equestrian, and triathlon, which may explain why these sports are overwhelmingly represented by white women (McDowell & Carter-Francique, 2016; Flowers, 2018).

- "At Legal Aid at Work, the Fair Play for Girls in Sports project focuses particularly on girls of color and girls who live in low-income communities to ensure equity among these underserved populations because girls of color encounter a variety of additional barriers to accessing fair play. Sixteen percent of K–12 public schools across the nation have over seventy-five percent students of color. This modern form of segregation produces a variety of resource inequalities, including in athletics. Forty percent of these heavily-minority schools have large gender inequality in their athletics; in comparison, only sixteen percent of heavily-white schools have these athletic inequalities" (Alexanian, 2020).

- Moreover, Pickett et al. (2012) conducted a study that expressly examined whether African American and white girls and women have equally benefited from Title IX. The authors reported "the effect of Title IX at the high school level may be to maintain the 'funneling' of Black female athletes into two main sports (e.g., basketball and track &



field), whereas white female athletes benefit the most from the addition of new sports and sports programs."

- This unequal benefit erects unintended barriers to access and participation in sports for African American women (McDowell & Carter–Francique, 2016; Flowers, 2018; Dees, 2008; Mathewson, 2012) Consequently, the notion of clustering has also led to the invisibility of African American women athletes in colleges.

- For example, Bruening (2005) reports the invisibility of African American women emerges as they are clustered with white women in data sets and research that seeks to examine women's experience in sports, hence obscuring the unique experience and challenges in college sports. On the other hand, African American women are overshadowed by their male counterparts when data seeks to highlight racialized experiences in college sports.

- Moreover, Mathewson (2012) cited, "A black woman who has been discriminated against has difficulty proving the requisite inequality. It may be difficult to prove that she was discriminated against on the basis of race, because blacks have not suffered as a group since black men do not share the injury."

One of the challenges in getting a more nuanced perspective on the racial dynamics at play as they intersect with gender in the college sport system is the collapsing of racial categories in the reporting of data. For example, NCAA data is often reported out with a category labeled "Female, Other." That category includes Native American/Alaska Native, Asian, Hawaiian/ Pacific Islander, individuals who identify with two or more races, international, as well as individuals for whom their race, ethnicity, and or country of origin is unknown. As a consequence, the percentages as reported might easily be misunderstood or cover over nuances that warrant further consideration.

## Title IX and Transgender Athletes

Title IX is poised to play an important role in securing the legal rights of transgender students to compete on athletic teams according to their gender identity. Though there has not yet been a case of judicial or regulatory enforcement where transgender students' rights to play sport were addressed as a matter of Title IX, emerging case law in other contexts suggests that the likely interpretation of the statute is that it supports inclusion and conflicts with the laws and policies in some states that prohibit transgender girls from competing in girls' sport.

In 2020, the Supreme Court held that sex discrimination provisions of federal employment discrimination law necessarily prohibit discrimination against a worker based on their transgender status. *Bostock v. Clayton County* (2020). Title IX, with similar statutory text prohibiting discrimination on the basis of sex, would almost certainly be construed to have the same application in admissions and other aspects of education that are most like employment. Though the contested employment discrimination in Bostock did not involve a sex-segregated context like athletics, there is good reason to predict that its

reasoning would apply in those situations as well. Specifically, Title IX litigation in analogous context of bathrooms and locker rooms has resulted in several judicial interpretations of Title IX confirming that a school's failure to affirm transgender student's gender identities, while doing so for cisgender students, is a form of sex discrimination prohibited by the statute (*Bostock v. Clayton*, 2020). For example, in *Grimm v. Gloucester County School Board*, the ACLU filed suit against the Gloucester County School Board for adopting a discriminatory bathroom policy that segregates transgender students from their peers. The school policy restricted transgender students from using communal restrooms aligning with their gender identities (*Grimm v. Gloucester*, 2021). The Fourth Circuit found that transgender students were entitled to protection from school bathroom policies that prohibit them from affirming their gender (*Grimm v. Gloucester*, 2021). Bathroom and locker rooms are similar to athletics for Title IX purposes, because these are the only aspects of education in which it is lawful to separate students on the basis of sex. The fact that courts have concluded as a matter of Title IX that girls who are transgender may not be excluded from facilities that lawfully exclude boys, suggests a similar result for athletics.

The current administration has signaled its intention to enforce Title IX in a way that maximizes protection for transgender rights, and, though it has not yet initiated any enforcement actions against schools that restrict the rights of transgender athletes, it has issued an interpretive rule endorsing in general terms the extension of the Supreme Court's holding in *Bostock v. Clayton* to Title IX (U.S. Department of Education, 2021b; Biden, 2021). This opens the door for Title IX enforcement against schools in states that prohibit or impose undue restrictions on transgender girls seeking to participate in girls' sport. A state that insisted its schools prohibit such participation would be consigning its schools to the loss of federal funding. This point is particularly salient in light of the wave of anti-transgender legislation that began in 2020, which has codified the exclusion of transgender girls and women from participating in sport that match their gender identity in several states.

Title IX's support for the rights of transgender girls to compete consistent with their gender identities in girls' sports does not conflict with the role the statute has played in securing athletic opportunities for women and girls. The law permits schools to provide separate girls' and women's sports because female students would otherwise have diminished opportunities — rationale that extends to transgender girls with equal strength. Transgender girls and women should be welcome to compete in sports consistent with their gender identities. Requirements for participation should be context- and age-appropriate and no more restrictive than necessary in light of the objectives of the sport in question. While hormone treatment or hormone level requirements may be appropriate in varsity college athletics, participation in contexts like youth sports, scholastic sports, and college club sports and intramurals should be less restrictive.

Transgender individuals are vulnerable to psychological harm because of societal norms that pressure them to deny and suppress their gender identities. Especially as transgender civil



rights as basic as access to medical care are up for debate in state legislatures, schools, families, and communities are in positions to mitigate the psychological pain and emotional harm that threaten transgender lives. The medical community agree that affirming the identity of a transgender person and allowing them to access sex-segregated activities and facilities that match their gender identity has a powerful positive impact. In contrast, policies and practices that reject transgender identities contribute to those risks. Welcoming a transgender girl into girls' sport can therefore be powerfully helpful, while rejecting her can be powerfully harmful.

While some transgender girls, including teens and adolescents, take gender-affirming hormones that make their body more typically female in appearance, many leading advocates in the sector do not support requiring these or other medical interventions as a condition for participation in youth and scholastic sport. For one reason, not everyone has access to supportive health care providers. For another, while hormone treatments are generally safe for most transgender people, they are not entirely free of health risks, including risks to one's fertility. The significant, resource-dependent, and highly personal decisions of if, when, and how to medically transition should be made by the transgender person in consultation with their medical providers and their family. It should not be a condition on the right of youth and teens to participate in sport. That right should be a given.

Some oppose the inclusion of transgender women with arguments that it is unsafe and unfair to let them play with and against cisgender girls. This assumption is problematic for several reasons. For one thing, the differences between male and female bodies are generalized differences. Cisgender boys may be bigger and stronger on average than cisgender girls, but some boys are small, and some girls are strong. There are plenty of examples of cisgender girls who compete in boys' sports successfully and safely. It is wrong to assume that just because a girl is transgender, that she is too good or too big to play with and against other girls. Moreover, when we tell cisgender girls that they are categorically disadvantaged relative to transgender girls, we unnecessarily reinforce sexist stereotypes that lead to girls' self-perception as athletically inferior, which in turn limits their athletic development.

Another problem with singling out transgender identity as the only source of competitive advantage worthy of imposing exclusions or restrictions is that it ignores lots of other factors that create diverse athletic abilities among girls. For example, girls whose parents have enrolled them in costly development programs from a young age have serious competitive advantages over those who don't have access to that opportunity. Yet we don't exclude or run separate programs for those athletes. Age is another example. Many scholastic sport programs permit and expect seniors and first-year students to compete with and against each other, despite differences in size and experience. We already tolerate significant diversity of physical characteristics and athletic ability within girls' sport even though such diversity distorts the idea of level playing field. Within this already diverse environment, it is not unreasonable to

make room for girls whose body types may be more masculine than the typical girl and who may have stronger athletic abilities than some girls.

When genuine concerns about safety do arise, they can be addressed through neutral policies that apply to all girls rather than singling out transgender girls. For example, some might think that it's dangerous to allow transgender girls to play a front row position in volleyball, because the tendency for those individuals assigned male at birth to be taller means that they will have the ability to spike the ball from a greater, more dangerous height. But not all transgender girls are tall, and some cisgender girls may be tall as well. Rather than banning or restricting all transgender girls for this reason, a neutral rule — like "no player over (X height) can play the front row" — addresses the risk of safety more completely, avoids excluding people unnecessarily, and avoids stigmatizing transgender girls by singling them out for different treatment.

Finally, it is important to remember the values professed by organizers of scholastic and youth sport. These programs have participation as a primary value and seek to develop way more than a participant's win-rate. Scholastic and youth sport support participants' educational, character development, health and fitness, and socio-emotional development as well as inclusivity. When these values predominate, concerns about a so-called level playing field should give way to the more important goal of helping and not harming transgender youth. If the argument against transgender inclusion is that it deprives cisgender girls of the opportunity to win, this argument is not only problematic for the reasons pointed out above, but also suggests that the sport organization in question needs to revisit their mission, values, and commitment to providing equitable access to youth sports. Another objection to transgender inclusion is the expressed concern that boys who are not transgender may pretend to be for some disingenuous purpose. However, more than 20 state athletic associations have or have had gender-identity based policies that only requires students to affirm their gender, some of them going back for almost 15 years, and the problem of disingenuous boys has not materialized. For one reason, schools are usually the entity responsible for affirming to the interscholastic athletic association that their athletes are participating in the right category. For another reason, policies can permit additional evidence to confirm that a student's sincerity may be introduced, such as a letter from a responsible person who knows them, such as a medical provider, counselor, or clergy. The permission of such evidence has proven effective at preventing or addressing the theoretical problem of disingenuous boys pretending to be girls.

Until recently transgender college athletes at NCAA member institutions had been competing for a decade under a policy issued in 2011. Transgender men who had received a medical exception for taking testosterone, were permitted to compete on men's teams or on women's teams, however, those women's teams would be reclassified as "mixed sex." Transgender women were prevented from competing on women's teams until after one year of testosterone suppression. The NCAA also provided for athletes who were not taking hormone treatment as part of



their transition, with transgender men athletes being afforded permission to compete on men's teams. Transgender women not taking hormone treatments were not permitted to participate on women's teams (NCAA Office of Inclusion, 2011).

In January of 2022, the NCAA Board of Governors approved a new policy to take effect immediately and follow a phased–in approach. Phase 1 would be implemented for the winter and spring of 2022 championships whereby, "Transgender student-athletes will need to document sport-specific testosterone levels beginning four weeks before their sport's championship selections. Phase 2 starts with the 2022–23 academic year, transgender student–athletes will need documented levels at the beginning of their season and a second, six months after the first. They will also need documented testosterone levels four weeks before championship selections. Full implementation (Phase 3) would begin with the 2023–24 academic year" (NCAA Media Center, 2022). Acceptable levels of testosterone will be determined on a sport–by–sport basis as defined by national sport governing bodies (NGB). In the absence of an NGB policy, athletes will be held to standards by international sport governing bodies. It will be important for women's sports advocates to monitor the implementation of this policy to ensure that incorporating NGB's policies does not result in the categorical or unreasonable exclusion of transgender women from NCAA sports.

While this section has so far focused on the rights of transgender women and girls to compete in sports that are designated as women's or girls' sports, it is also important to acknowledge that some transgender students do not identify as male or female. While these athletes retain the right to compete in the sports that match their sex assigned at birth, schools can improve opportunities for nonbinary athletes by increasing athletic opportunities that aren't restricted or divided by sex at all. This would give nonbinary students options for participating in sports free of the dissonance that would otherwise result from competing in the category that does not reflect who they really are inside. Having some options for gender-free sports would also give more diverse options to other boys and girls who might sometimes want to play together than always apart. Having an open category does not replace the need for trans athletes to be included consistent with their gender identities when binary categories exist.

### Title IX and Female Athletes with Disabilities

*A note about terminology: During the past 20 years, the term parasport has emerged as the term to capture the sport opportunities and experiences for people with disabilities and generally covers broad disability groups: deaf people, people with physical disabilities, and people with intellectual disabilities. In the literature, athletes with disabilities may be referred to as parasport athletes. In this section, terms are used as they appeared in reports or in the research.*

According to the National Center for Education Statistics, there are nearly 7 million students with disabilities attending the nation's public schools (Schaeffer, 2020). Students with

disabilities may comprise as much as 14% of total enrollment within public schools. Of that group, approximately 33% or 2.3 million are girls (Schaeffer, 2020).

- According to Brittain (2009), 90% of females with disabilities are not active in sport.

- In a report from the U.S. Government Accountability Office in 2010, boys with disabilities consistently participate in sport at higher rates than girls with disabilities.

- Boys in grades 1 through 7 participated on a school or community-based sports teams at a rate of 45% compared to 31% of girls with disabilities (U.S. Government Accountability Office, 2010).

- Among athletes with disabilities participating on school or community-based sports teams offered for grades 7 through 12, 37% were boys and 23% were girls (U.S. Government Accountability Office, 2010).

- According to the NFHS, of the 15,571 high school students who participated in adaptive sport activities during the 2018–19 academic year, 44% were female students (6,960) (NFHS, 2019).

In an appeal to sport leaders to consider their professional role in fostering participation for people with disabilities to participate in sport, Grimes and French (1987) point out that girls and women with disabilities encounter barriers as a result of discrimination because of their sex as well as their disability. Those barriers include:

- Lack of access to proper equipment, facilities, and trained practitioners, and facing ongoing challenges regarding funding and accommodations in comparison with men with disabilities (Clark & Mesch, 2018).

- Issues surrounding attitudes, communication, language, culture, (sporting) environment, religion, and social beliefs (Clark & Mesch, 2018; Fuller, 2018; Smith & Wrynn, 2014).



©iStock by Getty Images



- "A comparative and concerning dearth of college-level competitive adaptive sports venues (with some notable exceptions, such as the recent efforts by the City University of New York (CUNY) to build a collegiate wheelchair basketball team) (McGinnis et al., 2020).

- "In 2015, the Eastern Collegiate Athletics Conference (ECAC) became the first NCAA-sanctioned conference to adopt a comprehensive inclusive sport strategy providing championship opportunities for student-athletes with disabilities in swimming, rowing, and track & field, as an outgrowth of the 2013 NCAA Think Tank on Student-Athletes with Disabilities. Despite early enthusiasm, the championships have not been continued and there are no concrete signs of future support for systematic inclusion of student-athletes with disabilities from the NCAA" (McGinnis et al., 2020).

- In October of 2021, the USOPC and the NCAA announced the creation of a joint Para-College Inclusion Project, "which would include promoting adaptive sports and strengthening links between school leaders, adaptive programmes and leaders in American Para sport" (Burke, 2021).

Three federal laws have had an impact on schools providing disabled students with access to a free and appropriate education, unencumbered by discrimination. Those laws include 2004 Individuals with Disabilities Education Act (IDEA), the Rehabilitation Act of 1973 (Section 504), and the Americans with Disabilities Act of 1990 (ADA). By themselves and in combination with local and state laws, schools receiving federal funding are obligated to provide female athletes with disabilities equal opportunity to participate in sport, to make opportunities to participate in sport through accommodations that are reasonable; and to ensure that athletes are not discriminated against because of their disability.[7]

In 2010, researchers with the U.S. Government Accountability Office found that the U.S. Department of Education had "provided little information or guidance on PE or extracurricular athletics for students with disabilities" (p. 2, para. 3). Interviews with school officials and representatives from disability groups revealed that there was a need for greater clarification regarding the responsibilities schools have to provide athletes with disabilities reasonable access to sports teams. Guidance issued the following year by the Department of Education focused on accessibility in its various forms (access to facilities and equipment, access to transportation to participate), equipment (investment in modifying existing equipment or purchasing equipment appropriate for a particular individual or population, functionality of equipment), and personnel preparation (ensuring that staff are qualified and knowledgeable about athletes with disabilities). In 2013, a Dear Colleague letter was issued by the Office for Civil Rights emphasizing that:

A school district that offers extracurricular athletics must do so in such manner as is necessary to afford qualified students with disabilities an equal opportunity for participation. This means making reasonable modifications and providing those aids and services that are necessary to ensure an equal opportunity to participate, unless the school district can show that doing so would be a fundamental alteration to its program (Galanter, 2013a, para. 14).

While Christophel (2020) cites Title IX as a model to use in arguing for the need for the creation of separate sport championships and leagues for athletes with disabilities, there is also a strong argument that more attention should be paid to the accumulated effects of multiple forms of discrimination that might occur against a female parasport athlete should she also be a racial minority. As was the case in 2011 when the U.S. Department of Education determined that more research was needed to better understand the lived experiences of female athletes with disabilities, there is still a vacuum in terms of solid information on participation patterns, the need for better frameworks to foster greater participation at the high school level, and the need for greater commitment from sport governing bodies to address the needs of an underserved population.

## Title IX and Economically Disadvantaged Students and Students from Urban and Rural Communities

School sports hold value as they provide the foundation for many youths to begin their journey in sports. The first introduction to sports for many girls is through their educational school system. Physical education classes not only provide a source of exercise but also teach sports fundamentals and rules, which inspire youths to socialize in a team setting, gain healthy lifestyles, and build long-term relationships with sports.

- For some, extracurricular activities like sports clinics and youth summer camps are their first introduction to sports. These resources become a fundamental component in introducing girls to sports, through growing their interests in new sports and inspiring career aspirations in coaching and athletic training (Giroir, 2019).

- A family's ability to financially support their children's growth in sports directly impacts which sports they participate in, how frequently they participate, and how long they stay active in sports. A study found, 33% of African American parents stated that their daughter never participated in sports or had to stop due to lack of financial support (Staurowsky et al., 2015).

- A survey conducted by Aspen Institute's Project Play initiative found that "Youth ages 6-18 from low-income homes quit sports because of financial costs at six times the rate of kids from high-income homes" (Aspen Institute, 2020, para. 3).

---

7    Receipt of federal funding is only the "trigger" applicable to the Rehabilitation Act. IDEA applies to all public education systems, and ADA applies to all places of public accommodation and all state agencies – so ADA applies to private schools as well as public schools.



Youth from high-income homes have greater access to build their overall sport experience when compared to children from low-income homes. Youths from lower-income homes are not afforded this luxury, instead their access to sports and quality coaching is based on what is provided by their educational school systems or local communities. This experience may also shape which sports girls participate in and when they start sports. Mindfulness about this reality also argues for greater efforts to ensure Title IX compliance and enforcement in all schools. If the place where female athletes have the greatest likelihood of participating and competing are denying them those opportunities because the school systems are engaging in sex discrimination, where else will these female athletes from low-income families go?

- Girls from high-income homes also have the accessibility to start sports early. A study found that children from high-income homes typically begin sports around the age of 7, which is almost a year earlier than children from middle- and low-income homes (Aspen Institute, 2020).

- Financial support also impacts the quality of experience a youth has in sports. A study found high-income youths spend more time in practice or training than did low-income and middle-income youths. Additionally, it was noted low-income youths spend more time on pickup games and free play (Aspen Institute, 2020).

- The expenses of sports participation also fuel which sports youth can participate in and the number of sports opportunities they can pursue. The Aspen Institute (2020) found that "high-income households reported spending on average $1,099 annually for one child, compared to $719 for middle-income homes and $476 for low-income homes." These data show that there is correlation between sports selection and financial stability. The study further reported, "High-income parents paid twice as much on registration fees, travel and lodging, lessons and instructions, and camps as low-income parents."



Research over many years confirms that the access girls and women have to sport opportunity is directly connected to their environment. Community recreational resources and neighborhood population size affect how often girls and women participate in physical activity and sports. Whether a school offers athletic opportunities to females in compliance with Title IX requirements is another contributing factor. If the opportunity is not there, participation does not happen.

- Both urban and rural communities have unique qualities that shape experiences in sports. However, both are impacted by socioeconomic factors like low enrollment in schools, diversity, and lack of resources due to athletic budget cuts (Evans, 2020).

- According to Evans (2020), "Rural schools in districts facing socioeconomic disadvantage were also the least likely to integrate policies and practices that may strengthen sports programs."

- Additionally, both rural and urban communities are challenged by transportation and providing adequate facilities for events and practices (Evans, 2020).

Sports participation has been linked to positive benefits for youth, including postsecondary education attainment. In rural areas, girls are often at a deficit for access to sport for a variety of reasons such as proximity to school or athletic facilities, limited access to quality coaching, quantity of sporting opportunities, and the cost of participation. Rural areas have higher instances of child poverty (67%) than urban areas (47%) (Schaeffer et al., 2016). With consideration of suburban communities, sports participation is often higher among youth with greater access to resources, staff, and district-wide sport groups (Bell et al., 2018). Location also matters for girls in rural areas, as "youth sport participation plays an important role in the daily physical activity of children in rural communities" and family income has a significant influence (Kellstedt et al., 2021).

Girls are often drawn to sports to have fun and enjoy the team environment (Kane & LaVoi, 2007). Decreased opportunities and access to sport take away the opportunity for them to participate in sports and place them at a disadvantage in developing strong social skills that may support experiences that are related to college-going behaviors (Shifrer et al., 2015). Thus, income, location, and equitable access to sports are interrelated opportunities that, if remedied, can increase the post-secondary opportunities afforded to girls from low-income, rural, and urban areas (Pusch, 2014).



# Part X. Title IX and Other Areas of Review

## Title IX and Pregnant/Parenting Athletes

In the months preceding the 35th anniversary of Title IX in 2007, an ESPN *Outside the Lines* episode aired that featured the pressures female college athletes faced when they became pregnant. At the time, it was an arresting episode for many who simply had not thought about how pregnant female athletes were treated in the sport system, largely because pregnant female athletes were, for the most part, invisible. Stereotypes about pregnant women needing rest and protection often forced women out of participating in their sport (Hogshead-Makar & Sorensen, 2008). Negative social stigmas around young, unwed pregnant women cast a shadow over the lives of an untold number of female athletes, some of whom made decisions to get abortions. Subject to threats of expulsion from teams and loss of athletic scholarships, female athletes were unaware that Title IX offered protections against the sex discrimination that lie at the core of those pressures (Brake, 2008).

Shortly after that episode was broadcast, the Assistant Secretary in the Office of Civil Rights, Stephanie Monroe, issued a reminder to schools that Title IX's of their obligations to allow female athletes who may be pregnant, experiencing a false pregnancy, or going through or having just gone through childbirth or a termination of pregnancy and recovering from that, to continue playing and competing in their sports. Pregnancy or childbirth is considered under Title IX to be a temporary disability and a female athlete is to be accommodated accordingly.

In 2009, the NCAA released its Pregnant and Parenting Student-Athletes: Resources and Model Policies Handbook. In the same year, the NCAA adopted new bylaws to ensure that student-athletes would not lose their athletic scholarships if they became pregnant and that their competitive eligibility would be extended to accommodate them. While the NCAA did issue the model policy, schools are not compelled to have such a policy and no negative consequence follow if a school does not have one (Sorensen et al., 2009).

In a recent unpublished study (Guenther et al., under review) of a group of NCAA female athletes (n=126) surveyed about their Title IX knowledge in terms of pregnancy protections:

- Just under 61% held a belief that they had some legal protection for their athletic aid, eligibility, and participation if they were to experience an unplanned pregnancy.

- Significantly fewer (9.7%) of those who were aware of Title IX protection were also aware that the NCAA had rules that protected them if they experienced pregnancy.



©iStock by Getty Images

- Almost all (94%) did not receive information regarding their pregnancy rights from any sources.

- Less than 3% reported receiving information about pregnancy rights from their athletic department.

- The majority (69%) reported being unaware of any pregnancy rights prior to participating in this study.

- Almost all participants (97.6%) believed that the university athletic department should provide more information about pregnancy and pregnancy rights.

## Title IX and Esports

Regardless of whether esport (i.e., electronic sport) is recognized as a sport under Title IX, its rapid growth at the high school and college levels and the clear push to promote the activity on three fronts — as curricular and enrollment initiatives, potential varsity sport opportunities, and as student activities — warrants attention and consideration. "Colleges are awarding scholarships, granting degrees, fielding traveling esports teams, organizing gaming clubs, and building state-of-the-art esports arenas at the centers of campuses equipped with gear and gaming chairs" (Stoever, 2021, p. 861-862). The esport space has historically been a white male-dominated one that has raised profound concerns about mistreatment of girls and women as well as racial and sexual minorities. According to Stoever (2021), the online atmosphere adopted during the COVID-19 pandemic



in response to the necessity to socially distance added momentum to an already growing esport trend. Along with that came "corresponding technology-enabled abuse, sexual cyberviolence, and harassment — more relevant and prevalent than ever before" (Stoever, 2021, p. 859). Fox and Tang (2017) found, in a study of multiplayer online gamers, that more than 70% of the women players participated as male characters to avoid attacks on their competence and being sexually harassed.

While women and girls have experienced tremendous participation increases throughout traditional sport environments following the implementation of Title IX policy, non-traditional collegiate sport, such as esport are severely behind in achieving equitable access, opportunity, and participation for women and girls. Esports have been previously defined as competitive video gaming and/or a form of sports in which the primary aspects of the sport are facilitated by electronic systems such as personal computers (PC) or consoles (e.g., Xbox, PlayStation) (Hamari & Sjöblom, 2017).

- Overall, esports are a rapidly growing space, with estimates of $3 billion in revenue during 2022, combined with hundreds of millions of participants worldwide (Darvin, 2021a).

- As a result, colleges and universities across the United States have taken notice of this trend and there has been a tremendous increase in varsity collegiate esport programs over the previous five years (Darvin, 2021a).

- Varsity collegiate esports are a relatively young space, with the first program being founded in 2014 by Robert Morris University. Since that initial program began, over 175 institutions have added varsity collegiate esport programs.

While opportunities to compete at the varsity collegiate level of esports have skyrocketed, women are largely absent from participation. Men's dominance throughout the development and administration of esports organizations, events, and teams indicates that women are largely excluded from these environments (Darvin et al., 2020).

- At the collegiate level, although there are over 200 collegiate esports teams governed by the National Association of Collegiate Esports (NACE), only 4% of these programs are led by a woman coach (Darvin, 2021a).

- Similarly, and based on two 2021 reports, the proportion of women collegiate esports participants falls between 8–10% of the total roster (Darvin, 2021a; Seiner, 2021). As a result, roughly 90% of all esport scholarship dollars are going to men esport participants within these institutions.

## Table 14: 2019–20 Men and Women Participants and Coaches for all NACE-Sponsored Esport Programs

| Men | | Women | |
|---|---|---|---|
| Collegiate Players | Collegiate Coaches | Collegiate Players | Collegiate Coaches |
| N = 2658 (91.8%) | N = 180 (96%) | N = 233 (8.2%) | N = 8 (4%) |

- The average player roster for NACE sponsored esport teams is 30 players, but esport programs have a tremendous range in roster numbers compared to traditional sports and maintain anywhere from four to over 80 players (Darvin, 2021a; Seiner, 2021).

- Importantly, roughly a quarter of those players typically receive scholarships, with the average esport player payout landing at around $1,910 (Seiner, 2021). Esports rosters often fluctuate in size more frequently than traditional sport based on an overall lack of standardization as well as differences in the game genre(s) and game title(s) those schools compete in.

It is evident based on the incredibly low proportions of women collegiate esport players and coaches that women and girls face tremendous barriers and obstacles in their efforts to sustain and compete in esports (Darvin et al., 2021; Darvin et al., 2020; Ruvalcaba et al., 2018). These varying barriers and obstacles have been previously characterized as a "glass monitor" given that women and girls can see the opportunities to be involved within esports but lack the necessary support and opportunities that are regularly afforded to their men and boy counterparts (Darvin et al., 2021).

- As a result, there are lower rates of women involved within the major esports titles such as Overwatch (26% girls/women), Hearthstone (26% girls/women), Counter-Strike: Global Offensive (CS:GO: 24% girls/women), Rainbow 6: Siege (23% girls/women), and DOTA 2 (20% girls/women) (Darvin et al., 2021).

The importance of creating equitable access and opportunity for women to compete at the collegiate esport level through Title IX policy enforcement and regulation is evidenced in the participant breakdowns by age, which indicate steady growth of interest in esports for women.

- Specifically, 57% of women between the ages of 18–29 have self-identified that they play video games and/or participate in gaming (Hilbert, 2019). Similar to traditional sport in pre-Title IX eras when many stereotypically assumed women and girls were simply less interested in competitive sport, esport faces a similar crossroads (Darvin, 2021a; Paaßen et al., 2017).



- Rather than stereotypically assuming women and girls are less interested in competitive esport opportunities, it is critical to consider the obstacles and barriers women and girls face when entering and/or sustaining within esport spaces (Darvin et al, 2021; Ruvalcaba et al., 2018).

Given that most, if not all, of these institutions that sponsor esport programs receive some form of direct federal funding, these programs must adhere to Title IX policy (Darvin, 2021a; Supra, 2019; U.S. Department of Education, 1979). To that end, there are likely two distinct avenues by which Title IX regulation and oversight may occur.

- First, should the esports team at an institution be housed within the athletics department, then it is likely that the 1979 policy interpretation standards must be adhered to. This would mean then that participation opportunities and scholarship dollars would need to be administered equitably to both men and women. One of the threshold issues in this scenario is a determination if esports satisfies the requirements to be recognized as a sport under Title IX (Walton et al., 2020).

- Second, should the esports team at an institution be housed outside of the athletics department, Title IX policy will still be enforced to ensure women are provided with equitable access and opportunity to participate free from discrimination and/or hostility (Seiner, 2021).

One of the distinctions between the collegiate and high school sectors in terms of esports is the NCAA has thus far stayed away from recognizing esports as a varsity activity under its umbrella. In contrast, the NFHS has been actively working to position esports as a recognized varsity sport at the high school level, having entered into an agreement with PlayVS, an online gaming provider (NFHS News, 2018). Although esports have been promoted by the NFHS as a varsity sport, the NFHS does not as yet list it among the sports or activities that it tracks in terms of participation data.

Title IX regulations would undoubtedly work to ensure girls and women not only have equitable opportunities in collegiate and interscholastic esports but also to dismantle the prevailing discrimination and hostility women and girls face throughout the environment. However, in order for that to occur, Title IX needs to be deployed by school administrators to assess the reasons for the pronounced gender imbalance in programs and among those who run them; to consider the implications of the types of games large groups of students are being encouraged to play and the potential impact that has on school culture and the learning environment; and develop strategies for how to educate campus constituencies about what a Title IX compliant esport program needs to have.



©iStock by Getty Images



# Moving Forward into the Next 50 Years of Title IX

There is little question that Title IX has had a lasting impact on nation's schools and the opportunities available to pursue educational opportunity free of the limitations of gender stereotyping and gender discrimination. It is also clear that there is work to be done to create a sustainable system of Title IX compliance that withstands the tides of any political moment and ensures that each student entering a federally funded secondary and post-secondary institution with a dream in their heart will be empowered and uplifted in their pursuit.

In the specific area of athletics, the numbers tell a compelling story of opportunity. A society that once justified limiting sporting opportunities for girls and women on the basis of now disproven notions of female inferiority and physical delicacy has witnessed a transformation of the U.S. sport system to one where women as victors dominate on the world stage and demonstrate on a daily basis in their local communities what strong, talented, and forceful women can do.

For all of the positive impact that Title IX has had on girls and women in sport, the 50th anniversary is a time to celebrate the successes but to be clear that there remains much work to be done. As this report documents, the progress that has been made is often tenuous; falls short of what the law requires; has limits in terms of achieving equity for girls and women from non-white racial groups, sexual minorities, those with disability, and those from lower economic groups; and has yet to be consistently enforced around the country. Our findings show that many of the same conversations about female athletes being viewed as second-class citizens that were circulating during Title IX's 10th, 20th, 30th, and 40th anniversaries persist today. An overarching question that shaped this report is what needs to happen in order for us to move beyond these issues to realize more fully the bright shining future of a gender equitable sport system offered by the nation's schools that contributes to the intended values espoused in our U.S. democracy.

At the 50th anniversary, we are also left looking at different numbers, such as dollars spent on athletic scholarships and recruiting, coaching salaries, and the value of television contracts, that show educational institutions at every level fall short in their investment in the future of female athletes. Researchers who have explored the intersection between race, ability, gender identity, and gender reveal that, even among women, people with disabilities, and individuals who are transgender and nonbinary, equal access is not experienced the same way and that there are large groups of people who have limited to no access to sport. To ensure that we are not still talking about the same things (missed opportunities, pay equity issues, lack of media coverage for women's sports, inequitable



©iStock by Getty Images

representation of women and members of minority groups throughout athletic departments in leadership roles, etc.) in the decades ahead, we propose the following recommendations based on the research done here. It should be noted that the new research conducted for this report affirms work done for the Women's Sports Foundation's report entitled *Chasing Equity: The Triumphs, Challenges, and Opportunities in Sports for Girls and Women* (Staurowsky et al., 2020). As a consequence, some of the recommendations listed here are drawn from that report.



# Policy and Practice Recommendations

There are many steps that federal, state, and local policymakers; education administrators; sport governing bodies; coaches; and others can take to improve the conditions and opportunities for girls and women in sport and physical activities. Given what we know about the positive impacts of sports on the lives of girls and women and the protections guaranteed by Title IX, greater awareness, education, compliance, and transparency are needed to ensure equity for all.

While structures of governance and uninterrogated practices can impede progress and foster exclusions, particularly for girls and women of color, those from low-income backgrounds, LGBTQ-identified athletes, and girls and women athletes with disabilities, there is much that can be done to accelerate the pace of change. More targeted research can also provide greater transparency to support public policy implementation, women athletes, the conditions of equality and participation, and impacts and consequences of the status quo.

The following list of recommendations – including stepping up enforcement of Title IX, increasing data transparency, providing specific policy guidance to enable the inclusion of transgender and nonbinary athletes, and addressing resource inequities with greater focus on those experienced by women of color, LGBTQ athletes, and athletes with disabilities – will help ensure that the next fifty years of policy implementation will fulfill the full promise of Title IX. Some of these concur with recommendations advanced in the Women's Sports Foundation's *Chasing Equity: The Triumphs, Challenges, and Opportunities in Sports for Girls and Women* (Staurowsky et al., 2020), and from other researchers and groups where noted.

## Recommendations for Public Policy Makers

### Federal Policymakers:

- Federal-level institutions are key venues for promoting and enforcing equal practices through public policy. All efforts to implement Title IX fully and aggressively must be pursued by the U.S. Department of Education, the U.S. Congress, and the U.S. President.

  In order to achieve these outcomes, policymakers must work to ensure better education about reporting, transparency, monitoring, and enforcement of Title IX among those charged with implementing policy. Recommendations include:

  - Congressional policymakers should continue to provide full funding for the Office for Civil Rights (OCR) in the U.S. Department of Education. Adequate funding will enable the Office to strengthen and

expand its efforts to enforce Title IX and shorten the investigation and resolution timeline for all reviews.

- The OCR should move toward initiating proactive compliance reviews at a larger swath of educational institutions and provide technical assistance and guidance on emerging questions about Title IX enforcement. Federal policymakers could pursue this by passing the Patsy T. Mink and Louise M. Slaughter Gender Equity in Education Act of 2021 (H.R. 4097 & S.2186). This bill would recognize the need to provide more resources, training, and technical assistance to schools to ensure compliance with Title IX and prevent and reduce sex discrimination in all areas of education.

- The U.S. Department of Education should develop a federal reporting system that requires schools to publicly disclose a) which part of Title IX's three-part test for athletic participation they are using to comply; and, if appropriate, collect b) information regarding their history and continuing practice of program expansion and/or c) the methods used to fully and effectively meet the needs and interests of qualified female athletes.

- The U.S. Congress and the U.S. Department of Education should adjust the Equity in Athletics Disclosure Act (EADA) and its regulations so that the annual data it requests on its form fully encompass the practices of athletic departments in order to comprehensively assess gender equity practices, including the reporting of information about an institution's athletics-related capital as well as operating expenses.

- The U.S. Department of Education should establish an external audit system to promote public confidence in and full accuracy of EADA reports.

- The U.S. Department of Education should require critical institutional representatives (e.g., Title IX compliance offers, Directors of Athletics, etc.) to participate in annual Title IX training to ensure that those charged with implementing it within their institutions are fully knowledgeable of policy requirements and their role(s) in implementation.

- The Office for Civil Rights should create a one-stop website for school personnel, families, and students to understand and apply Title IX athletics standards in an easy-to-digest manner (adapted from Fair Play for Girls in Sport, Legal Aid at Work (K. Turner, 2021)).



- U.S. Congress should pass legislation extending similar EADA intercollegiate disclosure requirements to primary and secondary school districts where schools sponsor interscholastic athletic programs, in order to promote transparency and enforcement of Title IX at the elementary and secondary level of education. This should include disclosure of information regarding participation, expenditures, and budgets to help make public full information about the status of Title IX implementation and the equitable treatment of girls in sport.

- Policymakers should end the Title IX "contact sports exemption" that denies girls and women the opportunity to try out for some teams otherwise designated for boys and men. Specifically, this would mean that policymakers issue federal guidance allowing open tryouts for teams designated for boys or men irrespective of whether a similar team designated for girls or women is offered by the same school, college, or university.

- Policymakers should provide guidance and support for schools and universities in their efforts to create additional athletic opportunities for girls and women to participate in mixed-sex teams and develop research-informed policies and practices to ensure positive participation environments to support all student-athletes as they learn to play and compete together.

