Jacob K. Danziger (SBD 278219)
**ARENTFOX SCHIFF LLP**
44 Montgomery Street, 38th Floor
San Francisco, CA 94104 United States
Telephone: (734) 222-1516
Facsimile: (415) 757-5501
jacob.danziger@afslaw.com

Beth A. Wilkinson (*pro hac vice*)
Rakesh N. Kilaru (*pro hac vice*)
Kieran Gostin (*pro hac vice*)
Calanthe Cope-Kasten (*pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com
kgostin@wilkinsonstekloff.com
ccope-kasten@wilkinsonstekloff.com

Attorneys for Defendant
NATIONAL COLLEGIATE ATHLETIC ASSOCIATION
[Additional Counsel Listed on Signature Page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | Case No.: 4:20-cv-03919-CW |
| | **DEFENDANTS' JOINT OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE THE OPINIONS OF DEFENDANTS' EXPERT PROFESSOR BARBARA OSBORNE** |
| | Date:        September 21, 2023 |
| | Time:        2:30 p.m. |
| | Judge:       Hon. Judge Claudia Wilken |

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................. 1

II.     BACKGROUND .................................................................................................. 2

III.    ARGUMENT ....................................................................................................... 4

    A.   Professor Osborne's Opinions Are Admissible Expert
        Opinions Describing Title IX Industry Practices, Standards,
        History, and Context. ................................................................................ 6

        1.   Professor Osborne's Opinions Are Not Legal Conclusions
            and Are Similar to Frequently Admitted Title IX Expert
            Testimony. ....................................................................................... 7

        2.   Many of Professor Osborne's Opinions Are Answers to
            Hypothetical Questions, About Which Experts Are
            Permitted to Opine. ........................................................................ 9

        3.   Even If Professor Osborne's Opinions Implicate Certain
            Legal Issues, They Are Nevertheless Admissible. .......................... 9

        4.   Plaintiffs' Mere Disagreement With Professor Osborne's
            Opinions Is Not a Basis to Exclude Expert Opinions. ................... 11

    B.   Professor Osborne's Opinions Help Demonstrate Fatal Flaws
        with Plaintiffs' BNIL Model and How Individualized Issues
        Preclude Class Certification. .................................................................. 14

        1.   Professor Osborne's Opinions Confirm Plaintiffs' BNIL
            Model Is Not a Functioning, Evidence-Backed Model that
            Can Support Certification. ............................................................. 14

        2.   Professor Osborne's Opinions Confirm that Individual
            Injury Issues Predominate Given the Title IX Obligations at
            the Institutional Level. .................................................................. 16

        3.   Plaintiffs' Arguments for Ignoring Title IX Implications
            Only Confirm the Invalidity of their BNIL Damages Model
            at Certification. ............................................................................. 18

    C.   Professor Osborne Can Opine on the Financial Viability of
        Plaintiffs' BNIL Model Given Her Experience and Review of
        Supporting Documents. ........................................................................... 19

IV.    CONCLUSION ................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bao Xuyen Le v. Reverend Dr. Martin Luther King, Jr. Cnty.*,
  No. C18-55 TSZ, 2019 WL 2289681 (W.D. Wash. May 29, 2019)..........................9

*Bona Fide Conglomerate Inc. v. SourceAmerica*,
  No. 3:14-cv-00751-GPC-AGS, 2019 WL 1369007 (S.D. Cal. Mar. 26, 2019)
  .........................................................................................................8, 11, 20, 21

*Carrera v. Bayer Corp.*,
  727 F.3d 300 (3d Cir. 2013)................................................................15, 16

*Garcia v. Cnty. of Riverside*,
  No. CV 5:18-00839 SJO, 2019 WL 4282903 (C.D. Cal. June 7, 2019)..................9

*GSI Tech., Inc. v. Cypress Semiconductor Corp.*,
  No. 5:11–cv–03613–EJD, 2015 WL 364796 (N.D. Cal. Jan. 27, 2015) ................11

*Hangarter v. Provident Life & Acc. Ins.*,
  373 F.3d 998 (9th Cir. 2004) ..............................................................6, 20

*In re Hotel Tel. Charges*,
  500 F.2d 86 (9th Cir. 1974) ...............................................................16, 18

*Humphreys v. Regents of Univ. of Cal.*,
  No. C 04-03808 SI, 2006 WL 1867713 (N.D. Cal. July 6, 2006) .........................10

*Mansourian v. Board of Regents of University of California at Davis*,
  816 F. Supp. 2d 869 (E.D. Cal. Aug. 3, 2011).................................................10, 11

*In re Modafinil Antitrust Litig.*,
  837 F.3d 238 (3d Cir. 2016)................................................................17

*Moonbug Ent. Ltd. v. BabyBus (Fujian) Network Tech. Co. Ltd.*,
  No. 21-CV-06536-EMC, 2023 WL 4108838 (N.D. Cal. June 21, 2023)...............10

*Ohlensehlen v. Univ. of Iowa*,
  509 F. Supp. 3d 1085 (S.D. Iowa 2020) ......................................................10

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) ...............................................................17, 18

*Pejovic v. State Univ. of N.Y. at Albany*,
  No. 1:17-CV-1092, 2018 WL 3614169 (N.D.N.Y. July 26, 2018) ........................10

*Pogorzelska v. VanderCook College of Music*,
  No. 19-cv-05683, 2023 WL 3819025 (N.D. Ill. June 5, 2023)..........................6, 7, 8

ii

*Portz v. St. Cloud State Univ.*,
    297 F. Supp. 3d 929 (D. Minn. 2018) ...........................................................7, 8, 20

*Pulaski & Middleman, LLC v. Google, Inc.*,
    802 F.3d 979 (9th Cir. 2015) ....................................................................................15

*In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*,
    725 F.3d 244 (D.C. Cir. 2013) ...........................................................................15, 16

*S.S. by & through Stern v. Peloton Interactive, Inc.*,
    No. 321CV01367BENDEB, 2023 WL 2993391 (S.D. Cal. Apr. 17, 2023) ............7

*StarKist Co. v. Olean Wholesale Grocery Coop., Inc.*,
    143 S. Ct. 424 (2022) ...............................................................................................17

*Stevens v. Bringham Young Univ.*
    – Idaho, No. 4:16-cv-00530-BLW, 2020 WL 560572 (D. Idaho Feb. 3, 2020) ........8

*United States v. Johnson*,
    No. 14–cr–00412–THE, 2015 WL 5012949 (N.D. Cal. Aug. 24, 2015) , *aff'd*,
    875 F.3d 1265 (9th Cir. 2017) .................................................................................11

*United States v. Offil*,
    666 F.3d 168 (4th Cir. 2011) ...................................................................................10

*United States v. Pac. Gas & Elec. Co.*,
    No. 14-CR-00175-TEH, 2016 WL 3268994 (N.D. Cal. June 15, 2016) .................10

*Ward v. Apple Inc.*,
    No. 12-cv-05404-YGR, 2018 WL 934544 (N.D. Cal. Feb. 16, 2018),
    *aff'd*, 784 F. App'x 539 (9th Cir. 2019) ..............................................................5, 15

*Windham v. Am. Brands, Inc.*,
    565 F.2d 59 (4th Cir. 1977) .....................................................................................16

**Statues/Rules**

34 C.F.R. § 106.37(c)(1) ................................................................................................15

Fed. R. Civ. P. 23 ...........................................................................................15, 16, 17, 19

Fed. R. Evid. 702 ..................................................................................................1, 13, 20

iii

## I.      INTRODUCTION

Plaintiffs proposed a fatally flawed class-wide broadcast damages model that contemplates a but-for world in which student-athletes would have received over $1 billion in broadcast revenue sharing, with 96% of that value going to male student-athletes, and just 4% going to female student-athletes.  That but-for world admittedly gives *no consideration* to Title IX, which prohibits educational institutions that receive federal funding from discriminating on the basis of sex in their intercollegiate athletics programs and compels those institutions to provide equitable benefits to male and female student-athletes.  Professor Barbara Osborne—a preeminent independent Title IX expert deeply experienced in conducting Title IX programmatic reviews, audits, and evaluations—analyzed Plaintiffs' but-for world and opined that it is a practical impossibility.  Equally important, she explained that the individualized, institution-by-institution analysis that Title IX requires precludes an application of a single, uniform formula for determining putative BNIL compensation across multiple institutions.  Yet that is precisely what Plaintiffs' BNIL damages model attempts to do.

