# EXHIBIT 1

## To the Declaration of Rakesh N. Kilaru

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                   OAKLAND DIVISION

4    GRANT HOUSE and SEDONA PRINCE, on   Civil Action No.

5    behalf of themselves and all        4:20-cv-03919-CW

6    others similarly situated,

7                  Plaintiffs,

8    v.

9    NATIONAL COLLEGIATE ATHLETIC

10   ASSOCIATION; PAC-12 CONFERENCE;

11   THE BIG TEN CONFERENCE, INC.; THE

12   BIG TWELVE CONFERENCE, INC.;

13   SOUTHEASTERN CONFERENCE; and

14   ATLANTIC COAST CONFERENCE,

15                  Defendants.

16   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

17

18        VIDEO-RECORDED DEPOSITION OF BOB THOMPSON

19                    June 8, 2023

20                     9:29 a.m.

21                    Polsinelli
                 One East Washington Avenue
22                    Suite 1200
                   Phoenix, Arizona
23

             Reported by Eve K. Burton, RPR, CRR,
24   Arizona CR Certificate No. 50261, California CSR No. 12527

25                 Job No. J9703138



1            The video-recorded deposition of BOB THOMPSON,

2    noticed by Plaintiffs, was taken on June 8, 2023, from

3    9:29 a.m. to 2:38 p.m., at the offices of Polsinelli,

4    One East Washington Avenue, Suite 1200, Phoenix, Arizona,

5    before Eve K. Burton, RPR, CRR, Arizona CR Certificate

6    No. 50261, California CSR No. 12527.

7

8    APPEARANCES OF COUNSEL

9

10       For Plaintiffs:

11           WINSTON & STRAWN LLP
             DAVID GREENSPAN, ESQ.
12           ADAM I. DALE, ESQ.
             SCOTT SHERMAN, ESQ. (Via Zoom)
13           200 Park Avenue
             New York, New York  10166
14           (212) 294-5329
             dgreenspan@winston.com
15           aidale@winston.com
             ssherman@winston.com
16
             HAGENS BERMAN SOBOL SHAPIRO LLP
17           BENJAMIN J. SIEGEL, ESQ. (Via Zoom)
             715 Hearst Avenue, Suite 300
18           Berkeley, California  94710
             (510) 725-3000
19           bens@hbsslaw.com

20           HAGENS BERMAN SOBOL SHAPIRO LLP
             EMILEE SISCO, ESQ. (Via Zoom)
21           1301 Second Avenue, Suite 2000
             Seattle, Washington  98101
22           (206) 623-7292
             emilees@hbsslaw.com
23

24

25



1    APPEARANCES OF COUNSEL (Continued)

2

3        For Defendant National Collegiate Athletic
         Association:
4
             WILKINSON STEKLOFF
5            ROBERT J. LAIRD, ESQ.
             2001 M Street, NW, 10th Floor
6            Washington, D.C.
             (202) 847-4000
7            rlaird@wilkinsonstekloff.com

8
         For Defendant Pac-12 Conference:
9
             COOLEY LLP
10           MARK LAMBERT, ESQ. (Via Zoom)
             3175 Hanover Street
11           Palo Alto, California  94304-1130
             (650) 843-5003
12           mlambert@cooley.com

13           COOLEY LLP
             REBECCA TARNEJA, ESQ. (Via Zoom)
14           355 South Grand Avenue, Suite 900
             Los Angeles, California 90071
15           (213) 561-3225
             rtarneja@cooley.com
16

17       For Defendant Big Ten Conference, Inc.:

18           MAYER BROWN LLP
             GINA L. DEL TATTO, ESQ. (Via Zoom)
19           1221 Avenue of the Americas
             New York, New York  10020-1001
20           (212) 506-2483
             gdeltatto@mayerbrown.com
21

