# EXHIBIT 2

To the Declaration of
Rakesh N. Kilaru

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3               OAKLAND DIVISION

4

5  GRANT HOUSE and SEDONA PRICE,  )

6  on behalf of themselves and    )

7  all others similarly situated, )

8          Plaintiffs,           ) Civil Action No.

9     v.                         ) 4:20-cv-03919-CW

10  NATIONAL COLLEGIATE ATHLETIC    )

11  ASSOCIATION; PAC-12 CONFERENCE;)

12  THE BIG TEN CONFERENCE, INC.;  )

13  THE BIG TWELVE CONFERENCE,     )

14  INC.; SOUTHEASTERN CONFERENCE; )

15  and ATLANTIC COAST CONFERENCE, )

16          Defendants.            )

17  _____ )

18        ** NETWORK STRICTLY CONFIDENTIAL **

19

20     VIDEO DEPOSITION OF BARBARA OSBORNE

21       June 15, 2023, 9:41 a.m. CST

22          150 North Riverside Plaza

23          Chicago, Illinois 60606

24

25  Job No. J9780979



1          THE VIDEOGRAPHER:  Good morning.  We are

2    now on the record.  The time is now 9:41 a.m.

3    Central Standard time.  Here begins Media No. 1 on

4    the videotaped deposition of Barbara Osborne.

5          Today's date is June 15, 2023, taken in

6    the matter of In Re College Athlete NIL Litigation

7    filed in the United States District Court,

8    Northern District of California, Oakland Division.

9    Case number is 4:20-CV-03919.

10         My name is Gabriel Martin, and I'm the

11   videographer.  The court reporter today is

12   Cynthia Conforti, both with Esquire Deposition

13   Solutions.

14         Will the reporter please swear in the

15   witness.

16               (Witness sworn.)

17               BARBARA OSBORNE,

18   having been duly sworn, was examined and testified

19   as follows:

20                  EXAMINATION

21   BY MR. SIEGEL:

22      Q  Good morning, Professor Osborne.  Good

23   morning.

24      A  Morning.

25      Q  My name is Ben Siegel of the law firm



 1  be implicated, and the schools would have to be

 2  concerned about that because they're the ones that

 3  have to comply with Title IX.

 4          MS. CAPPS:  Objection, form.

 5          THE WITNESS:  Yes, that is true, that the

 6  schools would have to be concerned about this, and

 7  it would, if applied.

 8  BY MR. SIEGEL:

 9      Q  And it would implicate their own Title IX

10  responsibilities, correct?

11      A  It has a dramatic impact on their own

12  Title IX responsibilities, yes.

13      Q  Okay.  It implicates them.  You don't like

14  the word "implicate"?  I mean, I'm --

15      A  Yes.

16      Q  Okay.  I don't think it's controversial.

17  It's part of your opinion.  But anyway...

18          MS. CAPPS:  Objection, form.

19  BY MR. SIEGEL:

20      Q  That was the hardest paragraph, I have to

21  admit, to discuss with you.  So I'm glad we got

22  through it.

23          MS. CAPPS:  Objection, form.

24  BY MR. SIEGEL:

25      Q  In paragraph 31, please, if you look at



 1   that, can you read that to yourself quickly?

 2         Okay.  And I'm mainly going to focus you

 3   on the first sentence.

 4         As expressed in the first sentence, in

 5   this paragraph, again, assessing the broadcast NIL

 6   model in your view, the facts and law, your

 7   opinion is that the model is a, quote, violation

 8   of the Title IX regulations and policy

 9   interpretation sections governing the provision of

10   financial assistance.

11         Is that true?

12         MS. CAPPS:  Objection.  Objection, form.

13         THE WITNESS:  Yes.

14   BY MR. SIEGEL:

15      Q   Okay.  And that's one of the opinions

16   you're offering in this case?

17      A   Yes.

18      Q   Okay.  If you just turn the page to

19   paragraph 32.  Just read that to yourself again,

20   please.

21      A   I'm done.

22      Q   Okay.  Here, you know, again, assessing

23   the broadcast NIL model and your view of the facts

24   of the law, you opine what you term as the, quote,

25   payment scheme as a violation of Title IX,



1    correct?

2        A   If I were conducting an audit.

3        Q   Okay.  Again, if you were looking at this

4    payment scheme and I were asking you,

5    Professor Osborne, do you believe it's a violation

6    of Title IX, would that be your opinion?

7            MS. CAPPS:  Objection, form.

8            THE WITNESS:  So for -- in my report I

9    state that I would flag it as a violation if I

10   were conducting an audit.

