Pages 1 - 74

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Claudia Wilken, Judge

```
IN RE COLLEGE ATHLETE NIL        )
LITIGATION                       )   NO. 4:20-CV-03919 CW
_____)
```

Oakland, California
Thursday, September 21, 2023


**TRANSCRIPT OF REMOTE ZOOM VIDEO CONFERENCE PROCEEDINGS**


**APPEARANCES VIA ZOOM**:

For Plaintiffs:

HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
BY:  **STEVE W. BERMAN, ATTORNEY AT LAW**


HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
BY:  **BENJAMIN J. SIEGEL, ATTORNEY AT LAW**


WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
BY:  **JEFFREY L. KESSLER, ATTORNEY AT LAW**
     **DAVID L. GREENSPAN, ATTORNEY AT LAW**


**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED REMOTELY BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
CSR No. 7445, Official U.S. Reporter

```
1   APPEARANCES VIA ZOOM:   (CONTINUED)

2   For Plaintiffs:
                         WINSTON & STRAWN LLP
3                        101 California Street, Suite 3900
                         San Francisco, California 94111
4                  BY:   JEANIFER E. PARSIGIAN, ATTORNEY AT LAW
                         DREW H. WASHINGTON, ATTORNEY AT LAW
5

6   For Defendant National Collegiate Athletic Association:
                         WILKINSON STEKLOFF
7                        2001 M Street, NW
                         Washington, D.C. 20036
8                  BY:   RAKESH KILARU, ATTORNEY AT LAW

9   For Defendant Pac-12 Conference:
                         COOLEY LLP
10                       101 California Street, Fifth Floor
                         San Francisco, California 94111
11                 BY:   WHITTY SOMVICHIAN, ATTORNEY AT LAW

12  For Defendant The Big Ten Conference, Inc.:
                         MAYER BROWN LLP
13                       71 South Wacker Drive
                         Chicago, Illinois 60606-4637
14                 BY:   BRITT M. MILLER, ATTORNEY AT LAW

15  For Defendant The Big Twelve Conference, Inc.:
                         SIDLEY AUSTIN LLP
16                       2021 McKinney Avenue, Suite 2000
                         Dallas, Texas 75201
17                 BY:   NATALI WYSON, ATTORNEY AT LAW

18  For Defendant Southeastern Conference:
                         ROBINSON, BRADSHAW & HINSON, P.A.
19                       101 North Tryon Street, Suite 1900
                         Charlotte, North Carolina 28246
20                 BY:   ROBERT W. FULLER, ATTORNEY AT LAW

21  For Defendant Atlantic Coast Conference:
                         LATHAM & WATKINS LLP
22                       505 Montgomery Street, Suite 2000
                         San Francisco, California 94111
23                 BY:   CHRISTOPHER S. YATES, ATTORNEY AT LAW

24

25
```

| | |
|---|---|
1 | **<u>Thursday - September 21, 2023</u>** <u>2:46 p.m.</u>

2 <center><u>P R O C E E D I N G S</u></center>

3 <center>---o0o---</center>

4      **THE CLERK:**  Just a reminder to everyone observing:

5 These proceedings are being recorded by this Court and court

6 reported.  Any other recording of this proceeding, either by

7 video, audio, including screenshots or other copying of the

8 hearing, is strictly prohibited.

9      The United States District Court for the Northern

10 District of California is now in session, the Honorable Claudia

11 Wilken presiding.

12      Calling Civil Action 20-3919, In Re College Athlete

13 NIL Litigation.

14      Counsel, please state your appearance for the record,

15 beginning with the plaintiff.

16      **MR. BERMAN:**  Your Honor, Steve Berman on behalf of the

17 plaintiffs.

18      **MR. KESSLER:**  Good afternoon, Your Honor.  Jeffrey

19 Kessler on behalf of the plaintiffs.

20      Also here today is my partner, Mr. Greenspan, David

21 Greenspan, and Jeanifer Parsigian, who are also in attendance,

22 and our associate Drew Washington.  And also, Ben Siegel is

23 also here today from the Hagens Berman firm.

24      Thank you, Your Honor.

25      **MR. KILARU:**  Good afternoon, Your Honor.  For the

1  defendants, Rakesh Kilaru on behalf of the NCAA.

2          And also on the screen are Robert Fuller for the SEC,

3  Chris Yates for the ACC, Whitty Somvichian for the Pac-12,

4  Natali Wyson for the Big Twelve, and Britt Miller for the

5  Big Ten.

6          **THE COURT:**  Okay.  And did you want to state the

7  appearances of any others who aren't expected to argue but who

8  are present and would like to state their appearance?  You can

9  mention their names, if you'd like.

10          **MR. KILARU:**  No, Your Honor.  I think we'll just leave

11  it at that for now.  Thanks.

12          **THE COURT:**  And I am a little concerned about this

13  person at 1703...450 who seems to be here by phone.  I don't

14  know who they are or how they got promoted.

15          I guess they're gone.  That takes care of that,

16  whoever they were.

17          Okay.  So we have on the screen all the attorneys who

18  are expected to speak, I take it.  And we have the court

19  reporter, Ana Dub, we have the Courtroom Deputy, Jenny Galang,

20  and the law clerk also on the screen.  And I guess I've got you

21  all on one screen.  Nobody's on the next screen.

22          We're here today for a number of things, three *Daubert*

23  motions, two from defendant and one from plaintiff; motions for

24  class certification, a couple of, I guess you could call them,

25  housekeeping matters or efforts to bring in new things, and a

1  case management conference.

2         So why don't we start with the, sort of, housekeeping

3  matters.  We have a request by defendants to add to the record

4  or do something with additional pages from the additional

5  deposition that was taken of the plaintiffs' expert

6  Dr. Rascher.

7         And I can't remember now whether we have a response.

8  Yeah, I guess we have a response.

9         I guess what I would consider doing or would throw out

10 there is letting the defendants file a five-page brief on

11 Monday morning, explaining what it is they think the

12 supplemental deposition does to help them with their class cert

13 motion, and have the plaintiffs respond to that with their

14 five pages two days after that.

15         How does that sound?

16         **MR. KILARU:**  Your Honor, we're not --

17         **THE COURT:**  Hearing no objection, I'll assume everyone

18 thinks it's a great idea.

19         And we'll move on to the matter raised by plaintiffs

20 which is a claim that defendants have suddenly disclosed a lot

21 of people and things that hadn't been disclosed before or in a

22 timely fashion, and plaintiffs think that those people or

23 things should be -- should not be admitted because of the late

24 disclosure.

25         I haven't seen, I don't think, any response on that.

 1   There was some hope that perhaps some sort of meet and confer

 2   could be done to resolve that.  I don't want to argue it now

 3   because I don't know what the facts are.

 4          But if someone could give me a brief, one- or

 5   two-sentence description of the state of the problem, then I

 6   can maybe think of something to do about that also.

 7          **MR. KILARU:**  Sure, Your Honor.  I'm happy --

 8          **THE COURT:**  Mr. Kilaru, maybe you'd like to tell us

 9   what's up with that.

10          **MR. KILARU:**  Yes, I'm happy to, Your Honor.

11          The close of discovery isn't for, I believe, a month.

12   As we're continuing to prepare the defense of the case, we have

13   some additional witnesses that we believe have information that

14   bears on the case.  We wanted to disclose these witnesses

15   during discovery as opposed to after discovery.  There was a

16   little bit of a skirmish about that in the last case, and we

17   think it's proper for us to do so within discovery.

18          And we're happy to take depositions out of time of

19   these individuals and work with plaintiffs, as we've done on a

20   number of other occasions, including party witnesses, to do so.

21          **THE COURT:**  Have you made a complete list of all such

22   things and why you need them and why you didn't tell us about

23   them earlier?

24          **MR. KILARU:**  We're in the process of doing that,

25   Your Honor.  I believe two conferences have filed theirs.  The

1    rest will file ours -- NCAA will file ours promptly.  It just

2    relates to our continued investigation of the claims and the

3    continued evolution of the claims as we hear about the theories

4    plaintiffs are developing, including through their reply

5    briefs.

6          **THE COURT:**  Okay.  Well, I guess maybe what we could

7    do, then, is have you also on Monday morning, maybe not file

8    but submit to plaintiffs your proposal as to the new people

9    that you want to now disclose and why you want them and why you

10   didn't tell them earlier, and then have a meet and confer and

11   see if you can agree on any of them.

12          And if you can't, then I guess we'll have to have some

13   sort of brief motion practice, which I'd probably refer to

14   Judge Cousins, and in which I would ask Judge Cousins to

15   consider the reason for late disclosures and compare it with

16   the importance to the interests of justice of allowing the

17   witnesses and making decisions based on that sort of

18   calculation.

19          So how does that sound?

20          **MR. KILARU:**  Your Honor, we're happy to do that.

21          The only thing I would note is that, at least just

22   from our perspective, these aren't late disclosures.  Discovery

23   is still open and the plaintiffs are still serving subpoenas

24   and we're serving subpoenas.  The discovery period doesn't

25   close for a month.  So this isn't a situation where fact

```
 1   discovery is closed and we're coming in afterwards and trying
 2   to expand the record.  The record is still being developed.
 3           THE COURT:  Right.  And I don't know who these people
 4   are or what, but there are certain things that are subject to
 5   initial disclosures and certain things that are subject
 6   probably to answers to interrogatories and that sort of thing.
 7   And it may -- I'm just guessing here, based on prior
 8   experience, that there might be some argument that these people
 9   should have been disclosed earlier in some other format.
10           So if there isn't, then great, we don't have a
11   problem; but if there is, then we will be balancing the
12   importance of the testimony against the reasons for the
13   disclosure at the time that it was disclosed.
14           Does this sound all right to the plaintiffs?
15           MS. PARSIGIAN:  Yes, Your Honor.  We will accept
16   whatever they submit to us on Monday and meet and confer and
17   then get back to the Court if there is a continuing issue.
18           THE COURT:  Okay.  Now, these things aren't going to
19   impact my preparation of the class cert order, which I don't
20   want to delay, but -- so I don't feel the need to set an
21   aggressive schedule for resolving that.  I'll just trust you
22   all to resolve it as quickly as you can.  And to the extent
23   more discovery is required, keep in mind that I don't want it
24   to interfere with the continued progress of the case or with
25   the trial.
```

1          **MS. PARSIGIAN:**  Understood.

2      (Stenographer interrupts for clarification of the record.)

3          **MS. PARSIGIAN:**  This is Jeanifer Parsigian.  Thank you

4  very much.

5          **THE COURT:**  I thought she was asking me.

6                          (Laughter.)

7          **THE COURT:**  Okay.  So what else, on the short list?

8          Well, why don't we just talk about case management.

9  Well, I'll do that last.

10         We'll talk about the class certification motion.  Let

11  me start by confirming with defendants that you are not

12  opposing certification of an injunctive relief class.  Am I

13  right?

14         **MR. KILARU:**  That's correct, Your Honor.

15         **THE COURT:**  Okay.  So we're talking about the three

16  proposed damage classes; and in that regard, we're talking

17  about *Daubert* challenges to three of the experts.

