STUART PLUNKETT (SBN 187971)
Stuart.Plunkett@alston.com
**ALSTON & BIRD LLP**
560 Mission Street, Suite 2100
San Francisco, CA 94105
Telephone:      415-243-1000

*Attorney for Non-Party*
*National Football League Players Association*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | Case No.:  4:20-cv-03919-CW<br><br>Assigned to Judge Claudia Wilken<br><br>**NON-PARTY NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION'S STATEMENT IN SUPPORT OF SEALING CERTAIN CONFIDENTIAL BUSINESS MATERIAL IN PARTIES' CLASS CERTIFICATION FILINGS** |

## I.    INTRODUCTION

Formed in 1956, non-party National Football League Players Association (**"NFLPA"**) serves as the union for professional football players in the National Football League (**"NFL"**).  The NFLPA's main purpose is to protect NFL players' rights as professional football players, including by representing them in matters concerning wages, hours, and working conditions.  The NFLPA also represents the players' interest in negotiations concerning the Collective Bargaining Agreement, the labor agreement between the NFLPA and the NFL that outlines the terms for future employee players in the NFL through the Final League Year.[1]  In addition to representing the players' interests, NFLPA also enters into licensing agreements and other contractual relationships with third parties, permitting the creation and sale of various products and merchandise associated with the players' name and likeness.  With each of these purposes and roles, the NFLPA possesses highly sensitive, proprietary and valuable information that, if made public, would damage the NFLPA's business and ability to represent its members effectively.

Non-Party National Football League Players Association (**"NFLPA"**) submitted a Declaration and Supplemental Declaration by National Football League Players Incorporated's (**"PI"**) President, Steven J. Scebelo, in response to Plaintiffs' third-party subpoena for the production of documents, dated December 2, 2021, that was addressed to the NFLPA.  Mr. Scebelo's Declaration bears the designation HIGHLY CONFIDENTIAL – COUNSEL ONLY pursuant to the Stipulation and Protective Order entered in the above action (ECF No. 137).  From October 21, 2022 to September 1, 2023, parties in the above action filed a series of motions under seal relating to class certification and the exclusion of opinions, reports, and testimony by experts.  As set forth below, some of these documents contain NFLPA's confidential material (ECF Nos. 208, 209, 250, 251, 289, 290, and 291).

Accordingly, pursuant to Civil Local Rule 79-5(c) and (f), Non-Party NFLPA submits this statement and the accompanying declaration of Stuart Plunkett requesting that this Court maintain under seal NFLPA's confidential information from the documents identified below.  In recognition of the Court's strong desire for public access, this statement is narrowly tailored, supporting the sealing

---

[1]     The Final League Year for the current Collective Bargaining Agreement is 2030.

of only one document in its entirety and portions of the remainder of the documents.  Maintaining this information under seal is critical to protecting NFLPA's legitimate confidentiality interest and competitive standing.

## II.    NFLPA'S REQUESTS FOR SEALING

| Document | Portion of the Document Sought to be Sealed (Pages:Lines or Exhibit) | Reasons for Sealing |
|---|---|---|
|  | 1:1-3:4 | This section does not need to be sealed. |
| Declaration of Steven J. Scebelo in Response to Subpoena *Suces Tecum* | 3:5-12 | This section of the declaration contains the assignment provision of the NFLPA's Group Licensing Agreement, which is not publicly available. Disclosure of this information would cause serious competitive injury to NFLPA. |
|  | 3:13-19 | This section does not need to be sealed. |
|  | 3:20-22 | This section of the declaration contains commercially-sensitive details regarding licensing practices under the NFL/NFLPA Commercial Agreement, including how group players rights are licensed for sponsorship use. Disclosure of this information would cause serious competitive injury to NFLPA. |
|  | 3:23-26 | This section identifies Exhibit A, which contains highly sensitive details NFLPA's license agreements (including specific financial figures, dates, and third-party information). Disclosure of this information would cause serious competitive injury to NFLPA. |
|  | 3:27-4:5 | This section does not need to be sealed. |
|  | 4:6-8 | This section of the declaration contains commercially-sensitive details regarding NFLPA's group licensing programs, including how revenue is distributed to NFL players. Disclosure of this information would cause serious competitive injury to NFLPA. |
|  | 4:9-19 | This section of the declaration contains commercially-sensitive details regarding NFLPA's group licensing revenues, including information on the players' share of the revenues. Disclosure of this information would cause serious competitive injury to NFLPA. ==This information is also protected by non-disclosure and/or confidentiality agreements with players [to confirm].== |
|  | 4:20-26 | This section of the declaration contains commercially-sensitive details regarding NFLPA's group licensing revenues, including information on the players' share of the revenues and details on specific licensees. |

