1

2

3

4           IN THE UNITED STATES DISTRICT COURT

5         FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7   IN RE: COLLEGE ATHLETE NIL          Case No. 20-cv-03919 CW
    LITIGATION
                                        **ORDER DENYING MOTION TO**
8                                       **EXCLUDE DESSER AND RASCHER**
                                        **OPINIONS**
9

10                                      (Re: Dkt. No. 253)

11

12

13         Now before the Court is Defendants' motion to exclude under Federal Rule of Evidence

14   702 certain opinions of Edwin S. Desser, Plaintiffs' expert on sports media and broadcasting

15   rights, and Dr. Daniel A. Rascher, Plaintiffs' economics expert.  Docket No. 253.  Plaintiffs

16   oppose the motion.  Docket No. 292.  For the reasons set forth below, the Court denies the motion.

17   **I.      LEGAL STANDARD**

18         Under Federal Rule of Evidence 702, an expert is qualified as a witness if (a) the expert's

19   scientific, technical, or other specialized knowledge will help the trier of fact to understand the

20   evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c)

21   the testimony is the product of reliable principles and methods; and (d) the expert has reliably

22   applied the principles and methods to the facts of the case.  Fed. R. Evid. 702.  The proponent of

23   expert testimony has the burden of proving admissibility in accordance with Rule 702.  *See* Fed.

24   R. Evid. 702 advisory committee's note to 2000 amendment.  "Rule 702 should be applied with a

25   'liberal thrust' favoring admission[.]"  *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232

26   (9th Cir. 2017) (citation and internal quotation marks omitted).

27         An expert may testify if the proponent demonstrates that: (i) the expert is qualified; (ii) the

28   expert's opinions are relevant to the suit; and (iii) the expert's opinions are reliable.  *See Daubert*

United States District Court
Northern District of California

*v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 (1993).  "[T]he trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (citation and internal quotation marks omitted).  The focus of the district court's analysis "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.  In other words, the court's task "is to analyze not what the experts say, but what basis they have for saying it." *Wendell*, 858 F.3d at 1232 (citation and internal quotation marks omitted).  "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564.

## II.     DISCUSSION

### A.     Edwin S. Desser

Edwin S. Desser is Plaintiffs' expert on sports media and broadcasting rights.  *See* Desser Rep., Docket No. 209-3 (SEALED); Desser Reply Rep., Docket No. 290-3 (SEALED).  Desser has worked in the sports media industry since 1977 and has decades of experience in negotiating and valuing professional sports broadcast agreements.  Desser Rep. at 9.  He worked as a media executive for the National Basketball Association (NBA) for twenty-three years; some of that work involved negotiating media agreements with media companies such as ESPN, Turner Broadcasting, and NBC Sports.  *Id.* at 9-10.  Since 2005, Desser has been an independent media consultant; in that role, Desser has worked on rights negotiations and valuations for consulting clients that include Defendant NCAA and some NCAA conferences.  *Id.* at 10.  Desser also has provided expert testimony on sports broadcasting matters, including in prior litigation involving the names, images, and likenesses (NIL) of Division I football and basketball student-athletes.  *Id.*

As relevant here, Desser was tasked with opining on the estimated value of student-athletes' BNIL for Power Five Football Bowl Subdivision (FBS) games, and men's and women's Division I basketball games, as compared to the revenues Defendants make from broadcast contracts for those sports.  Desser concluded that at least ten percent of the value of (i.e., revenue from) the broadcast rights for those sports is attributable to the student-athletes' NIL contained in the broadcasts (hereinafter, the ten percent opinion).  *See id.* at 7, 52-59.  In formulating this

United States District Court
Northern District of California

opinion, Desser relied on his decades of experience in negotiating professional sports broadcast agreements, as well as his analysis of data he believes is probative, including professional sports group licensing royalty rates.  *See id.*

Desser was also tasked with estimating the per-sport revenue allocation for Defendants' multi-sport broadcast agreements.  *Id.* at 8.  Desser concluded that, for Defendants' broadcast agreements that cover multiple sports, the overall average allocation of the revenue is seventy-five percent to football, fifteen percent to men's basketball, five percent to women's basketball, and five percent to all other sports (hereinafter, the allocation opinion).  *Id.* at 8, 60-63.  In formulating this opinion, Desser relied on his decades of experience in negotiating sports media deals, discussions with many network and college conference executives during his career, and his review of relevant evidence, which includes audited financial statements, various broadcast contracts for college sports, and publicly available information that reflects or is indicative of the popularity of various college sports.  *See id.* at 60-62.

### 1.    Desser's opinion that the NIL used in sports broadcasts represents ten percent of the value of Defendants' broadcasting revenue

Defendants move to exclude Desser's ten percent opinion on the ground that it is unreliable.  Defendants contend that (1) the ten percent opinion lacks any factual basis because student-athletes' NIL in broadcasts have never been valued separately from other components of broadcast contracts prior to this litigation and, therefore, there is no "real-world" market for student-athlete NIL in broadcasts or "real-world" data that would permit reliable valuations; (2) Desser's industry experience is not an adequate basis for the ten percent opinion because he has never negotiated college sports broadcast rights; and (3) the group licensing royalty rates for the use of professional athletes' NIL in apparel, merchandise, and video games that Desser relied upon do not serve as a reliable basis for the ten percent opinion because those royalty rates do not speak to the value of student-athletes' NIL in broadcasts.  Docket No. 253 at 7-11.

Plaintiffs oppose the motion, arguing that (1) professionals such as Desser, who negotiate broadcasting rights, rely on their experience in estimating the value of components of broadcasting

rights, as Defendants' own expert, Bob Thompson, acknowledged[1]; (2) Desser explained how his extensive industry experience supports the ten percent opinion; (3) Desser validated his ten percent opinion by examining analogous data points, namely the royalty rates for the use of professional football and basketball players' NIL in apparel, other merchandise, and video games; and (4) the absence of real-world data as to the value of student-athletes' NIL in broadcasts is the direct result of Defendants' restrictions on student-athlete compensation.  Docket No. 292 at 8-13.

