1

2

3

4

5
IN THE UNITED STATES DISTRICT COURT

6
FOR THE NORTHERN DISTRICT OF CALIFORNIA

7
Case No. 20-cv-03919 CW

8
IN RE: COLLEGE ATHLETE NIL
LITIGATION

**ORDER GRANTING MOTION FOR CERTIFICATION OF DAMAGES CLASSES**

9

10

11
(Re: Dkt. Nos. 209, 320)

12

13

14
Now before the Court is Plaintiffs'[1] motion for certification under Rule 23(b)(3) of three

15
proposed damages classes,[2] Docket No. 209, as well as Defendants' motion for leave to file

16
supplemental authority,[3] Docket No. 320.  Defendants[4] oppose the motion for certification, and

17

18
[1] Plaintiffs are Sedona Prince, Grant House, and Tymir Oliver.

19
[2] The Court granted Plaintiffs' unopposed motion for certification under Rule 23(b)(2) of a

20
proposed class for declaratory and injunctive relief on September 22, 2023.  Docket No. 323.

21
[3] After the present motion for class certification had been fully briefed, Defendants filed a

22
motion for leave to file supplemental authority, namely the transcript of the supplemental deposition of Plaintiffs' economics expert, Dr. Daniel A. Rascher, which took place on September 1, 2023.  Docket No. 320.  During the hearing on September 21, 2023, the Court permitted each

23
side to file a five-page brief explaining the relevance of the transcript of Dr. Rascher's supplemental deposition to the class certification briefing.  The Court will consider the transcript

24
of Dr. Rascher's supplemental deposition, Docket No. 321-3, as well as the parties' five-page

25
briefs, Docket Nos. 333-2 and 336-2, in deciding the present motion for certification.

26
[4] Defendants are the National Collegiate Athletic Association (NCAA) and Conference

27
Defendants Pac-12 Conference, Big Ten Conference, Big 12 Conference, Southeastern Conference, and Atlantic Coast Conference.  The Conference Defendants are also known as the

28
"Power Five Conferences."

United States District Court
Northern District of California

Plaintiffs oppose the motion for leave to file supplemental authority. For the reasons set forth below, the Court grants Defendants' motion for leave to file supplemental authority and grants Plaintiffs' motion for certification of the proposed damages classes under Rule 23(b)(3).

## I.        BACKGROUND

This consolidated litigation began as two separate actions: (1) *House v. National Collegiate Athletic Association*, 4:20-cv-03919 (*House*); and (2) *Oliver v. National Collegiate Athletic Association*, 4:20-cv-04527 (*Oliver*). *House* was brought by named Plaintiffs Sedona Prince, a current Division I student-athlete who competes for the University of Oregon's women's basketball team, and Grant House, a current Division I student-athlete who competes for the Arizona State University's men's swimming and diving team. *Oliver* was brought by named Plaintiff Tymir Oliver, a former Division I student-athlete who competed for the University of Illinois' men's football team. In each of the two actions, Plaintiffs asserted claims against Defendants arising out of injuries they allegedly suffered as a result of certain NCAA rules, which are set and enforced by agreement of Defendants. The rules at issue restrict the compensation that student-athletes can receive in exchange for the commercial use of their names, images, and likenesses (NIL), and prohibit NCAA member conferences and schools from sharing with student-athletes the revenue they receive from third parties for the commercial use of student-athletes' NIL.[5] Plaintiffs allege that, absent the rules at issue, the NCAA and its member conferences and schools would allow student-athletes to take advantage of opportunities to profit from their NIL, and NCAA member conferences and schools would share with student-athletes the revenue they receive from third parties for the commercial use of student-athletes' NIL. The claims asserted in *House* and *Oliver* were for (1) conspiracy to fix prices in violation of Section 1 of the Sherman

---

[5] The challenged NCAA rules include those that prohibit student-athletes from receiving anything of value in exchange for the commercial use of their NIL; from endorsing any commercial product or service while they are in school, regardless of whether they receive any compensation for doing so; from receiving compensation for their NIL from outside employment; and from using their NIL to promote their own business ventures or engage in self-employment. The challenged rules also include those that preclude student-athletes from benefitting financially from their social media posts, personal brands, viral videos depicting their athletic performances, apparel sponsorships, and other opportunities related to the use of their NIL.

United States District Court
Northern District of California

Act, 15 U.S.C. § 1; (2) group boycott or refusal to deal in violation of Section 1 of the Sherman Act; and (3) unjust enrichment.  Plaintiffs sought an injunction restraining Defendants from enforcing the challenged NCAA rules; a judgment declaring void the challenged NCAA rules; damages; and attorneys' fees.

Defendants jointly moved to dismiss all claims in *House* and *Oliver*.  On June 24, 2021, the Court granted that motion only with respect to named Plaintiff Oliver's claims for injunctive relief.  *See Grant House v. Nat'l Collegiate Athletic Ass'n*, 545 F. Supp. 3d 804, 818 (N.D. Cal. 2021).  The Court otherwise denied the motions.  *See id.*

On July 14, 2021, the Court adopted a stipulation to consolidate *House* and *Oliver* and to permit Plaintiffs to file a consolidated complaint under the caption *In re College Athlete NIL Litigation*, Case No. 20-cv-03919.  Docket No. 154.

On July 26, 2021, Plaintiffs filed the Consolidated Amended Complaint (CAC), which is the operative complaint.  Docket No. 164.  Defendants filed answers to the CAC on September 22, 2021.  Docket Nos. 167-72.

In the CAC, Plaintiffs challenge the same NCAA rules and assert the same claims against the same Defendants named in the original complaints in *House* and *Oliver*.  However, Plaintiffs added new allegations to the CAC regarding the NCAA's new "interim" NIL policy, which became effective on July 1, 2021.  Pursuant to that policy, all Division I student-athletes may engage in certain activities to earn NIL compensation from third parties "without violating NCAA rules related to name, image and likeness."  CAC ¶ 22.  The NCAA allegedly has not repealed the challenged NIL rules that prohibit student-athletes from receiving anything in value in exchange for the commercial use of their NIL but has simply suspended the enforcement of some of those rules for an indeterminate period of time.  *See id.*  The rules whose enforcement has been suspended include those that prohibit student-athletes from using their NIL to promote products related to the student-athletes' sport and to promote their own businesses.  *Id.* ¶¶ 101-02.  The NCAA has not suspended the enforcement of NCAA rules that prohibit NCAA institutions from compensating student-athletes for the use of their NIL and that prohibit NIL compensation contingent upon athletic participation or performance, or enrollment at a particular school.  *Id.* ¶ 5.

1    The NCAA has allegedly "proclaimed the right to reinstate all of its suspended NIL restraints at

2    any time[.]"  *Id.* ¶ 22.

3           Plaintiffs allege that the challenged NCAA rules, whether they have been suspended as

4    part of the "interim" policy or not, are anticompetitive and violative of Section 1 of the Sherman

5    Act because they are agreements in restraint of trade that artificially fix or depress the prices paid

6    to student-athletes for the use of their NIL while they compete on their Division I teams.  Plaintiffs

7    aver, "Absent these nationwide restraints, Division I conferences and schools would compete

8    amongst each other by allowing their athletes to take full advantage of opportunities to utilize,

9    license, and profit from their NIL in commercial business ventures and promotional activities and

10   to share in the conferences' and schools' commercial benefits received from exploiting student-

11   athletes' names, images, and likenesses."  *Id.* ¶ 112.  Additionally, absent the challenged rules,

12   "conferences and schools would also compete for recruits by redirecting money that they currently

13   spend on extravagant facilities and coaching salaries to marketing programs and educational

14   resources designed to help their NCAA athletes develop and grow their personal brand value and

15   would seek out opportunities to co-market their athletes' NIL in conjunction with the school's

16   own marks."  *Id.* ¶ 113.

17          In the CAC, Plaintiffs seek the same relief they sought in the original complaints in *House*

18   and *Oliver*, including an injunction, a declaratory judgment, damages, and attorneys' fees.

19   **II.      LEGAL STANDARD**

20          A class action is "an exception to the usual rule that litigation is conducted by and on

21   behalf of the individual named parties only."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)

22   (citation and internal quotation marks omitted).  "Before certifying a class, the trial court must

23   conduct a rigorous analysis to determine whether the party seeking certification has met the

24   prerequisites of Rule 23."  *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir.

25   2012), *overruled on other grounds in Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods

26   LLC*, 31 F.4th 651, 682 n.32 (9th Cir. 2022) (en banc).  A party moving for certification must

27   establish "that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence."

28   *Olean*, 31 F.4th at 665.

The party moving for certification first must show that the four requirements of Rule 23(a) are met. Specifically, Rule 23(a) requires a showing that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). The party moving for certification also must show that the class can be certified based on at least one of the grounds in Rule 23(b). *See* Fed. R. Civ. P. 23(b). As relevant here, certification under Rule 23(b)(3) is appropriate if Plaintiffs show that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

## III.    DISCUSSION

Plaintiffs move for certification of three proposed damages classes under Rule 23(b)(3) with respect to their claims under Section 1 of the Sherman Act.[6] The proposed classes are defined as follows:

> **Football and Men's Basketball Class**: All current and former college athletes who have received full Grant-in-Aid (GIA) scholarships and compete on, or competed on, a Division I men's basketball team or an FBS football team, at a college or university that is a member of one of the Power Five Conferences (including Notre Dame), at any time between June 15, 2016 and the date of the class certification order in this matter. This Class excludes the officers, directors, and employees of Defendants. This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

> **Women's Basketball Class**: All current and former college athletes who have received full GIA scholarships and compete on, or competed on, a Division I women's basketball team, at a college or university that is a member of one of the Power Five

---

[6] In their motion for class certification, Plaintiffs do not address their claim for unjust enrichment. Defendants contend that Plaintiffs have thereby "abandoned certification on that claim." Docket No. 252 at 39. Plaintiffs do not respond to this argument in their reply. *See generally* Docket No. 290. Accordingly, the Court construes the motion as requesting certification of their claims under Section 1 of the Sherman Act only.

Conferences (including Notre Dame), at any time between June 15, 2016 and the date of the class certification order in this matter. This Class excludes the officers, directors, and employees of Defendants. This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

**Additional Sports Class**: Excluding members of the Football and Men's Basketball Class and members of the Women's Basketball Class, all current or former college athletes who competed on a Division I athletic team prior to July 1, 2021 and who received compensation while a Division I college athlete for use of their name, image, or likeness between July 1, 2021 and the date of the class certification order in this matter and who competed in the same Division I sport prior to July 1, 2021. This Class excludes the officers, directors, and employees of Defendants. This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

Plaintiffs request that the Court appoint (1) named Plaintiff Sedona Prince as the representative for the Women's Basketball Class; (2) named Plaintiff Grant House as the representative for the Additional Sports Class; (3) named Plaintiff Tymir Oliver as the representative for the Football and Men's Basketball Class; and (4) Hagens Berman Sobol Shapiro LLP and Winston & Strawn LLP as Co-Lead Class Counsel for the proposed damages classes.

Plaintiffs contend that the members of the proposed damages classes suffered injury and damages that fall within three categories: (1) broadcast NIL (BNIL) injury and damages, which arise out of student-athletes having been deprived of compensation they would have received from conferences for the use of their NIL in broadcasts of FBS football or Division I basketball games in the absence of the challenged rules; (2) video game injury and damages, which arise out of student-athletes having been deprived of compensation they would have received from video game publishers for the use of their NIL in college football or basketball video games in the absence of the challenged rules; and (3) third-party NIL injury and damages, which arise out of student-athletes having been deprived of compensation from third parties for their NIL from 2016 to July 1, 2021, when the interim NIL policy went into effect.

Plaintiffs do not contend that all members of each of the three proposed damages classes would have earned each of the three types of NIL compensation just described if the challenged rules had not been in place (i.e., in the "but-for" world). Instead: (1) the members of the Football

6

1  and Men's Basketball Class allege to have suffered BNIL injury and damages and video game

2  injury and damages and some members of that class also allege to have suffered third-party NIL

3  injury and damages; (2) the members of the Women's Basketball Class allege to have suffered

4  BNIL injury and damages and some members of that class also allege to have suffered third-

5  party NIL injury and damages; and (3) the members of the Additional Sports Class allege to have

6  suffered third-party NIL injury and damages, and some members of that class, namely those who

7  played FBS football or Division I men's basketball outside of the Power Five Conferences and

8  received a full grant-in-aid scholarship, allege to also have suffered video game injury and

9  damages.

10        **A.     Rule 23(a)**

11              **1.     Numerosity**

12        The requirement of numerosity looks to whether the proposed class is "so numerous that

13  joinder of all members individually is impracticable." Fed. R. Civ. P. 23(a)(1).  "Although there is

14  no exact number, some courts have held that numerosity may be presumed when the class

15  comprises forty or more members."  *See Krzesniak v. Cendant Corp.*, No. 05-05156, 2007 WL

16  1795703, at *7 (N.D. Cal. June 20, 2007) (citations omitted).

17        Here, Plaintiffs assert, and Defendants do not dispute, that the Football and Men's

18  Basketball Class has at least 6,280 members, the Women's Basketball Class has at least 856

19  members, and the Additional Sports Class has at least 7,384 members.  *See* Rascher Rep. ¶ 11(e),

20  Docket No. 209-2.

21        Because it is undisputed that each of the proposed damages classes is comprised of

22  hundreds, if not thousands, of student-athletes, and it would be impracticable to join them, the

23  Court finds that the numerosity requirement is satisfied.  *See In re Nat'l Collegiate Athletic Ass'n*

24  *Athletic Grant-In-Aid Cap Antitrust Litig.*, 311 F.R.D. 532, 539 (N.D. Cal. 2015) (finding that the

United States District Court
Northern District of California

7

United States District Court
Northern District of California

1    numerosity requirement was met because "the proposed classes comprise thousands of potential

2    members").

