Steve W. Berman (*pro hac vice*)
Emilee N. Sisco (*pro hac vice*)
Stephanie Verdoia (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
emilees@hbsslaw.com
stephaniev@hbsslaw.com

Benjamin J. Siegel (SBN 256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
bens@hbsslaw.com

*Class Counsel for Plaintiffs*

[Additional counsel on signature page]

Jeffrey L. Kessler (*pro hac vice*)
David G. Feher (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
Adam I. Dale (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
jkessler@winston.com
dfeher@winston.com
dgreenspan@winston.com
aidale@winston.com

Jeanifer E. Parsigian (SBN 289001)
WINSTON & STRAWN LLP
101 California Street, 34th Floor
San Francisco, CA 94111
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
jparsigian@winston.com

*Class Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

IN RE COLLEGE ATHLETE NIL
LITIGATION

Case No. 4:20-cv-03919-CW

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AND TO EXCLUDE THE OPINIONS OF DR. GAUTAM GOWRISANKARAN AND BARBARA OSBORNE**

**[PUBLIC REDACTED VERSION]**

Hrg. Date:      September 19, 2024
Time:            2:30 p.m.
Judge:          Hon. Claudia Wilken
Courtroom:   2, 4th Floor

1

2

<u>NOTICE OF MOTION AND MOTION</u>

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

3

4

5

6

7

8

9

10

PLEASE TAKE NOTICE that on September 19, 2024, in Courtroom 2 of the Honorable Claudia Wilken of the United States District Court for the Northern District of California, Oakland Division, located at 1301 Clay Street, Oakland, CA 94612, the Class Plaintiffs ("Plaintiffs") will and hereby do move the Court, under Federal Rule of Civil Procedure 56, for summary judgment, and, under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Federal Rule of Evidence 702, to exclude certain expert opinions of Dr. Gautam Gowrisankaran and Professor Barbara Osborne.  This motion is based on this notice of motion and motion, the accompanying memorandum of points and authorities, declarations, and pleadings and papers on file in this action.

11

<u>STATEMENT OF ISSUES TO BE DECIDED</u>

12

13

14

15

16

17

18

(1) Whether the Court should grant summary judgment on liability under Section 1 of the Sherman Act in favor of the Plaintiff Classes because the evidence is undisputed that (a) Defendants entered into binding agreements embodied in the Current NIL Rules and Prior NIL Rules; (b) these restraints have affected interstate commerce and caused substantial anticompetitive effects; (c) there are no procompetitive efficiencies promoted by these restraints; and (d) even if there were any procompetitive efficiencies promoted by these restraints, they could be achieved through less restrictive alternatives; and

19

20

21

(2) Whether the Court should exclude portions of Gautam Gowrisankaran's and Barbara Osborne's proffered expert testimony for failing to meet the standards for the admissibility of expert testimony under Federal Rule of Evidence 702.

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS ....................................................3

I.   THE UNDISPUTED CONTRACT, COMBINATION, OR CONSPIRACY TO CAP
     AND FIX NIL COMPENSATION .............................................................................3

    A.   Defendants' Prior NIL Rules ..........................................................................3

    B.   Defendants' Interim NIL Policy and the Current NIL Rules...........................4

II.  THE UNDISPUTED EVIDENCE THAT THE CHALLENGED RULES CAUSE
     ANTICOMPETITIVE EFFECTS...............................................................................4

    A.   Anticompetitive Harm From the Ban on Third-Party NIL Payments..............4

    B.   Anticompetitive Harm From the Ban on Direct NIL Payments .......................6

    C.   Defendants' Market Power Over Class Members' Athletic Services................8

III. THE UNDISPUTED EVIDENCE THAT DEFENDANTS CANNOT MEET THEIR
     BURDEN TO PROVE PROCOMPETITIVE BENEFITS............................................9

    A.   The Undisputed Evidence Shows No Connection Between the Challenged
          NIL Rules and Consumer Demand...................................................................10

    B.   Undisputed Evidence Demonstrates That There Is No Competitive Balance in
          Division I College Sports to Preserve and That the Challenged NIL Rules Do
          Not Promote It..................................................................................................11

    C.   The Undisputed Evidence Is Fatal to Defendants' Pay-for-Play Justification .................12

    D.   Defendants' Reallocation Justifications Fail and Are Factually Unsupportable ..............13

IV.  UNDISPUTED EVIDENCE OF LESS RESTRICTIVE ALTERNATIVES ..............17

SUMMARY JUDGMENT STANDARDS .......................................................................18

LEGAL ARGUMENT.....................................................................................................20

I.   THE COURT SHOULD CONDEMN THE CHALLENGED RULES UNDER A
     QUICK-LOOK ANALYSIS.....................................................................................20

    A.   Plaintiffs Have Presented Undisputed Evidence of Defendants' Contract,
          Combination or Conspiracy ...........................................................................20

    B.   The Anticompetitive Nature of the Challenged Rules Is Readily Apparent.....................21

II.   EVEN UNDER A FULL RULE-OF-REASON ANALYSIS, PLAINTIFFS HAVE
      UNDISPUTED EVIDENCE OF ANTICOMPETITIVE EFFECTS ..............................................24

      A.    Plaintiffs Have Presented Undisputed Direct Evidence That Defendants'
            Restraints Impose Significant Anticompetitive Effects..................................................24

      B.    Defendants Are Collaterally Estopped From Arguing Against Plaintiffs'
            Relevant Markets and Market Power....................................................................26

      C.    Plaintiffs Have Put Forth Sufficient Evidence to Prove Defendants Have
            Market Power in the Relevant Markets ............................................................28

III.  THE EVIDENCE IS UNDISPUTED THAT DEFENDANTS CANNOT MEET
      THEIR BURDEN TO PROVE PROCOMPETITIVE JUSTIFICATIONS FOR THE
      CHALLENGED RULES .........................................................................................32

      A.    Plaintiffs Are Entitled to Summary Judgment Against Defendants'
            Competitive Balance Justification ......................................................................33

      B.    Plaintiffs Are Entitled to Summary Judgment Against Defendants' Pay-For-
            Play Justification.................................................................................................35

      C.    Plaintiffs Are Entitled to Summary Judgment on Defendants' Claim That the
            Current NIL Rules Are Necessary to Support a Reallocation of Economic
            Benefits to Other Athletes or Less Profitable Conferences ..............................36

      D.    Title IX Is Not a Procompetitive Justification and There Is No Evidence That
            the Challenged NIL Rules Are Needed for Schools to Comply With Title IX ...............40

IV.   PLAINTIFFS HAVE MET THEIR BURDEN WITH UNDISPUTED EVIDENCE
      OF LESS RESTRICTIVE ALTERNATIVES...........................................................42

V.    THE OPINIONS OF GOWRISANKARAN AND OSBORNE ARE IRRELEVANT
      AND UNRELIABLE AND THE COURT SHOULD EXCLUDE THEM...................................43

      A.    Federal Rule of Evidence 702 and *Daubert* Standards......................................43

      B.    Gowrisankaran's Opinions on Procompetitive Justifications Are Contrary to
            Legal Standards and Thus Should Be Excluded as Irrelevant and Prejudicial .................44

      C.    Osborne's Opinions Are Irrelevant and Unreliable and the Court Should
            Exclude Them ......................................................................................................45

            1.    Osborne's Opinions Should Be Excluded Because She Is Again
                  Attempting to Offer Improper Legal Opinions.......................................46

            2.    Osborne's Opinions Should Also Be Excluded Because They Are
                  Unreliable...............................................................................................48

CONCLUSION..............................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)......................................................................................................19

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
   2012 WL 2571332 (N.D. Cal. June 30, 2012)................................................................45

*Appling v. State Farm Mut. Auto Ins. Co.*,
   340 F.3d 769 (9th Cir. 2003) .........................................................................................26

*Bhan v. NME Hosps., Inc.*,
   929 F.2d 1404 (9th Cir. 1991) .......................................................................................20

*Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*,
   683 F.3d 1144 (9th Cir. 2012) .......................................................................................43

*Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*,
   369 F.3d 212 (2d Cir. 2004)...........................................................................................26

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977)........................................................................................................36

*Cal. Dental Ass'n v. F.T.C.*,
   526 U.S. 756 (1999)........................................................................................................22

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   2016 WL 5871243 (N.D. Cal. Oct. 7, 2016)..................................................................24

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)........................................................................................................20

*Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*,
   754 F. Supp. 1336 (N.D. Ill. 1991) ...............................................................................22

*City of Long Beach v. Standard Oil Co. of Cal.*,
   46 F.3d 929 (9th Cir. 1995) ...........................................................................................45

*Cloud v. Pfizer Inc.*,
   198 F. Supp. 2d 1118 (D. Ariz. 2001)............................................................................48

*Cnty. of Tuolumne v. Sonora Comm. Hosp.*,
   236 F.3d 1148 (9th Cir. 2001) .......................................................................................20

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)...................................................................................................43, 44

iv

*Deslandes v. McDonald's USA, LLC,*
   81 F.4th 699 (7th Cir. 2023) ...........................................................................33

*Epic Games, Inc. v. Apple, Inc.,*
   67 F.4th 946 (9th Cir. 2023) ...........................................................29, 30, 31

*F.T.C. v. Ind. Fed'n of Dentists,*
   476 U.S. 447 (1986) ...................................................................................32, 42

*F.T.C. v. Publ'g Clearing House, Inc.,*
   104 F.3d 1168 (9th Cir. 1997) .......................................................................42

*F.T.C. v. Super. Ct. Trial Laws. Ass'n,*
   493 U.S. 411 (1990)..........................................................................32, 35, 41, 44

*Great W. Air, LLC v. Cirrus Design Corp.,*
   2019 WL 6529046 (D. Nev. Dec. 4, 2019)...................................................50

*Guidroz-Brault v. Mo. Pac. R.R. Co.,*
   254 F.3d 825 (9th Cir. 2001) .........................................................................44

*Hangarter v. Provident Life & Accident Ins. Co.,*
   373 F.3d 998 (9th Cir. 2004) .........................................................................46

*California ex rel. Harris v. Safeway, Inc.,*
   651 F.3d 1118 (9th Cir. 2011) .................................................................21, 23

*Image Tech. Serv's, Inc. v. Eastman Kodak Co.,*
   125 F.3d 1195 (9th Cir. 1997) .......................................................................31

*United States ex rel. Kelly v. Serco, Inc.,*
   846 F.3d 325 (9th Cir. 2017) .........................................................................44

*Lahoti v. VeriCheck, Inc.,*
   586 F.3d 1190 (9th Cir. 2009) .......................................................................20

*Law v. NCAA,*
   134 F.3d 1010 (10th Cir. 1998) ...................................................19, 22, 37, 42

*McNeil v. Nat'l Football League,*
   790 F. Supp. 871 (D. Minn. 1990)................................................................28

*Nat'l Soc'y of Prof'l Eng'rs v. United States,*
   435 U.S. 679 (1978)................................................................................ *passim*

*NCAA v. Alston,*
   594 U.S. 69 (2021)................................................................................. *passim*

*NCAA v. Bd. of Regents*,
    468 U.S. 85 (1984).................................................................................. *passim*

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*,
    375 F Supp. 3d 1058 (N.D. Cal. 2019) .................................................... *passim*

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*,
    958 F.3d 1239 (9th Cir. 2020) .........................................................................33

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*,
    2018 WL 1524005 (N.D. Cal. Mar. 28, 2018)..........................................3, 4, 20, 21

*In re NCAA Student-Athlete Name & Likeness Litig.*,
    37 F. Supp. 3d 1126 (N.D. Cal. 2014) ...........................................................32

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
    210 F.3d 1099 (9th Cir. 2000) .........................................................................19

*O.S.C. Corp. v. Apple Comput., Inc.*,
    792 F.2d 1464 (9th Cir. 1986) .........................................................................26

*O'Bannon v. NCAA*,
    7 F. Supp. 3d 955(N.D. Cal. 2014) ................................................................ *passim*

*O'Bannon v. NCAA*,
    802 F.3d 1049 (9th Cir. 2015) ........................................................................ *passim*

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018)...................................................................................24, 31

*Oltz v. St. Peter's Cmty. Hosp.*,
    861 F.2d 1440 (9th Cir. 1988) .....................................................................24, 26

*Parth v. Pomona Valley Hosp. Med. Ctr.*,
    630 F.3d 794 (9th Cir. 2010) .........................................................................19

*Primiano v. Cook*,
    598 F.3d 558 (9th Cir. 2010) .........................................................................44

*Resolution Trust Corp. v. Keating*,
    186 F.3d 1110 (9th Cir. 1999) .....................................................................27, 28

*Syverson v. IBM Corp.*,
    472 F.3d 1072 (9th Cir. 2007)..................................................................26, 27, 28

*Tanaka v. Univ. of S. Cal.*,
    252 F.3d 1059 (9th Cir. 2001) ...............................................................19, 26, 32

*Tennessee v. NCAA*,
   2024 WL 464164 (E.D. Tenn. Feb. 6, 2024) ...................................................29, 34

*Tennessee v. NCAA*,
   2024 WL 755528 (E.D. Tenn. Feb. 23, 2024) .....................................................34

*Texaco Inc. v. Dagher*,
   547 U.S. 1 (2006)...............................................................................................22

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
   875 F.2d 1369 (9th Cir. 1989) ...........................................................................45

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001).........................................................................29, 30

*United States v. Campos*,
   217 F.3d 707 (9th Cir. 2000) .............................................................................44

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001).............................................................................41

*United States v. Rincon*,
   28 F.3d 921 (9th Cir. 1994) ...............................................................................45

*United States v. Topco Assocs., Inc.*,
   405 U.S. 596 (1972)...........................................................................................33

### STATUTES

20 U.S.C. § 1681...........................................................................................................42

Sherman Act § 1.....................................................................................................*passim*

### OTHER AUTHORITIES

Fed. R. Civ. P. 56...................................................................................................19, 20

Fed. R. Evid. 403........................................................................................................45

Fed. R. Evid. 702................................................................................................*passim*

