# EXHIBIT 28

```
 1                   UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
 2                         OAKLAND DIVISION
                     CASE NO. 4:20-cv-03919-CW
 3
     GRANT HOUSE and SEDONA PRINCE,   )
 4   on behalf of themselves and all  )
     others similarly situated,       )
 5                                    )
                         Plaintiffs,  )
 6                                    )
           -vs-                       )
 7                                    )
     NATIONAL COLLEGIATE ATHLETIC     )
 8   ASSOCIATION; PAC-12 CONFERENCE;  )
     THE BIG TEN CONFERENCE, INC.;    )
 9   SOUTHEASTERN CONFERENCE; and     )
     ATLANTIC COAST CONFERENCE,       )
10                                    )
                         Defendants.  )
11

12               NETWORK STRICTLY CONFIDENTIAL

13

14        The 30(b)(6) videotaped deposition upon oral

15   examination of Jennifer Fraser, a witness produced

16   and sworn before me, Dana S. Miller, RPR, CRR, a

17   Notary Public in and for the County of Boone, State

18   of Indiana, taken on behalf of the Plaintiffs at the

19   offices of Faegre Drinker Biddle & Reath LLP, 300

20   North Meridian Street, Suite 2500, Indianapolis,

21   Marion County, Indiana, on the 14th day of

22   September, 2023, at 9:10 a.m., pursuant to the

23   Federal Rules of Civil Procedure.

24

25
```



```
 1   Q   Oh, thank you.
 2   A   Appreciate it.
 3   [REDACTED]
 4   [REDACTED]
 5   [REDACTED]
 6       Do you see that?
 7   A   I do.
 8   Q   And in the next kind of large bullet point, it
 9   [REDACTED]
10   [REDACTED]
11   [REDACTED]
12       Do you see that?
13   A   I do.
14   Q   Does that reflect that the Transformation Committee
15       considered direct NIL payments from institutions to
16       be a different thing than straight pay-for-play?
17   A   It did.
18           MS. ARAT:  Object to form.
19           THE WITNESS:  I'm sorry, Cali.
20   A   It did.
21           (Deposition Exhibit(s) 251 marked for
22       identification.)
23           THE WITNESS:  Thank you.
24   Q   Ms. Fraser, the court reporter is handing you
25       Exhibit 250.  This is --
```



```
 1        were permissible, and I think this is suggesting
 2        that the publishing of the value of the awards
 3        required to award on a gender-equitable basis is a
 4        commitment that's being recommended by the Board of
 5        Governors Congressional Subcommittee.  I don't read
 6        it as being like legislative recommendation as much
 7        as a commitment to those things.
 8    Q   Okay.  I will say that the first bullet here says
 9        ███████████████████████████████████████████████████
10        doesn't include any limit on it that I understand
11        academic performance awards to have been allowed
12        only up to a certain limit.
13            So my question is whether this is suggesting
14        consideration of unlimited academic performance
15        awards?
16            MS. ARAT:  Object to the form.
17    A   No, I don't believe it was.
18    Q   Okay.  I'm going to ask you to flip a couple of
19        ███████████████████████████████████████████████████
20        ███████████████████████████████████████████████████
21    A   Sure.
22        ███████████████████████████████████████████████████
23        ███████████████████████████████████████████████████
24        ███████████████████████████████████████████████████
25        ███████████████████████████████████████████████████
```



```
 1      [REDACTED]
 2      [REDACTED]
 3           Do you see that?
 4   A  I do.
 5      [REDACTED]
 6      [REDACTED]
 7      [REDACTED]
 8      [REDACTED]
 9      [REDACTED]
10           Do you see that?
11   A  I do.
12      [REDACTED]
13      [REDACTED]
14      [REDACTED]
15      [REDACTED]
16           Do you see that?
17   A  I do.
18      [REDACTED]
19      [REDACTED]
20      [REDACTED]
21      [REDACTED]
22           Do you see that?
23   A  I do.
24   Q  Yesterday you testified, and I think you testified
25      earlier, that these changes were not part of the
```



```
 1        Transformation Committee's recommend -- final
 2        recommendations; correct?
 3   A    That's right.
 4   Q    But as the 30(b)(6) witness, you would admit that
 5        the Cooperative Congressional Subcommittee Board
 6        did submit them to the Board of Governors for
 7        consideration; is that correct?
 8   A    I agree.
 9            MS. ARAT:  Object to the form.
10            THE WITNESS:  Oh, sorry.
11   A    I agree with that.
12   Q    So that suggestion included institutional NIL
13        payments to athletes for NIL and a potential
14        revenue share to student-athletes; correct?
15            MS. ARAT:  Object to form.
16   A    Those were concepts that were considered.
17   Q    Okay.
18            (Deposition Exhibit(s) 253 marked for
19        identification.)
20            THE WITNESS:  I'm getting my weightlifting in
21        this morning.  Thank you.
22            MS. PARSIGIAN:  I promised Clayton we wouldn't
23        get to 300 so -- or past 300.
24   Q    The court reporter had hand -- has handed you
25        Exhibit 253.  This is Bates number
```



```
 1       they've responded, sought, you know, NIL
 2       opportunities to receive additional compensation
 3       and benefits.
 4   Q   Okay.  One of the justifications that has been
 5       offered relates to Title 9 and gender equity.
 6           Is that consistent with your understanding?
 7   A   Yes.
 8   Q   Title 9 is a federal law --
 9           UNIDENTIFIED ZOOM ATTENDEE:  Unmute the stream
10       if you could.
11   A   Title 9 is a federal law.
12   Q   Is a -- are we -- Title 9 is a federal law that
13       applies to NCAA member institutions; correct?
14   A   Yes, in addition to other institutions of higher
15       education.
16   Q   Why would additional NCAA rules be needed to get
17       member institutions to comply with a federal law?
18           MS. ARAT:  Object to form.
19   A   Well, institutions are required to comply with the
20       federal law.  The regulations that exist promote
21       compliance with Title 9 and promote the principle
22       of gender equity by way of broad-based sports
23       sponsorship, numbers of opportunities for
24       student-athletes throughout Division I.
25   Q   So they're not needed, it's your position that they
```



```
 1         help members comply?
 2              MS. ARAT:  Object to form.
 3    A    Did I understand your -- did I hear your initial
 4         question that additional regulations, the word
 5         additional was in there?
 6    Q    In addition to Title 9.
 7              MS. ARAT:  Object to form.
 8    A    Thank you.  So because the NCAA as an entity isn't
 9         the enforcer of Title 9, the rules and regulations
10         that exist for its member institutions promote
11         gender equity and also aim to not put those
12         institutions in a position to be out of compliance
13         with Title 9.
14    Q    So your position is that it helps them comply?
15              MS. ARAT:  Object to form.
16    A    That would -- yes.
17    Q    Is it your position that the rules and regulations
18         that are challenged in this litigation are --
19         strike that.
20              The NCAA rules require Division I schools to
21         field a certain number of women's teams; correct?
22    A    They require a certain number of sports sponsors,
23         yes.
24    Q    Including requiring a certain number of women's
25         teams --
```



