# EXHIBIT 52

# 50 Years of Title IX:

## We're Not Done Yet

*A Women's Sports Foundation Research Report, May 2022*



"No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

# Letter from the CEO

This year, the Women's Sports Foundation, and many others around the nation, will mark the 50th anniversary of the passage of Title IX – the landmark legislation that guarantees girls and women equal access and treatment under the law in all areas of education. Even as we celebrate this essential legislation and the incredible progress made over the last 50 years, we know that the full promise of Title IX remains unfulfilled for many girls and women across our nation.

Passed in 1972, Title IX was enacted to ensure all girls and women would have equal access and every opportunity to thrive. And yet, as transformational as Title IX has been, five decades later there is still a great deal of work to be done to achieve true equity in sports, in education and in the workplace.

The WSF's latest report, *50 Years of Title IX: We're Not Done Yet*, celebrates progress made since the law's passage and identifies inequities yet to be addressed. As the following pages illuminate, unfortunately, there are still far too many students being denied equal opportunities and resources, including girls and women of color, with disabilities, and from low socioeconomic households, as well as LGBTQ, trans, and non-binary youth.

An exponential increase in girls' and women's participation in sports is perhaps Title IX's most notable achievement and one of the law's most lasting legacies. Sports participation is vital to the development of girls and women. The benefits are far-reaching and lifelong, including improved physical, social, and emotional health; enhanced confidence; academic success; leadership opportunities; and so much more. Progress over the last 50 years is impressive, and yet it is not enough. The playing field is not yet level — it's not even close.

With all eyes on Title IX during this pivotal year, it's imperative for all of us, across society, to sound the alarm that nothing short of transparency and action, fairness and justice, will suffice. We must do better.

As we work to further accelerate the pace of change for the next 50 years, this important report lays out policy and practice recommendations to guide how everyone can make sport and our nation more equitable for all girls and women. While we continue to celebrate Title IX and the myriad trailblazers who persisted in the fight to spur the creation of the law and help integrate it into society over the last 50 years, let's all commit to fulfilling its full promise by ensuring that opportunities for girls and women — on and off the field — are limitless.

All girls. All women. All sports.®

Danette Leighton, CEO



# Foreword and Acknowledgments

First, the Women's Sports Foundation is indebted to the study principal investigator, Ellen Staurowsky, Ph.D., Co-Lead Courtney Flowers, Ph.D., and contributing authors Erin Buzuvis, J.D., Lindsey Darvin, Ph.D., and Natalie Welch, Ph.D., whose research excellence brought this project to fruition. We are grateful for the leadership provided by Karen Issokson-Silver, MPH, Vice President, Research and Evaluation, Women's Sports Foundation, who conceived the project. A special note of thanks to Ellen Staurowsky, whose unwavering passion and scholarship around Title IX is unmatched. We are deeply grateful for your leadership.

We gratefully acknowledge Elizabeth Sharrow, Ph.D., Associate Professor in the School of Public Policy and the Department of History, University of Massachusetts, for developing the relevant evidence-based policy recommendations for this report to help shape future planning, research, and action.

The panel of scholars and practitioners who reviewed the findings provided invaluable feedback and improved the content and clarity of the final report immensely. We greatly appreciate their consultative energy and scholarly insights.

Sarah Axelson, *VP, Advocacy, Women's Sports Foundation*

Akilah Carter-Francique, Ph.D., *Associate Professor in African American Studies & Executive Director for the Study of Sport, Society and Social Change, San Jose State University*

Tomika Ferguson, Ph.D., *Assistant Dean, Student Affairs and Inclusive Excellence, Assistant Professor, Educational Leadership, Virginia Commonwealth University*

Amanda Kaufman, *Intern, Women's Sports Foundation, Bates College*

Yannick Kluch, Ph.D., *Assistant Professor, Sport Leadership & Director of Outreach and Inclusive Excellence at the Center for Sport Leadership, Virginia Commonwealth University*

Deborah Slaner Larkin, *Advocacy Committee, Women's Sports Foundation*

Anita Moorman, J.D., *Professor, Department of Health & Sport Sciences, University of Louisville*

Ajhanai Newton-Keaton, Ph.D., *Assistant Professor, Department of Health & Sport Sciences, University of Louisville*

Diana Parente, *Ph.D. candidate, University of Southern California Roosier School of Education, Director of Athletics Friends Academy*

Amanda Perkins-Ball, Ph.D., *Assistant Professor in Kinesiology & Sports Medicine Advisor, Rice University*

Moneque Walker Pickett, J.D., Ph.D., *Professor and Associate Chair of the Department of Criminal Justice, Saint Leo University*

Morgan Powell, *Senior Manager, Advocacy, Women's Sports Foundation*

Don Sabo, Ph.D., *Sport and Health Policy Advisor, Women's Sports Foundation*

Elizabeth Sharrow, Ph.D., *Associate Professor in the School of Public Policy and the Department of History, University of Massachusetts*

Martha Saavedra, Ph.D., *Associate Director, Center for African Studies, University of California Berkeley*

Marjorie Snyder, Ph.D., *Senior Research Advisor, Women's Sports Foundation*

Judy Sweet, *Advocacy Committee, Women's Sports Foundation*

Kim Turner, J.D., *Director of the Gender Equity Initiative, Coaching Corps*

Chris Voelz, *Advocacy Committee, Women's Sports Foundation*

Amy Wilson, Ph.D., *Managing Director of Inclusion, NCAA*

Eli Wolff, *Director, Power of Sport Lab*

Erianne Weight, Ph.D., *Associate Professor, Department of Exercise and Sport Science, Co-Director, Center for Research in Intercollegiate Athletics, University of North Carolina*

Erica Zonder, J.D., *Undergraduate Program Coordinator and Associate Professor, Health Promotion and Human Performance, Eastern Michigan University*

A special note of acknowledgement and appreciation is extended, as well, to Deana Monahan for her editorial and graphic skills.



## About The Women's Sports Foundation

The Women's Sports Foundation exists to enable girls and women to reach their potential in sport and life. We are an ally, an advocate and a catalyst. Founded by Billie Jean King in 1974, we strengthen and expand participation and leadership opportunities through research, advocacy, community programming and a wide variety of collaborative partnerships. The Women's Sports Foundation has positively shaped the lives of millions of youth, high school and collegiate student-athletes, elite athletes and coaches. We're building a future where every girl and woman can #KeepPlaying and unlock the lifelong benefits of sport participation. All girls. All women. All sports®. To learn more about the Women's Sports Foundation, please visit us at www.WomensSportsFoundation.org or follow us on Twitter at @WomensSportsFdn and Instagram/Facebook at @WomensSportsFoundation.

Contact us at info@WomensSportsFoundation.org or toll-free at 800.227.3988.

This report may be downloaded from www.WomensSportsFoundation.org. This report may be reproduced and distributed only in its entirety. Any material taken from this report and published or transmitted in any form, electronic or mechanical, must be properly attributed to *50 Years of Title IX: We're Not Done Yet* published by the Women's Sports Foundation.

Preferred Citation: Staurowsky, E. J., Flowers, C. L., Busuvis, E., Darvin, L., & Welch, N. (2022). *50 Years of Title IX: We're Not Done Yet*. Women's Sports Foundation.

© 2022, Women's Sports Foundation, All Rights Reserved.

# Table of Contents

Executive Summary ....................................................................................................................................................................7

Method and Design ..................................................................................................................................................................14

Part I. Introduction: Title IX's Broad Impact on U.S. Society....................................................................................................15

Part II. Brief History of Title IX and Its Impact on the Nation's Schools ..................................................................................19

Part III. A Brief Overview of Title IX's Legislative History as It Pertain to Athletics ...............................................................21

Part IV. Title IX and Athletics: The Legacy of the "Separate but Equal" Standard in Athletics Programs................................24

Part V. Title IX Athletics Compliance, Education and Enforcement .........................................................................................25

    The Roles and Responsibilities of Title IX Coordinators ...................................................................................................25

Part VI. Title IX's Two Key Athletics Areas: Equal Access to Participation & Equitable Treatment ........................................28

Part VII. Title IX's Three Athletic Compliance Areas: Athletic Participation, Athletic Scholarships, and Operational Support ...................29

    Title IX's Three–Part Test of Athletic Participation ..........................................................................................................29

    The Current State of Title IX and Athletics Participation Opportunities .........................................................................30

    Title IX and the Allocation of Athletic Scholarship Dollars .............................................................................................37

    Title IX and Equitable Treatment — Program Benefits ....................................................................................................39

Part VIII. Title IX, Marketing, and Promotion of Female Sports .............................................................................................45

    Availability and Quality of Sports Information and Marketing Personnel.........................................................................46

    Access to Other Publicity Resources for Men's and Women's Programs .........................................................................46

    Quantity and Quality of Publications and Other Promotional Devices Featuring Men's and Women's Programs ...................47

    Title IX, Female Athletes and Name, Image, and Likeness (NIL) Laws ...........................................................................49

Part IX. Title IX and Intersectionality......................................................................................................................................52

    Title IX, Gender, and Race Intersectionality ....................................................................................................................52

    Title IX and Transgender Athletes ...................................................................................................................................55

    Title IX and Female Athletes with Disabilities.................................................................................................................57

    Title IX and Economically Disadvantaged Students and Students from Urban and Rural Communities...........................58

Part X. Title IX and Other Areas of Review .............................................................................................................................60

    Title IX and Pregnant/Parenting Athletes .......................................................................................................................60

    Title IX and Esports .........................................................................................................................................................60

Moving Forward into the Next 50 Years of Title IX .................................................................................................................63

Policy and Practice Recommendations ....................................................................................................................................64

References.................................................................................................................................................................................74

# Executive Summary

On the 50th anniversary of Title IX's passage, there is much to celebrate. A federal civil rights law that has been credited with profoundly changing education in the United States by barring sex discrimination in the nation's schools, Title IX, along with other equity laws, helped to unlock access to educational and athletic opportunities, paving the way for inroads into historically male-dominated professions. The work of five decades of Title IX's impact is writ large in every sector of American society.

As Title IX's anniversary year unfolds, women are among the highest-ranking and most powerful government officials in the country, including U.S. Vice President Kamala Harris (the nation's first female vice president as well as the first African American and Asian American to serve in the role) and U.S. Speaker of the House Nancy Pelosi, who is serving her fourth term in that position. U.S. Secretary of the Interior Deb Haaland, member of the Laguna Pueblo, made history as the first Native American to serve as a cabinet secretary. Pathways once closed or significantly inaccessible to women have opened as Title IX created greater access to academic pursuits leading to careers in an array of occupations for women, including but not limited to astronauts, athletes, carpenters, chief executive officers, construction workers, doctors, engineers, entrepreneurs, farmers, filmmakers, firefighters, football coaches, investors, journalists, lawyers, musicians, police officers, military personnel, rock stars, Supreme Court justices, and television news anchors.

For girls and women playing, competing, and working in sport, times have changed dramatically from the days when girl and women athletes were viewed as novelties. Since Title IX's passage in 1972, generations of U.S. citizens as well as students at recipient institutions regardless of national origin, immigration status, or citizenship status (S. B. Goldberg, 2021; Lhamon, 2014) have witnessed the ascension of women's sport, inspired by the consistent excellence of U.S. female athletes on the international stage. Women of Team USA who competed in the Tokyo 2020 Olympic Games earned a total of 66 medals. If the U.S. women were their own country, their collective performance would have fallen third behind only the Russian Olympic Committee and China (Planos, 2021).

For all the progress made in helping girls and women in the United States realize their promise and potential as athletes and leaders in sport, those gains have been made without a full commitment to Title IX's mandate of equitable and fair treatment and more general principles of gender equity throughout the sport system. Just months before U.S. women won their seventh Olympic gold medal in women's basketball, obvious gender disparities that female athletes were subjected to at the NCAA Division I women's basketball championship in

2021 garnered national attention, leading to an external review of their practices. Findings revealed that:

> The NCAA's broadcast agreements, corporate sponsorship contracts, distribution of revenue, organizational structure, and culture all prioritize Division I men's basketball over everything else in ways that create, normalize, and perpetuate gender inequities. At the same time, the NCAA does not have structures or systems in place to identify, prevent, or address those inequities (Kaplan Hecker & Fink, 2021a, p. 2).[1]

Through the lens of the past 50 years, the full power of Title IX will not be realized without recognizing that not all girls and women, as well as individuals whose gender identity does not conform to Title IX's implicit and explicit gender binary, have benefitted from the legislation or been well-served by it.

- Asian, Black, Indigenous, Latinx, and other girls and women of color participate in sport at lower levels, face greater barriers to participation, and are historically excluded in sport leadership.

- Providing safe spaces for lesbian, gay, bisexual, transgender, and queer (LGBTQ+) athletes and sport leaders remains an urgent consideration.

- Female athletes with disabilities continue to receive fewer opportunities to pursue their athletic dreams.

- Access to sport opportunities varies greatly based on economic status and location (urban, suburban, or rural).

Title IX can play a critical role in contributing to a more inclusive sport environment for girls and women as they enter high school and college. However, for that kind of transformation to occur, there needs to be an end to gender discrimination in the nation's high school and college athletic departments. In this report, we seek to achieve three things. First, we acknowledge what has

---

[1]   While the NCAA received relief from the reach of Title IX in a narrow ruling in National Collegiate Athletic Association v. Smith (1999), U.S. Representative Jackie Speier (D-NJ), along with 16 cosponsors, introduced a resolution in June of 2021 affirming that the NCAA is subject to Title IX and is expected to prevent sex discrimination in the programs and activities that it runs. The fact that the premier college sport governing body in the world, with more than 1,200 college and university members, was found by external reviewers to have engaged in systemic gender discrimination for decades raises questions about the entire college sport system's commitment to gender equity and Title IX compliance. If NCAA member schools were so comfortable with the gender inequities within the NCAA, which they appear to be given the reports on the conduct of women's championships across all three divisions, what is happening on their own campuses?



changed since the passage of Title IX and the successes that have been realized. Second, we note what has not changed and the issues that remain to be addressed. Third, and most importantly, we focus on the next 50 years of Title IX, what needs to change, and initiatives undertaken in order to realize Title IX's promise of gender equitable treatment. Ultimately, we contemplate an approach to Title IX's next 50 years where persistent barriers to gender equity and fair treatment are addressed and where the U.S. sport system is recast to fully embrace a vision of inclusive excellence.

Our findings, based on a rigorous literature review and original research using publicly available data sets, reveal that there is much work to be done. The focus of our work was primarily on the enforcement of Title IX in athletics and the three major areas that should be reviewed in ongoing and regular Title IX audits: athletic participation opportunities, allocation of athletic scholarship funding, and allocation of resources in operational areas (recruiting, operating expenditures, coaches' salaries, as examples). There is a greater focus in the report on trends occurring in college sport because less research has been done on the high school sector as there is no national database that lends itself to comprehensive analysis.

The authors are keenly aware that another critical area of Title IX enforcement is sexual assault, harassment, and violence as well as the intersections with sport. Because of the magnitude of issues that have arisen during the past decade, we believe this warrants an entirely separate report, thus it is not addressed in this report.

Some of the key findings of this report are presented below.

1.  **Title IX's Impact: Girl/Women Athletes Participating in Near-Record Numbers**

Title IX has played a critical role in the evolution of sport for girls and women in the United States. Title IX's enactment served as a catalyst for the growth of sport participation opportunities for girls and women at the high school and college levels.

-   At the high school level, dramatic increases have been seen in participation opportunities, rising from 294,015 in 1972 to 3,402,733 in 2018–19 (the most recent reporting year). Girls comprised 7% of high school athletes participating on varsity teams in 1972; in 2018–19, that figure rose to 43%.

-   At the college level, we have come quite a distance from 1971–72 when female athletes numbered 29,977 to the 215,486 who were competing on teams sponsored by NCAA institutions in 2020–21. The percentage of women athletes competing on college teams has risen from 15% in 1972 to 44% during the 2020–21 academic year.

While the disruption caused by the coronavirus (COVID-19) pandemic impacted all sports at every level, it is difficult to assess the specific impact the coronavirus had on girls and women participating in varsity athletics. NCAA data for the 2020–21 academic year shows that there was a 2.66 percentage-point decline in female athletes playing with a 2.42 percentage-point decline in male athletes. The high school participation numbers have not been reported out after 2018–19, thus this is an area to watch and monitor into the future.

## Title IX's Three-Part Test of Gender Equity in Athletic Participation Opportunities

Under Title IX regulations, schools are presented with three ways that they can demonstrate that they are providing athletic opportunities that fully and effectively accommodate the interests of girl/women and boy/men athletes. Schools need meet only one of the three parts of the test to be in compliance.

**Part 1. Substantial Proportionality:** Girl/women athletes have opportunities that are proportional to their enrollment. In theory, if 50% of the student body is girls/women, 50% of athletic participation opportunities should be provided for girl/women athletes. Even a small gap between the enrollment of girls/women and athletic opportunities available to girl/women athletes (1%–3%) could represent a gap large enough to provide a viable athletic team for girl/women athletes, so schools need to be aware that "coming close" to substantial proportionality may not be close enough. In the absence of substantially proportional athletic opportunities, schools may rely on the second or third part of the test.

**Part 2. History and Continuing Practice of Program Expansion:** If disproportionally more athletic opportunities are offered to boy/men athletes than girl/women athletes, a school needs to demonstrate that it has been adding teams and athletic opportunities over time to address the shortfall for girl/women athletes. If a school does not offer substantially proportionate athletic opportunities to girl/women athletes and it cannot demonstrate a history and continuing practice of program expansion, the school can turn to the third part of the test.

**Part 3. Full and Effective Accommodation:** Under this test, schools need to demonstrate that they are providing teams to satisfy existing interest and those teams operate at a sufficiently competitive level. In assessing existing interest, administrators need to turn to existing club and intramural sport participation, expressed interest in specific sports, geographic location, national trends, and conference and league sport offerings.





©iStock by Getty Images

## 2.  Shortfalls After 50 Years: Inequities in Athletic Departments Persist

A study conducted by the Women's Sports Foundation (Staurowsky et al., 2020), an investigative report by Wesley Jenkins (2019) with the Chronicle of Higher Education, and an external review of the NCAA's approach to women's championships (Kaplan Hecker & Fink, 2021a, 2021b) revealed gross gender inequities across all college divisions, including disproportionately more athletic opportunities provided to men athletes and a shortfall in the investment of resources in women's athletic programs such as dollars allocated for athletic scholarships, recruiting, and coach compensation. There was cause for concern about widespread Title IX noncompliance in high school and college and university athletic programs before the COVID-19 pandemic began, and women's sports programs were clearly vulnerable to cuts during the pandemic. In 2020 alone, female and male athlete plaintiffs successfully challenged cuts to their programs at Brown University, William and Mary, University of North Carolina at Pembroke, East Carolina University, Dartmouth University, Clemson University, University of St. Thomas, LaSalle University, and Dickinson College under Title IX (Bailey Glasser, 2021).

Although it is more difficult to get a complete picture of what is happening at the high school level because less research has been done on that sector, similar concerns appear to exist at the high school level.

- Based on an analysis of athletic participation opportunities available to athletes in 15,000 high school programs using data from the National Center for Education Statistics (NCES) and the Civil Rights Data Collection (CRDC), only seven states offered athletic opportunities to female athletes proportional to the enrollment of female students in their schools (Webster, 2020).

- In an investigative series of Title IX athletics compliance at the high school level published by the Shirley Povich Center for Sports Journalism and the Howard Center for Investigative Journalism at the University of Maryland, girls are dramatically underserved at the high school level.  Through public records requests, journalists found that data gathered by the U.S. Education Department Office for Civil Rights are incomplete and underestimates the extent to which girl athletes do not have access to athletic opportunities proportional to their enrollment (Newhouse, 2022a).

- In a report from the U.S. Department of Education Office for Civil Rights (OCR) focusing on protecting the civil rights of students in the nation's schools, 3,609 complaints were filed with the OCR seeking relief under Title IX for gender inequities in high school athletic programs ranging from shortfalls in athletic participation opportunities to inequitable facilities to shortages in quality and quantity of coaching to an array of other benefits (Lhamon, 2015a).





*Sierra Brooks of the University of Michigan*

In retrospect, for Title IX protections against sex discrimination to remain unreachable for so many girls and women and/or so tenuous after five decades raises a question regarding how compliance and enforcement is framed and discussed. While Title IX compliance is determined on a case-by-case basis, patterns and trends in the research are highly suggestive that there are many institutions not in compliance with Title IX's expectations in the athletic area.

### 3.    The Clock Has Run Out: 50 Years Is Long Enough to Comply

At the time Title IX was enacted in 1972 and the policy interpretation for athletics was issued in 1979, high schools and colleges were afforded grace periods to come into compliance and even further latitude under a standard of what has been called "a reasonable period of time." In effect, a school could make the argument that they were out of compliance but, in order to comply, they needed more time to add opportunities, resources, facilities, and coaching staff (Stewart & Harris, 1979). The timeline for each institution was different given circumstances. These timelines were also changing as a result of an influx of female students at the college level after Title IX opened the door to academic opportunities that had previously been closed to girls and women (National Center for Education Statistics, 2022). As we enter the next half century of Title IX, many of those initial start-up considerations are no longer valid. Schools that have been slow off the mark in providing female athletes equal access to athletic opportunities can no longer claim that they did not have time to plan or to devise a way to accommodate female athletes. A record of long-term non-compliance and/or serial non-compliance is inherently unreasonable, and school administrators should take note of this.

### 4.    Title IX and Gender Equity: Greater Education is Needed

Since Title IX's passage, school administrators have been reminded by federal officials working at the U.S. Department of Education Office for Civil Rights about their obligations under Title IX. Those include providing Title IX oversight and creating internal avenues to educate stakeholders, monitoring and assessing Title IX compliance, documenting efforts to remedy sex discrimination and discouraging its perpetuation, and providing the resources needed to conduct investigations when necessary (Marcus, 2004; Matthews & McCune, 1977, 1987; Lhamon, 2015b). One of the consequences of the lack of a unified approach to Title IX compliance within schools is the persistent lack of knowledge among educators about what Title IX is and how it should advise their work (Nash et al., 2007). The accumulated effects of this slow, uneven, and at times neglectful attention to Title IX compliance infrastructure within institutions and athletic departments is reflected in research findings and concerns expressed by practitioners.

- In 2011, the Association of Title IX Administrators (ATIXA) was formed to "...create a venue for professional exchange between coordinators and other administrators with Title IX responsibilities, to finally and meaningfully wrap our heads around the Coordinator role, other Title IX-based administrative responsibilities, and best practices for institutional Title IX compliance" (ATIXA, 2020, para. 5).

- In 2013, the National Women's Law Center filed a complaint with the OCR alleging Title IX violations in the District of Columbia Public School athletic departments. They noted in the complaint that the district failed to provide the name and contact information for the Title IX coordinator. This led to the passage of the Title IX Equity Act in the District of Columbia in 2015.

- In 2015, OCR sent out a reminder to school administrators that "A critical responsibility for schools under Title IX is to designate a well-qualified, well-trained Title IX coordinator and to give that coordinator the authority and support necessary to do the job" (New, 2015).

- A series of studies assessing Title IX knowledge among athletics administrators, coaches, staff members, and college athletes revealed a general lack of knowledge about Title IX (Staurowsky & Weight, 2011, 2013; Staurowsky et al., 2017; Rodkey et al., 2019).

- In a poll of 506 children (aged 12–17) and 1,008 parents, conducted by the Shirley Povich Center for Sports Journalism and the Howard Center for Investigative Journalism at the University of Maryland and Ipsos, 71% of children aged 12–17 and 58% of parents knew nothing about Title IX (Newhouse, 2022b).

Five decades after the passage of Title IX, the roles, responsibilities, baseline expectations about the credentials and experience, and reporting lines remain loosely defined and vary greatly across the education landscape (Pappas, 2021). That variability translates into a similarly chaotic compliance



and enforcement environment when it comes to Title IX and athletic departments. In one of the few studies examining the experiences of Title IX athletics coordinators, findings revealed a general lack of clarity regarding who in athletic departments is supposed to handle Title IX oversight (Staurowsky & Rhoads, 2020).

### 5. Red Flags are Flying: Title IX in College and High School Sports

The Equity in Athletics Disclosure Act (EADA) passed in 1994 is a federal law requiring colleges and universities to publicly report gender equity information about their athletic programs, including athletic participation opportunities, revenues and expenses, money distributed in athletic scholarships, recruiting expenses, and number of coaches and coach salaries. Although EADA data is not designed to determine Title IX compliance, and Title IX compliance is determined on a case-by-case basis, analysis of EADA resource allocation trends reveal signs that institutions continue to engage in gender discrimination.

Some factors that signal widespread concern is revealed in an analysis of EADA data for 2019–20 that we conducted as part of this report:

- Fifty years after Title IX was enacted, 86% of NCAA institutions across all divisions offered higher rates of athletic opportunities to male athletes disproportionate to their enrollment. For the 2019–20 academic year, that gap favoring male athletes represented 58,913 missed opportunities for female athletes.

- That pattern of inequity extends beyond NCAA institutions into NAIA institutions as well as junior colleges. Combined, in 2019–20, female athletes had more than 80,000 fewer opportunities to play and compete than if their athletic programs had offered them opportunities proportional to their enrollment.

- In 2019–20, of the $241,40,778 spent on recruiting athletic talent to compete at the college level (in both two-year and four-year institutions), 30% was spent on recruiting female athletes ($75,290,142).

- In 2019–20, male athletes received $252 million more in athletic scholarships than female athletes received. If athletic departments offered athletic opportunities to female athletes proportional to enrollment, they would have had to award an additional $750 million in athletic scholarship assistance.

- In 2019–20, on average, coaches of women's teams received a much smaller percentage of salary compared to coaches of men's teams, ranging from 19% in NCAA Football Bowl Subdivision (FBS, formerly known as Division I–A) to 49% in NJCAA Division I.

- What the existing research reveals about gender equitable treatment in marketing and media within college athletic departments is two-fold: female athletes continue to be underserved in terms of promotional efforts, and that pattern within athletic departments appears to align with

the larger pattern of limited coverage of women's sports. At the high school level, so little research has been done that there is no basis to report what is happening in this sector.

Although it is more difficult to get a complete picture of what is happening at the high school level because less research has been done on that sector, similar concerns appear to exist. Based on an analysis of data reported by the National Federation of State High School Associations for the academic year 2018–19, high school girls in every state were provided proportionately less access to athletic participation opportunities compared to boys relative to enrollment. On average, high school girls were afforded 42% of athletic opportunities at the high school level despite the fact that girls made up 48.5% of full-time students enrolled. In order to remedy that 6.5% proportionality gap, high schools nationally would need to offer 1.1 million more opportunities for girls to play varsity sports. In a report from the OCR focusing on protecting the civil rights of students in the nation's schools, 3,609 complaints were filed with the OCR seeking relief under Title IX for gender inequities in high school athletic programs (Lhamon, 2015b).

### 6. At the Intersection: Race and Gender Under Title IX

There is a need to examine the intersectionality of race, gender, and Title IX to understand the overall impact of this educational law on women in sports. Using an intersectional approach provides an avenue to understand the meaning and challenges of multiple intersecting identities on a person's life (Crenshaw, 1989; McDowell & Carter-Francique, 2017).

Since the enactment of Title IX, Black, Indigenous, and People of Color (BIPOC) women athletes have experienced an increase in sport participation opportunities (Butler & Lopiano, 2003; Flowers, 2015; McDowell & Carter-Francique, 2017; Cooper & Newton, 2021), yet the "single axis" lens and racial clustering have distorted these statistics and obscure participation barriers that exist for these athletes.

As instrumental as Title IX has been in expanding opportunities for girls and women throughout U.S. society, feminists and critical race theorists point out that as is the case with any "single axis" law, meaning any law that focuses on one category of bias in addressing discrimination, it does not take into account how sex discrimination intersects with other forms of bias. In her book, *Getting in the Game: Title IX and the Women's Sports Revolution*, legal scholar Deborah Brake (2010) wrote that for all the progress made under Title IX, "...women have not shared equally in many of the post–Title IX gains" (p. 113). As Doris Corbett, Professor Emerita and administrator at both Howard University and the University of Northern Iowa, who played a key role in creating intercollegiate athletic opportunities at Howard and served as their first women's basketball coach (1973–74) wrote (2001), "Women of color experience a form of double jeopardy — racism and sexism. Because they are overlooked by society in general, their struggles in both sport and other aspects of life are compounded" (p. 307). As such, Title IX does not provide legal protection on the basis of race and, as a single-axis law, it solely focuses on gender, which has provided



barriers for Black females in sport (Flowers, 2015; Mathewson 2012). Further, Dees (2008) argues that *Brown v. Board* had a greater impact on Black women's sport participation than Title IX did due to expansion of access.

Similarly, Crenshaw (1989) argues that conventional antidiscrimination law employs a single-axis model that prohibits discrimination on the basis of race or gender, separately, but does not prohibit discrimination based on race and gender acting in concert. However, when examining the double jeopardy of race and gender felt by Black women, "A black woman who has been discriminated against has difficulty proving the requisite inequality. It may be difficult to prove that she was discriminated against on the basis of race, because blacks have not suffered as a group since black men do not share the injury" (Mathewson, 2012). Additionally, Mathewson (2012) reported a Black woman "may have faced obstacles proving that she was discriminated against on the basis of gender because women as a group have not suffered since white women do not share the injury". As such Pickett et al. (2012) suggested, "A focus on both race and gender equity in access and participation in interscholastic athletics is needed to ensure that Title IX addresses gender equity, while recognizing the double jeopardy status faced by women of color."

Racial clustering has also created barriers for BIPOC women in sports. Racial clustering can be attributed to economic inequalities and institutional disadvantages that exist in many communities of color and limited resource school districts (Sabo & Veliz, 2008; Zarrett et al., 2020). Racial clustering can be used to justify the increased numbers of Black women in basketball and track and field (Corbett & Johnson, 2000; Cooper & Newton, 2021) Further, Black women's participation in sports has been historically limited to track & field and women's basketball due to limited access to resources, which will be discussed later in this report, and being unjustly deemed unfit to participate in "country club sports" (i.e., tennis, golf, swimming) (Corbett & Johnson, 2000; Cooper & Newton, 2021; Carter-Francique & Flowers, 2013). Johnson (2008) offers another view of this notion by stating people of color face bias that centers on a perception that they "can only function in a team component with a designated role." As a result, racial and gender disparities continue to fuel participation obstacles for BIPOC women in college sports (Flowers, 2015; Corbett & Johnson, 2000; Cooper & Newton, 2021). This notion could explain the low numbers of BIPOC women in college sports. For example, white women represent the largest population of women athletes in NCAA Divisions I, II, and III conferences combined at 68%. Black women represent 11%, followed by Hispanic women (6%), International women (5%), women identifying with Two or More Races (5%), and Asian women (2%) (National Collegiate Athletic Association [NCAA], 2021a). The percentages of American Indian/Alaska Native and Native Hawaiian/Pacific Islander women registered at .05% although combined they accounted for 1,687 female athletes competing on teams competing under the umbrella of the NCAA (see Table 13 on page 52). Further, there is a need to examine the impact of Title IX on sports participation at historically Black colleges and universities (HBCUs) and, since HBCUs are not monolithic, there is also a need to explore the

impact of Title IX on HBCU sport participation at two- and four-year institutions outside of the NCAA (i.e., NAIA).

Overall, race and gender tremendously impact a woman's ability to holistically receive and benefit from Title IX. For example, in a study of data gathered through the CRDC for the academic year 2011–12, several important findings illustrate the influence of race and gender on access to educational and sport opportunities (National Women's Law Center [NWLC] & Poverty & Race Research Action Council [PRRAC], 2015). Some of those findings included the following:

- Over 40% of the nation's high schools are either heavily white (90% white) or heavily minority (white enrollment is 10% or less).

- Far fewer athletic opportunities are available to students in heavily minority schools compared to heavily white schools. In a typical heavily minority school, there are only 25 spots available on sports teams for every 100 students; in a typical heavily white school, there are 58 spots available on sports teams for every 100 students.

- Gender disparities in athletic opportunities were pervasive across schools; however, the gender disparities were greater in heavily minority schools.

- In a typical heavily white high school, girls had 82% of the athletic opportunities that boys had.

- In a typical heavily minority high school, girls had only 67% of the opportunities to play sports compared to opportunities provided for boys.

### 7.  Right to Play: Title IX and Transgender and Gender Nonconforming Athletes

Title IX is poised to play an important role in securing the legal rights of transgender students to compete on athletic teams according to their gender identity. Emerging case law in other contexts, such as employment nondiscrimination and access to school bathrooms, suggests that the likely interpretation of the statute is that it supports inclusion and conflicts with the laws and policies in some states that prohibit transgender girls from competing in girls' sport. The current administration has signaled its intention to enforce Title IX in a way that maximizes protection for transgender rights. At the same time, state legislatures are working to restrict transgender rights, including rights to participate in sports. Another important actor in this space is the NCAA, which has recently revised its own transgender participation policy to defer to the standards set by sports' national governing bodies (NGBs). Unlike the NCAA, NGBs have not created those policies with educational objectives or Title IX in mind. Advocates must remain vigilant to ensure that this development does not effectively exclude transgender women from accessing the opportunity to participate in college athletics. It also is imperative that Title IX advocates support the ability of gender nonconforming athletes to play and compete. Expanding opportunities for students to participate without restrictions and expectations imposed by gender labels (e.g., addition of new, inclusive sports models) can also create more pathways for inclusion.



### 8. Fostering Participation: Title IX and Athletes with Disabilities

Examinations of Title IX often overlook the gender gaps among students with disabilities. According to the National Center for Education Statistics, there are nearly 7 million students with disabilities attending the nation's public schools (Schaeffer, 2020). Students with disabilities may comprise as much as 14% of total enrollment within public schools (National Center for Education Statistics, 2021). Of that group, approximately 33% or 2.3 million are girls (Schaeffer, 2020).

- According to Brittain (2009), 90% of women with disabilities are not active in sport.

- In a report from the U.S. Government Accountability Office in 2010, boys with disabilities consistently participate in sport at higher rates than girls with disabilities.

- Boys in grades 1 through 7 participated on a school or community-based sports team at a rate of 45% compared to 31% of girls with disabilities (U.S. Government Accountability Office, 2010).

- Among athletes with disabilities participating on school- or community-based sports teams offered for grades 7 through 12, 37% were boys and 23% were girls (U.S. Government Accountability Office, 2010).

- According to the NFHS (2019), of the 15,571 high school students who participated in adaptive sport activities during the 2018–19 academic year, 44% were female students (6,960).

Christophel (2020) cites Title IX as a model to use in arguing for the need for the creation of separate sport championships and leagues for athletes with disabilities. There is also a strong argument that more attention should be paid to the accumulated effects of multiple forms of discrimination that might occur against a female parasport athlete should she also be a racial minority.

### 9. New Era in College Sports: Title IX and Name, Image, and Likeness

For decades, NCAA rules prevented college athletes from entering into endorsement contracts and making money from the use of their names, images, and likenesses (NILs). At the risk of losing their eligibility to compete in their sports, NCAA Division I college athletes, in particular, for decades could not appear in advertisements, participate in promotional activities, sign autographs, run their own sports camps, or publish under their own names and get paid.

After the state of California passed the Fair Pay to Play Act in 2019, which provided for college athletes to profit off their NILs and to have access to representatives, 26 other states passed similar laws with many taking effect in July of 2021 and some earlier. Faced with such a wave of opposition to its rules, the NCAA suspended its rules in the summer of 2021, ushering in what some have referred to as the NIL era of college sports. In the immediate aftermath of college athletes' access to their NIL rights, stories abounded about college athletes promoting



©iStock by Getty Images

all manner of ventures from restaurants to car dealerships to professional sport franchises to fitness products. The value of those endorsements ranged from the receipt of in-kind merchandise such as t-shirts and hats to the occasional six-figure deal.

- Olivia Dunne, an LSU gymnast, who has 5.7 million followers on social media is expected to reach over $1 million in endorsements after her first year. Among the companies she has deals with are Vuori (an active wear company) and PlantFuel (a wellness company) (Chen, 2021).

- La'Quanza Glover, a basketball player for Edward Waters University, is believed to be the first HBCU female athlete to sign an endorsement deal with Global Freight & Commerce (Bell, 2022).

- Linktree Partners, a linking platform, signed Marghzetta Frazier, UCLA gymnast, and Alana Walker, University of Virginia volleyball player, to "create and share content that showcases who they are on and off the court, using Linktree to connect their audiences to their content, brand deals, causes, playlists, communities and NIL ventures" (Dosh, 2021c).

In this evolving landscape, where 60%–64% of endorsement deals to college athletes are going to men (Associated Press, 2022), there is a need for ongoing vigilance to assess whether women athletes are being promoted in equitable ways and the avenues to access endorsement deals are being made available to them.



# Method and Design

This report draws upon publicly available data from sources such as the Equity in Athletics Disclosure Analysis Cutting Tool provided by the Office of Postsecondary Education of the United States Department of Education; the National Collegiate Athletic Association, the National Federation of State High School Associations as well as peer-reviewed research articles, law review articles, federal regulations, letters of guidance, and other reference material.

## A Research Note About Terminology:

**Sex v. Gender:** In scholarly literature as well as in mainstream reports, the terms "sex" and "gender" are often used interchangeably. As noted in introduction, the statute was passed at a time when those faced with discrimination were finding the words to express the harms done and the barriers that needed to be overcome (Sandler, 2000; Ware, 2011). In point of fact, feminist psychologist Rhoda Unger (1979), among others, was exploring a more nuanced understanding of determinants of behavior just as the conversation about Title IX's application to education was unfolding in 1979. She pointed out a need to differentiate the terms "sex" and "gender," with sex more narrowly referring to what she called "biological mechanisms" and gender taking into account the sociocultural factors that contribute to sex differences. Mindful of the need for inclusive language, we try, when possible, to use "gender."





**Racial and Ethnic Categories:** The racial and ethnic categories used in NCAA data sets are defined as follows:

**American Indian/Alaska Native:** A person having origins from North America and who maintains cultural identification through tribal affiliation or community recognition.

**Asian:** A person having origins from the Far East, Southeast Asia, or the Indian subcontinent.

**Black:** A person having origins in any of the Black racial groups of Africa (except those of Hispanic origin).

**Hispanic/Latino:** A person of Cuban, Puerto Rican, Central or South America or other Spanish culture or origins.

**International:** A person who is not a citizen or national of the United States and who is in this country on a visa or temporary basis.

**Native Hawaiian/Pacific Islander:** A person having origins in any of the original peoples of Hawaii, Guam, Samoa, or the Pacific Islands.

