# EXHIBIT 53

NEWS

# Hundreds of Colleges May Be Out of Compliance With Title IX. Here's Why.

By Wesley Jenkins

OCTOBER 23, 2019



ARDEN BARNES

**Lisa Niblock is one of two students suing the U. of Kentucky for not providing women with athletics opportunities proportionate to those it gives men.**

Lisa Niblock had no intention of suing the University of Kentucky when she transferred there two years ago. She just wanted to be closer to home and surrounded by classmates at a bigger school with a bigger atmosphere. Then Suzie Stammer approached her.

https://www.chronicle.com/article/hundreds-of-colleges-may-be-out-of-compliance-with-title-ix-heres-why/

Stammer had coached varsity field hockey for the university in the mid-1970s after the federal law known as Title IX compelled Kentucky and other colleges to provide women with the same intercollegiate sports opportunities as men. But by 1979, the university had demoted the team back to club status, and it has shown no willingness to reverse that decision since.

When members of the club team, advised by Stammer, asked Kentucky officials to elevate their sport to varsity status, they were told that a survey the university conducted last year showed there wasn't enough interest among students. For field hockey to be reinstated as a varsity sport, a student would have to sue, but no one was stepping forward.

# There are these instances, and Kentucky is one of them, how in certain spaces we're still not that far from where we were in 1972.

Stammer used to officiate at field hockey and lacrosse games in Louisville, Ky., when Niblock was a high-school athlete there. The two became reacquainted when Niblock transferred to Kentucky after spending her freshman year at Furman University playing lacrosse. Stammer thought Niblock could be a good candidate to bring the lawsuit, so she made the case.

On September 25, Niblock, along with Meredith Newman, a junior triathlete, filed [a federal lawsuit](#) accusing Kentucky of discriminating against female athletes. (Through her lawyer, Newman declined to comment for this article.)

Their case rests on the freely available [Equity in Athletics data,](#) which show that in 2017, women at Kentucky had 183 fewer participation opportunities in varsity athletics than men, proportionate to their respective enrollments. Stammer and Niblock aren't alleging that the university is unfairly cutting women's sports, as St. Cloud and Eastern Michigan Universities are accused of doing. Nor are they claiming that Kentucky is improperly counting athletes, as complaints against the University of Washington and Oregon State University claim. They are suing because Kentucky's numbers aren't where they are supposed to be, according to a key test laid out by Title IX.

https://www.chronicle.com/article/hundreds-of-colleges-may-be-out-of-compliance-with-title-ix-heres-why/

"It's 47 years later and you can understand the frustration of young women across the country who are saying: Why aren't you in compliance?" said Neena Chaudhry, general counsel at the National Women's Law Center.

Kentucky is not alone in being out of compliance with Title IX's "substantial proportionality" standard. In fact, it isn't even the most egregious offender in its own conference, according to the 2017 numbers.

# It's 47 years later and you can understand the frustration of young women across the country who are saying: Why aren't you in compliance?

The University of Florida lacked 202 participation opportunities, ranking as the 39th worst mark. Of the 348 NCAA Division I colleges listed in 2017, Kentucky's proportional participation of female athletes ranks as the 53rd worst. Niblock's former university, Furman, ranks 14th. And of those Division I schools, 201 are most likely out of compliance. In fact, of all the 1,085 institutions governed by the National Collegiate Athletic Association, 815 are probably out of compliance.

For many of the institutions at the top of the list, the heavy skew of female enrollment in recent years has made achieving proportionality a near impossibility. The University of North Carolina at Chapel Hill, which is the sixth worst on the list, offers 15 women's sports and had 402 female athletes in 2017, but its 60 percent female enrollment still left it 313 participation opportunities short.

"I don't think there's enough NCAA sports for us to add enough sports to get to proportional," said Lawrence R. (Bubba) Cunningham, athletic director at North Carolina. "So that's the good thing about the Office for Civil Rights and Title IX, it gives you three ways to comply."

The first way, substantial proportionality, Cunningham said, is "out of reach" for North Carolina. Under the second way, colleges must show a history of expanding opportunities for the underrepresented sex.

https://www.chronicle.com/article/hundreds-of-colleges-may-be-out-of-compliance-with-title-ix-heres-why/

Cunningham said North Carolina strives instead to satisfy the third option set forth in Title IX's three-prong "participation requirement" test: It tries to fully meet the demonstrated interest of the underrepresented sex. While North Carolina works hard to meet that third prong, many other colleges on the list might lack the resources to do so.

In theory, the Office for Civil Rights is in charge of ensuring that colleges meet Title IX's equal-opportunity guidelines for athletics. But with the current focus on battling sexual misconduct on campuses, that office has shown little interest in holding universities accountable for gender inequity in athletics.

The Kentucky lawsuit shows how the onus has fallen on the individual students to force their institutions into compliance. And according to Stammer, other colleges should be prepared, because if Lisa Niblock's lawsuit is successful, many more could follow.

**The Three-Prong Test Is Born**

Title IX was signed into law in 1972, but the provisions on varsity athletics came later. When the regulations for equal opportunity in athletics were drafted in 1974, the initial proposal called for direct proportionality. That standard didn't last.

