Redline of Second Consolidated Amended Complaint

# EXHIBIT 2

Steve W. Berman (*pro hac vice*)
Emilee N. Sisco (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
emilees@hbsslaw.com

Benjamin J. Siegel (SBN 256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
bens@hbsslaw.com

~~Steve W. Berman (*pro hac vice*)~~
~~Emilee N. Sisco (*pro hac vice*)~~
~~HAGENS BERMAN SOBOL SHAPIRO LLP~~
~~1301 Second Avenue, Suite 2000~~
~~Seattle, WA 98101~~
~~Telephone: (206) 623-7292~~
~~Facsimile: (206) 623-0594~~
~~steve@hbsslaw.com~~
~~emilees@hbsslaw.com~~

Jeffrey L. Kessler (*pro hac vice*)
David G. Feher (*pro hac vice*)
David L. Greenspan (*pro hac vice*) Adam I. Dale (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4698
Facsimile: (212) 294-4700
jkessler@winston.com
dfeher@winston.com
dgreenspan@winston.com
aidale@winston.com

Jeanifer E. Parsigian (SBN 289001) WINSTON & STRAWN LLP 101 California Street, 34th Floor San Francisco, CA 94111 Telephone: (415) 591-1000 Facsimile: (415) 591-1400 jparsigian@winston.com

*Counsel for Plaintiffs and the ~~Proposed~~ Classes*

[Additional counsel on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| GRANT HOUSE, TYMIR OLIVER, DEWAYNE CARTER, NYA HARRISON, and SEDONA PRINCE, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br>v.<br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION; PAC-12 CONFERENCE; THE BIG TEN CONFERENCE, INC.; THE BIG 12 CONFERENCE, INC.; SOUTHEASTERN CONFERENCE; and ATLANTIC COAST CONFERENCE,<br>~~IN RE COLLEGE ATHLETE NIL LITIGATION~~Defendants | No. 4:20-cv-03919 CW<br><br>SECOND CONSOLIDATED AMENDED COMPLAINT<br><br>CLASS ACTION<br><br>**DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

<u>Page</u>

I.      INTRODUCTION .................................................................................................. 1

II.     JURISDICTION AND VENUE ........................................................................... ~~17~~5

III.    PARTIES ............................................................................................................. ~~18~~6

        A.      Plaintiffs ................................................................................................. ~~18~~6

                1.      Grant House ................................................................................. ~~18~~6

                2.      Sedona Prince ............................................................................. ~~21~~10

                3.      Tymir Oliver ............................................................................... ~~24~~13

                4.      DeWayne Carter .......................................................................... 15

                5.      Nya Harrison ............................................................................... 18

        B.      Defendants ............................................................................................. ~~26~~20

        C.      Co-Conspirators .................................................................................... ~~30~~24

IV.     THE ILLEGAL AGREEMENTS TO RESTRAIN COMPETITION ................ ~~30~~24

        A.      NCAA NIL-Specific Compensation Rules ........................................... 26

        B.      NCAA Compensation Rules ................................................................... 28

        C.      NCAA Scholarship Limits ..................................................................... 30

        D.      Conference Rules ................................................................................... 30

V.      RELEVANT MARKETS ................................................................................... ~~33~~32

VI.     FACTUAL ALLEGATIONS .............................................................................. ~~41~~36

        A.      An Overview of the NCAA ................................................................... ~~41~~36

                1.      History and Purpose ................................................................... ~~41~~36

                2.      Governance Structure ................................................................. ~~42~~37

                3.      Bylaws and Enforcement ........................................................... ~~44~~39

B.     The commercial nature of Division I sports ................................ ~~47~~42

C.     The NCAA's history of antitrust violations ................................ ~~62~~56

D.     The Supreme Court's *Alston* decision, this Court's motion to dismiss ~~order~~and class certification orders, and state laws result in the NCAA and

Conference Defendants' interim suspension of many of their NIL restraints. .................................................................. ~~65~~60

E.   The challenged restraints are not necessary to serve any purported procompetitive purpose. ........................................... ~~67~~62

1.   Any procompetitive justification based on consumer demand for college sports is legally irrelevant because it concerns an entirely different market. ................................................... ~~67~~62

2.   Even if effects on consumer demand in output markets were relevant, the restraints at issue are not necessary to preserve consumer demand for college sports. .................................... ~~68~~63

3.   Education and ~~NIL~~ compensation are not mutually exclusive. .......... ~~75~~ 69

4.   ~~The NIL~~ NCAA compensation restrictions do not prevent exploitation—
they are exploitative. .......... ~~77~~ 71

5.   Female Athletes Have Been Especially Adversely Impacted by
NIL Restrictions and Will Profit in the New NIL Era .......... ~~78~~ 72

6.   The challenged restraints cannot be justified by the purported
need to cross-subsidize non-revenue sports. .......... 73

F.   There is significant support for allowing athletes to receive NIL
compensation and Plaintiffs have been damaged by Defendants'
anticompetitive restraints .......... ~~79~~ 74

~~1.   California Fair Pay to Play Act and subsequent state legislation. .......... 80~~

~~2~~1.   The NCAA and its members have made numerous
statements
supporting NIL compensation, in a stark departure from
previous positions taken before federal courts. .......... ~~81~~ 74

~~3~~2.   Statements from the Knight Commission on Intercollegiate
Athletics. .......... ~~91~~ 84

~~4~~3.   The NCAA has made exceptions for several years that have
allowed some athletes to profit from the value of their NILs .......... ~~92~~ 85

~~5~~4.   NCAA Division I athletes have sought the ability to compete
without anticompetitive restraint in the ~~market for NIL
payments~~ labor markets, and would receive such compensation
absent Defendants' unlawful
restraints. .......... ~~93~~ 86

~~6~~5.   Corporate sponsors value student-athlete NILs~~,~~ and would
compete for the rights to use Plaintiffs' NILs absent
Defendants' anticompetitive restraints. .......... ~~98~~ 91

~~7~~6.   When The NAIA Withdrew NIL Restrictions, Athletes
Prospered Financially and Academically. .......... ~~101~~ 93

VII. CLASS ALLEGATIONS .......... ~~102~~ 94

VIII. ANTITRUST ALLEGATIONS .......... ~~106~~ 99

IX.    CAUSES OF ACTION......................................................................................107100

       FIRST CLAIM FOR RELIEF VIOLATION OF SECTION 1 OF THE SHERMAN
       ACT—15 U.S.C. § 1 UNREASONABLE RESTRAINT OF TRADE...............................107

SECOND CLAIM FOR RELIEF—VIOLATION OF SECTION 1 OF THE
    SHERMAN ACT—15 U.S.C. § 1 UNREASONABLE RESTRAINT
    OF
    TRADE—GROUP BOYCOTT / REFUSAL TO DEAL .................................................... 109

THIRD CLAIM FOR RELIEF  UNJUST ENRICHMENT .......................... 111

X.      REQUEST FOR RELIEF ....................................................... 111103

XI.     JURY DEMAND ................................................................... 112104

For their Second Consolidated Amended Complaint ("Complaint") against Defendants National Collegiate Athletic Association ("NCAA"), Pac-12 Conference ("Pac-12"), Big Ten Conference ("Big Ten"), Big Twelve Conference ("Big 12"), Southeastern Conference ("SEC"), and Atlantic Coast Conference ("ACC"), Plaintiffs, on their own behalf and on behalf of all others similarly situated, allege as follows:

## I.     INTRODUCTION

1.     ~~4.34 million people were watching when the left sneaker of college basketball's biggest star split open on national television in the opening minutes of a 2019 game between archrivals Duke and the University of North Carolina. In that moment, the true nature of big-time college sports—and the powerful commercial influences that surround them—were laid bare. Zion Williamson, a Duke freshman and future number one pick in the 2019 NBA draft, suffered a knee sprain that forced him to the sidelines and sparked immediate speculation about whether the injury would end his career. By the following day, Nike, the manufacturer of the shoe Williamson was wearing, had suffered a $1.1 billion decline in its stock market value that analysts attributed directly to the incident.~~

2.     ~~Williamson wore Nikes because Duke has a multi-million dollar sponsorship contract with the company that requires the school's athletes to wear Nike apparel during all competitions. But, while the value of this lucrative deal is directly related to and derived from the commercial benefits that Nike gains by associating its products with college athletes—particularly star players like Williamson—Williamson himself earned nothing from the arrangement because the NCAA with the cooperation and agreement of the Conference Defendants and others, have prohibited all Division I athletes from being compensated for the commercial use of their names, images, and likenesses ("NILs"). As explained below, absent Defendants' restraints on student-athletes' NIL rights, Williamson and tens of thousands of other Division I athletes would have secured NIL compensation.~~

~~3~~1.     The hard work of college athletes has translated into billion-dollar television deals, ~~multi-million dollar~~multi-million-dollar coaching salaries, extravagant facilities, and lucrative commercial licensing and sponsorship agreements that greatly benefit the NCAA and its member conferences and schools as

well as NCAA executives, conference administrators, and college coaches. For those in positions of power at the NCAA or a Division I conference or school, the college sports industry has become immensely profitable. ~~The median salary for an athletic director at a Division I institution is now over $500,000 a year. More than 150 football and~~Indeed, each of the Power Five (or "P5") Conference commissioners are making more than $2.5 million annually, with the highest paid—former Big Ten commissioner, Jim Delany—reportedly earning $10.3 million in his final year at the conference.[1] The salaries for the top head coaches in FBS football and Division I men's basketball ~~coaches at Division I schools earn over~~exceed $~~1~~11 million per year, ~~with the top 25 football coaches earning an average of $5.2 million annually, and the top 25 basketball coaches earning an average of $3.2 million annually. In 2019, ten NCAA employees made over $550,000, three made over $1 million, and NCAA President Mark Emmert made $2.9 million in compensation working for this private, non-profit organization.~~[1][2] and compensation packages for the top head coaches in Division I women's basketball exceed $3 million per year.[3] This compensation continues to rise, with salaries for coaches in the Power Five Conferences increasing in 2023 by a "whopping 14.3% . . . from 2022."[4] The head football or basketball coach is the highest-paid public employee in states throughout the country, dwarfing the

---

[1] Zach Barnett, *Here's how much each Power 5 conference raked in last year*, Footballscoop (July 10, 2020), https://footballscoop.com/news/heres-how-much-each-power-5-conference-raked-in-last-year.

[2] Amanda Christovich and Doug Greenberg, *Who Is Highest-Paid Coach in College Football?*, Front Office Sports (October 4, 2023), https://frontofficesports.com/who-are-highest-paid-college-football-coaches/.

[3] Greg Lee and Amanda Christovich, *Who Is The Highest-Paid Women's College Basketball Coach?*, (November 6, 2023), https://frontofficesports.com/who-is-the-highest-paid-womens-college-basketball-coach/.

[4] Tom Schad and Steve Berkowitz, *Why College Football is King in Coaching Pay–Evenat Blue Blood Basketball Schools*, USA Today (October 3, 2023), https://www.usatoday.com/story/sports/ncaaf/2023/10/03/college-football-coach-pay-is-soaring-even-at-basketball-schools/70924373007/.

salaries of college presidents and all other state employees.[5] The profligate spending on coaches is exemplified by the fact that Texas A&M University went so far as to—when firing its head football coach, Jimbo Fisher, in November 2023—agree to pay Fisher more than *$76 million* to buy out the remainder of his contract.[6] In other words, they are paying him $76 million to *not* coach.

2.      This spending on coaches and athletic directors and conference commissioners has no end. A September 2023 report from the Knight Commission on Intercollegiate Athletics contains a financial analysis from CliftonLarsonAllen (CLA), which has projected that within ten years, P5 public institutions' spending on football coaches ($1.363 billion) would virtually equal the spending on athletic scholarships and medical expenses for *all athletes* across *all sports* at those same schools ($1.372 billion).[7]

3.      Although student-athletes provide their labor to fuel the industry, and they are the individuals whose athleticism, hard work, and character make college sports so popular, these same young men and women have received only a tiny fraction of the revenues they generate, while facing severe penalties for failing to abide by a labyrinth of rules that restrict meaningful financial participation in the Division I football/basketball financial juggernaut and restrict for all athletes, in whole or now in part, the compensation they may receive from their schools, conferences, or third parties for their athletic services and the use of their "NIL." [8]

4.      Through its Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports, including the conduct of schools, conferences, third-party business partners, and student-athletes. Among the many areas that the NCAA regulates are the compensation and benefits that athletes may receive while participating in college sports. At

---

[5] Charlotte Gibson, *Who's Highest-Paid in Your State?*, ESPN (last accessed on November 30, 2023). https://www.espn.com/espn/feature/story/_/id/28261213/dabo-swinney-ed-orgeron-highest-paid-state-employee.

[6] Pete Thamel, *Jimbo Fisher Fired by Texas A&M, to Receive Record Buyout*, ESPN (Nov. 12, 2023), https://www.espn.com/college-football/story/_/id/38880082/jimbo-fisher-expected-fired-texas-sources-confirm.

[7] Financial Projections Through 2032 For Division I FBS Programs, https://www.knightcommission.org/wp-content/uploads/2023/09/cla_financial_projections_report_2023.pdf, at p. 2.

[8] "NIL" refers to name, image and likeness.

various points in time, the NCAA has claimed that these rules are necessary to promote the NCAA's principle of "amateurism" and to preserve "a clear line of demarcation between intercollegiate athletics and professional sports"—a demarcation that applies only to athletes and not to coaches or administrators or schools or even to non-athlete college students.

5.     In addition, in the name of "cost containment," the NCAA also regulates the number of players in a sport who may receive athletic scholarships (in so-called "counter sports"), or the overall scholarship amount available in a sport (in so-called "equivalency sports"). Therefore, the NCAA rules deny scholarships to Division I athletes who would otherwise be offered scholarships but for the restraints of trade imposed by the scholarship restrictions. Had the NCAA and Division I members not agreed to impose the scholarship restraints, free and open competition to provide additional scholarships would have occurred.

5.     At issue in this Complaint are a particular subset of the NCAA's rules that have prohibited student-athletes from receiving anything of value in exchange for the commercial use of

---

1 *See* Steve Berkowitz, *NCAA president Mark Emmert credited with $2.9 million in total pay for 2019 calendar year*, July 19, 2021, USAToday.com, https://www.usatoday.com/story/sports/college/2021/07/19/ncaa-mark-emmert-total-pay-2019/8015855002/ (last visited July 25, 2021).

2 "NIL" refers to name, image and likeness.

their NILs. As explained in more detail below, after a series of legal setbacks, including in this litigation, the NCAA recently adopted a new, "interim" NIL policy to voluntarily and temporarily "suspend" enforcement of most (but not all) of these NIL rules, effective July 1, 2021. But none of the NIL rules have been repealed, and the NCAA freely admits that the changes are not intended to be permanent because, according to the NCAA, "the current legal and legislative landscape prevents a permanent solution at this time."[3] Moreover, even under its interim policy, the NCAA has not suspended enforcement of critical aspects of its NIL restraints, including those restraints prohibiting NCAA institutions from compensating student-athletes for use of their NILs, as well as restraints prohibiting NIL compensation from being contingent upon athletic participation or performance, or enrollment at a particular school. All of Defendants' NCAA NIL restraints are unreasonable restraints of trade, are unjustified, and should be enjoined. And the interim rules permitting many forms of NIL compensation from third parties (but not the schools themselves) were not in place for most of the Class period, during which class members would have been paid for their NIL rights absent the rules that were in place at that time.

6.      The NCAA proclaims that its overarching purpose is "to create a safe, and equitable environment that allows student-athletes to reach their full potential in academics, athletics and life," and that it is "united around one goal: creating opportunities for college athletes." The NCAA further purports to protect college athletes from commercial exploitation, yet it has conspired to create an anticompetitive market where student-athletes have been unable to benefit from the same opportunities that are available to their fellow classmates and powerless to realize the commercial value of available for their own athletic services and NILs. These young men and women—often from socio-economically disadvantaged backgrounds—are deprived of the economic and other benefits that the market would pay to use their NIL in an open and unrestrained market.

[3] *See Name | Image | Likeness Quick Guide to New NCAA Interim Policy*, ncaa.org, July 2021, https://ncaaorg.s3.amazonaws.com/ncaa/NIL/NIL_QuickGuideToNewPolicy.pdf (last visited July 25, 2021).

[1] *Name, Image and Likeness Policy Question and Answer*, ncaa.org, July 2021, https://ncaaorg.s3.amazonaws.com/ncaa/NIL/NIL_QandA.pdf (last visited July 25, 2021).

7.      And, despite the NCAA's capacity and willingness to enforce rule violations against athletes, it has failed since its inception to effectively and consistently police exploitative outside influences. Indeed, it is clear that the NCAA has no desire to pass any rules that would threaten the financial rewards the current system heaps upon its many non-student-athlete beneficiaries. Only under the most intense public and legal pressure has the NCAA adopted a non-permanent, "interim" policy change that has, at long last, permitted many forms of third party NIL compensation to student-athletes to take place (but only since July 1, 2021). Notably absent from the NCAA bylaws is any proscription or limitation on the amount of money that large corporate interests can pour into college sports and university athletic programs, and companies take advantage of the opportunity to derive immense profits by associating their brands with talented Division I athletes. Though the NCAA concedes that "corporations are willing to pay premium prices for the opportunity to put their products before the eyes of an enormous audience,"[5] and despite its purported commitment to protect student-athletes from "exploitation by professional and commercial enterprises," it has failed to implement any meaningful restrictions on corporate interests and payments *other than* to restrict NIL payments to college athletes. Moreover, because the NCAA lacks jurisdiction to regulate agents or third parties directly, any penalties it imposes for rule violations fall disproportionately on student-athletes.

8.      With so many cameras pointed at student-athletes and the inability to deal directly with the athletes, companies have instead entered into sponsorship and endorsement deals with the NCAA, conferences, schools, and coaches. As of 2019, Nike, Adidas, and Under Armor had exclusive rights to outfit 97 percent of all Division I football and basketball programs. Schools and coaches derive millions of dollars each year in income and non-cash benefits from these deals and college athletic programs have become defined by the apparel company that outfits their teams.

9.      The NCAA, conferences, and schools also promote themselves and their athletic programs via social media such as Instagram and Twitter, and have their athletes participate in social

[5] NCAA Task Force on Commercial Activity in Division I Intercollegiate Athletics, Final Report Supplement No. 6 (2009).

media blitzes for the commercial benefit of the NCAA and its members. Coaches and others associated with college athletic programs also reap the financial rewards of payments from social media companies and other lucrative aspects of the online economy. Yet, the NCAA's NIL restrictions have, up until July 1, 2021, barred student-athletes from commercially benefitting from their postings on social media, despite the fact that other college students are able to commercially benefit from social media opportunities and many do. There is no legal or economic reason why college athletes should not be permanently freed from any NCAA rules that prevent them from commercially benefitting from their names, images, and likenesses and participating in a free market for use of those NILs. The NCAA's recent about-face to suspend many of these restrictions on an "interim" basis demonstrates, conclusively, that there is no procompetitive justification for their imposition.

10.    Every person has a property interest in his or her public personality and should have the sole right to benefit from and restrict its commercial use. NCAA Executive Vice President of Regulatory Affairs, Oliver Luck, acknowledged as much as far back as the 2015 NCAA Convention, stating that "the name, image, likeness for an individual is a fundamental right—that any individual controls his or her name, image and likeness—and I don't believe that a student-athlete who accepts a grant-in-aid simply waives that right to his or her name, image, likeness."[6]

~~11~~7.    ~~Notwithstanding the existence of this right and its accompanying economic value, the~~ The NCAA and its members have committed violations of the federal antitrust laws and common law by engaging in an overarching conspiracy to: (a) fix the amount that student-athletes may be paid for the licensing, use, and sale of their names, images, and likenesses— at zero; ~~and~~ (b) foreclose student-athletes from the market for licensing, use, and sale of their names, images, and likenesses entirely; (c) fix the amount that student-athletes may be paid for their athletic services at no more than the value of a scholarship; and (d) limit the quantity of athletic scholarships available in the market for student-athletes' labor services. In addition to violating the antitrust laws, ~~Defendants have also unjustly enriched themselves and their for-profit business partners while causing extensive damage to the student-athletes.~~

---

[6] Steve Berkowitz, *Oliver Luck Brings Own Perspective to NCAA on O'Bannon Name and Likeness Issue*. USAToday.com, Jan. 16, 2015, https://www.usatoday.com/story/sports/college/2015/01/16/ncaa-convention-oliver-luck-obannon-name-and-likeness-court-case/21873331/ (last visited July 25, 2021).

12.     Absent the challenged restraints, Division I student-athletes would receive compensation for the use of their NILs in an open market. Division I athletes have created tremendous value in their NILs through their participation in both athletic and non-athletic activities. For example, in 2019 "[a]n exuberant top-scoring floor routine by UCLA's Katelyn Ohashi went viral[,] making her one of the most famous college gymnasts ever. But NCAA rules prevented Ohashi from making any money from the performance."[7] In a video op-ed featured by the New York Times, Ohashi argued that college athletes should be able to earn income from their athletic achievements. She said that in her "senior year [her] routine went viral with over 100 million views," but she was not able to earn a single dollar from this social media popularity.[8] Under the NCAA's rules, UCLA and the NCAA profited off of the value of Ms. Ohashi's NIL, but did not allow her to recoup any of that value for herself. And unfortunately, for a college gymnast like Ms. Ohashi, the value of her NIL will quickly diminish after graduation without viable professional sports options.

13.     Recent analyses demonstrate the valuable nature of student-athlete NILs across a wide range of Division I sports, including via social media platforms such as Twitter and Instagram. And the ability to capture that value while still in school is critically important for student-athletes, the majority of whom will not have an opportunity to compete professionally after college. As Duke men's basketball creative director, Dave Bradley, explained, "[f]or 95 percent of college athletes, their college careers will be the best time to grow and leverage their personal brands. Unless America knows you on a first-name basis like Zion[9] or Kyrie,[10] fan affinity and networking opportunity peaks in college. Therefore, it's crucial for athletes to understand and maximize their brands from day one."[11] As just one example of this, Alabama head football coach Nick Saban—who

---

[7] Katelyn Ohashi, *Everyone Made Money Off My N.C.A.A. Career, Except Me*, NYTimes.com, Oct. 9, 2019, https://www.nytimes.com/2019/10/09/opinion/katelyn-ohashi-fair-play-act.html (last visited July 25, 2021).

[8] *Id.*

[9] Zion Williamson played for the Duke University Blue Devils basketball team.

[10] Kylie Irving played for the Duke University Blue Devils basketball team.

[11] Adam Rowe, *@DukeMBB's social media dominance could mean $$ for its athletes*, 247sports.com, May 22, 2020, https://247sports.com/college/duke/Article/duke-blue-devils-basketball-name-image-and-likeness-athletes-147406166/ (last visited July 25, 2021).

reportedly earns over $9 million annually—has touted the fact that Alabama's new starting quarterback has signed nearly $1 million in third party NIL deals before playing in his first game and within just a few weeks of the NCAA's interim rules change.

14.    Other school officials have also expressed support for a change in the NIL restraints. Nebraska head football coach, Scott Frost, who commands an annual salary of $4,833,333, has stated that, "regardless of what change comes in NIL legislation, we want every Nebraska athlete to be prepared with the blueprint for success beyond the field." Frost further indicated that Nebraska has no concern about changes to NIL rules. "With the unrivaled passion of the Husker Fan base, I believe a current student athlete's brand can be considerable more valuable at Nebraska."[12] University of Michigan head football coach, Jim Harbaugh, whose base salary is $8,036,179, similarly confirmed that he and others in the UM athletic department "believe that the name, image and likeness is a very good thing. A player should have the same opportunity that a football coach has to profit off their name, image and likeness... Again, not the best to have a rule that says you can't. So we're all for it. We're all for name, image and likeness."[13]

15.    Absent the challenged restraints, schools would also compete amongst one another by

offering additional educational resources and services to help student-athletes learn marketing skills and develop and grow their personal brands. Indeed, on March 10, 2020, prior to the change to the interim NIL rules, the University of Nebraska announced its partnership with Opendorse to launch the first program designed to help student-athletes build their personal brand if the NCAA's NIL restraints were lifted. Nebraska's "Ready Now" program is available to athletes in all varsity sports and offers each athlete a current valuation of their personal brand, review and flag content that could have a negative impact on that brand, and provide insight to increase value. On June 1, 2020, the University of Colorado announced its own plans for a similar program that would provide the school's athletes with tools and resources to enable them to capitalize on their name, image, and

[12] J. Brady McCollough, *Nebraska prepares for student-athlete branding by partnering with Opendorse*, latimes.com, Mar. 10, 2020, https://www.latimes.com/sports/story/2020-03-10/nebraska-opendorse-nil-athlete-branding (last visited July 25, 2021).

[13] Clayton Sayfie, *Jim Harbaugh Is 'All For" NIL Proposal*, May 9, 2020, michigan.rivals.com, https://michigan.rivals.com/news/jim-harbaugh-is-all-for-nil-proposal (last visited July 25, 2021).

likeness in the event of a change in NCAA rules. The "Buffs with a Brand" program will provide CU student-athletes with new educational resources related to personal brand management, entrepreneurship, and financial literacy. Athletic Director, Rick George expressed his support for the program, noting that, "building a personal brand, and developing the skills to be a successful entrepreneur will help our student-athletes capitalize and build on their time at CU and beyond."[14] Such student assistance marketing programs are already underway in the NAIA, which lifted its ban on compensating athletes for NIL in late 2020.

16.    In its multimillion and multibillion dollar deals with broadcasters, the NCAA and its members institutions also reap tremendous financial rewards from using the NILs of college athletes on television. For example, in 2016, the NCAA negotiated an eight-year extension (until 2032) of its media contract for the broadcasting rights to March Madness, the annual Division I basketball tournament.[15] Under that agreement, the NCAA will receive $1.1 billion per year (an annual increase of over $325 million from the prior contract).[16] Similar broadcasting and multimedia deals provide millions of dollars to the NCAA, its conferences, and schools for licensing a variety of other men's and women's sports to some of the country's largest companies. From these massive deals, student-athletes receive no compensation for the use of their NILs, which they would have received from the NCAA or the schools or conferences who sell broadcast rights, absent the restraints at issue.

17.    A critical factual development related to student-athlete NIL rights was the passing of California's Fair Pay to Play Act in fall 2019,[17] in addition to similar proposed legislation in numerous other states at that time. The law was subject to an intense adverse lobbying campaign by the NCAA, which threatened legal action in an attempt to stop it – the Fair Pay to Play Act would

[14] David Plati, *CU Announces "Buffs With A Brand" Program*, June 1, 2020, cubuffs.com, https://cubuffs.com/news/2020/6/1/general-cu-announces-buffs-with-a-brand-program.aspx (last visited July 25, 2021).

[15] Frank Pallotta, *NCAA Extends March Madness TV Deal with Turner, CBS until 2032*, money.cnn.com, Apr. 12, 2016, https://money.cnn.com/2016/04/12/media/ncaa-march-madness-turner-cbs/index.html#:~:text=The%20 NCAA%20has%20extended%20its,game%20for%20another %20eight%20years.&text=In%202010%2C%20the%20NCAA%20and,is%20now%20extended%20t o%202032 (last visited July 25, 2021).

[16] *Id.*

[17] Cal. Educ. Code § 67456.

essentially create an unrestricted market in California for student-athletes and other parties to use and profit from the use of student-athlete NILs. Since California's law passed, numerous other states have considered and passed legislation permitting NCAA student-athletes to commercialize their NILs. As of July 21, 2021, a total of 27 states had passed bills or had executive orders signed recognizing college athletes' right to compensation for the commercial use of their NILs. And at least 16 of these laws or executive orders became effective on July 1, 2021, or allowed schools to opt in immediately as of that date (Alabama, Colorado, Connecticut, Florida, Georgia, Illinois, Kentucky, Louisiana, Mississippi, Nebraska, New Mexico, Ohio, Oklahoma, Oregon, Pennsylvania, and Texas).

18.     In the face of intense public pressure, including these various state NIL laws, the NCAA has finally admitted that it does not need all of its NIL restraints, that student-athletes should be permitted to capitalize on NIL opportunities, and that compensation to athletes will *not* undermine consumer demand for college sports. Indeed, as far back as October 2019, the NCAA announced that its top governing board "voted unanimously to permit students participating in athletics the opportunity to benefit from the use of their name, image, and likeness." On April 28, 2020, the NCAA formally endorsed an internal working group report recommending rule changes to permit student-athletes to receive compensation for product endorsements, autographs, and personal appearances, among other things. The NCAA then prepared legislation to reduce its NIL compensation restraints for consideration at its January 2021 meeting.

19.     But, the NCAA then halted moving forward with NIL rule changes after certiorari was granted on December 16, 2020 in the *Alston* litigation. In that case, the NCAA was seeking to overturn this Court's trial decision, affirmed by the Ninth Circuit, finding various NCAA's restraints on education-related compensation to violate the Sherman Act.[18] The NCAA was hoping the Supreme Court would adopt its and the Conferences' arguments that NCAA compensation

---

[18] *Alston* is also referred to herein as the *NCAA GIA Litigation. See NCAA v. Alston*, 141 S. Ct. 2141 (2021), *affirming In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239 (9th Cir. 2020), *affirming In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058 (N.D. Cal. 2019).

restraints—including NIL restraints—should be immunized from ordinary rule of reason scrutiny whenever the restraints are ostensibly justified on the basis of amateurism.

20.   While waiting for the Supreme Court's decision in *Alston*, the NCAA simultaneously continued its efforts to lobby Congress for a "safe harbor" from antitrust lawsuits challenging NCAA NIL rules (including this case). It also continued to keep on hold any changes in its NIL restraints, even though a number of state NIL laws were due to go into effect on July 1.

21.   The situation then drastically changed on June 21, 2021, when the Supreme Court unanimously affirmed the Ninth Circuit's decision approving this court's application of the rule of reason in *Alston*. In that ruling, the Supreme Court made it clear that all NCAA athlete compensation restraints were subject to the same rule of reason scrutiny as any other business's restraints on trade. The Supreme Court also agreed with the Ninth Circuit's affirmance of this Court's finding that NCAA restraints on education-related benefits were Sherman Act violations.[19] Subsequently, on June 24, 2021, this Court largely denied Defendants' motion to dismiss Plaintiffs' initial complaint in this action challenging Defendants' NIL restraints.

22.   It was in the wake of these legal developments, and the pressure of state NIL laws coming into effect on July 1, that the NCAA finally decided it could no longer maintain the NIL status quo and adopted its "interim" NIL policy, suspending (but not repealing) most of its NIL restraints. The "interim" policy was adopted on June 30, 2021 and became effective on July 1. Under this policy, Division I student-athletes, among others, are now permitted to receive many forms of NIL compensation from third parties, whether or not they are attending school in a state where an NIL law has taken effect. Specifically, even in states without an effective NIL law, the NCAA has declared that all student-athletes may engage in various activities to earn NIL compensation (with some important exceptions) "without violating NCAA rules related to name, image and likeness."[20] As noted above, however, the interim policy did not repeal any of the

[19] *See Alston*, 141 S. Ct. at 2155-2160, 2166.

[20] *See NCAA adopts interim name, image and likeness policy*, ncaa.org, June 30, 2021, https://www.ncaa.org/about/resources/media-center/news/ncaa-adopts-interim-name-image-and-likeness-policy (last visited July 25, 2021).

NCAA's NIL restraints, but merely "suspended" their enforcement for an uncertain time period. The NCAA has stated that "the current legal and legislative landscape prevents a permanent solution at this time."[21] In other words, the NCAA has proclaimed the right to reinstate all of its suspended NIL restraints at any time, and only intends to make permanent changes if and when the legal "landscape" is more favorable to it.

23.    Moreover, the NCAA has kept in place, even under its "interim" policy, some of the most restrictive aspects of its NIL rules. In a Q&A regarding the interim policy posted on its website, the NCAA states that its rules still prohibit an athlete from accepting any NIL compensation that is "contingent upon enrollment at a particular school" or based on an athlete's "athletic participation or achievement."[22] Furthermore, NCAA "Institutions providing compensation in exchange for the use of a student-athlete's name, image or likeness" is prohibited.[23] The combined anticompetitive effect of these continuing restrictions is substantial. Student-athletes are precluded from entering into lucrative sponsorship or other NIL compensation opportunities that are linked to their performance as athletes, and they are deprived of any opportunity to enter into agreements with their schools or conferences to be compensated for their NILs, whether from broadcasts of competitions or other commercial activities.

24.    Nonetheless, the period since July 1, 2021 is providing a natural economic experiment to show just how student-athletes profit from their NILs absent the NCAA-suspended NIL restraints. Specifically, within just the first few weeks under the interim rules, NIL payments have become widespread and lucrative and demonstrate the total amount of compensation payments that these athletes would have generated in previous years in the absence of such restraints. Indeed, thousands

---

[21] *See Name | Image | Likeness Quick Guide to New NCAA Interim Policy,* ncaa.org, July 2021, https://ncaaorg.s3.amazonaws.com/ncaa/NIL/NIL_QuickGuideToNewPolicy.pdf (last visited July 26, 2021); *see also Name, Image and Likeness Policy Question and Answer,* ncaa.org, July 2021, https://ncaaorg.s3.amazonaws.com/ncaa/NIL/NIL_QandA.pdf at Q3 ("**3. *How long will the interim NIL policy remain in effect?*** Until such time that either federal legislation or new NCAA rules are adopted.") (last visited July 26, 2021).

[22] *Name, Image and Likeness Policy Question and Answer,* ncaa.org, July 2021, https://ncaaorg.s3.amazonaws.com/ncaa/NIL/NIL_QandA.pdf (last visited July 25, 2021).

[23] *Id.*

of student-athletes have already taken advantage of the NIL opportunities available to them since July 1. Athletes are partnering with clothing brands, beverage companies, restaurants, cell phone companies, video game platforms, and other national and local retailers. For example, more than 40 athletes from the University of Florida alone received endorsement deals during the first week they were allowed to do so.[24] Recently, University of Michigan football players became the first student-athletes to receive compensation for licensing the use of their names on the back of football jerseys.[25] On July 20, 2021, the University of North Carolina and the Brandr Group announced the launching of the "first ever" Group Licensing Program for Student-Athletes.[26] The program "invites all UNC's current student-athletes to join a voluntary group licensing program, which will allow them to benefit from their NIL in conjunction with UNC's official trademark and logos." It is just a matter of time before other colleges start similar group licensing programs.

25. Hundreds of student-athletes have also made their debut on the paid personalized video service platform, Cameo. And, more than 4,000 student-athletes have partnered with Yoke Gaming, an app founded by former Notre Dame football player, Mick Assaf, that allows fans to pay to play video games with college and professional athletes.[27]

26. As noted above, on July 20, 2021, Alabama Coach, Nick Saban, stated that the presumptive starting quarterback for the team has already earned close to $1 million. Bryce signed with CAA—one of the most powerful sports-marketing agencies, for his marketing deals.