- Policymakers should provide guidance and support to schools that wish to offer additional athletic opportunities that aren't restricted or divided by gender at all (i.e., "gender-free teams"). Such teams could allow nonbinary students (and others) to participate in sports free of the dissonance that would otherwise result from competing in the category that does not comport with their gender identity. Exploring options for "gender-free" sports options could give more diverse participation opportunities to all athletes who might prefer integrated rather than segregated teams.

- The U.S. Department of Education should issue specific policy guidelines confirming that Title IX should be interpreted to provide opportunities to transgender and nonbinary students to participate in sports in a manner consistent with their gender identities and in accordance with the U.S. Supreme Court's ruling in *Bostock v. Clayton County*. In addition, policies should not supplant the right of any athlete to participate on teams that correspond to their sex assigned at birth if they so choose. For a nonbinary athlete, there might not be opportunities that correspond to or affirm their gender identities, since most sport teams are designated as either "boys'/men's'" or "girls'/women's." Nonbinary athletes should always, at a minimum, retain the right to join the team in accordance with their sex assigned at birth.

- The U.S. Department of Education should review and evaluate sunsetting "prong two," the continued history and practice of program expansion component of the



©iStock by Getty Images

three-prong test for Title IX compliance. Schools should now simply be offering proportional athletic opportunities under prong one or showing they gender-equitably meet all students' athletic interests under prong three. Fair Play for Girls in Sport (K. Turner, 2021) advocates for a similar stance.

- The U.S. Department of Education should review, update, and re-issue the 1990 athletics Investigator's Manual to ensure that it comports with current practices and circumstances of intercollegiate sport (adapted from Fair Play for Girls in Sport (K. Turner, 2021)).

- The U.S. Congress should pass the Equality Act to clarify, as a matter of federal law, that discrimination on the basis of gender identity and/or sexual orientation is prohibited in educational institutions and other key areas of American life.

- The U.S. Congress should pass the Safe Schools Improvement Act, which would require school districts to adopt anti-bullying and harassment policies that address many forms of gendered bullying, including on the basis of gender identity or sexual orientation.

- Because girls and women of color are less likely to receive the full benefits of policy implementation and access to sports, two policy changes could help address resulting issues. First, the U.S. Department of Education should modify its Civil Rights Data Collection (CRDC) to also collect race-specific data on sports participation. Collecting athletic participation data not just by gender, but also by gender broken down by race/ethnicity, is consistent with other key parts of the CRDC. The National Women's Law Center (NWLC) and the Poverty & Race Research Action Center (PRRAC) (2015) have long lobbied for this approach. Second, the U.S. Congress should pass the High School Data Transparency Act, which would require schools to



publicly report information on the status of female and male athletes and students, broken down by race and ethnicity, as well as expenditures on each sponsored sports team.

- This report also identifies the critical importance of institutional oversight at multiple levels. Thus, we recommend improved monitoring of athletic equity practices at the federal level to ensure that all school districts, universities, and colleges that receive federal funding designate an employee to serve as Title IX coordinator. They should make the Title IX coordinator's identity and contact information easy to find by students, personnel, and members of the public. The Office for Civil Rights should continue to enforce the law's Title IX coordinator requirement through investigations, resolutions, and, where necessary, adjudication.

- Federal policymakers should reexamine Title IX regulations to assess their applicability to club sports, intramurals, and recreation programs.

- Federal policymakers should conduct oversight of the equity practices of tax-exempt non-profits engaged in organizing competitive athletics (e.g., the NCAA, NAIA, high school athletic associations) given recent findings of the role such groups can play in the perpetuating of inequalities (in, for example, the 2021 NCAA Men's and Women's Basketball Tournaments).

- Policymakers should recognize the growing interest in and availability of esports at the high school and collegiate levels. Regardless of whether esport is recognized as a sport under Title IX, its emergence indicates the need to develop guidelines to ensure that school administrators are aware of their obligations under Title IX to provide equal access to participation opportunities and treatment. Further, steps should be taken to ensure that Title IX obligations do not cease simply because the form of sport involves a glass monitor and virtual playing field.

## State Policymakers:

- Athletic opportunities remain unequal for girls and women at all levels of education. At a minimum, states should monitor practices in their school districts to ensure that they are providing equal athletics opportunities to girls and boys in ways that are consistent with their obligations under Title IX.

- This report acknowledges the importance of working towards high-school-level public disclosure reports in every state to provide better data about current practices and expenditures in interscholastic athletics relative to the allocation of opportunities and resources.

- In the absence of a federal high school data reporting mandate (which we advocate for above), state legislatures (and/or state high school associations) should pass legislation that requires the public disclosure of equity practices in primary and secondary schools on the basis of

sex, broken down by race and ethnicity. These data should be made available to the public, both as manageable datasets that enable cross-school comparisons and via online "data cutting tools" such as those hosted by the U.S. Department of Education to make available the EADA reports.

- Given the unique vulnerabilities of youth athletes to potential sexual abuse, state-level policymakers should advance laws and policies that protect minor children from sexual abuse while participating in athletics. Existing guidance developed by SafeSport (U.S. Center for SafeSport, 2020) on Minor Athlete Abuse Prevention should influence their policy development.

- State policymakers should be proactive in implementing inclusive policies for transgender and nonbinary athletes by passing state-level gender identity and sexual orientation non-discrimination policies (where they do not already exist). Such policies should be generally applicable and also specify non-discrimination to ensure athletic access. These efforts can foster welcoming environments for all athletes and work to diminish barriers to participation.

- State policymakers should pay particular attention to the participation barriers confronting girls and women of color in racially segregated schools by analyzing participation rates and working with individual schools to add additional opportunities or teams as needed. We concur with the NWLC and the PRRAC (2015) in their recommendations to simultaneously advance gender and racial equity in sport.

- States should assess the accessibility of public parks and recreation centers, as access to these facilities can be key determinants of healthy lifestyles and safe physical activity.

## Local and Community Policymakers:

- Local governments can take many actions to ensure equitable access to public space, both for recreational use and for use by local/municipal sports leagues. Local governments should use funds from the federal Community Development Block Grant program to improve recreational facilities, parks, and play equipment, particularly for racially segregated and/or isolated, low-income communities. The NWLC and PRRAC (2015) offer a number of important recommendations. They include reviewing zoning laws to address infrastructure improvements and investing in areas and structures that facilitate physical activity. These local investments can be key vehicles to ensuring that young girls have access to sport and physical activity at a young age.

- Coaches and parents of athletes in local arenas should be supported in receiving access to information about the requirements of Title IX and the efforts of local and community sports organizations to ensure gender equitable policies. This programming could be run by municipal sports leagues and made available by the U.S. Department of Education.



- Local and municipal policies should support coaches and athletic staff in receiving affirmative training on how to navigate existing policy in their school district around transgender sports participation, as well as on how to ensure a transgender-affirming sports environment.

## Recommendations for Education Administrators and Sport Governing Bodies:

### For education administrators at all levels:

- Athletic and education administrators are key stakeholders in leadership towards equitable opportunities in sports on the basis of gender, race, and physical ability. They operate as critically important actors in the on-the-ground implementation of Title IX of the Education Amendments of 1972, Title VII and Title VI of the Civil Rights Act of 1964, and Section 504 of the Rehabilitation Act of 1973. Thus, they should be educated and supported in their evaluative and implementation roles to support athletic opportunities without discrimination.

- Athletic and education administrators should be supported in their efforts to develop opportunities for girls to participate in mixed-sex teams and work on policies to ensure positive participation environments to support all student-athletes as they learn to play and compete together.

- Administrators should routinely evaluate and balance fair treatment across the athletic program. They should evaluate practices across their athletic programs to ensure equity in equipment and supplies, facilities, scheduling, transportation, coaching, and more to examine whether women's/girls' teams are treated equally and so that they can then make continual adjustments where any imbalance exists. Keeping simple spreadsheets of issues



such as the uniform replacement schedule and facility scheduling ensures a "big picture" overview of what women/girls and men/boys get can help spur adjustments as needed (K. Turner, 2021).

- As required by federal law, each educational institution that receives federal funding must name a Title IX Coordinator. Information about the Coordinator's identity and contact information must be made accessible and easy to find by students, personnel, and members of the public.

- Administrators should ensure that Title IX coordinators are trained annually in Title IX requirements and implementation strategies. They should work with state education agencies and state athletic associations should ensure that training is available and financially accessible to school district personnel serving in Title IX coordinator roles.

- While the best practice for most institutions may be to structure the Title IX coordinator's position external to athletics (given needed oversight over other issues of sex non-discrimination), the Title IX coordinator should work closely with athletic department staff to ensure that gender equity issues in athletics are not overlooked by institutions simultaneously working to address other challenging Title IX issues, such as sexual misconduct or harassment. It may be helpful for a Title IX coordinator to designate deputy coordinators or other Title IX liaisons within the athletic department to facilitate necessary trainings and to ensure effective communication and reporting.

- Institution-wide committees that monitor and support the institution's Title IX compliance should ensure that gender equity in athletics is included on the committee's agenda or else designate a specific athletics-related subcommittee to address that issue. This would be supported by the passage of the Patsy T. Mink and Louise M. Slaughter Gender Equity in Education Act (originally introduced in 2021 as H.R. 4097 & S.2186). This bill would recognize the need to provide more resources, training, and technical assistance to schools to ensure compliance with Title IX – specifically coordinators – and prevent and reduce sex discrimination in all areas of education.

- Education on Title IX and its requirements is critical among coaches and athletes. As evidenced in the findings from this study, there is little consistency in approaches to Title IX compliance in athletic departments on the education of athletes and coaches. The lack of Title IX education among coaches, college athletes, and administrators in NCAA athletic departments has a disabling effect on the Title IX enforcement mechanism at the local level. As Staurowsky & Weight (2011, 2013) point out, the absence of knowing what the law does and does not require, and the limited capacity to review public disclosures about resource allocations in the athletic departments they compete and work for, results in athletes, coaches, and athletic department personnel who are unprepared to participate in a system of accountability that is inclusive.



- Empowering athletic administrators, coaches, and students to voice thoughts or concerns over equitable practices in athletics departments can ensure full policy implementation, which administrators must support through leadership. Additionally, administrators should ensure, in both policy and practice, that student whistleblowers are protected from reprisal when they report in good faith actual or perceived violations of the law, in keeping with Title IX's prohibition on retaliation.

- Because women remain under-represented across the sport industry in leadership positions, there must be continued attention to the sports workplace. Issues of recruitment and retention are critical for increasing women's leadership in coaching, administration, and executive positions, as is attention to issues of pay equity and equal treatment at work. Proactively addressing these issues is central to creating and maintaining an inclusive culture in which women and girls can fully participate in athletics.

- All administrators should support the annual use of LGBTQ and gender equity "respect and inclusion trainings." These are important spaces for sharing accurate information about Title IX and gender equity, and to proactively address bias against women and queer people in sport. We join Athlete Ally (2021) in recommending that these trainings:

  - Be held at least once a school year.

  - Be mandatory for all coaches, players, and staff.

  - Review all institutionalized LGBTQ harassment policies and team Codes of Conduct.

  - Cover allyship best practices. Athletic departments also should maintain up-to-date LGBTQ inclusion resources that are readily available to coaches, players, and staff throughout the year, in between annual trainings.

- All levels of administration should have clear and visible reporting systems for athletes, coaches, or staff to report incidences of sexist, misogynistic, racist, homophobic, or transphobic harassment or conduct within their team or work environment. These policies should allow for anonymous reporting and should be backed up with clear timelines for administrative response and action. They also should outline a non-exhaustive list of potential disciplinary outcomes and should be published in athlete handbooks that are distributed during orientation.

- Administrators should ensure that all facilities, including bathrooms, changing facilities, locker rooms, showers, and competition venues, enable all athletes facility access in ways that make them feel most comfortable and safe. Coaches and staff also should be permitted access to facilities that are consistent with their gender identities. All facilities policies should be clearly listed in the administrative handbook.

- Finally, in alignment with analysis from Fair Play for Girls in Sport (2021), schools that overcome the myths and misunderstandings about Title IX are able to afford and promote genuine equity. Employing an effective Title IX Coordinator and giving school staff regular, dynamic training helps (versus mere legal or policy documents that school staff may struggle to understand and follow). As Fair Play notes, common myths (to address and debunk) include: "there is a Title IX carve-out for football when no such exception exists; booster club donations need not be overseen and balanced between girls' and boys' teams; whether charter schools are equally subject to Title IX; whether Title IX applies to elementary, middle, and high school athletics (not just a college provision); that girls playing at all is enough; whether non-school programs are subject to Title IX; that prong two is a viable defense. Understanding Title IX is key." (Fair Play for Girls in Sport, 2021)

- Instilling a culture of equity from the top to the bottom of the organization can build awareness and instill lasting, equitable practices.

### Additional specific recommendations for Higher Education Administrators:

- Colleges and universities should seek to hire many and diverse women and nonbinary people into administrative positions within collegiate athletics. In addition to serving as role models, increasing the number of women in athletic administration can provide a critical mass of support for equity initiatives in the persistently male-dominated field of sport. It also can ensure that more women coaches are hired to coach both women's and men's teams. Furthermore, hiring women as administrators can propel important trickle-down effects, as the research shows that women athletic administrators are more likely to hire women coaches.

- Higher ed administrators should evaluate hiring practices at the collegiate level to ensure equitable opportunities for women. They should recruit gender-diverse pools of applicants for open positions developed by administrators and search committee members who are themselves diverse and knowledgeable in recognizing the subtleties of discrimination and are committed to overcoming it. They should standardize human resources policies and procedures to ensure neutral outcomes with regard to gender, race/ethnicity, disability, and LGBTQ status, as well as educate hiring committee members on inclusive practices and overcoming implicit bias.

- Administrators also should work to reduce gender bias and discrimination in the workplace with deliberate strategies to address each. They must evaluate role definitions and position descriptions to identify gender markers and identifiers, expand role definitions and position descriptions to eliminate gender bias, evaluate promotion practices to identify attributes more commonly aligned





©iStock by Getty Images

with one gender, and create hiring committees with diverse representation.

- Hiring practices also must evolve. Higher ed administrators should identify "targets of opportunity," such as intentionally seeking to hire a woman when a man retires. They should replace women coaches who leave with a woman coach when possible. They should publicize positive metrics and changes (such as achieving an A grade on an external "gender report card" or hiring a woman coach or administrator). They should review and audit practices, such as bonus structure and salary negotiation processes, to eliminate gender-biased recruitment and retention strategies and should implement tracking mechanisms and monitor progress on a regular basis. Ensuring accountability with incentives and consequences tied to funding for missed metrics is critical. Those administrators charged with hiring in collegiate athletics always should ensure that women or nonbinary candidates are a part of the finalist pool for coaching and athletic administration jobs.

- Administrators should proactively value and seek opportunities to hire women and nonbinary people to coach sports teams designated for men. The research shows that women's leadership can be a powerful antidote to bias against women in sport and society.

- Administrators should partner with programs across the institution/campus to diversify student enrollment and to actively recruit diverse graduates into internship and entry-level positions. They should factor diversity into all strategic decisions, including fundraising, marketing, management, and administration.

- Administrators must identify barriers to and opportunities for career advancement for women in sport. Creating mentoring programs are key to success. They should build in opportunities for women to learn from seasoned professionals and grow through mastering new challenges, identify male allies who have the power to help women advance and change the status quo, and financially support professional development opportunities for women will all support these aims. Administrators should also identify policies impacting parents and those who have caretaker responsibilities and generate new ideas to create a workplace supportive of families and employee well-being. They must eliminate practices of reliance on networks that limit inclusion of women and diverse colleagues and create career plans with employees to achieve metrics for consistent growth and advancement opportunities.



## National Collegiate Athletic Governing Bodies Administrators (e.g., NCAA, NAIA):

- Consistent with the findings from the external audit of NCAA equity practices conducted in 2021 by the law firm Kaplan Hecker & Fink (2021a, 2021b), we recommend follow-through on the recommendations to guide practice at collegiate governing bodies and to require that such groups provide structural support for gender equity.

- In order to motivate institutional compliance, the NCAA and other athletic associations should monitor Title IX compliance as a condition for membership, reviving its past practice of self-study and peer review.

- When governing bodies or associations are charged with hosting athletic competitions, they should develop equity plans for funding structures, staffing, marketing, promotion, sponsorships, and the athlete experience. All practices should be disclosed in an annual report. Equitable participation opportunities must be available for men and women across all NCAA Divisional Championships.

- In order to motivate institutional compliance, the NCAA and other athletic associations should monitor Title IX compliance as a condition for membership, reviving its past practice of self-study and peer review. Similarly, state athletic associations and/or state education agencies should provide compliance oversight as well.

- Governing bodies should conduct Title IX athletic education seminars at association events (e.g., annual meetings) and should make recordings of such seminars available online.

- Governing bodies/sports organizations should be required to have a Title IX or gender equity assessment by a relevant third party every three to five years (e.g., by federal, state, or local policymakers).

- All collegiate governing bodies should adopt policies that refrain from hosting championship events in states where anti-LGBTQ laws have been passed by the state legislature or by executive order. This is particularly pressing as a result of state legislative activity in recent years. The current status of LGBTQ laws can be found on the Movement Advancement Project website: https://www.lgbtmap.org/.

- The NCAA should expand its commitment to implementing policies that address and prevent sexual assault and harassment. Policies should incentivize athletic administrators to empower Title IX coordinators in their efforts to propose and adopt preventative measures among their athlete communities and on their campuses. They should empower coaches and teammates to center the wishes of survivors in any individual, team, or campus response.

## Primary and Secondary Education Administrators:

- Primary and Secondary Education Administrators should encourage their athletic directors to have written policies that address nondiscrimination and inclusion on the basis of gender identity, gender expression, and sexual orientation if their state does not have clear guidance under state law. Such non-discrimination protections benefit all athletes by fostering inclusive space.

- School administrators should make every attempt to ensure that students receive 150 minutes of physical activity each week through physical education classes. Research demonstrates that such opportunity increases children's desire to play sports, which impacts long-term sports participation (Illinois Enhance Physical Education Task Force, 2013).

- Schools that receive federal funding for student nutrition should fulfill their obligations to create school wellness programs and policies that should establish goals for the sports participation of enrolled girls. Providing good nutrition and access to physical activity can operate as powerful bulwarks against the attrition of girls from sports as they mature.

- Primary and Secondary Education Administrators should familiarize themselves with all Safe Sport guidelines designed to prevent sexual abuse in athletics, particularly abuse of minors.

## High School Athletic Association and School Administrative Policymakers:

- In order to motivate institutional compliance, the state athletic associations and/or state education agencies should monitor Title IX compliance as a condition of membership.

- State athletic governing bodies should be encouraged to monitor and continuously evaluate state-by-state sport trends around gender equity and the intersections of race and disability.

- We join GLSEN in recommending that state athletic associations should develop guidance for local education agencies and schools that affirms and supports the right of trans and nonbinary students to participate in interscholastic and intramural sports (GLSEN, 2021). Specifically, the following policies should guide the incorporation of trans and nonbinary athletes in high school association policy:

  - Students should have the right to participate in athletics in a manner consistent with their gender identity, even if that identity differs from the sex listed on their registration records or birth certificate.

  - Athletic associations and schools should work in partnership with the trans or nonbinary identified students to ensure that athletic participation and facility access (e.g., locker rooms) are safe and affirming.



- Policies for access to locker rooms, showers, and restroom facilities should ensure that trans and nonbinary athletes are allowed to use the facility where they feel most safe.

- Athletic association policies should specifically allow trans and nonbinary athletes to use a name or pronouns of their choice, even if inconsistent with identity documents.

- Leagues should explicitly ban and condemn homophobic, transphobic, and/or anti-LGBTQ conduct by coaches, athletes, fans and staff involved in athletic activity. Leagues and school administrators should explicitly outline potential consequences of violations of these policies and address clear mechanisms for lodging reports.

## Recommendations for Coaches:

### On creating inclusive teams:

- Consistent with Center for American Progress and Athlete Ally, we note that, given the rising number of youth identifying as transgender, nonbinary, or genderfluid, "efforts must be made by all stakeholders, including coaches, athletic directors, administrators, and state organizations, to ensure that sports environments and policies remain welcoming and affirming for youth who don't identify with a male or female gender. Nonbinary youth must also be able to meaningfully participate in sex-segregated athletic programs" (S.K. Goldberg, 2021, p. 25).

- Education of coaches at all levels of athletics is key to pursuing these aims (Athlete Ally, 2021).

- Coaches are key to creating supportive environments for LGBTQ+ athletes and should complete inclusion training. Athlete Ally's Champions of Inclusion is a free, comprehensive online curriculum that supports athletes, coaches, and administrators in understanding the issues and practices that can guide inclusive teams: http://allylearn.wpengine.com/

### On prevention of abuse of athletes:

- Background checks, qualifications, and education should be prioritized in hiring decisions of coaches.

- Implementing mandatory education and training of all coaches regarding emotional and physical abuse and appropriate motivation techniques can reduce the possibilities for abusive environments. Administrators should enforce a zero-tolerance policy for coaches emotionally and/or physically abusing athletes. They should include specific language in coaching contracts that prohibits abusive behaviors and that states any type of abuse is grounds for termination with cause. Recent high-profile events such as the revelations of Larry Nassar's sexual abuse of hundreds of girls and women

reveal that reports of abuse from female athletes are more apt to go under-investigated, so administrators must be particularly attentive to proactively addressing gender bias in investigations.

- Coaches should familiarize themselves with the 2022 SafeSport Minor Athlete Abuse Policies (U.S. Center for SafeSport, 2020) that are designed to provide guidance on mitigating possible conditions that can foster the possibility of sexual abuse.

### On supporting participation and retention:

- Coaches should be encouraged to help educate parents on the benefits of supporting their daughters' participation in physical activity and sport. Encouraging participation in sport at an early age helps girls enjoy full advantage of developmental factors associated with sport participation. Coaches can stress the importance of continued sport participation during the ages of and surrounding puberty and can educate parents and caregivers about how they can support their daughters' ongoing sport participation.

- Coaches should emphasize team building and inclusion when creating and strengthening girls' sport experiences while simultaneously focusing on skills building, communication, leadership, and other benefits of sport.

## Recommendations for Students, Athletes, Parents, Coaches, and Others

### National Level

- Title IX is a federal policy, so advocacy at the national levels is vital. You can advocate to ensure better education, reporting, transparency, monitoring, and enforcement of Title IX. Find the contact information for your U.S. Representative and U.S. Senators. Write them letters or emails; call their congressional offices. Advocate for:

  - Continued full funding of the Office for Civil Rights of the U.S. Department of Education, the division charged with oversight on policy violations, in the annual federal budget.

  - Support for the Patsy T. Mink and Louise M. Slaughter Gender Equity in Education Act (when introduced in 2021, the bill was H.R. 4097 & S.2186). This bill recognizes the need to provide more resources, training and technical assistance to schools to ensure compliance with Title IX and prevent and reduce sex discrimination in all areas of education.

  - Ask that any legislation governing NCAA athletes' names, images, and likenesses (or other athlete compensation) explicitly addresses gender equity and Title IX compliance.



## State Level

- State legislatures can play a role in how Title IX is implemented in your state, and what equity looks like in your school district. Recently, lawmakers in many states have also worked to disenfranchise transgender athletes at the state level. Efforts to address these issues are best directed to state-level policymakers. You can find the contact information for your state legislative representative and write to or call their legislative office. Advocate for:

  - State-level oversight of gender equity practices at school districts in your state.  Your state-level Department of Education can be encouraged to investigate equity practices, and in many states there are state laws that reinforce sex non-discrimination protections for students and athletes. Advocate that policy- and lawmakers in your state fully implement and enforce state laws and ordinances.

  - Policies that fully enfranchise transgender and nonbinary athletes in school-sponsored athletics. If you live in a state where lawmakers are attempting to pass trans-exclusionary policies, advocate that lawmakers vote such bills down. Write them letters or emails; call their office. Participate in demonstrations or protests that show support for transgender youth in your state.

- Many state-level high school policies are also created by the high school athletic association. You can find their contact information online. Write them an email or a letter and advocate for:

  - Oversight of Title IX and gender equity metrics among member schools. You can seek information about reports on their annual equity practices.

  - In many states, trans-inclusive policies are set by associations at the high school level. Advocate for inclusive policies that allow transgender athletes to fully participate.

## Local Level

- Many choices about what gender equity looks like are made by administrators in your local elementary, middle, or high school, or your municipal youth sports leagues. Write them an email, a letter, or place a phone call to your local school administrators. Advocate for:

  - Ensuring equitable treatment of all students in interscholastic athletics. A call to local administrators can go a long way to ensure that they understand that community members care about how decisions are made in athletic programs.



©iStock by Getty Images



**Women's Sports Foundation**
WomensSportsFoundation.org

50 Years of Title IX:
We're Not Done Yet

- Developing public documents about how the school is addressing gender equity in sports, as well as the full inclusion of LGBTQ+ athletes, BIPOC athletes, and athletes with disabilities.

### Recommendations for Researchers:

This report outlines many possible avenues for future research on public policy, women athletes, the conditions of equality and participation, and impacts/consequences of the status quo, including:

### On Title IX policy:

- Targeted research to explore in greater detail the intersections between Title IX of the Education Amendments of 1972, Title VII and Title VI of the Civil Rights Act of 1964, and Section 504 of the Rehabilitation Act of 1973 to promote equality of treatment and access for historically marginalized groups, including racial and ethnic minorities, LGBTQ+ people, and people with disabilities.

- Targeted research to evaluate existing metrics for assessing equal access and treatment under Title IX. Such research could inform potential changes in the EADA or could promote the adoption of a federal law to promote public disclosure regarding participation opportunities and resource allocations in high schools.

- Targeted research efforts to better understand gender equity practices required under Title IX, including, but not limited to, expenditures on facilities for female athletes, allocation of resources in academic support, and issues faced by those working in sports medicine and athletic training.

- Targeted research to better understand Title IX compliance in college and university intramural and club sport programs.

- Targeted research on Title IX athletics compliance in secondary schools.

- Targeted research to explore how best to educate coaches, administrators, and athletes on the requirements of Title IX.

- Targeted research that explores the impacts of sex-segregated athletic competition on athlete health and well-being, attitudes toward gender equality, attitudes toward transgender inclusion, and other topics.

- Targeted research on K-12 girls' issues, both the challenges around equity and advances, with a focus on BIPOC girls and girls in low-income communities.

### On inclusion in sport:

- Targeted research designed to develop models for the inclusion of athletes with disabilities in school-based varsity programs with attendant investments in facilities, equipment, coaching, administrative staff, athletic scholarships, and the other areas of resource allocation.

- Targeted research exploring the experiences of cisgender girls and women who play, train, and compete with trans girls and women and nonbinary athletes. Little is known about the positive impacts of team-based participation among trans and cis athletes.

- Targeted research to examine the marginalization of BIPOC women in athletic administration and coaching positions. Beyond participation as athletes, little research has been conducted on athletic career positions of BIPOC women.

### On the economics of gender equality:

- Targeted research on the resources allocated in the marketing and promotion of girls' and women's sports, including expenditures on marketing and athletic communications personnel, marketing and athletic communication personnel workloads and credentials, investment in promotional campaigns, television and streaming coverage, digital resources, advertising, educational efforts directed toward athlete branding, and other efforts that promote awareness about girls'/women's programs and girl/women athletes.

- Targeted research focusing on examining revenue generation efforts for women's sports programs at the high school and college levels. Such research would encompass examination of the structure of television contracts, sponsorship deals, merchandising opportunities, and media coverage. This also would cover an examination of how marketing units within athletic departments have expanded since the Title IX regulations were adopted and how resources are expended in video production units; data analytics; marketing and sponsorships; ticket policies, including pricing and promotions; and oversight of athletic fundraising foundations and booster clubs.

- Targeted research efforts to track the support services provided to female and male athletes by athletic departments to assist them in growing their brands as more athletes secure name, image, and likeness deals. With the emergence of group licensing opportunities, athletic department agreements with third parties, and opportunities for athletes to work in partnership with athletic departments in sharing use of institutional images, new areas of assessing gender equity are emerging.



# References

Adler, D., & Simon, A. (2022, January 10). *These women broke barriers in baseball*. MLB.com. https://www.mlb.com/news/women-break-barriers-in-baseball-history

Adler, M. (2018, August 16). *Why Renee Powell Hall at the University of St. Andrews matters*. https://www.golfdigest.com/story/why-renee-powell-hall-at-the-university-of-st-andrews-matters

Alexanian, T. (2020, June 23). *Title IX and AB 2404: Equity for girls and women in sport in 2020*. Legalaidatwork.com. https://legalaidatwork.org/blog/title-ix-and-ab-2404-equity-for-women-and-girls-in-sports-in-2020/

Ali, R. (2010, April 20). *Guidance on accommodating students' athletic interests and abilities: Standards for part three of the "three-part test"*. U.S. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/offices/list/ocr/letters/colleague-20100420.pdf

American Bar Association (2020). *Profile of the legal profession*. https://www.americanbar.org/content/dam/aba/administrative/news/2020/07/potlp2020.pdf

Americans With Disabilities Act of 1990, Pub. L. No. 101-336, 104 Stat. 328 (1990).

Amis, G. (2021, March 19). *Viral Tik Tok highlights differences between men's and women's NCAA tournament weight rooms*. KREM.com. https://www.krem.com/article/sports/ncaa/ncaab/march-madness/viral-tiktok-of-march-madness-weight-rooms/293-f8dbd43c-b496-42c6-a5db-3b95ded1e410

Anzidei, M. (2021). *More people than ever watch women's sports, but investment and media coverage still lag*. NorthJersey.com. https://www.northjersey.com/story/sports/2021/06/24/tv-viewership-increase-womens-sports-hurdles-remain-wnba-nwsl-espn/5306975001/

Ariail, C. (2021, October 5). *Does it matter that the women's NCAA tournament is now 'March Madness'?* Swish Appeal. http://www.swishappeal.com/ncaa/2021/10/5/22708600/ncaaw-womens-college-basketball-tournament-march-madness-final-four-gender-equity-report-uconn-aari

Aspen Institute (2020, January 14). *Survey: Low-income kids are 6 times more likely to quit sports due to costs*. https://www.aspenprojectplay.org/national-youth-sport-survey/low-income-kids-are-6-times-more-likely-to-quit-sports-due-to-costs

Associated Press. (1975, June 27). H.E.W. head says Title IX won't bankrupt schools. *New York Times*. https://www.nytimes.com/1975/06/27/archives/hew-head-says-title-ix-wont-bankrupt-schools-title-ix-explained-by.html

Associated Press. (2018, April 10). Venus, Serena Williams join Billie Jean King equal pay push. *USA Today*. https://www.usatoday.com/story/sports/tennis/2018/04/10/venus-serena-williams-join-billie-jean-king-equal-pay-push/33696109/

Associated Press. (2021a, August 3). Tamyra Mensah-Stock wins gold in wrestling at Tokyo Olympics. *The Denver Post*.

Associated Press. (2021b, December 25). Foreign college athletes left out of rush for NIL windfall. *Star Advertiser*. https://www.staradvertiser.com/2021/12/25/sports/sports-breaking/foreign-college-athletes-left-out-of-rush-for-nil-windfall/

Associated Press. (2022). *Male athletes lead way in NIL money, according to third-party data*. ESPN.com. https://www.espn.com/college-sports/story/_/id/33160929/male-athletes-lead-way-nil-money-per-data

Association of American Medical Colleges. (2019). 2019 fall enrollment, matriculant, and enrollment data tables. https://www.aamc.org/system/files/2019-12/2019%20AAMC%20Fall%20Applicant%2C%20Matriculant%2C%20and%20Enrollment%20Data%20Tables_0.pdf

Athlete Ally. (2021). *Ally guide for coaches*. https://coachingcorps.org/wp-content/uploads/2021/06/Ally-Guide-for-Coaches-Coaching-Corps.pdf

ATIXA. (2020). *About ATIXA and Title IX*. https://atixa.org/about/#WAN

Ayala, E. (2021, September 9). *Hiring women coaches takes intentionality. Just ask the NFL*. Onherturf.com. https://onherturf.nbcsports.com/2021/09/09/2021-nfl-season-record-12-women-coaches/

Bailey Glasser. (2021). *Title IX victories. Case studies*. https://www.baileyglasser.com/casestudy-casestudy-title-ix-victories

Barr, C., Sutton, W., & McDermott, E. (1999). Marketing implications of Title IX for collegiate athletic departments. *Sport Marketing Quarterly, 8*(3), 9-14.

Barroso, A., & Brown, A. (2021, May 25). *Gender pay gap in U.S. held steady in 2020*. Pew Research Center. https://www.pewresearch.org/fact-tank/2021/05/25/gender-pay-gap-facts/

Baseball For All (2021). *Making baseball a game for all*. https://baseballforall.com/baseball-for-all-story/

Battle, S. & Wheeler, T.E. (2017, February 22). *Dear colleague letter: Notice of language assistance*. U.S. Department of Education & U.S. Department of Justice. https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-title-ix.pdf



Bauer, A. (2001). If you build it, they will come: Establishing Title IX compliance in interscholastic sports as a foundation for achieving gender equity. *William & Mary Journal of Women & Law, 7*, 983–1009. https://scholarship.law.wm.edu/wmjowl/vol7/iss3/6

Baumann, K., & Cranney, S. (2020). *School enrollment in the United States: 2018*. U.S. Department of Commerce, U.S. Census Bureau. https://www.census.gov/content/dam/Census/library/publications/2020/demo/p20-584.pdf

Bayh, B. (1972, February 28). Reading of Amendment 874 to the Higher Education Act. *Congressional Record*, 5803–5815.

Bell, B. (2022, January 13). *La'Quanza Glover believed to be the first HBCU female athlete with an NIL deal*. Business of College Sports. https://businessofcollegesports.com/name-image-likeness/laquanza-glover-believed-to-be-the-first-hbcu-female-with-an-nil-deal/

Bell, D. R., Post, E. G., Trigsted, S. M., Schaefer, D. A., McGuine, T. A., Watson, A. M., & Brooks, M. A. (2018). Sport specialization characteristics between rural and suburban high school athletes. *Orthopaedic Journal of Sports Medicine, 6*(1), 2325967117751386. https://doi.org/10.1177/2325967117751386

Biden, J. (2021, March 9). *Executive order on guaranteeing an educational environment free from discrimination on the basis of sex, including sexual orientation or gender identity*. The White House. https://www.whitehouse.gov/briefing-room/presidential-actions/2021/03/08/executive-order-on-guaranteeing-an-educational-environment-free-from-discrimination-on-the-basis-of-sex-including-sexual-orientation-or-gender-identity/

Billie Jean King Leadership Initiative (2021). *Let's ignite a conversation about leadership and giving*. https://bjkli.org/

Bleiweis, R., Frye, J., & Khattar, R. (2021, November 17). *Women of color and the wage gap*. Center for American Progress. https://www.americanprogress.org/article/women-of-color-and-the-wage-gap/

Blumenthal, K. (2005). *Let me play: The law that changed the future of girls in America*. Atheneum.

Bodo, P. (2018, September 6). *Follow the money: How the pay gap in Grand Slam tennis finally closed*. ESPN.com. https://www.espn.com/tennis/story/_/id/24599816/us-open-follow-money-how-pay-gap-grand-slam-tennis-closed

Bolling, L. (2016, March 7). *Top 10 HBCU athletic departments generating revenue*. HBCUbuzz.com. https://hbcubuzz.com/2016/03/top-10-hbcu-athletic-departments-generating-revenue/

Bonnette, V. & Von Euler, M. (2004). *Title IX and college athletics: How it all works—in plain English*. Good Sports Inc.

Bonnette, V., & Daniel, L. (1990). *Title IX athletics investigator's manual*. U.S. Department of Education. Office for Civil Rights. https://files.eric.ed.gov/fulltext/ED400763.pdf

*Bostock v. Clayton County*, 590 U.S. 140, 140 S. Ct. 1731 (2020).

Boucher, C., Silva-Breen, H., & LaVoi, N. M. (2021, July). *Head coaches of women's collegiate teams: A comprehensive report on NCAA Division-I institutions, 2020-21*. The Tucker Center for Research on Girls & Women in Sport.

Brake, D. (2008). The invisible pregnant athlete and the promise of Title IX. *Harvard Journal of Law & Gender, 31*, 323. https://scholarship.law.pitt.edu/fac_articles/7/

Brake, D. (2010). *Getting in the game: Title IX and the women's sports revolution*. NYU Press

Brassil, G., & Draper, K. (2021, February 3). These women were NFL first: They're eager for company. *The New York Times*. https://www.nytimes.com/2021/02/03/sports/football/nfl-women-coaches.html

Brennan, C. (2021, July 7). *Women's College World Series tops College World Series in viewership*. Just Women's Sports. https://justwomenssports.com/womens-college-world-series-tops-college-world-series-in-viewership/

Brittain, I. (2009). *The Paralympic games explained* (1st ed.). Routledge.