Because the abject failure to account for Title IX is fatal to class certification, Plaintiffs try to exclude Professor Osborne's opinions primarily on the ground that she is offering an improper legal opinion.  The argument is meritless.  Not only have courts regularly and routinely admitted expert opinions like Professor Osborne's relating to Title IX, but her opinions are not on the ultimate legal issue of antitrust liability in this case.  Rather, her opinions on Title IX are being offered to demonstrate a fundamental and fatal flaw with Plaintiffs' class-wide BNIL damages model—namely, its failure to account for institutions' Title IX obligations and the individualized processes those institutions operate within to comply with the law.  And even if some portion of Professor Osborne's opinions are legal in nature, they are admissible because they are helpful in illuminating Title IX's application to Plaintiffs' unprecedented but-for world structure.

Rule 702 and *Daubert* are intended to guard against precisely the sort of speculative and implausible class damages methodologies Plaintiffs' experts offered, and not weaponized improperly to attack, as Plaintiffs attempt to do here, opinions that are undoubtedly reliable and

1

1    bear on an issue of critical importance to class certification.

2          The Court should deny Plaintiffs' motion to exclude Professor Osborne's opinions.

3    **II.      BACKGROUND**

4          Plaintiffs' proposed class-wide BNIL damages model contemplates a but-for world in

5    which certain student-athletes receive compensation for their name, image, and likeness used in

6    sports broadcasts ("BNIL"), with male student-athletes receiving approximately 96% of the

7    compensation, and female student-athletes on a single team receiving the remaining 4%.

8    However, the universities that make up the Conferences and for which the putative class

9    members play are subject to Title IX—a federal law requiring universities to treat men and

10   women equitably in the provision of athletics opportunities, benefits, and financial assistance.

11         To understand whether Plaintiffs' proposed but-for world could ever exist in light of the

12   Title IX issues it would create, Defendants consulted Professor Osborne, an expert in the

13   application, history, and context of Title IX.  Tellingly, Plaintiffs do not challenge Professor

14   Osborne's impressive credentials.  Professor Osborne is an independent Title IX consultant who

15   has conducted countless Title IX programmatic reviews, audits, and evaluations for collegiate

16   institutions, school systems, and athletics programs.  *See* Expert Report of Barbara Osborne,

17   ECF No. 254-3 ("Rpt.") ¶ 5.  This work entails detailed and individualized examinations of

18   institutions' athletics programs, including analysis of athletics department finances.  *Id.* ¶ 130.[1]

19   Various courts have appointed Professor Osborne to provide Title IX education and training at

20   defendant institutions as part of settlements, and to conduct ongoing and periodic assessments of

21   entire athletics programs pursuant to Title IX.  *Id.* ¶ 6.  Professor Osborne also has practical

22   experience within the university setting, serving as a professor at the University of North

23   Carolina at Chapel Hill since 1998, with a joint appointment in the Department of Exercise and

24   Sport Science and the School of Law.  *Id.* ¶ 1.  She also has 15 years of experience as a

25   university athletics administrator, including as a Senior Woman Administrator with oversight of

26   _____

27   [1] *See* Kilaru Decl. Ex. 3, Office for Civil Rights, Title IX Athletics Investigator's Manual 115,
     118 (1990) (model investigative plan for Title IX reviews, recommending that auditors ask for
28   copies of athletics program budgets, expenditures, and budget projections, and interview Athletic
     Financial Affairs Director).

women's athletics and Title IX issues, giving her first-hand knowledge of how athletics departments are administered and ensure compliance with Title IX. *Id.* ¶ 7.

Based on her training and experience in Title IX auditing and court-ordered monitoring, Defendants asked Professor Osborne to "assess whether there are Title IX implications and/or gender equity concerns raised by Plaintiffs' proposed" but-for world in the context of the putative BNIL damages class. *Id.* ¶ 12. To perform that assignment, Professor Osborne "used a methodology based on the one that [she] normally use[s] in the other Title IX audits or reviews that [she] conduct[s] but tailored to the facts of this case." *Id.* Although Professor Osborne holds a law degree, applying that methodology "doesn't require . . . being a lawyer." Kilaru Decl. Ex. 2, Transcript of Deposition of Professor Barbara Osborne ("Osborne Dep. Tr.") 149:4; *see also id.* at 152:1–5 (explaining that she performed an audit in her previous role as athletics administrator, that non-lawyer athletics administrators regularly perform Title IX audits, and that when she does Title IX audits, "they're hiring me as a consultant, not a lawyer").[2] As Professor Osborne explains, "[u]nderstanding whether a course of action implicates Title IX requires familiarity with Title IX's goals, legislative history and intent, and historic application"— knowledge that Professor Osborne gained through her "experience as a student-athlete, athletics administrator, teacher, scholar, and consultant." Rpt. ¶ 34.

Professor Osborne first offers a history of Title IX, its purpose, and its legislative history, including by detailing that Congress refused to exclude net revenue-generating sports from the scope of Title IX *eight times* (rejecting amendments that directly bear on Plaintiffs' but-for world and requested relief). *Id.* ¶¶ 71, 74–75, 148. Professor Osborne explains that, by rejecting those amendments, Congress rejected precisely what Plaintiffs propose with a but-for world that contemplates disproportionate payments to football and men's basketball student-athletes based on broadcast revenue: "Congress has repeatedly affirmed that there is no exception to Title IX allowing athletics programs to make benefits or opportunities available to certain teams on the basis that those teams generate net revenue." *Id.* ¶¶ 72–73.

---

[2] Nowhere in the Office for Civil Rights' Title IX Athletics Investigator's Manual does it require that any part of the audit be performed by a lawyer, https://files.eric.ed.gov/fulltext/ED400763.pdf (last visited Aug. 8, 2023).

1    Because the history and purpose of Title IX demonstrate that its restrictions would apply

2    to the BNIL payments contemplated in Plaintiffs' but-for world, Professor Osborne then

3    describes what a Title IX assessment in that but-for world would entail: "an institution-by-

4    institution analysis.  The differing numbers and proportions of male and female student-athletes

5    participating in athletics at each institution and the differing total amounts of financial aid

6    offered to student-athletes at each institution necessitate separate calculations to determine each

7    institution's compliance." *Id.* ¶ 113; *see also id.* ¶ 130 ("Determining compliance with these

8    requirements necessitates a highly individualized inquiry based on the percentage of men and

9    women participants in athletics at each member institution.").  This need for individualized Title

10   IX assessments in Plaintiffs' but-for world bears directly on whether Plaintiffs' proposed BNIL

11   damages model is tenable for purposes of class certification.  Put differently, whether Plaintiffs'

12   "but-for" world reflected in their alleged BNIL damages model could have existed depends on

13   whether Title IX allows the payments Plaintiffs say would have been made absent the alleged

14   restraints—a fact-intensive, institution-by-institution inquiry that depends on the unique

15   situations of every school.  *Id.* ¶¶ 76–94, 109–28, 130.  Professor Osborne's opinions therefore

16   bear directly on class certification—particularly as they relate to predominance—and are

17   admissible.