22

23

24

25



 1    APPEARANCES OF COUNSEL (Continued)

 2

 3         For Defendant Big Twelve Conference, Inc.:

 4              POLSINELLI
                LEANE K. CAPPS, ESQ. (Via Zoom)
 5              2950 North Harwood, Suite 2100
                Dallas, Texas  75201
 6              (214) 661-5537
                lcapps@polsinelli.com
 7
                POLSINELLI
 8              PHILLIP ZEECK, ESQ.
                900 West 48th Place, Suite 900
 9              Kansas City, Missouri  64112-1895
                (816) 572-4592
10              pzeeck@polsinelli.com

11         For Defendant Southeastern Conference:

12              ROBINSON BRADSHAW & HINSON, P.A.
                ROBERT W. FULLER, ESQ.
13              AMANDA PICKENS NITTO, ESQ.
                101 North Tryon Street, Suite 1900
14              Charlotte, North Carolina  28246
                (704) 377-2536
15              rfuller@robinsonbradshaw.com
                anitto@robinsonbradshaw.com
16

17         Also Present:

18              JAYLON JACKSON (Via Zoom)

19              MICHAEL PHAM, Videographer

20

21

22

23

24

25



 1 │ transfer from one institution to another institution.  And
 2 │ I believe that -- I think that's about it.
 3 │            As far as for an actual performance, like,
 4 │ "I'm going to -- you scored five touchdowns.  I'm going to
 5 │ give you 50 grand," no, I don't believe that happens.
 6 │ BY MR. GREENSPAN:
 7 │    Q.   Okay.  It's your -- can you confirm it's your
 8 │ opinion that "It would be inherently impractical for
 9 │ individual participants to own or control broadcast rights
10 │ in a sports event because any single participant could
11 │ withhold those rights and prevent the broadcast from
12 │ occurring"?
13 │    A.   Could you say that again.
14 │    Q.   If you want, it's on page -- I'm reading from --
15 │    A.   Oh.
16 │    Q.   -- page 8 of your report.
17 │    A.   Okay.  Third paragraph?
18 │    Q.   Yeah, the last sentence of the third paragraph.
19 │    A.   That's correct.
20 │    Q.   Okay.  And I want to focus -- that holds true for
21 │ any single participant could hold up a broadcast if that
22 │ participant controlled the -- controlled the right to use
23 │ their name, image, or likeness.
24 │            MR. FULLER:  Objection.
25 │            THE WITNESS:  And if it wasn't something



1  that the conference could warrant that they could provide,

2  yes.

3  BY MR. GREENSPAN:

4      Q.   Okay.  And it wouldn't matter if the participant

5  is the quarterback or the punter; that's the problem that

6  you are addressing in this sentence in your report,

7  correct?

8      A.   That's correct.

9      Q.   Okay.  And again, I think we've already

10 established this, but you're not offering the legal

11 opinion on the legal issue of whether an athlete owns the

12 right to his or her name, image, and likeness in a

13 broadcast.

14     A.   That's correct.

15     Q.   Okay.  Mr. Thompson, I'm going to do this a lot,

16 where I have quotes in my notes from your report that I'm

17 going to ask you about.  If ever you want to know where it

18 is in your report so you can find it and look in context,

19 just let me know.

20     A.   That would be great.

21     Q.   Okay.  Can you confirm your opinion that the NIL

22 marketplace for promoting and endorsing products

23 demonstrates that some college athletes have tremendous

24 NIL endorsement value and others have little or no NIL

25 endorsement value?



1    A.    That's correct.

2    Q.    Okay.   What, if anything, did you do to study

3  that issue, any work you did to arrive at that opinion?

4    A.    Just what I've read in the -- in the general

5  marketplace and what I know that, you know, occurs, you

6  know, based on reports, published reports.

7    Q.    What sort of published reports?

8    A.    Well, I mean, I read the newspaper.   I read the

9  internet.

10    Q.    I mean, so, for example, there are --

11          And we have -- we, of course, as Plaintiffs

12  in this matter, certainly, you know, track when there is

13  an announcement, you know, of a collective did this, you

14  know, a big brand did that.   But there are --

15          Are you familiar with Opendorse, for

16  example?