11   BY MR. SIEGEL:

12       Q   Okay.  But what if you were not conducting

13   an audit?  What if the Court were asking you:

14           Based on the review that you -- that you

15   conducted, Professor Osborne, do you believe that

16   the payment scheme is a violation of Title IX?

17           MS. CAPPS:  Objection to form.

18           THE WITNESS:  So, my -- I'm -- my job is

19   not to offer a legal opinion.

20           My job is to provide an expert opinion

21   related to how this all works and Title IX.  So I

22   would -- I -- as I said, that if I'm conducting an

23   audit, I would say that this is something that

24   would be a violation of Title IX.

25



1    BY MR. SIEGEL:

2       Q  But if you were -- if you did the exact

3    same analysis not in the context of an audit, but

4    if you looked at the same materials, did the same

5    analysis that you did for the purposes of this

6    report and you were asked to opine as to whether

7    the payment scheme is a violation of Title IX,

8    would that be your opinion?

9           MS. CAPPS:  Objection, form, calls for a

10   legal conclusion -- opinion.

11          THE WITNESS:  So, again, I think the words

12   matter.  I'm not offering a legal opinion in this

13   report.

14          What I am is offering the opinion of

15   someone who is an expert in Title IX about how

16   Title IX would be implicated in this process --

17   BY MR. SIEGEL:

18      Q  Okay.  Well, you know, I guess we do have

19   disagreement here, and it's fair to say that.

20          I'm just trying to understand what you did

21   here was looked at the broadcast NIL model, looked

22   at -- looked at the facts, read depositions, and

23   then came to this conclusion that you would flag

24   the payment scheme as a violation of Title IX?

25          MS. CAPPS:  Objection, form.



1  BY MR. SIEGEL:

2      Q  Isn't that -- isn't that the conclusion

3  that you reached?

4          MS. CAPPS:  Same objection.

5          THE WITNESS:  Yes.  I said I would flag it

6  as a violation of Title IX, but I'm not offering a

7  legal opinion.  I'm providing all of the

8  information for the Court to be able to find an

9  opinion.

10  BY MR. SIEGEL:

11      Q  Okay.  So is using the word "opinion" the

12  problem?  I mean, opinion -- your view, your

13  opinion, your belief is that the payment scheme is

14  a violation of Title IX, correct?

15          MS. CAPPS:  Objection to form.

16          THE WITNESS:  Okay.  My -- my personal

17  belief is that this is.  But, again, I want to

18  state that I am not -- this report is not my legal

19  opinion.

20  BY MR. SIEGEL:

21      Q  Okay.  I dis- -- I mean, obviously I

22  disagree with that.  But because -- well, you're

23  saying not just your personal opinion because

24  that's what you want it to be.  It's your personal

25  opinion because as an expert in Title IX, when you



1      Q  Has any U.S. body with legal authority

2   ever found a school liable under Title IX because

3   of the actions of the conferences under which it

4   was a member?

5      A  Not to the best of my knowledge.

6      Q  Okay.  Yet this is one of your opinions,

7   as you just stated, based on your application of

8   your view of the facts in this case as applied to

9   Title IX statute, its governing regulations --

10        MS. CAPPS:  Objection, form.

11   BY MR. SIEGEL:

12      Q  -- that -- guidance letters and other

13   administrative guidance, correct?

14        MS. CAPPS:  Objection, form, asked and

15   answered.

16        THE WITNESS:  Yes, I conclude that this

17   model would be implicated by Title IX that I --

18   I'm not aware of anything else because that model

19   that is proposed by Mr. Rascher did not exist

20   until he created it.

21   BY MR. SIEGEL:

22      Q  Okay.

23      A  So --

24      Q  But there hasn't been any case that's ever

25   found a school --



1        MS. CAPPS:  Can you let her finish her

2    answer?  She was still speaking.

3    BY MR. SIEGEL:

4        Q  Were you finished?

5        A  No, I wasn't.

6        Q  Okay.  Go ahead.

7        A  So Mr. Dascher created the model --

8        Q  Rascher.

9        A  Rascher.  I'm sorry.

10        Mr. Rascher created the model.  My job was

11   to evaluate that model which didn't exist on the

12   face of the Earth before he created it.

13        Under those circumstances, I believe that

14   because of these principles, Title IX applies to

15   that model.

16        Q  Okay.  But as you just stated, there's

17   never been a case in the history that you're aware

18   of that for any reason has ever applied Title IX

19   to the schools because of the actions of their

20   conferences, correct?

21        A  Yes.  But there's also never been in the

22   history of anything a situation where conferences

23   were --

24        Q  There's never been --

25        A  -- behaving in the way that they --



1        MS. CAPPS:  Please let her finish.

2        THE WITNESS:  -- would be required to

3   behave under this model.