18         I don't have a lot of questions about the class

19  certification or the experts, but the thing that I'd like to

20  hear about first -- and after that, I'll let you address the

21  things you think you need to -- but I'm not sure I'm grasping

22  the ideology and continued viability of the so-called

23  substitute -- substitution effect.

24         So what I'd like to do, if I could, is to have the

25  defendants start out from the beginning, like with basics

1  about:  What is a substitution effect?  Why does it matter in

2  this case?  Where did it come from?  And then I'll ask the

3  plaintiffs to tell me what they think of that.

4          So I don't want to go on forever about it, but if you

5  could just give me a back-to-basics explanation of what the

6  substitution effect is, where it came from, and what it's doing

7  in the case at this point, I would appreciate it.

8          Mr. Kilaru, would that be you?

9          **MR. KILARU:**  Yes, that would, Your Honor.  And I'm

10  happy to --

11          **THE COURT:**  Am I pronouncing your name right?

12          **MR. KILARU:**  You are.  Thank you.

13          **THE COURT:**  Okay.

14          **MR. KILARU:**  So I think the substitution effect

15  originates from the Rule 23 issues of predominance and

16  manageability, and it goes to the question of whether the

17  plaintiffs have a model, they can actually measure injury on a

18  reliable basis and include in the class only people who are

19  actually injured.  So that's the core question under the

20  substitution effect.

21          **THE COURT:**  Well, but is that -- the class is defined

22  in a certain way, and it's pretty straightforward.

23          **MR. KILARU:**  Yes, Your Honor.

24          **THE COURT:**  And --

25          **MR. KILARU:**  Sorry.

1      **THE COURT:**  -- at least as to two of them, the

2  broadcast and the video games, they're sort of, by definition,

3  included because they couldn't have been included -- or they

4  couldn't engage in that sort of activity with the preexisting

5  NCAA rules, and they claim that they should be able to and, in

6  so doing, would make money.

7      So there's not really a question of who they are.

8  It's the people who got on those teams who would be in a

9  position to play games on TV and play games in video games.

10      It's possibly a slightly different question on the

11  third-party NIL, but we don't really have a problem with

12  figuring out who's in the class.

13      **MR. KILARU:**  Your Honor, the issue is figuring out

14  who's injured and whether the class consists of people who are

15  injured and injury can be determined on a class-wide basis.

16      So just as in *O'Bannon*, you have a group of

17  individuals, and the question is:  Were those individuals

18  actually injured or not?

19      And the substitution effect makes it impossible to

20  determine that because, yes, the plaintiffs have a group of

21  people from 2016 through 2020 who they claim are injured, but

22  some of those people owe their spots in the class to decisions

23  by others that would have been different in the but-for world

24  that the plaintiffs are positing.

25      **THE COURT:**  Well, but you just can't unwrap facts for

1    years.   I mean, yes, somebody might have broken their leg when

2    they were in first grade and not be able to play football, but

3    the fact is, we end up with some teams with certain people on

4    them.   And, yes, it might be a question whether they can prove

5    that all those people were actually injured, but it's not hard

6    to prove who's on the teams.   And either they were all injured

7    by not being able to get any broadcast revenues or none of them

8    were.

9          But it's not a question of, oh, there's -- here's 15

10   people and if only something had been different, it would be a

11   different 15 people.   That just isn't that type of case.   It's

12   not like some of the other cases like -- well, some of the

13   other cases where this sort of issue has come up.

14        **MR. KILARU:**   Respectfully, Your Honor, I don't think

15   we agree with that.

16        **THE COURT:**   The problem with *O'Bannon* was it was a

17   question of who was in the video games.

18        **MR. KILARU:**   Your Honor, that was one of two problems

19   in *O'Bannon*.   One problem was figuring out who was in the video

20   games.   The other problem was figuring out who in the putative

21   class was actually injured or not.   They're separate parts of

22   the opinion.

23        There was a first part of the opinion that talked

24   about the substitution effect and the second part of the

25   opinion that talked about the difficulty of figuring out who

1   was in the video game or who was in the live sports broadcast.

2            On the first part, the substitution effect, what

3   the Court said, what Your Honor said is we have this group of

4   individuals and the plaintiffs are saying that they are all

5   injured.  They're the people who competed in Division I

6   athletics for the last four years.

7            In this case, it's actually a much smaller group.

8   It's just people, to start with the broadcast class, who

9   competed in a Power 5 school in just the sports of football and

10  basketball for the last four years.

11           So the question under Rule 23 is:  Can they show that

12  all of those people were injured?  And, yes, they say that they

13  were all injured, but the fact is that that cannot be

14  determined on a class-wide basis.

15           Because, let me just give you a specific example.  You

16  could have a student athlete at the University of Kentucky play

17  basketball from 2019 to 2020.  That person's in the class that

18  the plaintiffs have defined.  But in the but-for world the

19  plaintiffs are positing, there are other players who could have

20  taken that person's spot, someone who was at Kentucky the year

21  before and decided to stay for longer because of the increased

22  compensation that they can get, under the model, of hundreds of

23  thousands of dollars; or someone --

24           **THE COURT:**  Okay.  But they didn't.  They didn't.

25  Yes, maybe they could have, but they didn't.  And the people

1   who are on the team are the people who are on the team, not

2   people who maybe under some other scenario might have been on

3   the team.

4        **MR. KILARU:**  Yeah, but, Your Honor, this is an

5   antitrust case, and they have to show that those people are

6   actually injured, not just that they happened to be on the

7   team.

8        **THE COURT:**  Well, that's a different question.  That's

9   a different question.  There, we have to decide whether there

10  would have been agreements and what they would have been worth

11  and how they would have been divided and all that.  That's a

12  whole different question.  That's not a question of who's in

13  the class and who isn't.

14       But I think I see what you're saying, and let me just

15  ask the plaintiffs if they could respond to it briefly.

16       **MR. BERMAN:**  Good afternoon, Your Honor.  Steve Berman

17  on behalf of the class.

18       We don't have to -- as you pointed out, we know who's

19  in the class.  And all we have to do in a but-for world is to

20  say these people were subject to the restraint; they would have

21  been subject to the restraint four years ago.  We have no

22  reason, no evidence to suggest otherwise, that there'd be

23  different people.  What you heard from counsel today is pure

24  speculation, that some University of Kentucky basketball player

25  would have perhaps done something different.  They have no

1    evidence of that.

2          And Your Honor already found in the *Alston* case, where

3    they postulated the same kind of substitution effect, that it

4    was pure speculation.  Pure speculation is not enough at the

5    class certification hearing.

6          Judge Koh in the *High-Tech* case, which was a labor

7    case, a labor market case, said in determining the but-for

8    world -- and we cited this case -- we don't have to figure out

9    how the world would have looked differently.  We know who the

10   employees are today.  We take those employees, and we see

11   whether they were injured.  We don't try to re-create who else

12   might have come into the labor market in the high-tech

13   industry.  It'd be like -- if you could use this argument,

14   there would be no certification of any case.

15         Take a price-fix of chickens.  Right?  I happen to be

16   doing chickens right now, so it's on my mind.  They could say:

17   Well, look, if the price of chicken had been lower, someone

18   else besides the plaintiff would have bought that chicken; and

19   therefore, we don't know whether the plaintiff would have been

20   injured in the but-for world.

21         That's just not the law.  And I point out, very

22   briefly, the law has changed since the *O'Bannon* case.  The

23   defendants have no answer to the *Olean* case.  And the *Olean*

24   case says you can have a class even if there's up to 28 percent

25   of the people aren't injured.

1          So here, there's speculation, speculation that a few

2    people might not have been injured; and under *Olean*, that

3    doesn't cut it anymore.  That postdates Your Honor's opinion in

4    *O'Bannon*.

5          And you mentioned something about the lost opportunity

6    class, and maybe there's some legs to the substitution theory.

7    They don't assert the substitution theory to the lost

8    opportunity class.

9          **THE COURT:**  Oh, right.  Good point.

10         **MR. BERMAN:**  And there's a reason for that, just to

11   enlighten Your Honor for a second.  In the lost opportunity

12   class, we have someone who had a NIL opportunity after the

13   rules were lifted.  So we know who they are.

14         **THE COURT:**  Who had a what opportunity?  Oh, a NIL

15   opportunity?

16         **MR. BERMAN:**  NIL opportunity.  We know who they are.

17   They signed a deal.

18         And so we're just saying for those people, they would

19   have signed other deals during the four years going backward,

20   because Rascher explained how the market would have worked.  So

21   there is no substitution argument whatsoever.

22         **THE COURT:**  Can you distinguish this case from

23   *O'Bannon*?

24         **MR. BERMAN:**  Well, I can distinguish it in a number of

25   ways.

1            One, change of law, *Olean*.  You didn't have the

2    benefit of that opinion.

3            Two, you were concerned mostly in *O'Bannon*, as I read

4    the order, about the difficulties of trying to figure out who

5    was in those films.  There was no way --

6            **THE COURT:**  Well, that's clearly a separate issue and

7    not relevant here.  So I was just more interested in counsel's

8    description of the first half of the *O'Bannon* case.

9            **MR. BERMAN:**  Sure.  In *O'Bannon*, the plaintiffs'

10   experts conceded that there was substitution.

11           We not only don't concede there was substitution, but

12   we point to the *Alston* case, where there have now been benefits

13   paid.  They raised this argument in *Alston*.  You rejected it.

14   We have real-world testimony from Dr. Rascher.  There has been

15   no substitution, zero.  Kids are not moving because all of a

16   sudden they get educational benefits.

17           And we also know from Dr. Rascher that -- for example,

18   they postulate that maybe some athletes would have gone pro --

19   right? -- instead of staying in school; and therefore, we don't

20   have a match-up.  Maybe these kids in the class would be

21   professional people.

22           Well, Dr. Rascher has put forth in his report,

23   paragraphs 228, and the reply, 157-164, there are very few

24   slots available to go pro; and it's highly improbable that if

25   you're a student athlete and go pro and there's 45 basketball

1    slots, that the fact you might get some more NIL money in

2    college would change your decision.  It's just not plausible.

3    The opportunity to go pro is too great.

4            **THE COURT:**  Okay.  Did you want to reply, Mr. Kilaru,

5    particularly addressing *Olean*?

6            **MR. KILARU:**  Yes, Your Honor, a few things.

7            First, this has no similarity to *Olean* whatsoever.

8    That's a commodity case where the plaintiffs spit out an

9    overcharge for a group of people, and some of the people had a

10   positive overcharge and some didn't.  And the Court said:

11   Well, I look at that.  I can see who's injured and who's not

12   from the model.

13           That's very different from what you have here.  All

14   the plaintiffs have told you is that they have a model that

15   tells you who is in their putative class.  You can get that by

16   just looking at rosters.  That doesn't tell you who's injured.

17   It doesn't tell you who's actually injured.

18           And the logic of *O'Bannon* applies perfectly well here

19   because the logic of *O'Bannon* is, someone might stay in school

20   longer as a result of increased compensation.  We have proof of

21   that.  Someone might go to one of these schools --

22           **THE COURT:**  But it's not obvious -- I mean, it is --

23   whether or not they were injured is, I guess, a question; but

24   either they all were or none of them were.  They're all --

25           **MR. KILARU:**  Your Honor --

1          **THE COURT:**  -- similarly situated.