3

| Document | Portion of the Document Sought to be Sealed (Pages:Lines or Exhibit) | Reasons for Sealing |
|---|---|---|
| | | Disclosure of this information would cause serious competitive injury to NFLPA. ==This information is also protected by non-disclosure and/or confidentiality agreements with the licensees [to confirm].== |
| | 4:27-5:5 | This section of the declaration contains commercially-sensitive details regarding NFLPA's revenue s v Disclosure of this information would cause serious competitive injury to NFLPA. |
| | 5:6-10 | This section of the declaration contains commercially-sensitive details regarding NFLPA's engagements with licensees and sponsors for non-group licensing agreements. Disclosure of this information would cause serious competitive injury to NFLPA. |
| | 5:11-13 | This section of the declaration contains commercially-sensitive details regarding the valuation of player's rights. Disclosure of this information would cause serious competitive injury to NFLPA. |
| | 5:14-16 | This section does not need to be sealed. |
| | 5:17-27 | This section of the declaration contains commercially-sensitive details regarding NFLPA's practice of licensing player rights in connection with certain products. Disclosure of this information would cause serious competitive injury to NFLPA. |
| | 6:1-8:3 | This section does not need to be sealed. |
| | Exhibit A | Exhibit A is a spreadsheet containing information related to license agreements, including specific financial figures, dates, and third-party information. Disclosure of this information would cause serious commercial and competitive injury to NFLPA. Given the presence of personal third-party information ==and financial information subject to nondisclosure agreements [to be confirmed]==, this document should be sealed in its entirety. |
| Supplemental Declaration of Steven J. Scebelo | 1:16-3:15 | This section does not need to be sealed. |
| | 3:16-23 | This section of the declaration contains commercially-sensitive details regarding the way NFLPA generates revenue from the group licensing programs and distributes it to players. Disclosure of this information would cause serious competitive injury to NFLPA. |
| | 4:1-9 | This section does not need to be sealed. |
| | 4:10-13 | This section of the declaration contains commercially-sensitive details regarding NFLPA's royalty distribution |

| Document | Portion of the Document Sought to be Sealed (Pages:Lines or Exhibit) | Reasons for Sealing |
|---|---|---|
| | | to players. Disclosure of this information would cause serious competitive injury to NFLPA. |

   The below chart details the texts and exhibits of Plaintiff's recent class certification filings that should remain under seal given the above designations.

| Document | Text or Exhibit to be Sealed | Actual Text | Reasons for Sealing |
|---|---|---|---|
| Plaintiffs' Class Certification Motion (**ECF No. 208**) | p. 32 n. 57 | Exs. 52, 53 (NFLPA and NBPA declarations) | Portions of the Declaration of Steven J. Scebelo contain highly sensitive commercial information and should remain under seal. Those sections are specified in the chart above. |
| Declaration of Steve W. Berman in Support of Plaintiffs' Motion (**ECF No. 208-1**) | Ex. 52 | Exhibit 52 is the declaration of Steven J. Scebelo in response to Plaintiffs' subpoena. | Portions of the Declaration of Steven J. Scebelo contain highly sensitive commercial information and should remain under seal. Those sections are specified in the chart above. |
| Expert Report of Daniel A. Rascher (**ECF No. 209-2**) | p. 67 ¶ 141 | Over the years, these rates for the two flagship pro games (EA's Madden NFL and | |
| | p. 68 ¶ 141 | Take-Two's NBA 2K) range between 8.5% and 10% (with a 1% YOY escalator) for football … depending on the royalty base | |
| | p. 68 n. 157 | See "Electronic Arts (Video Games)," Exhibit 5 (excluding "joint endeavor projects") and "Take-Two Interactive Software, Inc.," Exhibit 7. | |
| | p. 78 ¶ 159 | Hence, in the NBA and NFL, stars earn the lion's share of endorsement money, but the players associations for each league (NBPA & NFLPA, respectively) run group-license pools where all full members of every team's roster share equally, whether they are superstars or benchwarmers.176 And in the analogous video game situation, where a whole roster is also needed, I show above that EA has stated it "would recommend using a group license where all the participating | |