"[T]he text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience," either alone or in combination with other knowledge, skill, training, or education. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment.  "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *Id.*

Desser's ten percent opinion satisfies those requirements.  In his report, Desser explained how he arrived at his estimate that at least ten percent of the value of Defendants' broadcast agreements is attributable to student-athletes' NIL in broadcasts for FBS football and Division I men's and women's basketball.  Desser relied on his decades of experience in negotiating professional sports media rights to estimate that about one half of the total value of sports broadcasts is attributable to athletes' contributions (with that total value including the value of NIL, as well as the value of their athletic performance).  Desser Rep. at 52-54; Desser Reply Rep. at 13-15.  He also relied on his experience to estimate that the majority of the value of athletes' contributions is attributable to the athletes' athletic performance, while a minority of that value, from twenty to thirty percent, is attributable to their NIL.  *See id.*  Based on those estimates and his experience, Desser concluded that ten percent is a conservative estimate of the value of

---

[1] Defendants' expert, Bob Thompson, testified that one of the factors that play a role in the negotiation and valuation of media agreements is "experience."  *See* Thompson Dep. Tr. at 75-76, Docket No. 290-1 ("Q: Is it fair to say that when networks or conferences negotiate media agreements and they make valuations, they are, in part, relying on, as you put it, their gut or their experience in the industry? A: I like to call it more experience than gut, but yes, you're correct.  I mean, it's just another element of what you do when you purchase rights.").

United States District Court
Northern District of California

United States District Court
Northern District of California

1    student-athletes' NIL in the broadcasts of Power Five FBS football and Division I men's and

2    women's basketball. *See id.*

3          In addition to being based on his experience, Desser's ten percent opinion is also based on

4    his review of the royalty rates in group licensing agreements for apparel, other merchandise, and

5    video games that use professional athletes' NIL. Desser Rep. at 56-59. Desser explained that

6    these royalty rates are probative of the value of student-athletes' NIL in broadcasts and that the

7    royalty rates for video games are the most probative because video games use athletes' NIL in a

8    manner that is very similar to how athletes' NIL are used in sports broadcasts, as video games

9    attempt to replicate real-life games. *See, e.g., id.* at 56-59; Desser Reply Rep. at 14-16. Further,

10   Desser explained that video game royalty rates are particularly helpful in estimating the value of

11   student-athletes' NIL in broadcasts because those royalty rates isolate the value of the athletes'

12   NIL from the value of their athletic performance, as video games employ athletes' NIL but do not

13   involve their athletic performance. *See id.*

14         Because Desser explained how his experience and review of royalty data that he deems to

15   be relevant and probative supports the ten percent opinion, the Court finds that the opinion is not

16   subject to exclusion as unreliable. *See Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, No. 5:16-

17   CV-06370-EJD, 2019 WL 4780183, at *3 (N.D. Cal. Sept. 30, 2019), *aff'd*, 20 F.4th 466 (9th Cir.

18   2021) (rejecting argument that an expert's opinions that were "not subject to peer review or exact

19   replication" were "unsupported" and holding that the opinions were sufficiently reliable because

20   they were based on the expert's experience and the expert "provide[d] a sufficient basis for

21   understanding how he reached his opinions and to show that they are supported"); *see also Ibekwe*

22   *v. White*, No. 14-CV-6523, 2016 WL 6963051, at *2 (C.D. Cal. Feb. 23, 2016) (denying motion to

23   exclude expert opinion about athlete pay, longevity, and lost wages on the ground that the opinion

24   had a sufficient basis in the expert's experience in "contracting and paying athletes" and his

25   review of evidence in the record).

26         Defendants cite no authority that compels a different conclusion. Defendants rely

27   primarily on opinions in which courts excluded expert testimony on patent damages. *See* Docket

28   No. 253 at 8. Those opinions are not helpful here because damages calculations in patent cases

                                                    5

United States District Court
Northern District of California

are governed by legal standards that are specific to patent cases, and courts consider those standards when determining whether opinions on patent damages are relevant and reliable under Rule 702.  *See, e.g.*, *GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247, at *4-5 (N.D. Cal. Apr. 16, 2014) (excluding patent expert's royalty rate opinion in relevant part because he failed to conduct "an explicit apportionment analysis, or explain[] [] why apportionment [wa]s inappropriate" according to the standard for calculating patent damages); *Open Text S.A. v. Box, Inc.*, 2015 WL 349197, at *5 (N.D. Cal. Jan. 23, 2015) (excluding patent expert's royalty rate opinion because it amounted to a "superficial recitation of the *Georgia-Pacific* factors [for determining patent damages], followed by conclusory remarks").

Plaintiffs have shown, and Defendants do not dispute, that damages calculations in antitrust cases are subject to a different, "relaxed" standard, which takes into account the fact that damages in an antitrust case necessarily must be based on inferences or assumptions about what would have occurred in the absence of the challenged anticompetitive conduct.  *See Knutson v. Daily Rev., Inc.*, 548 F.2d 795, 811 (9th Cir. 1976) (holding that courts employ "a relaxed standard for proving the amount of damages in an antitrust case" pursuant to which "it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate"); *see also Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.,* 773 F.2d 1506, 1511 (9th Cir. 1985) ("Defendants, whose illegal conduct operates to exclude others from the relevant market, should not benefit because their wrongdoing makes it more difficult for the plaintiff to establish the precise amount of its injury.  The jury is allowed to act on probable and inferential proof in determining the amount of damages even though such an award may be an approximation.") (internal citation omitted).

Defendants' main argument in support of their motion to exclude the ten percent opinion is that the value of NIL rights in broadcasts is a "concept fabricated for this litigation" because student-athletes' NIL in broadcasts have never been valued or sold separately from other components of college sports broadcast agreements.  Docket No. 253 at 3; Docket No. 304 at 2. Defendants contend that, because student-athletes' NIL have not been valued separately in the past, there is no "real-world market for stand-alone BNIL," which in turn means that (1) student-

1   athletes' NIL do not have value, and (2) any value that Desser attributes to student-athletes' NIL

2   lacks a "factual basis." *See* Docket No. 253 at 7.

3       The Court is not persuaded. Defendants disagree with Desser's conclusion that student-

4   athletes' NIL in broadcasts do have value and urge the Court to adopt their version of the facts,

5   namely that student-athletes' NIL in broadcasts do not have value. That there are conflicting

6   versions of the facts as to this issue is not a proper basis for excluding Desser's opinion about the

7   value of student-athletes' NIL. *See* Fed. R. Evid. 702 advisory committee's note to 2000

8   amendment ("The emphasis in the amendment on 'sufficient facts or data' is not intended to

9   authorize a trial court to exclude an expert's testimony on the ground that the court believes one

10  version of the facts and not the other."). The reliability of Desser's opinion depends on whether it

11  has an adequate basis, not on whether the opinion reached a particular conclusion. *See Daubert*,

12  509 U.S. at 595 ("The focus [of the inquiry envisioned by Rule 702], of course, must be solely on

13  principles and methodology, not on the conclusions that they generate.").