3                    **2.        Commonality**

4            Commonality requires "questions of law or fact common to the class." Fed. R. Civ. P.

5    23(a)(2).  To satisfy the commonality requirement, "[e]ven a single [common] question will do."

6    *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011).  The common question must be of

7    "such nature that it is capable of class-wide resolution—which means that the determination of its

8    truth or falsity will resolve an issue that is central to the validity of each of the claims in one

9    stroke."  *Id.* at 350.  The requirements of Rule 23(a)(2) have been construed "permissively," and

10   "[a]ll questions of fact and law need not be common to satisfy the rule."  *See Ellis v. Costco

11   Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) (citation omitted).

12           "[T]he court must make a 'rigorous assessment of the available evidence and the method or

13   methods by which plaintiffs propose to use the [class-wide] evidence to prove' the common

14   question in one stroke."  *Olean*, 31 F.4th at 666 (citation omitted).  "In determining whether the

15   'common question' prerequisite is met, a district court is limited to resolving whether the evidence

16   establishes that a common question is capable of class-wide resolution, not whether the evidence

17   in fact establishes that plaintiffs would win at trial."  *Id.* at 666-67.  This analysis may "entail

18   some overlap with the merits of the plaintiff's underlying claim."  *Id.* at 667 (citations and internal

19   quotation marks omitted).  Where that is the case, the "[m]erits questions may be considered

20   [only] to the extent [ ] that they are relevant to determining whether the Rule 23 prerequisites for

21   class certification are satisfied[.]"  *Id.*

22           Here, several questions of law and fact that pertain to the existence of an antitrust violation

23   are common to members of the proposed damages classes, including (1) whether the challenged

24   rules constitute a horizontal agreement, contract, or combination that caused significant

25   anticompetitive effects in the relevant markets for student-athletes' labor services; (2) whether

26   Defendants' procompetitive justifications for the challenged NCAA rules are valid; and (3)

27   whether any procompetitive justifications for the challenged NCAA rules can be achieved with

28   less restrictive alternatives.  Plaintiffs have pointed to common evidence that is capable of

1    answering these questions. *See, e.g.*, Rascher Rep. at 12, 35-47. Defendants do not dispute that

2    the questions just described are capable of resolution on a classwide basis with common proof.

3    Accordingly, the Court finds that the commonality requirement is met. *See In re High-Tech Emp.*

4    *Antitrust Litig.*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013) (Koh, J.) (holding that commonality

5    requirement was met because "Plaintiffs have demonstrated the existence of at least one common

6    question capable of generating a common answer (antitrust liability)," and reasoning that "[w]here

7    an antitrust conspiracy has been alleged, courts have consistently held that 'the very nature of a

8    conspiracy antitrust action compels a finding that common questions of law and fact exist.'")

9    (citation omitted).

10       Defendants argue, in a footnote and in passing, that the commonality requirement is not

11   met because the question of antitrust impact (i.e., whether each of the proposed class members

12   suffered injury as a result of the challenged rules that is of the type the antitrust laws were

13   designed to prevent), and the question of damages, are not capable of resolution by way of

14   common proof. *See* Docket No. 252 at 38 n.24. This argument is unavailing. As noted, the

15   commonality requirement requires the existence of only a "single" common question. *See Wal-*

16   *Mart*, 564 U.S. at 359. Here, there are *multiple* questions that go to the central issue of whether a

17   Section 1 violation exists that can be resolved with common proof, as discussed above. That is

18   sufficient to satisfy the commonality requirement. Defendants' argument is unpersuasive for the

19   additional reason that Plaintiffs have shown that the questions of antitrust injury and damages for

20   each of the three types of injuries at issue (BNIL, video game NIL, and third-party NIL) also are

21   capable of resolution on a classwide basis with common proof, as discussed in more detail below

22   in the context of the predominance factor of Rule 23(b)(3). That further supports the Court's

23   finding that the commonality requirement is satisfied.

24              **3.    Typicality**

25       The typicality requirement looks to whether the claims or defenses of the representative

26   parties are typical of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). "Typicality

27   refers to the nature of the claim or defense of the class representative, and not to the specific facts

28   from which it arose or the relief sought." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Cir. 1992) (internal citation and quotation marks omitted).  "In the antitrust context, generally,

2    typicality will be established by plaintiffs and all class members alleging the same antitrust

3    violation by defendants."  *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-In-Aid Cap*

4    *Antitrust Litig.*, 311 F.R.D. at 539 (citation and internal quotation marks omitted).

5         Here, Plaintiffs argue that the claims of named Plaintiffs Grant House, Sedona Prince, and

6    Tymir Oliver are typical of those of the members of the proposed damages classes each seeks to

7    represent because all three named Plaintiffs are or were Division I athletes and allege the same

8    antitrust violations as the members of the proposed damages classes, namely that the challenged

9    restrictions are anticompetitive and caused them cognizable antitrust injury by depriving them of

10   NIL compensation they would have received if the rules had not been in place.  *See, e.g.*, House

11   Decl. ¶¶ 2-6; Prince Decl. ¶¶ 2-7; Oliver Decl. ¶¶ 2-3; Berman Decl., Ex. 47-49.  That is the same

12   type of injury claimed by the members of the proposed classes they each seek to represent.  *See,*

13   *e.g.*, Rascher Rep. at 49-51.

14        Defendants do not dispute that Plaintiffs' showing is sufficient to meet the typicality

15   requirement.

16        Accordingly, the Court finds that the typicality requirement is satisfied.

17            **4.    Adequacy of Representation**

18        The requirement of adequate representation requires a showing that the representative

19   parties "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).

20   This requires inquiry into whether the representatives (i) have any conflicts of interest with class

21   members and (ii) will prosecute the action vigorously on behalf of the class.  *See Staton v. Boeing*

22   *Co.*, 327 F.3d 938, 957 (9th Cir. 2003).  Rule 23(g)(2) imposes a similar adequacy requirement on

23   class counsel.  *See* Fed. R. Civ. P. 23(g)(2) (providing that the court may appoint class counsel if

24   counsel will fairly and adequately represent the interests of the class based on factors that include

25   the work of counsel, their experience in handling the types of claims asserted in the action, their

26   knowledge of the applicable law, and the resources they will commit to the class).

27        Here, Plaintiffs have shown that named Plaintiffs House, Prince, and Oliver are adequate

28   representatives for the proposed damages classes they each seek to represent because their

interests are aligned with members of those classes in challenging the lawfulness of the challenged rules and in proving that those rules damaged class members.  Plaintiffs also have shown that House, Prince, and Oliver have significantly aided the prosecution of this litigation to date, which demonstrates that they will prosecute the action vigorously on behalf of the proposed classes. Each has responded to interrogatories, searched for responsive documents, and consulted with counsel about case strategy and discovery.  *See* Prince Decl. ¶¶ 13-15; House Decl. ¶¶ 9-10; Oliver Decl. ¶¶ 5-6.  This is sufficient to satisfy Rule 23(a)(4).

Defendants' arguments to the contrary are not persuasive.  First, Defendants contend that the adequacy requirement is not met because Plaintiffs have abandoned certain claims that they could have asserted in this action.  However, "[a] strategic decision to pursue those claims a plaintiff believes to be most viable does not render her inadequate as a class representative." *Todd v. Tempur-Sealy Int'l, Inc.*, No. 13-CV-04984-JST, 2016 WL 5746364, at *5 (N.D. Cal. Sept. 30, 2016) (collecting cases).  Any members of the proposed damages classes who wish to pursue the claims that Plaintiffs have abandoned for strategic reasons will have the opportunity to exclude themselves and file their own lawsuits.  Accordingly, this is not a proper ground for denying certification.

Second, Defendants contend that Tymir Oliver cannot adequately represent men's basketball players because he did not interact regularly with student-athletes outside of the football team while in college, he does not watch college basketball, and he is not sure that he knows everything he needs to know to be able to represent basketball players.  *See* Oliver Dep. Tr. at 102-03, 198, 263.  The Court is not persuaded.  "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997).  Oliver satisfies those requirements.  He is a member of the Football and Men's Basketball Class he seeks to represent, and he has the same interest as basketball players who are members of that proposed class in establishing that the challenged rules violate Section 1 and caused them antitrust injury by depriving them of broadcast NIL and video game NIL compensation they would have otherwise received.  Defendants have pointed to no evidence that Oliver has a conflict of interest with basketball players who are

1    members of the Football and Men's Basketball proposed class.  Accordingly, the Court finds that

2    Oliver is an adequate representative for that class.

3         Third, Defendants argue that conflicts exist among proposed class members because of the

4    methodology that Plaintiffs advance for establishing BNIL injury and damages.  As discussed in

5    more detail below in section III.B.1.a. of this order, that argument is unavailing.

6         In sum, the Court finds that the adequacy requirement is met.  The Court appoints named

7    Plaintiff Sedona Prince as the representative for the Women's Basketball Class; named Plaintiff

8    Grant House as the representative for the Additional Sports Class; and named Plaintiff Tymir

9    Oliver as the representative for the Football and Men's Basketball Class.

10        Plaintiffs have shown, and Defendants do not dispute, that Hagens Berman Sobol Shapiro

11   LLP and Winston & Strawn LLP satisfy the requirements for appointment as class counsel for the

12   proposed damages classes because both were previously appointed lead counsel for NCAA

13   student-athletes in complex antitrust actions and have achieved significant success in that role.

14   Because it is undisputed that Hagens Berman Sobol Shapiro LLP and Winston & Strawn LLP do

15   not have any conflict of interest with members of the proposed damages classes, and that they will

16   prosecute the action vigorously and fairly on behalf of those classes, the Court finds that the

17   requirements of Rule 23(a)(4) and Rule 23(g)(2) are met with respect to those law firms.  The

18   Court appoints Hagens Berman Sobol Shapiro LLP and Winston & Strawn LLP as Co-Lead Class

19   Counsel for the proposed damages classes.

20        **B.    Rule 23(b)(3)**

21        Under Rule 23(b)(3), a plaintiff must show that "the questions of law or fact common to

22   class members predominate over any questions affecting only individual members, and that a class

23   action is superior to other available methods for fairly and efficiently adjudicating the

24   controversy."  Fed. R. Civ. P. 23(b)(3).

25            **1.    Predominance**

26        "The predominance inquiry asks whether the common, aggregation-enabling, issues in the

27   case are more prevalent or important than the non-common, aggregation-defeating, individual

28   issues."  *Olean*, 31 F.4th at 664 (citation and internal quotation marks omitted).  "In order for the

United States District Court
Northern District of California

United States District Court
Northern District of California

plaintiffs to carry their burden of proving that a common question predominates, they must show that the common question relates to a central issue in the plaintiffs' claim." *See id.* at 665 (citation omitted). "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.* at 668 (citation and internal quotation marks omitted).

"[C]onsidering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Id.* (citation omitted).  The claims at issue here are alleged violations of Section 1 of the Sherman Act, 15 U.S.C. § 15.  The elements of a Section 1 claim are "(i) the existence of an antitrust violation; (ii) 'antitrust injury' or 'impact' flowing from that violation (i.e., the conspiracy); and (iii) measurable damages." *Id.* at 665-66 (citations omitted).

Where, as here, a claim under Section 1 arises out of the alleged anticompetitive effect of NCAA rules, the determination of whether there has been a Section 1 violation is based on the application of the rule of reason, which "generally requires a court to conduct a fact-specific assessment of market power and market structure to assess a challenged restraint's actual effect on competition." *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2151 (2021) (citation and internal quotation marks omitted).  The rule of reason calls for an assessment of whether the challenged NCAA rules constitute a contract, combination, or conspiracy affecting interstate commerce that produces significant anticompetitive effects in the relevant market; whether there are any procompetitive justifications for the rules; and whether any such procompetitive effects can be achieved by less restrictive alternatives. *See id.* at 2151-53, 2160-61.  The question of whether an antitrust violation under Section 1 exists naturally lends itself to common proof, because that determination "turns on defendants' conduct and intent along with the effect on the market, not on individual class members." *See In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 475 (N.D. Cal. 2020) (Alsup, J.) (citation omitted); *see also Nat'l Soc. of Prof'l Eng's v. United States*, 435 U.S. 679, 692 (1978) (holding that the rule of reason involves evaluating the

competitive effect of an agreement by "analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed").

Antitrust impact flowing from the antitrust violation is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Olean*, 31 F.4th at 666 (citation and internal quotation marks omitted). "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations . . . would be likely to cause.'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (citation omitted). A court may find that antitrust impact can be established on a classwide basis if the plaintiff can point to evidence that each class member could rely upon in an individual action to show "antitrust impact of *any* amount." *Olean*, 31 F.4th at 679 (emphasis added).

"Damages are measured only after each plaintiff has demonstrated that the defendant's conduct caused the plaintiff to suffer an antitrust injury." *Id.* (citation omitted). "The guiding principle is that the antitrust victim should recover the difference between its actual economic condition and its 'but for' condition" absent the antitrust violation." P. Areeda & H. Hovenkamp, *An Analysis of Antitrust Principles and Their Application* § 392 (5th ed. 2023 supp.) (Areeda). "Because antitrust damage calculations necessarily require a determination of what would have been in a 'but for' world, there is an inescapable element of uncertainty in those calculations." *Id.* Accordingly, while the plaintiffs must advance a damages model that is capable of measuring damages on a classwide basis that are consistent with their theory of liability, the damages "[c]alculations need not be exact" at the class certification stage. *Comcast*, 569 U.S. at 35. "The Supreme Court has repeatedly explained that courts should afford plaintiffs relatively broad leeway in constructing a damages model — at least within the 'just and reasonable inference[s] from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business.'" *In re Glumetza Antitrust Litig.*, 336 F.R.D. at 479 (quoting *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946)). This is because "[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." *See J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981). "The

wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise."  Areeda § 392; *see also Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.,* 773 F.2d 1506, 1511 (9th Cir. 1985) ("Defendants . . . should not benefit because their wrongdoing makes it more difficult for the plaintiff to establish the precise amount of its injury.  The jury is allowed to act on probable and inferential proof in determining the amount of damages even though such an award may be an approximation.") (internal citation omitted).