# GLOSSARY OF TERMS

| Term | Definition |
|------|-----------|
| ***Alston I*** | *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058 (N.D. Cal. 2019), *aff'd*, 958 F.3d 1239 (9th Cir. 2020), *aff'd sub nom., NCAA v. Alston*, 594 U.S. 69 (2021) |
| ***Alston II*** | *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239 (9th Cir. 2020), *aff'd sub nom. NCAA v. Alston*, 594 U.S. 69 (2021) |
| ***Alston III*** | *NCAA v. Alston*, 594 U.S. 69 (2021) |
| ***Alston Summary Judgment*** | *In re NCAA Grant-in-Aid Cap Antitrust Litig.*, 2018 WL 1524005 (N.D. Cal. March 28, 2018) |
| **Challenged NIL Rules** | The Prior and Current NIL Rules |
| **Current NIL Rules** | NCAA's Interim NIL Policy (**Ex. 13**) |
| **Ex.** | Exhibit to the Declaration of Steve W. Berman in Support of Plaintiffs' Motion for Summary Judgment and to Exclude the Opinions of Dr. Gautam Gowrisankaran and Barbara Osborne, filed concurrently herewith |
| **Gowrisankaran Rpt.** | Expert Report of Gautam Gowrisankaran, Ph.D., dated December 1, 2023 (**Ex. 6**) |
| **Gowrisankaran Rebuttal** | Expert Rebuttal Report of Gautam Gowrisankaran, Ph.D., dated January 26, 2024 (**Ex. 7**) |
| **Gowrisankaran Reply** | Expert Reply Report of Gautam Gowrisankaran, Ph.D., dated February 23, 2024 (**Ex. 8**) |
| **Langer Rpt.** | Expert Report of Ashley Langer, Ph.D., dated January 26, 2024 (**Ex. 9**) |
| ***O'Bannon Summary Judgment*** | *In re NCAA Student-Athlete Name & Likeness Litig.*, 37 F. Supp. 3d 1126 (N.D. Cal. 2014) |
| ***O'Bannon I*** | *O'Bannon v. NCAA*, 7 F. Supp. 3d 955 (N.D. Cal. 2014), *aff'd in part, vacated in part*, 802 F.3d 1049 (9th Cir. 2015) |
| ***O'Bannon II*** | *O'Bannon v. NCAA*, 802 F.3d 1049 (9th Cir. 2015) |
| **Osborne Rpt.** | Merits Expert Report of Barbara Osborne, dated December 1, 2023 (**Ex. 56**) |
| **Osborne Rebuttal** | Merits Rebuttal Expert Report of Barbara Osborne, dated January 26, 2024 (**Ex. 10**) |
| **Poret Rpt.** | Expert Report of Hal Poret in Matter of *In Re College Athlete NIL Litigation*, dated December 1, 2023 (**Ex. 4**) |
| **Prior NIL Rules** | NCAA Bylaws banning athletes' NIL compensation in effect until July 1, 2021 |

| Term | Definition |
|---|---|
| **Rascher Rpt.** | Expert Report of Daniel A. Rascher, dated December 1, 2023 (**Ex. 1**) |
| **Rascher PCJ Rebuttal** | Expert PCJ Rebuttal Report of Daniel A. Rascher, dated January 26, 2024 (**Ex. 2**) |
| **Rascher Reply** | Expert Reply Report of Daniel A. Rascher, dated February 23, 2024 (**Ex. 3**) |
| **Tennessee TRO Decision** | *Tennessee v. NCAA*, 2024 WL 464164 (E.D. Tenn. Feb. 6, 2024) |
| **Tennessee Prelim. Inj. Decision** | *Tennessee v. NCAA*, 2024 WL 755528 (E.D. Tenn. Feb. 23, 2024) |
| **Williams Rpt.** | Expert Report of Darrell L. Williams, dated January 26, 2024 (**Ex. 5**) |

### INTRODUCTION

Undisputed facts and settled principles of law dispose of most of this litigation.  Summary judgment on liability should be entered against the Defendants, either under the "quick-look" or full rule-of-reason standard.  *First*, the challenged concerted actions in restraint of trade are not in dispute; they are embodied in the NCAA's written rules and enforcement mechanisms.  *Second*, there is no genuine dispute that Defendants' conspiracy significantly restrains competition for Division I college athletes with respect to NIL compensation.  Indeed, since Defendants provisionally lifted just some of their restraints, NIL opportunities and compensation have exploded.  The evidence is not contested.  *Third*, Defendants fail to create a triable issue on any procompetitive justification.  Their all too familiar parade of horribles fails as a matter of law because, as the Supreme Court reaffirmed in *Alston III*, the NCAA and their co-conspirators cannot escape the consequences of having to compete under the antitrust laws.  Without the special dispensation Defendants asked for from the Supreme Court, their asserted procompetitive justifications are legally insufficient under controlling law.  And their justifications also collapse under the weight of the undisputed facts.  *Fourth*, even if Defendants could raise a genuine issue of fact about any of their claimed justifications, any such justification indisputably could be achieved through alternative rules that would be virtually as effective but substantially less restrictive.

Plaintiffs challenge two categories of NCAA NIL rules: (1) the Prior NIL Rules, completely banning NIL compensation up until July 1, 2021; and (2) the Current NIL Rules, imposed on an interim basis on July 1, 2021, which lifted some, but not all, of the Prior NIL Rules.  Most significantly, while the Current NIL Rules permit most forms of third-party payments, they continue to prohibit any NIL payments to college athletes from conferences or schools, including payments for Broadcast NIL ("BNIL").

As this Court knows well, for decades, Defendants decried any type and amount of NIL compensation for college athletes as ruinous to college sports.  Then, on July 1, 2021, Defendants dramatically changed their rules by permitting most forms of third-party NIL payments.  Competition ensued, athletes benefitted, and—as always—college sports continued to thrive.  The undisputed evidence establishes that lifting the Prior NIL Rules in July 2021 has caused no harm to college athletics.  Rather, Defendants have *embraced* third-party NIL compensation as being in the best interest of both Class

Members and Division I college sports.  This demonstrates with crystal clarity that the Prior NIL Rules cannot survive Section 1 under either quick-look or full-blown rule-of-reason review.  In fact, Defendants' expert on liability—Gautam Gowrisankaran—testified at his deposition that ███████████████ ████████████████████████████████████████████████████████

As for the Current NIL Rules, which continue the ban on any direct NIL payments by conferences or schools, the undisputed facts show that these restraints are also significantly anticompetitive with no procompetitive justification.  Indeed, the NCAA's current President, Charles Baker, recently made a proposal *to permit direct NIL payments by the conferences and the schools to Division I athletes*.  He said that doing so would *benefit* Division I college athletics and be consistent with NCAA goals.  On this record, the case for summary judgment on liability under Section 1 could not be stronger.

Defendants' rejoinder is that the business of college sports would be better off with a cartel—not competition—dictating marketing outcomes.  This position seeks to turn antitrust jurisprudence upside down and ignores the Supreme Court decision in *Alston III*.  In support, Defendants rely on a combination of the proffered expert testimony of Gowrisankaran (and perhaps Dr. Ashley Langer and Prof. Barbara Osborne), and the self-serving and unsupportable assertions of a few athletics officials.  Defendants' purported justifications must all be rejected as contrary to settled law and bereft of evidentiary support.

Specifically, Defendants argue that ████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████ (*see* **Ex. 6** (Gowrisankaran Rpt.), ¶¶ 49–167)—policy preferences that are *not* procompetitive as a matter of law.

Strikingly, Defendants have not come forward with any purported evidence—including any expert testimony—that their "amateurism" rules were or are needed to promote consumer demand, *i.e.*, the centerpiece of Defendants' decades-long excuse for restricting compensation in the labor markets for college athletes.  Defendants abandoned this justification in favor of the legally invalid arguments that competition is bad for college athletics and that economic restraints in the labor markets for football and

basketball athletes can be justified by spreading cross-market benefits to other athletes and conferences.

Finally, because Gowrisankaran offers purported procompetitive justifications that are not legally cognizable, his proffered expert testimony in support of these justifications must be excluded under Federal Rule of Evidence 702.[1]  The same is true of Osborne's reformulated expert testimony with respect to the application of Title IX.  Although dressed up in new clothes, Osborne once again offers unfounded and irrelevant legal opinions about Title IX in an attempt to invade the province of the Court.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.   The Undisputed Contract, Combination, or Conspiracy to Cap and Fix NIL Compensation

There can be no genuine dispute that Defendants are horizontal competitors in the relevant labor markets (*see Alston Summary Judgment*, at *8), nor that these competitors have engaged in concerted action through documented and agreed-upon restraints of trade.[2]  Non-compliant NCAA members face draconian penalties.[3]

#### A.   Defendants' Prior NIL Rules

Under the Prior NIL Rules, college athletes were restricted from, among other things, endorsing any commercial product or service (**Ex. 12** (2021-22 NCAA D1 Manual), Bylaw 12.5.2.1), receiving "any renumeration for value or utility that the student-athlete may have for [an] employer because of the publicity, reputation, fame or personal following obtained because of athletics ability" (*id.* at Bylaw 12.4.1.1), or even using their own name, image, or reputation to promote their *own* personal business ventures (*id.* at Bylaw 12.4.4).  Defendants agreed to boycott any athletes—by declaring them ineligible

---

[1] Langer testified that ███████████ **Ex. 11** (Langer Tr.), 27:13–20.  Plaintiffs reserve the right to challenge through a motion in limine the admissibility of her damages opinions, specifically ██████████
*See* **Ex. 9** (Langer Rpt.), ¶¶ 143–61.
[2] *See* **Ex. 12** (2021–22 NCAA D1 Manual), Bylaws 12.4.1.1, 12.4.4, 12.5.2.1; **Ex. 13** (Interim NIL Policy).
[3] *See* **Ex. 12** (2021–22 NCAA D1 Manual), Bylaw 1.3.2 (requiring members to follow NCAA rules and threatening discipline of members that fail to do so); *see also id.* at Bylaw 2.8.1 ("Each institution shall comply with all applicable rules and regulations of the Association in the conduct of its intercollegiate athletics programs," and "[m]embers of an institution's staff, student-athletes, and other individuals and groups representing the institution's athletics interests shall comply with the applicable Association rules, and the member institution shall be responsible for such compliance."); *id.* at Bylaw 3.1.1 (reinforcing that "institutions or organizations must accept and observe the principles set forth in the constitution and bylaws of the Association").

to compete in NCAA events—who violated these rules.[4]

### B. Defendants' Interim NIL Policy and the Current NIL Rules

After the Supreme Court's unanimous affirmance in *Alston III*, the NCAA suspended the Prior NIL Rules.  On July 1, 2021, it enacted an "interim" policy permitting Division I athletes to receive NIL compensation from third parties.[5]  The Current NIL Rules do not permit the NCAA, conferences, or schools to make direct payments to athletes for the use of their NILs, including for the use of BNIL in broadcasts of college sports.[6]  In other words, Defendants now embrace NIL compensation . . . so long as they do not have to pay for it.

The Current NIL Rules also make clear that the NCAA continues to prohibit athletes from receiving compensation based on "[a]thletics participation" or "performance."[7]  Just like with the Prior NIL Rules, Defendants agree to boycott any athletes, by declaring them ineligible for NCAA sports, if they violate the Current NIL Rules.[8]  None of these facts are in dispute.[9]

## II. The Undisputed Evidence That the Challenged Rules Cause Anticompetitive Effects

In *Alston*, the Court held that Defendants' compensation restraints indisputably caused significant anticompetitive effects.  *See Alston Summary Judgment*, at *8.  Although the restraints here are different, the undisputed nature of the evidence is the same.

### A. Anticompetitive Harm From the Ban on Third-Party NIL Payments

As set forth below, the Court need not even engage in full-blown rule-of-reason analysis because the Prior and Current NIL Rules may be condemned under a quick-look analysis.  In any event, Plaintiffs have come forward with indisputable and direct economic evidence that the restraints on third-party NIL in the Prior NIL Rules caused significant anticompetitive harm and inefficiency in the labor markets for

---

[4] *Id.* at Bylaw 3.2.4.4 (every NCAA school "is responsible for certifying the eligibility of student-athletes under the terms of the constitution, bylaws or other legislation of the Association" and institutions are "obligated immediately to apply all applicable rules and withhold ineligible student-athletes from all intercollegiate competition").
[5] *See* **Ex. 13** (Interim NIL Policy).
[6] *Id.*
[7] *See* **Ex. 14** (Interim NIL Policy Guidance Regarding Third-Party Involvement), at 3.
[8] *See id.* (Defendants are still required to comply with all other NCAA rules and legislation); *supra* n.3.
[9] *See* ECF No. 170, NCAA Answer ¶¶ 4–6; *see also* ECF No. 167, ACC Answer ¶¶ 4–5, 7; ECF No. 168, SEC Answer ¶¶ 4–5, 7; ECF No. 169, Big 12 Answer ¶¶ 4–5, 7; ECF No. 171, Big Ten Answer ¶¶ 4–5, 7; ECF No. 172, Pac-12 Answer ¶¶ 4–5, 7.

4

class members' athletic services.  This unassailable evidence flows from the natural experiment that followed the NCAA allowing NIL compensation through third-party transactions.

Specifically, since July 2021, the undisputed evidence shows that third-party NIL deals have exploded and continue to grow.  Indeed, Defendants' economic expert describes █████████████████████████████████████████████████████████████████████████ **Ex. 6** (Gowrisankaran Rpt.), ¶¶ 31–33.  And numerous Defendant witnesses admitted that the Prior NIL Rules prevented these deals, even though NCAA members would have supported them and support them now.  For example, NCAA Vice President of Division I Governance, Kevin Lennon, testified that ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *See* **Ex. 15** (Lennon Tr.), 97:23–101:3; 308:4–25.  Big Ten 30(b)(6) witness, Kerry Kenny, similarly testified that ████████████████████████████████ **Ex. 16** (Big 10 30(b)(6) (Kenny) Tr.), 87:10–88:13.  And SEC Commissioner Greg Sankey testified about a ███████████████████████████████████████████████████████████████████████████████ **Ex. 17** (SEC 30(b)(6) (Sankey) Tr.), 136:24–143:18.[10]

In addition to the NIL deals that are taking place at universities across the country, many schools are competing for athletes by setting up programs and partnerships that help facilitate NIL deals for athletes and provide NIL-related education.  *See* ECF No. 209-2 (Rascher Class Cert. Rpt.), ¶¶ 49–53. For example, Michigan State University representative Alexandra Breske testified that ███████████ ████████████████████████████████████████████████████████████████████████████████████████

---

[10] *See also* **Ex. 18** (ACC 30(b)(6) (Hostetter) Tr.), 94:20–95:6 ██████████████████████████████ ████████████ **Ex. 19** (ACC 30(b)(6) (Tario) Tr.), 122:10–124:18 (██████████████████████████████████████ ██████████████████████████████████████████); **Ex. 20** (Big 12 30(b)(6) (Gibson) Tr.), 20:3–8 (testifying that athletes are now able to sell autographs under the interim NIL policy).

5

**Ex. 21** (MSU 30(b)(6) (Breske) Tr.), 61:17–66:6.

. *Id.* at 58:8–59:21.  Breske even testified that

. *Id.* at 33:21–35:3.  Similarly, University of Oregon 30(b)(6) witness Jody Sykes testified about

*See* **Ex. 22** (University of Oregon 30(b)(6) (Sykes) Tr.), 43:10–44:19; 78:23–79:18.

There is also undisputed evidence that the Prior NIL Rules had the effect of preventing the licensing of college athletes' NILs for use in video games and other group licensing arrangements.

. **Ex. 1** (Rascher Rpt.), ¶ 61.  Now, EA is planning to release a new college football game incorporating class members' NILs, providing further evidence that the Prior NIL Rules restrained competition.[11]

Consistent with Defendants' admissions, as Rascher explains,

*Id.* ¶ 54.

. *Id.* ¶ 55.

**B.   Anticompetitive Harm From the Ban on Direct NIL Payments**

Plaintiffs have also come forward with indisputable and direct economic evidence that the ban on direct NIL payments in the Prior NIL Rules caused, and the continued ban of such payments in the Current

---

[11] *See* **Ex. 23** (Adam Rittenberg, *Over 10,000 Players Opt in to EA Sports College Football 25*, ESPN (Mar. 4, 2024)) (detailing inclusion of over 10,000 college football players in EA's new *College Football* video game being released in Summer 2024).

1  NIL Rules causes, significant anticompetitive harm and inefficiency in the labor markets for class

2  members' athletic services.

3  There is no dispute that the ban on direct NIL payments blocks schools and conferences from

4  providing significant amounts of NIL payments to class members that would occur absent the rules.