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13         Do you see that?
14         MS. ARAT:  So I'm just -- I have no reason to
15    believe that these are not accurate numbers.  I
16    suspect that you have done this completely
17    correctly, but because I don't have the numbers in
18    front of me, I just am going to put a preservation
19    objection on the record here to make sure that
20    everything gets checked out as accurate.
21 BY MS. PARSIGIAN:
22
23
24
25
```



| | | |
|---|---|---|
| 1 | | ███████████████████████████████████ |
| 2 | A | That is what is reflected here, yes. |
| 3 | Q | Has the NCAA done studies on this before? |
| 4 | A | Not to my knowledge.  The NCAA is not the enforcer |
| 5 | | of Title 9. |
| 6 | Q | Okay.  Thank you.  Have you done -- has the NCAA |
| 7 | | done studies regarding any Title 9 issues that have |
| 8 | | come up in relation to third-party NIL payments? |
| 9 | A | No, not to my knowledge. |
| 10 | Q | Okay.  I'm going to ask you to go back to the |
| 11 | | deposition notice that was the first document that |
| 12 | | we marked today.  Can you remind me what the |
| 13 | | exhibit number of that is? |
| 14 | A | 245. |
| 15 | Q | Okay.  And I'm going to ask you to turn to page 3 |
| 16 | | to the third bullet.  And that reads, "Facts |
| 17 | | supporting the NCAA's contention that the challenge |
| 18 | | rules are needed to expand output and avoid a |
| 19 | | reduction in athletic opportunities," and then it |
| 20 | | lists some additional information -- details about |
| 21 | | that topic. |
| 22 | | Do you see that? |
| 23 | A | I do, yes. |
| 24 | Q | And you understand that you're designated on that |
| 25 | | topic? |



```
 1   A   I do.
 2   Q   Does the NCAA have rules about the minimum number
 3       of sports that a school has to offer to be part of
 4       Division I?
 5   A   It does.
 6   Q   And is the rule that a school must offer 14 sports
 7       if they're part of Division I, and if they're part
 8       of FBS they have to offer 16 sports; is that
 9       correct?
10   A   That is accurate.  That one I knew.
11   Q   Okay.  So that rule, which is not challenged in
12       this litigation, serves to maintain output of
13       athletic participation opportunities for
14       student-athletes; correct?
15   A   What I -- I would say it just slightly different.
16       Output isn't a word that I would use, although I
17       know that it's noted here.  It ensures that there's
18       broad-based sport participation opportunities.
19   Q   Okay.
20   A   Yes.
21   Q   And since schools have moved to paying Alston
22       awards, has there been a reduction in the number of
23       sports offered?
24           MS. ARAT:  Object to form.
25   A   You know, annually sport -- schools, pardon me,
```