**Two or More Races:** A person identifying with more than one race/ethnicity category.

**Unknown:** A person whose race/ethnicity is unknown.

**White:** A person having origins from Europe, North Africa, or the Middle East (except those of Hispanic origin).



# Part I. Introduction: Title IX's Broad Impact on U.S. Society

Since the passage of Title IX, girls' and women's participation and access in sport has been remarkable. Each generation has pushed and expanded the boundaries of what girls and women can achieve in the sport system as athletes, coaches, administrators, executives, producers, marketers, and creators of content, writing an ever-evolving women's sport story that is a part of the American story. They have transformed the impossible into the possible and the possible into the wondrous. Along the way sporting organizations and associations have expanded advocacy efforts and provided financial resources to support women's sports.

Title IX has been a key contributor to the continuous growth of women's sports. Millions of girls and women have been positively impacted due to this legislation. For example, prior to 1972, sports opportunities were overwhelmingly offered to boys. The need for Title IX's prohibition against sex discrimination is directly tied not just to opportunity but also to keeping girls in sport to realize the benefits that flow from them. The stakes are high:

- Girls' retention in sports greatly impacts their future growth outside of sports. Explicitly, girls build personal quality traits like team leadership, collaboration, and self-confidence through sports participation and learn pertinent professional skills that lead to their success in careers after college as well as support their personal growth throughout life (Staurowsky et al., 2015; Staurowsky, 2016b; Staurowsky et al., 2020b).

- Sports participation increases girls' chances at living healthy lifestyles and benefitting from positive self-identity. As such, young girls active in sports competition are 20% less likely to get breast cancer later in life (Staurowsky et al., 2015).

- High school girls who compete in sports are more likely to have positive body images than non-athletes. Therefore, participation in sports confers both immediate and long-term benefits for girls who compete. Hence, sports participation directly impacts girls' quality of life and supports immediate and long-term benefits (Sabo & Veliz, 2008; Staurowsky et al., 2015; Staurowsky, 2016b; Staurowsky et al., 2020).

- Girls' sports participation has also been linked to higher levels of family satisfaction (quality of family member interaction, closeness, communication). Sabo and Veliz (2008) reported higher family satisfaction, in both single-parent and dual-parent families when girls participate in sports. Girls' sports participation is linked to the futures of women leaders.

- In a survey of 400 women executives, 94% reported having competed as athletes. Among women C-suite executives, 52% played college sports while 39% of the women working at the management level played college sports (Ernst & Young, 2014).

Female athletes have made tremendous contributions to the success of U.S. teams in international competition. Their positive impact continued during the Tokyo 2020 Olympic Games.

- American athletes broke a record by earning 66 medals in women's events, the most ever for the women of any country. The women took home 23 gold medals, which helped the United States rank number one in the gold-medal count (Planos, 2021).

- According to (Staurowsky et al., 2020) women's team sports have dominated the Olympic Games for the past 30 years. Further, the United States has dominated the women's team sports in track and field, basketball, soccer, and softball. Also worth celebrating, the U.S. women's volleyball team claimed its first gold medal at the Tokyo Games (Associated Press, 2021a).

- Additionally, BIPOC women athletes were represented and celebrated at the Tokyo Games. Tamyra Mensah-Stock became the first U.S. African American woman to win an Olympic gold medal in wrestling (Associated Press, 2021a). Further, Allyson Felix became the most decorated Olympic woman in track and field by winning her 10th Olympic medal (Minsberg, 2021).



*Tamyra Mensah-Stock*



- At the Tokyo Games, 186 out LGBTQ+ athletes from 30 countries competed. The United States had the largest number of out LBGTQ+ athletes with 36 (Outsports, 2021).

- U.S. Paralympians Breanna Clark and Susanna Scaroni both won gold in the 400 meters–T20 and 5,000 meters T-54 events respectively in Tokyo. Kendall Gretsch, also a Nordic skiing gold medalist, won gold in the women's PTWC triathlon (Reinert, 2021).

The benefits provided by sport participation supports the need to advocate for and fuel the growth of participation and development of access opportunities for all girls and women across all levels of sports. Title IX has served to encourage the growth of girls and women's sport opportunities since 1972.

- For example, Girls on the Run, a national nonprofit with more than 12,000 locations across North America, focuses on teaching young girls life skills through running. Sports 4 Life, co-founded by the Women's Sports Foundation and espnW, is a national initiative designed to increase participation and retention of African American, Hispanic, and Native American girls in youth development.

- The need for more programs like Girls on the Run and Sports 4 Life is evidenced in data regarding sports access to girls attending low-income schools or to those with limited financial access to sports. Veliz et al. (2019) reported "during the 2015–16 school year, 15.4% of low-poverty schools indicated offering no interscholastic sports compared to 33.6% of high poverty schools". Additionally, it was reported that when high-poverty schools offer sports, they offer a third fewer sports and sports teams than other schools (Veliz et al., 2019). This trend is similarly seen in limited resource colleges as well (Hearn et al., 2018).

As doors for women in sport have opened since the passage of Title IX, the need for advocacy and support has led to the formation of organizations like the Women's Sports Foundation, Women Leaders in College Sports, Black Women in Sports Foundation, Women in Sports and Events, Association of Women in Sports Media, Wasserman's The Collective, WeCOACH, espnW: Women + Sports Summit, and other national and regional women's sport marketing, media, and coaching associations that work vigorously to provide access and a voice for women in sports.

- Title IX has assisted in paving the way for some historical hirings in professional sports. In 2020, Kim Ng shattered the glass ceiling and broke down racial barriers by becoming the first woman and first person of East Asian descent to lead the front office of an MLB franchise by becoming the first female General Manager for the Miami Marlins (Brassil & Draper, 2021).

- MLB continued this trend in 2020 when Alyssa Nakken was hired to the San Francisco Giants' coaching staff and became the first woman to serve in an on-field capacity during an MLB game (Adler & Simon, 2020). Before Alyssa Nakken, there was Rachel Balkovec, who opened the MLB doors to women in 2019 by becoming the first woman to be hired full-time for an MLB team (Brassil & Draper, 2021).

- Latina women have accomplished several significant firsts in the sport of baseball, including Linda Alvarado, who became the first woman to bid to buy a major league franchise and then served as the first Hispanic team owner with the Colorado Rockies in the 1990s. Jessica Mendoza, a highly decorated Olympic softball player, became the first woman baseball commentator on ESPN in 2015 (Smithsonian Staff, 2021).

- In 2017, the staff of *USA Today* named Dr. Justine Siegal as one of the "100 Most Powerful People in MLB". She was hired by the Oakland Athletics in 2015 as the first woman coach in MLB history (Siegal, 2020). She founded "Baseball For All," an organization that focuses on empowering girls to explore their love for the game of baseball (Baseball for All, 2021).

- In 2021, there were four Native American women athletes who competed in the NCAA Division I women's basketball tournament: Arkansas's Chelsea Dungee (Cherokee Nation), Missouri State's Brice Calip (Muckogee [Creek] Nation), Oklahoma State's Lexy Keys (Cherokee Nation), and South Dakota's Aspen Williston (Chocktaw Nation) (NDNSports Staff, 2021).

In 2021, as name, image, and likeness legislation passed by 27 states started to go into effect, causing the NCAA to relax its former prohibition against college athletes earning money from endorsements, new horizons opened up for female athletes. The ability to enter into NIL deals is a game changer for the women who stand to profit and for the sport system overall. In the age of social media, the opportunity for female athletes to generate as much if not more endorsement revenue than their college male counterparts is not only within reach but here (Darvin, 2021b).

- According to a study that evaluated endorsement deal potential, 13 out of 25 college athletes who were ranked



*Alyssa Nakken of the San Francisco Giants*



with the greatest endorsement deal potential were women. Additionally, the annual endorsement deal potential noted was between a low of $14,000 to a high of $476,000 for select female and male college athletes (Maestas & Belzer, 2020).

- The earning potential of the UCLA women's gymnastics team was estimated at $1,250,000 (Maestas & Belzer, 2020).

- Inequities currently exist in the marketplace with companies like INFLCR reporting that 59% of the NIL deals (n=70,000) they tracked were signed by men athletes while another company, Opendorse, which handles NIL endorsements for NCAA Division I athletes reported that men received 64.7% of the available compensation (Hunzinger, 2022).

Given that we are only in the first few months of this era of college athlete endorsements, this is an area to monitor in terms of Title IX compliance and gender equity in college athletic departments, not only in terms of NIL trends and how those are unfolding, but also in terms of obligations under Title IX to provide equitable support to women athletes and programs in marketing, promotions, and publicity.

Racial and gendered barriers continue to fall as women like Michele Roberts, the first woman to serve as the Executive Director of the National Basketball Players Association, became the first woman ever to head a major professional sports union in North America, are hired. After serving in that role since 2014, Roberts was succeeded by Tamika Tremaglio in 2022 (Golliver, 2022).

- In 2018, Cynthia Marshall became the first African American CEO in the history of the NBA when she was hired by the Dallas Mavericks.

- The NFL made similar strides in gender equity as the San Francisco 49er's hired Katie Sowers, the first openly gay and first woman to coach in Super Bowl history. In 2021, there were 12 women coaching in the NFL (Ayala, 2021).

- In 2020, Jennifer King became the first African American woman to become a full-time coach in the NFL. Further, in 2021, Maia Chaka made history by becoming the first African American woman to officiate an NFL game, making her the second woman behind Sarah Thomas, who was the first woman hired as a full-time referee. Sarah Thomas later became the first woman to referee a Super Bowl (Farrington, 2021).

Undoubtedly, these women stand on the backs of the unsung sheroes who faced gender and racial discrimination to break down the barriers in their respective sports: Women like Janet Guthrie, who became the first woman to compete in NASCAR's Winston Cup Series in 1976; or like Toni Stone, who signed with the Indianapolis Clowns of the Negro American League in 1953, making her the first female professional baseball player in a top-tier men's league (Stezano, 2018).

Additionally, African American women have achieved some major victories, with golf being just one example. Renee Powell,



*Renee Powell accepts the Charlie Sifford Award at the 2022 World Golf Hall of Fame Induction*

who stands as a beacon and voice for African American women in golf, became the second African American woman in 1967 to compete on the LPGA Tour, the first being Althea Gibson (Adler, 2018). In 2016, for the first time, four Black women competed on the Ladies Professional Golf Association (LPGA) Tour at the same time. Mariah Stackhouse, Sadena Parks, Cheyenne Woods, and Ginger Howard joined Shasta Averyhardt, the first African American woman from a HBCU (Jackson State University) to earn a LPGA Tour card, and LaRee Sugg in carrying on the path set by Alethea Gibson and Renee Powell in opening doors for Black women in golf (Cook, 2016). Further, Renee Powell continues to break through the glass ceiling in golf. In 2021, Powell became the first woman to be awarded the PGA Golf Professional of the Year Award (Cook, 2021). A few months later, Powell was honored as the first recipient of the Charlie Sifford Award at the World Golf Hall of Fame (PGA Staff, 2022).

Title IX has forged a bridge for women, including BIPOC women, to career positions in sports. Although more work needs to be done before the celebration begins, it's undeniable the impact Title IX has had in shining a spotlight on the importance of women leaders in the sport system and the talent they bring to their respective roles (Carpenter, & Acosta, 2005; Flowers, 2015; McDowell & Carter-Francique, 2017; Cooper & Newton, 2021; Pickett et al., 2012). With so many outstanding achievements and signs of progress, the reality remains that Black women have been marginalized in athletic coaching and administration positions (McDowell & Carter-Francique, 2017). Specifically, Black women reported having their qualifications and abilities questioned, having resentment expressed towards them holding key positions, and being perceived as incapable of successfully performing their jobs (McDowell & Carter-Francique, 2017). It was further noted that Black women experience "pressure to prove themselves on a consistent basis, to know their job well with minimal or no help or guidance, to avoid making mistakes, and to take on countless tasks and roles to prove their worth"



(McDowell & Carter-Francique, 2017). The majority of research highlights sports participation of Black women and not athletic career positions (McDowell & Carter-Francique, 2017; Pickett et al., 2012); therefore, there is a need to expand research in this area to further examine the marginalization of Black women in athletic administration and coaching positions.

For all of the progress that has taken place and continues to occur, much work remains. The hosting of the 2022 NCAA Women's Division I Basketball Final Four in Minneapolis, which took place on the original homeland of the Dakota and Ojibwe people, became a focal point around consciousness raising that Native athletes are significantly underrepresented in NCAA sponsored sports. As Native lawyer and former Wisconsin women's basketball player, Stomski Seim, commented, "There has been an issue for a long time – there is barely 1% of all NCAA student-athletes [who] are Native Americans.  It is not because of talent. It's not because of lack of love of competition in sport. It's really a lack of access to those opportunities" (Hallman, 2022).

During the 2021 NCAA Division I women's basketball tournament, discrepancies in weight rooms, food, media coverage, and venues drove gender equity debates. An outcry for more equitable facilities and treatment was fueled by social media posts by women's basketball tournament participants and media covering the tournaments. External reviews of not just the NCAA women's basketball but all women's championships across all divisions revealed systemic discrimination (Kaplan Hecker & Fink, 2021a, 2021b). These issues in women's college basketball can be found in virtually every other college women's sport program, in girls' sports from K–12, and in women's Olympic and professional sport as well.

An increase in the number of athletes speaking up against inequitable resources has also sparked further discussion around discrimination, gender equality, racial justice, as well as mental health.

- The U.S. National Women's Soccer Team's (USWNT) legal battle with the U.S. Soccer Federation over equal pay shed light for many on the severity of the gender pay gap in professional sports. In February of 2022, the USWNT and U.S. Soccer Federation reached a $24 million settlement agreement regarding equal pay claims (Goodman, 2022). While compensation for women has improved over the past decade, the gap still exists. For broad context, while compensation for women has improved over the past decade, the pay gap still exists and has remained relatively stable in the United States over the past 15 years or so. In 2020, women earned 84% of what men earned, according to a Pew Research Center analysis of median hourly earnings of both full- and part-time workers (Barroso & Brown, 2021). Women of color experience an even more significant wage gap, closer to 64% for Black women (Bleiweis et al., 2021)

- Tennis legends Venus and Serena Williams were vocal advocates for pay equality in tennis. According to ESPN, the U.S. Open was the first of four major tennis tournaments to award equal prize money to men and women (Bodo, 2017). As advisory board members for the Billie Jean King Leadership Initiative (BJKLI), the Williams sisters continue to promote equality in pay in professional sports. BJKLI stands as a leader in advocating for equal pay for equal work through promoting equality, access, and inclusion (Associated Press, 2018)

Just as heroic, members of the WNBA stood in solidarity against racial discrimination and injustice. To bring awareness to racial discrimination and gun violence the teams wore shirts that read, *"Change Starts With Us: Justice & Accountability,"* which honored Philando Castile and Alton Sterling, who were both victims of racial violence.

- Additionally, members of the Indiana Fever took a knee in protest over the police shootings of Alton Sterling and Philando Castile before their playoff game against the Phoenix Mercury. The player's activism also included bringing awareness to voting rights and sexism (Tsuji, 2016).

- As a result, the WNBA announced their 2020 season would be dedicated to social justice and launched The Justice Movement. The goal of The Justice Movement is to continue the conversations about race, voting rights, LGBTQ+, and gun control. They also dedicated the 2020 season to Breanna Taylor and launched the #SayHerName Campaign (WNBA, 2020).

As we enter the next 50 years of Title IX, we celebrate the progress but acknowledge that the women's sport story that is being written is not as inclusive as it could be, that the gender binary that forms the basis for the foundation of the sport system in the United States has, in many ways, greatly benefitted girls and women, but not equally (for marginalized girls and BIPOC girls and women far less) and not for those who do not easily fit within the confines of a gender binary that insists on separating human beings into an either/or category of female/male. Beyond gender, sport is a human experience. Within it, there should be a place for everyone to experience its joys and benefits.



# Part II. Brief History of Title IX and Its Impact on the Nation's Schools

Within a sport culture where U.S. women are leaping, racing, sprinting, throwing, and vaulting into their futures with a fierceness and flare that captures the attention of global audiences, inspiring awe and admiration, it hardly seems possible that such performances emerge directly from a time when strength in a woman was an indictment of her character and femininity. And yet, as we approach the 50th anniversary of Title IX, it was that accusation of "coming on too strong for a woman" that fueled the work of Dr. Bernice (Bunny) Sandler in the late 1960s to document the ways in which girls and women were being held back by sexist stereotypes in the nation's schools.

As a professor with a newly minted doctoral degree in counseling and personnel services from the University of Maryland, Dr. Sandler found it puzzling that she applied for, and was turned down for seven tenure-eligible positions in her home department after establishing a reputation as a good professor among the undergraduates she taught there. Seeking an explanation, she learned from a male colleague that the department viewed her as "too strong for a woman" (Sandler, 2000), a term reflective of stereotypical attitudes that women were less qualified intellectually and temperamentally for careers in professions in academia, business, law, medicine, military, politics, and sports, for example.

Confronting that reality at a time when there were few reports on how women were treated in the workplace and at a time when "phrases like sexism and sexual harassment were not even in common usage" (Ware, 2011, p. 46), the initial rejection Dr. Sandler encountered as a professor and researcher fueled her collaboration with the Women's Equity Action League (WEAL). After combing through federal legislation in an attempt to find something to challenge "an industry-wide pattern" of sex discrimination and finding it in an executive order issued by President Lyndon B. Johnson, she worked with WEAL to file complaints against 250 colleges and universities (Griggs, 2019; Rose, 2015, 2018). Sandler's work became the foundation for seven days of hearings conducted in 1970 under the auspices of the House Committee on Education and Labor, where Representative Edith Green (D–OR) served as chair of the special subcommittee on education. The outcome of those hearings was a two-volume, 1,300-page report documenting the depths of the unfair treatment women faced in U.S. colleges and universities (Sandler, 2000). It would take that level of documentation to overcome the denials from school officials about the second-class status women were subjected to within higher education.

An overarching mindset that afforded preferential treatment to men and limited opportunity for women was reflected in the 1960s and 1970s in the routine policies and practices that governed life on college and university campuses. Emblematic of the times:

- Twenty-one thousand female students were denied admission to state universities in Virginia in the early 1960s at a time when not a single male student was denied admission (Sandler, 2007).

- At the University of North Carolina, separate admission policies requiring female applicants to be "especially well-qualified" (a standard not in place for male applicants) resulted in the 1970 freshman class being composed of nearly 1,900 men and only 426 women (Blumenthal, 2005; McMillen, 1997).

- When more qualified female applicants sought admission to the University of Michigan, requirements were adjusted to ensure that there would not be an "over-balance" of women (Sandler, 2007).

- Many medical and law schools used quotas to limit the number of women per class. Those quotas accounted for the fact that at the end of the 1960s women made up 7% of the doctors in the United States (Blumenthal, 2005; Sandler, 2007).

Those hearings laid the groundwork for the enactment of Title IX two years later, championed by Green along with U.S. Senator Birch Bayh (D–IN) and Representative Patsy Mink (D–HI). Considered the "Mother of Title IX", Mink's advocacy on behalf of women in education emanated from her own experiences. When she was denied admission to medical school, she sought admission to law school. After earning her degree in law, she was denied employment as a lawyer because she had a child. When those doors closed, she found a way, working tirelessly as the first Asian American and woman of color to serve in the United States Congress. For her advocacy and life of service, Title IX was eventually renamed the Patsy Matsu Takemoto Mink Equal Opportunity in Education Act. Reflecting on the influence that both the legislation and Mink have had, U.S. Senator Mazie Horono (D–HI) stated, "Patsy's legacy lives on in every female student and athlete in America who's been given a fair shot to compete in the classroom and on the playing field" (Wang, 2014, para. 6).[2]

---

2   *A book on Patsy Mink's life and legacy entitled* Fierce and Fearless: Patsy Takemoto Mink, First Women of Color in Congress, *authored by Judy Tzu-Chun Wu and Gwendolyn Mink is expected to be published by NYU Press in May of 2022.*



**Table 1. Impact of Title IX on Representation of Girls and Women in Athletic Programs and Education**

| Program or Setting | Gender of Participants | Participation by Year | |
| --- | --- | --- | --- |
| | | 1972–72 | 2018–19 |
| High school varsity sports participation | Boys | 3,666,917 | 4,534,758 |
| | Girls | 294,015 | 3,402,733 |
| NCAA varsity sports participation | Men | 170,384 | 278,988 |
| | Women | 29,977 | 219,177 |
| Receiving bachelor's degrees | Men | 500,590 | 857,545 |
| | Women | 386,683 | 1,155,309 |
| Entering medical school | Men | 10,435 | 10,864 |
| | Women | 1,653 | 11,611 |
| Attending law school | Men | 85,554 | 52,555 |
| | Women | 8,914 | 60,175 |

*Data for this table were drawn from: National Federation of State High School Associations (2019); National Collegiate Athletic Association (2020); Digest of Educational Statistics (2021); Association of American Medical Colleges (2019); and American Bar Association (ABA) Profile of the Profession (2020).*



*Sarah Davis of the Minnesota Golden Gophers scores during the 2014 NCAA Women's Ice Hockey Championship.*



# Part III. A Brief Overview of Title IX's Legislative History as It Pertain to Athletics

As a federal civil rights law, it is important to understand that Title IX is modeled after Title VI of the Civil Rights Act of 1964, which bars discrimination on the basis of race, color, or national origin in programs or activities that received federal financial assistance. In his introduction of the bill in February of 1972, U.S. Senator Birch Bayh explained that Title IX was designed to recognize that sex discrimination rendered girls and women second-class citizens and the appropriate remedy to address this issue was to ensure that "...our national policy prohibits sex discrimination at all levels of education" (Bayh, 1972, p. 5807).

Known for its succinct 37-word mandate, Title IX reads as follows:

> No person in the United States shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance (Education Amendments Act of 1972, 2018, Section 1681(a)).

At the time Title IX was passed, men's and women's athletic departments at the college level largely operated in separate spheres. The Association for Intercollegiate Athletics for Women (AIAW), founded in 1971, played a key role in educating public policy makers about the state of women's sport on college campuses. As the implications of Title IX's mandate for fair and equitable treatment began to take hold, college sport power brokers representing men's athletic interests started to mobilize resistance. Working through the National Collegiate Athletic Association (NCAA), which at the time was an all-male institution, they lobbied for athletics to be exempted from the reach of Title IX. Amendments authored by Republican senator from Texas, John Tower, initially sought to remove athletics entirely from Title IX's application. When that effort failed, there were subsequent efforts to insulate the revenue-producing sports of football and men's basketball from an analysis under Title IX. Those efforts failed as well (Staurowsky, 2016a; Suggs, 2005).

Fears that bringing fair and equitable treatment to female athletes in athletics would damage or destroy men's athletics were powerful talking points that held sway over members of Congress and the American public. Those fears were somewhat assuaged with the passage of the Javits Amendment, which clarified that athletic departments would not be compelled to invest the exact same amount of money in men's and women's sports but would need to provide the same quality of experience for male and female athletes. In effect, the determination of quality would be anchored in the nature of the sport, avoiding a hard and fast rule that for every dollar spent on a male athlete there must be a dollar spent on a female athlete. Thus, if it cost more money to equip a football team compared to a field hockey team, it was acceptable to spend more money on the football team (Staurowsky, 2016a).



© iStock by Getty Images

As is the case with all federal legislation, each branch of government (legislative, judicial, and executive) plays a role in effectuating the intent of Title IX and ensuring its enforcement. The U.S. Congress not only enacted Title IX but also has entertained amendments to clarify its scope; the executive branch, through the appropriate governmental agency (initially the U.S. Department of Health, Education, and Welfare (HEW) and now the U.S. Department of Education), provides oversight in terms of education and compliance; and the nation's courts have served as an avenue for disputes regarding sex discrimination to be remedied under Title IX (Staurowsky, 2016a).

When officials with HEW set about circulating regulations to clarify Title IX's application to school in 1974, it became clear that the idea of providing fair and equitable treatment to female athletes had struck a nerve with educational administrators. Of the nearly 10,000 responses submitted by various stakeholders (lobbyists, athletic directors, teachers, parents) in response to HEW's call for comments, 90% of them addressed concerns about athletics despite the fact that athletics is only one of myriad educational opportunities offered by schools (Carpenter & Acosta, 2005; Samuels and Galles, 2003). Appearing before a U.S. House education subcommittee in June of 1975 after the regulations were released, then Secretary of HEW, Casper Weinberger, quipped that he "...had not realized until the comment period that athletics is the single most important thing in the United States" (Associated Press, 1975). He also noted in his remarks that the NCAA's characterization of title IX as something that would "bankrupt" college athletic departments was simply, in his words, wrong.



Despite Weinberger's attempts to offer assurances that Title IX did not threaten men's sports, efforts continued to derail Title IX's application to athletic departments, surfacing in a lawsuit brought by Grove City College against the government, arguing that since it did not directly receive federal financial assistance it was not obligated to comply with Title IX. In *Grove City v. Bell* in 1984, while the U.S. Supreme Court disagreed, noting that students at Grove City were recipients of federally funded loan programs, the Court did narrow the scope of Title IX's application only to the financial aid office. For a time, the NCAA and representatives of men's college sport interests seemed to have won the day in getting athletic departments exempted from the equitable treatment requirements of Title IX. Due to the impact of the ruling not just on Title IX's application but also its adverse effect on the application of other civil rights laws, Congress intervened to pass the Civil Rights Restoration Act in 1987, making clear that Title IX applied to the institutional, not just programmatic level (Sack & Staurowsky, 1998).[3]

Two decades after Title IX was passed, vast gender inequities and continuing resistance to providing equitable treatment to female athletes endured as did the hesitancy of presidential administrations to deal with Title IX athletics regulations. President Gerald R. Ford (1974–77) wavered on the release of the regulation itself while President Jimmy Carter (1977–81) did the same with the "Policy Interpretation." During President Ronald Reagan's administration, delays occurred as his administration entertained the idea that Title IX should not apply at all to athletics, a consideration that paralleled the Grove City case. Even after the passage of the Civil Rights Restoration Act, which restored enforcement authority to apply Title IX to athletics, presidential administrations under George H. W. Bush (1989–93) and in the early years of Bill Clinton (1993–2001) remained less than aggressive about ensuring that female athletes competing in the nation's schools were protected from sex discrimination. "As a result, the public's perception of Title IX's constitutional legitimacy was seriously eroded. A statute that was out of sight was also, to the public, out of mind" (Orleans, 1996, p. 137). In point of fact, the impetus for school administrators to pay attention to Title IX enforcement occurred as a result of a U.S. Supreme Court decision providing for students to receive injunctive relief from the sex discrimination

---

[3]   *"An initial challenge to the breadth of Title IX in Grove City narrowed the scope of Title IX to only those educational programs directly receiving financial assistance, which raised the question whether athletic departments which did not directly receive federal financial assistance would be beyond the reach of the statute. In applying Grove City in an athletics context, one federal court held athletic scholarships were outside the coverage of Title IX (See Bennett v. West Texas State University, 1986) and another rejected such a narrow interpretation of Title IX's applicability to athletic financial aid (See Haffer v. Temple University, 1987). This uncertainty further delayed implementation of Title IX in athletics. Consequently, it was not until 1988 (more than 15 years after the enactment of Title IX), that Congress passed the CRRA in 1998 restoring the broad scope of coverage of Title IX and mandating institutional compliance across all programs within an educational institution. As Sack and Staurowsky (1998) document, the NCAA was looking for a case like this to achieve what it had been unable to do with the proposed Tower Amendments, and that was to exempt athletics from the reach of Title IX."*

they were experiencing and receive monetary damages (punitive and compensatory) when schools failed to address sex discriminatory behaviors and practices (Orleans, 1996).

In 1993, research conducted by the NCAA's Gender Equity Task Force was released. Findings revealed that the college sport system had changed slowly to include women, with a disproportionately high 70% of athletic opportunities continuing to be made available to male athletes. Similar trends were found in the allocation of financial resources to support men's teams, including nearly 77% of operating budgets, 70% of athletic scholarship funds, and 83% of recruiting dollars (Hosick, 2007).

Female athletes sought relief in the courts from the pervasive mindset among administrators that women's athletics was just not as important as men's sport and that women had not earned the right to be treated fairly and equitably. In the landmark case of Cohen v. Brown University, that mindset would continue to be challenged. Significantly, Cohen reaffirmed that it was "well-settled that Title IX applies to all of an institution's programs if any part of an educational institution receives federal funds." Cohen also confirmed that the Department of Education's Title IX regulations and policy interpretations were entitled to substantial deference when interpreting the scope and application of Title IX. And lastly, Cohen interpreted the phrase "substantially proportionate" as used in the DOE regulations related to participation opportunities to be properly found only where the institution's "actual" participation opportunities in its intercollegiate athletic program mirrors the student enrollment as closely as possible.

In an effort at creating some transparency around how schools were responding to Title IX's mandate that female athletes receive equal access and equal treatment in athletics at the college and university level, the Equity in Athletics Disclosure Act (EADA) was passed in 1994. Yet a similar law still does not exist for K–12 athletic programs, meaning accountability and transparency is often quite lacking.

Over time, the federal agencies charged with overseeing enforcement of civil rights laws in educational settings, first HEW and then the U.S. Department of Education Office for Civil Rights, continued to develop resources to support school administrators in their compliance efforts. The publication of Title IX's regulations would be followed up four years later with the Intercollegiate Athletics Policy Interpretation in December of 1979 and the Title IX Athletics Investigators Manual in 1990.

Additional policy guidance has been provided in the form of memorandums and letters of clarification issued by the OCR are listed below. When the law was first passed in 1972, schools were given grace periods, or a reasonable period of time to comply with Title IX's requirements.

- 1975 Letter to Chief State School Officers, Title IX Obligations in Athletics emphasized that the adjustment period allowed for schools to achieve compliance was not a waiting period. Schools were to move expeditiously, but no later than July 21, 1978, to fully implement a plan to fully and effectively accommodate the athletic interests and abilities of both sexes (Holmes, 1975).



- Intercollegiate Athletics Policy Interpretation in December of 1979.

- 1990 Title IX Athletics Investigator Manual (Bonnette & Daniel, 1990).

- 1996 Dear Colleague Letter and Clarification of Intercollegiate Athletics Policy: Three Part Test, which responded to the need for additional guidance regarding "whether students of both sexes are provided nondiscriminatory opportunities to participate in athletics" (Cantu, 1996).

- 1997 Dear Colleague Letter: Bowling Green State University and Letter from Mary Francis O'Shea, National Coordinator for Title IX Athletics, which noted that the Office of Civil Rights of the U.S. Department of Education was investigating 25 complaints about the way in which athletic scholarships were allocated in intercollegiate athletic programs, clarifying that those allocations needed to be substantially proportionate to the participation rates of female and male athletes.

- 2002 Guidelines on Current Title IX Requirements Related to Single-Sex Classes and Schools, which clarified that students were not to be segregated on the basis of sex in courses or activities in physical education and that students were to be grouped according to objective standards of physical performance. However, exceptions were permitted for sports involving bodily contact (Paige, 2002).

- 2003 Dear Colleague Letter with Further Clarification of Intercollegiate Athletics Policy Guidance Regarding Title IX Compliance, emphasizing the flexibility of the three-part test used to assess whether a school is offering equal athletic opportunities to female and male students. It further notes that "nothing in Title IX requires the cutting or reduction of teams in order to demonstrate compliance with Title IX, and that the elimination of teams is a disfavored practice" (Reynolds, 2003).

- 2005 Dear Colleague Letter with Additional Clarification of Intercollegiate Athletics Policy: Three-Part Test – Part Three. Information issued in this clarification that allowed for the use of a single survey to assess interest in participating in athletics and a user's guide offering a "model survey" was later found by the OCR to be "inconsistent with the nondiscriminatory methods of assessment set forth in the 1979 Policy Interpretation and the 1996 Clarification and do not provide the appropriate and necessary clarity regarding nondiscriminatory assessment methods, including surveys" (see clarification from 2010).[Withdrawn]

- 2007 Guidance on Nondiscriminatory Treatment of Pregnant Students in Athletic Scholarships, which cautioned schools that taking an athletic scholarship away from an athlete because she is pregnant violates Title IX (Monroe, 2007).

- 2008 Dear Colleague Letter with Guidance on Determining which Athletic Activities Can be Counted for Purposes of Title IX Compliance reviewed the factors that are considered when determining which athletic activities offered by a school are counted under Title IX (Monroe, 2008).

- 2008 Dear Colleague Letter, which reaffirmed the U.S. Department of Education's position regarding the three-part test and its application to high school interscholastic athletic programs in terms of assessing student interests and abilities (Spellings, 2008).

- 2010 Dear Colleague Letter with Guidance on Accommodating Students' Athletic Interests and Abilities: Standards for Part Three of the "Three-Part Test," which, as noted above, withdrew the 2005 Dear Colleague Letter and model survey (Ali, 2010).

- 2013 Dear Colleague Letter with Guidance on the Prohibition Against Retaliation Under Federal Civil Rights Laws including Title VI, Title IX, ADA Title II Section 504, which addressed the importance of protecting individuals coming forward to report discrimination from retaliation (Galanter, 2013b). 2013 Dear Colleague Letter with Guidance on Supporting the Academic Success of Pregnant and Parenting Students, which included a pamphlet that explained Title IX's requirements as they pertain to pregnant and parenting students (Galanter, 2013c).

- 2015 Title IX Resource Guide. While this document was rescinded during the Trump Administration, it remains on the U.S. Department of Education website as a historical reference (Lhamon, 2015c).

- 2015 Guidance on Voluntary Youth Service Organizations. This document provides guidance regarding under what circumstances a school district may offer single-sex programming under Title IX (Lhamon, 2015d).

- 2017 Dear Colleague Letter, which rescinded the 2015 and 2016 U.S. Department of Education and U.S. Department of Justice's position regarding discrimination on the basis of gender identity as constituting sex discrimination under Title IX. As of August of 2021, this letter is under review (Battle & Wheeler, 2017).

- In 2020, the Office for Civil Rights issued assistance to schools regarding expectations for meeting obligations under Title VI, Title IX, and ADA Title II/Section 504 during the COVID-19 pandemic, noting that schools could not adopt a blanket policy of putting off investigations or proceedings during this time.

For school administrators in 2022 to continue to be unaware of Title IX standards and how they apply to athletic departments 50 years after the law was enacted strains the concept of reasonableness and can be seen as an act of evasion. The Higher Education Opportunity Act (2008) requires that institutions each year attest that they are complying with federal law.

While the Office for Civil Rights has the power to withhold federal funding from schools that fail to comply with federal law, in Title IX's first five decades no school has been punished with that penalty.



# Part IV. Title IX and Athletics: The Legacy of the "Separate but Equal" Standard in Athletics Programs

The expanse of Title IX's reach in terms of athletic programs sponsored by federally funded educational institutions includes intercollegiate and interscholastic athletic programs (varsity, junior varsity, and sub-varsity programs), intramural programs, and club sports. Because funding and administration models for these programs are different, meaning intercollegiate and interscholastic programs typically have more resources and support provided by institutions with intramural and club sports operating from student initiatives and student-led leadership models, there are nuances that come into play in determining Title IX compliance within each of those areas.

One of the authors of Title IX's athletics regulations, Jeff Orleans (1996), explained that the law's application to federally funded educational institutions points to both the constitutional and moral jurisdiction of Title IX. Offering a window into the governmental interest in ensuring that citizens attend schools free of sex discrimination, Orleans (1996) wrote, "...federal support means that discrimination in an activity is not merely an institutional error but amounts to biased action by the

government itself" (p. 134). The linchpin here is the purpose to which taxpayer dollars are dedicated as they circulate through school systems and colleges and universities. As Orleans (1996) helpfully points out, taxpayers ought not be excluded from programs that they financially support, nor should the government be subsidizing programs that arbitrarily exclude citizens from participating in them (p. 134).

In recognition of what has historically been a central organizing principle for athletic programs, Title IX's regulations provide for boys and girls and men and women to have separate athletic programs, justified on the basis of perceived social, philosophical, and biological reasons. As a consequence, from its earliest beginnings, the regulatory framework that established a school's obligations under Title IX in the athletic area allowed for sex-segregated athletic programs arranged around the concept of a gender binary. The embrace of sex segregation in Title IX's application to athletics puts it at odds with other civil rights statutes that require sex integration (Buzuvis, 2020).



©iStock by Getty Images



# Part V. Title IX Athletics Compliance, Education and Enforcement

After Title IX's passage, there was an expectation that compliance would be achieved in elementary schools by 1976; high schools and colleges and universities by 1978 (Bauer, 2001)). According to scholars Linda Carpenter and Vivian Acosta (2005), there are three ways in which Title IX can be enforced: voluntary and ongoing reviews and audits conducted internally within schools, lawsuits, and reviews conducted by the U.S. Department of Education Office for Civil Rights triggered by citizen complaints. State departments of education do audits as well, and many states have their own versions of Title IX on the state level.

While Title IX has had a demonstrable effect on the nation's schools, the path to compliance and enforcement has been marked by delays, detours, and derailments (Staurowsky, 2016a; Staurowsky et al., 2020; Staurowsky & Rhoads, 2020). In 2019, only 27% of U.S. women high school sport leaders (n=877) and 44% of college sport leaders (n=1,155) reported a belief that institutions had a strong or very strong record of Title IX compliance (Staurowsky et al., 2020).

A study conducted by the Women's Sports Foundation (Staurowsky et al., 2020); an investigative report by Wesley Jenkins (2019) with the Chronicle of Higher Education, and the external review of the NCAA's approach to women's championships revealed gross gender inequities across all divisions (Kaplan Hecker & Fink, 2021a, 2021b), there is ample support for a conclusion that cause for concern about widespread Title IX noncompliance in college and university athletic programs existed before the COVID-19 pandemic began and women's sports programs were clearly vulnerable to cuts during the pandemic. In 2020–21 alone, female and male athlete plaintiffs successfully challenged cuts to their programs at Brown University, William and Mary, University of North Carolina at Pembroke, East Carolina University, Dartmouth University, Clemson University, University of St. Thomas, LaSalle University, and Dickinson College under Title IX (Bailey Glasser, 2021).

Although it is more difficult to get a complete picture of what is happening at the high school level because less research has been done on that sector, similar concerns appear to exist at the high school level.

- Based on an analysis of athletic participation opportunities available to female and male athletes in 15,000 high school programs using data from the National Center for Education Statistics (NCES) and the Civil Rights Data Collection (CRDC), only seven states offered athletic opportunities to female athletes proportional to the enrollment of female students in their schools (Webster, 2020).

- In a report from the OCR focusing on protecting the civil rights of students in the nation's schools, 3,609 complaints were filed with the OCR seeking relief under Title IX for gender inequities in high school athletic programs (Lhamon, 2015b).

- According to U.S. Department of Education's Report on Pending Cases Currently Under Investigation at Elementary-Secondary and Post-Secondary Schools as of February 2, 2022, Title IX athletics complaints had been filed against 71 high schools and school districts in 27 states and the District of Columbia.