Ultimately, the three-prong test was introduced, but its viability to enforce compliance wasn't weighed by the courts until the early 1990s. Cases like *Roberts v. Colorado State Board of Agriculture* and *Cook v. Colgate University* came early in the decade and showed that the courts were willing to rule against colleges that were not meeting compliance standards. But the seminal case of the era was decided in 1996.

https://www.chronicle.com/article/hundreds-of-colleges-may-be-out-of-compliance-with-title-ix-heres-why/



ARDEN BARNES

**Suzie Stammer (left) coached varsity field hockey at the U. of Kentucky in the 1970s. But in 1979, the sport was demoted to club status. Now Stammer has enlisted Lisa Niblock and another student to file a Title IX lawsuit against the university in hopes of forcing it to restore field hockey to varsity status.**

*Cohen v. Brown* originated when nine female athletes sued Brown University in April 1992 for downgrading the funding of the women's volleyball and gymnastics teams to donor-funded programs. With the change, the university was not Title IX compliant, the athletes argued.

U.S. District Court Judge Raymond J. Pettine agreed. "Title IX does not require an institution to provide any athletics opportunities to its students," the judge wrote in his 1996 decision. "What it does require is that an institution provide equal opportunity to both genders in any program it chooses to offer."

Defining Title IX athletic compliance standards became a priority for the Bill Clinton and George W. Bush presidential administrations, "albeit in different directions," said Welch Suggs, author of *A Place on the Team: The Triumph and Tragedy of Title*

https://www.chronicle.com/article/hundreds-of-colleges-may-be-out-of-compliance-with-title-ix-heres-why/

*IX,* and an associate professor of journalism and mass communications at the University of Georgia.

Partially in response to the *Cohen v. Brown* decision, the Office for Civil Rights sent a "Dear Colleague" letter to colleges in January 1996, clarifying the three-part test for proportional participation.

As part of the clarification, the Office for Civil Rights set the standard that to satisfy the first prong, the difference in participation opportunities must "not be sufficient to sustain a viable team." That is, if a college added a team for the underrepresented sex, the disparity would flip. The largest women's varsity team roster size for all divisions in 2018 was rowing, with the median team comprising 31.3 participants. Rounding up, that means that any university with a participation opportunity disparity of 33 or larger is out of compliance with prong one. And that's the most generous reading. Universities that already have a women's rowing team are then measured by the median size of the teams they don't have. Most teams have 10 to 25 athletes.

But universities can remain in compliance by meeting one of the other two tests. That's why those prongs exist. When the original legislation was drafted, colleges expected to remain out of compliance, according to Scott Schneider, a lawyer and expert on Title IX. Prongs two and three, he said, were introduced to give institutions some leeway.

The idea behind prong two is simple: As long as they are working toward compliance they meet the spirit of the law. Except, if universities have relied on prong two and truly have demonstrated a history of expansion, then at some point in the decades since Title IX became law, they should have hit proportionality.

"Basically, no school can meet prong two," Chaudhry said. "If you're not meeting prong one, then really it's about prong three, which is showing you're fully accommodating the interests and abilities of your female students."

That third prong can give universities cover. Victoria Jackson, a sports historian and clinical assistant professor of history at Arizona State University, calls it the "political prong," subject to fluctuation based on the party in charge. "In an Obama White House, it's hard to use the third prong," Jackson said. But with Betsy DeVos as education secretary, "it looks like you can use the third prong in ways that don't get to the intent or heart of the law."

https://www.chronicle.com/article/hundreds-of-colleges-may-be-out-of-compliance-with-title-ix-heres-why/

To defend against Lisa Niblock's lawsuit, the University of Kentucky will most likely rely on prong three. "With 22 sports, UK has the broadest-based athletics program in the Southeastern Conference," Jay Blanton, a university spokesman, said in a statement. "Based on our surveys of our students, the current sports offerings fully accommodate the interests and abilities of our undergraduate students."

**The Problem With Surveys**

Surveys as a measure for prong-three compliance have long been a source of contention. *Cohen v. Brown*'s full accommodation clause said universities must "fully" meet demonstrated interest and abilities, which is "a much taller task than just doing a survey," said Suggs, who is a former senior editor at *The Chronicle*. In fact, in 2005, the Office for Civil Rights introduced a template for a "model survey" for institutions to ensure compliance but then scrapped it five years later. The 2005 clarification also put the burden of proof for compliance on OCR or the students themselves, not the universities, and set the standard for noncompliance as "a preponderance of evidence."

Kentucky's 2018 athletics-interest survey begins by asking students to mark which Kentucky sporting events they attend or watch. Men's and women's sports are delineated. It asks how many hours students spend attending and watching the events before asking, "Why don't you attend UK varsity sports events?" Only after that does the survey offer a "Varsity interest check." Students can mark any sports they would be interested in, and depending on the sports chosen, some follow-up questions appear.

For lacrosse, the survey asks respondents if they believe they could play the sport at a Division I level. It then asks them to objectively demonstrate their ability. Respondents can accomplish that through recruitment experiences (they were recruited by a Division I school to play lacrosse); credentials (they were named a United States Lacrosse All-American); and skills (they can run a mile in under five minutes).