[24] Zach Abolverdi, *Over 40 UF athletes land endorsement deals during first week of NIL*, Gainesville.com, July 8, 2021, https://www.gainesville.com/story/sports/2021/07/08/first-week-nil-nets-over-40-endorsement-deals-gators-athletes/7886499002/ (last visited July 25, 2021).

[25] *See* Darren Rovell, *Michigan Football Players Are First To Cash In on Jersey Sales*, actionnetwork.com, July 17, 2021, https://www.actionnetwork.com/ncaaf/michigan-football-jersey-sales-college-football (last visited July 25, 2021).

[26] *See UNC and The Brandr Launch Group Licensing Program for Current Student-Athletes*, goheels.com, July 20, 2021, https://goheels.com/news/2021/7/20/general-unc-and-the-brandr-launch-group-licensing-program-for-current-student-athletes.aspx (last visited July 25, 2021).

[27] Brandon Marcello, *Tracking NIL deals across the NCAA*, July 2, 2021, 247sports.com, https://247sports.com/LongFormArticle/Name-Image-and-Likeness-NIL-deals-endorsements-tracker-list-college-football-basketball-gymnastics-167253980/#167253980_1 (last visited July 25, 2021).

27. The temporary suspension of some of the NCAA's NIL rules has also opened up new business opportunities that athletes are taking advantage of. For example, University of Miami quarterback, D'Eriq King, and Florida State quarterback, McKenzie Milton, co-founded Dreamfield, a marketplace for college athletes to sell autographs, book live engagements, and sell non-fungible tokens.[28] And numerous athletes have launched their own apparel lines, including University of Nebraska volleyball player Lexi Sun,[29] University of Kentucky basketball player Dontaie Allen,[30] University of Iowa basketball player Jordan Bohannon,[31] and University of Texas football players DeMarvion Overshown and Josh Thompson.[32]

28. Companies are now lining up to work with student-athletes who can market their NIL rights. Unilever, for example, plans to spend $5 million over the next five years in partnerships with college athletes promoting the deodorant brand Degree. The company announced that it will spend equally on male and female athletes from a diverse range of sports and backgrounds. Meanwhile, a restaurant chain based in Lincoln, Nebraska, has offered a flat fee to the first 100 University of Nebraska athletes who promote the restaurant's rewards program on their social media accounts.[33] And, MMA studio, American Top Team, is offering $500/month to any University of Miami player

[28] Eben Novy-Williams, *NIL Deals Arrive Quickly As NCAA Athletes Flex New Financial Freedom*, Sportico.com, July 1, 2021, https://www.sportico.com/leagues/college-sports/2021/nil-deal-examples-1234633234/ (last visited July 25, 2021).

[29] With the ink on the new interim NIL rules barely dry, Lexi Sun opened her clothing brand "Sunny Crew" in collaboration with Ren Athletics.

[30] On July 7, 2021, Allen filed two trademarks with the intent to launch a clothing and shoe line.

[31] Bohannon launched his apparel line, J30, on July 1, 2021.

[32] On July 1, 2021 Overshown tweeted: With the new NIL rule. I have partnered with jet.studies to launch my own brand! This features hoodies, shirts, and more!

[33] Dan Murphy, *Let's make a deal: NCAA athletes cashing in on name, image and likeness*, ESPN.com, July 1, 2021, https://www.espn.com/college-sports/story/_/id/31738893/ncaa-athletes-cashing-name-image-likeness (last visited July 25, 2021).

who endorses the brand.[34] On June 30th, the delivery service GoPuff announced that it will pay every NCAA athlete who promotes the brand on social media.[35]

29. And, with the NCAA's suspension of most of the NIL restraints, school athletic departments across the country are offering new educational programming to their athletes. As of July 1, 2020, 53 of the 65 Power Five universities had announced an NIL-related initiative partnering with companies like Opendorse, INFLCR or Altius Sports.[36] Other smaller schools are also offering new NIL-focused classes and hiring additional staff to give their athletes a competitive edge in the NIL market. In May, Duquesne University hired Jordon Rooney as the first Division I "personal brand coach."[37]

30. The NCAA's decision to now permit student-athletes to receive NIL compensation from third parties makes clear that its previous position before federal trial and appellate courts—that *any* form of NIL payments to NCAA athletes would irreparably damage consumer demand—is unfounded. Indeed, schools across the country are lauding the opportunity of their athletes to earn NIL compensation, recognizing both the economic and educational opportunities that such NIL deals provide.

31. None of the NCAA's NIL restraints—including the NIL rules that the NCAA is continuing to enforce under its interim policy—enhance consumer demand for college sports (which, in any event, concerns a market separate from the labor markets for student-athletes that have been restrained by the anticompetitive rules), nor do they further any other claimed procompetitive

---

[34] DeArbea Walker, *Here Are Some Brand Deals NCAA Athletes Inked in the First Week of NIL Eligibility*, adweek.com, July 8, 2021, https://www.adweek.com/brand-marketing/brand-deals-ncaa-athletes-inked-in-nil-eligibility/ (last visited July 25, 2021).

[35] Businesswire.com, *Gopuff and Opendorse Partner to Pitch Every College Athlete Their First Deal in the NIL Era*, June 30, 2021, https://www.businesswire.com/news/home/20210630005801/en/Gopuff-and-Opendorse-Partner-to-Pitch-Every-College-Athlete-Their-First-Deal-in-the-NIL-Era (last visited July 25, 2021).

[36] Lila Bromberg, *In the NIL Arms Race, Some Schools Are Going the Extra Mile to Help Their Athletes*, July 1, 2021, SI.com, https://www.si.com/college/2021/07/01/name-image-likeness-programs-schools-ncaa (last visited July 15, 2021).

[37] Goduquesne.com, *Jordon Rooney Named Personal Brand Coach*, May 3, 2021, https://goduquesne.com/news/2021/5/3/general-jordon-rooney-named-personal-brand-coach.aspx (last visited July 25, 2021).

purpose. Recent surveys and other contemporary measures of public sentiment, including the state legislation discussed *supra*, indicate that consumer demand for college sports would not diminish if student-athletes were permanently allowed to receive NIL compensation or if the continued restrictions of the interim policy were lifted. Indeed, the results of a 2019 Turnkey Sports poll of more than 2,000 senior-level sports industry executives suggest that there would likely be a *positive* impact on fan interest if college athletes were permitted to monetize their NILs.[38] And, when College Pulse surveyed 829 college students at 51 universities in June 2021, 89% said that student-athletes should be able to profit off their likeness, 88% said athletes should be able to profit by endorsing products on social media, and 93% said athletes should be able to profit by appearing in advertisements.[39] Far from jeopardizing consumer demand, consumers laud college athletes' ability to earn NIL income as just and fair and long overdue. No evidence has emerged since July 1, 2021, that these forecasts were wrong.

32.    No procompetitive purposes are served by the NCAA' NIL rules. They all should thus be permanently enjoined, including those aspects of the NIL rules that the NCAA states it will continue to enforce under its interim policy: the rules barring NIL compensation "contingent upon enrollment at a particular school," based on an athlete's "athletic participation or performance," and the rules barring NIL compensation provided by NCAA institutions in exchange for the use of a student-athlete's name, image or likeness. These are all unjustified and unreasonable restraints on competition in the relevant labor markets. However, to the extent that any of the NIL rules are found to serve any procompetitive purposes, reasonable and patently less restrictive alternatives are available that would be virtually as effective in achieving any such procompetitive purpose.

33.    For example, an injunction could forbid enforcement of national NCAA NIL rules, but permit such rules at the conference level. In a recent interview about NIL, NCAA President Mark

[38] Michael Smith, Liz Mullen, *College Sports: Sharper Resolution*, sportsbusinessdaily.com, Dec. 2, 2019, https://www.sportsbusinessdaily.com/Journal/Issues/2019/12/02/In-Depth/NIL.aspx (last visited July 25, 2021).

[39] Jenn Hatfield, *Even Students Who Aren't Athletes Think the NCAA is a Problem*, fivethirtyeight.com, July 12, 2021, https://fivethirtyeight.com/features/college-students-dont-like-how-the-ncaa-treats-student-athletes/ (last visited July 25, 2021).

Defendants have also unjustly enriched themselves and their for-profit business partners while causing extensive damage to the student-athletes.

~~Emmert agreed that sports serve different functions at different schools, and that the NCAA needs to govern in a way that is more reflective of that reality, with consideration given to a decentralized and deregulated version of college sports, shifting power back to conferences and campuses.[40] Indeed, the NCAA's interim policy, in which most of its NIL rules are suspended, expressly leaves it up to the individual conferences and schools to determine whether any additional NIL rules are necessary. This natural experiment is providing strong confirmation that leaving any rules to the conferences and schools is a reasonable less restrictive alternative that is virtually as effective as the NCAA rules in achieving any claimed procompetitive objective.~~

~~34.    A permanent injunction could also embody a reasonable less restrictive alternative to the NCCA's current set of NIL rules, by permitting athletes to receive compensation only from third parties, or for non-game-related commercial uses of their NILs including, but not limited to: business promotions, autograph signings, social media advertising and content creation, product endorsements, licensed merchandise sales, personal appearances, books, and movies.~~

~~35~~8.    Accordingly, on behalf of a class of Division I student-athletes, Plaintiffs request an injunction permanently restraining Defendants from enforcing all of their unlawful and anticompetitive rules ~~restricting the NIL~~that restrict the compensation available to class members.~~[41]~~ from conferences and schools, and that limit the number of athletic scholarships available to class members.[9]

9.    On behalf of the previously certified Football and Men's Basketball Class, as amended herein, Plaintiffs seek the compensation that these class members would have received from their schools or conferences absent Defendants' unlawful restraints on pay-for-play compensation, a share of game telecast revenue and compensation that these class members would have received from their schools or conferences for their Broadcast NILs ("BNIL"), and the compensation that these class members would have received for their NILs from third parties for use in video games and in individual NIL agreements, including marketing, sponsorship, social media, branding, promotional and other NIL deals.[10]

10.    On behalf of the previously certified Women's Basketball Class, as amended herein, Plaintiffs seek the compensation that these class members would have received from their schools or conferences absent Defendants' unlawful restraints on pay-for-play compensation, a share of game

telecast revenue and compensation that these class members would have received from their schools or conferences for their BNILs, and the compensation that these class members would have received for their NILs from third parties in individual NIL agreements, including marketing, sponsorship, social media, branding, promotional and other NIL deals.[11]

36.    Additionally, on behalf of the members of the Group Licensing Damages Sub-Class, Plaintiffs seek the share of group licensing revenues, including but not limited to game telecast group licensing revenue, that members of this Sub-Class would have received absent Defendants' unlawful conduct.[42]

---

[40] *See* Associated Press, *NCAA's Emmert: It is time to decentralize college sports,* collegebasketball.nbcsports.com, July 15, 2021, https://collegebasketball.nbcsports.com/2021/07/15/ncaas-emmert-it-is-time-to-decentralize-college-sports/ (last visited July 25, 2021).

[41][9] The Declaratory and Injunctive Relief Class is defined as: "All NCAA athletes who compete on, or competed on, a Division I athletic team at any time between June 15, 2020 andthrough the date of judgment in this matterany injunctive relief ordered by the Court." *See infra*, Part VII.

[42][10] The Group Licensing Damages Sub-ClassFootball and Men's Basketball Class is defined as: "All current and former NCAAcollege athletes who have received full Grant-in-Aid (GIA) scholarships and compete on, or competed on, a Division I men's or women's basketball team or an FBS football team, at a college or university that is a member of one of the Power Five Conferences (or at an independent school that has an FBS football teamincluding Notre Dame), at any time between June 15, 2016 and the date of final judgment in this matter." *See infra*, Part VII.

[11] The Women's Basketball Class is defined as "All current and former college athletes who have received full GIA scholarships and compete on, or competed on, a Division I women's basketball at

37.   Further, on behalf of the Lost Opportunities Damages Sub-Class, Plaintiffs seek

11.   On behalf of the previously certified Additional Sports Class, as amended herein, damages for Plaintiffs seek the compensation that these class members would have received from schools or conferences absent Defendants' unlawful restraints on pay-for-play compensation and the compensation that these class members would have received for their NILs from third parties in individual NIL agreements, including marketing, sponsorship, social media, branding, promotional and other NIL deals during the four years prior to July 1, 2021.⁴³2021.¹²

38.   Additionally, on behalf of the members of the Former Player Damages Sub-Class, Plaintiffs seek damages for the compensation these class members would have received for their NILs from third parties in individual agreements, including marketing, sponsorship, social media, branding, promotional and other NIL deals between June 15, 2016 and the date of trial.⁴⁴

## II.   JURISDICTION AND VENUE

3912.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), as this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. 28 U.S.C. §§ 15(a) and 26. The Court also has jurisdiction over this matter under 28 U.S.C. § 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some of the members of the proposed class are citizens of a state different from the Defendants.

4013.   Venue is proper because Defendants reside, are found, have agents, and transact business in this District as provided in 28 U.S.C. §§ 1391(b) and (c) and in Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22.

4114.   This Court has personal jurisdiction over Defendants because, *inter alia*, they: (a) transacted business throughout the United States, including in this District; (b) participated in organizing intercollegiate athletics athletic contests, and/or licensing or selling merchandise throughout the United States, including in this District; (c) had substantial contacts with the United States, including

---

⁴³ The Lost Opportunities Damages Sub-Class is defined as: "All current Division I athletes in their second or later year of eligibility (or first year of eligibility after receiving a red shirt the prior year) who receive compensation for use of their name, image, or likeness for all or any part of the period between July 1, 2021 and June 30, 2022." *See infra*, Part VII.

a college or university that is a member of one of the Power Five Conferences (including Notre

Dame), at any time between June 15, 2016 and the date of final judgment in this matter." *See infra* Part VII.

44 12 The ~~Former Player Damages Sub-Class is defined as: "All former NCAA~~ Additional Sports Class is defined as "Excluding members of the Football and Men's Basketball Class and members of the Women's Basketball Class, all other current and former Division I college athletes who competed on~~,~~ a Division I athletic team at any time between June 15, 2016 and the date of ~~trial who would~~ final judgment in this matter, including but not limited to those who (i) have received a full or partial GIA; and/or (ii) received compensation for the use of their name, image, ~~or likeness during their period of eligibility absent Defendants' unlawful conduct~~ and likeness since July 1, 2021 while a college athlete if they competed in the same Division I sport prior to July 1, 2021." *See infra~~,~~* Part VII.

~~United States, including~~ in this District~~; (c) had substantial contacts with the United States, including in this District~~; and (d) were engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District. Numerous NCAA Division I universities or colleges also are found within this District, *e.g.,* the University of ~~California  Berkeley~~ ("~~California—Berkeley~~ ("Cal~~"~~"), Stanford University, Santa Clara University, the University of San Francisco ("~~"~~USF~~"~~"), and St. ~~Mary's~~Mary's College.

III.     PARTIES

A.     Plaintiffs

1.     Grant House



    ~~42~~15.   Plaintiff Grant House, an individual, is a resident of Tempe, Arizona and a ~~current~~former Division I athlete who ~~competes~~competed for the Arizona State University ("~~"~~ASU~~"~~") ~~men's~~men's swimming and diving team through the 2022-23 academic year.

    ~~43~~16.   Before college, House was a heavily recruited star athlete from Maineville, Ohio. He was named Greater Cincinnati Male Swimmer of the Year four years in a row (2013-2016), and he is the winningest athlete in Ohio High School Athletic Association ("~~"~~OHSAA~~"~~") history with 13 state swimming championships—eight as an individual and five on relays—as well as a 2016 state championship in water polo. He was also a two-time National Swimming Club Association ("~~"~~NSCA~~"~~") national champion, a 2016 Olympic trials qualifier, and he competed in the 2015 Junior World Championships in Singapore, winning a gold medal in the 4x200m freestyle relay.

44~~17~~.   As the number four swimming recruit in the nation coming out of high school, House received scholarship offers from numerous top-caliber Division I programs including the University of Texas, Ohio State University, the University of California–Berkeley, the University of Louisville, the University of Indiana, and Arizona State University. He ultimately accepted a full scholarship offer and committed to swim and attend school at ASU in the fall of 2016 and he enrolled at ASU in the fall of 2017.

45~~18~~.   House swam in his first college meet in the fall of 2017 and he was an immediate impact player for ASU, breaking multiple school time records and ultimately being named the Sun Devils' Most Valuable Men's Swimmer as a true freshman. At the 2018 Pac-12 Championships, he earned a podium finish (3rd) in the 200yd free, placed 11th in the 500yd free and 12th in the 100yd free, and he helped his team to a 2nd place finish in the 4x200yd free relay. At the 2018 NCAA Championships, he finished 10th in nation in the 4x200yd free relay and 14th in the 200yd free, earning two NCAA All-American honorable mentions.

46~~19~~.   As a sophomore, House continued to dominate in the pool for ASU. At the 2019 Pac-12 Championships, he led the Sun Devils' 4th place 4x200yd free relay, and placed 2nd in the 200yd free, 4th in the 200yd individual medley, and 10th in the 200yd breaststroke. At the 2019 NCAA Championships, his relay team placed 8th in the 4x100yd free and 9th in the 4x200yd free, and he finished 10th individually in the 200yd breaststroke. With these performances he earned two more NCAA All-American honorable mentions as well as his first All-American honor.

47~~20~~.   In addition to college competition, House also competed in the 2019 Pan American Games in Lima, Peru as a member of the U.S. 4x100m and 4x200m relay teams, which each finished 2nd, and individually in the 200m free, finishing 6th. House also represented Team USA at the 2019 World University Games in Naples, Italy where he led his team to a gold medal finish in the men's 4x200m free relay.

48~~21~~.   Along with his many athletic achievements, House ~~is~~was also an outstanding student who,
as a sophomore with a 4.0 GPA, was named to the 2019 Google Cloud Academic All-America Division I Men's At-Large team. He ~~is currently pursuing~~graduated with a Bachelor of Science in Exercise Physiology and Wellness in 2022, completed a Sports Law & Business Master of Laws degree in 2023, and

~~Physiology and Wellness and~~ plans to one day start his own business offering performance consultation services to Olympic hopefuls and other elite athletes.

~~49~~22.    On September 6, 2019, House announced his decision to take an Olympic redshirt year, sitting out of what would have been his junior season with ASU to train for the U.S. Olympic Trials. House trained for the Olympics under ASU coach Bob Bowman, who was formerly the head coach of the 2016 men's U.S. Olympic team and is perhaps best known as the long-time coach of record-breaking Olympian Michael Phelps. In ~~a recent~~an interview with USA Swimming, Bowman expressed his high regard for House: "Grant House is one of the hardest working swimmers I've ever coached. He's gone from being a promising junior swimmer to a bona fide world-class competitor."~~45~~13

~~50.    House will return to ASU for the upcoming 2021-22 academic year and he plans to compete for the Sun Devils for his remaining year of NCAA eligibility.~~

~~51~~23.    Along with his efforts in the pool and in the classroom, House ~~has~~ also ~~taken~~took on a proactive leadership role in his academic and athletic communities. He ~~is~~was involved on his own college campus as a member of the Sun Devil Athletics Board, an advisory group comprised of nine faculty and four students charged with informing the ASU president on policies, programs, and other matters pertaining to intercollegiate athletics. House also ~~represents~~represented ASU athletes, and ~~works~~worked to be a part of the broader discussion about issues affecting all Division I athletes, as a member of both the Pac-12 Student-Athlete Advisory Committee and Pac-12 Student-Athlete Leadership Team, and as President of the NCAA Division I Student-Athlete Advisory Committee at ASU.

~~52~~24.    As a star athlete as well as an exceptional student and leader, House has built a valuable reputation and name for himself within the local Tempe, Arizona community and the world of swimming in general. House has also established an online following through his own personal social media accounts on Twitter, Facebook, Instagram, and Snapchat, as well as an internet podcast—Swim Bros Podcast—which he and his brother created in 2016. Through Swim Bros Podcast, House and his brother discuss a wide range of topics related to the sport of swimming at

---

~~45~~13 USA Swimming Release, *Swimming's House Named to World University Games Roster*, Oct. 18, 2018,

https://thesundevils.com/news/2018/10/18/mens-swimming-diving-swimmings-house-named-to-world-university-games-roster.aspx (last visited July 25, 2021).

~~Podcast, House and his brother discuss a wide range of topics related to the sport of swimming at~~ both the collegiate and Olympic levels and feature interviews with athletes and other guests who offer their own perspectives and provide insight on various current events in the world of swimming.

~~53~~25.     ASU benefits greatly from the positive associations it is able to build with its star athletes, including House, through promotional activities featuring the athletes. ~~In the last three years,~~ House has created and/or been involved with numerous "hype" videos and other promotional content that the Sun Devils' marketing team has posted or reposted on its various social media accounts. In 2018, for example, House was asked to speak on behalf of the school's athletic nutrition program in several videos that were published as part of a promotional campaign on the official Twitter feed of Sun Devil Sports Nutrition (@FueltheFork). Photos of House and replays of his best races ~~are~~were posted regularly on ASU's social media accounts, and he was also featured on the school's official swim & dive meet schedule. However, ~~because NCAA rules have prohibited him from doing so~~until July 1, 2021, House ~~has yet~~failed to derive any personal profit from his social media activity or any other use of his name, image, or likeness because NCAA rules prohibited him from doing so.

26.     Mr. House has been a valuable asset to ASU and the Pac-12. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation—and the Conference Defendants' rules reinforcing these restraints—House would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

## 2. Sedona Prince



(Modified)

~~54~~27.   Plaintiff Sedona Prince, an individual, is a resident of ~~Eugene, Oregon~~Fort Worth, Texas and a current

Division I athlete who competes for the Texas Christian University ~~of Oregon ("UO")~~

~~women's~~("TCU") women's basketball team.

~~55~~28.   Before college, the 6-foot-7 forward was a heavily recruited star athlete from Liberty

Hill, Texas. Prince started in all 154 of her high school games, totaling 2,759 points scored, 1,493

rebounds, and 924 blocked shots by the end of her senior year. In 2018, she was a

~~McDonald's~~McDonald's High

School All-American and Jordan Brand Classic participant, and she capped her stellar high school career by being named the Texas Girls Coaches Association Basketball Athlete of the Year.

5629.   In addition to interscholastic competition, Prince also competed with the USU.S. national team at the 2015 FIBA U16 Americas Championship in Puebla, Mexico, and the 2016 FIBA U17 World Championships in Zaragoza, Spain, where Team USA won bronze medals.

5730.   Coming out of high school, ESPN ranked Prince the No. 8 recruit in the nation, and she received full athletic scholarship offers from numerous top Division I programs, including the University of Connecticut, University of Notre Dame, University of Louisville, and University of Texas at Austin ("UT"). She ultimately accepted the offer from Texas and committed to play basketball and attend school at UT starting in the fall of 2018.

~~58~~31.   Prince redshirted her freshman season with the Texas Longhorns after suffering a serious leg injury while representing Team USA at the U18 FIBA Americas Championship in Mexico City in the summer of 2018, where Team USA won the gold medal.

~~59~~32.   Prince had to undergo several surgeries and other medical procedures after her injury, incurring bills in the tens of thousands of dollars. She was incredibly stressed about her injuries, not knowing if she would ever play again. And the economic strain made it even worse. She was particularly upset that NCAA rules prohibited her from obtaining outside compensation based on her name and image, including from social media or endorsements, to help pay these substantial bills. While Prince feels fortunate that she was able to receive some financial help from her parents, she knows that many other student-athletes from underprivileged backgrounds do not have the benefit of such support and, in the event of an injury, are instead left with significant personal debt.

~~60~~33.   In the summer of 2019, Prince decided to transfer to the University of Oregon ("UO") but, due to NCAA transfer rules, she was forced to sit out of the 2019-20 season with the Ducks.

~~61~~34.   Although UO applied for a hardship waiver to restore her freshman year of eligibility, the NCAA denied the request. She was able to travel with the team, but she could not play in the games. At the time, UO basketball fans started making "Free Sedona" t-shirts in support of Prince's efforts to be allowed to compete. The fans asked Prince if she wanted to sell shirts herself to make some money, but she had to decline because she believed that if she sold any apparel with her name

or likeness on it, she would get in trouble with the NCAA. That really hit home with her as a demonstration of how absurd and unfair the NCAA's NIL rules truly are.

35. Prince transferred to, and is currently playing for, TCU, where she is pursuing a 62. Prince is currently playing for UOMaster of Liberal Arts degree. As a redshirt sophomore in the 2020-21 season,
she was a leading player for theUO's women's basketball team and instrumental in helping Oregon toUO reach the NCAA Championship Tournament Sweet 16. She plans to continue competing for the Ducks during her two remaining years of eligibility.

6336.   As an elite athlete and rising star in the world of women's basketball, Prince has already created a name for herself among fans, and she has established a significant online following through her personal social media accounts. As of July 11, 2024, Prince currently has 2.5had 2.7 million followers and 94194.4 million likes on TikTok (@sedonerrr), as well as 241,000167,000 followers on Instagram (@sedona. sedonaprince)

and ~~more than forty thousand~~38,800 followers on Twitter (@sedonaprince_). While attending college, Prince has been involved in several multimedia campaigns for the basketball programs at her schools, including a campaign promoting the UO women's basketball team, which has some of the best attendance and viewership figures in all of women's college basketball.

~~64~~37.   Prince is very interested in business and entrepreneurship, and ~~is taking~~took college classes on

these subjects. She is particularly interested in brand-building and is working hard to learn more about how she can grow her personal brand value, including on social media and for other potential sponsorship opportunities.

~~65~~38.   Prince also plans to continue to use her voice to promote positive social change. At the University of Texas, she was a founder of the athlete-led organization, Outletes and Allies, which was created to be a safe space for LGBTQIA+ student-athletes and allies at the university. Prince helped organize monthly meetings with speakers, and she is very proud that this work put the University of Texas ahead in the Big 12 Conference in terms of promoting LGBTQIA+ inclusivity.

~~66~~39.   Prince has also used her platform to bring awareness to current gender inequalities within the world of NCAA college sports. ~~This spring, she~~She highlighted some of the significant disparities between the resources provided to the men's and women's teams in ~~this year's~~the 2021 March Madness championship tournament in a video she posted to her TikTok that went viral shortly thereafter. She plans to use her voice in the future to continue supporting positive social change.

6740.   ~~Until very recently~~Prince never derived any personal profit from her schools' use of her name, image

and likeness in its broadcast, marketing, and social media, and other activities to generate ticket sales and other revenues for the school because NCAA rules prohibited her from doing so. Until July 1, 2021, Prince had never derived any personal profit from her social media activity or any other use of her name, image, or likeness because NCAA rules prohibited her from doing so. However, since some of the rules were suspended ~~on July 1~~, she has been contacted by several major brands regarding potential endorsement deals and has already earned more than $20,000 through social media alone.

41.     Ms. Prince has been a valuable asset to the schools for which she has played. As a high-performing player on the women's basketball team, she helped to generate substantial revenues that derived from, among other things, broadcasting agreements, ticket sales, and sponsorships. But

the NCAA's pay-for-play rules prohibited her from earning any compensation or benefits for her athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation—and the Conference Defendants' rules reinforcing these restraints—Prince would have received substantial additional compensation in the relevant labor market for her services. She was harmed by these anticompetitive rules.

### 3. Tymir Oliver



6842.    Plaintiff Tymir Oliver, an individual, is a ~~resident of New Castle, Delaware and a~~ Division I athlete who competed for the University of Illinois ~~men's~~men's football team.

6943.    Before college, Mr. Oliver was a ~~highly-recruited~~highly recruited star athlete. He was given a three-star ranking by both 247 Sports and ESPN.com and ranked as a top-30 recruit in Pennsylvania. ESPN.com ranked him as No. 24 and 247 Sports had him as its No. 28 ranked player. In 2015, he was selected First-Team All-State by the Pennsylvania Football Writers Association. He was also named All-State twice and All-City ~~three~~lu•ee times. He captained his football team as both a junior and senior while also being ranked in the top five of his graduating class.

7044.    Mr. Oliver received full athletic scholarship offers from numerous elite Division I programs, including Boston College, Northwestern, Michigan State, University of Virginia, University of Pittsburgh, Rutgers, and Temple. He ultimately accepted the offer from University of Illinois starting in 2016 because he thought it was a chance to be a part of something great.

71~~45~~.   Mr. Oliver played in twelve games as a freshman, mostly on special teams, and in his sophomore year, he was selected as a Team Captain playing in twelve games, while starting ten at

defensive tackle. During his sophomore season Oliver had 33 tackles, 4.5 tackles for losses (tied for second on the team), 3.0 sacks (tied for third on the team), while also having two pass defenses and two hurries. In his junior season he started all twelve games at defensive tackle with 27 tackles, 2.5 tackles for losses, 1.0 sacks, four pass break-ups, and one quarterback hurry. He also had a career-high seven tackles against rival Iowa. In his senior season, Oliver played in ~~thirteen~~13 games with ~~twelve~~12 solo tackles and 17 assisted tackles with 4.5 tackles for losses. He tied his career-high with seven tackles versus No. 6 ranked Wisconsin to help Illinois win 24-23 and achieve one of the biggest upsets in Big Ten history.

~~72~~46.   As an elite athlete and Team Captain, Mr. Oliver's name and face were repeatedly used by the University of Illinois to generate money by selling tickets and jerseys. For example, the University of Illinois used his image for homecoming pictures and during his junior year, Oliver was also required to participate in a photoshoot for the new University of Illinois Nike jersey reveal. His picture was published front and center on the "Fighting Illini" webpage, advertising that the "new blue jerseys will be available for fans to purchase this fall."[~~46~~14] He was also included in a video montage used to introduce and sell the University of Illinois' new jerseys. In addition, ~~Tymir's~~Oliver's image was featured on tickets and flyers all around campus promoting the team and its upcoming games. And his picture was also used by the university on its various social media accounts to promote games and open practices. The Fighting Illini Football website and other University of Illinois social media accounts would have pre- and post-game content that included Mr. Oliver to promote the sale of tickets and merchandise.

~~73~~47.   Mr. Oliver never derived any personal profit from the University of Illinois's use of his name, image and likeness in its broadcast, marketing, and social media, and other activities to ~~generate ticket sales and other revenues for the school because NCAA rules prohibited him from doing so.~~

---

[~~46~~14] *See* Illini Football Release, *Fighting Illini Football Unveils New Uniform Designs*, fightingillini.com, Apr. 6, 2018, https://fightingillini.com/news/2018/4/5/football-fighting-illini-unveil-new-uniform-designs.aspx (last visited July 26, 2021).

generate ticket sales and other revenues for the school because NCAA rules prohibited him from doing so.

48.     Mr. Oliver has been a valuable asset to the University of Illinois and the Big Ten. As a high-performing player on the football team, he helped to generate substantial revenues that the university and the Conference derive from Illinois football, through, among other things, broadcasting agreements, ticket sales, and sponsorships. But the NCAA's pay-for-play rules prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation—and the Conference Defendants' rules reinforcing these restraints—Oliver would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 4.   DeWayne Carter

(Added)



49.     Plaintiff DeWayne Carter ("Carter") is a resident of Buffalo, New York, and played defensive tackle for Duke University's ("Duke") football team.

50.     Carter was a heavily recruited star athlete from Pickerington, Ohio. He was a 4-year letterman at Pickerington Central and was rated the No. 33 defensive tackle in the nation according

to *Rivals.com* and *247Sports.com*. With help from Carter, Pickerington Central reached the OHSAA Division I semifinals during Carter's sophomore and senior years and won the state title Carter's junior year. Carter was a 2-time all-conference and all-district selection. And his senior year, he was a team captain and earned first team all-state honors from the Associated Press.

51.   As a coveted 3-star recruit, Carter had full scholarship offers from roughly 20 Power Five schools, including the University of Michigan, the University of Tennessee, Notre Dame, Boston College, and Duke. He ultimately accepted a full scholarship offer from, committed to play football for, and enrolled at Duke in the summer of 2019.

52.   Carter redshirted the 2019 season—playing 3 games that season—and played all 11 games in the 2020 season. During the 2020 season, Carter received the Ace Parker Award—an honor that Duke's football program "present[s] annually to an individual who displays unparalleled commitment to the team and overcomes adversity to contribute."[15]

53.   In 2021, as a redshirt sophomore, Carter was named team captain: an honor that he held every season since. He was the first player in program history to earn that honor for 3 seasons.

54.   Carter's on-field accomplishments in 2021 were far-reaching. He started 12 games, was on field for 801 snaps, and was first in the ACC and tied for eleventh in the nation in forced fumbles. He was selected the ACC Defensive Lineman of the Week, after having 3 tackles, 2 forced fumbles, 1 pass-breakup, and 1 quarterback-pressure against Northwestern. He was a Third Team All-ACC selection and the recipient of the program's Mike McGee Award—an honor presented each year to the team's top defensive lineman.

55.   In 2022, Carter started all 13 games, and was, again, a gamechanger. He tied for first in the ACC and third nationally in fumble recoveries, and was fourth in the ACC and thirteenth nationally in forced fumbles. He returned a fumble 35 yards for a touchdown against NC A&T—the sixth-longest fumble recovery for a touchdown in program history—and registered 2 pass-breakups against the University of Central Florida in the Military Bowl, making him 1 of just 7 players in

---

[15] *DeWayne Carter*, Duke University, https://goduke.com/sports/football/roster/dewayne-carter/19207.

Duke history to do so in a bowl game. As a result of his achievements, Carter was a Second Team All-ACC selection and Third Team All-America selection by College Football Network.

56.     In 2023, as a returning starter, Carter played in each of Duke's 12 regular-season games. He is just the seventeenth player in Duke history to record 11.5 career sacks and is fourth in program history in forced fumbles. Carter led Duke to a victory in the Birmingham Bowl on December 23, 2023.

57.     Along with his many athletic achievements, Carter was an outstanding student. He majored in psychology, with a double minor in theater and education. In 2021 and 2022, he was named an Arthur Ashe Jr. Sports Scholars finalist, which honors students of color who have excelled both in the classroom and in their sport. He is a 3-time ACC Academic Honor Roll recipient, and in 2023, he received the ACC's Jim Tatum Award, which goes to the top senior student-athlete in the Conference.

58.     Carter was an active member of Duke's United Black Athletes and Student-Athlete Advisory Committee and represented the school on the Division I NCAA Football Oversight Committee Student-Athlete Connection Group. Showing his commitment to the broader Durham community, Carter worked with Habitat for Humanity, tutored at KIPP Durham College Preparatory School and Durham Public School Ignite, made time to read to youths at Southwest and Glenn Elementary, and coached youth league baseball for First Calvary Baptist Church.

59.     Following graduation, Carter was drafted in the NFL by the Buffalo Bills in the third round. After his NFL career, Carter plans to become a teacher and open a community center to continue being a strong male role model.

60.     Carter never derived any personal profit from Duke's use of his name, image and likeness in its broadcast, marketing, and social media, and other activities to generate ticket sales and other revenues for the school because NCAA rules prohibited him from doing so.