Bruening, J.E. (2005). Gender and racial analysis of sport: Are all the women White and all the Blacks men? *Quest, 57*(3), 330–349. https://doi.org/10.1080/00336297.2005.10491861

Brunner, J., & Turner, K. (2017). *Northern California school district agrees to settle gender equity claims* [Press release]. Legal Aid at Work. https://legalaidatwork.org/releases/northern-california-school-district-agrees-settle-gender-equity-claims/

Bryant, A., & Joshi, C. (2021, November 10). *College sport NIL is headed for a collision with Title IX*. Sportico.com. https://www.sportico.com/law/analysis/2021/college-sports-nil-title-ix-1234645328/

Burke, P. (2021, October 15). *USOPC Think Tank calls for further collaboration between USOPC and NCAA to strengthen collegiate sport after COVID-19 pandemic*. Inside the Games. https://www.insidethegames.biz/articles/1114229/usopc-college-sport-think-tank-ncaa

Burtka, A. T. (2019, October 11). *Girls play sports less than boys, miss out on crucial benefits*. Global Sport Matters. https://globalsportmatters.com/youth/2019/10/11/girls-play-sports-less-than-boys-miss-out-on-crucial-benefits/

Butler, J., & Lopiano, D. (2003). *Title IX and race in intercollegiate sport*. Women's Sports Foundation. https://www.womenssportsfoundation.org/wp-content/uploads/2016/08/title_ix_and_race_full.pdf

Buysse, J. M. & Wolter, S. M. (2019, August). *A 26-year longitudinal analysis of intercollegiate Division I media guides in a changing sports media landscape, 1989-2017*. The Tucker Center for Research on Girls & Women in Sport. https://www.cehd.umn.edu/tuckercenter/library/docs/research/Media-Guide-Longitudinal-Report.pdf



Buzuvis, E. (2020). Title IX: Separate but equal for girls and women in sport. In D. L. Brake, M. Chamallas, & V. L. Williams (Eds.), *The Oxford handbook of feminism and law in the United States*. Forthcoming. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3734582

California Code, Education Code ch. 3, EDC § 33353. https://leginfo.legislature.ca.gov/faces/codes_displayText.html?lawCode=EDC&division=2.&title=2.&part=20.&chapter=3.&article=3

Cantu, N. (1996). *Dear colleague letter: Clarification of intercollegiate athletics policy guidance: Three-part test*. U.S. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/offices/list/ocr/docs/clarific.html#two

Carpenter, L. J., & Acosta, V. (2005). *Title IX*. Human Kinetics Publishers.

Carter-Francique, A.R., & Richardson, M. (2015). Black female athlete experiences at historically Black colleges and universities. In B. Hawkins, J. Cooper, A. Carter-Francique, & J.K. Cavil (Eds.), *The athletic experience at historically Black colleges and universities: Past, present, and persistence* (pp. 61–84). Rowan & Littlefield.

Carter-Francique, A.R. & Flowers, C.L. (2013). Intersections of race, ethnicity, and gender in sport. In E. Roper (Ed.) Rotterdam, *Gender relations in sport*. Sense Publishers.

Chen, S. (2021). *Female athletes who cashed in on NIL deals*. Just Women's Sport. https://justwomenssports.com/female-athletes-who-have-cashed-in-on-nil-deals/

Christophel, J. E., (2020). Leveling the playing field: Disability, Title IX, and high school sports. *Washington University Journal of Law & Policy, 62*. https://openscholarship.wustl.edu/law_journal_law_policy/vol62/iss1/17

Christovich, A. (2021a, October 8). *High schoolers already profiting*. Front Office Sports. https://frontofficesports.com/newsletter/fos-college-rise-of-high-school-nil/

Christovich, A. (2021b, December 22). *NCAA women's volleyball draws record ratings*. Front Office Sports. https://frontofficesports.com/ncaa-womens-volleyball-championship-draws-record-ratings/

Clark, G. (2021, May 6). *National billboard campaign for Notre Dame football unveiled*. FightingIrishwire.com. https://fightingirishwire.usatoday.com/2021/05/06/national-billboard-campaign-for-notre-dame-football-unveiled/

Clark, B., & Mesch, J. (2018). A global perspective on disparity of gender and disability for deaf female athletes. *Sport in Society, 21*(1), 64–75. https://doi.org/10.1080/17430437.2016.1225808

College Sports Information Directors Association. (2020). *College athletics communications survey: 2020 compensation and career survey*. https://cosida.com/documents/2020/5/28//SalarySurveyGraphic_2020_part4_v3.pdf?id=3002

College Sports Information Directors Association. (2022, February 7). *CoSIDA introduces diversity & inclusion fellowship program in partnership with the Knight Commission on Intercollegiate Athletics*. https://cosida.com/documents/2020/5/28/SalarySurveyGraphic_2020_part4_v3.pdf?id=3002

Cook, D. (2016, August 25). Four Black women now permeate the LPGA Tour. *The African American Golfer's Digest*. https://africanamericangolfersdigest.com/four-black-women-now-permeate-the-lpga-tour/

Cook, D. (2015, October 28). Renee Powell, First Women recipient of PGA Golf Professional of the Year Award. *The African American Golfer's Digest*. https://africanamericangolfersdigest.com/renee-powell-first-woman-recipient-of-pga-golf-professional-of-the-year-award

Cooky, C., Council, L. D., Mears, M. A., Messner, M. A. (2021) One and done: The long eclipse of women's televised sports, 1989–2019. *Communication & Sport, 9*(3), 347–371. doi:10.1177/21674795211003524

Cooper, J. N., & Newton, A. (2021). Black female college athletes' sense of belonging at a historically Black college and university (HBCU). *The Journal of Negro Education, 90*(1), 71–83.

Cooper, J. N., Cavil, J. K., & Cheeks, G. (2014). The state of intercollegiate athletics at historically Black colleges and universities (HBCUs): Past, present, & persistence. *Journal of Issues in Intercollegiate Athletics, 7*, 307–332.

Cooper, J. N., Davis, T. J., & Porter, C. J. (2017). Success Through community cultural wealth: Reflections from Black female college athletes at a historically Black college/university (HBCU) and a historically white institution (HWI). *Journal of Intercollegiate Sport, 10*, 129.

Corbett, D., & Johnson, W. (2000). The African American female in collegiate sport: Sexism and racism. In Brooks, D., & Althouse, R. (Eds.), *Racism in college athletics: The African American athlete's experience* (pp. 199–225). Fitness Information Technology.

Corbett, D. (2001). Minority women of color: Unpacking racial ideology. In G. Cohen (Ed.), *Women in sport issues and controversies* (pp. 291–310). National Association for Girls and Women in Sport.

Crenshaw, K. (1989). Demarginalizing the intersection of race and sex: A Black feminist critique of antidiscrimination doctrine, feminist theory, and antiracist politics. *University of Chicago Legal Forum, 140*, 139–167.

Crenshaw, K. (2002). Mapping the margins: Intersectionality, identity politics, and violence against women of color. *Stanford Law Review, 43*, 1241–1299. doi:10.2307/1229039

Dahl, G. (2012). *Secondary athletic administrators' perceptions of Title IX policy changes*. (Publication No. 1344) [Doctoral dissertation, University of North Dakota]. https://commons.und.edu/theses/1344



Darvin, L., Vooris, R., & Mahoney, T. (2020). The playing experiences of esport participants: an analysis of treatment discrimination and hostility in esport environments. *Journal of Athlete Development and Experience, 2*(1), 36–50.

Darvin, L., Holden, J., Wells, J., & Baker, T. (2021). Breaking the glass monitor: examining the underrepresentation of women in esports environments. *Sport Management Review, 24*(3), 475–499, 1–25.

Darvin, L. (2021a, March 12). *At colleges nationwide, esports teams dominated by men.* The Conversation. https://theconversation.com/at-colleges-nationwide-esports-teams-dominated-by-men-154793

Darvin, L. (2021b, September 29). *New NCAA endorsement rules could benefit women more than men.* The Conversation. https://theconversation.com/new-ncaa-endorsement-rules-could-benefit-women-more-than-men-166003

Davis, A.R. (2021, May 24). *Chutes and Ladders: Black Women ADs' Long Journey to the Top.* Global Sport Matters. https://globalsportmatters.com/culture/2021/05/24/nina-king-duke-tradition-black-women-ads-journey/

Dean, N. A., Bundon, A., Howe, P. D., & Abele, N. (2021). Gender parity, false starts, and promising practices in the Paralympic movement, *Sociology of Sport Journal* (published online ahead of print 2021). https://journals.humankinetics.com/view/journals/ssj/aop/article-10.1123-ssj.2021-0030/article-10.1123-ssj.2021-0030.xml

Dees, J. A. (2004). Do the right thing: A search for an equitable application of Title IX in historically Black colleges and university athletics. *Capital University Law Review, 33*(1), 219–274.

Dees, J. A. (2008). Access or interest: Why Brown has benefited African-American women more than Title IX. *University of Missouri Kansas City Law Review, 76,* 625–642.

Digest of Education Statistics. (2020). *Table 318.10. Degrees conferred by postsecondary institutions, by level of degree and sex of student; Selected years, 1869-70 through 2029-30.* National Center for Education Statistics. https://nces.ed.gov/programs/digest/d20/tables/dt20_318.10.asp

Dittmore, S. (2016). *The constantly changing world of media content in college athletics.* Athleticdirectoru.com. https://www.athleticdirectoru.com/articles/the-constantly-changing-world-of-media-content-in-college-athletics/

Dodds, D. (2022, January 26). *Inside the world of 'collectives' using name, image, and likeness to pay college athletes, influence programs.* CBSSports.com. https://www.cbssports.com/college-football/news/inside-the-world-of-collectives-using-name-image-and-likeness-to-pay-college-athletes-influence-programs/

Dosh, K. (2021a, June 2). Is there a Title IX issue with Notre Dame's football recruiting billboards? *Forbes.* https://www.forbes.com/sites/kristidosh/2021/06/02/is-there-a-title-ix-issue-with-notre-dames-football-recruiting-billboards/?sh=1df06ed4691f

Dosh, K. (2021b, December 21). FSU softball lands NIL deal with cryptocurrency exchange FTX. *Forbes.* https://www.forbes.com/sites/kristidosh/2021/12/29/fsu-softball-lands-nil-deal-with-cryptocurrency-exchange-ftx/?sh=cd1ab377c882

Dosh, K. (2021c, December 28). *Linktree announces NIL partnerships with 5 college athletes.* Business of College Sports. https://businessofcollegesports.com/name-image-likeness/linktree-announces-nil-partnerships-with-5-college-athletes/

Druckman, Rothschild, J. E., & Sharrow, E. A. (2018). Gender policy feedback: Perceptions of sex equity, Title IX, and political mobilization among college athletes. *Political Research Quarterly, 71*(3), 642–653. https://doi.org/10.1177/1065912917753078

Edelman, M. (2022, January 1). Women athletes are big winners in college sports' 2021 NIL reform. *Forbes.* https://www.forbes.com/sites/marcedelman/2022/01/01/womens-college-athletes-are-big-winners-in-2021-nil-reform/?sh=718c2dddde55

Education Amendments Act of 1972, 20 U.S.C. §§1681 – 1688 (2018).

Ernst & Young (2014). *Female executives say sport helps accelerate leadership and career potential.* PRNewswire.com. https://www.prnewswire.com/news-releases/female-executives-say-participationin-sport-helps-accelerate-leadership-and-careerpotential-278614041.html

Evans, M.B. (2020). *Exploring disparities in school sports participation in rural Pennsylvania.* Center for Rural Pennsyvania. https://www.rural.palegislature.us/documents/reports/Disparities-in-Sports-Participation-2020.pdf

Fair Pay to Play Act, Cal SB 206 (2019–2020), Chapter 383 (Cal. Stat. 2019). https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201920200SB206

Fair Play for Girls in Sport. (2021, April 22). *Nine best practices in K-12 schools regarding Title IX & athletic programs.* Legal Aid at Work.

Farrington, D. (2021). *Maia Chaka is the 1st Black woman to officiate an NFL game.* NPR. https://www.npr.org/2021/09/13/1036580405/maia-chaka-first-black-woman-officiate-nfl-game

Flowers, C. L. (2015). Legal issues and the Black female athlete's collegiate experience at HBCUs. In B. J. Hawkins, J. Cooper, A. R. Carter-Francique, and J. K. Cavil (Eds.), *Black college athletes: The sporting life at historically Black colleges and universities.* Rowman & Littlefield Publishing Group.

Flowers, C. L. (2018). Review of the book *Exploring diversity at historically Black colleges and universities: Implications for policy and practice,* by Robert T. Palmer C. Rob Shorette II Marybeth Gasman. *Journal of Negro Education, 87*(2), 186–188. https://www.muse.jhu.edu/article/802670

Fox, J. & Tang, W. (2017). Women's experiences with general and sexual harassment in online video games: Rumination, organizational responsiveness, withdrawal, and coping strategies, *New Media & Society, 19,* 1290–1291, 1304.



Franklin, C. (2021). Title IX administers a booster shot: The effect of private donations on Title IX. *Northwestern Journal of Law and Social Policy, 16*(2), 145–163. https://www.proquest.com/scholarly-journals/title-ix-administers-booster-shot-effect-private/docview/2536826085/se-2?accountid=11644

Fuller, L.K. (2018). *Female Olympian and Paralympian events: Analyses, backgrounds, and timelines.* Springer.

Galanter, S. (2013a, January 25). *Dear colleague letter: Students with disabilities in extracurricular activities.* U.S. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201301-504.html

Galanter, S. (2013b, April 24). *Guidance on the prohibition against retaliation under federal civil rights laws.* U.S. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201304.pdf

Galanter, S. (2013c, June 25). *Guidance on supporting the academic success of pregnant and parenting students.* U.S. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201306-title-ix.pdf

Gaines, C. (2016). *The 25 schools that make the most money in college sports.* Insider. http://www.businessinsider.com/schools-most-revenue-college-sports-2016- 10/#25-ucla--969-million-1

GLSEN. (2019). *The 2019 national school climate survey.* https://www.glsen.org/sites/default/files/2021-04/NSCS19-FullReport-032421-Web_0.pdf

GLSEN. (2021). *Gender affirming and inclusive athletics participation.* https://www.glsen.org/sites/default/files/2021-05/GLSEN_Transathlete_Policies_Issue_Brief-05-03-21.pdf

Goldberg, S. B. (2021, October 18). *Confronting discrimination based on national origin and immigration status.* Office for Civil Rights Blog. https://www2.ed.gov/about/offices/list/ocr/blog/20211018.html

Goldberg, S. K. (2021, February 8). *Fair play: The importance of sports participation for transgender youth.* Center for American Progress. https://www.americanprogress.org/issues/lgbtq-rights/reports/2021/02/08/495502/fair-play/

Golliver, B. (2022, January 25). Rainmaker. Boss. Baker. Meet Tamika Tremaglio, the new head of the NBA players' union. *Washington Post.* https://www.washingtonpost.com/sports/2022/01/25/tamika-tremaglio-nba-players-union/

Goodman, M. (2022, February 22). *USWNT, U.S. Soccer reach $24 million equal pay settlement.* CBS Sports. https://www.cbssports.com/soccer/news/uswnt-u-s-soccer-reach-24m-equal-pay-settlement-megan-rapinoe-says-justice-comes-in-the-next-generation/

Giroir, B. (2019). *The national youth sports strategy.* U.S. Department of Health and Human Services. https://health.gov/sites/default/files/2019-10/National_Youth_Sports_Strategy.pdf

Griffin, P., & Carroll, H. (2011). *NCAA inclusion of transgender student-athletes.* National Collegiate Athletic Association. https://www.ncaa.org/sites/default/files/Transgender_Handbook_2011_Final.pdf

Griggs, B. (2019, January 13). *You may not know her name. But Bernice Sandler, the godmother of Title IX, changed women's rights forever.* CNN.com. https://www.cnn.com/2019/01/08/us/bernice-sandler-title-ix-dies/index.html

Grimes, P. S., & French, L. M. (1987). Barriers to disabled women's participation in sports. *The Journal of Physical Education, Recreation & Dance, 58,* 24–27.

*Grimm v. Gloucester County School Board* (2021), United States Supreme Court, 972 F.3d at 618.

Guaglione, S. (2021, April 8). *Why growth of women's sports coverage and advertiser interest is bogged down by small steps forward.* Digiday. https://digiday.com/media/why-growth-of-womens-sports-coverage-and-advertiser-interest-is-bogged-down-by-small-steps-forward/

Guenther, E. A., Sorensen, E. A., & Champagne, L. (under review). *Pregnancy rights information increases female intercollegiate student-athletes' intent to seek help.*

Hallman, C. (2022, March 10). Native Americans underrepresented in NCAA. *Minnesota Spokesman-Recorder.* https://spokesman-recorder.com/2022/03/10/1097804/

Hamari, J. & Sjöblom, M. (2017). What is esports and why do people watch it? *Internet Research, 27,* 211–232.

Hawkins, B. (2010). *The new plantation: Black athletes, college sports, and historically white colleges and universities.* Palgrave-MacMillan.

Hawkins, J., Cooper, A. R., Carter-Francique, & Cavil, J. K. (2015). *Black college athletes: The sporting life at historically Black colleges and universities.* Rowman & Littlefield Publishing Group

Hearn, J., Suggs, W., & May-Trifiletti, J. (2018). *Taking the field: Intercollegiate athletics on CIC campuses.* The Council of Independent Colleges. https://www.cic.edu/resources-research/charts-data/reports/athletics-report-2018

Higher Education Opportunity Act of 2008, Pub. L. No. 110–315, 122 Stat. 3078 (2008). https://www.govinfo.gov/content/pkg/PLAW-110publ315/pdf/PLAW-110publ315.pdf

Hilbert, J. (2019, April 9). *Gaming and gender: How inclusive are e-sports?* The Sports Integrity Initiative. https://www.sportsintegrityinitiative.com/gaming-gender-how-inclusive-are-esports/

Hogshead-Makar, N. & Sorensen, E. (2008). *Pregnant & parenting student-athletes: Resources & model policies.* National Collegiate Athletic Association. https://www.ncaa.org/about/resources/inclusion/pregnant-parenting-student-athletes



**Women's Sports Foundation**
WomensSportsFoundation.org

50 Years of Title IX:
We're Not Done Yet

Holmes, P. (1975, November 11). *Letter to chief state school officers, Title IX obligations in athletics*. U.S. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/offices/list/ocr/docs/holmes.html

Hosick, M. B. (2007, May 21). A force for equity: NCAA Task Force set educational benchmarks for gender balance. *NCAA News*. https://ncaanewsarchive.s3.amazonaws.com/2007/Association-wide/a-force-for-equity---05-21-07-ncaa-news.html

Hruby, P. (2021, May 7). Lonely at the top: Few college athletic directors are women and people of color. Global Sport Matters. https://globalsportmatters.com/business/2021/05/07/few-college-athletic-directors-minorities-ncaa/

Huffman, S., Tuggle, C. A., & Rosengard, D. S. (2004). How campus media cover sports: The gender-equity issue, one generation later. *Mass Communication and Society, 7*, 475–489.

Hunzinger, E. (2022, January 27). Male athletes leading the way in NIL money. *The Detroit News*. https://www.detroitnews.com/story/sports/college/2022/01/27/male-athletes-leading-way-nil-money/9246862002/

Illinois Enhance Physical Education Task Force. (2013). *Illinois Enhance Physical Education Task Force: Recommendations and report*. Illinois State Board of Education. https://www.isbe.net/Documents/epe-ga-report0813.pdf

Individuals with Disabilities Education Act, 20 U.S.C. § 1400 (2004)

IPC. (2021, August 24). *Tokyo 2020 sets the record for most athletes and women at the Paralympic Games*. https://www.paralympic.org/news/tokyo-2020-sets-record-most-athletes-and-women-paralympic-games

*Jackson v. Birmingham Board of Education*. 544 U.S. 167. 2005.

Jackson, W. (2021, November 17). NCAA women's basketball tournament expansion from 64 to 68. *Sports Illustrated*. https://www.si.com/college/2021/11/17/ncaa-approves-womens-basketball-tournament-expansion-from-64-to-68-teams

Jang, I. (2017). *Social media coverage of women's sports: A case study of NCAA Division I conferences' Facebook pages* [Unpublished thesis]. University of Southern Illinois. https://opensiuc.lib.siu.edu/cgi/viewcontent.cgi?article=2057&context=gs_rp

Jenkins, W. (2019, November 8). Why hundreds of colleges may be out of compliance with Title IX. *The Chronicle of Higher Education, 66*(10), n.p.

Jessop, A., & Sabin, J. (2021). The sky is not falling: Why name, image, and likeness legislation does not violate Title IX and could narrow the publicity gap between men's sport and women's sport athletes. *Journal of Legal Aspects of Sport, 31*, 253–288.

Johnson, G. (2021, September 29). *March Madness brand will be used for DI Women's Basketball Championship*. NCAA. https://www.ncaa.com/news/basketball-women/article/2021-09-29/march-madness-brand-will-be-used-di-womens-basketball-championship

Johnson, M. M. (2008). *The African American woman golfer: Her legacy*. Praeger Publishers

Judge, J. (2011). *Title IX as applied to intercollegiate athletics*. Higheredcompliance.com. https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.higheredcompliance.org%2F2wp-content%2Fuploads%2F2018%2F10%2Fx-11-03-7.doc&wdOrigin=BROWSELINK

Kane, M. J., & Lavoi, N. (2007). *The 2007 Tucker Center research report: Developing physically active girls: An evidence-based multidisciplinary approach*. The Tucker Center for Research on Girls & Women in Sport. University of Minnesota. https://www.cehd.umn.edu/tuckercenter/library/docs/research/2007-Tucker-Center-Research-Report.pdf

Kaplan Hecker & Fink. (2021a, August 2). *NCAA gender equity external review report: Phase I*. https://kaplanhecker.app.box.com/s/6fpd51gxk9ki78f8vbhqcqh0b0o95oxq

Kaplan Hecker & Fink. (2021b, October 25). *NCAA gender equity external review report: Phase II*. https://kaplanhecker.app.box.com/s/y17pvxpap8lotzqajjan9vyye6zx8tmz

Keith, B. (2018, May 22). *Television ratings for men's NCAA volleyball championship drop again*. Volleyballmob.com. https://volleymob.com/television-ratings-for-mens-ncaa-volleyball-championship-drop-again/

Kellstedt, D. K., Schenkelberg, M. A., Von Seggern, M. J., Rosenkranz, R. R., Welk, G. J., High, R., & Dzewaltowski, D. A. (2021). Youth sport participation and physical activity in rural communities. *Archives of Public Health, 79*(1), 1–8.

Klein, S. (2016). *Reinvigorating the role of the Title IX coordinator: A requirement and resource*. Feminist Majority Foundation. https://feminist.org/wp-content/uploads/2020/06/Full-Title-IX-Coordinators-9-16.pdf

LaVoi, N. M., & Boucher, C. (2020, April). *Head coaches of women's collegiate teams: A report on select NCAA Division-I institutions, 2019-20*. The Tucker Center for Research on Girls & Women in Sport. University of Minnesota.

Lapchick, R. (2021). *The 2020 racial and gender report card*. The Institute for Diversity and Ethics in Sport. University of Central Florida. https://www.tidesport.org/_files/ugd/138a69_bee975e956ad45949456eae2afdc74a2.pdf

Lapchick, R. (2022). *The 2021 DI FBS leadership college racial and gender report card: The lack of diversity within collegiate athletic leadership continues*. The Institute for Diversity and Ethics in Sport. University of Central Florida. https://43530132-36e9-4f52-811a-182c7a91933b.filesusr.com/ugd/403016_2885084836ea46ffad0e44454ccadab6.pdf

Lerner, P., & Lakowski, T. (2009). *Play fair: A Title IX playbook for victory*. Women's Sports Foundation. https://www.womenssportsfoundation.org/wp-content/uploads/2016/09/play_fair_final.pdf



**Women's Sports Foundation**
WomensSportsFoundation.org

50 Years of Title IX:
We're Not Done Yet

Lhamon, C. E. (2014, April 24). *Questions and answers on Title IX and sexual violence*. U.S. Department of Education. https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf [NOTE: While this document has been formally rescinded by the Department of Education, it has historical value and, therefore, has been included in this report.]

Lhamon, C. (2015a). *Dear colleague letter on Title IX coordinators*. U.S. Department of Education. Office of Civil Rights. https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201504-title-ixcoordinators.pdf

Lhamon, C. (2015b). *Protecting civil rights, advancing equity*. U.S. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/reports/annual/ocr/report-to-president-and-secretary-of-education-2013-14.pdf

Lhamon, C. (2015c). *Title IX resource guide*. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/offices/list/ocr/docs/dcl-title-ix-coordinators-guide-201504.pdf

Lhamon, C. (2015d, December 15). *Notice of language assistance dear colleague letter on voluntary youth service organizations*. U.S. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201512-voluntary-youth-service-organizations.pdf

Lopiano, D., Sommer, J., Zimbalist, A., Gill, E., Gurney, G., Hsu, M., Lever, K., Porto, B., Ridpath, D. B., Sack, A., Smith, B., & Thatcher, S. (2021) *Position statement: NILs and Title IX: Education institutions must fix the promotion, publicity, and recruiting inequities critical to the NIL monetization success of college female athletes and must not use or assist third parties to evade their Title IX obligations*. https://www.thedrakegroup.org/wp-content/uploads/2021/10/10-12-21-Position-Statement-Title-IX-and-NILs.pdf

Maestas, A. J., & Belzer, J. (2020). *How much is NIL worth to student athletes?* AthleticDirectorU.com. https://athleticdirectoru.com/articles/how-much-is-nil-really-worth-to-student-athletes/

Malik, M. R. (2016). *A content analysis of gender-specific media coverage of sport: NCAA athletic department home webpages* (Publication No. 2703) [Master's Thesis]. University of Nevada, Las Vegas. http://dx.doi.org/10.34917/9112137

Marcus, K. (2004). *Dear colleague letter: Title IX grievance procedures, elementary and secondary education*. U.S. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/offices/list/ocr/responsibilities_ix.html

Matthews, M., & McCune, S. D. (1977). *Title IX grievance procedures: an introductory manual*. U.S. Department of Education, Office for Civil Rights.

Matthews, M., & McCune, S. D. (1987). *Title IX grievance procedures: an introductory manual*. U.S. Department of Education, Office for Civil Rights.

Mathewson, A. D. (2012). Remediating discrimination against African American females at the intersection of Title IX and Title VI. *Wake Forest Journal of Law & Policy, 2*, 295. https://digitalrepository.unm.edu/law_facultyscholarship/379

Mauss, J. (2021, July 3). *Fresno State's Cavinder twins could make more than double basketball coaches salary*. MountainWestwire.com. https://mwwire.com/2021/07/03/fresno-states-cavinder-twins-could-make-more-than-double-than-basketball-coach/

McDowell, J., & Carter-Francique, A. (2017). An intersectional analysis of the workplace experiences of African American female athletic directors. *Sex Roles, 77*(5), 393–408.

McDowell, J., & Carter-Francique, A. (2016). Experiences of female athletes of color. In E. Staurowsky (Ed.), *Women and sport: Continuing a journey of liberation to celebration* (pp. 95–115). Human Kinetics.

McDowell, J., Deterding, R., Elmore, T., Morford, E., & Morris, E. (2016). Title IX and campus recreation: Guidelines to increase gender equity in club and intramural sport programs. *Recreational Sports Journal, 40*(2), 133–151. https://doi.org/10.1123/rsj.2016-0012

McGinnis, K., Goutos, D., & Tuakli-Wosornu, T. (2020). Diversifying diversity, equity, and inclusion in American college athletics: The case for adaptive (and other non-traditional) sports. *The Sports Journal*. https://thesportjournal.org/article/diversifying-diversity-equity-and-inclusion-in-american-college-athletics-the-case-for-adaptive-and-other-non-traditional-sports/

McMillen, N. R. (1997). *Remaking Dixie: The impact of World War II on the American South*. University Press of Mississippi.

Minsberg, T. (2021, August 8). Allyson Feliz wins her 10th gold Olympic medal, tying an American record in her sport. *The New York Times*.

Monroe, S. (2007, June 25). *Dear colleague letter*. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/offices/list/ocr/letters/colleague-20070625.pdf

Monroe, S. (2008, September 17). *Guidance on determining which athletic activities can be counted for purposes of Title IX compliance*. U.S. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/offices/list/ocr/letters/colleague-20080917.pdf

NAIA (2020, June 29). *Unprecedented growth leads NAIA to greenlight women's flag football to emerging sport status* [Press release]. https://www.naia.org/sports/wflag/2020-21/releases/WFLAG_EmergingSport_6_29_20?gclid=Cj0KCQiA3rKQBhCNARIsACUEW_ZGk3sNZBSr65BUn5ziMB8n-NlI0AKNe3Rw3pZscbxWgMhsCDXg2SAaAqXtEALw_wcB

Nash, M. A., Klein, S. S., & Bitters, B. (2007). The role of government in advancing gender equity in education. In S. Klein (Ed.), *Handbook for achieving gender equity through education* (pp. 63–101). Lawrence Erlbaum Associates



National Center for Educational Statistics. (2022). Total fall enrollment in degree-granting postsecondary institutions, by attendance status, sex of student, and control of institution: Selected years, 1947 through 2028. *Digest of Education Statistics*. https://nces.ed.gov/programs/digest/d18/tables/dt18_303.10.asp?current=yes%22%20%5C%22%20_blank

National Center for Educational Statistics (2020). *College enrollment rates*. https://nces.ed.gov/programs/coe/pdf/coe_cpb.pdf

National Center for Educational Statistics. (2021, May). *Students with disabilities*. U.S. Department of Education. https://nces.ed.gov/programs/coe/indicator/cgg

National Collegiate Athletic Association. (2020). *NCAA sport sponsorship and participation rates report (1956-1957 through 2019-2020)*. NCAAorg.s3.amazonaws.com/research/sportpart/2019-20RES_SportsSponsorshipParticipationRatesReport.pdf

National Collegiate Athletic Association. (2021a). *NCAA sport sponsorship and participation rates report (1956-1957 through 2020-2021)*. https://ncaaorg.s3.amazonaws.com/research/sportpart/2021RES_SportsSponsorshipParticipationRatesReport.pdf

National Collegiate Athletic Association. (2021b). *Race and gender demographics database*. https://www.ncaa.org/sports/2018/12/13/ncaa-demographics-database.aspx

National Collegiate Athletic Association. (2022). *Emerging sports for women*. https://www.ncaa.org/sports/2016/3/2/emerging-sports-for-women.aspx

National Federation of State High School Associations. (2018). *High school sports participation increases for 29th consecutive year*. https://www.nfhs.org/articles/high-school-sports-participation-increases-for-29th-consecutive-year

National Federation of State High School Associations. (2019). *High school participation survey archive*. https://www.nfhs.org/sports-resource-content/high-school-participation-survey-archive/

*National Women's Law Center v. District of Columbia Public Schools*. (2013, June 27). Complaint filed with the U.S. Department of Education Office for Civil Rights, Washington DC Metro Area. https://nwlc.org/wp-content/uploads/2015/08/2013_6_27_dcps_complaint_final.pdf

National Women's Law Center & Poverty & Race Research Action Council. (2015). *Finishing last: Girls of color and school sports opportunities*. https://prrac.org/pdf/GirlsFinishingLast_Report.pdf

NCAA Media Center. (2022, January 19). *Board of Governors updates transgender participation policy*. National Collegiate Athletic Association. https://www.ncaa.org/news/2022/1/19/media-center-board-of-governors-updates-transgender-participation-policy.aspx

NCAA Office of Inclusion. (2011). *NCAA inclusion of transgender student-athletes*. https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/INC_TransgenderHandbook.pdf

NCAA Staff. (2022, February 17). *2022 March Madness: Women's NCAA tournament complete schedule, dates, TV times*. National Collegiate Athletic Association. https://www.ncaa.com/news/basketball-women/article/2021-04-19/2022-ncaa-womens-basketball-tournament-dates-schedule

NDNSports Staff. (2021, March 16). *Native American athletes in the Women's 2021 NCAA March Madness basketball tournament*. NDNSports.com. http://www.ndnsports.com/native-american-athletes-in-the-womens-2021-ncaa-march-madness-basketball-tournament/

New, J. (2015, April 27). *Title IX coordinators required*. Insidehighered.com. https://www.insidehighered.com/news/2015/04/27/education-department-reminds-colleges-hire-title-ix-coordinators

Newhouse, K. (2022a, April 11). *Federal Title IX data on sports participation is unreliable*. CNSMaryland.org. https://cnsmaryland.org/2022/04/11/title-ix-federal-sports-data/

Newhouse, K. (2022b, April 11). *Poll: Most parents, students know "nothing at all" about Title IX*. CNSMaryland.org. https://cnsmaryland.org/2022/04/11/title-ix-poll/

NFHS News. (2018, April 24). *NFHS, NFHS Network announce partnership with PlayVS to begin esports in high schools nationwide*. https://www.nfhs.org/articles/nfhs-nfhs-network-announce-partnership-with-playvs-to-begin-esports-in-high-schools-nationwide/

Nowicki, J. (2018). *High school sports: Many schools encouraged equal opportunities, but further education could help athletics administrators under Title IX*. United States Government Accountability Office Report to Congressional Committees. https://www.gao.gov/assets/gao-18-425.pdf

Office for Civil Rights. (1979, December 11). *A policy interpretation: Title IX and intercollegiate athletics*. U.S. Department of Education. https://www2.ed.gov/about/offices/list/ocr/docs/t9interp.html

Office for Civil Rights. (2005). *Additional clarification of intercollegiate athletics policy: Three-part test — part three*. U.S. Department of Education. https://www2.ed.gov/about/offices/list/ocr/letters/200503017-additional-clarification-three-part-test.pdf

Office for Civil Rights. (2020, May 12). *Questions and answers for postsecondary institutions regarding the COVID-19 national emergency*. U.S. Department of Education. https://www2.ed.gov/about/offices/list/ocr/docs/20200512-qa-psi-covid-19.pdf

Orleans, J. (1996). An end to the odyssey: Equal athletic opportunities for women. *Duke Journal of Gender, Law, and Policy*, *3*, 131–162. https://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=1226&context=djglp



Osborne, B. (2017). Failing to fund fairly: Title IX athletics scholarships compliance, *Tennessee Journal of Race, Gender, & Social Justice, 6*(1), Article 6.

O'Shea, M. F. (1998, July 23). *Dear colleague letter: Bowling Green State University*. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/offices/list/ocr/docs/bowlgrn.html#bowlgrn1

Outsports. (2021, September 21). *At least 186 out athletes at the Tokyo Summer Olympics, by far a record*. Outsports.com. https://www.outsports.com/olympics/2021/7/12/22565574/tokyo-summer-olympics-lgbtq-gay-athletes-list

PA Department of Education. (2022). *Disclosure of interscholastic athletic opportunity*. https://www.education.pa.gov/Teachers%20-%20Administrators/Interscholastic%20Athletic%20Opportunity/Pages/default.aspx

Paaßen, B., Morgenroth, T., & Stratemeyer, M. (2017). What is a true gamer? The male gamer stereotype and the marginalization of women in video game culture. *Sex Roles, 76*, 421–435.

Paige, R. (2002, May 3). *Single-sex classes and schools: Guidelines on Title IX requirements*. Department of Education. https://www2.ed.gov/policy/rights/guid/ocr/edlite-t9-guidelines-ss.html

Palmer, R. T., Shorette, R., & Gasman, M. (2015). *Exploring diversity at historically Black colleges and universities: Implications for policy and practice*. Jossey-Bass.

Pappas. (2021). Competition and collaboration: Title IX Coordinators and the barriers to achieving educational equity. *International Journal of Discrimination and the Law, 21*(2), 94–116. https://doi.org/10.1177/13582291211014403

Paulsen. (2021, April). *Ratings: NCAA gymnastics, racing, MLS, and more*. Sports Media Watch. https://www.sportsmediawatch.com/2021/04/ncaa-gymnastics-ratings-abc-most-watched-decade-f1-indycar-mls/

Perry, N. (2021, October 6). *Girls flag football on rise in high schools, state associations*. National Federation of State High School Associations. https://www.nfhs.org/articles/girls-flag-football-on-rise-in-high-schools-state-associations/

PGA Staff. (2022, March 10). *Renee Powell continues to inspire as she earns the inaugural Charlie Sifford Award*. PGA.com. https://www.pga.com/story/renee-powell-continues-to-inspire-as-she-earns-the-inaugural-charlie-sifford

Pickett, M. W., Dawkins, M., P., & Braddock, J. H. (2012). Race and gender equity in sports: Have White and African-American females benefited equally from Title IX. *American Behavioral Scientist, 56*(11), 1581–1603.

Planos, J. (2021, August 9). *What do 60 percent of America's gold medals from Tokyo have in common?* Fivethirtyeight.com. https://fivethirtyeight.com/features/american-women-stole-the-show-in-tokyo/

Powell, J. (2021, November 30). *Paige Bueckers' major NIL deal only leads to more questions*. Bleacher Report. https://bleacherreport.com/articles/2950930-paige-bueckers-major-nil-deal-only-leads-to-more-questions

Pickett, M. W., Dawkins, M. P., & Braddock, J. H. (2012). Race and Gender Equity in Sports: Have White and African American Females Benefited Equally From Title IX? *The American Behavioral Scientist (Beverly Hills), 56*(11), 1581–1603. https://doi.org/10.1177/0002764212458282

Postsecondary National Policy Institute (2020). *Black students in higher education: Fact sheet*. https://pnpi.org/black-students/

Pusch. (2014). Urban struggles: an analysis of Title IX and urban high school athletic opportunities for girls. *Wisconsin Journal of Law, Gender & Society, 29*(2), 317–340.

Randolph, M., & Ray, C. (2018). *District of Columbia Athletic Association Title IX Athletic Equity Act of 2015 report*. District of Columbia Athletic Association. https://cdn4.sportngin.com/attachments/document/0149/9718/DCSAA_Athletics_Title_IX_Report_2016-17.pdf#_ga=2.113607495.1902113714.1644786769-1058656019.1644786768

Rehabilitation Act of 1973, 34 C.F.R. Part 104.