18   **III.    ARGUMENT**

19       Plaintiffs' motion to exclude Professor Osborne's expert testimony fails for three reasons.

20       **First**, Professor Osborne's opinions are appropriate expert opinion regarding industry

21   practices and standards and the history and context of Title IX, not improper legal conclusions on

22   the ultimate issue in this case.  Based on her extensive experience in athletics administration and

23   conducting Title IX audits, she provides information and opinions about industry practices and

24   standards related to Title IX compliance—information that courts have frequently admitted.

25   Professor Osborne's opinions do not speak to the ultimate legal issue of whether Defendants

26   violated Section 1 of the Sherman Act, but rather explain the implausibility of Plaintiffs' but-for

27   world, which ignores the individualized assessments that would be necessary to ensure

28   compliance with Title IX.  Plaintiffs' mere disagreement with some of Professor Osborne's

4

opinions (all of which is attorney argument, unsupported by any Title IX rebuttal expert endorsing Plaintiffs' BNIL model) is not a proper basis for exclusion. And, even if some of Professor Osborne's opinions are legal conclusions (they are not), courts in the Ninth Circuit and nationwide have held that legal opinions involving complex subject matters—such as Plaintiffs' unprecedented but-for world and its interplay with Title IX—are admissible.

*Second*, Professor Osborne's expert opinions are helpful to the Court in resolving Plaintiffs' class certification motion. Specifically, Professor Osborne opines that, given the individualized, fact-intensive nature of a Title IX assessment, class-wide "implementation of the [Plaintiffs' BNIL] Model is impractical if not impossible given the requirements of Title IX." Rpt. ¶ 150. That opinion is directly relevant to the predominance inquiry at class certification, as Plaintiffs must present a valid class-wide economic model for injury and damages to certify a damages class. *Ward v. Apple Inc.*, No. 12-cv-05404-YGR, 2018 WL 934544, at *3 (N.D. Cal. Feb. 16, 2018), *aff'd*, 784 F. App'x 539, 541 (9th Cir. 2019) (experts' "failure to provide 'properly analyzed, reliable evidence that a common method of proof exists to prove impact on a class-wide basis' is fatal" (simplified)); *see also* Defs' Joint Opp'n to Pls' Mot. for Class Cert., ECF No. 249 at 21–33. Professor Osborne's opinions demonstrate that individual issues will predominate because Plaintiffs' proposed class-wide BNIL damages model is impossible to implement given the Title IX mandates that Plaintiffs admittedly did not consider.

*Third*, Professor Osborne is qualified to offer opinions about the financial implications of Plaintiffs' BNIL damages model as related to Title IX compliance. Professor Osborne has first-hand experience in athletics department administration, regularly reviews athletics department finances in the course of conducting Title IX audits, and, in her capacity as an expert in this case, reviewed NCAA financials proving that nearly all athletics departments are net-revenue negative. Rpt. ¶¶ 5, 7, 131. That experience and data is more than sufficient for Professor Osborne to conclude that the BNIL damages model proposed by Plaintiffs would have a devastating impact on athletics programs. Given the billions of dollars in broadcast payments that Plaintiffs inject into their but-for world, "it would be virtually impossible to locate sufficient additional funds to ensure some form of compensation for female student-athletes proportional to

5

the significant amounts that Plaintiffs contemplate for male student-athletes under the Broadcast Model."  *Id.* ¶ 133.

  **A.** **Professor Osborne's Opinions Are Admissible Expert Opinions Describing Title IX Industry Practices, Standards, History, and Context.**

  Professor Osborne opines about the practical application, history, and context of Title IX, based on her years of experience conducting Title IX audits and her knowledge of industry practices and standards.[3]  Nevertheless, Plaintiffs seek to exclude Professor Osborne's testimony, claiming that she offers improper legal conclusions.  In doing so, Plaintiffs apparently confuse the "difference between 'stating a legal conclusion' (which is not permitted) and 'providing concrete information against which to measure abstract legal concepts' (which is permitted)."  *Pogorzelska v. VanderCook College of Music*, No. 19-cv-05683, 2023 WL 3819025, at *7 (N.D. Ill. June 5, 2023) (citation omitted).  "It is well-established . . . that expert testimony concerning an ultimate issue is not per se improper."  *Hangarter v. Provident Life & Acc. Ins.*, 373 F.3d 998, 1016 (9th Cir. 2004) (alteration in original) (citation omitted).  Although "an expert witness cannot give an opinion as to her *legal conclusion*," or "instruct[] the jury as to the applicable law," "expert testimony that is 'otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."  *Id.* (quoting Fed. R. Evid. 704(a)).

  Beyond the fact that Plaintiffs grossly overstate the degree to which expert testimony on legal issues may be inadmissible in some circumstances, Professor Osborne's opinions are neither improper legal conclusions nor being offered on the ultimate legal issue of whether there is an antitrust violation in this case.  Rather, she (1) describes the legislative history and purpose of Title IX, including rejected amendments that bear directly on Plaintiffs' proposed but-for world; (2) describes the factors a Title IX audit takes into account, including individualized assessments that vary from institution to institution; and (3) identifies the types of payments that would likely be flagged by a Title IX audit and therefore likely would not occur in a but-for world, fatally undermining Plaintiffs' proposed class-wide BNIL damages model.  At no point does Professor Osborne opine about any ultimate legal issues, such as those related to the

---

[3] *E.g.*, Rpt. ¶¶ 27, 29–30, 34–75, 119–25.

Sherman Act.  And even if she did, her opinions would still be helpful and admissible.

1.   Professor Osborne's Opinions Are Not Legal Conclusions and Are Similar to Frequently Admitted Title IX Expert Testimony.

Professor Osborne's opinions regarding the history and context of Title IX and industry practices and standards are not legal conclusions because they do not attempt to resolve the ultimate legal issue in this case, and in any event, courts regularly allow such expert testimony. Professor Osborne is providing "concrete information" about Title IX "against which to measure abstract legal concepts."  *Pogorzelska*, 2023 WL 3819025, at *7; *see also S.S. by & through Stern v. Peloton Interactive, Inc.*, No. 321CV01367BENDEB, 2023 WL 2993391, at *2, *6 (S.D. Cal. Apr. 17, 2023) (allowing expert testimony about the standard of care for warning labels on fitness equipment for the purpose of opining on whether defendant's conduct breached the applicable standard).  Expert testimony about Title IX and "the standards followed by schools" is "commonplace, and numerous federal courts have recognized that 'expert testimony regarding how schools effectively approach Title IX discrimination can be helpful . . . .'" *Pogorzelska*, 2023 WL 3819025, at *7 (quoting *Doe v. Coastal Carolina Univ.*, No. 4:18-cv-268-SAL, 2021 WL 1651057, at *3 (D.S.C. Mar. 8, 2021) and citing cases).