17    A.    Yes.

18    Q.    Okay.   And Opendorse, apparently, has lots of

19  data about NIL deals with college athletes.   Are you

20  generally familiar with that?

21    A.    Yes.

22    Q.    Did you look at, you know, information from

23  Opendorse?

24    A.    For this?

25    Q.    In arriving at this opinion.



 1 | depending on what they are, can have different values, I
 2 | imagine that it's more valuable to have the back-end
 3 | rights circle than to not have it at all, from the
 4 | perspective of the network.  Is that right?
 5 |                 MR. FULLER:  Objection, I guess.
 6 |                 Answer the question.
 7 |                 THE WITNESS:  Not necessarily.  It would
 8 | depend on how much you have to pay for that right.
 9 | BY MR. GREENSPAN:
10 |     Q.   Okay.  Let's put aside what you have to pay for
11 | it, but in terms of it's more valuable to a network to
12 | have back-end rights than to have none, correct?
13 |     A.   All things being equal, if the price was the
14 | thing whether you had the right or not had the right, yes,
15 | it's more valuable to have them.
16 |     Q.   Okay.  Now let's get to your point about it
17 | depends what you have to pay for them.  Back-end rights --
18 | I think we discussed this before:  There is no separate
19 | market for back-end rights, correct?
20 |                 MR. FULLER:  Objection.
21 |                 THE WITNESS:  Not that I'm aware of.
22 | BY MR. GREENSPAN:
23 |     Q.   Okay.  And back-end rights -- there's no separate
24 | price for back-end rights within a media agreement,
25 | correct?



1     A.    Not in my experience, no.

2     Q.    Okay.  So how would a network -- how did you at

3  Fox?  How would you do it now at Thompson consulting?  How

4  would you go about figuring out what is the price worth

5  paying to get the back-end rights?

6     A.    It's almost not what it's worth paying.  It's

7  worth -- it's what -- it's about what you're not prepared

8  to pay to not have an advantage in a renewal.

9           Back-end rights are all about renewals.

10  Back-end rights aren't about the current agreement.  It's

11  all about what happens next.

12          And so, you know, some back-end rights I

13  would want very strong if I felt very strongly about the

14  product, and I'd want a right to match, flat out.  Others,

15  I'd -- you know, I might want to take a look at it, and

16  I'd be prepared to walk if I don't think it's something --

17  you know, if I think it's on the margins.

18          So you can't -- you can't look at them and

19  just lump them all in the same circle here and say they're

20  all worth the same amount going forward.

21     Q.    So let's go with the product that you like very

22  much and you want the right to match, and the seller --

23  let's say it's a conference -- says to you, "Mr. Thompson,

24  here's an agreement with the very strong right to match

25  that you want.  Here's an agreement with no right to



 1  match."

 2            How would you go about determining what the

 3  price is worth paying for those two options?

 4            MR. FULLER:  Objection.

 5            THE WITNESS:  Well, I'd look at the various

 6  other circles that are affected by either having these

 7  rights or not having these rights, and then I would make

 8  some sort of a determination based on that as to whether

 9  or not I wanted the back-end rights or I didn't care if I

10  had back-end rights.

11  BY MR. GREENSPAN:

12     Q.   But in my hypothetical, we've established you

13  want the back-end rights; you want the right to match;

14  it's the product you really want.

15            So my question is, all else equal, one --

16  two draft media agreements are put in front of you.

17  Everything is the same.  We're talking about the product;

18  you really like it.  You really want the right to match.

19  One contract has the right to match.  One doesn't.  How

20  would you, as the buyer, determine "What is the difference

21  in price that I am willing to pay for Option 1 versus

22  Option 2?"

23            MR. FULLER:  Objection.

24            THE WITNESS:  I think I just said that.  I

25  said we'd look at the other circles here that are affected



 1   by back-end rights and keeping the product going forward

 2   and be able to come up with some sort of a figure that

 3   would give me a clue as to whether or not we should pay

 4   the fee -- or pay the deal that has the back-end rights or

 5   accept, which I probably wouldn't do, the one that

 6   doesn't.