4        MR. SIEGEL:  Yeah.  I did ask a yes-or-no

5   question.

6   BY MR. SIEGEL:

7     Q  But conferences do things all the time,

8   right?  They do things -- conferences take lots

9   and lots of actions.

10        MS. CAPPS:  Objection, form.

11        THE WITNESS:  Conferences do take lots and

12   lots of actions, yes.

13   BY MR. SIEGEL:

14     Q  And there's never been an allegation that

15   because of something that a conference did, a

16   schools Title IX liability was triggered, correct?

17        MS. CAPPS:  Objection, form, asked and

18   answered.

19        THE WITNESS:  I -- yes, that is correct.

20   BY MR. SIEGEL:

21     Q  Okay.  All right.  And I'd like to go

22   through some of these factors in paragraph 78 that

23   you identify.

24        So looking at page 30 in paragraph 78, I'm

25   focused on A, but I think you explain that in more



1  detail on page 31, Section A.

2      A  Okay.

3      Q  Okay.  You say that one -- one factor for

4  this conclusion that we just discussed is that

5  conferences are governed and controlled, in your

6  opinion, by a board of directors and composed of

7  representatives of member institutions.  Correct?

8      A  Yes.

9      Q  Okay.  And, again, you didn't cite any

10  legal authority holding that this makes schools

11  liable for the actions of conferences, did you?

12      MS. CAPPS:  Objection, form.

13      THE WITNESS:  No.

14  BY MR. SIEGEL:

15      Q  Okay.  Are you an expert in entity law?

16      A  Can you tell me what entity law is?

17      Q  Like corporations law.

18      A  Oh, I -- no, I'm not an expert in

19  corporate law, no.

20      Q  Are you an expert in piercing the

21  corporate veil?

22      A  I'm not an expert in that area, no.

23      Q  Okay.  And for factual support for this

24  proposition, you cite only the declarations of

25  conference and school officials and the conference



1          THE VIDEOGRAPHER:  We are back on the

2     record at 12:38 p.m.

3     BY MR. SIEGEL:

4          Q  Good afternoon, Professor Osborne.

5             I'd like to direct your attention to one

6     of the sections that makes up Part V, and I am

7     going to skip ahead to Section 5(c) on page 42.

8             Are you there?

9          A  Yes.

10         Q  Okay.  So in this section, you discuss

11    first the financial assistance requirements of

12    Title IX, correct?

13         A  Yes.

14         Q  Okay.  And you conclude on page 42, and

15    then continuing on in that subsection, that

16    Professor Rascher's broadcast NIL model, among

17    other things, implicates the financial assistance

18    requirements under Title IX, right?

19         A  Yes.

20         Q  Okay.  And you write in paragraph 110, if

21    you just -- don't mind, it's on page 44.

22            The regulations' provision on athletic

23    scholarships are distinct from the regulations'

24    provisions on general "financial assistance" but

25    are instructive as to how Title IX compliance



1   would be measured for the broadcast payment

2   payments.

3         Do you see that?

4      A  For the broadcast model payments, yes.

5      Q  Broadcast model payments, sorry.

6         Is that -- is that an accurate statement

7   of your opinion also as you sit here today?

8      A  Yes.

9      Q  Okay.  Do you cite any legal authority to

10  support that conclusion that they're instructive?

11     A  No, I don't.

12     Q  Okay.  Are you aware of any court cases

13  that have adopted that position?

14     A  No, I don't, because no court cases have

15  had to look at this model.

16     Q  Okay.  The basis for your conclusions that

17  the regulations' provisions on athletic

18  scholarships are instructive as to how the Title

19  IX compliance would be measured for broadcast

20  payments, the ones that plaintiffs propose, is

21  based on your interpretation of the regulations as

22  applied to the facts of the case, correct?

23     A  Yes, but I think that those are the same

24  as anybody who looks at Title IX would apply it.

25     Q  Any layperson off the street?



 1      A   Any person who is required to follow the
 2   regulations.
 3          The reason I conclude this is because you
 4   have the final -- financial assistance regulation
 5   in general.  Financial aid is a subsection of
 6   that.  And then you have the athletics-specific
 7   reg- -- explanation, right?  And so because we're
 8   applying this to an athletics situation, I think
 9   it's reasonable to apply the framework that's
10   provided in the athletics section to this
11   proposal.
12          MR. SIEGEL:  I appreciate that, but I move
13   to strike that answer as nonresponsive.
14   BY MR. SIEGEL:
15      Q   Really, I understand that you want to give
16   your explanation, but your -- the time to give an
17   explanation is here in the report or in direction
18   response to my questions or if your lawyers want
19   to ask you -- your lawyers are entitled to ask you
20   questions at the end of today.  They may choose
21   to, they may choose not to.
22          But if they ask you:  Professor Osborne
23   explain your opinion, then -- that's when you're
24   entitled to do it or if you get an opportunity to
25   write another report or if you're testifying in



1      Q   Mm-hmm.

2      A   -- the institution can just fix that by

3   providing an equal amount on the other side.