2          They're all coming in and they're all going to be on

3     TV, and either they're all going to get paid or none of them is

4     going to get paid.

5          **MR. KILARU:**  Your Honor, with apologies, that's not

6     what you said in *O'Bannon*, and that's not true.

7          In *O'Bannon*, the question was this.  Yes, we have

8     someone who we know is in the class.  But what Your Honor said

9     is:  We don't know if that person would have been displaced

10    from the class by someone staying longer in college as a result

11    of increased compensation or them getting booted out of

12    Division I entirely by another athlete who is excited about the

13    opportunity they took.

14         In this case, you have *O'Bannon* dialed up to 11

15    because instead of what we were talking about in *O'Bannon*,

16    which was the modest additional amount of compensation, you

17    have hundreds of thousands of dollars being put on the table in

18    this hypothetical but-for world.

19         Some student athletes, under the plaintiffs' model,

20    could make 300-, 400,000 dollars over a four-year span, and

21    that's going to implicate the exact same effects you found

22    earlier.  Are some students going to stay later?  Yes.  We have

23    proof of this that we put in our brief, proof of student

24    athletes who today are staying in school longer because of the

25    other NIL opportunities that they have, before you even add

1    $400,000 of additional compensation in the mix.

2            We also have a new substitution effect problem here

3    because the plaintiffs have limited their class to just the

4    Autonomy 5 schools.  So that's just 69 institutions.  So there

5    are tons of student athletes every year who go to schools in

6    the Big East.

7            Just to give you a concrete example, the last two

8    men's and women's -- the last men's national championship

9    champion was the Yukon men's team, and the women's Yukon team

10   is historically great.  They're not in the A5.  There are

11   players every year who go to those schools --

12           **THE COURT:**  Can we go with P5 here?

13           **MR. KILARU:**  Sure.  Happy to do P5.

14           **THE COURT:**  I see P5 and A5.

15           **MR. KILARU:**  There are players --

16           **THE COURT:**  I keep wondering:  Is there a difference?

17   So if we could just agree --

18           **MR. KILARU:**  I don't think there is.

19           **THE COURT:**  -- on P5 for all purposes.

20           **MR. KILARU:**  I'm happy to use P5.

21           **THE COURT:**  Thank you.

22           **MR. KILARU:**  Your Honor, there's people who go to

23   schools in the Big East that are not part of the P5.  These are

24   elite basketball recruits.  They are recruited on par with the

25   people who are in the putative class.

1          Those people will make different decisions if in the

2     P5, they can get what they currently get; or outside the P5,

3     they can get what they currently get; and in the P5, they can

4     get hundreds of thousands of dollars more.  That is the literal

5     same logic as in *O'Bannon*, but it's much more pronounced here

6     because of their class and their claims.

7          **THE COURT:**  What about counsel's analogy to the

8     chickens; that while there may be scenarios in which it's a

9     different chicken, it doesn't really matter because there's

10    going to be -- some chicken is going to be there?  Or that

11    somebody else is going to -- if you don't buy the chicken for

12    this price, somebody else is going to buy the chicken?

13         And that may be true and it may have some sort of

14    impact on something, but it doesn't have an impact on who's in

15    the class.

16         **MR. KILARU:**  Your Honor, I think there's a

17    fundamental difference.

18         **THE COURT:**  I didn't say it as well as he did, but

19    could you respond to Mr. Berman's --

20         **MR. KILARU:**  Sure, Your Honor.  There's a --

21         **THE COURT:**  -- argument that if this were true, then

22    every antitrust case could have the same -- could have the same

23    sort of argument to be made:  Oh, what if this?  What if that?

24    What if somebody else did something else?

25         **MR. KILARU:**  I think if what the plaintiff said is

1   true, every antitrust case would be certified, because the

2   plaintiffs would say:  We've identified every person who's in

3   the class; there was an injury; therefore, we get to move on.

4          I think the law requires them to posit what the

5   but-for world is and who the people are who are actually

6   injured.

7          And, again, this is very different from a commodity

8   case.  This is not a case where there's a bunch of purchases

9   and people buy chickens or they don't.  This is where students

10  go to school and what decisions they make when they get there

11  about how long to stay there and when they decide to leave.

12  That's a fundamentally different set of decisions.  It involves

13  behavioral choices and economic choices.

14         And the plaintiffs have no model that actually

15  accounts for those distinctions and those choices.  And the

16  model that they generated of the but-for world, I think, skews

17  those choices and will actually cause -- would have caused

18  different people to make different choices.  So their model

19  does not tell you who was actually injured.  And if one were to

20  certify the class that they've identified, there would be a

21  significant number of people who are uninjured; and unlike in

22  the chicken case, we wouldn't know who they are.

23         In the chicken case, you have a model --

24         **THE COURT:**  We would or wouldn't?

25         **MR. KILARU:**  We would not.

1          In the chicken case, you have a model, and it says

2     here are the transactions that have zero overcharge and here

3     are the transactions that actually have an overcharge.

4          In this, we would instead be trying to figure out who

5     would have attended these schools.

6          And I think the last thing I will say on this is,

7     think about it from the perspective of an individual case.  If

8     an individual student athlete brought this claim, we would be

9     entitled to present evidence that that individual student

10    athlete wouldn't have been in the Power 5 in the but-for world

11    that they're positing because they would have been displaced by

12    someone who played their position and stayed longer for the

13    extra $100,000 or displaced by another elite recruit who took

14    their spot because that elite recruit wanted the $100,000.

15         But to figure out who is actually in the class on a

16    class-wide basis, you'd have to look at every individual

17    student athlete; you'd have to figure out if they would have

18    maintained their spot in the but-for world; who might have

19    taken it.  And that's why this is different from a chicken case

20    where you just have a set of mathematical transactions and an

21    algorithmic model.

22         **THE COURT:**  Okay.

23         **MR. BERMAN:**  Your Honor, can I go very briefly?

24         **THE COURT:**  Okay.

25         **MR. BERMAN:**  Three points, Your Honor, less than two

minutes.

There are three cases that have rejected the recon- -- the effort by counsel here to reconstruct a but-for world in the way he thinks we have to do it.

*In Re National Football League Sunday Ticket Antitrust Litigation*.  It's not binding, but it's from the Central District of California, 2023 case, very recent.  The Court ruled that you can't defeat class certification by saying, well, class members would face different effects in a but-for world based on each members' unique preferences.

In *High-Tech*, again, Judge Koh, in certifying a labor market class, the Court refused to consider whether higher wages in the but-for world would have caused the workers who held those jobs in the actual world to be replaced.

And finally, in the *Glumetza Antitrust Litigation*, which I think provides a very important case from Judge Alsup when he was dealing with the but-for world, he said something that is, I think, a critical framing issue.  He said (as read):

"The vagaries of the marketplace deny us sure knowledge of what plaintiffs' situation would have been.  We don't know.  Defendants restraint caused that."

We don't know exactly and precisely, but we're given, according to Judge Alsup, citing the Supreme Court, leeway in our models.  And we believe that our model and our class

1   adequately accounts for the substitution effect.

2           **THE COURT:**  I didn't catch the name of that last case.

3           **MR. BERMAN:**  The last case was *Glumetza*,

4   G-l-u-m-e-z-t-z-a.  It's a Northern District of California case

5   from Judge Alsup, two thousand- --

6           **THE COURT:**  Okay.

7           **MR. BERMAN:**  -- 21.

8           **THE COURT:**  Okay.  All right.  Well, I guess my

9   other -- well, I'd like to, before I just turn it over to you,

10  turn to the *Daubert* questions.

11          I'm not inclined to exclude Dr. Rascher or Mr. Desser.

12  But with respect to Professor Osborne, I do think that some of

13  what she is being proffered for is telling me what the law is,

14  and I think that's my job.  And I have to get it briefed, and

15  you all can brief it and tell me what Title IX means and what

16  it doesn't mean and whether it applies or doesn't apply.  But

17  I think that's for you to brief and for me to decide, and not

18  for an expert to talk about.

19          So I'm inclined to exclude that portion of it, but not

20  to exclude the rest of what she has to say.

21          Does anyone want to address any of that, in

22  particular, briefly?

23          **MR. KESSLER:**  Well --

24          **MR. KILARU:**  Sure, Your Honor.

25          **MR. KESSLER:**  I'm sorry.  Do you want plaintiff or

defendant to address first?

        **THE COURT:**  Well, I was offering both an opportunity.
I guess you can go ahead.

        **MR. KESSLER:**  Thank you.  Jeffrey Kessler, Your Honor.

        Yeah, we obviously agree with your ruling on excluding
the legal opinions.

        There is one other opinion she offered which I also
think should be excluded on another ground.  She offered the
opinion that the schools would not have adequate financial
resources available to them in order to spend more money on
women's sports to comply with Title IX and also be able to pay
out the type of money that were in the but-for world.

        The problem with her offering that opinion is, first,
she didn't do any work for that opinion.  She didn't look at
any school finances, she admitted.  She didn't do any analysis
of the numbers.  She has no experience in school finances.  In
other words, she's a legal expert; she's not a school
administrator of finances or CFO.  But not only did she not do
the work, she has no expertise.  Because she's not an
economist, an accountant, a financial officer, no particular
thing, she's not qualified to talk about the economic
capability of the schools.

        So for that one opinion, we think it also should be
excluded based on her lacking the qualifications and having not
done any real work to support it.  It's just her kind of

1    feeling that schools wouldn't have that money available.

2              That's all for me, Your Honor.

3              **THE COURT:**  Someone on the defense side want to

4    respond on these points?

5              **MR. KILARU:**  Sure, Your Honor.  I'll start with the

6    end and work backwards.

7              What Mr. Kessler said doesn't represent

8    Ms. Osborne's -- Dr. Osborne's opinions in any way.  She's not

9    just basing this on a feeling.  She's basing her opinions about

10   what athletic departments can and can't do on her considerable

11   experience working as a Title IX consultant.

12             I think the experience she's bringing to bear on this

13   in real world is actually quite superior to the experience that

14   their expert, Mr. Desser, is bringing on broadcast NIL, where

15   he's just kind of making up a market and saying what the

16   numbers are.

17             So we don't think there's a basis for excluding that

18   conclusion.

19             **THE COURT:**  Well, it's more a question of, I guess,

20   looking at balance sheets and reading them and saying what they

21   say.  And I'm not sure we need a Title IX expert to look at

22   balance sheets and say here's how much money this school gets

23   and here's how much money that school spends and that sort of

24   thing.

25             **MR. KILARU:**  Your Honor, I think if this class is

1  going to get certified -- and, obviously, we don't think it

2  should -- we're going to have to try this case to a jury.

3       And in front of a jury, I think if we're not allowed

4  to point out the serious flaws with the models that the

5  plaintiffs brought forth of the but-for world, specifically

6  about Title IX and the funding and how the funding would

7  actually work in the world they're positing where a huge amount

8  of top-line revenue is devoted to a very small number of

9  student athletes -- we have to be able to present that at a

10  trial.