| Document | Text or Exhibit to be Sealed | Actual Text | Reasons for Sealing |
|---|---|---|---|
| | | players would have the opportunity to be represented in our game and compensated equally,"177 while in EA's spreadsheets the company has, in fact, modeled a fixed annual percentage royalty for payments to athletes. | |
| | p. 78 n. 176 | Declaration of Steven Scebelo (NFLPA), September 26, 2022, ¶15 (NFLPA_000001 at 005). "The players' share of Group Licensing Revenue is referred to as the "Group Player Pool" and is shared equally among all active members of NFLPA/PI who meet the eligibility criteria outlined below. As a matter of union policy, a player's marketability is not utilized as an eligibility factor to share in the funds that are distributed equally." | |
| | p. 82 ¶ 165 | Furthermore, the payments derived from Player Association group-license agreements are typically split equally between all athletes.192 For example, the NFLPA has declared that "[t]he players' share of Group Licensing Revenue is referred to as the 'Group Player Pool' and is shared equally among all active members of NFLPA/PI who meet the eligibility criteria outlined below. As a matter of union policy, a player's marketability is not utilized as an eligibility factor to share in the funds that are distributed equally." | |
| | p. 82 n. 192 | Declaration of Steven Scebelo (NFLPA), September 26, 2022, ¶¶15-17 (NFLPA_000001 at 05-06). | Portions of the Declaration of Steven J. Scebelo contain highly sensitive commercial information and should remain under seal. Those sections are specified in the chart above. |
| | p. 82 n. 193 | Declaration of Steven Scebelo (NFLPA) (NFLPA_000001), ¶15… For NFL football players, revenue is "shared equally," unless from products featuring a particular athlete: "Revenue generated from products featuring an individual player is directly attributed to the individual players based on the | |

| Document | Text or Exhibit to be Sealed | Actual Text | Reasons for Sealing |
|---|---|---|---|
| | | royalties actually generated by the use of their name, image, and likeness rights. The most prominent example of this type of program is jersey sales, which pays based on the sales of each particular | |
| | p. 83 n. 193 | player's jersey." Declaration of Steven Scebelo (NFLPA), September 26, 2022, ¶¶15-17 (NFLPA_000001 at 0005-0006). | |
| | p. 85 ¶ 172 | the group-license royalty rates charged for the use of professional football and basketball athletes' NILs for digital products and collectible cards range from 4 to 25 percent. | |
| | p. 86 Ex. 5 | This exhibit includes specific financial figures, dates, and other information related to the terms of certain NFLPA licensing agreements. | |
| | p. 86 n. 198 | Selected license terms from NFLPA_000010. I selected licensees with minimum guarantees above or equal to $500,000, with non-zero and non-missing royalty rates, and with product types that are likely to show name, image, and likeness of a pro player – these are mainly various video and mobile games, as well as physical and digital collectible cards. See Exhibit 5 backup for more detail. "Product Type" was "Licensed Rights (i.e., product type)" in the original document. Royalty term descriptions were taken directly from NFLPA. | |
| Expert Report of Edwin S. Desser **(ECF No. 209-3)** | p. 40 Sec. 9 | video game, apparel, and trading card agreements. The licensees pay to acquire the NIL of all NFLPA … members even though the licensees do not actually include all players in their video games, or make jerseys or trading cards for all players, or even know all their identities when the deal is originally negotiated. The licensees nonetheless want the flexibility to add or substitute player NIL as a season unfolds (e.g., to begin making jerseys | |