14      Here, Desser provided a sufficient basis for his opinion that student-athletes' NIL in

15  broadcasts have value even if they have not been valued or sold separately from other components

16  of Defendants' broadcast contracts. Desser acknowledged that there are no real-world broadcast

17  agreements in which the NIL of student-athletes was valued separately from other components of

18  the agreements; he explained that broadcast contracts generally bundle the rights conveyed for an

19  overall price and do not break out the value of each component of the contract unless there is a

20  business purpose for doing so. *See* Desser Rep. at 6-7, 32-39, 53-54, 58-59; Desser Reply Rep. at

21  22. Desser explained that, although student-athletes' NIL have not been assigned a separate value

22  in Defendants' broadcast contracts to date, they nevertheless have value because NIL is a

23  necessary component of sports broadcasts; without NIL (i.e., without displaying players' faces or

24  names), sports broadcasts would be less interesting to watch and would therefore be less attractive

25  for advertisers. *See* Desser Rep. at 32-39. Desser also explained that the fact that student-athletes'

26  NIL have value also can be inferred from the fact that media companies bargain to secure the

27  rights to student-athletes' NIL in broadcast agreements and "require contractual assurances from

28  the Power 5 conferences or the NCAA that all rights to use such athlete NILs are being conveyed

or that the conferences or the NCAA are indemnifying media partners for their use. These contractual assurances have been deemed by the broadcast partners to be necessary despite any claims by the NCAA that such rights are not legally protected under a particular state's laws, as each media partner has to be certain that it has the rights to use athlete NIL throughout the country for all potential participants in the games." *Id.* at 6; *see also id.* at 24, 31-32; Desser Reply Rep. at 3-4. These explanations provide sufficient support for Desser's opinion that student-athletes' NIL in broadcasts do have value. Desser's opinion about the specific estimated value of student-athletes' NIL in broadcasts (i.e., at least ten percent of Defendants' broadcast revenues) also has adequate support, for the reasons discussed above. That these opinions may be novel is not a proper basis for excluding them given that they have sufficient support. *See Potter ex rel. Potter v. Bowman*, No. 05CV00827 REBPAC, 2006 WL 3760267, at *3 (D. Colo. Dec. 18, 2006) ("If the reliability and relevance requirements of Rule 702 are otherwise satisfied, the expert's opinion is admissible regardless of its novelty *vel non*.").

Defendants also contend that Desser's ten percent opinion is unreliable because Desser does not have experience in negotiating college sports media agreements. However, Desser explained why his experience in negotiating professional sports media contracts is relevant and serves as a reliable foundation for the ten percent opinion. *See* Desser Reply Rep. at 6-7 ("My experience negotiating professional league broadcast agreements in which athletes' Broadcast NIL was included provides me with the expertise needed to estimate the minimum value that college athletes' NIL supplies in a sports broadcasting agreement. There is a substantial similarity between professional and college sports broadcast agreements. Both professional and college sports broadcasting deals use similar forms of media license agreements; have the same networks as licensees; have the same TV producers, directors, and often announcers creating the media product; and use the same equipment to capture the games. Furthermore, most of the same sponsors support the programming, the same distributors (cable, satellite, and vMVPDs) deliver game telecast signals to consumers, and many of the same viewers are watching."). Additionally, Desser has experience as a consultant in connection with college media rights. *See id.* at 7.

1   Defendants' challenges to Desser's experience go to the weight to be accorded to his ten percent

2   opinion, not its admissibility.

3         Defendants also contend that the professional sports group licensing royalty rates that

4   Desser relied upon to support the ten percent opinion do not, in fact, support it.  For example,

5   Defendants argue that the group licensing royalty rates for professional sports that Desser relied

6   upon are not adequate comparators for estimating the value of student-athletes' NIL in broadcasts

7   because they do not involve sports broadcasts and instead pertain to products such as apparel,

8   video games, and other merchandise.  *See* Docket No. 253 at 9-10.  However, Defendants'

9   challenges to Desser's comparators and assumptions do not go to admissibility and instead go to

10  the weight to be accorded to his ten percent opinion.  *See Alaska Rent-A-Car, Inc. v. Avis Budget

11  Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013) (holding that challenges to expert's "assumptions and

12  comparators" "go to the weight of the testimony and its credibility, not its admissibility"); *see also

13  Michery v. Ford Motor Co.*, 2017 WL 10362135, at *3 (C.D. Cal. Oct. 23, 2017) ("Whether [the

14  expert] relied on facts Defendant[s] disagree[] with," specifically data on comparators, "does not

15  affect the admissibility of his testimony.").  Desser adequately explained why he believes that the

16  group licensing royalty rates he relied upon are probative of the value of student-athletes' NIL in

17  broadcasts, as discussed above.  *See, e.g.*, Desser Rep. at 58-59; Desser Reply Rep. at 14-16.

18        For the foregoing reasons, the Court denies Defendants' motion to exclude Desser's ten

19  percent opinion.

20        **2.    Desser's opinion regarding the allocation of multi-sport broadcast
                 contract revenues among football and men's and women's basketball**
21

22        Defendants move to exclude as unreliable Desser's allocation opinion, which provides that

23  the overall average allocation of Defendants' broadcast revenues from multi-sport broadcast

24  contracts is approximately seventy-five percent to football, fifteen percent to men's basketball,

25  five percent to women's basketball, and the remaining five percent to other college sports

26  collectively.  Defendants argue that this opinion is unreliable because (1) Desser relies on his

27  experience without explaining how it supports the allocation opinion; (2) there is no basis to infer

28  that all conferences, including the Power Five Conferences, would allocate multi-sport broadcast

United States District Court
Northern District of California

1    revenue to various sports in a consistent ratio; and (3) Desser ignored evidence in the record that

2    contradicts his allocation opinion, such as evidence of allocations by Defendant Southeastern

3    Conference that differ from Desser's allocation, and evidence showing that women's sports have

4    increased in popularity recently.  Docket No. 253 at 11-13.

5         Plaintiffs respond that (1) Desser's allocation opinion is reliable because it is based on his

6    decades of experience in sports broadcasting rights negotiation and valuation, as well as his

7    examination of real-world allocations of broadcast revenues based on documents in the record;

8    and (2) the fact that Desser's allocation differs from that of Defendants' expert, Bob Thompson, is

9    not a proper ground for excluding Desser's allocation opinion.  Docket No. 292 at 13-14.