Plaintiffs contend that the predominance requirement is met with respect to all three proposed damages classes because the questions that are central to their claims under Section 1 are capable of resolution on a classwide basis with common proof, including whether the challenged NCAA rules violate Section 1, whether the members of the proposed classes suffered antitrust injury as a result of that violation, and classwide damages.

Defendants do not dispute that the question of whether the challenged rules violate Section 1 can be answered on a classwide basis with common evidence.  Defendants nevertheless argue that Plaintiffs have not satisfied the predominance requirement because they have not shown that the questions of antitrust impact and damages can be resolved on a classwide basis with common proof.  Defendants contend that, because antitrust impact and damages are central issues to a Section 1 claim, the predominance requirement cannot be met where, as here, antitrust impact and damages require individualized determinations, as those individual inquiries will overwhelm common issues in the action.

Below, the Court addresses the parties' arguments with respect to each of the three types of antitrust injuries and damages that Plaintiffs allege (i.e., BNIL injury and damages, video game injury and damages, and third-party NIL injury and damages).  In analyzing the parties' arguments, the Court is mindful that, when "making the determinations necessary to find that the prerequisites of Rule 23(b)(3) are satisfied, the district court must proceed just as the judge would resolve a dispute about any other threshold prerequisite for continuing a lawsuit."  *Olean*, 31 F.4th at 667 (citation and internal quotation marks omitted).  "[A] district court cannot decline certification merely because it considers plaintiffs' evidence relating to the common question to be

unpersuasive and unlikely to succeed in carrying the plaintiffs' burden of proof on that issue." *Id.* (citation omitted). Rather, if "each class member could have relied on [the plaintiffs' evidence] to establish" the common question "if he or she had brought an individual action," and the evidence "could have sustained a reasonable jury finding" on the merits of the common question, "then a district court may conclude that the plaintiffs have carried their burden of satisfying the Rule 23(b)(3) requirements as to that common question of law or fact." *See id.* (citation and internal quotation marks omitted). Additionally, the Court is mindful that it cannot "decline to certify a class that will require determination of some individualized questions at trial, so long as such questions do not predominate over the common questions." *Id.* at 668. "[D]amages calculations alone cannot defeat class certification." *See Pulaski & Middleman, LLC v. Google, Inc*., 802 F.3d 979, 987-88 (9th Cir. 2015).

### a.    Broadcast NIL

Plaintiffs argue they can rely on common evidence to show at trial that, absent the challenged rules, every member of the Football and Men's Basketball Class and the Women's Basketball Class would have received compensation for the use of their NIL in football or basketball broadcasts in the absence of the challenged rules in an amount greater than zero (i.e., to establish antitrust injury for BNIL). Plaintiffs also argue that they can rely on common evidence to measure the amounts of BNIL compensation that members of the Football and Men's Basketball Class and the Women's Basketball Class would have received in the absence of the challenged rules (i.e., to calculate BNIL damages on a classwide basis). Plaintiffs point to the opinions of experts Edward S. Desser and Dr. Daniel A. Rascher as that common evidence.

Edwin S. Desser is Plaintiffs' expert on sports media and broadcasting rights. *See* Desser Rep., Docket No. 209-3 (SEALED); Desser Reply Rep., Docket No. 290-3 (SEALED). Desser has worked in the sports media industry since 1977 and has decades of experience in negotiating and valuing professional sports broadcast agreements. Desser Rep. at 9. He worked as a media executive for the National Basketball Association (NBA) for twenty-three years; some of that work involved negotiating media agreements with media companies such as ESPN, Turner Broadcasting, and NBC Sports. *Id.* at 9-10. Since 2005, Desser has been an independent media

consultant; in that role, Desser has worked on rights negotiations and valuations for consulting clients that include Defendant NCAA and some NCAA conferences. *Id.* at 10.  Desser also has provided expert testimony on sports broadcasting matters, including in prior litigation involving the names, images, and likenesses (NIL) of Division I football and basketball student-athletes.  *Id.*

As relevant here, Desser was tasked with opining on the estimated value of student-athletes' BNIL for Power Five Football Bowl Subdivision (FBS) games, and men's and women's Division I basketball games, as compared to the revenues Defendants make from broadcast contracts for those sports.  Desser concluded that at least ten percent of the value of (i.e., revenue from) the broadcast rights for those sports is attributable to the student-athletes' NIL contained in the broadcasts (hereinafter, the ten percent opinion).  *See id.* at 7, 52-59.  In formulating this opinion, Desser relied on his decades of experience in negotiating professional sports broadcast agreements, as well as his analysis of data he believes is probative, including professional sports group licensing royalty rates.  *See id.*

Desser was also tasked with estimating the per-sport revenue allocation for Defendants' multi-sport broadcast agreements.  *Id.* at 8.  Desser concluded that, for Defendants' broadcast agreements that cover multiple sports, the overall average allocation of the revenue is seventy-five percent to football, fifteen percent to men's basketball, five percent to women's basketball, and five percent to all other sports (hereinafter, the allocation opinion).  *Id.* at 8, 60-63.  In formulating this opinion, Desser relied on his decades of experience in negotiating sports media deals, discussions with many network and college conference executives during his career, and his review of relevant evidence, which includes audited financial statements, various broadcast contracts for college sports, and publicly available information that reflects or is indicative of the popularity of various college sports.  *See id.* at 60-62.

Dr. Daniel A. Rascher is Plaintiffs' economics expert.  *See* Rascher Rep., Docket No. 209-2 (SEALED); Rascher Reply Rep., Docket No. 290-2 (SEALED).  Dr. Rascher is a Professor and Director of Academics Programs for the Master of Science in Sport Management program at the University of San Francisco, and is a partner of OSKR, LLC, an economic consulting firm. Rascher Rep. at 2.  Dr. Rascher served as an expert in college sports labor markets at class

certification in prior actions related to the present one, including *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-In-Aid Cap Antitrust Litig.*, 311 F.R.D. 532 (N.D. Cal. 2015) (*Alston*) and *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, No. C 09-1967 CW, 2013 WL 5979327 (N.D. Cal. 8, 2013) (*O'Bannon*).  He also was a testifying economics expert in *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058 (N.D. Cal. 2019), *aff'd*, 958 F.3d 1239 (9th Cir. 2020), *aff'd sub nom. Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141 (2021).

As relevant here, Dr. Rascher constructed a methodology to estimate classwide injury and damages based on the BNIL payments that members of the proposed Football and Men's Basketball Class and the proposed Women's Basketball Class would have received absent the challenged rules, which prohibit conferences and schools from paying student-athletes for their NIL in broadcasts (hereinafter, BNIL methodology).  Rascher Rep. at 73-94.  Dr. Rascher modeled a but-for world in which, during the class period, the challenged rules that prohibit conferences and schools from paying student-athletes for their NIL in broadcasts did not exist, but other NCAA rules remained in place, including those that prohibit conferences and schools from paying student-athletes for their athletic performance.  *See id.* at 4.

Based on his review of the discovery record and his expertise as a sports economist, Dr. Rascher opined that, absent the challenged rules: (1) the Power Five Conferences would have competed with each other to attract FBS football and Division I basketball student-athletes by offering them payments for their NIL in broadcasts, because that would have enabled the conferences to maximize their broadcast revenues[7]; (2) that this competition would have led each

---

[7] Dr. Rascher explained, based on his review of the record, that the vast majority of the football and basketball games of the Power Five Conferences' member schools are subject to broadcast agreements that were entered into by the Power Five Conferences as opposed to member schools.  Rascher Rep. at 74 n.171.  The revenues from those agreements are generally distributed to the member schools.  There are a few exceptions, namely contracts that are negotiated by the NCAA instead of the conferences, but "a substantial portion of the revenue" derived from those agreements is nevertheless distributed to the participating conferences, including the Power Five. *See id.*

United States District Court
Northern District of California

of the Power Five Conferences to enter into *ex ante*[8] group-licensing[9] deals with proposed class members in each conference, namely incoming FBS football and Division I men's and women's basketball student-athletes, who are recipients of full grant-in-aid scholarships, for the use of their NIL in broadcasts[10]; and (3) that, pursuant to those *ex ante* group-licensing deals, each Power Five conference would have offered equal payments to those student-athletes in the conference for the use of their NIL in FBS football and basketball broadcasts.  *Id.* at 75-84.

Dr. Rascher estimated the economic value that the conferences would have paid members of the proposed football and basketball classes for the use of their NIL in broadcasts as follows.  First, Dr. Rascher estimated the collective value of the broadcast NIL of the proposed class members as being approximately ten percent of the value (revenue) that the Power Five Conferences receive from broadcasting contracts for FBS football and Division I basketball.  That estimate is based on Desser's ten percent opinion (discussed above), as well as Dr. Rascher's own analysis of data that he considers to be probative, including professional sports group licensing royalty rates for the use of professional athletes' NIL in digital products and collectible cards.  *See* Rascher Rep. at 84-87.  Second, Dr. Rascher determined the value of the broadcast contracts from which each of the Power Five Conferences derived broadcasting revenue during the damages period for FBS football and Division I basketball.  *See id.* at 88-91.  For multi-sport broadcast

---

[8] In the context of Dr. Rascher's report, *ex ante* refers to the time at which the student-athletes agree to join the sports program of an NCAA school, which takes place *before* the student-athletes' NIL are used in any broadcasts.  *See* Rascher Rep. at 75, 77-83; Rascher Reply Rep. at 48-49.

[9] Dr. Rascher opined that group licenses, as opposed to individual licenses, would be the expected economic outcome because, for the purpose of producing a broadcast, "having the entire team is important[.]"  *See* Rascher Rep. at 78.  Additionally, Dr. Rascher concluded, based on Desser's opinions, that broadcasters typically require their contracting partners, including the Power Five Conferences, to have secured the NIL rights of all player participants in a game telecast.  *See id.* at 83.

[10] Dr. Rascher opined that "there likely would be other Division I football and basketball players who would have received Broadcast NIL payments in the but-for world in which such payments were permitted" but "it is conservative to conclude that, at the very least, all athletes in these two classes would have received such payments."  Rascher Rep. at 73.

United States District Court
Northern District of California

contracts, Dr. Rascher relied on Desser's allocation opinion (discussed above), as well as his own review of relevant data, to estimate the allocation of the revenues from those multi-sport contracts to FBS football, and men's and women's Division I basketball, respectively. *See id.* Third, for each of the Power Five Conferences, Dr. Rascher multiplied the total revenues of each conference for each of the relevant sports by ten percent (i.e., by the value of student-athletes' NIL in broadcasts as compared to the value of the broadcast contracts), with the product representing the student-athlete share of each conference's revenues for each sport. *See id.* at 91.

Finally, to estimate individual damages, Dr. Rascher divided the total student-athlete share of each conference's broadcast revenues for each sport by the number of class members in each conference, year, and sport to estimate the individual payment that each proposed class member would have received each year in the absence of the challenged rules. *See id.* This division resulted in equal shares of conference broadcast revenue among proposed class members for each conference, each sport, and each year in the damages period. *See id.* at 91-94 & Ex. 12. These are preliminary damages allocation estimates; Dr. Rascher will finalize his estimates when discovery is completed. *Id.* at 7.

The Court finds that Dr. Rascher's BNIL opinions and methodology, which rely on some of Desser's opinions as discussed above, are sufficiently reliable and capable of supporting a reasonable jury finding that members of the proposed Football and Men's Basketball Class and the Women's Basketball Class would have received BNIL compensation in an amount greater than zero in the absence of the challenged rules. The Court, therefore, finds that Dr. Rascher's BNIL opinions and methodology are capable of resolving the question of antitrust injury in one stroke for proposed class members who allege BNIL injury. The Court also finds that Dr. Rascher's BNIL opinions and methodology are sufficiently reliable and capable of measuring BNIL damages for members of the Football and Men's Basketball Class and the Women's Basketball Class. Because the questions of whether there was an antitrust violation with respect to BNIL, BNIL antitrust injury, and BNIL damages are capable of resolution with common proof, the Court finds that the predominance requirement is met with respect to the Football and Men's Basketball Class and the Women's Basketball Class insofar as they allege BNIL injury.

Defendants contend that Dr. Rascher's BNIL methodology is not capable of resolving the questions of BNIL antitrust injury and damages for members of the Football and Men's Basketball Class and the Women's Basketball Class, but all of the arguments they advance are unavailing.

First, Defendants contend that Plaintiffs' BNIL methodology "cannot survive Rule 23(b)(3)" because it is "fatally speculative and contrary to the record." Docket No. 252 at 23-24.[11] Defendants rely on footnote nine of *Olean*, 31 F.4th at 666 n.9, to support that proposition.[12] *See* Hr'g Tr. at 31; *see also* Docket No. 252 at 23 n.19.