5  Defendants dispute how much and to whom NIL compensation would be paid absent the ban on direct

6  NIL payments, but they do not dispute that the rules are significantly reducing available NIL compensation

7  to class members.  In their interrogatory responses, ████████████████████████████████████

8  ███████████████████████████████████████████████████████████████████████████

9  ██████████████████.[12]  And, in arguing against the supposedly ruinous effects of competition that

10  would result if the direct NIL ban were eliminated, Defendants' experts admit that██████████████

11  ████████████████████████████████████████████████████████.[13]  For example,

12  Gowrisankaran claims that ██████████████████████████████████████████████████

13  ███████████████████████████████████████████████████████████████████████████

14  ███████████████████████████████████████████████████████████████████████████

15  █████████████████████████████."  **Ex. 7** (Gowrisankaran Rebuttal), ¶ 10 (emphasis added).  Langer

16  similarly claims that ██████████████████████████████████████████████████████████

17  ███████████████████████████████████████████████████████████████████████████

18  ███████████████████████████████████████████████████████████████████████████

19  ████████████"  **Ex. 9** (Langer Rpt.), ¶ 66 (emphasis added).

20  In fact, it is precisely because the Current NIL Rules prevent direct NIL payments, which otherwise

21  would be provided to class members in a competitive market, that Defendants claim that ████████

22  ███████████████████████████████████████████████████████████████████████████

23  ███████████████████████████████████████.  *See* **Ex. 6** (Gowrisankaran Rpt.), ¶¶

24  64–119; **Ex. 9** (Langer Rpt.), ¶¶ 137–61.  This is an admission that the Current NIL Rules cause substantial

25  anticompetitive effects ████████████████████████████████████████████.

---

[12] *See, e.g.*, **Ex. 24** (NCAA's Suppl. Resps. & Objs. to Pls.' 1st Set of Interrogs.), at 13.
[13] While Plaintiffs disagree that these outcomes are likely to occur, the claims made by Defendants' experts are nevertheless admissions that the Current NIL Rules are anticompetitive.

1    Finally, Rascher provides indisputable direct economic evidence of the anticompetitive effects of

2    the ban on direct NIL payments. ███████████████████████████████████████████████████

3    ███████████████████████████████████████████████████████████████████████████████████

4    ███████████████    *See* **Ex. 1** (Rascher Rpt.), ¶¶ 30–50.

5    **C.   Defendants' Market Power Over Class Members' Athletic Services**

6        Defendants' absolute—monopsony—power over the relevant labor markets is not susceptible to

7    genuine dispute.  *Alston I*, at 1097.  As discussed *infra*, at pp. 24-26, the Court can grant summary

8    judgment on the first step of the rule of reason without evaluating Defendants' market power in the

9    relevant markets because there is *direct evidence* that the Challenged NIL Rules caused anticompetitive

10   harm.  But, in any event, Plaintiffs have carried their burden of proof through the testimony of Rascher

11   establishing relevant labor markets for athletes, in which Defendants' members have monopsony power.

12       Significantly, while Gowrisankaran argues that ███████████████████████████████

13   ███████████████████████████████████████████████████████████████████████████████████

14   ███████████████████████████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████.  *See* **Ex. 7**

16   (Gowrisankaran Rebuttal), ¶ 62 ██████████████████████████████████████████████

17   ███████████████████████████████████████████████████████████████████████████████████

18   ███████████████████████████████████████████████████████████████████████████████████

19   █████████████████")**; Ex. 25** (Gowrisankaran Tr.), 252:2–15 (agreeing that "████████

20   ██████████████████████████████████████")**; Ex. 6** (Gowrisankaran Rpt.), ¶ 25.

21   Further Gowrisankaran admits that ███████████████████████████████████████████

22   ███████████████████████████████████████████████████████████████████████████████████

23   ████████████████ (*see* **Ex. 25** (Gowrisankaran Tr.), 33:6–11), ████████████████████

24   ███████████████████████████████████████████████████████████████████████████████████

25   ████████████████.  *See id.* at 26:8–9.

26       To determine the relevant markets, Rascher tests ██████████████████████████████

27   ███████████████████████████████████████████████████████████████████████████████████

28

1  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ **Ex. 1** (Rascher

2  Rpt.), ¶ 68.  Rascher concludes that the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

3  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

4  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  *Id.* ¶¶ 78–100.  These are the

5  same labor markets that the Court found on summary judgment in *Alston*.  *Alston Summary Judgment*, at

6  *8.  Defendants thus are also collaterally estopped from making contrary arguments as to the relevant

7  labor markets; Defendants' monopsony power was established in the prior litigation against them.  *Id.*

8  **III. The Undisputed Evidence That Defendants Cannot Meet Their Burden to Prove**

9  **Procompetitive Benefits**

10  At the outset of this case, Defendants asserted through answers and interrogatory responses a grab

11  bag of purported procompetitive justifications for the Challenged NIL Rules.  Most have been abandoned.

12  Gone is "amateurism"—Defendants' long-claimed justification that NCAA compensation restraints are

13  necessary to preserve consumer demand for college athletics.  Gowrisankaran and Langer, for example,

14  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

15  ▓▓▓▓▓▓▓.[14]  Plaintiffs engaged an expert ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

16  ▓▓▓▓▓▓▓▓▓▓▓; Defendants offered no consumer survey or expert testimony in response.  In the wake

17  of amateurism's demise as the claimed justification for Defendants' horizontal price-fixing, Defendants

18  offer a set of purported justifications, which, at their core, are based on the premise that competition itself

19  is undesirable for the labor markets in college sports.  Gowrisankaran is the spokesperson for this legally

20  unsustainable position.

21  For the restriction banning third-party NIL payments in the Prior NIL Rules, ▓▓▓▓▓▓▓▓▓▓

22  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

[14] **Ex. 11** (Langer Tr.), 82:8–19 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓**"); Ex. 6**

(Gowrisankaran Rpt.), ¶¶ 49–175 (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓);

**Ex. 8** (Gowrisankaran Reply), ¶ 69 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓**"); Ex. 25** (Gowrisankaran

Tr.), 206:1–207:12 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓**"); *id.* at 221:13–223:13 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

9



1  ███████████████████████████████████. Instead, at his deposition, Gowrisankaran admitted

2  ████████████████████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████████████. **Ex. 25**

4  (Gowrisankaran Tr.), 45:10–17.[15]

5      For the Current NIL Rules (including the restraints on direct NIL payments that were also in the

6  Prior NIL Rules), Defendants claim three justifications: ██████████████ (**Ex. 6** (Gowrisankaran

7  Rpt.), ¶¶ 120–67); ████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████████████████

9  ███████████████ (*id.* ¶¶ 49–63); and ████████████████████████████████████

10 ████████████████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████) (*id.* ¶¶ 64–119).

13 Gowrisankaran opines that ██████████████████████████████████████████████

14 ███████████████████████████████████████. *See id.* ¶¶ 62–65.

### A. The Undisputed Evidence Shows No Connection Between the Challenged NIL Rules and Consumer Demand

16

17      Again, Defendants have offered no evidence to demonstrate that the Challenged NIL Rules were

or are necessary to preserve consumer demand.[16]  Rather, it is Plaintiffs who offer the *only* expert evidence

18 in the record ███████████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████████████████████

23 ████████████████████. **Ex. 4** (Poret Rpt.), at 1–2, 6. ██████████████████

24 ████████████████████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████████████████████

26 [15] ("Q: ████████████████████████████████████████████████████████████████

27 ████████████.").

28 [16] *See supra* n.14 and corresponding text.

1    . *Id*. at 45–49.

2

3

4

5

6    *Id*. at 7, 9, 47–48.  Poret's findings are unrebutted and undisputed, as

7    Defendants have *no* opposing survey or survey expert.  Moreover, Poret's survey results are confirmed by

8    .[17]

9    **B.  Undisputed Evidence Demonstrates That There Is No Competitive Balance in Division I College Sports to Preserve and That the Challenged NIL Rules Do Not Promote It**

10

11    Gowrisankaran opines that

12    (**Ex. 6** (Gowrisankaran Rpt.), ¶¶ 120–67), but the undisputed evidence—much of it

13    from the testimony of Defendants' own witnesses—establishes that there is no competitive balance in

14    Division I sports to serve as the predicate for such a purported justification.  Nor do Defendants make any

15    attempt to connect the purported need for competitive balance to consumer demand.

16    Neither Gowrisankaran nor Langer

17    .  **Ex. 11**

18    (Langer Tr.), 275:17–276:6

19

20    *id.* at 66:21–67:14

21    );  **Ex. 6** (Gowrisankaran Rpt.), ¶¶ 125, 171;  **Ex. 25**

22    (Gowrisankaran Tr.), 300:21–302:8

23    );  *see also* **Ex. 2** (Rascher PCJ Rebuttal), ¶¶ 234–37.  Further,

24    [17] The NCAA commissioned

.  *See, e.g.*,

25    **Ex. 26**
(NCAAHOUSE00107693 at -7982)

26    ; **Ex. 27**

27

28    ").

1 as in *O'Bannon*, Defendants' own fact witnesses have debunked competitive balance in Division I college

2 sports as a myth.[18]  *See O'Bannon I*, at 978–79.

3       Moreover, NCAA President Baker recently made a proposal for changes in the Current NIL Rules

4 that would, among other things, permit schools and conferences to make direct payments to athletes for

5 their NIL.  *See* **Ex. 30** (Baker Letter to Athletes).  Per President Baker, his proposal would *improve*—not

6 harm—the existing state of competitive balance.  *See id.* ("Smaller clusters of similar athletics departments

7 determining appropriate benefits levels for their student-athletes will also create more competitive

8 balance, while helping to protect those passionate rivalries and maintain current access to national

9 championship events."); *see also* **Ex. 32** ).  In the face of this devastating admission by

10 the NCAA President, it is not possible for Defendants to even raise a genuine issue of fact that the

11 protection of competitive balance could be a procompetitive justification for the Challenged NIL Rules

12 prohibiting direct NIL payments.  *See* **Ex. 32**

13

14

15 .

16   **C.  The Undisputed Evidence Is Fatal to Defendants' Pay-for-Play Justification**

17       Defendants claim that

18

19 ." **Ex. 6** (Gowrisankaran

20 Rpt.), ¶¶ 49–63; *see also* **Ex. 9** (Langer Rpt.), ¶ 102.  But as Defendants' experts attest,

21 ――――――――――
[18] *See, e.g.,* **Ex. 28** (NCAA 30(b)(6) (Fraser) Tr.), 147:1–148:5

22 ); **Ex. 29** (Bowlsby Tr.), 20:15–21:5

23 "); *id.* at 23:1–24:22 (admitting "that the level playing field has always been a bit of a mirage"); **Ex. 30** (Baker Letter to Athletes) ("It's no secret that

24 the growing financial gap between the highest-resourced colleges and universities and other schools in Division I has created a new series of challenges.").

25 . *See* **Ex. 16** (Big Ten 30(b)(6) (Kenny) Tr.), 185:8–186:5(

26 ); **Ex. 31** (Phillips Tr.), 177:5–19

27

28 ).

1

2         ).   **Ex. 11** (Langer Tr.), 89:12–90:12

3       ); *see also* **Ex. 6**

4 (Gowrisankaran Rpt.), ¶¶ 53–54; **Ex. 7** (Gowrisankaran Rebuttal), ¶ 22; **Ex. 8** (Gowrisankaran Reply), ¶¶

5 114–15.  None of the existing rules against pay for play are challenged here.

6         Defendants nonetheless argue that it would be too hard for them to enforce the rules prohibiting

7 pay for play if schools were allowed to make direct NIL payments.  This is baffling.

8

9       .  *See* **Ex. 11** (Langer Tr.), 89:12–

10 90:12.   The Court can take NCAA President Baker's word for it: he has reaffirmed the NCAA's

11 commitment to enforcing the NCAA's rules against pay for play,[19] notwithstanding NIL rules changes he

12 is proposing that would permit direct NIL payments.  *See* **Ex. 30** (Baker Letter to Athletes).[20]

13     **D.   Defendants' Reallocation Justifications Fail and Are Factually Unsupportable**

14         Gowrisankaran opines that

15

16       ."  **Ex. 6** (Gowrisankaran Rpt.), ¶ 65.  More pointedly, he argues that

17

18

19

20

21 [19] *See* **Ex. 33** (Nicole Auerbach (@nicoleauerbach), Twitter (Mar. 1, 2024, 4:24 PM)), (announcing a
   freeze on NCAA investigations involving third-party participation in NIL-related activities, but noting

22 that the NCAA staff would continue enforcing "[t]he prohibition on pay-for-play/payment for specific
   athletic performance").

23 [20]       .  *See, e.g.,* **Ex. 28** (NCAA

24 30(b)(6) (Fraser) Tr.), 19:14–17       ); *id.* at 29:22–

25 31:16 (referring to **Ex. 34**       

26       "); **Ex. 35**

27

28       ").

1    ██████████████████████████████████████████████. *Id.* ¶¶ 68, 76.

2         Even putting aside the lack of factual support for this argument, it is not a *procompetitive*

3    justification.   As one of Plaintiffs' economists (Dr. Darryl Williams) explains: ████████████

4    █████████████████████████████████████████████████████████████████████████████████████

5    █████████████████████████████████████████████████████████████." **Ex. 5**

6    (Williams Rpt.), ¶ 10.  Procompetitive effects are those—as the name suggests—that occur through

7    *competition* in the relevant market. **Ex. 36** (Williams Tr.), 43:24–44:2 ██████████████████

8    █████████████████████████████████████████████████████████████████████████████████████

9    ██████████████████████████████████████"); *id.* at 71:16–21.  Here, the claimed

10   reallocation of economic benefits caused by the Current NIL Rules ████████████████████████

11   ███████████████████████████████████████████████████.[21]  While

12   it is dubious that the claimed reallocation is even socially desirable,[22] it is indisputable that such a

13   reallocation would not be a *procompetitive justification.*

14        In addition, Gowrisankaran's opinions that ████████████████████████████████████████

15   █████████████████████████████████████████████████████████████████████████████████████

16   █████████████████████████████████████████████████████████████████████████████████████

17   ████████████████████████████████████████.  Indeed, Gowrisankaran admitted that

18   █████████████████████████████████████████████████████████████████████████████████████

19   ─────────────────────────
     [21] Gowrisankaran also claims (again without factual support) that ████████████████████████

20   ████████████████████████████████████████████████████████████████. *See* **Ex. 6** (Gowrisankaran Rpt.), ¶ 65.

21   However, because Gowrisankaran does not make any claim that ████████████████████████████

22   █████████████████████████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████

24   [22] For example, Defendants would have direct NIL payments siphoned away from the largely poor and
     minority athletes in the revenue sports of FBS football and Division I basketball to reallocate benefits to
     the largely wealthier and predominantly white athletes in non-revenue sports such as tennis, golf, rowing
25   and lacrosse.  *See* **Ex. 37** (Who Profits From Amateurism? Rent-Sharing in Modern College Sports by
     Craig Garthwaite, *et al.*), at Abstract ("Using complete roster data for every athlete playing sports at
26   these schools in 2018, we conclude that the existing limits on player compensation effectively transfer
     resources away from students who are more likely to be black and more likely to come from poor
27   neighborhoods towards students who are more likely to be white and come from higher-income
     neighborhoods"); **Ex. 11** (Langer Tr.), 328:15–329:7 ███████████████████████████████████████).

28

1 ███████████████████████████████████████████████████████████

2 ███████████████████████████████████████████████). *See* **Ex.**

3 **25** (Gowrisankaran Tr.), 183:11–185:4.