```
 1   Q   And this says, "The challenged conduct serves the
 2       procompetitive goal of expanding output, promoting
 3       competitive balance between and among NCAA member
 4       institutions, and improving the quality of college
 5       education and athletic competition," and then it
 6       goes on with some detail.
 7           We've talked about some of this today, but I
 8       want to talk about the portion about promoting
 9       competitive balance.
10   A   Okay.
11   Q   Do Division I schools have significant differences
12       among them in their total athletic budgets
13       annually?
14   A   Yes.
15   Q   Do they have different amounts that they're able to
16       spend on facilities?
17   A   Yes.
18   Q   What about coaching?
19   A   Yes.
20   Q   Training?
21   A   Overall budgets, yes.
22   Q   So there are significant differences already in
23       their ability to compete both on the field and to
24       recruit student-athletes; correct?
25           MS. ARAT:  Object to form.
```



```
 1   A   There are differences in athletic budgets, yes.
 2   Q   Okay.  And the NCAA doesn't regulate any of that
 3       spending?  I think we talked about that earlier.
 4           MS. ARAT:  Object to form.
 5   A   The actual dollar figures, no.
 6   Q   Okay.
 7   A   The regulations are in the areas of things like all
 8       Division I institutions have the same number of
 9       recruiting days that can be used.  And so, there's
10       an equitable treatment there based on those types
11       of elements, but not in the total dollar output,
12       no.
13   Q   Do -- does having additional financial resources
14       allow some schools to have an advantage in
15       recruiting?
16           MS. ARAT:  Object to form.
17   A   I can't say.
18   Q   Okay.  Let's look back at Exhibit 248.
19   A   Is that from today, too?
20   Q   Yes.
21   A   Okay.  Okay.
22   Q   This is the FSLWG final report?
23   A   Yes.
24   Q   And I will ask you to look at page 6.
25   A   Okay.
```



```
1    STATE OF INDIANA         )
                              )  SS:
2    COUNTY OF BOONE          )

3         I, Dana S. Miller, RPR, CRR, a Notary Public in

4    and for the County of Boone, State of Indiana at

5    large, do hereby certify that JENNIFER FRASER, the

6    deponent herein, was by me first duly sworn to tell

7    the truth, the whole truth, and nothing but the

8    truth in above-captioned cause.

9         That the foregoing deposition was taken on

10   behalf of the Plaintiffs at the offices of Faegre

11   Drinker Biddle & Reath LLP, 300 North Meridian

12   Street, Suite 2500, Indianapolis, Marion County,

13   Indiana, on the 14th day of September, 2023,

14   pursuant to the Applicable Rules.

15        That said deposition was taken down in

16   stenograph notes and afterwards reduced to

17   typewriting under my direction, and that the

18   typewritten transcript is a true record of the

19   testimony given by said deponent; and thereafter

20   presented to said deponent for his/her signature;

21        That the parties were represented by their

22   aforementioned counsel;

23        I do further certify that I am a disinterested

24   person in this cause of action; that I am not a

25   relative or attorney of either party, or otherwise
```



1  interested in the event of this action, and am not
2  in the employ of the attorneys for either party.
3       IN WITNESS WHEREOF, I have hereunto set my hand
4  and affixed my notarial seal this 18th day of
5  September, 2023.
6
7  _____
         Dana S. Miller
8
9  Commission Number 0675790
10 My Commission Expires:
   January 17, 2024
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



# DEPOSITION ERRATA SHEET

Case Name: In Re: College Athlete NIL Litigation
Deposition Date: September 14, 2023
Deponent: Jennifer Fraser—30(b)(6)

| Pg. | No. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| 16 | 11 | indicated that | indicating that | Transcription error |
| 35 | 19 | for conferences | or conferences | Transcription error |
| 36 | 10 | as a designation | is a designation | Typographical error |
| 39 | 5,8,11,12,21 | Title **9** | Title **IX** | Typographical error |
| 40 | 6,9,13 | Title **9** | Title **IX** | Typographical error |
| 40 | 22 | sports sponsors | sports sponsored | Transcription error |
| 43 | 5 | Title **9** | Title **IX** | Typographical error |
| 44 | 8 | Title **9** | Title **IX** | Typographical error |
| 46 | 5,7 | Title **9** | Title **IX** | Typographical error |
| 49 | 24 | **Uh**-huh | **Nuh**-huh | Typographical error |
| 51 | 11 | challenge rules | challenged rules | Typographical error |
| 52 | 5 | Title **9** | Title **IX** | Typographical error |
| 64 | 1 | Specific | specifics | Typographical error |
| 74 | 25 | well **into** the | well **in** the | Transcription error |
| 80 | 24 | challenge rules | challenged rules | Typographical error |
| 83 | 15 | there was new source | there was **a** new source | Transcription error |
| 122 | 19 | that's **where** it states | that's **what** it states | Transcription error |
| 128 | 20 | Division I **Sec** | Division I **SAAC** | Transcription error |
| 151 | 21 | challenged **roles** | challenged **rules** | Transcription error |

*Jennifer A. Fraser* (signature)
Jenn Fraser
October 30, 2023