## The Roles and Responsibilities of Title IX Coordinators

In retrospect, for Title IX protections against sex discrimination to remain unreachable and/or so tenuous for female athletes after five decades raises questions about how compliance and enforcement are framed and discussed. A key aspect of Title IX compliance as conceived by HEW in the early 1970s was the creation of an avenue within schools where stakeholders could be educated about Title IX and monitoring systems could be put into place to assess compliance and remedy sex discrimination as it was occurring and to ensure that there was a way for those harmed by sex discrimination to have that discrimination remedied and their rights to unfettered access to education protected. Schools were thus required to designate a Title IX coordinator to take on those roles and responsibilities.

Widespread failure to appoint Title IX coordinators, publicize who they were, or provide training and support to them has slowed compliance and enforcement efforts in the spaces where those experiencing sex discrimination need it most: on the ground in the classroom, on the athletic field, in the locker room, on the court, on the track, and in the arena. Describing the attitude of school administrators to their obligation to appoint a Title IX coordinator in the first two and half decades after the passage of Title IX, Carpenter and Acosta (2005) noted, "Other than posting a name and title on the back-corridor bulletin board, many schools did little to disseminate to the campus community information about the requirements of Title IX" (p. 8). This problem persisted into the third decade. In a Title IX compliance review of selected institutions conducted in 2004 by acting assistant secretary for Civil Rights Kenneth Marcus, failure to inform school communities about the identity of their Title IX coordinator and how to contact them was the most frequently identified problem (Marcus, 2004).

Since Title IX's passage, federal officials with the Office for Civil Rights have reminded school administrators about their obligations to provide Title IX oversight: create internal



avenues to educate stakeholders, monitor and assess Title IX compliance, document efforts to remedy sex discrimination and discourage its perpetuation, and provide the resources needed to conduct investigations when necessary (Marcus, 2004; Matthews & McCune, 1977, 1987; Lhamon, 2015a, Staurowsky & Rhoads, 2020).

- In 2011, the Association of Title IX Administrators (ATIXA) was formed to "...create a venue for professional exchange between coordinators and other administrators with Title IX responsibilities, to finally and meaningfully wrap our heads around the Coordinator role, other Title IX–based administrative responsibilities, and best practices for institutional Title IX compliance" (ATIXA, 2020, para. 5).

- In a 2012 survey of secondary athletic administrators in the state of North Dakota, they reported a perception that there was a lack of contact/education with the Office for Civil Rights and a lack of sample policies and research on Title IX compliance and the high school sector. They also noted that when policies are implemented, there is not enough high school representation to take into account issues high school athletic directors face at the local level (Dahl, 2012).

- In 2013, the National Women's Law Center filed a complaint with the Office for Civil Rights alleging Title IX violations in the District of Columbia Public School athletic departments. They noted in the complaint that the District failed to provide the name and contact information for the Title IX coordinator. This case led to the passage of the Title IX Equity Act in the District of Columbia in 2015.

- In 2015, the Office for Civil Rights sent out a reminder to school administrators that "A critical responsibility for schools under Title IX is to designate a well-qualified, well-trained Title IX coordinator and to give that coordinator the authority and support necessary to do the job" (New, 2015).

- Knowing the identity of the Title IX coordinator is critical. In a study of nearly 1,100 college and university coaches, just over 30% were aware of who their Title IX coordinator was, and 42.8% were not sure (Staurowsky & Weight, 2013).

- According to the Feminist Majority Foundation, difficulty in finding information about Title IX coordinators was particularly pronounced in local district and school levels (Klein, 2016).

- In a project examining the availability of information to the general public about Title IX coordinators, including contact information and how to file a complaint, 37% of 51 school districts in two Michigan counties did not mention Title IX on their websites or provide any information, 26% provided information, and 36% mentioned some but not all of the information (Klein, 2016).

- A study of high school athletic administrators conducted by the U.S. Government Accountability Office (GAO) in 2017 revealed an estimated 51% were either unaware of who their Title IX coordinator was or felt unsupported by their Title IX coordinator (Nowicki, 2018).



©iStock by Getty Images

- The U.S. Government Accountability Office reported that OCR officials were not aware of how closely Title IX coordinators worked with high school athletic administrators on Title IX compliance. Officials of an association that conducts Title IX trainings expressed a belief that Title IX coordinators' working in the high school sector had low familiarity with regulations pertaining to athletics (Nowicki, 2018).

- A series of studies assessing Title IX knowledge among athletics administrators, coaches, staff members, and college athletes revealed a general lack of knowledge about Title IX (Staurowsky & Weight, 2011, 2013; Staurowsky et al., 2017; Rodkey et al., 2019).

The lack of a unified approach to Title IX compliance has been credited with fostering a persistent lack of knowledge among educators about what Title IX is and how they need to take it into account when doing their work (Nash et al., 2007). The accumulated effects of this slow, uneven, and at times neglectful attention to Title IX compliance infrastructure within institutions and athletic departments is reflected in research findings and concerns expressed by practitioners.

- Half (50%) of NCAA Division I head coach respondents indicated that their department did not have a Gender Equity Committee (Weight & Staurowsky, 2014).

- Despite Title IX's admonition that administrators refrain from retaliating against coaches when they bring forward concerns about Title IX compliance, in Staurowsky and Weight (2013), 12% of college coach respondents indicated that they felt they might lose their job if they advocated for Title IX. Further, nearly 20% of female coaches felt they might lose their job if they advocated for Title IX, and 35% of coach respondents were either hesitant or believed it was too risky to bring up Title IX issues in their athletic department.



- In a study of athletics administrators, coaches, and staff within NCAA Division II schools (Rodkey et al., 2019), 17% of respondents (N=157) did not know who their Title IX coordinator was, 23% were not aware that students should know who the Title IX coordinator was, and 25% were not aware of Title IX's whistleblower protections.

- According to Staurowsky and Weight (2013), 83% of college coaches (N=1,093) reported that they never received any formal training about Title IX as part of preparation for their jobs.

- When asked whether they agreed or disagreed that they had received adequate Title IX education and training, more than a third of NCAA Division I athletic department personnel indicated that they disagreed (Rodkey et al., 2019).

Five decades after the passage of Title IX, the roles, responsibilities, even baseline expectations about the credentials and experience of Title IX coordinators, and reporting lines remain loosely defined and vary greatly across the education landscape generally (Pappas, 2021). That variability translates into a similarly chaotic compliance and enforcement environment when it comes to Title IX and athletic departments. In one of the few studies examining the experiences of Title IX athletics coordinators, findings from The Title IX Athletics Compliance Officers: Who Are They and What Are Their Challenges Survey (n=90 NCAA Division I administrators with responsibility for Title IX oversight) revealed a general lack of clarity regarding who in athletic departments are supposed to handle Title IX oversight (Staurowsky & Rhoads, 2020). While some schools had a secondary Title IX athletics coordinator designated in the athletic department, the responsibility for Title IX compliance in the athletic department was often unclear. Additional findings include the following:

- 75% of respondents also held the title of Senior Woman Administrator

- 60% reported that overseeing Title IX compliance in athletics was a default assignment because they were a woman administrator, and only a third had specific training in Title IX prior to taking on the role.

Although a large majority of respondents indicated a commitment level to gender equity and Title IX compliance in their athletic department was good to excellent, the level of support to fulfill such a commitment was not evident as reflected in:

- 51% indicating that funding support for Title IX education efforts was fair to poor

- 45% indicating that funding support to attend trainings was fair to poor

- 49% indicating that workload allocations to do the job was fair to poor

- 49% reporting that Title IX resources were not available to athletes on the athletics website

- 2–3% of respondents reporting that they taught athletes and coaches how to read an EADA report (Staurowsky & Rhoads, 2020).

For girl/women athletes and those working in athletic departments, the path to finding out who handles Title IX complaints and how to file them is often unmarked or difficult to find. Less than half of the Title IX athletics compliance officers who responded to the Staurowsky and Rhoads (2020) survey indicated that Title IX educational resources were made available on their athletic department websites. Further, the reporting structures for those assigned roles as Title IX athletics coordinators vary widely from institution to institution. Some are wholly contained within the athletic department, others have informal reporting relationships with the institution's Title IX Office (57%), and less than 20% had a dotted line reporting relationship with the Title IX Office.

Inconsistency in reporting structure between athletic departments and institutional Title IX offices creates vulnerabilities for those assigned responsibility to oversee Title IX compliance and enforcement efforts. The independence needed to conduct objective evaluations can be compromised when circumstances place Title IX compliance officers at odds with the people who have the power to promote them and/or extend their contracts. As Staurowsky and Rhoads (2020) found:

- For 64% of Title IX athletics coordinators, institutional Title IX compliance officers played no role in their job performance evaluation, which has implications for those willing to take on the role and their effectiveness in it.

- The fact that a large majority of Title IX athletics coordinators working in athletic departments are not evaluated by an institutional Title IX coordinator "potentially sheds light on the 19 percent of respondents who reported they had been retaliated against or thought they might have been retaliated against; the 28 percent who indicated that they were or might have been pressured to remain silent about a Title IX issue; and the 17 percent who felt they could or might lose their jobs by engaging in the advocacy necessary to fulfill their roles relative to Title IX. The chilling effect of such threats mirrors findings from other studies…" (Staurowsky & Rhoads, 2020, p. 399).

As an agenda is set for the next 50 years of Title IX, the structures and processes that support Title IX education, monitoring, and enforcement effort will be key. As legal scholar Catherine Stimpson notes: "legal remedies for sex discrimination are necessary but not sufficient" (p. 262).



# Part VI. Title IX's Two Key Athletics Areas: Equal Access to Participation & Equitable Treatment

Title IX's application to athletic programs hones in on two key areas that logically connect, beginning with an equal opportunity for female athletes to participate in sports that they have an interest in and aptitude for. A companion to this is the issue of equitable treatment, meaning that once female athletes have an equal opportunity to participate, they will then be treated equitably when compared to male athletes. In effect, it is expected that female athletes will be afforded the same opportunity as male athletes to participate in athletics while the supports they are given are equitable, taking into account that different supports may be necessary to create equal access. Therefore, Title IX provides for assessing the allocation of resources across the athletic department and in the aggregate and does NOT require:

- The same funding to the overall women's and men's programs.

- The same funding to women's and men's teams in the same sports.

- The same benefits to female and male athletes in the same sports.

- The same numbers of teams offered to male and female athletes.

- The same sports for women and men.

- That schools compete at a specific level (Bonnette & Von Euler, 2004, p. 7).



*Scout Bassett*



# Part VII. Title IX's Three Athletic Compliance Areas: Athletic Participation, Athletic Scholarships, and Operational Support

In assessing whether an athletic program is in compliance with Title IX requirements, three broad areas are considered: equal accommodation (participation opportunities), equal treatment (benefits that comprise operational support), and athletic scholarships for schools that offer them (Staurowsky et al., 2020). In the sections to follow, how each of the areas is reviewed under Title IX will be explained along with a snapshot of trends.

## Title IX's Three-Part Test of Athletic Participation

The standard of measurement used to determine if athletes are receiving an equal opportunity to participate is the three-part test. The test gives school administrators the chance to explain how they are complying with the law and offers flexibility because of its design. Schools need only to demonstrate that the athletic opportunities they offer satisfy one of the three parts of the test. School administrators, however, are cautioned that a lack of financial resources is not a defense or a justification for operating athletic programs that are not gender equitable (Staurowsky et al., 2020). An explanation of the three-part test and factors used in assessing each is outlined below.

### Part 1. Substantial Proportionality

In response to this first part of the test, school administrators need to provide an analysis of the proportional distribution of athletic participation opportunities for girl/women and boy/men athletes in relationship to their proportional representation in the undergraduate or high school population. A program might be regarded as satisfying this part of the test if the number of athletic opportunities it would take to achieve proportionality would not sustain a viable athletic team. If a school's athletic program does not meet the substantial proportionality standard, they may still comply with Title IX's requirements by satisfying one of the other two parts of the test.

### Part 2. History and Continuing Practice of Program Expansion

This part of the test acknowledges that athletic opportunities for the underrepresented sex are not proportional to enrollment, however the institution demonstrates that it is progressively addressing shortfalls for the underrepresented sex and is responding to their developing interests and abilities. Institutions can demonstrate that they have a **history** of program expansion by providing:

- A timeline that shows new varsity teams have been added or club teams have been elevated to varsity status;

- A record that shows the number of athletic opportunities for the underrepresented sex has occurred over time; and/or

- Documentation that the institution responded affirmatively when requests were made to add teams or elevate sports by students or others (a gender equity committee, for example).

Institutions are cautioned that adding a sport by itself is not sufficient to meet this standard, there must also be a demonstrable effort to address the needs of the underrepresented sex on a **continuing basis**. Thus, administrators are also called upon to show that there is a plan in place, that action has been taken on the plan, policies for how to request the elevation or addition of teams has been communicated to students, and that gender equitable policies that guide decision making exist and are used. It is not sufficient to have a plan; it must be one that currently is being implemented and is responsive to addressing interests and abilities. Failing to meet either of the first two parts of the test (athletic opportunities are not proportional to enrollment and no history and continuing practice of program expansion), administrators still have the option of making their case with the third part of the test.

### Part 3. Full and Effective Accommodation of Interests and Abilities

Under this part of the test, an argument is made that the athletic opportunities offered reflect the genuine interest and abilities of the athletes in a school system or higher education institution. In effect, the school has done what it can to offer athletic opportunities proportional to enrollment but fail to meet that standard for one of the following reasons:

- There are just not enough athletes of the underrepresented sex to support a viable team.

- Even if there are athletes who have an interest in playing a particular sport, they may not have the ability to do so.

- Even if a team were offered, there are no reasonable avenues of competition available.

Among the factors considered in evaluating whether there are athletes whose needs have not been met within the athletic department, reviews should consider:

- Requests by students and admitted students that a particular sport be added.



- Requests that an existing club sport be elevated to intercollegiate team status.

- Participation in particular club or intramural sports.

- Interviews with students, admitted students, coaches, administrators and others regarding interest in particular sports.

- Results of questionnaires of students and admitted students regarding interests in particular sports and participation in particular interscholastic sports by admitted students.

- Participation rates in sports as reported by high school athletic associations and in communities where a particular institution draws students.

In assessing the viability of a sport, administrators should rely on records documenting participation in club and intramural sports; the opinions of athletics department stakeholders (coaches, administrators, and athletes); and the competitive strength of existing club sports (Cantu, 1996).

## The Current State of Title IX and Athletics Participation Opportunities

### High School Athletic Participation Opportunities

A major accomplishment of Title IX can be seen in the millions of girls playing high school sports. The National Federation of State High School Associations (NFHS) cited the growth in girls' sports as a key contributing factor in registering increases in high school sports participation for the 29th consecutive year (NFHS, 2018). That said, there has historically been less research done on high school athletic programs and compliance with Title IX, in part due to the lack of publicly available information and/or information that is difficult to access without initiating public records requests. Unlike the college and university level, the high school level does not have an equivalent federal law like the Equity in Athletics Disclosure Act that results in the creation of a central, national database with information regarding each high school in the country, participation opportunities and allocation of resources.

There are some states and a territory that do have laws requiring high schools to report on athletic participation opportunities as allocated by gender. Some of these include:

- District of Columbia passed the Title IX Equity Act in 2015. Athletics administrators in the District are required to complete Title IX education. The Act also requires public and public charter schools in the District to submit detailed information about athletic participation opportunities and allocation of resources to men's and women's programs (Randolph & Ray, 2018).

- According to the California Education Code (EDC § 33353), the California Interscholastic Federation will report to the Legislature and the Governor about its activities on or before 2023. As part of that report, they are required to report on "Gender equity in interscholastic athletics,

including, but not limited to, the number of male and female pupils participating in interscholastic athletics in secondary schools, and action taken by the California Interscholastic Federation in order to ensure compliance with Title IX of the federal Education Amendments of 1972."

- In the Commonwealth of Pennsylvania, an amendment to the state's public school code passed in 2012 requires disclosure of interscholastic athletic opportunities and other athletic resource allocations. While money coming from outside of schools (such as booster money) is not disclosed in terms of revenue, it is tracked in terms of expenditures. This act requires disclosure for public schools, grades 7–12 (PA Department of Education, 2022).

Broad general trends are available through the National Federation of State High School Associations. As reflected in Figure 1 (on following page), opportunities for girls to participate in high school sports have increased dramatically from 294,015 in 1972 to 3,402,733 in the academic year 2018–19 (the most recent year for which data was reported as of this writing), an increase of 1,057% over time.

Below are some of the key findings from our search for information regarding gender trends occurring in the high school sector. The NFHS is missing reports in 2019–20 and 2020–21 because of the pandemic. Thus, the most recent reporting year for athletic participation opportunities as of this writing is 2018–19.

- In 2018–19, boy athletes received 57% of participation opportunities compared to 43% for girl athletes. Given that girls nationwide made up 51% of the overall student high school population (Baumann & Craney, 2020), it would take 952,498 athletic opportunities to close the gap for females.

- The NFHS reported that girls accounted for 3,400,297 of the 7,963,535 total of NFHS athletes during the 2018–19 athletic season. This was a 75,971 increase from the previous year and the largest one-year girls' participation increase since the 2000–01 athletic season.

- The popularity of competitive spirit contributed to the rise of girls' participation as it had an increase of 18,712 girls that participated in this sport. This brought competitive spirit in at number nine of the 10 most popular girls' programs.

- Ranked number one was outdoor track and field. Additionally, volleyball (8,470), soccer (6,810), and lacrosse (5, 423) showed significant increases in girls' participation as well.

- According to a survey of North Carolina High School Athletic Association (NCSHAA) athletic directors conducted by High School OT in May of 2021 examining the impact of the COVID–19 pandemic on the dropping of varsity and junior varsity teams, girls' sports have been impacted more negatively. In 2020–21, with 333 girls' teams were dropped, compared to 317 boys' teams (Stevens, 2021).



Women's Sports Foundation
WomensSportsFoundation.org

**30**



**Figure 1. U.S. High School Athletic Participation Opportunities by Gender, 1971–72 through 2018–19**

Data Source:  National Federation of State High School Associations Athletics Participation Survey, 2019

- NCSHAA athletic directors reported that during the 2020–21 academic year, girls' participation on existing teams declined more than boys' participation. "In track & field, the sport with the most participation from female athletes in high school, 67% of girls' teams report declining participation, compared to 61.5% of boys' teams. In basketball, 69% of girls' teams reported declining participation this year, compared to 41% of boys' teams. Data also shows 57.1% of softball teams have seen a drop in participation this year, compared to 41% of baseball teams" (Stevens, 2021).

While comprehensive reports on Title IX compliance within high schools is lacking, news accounts and studies undertaken within individual states reveals broad concerns. Those concerns are amplified for schools with larger minority populations.

- In a 2013 complaint filed with the Office for Civil Rights, the National Women's Law Center alleged that the District of Columbia Public Schools offered male athletes disproportionally more athletic opportunities to compete on varsity athletic teams, a situation that would have required adding 688 opportunities to remedy the lack of access for female athletes. They also asserted that schools in the District were unable to demonstrate a history and continuing practice of program expansion and that girls in the District had expressed overwhelming interest in playing sports.

- The National Women's Law Center, in the OCR complaint they filed on behalf of female high school athletes in the District of Columbia argued that the sex discrimination female athletes were experiencing was systemic in the District. As a consequence, one school's failure to provide proportional opportunities was affecting the ability of other schools to offer viable programs that female athletes would benefit from.

- In a study of data gathered through the CRDC for the academic year 2011–12, several important findings illustrate the influence of race and gender on access to educational and sport opportunities (NWLC & PRRAC, 2015). Some of those findings included the following:

  - Over 40% of the nation's high schools are either heavily white (90% white) or heavily minority (white enrollment is 10% or less).

  - Far fewer athletic opportunities are available to students in heavily minority schools than to students in heavily white schools. In a typical heavily minority school, there are only 25 spots available on sports teams for every 100 students; in a typical heavily white school, there are 58 spots available on sports teams for every 100 students.

  - Gender disparities in athletic opportunities were pervasive across schools; however, the gender disparities were greater in heavily minority schools.



- In a typical heavily white high school, girls had 82% of the athletic opportunities compared to boys.
- In a typical heavily minority school, girls had only 67% of the opportunities to play sports compared to opportunities provided for boys.

An examination of the growth areas for girls' high school sports reveals that there has slowly been an expansion of opportunities in the variety of sports offered to girls. Notably that growth, and the pace of growth, is linked to budget considerations.

- During the 2018–19 season volleyball increased by 6,225 participants from the previous year for a total of 452,808. Over the decade between 2008–09 and 2018–19, volleyball added 48,823 participants and was ranked as the number-two sport for girls behind outdoor track and field, which had 488,267 participants (NFSH, 2019).

- Girls' participation in high school sports continued to grow not only in numbers but also in the variety of sports played. According to the NFHS most girls participated in basketball in the '70s. The '80s realized an increase in cross country and softball participation, and the '90s introduced interest in soccer, which grew from 700 girls to 210,000 in 25 years (Perry, 2021). Also, the NFHS reported in 2018–19 there were 400,000 girls playing high school soccer, which is a 56,200-percent increase in 50 years.

- The increase in girls' participation in high school sports also can be attributed to the adoption of team competitive sports like lacrosse, competitive spirit, ice hockey, sand volleyball, and flag football. For example, girls' flag football is currently sponsored by five NFHS member associations: Alabama, Alaska, Georgia, Florida, and Nevada. The cost-effective nature of sports can be used as a catalyst in understanding its rise in popularity and its growth potential (NFSH, 2019).



©iStock by Getty Images

- Further, expensive equipment and overall cost to facilitate a sport can be a challenge for some schools. This can limit opportunities and access for girls in sports. Therefore, funding, sponsorship, and donations to high school sports can increase access by providing more opportunities for girls to participate. At the same time, there is an equity issue if the investment in girls' sports is based on a cheaper model of funding compared to boys' sports.

- The funding opportunities for girls' sports are few and limited, but in 2021, Nike and the NFL announced a $5 million partnership, offering one-time $100,00 payments to any state association seeking to set up a flag football pilot program (Perry, 2021).

- To ensure the growth of sports opportunities for women and girls, external funding outside of athletic agencies is needed. Although these funding opportunities are currently limited, they continue to grow. One example can be seen in high school flag football. Organizations like RCX Sports, the official operating partner of NFL FLAG, Arthur M. Blank Family Foundation, and several NFL organizations are stepping up to support and promote sports for girls and women (Perry, 2021).

- As stated previously sports participation can lead to an improvement of mental health and self-esteem in girls, and, therefore, involvement in sports can become vital to their development (Burtka, 2019). Therefore, organizations that use sports to teach life skills and promote diversity and inclusion are a pivotal component in the health and development of young girls.

- Further safety and school climate are also impactful to participation rates in high school sports. According to a study conducted by GLSEN (2019), "59.1% of LGBTQ students felt unsafe at school because of their sexual orientation, 42.5% because of their gender expression, and 37.4% because of their gender." Further the study found 77.6% of LGBTQ students avoided school functions, 71.8% avoided extracurricular activities, and 25.15 avoided school athletic fields or facilities because they felt unsafe or uncomfortable (GLSEN, 2019).

An area that is covered by Title IX but requires scrutiny is recreational sports, club sports, and intramurals at both the high school and college level.

- In 2014, researchers at George Mason University requested final investigation letters from the Office for Civil Rights for complaints pertaining to collegiate club sports, recreation, and intramural programs for the years 2004 through 2010. They were told there were none (McDowell et al., 2016).

- While this may reflect that these areas are run gender equitably, there is so little systematic information available that this cannot be assumed.

## College and University Athletic Participation Opportunities

As a general overview, athletic participation opportunities for girls and women in high schools and colleges have dramatically increased from the 1970s to the present. At the college level, there has been a 618% increase in athletic opportunities for female undergraduates in the five decades since the passage of Title IX. We have come a distance from the academic year 1971–72 when just 29,977 female athletes competed in collegiate sports, compared to the 215,486 female athletes who competed on teams sponsored by NCAA institutions in 2020–21 (see data below for other athletic associations). As Figure 2 however illustrates, despite that progress, opportunities for female athletes to participate in varsity sports at the college level continue to lag behind opportunities for male athletes, and the opportunities that are available are not proportional to the representation of female students in the full-time undergraduate population.

- According to EADA data filed for the 2019–20 academic year by two- and four-year institutions, female undergraduates made up 54.5% of the undergraduate population (4.6M+ out of 8.6M+) within the 2,074 institutions reporting. On average, female athletes received 43% of athletic opportunities (290,749 out of 678,245), representing a gap that falls short of enrollment by nearly 12 percentage points. In order to close that gap, schools would need to add 81,389 athletic opportunities for females (U.S. Department of Education, 2021a).

- In an analysis of EADA data filed for the 2019–20 academic years, only 94 of the 1,083 NCAA (8.6%) schools reporting met the proportionality standard for participation under the three-part test, offering males and females athletic opportunities proportional to enrollment, while 55 (5%) institutions provided athletic opportunities to female athletes at rates beyond their representation in the student body. The vast majority of institutions across all three divisions (86% or 933) offered higher rates of athletic opportunities to male athletes disproportionate to their enrollment (U.S. Department of Education, 2021a). In order to close that gap, schools would need to add 49,359 athletic opportunities for females (U.S. Department of Education, 2021a).

- In 2019–20, only 18.8% of NCAA Division I institutions (66 of 350) offered athletic opportunities to female athletes proportional to their enrollment. More than seventy percent (74%) of NCAA Division I schools (260 of 350) offered disproportionately higher numbers of athletic participation opportunities to male athletes, ranging from 2% to 37% above the ratio of male enrollment (U.S. Department of Education, 2021a).

- In NCAA Division II institutions, 57% of undergraduates were female in 2019–20. Female athletes at those schools were offered 42% of the available athletic opportunities. Division II institutions would need to add an additional 18,585 athletic opportunities for women to close that 15–percentage-point gap (U.S. Department of Education, 2021a).

### Figure 2. NCAA Athletic Participation Opportunities Across All Divisions by Gender, 1971–72 through 2020–21



Data Source:  NCAA Sports Sponsorship and Participation Rates Report, 2021



- Among NCAA Division II institutions in 2019-20, only 5.7% offered female athletic opportunities proportional to enrollment (18 of 312). The vast majority of Division II schools – 92% or 287 of 312 – offered male athletic opportunities at rates that exceeded the percent of males enrolled in the undergraduate population. Gaps favoring males ranged from 2% to 37% (U.S. Department of Education, 2021a).

- At the NCAA Division III level, women composed 55% of undergraduate enrollment while they were offered 42% of athletic opportunities. Division III schools would need to add 24,640 new athletic opportunities to adjust for this 13 percentage-point gap (U.S. Department of Education, 2021a).

- Among NCAA Division III institutions, only 3% of schools (14 of 427) offered female athletes participation opportunities proportional to enrollment. Similar to schools in Division II, 91% of Division III schools (390 of 427) offered athletic opportunities to male students at rates higher than their enrollment in the undergraduate population. Gaps favoring males ranged from 2% to 37% (U.S. Department of Education, 2021a).

In an analysis of athletic participation opportunities offered by NCAA institutions in 2002-03, 2009-10, 2018-19, and 2019-20 (see Table 2 on following page), there is a general trend across all college sport governing bodies and divisions within those governing bodies that shows the gap between female athletes' athletic opportunities and women's enrollment is slowly closing. While the gap is closing, the number of opportunities to achieve proportionality for female athletes continues to grow as well. Although this may appear counterintuitive, there are two things operating here that contribute to such a result. The first is that female enrollment has gone up and female athletic opportunities have not kept pace with it. And second, opportunities for male athletes have continued to rise as well.

Given the substantial proportionality standard has been in place since the late 1970s and millions of girls have competed in varsity sports at the high school level, these patterns raise questions about the persistence in this trend, now 50 years in the making, that female athletes continue to have disproportionately fewer athletic opportunities compared to male athletes across the board. The pipeline of potential female high school varsity athletes is far more populated — not just by thousands but by millions — than it was in 1972. It seems reasonable, at least based on the numbers, that there would be female athletes who could compete if opportunities were offered at a proportional level.

As shown in Table 2, because athletic participation opportunities are not proportional for female athletes, they miss the opportunity to play and compete on college and university teams in large numbers. In 2002-03, female athletes lost out on 52,965 participation opportunities. By 2019-20, that figure is estimated to be more than 80,000.

While EADA athletics participation data attest to a finding that male athletes continue to benefit from more athletic opportunities than female athletes do, this general pattern is confirmed in other data sets.

- According to the NCAA Sports Sponsorship and Participation Report published in December of 2021, there was a drop in NCAA championship sport participation for both female and male athletes during the 2020-21 academic year for the first time in nearly 20 years. In terms of the net loss, it was somewhat greater for male athletes, with female athletes losing 5,726 opportunities and male athletes losing 6,642. However, because women receive fewer athletic opportunities in the aggregate and are disproportionate to their enrollment in the general student body, the change had a slightly greater negative impact on female athletes with a -2.66% change compared to a -2.42% change for men.

- Colleges also struggle to build funding opportunities for women's sports, but in 2020, the National Association of Intercollegiate Athletics (NAIA) partnered with the NFL to bring collegiate women's flag football to their member institutions (NAIA, 2020).

- Although there has been a public perception that Title IX has negatively impacted men's sports participation, an analysis of NCAA sports participation data between 2011-12 and 2020-21 shows that NCAA men's participation in sports rose from 27% to 35% whereas women's participation increased 12 to 18% during that same time frame (Hearn et al., 2018).

- In a report from the Council on Independent Colleges (CIC), "Growth in women's participation has been even more dramatic in non-NCAA institutions: The change from 14 to 22 percent represents a jump of over 50 percent in just 12 years" (Hearn et al., 2018).

- Between 1988-2016, there was a net gain in the number of teams offered in NCAA schools, with 594 added in Division II and 751 added in Division III. There was, however, a net loss of 330 men's teams in Division I (Wilson, 2017).

- According to the U.S. Government Accountability Office, of the 948 colleges that added women's teams, 72% of them did so without cutting other men's or women's teams (Sabo & Snyder, 2013).

## HBCU participation and access rates

Historically Black Colleges and Universities (HBCUs) provide a unique opportunity to explore race and gender experiences of women in sports as these institutions were founded to provide educational opportunities for Black men and women. HBCUs were built on a cultural fabric that promotes academic excellence through nurturing self-esteem and confidence and supporting the holistic growth of students, faculty, and staff of various cultural and ethnic backgrounds. HBCUs also promote cultural awareness, provide a rich history, and actively support first-generation and low-income students.



**Table 2. Percentage of Proportionality Gap and Number of Missed Opportunities by College Sport Governing Body and Division**

| | 2003 | | 2010 | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|---|---|
| | Percent of Gap | # of Missed Opp. | Percent of Gap | # of Missed Opp. | Percent of Gap | # of Missed Opp. | Percent of Gap | # of Missed Opp. |
| CCCAA | 20.6% | 5,080 | 17% | 4,386 | 15.6% | 4,079 | 15.6% | 4,079 |
| NAIA DI | 20% | 3,171 | 18% | 3,914 | 15.9% | 5,590 | 15.9% | 5,596 |
| NAIA D II | 18.3% | 3,689 | 16.7% | 4,634 | 15.3% | 7,250 | 15.4% | 7,125 |
| NCAA DI w/o football | 6.4% | 1,744 | 5% | 1,595 | 4.4% | 1,673 | 4.4% | 1,521 |
| NCAA DIFBS | 7.6% | 5,084 | 4.4% | 3,158 | 4.5% | 3,420 | 4.5% | 3,420 |
| NCAA DI-FCS | 12.4% | 2,970 | 10.8% | 6,442 | 11.6% | 7,501 | 11.1% | 7,599 |
| NCAA DII | 6.5% | 1,744 | 18% | 11,345 | 17.4% | 5,176 | 17.3% | 13,407 |
| NCAA DII w/o football | 12% | 3,083 | 10.3% | 3,350 | 10.7% | 4,922 | 10.2% | 4,903 |
| NCAA DIII | 15.8% | 15,930 | 15.3% | 17,772 | 14.6% | 19,081 | 14.6% | 19,081 |
| NCAA DIII w/o football | 9.3% | 3,270 | 9.3% | 4,278 | 8.9% | 4,941 | 8.9% | 4,941 |
| NCCAA DI | No data | No data | 27.0% | 230 | 18.9% | 116 | 17% | 104 |
| NCCAA DII | 6.3% | 88 | 6.8% | 126 | 5.7% | 131 | 6.1% | 171 |
| NJCAA DI | 20.1% | 4,193 | 18.4% | 4,467 | 17.3% | 5,370 | 17.4% | 5,331 |
| NJCAA DII | 16.2% | 1,588 | 15% | 1,817 | 13.0% | 1,857 | 13% | 1,849 |
| NWCA | 7.8% | 233 | 6.5% | 226 | 9.1% | 361 | 9 % | 361 |
| Other | 15.9% | 1,026 | 13.4% | 1,068 | 9.5% | 856 | 9.3% | 824 |
| USCAA | 8.4% | 72 | 7.3% | 552 | 10.5% | 470 | 10.0% | 453 |
| **Total Missed Opportunities** | **13%** | **52,965** | **13%** | **69,160** | **12.6%** | **72,794** | **11.9%** | **80,765** |

*Data drawn from the Equity in Athletics Cutting Tool.*

*CCCAA = California Community College Athletic Conference, NAIA = National Association of Intercollegiate Athletics, NCAA = National Collegiate Athletic Association, NCCAA = National Christian Collegiate Athletic Association, NWAC = Northwest Athletic Conference, USCAA = United States Collegiate Athletic Association*

According to the National Center for Educational Statistics (2020) in 2020, there were 101 HBCUs located in 19 states, plus the District of Columbia and the U.S. Virgin Islands, and, of those institutions, 52 were public institutions and 49 were private nonprofit institutions. Further enrollment of women at HBCUs "has been higher than male enrollment in every year since 1976. The percentage of female enrollment at HBCUs increased from 53 percent in 1976 to 64 percent in 2020" (National Center for Educational Statistics, 2020).

Unfortunately, there is an extreme lack of research regarding sport participation at HBCUs (Cooper & Newton, 2021; Hawkins, 2010; Cooper et al., 2017; Cooper et al., 2014) and even less research that examines the sporting experience of HBCU Black women athletes (Flowers, 2015; Cooper & Newton, 2021; Carter-Francique & Richardson, 2015; McDowell & Carter-Francique, 2017). Moreover, most research that examines HBCU women athletes has reported breaking gendered and racial sports barriers, celebrated historic milestones in sports competition (Carter-Francique & Richardson, 2015) or debated the complexities of the participation of non-Black athletes on HBCU athletic rosters (Flowers, 2015).





©Jeff Golden/Getty Images

Contrary to popular belief, HBCUs serve more than Black, Christian, and heterosexual students (Flowers, 2018; Palmer et al., 2015). According to the National Center Education Statistics (2020), "In 2019, non-Black students made up 24 percent of enrollment at HBCUs, compared with 15 percent in 1976." Further Palmer et al. (2015) reported, "White student enrollment at four-year HBCUs has not increased at all since 1987 and, in fact, has decreased and Latino/a enrollment at HBCUs has increased by 90% since 2000."

HBCUs are relevant and should further be explored as they provide a unique academic experience for Black women athletes. For example, Carter-Francique & Richardson (2015) reported HBCUs provide a safe environment for Black women athletes due to the cultural and familial sense of belonging.

HBCU athletic departments face several obstacles that have greatly impacted sporting opportunities for women at these institutions (Hawkins, 2010; Reynolds et al., 2012). Specifically, HBCUs face systemic racism, economic deprivation, limited power, and disproportionate budget cuts (Cooper et al., 2014; Reynolds et al., 2012). Explicitly, "More specifically, consistent with the historical racial hierarchy in the U.S., the White-controlled government continues to hold the power to determine which institutions have the right to federal support" (Cooper et al., 2014, p. 313).

- According to EADA data for 2018–19, among the 47 institutions in the four HBCU conferences (Central Intercollegiate Athletic Conference, Mid-Eastern Athletic Conference, Southern Intercollegiate Athletic Conference, and Southwestern Athletic Conference), nearly 63% of undergraduate students were women (90,743 out of 144,067) while 40% of athletes are women (5,786 out of 14,541) (U.S. Department of Education, 2021a).

- The average gap between undergraduate women student enrollment compared to the proportion of athletic opportunities available to women athletes at HBCUs in 2018–19 was 23%, with a range of 6% to 37% (U.S. Department of Education, 2021a). This represents 3,344 missed athletic opportunities for female athletes.

- It is not surprising that African American women lead white women in representation at HBUCs across all divisions. NCAA (2021) reported 4,854 African American women participated in HBCU sports, whereas 549 white women and 683 women who identified as other participated in HBCU sports. Yet, African American men drastically outnumbered African American women with 8,337 participants in 2020.



- Further, African American women in HBCU sports produce higher graduation rates compared with their Black male counterparts (Cooper et al., 2017). This academic prowess can be attributed to HBCUs providing spaces that fuel gender equity in sports (Carter-Francique & Richardson, 2015).

- Although similar to predominantly white institutions (PWIs) the numbers for men in HBCU sports surpass women. Specifically, 9,895 men are currently participating in all three NCAA divisions combined and women only represent 6,086 (NCAA, 2020).

- Additionally, women competing at HBCUs are also greatly impacted by the lack of financial resources at their institutions. For example, Oregon, a top revenue-generating athletic program reporting $196.2 million in 2014–15 made more than all of the top 10 revenue-generating HBCUs combined at $113.2 million (Bolling, 2006). Furthermore, the Aggies' three-year average football revenue of $57.9 million is currently larger than any HBCU athletic program budget (Gaines, 2016).

- The lack of funding opportunities has greatly impacted HBCUs' ability to expand and retain women's sports opportunities. Further, as minority-serving institutions, the financial hardships of HBCUs also impact the overall participation and access rates of women of color in college sports.

Even with the challenges that need to be addressed, these institutions provide a cultural and gender-based support system, which makes the HBCU athletic experience unique for women athletes. For example, HBCUs provide an opportunity for women of color to experience racial uplifting, explore ethnic traditions, and be immersed in an environment that provides women of color support through racial empowerment (Carter-Francique & Richardson, 2015; Cooper et al., 2017; Cooper et al., 2014)

## Title IX and the Allocation of Athletic Scholarship Dollars

Title IX regulations require athletic departments that award athletic scholarships to distribute those scholarship dollars to athletes proportionate to the percentage of athletes of each sex. For example, if 55% of a school's athletes are female, they should receive 55% of the athletic financial aid. If those percentages are not the same (within one percentage point), that difference must be justified by a non-discriminatory factor, such as men's teams having more students receiving financial aid awards based on out-of-state rather than in-state tuition, or a normal fluctuation in enrollment or participation. As is noted in a 1998 letter to Nancy Footer, general counsel at Bowling Green State University, from Mary Francis O'Shea, the U.S. Department of Education's National Coordinator for Title IX Athletics notes, "...at those colleges where 1% of the entire athletic scholarship budget is less than the value of one full scholarship, OCR will presume that a disparity of up to the value of one full scholarship is equitable and nondiscriminatory."