Lastly, the survey asks respondents about various varsity agreements. Would they still compete without scholarships? Would they submit to random drug testing and social-media monitoring? Would they adhere to curfews and nutritional programs and marketing commitments and practice schedules up to 20 hours per week in-season?

https://www.chronicle.com/article/hundreds-of-colleges-may-be-out-of-compliance-with-title-ix-heres-why/

The survey showed that 81 students expressed interest in creating a varsity women's lacrosse team, well above the average roster size of 23.4. But Kentucky deemed that only one respondent had the ability, according to the "objective criteria." And none were willing to accept the restrictions.

Kentucky argues that the survey proves it meets demonstrated interest. Jill Zwagerman, Niblock's lawyer, and Suggs say the methodology is flawed. "It's a self-selected sample," Suggs said. "If someone was recruited to play lax at another school, they would probably be there."

Cheryl Cooky, an associate professor at Purdue University who studies the cultural impact of gender inequality in sports, said that regardless of the methodology, the survey itself doesn't reflect the intent of the law. "I imagine those who drafted the three prongs of compliance were not anticipating or envisioning institutions asking for specific performance requirements," she said. Ability, in the spirit of the law, does not mean competing at the highest possible level, she added.

When the Office for Civil Rights revoked the model survey in 2010, it said it would evaluate a multitude of factors to assess demonstrated interest instead. One of the factors considered: "Requests for the elevation of an existing club sport to intercollegiate status."

**An Influx of Women**

Under the Obama White House, the focus of Title IX enforcement strayed from athletics opportunities to inquiries into sexual harassment and sexual assault. That priority has remained under the Trump administration, though as Suggs said of the Clinton and Bush presidencies, "albeit in a different direction."

American college campuses flipped from majority-male enrollment to majority female about 40 years ago. Even though women make up more than 55 percent of college enrollments nationwide, their athletics-participation opportunities have stagnated around 42 percent, according to Suggs. Football programs contribute to that. With no women's sport that has an equivalent roster size, it becomes more difficult for football-supporting institutions to also field women's opportunities proportionate to men's.

https://www.chronicle.com/article/hundreds-of-colleges-may-be-out-of-compliance-with-title-ix-heres-why/

"The cultural consequence of that is that it continues to send subtle and not-so-subtle messages to women that their participation is a lower priority," said Cooky. "There are these instances, and Kentucky is one of them, how in certain spaces we're still not that far from where we were in 1972."

Institutions like North Carolina have the resources to support as many women's teams as possible, even if it doesn't bring them much closer to proportionality. North Carolina has the 10th-most female athletes out of all Division I schools despite being the sixth-worst in terms of proportional participation opportunities. By comparison, Kentucky is 149th in the number of female athletes.

Instead of working to address participation inequality in sports, universities assume they'll get away with noncompliance until somebody sues or files a complaint, said Chaudhry. The incentive is for colleges to keep the status quo, said Cooky, and "hope, fingers crossed, that a couple of really brave students don't come forward with a lawsuit." And in recent years, colleges haven't had much to worry about.

The politicization of civil rights means that students are the main line of defense for equal opportunities under Title IX. But it's extremely difficult for individual students or a group of students to bring suits. For one, the process generally lasts years, with the students never actually getting to enjoy the fruits of their labor. And colleges generally have more than enough resources to fight it, according to Donna Lopiano, a former gender-equity consultant to the Office for Civil Rights. "Unless you have deep pockets to sue," she said, "there's a power imbalance there."

Usually, the lawsuits come about when a university has cut a sport and the athletes have already lost their chance to play, Lopiano said. And Lisa Niblock is no different. As a senior, she has already given up her dream of playing collegiate lacrosse. She just got her certificate to officiate collegiate lacrosse games, and that's enough to satisfy her passion for the sport.

But with the lawsuit, she's not worried about the timeline or the potential cost; she's thinking of all the women who want to compete in varsity athletics at Kentucky in the future.

Stammer's fight to bring field hockey back to varsity status ultimately hinged on persuading a 21-year-old college senior to file a federal lawsuit. And with the Department of Education allowing hundreds of colleges to remain out of compliance, enforcing equal participation in athletics falls to those 18- to 22-years-olds across the

https://www.chronicle.com/article/hundreds-of-colleges-may-be-out-of-compliance-with-title-ix-heres-why/

country. Stammer has also started a GoFundMe to finance other lawsuits if students want to hold their colleges accountable.

"It has to be student-driven," Stammer said. "You have to find a certain type of individual like Lisa Niblock who sees the disparity and has the courage and the strength and the tenacity to say I'm going to do something about it."

*Wesley Jenkins is an editorial intern at* The Chronicle. *Follow him on Twitter [@_wesjenks](#), or email him at [wjenkins@chronicle.com](#).*

*A version of this article appeared in the [November 8, 2019, issue](#).*

*We welcome your thoughts and questions about this article. Please [email the editors](#) or [submit a letter](#) for publication.*

https://www.chronicle.com/article/hundreds-of-colleges-may-be-out-of-compliance-with-title-ix-heres-why/