61.     Carter has been a valuable asset to Duke and the ACC. As a high-performing player on the football team, he helped to generate substantial revenues that the university and the Conference derive from Duke football, through, among other things, broadcasting agreements, ticket sales, and sponsorships. But the NCAA's pay-for-play rules prohibited him from earning any

compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation—and the Conference Defendants' rules reinforcing these restraints—Carter would have received substantial additional compensation in the relevant labor market for his services. He was harmed by these anticompetitive rules.

### 5.    Nya Harrison



(Added)

62.    Plaintiff Nya Harrison ("Harrison") is a resident of Palo Alto, California, and currently is a senior and a defender on Stanford University's ("Stanford") Division I women's soccer team. This past season, the Stanford women's soccer team defense was ranked No. 1 in the country.

63.    Harrison was a highly recruited athlete from San Diego, California. She led her high school, Del Norte High School, to a quarterfinal finish at the 2018 San Diego Section CIF Division II Championship, and led her competitive club team—the San Diego Surf—to a No. 1 ranking in the 2019-2020 season.

64.    In addition, Harrison is part of the United States National Team system and has competed in 5 domestic and 1 international camp for the U16 and U18 teams. She has played in 7 matches as part of the United States National Team program, including with the U18 team at the Tricontinental Cup, and participated in the U20 Women's National Team Call-Up Camp.

65.     Harrison was recruited by several Division I schools to play soccer, including the University of Southern California, University of California – Los Angeles, University of California – Berkeley, and Notre Dame. Ultimately, Harrison accepted an offer to play for, and enrolled at, Stanford in August 2021.

66.     Harrison made an immediate impact for the Stanford women's soccer team. As a freshman, in 2021, she appeared in 6 matches, and helped a back line that posted 9 shutouts and limited opponents to 0.85 goals per match.

67.     As a sophomore, in 2022, she was an integral part of a Pac-12 Championship-winning team, appearing in 9 matches and leading Stanford to 12 shutouts, while limiting opponents to 0.55 goals per game.

68.     As a junior, Harrison helped lead Stanford to the NCAA National Championship game, starting in 11 of the 20 matches she appeared in and guiding Stanford to 14 shutouts, while limiting opponents to 0.60 goals per game.

69.     Off the pitch, Harrison is a dedicated student and advocate. She is a Bioengineering major and was named to the Pac-12 Fall Academic Honor Roll in 2022 and 2023. She is the President of CardinalBLCK, a group of Black college athletes that have banded together to promote social justice, amplify Black voices both inside and outside of athletics, and create a community to endure beyond the athletes' time at Stanford.

70.     After her senior season, Harrison hopes to play soccer professionally.

71.     Until July 1, 2021, Harrison never derived any personal profit from her social media activity or any other use of her name, image, or likeness because NCAA rules prohibited her from doing so.

72.     Harrison has been harmed, and is continuing to being harmed, by the NCAA's rules prohibiting pay-for-play—and the Conference Defendants' rules reinforcing these restraints—which have artificially restricted her from earning compensation for her athletic services in the relevant labor market.

**B.      Defendants**

7473.  **National Collegiate Athletic Association ("NCAA")** describes itself as an "unincorporated not-for-profit educational organization founded in 1906," and maintains its principal place of business located at 700 W. Washington Street, Indianapolis, Indiana 46204. The NCAA further states that it "is the organization through which the colleges and universities of the nation speak and act on athletic matters at the national level." It is composed of more than 1,200 colleges, universities, and athletic conferences located throughout the United States.

7574.  Through the NCAA Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports. The Constitution and Bylaws were adopted by votes of the member institutions and may be amended by votes of the member institutions. The NCAA has also established an enforcement program to ensure that institutions and athletes comply with NCAA rules. Through its enforcement program, the NCAA has the authority to impose severe penalties on member schools and athletes for non-compliance.

7675.  The NCAA includes 1,1021,099 active member schools, and these schools are organized into three Divisions. Division I includes 353352 schools, including 242267 with major football programs. Divisions II and III include schools with much less extensive or no football programs. As a practical matter, any academic institution that wishes to participate in any meaningful way in the highest and most popular levels of college sports must maintain membership in the NCAA and abide by the Division I rules and regulations promulgated by the NCAA and its members.

7776.  In its Consolidated Financial Statements for the fiscal year ending August 31, 2019, the NCAA reported total revenues of $1,118,495,545.[47]1,118,495,545.[16]

7877.  **Pac-12 Conference ("Pac-12")** is an unincorporated association, with its principal place of business located in this District at 360 3rd Street, thirdThird floor, San Francisco, California 94107. The Pac-12 is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I. In its 2017 IRS Form 990 the Pac-12 identified itself as a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and stated that,

_____

[47][16] NCAA Consolidated Financial Statements August 31, 2019 and 2018.

for the fiscal year ending June 30, 2018, it obtained gross revenues of $496,930,601. The Pac-12's "2018-19 Handbook" states that the conference was organized for purposes including: "[t]o provide its members with a jointly governed body for sponsoring, supervising and regulating intercollegiate athletics as a conference member of the National Collegiate Athletics Association ('NCAA') in accordance with the principles, policies, constitution and bylaws of the NCAA" and "[t]o assist its members in funding and promoting their intercollegiate athletics programs."

~~79~~78. The Pac-12's current members are the following ~~12~~ institutions: ~~University of Arizona, Arizona State University, University of California- Berkeley, University of Colorado, University of Oregon,~~ Oregon State University, ~~Stanford University, University of California, Los Angeles, University of Southern California, University of Utah, University of Washington,~~ and Washington State University.

~~80~~79. Defendant Pac-12 during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged class members, and will continue to damage class members unless enjoined.

~~81~~80. **The Big Ten Conference, Inc. ("Big Ten")** is a nonprofit corporation, organized under the laws of Delaware, with its principal place of business located at 5440 Park Place, Rosemont, Illinois 60018. The Big Ten is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I. In its 2017 IRS Form 990 the Big Ten identified itself as a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and stated that, for the fiscal year ending June 30, 2018, it obtained gross ~~revenue~~revenues of $758,899,883.

~~82~~81. The Big Ten's members are the following ~~14~~ institutions: University of California, Los Angeles, University of Illinois at Urbana-Champaign, Indiana University, University of Iowa, University of Maryland, University of Michigan, Michigan State University, University of Minnesota, University of Nebraska–Lincoln, Northwestern University, Ohio State University, University of Oregon, Pennsylvania State University, Purdue University, Rutgers University ~~of Wisconsin–Madison~~, University of ~~Maryland, and Rutgers~~Southern California, University of Washington, and University ~~of Wisconsin–Madison~~. All of the Big Ten's football members are also members of the NCAA's Division I, Football Bowl Subdivision.

8382.    Defendant Big Ten during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged class members, and will continue to damage class members unless enjoined.

8483.    **The Big 12 Conference, Inc. ("Big 12")** is a nonprofit corporation organized under the laws of Delaware, with its principal place of business located at 400 East John Carpenter Freeway, Irving, Texas 75062. The Big 12 is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I. In its 2017 IRS Form 990 the Big 12 stated that it is a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and that, for the fiscal year ending June 30, 2018, it obtained gross revenues of $373,924,498. The Big 12 further stated in its IRS filing that its mission is to "organize, promote and administer intercollegiate athletics among its member institutions" and to "optimize revenues and provide supporting service sompatible [sic] with both academic and competitive excellence."

8584.    The Big 12's current members are the following 10 institutions: Arizona State University, University of Arizona, Baylor University, Brigham Young University, University of Central Florida, University of Cincinnati, University of Colorado, University of Houston, Iowa State University, University of Kansas, Kansas State University, University of Oklahoma, Oklahoma State University, University of Texas-Austin, Texas Christian University, Texas Tech University, University of Utah, and West Virginia University. All of the Big 12's football members are also members of the NCAA's Division I, Football Bowl Subdivision.

8685.    Defendant Big 12 during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged class members, and will continue to damage class members unless enjoined.

8786.    **Southeastern Conference ("SEC")** is an unincorporated association, with its principal place of business located at 2201 Richard Arrington Boulevard North, Birmingham, Alabama 35203-1103. The SEC is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I. In its 2017 IRS Form 990 the SEC identified itself as a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and stated that, for the fiscal year ending August 31, 2018, it obtained revenues of

$659,938,592. It further identified its mission is to "promote and administer intercollegiate athletic competition among its ~~14~~ member institutions located in the Southeastern United States."

8887.   The SEC's current members are the following 14 institutions: University of Florida, University of Georgia, University of Kentucky, University of Missouri, University of Oklahoma, University of South Carolina, University of Tennessee, University of Texas-Austin, Vanderbilt University, University of Alabama, University of Arkansas, Auburn University, Louisiana State University, University of Mississippi, Mississippi State University, and Texas A&M University. All of the SEC's football members are also members of the NCAA's Division I, Football Bowl Subdivision.

8988.   Defendant SEC during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged class members, and will continue to damage class members unless enjoined.

9089.   **Atlantic Coast Conference ("ACC")** is an unincorporated association with its principal place of business located at 4512 Weybridge Lane, Greensboro 620 South Tryon Street, Suite 1200, Charlotte, North Carolina 27407 28202. The ACC is a multi-sport collegiate athletic conference and a formal "conference member" of Defendant NCAA's Division I. In its 2017 U.S. Internal Revenue Service ("IRS") Form 990 the ACC stated that it is a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and that, for the fiscal year ending June 30, 2018, it obtained gross revenues of $464,677,828. The ACC further stated in its IRS filing that it "exists to promote and regulate inter-collegiate intercollegiate athletic programs for and among twelve member institutions, all of which are non-profit educational institutions."

9190.   The ACC's current members are the following 15 institutions: Boston College, University of California, Berkeley, Clemson University, Duke University, Florida State University, Georgia Institute of Technology ("Georgia Tech"), University of Miami, University of North Carolina–Chapel Hill, North Carolina State University, University of Pittsburgh, Southern Methodist University, Stanford University, Syracuse University, University of Virginia, Virginia Polytechnic Institute and State University ("Virginia Tech"), Wake Forest University, and the University of Louisville. Also, as the ACC stated in its 2012-13 annual report, the University of Notre Dame

"officially joined the ACC on July 1, 2013 ... Notre Dame will compete as a full member in all conference sponsored sports with the exception of football, which will play five games annually against league programs."

9291.   Defendant ACC during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged class members, and will continue to damage class members unless enjoined.

9392.   Defendants Pac-12, Big Ten, Big 12, SEC, and ACC are collectively referred to herein as the "Power Five Conference Defendants" or "Conference Defendants," and these conferences are referred to collectively in this Complaint as the "Power Five" or "Power Five Conferences."

9493.   Whenever in this Complaint Plaintiffs make reference to any act, deed, or transaction of a Defendant, the allegation means that the Defendant engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control or transaction of the Defendant's business or affairs.

**C.      Co-Conspirators**

9594.   Various persons, firms, corporations, organizations and other business entities, some unknown and others known, have participated as unnamed co-conspirators in the violations alleged herein, including the NCAA's member-schools and other NCAA Division I athletic conferences not named as defendants in this Complaint. Representatives of those schools and conferences serve on NCAA committees which promulgate rule changes. Representatives of those schools and conferences voted to adopt the rules prohibiting NIL compensation and compensation for athletic services, as well as the rules limiting the number of athletic scholarships available to college athletes, and thus agreed to impose the restraintrestraints on trade described herein. All Division I schools and conferences continue to benefit from those restraints of trade by virtue of their agreement to abide by the restraints.

**IV.      THE ILLEGAL AGREEMENTS TO RESTRAIN COMPETITION**

95.      Defendants' anticompetitive agreements are not secret or disputable. They are a matter of public record, codified in the NCAA Division I Manual (the NCAA's rulebook) and the

rulebooks of each Conference Defendant. They are proposed, drafted, voted upon, and agreed to by the NCAA members—including the Conference Defendants—that compete for the services of college athletes in the various relevant labor markets. These anticompetitive rules are also strictly enforced, so that the competing NCAA member institutions have no choice but to comply with them or face severe cartel penalties.

96.      Plaintiffs bring this suit to challenge and seek damages caused by the NCAA and the Conference Defendants' restraints that prohibit, cap, or otherwise limit the compensation that Division I student-athletes may receive from schools or conferences including for the use of their names, images, likenesses, and athletic reputations in the manners discussed in this Complaint. These restraints are effectuated through the NCAA's rules, regulations, and interpretations which collectively prohibit, as well as compensation for their athletic services. Plaintiffs also challenge the NCAA and Conference Defendants' restraints limiting Division I athletes from receiving compensation based on their athletic skills or ability. Some of the specific bylaws that create the restraints are discussed below.' ability to enter into NIL transactions with third parties. Further, Plaintiffs challenge the NCAA and Conference Defendants' restraints limiting the number of athletic scholarships available to student-athletes.

97.      Article 4 of the NCAA Constitution ("Rules, Compliance and Accountability") provides: "Each member institution . . . shall hold itself accountable to support and comply with the rules and principles approved by the membership. Further, each school shall ensure that its staff, student-athletes, and other individuals and groups representing the institution's athletics interests comply with applicable rules (institutional, conference, divisional and Association-wide) in the conduct of the institution's intercollegiate athletics program."

98.      The NCAA rules, and each Conference Defendant's rules, that prohibit or otherwise limit the compensation that players may receive for their athletic services are illegal cartel agreements. The NCAA rules, and each Conference Defendant's rules, that limit the scholarships and roster spots available to players for their athletic services are illegal cartel agreements. These rules include, but are not limited to NCAA Bylaws 12.01.4, 12.1.2, 12.1.2.1, 12.4.1, 12.4.1.1, 12.4.2.3, 12.4.4, 12.5.2.1, 12.5.2.2, 15.02.2, 15.02.6, 15.1, 15.5.1, 15.5.2, 15.5.3, 15,5,4, 15.5.5, 15.5.6, 16.02.3, 16.1.4, 16.11.2 (individually, and as interpreted and applied in conjunction with each other).

**A.**      **NCAA NIL-Specific Compensation Rules**

~~97~~99.   The NCAA's rules in force during most of the Class Period ~~prohibit student-athletes~~prohibited student-

athletes from endorsing any commercial product or service while they are in school, regardless of ~~whether or~~

whether or not they receive any compensation for doing so. NCAA Bylaw 12.5.2.1 ("Advertisements ~~and Promotions~~

and Promotions After Becoming an Student-Athlete") states:

> After becoming a student-athlete, an individual shall not be eligible for participation in intercollegiate athletics if the individual:
>
> (a)   Accepts any remuneration for or permits the use of his or her name or picture to advertise, recommend or promote directly the sale or use of a commercial product or service of any kind; or
>
> (b) Receives remuneration for endorsing a commercial product or service through the individual's use of such product or service.

~~98~~100. The NCAA also burdens student-athletes with the responsibility of policing any

commercial uses of their NILs that take place without their knowledge or permission. NCAA Bylaw ~~12.5.2.2~~

12.5.2.2 ("Use of a Student-Athlete's Name or Picture Without Knowledge or Permission") states:

> If a student-athlete's name or picture appears on commercial items (e.g., T-shirts, sweatshirts, serving trays, playing cards, posters) or is used to promote a commercial product sold by an individual or agency without the student-athlete's knowledge or permission, the student-athlete (or the institution acting on behalf of the student-athlete) is required to take steps to stop such an activity in order to retain his or her eligibility for intercollegiate athletics.

~~99.~~      101. NCAA rules further restrict student-athletes' outside employment and the

compensation that they may receive from third-party employers. The NCAA rules *allow* athletes to

obtain outside employment while attending college and participating in NCAA sports. And they even

permit multi-sport athletes to retain their college eligibility in one sport while simultaneously

competing (and receiving a salary) as a professional in a different sport.[~~48~~18] However, the NCAA rules

restrict virtually all NIL-related opportunities and compensation that athletes can obtain through

outside employment.

100. While a student-athlete may generally earn money from any "on- or off-campus employment" unrelated to his or her athletic ability, Bylaw 12.4.1 ("Criteria Governing

48 18 NCAA Bylaw 12.1.3.

102. While a student-athlete may generally earn money from any "on- or off-campus employment" unrelated to his or her athletic ability, NCAA Bylaw 12.4.1 ("Criteria Governing Compensation to Student-Athletes") limits the remuneration that athletes can receive from outside employers to "a rate commensurate with the going rate in that locality for similar services." And NCAA Bylaw 12.4.1.1 ("Athletics Reputation") specifically prohibits athletes from receiving "any remuneration for value or utility that the student-athlete may have for the employer because of the publicity, reputation, fame or personal following that he or she has obtained because of athletics ability." While, as of July 1, 2021, the NCAA temporarily suspended enforcement of this rule, it has not been removed from the NCAA's bylaws. Moreover, the interim policy continues to prohibit schools from licensing athletes' NILs and bundling those rights to feature the athletes as part of the school's licensing arrangements.

101. 103. NCAA Bylaw 12.4.2.3 ("Athletics Equipment Sales") instructs, for example: "a student-athlete provides that "a student-athlete may not be employed to sell equipment related to the student-athlete's sport if his or her name, picture or athletics reputation is used to advertise or promote the product, the job or the employer. If the student-athlete's name, picture or athletics reputation is not used for advertising or promotion, the student-athlete may be employed in a legitimate sales position, provided he or she is reimbursed at an hourly rate or set salary in the same manner as any nonathlete salesperson." While, as of July 1, 2021, the NCAA has temporarily suspended enforcement of this rule, it has not been removed from the NCAA's bylaws. And again, the interim policy continues to prohibit schools from licensing athletes' NILs and bundling those rights to feature the athletes as part of the school's licensing arrangements.

102 104. The NCAA's rules also restrict the NIL-related compensation that athletes can obtain through self-employment and personal business ventures. Bylaw 12.4.4 ("Self-Employment") states that "a student-athlete may establish his or her own business, provided the student-athlete's name, photograph, appearance or athletics reputation are not used to promote the business." While, as of July 1, 2021, the NCAA has temporarily suspended enforcement of this rule, it has not been removed from the NCAA's bylaws.

103. Any Division I school that deviates from these rules may be subject to severe sanctions. Potential punishments for rules violations include a complete ban on football participation

(the "death penalty"), as well as a reduction in the number of grants-in-aid a school can offer, or even expulsion from the NCAA.

104.    As explained in the Introduction, the105. The NCAA, effective July 1, 2021, adopted an "interim" NIL policy to suspend

enforcement of some aspects of its NIL rules. But, the NIL restraints at issue have not been

withdrawn or removed from the NCAA rules, and the NCAA remains free to change its NIL rules at

any time in the future at its discretion and/or to revert back to full enforcement of all of the NIL

rules, and it has stated that "the current legal and legislative landscape prevents a permanent solution

at this time."[4919] Moreover, even under its interim policy, the NCAA has not suspended enforcement

of some of the most restrictive aspects of its NIL rules. For example, the NCAA states that under its

interim policy, NIL compensation still cannot be "contingent upon enrollment at a particular school"

or based on "athletic participation or performance."[5020] That is an onerous restriction, as a sponsor

could otherwise have language in an endorsement deal that ties payment to being actively playing the

sport, achieving an athletic accomplishment (such as playing in or winning a Bowl game) or playing

the sport at a particular school. A sponsor may refuse to enter into an endorsement deal if it is not

able to put this language in a contract. Furthermore, "Institutions providing compensation in

exchange for the use of a student-athlete's name, image or likeness" remains prohibited under the

interim policy.[5121]

**B.    NCAA Compensation Rules**

106. Article 12 of the NCAA Bylaws ("Amateurism and Athletics Eligibility") is the

foundation of Defendants' unlawful agreements to fix the amount of compensation that may be paid

to student athletes for their athletic services. Bylaw 12.1.2 provides:

> A [student athlete] loses amateur status and thus shall not be eligible
> for intercollegiate competition in a particular sport if the individual: (a)
> [u]ses athletics skill (directly or indirectly) for pay in any form in that
> sport; [or] (b) [a]ccepts a promise of pay even if such pay is to be
> received following the completion of intercollegiate athletics
> participation . . . .

[19] *See Name | Image | Likeness Quick Guide to New NCAA Interim Policy*, https://ncaaorg.s3.amazonaws.com/ncaa/NIL/NIL_QuickGuideToNewPolicy.pdf (last visited July 25, 2021).

[20] *Name, Image and Likeness Policy Question and Answer*, https://ncaaorg.s3.amazonaws.com/ncaa/NIL/NIL_QandA.pdf (last visited July 25, 2021).

[21] *Id.*

107.    Bylaw 12.1.2.1 then includes a non-exhaustive, two-page list of "Prohibited Forms of
Pay," including any "direct or indirect salary, gratuity or comparable compensation"; any "division
or split of surplus (bonuses, game receipts, etc.);" any "[e]ducational expenses not permitted by the
governing legislation of this Association [*i.e.*, the NCAA]"; and any "[p]referential treatment,
benefits or services." The NCAA rules then continue with nearly two pages of "Exceptions to
Amateurism Rule." Bylaw 12.1.2.4, *et seq*. Unless an exception applies, the NCAA Bylaws
categorically prohibit conferences and schools from providing any form of pay to college athletes.

108. Article 15 of the NCAA Bylaws ("Financial Aid") restricts the amount and type of, and
method by which, schools can provide financial aid to athletes. Financial aid "is not considered to be
pay or the promise of pay for athletics skill, provided it does not exceed the financial aid limitations
set by [NCAA's] membership." *See* Bylaw 12.01.4. Bylaw 15.1 allows athletes to receive financial
aid "based on athletics ability" "up to the value of a full grant-in-aid, plus any other financial aid up
to the cost of attendance." "Full Grant-in-Aid" is "financial aid that consists of tuition and fees,
room and board, books and other expenses related to attendance at the institution up to the cost of
attendance." NCAA Bylaw 15.02.6. "Cost of attendance" (or COA) is the "amount calculated by an
institutional financial aid office, using federal regulations, that includes the total cost of tuition and
fees, living expenses, books and supplies, transportation, and other expenses related to attendance at
the institution." NCAA Bylaw 15.02.2. If an athlete receives financial aid in excess of the COA,
they "shall not be eligible to participate in intercollegiate athletics." NCAA Bylaw 15.1.

109.    Article 16 ("Awards, Benefits and Expenses for Enrolled Student-Athletes")
similarly
prohibits NCAA members from providing benefits to athletes based on their athletic abilities. Bylaw
16.11.2 provides, "The student-athlete shall not receive any extra benefit." "Extra benefit" is defined
as "any special arrangement by an institutional employee or representative of the institution's
athletics interests to provide the student-athlete or the student-athlete's family members or friends
with a benefit not expressly authorized by NCAA legislation." *See* NCAA Bylaw 16.11.2; *see also*
NCAA Bylaw 16.02.3.

**C.     NCAA Scholarship Limits**

110.     The NCAA bylaws artificially restrain the athletic scholarships available for college-athlete labor services by setting maximum numbers or amounts of scholarships that can be provided in each sport. For example, NCAA Bylaw 15.5.2 states that "[a]n institution shall be limited in any academic year to the total number of counters (head count) in ... Women's Gymnastics 12[,] Women's Tennis 8[, and] Women's Volleyball 12." This means that each institution can provide athletic scholarships (in any amount up to the NCAA cap) to this maximum number of athletes set for each sport. Similarly, the NCAA sets maximum numbers of scholarship recipients at 85 for FBS football (NCAA Bylaw 15.5.6.1), 13 each for men's and women's basketball (NCAA Bylaws 15.5.5.1 and 15.5.5.2), and a maximum value of 11.7 scholarships to a maximum of 27 athletes for baseball (NCAA Bylaw 15.5.4.1).

111. The NCAA Bylaws 15.5.3.1.1 ("Maximum Equivalency Limits, Men's Sports") and 15.5.3.1.2 ("Maximum Equivalency Limits, Women's Sports") also "limit [] the value (equivalency) of financial aid awards that an institution may provide in any academic year" in the other NCAA sports.

**D.     Conference Rules**

112. As NCAA members, the Conference Defendants have agreed to the NCAA rules restricting NIL and other types of compensation as well as the number of scholarships. To that end, Conference Defendants have also adopted their own rules (which may be more restrictive but not more permissive than the NCAA's rules) to reinforce the NCAA's restraints. Examples of the Conference Defendants' anticompetitive rules include:

a. ACC Constitution, Article 1.2.1 ("General Purpose"): "The Conference aims to . . . [c]oordinate and foster compliance with Conference and NCAA rules."[22]

---

[22] ACC Manual, 2020–21, https://virginiatech.sportswar.com/wp-content/uploads/sites/15/2022/08/2020-21-ACC-Manual-2020-9-17-2.pdf (last visited July 10, 2024).

b. ACC Manual, Bylaw 2.2 ("NCAA Regulations"): "All [ACC] Members are bound by NCAA rules and regulations, unless Conference rules are more restrictive."[23]

c. Big Ten Conference Handbook, Rule 14.01.3 ("Compliance with NCAA and Conference Legislation"): "The Constitution and Bylaws of the National Collegiate Athletic Association shall govern all matters of student-athlete eligibility except to the extent that such rules are modified by the Conference Rules and Agreements."[24]

d. Big 12 Bylaw 1.2.3 ("Adherence to NCAA Rules"): "All Members of the Conference are committed to complying with NCAA rules and policies. . . . In addition, the conduct of Members shall be fully committed to compliance with the rules and regulations of the NCAA and of the Conference."[25]

e. Big 12 Bylaw 6.1 ("Eligibility"): "A student-athlete must comply with appropriate minimum requirements of the NCAA and the Conference in order to be eligible for athletically related aid, practice, and/or competition in any intercollegiate sport."[26]

f. Big 12 Bylaw 6.4.3 ("Financial Aid Reports"): "Each institution shall comply with all financial aid legislation of the NCAA and the Conference."[27]

g. Pac-12 Bylaw 4-2 ("Application of NCAA Legislation"): "The Conference is a member of the NCAA, therefore, all member institutions are bound by NCAA rules and regulations unless the Conference rules are more demanding."[28]

---

[23] *Id.*

[24] Big Ten Conference Handbook, 2017–2018, https://iuhoosiers.com/documents/2018/4/5//2017_18_Big_Ten_Conference_Handbook.pdf?id=27323 (last visited July 10, 2024).

[25] Big 12 2021–22 Conference Handbook, https://s3.amazonaws.com/big12sports.com/documents/2021/8/16/Handbook_v_3_08_16_2021_.pdf (last visited July 10, 2024).

[26] *Id.*

[27] *Id.*

[28] Pac-12 Conference 2021–22 Handbook, Aug. 1, 2021, https://pac-12compliance.org/wp-content/uploads/2021/08/2021-22-P12-Handbook.V1.pdf (last visited July 10, 2024).

      h.   Pac-12 Executive Regulation 3-1 ("NCAA Rules"): "The rules of the National Collegiate Athletic Association shall govern all matters concerning financial aid to student-athletes except to the extent that the CEO Group modifies such rules to be applied on a conference wide basis."[29]

      i.   SEC Constitution, Article 5.01.1 ("Governance"): "The Conference shall be governed by the Constitution, Bylaws, and other rules, regulations, and legislation of the Conference and the NCAA."[30]

      j.   SEC Bylaws 15.01.1 ("Institutional Financial Aid Permitted"): "Any scholarship or financial aid to a student-athlete must be awarded in accordance with all NCAA and Conference regulations."[31]

113. Any Division I school that deviates from NCAA rules may be subject to severe sanctions. Potential punishments for rules violations include a complete ban on participation (the "death penalty"), as well as a reduction in the number of grants-in-aid a school can offer, or even expulsion from the NCAA.

## V.    RELEVANT MARKETS

~~105~~114. The relevant markets are the nationwide markets for the labor of NCAA Division I college athletes in the various sports in which they compete. In these labor markets, current and prospective athletes compete ~~for roster spots~~to participate on the various Division I athletic teams. NCAA Division I member institutions compete to recruit and retain the best players by offering unique bundles of goods and services including scholarships to cover the cost of attendance, tutoring, and

---

academic [49] *See Name | Image | Likeness Quick Guide to New NCAA Interim Policy*, https://ncaaorg.s3 .amazonaws.com/ncaa/NIL/NIL_QuickGuideToNewPolicy.pdf (last visited July 25, 2021).

[50] *Name, Image and Likeness Policy Question and Answer*, https://ncaaorg.s3.amazonaws.com/ ncaa/NIL/NIL_QandA.pdf (last visited July 25, 2021).

[51] *Id.*

~~academic~~ support services, as well as access to state-of-the-art athletic training facilities, premier coaching, medical treatment, and opportunities to compete at the highest level of college sports, often in front of large crowds and television audiences. In exchange, student-athletes must provide their athletic services and acquiesce in the use of their NILs by the NCAA and its members for commercial and

---

[29] *Id.*
[30] Southeastern Conference Constitution and Bylaws, 2023–2024, https://a.espncdn.com/sec/media/2023/2023-24%20SEC%20Bylaws.pdf (last visited July 10, 2024).
[31] *Id.*

promotional purposes without compensation. They also implicitly agree to pay any costs of attending college and participating in intercollegiate athletics that are not covered by their scholarships.

~~106~~115.        All of the colleges and universities in Division I, which the NCAA itself defines as

the highest level of competition in college sports, compete in the relevant labor markets. This includes all colleges and universities that are members of the Power Five Conference Defendants, as well as the schools and conferences that collude with the Defendants through NCAA rules to fix the maximum ~~price paid~~compensation to athletes in exchange for the commercial use of their NILs and their athletic services while working on Division I teams. These colleges and universities also fix the maximum number of athletic scholarships available to student-athletes at each college or university through NCAA rules.

~~107~~116. The NCAA and its members have the ability to control price and exclude competition in these labor markets. All NCAA members have agreed to utilize and abide by the NCAA's bylaws, including the provisions detailed herein~~, which have been used by the NCAA and its members to fix the prices at which student-athletes are able to be paid for their commercial licensing rights, including but not limited to individual and group licensing rights, and/or to foreclose student-athletes from marketing such NIL rights to any party~~. The NCAA and its members have the power to exclude from these markets any member who is found to violate its rules.~~As described above, the NCAA has adopted an "interim" NIL policy to temporarily suspend enforcement of some aspects of its NIL rules. But the restraints at issue have not been withdrawn from the challenged Bylaws, the NCAA remains free to resume the enforcement of, or change, its NIL rules in the future at any time at its discretion, and the NCAA has explicitly stated that a number of its NIL restraints remain in place even under the interim policy.~~

~~108~~117.        The NCAA imposes a wide variety of restraints on student-athletes as a condition for

their being able to play for a Division I team. For example, athletes may not receive compensation beyond educational expenses approved by the NCAA; they must meet minimum requirements for

educational progress; and they are strictly limited in their ability to receive compensation for any services that might be understood to reflect on their athletic ability or reputation. If student-athletes had the opportunity to receive a college education and compete at an elite level of intercollegiate competition without these restrictions, many would choose to do so. The fact that they agree to these conditions demonstrates the market power of the NCAA and its members in each of the relevant labor markets for Division I athletes.

~~109~~118.        There are no reasonable substitutes for the educational and athletic opportunities

offered by NCAA Division I schools in the relevant labor markets. No other division or association of collegiate athletics provides the same combination of goods and services offered in Division I. Schools in NCAA ~~Divisions~~Division II, for example, provide fewer athletic scholarships than Division I schools, which results in a lower level of athletic competition, and much lower notoriety. Schools in

NCAA Division III do not provide any athletic scholarships at all and a lower level of competition. The National Intercollegiate Athletic Association (NAIA), National Junior College Athletic Association (NCCAA), and United States Collegiate Athletic Association (USCAA) likewise provide less scholarship money and offer a much lower level of competition. And schools in these other divisions and associations are often smaller than Division I schools, spend far less resources on athletics, and many do not even provide the opportunity to attend a four-year college. Nor are equivalent labor market opportunities offered by the professional leagues. Indeed, neither the National Football League (NFL) nor the National Basketball Association (NBA) permits players to enter the league immediately after high school. And, although some minor leagues and professional leagues in other sports do permit athletes to compete immediately after high school, recruits rarely forego opportunities to play Division I sports in order to play professionally. The qualitative differences between the opportunities offered in NCAA Division I, including the opportunity to receive a college education, and those offered by other sports leagues illustrate that Division I schools operate in distinct labor markets for their athletes.

~~110~~119.      Because Division I schools are the only suppliers in these relevant labor markets, they

have the power, when acting in concert through the NCAA and its conferences, to fix the quantity and price of labor. They have chosen to exercise this power by enacting collectively agreed-to, horizontal rules

that strictly limit the compensation and terms of employment for Division I athletes~~, including uniform rules limiting the ability of the athletes to receive any compensation for their NIL rights~~. If any school seeks to depart from these fixed employment terms~~, by offering recruits greater opportunity to monetize their NILs, for example, or offering an upfront payment and/or royalty for the right to bundle the athlete's NIL with the school's own intellectual property in joint deals~~, that school may be subject to sanctions or expulsion by the NCAA.

120. As discussed above, effective July 1, 2021, the NCAA ~~has~~ suspended the enforcement of ~~many of these NIL~~ rules prohibiting NIL compensation from third parties, but only on an interim basis. That has led to an explosion of NIL compensation currently being provided to student-athletes. The fact that this occurred only after the NCAA stated that it was temporarily suspending enforcement of some of the NIL restraints is further evidence of the NCAA's market power, and of the ~~incredible~~ anticompetitive impact of their use of this market power to eliminate an entire category of welfare-enhancing commercial activity.

~~111~~121. By contrast, because the NCAA has not suspended the enforcement of its rules barring schools and conferences from providing compensation in addition to the fixed financial-aid amount allowed, including any NIL compensation to student-athletes, no NCAA member ~~institutions have~~institution has begun to directly provide NIL compensation to student-athletes. This further demonstrates the monopsony power of the NCAA ~~acting through the institutions' agreed-to NIL rules and policies~~.

~~112~~122. The agreement to abide by the NCAA's ~~NIL~~compensation and scholarship maximum rules is anticompetitive because, among other things, it undermines schools' efforts to compete freely for the best college recruits. ~~Absent these nationwide restraints, Division I conferences and schools would compete amongst each other by allowing their athletes to take full advantage of opportunities to utilize, license, and profit from their NILs in commercial business ventures and promotional activities and to share in the conferences' and schools' commercial benefits received from exploiting student-athletes' names, images, and likenesses.~~

123.    Absent these nationwide restraints, there would have been free and vigorous competition for the services of college athletes with schools or conferences offering more scholarships and compensation for athletic services and the use of NILs.

124.    Again, the events since July 1 have proven this to be true, as schools and conferences have permitted student-athletes to commercialize their NILs once the NCAA restraints were suspended, and the quantity of output has exploded, resulting in higher compensation to a large number of athletes who had previously been subject to the pre-July 1, 2021 cap. To date, Plaintiffs are unaware of any Division I school or ~~Conference~~conference that has chosen to prohibit NIL compensation

that is currently permitted by the NCAA and applicable law. But no NIL compensation has been provided directly by NCAA institutions to athletes, as the NCAA has not suspended its rules barring such NIL compensation by its members. If these NCAA rules were not in effect, such compensation by the schools, including for group licensing rights for broadcasts and other purposes, would be provided.