Reinert, B. (2021, September 9). *Meet Team USA's golden stars of the Tokyo Paralympics*. TeamUSA.org. https://www.teamusa.org/News/2021/September/09/Meet-Team-USAs-Golden-Stars-Of-The-Tokyo-Paralympics

Reynolds, G. (2003, July 11). *Untitled correspondence*. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/offices/list/ocr/title9guidanceFinal.pdf

Reynolds, L., Fisher, D., & Cavil, J. K. (2012). Impact of demographic variables on African American student athletes' academic performance. *Educational Foundations, 26*(3), 93–111.

Rodkey, J., Staurowsky, E. J., Kelly, K., & Sonderfeld, T. (2019, April). *Examining the knowledge and perceptions of Division II collegiate athletic administrators, staff, and coaches regarding gender equity and Title IX standards*. [Paper presented]. College Sport Research Institute Conference, University of South Carolina, Columbia, SC.

Rose, D. (2018). *Citizens by degree: Higher education policy and the changing gender dynamics of American citizenship*. Oxford University Press.

Rose, D. (2015). Regulating opportunity: Title IX and the birth of gender-conscious higher education policy. *Journal of Policy History, 27*(1), 157–83.

Ruvalcaba, O., Shulze, J., Kim, A., Berzenski, S. R., & Otten, M. P. (2018). Women's experiences in esports: Gendered differences in peer and spectator feedback during competitive video game play. *Journal of Sport and Social Issues, 42*, 295–311.

Sabo, D., & Snyder, M. (2013). *Progress and promise: Title IX at 40 white paper*. SHARP Center for Women and Girls.



Sabo, D., & Veliz, P. (2008). *Go out and play*. Women's Sports Foundation.

Sabo, D., Veliz, P., & Staurowsky, E. J. (2016). *Beyond Xs and Os: Gender bias and coaches of women's teams*. Women's Sports Foundation.

Sack, A. L., & Staurowsky, E. J. (1998). *College athletes for hire: The evolution and legacy of the NCAA amateur myth*. Praeger Press.

Samuels, J., & Galles, K. (2003). In defense of Title IX: Why current policies are required to ensure equality of opportunity. *Marquette Sports Law Review, 14*(1), 11–47. http://scholarship.law.marquette.edu/sportslaw/vol14/iss1/21

Sandler, B. R. (2000). "Too strong for a woman" — The five words that created Title IX. *Equity & Excellence in Education, 33*(1), 9–13. DOI: 10.1080/1066568000330103

Sandler, B. R. (2007). Title IX: How we got it and what a difference it made. *Cleveland State Law Review, 55*(4), 473–489. https://engagedscholarship.csuohio.edu/cgi/viewcontent.cgi?article=1193&amp;context=clevstlrev

Savatovic-Hathorn, S. (2021). *Student-athletes on Twitter: A content analysis of media, gender, and sentiment* [Unpublished master's thesis]. Kansas State University. https://krex.k-state.edu/dspace/handle/2097/41465

Schaeffer, K. (2020, April 23). *As schools shift to online learning, here's what we know about disabled students*. Pew Research Center. https://www.pewresearch.org/fact-tank/2020/04/23/as-schools-shift-to-online-learning-amid-pandemic-heres-what-we-know-about-disabled-students-in-the-u-s/

Seiner, J. (2021, March 12). *AP study: Nearly 90% of esports scholarships going to men*. Associated Press. https://apnews.com/article/esports-gender-inequality-scholarships-men-1823321276db40fea37dc8d9e5410643

Sheffer, M. L. (2020). New media, old ways: An analysis of sports media's depiction of female athletes on Instagram and Snapchat. *Journal of Sports Media, 15*(2), 31–50. doi:10.1353/jsm.2020.0009.

Shifrer, D., Pearson, J., Muller, C., & Wilkinson, L. (2015). College-going benefits of high school sports participation: Race and gender differences over three decades. *Youth & Society, 47*(3), 295–318. https://doi.org/10.1177/0044118X12461656

Shirley Povich Center for Sports Journalism and Howard Center for Investigative Journalism at the University of Maryland Philip Merrill College of Journalism. (2022). *Unlevel playing fields*. CNSMaryland.org. https://cnsmaryland.org/titleix/

Siegal, J. (2020). *A serial disrupter*. https://www.justinesiegal.com

Smith, M. M., & Wrynn, A. M. (2014). History of gender and gender equality in the Olympics and Paralympics. In J. Hargreaves & E. Anderson (Eds.), *Routledge handbook of sport, gender, and sexuality* (pp. 57–65). Routledge.

Smithsonian Staff. (2021, August 23). *Three Latinas that made baseball history*. Because of Her Story. Smithsonian Institution. https://womenshistory.si.edu/news/2021/08/three-latinas-who-made-baseball-history

Sorensen, E., Sincoff, M., & Siebeneck, E. (2009). The need for an effective student-athlete pregnancy policy. *Journal of Issues in Intercollegiate Athletics, 1*, 25–45. http://csri-jiia.org/old/documents/publications/research_articles/2009/JIIA_2009_3_Sorensen_Publish%20Copy_1.0.pdf

Speier, J. (2021, June 29). *Speier, Sherrill introduce resolution affirming the NCAA is subject to Title IX; Must work to prevent sex discrimination against women athletes* [Press release]. https://speier.house.gov/press-releases?id=DC2A490F-42C0-4A1B-A3EE-F07F3C51DAF7

Spellings, M. (2008, March 27). *Title IX athletics three-part test*. U.S. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/offices/list/ocr/letters/title-ix-2008-0327.pdf

Staurowsky, E. J. (2016a). Title IX in its third decade: The Commission on Opportunity in athletics. *Entertainment and Sports Law Journal (Coventry, England), 2*(3). https://doi.org/10.16997/eslj.129

Staurowsky, E. J. (2016b). *Women and sport: Continuing a celebration from liberation to celebration*. Human Kinetics.

Staurowsky, E. J., DeSousa, M. J., Miller, K. E., Sabo, D., Shakib, S., Theberge, N., Veliz, P., Weaver, A., & Williams, N. (2015). *Her life depends on it III: Sport, physical activity, and the health and well-being of American girls and women*. Women's Sports Foundation.

Staurowsky, E. J., & Rhoads, A. (2020). Title IX coordinators in NCAA Division I institutions: Roles, responsibilities, and potential conflicts of interest. *Journal of Issues in Intercollegiate Athletics, 13*, 381–404. http://csri-jiia.org/wp-content/uploads/2020/11/RA_2020_18.pdf

Staurowsky, E. J., Watanabe, N., Cooper, J., Cooky, C., Lough, N., Paule-Koba, A., Pharr, J., Williams, S., Cummings, S., Issokson-Silver, K., & Snyder, M. (2020). *Chasing equity: The triumphs, challenges, and opportunities in sports for girls and women*. Women's Sports Foundation.

Staurowsky, E. J., & Weight, E. A. (2011). Title IX literacy: What coaches don't know and need to find out. *The Journal of Intercollegiate Sport, 4*(2), 190–209.

Staurowsky, E. J., & Weight, E.A. (2013). Discovering dysfunction in Title IX implementation: NCAA administrator literacy, responsibility, and fear. *Journal of Applied Sport Management, 5*(1), 1–30.

Staurowsky, E. J., Zonder, E., & Reimer, B. (2017). Title IX knowledge among college athletes and non-athletes in NCAA Division I and III institutions. *Women in Sport and Physical Activity Journal, 25*, 30–42.



Stevens, R. E., Loudon, D. L., & McConkey, C. W. (1995). Sport marketing among colleges and universities. *Sport Marketing Quarterly, 4*(1), 41–47.

Stevens, N. (2021, May 21). *Despite more in person learning, loosening of restrictions, sports participation still on the decline in NC*. HighSchoolOT.com. https://www.highschoolot.com/despite-more-in-person-learning-loosening-of-restrictions-sports-participation-still-on-decline-in-nc/19689383/

Stezano, M. (2018, August 22). *7 women who broke down barriers in sport*. History.com. https://www.history.com/news/7-women-who-broke-down-barriers-in-sports

Stewart, R., & Harris, P. (1979). *A policy interpretation: Title IX and intercollegiate athletics*. U.S. Department of Education. https://www2.ed.gov/about/offices/list/ocr/docs/t9interp.html

Stimpson, C. R. (2022). Dereliction, due process, and decorum: The crises of Title IX. *Signs: Journal of Women in Culture and Society, 47*(2), 261–93. https://doi.org/10.1086/716653

Stoever, J. K. (2021). Title IX, esports, and #EToo. *The George Washington Law Review, 89*, 857–931. https://www.gwlr.org/wp-content/uploads/2021/07/89-Geo.-Wash.-L.-Rev.-857.pdf

Suggs, W. (2005). *A place on the team: The triumph and tragedy of Title IX*. Princeton University Press.

Supra, J. D. (2019, March 4). *Title IX compliance creates hurdles for collegiate esports programs*. https://www.jdsupra.com/legalnews/title-ix-compliance-creates-hurdles-for-99240/

The Athletic Staff. (2021, July 20). *UNC launches first group licensing program under new policy*. The Athletic. https://theathletic.com/news/unc-launches-first-group-licensing-program-under-new-nil-policy/gChv1KdJCmlI/

Tsuji, A. (2016, September 21). Entire Indiana Fever team locks arms, kneels during national anthem. *USA Today*. https://www.usatoday.com/story/sports/ftw/2016/09/21/entire-indiana-fever-team-locks-arms-and-kneels-for-national-anthem/90811142/

Turner, C. (2021, September 21). SmartyStreets enters into NIL deal with all female athletes at BYU. *The Daily Universe*. https://universe.byu.edu/2021/09/21/smartystreets-enters-into-nil-deal-with-all-female-athletes-at-byu/

Turner, K. (2021, June 10). *Fair play for girls in sports*. Legal Aid at Work. https://www.fairplayforgirlsinsports.org/

Unger, R. K. (1979). Toward a redefinition of sex and gender. *American Psychologist, 34*(11), 1085–1094. https://doi.org/10.1037/0003-066X.34.11.1085

USA Today Staff. (2017, April 8). The 100 most powerful people in MLB. *USA Today*. https://www.usatoday.com/story/sports/mlb/2017/04/08/mlb-100-most-powerful-people/100172102/

U.S. Center for SafeSport. (2020, September 22). *2022 minor athlete abuse prevention policies*. https://uscenterforsafesport.org/wp-content/uploads/2020/09/FINAL-2022-MAAPP-9.21.pdf

U.S. Department of Education. (2011). *Creating equal opportunities for children and youth with disabilities to participate in physical education and extracurricular athletics*. Office of Special Education and Rehabilitative Services. Office of Special Education Programs.

U.S. Department of Education. (2021a). *Equity in Athletics Disclosure data analysis*. Office of Postsecondary Education. https://ope.ed.gov/athletics/

U.S. Department of Education. (2021b, June 22). Enforcement of Title IX of the Education Amendments of 1972 with respect to discrimination based on sexual orientation and gender identity in light of *Bostock v. Clayton County*, 86 FR 32637. *Federal Register*. https://www.federalregister.gov/documents/2021/06/22/2021-13058/enforcement-of-title-ix-of-the-education-amendments-of-1972-with-respect-to-discrimination-based-on

U.S. Department of Education. (2022a). *Equity in Athletics Disclosure data analysis*. Office of Postsecondary Education. https://ope.ed.gov/athletics/

U.S. Department of Education. (2022b, February 2). *Report on pending cases currently under investigation at elementary-secondary and post-secondary schools*. https://www2.ed.gov/print/about/offices/list/ocr/docs/investigations/open-investigations/tix.html#

U.S. Government Accountability Office. (2010). *Students with disabilities: More information and guidance could improve opportunities in physical education and athletics*. https://www.gao.gov/assets/gao-10-519.pdf

Veliz, P., Snyder, M., & Sabo, D. (2019). *The state of high school sports in America: An evaluation of the nation's most popular extracurricular activity*. Women's Sports Foundation.

Walton, D. R., Lower-Hoppe, L., & Horger, M. (2020). Do esports classify as an intercollegiate sport? Legal analysis of Title IX. *Journal of Issues in Intercollegiate Athletics, 13*, 94–118. http://csri-jiia.org/wp-content/uploads/2020/04/RA_2020_05.pdf

Wang, F. (2014, November 24). *Hawaii's Patsy Mink honored with the Presidential Medal of Freedom*. NBC.com. https://www.nbcnews.com/news/asian-america/hawaiis-patsy-mink-honored-presidential-medal-freedom-n248951

Ware, S. (2011). *Title IX: A brief history with documents*. Waveland Press, Inc.

Webster, K. (2020). *To what extent did Title IX create equality within athletics: Analyzing female athletic participation in high school institutions* [Unpublished senior thesis]. Bemidji State University. https://www.bemidjistate.edu/academics/departments/political-science/wp-content/uploads/sites/40/2020/06/2695429-12052336-Kellyn-Webster-May-3-2020-624-PM-Final-Thesis.pdf

Weight, E., & Staurowsky, E. J. (2014). Title IX literacy among NCAA administrators & coaches: A critical communications approach. *International Journal of Sport Management, 3*, 257–285.



Wilson, A. (2017). *45 years of Title IX: The status of women in intercollegiate athletics*. National Collegiate Athletic Association. http://www. ncaa.org/sites/default/files/TitleIX45-295-FINAL_WEB.pdf

WNBA (2020). *WNBA announces a 2020 season dedicated to social justice*. https://www.wnba.com/news/wnba-announces-a-2020-season-dedicated-to-social-justice/

Yiamouyiannis, A., & Hawes, K. (2015). Title IX and intercollegiate athletics: An analysis of EADA data on student enrollment, sport participation and scholarship allocation. *Women in Sport and Physical Activity Journal, 23*(1), 26–33. https://journals. humankinetics.com/view/journals/wspaj/23/1/article-p26.xml

Zarrett, N., Veliz, P. T., & Sabo, D. (2020). *Keeping girls in the game: Factors that influence sport participation*. Women's Sports Foundation.

Zboraj, M. (2021, July 1). *GoPuff offers student-athletes their 1ˢᵗ endorsement deal*. ProgressiveGrocer.com. https://progressivegrocer.com/gopuff-offers-student-athletes-their-1st-endorsement-deal

Zullo, R. (2018). Sports marketing and publicity efforts Division II intercollegiate athletics. *The Sport Journal, 24*, 21. https://thesportjournal.org/article/sports-marketing-publicity-efforts-in-division-ii-intercollegiate-athletics/



# Imagine what the next 50 years will bring.

## WSF salutes Title IX.






**Find us here**
Women's Sports Foundation
247 W 30th Street, 5th Floor
New York, NY 10001
800.227.3988

WomensSportsFoundation.org

Keep being inspired       

# EXHIBIT 66

7/19/23, 12:32 PM
Hundreds of Colleges May Be Out of Compliance with Title IX. Here's Why.
Case 4:20-cv-03919-CW Document 289-1 Filed 07/21/23 Page 349 of 457

# THE CHRONICLE OF HIGHER EDUCATION

**NEWS**

# Hundreds of Colleges May Be Out of Compliance With Title IX. Here's Why.

*By Wesley Jenkins*

OCTOBER 23, 2019



You have 1 free article left. **Subscribe** for unlimited access.

7/19/23, 12:32 PM    Hundreds of Colleges May Be Out of Compliance with Title IX. Here's Why.

Case 4:20-cv-03919-CW   Document 289-1   Filed 07/21/23   Page 349 of 457

**Lisa Niblock is one of two students suing the U. of Kentucky for not providing women with athletics opportunities proportionate to those it gives men.**

Lisa Niblock had no intention of suing the University of Kentucky when she transferred there two years ago. She just wanted to be closer to home and surrounded by classmates at a bigger school with a bigger atmosphere. Then Suzie Stammer approached her.

Stammer had coached varsity field hockey for the university in the mid-1970s after the federal law known as Title IX compelled Kentucky and other colleges to provide women with the same intercollegiate sports opportunities as men. But by 1979, the university had demoted the team back to club status, and it has shown no willingness to reverse that decision since.

When members of the club team, advised by Stammer, asked Kentucky officials to elevate their sport to varsity status, they were told that a survey the university conducted last year showed there wasn't enough interest among students. For field hockey to be reinstated as a varsity sport, a student would have to sue, but no one was stepping forward.

# "There are these instances, and Kentucky is one of them, how in certain spaces we're still not that far from where we were in 1972."

RECOMMENDED ARTICLES



A DIFFERENT KIND OF PRISON ED
**Lessons in Imprisonment**



SPORTS AND MONEY
**'There's So Many Questions': Sports-Realignment Shocker Could Mean a Sea Change for Higher Ed**

Stammer used to officiate at field hockey and lacrosse games in Louisville, Ky., when Niblock was a high-school athlete there. The two became reacquainted when Niblock transferred to Kentucky after spending her freshman year at Furman University playing lacrosse. Stammer thought Niblock could be a good candidate to bring the lawsuit, so she made the case.

You have 1 free article left. **Subscribe** for unlimited access.

On September 25, Niblock, along with Meredith Newman, a junior triathlete, filed a federal lawsuit accusing Kentucky of discriminating against female athletes. (Through her lawyer, Newman declined to comment for this article.)

Their case rests on the freely available Equity in Athletics data, which show that in 2017, women at Kentucky had 183 fewer participation opportunities in varsity athletics than men, proportionate to their respective enrollments. Stammer and Niblock aren't alleging that the university is unfairly cutting women's sports, as St. Cloud and Eastern Michigan Universities are accused of doing. Nor are they claiming that Kentucky is improperly counting athletes, as complaints against the University of Washington and Oregon State University claim. They are suing because Kentucky's numbers aren't where they are supposed to be, according to a key test laid out by Title IX.

"It's 47 years later and you can understand the frustration of young women across the country who are saying: Why aren't you in compliance?" said Neena Chaudhry, general counsel at the National Women's Law Center.

Kentucky is not alone in being out of compliance with Title IX's "substantial proportionality" standard. In fact, it isn't even the most egregious offender in its own conference, according to the 2017 numbers.

## "It's 47 years later and you can understand the frustration of young women across the country who are saying: Why aren't you in compliance?"

The University of Florida lacked 202 participation opportunities, ranking as the 39th worst mark. Of the 348 NCAA Division I colleges listed in 2017, Kentucky's proportional participation of female athletes ranks as the 53rd worst. Niblock's former university, Furman, ranks 14th. And of those Division I schools, 201 are most likely out of compliance. In fact, of all the 1,085 institutions governed by the National Collegiate Athletic Association, 815 are probably out of compliance.

For many of the institutions at the top of the list, the heavy skew of female enrollment in recent years has made achieving proportionality a near impossibility. The University of North Carolina

You have 1 free article left. **Subscribe** for unlimited access.

athletes in 2017, but its 60 percent female enrollment still left it 313 participation opportunities short.

"I don't think there's enough NCAA sports for us to add enough sports to get to proportional," said Lawrence R. (Bubba) Cunningham, athletic director at North Carolina. "So that's the good thing about the Office for Civil Rights and Title IX, it gives you three ways to comply."

The first way, substantial proportionality, Cunningham said, is "out of reach" for North Carolina. Under the second way, colleges must show a history of expanding opportunities for the underrepresented sex.

Cunningham said North Carolina strives instead to satisfy the third option set forth in Title IX's three-prong "participation requirement" test: It tries to fully meet the demonstrated interest of the underrepresented sex. While North Carolina works hard to meet that third prong, many other colleges on the list might lack the resources to do so.

In theory, the Office for Civil Rights is in charge of ensuring that colleges meet Title IX's equal-opportunity guidelines for athletics. But with the current focus on battling sexual misconduct on campuses, that office has shown little interest in holding universities accountable for gender inequity in athletics.

The Kentucky lawsuit shows how the onus has fallen on the individual students to force their institutions into compliance. And according to Stammer, other colleges should be prepared, because if Lisa Niblock's lawsuit is successful, many more could follow.

**The Three-Prong Test Is Born**

Title IX was signed into law in 1972, but the provisions on varsity athletics came later. When the regulations for equal opportunity in athletics were drafted in 1974, the initial proposal called for direct proportionality. That standard didn't last.

Ultimately, the three-prong test was introduced, but its viability to enforce compliance wasn't weighed by the courts until the early 1990s. Cases like *Roberts v. Colorado State Board of Agriculture* and *Cook v. Colgate University* came early in the decade and showed that the courts

You have 1 free article left. **Subscribe** for unlimited access.

7/19/23, 12:32 PM
Case 4:20-cv-03919-CW Document 389-1 Filed 07/21/23 Page 352 of 457
Hundreds of Colleges May Be Out of Compliance With Title IX. Here's Why.

were willing to rule against colleges that were not meeting compliance standards. But the seminal case of the era was decided in 1996.



ARDEN BARNES

**Suzie Stammer (left) coached varsity field hockey at the U. of Kentucky in the 1970s. But in 1979, the sport was demoted to club status. Now Stammer has enlisted Lisa Niblock and another student to file a Title IX lawsuit against the university in hopes of forcing it to restore field hockey to varsity status.**

*Cohen v. Brown* originated when nine female athletes sued Brown University in April 1992 for downgrading the funding of the women's volleyball and gymnastics teams to donor-funded programs. With the change, the university was not Title IX compliant, the athletes argued.

U.S. District Court Judge Raymond J. Pettine agreed. "Title IX does not require an institution to provide any athletics opportunities to its students," the judge wrote in his 1996 decision. "What it does require is that an institution provide equal opportunity to both genders in any program it chooses to offer."

---

You have 1 free article left. **Subscribe** for unlimited access.

Defining Title IX athletic compliance standards became a priority for the Bill Clinton and George W. Bush presidential administrations, "albeit in different directions," said Welch Suggs, author of *A Place on the Team: The Triumph and Tragedy of Title IX,* and an associate professor of journalism and mass communications at the University of Georgia.

Partially in response to the *Cohen v. Brown* decision, the Office for Civil Rights sent a "Dear Colleague" letter to colleges in January 1996, clarifying the three-part test for proportional participation.

As part of the clarification, the Office for Civil Rights set the standard that to satisfy the first prong, the difference in participation opportunities must "not be sufficient to sustain a viable team." That is, if a college added a team for the underrepresented sex, the disparity would flip. The largest women's varsity team roster size for all divisions in 2018 was rowing, with the median team comprising 31.3 participants. Rounding up, that means that any university with a participation opportunity disparity of 33 or larger is out of compliance with prong one. And that's the most generous reading. Universities that already have a women's rowing team are then measured by the median size of the teams they don't have. Most teams have 10 to 25 athletes.

But universities can remain in compliance by meeting one of the other two tests. That's why those prongs exist. When the original legislation was drafted, colleges expected to remain out of compliance, according to Scott Schneider, a lawyer and expert on Title IX. Prongs two and three, he said, were introduced to give institutions some leeway.

The idea behind prong two is simple: As long as they are working toward compliance they meet the spirit of the law. Except, if universities have relied on prong two and truly have demonstrated a history of expansion, then at some point in the decades since Title IX became law, they should have hit proportionality.

"Basically, no school can meet prong two," Chaudhry said. "If you're not meeting prong one, then really it's about prong three, which is showing you're fully accommodating the interests and abilities of your female students."

That third prong can give universities cover. Victoria Jackson, a sports historian and clinical assistant professor of history at Arizona State University, calls it the "political prong," subject to

You have 1 free article left. **Subscribe** for unlimited access.

prong," Jackson said. But with Betsy DeVos as education secretary, "it looks like you can use the third prong in ways that don't get to the intent or heart of the law."

To defend against Lisa Niblock's lawsuit, the University of Kentucky will most likely rely on prong three. "With 22 sports, UK has the broadest-based athletics program in the Southeastern Conference," Jay Blanton, a university spokesman, said in a statement. "Based on our surveys of our students, the current sports offerings fully accommodate the interests and abilities of our undergraduate students."

**The Problem With Surveys**

Surveys as a measure for prong-three compliance have long been a source of contention. *Cohen v. Brown*'s full accommodation clause said universities must "fully" meet demonstrated interest and abilities, which is "a much taller task than just doing a survey," said Suggs, who is a former senior editor at *The Chronicle*. In fact, in 2005, the Office for Civil Rights introduced a template for a "model survey" for institutions to ensure compliance but then scrapped it five years later. The 2005 clarification also put the burden of proof for compliance on OCR or the students themselves, not the universities, and set the standard for noncompliance as "a preponderance of evidence."

Kentucky's 2018 athletics-interest survey begins by asking students to mark which Kentucky sporting events they attend or watch. Men's and women's sports are delineated. It asks how many hours students spend attending and watching the events before asking, "Why don't you attend UK varsity sports events?" Only after that does the survey offer a "Varsity interest check." Students can mark any sports they would be interested in, and depending on the sports chosen, some follow-up questions appear.

For lacrosse, the survey asks respondents if they believe they could play the sport at a Division I level. It then asks them to objectively demonstrate their ability. Respondents can accomplish that through recruitment experiences (they were recruited by a Division I school to play lacrosse); credentials (they were named a United States Lacrosse All-American); and skills (they can run a mile in under five minutes).

Lastly, the survey asks respondents about various varsity agreements. Would they still compete without scholarships? Would they submit to random drug testing and social-media monitoring?

You have 1 free article left. Subscribe for unlimited access.

Would they adhere to curfews and nutritional programs and marketing commitments and practice schedules up to 20 hours per week in-season?

The survey showed that 81 students expressed interest in creating a varsity women's lacrosse team, well above the average roster size of 23.4. But Kentucky deemed that only one respondent had the ability, according to the "objective criteria." And none were willing to accept the restrictions.

Kentucky argues that the survey proves it meets demonstrated interest. Jill Zwagerman, Niblock's lawyer, and Suggs say the methodology is flawed. "It's a self-selected sample," Suggs said. "If someone was recruited to play lax at another school, they would probably be there."

Cheryl Cooky, an associate professor at Purdue University who studies the cultural impact of gender inequality in sports, said that regardless of the methodology, the survey itself doesn't reflect the intent of the law. "I imagine those who drafted the three prongs of compliance were not anticipating or envisioning institutions asking for specific performance requirements," she said. Ability, in the spirit of the law, does not mean competing at the highest possible level, she added.

When the Office for Civil Rights revoked the model survey in 2010, it said it would evaluate a multitude of factors to assess demonstrated interest instead. One of the factors considered: "Requests for the elevation of an existing club sport to intercollegiate status."

**An Influx of Women**

Under the Obama White House, the focus of Title IX enforcement strayed from athletics opportunities to inquiries into sexual harassment and sexual assault. That priority has remained under the Trump administration, though as Suggs said of the Clinton and Bush presidencies, "albeit in a different direction."

American college campuses flipped from majority-male enrollment to majority female about 40 years ago. Even though women make up more than 55 percent of college enrollments nationwide, their athletics-participation opportunities have stagnated around 42 percent, according to Suggs. Football programs contribute to that. With no women's sport that has an equivalent roster size, it

You have 1 free article left. Subscribe for unlimited access.

becomes more difficult for football-supporting institutions to also field women's opportunities proportionate to men's.

"The cultural consequence of that is that it continues to send subtle and not-so-subtle messages to women that their participation is a lower priority," said Cooky. "There are these instances, and Kentucky is one of them, how in certain spaces we're still not that far from where we were in 1972."

Institutions like North Carolina have the resources to support as many women's teams as possible, even if it doesn't bring them much closer to proportionality. North Carolina has the 10th-most female athletes out of all Division I schools despite being the sixth-worst in terms of proportional participation opportunities. By comparison, Kentucky is 149th in the number of female athletes.

Instead of working to address participation inequality in sports, universities assume they'll get away with noncompliance until somebody sues or files a complaint, said Chaudhry. The incentive is for colleges to keep the status quo, said Cooky, and "hope, fingers crossed, that a couple of really brave students don't come forward with a lawsuit." And in recent years, colleges haven't had much to worry about.

The politicization of civil rights means that students are the main line of defense for equal opportunities under Title IX. But it's extremely difficult for individual students or a group of students to bring suits. For one, the process generally lasts years, with the students never actually getting to enjoy the fruits of their labor. And colleges generally have more than enough resources to fight it, according to Donna Lopiano, a former gender-equity consultant to the Office for Civil Rights. "Unless you have deep pockets to sue," she said, "there's a power imbalance there."

Usually, the lawsuits come about when a university has cut a sport and the athletes have already lost their chance to play, Lopiano said. And Lisa Niblock is no different. As a senior, she has already given up her dream of playing collegiate lacrosse. She just got her certificate to officiate collegiate lacrosse games, and that's enough to satisfy her passion for the sport.

But with the lawsuit, she's not worried about the timeline or the potential cost; she's thinking of all the women who want to compete in varsity athletics at Kentucky in the future.

You have 1 free article left. Subscribe for unlimited access.

Stammer's fight to bring field hockey back to varsity status ultimately hinged on persuading a 21-year-old college senior to file a federal lawsuit. And with the Department of Education allowing hundreds of colleges to remain out of compliance, enforcing equal participation in athletics falls to those 18- to 22-years-olds across the country. Stammer has also started a GoFundMe to finance other lawsuits if students want to hold their colleges accountable.

"It has to be student-driven," Stammer said. "You have to find a certain type of individual like Lisa Niblock who sees the disparity and has the courage and the strength and the tenacity to say I'm going to do something about it."

*Wesley Jenkins is an editorial intern at* The Chronicle. *Follow him on Twitter* @_wesjenks, *or email him at* wjenkins@chronicle.com.

A version of this article appeared in the November 8, 2019, issue.

We welcome your thoughts and questions about this article. Please email the editors or submit a letter for publication.

TEACHING & LEARNING     ATHLETICS

## IN THE CHRONICLE STORE



**The Future of Teaching**



**A Curriculum That Matters**



**The Future of Gen Z**

You have 1 free article left. Subscribe for unlimited access.

7/19/23, 12:32 PM
Case 4:20-cv-03919-CW Document 289-1 Filed 07/21/23 Page 359 of 457
Hundreds of Colleges May Be Out of Compliance With Title IX. Here's Why.



**The Accessible Campus**


1255 23rd Street, N.W. Washington, D.C. 20037
© 2023 The Chronicle of Higher Education

You have 1 free article left. **Subscribe** for unlimited access.

# EXHIBIT 67

TITLE IX: FALLING SHORT AT 50

# Female athletes stiffed on scholarships at some of the biggest colleges in the country

**Kenny Jacoby** **Rachel Axon** **Lindsay Schnell** **Steve Berkowitz** USA TODAY
Published 2:00 AM PDT Aug. 17, 2022 **Updated 2:34 AM PST Dec. 15, 2022**

To salute the 50th anniversary of Title IX and its women's sports program, the University of South Florida created a video this spring featuring highlights, photos and a by-the-numbers commemoration of achievements by its female athletes: NCAA and conference championships won, All-American honors received, USF Athletics Hall of Fame honorees named.

Left unsaid: USF was shortchanging the same athletes under the very law it celebrated.

In 2020-21, USF gave more athletic scholarship money to its football team of 117 players than to the 204 athletes on its 10 women's teams combined.  Altogether, the school stiffed female athletes by nearly $900,000 in scholarships that year, in violation of Title IX, the federal law prohibiting sex discrimination in education, a USA TODAY investigation found.

## About the series

USA TODAY's "Title IX: Falling short at 50" exposes how top U.S. colleges and universities still fail to live up to the landmark law that bans sexual discrimination in education. Title IX, which turned 50 this summer, requires equity across a broad range of areas in academics and athletics. Despite tremendous gains during the past five decades, many colleges and universities fall short, leaving women struggling for equal footing.

Title IX requires schools to distribute athletic scholarship dollars equitably, but such disparities have existed at USF each of the past 18 years – as far back as public data is available. To comply with Title IX, the Bulls would have needed to give women an additional $11 million in athletic scholarships over that time.

"It's insanely frustrating," said Karen-Kay Lyvers, a former USF track and field athlete who racked up nearly $20,000 in student loans despite earning a partial athletic scholarship during her two years at the school.

She lamented that, while many female athletes struggle, some male athletes "who don't even get their uniforms dirty at games (are) able to coast through college with no debt, even though they don't contribute to the school or conference or score points."

Lyvers, who transferred to Wichita State University in 2020, told USA TODAY she had no idea about Title IX's scholarship equity requirement or that her college openly skirted it.

"Why don't they tell us that?" she said.

Each year, thousands of the nation's top college female athletes, like Lyvers, get the short end of the same stick.

The majority of public schools that competed in the NCAA's Football Bowl Subdivision – the highest echelon of college sports – failed to comply with Title IX's scholarship requirement, USA TODAY's investigation found.

Unlike some Title IX requirements that are subjective and complex, the calculation for its scholarship requirement is relatively straightforward. U.S. Department of Education policy says the percentage of athletic scholarship dollars a college awards male and female athletes must fall within 1 percentage point of their representation in the athletic department.

A school where 45% of athletes are women, for instance, must give them between 44% and 46% of its athletic financial aid.

But of 107 FBS public universities analyzed by USA TODAY, only 32 complied with the requirement, data the schools reported to the Department of Education and NCAA show. Forty-nine of them underfunded athletic scholarships for women. The other 26 underfunded men's scholarships, but in nearly every case it was because they had so few women athletes in the first place.

The schools that underfunded women would have needed to give them $23.7 million more in athletic scholarships in 2020-21 alone to comply with the law, the analysis found – nearly a half-million per school.

# Where schools have fallen short of Title IX scholarship requirements





https://www.usatoday.com/in-depth/news/investigations/2022/08/17/female-athletes-stiffed-scholarship-money-colleges-title-ix/7640647001/?gps-source=BRNMSVCPSPXXTITLEIX&itm_source=usat&itm_medium=onsite-spike&itm_campaign=titleix-storytellingstudio-n&itm_content=static

| School | Athletes who are female | Percentage of scholarship money given to female athletes | Female athlete scholarship difference (Title IX compliance measure) |
|---|---|---|---|
| New Mexico | 50.5% | 41.7% | -8.8% |
| South Florida | 44.0% | 35.9% | -8.1% |
| Central Michigan | 52.5% | 45.0% | -7.4% |
| Florida International | 51.5% | 44.5% | -7.0% |
| San Diego State | 57.2% | 50.6% | -6.6% |
| Utah State | 48.6% | 42.5% | -6.1% |

SOURCE: USA TODAY analysis of 2020-21 financial data submitted to the NCAA and federal government by the 107 public schools in the Division I Football Bowl Subdivision

Only the University of New Mexico reported a wider gap for female athletes than USF. Although 50.5% of its athletes were women, New Mexico awarded them just 41.7% of athletic scholarship money – a $1.25 million shortfall. The average Lobos male athlete received $23,700, while the average Lobos female athlete got $16,600.

In a statement, New Mexico touted its progress on Title IX in recent years and said the reason for its disparity was nondiscriminatory. It declined to answer further questions.

The Department of Education permits differences greater than 1 percentage point if they can be explained by nondiscriminatory factors. For instance, some schools told USA TODAY they spent more on scholarships for male athletes because more of them came from out of state, so their tuition costs were higher. The department might consider that a nondiscriminatory factor, assuming the school did not discriminate against female athletes by devoting more recruiting resources toward men's teams.

Other schools told USA TODAY the scholarship numbers they submitted to the Department of Education and NCAA should not be used at all to assess their Title IX compliance because they baked in some costs – such as summer school tuition – that the department would exclude from a compliance assessment. Despite gender disparities in their public-facing numbers, some of these schools said they keep their correct numbers internal, and that those numbers showed them in compliance.



Neena Chaudhry, general counsel for the National Women's Law Center
"For many athletes, an athletic scholarship can make the difference between being able to go to school or not. In addition to sending a message to women about how they're valued, this is real money that makes a real difference in people's lives."

MARY KATE MCKENNA PHOTOGRAPHY

"For many athletes, an athletic scholarship can make the difference between being able to go to school or not," said Neena Chaudhry, general counsel for the National Women's Law Center, which has litigated dozens of Title IX cases on behalf of female athletes. "In addition to sending a message to women about how they're valued, this is real money that makes a real difference in people's lives."

As increasingly more students grapple with the rising costs of college and amass more debt as a result, the disparate treatment is even worse for athletes of color, who disproportionately have struggled to afford higher education without financial aid.

"Women of color, we're always getting screwed," said Shamier Little, the rare track athlete on a full scholarship when she ran for Texas A&M University from 2013 to 2016. Most of her teammates, she said, had to pay their way through school, at least partially.

"Growing up, all my mama talked about was how she wouldn't wish college debt on her worst enemy," said Little, who left school early to go pro. Adidas, her sponsor, paid for her to finish her degree.

https://www.usatoday.com/in-depth/news/investigations/2022/08/17/female-athletes-stiffed-scholarship-money-colleges-title-ix/7640647001/?gps-source=BRNMSVCPSPXXTITLEIX&itm_source=usat&itm_medium=onsite-spike&itm_campaign=titleix-storytellingstudio-n&itm_content=static



Shamier Little, who attended Texas A&M on a rare full scholarship as a track athlete

"Women of color, we're always getting screwed."

KIRBY LEE, USA TODAY SPORTS

The findings underscore how the playing field at many of the universities with the largest and wealthiest sports programs remains uneven for female athletes, 50 years after the landmark civil rights law was enacted. Closing the gap, however, is not quite as simple as writing more women bigger checks.

Scholarship limits that NCAA schools imposed on themselves 40 years ago make it difficult to distribute the dollars equitably. While those limits let schools place up to 85 football players on full-ride scholarships, no women's sport has a limit higher than 20.

USF, for example, funded scholarships for each of its women's teams at nearly the full capacity that NCAA rules permit. Giving them the additional $900,000 necessary to comply with Title IX would have pushed them over the limits and subjected the teams to penalties, including championship bans, scholarship reductions, and athletes being ruled ineligible.

This year, for the first time in two decades, USF announced it will add two new women's teams over the next three years – a move that will create the capacity for 20 more full-ride scholarships. Even so, it's not clear that will be enough to bring USF into Title IX compliance.