The same is true with regard to testimony about "the history and purposes of Title IX." *Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929, 953 (D. Minn. 2018).  Even Plaintiffs acknowledge that "courts in this circuit and elsewhere have allowed experts to testify about 'the history and purposes' of Title IX, as well as the 'industry practice or standards' that are relevant to a case."  Pls' Mot. to Exclude the Opinions of Defs' Expert Professor Barbara Osborne ("Mot.") at 6.  Those are precisely the opinions that Professor Osborne offers.  *See, e.g.*, Rpt. ¶ 27 (reciting the purpose of Title IX); *id.* ¶¶ 45–52 (explaining Title IX financial assistance regulations); *id.* ¶¶ 53–60 (describing Title IX's requirements around equivalent treatment and benefits for athletes); *id.* ¶¶ 61–63 (explaining how Title IX addresses participation opportunities); ¶¶ 74–75, 148 (discussing the history of Title IX).  Professor Osborne's opinions fall within the heartland of the types of Title IX testimony that courts regularly allow.

By contrast, when expert opinions have been excluded as improper legal opinions, it is

7

generally because the expert is attempting to step into the shoes of the trier of fact by offering an opinion directly on the ultimate legal issue.  Professor Osborne does no such thing.  Liability under the Sherman Act—not Title IX—is the ultimate legal issue here.  *Cf. Bona Fide Conglomerate Inc. v. SourceAmerica*, No. 3:14-cv-00751-GPC-AGS, 2019 WL 1369007, at *3 (S.D. Cal. Mar. 26, 2019) ("[A]n expert witness cannot give an opinion as to her *legal conclusion*, *i.e.*, an opinion on an ultimate issue of law."  For example, "[i]n breach of contract cases, the expert may not be allowed to opine on the meaning and import of disputed terms.") (cleaned up)).  That fact distinguishes this case from those cited by Plaintiffs.  The claims in *Portz*, for example, were specifically about whether the defendant violated Title IX, and thus expert opinion regarding that specific issue was inadmissible.  *Portz*, 297 F. Supp. 3d at 953; *see also Stevens v. Bringham Young Univ. – Idaho*, No. 4:16-cv-00530-BLW, 2020 WL 560572, at *2 (D. Idaho Feb. 3, 2020) (excluding expert opinions regarding Title IX requirements in case alleging sexual harassment claims actionable under Title IX).

Professor Osborne offers no "legal conclusion" as to whether Defendants violated Section 1 of the Sherman Act or have been unjustly enriched.  Rather, her opinions inform the Court regarding Title IX practices, standards, and individualized assessment considerations that would be implicated by the but-for world contemplated by Plaintiffs' BNIL damages model. While there are limited instances when Professor Osborne suggested—in response to repeated questioning during deposition—that she has opinions about whether Plaintiffs' but-for world violates Title IX, "soundbites in a deposition taken out of context do not provide a basis for barring expert testimony."  *Pogorzelska*, 2023 WL 3819025, at *9 (citing cases).  She repeatedly confirmed that she is "not offering a legal opinion," but is instead offering "the opinion of someone who is an expert in Title IX about how Title IX would be implicated in this process." Osborne Dep. Tr. 55:2–16; *see also id.* at 54:18–24 ("[M]y job is not to offer a legal opinion. My job is to provide an expert opinion related to how this all works and Title IX."); *id.* at 152:1– 5, 153:24–154:3 (explaining that a Title IX audit is not a legal opinion and does not require legal training to perform).  Professor Osborne's opinions are that Title IX assessments require individualized assessments and that Plaintiffs' BNIL but-for world would implicate Title IX

issues of the sort that she would flag in an audit.

### 2.   Many of Professor Osborne's Opinions Are Answers to Hypothetical Questions, About Which Experts Are Permitted to Opine.

Relatedly, many of Professor Osborne's statements that Plaintiffs mischaracterize as legal conclusions are actually permissible opinions that address the hypothetical but-for world Plaintiffs claim would have existed in the absence of the challenged rules.  "[E]xperts are permitted to respond to hypothetical questions that resemble the facts of a case."  *Garcia v. Cnty. of Riverside*, No. CV 5:18-00839 SJO (ASx), 2019 WL 4282903, at \*10–11 (C.D. Cal. June 7, 2019) (citing *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2017 WL 1391491, at \*5 (N.D. Cal. Apr. 12, 2017)).  In *Garcia*, for example, the court allowed an expert to testify "about hypothetical situations" and "whether Defendants' actions complied with the standards that generally guide law enforcement . . . ."  *Id.* at \*11; *see also Bao Xuyen Le v. Reverend Dr. Martin Luther King, Jr. Cnty.*, No. C18-55 TSZ, 2019 WL 2289681, at \*1 (W.D. Wash. May 29, 2019) (allowing an expert to explore, through hypotheticals, whether officers' use of force against the plaintiff was excessive because the subject was beyond an average fact-finder's common knowledge).  Here, Professor Osborne similarly and permissibly applies her extensive experience with Title IX audits to opine that "a uniform percentage-based allocation of the Broadcast Model payments to all institutions is both impractical and unworkable given Title IX's financial aid and assistance requirements" and the "individual nature of the factors associated with performing" a Title IX audit. Rpt. ¶ 130(c); *see also id.* ¶ 96 (responding to hypothetical of how she would evaluate Title IX compliance if she "were conducting an audit").

### 3.   Even If Professor Osborne's Opinions Implicate Certain Legal Issues, They Are Nevertheless Admissible.

Even if Professor Osborne's opinions were to constitute legal conclusions, they would still be admissible.  Contrary to what Plaintiffs suggest, courts have allowed experts to opine on legal issues when cases involve "complex subject matter," either legally or substantively.  *See, e.g., Moonbug Ent. Ltd. v. BabyBus (Fujian) Network Tech. Co. Ltd.*, No. 21-CV-06536-EMC, 2023 WL 4108838, at \*12 (N.D. Cal. June 21, 2023) (admitting expert testimony "given the

9

1  somewhat complex subject matter" of the case); *see also United States v. Pac. Gas & Elec. Co.*,

2  No. 14-CR-00175-TEH, 2016 WL 3268994, at *1 (N.D. Cal. June 15, 2016) (admitting expert

3  testimony "to help the jury digest this complex regulatory framework"); *United States v. Offil*,

4  666 F.3d 168, 174 (4th Cir. 2011) (same).

5      Title IX can give rise—as it does in this context—to "complex and fact intensive

6  questions."  *Pejovic v. State Univ. of N.Y. at Albany*, No. 1:17-CV-1092 (TJM/DTS), 2018 WL

7  3614169, at *8 (N.D.N.Y. July 26, 2018) ("The law of Title IX with respect to the equal

8  provision of athletic opportunities is complex and fact intensive.").  In part for that reason, courts

9  have allowed experts to give legal opinions in Title IX cases.  In *Mansourian v. Board of*

10  *Regents of University of California Davis*, 816 F. Supp. 2d 869 (E.D. Cal. Aug. 3, 2011), for

11  example, experts for both plaintiffs and defendants "gave testimony regarding their conflicting

12  opinions on whether [the university defendant] complied with Title IX and achieved gender

13  equity requirements, the issues at the heart of [the] litigation."  *Id.* at 886 n.16.  The court

14  allowed such expert testimony, "given the unique nature of the quasi-factual, quasi-legal issues

15  surrounding Title IX."  *Id.*  Expert testimony concerning Title IX compliance has been admitted

16  in other Title IX cases as well.  *See, e.g.*, *Ohlensehlen v. Univ. of Iowa*, 509 F. Supp. 3d 1085,

17  1100 (S.D. Iowa 2020) (citing expert testimony on university compliance with Title IX's

18  substantially proportionate participation opportunities requirement in ruling on plaintiffs' motion

19  for preliminary injunction); *Humphreys v. Regents of Univ. of Cal.*, No. C 04-03808 SI, 2006

20  WL 1867713, at *5 (N.D. Cal. July 6, 2006) (admitting expert testimony about the "contours of

21  Title IX [and] the intricate regulatory scheme created by the NCAA rules" in a Title IX gender

22  discrimination case, while excluding expert testimony about ultimate liability that lacked

23  evidentiary support).