 7              Each of these are dependent on not only

 8   within the current term of the agreement, but many of

 9   these things extend beyond the term of this agreement,

10   things like retransmission consent fees, things like cable

11   subscriber fees.

12              This might be a three-year deal or a

13   four-year deal, and my distribution agreements might be

14   seven-year deals.  And so if I lose this product at some

15   point during the term of my distribution deals, then I

16   have to get into a situation where I have to figure out,

17   "Am I going to have to give money back?  Or what am I

18   going to replace it with, and what's that going to cost?"

19              And so that's why it's just not that

20   clear-cut of a -- I mean, you look at the elements, and

21   then you make the determination as to the value of the

22   back-end rights.

23   BY MR. GREENSPAN:

24      Q.   But you would be able to make that determination.

25   I understand it's not clear, but as a network or a



1  consultant for a network, you would be able to assess the

2  relative value between Contract, you know, 1 that has the

3  back-end rights and Contract 2 that doesn't.

4                    MR. FULLER:  Objection.

5                    THE WITNESS:  Yeah, because these things --

6  these are all things that exist in the real world.  I

7  mean, affiliate fees are affiliate fees.  I can look at a

8  contract and tell you what that is and tell you what

9  happens if I don't have those rights.  I can look at

10 advertising revenues and advertising packages and say, "If

11 I don't have this product, this is what I'm going to

12 have."

13                    So these are all very quantifiable things.

14 They exist.  They're traded on daily.  But they're not

15 things that are unquantifiable because they don't exist in

16 the real world right now.

17 BY MR. GREENSPAN:

18    Q.   Okay.  Well, I mean, I take it, you're alluding

19 to broadcast NIL.

20    A.   Correct.

21    Q.   Okay.  But men's basketball, women's basketball,

22 FBS football, these are property rights that exist in the

23 real world, yeah?

24    A.   Yes.

25    Q.   Okay.  And you would be able to -- so let's say



1   one -- again, let's put back-end rights aside.  We've got

2   two contracts.  All else is equal.  One contains some

3   women's basketball, and one doesn't.  You would be able to

4   assess the relative value between those two contracts,

5   what you're willing to pay for the contract that includes

6   women's basketball and the contract that doesn't.

7        A.   I could assess and I could also go with what I

8   consider the value to be going forward, and that might be

9   purely a -- you know, my gut.

10              So it's not -- it's not all 100 percent

11   black-and-white, but I mean, these are very quantifiable

12   things, so yeah, I can -- I can get to a number.  Whether

13   or not I want to accept that number or not, that's a

14   totally different thing.

15        Q.   But to get to that number, you'd rely on your

16   experience.

17        A.   Partially.

18        Q.   Okay.

19        A.   But also math, because these are quantifiable

20   things.

21        Q.   Well, you didn't do any math in this case.

22        A.   No.  I wasn't -- I wasn't asked to.

23        Q.   Is it fair to say that when networks or

24   conferences negotiate media agreements and they make

25   valuations, they are, in part, relying on, as you put it,



1   their gut or their experience in the industry?

2        A.   I like to call it more experience than gut, but

3   yes, you're correct.  I mean, that's just another element

4   of what you do when you purchase rights.  You know, it's

5   kind of like buying a car.  You go, "Do I feel good about

6   this car?  You know, does it -- you know, sure, the car

7   costs X, and the warranty is worth Y, and it gets Z for

8   gas mileage, but does my gut tell me that this is a good

9   deal?"

10       Q.   Okay.  All right.  Let's talk about Mr. Desser's

11  10 percent opinion.

12       A.   Okay.

13       Q.   It's your opinion that --

14            This is on page 35, if you want to keep up

15  with me.