4      Q   Could they?

5         MS. CAPPS:  Objection, form.

6   BY MR. SIEGEL:

7      Q   Hypothetically?

8      A   Hypothetically, it's possible.

9      Q   There's no legal -- I'm saying it's not --

10  it wouldn't be -- it wouldn't be -- it wouldn't be

11  illegal to do that?

12        MS. CAPPS:  Objection, form, calls for a

13  legal conclusion.

14        THE WITNESS:  It would not be a violation

15  or it wouldn't be illegal as far as I know.  But

16  that's not Rascher's model.

17  BY MR. SIEGEL:

18     Q   Okay.  Does Rascher's model say anything

19  about what schools or conferences can or cannot

20  provide outside of what his model provides?

21     A   No.  Rascher's model says what needs to be

22  provided, and his model provides an enormous

23  amount of benefit to men and a teeny-tiny little

24  benefit to women.

25     Q   Well, it's not what needs to be provided.



1  He is predicting what he believes the but-for

2  world would have looked like. It's not his

3  personal -- it's not his personal opinion. It's

4  his expert opinion about what the but-for world

5  would have looked like and how damages --

6  specifically in this case, his -- his model was

7  for modeling past damages, not how things should

8  be moving forward but modeling past damages,

9  correct?

10     A  Right. And in his but-for world, he based

11  that on an economic opinion and not on the

12  regulatory landscape that institutions have to

13  comply with. And he also said in his deposition

14  that he did not consider Title IX.

15     Q  The question is -- is whether or not his

16  model says that, you know, that there can't be

17  other funds provided by whomever, whether it be a

18  private donor, a conference, or a school, in

19  addition to how damages are allocated according to

20  his model. Does he say anything like that?

21        MS. CAPPS: Objection, form.

22        THE WITNESS: No, he -- he presents his

23  model, and is limited to just what he says in his

24  model.

25



```
 1   BY MR. SIEGEL:
 2       Q  Okay.  And -- okay.  I'm going to ask you
 3   to turn to page -- page 47.
 4          Okay.  In this section, you talk about --
 5   your opinion that the broadcast model directly
 6   implicates the equitable treatment provisions.
 7          Do you see that?
 8       A  Yes.
 9       Q  Okay.  And you conclude in this section
10   that the plaintiffs' broadcast model violates
11   Title IX's equitable treatment provisions,
12   correct?
13       A  Correct.
14       Q  And you cite Federal Regulation
15   34 C.F.R. § 106.41(c) and the policy
16   interpretation 7(b)(2) for this conclusion; is
17   that correct?
18       A  Yes.
19       Q  Okay.  So, again, has your interpretation
20   of those provisions and how they would provide
21   here ever been endorsed by any court or other
22   legal authority?
23          MS. CAPPS:  Object to form.
24          THE WITNESS:  I -- so the general
25   financial assistance has been supported by many
```



 1  courts.

 2  BY MR. SIEGEL:

 3      Q  I mean, how -- how -- how it would

 4  characterize -- how it would apply in this

 5  particular situation.

 6      A  No, as, again, this particular situation

 7  doesn't exist in the real world, so the Court

 8  wouldn't have been able to --

 9      Q  Okay.

10      A  -- have a case about it.

11      Q  Okay.  And outside of -- and outside of

12  your -- looking at these regulations, looking at

13  the model, looking at the background facts, did

14  you rely on any other peer-reviewed method for

15  this conclusion?

16          MS. CAPPS:  Object to form.

17          THE WITNESS:  Again, this is a brand-new

18  model, so there wouldn't have been anything out

19  there.  I'm just applying the regular regulations

20  as it would fit the situation.

21  BY MR. SIEGEL:

22      Q  Right, like any lawyer would do, correct?

23          MS. CAPPS:  Objection, form.

24          THE WITNESS:  Like any person working in

25  athletics would do; like any person who's



1   analyzing Title IX would do.

2        When I worked in college athletics, I had

3   to look at whether or not we were doing things.