11       And we think Dr. Osborne's testimony is -- or

12  Professor Osborne's testimony is admissible.  It doesn't go to

13  the ultimate issue.  It doesn't usurp the jury's role.  We

14  don't think it usurps your role because, obviously, Your Honor

15  could give instruction on Title IX, to the extent they're

16  needed.  But this is a huge flaw in their model, and we think

17  that it's something we have to be able to present evidence on,

18  and Dr. -- and Professor Osborne is our way of doing that.

19       **THE COURT:**  Well, with respect to what Title IX says

20  and means, yes.

21       With respect to how much money schools have and what

22  they spend it on and how much more they could spend on it,

23  that's a different question.  You could say they could spend

24  more money buying chickens than they are.  But it's a question

25  of finance, and that's -- we don't need a Title IX person for

1  that; we need an economist or a CFO or a CPA or something like

2  that, I would think, at trial.

3          **MR. KILARU:**  Your Honor, just I would say on that

4  point, we don't agree that you have to have an economist for

5  that.  I mean, I don't think her testimony is that different

6  from what Dr. Rascher is purporting to offer in rebuttal to her

7  points.  So I'm not sure the distinction between saying

8  Dr. Rascher should get to testify in rebuttal to it and Dr. --

9  and Professor Osborne shouldn't get to do it.

10          The last thing I would note on this, Your Honor, is

11  I think it goes to the issues with Desser and with Rascher.

12  I'm not going to, here today, quarrel with you on the *Daubert*

13  argument.  We stand by our arguments, and we think that both of

14  them should be excluded.

15          But I just want to note, under the case that

16  Mr. Berman mentioned earlier, *Olean*, just the fact that those

17  two experts may clear *Daubert*, in your view, doesn't mean that

18  they've proffered a working economic model that answers the

19  questions for class certification.  Footnote 9 of *Olean* talks

20  about how even if expert testimony gets past the *Daubert* stage,

21  it can still fail to satisfy Rule 23 if it's based on

22  unsupported assumptions or untenable real-world outcomes or

23  prompts irrational results.

24          And I think this is the bigger and broader issue with

25  at least their BNIL model.  We think it also pervades the lost

1   opportunities model, which is that the experts have just made

2   up a series of assumptions that ground their ability and are

3   essential to their ability to generate class-wide answers.

4        They have assumptions that it's okay to have a world

5   where men get 96 percent of revenues and women get 4 percent.

6        They have an assumption that conferences in a but-for

7   world will make payments, even though there is literally zero

8   evidence of conferences ever doing that.

9        They have assumptions that schools will allow the

10  conferences to make the payments, even though in every

11  real-world example we have, including the news of the last few

12  weeks, it's clear that schools want to compete with each other

13  vigorously for student athletes.

14        They have assumptions that 10 percent of broadcast

15  contracts are attributable to NIL, which Desser admitted he has

16  literally no support for.

17        So, obviously, we can talk about these more in the

18  context of the class cert model -- motion.  I would just note

19  that I think that these are serious flaws under Rule 23, even

20  if Your Honor doesn't view them as flaws under 702, which we

21  think they are as well.

22        **THE COURT:**  Okay.  Well, you've sort of gotten into

23  the merits, then, of the class cert motions.

24        And I guess all I want to do at this point is give you

25  an opportunity to briefly address what you think needs to be

1  emphasized or that has come up today or that came up in the

2  briefing and wasn't adequately discussed or whatever.

3          If I think of questions I have for you when I hear it,

4  I'll ask them, but I don't have any particular questions other

5  than the ones that I've -- that I've just raised.

6          So if you'd like to take ten minutes to just talk

7  generally about the class cert motion; then I can hear from

8  plaintiff; and then we can go on to the case management

9  conference.

10          **MR. KILARU:**  Sure, Your Honor.  I'm happy to do that.

11          I think it's probably best to take these class by

12  class or damages claim by damages claim, just for efficiency.

13          So I'd start with their broadcast NIL class.  The key

14  flaws here that we'd emphasize -- I'm going to try not to

15  replicate the briefs too much -- are the failure of their model

16  to come up with a reliable way to measure injury on a

17  class-wide basis and the serious, intractable inter- and

18  intra-class conflicts that their model creates, which we

19  haven't talked about yet today.

20          I think the key thing that the plaintiffs need to

21  satisfy Rule 23 is a working economic model that could actually

22  exist in the real world.  There's a case from the

23  Ninth Circuit, *Dolphin Tours*, that says what you have to look

24  at in these cases is what the world would have looked like if

25  you got rid of the alleged anticompetitive conduct.

1            And what the plaintiffs have done here is say:  We

2      have a theory that all rules regarding NIL would be lifted.

3            But in order to satisfy Rule 23, they've actually come

4      in with a complete set of assumptions that don't model what

5      would happen if you actually lifted all those restraints.  The

6      but-for world in the damages case needs to take away the

7      alleged restraints and model what would happen.

8            **THE COURT:**  Why do you say they're saying that all NIL

9      rules have to be lifted?  They aren't lifting them with respect

10     to the schools, for starters.

11            **MR. KILARU:**  Right, but they're asking, Your Honor,

12     for all --

13            **THE COURT:**  There's a lot of rules.  I'm not sure the

14     plaintiffs are asking to lift all of them.

15            **MR. KILARU:**  They're asking to lift all NCAA-level

16     rules.  But what they're positing, then, in their but-for world

17     is a series of things that wouldn't happen in that world, and

18     we know they wouldn't happen because the plaintiffs haven't

19     proffered a single piece of evidence for them.

20            Number one, that somehow 10 percent of revenues are

21     tied to broadcast NIL.  That's completely made up by their

22     expert, and he admitted it.  There's no support for that

23     anywhere in the record.  That's a classic unsupported

24     assumption under *Olean*.

25            There's a Title IX issue, that 96 percent of their

```
 1   damages --
 2         THE COURT:  The problem with your argument about the
 3   made-up aspect is that the reason there's no evidence out there
 4   about what a NIL -- what NIL is worth is because the NCAA has
 5   prevented anyone from paying it.  And this kind of argument is
 6   addressed in a number of different cases, and it's troublesome.
 7         MR. KILARU:  Your Honor, I don't think that's right
 8   because here, there are -- there are other regimes in the real
 9   world where there are broadcast of sports.  Look at the
10   professional sport example.  And across all of those examples
11   in professional sports where games are televised on -- put on
12   television, there's not a single example of broadcast NIL being
13   artificially disseminated out and --
14         THE COURT:  Right, because --
15         MR. KILARU:  -- provided a value --
16         THE COURT:  -- the pros get salaries; they get paid.
17         So they don't break it down and say, "Here is your
18   $10 million salary, and we're giving you X amount of that as
19   being on TV and Y amount of it as going to the rotary club and
20   speaking and Z amount of it as whatever."  They don't break it
21   down because they don't have to.
22         Here, the players aren't getting paid; so there hasn't
23   been that sort of necessity to decide how much of the broadcast
24   contracts that the schools are getting is attributable to
25   the -- to the student athletes.
```

1              **MR. KILARU:**  Your Honor, we don't agree with that.  I

2      mean, I think the fact that there's no real-world scenario

3      where anyone thinks a broadcast NIL actually confirms an

4      argument that we've made before at the motion to dismiss stage.

5      There is no right of anything in these broadcasts, to begin

6      with.

7              But setting that aside, there's no scenario --

8              **THE COURT:**  There is no what?

9              **MR. KILARU:**  There's no right --

10             **THE COURT:**  There is no right?

11             **MR. KILARU:**  -- of publicity, no compensable right --

12             **THE COURT:**  Oh.  No right of publicity.  Oh, okay.

13             **MR. KILARU:**  But I know you ruled on it.  I'm not

14     going back to that.

15             The point I'm making is more that if the plaintiffs

16     were right, that some aspect of broadcast contracts were

17     related to NIL, there would be some evidence somewhere in the

18     world that that is true.

19             And there are sport leagues, like the PGA, for

20     example, where NIL rights are assigned and there's no

21     compensation to certain players at all.

22             So it's just not the case that there's some real-world

23     analogy that they can point to or that the sole reason why

24     there isn't evidence is because of the restraints that they're

25     challenging.

1          Moving past the 10 percent to Title IX, unless you

2    have questions on the 10 percent piece.

3          **THE COURT:**  No.  Go ahead.

4          **MR. KILARU:**  The Title IX issue is, we think, a very

5    significant one.  They're the ones who have to model the

6    but-for world that could exist in reality.  That's what

7    *Dolphin Tours* says.  That's what they're required to do under

8    Rule 23.

9          Their model assigns 96 percent of the revenues in this

10   fixed pot to men and 4 percent to women, and they haven't done

11   anything to account for that.  Dr. Rascher admitted at his

12   deposition that he hasn't considered Title IX at all.  And at

13   no point in their initial report, in their reply report, after

14   we raised this issue through rebuttal experts, did they ever

15   try to offer a solution for this problem.  There isn't one.

16         **THE COURT:**  Well, I guess what they say is that the

17   schools aren't paying the money; the conferences are paying the

18   money.  And Title IX covers schools, not conferences.

19         **MR. KILARU:**  I think there's two things they say.

20   That's one of them, Your Honor.

21         On that one, Professor Osborne has given testimony

22   about why that doesn't work.  It's on page 30 of her report.

23   It's that the schools are controlling every aspect of the

24   payments that would actually be made because they're the voting

25   member of the conferences.  So I don't think that that sort of

end run around Title IX works.  They also have offered no

actual evidence or testimony or expertise of their own to rebut

what Professor Osborne says.

Second, they say that Title IX doesn't apply to

damages; but that has nothing to do with the key question,

which is whether they have actually modeled a but-for world

that could exist.  The world that they have posited is not one

that could ever exist because of Title IX, and so that's a key

problem.

The next --

**THE COURT:**  Well, maybe the schools would have to be

more creative and come up with some kind of way that paid the

female athletes some share of the revenue as well.

**MR. KILARU:**  Well, they've actually allocated all of

the share of the revenue, Your Honor.  They said there's

10 percent that's attributable to BNIL, and their model gives

96 percent of it to the men and it leaves nothing else behind.

So that that's the answer?  They haven't give you an answer to

that, and they can't cure that.  And it's not enough for them

to just get up and speculate and say:  There might be a way to

cure the problems with our model that we haven't modeled or

explained in any way.

The conference payments is a separate and important

issue.  Their expert cannot identify a single example in the

real world of conferences making systemic payments like what

 1  they're proposing for broadcast NIL.  It makes no sense because

 2  schools are the ones who --

 3      THE COURT:  Well, maybe they'll have to if that turns

 4  out -- if that is what an injunction tells them to do.  Maybe

 5  they haven't done it before, but maybe they will.

 6      MR. KILARU:  Right.  But, again, they have to model a

 7  world that would exist without artificial restraints placed on

 8  it by a court.  They have to model a world that would exist in

 9  the real world.

10      And what they've modeled is a model --

11      THE COURT:  Well, they model something that would be

12  le- -- that would comply with what the Court ordered if the

13  Court found an antitrust violation.

14      MR. KILARU:  Your Honor, I'm not sure that --

15  respectfully, I don't think the Court could order conferences

16  to make certain payments or not.  Like, I --

17      THE COURT:  No.

18      MR. KILARU:  -- don't think that could --

19      THE COURT:  But, no.

20      MR. KILARU:  -- come out of an antitrust; so --

21      THE COURT:  But the Court could order that they not

22  commit antitrust violations or that they not do certain things

23  that they've been doing.