| Document | Text or Exhibit to be Sealed | Actual Text | Reasons for Sealing |
|---|---|---|---|
| | | for an emerging player). | |
| | p. 40 n. 43 | *See, e.g.,* NFLPA_0000010. | |
| | p. 56 Sec. 15.3 | A review of summary data for these licenses for apparel and hardline goods reveals a median royalty rate of 14% | |
| | p. 56 n. 66 | *See* NFLPA_0000010. Calculated as median value of single license wholesale rates. | |
| | p. 59 Sec. 16 | A review of NFLPA license summaries generally indicates a group median royalty rate of approximately 15%. | |
| | p. 59 n. 72 | NFLPA_0000010 (analyzing Single License Wholesale Rates). | |
| Defendants' Notice of Motion, Motion, and Memorandum of Points and Authorities in Support Thereof to Exclude the Opinions, Reports, and Testimony of Edwin Desser and Daniel **(ECF No. 250)** | p. 11:1-2 | the "median" royalty rate | |
| | p. 14:18 | trading cards and video games | |
| | p. 14:21 | The redacted portion of this sentence includes specific figures for variance between valuations of licensing agreements among NFLPA, NBPA and WNBPA. | |
| Expert Report of Catherine Tucker, Ph.D. **(ECF No. 251-1)** | p. 147 (Fig. 12) | This figure includes images of a trading card from NFLPA's group licensing agreement with Panini America | |
| | p. 147 n.374 | Cracknell, Ryan, "2022 Panini XR Football Checklist, Team Set Lists and Details," *Beckett*, available at https://www.beckett.com/news/2022-panini-xr-footballcards/, accessed on March 20, 2023 | |
| | p. 148 ¶ 164 | This excerpt contains information about group licensing rates for the NFL and NBA group license deals for video games. Specifically notes that the Desser report calculates the median NFLPA group license deals | |

| Document | Text or Exhibit to be Sealed | Actual Text | Reasons for Sealing |
|---|---|---|---|
| | | for digital products to be 15 percent. | |
| | p. 148 n.377 | "A review of NFLPA license summaries generally indicates a group median royalty rate of approximately 15%."). | |
| Expert Report of Bob Thompson **(ECF No. 251-2)** | p. 38 n.112 | This footnote cites to the declaration of Steven J. Scebelo in response to plaintiffs' subpoena. | |
| | p. 41 | each player retains all rights to license his or her individual NIL rights on a non-group basis | |
| | p. 41 | EA pays a flat licensing fee to the NFLPA and NFLPI, not a royalty or a percentage of the revenue generated from selling EA products. EA has no involvement with or control over how NFLPI distributes the fee paid by EA. | |
| | p. 41 n.132 | Scebelo Dec. ¶ 18. | |
| | p. 42 n.140 | royalties for products featuring an individual NFL player's NIL, like a jersey, are paid to the individual player featured on the product. Scebelo Dec. ¶¶ 17-18. | |
| Declaration of Steve W. Berman in Further Support of Plaintiff's Motion for Class Certification **(ECF No. 289-1)** | Ex. 58, p. 86:13-15 | You don't disagree with his testimony that TV-related revenue is shared by NFL players through both benefits and player compensation. | |
| Reply Report of Edwin S. Desser **(ECF No. 289-2)** | p. 14 ¶ 3.2.1 | Chart showing 15% median wholesale royalty for NFLPA video games and 14% for licensed hardline and apparel. | |
| | p. 16 | Between 8-12% | |
| Expert Reply Report of Daniel A. Rascher **(ECF No. 290-2)** | p. 56 ¶ 102 | 25%, | |
| | p. 57 ¶ 102 | establish that 10% is a conservative estimate in comparison to these yardstick deals, as it is at or below median royalty rates for professional football and basketball licensing | |

| Document | Text or Exhibit to be Sealed | Actual Text | Reasons for Sealing |
|---|---|---|---|
| | | deals involving athlete NIL. | |
| Plaintiffs' Opposition to Defendants' Motion to Exclude the Opinions, Reports, and Testimony of Edwin Desser and Dr. Daniel Rascher **(ECF No. 291)** | 4:19-20 | This excerpt indicates that the median royalty rate for the NFLPA's apparel and merchandise agreements for player NIL is 14%. | |
| | 4:22-23 | This excerpt indicates that in video game licensing agreements the median royalty rate is 15% for the NFLPA. | |