10        As noted above, where an expert's opinion is based solely or primarily on his experience,

11   the expert "must explain how that experience leads to the conclusion reached, why that experience

12   is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *See*

13   Fed. R. Evid. 702 advisory committee's note to 2000 amendment.  Desser's allocation opinion

14   meets those requirements.  Desser explained that the allocation opinion is based on his decades of

15   experience in negotiating sports media deals, discussions with many network and college

16   conference executives during his career, and his review of relevant evidence, which includes

17   audited financial statements for Defendant Southeastern Conference, various broadcast contracts

18   for college sports, and publicly available information about the popularity of various college

19   sports.  *See* Desser Rep. at 60-62.  Desser explained that, in light of his experience and review of

20   the evidence just described, he believes that FBS football is, by far, the primary driver of college

21   broadcast values due to its popularity relative to other college sports; that men's basketball comes

22   in at a distant second to football in terms of the value it contributes to broadcast contracts because

23   it is significantly less popular than football; that women's basketball is significantly less popular

24   than men's basketball and the value it contributes to broadcast contracts is, therefore, a fraction of

25   that of men's basketball; and that other sports, collectively, contribute the least value to broadcast

26   contracts because their popularity is minimal, as is evident from the fact that they often are made

27   available only on streaming platforms or conference networks.  *See id*.  Desser's allocation of the

28   revenues for Defendants' multi-sport broadcast agreements is consistent with this rationale.

United States District Court
Northern District of California

1    Accordingly, there is a sufficient basis for the allocation opinion and it is not subject to exclusion

2    as unreliable.

3         Defendants have not shown otherwise.  Defendants argue that there is "no basis to infer

4    that every conference would identically allocate 10% of broadcast revenues 75%-15%-5%

5    amongst the Football, Men's and Women's Basketball Classes respectively."  Docket No. 253 at

6    12.  Desser, however, does not opine that each conference would allocate revenues in exactly the

7    same percentages.  Desser's allocation opinion is an "overall average allocation," *see* Desser Rep.

8    at 60, that "appl[ies] across the multi-sport college broadcast agreements" for all Defendants in

9    this case, *see* Desser Reply Rep. at 18 ("This allocation is not conference-specific, season-specific,

10   nor school-specific, but rather serves as a reasonable allocation to apply across the multi-sport

11   college broadcast agreements I have examined in this case.").  Defendants' misinterpretation of

12   Desser's opinion is not a proper ground for excluding it.

13        Defendants contend that any allocation of revenues from multi-sport broadcast contracts

14   would need to be "conference specific and revised annually" in light of variations that exist from

15   school to school, conference to conference, year to year, and so forth.  *See* Docket No. 253 at 11-

16   12.  However, Desser provided a sufficient basis for his "overall average allocation" across

17   conferences despite those variations.  He explained that "any 'school-to-school,' 'conference-to-

18   conference,' 'year-to-year,' 'network-to-network' or other variation is factored into the final rights

19   fee (or price) a broadcaster is willing to pay.  Because my Allocation Opinion is applied to the

20   final rights fees Defendants receive (i.e., after any such variations have been factored in), my

21   opinion already accounts for any impact of such variations."  Desser Reply Rep. at 28.

22   Defendants' criticisms of Desser's approach go to the weight to be accorded to his allocation

23   opinion, not its admissibility.

24        Defendants also contend that the documents and evidence that Desser relied upon in

25   formulating the allocation opinion are not probative, and that Desser cherry-picked aspects of

26   those documents while ignoring other aspects that undermine his allocation opinion.  Those

27   criticisms likewise go to the weight to be accorded to Desser's allocation opinion, not its

28   admissibility.  *See In re Juul Labs, Inc. Mktg., Sales Pracs. & Prod. Liab. Litig.*, No. 19-MD-

02913-WHO, 2022 WL 1814440, at *4 (N.D. Cal. June 2, 2022) ("JLI's arguments that these experts failed to consider documentary evidence and studies that JLI contends contradict their opinions and that some experts only reviewed 'cherry-picked' evidence or restricted their review to only a limited set of JLI's campaigns go to the weight of these experts' opinions and do not justify wholesale exclusion.").

For the foregoing reasons, the Court denies Defendants' motion to exclude Desser's allocation opinion.

### B.   Dr. Daniel A. Rascher

Dr. Daniel A. Rascher is Plaintiffs' economics expert.  *See* Rascher Rep., Docket No. 209-2 (SEALED); Rascher Reply Rep., Docket No. 290-2 (SEALED).  Dr. Rascher is a Professor and Director of Academics Programs for the Master of Science in Sport Management program at the University of San Francisco, and is a partner of OSKR, LLC, an economic consulting firm. Rascher Rep. at 2.  Dr. Rascher served as an expert in college sports labor markets at class certification in prior actions related to the present one, including *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-In-Aid Cap Antitrust Litig.*, 311 F.R.D. 532 (N.D. Cal. 2015) (*Alston*) and *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, No. C 09-1967 CW, 2013 WL 5979327 (N.D. Cal. 8, 2013) (*O'Bannon).*  He also was a testifying economics expert in *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058 (N.D. Cal. 2019), *aff'd*, 958 F.3d 1239 (9th Cir. 2020), *aff'd sub nom. Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141 (2021).

As relevant here, Dr. Rascher's task was to construct methodologies to estimate classwide injury and damages for two types of harm that certain members of the proposed classes allegedly suffered: (1) broadcast NIL (BNIL) injury and damages, and (2) third-party NIL injury and damages.

Dr. Rascher constructed a methodology to estimate BNIL injury and damages based on the payments that members of the proposed Football and Men's Basketball Class and the proposed Women's Basketball Class allegedly would have received absent the challenged rules, which prohibit conferences and schools from paying student-athletes for their NIL in broadcasts

United States District Court
Northern District of California

(hereinafter, BNIL methodology).  Rascher Rep. at 73-94.  To estimate those payments, Dr. Rascher modeled a but-for world in which, during the class period, the challenged rules that prohibit conferences and schools from paying student-athletes for their NIL in broadcasts did not exist, but other NCAA rules remained in place, including those that prohibit conferences and schools from paying student-athletes for their athletic performance.  *See id.* at 4.