In footnote nine of *Olean*, the Ninth Circuit noted that "[c]ourts have frequently found that expert evidence, while otherwise admissible under *Daubert*, was inadequate to satisfy the prerequisites of Rule 23," such as where "the evidence contained unsupported assumptions," as in *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 29 (1st Cir. 2008). *See* 31 F.4th at 666 n.9. In *In re New Motor Vehicles*, the plaintiffs alleged that a class of consumers who purchased cars in the United States suffered antitrust injury as a result of an alleged conspiracy to discourage imports of lower-cost cars from Canada. The plaintiffs argued that consumers suffered antitrust injury because they paid higher prices for vehicles than they would have paid but for the alleged conspiracy, and they presented expert testimony that, in the absence of the conspiracy,

---

[11] Defendants filed a separate motion to exclude under Federal Rule of Evidence 702 Edwin Desser's ten percent opinion and allocation opinion, as well as Dr. Rascher's BNIL methodology, on the ground that they are unreliable and speculative. *See* Docket No. 253. For the reasons discussed in the Court's separate order resolving that motion, the Court has found that Desser's opinions and Dr. Rascher's BNIL methodology are reliable and not subject to exclusion under Rule 702. The Court incorporates here by reference its findings as to why the opinions at issue are adequately supported and reliable.

[12] In their opposition brief, Defendants also rely on *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807 (9th Cir. 1988), for the proposition that "courts deny certification where, like here, a plaintiff's common proof of class-wide impact and damages rests upon speculation." *See* Docket No. 252 at 23. *McGlinchy* does not help Defendants, because that case says nothing about the standards for evaluating expert testimony at the class certification stage. *See* 845 F.2d at 806-07 (in an action that did not involve a Rule 23 class, affirming the exclusion of expert testimony on damages at the summary judgment stage on the basis that it "did not meet the standard that, in the context of a motion for summary judgment, an expert must demonstrate his competence or back up his opinion with specific facts"). The other cases that Defendants cite in their opposition are not binding on this Court. *See* Docket No. 252 at 22-23.

there would have been an influx of lower-cost cars from Canada to the United States and car dealers in the United States would have set lower prices for cars to compete with lower-cost cars from Canada.  The expert's theory of antitrust injury relied on the assumptions that the alleged conspiracy caused upward pressure on national dealer invoice pricing and the Manufacturer's Suggested Retail Price (MSRP) for cars in the United States, and that the upward pressure necessarily raised the prices that American consumers paid for cars.  The First Circuit rejected those assumptions as lacking sufficient support, reasoning that the expert had not described how large the influx of Canadian cars into the United States would have had to be to raise dealer invoice pricing and MSRP for cars in the United States, or shown that "it can be presumed that all purchasers of those affected cars paid higher retail prices."  *See In re New Motor Vehicles*, 522 F.3d at 28-29.  The First Circuit explained that "[t]oo many factors play into an individual negotiation [to purchase a vehicle] to allow an assumption—*at least without further theoretical development*—that any price increase or decrease [of dealer invoice pricing or MSRP] will always have the same magnitude of effect on the final price paid" by individual consumers.  *See id.* (emphasis added).  Accordingly, the First Circuit concluded that the expert's theory of antitrust injury and damages did not support certification under Rule 23(b)(3) because "more work remained to be done in the building of plaintiffs' damages model and the filling out of all steps of plaintiffs' theory of impact."  *Id.* at 29.

Here, Defendants argue that Plaintiffs' BNIL methodology is based on unsupported assumptions because, according to Defendants (1) "[n]othing supports the existence of an independent market for BNIL rights, or that such rights would universally constitute 10% of broadcasts revenues"; (2) there is "no basis" for the assumption that the Power Five Conferences would allocate broadcast revenue of multi-sport contracts pursuant to Desser's allocation opinion (i.e., seventy-five percent to football, fifteen percent to men's basketball, five percent to women's basketball, and five percent to all other sports); and (3) there is "no basis" for Dr. Rascher's opinion that the Power Five Conferences would make equal BNIL payments to student-athletes in each conference and that conferences, and not schools, would determine whether to make such payments and in what amount.  *See* Docket No. 252 at 23-24.

United States District Court
Northern District of California

1    The Court has carefully reviewed the reports and deposition testimony of Desser and

2    Dr. Rascher, as well as the evidence that Defendants cite in support of their arguments, and finds

3    that none of the opinions and assumptions to which Defendants point require "further theoretical

4    development" or "more work," as the expert testimony on antitrust injury and damages in *In re*

5    *New Motor Vehicles* did.

6    Defendants argue that there is no basis to assume that student-athletes' NIL in broadcasts

7    have value, much less a specific value, because no payments have been made to date to student-

8    athletes (or professional athletes) by anyone to compensate them specifically for their BNIL and

9    because Defendants' broadcast contracts do not separately value student-athletes' NIL.[13]  *See*

10   Docket No 252 at 7-16, 23-24.  However, the Court finds ample support for Plaintiffs' assumption

11   that student-athletes NIL in broadcasts have value, and that their value is at least ten percent of the

12   revenues of Defendants' broadcasting contracts.  Desser acknowledges that there have been no

13   prior instances in which BNIL has been negotiated or valued separately from other components of

14   broadcast agreements because there has been no business reason for doing so to date.  *See, e.g.*,

15   Desser Reply at 12-13, Desser Dep. Tr. at 34.  Desser opines that student-athletes' BNIL

16   nevertheless have value and that such value can be inferred from the fact that broadcasts require

17   the use of student-athletes' NIL, and that media companies "require contractual assurances from

18   the Power 5 conferences or the NCAA that all rights to use such [student-]athlete NILs are being

19   conveyed or that the conferences or the NCAA are indemnifying media partners for their use.

---

20   

21   [13] In support of this argument, Defendants cite evidence that includes the report of their
     media rights expert, Bob Thompson, as well as various declarations, for the proposition that, to
22   date, student-athletes' NIL have not been valued or sold separately from other components of
     broadcast agreements and that, for that reason, either student-athletes' BNIL do not have value or
23   it is impossible to determine the value of student-athletes' BNIL.  *See* Thompson Rep. at 17-27,
     35-46; *see also* Sankey Decl. ¶ 23; Kerry Kenny Decl. ¶ 13; George Kliavkoff Decl. ¶ 27; Chad
24   Weiberg Decl. ¶ 13; Mack Rhoades Decl. ¶ 13; Ben Tario Decl. ¶ 28.  Defendants also point to the
     declarations of executives of professional athletes' associations for the proposition that, because
25   professional athletes receive an individually-negotiated salary, there is no basis for Plaintiffs'
     assumption that student-athletes would receive compensation for their BNIL based on a
26   percentage of the revenues of Defendants' broadcast contracts.  *See* Scebelo Supp. Decl. ¶¶ 4-5;
     Arrick Supp. Decl. ¶ 4.  This evidence goes to the persuasiveness of Desser and Rascher's
27   opinions, which is a matter for the jury.

28

1  These contractual assurances have been deemed by the broadcast partners to be necessary despite

2  any claims by the NCAA that such rights are not legally protected[.]"  *See* Desser Rep. at 6; *see*

3  *also id.* at 24, 31-32; Desser Reply Rep. at 3-4, 10-15.  The assumption that the value of student-

4  athletes' BNIL is at least ten percent of the revenues of Defendants' broadcast contracts is based

5  on (1) Desser's ten percent opinion, which in turn is based on his decades of experience

6  negotiating professional sports broadcasting agreements[14] and his review of relevant data that

7  includes group licensing royalties for apparel, merchandise, and video games involving

8  professional athletes' NIL that he believes are probative, *see* Desser Reply at 13-15; and (2)

9  Dr. Rascher's own assessment of relevant data that includes group licensing royalties for digital

10  products and collectible cards for the use of professional athletes' NIL, which he believes are

11  probative, Rascher Rep. at 84-87.[15]  The Court finds that the foregoing support is sufficient and

12  that it distinguishes the assumptions at issue from those in *In re New Motor Vehicles*.

13  Defendants also argue there is no basis for the assumption that the Power Five Conferences

14  would allocate their revenues from multi-sport contracts in the manner that Desser and

15  Dr. Rascher opined, namely seventy-five percent to football, fifteen percent to men's basketball,

16  and five percent to women's basketball.[16]  But that assumption has adequate support in Desser's

17

---

18  [14] Notably, Defendants' media rights expert, Bob Thompson, testified that networks and
    conferences rely, at least in part, on their "experience" when negotiating or valuing media rights.
19  *See* Thompson Dep. Tr. at 75-76.

20  [15] Defendants argue that the group licensing royalty rates that Desser and Dr. Rascher
21  relied upon do not indicate that student-athletes' NIL in broadcasts have value because those
    royalty rates "have nothing to do with BNIL."  Docket No. 252 at 9.  The Court finds that this
22  argument goes to the persuasiveness of Desser and Dr. Rascher's opinions, which is a matter for
    the jury.  Desser and Dr. Rascher offered adequate responses to Defendants' criticisms.  *See*, *e.g.*,
23  Desser Reply Rep. at 14-16; Rascher Reply Rep. at 26.  A jury reasonably could find that the
    royalty rates that Desser and Dr. Rascher relied upon are probative of the value of student-athletes'
24  NIL in broadcasts.

25  [16] To support this argument, Defendants cite evidence that includes various declarations for
26  the proposition that current broadcast agreements that cover multiple sports do not allocate
    revenues among individual sports, *see, e.g.*, Kenny Decl. ¶ 15; Sankey Decl. ¶¶ 32-34; and the
27  report of their media rights expert, Bob Thompson, and various declarations, for the proposition
    that different conferences have different priorities when they negotiate multi-sport agreements and
28  that, therefore, it is illogical to assume that there could be a common allocation among sports

allocation opinion, which is based on his decades of experience in negotiating sports media deals, discussions with many network and college conference executives during his career, and his review of relevant evidence, which includes audited financial statements for Defendant Southeastern Conference, various broadcast contracts for college sports, and publicly available information about the popularity of various college sports.[17]  *See* Desser Rep. at 60-62. Additionally, that assumption is based on Dr. Rascher's own assessment of data that he believes serve as reliable indicators of demand for various college sports; based on his review of that data, Dr. Rascher opines that Desser's allocation is reasonable.[18]  *See* Rascher Rep. at 89.  The Court finds that the foregoing is sufficient support for the allocation assumption.

Defendants next contend that there is no basis for the assumptions that, in the absence of the challenged rules, the Power Five Conferences would make equal BNIL payments to class members before their enrollment and that the conferences, not schools, would decide whether to make BNIL payments and in what amount.[19]  Docket No. 252 at 24.  The Court disagrees.  Those

---

across all conferences, *see* Thompson Rep. at 18, 21; Tario Decl. ¶ 31; Sankey Decl. ¶¶ 35–37; Weiberg Decl. ¶ 16; Kliavkoff Decl. ¶ 24.  The Court finds that this evidence goes to the persuasiveness of Desser and Dr. Rascher's opinions and assumptions, which is a matter for the jury.

[17] Defendants contend that Desser misinterpreted and cherry-picked aspects of the documents and materials that form the basis of his allocation opinion.  *See* Docket No. 252 at 15. Those arguments go to the persuasiveness of Desser's allocation opinion, which is a matter for the jury.

[18] Defendants argue that the data that Dr. Rascher analyzed are incomplete or otherwise do not support the conclusions that Dr. Rascher drew from them.  *See* Docket No. 252 at 15.  Those arguments go to the persuasiveness of Dr. Rascher's opinions, which is a matter for the jury.

[19] In support of this argument, Defendants point to evidence that includes declarations by executives of various conferences for the proposition that conferences are not involved in recruiting activities, *see* Sankey Decl. ¶ 12; Kliavkoff Decl. ¶ 12; Tario Decl. ¶ 10; Hawley Decl. ¶ 13; the report of their economics expert, Dr. Catherine Tucker, for the proposition that Dr. Rascher's opinions regarding conferences' BNIL payments in the but-for world are speculative and that payments for labor are based on talent, *see* Tucker Rep. ¶¶ 90-98, and for the proposition that schools offer other forms of compensation (such as scholarships) to student-athletes in varying amounts and at different times, *see id.* ¶¶ 123-30; the declarations of various conference executives for the proposition that conferences would not make BNIL payments as contemplated by Dr. Rascher, *see* James Decl. ¶¶ 23-24; Weiberg Decl. ¶ 18; Lee Decl. ¶ 22; the

1    assumptions are supported by Dr. Rascher's opinions, which are based on economic theory and

2    economic analysis and his review of the record.  Dr. Rascher opined that one way in which

3    schools compete with one another to recruit student-athletes is by forming conferences.  *See, e.g.*,

4    Rascher Report at 74-77; Rascher Supp. Dep. Tr. at 105-06 (testifying that schools compete with

5    each other to recruit student-athletes "within the context of being in a conference").  As discussed

6    in more detail above, Dr. Rascher opined that, in the absence of the challenged rules, it would

7    have been economically efficient and rational for the Power Five Conferences (rather than

8    schools) to have competed with each other to make BNIL payments to class members before their

9    enrollment because doing so would help the conferences maximize their broadcast revenues, and

10   because conferences, not schools, aggregate school broadcasting rights, enter broadcast deals with

11   broadcasters that contain contractual assurances regarding the use of student-athletes' BNIL, and

12   distribute the revenues to member schools.  *See, e.g.*, Rascher Rep. at 75-84; Rascher Reply Rep.

13   at 44-48.  Dr. Rascher opined that equal payments to student-athletes for their BNIL via a group

14   license (as opposed to varying, individual payments based on talent, for example) would have

15   been the economic equilibrium because of factors that include: the competition in recruiting;

16   efficiencies achieved by virtue of having student-athletes signing a group NIL license at the same

17   time that they sign paperwork for their full grants-in-aid; the desire to avoid situations in which

18   student-athletes try to negotiate for a higher NIL payment at a date after they enter school or

19   where a school might refuse to pay for broadcast NIL after the student-athlete has committed to

20   the school; the need to secure the NIL rights of all players in a broadcast at the networks' request

21   in advance of the broadcast; the uncertainty about which student-athletes' NIL will need to be

22   used in broadcasts (because of changes in starting positions, injuries, etc.); and the fact that each

23   conference shares its broadcast revenues among its member schools equally.  *See* Rascher Rep. at

24   _____

25   report of their media rights expert, Bob Thompson, for the proposition that salaries in professional
     sports vary by athlete, Thompson Rep. at 38-39; and the declaration of a sports agent for
26   professional athletes for the proposition that student-athletes would not accept equal payments for
     BNIL, Sexton Decl. ¶¶ 10-11.  The Court finds that these arguments and evidence go to the
27   persuasiveness of Dr. Rascher's opinions and assumptions, which is a matter for the jury.  Dr.
     Rascher adequately responded to these criticisms.  *See*, *e.g.*, Rascher Reply Rep. at 44-56.
28

77-83; Rascher Reply Rep. at 48-50.  The Court finds that the foregoing is sufficient support for the assumptions at issue.