4      Nor is there any factual basis for Defendants' argument that ███████

5 ███████████████████████████████████████████████████████████

6 ███████████████████████████████████████████████████████████

7 ██████. *See* **Ex. 11** (Langer Tr.), 340:20–341:4 ████████████████

8 ███████████████████████████████████████████████); *id.* at

9 341:10–343:14 ██████████████████████████████████████████

10 ████████████████████████████); *see also* **Ex. 1** (Rascher Rpt.), ¶ 46 (████████

11 ███████████████████████████████████████████████████████

12 ██████████████████████████████). None of Defendants' experts has done any survey of

13 athletes to support their counter-factual view that ████████████████████████

14 ███████████████████████████████████████████████████████████

15 █████████████████.

16      It is also undisputed that ████████████████████████████████████

17 ███████████████████████████████████████████████████████████

18 ███████████████████████████████████████████████████████████

19 ███████████████████████████████████████████████████████████

20 ██████████████████████████████████. *See* **Ex. 2** (Rascher PCJ Rebuttal), ¶ 120 (citing ECF

21 No. 290-2 (Rascher Class Cert. Reply), ¶ 36). As Rascher explains, ██████████

22 █████████████████████████████████████████"). Thus, ███████

23 ███████████████████████████████████████████████████████████

24 ███████████████████████████████████████████████████████████

25 █████████████████████." ECF No. 290-2 (Rascher Class Cert. Reply), ¶ 36. And the new College

26 Football Playoff format—expanding the number of games from three to eleven—already has led to new

27 broadcast agreements which will generate a further increase in revenue to the tune of $1.3 billion annually

28

████████████████████████████████████

████████████. **Ex. 2** (Rascher PCJ Rebuttal), ¶ 120.[23]

Moreover, the Knight Commission on Intercollegiate Athletics studied the financial projections through 2032 for Division I FBS public athletics programs and determined that if Defendants' spending patterns continue, "total compensation for 594 football coaches at 54 FBS public institutions in the [Power Five] conferences ($1.363 billion) will be just $9 million lower than spending on 'athlete scholarships and medical expenses' combined ($1.372 billion) for more than 30,000 athletes across *ALL* sports at those institutions." **Ex. 39** (Knight Commission Report), at 2 (emphasis in original). The report further projects that "[o]ver the next decade, an increasing number of [Power Five institutions] are projected to experience a 'crossover point' where compensation for 11 'countable' football coaches per campus will exceed total institutional spending on 'athlete scholarships and medical expenses' combined for *ALL* college athletes across *ALL* sports at that school." *Id.* (emphasis in original). Permitting direct NIL payments to change this spending trend can only be procompetitive (and a social good).

Defendants also ignore the guardrails that are already in place to preserve spending on non-revenue sports in the future. If the Current NIL Rules are enjoined, NCAA rules requiring Division I member schools to maintain a minimum number of sports,[24] and requiring FBS institutions to "[a]nnually offer a minimum of 200 athletics grants-in-aids or expend at least $4 million on grants-in-aid to student-athletes in athletics programs" would still be in place to prevent any reductions below these levels.[25] And the NCAA has recently enacted rules that will increase the minimum levels of support to non-revenue sports. Starting in August 2027, NCAA rules will "[r]equire all FBS programs to provide 90% of the total number of allowable scholarships over a two-year rolling period across 16 sports, including football. FBS schools will also be required to fund 210 scholarships each year, amounting to no less than $6 million annually."[26]

---

[23] *See also* **Ex. 38** (Ross Dellenger, *Sources: College Football Playoff Agrees to New Contract With ESPN*, Yahoo Sports (Mar. 15, 2024)) (announcing finalized contract).

[24] NCAA Division I institutions are required to sponsor a minimum of 13 varsity sports, or 16 varsity sports for those in FBS. **Ex. 40** (2022–23 NCAA D1 Manual), Bylaws 20.10.6, 20.10.9.1; **Ex. 41** (2023–24 NCAA D1 Manual), Bylaws 20.10.6, 20.10.9.1; *see also* **Ex. 28** (NCAA 30(b)(6) (Fraser) Tr.), 47:2–10. ████████████████████████ *See* **Ex. 21** (MSU 30(b)(6) (Breske) Tr.), 93:7–94:2.

[25] **Ex. 40** (2022–23 NCAA D1 Manual), Bylaw 20.10.9.4.

[26] **Ex. 42** (*DI Council Approves Changes to Notification-of-Transfer Windows*, NCAA Media Center (Oct. 4, 2023)).

Defendants' expert testified that he was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *See* **Ex. 25** (Gowrisankaran Tr.), 308:10–313:1.

Finally, while Gowrisankaran opines that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[27]  Fact witnesses similarly confirmed that differences in television revenues drove recent conference realignment.[28] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *See* **Ex. 25** (Gowrisankaran Tr.), 298:3–15.

## IV.  Undisputed Evidence of Less Restrictive Alternatives

Plaintiffs have come forward with undisputed evidence of less restrictive alternatives should the Court need to reach this issue, which it should not, given the absence of any procompetitive justification.

As an initial matter, the Current NIL Rules—which repeal the Prior NIL Rules on an interim basis—are clearly a less-restrictive alternative to prohibiting third-party NIL payments, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *See* **Ex. 1** (Rascher Rpt.), ¶ 128.  Quite the opposite.  The experience of the last two and a half years has shown that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[29]

[27] **Ex. 11** (Langer Tr.), 282:24–285:17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; *see also* **Ex. 9** (Langer Rpt.), ¶ 61; **Ex. 6** (Gowrisankaran Rpt.), ¶ 255 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); **Ex. 25** (Gowrisankaran Tr.), 296:9–297:▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); **Ex. 2** (Rascher PCJ Rebuttal), ¶¶ 251–58.

[28] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[29] *See, e.g.*, **Ex. 45** (Warren Tr.), 64:11–64:18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."); *id.* at 66:10–66:20, 157:15–159:23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); **Ex. 18** (ACC 30(b)(6) (Hostetter) Tr.), 54:12–56:8 (▮▮▮▮▮▮

Further, Defendants cannot dispute that President Baker's proposal to permit direct NIL payments and require various payments to athletes by the schools in the Power Five conferences would be a less restrictive alternative that President Baker himself has declared would be good for college sports and improve competitive balance.  *See* **Ex. 30** (Baker Letter to Athletes); **Ex. 32** (▋▋▋▋▋▋).  This pronouncement by President Baker is an admission by the NCAA that, by itself, establishes the existence of less restrictive alternatives.

Nor can Defendants genuinely dispute ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋.  *See* **Ex. 1** (Rascher Rpt.), ¶¶ 129–134.  And, as discussed above, Defendants already have separate rules prohibiting pay for play not challenged in this litigation.  *Supra* pp 12–13.

Similarly, regarding ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋.  *Supra* n.24; *see also* **Ex. 3** (Rascher Reply), ¶¶ 255–60.  As Defendants' witnesses have acknowledged, ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋[30]  And, in addition to those rules, ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋.  *Supra* n.25.[31] Plaintiffs are not challenging any of those rules in this litigation.  And, if needed, Defendants could strengthen NCAA rules requiring support for non-revenue sports as part of a less restrictive alternative to the Current NIL Rules (as President Baker proposed).

## SUMMARY JUDGMENT STANDARDS

This Court should grant summary judgment in favor of Plaintiffs if they show "that there is no

---

▋▋); **Ex. 17** (SEC 30(b)(6) (Sankey) Tr.), 104:7–20 (testifying that interest in SEC sports has stayed high since NIL rule change); **Ex. 43** (SEC 30(b)(6) (Hussey) Tr.), 85:11–86:8 (▋▋▋▋▋▋▋▋); *id*. at 61:13–21 ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋).

[30] *See, e.g.*, **Ex. 28** (NCAA 30(b)(6) (Fraser) Tr.), 47:17–18 ▋▋▋▋▋▋▋▋▋▋▋▋▋▋"); **Ex. 20** (Big 12 30(b)(6) (Gibson) Tr.), 138:5–139:11 ▋▋▋▋▋▋▋▋▋▋▋▋▋.

[31] *See also* **Ex. 46** (Tealer Tr.), 72:3–18 ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋.

genuine dispute as to any material fact and [they are] entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   A fact issue is "material" only if it could affect the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   A fact issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Id.*   For issues on which the  non-moving party bears the burden of proof at trial (here, Defendants' procompetitive justifications), if that party fails to make a showing sufficient to establish the existence of essential elements of its case, the "plain language of Rule 56(c) mandates the entry of summary judgment."   *Parth v. Pomona Valley Hosp. Med. Ctr.*, 630 F.3d 794, 798–99 (9th Cir. 2010) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000) ("[T]he moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.").

To prevail on a Sherman Act § 1 claim, a plaintiff must show "'(1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade . . . ; and (3) that the restraint affected interstate commerce.'"  *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1062 (9th Cir. 2001). Claims challenging NCAA restraints under Section 1 of the Sherman Act have been evaluated under the quick-look rule[32] and the full rule of reason.[33]

Quick-look review applies when the challenged rules directly restrain competition among horizontal competitors in a manner that is discernible in "the twinkling of an eye."  *NCAA v. Bd. of Regents*, 468 U.S. 85, 109 n.39 (1984); *see also Law v. NCAA*, 134 F.3d 1010, 1020 (10th Cir. 1998) ("[W]here a practice has obvious anticompetitive effects—as does price-fixing—there is no need to prove that the defendant possesses market power.  Rather, the court is justified in proceeding directly to the question of whether the procompetitive justifications advanced for the restraint outweigh the anticompetitive effects under a 'quick look' rule of reason.").

Under full rule-of-reason review, the plaintiff bears the burden at the first step "to prove that the

---

[32] *See NCAA v. Bd. of Regents*, 468 U.S. 85, 109 n.39, 120 (1984); *Law v. NCAA*, 134 F.3d 1010, 1020 (10th Cir. 1998).
[33] *See O'Bannon I*, at 985 (N.D. Cal. 2014); *Alston I*, at 1096.

challenged restraint has a substantial anticompetitive effect." *Alston III*, at 96. "Should the plaintiff carry that burden, the burden then shifts to the defendant to show a procompetitive rationale for the restraint." *Id.* (internal quotation marks omitted). "If the defendant can make that showing, the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* at 96–97 (quotations omitted). In addition, if Plaintiffs cannot prove a less restrictive alternative, Ninth Circuit case law requires a fourth step: to "balance the harms and benefits [of the restraint] to determine whether [it is] reasonable.[34] *Cnty. of Tuolumne v. Sonora Comm. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001); *see also Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991) (at the fourth step, "the court must weigh the harms and benefits to determine if the behavior is reasonable on balance").

Under Rule 56, partial summary judgment may be granted to establish liability, leaving the amount of damages to be determined at trial. *See, e.g.*, *Celotex Corp.* 477 U.S. at 322 n.4 ("[S]ummary judgment . . . may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages."). Partial summary judgment may also be granted as to some but not all elements of the Section 1 liability analysis, while leaving any genuine factual disputes on liability for trial. *Alston Summary Judgment*, at *8 (granting partial summary judgment as to the issue of whether there were anticompetitive effects in the relevant markets). There are thus a variety of ways that partial summary judgment may narrow the issues for trial. *See Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1202 n.9 (9th Cir. 2009) ("[P]artial summary judgment . . . serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact").

## LEGAL ARGUMENT

### I. The Court Should Condemn the Challenged Rules Under a Quick-Look Analysis

#### A. Plaintiffs Have Presented Undisputed Evidence of Defendants' Contract, Combination or Conspiracy

In most antitrust actions, the very existence of a "contract, combination, or conspiracy" in restraint of trade is a contested factual issue. But, as in other cases challenging NCAA and conference rules,

---

[34] Plaintiffs are not seeking summary judgment under the fourth balancing step of the rule-of-reason standard and reserve their rights to argue that the anticompetitive harms outweigh any procompetitive effects at trial.

1    Defendants have conspired in the open, and the terms of their horizontal agreements are not in dispute.[35]

2         The challenged NCAA agreements and rules—the Challenged NIL Rules—are formally

3    memorialized in the annually published NCAA Division I Manual and the Interim NIL Policy.  *Supra* pp.

4    3–4.  The parties do not dispute the terms of those agreements, or the fact that Defendants employ a formal

5    staff to enforce those agreements and impose penalties for noncompliance.  *See id.*

6         The evidence of Defendants' rules and enforcement is the same type of evidence—of an agreement

7    among the NCAA and its member conferences—that was held sufficient to establish a contract,

8    combination, or conspiracy in *Alston*, *O'Bannon*, and *Board of Regents*.  *See Alston Summary Judgment*,

9    at *7 (holding that "[t]he existence of a contract, combination or conspiracy that affects interstate

10   commerce is undisputed in this case"); *O'Bannon II*, at 1072 (holding that the NCAA's "compensation

11   rules" are an agreement to "fix the price of one component (NIL rights) of the bundle that schools provide

12   to recruits"); *Bd. of Regents*, 468 U.S. at 98–99 ("There can be no doubt that the challenged practices of

13   the NCAA constitute a 'restraint of trade' in the sense that they limit members' freedom to negotiate and

14   enter into their own television contracts.").  Plaintiffs are thus entitled to summary judgment on the

15   existence of a contract, combination, or conspiracy.

16   **B.  The Anticompetitive Nature of the Challenged Rules Is Readily Apparent**

17        Horizontal agreements between competitors to fix prices or otherwise restrain trade are assessed

18   under per se, full rule-of-reason, or "quick-look" analysis.  The "quick look" is a "truncated rule of reason"

19   analysis that is "appropriately used where 'an observer with even a rudimentary understanding of

20   economics could conclude that the arrangements in question would have an anticompetitive effect on

21   customers and markets.'"  *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1134 (9th Cir. 2011)

22   (quoting *Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770 (1999)).  In such situations, "[f]ull rule of reason

23   treatment is unnecessary" because "the anticompetitive effects [of a challenged agreement] are clear even

24   in the absence of a detailed market analysis."  *Id.*  "Once it is established that the restraint is inherently

25   suspect and the anticompetitive effects are easily ascertained, then the burden shifts to the [defendants] to

26   produce evidence of procompetitive justification or effects."  *Id.* at 1138; *see also Alston III*, at 89

27

28   ───────────────────────────
     [35] *See supra* pp. 3–4; *Alston III*, at 86; *O'Bannon I*, at 985; *Bd. of Regents*, 468 U.S. at 99.

("agreements among competitors" may "be rejected after only a quick look" if they "obviously threaten to reduce output and raise prices"); *Texaco Inc. v. Dagher*, 547 U.S. 1, 7 n.3 (2006) (courts should "appl[y] the quick look doctrine to business activities that are so plainly anticompetitive that courts need undertake only a cursory examination before imposing antitrust liability").

The Supreme Court has applied the quick-look approach in multiple situations where the "likelihood of anticompetitive effects [could] be easily ascertained." *Cal. Dental Ass'n*, 526 U.S. at 770. Indeed, the quick-look approach for condemning horizontal restraints was first articulated by the Supreme Court in a case striking down the college football broadcast rules of the NCAA. *Bd. of Regents*, 468 U.S. at 109–10. And the lower courts have followed suit, applying the quick-look standard in appropriate cases to condemn horizontal restraints imposed by the NCAA and other sports associations. *See, e.g.*, *Law*, 134 F.3d at 1020 (applying quick look to condemn NCAA rules limiting the compensation to entry-level, assistant basketball coaches); *Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 754 F. Supp. 1336, 1362–64 (N.D. Ill. 1991) (applying quick look to prohibit restriction on the number of games NBA teams could sell to superstations), *aff'd*, 961 F.2d 667 (7th Cir. 1992).