In addition, athletic financial aid policies as a whole must treat men and women fairly. For example, if most of the financial aid awarded to athletes of one sex consists of grants, and the other sex receives mostly loans and work-study opportunities, that would violate Title IX even if the overall amount of financial aid is distributed proportionate to gender (Osborne, 2017; Staurowsky, 2016a).

Rates and patterns of compliance with Title IX's scholarship regulations vary widely by division. Fifty-eight percent of schools in the Division I Football Bowl Subdivision favor male athletes in the distribution of athletic financial aid, while 21% of them are in compliance (within one percentage point) with Title IX's scholarship regulations. The remaining 22% favor female athletes in the allocation of athletic financial aid (see Table 3).

**Table 3: Athletic Financial Aid Regulation Compliance Patterns by NCAA Division in 2019–20**

|  | In compliance, within 1% | Not in compliance, men favored | Not in compliance, women favored |
|---|---|---|---|
| Division I FBS (126 schools) | 26 schools (21%) | 73 schools (58%) | 28 schools (22%) |
| Division I FCS (119 schools) | 22 schools (18%) | 31 schools (26%) | 66 schools (55%) |
| Division I no football (96 schools) | 2 schools (2%) | 11 schools (11%) | 83 schools (86%) |
| Division II with football (162 schools) | 31 schools (31%) | 26 schools (16%) | 105 schools (65%) |
| Division II no football (146 schools) | 10 schools (10%) | 26 schools (18%) | 107 schools (73%) |
| Total (649 schools) | 91 schools (14%) | 167 schools (26%) | 389 schools (60%) |



Outside of Division I FBS, it is more likely that female athletes receive a greater share of athletic scholarship dollars than their rate of participation (see Table 1 on page 19). In fact, 86% Division I schools without football, as well as 73% Division II schools without football, favor women athletes in the distribution of athletic financial aid. This trend holds in terms of HBCU Division I and II institutions as well, where 70% of institutions favor female athletes in their allocation of athletically related financial aid. However, because the test for compliance compares the scholarship dollars to the rate of participation, a compliance analysis actually obscures the extent to which female athletes' advantage in the scholarship dollar distribution is caused by schools' failure to provide female students with equitable athletic opportunities in the first place.[4] If the present distribution of athletic financial aid was compared to the hypothetical rate of participation that would exist if schools distributed athletic opportunities proportionate to the gender breakdown of their undergraduates, the vast majority of schools (85%) would be short-changing female athletes. This is because male students receive a greater share of athletic opportunities than warranted by the percentage of the student population that is male. The gender disparity in opportunity is a violation of a separate regulatory provision, one discussed elsewhere in this Report (see the above section), but one that also costs female students in ways that do not appear in the compliance analysis of the athletic scholarship regulation and are thus worth noting here.

Another way to recognize the impact of schools' failure to proportionally allocate athletic opportunities is to consider the dollar amount difference that it makes for female students as a whole. In 2019–20, schools awarding athletic financial aid (AFA) distributed a total of $3.5 billion to male and female athletes. Male athletes received $1.9 billion of that amount, $252 million more than female athletes received. All NCAA divisions with football provided more athletic financial aid to men than to women and by much larger disparities than those that favored women at non-football schools. See Table 4.

Moreover, all divisions favor men if we evaluate the disparity based on the amount that women would receive if they had equitable athletic opportunities. In other words, if schools actually distributed athletic opportunities in proportion to women's percentage of enrolled undergraduates, and then distributed scholarship dollars proportionate to that distribution ratio, female students would receive an additional $741 million. Table 2 shows the opportunity gap breakdown by NCAA division.

In sum, even though describing "compliance" paints a mixed picture where women come out ahead in most divisions and behind in only Division I FBS, this conclusion must be considered in context with the fact that women's athletic opportunities are themselves suppressed. Accounting for that, we can see that women have far less opportunity than men to subsidize their education by playing sport. See also Yiamouyiannis and Hawes (2015).

### Table 4. Allocations of Athletic Financial Aid (AFA) by Gender in NCAA Divisions 2019–20

| NCAA Division | Total AFA to men | Total AFA to women | Difference: how much more AFA men receive than women | Additional AFA that would be required if women had athletic opportunities proportionate to enrollment |
|---|---|---|---|---|
| DI FBS | $839,983,491 | $657,502,106 | $182,481,385 | $284,552,079 |
| DI FCS | $422,314,174 | $349,213,356 | $73,100,818 | $224,652,440 |
| DI NFB | $231,014,366 | $300,692,948 | $(69,678,582) | $5,538,821 |
| DII FB | $251,481,948 | $167,914,951 | $83,566,997 | $156,897,563 |
| DII NFB | $154,367,066 | $171,752,269 | $(17,385,203) | $69,420,621 |
| **Total** | **$1,899,161,045** | **$1,647,075,630** | **$252,085,415** | **$741,061,525** |

4   *This calculation provides a sense of how much women are being short-changed but is not entirely precise for two reasons. First, schools can comply with Title IX's requirement to equitably distribute athletic opportunities by fully satisfying the interests and abilities of the underrepresented sex, which may result in compliance even though women are underrepresented in athletic opportunities. However, most schools are not actively assessing women's athletic interest (Staurowsky et al., 2020), and if they were there, they would likely discover that interest exceeds opportunity because there are so many more high school athletic opportunities for girls than there are at the collegiate level.*

*The second reason why this calculation produces only an estimate of the scholarship dollar amount women lose by schools' failure to comply with Title IX's requirement to equitably distribute athletic opportunities is compliance with the scholarship regulation is measured by comparing the athletic financial aid ratios for each sex to the ratio of student-athletes of each sex, not opportunities for each sex. Thus, if a school has more multi-sport athletes who are female than male, it may comply with the scholarship regulation even if it distributes AFA at a ratio less than the ratio of opportunities.*



This context is important for courts and regulators to consider when evaluating institutions' compliance with Title IX. Schools who are technically out of compliance with the AFA regulation in women's favor, because women receive an inequitable share of athletic opportunities, should not have to shrink women's share of the AFA budget. This recommendation actually reflects what seems to be OCR's operating procedure. Enforcement actions that it has taken in the last several years involving schools who are out of compliance with the scholarship regulation because they are favoring women in the distribution of AFA, but short-changing women in the distribution of opportunities, have shown that those schools had the opportunity to argue that that "program expansion" for women is the reason for noncompliance. However, the fact that the OCR has not publicized this widely, such as in a Dear Colleague Letter or other regulatory guidance, risks the possibility that schools do not understand that favoring female athletes under the scholarship regulation may be defensible when female students receive a disproportionately low share of athletic opportunities.

## Title IX and Equitable Treatment — Program Benefits

As the third key area of assessing Title IX compliance within athletic departments, the distribution of resources (e.g., money, facilities, staffing) to support equal access to sport participation covers the array of operational items that are needed to support sport participation. Historically referred to as the "laundry list," the areas covered under benefits include the following: equipment, uniforms, and supplies; access to tutoring/academic support; medical training facilities and staff; support services; scheduling of games and practice times; assigned coaches; publicity; travel and daily per diem allowances; locker rooms, practice, and competitive facilities; and recruitment.

Whether revenue is generated through television contracts, student fees, merchandising, donations from boosters, ticket sales, or other sources, the focus of a Title IX analysis is on the quality of the experience that results from the revenue, not the source. A persistent area of misunderstanding over the years in terms of Title IX is how money from loyal donors is handled. A typical scenario involves a greater willingness on the part of donors to contribute to men's athletic teams. In circumstances where men's teams are benefitting from additional financial resources, funding needs to be found to provide similar benefits to women's teams.

It was documented inequities in these areas that received so much attention during March Madness in the spring of 2021. A tweet from then Stanford women's basketball strength and conditioning coach Ali Kershner and followed with the release of a Tik Tok video by University of Oregon women's basketball player Sedona Prince showed that female athletes at the women's tournament were given a stack of weights to use while athletes at the men's tournament were provided a full weight room. The video itself went viral, receiving more than 7 million views (Amis, 2021, Johnson, 2021). The routine nature of the inequities as shown in side-by-side comparisons prompted the kinds of questions that are expected to be raised under Title IX.

Why was a stack of weights for the women considered to be acceptable while the man had a full weight room to work out in? Why were the women given food of poorer quality and variety? Why were the men tested for COVID with a more reliable test?

In an external report commissioned by the NCAA to investigate gender equity in the running of its own championships in the aftermath of the release of that video, the outside law firm who conducted the review reported that

> ...there were differences in the goods, services, and resources provided to the women's basketball players, including their weight training facilities, COVID-19 tests, food, recreational opportunities, and gifts and mementos. In addition, there have been significant—and longstanding—disparities in the production and operation of the championships, including, among other things, differences in the quality and quantity of branding and signage at the arenas and host cities; in the use of the "March Madness" trademark; and in the sponsorship of the fan festivals, etc. In all of these areas and more, the experience of the women's tournament participants was markedly different from and inferior to that of the men's tournament participants (Kaplan Hecker & Fink, 2021a, p. 7).[5]

In 2018, 1,615 college athletes completed a survey from the Big Ten about their views on Title IX and its equity mandate (Druckman et al., 2018). Results indicated that there was widespread support for what the researchers called "the spirit of the policy." However, there was still a sizable and important population that believed that there was an inequitable distribution of resources and opportunities between men's and women's programs and that there was a need for a redistribution of resources. The athlete respondents were also inclined to take action to resolve gender inequities in the college sport system (Druckman et al., 2018). This study demonstrates that athletes (both male and female) were aware of inequities in their athletic departments before the pandemic of 2020.

Researchers, Title IX advocates, and athletic department insiders have known this as well. There has been a long history of girls receiving inferior treatment and access to the support they need to compete on equal terms with boys. As one example, in a lawsuit filed on behalf of girl athletes in the Red Bluff Joint Union High School District in 2017, shortfalls were identified in almost all operational support areas, including practice facilities, locker rooms and team rooms, uniform quantity and quality, equipment room storage capacity, and a host of other issues. The school district settled and agreed to create a plan to remedy the problems identified. However, an attorney Jane Brunner from Siegel, Lee, and Brunner found that in the course of working on the case that "almost all high schools are out of compliance with Title IX" (Brunner & Turner, 2017).

---

5   Following the controversy, the NCAA expanded the women's tournament bracket from 64 to 68 teams, (Jackson, 2021); permission was given for the women's tournament to use the trademarked marketing term "March Madness" (Arial, 2021); and in 2023, the Sweet 16/Elite 8 will be held at two sites (NCAA, 2022). The NCAA's steps to address issues raised can be found here: https://www.ncaa.org/sports/2021/9/27/genderequityupdates.aspx



Some sense of the dimension of the issue of gender inequity within college and university athletic departments can be gleaned from how resources are allocated within athletic departments documented in annual EADA reports. However, the expense categories are broad, capturing operating expenses by team, total operating expenses, recruiting, and athletic scholarship allocations as well as a large category labeled **non-gender-specific allocations**. As a result, refined analyses according to line items (e.g., hotel, meal, and travel costs) are difficult to find and conduct (see Table 5 below).

- Of the more than $14 billion spent on athletic programs at the NCAA Division I level in 2018–19, 46% was spent on men's programs ($6.5 billion+), 22% on women's programs ($3 billion +), less than 1% on coed programs ($5 million +), and 32% ($4.5 billion+) to non-gender-specific allocations. Expenditures in men's programs are more than twice what they are for women's programs (U.S. Department of Education, 2022a).

- At the NCAA Division II level, schools spent over $2 billion to support athletic programs in 2018–19, with 42% supporting men's programs ($843 million+), 34% supporting women's programs ($677 million+), less than 1% on coed programs ($4 million+), and 24% being allocated to expenses not designated for either gender ($488 million+) (U.S. Department of Education, 2022a).

- In 2018–19, NCAA Division III institutions spent more than $1.2 billion on varsity sports. Of that, men's sports received 38% ($485 million+), women's sports received 28% ($363 million+), coed programs received less than 1% ($4 million+), and 33% ($439 million+) was allocated to non-gender-specific expenses (U.S. Department of Education, 2022a).

- Across all three divisions, over a third of budget allocations are reported in the "non-gender specific allocations" category. In the absence of more specifics about what is included in this category, it is difficult to assess publicly who benefits from this area of allocation.

- In an analysis of data furnished through the NCAA Financial Reporting System, the largest gaps in expenditures

between male and female programs, including total expenses, recruiting, scholarships, head coach compensation, and assistant coach compensation, occur in NCAA Division I FBS institutions (Wilson, 2017).

As reflected in Table 6 (on following page), by percentage, women's sport programs across all divisions and subdivisions received between 18% and 38% of budget expended. Women's programs in NCAA Division I–FBS receive the smallest percentage of budget expended at 18%. Non-football divisions expend a higher percentage of their budgets on women's sports, although in NCAA Division III non-football, they also report the highest percentage of expenditures in the not allocated by gender category.

### Financial Resources Spent on Recruiting Female Athletes to Play at the College Level

In terms of expenditures on recruiting, based on 2019–20 EADA data:

- Of the more than $241 million spent on recruiting athletes to play at the two-year, junior college, and four-year college levels in 2019–20, 31% was spent on recruiting female athlete talent (see Table 7 below) (U.S. Department of Education, 2021a).

- Among the 351 NCAA Division I institutions, total spending on recruiting amounted to $196,472,185. Of that amount, 29% ($ 57,871,962) was allocated to recruiting female athletes (U.S. Department of Education, 2021a).

- The most equitable spending on recruitment of female athletes was found in non-football playing institutions, with NCAA Division III non-football devoting nearly half of available recruiting resources (49%) to female athletes. The category with the least equitable allocation of recruiting resources was NCAA Division I Football Bowl Subdivision (FBS) institutions, in which 27% of recruiting dollars went to female athletes (U.S. Department of Education, 2021a) (see Table 7 on following page).

### Table 5. Amount and Percentage of Total Expenditures by Gender in NCAA College Athletic Departments by Affiliation and Division, 2018–19

| NCAA Division | Expenses–Men | % Men | Expenses–Women | % Women | Expenses–Coed | % Coed | Not Allocated | % NA | Total |
|---|---|---|---|---|---|---|---|---|---|
| DI | $6,466,322,961 | 46% | $3,067,580,553 | 22% | $5,974,187 | 0% | $4,539,254,384 | 32% | $14,079,132,085 |
| DII | $843,737,853 | 42% | $677,733,663 | 34% | $4,193,650 | 0% | $488,734,943 | 24% | $2,014,400,109 |
| DIII | $485,972,174 | 38% | $363,248,607 | 28% | $4,175,870 | 0% | $439,448,264 | 34% | $1,292,844,915 |
| **Total** | **$7,796,032,988** | **45%** | **$4,108,562,823** | **24%** | **$14,343,707** | **0%** | **$5,467,437,591** | **31%** | **$17,386,377,109** |



**Table 6. Amount and Percentage of Total Expenditures by Gender in NCAA College Athletic Departments by Affiliation, Division, and Subdivision, 2018–19**

| NCAA Division | Expenses – Men | % Men | Expenses – Women | % Women | Expenses – Coed | % Coed | Not Allocated | % NA | Total |
|---|---|---|---|---|---|---|---|---|---|
| FBS | $4,663,337,146 | 48% | $1,753,750,806 | 18% | $3,795,389 | 0% | $3,308,175,944 | 34% | $9,729,059,285 |
| FCS | $1,129,488,360 | 44% | $722,642,791 | 28% | $1,857,624 | 0% | $728,881,112 | 28% | $2,582,869,887 |
| DINF | $673,497,455 | 38% | $591,186,956 | 33% | $321,174 | 0% | $502,197,328 | 28% | $1,767,202,913 |
| **Subtotal** | **$6,466,322,961** | **46%** | **$3,067,580,553** | **22%** | **$5,974,187** | **0%** | **$4,539,254,384** | **32%** | **$14,079,132,085** |
| DIIFB | $538,012,389 | 46% | $355,247,365 | 30% | $2,225,724 | 0% | $271,566,260 | 23% | $1,167,051,738 |
| DIINFB | $305,725,464 | 36% | $322,486,298 | 38% | $1,967,926 | 0% | $217,168,683 | 26% | $847,348,371 |
| **Subtotal** | **$843,737,853** | **42%** | **$677,733,663** | **34%** | **$4,193,650** | **0%** | **$488,734,943** | **24%** | **$2,014,400,109** |
| DIIIF | $365,802,874 | 40% | $243,898,039 | 27% | $2,678,100 | 0% | $292,007,309 | 32% | $904,386,322 |
| DIIINF | $120,169,300 | 31% | $119,350,568 | 31% | $1,497,770 | 0% | $147,440,955 | 38% | $388,458,593 |
| **Subtotal** | **$485,972,174** | **38%** | **$363,248,607** | **28%** | **$4,175,870** | **0%** | **$439,448,264** | **34%** | **$1,292,844,915** |

**Table 7. Amount and Percentage of Allocation of Recruiting Dollars by Gender, 2019–20**

| College Sport Governing Body | Recruit $ – Male | % of Recruit $ – Male | Recruit $ – Female | % of Recruit $ – Female | Recruit $ – Coed | % of Recruit $ – Coed | Total |
|---|---|---|---|---|---|---|---|
| NCAA DI | $138,528,155 | 71% | $57,871,962 | 29% | $72,068 | 0% | $196,472,185 |
| NCAA FBS | $103,741,429 | 73% | $37,721,499 | 27% | $45,680 | 0% | $141,508,608 |
| NCAA FCS | $22,825,727 | 66% | $11,530,694 | 34% | $13,526 | 0% | $34,369,947 |
| NCAA W/O FB | $11,916,328 | 58% | $8,584,457 | 42% | $- | 0% | $20,500,785 |
| NCAA DII FB | $6,587,830 | 68% | $3,086,849 | 32% | $22,008 | 0% | $9,696,687 |
| NCAA DII w/o FB | $2,564,151 | 52% | $2,325,660 | 32% | $16,891 | 0% | $4,906,702 |
| NCAA DIII FB | $8,747,589 | 66% | $4,569,787 | 34% | $35,240 | 0% | $13,352,616 |
| NCAA DIII w/o FB | $2,150,547 | 51% | $2,045,585 | 49% | $12,771 | 0% | $4,208,903 |
| NAIA DI | $1,292,042 | 59% | $868,969 | 40% | $33,589 | 2% | $2,194,600 |
| NAIA DII | $1,781,674 | 59% | $1,201,513 | 40% | $34,926 | 1% | $3,018,113 |
| CCCAA | $62,652 | 48% | $68,836 | 52% | $- | 0% | $131,488 |
| NJCAA | $1,992,087 | 56% | $1,528,621 | 43% | $18,644 | 1% | $3,539,352 |
| NJCAA DI | $1,581,538 | 56% | $1,205,762 | 43% | $16,873 | 1% | $2,804,173 |
| NJCAA DII | $316,893 | 56% | $248,450 | 44% | $1,771 | 0% | $567,114 |
| NJCAA DIII | $93,656 | 56% | $74,409 | 44% | $- | 0% | $168,065 |
| USCAA | $82,232 | 57% | $60,147 | 41% | $3,152 | 2% | $145,531 |
| NCCAA | $101,847 | 53% | $88,680 | 47% | $- | 0% | $190,527 |
| NWAC | $67,343 | 46% | $80,224 | 54% | $- | 0% | $147,567 |
| **Total** | **$165,905,565** | **69%** | **$75,290,142** | **31%** | **$327,139** | **0%** | **$241,450,778** |



Although Title IX regulations do not require equal spending on men's and women's sports, there is an expectation that athletes will be afforded equitable treatment across the entire athletic program and equal access to benefits from expenditures. As a consequence, if male athletes receive access to top-of-the-line facilities, equipment, coaching, and support, there is an expectation that female athletes will also have access to a similar caliber of resources.

## Allocation in the Quality and Quantity of Coaches

The interest in the quality and quantity of coaches under Title IX flows from a concern about how coaches shape and impact the experience of athletes. Thus, if girls' and women's programs have fewer and less qualified coaches compared to boys' and men's teams, female athletes are denied access to a critical part of the athletic experience. Parsing out what is going on within an athletic department relative to recruitment, hiring, and retention of coaches for girls' and women's teams can be challenging.

Importantly, the climate within which coaches of women's teams operate affects the attractiveness of the profession and the ability of coaches to do their jobs. If women's programs are starved for resources or if coaches are called upon to regularly fight battles for basic fair and equitable treatment on behalf of female athletes, the requirements of their positions are different than for those coaching men's sports. Retaliation claims were recognized by the U.S. Supreme Court in 2005 as a form of intentional discrimination on the basis of sex under Title IX in *Jackson v. Birmingham Board of Education* (2005). The Court held where retaliation occurs because one speaks out about sex discrimination, the "on the basis of sex" requirement is met regardless of if the person was the target of the discrimination or a member of the underrepresented sex subject to the discrimination. In other words, a male coach of a female sports team could sue under Title IX for actions taken by the university in retaliation against him for reporting Title IX violations. The



©iStock by Getty Images

Court further noted that "reporting incidents of discrimination in integral to Title IX enforcement and would be discouraged if retaliating against those who report went unpunished. Indeed, if retaliation were not prohibited, Title IX enforcement scheme would unravel" (*Jackson v. Birmingham Board of Education*, at p. 11). However, despite these legal protections, coaches and administrators feel pressure that they could lose their jobs if they speak up or remain silent because of fear of retribution. This kind of threat has a chilling effect on achieving the goal of eliminating sex discrimination, creating more inclusive environments within athletic departments, ultimately impacting the lives of female athletes as they attempt to gain equal access to opportunities to compete and thrive in their athletic endeavors in a manner similar to that of male athletes.

In a Women's Sports Foundation study of how coaches of women's teams (both female and male coaches) experienced gender bias in college athletic departments, Sabo et al. (2016) found the following:

- Men coaches had more professional advantages, as two-thirds (65%) of current coaches felt that it was easier for men to get top-level coaching jobs, while three-quarters (75%) said men had an easier time negotiating salary increases. More than half (54%) believed that men were more likely to be promoted, to secure a multi-year contract upon hiring (52%), and to be rewarded with salary increases for successful performance (53%).

- Thirty-three percent of female coaches indicated that they were vulnerable to potential retaliation if they ask for help with a gender bias situation.

- More than 40% of female coaches said they were "discriminated against because of their gender," compared to 28% of their male colleagues.

- Almost half (48%) of the female coaches and just over a quarter (27%) of the male coaches in the study reported "being paid less for doing the same job as other coaches." Twice as many female coaches as male coaches felt their performance was evaluated differently because of gender (15% versus 6%).

In terms of compensation, while many factors affect pay equity, there has been a long-standing and persistent pattern of gender differences in the compensation of coaches of men's and women's programs at the college and university level. In 2019–20, on average, coaches of women's teams received a much smaller percent of salary compared to coaches of men's teams, ranging from 19% in NCAA FBS to 49% in NJCAA Division I (see Table 8 on following page).

At the assistant and associate coach levels, average salaries for coaches of women's teams range from 25% to 48% of the average spent (see Table 9 on following page).

The gendered dynamics within an athletic department is unlike almost any other in that men's programs are run primarily by men. During the past 50 years, only 2–3% of coaches of men's teams are women. Conversely, as a matter of historical record, after Title IX's enactment, women lost ground in leadership



**Table 8. Average Head Coach Salary by Division and Gender of Team, 2019–20**

| Sport Governing Body | Men's Teams | % Men's Teams | Women's Teams | % Women's Teams | Total |
|---|---|---|---|---|---|
| NCAA FBS | $773,085 | 81% | $179,309 | 19% | $952,394 |
| NCAA FCS | $142,995 | 66% | $73,685 | 34% | $216,680 |
| NCAA No FB | $168,975 | 67% | $84,959 | 33% | $253,934 |
| NCAA DII FB | $59,639 | 58% | $43,598 | 42% | $103,237 |
| NCAA DII NFB | $47,144 | 53% | $42,225 | 47% | $89,369 |
| NCAA DIII FB | $42,057 | 61% | $26,787 | 39% | $68,844 |
| NAIA DI | $35,110 | 53% | $30,784 | 47% | $65,894 |
| NAIA DII | $16,412 | 55% | $13,167 | 45% | $29,579 |
| NJCAA DI | $34,789 | 53% | $30,631 | 47% | $65,420 |
| NJCAA DII | $14,040 | 51% | $13,250 | 49% | $27,290 |
| NJCAA DIII | $12,165 | 52% | $11,153 | 48% | $23,318 |

**Table 9. Average Assistant/Associate Coach Salary by Division and Gender of Team, 2019–20**

| Sport Governing Body | Men's Teams | % Men's Teams | Women's Teams | % Women's Teams | Total |
|---|---|---|---|---|---|
| NCAA FBS | $104,630.00 | 69% | $47,056.00 | 31% | $151,686.00 |
| NCAA FCS | $195,281.00 | 75% | $65,333.00 | 25% | $260,614.00 |
| NCAA No FB | $51,052.00 | 59% | $35,023.00 | 41% | $86,075.00 |
| NCAA DII FB | $56,562.00 | 59% | $39,217.00 | 41% | $95,779.00 |
| NCAA DII NFB | $26,796.00 | 60% | $17,687.00 | 40% | $44,483.00 |
| NCAA DIII FB | $17,130.00 | 52% | $15,630.00 | 48% | $32,760.00 |
| NAIA DI | $15,308.00 | 52% | $13,989.00 | 48% | $29,297.00 |
| NAIA DII | $4,833.00 | 52% | $4,379.00 | 48% | $9,212.00 |
| NJCAA DI | $3,695.00 | 52% | $3,396.00 | 48% | $7,091.00 |
| NJCAA DII | $13,294.00 | 61% | $8,639.00 | 39% | $21,933.00 |
| NJCAA DIII | $6,318.00 | 53% | $5,546.00 | 47% | $11,864.00 |



Women's Sports Foundation
WomensSportsFoundation.org

positions in athletics administration and coaching. Dropping from a high of 95% of women running women's athletics in 1972, athletic department reorganizations in the 1970s resulted in women college sport leaders being demoted or their positions eliminated along with separate athletic programs for women. Numerous factors contributed to this decline, including but not limited to gender bias in recruiting, hiring, and retention; double standards; pay inequities; and retaliation against women who advocated for gender equity (Sabo et al., 2016). It has taken 50 years for women to make progress in regaining ground lost following those changes. Women coaches as well have been underrepresented in athletic departments, comprising less than half of the head coaches of women's teams. During the 2020–21 academic year, women's representation in athletic department, based on NCAA data, was as follows:

- One quarter (25%) of NCAA athletic directors were women (n=270.1106).

- Women comprised 36% of associate athletic directors (n=1,010/3,091) and assistant athletic directors (n=1,050/2,916).

- One quarter (25%)  of head coaches were women (n=4,988/20,111).

- Within the assistant coaching ranks, 28% were women (n=12,474/44,807).

- Among strength coaches, 18% were women (n=424/2,711).

In ongoing longitudinal studies of the status of women in college coaching, LaVoi and Boucher. (2020) noted that the representation of women coaches of women's teams had largely remained stagnant. In a comprehensive report of NCAA Division I institutions (Boucher et al., 2021), female coaches of women's teams comprised 42.7% of the coaching ranks. When gender and race are considered, the inequities are even more stark.

- The NCAA Race and Gender Demographics Database reveals that in the 2020-21 academic year, 3% of athletic directors were Black women; 2% of head coaches were Black women, with another 2% identifying as Native American/Alaska Native, Asian, Pacific Islander, Hispanic, or two or more races (NCAA, 2021b).

- The percentage of Black women serving as associate directors of athletics rose slightly to 4% and those identifying in another racial or ethnic category was 2% (NCAA, 2021b). The pattern is largely the same for assistant athletic directors with a slight increase to 3% for women identifying in another non-white racial or ethnic category.

- According to the Racial and Gender Report Card (Lapchick, 2022), which provides statistics on hiring practices of women and BIPOC people in college sport, disparities still exist in racial and gender representation and hiring practices.

- In 2010–11 women held 39.5% of the head coaching positions for women's teams and in 2020-21, they held only 41% across all three divisions in NCAA women's teams (Lapchick, 2021). Lapchick (2022) also reported declines

in racial hiring in the NCAA. Yet, there were also some monumental hires.

- Prior to the hiring of Nina King by Duke University, Carla Williams by the University of Virginia, and Candice Story Lee by Vanderbilt University in 2020 there had never been an African American women athletic director in the NCAA Power Five conferences (Davis, 2021). The visibility of these African American women breaking both gender and racial barriers in college athletics displays the gross historical exclusion of women of color in leadership positions in college sports.

- However, just as disturbing, a study found that Asian and Latinx women also made gains but combined only account for 3% of leaders holding athletic director positions (Hruby, 2021). The lack of women of color in college leadership positions is not surprising as 76.3% of administrators at the NCAA headquarters are white and 86.7% of conference commissioners are white in Division I (Lapchick, 2020, 2021).

- Adding to the obstacles facing women of color in 2011 African Americans held 8.5% of athletic director positions and in 2020–21 they held only 9% (Lapchick, 2021). However, these numbers exclude the leadership positions held by African American women at Historically Black Colleges and Universities (HBCUs).

- From 2010 to 2018 HBCUs hired 36% of African American women athletic directors (Davis, 2021). Hence for African American women seeking leadership positions in sports HBCUs are a vital component to their career growth and provide accessibility to leadership roles.

- However, HBCUs also face systemic racism which has greatly hindered their growth potential (Cooper et al., 2014; Cooper & Newton, 2201; Hawkins, 2010) they also face economic deprivation which could vitally impede the future of African American women, and especially women of color, in college athletic leadership positions (Hawkins et al., 2015).



# Part VIII. Title IX, Marketing, and Promotion of Female Sports

According to the Policy Interpretation adopted in 1979, compliance in the area of publicity is assessed considering several factors, among them the availability and quality of sports information personnel, access to other publicity resources for men's and women's programs, and the quantity and quality of publications and other promotional devices featuring men's and women's programs.

Marketing and promotions also fall under this broad category of publicity. In the Women's Sports Foundation's guide, *Play Fair: A Title IX Playbook for Victory*, questions to consider when assessing whether an athletic program was providing equitable treatment to female athletes in the area of publicity and promotions include the following:

- What is the availability and quality of sports information personnel?

- Is there balanced access to other publicity resources for men's and women's programs?

- Are the publicized images and realities of students' sport experiences fueling negative gender stereotypes—the men's photos are actively engaged, the women are standing and posing?

- Do teams have a comparable quantity and quality of publications and other promotional devices featuring men's and women's programs?

- Are cheerleaders, pep bands, and school administrators present at sports events in a manner that demonstrates their support for all teams? (Lerner & Lakowski, 2009, p. 14).

In an effort to clarify an institution's obligations in this area in terms of media coverage, Title IX consultant Janet Judge (2011) wrote, "While no athletics department can guarantee coverage of women's teams in those papers, radio or television programs that the institution does not control, the school can guarantee that equivalent efforts to publicize and promote the women's programs are in effect. Title IX requires that departments strive to meet the overall goal of equivalent publicity for men's and women's sports overall" (p. 12).

Although Title IX's reach does not extend to the independent choices of media outlets to cover sporting events that they consider newsworthy, the issue of coverage of women's sports is a more complicated matter. The marketing and promotion of women's sport is one that has often been boiled down to a "chicken or egg" debate. The question being, what comes first, more coverage of women's sports to promote? Or more money put into promotion and, therefore, more demand for women's sports coverage? (Guaglione, 2021). As Dr. Lindsay Darvin (2021b) has noted, preferences do not develop in isolation. It

is highly difficult for consumers to become fans of something they are rarely, if ever, exposed to. Broadcast networks argue that women's sports do not produce "good" ratings, but without promotion and more coverage, there is little opportunity for women's sports viewership to grow.

At the time when the regulations were written in the 1970s, sports information offices served largely in a media services role, focusing on the technical delivery of information to support members of the media covering their teams and working with coaches and athletes. Contrary to the multi-billion-dollar television contracts, conference networks, 24/7 sports coverage, the availability of digital platforms, and social media, college sport media coverage was anchored more in local and regional outlets. Further, there were no units focusing on marketing within athletic departments at that time. In 1980, it was highly unusual that people working in a college or university athletic department had a position title with the term "marketing" in it. By the mid-1990s, 66% of administrators responding to a survey about marketing efforts in their athletic departments reported that someone on their staff was expressly assigned responsibility for it and within that group, only 63% of those assigned marketing responsibilities were full-time (Stevens et al., 1995).

The organizational arrangements within college and university athletic departments in terms of marketing and media have expanded dramatically since then. Thus, even the terms "sports information" and "publicity" in the regulations may be too narrow to capture the efforts undertaken in 21st century athletic departments to market and promote programs. This is recognized in the *Title IX Investigators Manual*, published





in 1990, where terms like marketing and promotion are added to the lexicon (Bonnette & Daniel, 1990). As Dittmore (2016) noted, "Athletic departments have become increasingly more sophisticated in production over the past five or so years to the point where it is often difficult to distinguish between content on the evening news, and content on a department website." In some athletic departments, simple classifications of athletic communications and marketing do not capture the complexity of these units that may include, or be housed in, other units such as video production, social media content and strategy, and fan engagement.

Because of the lack of specificity in the EADA's broad revenue and expense categories, that public disclosure report does not provide a breakdown in terms of how marketing resources are allocated. Additionally, because of the way in which television contracts are bundled at the conference and national levels (NCAA), there has been little scrutiny of those agreements. Further, athletic department partnerships with third parties such as Learfield, a media and technology services company that provides support in all areas of media (publishing, audio, digital, and social), remain largely under the radar in terms of Title IX scrutiny.

### Availability and Quality of Sports Information and Marketing Personnel

In assessing this area, the total number of people working in sports information should be considered, including full-time, part-time, graduate assistant, and undergraduate student workers. This is a potentially vulnerable area in terms of Title IX violations if more experienced staff are assigned to men's sports and less experienced staff are assigned to women's sports. There is little research on the national patterns of investment in this area in terms of personnel and their assignments.

From a gendered perspective, sports information offices within college and university athletic departments have historically been male dominated. In a 2020 survey conducted by the College Sports Information Directors Association (CoSIDA) (n=1,300), 81% of respondents were male and 18% female, 91% were white, and 8% were non-white. As NCAA data for 2020–21 reveals, sports information and marketing director roles within athletic departments continue to be male dominated (see Table 10). That said, these data are limited because the NCAA's survey does not capture all the people working in marketing and media within college and university athletic departments.[6]

---

6    The College Sports Information Directors Association (CoSIDA) and the Knight Commission on Intercollegiate Athletics launched a fellowship program on February 7, 2022, that is "designed to encourage a greater understanding of how those in athletics communications offices at all levels can become effective champions for diversity, equity and inclusion in college athletics". https://cosida.com/news/2022/2/7/general-cosida-introduces-diversity-inclusion-fellowship-program-in-partnership-with-the-knight-commission-on-intercollegiate-athletics.aspx

### Table 10. Marketing and Media Personnel in NCAA Colleges and Universities, 2020–21

| Title | Male | Female | Total |
|---|---|---|---|
| Promotions/Marketing Mgr. | 826 (61%) | 522 (39%) | 1,348 |
| Sports Information Dir. | 1,068 (87%) | 161 (13%) | 1,229 |
| SID (Ass't/Assoc) | 1,195 (76%) | 374 (24%) | 1,570 |

*Source of Data: NCAA Gender & Race Demographic Database*

As a case in point, an analysis of staffing allocations in the marketing area among the top 10 revenue-generating programs in NCAA Division I revealed more than six times as many sport-specific marketing roles were assigned to men's sport teams than women's sport teams (Jessop & Sabin, 2021).

### Access to Other Publicity Resources for Men's and Women's Programs

The broad category of publicity resources could include posters, digital advertising, schedule cards, print advertising, radio advertising, and television (Zullo, 2018). There is very little research that breaks down how athletic departments allocate resources to men's and women's sport programs in this area. There are questions that can be raised about whether athletic department personnel approach marketing and promoting men's and women's programs from a gender-equitable perspective.

As an example, when the University of Notre Dame football program unveiled what they called a recruiting campaign in May of 2021 featuring high-profile players from the team on billboards in their hometowns or within the states they come from, the question of whether the promotional effort was in line with Title IX expectations arose (Clark, 2021; Dosh, 2021a). This is the kind of area where questions should be raised in terms of how the institution is promoting women's sports and whether the investment of time, personnel, and resources in the creation of campaigns is being allocated equitably between both men's and women's programs. Further, this type of campaign also illustrated, from a Title IX compliance perspective, that there are intersections across functions within athletic departments that mutually support one another, meaning that even if an argument is made that this was an investment in recruiting, it contributes to the stature of the brand. A primary target of the campaign may be getting the attention of recruits, but the ultimate goal is revenue generation. Given that they were using individual players, the effort was also enhancing the individual brands of those players, thus there is an additional Title IX question as to whether the achievements of female athletes at Notre Dame were similarly recognized in such a high-profile fashion. While Title IX does not require identical



spending, how a school justifies an amplified media platform for a men's program and male athletes needs to have some kind of reasonable answer in terms of what they are doing to promote women's programs and female athletes.

In the only study we are aware of that looked at Title IX in relationship to the marketing of college and university athletic departments, key results were discussed within the context of their Title IX implications (Barr et al., 1999). As a benchmark, their key findings largely portended the problems that emerged regarding the gender inequalities found in women's college sport in 2021. Among the key findings were the following:

- In 1999, nearly 63% of marketing budgets were allocated to men's programs and 37% allocated to women's programs. This was self-reported data from the participants in the study.

- The two criteria most often cited by athletics administrators in determining marketing support for programs were revenue and attendance, a situation that creates a self-fulfilling cycle in that men's programs that are more established, have larger existing audiences, and have cultivated revenue streams get more support.

- Then as now, there is no systematic way readily in place to assess how marketing resources and support are allocated within athletic departments. However, Barr et al. (1999) found that athletics administrators reported that marketing staff support devoted to women's programs was low.

- Statistically significant differences were found in the practices used in merchandising programs, sponsor-appreciation activities, golf tournaments, and other fundraisers between men's and women's programs.

In assessing the Title IX implications of those findings, Barr et al. (1999) noted that:

- If marketing practices are driven by revenue and attendance leading to most or all marketing resources going to men's sports, there is a potential Title IX violation.

- It is important when allocating marketing resources under Title IX to consider not just existing revenue generation and attendance but also potential for revenue generation and attendance.

- Television contracts designed for women's program should be developed with those specific markets in mind.

- Among the factors that should be considered in the marketing area in terms of Title IX compliance is the availability and quality of personnel involved in marketing efforts for women's programs.

## Quantity and Quality of Publications and Other Promotional Devices Featuring Men's and Women's Programs

As a general trend, women's college sport media coverage aligns with general trends in the overall media coverage

of women's sports, meaning that while women's college sports have benefitted from the age of streaming and many schools do stream women's and men's games on their athletic department websites, women's college sport in general receives very little media attention. The array of media materials that schools create in support of their athletic programs (game programs, media guides, websites, blogs, coaches' podcasts or shows) warrants reviews in terms of Title IX's standard of equitable treatment.