113. Because they cannot directly compensate the athletes for their NIL rights, schools have diverted funds to other uses. Absent the NCAA's NIL rules, conferences and schools would also compete for recruits by redirecting money that they currently spend on extravagant facilities and coaching salaries to marketing programs and educational resources designed to help their NCAA athletes develop and grow their personal brand value and would seek out opportunities to co-market their athletes' NIL in conjunction with the school's own marks. As discussed above, school athletic departments across the country are now offering new educational programming to their athletes aimed at helping them to maximize their new NIL opportunities. As of July 1, 2021, 53 of the 65 Power Five universities had announced an NIL-related initiative partnering with companies like Opendorse, INFLCR or Altius Sports.[52] Schools are also offering new NIL-focused classes and hiring additional marketing staff to give their athletes a competitive edge. For example, on June 24, 2021, Michigan State announced its EverGreen program "which focuses on four pillars" for athletes to maximize their earnings potential: brand, exposure, educate and innovate." Its in-state rival the University of Michigan football program hired a staffer in its recruiting department to help players with their branding. Ohio State launched "THE Platform" to allow athletes to maximize their brand. Stanford, on June 30, 2021, launched "Cardinal Connect" a new program designed to help Stanford athletes to take advantage of NIL opportunities. Likewise, UC Berkeley announced a similar program called "Golden."

114. 125. The harm to student-athletes from the NCAA's NIL restraints is obvious. Many college athletes have created significant value in their NILs and, absent the Absent the challenged restraints,

more student-athletes would obtain scholarships, and many student-athletes [52] Lila Bromberg, *In the NIL Arms Race, Some Schools Are Going the Extra Mile to Help Their Athletes*, SI.com, July 1, 2021, https://www.si.com/college/2021/07/01/name-image-likeness-programs-schools-ncaa (last visited July 25, 2021).

would receive additional compensation from conferences or schools for the use of their use in an open market NILs and providing athletic services. These young men and women—often from socio-economically disadvantaged backgrounds—have been deprived of the economic benefit the market would otherwise pay. The adverse impact of this harm is exacerbated by the fact that only a small percentage of college athletes student-athletes will ever play professionally. As a result, for most student-athletes, college is when their NIL rights are most valuable. For example, Olivia Dunne is a freshman gymnast at LSU who has nearly 5 million combined followers on Instagram, Twitter, and TikTok, and absent NIL restrictions, has long had one of the most valuable brands in college sports. The harm to athletes is proven by what has happened since many of the NIL rules were suspended on July 1, 2021, with thousands of athletes now profiting from NIL deals and companies jumping at the opportunity to finally work with them.

115.     While the NCAA's current rules allow, and in fact require, athletes to participate in the promotion of NCAA sports through the use of their NILs in advertising and interaction with the community of sports consumers, donors, and media, the NCAA and its members have reaped 100 percent of the financial benefits of such promotion and continue to agree among themselves not to provide NIL compensation directly to NCAA athletes. For example, while pursuant to NCAA rules student-athletes have been strictly prohibited from doing so, the NCAA and its members realize significant benefits by entering into licensing, marketing, sponsorship, advertising, broadcast, and other commercial agreements that involve the group use of student-athlete NILs. Absent the restraints, the student-athletes would compete freely in both group licensing and to obtain individual endorsement, sponsorship, and other NIL-related deals, payments for their participation in promotional activities (*e.g.*, personal appearances, signing autographs), as well as social media branding and influencer activities. The explosion in such deals provided to the athletes since July 1 have shown this to be true.

116.     Although irrelevant to questions focused within the relevant markets, even if one looks outside of these markets, the NCAA's "zero compensation" policy for the use of student-athletes' NILs is not necessary to achieve the NCAA's purported goals of promoting consumer demand for college sports by maintaining a distinction between college and professional sports, or

treating student-athletes in the same manner as the student body in general, or for any other claimed, procompetitive purpose.

117. Moreover, to the extent that any procompetitive purposes are served by the NIL rules (they are not), reasonable and patently less restrictive alternatives are available that would be virtually as effective in achieving any claimed procompetitive purpose. As discussed above, one such less restrictive alternative would be the interim policy's system of leaving most NIL rules to the individual schools and conferences.

118. The challenged restraints are entirely unique to student-athletes. There are no comparable rules restricting a non-athlete student's pursuit of career options or use of his or her name, image, likeness, or skillset. In contrast to athletes, all other students on college campuses have the freedom to use their NILs to start a business, advertise commercial products and services and to be compensated at whatever rate an employer sees fit. For example, a music student on a full scholarship who performs in the school band is not barred from being paid more than other employees to work at a local music store, if the employer feels that the student's music skills and reputation would increase sales or traffic into the store. Nor is the same music student prevented from receiving compensation from social media websites such as Twitter or Instagram if enough fans "follow" or "subscribe to" their accounts and posts. According to Brian Freeman, CEO of HeartBeat, a company that connects brands with up-and-coming and established social media influencers, there is a huge audience for social media content related to college life and, of the 250,000 influencers working with the company, approximately 10,000 are current college students.[53]

119. In fact, while student-athletes have been strictly prohibited from receiving any compensation for their involvement in promotional social media campaigns for their schools' athletic programs, many schools employ their non-athlete students in paid positions as "campus influencers." This is because institutions realize that students drive interest and engagement in a way that colleges can't and many have built student influencers into their marketing strategies. Temple University, for

[53] Lindsay McKenzie, *Big Influencers on Campus,* Dec. 5, 2019, INSIDE HIGHER ED, https://www.insidehighered.com/news/2019/12/05/working-student-social-media-influencers (last visited July 25, 2021).

example, targets the students on its campus who have developed large social media followings on their own personal accounts and hires them to serve as video bloggers who are paid to create and post promotional videos giving campus tours, discussing topics like studying abroad, and answering questions such as "what's in my book bag" or "how to survive finals week."[54] Colorado State University recently started a YouTube channel called "A Ram's Life" that portrays life at CSU "from the eyes of students themselves."[55] The channel was created by paid student interns and features videos made by student "vloggers" who are employed by the school's social and digital media team.[56]

120.    The anticompetitive character of the NIL rules is further highlighted by the fact that other students are free to capitalize on college players' athletic reputations while the players themselves have been barred from doing so. In 2016, it was reported that Breana Dodd, a student at the University of Tennessee and then-girlfriend of Tennessee wide receiver Josh Smith, had earned a position as a paid social media endorser for the Hershey Company after being crowned "hottest college football girlfriend of the season" by Barstool Sports.[57] At the same time, Smith himself was prohibited by the NCAA from securing the same kind of deal.

121. Even NCAA President Emmert has admitted in a recent interview about NIL rules that student-athletes should be permitted to do "anything" that a regular student is permitted to do unless there is some very compelling competitive balance concern that passes a "high bar."[58] No such competitive balance justification—much less one that passes a "high bar"—exists.

[54] *Id.*

[55] *Available at* https://www.youtube.com/channel/UCYvSJ1wawc7RMmYKufrJSYg/about (last visited July 26, 2021).

[56] Ashley Manweiler, *Join Our Team: #CSUSocial is Hiring a Student Vlogger*, social.colostate.edu, May 18, 2020, http://social.colostate.edu/2020/05/18/join-our-team-csusocial-is-hiring-a-student-vlogger/ (last visited July 25, 2021).

[57] Josh Levin, *A College Football Player's Girlfriend Can Get Paid to Endorse Candy. Her Boyfriend Can't.*, Slate.com, May 5, 2016, https://slate.com/culture/2016/05/breana-dodd-can-get-paid-to-endorse-candy-her-boyfriend-colleg e-football-player-josh-smith-cant.html (last visited July 25, 2021).

[58] YouTube, *Inside the NCAA, NCAA Social Series EP 65*, Twitter.com, July 15, 2021, https://twitter.com/insidethencaa/status/1415831043098112001?s=21 (last visited July 25, 2021).

122.The injuries that Plaintiffs and the class

members are incurring and will continue to incur will not be fully compensable by monetary damages. This is particularly true due to the short length of NCAA careers, and the challenges in estimating and proving the total amount of damages suffered by Plaintiffs as a result of Defendants' unlawful conduct.

## VI.    FACTUAL ALLEGATIONS

### A.    An Overview of the NCAA

#### 1.    History and Purpose

~~123~~126. Former NCAA Executive Director Walter Byers, in his 1995 book, *Unsportsmanlike Conduct: Exploiting College Athletes*, wrote: "[t]he first intercollegiate competition in the United States was conceived and organized by students in the mid-1840s. By the turn of the century, eastern colleges were competing in some 19 sports. This all came about through student initiative and effort. The students set in place the underlying structure for college sports. Today, professional coaches, professional managers and money-minded presidents have total control. It is time to give back to the students who play sports the freedoms they deserve. At a minimum, they are entitled to freedoms enjoyed by their fellow students."

~~124~~127. The NCAA "was founded in 1906 to protect young people from the dangerous and exploitative athletics practices of the time."[~~59~~32] According to the NCAA, "[t]he rugged nature of early-day football, typified by mass formations and gang tackling, resulted in numerous injuries and deaths," prompting President Theodore Roosevelt to convene two White House conferences with college athletics leaders to encourage safety reforms. As a result of several subsequent meetings of colleges and universities to initiate changes in football playing rules to protect the safety of student-athletes, on March 31, 1906, 62 institutions became charter members of the Intercollegiate Athletic Association of the United States (IAAUS). The IAAUS took its present name, the NCAA, in 1910.

~~125~~128. For several years, the NCAA was a discussion group and rules-making body, but in 1921 the first NCAA national championship was conducted: the National Collegiate Track and Field

---

[~~59~~32] Dan Treadway, *Why Does the NCAA Exist?* HuffPost.com, Dec. 6, 2017, https://www.huffpost.com/entry/johnny-manziel-ncaa-eligibility_b_3020985 (last visited July 25, 2021).

Championships. Gradually, more rules committees were formed and more championships were created, including a basketball championship in 1939.

126129.        According to the NCAA, "[a]s college athletics grew, the scope of the nation's athletics programs diverged, forcing the NCAA to create a structure that recognized varying levels of emphasis. In 1973, the Association's membership was divided into three legislative and competitive divisions—I, II and III. Five years later, Division I members voted to create subdivisions I-A and I-AA (renamed the Football Bowl Subdivision and the Football Championship Subdivision in 2007) in football." The NCAA "began administering women's athletics programs in 1980 when Divisions II and III established 10 championships for 1981-82. A year later, the historic 75th Convention adopted an extensive governance plan to include women's athletics programs, services and representation. The delegates expanded the women's championships program with the addition of 19 events, many of them Division I and National Collegiate (all division) championships."

127130. Article 1 of the NCAA Constitution states that the NCAA's basic purpose is "to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body and, by so doing, retain a clear line of demarcation between intercollegiate athletics and professional sports."

128131.        The NCAA proclaims it is "dedicated to the well-being and lifelong success of college athletes," and "united around one goal: creating opportunities for college athletes."6033

## 2.        Governance Structure

129132.        The NCAA describes itself as an "unincorporated not-for-profit educational organization . . . through which the colleges and universities of the nation speak and act on athletic matters at the national level."6134 The NCAA proclaims it is "a voluntary association of more than 1,200 institutions, conferences, and organizations devoted to the sound administration of intercollegiate athletics in all its phases," and that "[t]hrough the NCAA, its members consider any athletics issue that crosses regional or conference lines and is national in character." According to its

6033 2018 IRS Form 990.
6134 NCAA Consolidated Financial Statements, FY 2018 & 2019.

IRS tax returns, the NCAA's "active member institutions and voting conferences are the ultimate voice in all Association decisions."[6235]

~~130~~133. The NCAA "oversees 89 championships in 23 sports," and "more than 400,000 college athletes competing in three divisions at over 1,000 colleges and universities." The NCAA website further states:

> Each member school is able to choose a level of competition that best fits its mission. Competition is offered in Division I (the largest programs that provide the most athletically related financial aid for student-athletes), Division II (limited financial aid) and Division III (no athletically related financial aid).

> There are 1,066 active member schools in the NCAA membership—340 in Division I, 290 in Division II and 436 in Division III. The NCAA also contains 95 member conferences in all three divisions. Overall membership—counting schools, conferences and related associations—is 1,273.

> Division I is subdivided based on football affiliation. A total of 120 schools are members of the Football Bowl Subdivision (FBS). That subdivision is characterized by postseason play outside the NCAA structure and also by higher financial aid allocations. The second Division I subdivision is the Football Championship Subdivision, which contains 122 schools that participate in the NCAA's Division I Football Championship. The remaining 98 Division I schools do not sponsor football.

~~131~~134.    According to the NCAA, "Division I offers three classes of membership: active, conference and affiliated." NCAA Constitution Article 3.02.3, titled "Membership Categories," provides:

> **3.02.3.1 Active Member.** An active member is a four-year college or university that is accredited by the appropriate regional accrediting agency and duly elected to active membership under the provisions of this article (see Constitution 3.2.3). Active members have the right to compete in NCAA championships, to vote on legislation and other issues before the Association, and to enjoy other privileges of membership designated in the constitution and bylaws of the Association.

> **3.02.3.2 Member Conference.** A member conference is a group of colleges and/or universities that conducts competition among its members and determines a conference champion in one or more sports (in which the NCAA conducts championships or for which it is responsible for providing

playing rules for intercollegiate competition), duly elected to conference membership under the provisions of this article (see Constitution 3.3.3). A member conference is entitled to all of the privileges of active members except the right to compete in NCAA championships (see Constitution

6235 2018 IRS Form 990.

3.3.2). Only those conferences that meet specific criteria as competitive and legislative bodies (see Constitution 3.02.1 and 3.02.2) and minimum standards related to size and division status are permitted to vote on legislation or other issues before the Association.

132135.      The NCAA's website explains that, "[e]ach division creates its own rules governing

personnel, amateurism, recruiting, eligibility, benefits, financial aid, and playing and practice

seasons—consistent with the overall governing principles of the Association. Every program must

affiliate its core program with one of the three divisions."

133136. The NCAA "operates through a governance structure, which empowers each division

to guide and enhance their ongoing division-specific activities."6336 In Division I, the legislative

system is based on conference representation and an eighteen membereighteen-member Board of Directors that

approves legislation. The governance structure also includes an Executive Committee composed of

sixteen chief executive officers that oversees association-wide issues and is charged with ensuring

that each division operates consistently with the basic purposes, fundamental policies, and general

principles of the NCAA.

### 3.    Bylaws and Enforcement

134137. The NCAA and its members govern themselves through the NCAA manual, which is

promulgated yearly and updated quarterly. The manual contains, among other things, the NCAA's

Constitution and operating Bylaws, which includes nearly five hundred pages of regulations

governing all aspects of college sports.

135138. The Constitution and Bylaws were adopted—and may be amended—by votes of the

NCAA membership. Article 5.2.2 ("Operating Bylaws") states that "[e]ach division may adopt

legislation to be included in the operating bylaws of the Association, which provide rules and

regulations not inconsistent with the provisions of the constitution and which shall include, but not

be limited to, the following particulars: (a) The administration of intercollegiate athletics by members of the Association; (b) The establishment and control of NCAA championships (games, matches, meets and tournaments) and other athletics events sponsored or sanctioned by the

63 36 NCAA Consolidated Financial Statements, August 31, 2019 and 2018.

Association; (c) The procedures for administering and enforcing the provisions of the constitution and bylaws; and (d) The adoption of rules of play and competition in the various sports, and the delegation of authority in connection with such subjects to individuals, officers or committees."

136139.        The manual also contains extensive provisions requiring member schools to follow

NCAA rules and providing for discipline of members that fail to do so. For example, Article 1.3.2 ("Obligations of Member Institutions") states that "[l]egislation governing the conduct of intercollegiate athletics programs of member institutions shall apply to basic athletics issues such as admissions, financial aid, eligibility and recruiting. Member institutions shall be obligated to apply and enforce this legislation . . . ." Article 2.8.1 ("Responsibility of Institution") reiterates that "[e]ach institution shall comply with all applicable rules and regulations of the Association in the conduct of its intercollegiate athletics programs," and that "[m]embers of an institution's staff, student-athletes, and other individuals and groups representing the institution's athletics interests shall comply with the applicable Association rules, and the member institution shall be responsible for such compliance."

137140.        Article 3.1 ("Eligibility for Membership") reinforces that "institutions or organizations must accept and observe the principles set forth in the constitution and bylaws of the Association." And Article 3.2.1.2 ("Compliance with Association Rules") mandates that each institution "shall administer its athletics programs in accordance with the constitution, bylaws and other legislation of the Association."

138141.        Similarly, Article 3.2.4 ("Conditions and Obligations of Membership") states that

"[a]n active member institution agrees to administer its athletics program in accordance with the constitution, bylaws and other legislation of the Association." And, pursuant to Article 3.2.4.4 ("Certification of Eligibility/Declaration of Ineligibility"), every NCAA school "is responsible for certifying the eligibility of student-athletes under the terms of the constitution, bylaws or other legislation of the Association" and institutions are "obligated immediately to apply all applicable rules and withhold ineligible student-athletes from all intercollegiate competition." In other words, the NCAA mandates a collective boycott by all members of any athlete found to have deviated from the price-fixing activity alleged in this Complaint.

~~139~~142. To reinforce its rules, the NCAA goes even further. For example, Article 3.2.4.11 ("Discipline of Member") states that, "active members shall refrain from athletics competition with designated institutions under the provisions of the Association's enforcement procedures." To put it another way, the NCAA mandates a collective boycott by all members of any school found to have deviated from the price-fixing activity alleged in this Complaint.

~~140~~143. Article 2.8.3 ("Penalty for Noncompliance") states that "[a]n institution found to have violated the Association's rules shall be subject to such disciplinary and corrective actions as may be determined by the Association." Article 3.2.5.1 ("Termination or Suspension") states that "[t]he membership of any active member ... failing to meet the conditions and obligations of membership may be suspended, terminated or otherwise disciplined." Article 3.01.4 ("Termination or Suspension of Membership") states that "[a]ll rights and privileges of a member shall cease immediately upon termination or suspension of its membership." And, Article 3.2.5.1.1 ("Cessation of Rights and Privileges") states that "[a]ll rights and privileges of the member shall cease upon any termination or suspension of active membership."

~~141~~144. Conferences also enforce the NCAA's rules. For example, the Pac-12's 2018-19 Handbook states that "[t]he Conference is formed for the following purposes: a. To provide its members with a jointly governed body for sponsoring, supervising and regulating intercollegiate athletics as a member of the National Collegiate Athletics Association ('NCAA') in accordance with the principles, policies, constitution and bylaws of the NCAA...." The Handbook continues that "[t]he members of the Conference value: ... Compliance with Conference and NCAA rules" and that "[t]he Conference may place a member on probation or suspension, or terminate its membership, by vote of at least three-fourths of all of the members of the CEO Group eligible to vote on the matter, for one or more of the following reasons: ... Violating rules and regulations of the NCAA, or becoming ineligible for active membership in Division I of the NCAA, by a written determination of the NCAA; ... Such disciplinary action may also include the assessment of financial penalties." It continues that "[t]he Conference is a member of the NCAA, therefore, all member institutions are bound by NCAA rules and regulations unless the Conference rules are more demanding," and "[t]he rules of the National Collegiate Athletic Association shall govern all matters concerning financial aid

to student-athletes except to the extent that such rules are modified by the CEO Group." All of the other ~~conference~~Conference Defendants have similar rules agreeing to abide by and enforce NCAA bylaws.

~~142~~145.        In addition to controlling its members, the NCAA also regulates college athletes. Bylaw 14.01.3 ("Compliance With Other NCAA and Conference Legislation") mandates that, "to be eligible to represent an institution in intercollegiate athletics competition, a student-athlete shall be in compliance with all applicable provisions of the constitution and bylaws of the Association..." Bylaw 12.7.2 ("Student-Athlete Statement") states that each year a college athlete "shall sign a statement in a form prescribed by the Legislative Council ... related to ... eligibility ... financial aid, amateur status ... [f]ailure to complete and sign the statement shall result in the student-athlete's ineligibility for participation in all intercollegiate competition."

## B.        The commercial nature of Division I sports

~~143~~146.        The rapid and largely unconstrained escalation of commercialization in college sports makes it increasingly difficult to justify the ever-expanding divide between student-athletes, who have been compensated only with restrictive, in-kind benefits or expense reimbursement, and the business of the sports they play. This divide has eroded the value of the education that athletes receive and gives rise to high-profile violations of NCAA rules that highlight the pervasive influence of money in college sports and the lack of commitment to academics.

~~144~~147. In a January 2020 interview with ESPN, former NCAA Vice President of Championships, Mark Lewis explained the highly commercialized nature of big-time college sports: "The priority is to monetize the sport, that's taken precedence over everything else. If that's the model—and there's nothing wrong with that—then you can't expect the players to live by the same set of rules [as they did in the past]. To me, it's just a question of fairness." Lewis continued, "If you go back 30 or 40 years to all the ways pro sports tried to be financially successful and compared that to college sports, you didn't check all those boxes. There were legitimate differences ... Then, you could say the focus was an academic-oriented situation. But in this drive for revenue now, the boxes

line up the same. Colleges are doing everything that pro sports leagues are doing to make money. So how come you're treating the participants radically different? You can't justify it."[6437]

145148.        The money generated by the college sports enterprise is staggering. In 2019, the

NCAA reported total revenues of $1,118,495,545.[65]1,118,495,545.[38] And it is important to note that the revenues reported *by the NCAA* are only a fraction of the total revenues brought in by Division I college sports each year. And, whether through sponsorship arrangements, ticket sales, television contracts, apparel deals, merchandise sales, or increasing student fees, the revenue streams for conferences and individual athletics programs are varied and robust.

146149.        College sports have also proved to be highly profitable for corporate interests that find

every way imaginable to market and exploit student-athletes. While corporations have fueled the massive growth of the college sports industry, their profit margins have simultaneously expanded off the backs of "amateur" college athletes.

147150. For example, television networks have capitalized on the immense profitability of the college sports machine through substantial broadcasting deals with the NCAA and its members. In 2016, CBS Sports and Turner Broadcasting signed an eight-year, $8.8 billion extension with the NCAA for broadcasting rights to the March Madness basketball tournament. In the same year, the Big Ten conference signed a six-year deal with Fox, ESPN, and CBS worth $2.64 billion.[6639] That contract mirrors similar deals that the other Power Five conferences and schools have made with broadcasters to launch their own channels. In 2011, for example, the University of Texas signed a deal with ESPN worth $300 million over 20 years that created the Longhorn Network.[6740]

---

[6437] Dan Murphy, *Former NCAA executive Mark Lewis supports college players earning money,* ESPN.com, Jan. 21, 2020,
https://www.espn.com/college-sports/story/_/id/28530364/former-ncaa-executive-mark-lewis-supports-college-players-earning-money (last visited July 25, 2021).

[6538] NCAA Consolidated Financial Statements, August 31, 2019 and 2018.

[6639] Lev Facher, *Report: Big Ten getting $2.64 billion in new TV deal*, Indystar.com, June 20, 2016,
https://www.indystar.com/story/sports/college/2016/06/20/report-espn-pay-more-than-1-billion-big-ten-footballgames/86133418/ (last visited July 25, 2021).

[6740] Spencer Hall, *The Longhorn Network and ESPN Sign Texas-Sized Deal (Yeehaw!),* SBNation.com, Jan. 19, 2011,

https://www.sbnation.com/ncaa-football/2011/1/19/1944110/texas-longhorn-network-espn-sign-deal (last visited July 25, 2021).

148151. Every television deal, whether with the NCAA, its conferences, or individual programs, nets broadcasters substantial advertising revenues. With championship game ads going for $1.5 million each, corporate spending on the March Madness tournament now rivals that of the Super Bowl. It is estimated that CBS and Turner took in $1 billion from advertisements during the 2018 tournament.[6841] In 2019, the University of Virginia's overtime victory over Texas Tech drew 19.6 million viewers and that game alone was reported to have generated $114 million in ad spending.[6942] Despite the fact that student-athletes contribute a substantial portion of the value that supports the massive revenues generated in these deals (through both their athletic performances and the use of their NILs), because of the challenged restraints agreed to by Defendants, student-athletes do not receive any share in those revenues apart from the limited scholarships and benefits that NCAA rules permit. Absent these restraints, student-athletes would receive the market value commensurate with what they contribute.

149152. With so many cameras pointed at college sporting events, corporations have also realized an opportunity to profit by associating their products and services with student-athletes. Because the NCAA has prevented them from dealing directly with individual athletes, brands have found other ways to leverage the college sports platform to their advantage, including by entering into lucrative sponsorship deals with the NCAA, conferences, schools, and coaches.

150153. The NCAA maintains an official list of "corporate champions and partners" that currently includes 18 major corporations ranging from Coca-Cola, AT&T, and Capital One to Google, Geico, and Uber. These companies gain exclusive marketing and promotional rights to all 89 NCAA championship events, including the Division I Men's Basketball Championship and Football Championships. Those rights pay dividends as each commercial or logo embedded in the NCAA's programming has the potential to reach millions. As a result, and as U.S. Senator Chris Murphy noted in his 2019 report, *Madness, Inc.*, "Everything that can be branded has been. That

---

[6841] Andrew Lisa, *The Money Behind the March Madness NCAA Basketball Tournament*, Finance.yahoo.com, Mar. 9, 2020, https://finance.yahoo.com/news/money-behind-march-madness-ncaa-194402803.html (last visited July 25, 2021).

[6942] *Id.*

iconic moment where athletes climb a ladder as they cut down the nets to celebrate a berth in the Final Four or the championship? Even the ladder is sponsored."[7043]

~~151~~154.        The nation's largest sports apparel companies also compete for what they recognize is

prime advertising real estate—college athletes whose games are broadcast for millions to see. Because the NCAA has prohibited them from dealing directly with the athletes, instead of the athletes being compensating for the use of their NILs (as would occur absent the restraints), apparel companies enter into lucrative agreements with schools and coaches instead. In 2019, Nike, Adidas, and Under ~~Armor~~Armour had secured exclusive rights to outfit 97 percent of all Division I football and basketball programs, and it was reported that, in that year alone, these three companies spent over $300 million ~~dollars~~ on college sponsorship contracts. Universities receive substantial sums from these sponsorships, and apparel advertising on network telecasts of college basketball games also helps, together with advertising from other sources, to support the large media rights payments to the NCAA and its members.

~~152~~155. Division I programs are now defined by the apparel company that outfits their teams. For example, the University of Michigan is a Nike school, having signed a $173.8 million ~~dollar~~ contract with the company in 2016. In 2017, the Ohio State University signed a 15-year, $252 million deal with Nike that included a $20 million cash signing bonus. And UCLA signed a record-setting deal with Under ~~Armor~~Armour worth $280 million.[7144]

~~153~~156.        Schools can further increase their sponsorship revenues by staying loyal to a particular brand. For example, when Clemson University signed a 10-year contract extension with Nike in 2018 that granted its athletic department more than $58 million in "apparel allowances, direct cash payouts, and royalties," the school doubled its annual payout.[45] Meanwhile, Indiana

---

[7043] Chris Murphy, *Madness, Inc. How Everyone is getting rich off college sports – except the players*, Murphy.Senate.gov, Mar. 28, 2019, https://www.murphy.senate.gov/download/madness-inc (last visited July 25, 2021).

[7144] ESPN.com, *Breaking down college shoe and apparel deals,* Sept. 27, 2017, http://www.espn.com/mens-collegebasketball/story/_/id/20837463/a-look-colleges-apparel-shoe-deals (last visited July 25, 2021).

[45] Sports Business Journal, *Clemson's 10-year Nike Extension Doubles Value of Previous Deal,* sportsbusinessdaily.com, Aug. 6, 2018,

~~direct cash payouts, and royalties," the school doubled its annual payout.72  Meanwhile, Indiana~~ University's renewed contract with Adidas nearly doubled its payments from $3.7 million per year under its prior agreement to $6.7 million.~~73~~46

~~154~~157.        Over time, major apparel retailers, predominantly Nike and Adidas, have come to

dominate the funding of American Amateur Union ("AAU") basketball and other youth teams and tournaments in an effort to affiliate their brands and products with the next generation of sports stars. The value companies obtain from investing in and affiliating with youth teams is derived from the opportunity it provides to create relationships with top prospects and those around them from a young age. These early relationships allow the companies to influence which colleges prospects will attend and, ultimately, which brands they will endorse if and when they go pro. The system creates a strong incentive for basketball coaches at all levels to remain loyal to a particular brand—and have their players do the same—while also continuing to recruit fresh talent on behalf of the company they affiliate with. As a result, AAU basketball has become a nationwide marketplace for the most talented young basketball players in the country and is now a recruiting battleground for college coaches and corporations alike.

~~155~~158.        While many factors might influence the college selected by a young athlete, there is

evidence demonstrating that early affiliation with a particular brand often holds significant weight in an athlete's future decisions. Between 2003 and 2017, roughly 80 percent of five-star prospects from Nike-affiliated AAU teams went on to play for a Nike-sponsored college. And of the five-star players who ultimately reached the NBA, roughly 87 percent of those who were affiliated with Nike through youth teams and colleges, continued to endorse the company as professionals.~~74~~47

159.        The impact of apparel company influences are not limited to men's basketball. In April 2020, shortly after becoming the number one pick in the 2020 WNBA draft, reigning NCAA

~~72~~ ~~Sports Business Journal,~~ ~~*Clemson's 10 year Nike Extension Doubles Value of Previous Deal,*~~ ~~sportsbusinessdaily.com, Aug. 6, 2018,~~ https://www.sportsbusinessdaily.com/Daily/Issues/2018/08/06/Marketing-and-Sponsorship/Clemson-Nike.aspx (last visited July 25, 2021).

~~73~~46 Zach Osterman, *IU to get 81% hike in apparel revenue in Adidas deal*, IndyStar.com, Aug. 17, 2015, https://www.indystar.com/story/sports/college/indiana/2015/08/17/iu-adidas-extend-apparel-agreement/31887747/ (last visited July 25, 2021).

7447 Chris White, *By the Numbers: Once Nike gets a five-star college recruit, he's unlikely to ever leave*, USAtoday.com, Feb. 26, 2018, https://sports.usatoday.com/2018/02/26/by-the-numbers-once-nike-gets-a-fivestar-college-recruit-hes-unlikely-to-ever-leave/ (last visited July 25, 2021).

156.   The impact of apparel company influences are not limited to men's basketball. In April 2020, shortly after becoming the number one pick in the 2020 WNBA draft, reigning NCAA national player of the year and former Oregon Duck, Sabrina Ionescu—former teammate of Plaintiff and current Oregon Duck Sedona Price—signed a multi-year endorsement deal with Nike. Nike co-founder co-founder Phil Knight is a major donor for the University of Oregon athletics program and Ionescu recently confirmed that Nike's close ties to the university factored heavily into her decision to sign with the company amid aggressive offers and competition from other brands. "Obviously going to an Oregon school and coming from Nike and knowing Phil Knight and just knowing everyone on the Nike side [factored into the decision]" said Ionescu, "Being a Nike athlete for the last 10 years ... ultimately I think Nike is the best decision—just kind of staying loyal to my roots and continuing to be a Nike athlete at the professional level."75 48

157 160.      In 2014, then University of Louisville head basketball coach Rick Pitino criticized the

system, claiming that because Louisville was sponsored by Adidas, he couldn't recruit a player from a Nike-sponsored AAU team: "Believe me, it's a very competitive thing by these shoe companies to get players. They're going out and recruiting like us, in the summertime. 'Let's get this kid into the (Nike) EYBL. Let's get this kid in the Adidas Nations.'" It's hard for coaches to resist the system, Pitino says, because "our pockets are lined with their money."76 49 Ironically, 98 percent of the income from Louisville's recent Adidas sponsorship deal went directly to Pitino. In 2015-16, Pitino was reportedly paid $1.5 million through the agreement while just $25,000 went to the program.

158 161.      In 2017, the FBI announced a sweeping corruption investigation that implicated Pitino

along with other college coaches, as well as financial advisors, and Adidas executives in a conspiracy to pay five-star high school recruits to attend Louisville and other Adidas-sponsored universities. Three federal criminal complaints released in September 2017 detail some aspects of the corruption and exploitation that occurs in the current system when coaches, agents, and shoe

---

75 48 Adam Wells, *Liberty's Sabrina Ionescu Agrees to Multi-Year Endorsement Contract with Nike*, bleacherreport.com, Apr. 17, 2020, https://bleacherreport.com/articles/2887160-sabrina-ionescu-agrees-to-multi-year-endorsement-contract-with-nike (last visited July 25, 2021).

76 49 Associated Press, *Pitino: Shoe companies too influential*, ESPN.com, Oct. 9, 2014, https://www.espn.com/mens-college-basketball/story/_/id/11672004/rick-pitino-wants-eliminate -influence-athletic-shoe-companies-recruiting (last visited July 25, 2021).

~~corruption and exploitation that occurs in the current system when coaches, agents, and shoe~~ companies work together to control a prospect's basketball career and business dealings for their own enrichment.

~~159~~162. According to Sonny Vaccaro, a retired Nike executive and the person many consider to be the godfather of basketball endorsement money: "Everybody is involved in this scandal. There's nobody left out. The most important person in the transaction is that high school kid ... and he's the poorest of all of them. And they're all bidding on his ability to play basketball—to win championships, go to the Final Four, to sell shoes, to sell suits, to put money in investments ... the universities are now co-conspirators in everything that happens... It's a willing co-conspiracy. The shoe company wants to sell shoes. The university wants to win games so they get more money from the shoe company."~~77~~50 Vaccaro acknowledges that "there's been scandals in college athletics forever. And there's been a word in college athletics forever: Amateurism. And amateurism and scandal go together."

~~160~~163.     While athletes have not been allowed to profit from ~~social media activities,~~schools' and conferences' social

media activities, social media sponsorships have become a staple in negotiations of corporate partnership deals for many major college athletic programs. In addition to television deals and apparel contracts, social media plays an important role in each school's quest for more revenue, providing brand exposure, fan interaction, and increased awareness of events at a relatively low cost to athletic departments. A strong social media presence is appealing to potential sponsors, and teams can drastically increase the value of their sponsorships by creating high-quality, engaging content featuring brand logos and often the NILs of student-athletes.

~~161.~~     164. For example, it was reported in 2015 that the University of Southern California

("USC") athletics department was sending about a dozen sponsored messages each week across each of its official social media accounts, including on Twitter, Facebook, Instagram, and Snapchat.

---

~~77~~50 Gentry Estes, *College basketball's trap: How agents and shoe companies team up to exploit athletes*, courier-journal.com, Feb. 25, 2018, https://www.courier-journal.com/story/news/2018/02/25/college-basketball-recruiting-scandal-system-traps-players/370215002/ (last visited July 25, 2021).