"USF Athletics has historically expanded opportunities and support for female student-athletes and continues to do so with the recent additions of a women's lacrosse program and a women's beach volleyball program that increase our total of varsity women's sports teams to 12 – all of which are fully funded for available scholarships under NCAA rules," associate athletic director Brian Siegrist told USA TODAY in an emailed statement.

https://www.usatoday.com/in-depth/news/investigations/2022/08/17/female-athletes-stiffed-scholarship-money-colleges-title-ix/7640647001/?gps-source=BRNMSVCPSPXXTITLEIX&itm_source=usat&itm_medium=onsite-spike&itm_campaign=titleix-storytellingstudio-n&itm_content=static

The data the school submits to the Department of Education, Siegrist said, "does not provide a complete picture in regards to USF's support for female student-athletes."



The University of South Florida is located in Tampa and has nearly 30,000 undergraduate students on its campus each year.
AIMEE BLODGETT, UNIVERSITY OF SOUTH FLORIDA

Yet dozens of other universities decide again and again to adhere to NCAA rules and violate federal law, at the expense of female athletes. It's a choice experts criticize as morally and legally wrong. But given that NCAA enforcers have proven far more likely than the Department of Education to punish schools, experts said, the practice continues.

In its history, the Education Department has never revoked a school's federal funding over Title IX violations. Despite annually collecting data from thousands of colleges that point to obvious offenders, it rarely, if ever, investigates them proactively. And the department's staff of investigators, who must handle thousands of complaints across a range of issues including Title IX, decreased from 417 in 2011 to 334 in 2021, according to the department's budget request for fiscal year 2023.

Aggrieved athletes are left to figure out the rules themselves, assess if their own schools are breaking them and file a complaint with the department or hire lawyers to sue their institutions.

"The idea that somehow NCAA rules could be used as a defense in terms of violating a federal law is quite astonishing by itself," said Ellen Staurowsky, a professor of sports media at Ithaca College who studied the issue for the nonprofit Women's Sports Foundation. "But I think it's also telling because the NCAA will penalize the school if it's in violation of its rules.

"The federal government has not."

https://www.usatoday.com/in-depth/news/investigations/2022/08/17/female-athletes-stiffed-scholarship-money-colleges-title-ix/7640647001/?gps-source=BRNMSVCPSPXXTITLEIX&itm_source=usat&itm_medium=onsite-spike&itm_campaign=titleix-storytellingstudio-n&itm_content=static

# NCAA scholarship limits hurt women

In February, 17 current and former members of San Diego State University's women's rowing and track and field teams sued their school, alleging it violated Title IX for more than a decade by underfunding scholarships for female athletes.

In an April motion to dismiss the lawsuit, San Diego State said its hands were tied because NCAA scholarship limits precluded it from providing women more money.

The legal dispute, which remains ongoing, illuminates the inherent Title IX conflict NCAA limits create.

Unlike the majority of FBS public universities, San Diego State indisputably complied with a different Title IX standard: It provided men and women opportunities to play sports at rates proportional to their enrollment. Its student body and athlete population were both 57% female in 2020-21.



San Diego State University was sued this year by current and former female athletes who allege SDSU violated Title IX for more than a decade by underfunding scholarships for female athletes.
DENIS POROY, AP

Achieving proportionality required the Aztecs to sponsor twice as many women's teams as men's to offset their 113-man football roster. San Diego State sponsored women's

https://www.usatoday.com/in-depth/news/investigations/2022/08/17/female-athletes-stiffed-scholarship-money-colleges-title-ix/7640647001/?gps-source=BRNMSVCPSPXXTITLEIX&itm_source=usat&itm_medium=onsite-spike&itm_campaign=titleix-storytellingstudio-n&itm_content=static

basketball, cross country, golf, lacrosse, soccer, softball, swimming and diving, tennis, volleyball and water polo, in addition to rowing and track and field.

But NCAA limits capped the number of scholarships it could offer the women. For all 12 women's sports combined, San Diego State had up to the equivalent of 139 full-ride scholarships to divvy among its 305 female athletes. For male athletes, that ceiling was 128.6 – almost as many scholarships, despite the Aztecs sponsoring just six men's teams, with 228 athletes.

Therein lies the problem. If San Diego State had maxed out its limits for both sexes, only 51.9% of its total scholarship money would have gone to women – roughly 5 percentage points short of what Title IX required.

"That's not a justification for discriminating against women," Chaudhry said. "If there's a rule that schools think is hampering their ability to comply, then they need to figure out how to have that rule changed or how to comply nevertheless."

San Diego State did not respond to multiple emails requesting comment.

"This lawsuit is in no way us saying we're ungrateful for the experience we've had," said Carina Clark, a track athlete and plaintiff in the case. "I think I can speak for all of us when I say we'll remember it for the rest of our lives. This is ultimately about what we can do to change things for those coming after us. What SDSU is doing isn't right."

Why were scholarship capacities for male and female athletes nearly equal at San Diego State, when it had six fewer men's teams than women's? The answer, as it so often is in questions of equity in college sports, is football.

The NCAA scholarship limit for FBS football teams is 85 full-ride equivalents. No other NCAA men's or women's sport comes close.

Rowing and track and field are the only women's sports with average roster sizes that approach football's, but their scholarship limits pale in comparison. Their respective limits are 20 and 18, even though teams of 100-plus female rowers and 60-plus female track and field athletes are common.

For soccer and softball – two of the nation's most popular women's sports – the limits of 14 and 12, respectively, barely allow for enough full-rides to field a starting lineup.

# Scholarship limits for most common men's and women's sports

https://www.usatoday.com/in-depth/news/investigations/2022/08/17/female-athletes-stiffed-scholarship-money-colleges-title-ix/7640647001/?gps-source=BRNMSVCPSPXXTITLEIX&itm_source=usat&itm_medium=onsite-spike&itm_campaign=titleix-storytellingstudio-n&itm_content=static



"Eighty-five players on a football team is ridiculous," said David Berri, an economics professor at Southern Utah University. "You only play 22 of them. You don't need four strings."

Over the years, various college football coaches and athletics administrators have countered that 85 scholarships are necessary because of the sport's injury rate and because college teams can't just add players during a season to replace those who get hurt, the way NFL teams do.

They've also expressed concern that, without 85 scholarships available, the quality of play would suffer, fan and commercial interest would decline and the sport would not generate the revenue that it does.



**5 charts show athletic scholarships' bias toward football – and against women**

https://www.usatoday.com/in-depth/news/investigations/2022/08/17/female-athletes-stiffed-scholarship-money-colleges-title-ix/7640647001/?gps-source=BRNMSVCPSPXXTITLEIX&itm_source=usat&itm_medium=onsite-spike&itm_campaign=titleix-storytellingstudio-n&itm_content=static

**Explore the graphics**

While NCAA scholarship limits are lower for men's teams than women's teams of the same sport, those differences do little to close the football gap.

Of the 107 universities analyzed by USA TODAY, the total scholarship capacity was higher for men's teams than women's at 104 of them. Only San Diego State, Eastern Michigan University, and the University of California, Berkeley, had higher capacities for women.

Additionally, just because schools can award that many scholarships doesn't mean all of them can afford to. Eighty-five FBS public universities did not fully fund women's scholarships in 2020-21, USA TODAY found.

The limits are unfair to both women and men, said Barbara Osborne, a University of North Carolina at Chapel Hill sport administration professor who studied the issue in 2017.

Soccer, she noted, is one of the most popular youth sports in the country, but under NCAA limits, schools have only two dozen soccer scholarships for men and women combined.

Efforts have been made to increase scholarship limits for some women's sports since schools first adopted them in 1982-83 – the year after the NCAA started sponsoring women's championships. But the schools collectively voted down most of those proposals, and successful ones barely moved the needle.

Over the past 25 years, schools have voted to increase limits for women's soccer by three; track and field and gymnastics by two; and field hockey, lacrosse, and softball by one each. The last increase came in 2006, though the NCAA has since added beach volleyball as a championship sport.



US Youth Soccer, the largest youth sport organization in the country, says it registers nearly 3

https://www.usatoday.com/in-depth/news/investigations/2022/08/17/female-athletes-stiffed-scholarship-money-colleges-title-ix/7640647001/?gps-source=BRNMSVCPSPXXTITLEIX&itm_source=usat&itm_medium=onsite-spike&itm_campaign=titleix-storytellingstudio-n&itm_content=static

million players annually. Additionally, nearly 1 million kids play soccer in high school, according to the National Federation of State High School Associations.

TOM DORSEY AP

NCAA governing bodies recently have discussed the prospect of ending scholarship limits altogether. But so far, no proposals have been formally submitted for a vote.

In a statement to USA TODAY, the NCAA stressed that its member schools – not its national office – propose and adopt scholarship limits.

"If any member school is concerned that these rules are prohibiting them from complying with Title IX, they are encouraged to sponsor additional women's sports on campus and/or propose new rules at any time to allow for greater support," the statement said.

Without the NCAA or Department of Education actively enforcing compliance with the law, UNC's Osborne said, it's unlikely schools will suddenly start holding themselves accountable.

"There's not a large number of schools that are actually in compliance, so there's not going to be a majority that would get that legislation passed," she said.

"They have no incentive for doing that."

## Female athletes denied opportunities

Dozens of FBS schools landed within Title IX's required 1 percentage point range on scholarships, despite NCAA limits that can make compliance difficult.

Most of those schools, however, denied female athletes fair representation to start, which made compliance for them easy.

Take Arkansas State University, a school whose enrollment in 2020-21 was 60% female. Only 39% of its athletes were women.

Arkansas State would have needed to more than double its number of female athletes, 131, for them and their male counterparts to have received equitable participation opportunities. But it gave women 39% of athletic scholarship money – squarely within the 1 percentage point range.

The school acknowledged USA TODAY's request for a comment but did not provide one.

The Department of Education's formula for assessing scholarship equity, experts say, bakes in discrimination.



**Title IX aimed to get women into grad schools. Over 50 years, it shaped their role in sports.**

**Explore the timeline**

"That's such an insane way of doing it," said Berri, the SUU professor. "You're saying, 'I discriminated. That means I get to discriminate on scholarships, as well, because I already started off discriminating.' That's crazy."

The formula would work just fine if Title IX guaranteed women adequate representation in athletic departments. But it doesn't.

While Title IX requires schools to provide women and men "equitable" opportunities to play sports, the Department of Education offers them three ways to demonstrate they are doing so.

Proportionality – meaning the percentage of participation opportunities they offer female athletes roughly equals the percentage of their undergraduate students who are women – is the surest way.

The other two ways – showing they are steadily moving in that direction, and showing their existing sports offerings meet their students' abilities and interests – give schools outs that allow them to continue discriminating.

A USA TODAY analysis found 87% of FBS schools did not meet the proportionality standard in 2020-21. Most, including Arkansas State, did not answer a USA TODAY survey asking if they comply with Title IX's participation equity requirement and, if so, which of the three ways they use to comply.

https://www.usatoday.com/in-depth/news/investigations/2022/08/17/female-athletes-stiffed-scholarship-money-colleges-title-ix/7640647001/?gps-source=BRNMSVCPSPXXTITLEIX&itm_source=usat&itm_medium=onsite-spike&itm_campaign=titleix-storytellingstudio-n&itm_content=static

"You have to create the participation opportunities and provide the financial aid opportunities in order to achieve compliance with the spirit of the law," Osborne said. "If you're still not in participation-opportunity compliance, yay that you're giving women enough money, but you're still not providing enough opportunities for women."

The imbalance in participation opportunities creates a facade that dozens of schools give female athletes too much scholarship money. In reality, those schools simply don't have enough female athletes.



University of Nebraska athletes train in Lincoln, Neb., on Aug. 12, 2020.
THE ASSOCIATED PRESS

At the University of Nebraska, for instance, men accounted for 59% of athletes in 2020-21 but received 53% of scholarship money – a 6 percentage point gap that put it out of Title IX compliance. But men comprised 51% of the student body, meaning they already received more than fair share of opportunities.

When female athletes lack fair representation, said Andrew Zimbalist, a sports economist at Smith College, "there's no question that the discrimination becomes compounded."

"The level of scholarships, the level of different kinds of treatment and facilities, isn't relevant if people aren't playing sports," Zimbalist said. "If you're not playing sports, there's no scholarship to be had."



Catherine Lhamon, assistant secretary of the Office for Civil Rights in the Department of Education

LESLIE B. WILLIAMS, U.S. DEPARTMENT OF EDUCATION

The Department of Education did not answer specific questions about its standards on proportionality and scholarships. In a statement to USA TODAY, assistant secretary Catherine Lhamon highlighted progress for women in Title IX's first 50 years.

"The Department is fully committed to continuing this progress and ensuring there is robust support for collegiate women's sports," Lhamon's statement said. "Congress requires every school to do its own work to meet its Title IX obligations in the classroom and on the sports field so all students have equal opportunities to thrive.

"We will continue to educate schools on ways to ensure compliance with the law and are prepared to ensure rigorous enforcement against claims of sex discrimination of any kind."

## 'Don't look behind the curtain'

The Department of Education typically investigates a school only when a member of the public, such as an athlete, parent or coach, files a complaint presenting evidence of sex discrimination.

But that's hard to do when such evidence is scant. Despite the federal Equity in Athletics Disclosure Act requiring universities to report data – including those on scholarships – to the federal government, the Department of Education's public-facing database contains numbers that often are inaccurate or misleading. When USA TODAY contacted 20 FBS colleges about gender disparities in their reported numbers, many said the data was wrong or couldn't be used to assess Title IX compliance.

https://www.usatoday.com/in-depth/news/investigations/2022/08/17/female-athletes-stiffed-scholarship-money-colleges-title-ix/7640647001/?gps-source=BRNMSVCPSPXXTITLEIX&itm_source=usat&itm_medium=onsite-spike&itm_campaign=titleix-storytellingstudio-n&itm_content=static

San Diego State argued as much in its response to the female rowers and track and field athletes' federal lawsuit. Louisiana State University made a similar claim in response to USA TODAY's questions.

LSU's public-facing data showed 50.1% of its athletes were female in 2020-21 but that it gave them only 45.3% of scholarship money – a $960,000 shortfall. Cody Worsham, the athletic department's chief brand officer, told USA TODAY that, to the contrary, LSU was perfectly in compliance that year.

"Without having seen the specific data set you've utilized, it is likely your analysis has failed to account for information that is excluded from Title IX financial aid scholarship analysis," Worsham said. "Our numbers for 2020-21 are within the 1% deviation of participation and scholarships extended by gender as required by federal law.

"Any reporting to the contrary would be inaccurate."



Louisiana State University, located in Baton Rouge, Louisiana, shorted female athletes by nearly $1 million on scholarship money, according to its public-facing data. But the school said those numbers are wrong and that it complies with Title IX.
SCOTT CLAUSE, USA TODAY NETWORK

It's true that small differences can exist between the public-facing numbers and the numbers the Department of Education would use to assess a school's Title IX compliance, said Arthur Bryant, an attorney representing the San Diego State athletes – but not the types of massive differences LSU described.

"That's a good approach – 'Don't look behind the curtain!'" Bryant said, chuckling. "Yes, there can be minor differences. But they're very unlikely to give you a false perception of what's happening."

Upon further questioning by USA TODAY, Worsham acknowledged LSU's reported numbers were incorrect. For example, rather than report the exact dollar amounts it awarded male and female athletes on its track and field and swimming and diving teams that year, it took the combined amounts it gave to men and women on those teams and divided the totals by two. No other Southeastern Conference school reported its numbers that way.

USA TODAY contacted athletic directors, athletics compliance directors and sports information directors at 19 other FBS public schools whose public-facing data showed the highest levels of discrimination against women. Each school's percentage of athletes who were female was at least 3.5 points higher than the percentage of scholarship money they received.

Asked why they fell outside of the required 1 percentage point range in 2020-21, their answers ran the gamut:

- Two schools – Boise State University and Georgia State University – admitted they did not comply with Title IX's scholarship requirement. Both said their numbers were thrown off by an NCAA rule adopted in response to the coronavirus pandemic that gave some athletes an extra year of eligibility.
- Georgia State additionally said its reported numbers were incorrect and provided updated numbers, which showed it was still out of compliance but by less. LSU and East Carolina University also provided alternative numbers, which showed LSU squarely in compliance and ECU off by half a percentage point.
- New Mexico, the University of Wyoming, Ohio University and the University of Nevada, Las Vegas, said their gaps – all greater than 4.5 percentage points – were explained by permissible, nondiscriminatory reasons. For instance, they said a greater share of their male athletes came from out of state or attended summer school, while more female athletes received non-athletic academic aid.
- Eastern Michigan University said it complied with "all aspects of Title IX" and provided no explanation for its disparity. The school's athletics program currently operates under a consent decree and monitoring by a court-appointed referee. The decree resolved a Title IX lawsuit filed four years ago. The referee's first report, in August 2021, said the university was making satisfactory progress and working in good faith to comply.
- USF, Central Michigan University and New Mexico State University did not dispute their noncompliance but did not answer USA TODAY's question. They provided statements touting their progress on Title IX in the past 50 years and compliance with the law in other areas.
- San Diego State, Florida International University, Utah State University, Miami University of Ohio, Appalachian State University and Bowling Green State University did not respond to multiple emails. University of Minnesota officials did not respond after initially asking for more time, which USA TODAY granted.
- Michigan State University, which was sued for Title IX violations by female athletes last year, declined to comment, citing pending litigation.

https://www.usatoday.com/in-depth/news/investigations/2022/08/17/female-athletes-stiffed-scholarship-money-colleges-title-ix/7640647001/?gps-source=BRNMSVCPSPXXTITLEIX&itm_source=usat&itm_medium=onsite-spike&itm_campaign=titleix-storytellingstudio-n&itm_content=static

Requiring schools to report numbers was supposed to be "the first step to increase compliance with Title IX," then-U.S. Rep. Cardiss Collins said in a 1993 subcommittee hearing during which she introduced the bill that became the Equity in Athletics Disclosure Act.

Nearly 20 years later, the Department of Education says the law is not supposed to be used to assess Title IX compliance – but rather, for prospective students to assess if a school is committed to providing "equitable opportunities."

The unreliability of schools' self-reported numbers adds yet another obstacle for athletes like Lyvers, who had little understanding of Title IX's requirements and was already struggling to make ends meet.

"There was not one semester where I wasn't incredibly stressed and scraping together money to be able to register for classes," Lyvers told USA TODAY.

It shouldn't be the responsibility of female athletes, she said, to learn the law and force their schools to treat women fairly.

"I think the main thing people, including athletes, don't realize is this is a business," Lyvers said. "No one prepares you for how it works."

# EXHIBIT 68



2022-23 NCAA®

# DIVISION I **MANUAL**

**EFFECTIVE**
**AUGUST 1, 2022**

**12.1.2.1.4.3.1 Expenses Prior to Full-Time Collegiate Enrollment -- Professional Sports Organization.** Prior to full-time collegiate enrollment, an individual may accept up to actual and necessary expenses for competition and practice held in preparation for such competition from a professional sports organization that sponsors the event. *(Adopted: 10/16/12)*

**12.1.2.1.4.3.2 Expenses/Benefits Related to Olympic or Paralympic Games.** Members of an Olympic or Paralympic team may receive all nonmonetary benefits and awards provided to members of an Olympic or Paralympic team beyond actual and necessary expenses and any other item or service for which it can be demonstrated that the same benefit is available to all members of that nation's Olympic or Paralympic team or the specific sport Olympic or Paralympic team. *(Adopted: 11/1/00, Revised: 1/19/13 effective 8/1/13, 1/22/20)*

**12.1.2.1.4.4 Expenses for Family Members of Participants in Athletics Competition.** Expenses received by the family members of a participant in athletics competition from a nonprofessional organization sponsoring the competition in excess of actual and necessary travel, room and board expenses, or any entertainment expenses, unless such expenses are made available to the family members of all participants in the competition. *(Adopted: 1/16/93, Revised: 1/11/97, 4/25/18)*

**12.1.2.1.4.4.1 Postseason Bowl Event. [FBS]** On one occasion per year, a student-athlete may designate either additional individuals or substitutes (not to exceed a total of six individuals) to receive entertainment expenses related to an event organized by the nonprofessional sponsor of a postseason bowl game specifically for the family members of student-athletes participating in the postseason bowl. For an institution that participates in an additional postseason game between the winners of two postseason bowl games [see Bylaw 17.11.6.2.1-(d)], a student-athlete may designate either additional individuals or substitutes (not to exceed a total of six individuals) to receive entertainment expenses related to an event organized by the nonprofessional sponsor of the additional game specifically for the family members of student-athletes participating in the additional game. The additional individuals or substitutes designated by the student-athlete shall be subject to the review and approval of the institution's athletics director (or designee). *(Adopted: 4/29/04 effective 8/1/04, Revised: 4/25/18, 1/23/19)*

**12.1.2.1.5 Payment Based on Performance.** Any payment conditioned on the individual's or team's place finish or performance or given on an incentive basis that exceeds actual and necessary expenses, or receipt of expenses in excess of the same reasonable amount for permissible expenses given to all individuals or team members involved in the competition. *(Revised: 4/25/02 effective 8/1/02, 1/19/13 effective 8/1/13)*

**12.1.2.1.5.1 Operation Gold Grant.** An individual (prospective student-athlete or student-athlete) may accept funds that are administered by the U.S. Olympic and Paralympic Committee pursuant to its Operation Gold program. *(Adopted: 4/26/01, Revised: 10/17/19)*

**12.1.2.1.5.2 Incentive Programs for International Athletes.** An international prospective student-athlete or international student-athlete may accept funds from a country's national Olympic and/or Paralympic governing body (equivalent to the U.S. Olympic and Paralympic Committee) based on place finish in one event per year that is designated as the highest level of international competition for the year by the governing body. *(Adopted: 1/17/15 effective 8/1/15, Revised: 10/17/19, 1/22/20)*

**12.1.2.1.5.3 Awards Based on Performance in Outside Competition.** An individual may receive an award (e.g., trophy, medal, saddle) based on place finish or performance in outside competition, subject to the applicable awards limits (see Bylaw 16.1). *(Adopted: 8/26/10)*

**12.1.2.1.6 Preferential Treatment, Benefits or Services.** Preferential treatment, benefits or services because of the individual's athletics reputation or skill or pay-back potential as a professional athlete, unless such treatment, benefits or services are specifically permitted under NCAA legislation. **[R]** *(Revised: 1/11/94, 1/14/08)*

**12.1.2.1.7 Prize for Participation in Institution's Promotional Activity.** Receipt of a prize for participation (involving the use of athletics ability) in a member institution's promotional activity that is inconsistent with the provisions of Bylaw 12.5 or approved official interpretations. *(Revised: 11/1/07 effective 8/1/08)*

**12.1.2.2 Use of Overall Athletics Skill -- Effect on Eligibility.** Participation for pay in competition that involves the use of overall athletics skill (e.g., "superstars" competition) constitutes a violation of the Association's amateur-status regulations; therefore, an individual participating for pay in such competition is ineligible for intercollegiate competition in all sports. (See Bylaw 12.5.2.3.3 for exception related to promotional contests.) *(Revised: 4/25/02 effective 8/1/02)*

**12.1.2.3 Road Racing.** "Road racing" is essentially the same as cross country or track and field competition and cannot be separated effectively from those sports for purposes of Bylaws 12.1, 12.2 and 12.8.3.2. Therefore, a student-athlete who

# EXHIBIT 69

# FILED UNDER SEAL

# EXHIBIT 70

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF CALIFORNIA

3               OAKLAND DIVISION

4

5

6   IN RE COLLEGE ATHLETE NIL     )   Case No.
                                  )   4:20-cv-03919 CW
7   LITIGATION                    )
    _____)

8

9

10

11

12

13          DEPOSITION OF DANIEL RASCHER

14             Tuesday, January 10, 2023

15

16

17

18

19

20

21

22   JOB NO. 220885

23   REPORTED BY:

24   HEIDI BELTON, CSR, RMR, CRR, CCRR, CRC

25   CSR No. 12885

1  license?

2      A.   Correct.

3      Q.   Okay.  And the other -- the NI- -- the

4  other group licensing contracts that you've looked

5  at or agreements you've looked at from professional

6  football and basketball, you'd agree that none of

7  those involve media rights; correct?

8      A.   Would you define "media rights" that

9  you're using?

10     Q.   They don't involve compensation related to

11  participation in a broadcast; correct?

12     A.   Some of them have digital media elements

13  of them, but they're not -- a lot of those licenses

14  are -- I mean, they're not for the use of their NIL

15  in a -- let's say a live broadcast.

16     Q.   Right.  So none of those group licenses --

17  group licensing agreements you look at involve

18  payments related to the use of NIL in a live

19  telecast of a sporting event; correct?

20     A.   I believe so, yeah.

21     Q.   Okay.  When you're calculating damages for

22  the men's basketball, women's basketball, and

23  football classes, you are calculating damages based

24  on a group license for the use of NIL in a live

25  telecast of a sporting event; correct?

Page 291

1                    CERTIFICATE OF REPORTER

2              I, HEIDI BELTON, a Certified Shorthand

3    Reporter, hereby certify that the witness in the

4    foregoing deposition was by me duly sworn to tell

5    the truth, the whole truth, and nothing but the

6    truth in the within-entitled cause;

7              That said deposition was taken down in

8    shorthand by me, a disinterested person, at the time

9    and place therein stated, and that the testimony of

10   the said witness was thereafter reduced to

11   typewriting, by computer, under my direction and

12   supervision;

13             That before completion of the deposition

14   review of the transcript was not requested.

15             I further certify that I am not of counsel

16   or attorney for either or any of the parties to the

17   said deposition, nor in any way interested in the

18   event of this cause, and that I am not related to

19   any of the parties thereto.

20   DATED:  January 11, 2023

21   _____

22             HEIDI BELTON, CSR, RMR, CRR, CCRR, CRC

23             CSR NO. 12885

24

25

# EXHIBIT 71

# A Model of a Professional Sports League [†]

Dan Rascher [‡]

September 1, 1996

## Abstract

This paper considers a multi-firm analysis of a cartel. It examines the individual owner's choice of labor, the primary factor of production, and the cartels choice of revenue sharing and salary cap policies in both a profit maximizing model and a utility maximizing model. The effect of decision making outcomes on labor market issues such as talent distribution and wages is explored. Cartel innovation and stability are discussed, especially the likelihood of adoption of institutional policies. The effect of the degree of the salary cap restriction (from unbinding to partially binding to completely binding) is examined. The optimal revenue sharing agreement and salary cap level are generally found to be 100% and 0%, respectively, from the owners' perspective. Wages are found to decrease with increases in revenue sharing and decreases in the salary cap level.

[†]Comments appreciated. Send to rascher@econ.berkeley.edu; 609 Evans Hall, Department of Economics, UC Berkeley, Berkeley, CA 94720; or to 92 Emery Bay Dr., Emeryville, CA 94608.

[‡]Graduate student in the Economics Department, UC Berkeley.

1

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

Electronic copy available at: https://ssrn.com/abstract=1601

Sport is friendship. Sport is health. Sport is education. Sport is life.

—Juan Antonio Samaranch

Centennial Olympic Games

# Part I

# Introduction

## 1   Economics and Sports

Leisure is an important component of our happiness. It is a common notion that we work to be able to afford leisure.[1] The average person in the U.S. between 25 and 64 years of age spends about the same amount of time at work as they do involved in leisure activities, roughly 25% of their time.[2] Sports is a popular form of leisure whether a participant or a fan. Part of the intrigue of sports is the uncertainty involved. Anything can happen, and it usually will.

Why should economists care about economics as it relates to sports? From a societal perspective, sports is one of the few industries which gets its own section in the newspaper, as well as its own 24 hour network, while most of the other industries are grouped together in the business section. In 1991 approximately 87.4 million fans attended the three major professional sports in the U.S. (baseball, football, and basketball) earning over $2 billion in gate receipts, and the sale of broadcast rights created an additional $1.8 billion (Quirk and Fort, 1992). In 1985 the NCAA (a non-profit organization!) grossed over $1 billion, most of which came from the 50 million fans who attended college football and basketball games (Fleisher, Goff, and Tollison, 1992). These numbers don't even include many other sports such as golf, bowling, auto racing, tennis, etc. Often 10-15% of corporate marketing budgets are earmarked for sponsorship of sports events or players. About $30 billion is spent on

---

[1] Leisure is "freedom from the necessity of labor." -Aristotle (Ernest Baker, 1972).

[2] Juster and Stafford (1991).

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

Electronic copy available at: https://ssrn.com/abstract=1601

sports equipment in the United States each year. Americans bet $304 billion in 1991, with gambling on sporting events estimated to be around $27.3 billion, including the black market (*Economist,* 1993). Sports is a primary way to spend leisure time either by playing or by watching.

In addition, athletes are in the public eye and are often purported to be role models. What other occupation is there where each worker's salary is publicly known and discussed at the water cooler or on radio talk shows? In 1922, MLB was awarded exemption from the antitrust laws and ever since, professional sports has been mostly free to reign in the land of the unregulated monopoly.[3]

The study of sports is similar to the study of economics in general. Sporting events are environments where participants respond to incentives and constraints. Athletes, coaches, owners, and even gamblers make decisions under uncertainty and outcomes are produced. The wage structure may affect how players interact with each other or how much effort they put forth. Players react to the severity and probability of punishment by breaking the rules less often. Coaches try to maximize production efficiency and minimize managerial slack. Owners' objectives are functions of winning and profit. Fans search for optimal gambling strategies.

Data involving sports is abundant, cheap, and generally of high quality. A professional athlete is one of the few occupations whose productivity is measured and made public on a daily basis.

These reasons are precisely why the economics and sports literature is so abundant.[4] Most of the research is in labor, but there is a significant amount of work in industrial organization, finance, institutional economics, public economics, comparative systems, and management science.

The rest of the paper is organized as follows. Section two will discuss some of the features pertaining to the economics of professional sports leagues. Next, will be an examination of the previous models of professional sports leagues. Issues to be

---

[3] *Federal Baseball Club of Baltimore v. National League et al.,* 259 U.S. 200 (1922).

[4] See the literature review on sports and economics by Rascher, 1995.

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

examined with this model will comprise section four. Section five will be the model and results. Finally, section six will be a discussion of the results, the generalizability of the model, and future research.

## 2    The Economics of Professional Sports Leagues

What are the economic characteristics of a professional sports league? A professional sports league can be viewed as a classic example of a cartel, with a few exceptions. The product is contests between its members as well as the shared experience partially derived from simultaneous consumption. The social exchange following a contest may be a more significant portion of the value of the product than the game itself, as evidenced by the plethora of Monday-morning-quarterback call in shows. While most goods have some degree of a common bond feeling among its purchasers, it is likely that it is a small share of the product's value compared to the product of a sports league.[5] Not only is there a shared experience, but the value of it increases as more consumers purchase the product. The more fans there are, the better for each fan, i.e. a positive consumption network externality.[6]

The amount of output produced depends on the number of viewers or purchasers of the product. To maintain sufficient demand for these contests, the members must provide an entertaining game. One component of the demand is the absolute quality of the participants. Another part of the entertainment factor is the likelihood of a close contest, i.e. the relative quality of the contestants.[7]

Unlike most businesses or cartels, firms in a sports league need viable competi-

---

[5]Saturn has attempted to create the feeling of a shared experience that goes along with the purchase of its automobiles. This was thought to be strange enough to evoke a spoof on a sitcom about the "Saturn owners club". If it had been a "Raiders club", no one would have thought twice about it.

[6]One of the many reasons for the failure of rival leagues such as the USFL and the WFL is because of the positive consumption network externality associated with sports. It forms a natural barrier to entry because fans of the sport would have to learn about the new teams and players in a new league. There isn't any tradition or any rivalries in a new league. There is an "installed base" of fans in the incumbent's league.

[7]Fort and Quirk (1995) use relative quality while Atkinson, Stanley, Tschirhart (1988) use absolute quality in their demand specifications.

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

tors. While a certain amount of domination is optimal, from an individual owners perspective, too much will result in league dissolution, and thus a lower utility for every owner. Hence, there is a limited positive production network externality.[8] Up to a point, more competitors are better than less, a major exception to classical cartel theory.

Many cartels have a monopsony in some of their input markets. Since the inception of professional sports leagues in the U.S., this has also been the case. Competition from other leagues has been infrequent and usually unsuccessful.[9] Thus, the leagues have adopted rules to exploit the monopsonistic structure of the labor market. On the other hand, the skills to play professional sports are unique. Unions have formed which have given the players bargaining power. The nature of the product technology coupled with the uniqueness of the skills of the players helps explain why athletes are paid such large sums compared to other occupations. Actors, musicians, and even software engineers are also highly paid because of the same reasons. In this bilateral monopoly situation, many work stoppages have occurred because neither the monopsony nor the union has been sufficiently powerful enough to prevent them.[10]

What is the nature of the product technology and why have professional sports leagues been able to deter entry? One reason is that the leagues are capacity constrained by the technology they use. Stadiums or venues which are large enough to house contests between league members are in fixed supply. The leagues assign exclusive franchise territories to each team to keep them from competing with themselves. A potential entrant would have to secure enough unused stadium capacity for the minimum number of teams to form a league.[11] The other major outlet for sports contests is television. In 1961, Congress passed the Sports Broadcasting Act which

---

[8] What Neale (1964) termed "the peculiar economics of sports" is just the positive production network externality.

[9] Quirk and Saposnik (1992) test a model of rival leagues and compare it to the actual rival leagues of the National Football League (NFL).

[10] Scully (1995) discusses the history of the four major professional leagues, and their unions, in the U.S., the National Hockey League (NHL), the NBA, MLB, and the NFL, and their competitors.

[11] It would seem optimal for an incumbent to have at least one team in almost every major population center to prevent entry, while at the same time leaving a few cities open for the existing teams to use as bargaining power against the stadium owners.

Electronic copy available at: https://ssrn.com/abstract=1601

allows a league to package its broadcast rights for sale to the networks, instead of on a team by team basis. The historical lack of numerous television outlets also created a capacity constraint.

Another barrier to entry is the nature of the product market, which might resemble a winner-take-all market (Frank and Cook, 1995). Competitors in this market receive little or no business, only the best survive. These markets (such as film, music, and software) all exhibit high fixed costs and low marginal costs. In sports, selling an additional million units of output only requires that a million people turn on the TV. Consumers will only purchase the highest quality product, because it won't cost significantly more than the lower quality ones; there is no room for second-tier talent in winner-take-all markets.

Collective bargaining agreements with the players are common in professional sports and are exempt from the antitrust laws. Combined with the Supreme Court's 1922 decision, which ruled that baseball was not involved in interstate commerce and thus did not fall under the control of antitrust laws, professional sports, especially baseball, are surrounded by barriers to entry. However, the recent technological changes in television such as the introduction of national cable stations (WTBS, TNT, WGN, ESPN, etc.) and three new networks (Fox, UPN, WBN) has lowered one of the barriers. In fact, a new football league, All- Star Football, is set to begin play in the fall of 1996 on some of the smaller television outlets, and it hopes that its product is differentiated enough (and of high enough quality) such that it won't fall prey to the winner-take-all phenomenon.

## 3    Previous Models of Professional Sports Leagues

A few models of professional sports leagues have been developed to examine the effects of the anti-trust exemption, the reserve clause, and revenue sharing. In the first article on the economics of sports, Rottenberg (1956) explains the structure and effects of the baseball players labor market. Teams should have nearly the same revenue potential

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

or use revenue sharing to maintain league viability. Collusion is difficult because of the inconsistent interests within baseball. There exists a monopsony in the labor market and local monopolies in the product market. According to the invariance principle, the reserve clause should have no effect on player distribution. The invariance principle, an application of the Coase Theorem, states that player talent will go to its most profitable use regardless of ownership. Even though players are paid much less than their marginal revenue product, they might not be exploited because their total cost also includes training, scouting, and coaching costs, and the sunk cost of all of the players who do not make it. Rottenberg discusses many scenarios to create an equal distribution of talent and concludes that a free agent market is the best because it also maximizes welfare.

In the first mathematical model of a professional sports league, El-Hodiri and Quirk, EQ (1971), examine whether the current organization of professional team sports will lead to equalization of playing strengths. They develop a dynamic model involving wages, revenues, trades, the draft, skill level, and the probability of winning a game. Profit maximization is not consistent with the equalization of playing strengths unless all teams are affected equally by a change in strength of one team in terms of gate receipts, or if the home team receives at least half of the gate receipts and all teams have the same revenue function. Additionally, to ensure equalization, there must be a constant supply of new playing skill and no cash sales. Equal strengths will converge regardless of the initial allocation of talent. Fewer teams and a quicker depreciation of talent will speed up the convergence process.

Atkinson, Stanley, and Tschirhart, AST (1988), develop a model of a professional sports league which shows how revenue sharing encourages an optimal distribution of resources among agents (teams). The principal (league) tries to devise an incentive scheme that will induce agents to maximize total output. The agents, on the other hand, receive private non- monetary benefits which are not shared. This leads to the classical principal-agent problem. Empirically, they show that revenue sharing has desirable properties for the NFL, but is partially mitigated if teams are not profit

Electronic copy available at: https://ssrn.com/abstract=1601

maximizers. Nevertheless, it does appear that the NFL has moved towards an optimal distribution of talent with the parity that exists.

Fort and Quirk, FQ (1995), develop a profit maximizing model of a professional sports league. They discuss the issues in determining the definition of winning, whether it be season-long winning percentage or championship prospect and show that baseball is not represented by the championship model. The effects of the reserve system versus free agency are examined. A salary cap results in equal playing strengths and would be adopted if it is sufficiently low. It is the only incentive mechanism which can maintain league viability and competitive balance. The theory fails to explain the NBA's performance because the NBA salary cap is very "soft", i.e. the NBA's salary cap isn't a true cap. The implications of the rookie draft show that it mostly has no effect on competitive balance. An increase in revenue sharing has no effect on competitive balance and lowers player salaries. Profits increase in one version of the model, but are ambiguous, with respect to changes in revenue sharing, in a more complete version.