24      As in *Mansourian* and similar cases, Professor Osborne's opinions—regardless of

25  whether they are characterized as "legal"—are helpful to the Court, particularly given the unique

26  and unprecedented but-for world that Plaintiffs constructed in an attempt to model their BNIL

27  damages.  A court has never before had to grapple with the scenario Plaintiffs posit, in which

28  Plaintiffs claim that Conferences, rather than the schools for which student-athletes play, would

1    make direct payments to student-athletes that result in vastly disproportionate payments to men.

2    The complexities that arise from mapping Title IX's regulatory regime onto this novel construct

3    place this case squarely within the universe of "complex" cases that would benefit from expert

4    opinion.  Thus, Professor Osborne's opinions about how Title IX auditors would approach

5    Plaintiffs' but-for world are valuable and admissible expert evidence, just like the opinions in

6    *Mansourian*.  If anything, Professor Osborne's opinions here are even more limited—and,

7    therefore, more readily admissible—than the opinions admitted in *Mansourian*, as Professor

8    Osborne opines only that certain BNIL payments would be flagged during a Title IX audit, not

9    that particular actions taken by a specific institution violate Title IX.  And unlike the opinions in

10   *Mansourian*, Professor Osborne does not opine on the ultimate liability issue in this case—

11   whether the challenged rules violate antitrust laws.

12                 4.    Plaintiffs' Mere Disagreement With Professor Osborne's Opinions Is Not
13                       a Basis to Exclude Expert Opinions.

14          The remainder of Plaintiffs' arguments for exclusion of Professor Osborne's opinions as

15   "improper legal opinions" are lawyer-driven disagreements on the substance of Professor

16   Osborne's opinions.  Plaintiffs do not actually engage with these issues on the merits, and their

17   disagreements with Professor Osborne's opinions at best go to weight and not admissibility.  *See*

18   *Bona Fide*, 2009 WL 1369007, at *2.  For example, Plaintiffs argue (with no expert support) that

19   their but-for world does not implicate Title IX because neither the Conferences nor damages

20   awards are subject to Title IX.  Mot. at 3–4, 6–7.  But the fact that Plaintiffs disagree with

21   Professor Osborne's conclusions is not grounds for exclusion, since Professor Osborne has a

22   sufficient basis for her conclusions.  *See United States v. Johnson*, No. 14–cr–00412–THE, 2015

23   WL 5012949, at *3 (N.D. Cal. Aug. 24, 2015), *aff'd*, 875 F.3d 1265 (9th Cir. 2017) (to the extent

24   the party moving to exclude expert testimony disagrees with the expert, the moving party "may

25   do so through the presentation of [its] own expert and cross-examination" of the expert with

26   which it disagrees); *GSI Tech., Inc. v. Cypress Semiconductor Corp.*, No. 5:11–cv–03613–EJD,

27   2015 WL 364796, at *4 (N.D. Cal. Jan. 27, 2015) (While the moving party "is free to question

28   the basis for [the expert's] opinion during cross-examination, and may also present counter-

1  testimony through its own experts, it has not provided reason sufficient to exclude [the expert's]

2  testimony as ipse dixit or 'inadmissible speculation.").

3         Plaintiffs are also wrong on those points.  Plaintiffs simply ignore the support Professor

4  Osborne cited for her opinions and the analysis she performed.  For example, to conclude that the

5  BNIL payments in Plaintiffs' contemplated but-for world would "require[] member institutions'

6  substantial involvement and approval" and thus "implicate[] Title IX," Professor Osborne

7  analyzed the Conferences' bylaws and various agreements between Conferences and universities

8  (among other things).  Rpt. ¶¶ 78–79; *see generally id.*, Part IV.

9         In particular, Plaintiffs' but-for theory requires a world in which the Conferences

10  (governed by their member institutions) create, monitor, and administer a complicated

11  framework that directs broadcast revenue-sharing payments to student-athletes.  Conferences

12  would have to establish a formula (through votes by member institutions) for identifying the pool

13  of BNIL money to be distributed.  Conferences would then have to create rules (through more

14  votes by member institutions, including votes to amend existing Conference bylaws) for

15  allocation of payments to student-athletes by year and by sport.  Finally, member institutions

16  would need to cooperate with the Conferences to facilitate the BNIL payments, by providing the

17  Conferences with names, contact details, and other information about the student-athletes slated

18  to receive payments.  *Id.* ¶ 94.  Because of these factors, Professor Osborne explains, Plaintiffs'

19  but-for world "implicates Title IX even though it contemplates that the Conferences, and not

20  their member institutions, would 'make' the broadcast revenue payments."  *Id.* ¶ 93 (footnote

21  omitted).  Any other conclusion would mean that "institutions could easily circumvent Title IX

22  by using the Conferences or other third-parties formed or governed by the institutions themselves

23  intentionally to distribute benefits, opportunities, and payments to student-athletes in a way that

24  discriminated based on sex."  *Id.*  Since Title IX's inception, courts and the Office of Civil

25  Rights "have rejected this type of end-run around the requirements of Title IX."  *Id.*

26         Plaintiffs' critiques of this straightforward reasoning suffers from three flaws.

27         First, Plaintiffs' criticism of Professor Osborne for not identifying certain caselaw

28  reaching the same conclusions as Professor Osborne based on the facts contemplated in

1   Plaintiffs' but-for world makes no sense, given their argument that she be excluded for

2   purportedly offering improper legal opinions.  Professor Osborne is a Title IX expert, not a legal

3   expert.  Her report is not a legal brief or a law review article; rather, she "used a methodology

4   based on the one that [she] normally use[s] in the other Title IX audits or reviews that [she]

5   conduct[s] but tailored to the facts of this case." Rpt. ¶ 12.  Professor Osborne did not need to

6   cite caselaw for her opinions to be adequately "based on sufficient facts or data."  Fed. R. Evid.

7   702.  Professor Osborne's opinions, supported by her review and analysis of Conference bylaws,

8   agreements, and other documents, clear that bar.