16            There is no separate market for broadcast

17  NIL rights, and there is no instance when any person or

18  entity ever paid or was paid for broadcast NIL rights

19  only.  That's your opinion, correct?

20       A.   That's correct.

21       Q.   Okay.  And just to try to unpackage it, here -- I

22  know you have other opinions, too.  Here you're just

23  saying, the way Mr. Desser has offered an opinion about

24  the value of broadcast NIL standing alone, here what

25  you're saying is, that broadcast NIL standing alone has



1  Mr. Sankey's statement here that "football and men's

2  basketball have far higher ratings than any other sport

3  and are far more attractive to broadcasts and networks"?

4      A.   Well, again, a lot of it depends on what the

5  package is.  If I'm comparing a package that has

6  1 football game and 20 basketball games to a package that

7  has 20 football games and 1 basketball game, I would say

8  the latter is more valuable.  But, you know, it just

9  depends, makeup -- the makeup of the package.

10          If you wanted to say, "One football game and

11  one basketball game, are those the two most popular sports

12  within collegiate sports?" then yes, I would agree.

13      Q.   Okay.  And that's a fair qualifier.  I understand

14  that in a partic- -- you know, if a rights agreement has a

15  hundred men's --

16      A.   Right.

17      Q.   -- basketball games and one suboptimal football

18  game, it's going to be different.

19          But all else equal, we agree football is the

20  driver and that football and men's basketball together

21  have far higher ratings than any other college sport.

22      A.   Generally, but not always.  There are certain

23  outliers that do better in certain parts of the country

24  than men's basketball.

25      Q.   Within the Power Five?



1    A.   Yes.

2    Q.   In the next paragraph, Mr. Sankey states that

3  "despite concerted efforts by the SEC to promote women's

4  sports, broadcasts and other distributions of women's

5  sports over the course of a season, and for purposes of

6  negotiating broadcast rights payments, have never been as

7  popular with viewers and as attractive to broadcasters and

8  networks as are football and men's basketball."

9    A.   That's a fair statement, yes.

10    Q.   Okay.  And so, again -- and I'm speaking in very

11  broad terms.  I understand contracts can be different.  I

12  understand you view all contracts to be different.

13          But do you agree, as a general proposition,

14  for the Power Five and Notre Dame, sort of the hierarchy

15  between the three sports that we've predominantly been

16  talking about today, in terms of value to a network, it's

17  football, number one; number two, men's basketball; number

18  three, women's basketball?

19          MR. FULLER:  Objection.

20          THE WITNESS:  Again, not in all cases.  I

21  think that there are certain outliers.  And as I -- when I

22  say an outlier, let's say Big Ten hockey.  Very big in

23  that part of the country.  Probably bigger than women's

24  basketball.  You move down to the Southeast Conference,

25  well, they don't play hockey, so women's basketball is



1   probably higher than a sport that doesn't exist.

2                  But there are -- there are regional flavors

3   or regional specialties, whatever you want to call them,

4   that would outrate women's basketball.  You know, the

5   hockey analogy for the bid -- or for the Big Ten being

6   better than basketball is probably -- I probably misspoke

7   there, but certainly there are possibilities where it

8   would exceed -- there are sports that would exceed women's

9   basketball.  You know, it's growing, and, you know, this

10  was a very good year, but a very good year does not a

11  trend make.

12                 But I think generally what you're saying is

13  correct, but there are certain outliers that would eclipse

14  the value of women's basketball.

15  BY MR. GREENSPAN:

16      Q.   Okay.  And maybe you've just predicted or just

17  pre-empted the question I was going to ask.  But in sort

18  of my very broad-stroke pecking order of football followed

19  by men's basketball followed by women's basketball, let me

20  try to see if I fairly summarize your testimony:

21                 Generally, that is the pecking order, point

22  one.

23                 And point two is, there are some outliers.

24  The outliers concern when there is a sport that would take

25  women's basketball's third position in that hierarchy.