4   It doesn't require me being a lawyer to do that.

5   BY MR. SIEGEL:

6     Q   Doesn't -- so any -- so you're -- are you

7   saying that your qualifications as a law professor

8   and lawyer and a law professor who studied this is

9   not part of what qualifies you to give this

10  opinion?

11    A   No --

12        MS. CAPPS:  Objection, form.

13        THE WITNESS:  -- I am saying that

14  everything about my background contributes to my

15  qualifications in -- in applying this, because

16  I've lived it as an athletic administrator; I've

17  studied it as a professor, and I've utilized my

18  lawyering skills when working for Ice Miller to

19  apply the law in that way.  But --

20  BY MR. SIEGEL:

21    Q   I'm not denying your credentials --

22    A   Right.

23    Q   Well, first of all, you were working --

24  you haven't worked at Brandeis since 1998?

25    A   This is correct.



1        Q   And that has Division III athletics.

2   There's not Division I athletics at that school,

3   correct?

4        A   That is correct.

5        Q   And no, there's no football program there,

6   correct?

7        A   That is correct.

8        Q   I'm not -- and I'm not disputing your

9   qualifications.  I'm just -- I'm honestly curious

10  as to why you are denying the fact that as a law

11  professor who studies this and researches this and

12  teaches courses about it and does research about

13  it, that you're saying that you are not providing

14  a legal analysis that frankly could appear in a

15  law review article?

16          MS. CAPPS:  Objection, form.

17          THE WITNESS:  No, I think I conduct legal

18  analysis, absolutely, but my -- my report is not a

19  legal opinion.  And you asked about my --

20  BY MR. SIEGEL:

21        Q   If the broadcast model directly

22  implicates --

23          (Simultaneous speaking.)

24          MS. CAPPS:  If you can let her finish your

25  question.  She's been interrupted



```
 1  three simultaneously times now.

 2  BY MR. SIEGEL:

 3      Q  That the disproportionate of payments is a

 4  violation of Title IX's equitable treatment

 5  provisions, that's not a legal conclusion?

 6      A  Where are you at?  I'm sorry.

 7      Q  On paragraph 118 --

 8      A  Okay.

 9      Q  -- in the last sentence, you said -- and

10  I'll be fair to you, you say fully:

11          I would flag these disproportionate

12  payments as a violation of Title IX's equitable

13  treatment provisions if I were conducting and

14  audit.  Right?

15      A  Right, I would "flag" it if I were

16  conducting an audit.

17      Q  If you were conducting an audit, wouldn't

18  the client be asking you for your legal opinion

19  about whether or not those disproportionate

20  payments violate Title IX?

21          MS. CAPPS:  Objection, form.

22  BY MR. SIEGEL:

23      Q  Isn't -- isn't -- wouldn't that be the

24  purpose of your audit?

25          MS. CAPPS:  Same objection, form.
```



1          THE WITNESS:  The purpose of my audit,

2     when I've done audits -- again, I've done an audit

3     when I was an athletic administrator.  I've done

4     audits as a consultant.  So they're hiring me as a

5     consultant, not a lawyer.

6     BY MR. SIEGEL:

7          Q  As a consultant who's a law professor,

8     who's -- who teaches courses and an expert in

9     Title IX --

10         A  Right.

11         Q  -- and has written extensively on it --

12         A  Right.  Right.

13         Q  -- correct?

14         A  And so I flagged those in an audit, and

15    it's up to the institution with what they want to

16    do with it.  I'm not...

17         Q  I understand, but if you were conducting

18    an audit, wouldn't it be -- you'd be using your

19    legal expertise to provide this opinion?

20         MS. CAPPS:  Objection, form, asked and

21    answered.

22         THE WITNESS:  My legal expertise is a part

23    of all of the expertise that I'm offering them,

24    yes.

25



```
 1   BY MR. SIEGEL:

 2      Q   Okay.  But you're still going to maintain

 3   that -- that -- when you say here that these

 4   disproportionate payments are a violation of

 5   Title IX's equitable treatment provisions, that's

 6   not a legal opinion?

 7          MS. CAPPS:  Objection, form, asked and

 8   answered.

 9          THE WITNESS:  This full sentence says I

10   would flag these disproportionate payments as a

11   violation if I was conducting an audit --

12   BY MR. SIEGEL:

13      Q   Right, but that's not a legal --

14      A   -- that's -- that's providing -- that's --

15          MS. CAPPS:  You're interrupting her again.

16   You're not allowing her to finish her answer.

17          THE WITNESS:  That's -- I'm sorry.

18          MS. CAPPS:  Please finish your answer.

19   Excuse me.

20          THE WITNESS:  That's providing advice to a

21   school that asks you to do an audit.

22   BY MR. SIEGEL:

23      Q   Okay.  Last question:

24          And that advice is not in the form of a

25   legal opinion?
```



1       A   No.

2       Q   Okay.

3       A   It's a consulting opinion.

4       Q   Okay.  So getting back to this question

5    about schools being liable for the actions of the

6    conferences under the broadcast model, I have a

7    question related to that.