24      MR. KILARU:  Sure.  And then the conferences would

25  decide and their members would decide how to respond to that.

```
1          What the plaintiffs have posited that would come out
2   of that world is one where conferences decide to make
3   horizontally equal payments to every athlete in a specific
4   sport.
5          And we often hear about natural experiments from the
6   plaintiffs.  Here, the natural experiments cut in our favor.
7          Your Honor issued an injunction in Alston.  What
8   happened in response to that is not conferences setting rules
9   saying that every student athlete in certain sports get a
10  certain amount of money.  What came out in response to that is
11  schools deciding, on an individual-school-by-individual-school
12  basis, what payments that they would make, in competition with
13  each other and based on their own institutional values.
14         That is what all of the evidence tells us would happen
15  if the plaintiffs were actually to prevail in this case.  But
16  their expert hasn't modeled school competition.  He's done
17  nothing to actually assess that.  And there's no evidence
18  anywhere to suggest that one conference -- and I'm not going to
19  use the specifics because of the confidentiality issues -- but
20  that one conference will just sit by and accept paying $20,000
21  to certain student athletes when a rival conference against
22  whom it's recruiting can pay $50,000 for student athletes.
23  Again, everything we're seeing in the world of college
24  athletics right now tells us that that's not something that
25  schools are going to abide by.
```

1    So the world that they've posited has a series of
2    artificial restraints built into it so that they can (a) try to
3    show some kind of commonality and (b) stick with this
4    revenue-sharing model that they're very focused on but that
5    doesn't actually resemble what can ever happen in the real
6    world.

7    We have another natural experiment which is that in
8    non-revenue sports, some student athletes get scholarships and
9    some don't.  And schools decide on an individual-by-individual
10   basis:  Should we pay the student athlete or not?  And there's
11   every reason to think that that would be the case in the
12   context of recruiting for elite student athletes for football
13   and basketball.

14   And it's particularly reasonable to think that that
15   would be the case in a case about NIL.  NIL is inherently
16   individualized.  There's no way that you could say that two
17   people have the same NIL value based on an artificial set of
18   characteristics.  And there's no earthly reason to think that a
19   school is going to look at the star quarterback on the top
20   team -- high school team and value them the exact same as a
21   backup offensive lineman who's going to play on a different
22   team.  But, again, that's something that plaintiffs' model puts
23   in.

24   And I think what *Olean* says, what *Mcglinchey* says,
25   what other cases say is at some point, if there are just so

 1   many implausible assumptions stacked up on top of each other,

 2   that can't clear Rule 23.  Because, again, to use Mr. Berman's

 3   argument from earlier, if the plaintiffs were right, a class

 4   could be certified in every case because the plaintiffs could

 5   just say, "Here's a set of assumptions that create common

 6   impact.  Let's go to a jury."  That's not the law.  They have

 7   to actually come up with a working economic model that

 8   resembles what the real world could look like.

 9           If I could talk very briefly about conflicts and the

10   lost opportunities class.  I'll try to be brief.

11           I think the conflicts issues here are very significant

12   because, as in the *Shields* case, which was decided recently by

13   another judge in the Northern District, the plaintiffs are

14   taking a fixed pot of money as to broadcast NIL and they're

15   allocating it to student athletes, who in individual trials

16   would have every incentive to come in and argue that that

17   allocation is wrong.

18           The plaintiffs say, well, every football player is

19   going to get a share of 75 percent.  In an individual case, the

20   quarterback of a football team in the SEC would come in and

21   say, "I'm a superstar.  I should get way more than that, and

22   other athletes should get nothing."  That is the type of

23   pitting people against each other, conflicts over a fixed pot

24   of money, that was exactly the issue in *Shields*.  There's no

25   daylight between those two cases.

1        There's also inter-class conflicts.  The plaintiffs

2  said in their case management statement that it's irrelevant

3  what the effects on non-revenue sports would be as to -- as

4  opposed to what the effects would be on some of their models

5  for football and basketball.  I think that's a pretty

6  extraordinary statement.

7        They're purporting to represent a class of all student

8  athletes in Division I, revenue student athletes and not.  It

9  is a fact, an undisputed fact, that the revenues from the

10  so-called revenue sports of football and basketball support

11  these other sports that are offered on campus.

12        Plaintiffs' model just takes some of that revenue and

13  gives it to a subset of student athletes, which is something

14  that no athlete in the lost opportunity class would argue for

15  in an individual case.  There's no way an athlete who is one of

16  their putative class members who has a third-party NIL deal

17  would say:  It's a great idea for the school to take some of

18  the money that funds my scholarship and give it to someone

19  else.

20        But these are all people they're purporting to --

21        **THE COURT:**  When you refer to the lost opportunity,

22  you're talking about the third-party NIL, what they call --

23        **MR. KILARU:**  Yes, Your Honor.

24        **THE COURT:**  -- the third-party NIL?

25        **MR. KILARU:**  I believe it may have been called that at

1   one point.

2           **THE COURT:**  Okay.

3           **MR. KILARU:**  But, yes.

4           So we think these conflicts are significant, and

5   they're not ones that can be remedied through any sort of --

6   they haven't tried to remedy them and they can't remedy them.

7           On the lost opportunities class, the plaintiffs are

8   trying to take something that is inherently individualized,

9   which is the value of an individual student athlete's NIL,

10  which is something that their own expert admits varies across

11  time and across year and across playing time and across

12  opportunity, and they're trying to generalize whatever happened

13  after July 21st, '21, to whatever happened before.

14          And there are, again, a series of completely untenable

15  assumptions built into that model, and it doesn't work as a

16  model because it systematically disadvantages certain members

17  of their class to the exclusion of others.

18          **THE COURT:**  Well --

19          **MR. KILARU:**  I wasn't sure if you were going to ask a

20  question.

21          **THE COURT:**  Well, going back to the broadcast and the

22  video games, the argument that's made is that while it may be

23  that star athletes might -- if they were negotiating for a

24  salary, might try to negotiate something more; but when we're

25  talking about signing up people before an academic year to be

1   on TV and they can't be on TV unless all of them agree to be on

2   TV, that that makes it into a sort of a different calculus.

3          And the same with the video games.  If the popularity

4   of video games is the realism of them, which I gather it is,

5   the realism is, we've got all these guys or -- well, I guess

6   it's all guys, huh? -- all these guys on the team, and either

7   they all have to be in or their video game isn't going to be

8   particularly popular and they aren't going to be wanted.

9          So perhaps the notion of negotiating for a higher

10  salary might make sense in the context of negotiating for a

11  higher salary but doesn't make sense in the context of what has

12  to be, by definition, a group effort.

13         **MR. KILARU:**  I think just a few things on that,

14  Your Honor.

15         First, whatever the merits of that argument on an

16  aggregate basis, it is certainly not what an individual student

17  athlete would argue is appropriate in an individual case.  If

18  there were a case that involved just the star quarterback of

19  the USC football team, there is no way he would come into court

20  and say, "Broadcasters want my NIL and everyone else's NIL the

21  same, so I'd happily accept an equal payment to everyone else

22  just to make the broadcast work."  But they're eliding that in

23  their model.

24         Second, they don't believe that it is true that you

25  need everyone in a broadcast to be compensated for NIL because

```
 1   their own model excludes a ton of people who are shown in the
 2   broadcast.  There are players on football teams who don't have
 3   scholarships.  They are shown on television in the broadcast.
 4   One of the most common groups of people who doesn't have a
 5   scholarship is the kicker.  The kicker is on TV all the time,
 6   often at the most dramatic moments of the game.  And that
 7   person is not getting compensated under their model.  So I
 8   don't think even they, in their model, actually believe that
 9   every participant in the game needs to have the NIL in order
10   for it to work.
11          And then last, just on the video game piece, if what
12   you're saying is true, I think we'd have a different reality
13   than we have.  We have been hearing about the sports video game
14   coming up for over two years now.  There is no structure in
15   place today for licensing, and certainly, the evidence that we
16   have in the record does not suggest that there's a view that
17   you need everyone and to compensate everyone to make the game
18   work.
19          THE COURT:  There is some evidence to that effect.  I
20   can't cite you page and line of where it is, but it seems like
21   I've seen that.  But maybe counsel will be able to tell us.
22          Okay.  Let me think.  I had one other thing about
23   the -- question about the third category.
24          Oh.  What's wrong with the predictive quality,
25   assuming that we don't have anything other than predicting
```

1   because we don't have any real-world examples of getting NIL

2   payments?  But the notion that if John Doe got X dollars this

3   year when an NIL could be paid, why isn't it reasonable to say

4   he probably would have gotten that same amount in the previous

5   years, with perhaps some adjustment for the fact that if he had

6   COVID or he broke his leg or something like that?

7           **MR. KILARU:**  I think for three reasons, Your Honor.

8           I think, first, their expert admits that there are a

9   whole host of other factors that assess whether or not you can

10  get an NIL deal or not:  your marketability, your interest in

11  pursuing social media, the success of your team, whether you're

12  involved in a personal controversy.  None of those --

13          **THE COURT:**  But all those things were in effect when

14  you got your money that you got after July 21st, 2021.

15          **MR. KILARU:**  Well, they were at that point in time,

16  but we don't --

17          **THE COURT:**  Right.

18          **MR. KILARU:**  -- know what they would have been in the

19  previous year or the year before that.

20          If you were a starter in 2021, you --

21          **THE COURT:**  Well, that's my point.  Is it not logical

22  to assume that it would be?

23          **MR. KILARU:**  It's not, Your Honor, because the nature

24  of these transactions is that they vary, and your ability to

25  monetize depends on specific moments in time.  And the

1    plaintiffs simply assume that away in their model.

2         I think a second and related point to this is that the

3    model systematically disadvantages some class members over

4    others in a way that no individual would argue for in an

5    individual case.

6         Their model takes, as the high water mark, 2021 and

7    says if you have a deal in 2021, that is your compensation

8    effectively for prior years.  But if you're a player who had

9    huge NIL value in 2019 and 2020 because you're a starter and

10   much less NIL value in 2021, their model doesn't really account

11   for that, and it systematically disadvantages you in a way you

12   would never argue is appropriate in an individual case.

13        And just to highlight the variance here, I think it's

14   useful to look at the two named plaintiffs who are actually

15   bringing an NIL claim.  One of them is Sedona Prince, whose NIL

16   value was highest, she admitted, before July 1st of 2020.

17        **THE COURT:**  Okay.  I want to move along, and I don't

18   want to get into details about individual cases.  I can look

19   that up.

20        **MR. KILARU:**  Okay, Your Honor.  I won't get into

21   individuals.  I'll just say that I think the named plaintiffs

22   highlight how much variance there is and how hard it would be

23   to administer this on a class-wide basis, because there's a

24   whole separate issue of whether payments that are recorded in a

25   database were actually ever made, which is another issue that

1  would implicate many trials and the concerns that were raised

2  in the Ninth Circuit's *Bowerman* decision.

3         THE COURT:  Okay.  Would the plaintiffs like to

4  respond in a not longer amount of time?