## III.   THERE ARE COMPELLING REASONS TO SEAL NFLPA'S CONFIDENTIAL BUSINESS INFORMATION.

The Ninth Circuit recognizes that public access to judicial records is "not absolute." *Kamakana v. City & County of Honolulu,* 447 F.3d 1172, 1178 (9th Cir. 2006).  Courts generally have broad discretion to prevent disclosure of "many types of information, including but not limited to trade secrets or other confidential research, development, or commercial information."  *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.,* 307 F.3d 1206, 1211 (9th Cir. 2002).  Here, NFLPA seeks to keep under seal its confidential information revealed in the above filings and there are compelling reasons to do so.  *Kamakana,* 447 F.3d at 1178-79 (Recognizing that there must be "compelling reasons" for sealing "sufficient to outweigh the public's interest in disclosure.").

Specifically, the parties' filings contain nonpublic information about NFLPA, including confidential information regarding NFLPA's contractual agreements with third parties and granular details about its licensing agreements and royalty shares.  Because "confidential business information in the form of 'license agreements, financial terms, details of confidential licensing negotiations, and business strategies' satisfies the 'compelling reasons' standard" in the Ninth Circuit, NFLPA's confidential information should remain sealed.  *Jones v. PGA Tour, Inc.,* No. 22-cv-04486-BLF, 2023 WL 357000 (N.D. Cal. 2023).  Additionally, the disclosure of NFLPA's information such as "pricing terms, royalty rates, and guaranteed minimum payment terms" with other parties can "harm the parties

in future negotiations" and consequently harm NFLPA's competitive standing.  *In Re Electronic Arts,* 298 F. App'x 568, 569 (9th Cir. 2008); *In re Qualcomm Litigation,* No. 3:17-cv-0108-GPC-MDD, 2017 WL 5176922, at *2 (S.D. Cal. Nov. 8, 2017); *see also Roley v. Google LLC,* No. 18-cv-07537-BLF, 2020 WL 13517498, *1 (N.D. Cal. 2020) (finding sealing permissible where "business competitors seek[] to replicate [a company's] business practices and circumvent the time and resources necessary in developing their own practices and strategies.").

Moreover, courts in the Ninth Circuit have granted motions to seal where the information in question is subject to a confidentiality or nondisclosure agreement.  *See ScaleMP, Inc. v. TidalScale, Inc.,* No. 18-cv- 04716-EDL, 2019 U.S. Dist. LEXIS 226869, at *26 n.6 (N.D. Cal. March 6, 2019) (granting motion to seal email communications because it contained information covered by a nondisclosure agreement).  NFLPA respectfully requests that this Honorable Court do the same as certain sections, as identified in the chart above, reference extremely sensitive and proprietary information covered by nondisclosure and confidentiality agreements.  When a non-party like NFLPA "d[oes] not voluntarily put [its confidential information] at issue" in the litigation, courts have afforded greater deference to keeping documents under seal so as to avoid "chill[ing] investigations in the future where third party documents are essential."  *United States v. Bazaarvoice, Inc.,* No. 13-cv-00133-WHO, 2014 WL 11297188, at *1 (N.D. Cal. Jan. 21, 2014).  Consequently, for the foregoing reasons, there are compelling reasons to keep NFLPA's confidential information under seal.

## IV.   THE COMPELLING REASONS TO SEAL OOUTWEIGH ANY PUBLIC INTEREST IN THE REDACTED MATERIAL.

The NFLPA's request to seal a portion of the parties' filings and accompanying exhibits is the result of its good faith effort to only seek the sealing of information that is confidential, commercially sensitive, and cannot be protected from public disclosure through less restrictive means.  Any public interest in disclosing the redacted information is outweighed by the prejudice that will result to NFLPA, a non-party to the above litigation, if no protection is granted.

///

///

1    DATED:  September 29, 2023          ALSTON & BIRD LLP

2

3                                        */s/ Stuart Plunkett*
                                         Stuart Plunkett

4
                                         *Attorney for Non-Party*
5                                        *National Football League Players Association*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NON-PARTY NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION'S STATEMENT ISO SEALING
Case No. 4:20-cv-03919-CW