Based on his review of the discovery record and his expertise as a sports economist, Dr. Rascher opined that, absent the challenged rules: (1) the Power Five Conferences would have competed with each other to attract FBS football and Division I basketball student-athletes by offering them payments for their NIL in broadcasts, because that would have enabled the conferences to maximize their broadcast revenues[2]; (2) that this competition would have led each of the Power Five Conferences to enter into *ex ante*[3] group-licensing[4] deals with proposed class

---

[2] Dr. Rascher explained, based on his review of the record, that the vast majority of the football and basketball games of the Power Five Conferences' member schools are subject to broadcast agreements that were entered into by the Power Five Conferences as opposed to member schools.  Rascher Rep. at 74 n.171.  The revenues from those agreements are generally distributed to the member schools.  There are a few exceptions, namely contracts that are negotiated by the NCAA instead of the conferences, but "a substantial portion of the revenue" derived from those agreements is nevertheless distributed to the participating conferences, including the Power Five. *See id.*

[3] In the context of Dr. Rascher's report, *ex ante* refers to the time at which the student-athletes agree to join the sports program of an NCAA school, which takes place *before* the student-athletes' NIL are used in any broadcasts.  *See* Rascher Rep. at 75, 77-83; Rascher Reply Rep. at 48-49.  Dr. Rascher explained that *ex ante* group deals involving equal payments are the "stable equilibrium" because of factors that include: the competition in recruiting; efficiencies achieved by virtue of having student-athletes signing the group NIL license at the same time that they sign paperwork for their full grants-in-aid; the desire to avoid "hold up" situations in which student-athletes try to negotiate for a higher NIL payment at a date after they enter school; the need to secure the NIL rights of "all class members" in order to ensure that the NIL of any student-athlete who might be filmed during a game can actually be used in the broadcast; and the uncertainty about which student-athletes' NIL will need to be used in broadcasts (because of changes in starting positions, injuries, etc.).  *See* Rascher Rep. at 77-81.

[4] Dr. Rascher opined that group licenses, as opposed to individual licenses, would be the expected economic outcome because, for the purpose of producing a broadcast, "having the entire team is important[.]"  *See* Rascher Rep. at 78.  Additionally, Dr. Rascher concluded, based on Desser's opinions, that broadcasters typically require their contracting partners, including the

United States District Court
Northern District of California

members in each conference, namely incoming FBS football and Division I men's and women's basketball student-athletes, who are recipients of full grant-in-aid scholarships, for the use of their NIL in broadcasts[5]; and (3) that, pursuant to those *ex ante* group-licensing deals, each Power Five conference would have offered equal payments to those student-athletes in the conference for the use of their NIL in FBS football and basketball broadcasts.  *Id.* at 75-84.

Dr. Rascher estimated the economic value that the conferences would have paid members of the proposed football and basketball classes for the use of their NIL in broadcasts as follows. First, Dr. Rascher estimated the collective value of the broadcast NIL of the proposed class members as being approximately ten percent of the value (revenue) that the Power Five Conferences receive from broadcasting contracts for FBS football and Division I basketball.  That estimate is based on Desser's ten percent opinion (discussed above), as well as Dr. Rascher's own analysis of data that he considers to be probative, including professional sports group licensing royalty rates for the use of professional athletes' NIL in digital products and collectible cards.  *See* Rascher Rep. at 84-87.  Second, Dr. Rascher determined the value of the broadcast contracts from which each of the Power Five Conferences derived broadcasting revenue during the damages period for FBS football and Division I basketball.  *See id.* at 88-91.  For multi-sport broadcast contracts, Dr. Rascher relied on Desser's allocation opinion (discussed above), as well as his own review of relevant data, to estimate the allocation of the revenues from those multi-sport contracts to FBS football, and men's and women's Division I basketball, respectively.  *See id.*  Third, for each of the Power Five Conferences, Dr. Rascher multiplied the total revenues of each conference for each of the relevant sports by ten percent (i.e., by the value of student-athletes' NIL in

---

Power Five Conferences, to have secured the NIL rights of all player participants in a game telecast.  *See id.* at 83.

[5] Dr. Rascher opined that "there likely would be other Division I football and basketball players who would have received Broadcast NIL payments in the but-for world in which such payments were permitted" but "it is conservative to conclude that, at the very least, all athletes in these two classes would have received such payments."  Rascher Rep. at 73.

broadcasts as compared to the value of the broadcast contracts), with the product representing the student-athlete share of each conference's revenues for each sport.  *See id.* at 91.

Dr. Rascher then divided the total student-athlete share of each conference's broadcast revenues for each sport by the number of class members in each conference, year, and sport to estimate the individual payment that each proposed class member would have received each year in the absence of the challenged rules.  *See id.*  This division resulted in equal shares of conference broadcast revenue among proposed class members for each conference, each sport, and each year in the damages period.  *See id.* at 91-94 & Ex. 12.  These are preliminary damages allocation estimates; Dr. Rascher will finalize his estimates when discovery is completed.  *Id.* at 7.

Separately, Dr. Rascher constructed a "before-and-after" methodology to estimate third-party NIL injury and damages based on the third-party NIL compensation that members of the proposed Additional Sports Class and eligible members of the proposed Football and Men's and Women's Basketball Classes allegedly would have received absent the challenged NCAA rules (hereinafter, third-party NIL methodology).  Rascher Rep. at 94-117.  The enforcement of those challenged rules was suspended by Defendants on July 1, 2021, pursuant to their interim NIL policy; the interim NIL policy permits student-athletes to receive third-party NIL payments without losing their NCAA eligibility.  Accordingly, Dr. Rascher's methodology is designed to measure third-party NIL injury and damages for eligible members of the proposed classes described above for the time period beginning with the 2016-2017 academic school year and ending on July 1, 2021, when the interim NIL policy went into effect.  *See id.* at 94.

Dr. Rascher's "before-and-after" methodology requires first a determination of the third-party NIL payments of eligible proposed class members that took place in the "after period."  This begins on July 1, 2021, the date when the challenged NCAA rules prohibiting third-party NIL payments were suspended pursuant to the interim NIL policy, and ends on the date of class certification.  Those "after period" payments are the baseline for estimating the third-party NIL payments that would have occurred each year in the "before period" for those class members in the absence of the challenged NCAA rules; the "before period" ranges from the 2016-2017 academic year to July 1, 2021.  *See id.* at 97-98.  Dr. Rascher opined that each of the "after period"

United States District Court
Northern District of California

payments is a reliable and conservative estimate or approximation of the economic value of third-party NIL payments that student-athletes would have received in the absence of the challenged rules, because it captures NIL value effects from the identity of each student-athlete and his or her sport, position, and school. *See* Rascher Reply Rep. at 61-63.