In sum, whereas the "plaintiffs in *New Motor Vehicles* had not provided a thorough explanation or developed a model showing how they would establish their theory [of antitrust impact]," *Olean*, 31 F.4th at 679, Dr. Rascher's BNIL methodology and the assumptions underlying it are well-developed and sufficiently reliable and capable of establishing BNIL antitrust injury and damages for members of the Football and Men's Basketball Class and Women's Basketball Class.

Second, Defendants point to their own evidence to argue that the assumptions underlying Dr. Rascher's BNIL methodology, which the Court has found are sufficiently supported and reliable, are wrong.[20]  *See* Docket No. 252 at 6-15.  In short, Defendants contend that their evidence shows that proposed class members would not have received BNIL compensation in the absence of the challenged rules as Dr. Rascher opined.  *See id.*  The Court finds that Defendants' arguments and evidence go to the persuasiveness of Dr. Rascher's methodology and do not impact the Court's finding that Dr. Rascher's BNIL methodology is capable of resolving on a classwide basis the questions of BNIL antitrust impact and damages for the Football and Men's Basketball and Women's Basketball proposed classes.  As noted, a "lack of persuasiveness is not fatal to class certification."  *Olean*, 31 F.4th at 679.

Relatedly, Defendants argue in passing that there is "no way" for them to present their "highly individualized evidence" that shows that student-athletes would not have received BNIL compensation in the absence of the challenged rules without overwhelming a class trial with individual inquiries.  Docket No. 252 at 33.  This is not persuasive.  The contentions that Defendants make in their opposition brief regarding the purported absence of BNIL injury suffered by the proposed class members are merits arguments that apply to all proposed class members who allege BNIL injury, or at least large swathes of them.  *See id.* at 6-16.  For example, Defendants contend that there is no market for student-athletes' BNIL and that student-athletes'

[20] The Court summarized this evidence in footnotes, above.

United States District Court
Northern District of California

1    BNIL, therefore, have no value.  These arguments do not defeat predominance; to the contrary,

2    they emphasize that a class action is the proper vehicle for the claims in this case.

3         Third, Defendants contend that Dr. Rascher's BNIL methodology is not capable of

4    supporting Plaintiffs' motion for certification because the model is not consistent with Plaintiffs'

5    theory of liability.  Docket No. 252 at 24.  Defendants contend that Plaintiffs' theory of liability is

6    premised on schools competing in a market for student-athletes' labor, but Dr. Rascher's BNIL

7    methodology is not consistent with that theory because it provides that conferences, not schools,

8    would compete to provide BNIL payments to student-athletes within a given sport.  *See id.*

9    Defendants contend that Dr. Rascher's assumption that conferences would make BNIL payments

10   to class members "has no real-world analog, is belied by the declarations of numerous conference

11   and school representatives, and misunderstands the nature of competition in Plaintiffs' proposed

12   labor market."  *See* Docket No. 333-2 at 1.  According to Defendants, "[s]chools, not conferences,

13   compete with each other in recruiting, and schools, not conferences, decide what amount of

14   scholarship aid to give to individual students."  *Id.*

15        The Court finds that Dr. Rascher's BNIL methodology is consistent with Plaintiffs' theory

16   of liability.  In the operative complaint, Plaintiffs aver that the challenged rules caused them injury

17   and damages because, "[a]bsent these nationwide restraints, *Division I conferences and schools*

18   *would compete* amongst each other by allowing their athletes to take full advantage of

19   opportunities to utilize, license, and profit from their NIL in commercial business ventures and

20   promotional activities and *to share in the conferences' and schools' commercial benefits received*

21   *from exploiting student-athletes' names, images, and likenesses*."  *See* CAC ¶ 112 (emphasis

22   added).  Dr. Rascher's BNIL methodology establishes that members of the Football and Men's

23   Basketball and Women's Basketball proposed classes would have received BNIL compensation

24   from conferences in the absence of the challenged rules that prohibit conferences and schools from

25   sharing the commercial benefits they receive from exploiting student-athletes' BNIL, consistent

26   with the theory of liability alleged in the CAC.  Dr. Rascher's methodology, therefore, measures

27   BNIL injury and damages that flow from the conduct that Plaintiffs allege is violative of Section

28   1.  *Cf. Comcast*, 569 U.S. at 36-37 (holding that the plaintiffs' damages model was not consistent

with the plaintiffs' theory of liability because "the model failed to measure damages resulting from the particular antitrust injury on which [the defendants'] liability [was] premised").  Defendants argue and point to evidence that conferences currently do not make BNIL payments or compete for the labor of student-athletes, and that it is unlikely that conferences would do so in the absence of the challenged rules.  *See* Docket No. 232 at 24-25.  Those arguments and evidence go to the persuasiveness of Dr. Rascher's BNIL methodology, not to whether the methodology is consistent with Plaintiffs' theory of liability.

Fourth, Defendants argue that "Plaintiffs' BNIL methodology also cannot support certification unless the Court concludes that the methodology complies with Title IX" because a "but-for world designed to eliminate an alleged legal violation cannot be a legal violation of its own."  Docket No. 252 at 28.  Relying on the report of their Title IX expert, Barbara Osborne, Defendants argue that Title IX obligations "preclude" the but-for world BNIL payments contemplated by Dr. Rascher's BNIL methodology, because ninety-six percent of those payments would go to male student-athletes and only four-percent would go to female student-athletes.  *See id.*  Defendants also contend that, because the BNIL payments at issue are subject to Title IX, an individualized assessment must be conducted at each school to ensure that the amounts paid to student-athletes for BNIL comply with Title IX, which in turn means that BNIL payments cannot be calculated on a classwide basis by way of Dr. Rascher's BNIL methodology.  *See id.*

The Court is not persuaded.  First, Defendants have not cited any authority to support the proposition that Dr. Rascher's BNIL methodology "cannot support certification unless the Court concludes that the methodology complies with Title IX."[21]  Second, Defendants' arguments

---

[21] During the hearing, Defendants argued that Dr. Rascher's BNIL payments are contrary to *Dolphin Tours*, 773 F.2d at 1511, because Dr. Rascher's BNIL but-for world could not "exist in reality."  *See* Hr'g Tr. at 35.  *Dolphin Tours* holds that a damages model in an antitrust case "must presume the existence of rational economic behavior in the hypothetical free market."  *See id.*  It also holds that, "[i]n economic terms, the amount of damages is the difference between what the plaintiff could have made in a hypothetical free economic market and what the plaintiff actually made in spite of the anticompetitive activities."  *See id.*  Dr. Rascher's BNIL model satisfies those requirements.  It assumes that market participants are engaging in rational economic behavior, *see*, *e.g.*, Rascher Dep. Tr. at 32, and his model measures the difference between what proposed class members would have received in BNIL compensation in a hypothetical market free of the

United States District Court
Northern District of California

presuppose that Title IX would apply to the BNIL payments contemplated by Dr. Rascher, but Defendants have not shown that such is the case. As discussed above, those payments would have been made by conferences, not schools, in Dr. Rascher's BNIL but-for world. Defendants rely on the opinions of their Title IX expert, Barbara Osborne, who concluded in her report that the payments contemplated by Dr. Rascher's BNIL model would be subject to Title IX and would violate Title IX if they were distributed by conferences in the ratios that Dr. Rascher proposes. *See* Docket No. 252 at 16, 28. However, the Court excludes Osborne's opinions for the purpose of resolving the present motion for certification on the grounds that they are impermissible legal conclusions and are unreliable; this is discussed more detail in the Court's separate order resolving Plaintiffs' motion to exclude Osborne's opinions. Because Defendants have not established that the BNIL payments contemplated by Dr. Rascher's BNIL methodology would be subject to Title IX's requirements, Dr. Rascher's failure to account for Title IX (1) does not render his BNIL methodology unreliable or incapable of supporting Plaintiffs' motion for certification, and (2) does not mean that individualized inquiries at each school would have been required to determine the BNIL amounts that student-athletes would have received in the absence of the challenged rules.[22]

---

challenged rules with what they actually received in the real world, *see* Rascher Rep. at 73-94. Dr. Rascher's BNIL but-for world takes into account and reflects the broadcast revenues that Defendants make in the real world from the relevant sports. Because Defendants' revenues for broadcasts of men's sports are greater than those they receive for broadcasts of women's sports, the damages that Dr. Rascher estimates for male class members are greater than those he estimates for female class members. *See* Rascher Reply Rep. at 58-59. This is not inconsistent with *Dolphin Tours*' requirements for calculating damages. *Dolphin Tours* does not address the question of whether a damages model must take into account a law like Title IX when determining damages amounts. Accordingly, the Court is not persuaded that *Dolphin Tours* requires the rejection of Dr. Rascher's BNIL model because of his failure to address or account for Title IX in estimating BNIL payments.

[22] Even if the conference payments contemplated by Dr. Rascher's BNIL model were subject to Title IX, that would not impact the Court's finding that common questions predominate over individual ones with respect to proposed class members who allege BNIL injury and damages. Title IX would impact only the *amount* of the BNIL payments that would have been made to the members of the Football and Men's Basketball and Women's Basketball proposed classes in the but-for world (i.e., it would impact only the question of damages). Title IX would not alter the Court's finding that Dr. Rascher's BNIL model is capable of resolving the question of BNIL antitrust impact on a classwide basis for members of the Football and Men's Basketball and Women's Basketball proposed classes. Each of those proposed class members could rely on

1    Fifth, Defendants contend that, even if Dr. Rascher's BNIL payments are not subject to

2  Title IX, those payments nevertheless would never be implemented for "gender equity reasons."

3  Docket No. 252 at 29.  As support, Defendants cite the declarations of various athletics directors

4  and conference commissioners and executives, which provide that they do not support, or that

5  their respective schools or conferences likely would not implement, the payments contemplated in

6  Dr. Rascher's BNIL model because of gender equity concerns.  *See* Lee Decl. ¶ 19; Kliavkoff

7  Decl. ¶ 25; Sankey Decl. ¶ 47(a); James Decl. ¶ 19; Hawley Decl. ¶ 16(a); Flores Decl. ¶ 16;

8  Tanner Decl. ¶ 9.  Defendants' evidence is irrelevant to the question of whether Dr. Rascher's

9  BNIL methodology is capable of resolving the questions of antitrust injury and damages on a

10  classwide basis for the proposed class members who allege BNIL injury and damages; it goes to

11  the persuasiveness of Dr. Rascher's BNIL model, which is a matter for the jury.

12    Sixth, Defendants argue, in passing, that "Plaintiffs also fail to account for as many as 15

13  state laws that forbid conferences and member institutions from making direct payments to

14  student-athletes," which Defendants represent went into effect on July 1, 2021.  Docket No. 252 at

15  16.  Defendants argue that, if "NIL opportunities were permitted earlier, as Plaintiffs urge, the

16  real-world evidence is that state laws would have sprung into effect earlier too."  *See id.*

17  Defendants do not explain how these state laws are relevant to the present motion for class

18  certification.  To the extent that Defendants intend to suggest that Dr. Rascher was required to

19  incorporate the state laws in question into his BNIL but-for world, Defendants have not cited any

20

21

22  _____

23  Dr. Rascher's BNIL methodology to establish at trial that the challenged rules deprived them of
compensation for their BNIL from the conferences in an amount greater than zero based on the ten
24  percent of broadcast revenues that Dr. Rascher opines the Power Five Conferences would have
used to compensate student-athletes for their BNIL.  Because common evidence would resolve the
25  central common questions of (1) whether Defendants committed an antitrust violation in the
context of BNIL, and (2) whether the members of the Football and Men's Basketball and
26  Women's Basketball proposed classes suffered antitrust impact as a result of that violation, the
predominance requirement would be satisfied with respect to the Football and Men's Basketball
27  and Women's Basketball proposed classes even if individual inquiries were required to determine
the amounts of BNIL compensation that would have been paid to the proposed class members
28  while complying with Title IX.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   authority to support that proposition.  Accordingly, the Court finds that Defendants' arguments as

2   to the state laws in question are irrelevant to the class certification analysis.

3           Finally, Defendants contend that conflicts exist as a result of Dr. Rascher's BNIL but-for

4   world and that this precludes certification.  Docket No. 252 at 29-32.  Defendants argue that these

5   conflicts exist because: (1) Dr. Rascher's BNIL methodology allocates a fixed amount of BNIL

6   revenue to each sport (seventy-five percent to football, fifteen percent to men's basketball, and

7   five percent to women's basketball) and this "pits each sport against each other"; (2) star players

8   would argue in their individual cases that they are entitled to more than the equal BNIL payments

9   Dr. Rascher claims all proposed class members in each sport would have received; and (3)

10  Plaintiffs' but-for BNIL world requires a substantial amount of the broadcast money generated by

11  football and men's basketball to be earmarked for those athletes, even though in the real world,

12  that same money helps fund non-revenue sports, such as the sports played by members of the

13  Additional Sports Class.  *See id.*

14          "[T]his circuit does not favor denial of class certification on the basis of speculative

15  conflicts."  *Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003) (citation omitted).  "[T]he

16  mere potential for a conflict of interest is not sufficient to defeat class certification; the conflict

17  must be actual, not hypothetical."  *Berrien v. New Raintree Resorts Int'l, LLC*, 276 F.R.D. 355,

18  359 (N.D. Cal. 2011).  Here, Defendants point to no direct evidence of an actual conflict between

19  members of the proposed classes resulting from Dr. Rascher's BNIL methodology or his proposed

20  BNIL damages allocation.[23]  Accordingly, the purported conflicts to which Defendants point are

21  speculative and, as such, they are not obstacles to granting class certification.  *See Cummings*, 316

22  F.3d at 896; *see also Soc. Servs. Union, Loc. 535, Serv. Emps. Int'l Union, AFL-CIO v. Santa*

23

24

25          [23] Defendants cite the declarations of various conference and athletics department

26  executives for the proposition that allocating broadcasting revenues as Dr. Rascher proposes *could*
    result in the elimination of some sports teams or programs.  *See* Sankey Decl. ¶ 53; Flores Decl. ¶

27  13; Rhoades Decl. ¶ 19; Weiberg Decl. ¶ 20.  These declarations do not establish the existence of
    an actual conflict among members of the proposed classes.