In *Board of Regents*, the Supreme Court held that a "naked restraint on price and output requires some competitive justification even in the absence of a detailed market analysis." 468 U.S. at 110. There, the plaintiffs challenged NCAA rules regarding television broadcasting that fixed broadcast prices and limited output, *i.e.*, the number of games that could be televised. *Id.* at 93–94. The Court noted that "[b]ecause it restrains price and output, the NCAA's television plan has a significant potential for anticompetitive effects." *Id.* at 104. And that potential "ha[d] been realized," according to the district court's findings, because "if member institutions were free to sell television rights, many more games would be shown on television." *Id.* at 105. The Court found that the NCAA's rules "create[d] a price structure that is unresponsive to viewer demand and unrelated to the prices that would prevail in a competitive market." *Id.* at 106. The NCAA argued that its broadcast rules could have no significant anticompetitive effect because it did not have market power in the market for television advertising. *Id.* at 109. The Court disagreed, holding that "[a]s a matter of law, the absence of proof of market power does not justify a naked restriction on price or output." *Id.*

1    Previously, the Ninth Circuit, and this Court following it, has applied the full rule of reason to

2    assess the NCAA's compensation restraints to athletes in *O'Bannon* and *Alston*. *O'Bannon II*, at 1069–

3    70; *Alston I*, at 1095.  However, that was before the unanimous Supreme Court in *Alston* made clear that

4    its prior decision in *Board of Regents* did not hold that the NCAA should be afforded any special deference

5    under the antitrust laws for its compensation restraints. *Alston III*, at 91–93.  Now that it has been decreed

6    that the NCAA should be treated like any other business under the antitrust laws, its compensation

7    restraints against college athletes should be subjected to quick-look review.  This is especially true in this

8    case, where the Defendants are no longer even asserting an amateurism defense for the Challenged NIL

9    Rules, putting Defendants in the same position as any other group of competitors seeking to defend what

10   are clear horizontal restraints on competition.

11   The Challenged NIL Rules are horizontal agreements among competitors (*supra* pp. 3–4) that

12   interfere with price—the "central nervous system of the economy"—by fixing the amount that NCAA

13   member schools and conferences may pay college athletes for the use of their NILs *at zero*.  *See id*.

14   Further, the Prior and Current NIL Rules have undeniably "created a price structure" that is both

15   unresponsive to demand and "unrelated to the prices that would prevail in a competitive market." *Bd. of*

16   *Regents*, 468 U.S. at 106.  Someone with "even a rudimentary understanding of economics could

17   conclude" that both the Prior NIL Rules and the Current NIL Rules "have an anticompetitive effect."

18   *Safeway*, 651 F.3d at 1134.

19   The application of the quick-look rule is especially appropriate for the restraints on third-party NIL

20   payments in the Prior NIL Rules.  For those restraints, unlike in prior cases, the Court here has the benefit

21   of undisputed evidence that ████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████████████████████

24   ██████████████████████████████████████.  Indeed, this is why Defendants' expert ████████

25   ████████████████████████████████.  *See* **Ex. 25** (Gowrisankaran Tr.), 45:10–

26   17; *id.* at 46:23–47:4. Real-world experience has exposed the fact that prohibiting third-party NIL

27   payments was blatantly anticompetitive and unjustifiable.  It is precisely in this context that the quick-

28

23

look standard of review is most applicable.[36]

## II. Even Under a Full Rule-of-Reason Analysis, Plaintiffs Have Undisputed Evidence of Anticompetitive Effects

### A. Plaintiffs Have Presented Undisputed Direct Evidence That Defendants' Restraints Impose Significant Anticompetitive Effects

Under a rule-of-reason analysis, Plaintiffs may satisfy their initial burden of demonstrating anticompetitive effects indirectly or directly. *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018). "Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition." *Id.* Direct evidence is proof of "actual detrimental effects on competition," including "reduced output, increased prices, or decreased quality in the relevant market." *Id.* When Plaintiffs produce direct evidence of anticompetitive effects, a detailed market analysis is unnecessary. *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1448 (9th Cir. 1988). "[M]arket definition and market power are merely tools designed to uncover competitive harm," so "proof of actual detrimental effects such as reduction of output can obviate the need . . . [for] elaborate market analysis." *Id.* (quoting *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986)).

As described above, Plaintiffs have produced undisputed, direct evidence of the anticompetitive effects of the Challenged NIL Rules, none of which is genuinely disputed by Defendants. As for the Prior NIL Rules, Defendants' own fact and expert witnesses described ███████████████████████

███. *Supra* pp. 5–6; *see also* **Ex. 1** (Rascher Rpt.), ¶¶ 51–59 (██████████████████████

████████████████████████████████). It is also undisputed that ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████. *Id.* ¶¶ 60–64. Even Gowrisankaran, the defense expert tasked with challenging Rascher's direct effects analysis, ███████████████████

████████████████████████████████████████████████

---

[36] *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 5871243, at *4 (N.D. Cal. Oct. 7, 2016) ("courts make judgments based on judicial experience with certain types of restraints and market contexts, without demanding such extensive inquiry into the market in which the specific restraint at issue operates") (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 318 n.14 (3d Cir. 2010)).

. *See* **Ex. 6** (Gowrisankaran Rpt.), ¶¶ 18–51.

And as for the Current NIL Rules, as explained above, Defendants have admitted that

. *Supra* p. 7.  Defendants' experts agree.  *Supra* pp. 7–8; *see also* **Ex. 1** (Rascher Rpt.), ¶¶ 24–50

).  Such "[r]estrictions on price and output are the paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit."  *Bd. of Regents*, 468 U.S. at 107–08.

Defendants' failure to dispute any of this evidence is not surprising given the litigation history.  In *Alston*, Defendants did not "dispute that its member schools compete fiercely for student-athletes but remain subject to NCAA-issued-and-enforced limits on what compensation they can offer."  *Alston III*, at 86.  In *O'Bannon*, Defendants did not "dispute the district court's conclusion that the compensation rules restrain the NCAA's member schools from competing with each other."  *O'Bannon II*, at 1070.  Similarly, here, Defendants cannot genuinely dispute that the Challenged NIL Rules prevent NCAA member schools and conferences from competing with one another in terms of the NIL opportunities and compensation they could provide or permit to be provided to class members.  *Supra* pp. 6–8; *see* **Ex. 6** (Gowrisankaran Rpt.), ¶¶ 18–51.

Instead, Gowrisankaran's only rejoinder is that

. *See id.* ¶¶ 152–54.  But this argument has nothing to do with the undisputed facts that show that the Current and Prior NIL Rules directly restrain competition.  Rather, they are arguments—which we will address below—about the purported procompetitive justification for the restraints and a claim that some class members are not injured.  They have nothing to do with the indisputable anticompetitive effects Defendants have inflicted on the relevant markets.

1   "Antitrust injury and competitive injury are conceptually distinct." *Blue Tree Hotels Inv. (Can.),*

2   *Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 220 (2d Cir. 2004).  Antitrust injury

3   concerns "whether the challenged conduct has actually caused harm to the plaintiff," while competitive

4   injury "concerns the potential effect certain conduct may have on competition generally."  *Id.* (quotation

5   omitted); *see also O.S.C. Corp. v. Apple Comput., Inc.*, 792 F.2d 1464, 1469 (9th Cir. 1986)

6   (distinguishing between "[i]njury to an antitrust plaintiff" and "injury to competition").  At the first step

7   of the rule-of-reason inquiry, what matters is "the impact upon competitive conditions," not whether an

8   individual plaintiff or class member was injured.  *Tanaka*, 252 F.3d at 1064.  Plaintiffs have produced

9   undisputed direct evidence that the Challenged NIL Rules substantially harm competition in the markets

10  for student-athlete services by preventing NCAA member schools from competing for athletes via NIL

11  opportunities and compensation.  *Supra* pp. 4–8; *see Alston I*, at 1098.  The undisputed evidence that "the

12  NCAA schools have agreed to value the athletes' NIL at zero" demonstrates an "anticompetitive effect"

13  that "satisf[ies] the plaintiffs' initial burden under the Rule of Reason."  *O'Bannon II*, at 1071 (internal

14  quotation marks omitted).  Thus, no detailed market analysis is necessary. *See Oltz*, 861 F.2d at 1448.

15  ## B.  Defendants Are Collaterally Estopped From Arguing Against Plaintiffs' Relevant Markets and Market Power

16

17      Even if the Court applied full rule-of-reason scrutiny and required that Plaintiffs define the relevant

18  markets, prior litigation has already established that Defendants have monopsony power in the relevant

19  markets—the sports-specific labor markets for Plaintiffs' athletic services.  Defendants are barred from

20  arguing otherwise.

21      Issue preclusion "prevents a defendant from relitigating the issues which a defendant previously

22  litigated and lost against another party."  *Syverson v. IBM Corp.*, 472 F.3d 1072, 1078 (9th Cir. 2007)

23  (internal quotation marks omitted).  Offensive, nonmutual issue preclusion (sometimes called collateral

24  estoppel) is appropriate when (1) there was a full and fair opportunity to litigate the identical issue in the

25  prior action; (2) the issue was actually litigated and necessarily decided in the prior action; (3) the issue

26  was decided in a final judgment; and (4) the party against whom issue preclusion is asserted was a party

27  to or in privity with a party to the prior action.  *Id.*; *Appling v. State Farm Mut. Auto Ins. Co.*, 340 F.3d

28  769, 775 (9th Cir. 2003).  A court may decline to apply issue preclusion when doing so would be unfair.

*Syverson*, 472 F.3d at 1078.  "Indices of unfairness" include whether a plaintiff is being rewarded for failing to join a prior action; whether defendants had an incentive to defend the first suit "with full vigor"; whether there are multiple inconsistent judgments on the issue in question; and "whether the defendant might be afforded procedural opportunities" in the second action "that were unavailable in the first 'and that could readily cause a different result.'" *Id.* at 1078–79 (quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330–31 (1979)).

In *Alston*, this Court found that the college-athlete plaintiffs had "establish[ed] the existence of a relevant market comprising national markets for [college-athletes'] labor in the form of athletic services in men's and women's Division I basketball and FBS football, wherein each class member participates in his or her sport-specific market," and that Defendants "have near complete dominance of, and exercise monopsony power in, the relevant market." *Alston I*, at 1097.  On appeal, the Defendants did not contest either the district court's definition of the relevant market *or* "that the NCAA enjoys monopoly (or, as it's called on the buyer side, monopsony) control in that labor market—such that it is capable of depressing wages below competitive levels and restricting the quantity of student-athlete labor."  *See Alston III*, at 86.  And Defendants' monopsony power in the relevant labor markets is also repeatedly discussed in the Supreme Court's unanimous affirmance.  *See, e.g.*, *id.* at 86, 90, 109–10.

The relevant market and market power issues in this action and *Alston* are "identical for purposes of collateral estoppel."  *Resolution Trust Corp. v. Keating*, 186 F.3d 1110, 1116 (9th Cir. 1999).  The issues here are (1) whether there are sport-specific markets for college-athletes' athletic services and (2) whether Defendants have monopsony power in those markets.  The issues in *Alston* were the same.  *Alston I*, at 1067–70.  Defendants had a full, fair opportunity to litigate relevant markets and market power in *Alston*.  Those issues were necessarily decided as part of the Court's rule-of-reason analysis in *Alston*, and they were actually litigated.  *Alston I*, at 1097.  The Court held that Defendants had monopsony power in the relevant markets after a 10-day bench trial, during which "[i]t heard experts and lay witnesses from both sides, and received volumes of evidence and briefing."  *Alston III*, at 80; *see also Alston I*, at 1067–70.  Here, Plaintiffs have established the same relevant markets as in *Alston*:  the national markets for Plaintiffs' labor, *i.e.*, athletic services, with each class member participating in his or her sport-specific

market.  Plaintiffs have also shown that Defendants enjoy monopsony power in those relevant markets.  In *Alston*, these issues were decided in a final judgment against the same Defendants here.  Issue preclusion thus prevents Defendants from re-litigating these points.  *See McNeil v. Nat'l Football League*, 790 F. Supp. 871, 893 (D. Minn. 1990) (holding that the NFL was "precluded from relitigating the determination that the services of major league professional football players in the United States constitutes a relevant market" for purposes of the plaintiffs' antitrust claims because that issue had been decided in previous litigation against the NFL).

Although this case involves different NCAA rules than *Alston* and asserts claims on behalf of college athletes who played sports in addition to football and basketball, that does not render the doctrine inapplicable.  Indeed, it is undisputed that there is "substantial overlap" between the evidence or argument on relevant market that would be presented in this proceeding and the evidence or argument that was presented in *Alston*.  *See, e.g.*, **Ex. 3** (Rascher Reply), ¶¶ 61–62, 76, 91.  And any new evidence or argument about other sports that would be presented in this proceeding "involves application of the same rule of law as that involved in" *Alston*.[37]

Nor are "indices of unfairness" present.  Plaintiffs are not being rewarded for failing to join a prior action—Defendants were incentivized to (and did) litigate *Alston* vigorously (*see Alston III*, at 80)—and there are no procedural opportunities available to Defendants here that could cause a different result than the one reached in *Alston*.  *See Syverson*, 472 F.3d at 1079 (describing "indices of unfairness").  And far from there being "multiple inconsistent judgments" on the issues in question (*id.*), courts have repeatedly held that there are relevant markets for the sport-specific athletic services of college athletes and that Defendants enjoy monopsony power in those markets.  *Alston I*, at 1067–70; *O'Bannon I*, at 991–93.  Those holdings have either been affirmed on appeal or Defendants have chosen not to challenge them.  *See O'Bannon II*, at 1070; *Alston III*, at 86.

### C.  Plaintiffs Have Put Forth Sufficient Evidence to Prove Defendants Have Market Power in the Relevant Markets

Even if the Court does consider relevant markets and market power anew, the undisputed facts

---

[37]  *See Keating*, 186 F.3d at 1116 (describing factors analyzed when determining whether issues are identical); *see also McNeil*, 790 F. Supp. at 891–93 (NFL precluded from relitigating relevant market based on findings in prior antitrust cases challenging different restraints).

1    establish there is no reason for a new conclusion.  Defendants and their co-conspirators have monopsony

2    power—the power to collectively depress input prices—in each relevant market, as they comprise *all, or*

3    *virtually all*, of the reasonably interchangeable competitors in those markets.  *See supra* pp. 8–9.

4              This is not a controversial proposition.  Defendants and their co-conspirators have repeatedly been

5    found to have monopsony power in the markets for student-athlete services, and they have repeatedly

6    chosen not to challenge such findings on appeal.  As the Supreme Court put it, "[t]he NCAA *accepts* that

7    its members collectively enjoy monopsony power in the market for student-athlete services, such that its

8    restraints can (and in fact do) harm competition."  *Alston III*, at 90.  Similarly, in *O'Bannon*, the NCAA

9    did not challenge this Court's finding that there was a "market for recruits' athletic services."  *O'Bannon*

10   *I*, at 991; *see also O'Bannon II*, at 1070–71, 1071 n.14.  These holdings are consistent with those of other

11   courts that have found "no dispute that the NCAA enjoys complete power over the labor market within

12   Division I athletics."  *Tennessee TRO Decision*, at *4.

13             The relevant market is "'the area of effective competition'—i.e., 'the arena in which significant

14   substitution in consumption or production occurs."  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 975

15   (9th Cir. 2023) (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018)).  To conduct a relevant

16   market inquiry, "courts must determine which products have a reasonable interchangeability of use or

17   sufficient cross-elasticity of demand with each other."  *Id.* (internal quotation marks omitted).  Cross-

18   elasticity of demand exists "if consumers would respond to a slight increase in the price of one product by

19   switching to another product."  *Todd v. Exxon Corp.*, 275 F.3d 191, 201–02 (2d Cir. 2001) (quotation

20   omitted).  Thus, "the inquiry is whether a 'hypothetical cartel' would be 'substantially constrained' from

21   increasing prices by the ability of customers to switch to other producers."  *Id.* at 202 (internal quotation

22   marks omitted); *see also Epic*, 67 F.4th at 975.