- In a 26-year longitudinal study of NCAA Division I media guides from 1989–2017, Buysse and Wolter (2019) document how Title IX's equity standards influenced an increase in the publication of media guides for women's programs. They further show that the representation of female athletes in media guides reflected positive changes during the first 14 years of their review, meaning they were being shown as competent athletes in their uniforms, in athletic settings, and in action shots. In the last year of their review, however, this trend reversed, when there was a return to a greater emphasis on representing female athletes in traditionally feminine frames (hair, dress, makeup) instead of in their athletic uniform.

- In a content analysis of articles on NCAA Division I athletic department websites (n=30), mixed results were found in the coverage of female athletes. In terms of good news, coverage of female athletes was similar to that of male athletes, meaning "Both genders were portrayed in photographs primarily as true athletes and written about in articles mostly concerning factual information directly related to their athletics" (Malik, 2016, p. 57).

- At the same time, only 36.6% of articles and 33.1% of photographs represented female athletes, ranging from 10.3% to 6.8% below their actual participation numbers (Malik, 2016, p. 58).

- Women were represented in 33.5% (n=59) of the total article sample, while articles that represented men's athletics made up 58% (n=102) of the total sample. Females and males were represented equally in 4% of the articles, and biological sex indeterminate articles made up the remaining 4.5% of the sample (Malik, 2016, p. 58).

- In a longitudinal study of quantitative coverage of women's sport in televised sports news and highlight shows conducted by Cooky et al. (2021) over the past three decades, the percentage of women's sports news constituted between 5.7% to 5.85% of all sports coverage, an increase from the low point for women's sports coverage, which was under 2%. Still, coverage within the 5% range is still less than what it was in 1999 and only slightly above what it was in 1989.

- "The proportion of coverage devoted to women's sports in our sample of daily online newsletters (8.7%) and Twitter (10.2%) was higher than in TV news and SportsCenter, however markedly lower than for men's sports" (Cooky et al., 2021).





©iStock by Getty Images

- In a content analysis of tweets posted by NCAA Division I female and male basketball players (n=88) between the dates of February 1, 2020, and February 1, 2021, female players on average posted somewhat more frequently than male players (434 tweets compared to 383 tweets, respectively) (Savatovic-Hathorn, 2021)

- In that same study, Savatovic-Hathorn (2021) wrote, "The highest number of followers on the men's side had 58,700 followers, while on the women's side had 18,700 followers" (p. 29). "Males had on average three times more followers or 6,676 compared to females who had 1,844" (p. 46).

- For both females and males in the study, 95% of their original posts covered three themes: diversion (personal life, music, social justice), content (athletes posted photos, videos), and interactivity (they engaged with others). When broken down by gender, female athletes tweeted more diversion and content; male athletes were more interactive, dealing with fanship and information (Savatovic-Hathorn, 2021).

- A content analysis of female and male athletes depicted in Snapchat and Instagram accounts run by ESPN, CBSSports, Fox Sports, and NBC Sports between October 2017–February 2018 revealed far fewer representations of female athletes: only 25% of Instagram images and 7% of Snap images posted (Sheffer, 2020).

- In the content analysis mentioned above, "female athletes were significantly shown in more aesthetic (16%) or neutral sports (37%) more often than male athletes (0.9% and 11%, respectively)" (Sheffer, 2020, p. 40). Female athletes were also shown more frequently with family and friends when compared to male athletes. "Instagram images showed female athletes with family or friends 63% of the time compared with only 10% of the Snapchat images, while only 12% of Instagram and 3% of Snapchat images of male athletes were shown with family or friends" (p. 40).

- An analysis of media coverage of men's and women's sports on 10 NCAA Division I conference Facebook sites (five FBS, five FCS) revealed that 53% of photos were devoted to men's sports and 41% to women's sports. Out of 1,145 photographs that included game schedules and special news, 58.6% were promoting men's sports, 26.2% were promoting women's sports, and less than 3% included both men's and women's sports in the same photograph (Jang, 2017).

- In a 2004 study of campus media's coverage of women's sports, "College newspapers in the study covered male athletes and events in 72.7% of their sports stories, and college television operations devoted 81.5% of their sports stories to males. The overall amount of time or space devoted to comments from female or male participants or observers mirrored the discrepancy in the number of stories devoted to male versus female athletes. However, when college sports media did cover female athletes, the quality of the coverage was equivalent to that given to men. There was no significant difference in the average number of words per print story or the average number of seconds per broadcast story, nor was there a difference in the way the stories were presented based on the sex of the athletes. However, the huge disparity in the quantity of coverage indicates that campus media mirror professional media in regard to gender equity in their coverage of sports" (Huffman et al., 2004).

What the existing research reveals about gender equitable treatment in marketing and media within college athletic departments is two-fold: female athletes continue to be underserved in terms of promotional efforts and that patterns within athletic departments appear to align with the larger pattern of limited coverage of women's sports. At the high school level, there is so little research that has been done, there is no basis to report what is happening in this sector.

With that said, there are both troubling and hopeful signs that have emerged in the last year about the gender inequalities that exist in the treatment of female athletes by the nation's premier college sport governing body, that being the NCAA. As was widely documented in the news in March of 2021, women's college basketball players were treated as second-class citizens in what is supposed to be their national showcase. The infamous "tweet heard round the world" showed that a stack of weights was provided for the women's tournament while a fully equipped weight room was available to the men; the stark differences in food (pre-packaged meals versus full buffets), the investment in different COVID tests, with the more expensive and accurate tests made available to male athletes; gift bags for the women that were markedly less generous than those for the men; and other issues. In the external investigation requested by the NCAA that followed, findings revealed that women's college basketball and other women's sports have much greater value than existing contracts indicate (Kaplan Hecker & Fink, 2021a). Among the findings:

- The NCAA Division I men's basketball tournament is marketed as a single property, with a contract worth $1 billion in revenue per year with CBS Sports and Turner.



- The NCAA Division I women's basketball tournament has been bundled along with 29 other NCAA championships; the entire bundle is valued at $34 million per year.

- The NCAA's deal with CBS Sports and Turner has a provision that sponsorships for all NCAA championships, including women's basketball, are controlled by CBS Sports and Turner.

- The value of the NCAA Division I women's basketball tournament is estimated to have been undervalued and is projected to be worth between $84 and $112 million.

As the fog lifts on beliefs that women's college sport is not attractive to audiences and sponsors, there are ample indicators that there is value to be pursued in the women's college sport space.

- As has been the case for many years, ESPN's broadcast of the Women's College World Series regularly attracts audiences that compete favorably with professional sport audiences. In 2021, the WCWS three-game championship series featuring Oklahoma and Florida State drew an average of 1.84 million viewers, a 15% increase from what it was in 2019 (Anzidei, 2021).

- The average viewership for the WCWS outpaced that of the men's event, the College World Series (CWS), which averaged 775,000 viewers per game. The WCWS also had the most viewed game with 2.1 million viewers, compared to the CWS, whose most watched game drew 1.7 million viewers (Brennan, 2021).

- The 2021 WCWS drew an audience that was larger than the one for Game 2 of the NHL playoffs featuring the New York Islands and the Boston Bruins aired on the NBC Sports Network on the same day (Anzidei, 2021).

- According to Sports Media Watch, in 2021, the NCAA Women's Gymnastics Championships was the most-watched gymnastics telecast in 10 years. The event drew a .52 rating with an audience of 808,000, an increase of 519% from 2019 (Paulsen, 2021).

- In December of 2021, NCAA women's volleyball drew record ratings, with 1.9 million viewers tuning in to the championship match between Wisconsin and Nebraska (Christovich, 2021b). The ratings were up 71% from the spring season and 119% up from 2019 (Christovich, 2021b). Compared to the women's volleyball ratings, ratings for men's volleyball have been on the decline. In 2018, the NCAA Men's Volleyball Championship drew 190,000 viewers (Keith, 2018).

## Title IX, Female Athletes and Name, Image, and Likeness (NIL) Laws

For decades, NCAA rules prevented college athletes from entering into endorsements contracts and to make money from the use of their names, images, and likenesses (NILs). At the risk of losing their eligibility to compete in their sports, NCAA Division I college athletes, in particular, for decades could not appear in advertisements, participate in promotional activities, sign autographs, run their own sports camps, or publish under their own names and get paid.

After the state of California passed the Fair Pay to Play Act in 2019, which provided for college athletes to profit off their NILs and to have access to representatives, 26 other states passed similar laws with many taking effect in July of 2021 and some earlier. Faced with such a wave of opposition to its rules, the NCAA suspended its rules in the summer of 2021, ushering in what some have referred to as the NIL era of college sports. In the immediate aftermath of college athletes' access to their NIL rights, stories abounded about college athletes promoting all manner of ventures from restaurants to car dealerships to professional sport franchises to fitness products. The value of those endorsements ranged from the receipt of in-kind merchandise, such as t-shirts and hats, to the occasional six-figure deal.

Referred to as a significant reform in the college sport space, at times being represented as a game changer, opportunities to enter into endorsement deals simply restores a right to college athletes they have long been denied as a result of NCAA rules (Staurowsky, 2021). As the market continues to evolve, it is difficult to predict how lucrative it might be for all athletes, and for women athletes specifically. According to Blake Lawrence, CEO of Opendorse, a company that provides services to educate athletes about how to build their brands, the average compensation for college athletes who landed NIL deals within the first five months was $1,256 or $250 per month. Breaking down the numbers further, "The median for all Division I athletes between July 1 and November 30 [2021] was $6 per month" (Associated Press, 2021, para. 13).

The opening market for female athletes to pursue opportunities to build their brands has been heralded as an important development that has the potential not only to benefit individual female college athletes whose value has long been suppressed by restrictive NCAA rules but also help to elevate women's college sport programs in general. As sport lawyer, Marc Edelman (2022) noted in *Forbes*,

> For years, the NCAA's leadership had proclaimed that state-mandated NIL reform would lead to a worsening of the gender divide of college sports. However, in reality, women's college athletes have been some of the biggest beneficiaries of college sports' 2021 economic reform (para. 1).

In July of 2021, Opendorse announced a partnership with GoPuff, who markets their delivery service for food, drinks, and school supplies to college students, to facilitate NIL deals with college athletes (Zboraj, 2021). Athletes receive payments by promoting GoPuff on their social media platforms. Female athletes to sign on with GoPuff included Mia Raffael (University of Miami track and field), Kathleen Jones (Ohio State tennis), and Hannah Preissler (University of Nebraska track and field) (Chen, 2021).

Creating a campaign in line with the NIL era, Degree Deodorant launched the #BreakingLimits campaign, which was designed



to celebrate athletes who had overcome adversity. Athletes included in that campaign included Charlotte Teeter (Texas Tech soccer), Dana Rettke (University of Wisconsin volleyball), Gloria Mutiri (University of Oregon volleyball), Asikia O'Neal (University of Texas volleyball), Bailey Moody (University of Alabama wheelchair basketball), Chayla Edwards (University of Wisconsin ice hockey), Emma Hoffart (Missouri Western State University softball), Jazmyn Foberg (University of Florida gymnastics), Jhenna Gabriel (University of Texas volleyball), Lawrence Sapp (University of Cincinnati para-swimming), and Logan Eggleston (University of Texas volleyball) (Chen, 2021).

Examples of individual deals that female college athletes have struck include the following:

- Paige Bueckers, University of Connecticut point guard, signed two major endorsement deals in 2021. She became the first NCAA athlete to enter into an agreement with Gatorade that is reported to be worth an estimated $1 million. She also became a brand ambassador for StockX, an apparel and footwear brand (Edelman, 2021; Powell, 2021).

- The Cavinder twins, Haley and Hannah, who play basketball for Fresno State, have agreements with Boost Mobile and Six Star Pro Nutrition. With a joint Tik Tok account that has drawn a half-million followers and Instagram accounts where each has a following of 250,000, their earning power as influencers is believed to be substantial. One projection estimates that they have the capability of generating $45,000 per year from their social media accounts and another $520,000 from their Tik Tok accounts (Mauss, 2021).

- Lexi Sun, a Nebraska volleyball player, created a jewelry collection for Borsheims and a custom sweatshirt for REN (Chen, 2021).



*Paige Bueckers, University of Connecticut point guard*

- University of South Carolina basketball player Aliyah Boston entered into a deal with the regional fast-food chicken chain, Bojangles (Chen, 2021).

- Azzi Fudd, a basketball player with the University of Connecticut, is an ambassador with Chipotle (Chen, 2021).

- A softball player for the University of Georgia, Jaiden Fields, is also a brand ambassador with Chipotle (Chen, 2021).

- Olivia Dunne, an LSU gymnast, who has 5.7 million followers on social media, is expected to reach over $1 million in endorsements after her first year. Among the companies she has deals with are Vuori (an active wear company) and PlantFuel (a wellness company) (Chen, 2021).

- La'Quanza Glover, a basketball player for Edward Waters University, is believed to be the first HBCU female athlete to sign an endorsement deal, which she did with Global Freight & Commerce (Bell, 2022).

- Linktree Partners, a linking platform, signed Marghzetta Frazier, UCLA gymnast, and Alana Walker, University of Virginia volleyball player, to "create and share content that showcases who they are on and off the court, using Linktree to connect their audiences to their content, brand deals, causes, playlists, communities and NIL ventures" (Dosh, 2021c).

High school female athletes have also drawn attention from sponsors as well. Jada Williams, who was ranked 21 nationally in the 2023 HoopGurlz Ranking-Super 60 by ESPN, signed with Spalding in February of 2022. As an ambassador for the brand, "She'll work on marketing campaigns, event to promote women's youth basketball, and collaborate on a 'limited edition' basketball series" (Christovich, 2021a).

Some of the deals that athletes have landed have been extended to groups and/or are group licensing deals.

- As a case in point, the University of North Carolina-Chapel Hill entered into a partnership with The Brandr Group (TBG), to allow athletes in their program to profit from the use of UNC-Chapel Hill official trademarks and logos. Athletes can participate in this voluntarily, and under the terms, in group licensing opportunities that will be developed by TBG in the apparel and non-apparel space and well as co-branded sponsorships (The Athletic Staff, 2021).

- Tech company SmartyStreets, whose CEO Jonathan Oliver is a Brigham Young University (BYU) graduate, made a commitment to pay every female athlete at BYU (whether they are on scholarship or are walk-ons) $6,000 for representing the company. Athletes are expected to promote the company on their social media platforms, attend company events, allow their images to be used in the company's promotional materials, and wear SmartyStreets apparel (C. Turner, 2021).

- Other teams to receive deals include Alabama women's gymnastics with CrowdPush and UCLA's women's



basketball and Florida State softball with FTX, a cryptocurrency exchange. In the FSU softball deal, if the athletes complete all of the items they have been asked to do as part of the agreement, they will make $80,000 as a group (Dosh, 2021b). For a roster that carries 27, in theory, that would amount to less than $3,000 per player.

Third-party entities like Division Street, a company formed by billionaire and chair emeritus of Nike Phil Knight and former Nike executives to support athletes at the University of Oregon to develop their brands and increase their marketability, has drawn attention for potentially violating NCAA rules that still prevent athletes from being paid for their athletic performances, bar schools from providing benefits to athletes that are not available to other students, and prevent schools from offering monetary inducements to persuade a recruit to sign with them. Lopiano et al. (2021) in a position statement on NILs and Title IX cautioned that institutional obligations extended to businesses such as Division Street.

In a new market, the endorsement deals are varied from exclusive interviews or speaking engagements to autograph signings to memorabilia to appearances to social media influencers. Other kinds of initiatives that have targeted men's teams have drawn scrutiny in terms of Title IX compliance. Some collectives have been formed to fund specific teams and specific roles on those teams. For example, The Clark Field Collective at Texas has offered $50,000 to each of the offensive lineman on the Longhorns team. While the Clark Field Collective website stated that it is organizing committees for all teams and has a special interest in promoting the interests of women athletes, the offer to University of Texas offensive lineman has raised concerns about fairness and equity, and whether, even as a structured third-party operating outside of the institution and athletic department, Title IX has been violated because only men athletes have benefited financially (Dodds, 2022).

Depending on the nature of the agreements that athletes are entering into, their origins, and specifics, and depending on what college and university athletic programs are doing in engaging athletes around the NIL opportunity, there may be Title IX implications. Male athletes who receive more marketing from athletic departments will be positioned to build their brands and reap the benefits more than female athletes. Thus, increased scrutiny of what athletic departments are doing to promote female athletes and women's sports and meeting obligations under Title IX (see above section) is needed. As renowned civil rights attorneys Arthur Bryant and Cary Joshi (2021) note, there is the potential for a college or university athletic department to run afoul of Title IX. They offer several scenarios that athletic department personnel should be mindful about:

- The university trains its men's basketball team on how to navigate the world of contracts and agents but does not similarly train any women's team.

- The university allows the football team members to use its trademarked logo in an ad for a sports apparel brand but does not allow any women's team members to do so.

- The women's swimming and diving team coach holds meetings with various vendors to feature her team members on their website, but no men's team coaches hold similar meetings.

- The men's baseball team members are paid by the university's apparel partner to have jerseys sold with their names on the back, but no female athletes are offered similar deals.

While women athletes and women's programs have not been promoted fairly and equitably over the years, it should not be assumed that women athletes need wait on athletic departments to comply with Title IX in order to realize benefits from endorsement deals. As Jessop and Sabin (2021), point out, the U.S. Women's National Soccer Team (USWNT) negotiated for a return of their group licensing rights from U.S. Soccer in 2017 as part of their collective bargaining process. The USWNT in turn assigned those rights to R.E.P., the licensing arm of the National Football Players Association. Within two years, the USWNT earned more than $1 million in revenue from group licensing deals (Jessop & Sabin, 2021).

The implications of this are two-fold. First, women athletes are demonstrating that they have value in the market and the restoration of rights to college athletes to pursue endorsement deals creates opportunities for female athletes to benefit. At the same time, there is no question that high school and college women athletes would be better positioned to reap the benefits of endorsements if institutions had been more closely monitored in terms of the marketing and promotion of girls/women sports. These developments should signal a concern within institutions to examine their allocation of personnel and resources in the marketing and promotion of girls/women athletes and girls/women sports. As Bryant and Joshi (2021) note, this is an area of Title IX vulnerability for high school and college athletic departments.



*Giselle Juarez of the Oklahoma Sooners pitches during the 2021 Women's College World Series Championship.*



# Part IX. Title IX and Intersectionality

## Title IX, Gender, and Race Intersectionality

As instrumental as Title IX has been in expanding opportunities for girls and women throughout American society, feminists and critical race theorists point out that — as is the case with any "single axis" law, meaning any law that focuses on one category of bias in addressing discrimination — it by itself does not take into account how sex discrimination intersects with other forms of bias. In her book *Getting in the Game: Title IX and the Women's Sports Revolution*, legal scholar Deborah Brake (2010) wrote that for all of the progress made under Title IX, "...women have not shared equally in many of the post–Title IX gains" (p. 113). As Doris Corbett, Professor Emerita and administrator at both Howard University and the University of Northern Iowa, who played a key role in creating intercollegiate athletic opportunities at Howard and served as their first women's basketball coach (1973–74), wrote, "Women of color experience a form of double jeopardy — racism and sexism. Because they are overlooked by society in general, their struggles in both sport and other aspects of life are compounded" (Corbett, 2001, p. 307).

In the Women's Sports Foundation's report on *Title IX and Race in Intercollegiate Sport*, Butler and Lopiano (2003) noted that, "Race and gender inequalities are intertwined by their very natures. When female athletes face discrimination because of their gender, female athletes of color are similarly affected. When students of color face discrimination based on their race, female athletes of color are similarly affected. Thus, female athletes of color are in double jeopardy, facing the effects of gender and race discrimination" (p. 7). See Table 11 for the breakdown of athletic opportunities for male and female athletes by race, ethnicity, and gender within the NCAA between 2012 and 2021.

Controversially, Dees (2004), argues *Brown v. Board of Education* and anti-discrimination laws that use a single-axis lens have also assisted in increasing in athletic participation opportunities for African American women in intercollegiate athletics. Others have reported the single-axis lens limited or restricted African American women's access to intercollegiate competition (Mathewson, 2012; Flowers, 2015). Specifically, Title IX as a single-axis legislation that provides remediation for gender discrimination simultaneously ignores racial discrimination against African American women (Mathewson, 2012; Flowers, 2015).

- Also, Mathewson (2012), argues Title IX seeks to benefit white women athletes more than African American women as "Title IX was designed to target discrimination and promote equality along the single-axis of gender." Therefore single-axis-based anti-discrimination laws like Title IX have not provided remedies for African American women's and girls' participation in athletics.

- Crenshaw (2002), in recognizing the intersectionality between multiple forms of inequality and identity, illustrates the limits of Title IX as a single-axis law focusing on gender. The concept of intersectionality broadens the analysis to consider the intersections between race, class, and gender.

- Moreover, (Mathewson, 2012) cited, "A black woman who has been discriminated against has difficulty proving the requisite inequality. It may be difficult to prove that she was discriminated against on the basis of race, because blacks have not suffered as a group since black men do not share the injury."

According to the Postsecondary National Policy Institute (PNPI) (2020), between 12% to 13% of the undergraduate populations at four-year public and private non-profit colleges and universities were Black. As shown below (Table 11), the percent of Black female athletes falls well short of those percentages.

### Table 11. Percentage of NCAA Athletes by Race, Ethnicity, and Gender, 2012–21

|  | Male White | Male Black | Male Other | Female White | Female Black | Female Other |
|---|---|---|---|---|---|---|
| 2021 | 33 | 11 | 11 | 30 | 5 | 9 |
| 2020 | 33 | 11 | 11 | 30 | 5 | 9 |
| 2019 | 34 | 11 | 11 | 30 | 5 | 9 |
| 2018 | 34 | 11 | 10 | 30 | 5 | 9 |
| 2017 | 35 | 11 | 10 | 31 | 5 | 8 |
| 2016 | 35 | 11 | 10 | 31 | 5 | 8 |
| 2015 | 36 | 11 | 9 | 31 | 5 | 8 |
| 2014 | 37 | 11 | 9 | 32 | 5 | 7 |
| 2013 | 37 | 11 | 9 | 32 | 5 | 7 |
| 2012 | 38 | 11 | 8 | 32 | 5 | 6 |

*Note: The "Other" category may include international athletes, athletes who identify as two or more races, Asian, Native American/Hawaiian, Alaskan and Pacific Islander, and unknown.*



When the number and percentage of women athletes competing on teams sponsored by NCAA member institutions are considered over the span of 10 years between 2012–21, the majority are white. Having said that, a shift has been occurring with the percentage of white women athletes slowly declining over time from a high of 74% in 2012 to 68% in 2021. There is an impression, based on the way that race and ethnicity data are reported that the "Other" women athlete category is growing in terms of representation, with an increase from 15% in 2012 to 21% in 2021; with the representation of Black women athletes remaining constant over a 10-year period at 11% (see Table 12 below).

As a result, racial disparities continue to create obstacles for BIPOC women in college sports. For example, white women represent the largest population of women athletes in NCAA Division I, II, and III conferences combined at 68%. Black women represent 11%, followed by Hispanic women at 6%, international women at 5%, women identifying with two or more races at 5%, and Asian women at 2% (NCAA, 2021b). The percentage of American Indian/Alaska Native and Native Hawaiian/Pacific Islander women registered at 0.05% although combined they accounted for 1,687 female athletes competing on teams competing under the umbrella of the NCAA (see Table 13).

### Table 13. NCAA Female Athletes by Race/Ethnicity, 2020–21

|  | NCAA Women Athletes | Percentage |
|---|---|---|
| American Indian/Alaska Native | 932 | <1% |
| Asian | 5,182 | 2% |
| Black | 23,489 | 11% |
| Hispanic/Latino | 13,487 | 6% |
| Native Hawaiian/Pacific Islander | 755 | <1% |
| International | 9,860 | 5% |
| Two or More Races | 10,498 | 5% |
| Unknown | 5,839 | 3% |
| White | 147,879 | 68% |
| **Total** | **217,921** | **100%** |

An examination of NCAA data across all divisions in 26 sports for the 2020–21 academic year revealed the highest representation of female athletes of color (American Indian/Alaska Native, Asian, Black, Native Hawaiian/Pacific Islander, and individuals who identified with two or more races) were participating in these sports: women's basketball (39%), women's fencing (36%), women's indoor track (27%), women's outdoor track (28%), and women's rugby (27%).

### Table 12. NCAA Female Athletes by Race/Ethnicity, 2012–21

|  | Female White | % Female White | Female Black | % Female Black | Female Other | % Female Other | Total |
|---|---|---|---|---|---|---|---|
| 2021 | 148,036 | 68% | 23,495 | 11% | 46,591 | 21% | 218,122 |
| 2020 | 151,650 | 68% | 24,452 | 11% | 46,910 | 21% | 223,012 |
| 2019 | 150,206 | 68% | 24,456 | 11% | 44,834 | 20% | 219,496 |
| 2018 | 149,980 | 69% | 24,422 | 11% | 42,373 | 20% | 216,775 |
| 2017 | 150,181 | 70% | 23,930 | 11% | 40,106 | 19% | 214,217 |
| 2016 | 149,099 | 71% | 23,487 | 11% | 37,759 | 18% | 210,345 |
| 2015 | 148,606 | 71% | 23,226 | 11% | 36,151 | 18% | 207,983 |
| 2014 | 147,600 | 72% | 22,407 | 11% | 33,633 | 17% | 203,640 |
| 2013 | 144,963 | 73% | 21,971 | 11% | 31,642 | 16% | 198,576 |
| 2012 | 142,916 | 74% | 21,588 | 11% | 28,468 | 15% | 192,972 |

*Note: The "Other" category may include international athletes, athletes who identify as two or more races, Asian, Native American/ Hawaiian, Alaskan and Pacific Islander, and unknown.*



- Of the 26 sports, only two — women's wrestling (45%) and women's fencing (43%) — have fewer white female athletes than female athletes from other racial and ethnic groups and countries of origin other than the United States.

- The five least racially diverse sports with large majorities of white female athletes were women's equestrian (88%), women's field hockey (83%), women's ice hockey (79%), women's lacrosse (84%), and women's rifle (84%).

- Asian female athletes comprise 25% of those competing in the sport of women's fencing, while the three sports where Hispanic/Latina athletes have greatest representation were women's wrestling (28%), women's water polo (13%), and women's softball (10%).

Further, college athletic access and participation opportunities for women are unevenly distributed along racial lines (Carter-Francique & Flowers, 2013; Flowers, 2015; Butler & Lopiano, 2003). One of the factors contributing to that distribution is racial clustering.

- Racial clustering is evident in the steering of racial minority women into specific sports, in particular basketball and track (Dees, 2008; Flowers, 2018). Consequently, African American women are highly populated in women's basketball and track and field and disproportionate in NCAA emerging sports.

- Yet, racial clustering in women's basketball and track and field have provided skewed rates of African American women in college and high school sports.

- Based on a recommendation made by the Gender Equity Task Force in 1994 the NCAA adopted the Emerging Sports program as a resource to increase women's participation opportunities in sports. Current NCAA emerging sports are tumbling, equestrian, rugby, triathlon, and women's wrestling (NCAA, 2022). These sports represent extremely low numbers of African American and racial minority women participants. Therefore, Title IX has not provided gender equity for all women in sports. Moreover, African American and racial minority women athletes face both racial and gender burdens while attempting to gain access to sports.

- McDowell & Carter-Francique (2016) reported "racial clustering and low representation of women of color in nontraditional sports at the college level is also correlated to limited opportunities for girls of color to participate in these sports at the youth and high school levels."

- However, McDowell & Carter-Francique (2016) also offer another catalyst to the increased numbers of African American women in basketball: cultural significance to the African American community. Specifically, the cultural connection of basketball and track and field to the African American community through family, schools, and community socialization may contribute to the majority representation of African American in interscholastic and intercollegiate basketball and track & field competition.



©iStock by Getty Images

- Shifrer et al. (2015) investigated the college-going benefits of high school sports participation from a race/gender perspective. They concluded that, "Across the last three decades, diverse students, with the exception of Black girls, have reaped the college-going benefits of high school sports participation." (p. 314). They associate this with decreased athletic opportunities at the high school level, social/economic/financial challenges, and cultural influences.

Further, cultural conversations surrounding African American women athletes must also include socioeconomic status. Women of color from lower socioeconomic backgrounds have limited access to emerging sports like lacrosse, equestrian, and triathlon, which may explain why these sports are overwhelmingly represented by white women (McDowell & Carter-Francique, 2016; Flowers, 2018).

- "At Legal Aid at Work, the Fair Play for Girls in Sports project focuses particularly on girls of color and girls who live in low-income communities to ensure equity among these underserved populations because girls of color encounter a variety of additional barriers to accessing fair play. Sixteen percent of K–12 public schools across the nation have over seventy-five percent students of color. This modern form of segregation produces a variety of resource inequalities, including in athletics. Forty percent of these heavily-minority schools have large gender inequality in their athletics; in comparison, only sixteen percent of heavily-white schools have these athletic inequalities" (Alexanian, 2020).

- Moreover, Pickett et al. (2012) conducted a study that expressly examined whether African American and white girls and women have equally benefited from Title IX. The authors reported "the effect of Title IX at the high school level may be to maintain the 'funneling' of Black female athletes into two main sports (e.g., basketball and track &



field), whereas white female athletes benefit the most from the addition of new sports and sports programs."

- This unequal benefit erects unintended barriers to access and participation in sports for African American women (McDowell & Carter–Franqiue, 2016; Flowers, 2018; Dees, 2008; Mathewson, 2012) Consequently, the notion of clustering has also led to the invisibility of African American women athletes in colleges.

- For example, Bruening (2005) reports the invisibility of African American women emerges as they are clustered with white women in data sets and research that seeks to examine women's experience in sports, hence obscuring the unique experience and challenges in college sports. On the other hand, African American women are overshadowed by their male counterparts when data seeks to highlight racialized experiences in college sports.

- Moreover, Mathewson (2012) cited, "A black woman who has been discriminated against has difficulty proving the requisite inequality. It may be difficult to prove that she was discriminated against on the basis of race, because blacks have not suffered as a group since black men do not share the injury."

One of the challenges in getting a more nuanced perspective on the racial dynamics at play as they intersect with gender in the college sport system is the collapsing of racial categories in the reporting of data. For example, NCAA data is often reported out with a category labeled "Female, Other." That category includes Native American/Alaska Native, Asian, Hawaiian/ Pacific Islander, individuals who identify with two or more races, international, as well as individuals for whom their race, ethnicity, and or country of origin is unknown. As a consequence, the percentages as reported might easily be misunderstood or cover over nuances that warrant further consideration.

## Title IX and Transgender Athletes

Title IX is poised to play an important role in securing the legal rights of transgender students to compete on athletic teams according to their gender identity. Though there has not yet been a case of judicial or regulatory enforcement where transgender students' rights to play sport were addressed as a matter of Title IX, emerging case law in other contexts suggests that the likely interpretation of the statute is that it supports inclusion and conflicts with the laws and policies in some states that prohibit transgender girls from competing in girls' sport.

In 2020, the Supreme Court held that sex discrimination provisions of federal employment discrimination law necessarily prohibit discrimination against a worker based on their transgender status. *Bostock v. Clayton County* (2020). Title IX, with similar statutory text prohibiting discrimination on the basis of sex, would almost certainly be construed to have the same application in admissions and other aspects of education that are most like employment. Though the contested employment discrimination in Bostock did not involve a sex-segregated context like athletics, there is good reason to predict that its

reasoning would apply in those situations as well. Specifically, Title IX litigation in analogous context of bathrooms and locker rooms has resulted in several judicial interpretations of Title IX confirming that a school's failure to affirm transgender student's gender identities, while doing so for cisgender students, is a form of sex discrimination prohibited by the statute (*Bostock v. Clayton*, 2020). For example, in *Grimm v. Gloucester County School Board*, the ACLU filed suit against the Gloucester County School Board for adopting a discriminatory bathroom policy that segregates transgender students from their peers. The school policy restricted transgender students from using communal restrooms aligning with their gender identities (*Grimm v. Gloucester*, 2021). The Fourth Circuit found that transgender students were entitled to protection from school bathroom policies that prohibit them from affirming their gender (*Grimm v. Gloucester*, 2021). Bathroom and locker rooms are similar to athletics for Title IX purposes, because these are the only aspects of education in which it is lawful to separate students on the basis of sex. The fact that courts have concluded as a matter of Title IX that girls who are transgender may not be excluded from facilities that lawfully exclude boys, suggests a similar result for athletics.

The current administration has signaled its intention to enforce Title IX in a way that maximizes protection for transgender rights, and, though it has not yet initiated any enforcement actions against schools that restrict the rights of transgender athletes, it has issued an interpretive rule endorsing in general terms the extension of the Supreme Court's holding in *Bostock v. Clayton* to Title IX (U.S. Department of Education, 2021b; Biden, 2021). This opens the door for Title IX enforcement against schools in states that prohibit or impose undue restrictions on transgender girls seeking to participate in girls' sport. A state that insisted its schools prohibit such participation would be consigning its schools to the loss of federal funding. This point is particularly salient in light of the wave of anti–transgender legislation that began in 2020, which has codified the exclusion of transgender girls and women from participating in sport that match their gender identity in several states.

Title IX's support for the rights of transgender girls to compete consistent with their gender identities in girls' sports does not conflict with the role the statute has played in securing athletic opportunities for women and girls. The law permits schools to provide separate girls' and women's sports because female students would otherwise have diminished opportunities — rationale that extends to transgender girls with equal strength. Transgender girls and women should be welcome to compete in sports consistent with their gender identities. Requirements for participation should be context- and age-appropriate and no more restrictive than necessary in light of the objectives of the sport in question. While hormone treatment or hormone level requirements may be appropriate in varsity college athletics, participation in contexts like youth sports, scholastic sports, and college club sports and intramurals should be less restrictive.

Transgender individuals are vulnerable to psychological harm because of societal norms that pressure them to deny and suppress their gender identities. Especially as transgender civil



rights as basic as access to medical care are up for debate in state legislatures, schools, families, and communities are in positions to mitigate the psychological pain and emotional harm that threaten transgender lives. The medical community agree that affirming the identity of a transgender person and allowing them to access sex-segregated activities and facilities that match their gender identity has a powerful positive impact. In contrast, policies and practices that reject transgender identities contribute to those risks. Welcoming a transgender girl into girls' sport can therefore be powerfully helpful, while rejecting her can be powerfully harmful.

While some transgender girls, including teens and adolescents, take gender-affirming hormones that make their body more typically female in appearance, many leading advocates in the sector do not support requiring these or other medical interventions as a condition for participation in youth and scholastic sport. For one reason, not everyone has access to supportive health care providers. For another, while hormone treatments are generally safe for most transgender people, they are not entirely free of health risks, including risks to one's fertility. The significant, resource-dependent, and highly personal decisions of if, when, and how to medically transition should be made by the transgender person in consultation with their medical providers and their family. It should not be a condition on the right of youth and teens to participate in sport. That right should be a given.

Some oppose the inclusion of transgender women with arguments that it is unsafe and unfair to let them play with and against cisgender girls. This assumption is problematic for several reasons. For one thing, the differences between male and female bodies are generalized differences. Cisgender boys may be bigger and stronger on average than cisgender girls, but some boys are small, and some girls are strong. There are plenty of examples of cisgender girls who compete in boys' sports successfully and safely. It is wrong to assume that just because a girl is transgender, that she is too good or too big to play with and against other girls. Moreover, when we tell cisgender girls that they are categorically disadvantaged relative to transgender girls, we unnecessarily reinforce sexist stereotypes that lead to girls' self-perception as athletically inferior, which in turn limits their athletic development.

Another problem with singling out transgender identity as the only source of competitive advantage worthy of imposing exclusions or restrictions is that it ignores lots of other factors that create diverse athletic abilities among girls. For example, girls whose parents have enrolled them in costly development programs from a young age have serious competitive advantages over those who don't have access to that opportunity. Yet we don't exclude or run separate programs for those athletes. Age is another example. Many scholastic sport programs permit and expect seniors and first-year students to compete with and against each other, despite differences in size and experience. We already tolerate significant diversity of physical characteristics and athletic ability within girls' sport even though such diversity distorts the idea of level playing field. Within this already diverse environment, it is not unreasonable to

make room for girls whose body types may be more masculine than the typical girl and who may have stronger athletic abilities than some girls.

When genuine concerns about safety do arise, they can be addressed through neutral policies that apply to all girls rather than singling out transgender girls. For example, some might think that it's dangerous to allow transgender girls to play a front row position in volleyball, because the tendency for those individuals assigned male at birth to be taller means that they will have the ability to spike the ball from a greater, more dangerous height. But not all transgender girls are tall, and some cisgender girls may be tall as well. Rather than banning or restricting all transgender girls for this reason, a neutral rule — like "no player over (X height) can play the front row" — addresses the risk of safety more completely, avoids excluding people unnecessarily, and avoids stigmatizing transgender girls by singling them out for different treatment.

Finally, it is important to remember the values professed by organizers of scholastic and youth sport. These programs have participation as a primary value and seek to develop way more than a participant's win-rate. Scholastic and youth sport support participants' educational, character development, health and fitness, and socio-emotional development as well as inclusivity. When these values predominate, concerns about a so-called level playing field should give way to the more important goal of helping and not harming transgender youth. If the argument against transgender inclusion is that it deprives cisgender girls of the opportunity to win, this argument is not only problematic for the reasons pointed out above, but also suggests that the sport organization in question needs to revisit their mission, values, and commitment to providing equitable access to youth sports. Another objection to transgender inclusion is the expressed concern that boys who are not transgender may pretend to be for some disingenuous purpose. However, more than 20 state athletic associations have or have had gender-identity based policies that only requires students to affirm their gender, some of them going back for almost 15 years, and the problem of disingenuous boys has not materialized. For one reason, schools are usually the entity responsible for affirming to the interscholastic athletic association that their athletes are participating in the right category. For another reason, policies can permit additional evidence to confirm that a student's sincerity may be introduced, such as a letter from a responsible person who knows them, such as a medical provider, counselor, or clergy. The permission of such evidence has proven effective at preventing or addressing the theoretical problem of disingenuous boys pretending to be girls.

Until recently transgender college athletes at NCAA member institutions had been competing for a decade under a policy issued in 2011. Transgender men who had received a medical exception for taking testosterone, were permitted to compete on men's teams or on women's teams, however, those women's teams would be reclassified as "mixed sex." Transgender women were prevented from competing on women's teams until after one year of testosterone suppression. The NCAA also provided for athletes who were not taking hormone treatment as part of



their transition, with transgender men athletes being afforded permission to compete on men's teams. Transgender women not taking hormone treatments were not permitted to participate on women's teams (NCAA Office of Inclusion, 2011).