(Added)



SLI

(Deleted)



Fox Sports, the ~~school's~~school's rights holder, confirmed at the time that revenue from those sponsored posts was approaching the mid-six-figures annually and the report further noted that ~~"~~"Fox and USC have seen no evidence that the presence of sponsor branding turns off Trojans~~"~~ fans... ~~it's~~it's the content in the graphic that drives views, whether a sponsor is present or not.~~278~~51 ~~162~~165. Other Division I schools negotiate similar social media sponsorship arrangements and incorporate brand logos into their own athletic posts in exchange for payment from the brands.



Sponsored post by official Twitter account of UCLA Athletics (@UCLAAthletics)

---

[78] Michael Smith, *Colleges find revenue stream in social media,* sportsbusinessdaily.com, Oct. 12, 2015,
https://www.sportsbusinessdaily.com/Journal/Issues/2015/10/12/Colleges/College-social-media.aspx
(last visited July 25, 2021).

(Deleted)





Sponsored post by official Twitter account of North Carolina State football (@PackFootball)



Sponsored post by official ~~Instagram~~ histogram account of Mississippi State football (@hailstatefb)

~~163~~166.      In the 2017-18 academic year, sponsorship spending on college athletic departments, conferences, bowl games, and related properties totaled $1.24 billion.[~~79~~52] In 2018, the Pac-12 conference alone generated $153.13 million—15 percent of its total revenues ($1,011.97 million)—from corporate sponsorship, advertising and licensing.[~~80~~53] Pac-12 schools derived similar portions of their revenues from sponsorships as well. For example, in 2018, corporate sponsorships accounted for 16 percent ($18.07 million) of ASU's total athletic department operating revenues ($113.64 million).[~~81~~54]

~~164~~167. Flush with cash and unable to compete for athletes on the basis of financial remuneration, colleges invest their revenues internally. The constant drive to win, either between big-time Power Five schools or smaller programs hoping to make the jump onto the national stage, fuels an "arms race" that has inflated staff salaries and rationalized lavish athletic facilities, among other spending intended to make the school as competitive as possible in recruiting.

~~165~~168.      Collegiate athletic programs invest in facilities that outshine even their most impressive professional counterparts. In 2018, for example, Clemson finished construction of a $55-~~million-dollar~~million football complex complete with a miniature golf course, plunge pool, sand volleyball courts, laser tag, bowling lanes, movie theater, barber shop, and 23,000 square-foot weight room.[~~82~~55] In 2019, the University of South Carolina completed its own $50-~~million-dollar~~ million, 110,000 square-foot football

---

[~~79~~52] *Sponsorship spending on College Athletics to Total $1.24 billion in 2017/2018 Season*, sponsorhip.com, Mar. 19, 2018, https://www.sponsorship.com/Report/2018/03/19/Sponsorship-Spending-On-College-Athletics-To-Total.aspx (last visited July 25, 2021).

[~~80~~53] College Athletics Financial Information (CAFI) Database, http://cafidatabase.~~knight commission~~knightcommission.org/fbs/pac-12#!quicktabs-tab-where_the_money-1 (last visited July 25, 2021).

[~~81~~54] College Athletics Financial Information (CAFI) Database, http://cafidatabase.~~knight commission~~knightcommission.org/fbs/pac-12/arizona-state-university#!quicktabs-tab-where_the_money-1 (last visited July 25, 2021).

[~~82~~55] Cork Gaines, *Clemson's $55 million football complex shows how swanky college football facilities have become for the top programs*, businessinsider.com, Jan. 8, 2019,

https://www.businessinsider.com/photos-clemsons-football-facility-2017-10#now-check-out-the-drinking-diet-tom-brady-put-gronk-on-28 (last visited July 25, 2021).

~~football~~ operations building which features, among other things, a music recording studio, video arcade, and 12-foot by 27-foot video display made of thirty-six 55-inch flat screen televisions.~~83~~56

~~166~~169.        The college sports industry has also become increasingly lucrative for university

athletic administrators and coaches. The median salary for an athletic director at a Division I institution is now over $500,000 ~~a~~per year. Meanwhile, more than 150 football and men's basketball coaches at Division I schools earn over $1 million per year, with the top 25 football coaches earning an average of $5.2 million annually and the top 25 basketball coaches earning an average of $3.2 million annually.~~84~~57 Today, the highest paid public employees in 41 of the 50 states are college football or basketball coaches.

~~167~~170.        Since 1984, the average base salary for head football coaches at public universities

has grown 750 percent (adjusted for inflation). As an example, Nick Saban, former head football coach at the University of Alabama, made $11 million in 2017—more than any NFL coach.~~85~~58 Mike Krzyzewski, former head basketball coach at Duke, a private university, made $8.98 million in the same year. These figures represent just one aspect of the compensation that college coaches receive. On top of extravagant salaries, coaching contracts often include additional perks like complimentary flight time on private jets, personal cars, country club memberships, negotiated percentages of ticket sales, and six-figure performance bonuses. ~~And, many of these coaches make money from endorsing products when student-athletes are forbidden from doing so. For example, in 2018 Kirby Smart, the Georgia football coach, was paid $150,000 for appearing in a commercial for a Ford 150 truck. LSU football coach Ed Orgeron, was paid $226,000 from the Raisin Cane Chicken Fingers restaurant~~

171.    Coaches also share in the revenues that their schools bring in from commercial sponsorship contracts and generate income from their own personal NIL deals, including

---

~~83~~56 Josh Kendall, *South Carolina already reaping benefits of p'henomenal' new football ops center*, thestate.com, Feb. 4, 2019, https://www.thestate.com/sports/college/university-of-south-carolina/usc-football/josh-kendall-blog/article225502770.html (last visited June 14, 2020).

~~84~~57 Multiple Contributors, *The perks of being a college football coach: Cars, planes, and ... good behavior bonuses?,* ESPN.com, Aug. 16, 2017, https://www.espn.com/college-football/story/_/id/20176937/college-football-coaches-perks-sweeten

-deals-nick-saban-dabo-swinney-jim-harbaugh-urban-meyer-jimbo-fisher-mike-leach (last visited July 25, 2021).

858 Monte Burke, *Nick Saban Will Make $11 Million Next Football Season And He Is Worth Every Penny*, forbes.com, May 2, 2017, https://www.forbes.com/sites/monteburke/2017/05/02/nick-saban-will-make-11-million-next-football-season-and-he-is-worth-every-penny/#3b912a476403 (last visited July 25, 2021).

~~chain. Les Miles, the football coach at Kansas, was paid $25,000 for appearing in a TV commercial that featured him watering a football field with a hose hooked up to a giant Dos Equis beer keg. And the charismatic Michigan coach Jim Harbaugh was paid $250,000 for his appearing in Downy Wrinkle Guard commercials.~~

~~168.~~   ~~Coaches also share in the revenues that their schools bring in from commercial sponsorship contracts and generate income from their own personal NIL deals~~ including consultation contracts with apparel companies, television and radio programs, employment by or ownership of sports camps and clinics, book deals, and commercial speaking engagements.

~~169~~172. For example, between 2014 and 2017, University of ~~Kentucky~~Kentucky's ("UK") ~~head~~then-head basketball coach John Calipari reported approximately $1.1 million in outside income on top of his $7.75 million salary from UK. The sources of this income included Calipari's personal contract with Nike, book and video royalties, and various speaking fees.~~86~~59

~~170~~173.   In 2014, Michigan State University signed an apparel deal with Nike that included a $100,000 annual cash payment to ~~head~~then-head football coach Mel Tucker. Men's basketball coach Tom Izzo also benefitted from the school's apparel deal, as well as from a separate personal contract with Nike that netted him a $50,000 signing bonus, $400,000 in annual compensation, $95,000 per year in equipment and apparel, and the opportunity to receive additional bonuses if his team wins in the post-season tournament. Izzo also received $35,000 in outside income from his camps and clinics.~~87~~60

~~171~~174. University of North ~~Carolina~~Carolina's ("UNC") former basketball coach Roy Williams ~~recently~~ released the details of his personal contract with Nike, which paid out $250,000 in 2018. Williams's compensation from Nike ~~is~~was set to increase gradually over the next ten years, ultimately reaching $340,000 by 2028.[61] In December 2018, four other UNC coaches also had personal service contracts with Nike. Along with Williams, Mack Brown (football), Anson Dorrance (women's soccer), Mike Fox (baseball), and Sylvia Hatchell (women's basketball) each had similar deals. UNC also has its own ten-year contract with the retailer that runs through 2028. In 2019, the school received $5.1 million in product and $3.25 million in cash from Nike.[62]

---

~~86~~59 Linda Blackford, *UK pays Coach Cal $7.75 million a year. Here's how he makes even more,* Kentucky.com, Oct. 12, 2017, https://www.kentucky.com/news/local/education/article178430576.html (last visited July 25, 2021).

[87][60] Rod Beard, *Michigan State's Nike Deal worth $34M for 10 years,* detroitnews.com, July 18, 2015, https://www.detroitnews.com/story/sports/college/michigan-state-university/2015/07/18/michigan-states-nike-deal-worth-years/30325697/ (last visited July 25, 2021).

[61] Dane Huffman, *UNC extends deals with Roy Williams, Nike, others,* bizjournals.com, Dec. 19, 2018, https://www.bizjournals.com/triangle/news/2018/12/19/unc-extends-deals-with-roy-williams-nike-others.html (last visited July 25, 2021).

[62] *Id.*

~~$340,000 by 2028.[88] Four other UNC coaches also have personal service contracts with Nike. Along with Williams, Mack Brown (football), Anson Dorrance (women's soccer), Mike Fox (baseball), and Sylvia Hatchell (women's basketball) each~~ ~~have~~ ~~similar deals. UNC also has its own ten-year contract with the retailer that runs through 2028. In 2019, the school received $5.1 million in product and $3.25 million in cash from Nike.[89]~~

~~172~~175. While NCAA rules allow college athletes to trademark their names or slogans, they have prohibited athletes from collecting any royalties from the use of those trademarks. Meanwhile, coaches are free to profit from the licensing of their own trademarks. For example, Clemson football coach Dabo Swinney has trademarked his own name and, in 2016, he applied to trademark the phrases "BYOG" and "Bring Your Own Guts" after a post-game interview in which he said the phrases went viral. Time Magazine reported that as part of Swinney's $3.3 million compensation package, Clemson paid him $500,000 in 2015 for the rights to market his name, image, and likeness. And, thanks to the trademarks, other parties that sell Swinney trademarked products must pay 10 percent of the wholesale price to the coach for using his name, and an additional 10 percent for using BYOG or Bring Your Own Guts. The Collegiate Licensing Company, which helps manage Swinney's relationships with outside vendors, has reportedly given permission to at least 13 companies, including Nike, to sell merchandise stamped with the BYOG slogan, Swinney's name, or both.~~90~~63

~~173~~176. While student-athletes ~~have been~~were barred from receiving compensation for promotional appearances, schools can profit by selling "access" to their athletes to the highest bidder. For example, ESPN reported that, in 2013, Texas A&M auctioned a seat next to Heisman Trophy winner

---

~~88~~ ~~Dane Huffman, *UNC extends deals with Roy Williams, Nike, others,* bizjournals.com, Dec. 19, 2018, https://www.bizjournals.com/triangle/news/2018/12/19/unc-extends-deals-with-roy-williams-nike-others.html (last visited July 25, 2021).~~

~~89~~ ~~*Id.*~~

~~90~~ ~~Sean Gregory, *Meet Dabo Swinney®, The Clemson Coach Who Trademarked More Than His Name*, TIME.com, Jan. 8, 2016, https://time.com/4171504/dabo-swinney-clemson-coach-who-trademarked-bring-your-own-guts/ (last visited July 25, 2021).~~

Johnny Manziel at an athletic department banquet to a booster for $~~20,000.~~[91][20,000.][64] In the absence of rules limiting athletes from making similar deals, such compensation to the athletes would have been the norm. Already, since the temporary suspension of most NIL rules on July 1, 2021, Texas A&M football players Isaiah Spiller and Demani Richardson are set to earn $10,000 each for exclusive interviews posted to Aggies-centric website TexAgs.com.[~~92~~][65]

[63] Sean Gregory, *Meet Dabo Swinney®, The Clemson Coach Who Trademarked More Than His Name*, TIME.com, Jan. 8, 2016, https://time.com/4171504/dabo-swinney-clemson-coach-who-trademarked-bring-your-own-guts/ (last visited July 25, 2021).

[64] Darren Rovell, Justine Gubar, *Sources: NCAA investigating Manziel*, ESPN.com, Aug. 4, 2013, https://www.espn.com/espn/otl/story/_/id/9537999/otl-ncaa-investigating-johnny-manziel-profiting-autographs (last visited July 25, 2021).

[65] Jace Evans, *Texas A&M players Isaiah Spiller, Demani Richardson make $10,000 each for interviews with fan site in NIL deal*, USAToday.com, July 18, 2021, https://www.usatoday.com/story/sports/ncaaf/sec/2021/07/17/texas-am-football-players-making-10-k-interviews-nil-deal/8005537002/ (last visited July 10, 2024).

174177. And, while student-athletes have beenwere prohibited from receiving compensation in exchange for their autographs, others have been free to profit from the sale of those same autographs without fear of penalty. In 2013, at the same time Manziel was being investigated by the NCAA for allegedly accepting money in exchange for signing autographs for memorabilia brokers, ESPN reported that independent merchandiser Aggieland Outfitters had "recently auctioned off six helmets signed by Manziel and Texas A&M's other Heisman Trophy winner, John David Crow, for $81,000."9366 At the time, NCAA Vice President Kevin Lennon acknowledged that "student-athletes are often asked for autographs from fans, but unfortunately, some individuals' sole motivation in seeking an autograph is for resale."9467

175178. From what they wear, to where you can watch them and what advertisements come across your screen, in the modern world of big-time college sports, student-athletes serve the financial interests of their colleges and the corporations that have paid well to turn them into walking billboards.

91 Darren Rovell, Justine Gubar, *Sources: NCAA investigating Manziel*, ESPN.com, Aug. 4, 2013, https://www.espn.com/espn/otl/story/_/id/9537999/otl-ncaa-investigating-johnny-manziel-profiting-autographs (last visited July 25, 2021).

92 Jace Evans, *Texas A&M players Isaiah Spiller, Demani Richardson make $10,000 each for interviews with fan site in NIL deal*, USAToday.com, July 18, 2021, https://www.usatoday.com/story/sports/ncaaf/sec/2021/07/17/texas-am-football-players-making-10-k-interviews-nil-deal/8005537002/ (last visited July 23, 2021).

93 *Id.*

94 George Schroeder, *'No evidence' Manziel took money for autographs, A&M says*, USAToday.com, Aug. 28, 2013, https://www.usatoday.com/story/sports/ncaaf/sec/2013/08/28/johnny-manziel-suspended-for-first-half-of-texas-am-opener-vs-rice/2723767/ (last visited July 25, 2021).

~~176~~179. If not for the NCAA's restrictions on athlete NIL compensation, there would have also ~~be~~been (as there now is) a market for NCAA sports video games from which the athletes would share in the revenues. EA Sports produced college sports video games, which were wildly popular with fans, until former Arizona State University quarterback Sam Keller sued EA and the NCAA, arguing that they were illegally profiting from the images of college football and basketball players in such games.[~~95~~68] The *Keller* case established that video games like the previously-marketed *NCAA Football* and *NCAA Basketball* titles cannot be produced without obtaining permission from the athletes to use their NILs. But, although EA indicated that it was willing to pay players to use their

[66] *Id.*

[67] George Schroeder, *'No evidence' Manziel took money for autographs, A&M says*, USAToday.com, Aug. 28, 2013, https://www.usatoday.com/story/sports/ncaaf/sec/2013/08/28/johnny-manziel-suspended-for-first-half-of-texas-am-opener-vs-rice/2723767/ (last visited July 10, 2024).

[68] *Keller v. Elec. Arts Inc.* (*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*), 724 F.3d 1268 (9th Cir. 2013).

likenesses in the games, the NCAA refused to change its rules to allow such payments.[96][69] And, when the case ultimately settled for a total of $60 million paid to the 24,819 student-athletes whose NILs were featured in the games from 2003 to 2014, the NCAA ended its licensing agreement with EA and the games were discontinued after *NCAA Football 14*.

~~177~~180.        In light of the recent developments related to college athlete NIL rights, in February 2021, EA announced its intention to revive its college sports games. And, on July 1, 2021, EA released a statement indicating that it is "watching the recent developments regarding student-athlete name, image and likeness very closely. It's still very early stages at this point, and we plan to explore the possibility of including players in EA SPORTS College Football."[97][70] A number of organizations have announced their intention to enter the group licensing business for Division I athletes to help them take advantage of these opportunities now that the NCAA has suspended many of its NIL rules.[98][71]

95 *Keller v. Elec. Arts Inc.* (*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*), 724 F.3d 1268 (9th Cir. 2013).

**C.        The NCAA's history of antitrust violations**

181. Rather than permit student-athletes to engage in competition for NIL payments as the commercial nature of college sports has exploded, Defendants have combined and conspired to foreclose athletes from the market entirely. This has been accomplished by Defendants jointly adopting and imposing rules that have the purpose and effect of preventing players from offering the use of their NILs in competitive markets.

182.        The NCAA has a history of violating federal antitrust law. As a result, over the years, numerous parties have brought and successfully prosecuted antitrust lawsuits against the NCAA. In each of these cases, the NCAA and its members argued that loosening their anticompetitive restraints

---

[96][69] *See* Kevin Trahan, *Court filing: EA Sports wanted to pay college football players, but couldn't*, SBnation.com, June 4, 2021, https://www.sbnation.com/college-football/2014/6/4/5779102/ea-sports-ncaa-lawsuit-pay-players (last visited July 25, 2021).

[97][70] *See* Matthew Liebl, NCAA: What the new NIL rule means for EA Sports College Football game, Apptrigger.com, July 4, 2021, https://apptrigger.com/2021/07/04/ea-sports-college-football-ncaa-nil/ (last visited July 25, 2021).

[98][71] *See* Emily Caron, *Oneteam, Opendorse Deal to Bring Group Licensing to College Athletes*, Sportico.com, June 29, 2021, https://www.sportico.com/leagues/college-sports/2021/oneteam-partners-opendorse-group-licensing-college-athletes-nil-1234632980/ (last visited July 25, 2021).

C.   The NCAA's history of antitrust violations

178. Rather than permit student-athletes to engage in competition for NIL payments as the commercial nature of college sports has exploded, Defendants have combined and conspired to foreclose athletes from the market entirely. This has been accomplished by Defendants jointly adopting and imposing rules that have the purpose and effect of preventing players from offering the use of their NILs in competitive markets.

179. The NCAA has a history of violating federal antitrust law. As a result, over the years, numerous parties have brought and successfully prosecuted antitrust lawsuits against the NCAA. In each of these cases, the NCAA and its members argued that loosening their anticompetitive restraints would be the death knell of amateurism and would irreparably damage consumer demand for college sports. Yet, time and time again, the NCAA's specious claims have proven false and demand has only continued to steadily grow up through the present.

180 183. In 1984, the U.S. Supreme Court ruled in *NCAA v. Board of Regents* that the NCAA had violated the Sherman Act by limiting the number of live televised football games under the media plan it adopted for the 1982-85 football seasons. In conjunction with the plan, the NCAA had announced that it would punish any member institution that abided by a competing agreement with another network to televise more games. At the Supreme Court, the NCAA decried schools freely competing to sell their broadcast rights, claiming that such activity would pose an existential threat to amateurism and consumer demand. But the Court granted injunctive relief and held that the NCAA's anticompetitive scheme unlawfully restrained the market for live broadcasts of college football games.99 72 Since then, schools have engaged in such competition and generate generated billions of dollars in revenues as a result. And, despite the NCAA's dire predictions about the destruction of college sports, consumer demand now flourishes more than ever.

181 184. In *Law v. NCAA*, the Court of Appeals for the Tenth Circuit upheld a summary judgment ruling that the NCAA's then-existing cap on part-time coaches' salaries at $16,000 per

---

99 468 U.S. 85, 119 (1984) (rejecting NCAA argument that restricting sale of broadcast rights was necessary "to preserve amateurism").

year was an unlawful restraint of trade. The NCAA opposed allowing schools to freely compete, claiming that it would be contrary to the collegiate model. The Court of Appeals held that the presence of a horizontal agreement to fix compensation was presumptively anticompetitive, and that the NCAA had failed to present even a triable issue concerning whether the salary restraint was procompetitive.[~~100~~73] Today, such competition is unrestrained, assistant coaches often earn *millions*,[~~101~~74] and consumer demand still flourishes.

---

[72] 468 U.S. 85, 119 (1984) (rejecting NCAA argument that restricting sale of broadcast rights was necessary "to preserve amateurism").

[73] 134 F.3d 1010, 1021 (10th Cir. 1998) (rejecting NCAA's proposed procompetitive justifications for restricting assistant coach salaries).

[74] For example, between 2009 and 2015, assistant men's basketball coaches' salaries increased by nearly 40 percent.

182185. In *White v. NCAA*, the NCAA argued against allowing schools to freely compete by offering cost-of-attendance ("COA") scholarships, calling such scholarships "pay for play."[102][75] Today such competition is unrestrained, and both full COA scholarships and payments *above* COA are ubiquitous (as discussed further below, and recently confirmed by the Ninth Circuit and Supreme Court), while consumer demand for college sports is healthier than ever.

183186. In 2009, a group of Division I men's basketball and football student-athletes brought an antitrust class action—*O'Bannon v. NCAA*[103]*NCAA*[76]—challenging the NCAA's rules that prevent athletes from receiving a share of the revenue from member institutions that the NCAA and its members derive from the use of athletes' NILs in live game broadcasts, related footage, and video games. The district court held that the challenged rules were more restrictive than necessary to achieve any legitimate procompetitive justification and thus violated the antitrust laws. The district court enjoined the NCAA from prohibiting its schools from directly paying athletes (1) full COA scholarships and (2) $5,000 per year in deferred compensation for the game-related use of their NILs, through trust funds distributable after the athletes leave school. The Ninth Circuit affirmed the liability finding and COA portion of the remedy, but held that on the particular record before the district court, plaintiffs had not shown that allowing payments directly from schools in deferred

---

[100] 134 F.3d 1010, 1021 (10th Cir. 1998) (rejecting NCAA's proposed procompetitive justifications for restricting assistant coach salaries).

[101] For example, between 2009 and 2015, assistant men's basketball coaches' salaries increased by nearly 40 percent.

[102] *See* NCAA Memo. P&A in Support. Summ. J. 28, *White v. NCAA*, No. 06-cv-99 (C.D. Cal. Oct. 22, 2007, ECF No. 220).

[103] 802 F.3d 1049 (9th Cir. 2015).

compensation for game-related NIL usage would be virtually as effective as the existing restraints in preserving "amateurism"—and thus consumer demand for college sports.[10477] Since the *O'Bannon* decision, based on new evidence and recent factual developments, this Court for the Northern District of California found in a decision upheld by the Ninth Circuit and Supreme Court that the NCAA's compensation rules "'do not follow any coherent definition of amateurism.'"[10578] Moreover, since *O'Bannon*, student-athletes regularly receive compensation from their schools that exceeds COA—including both

---

[75] *See* NCAA Memo. P&A in Support. Summ. J. 28, *White v. NCAA*, No. 06-cv-99 (C.D. Cal. Oct. 22, 2007, ECF No. 220).

[76] 802 F.3d 1049 (9th Cir. 2015).

[77] *See id.* at 1072-79.

[78] *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig. ("NCAA GIA")*, 958 F.3d 1239, 1249 (9th Cir. 2020) (quoting and *affirming In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1074 (N.D. Cal. 2019)).

education and non-education-related compensation—and consumer demand for college sports has continued to grow exponentially.

~~184~~187.         After years of litigation following complaints filed in 2014, on May 18, 2020, the

Ninth Circuit Court of Appeals upheld a decision and injunction entered by this United States

District Court for the Northern District of California in favor of a nationwide class of college-athletes

challenging NCAA-imposed caps on athletic scholarships.~~106~~79 In *In re NCAA Athletic Grant-in-Aid Cap*

*Antitrust Litigation*, the Ninth Circuit affirmed the district court's holding that NCAA's compensation

restraints—agreed to by the Defendants in this Complaint—imposed substantial anticompetitive

effects in relevant markets that were not justified by procompetitive justifications, and that there

were less restrictive alternatives to the rules that would be virtually as effective in serving any

procompetitive purpose for them. The Ninth Circuit affirmed the district court's order enjoining the

NCAA from enforcing rules that restrict education-related benefits that its member institutions may

offer student-athletes.

~~185~~188.         In reaching its decision in the *NCAA GIA* litigation, the Ninth Circuit held that

"[a]ntitrust decisions are particularly fact-bound," the "Rule of Reason contemplate[s] case-by-case

analysis" that is "inherently fact-dependent" and "evaluates dynamic market conditions and

consumer preferences, and, citing *O'Bannon*, that "courts must continue to subject NCAA rules,

including those governing compensation, to antitrust scrutiny."80

---

~~104 *See id.* at 1072-79.~~

~~105 *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig. ("NCAA GIA")*, 958 F.3d 1239, 1249 (9th Cir. 2020) (quoting and *affirming In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1074 (N.D. Cal. 2019)).~~

~~106~~79 *NCAA GIA*, 958 F.3d 1239.

80 *NCAA GIA*, 958 F.3d at 1253; *see also id.* (citing *Flooring Mfrs.' Ass'n v. United States*, 268 U.S. 563, 579 (1925) ("[E]ach case arising under the Sherman Act must be determined upon the particular facts disclosed by the record, and . . . opinions in those cases must be read in the light of their facts"); Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 1205c3 (4th ed. 2018) ("Continuing contracts in restraint of trade," are "typically subject to continuing reexamination," and "even a judicial holding that a particular

agreement is lawful does not immunize it from later suit or preclude its reexamination as circumstances change.").

consumer preferences, and, citing *O'Bannon*, that "courts must continue to subject NCAA rules, including those governing compensation, to antitrust scrutiny."[107]

**D.     The Supreme Court's *Alston* decision, this Court's motion to dismiss ~~order~~and class certification orders, and state laws result in the NCAA and Conference Defendants' interim suspension of many of their NIL restraints.**

~~186~~189.     In *NCAA v. Alston*, 141 S. Ct. 2141 (2021), decided on June 21, 2021, the Supreme

Court reviewed the Ninth Circuit's decision and unanimously affirmed it in full 9-0.

Contrary to Defendants' argument, the Supreme Court held that the NCAA's so-called amateurism

rules are subject to the same rule-of-reason analysis applicable to other businesses, especially

because the "NCAA *accepts* that its members collectively enjoy monopsony power in the market for

~~student~~ student-athlete~~athlete~~ services, such that its restraints can (and in fact do) harm

competition."[10881] The Court further held that nothing in its decision in *Board of Regents* approved of

the NCAA's limits on athlete compensation or provided the NCAA with any reduced scrutiny

under, or protection from, rule of reason review.[10982] Finally, the Supreme Court agreed with the

Ninth Circuit's affirmance of this Court's application of the rule-of-reason, finding that the

NCAA's restraints on education-related benefits violated Section 1 of the Sherman Act.[11083] In a

concurring opinion, Justice Kavanaugh wrote that the NCAA's remaining compensation rules (*i.e.*,

those *not* at issue in *Alston*) "may lack" a legally valid procompetitive justification, that its "current

compensation regime raises serious questions under the antitrust laws," and reiterated that the

"NCAA is not above the law."[11184]

---

[107] *NCAA GIA*, 958 F.3d at 1253; *see also id.* (citing "*Flooring Mfrs.' Ass'n v. United States*, 268 U.S. 563, 579 (1925) ('[E]ach case arising under the Sherman Act must be determined upon the particular facts disclosed by the record, and . . . opinions in those cases must be read in the light of their facts'); Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 1205c3 (4th ed. 2018) ('Continuing contracts in restraint of trade,' are 'typically subject to continuing reexamination,' and 'even a judicial holding that a particular agreement is lawful does not immunize it from later suit or preclude its reexamination as circumstances change.'").

[108] *Alston*, 141 S. Ct. at 2156 (emphasis in original).
[109] *Id.* at 2157-58.
[110] *Id.* at 2155-2160, 2166.
[111] *Id.* at 2166-69 (Kavanaugh, J., concurring).

~~187~~190.    A few days following the *Alston* decision, on June 24, 2021, this Court ruled on Defendants' motion to dismiss Plaintiffs' original complaints challenging Defendants' NIL rules. The Court largely denied Defendants' motion to dismiss.[85]

~~188~~191. Around the same time that the *Alston* and *House* decisions were issued, the NCAA and its members were facing the prospect of an effective date of July 1, 2021, for several state laws and executive orders that would permit student-athletes to monetize their NILs. Indeed, at least sixteen of these laws became effective on July 1, 2021 or allowed schools to opt in immediately as of

---

[81] *Alston*, 141 S. Ct. at 2156 (emphasis in original).
[82] *Id.* at 2157-58.
[83] *Id.* at 2155-2160, 2166.
[84] *Id.* at 2166-69 (Kavanaugh, J., concurring).
[85] Order Granting in Part and Denying in Part Motions to Dismiss, ECF No. 152.

that date (Alabama, Colorado, Connecticut, Florida, Georgia, Illinois, Kentucky, Louisiana, Mississippi, Nebraska, New Mexico, Ohio, Oklahoma, Oregon, Pennsylvania, and Texas).

~~189.~~   ~~As discussed above, in~~192.   In the face of these developments in the legal landscape,

Defendants decided to adopt

their new, "interim" NIL policy, which was announced on June 30 and became effective on July 1, 2021. That policy temporarily suspended enforcement of many of the NCAA's NIL restraints.

~~190~~193.      The period after adoption of the NCAA's interim policy is already providing a natural

experiment where student-athletes are, with certain continuing limitations, able to market their NILs to third parties. Indeed, NCAA President Emmert stated in a recent video that seeing "how all this unfolds" will be informative about what rules there should be and what is in the best interests of the athletes.~~112~~86 What we have seen thus far is that NIL opportunities are widespread and have been taken advantage of by student-athletes across a wide variety of sports—without any harm to consumer demand. Representatives of Defendants have admitted that the suspension of most NCAA NIL rules, with the authority now vested in the individual schools and conferences, has gone well since July 1. On July 7, Purdue Athletics Director, Mike Bobinski commented that, "for all the wringing of hands and other gloom and doom prognostications, I don't see (any of that) yet."~~113~~87 And Big 12 Commissioner Bob Bowlsby stated on July 14, 2021, during one of the Big 12 Media Days, that "I think relative to name, image and likeness there was a commonly held misperception that the sky was going to fall on July 1 and we were going to be in an Armageddon scenario," but "[o]bviously that hasn't happened. There have been some things that have occurred that have raised eyebrows, but generally speaking, schools are managing it."88

---

~~112~~86 *See* ~~YouTube,~~ *Inside the* NCAA, *NCAA Social Series EP 65*, Twitter.com, July 15, 2021, https://twitter.com/insidethencaa/status/1415831043098112001?s=21 (last visited July 25, 2021).

~~113~~87 *See* Ray Couture, *Purdue AD addresses NIL concerns*, MDJonline.com, July 6, 2021, https://www.mdjonline.com/neighbor_newspapers/extra/news/purdue-ad-addresses-nil-concerns/article_a0bb2362-d01c-5b49-a736-03037e35d13a.html (last visited July 25, 2021).

88 *See* Frank Bonner II, *Big 12 Commissioner Bob Bowlsby says 'anyone not getting vaccinated is taking unnecessary and unwarranted risks'*, TulsaWorld.com, July 14, 2021, https://tulsaworld.com/sports/college/osu/big-12-commissioner-bob-bowlsby-says-anyone-not-getti

ng-vaccinated-is-taking-unnecessary-and-unwarranted/article_7b845f22-e4cf-11eb-8949-5fae51ac6
d45.html (last visited July 10, 2024).

194.    On September 22, 2023, the Court granted plaintiffs' motion for certification of an injunctive relief class.[89] On November 3, 2023, the Court granted plaintiffs' motion for certification of three damages classes.[90]

~~Commissioner Bob Bowlsby stated on July 14, 2021, during one of the Big 12 Media Days, that "I think relative to name, image and likeness there was a commonly held misperception that the sky was going to fall on July 1 and we were going to be in an Armageddon scenario," but "[o]bviously that hasn't happened. There have been some things that have occurred that have raised eyebrows, but generally speaking, schools are managing it."[114]~~

**E.    The challenged restraints are not necessary to serve any purported procompetitive purpose.**

~~191.    The NCAA's prohibition on student-athletes receiving compensation for use of their NILs is unnecessary to further any purported procompetitive purpose.~~

**1.    Any procompetitive justification based on consumer demand for college sports is legally irrelevant because it concerns an entirely different market.**

~~192~~195.    As explained *supra*, Defendants' restraints have anticompetitive effects in the relevant Division I labor markets. The purported procompetitive justifications, on the other hand, concern entirely separate and distinct output markets for Division I sports and are therefore legally irrelevant for antitrust analysis in this case.

~~193~~196. The purported procompetitive benefit relied upon most heavily by Defendants in recent antitrust litigation challenging NCAA compensation restraints is the claim that such restraints are necessary to preserve consumer demand for college sports. But, even if the challenged restraints did have some positive effect on consumer demand—they do not—those benefits would relate to the consumer output markets for college sports, which is distinct from the relevant labor markets here that are directly restrained by Defendants' rules.

~~194~~197.    The Ninth Circuit in the *NCAA GIA* litigation~~,~~ explained that "[i]t is not settled"

whether courts may "consider a restraint's procompetitive benefits in a market outside the market

deemed relevant for the purpose of evaluating a restraint's anticompetitive effects." ~~115~~91 Because the

114 *See* Frank Bonner II, *Big 12 Commissioner Bob Bowlsby says 'anyone not getting vaccinated is taking unnecessary and unwarranted risks'*, TulsaWorld.com, July 14, 2021, https://tulsaworld .com/sports/college/osu/big-12-commissioner-bob-bowlsby-says-anyone-not-getting-vaccinated-is-t aking-unnecessary-and-unwarranted/article_7b845f22-e4cf-11eb-8949-5fae51ac6d45.html (last visited July 25, 2021).

115 *NCAA GIA*, 958 F.3d at 1257.

issue was not raised by parties in that case, it was not addressed by the Court either.~~116~~92 But,

concurring in the decision, Chief Judge Smith wrote that "the underlying purpose of the Sherman

Act—promoting competition—counsels in favor of conducting a more limited Rule of Reason

analysis," confined to the market that is being restrained. "If the purpose of the Rule of Reason is to

---

89 ECF No. 323.

90 ECF No. 387.

91 *NCAA GIA*, 958 F.3d at 1257.