Recently, Vrooman (1995) developed a profit maximizing model where both revenue and cost are functions (either increasing or decreasing) of market size and winning percentage. It allows for greater generality then some of the previous profit maximizing models. However, it empirically shows that some of the freedom of the parameters is unnecessary, especially in the NFL and the NBA. Theoretically, the model demonstrates that large market teams need not dominate small market teams, revenue sharing will have no effect on competitive balance and depress player costs (like the FQ model), and the salary cap will lead to more competitive *imbalance*. In comparisons across leagues (NFL, MLB, and NBA) the data are fairly consistent with some of the hypotheses of the model.

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

8

Electronic copy available at: https://ssrn.com/abstract=1601

# 4   Issues to be Examined

Most of the previous literature investigates a limited number of questions pertaining to the economics of a sports league. This treatment will address many issues simultaneously in order to control for the potential cross-effects of important variables. It will re-examine previously researched issues and explore new areas.

The previous issues to be examined include the following. Is the equalization of playing strengths consistent with profit maximization? What is the optimal distribution of talent from the league's perspective? Do increases in revenue sharing decrease market wages? What are the effects of a salary cap on competitive balance? Under what circumstances will it be adopted?

Some of the new areas include the following. From the leagues perspective, what is the optimal revenue sharing arrangement, salary cap, and degree of parity in a professional sports league? What is the effect of revenue sharing on the choice of talent, parity, capped wages, and unconstrained wages? What is the effect of the salary cap on talent chosen, parity, and revenue sharing effects? Because league balance is a public good, is free-riding by one team on the league's talent a potential problem and how is it affected by revenue sharing and a salary cap? Is a free agent price war a potential problem and how is it affected by revenue sharing and a salary cap? How is the stability of the cartel affected by various distributions of owner objectives? Does the draft cause the degree of parity to be higher than is optimal from the league's perspective? Can college sports be examined using a variant of this model, as a monopsonistic free agent labor market with a salary cap?

The issue being addressed in this paper is not as focused as most research endeavors such as; "what is the effect of $X$ on $Y$?" or "why does $X$ do what it does?" It is a more open ended perspective of the issues involved in the economics of sports. This is one of the first attempts at directly incorporating non-profit maximizing owner objectives into a sports league model. Thus, there are multiple owner types as well as multiple market sizes. This research is not only the first to examine some of the

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

issues listed above, but it is the first multi-decision maker, multi-choice variable model. By allowing the league to choose the salary cap and revenue sharing arrangements simultaneously, followed by the owners choice of talent levels, it generalizes some of the previous research.

## 5   Contributions

The summary states some of the more direct results, but more generally one of the contributions of the paper is that it provides a more general demand specification than the previous research by including both absolute and relative measures of quality. The model also uses a more general objective function for the owners than the previous literature, incorporating both winning for winning's sake and profit maximizing. It constantly compares the analysis of the general objective function with the profit maximizing one. In one sense it is a comparison in general of utility and profit maximizing models of decision making. It further explores the effects of the inclusion of a salary cap into the investigation. Unlike previous research, it examines a partially binding salary cap as well as the more traditional completely binding examination. A multi-team framework is used to help capture the important components involved in the analysis of the likelihood of adoption of specific proposals. The paper utilizes a two stage setting because a utility maximizing model is used for the owners decision process, and there exists asymmetric information with respect to the true type of each owner. Therefore, a separate examination of how the league would act is undertaken. This research can also be viewed as simply a cartel model of an industry tailored towards the specifics of the industry.

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

# Part II

# The Model

## 6  The Setup

There are two sets of decision makers, the league, and the individual owners. The period consists of two stages. During stage one the league makes its decisions to maximize its objective. Stage two involves individual owners making their decisions to maximize their objectives. The league makes its decisions in order to maximize the following objective function:

$$\Pi = \sum_{i=1}^{n} \pi_i, \tag{1}$$

where $\pi_i$ is the profit of *team i*. It chooses $\rho$ and $\delta$ which represent the revenue sharing arrangement, and the salary cap respectively. These variables will be explained in more detail below.

The individual owners each maximize the following objective function:

$$U_i = \alpha_i Win_i + (1 - \alpha_i)\pi_i, \tag{2}$$

where $\alpha_i$ is the proportion that *owner i* trades off winning and profit making in his/her utility function and is thus a given trait of each owner.[12] The previous literature has assumed profit maximizing owners while admitting that it is probably not a correct description of owner preferences.[13] If the decision makers for the league are the owners, then why wouldn't they maximize $\sum_{i=1}^{n} U_i$ instead of $\sum_{i=1}^{n} \pi_i$? One reason is

---

[12]It is noted that $Win_i$ and $\pi_i$ are in different units and thus adding them requires a transformation into utils. This is ignored because it only affects the magnitudes of the coefficients, not their signs. This formulation assumes that the owner is risk-neutral with respect to the tradeoff of winning and profits. Owners differ only by their type, $\alpha_i$. Thus, each objective function may be different for each owner.

[13]"Profit maximization is somewhat controversial...(it) is not descriptive of leagues where the satisfaction obtained from winning per se can be an important factor in decision making" (FQ, pg. 1266). It is likely that winning is an important part of an owner's decision criteria as evidenced by the high capital gains from franchise sales that are associated with meager profits. See Zimbalist (1992) pgs. 61-62, AST pgs. 42-43, and Cairns, Jennett, and Sloane (1985).

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

that the cartel hires a commissioner, who makes the decisions, to keep the individual members from hurting themselves financially. Perhaps a more compelling argument is that there exists asymmetric information with respect to owner types, $\alpha_i$. Only *owner i* knows $\alpha_i$ for sure. The other owners receive signals based on previous decisions of *owner i*. As a result, the league attempts a second best solution.[14] *Team i* chooses the net amount of talent that it buys, or receives through trade, from *team j*, and the net level of talent signed as free agents.[15] $Win_i$ is the winning percentage of *team i*.[16]

Talent is the main input used by the league to produce its output, a sports contest.[17] It is standard in the literature to aggregate the individual talents from each position to form a team talent level. Although, by doing so, many interesting aspects of the labor market and the team production function are lost. In particular, the various wage classes (reserve clause, arbitration eligible, and free agent), the team production function, and managerial skill are reduced to one dimension, the scalar $T_i$.[18] This treatment will use the aggregated $T_i$ and assume that each coach or manager has maximized team talent given the positional inputs.

Returning to the explanation of the individual team's optimization process, *team i* trades off profit making and winning in its utility function. The winning portion of $U_i$ is $Win_i = g(T_i, T_j) + \epsilon_i$, where $g(T_i, T_j)$ is a function that takes the talent levels of *team i* and *team j* and outputs a probability of winning for *team i* when it plays a game against *team j*. $\epsilon_i$ is an error term that includes intangibles like luck, and other determinants of winning besides talent levels, with $E(\epsilon_i) = 0$.[19] $Win_i$ is part of the

---

[14] A related question is whether *owner i* would have the incentive to reveal his true type. If so, then the league could maximize $\sum_{i=1}^{n} U_i$.

[15] It should be mentioned that *team i* cannot choose the amount of talent it receives from *team j* unilaterally. Its choice of talent partially determines the talent of and is partially determined by the talent of the other teams in the league.

[16] Other research has stressed the importance of winning championships versus games. See Jennett (1984) and Whitney (1988, 1993).

[17] Of course there are other inputs such as management and stadiums, but talent is the center of attention for this analysis.

[18] See the appendix for a description of an expanded, dynamic model.

[19] Because a win for one team means a loss for another team, and $\sum_{i=1}^{n} Win_i = \frac{n}{2}$, $Win_i$ is further restricted as $Win_i = \frac{n}{2} - \sum_{j \neq i}^{n} Win_j$. Thus, efforts to increase the win percentage of one team must coincide with a decrease in

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

production function for the league. Specifically

$$g(T_i, T_j) = \sum_{j \neq i}^{n} \left( \frac{T_i}{T_i + T_j} * pctgam_{ij} \right),$$
(3)

where $pctgam_{ij}$ is the percentage of games played between $team\ i$ and $team\ j$.[20]

The profit of $team\ i$ is defined as $rev_i - costs_i$, where

$$rev_i = \rho \sum_{j \neq i}^{n} gh_{ij} + (1 - \rho) \sum_{j \neq i}^{n} gr_{ij},$$
(4)

and $gh_{ij}$ is the gate receipts produced at all home games of $team\ i$ against $team\ j$. $gr_{ij}$ is the gate receipts produced at all away games of $team\ i$ against $team\ j$. $\rho$ represents the revenue sharing arrangement chosen by the league in stage one and is constrained by $0 \leq \rho \leq 1$. It is a fraction to be shared between the home and away teams for each game.[21] Television, merchandising, and franchise fee revenue are not included in this analysis.[22] Generally, local television revenue is kept by the home team, while national television, merchandise, and franchise fee revenue are shared equally. The exact rules in professional sports regarding these issues are constantly changing; currently MLB is considering having local television revenue be shared.

Specifically, $gh_{ij}$ is a function of the demand for home games, $Q_h$, where we adopt a specific functional form $Q_h = S_i(AT_i + BT_j + C(T_i - T_j)^2)$, and $A > B > 0 > C$.[23] $A$ is the marginal propensity to attend home games with respect to the home team's talent. $B$ is the marginal propensity to attend home games with respect to the visiting team's talent and is assumed to be less important to the home town fans. $C$ is the

---

the win percentage of other teams. Additionally, $\epsilon_i$ and $\epsilon_j$ are jointly distributed.

[20]It will be assumed that $pctgam_{ij} = \frac{1}{n-1}, \forall i, j$.

[21]This is the type of revenue sharing method most common in professional team sports. The NFL splits gate receipts 60% for the home team and 40% for the away team. MLB uses an 80% - 20% and a 90% - 10% rule in the American League and National League respectively. Before 1984 the NBA used this sharing technique; now they pool all receipts together and split them.

[22]See FQ for a treatment of television and merchandise revenue. The expanded model in the appendix includes these issues because franchise fees are dynamic in nature.

[23]Demmert (1973) and Neale (1964) have pointed out that the product of a sports league isn't typical. Two firms cooperate on a date, location, and rules, but compete on the field resulting in a contest. Alone, one firm cannot produce anything. The output is a contest, but the amount of output is really measured by the number of consumers, not the number of contests. There are other situations when one firm depends on another; a computer maker needs a software maker and vice versa, but a computer maker certainly doesn't need another computer maker.

13

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

marginal propensity to attend home games that is attributable to the closeness of contest portion of demand. $S_i$ is a scalar which controls for the potential demand from market size, income, and other factors across cities.[24] $Q_h$ satisfies the consideration that the closeness of the contest as well as high quality play are important aspects of the demand for sports contests.[25] The restrictions on $A$, $B$, and $C$ are consistent with the notion that demand is maximized when the probability that the home team wins a particular game is greater than 0.5, but less than 1.[26] It is likely that the home team fans care more about changes in the home team's level of talent than changes in the away teams talent levels. Likewise, $gr_{ij}$ is a function of the demand for away games, $Q_r$, where $Q_r = S_j(DT_j + ET_i + F(T_j - T_i)^2)$, and $D > E > 0 > F$.[27] The variables have similar meaning to the home demand equation except they refer to the demand on the road.[28]

The only variable costs in this model are labor costs. All other costs are assumed to be fixed. Specifically, $costs_i = wT_i + FC_i$, where $w$ is the wage per unit of talent, $T_i$, and $FC_i$ is the fixed cost of operation for one season. In a pure free agent market, the labor supply curve would be horizontal at the players' reservation wage, $w^r$, and become vertical at the maximum number of players allowed in the league. There would be one wage per unit of talent where the market labor demand curve crossed the market labor supply curve.[29]

One of the choice variables for the league in *stage one* is the salary cap level, $\delta$, where $0 \leq \delta \leq \infty$. In practice, the salary cap for a team is a fixed percentage of the

---

[24]See pages 12-27 from Cairns, Jennett, and Sloane (1986) regarding the components of demand for sports events.

[25]FQ only use relative quality in their demand specification. Although, they use winning instead of talent as a factor in demand, they assume that an increase in one unit of talent increases winning by one unit. The demand function used here prevents two equally rated poor teams from enticing the same demand as two equally rated excellent teams.

[26]Knowles, Sherony, and Haupert (1992) show empirically that the probability of the home team winning which maximizes attendance is approximately 0.6, thus lending credence to the relative quality aspect of demand.

[27]The model ignores the possibility of home field advantage, although it could easily be incorporated by letting talent be slightly larger at home than on the road. It is unlikely to change the results of the analysis.

[28]It should be noted that one team's home game is another team's away game, and thus the variables are further restricted to reflect this.

[29]Throughout the paper there is an assumption of non-competing leagues. Thus, the reservation wage is assumed to be insignificant compared to the prevailing wages in professional sports. Thus, only the vertical portion of the labor supply curve will be of interest.

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

previous season's total league revenues, or the current season's projected revenues, divided equally among the teams. This is a form of revenue sharing between the owners and the players. A particular team is restricted in the following way:

$$wT_i \leq \frac{\delta}{n} \sum_{i=1}^{n} rev_i, \tag{5}$$

where $w$ is the wage per unit of talent, $T_i$, and $rev_i$ is the projected revenue for the current season. Therefore, *team $i$*'s labor demand is:

$$T_i = min \left\{ L_D(w, D_i, \rho, ...), \ \frac{\delta}{\overline{w}n} \sum_{i=1}^{n} rev_i \right\}, \tag{6}$$

where $L_D(\cdot)$ is the unrestricted demand for labor, and $\overline{w}$ is the salary cap wage. The salary cap is always in existence. It will only be a factor if it is sufficiently small.

# 7   Results

## 7.1   Analysis of the Owner's Problem

The owners take $\rho$ and $\delta$ as given when choosing $T_i$. The first order condition from *owner $i$*'s optimization problem results in:

$$w = \left( \frac{\alpha_i}{1 - \alpha_i} \right) \frac{\partial win_i}{\partial T_i} + \left\{ \rho \sum_{j \neq i}^{n} \frac{\partial gh_{ij}}{\partial T_i} + (1 - \rho) \sum_{j \neq i}^{n} \frac{\partial gr_{ij}}{\partial T_i} \right\}. \tag{7}$$

The second part of (7) is the total marginal revenue product of talent. It is the convex combination of the $MRP_{T_i}$ for all home games ($MRP_i^H$) and the $MRP_{T_i}$ for all road games ($MRP_i^R$) weighted by the revenue sharing fraction. The first part of equation (7) is the marginal winning product ($MWP_i$) of talent weighted by a function of the owner's penchant for winning. *Team $i$* will hire talent up to the point where the total marginal revenue product of talent combined with the marginal winning product of talent, weighted by the owner's individual preference for winning versus profit, equals the market wage for talent.[30] Specifically:

$$\frac{\partial win_i}{\partial T_i} = \sum_{j \neq i}^{n} \frac{pctgam_{ij}(T_j - T_i \frac{\partial T_j}{\partial T_i})}{(T_i + T_j)^2} > 0, \tag{8}$$

---

[30]This is what *team $i$* would like to hire given that the salary cap is not binding.

15

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

and $\frac{\partial gh_{ij}}{\partial T_i} = \frac{\partial gh_{ij}}{\partial Q_h}\frac{\partial Q_h}{\partial T_i}$. Similarly, $\frac{\partial gr_{ij}}{\partial T_i} = \frac{\partial gr_{ij}}{\partial Q_r}\frac{\partial Q_r}{\partial T_i}$. The marginal effect of talent on revenue equals the marginal effect of demand on revenue multiplied by the marginal effect of talent on attendance. Presumably the former effect is the ticket price, $P_i$ and $P_j$ respectively.[31] The latter effect for home games, $\frac{\partial Q_h}{\partial T_i}$, is explicitly written as:

$$\frac{\partial Q_h}{\partial T_i} = S_i\left[A + B\frac{\partial T_j}{\partial T_i} + 2C(T_i - T_j)\left(1 - \frac{\partial T_j}{\partial T_i}\right)\right] \qquad (9)$$

and for away games:

$$\frac{\partial Q_r}{\partial T_i} = S_j\left[D\frac{\partial T_j}{\partial T_i} + E + 2F(T_j - T_i)\left(\frac{\partial T_j}{\partial T_i} - 1\right)\right]. \qquad (10)$$

As shown in equation (8), the marginal winning product of talent, $MWP_i$, is always positive because $-1 \leq \frac{\partial T_j}{\partial T_i} \leq 0$. An increase in *team i*'s talent must lead to a decrease in the talent of the rest of the league due to the conservation of talent.[32] It might be that all, part, or none of the talent comes from a particular *team j*. Also, there are decreasing returns to winning from increases in talent as is typical with production functions.

Referring to equation (9), $A$ is positive, and $B\frac{\partial T_j}{\partial T_i}$ is negative. However, $A > | B\frac{\partial T_j}{\partial T_i} |$ because $\frac{\partial T_j}{\partial T_i}$ is constrained as mentioned above and $A > B$ as described in the setup. $2C(T_i - T_j)(1 - \frac{\partial T_j}{\partial T_i})$ is positive for $T_j > T_i$ because $C < 0$. Overall, an increase in the talent of *team i* results in a direct increase in demand from having the home team improve, a direct decrease in demand from having the visiting team decline, and an increase in demand due to a closer contest with more uncertainty, if $T_j$ was greater than $T_i$ to begin with.[33] If $T_j < T_i$ it is still possible to have an increase in demand from an increase in $T_i$. It depends on the relative values of $A$, $B$, and $C$.[34]

Equation (10) refers to the effect of changes in *team i*'s talent on the demand for their road games. $D\frac{\partial T_j}{\partial T_i}$ is negative and $E$ is positive, while their sum can be either

---

[31] $\frac{\partial gh_{ij}}{\partial Q_h}$ should be $MR_i$ which we will assume is constant at $P_i$.

[32] Since there is a fixed number of positions in the league, and the wage is assumed to be significantly greater than the players' reservation wage, the amount of talent in the league is fixed at $\Upsilon$. Thus, as one team gains talent, at least one other team must lose talent, after all of the Pareto-improving trades have been made.

[33] This is all adjusted by market size, $S_i$.

[34] AST assume that an increase in *team i*'s talent always leads to an increase in *team i*'s demand. This model allows for there to be an optimal probability of winning which is less than one.

Electronic copy available at: https://ssrn.com/abstract=1601

positive or negative. $2F(T_j - T_i)(\frac{\partial T_j}{\partial T_i} - 1)$ is positive if $T_j > T_i$ because an increase in $T_i$ leads to a closer contest.[35]

### 7.1.1   Wage Rate

The following proposition is analogous to *Proposition 1* in AST, except it is set in the context of this model.

*Proposition 1*- The wage rate per unit of talent will equal the total marginal revenue product of talent plus the weighted marginal winning product of talent realized by *team i*, where the weight is $\frac{\alpha_i}{(1-\alpha_i)}$.

*Proof*- This follows immediately from the first order conditions of the owners problem as shown in equation (7).

*Proposition 1* in AST states that the wage rate is equal to the marginal revenue product assuming that the owners are profit maximizers. The current model allows for non-profit maximizing behavior by the owners. Thus, AST's *Proposition 1* is a specific case of *Proposition 1* here, where $\alpha_i = 0$, and the effect of an increase in *team i*'s talent on *team i*'s revenue is always positive.[36]

Previous research has assumed that the marginal revenue product of talent is always positive. Thus, the wage was necessarily positive. Many of the following results require a positive wage, thus an analysis of its likelihood is warranted. Here, it is possible for the marginal revenue product from home and away games to be negative enough to outweigh the marginal winning product which is always positive. What are the necessary conditions which ensure that $w$ is positive? Figure 1 shows $\frac{Q_h}{S_i}$ and $\frac{Q_r}{S_j}$ as a function of $T_i$ for a given $T_j$.[37] As $T_j$ decreases, both curves move to the left into the negative quadrant. If $T_j$ were negative enough, the $MP_{T_i}$ for

---

[35]$D$ and $E$ like $A$ and $B$ account for the absolute quality of the teams, while $C$ and $F$ account for the relative quality of the teams with respect to demand.

[36]AST use a slightly different revenue sharing rule which makes their *Proposition 1* not exactly a special case in form, but in content.

[37]Each demand is divided by its market size to measure the demand per consumer so comparisons across various market sizes can be made.

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

both home and away games would be negative regardless of $T_i$'s value.[38] For a fixed positive $T_j$, larger levels of $T_i$ appear on the negatively sloped portion of both curves and thus $w$ would be negative if they outweighed $MWP_{T_i}$. The following corollary describes conditions where $w$ is positive.

*Corollary 1*- The wage will be positive if $T_i \leq T_j + \left( \frac{A \frac{\partial T_j}{\partial T_i} + B}{2C \left( \frac{\partial T_j}{\partial T_i} - 1 \right)} \right)$, assuming that $A = D$, $B = E$, and $C = F$.[39]

*Proof*- From equations (7) and (8), and noting that for a given $T_j$, if $MRP_i^R > 0$, then $MRP_i^H > 0$, the proof reduces to showing that $MRP_i^R > 0$. $MRP_i^R > 0$ if $\left( A + B \frac{\partial T_j}{\partial T_i} + 2C(T_j - T_i) \left( \frac{\partial T_j}{\partial T_i} - 1 \right) \right) > 0$. *Q.E.D.*

In figure 1, this is just the range of $T_i$ to the left of point 1. In this range, all slopes are positive. This is not a necessary condition, but only sufficient. It shows that there are ranges of $T_i$ and $T_j$ such that $w$ is positive, regardless of the values for $\rho$, $\alpha_i$, $P_i$, and $P_j$. The following corollary describes a larger range for $T_i$ where $w$ is positive.

---

[38] It makes no sense to have a negative $T_j$. For $\frac{Q_r}{\delta_j}$ to cross the $T_i$ axis to the right of the origin $T_j > -\frac{A}{C}$.

[39] This assumption ensures that $Q_r$ is positive over some range of $T_i$. Without it, $Q_r$ could always be negative. It implies that individual fans in different cities react to changes in talent in a similar way.

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

### 7.1.2   Comparison with EQ

*Corollary 2*- If all revenue functions are identical across teams in the league[40], $w$ will be positive when perfect parity exists if

$$\rho > \left(\frac{\alpha_i}{1-\alpha_i}\right)\frac{1}{4TPS(A-B)(n-1)} + \frac{A-B(n-1)}{n(A-B)}. \tag{11}$$

*Proof*- Noting that $\sum_{j\neq i}^{n}\frac{\partial T_j}{\partial T_i} = -1$, the assumptions reduce (7) to $w = \left(\frac{\alpha_i}{1-\alpha_i}\right)\frac{n}{4T(n-1)} + PSA(\rho n - 1) + B[(1-\rho)n - 1]$, where $T = T_i = T_j$. *Q.E.D.*

In figure 1, this corresponds to the range of $T_i$ to the left of point 2, where $\frac{Q_h}{S_i}$ and $\frac{Q_r}{S_j}$ cross and $T_i = T_j$. All of the restrictions are necessary because the slope of $\frac{Q_r}{S_j}$ could be negative enough at this point to outweigh the positive slope of $\frac{Q_h}{S_i}$ and of $Win_i$.[41]

This corollary considers the same question as *Proposition 3* in EQ. EQ show that if revenue functions are identical, equal playing strengths among teams is consistent with profit maximization if $\rho > 0.5$.[42] In our model, if the wage isn't positive when $T_i = T_j$, *team i* won't want to increase its talent level to that of *team j*'s. Thus, equal playing strengths won't be sustainable. Perfect parity will only be sustainable if the wage is positive, which is true if $\rho$ is sufficiently large.

Does $\rho$ have to be larger than 0.5 as in the EQ model? *Corollary 2* allows for non-profit maximizing behavior, but can be converted into profit maximizing behavior by setting $\alpha_i = 0$. In that case the restriction is $\rho > \frac{A-B(n-1)}{n(A-B)}$ which equals 0.5 if $n = 2$, and is less than 0.5 for any $n > 2$. As $n \to \infty$, the restriction on $\rho \to 0$. If $n$ is large enough, more than half of the gate receipts can go to the visiting team without jeopardizing the ability to maintain parity across the league.

The 0.5 cutoff point in EQ comes from having the marginal effect of $T_i$ on *team i*'s home gate receipts be equal but opposite to the marginal effect of $T_i$ on *team*

---

[40]To make all of the revenue functions the same, $P = P_i = P_j$, and $S = S_i = S_j$.

[41]$Win_i$ is not shown on the graph because the units wouldn't match those on the vertical axis. It looks like a classical production function beginning at the origin, concave, and increasing asymptotically toward one, a perfect winning percentage, as $T_i$ increases.

[42]See EQ, pg. 1312. The EQ model gets large returns by assuming perfect parity.

19

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

$i$'s road receipts, assuming perfect parity. In our model, that would only be true if $A + B\frac{\partial T_j}{\partial T_i} = -(A\frac{\partial T_i}{\partial T_i} + B)$, letting $A = D$ and $B = E$. Since $A \neq B$, it cannot be true. The restriction on the revenue sharing rule is less confined here because with perfect parity, a slight increase in $T_i$ increases demand for home games more than it decreases demand for away games. In other words, in figure 1 where $T_i = T_j$, the slope of $\frac{Q_h}{S_i}$ is greater in absolute value than the slope of $\frac{Q_r}{S_j}$.

If the home town fans increase their preference for a high quality home team versus a high quality visiting team (as the distance between $A$ and $B$ increases), it becomes more difficult for $\rho$ to satisfy the restriction. Thus, the home team has to receive a larger share of the home gate receipts (an increase in $\rho$) for the wage to be positive and for equal playing strengths to be sustainable.

The upshot is that perfect parity is sustainable under profit maximization if *Corollary 2* is true. The value of $\rho$ which allows equal playing strengths to be sustainable is less restrictive than in the EQ model. This is primarily due to the different assumptions regarding the demand specification.

### 7.1.3   Effect of Winning on the Revenue Sharing Restriction

If we allow winning to be part of the owner's optimization problem directly ($\alpha_i > 0$), we might expect the restrictions on $\rho$ to be greater. As owners become more interested in winning, the ability to maintain parity becomes harder.[43] From *Corollary 2*, $\frac{\partial \rho}{\partial \alpha_i} > 0$ and thus the threshold for $\rho$ is higher, as expected. Therefore, as winning becomes more important, the revenue sharing rule must be more restrictive for perfect parity to be sustainable.

### 7.1.4   Effect of the Market Size on the Distribution of Talent

Of course all revenue functions aren't equal across teams as in the previous examination. From equation (7), and ignoring the winning portion of the owner's objective

---

[43]In AST pg. 29, it is noted that optimization other than pure profit maximization negates some of the effects of revenue sharing.

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

function, it can be seen that large market teams, those with a high $S_i$, will have more talent than small market teams in equilibrium.[44] A large $S_i$ must be coupled with a low $A + B\frac{\partial T_j}{\partial T_i} + 2C(T_i - T_j)(1 - \frac{\partial T_j}{\partial T_i})$ to satisfy equation (7). To make $A + B\frac{\partial T_j}{\partial T_i} + 2C(T_i - T_j)(1 - \frac{\partial T_j}{\partial T_i})$ low requires a large $T_i$. Including $\alpha_i$, the owners penchant for winning, alters the distribution of talent. As will be shown below, a large $\alpha_i$ is associated with a large demand for talent. A small market team with an owner who desires winning might have more talent than a large market team, but *ceteris paribus*, large market teams will have more talent than small market teams in equilibrium.[45]

### 7.1.5  Effect of the Number of Teams on the Wage Rate

What is the effect of the number of teams on the wage rate? Taking equation (7) and letting $T_j = T$, $P_j = P$, and $S_j = S$, where $T$, $P$, and $S$ are constants,

$$w = \left(\frac{\alpha_i}{1 - \alpha_i}\right) \frac{(n-1)T + T_i}{(n-1)(T_i + T)^2} + \rho P_i S_i [A(n-1) - B + 2Cn(T_i - T)]$$
$$+ (1 - \rho)PS[B(n-1) - A + 2Cn(T_i - T)]. \tag{12}$$

The following proposition shows that an increase in the number of teams raises the marginal revenue product and lowers the marginal winning product.

*Proposition 2-* The effect of the number of teams on the wage rate, $\frac{\partial w}{\partial n}$, is positive for sufficiently low values of $\alpha_i$ and negative for sufficiently high values of $\alpha_i$, letting $T$, $P$, and $S$ be the talent level, product price, and market size for each team, respectively.[46]

*Proof-* Taking equation (12),

$$\frac{\partial w}{\partial n} = \left(\frac{\alpha_i}{1 - \alpha_i}\right) \frac{-1}{4T(n-1)^2} \; + \; PS[\rho A + (1 - \rho)B], \tag{13}$$

which will be positive if $\alpha_i < \frac{Q}{1+Q}$, where $Q = PS[\rho A + (1 - \rho)B][4T(n-1)^2]$, and negative if $\alpha_i > \frac{Q}{1+Q}$. *Q.E.D.*

---

[44] This assumes that the overall price to watch a game doesn't vary significantly across teams.

[45] The term *large market* refers to a market that has a high demand for a sports contest. It is most likely from a large population, but can also be due to a lack of substitutes or a collective desire to watch sporting events.

[46] More general versions of the proposition are indeterminate because they depend on the values of $\alpha_i$, $\rho$, and $T_i$ versus $T$. The assumptions involving $T$, $P$, and $S$ imply that $\alpha_i$ is fixed for all $i$, or else $T_i$ would not equal $T$ in equilibrium.

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

The first part of (13) is $\frac{\partial^2 Win_i}{\partial n \partial T_i}$ and is negative. The increase in $Win_i$ from an increase in talent is smaller as more teams are added to the league. When *team i* acquires one unit of talent, the average decrease in talent of the other teams required to create that one unit is smaller because it is spread over a larger number of teams. The incentive for a team to add more talent diminishes with respect to the winning portion of the owners optimization function. Hence, an increase in the number of teams will drive the wage down due to the owners penchant for winning.

The second part of (13) refers to the effect of the number of teams on the home and road marginal revenue products. It is positive. Thus, an increase in the number of teams further increases the revenue gained from acquiring one more unit of talent because more games are played. Overall, the effect of $n$ on $w$ depends on the weights assigned to the marginal winning and marginal revenue products, specifically $\alpha_i$.

For a pure profit maximization model, the first part of (13) will be zero because $\alpha_i$ will be zero. Hence, an increase in the number of teams will increase the wage because the players have to play more games and since talent is fixed it will be competed for more heavily.[47]

### 7.1.6   Effect of Winning on the Wage Rate

In choosing talent, the profit motive causes the optimal amount chosen to be limited by costs (the wage) and the nature of demand. A higher level of talent is associated with a better team and thus more fans, but demand is mitigated by possible decreases in the closeness of the contest and decreases in the opposing teams talent. The winning motive faces no such constraints. The more talent the better. As would be expected, a higher winning motive in the owner's utility function leads to a greater demand for talent and thus a higher wage rate for talent.

---

[47]In most leagues, there isn't a corresponding increase in the number of games played when expansion occurs. If the expansion team is a poor team, as is usually the case, but draws a big crowd due to the novelty, then the effect on an individual team's marginal revenue product is indeterminate. The substitution of a low talented expansion team on the schedule will likely decrease the marginal revenue product of playing them. The opposite is true due to the novelty or newness effect.

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

*Proposition 3*- A larger $\alpha_i$ leads to a larger $w$ or $\frac{\partial w}{\partial \alpha_i} > 0$.[48]

*Proof*- $\frac{\partial w}{\partial \alpha_i} = \frac{\frac{\partial win_i}{\partial T_i}}{(1-\alpha_i)^2} > 0$.  *Q.E.D.*

AST empirically show that owners do not act as pure profit maximizers and claim that as a result, the effectiveness of revenue sharing as an incentive mechanism for encouraging the optimal distribution of talent is diminished. In (7) it can be seen that as $\alpha_i$ increases, the importance of $\rho$ in the talent decision diminishes. The wage here is larger than the wage in AST simply because winning is a part of the owners optimization problem. AST report that salaries significantly exceed current marginal revenue products, on average being *seven* times greater. This could be interpreted to mean that the marginal winning product and its coefficient, $\left(\frac{\alpha_i}{1-\alpha_i}\right)$, are six times greater than the total marginal revenue product including $\rho$. This is important with respect to the ability of the league to use revenue sharing as an incentive mechanism. The mechanism won't work as well if winning plays a large part in the decision making process of owners, as it apparently does.

### 7.1.7   The Effect of Changes in Revenue Sharing on the Distribution of Talent

Before an examination of the effect of revenue sharing on the wage rate can occur, the effect of changes in revenue sharing on the distribution of talent must be explored. $\frac{\partial w}{\partial \rho}$ will be affected by $\frac{\partial T_i}{\partial \rho}$. The literature has been inconsistent in its approach to this aspect. Both EQ and FQ assert that revenue sharing does not influence the distribution of talent throughout the league, i.e. $\frac{\partial T_i}{\partial \rho} = 0$. On the other hand, AST state that $\frac{\partial T_i}{\partial \rho} > 0$. Here, $\sum_{i=1}^{n} \frac{\partial T_i}{\partial \rho} = 0$ from the conservation of talent assumption, allowing $\frac{\partial T_i}{\partial \rho}$ to be anything as long as it adds to zero.

---

[48] $\alpha_i$ is not a choice variable, it is ordained upon each owner. This proposition shows the effects of various owner types.

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

**Pure Profit Maximization**   Figure 2 shows what happens to the labor market when revenue sharing increases. Labor supply is vertical because there are a fixed number of players in the league and it is assumed that the best players available are playing. When $\rho$ drops (an increase in revenue sharing), labor demand shifts down, as will be explained below. To help understand which teams are changing their talent levels, a discussion of the decomposition of a drop in the wage is useful. Equation (7) shows the conditions which teams adhere to when choosing talent. Ignoring the first term, the winning portion, it can be seen that $\rho MRP_i^H + (1-\rho)MRP_i^R = w$, which is a constant. To further illustrate the effect, using equation (12), let

$$\frac{\partial w}{\partial \rho} = P_i S_i [A(n-1) - B + 2Cn(T_i - T)] + \rho P_i S_i \left[ 2Cn \frac{\partial T_i}{\partial \rho} \left( \frac{n}{n-1} \right) \right]$$

$$-PS[-A + B(n-1) + 2Cn(T_i - T)] + (1-\rho)PS \left[ 2Cn \frac{\partial T_i}{\partial \rho} \left( \frac{n}{n-1} \right) \right]$$

$$+ \left( \left( \frac{\alpha_i}{1-\alpha_i} \right) \left( 2 \left( \frac{\partial T_i}{\partial \rho} \right) \frac{\frac{-2n+3}{n-1} T_i - (n-1)T}{(T_i + T)^3(n-1)} \right) \right), \qquad (14)$$

24

Electronic copy available at: https://ssrn.com/abstract=1601

where $\frac{\partial T}{\partial \rho} = \left(\frac{-1}{n-1}\right)\frac{\partial T_i}{\partial \rho}$ due to the conservation of talent assumption.[49]

Using equation (14), the movement from point 1 to point 2 in figure 2 shows that the wage is constant, but the amount of talent decreases. When $\rho$ decreases (an increase in revenue sharing), $\rho MRP_i^H + (1-\rho)MRP_i^R < w$, ignoring the second, fourth, and fifth terms, the $\frac{\partial T_i}{\partial \rho}$ terms, in equation (14). The amount that $\rho MRP_i^H + (1-\rho)MRP_i^R$ is less than $w$ is different for all teams. To go to point 2, all teams must raise $\rho MRP_i^H + (1-\rho)MRP_i^R$ by a different amount up to $w$. The second and fourth terms show the adjustment made to the $MRP$'s from changes in $T_i$ due to the drop in $\rho$. To counteract the drop in $\rho MRP_i^H + (1-\rho)MRP_i^R$, the second and fourth terms must be negative ($MRP$'s get larger as $T_i$ drops) to make $\frac{\partial w}{\partial \rho} = 0$ as it is shown to be at point 2.[50] To make them negative, $\frac{\partial T_i}{\partial \rho}$ must be positive. Thus, talent must decrease for each team at this interim step. Even though the amount that $\rho MRP_i^H + (1-\rho)MRP_i^R$ is less than $w$ differs across teams, the decrease in $T_i$ will be the same. At point 2, the distribution of talent remains unchanged from a change in the revenue sharing arrangement. To finish the complete effect, the movement to point 3 must be explained.

Moving from point 2 to point 3, the wage will drop and the aggregate amount of talent will increase to its original level. At point 2 there was an excess supply of talent, but $\rho MRP_i^H + (1-\rho)MRP_i^R = w$ because each team lowered its talent level raising the left hand side up to $w$. This excess supply of talent will cause the wage to drop to point 3 with $\rho MRP_i^H + (1-\rho)MRP_i^R > w$. To get to point 3, the teams must decrease $\rho MRP_i^H + (1-\rho)MRP_i^R$. To accomplish this they must, of course, raise their talent levels to lower the $MRP$'s. Therefore, the second term, as well as the fourth, in (14) must increase by the same amount that it decreased earlier for each team. Equilibrium is achieved at point 3 where the distribution of talent is the same as at point 1. Thus, EQ and FQ are correct in their assertion that revenue sharing has no effect on the distribution of talent under individual team profit maximization.