9           Second, after being repeatedly asked at her deposition whether she could cite a case

10   supporting her position, Professor Osborne explained there would be none because Plaintiffs'

11   made-for-litigation but-for world is unprecedented: "this sort of thing has never been out there in

12   the universe, and a Court has never had to decide about it."  Osborne Dep. Tr. 166:25–167:2,

13   100:16–101:3, 119:12–15.  The lack of caselaw does not undermine Professor Osborne's

14   opinions (much less render them inadmissible, as Plaintiffs argue).  Rather, it confirms that

15   Plaintiffs' alleged but-for world is unprecedented, implausible, and disconnected from reality.

16           Finally, Plaintiffs' complaint that "Professor Osborne offers the inadmissible, and

17   unsupported, legal opinion that Title IX applies to a *damages award for past harm*," Mot. at 7, is

18   a red herring.  Professor Osborne did not offer an opinion on whether damages awards are

19   subject to Title IX; rather, her opinion is that Plaintiffs' but-for world implicates significant

20   individualized issues under Title IX and is impossible to square with Title IX's history, purpose,

21   and industry application.  *See* Osborne Dep. Tr. 146:10–14 ("And in [Plaintiffs' expert's] but-for

22   world, he based that on an economic opinion and not on the regulatory landscape that institutions

23   have to comply with.  And he also said in his deposition that he did not consider Title IX."); *id.*

24   at 170:14–19 ("But the model says that in the but-for world this is what would have happened

25   had they not had that [NIL] rule.  And in the real world had they not had that rule, those things

26   would have been implicated under Title IX.").  The relevant question at this stage is not whether

27   paying out Plaintiffs' desired BNIL damages would violate Title IX; it is whether Plaintiffs'

28   BNIL damages model is capable of reliably estimating class-wide damages in light of the

13

individualized Title IX issues that model creates and fails to resolve. Professor Osborne's

opinions are reliable and helpful in answering that relevant question. Her opinions regarding the

legislative history and industry-wide standards and practices related to Title IX demonstrate that

the plausibility of Plaintiffs' but-for world necessarily requires an institution-by-institution

determination, which means Plaintiffs' BNIL damages model cannot support class certification.[4]

**B.**     **Professor Osborne's Opinions Help Demonstrate Fatal Flaws with Plaintiffs' BNIL Model and How Individualized Issues Preclude Class Certification.**

Plaintiffs wrongly assert "the issues on which Professor Osborne opines have no bearing

on the Court's class certification determination." Mot. at 13. To the contrary, Professor

Osborne's opinions reveal serious flaws in Plaintiffs' BNIL model that go directly to class

certification. First, as Professor Osborne explains, Title IX obligations would outright preclude

the sort of pay disparity proposed by Rascher's BNIL formula, under which 96% (or $1.3

billion) of BNIL payments from 2016-2021 go to male student-athletes, leaving only 4% (or $50

million) to female student-athletes—a defect that cannot be "fixed." Rpt. ¶¶ 106 & 129–36; *see*

*also* Defs' Joint Opp'n to Pls' Mot. for Class Cert., ECF No. 249 at 15–16, 28–29. Second,

Professor Osborne's opinion confirms that Plaintiffs' model in no way accounts for the

individualized Title IX inquiries required for every school, in every year of the class period, to

ensure compliance. Rpt. ¶ 113. This bears upon this Court's predominance analysis, as

Plaintiffs' proposed BNIL but-for world, which impermissibly allocates 96% of the available

share of alleged BNIL to men, implausibly ignores the individualized, institution-by-institution

analysis required by Title IX that would predominate in assessing antitrust injury to members of

the putative class.

1.     Professor Osborne's Opinions Confirm Plaintiffs' BNIL Model Is Not a Functioning, Evidence-Backed Model that Can Support Certification.

Antitrust plaintiffs must present valid economic models that courts must rigorously

---

[4] Professor Osborne's opinions further demonstrate that Plaintiffs' BNIL damages model cannot support class certification because it fails to account for Title IX, a statute that indisputably applies to the Defendants' member schools and places limitations on their distribution of benefits—monetary and otherwise—to student-athletes. *See* Defs' Joint Opp'n to Pls' Mot. for Class Cert., ECF No. 249 at 15–16, 28–29.

14

1   scrutinize before certifying a class.  *See Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d

2   979, 987–88 (9th Cir. 2015); *see also Ward*, 2018 WL 934544, at *3.  That is because Rule 23

3   "not only authorizes a hard look at the soundness of statistical models that purport to show

4   predominance," but "commands it." *In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No.*

5   *1869,* 725 F.3d 244, 255 (D.C. Cir. 2013).  A district court must be able to "see the model in

6   action" instead of operating solely on "plaintiff's assurances [that] it will be effective." *Carrera*

7   *v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013) (a plaintiff cannot satisfy Rule 23 by proposing

8   a method "without any evidentiary support that the method will be successful").

9           Here, Professor Osborne's opinions confirm that Plaintiffs' BNIL model cannot support

10   class certification as it is neither one that can actually function in the real world, nor one that is

11   backed by evidence.  Plaintiffs' BNIL model does not account for Title IX whatsoever, which

12   requires that financial assistance opportunities be available "for members of each sex **in**

13   **proportion to the number of students of each sex** participating in interscholastic or

14   intercollegiate athletics." 34 C.F.R. § 106.37(c)(1) (emphasis added).  Institutions have been

15   "found in compliance if the proportion of all athletics aid that the institution provides to student-

16   athletes of each sex is within 1% of the proportion of all student-athletes at the institution that are

17   male or female, respectively, or if any disparity can be explained based on legitimate,

18   nondiscriminatory factors."  Rpt. ¶ 51.[5]

19           Title IX also requires that men and women be treated in an equitable manner in the

20   context of intercollegiate athletics.  "[D]etermining compliance with this requirement under Title

21   IX requires examining the availability, quality and kinds of benefits, opportunities, and treatment

22   for student-athletes across a 'laundry list' of athletics program components."  Rpt. ¶¶ 53–54

23   (citing Policy Interpretation §§ VII.B.1, VII.B.2, 34 C.F.R. § 106.41(c)).  The "laundry list"

24   includes components such as recruiting, but also a number of other components that must be

25   considered in a Title IX assessment.  Rpt. ¶ 54 (citing 34 C.F.R. § 106.41(c) and Policy

26   _____

27   [5] The agency responsible for Title IX enforcement, the Office for Civil Rights ("OCR") has
    advised that "there will be a strong presumption that an unexplained disparity of more than 1% is
    in violation of the 'substantially proportionate' requirement" of Title IX. Dr. Mary Frances

28   O'Shea, *Dear Colleague Letter: Bowling Green State University*, U.S. Dep't of Educ., Off. for
    Civ. Rts. (July 23, 1998), ECF No. 251-8.

15

Interpretation § VII.B.1); *see also id.* ¶ 126 (using BNIL payments "as recruiting inducements would create inequitable financial resources for recruiting in violation of Title IX").[6]  "For each program component in the laundry list, Title IX compares the men's athletics program as a whole to the women's athletics program as a whole and then an overall assessment is made of the men's program as compared to the women's program."  Rpt. ¶ 55.  "[T]he benefits and resources . . . need not be identical to satisfy the equivalent treatment test, they must be equal or equal in effect."  *Id.*  Disparity in just "one program component can alone constitute a Title IX violation if it is substantial enough to deny equality of athletic opportunity to students of one sex."  *Id.* ¶ 57.

As Professor Osborne explains, allocating 96% of the share of alleged BNIL revenues to men makes compliance with this requirement impossible.  Her opinion bears directly on the validity of Plaintiffs' model in the real world, and renders it invalid as a basis for certification of their proposed BNIL damages class.  *See Rail Freight*, 725 F.3d at 255; *Carrera*, 727 F.3d at 306.

### 2.   Professor Osborne's Opinions Confirm that Individual Injury Issues Predominate Given the Title IX Obligations at the Institutional Level.