1        A.    That's correct.

2        Q.    Okay.  As a general proposition, not with respect

3   to any one particular broadcast agreement, do you have an

4   opinion about the relative value, football, men's

5   basketball, women's basketball?

6        A.    Yes.

7        Q.    What is it?

8        A.    I would say that football is clearly the driver;

9   basketball a distant second; women's basketball, even less

10  than Mr. Desser puts forth.

11       Q.    Your opinion is that Mr. Desser has overvalued

12  women's basketball.

13       A.    Yes.

14       Q.    Do you have an opinion -- again, we're talking

15  broad strokes, not about a particular broadcast rights.

16  If there's a hundred broadcast dollars across the nation

17  for Power Five and Notre Dame sports -- hundred bucks,

18  that's it -- how many dollars are going to go to football,

19  how many dollars are going to go to men's basketball, and

20  how many dollars are going to go to women's basketball?

21       A.    That's not --

22             MR. FULLER:  Objection.

23             THE WITNESS:  That's not something I really

24  tore apart to put forth.

25



173

```
 1        D E P O S I T I O N   S I G N A T U R E   P A G E
          IN RE COLLEGE ATHLETE NIL LITIGATION
 2         Assignment No. J9703138

 3

 4                  DECLARATION UNDER PENALTY OF PERJURY

 5

 6                  I declare under penalty of perjury that I

 7     have read the entire transcript of my deposition taken in

 8     the above-captioned matter or the same has been read to

 9     me, and the same is true and accurate, save and except for

10     changes and/or corrections, if any, as indicated by me on

11     the DEPOSITION ERRATA SHEET hereof, with the understanding

12     that I offer these changes as if still under oath.

13

14

15                  Signed on the  19   day of

16          June          , 2023.

17

18

19

20                       BOB THOMPSON

21

22

23

24

25
```

**ERRATA SHEET**

Case Name: In Re: College Athlete NIL Litigation
Deposition Date: June 8, 2023
Deponent: Bob Thompson

| Page | Line | Now Reads | Should Read | Reason |
|------|------|-----------|-------------|--------|
| 11 | 18 | he pledged to the team | he pledged to buy the team | Clarification |
| 19 | 13 | together a regional | together a number of regional | Clarification |
| 22 | 16 | ARS | Ares | Transcription error |
| 22 | 24 | ARS | Ares | Transcription error |
| 37 | 7 | retain | remain | Transcription error |
| 48 | 2 | reached a | reached an | Transcription error |
| 70 | 14 | thing | the same | Clarification |
| 88 | 25 | Saturday | Sunday | Clarification |
| 108 | 24 | than men's | than with men's | Clarification |
| 110 | 5 | bid | Big | Transcription error |
| 113 | 16 | revenues | expenses | Clarification |
| 145 | 24 | SC | USC | Clarification |
| 150 | 13 | school | schools | Transcription error |

Bob Thompson
July 17, 2023

```
 1                    REPORTER'S CERTIFICATION

 2             I, Eve K. Burton, Registered Professional

 3    Reporter, Certified Realtime Reporter, Certified Reporter

 4    in and for the State of Arizona, and Certified Shorthand

 5    Reporter in and for the State of California, do hereby

 6    certify:

 7             That the foregoing witness was by me duly

 8    sworn; that the deposition was then taken before me at the

 9    time and place herein set forth; that the testimony and

10    proceedings were reported stenographically by me and later

11    transcribed into typewriting under my direction, all to

12    the best of my skill and ability; that the foregoing is a

13    true record of the testimony and proceedings taken at that

14    time; that the witness has requested a review pursuant to

15    Rule 30(e)(2); that I am a disinterested person to said

16    action.

17

18             IN WITNESS WHEREOF, I have subscribed my

19    name this 12th day of June, 2023.

20

21

22    _____
      Eve K. Burton, RPR, CRR,
      AZ Certified Reporter No. 50261
23    CA CSR No. 12527

24

25
```