8          If a conference in its broadcast agreement

9    gave more air time to men's sports, as opposed to

10   women's sports, would that implicate the schools'

11   Title IX obligations?

12      A   No.

13      Q   Why not?

14      A   Because the broadcast air time is

15   controlled by a third party.  But the revenue

16   payments that come back to the institution are

17   then used for the benefit of the entire program,

18   male and female athletes.

19          So the air time, which is response to a

20   market, as far as fan preference for watching some

21   games over other games, is what generates the

22   revenue in the broadcast rights agreement, but the

23   money that funnels back to the schools under

24   Title IX is a source of revenue, among many, that

25   has to be used in an equitable way within the

 1  program.

 2      Q  So if in the broadcast agreement itself

 3  the conference agreed that more air time would be

 4  given to men's sports than women's sports, you

 5  don't think that would implicate the schools'

 6  Title IX obligations?

 7      A  No.

 8      Q  Okay.  And what if in the broadcast

 9  agreement the conferences agreed that more

10  publicity would be provided for promoting men's

11  athletic contests versus female athlete

12  contests --

13          MS. CAPPS:  Objection, form.

14  BY MR. SIEGEL:

15      Q  -- contests -- would that violate --

16  implicate the schools' Title IX obligations?

17          MS. CAPPS:  Objection, form.  Same

18  objection.

19          THE WITNESS:  So the con- -- the

20  conference agreement with the broadcaster, you're

21  saying that that document provides more promotions

22  for men's events than women's events.

23  BY MR. SIEGEL:

24      Q  Yeah, if that were true.  Hypothetically.

25      A  Hypothetically, if that were true, I still



1          MS. CAPPS:  Objection, form.

2          THE WITNESS:  I -- yes, I looked at the

3     broadcast model and applied Title IX, and so I

4     offered my opinion as whether or not Title IX

5     would be implicated by that model.

6     BY MR. SIEGEL:

7        Q  Okay.  And again, you're opining about

8     Dr. Rascher's class-wide methodology for awarding

9     past damages to Power Five Conference football and

10    men's and women's basketball players, right?

11       A  Yes.

12       Q  Okay.  And, again, if you look at -- if

13    you look at your table of contents, Part V, one

14    conclusion is that plaintiffs' broadcast model

15    violates Title IX?

16       A  Yes.  I was going for a punchy headline.

17       Q  And you succeeded.

18          And, again, you understand that

19    Dr. Rascher's broadcast NIL damages model, in his

20    class certification report, is designed to explain

21    to the Court, among other things, how plaintiffs

22    can prove past class-wide impact and measure past

23    damages to award damages to members of the Power

24    Five men's football and basketball class and

25    women's basketball class?



1          MS. CAPPS:  Objection, form.

2          THE WITNESS:  Yes, he --

3    BY MR. SIEGEL:

4      Q  Okay.

5      A  -- proposes that model.

6      Q  And your report generally opines, if the

7    model was used as Dr. Rascher had designed it to

8    award past damages to these athletes, that it --

9    it would have implicated Title IX?

10     A  Yes.

11     Q  Okay.  In doing -- in performing this

12   task, have you identified a single case in your

13   report where a Court held that to award damages to

14   a plaintiff or a group of plaintiffs would not be

15   permitted because it would violate Title IX?

16     A  I am --

17         MS. CAPPS:  Object to form.

18         THE WITNESS:  -- not.

19   BY MR. SIEGEL:

20     Q  I'm sorry.  You're not aware, right?

21     A  I am not aware.

22     Q  Okay.  You know, in fact, a Court has

23   never held that to be true, as far as you know,

24   correct?

25     A  As far as I know, this sort of thing has



1  never been out there in the universe, and a Court

2  has never had to decide about it.

3       Q  I just want to make it clear you

4  understand the breadth of what I'm asking --

5       A  Uh-huh.

6       Q  -- you, okay?

7          A Court has never held that to award

8  damages to a plaintiff or single plaintiffs,

9  whether or not to broadcast NIL damages or for any

10  other claim, would not be permitted because to

11  award damages in such a way would violate

12  Title IX.

13       MS. CAPPS:  Objection, form.

14  BY MR. SIEGEL:

15       Q  Is that true?

16       MS. CAPPS:  Calls for a legal conclusion,

17  asked and answered.