5         MR. KESSLER:  I will do my best, Your Honor.  I'm

6  going to start off, and then Mr. Berman will conclude.  But

7  we'll be brief, I promise.

8         THE COURT:  Yeah.  And I can't hear you very well.  I

9  don't know if that's because you're in a big room or if I need

10  to turn up my speaker.

11         MR. KESSLER:  Is -- is this better?

12         THE COURT:  I'm going to try turning up my speaker,

13  and I hope that that won't cause various undesirable side

14  effects.

15         MR. KESSLER:  Is this better, Your Honor, now?  Can

16  you hear me?

17         THE COURT:  I can hear you, but it's just not --

18         MR. KESSLER:  All right.  I'll -- I'll speak up more

19  loudly.  And if I'm speaking too loudly, please tell me.

20         THE COURT:  It seems like I -- I think I've turned it

21  up as loudly as I can here.

22         MR. KESSLER:  Okay.  So, first, I'll address the

23  broadcast NIL damages methodology.

24         There are no made-up assumptions in that model.  What

25  we have is, first, Mr. Desser, who is one of the most

experienced experts in the negotiation of sports broadcast
agreements, who uses his expertise and experience to determine
that the value of NIL in broadcast would be at least
10 percent.

Now, where does he get that from?  He didn't just pull
this out of thin air.  What he did is, based on his experience,
he first determined that the value that athletes bring to the
broadcast collectively is about 50 percent.  And he based that
on his years of negotiating contracts, which is unparalleled,
and, number two, looking at the NFL and the NBA, because it's
basketball and football, and seeing how in those sports they
get about 50 percent as well in total.

But he said 50 percent includes the payment for
playing the games, the compensation.  That's prohibited in the
NCAA, as Your Honor pointed out.

So the but-for world, he has to assume -- and this is
very important.  He can't assume a but-for world where
compensation for playing games is allowed.  All he could assume
is a but-for world where everything stays the same except the
NIL rules are removed, the ones we're challenging.  So in that
rule -- in that world, the NCAA rules prohibit any compensation
for playing the games still, but we have struck down the rules
that you can't pay them for their NIL.

And so he has to say:  Well, what's the portion of the
50 percent that would be for the NIL?

1          Now, what could you look at as comparables?  We heard

2     counsel say, well, there's no real-world market for that.  And

3     as Your Honor pointed out, that's because the NCAA didn't

4     permit any market for that.  But there are real-world

5     transactions.

6          **THE COURT:**  I'm sorry to interrupt you, but did I turn

7     my camera off while I was fooling with the volume on the --

8          **MR. KESSLER:**  No.  We can --

9          **THE COURT:**  -- speaker?

10         **MR. KESSLER:**  -- still see you.

11         We can still see you, Your Honor.  You're fine.

12         **THE COURT:**  You all can?

13         **MR. KESSLER:**  Yes.

14         **THE COURT:**  Okay.

15         **MR. KESSLER:**  Okay.

16         **THE COURT:**  Sorry.

17         **MR. KESSLER:**  So there are real-world transactions he

18    looked at.  He looked at -- and Dr. Rascher did as well.  They

19    looked at transactions for video games, for apparel, for other

20    areas where the only thing being sold is the NIL rights of the

21    players because it's not the games.  It's giving their names,

22    images, and likenesses.

23         And what did he find?  He found the range of each of

24    those games, each of those products, everything he looked at,

25    was in this ballpark of sort of 10 to 15 percent, and he came

 1    out at the low part of that range.

 2          So he looked at real-world transactions, which confirm

 3    his expertise.  He didn't just assume 10 percent.  He found it

 4    through expert analysis of the record.  And so, Your Honor, we

 5    think that is a very reasonable way to model the world.

 6          Then what Dr. Rascher did is he said competition among

 7    the conferences will cause the athletes to realize the full

 8    10 percent.  It can't be -- it can't be more than their NIL

 9    value.

10          They criticized Dr. Rascher, saying why wouldn't they

11    give more money to the quarterback?  Because NCAA rules --

12    which we're not challenging -- said you can't give money based

13    on performance.  You can't give money based on how you play on

14    the field.  We have to assume the but-for world as it would

15    exist except for this one change.

16          So in that world where you only can get paid for your

17    NIL, it's going to be based on up to the maximum of 10 percent,

18    because that's the value that they found, and it's going to be

19    paid out equally, because the testimony -- this is unrebutted.

20    Every broadcaster required all the NIL rights.  Their own

21    expert, Mr. Thompson, admitted you need all the NIL rights

22    because you don't know which athletes are going to start.  Even

23    if you have a starting quarterback, he might get hurt; the

24    backup might play.  You don't know who's going to come out.

25          And, therefore, since you need them all, it's like a

 1   group license, Your Honor, which is how we postulate it would

 2   be.  This is how video games are done.  They get a group

 3   license for everyone in the real world, and they divide the

 4   money equally.

 5          If you look at the NFL -- and Dr. Rascher did -- when

 6   you have a video game in the NFL, you can be the biggest star,

 7   Tom Brady, or you could be the lowest player; everyone is

 8   included in and everyone gets an equal share.

 9          **THE COURT:**  What about counsel's argument that the

10   star quarterback would object and say that's -- "I deserve more

11   and I don't like it"?

12          **MR. KESSLER:**  NCAA --

13          **THE COURT:**  And that that's a conflict within the

14   class.

15          **MR. KESSLER:**  Well, one, it's not a conflict within

16   the class because as Dr. Tucker, their expert, said, if you

17   have a reliable, reasonable model, the fact that some class

18   members would get more under that model than others doesn't

19   create a conflict.  And Dr. Tucker admitted this because every

20   damage model might pay a different class member differently.

21   So if you change the model, you can never have a class.

22          In this model, by the way, everyone gets paid the

23   same.  And what the interests of the class is, right now

24   they've got nothing.  Right?  They weren't allowed to get any

25   dollars.  So it's in all the interests of the class to have a

1   reasonable, reliable model.  So that's not a conflict.

2            In terms of the quarterback insisting on more, the

3   NCAA rules in the but-for world don't let you pay more to

4   recruit the quarterback.  That is what's still prohibited.  It

5   only could be the NIL rights.  And we've seen again in the real

6   world, basketball players all get paid the same for video

7   games.  When they do collectibles, they all get paid the same

8   because they all need it.  When they do deals where everyone is

9   required, the way that gets paid out is an equal value.  So

10  that's the real world.

11           And remember, Your Honor, the issue of allocating

12  damages, which is what we're talking about now, is not even the

13  issue of class certification.  That's an issue for down the

14  road.

15           The issue of class certification is class-wide impact.

16  And the measure of 10 percent for the whole class, there's no

17  conflict in that.  Even if after the trial, there were issues

18  of how do you allocate it, courts deal with that down the road;

19  and if there are any conflicts, you could get separate counsel

20  to advocate, well, I want more or less out of it.  But the jury

21  is only going to find what's the class-wide number, and that

22  clearly is within this broadcast NIL.

23           The last thing I want to say about broadcast NIL,

24  Your Honor, is just the following:  All of the assumptions

25  here -- and this goes into Title IX -- is based on the real

world as we found it.  The reason why 10 percent goes more

money to men than women is because, regrettably, the broadcast

contracts are much larger for men's basketball than female

basketball, for example.

Now, whose fault is that?  There may be, frankly, real

deficiencies in the NCAA as to how they have promoted women's

basketball and why that gap is so big, but that is the but-for

world as our expert could take it.  If the expert was --

**THE COURT:**  Well, maybe the schools and the

conferences are obliged to fix that and to make up for it.

**MR. KESSLER:**  And that's correct, Your Honor.  And if

there is a Title IX issue -- and I think *Alston* is a great

example.  You will remember, in *Alston* we only had an order

from Your Honor with respect to men's and women's basketball

and football.  Those are the only things we had.  And because

there are so many more football players, that would mean there

would be many more *Alston* payments to the men than the women.

What did the conferences do?  They went out and

voluntarily decided to extend *Alston* payments in most

conferences, not all conferences, but in most of the Power 5

conferences to all of their sports.  So women's volleyball

players and tennis players and gymnasts, they all are eligible

for *Alston* payments now too.  The schools found a way to do

equity, as they should.

But that doesn't mean for damages, that we could

 1    somehow assume in the but-for world that that happened.  They

 2    would then come in and say:  Well, you're speculating all this

 3    money would be paid.  And he said:  Well, how would that be

 4    paid if 10 percent doesn't cover it?

 5            There's no limit in the but-for -- in going forward.

 6    We're not -- going forward, not backwards.  Going forward, they

 7    could pay the women as much as they want.  There's nothing to

 8    stop them.  We're not going to ever ask you to issue an order

 9    saying you can't pay the money, just like in *Alston*.  So they

10    were able to pay that money.  So this is a non-issue.

11            The other thing about Title IX is that there's no

12    question -- we're only looking at damages now, not the future.

13    There is not a single case that says Title IX applies to

14    damages payments.  Doesn't make any sense.

15            Let's say you had a discrimination case and the case

16    was discrimination against women, and you had a damage class

17    where women got all this money.  Could you come in and argue

18    that, well, because you're paying damages now to the women in a

19    discrimination class, that that somehow violates Title VII,

20    just because you're giving all this money now to women instead

21    of to men?  Of course not.  When damages are remedying for a

22    wrong, they're not subject to Title IX, to begin with.  So

23    Title IX is a non-issue.

24            And it doesn't apply to conferences.  And one of the

25    arguments they make is, well, conferences have never paid this

1   money before.  Well, of course they haven't because the rules

2   prohibited them from paying it.

3          And remember, we're talking about plausibility.  The

4   reason, Your Honor, we were referencing an article today in the

5   *New York Times* by Jordan Acker, who is the chairman of the

6   Board of Regents of Michigan, is in this very article today,

7   just coincident, Mr. Acker says:  What the NCAA must do is have

8   the conferences pay a percentage of their television revenues

9   to the athletes because that's the only thing that makes sense

10  going forward.  That's from the former chair of the Board of

11  Regents of the University of Michigan, one of the Power

12  schools, and he talks about the growing support for that.  So

13  how could that be implausible?

14         And remember, at class certification, you're not

15  deciding who's ultimately right.  You're just deciding is the

16  modeling of the world realistic enough that it can go on to the

17  jury for the jury to decide.

18         When you have NCAA, you know, witnesses, you have

19  their own heads of the universities saying conferences can pay

20  this money, how could this be an implausible model that they

21  say we're just making up out of thin air in terms of that?

22         So, Your Honor, that's all I wanted to say about

23  broadcast NIL, unless you have anything else that you need to

24  hear about --

25         **THE COURT:**  No.  But I do need you to finish up.  So

1  if you want to talk about the other two, you should do that --

2        **MR. KESSLER:**  Yeah.  I'm just going to say --

3        **THE COURT:**  -- promptly.

4        **MR. KESSLER:**  -- something about the third party, what

5  we call the lost opportunity class, the third party, and

6  Mr. Berman will finish.

7        Quickly, on the lost opportunity, the lost opportunity

8  is a classic but -- before-and-after methodology.  That

9  methodology has been accepted time and time again in the

10  courts.  Their own expert, Dr. Tucker, said it is a very, very

11  well-accepted methodology in antitrust cases.