Dr. Rascher used the third-party NIL payments that proposed class members received over the course of one year of the "after period" to estimate on a preliminary basis the lower bound of the third-party NIL compensation that proposed class members collectively would have received in the absence of the challenged rules during one year of the "before period." *See* Rascher Rep. at 102-03; Rascher Reply Rep. at 61-62. This estimate was limited to one year because Dr. Rascher did not have sufficient "after period" data to estimate damages for additional years of the "before period." *See* Rascher Dep. Tr. at 251-52; Rascher Rep. at 102-03; Rascher Reply Rep. at 61-62. Dr. Rascher will update his estimates as discovery is completed. *See* Rascher Rep. at 7, 102-03; Rascher Reply Rep. at 61-62. Dr. Rascher relied on the third-party NIL payment information that student-athletes reported to their schools to determine the "after period" payments, but he could employ other publicly available information for his forthcoming merits report, if necessary. *See* Rascher Dep. Tr. at 253; Rascher Reply Rep. at 61 n.171. Dr. Rascher excluded any student-athletes who did not obtain compensation for third-party NIL in the "after period" because, according to Dr. Rascher, the absence of third-party NIL payments in the "after period" indicates that student-athletes might not have received third-party NIL payments in the "before period." *See* Rascher Rep. at 98. Dr. Rascher also did not calculate damages for years in the "before period" during which a student-athlete did not play the same sport in connection with which he or she received third-party NIL compensation in the "after period." *See id.* at 113.

In his forthcoming merits report, Dr. Rascher intends to adjust the baseline estimate for the "before period" payments to account for material supply and demand differences between the before and after periods for each student-athlete based on factors that include: (1) whether a class member transferred from a school in one conference during the "before period" to a different school or conference in the "after period" if the transfer could result in a statistically significant difference in the transferred athlete's NIL compensation; (2) whether changes to the athlete's role

on the team were substantial enough to significantly affect compensation for the use of the athlete's NIL; and (3) the negative impact of the pandemic on demand for Division I college sports during part of the "before period." *Id.* at 99-117.  To adjust for those factors, Dr. Rascher will use data that is available to schools or is publicly available.  *See id.* at 102-111; Rascher Reply Rep. at 69-82.  In his reply report, Dr. Rascher applied those adjustments to a subset of members of the relevant proposed classes to show that his methodology can reliably measure "before period" third-party NIL compensation while accounting for material supply and demand differences between the before and after periods.  *See* Rascher Reply Rep. at 70-82.

### 1.    Dr. Rascher's BNIL methodology

Defendants move to exclude Dr. Rascher's BNIL methodology on the ground that it is unreliable.  They argue that the methodology is unreliable because (1) it uses as an input Desser's opinion that the value of student-athletes' NIL in broadcasts is ten percent of the value of Defendants' broadcast contracts even though, according to Defendants, that opinion is speculative and unsupported; (2) it is inconsistent with economic theory and relevant evidence because it is premised on the assumption that all proposed class members who received a full grant-in-aid have sufficient value in the labor market to receive equal broadcast NIL payments regardless of their relative skill and marketability; (3) it is inconsistent with "economic rationality" because it assumes that each conference would pay proposed class members ten percent of its broadcasting revenue even though that would place some conferences at a recruiting disadvantage given that broadcasting revenue varies by conference; and (4) Dr. Rascher's but-for world is "impossible" because it fails to take into account Title IX requirements and state laws that went into effect after July 2021, which Defendants contend prohibit conferences and institutions from paying student-athletes for their NIL.  Docket No. 253 at 14-18.

Plaintiffs respond that Defendants have not advanced a proper ground for excluding Dr. Rascher's BNIL methodology.  Docket No. 292 at 15.  Plaintiffs contend that Defendants' motion to exclude is premised on the theory that Dr. Rascher's inputs and assumptions are incorrect, but an expert's opinions cannot be excluded at the class certification stage on that basis.

1    Plaintiffs argue that all of Defendants' criticisms of Dr. Rascher's BNIL methodology go to its

2    weight, not its admissibility.  Docket No. 292 at 15-18.

3            For the reasons below, the Court finds that Defendants have not shown that Dr. Rascher's

4    BNIL methodology is subject to exclusion under Rule 702.

5            Defendants' first argument is that Dr. Rascher's BNIL methodology is unreliable because

6    it uses as an input Desser's ten percent opinion, which Defendants contend is speculative and

7    unsupported.  *See* Docket No. 253 at 14.  This argument is not persuasive.  For the reasons

8    discussed above, the Court has found that Desser's ten percent opinion is not unreliable.  Further,

9    Dr. Rascher's BNIL methodology does not rely exclusively on Desser's ten percent opinion to

10   conclude that a reasonable estimate of the value of student-athletes' NIL in broadcasts is ten

11   percent of the value of Defendants' broadcast contracts.  Dr. Rascher conducted his own analysis,

12   which involved examining the royalty rates in group licensing agreements for the use of

13   professional athletes' NIL in digital products and collectible cards.  *See* Rascher Rep. at 85-87.

14   Based on those group licensing royalty rates, Dr. Rascher concluded that Desser's estimate that the

15   value of student-athletes' NIL in broadcasts is about ten percent of the value of Defendants'

16   broadcast agreements is reasonable.[6]  *See id.*  Accordingly, Dr. Rascher's opinion that the value of

17   student-athletes' NIL in broadcasts is approximately ten percent of the value of Defendants'

18   broadcast agreements has adequate support.  The BNIL methodology is not unreliable because it

19   relies on that opinion.

20           Defendants' second argument is that Dr. Rascher's BNIL methodology is unreliable

21   because it is premised on an assumption that is "inconsistent with economic theory," namely that

22   every member of the relevant proposed classes would receive an equal payment for broadcast NIL,

23   _____

24           [6] Defendants argue, in passing, that the group licensing agreements Dr. Rascher relied
     upon are "improper comparators to student-athlete BNIL" because they do not pertain to sports
25   broadcasts.  *See* Docket No. 253 at 14.  As discussed above, challenges to an expert's comparators
     or assumptions go to the weight to be accorded to his opinion, not to its admissibility.  *See*
26   *Michery*, 2017 WL 10362135, at *3.  Defendants also argue, in passing, that the group licensing
     agreements Dr. Rascher relied upon do not support his conclusion that the value of student-
27   athletes' NIL in broadcasts is ten percent of Defendants' broadcast revenue, because the royalty
     rates for professional athletes' NIL in those agreements vary.  *See* Docket No. 253 at 14.  This
28   criticism also goes to the weight to be accorded to Dr. Rascher's BNIL methodology, not its
     admissibility.