28

1    *Clara Cnty.*, 609 F.2d 944, 948 (9th Cir. 1979) ("Mere speculation as to conflicts that may

2    develop at the remedy stage is insufficient to support denial of initial class certification.").

3            Defendants cite no authority that compels a different conclusion.  The authorities that

4    Defendants cite for the proposition that the purported conflicts created by Dr. Rascher's BNIL

5    methodology preclude class certification are not binding and are distinguishable.  *In re NCAA I-A*

6    *Walk-On Football Players Litig.*, No. C04-1254C, 2006 WL 1207915, at *7-9 (W.D. Wash. May

7    3, 2006) (*Walk-On Football Players*) and *Shields v. Fed'n Internationale de Natation*, No. 18-CV-

8    07393-JSC, 2022 WL 425359, at *7-9 (N.D. Cal. Feb. 11, 2022) (*Shields*), the plaintiffs asserted

9    claims arising out of anticompetitive conduct that allegedly deprived the proposed class members

10   of *the opportunity to compete* against other proposed class members for compensation that never

11   became available as a result of the defendant's alleged anticompetitive conduct.  In *Walk-On*

12   *Football Players*, that compensation was in the form of scholarships that were never awarded

13   because of an allegedly anticompetitive agreement that capped the number of scholarships that

14   each college football team could award to football players; in *Shields*, that compensation was in

15   the form of awards of prize money that swimmers could have obtained for their performance

16   results at swimming events that never occurred because of the allegedly anticompetitive conduct

17   of a swimming organization.  In both cases, the plaintiffs' theory of liability left an open question

18   as to which of the class members would have received the finite number of awards that would

19   have been available in the absence of the allegedly anticompetitive conduct.  In each case, the

20   court found that the class could not be certified because intra-class conflicts existed in that each

21   class member would be forced to prove his entitlement to the awards that would have been

22   available in the but-for world by arguing that other class members would not have received the

23   awards.  In other words, if the plaintiffs prevailed on their theory of liability in those cases, the

24   process for proving individual damages would turn class members against one another because

25   one class member's recovery would necessarily preclude the recovery of another class member.

26   *See id.*

27           Here, unlike in *Walk-On Football Players* and *Shields*, Plaintiffs' theory of liability does

28   not require each proposed class member to prove his or her entitlement to BNIL damages in a

manner that would necessarily eliminate the recovery of other class members. According to Plaintiffs' theory of liability and Dr. Rascher's BNIL model, *every* member of the proposed classes suffered injury as a result of the challenged rules and would have received a payment for the use of their NIL in the absence of the challenged rules; this means that, if Plaintiffs prevail at trial, *every* class member will be entitled to receive a piece of the damages pie. Unlike in *Walk-On Football Players* and *Shields*, the theory of liability here does not assume that proposed class members would have had to compete with each other for BNIL payments that are limited in quantity, and that only some (but not all) of the proposed class members would have been able to receive a BNIL payment. Accordingly, the conflicts that precluded certification in *Walk-On Football Players* and *Shields* do not exist here. That Dr. Rascher's BNIL model allocates slices of the damages pie in ways that benefit some class members more than others is not problematic because Dr. Rascher provides a rationale for this proposed allocation that a reasonable jury could accept, as discussed above, and because class members will have the opportunity to exclude themselves to the extent they would like to advance a different theory of liability and damages in their own individual actions. Further, if an actual conflict among class members were to arise at the damages-allocation phase of the litigation, as a result of Dr. Rascher's methodology for allocating damages or otherwise, any such conflict can be addressed at that juncture. *See Cummings*, 316 F.3d at 896 ("Class certification is not immutable").

For the foregoing reasons, the Court finds that Plaintiffs have met their burden to show that antitrust impact and damages for the proposed classes that allege BNIL injury and damages can be resolved on a classwide basis, by way of the opinions of Desser and Dr. Rascher's BNIL methodology.

### b.    Video game NIL

Plaintiffs argue that they can rely on common evidence to show at trial that, absent the challenged NIL rules, every member of the Football and Men's Basketball Class and some members of the Additional Sports Class (i.e., FBS football or Division I men's basketball athletes outside of the Power Five Conferences who received a full grant-in-aid scholarship) would have received compensation for the use of their NIL in football or basketball video games in an amount

greater than zero (i.e., to establish video game NIL injury). Plaintiffs also argue that they can rely on common evidence to measure the video game NIL compensation that proposed class members who allege video game NIL injury would have received in the absence of the challenged rules (i.e., to calculate video game NIL damages on a classwide basis). Plaintiffs point to the opinions of their economics expert, Dr. Rascher.

Dr. Rascher opined, based on his economics expertise and review of the record, that, absent the challenged rules, FBS football and Division I men's basketball players who received a full-grant-in aid during the class period (regardless of whether they played on teams in the Power Five Conferences) would have received compensation for the use of their NIL in college football and basketball video games. Rascher Rep. at 58-73. Based on documents produced in this litigation, Dr. Rascher opined that, prior to the *O'Bannon* litigation, Electronic Arts developed and sold very successful college football and men's basketball video games through licensing arrangements with the NCAA, its FBS and Division I conferences, and hundreds of NCAA member schools, but the NCAA and several Defendants ceased participating in those arrangements after the *O'Bannon* litigation began. *Id.* at 59. According to Dr. Rascher, Defendants have used their power in the relevant labor markets to block FBS football and Division I men's basketball players from entering into a NIL deal with video game publishers interested in producing college football and basketball video games. *Id.* at 61. Dr. Rascher opined that a video game company[24] has continually wanted to produce college football and men's basketball video games, and since the interim NIL rules went into effect, has attempted to license rights for a forthcoming college football video game to include all FBS teams. *See id.* Based on documents produced in this litigation, Dr. Rascher opined that, for that college football video game, that video game company would pay every participating student-athlete on each team the same amount for the use of their NIL in video games as part of a group license, or an equal share of a pool set at a

---

[24] The Court omits from this order the name of the video game company and other information discussed in Dr. Rascher's report, such as amounts of video game payments and royalties, because doing so could reveal sealable information. The omitted information is not material to the resolution of the present motion for certification.

United States District Court
Northern District of California

fixed royalty percentage. *See id.* at 62.  He further opined, based on documents in the record, that a video game company plans to publish a Division I men's basketball video game while affording student-athletes similar rights. *See id.* at 62-63.

According to Dr. Rascher, in the absence of the challenged rules during the class period, a video game company would have offered to pay at least all eighty-five full-scholarship athletes on all FBS college football teams for the right to use their NIL in a college football video game, *id.* at 62, and it would have offered to pay least all thirteen full-scholarship athletes on each Division I men's basketball team for the right to use their NIL in a college basketball video game, *id.* at 62-64.

To estimate video game NIL payments that proposed class members would have received in the absence of the challenged rules, Dr. Rascher used "yardsticks" that include a video game company's royalty payment projections for a football video game, royalty rates and sales revenues he observed for video games for professional sports, and other data he believes is probative. *See id.* at 66-67, 69.  Based on those yardsticks, Dr. Rascher opined that video game makers in the but-for world would have paid student-athletes a fixed royalty rate based on the sales of each type of college video game per year. *Id.* at 65.  To determine the total classwide damages amount (before allocation to individual class members), Dr. Rascher projected what the expected sales for the college football and basketball video games would have been in the but-for world each year and then multiplied those sales by the fixed royalty rate. *See id.* at 65-70.  He then used this value to establish the "per-athlete offer for each year" based on the assumption that there would be eighty-five football and thirteen basketball full-scholarship players, per school, per year, for each video game. *Id.* & Ex. 3, 4.  Dr. Rascher opined that this methodology allows him to measure video game damages classwide for the members of the Football and Men's Basketball Class and eligible members of the Additional Sports Class. *Id.* at 70-71. These are preliminary damages estimates; Dr. Rascher will finalize his estimates when discovery is completed. *Id.* at 7.

The Court finds that Dr. Rascher's video game NIL methodology is sufficiently reliable and capable of supporting a reasonable jury finding that the proposed class members who allege video game NIL injury would have received video game NIL compensation in an amount greater

1    than zero in the absence of the challenged rules.  The Court, therefore, finds that Dr. Rascher's

2    methodology is capable of resolving the question of antitrust injury in one stroke for proposed

3    class members who allege video game NIL injury.  The Court also finds that Dr. Rascher's video

4    game NIL methodology is sufficiently reliable and capable of measuring damages for proposed

5    class members who allege video game NIL injury.  Because the questions of whether there was an

6    antitrust violation, antitrust injury, and damages with respect to video game NIL are capable of

7    resolution with common proof, the predominance requirement is met with respect to proposed

8    class members who allege video game NIL injury.

9            Defendants' arguments to the contrary are unavailing.  First, Defendants contend that

10   "[t]here is no basis for certification as to Video Game NIL, because Plaintiffs' ability to show

11   class-wide injury depends on speculative premises for which they have no proof."[25]  Docket No.

12   252 at 33-34.  Specifically, Defendants contend that the but-for world that Dr. Rascher postulates

13   is "speculative at best for football" because no new college football video games have been

14   released since the interim NIL policy went into effect even though Dr. Rascher states in his report

15   that a video game company would like to release one.  They continue that it is "entirely baseless

16   for basketball" because there is no evidence that any video game company would have made a

17   men's college basketball video game during the class period.  *See id.*  As support, Defendants cite

18   the report of Dr. Catherine Tucker, who opined that Dr. Rascher's opinions regarding college

19   football and basketball video games in the but-for world are speculative, *see* Tucker Rep. ¶¶ 280-

20   287, as well as various documents that Defendants contend show that no college video games, and

21   no group licenses for the use of student-athletes' NIL in video games, are imminent or likely.  *See*

22   Docket No. 252 at 18-19, 32-33.

23           The Court finds that Defendants' arguments go to the persuasiveness of Dr. Rascher's

24   opinions, not to whether his video game NIL methodology is capable of resolving the questions of

25   video game NIL injury and damages on a classwide basis.  Dr. Rascher cited multiple documents

26   produced in this litigation that support his opinion that college football and men's basketball video

27   _____

28        [25] Defendants did not move to exclude Dr. Rascher's video game NIL opinions or model.

United States District Court
Northern District of California

1    games would have been marketed in the but-for world in the absence of the challenged rules, and

2    that a video game company would have compensated student-athletes for their NIL in connection

3    with those games in the amounts described in his report.  *See* Rascher Rep. at 58-73*; see also*

4    Rascher Reply Rep. at 32-33.  Defendants' disagreement with Dr. Rascher's interpretation of those

5    documents and the inferences he draws therefrom is not a proper basis for denying class

6    certification.

7         Defendants next contend that there is no evidence to support Dr. Rascher's assumption that

8    a "common payment would be determined based on a fixed annual percentage royalty" as in the

9    professional sports video games that Dr. Rascher used as yardsticks.  *See* Docket No. 252 at 34.

10   Defendants contend that various documents do not support that assumption, and that a video

11   company "has confirmed that there are material differences between college and pro sports."  *See*

12   *id.*  The Court finds that this argument also goes to the persuasiveness of Dr. Rascher's opinions,

13   not to whether they are capable of resolving the questions of video game NIL injury and damages

14   on a classwide basis.  Dr. Rascher discussed in his report the evidence that he believes supports his

15   opinion that a common payment to student-athletes would be made based on a fixed royalty; that

16   evidence includes documents produced in discovery that show that a video game company

17   discussed compensating student-athletes for NIL in a college video game with a fixed royalty paid

18   in equal amounts to each player.  *See, e.g.*, Rascher Rep. at 69.  Defendants' contention that other

19   relevant documents in the record contradict Dr. Rascher's opinion is a merits argument for the jury

20   to evaluate; it does not preclude class certification.

21        For the foregoing reasons, the Court finds that Plaintiffs have met their burden to show that

22   video game NIL antitrust impact and damages can be resolved on a classwide basis via

23   Dr. Rascher's video game NIL opinions and model.

24                    **c.    Third-party NIL**

25        Plaintiffs argue that the members of the Additional Sports Class, and some members of the

26   Football and Men's Basketball Class and Women's Basketball Class, can rely on common

27   evidence to show at trial that, absent the challenged rules, each of them would have received

28   compensation from third parties for the use of their NIL prior to July 1, 2021, in an amount greater

than zero (i.e., to establish third-party NIL antitrust injury).  Plaintiffs also argue that they can rely on common evidence to measure the amounts of third-party NIL compensation that members of the relevant proposed classes would have received in the absence of the challenged rules (i.e., to calculate third-party NIL damages on a classwide basis).  Plaintiffs point to the opinions of their economics expert, Dr. Rascher, as that common evidence.