23             Gowrisankaran argues that ███████████████████████████████████████

24   ████████████████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████."  **Ex. 7** (Gowrisankaran

26   Rebuttal), ¶ 61.  But he ███████████████████████████████████████████████████

27   ██████████████████████████████████████████████████.  Such arguments

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT OPINIONS
CASE NO. 4:20-CV-03919-CW

do nothing to undermine Rascher's opinions, supported by economic evidence, that

███████████████████████████████████████. *See supra* pp. 8–9, 26–29; **Ex. 1** (Rascher Rpt.), ¶¶

65–118; **Ex. 3** (Rascher Reply), ¶¶ 60–166.  As this Court has previously found, Division I sports offer a

"combination of a college education, high-level television exposure, and opportunities to enter

professional sports" that is not available "other than from Division I schools." *Alston I*, at 1067; *see*

*O'Bannon I*, at 968 ("[T]here are no professional football or basketball leagues capable of supplying a

substitute for the bundle of goods and services that FBS football and Division I basketball schools

provide."); *see also supra* pp. 18–19; **Ex. 1** (Rascher Rpt.), ¶ 68.  Gowrisankaran proffers

█████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████. *See Todd*, 275 F.3d at

202; **Ex. 7** (Gowrisankaran Rebuttal), ¶¶ 60–88.  In fact, Gowrisankaran agrees that

██████████████████████████████████████████. *See, e.g.*, **Ex. 6** (Gowrisankaran

Rpt.), ¶ 81.  This renders his challenges to Rascher's market definitions implausible, as class members

have no alternative to obtain the unique bundle of opportunities that Division I college sports offers.

Nor is there any genuine dispute about the existence of Defendants' monopsony power.  As

previously noted, Gowrisankaran ████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████████

███████████. *See* **Ex. 7** (Gowrisankaran Rebuttal), ¶ 62 ████████████████████████████

███████████████████████████████████████████████████"); **Ex. 25**

(Gowrisankaran Tr.), 252:2–15 ████████████████████████████████████████████

████████████████████████).  "Market power is generally inferred from the defendant's possession of a

high market share and the existence of significant barriers to entry." *Epic*, 67 F.4th at 983 (quotation

omitted).  Gowrisankaran █████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████████

████████████████████████████. *See* **Ex. 25** (Gowrisankaran

Tr.), 33:6–11.  This means ███████████████████████████████████████████████

█████████████████████████████████████████████████████████. *See* **Ex. 1**

(Rascher Rpt.), ¶¶ 65–118; **Ex. 3** (Rascher Reply), ¶¶ 73, 116–19.  These facts present a market share higher than that required in the case law.  *See Epic*, 67 F.4th at 971, 984–85 (affirming district court's finding that "Apple has market power in the mobile-games-transactions market, evidenced by its 52 to 57% market share and barriers to entry"); *Image Tech. Serv's, Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997) ("Courts generally require a 65% market share to establish a prima facie case of market power.").  As a result, athletes in Division I are "forced to accept, to the extent they want to attend college and play sports at an elite level after high school, whatever compensation is offered to them by Division I schools, regardless of whether any such compensation is an accurate reflection of the competitive value of their athletic services." *Alston I*, at 1070.

Finally, Gowrisankaran cannot raise any genuine issue regarding anticompetitive effects by opining that ████████████████████████████████████████████████. *See* **Ex. 7** (Gowrisankaran Rebuttal), ¶¶ 93–101.  By definition, a horizontal agreement that restrains the competitive terms offered in a labor market causes an anticompetitive effect, as those are the compensation terms a competitive market would produce.  *Alston I*, at 1109.  Defendants cannot dispute this anticompetitive effect by arguing that ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████.  The undisputed facts are that, absent the Prior and Current NIL Rules, the athletes would have received NIL payments, and Defendants ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████.[38]

Because undisputed evidence establishes that Defendants have used their dominance in college athletics to restrict competition, the burden shifts to Defendants to establish procompetitive justifications for their horizontal price-fixing agreement.  *Amex*, 585 U.S. at 541.

---

[38] Further, Gowrisankaran's analysis of the athletes' revenue contribution is clearly unreliable. ██████████████████████████████████████████████.  ECF No. 290-3 (Desser Class Cert. Rpt.), at 52.  Gowrisankaran offers ██████████████████ ████████████████████████████████████████████████

**III. The Evidence Is Undisputed That Defendants Cannot Meet Their Burden to Prove Procompetitive Justifications for the Challenged Rules**

Defendants bear the burden of proving that the Challenged NIL Rules "actually promote [] competition in a relevant market." *O'Bannon Summary Judgment*, at 1150.  To do so, Defendants must produce evidence that: (1) the anticompetitive restraint promotes the proffered justification; and (2) that the proffered justification enhances competition.  *See id.* at 1151; *Tanaka*, 252 F.3d at 1063; *see also Ind. Fed'n of Dentists*, 476 U.S. at 459 (proving anticompetitive effects is "sufficient as a matter of law to establish a [Section 1] violation" where defendants fail to prove "some countervailing procompetitive virtue" for the restraint).  Defendants fail on both counts.  There is no probative evidence that the Prior NIL Rules did, or that the Current NIL Rules do, produce any outcome that qualifies as procompetitive.

For starters, Gowrisankaran ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *See* **Ex. 25** (Gowrisankaran Tr.), 45:10–17, 46:23–47:4.  This leaves Defendants with *zero* evidence of a procompetitive justification for those restraints.  The Court should thus enter summary judgment for Plaintiffs on Defendants' liability regarding the third-party NIL restraints embodied in the Prior NIL Rules.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Such pleas to avoid "ruinous competition" are not a cognizable procompetitive defense under Section 1 of the Sherman Act.  *See F.T.C. v. Super. Ct. Trial Laws. Ass'n*, 493 U.S. 411, 424 (1990); *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978).  And no less an authority than a unanimous Supreme Court just told the NCAA to stop complaining about having to compete: "until Congress says otherwise, the only law it has asked [courts] to enforce is the Sherman Act, and that law is predicated on one assumption alone—'competition is the best method of allocating resources' in the Nation's economy." *Alston III*, at 96 (citation omitted).  Because Defendants' justifications are arguments against competition itself, they are invalid as a matter

of law.  *See Prof'l Eng'rs*, 435 U.S. at 695 ("Even assuming occasional exceptions to the presumed consequences of competition, the statutory policy precludes inquiry into the question whether competition is good or bad.").  As Justice Kavanaugh emphasized in his concurring opinion in *Alston*, "the NCAA is not above the law."  *Alston III*, at 112; *id* at 109 ("[T]here are serious questions whether the NCAA's remaining compensation rules can pass muster under ordinary rule of reason scrutiny.  Under the rule of reason, the NCAA must supply a legally valid procompetitive justification for its remaining compensation rules.  As I see it, however, the NCAA may lack such a justification.").

Defendants' justifications additionally fail as a matter of law because they cross markets.  To legally qualify as a procompetitive justification, the offsetting procompetitive benefit must occur in the same market in which competition is being restrained.  *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 611 (1972) ("If a decision is to be made to sacrifice competition in one portion of the economy for greater competition in another portion, this too is a decision that must be made by Congress and not by private forces or by the courts."); *Alston II*, at 1269–71 (Smith, J., concurring); ECF No. 152, Order Granting in Part and Den. in Part Mot. to Dismiss, at 11–13; *see also Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 703 (7th Cir. 2023) ("One problem with this approach is that it treats benefits to consumers (increased output) as justifying detriments to workers (monopsony pricing).  That's not right; it is equivalent to saying that antitrust law is unconcerned with competition in the markets for inputs, and *Alston* establishes otherwise."); *Amex*, 585 U.S. at 573–74 (Breyer, J., dissenting).  Here, Defendants are trying to justify anticompetitive effects in labor markets for football and basketball players based on putative benefits to athletes in different non-revenue labor markets.  This is a legally invalid position.

## A.  Plaintiffs Are Entitled to Summary Judgment Against Defendants' Competitive Balance Justification

Defendants argue that the Prior and Current NIL Rules were or are necessary to preserve competitive balance.  This argument fares no better here than it did in *O'Bannon*, *Alston*, or in the recent *Tennessee v. NCAA* case, each of which rejected the NCAA's argument that preserving competitive balance was a justification for its compensation restrictions.

To start, the competitive balance defense here is even weaker than it was when this Court rejected it in *O'Bannon* and then again in *Alston*.  In those cases, Defendants were still arguing that the preservation

1   of competitive balance was necessary to maintain consumer demand through its amateurism model.

2   *O'Bannon I*, at 1001.  Although the argument was bereft of evidentiary support, linking competitive

3   balance within a sports league to consumer demand had at least been recognized by some courts.  *See Bd.*

4   *of Regents*, 468 U.S. at 119–20 ("The hypothesis that legitimates the maintenance of competitive balance

5   as a procompetitive justification under the Rule of Reason is that equal competition will maximize

6   consumer demand for the product."); *O'Bannon I*, at 1001 (competitive balance may be a procompetitive

7   justification if it increases demand for a league's product).   Here, however, ███████████████

8   ████████████████████████████████████████████████████████████████████████████

9   ██████████████████████. *See supra* pp. 10–12.

10      Similarly, in the *Tennessee v. NCAA* decision granting a preliminary injunction against certain

11   portions of the Current NIL rules (those portions prohibiting third parties from offering NIL deals to

12   recruited athletes before they commit to a particular school), the court found that "spreading competition

13   evenly across the member institutions by restraining trade is precisely the type of anticompetitive conduct

14   the Sherman Act seeks to prevent."  *Tennessee Prelim. Inj. Decision*, at *4 (finding that competitive

15   balance itself "is not relevant"); *see also Tennessee TRO Decision*, at *4 (noting that competitive balance

16   "has historically been *rejected* as a procompetitive benefit of restrictions on student-athlete

17   compensation").  Further, in light of the principle that cross-market justifications are not permissible as

18   Section 1 justifications—a principle cited favorably by this Court in denying Defendants' motion to

19   dismiss (*see* ECF No. 152, Order Granting in Part and Den. in Part Mot. to Dismiss, at 11–13)—even a

20   competitive balance justification tied to consumer demand should not be cognizable if it cannot be shown

21   to lead to procompetitive effects in the restrained labor markets by preserving the demand which supports

22   athlete jobs.  *Supra* p. 33 (citing cases).

23      Even if Defendants' new permutation of a competitive balance defense passed legal muster, it

24   would fail as a matter of the undisputed facts.  As in *O'Bannon*, the record is replete with admissions of

25   NCAA and conference officials—and Defendants' own experts Langer and Gowrisankaran—that ██████

26   ██████████████████████████. *See supra* p. 11–12; **Ex. 11** (Langer Tr.), 66:21–67:14, 275:17–276:6;

27   **Ex. 25** (Gowrisankaran Tr.), 300:21–302:8 (

28

1   ████████████████████████████████████████████"); *see also O'Bannon I*, at 978–79.

**B.   Plaintiffs Are Entitled to Summary Judgment Against Defendants' Pay-For-Play Justification**

Defendants' pay-for-play justification fares no better.  Defendants' pay-for-play claim lacks any connection to consumer demand, as Defendants have abandoned their decades-old argument that consumers care about the concept of amateurism.[39]  Without any connection to consumer demand or any other economic welfare benefit, Defendants' pay-for-play argument is the opposite of a *procompetitive* justification and has no basis in law: it is an express attempt to suppress the results of a competitive labor market for NIL rights because of a claim that such competition would be "ruinous" to college sports.  The law is clear that such a purported justification must be rejected because Section 1 Defendants are not entitled to a defense based on the claim that the outcome of a competitive market is undesirable.  *Super. Ct. Trial Laws. Ass'n*, 493 U.S. at 424; *Prof'l. Eng'rs*, 435 U.S. at 692.  As the Supreme Court has made clear, if the NCAA believes it is entitled to special treatment under the antitrust laws, Congress is its only forum for making such an argument.  *See Alston III*, at 96; *Prof'l Eng'rs*, 435 U.S. at 689–90.

In addition to this fatal legal defect, Defendants' pay-for-play justification is factually unsupportable.  No institution in the United States can rival Defendants' uncanny ability to say one thing while doing the opposite.  It is undisputed that the NCAA **already** distinguishes between NIL and performance compensation, prohibiting the latter while permitting third-party compensation in the former category.  *See supra* p. 4; *see also supra* p. 13 (President Baker reaffirming commitment to enforcing pay-for-play rules following additional changes to third-party NIL rules).  Undisputed evidence also shows that Defendants have proposed plans allowing for direct NIL payments, *without allowing pay for play*. *Supra* pp. 12-13, 18.  Most notably, NCAA President Baker recently proposed to revise the Current NIL Rules to permit schools and conferences to make direct NIL payments, without any indication that such changes would impact the remaining pay-for-play rules.  *See* **Ex. 32** (Baker Proposal) & **Ex. 30** (████████████████████████).  To the contrary, he has made the admission, binding on Defendants, that permitting

---

[39] This Court has previously suggested that avoiding pay for play is a cognizable procompetitive justification only to the extent the restraints at issue "[a]re necessary to maintain consumer demand." *See Alston I*, at 1098–101. ████████████████████████████████████████████████████████████████

1    such direct payment would actually strengthen—not weaken—college sports.  **Ex. 30** (Baker Letter to

2    Athletes) ("I recently shared a proposal with Division I membership that is a positive step to modernize

3    college sports in an equitable fashion and best support your academic and athletic success.").  Based on

4    this record, Defendants have not raised a genuine issue of fact on a procompetitive justification for the

5    Challenged NIL Rules based on preventing pay for play.

6       **C.  Plaintiffs Are Entitled to Summary Judgment on Defendants' Claim That the Current
             NIL Rules Are Necessary to Support a Reallocation of Economic Benefits to Other
7            Athletes or Less Profitable Conferences**

8           Defendants claim that the Current NIL Rules are justified by the need to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮)" (**Ex.**

10   **6** (Gowrisankaran Rpt.), ¶ 64), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12   (*id.* ¶¶ 136–51).  But these purported justifications are nothing short of a desire to redistribute revenues

13   earned by more competitive athletic programs to weaker ones as a result of the efficient operation of

14   competitive labor markets.  This is the opposite of a procompetitive justification as a matter of law.

15          Antitrust laws "were enacted for the protection of *competition*, not *competitors*."  *Brunswick Corp.*

16   *v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (internal quotation marks omitted).  For this reason,

17   the desire to reallocate the outcomes of a competitive market are not procompetitive justifications.  *See*

18   *supra* pp. 32–33.  Defendants' argument is, in essence, that it is necessary to protect athletes who are

19   weaker competitors (and thus would not obtain NIL payments) and conferences who are weaker (and thus

20   would lose the most talented athletes to NIL competition) because it is socially desirable to do so.  But

21   under Section 1 of the Sherman Act, as well as established principles of industrial organization economics,

22   it is not up to private competitors, like the NCAA, to determine that the allocation outcome of competition

23   is not desirable.  *See* **Ex. 36** (Williams Tr.), 43:24–44:2 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.").  Defendants tried to convince the Supreme Court that their

26   social and policy preferences deserve greater deference under Section 1, but that position was unanimously

27   and resoundingly rejected.  *Alston III*, at 87–96.