In January of 2022, the NCAA Board of Governors approved a new policy to take effect immediately and follow a phased–in approach. Phase 1 would be implemented for the winter and spring of 2022 championships whereby, "Transgender student-athletes will need to document sport-specific testosterone levels beginning four weeks before their sport's championship selections. Phase 2 starts with the 2022–23 academic year, transgender student–athletes will need documented levels at the beginning of their season and a second, six months after the first. They will also need documented testosterone levels four weeks before championship selections. Full implementation (Phase 3) would begin with the 2023–24 academic year" (NCAA Media Center, 2022). Acceptable levels of testosterone will be determined on a sport–by–sport basis as defined by national sport governing bodies (NGB). In the absence of an NGB policy, athletes will be held to standards by international sport governing bodies. It will be important for women's sports advocates to monitor the implementation of this policy to ensure that incorporating NGB's policies does not result in the categorical or unreasonable exclusion of transgender women from NCAA sports.

While this section has so far focused on the rights of transgender women and girls to compete in sports that are designated as women's or girls' sports, it is also important to acknowledge that some transgender students do not identify as male or female. While these athletes retain the right to compete in the sports that match their sex assigned at birth, schools can improve opportunities for nonbinary athletes by increasing athletic opportunities that aren't restricted or divided by sex at all. This would give nonbinary students options for participating in sports free of the dissonance that would otherwise result from competing in the category that does not reflect who they really are inside. Having some options for gender-free sports would also give more diverse options to other boys and girls who might sometimes want to play together than always apart. Having an open category does not replace the need for trans athletes to be included consistent with their gender identities when binary categories exist.

### Title IX and Female Athletes with Disabilities

*A note about terminology: During the past 20 years, the term parasport has emerged as the term to capture the sport opportunities and experiences for people with disabilities and generally covers broad disability groups: deaf people, people with physical disabilities, and people with intellectual disabilities. In the literature, athletes with disabilities may be referred to as parasport athletes. In this section, terms are used as they appeared in reports or in the research.*

According to the National Center for Education Statistics, there are nearly 7 million students with disabilities attending the nation's public schools (Schaeffer, 2020). Students with

disabilities may comprise as much as 14% of total enrollment within public schools. Of that group, approximately 33% or 2.3 million are girls (Schaeffer, 2020).

- According to Brittain (2009), 90% of females with disabilities are not active in sport.

- In a report from the U.S. Government Accountability Office in 2010, boys with disabilities consistently participate in sport at higher rates than girls with disabilities.

- Boys in grades 1 through 7 participated on a school or community-based sports teams at a rate of 45% compared to 31% of girls with disabilities (U.S. Government Accountability Office, 2010).

- Among athletes with disabilities participating on school or community-based sports teams offered for grades 7 through 12, 37% were boys and 23% were girls (U.S. Government Accountability Office, 2010).

- According to the NFHS, of the 15,571 high school students who participated in adaptive sport activities during the 2018–19 academic year, 44% were female students (6,960) (NFHS, 2019).

In an appeal to sport leaders to consider their professional role in fostering participation for people with disabilities to participate in sport, Grimes and French (1987) point out that girls and women with disabilities encounter barriers as a result of discrimination because of their sex as well as their disability. Those barriers include:

- Lack of access to proper equipment, facilities, and trained practitioners, and facing ongoing challenges regarding funding and accommodations in comparison with men with disabilities (Clark & Mesch, 2018).

- Issues surrounding attitudes, communication, language, culture, (sporting) environment, religion, and social beliefs (Clark & Mesch, 2018; Fuller, 2018; Smith & Wrynn, 2014).





- "A comparative and concerning dearth of college-level competitive adaptive sport venues (with some notable exceptions, such as the recent efforts by the City University of New York (CUNY) to build a collegiate wheelchair basketball team) (McGinnis et al., 2020).

- "In 2015, the Eastern Collegiate Athletics Conference (ECAC) became the first NCAA-sanctioned conference to adopt a comprehensive inclusive sport strategy providing championship opportunities for student-athletes with disabilities in swimming, rowing, and track & field, as an outgrowth of the 2013 NCAA Think Tank on Student-Athletes with Disabilities. Despite early enthusiasm, the championships have not been continued and there are no concrete signs of future support for systematic inclusion of student-athletes with disabilities from the NCAA" (McGinnis et al., 2020).

- In October of 2021, the USOPC and the NCAA announced the creation of a joint Para-College Inclusion Project, "which would include promoting adaptive sports and strengthening links between school leaders, adaptive programmes and leaders in American Para sport" (Burke, 2021).

Three federal laws have had an impact on schools providing disabled students with access to a free and appropriate education, unencumbered by discrimination. Those laws include 2004 Individuals with Disabilities Education Act (IDEA), the Rehabilitation Act of 1973 (Section 504), and the Americans with Disabilities Act of 1990 (ADA). By themselves and in combination with local and state laws, schools receiving federal funding are obligated to provide female athletes with disabilities equal opportunity to participate in sport, to make opportunities to participate in sport through accommodations that are reasonable; and to ensure that athletes are not discriminated against because of their disability.[7]

In 2010, researchers with the U.S. Government Accountability Office found that the U.S. Department of Education had "provided little information or guidance on PE or extracurricular athletics for students with disabilities" (p. 2, para. 3). Interviews with school officials and representatives from disability groups revealed that there was a need for greater clarification regarding the responsibilities schools have to provide athletes with disabilities reasonable access to sports teams. Guidance issued the following year by the Department of Education focused on accessibility in its various forms (access to facilities and equipment, access to transportation to participate), equipment (investment in modifying existing equipment or purchasing equipment appropriate for a particular individual or population, functionality of equipment), and personnel preparation (ensuring that staff are qualified and knowledgeable about athletes with disabilities). In 2013, a Dear Colleague letter was issued by the Office for Civil Rights emphasizing that:

A school district that offers extracurricular athletics must do so in such manner as is necessary to afford qualified students with disabilities an equal opportunity for participation. This means making reasonable modifications and providing those aids and services that are necessary to ensure an equal opportunity to participate, unless the school district can show that doing so would be a fundamental alteration to its program (Galanter, 2013a, para. 14).

While Christophel (2020) cites Title IX as a model to use in arguing for the need for the creation of separate sport championships and leagues for athletes with disabilities, there is also a strong argument that more attention should be paid to the accumulated effects of multiple forms of discrimination that might occur against a female parasport athlete should she also be a racial minority. As was the case in 2011 when the U.S. Department of Education determined that more research was needed to better understand the lived experiences of female athletes with disabilities, there is still a vacuum in terms of solid information on participation patterns, the need for better frameworks to foster greater participation at the high school level, and the need for greater commitment from sport governing bodies to address the needs of an underserved population.

## Title IX and Economically Disadvantaged Students and Students from Urban and Rural Communities

School sports hold value as they provide the foundation for many youths to begin their journey in sports. The first introduction to sports for many girls is through their educational school system. Physical education classes not only provide a source of exercise but also teach sports fundamentals and rules, which inspire youths to socialize in a team setting, gain healthy lifestyles, and build long-term relationships with sports.

- For some, extracurricular activities like sports clinics and youth summer camps are their first introduction to sports. These resources become a fundamental component in introducing girls to sports, through growing their interests in new sports and inspiring career aspirations in coaching and athletic training (Giroir, 2019).

- A family's ability to financially support their children's growth in sports directly impacts which sports they participate in, how frequently they participate, and how long they stay active in sports. A study found, 33% of African American parents stated that their daughter never participated in sports or had to stop due to lack of financial support (Staurowsky et al., 2015).

- A survey conducted by Aspen Institute's Project Play initiative found that "Youth ages 6-18 from low-income homes quit sports because of financial costs at six times the rate of kids from high-income homes" (Aspen Institute, 2020, para. 3).

---

7    *Receipt of federal funding is only the "trigger" applicable to the Rehabilitation Act. IDEA applies to all public education systems, and ADA applies to all places of public accommodation and all state agencies – so ADA applies to private schools as well as public schools.*



Youth from high-income homes have greater access to build their overall sport experience when compared to children from low-income homes. Youths from lower-income homes are not afforded this luxury, instead their access to sports and quality coaching is based on what is provided by their educational school systems or local communities. This experience may also shape which sports girls participate in and when they start sports. Mindfulness about this reality also argues for greater efforts to ensure Title IX compliance and enforcement in all schools. If the place where female athletes have the greatest likelihood of participating and competing are denying them those opportunities because the school systems are engaging in sex discrimination, where else will these female athletes from low-income families go?

- Girls from high-income homes also have the accessibility to start sports early. A study found that children from high-income homes typically begin sports around the age of 7, which is almost a year earlier than children from middle- and low-income homes (Aspen Institute, 2020).

- Financial support also impacts the quality of experience a youth has in sports. A study found high-income youths spend more time in practice or training than did low-income and middle-income youths. Additionally, it was noted low-income youths spend more time on pickup games and free play (Aspen Institute, 2020).

- The expenses of sports participation also fuel which sports youth can participate in and the number of sports opportunities they can pursue. The Aspen Institute (2020) found that "high-income households reported spending on average $1,099 annually for one child, compared to $719 for middle-income homes and $476 for low-income homes." These data show that there is correlation between sports selection and financial stability. The study further reported, "High-income parents paid twice as much on registration fees, travel and lodging, lessons and instructions, and camps as low-income parents."



Research over many years confirms that the access girls and women have to sport opportunity is directly connected to their environment. Community recreational resources and neighborhood population size affect how often girls and women participate in physical activity and sports. Whether a school offers athletic opportunities to females in compliance with Title IX requirements is another contributing factor. If the opportunity is not there, participation does not happen.

- Both urban and rural communities have unique qualities that shape experiences in sports. However, both are impacted by socioeconomic factors like low enrollment in schools, diversity, and lack of resources due to athletic budget cuts (Evans, 2020).

- According to Evans (2020), "Rural schools in districts facing socioeconomic disadvantage were also the least likely to integrate policies and practices that may strengthen sports programs."

- Additionally, both rural and urban communities are challenged by transportation and providing adequate facilities for events and practices (Evans, 2020).

Sports participation has been linked to positive benefits for youth, including postsecondary education attainment. In rural areas, girls are often at a deficit for access to sport for a variety of reasons such as proximity to school or athletic facilities, limited access to quality coaching, quantity of sporting opportunities, and the cost of participation. Rural areas have higher instances of child poverty (67%) than urban areas (47%) (Schaeffer et al., 2016). With consideration of suburban communities, sports participation is often higher among youth with greater access to resources, staff, and district-wide sport groups (Bell et al., 2018). Location also matters for girls in rural areas, as "youth sport participation plays an important role in the daily physical activity of children in rural communities" and family income has a significant influence (Kellstedt et al., 2021).

Girls are often drawn to sports to have fun and enjoy the team environment (Kane & LaVoi, 2007). Decreased opportunities and access to sport take away the opportunity for them to participate in sports and place them at a disadvantage in developing strong social skills that may support experiences that are related to college-going behaviors (Shifrer et al., 2015). Thus, income, location, and equitable access to sports are interrelated opportunities that, if remedied, can increase the post-secondary opportunities afforded to girls from low-income, rural, and urban areas (Pusch, 2014).



# Part X. Title IX and Other Areas of Review

## Title IX and Pregnant/Parenting Athletes

In the months preceding the 35th anniversary of Title IX in 2007, an ESPN *Outside the Lines* episode aired that featured the pressures female college athletes faced when they became pregnant. At the time, it was an arresting episode for many who simply had not thought about how pregnant female athletes were treated in the sport system, largely because pregnant female athletes were, for the most part, invisible. Stereotypes about pregnant women needing rest and protection often forced women out of participating in their sport (Hogshead-Makar & Sorensen, 2008). Negative social stigmas around young, unwed pregnant women cast a shadow over the lives of an untold number of female athletes, some of whom made decisions to get abortions. Subject to threats of expulsion from teams and loss of athletic scholarships, female athletes were unaware that Title IX offered protections against the sex discrimination that lie at the core of those pressures (Brake, 2008).

Shortly after that episode was broadcast, the Assistant Secretary in the Office of Civil Rights, Stephanie Monroe, issued a reminder to schools that Title IX's of their obligations to allow female athletes who may be pregnant, experiencing a false pregnancy, or going through or having just gone through childbirth or a termination of pregnancy and recovering from that, to continue playing and competing in their sports. Pregnancy or childbirth is considered under Title IX to be a temporary disability and a female athlete is to be accommodated accordingly.

In 2009, the NCAA released its Pregnant and Parenting Student-Athletes: Resources and Model Policies Handbook. In the same year, the NCAA adopted new bylaws to ensure that student-athletes would not lose their athletic scholarships if they became pregnant and that their competitive eligibility would be extended to accommodate them. While the NCAA did issue the model policy, schools are not compelled to have such a policy and no negative consequence follow if a school does not have one (Sorensen et al., 2009).

In a recent unpublished study (Guenther et al., under review) of a group of NCAA female athletes (n=126) surveyed about their Title IX knowledge in terms of pregnancy protections:

- Just under 61% held a belief that they had some legal protection for their athletic aid, eligibility, and participation if they were to experience an unplanned pregnancy.

- Significantly fewer (9.7%) of those who were aware of Title IX protection were also aware that the NCAA had rules that protected them if they experienced pregnancy.



©iStock by Getty Images

- Almost all (94%) did not receive information regarding their pregnancy rights from any sources.

- Less than 3% reported receiving information about pregnancy rights from their athletic department.

- The majority (69%) reported being unaware of any pregnancy rights prior to participating in this study.

- Almost all participants (97.6%) believed that the university athletic department should provide more information about pregnancy and pregnancy rights.

## Title IX and Esports

Regardless of whether esport (i.e., electronic sport) is recognized as a sport under Title IX, its rapid growth at the high school and college levels and the clear push to promote the activity on three fronts — as curricular and enrollment initiatives, potential varsity sport opportunities, and as student activities — warrants attention and consideration. "Colleges are awarding scholarships, granting degrees, fielding traveling esports teams, organizing gaming clubs, and building state-of-the-art esports arenas at the centers of campuses equipped with gear and gaming chairs" (Stoever, 2021, p. 861–862). The esport space has historically been a white male-dominated one that has raised profound concerns about mistreatment of girls and women as well as racial and sexual minorities. According to Stoever (2021), the online atmosphere adopted during the COVID-19 pandemic



in response to the necessity to socially distance added momentum to an already growing esport trend. Along with that came "corresponding technology-enabled abuse, sexual cyberviolence, and harassment — more relevant and prevalent than ever before" (Stoever, 2021, p. 859). Fox and Tang (2017) found, in a study of multiplayer online gamers, that more than 70% of the women players participated as male characters to avoid attacks on their competence and being sexually harassed.

While women and girls have experienced tremendous participation increases throughout traditional sport environments following the implementation of Title IX policy, non-traditional collegiate sport, such as esport are severely behind in achieving equitable access, opportunity, and participation for women and girls. Esports have been previously defined as competitive video gaming and/or a form of sports in which the primary aspects of the sport are facilitated by electronic systems such as personal computers (PC) or consoles (e.g., Xbox, PlayStation) (Hamari & Sjöblom, 2017).

- Overall, esports are a rapidly growing space, with estimates of $3 billion in revenue during 2022, combined with hundreds of millions of participants worldwide (Darvin, 2021a).

- As a result, colleges and universities across the United States have taken notice of this trend and there has been a tremendous increase in varsity collegiate esport programs over the previous five years (Darvin, 2021a).

- Varsity collegiate esports are a relatively young space, with the first program being founded in 2014 by Robert Morris University. Since that initial program began, over 175 institutions have added varsity collegiate esport programs.

While opportunities to compete at the varsity collegiate level of esports have skyrocketed, women are largely absent from participation. Men's dominance throughout the development and administration of esports organizations, events, and teams indicates that women are largely excluded from these environments (Darvin et al., 2020).

- At the collegiate level, although there are over 200 collegiate esports teams governed by the National Association of Collegiate Esports (NACE), only 4% of these programs are led by a woman coach (Darvin, 2021a).

- Similarly, and based on two 2021 reports, the proportion of women collegiate esports participants falls between 8–10% of the total roster (Darvin, 2021a; Seiner, 2021). As a result, roughly 90% of all esport scholarship dollars are going to men esport participants within these institutions.

## Table 14: 2019–20 Men and Women Participants and Coaches for all NACE-Sponsored Esport Programs

| Men | | Women | |
|---|---|---|---|
| Collegiate Players | Collegiate Coaches | Collegiate Players | Collegiate Coaches |
| N = 2658 (91.8%) | N = 180 (96%) | N = 233 (8.2%) | N = 8 (4%) |

- The average player roster for NACE sponsored esport teams is 30 players, but esport programs have a tremendous range in roster numbers compared to traditional sports and maintain anywhere from four to over 80 gamers (Darvin, 2021a; Seiner, 2021).

- Importantly, roughly a quarter of those players typically receive scholarships, with the average esport player payout landing at around $1,910 (Seiner, 2021). Esports rosters often fluctuate in size more frequently than traditional sport based on an overall lack of standardization as well as differences in the game genre(s) and game title(s) those schools compete in.

It is evident based on the incredibly low proportions of women collegiate esport players and coaches that women and girls face tremendous barriers and obstacles in their efforts to sustain and compete in esports (Darvin et al., 2021; Darvin et al., 2020; Ruvalcaba et al., 2018). These varying barriers and obstacles have been previously characterized as a "glass monitor" given that women and girls can see the opportunities to be involved within esports but lack the necessary support and opportunities that are regularly afforded to their men and boy counterparts (Darvin et al., 2021).

- As a result, there are lower rates of women involved within the major esports titles such as Overwatch (26% girls/women), Hearthstone (26% girls/women), Counter-Strike: Global Offensive (CS:GO: 24% girls/women), Rainbow 6: Siege (23% girls/women), and DOTA 2 (20% girls/women) (Darvin et al., 2021).

The importance of creating equitable access and opportunity for women to compete at the collegiate esport level through Title IX policy enforcement and regulation is evidenced in the participant breakdowns by age, which indicate steady growth of interest in esports for women.

- Specifically, 57% of women between the ages of 18–29 have self-identified that they play video games and/or participate in gaming (Hilbert, 2019). Similar to traditional sport in pre-Title IX eras when many stereotypically assumed women and girls were simply less interested in competitive sport, esport faces a similar crossroads (Darvin, 2021a; Paaßen et al., 2017).



Women's Sports Foundation
WomensSportsFoundation.org

50 Years of Title IX:
We're Not Done Yet

- Rather than stereotypically assuming women and girls are less interested in competitive esport opportunities, it is critical to consider the obstacles and barriers women and girls face when entering and/or sustaining within esport spaces (Darvin et al, 2021; Ruvalcaba et al., 2018).

Given that most, if not all, of these institutions that sponsor esport programs receive some form of direct federal funding, these programs must adhere to Title IX policy (Darvin, 2021a; Supra, 2019; U.S. Department of Education, 1979). To that end, there are likely two distinct avenues by which Title IX regulation and oversight may occur.

- First, should the esports team at an institution be housed within the athletics department, then it is likely that the 1979 policy interpretation standards must be adhered to. This would mean then that participation opportunities and scholarship dollars would need to be administered equitably to both men and women. One of the threshold issues in this scenario is a determination if esports satisfies the requirements to be recognized as a sport under Title IX (Walton et al., 2020).

- Second, should the esports team at an institution be housed outside of the athletics department, Title IX policy will still be enforced to ensure women are provided with equitable access and opportunity to participate free from discrimination and/or hostility (Seiner, 2021).

One of the distinctions between the collegiate and high school sectors in terms of esports is the NCAA has thus far stayed away from recognizing esports as a varsity activity under its umbrella. In contrast, the NFHS has been actively working to position esports as a recognized varsity sport at the high school level, having entered into an agreement with PlayVS, an online gaming provider (NFHS News, 2018). Although esports have been promoted by the NFHS as a varsity sport, the NFHS does not as yet list it among the sports or activities that it tracks in terms of participation data.

Title IX regulations would undoubtedly work to ensure girls and women not only have equitable opportunities in collegiate and interscholastic esports but also to dismantle the prevailing discrimination and hostility women and girls face throughout the environment. However, in order for that to occur, Title IX needs to be deployed by school administrators to assess the reasons for the pronounced gender imbalance in programs and among those who run them; to consider the implications of the types of games large groups of students are being encouraged to play and the potential impact that has on school culture and the learning environment; and develop strategies for how to educate campus constituencies about what a Title IX compliant esport program needs to have.



©iStock by Getty Images



**Women's Sports Foundation**
WomensSportsFoundation.org

# Moving Forward into the Next 50 Years of Title IX

There is little question that Title IX has had a lasting impact on nation's schools and the opportunities available to pursue educational opportunity free of the limitations of gender stereotyping and gender discrimination. It is also clear that there is work to be done to create a sustainable system of Title IX compliance that withstands the tides of any political moment and ensures that each student entering a federally funded secondary and post-secondary institution with a dream in their heart will be empowered and uplifted in their pursuit.

In the specific area of athletics, the numbers tell a compelling story of opportunity. A society that once justified limiting sporting opportunities for girls and women on the basis of now disproven notions of female inferiority and physical delicacy has witnessed a transformation of the U.S. sport system to one where women as victors dominate on the world stage and demonstrate on a daily basis in their local communities what strong, talented, and forceful women can do.

For all of the positive impact that Title IX has had on girls and women in sport, the 50th anniversary is a time to celebrate the successes but to be clear that there remains much work to be done. As this report documents, the progress that has been made is often tenuous; falls short of what the law requires; has limits in terms of achieving equity for girls and women from non-white racial groups, sexual minorities, those with disability, and those from lower economic groups; and has yet to be consistently enforced around the country. Our findings show that many of the same conversations about female athletes being viewed as second-class citizens that were circulating during Title IX's 10th, 20th, 30th, and 40th anniversaries persist today. An overarching question that shaped this report is what needs to happen in order for us to move beyond these issues to realize more fully the bright shining future of a gender equitable sport system offered by the nation's schools that contributes to the intended values espoused in our U.S. democracy.

At the 50th anniversary, we are also left looking at different numbers, such as dollars spent on athletic scholarships and recruiting, coaching salaries, and the value of television contracts, that show educational institutions at every level fall short in their investment in the future of female athletes. Researchers who have explored the intersection between race, ability, gender identity, and gender reveal that, even among women, people with disabilities, and individuals who are transgender and nonbinary, equal access is not experienced the same way and that there are large groups of people who have limited to no access to sport. To ensure that we are not still talking about the same things (missed opportunities, pay equity issues, lack of media coverage for women's sports, inequitable



©iStock by Getty Images

representation of women and members of minority groups throughout athletic departments in leadership roles, etc.) in the decades ahead, we propose the following recommendations based on the research done here. It should be noted that the new research conducted for this report affirms work done for the Women's Sports Foundation's report entitled *Chasing Equity: The Triumphs, Challenges, and Opportunities in Sports for Girls and Women* (Staurowsky et al., 2020). As a consequence, some of the recommendations listed here are drawn from that report.



# Policy and Practice Recommendations

There are many steps that federal, state, and local policymakers; education administrators; sport governing bodies; coaches; and others can take to improve the conditions and opportunities for girls and women in sport and physical activities. Given what we know about the positive impacts of sports on the lives of girls and women and the protections guaranteed by Title IX, greater awareness, education, compliance, and transparency are needed to ensure equity for all.

While structures of governance and uninterrogated practices can impede progress and foster exclusions, particularly for girls and women of color, those from low-income backgrounds, LGBTQ-identified athletes, and girls and women athletes with disabilities, there is much that can be done to accelerate the pace of change. More targeted research can also provide greater transparency to support public policy implementation, women athletes, the conditions of equality and participation, and impacts and consequences of the status quo.

The following list of recommendations – including stepping up enforcement of Title IX, increasing data transparency, providing specific policy guidance to enable the inclusion of transgender and nonbinary athletes, and addressing resource inequities with greater focus on those experienced by women of color, LGBTQ athletes, and athletes with disabilities – will help ensure that the next fifty years of policy implementation will fulfill the full promise of Title IX. Some of these concur with recommendations advanced in the Women's Sports Foundation's *Chasing Equity: The Triumphs, Challenges, and Opportunities in Sports for Girls and Women* (Staurowsky et al., 2020), and from other researchers and groups where noted.

## Recommendations for Public Policy Makers

### Federal Policymakers:

- Federal-level institutions are key venues for promoting and enforcing equal practices through public policy. All efforts to implement Title IX fully and aggressively must be pursued by the U.S. Department of Education, the U.S. Congress, and the U.S. President.

  In order to achieve these outcomes, policymakers must work to ensure better education about reporting, transparency, monitoring, and enforcement of Title IX among those charged with implementing policy. Recommendations include:

  - Congressional policymakers should continue to provide full funding for the Office for Civil Rights (OCR) in the U.S. Department of Education. Adequate funding will enable the Office to strengthen and

  expand its efforts to enforce Title IX and shorten the investigation and resolution timeline for all reviews.

- The OCR should move toward initiating proactive compliance reviews at a larger swath of educational institutions and provide technical assistance and guidance on emerging questions about Title IX enforcement. Federal policymakers could pursue this by passing the Patsy T. Mink and Louise M. Slaughter Gender Equity in Education Act of 2021 (H.R. 4097 & S.2186). This bill would recognize the need to provide more resources, training, and technical assistance to schools to ensure compliance with Title IX and prevent and reduce sex discrimination in all areas of education.

- The U.S. Department of Education should develop a federal reporting system that requires schools to publicly disclose a) which part of Title IX's three-part test for athletic participation they are using to comply; and, if appropriate, collect b) information regarding their history and continuing practice of program expansion and/or c) the methods used to fully and effectively meet the needs and interests of qualified female athletes.

- The U.S. Congress and the U.S. Department of Education should adjust the Equity in Athletics Disclosure Act (EADA) and its regulations so that the annual data it requests on its form fully encompass the practices of athletic departments in order to comprehensively assess gender equity practices, including the reporting of information about an institution's athletics-related capital as well as operating expenses.

- The U.S. Department of Education should establish an external audit system to promote public confidence in and full accuracy of EADA reports.

- The U.S. Department of Education should require critical institutional representatives (e.g., Title IX compliance offers, Directors of Athletics, etc.) to participate in annual Title IX training to ensure that those charged with implementing it within their institutions are fully knowledgeable of policy requirements and their role(s) in implementation.

- The Office for Civil Rights should create a one-stop website for school personnel, families, and students to understand and apply Title IX athletics standards in an easy-to-digest manner (adapted from Fair Play for Girls in Sport, Legal Aid at Work (K. Turner, 2021)).



- U.S. Congress should pass legislation extending similar EADA intercollegiate disclosure requirements to primary and secondary school districts where schools sponsor interscholastic athletic programs, in order to promote transparency and enforcement of Title IX at the elementary and secondary level of education. This should include disclosure of information regarding participation, expenditures, and budgets to help make public full information about the status of Title IX implementation and the equitable treatment of girls in sport.

- Policymakers should end the Title IX "contact sports exemption" that denies girls and women the opportunity to try out for some teams otherwise designated for boys and men. Specifically, this would mean that policymakers issue federal guidance allowing open tryouts for teams designated for boys or men irrespective of whether a similar team designated for girls or women is offered by the same school, college, or university.

- Policymakers should provide guidance and support for schools and universities in their efforts to create additional athletic opportunities for girls and women to participate in mixed-sex teams and develop research-informed policies and practices to ensure positive participation environments to support all student-athletes as they learn to play and compete together.

- Policymakers should provide guidance and support to schools that wish to offer additional athletic opportunities that aren't restricted or divided by gender at all (i.e., "gender-free teams"). Such teams could allow nonbinary students (and others) to participate in sports free of the dissonance that would otherwise result from competing in the category that does not comport with their gender identity. Exploring options for "gender-free" sports options could give more diverse participation opportunities to all athletes who might prefer integrated rather than segregated teams.

- The U.S. Department of Education should issue specific policy guidelines confirming that Title IX should be interpreted to provide opportunities to transgender and nonbinary students to participate in sports in a manner consistent with their gender identities and in accordance with the U.S. Supreme Court's ruling in *Bostock v. Clayton County*. In addition, policies should not supplant the right of any athlete to participate on teams that correspond to their sex assigned at birth if they so choose. For a nonbinary athlete, there might not be opportunities that correspond to or affirm their gender identities, since most sport teams are designated as either "boys'/men's'" or "girls'/women's." Nonbinary athletes should always, at a minimum, retain the right to join the team in accordance with their sex assigned at birth.

- The U.S. Department of Education should review and evaluate sunsetting "prong two," the continued history and practice of program expansion component of the



©iStock by Getty Images

three-prong test for Title IX compliance. Schools should now simply be offering proportional athletic opportunities under prong one or showing they gender-equitably meet all students' athletic interests under prong three. Fair Play for Girls in Sport (K. Turner, 2021) advocates for a similar stance.

- The U.S. Department of Education should review, update, and re-issue the 1990 athletics Investigator's Manual to ensure that it comports with current practices and circumstances of intercollegiate sport (adapted from Fair Play for Girls in Sport (K. Turner, 2021)).

- The U.S. Congress should pass the Equality Act to clarify, as a matter of federal law, that discrimination on the basis of gender identity and/or sexual orientation is prohibited in educational institutions and other key areas of American life.

- The U.S. Congress should pass the Safe Schools Improvement Act, which would require school districts to adopt anti-bullying and harassment policies that address many forms of gendered bullying, including on the basis of gender identity or sexual orientation.

- Because girls and women of color are less likely to receive the full benefits of policy implementation and access to sports, two policy changes could help address resulting issues. First, the U.S. Department of Education should modify its Civil Rights Data Collection (CRDC) to also collect race-specific data on sports participation. Collecting athletic participation data not just by gender, but also by gender broken down by race/ethnicity, is consistent with other key parts of the CRDC. The National Women's Law Center (NWLC) and the Poverty & Race Research Action Center (PRRAC) (2015) have long lobbied for this approach. Second, the U.S. Congress should pass the High School Data Transparency Act, which would require schools to



publicly report information on the status of female and male athletes and students, broken down by race and ethnicity, as well as expenditures on each sponsored sports team.

- This report also identifies the critical importance of institutional oversight at multiple levels. Thus, we recommend improved monitoring of athletic equity practices at the federal level to ensure that all school districts, universities, and colleges that receive federal funding designate an employee to serve as Title IX coordinator. They should make the Title IX coordinator's identity and contact information easy to find by students, personnel, and members of the public. The Office for Civil Rights should continue to enforce the law's Title IX coordinator requirement through investigations, resolutions, and, where necessary, adjudication.

- Federal policymakers should reexamine Title IX regulations to assess their applicability to club sports, intramurals, and recreation programs.

- Federal policymakers should conduct oversight of the equity practices of tax-exempt non-profits engaged in organizing competitive athletics (e.g., the NCAA, NAIA, high school athletic associations) given recent findings of the role such groups can play in the perpetuating of inequalities (in, for example, the 2021 NCAA Men's and Women's Basketball Tournaments).

- Policymakers should recognize the growing interest in and availability of esports at the high school and collegiate levels. Regardless of whether esport is recognized as a sport under Title IX, its emergence indicates the need to develop guidelines to ensure that school administrators are aware of their obligations under Title IX to provide equal access to participation opportunities and treatment. Further, steps should be taken to ensure that Title IX obligations do not cease simply because the form of sport involves a glass monitor and virtual playing field.

## State Policymakers:

- Athletic opportunities remain unequal for girls and women at all levels of education. At a minimum, states should monitor practices in their school districts to ensure that they are providing equal athletics opportunities to girls and boys in ways that are consistent with their obligations under Title IX.

- This report acknowledges the importance of working towards high-school-level public disclosure reports in every state to provide better data about current practices and expenditures in interscholastic athletics relative to the allocation of opportunities and resources.

- In the absence of a federal high school data reporting mandate (which we advocate for above), state legislatures (and/or state high school associations) should pass legislation that requires the public disclosure of equity practices in primary and secondary schools on the basis of

sex, broken down by race and ethnicity. These data should be made available to the public, both as manageable datasets that enable cross-school comparisons and via online "data cutting tools" such as those hosted by the U.S. Department of Education to make available the EADA reports.

- Given the unique vulnerabilities of youth athletes to potential sexual abuse, state-level policymakers should advance laws and policies that protect minor children from sexual abuse while participating in athletics. Existing guidance developed by SafeSport (U.S. Center for SafeSport, 2020) on Minor Athlete Abuse Prevention should influence their policy development.

- State policymakers should be proactive in implementing inclusive policies for transgender and nonbinary athletes by passing state-level gender identity and sexual orientation non-discrimination policies (where they do not already exist). Such policies should be generally applicable and also specify non-discrimination to ensure athletic access. These efforts can foster welcoming environments for all athletes and work to diminish barriers to participation.

- State policymakers should pay particular attention to the participation barriers confronting girls and women of color in racially segregated schools by analyzing participation rates and working with individual schools to add additional opportunities or teams as needed. We concur with the NWLC and the PRRAC (2015) in their recommendations to simultaneously advance gender and racial equity in sport.

- States should assess the accessibility of public parks and recreation centers, as access to these facilities can be key determinants of healthy lifestyles and safe physical activity.

## Local and Community Policymakers:

- Local governments can take many actions to ensure equitable access to public space, both for recreational use and for use by local/municipal sports leagues. Local governments should use funds from the federal Community Development Block Grant program to improve recreational facilities, parks, and play equipment, particularly for racially segregated and/or isolated, low-income communities. The NWLC and PRRAC (2015) offer a number of important recommendations. They include reviewing zoning laws to address infrastructure improvements and investing in areas and structures that facilitate physical activity. These local investments can be key vehicles to ensuring that young girls have access to sport and physical activity at a young age.

- Coaches and parents of athletes in local arenas should be supported in receiving access to information about the requirements of Title IX and the efforts of local and community sports organizations to ensure gender equitable policies. This programming could be run by municipal sports leagues and made available by the U.S. Department of Education.



- Local and municipal policies should support coaches and athletic staff in receiving affirmative training on how to navigate existing policy in their school district around transgender sports participation, as well as on how to ensure a transgender-affirming sports environment.

## Recommendations for Education Administrators and Sport Governing Bodies:

### For education administrators at all levels:

- Athletic and education administrators are key stakeholders in leadership towards equitable opportunities in sports on the basis of gender, race, and physical ability. They operate as critically important actors in the on-the-ground implementation of Title IX of the Education Amendments of 1972, Title VII and Title VI of the Civil Rights Act of 1964, and Section 504 of the Rehabilitation Act of 1973. Thus, they should be educated and supported in their evaluative and implementation roles to support athletic opportunities without discrimination.

- Athletic and education administrators should be supported in their efforts to develop opportunities for girls to participate in mixed-sex teams and work on policies to ensure positive participation environments to support all student-athletes as they learn to play and compete together.

- Administrators should routinely evaluate and balance fair treatment across the athletic program. They should evaluate practices across their athletic programs to ensure equity in equipment and supplies, facilities, scheduling, transportation, coaching, and more to examine whether women's/girls' teams are treated equally and so that they can then make continual adjustments where any imbalance exists. Keeping simple spreadsheets of issues



such as the uniform replacement schedule and facility scheduling ensures a "big picture" overview of what women/girls and men/boys get can help spur adjustments as needed (K. Turner, 2021).

- As required by federal law, each educational institution that receives federal funding must name a Title IX Coordinator. Information about the Coordinator's identity and contact information must be made accessible and easy to find by students, personnel, and members of the public.

- Administrators should ensure that Title IX coordinators are trained annually in Title IX requirements and implementation strategies. They should work with state education agencies and state athletic associations should ensure that training is available and financially accessible to school district personnel serving in Title IX coordinator roles.

- While the best practice for most institutions may be to structure the Title IX coordinator's position external to athletics (given needed oversight over other issues of sex non-discrimination), the Title IX coordinator should work closely with athletic department staff to ensure that gender equity issues in athletics are not overlooked by institutions simultaneously working to address other challenging Title IX issues, such as sexual misconduct or harassment. It may be helpful for a Title IX coordinator to designate deputy coordinators or other Title IX liaisons within the athletic department to facilitate necessary trainings and to ensure effective communication and reporting.

- Institution-wide committees that monitor and support the institution's Title IX compliance should ensure that gender equity in athletics is included on the committee's agenda or else designate a specific athletics-related subcommittee to address that issue. This would be supported by the passage of the Patsy T. Mink and Louise M. Slaughter Gender Equity in Education Act (originally introduced in 2021 as H.R. 4097 & S.2186). This bill would recognize the need to provide more resources, training, and technical assistance to schools to ensure compliance with Title IX – specifically coordinators – and prevent and reduce sex discrimination in all areas of education.

- Education on Title IX and its requirements is critical among coaches and athletes. As evidenced in the findings from this study, there is little consistency in approaches to Title IX compliance in athletic departments on the education of athletes and coaches. The lack of Title IX education among coaches, college athletes, and administrators in NCAA athletic departments has a disabling effect on the Title IX enforcement mechanism at the local level. As Staurowsky & Weight (2011, 2013) point out, the absence of knowing what the law does and does not require, and the limited capacity to review public disclosures about resource allocations in the athletic departments they compete and work for, results in athletes, coaches, and athletic department personnel who are unprepared to participate in a system of accountability that is inclusive.



- Empowering athletic administrators, coaches, and students to voice thoughts or concerns over equitable practices in athletics departments can ensure full policy implementation, which administrators must support through leadership. Additionally, administrators should ensure, in both policy and practice, that student whistleblowers are protected from reprisal when they report in good faith actual or perceived violations of the law, in keeping with Title IX's prohibition on retaliation.

- Because women remain under-represented across the sport industry in leadership positions, there must be continued attention to the sports workplace. Issues of recruitment and retention are critical for increasing women's leadership in coaching, administration, and executive positions, as is attention to issues of pay equity and equal treatment at work. Proactively addressing these issues is central to creating and maintaining an inclusive culture in which women and girls can fully participate in athletics.

- All administrators should support the annual use of LGBTQ and gender equity "respect and inclusion trainings." These are important spaces for sharing accurate information about Title IX and gender equity, and to proactively address bias against women and queer people in sport. We join Athlete Ally (2021) in recommending that these trainings:

  - Be held at least once a school year.

  - Be mandatory for all coaches, players, and staff.

  - Review all institutionalized LGBTQ harassment policies and team Codes of Conduct.

  - Cover allyship best practices. Athletic departments also should maintain up-to-date LGBTQ inclusion resources that are readily available to coaches, players, and staff throughout the year, in between annual trainings.

- All levels of administration should have clear and visible reporting systems for athletes, coaches, or staff to report incidences of sexist, misogynistic, racist, homophobic, or transphobic harassment or conduct within their team or work environment. These policies should allow for anonymous reporting and should be backed up with clear timelines for administrative response and action. They also should outline a non-exhaustive list of potential disciplinary outcomes and should be published in athlete handbooks that are distributed during orientation.

- Administrators should ensure that all facilities, including bathrooms, changing facilities, locker rooms, showers, and competition venues, enable all athletes facility access in ways that make them feel most comfortable and safe. Coaches and staff also should be permitted access to facilities that are consistent with their gender identities. All facilities policies should be clearly listed in the administrative handbook.