92 *Id.*

determine whether a restraint is net procompetitive or net anticompetitive, accepting procompetitive effects in a collateral market disrupts that balancing. It weakens antitrust protections by permitting defendants to rely on a broader array of justifications that promote competition, if at all, in collateral markets where the restraint under analysis does not occur."[117][93]

**2.     Even if effects on consumer demand in output markets were relevant, the restraints at issue are not necessary to preserve consumer demand for college sports.**

198. Whatever doubt there may have been about the validity of Defendants' amateurism justification in 2019, when the *Grant-in-Aid Cap* trial was conducted, ensuing market realities and new factual developments show that "amateurism" is no longer a legitimate procompetitive justification for any of the Defendants' compensation restraints. Specifically, despite the ubiquitous payment of "*Alston* benefits," the continuation and expansion of full-COA scholarships and payments, and substantial and unlimited NIL payments from third parties, there has been no adverse effect on consumer demand for Division I college sports. To the contrary, the NCAA concedes that these payments and benefits to college athletes have not had any adverse impact on consumer demand.

199.    In fact, since the NCAA has allowed these benefits and compensation, television ratings and revenues (broadcast and otherwise) for Division I college sports have increased exponentially. Accordingly, a number of NCAA and Conference officials have since admitted that amateurism is no longer a justification for their restraints.

195. In the *NCAA GIA* litigation, discussed *supra*, the District Court for the Northern District of California held that, based on the evidence before the court, certain NCAA restrictions on athlete compensation paid by schools may have a limited procompetitive effect to the extent that they preserve consumer demand by supporting the distinct character and product of college sports and maintain a line of demarcation between intercollegiate athletics and professional sports. The Court described the difference between college and pro sports that it found may relate to consumer demand as follows: "In addition to the fact that college sports are played by students actually attending the college, student-athletes are not paid the very large salaries that characterize the professional sports leagues."[118]

196.   The NCAA could eliminate its restrictions on student-athletes' rights to

commercialize their own names, images, and likeness without harming consumer demand. To begin with, the Plaintiffs here request only the freedom to seek the commercial benefits that use of their own NILs may generate. Compensation for NIL is entirely different from the professional-type salaries contemplated by the court in the *NCAA GIA* litigation. Unlike such salaries, NIL

116 *Id.*

117 *Id.* at 1269 (Smith, C.J., concurring).

118 *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d at 1082.

~~compensation does not involve "pay for play" or otherwise create any inconsistency with the purported "amateur nature" of college athletics.~~

~~197~~200. Moreover, recent public opinion surveys demonstrate that fans support student-athletes being able to profit from the use of their NILs, and thus that consumer demand would not be negatively affected if Defendants' anticompetitive NIL restraints were eliminated. Indeed, the growing public sentiment in support of student-athlete NIL rights indicates that the lifting of these restraints would actually improve fan interest in college sports.

~~198~~201.      In June 2021, College Pulse surveyed 829 college students at 51 universities in June 2021. The results of that survey indicated that 89% of students surveyed believe that student-athletes

---

[93] *Id.* at 1269 (Smith, C.J., concurring).

should be able to profit off their likenesses, 88% think the athletes should be able to profit by endorsing products on social media, and 93% think the athletes should be able to profit by appearing in advertisements.[~~119~~94]

~~199~~202.        In December 2019, the Associated Press polled 1,053 American adults: 66 percent of

respondents supported allowing athletes to earn money from the use of their NILs.[~~120~~95]

~~200~~203.        The results of a November 2019 Turnkey Sports Poll of more than 2,000 senior-level

sports industry executives similarly indicated that consumer demand for intercollegiate athletics will not suffer if college athletes are permitted to monetize their NILs. Only 14 percent of the respondents in that study opined that allowing student-athletes to benefit from their NILs would have a negative effect on fan interest, while 45 percent indicated that such a change would have "no impact" on fan interest, and 35 percent believed it would actually positively impact fan interest.[~~121~~96] These recent survey results indicate that if student-athletes were allowed to monetize and profit from their own NILs it would likely increase fan interest in, and consumer demand for, college sports.

204. In May 2022, *The Washington Post* and the University of Maryland conducted a poll in which 88% of 1,503 respondents said that allowing athletes to receive NIL compensation either "hasn't made a difference" or had a "positive impact" on their enjoyment of college sports.[97]

205. More broadly, survey evidence presented by the plaintiffs in the *NCAA GIA* litigation "tested [consumer] behavior and found that consumers would continue to view or attend college athletics (at the same rate) even if eight types of compensation that the NCAA currently prohibits or

---

[~~119~~94] Jenn Hatfield, *Even ~~St~~udents Who Aren't Athletes Think the NCAA is a Problem*, ~~fivethirtyeight~~fivethirtyeight.com, July 12, 2021, https://fivethirtyeight.com/features/college-students-dont-like-how-the-ncaa-treats-student-athletes/ (last visited July 25, 2021).

[~~120~~95] Michael T. Nietzel, *Americans Now Overwhelmingly Support College Athletes Earning Endorsement and Sponsorship Money*, forbes.com, Feb. 11, 2020, https://www.forbes.com/sites/michaeltnietzel/2020/02/11/americans-now-overwhelmingly-support-college-athletes-earning-endorsement-and-sponsorship-money/#3299f721648e (last visited July ~~25~~10, ~~2021~~2024).

[~~121~~96] Michael Smith, Liz Mullen, *College Sports: Sharper Resolution*, sportsbusinessdaily.com, Dec. 2, 2019, https://www.sportsbusinessdaily.com/Journal/Issues/2019/12/02/In-Depth/NIL.aspx (last visited July 25, 2021).

[97] Emily Giambalvo, Scott Clement, and Emily Guskin, *NIL hasn't made a difference for most in enjoyment of college sports, poll finds*, The Washington Post (June 30, 2022), https://www.washingtonpost.com/sports/2022/06/30/nil-college-sports-fans-poll/.

survey results indicate that if student-athletes were allowed to monetize and profit from their own NILs it would likely increase fan interest in, and consumer demand for, college sports.

201. More broadly, survey evidence presented by the plaintiffs in the *NCAA GIA* litigation "tested [consumer] behavior and found that consumers would continue to view or attend college athletics (at the same rate) even if eight types of compensation that the NCAA currently prohibits or limits were individually implemented."[122][98] In fact, the survey results indicated that consumers would tend to watch or attend *more* college sports events if athletes were treated more fairly by being provided with additional compensation that the NCAA rules currently prohibit.

202206. Indeed, the NCAA itself acknowledged in its April 17, 2020 Final Report and Recommendations that "allowing such compensation for some promotional or commercial activities can likely be accommodated in a manner consistent with the NCAA's model of amateur intercollegiate competition."[123][99]

203. Moreover, compensation for NILs is *more* firmly on the "amateur" side of the line than athletic scholarships and other forms of compensation that are currently sanctioned by the NCAA and more closely resemble "pay for play," and which have not reduced consumer demand. NCAA athletes are already permitted to receive various forms of non-education-related compensation ranging from a few hundred dollars to seven-figure amounts. For example, football players can receive up to $550 in gifts for playing in post-season bowl games. Tennis players can earn up to $10,000 a year in prize money. Olympic athletes can earn hundreds of thousands of dollars for winning medals (in one case, a University of Texas swimmer earned $740,000 from Singapore for winning an Olympic gold medal). And schools have paid tens of thousands of dollars for loss of value insurance policies to entice elite athletes to stay and compete in college without risking loss of professional earnings due to injury.

---

[122] *See NCAA GIA*, 958 F.3d at 1250 (discussing evidence presented to district court).

[123] NCAA Federal and State Legislation Working Group Final Report and Recommendations, ncaa.org, Apr. 17, 2020, https://ncaaorg.s3.amazonaws.com/committees/ncaa/wrkgrps/fslwg/Apr2020FSLWG_Report.pdf (last visited July 25, 2021).

~~204~~207. The Ninth Circuit in the *NCAA GIA* litigation affirmed that the record in the case supported the district court's findings that NCAA rules "permit a wide range of above-[cost-of-attendance] payments—both related and unrelated to education. Without losing their eligibility, student-athletes may receive, for instance: "(i) awards valued at several hundred dollars for athletic performance ('athletic participation awards')[,] which may take the form of Visa gift cards; (ii) disbursements—sometimes thousands of dollars—from the NCAA's Student Assistance Fund ("SAF") and Academic Enhancement Fund ('AEF') for a variety of purposes, such as academic achievement or graduation awards, school supplies, tutoring, study-abroad expenses, post-eligibility financial aid, health and safety expenses, clothing, travel, 'personal or family expenses,' loss-of-value insurance policies, car repair, personal legal services, parking tickets, and magazine subscriptions[;] (iii) cash stipends of several thousands of dollars calculated to cover costs of attendance beyond the fixed costs of tuition, room and board, and books, but used wholly at the student-athlete's discretion[;] (iv) mandatory medical care (available for at least two years after the athlete graduates) for an athletics-related injury; (v) unlimited meals and snacks; (vi) reimbursements for expenses incurred by student-athletes' significant others and children to attend certain athletic competitions; and (vii) a $30 per diem for 'unitemized incidental expenses during travel and

---

[98] *See NCAA GIA*, 958 F.3d at 1250 (discussing evidence presented to district court).

[99] NCAA Federal and State Legislation Working Group Final Report and Recommendations, ncaa.org, Apr. 17, 2020, https://ncaaorg.s3.amazonaws.com/committees/ncaa/wrkgrps/fslwg/Apr2020FSLWG_Report.pdf (last visited July 10, 2024).

practice' for championship events."[124][100] The Ninth Circuit's decision explained that "[t]he record indicates that the NCAA does little to regulate or monitor the use of these funds" from the "Student Assistance Fund" or "Academic Enhancement Fund."[125][101]

205. Indeed, in the past five years208. In its recent history, the NCAA has carved outmade many exceptions allowing for additional payments to student-athletes—both education and non-education related—beyond the cost of attendance. For example, before 2015, athletic participation awards did not take the form of cash-equivalent Visa gift cards. And, when the NCAA changed its rules to allow full COA scholarships in August 2015, the number of student-athletes receiving above-COA payments, such as cash stipends, Pell Grants, and AEF and SAF distributions, increased significantly. This expansion of above-COA

---

[124] *NCAA GIA*, 958 F.3d at 1244-45.
[125] *Id.* at 1245.

payments has not coincided with any decline in consumer demand for intercollegiate athletics. To the contrary, demand for college sports has only risen, as demonstrated by the consistent and ever-growing revenues brought in by Division I basketball and FBS football. Thus, the current factual record shows that non-educational payments to student-athletes in excess of COA are no longer a "quantum leap" from NCAA practice, as the court held it would be at the time of *O'Bannon*.[126][102]

[206][209].Two-sport athletes have also received million-dollar payments as professionals in one sport while retaining NCAA eligibility in another. For example, in 2018, Kyler Murray signed a $9 million dollar contract to play baseball for the Oakland A's while he was still playing football at the University of Oklahoma. If such compensation does not implicate "pay-for-play" or otherwise undermine the distinction between college and professional, it is hard to imagine how compensation for NIL rights would do so. And again, all these forms of compensation have been permitted, and consumer demand for college sports has only increased.

[207][210]. Moreover, allowing NIL compensation would not affect consumer demand for college sports to the extent that such demand is "driven by consumers' perception that student-athletes are students."[127][103] Plaintiffs do not challenge any of the NCAA's existing rules and regulations that

---

[100] *NCAA GIA*, 958 F.3d at 1244-45.
[101] *Id.* at 1245.
[102] *Id.* at 1255 (quoting and citing *O'Bannon*, 802 F.3d at 1078).
[103] *See In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d at 1105.

require college athletes to be students in good standing at their respective schools. And if athletesstudent-athletes are allowed to capitalize onreceive scholarships beyond the current limits and/or compensation for their NILs while in collegeand athletic services, schools will provide educational resources and programs designed to help their athletes learn about personal brand management and athletes will gain access to new academic opportunities to develop marketing and financial skills. This is already happening with the NCAA's current suspension of some of the NIL rules. School athletic departments across the country are offering new educational programming to their athletes and as of July 1, 2021 53 of the 65 Power Five universities had announced an NIL-related initiative partnering with companies like Opendorse, INFLCR, or Altius Sports.[128][104] Schools are also offering new NIL-focused classes and

[126] *Id.* at 1255 (quoting and citing *O'Bannon*, 802 F.3d at 1078).

[127] *See In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d at 1105.

[128] Lila Bromberg, *In the NIL Arms Race, Some Schools Are Going the Extra Mile to Help Their Athletes*, SI.com, July 1, 2021, https://www.si.com/college/2021/07/01/name-image-likeness-programs-schools-ncaa (last visited July 25, 2021).

hiring additional staff to give their athletes an edge. That is in keeping with the NCAA's purported objective to help athletes prepare for life after college, which for the vast majority of them does not include a professional sports career. NCAA President agreed in a recent interview that providing NIL opportunities encourages student-athletes to experience and try out different professional options.[129][105]

~~208~~211. The district court in the *NCAA GIA* litigation relied on testimony by the NCAA's and conferences' own witnesses that consumer demand for Division I basketball and FBS football is actually driven by consumers' perception that student-athletes are, in fact, students. For example, University of Wisconsin-Madison Chancellor Rebecca Blank testified that fans of college sports "love seeing their fellow students out there playing" and that viewership of college sports is based on student-athletes being "students at the university." Eugene Smith, athletic director at the Ohio State University, testified to a similar point and explained the "collegiate fan is more aligned to the educational experience that college sports provide." AAC Commissioner and former CBS/ESPN executive, Michael Aresco, noted that the programming of televised college sports focuses on "the college experience," which includes the campus, academics, and community service.[130][106] The district

---

[104] Lila Bromberg, *In the NIL Arms Race, Some Schools Are Going the Extra Mile to Help Their Athletes*, SI.com, July 1, 2021, https://www.si.com/college/2021/07/01/name-image-likeness-programs-schools-ncaa (last visited July 25, 2021).

[105] YouTube, *Inside the NCAA, NCAA Social Series EP 65*, Twitter.com, July 15, 2021, https://twitter.com/insidethencaa/status/1415831043098112001?s=21 (last visited July 25, 2021).

[106] *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d at 1082.

court concluded (and the Ninth Circuit affirmed on appeal) that this testimony did not support, but rather undermined, the NCAA's justification for its compensation rules because, in the absence of those rules, college athletes would still be students.[131][107] Such testimony similarly suggests that the restraints challenged in this Complaint are not necessary to preserve consumer demand for college sports. Absent the challenged NIL rules, college athletes would remain students and "fellow students, alumni, and neighbors of the schools would continue to identify with them."[132][108]

209.   Critics of a system that permits NIL compensation have expressed fears that it will be abused as a recruiting tool or transformed into a disguised form of "pay-for-play." But comparable abuses already exist in college athletics, as evidenced by the recent FBI probe into corruptive

---

[129] YouTube, *Inside the NCAA, NCAA Social Series EP 65*, Twitter.com, July 15, 2021, https://twitter.com/insidethencaa/status/1415831043098112001?s=21 (last visited July 25, 2021).

[130] *Id.* at 1082.

[131] *Id.*

[132] *Id.*

recruiting practices in numerous Division I basketball programs. In 2017, allegations surfaced that coaches were working with agents, sneaker company executives and financial advisors to steer players to their schools in exchange for large sums of cash. The investigation ultimately cost Hall of Fame coach Rick Pitino his job and led to the arrests of three Adidas executives, a financial advisor, an AAU coach, a former sports agent, and several college assistant coaches.

210212. The fact that the NIL compensation rules are not needed to preserve consumer demand is conclusively established by the natural experiment of the NCAA's interim NIL policy. Most NIL rules have been suspended and scores of Division I athletes are now receiving NIL compensation across Division I sports. Yet, there is no evidence that these dramatic and conspicuous NIL payments have in any way adversely impacted consumer interest or demand for Division I sports. To the contrary, it is precisely because so many fans are supportive of Division I athletes that the many sponsors and business are so interested in partnering with the athletes and paying for their NIL rights.

211213. Moreover, to the extent that the purported procompetitive purpose of promoting consumer demand is served by the rules at all—it is not—there are reasonable and patently less restrictive alternatives available. For example, as discussed above, an injunction could forbid enforcement of national NCAA NIL rules, but permit such rules at the conference and school level. In a recent an interview about NIL, former NCAA President Mark Emmert agreed that sports serve different functions at different schools, and that the NCAA needs to govern in a way that is more reflective of that, with consideration given to a decentralized and deregulated version of college sports, shifting power back to conferences and campuses.[133] And the NCAA's interim policy, in fact, has adopted just such a school and conference empowerment structure as the less restrictive alternative currently in effect, without any evidence of harm to consumer demand. Other examples of less restrictive alternatives include an injunction that would permit athletes to receive compensation only from third

---

[133] Ralph D. Russo, *NCAA's Emmert: It is time to decentralize college sports*, apnews.com, July 15, 2021, https://apnews.com/article/sports-business-college-sports-63d1739ab77795561b705a8fee31dcae. In a different interview about NIL, President Emmert reiterated that it was time to "rethink a whole lot of [the] old assumption" that one needs to "treat all sports the same," that treatment has to be the same "across the board" and "rules have to apply exactly the same" to everyone. He emphasized that the NCAA needs to be "more flexible."

https://twitter.com/insidethencaa/status/1415831043098112001?s=21 (lasted visited July 25, 2021).

[107] *Id.*

[108] *Id.*

~~parties, or only for non-game-related uses of their NILs in commercial activities including, but not limited to: business promotions, autograph signings, social media, product endorsements, licensed merchandise sales, personal appearances, books, and movies. In *O'Bannon*, the Ninth Circuit distinguished prize award money allowed for tennis recruits from the payments sought by the plaintiffs finding that "award money from outside athletic events implicates amateurism different than allowing schools to pay student-tennis players directly."[134] Thus, while recent factual developments demonstrate that no NIL restrictions are necessary to preserve consumer demand for college sports, NIL payments from third parties are even further removed from any type of compensation that arguably could adversely impact such demand.~~

~~212~~214. Fears about potential abuses of a competitive market should not be conflated with fears of competition itself, nor do they justify restrictions on a free market.

### 3.    Education and ~~NIL~~ compensation are not mutually exclusive.

~~213~~215.        The NCAA, in other litigation, has also argued that its compensation rules somehow promote the integration of student-athletes with their academic communities and that payments for NILs or compensation based on athletic performance would "create a wedge" between student-athletes and the student body at large. The NCAA has further claimed that the "chase for endorsements" could interfere with student-athletes' focus on education.

~~214~~216.        To begin with, this paternalistic rationale does not constitute a legitimate procompetitive justification for a sweeping market restraint on adult student-athletes being able to commercially benefit from their own names, images, and likenesses.

~~215~~217. Moreover, in *O'Bannon*, the Court held that this purported goal is better achieved by other NCAA rules, such as those requiring athletes to attend class or forbidding more than a certain number of practice hours per week.[~~135~~109] And, while the Court acknowledged the NCAA may have some interest in preventing a social "wedge" between athletes and the rest of the student body, it held

~~[134] *Id.* at 1077 n.21.~~
~~[135] 802 F.3d at 1061.~~

that, "it does not justify a total, 'sweeping prohibition' on paying student-athletes for the use of their NILs."[136][110]

216218.        For one, income disparities already exist on college campuses as a result of family

background and wealth derived from other sources. And, despite the existing disparities, there is no evidence that students with more financial resources are negatively impacted in terms of their integration with peers or the quality of education they receive.

217219.        The ability to take advantage of NIL opportunities and relatedearn compensation will

enhance, not detract from, the integration and academic experiences of college athletes. Education and pay are not mutually exclusive and are, in fact, pursued simultaneously by millions of college students across America. And as noted herein,

---

[109] 802 F.3d at 1061.
[110] *Id.* at 1060.

schools now admit that marketing NIL brings its own educational benefits as it teaches students business, marketing and promotional skills that are themselves educational in nature.

218220. In the *NCAA GIA* litigation, the district court rejected the NCAA's so-called "academic integration" and "wedge" arguments,137111 and its finding was not challenged by the NCAA on appeal. Moreover, as explained above, the Ninth Circuit found a wealth of evidence showing that NCAA rules already permit athletes to receive numerous above-COA payments "related and unrelated to education."

219221. The NILNCAA's compensation restrictions do not promote integration and in fact create a

significant divide

between the rights enjoyed by purely academic students and those allowed to athletes. The NCAA itself has acknowledged that "the current rules preclude student-athletes from engaging in a wide range of promotional activities that are open to college students generally, a situation that is inconsistent with the NCAA's goal of treating student-athletes in the same manner as the student-body in general."138112 Non-athlete students are free to exploit the full potential of their NIL rights

---

136 *Id.* at 1060.

137 *In re NCAA Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d at 1083-86.

138 NCAA Federal and State Legislation Working Group Final Report and Recommendations, ncaa.org, Apr. 17, 2020, https://ncaaorg.s3.amazonaws.com/committees/ncaa/wrkgrps/fslwg/Apr2020FSLWG_Report.pdf (last visited July 25, 2021).

while student-athletes have been forced to forego any NIL compensation whatsoever under the NCAA's complicated system of regulations. Allowing student-athletes to monetize their NILs will increase the validity of the NCAA's claim that the athletes are "students first" by treating athletes more like their peers.

~~220~~222.       Plaintiffs do not challenge the NCAA's existing rules and regulations that require

them to be students in good standing at their respective schools or that require athletes to meet certain academic standards to remain eligible for competition. Moreover, if athletes were allowed to ~~capitalize on their NILs~~earn compensation for their athletic services or NIL while in school, schools would provide additional educational resources and programs designed to help athletes learn about finances, marketing and personal brand management and athletes would gain access to new opportunities to develop ~~marketing~~life skills. As explained above, this is already happening with schools investing substantial

---

[111] *In re NCAA Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d at 1083-86.

[112] NCAA Federal and State Legislation Working Group Final Report and Recommendations, ncaa.org, Apr. 17, 2020, https://ncaaorg.s3.amazonaws.com/committees/ncaa/wrkgrps/fslwg/Apr2020FSLWG_Report.pdf (last visited July 10, 2024).

resources to provide new educational opportunities to give their athletes the best opportunity to maximize their NIL value.

**4.    ~~The NIL~~NCAA compensation restrictions do not prevent exploitation—they are exploitative.**

~~221~~223. The NCAA has also previously argued that the elimination of its ~~NIL~~compensation restrictions would lead to "over-commercialization, which transposes the collegiate model into a system that more closely resembles the professional sports approach." In particular, the NCAA has asserted that its no-endorsement rules "prevent students from becoming billboards for commercialism."

~~222~~224.    To begin with, this supposed rationale does not constitute a legitimate procompetitive justification for a sweeping market restraint on ~~adult student-athletes being able to monetize their own names, images, and likenesses~~college athlete compensation.

~~223~~225. Moreover, in a system where billions of dollars are generated primarily off the backs (literally, when sponsors pay to outfit athletes with branded equipment and apparel) and athletic successes of student-athletes, the restrictions on ~~NIL~~ compensation do not prevent exploitation—they are exploitative. As explained above, whatever downside comes from commercialization is already impacting college athletes; the current rules merely ensure they have a limited share in the benefits from such commercialization. The unfairness in this arrangement grows exponentially with each new multi-million (or multi-billion) dollar television and sponsorship deal, coaching contract, and facility construction, while the selective and blanket restrictions on student-athletes are maintained. As it

stands, the current system does far more to advance the financial interests of the NCAA, broadcasters, corporations, and athletic departments than it does for the athletes who provide the product from which everyone else profits.

224226. John Shoop, former offensive coordinator for the University of North Carolina football team, described his first-hand perspective of the inequities of this system in a 2018 documentary: "I know people say these players get everything. No they don't get everything. What they get is a facility that might have a barbershop in it, tons of flat screen TVs, they might get a bunch of Nike spikes. At this time in their life, when they really did have incredible value, I was the one absorbing all that value, not them. That didn't feel good to me. I was the one getting paid a lot,

not them. For some of these young men, these are the four years where their earning potential is higher than it's ever been. This is it. When they graduate, they're done... They're propelling a billion-dollar industry right here and they're getting a sweat suit for it."[139][113]

225227.      The harm to student-athletes is exacerbated because only a small number of them will

go on to play professionally. This fact highlights that for most Division I athletes, their college years are when they may have their greatest earning potential.

are when their NIL is most valuable. Yet, because of NCAA rules, it has been the only time they are not allowed to benefit from NIL compensation.

226228.      The current restrictions have also created an incentive for student-athletes, boosters,

agents, third parties third parties, and others to violate the rules and enter into under-the-table deals. The absence of an above-the-board market has thus created an environment where exploitation is more, not less, likely. On the other hand, permitting NIL payments out in the open would allow the NCAA and its members to more effectively educate the athletes on how to avoid exploitation.

### 5.      Female Athletes Have Been Especially Adversely Impacted by NIL Restrictions and Will Profit in the New NIL Era.

227229. The NIL rules have adversely impacted female athletes more than their male counterparts because (1) they have fewer professional opportunities and they must use their time in

[139] HBO, Student Athlete (2018), www.hbo.com/documentaries/student-athlete (last visited July 25, 2021).

school to monetize, and (2) because the NCAA promotes female sports less than it does male sports and thus many female athletes are not as well known.

228230. There has beenwas unanswered demand for the use of NIL of female athletes before the
interim NIL rules. Take Hayley Hudson, a Stanford volleyball star who hashad to turn down an offer from a sunglass company, a clothing company, and a TV company who wanted to make a reality show based on "tall families." She "medically retired" from volleyball before the interim NIL rules were in effect.

229231. A study conducted last year by the website AthleticDirectorU and the marketing firm
Navigate Research found that 13 of the 25 college athletes with the greatest annual endorsement potential between $46,000 and $630,000 were female athletes.

---

[113] HBO, Student Athlete (2018), www.hbo.com/documentaries/student-athlete (last visited July 25, 2021).

230232.     The impact of the restraints on female athletes is further exacerbated by the NCAA's

unequal treatment of female athletes. The largest revenue source for the NCAA is men's basketball, and the NCAA Tournament. The NCAA makes money from selling tickets and TV revenue. It then takes that revenue and pays a large percentage to conferences based on how many games are won by teams in the conference.

231233. Women's basketball has become immensely popular. Take, for example, the 2019 Final Four in Tampa. It set attendance records. More than 3 million TV viewers watched Baylor's 82-81 victory over Notre Dame in the final. Roughly 274,507 fans attended the 2019 Women's Tournament. Yet, the women's teams and conferences received no payouts. So, a men's team receives a payout for just one win, while a female championship team receives nothing. This ultimately means the women's teams are under-resourced compared to the men and this under- under-resourcingresourcing depresses the value of women's NILs.

**6.      The challenged restraints cannot be justified by the purported need to cross-subsidize non-revenue sports.**

234.     The NCAA has also sought to justify its compensation restraints based on the purported need to prevent compensation to high-revenue-sport athletes from draining cross-subsidies to the non-revenue sports. This justification is legally and factually invalid.

235.     First, the justification is, once again, not procompetitive. It amounts to arguing that the efficient allocation of a competitive market is somehow undesirable and that there is a need to suppress compensation to higher-revenue-generating athletes so that they can subsidize non-revenue-generating sports. That is an argument that competition itself and allocative efficiency are undesirable, which is not a procompetitive or legally viable justification under the Sherman Act.

236.     Second, allowing compensation to high-revenue-sport athletes would not have a negative impact on any subsidies these sports provide to low- or non-revenue sports. The amount of these subsidies is tiny compared to the vast revenues generated by FBS football and Division I basketball, and thus any compensation for athletes in these high-revenue sports will not impact schools' ability to maintain their current subsidization of lower-revenue sports. In fact, history shows, that every time a new form of compensation has been permitted for Division I athletes—full

COA, *Alston* education-related benefits, third-party NIL payments—there has been no adverse impact on the subsidization of low- or non-revenue sports.

237.   Third, if needed, the excessive compensation paid to coaches, athletic directors, NCAA executives, and Conference commissioners (among others) show that there is more than enough money to make up for any hypothetical revenue reallocation that could impact low- or non-revenue sport subsidies. In Division III—where there are no high-revenue sports to subsidize others—the schools themselves support all sports (which are, by definition, non-revenue), just like they do all other activities at their institutions.

238.   In short, the claim that direct NIL or BNIL compensation, or college-athlete pay-for-play compensation would harm low- or non-revenue sports is both legally untenable and factually unsupported as a purported justification for the Defendants' anticompetitive compensation restraints.

**F.   There is significant support for allowing athletes to receive NIL compensation and Plaintiffs have been damaged by Defendants' anticompetitive restraints.**

~~232~~239. There is widespread support among college sports administrators, athletes, legislators, and the public at large for the concept of allowing Division I athletes to be compensated for their NILs. It is also clear that Defendants' rules prohibiting such compensation have damaged and will continue to damage athletes absent a court-imposed remedy.

1.   California Fair Pay to Play Act and subsequent state legislation.

233.   State legislators have recognized and acted on the massive inequities that exist in the current college sports industry. On September 30, 2019, California became the first to open the door for college athletes in that state to monetize their NILs when Governor Gavin Newsom signed CA Senate Bill 206 ("SB 206"), dubbed the Fair Pay to Play Act. The law was initially planned to take effect on January 2023, but efforts are underway to move the start date up to September 2021.[140]

234.   SB 206 will essentially create an unrestricted market for student-athletes and other parties to use and profit from the use of athlete NILs. Under the new law, college athletes in California will be able to be make money for advertisements, sponsorships, endorsements, and signing autographs without losing their NCAA eligibility or scholarships. Student-athletes in California will also be able to monetize their social media accounts and use their NILs to advertise and promote their own work-product and business ventures.

235. According to Erwin Chemerinsky, Dean of the Cal Berkeley School of Law, "this is not just about elite male athletes in football and basketball. Female athletes in particular, have a great deal to gain from SB 206 because they have far fewer opportunities to play professional sports than male athletes. For many female athletes, college may be the only real time to achieve compensation from their talent. Moreover, if female athletes could market themselves ... it likely would raise the profile of women's sports in general and provide even more opportunities for female athletes."[141]

236. Following passage of SB 206, several other states have considered and passed legislation permitting student-athletes to commercialize their NILs. As of July 21, 2021, a total of 27 states had passed bills or had executive orders signed recognizing college athletes' right to compensation for the commercial use of their NILs.

---

[140] *See* Ryan Teoh, *Fair Pay to Play Act to take effect beginning Sept. 1*, DailyCal.org, June 24, 2021, https://www.dailycal.org/2021/06/24/fair-pay-to-play-act-to-take-effect-beginning-sept-1/ (last visited July 25, 2021).

[141] Erwin Chemerinsky, *Colleges make lots of money off of sports. Why can't student athletes do the same?*, sacbee.com, Sept. 6, 2019, https://www.sacbee.com/opinion/california-forum/article 234702882.html (last visited July 25, 2021).

237. The NCAA initially opposed SB 206 and other similar legislative proposals, claiming that they are unconstitutional and warning that they will "wipe out the distinction between college and professional athletics."[142] In a response sent to Governor Newsom in September 2019, the NCAA even went as far as threatening to ban California schools from future NCAA playoffs if the law goes into effect.

238. Nevertheless, with political and legal pressures mounting and public opposition to the unfairness intensifying, the NCAA began to change its position on NIL rights, doing a complete about-face from its previous stance and purporting to embrace the concept that student-athletes should be able to monetize their NILs.

**21. The NCAA and its members have made numerous statements supporting NIL compensation, in a stark departure from previous positions taken before federal courts.**

239240. Even while continuing to enforce the NCAA's NIL restraints, representatives of the NCAA and its member schools and conferences made a multitude of public comments in recent years acknowledging the unfairness in the system and supporting the concept of allowing athletes to financially benefit from their NILs. That led to an official NCAA report issued on April 29, 2020 acknowledging that NCAA athletes should have the right to benefit from their NILs. The NCAA then stated that it was prepared to make official changes to its NIL rules in January 2021 that would permit some athlete monetization of NIL rights, before it delayed those plans after the Supreme Court granted certiorari in the *Alston* case. But, as explained above, after the NCAA lost in the Supreme Court in a unanimous decision making it clear that it was fully subject to scrutiny under the

rule of reason, and after the NCAA had its motion to dismiss denied in this case, the NCAA enacted its new "interim" NIL policy which permits Division I athletes to monetize their NIL rights in many (although not all) respects.

[142] ~~Members of the NCAA Board of Governors, *NCAA responds to California Senate Bill 206*, ncaa.org, Sept. 11, 2019, http://www.ncaa.org/about/resources/media-center/news/ncaa-responds-california-senate-bill-206 (last visited July 25, 2021).~~

240241. In 2015, NCAA Vice President for Regulatory Affairs Oliver Luck was quoted as saying, "I do believe that the name, image, likeness for an individual is a fundamental right—that any individual controls his or her name, image and likeness—and I don't believe that a student-athlete who accepts a grant-in-aid simply waives that right to his or her name, image, likeness."143114

241242. In March 2018, Mark Emmert acknowledged that the Olympic model, in which athletes are permitted to obtain third-party endorsement deals and other NIL-related compensation, was under consideration by the NCAA at that time, and he suggested that such a model could be a viable option for intercollegiate athletics: "There's a lot of discussion about the Olympic model and I think it's well deserving of serious consideration inside the context of college sports."144115

242243. A 2019 CBS Sports survey of more than 100 Division I coaches revealed that 77 percent of the coaches polled support an Olympic-style model for college sports that allows student-athletes to profit off of their NILs.145116

243244. During an interview on April 24, 2020, University of Michigan athletic director, Athletic Director Warde Manuel voiced his support for the concept of allowing student-athletes to accept NIL compensation: "It's the right thing to do... I think this is good for our [student-athletes]... It allows them to be considered just like any other student who would have the opportunity to profit." Manuel rejected the claim, long relied upon by the NCAA to justify its restraints, that the outright ban on

---

143114 Steve Berkowitz, *Oliver Luck brings own perspective to NCAA on O'Bannon name and likeness issue*, USAToday.com, Jan. 16, 2015, https://www.usatoday.com/story/sports/college/2015/01/16/ncaa-convention-oliver-luck-obannon-name-and-likeness-court-case/21873331/ (last visited July 25, 2021).

144115 Richard Johnson, *Here's why Mark Emmert's comment on the NCAA embracing the Olympic mode of compensation is meaningless*, SBNation.com, Mar. 3, 2018, https://www.sbnation.com/college-football/2018/3/3/17075570/mark-emmert-says-hes-open-to-olympic-model (last visited July 2510, 20212024).

145116 Gary Parish, *Candid Coaches: Would you support an Olympic-style model for student-athletes?*, cbssports.com, Sept. 3, 2019, https://www.cbssports.com/college-basketball/news/candid-coaches-would-you-support-an-olympic-style-model-for-student-athletes/ (last visited July 25, 2021).