---

[49]Equation (12) assumes that $T_j = T, \forall j$. Thus, $T$ represents the talent level of each of the other $n-1$ teams in the league.

[50]The fifth term, the winning portion, is still being ignored for now because this is the profit maximization analysis.

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

**Utility Maximization**    The inclusion of the winning portion of the owner's decision problem, letting $\alpha_i > 0$, into the analysis of $\frac{\partial w}{\partial \rho}$ changes the results. In (7), a weighted combination of the $MWP_i$, $MRP_i^H$, and $MRP_i^R$ has to be equal to the wage. A particular team could have lower $MRP$'s than the rest of the league, but a high $\alpha_i$, preference for winning, and still satisfy the equation.[51]

If $\rho$ decreases, the right hand side of (7) is less than the wage at point 1 in figure 2, just as before. A team with a large $\alpha_i$ will have its right hand side only slightly below $w$ because any change in $\rho$ won't have much of an effect on the left hand side of (7). To reach point 2, the drop in $T_i$ is less than under profit maximization. A decrease in $T_i$ not only increases the $MRP_i^H$ and the $MRP_i^R$, but also the $MWP_i$, so the change in $T_i$ required is less. To reach point 2, overall talent will have decreased less, i.e. the market labor demand curve won't shift back as much. Not only does the market size affect how much $T_i$ drops, but so does $\alpha_i$. It is possible to have a large market team (with a small $\alpha_i$) decrease its talent more than a small market team (with a large $\alpha_i$) to get to point 2. This is the opposite of what occurs with profit maximization. However, *ceteris paribus*, a larger $\alpha_i$ team is associated with a smaller decrease in talent and a smaller $\alpha_i$ team is associated with a larger decrease in talent. Again, this is an intermediate result, a disequilibrium not observed.

To move to the final spot, point 3, the wage drops and the teams have to increase their talent levels to make $MRP_i^H$, $MRP_i^R$, and $MWP_i$ decrease. Initially, the right hand side of (7) was less than the wage after the decrease in $\rho$. The amount that it was less than $w$ varied per team. At point 2, the right hand side for each team was equal to the wage, implying that some teams had to raise it more than others. Finally, at point 3, the wage decreases an equal amount below the right hand side for each team. The increase in talent that needs to occur to have the right hand side equal the wage at this new lower level will not be exactly the opposite of the previous decrease for each team. In other words, at point 1, the difference between the wage and the right hand side varied for each team. At point 2, decreases in talent occur

---

[51] Thomas Yawkey, a former owner of the Boston Red Sox, comes to mind.

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

for each team to make the right hand side equal the wage. At point 3, the difference between the wage and the right hand side is the same for each team, so the exact opposite of what was done to get from point 1 to point 2 will not get to point 3. The net result is that high $\alpha_i$ teams will increase their talent and low $\alpha_i$ teams will decrease their talent overall when $\rho$ decreases. Thus, including $\alpha_i > 0$ changes the result of the profit maximization analysis.

An increase in revenue sharing has different effects for a profit maximizing objective function and one that includes a separate winning motive. If the league contained pure profit maximizers, the distribution of talent would remain the same due to an increase in revenue sharing ($\frac{\partial T_i}{\partial \rho} = 0$). The inclusion of owners who have a penchant for winning results in a net gain in talent for high $\alpha_i$ teams and a net decrease in talent for low $\alpha_i$ teams. Hence, a desire to win causes a change in the distribution of talent towards less parity when revenue sharing is increased.

### 7.1.8   Effect of Revenue Sharing on the Wage Rate

The assertion in EQ and FQ, that $\frac{\partial T_i}{\partial \rho} = 0$, under pure profit maximization has been shown to be theoretically correct in the previous section. In AST, *Proposition 3* says that increased revenue sharing decreases league costs by lowering the wage, assuming that increases in the talent of *team i* increase its revenues more than *team j*'s revenues. For a utility maximizing model, $\frac{\partial w}{\partial \rho}$ is ambiguous. Low talented teams will drive the wage down for sure, while high talented teams might push the wage up when revenue sharing is increased. Rearranging equation (14) leads to

$$\frac{\partial w}{\partial \rho} = [MRP_i^H - MRP_i^R] + \left[2C\left(\frac{n^2}{n-1}\right)\frac{\partial T_i}{\partial \rho}\right](\rho P_i S_i + (1-\rho)PS)$$
$$+ \left(\left(\frac{\alpha_i}{1-\alpha_i}\right)\left(2\left(\frac{\partial T_i}{\partial \rho}\right)\frac{\left(\frac{-2n+3}{n-1}\right)T_i - (n-1)T}{(T_i+T)^3(n-1)}\right)\right). \quad (15)$$

The first two parts of (15) are positive, across all teams as a whole, while the last part is positive for low talented teams, and negative for high talented teams. Thus, it is likely that $\frac{\partial w}{\partial \rho} > 0$ for a utility maximizing model because even when $\alpha_i$ is large,

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

the denominator of the third part of (15) is large also.

*Proposition 4-* Under profit maximization, an increase in revenue sharing lowers the wage in equilibrium.

*Proof-* Under profit maximization, (15) reduces to $\frac{\partial w}{\partial \rho} = [MRP_i^H - MRP_i^R] > 0$ in equilibrium, across all teams, because $\frac{\partial T_i}{\partial \rho} = 0$. *Q.E.D.*

This result is analogous to AST's and FQ's result. Decreasing the percentage of home gate receipts that the home team gets to keep decreases the incentive to hire more talent and thus lowers the wage rate. The home team's decision has a smaller direct effect on its revenue than if there were less revenue sharing. The demand for talent will decrease because the returns to acquiring a unit of talent won't be directly realized by *team i* as much, but will be shared with the league. AST state that "in the absence of pure profit maximizing behavior, revenue sharing's effect on talent distribution and salaries is ambiguous," (AST, pg. 42). With respect to our utility maximizing model, this statement is half true. The effect of an increase in revenue sharing on wages is ambiguous, as AST state, but likely positive. However, an increase in revenue sharing increases the talent level of high $\alpha_i$ teams, and decreases the talent level of low $\alpha_i$ teams.

### 7.1.9   Salary Cap

The previous analysis has been executed with no wage ceiling. What will be the effect of a salary cap on the results thus far? With a completely binding salary cap, the market wage would be $\overline{w} = \frac{\delta}{T_i n} Rev$, where $Rev$ is the total revenue in the league from the previous season, or an estimate for the current season, $\sum_{i=1}^{n} \sum_{j \neq i}^{n} gh_{ij}$.[52] There are three situations a league can be in with respect to a salary cap. One circumstance has been investigated above where the salary cap level is so high as to not be binding for any teams. The second situation is when some, but not all, of the teams would like to exceed the salary cap, so it is partially binding. A cap that is set low enough such that it causes a constraint for every team is the final situation.

---

[52] A binding salary cap implies $\overline{w} < w$.

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

**Partially Binding Salary Cap**   Under a partially binding salary cap some teams will be forced to hire less talent than they desire. Because of the conservation of talent there is always a fixed amount of talent in the league, $\Upsilon$. If one team can't hire a unit of talent that it would normally hire without a cap, a second team, who hasn't hit the cap yet, will hire that unit and pay a lower wage than the unconstrained wage. The irony is that the second team is now hiring more talent in the face of a salary cap than it would have without the cap. Therefore, $\frac{\partial T_i}{\partial \delta} > 0$ for teams that are constrained by the salary cap and $\frac{\partial T_i}{\partial \delta} < 0$ for teams that still have room under the cap. Large market or large $\alpha_i$ teams have more talent than small market or small $\alpha_i$ teams in equilibrium in an unconstrained labor market (see section 7.1.4). If a partially binding salary cap is imposed, talent will shift from the relatively high talent, large market, large $\alpha_i$ teams to the relatively low talent, small market, small $\alpha_i$ teams thus increasing the level of parity in the league.

The wage paid for a unit of talent decreases, but by how much?

$$\frac{\partial \overline{w}}{\partial \delta} = \frac{Rev}{T_i n} - \frac{\delta \frac{\partial T_i}{\partial \delta}}{T_i^2 n} Rev + \frac{\delta}{T_i n} \sum_{i=1}^{n} \frac{\partial T_i}{\partial \delta} \left( \rho MRP_i^H + (1-\rho) MRP_i^R \right) \quad (16)$$

which is broken into three parts. The first part is the direct effect of a change in the salary cap level on the wage. The wage is a fraction of the average revenue per unit of talent. If the fraction decreases, the wage decreases. The second part is the effect of a change in $\delta$ on the talent level of *team i*. Third, the total revenue produced by the league might change from a movement in $\delta$. Not only does a change in the salary cap affect the wage directly, but also indirectly through changes in the distribution of talent throughout the league.

**Profit Maximization**   The first and second parts result in a positive number.[53] If we let $\alpha_i = 0$, effectively making the model a pure profit maximizing one, the third part of (16) is zero for a very slightly binding cap, and positive for any significant cap.[54]

---

[53]For proof of this claim, see *Proposition 5*.

[54]This is not the same as the revenue sharing analysis above. $MRP_i^H$ and $MRP_i^R$ are higher for the high talented teams which lose talent due to the cap ($\frac{\partial T_i}{\partial \delta} > 0$). They are lower for the low talented teams who receive new talent from the high talented teams ($\frac{\partial T_i}{\partial \delta} < 0$).

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

Ignoring the utility of winning in the owner's maximization problem, unsurprisingly, a more restrictive salary cap lowers the wage. Although, at the new distribution of talent, $\rho MRP_i^H + (1-\rho)MRP_i^R > w$ for the teams that lost talent and $\rho MRP_i^H + (1-\rho)MRP_i^R < w$ for the teams that gained talent. The cap creates the incentive for talent to shift back to its original distribution. Thus, enforcement is a problem.[55]

**Utility Maximization**   The inclusion of $\alpha_i$ into the analysis changes the results. To avoid intertwining the effects of more than one variable, let $P_i S_i = PS$. The high talent teams are the ones who are directly affected by the imposition of a salary cap, thus $\frac{\partial T_i}{\partial \delta} > 0$ for them. The low talent teams have excess capacity under the cap and will acquire the extra talent, but at a reduced wage. In other words, $\frac{\partial T_i}{\partial \delta} > 0$ when the $MRP_i^H$ is low (high talent teams), and $\frac{\partial T_i}{\partial \delta} < 0$ when the $MRP_i^H$ is high (low talent teams). As talent shifts from high $\alpha_i$ to low $\alpha_i$ teams the $MRP$'s converge towards each other, only becoming equal when the cap is completely binding and all talent levels are the same. Thus, the third part of equation (16) is negative in the utility maximizing model. Overall, as with profit maximization, a more restrictive salary cap lowers the wage.

*Proposition 5*- A more restrictive salary cap decreases the wage in a utility maximizing model and a pure profit maximizing model.

*Proof*- First, note that $\frac{Rev}{T_i n} > 0$ in equation (16). Second, $-\left[\frac{\delta \frac{\partial T_i}{\partial \delta}}{T_i^2 n} Rev\right]$ nets out to be positive across the league because for the teams where $\frac{\partial T_i}{\partial \delta} > 0$, the denominator is larger than when $\frac{\partial T_i}{\partial \delta} < 0$. The third part is positive (zero for a barely restrictive cap) Thus, for a profit maximizing model, $\frac{\partial w}{\partial \delta} > 0$. For the utility maximization model, the last part of (16) is negative, but gets canceled out by $\frac{Rev}{T_i n}$ because total league revenue is larger than the sum of the marginal revenue products across each team multiplied by the salary cap fraction. To show this, note that the third part of equation (16) can be rewritten as $\frac{\delta}{T_i n} \frac{\partial Rev}{\partial \delta}$. Canceling common denominators yields a comparison between $Rev$ and $\delta \frac{\partial Rev}{\partial \delta}$. Even though $\delta$ is unbounded, if it is large enough to become

---

[55] In the NBA, the large market teams who are supposed to lose talent with the introduction of a salary cap, have managed to hold on to their talent, thus effectively circumventing the "soft" cap.

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

unrestrictive, $\frac{\partial T_i}{\partial \delta} = 0$ and $\frac{\partial \overline{w}}{\partial \delta} = \frac{Rev}{T_i n} > 0$. Thus, $Rev$ is larger than $\frac{\partial Rev}{\partial \delta}$ because total league revenue is larger than the change in league revenue due to a change in the salary cap or else more revenue would have been lost than originally existed. $Q.E.D.$

If a partially binding salary cap is imposed upon a free agent labor market there is a change in the distribution of talent towards a league with more parity. The wage paid per unit of talent decreases, but less so when the owners' fondness for winning is included in the analysis.[56]

**Completely Binding Salary Cap**   The introduction of a completely binding salary cap causes all teams to adjust their talent levels such that there is perfect parity in the league.[57] Since all teams are allowed to spend the same amount, they will be able to purchase exactly the same amount of talent. The effect on the wage is the same as in the previous section. A further decrease in the salary cap will decrease the wage paid, but will not change the distribution of talent or the revenue structure. Thus, $\frac{\partial \overline{w}}{\partial \delta} = \frac{Rev}{T_i n} > 0$.

### 7.1.10   The Adoption of a Revenue Sharing Proposal

Not all of the disagreements in professional team sports have been between the owners and the players. Part of the reason that cartels have difficulty innovating and adopting new ideas is that adoption often requires that a significant majority be in favor of a specific proposal. Even though increased revenue sharing and the institution of a salary cap both increase league profits, would such proposals be passed by the owners? Adoption is less likely if the relative strengths of each owner are vastly different. Intracartel rivalry can create as much of an impasse as negotiations between owners and workers.

---

[56] A high desire to win increases the labor demand and thus to some extent mitigates the decrease in the wage, similar to the analysis on page 22.

[57] All teams face the same wage from competition, and must have the same wage bill, $\overline{w} T_i$. The salary cap can be rewritten as $T_i = \frac{\delta}{\overline{w} n} Rev$ which is a constant across $i$. Thus, $T_i = T_j, \forall i, j$.

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

**Pure Profit Maximizing Without a Salary Cap**   Increased revenue sharing causes a decrease in each team's wage bill.[58]  League revenue remains constant, but league profits increase. For a specific revenue sharing arrangement to be endorsed by each owner, there must be an increase in profits for each team, assuming pure profit maximization. Therefore, revenues must increase, or decrease less in absolute terms, than the decrease in the wage bill, for each team to desire a revenue sharing rule.

$$\frac{\partial \pi_i}{\partial \rho} = \sum_{j \neq i}^{n} \left( gh_{ij} - gr_{ij} \right) - \left( MRP_i^H - MRP_i^R \right) T_i. \tag{17}$$

*Proposition 6-* Each team will desire an increase in revenue sharing in the pure profit maximizing model without a salary cap.

*Proof-* If $\frac{\partial \pi_i}{\partial \rho} < 0$ then *team i* will desire an increase in revenue sharing. Rewrite equation (17) as $\frac{\partial \pi_i}{\partial \rho} = F(T_i) - GT_i$, where $F(T_i) \equiv \sum_{j \neq i}^{n} \left( gh_{ij} - gr_{ij} \right)$, and $G \equiv \left( MRP_i^H - MRP_i^R \right)$. Note that $F'(T_i) = G > 0$ because the derivative of home game revenue with respect to talent is just the home game marginal revenue product. Also note that for an average team with talent $T_i = T$, $F(T) = 0$ and $GT > 0$. Since $F'(T_i) = G > 0$ and $F(T_i = T) < GT$, then $\frac{\partial \pi_i}{\partial \rho} < 0$, $\forall i, T_i$. Since the first part of (17) has the same slope as the second part and is less than the second part at $T_i = T$, then $\frac{\partial \pi_i}{\partial \rho} < 0$ and constant. The slope is $\left( MRP_i^H - MRP_i^R \right)$ and the value of $F(T_i = T) = 0$ while $GT = PSn(A - B)T > 0$. *Q.E.D.*

Figure 3 is a graph of equation (17) broken into the first and second parts. It shows that the difference between $\sum_{j \neq i}^{n} \left( gh_{ij} - gr_{ij} \right)$ and $\left( MRP_i^H - MRP_i^R \right) T_i$ is constant and negative across all $T_i$. Thus, there is no damaged party to compensate from an increase in revenue sharing. With an increase in revenue sharing, small market teams gain revenue from large market teams and see their wage bill decrease. Large market teams lose revenue, but see a decrease in their wage bill that more than makes up for their revenue loss. Small market teams will see the same increase in their profit as large market teams. As a percentage of previous profits they will see a larger gain than large market teams. FQ ask the same question and decide that small market

---

[58]As shown previously there is a decrease in the league wage bill, but the distribution of talent remains unchanged.

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

teams will be in favor of an increase in revenue sharing, while there *might* exist large market teams that are for it. What causes the FQ model to differ from this model? Upon subsequent calculation, it can be seen that there is no $T_i^*$ where teams begin to lose profit from an increase in revenue sharing. In fact, the FQ model has exactly the same result, all teams will gain an equal amount of profit from an increase in revenue sharing.

All teams will increase there profit by $PSn(A - B)T$ for a unit decrease in $\rho$. Going from zero revenue sharing to 100% revenue sharing will increase the leagues profit by $PSn^2(A - B)T$. Unlike in previous research, all teams will be in favor of an increase in revenue sharing.[59]

**Pure Profit Maximizing With a Salary Cap**   For each owner, self-created revenue remains unchanged with changes in $\rho$ and costs are directly related to revenue. This is just a case of large market teams handing money over to small market teams. Thus,

---

[59]On March 21, 1996, the owners voted unanimously to adopt revenue sharing.

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

small market teams are in favor of increased revenue sharing while large market teams are against it. The relevant equation is

$$\frac{\partial \pi_i}{\partial \rho} = \sum_{j \neq i}^{n} \left( gh_{ij} - gr_{ij} \right). \tag{18}$$

**Utility Maximizing Without a Salary Cap**   The inclusion of the winning motive into the analysis makes it less likely than for pure profit maximizing without a salary cap, but more likely than pure profit maximizing with a salary cap that a revenue sharing agreement will be passed.[60] The relevant equation is

$$\frac{\partial U_i}{\partial \rho} = (1 - \alpha_i) \left[ \sum_{j \neq i}^{n} \left( gh_{ij} - gr_{ij} \right) - \frac{\partial w}{\partial \rho} T_i \right]. \tag{19}$$

Low talented teams will be in favor of an increase in revenue sharing in spite of the fact that they will lose talent. The loss of talent will decrease their winning percentage and self-created revenues, but will be mitigated by the decrease in the amount of talent which has to be compensated. Additionally, they will receive more revenue from the sharing policy because the first part of equation (19) is negative for sufficiently low talented teams. Also, not only will less talent have to be paid, but the wage rate will decrease. Overall, equation (19) is negative for low talented teams.

High talented teams gain talent and thus increase their winning percentage and most likely their self-created revenue, when revenue sharing is increased. They will also see a decrease in their wage bill from the last part of (19) as was explained in the analysis of equation (17) as well as a decrease in revenue from sharing more of their revenue. Overall, large market teams lose revenue due to increased sharing and possibly due to an increase in talent, but will gain in winning percentage, and experience a decrease in their talent costs. Thus, they will be in favor of an increase in revenue sharing if equation (19) is negative.

An average talented team undergoes no change in its talent level. Thus, it will be in favor of an increase in revenue sharing because $\frac{\partial U_i}{\partial \rho} = - (1 - \alpha_i) \left[ (MRP_i^H - MRP_i^R) T \right] <$ 0. The wage bill decreases for an average talented team.

---

[60] A $\frac{3}{4}$ majority is required in MLB to pass a revenue sharing proposal.

34

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

There might exist a critical talent level where teams above it will be against increased revenue sharing, while teams below it will desire more revenue sharing. This critical level is above the average talented team.

**Utility Maximizing With a Salary Cap**   In the complete version of the model, the league is more likely to pass a revenue sharing increase than in the profit maximizing model with a salary cap, except under a completely binding cap, where it is equally likely.

$$\frac{\partial U_i}{\partial \rho} = (1 - \alpha_i) \left[ \sum_{j \neq i}^{n} (gh_{ij} - gr_{ij}) + \frac{\partial T_i}{\partial \rho} V - \frac{\delta}{n} \sum_{i=1}^{n} \frac{\partial T_i}{\partial \rho} \left( \rho MRP_i^H + (1 - \rho) MRP_i^R \right) \right],$$
(20)

where $V$ is the marginal value of talent.[61]

An increase in revenue sharing will cause a highly talented team to lose revenue directly from sharing. However, they will gain talent and thus increase their self-created revenue while paying a lower wage in the process. There likely exists a critical level of talent where teams above that level will be against increased revenue sharing while teams below that level will desire it. The critical talent level will lie above the average talent level because at $T_i = T$, $\frac{\partial U_i}{\partial \rho} < 0$, holding $P_i S_i$ constant to isolate the penchant for winning effect. Thus, an average talented team will desire an increase in revenue sharing simply due to the decrease in wage costs which will occur.

Low talented teams will gain revenue directly from sharing with the high talented teams when $\rho$ is decreased. They will lose talent which will decrease their self-created revenue, but also see a decrease in their wage costs. Overall, low talented teams will desire an increase in revenue sharing.

If the salary cap was completely binding, $\frac{\partial U_i}{\partial \rho} = (1 - \alpha_i) \frac{\partial \pi_i}{\partial \rho}$. At this distribution of talent, $\frac{\partial T_i}{\partial \rho} = 0$, which is the same as the profit maximizing case with a salary cap. Large market teams would dislike increased revenue sharing while small market

---

[61]Specifically, $V = \alpha_i MWP_i + (1 - \alpha_i) \left[ \rho MRP_i^H + (1 - \rho) MRP_i^R \right]$. For a constant $\alpha_i$, $V$ and the $MRP$'s are higher for high talented teams than for low talented teams. For a constant $P_i S_i$, $V$ and the $MRP$'s are lower for high talented teams than for low talented teams.

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

teams would desire it.

### 7.1.11   The Adoption of a Salary Cap Proposal

Currently, a salary cap exists in the NBA and the NFL, but not in Major League Baseball. A salary cap is a form of revenue sharing between the owners and the players because the players receive a certain percentage of league revenues. In the NFL, the 1995 salary cap was \$37.1 million per team, or 63% of projected revenues. The players directly share in the success of the league. For a specific salary cap proposal to be adopted, each owner must receive an expected increase in their utility from a decrease in $\delta$.

$$\frac{\partial U_i}{\partial \delta} = (1 - \alpha_i)\left[\frac{\partial T_i}{\partial \delta}V - \left(\frac{Rev}{n} + \frac{\delta}{n}\sum_{i=1}^{n}\frac{\partial T_i}{\partial \delta}\left(\rho MRP_i^H + (1-\rho)MRP_i^R\right)\right)\right], \quad (21)$$

where $V = \alpha_i MWP_i + (1 - \alpha_i)\left[\rho MRP_i^H + (1-\rho)MRP_i^R\right]$.

**Utility Maximizing**   A more stringent salary cap causes each team's wage bill to decline by a constant amount, the last part of equation (21). Teams with low levels of talent purchase the excess supply of talent in the league due to the salary cap constraint on the highly talented teams. Thus, low talented teams see an increase in their winning percentage and their revenue. They will be in favor of a lower salary cap proposal.

A team that has the same wage costs as the proposed salary cap will see no change in its level of talent, and thus will be in favor of the proposal due to the decrease in its wage bill.

Highly talented teams lose talent due to the adoption of a salary cap. Their wins decrease as does their revenue. Although, a closer inspection of (21) reveals that even highly talented teams will likely be in favor of a salary cap proposal. If the average revenue per team, $\frac{Rev}{n}$, is greater than the value of the loss in talent for *team i*, $\frac{\partial T_i}{\partial \delta}V$, plus the average net change in revenue throughout the league times the salary cap percentage, $\frac{\delta}{n}\sum_{i=1}^{n}\frac{\partial T_i}{\partial \delta}\left(\rho MRP_i^H + (1 - \rho)MRP_i^R\right)$, then teams with high

Electronic copy available at: https://ssrn.com/abstract=1601

talent levels will desire a decrease in $\delta$. Only very talented teams, who face a drastic decrease in $\delta$, will be against the salary cap proposal.

Overall, most teams will be in favor of a specific salary cap proposal. Low talented teams will gain the most while high talented teams will gain the least or even lose from a decrease in $\delta$ under a utility maximizing model.

**Profit Maximizing**   If all owners are pure profit maximizers, equation (21) reduces to

$$\frac{\partial \pi_i}{\partial \delta} = \frac{\partial T_i}{\partial \delta} Y - \left( \frac{Rev}{n} + \frac{\delta}{n} \sum_{i=1}^{n} \frac{\partial T_i}{\partial \delta} Y \right), \tag{22}$$

because $\alpha_i = 0$.[62]

Small market teams with low talent levels desire a decrease in the salary cap because (1) they gain talent, which increases their revenue, and (2) they face lower wage costs. Very large market teams might dislike a decrease in the salary cap. The lost revenue might outweigh the decrease in their wage bill, but not necessarily. If the average revenue per team, the decrease in wage costs, outweighs the value of their lost talent, the decrease in revenue, a team will be in favor of a decrease in $\delta$. If the league is already in a perfect parity situation due to a previous salary cap or similar market sizes, then all teams will desire a decrease in $\delta$ because team revenues won't change, but team wages will decrease.

The FQ model shows that as long as the decrease in the salary cap level is large enough, all teams, even large market teams, will be in favor of it. This assumes that any decrease in $\delta$, however small, leads to perfect parity immediately. In other words, a small decrease in $\delta$ causes the same large drop in talent for *team i* (to the point where perfect parity exists) that a large decrease in $\delta$ causes. Naturally a tiny decrease in $\delta$ would be despised by a large market team because they would lose a large, fixed amount of talent, but only see their wage costs drop by a small amount. A large decrease in $\delta$ would be accompanied by the same fixed drop in talent (the revenue decrease would be equal), but by a larger decrease in costs, thus causing *team i* to desire the lower salary cap.

---

[62]$Y = \left( \rho MRP_i^H + (1 - \rho) MRP_i^R \right).$

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

Figure 4 is a picture of revenues and costs as they relate to the salary cap level taken from equation (22). Assume that point 1 corresponds to the current salary cap level (just above the binding level). The top line is the revenue of a large market team, *team i*, who will lose talent if $\delta$ is decreased. The bottom line is the wage costs of *team i*.[63] The FQ model assumes that a small decrease in $\delta$ from point 1 to point 2 actually brings *team i* to the situation at point 5 where the salary cap level is completely binding and perfect parity exists. In that case, *team i* wouldn't want a small decrease in $\delta$. It would only prefer a drop in the salary cap level if it were to go to point 6 or lower. Below point 6, *team i* sees an increase in its profit from the original salary cap level at point 1 (the vertical distance is greater than $H$). The FQ statement, that a large market team will only prefer a decrease in the salary cap level if it is large enough, is true assuming that any decrease in $\delta$ from point 1 automatically takes a team at least to the situation at point 5.

---

[63] The slope of the top line is the first part of equation (22), while the slope of the bottom line is the last part of the equation.

Electronic copy available at: https://ssrn.com/abstract=1601

The profit maximizing model in equation (22) shows that there are two levels of $\delta$ which are local maxima, one of which is a global maximum, with respect to profits. Assuming that point 1 is the current level of $\delta$, *team i* would be in favor of a decrease in $\delta$ over to point 4. It would prefer stopping at point 3, the local maximum level of $\delta$ corresponding to profits. Like FQ, if the proposal was for $\delta$ to go below point 4, *team i* would prefer that it go all the way down below point 6 (to point 7 for instance), certainly not stopping at point 5, the lowest profit level for *team i*. Overall, large market teams are in favor of sufficiently small decreases or sufficiently large decreases in the salary cap level, but not intermediate decreases.

### 7.1.12   Summary of Results from the Owner's Problem

**Unrestricted Wage**   The owner's problem consists of the owner choosing a level of talent to maximize his/her objective function. The wage is a convex combination of the marginal winning and marginal revenue products. A comparison is made to EQ on the sustainability of equal playing strengths. EQ requires that $\rho > \frac{1}{2}$ while this model shows that values less than $\frac{1}{2}$ are sufficient for equal playing strengths to be sustainable.

Increases in $\alpha_i$ increase the wage. Large market, high $\alpha_i$ teams will have more talent than small market, low $\alpha_i$ teams in equilibrium. An increase in the number of teams in the league lowers the marginal winning product, but may increase or decrease the marginal revenue product, depending on the net effect of the tradeoff between the low talent of the expansion team and its high novelty demand. The effect of an increase in revenue sharing on the wage is ambiguous except under pure profit maximization, where the wage increases. Under profit maximization, $\frac{\partial T_i}{\partial \rho} = 0$ which causes $\frac{\partial w}{\partial \rho} > 0$ as in AST. As a result, each team sees an increase in profits when revenue sharing is increased. Inclusion of the winning motive likely causes a decrease in the wage when revenue sharing is increased. Ironically, parity is reduced when more revenue sharing occurs because high $\alpha_i$ teams with relatively high levels of talent increase their talent while low talented, low $\alpha_i$ teams, decrease their talent

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

39

Electronic copy available at: https://ssrn.com/abstract=1601

levels.

All teams will desire an increase in revenue sharing under pure profit maximization. Each team will see a decline in their wage costs. Incorporation of the winning portion of the owners objective function causes teams with low and average levels of talent to be in favor of increased revenue sharing, while sufficiently high talented teams might be against it, holding market size equal.

**Restricted Wage**    If all owners are pure profit maximizers, the introduction of a salary cap will decrease league costs. It will lead to a higher degree of parity in the league and individual team revenues will be altered. The low $\alpha_i$, small market teams will receive talent from the high $\alpha_i$, large market teams. The wage paid per unit of talent will decrease, and the wage bill for each team will decline. If a completely binding cap is already in place and an even lower salary cap is instituted, it will decrease the wage paid per unit of talent, but maintain perfect parity. All salary cap proposals will be preferred by small market teams under profit maximization. Highly talented teams are likely to pass a proposal which has a sufficiently small decrease in the salary cap restriction, or a sufficiently large decrease. An intermediate decrease in the salary cap level will not be desired by large market teams.

If the owners penchant for winning is included, league revenues and wages will decrease from a tighter salary cap. A salary cap proposal will be adopted by the low and average talented teams. An average talented team will be in favor of a decrease in the salary cap level. Highly talented teams will pass the proposal under specific conditions.

The complete model indicates that all teams except sufficiently large market teams will desire an increase in revenue sharing. The profit maximizing case with a salary cap suggests that small market owners will receive revenue directly from large market owners. Small market teams will be in favor of increased revenue sharing, while large market teams will be against it.

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

Electronic copy available at: https://ssrn.com/abstract=1601

## 7.2   Analysis of the League's Problem

The league's problem consists of choosing an optimal revenue sharing arrangement and salary cap. There is asymmetric information between the league and the owners with respect to each owner's $\alpha_i$, their penchant for winning. Each owner knows their own $\alpha_i$, but the league does not, except by observing the previous season's talent levels for each team, which is imperfect due to random effects. Thus, the league maximizes profit not utility. *Ceteris paribus*, the teams with more talent have owners who have a greater desire to win for the sake of winning. This section will show the optimal revenue sharing arrangement with and without a salary capped wage and the optimal salary cap arrangement under pure profit maximizing as well as utility maximizing.

### 7.2.1   Optimal Revenue Sharing Arrangement

**Pure Profit Maximizing Owners Without a Salary Cap**   The first order condition from the league's optimization problem involves maximizing $\sum_{i=1}^{n} \pi_i$ by choosing the revenue sharing arrangement.[64] The first order condition with respect to $\rho$ yields

$$\frac{\partial \Pi}{\partial \rho} = -\sum_{i=1}^{n} T_i \left( MRP_i^H - MRP_i^R \right) = -\frac{\partial w}{\partial \rho} \Upsilon < 0, \qquad (23)$$

where $\Pi = \sum_{i=1}^{n} \pi_i$. Since $\frac{\partial w}{\partial \rho}$ is always positive, the optimal revenue sharing arrangement for the league is $\rho^* = 0$. All revenue should go to the road team.

When revenue sharing increases, the league revenue remains constant while the league wage bill always decreases, thus making league profits maximized when there is 100% revenue sharing as is the case in the FQ model (FQ, page 1289). League revenue remains unchanged with changes in $\rho$ because the talent distribution throughout the league also remains unchanged. For an individual team, the total season marginal demand is less on the road then at home. If they are being paid only for their road games, they have a lower demand for talent and thus the overall wage decreases. The

---

[64]Because the players unions in professional sports are sufficiently powerful, it is common for $\delta$ and possibly $\rho$ to be jointly chosen by the league and the union. This version of the model does not attempt to address the bargaining game between the league and the union, but will discuss the union's likelihood of approving certain proposals.

41

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

wage decreases for all teams and since the distribution of talent remains unchanged the demand for home and away games does not change. Choosing $\rho = 0$ artificially creates a lower demand for talent, thus lowering league costs without diminishing the league's quality.

**Pure Profit Maximizing Owners With a Completely Binding Salary Cap**   The salary capped wage, $\overline{w}$, is a function of league revenue. Since league revenue remains unchanged when $\rho$ changes, the salary capped wage will remain unchanged also. Changes in the revenue sharing arrangement won't have any affect on league profits. Thus,

$$\frac{\partial \Pi}{\partial \rho} = \sum_{i=1}^{n} \left[ \sum_{j \neq i}^{n} \left( gh_{ij} - gr_{ij} \right) \right] = 0, \tag{24}$$

because total home gate receipts across the league equal total road gate receipts by definition. With a completely binding salary cap in place, the optimal level of revenue sharing is anything from 0% to 100%. The league wage bill won't change when $\rho$ is changed. Profit is unaffected because revenue and cost, which is a function of revenue, remain constant as talent distribution remains constant.

**Utility Maximizing Owners Without a Salary Cap**   Optimal revenue sharing depends on $\alpha_i$ indirectly because $\alpha_i$ affects the marginal revenue product of talent through the amount of talent chosen.[65] *Proposition 3* shows that a high $\alpha_i$ leads to the choice of more talent which results in a lower marginal revenue product.

When $\alpha_i$ is large, *team i* hires more talent than profit maximizing would suggest. Other teams have, on average, less than their profit maximizing level of talent because of the conservation of talent. An increase in the optimal revenue sharing arrangement (a decrease in $\rho^*$) would take some of the revenue away from the *win at all costs* team and distribute it among the other teams, but might increase the self- created revenue of the large market team.[66]

---

[65] Even though the league is maximizing league profits, if the owners aren't, the league must take this into account when choosing its optimal levels.

[66] If the large market team is already sufficiently dominant, self-created revenue may actually decrease.

Electronic copy available at: https://ssrn.com/abstract=1601

The inclusion of the owners penchant for winning adds a revenue term to the league's first order conditions and changes the cost term.

$$\frac{\partial \Pi}{\partial \rho} = -\sum_{i=1}^{n} T_i \left\{ \left( MRP_i^H - MRP_i^R \right) + 2C \left( \frac{n^2}{n-1} \right) \left[ \rho P_i S_i + (1-\rho) PS \right] \frac{\partial T_i}{\partial \rho} \right\} < 0. \tag{25}$$

The first term is similar to equation (23) except it isn't constant across teams. The last term is the rest of the adjustment to team costs caused by changes in the distribution of talent across the league. Overall, league profit increases with an increase in revenue sharing due to the decrease in wage costs across the league. If all teams have equal levels of talent, then the increase in league profits is equal to the effect in the pure profit maximizing model of equation (23). Thus, the optimal revenue sharing arrangement is the same as for profit maximizing, 100% revenue sharing ($\rho^* = 0$).

**Utility Maximizing Owners With a Salary Cap**   The complete model, with utility maximizing and a salary cap, leads to

$$\frac{\partial \Pi}{\partial \rho} = (1-\delta) \sum_{i=1}^{n} \frac{\partial T_i}{\partial \rho} \left( \rho MRP_i^H + (1-\rho) MRP_i^R \right). \tag{26}$$

$\sum_{i=1}^{n} \frac{\partial T_i}{\partial \rho} \left( \rho MRP_i^H + (1-\rho) MRP_i^R \right) > 0$ when holding $P_i S_i$ constant across teams. The $MRP$'s are lower for the high talented, high $\alpha_i$ teams than for the low talented, low $\alpha_i$ teams.[67] When holding $\alpha_i$ constant and letting $P_i S_i$ vary across teams, $\sum_{i=1}^{n} \frac{\partial T_i}{\partial \rho} \left( \rho MRP_i^H + (1-\rho) MRP_i^R \right) < 0$ because the $MRP$'s are higher for the large market, high talented teams than for the small market, low talented teams.

An increase in revenue sharing *increases* league profits when holding $\alpha_i$ constant across teams and *decreases* league profits when holding $P_i S_i$ constant. The net effect depends on the relative ranges of $\alpha_i$ and $P_i S_i$. The introduction of a salary cap into the analysis causes the optimal revenue sharing arrangement to be either $\rho^* = 1$ or $\rho^* = 0$. Without a salary cap, an increase in revenue sharing causes a decrease in the wage paid. The decrease in self-created revenue for small market teams is exactly

---

[67] $\frac{\partial T_i}{\partial \rho} < 0$ for high talented teams.

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

countered by an equivalent decrease in the amount of talent that has to be paid. The net effect is just the value of the change in the wage. With a salary cap, there is a change in the wage bill because there is a change in league revenue. However, the change in the wages paid is only a fraction, $\delta$, of the change in revenue which occurs. The change in league profit from an increase in revenue sharing is the change in league revenue minus $\delta$ times the change in league revenue.