Professor Osborne's opinions further speak to whether individual injury can be established using common proof.  Decisions dating back decades hold that if individualized injury issues predominate, class certification must be denied. *See, e.g., In re Hotel Tel. Charges*, 500 F.2d 86, 89 (9th Cir. 1974); *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 68–69 (4th Cir. 1977).  Certification is improper under Rule 23(b)(3) if the court would have to resolve "individualized questions regarding which [class] members . . . suffered an injury." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 681 (9th Cir. 2022), *cert. denied sub nom. StarKist Co. v. Olean Wholesale Grocery Coop., Inc.*, 143 S. Ct. 424 (2022).  Fact of injury "often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as

---

[6] Other components from the "non-exhaustive" list include "provision and maintenance of equipment and supplies;" "scheduling of games and practice times;" "travel and per diem allowances;" "opportunity to receive coaching and academic tutoring;" "assignment and compensation of coaches and tutors;" "provision of locker rooms, practice and competitive facilities;" "provision of medical and training facilities and services;" "provision of housing and dining services and facilities;" "publicity;" and "support services."  Rpt. ¶ 54.

opposed to common, proof." *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 262 (3d Cir. 2016), as amended (Sept. 29, 2016).

Plaintiffs' "common proof" for certification of the proposed BNIL damages class is based on the hypothetical "but-for world" wherein a portion of the Conferences' broadcast revenues would be distributed in equal payments to full GIA scholarship football and basketball student-athletes. Rpt. ¶ 18.  Professor Osborne's analysis shows that Plaintiffs' made-up BNIL damages model contemplates a but-for world that could never exist because of the individualized Title IX issues the proposed Conference-wide payments would raise at every single institution:

> [I]n looking at the underlying numbers and allocations to determine whether implementing Plaintiffs' Broadcast Model would violate Title IX, the Court would have to conduct an **institution-by-institution analysis**. The differing numbers and proportions of male and female student-athletes participating in athletics at each institution and the differing total amounts of financial aid offered to student-athletes at each institution **necessitate separate calculations** to determine each institution's compliance with the financial assistance regulations.

Rpt. ¶ 113 (emphases added).

Title IX's equivalent treatment test necessarily requires a detailed assessment of the parts of the whole: each of the program components for each athletics team from each school.  Those components, along with all the others from the "non-exhaustive" "laundry list," would need to be evaluated for each of the athletics teams in order to determine whether, overall, "male and female student-athletes are treated in an equitable manner across the totality of the athletics programs." *See id.* ¶ 55.  This is a detailed injury analysis that must be individualized to each institution, and cannot be applied on a Conference-wide, much less a class-wide, basis.

Because of the variety of inputs that factor into a Title IX analysis—from gender breakdown, to facilities, to support services, to alternative nondiscriminatory justifications for discrepancies in financial assistance—Professor Osborne further opines that "there is **no uniform formula** for aid allocations that could be applied in an **across-the-board manner to all institutions**." Rpt. ¶ 130(a) (emphases added).  Yet that is precisely what Plaintiffs' but-for world contemplates: a uniform formula applied in an across-the-board manner to all institutions. In Plaintiffs' but-for world, all scholarship athletes in the same sport in the same Conference would receive the same BNIL payment, despite the variance between institutions in relevant

17

factors, such as gender breakdown, existing financial assistance and financial aid distributions, facilities, coaching, and so on.  "Even if Plaintiffs attempted to revise their Broadcast Model to allocate revenue share payments per school on a proportional basis"—which they did not—"the historical numbers and corresponding split would be difficult (if not impossible) to deduce on a class-wide basis because of the separate analysis that would still need to be performed every year at each school."  *Id.*  Any class-wide model is "both impractical and unworkable"—which weighs heavily against class certification.  *See id.*

The individualized nature of Title IX assessments as between institutions means that the extent to which class members at each institution within each of the Conferences suffered antitrust injury would require an institution-by-institution analysis, and confirms that Plaintiffs' BNIL damages model, which neglects Title IX implications altogether, presents insurmountable predominance issues that preclude class certification.  *See Olean*, 31 F.4th at 681; *Hotel Tel. Charges*, 500 F.2d at 89.

> 3. Plaintiffs' Arguments for Ignoring Title IX Implications Only Confirm the Invalidity of their BNIL Damages Model at Certification.

Plaintiffs wrongly argue that the Court should ignore these Title IX implications because "Defendants (and their member schools) have always spent more money to support FBS football and men's basketball than women's basketball," and that "the NCAA and its members" have at times opposed certain applications of Title IX to college sports.  Mot. at 10–12.  But differences in funding, standing alone, do not indicate a Title IX violation, much less that Defendants would have chosen to violate Title IX in the but-for world.  As Professor Osborne explains, Title IX compliance requires detailed, institution-by-institution analysis that cannot be simplified to solely a comparison between the amount spent on particular items or efforts as between men's and women's sports.  *See supra* at III.B.1–2.  Moreover, multiple witnesses submitted declarations stating that their institutions would not approve Plaintiffs' contemplated revenue-sharing model because of Title IX concerns.  Lee Decl., ECF No. 249-15 ¶ 19; Kliavkoff Decl., ECF No. 252-2 ¶ 25; Sankey Decl., ECF No. 252-1 ¶ 47(a); James Decl., ECF No. 249-11 ¶ 19; Hawley Decl., ECF No. 249-9 ¶ 16(a); Flores Decl., ECF No. 249-13 ¶ 16; Tanner Decl., ECF

18

No. 249-12 ¶ 9.  Plaintiffs' speculation that schools would ignore their Title IX obligations is not only baseless, but is contradicted by the record.

Plaintiffs' argument thus boils down to a tacit recognition that the BNIL model would simply continue to perpetuate past disparities and discriminatory treatment of female student-athletes.  As Professor Osborne notes, "While progress has certainly been made in this regard, the efforts to achieve Title IX's goals remain ongoing."  Rpt. ¶ 153.  But importantly, as a leading expert in her field, Professor Osborne warns that, "[i]n [her] view, Plaintiffs' Broadcast Model would reflect a reversal of those efforts" and "undermine the years of advancement and increasing support for women's sports since Title IX's enactment."  *Id*. ¶ 154.  And, ultimately, it is Plaintiffs' burden to present a plausible, but-for world that does not create a new violation.  Instead of carrying that burden, neither Plaintiffs nor their experts considered Title IX at all.  Rascher Dep. Tr., ECF No. 254-5 at 111:19–21, 130:20–24.  Professor Osborne's description of Title IX's individualized assessments explains why that failure to consider Title IX is fatal to the ability of Plaintiffs' class damages model to satisfy Rule 23's predominance requirement.

### C.   Professor Osborne Can Opine on the Financial Viability of Plaintiffs' BNIL Model Given Her Experience and Review of Supporting Documents.

Plaintiffs similarly miss the mark in critiquing Professor Osborne's opinion that any Title IX violation could not be ameliorated by increasing spending elsewhere because "it would be virtually impossible to locate sufficient additional funds to ensure some form of compensation for female student-athletes proportional to the significant amounts that Plaintiffs contemplate for male student-athletes under the Broadcast Model."  Rpt. ¶ 133.[7]  As Professor Osborne explains, "[u]nder Plaintiffs' Broadcast Model, institutions would need to find an equivalent amount of funding to provide equitable financial support for women's athletics programs in order to comply with Title IX[,]" and "[h]istory tells us that this process would likely lead to the elimination of participation opportunities for men (and possibly even women) in non-revenue generating sports."  *Id.* ¶ 134.  Plaintiffs' but-for world "would likely result in a reduction of overall

---

[7] Notably, even if potential Title IX issues could be ameliorated, such attempted amelioration would still need to be done on an institution-by-institution basis. Rpt. ¶¶ 129–30, 134.  Thus, this argument has no bearing on the fact that Plaintiffs have failed to demonstrate predominance.

participation opportunities in college sports, which could harm certain class members in the

Additional Sports Class, among others." *Id.* ¶ 136.  The upshot is, any attempt to achieve "Title

IX compliance with Plaintiffs' Broadcast Model could . . . have a sizable impact on the viability

of athletics programs overall (both men's and women's sports)." *Id.* ¶ 134.