18       THE WITNESS:  I am not aware of any cases

19  that would have cited that, no.

20  BY MR. SIEGEL:

21       Q  Okay.  And what part of Title IX would

22  prohibit distribution of NCAA and conference funds

23  as damages to student-athletes as violative of

24  Title IX?

25       MS. CAPPS:  Objection, form.



1          THE WITNESS:  So I explained in my report

2    why I think that this -- these funds would be

3    subject to Title IX because of the five criteria

4    that are expressed in the report, that those --

5    that combination of factors is what makes this

6    subject to Title IX.

7    BY MR. SIEGEL:

8        Q  I'm not -- I'm not talking about if the

9    model is implemented.  I'm saying if the Court

10   award damages as -- plaintiffs seek damages.  They

11   don't seek the conferences to actually distribute

12   the money in this way as part of a broadcast NIL

13   model.  They seek damages in this lawsuit --

14         MS. CAPPS:  Objection --

15   BY MR. SIEGEL:

16       Q  -- for what they believe to be violations

17   of the Sherman Antitrust Act.

18         MS. CAPPS:  Objection, form.

19   BY MR. SIEGEL:

20       Q  Do you understand -- do you understand

21   what I'm saying?

22         MS. CAPPS:  Same objection.

23         THE WITNESS:  Right.

24         But, again, the schools still have to

25   comply with Title IX.  By having to pay these



1    damages, they are providing payments and

2    substantial assistance in the provision of

3    payments in a way that implicates Title IX.

4    BY MR. SIEGEL:

5        Q   But a Court has never held that -- like

6    you just -- you just agreed that a Court has never

7    held that the payment of a damages awarded to a

8    plaintiff has violated or implicates Title IX in

9    any way, have you?

10       A   I said --

11           MS. CAPPS:  Objection.

12           THE WITNESS:  -- to the best of my

13   knowledge.

14   BY MR. SIEGEL:

15       Q   Okay.  So I'm just asking is there

16   something specifically in Title IX that talks

17   about how -- about past damages awards?

18       A   No, there is not.

19       Q   Okay.  And you understand that in asking

20   for these damages, plaintiffs are not seeking to

21   take back scholarships or compensation from any

22   athlete in the past who already received

23   compensation from any NCAA member school

24   conference or the NCAA itself, right?

25           MS. CAPPS:  Objection, form.



1          THE WITNESS:  No, they are seeking to

2    provide additional funding to people who didn't

3    receive that funding in the past, which, again, in

4    every year that that would have happened, going

5    back to 2016, would have created that Title IX

6    imbalance.

7    BY MR. SIEGEL:

8       Q  They're asking for damages in a lawsuit.

9    They're not asking for a broadcast model moving

10   forward of any particular form --

11      A  Right.

12      Q  -- or shape.

13         MS. CAPPS:  Objection, form.

14         THE WITNESS:  But the model says that in

15   the but-for world this is what would have happened

16   had they not had that rule.

17         And in the real world had they not had

18   that rule, those things would have been implicated

19   under Title IX.

20   BY MR. SIEGEL:

21      Q  I mean, again, I just want to make sure

22   you're answering my question:

23         That all the funds that are going to

24   athletes, male or female in the past, none of that

25   money is being taken away.  Plaintiffs aren't



 1  seeking to take away any scholarships from anybody

 2  or taking away any money or saying to any athletes

 3  in any sport, "Give us back your money because we

 4  made a claim in this lawsuit"?

 5       MS. CAPPS:  Objection, form.

 6       THE WITNESS:  No, they're not taking back

 7  any money.

 8  BY MR. SIEGEL:

 9    Q  What's being implicated here are the

10  profits, what -- many years later of NCAA and the

11  conferences.  That's what you're defending,

12  correct?

13       MS. CAPPS:  Objection, form.

14       THE WITNESS:  No, that is not.

15  BY MR. SIEGEL:

16    Q  No?  I thought this case was about damages

17  and a lawsuit against the NCAA and the

18  conferences?

19       MS. CAPPS:  Objection, form.

20       THE WITNESS:  Right.  This -- this is an

21  antitrust lawsuit that follows an economic model

22  that gives zero consideration to the real world

23  that schools live in which requires them to comply

24  with Title IX.

25



1          It's not -- you know, anybody could see

2    easily that if even small amounts impact athletics

3    departments negatively the kinds of amounts that

4    are in this model would have a massive impact on

5    an athletics department.