12        And what they're quibbling over is have proper

13  adjustments been made between the before and after period.

14  Dr. Rascher has adjusted for COVID.  He has adjusted for

15  whether you're a starter or a substitute.  He has adjusted for

16  whether you change conferences in the value.  The value --

17        **THE COURT:**  How did he do that?  Does he come up with

18  an amount for each thing, like everybody who changed

19  conferences gets 100 more dollars and everybody who had COVID

20  gets 100 less dollars?  Things like that?

21        **MR. KESSLER:**  Well, not if you got COVID, Your Honor.

22        What he did is -- I'll give you an example -- is

23  that -- and he tested this on the Big Ten and the SEC for

24  basketball and football players so far.  At trial, he's going

25  to do this for everyone in the class.

1    And he explained the methodology for now.  And the way

2    he did it is, so, for example, he looks at, let's say, two

3    conferences:  the SEC, let's say, and the Big Ten.  And he

4    actually statistically measures is there a difference in NIL

5    payment values by virtue of what conference you were in.  And

6    if he finds a statistically significant difference, he takes

7    that adjustment.  And if you shifted conferences from the

8    before period to the after period, he will adjust up and down

9    to that.

10   He tests, statistically, if being in the top quartile

11   of playing time in basketball versus the second quartile or the

12   third -- you know, he does each of the quartile -- does that

13   affect your NIL value statistically?  And if there's a

14   difference and you shifted your playing time, then he does an

15   adjustment for that.

16   For COVID, he did an adjustment class-wide for the

17   fact that revenues were depressed during COVID and may,

18   therefore, depress the amount of NIL payment.  So he did a

19   class-wide adjustment there.

20   And normally, Your Honor -- and I've done a lot of

21   these cases.  I know you've seen them.  Normally, the other

22   expert comes in and says:  Oh, you should make these three

23   other adjustments, and here's what they would show.  Why didn't

24   you make them?

25   Here, the expert's done nothing.  They don't suggest

1   any other adjustments.  They just come in and say:  We don't

2   think your adjustments are sufficient.

3          That might be something they can argue to the jury,

4   Your Honor, but the case law makes it clear, that is not a

5   basis for defeating class certification when all we're trying

6   to show here is that this is a reasonable class-wide method

7   with the classic before-and-after methodology for doing this.

8          So I know I've used up I hope not all the time because

9   I'm going to have Mr. Berman please finish briefly on the other

10  portions, if I can.

11         **THE COURT:**  Okay.

12         **MR. BERMAN:**  I try to tell my young attorneys that

13  less is more; so I'll be way less.

14         First, Your Honor, the discussion that Mr. Kessler

15  just told you about Dr. Rascher --

16         **THE COURT:**  Oh, there you go.  Now you turned it up.

17  Did you do something?

18         **MR. BERMAN:**  I didn't do anything.

19         **THE COURT:**  Oh, it suddenly got louder.

20         **MR. BERMAN:**  So --

21         **THE COURT:**  Okay.  Go ahead.

22         **MR. BERMAN:**  -- the discussion that Mr. Kessler was

23  referring to, where Dr. Rascher makes all these adjustments for

24  the lost opportunity class, is at page 69 through 80 of his

25  reply.

1          Allocation, there was a conflict because of this star

2    quarterback issue.  There's no conflict because, as Mr. Kessler

3    explained, in our model, based on what we think is the real

4    world, there wouldn't be a negotiation for broadcast revenue

5    between the star quarterback and CBS or ESPN.  It would be done

6    on a groupwide basis.

7          The same is true --

8          THE COURT:  No.  The negotiation would be between the

9    star quarterback in his living room with the recruiter from

10   Minnesota or whatever.

11         MR. BERMAN:  But not on broadcast revenue because no

12   one is going to start negotiating with student athletes one by

13   one for broadcast revenue.  It's done --

14         THE COURT:  Well, maybe the athletes would.  Maybe

15   they -- I mean, that seems to be what they're positing, that

16   the star --

17         MR. BERMAN:  But they --

18         THE COURT:  -- quarterback would say:  I'm not going

19   to come for a mere 10 percent of the broadcast revenues.  I

20   want -- I'm the star.  For me to come to your school, I need

21   more.

22         MR. BERMAN:  Well, we put in the reliable revenue

23   model from Dr. -- from Mr. Desser that says that's not the way

24   it would work.  You've admitted it.  We're not *Daubert*ing it.

25   It's for the jury to decide who's right or who's wrong.  It's a

1    class-wide issue.  Either we're all right or we're not right.

2          And the NCAA is not allowed, under its rules, to do

3    the kind of recruiting that you just mentioned.  They can't go

4    into a room and say that.

5          The conflict doesn't also exist on video games

6    because -- this is, again, Rascher at 129 and 137 -- EA Sports

7    has said:  We want to pay the kids equally.  We're not going to

8    negotiate with each kid.  It's not possible.

9          So we put in a plausible model that this would be done

10   on a group basis, and therefore, there's no conflict.

11         The conflict between -- sports conflict between the

12   revenue-producing sports and the non-revenue-producing sports

13   is based on speculation.  What they're saying is:  We couldn't

14   afford your model, and so we would cut sports, and so you have

15   a conflict.

16         There's no economic analysis whatsoever from any

17   school or any conference that they put before you that shows

18   that.  It's the same kind of nonsense that they used at the

19   *Alston* trial, where they had people come in and say demand

20   would go down and they had no economic study.

21         The only economics that suggest there's no conflict

22   and this wouldn't happen is Dr. Rascher, and that's at reply,

23   paragraph 36.  What Dr. Rascher found was that broadcast

24   revenue would be 24 percent of total revenues.  So you take

25   10 percent of 24.  You're talking about 2.4 percent of revenues

1  that would now be added costs that they would have to

2  distribute.

3          But their actual revenues in the last few years had

4  increased by more than 2.4.  So they're making money.  They're

5  not going to go out of business.  They're still making money,

6  even if they paid the 2.4 percent of broadcast revenues.  So --

7          **THE COURT:**  I sort of lost you there.  Are you talking

8  about the schools, the conferences, or the NCAA?

9          **MR. BERMAN:**  The conferences.

10          **THE COURT:**  The conferences.

11          **MR. BERMAN:**  Right.  So if they had to pay the

12  2.4 percent -- right? -- to the student athletes, that's still

13  less than the increased revenue they're making every year.

14          **THE COURT:**  Oh, okay.

15          **MR. BERMAN:**  So there's nothing to suggest that any

16  sport would be imperiled, and therefore, there's no conflict.

17          And the last point I'd like to make is on the lost

18  opportunity class, where counsel said, look --

19          **THE COURT:**  By lost -- I wish we had just called it

20  the same thing all the time.  You're talking about the

21  third-party NIL?

22          **MR. BERMAN:**  Third-party NIL.  Okay.  Third-party NIL.

23  I apologize.

24          For the third-party NIL class, counsel said there's a

25  conflict because people wouldn't be happy if they got a certain

1   amount of dollars this year from NIL and they didn't play much

2   and they may have gotten more money in earlier years because

3   they played a lot.  Well, we agree.  That's why Dr. Rascher

4   modeled that.  His model takes care of that, takes care of the

5   amount of playing time, as Mr. Kessler pointed out --

6           **THE COURT:**  With the adjustments, you mean?

7           **MR. BERMAN:**  Exactly.  So there's no conflict in the

8   third-party NIL class.

9           And, again, the third-party NIL class, we go back

10  to --

11          **THE COURT:**  It's more of a third-party NIL damage

12  category.

13          **MR. BERMAN:**  Yes.  Yes.

14          What we've done is, as Jeff pointed out, we know what

15  they made once the restriction was lifted.  We're backcasting,

16  we're doing it before and after.

17          And what counsel is suggesting, there's a host of

18  things that could have happened.  But, again, I go back to the

19  framing issue that Judge Alsup noted.  We can't know with

20  precision what exactly would have happened because we don't

21  know how the world would have operated because of their

22  restraints.  And so we've made a reasonably reliable backcast

23  of what would have happened.  That's all that we're required to

24  do in these circumstances.

25          And that's all I have, unless you have more questions,

1    Your Honor.

2              **THE COURT:**  No, that's fine.

3          Did you want to reply briefly, Mr. Kilaru?

4          **MR. KILARU:**  Very briefly, Your Honor, and I promise

5    I'll only say things that haven't been said before.

6              **THE COURT:**  Oh, good.

7          **MR. KILARU:**  First, Your Honor, Mr. Kessler mentioned

8    how they looked at group licenses that happen in other sports.

9              I think it's really important to remember the claim

10   that they've pleaded, which is a labor market claim.  They

11   pleaded that at the motion to dismiss stage to get around

12   previous decisions.

13             They're modeling -- they're supposed to be modeling

14   the labor market, and their expert admitted that these group

15   licenses where people's NILs are used on trading cards are not

16   payments that are made in a group -- made in a labor market.

17   They're not.  Those are not labor market payments.  He said

18   they're something different.

19             **THE COURT:**  I don't know what you mean by that.  What

20   do you mean, they're not --

21         **MR. KILARU:**  So Mr. Kessler --

22         **THE COURT:**  -- a labor market?

23         **MR. KILARU:**  -- said we have -- Mr. Kessler said we

24   have all these examples of trading cards, of playing cards,

25   things like that.

1          Their expert --

2          **THE COURT:**  Well --

3          **MR. KILARU:**  -- said -- admitted -- Dr. Rascher

4   admitted those are not payments made in a labor market where --

5          **THE COURT:**  Okay.  Those are pretty de minimis,

6   I think.  I'm more interested in the video games, which were

7   quite remunerative, it seems, and popular.

8          **MR. KILARU:**  I think the more important --

9          **THE COURT:**  And as I understand it, they were done by

10  way of group licenses --

11         **MR. KILARU:**  They were --

12         **THE COURT:**  -- back in the day.

13         **MR. KILARU:**  Yes, Your Honor.  But I think this also

14  goes to the question of what they're trying to model with their

15  broadcast NIL claim, which is supposed to be modeling a labor

16  market, not some separate market for licenses.  That's --

17         **THE COURT:**  Well, now you're switching to the

18  broadcast.  There's --

19         **MR. KILARU:**  It's both of them.

20         **THE COURT:**  You've got your broadcast, your video

21  games, and your other.

22         **MR. KILARU:**  For both of them --

23         **THE COURT:**  Which is it you're saying isn't addressing

24  the labor market?

25         **MR. KILARU:**  So both the broadcast and the video game

```
1   claims are supposed to be modeled on a labor market.  That's
2   what you ruled at the motion to dismiss.
3           THE COURT:  Okay.
4       MR. KILARU:  And the point I'm making is that the
5   model that they've come up with doesn't mention any -- doesn't
6   resemble any functioning labor market.
7           There's a declaration in the record from Jimmy Sexton.
8   And I won't talk about what it says.  But he's a professional
9   sports agent who says this is not how this labor marked ever
10  developed.  The precise type of negotiating -- negotiating you
11  talked about, where the star quarterback says "I need more
12  money to attend your particular school," that's what happens in
13  labor markets.  Players negotiate for the biggest salary they
14  can.  They don't just accept some equal payment that's given to
15  everyone on the theory that half a loaf is better than none.
16  That's not what happens in a labor market.
17      THE COURT:  Well, the school could come and say, "You
18  should come to my school because we have -- we're really
19  popular --
20    (Stenographer interrupts for clarification of the record.)
21      THE COURT:  The reporter is having trouble hearing?
22          Oh, sorry.  I probably put my hand in front of my
23  mouth.  Sorry.
24          (Record read as follows:
25          "THE COURT:  Well, the school could come and
```

1          say, 'You should come to my school because we

2          have -- we're really popular' --")

3     **THE COURT:**  -- and we have a lot of video game

4  contracts, and you'll get your fair share or your equal share

5  of those.