United States District Court
Northern District of California

regardless of each athlete's individual talent or marketability.  Docket No. 253 at 15.  As support, Defendants point to the opinions of their own expert, Dr. Catherine Tucker, who opines that, pursuant to the "economics of superstars," athletes get paid based on their talent and payments to athletes, therefore, necessarily vary.  *See id.* (citing Tucker Rep. ¶¶ 91-110, Docket No. 254-1). Defendants also cite articles in sports economics, including an article by Dr. Rascher, that Defendants contend support the proposition that athletes' compensation varies based on talent. *See id.*

After carefully reviewing Dr. Rascher's report, the Court is satisfied that Dr. Rascher provides an adequate basis for his opinion that, absent the challenged rules, the Power Five Conferences would each have paid members of the relevant proposed classes in the conference for the use of their NIL in broadcasts in equal amounts.  Rascher Rep. at 75.  The basis for that opinion is economic theory and examples of equal payments in the professional sports context that Dr. Rascher believes are probative.  Specifically, Dr. Rascher opined that, absent the challenged rules and acting rationally, the Power Five Conferences would compete with each other to attract student-athletes who would add value to their broadcasts and media rights agreements and would help them maximize their broadcast revenues.[7]  *Id.* at 75-84.  In light of that competition, and given factors that include (1) that broadcasters would want certainty *ex ante* that they can use the NIL of players who could potentially appear in a broadcast, and (2) that conferences cannot know in advance which players will actually appear in broadcasts, will be starters, will get injured, and so forth, the stable equilibrium would be for the Power Five Conferences to make equal broadcast NIL payments to student-athletes who are members of the proposed classes *ex ante*, before any broadcasts begin.  *See id.* at 77-83.  Dr. Rascher opined that this but-for scenario is supported by real-world evidence, which includes evidence of equal sharing of group licensing revenue among

---

[7] Dr. Rascher explains that one of the reasons why he assumes conference-level competition (rather than school-level competition) for the purpose of estimating broadcast NIL damages is that conferences, and not schools, enter into broadcast agreements with media companies.  *See* Rascher Rep. at 76-77.

United States District Court
Northern District of California

professional athletes, regardless of talent, and the fact that each conference shares its broadcast revenues among its member schools equally. *See id.* at 82-83; Rascher Reply Rep. at 48-50.

Dr. Rascher specifically responded to Defendants' criticism of his equal-payments opinion. He explained that unequal payments for broadcast NIL would not be consistent with rational economic behavior. Dr. Rascher opined that, at the conference-level of competition, a conference would not choose an equilibrium in which its broadcast revenues were targeted to a few very talented athletes in the conference, because that would place less elite schools in the conference at a recruiting disadvantage, both at the intra- and inter-conference level.[8] *See* Rascher Rep. at 81 n.190; *see also* Rascher Reply Rep. at 53. Dr. Rascher also explained that paying more for the broadcast NIL of "superstars," consistent with the opinions of Defendants' expert, Dr. Tucker, would amount to paying student-athletes for their athletic performance, which cannot occur because of NCAA rules that prohibit those payments. Rascher Reply Rep. at 53-54. Dr. Rascher opined that Dr. Tucker's "superstars" theory of athlete compensation is applicable only in a "completely unconstrained competitive labor market" and "cannot occur" in a world in which Defendants' restrictions on compensation for athletic performance remain in place. *See id.* at 54. Dr. Rascher's BNIL methodology assumes that the NCAA's restrictions on performance-based compensation will remain in place because Plaintiffs do not challenge them in this action. *See id.* at 53-54.

That Dr. Rascher's opinions regarding equal BNIL payments are not consistent with the opinions of Dr. Tucker or the articles that Defendants cite in their motion to exclude is not a proper basis for excluding his BNIL methodology.[9] *See* Fed. R. Evid. 702 advisory committee's

---

[8] Defendants argue in their reply that "Desser essentially conceded that BNIL payments to student-athletes would vary." *See* Docket No. 304 at 7 (citing Rascher Dep. Tr. 54:5-55:7, 92:9-94:7). The Court finds no such concession in the portions of Dr. Rascher's deposition that Defendants cite.

[9] Defendants cite in their opening brief an article by Dr. Rascher that they contend shows that Dr. Rascher's opinion regarding equal BNIL payments in this case contradicts his own prior work. Plaintiffs contend, and Defendants do not dispute, that the article in question assumed unequal labor payments based on talent in a "pure free agent market." *See* Docket No. 292 at 17 n.6. Because Dr. Rascher's but-for world assumes that NCAA restrictions on performance-based compensation would remain in place (i.e., it assumes that the market is *not* free of restrictions), the

note to 2000 amendment ("The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.").  Defendants' motion to exclude the opinions at issue turns on whether the opinions have adequate support, and the Court finds, in light of the discussion above, that they do.  Defendants' challenges to Dr. Rascher's assumptions go to the weight to be accorded to his opinions, not their admissibility.  *See In re Nat'l Football League's Sunday Ticket Antitrust Litig*., No. ML152668PSGJEMX, 2023 WL 1813530, at *8 (C.D. Cal. Feb. 7, 2023) ("[C]ritiques about unsupported assumptions properly go to weight, not admissibility.").

Defendants' third argument is that Dr. Rascher's BNIL methodology is unreliable because it is premised on the assumption that each conference would pay ten percent of its broadcast revenue to recruit football and basketball student-athletes.  Defendants argue that that assumption "departs sharply from economic rationality" because, given the variation in conference broadcast revenue, some conferences would be at a recruiting disadvantage relative to other conferences that have greater broadcast revenue.  Docket No. 253 at 16.  The Court is not persuaded.  Dr. Rascher adequately explained why, in his view, it would not be economically irrational for conferences to pay ten percent of their respective broadcasting revenues to recruits in his but-for world.  Dr. Rascher opined that "differences in conference broadcast revenues already create a competitive environment in which smaller revenue conferences consistently invest less in recruiting, building facilities, paying coaches, etc. – all factors that affect athletes' decision-making on where to attend school and play their sport. . . . In other words, the conferences are already 'content' with spending different amounts based on revenue differences and it is reasonable to assume that the same would be true in the but-for world in which Broadcast NIL payments were permitted."  *See* Rascher Reply Rep. at 103.  Defendants' disagreement with, or challenges to, Dr. Rascher's assumptions or economic reasoning go to the weight to be accorded to his opinions, not their admissibility.

---

article in question has no relevance to the question of whether his BNIL opinions are reliable.