Dr. Rascher constructed a "before-and-after" methodology to estimate the third-party NIL compensation that members of the proposed Additional Sports Class and eligible members of the proposed Football and Men's and Women's Basketball Classes allegedly would have received absent the challenged NCAA rules (hereinafter, third-party NIL methodology).  Rascher Rep. at 94-117.  As noted, the enforcement of those challenged rules was suspended by Defendants on July 1, 2021, pursuant to their interim NIL policy; the interim NIL policy permits student-athletes to receive third-party NIL payments without losing their NCAA eligibility.  Accordingly, Dr. Rascher's methodology is designed to measure third-party NIL injury and damages for eligible members of the proposed classes described above for the time period beginning with the 2016-2017 academic school year and ending on July 1, 2021, when the interim NIL policy went into effect.  *See id.* at 94.

Dr. Rascher's "before-and-after" methodology requires first a determination of the third-party NIL payments of eligible proposed class members that took place in the "after period."  This begins on July 1, 2021, the date when the challenged rules prohibiting third-party NIL payments were suspended pursuant to the interim NIL policy, and ends on the date of class certification.  Those "after period" payments are the baseline for estimating the third-party NIL payments that would have occurred each year in the "before period" for those class members in the absence of the challenged rules; the "before period" ranges from the 2016-2017 academic year to July 1, 2021.  *See id.* at 97-98.  Dr. Rascher opined that each of the "after period" payments is a reliable and conservative estimate or approximation of the economic value of third-party NIL payments that student-athletes would have received in the absence of the challenged rules, because it captures NIL value effects from the identity of each student-athlete and his or her sport, position, and school.  *See* Rascher Reply Rep. at 61-63.

Dr. Rascher used the third-party NIL payments that proposed class members received over the course of one year of the "after period" to estimate on a preliminary basis the lower bound of the third-party NIL compensation that proposed class members collectively would have received in the absence of the challenged rules during one year of the "before period." *See* Rascher Rep. at 102-03; Rascher Reply Rep. at 61-62.  This estimate was limited to one year because Dr. Rascher did not have sufficient "after period" data to estimate damages for additional years of the "before period." *See* Rascher Dep. Tr. at 251-52; Rascher Rep. at 102-03; Rascher Reply Rep. at 61-62. Dr. Rascher will update his estimates as discovery is completed. *See* Rascher Rep. at 7, 102-03; Rascher Reply Rep. at 61-62.  Dr. Rascher relied on the third-party NIL payment information that student-athletes reported to their schools to determine the "after period" payments, but he could employ other publicly available information for his forthcoming merits report, if necessary. *See* Rascher Dep. Tr. at 253; Rascher Reply Rep. at 61 n.171.  Dr. Rascher excluded any student-athletes who did not obtain compensation for third-party NIL in the "after period" because, according to Dr. Rascher, the absence of third-party NIL payments in the "after period" indicates that student-athletes might not have received third-party NIL payments in the "before period." *See* Rascher Rep. at 98.  Dr. Rascher also did not calculate damages for years in the "before period" during which a student-athlete did not play the same sport in connection with which he or she received third-party NIL compensation in the "after period." *See id.* at 113.

In his forthcoming merits report, Dr. Rascher intends to adjust the baseline estimate for the "before period" payments to account for material supply and demand differences between the before and after periods for each student-athlete based on factors that include: (1) whether a class member transferred from a school in one conference during the "before period" to a different school or conference in the "after period" if the transfer could result in a statistically significant difference in the transferred athlete's NIL compensation; (2) whether changes to the athlete's role on the team were substantial enough to significantly affect compensation for the use of the athlete's NIL; and (3) the negative impact of the pandemic on demand for Division I college sports during part of the "before period." *Id.* at 99-117.  To adjust for those factors, Dr. Rascher will use data that is available to schools or is publicly available. *See id.* at 102-111; Rascher Reply Rep. at

69-82.  In his reply report, Dr. Rascher applied those adjustments to a subset of members of the relevant proposed classes to show that his methodology can reliably measure "before period" third-party NIL compensation while accounting for material supply and demand differences between the before and after periods.  *See* Rascher Reply Rep. at 70-82.

The Court has carefully reviewed Dr. Rascher's opinions on third-party NIL and his third-party NIL methodology and finds that they are reliable[26] and capable of supporting a reasonable jury finding that the proposed class members who allege third-party NIL injury would have received third-party NIL compensation in an amount greater than zero in the absence of the challenged rules.  Each member of the relevant proposed classes could, in individual actions, rely on Dr. Rasher's third-party NIL methodology and opinion that "after period" third-party NIL payments are a reliable baseline of the economic value of third-party NIL payments they and other similarly-situated student-athletes would have received but-for the challenged rules.  *See* Rascher Rep. at 102-04 & Ex. 14.  The Court, therefore, finds that Dr. Rascher's opinions and third-party NIL methodology are capable of resolving the question of antitrust injury in one stroke for proposed class members who allege third-party NIL injury.  The Court also finds that Dr. Rascher's opinions are reliable and capable of measuring damages for proposed class members who allege third-party NIL injury.  Because the questions of whether there was an antitrust violation, antitrust injury, and damages with respect to third-party NIL are capable of resolution with common proof, the predominance requirement is met with respect to proposed class members who allege third-party NIL injury.

Defendants' arguments to the contrary lack merit.  First, Defendants contend that Plaintiffs have advanced "no valid and workable model" to measure third-party NIL injury and damages "that can be tested" for the entire class period because Dr. Rascher has so far employed only one

---

[26] Defendants filed a separate motion to exclude Dr. Rascher's third-party NIL methodology under Federal Rule of Evidence 702 on the basis that it is unreliable.  As discussed in the Court's separate order resolving that motion, the Court has found that the opinions at issue are reliable and not subject to exclusion under Rule 702.  The Court incorporates here by reference its findings on that issue.

United States District Court
Northern District of California

United States District Court
Northern District of California

year's worth of data.  Docket No. 252 at 34.  The Court is not persuaded.  Dr. Rascher's third-party NIL model employs the before-and-after methodology, which is widely accepted as a valid method for determining impact and damages in antitrust cases.  *See In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 145 (C.D. Cal. 2007) (holding that the "before-and-after methodology has been accepted by numerous courts" as a way of determining impact and damages on a class-wide basis) (collecting cases).  Dr. Rascher tested his third-party NIL methodology for a subset of class members based on data that is currently available to him to demonstrate that it can reliably measure third-party NIL payments for the "before period" while accounting for factors that could materially impact supply and demand between the before and after periods.  *See* Rascher Reply Rep. at 70-82.  Defendants have not cited any binding authority showing that Plaintiffs are required to do more at this stage of the litigation.[27]  The Court finds that Dr. Rascher's third-party NIL methodology is capable of reliably measuring third-party NIL damages for proposed class members who allege third-party NIL injury for the entire class period.  That Dr. Rascher has so far employed third-party NIL compensation data that covers only one year does not impact the Court's finding.  Dr. Rascher explained that his failure to use data for other years is the result of that data not being available because discovery is still ongoing.  *See* Rascher Dep. Tr. at 251-52; Rascher Rep. at 102-03; Rascher Reply Rep. at 61-62.

Second, Defendants contend that Dr. Rascher's third-party NIL model does not reliably measure damages because it fails to consider factors that could have impacted third-party NIL opportunities and payments during the class period.  Docket No. 252 at 34-36.  Those factors

---

[27] Defendants' reliance on *Ward v. Apple Inc.*, 784 F. App'x 539, 540 (9th Cir. 2019) for the proposition that Dr. Rascher's third-party NIL model is insufficiently developed is unavailing. There, the district court denied class certification and the denial was upheld on appeal because the expert did not construct any model for measuring antitrust injury or damages and "merely asserted that he would be able to develop a model at some point in the future."  *See id.*  That is not the case here.  Defendants also rely on *In re Google Play Store Antitrust Litig.*, No. 20-CV-05761-JD, 2023 WL 5532128, at *9 (N.D. Cal. Aug. 28, 2023) for the proposition that a model that is based on assumptions that are speculative and not supported by the evidence cannot support certification under Rule 23(b)(3).  *See* Docket No. 333-2 at 4.  That case is inapposite.  There, the district court rejected a model for proving antitrust injury and damages at the summary judgment stage that previously had been offered to support a motion for class certification on the ground that it was not supported by the evidence available at the merits stage.  *See id.*  In this case, the record is not fully developed at this juncture and the Court evaluates Dr. Rascher's model accordingly.

United States District Court
Northern District of California

1    include variances in the athletes' marketability based on competitiveness, marketing, off-field

2    controversies, viral moments, and the availability of platforms where NIL can be monetized.  *See*

3    *id.*  Once again, the Court is not convinced.  Dr. Rascher explained that his third-party NIL

4    methodology adjusts the baseline third-party NIL payments based on factors that, in light of his

5    economics expertise and review of the record, he believes would account for material differences

6    in supply and demand between the before and after periods.  *See* Rascher Rep. at 99-117; Rascher

7    Reply Rep. at 69-82.  The Court finds that Dr. Rascher has sufficiently shown that the factors he

8    selected are capable of accounting for material supply and demand differences between the before

9    and after periods and that his third-party NIL methodology can, therefore, reliably measure third-

10   party NIL injury and damages on a classwide basis.  Defendants' arguments that Dr. Rascher must

11   consider factors other than the ones he selected goes to the persuasiveness of Dr. Rascher's third-

12   party NIL methodology and opinions.

13            Third, in their supplemental brief, Defendants point to one example of a student-athlete

14   who received third-party NIL compensation, in the "after period" in his third season playing (in

15   2021-22), of almost $60,000.  Docket No. 333-2 at 3.  Defendants contend that Dr. Rascher's

16   model assumes that the athlete would have received the same amount of compensation his

17   freshman year (2018-2019), during which he did not play because he was redshirted.  Defendants

18   contend that it "makes no sense" that Dr. Rascher's third-party NIL model assigns this athlete

19   damages for 2018-2019 of almost $60,000 even though the athlete did not play that year.  *See id.*

20   Defendants contend that this example "demonstrates that Rascher's model is built to assume

21   positive injury for everyone in the class, even where those class members had zero hours of

22   playing time in the before period."  *Id.*  Defendants cite *Van v. LLR, Inc.*, 61 F.4th 1053, 1068-69

23   (9th Cir. 2023) for the proposition that "[t]he law does not permit" Dr. Rascher's third-party NIL

24   model to "assume positive injury for everyone in the class."  *Id.*

25            In *Van*, the Ninth Circuit reversed the district court's certification under Rule 23(b)(3) of a

26   class of purchasers who allegedly were improperly charged sales tax on their purchases of certain

27   products.  *See* 61 F.4th at 1060.  The basis for the reversal was that the district court failed to

28   consider whether individualized issues would predominate over common ones in light of evidence

1    that any improper tax paid by some class members had been offset by discounts provided to them

2    by retailers for that purpose, which meant that those class members suffered no injury.  *See id.* at

3    1068-69.  The defendant presented "evidence that at least eighteen of the 13,680 discounts

4    provided to class members were provided for the purpose of offsetting the improperly assessed

5    sales tax."  *See id.*  The Ninth Circuit reasoned that this evidence "was sufficient to prove that an

6    inquiry into the circumstances and motivations behind each of the 13,680 discounts might be

7    necessary[.]"  *Id.* at 1069.  The Ninth Circuit held that, "[w]hen a defendant substantiates such an

8    individualized issue in this way, the district court must determine whether the plaintiff has proven

9    by a preponderance of the evidence that the questions of law or fact common to class members

10   predominate over any questions affecting only individual members—that is, whether a class-

11   member-by-class-member assessment of the individualized issue will be unnecessary or

12   workable."  *See id.* at 1069.  Because the district court had failed to undertake that inquiry, the

13   court of appeals vacated the order granting certification under Rule 23(b)(3) and remanded the

14   action so that the district court could conduct a new predominance analysis.

15           Here, Defendants have not pointed to evidence indicating that an individualized inquiry

16   might be required to determine whether proposed class members for whom Dr. Rascher calculated

17   third-party NIL damages were not, in fact, injured by the challenged rules.  Defendants' example

18   of the student-athlete who, according to Dr. Rascher's methodology, would have received almost

19   $60,000 in third-party NIL compensation in a redshirt year in the "before period" is not evidence

20   that an individualized inquiry might be necessary to determine whether he, or any other proposed

21   class members who similarly were redshirted in the "before period," did not suffer third-party NIL

22   antitrust injury as a result of the challenged rules.  This is because Dr. Rascher provided an

23   adequate explanation for why his model estimates that the student-athlete would have received

24   third-party NIL compensation in the absence of the challenged rules, even when he was redshirted.

25   Dr. Rascher testified that it is reasonable to assume that student-athletes who received third-party

26   NIL compensation in the "after period" would have received third-party NIL compensation of

27   similar economic value in the "before period," even if they were redshirted, because student-

28   athletes who received "after period" compensation have NIL value based on a variety of factors

44

and that value was reflected in the "after period" compensation they received.  *See* Rascher Supp. Dep. Tr. at 132-34, 138-40; *see also* Rascher Reply Rep. at 61.  Dr. Rascher also testified that it is not unusual for incoming freshman student-athletes to receive NIL payments, even if it is possible that they could be redshirted upon entering college, because those student-athletes have NIL value based on the fact that they were recruited in high school, received full scholarships, and are going to play for their college team in later years. [28]  *See* Rascher Supp. Dep. Tr. at 113-16, 129-30.

If the jury finds Dr. Rascher's third-party NIL methodology and testimony to be persuasive, then the proposed class members who allege third-party NIL injury, including those for whom Dr. Rascher's methodology calculated third-party NIL damages during a redshirt year, will succeed in establishing antitrust injury and damages.  If the jury does not find Dr. Rascher's third-party NIL model and testimony to be persuasive, then all proposed class members who allege third-party NIL injury, including those who were redshirted, will not succeed in establishing antitrust injury and their Section 1 claims will fail.  No class-member-by-class-member inquiries will be required in either scenario to determine whether proposed class members suffered injury.