28

1    Defendants' claim that the goal to expand the number of student athletes the schools will support

2    is "output-expanding" is an impermissible attempt to make "cost-cutting" a procompetitive justification.

3    Although enhancing output can be a procompetitive justification in certain circumstances—for instance,

4    where collaboration is necessary to produce a product that otherwise would not exist—that is not what

5    Defendants claim here.  Instead, the crux of Defendants' position is that it would be too expensive for

6    certain schools (competitors) to continue to support non-revenue sports programs and investments that

7    purportedly benefit student athletes (such as exorbitant coaching and administrator salaries, as well as

8    luxury facilities) to the same degree if they were *permitted* to make direct NIL payments.  Setting aside

9    the factual bankruptcy of this argument (*supra* pp. 13–17), "cost-cutting by itself is not a valid

10    procompetitive justification." *Law*, 134 F.3d at 1022–23 ("We are dubious that the goal of cost reductions

11    can serve as a legally sufficient justification for a buyers' agreement to fix prices even if such cost

12    reductions are necessary to save inefficient or unsuccessful competitors from failure.").

13    Gowrisankaran himself has admitted that ███████████████████████████

14    ████████████████████████████████████████████████████████████████████

15    ████████████████████████████████████████████. *See* **Ex. 25** (Gowrisankaran

16    Tr.), 122:15–123:5.  And while he tried to claim at his deposition that ████████████████

17    ████████████████████████████████ Moreover, if there was such an

18    externality, that would be no different than the one claimed in *National Society of Professional Engineers*,

19    which is something only Congress, not private parties, can redress.  *See* 435 U.S. at 689–90.

20    Nor is it a legally valid justification for Defendants to argue that ████████████████

21    ████████████████████████████████████████████████████████████████████

22    ████████████████████████████████████████████████████████████████████

23    ████████████████████████████████████████████. **Ex. 6**

24    (Gowrisankaran Rpt.), ¶¶ 95–99.  Putting aside the fact that this wealth transfer from poorer, minority

25    athletes in Division I basketball and football to wealthier and predominantly white athletes in the non-

26    revenue sports is not a "public good" (*see supra* n.22), antitrust law simply does not allow private

27    competitors to decide for themselves that the economic outcome of competitive markets is socially

28

1   undesirable.  *See supra* p. 32–33 (citing cases).  Further, as Rascher and Williams demonstrate,

2

3

4

5   ████████████████████████████████████████████████████.  **Ex. 2** (Rascher PCJ Rebuttal), ¶¶ 95–110; *see*

6   **Ex. 5** (Williams Rpt.), ¶ 5 ("█████████████████████████████████████████████████████████

7   ███████████████████████████

8          Moreover, Defendants' claim that athletes benefit as much when the salary of an Athletic Director

9   is doubled, or a head football coach is given a $75 million severance payment, as they would from

10   receiving payments for their NIL, is wrongheaded.  Simply put, if the new football coach at Alabama only

11   makes $8 million, instead of the $10.8 million he will now be paid (after making $4.2 million at his prior

12   school), but Alabama athletes can receive NIL payments, the athletes will be better—not worse—off.  *See*

13   **Ex. 57** (Dep. Ex. 929); **Ex. 11** (Langer Tr.), 125:3–128:11.  Or as now-former Michigan head football

14   coach Jim Harbaugh recently stated, student athletes will be better off if coaches stop "robbing" them of

15   their rightful share of broadcast revenues.[40]

16          Even if reallocating revenues was considered a possible procompetitive justification, Defendants

17   have failed to put forward any probative evidence to substantiate it.  For example, Defendants have

18   ████████████████████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████.[41]  Further, Defendants have made it clear that if

20   they permit direct NIL payments in the future—as President Baker has ██████████████████████

21   ████████████████████████████████████████████████████████████████.  *Supra*

22   p. 16–17.  Indeed, NCAA rules already *require* a minimum number of sports to be sponsored to compete

23   in Division I.[42]  Similarly, ████████████████████████████████████████████████████████

---

[40] **Ex. 55** (Matt Wadleigh, *Michigan Coach Harbaugh Makes NIL Revenue Sharing Suggestion*, Sports Illustrated (Jan. 8, 2024)).

[41] *See, e.g.*, **Ex. 18** (ACC 30(b)(6) (Hostetter) Tr.), 261:21–262:2 ("O██████████████████████████

[42] **Ex. 40** (2022–23 NCAA D1 Manual), Bylaw 20.10.6, 20.10.9.1; **Ex. 41** (2023–24 NCAA D1 Manual), Bylaw 20.10.6, 20.10.9.1; **Ex. 28** (NCAA 30(b)(6) (Fraser) Tr.), 47:2–18 ███████████████████████████████████████████████████████████████████████████████").

38

1     ████████████████████████████████████████.[43]   Gowrisankaran did not

2 consider any of this in reaching his speculative opinion that ████████████████

3 ████████████████████████████████████. *See* **Ex. 25** (Gowrisankaran Tr.),

4 308:10–313:1.  Moreover, Gowrisankaran admitted that ████████████████████

5 ████████████████████████████████████████████████████████████████████

6 ████████████████████████████ *See id.* at 179:16–184:9.

7      On top of this, the undisputed evidence ████████████████████████

8 ████████████████████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████████████

11 ████. **Ex. 2** (Rascher PCJ Rebuttal), ¶ 178 (████████████████████████

12 ████████████████████████████████████████); *see* **Ex. 1** (Rascher Rpt.), ¶ 103.

13 ████████████████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████. **Ex. 2** (Rascher PCJ

15 Rebuttal), ¶ 120 n.112.  These undisputed economic facts show ██████████████

16 ████████████████████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████████████████████

18 ████. *See id.* ¶ 120.  While Defendants' experts try to analogize the schools to households with a fixed

19 budget, the Power Five schools that will make almost all the NIL payments are more akin to a household

20 that won the lottery.  Schools outside the Power Five will only make those NIL payments they can afford.

21      Indeed, as Rascher has shown, ████████████████████████████████

22 ████████████████████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████████████████

24 ████████████████████████████████████████████████. *Id.* ¶ 31.

25 ████████████████████████████████████████████████████████████████████

26 ████████████████" *Id.* ¶¶ 171–72.  The most recent example is new school investments in third-party

27 _____

28 [43] *Supra* n. 26.

<div align="center">39</div>

1   NIL platforms for their student athletes.[44]   Meanwhile, under the Current NIL Rules, the Knight

2   Commission projects that Power Five schools will, by 2032, pay more to 11 football coaches per school

3   than they spend on academic scholarships and medical care for more than 30,000 athletes.  **Ex. 39** (Knight

4   Commission Report), at 2.  On this record, there is no support for Defendants' claim that permitting direct

5   NIL payments will cause a loss of funding to athletic department investments that actually benefit athletes.

6          Finally, Defendants cannot raise a genuine issue of material fact in support of their claim that █████

7   ████████████████████████████████████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████████████████████████████████████

9   ██████████████).[45]   *See* **Ex. 6** (Gowrisankaran Rpt.), ¶¶ 136–51.   In contrast to their expert's

10  speculation, the undisputed facts show that ██████████████████████████████████████████████████

11  ███████████████████████████████████████████.  *See supra* p. 17.   Moreover, ████████████████

12  ████████████████████████████████████████████████████████████████████████████████████████████

13  ██████████████.  *See* **Ex. 25** (Gowrisankaran Tr.), 298:3–15.  Instead, President Baker has proposed further

14  concentration of the top revenue schools in his new proposal and has concluded that such a concentration

15  would be better for college sports, student athletes, and competitive balance.  **Ex. 30** (Baker Letter to

16  Athletes); **Ex. 32** ██████████████).

17      **D.  Title IX Is Not a Procompetitive Justification and There Is No Evidence That the**
        **Challenged NIL Rules Are Needed for Schools to Comply With Title IX**
18
           In their interrogatory responses, ████████████████████████████████████████████████████
19
    ██████████████████████████████████.[46]   They have again put forward Barbara
20
21  Osborne—whose testimony and opinions this Court previously excluded—as an affirmative and rebuttal

22  _____
    [44] *See, e.g.*, **Ex. 47** (Pollard Tr.), 77:8–78:3; **Ex. 48** (Weiberg Tr.), 156:12–157:18; *supra* pp. 5–6.
23  [45] Defendants' claim that the Current NIL Rules are necessary to allow teams to continue competing at
        the highest level of college sports is specious considering they have recently passed a rule to "[i]ncrease
24      the application fee for transitioning from FCS to FBS from $5,000 to $5 million"—*i.e.*, making it more
        difficult for teams to join the highest level of college sports.  **Ex. 42** (Article on Changes to Notification-
25      of-Transfer Windows).  If Defendants were really concerned with allowing smaller conferences to
        compete, they could reduce these fees to zero and allow those schools to reinvest their money in their
26      student athletes.
    [46] *See, e.g.*, **Ex. 24** (NCAA's Suppl. Resps. & Objs. to Pls.' 1st Set of Interrogs.), at 16 ██████████
27  ██████████████████████████████████████████████████████████████████████████████████████████
28  ████████████████████████████████████████████████████████████████.'").

                                              40

1    expert to opine on issues surrounding Title IX.  For the reasons set forth below in support of Plaintiffs'

2    motion to exclude (*see infra* pp. 46–50), the Court should once again strike Osborne's Title IX opinions.

3          But in any event, Osborne admitted at her deposition that ███████████████████

4    ████████████████████,[47] and in addition, the Court should rule that, as a matter of law,

5    compliance with Title IX is not a cognizable procompetitive justification.  *See Alston III*, at 94–95 ("This

6    Court has regularly refused materially identical requests from litigants seeking special dispensation from

7    the Sherman Act on the ground that their restraints of trade serve uniquely important social objectives

8    beyond enhancing competition.").   As discussed above, procompetitive justifications must enhance

9    competition and promote economic welfare rather than endorse social or policy objectives.  *See Prof'l*

10   *Eng'rs*, 435 U.S. at 692 (rejecting public safety justification for a restraint and holding "the purpose of the

11   [rule of reason] analysis is to form a judgment about the competitive significance of the restraint; it is not

12   to decide whether a policy favoring competition is in the public interest, or in the interest of the members

13   of an industry"); *Super. Ct. Trial Laws. Ass'n*, 493 U.S. at 424 (boycott by lawyers in support of greater

14   funds for indigent representation could not be justified by social policy objectives).

15          Further, Defendants agree they are *already* required to comply with Title IX *regardless* of whether

16   the Current NIL Rules are enjoined.[48]  Defendants ignore the basis of a procompetitive justification—that

17   *the challenged conduct* is necessary to enhance competition—not that the challenged conduct is necessary

18   for Defendants' member schools to meet their legal obligations.  Just as a company could not defend price-

19   fixing by relying on copyright laws, compliance with Title IX does not act as a shield to justify violating

20   the Sherman Act.   *See, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 63 (D.C. Cir. 2001)

21   ("Intellectual property rights do not confer a privilege to violate the antitrust laws.") (quotation omitted).

22          But even if the Court considers this a cognizable justification, Defendants have not raised any

23   genuine issue of material fact in support of their claim that they could not pay for NIL without violating

24   ───────────────────────────────
     [47] *See* **Ex. 49** (Osborne Tr.), 25:12-20.
25   [48] **Ex. 28** (NCAA 30(b)(6) (Fraser) Tr.), 39:12–40:16 ███████████████████

26   ███████████████████████████████████████████████████████

27   ███████████████████████████████████████████████████████

28   ███████████████████████████████████████████████████████ ").

Title IX.  *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997) (defendant "must produce significant probative evidence that demonstrates that there is a genuine issue of material fact"). If Title IX applies to such direct NIL payments, then it just means that Defendants will have to consider gender equality when making them, as President Baker has stated in his proposal to permit such payments. **Ex. 30** (Baker Letter to Athletes). ████████████████████████████████████████████████████████████████████████████ [49]

Alternatively, if Title IX does not apply, then it is irrelevant to this issue.  Defendants currently spend unequal amounts on women's and men's sports without violating Title IX.[50]  And conferences should not be subject to Title IX for BNIL payments if they do not receive government funds.  *See* 20 U.S.C. § 1681.  But in either situation—whether or not Title IX applies—this could not be a procompetitive justification for a Section 1 violation.

## IV.  Plaintiffs Have Met Their Burden With Undisputed Evidence of Less Restrictive Alternatives

Because Defendants have failed to meet their burden to prove any of their proffered procompetitive justifications, there is no need for the Court to consider less restrictive alternatives or to balance the competitive effects of the restraints.  *See Ind. Fed'n of Dentists*, 476 U.S. at 464–66; *Law*, 134 F.3d at 1021.  But, even if there was a triable issue on Defendants' procompetitive justifications, the existence of less restrictive alternatives that would be virtually as effective is beyond dispute.

Indeed, as explained *supra* pp. 17–18, the Current NIL Rules are already less restrictive than the

---

[49] **Ex. 18** (ACC 30(b)(6) (Hostetter) Tr.), 261:3–20 ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

██████ ; **Ex. 45** (Warren Tr.), 96:18–97:4 █████████████████████████████████████████████████

██████████████████████████████████████████ ), ¶ 263; *see also* **Ex. 49** (Osborne Tr.),

180:13–23 ███████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ .

[50] **Ex. 28** (NCAA 30(b)(6) (Fraser) Tr.), 45:25–46:5 ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

██████ ); **Ex. 29** (Bowlsby Tr.), 95:1–9 ( ████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████ ").

Prior NIL Rules because they permit third-party NIL, and since the implementation of the Current NIL Rules, thousands of class members have received third-party compensation without any resulting harm to college sports.  Thus, at a minimum, ████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

██████████████.  *See* **Ex. 1** (Rascher Rpt.), ¶ 128.

There are also less restrictive alternatives to the Current NIL Rules and the portion of the Prior NIL Rules which banned direct NIL payments.  For example, the current restraints could be replaced with the proposal of President Baker, which would permit direct NIL payments while also imposing minimum spending requirements on conferences and schools.  Baker has declared that this less restrictive proposal would be in the interests of the NCAA and its athletes and accomplish many of their objectives.  *See* **Ex. 30** (Baker Letter to Athletes); **Ex. 32** ████████████).

Another less restrictive alternative for the Current NIL Rules would be to replace them with a system that would allow individual conferences to make their own NIL-related rules in competition with each other.  As explained above, there is no evidence that NCAA restrictions on NIL compensation are necessary to promote any legitimate procompetitive justification, but if such a justification exists, ██

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ (*supra* p. 18),

███████████████████████████████████████████████████████████████████████

██████████.  *See* **Ex. 1** (Rascher Rpt.) ¶¶ 129–34.  Further, the NCAA could impose additional guardrails as a less restrictive restraint—consistent with the Baker proposal—that would enhance current rules for supporting non-revenue sports, and even, if necessary, adopt a rule to bar conference realignment, if that is found to be a procompetitive objective.

In short, the undisputed facts establish that the NCAA itself knows that less restrictive alternatives exist to allow direct NIL payments, while effectively preserving any claimed procompetitive objective.