- Finally, in alignment with analysis from Fair Play for Girls in Sport (2021), schools that overcome the myths and misunderstandings about Title IX are able to afford and promote genuine equity. Employing an effective Title IX Coordinator and giving school staff regular, dynamic training helps (versus mere legal or policy documents that school staff may struggle to understand and follow). As Fair Play notes, common myths (to address and debunk) include: "there is a Title IX carve-out for football when no such exception exists; booster club donations need not be overseen and balanced between girls' and boys' teams; whether charter schools are equally subject to Title IX; whether Title IX applies to elementary, middle, and high school athletics (not just a college provision); that girls playing at all is enough; whether non-school programs are subject to Title IX; that prong two is a viable defense. Understanding Title IX is key." (Fair Play for Girls in Sport, 2021)

- Instilling a culture of equity from the top to the bottom of the organization can build awareness and instill lasting, equitable practices.

### Additional specific recommendations for Higher Education Administrators:

- Colleges and universities should seek to hire many and diverse women and nonbinary people into administrative positions within collegiate athletics. In addition to serving as role models, increasing the number of women in athletic administration can provide a critical mass of support for equity initiatives in the persistently male-dominated field of sport. It also can ensure that more women coaches are hired to coach both women's and men's teams. Furthermore, hiring women as administrators can propel important trickle-down effects, as the research shows that women athletic administrators are more likely to hire women coaches.

- Higher ed administrators should evaluate hiring practices at the collegiate level to ensure equitable opportunities for women. They should recruit gender-diverse pools of applicants for open positions developed by administrators and search committee members who are themselves diverse and knowledgeable in recognizing the subtleties of discrimination and are committed to overcoming it. They should standardize human resources policies and procedures to ensure neutral outcomes with regard to gender, race/ethnicity, disability, and LGBTQ status, as well as educate hiring committee members on inclusive practices and overcoming implicit bias.

- Administrators also should work to reduce gender bias and discrimination in the workplace with deliberate strategies to address each. They must evaluate role definitions and position descriptions to identify gender markers and identifiers, expand role definitions and position descriptions to eliminate gender bias, evaluate promotion practices to identify attributes more commonly aligned





©iStock by Getty Images

with one gender, and create hiring committees with diverse representation.

- Hiring practices also must evolve. Higher ed administrators should identify "targets of opportunity," such as intentionally seeking to hire a woman when a man retires. They should replace women coaches who leave with a woman coach when possible. They should publicize positive metrics and changes (such as achieving an A grade on an external "gender report card" or hiring a woman coach or administrator). They should review and audit practices, such as bonus structure and salary negotiation processes, to eliminate gender-biased recruitment and retention strategies and should implement tracking mechanisms and monitor progress on a regular basis. Ensuring accountability with incentives and consequences tied to funding for missed metrics is critical. Those administrators charged with hiring in collegiate athletics always should ensure that women or nonbinary candidates are a part of the finalist pool for coaching and athletic administration jobs.

- Administrators should proactively value and seek opportunities to hire women and nonbinary people to coach sports teams designated for men. The research shows that women's leadership can be a powerful antidote to bias against women in sport and society.

- Administrators should partner with programs across the institution/campus to diversify student enrollment and to actively recruit diverse graduates into internship and entry-level positions. They should factor diversity into all strategic decisions, including fundraising, marketing, management, and administration.

- Administrators must identify barriers to and opportunities for career advancement for women in sport. Creating mentoring programs are key to success. They should build in opportunities for women to learn from seasoned professionals and grow through mastering new challenges, identify male allies who have the power to help women advance and change the status quo, and financially support professional development opportunities for women will all support these aims. Administrators should also identify policies impacting parents and those who have caretaker responsibilities and generate new ideas to create a workplace supportive of families and employee well-being. They must eliminate practices of reliance on networks that limit inclusion of women and diverse colleagues and create career plans with employees to achieve metrics for consistent growth and advancement opportunities.



## National Collegiate Athletic Governing Bodies Administrators (e.g., NCAA, NAIA):

- Consistent with the findings from the external audit of NCAA equity practices conducted in 2021 by the law firm Kaplan Hecker & Fink (2021a, 2021b), we recommend follow-through on the recommendations to guide practice at collegiate governing bodies and to require that such groups provide structural support for gender equity.

- In order to motivate institutional compliance, the NCAA and other athletic associations should monitor Title IX compliance as a condition for membership, reviving its past practice of self-study and peer review.

- When governing bodies or associations are charged with hosting athletic competitions, they should develop equity plans for funding structures, staffing, marketing, promotion, sponsorships, and the athlete experience. All practices should be disclosed in an annual report. Equitable participation opportunities must be available for men and women across all NCAA Divisional Championships.

- In order to motivate institutional compliance, the NCAA and other athletic associations should monitor Title IX compliance as a condition for membership, reviving its past practice of self-study and peer review. Similarly, state athletic associations and/or state education agencies should provide compliance oversight as well.

- Governing bodies should conduct Title IX athletic education seminars at association events (e.g., annual meetings) and should make recordings of such seminars available online.

- Governing bodies/sports organizations should be required to have a Title IX or gender equity assessment by a relevant third party every three to five years (e.g., by federal, state, or local policymakers).

- All collegiate governing bodies should adopt policies that refrain from hosting championship events in states where anti-LGBTQ laws have been passed by the state legislature or by executive order. This is particularly pressing as a result of state legislative activity in recent years. The current status of LGBTQ laws can be found on the Movement Advancement Project website: https://www.lgbtmap.org/.

- The NCAA should expand its commitment to implementing policies that address and prevent sexual assault and harassment. Policies should incentivize athletic administrators to empower Title IX coordinators in their efforts to propose and adopt preventative measures among their athlete communities and on their campuses. They should empower coaches and teammates to center the wishes of survivors in any individual, team, or campus response.

## Primary and Secondary Education Administrators:

- Primary and Secondary Education Administrators should encourage their athletic directors to have written policies that address nondiscrimination and inclusion on the basis of gender identity, gender expression, and sexual orientation if their state does not have clear guidance under state law. Such non-discrimination protections benefit all athletes by fostering inclusive space.

- School administrators should make every attempt to ensure that students receive 150 minutes of physical activity each week through physical education classes. Research demonstrates that such opportunity increases children's desire to play sports, which impacts long-term sports participation (Illinois Enhance Physical Education Task Force, 2013).

- Schools that receive federal funding for student nutrition should fulfill their obligations to create school wellness programs and policies that should establish goals for the sports participation of enrolled girls. Providing good nutrition and access to physical activity can operate as powerful bulwarks against the attrition of girls from sports as they mature.

- Primary and Secondary Education Administrators should familiarize themselves with all Safe Sport guidelines designed to prevent sexual abuse in athletics, particularly abuse of minors.

## High School Athletic Association and School Administrative Policymakers:

- In order to motivate institutional compliance, the state athletic associations and/or state education agencies should monitor Title IX compliance as a condition of membership.

- State athletic governing bodies should be encouraged to monitor and continuously evaluate state-by-state sport trends around gender equity and the intersections of race and disability.

- We join GLSEN in recommending that state athletic associations should develop guidance for local education agencies and schools that affirms and supports the right of trans and nonbinary students to participate in interscholastic and intramural sports (GLSEN, 2021). Specifically, the following policies should guide the incorporation of trans and nonbinary athletes in high school association policy:

  - Students should have the right to participate in athletics in a manner consistent with their gender identity, even if that identity differs from the sex listed on their registration records or birth certificate.

  - Athletic associations and schools should work in partnership with the trans or nonbinary identified students to ensure that athletic participation and facility access (e.g., locker rooms) are safe and affirming.



- Policies for access to locker rooms, showers, and restroom facilities should ensure that trans and nonbinary athletes are allowed to use the facility where they feel most safe.

- Athletic association policies should specifically allow trans and nonbinary athletes to use a name or pronouns of their choice, even if inconsistent with identity documents.

- Leagues should explicitly ban and condemn homophobic, transphobic, and/or anti-LGBTQ conduct by coaches, athletes, fans and staff involved in athletic activity. Leagues and school administrators should explicitly outline potential consequences of violations of these policies and address clear mechanisms for lodging reports.

## Recommendations for Coaches:

### On creating inclusive teams:

- Consistent with Center for American Progress and Athlete Ally, we note that, given the rising number of youth identifying as transgender, nonbinary, or genderfluid, "efforts must be made by all stakeholders, including coaches, athletic directors, administrators, and state organizations, to ensure that sports environments and policies remain welcoming and affirming for youth who don't identify with a male or female gender. Nonbinary youth must also be able to meaningfully participate in sex-segregated athletic programs" (S.K. Goldberg, 2021, p. 25).

- Education of coaches at all levels of athletics is key to pursuing these aims (Athlete Ally, 2021).

- Coaches are key to creating supportive environments for LGBTQ+ athletes and should complete inclusion training. Athlete Ally's Champions of Inclusion is a free, comprehensive online curriculum that supports athletes, coaches, and administrators in understanding the issues and practices that can guide inclusive teams: http://allylearn.wpengine.com/

### On prevention of abuse of athletes:

- Background checks, qualifications, and education should be prioritized in hiring decisions of coaches.

- Implementing mandatory education and training of all coaches regarding emotional and physical abuse and appropriate motivation techniques can reduce the possibilities for abusive environments. Administrators should enforce a zero-tolerance policy for coaches emotionally and/or physically abusing athletes. They should include specific language in coaching contracts that prohibits abusive behaviors and that states any type of abuse is grounds for termination with cause. Recent high-profile events such as the revelations of Larry Nassar's sexual abuse of hundreds of girls and women

reveal that reports of abuse from female athletes are more apt to go under-investigated, so administrators must be particularly attentive to proactively addressing gender bias in investigations.

- Coaches should familiarize themselves with the 2022 SafeSport Minor Athlete Abuse Policies (U.S. Center for SafeSport, 2020) that are designed to provide guidance on mitigating possible conditions that can foster the possibility of sexual abuse.

### On supporting participation and retention:

- Coaches should be encouraged to help educate parents on the benefits of supporting their daughters' participation in physical activity and sport. Encouraging participation in sport at an early age helps girls enjoy full advantage of developmental factors associated with sport participation. Coaches can stress the importance of continued sport participation during the ages of and surrounding puberty and can educate parents and caregivers about how they can support their daughters' ongoing sport participation.

- Coaches should emphasize team building and inclusion when creating and strengthening girls' sport experiences while simultaneously focusing on skills building, communication, leadership, and other benefits of sport.

## Recommendations for Students, Athletes, Parents, Coaches, and Others

### National Level

- Title IX is a federal policy, so advocacy at the national levels is vital. You can advocate to ensure better education, reporting, transparency, monitoring, and enforcement of Title IX. Find the contact information for your U.S. Representative and U.S. Senators. Write them letters or emails; call their congressional offices. Advocate for:

  - Continued full funding of the Office for Civil Rights of the U.S. Department of Education, the division charged with oversight on policy violations, in the annual federal budget.

  - Support for the Patsy T. Mink and Louise M. Slaughter Gender Equity in Education Act (when introduced in 2021, the bill was H.R. 4097 & S.2186). This bill recognizes the need to provide more resources, training and technical assistance to schools to ensure compliance with Title IX and prevent and reduce sex discrimination in all areas of education.

  - Ask that any legislation governing NCAA athletes' names, images, and likenesses (or other athlete compensation) explicitly addresses gender equity and Title IX compliance.



## State Level

- State legislatures can play a role in how Title IX is implemented in your state, and what equity looks like in your school district. Recently, lawmakers in many states have also worked to disenfranchise transgender athletes at the state level. Efforts to address these issues are best directed to state-level policymakers. You can find the contact information for your state legislative representative and write to or call their legislative office. Advocate for:

  - State-level oversight of gender equity practices at school districts in your state.  Your state-level Department of Education can be encouraged to investigate equity practices, and in many states there are state laws that reinforce sex non-discrimination protections for students and athletes. Advocate that policy- and lawmakers in your state fully implement and enforce state laws and ordinances.

  - Policies that fully enfranchise transgender and nonbinary athletes in school-sponsored athletics. If you live in a state where lawmakers are attempting to pass trans-exclusionary policies, advocate that lawmakers vote such bills down. Write them letters or emails; call their office. Participate in demonstrations or protests that show support for transgender youth in your state.

- Many state-level high school policies are also created by the high school athletic association. You can find their contact information online. Write them an email or a letter and advocate for:

  - Oversight of Title IX and gender equity metrics among member schools. You can seek information about reports on their annual equity practices.

  - In many states, trans-inclusive policies are set by associations at the high school level. Advocate for inclusive policies that allow transgender athletes to fully participate.

## Local Level

- Many choices about what gender equity looks like are made by administrators in your local elementary, middle, or high school, or your municipal youth sports leagues. Write them an email, a letter, or place a phone call to your local school administrators. Advocate for:

  - Ensuring equitable treatment of all students in interscholastic athletics. A call to local administrators can go a long way to ensure that they understand that community members care about how decisions are made in athletic programs.



©iStock by Getty Images



- Developing public documents about how the school is addressing gender equity in sports, as well as the full inclusion of LGBTQ+ athletes, BIPOC athletes, and athletes with disabilities.

## Recommendations for Researchers:

This report outlines many possible avenues for future research on public policy, women athletes, the conditions of equality and participation, and impacts/consequences of the status quo, including:

### On Title IX policy:

- Targeted research to explore in greater detail the intersections between Title IX of the Education Amendments of 1972, Title VII and Title VI of the Civil Rights Act of 1964, and Section 504 of the Rehabilitation Act of 1973 to promote equality of treatment and access for historically marginalized groups, including racial and ethnic minorities, LGBTQ+ people, and people with disabilities.

- Targeted research to evaluate existing metrics for assessing equal access and treatment under Title IX. Such research could inform potential changes in the EADA or could promote the adoption of a federal law to promote public disclosure regarding participation opportunities and resource allocations in high schools.

- Targeted research efforts to better understand gender equity practices required under Title IX, including, but not limited to, expenditures on facilities for female athletes, allocation of resources in academic support, and issues faced by those working in sports medicine and athletic training.

- Targeted research to better understand Title IX compliance in college and university intramural and club sport programs.

- Targeted research on Title IX athletics compliance in secondary schools.

- Targeted research to explore how best to educate coaches, administrators, and athletes on the requirements of Title IX.

- Targeted research that explores the impacts of sex-segregated athletic competition on athlete health and well-being, attitudes toward gender equality, attitudes toward transgender inclusion, and other topics.

- Targeted research on K–12 girls' issues, both the challenges around equity and advances, with a focus on BIPOC girls and girls in low-income communities.

### On inclusion in sport:

- Targeted research designed to develop models for the inclusion of athletes with disabilities in school-based varsity programs with attendant investments in facilities, equipment, coaching, administrative staff, athletic scholarships, and the other areas of resource allocation.

- Targeted research exploring the experiences of cisgender girls and women who play, train, and compete with trans girls and women and nonbinary athletes. Little is known about the positive impacts of team-based participation among trans and cis athletes.

- Targeted research to examine the marginalization of BIPOC women in athletic administration and coaching positions. Beyond participation as athletes, little research has been conducted on athletic career positions of BIPOC women.

### On the economics of gender equality:

- Targeted research on the resources allocated in the marketing and promotion of girls' and women's sports, including expenditures on marketing and athletic communications personnel, marketing and athletic communication personnel workloads and credentials, investment in promotional campaigns, television and streaming coverage, digital resources, advertising, educational efforts directed toward athlete branding, and other efforts that promote awareness about girls'/women's programs and girl/women athletes.

- Targeted research focusing on examining revenue generation efforts for women's sports programs at the high school and college levels. Such research would encompass examination of the structure of television contracts, sponsorship deals, merchandising opportunities, and media coverage. This also would cover an examination of how marketing units within athletic departments have expanded since the Title IX regulations were adopted and how resources are expended in video production units; data analytics; marketing and sponsorships; ticket policies, including pricing and promotions; and oversight of athletic fundraising foundations and booster clubs.

- Targeted research efforts to track the support services provided to female and male athletes by athletic departments to assist them in growing their brands as more athletes secure name, image, and likeness deals. With the emergence of group licensing opportunities, athletic department agreements with third parties, and opportunities for athletes to work in partnership with athletic departments in sharing use of institutional images, new areas of assessing gender equity are emerging.



# References

Adler, D., & Simon, A. (2022, January 10). *These women broke barriers in baseball.* MLB.com. https://www.mlb.com/news/women-break-barriers-in-baseball-history

Adler, M. (2018, August 16). *Why Renee Powell Hall at the University of St. Andrews matters.* https://www.golfdigest.com/story/why-renee-powell-hall-at-the-university-of-st-andrews-matters

Alexanian, T. (2020, June 23). *Title IX and AB 2404: Equity for girls and women in sport in 2020.* Legalaidatwork.com. https://legalaidatwork.org/blog/title-ix-and-ab-2404-equity-for-women-and-girls-in-sports-in-2020/

Ali, R. (2010, April 20). *Guidance on accommodating students' athletic interests and abilities: Standards for part three of the "three-part test".* U.S. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/offices/list/ocr/letters/colleague-20100420.pdf

American Bar Association (2020). *Profile of the legal profession.* https://www.americanbar.org/content/dam/aba/administrative/news/2020/07/potlp2020.pdf

Americans With Disabilities Act of 1990, Pub. L. No. 101-336, 104 Stat. 328 (1990).

Amis, G. (2021, March 19). *Viral Tik Tok highlights differences between men's and women's NCAA tournament weight rooms.* KREM.com. https://www.krem.com/article/sports/ncaa/ncaab/march-madness/viral-tiktok-of-march-madness-weight-rooms/293-f8dbd43c-b496-42c6-a5db-3b95ded1e410

Anzidei, M. (2021). *More people than ever watch women's sports, but investment and media coverage still lag.* NorthJersey.com. https://www.northjersey.com/story/sports/2021/06/24/tv-viewership-increase-womens-sports-hurdles-remain-wnba-nwsl-espn/5306975001/

Ariail, C. (2021, October 5). *Does it matter that the women's NCAA tournament is now 'March Madness'?* Swish Appeal. http://www.swishappeal.com/ncaa/2021/10/5/22708600/ncaaw-womens-college-basketball-tournament-march-madness-final-four-gender-equity-report-uconn-aari

Aspen Institute (2020, January 14). *Survey: Low-income kids are 6 times more likely to quit sports due to costs.* https://www.aspenprojectplay.org/national-youth-sport-survey/low-income-kids-are-6-times-more-likely-to-quit-sports-due-to-costs

Associated Press. (1975, June 27). H.E.W. head says Title IX won't bankrupt schools. *New York Times.* https://www.nytimes.com/1975/06/27/archives/hew-head-says-title-ix-wont-bankrupt-schools-title-ix-explained-by.html

Associated Press. (2018, April 10). Venus, Serena Williams join Billie Jean King equal pay push. *USA Today.* https://www.usatoday.com/story/sports/tennis/2018/04/10/venus-serena-williams-join-billie-jean-king-equal-pay-push/33696109/

Associated Press. (2021a, August 3). Tamyra Mensah-Stock wins gold in wrestling at Tokyo Olympics. *The Denver Post.*

Associated Press. (2021b, December 25). Foreign college athletes left out of rush for NIL windfall. *Star Advertiser.* https://www.staradvertiser.com/2021/12/25/sports/sports-breaking/foreign-college-athletes-left-out-of-rush-for-nil-windfall/

Associated Press. (2022). *Male athletes lead way in NIL money, according to third-party data.* ESPN.com. https://www.espn.com/college-sports/story/_/id/33160929/male-athletes-lead-way-nil-money-per-data

Association of American Medical Colleges. (2019). 2019 fall enrollment, matriculant, and enrollment data tables. https://www.aamc.org/system/files/2019-12/2019%20AAMC%20Fall%20Applicant%2C%20Matriculant%2C%20and%20Enrollment%20Data%20Tables_0.pdf

Athlete Ally. (2021). *Ally guide for coaches.* https://coachingcorps.org/wp-content/uploads/2021/06/Ally-Guide-for-Coaches-Coaching-Corps.pdf

ATIXA. (2020). *About ATIXA and Title IX.* https://atixa.org/about/#WAN

Ayala, E. (2021, September 9). *Hiring women coaches takes intentionality. Just ask the NFL.* Onherturf.com. https://onherturf.nbcsports.com/2021/09/09/2021-nfl-season-record-12-women-coaches/

Bailey Glasser. (2021). *Title IX victories. Case studies.* https://www.baileyglasser.com/casestudy-casestudy-title-ix-victories

Barr, C., Sutton, W., & McDermott, E. (1999). Marketing implications of Title IX for collegiate athletic departments. *Sport Marketing Quarterly, 8*(3), 9-14.

Barroso, A., & Brown, A. (2021, May 25). *Gender pay gap in U.S. held steady in 2020.* Pew Research Center. https://www.pewresearch.org/fact-tank/2021/05/25/gender-pay-gap-facts/

Baseball For All (2021). *Making baseball a game for all.* https://baseballforall.com/baseball-for-all-story/

Battle, S. & Wheeler, T.E. (2017, February 22). *Dear colleague letter: Notice of language assistance.* U.S. Department of Education & U.S. Department of Justice. https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-title-ix.pdf



Bauer, A. (2001). If you build it, they will come: Establishing Title IX compliance in interscholastic sports as a foundation for achieving gender equity. *William & Mary Journal of Women & Law, 7*, 983–1009. https://scholarship.law.wm.edu/wmjowl/vol7/iss3/6

Baumann, K., & Cranney, S. (2020). *School enrollment in the United States: 2018*. U.S. Department of Commerce, U.S. Census Bureau. https://www.census.gov/content/dam/Census/library/publications/2020/demo/p20-584.pdf

Bayh, B. (1972, February 28). Reading of Amendment 874 to the Higher Education Act. *Congressional Record*, 5803–5815.

Bell, B. (2022, January 13). *La'Quanza Glover believed to be the first HBCU female athlete with an NIL deal*. Business of College Sports. https://businessofcollegesports.com/name-image-likeness/laquanza-glover-believed-to-be-the-first-hbcu-female-with-an-nil-deal/

Bell, D. R., Post, E. G., Trigsted, S. M., Schaefer, D. A., McGuine, T. A., Watson, A. M., & Brooks, M. A. (2018). Sport specialization characteristics between rural and suburban high school athletes. *Orthopaedic Journal of Sports Medicine, 6*(1), 2325967117751386. https://doi.org/10.1177/2325967117751386

Biden, J. (2021, March 9). *Executive order on guaranteeing an educational environment free from discrimination on the basis of sex, including sexual orientation or gender identity*. The White House. https://www.whitehouse.gov/briefing-room/presidential-actions/2021/03/08/executive-order-on-guaranteeing-an-educational-environment-free-from-discrimination-on-the-basis-of-sex-including-sexual-orientation-or-gender-identity/

Billie Jean King Leadership Initiative (2021). *Let's ignite a conversation about leadership and giving*. https://bjkli.org/

Bleiweis, R., Frye, J., & Khattar, R. (2021, November 17). *Women of color and the wage gap*. Center for American Progress. https://www.americanprogress.org/article/women-of-color-and-the-wage-gap/

Blumenthal, K. (2005). *Let me play: The law that changed the future of girls in America*. Atheneum.

Bodo, P. (2018, September 6). *Follow the money: How the pay gap in Grand Slam tennis finally closed*. ESPN.com. https://www.espn.com/tennis/story/_/id/24599816/us-open-follow-money-how-pay-gap-grand-slam-tennis-closed

Bolling, L. (2016, March 7). *Top 10 HBCU athletic departments generating revenue*. HBCUbuzz.com. https://hbcubuzz.com/2016/03/top-10-hbcu-athletic-departments-generating-revenue/

Bonnette, V. & Von Euler, M. (2004). *Title IX and college athletics: How it all works—in plain English*. Good Sports Inc.

Bonnette, V., & Daniel, L. (1990). *Title IX athletics investigator's manual*. U.S. Department of Education. Office for Civil Rights. https://files.eric.ed.gov/fulltext/ED400763.pdf

*Bostock v. Clayton County*, 590 U.S. 140, 140 S. Ct. 1731 (2020).

Boucher, C., Silva-Breen, H., & LaVoi, N. M. (2021, July). *Head coaches of women's collegiate teams: A comprehensive report on NCAA Division-I institutions, 2020-21*. The Tucker Center for Research on Girls & Women in Sport.

Brake, D. (2008). The invisible pregnant athlete and the promise of Title IX. *Harvard Journal of Law & Gender, 31*, 323. https://scholarship.law.pitt.edu/fac_articles/7/

Brake, D. (2010). *Getting in the game: Title IX and the women's sports revolution*. NYU Press

Brassil, G., & Draper, K. (2021, February 3). These women were NFL first: They're eager for company. *The New York Times*. https://www.nytimes.com/2021/02/03/sports/football/nfl-women-coaches.html

Brennan, C. (2021, July 7). *Women's College World Series tops College World Series in viewership*. Just Women's Sports. https://justwomenssports.com/womens-college-world-series-tops-college-world-series-in-viewership/

Brittain, I. (2009). *The Paralympic games explained* (1st ed.). Routledge.

Bruening, J.E. (2005). Gender and racial analysis of sport: Are all the women White and all the Blacks men? *Quest, 57*(3), 330–349. https://doi.org/10.1080/00336297.2005.10491861

Brunner, J., & Turner, K. (2017). *Northern California school district agrees to settle gender equity claims* [Press release]. Legal Aid at Work. https://legalaidatwork.org/releases/northern-california-school-district-agrees-settle-gender-equity-claims/

Bryant, A., & Joshi, C. (2021, November 10). *College sport NIL is headed for a collision with Title IX*. Sportico.com. https://www.sportico.com/law/analysis/2021/college-sports-nil-title-ix-1234645328/

Burke, P. (2021, October 15). *USOPC Think Tank calls for further collaboration between USOPC and NCAA to strengthen collegiate sport after COVID-19 pandemic*. Inside the Games. https://www.insidethegames.biz/articles/1114229/usopc-college-sport-think-tank-ncaa

Burtka, A. T. (2019, October 11). *Girls play sports less than boys, miss out on crucial benefits*. Global Sport Matters. https://globalsportmatters.com/youth/2019/10/11/girls-play-sports-less-than-boys-miss-out-on-crucial-benefits/

Butler, J., & Lopiano, D. (2003). *Title IX and race in intercollegiate sport*. Women's Sports Foundation. https://www.womenssportsfoundation.org/wp-content/uploads/2016/08/title_ix_and_race_full.pdf

Buysse, J. M. & Wolter, S. M. (2019, August). *A 26-year longitudinal analysis of intercollegiate Division I media guides in a changing sports media landscape, 1989-2017*. The Tucker Center for Research on Girls & Women in Sport. https://www.cehd.umn.edu/tuckercenter/library/docs/research/Media-Guide-Longitudinal-Report.pdf



Buzuvis, E. (2020). Title IX: Separate but equal for girls and women in sport. In D. L. Brake, M. Chamallas, & V. L. Williams (Eds.), *The Oxford handbook of feminism and law in the United States.* Forthcoming. https://papers.ssrn.com/sol3/papers. cfm?abstract_id=3734582

California Code, Education Code ch. 3, EDC § 33353. https://leginfo.legislature.ca.gov/faces/codes_displayText. html?lawCode=EDC&division=2.&title=2.&part=20.&chapter=3.&article=3

Cantu, N. (1996). *Dear colleague letter: Clarification of intercollegiate athletics policy guidance: Three-part test.* U.S. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/offices/list/ocr/docs/clarific.html#two

Carpenter, L. J., & Acosta, V. (2005). *Title IX.* Human Kinetics Publishers.

Carter-Francique, A.R., & Richardson, M. (2015). Black female athlete experiences at historically Black colleges and universities. In B. Hawkins, J. Cooper, A. Carter-Francique, & J.K. Cavil (Eds.), *The athletic experience at historically Black colleges and universities: Past, present, and persistence* (pp. 61–84). Rowan & Littlefield.

Carter-Francique, A.R. & Flowers, C.L. (2013). Intersections of race, ethnicity, and gender in sport. In E. Roper (Ed.) Rotterdam, *Gender relations in sport.* Sense Publishers.

Chen, S. (2021). *Female athletes who cashed in on NIL deals.* Just Women's Sport. https://justwomenssports.com/female-athletes-who-have-cashed-in-on-nil-deals/

Christophel, J. E., (2020). Leveling the playing field: Disability, Title IX, and high school sports. *Washington University Journal of Law & Policy, 62.* https://openscholarship.wustl.edu/law_journal_law_policy/vol62/iss1/17

Christovich, A. (2021a, October 8). *High schoolers already profiting.* Front Office Sports. https://frontofficesports.com/newsletter/fos-college-rise-of-high-school-nil/

Christovich, A. (2021b, December 22). *NCAA women's volleyball draws record ratings.* Front Office Sports. https://frontofficesports.com/ncaa-womens-volleyball-championship-draws-record-ratings/

Clark, G. (2021, May 6). *National billboard campaign for Notre Dame football unveiled.* FightingIrishwire.com. https://fightingirishwire.usatoday.com/2021/05/06/national-billboard-campaign-for-notre-dame-football-unveiled/

Clark, B., & Mesch, J. (2018). A global perspective on disparity of gender and disability for deaf female athletes. *Sport in Society, 21*(1), 64–75. https://doi.org/10.1080/17430437.2016.1225808

College Sports Information Directors Association. (2020). *College athletics communications survey: 2020 compensation and career survey.* https://cosida.com/documents/2020/5/28//SalarySurveyGraphic_2020_part4_v3.pdf?id=3002

College Sports Information Directors Association. (2022, February 7). *CoSIDA introduces diversity & inclusion fellowship program in partnership with the Knight Commission on Intercollegiate Athletics.* https://cosida.com/documents/2020/5/28//SalarySurveyGraphic_2020_part4_v3.pdf?id=3002

Cook, D. (2016, August 25). Four Black women now permeate the LPGA Tour. *The African American Golfer's Digest.* https://africanamericangolfersdigest.com/four-black-women-now-permeate-the-lpga-tour/

Cook, D. (2015, October 28). Renee Powell, First Women recipient of PGA Golf Professional of the Year Award. *The African American Golfer's Digest.* https://africanamericangolfersdigest.com/renee-powell-first-woman-recipient-of-pga-golf-professional-of-the-year-award

Cooky, C., Council, L. D., Mears, M. A., Messner, M. A. (2021) One and done: The long eclipse of women's televised sports, 1989–2019. *Communication & Sport, 9*(3), 347–371. doi:10.1177/2167479521003524

Cooper, J. N., & Newton, A. (2021). Black female college athletes' sense of belonging at a historically Black college and university (HBCU). *The Journal of Negro Education, 90*(1), 71–83.

Cooper, J. N., Cavil, J. K., & Cheeks, G. (2014). The state of intercollegiate athletics at historically Black colleges and universities (HBCUs): Past, present, & persistence. *Journal of Issues in Intercollegiate Athletics, 7,* 307–332.

Cooper, J. N., Davis, T. J., & Porter, C. J. (2017). Success Through community cultural wealth: Reflections from Black female college athletes at a historically Black college/university (HBCU) and a historically white institution (HWI). *Journal of Intercollegiate Sport, 10,* 129.

Corbett, D., & Johnson, W. (2000). The African American female in collegiate sport: Sexism and racism. In Brooks, D., & Althouse, R. (Eds.), *Racism in college athletics: The African American athlete's experience* (pp. 199–225). Fitness Information Technology.

Corbett, D. (2001). Minority women of color: Unpacking racial ideology. In G. Cohen (Ed.), *Women in sport issues and controversies* (pp. 291–310). National Association for Girls and Women in Sport.

Crenshaw, K. (1989). Demarginalizing the intersection of race and sex: A Black feminist critique of antidiscrimination doctrine, feminist theory, and antiracist politics. *University of Chicago Legal Forum, 140,* 139–167.

Crenshaw, K. (2002). Mapping the margins: Intersectionality, identity politics, and violence against women of color. *Stanford Law Review, 43,* 1241–1299. doi:10.2307/1229039

Dahl, G. (2012). *Secondary athletic administrators' perceptions of Title IX policy changes.* (Publication No. 1344) [Doctoral dissertation, University of North Dakota]. https://commons.und.edu/theses/1344



Darvin, L., Vooris, R., & Mahoney, T. (2020). The playing experiences of esport participants: an analysis of treatment discrimination and hostility in esport environments. *Journal of Athlete Development and Experience, 2*(1), 36-50.

Darvin, L., Holden, J., Wells, J., & Baker, T. (2021). Breaking the glass monitor: examining the underrepresentation of women in esports environments. *Sport Management Review, 24*(3), 475-499, 1-25.

Darvin, L. (2021a, March 12). *At colleges nationwide, esports teams dominated by men*. The Conversation. https://theconversation.com/at-colleges-nationwide-esports-teams-dominated-by-men-154793

Darvin, L. (2021b, September 29). *New NCAA endorsement rules could benefit women more than men*. The Conversation. https://theconversation.com/new-ncaa-endorsement-rules-could-benefit-women-more-than-men-166003

Davis, A.R. (2021, May 24). *Chutes and Ladders: Black Women ADs' Long Journey to the Top*. Global Sport Matters. https://globalsportmatters.com/culture/2021/05/24/nina-king-duke-tradition-black-women-ads-journey/

Dean, N. A., Bundon, A., Howe, P. D., & Abele, N. (2021). Gender parity, false starts, and promising practices in the Paralympic movement, *Sociology of Sport Journal* (published online ahead of print 2021). https://journals.humankinetics.com/view/journals/ssj/aop/article-10.1123-ssj.2021-0030/article-10.1123-ssj.2021-0030.xml

Dees, J. A. (2004). Do the right thing: A search for an equitable application of Title IX in historically Black colleges and university athletics. *Capital University Law Review, 33*(2), 219-274.

Dees, J. A. (2008). Access or interest: Why Brown has benefited African-American women more than Title IX. *University of Missouri Kansas City Law Review, 76*, 625-642.

Digest of Education Statistics. (2020). *Table 318.10. Degrees conferred by postsecondary institutions, by level of degree and sex of student; Selected years, 1869-70 through 2029-30*. National Center for Education Statistics. https://nces.ed.gov/programs/digest/d20/tables/dt20_318.10.asp

Dittmore, S. (2016). *The constantly changing world of media content in college athletics*. Athleticdirectoru.com. https://www.athleticdirectoru.com/articles/the-constantly-changing-world-of-media-content-in-college-athletics/

Dodds, D. (2022, January 26). *Inside the world of 'collectives' using name, image, and likeness to pay college athletes, influence programs*. CBSSports.com. https://www.cbssports.com/college-football/news/inside-the-world-of-collectives-using-name-image-and-likeness-to-pay-college-athletes-influence-programs/

Dosh, K. (2021a, June 2). Is there a Title IX issue with Notre Dame's football recruiting billboards? *Forbes*. https://www.forbes.com/sites/kristidosh/2021/06/02/is-there-a-title-ix-issue-with-notre-dames-football-recruiting-billboards/?sh=1df06ed4691f

Dosh, K. (2021b, December 21). FSU softball lands NIL deal with cryptocurrency exchange FTX. *Forbes*. https://www.forbes.com/sites/kristidosh/2021/12/29/fsu-softball-lands-nil-deal-with-cryptocurrency-exchange-ftx/?sh=cd1ab377c882

Dosh, K. (2021c, December 28). *Linktree announces NIL partnerships with 5 college athletes*. Business of College Sports. https://businessofcollegesports.com/name-image-likeness/linktree-announces-nil-partnerships-with-5-college-athletes/

Druckman, Rothschild, J. E., & Sharrow, E. A. (2018). Gender policy feedback: Perceptions of sex equity, Title IX, and political mobilization among college athletes. *Political Research Quarterly, 71*(3), 642–653. https://doi.org/10.1177/1065912917753078

Edelman, M. (2022, January 1). Women athletes are big winners in college sports' 2021 NIL reform. *Forbes*. https://www.forbes.com/sites/marcedelman/2022/01/01/womens-college-athletes-are-big-winners-in-2021-nil-reform/?sh=718c2dddde55

Education Amendments Act of 1972, 20 U.S.C. §§1681 – 1688 (2018).

Ernst & Young (2014). *Female executives say sport helps accelerate leadership and career potential*. PRNewswire.com. https://www.prnewswire.com/news-releases/female-executives-say-participationin-sport-helps-accelerate-leadership-and-careerpotential-278614041.html

Evans, M.B. (2020). *Exploring disparities in school sports participation in rural Pennsylvania*. Center for Rural Pennsyvania. https://www.rural.palegislature.us/documents/reports/Disparities-in-Sports-Participation-2020.pdf

Fair Pay to Play Act, Cal SB 206 (2019-2020), Chapter 383 (Cal. Stat. 2019). https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201920200SB206

Fair Play for Girls in Sport. (2021, April 22). *Nine best practices in K-12 schools regarding Title IX & athletic programs*. Legal Aid at Work.

Farrington, D. (2021). *Maia Chaka is the 1st Black woman to officiate an NFL game*. NPR. https://www.npr.org/2021/09/13/1036580405/maia-chaka-first-black-woman-officiate-nfl-game

Flowers, C. L. (2015). Legal issues and the Black female athlete's collegiate experience at HBCUs. In B. J. Hawkins, J. Cooper, A. R. Carter-Francique, and J. K. Cavil (Eds.), *Black college athletes: The sporting life at historically Black colleges and universities*. Rowman & Littlefield Publishing Group.

Flowers, C. L. (2018). Review of the book *Exploring diversity at historically Black colleges and universities: Implications for policy and practice*, by Robert T. Palmer C. Rob Shorette II Marybeth Gasman. *Journal of Negro Education, 87*(2), 186-188. https://www.muse.jhu.edu/article/802670

Fox, J. & Tang, W. (2017). Women's experiences with general and sexual harassment in online video games: Rumination, organizational responsiveness, withdrawal, and coping strategies, *New Media & Society, 19*, 1290-1291, 1304.



Franklin, C. (2021). Title IX administers a booster shot: The effect of private donations on Title IX. *Northwestern Journal of Law and Social Policy, 16*(2), 145–163. https://www.proquest.com/scholarly-journals/title-ix-administers-booster-shot-effect-private/docview/2536826085/se-2?accountid=11644

Fuller, L.K. (2018). *Female Olympian and Paralympian events: Analyses, backgrounds, and timelines.* Springer.