NIL compensation is necessary to prevent the destruction of college sports: "Sometimes the doom and gloom gets a bit much. We adapt, we move."[146][117]

~~244~~245. In a 2014 interview with CBS Sports, Notre ~~Dame Athletics~~Dame's then-Athletics Director Jack ~~Swarbrick~~

Swarbrick spoke about the inequitable effect of the existing NIL restraints: "if our standard had ~~been what's~~

been what's the rule for other students, capturing name, image and likeness outside team activity, the ~~musician at~~

musician at school doesn't have that limitation. I'm not sure why the student-athlete should, either...

I think it would contribute to reducing so many of the problems we have which really spring from ~~this~~

this situation we created when we say they're not going to be the same as other students."[147] ~~Swarbrick~~[118]

Swarbrick reiterated this point as recently as April 2020, explaining that, "since regular students have ~~the~~

the opportunity to exploit their name, image and likeness, we've always felt students who are ~~athletes~~

athletes should have a version of that."[148][119]

~~245~~246. In October 2019, the Big South ~~conference commissioner~~conference's then-commissioner Kyle Kallander

echoed this sentiment:

> "We must provide an opportunity for student athletes to benefit from NIL. I believe it just makes common sense to allow athletes to be involved in entrepreneurship, business, modeling, online initiatives, and other activities where NIL may be a factor. Other students are taking advantage of this. Ours should as well. I'm even willing to consider some athletics-related monetization—through autograph signing, jersey sales, video games, etc. These activities can be directly tied to their individual NIL. It makes sense."[149][120]

247. Numerous school officials have also expressed support for a change in the NIL

restraints. Nebraska's then-head football coach, Scott Frost, stated that, "regardless of what change

---

[146][117] Aaron McMann, *Michigan AD Warde Manuel for an NIL bill: 'It's the right thing to do'*, mlive.com, Apr. 27, 2020, https://www.mlive.com/wolverines/2020/04/michigan-ad-warde-manuel-for-an-nil-bill-its-the-right-thing-to-do.html (last visited July 25, 2021).

147118 Ryan Ritter, *Jack Swarbrick Speaks Out on Paying Student Athletes,* herloyalsons.com, Dec. 11, 2014, https://www.herloyalsons.com/blog/2014/12/11/jack-swarbrick-speaks-paying-student-athletes/ (last visited July 25, 2021).

148119 Dennis Dodd, *What's ahead in the name, image and likeness rights debate as recommendations set to be submitted*, cbssports.com, Apr. 22, 2020. https://www.cbssports.com/college-football/news/whats-ahead-in-the-name-image-and-likeness-rights-debate-as-recommendations-set-to-be-submitted/ (last visited July 2510, 20212024).

149120 Brian Mull, *Big South Commissioner Discusses Name, Image, Likeness*, bigsouthsports.com, Oct. 30, 2019, https://bigsouthsports.com/news/2019/10/30/general-big-south-commissioner-discusses-name-image-likeness.aspx (last visited July 25, 2021).

246. Numerous school officials have also expressed support for a change in the NIL  restraints. Nebraska head football coach, Scott Frost, stated that, "regardless of what change comes in NIL legislation, we want every Nebraska athlete to be prepared with the blueprint for success beyond the field." Athletics Director Garrett Klassy further indicated that Nebraska has "no concern" about changes to NIL rules. "We have the most passionate fan base and sponsors in the country and we fully expect them to continue to support Nebraska if NIL legislation changes."[150][121]

247248. University of Michigan headMichigan's then-head football coach, Jim Harbaugh similarly confirmed that he and others in the UM athletic department "believe the name, image and likeness is a very good thing. A player should have the same opportunity that a football coach has to profit off their name, image and likeness... Again, not the best to have a rule that says you can't. So we're all for it. We're all for name, image and likeness."[151][122] According to its official budget, UM received $18.4 million in "corporate sponsorship" and $9.4 million in "licensing royalties" in 2019.[152]2019.[123]

248249. Former Ohio State basketball coach, Chris Holtmann expressed a similar sentiment: "I think given the amount of money that's generated from college sports, in particular our sport the NCAA tournament, and obviously we know what a profound impact college football has on the overall economy of a university and a campus, I think it makes sense to allow guys, to allow athletes, men and women, to profit off of this. Again, I think it's going to, just like the regular marketplace, it's going to be significant for some and maybe somewhat insignificant for others. But that's also a lesson as to what life is going to look like in the marketplace beyond college."[153][124]

250. Auburn men's basketball coach Bruce Pearl stated in May 2021 that "the idea that they are going to be able to be compensated for their own name, image and likeness, it absolutely

---

[150][121] J. Brady McCollough, *Nebraska prepares for student-athlete branding by partnering with Opendorse*, latimes.com, Mar. 10, 2020, https://www.latimes.com/sports/story/2020-03-10/nebraska-opendorse-nil-athlete-branding (last visited July 25, 2021).

[151][122] Clayton Sayfie, *Jim Harbaugh is 'All For' NIL proposal*, michigan.rivals.com, May 9, 2020, https://michigan.rivals.com/news/jim-harbaugh-is-all-for-nil-proposal (last visited July 25, 2021).

[152][123] Zach Shaw, *Unpacking Jim Harbaugh's comments on NIL pay and NCAA amateurism*, 247sports.com, Oct. 8, 2019, https://247sports.com/college/michigan/LongFormArticle/Unpacking-Michigan-football-coach-Jim-Harbaughs-comments-on-NIL-pay-NCAA-amateurism-and-the-Fair-Pay-Act-136697466/#136697466_7 (last visited July 25, 2021).

~~153~~124 Colin Hass-Hill, *Chris Holtmann Working Proactively Behind Scenes to use Name, Image, Likeness Reform in Recruiting for Ohio State*, elevenwarriors.com, May 6, 2020, https://www.~~eleven warriors~~elevenwarriors.com/ohio-state-basketball/2020/05/113914/chris-holtmann-proactively-working-behind-scenes-to-use-name-image-likeness-reform-in-recruiting-for-ohio-state (last visited July ~~25~~10, ~~2021~~2024).

249.   Auburn men's basketball coach,  Bruce Pearl stated in May 2021 that,  "the idea that they are going to be able to be compensated for their own name, image and likeness, it absolutely makes sense. Auburn is going to kind of do everything we can to support those student-athletes and, from a compliance standpoint, manage it. There are limits to what we can do with it, but we'll pay very close attention to what's being done around the country and do everything we can to assist the kids."[154][125]

250251. Fresno State Athletic Director, Terry Tumey also spoke out in support of student-athletes' NIL rights in March of 2021, explaining that "having folks understand how to better their brand is no different than a person going to business school and learning how to market a product."[155][126]

251252. Indeed, A-10 Conference Commissioner, Bernadette McGlade, explained in November 2020 that "truly exceptionally elite student-athletes will have an incentive to pursue the collegiate experience with a more permissive legislative structure, and may benefit from a real-world 'internship' type experience in managing their own NIL and the associated opportunities."[156][127]

252253. Kristin Williams, Senior Associate Commissioner for Institutional Services/Woman Administrator for the Mid-American Conference, confirmed that "the concern that this may create a recruiting benefit to institutions that have commercial entities willing and interested in supporting the student-athlete endorsements is not unique. For instance, there was worry that the allowance of cost of attendance would be a recruiting advantage/disadvantage and certain institutions would abuse this opportunity. This was not the case as the value managed itself, as any other recruiting opportunity has, and the commercial promotions to student-athlete's name, image and likeness would also work itself out through the market. The market will settle itself."[128]

[154][125] Jordan D. Hill, *Auburn coaches, athletic director preparing for Alabama's name, image and likeness law*, oan.com, May 13, 2021, https://oanow.com/sports/college/auburn/auburn-coaches-athletic-director-preparing-for-alabama-s-name-image-and-likeness-law/article_186fb45c-b3ee-11eb-900e-d34b267d4e99.html (last visited July 2510, 20212024).

[155][126] David Hale, *Social media stardom: How changes to NIL will benefit athlete-influencers across the NCAA*, ESPN.com, Mar. 8, 2021, https://www.espn.com/womens-college-basketball/story/_/id/30945653/social-media-stardom-how-changes-nil-benefit-athlete-influencers-ncaa (last visited July 2510, 20212024).

[156][127] Andy Wittry, *Memos obtained from 19 DI conferences shed light on name, image and likeness views*, andywittry.substack.com, Nov. 23, 2020,

https://andywittry.substack.com/p/memos-obtained-from-19-di-conferences (last visited July ~~25~~10, ~~2021~~2024).

[128] *Id.*

to student-athlete's name, image and likeness would also work itself out through the market. The market will settle itself."[157]

~~253~~254. Former Big South Conference Commissioner~~,~~ Kyle Kallander~~,~~ also explained that ~~"other than~~

"other than the legal risks, perhaps the other biggest concern of the membership with NIL is the

'fairness' issue. What if 'his' quarterback can make more on autographs than 'mine'? Frankly, ~~intercollegiate~~

intercollegiate athletics isn't 'fair' now, at least when using that type of test. Institutions have

different levels of support, resources, and following. We shouldn't let the fact that student-athletes at ~~some institutions~~

some institutions may command a higher monetization than others get in the way of a common sense solution."[~~158~~129]

~~254~~255. In October 2019, the NCAA announced that its governing board "voted unanimously

to permit students participating in athletics the opportunity to benefit from the use of their name,

image, and likeness in a manner consistent with the collegiate model."[~~159~~130]

~~255~~256. The board's report concluded that "enhanced opportunities related to name, image or

likeness would be an appropriate extension of efforts to modernize NCAA rules in a way that is

consistent with our values and principles. We believe additional flexibility in this space can and must

continue to support the collegiate model in clear contrast to the professional sports model."[~~160~~131]

~~256~~257. The report continued:

> "the working group generally believes student-athletes should be permitted to use their name, image or likeness to promote their own work product or business, particularly when the work product or business is not related to athletics. Even when the work product or business is related to athletics, the working group believes sufficient controls can be developed to mitigate potential abuse, including current rules related to recruitment offers and inducements and extra benefits, and permit student-athletes to pursue opportunities in a manner consistent with the collegiate model... It is important to note that NCAA bylaws already allow for student-athletes to have outside employment and business activity. This framework of review and regulation is specific to when student-athletes wish to lend their name, image or likeness to promote a student's own enterprise or an employer's business activity, such that name, image and likeness become intertwined."

[~~157~~129] *Id.*

158 *Id.*

159130 *Board of Governors starts process to enhance name, image and likeness opportunities*, ncaa.org, Oct. 29, 2019, http://www.ncaa.org/about/resources/media-center/news/board-governors-starts-process-enhance-name-image-and-likeness-opportunities (last visited July 25, 2021).

160131 *Report of the NCAA Board of Governors October 29, 2019 Meeting*, ncaa.org, https://ncaaorg.s3ncaaorg.s3.amazonaws.com/committees/ncaa/exec_boardgov/Oct2019BOG_Report.pdf (last visited July 2510, 20212024).

likeness to promote a student's own enterprise or an employer's business activity, such that name, image and likeness become intertwined."

257258. On April 29, 2020, the NCAA announced its official endorsement of a broad spectrum of recommendations from the working group that would allow college athletes to be compensated by third parties for commercial use of their NILs in "third-party endorsements or social media influencer activity... social media content creation and distribution, promotion of student-athlete businesses (music, art, athletic lessons, etc.), and personal promotional activities (autograph signings, etc.)."[161][132]

258259. Despite the fact that such compensation would not be tethered to educational expenses or costs incidental to college athletics participation, and could be substantial, the working group confirmed that it "has received feedback from all three divisions that illustrates allowing such compensation for promotional or commercial activities can likely be accommodated in a manner consistent with the NCAA's model of intercollegiate competition."[162][133] Indeed, the report explains that allowing student-athletes to receive such compensation could actually help them "directly offset their educational costs without undermining the Association's model of intercollegiate athletics."[163][134]

259260. Notably, the statements by the NCAA are a complete reversal from positions it took before the federal courts, including in the *O'Bannon* case. There, the NCAA insisted before the Ninth Circuit Court of Appeals that NIL payments—no matter how small—would be "anathema to amateurism," would constitute "pay-for-play," and would "blur the clear line between amateur college sports and their professional counterparts."[164][135] The NCAA argued that permitting *any* NIL payments would destroy amateurism and be ruinous to consumer demand because such payments are not related to educational expenses:

"Contrary to the [district] court's view, *amateurism is not simply a matter of the amount of any payment*. Allowing student-athletes to receive compensation for

---

[161][132] *NCAA Board of Governors Federal and State Legislation Working Group Final Report and Recommendations*, ncaa.org, Apr. 17, 2020, https://ncaaorg.s3.amazonaws.com/committees/ncaa/wrkgrps/fslwg/Apr2020FSLWG_Report.pdf, (last visited July 2510, 20212024).

[162][133] *Id.*

[163][134] *Id.*

[164][135] *O'Bannon v. NCAA*, Nos. 14-16601 & 14-17068 (9th Cir.), Brief for NCAA at 57 (Nov. 14, 2014, ECF No. 13-1) ("NCAA *O'Bannon* Br."); NCAA Mem. P. & A. in Supp. Summ. J. 28.

"Contrary to the [district] court's view, *amateurism is not simply a matter of the amount of any payment*. Allowing  student-athletes to receive compensation for specific commercial revenue generated via use of their NILs is no less anathema to amateurism than paying football players $100 per sack."[165][136]

260261. In April 2020, the NCAA acknowledged that its "current rules related to NIL commercialization are in need of modernization,"[166][137] and directed its three divisions to draft NIL legislative proposals that are in line with the recommendations by 2021.

261262.    The NCAA suggested that its policy shift demonstrated a "willingness to respond to the evolving needs of student-athletes, and its long track record of providing remarkable opportunities for student-athletes to gain access to higher education," but the NCAA's announcement made clear that it "was primarily motivated to form the working group and charge it with reviewing the NCAA's rules regarding student-athlete NIL by proposals of state and federal legislation on this topic." The report also explicitly criticizes and downplays the positive benefits for student-athletes resulting from antitrust litigation against the NCAA, including what it terms ongoing litigation to "second guess the Division I membership," and it has proposed that the NCAA "seek an exemption from federal and state antitrust laws."[167][138] Indeed, while the NCAA claimed to be working towards some "modernization" of the NIL rules, it was actively and aggressively seeking an exemption from federal and state antitrust law that would allow it to continue its anticompetitive practices without legal repercussion.

262263.    The Associated Press also reported that the Power Five athletic conferences spent at least $350,000 in the first three months of 2020 "as part of a coordinated effort to influence Congress on legislation affecting the ability of college athletes to earn endorsement money." Those

~~165~~136 NCAA *O'Bannon* Br. at 57.

~~166~~137 NCAA Board of Governors Federal and State Legislation Working Group Final Report and Recommendations, ncaa.org, Apr. 17, 2020, https://ncaaorg.s3.amazonaws.com/committees/ncaa/wrkgrps/fslwg/Apr2020FSLWG_Report.pdf (last visited July ~~25~~10, ~~2021~~2024).

~~167~~138 *Id.*

expenditures came on the heels of a combined $750,000 spent on lobbying by the NCAA, ACC, and Big 12 in ~~2019.~~[168]2019.[139]

263264. And the Power Five conferences on May 23, 2020 sent a letter to congressional leaders, where in the context of discussing potential federal NIL-related legislation, they requested statutory immunity from certain antitrust laws and state laws protecting NIL rights.[169][140] In sum, while the NCAA and its members were forced to admit that there is no legitimate basis to exclude athletes from being able to commercialize their own names, images, and likenesses—their personal property—the NCAA and its members also indicated that they would only want to permit such NIL compensation if this could be done with continued restrictions to protect the NCAA's own commercial interests and antitrust immunity to boot.

264265.       In fall 2020, the NCAA's Division I Council drafted legislation to allow athletes to commercially benefit from their NILs, with a final vote set to take place in January 2021. But, as discussed above, the NCAA halted moving forward with NIL rule changes after certiorari was granted on December 16, 2020 in the *Alston* litigation. The NCAA was hoping the Supreme Court would provide a legal opinion and framework that would provide it with protection to continue some of the NIL restraints, without facing the prospect of continued antitrust liability for maintaining those restrictions. Indeed, the U.S. Department of Justice sent the NCAA a letter warning it that continued NIL restraints would be subject to antitrust review. In response, the NCAA Board of Governors announced that it was going to delay making any NIL rule changes while it waited for the *Alston* decision.

265266. During the period before the Supreme Court's *Alston* decision, representatives of the NCAA and its member schools and conferences continued to make statements supporting the concept of allowing athletes to financially benefit from their NILs. For example, in a hearing before the Senate Committee on Health, Education, Labor & Pensions on September 23, 2020, University of

---

[168][139] *AP Exclusive: Power Five spend big on lobbying Congress*, collegebasketball.nbcsports.com, May ~~2019~~, 2020, https://~~collegebasketball.nbcsports.com/2020/05/20/~~apnews.com/ap-exclusive-power-five-spend-big-~~on-lobbying-congress~~/401b1cac7b8a96b2f98772ca709b79d7 (last visited July ~~25~~10, ~~2021~~2024).

[169][140] *See* Brett McMurphy, Twitter.com, May 29, 2020, https://twitter.com/Brett_McMurphy/status/1266411058044035075/photo/1 (last visited July 25, 2021).

the Senate Committee on Health, Education, Labor & Pensions on September 23, 2020, University of Wisconsin ~~chancellor,~~Chancellor Rebecca Blank, who testified for Defendants during the *Alston* trial that Wisconsin "would have a very serious conversation about whether we wanted to continue under our current type of student athlete programs" if NCAA athletes were paid, stated: "New opportunities for NIL can exist within the confines of our student-athlete model . . . preserving the educational opportunities for hundreds of thousands, while modernizing endorsement opportunities for all."[~~170~~141]

~~266~~267.    Similarly, Auburn ~~University Athletic~~University's then-Athletic Director Allen Greene stated in May 2021 that at Auburn, "[w]e embrace NIL and welcome the opportunities and challenges. We fully support our student-athletes and their opportunity to utilize Auburn's national brand to put themselves in the best position to capitalize on the benefits of NIL. Our mission remains to educate, support and develop our student-athletes at every moment to create Auburn men and women."[~~171~~142]

~~267~~268. Even former NCAA President Mark Emmert provided testimony before the Senate Commerce Committee on June 9, 2021 that the NCAA supported providing NIL opportunities for student-athletes (contrary to the NCAA's longstanding rules to the contrary). At the same time, however, he requested federal legislation to provide a "safe harbor" against lawsuits from "lawyers using the weapon of antitrust laws" to challenge the NCAA's NIL rules.[~~172~~143] The NCAA thus made clear that it still hoped to continue some of its NIL restraints without antitrust scrutiny.

---

[~~170~~141] Utah State University Athletic Director John Hartwell likewise confirmed: "We believe ~~there is a way to provide addit~~ional income opportunities to student-athletes through NIL, while preserving the collegiate model and the student-athletes' amateur status." Karen Dennis, the Director of Track & Field at ~~the~~ Ohio State University, distinguished NIL compensation from "pay to play" and testified: "Providing our student-athletes the opportunity to monetize their talents through NIL will allow them to grow and use their intellectual and creative talents beyond their athletic abilities. . . . Given the opportunity to brand themselves while in college with technical, intellectual, tangible and legal resources at their disposal, a greater number of student athletes will leave school better prepared for life and global citizenship." Full committee hearing and the written testimonies of Rebecca Blank, Karen Dennis, and John Hartwell~~,~~ are available at: https://www.help.senate.gov/hearings/compensating-college-athletes-examining-the-potential-impact-on-athletes-and-institutions (last visited July 25, 2021).

[~~171~~142] *See Auburn Athletics Launches SPIRIT, a Comprehensive Name, Image and Likeness Program,* auburntigers.com, May 20, 2021, https://auburntigers.com/news/2021/5/20/general-auburn-athletics-launches-spirit-a-comprehensive-name-image-and-likeness-program.aspx (last visited July 25, 2021).

172143 *See Hearing Before the United States Senate Committee on Commerce, Science and Transportation, Written Testimony of Dr. Mark Emmert, President, National Collegiate Athletic Association, commerce.senate.gov, June 9, 2021,*

~~3~~2.        **Statements from the Knight Commission on Intercollegiate Athletics.**

~~268. Five~~269. Roughly eight years ago, the Knight Commission on Intercollegiate Athletics ~~commissioned~~

commissioned research on the topic of student-athlete NIL rights. In May 2016, Tulane law professor ~~and Associate~~

and Associate Provost for NCAA Compliance~~,~~ Gabe Feldman presented a white paper to the

Commission in which he concluded that, at very least, that "the non-game related NIL restrictions ~~are unnecessary to the~~

are unnecessary to the NCAA's core goals and may actually be counterproductive," and he

recommended an NCAA rule change "to allow student-athletes to secure endorsement deals or

otherwise receive compensation for use of their NILs, including value derived from their athletic

ability, as long as such use is not related to their participation in the underlying athletic event or

derivative of the underlying event (including broadcast, re-broadcast, etc.)."~~173~~144

~~269~~270. While limited, the Knight Commission report concluded, among other things, that the

NCAA's prohibition on non-game-related NIL compensation is "not necessary to preserve the

distinct character and product of amateur collegiate sports," that "education and NIL payments are

not mutually exclusive," and that "the restrictions on non-game related NIL deals do not prevent

exploitation—they are exploitative."~~174~~145

~~270~~271. On April 3, 2020, the Knight Commission issued a follow-up statement outlining its

current position on the issue of student-athlete NIL rights:

> "The Knight Commission on Intercollegiate Athletics believes an updated model of ~~college sports is~~ necessary to ensure the fair treatment of college athletes and to better prioritize their education, health, safety, and success. This model must maintain the two foundational elements that distinguish college sports from professional sports: college athletes must be full-time academically eligible students and institutions must be prohibited from paying them for their athletics participation."~~175~~146

*Association,* commerce.senate.gov, June 9, 2021,
https://www.commerce.senate.gov/services/files/B28D0810-54D7-4C53-8058-B04A8ED4684B (last
visited July ~~25~~10, ~~2021~~2024).

~~173~~144 Gabe Feldman, *The NCAA and "Non-Game-Related" Student-Athlete Name, Image and Likeness Restrictions*, Knightscommission.org, May 2016, https://www.knightcommission.org/wp-content/uploads/2008/10/feldman_nil_white_paper_may_2016.pdf (last visited July 25, 2021).

~~174~~145 *Id.*

~~175~~146 *Knight Commission on Intercollegiate Athletics Principles for New Rules on the Use of College Athletes' Name, Image and Likeness*, Knightcommission.org, Apr. 3, 2020, ~~https://www.knightcommission.org/wp-content/uploads/2020/04/kcia-principles-new-rules-use-college-athletes-nil-040320-01.pdf (last visited July 25, 2021).~~

**4~~3~~. The NCAA has made exceptions for several years that have allowed some athletes to profit from the value of their NILs.**

~~271~~272. Even before the NCAA's "interim" NIL policy change, more than 200 legislative relief waivers have been submitted to the NCAA since 2015 requesting to allow certain athletes to use and/or profit from the use of their NILs in various commercial activities. According to Atlantic 10 conference commissioner Bernadette McGlade, the NCAA has been approving waivers at a high rate to allow athletes to earn money if they want to develop a product or write a book, for example.[~~176~~147] Approximately 95 percent of these waivers have been approved.[~~177~~148] Since 2018, institutions have also had the flexibility to apply pre-set guidelines from a list of NCAA-approved waivers. According to the NCAA, "it is not possible to accurately account for these local waivers, but they likely significantly exceed those allowed by the NCAA."[~~178~~149]

~~272~~273. According to the NCAA, the waiver process has allowed athletes to use their NIL to promote products or businesses in the following types of circumstances:

> a. An athlete was allowed to use her name and picture on a website and social media accounts to promote a clothing business that she created;
>
> b. An athlete was allowed to use his NIL to promote a company that he created to provide personalized nutrition advice for clients; and
>
> c. An athlete was allowed to use her name and photo on a website to promote a photography business that she had created (and that was named after her).[~~179~~150]

---

https://www.knightcommission.org/wp-content/uploads/2020/04/kcia-principles-new-rules-use-college-athletes-nil-040320-01.pdf (last visited July 25, 2021).

~~273. As another example Notre Dame women's basketball player Arike Ogunbowale was granted a waiver in 2018 that allowed her to compete on the ABC television show *Dancing with the Stars* and to accept prize money from the show (contestants earn $125,000 for appearing and~~

[~~176~~147] Associated Press, *NCAA poised to move toward allowing athletes to make money*, CNBC.com, Oct. 28, 2019,

https://www.cnbc.com/2019/10/28/ncaa-poised-to-move-toward-allowing-athletes-to-make-money.html (last visited July 25, 2021).

177149 *Name Image and Likeness: What Student-Athletes Should Know*, ncaa.org, https://ncaaorg.s3.amazonaws.com/ncaa/NIL/2020_NILresource_SA.pdf (last visited July 25, 2021).

178149 *NCAA Board of Governors Federal and State Legislation Working Group Final Report and Recommendations*, ncaa.org, Apr. 17, 2020, https://ncaaorg.s3.amazonaws.com/committees/ncaa/wrkgrps/fslwg/Apr2020FSLWG_Report.pdf (last visited July 2510, 20212024).

179150 *Id.*

274. As another example, Notre Dame women's basketball player Arike Ogunbowale was granted a waiver in 2018 that allowed her to compete on the ABC television show *Dancing with the Stars* and to accept prize money from the show (contestants earn $125,000 for appearing and $325,000 if they win) while remaining NCAA eligible. According to the NCAA, it made this exception because it considered Ogunbowale's participation on the show to be "unrelated to her basketball abilities." But it is obvious that Ogunbowale was invited specifically because of her skills on the college basketball court—she was the star player of the 2018 March Madness tournament and made a game-winning shot at the buzzer to win the national championship for Notre Dame. That performance is what landed her on the Ellen Degeneres Show and the cover of Sports Illustrated, and there is no doubt it is what earned her a spot on *DWTS*.

274275.       These examples of student-athletes being able to profit from their own NILs, including in very publicized ways such as performing on *Dancing with the Stars*, have occurred while the revenue of college sports has continued to explode. Certainly then, it cannot be reasonably argued that allowing other athletes to obtain similar benefits would cause a decline in consumer demand.

**54.       NCAA Division I athletes have sought the ability to compete without ~~anticompetitive restraint in the market for NIL payments, and would receive such~~ anticompetitive restraint in the labor markets, and would receive such compensation absent Defendants' unlawful restraints.**

275276. While some Division I student-athletes ~~have been~~were lucky enough to obtain waivers from the NCAA prior to July 1, 2021, most ~~have been~~were denied the opportunity to engage in any NIL-related activities and receive any NIL compensation without losing NCAA eligibility. Similar restraints have prevented them from receiving any compensation for their athletic services. Despite the NCAA's purported aim "to create an environment that allows student-athletes to reach their full potential in academics, athletics and life"—and in contrast to their non-athlete counterparts—student-athletes know that even while participating in intercollegiate sports competition at a high level and attending college as an student at the same time, they have been unable to pursue NIL opportunities or other compensation opportunities from the conferences or the schools that could significantly benefit them financially, academically, and in their future careers.

~~276~~277. On October 9, 2019, ~~the~~*The* New York Times ~~reported[180]~~reported[151]:

> "An exuberant top-scoring floor routine by UCLA's Katelyn Ohashi went viral this year, making her one of the most famous college gymnasts ever. But NCAA rules prevented Ohashi from making any money from the performance."

~~[180] Katelyn Ohashi, *Everyone Made Money Off My N.C.A.A. Career, Except Me*, NYTimes.com, Oct. 9, 2019, https://www.nytimes.com/2019/10/09/opinion/katelyn-ohashi-fair-play-act.html (last visited July 25, 2021).~~

In a video op-ed featured in the article, Ohashi argues that college students should be given the ability to earn income from their athletic achievement:

> "My senior year my routine went viral with over 100 million views. Along with this came a lot of attention and opportunities, but I couldn't capitalize on them. I was handcuffed by the NCAA rules that prevented me from deriving any benefit from my own name and likeness, despite the fact that after my final meet, I had no pro league to join. How different would things be for me had I been able to use my image and name in my last year of school in order to promote the things that I want to further my future? I want to make sure that the next person doesn't have to wonder."

> Ohashi continued: "It's not about paying salaries to college athletes, it's about empowering student-athletes to rightfully earn off their individual name and likeness without sacrificing the opportunity to get an education. It's about making sure if a student-athlete's jersey is still selling in the bookstore ten years after graduation that they get a cut. It's about recognizing that women only receive 4% of all coverage in sports media, and giving us the freedom to leverage sponsored deals to break through. It's about treating student-athletes with the same respect as the other student who can freely profit off their talent as writers, artists, DJs, programmers, or scientists while in college."

> Further she says, "critics say that allowing student-athletes to earn endorsement income will come at the expense of Title IX or non-revenue-generating sports. But from experience, allowing an athlete, especially a woman or Olympic sport athlete who for the most part are staying and graduating from NCAA institutions to take advantage of unexpected moments like I had, empowers us to help finally earn what we deserve."

~~277~~278. Lilly King, a world record-holder, two-time Olympic gold medalist, and the winningest breaststroke swimmer in NCAA history has also been an outspoken advocate of allowing student-athletes to benefit from their NILs. King attended Indiana University ("IU"). She was forced to turn down at least $60,000 in bonuses when she set two world records at the 2017 World

---

[151] Katelyn Ohashi, *Everyone Made Money Off My N.C.A.A. Career, Except Me*, NYTimes.com, Oct. 9, 2019, https://www.nytimes.com/2019/10/09/opinion/katelyn-ohashi-fair-play-act.html (last visited July 25, 2021).

Championships, although the NCAA did arbitrarily allow her to keep the other more than $100,000 that she was awarded by the USOC for her performance in the Olympics.

278279. In October 2019, King explained that IU, the Big Ten, and the NCAA were able to

feature her in advertisements and announcements without compensation. They could promote her, she said, but she wasn't allowed to promote herself. King was quoted as saying: "I won an Olympic

gold medal at 19. So I still had to wait three more years to do anything to promote myself [before finishing school]. As an athlete. As a Hoosier. These are things I'm proud of being."~~181~~152

~~279~~280. When Katie Ledecky swam for Stanford after the 2016 Olympic Games, she could not accept an estimated $5 ~~million a year~~million-per-year endorsement deal. Her teammate, 14-time NCAA champion Simone Manuel, also forewent significant sponsorship opportunities.

~~280~~281. Less than a week after the NCAA's March 12, 2020 decision to cancel its postseason tournament basketball in the wake of the ongoing coronavirus pandemic, senior Oregon basketball player Sabrina Ionescu, and teammate of Plaintiff Sedona Prince, initiated endorsement talks with multiple brands. By the end of April, before she had even graduated from college, the 22-year-old Ionescu had secured offers worth multiple times her expected WNBA salary, some of which even outpaced the value of recent WNBA Finals MVP-level player deals. Ionescu ultimately signed a multi-year endorsement contract with Nike.

~~281~~282. If the NCAA had not prohibited her from doing so, Ionescu would have been able to benefit from the value she provided to Nike and the money she was already generating for the company and her university long before her college playing days were over. In November 2019, the UO bookstore released a "White Nike Replica # 20 basketball jersey" representing the number 20 jersey that Ionescu wore for the Ducks. The $75 jerseys sold out in less than an hour and have been reselling for twice as much ever since.~~182~~153 In mid-December, Nike released another number 20 replica ~~jersey in green which sells for $75 at the university bookstore and on the retailer's website to this day.183 Because of the challenged restraints, Ionescu has received zero percent of the profits from these sales.~~

---

~~181~~152 David Woods, *Robbie Hummel, Lilly King favor college athletes profiting off their names and images*, Indystar.com, Oct. 2, 2019, https://www.indystar.com/story/sports/college/purdue/2019/10/02/lilly-king-robbie-hummel-favor-college-athletes-profiting-off-names-images/3825833002/ (last visited July 25, 2021).

~~182~~153 Nick DePaula, *Nike Signs No. 1 Pick Sabrina Ionescu to multi-year endorsement deal,* ESPN.com, Apr. 17, 2020, https://www.espn.com/wnba/story/_/id/29051284/nike-signs-no-1-pick-sabrina-ionescu-multi-year-endorsement-deal (last visited July 25, 2021).

~~183 Nike College Replica (Oregon) jersey, available at https://www.nike.com/t/replica-oregon-basketball-jersey-d6B3WZ/P32919-OD1 (last visited July 25, 2021).~~

jersey in green which sells for $75 at the university bookstore and on the retailer's website to this day.[154] Because of the challenged restraints, Ionescu has received zero percent of the profits from these sales.

282. Recent analyses  283.    Analyses of the NIL value of student-athletes competing in several Division I sports

also demonstrate the economic harm to Plaintiffs and class members caused by Defendants' restraints. On May 25, 2020, news website Axios.com reported estimates by Opendorse—a social publishing platform that helps professional athletes build their brands—of the social media earnings that student-athletes could obtain if they were not prevented from doing so by the NCAA. "Based on actual data from the last decade of providing the technology behind millions of dollars of transactions between brands and professional athletes," Opendorse estimated positive earnings for all of the student-athletes in its sample analysis, which included football players, men's and women's basketball players, and female gymnasts. The analysis looked specifically at Twitter and Instagram, evaluating the per-post value for various student-athletes. Based on its formula, Opendorse

estimated, for example, the annual lost value for social media posts by Sam Ehlinger, quarterback of the University of Texas football team, at $962,000. As a second example, Morgan Hurd, a gymnast at the University of Florida, had an estimated potential earning value of $44,000 from social media.[184][155]

283284.The website fivethirtyeight.com, which focuses on opinion poll analysis, politics, and economics, also reported estimates by Opendorse of the potential social media earnings for a different group of student-athletes. Opendorse's appraisals were "based on a decade's worth of transactional data between businesses and professional athletes, specific to each respective sport. Taking into account an athlete's current audience size, engagement rate and seven other proprietary data points, [Opendorse CEO Blake] Lawrence and his team at Opendorse distilled their estimates of an athlete's post value on Instagram and Twitter—and a potential range of earnings."[185] Opendorse examined the earning potential of student-athletes in nine different college sports—women's basketball, men's basketball, football, women's softball, men's wrestling, women's volleyball,

---

[154]    *Nike   College   Replica   (Oregon)* jersey,   available   at https://www.nike.com/t/replica-oregon-basketball-jersey-d6B3WZ/P32919-OD1 (last visited July 25, 2021).

~~184~~155 Jeff Tracy, *How much college athletes could earn as social media influencers*, Axios.com, May 25, 2020, https://www.axios.com/college-athletes-earnings-social-media-influencers-35ce09f0-3bc2-46fa-ae5a-eba8ff61079b.html (last visited July 25, 2021).