### 7.2.2   Optimal Salary Cap Level

**Profit Maximizing Owners**   The current salary cap level in the NBA is $\delta = 0.6$, which means that the players collectively receive 60% of league revenues.[68] Under profit maximization, the effect of changes in the salary cap level on league profit is

$$\frac{\partial \Pi}{\partial \delta} = (1 - \delta) \sum_{i=1}^{n} \frac{\partial T_i}{\partial \delta} \left( \rho MRP_i^H + (1 - \rho) MRP_i^R \right) - \sum_{i=1}^{n} rev_i < 0. \qquad (27)$$

League profit can be written as $\Pi = (1 - \delta) \sum_{i=1}^{n} rev_i$ when a salary cap is included. It is straight forward to see that as $\delta$ varies, the league profit varies by total league revenue plus changes in league revenue. Thus, the optimal salary cap level under pure profit maximization is $\delta^* = 0$ even though the sign of the first part of (27) is positive because total league revenue (the decrease in costs) is greater than any losses in league revenue due to the introduction of the salary cap. Obviously, the owners would like to pay the players as little as possible. Actually, with the salary cap level at zero, many players would quit. From the owners perspective, the salary cap level should be decreased until it causes players to search for a new line of work i.e. as low as the players reservation wage. As mentioned earlier, the players wages are significantly higher than their reservation wage. In fact the conservation of talent assumption is derived from this belief as the market labor supply curve is vertical at the number of players in the league.[69]

---

[68] Actually, the current salary cap being used in professional sports leagues is known as a "soft cap" because many teams are spending above the cap limit. This is due to grandfather clauses of various sorts. See FQ pg. 1280.

[69] No provision is included to allow an increase in wages to increase the absolute quality of the game, i.e. efficiency wages. In other words, the total amount of talent in the league, $\Upsilon$, is constant throughout a season regardless of the level of the wage.

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

**Utility Maximizing Owners**   The league's choice of revenue sharing remained the same when the penchant for winning was included, and that is the case with the salary cap. The optimal salary cap level is still zero.

$$\frac{\partial \Pi}{\partial \delta} = (1 - \delta) \sum_{i=1}^{n} \frac{\partial T_i}{\partial \delta} \left( \rho MRP_i^H + (1 - \rho) MRP_i^R \right) - \sum_{i=1}^{n} rev_i < 0. \qquad (28)$$

The sign of the first part of equation (28) depends on the relative ranges of $\alpha_i$ and $P_i S_i$ across teams. Not only is the owners' share of revenue increasing when $\delta$ declines, but possibly so is the revenue from which it is extracted. Talent is migrating from the high talented teams, to the low talented teams. Again, the optimal salary cap level, $\delta^*$, is zero or as low as it can go before players change occupations.

### 7.2.3   Summary of the Analysis of the League's Problem

Table 1 summarizes the leagues choice of a revenue sharing and salary cap arrangement.

The main feature of the optimal revenue sharing level without a salary cap is that it creates a lower level of demand for labor without changing the product demand. There is a decrease in overall wage costs, and thus an increase in league profit. A profit maximizing model with a salary cap leads to the conclusion that any choice of $\rho$ leads to the same level of league profit. The revenue sharing level is a tool which decides who shall receive the spoils, the large market teams, or the small market teams. The

Electronic copy available at: https://ssrn.com/abstract=1601

complete model shows that, given a salary cap exists, the issue is whether a decrease in $\rho$ will lead to an increase or a decrease in league revenue. It depends on the relative distributions of $\alpha_i$ and $P_iS_i$ across teams. The optimal salary cap level is zero, from the owners perspective, simply because they get to keep more of the league revenue than if it were higher.[70]

# Part III

# Conclusion

This section will briefly summarize the results from the model and discuss some of the implications including a policy prescription. Additionally, further extensions of the model will be explored as well as possible empirical tests. Finally, a look at the generalizability of the research will be mentioned.

## 8   Summary

The model shows sufficient conditions for the league to exist, i.e. there is a positive value for the wage for certain ranges of $T_i$ and $T_j$. Previous research had mostly assumed that the market wage was significantly above the players' reservation wage.

The EQ and FQ models require that $\rho > 0.5$ or else "teams face the perverse incentive that they are better off losing than winning," (FQ, pg. 1287). It is not perverse to desire to lose games, especially in the profit maximizing model where winning for winning's sake plays no part. It is only perverse if the fans begin to doubt the legitimacy of the contest, i.e. that teams are throwing games, and stop purchasing the product.[71] In the profit maximizing model, increased revenue sharing lowers the demand for talent and thus the wage. It doesn't affect the distribution of

---

[70]Of course the salary cap should be just at or above the players reservation wage to keep the industry in business.

[71]Daly (1992) discusses the importance of contest legitimacy to demand. He argues for the reserve clause system because star players are team specific assets and thus need to establish that they are credible against opportunism and moral hazard such as switching teams, holding out, or shirking.

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

talent, so contest legitimacy isn't a problem.

Talent is the engine that drives a sports league. *Ceteris paribus*, teams with larger markets will have more talent, in equilibrium. The $S_i$ parameter is used to capture any aspects of a team's market that would affect demand except for the price, $P_i$, and the talent level. Some of the common factors included in $S_i$ are population size, income levels, substitute goods, etc. Also, teams whose owners have a high penchant for winning will have more talent in equilibrium, all else equal. In a profit maximizing model, the distribution of talent will be determined by the distributions of the market size, the product price, the marginal propensities to attend games due to talent levels, and the salary cap level. A utility maximizing model would additionally include the revenue sharing level and the penchant for winning.

Both the EQ and FQ models contain the feature that revenue sharing does not affect the distribution of talent. The AST model uses $\frac{\partial T_i}{\partial \rho} > 0$. In a profit maximizing model, it was shown that $\frac{\partial T_i}{\partial \rho} = 0$. For a utility maximizing model, an increase in revenue sharing led to an increase in talent for high $\alpha_i$ teams, and a decrease in talent for low $\alpha_i$ teams. Parity is unaffected in a profit maximizing model, but is likely to be lowered in a utility maximizing model when revenue sharing is increased.

The model has also verified a common result from the previous literature, that $\frac{\partial w}{\partial \rho} > 0$ in profit maximizing models. It has also shown that an increase in revenue sharing will likely decrease the wage in a utility maximizing model. The effect of a salary cap has been to increase the level of parity in the league and to decrease the wage per unit of talent.

The likelihood of adoption of specific revenue sharing and salary cap proposals was examined in the context of the following four versions of the model; (1) pure profit maximizing without a salary cap, (2) pure profit maximizing with a salary cap, (3) utility maximizing without a salary cap, and (4) utility maximizing with a salary cap. All teams would be in favor of an increase in revenue sharing in case (1). Low talented teams would be in favor of decreasing $\rho$ in case (2). Versions (3), and (4) would find small to slightly above average talented teams in favor of increased revenue sharing.

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

In the profit maximizing model, all teams would be in favor of lowering the salary cap if it were a sufficiently small or a sufficiently large decrease. Almost all teams in the utility maximizing model would be in favor of decreasing $\delta$. In both models, if a completely binding salary cap already existed, then all teams would be in favor of a further decrease in the salary cap.

In terms of maximizing league wide profits, the league would set the salary cap as low as the players' reservation wage so as to not cause a mass exodus of talent into other occupations, but still give the owners the greatest portion possible of the revenue generated. In both the profit and utility maximizing models without a salary cap, the optimal revenue sharing arrangement is to set $\rho^* = 0$.[72] Thus, all of the revenue from a game goes to the road team. This creates a lower labor demand without changing the product demand. League profit, in the profit maximizing model with a salary cap, is unaffected by the choice of $\rho$. In the context of the utility maximizing model with a salary cap, the optimal revenue sharing level is either $\rho^* = 0$ or $\rho^* = 1$ depending on the spread of the distributions of $\alpha_i$ and $P_i S_i$. When $\alpha_i$ has a distribution with less variance than the distribution of $P_i S_i$ then $\rho^* = 1$, otherwise $\rho^* = 0$.

## 9   Implications

Are the antitrust exemption for baseball and the subsequent government policies regarding professional sports justified?[73] The antitrust exemption allows the reserve clause and the rookie draft on the grounds that they enforce a minimum level of parity which is needed for a league to be viable. As is shown here, as well as in the previous literature, in a profit maximizing model the equilibrium distribution of talent is not one where equalization of playing strengths occurs. Larger market teams will have more talent. The utility maximizing model faces the same situation unless an unlikely distribution of $\alpha_i$'s exists which counteracts the market size affect. EQ state that the antitrust exemption "appears to be amply justified" because of these reasons (EQ,

---

[72] The league only maximizes league profits, but in the context of the utility maximizing model.

[73] See Scully (1995), pgs. 21, 27, 35, 37, and 137 for a discussion of subsequent government policies.

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

page 1319). Recently, the NBA and the NFL have introduced a salary cap through collective bargaining. A salary cap has been shown to lead to equalization of playing strengths. Thus, the exemption, on parity grounds, isn't needed in leagues with a salary cap.

Another implication involves the result that an increase in revenue sharing lowers the wage. U.S. District Judge Sonia Sotomayor issued an injunction on March 31, 1995 which prevents the owners from making any rule changes without her permission. On March 21, 1996, the owners voted to adopt a more aggressive revenue sharing plan, but "do not want to be in a position where Sotomayor determines new revenue sharing rules affect salaries," (AP, March 21, 1996). Thus, Judge Sotomayor may block the revenue sharing proposal if she feels it will hurt the union. Analyses of sports leagues have public policy implications.

## 9.1   Policy Prescription

If the assumptions of the model are true, what type of policy can be formulated? Competition among the owners for talent in a free agent market results in a distribution of talent which maximizes league revenues.[74] The earnings are divided among the owners and the players based on the market size, price, and the wage.[75] There are tools available to the owners and the players to move talent around, e.g. the salary cap level, the revenue sharing arrangement, the amateur draft, and the reserve clause.[76] Any policy changes could shrink the pie, but could increase the share for a particular group.

From the owners perspective, an increase in revenue sharing (a decrease in $\rho$) will increase each team's profits in a pure profit maximizing model with no salary cap. The players will dislike it because there will be a decrease in the wage per unit of talent. Adding a salary cap will be desired by all of the teams if it is a large enough

---

[74]The utility maximizing model results in a distribution of talent which maximizes the total utility in the league.

[75]The division of earnings is also based on $\alpha_i$ in a utility maximizing model.

[76]The reserve clause can be viewed in this model by assuming that contracts can be traded freely among the teams. The wage will be lower because of the monopsony power of each individual team.

Electronic copy available at: https://ssrn.com/abstract=1601

decrease, but be disliked by the players. Large market teams will prevent an increase in revenue sharing in a profit maximizing model with a salary cap. Since total league revenue remains unchanged, there is no incentive for the league to pass it and make side payments to the damaged parties i.e. the large market teams. In this case, the players will agree with the large market teams.

In the utility maximizing model with no salary cap, even though very large market teams realize a decrease in their utility, it will be in the best interest of the other teams to agree to make side payments to the appropriate large market teams in exchange for lowering $\rho$.[77] Again, the players will dislike the resultant decrease in their wage. In the complete model, if $P_i S_i$ varies more than $\alpha_i$, again it will be in the interest of the small market teams to compensate the large market teams to agree to an increase in revenue sharing.

Any favorable policy for the owners is unfavorable to the players, hence the number of work stoppages observed. In each of these cases, the players would have the incentive to make side payments to the owners to disallow a decrease in either $\rho$ or $\delta$. Mainly, the owners need to work with themselves and the players to divide the league revenues appropriately so that they keep the pie maximized. The information asymmetry in the utility maximizing model makes this even more difficult.

The amateur draft is likely to have no effect on league talent distribution because of trades, but will increase the value of the small market teams relative to the large market teams. The rookie salary cap is a policy tool which is beneficial to both the owners and the players because it lowers costs to the owners and increases the room under the salary cap available to current players. It is likely to be passed because amateurs aren't in the players unions so they don't vote and they have low bargaining power anyway.[78] If possible, the league should assign the small market teams to the owners with a high $\alpha_i$ because of the closeness of contest portion of the demand

---

[77] The mechanics of how to decide the suitable amount of side payments and from whom they shall come is a difficult question because all teams will claim to be the damaged party. Although, it should be resolved by examining which teams have the most talent before the proposal. They are the damaged parties.

[78] The NBA's rookie cap will begin in the 1996-97 season.

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

function. Also, in the utility maximizing model, salary cap proposals increase parity while revenue sharing proposals decrease parity, thus they can be used jointly to reach desired parity levels.

In the National League of MLB, there is no gate revenue sharing and no salary cap. It may appear that the union is sufficiently powerful to prevent the league from taking more revenue from the players, but this was the arrangement before the players formed a union. Possibly, the gain to the league from a decrease in $\rho$ below 1 is smaller than the loss by the players. In a utility maximizing model, the league gains $(1 - \alpha)\frac{\partial w}{\partial \rho}\Upsilon$, while the players lose $\frac{\partial w}{\partial \rho}\Upsilon$ collectively.[79] Thus, maybe the players have made side payments to the league, in the form of lower wages, in order to prevent them from increasing the revenue sharing level.

## 10    Extensions of the Model

### 10.1    A Dynamic Model

One of the ultimate goals of this line of research is to develop a model which incorporates the dynamic nature of the industry to accommodate expansion issues, the optimal league size, free- riding, free agent price wars, the amateur draft, the intricacies of the team production function, a multitiered labor market, and a division of owners' desire for winning into winning percentage and championship potential. The revenue sharing level and the salary cap might influence the optimal team size and the rate of expansion through lowering costs and increasing the viability of certain franchise locations. The initial setup of this type model is described in the appendix.

### 10.2    Empirical Tests

A natural next step in this research area is to test the model empirically. An examination of the value of winning would help determine whether the utility maximizing model or the profit maximizing model is more appropriate. One possible way to

---

[79] $\alpha_i$ was set to $\alpha$ for all teams to make the comparison clearer.

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

measure this would be to note that in equilibrium $w = \left(\frac{\alpha_i}{1-\alpha_i}\right) MWP_i + \rho MRP_i^H + (1-\rho)MRP_i^R$. Knowing $w$ and $\rho$, and measuring the marginal revenue products, the value of $\left(\frac{\alpha_i}{1-\alpha_i}\right) MWP_i$ could be determined. A test of the demand specification would reveal the importance of absolute quality versus relative quality. A goal would be to get estimates of $A$, $B$, and $C$. Another implication of the model is that the level of revenue sharing affects the distribution of talent in the utility maximizing model. What is $\frac{\partial T_i}{\partial \rho}$ for real? If it weren't zero that would be consistent with the notion that profit maximization is not the sole objective of sports team owners? Finally, the estimates could be used in a simulation of the model to see if it appears stable.

### 10.3   Cartel Instability

One of the aspects of the study of cartel economics confronts the forces that make the cartel firms different from a simple monopoly. If all firms in a cartel were similar, there would be no problems with price wars or policy adoption. A sports league cartel faces many of the same stability issues as traditional cartels. The model shows that if all teams had the same size markets, 100% revenue sharing would be adopted by every owner. As market size variation increases, the likelihood of adoption of both revenue sharing and salary cap proposals decreases. The same holds true for variations in $\alpha_i$. A cartel of dissimilar firms can lead to low rates of innovation.

A dynamic model might show that free-riding on the league's talent would be part of an equilibrium strategy. It would lower costs and increase the value of draft picks. The San Diego Padres' "fire sale" during the 1993 season actually turned them into a profitable team. They cheated on the cartel by getting rid of most of their good, expensive players. It resulted in lowering their costs but did not reduce their revenue as much because they still played the same quality teams as before. Although, the cartel is against this strategy, certain teams like the opportunity to acquire the excess talent. A team can also cheat on the cartel by engaging in a price war for free agents, i.e. an input price war or bidding war. Except for the collusion years of 1985-86, MLB has been unable to prevent itself from bidding wages up to levels so high as to put

Electronic copy available at: https://ssrn.com/abstract=1601

some teams in financial panic (see Whitney, 1993).

## 10.4   A Model of the NCAA

The National Collegiate Athletic Association (NCAA) is a group of over one thousand colleges and universities which dominate college athletics.[80] An adaptation of this model could be used to examine the economics of the NCAA. It could be modeled as a free agent labor market with a salary cap and no union. College athletes can choose to attend any school that will accept them, they are paid low wages (payments in-kind, grants-in-aid, tuition scholarships) which are virtually the same across member institutions, and they have no bargaining power.[81] The athletic directors under the direction of the chancellor could be the decision makers with winning and revenues in mind. The association has a monopsony and is noted to receive huge revenues compared to its costs, although it is officially a non-profit organization.[82]

# 11   Generalizing the Results

The key difference between the sports industry and other traditional cartels is "the peculiar economics of sports" where the member firms *desire* competition. Team owners work towards fostering competition instead of trying to drive each other out of business. The contributions of this area of research definitely apply to any sports leagues, whether pro, amateur, team, or individual. Is there a way to generalize the findings to other domains? Are there other industries with a positive production network externality who desire some form of competition? Coke may have done the "base marketing" for cola in general which may have benefited Pepsi when it first began its operations. Thus, Pepsi may have desired competition from Coke in that sense. Pepsi's marketing strategy would then be to differentiate itself from Coke. At

---

[80] The National Association of Intercollegiate Athletics is another collegiate athletic association. It is mostly made up of schools with small athletic programs.

[81] The value of their scholarship varies with the quality of their institution.

[82] Fleisher, Goff, and Tollison (1992) examine in detail the cartel behavior of the NCAA.

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

Electronic copy available at: https://ssrn.com/abstract=1601

the beginning of the product lifecycle, there might exist positive production network externalities.

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

# APPENDIX

## A Dynamic Version of the Model

*Equations*

| | |
|---|---|
| league objective: | $\sum_{\tau=1}^{\infty} \sum_{i=1}^{n} \pi_{i,\tau}$ |
| owner objective: | $\sum_{\tau=1}^{\infty} \alpha_{i,\tau} Win_{i,\tau} + (1 - \alpha_{i,\tau})\pi_{i,\tau}$ |
| league choice variables: | $\rho, n, \delta, FF$ |
| team choice variables: | $\vec{t}_{i,a,w,s}^{\tau}$ |
| winning function: | $Win_i = \beta_i wpct_i + (1 - \beta_i)champ_i$ |
| labor updating equation: | $\vec{t}_{i,a,w,s}^{\tau} = t_{i,\tau-1,w,s}^{\tau-1}(1 - \mu) + t_{i,\tau^c 1,w,s}^{\tau}$ |
| team production function: | $T_i = \prod_{s=1}^{m} t_{i,s}^{\rho_s}$ |
| winning percentage: | $wpct_i = \sum_{j \neq i}^{n} \left( \frac{T_i}{T_i + T_j} pctgam_{ij} + \epsilon_i \right)$ |
| team revenue: | $rev_i = \rho \sum_{j \neq i}^{n} gh_{ij} + (1 - \rho) \sum_{j \neq i}^{n} gr_{ij} + LTV_i + NTV_i + FF_i$ |
| home game gate receipts: | $gh_{ij} = f(Q_{hi})$ |
| road game gate receipts: | $gr_{ij} = f(Q_{ri})$ |
| home game demand: | $Q_{hi} = S_i(AT_i + BT_j + C(T_i - T_j)^2)$ |
| road game demand: | $Q_{ri} = S_j(DT_j + ET_i + F(T_j - T_i)^2)$ |
| local television revenue: | $LTV_i = L(Q_{hi})$ |
| national television revenue: | $NTV = R(\vec{Q}_h)$ |
| franchise fee 1: | $FF = sum_{\tau=0}^{\infty} E(\pi_{n+1,\tau})d^{\tau}$ |
| franchise fee 2: | $FF = \left( \frac{1}{n+1} \right) NTV \left( \frac{\partial NTV}{\partial n} \right)$ |
| iso-expenditures: | $costs_i = \vec{w}' \vec{t}_{i,a,w,s}^{\tau} + FC_i$ |
| fixed costs: | $FC_i = constant \left( \frac{1}{1+(N-n)} \right)$ |
| salary cap: | $\vec{w}' \vec{t}_{i,a,w,s}^{\tau} \leq \frac{\delta}{n} Rev$ |
| labor demand: | $\vec{t}_{i,a,w,s}^{\tau} = min \left\{ F(w, Q_{hi}, Q_{ri}, \rho, ...), \frac{\delta}{n\vec{w}'} Rev \right\}$ |
| amateur draft: | $x_i = \left( \frac{1 - \left( \frac{wpct_i}{\sum_{i=1}^{n} wpct_i} \right)}{n-1} \right) D_x$ |

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

*Variables*

| | |
|---|---|
| $\tau$ | the period. |
| $\pi_{i,\tau}$ | the profit of *team i* in period $\tau$. |
| $\alpha_i$ | the proportion that *owner i* trades off winning and profit making. |
| $champ_i$ | the probability that *team i* wins the championship. |
| $\rho$ | the fraction of gate receipts that the home team keeps (revenue sharing). |
| $n$ | the number of teams in the league. |
| $\delta$ | the fraction of revenues that the players receive (salary cap). |
| $\vec{t}_{i,a,w,s}^{\tau}$ | the vector of talent for *team i* in period $\tau$. |
| $a$ | how the unit of talent was acquired. |
| $w$ | the wage class the unit is part of. |
| $s$ | the position the unit plays. |
| $\tau - 1$ | from the previous period. |
| $\tau^c_{-} 1$ | the complement to $\tau - 1$. |
| $\mu$ | the rate of depreciation or appreciation of the player's skill. |
| $\rho_s$ | indicates the importance of each position to team talent. |
| $pctgam_{ij}$ | the percentage of *team i*'s games played against *team j*. |
| $\epsilon_i$ | error term which includes intangibles like luck. |
| $R(\vec{Q_h})$ | national TV revenue is based on the vector of demand for all games. |
| $E(\pi_{n+1,\tau})d^{\tau}$ | the expected discounted profit of the expansion team. |
| $N$ | the number of unoccupied potential franchise locations. |
| $D_x$ | the total talent in the draft pool. |

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

# References

**Atkinson, Scott E., Linda R. Stanley, and John Tschirhart**. 1988. "Revenue Sharing as an incentive in an agency problem: an example from the National Football League." *RAND Journal of Economics 19, No. 1: 27- 43.*

**Aristotle**. 1972. *Politics.* translated by Ernest Baker. Oxford University Press.

**Cairns, J., N. Jennett, and P.J. Sloane**. 1986. "The Economics of Professional Team Sports: A Survey of Theory and Evidence." *Journal of Economic Studies 13: 1-80.*

**Daly, George G**. 1992. "The Baseball Player's Labor Market Revisited." *Diamonds Are Forever.* Edited by Paul Sommers. Brookings Institution.

**Demmert, Henry G**. 1973. *The Economics of Professional Team Sports.* Lexington, Mass., Lexington Books.

**Economist**. 1993. "Imperfect Game." *Economist v327, n7805, April 3.*

**El Hodiri, Mohamed, and James Quirk**. 1971. "An Economic Model of a Professional Sports League." *Journal of Political Economy 79, Nov. - Dec.: 1302-19.*

**Fleisher, Arthur A., Brian L. Goff, and Robert D. Tollison**. 1992. *The National Collegiate Athletic Association: A Study in Cartel Behavior.* University of Chicago Press.

**Fort, Rodney, and James Quirk**. 1995. "Cross- subsidization, Incentives, and Outcomes in Professional Team Sports Leagues." *Journal of Economic Literature 33, No. 3: 1265-1299.*

**Frank, Robert H., and Philip J. Cook**. 1995. *The Winner-Take-All Society : How More and More Americans Compete for Ever Fewer and Bigger Prizes, Encouraging Economic Waste, Income Inequality, and an Impoverished Cultural Life.* New York, NY. Free Press.

**Jennett, Nicholas I**. 1984. "Attendances, Uncertainty of Outcome and Policy in Scottish League Football." *Scottish Journal of Political Economy 31, No. 2: 176-198.*

Electronic copy available at: https://ssrn.com/abstract=1601

For an electronic copy of this paper, please visit: http://ssrn.com/abstract=1601

**Juster, F. Thomas, and Frank P. Stafford**. 1991. "The Allocation of Time: Empirical Findings, Behavioral Models, and Problems of Measurement." *Journal of Economic Literature 29, No. 2: 471-522.*

**Knowles, Glenn, Keith Sherony, and Mike Haupert**. 1992. "The Demand for Major League Baseball: A Test of the Uncertainty of Outcome Hypothesis." *The American Economist 36, No. 2: 72-80.*

**Neale, Walter**. 1964. "The Peculiar Economics of Professional Sports." *Quarterly Journal of Economics 78: 1-14.*

**Quirk, James P., and Rodney Fort**. 1992. *Pay Dirt: The Business of Professional Team Sports.* Princeton, NJ. Princeton University Press.

**Quirk, James P., and Rubin Saposnik**. 1992. "The Great Football Wars: Entry into the Professional Team Sports Industry." *Advances in the Economics of Sport. Vol. 1.* Edited by Gerald W. Scully. JAI Press Inc. Pg. 179-213.

**Rascher, Daniel A.**. 1995. "Sports and Economics: Literature Review and Research Ideas." UC Berkeley unpublished document, Berkeley, CA.

**Rottenberg, Simon**. 1956. "The Baseball Players' Labor Market." *Journal of Political Economy 64: 242-258.*

**Scully, Gerald W**. 1995. *The Market Structure of Sports.* University of Chicago Press.

**Vrooman, John**. 1995. "A General Theory of Professional Sports Leagues." *Southern Economic Journal 64, No. 4: 971-990.*

**Whitney, James D**. 1988. "Winning Games Versus Winning Championships: The Economics of Fan Interest and Team Performance." *Economic Inquiry XXVI, October: 703-724.*

**Whitney, James D**. 1993. "Bidding Till Bankrupt: Destructive Competition in Professional Team Sports." *Economic Inquiry XXXI, January: 100-115.*

**Zimbalist, Andrew**. 1992. *Baseball and Billions: A Probing Look Inside the Big Business of Our National Pastime.* New York, NY. Basic Books.

Electronic copy available at: https://ssrn.com/abstract=1601

# EXHIBIT 72

# *N.C.A.A. Chief, Pressured by State Laws, Pushes to Let Athletes Cash In*

Five states are poised to allow college athletes to profit from their fame starting on July 1, and the N.C.A.A.'s leader says the association is preparing to respond.



South Florida players huddling before a basketball game against North Carolina State in the N.C.A.A. tournament in San Antonio.Credit...Eric Gay/Associated Press



**By [Alan Blinder](#)**
Published May 8, 2021Updated Sept. 17, 2021

CORAL GABLES, Fla. — The University of Miami has long been able to make a glossy pitch to the students it hopes will star on its sports teams: an exceptional athletic tradition, respected academics, South Florida's sun-kissed glamour.

For months, though, coaches at Miami — and every other college in Florida — have had a new selling point: Play here and, thanks to a new state law, maybe make some money off your athletic fame.

Florida and four other states are poised to allow players to make endorsement deals starting this summer, and with universities in other states anxious about losing recruits, the N.C.A.A. is moving anew toward extending similar rights to college athletes across the country.

In an interview with The New York Times on Friday, the N.C.A.A.'s president, Mark Emmert, said he would recommend that college sports' governing bodies approve new rules "before, or as close to, July 1," when the new laws are scheduled to go into effect in Florida, Alabama, Georgia, Mississippi and New Mexico.

The changes together promise to reshape a multibillion-dollar industry and to test the N.C.A.A.'s generations-long assertions that student-athletes should be amateurs who play mainly for scholarships and that college sports appeal to fans partly because the players are not professionals.



George Pickens of Georgia leaping over Darrick Forrest of Cincinnati in a game last season. Georgia is one of five states that, starting in July, will allow college athletes to profit from their fame. Todd Kirkland/Getty Images

"When I was playing college football, my priorities were girls, football and then school," said Mark Richt, who led the football programs at Georgia and Miami before he retired from coaching in 2018. "Now it's going to be money, girls, football, school."

Under a proposal that has been before N.C.A.A. members for months, student-athletes could be paid in exchange for use of their names, images and likenesses by many private companies. The plan, which could take effect on Aug. 1, would also let players earn money through advertisements on their social media accounts.

"We need to get a vote on these rules that are in front of the members now," Emmert said.

The current proposal would give colleges and universities the power to block some agreements if they conflict with "existing institutional sponsorship arrangements," meaning that an athlete might not be able to strike an endorsement deal with Adidas if his or her college already has one with Nike. Other possible restrictions include bans on promoting sports betting and on hiring agents "to secure an opportunity as a professional athlete."

Emmert and other college sports executives acknowledge, though, that the plans N.C.A.A. officials are contemplating will not fully resolve the sprawling debate. The proposed guidelines, which could still be modified, differ in some respects from the new state laws, which themselves are far from uniform.

"The inherent issue with the N.C.A.A. is its bylaw changes that were drafted don't go as far as some of the state laws, so you're still going to have tension around state laws and N.C.A.A. rules," said Greg Sankey, the commissioner of the Southeastern Conference, where six of 14 colleges expect to operate under new statutes beginning in July.

Sankey is among the executives who have urged Congress to set a coast-to-coast standard to override a blur of state laws.
Image



Greg Sankey, the commissioner of the Southeastern Conference, testified last year at a hearing on Capitol Hill about student-athlete compensation. Susan Walsh/Associated Press

In Florida, for instance, colleges will be required to conduct financial literacy workshops for student-athletes. Colleges in Alabama may forbid their players to cut deals with alcohol companies. Georgia's law allows for an arrangement in which players can sometimes be compelled to share portions of their income with other athletes.

Other states, including California, Michigan and New Jersey, have similar laws set to come into force in the months and years ahead.

The question of whether and how student-athletes should be able to make money has long simmered, particularly as many coaches drew seven-figure salaries, universities erected eye-popping athletic buildings and television rights deals brought in billions of dollars. The subject exploded in 2019, when California defied the N.C.A.A.'s warnings and passed its law, scheduled to take effect in 2023.

The N.C.A.A.'s deliberate pace toward change brewed more frustration among university administrators and lawmakers, leading to more proposals in more statehouses. In an interview last year, Donna E. Shalala, a former president of the University of Miami who became a Democratic member of Congress, lamented that the N.C.A.A. had "no strategy" and "no clear message" as it pleaded its case to lawmakers in the nation's capital.

More than a year later, the swirl of statutes and potential rules still has the college sports industry looking to Washington for a fix. Although proposals are circulating on Capitol Hill, it is far from clear whether a federal bill will pass in 2021.

"We need a system that is fair to all of our student-athletes and protects the scholarships of student-athletes in both the revenue and Olympic sports and does not do anything to destroy the collegiate model that basically has provided life-changing educational opportunities to so many individuals, including my father, my brother, myself, my son," said Kevin Warren, the commissioner of the Big Ten Conference, whose 14 universities are not in states with laws taking effect in July.

The N.C.A.A. had been planning a vote on its proposals in January, but postponed after the Trump administration raised antitrust concerns. Emmert said on Friday that N.C.A.A. officials had been in contact with the Justice Department to discuss the misgivings of regulators.

His conclusion that the association should now sign off on its long-planned rules will ease some nerves in college sports. Athletic officials have feared that the new state laws by themselves would abruptly create dramatic competitive gaps.



The N.C.A.A. earned more than $850 million from the television rights for this year's Division I men's basketball tournament. Keith Srakocic/Associated Press

University and marketing executives across the country anticipate that some players will land extremely valuable agreements, but they expect most opportunities to involve local businesses offering thousands or tens of thousands of dollars — far from enough to, say, buy a glittering condominium overlooking South Beach.

"I don't think everyone on the football team would get a shoe deal, let alone when you add in 300-plus other student-athletes," said Blake James, the Miami athletic director who worked with state legislators to develop the Florida law.

Experts believe that new standards will be particularly important for women, who command large, loyal audiences as college athletes but have fewer lucrative opportunities in professional sports. But more broadly, the new rules could substantially benefit thousands of college sports participants who are largely barred under N.C.A.A. rules from earning money in ways that other students can. Those restrictions have increasingly angered Democratic and Republican officials.

"We don't want to change the character of sports," said Representative Chip LaMarca, the Republican architect of Florida's law. "We're just trying to add the same economic freedom and fairness that a typical student in college would have."

Players are ready to embrace new opportunities. When Florida lawmakers mulled whether to delay the measure they approved last year, D'Eriq King, a Miami quarterback, wrote on Twitter: "Don't back down now. Let us profit off OUR name image and likeness. We deserve it!"

Emmert would not discuss whether the association might challenge any of the state laws in court. He said, though, that he did not expect any decisions about new industry rules to hinge on the outcome of a case the association recently argued before the United States Supreme Court, which is considering the scope of the N.C.A.A.'s powers.

Complications loom amid widespread uncertainty about the rules, and there is a consensus that they will almost certainly change again, particularly if Congress steps in.

Consider Miami, one of three Atlantic Coast Conference schools to be covered by the new state laws on July 1.



Gov. Ron DeSantis of Florida signed a bill last year that would allow college athletes in the state to earn money from endorsement deals. Lynne Sladky/Associated Press

Before and after Gov. Ron DeSantis signed Florida's measure into law on Miami's campus last June, university officials grappled with how to work under the new statute. In December, Miami announced that its football program had partnered with an Alabama firm, INFLCR, to help students navigate the thicket of rules and opportunities. Coach Manny Diaz promoted the agreement as the groundwork for players to "build your brand in the heart of one of the world's most dynamic cities."

But James, the athletic director, acknowledged that his staff's preparations may have only so much of a shelf life.

"We're planning under the set of rules that we know," he said recently in his memorabilia-stuffed office. "The reality is that those rules are going to change at some point between now and I'll say July 1, 2022."



Miami quarterback D'Eriq King used his Twitter account to urge Florida lawmakers to stick with plans for the new law to take effect on July 1.  Al Diaz/Miami Herald, via Associated Press

He conceded that he had probably not always been eager to see the types of changes coming. Then again, James said, he once voted on a proposal to limit text messages from coaches to recruits because, in the era before unlimited plans, students and their families found themselves facing exorbitant phone bills.

"Now, you fast forward, to think that we're not going to text is crazy," he said with a chuckle. The latest moves toward change have also come to seem inevitable.

"When you look at where social media is and the ability of an individual to really have a brand, yeah, we've definitely evolved to that spot," James said.

Or as Richt, who is now a television analyst for the ACC Network, put it: "It's here, so you better embrace it."

**Alan Blinder** travels the country covering college sports and is based in Atlanta. In his previous role as a national correspondent, he reported from more than two dozen states. He joined The Times in 2013. More about Alan Blinder

# EXHIBIT 73

# Wisconsin: 'No plans to stop offering athletics' in wake of chancellor's testimony in player-compensation trial



**Nick Bromberg**
·**College football and motorsports writer**
September 18, 2018



Wisconsin is wholeheartedly in favor of the NCAA's current rules regarding player compensation. (Getty)

The University of Wisconsin issued a statement Tuesday saying the school had no intention to disband its athletic department.

https://www.yahoo.com/news/wisconsin-no-plans-stop-offering-athletics-wake-chancellors-testimony-player-compensation-trial-175836653.html?%207

No, Saturday's loss to BYU wasn't so traumatic that the school started thinking about the future of the football program and other sports. The statement comes on the heels of testimony by chancellor Rebecca Blank, who said Monday that it was "not clear" the school would have athletics if players were paid.

## Blank made comments at antitrust trial

Blank's testimony came as part of an antitrust trial in Oakland, California, about the limits of player compensation in college sports.

From Law 360:

*"It's not clear that we would continue to run an athletic program," said Blank, whose school is a member of the Big Ten Conference. "We're not interested in professional sports. We're interested in student-athletes."*

NCAA athletes are not currently paid above cost of attendance stipends. The NCAA has long argued that players can't be paid because they are students and amateurs. Players are also prevented from using their likeness to earn money via endorsements and other endeavors. The trial began in early September and the plaintiffs argue that the NCAA's rules regarding player compensation are illegal.

## Full Wisconsin statement

The school's statement, which you can read in full below via Madison's News 3, echoes Blank's comments that the NCAA's current rules "are appropriate to maintain a market for amateur athletics in the university setting.

*The University of Wisconsin has no plans to stop offering athletics. Chancellor Blank strongly supports Wisconsin's athletic program and believes the Badgers are a major asset to our campus and the Big Ten.*

*The chancellor's comments yesterday were offered in the context of describing the economics of running a major broad-based amateur athletics program.*

*If a change to the structure of college athletics were to occur, UW would expect to be part of any conversation within the Big Ten and nationally about what that would mean for university athletic programs.*

*Plaintiffs in federal litigation have sought to invalidate NCAA rules governing the compensation that may be paid to collegiate student-athletes, arguing that student athletes are treated as professional athletes and should enjoy compensation for the use of their images, names and likenesses.*

*Chancellor Blank provided testimony to the court that there is a market separate from professional sports for amateur sports, that college athletes are students first, that paying student athletes would undermine the university community and treat certain student athletes differently than others.*

*Chancellor Blank believes that the current set of NCAA rules governing payments to student athletes for the use of their names, images and likenesses are appropriate to maintain a market for amateur athletics in the university setting.*

American Athletic Conference commissioner Mike Aresco also testified at the trial on Monday. Per a reporter covering the trial, Aresco said television ratings increases for college sports were connected to the fact that players were amateurs. He was unable to back the assertion with data.

Awareness of the lack of rights college athletes have has dramatically increased in recent years. The result of the trial has a great chance to accelerate the player rights movement or bring it to a grinding halt.

— — — — — — —

**Nick Bromberg** is a writer for Yahoo Sports.

https://www.yahoo.com/news/wisconsin-no-plans-stop-offering-athletics-wake-chancellors-testimony-player-compensation-trial-175836653.html?%207