Plaintiffs contend these opinions go beyond Professor Osborne's qualifications.  Mot. at

8–9.  But Rule 702 "contemplates a broad conception of expert qualifications." *Hangarter*, 373

F.3d at 1018 (simplified).  "[S]o long as the expert's testimony remains within the 'reasonable

confines of [her] subject area,' it is admissible." *Bona Fide*, 2009 WL 1369007, at *5 (quoting

*Avila v. Willits Envt'l Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011)).

Professor Osborne has years of experience as an athletics administrator and Title IX

auditor.  Funding for athletics programs is a key aspect of Title IX audits and administration of

athletics departments, *see supra* Section II, and "in doing a Title IX audit, you regularly look at

budgets and figures and all those things."  Osborne Dep. Tr. 183:7–9.  Courts have allowed

"expert[s] in the application of Title IX" to "testify about the disparity in athletic-based financial

aid" even though they are not "mathematician[s] or statistician[s]" because the experts are

"qualified to undertake this simple mathematic analysis in light of . . . previous experience."

*Portz*, 297 F. Supp. 3d at 955.  Moreover, Professor Osborne relied not only on her experience as

a Title IX auditor and athletics administrator, but also on her review of a NCAA finances

database that shows very few athletics departments have a positive net generated revenue and

other secondary sources demonstrating that most athletics programs lose money.  Rpt. ¶¶ 131,

133; *see also* Osborne Dep. Tr. 184:11–14 ("[A]n independent study is not necessary when you

just look at the amounts that are involved and how that impacts an athletics department.").

Professor Osborne's opinions are well within the "reasonable confines" of her "subject

area." *See Bona Fide*, 2009 WL 1369007, at *5.  Professor Osborne has the qualifications and

data to opine regarding the practical financial implications of Plaintiffs' BNIL damages model:

the destruction of entire athletics programs and the economic model underpinning college sports.

**IV.    CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' Motion in its entirety.

20

Dated:  August 11, 2023

Respectfully Submitted,

**WILKINSON STEKLOFF LLP**

By: _/s/ Rakesh N. Kilaru_
Beth A. Wilkinson (*pro hac vice*)
Rakesh N. Kilaru (*pro hac vice*)
Kieran Gostin (*pro hac vice*)
Calanthe Cope-Kasten (*pro hac vice*)
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
kilaru@wilkinsonstekloff.com
kgostin@wilkinsonstekloff.com
ccope-kasten@wilkinsonstekloff.com

Jacob K. Danziger (SBN 278219)
ARENTFOX SCHIFF LLP
44 Montgomery Street, 38th Floor
San Francisco, CA 94104
Telephone: (734) 222-1516
Facsimile: (415) 757-5501
jacob.danziger@afslaw.com

Attorneys for Defendant
NATIONAL COLLEGIATE
ATHLETIC ASSOCIATION

**LATHAM & WATKINS LLP**

By: _/s/ Christopher S. Yates_
Christopher S. Yates (SBN 161273)
Aaron T. Chiu (SBN 287788)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
chris.yates@lw.com
aaron.chiu@lw.com

Anna M. Rathbun (SBN 273787)
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-1061
Facsimile: (202) 637-2201
anna.rathbun@lw.com

D. Erik Albright (*pro hac vice*)
Jonathan P. Heyl (*pro hac vice*)
Gregory G. Holland (*pro hac vice*)
FOX ROTHSCHILD LLP
230 North Elm Street, Suite 1200
Greensboro, NC 27401
Telephone: (336) 378-5368
Facsimile: (336) 378-5400
ealbright@foxrothschild.com
jheyl@foxrothschild.com
gholland@foxrothschild.com

Attorneys for Defendant
THE ATLANTIC COAST CONFERENCE

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MAYER BROWN LLP**

By: _/s/ *Britt M. Miller*
Britt M. Miller (pro hac vice)
Daniel T. Fenske (pro hac vice)
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711
bmiller@mayerbrown.com
dfenske@mayerbrown.com

Christopher J. Kelly (SBN 276312)
Two Palo Alto Square, Suite 300 3000
El Camino Real
Palo Alto, CA 94306
Telephone: (650) 331-2000
Facsimile: (650) 331-2060
cjkelly@mayerbrown.com

Attorneys for Defendant
THE BIG TEN CONFERENCE, INC.

**COOLEY LLP**

By: _/s/ *Whitty Somvichian*
Whitty Somvichian (SBN 194463)
Kathleen R. Hartnett (SBN 314267)
Ashley Kemper Corkery (SBN 301380)
3 Embarcadero Center, 20th Floor
San Francisco, California 94111-4004
Telephone: (415) 693 2000
Facsimile: (415) 693 2222
wsomvichian@cooley.com
khartnett@cooley.com
acorkery@cooley.com

Mark Lambert (SBN 197410)
3175 Hanover Street
Palo Alto, CA 94304-1130
Telephone: (650) 843-5000
Facsimile: (650) 849-7400
mlambert@cooley.com

Dee Bansal (*pro hac vice*)
1299 Pennsylvania Ave. NW, Suite 700
Washington, DC 20004-2400
Telephone: (202) 842 7800
Facsimile: (202) 842 7899
dbansal@cooley.com

Attorneys for Defendant
PAC-12 CONFERENCE

22

**ROBINSON, BRADSHAW & HINSON, P.A.**

By: /s/ *Robert W. Fuller*
Robert W. Fuller, III (pro hac vice)
Lawrence C. Moore, III (pro hac vice)
Amanda P. Nitto (pro hac vice)
Travis S. Hinman (pro hac vice)
101 N. Tryon St., Suite 1900
Charlotte, NC 28246
Telephone: (704) 377-2536
Facsimile: (704) 378-4000
rfuller@robinsonbradshaw.com
lmoore@robinsonbradshaw.com
anitto@robinsonbradshaw.com
thinman@robinsonbradshaw.com

Mark J. Seifert (SBN 217054)
SEIFERT ZUROMSKI LLP
One Market Street, 36th Floor
San Francisco, California 941105
Telephone: (415) 999-0901
Facsimile: (415) 901-1123
mseifert@szllp.com

Attorneys for Defendant
SOUTHEASTERN CONFERENCE

**SIDLEY AUSTIN LLP**

By: /s/ *David L. Anderson*
David L. Anderson (SBN 149604)
dlanderson@sidley.com
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-1200
Facsimile: (415) 772-7412

Angela C. Zambrano (pro hac vice)
angela.zambrano@sidley.com
Natali Wyson (pro hac vice)
nwyson@sidley.com
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Tel: (214) 969-3529
Fax: (214) 969-3558

Chad Hummel (SBN 139055)
chummel@sidley.com
1999 Avenue of the Stars, Suite 1700
Los Angeles, CA 90067
Tel: (310) 595-9505
Fax: (310) 595-9501

Attorneys for Defendant
THE BIG 12 CONFERENCE, INC.

23

1

## **FILER'S ATTESTATION**

2          I, Rakesh N. Kilaru, am the ECF user whose identification and password are being used

3    to file Defendants' Joint Opposition to Plaintiffs' Motion to Exclude the Opinions of

4    Defendants' Expert Professor Barbara Osborne.  In compliance with Local Rule 5-1(h)(3), I

5    hereby attest that all signatories hereto concur in this filing.

6                                                              */s/ Rakesh N. Kilaru*
                                                              Rakesh N. Kilaru

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28