6        Q   Okay.  But this is not part of your

7    Title IX analysis, correct?

8          MS. CAPPS:  Objection, form.

9    BY MR. SIEGEL:

10       Q   This is an economic -- isn't this an

11   economic analysis of what a certain amount of

12   expenditures would -- would -- would -- what

13   impact that would have had --

14         MS. CAPPS:  Objection, form.

15   BY MR. SIEGEL:

16       Q   -- on athletic department budgets?

17         MS. CAPPS:  Same objection.

18         THE WITNESS:  No, this statement is in the

19   section that explains why this model can't be

20   adjusted to comply with Title IX.  So it is a

21   Title IX analysis.

22   BY MR. SIEGEL:

23       Q   It says:

24         The sheer amount of broadcast revenues

25   that would be redirected towards student-athlete



1  payments would require massive overhauls to

2  athletic programs.

3      A  Yes.

4      Q  So that necessarily would require looking

5  at the budgets and expenditures and resources of

6  athletic programs during the class period?

7      A  Yes.  And in doing a Title IX audit, you

8  regularly look at budgets and figures and all of

9  those things, but it is not an economic analysis.

10      Q  You don't cite any of those Title IX

11  audits or any other analyses that you or anyone

12  else has done that comes remotely close to

13  supporting what you're saying, do you?

14          MS. CAPPS:  Objection form.

15          THE WITNESS:  No, I'm just applying the

16  regulations, et cetera, and showing that impact,

17  but this is my conclusion, yes.

18  BY MR. SIEGEL:

19      Q  Okay.  Page 53, at the top you write:

20          It would be virtually impossible to locate

21  sufficient additional funds to ensure some form of

22  compensation for female student-athletes

23  proportional to the significant amount that

24  plaintiffs contemplate for male studies -- for

25  student-athletes under the broadcast model.



1        Is that -- is that one of your expert

2    opinions in this report?

3        A  It is.

4        Q  Okay.  Again, you did no independent

5    studies to actually support that opinion --

6           MS. CAPPS:  Objection, form.

7    BY MR. SIEGEL:

8        Q  -- did you?

9        A  No, because --

10          MS. CAPPS:  Same objection.

11          THE WITNESS:  -- an independent study is

12   not necessary when you just look at the amounts

13   that are involved and how that impacts an

14   athletics department.

15          MR. SIEGEL:  I'll strike that as

16   nonresponsive.

17   BY MR. SIEGEL:

18       Q  In addition to no independent studies,

19   again, none of the secondary sources you cite are

20   doing any kind of analysis that would be relevant

21   to -- strike that.

22          None of the secondary sources you cite are

23   analyses of how many -- how much additional funds

24   would be needed to compensate female

25   student-athletes proportional to the amounts that



 1  plaintiffs contemplate for male student-athletes

 2  under the broadcast model --

 3          MS. CAPPS:  Objection, form.

 4  BY MR. SIEGEL:

 5      Q  -- correct?

 6          MS. CAPPS:  Same objection, form.

 7          THE WITNESS:  Can you repeat that, please?

 8  BY MR. SIEGEL:

 9      Q  Yeah.  I'm just asking if any of these

10  secondary sources are examining the amount of

11  additional funds that are necessary to compensate

12  female student-athletes for certain levels of

13  expenditures for male student-athletes?

14          MS. CAPPS:  Object to form.

15          THE WITNESS:  No, none of those -- I've

16  repeated this several times, that none of those

17  studies can contemplate something that was just

18  created.

19          But on the very next page, it explains how

20  we -- you know, that from Rascher's model, there

21  are these numbers.  And those numbers, I think,

22  speak for themselves in what kind of an impact

23  they would have on an athletics department.

24  BY MR. SIEGEL:

25      Q  Okay.  You looked at -- you looked at the



```
 1        CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

 2              I, Cynthia J. Conforti, Certified

 3    Shorthand Reporter No. 084-003064, CSR, CRR, and a

 4    Notary Public in and for the County of Cook, State

 5    of Illinois, the officer before whom the

 6    foregoing deposition was taken, do hereby certify

 7    that the foregoing transcript is a true and

 8    correct record of the testimony given; that said

 9    testimony was taken by me stenographically and

10    thereafter reduced to typewriting under my

11    direction; that reading and signing was requested;

12    and that I am neither counsel for, related to, nor

13    employed by any of the parties to this case and

14    have no interest, financial or otherwise, in its

15    outcome.

16       IN WITNESS WHEREOF, I have hereunto set my

17    hand and affixed my notarial seal this 19th day of

18    June, 2023.

19

20    My commission expires: October 30, 2023

21

22

23    _____

24    Notary Public in and for the

25    State of Illinois
```