6     **MR. KILARU:**  That may be something the school says,

7  but the question is:  Would the school also say, "And we would

8  like to be able to give you more money" and the player would

9  say "I want more money because I'm a superstar.  I'm the

10  quarterback"?

11          **THE COURT:**  Well, okay.

12     **MR. KILARU:**  The star quarterback at USC --

13     **THE COURT:**  But the fact that they're -- are you

14  saying that it wouldn't be a labor market issue if they were --

15  if they were using as an incentive that they had a lot of video

16  games that the person would share into?  Why would that not be

17  a labor market --

18     **MR. KILARU:**  What I'm saying is that the model that

19  they have is not a labor market model.  It's a group license

20  model where everyone gets the same thing by virtue of being in

21  a group license.  It's not what would happen in an actual labor

22  market.

23          And their own expert admits that because in his own

24  literature, in his own work, he says people in sports labor

25  markets are compensated based on their units of talent, not on

1   some idea that everyone is going to get the exact same amount.

2        **THE COURT:**  Okay.

3        **MR. KILARU:**  Second, Your Honor, it's not a defense to

4   Title IX to say what Mr. Kessler said, that more revenues are

5   generated by some sports than others.  That's just not how

6   Title IX works.  That's not a defense to Title IX.

7        Third, the point is not that damages are subject to

8   Title IX.  It's that the world that they're modeling could not

9   exist because of Title IX.  And it's not just the aggregate --

10       **THE COURT:**  Because there's not enough money?

11       **MR. KILARU:**  It's because of what they've done.

12  They've allocated all the money to men and allocated very

13  little to women.  That's the Title IX problem.  That's their

14  model.  That's the world they want you to sign off on.  That's

15  not a world that could exist.

16       **THE COURT:**  Well, maybe they're going to have to spend

17  more of their money and pay more people or --

18       **MR. KILARU:**  But they can't do that, Your Honor.

19       **THE COURT:**  -- divide it more ways.

20       **MR. KILARU:**  Well, that's -- first of all, the

21  dividing more ways, they came up with the model, and they can't

22  alter it now.  Their model doesn't divide it more ways.

23       But, second, they also said -- you look at how they

24  built their model, the only thing that's permissible to be paid

25  for is the NIL that comes out of broadcast.  What they say is

1    the NIL that comes out of broadcast is the 10 percent.  They've

2    allocated the whole 10 percent.  So to the extent they're

3    talking about equalizing payments for NIL, their model has no

4    mechanism for them to do that.

5           The last point I would make, Your Honor, is just on

6    the third-party class -- or the third-party NIL class.  What

7    Mr. Kessler said isn't entirely accurate.  We didn't come in

8    with our own adjustments to their model because the point is

9    that none of this can be done in the aggregate.  Even the

10   adjustments Dr. Rascher has come up with basically say:  Well,

11   if you were in the SEC, you might have had a higher NIL value

12   than to -- than if you were in the Pac-12.

13          That is not how NIL works.  No individual student

14   athlete is tied to the conference that they played in.  It's

15   tied to a number of intensely personal qualifications and

16   qualities that vary over time.  And the very act of creating a

17   model like they have, that assumes everything can be done in

18   the aggregate, everything that can be done in bunches, and

19   everything that happened after one period in time would be

20   replicated before, is precisely the problem.

21          **THE COURT:**  Okay.

22          **MR. KESSLER:**  Sorry.  Just one minute.

23          **THE COURT:**  Okay.

24          **MR. KESSLER:**  Okay.  Dr. Rascher's model is a labor

25   market model.  He explains that in his report.

1          What this is about is how the athletes will be

2    compensated instead of having a rule that prohibits them from

3    being compensated for the NIL.  That's all in the labor market.

4          The reason we looked at things like video games and

5    products is to just value the NIL value, to cover what would be

6    the NIL value that the NCAA would allow.

7          And this goes to my last point.  Mr. Sexton, who he

8    points to, said:  Oh, the quarterback will hold out for more

9    money to go to the school.  NCAA rules prohibit that in the

10   but-for world and in this world.  Mr. Sexton is talking about a

11   labor market that is completely unrestrained.  We don't have

12   that option.  We have to model a world where the NIL

13   restrictions are gone, but the no-pay-for-play rules are still

14   in effect.  If the NCAA wants to now give up all their

15   pay-for-play rules going forward, we would be delighted, and

16   you won't have these issues going forward.

17         But in the past, we have to deal with the reality, and

18   the reality was they had those pay-for-play rules, and that's

19   why Mr. Sexton's world can't exist in the but-for world.

20         Finally, NIL, he says:  Well, you have personal

21   qualities, like social media presence, that are important to

22   NIL.  We agree.  But you're going to have those same qualities

23   in the before period and the after period.  There's no reason

24   to think you're a different person in the before and after

25   period.  And every before and after period makes assumptions

1   that you hold everything else you can constant, adjust for

2   changes in the demand.  That's exactly what we've done here,

3   Your Honor.

4          That's all I have, unless you have something else for

5   me.

6          **THE COURT:**  All right.  I'd like to turn to case

7   management issues for just a minute.  I don't think there's too

8   much.

9          We've got a stipulated schedule which has us headed

10  for trial a year from January, which is an awfully long time

11  from now.  If you wanted to do it sooner, I could do it sooner.

12  I don't quite know how we got a trial date so late, but I guess

13  that was something you all agreed to.  But -- and given if

14  that's the trial date, then all of the other dates fall before

15  it.

16         But my question is what you propose to do to try to

17  settle the case.  I think you said you had chosen a mediator,

18  if I'm not mistaken.

19         **MR. KILARU:**  We have, Your Honor.

20         **THE COURT:**  And I don't know if you've met with that

21  mediator already or have plans to meet with the mediator or

22  what you are thinking about the best way and time to try to

23  settle if not all of the case, than perhaps a partial

24  settlement as has -- as was done in some of the other cases.

25         **MR. KILARU:**  Your Honor, I'm happy to start.

 1  Mr. Berman can obviously fill in.

 2          Obviously, I don't think we want to get into the

 3  details of any discussions --

 4          **THE COURT:**  No.  And I don't want to put you on the

 5  spot either.

 6          **MR. KILARU:**  No, that's fair.

 7          We've had some discussions.  We intend to continue

 8  working on those discussions, is what I would say at this

 9  point.

10          **THE COURT:**  Okay.  And what do you think, Mr. Berman?

11          **MR. BERMAN:**  We are aware of our responsibilities

12  under the local rules to try to --

13          **THE COURT:**  Could you do whatever you did before to

14  make yourself louder?

15          **MR. BERMAN:**  We're aware that we're supposed to be,

16  you know, trying to settle under the local rules.  We think we

17  are fulfilling what we're supposed to do.  And I don't really

18  want to say more than that.

19          **THE COURT:**  I could issue an order.  Maybe neither of

20  you wants to step out on this.  But I could issue an order.

21          **MR. BERMAN:**  We don't think there's --

22          **THE COURT:**  For the certain numbers of conferences

23  with certain participations and certain time frames that they

24  would happen, like after the class cert order comes out, before

25  the summary judgment motion is made.

```
 1            Maybe you don't want to admit that you think that's a
 2   good idea, but I could do that.
 3            MR. BERMAN:  We don't think it's necessary,
 4   Your Honor.  We're not trying to go in detail because --
 5            THE COURT:  No, I -- right.  I know why you don't want
 6   to talk about it but --
 7            MR. BERMAN:  It's happening.
 8            THE COURT:  Okay.  You could just say something like
 9   "A more hands-on approach might be helpful" or "Some deadlines
10   might be helpful" or something like that.
11            But I don't hear anybody saying that.
12            MR. KILARU:  I think we will come -- I think we'll
13   come to you if we need that, Your Honor.  I don't know if
14   Mr. Berman disagrees with that right now.  We don't think that
15   that's necessary.
16            THE COURT:  Okay.  Well, either of you should feel
17   free to raise it.  You can raise it privately, just amongst
18   yourselves, if you prefer.  But I don't want everyone standing
19   on ceremony and saying:  I can't be the one to propose this.
20            MR. BERMAN:  There's no ceremony going on here,
21   Your Honor.
22                         (Laughter.)
23            THE COURT:  Okay.
24            MR. BERMAN:  The other thing I would note is when I
25   was getting ready for the CMC, I had the same reaction you did.
```

1   Wow, why is our trial date a year from now?  So --

2          **THE COURT:**  Well, you stipulated to it.

3          **MR. BERMAN:**  Yeah, we did, and I think that was --

4          **THE COURT:**  If there had been an earlier stipulation,

5   which was, likewise, somewhat -- I don't want to say

6   "relaxed" -- which was, likewise, rather lengthy, and then you

7   stipulated to extending it, and I signed off on the

8   stipulation.  Now I'm sort of wondering why.

9          But there it is.

10         **MR. BERMAN:**  Your Honor --

11         **THE COURT:**  If you want to talk about that too, I'd be

12  amenable to trying to tighten that up.

13         **MR. BERMAN:**  Yeah.  We will -- I'm going to raise it

14  because I had a reaction:  Why did we do this?  I can't

15  remember why we did.  And so --

16         **THE COURT:**  I think that was my question too.  Not why

17  did you do it, but why did I do it.

18         **MR. BERMAN:**  Okay.

19         **THE COURT:**  Okay.  Anything else, then, from anybody?

20         **MR. BERMAN:**  Not from our side, Your Honor.

21         **THE COURT:**  And what do we have next?  I guess you're

22  finishing up -- oh, we've got some briefing coming in next

23  week.  I hope that won't resolve into a contested thing.  But

24  if it does, I'll do it on the papers, I'm sure, or send it to

25  Judge Cousins.

```
 1          And then, after that, you're doing your discovery; and
 2   then you're getting into your expert disclosures and expert
 3   discovery; and then your summary judgment is aimed at about a
 4   year from now and your trial, about a year and a half from now.
 5          Okay.  Thank you.
 6          MR. BERMAN:  Thank you, Your Honor.
 7          MR. KILARU:  Thanks, Your Honor.
 8          MR. KESSLER:  Thank you, Your Honor.
 9          THE CLERK:  Court is in recess.
10          (Proceedings adjourned at 4:16 p.m.)
11                        ---o0o---
12
13                   CERTIFICATE OF REPORTER
14          I certify that the foregoing is a correct transcript
15   from the record of proceedings in the above-entitled matter.
16
17   DATE:  Tuesday, September 26, 2023
18
19
20
21   _____
22          Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
        CSR No. 7445, Official United States Reporter
23
24
25
```