Finally, Defendants contend that Dr. Rascher's BNIL methodology is unreliable because his but-for world is "impossible" given that it does not take into account either Title IX, diversity and equity concerns, or state laws that Defendants claim went into effect in July 2021 and allegedly prohibit conferences and schools from paying student-athletes for their NIL.[10]  Docket No. 253 at 17-18.

The Court finds that Defendants have not shown that Dr. Rascher's BNIL methodology is subject to exclusion as unreliable for the reasons they advance.  Defendants rely primarily on *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 267-68 (3d. Cir. 1998) for the proposition that "[a]n economic analysis cannot ignore laws that affect the marketplace."  *See* Docket No. 253 at 17.  But *City of Pittsburg* has nothing to do with the admissibility of expert testimony under Rule 702 or with the standards for evaluating an expert's analysis on antitrust damages.[11]  The other authorities that Defendants rely upon are similarly unhelpful.  *See Costco Wholesale Corp. v. Maleng*, 522 F.3d 874, 881 (9th Cir. 2008) (addressing the question of "whether certain restrictions imposed by the State of Washington on the sale of wine and beer are preempted by federal antitrust laws"); *Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1124 (E.D. Cal. 2002) (granting summary judgment for the defendants on Sherman Act claims brought by a professional golfer against the PGA tour and others in relevant part because the plaintiff's evidence on

---

[10] Defendants do not identify the state laws in question in their motion to exclude.  *See generally* Docket No. 253.

[11] In *City of Pittsburgh*, 147 F.3d at 267-68, the Third Circuit affirmed the dismissal under Rule 12(b)(6) of claims under Section 1 of the Sherman Act and the Clayton Act on the ground that there was no causal connection between the alleged antitrust injury and the allegedly anticompetitive conduct of the two defendants, which were electric power companies.  The claims arose out of a proposed merger and premerger agreement between the two defendants.  The plaintiff alleged that it suffered injuries as a result of the proposed merger because the merger would lessen competition in the market for providing electric services in a particular locality.  The Third Circuit held that the claims failed as matter of law because the two defendants had never competed and there was no indication that they would ever compete in the market for providing electric services in the locality.  As the plaintiff acknowledged in the complaint and documents attached to it, the provision of electric services in that locality depended on whether a regulatory agency issued a permit for doing so, and it was not a given that the agency would issue a permit to one of the defendants so that they could become competitors.  The Third Circuit held that the "purported lessening of competition was not caused by the premerger agreement and proposed merger" between the defendants, but "by the regulated nature of utility services" as alleged in the complaint.  *See id.*

1  damages was limited to his own affidavit and the affidavit lacked "a theoretical foundation for his

2  proof of damages," could not "be easily remedied prior to trial," and "would require a jury to

3  engage in speculation or guesswork" as to his damages). Defendants' disagreements with what

4  Dr. Rascher did or did not consider in constructing his but-for world go to the weight to be

5  accorded to his BNIL methodology, not its admissibility. *See In re Lidoderm Antitrust Litig.*, No.

6  14-MD-02521-WHO, 2017 WL 679367, at *12 (N.D. Cal. Feb. 21, 2017) (holding that dispute

7  about "what the appropriate inputs should be does not undermine the approach or the reliability of

8  [the expert's] model").

9      The Court denies Defendants' motion to exclude Dr. Rascher's BNIL methodology.

10      **2.    Dr. Rascher's third-party NIL methodology**

11      Defendants move to exclude Dr. Rascher's third-party NIL methodology on the basis that

12  it is unreliable. Defendants contend that this before-and-after methodology does not account for

13  "the myriad factors relevant to third-party NIL monetization" that may differ between the before

14  and after periods, such as variability in the popularity of student-athletes, variability in the

15  performance of student-athletes, and changes in the market for social media and other platforms

16  for generating NIL revenue. Docket No. 253 at 18-20. Defendants contend that Dr. Rascher

17  "assumes that NIL value in the marketplace is the same every year, such that post-July 1, 2021

18  reported NIL deal value is perfectly predictive of the NIL deal value every student-athlete would

19  have achieved in the before period." *Id.* at 18.

20      The Court disagrees. It is not the case, as Defendants contend, that Dr. Rascher's third-

21  party NIL methodology is designed to simply assume that the NIL values he observed in the "after

22  period" are "perfectly predictive" of NIL values in the "before period" without accounting for

23  factors that could have created material differences in NIL values between the periods. Instead,

24  Dr. Rascher's third-party NIL methodology is designed to take the economic value of NIL

25  payments in the "after period" and use them as a *baseline* for estimating the economic value of

26  payments in the "before period," with that baseline being adjusted where appropriate to account

27  for material differences in supply and demand between the before and after periods based on

28  factors that include: (1) conference or school transfers; (2) changes in the athletes' role; and (3) the

23

1    negative impact of the pandemic on demand for Division I college sports.  *See* Rascher Rep. at 99-

2    117.  Dr. Rascher tested his methodology (using the adjustments just described) for a subset of

3    members of the relevant proposed classes to demonstrate that the methodology can reliably

4    calculate third-party NIL payments for the "before period" while accounting for factors that could

5    create material differences in supply and demand between the before and after periods.  *See*

6    Rascher Reply Rep. at 70-82.  In light of the foregoing, Dr. Rascher's third-party NIL

7    methodology is not subject to exclusion on the basis that it is unreliable.  *Cf. McGlinchy v. Shell*

8    *Chem. Co.*, 845 F.2d 802, 807 (9th Cir. 1988) (affirming exclusion of expert's before-and-after

9    damages analysis on the ground that the expert failed to "confirm that relevant market conditions

10   were the same before and after the time the injury was alleged to have occurred"); *In re Live*

11   *Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 978 (C.D. Cal. 2012) (excluding expert's before-

12   and-after damages analysis in relevant part because the expert "impermissibly assumes that any

13   observed increase in average ticket prices after 2000 is due entirely to Defendants' anticompetitive

14   conduct, without meaningfully testing this assumption").

15        To the extent that Defendants challenge Dr. Rascher's third-party NIL methodology on the

16   basis that he should have adjusted for factors other than the ones discussed in his report, that

17   challenge goes to the weight to be accorded to his third-party NIL methodology, not its

18   admissibility.

19        The Court denies Defendants' motion to exclude Dr. Rascher's third-party NIL

20   methodology.

21   **III.    CONCLUSION**

22        For the reasons discussed above, the Court denies Defendants' motion to exclude certain

23   opinions by Edwin S. Desser and Dr. Daniel A. Rascher.

24        IT IS SO ORDERED.

25   Dated: November 3, 2023

26   CLAUDIA WILKEN
     United States District Judge

27

28

24