Defendants cite *Bowerman v. Field Asset Servs., Inc.*, 39 F.4th 652, 663 (9th Cir. 2022) (*Bowerman I*) for the proposition that the example of the redshirted student-athlete discussed above "confirms that damages cannot be calculated formulaically for each class member, precluding certification."  Docket No. 333-2 at 4; *see also* Docket No. 252 at 36.  *Bowerman I* was amended and superseded on denial of rehearing en banc by *Bowerman v. Field Asset Servs., Inc.*, 60 F.4th 459, 469 (9th Cir. 2023) (*Bowerman II*).  In *Bowerman II*, the plaintiffs brought claims based on allegations that the defendant had willfully misclassified the plaintiffs as independent contractors, and failed to pay them overtime compensation and indemnify them for their business

---

[28] Citing to pages 136 to 139 of Dr. Rascher's supplemental deposition transcript, Defendants argue that "Rascher's justification" for his model's estimate for the student-athlete's NIL earnings for his first season during which he did not play is that the athlete "was injured just before the 2021–22 season and so had the same minutes (zero) in 2021–22 as he had in 2018–19." Docket No. 333-2 at 3 (citing Rascher Suppl. Dep. 136:3–139:15).  The Court has reviewed the portions of the transcript that Defendants cite and finds no indication that Dr. Rascher offered that purported justification.  *See* Rascher Supp. Dep. Tr. at 136-39.

expenses. *See id.* at 465. The Ninth Circuit reversed an order denying a motion to decertify a damages class under Rule 23(b)(3) on the basis that the predominance requirement was not met because individual questions regarding injury and damages outweighed common questions. In reaching that conclusion, the Ninth Circuit relied, in relevant part, on the fact that, after the district court certified the class, the plaintiffs withdrew their expert's model for calculating damages on an aggregate basis because of the district court's concerns about its reliability. *See id.* at 469. The Ninth Circuit also relied on the fact that a bellwether jury trial to determine damages for a subset of class members had demonstrated that damages were not "calculable by any common method" and that the district court had noted after that bellwether trial that determining damages would require individualized testimony concerning the work history and credibility of 156 class members, and the process would be "far messier" than the plaintiffs had represented at the time the district court certified the class. *See id.* at 466-67, 69-70. The Ninth Circuit concluded that, "[i]n light of the complexity of the individualized questions and the absence of any representative evidence introduced to fill the class members' evidentiary gap, the individual issues predominate over the common questions in this case." *See id.* at 471.

*Bowerman II* is irrelevant given that Plaintiffs have advanced a common methodology for measuring third-party NIL injury and damages for all proposed class members who allege them. For the reasons discussed above, Dr. Rascher's third-party NIL model is sufficiently reliable and capable of supporting a reasonable jury finding of third-party NIL injury and damages for all proposed class members who allege that type of injury and damages, including those for whom Dr. Rascher calculated damages during a redshirt year in the "before period." Thus, is not the case here, as in *Bowerman II*, that the only method for establishing third-party NIL injury and damages for proposed class members will be individualized testimony at trial.

Finally, Defendants argue that Dr. Rascher's third-party NIL model fails to address "individualized evidence" that "Defendants have a right to present at trial" pertaining to the question of whether student-athletes' "after period" third-party NIL compensation is representative of the compensation they could have received in the "before period," such as evidence regarding student-athletes' marketability based on controversies, talent, and eligibility issues, and the

United States District Court
Northern District of California

1   accuracy of "after period" third-party NIL compensation that student-athletes reported to their

2   schools.  *See* Docket No. 252 at 34-36; Docket No. 333-2 at 4.  The Court finds that this argument

3   has no bearing on whether the proposed classes can be certified, because Defendants have not

4   shown that certifying the classes would preclude them from presenting at trial the "individualized

5   evidence" at issue.  *See Van*, 61 F.4th at 1068 ("We do not permit a defendant to support its

6   invocation of individualized issues with mere speculation.).  That Dr. Rascher may not have

7   incorporated or addressed some of the individualized evidence in question as part of his third-party

8   NIL methodology does not mean that Defendants will not have the opportunity to address it at

9   trial.

10         The Court finds that Plaintiffs have met their burden to show that antitrust impact and

11   damages for third-party NIL can be determined on a classwide basis by way of Dr. Rascher's

12   third-party NIL methodology.

13         In sum, the Court finds that Plaintiffs have shown that the questions of antitrust injury and

14   damages with respect to broadcast NIL, video game NIL, and third-party NIL are capable of

15   resolution with common evidence on a classwide basis, notwithstanding Defendants' critiques.

16   Each member of the proposed classes could rely at trial on Dr. Rascher's models (which rely to

17   some extent on some of Desser's opinions, as discussed above) to establish antitrust injury and

18   damages in their own individual actions, if they were bringing such actions.  Defendants' critiques

19   of Desser's opinions and Dr. Rascher's models "improperly conflate[] the question whether

20   evidence is capable of proving an issue on a class-wide basis with the question whether the

21   evidence is persuasive."  *Olean*, 31 F.4th at 679.

22         Because Plaintiffs have met their burden to show that the issues of antitrust injury and

23   damages can be resolved with common proof on a classwide basis, and given that it is undisputed

24   that the central question of whether the challenged rules violate Section 1 is also capable of

25   resolution with common proof on a classwide basis, the Court finds that Plaintiffs have met their

26   burden to show that the predominance requirement of Rule 23(b)(3) is met with respect to the

27   proposed damages classes.  *See id.* at 668.

28

1

2.      **Superiority**

2        Rule 23(b)(3) requires a court to consider whether a class action would be a superior

3   method of litigating the claims of the proposed class members by taking into account (A) the class

4   members' interests in individually controlling the prosecution or defense of separate actions; (B)

5   the extent and nature of any litigation concerning the controversy already begun by or against

6   class members; (C) the desirability or undesirability of concentrating the litigation of the claims in

7   the particular forum; and (D) the likely difficulties in managing a class action.  Fed. R. Civ. P.

8   23(b)(3).

9        These factors weigh in favor of granting certification.  As to the first factor, Plaintiffs have

10  shown that class members are unlikely to want to pursue individual actions because the amount of

11  damages that each class member can recover is likely too low relative to the costs of litigating a

12  complex antitrust class action against Defendants, who are sophisticated and repeat litigants.  As

13  to the second factor, Plaintiffs represent, and Defendants do not dispute, that there is no other

14  action involving claims against Defendants similar to those asserted here.  As to the third factor,

15  litigating the action in this forum is desirable because this Court has presided over several other

16  actions involving antitrust challenges to NCAA rules and involving the same Defendants.  As to

17  the fourth factor, the Court is persuaded that managing this case as a class action would not be

18  difficult given that the issues central to Plaintiffs' Section 1 claims are capable of resolution on a

19  classwide basis with common proof, as discussed above.  Accordingly, the Court finds that

20  Plaintiffs have shown that a class action would be superior to individual litigation.

21       Defendants' arguments to the contrary do not compel a different conclusion.  Defendants

22  argue that the "substitution effect" that this Court held in *O'Bannon* was a "barrier to

23  manageability" in that case, and that precluded a finding that a class action was superior to

24

25

26

27

28

United States District Court
Northern District of California

1   individual litigation under Rule 23(b)(3), is also present here as a result of Dr. Rascher's BNIL

2   methodology.[29]  Docket No. 252 at 17-18, 25-28.

3         In *O'Bannon*, this Court credited the testimony of the plaintiffs' expert, Dr. Roger Noll,

4   that, in the absence of the rules challenged in that case, more talented student-athletes would have

5   stayed in college to play Division I sports instead of leaving for more lucrative endeavors (such as

6   professional sports), and this would have resulted in the displacement of less talented athletes.  *See*

7   2013 WL 5979327, at *8.  The displaced student-athletes would have been forced to play for less

8   desirable Division I teams or would have been forced out of Division I entirely.  *See id.*  "In either

9   case, they would not have suffered injuries as members of the teams for which they actually

10  played because, as Dr. Noll suggests, they would never have been able to play for those teams in

11  the absence of the challenged restraints."  *See id.*  "Indeed, many of these individuals . . . may

12  have even benefitted from the challenged restraints by earning roster spots that would have

13  otherwise gone to more talented student-athletes."  *Id.*  The Court held, "Plaintiffs have not

14  provided a feasible method for determining which members of the Damages Subclass would still

15  have played for Division I teams—and, thus, suffered the injuries alleged here—in the absence of

16  the challenged restraints.  This shortcoming likewise contributes to the impossibility of

17  determining which class members were actually injured by the NCAA's alleged restraints on

18  competition and, as such, precludes certification under Rule 23(b)(3)."  *See id.* at *9.  Defendants

19  argue that the substitution effects in this case are not just theoretical but real, because some

20  student-athletes are choosing to stay longer in college sports as a result of the fact that they can

21  receive NIL compensation under the interim NIL rules.  Docket No. 252 at 17-18; 26-27.

22        The Court is not persuaded.  The definitions of the proposed damages classes adequately

23  identify the class members that Plaintiffs seek to represent and would be bound by a judgment if

24  the classes are certified, namely the Division I student-athletes in the real world who participated

---

[29] Defendants' arguments regarding substitution effects are limited to Dr. Rascher's "BNIL But-For World," *see* Docket No. 252 at 17, suggesting that those arguments pertain only to proposed class members who allege BNIL injury.

United States District Court
Northern District of California

United States District Court
Northern District of California

in the relevant sports and either received a full grant-in-aid (Football and Men's Basketball Class and Women's Basketball Class) or third-party NIL compensation (Additional Sports Class) during the relevant time periods.  The Court finds no indication in the record that it would be difficult, much less impossible, to determine which student-athletes satisfy the criteria for class membership.  Further, as discussed above, Plaintiffs have proffered common evidence that all of the student-athletes who fall within the class definitions were subject to the challenged rules during the relevant time period and suffered injury because the challenged rules precluded them from receiving NIL compensation they would have received in the absence of the rules.  If a jury is persuaded by Plaintiffs' evidence, then Plaintiffs will succeed in establishing antitrust injury for *all* members of the proposed classes.  If a jury is not persuaded by Plaintiffs' evidence, then Plaintiffs' Section 1 claims will fail for *all* members of the proposed classes for failure to establish the element of antitrust injury.  No manageability or ascertainability issues would arise in either scenario.

Defendants' argument that ascertainability and manageability concerns would arise because the so-called substitution effects would change the identities of class members in the but-for world and would make it impossible to determine which class members were injured is unavailing.  In antitrust cases such as this one, injury and damages are determined by comparing, on the one hand, the payments that each class member who falls within the class definition received in the real world with, on the other hand, the payments that *that same class member* would have received in the but-for world.  *See* Rascher Reply Rep. at 83-84.  The difference between the two payments represents that class member's injury and damages.  For the purpose of this comparison, the identity of the class members does not change between the real world and the but-for world.  *See id.*; *see also* Areeda § 392 ("The guiding principle is that the antitrust victim should recover the difference between its actual economic condition and its 'but for' condition" absent the antitrust violation.") (emphasis added).  Accordingly, the so-called substitutions or displacements that may or may not take place in a hypothetical but-for world are irrelevant to the determination of whether members of the proposed classes suffered antitrust injury.  *See In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, No. ML152668PSGJEMX, 2023 WL

1   1813530, at *12 (C.D. Cal. Feb. 7, 2023) (rejecting arguments that certification under Rule

2   23(b)(3) could not be granted on the basis that "numerous class members would actually be worse

3   off in each of Plaintiffs' but-for worlds, and it is impossible to identify them without having

4   individual mini-trials" and that "class members would face different effects, including harm, by

5   the but-for worlds based on each member's unique preferences").

6        Defendants also argue that a second manageability concern in *O'Bannon* that precluded

7   certification under Rule 23(b)(3) in that case also exists here.  Docket No. 252 at 32.  Defendants

8   contend that, as in *O'Bannon*, it would be impossible to determine "which student-athletes were

9   actually depicted" in game footage.  *See* 2013 WL 5979327, at *9.  The Court disagrees.  In

10  *O'Bannon*, individual inquiries were necessary because the definition of the proposed class was

11  limited to student-athletes who appeared in game footage during the class period, and the plaintiffs

12  did not propose a common method for identifying which student-athletes on each team roster

13  appeared in televised games.  *See id.*  The Court reasoned, "Without a means of accomplishing

14  these tasks on a class-wide basis, Plaintiffs would have to cross-check thousands of team rosters

15  against thousands of game summaries and compare dozens of game schedules to dozens of

16  broadcast licenses simply to determine who belongs in the Damages Subclass.  This is not a

17  workable system for identifying class members."  *See id.*  Those concerns do not exist here

18  because class membership does not depend on having appeared in game footage and Plaintiffs

19  have proffered common evidence that *every* member of the proposed classes suffered antitrust

20  injury and damages, as discussed above.

21  **IV.   CONCLUSION**

22       For the reasons discussed above, the Court GRANTS Plaintiffs' motion for certification of

23  the three proposed damages classes under Rule 23(b)(3).

24       The Court appoints named Plaintiff Sedona Prince as the representative for the Women's

25  Basketball Class; named Plaintiff Grant House as the representative for the Additional Sports

26  Class; named Plaintiff Tymir Oliver as the representative for the Football and Men's Basketball

27

28

*United States District Court*
*Northern District of California*

51

Class; and Hagens Berman Sobol Shapiro LLP and Winston & Strawn LLP as Co-Lead Class

Counsel for the proposed damages classes.

     IT IS SO ORDERED.

Dated: November 3, 2023



CLAUDIA WILKEN
United States District Judge