## V.   The Opinions of Gowrisankaran and Osborne Are Irrelevant and Unreliable and the Court Should Exclude Them

### A.   Federal Rule of Evidence 702 and *Daubert* Standards

The proponent of expert testimony bears the burden of establishing its admissibility.  *Bldg. Indus.*

*Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012).  The Ninth Circuit has explained that Rule 702 requires that the evidence "assist the trier of fact, or in other words, that it be ***relevant***" to the issues presently before the Court.  *Guidroz-Brault v. Mo. Pac. R.R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001) (emphasis added) (internal quotation marks omitted).  Further, Rule 702 demands that expert testimony be ***reliable***—that it "relate to scientific, technical, or other specialized knowledge, which does not include unsupported speculation and subjective beliefs." *Id.*

Under Rule 702, "'matters of law are inappropriate subjects for expert testimony.'"  *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 337 (9th Cir. 2017) (quoting *Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1052 (9th Cir. 2012)).  Rule 702 "requir[es] trial judges to serve as 'gatekeepers' to all expert testimony to ensure it meets these requirements." *United States v. Campos*, 217 F.3d 707, 719 (9th Cir. 2000) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993)).

**B. Gowrisankaran's Opinions on Procompetitive Justifications Are Contrary to Legal Standards and Thus Should Be Excluded as Irrelevant and Prejudicial**

For expert testimony to be relevant under Rule 702 and *Daubert*, it must have "a valid connection to the pertinent inquiry."  *See Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010).   Here—as demonstrated above—Gowrisankaran advances ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████. *See supra* pp. 32–40.  Such opinions are diametrically at odds with established Supreme Court precedent and thus useless and confusing to the jury.  *See Super. Ct. Trial Laws. Ass'n*, 493 U.S. at 424 ("The social justifications proffered for respondents' restraint of trade thus do not make it any less unlawful."); *Prof'l Eng'rs*, 435 U.S. at 692.

As shown above, Gowrisankaran bases his justification opinion ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████. *Supra* pp. 32–40.  At deposition, he claimed ████████████████████████████████████████ **(Ex. 25** (Gowrisankaran Tr.), 112:15–117:6), but no case has ever accepted, or even discussed, that concept.  Instead, as this Court has recognized, trying to justify restraints in the revenue sports markets by arguing

44

1   it will yield benefits in the non-revenue sports markets is not a cognizable justification. *Supra* pp. 32–33.

2   All of these social policy justifications should thus be excluded as irrelevant and unhelpful to the jury.

3       Gowrisankaran's opinions on procompetitive justifications are also unreliable and inadmissible

4   because they are the opposite of established principles of industrial organization economics in

5   differentiating between procompetitive and anticompetitive effects. *See* **Ex. 36** (Williams Tr.), 81:8–21

6   ████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████

8   ███████████████████████████.");  **Ex. 5** (Williams Rpt.), ¶¶ 21–55; **Ex. 2** (Rascher PCJ Rebuttal), ¶ 13

9   ████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████

12  █████████████████████."); *see generally id.* ¶¶ 12–49.

13      It is the Court's province and duty to exclude legally irrelevant opinions in these circumstances,

14  which can only confuse the jury. *See United States v. Rincon*, 28 F.3d 921, 926 (9th Cir. 1994) ("District

15  courts must strike the appropriate balance between admitting reliable, helpful expert testimony and

16  excluding misleading or confusing testimony."); *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 2012 WL

17  2571332, at *10 (N.D. Cal. June 30, 2012) (excluding expert testimony that "[wa]s not relevant to any

18  legal issues" and where "any potential relevance [wa]s outweighed by the risk of confusing the issues");

19  *see also* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially

20  outweighed by a danger of . . . confusing the issues [or] misleading the jury"); *City of Long Beach v.*

21  *Standard Oil Co. of Cal.*, 46 F.3d 929, 938 (9th Cir. 1995) (affirming decision to exclude evidence that

22  "would have injected needless confusion" into case); *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875

23  F.2d 1369, 1379–80 (9th Cir. 1989) (similar).

24  **C.   Osborne's Opinions Are Irrelevant and Unreliable and the Court Should Exclude Them**

25      Defendants previously attempted to put forth Barbara Osborne as a Title IX expert in this case in

26  opposing Plaintiffs' Motion for Class Certification, and this Court granted Plaintiffs' motion to exclude

27

28

Osborne's testimony in its entirety "as impermissible legal conclusions and as unreliable."[51]   More specifically, the Court found that Osborne's opinions amounted to improper legal conclusions because she attempted to opine on "what Title IX requires or does not require, based on her understanding of the history of Title IX or otherwise."[52]   The Court further found her opinions unreliable because (1) her experience as a Title IX "consultant" did not render her qualified to offer them, and (2) she failed to provide reliable evidence to support them.  Defendants once again offer Osborne as an expert on the merits of this case to opine on issues surrounding Title IX and Plaintiffs' requested relief.  For the reasons set forth below, the Court should again exclude Osborne's opinions in their entirety.

### 1. Osborne's Opinions Should Be Excluded Because She Is Again Attempting to Offer Improper Legal Opinions

As this Court explained when it previously excluded Osborne's opinions, "[t]he plain language of Federal Rule of Evidence 702 is clear that an expert may testify in the form of an opinion if her testimony 'will help the trier of fact to understand the *evidence* or to *determine a fact* in issue.' . . . . 'Expert testimony is not proper for issues of law.  Experts interpret and analyze factual evidence.  They do not testify about the law[.]'"[53]   *See also Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) ("[A]n expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law. Similarly, instructing the jury as to the applicable law is the distinct and exclusive province of the court.") (emphasis in original) (internal quotations marks omitted).

Osborne admits that ████████████████████████████████████████,[54] and as the Court aptly observed when it previously excluded her opinions at the class certification phase, "[g]iven that Title IX is a law, it would stand to reason that being a 'Title IX expert' would make one an expert on Title IX law."[55]   Despite Osborne's repeated insistence that she is not offering any legal opinions,[56] it is clear that the central purpose of her reports is (again) to do precisely that.  The first paragraph of Osborne's merits rebuttal report explicitly states that she was ███████████████████████████████████████

---

[51] **Ex. 50** (Order Excluding Osborne), at 18.
[52] *Id.* at 12.
[53] *Id.* at 10 (internal citations omitted).
[54] *See* **Ex. 49** (Osborne Tr.), 102:1–4 ██████████████████████████████████.").
[55] **Ex. 50** (Order Excluding Osborne) at 16.
[56] *See, e.g.*, **Ex. 49** (Osborne Tr.), 18:10, 18:14–15.

1

2                                                                          ."[57]   And while this

3   time around she attempts to avoid the Court's prior ruling by

4

5                            ,[58]  she is still offering improper interpretations of the law and its application to the

6   issues in this case.

7            For example, Osborne opines that

8

9

10

11

12                                  ."[59]   Her report further states that,

13

14

15

16                     ."[60]   And she goes on to draw the conclusion that

17

18

19                     ."[61]   Regardless of how Osborne has tried to reframe her opinions

20                                  ), this is clearly a thinly-disguised attempt to revive the same legal opinions

21   that this Court already excluded.   Indeed, Osborne admitted during her deposition that

22

23

24   [57] **Ex. 10** (Osborne Rebuttal), ¶ 1.

25   [58] *See* **Ex. 49** (Osborne Tr.), 50:11–16
                                                           .").

26   [59] **Ex. 10** (Osborne Rebuttal), ¶ 65; *see also* **Ex. 49** (Osborne Tr.), 60:14–19
                                            .").

27   [60] **Ex. 10** (Osborne Rebuttal), ¶ 71.

28   [61] *Id.*



.[62]

It is for the Court to decide how Title IX should be interpreted and whether the law has any application to the issues in this case (it does not). As it did in excluding Osborne's previous report, the Court should again find the opinions set forth in her merits reports are simply "a reflection of Osborne's application of her interpretation of Title IX's requirements to the facts of the case."[63] Moreover, even if the Court finds that Osborne is no longer offering her *own* legal opinions, it should nevertheless exclude her testimony under Rule 702 because she purports to opine on —and thus attempts to offer impermissible *hearsay* legal opinions.

**2. Osborne's Opinions Should Also Be Excluded Because They Are Unreliable**

Osborne's opinions should also be excluded because they are irrelevant and unreliable. Rule 702 demands reliable expert testimony, which must be "based on sufficient facts or data" and must be the product of the expert's reliable application of "reliable principles and methods" to the facts of the case. Fed. R. Evid. 702. Reliance on anecdotal observations or unfounded subjective beliefs does not satisfy the requirements under Rule 702. *Cloud v. Pfizer Inc.*, 198 F. Supp. 2d 1118, 1133–34 (D. Ariz. 2001) (reliance on compilations of occurrences do not satisfy Rule 702 or *Daubert I*) (citing *Jones v. United States*, 933 F. Supp. 894, 899–900 (N.D. Cal. 1996), *aff'd* 127 F.3d 1154 (9th Cir.1997), *cert. denied* 524 U.S. 946 (1998)).

Osborne opines in her report that ."[64] But Osborne is not qualified to offer this opinion and she provides no reliable methodology to support it. Indeed, she admitted

[62] *See* **Ex. 49** (Osborne Tr.), 80:15–20

[63] **Ex. 50** (Order Excluding Osborne), at 12.

[64] **Ex. 10** (Osborne Rebuttal), ¶ 21.

1  during her deposition that █████████████████████████████████████████████

2  ████████████████████████████████████████████████████████.[66]  More importantly,

3  Osborne admitted in her deposition that she ████████████████████████████████

4  █████████████████████████████████████████████████████████████████████████

5  █████████████████████████████████████████████████████████████████████████.[67]

6  But Osborne's opinions about what ██████████████████████████████████████████

7  █████████████████████████████████████████████████████████████████████████

8  ██.[68]  Moreover, to the extent Osborne suggests that █████████████████████████

9  ██████, her conclusions are not relevant to the issues in this case if █████████████

10  ██████████████████████████████████████████████.

11       Moreover, as was the case in her previous report, Osborne's overarching opinions are based on

12  █████████████████████████████████████████████████████████████████████████

13  █████████████████████████████████████████████████████████████████████████

14  █████████████████████████████████████████████████████████████████████████

15  █████████████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████,"[69] this is simply not

17  supported by the evidence.

18       Indeed, while Osborne suggests in her report that ████████████████████████

19  █████████████, she acknowledged during her deposition that ████████████████████

20  ██████████████████████████.[70]  After their efforts were unsuccessful, the NCAA filed a lawsuit

21  challenging the legality of Title IX, and it continued to argue for years that Title IX would destroy

22  intercollegiate athletics.  And the unfortunate reality is that, even fifty years later, the NCAA has done

23  little to truly ensure gender equity in college sports.  After the lead plaintiff in this case, Sedona Prince,

24  exposed significant gender disparities at the 2021 March Madness basketball tournament, the NCAA

---

[65] **Ex. 49** (Osborne Tr.), 27:22–25.
[66] *Id.*, 19:5–13.
[67] *Id.*, 195:6–19.
[68] *Id.*, 41:21–42:7.
[69] **Ex. 56** (Osborne Rpt.), ¶ 19; **Ex. 10** (Osborne Rebuttal), ¶ 47.
[70] *See* **Ex. 49** (Osborne Tr.), 128:9–13.

49

commissioned an independent gender equity report which revealed that "gender disparities in the NCAA championships stem from the structure and culture of the NCAA itself."[71]  Among other things, that report found that "the NCAA's simultaneous failure to put in place systems to identify, prevent, and address gender inequities across its championships has allowed gender disparities in these and other sports to persist for too long."[72]  The NCAA disclaims any responsibility for enforcing Title IX compliance among its members and numerous recent studies have revealed significant inequities and widespread non-compliance with Title IX at schools across all NCAA divisions, including disproportionately more athletic opportunities provided to male athletes and shortfalls in the investment of resources in women's athletic programs.[73]  Given the NCAA's historical lack of commitment to gender equity and the current lack of Title IX compliance among its schools, Osborne's assumption that ███████████████████████ ███████████████████████████ is unfounded and unreliable.

Osborne's subjective beliefs, untethered to the evidence in this case or any actual methodology, "do not rise to the level of expert opinions" under Rule 702 and should be excluded. *Great W. Air, LLC v. Cirrus Design Corp.*, 2019 WL 6529046, at *10 (D. Nev. Dec. 4, 2019) (strongly held personal beliefs based on experience "do not rise to the level of expert opinions").

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that their motion for summary judgment and motions to exclude be granted.

---

[71] **Ex. 51** (NCAA External Gender Equity Review, Phase II), at 2.
[72] *Id.*
[73] *See* **Ex. 52** (Women's Sports Foundation, *50 Years of Title IX: We're Not Done Yet*), at 9, 33–34; **Ex. 53** (Chronicle of Higher Education, *Hundreds of Colleges May Be Out of Compliance with Title IX*); **Ex. 54** (Kenny Jacoby *et al.*, *Title IX: Falling Short at 50, Female Athletes Stiffed on Scholarships at Some of the Biggest Colleges in the Country*, USA Today (Dec. 15, 2022)).

Dated: April 3, 2024

Respectfully submitted,

By  */s/ Steve W. Berman*

    Steve W. Berman (*Pro hac vice*)
    Emilee N. Sisco (*pro hac vice*)
    Stephanie Verdoia (*pro hac vice*)
    Meredith Simons (SBN 320229)
    HAGENS BERMAN SOBOL SHAPIRO LLP
    1301 Second Avenue, Suite 2000
    Seattle, WA 98101
    Telephone: (206) 623-7292
    Facsimile: (206) 623-0594
    steve@hbsslaw.com
    emilees@hbsslaw.com
    stephaniev@hbsslaw.com
    merediths@hbsslaw.com

    Benjamin J. Siegel (SBN 256260)
    HAGENS BERMAN SOBOL SHAPIRO LLP
    715 Hearst Avenue, Suite 300
    Berkeley, CA 94710
    Telephone: (510) 725-3000
    Facsimile: (510) 725-3001
    bens@hbsslaw.com

    Jeffrey L. Kodroff (*pro hac vice*)
    Eugene A. Spector (*pro hac vice*)
    SPECTOR ROSEMAN & KODROFF, PC
    2001 Market Street, Suite 3420
    Philadelphia, PA 19103
    Telephone: (215) 496-0300
    Facsimile: (215) 496-6611
    jkodroff@srkattorneys.com
    espector@srkattorneys.com

    *Class Counsel for Plaintiffs*

By  */s/ Jeffrey L. Kessler*

    Jeffrey L. Kessler *(pro hac vice)*
    David G. Feher *(pro hac vice)*
    David L. Greenspan *(pro hac vice)*
    Adam I. Dale *(pro hac vice)*
    Sarah L. Viebrock *(pro hac vice)*
    Neha Vyas (*pro hac vice*)
    WINSTON & STRAWN LLP
    200 Park Avenue
    New York, NY 10166-4193
    Telephone: (212) 294-6700
    Facsimile: (212) 294-4700
    jkessler@winston.com
    dfeher@winston.com
    dgreenspan@winston.com
    aidale@winston.com
    sviebrock@winston.com
    nvyas@winston.com

    Jeanifer E. Parsigian (SBN 289001)
    Drew H. Washington (SBN 350107)
    WINSTON & STRAWN LLP
    101 California Street, 35th Floor
    San Francisco, CA 94111
    Telephone: (415) 591-1000
    Facsimile: (415) 591-1400
    jparsigian@winston.com
    dwashington@winston.com

    *Class Counsel for Plaintiffs*

1

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)

Pursuant to Civil Local Rule 5-1(i)(3), the filer of this document attests that concurrence in the filing of this document has been obtained from the signatories above.

By: */s/ Steve W. Berman*
Steve W. Berman