Galanter, S. (2013a, January 25). *Dear colleague letter: Students with disabilities in extracurricular activities.* U.S. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201301-504.html

Galanter, S. (2013b, April 24). *Guidance on the prohibition against retaliation under federal civil rights laws.* U.S. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201304.pdf

Galanter, S. (2013c, June 25). *Guidance on supporting the academic success of pregnant and parenting students.* U.S. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201306-title-ix.pdf

Gaines, C. (2016). *The 25 schools that make the most money in college sports.* Insider. http://www.businessinsider.com/schools-most-revenue-college-sports-2016- 10/#25-ucla--969-million-1

GLSEN. (2019). *The 2019 national school climate survey.* https://www.glsen.org/sites/default/files/2021-04/NSCS19-FullReport-032421-Web_0.pdf

GLSEN. (2021). *Gender affirming and inclusive athletics participation.* https://www.glsen.org/sites/default/files/2021-05/GLSEN_Transathlete_Policies_Issue_Brief-05-03-21.pdf

Goldberg, S. B. (2021, October 18). *Confronting discrimination based on national origin and immigration status.* Office for Civil Rights Blog. https://www2.ed.gov/about/offices/list/ocr/blog/20211018.html

Goldberg, S. K. (2021, February 8). *Fair play: The importance of sports participation for transgender youth.* Center for American Progress. https://www.americanprogress.org/issues/lgbtq-rights/reports/2021/02/08/495502/fair-play/

Golliver, B. (2022, January 25). Rainmaker. Boss. Baker. Meet Tamika Tremaglio, the new head of the NBA players' union. *Washington Post.* https://www.washingtonpost.com/sports/2022/01/25/tamika-tremaglio-nba-players-union/

Goodman, M. (2022, February 22). *USWNT, U.S. Soccer reach $24 million equal pay settlement.* CBS Sports. https://www.cbssports.com/soccer/news/uswnt-u-s-soccer-reach-24m-equal-pay-settlement-megan-rapinoe-says-justice-comes-in-the-next-generation/

Giroir, B. (2019). *The national youth sports strategy.* U.S. Department of Health and Human Services. https://health.gov/sites/default/files/2019-10/National_Youth_Sports_Strategy.pdf

Griffin, P., & Carroll, H. (2011). *NCAA inclusion of transgender student-athletes.* National Collegiate Athletic Association. https://www.ncaa.org/sites/default/files/Transgender_Handbook_2011_Final.pdf

Griggs, B. (2019, January 13). *You may not know her name. But Bernice Sandler, the godmother of Title IX, changed women's rights forever.* CNN.com. https://www.cnn.com/2019/01/08/us/bernice-sandler-title-ix-dies/index.html

Grimes, P. S., & French, L. M. (1987). Barriers to disabled women's participation in sports. *The Journal of Physical Education, Recreation & Dance, 58,* 24–27.

*Grimm v. Gloucester County School Board* (2021), United States Supreme Court, 972 F.3d at 618.

Guaglione, S. (2021, April 8). *Why growth of women's sports coverage and advertiser interest is bogged down by small steps forward.* Digiday. https://digiday.com/media/why-growth-of-womens-sports-coverage-and-advertiser-interest-is-bogged-down-by-small-steps-forward/

Guenther, E. A., Sorensen, E. A., & Champagne, L. (under review). *Pregnancy rights information increases female intercollegiate student-athletes' intent to seek help.*

Hallman, C. (2022, March 10). Native Americans underrepresented in NCAA. *Minnesota Spokesman-Recorder.* https://spokesman-recorder.com/2022/03/10/1097804/

Hamari, J. & Sjöblom, M. (2017). What is esports and why do people watch it? *Internet Research, 27,* 211–232.

Hawkins, B. (2010). *The new plantation: Black athletes, college sports, and historically white colleges and universities.* Palgrave-MacMillan.

Hawkins, J., Cooper, A. R., Carter-Francique, & Cavil, J. K. (2015). *Black college athletes: The sporting life at historically Black colleges and universities.* Rowman & Littlefield Publishing Group

Hearn, J., Suggs, W., & May-Trifiletti, J. (2018). *Taking the field: Intercollegiate athletics on CIC campuses.* The Council of Independent Colleges. https://www.cic.edu/resources-research/charts-data/reports/athletics-report-2018

Higher Education Opportunity Act of 2008, Pub. L. No. 110–315, 122 Stat. 3078 (2008). https://www.govinfo.gov/content/pkg/PLAW-110publ315/pdf/PLAW-110publ315.pdf

Hilbert, J. (2019, April 9). *Gaming and gender: How inclusive are e-sports?* The Sports Integrity Initiative. https://www.sportsintegrityinitiative.com/gaming-gender-how-inclusive-are-esports/

Hogshead-Makar, N. & Sorensen, E. (2008). *Pregnant & parenting student-athletes: Resources & model policies.* National Collegiate Athletic Association. https://www.ncaa.org/about/resources/inclusion/pregnant-parenting-student-athletes



Holmes, P. (1975, November 11). *Letter to chief state school officers, Title IX obligations in athletics*. U.S. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/offices/list/ocr/docs/holmes.html

Hosick, M. B. (2007, May 21). A force for equity: NCAA Task Force set educational benchmarks for gender balance. *NCAA News*. https://ncaanewsarchive.s3.amazonaws.com/2007/Association-wide/a-force-for-equity---05-21-07-ncaa-news.html

Hruby, P. (2021, May 7). *Lonely at the top: Few college athletic directors are women and people of color*. Global Sport Matters. https://globalsportmatters.com/business/2021/05/07/few-college-athletic-directors-minorities-ncaa

Huffman, S., Tuggle, C. A., & Rosengard, D. S. (2004). How campus media cover sports: The gender-equity issue, one generation later. *Mass Communication and Society, 7*, 475–489.

Hunzinger, E. (2022, January 27). Male athletes leading the way in NIL money. *The Detroit News*. https://www.detroitnews.com/story/sports/college/2022/01/27/male-athletes-leading-way-nil-money/9246862002/

Illinois Enhance Physical Education Task Force. (2013). *Illinois Enhance Physical Education Task Force: Recommendations and report*. Illinois State Board of Education. https://www.isbe.net/Documents/epe-ga-report0813.pdf

Individuals with Disabilities Education Act, 20 U.S.C. § 1400 (2004)

IPC. (2021, August 24). *Tokyo 2020 sets the record for most athletes and women at the Paralympic Games*. https://www.paralympic.org/news/tokyo-2020-sets-record-most-athletes-and-women-paralympic-games

*Jackson v. Birmingham Board of Education*. 544 U.S. 167. 2005.

Jackson, W. (2021, November 17). NCAA women's basketball tournament expansion from 64 to 68. *Sports Illustrated*. https://www.si.com/college/2021/11/17/ncaa-approves-womens-basketball-tournament-expansion-from-64-to-68-teams

Jang, I. (2017). *Social media coverage of women's sports: A case study of NCAA Division I conferences' Facebook pages* [Unpublished thesis]. University of Southern Illinois. https://opensiuc.lib.siu.edu/cgi/viewcontent.cgi?article=2057&context=gs_rp

Jenkins, W. (2019, November 8). Why hundreds of colleges may be out of compliance with Title IX. *The Chronicle of Higher Education, 66*(10), n.p.

Jessop, A., & Sabin, J. (2021). The sky is not falling: Why name, image, and likeness legislation does not violate Title IX and could narrow the publicity gap between men's sport and women's sport athletes. *Journal of Legal Aspects of Sport, 31*, 253–288.

Johnson, G. (2021, September 29). *March Madness brand will be used for DI Women's Basketball Championship*. NCAA. https://www.ncaa.com/news/basketball-women/article/2021-09-29/march-madness-brand-will-be-used-di-womens-basketball-championship

Johnson, M. M. (2008). *The African American woman golfer: Her legacy*. Praeger Publishers

Judge, J. (2011). *Title IX as applied to intercollegiate athletics*. Higheredcompliance.com. https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.higheredcompliance.org%2Fwp-content%2Fuploads%2F2018%2F10%2Fx-11-03-7.doc&wdOrigin=BROWSELINK

Kane, M. J., & Lavoi, N. (2007). *The 2007 Tucker Center research report: Developing physically active girls: An evidence-based multidisciplinary approach*. The Tucker Center for Research on Girls & Women in Sport. University of Minnesota. https://www.cehd.umn.edu/tuckercenter/library/docs/research/2007-Tucker-Center-Research-Report.pdf

Kaplan Hecker & Fink. (2021a, August 2). *NCAA gender equity external review report: Phase I*. https://kaplanhecker.app.box.com/s/6fpd51gxk9ki78f8vbhqcqh0b0o95oxq

Kaplan Hecker & Fink. (2021b, October 25). *NCAA gender equity external review report: Phase II*. https://kaplanhecker.app.box.com/s/y17pvxpap8lotzqajjan9vyye6zx8tmz

Keith, R. (2018, May 22). *Television ratings for men's NCAA volleyball championship drop again*. Volleyballmob.com. https://volleymob.com/television-ratings-for-mens-ncaa-volleyball-championship-drop-again/

Kellstedt, D. K., Schenkelberg, M. A., Von Seggern, M. J., Rosenkranz, R. R., Welk, G. J., High, R., & Dzewaltowski, D. A. (2021). Youth sport participation and physical activity in rural communities. *Archives of Public Health, 79*(1), 1–8.

Klein, S. (2016). *Reinvigorating the role of the Title IX coordinator: A requirement and resource*. Feminist Majority Foundation. https://feminist.org/wp-content/uploads/2020/06/Full-Title-IX-Coordinators-9-16.pdf

LaVoi, N. M., & Boucher, C. (2020, April). *Head coaches of women's collegiate teams: A report on select NCAA Division-I institutions, 2019-20*. The Tucker Center for Research on Girls & Women in Sport. University of Minnesota.

Lapchick, R. (2021). *The 2020 racial and gender report card*. The Institute for Diversity and Ethics in Sport. University of Central Florida. https://www.tidesport.org/_files/ugd/138a69_bee975e956ad45949456eae2afdc74a2.pdf

Lapchick, R. (2022). *The 2021 DI FBS leadership college racial and gender report card: The lack of diversity within collegiate athletic leadership continues*. The Institute for Diversity and Ethics in Sport. University of Central Florida. https://43530132-36e9-4f52-811a-182c7a91933b.filesusr.com/ugd/403016_2885084836ea46ffad0e44454ccadab6.pdf

Lerner, P., & Lakowski, T. (2009). *Play fair: A Title IX playbook for victory*. Women's Sports Foundation. https://www.womenssportsfoundation.org/wp-content/uploads/2016/09/play_fair_final.pdf



Lhamon, C. E. (2014, April 24). *Questions and answers on Title IX and sexual violence*. U.S. Department of Education. https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf [NOTE: While this document has been formally rescinded by the Department of Education, it has historical value and, therefore, has been included in this report.]

Lhamon, C. (2015a). *Dear colleague letter on Title IX coordinators*. U.S. Department of Education. Office of Civil Rights. https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201504-title-ixcoordinators.pdf

Lhamon, C. (2015b). *Protecting civil rights, advancing equity*. U.S. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/reports/annual/ocr/report-to-president-and-secretary-of-education-2013-14.pdf

Lhamon, C. (2015c). *Title IX resource guide*. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/offices/list/ocr/docs/dcl-title-ix-coordinators-guide-201504.pdf

Lhamon, C. (2015d, December 15). *Notice of language assistance dear colleague letter on voluntary youth service organizations*. U.S. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201512-voluntary-youth-service-organizations.pdf

Lopiano, D., Sommer, J., Zimbalist, A., Gill, E., Gurney, G., Hsu, M., Lever, K., Porto, B., Ridpath, D. B., Sack, A., Smith, B., & Thatcher, S. (2021) *Position statement: NILs and Title IX: Education institutions must fix the promotion, publicity, and recruiting inequities critical to the NIL monetization success of college female athletes and must not use or assist third parties to evade their Title IX obligations*. https://www.thedrakegroup.org/wp-content/uploads/2021/10/10-12-21-Position-Statement-Title-IX-and-NILs.pdf

Maestas, A. J., & Belzer, J. (2020). *How much is NIL worth to student athletes?* AthleticDirectorU.com. https://athleticdirectoru.com/articles/how-much-is-nil-really-worth-to-student-athletes/

Malik, M. R. (2016). *A content analysis of gender-specific media coverage of sport: NCAA athletic department home webpages* (Publication No. 2703) [Master's Thesis]. University of Nevada, Las Vegas. http://dx.doi.org/10.34917/9112137

Marcus, K. (2004). *Dear colleague letter: Title IX grievance procedures, elementary and secondary education*. U.S. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/offices/list/ocr/responsibilities_ix.html

Matthews, M., & McCune, S. D. (1977). *Title IX grievance procedures: an introductory manual*. U.S. Department of Education, Office for Civil Rights.

Matthews, M., & McCune, S. D. (1987). *Title IX grievance procedures: an introductory manual*. U.S. Department of Education, Office for Civil Rights.

Mathewson, A. D. (2012). Remediating discrimination against African American females at the intersection of Title IX and Title VI. *Wake Forest Journal of Law & Policy, 2*, 295. https://digitalrepository.unm.edu/law_facultyscholarship/379

Mauss, J. (2021, July 3). *Fresno State's Cavinder twins could make more than double basketball coaches salary*. MountainWestwire.com. https://mwwire.com/2021/07/03/fresno-states-cavinder-twins-could-make-more-than-double-than-basketball-coach/

McDowell, J., & Carter-Francique, A. (2017). An intersectional analysis of the workplace experiences of African American female athletic directors. *Sex Roles, 77*(5), 393–408.

McDowell, J., & Carter-Francique, A. (2016). Experiences of female athletes of color. In E. Staurowsky (Ed.), *Women and sport: Continuing a journey of liberation to celebration* (pp. 95–115). Human Kinetics.

McDowell, J., Deterding, R., Elmore, T., Morford, E., & Morris, E. (2016). Title IX and campus recreation: Guidelines to increase gender equity in club and intramural sport programs. *Recreational Sports Journal, 40*(2), 133–151. https://doi.org/10.1123/rsj.2016-0012

McGinnis, K., Goutos, D., & Tuakli-Wosornu, T. (2020). Diversifying diversity, equity, and inclusion in American college athletics: The case for adaptive (and other non-traditional) sports. *The Sports Journal*. https://thesportjournal.org/article/diversifying-diversity-equity-and-inclusion-in-american-college-athletics-the-case-for-adaptive-and-other-non-traditional-sports/

McMillen, N. R. (1997). *Remaking Dixie: The impact of World War II on the American South*. University Press of Mississippi.

Minsberg, T. (2021, August 8). Allyson Feliz wins her 10th gold Olympic medal, tying an American record in her sport. *The New York Times*.

Monroe, S. (2007, June 25). *Dear colleague letter*. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/offices/list/ocr/letters/colleague-20070625.pdf

Monroe, S. (2008, September 17). *Guidance on determining which athletic activities can be counted for purposes of Title IX compliance*. U.S. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/offices/list/ocr/letters/colleague-20080917.pdf

NAIA (2020, June 29). *Unprecedented growth leads NAIA to greenlight women's flag football to emerging sport status* [Press release]. https://www.naia.org/sports/wflag/2020-21/releases/WFLAG_EmergingSport_6_29_20?gclid=Cj0KCQiA3rKQBhCNARIsACUEW_ZGk3sNZBSr65BUn5ziMB8n-NII0AKNe3Rw3pZscbxWgMhsCDXg2SAaAqXtEALw_wcB

Nash, M. A., Klein, S. S., & Bitters, B. (2007). The role of government in advancing gender equity in education. In S. Klein (Ed.), *Handbook for achieving gender equity through education* (pp. 63–101). Lawrence Erlbaum Associates



National Center for Educational Statistics. (2022). Total fall enrollment in degree-granting postsecondary institutions, by attendance status, sex of student, and control of institution: Selected years, 1947 through 2028. *Digest of Education Statistics*. https://nces.ed.gov/programs/digest/d18/tables/dt18_303.10.asp?current=yes%22%20%5Ct%20%22_blank

National Center for Educational Statistics (2020). *College enrollment rates*. https://nces.ed.gov/programs/coe/pdf/coe_cpb.pdf

National Center for Educational Statistics. (2021, May). *Students with disabilities*. U.S. Department of Education. https://nces.ed.gov/programs/coe/indicator/cgg

National Collegiate Athletic Association. (2020). *NCAA sport sponsorship and participation rates report (1956-1957 through 2019-2020)*. https://ncaaorg.s3.amazonaws.com/research/sportpart/2019-20RES_SportsSponsorshipParticipationRatesReport.pdf

National Collegiate Athletic Association. (2021a). *NCAA sport sponsorship and participation rates report (1956-1957 through 2020-2021)*. https://ncaaorg.s3.amazonaws.com/research/sportpart/2021RES_SportsSponsorshipParticipationRatesReport.pdf

National Collegiate Athletic Association. (2021b). *Race and gender demographics database*. https://www.ncaa.org/sports/2018/12/13/ncaa-demographics-database.aspx

National Collegiate Athletic Association. (2022). *Emerging sports for women*. https://www.ncaa.org/sports/2016/3/2/emerging-sports-for-women.aspx

National Federation of State High School Associations. (2018). *High school sports participation increases for 29th consecutive year*. https://www.nfhs.org/articles/high-school-sports-participation-increases-for-29th-consecutive-year

National Federation of State High School Associations. (2019). *High school participation survey archive*. https://www.nfhs.org/sports-resource-content/high-school-participation-survey-archive/

*National Women's Law Center v. District of Columbia Public Schools*. (2013, June 27). Complaint filed with the U.S. Department of Education Office for Civil Rights, Washington DC Metro Area. https://nwlc.org/wp-content/uploads/2015/08/2013_6_27_dcps_complaint_final.pdf

National Women's Law Center & Poverty & Race Research Action Council. (2015). *Finishing last: Girls of color and school sports opportunities*. https://prrac.org/pdf/GirlsFinishingLast_Report.pdf

NCAA Media Center. (2022, January 19). *Board of Governors updates transgender participation policy*. National Collegiate Athletic Association. https://www.ncaa.org/news/2022/1/19/media-center-board-of-governors-updates-transgender-participation-policy.aspx

NCAA Office of Inclusion. (2011). *NCAA inclusion of transgender student-athletes*. https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/INC_TransgenderHandbook.pdf

NCAA Staff. (2022, February 17). *2022 March Madness: Women's NCAA tournament complete schedule, dates, TV times*. National Collegiate Athletic Association. https://www.ncaa.com/news/basketball-women/article/2021-04-19/2022-ncaa-womens-basketball-tournament-dates-schedule

NDNSports Staff. (2021, March 16). *Native American athletes in the Women's 2021 NCAA March Madness basketball tournament*. NDNSports.com. http://www.ndnsports.com/native-american-athletes-in-the-womens-2021-ncaa-march-madness-basketball-tournament/

New, J. (2015, April 27). *Title IX coordinators required*. Insidehighered.com. https://www.insidehighered.com/news/2015/04/27/education-department-reminds-colleges-hire-title-ix-coordinators

Newhouse, K. (2022a, April 11). *Federal Title IX data on sports participation is unreliable*. CNSMaryland.org. https://cnsmaryland.org/2022/04/11/title-ix-federal-sports-data/

Newhouse, K. (2022b, April 11). *Poll: Most parents, students know "nothing at all" about Title IX*. CNSMaryland.org. https://cnsmaryland.org/2022/04/11/title-ix-poll/

NFHS News. (2018, April 24). *NFHS, NFHS Network announce partnership with PlayVS to begin esports in high schools nationwide*. https://www.nfhs.org/articles/nfhs-nfhs-network-announce-partnership-with-playvs-to-begin-esports-in-high-schools-nationwide/

Nowicki, J. (2018). *High school sports: Many schools encouraged equal opportunities, but further education could help athletics administrators under Title IX*. United States Government Accountability Office Report to Congressional Committees. https://www.gao.gov/assets/gao-18-425.pdf

Office for Civil Rights. (1979, December 11). *A policy interpretation: Title IX and intercollegiate athletics*. U.S. Department of Education. https://www2.ed.gov/about/offices/list/ocr/docs/t9interp.html

Office for Civil Rights. (2005). *Additional clarification of intercollegiate athletics policy: Three-part test — part three*. U.S. Department of Education. https://www2.ed.gov/about/offices/list/ocr/letters/200503017-additional-clarification-three-part-test.pdf

Office for Civil Rights. (2020, May 12). *Questions and answers for postsecondary institutions regarding the COVID-19 national emergency*. U.S. Department of Education. https://www2.ed.gov/about/offices/list/ocr/docs/20200512-qa-psi-covid-19.pdf

Orleans, J. (1996). An end to the odyssey: Equal athletic opportunities for women. *Duke Journal of Gender, Law, and Policy*, *3*, 131–162. https://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=1226&context=djglp



Osborne, B. (2017). Failing to fund fairly: Title IX athletics scholarships compliance, *Tennessee Journal of Race, Gender, & Social Justice, 6*(1), Article 6.

O'Shea, M. F. (1998, July 23). *Dear colleague letter: Bowling Green State University*. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/offices/list/ocr/docs/bowlgrn.html#bowlgrn1

Outsports. (2021, September 21). *At least 186 out athletes at the Tokyo Summer Olympics, by far a record*. Outsports.com. https://www.outsports.com/olympics/2021/7/12/22565574/tokyo-summer-olympics-lgbtq-gay-athletes-list

PA Department of Education. (2022). *Disclosure of interscholastic athletic opportunity*. https://www.education.pa.gov/Teachers%20-%20Administrators/Interscholastic%20Athletic%20Opportunity/Pages/default.aspx

Paaßen, B., Morgenroth, T., & Stratemeyer, M. (2017). What is a true gamer? The male gamer stereotype and the marginalization of women in video game culture. *Sex Roles, 76*, 421–435.

Paige, R. (2002, May 3). *Single-sex classes and schools: Guidelines on Title IX requirements*. Department of Education. https://www2.ed.gov/policy/rights/guid/ocr/edlite-t9-guidelines-ss.html

Palmer, R. T., Shorette, R., & Gasman, M. (2015). *Exploring diversity at historically Black colleges and universities: Implications for policy and practice*. Jossey-Bass.

Pappas. (2021). Competition and collaboration: Title IX Coordinators and the barriers to achieving educational equity. *International Journal of Discrimination and the Law, 21*(2), 94–116. https://doi.org/10.1177/13582291211014403

Paulsen. (2021, April). *Ratings: NCAA gymnastics, racing, MLS, and more*. Sports Media Watch. https://www.sportsmediawatch.com/2021/04/ncaa-gymnastics-ratings-abc-most-watched-decade-f1-indycar-mls/

Perry, N. (2021, October 6). *Girls flag football on rise in high schools, state associations*. National Federation of State High School Associations. https://www.nfhs.org/articles/girls-flag-football-on-rise-in-high-schools-state-associations/

PGA Staff. (2022, March 10). *Renee Powell continues to inspire as she earns the inaugural Charlie Sifford Award*. PGA.com. https://www.pga.com/story/renee-powell-continues-to-inspire-as-she-earns-the-inaugural-charlie-sifford

Pickett, M. W., Dawkins, M., P., & Braddock, J. H. (2012). Race and gender equity in sports: Have White and African-American females benefited equally from Title IX. *American Behavioral Scientist, 56*(11), 1581–1603.

Planos, J. (2021, August 9). *What do 60 percent of America's gold medals from Tokyo have in common?* Fivethirtyeight.com. https://fivethirtyeight.com/features/american-women-stole-the-show-in-tokyo/

Powell, J. (2021, November 30). *Paige Bueckers' major NIL deal only leads to more questions*. Bleacher Report. https://bleacherreport.com/articles/2950930-paige-bueckers-major-nil-deal-only-leads-to-more-questions

Pickett, M. W., Dawkins, M. P., & Braddock, J. H. (2012). Race and Gender Equity in Sports: Have White and African American Females Benefited Equally From Title IX? *The American Behavioral Scientist (Beverly Hills), 56*(11), 1581–1603. https://doi.org/10.1177/0002764212458282

Postsecondary National Policy Institute (2020). *Black students in higher education: Fact sheet*. https://pnpi.org/black-students/

Pusch. (2014). Urban struggles: an analysis of Title IX and urban high school athletic opportunities for girls. *Wisconsin Journal of Law, Gender & Society, 29*(2), 317–340.

Randolph, M., & Ray, C. (2018). *District of Columbia Athletic Association Title IX Athletic Equity Act of 2015 report*. District of Columbia Athletic Association. https://cdn4.sportngin.com/attachments/document/0149/9718/DCSAA_Athletics_Title_IX_Report_2016-17.pdf#_ga=2.113607495.1902113714.1644786769-1058656019.1644786768

Rehabilitation Act of 1973, 34 C.F.R. Part 104.

Reinert, B. (2021, September 9). *Meet Team USA's golden stars of the Tokyo Paralympics*. TeamUSA.org. https://www.teamusa.org/News/2021/September/09/Meet-Team-USAs-Golden-Stars-Of-The-Tokyo-Paralympics

Reynolds, G. (2003, July 11). *Untitled correspondence*. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/offices/list/ocr/title9guidanceFinal.pdf

Reynolds, L., Fisher, D., & Cavil, J. K. (2012). Impact of demographic variables on African American student athletes' academic performance. *Educational Foundations, 26*(3), 93–111.

Rodkey, J., Staurowsky, E. J., Kelly, K., & Sonderfeld, T. (2019, April). *Examining the knowledge and perceptions of Division II collegiate athletic administrators, staff, and coaches regarding gender equity and Title IX standards*. [Paper presented]. College Sport Research Institute Conference, University of South Carolina, Columbia, SC.

Rose, D. (2018). *Citizens by degree: Higher education policy and the changing gender dynamics of American citizenship*. Oxford University Press.

Rose, D. (2015). Regulating opportunity: Title IX and the birth of gender-conscious higher education policy. *Journal of Policy History, 27*(1), 157–83.

Ruvalcaba, O., Shulze, J., Kim, A., Berzenski, S. R., & Otten, M. P. (2018). Women's experiences in esports: Gendered differences in peer and spectator feedback during competitive video game play. *Journal of Sport and Social Issues, 42*, 295–311.

Sabo, D., & Snyder, M. (2013). *Progress and promise: Title IX at 40 white paper*. SHARP Center for Women and Girls.



Women's Sports Foundation
WomensSportsFoundation.org

50 Years of Title IX:
We're Not Done Yet

Sabo, D., & Veliz, P. (2008). *Go out and play*. Women's Sports Foundation.

Sabo, D., Veliz, P., & Staurowsky, E. J. (2016). *Beyond Xs and Os: Gender bias and coaches of women's teams*. Women's Sports Foundation.

Sack, A. L., & Staurowsky, E. J. (1998). *College athletes for hire: The evolution and legacy of the NCAA amateur myth*. Praeger Press.

Samuels, J., & Galles, K. (2003). In defense of Title IX: Why current policies are required to ensure equality of opportunity. *Marquette Sports Law Review, 14*(1), 11–47. http://scholarship.law.marquette.edu/sportslaw/vol14/iss1/21

Sandler, B. R. (2000). "Too strong for a woman" — The five words that created Title IX. *Equity & Excellence in Education, 33*(1), 9–13. DOI: 10.1080/1066568000330103

Sandler, B. R. (2007). Title IX: How we got it and what a difference it made. *Cleveland State Law Review, 55*(4), 473–489. https://engagedscholarship.csuohio.edu/cgi/viewcontent.cgi?article=1193&amp;context=clevstlrev

Savatovic-Hathorn, S. (2021). *Student-athletes on Twitter: A content analysis of media, gender, and sentiment* [Unpublished master's thesis]. Kansas State University. https://krex.k-state.edu/dspace/handle/2097/41465

Schaeffer, K. (2020, April 23). *As schools shift to online learning, here's what we know about disabled students*. Pew Research Center. https://www.pewresearch.org/fact-tank/2020/04/23/as-schools-shift-to-online-learning-amid-pandemic-heres-what-we-know-about-disabled-students-in-the-u-s/

Seiner, J. (2021, March 12). *AP study: Nearly 90% of esports scholarships going to men*. Associated Press. https://apnews.com/article/esports-gender-inequality-scholarships-men-1823321276db40fea37dc8d9e5410643

Sheffer, M. L. (2020). New media, old ways: An analysis of sports media's depiction of female athletes on Instagram and Snapchat. *Journal of Sports Media, 15*(2), 31–50. doi:10.1353/jsm.2020.0009.

Shifrer, D., Pearson, J., Muller, C., & Wilkinson, L. (2015). College-going benefits of high school sports participation: Race and gender differences over three decades. *Youth & Society, 47*(3), 295–318. https://doi.org/10.1177/0044118X12461656

Shirley Povich Center for Sports Journalism and Howard Center for Investigative Journalism at the University of Maryland Philip Merrill College of Journalism. (2022). *Unlevel playing fields*. CNSMaryland.org. https://cnsmaryland.org/titleix/

Siegal, J. (2020). *A serial disrupter*. https://www.justinesiegal.com

Smith, M. M., & Wrynn, A. M. (2014). History of gender and gender equality in the Olympics and Paralympics. In J. Hargreaves & E. Anderson (Eds.), *Routledge handbook of sport, gender, and sexuality* (pp. 57–65). Routledge.

Smithsonian Staff. (2021, August 23). *Three Latinas that made baseball history*. Because of Her Story. Smithsonian Institution. https://womenshistory.si.edu/news/2021/08/three-latinas-who-made-baseball-history

Sorensen, E., Sincoff, M., & Siebeneck, E. (2009). The need for an effective student-athlete pregnancy policy. *Journal of Issues in Intercollegiate Athletics, 1*, 25–45. http://csri-jiia.org/old/documents/publications/research_articles/2009/JIIA_2009_3_Sorensen_Publish%20Copy_1.0.pdf

Speier, J. (2021, June 29). *Speier, Sherrill introduce resolution affirming the NCAA is subject to Title IX; Must work to prevent sex discrimination against women athletes* [Press release]. https://speier.house.gov/press-releases?id=DC2A490F-42C0-4A1B-A3EE-F07F3C51DAF7

Spellings, M. (2008, March 27). *Title IX athletics three-part test*. U.S. Department of Education. Office for Civil Rights. https://www2.ed.gov/about/offices/list/ocr/letters/title-ix-2008-0327.pdf

Staurowsky, E. J. (2016a). Title IX in its third decade: The Commission on Opportunity in athletics. *Entertainment and Sports Law Journal (Coventry, England), 2*(3). https://doi.org/10.16997/eslj.129

Staurowsky, E. J. (2016b). *Women and sport: Continuing a celebration from liberation to celebration*. Human Kinetics.

Staurowsky, E. J., DeSousa, M. J., Miller, K. E., Sabo, D., Shakib, S., Theberge, N., Veliz, P., Weaver, A., & Williams, N. (2015). *Her life depends on it III: Sport, physical activity, and the health and well-being of American girls and women*. Women's Sports Foundation.

Staurowsky, E. J., & Rhoads, A. (2020). Title IX coordinators in NCAA Division I institutions: Roles, responsibilities, and potential conflicts of interest. *Journal of Issues in Intercollegiate Athletics, 13*, 381–404. http://csri-jiia.org/wp-content/uploads/2020/11/RA_2020_18.pdf

Staurowsky, E. J., Watanabe, N., Cooper, J., Cooky, C., Lough, N., Paule-Koba, A., Pharr, J., Williams, S., Cummings, S., Issokson-Silver, K., & Snyder, M. (2020). *Chasing equity: The triumphs, challenges, and opportunities in sports for girls and women*. Women's Sports Foundation.

Staurowsky, E. J., & Weight, E. A. (2011). Title IX literacy: What coaches don't know and need to find out. *The Journal of Intercollegiate Sport, 4*(2), 190–209.

Staurowsky, E. J., & Weight, E.A. (2013). Discovering dysfunction in Title IX implementation: NCAA administrator literacy, responsibility, and fear. *Journal of Applied Sport Management, 5*(1), 1–30.

Staurowsky, E. J., Zonder, E., & Reimer, B. (2017). Title IX knowledge among college athletes and non-athletes in NCAA Division I and III institutions. *Women in Sport and Physical Activity Journal, 25*, 30–42.



Stevens, R. E., Loudon, D. L., & McConkey, C. W. (1995). Sport marketing among colleges and universities. *Sport Marketing Quarterly, 4*(1), 41–47.

Stevens, N. (2021, May 21). *Despite more in person learning, loosening of restrictions, sports participation still on the decline in NC*. HighSchoolOT.com. https://www.highschoolot.com/despite-more-in-person-learning-loosening-of-restrictions-sports-participation-still-on-decline-in-nc/19689383/

Stezano, M. (2018, August 22). *7 women who broke down barriers in sport*. History.com. https://www.history.com/news/7-women-who-broke-down-barriers-in-sports

Stewart, R., & Harris, P. (1979). *A policy interpretation: Title IX and intercollegiate athletics*. U.S. Department of Education. https://www2.ed.gov/about/offices/list/ocr/docs/t9interp.html

Stimpson, C. R. (2022). Dereliction, due process, and decorum: The crises of Title IX. *Signs: Journal of Women in Culture and Society, 47*(2), 261–93. https://doi.org/10.1086/716653

Stoever, J. K. (2021). Title IX, esports, and #EToo. *The George Washington Law Review, 89*, 857–931. https://www.gwlr.org/wp-content/uploads/2021/07/89-Geo.-Wash.-L.-Rev.-857.pdf

Suggs, W. (2005). *A place on the team: The triumph and tragedy of Title IX*. Princeton University Press.

Supra, J. D. (2019, March 4). *Title IX compliance creates hurdles for collegiate esports programs*. https://www.jdsupra.com/legalnews/title-ix-compliance-creates-hurdles-for-99240/

The Athletic Staff. (2021, July 20). *UNC launches first group licensing program under new policy*. The Athletic. https://theathletic.com/news/unc-launches-first-group-licensing-program-under-new-nil-policy/gChv1KdJCmlI/

Tsuji, A. (2016, September 21). Entire Indiana Fever team locks arms, kneels during national anthem. *USA Today*. https://www.usatoday.com/story/sports/ftw/2016/09/21/entire-indiana-fever-team-locks-arms-and-kneels-for-national-anthem/90811142/

Turner, C. (2021, September 21). SmartyStreets enters into NIL deal with all female athletes at BYU. *The Daily Universe*. https://universe.byu.edu/2021/09/21/smartystreets-enters-into-nil-deal-with-all-female-athletes-at-byu/

Turner, K. (2021, June 10). *Fair play for girls in sports*. Legal Aid at Work. https://www.fairplayforgirlsinsports.org/

Unger, R. K. (1979). Toward a redefinition of sex and gender. *American Psychologist, 34*(11), 1085–1094. https://doi.org/10.1037/0003-066X.34.11.1085

USA Today Staff. (2017, April 8). The 100 most powerful people in MLB. *USA Today*. https://www.usatoday.com/story/sports/mlb/2017/04/08/mlb-100-most-powerful-people/100172102/

U.S. Center for SafeSport. (2020, September 22). *2022 minor athlete abuse prevention policies*. https://uscenterforsafesport.org/wp-content/uploads/2020/09/FINAL-2022-MAAPP-9.21.pdf

U.S. Department of Education. (2011). *Creating equal opportunities for children and youth with disabilities to participate in physical education and extracurricular athletics*. Office of Special Education and Rehabilitative Services. Office of Special Education Programs.

U.S. Department of Education. (2021a). *Equity in Athletics Disclosure data analysis*. Office of Postsecondary Education. https://ope.ed.gov/athletics/

U.S. Department of Education. (2021b, June 22). Enforcement of Title IX of the Education Amendments of 1972 with respect to discrimination based on sexual orientation and gender identity in light of *Bostock v. Clayton County*, 86 FR 32637. *Federal Register*. https://www.federalregister.gov/documents/2021/06/22/2021-13058/enforcement-of-title-ix-of-the-education-amendments-of-1972-with-respect-to-discrimination-based-on

U.S. Department of Education. (2022a). *Equity in Athletics Disclosure data analysis*. Office of Postsecondary Education. https://ope.ed.gov/athletics/

U.S. Department of Education. (2022b, February 2). *Report on pending cases currently under investigation at elementary-secondary and post-secondary schools*. https://www2.ed.gov/print/about/offices/list/ocr/docs/investigations/open-investigations/tix.html#

U.S. Government Accountability Office. (2010). *Students with disabilities: More information and guidance could improve opportunities in physical education and athletics*. https://www.gao.gov/assets/gao-10-519.pdf

Veliz, P., Snyder, M., & Sabo, D. (2019). *The state of high school sports in America: An evaluation of the nation's most popular extracurricular activity*. Women's Sports Foundation.

Walton, D. R., Lower-Hoppe, L., & Horger, M. (2020). Do esports classify as an intercollegiate sport? Legal analysis of Title IX. *Journal of Issues in Intercollegiate Athletics, 13*, 94–118. http://csri-jiia.org/wp-content/uploads/2020/04/RA_2020_05.pdf

Wang, F. (2014, November 24). *Hawaii's Patsy Mink honored with the Presidential Medal of Freedom*. NBC.com. https://www.nbcnews.com/news/asian-america/hawaiis-patsy-mink-honored-presidential-medal-freedom-n248951

Ware, S. (2011). *Title IX: A brief history with documents*. Waveland Press, Inc.

Webster, K. (2020). *To what extent did Title IX create equality within athletics: Analyzing female athletic participation in high school institutions* [Unpublished senior thesis]. Bemidji State University. https://www.bemidjistate.edu/academics/departments/political-science/wp-content/uploads/sites/40/2020/06/2695429-12052336-Kellyn-Webster-May-3-2020-624-PM-Final-Thesis.pdf

Weight, E., & Staurowsky, E. J. (2014). Title IX literacy among NCAA administrators & coaches: A critical communications approach. *International Journal of Sport Management, 3*, 257–285.



Wilson, A. (2017). *45 years of Title IX: The status of women in intercollegiate athletics*. National Collegiate Athletic Association. http://www. ncaa.org/sites/default/files/TitleIX45-295-FINAL_ WEB.pdf

WNBA (2020). *WNBA announces a 2020 season dedicated to social justice*. https://www.wnba.com/news/wnba-announces-a-2020-season-dedicated-to-social-justice/

Yiamouyiannis, A., & Hawes, K. (2015). Title IX and intercollegiate athletics: An analysis of EADA data on student enrollment, sport participation and scholarship allocation. *Women in Sport and Physical Activity Journal, 23*(1), 26-33. https://journals.humankinetics.com/view/journals/wspaj/23/1/article-p26.xml

Zarrett, N., Veliz, P. T., & Sabo, D. (2020). *Keeping girls in the game: Factors that influence sport participation*. Women's Sports Foundation.

Zboraj, M. (2021, July 1). *GoPuff offers student-athletes their 1st endorsement deal*. ProgressiveGrocer.com. https://progressivegrocer.com/gopuff-offers-student-athletes-their-1st-endorsement-deal

Zullo, R. (2018). Sports marketing and publicity efforts Division II intercollegiate athletics. *The Sport Journal, 24*, 21. https://thesportjournal.org/article/sports-marketing-publicity-efforts-in-division-ii-intercollegiate-athletics/



# Imagine what the next 50 years will bring.
## WSF salutes Title IX.






**Find us here**
Women's Sports Foundation
247 W 30th Street, 5th Floor
New York, NY 10001
800.227.3988

WomensSportsFoundation.org

Keep being inspired