~~185 Josh Planos, *How Much Money Could Student-Athletes Make As Social Media Influencers?*, fivethirtyeight.com, May 15, 2020, https://fivethirtyeight.com/features/how-much-money-could-student-athletes-make-as-social-media-influencers/ (last visited July 25, 2021).~~

C                                                                                      5

an athlete's post value on Instagram and Twitter—and a potential range of earnings."[156] Opendorse examined the earning potential of student-athletes in nine different college sports—women's basketball, men's basketball, football, women's softball, men's wrestling, women's volleyball, women's soccer, and men's soccer—and projected positive social media earnings for each student-athlete examined. Two of the top four potential earners recognized in the study are female athletes, which is significant because women have fewer opportunities to continue their playing careers after graduating from college.[~~186~~157] These analyses illustrate how the challenged restraints have had a negative economic impact on a wide range of Division I athletes, including those who are members of the ~~Former Players Damages Sub-Class~~Additional Sports Class, described *infra* in Part VII.

~~284~~285.        As explained above, there is now a natural experiment occurring where one can see how the NIL market ~~develops~~has developed post-July 1, 2021, following the NCAA's suspension of many of its NIL rules. ~~In~~Within only ~~the~~a few weeks ~~since then~~, thousands of student-athletes, female and male, across a variety of sports, at myriad Division I schools ~~are~~were making money from their NILs. ~~In a recent interview,~~Former NCAA President Emmert recognized that he and the NCAA ~~are~~were learning new things ~~every~~by the day ~~as~~in the post-July 1, 2021 world ~~unfolds~~, including what is in the best interests of athletes. He ~~also~~ recognized that NIL compensation ~~will~~would be going to athletes across many sports and the different NCAA divisions, often disconnected to pure athletic talent, and gave examples of sports camps, commentating and social media as areas with enormous financial potential.[~~187~~158] These facts demonstrate the significant damage that the challenged NIL restraints have caused to ~~members of the Lost Opportunities Damages Sub-Class, which consists of those Division I~~ student-athletes ~~in their second or later year of eligibility (or first year of eligibility after receiving a red shirt the prior year) who have received NIL compensation since July 1, 2021, but who were prevented from doing so in prior years because of the NCAA's NIL restraints~~. Indeed, ~~to date,~~there has been no indication of any negative impact of this activity on consumer demand. To the contrary, the explosion of interest from consumer-facing companies in using athletes as product spokespeople is a strong indication that firms believe such payment will induce more consumer spending, rather than turn consumers off.

~~285.~~ Moreover, as explained previously, the NCAA, conferences, and schools make an enormous amount of money from, among other things, television broadcasting agreements that

C                                                                                                    5

[156] Josh Planos, *How Much Money Could Student-Athletes Make As Social Media Influencers?*, fivethirtyeight.com, May 15, 2020, https://fivethirtyeight.com/features/how-much-money-could-student-athletes-make-as-social-media-influencers/ (last visited July 25, 2021).

186[157] *Id.*

187[158] *See Inside the NCAA, NCAA Social Series EP 65,* Twitter.com, July 15, 2021, https://twitter.com/insidethencaa/status/1415831043098112001?s=21 (last visited July 25, 2021).

286. Moreover, as explained previously, the NCAA, conferences, and schools make an enormous amount of money from, among other things, television broadcasting agreements that involve the use of student-athletes' names, images, and likenesses. Defendants have been unjustly

enriched from these deals at the expense of student-athletes, including those who are members of the Football and Men's Basketball Class and Women's Basketball Class Group Licensing Damages Sub-Class, described *infra* in Part VII. In the absence of the challenged restraints, market-based competition would have led student-athletes to receive, among other things, a share of revenues for the group licensing of their NILsBNILs. These athletes, including those who are would be able to offer group licenses to their members of the Group Licensing Damages Sub-Class, would be able to offer group licenses to their

schools and conferences, which could in turn package them to broadcast and other companies with school and conference rights. Due to the ongoing unlawful NIL restraints of Defendants, members of

the Football and Men's Basketball Class and Women's Basketball Class have been deprived of the opportunity to receive group lthe Group Licensing Damages Sub-Class have been deprived of the opportunity to receive group licensing compensation for their BNIL rights that they otherwise would have received from NCAA members obut for ther conferences.challenged conduct

### 65. Corporate sponsors value student-athlete NILs, and would compete for the rights to use Plaintiffs' NILs absent Defendants' anticompetitive restraints.

286287.Business leaders have long recognized that, absent the challenged restraints, there would be significant opportunities for college athletes to make commercial use of their NILs. What has occurred since July 1 shows that to be true beyond a shadow of a doubt. Senior executives at the nation's leading influencer marketing companies are enthusiastic about the prospect of being able to work with student-athletes, and even before the NCAA announced its interim policy change, many had already put strategies into place to begin as soon as possible if the rules change to allow it.

287288. According to Mae Karwowski, founder and CEO of Obvious.ly, her company is about third party already hearing from its brands: "They're chomping at the bit. We're also ramping up our talent and recruitment efforts to make sure that athletes have the best possible representation and contracts as they're entering this space. People love sports, and social media is a huge overdue opportunity for college athletes."188159

C                                                                                                   5

188159 Kristi Dosh, *Marketers Bullish On Monetization Opportunities for NCAA Athletes with NIL Rights*, forbes.com, Dec. 3, 2019, https://www.forbes.com/sites/kristidosh/2019/11/25/marketers-bullish-on-monetization-opportunities-for-student-athletes-with-nil-rights/#f25fd487aa49 (last visited July 25, 2021).

C                                                                                                5

288289.Stephanie Stabulis, Vice President of HireInfluence, confirmed that, "in 2018-2019 alone, our company has developed strategies for at least four to five brands targeting student-athletes, and we have been restricted due to the NCAA regulations. The demand is already there, so we see potential for brands to move quickly to work with student-athletes." Regardless of their star status, Stabulis says there is money for student-athlete influencers at every level while they are still in college: "Because it's a niche market, we can expect influencers to be able to make about $250 to $1,000 per post, at these lower beginning ranges. That will escalate as the athlete can reach more people through their social media outlets... For endorsement deals that rely on paying for an athlete's name, likeness and deeper partnership or ambassadorship, we anticipate this is higher."[189160] A July 21, 2021 article, reporting on the Bryce Young endorsement deals, indicated that Tua Tagovailoa could have monetized his NIL at "three to five million easy."[190161]

289290. Matthew Micheli, co-founder and managing partner at Viral Nation, explained that "some of these athletes could arguably be more popular than their pro counterparts. For example, Tua Tagovailoa in college football would probably out-earn 90% of starting NFL quarterbacks if given the opportunity. I could almost guarantee that." Micheli says Instagram and YouTube are the two most valuable social media platforms for monetization right now and that a student-athlete with a following of over 25,000 could earn $2,000 to $4,000 per month between digital advertisements and local sponsorships. According to Micheli, "for athletes who produce video content, their earnings can easily be in the six-figure range annually to start."[191162]

290291. Micheli also commented on the extremely limited timeframe student-athletes have to take advantage of their NIL value: "Once the college athlete's career is over and they don't go pro, their marketability essentially goes away ... Endorsements will most likely become non-existent. They become old news unless they go pro or go into another career that would require them to keep

189 160 *Id.*

190161 Randall Williams, *Sophomore Alabama Quarterback Nears $1 Million in NIL Pay, Saban Says*, Sportico.com, July 20, 2021, https://www.sportico.com/personalities/athletes/2021/saban-bryce-youngs-nil-pay-1234634836/ (last visited July 23, 2021).

162 *Id.*

*Id.*

up a social presence. There could be some anomalies or outliers to this, but for the most part, all is lost for them, unfortunately."[192][163]

291.   Social media companies are also working with universities to prepare for a world in which student-athletes are able to profit from their NILs.

292. On March 10, 2020, the University of Nebraska announced its partnership with Opendorse to launch the first program designed to help student-athletes build their personal brands and maximize their earning potential if the NCAA's NIL restraints are lifted. The Ready Now program will be available to athletes in all varsity sports and will offer each athlete a current valuation of their personal brand, review and flag content that could have a negative impact on that brand, and provide insight to increase value.

293. Opendorse CEO and former Nebraska football player, Blake Lawrence, recently indicated that the company has "been preparing for this moment for over seven years." According to Lawrence, "today, every professional athlete endorsement starts with an analysis of the athlete's digital presence, and we expect the same to be true with student-athletes." Lawrence noted that "social media monetization ... levels the playing field, as any athlete—from Heisman contenders to walk-ons—can build an audience that sponsors or advertisers value... it may be easier for superstars, but every athlete will have the opportunity to leverage free, widely accessible technology platforms to grow and monetize their NIL ... While most will not be national names, organizations in local markets stand to provide real opportunity and receive significant value by partnering with regional and local student-athletes upon changes to NIL regulation."

294. Based on his personal and professional experience, Lawrence also explained how schools would compete during the recruiting process if Defendants' unlawful restraints did not exist. "Showcasing the value of going to schools XYZ, or one university over another, showing that current school's earning power, that's going to be huge," Lawrence has said. If the rules were

*Id.*

C                                                                                                    5

changed, schools would have to answer from recruits: "How much money can I make off my name, image and likeness if I go to your school versus another school?"[193]

295292. Former Fresno State basketball players Hanna and Haley Cavinder had as of March 8, 2021

2021, 2.7 million followers on TikTok. According to the CEO of Opendorse, they have as much value as

value as star quarterback Trevor Lawrence. In aA March 8, 2021 an ESPN article reporting on the twins

indicated they were being contacted by companies "every single day."

296293.     Certain school officials now admit that allowing athletes to market their NIL enhances

their educational experience. For example, Fresno State Athletic Director Terry Tumey stated,

"Having folks understand how to better their brand is no different than a person going to business school and learning how to market a product."[194165]

### 76.     When The NAIA Withdrew NIL Restrictions, Athletes Prospered Financially and Academically.

297294. In November 2020, the NAIA amended its NIL restrictions as follows:

**SUBJECT: AMATEUR CODE – NAME, IMAGE, AND LIKENESS COMPENSATION**

**VII SECTION B ACTS PERMITTED BY NAIA AMATEUR CODE**

The following acts will NOT cause an athlete to lose amateur standing.
...

6.     Participating in radio or television programs for the purpose of promoting an amateur athletic event.

7.     Receiving reasonable compensation for supervision of physical education, playground or recreational activities.

8.     Receiving compensation for use of name, image or likeness to promote any commercial product or enterprise, or public or media appearance. It is the responsibility of the student-athlete to notify their institution's athletics director in writing of any compensation

C                                                                                                    5

the student receives from the use of their name, image or likeness
in relation to their school or status as a student-athlete.

[193] Josh Planos, *How Much Money Could Student-Athletes Make As Social Media Influencers?*,
fivethirtyeight.com, May 15, 2020,
https://fivethirtyeight.com/features/how-much-money-could-student-athletes-make-as-social-medi
a-influencers/ (last visited July 25, 2021).

[163] *Id.*

[194][165] David M. Hale, *Social media stardom: How changes to NIL will benefit athlete-influencers
across the NCAA*, ESPN.com, Mar. 8, 2021,
https://www.espn.com/womens-college-basketball/story/_/id/30945653/social-media-stardom-ho
w-changes-nil-benefit-athlete-influencers-ncaa (last visited July 2510, 20212024).

the student receives from the use of their name, image or likeness in relation to their school or status as a student-athlete.

298295. NAIA athletes immediately began to market their NILs and they have been incredibly successful in the new world of opportunities available to them. FreshmanThen freshman Aquinas Volleyball player, Chloe Mitchell, became the first NAIA athlete to monetize her NIL in December 2020 when she turned a home project DIY video into a successful online brand. Since then, Mitchell has received numerous sponsorship deals that have allowed her to pay off her student loans, buy a computer and a car, and start saving for her first house. She also started a company called PlayBooked, which connects college athletes with fans and brands interested in doing NIL deals with them. As of March 2021, PlayBooked was already working with more than 200 NAIA athletes.195166 Mitchell says that her experience with NIL has been nothing but positive. Not only is she making money, but she says it has also made her a better student and is teaching her valuable marketing and business skills, and that the new opportunities have made her feel more connected with her teammates and peers on campus.

299296. Hundreds of other NAIA athletes are also taking advantage of their new NIL opportunities. For example, basketball player, Victor Faria, is creating content on YouTube and using the money he has earned to pay for his tuition at Northern New Mexico College. Track and Field athlete, Connor Clemens has already earned money from two promotional videos he created, and says that having the opportunity to monetize his NIL has been extremely helpful to be able to pay his bills and develop professional networking skills. And Clarke University lacrosse player, Tucker Labelle, has also had a very positive experience in the new world of NIL since becoming a Class Action Allegations.

## VII. CLASS ALLEGATIONS

300297. Plaintiffs Grant House, DeWayne Carter, Nya Harrison, and Sedona Prince bring this action under Federal Rule of Civil Procedure 23(b)(2) on their own behalf and on behalf of the following Class:

The "Declaratory and Injunctive Relief Class"—

All student-athletes who compete on, or competed on, a Division I athletic team at any time between June 15, 2020 through the date of

C                                                                                          5

any injunctive relief ordered by the Court.

195166 *Id.*

> All student-athletes who compete on, or competed on, a Division
> I athletic team at any time between June 15, 2020 and the date of
> judgment in this matter. This Class excludes the officers, directors, and employees of
> Defendants. This Class also excludes all judicial officers presiding
> over this action and their immediate family members and staff, and
> any juror assigned to this action.

298.    On behalf of the previously certified Declaratory and Injunctive Relief Class,

Plaintiffs request an injunction permanently restraining Defendants from enforcing all of their

unlawful and anticompetitive rules that restrict the compensation available to class members from

conferences and schools, including those that limit the number of athletic scholarships available to

class members.

301.   299. Plaintiffs Tymir Oliver and DeWayne Carter also bring this action under Federal Rule

of Civil Procedure 23(b)(3) on their own behalf and on behalf of the following Sub-ClassClass:

The "Group Licensing Damages Sub-ClassFootball and Men's Basketball Class"—

> All current and former student-athletes whocollege athletes who have
> received full GIA scholarships and compete on, or competed on, a
> Division I men's or women'sbasketball team or an FBS football team,
> at a college or university that is a member of one the Power Five
> Conferences (or at an independent school that has an FBS football
> teamincluding Notre Dame), at any time between June 15, 2016 and
> the date of final judgment in this matter.

> This Sub-ClassClass excludes the officers, directors, and employees of
> Defendants. This Sub-ClassClass also excludes all judicial officers presiding
> over this action and their immediate family members and staff, and any
> juror assigned to this action.

302.   300.   On behalf of the members of the Group Licensing Damages Sub-Class,
Plaintiffs seekpreviously certified Football and Men's Basketball Class, as

amended herein, Plaintiffs seek the compensation that these class members would have received

the share of group licensing revenues, including but not limited toabsent Defendants' unlawful
restraints on sharing game telecast group licensingrevenue for their BNILs, the

C                                                                                                    5

compensation that these class members would have received for their NILs from third parties for use in video games and in individual NIL agreements, including marketing, sponsorship, social media, branding, promotional and other NIL deals during the four years prior to July 1, 2021. In addition, Plaintiffs seek the compensation that these class members would have received, starting in the 2019-

revenue, that members of this Sub-Class would have received2020 academic year, absent Defendants' unlawful conductrestraints on pay-for-play compensation.

303. Plaintiffs Grant House and      301.   Plaintiff Sedona Prince bringalso brings this action under Federal Rule of Civil Procedure

Civil Procedure 23(b)(3) on theirher own behalf and on behalf of the following Sub-ClassClass:

The "~~Lost Opportunities Damages Sub-Class~~ Women's Basketball Class"—

~~All current Division I athletes in their second or later year of eligibility (or first year of eligibility after receiving a red shirt the prior year) who receive compensation for use of their name, image, or likeness for all or any part of the period between July 1, 2021 and June 30, 2022.~~

All current and former college athletes who have received full GIA scholarships and compete on, or competed on, a Division I women's basketball team at a college or university that is a member of one of the Power Five Conferences (including Notre Dame), at any time between June 15, 2016 tand the date of final judgment in this matter.

This ~~Sub-Class~~ Class excludes the officers, directors, and employees of Defendants. This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

~~304~~302. On behalf of the ~~members of the Lost Opportunities Damages Sub-Class, Plaintiffs~~previously certified Women's Basketball Class, which is amended herein, Plaintiffs seek the compensation that these class members would have received absent Defendants' unlawful restraints on sharing game telecast revenue for their BNILs, the compensation that these class members would have received for their NILs from third parties for use in video games and in individual NIL agreements, including marketing, sponsorship, social media, branding, promotional and other NIL deals during the four years prior to July 1, 2021. In addition, Plaintiffs seek the ~~NIL~~ compensation that these class members ~~of this Sub-Class~~ would have received, starting in the 2019-2020 academic year, absent Defendants' unlawful ~~conduct~~restraints on pay-for-play compensation.

~~305.~~   303. Plaintiffs Grant House and Nya Harrison also bring this action under Federal Rule of Civil Procedure 23(b)(3) on their own behalf and on behalf of the following ~~Sub-Class~~Class:

The "~~Former Players Damages Sub-Class~~Additional Sports Class"—

~~All former NCAA~~Excluding members of the Football and Men's Basketball Class and members of the Women's Basketball Class, all current and former college athletes who competed on a Division I athletic team at any time ~~between~~from June 15, 2016 ~~and~~through the date of ~~trial who would have~~final judgment in this matter, including those who (i) have received a full or partial GIA; and/or (ii) received compensation for ~~the~~ use of their name, image, ~~or likeness during their period of eligibility absent Defendants' unlawful conduct~~and likeness since July 1, 2021 while a college athlete if they competed in the same Division I sport prior to July 1, 2021.

This ~~Sub-Class~~Class excludes the officers, directors, and employees of Defendants. This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

306.   304.   On behalf of the members of the Former Players Damages Sub-Class, Plaintiffs seek previously certified Additional Sports Class, which is amended herein, Plaintiffs seek the compensation that these class members would have received for their NILs from third parties in individual NIL agreements, including marketing, sponsorship, social media, branding, promotional and other NIL deals prior to July 1, 2021, absent Defendants unlawful restraints. In addition, Plaintiffs seek the compensation that these class members would have received, starting in the 2019-2020 academic year, absent Defendants' unlawful restraints on pay-for-play compensation. Plaintiffs also seek compensation for any additional scholarships these class members would have received, starting in the 2019-2020 academic year, absent Defendants' unlawful restraints on scholarships.

the NIL compensation that members of this Sub-Class would have received absent Defendants' unlawful conduct.

307.   305.   The Declaratory and Injunctive Relief Class, the Group Licensing Damages Sub-Football and Men's Basketball Class, the Women's Basketball Class, and the Additional Sports Class are Class, the Lost Opportunities Damages Sub-Class, and the Former Players Damages Sub-Class are referred to collectively herein as "the "Classes."

308 306. In addition to seeking certification of nationwide classes for their antitrust claims, *see* First and Second Claims for Relief, *infra*, Plaintiffs also seek certification of a nationwide class for purposes of their unjust enrichment claims, *see* Third Claim for Relief, *infra*.

309 307. The Classes are so numerous that joinder of all members is impracticable. While the exact number of members each of the Classes is unknown to Plaintiffs at this time and can only be discerned through discovery, Plaintiffs are informed and believe that there are several thousand members of each of the Classes.

310 308.   Plaintiffs' claims are typical of the claims of the other members of the Classes. Plaintiffs and other members of the Classes sustained damages arising out of Defendants' common course of conduct in violation of law as complained herein. The injuries and damages of each

member of the Classes were directly caused by Defendants' wrongful conduct in violation of laws as alleged herein.

311309. Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

312310. Numerous common questions of law and fact exist as to all members of the Classes, and these common questions predominate over any questions affecting solely individual members of the Classes. Although in many cases the Defendants admit that they have in fact engaged in the conduct listed below, nevertheless among the questions of law and fact common to the Classes are:

    a. Whether Defendants engaged in a contract, combination, or conspiracy to unreasonably restrain trade by limiting the compensation available to members of the Classes for use of their names, images and/or likenesses;

    b. Whether such conduct caused members of the Classes to receive less compensation than members of the Classes would have received for use, of their; names, images, and/or likenesses in a truly competitive market;

    c. The duration of the contract, combination, or conspiracy alleged herein;

    d. Whether Defendants violated Section 1 of the Sherman Act;

    e. Whether the conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiffs and class members; and

    f. Whether the Class is entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief.

313311. Additional common questions of law and fact specific to the Group LicensingFootball and Men's Damages Sub-Class, the Lost Opportunities Damages Sub-Class, and the Former Players Damages Basketball Class, the Women's Basketball Class, and the Additional Sports NIL Class include the Sub-Class include the following:

    a. The appropriate measure of damages sustained by Plaintiffs and sub-classclass members; and

    b. Whether Defendants have been unjustly enriched.

314312. Defendants have acted or refused to act on grounds generally applicable to the members of Declaratory and Injunctive Relief Class, thereby making final injunctive relief appropriate for the members of the Declaratory and Injunctive Relief Class as a whole.

315313.Plaintiffs' claims are typical of the Class because the ~~NIL~~ restraints ~~have injured both~~on their compensation

for NILs and athletic services and available scholarships have injured both Plaintiffs and the

members of the Classes.

316314.Plaintiffs are adequate representatives of the Classes and will protect the claims and

interests of the Classes. Plaintiffs do not have interests that conflict with those of the Classes and

Plaintiffs will vigorously prosecute the claims alleged herein.

317315. A class action is superior to other methods for the fair and efficient resolution of this controversy. The class action device presents fewer management difficulties, and provides the benefit of a single adjudication, economy of scale, and comprehensive supervision by a single court. The damages suffered by Plaintiffs and each member of the Classes are relatively small as compared to the expense and burden of individual prosecution of the claims asserted in this litigation. Thus, absent class certification, it would not be feasible for Plaintiffs and members of the Classes to redress the wrongs done to them. It also would be grossly inefficient for the judicial system to preside over large numbers of individual cases. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the judicial system. Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII. ANTITRUST ALLEGATIONS

318316. Defendants' contract, combination, and conspiracy described herein consisted of a continuing horizontal and vertical agreement, understanding, and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to artificially fix, depress, maintain, and/or stabilize prices received by Plaintiffs and class members for the use of their names, images and/or likenesses in the United NIL rights and athletic services, and to restrict scholarships available to Plaintiffs and class members in the United States, its territories and possessions.

319317. In formulating and effectuating the contract, combination, or conspiracy, Defendants and their co-conspirators did those things that they unlawfully combined and conspired to do, including, among other things:

C                                                                                                    5

a. agreeing to artificially fix, depress, maintain, and/or stabilize prices paid to Plaintiffs and class members for the use of their names, images and/or likenesses; and

b. agreeing to artificially fix, depress, maintain, and/or stabilize prices paid to Plaintiffs and class members for their athletic services; and

c. agreeing to artificially fix, depress, maintain, and/or stabilize the number of scholarships available to Plaintiffs and class members.

bd. implementing and monitoring the conspiracy among cartel members.

320318. The activities described above have been engaged in by Defendants and their

co-conspirators for the purpose of effectuating the unlawful agreement to fix, depress, maintain

and/or stabilize prices paid to and scholarships available to Plaintiffs and Class Members for the use

of their names, images and/or

likenesses.

321319. Defendants' actions constitute an unreasonable restraint of trade.

## IX.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

**Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1**
**Unreasonable Restraint of Trade**

322320. Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as

if fully set forth herein.

323321. Defendants and their co-conspirators, by and through Defendants' and co-

conspirators' officers, directors, employees, agents, or other representatives, have entered into a

continuing horizontal and vertical contract, combination, and conspiracy in restraint of trade in the

relevant markets to artificially depress, fix, maintain, and/or stabilize the prices paid to members of

the Classes for the use of, and to limit supply for, the licensing and sale of their images, likenesses

and/or names and for their athletic services in the United States and its territories and possessions, in

violation of Section 1 of the Sherman Act (15 U.S.C. § 1). If Plaintiffs and class members were free to

license and sell their

images, likenesses and/or names, many more licenses would be sold. This output restriction also has

the effect of raising the prices charged by the NCAA and its members for licensing rights.

324322. Defendants' unlawful conduct deprived Plaintiffs and members of the Classes of

compensation for the use of their names, images, and likenesses and their athletic services. This

unreasonable restraint on competition has artificially limited supply and depressed compensation

paid to Plaintiffs and the members of the Classes for the use of their images, likenesses and/or names.

and for their athletic services.

325323. Plaintiffs and the members of the Classes received less than they otherwise would have received for the use of their images, likenesses and/or names and their athletic services and in a competitive marketplace, were thus damaged, and seek to recover for those damages.

326.   On information and belief, the NCAA always conditioned eligibility to play Division I sports on the relinquishment to the NCAA and its members by the athlete of all rights to be compensated for his or her image, likeness and/or name associated with the playing of those sports.

327324. Defendants and their co-conspirators' abridgment of compensation rights for current

and former student-athletes is not connected to any legitimate non-commercial goal. Defendants'

actions are solely to enhance revenue for themselves and their for-profit business partners by, for

example, being able to take all of the revenue related to the commercial use of student-athletes'
names, images, and likenesses for themselves. Defendants' actions have no relationship to any
alleged goal of "amateurism," or any legitimate procompetitive purpose. The NCAA's actions
directly regulate commercial markets and therefore are illegal.

~~328~~325. As a direct and proximate result of Defendants' scheme, Plaintiffs and the members of

the Classes have been injured and financially damaged. Plaintiffs' and class members' injuries
consist of receiving lower prices for use of their NILs and for their athletic services than they would
have received absent Defendants' conduct. Plaintiffs' and class members' injuries are of the type the
antitrust laws were designed to prevent and flow from that which makes Defendants' conduct
unlawful.

~~329~~326.      Defendants and their co-conspirators have collectively conspired to illegally limit and

~~depress the compensation to student-athletes for use of their NILs. This~~ depress the compensation to student-athletes for the use of their NILs and athletic services. This

anticompetitive and illegal scheme has unreasonably restrained trade.

~~330~~327.      The anticompetitive effects of Defendants' scheme substantially outweigh any alleged

procompetitive effects that may be offered by Defendants, including that their collusive conduct is
shielded by the NCAA's concept of "amateurism." Moreover, reasonable and less restrictive
alternatives are available to Defendants' current anticompetitive practices.

~~331~~328. The amount of damages suffered by Plaintiffs and the members of the Classes has not

yet been ascertained. Pursuant to Section 4 of the Clayton Act, Plaintiffs are entitled to recover from
Defendants treble the amount of actual damages, as well as an award of reasonable attorneys'

C                                                                              5

fees and costs of suit.

~~332~~329. Plaintiffs and members of the Classes are entitled to a permanent injunction that

terminates the ongoing violations alleged in this Complaint.

### SECOND CLAIM FOR RELIEF

**Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1**
**Unreasonable Restraint of Trade – Group Boycott / Refusal to Deal**

~~333~~330.         Plaintiffs adopt and incorporate by reference all prior paragraphs of this

Complaint as

if fully set forth herein.

334331. Defendants and their co-conspirators, by and through Defendants' and co-coconspirators conspirators' officers, directors, employees, agents, or other representatives, entered into a continuing horizontal and vertical contract, combination, and conspiracy in restraint of trade to effectuate a horizontal group boycott of members of the Classes. Defendants' group boycott/refusal to deal encompasses Defendants' concerted acts to prevent Class Members from being compensated for the use of their images, likenesses and/or names and athletic services for use of their images, likenesses and/or names and/or their concerted refusal to permit compensation to be paid to members of the Classes for use of their images, likenesses and/or names, in the United States and its territories and possessions, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

335332.   Defendants' group boycott/refusal to deal includes Defendants' concerted action to require all current student-athletes to abide by regulations and bylaws that purport to require each of . This concerted action them to relinquish the rights for use of their images, likenesses and/or names. This concerted action is in effect a refusal to deal with members of the Classes on compensation rights issues, and forecloses them from full access to the marketplace. Defendants use the eligibility rules as a threat of a boycott to force all student-athletes to abide by the rules.

336.   Defendants' group boycott/refusal to deal also includes Defendants' ongoing concerted action to deny class members compensation in the form of royalties for the continued use of their images, likenesses and/or names for profit, including, but not limited to, through restrictions in the bylaws.

C                                                                                                5

337333. Plaintiffs and the members of the Classes received less than they otherwise would have received for the use of their NILs in a competitive marketplace, were thus damaged, and seek to recover for those damages.

338.    On information and belief, the NCAA always conditioned eligibility to play Division I sports on the relinquishment to the NCAA and its members by the athlete of all rights to be compensated for his or her image, likeness and/or name associated with the playing of those sports.

339.    Defendants and their co-conspirators' abridgment of compensation rights for student-athletes is not connected to any legitimate non-commercial goal. Defendants' actions are solely to enhance revenue for themselves and their for-profit business partners, by, for example, being able to take all of the revenue related to the commercial use of student-athletes' names, images, and likenesses for themselves. Defendants' actions have no relationship to any alleged goal of preserving "amateurism," or any procompetitive purpose. The NCAA's actions directly regulate a commercial market and therefore are illegal.

340334. As a direct and proximate result of Defendants' group boycott, Plaintiffs and the members of the Classes have been injured and financially damaged. Plaintiffs' and class members' injuries consist of denial of compensation for use of their images, likenesses and/or names and athletic services. Plaintiffs' and class members' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

341.    Defendants and their co-conspirators have collectively conspired to illegally deny compensation to student-athletes for continued use of their images, likenesses and/or names in unreasonable restraint of trade.

342335. The anticompetitive effects of Defendants' group boycott substantially outweigh any alleged procompetitive effects that may be offered by Defendants, including that their collusive conduct is shielded by the NCAA's concept of "amateurism" or any procompetitive purpose. Moreover, reasonable and less restrictive alternatives are available to Defendants' current anticompetitive practices.

343336. The amount of damages suffered by Plaintiffs and the members of the Classes has not yet been ascertained. Pursuant to Section 4 of the Clayton Act, Plaintiffs are entitled to recover from

C                                                                                                      5

Defendants treble the amount of actual damages, as well as an award of reasonable attorneys' fees and costs of suit.

344337. Plaintiffs and the ClassesDeclaratory and Injunctive Relief Class are entitled to a permanent injunction that terminates the

injunction that terminates the ongoing violations alleged in this Complaint.

### THIRD CLAIM FOR RELIEF

### Unjust Enrichment

345338. Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

346339. Defendants have been unjustly enriched as a result of the unlawful conduct detailed herein at the expense of Plaintiffs and Class Members. Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred upon them via their wrongful conduct, and it would be unjust for them to be allowed to do so.

347340. Plaintiffs seek disgorgement of all Defendants' profits resulting from the wrongful conduct described herein and establishment of a constructive trust from which Plaintiffs and the Class Members may seek restitution.

### X.      REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Classes, request judgment as follows:

A.      For actual damages according to the proof at trial;

B.      For treble damages pursuant to 15 U.S.C. § 15;
C.      For a declaratory judgment declaring as void the NCAA's Bylaws that operate to impose a restrictionrestrictions on the compensation Division I student-athletes can receive in exchange for the commercial use of their names, images, and likenesses;from the schools, conferences, or third parties for their NILs or athletic services and the NCAA's Bylaws that operate to impose restrictions on the athletic scholarships available for college-athlete labor services by setting maximum numbers or amounts of scholarships that can be provided in each sport;

C                                                                                                   5

D.      For an injunction restraining the NCAA and Conference Defendants from enforcing their unlawful and anticompetitive ~~agreement~~<u>agreements</u> to restrict the ~~NIL~~<u>(a)</u> compensation available to ~~class members.~~<u>Division I</u>

student-athletes from the schools, conferences or third parties for their services or NILs; and (b) athletic scholarships available to Division I student-athletes;

E.  For Plaintiffs' attorneys' fees, costs, and expenses; and

F.  For other such relief that the Court may deem just and equitable.

**XI.   JURY DEMAND**

Plaintiffs, on behalf of themselves and all others similarly situated, hereby request a jury trial on any and all claims so triable.

DATED this 26th day of July, 2024                Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP          WINSTON & STRAWN LLP

Steve W. Berman (*pro hac vice*)                    Jeffrey L. Kessler (*pro hac vice*)
Emilee N. Sisco (*pro hac vice*)                     David G. Feher (*pro hac vice*)
1301 Second Avenue, Suite 2000              David L. Greenspan (*pro hac vice*)
Seattle, WA 98101                           Adam I. Dale (*pro hac vice*)
Telephone: (206) 623-7292                   WINSTON & STRAWN LLP
                                            200 Park Avenue
Facsimile: (206) 623-0594                   New York, NY 10166-4193
steve@hbsslaw.com                           Telephone: (212) 294-4698
emilees@hbsslaw.com                         Facsimile: (212) 294-4700
                                            jkessler@winston.com

Benjamin J. Siegel (SBN 256260)             dfeher@winston.com
715 Hearst Avenue, Suite 202                dgreenspan@winston.com
Berkeley, CA 94710

Telephone: (510) 725-3000
Facsimile: (510) 725-3001                   Jeanifer E. Parsigian (SBN 289001)
bens@hbsslaw.com                            WINSTON & STRAWN LLP
                                            101 California Street
Jeffrey L. Kodroff                          San Francisco, CA 94111
SPECTOR ROSEMAN & KODROFF PC                Telephone: (415) 591-1000
Two Commerce Square
                                            jparsigian@winston.com
Philadelphia, PA 19103
Telephone: (215) 496 0300                   *Counsel for Plaintiffs and the Classes*
Facsimile: (215) 496 6611

*Counsel for Plaintiffs and the Classes*

## JURY DEMAND

Plaintiffs, on behalf of themselves and all others similarly situated, hereby request a jury trial

on any and all claims so triable.

DATED this 26th day of July, 2021          Respectfully submitted,
HAGENS BERMAN SOBOL SHAPIRO LLP

By:   /Steve W. Berman

Steve W. Berman (*pro hac vice*)

Emilee N. Sisco (*pro hac vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
emilees@hbsslaw.com

Benjamin J. Siegel (#256260)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
bens@hbsslaw.com

Jeffrey L. Kodroff
SPECTOR ROSEMAN & KODROFF PC
Two Commerce Square
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

*Counsel for Plaintiffs and the Proposed Classes*

C                                                                              5

WINSTON & STRAWN LLP

by:    /Jeffrey L. Kessler
                                        Jeffrey L. Kessler (*pro hac vice*)

David G. Feher (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
Adam I. Dale (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4698
Facsimile: (212) 294-4700
jkessler@winston.com
dfeher@winston.com
dgreenspan@winston.com
aidale@winston.com

Jeanifer E. Parsigian (SBN 289001)
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
jparsigian@winston.com

*Counsel for Plaintiffs and the Proposed Classes*

| **Summary report:** **Litera Compare for Word 11.5.0.74 Document comparison done on 7/25/2024 10:46:50 AM** | |
|---|---|
| **Style name:** W&S Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** 164 Consolidated Amended Complaint.pdf | |
| **Modified filename:** Exhibit 1_House_Carter Second Amended Complaint_(19832124)_(23).pdf | |
| **Changes:** | |
| Add | 1448 |
| Delete | 1477 |
| Move From | 142 |
| Move To | 142 |
| Table Insert | 1 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 9 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 3219 |