Steve W. Berman (*pro hac vice*)
Emilee N. Sisco (*pro hac vice*)
Stephanie Verdoia (*pro hac vice*)
Meredith Simons (SBN 320229)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com
emilees@hbsslaw.com
stephaniev@hbsslaw.com
merediths@hbsslaw.com

Benjamin J. Siegel (SBN 256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
bens@hbsslaw.com

*Class Counsel for Plaintiffs*

[Additional counsel on signature page]

Jeffrey L. Kessler (*pro hac vice*)
David G. Feher (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
Adam I. Dale (*pro hac vice*)
Sarah L. Viebrock (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
jkessler@winston.com
dfeher@winston.com
dgreenspan@winston.com
aidale@winston.com
sviebrock@winston.com

Jeanifer E. Parsigian (SBN 289001)
WINSTON & STRAWN LLP
101 California Street, 34th Floor
San Francisco, CA 94111
Telephone: (415) 591-1000
jparsigian@winston.com

*Class Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | Case No. 4:20-cv-03919-CW<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY SETTLEMENT APPROVAL**<br><br><br>Hrg. Date:   September 5, 2024<br>Time:   2:30 p.m.<br>Judge:   Hon. Claudia Wilken<br>Courtroom:   2, 4th Floor |

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on September 5, 2024, in Courtroom 2 of the Honorable Claudia Wilken of the United States District Court for the Northern District of California, Oakland Division, located at 1301 Clay Street, Oakland, CA 94612, the Class Plaintiffs ("Plaintiffs") will and hereby do move the Court pursuant to Federal Rules of Civil Procedure 23 for an order:

1. Preliminarily approving a proposed class action settlement with the National Collegiate Athletic Association, Pac-12 Conference, The Big Ten Conference, Inc., The Big 12 Conference, Inc., Southeastern Conference, and Atlantic Coast Conference (collectively, "Defendants");

2. Provisionally certifying the proposed Settlement Classes;

3. Appointing Hagens Berman Sobol Shapiro LLP and Winston & Strawn LLP as Settlement Class Counsel;

4. Directing notice to the proposed Settlement Classes and approving the manner and form of Notice and proposed Distribution Plan to Settlement Class Members;

5. Appointing Grant House, Sedona Prince, Tymir Oliver, DeWayne Carter, and Nya Harrison (the "Class Representatives") as representatives for the proposed Settlement Classes for the purposes of disseminating notice;

6. Authorizing retention of Verita Global, LLC ("Verita") as Settlement Administrator; and

7. Scheduling a final hearing to determine whether the Settlement is fair, reasonable, and adequate under Rule 23(e)(2) and whether the proposed Settlement Classes should be certified (the "Final Fairness Hearing").

This motion is based on this Notice of Motion and Motion for Preliminary Approval of Settlement with Defendants, the following memorandum of points and authorities, the Settlement Agreement filed herewith, the Declaration of Steve W. Berman in Support of Plaintiffs' Motion for Preliminary Settlement Approval, the pleadings and papers on file in this action, and such other matters as the Court may consider.

010912-11/2686178 V1

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................1

II.   PROCEDURAL HISTORY ..................................................................................3

    A.   Background .................................................................................................3

    B.   Procedural History .....................................................................................3

III.  THE SETTLEMENT .............................................................................................6

    A.   The Settlement Negotiations......................................................................6

    B.   The Settlement Classes ..............................................................................6

    C.   The Settlement Consideration and Release of Claims................................7

        1.   Monetary Relief. ..............................................................................8

        2.   Injunctive Relief...............................................................................8

        3.   Settlement Release. .........................................................................10

    D.   Distribution Plan ......................................................................................11

    E.   Notice Plan...............................................................................................13

        1.   Notice to Settlement Classes Prior to Final Approval and
           Distribution of Settlement Funds. ..................................................13

        2.   Additional Notice to Incoming College Athletes During
           Injunctive Settlement Term............................................................14

IV.   LEGAL STANDARD..........................................................................................15

V.    THE SETTLEMENT WARRANTS PRELIMINARY APPROVAL .................15

    A.   The Settlement is Fair, Reasonable, and Adequate..................................15

        1.   The Classes have been zealously represented...................................15

        2.   The Settlement Agreement resulted from arm's length
           negotiations....................................................................................16

        3.   The Settlement provides extraordinary relief for the
           Classes............................................................................................16

010912-11/2686178 V1

a. The Settlement provides substantial monetary benefits...........................................................................17

b. The Settlement provides ground-breaking injunctive relief.....................................................................21

4. The Settlement treats Class Members equitably.........................24

5. The Settlement satisfies the factors set forth in the Northern District of California's Procedural Guidance. .......................25

a. The differences between the settlement classes and certified classes properly reflect the contours of the settlement. ...........................................................................25

b. The settlement releases are appropriate for this settlement. ...........................................................................27

c. Other cases affected by the settlement....................................28

d. Verita was selected as settlement administrator through a competitive bidding process. ..........................28

e. Counsel will request reasonable attorneys' fees and reimbursement of costs. ..........................................29

6. Counsel will request reasonable class representative service awards ....................................................................................30

B. The Proposed Notice Program Satisfies Rule 23 .............................32

C. The Settlement Classes Merit Certification ......................................33

1. The Proposed Settlement Classes Satisfy the Requirements of Rule 23(a) ...........................................................................34

a. Numerosity........................................................................34

b. Commonality.....................................................................34

c. Typicality. .........................................................................34

d. Adequacy of Representation. ...........................................35

2. The Proposed Settlement Declaratory and Injunctive Relief Class Satisfies the Requirements of Rule 23(b)(2)......................35

3. The Proposed Settlement Damages Classes Satisfy Rule 23(b)(3) .............................................................................35

010912-11/2686178 V1

D.   The Court Should Appoint Hagens Berman and Winston & Strawn
      as Settlement Class Counsel ................................................................36

E.   Proposed Schedule for Notice and Final Approval.......................................37

VI.   CONCLUSION................................................................................................37

010912-11/2686178 V1

1

## <u>TABLE OF AUTHORITIES</u>

2

Page(s)

3

**Cases**

4

*In re Anthem, Inc. Data Breach Litig.*,
5
   327 F.R.D. 299 (N.D. Cal. 2018) ........................................................................16

6
*Bergman v. Thelen LLP*,
7
   2016 WL 7178529 (N.D. Cal. Dec. 9, 2016) ......................................................25

8
*In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*,
   85 F.4th 1070 (11th Cir. 2023) ...........................................................................28

9
*Brown v. Hain Celestial Grp., Inc.*,
10
   2014 WL 6483216 (N.D. Cal. Nov. 18, 2014) ...................................................25

11
*In re: Cathode Ray Tube (CRT) Antitrust Litig.*,
   2015 WL 9266493 (N.D. Cal. Dec. 17, 2015) ....................................................24
12

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*,
13
   2016 WL 3648478 (N.D. Cal. July 7, 2016) .......................................................18

14
*Churchill Vill., LLC v. Gen. Elec.*,
15
   361 F.3d 566 (9th Cir. 2004) ..............................................................................32

16
*Garner v. State Farm Mut. Auto Ins. Co.*,
   2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) ....................................................16
17

18
*In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.*,
   357 F.3d 800 (8th Cir. 2004) ..............................................................................25

19
*Hanlon v. Chrysler Corp.*,
20
   150 F.3d 1011 (9th Cir. 1998), *overruled in part on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) .....................................................30, 36

21
*Hanon v. Dataproducts Corp.*,
22
   976 F.2d 497 (9th Cir. 1992) ..............................................................................34

23
*Hesse v. Sprint Corp.*,
   598 F.3d 581 (9th Cir. 2010) ..............................................................................27
24

25
*In re Ikon Office Solutions, Inc., Sec. Litig.*,
   194 F.R.D. 166 ....................................................................................................26

26

27

28

010912-11/2686178 V1

*Lanier v. Nat'l Basketball Ass'n*,
    82 Civ. 4935 (S.D.N.Y. 1983) .......................................................................23

*In re Literary Works in Elec. Databases Copyright Litig.*,
    654 F.3d 242 (2d Cir. 2011).........................................................................28

*In re Lithium Ion Batteries Antitrust Litig.*,
    2020 WL 7264559 (N.D. Cal. Dec. 10, 2020)..................................18, 19

*Meijer, Inc. v. Warner Chilcott Holdings Co. Ill., Ltd.*,
    565 F. Supp. 2d 49 (D.D.C. 2008) .............................................................19

*Nat'l Basketball Ass'n v. Williams*,
    857 F. Supp. 1069 (S.D.N.Y. July, 18, 1994).............................................22

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
    375 F. Supp. 3d 1058 (N.D. Cal. 2019) ..........................................18, 20, 23

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
    958 F.3d 1239 (9th Cir. 2020) .........................................................20, 24

*Nat'l Collegiate Athletic Ass'n v. Alston*,
    594 U.S. 69 (2021)......................................................................................5, 24

*In re NCAA 1-A Walk-on Football Players Litig.*,
    2006 WL 1207915 (W.D. Wash. May 3, 2006).............................................19

*Nitsch v. DreamWorks Animation SKG Inc.*,
    2017 WL 399221 (N.D. Cal. Jan. 19, 2017) ................................................15

*O'Bannon v. NCAA*,
    7 F. Supp. 3d 955 (N.D. Cal. 2014), *aff'd in part, vacated in part O'Bannon v. NCAA*,
    802 F. 3d 1049 (9th Cir. 2015) ..................................................................23

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 934 (9th Cir. 2015) .........................................................29, 30, 31

*In re Resistors Antitrust Litig.*,
    2020 WL 2791922 (N.D. Cal. Mar. 24, 2020)................................................24

*Roberts v. Texaco, Inc.*,
    979 F. Supp. 185 (S.D.N.Y. 1997).............................................................32

*Robertson v. Nat'l Basketball Ass'n*,
    389 F. Supp. 867 (S.D.N.Y. 1975).............................................................22

010912-11/2686178 V1

*Robertson v. Nat'l Basketball Ass'n*,
72 F.R.D. 64 (S.D.N.Y. 1976), *aff'd*, 556 F.2d 682 (2d Cir. 1977)....22, 23

*Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.*,
2016 WL 7743407 (N.D. Cal. Dec. 7, 2016) (Wilken, J.)....15

*Spann v. J.C. Penney Corp.*,
314 F.R.D. 312 (C.D. Cal. 2016)....26

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003)....22, 30

*Stephens v. US Airways Grp., Inc.*,
102 F. Supp. 3d 222 (D.D.C. 2015)....21

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
2011 WL 13152270 (N.D. Cal. Aug. 24, 2011)....25

*In re Titanium Dioxide Antitrust Litig.*,
2013 WL 6577029 (D. Md. Dec. 13, 2013)....31

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*,
2013 WL 12327929 (C.D. Cal. July 24, 2013)....17, 22, 30

*Trombley v. Nat'l City Bank*,
826 F. Supp. 2d 179 (D.D.C. 2011)....21

*Vasquez v. USM Inc.*,
2015 WL 12857082 (N.D. Cal. Apr. 13, 2015)....15

*Velez v. Novartis Pharm. Corp.*,
2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010)....31

*In re Vitamin C Antitrust Litig.*,
2012 WL 5289514 (E.D.N.Y. Oct. 23, 2012)....19

*Vizcaino v. Microsoft Corp.*,
290 F.3d 1043 (9th Cir. 2002)....30

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
229 F. Supp. 3d 1052 (N.D. Cal. 2017)....16

*White v. Nat'l Football League*,
756 F. 3d 585 (8th Cir. 2014)....22

*White v Nat'l Football League,*
    822 F. Supp. 1389 (D. Minn. 1993) ........................................................22

**Federal Rules**

Fed. R. Civ. P. 23 ................................................................ *passim*

**Other Authorities**

*Procedural Guidance for Class Action Settlements* (Aug. 4, 2022),
    https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-
    settlements/ ........................................................26

010912-11/2686178 V1

1

## GLOSSARY OF DEFINED TERMS

2

| TERM | DEFINITION |
|---|---|
| Berman Decl. | Declaration of Steve W. Berman in Support of Plaintiffs' Motion for Preliminary Settlement Approval, concurrently filed herewith |
| Complaint | Second Consolidated Amended Complaint, concurrently filed herewith |
| ECF No. | Unless otherwise indicated, docket references are to the docket in No. 4:20-cv-03919-CW |
| Ex. | Unless otherwise indicated, all Ex. references are to the Berman Decl. |
| Motion | Plaintiffs' Notice of Motion and Motion for Preliminary Settlement Approval |
| Rascher Decl. | Declaration of Daniel A. Rascher, concurrently submitted herewith |
| Settlement Agreement or SA | Stipulation and Settlement Agreement, Ex. 1 to Declaration of Steve W. Berman in Support of Plaintiffs' Motion for Preliminary Settlement Approval, concurrently filed herewith |
| Injunctive Relief Settlement or IRS | Injunctive Relief Settlement, Appendix A to Ex. 1 to Declaration of Steve W. Berman in Support of Plaintiffs' Motion for Preliminary Settlement Approval, concurrently filed herewith |

010912-11/2686178 V1

## I.      INTRODUCTION

Plaintiffs have secured a revolutionary settlement agreement with the NCAA and its five major conferences that will have a profoundly positive impact on the tens of thousands of college athletes at the hundreds of colleges and universities that play Division I sports each year. The Settlement, negotiated at arms-length before one of the nation's preeminent mediators (Prof. Eric Green), secures $2.576 billion in damages for college athletes who have been denied compensation for the use of their names, images, and likenesses (NILs) and for their athletic performances. In Exhibit A to this Motion, Plaintiffs provide approximate settlement recovery information by Class and type of claimed damages, which shows that, among other things, the thousands of members of the Football and Men's Basketball Class will receive an average of $91,000 for their BNIL claims[1] and $40,000 for their athletic compensation claims, and a recovery range for their videogame NIL claims up to $4000, over a ten year period. Those who played before and after the NCAA changed its NIL rules in July 2021 to allow for third-party payments also may receive Lost Opportunity NIL payments within a wide range depending on several factors, but up to as much as $800,000. Members of the Women's Basketball Class will also receive Lost Opportunity NIL damages depending on when they played and the NIL deals they've made (up to as much as $300,000), as well as averages of $23,000 and $14,000 for their BNIL and athletic compensation claims, respectively. Members of the Additional Sports Class also will receive significant settlement recoveries, with ranges depending on the sport and years played, number of claimants, and their NIL deals. For example, members of this Class could receive Lost Opportunity NIL payments up to approximately $1.8 million.

The settlement will also reshape the economic landscape of college sports, shepherding in changes to Defendants' longstanding and aggressively defended rules and achieving injunctive relief that will enable future college athletes to receive tens of billions of dollars in new forms of benefits over the next ten years. The injunctive relief settlement mandates that during those ten years, NCAA Division I schools will be able to provide their student-athletes with previously prohibited direct payments and benefits worth up to 22% of the Power Five schools' average athletic revenues each year (referred to as the "Pool"

---

[1] The parties reserve their rights as to whether any right exists to license name, image, and likeness for use in a television broadcast of a collegiate athletic contest. The Injunctive Relief Settlement provides that no licenses or agreements between NCAA member institutions and student-athletes under the settlement shall specify "payments for the right to use a student-athlete's NIL for a broadcast of collegiate athletic games or competitive athletic events." IRS at 5-6.

amount). Economic expert Dr. Daniel Rascher estimates that the annual Pool amount will start at more than $20 million per school in the 2025-26 school year and grow to $32.9 million per school in 2034-35. Focusing only on the Power Five schools—even though these funds can be spent by all Division I schools—the settlement would allow for additional spending by these schools of up to $1.6 billion for 2025-26, and totaling $19.4 billion for the 10-year period. These additional benefits schools will be able to offer will be ***over and above*** existing scholarship, medical, and other benefits currently permitted, and which the settlement requires remain permitted. Dr. Rascher estimates that, in 2025-2026, the combined value of these existing benefits to Division I athletes and the new 22% Pool benefits is 51% of Division I revenues—meaning college athletes may have the ability to receive the same percentage of revenues as professional athletes in the NFL, NBA, and other professional leagues. Rascher Decl., ¶¶ 82-87. College athletes will finally be able to share in the billions of dollars their compelling stories and dynamic performances have generated for their schools, conferences, and the NCAA. This is nothing short of a seismic change to college sports following more than four years of hard-fought victories in this case.

Plaintiffs also propose a comprehensive notice program designed by experienced Settlement Administrator, Verita. *See* Declaration of Carla Peak ("Peak Decl."), concurrently submitted herewith. The proposed notice program includes direct email or postcard notice and digital notice to more than 80% of potential Settlement Class Members. The Administrator will deliver a state-of-the-art media notice program, including notice via digital and social media, earned media, and an extensive organic media effort. The Administrator will maintain a case-specific website, collegeathletecompensation.com, to provide Settlement Class Members with access to information about the Settlement, and to provide a secure online mechanism for Settlement Class Members to review their estimated settlement payments and, where required, submit online claim forms.

If approved, the Settlement will result in one of the largest payouts in an antitrust settlement in U.S. history and lead to pro-competitive changes benefitting college athletes. For these reasons, Plaintiffs respectfully request an order: (1) preliminarily approving the Settlement; (2) provisionally certifying the proposed Settlement Classes; (3) appointing Hagens Berman Sobol Shapiro LLP and Winston & Strawn LLP as Settlement Class Counsel; (4) directing notice to the Settlement Classes pursuant to the proposed

1  manner and form of notice; (5) appointing Grant House, Sedona Prince, Tymir Oliver, DeWayne Carter,

2  and Nya Harrison ("Class Representatives") as representatives for the proposed Settlement Classes for the

3  purpose of class notice; (6) authorizing retention of Verita as the Settlement Administrator; and (7)

4  scheduling a final hearing to determine whether the Settlement is fair, reasonable, and adequate under

5  Rule 23(e)(2) and whether the proposed Settlement Classes should be certified ("Final Fairness Hearing").

## II.     PROCEDURAL HISTORY

### A.     Background

8       This settlement is the culmination of efforts that began fifteen years ago with *Keller v. Electronic*

9  *Arts, Inc.*, No. C-09-1967 (N.D. Cal.) and *O'Bannon v. NCAA*, No. 09-cv-3329-CW (N.D. Cal.), cases

10  alleging that NCAA member institutions conspire to suppress payments to Division I football and

11  basketball players for the use of their NILs. Despite those cases, Defendants' NIL restraints have remained

12  largely in place. While an appeal was pending in *O'Bannon*, plaintiffs filed *In re Athletic Grant-in-Aid*

13  *Cap Antitrust Litigation* ("*Alston*"), challenging various NCAA restrictions, including scholarship limits

14  and rules prohibiting direct payments for athletic performance. After years of hard-fought litigation, this

15  Court in *Alston* struck down the NCAA's rules limiting education-related compensation and benefits. That

16  decision was upheld by the Ninth Circuit and later affirmed by the Supreme Court in a 9-0 decision. But

17  Defendants' NIL and pay-for-play rules remained in place and the legal attack on them was defeated.

18       While *Alston* was pending before the Supreme Court, Plaintiffs Grant House and Sedona Prince

19  filed *House v. NCAA* on June 15, 2020, and Plaintiff Tymir Oliver filed *Oliver v. NCAA* on July 8, 2020.

20  Both cases challenged the NCAA's restrictions on NIL compensation. They were consolidated as *In re*

21  *College Athlete NIL Litigation. See* ECF No. 154. On December 7, 2023, Plaintiffs DeWayne Carter, Nya

22  Harrison, and Sedona Prince filed *Carter v. NCAA*, No. 4:23-cv-6325, renewing the challenge against the

23  NCAA's prohibition on compensation for athletic services that began with *Alston*.

24       As this Court knows well, the decades-long history of antitrust litigation against the NCAA has

25  involved unique factual and legal arguments and hard-fought, incremental successes for college athletes.

### B.     Procedural History

27       This case began when *House* was filed on June 15, 2020. The complaint brought antitrust and

1 unjust enrichment claims against the NCAA and its five most prominent conferences, challenging the

2 NCAA rules that prohibited college athletes from receiving anything of value in exchange for the

3 commercial use of their NILs, whether from third parties or directly from Defendants or their member

4 schools. Plaintiffs defeated Defendants' motion to dismiss in June 2021. ECF No. 152. Plaintiffs filed a

5 Consolidated Amended Complaint on July 26, 2021. ECF No. 164.

6    Plaintiffs have litigated extensively to develop facts, economic theories, and models for class-wide

7 damages. Over the last four years, Plaintiffs negotiated discovery protocols and search terms and reviewed

8 millions of pages of documents. To obtain the evidence needed to support their claims, Plaintiffs

9 subpoenaed nearly 200 third parties, including 153 NCAA member schools, multiple professional leagues

10 and player associations, and several other industry participants. Plaintiffs deposed 40 fact witnesses,

11 including the former President of the NCAA, conference commissioners, and athletic directors, and

12 Defendants deposed the named Plaintiffs. Experts for both sides have been deposed, sometimes more than

13 once, and have collectively submitted 22 reports totaling 2,885 pages. Plaintiffs' economists worked

14 extensively with data from Defendants, hundreds of schools, and other sources to develop a model capable

15 of calculating reliable damages estimates for the classes. Berman Decl., ¶ 3.

16    On October 21, 2022, Plaintiffs filed a motion for class certification. ECF No. 208. Plaintiffs'

17 motion was supported by detailed reports from their economic expert, Dr. Daniel Rascher, and broadcast

18 expert, Edwin Desser. On April 28, 2023, Defendants filed their opposition to class certification along

19 with three supporting expert reports. Defendants also moved to exclude Plaintiffs' experts. ECF Nos. 249,

20 250. Plaintiffs filed their reply in support of class certification and opposition to Defendants' *Daubert*

21 motion on July 21, 2023. ECF Nos. 289, 291. They simultaneously filed a motion to exclude one of

22 Defendants' experts, Prof. Barbara Osborne. ECF No. 293.

23    On September 22, 2023, this Court certified Plaintiffs' proposed Declaratory and Injunctive Relief

24 Class under Fed. R. Civ. P. 23(b)(2). ECF No. 323. On November 3, 2023, the Court certified Plaintiffs'

25 three damages classes under Fed. R. Civ. P. 23(b)(3), granted Plaintiffs' motion to exclude Prof. Osborne,

26 and denied Defendants' motion to exclude Dr. Rascher and Mr. Desser. ECF Nos. 385-87. Defendants

27 filed a Rule 23(f) petition seeking to appeal the certification order, which was denied by the Ninth Circuit.

28

*In re College Athlete NIL Litig.*, No. 23-3607 (9th Cir. Jan. 18, 2024), ECF No. 8.

On December 7, 2023, *House* plaintiff Sedona Prince and two other current college athletes, DeWayne Carter and Nya Harrison, filed *Carter v. NCAA*, No. 3:23-cv-06325-RS (N.D. Cal.), which alleged that the NCAA's rules prohibiting payments for athletic services violate the antitrust laws. Discovery had not formally begun in *Carter* when Plaintiffs and the NCAA resumed settlement negotiations that began in May 2023, intending to resolve all claims challenging the NCAA's compensation restrictions. *See* Section III.A, *infra*. Plaintiffs' counsel had conducted extensive discovery regarding, and litigated, the NCAA's restrictions on athlete benefits during *Alston*. *See Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 80 (2021) (noting that the parties submitted "volumes of evidence and briefing" to this Court in *Alston*). They were thus well-aware of the legal issues that would be at play in any litigation challenging the NCAA's restrictions on athlete benefits, the evidence that existed related to those issues, and the challenges to (among other things) certifying damages classes. The evidence collected during discovery in *House* was also related to a variety of issues relevant to claims for additional compensation for athletic participation. For example, the evidence Plaintiffs had collected about Defendants' procompetitive justifications in *House* is relevant to their claims for additional compensation for athletic participation.

On April 3, 2024, the *House* Plaintiffs filed a motion for summary judgment and motion to exclude the opinions of two of Defendants' experts, Dr. Gautam Gowrisankaran and Barbara Osborne. ECF No. 414. Plaintiffs filed additional merits expert reports, including one from Dr. Darryl Williams. ECF No. 414 (Ex. 5 to Steve Berman's Summary Judgment Declaration); *see also id.* at Exs. 1-4.

On May 30, 2024, the Court stayed all case deadlines pending resolution of the present settlement. ECF No. 421. The same day, in *Carter*, Judge Seeborg entered a stipulated order extending Defendants' deadline to respond to the complaint due to the parties' settlement negotiations. ECF No. 100, No. 3:23-cv-06325-RS (N.D. Cal.). The *Carter* claims have now been consolidated in the operative Second Amended Complaint ("Complaint"), filed concurrently with this Motion.

As the chronology above attests, the Parties devoted significant resources to developing the discovery record, and they aggressively litigated their claims and defenses until reaching the proposed

settlement agreement.

### III.     THE SETTLEMENT

**A.     The Settlement Negotiations**

Settlement discussions began in November 2022, with the assistance of nationally prominent mediator Professor Eric D. Green, who has significant experience mediating disputes involving challenges to the NCAA's compensation rules. Berman Decl., ¶ 4. After discussing resolution with Prof. Green in November 2022, the parties continued their discussions in early 2023, and had four mediation sessions with Prof. Green in May, July, August, and September 2023. The settlement discussions were structured and sequenced to compartmentalize negotiations separately based on different relief and different claims. *Id.*, ¶¶ 4, 6, 8-9. These sessions occurred after more than two-and-half years of active litigation in this matter, and were vigorous and detail-driven. However, the parties could not reach agreement.

The sessions included discussions of NIL and compensation for athletic participation as of August 2023. *Id.*, ¶ 6. In fall 2023, this Court certified an injunctive relief class and three damages classes in *House.* One of the *House* plaintiffs (and two other named plaintiffs) filed *Carter* on December 7, 2023. Settlement discussions continued in December 2023 and into the spring of 2024, with the parties participating in lengthy mediation sessions on April 24 and 25, 2024. This round of mediation was sharply focused, and in May, the essential elements of the settlement were memorialized in Settlement Terms Sheets, signed on May 23-24, 2024. *Id.*, ¶¶ 8-9. Throughout, the discussions continued to be separated for injunctive relief and the different types of damages claims. The parties first focused on negotiations regarding settling the injunctive relief claims. Only after agreeing to the principal terms of the injunctive relief settlement did the parties turn to discussions of damages. Plaintiffs then made separate demands for damages relating to NIL damages and additional compensation damages (and a demand relating to damages in the *Hubbard* matter). The demands, subsequent negotiations, and ultimate agreed-upon settlement amounts took into account the different damages estimates, procedural postures, and risks and strengths of the respective claims. *Id.* Mediator Eric Green facilitated and monitored the talks.

**B.     The Settlement Classes**

Plaintiffs seek to certify four Settlement Classes: one Settlement Declaratory and Injunctive Relief

1   Class pursuant to Rule 23(b)(2) and three Settlement Damages Classes pursuant to Rule 23(b)(3)

2   (collectively referred to herein as the "Settlement Classes").  They are defined as follows:

3   The "Settlement Declaratory and Injunctive Relief Class" (represented by Plaintiffs Grant House,

4   DeWayne Carter, Nya Harrison, and Sedona Prince)—

5   All student-athletes who compete on, competed on, or will compete
    on a Division I athletic team at any time between June 15, 2020
6   through the end of the Injunctive Relief Settlement Term.[2]

7   The "Settlement Football and Men's Basketball Class" (represented by Plaintiffs Tymir Oliver and

8   DeWayne Carter)—

9   All student-athletes who have received or will receive full GIA
    scholarships and compete on, competed on, or will compete on a
10  Division I men's basketball team or an FBS football team, at a
    college or university that is a member of one of the Power Five
11  Conferences (including Notre Dame), and who have been or will be
    declared initially eligible for competition in Division I at any time
12  from June 15, 2016 through September 15, 2024.

13  The "Settlement Women's Basketball Class" (represented by Plaintiff Sedona Prince)—

14  All student-athletes who have received or will receive full GIA
    scholarships and compete on, competed on, or will compete on a
15  Division I women's basketball team at a college or university that is
    a member of one the Power Five Conferences (including Notre
16  Dame), and who have been or will be declared initially eligible for
    competition in Division I at any time from June 15, 2016 through
17  September 15, 2024.

18  The "Settlement Additional Sports Class" (represented by Plaintiffs Grant House and Nya

19  Harrison)—

20  Excluding members of the Football and Men's Basketball Class and
    members of the Women's Basketball Class, all student-athletes who
21  compete on, competed on, or will compete on a Division I athletic
    team and who have been or will be declared initially eligible for
22  competition in Division I at any time from June 15, 2016 through
    September 15, 2024.

23

24  **C.    The Settlement Consideration and Release of Claims**

25      In exchange for a release of claims, the Settlement provides for billions of dollars' worth of

26  monetary relief, as well as injunctive relief that will fundamentally restructure college sports, ensuring

27  that student-athletes can compete for compensation based on the value they provide to their universities

28  ___

[2] Each settlement class excludes the officers, directors, and employees of Defendants, as well as all judicial officers presiding over this action and their immediate family members and staff.

through their NILs and athletic performances.

### 1. Monetary Relief.

Defendants will pay $2.576 billion to the Settlement Damages Classes, including $1.976 billion for the NIL damages claims ("NIL Settlement Fund") and $600 million in additional compensation ("Addition Compensation Settlement Fund"), which includes relief for the athletic services claims. SA, ¶¶ 1(c), (ee). The NIL Settlement Fund is 67.4% of estimated NIL damages and the Additional Compensation Settlement Fund is 31.6% of estimated damages for the athletic services claims, both well above the usual percentages obtained in these types of settlements. *See* Section V.A.3.a, *infra*.

### 2. Injunctive Relief.

In addition to nearly $2.6 billion in damages, the settlement provides for ground-breaking injunctive relief. During the ten-year Injunctive Settlement Term,[3] NCAA Division I schools can provide their student-athletes with previously prohibited direct benefits worth up to 22% of the Power Five schools' average athletic revenues each year (referred to as the "Pool" amount). Based on the revenues of Power Five schools, Dr. Rascher has estimated that the annual Pool amount will start at more than $20 million per school in the 2025-26 school year and grow to $32.9 million per school in 2034-35.[4] For all Power Five Schools, that would allow for additional spending of up to $1.6 billion for 2025-26, growing to $2.3 billion in 2034-35, and totaling $19.4 billion for the 10-year period of the Injunctive Settlement Term. Rascher Decl., ¶ 85 Ex. 25.

The foregoing amounts focus on schools in the Power Five Conferences; however, under the settlement, the Pool for additional spending extends to *all* Division I schools. Thus, all 363 Division I schools will be able to provide benefits to student-athletes up to the Pool amount every year. Schools outside the Power Five do not generate as much revenue as Power Five schools and are likely to spend less than they are permitted to spend on student-athlete compensation. But even if non-Power Five schools spend just three percent as much as Power Five schools on direct compensation (and there are good reasons to think they will based on even a conservative estimate, *see id.*, ¶ 84), that could result in billions more being paid to college athletes over the next ten years. *Id.*

---

[3] The Injunctive Settlement Term begins following Final Approval of the Settlement and ends ten (10) academic years from the date of Final Approval. SA, ¶ 1(bb).
[4] The pool for the 2025-26 school year will be calculated based on the data available at that time.

The Settlement Agreement provides that the additional Pool compensation and benefits schools will be able to offer will be ***over and above*** existing scholarship and other benefits currently permitted by NCAA rules, including third-party NIL payments. IRS at 8, 14. In other words, the Settling Defendants have agreed that the NCAA cannot create rules that reduce existing benefits provided to NCAA Division I college athletes and must continue to allow third-party NIL payments. The Settlement Agreement details the types of additional compensation that may be counted against the Pool, and how to calculate the Pool amount itself, to make sure that the additional benefits secured by the Settlement are maximized in favor of athletes during the Injunctive Settlement Term. IRS at 12-14. Class Counsel will have the ability to audit the revenues and Pool calculations to make sure they are being properly recorded and to enforce anti-collusion provisions that will ensure that the schools compete with each other in making benefit and compensation decisions for athletes. IRS at 15-17.

In addition to this substantial increase in permitted compensation, the settlement also secures other valuable injunctive relief. That relief includes generally, with narrow limitations spelled out in the agreement: changing all NCAA and conference rules to permit the new direct benefits from schools to student-athletes allowed by the injunctive settlement (a sea change to NCAA rules that have existed for decades), allowing for payments for institutional brand promotion of student-athlete NIL, and continuing to permit student-athletes to earn NIL payments from third parties. IRS at 5-6, 18-19, 21. With regard to the latter issue, on an explicitly interim basis, the NCAA suspended enforcement of its rules prohibiting third-party NIL deals in July 2021, after this litigation was filed and the *Alston* plaintiffs won at the Supreme Court. That rule change has allowed college athletes to earn hundreds of millions of dollars in the last three years, and the Settlement Agreement makes that change permanent. As part of its implementation, NCAA compensation and benefit rules as revised by the settlement will be permitted, as will certain new rules limiting boosters to making fair market value payments for NIL, addressing the number of seasons/length of time college athletes are eligible to receive benefits, the progress required toward a degree for a college athletes to be eligible to receive benefits under the Injunctive Relief Settlement, rules preventing circumvention of the agreement, as well as other rules detailed in the Injunctive Relief Settlement. IRS at 19-20.

The Injunctive Relief Settlement also requires that the NCAA's rules be modified to eliminate all scholarship limits. The economic value of these additional aspects of the injunctive relief are difficult to quantify with precision—but are undeniably of astronomical value to college athletes. The Injunctive Settlement also establishes processes, including audit rights, for Class Counsel to ensure that the rules implementing the Injunctive Settlement will be followed. IRS at 15-17. And it establishes a new neutral arbitration system for resolving NCAA eligibility disputes between individual athletes or Member Institutions and the NCAA or conferences arising from the Injunctive Settlement. IRS at 22-25.

Importantly, the Injunctive Relief Settlement takes a neutral position and thus will not interfere with any collective bargaining efforts between college athletes and Defendants or NCAA member schools, in the event that a change in law or circumstances permits collective bargaining. If that occurs, the benefits permitted under the Injunctive Relief Settlement may be made part of any collectively bargained compensation package or alternative structure. Thus, the Settlement will not preclude the parties to any such bargaining from agreeing upon additional, expanded, or different benefits than those permitted by the Injunctive Relief Settlement. IRS at 27-28.

### 3.     Settlement Release.

The Settlement Agreement has separate provisions for the release of damages claims and injunctive relief claims. In exchange for the consideration provided by the settlement, members of the Damages Classes release all claims that were or could have been raised in the lawsuit – "prior to Final Approval" – "(1) on account of, arising out of, or resulting from any and all previously existing NCAA and conference rules regarding monies and benefits that may be provided to student-athletes by the NCAA, Division I conferences and/or Division I Member Institutions, or (2) relating in any way to any NCAA or conference limitations on the numbers of scholarships allowed or permitted in any sport." SA ¶ 1(oo).

The Settlement Agreement also releases "all declaratory and injunctive relief" claims that were or could have been raised in the lawsuit "prior to Final Approval or during the Injunctive Relief Settlement Term," which are on account of, arising out of, or resulting from "the continuation of existing (at the time of filing for preliminary approval of the Injunctive Relief Settlement) NCAA and conference rules, as well

as new or revised NCAA and conference rules agreed to as part of the Injunctive Relief Settlement, regarding (i) monies and benefits that may be provided to student-athletes by the NCAA, Division I conferences and/or Division I Member Institutions under NCAA or conference rules; (ii) NCAA roster and scholarship limits as agreed to in the Injunctive Relief Settlement; or (iii) the subjects addressed by the Related Injunctive Relief NCAA & Conference Rules." SA ¶ 1(pp).[5]

As discussed further below, during the Injunctive Settlement Term yearly notice will be provided to "all incoming Division I student-athletes" about the terms of the Injunctive Relief Settlement. SA ¶ 14. Analogously, while the specified "declaratory and injunctive relief claims" are released through the Injunctive Settlement Term, the release of damages claims is temporally limited to classes that end on September 15, 2024 and regarding claims that were or could have been raised in the lawsuit prior to Final Approval. SA ¶¶ 1(n), (oo). There is also no release of any claims regarding NCAA rules on other subjects, such as transfer rules or eligibility rules for athletes who receive prize money or other compensation for competing in events outside of the NCAA.

## D.     Distribution Plan

The NIL Settlement Fund of $1.976 billion will be allocated proportionally to the three NIL damages categories—BNIL, Videogame NIL, and Lost NIL Opportunities—based on Dr. Rascher's estimated single damages for each category. This means $1,815,000,000 will be allocated to the BNIL Settlement Fund, $71,500,000 will be allocated to the Videogame Settlement Fund, and $89,500,000 will be allocated to the Lost NIL Opportunities Settlement Fund. Rascher Decl., ¶¶ 21, 27, 32.

Based on the damages allocation methodology presented in Dr. Rascher's class certification reports and in his merits reports, the BNIL Settlement Fund will be allocated *pro rata* to members of the Football and Men's Basketball Class and Women's Basketball Class based on what sport the athlete played, the conference in which he or she played, and the year(s) in which he or she played.[6] If a class

---

[5] Subsection (iii) regarding Related Injunctive Relief NCAA & Conference Rules is defined in the Settlement Agreement to mean particular rules enacted for implementation of the settlement, including certain rules related to boosters, rules governing the number of seasons/length of time student-athletes are eligible to receive benefits, rules requiring progress toward a degree to receive benefits, and rules modified to the terms of the Injunctive Settlement and Settlement Agreement. SA ¶ 1(qq).

[6] This will be reduced proportionally from Rascher's damages estimate by the settlement's percentage reduction from the single damages estimate, and less any amount ordered by the Court for administrative costs and attorneys' fees and costs—resulting in a "BNIL Net Settlement Fund."

member played a sport for more than one year, each of his or her school-year *pro rata* shares will be added to calculate the class member's total *pro rata* share of BNIL damages. Rascher Decl., ¶¶ 27-28. The final distribution amounts will be net of any Court-approved fees and costs.

Also using the formulaic damages allocation methodology presented in Dr. Rascher's class certification and merits reports, the Videogame Settlement Fund will be allocated *pro rata* to members of the Football and Men's Basketball Class and Additional Sports Class based on what sport the athlete played (football or men's basketball) and the year(s) in which he played. Rascher Decl., ¶¶ 20-22. After calculation of the total estimated videogame damages for the members of these classes, and a proportionate reduction for the settlement, minus applicable fees and costs approved by the Court, each class member's sport and years played will be used to determine his settlement amount.

Also based on Dr. Rascher's previously developed damages methodology, the Lost Opportunities Net Settlement Fund (total settlement fund minus applicable fees and costs), will be allocated to members of the Football and Men's Basketball Class, Women's Basketball Class, and Additional Sports Class, using Dr. Rascher's "before and after" methodology to estimate the third-party NIL damages for members of these classes who received third-party NIL payments after the interim NIL rule changes in July 2021, and who played their sports during previous years of eligibility during the class period when third-party NIL payments were not allowed. This Court described the details of that methodology in its Class Certification Order, which relies on the "after period" earnings post-2021 to estimate the pre-2021 earnings for individual athletes (with some class-wide formulaic adjustments). Rascher Decl., ¶¶ 31-32.

The Additional Compensation Net Settlement Fund is the $600 million settlement amount minus a proportionate share of the Court-approved fees and costs. That fund will be divided into two portions, one for members of the Football and Men's Basketball Class and Women's Basketball Class (the "Power Five Football and Basketball Portion"), and one for all other athletes (the "General Portion"). Rascher Decl., ¶¶ 50-81. Ninety-five percent of the Additional Compensation Net Settlement Fund will be allocated to the Power Five Football and Basketball Portion, with that distributed in a ratio of 75/15/5 to athletes across the three sports (football, men's basketball, and women's basketball). Within each sport, damages amounts will be calculated using a formula that includes a standardized minimum amount (akin

to a base compensation). The formula also includes individualized adjustments based on seniority, recruiting star rating, and certain performance metrics. *Id.*, ¶¶ 51-66.

The remaining 5% of the Additional Compensation Net Settlement Fund will be allocated proportionally among Additional Sports Class claimants who received a partial or full GIA from the 2019-20 school year through the end of the class period (the "General Portion"). Athlete claimants will receive an expanded share if they played certain sports at certain schools outside of the Power Five where their school's team is among the highest revenue generating. Rascher Decl., ¶¶ 67-81.

**E.   Notice Plan**

**1.   Notice to Settlement Classes Prior to Final Approval and Distribution of Settlement Funds.**

Plaintiffs have attached to this motion a declaration from the Settlement Administrator, Verita, that proposes a comprehensive notice program and includes proposed class notices and a sample claim form. Peak Decl. ¶¶ 13-45, Exs. 1- 6.  The proposed notice program provides individual direct notice to all reasonably identifiable members of the Damages Settlement Classes via email or postcard notice, along with a robust social media notice program, dedicated website, and toll-free telephone line where Settlement Class Members can learn more about their rights and options pursuant to the terms of the Settlement.  *See id.*, ¶¶ 13-45.

For direct notice, Verita will send individual notice by email or postcard to members of the proposed Damages Settlement Classes whose contact information can be obtained. Defendants are requesting from their member schools the most recent contact information for Settlement Class Members. Verita will also employ additional methods to help ensure that as many Settlement Class Members as possible receive notice via email, postcard, and publication notice. For example, prior to distributing email notice, Verita will engage in an email cleansing and validation process to help ensure the quality of recipient email addresses. *See id.*, ¶¶ 20-23. Verita will also expend considerable resources to provide digital notice via websites and popular social media channels. *See id.*, ¶¶ 33-36.

The content of the direct notice emails will be the Email Notice attached to the Peak Declaration. *See id.*, Ex. 1. The proposed Postcard Notice is attached to Peak Declaration as Exhibit 2. These notice

documents will, *inter alia*, inform Settlement Class Members about the total settlement fund and additional details about allocation and settlement administration (claims filing, etc.). *See id.*

Verita will establish a case-specific toll-free hotline and case-specific website, with the domain reserved as collegeathletecompensation.com. *Id.*, ¶¶ 42-45. On the settlement website, Settlement Class Members will be able to view general information about this class action, read relevant Court documents, and review important dates and deadlines pertinent to the Settlement. For example, the detailed long-form notice will be available for download on the website ("Class Notice"). *See id.*, ¶ 46 Ex. 5. The Settlement Website will be designed to be user-friendly and make it easy for Settlement Class Members to find information about the Settlement, and it will also have a link Settlement Class Members can use to send an email with additional questions to a dedicated email address. *See id.* ¶¶ 42-45.

All email and postcard notices will contain a unique ClaimID and PIN to allow athletes to review and update their contact information via the case website. Approximately 60 days after Notice is sent, on the case website athletes will be provided with their estimated settlement awards, to the extent necessary information has been provided by the claimant and/or the applicable university. *See Id.* ¶ 27. Settlement Class Members will have the ability to electronically submit claims for damages where required. *Id.* ¶¶ 46-47. That includes claims for lost opportunity damages not in Dr. Rascher's deals database and claims by members of the Additional Sports Class for videogame damages and additional compensation for athletic participation damages.

### 2. Additional Notice to Incoming College Athletes During Injunctive Settlement Term.

In addition to the notice sent prior to final approval, the Settlement Agreement provides that during the Injunctive Settlement Term, Defendants or their member schools will provide a notice of the Injunctive Relief Settlement and its terms to all incoming Division I student-athletes. SA ¶ 14. When an NCAA Division I athlete completes their normal paperwork to be eligible to play their first season, they will receive the notice. All of these incoming student-athletes will have the right to file written objections to a continuation of the Injunctive Relief Settlement within 60 days of receiving the notice. *Id.* The form and content of the notice Defendants or their member institutions will provide to incoming student-athletes will be agreed to by Plaintiffs. *Id.* Class Counsel will endeavor to have additional Class Representatives

appointed, as needed, during the Injunctive Settlement Term, with the goal of having at least one current college athlete as an Injunctive Class representative for each year of the Injunctive Settlement Term.[7]

## IV.   LEGAL STANDARD

Federal Rule of Civil Procedure 23(c) requires judicial approval of any compromise or settlement of class action claims. Preliminary approval is not a dispositive assessment of the fairness of the proposed settlement; rather, preliminary approval assesses whether the proposed settlement falls within the "range of possible approval." *Vasquez v. USM Inc.*, 2015 WL 12857082, at *2 (N.D. Cal. Apr. 13, 2015); *accord Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.*, 2016 WL 7743407, at *2 (N.D. Cal. Dec. 7, 2016) (Wilken, J.). Preliminary approval establishes an "initial presumption of fairness, such that notice may be given to the class and the class may have a full and fair opportunity to consider the proposed [settlement] and develop a response." *Nitsch v. DreamWorks Animation SKG Inc.*, 2017 WL 399221, at *1 (N.D. Cal. Jan. 19, 2017). A settlement may preliminarily be approved upon a "showing that the court will likely be able to (i) approve the proposal under Rule 23(c)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(c)(1). Factors courts consider under Rule 23(c)(2) include whether:

(A)   the class representatives and class counsel have adequately represented the class;

(B)   the proposal was negotiated at arm's length;

(C)   the relief provided for the class is adequate, taking into account: (i) the   costs,   risks,   and delay of trial and appeal; (ii)  the   effectiveness of any proposed method of   distributing relief to the class, including the method of processing class-member claims; (iii)   the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(c)(3); and

(D)   the proposal treats class members equitably relative to each other.

All of the preliminary approval requirements are met here.

## V.   THE SETTLEMENT WARRANTS PRELIMINARY APPROVAL

### A.   The Settlement is Fair, Reasonable, and Adequate

#### 1.   The Classes have been zealously represented.

As described in Section II.B, *supra*, Class Counsel have aggressively pursued and analyzed a

---

[7] To assist in obtaining ongoing information from college athletes during the Injunctive Settlement Term with respect to implementation, monitoring, and enforcement of the Settlement Agreement, Class Counsel will call upon established college player advocacy organizations to provide input on the views of class members, including from Athletes.Org led by Jim Cavale and the National College Players Association led by Ramogi Huma.

massive discovery record, which includes hundreds of thousands of documents and voluminous transactional data. Class Counsel have also conducted or defended more than fifty depositions; retained prominent economic, survey, and broadcast experts; defeated Defendants' attempt to dismiss Plaintiffs' claims; and achieved class certification for an injunctive relief class and three large damages classes. The Class Representatives have likewise devoted hundreds of hours to these cases, consulting with counsel, reviewing drafts of documents, responding to extensive discovery requests, gathering and producing thousands of pages of documents, and preparing for and attending depositions. This zealous representation supports preliminary approval. *See* Fed. R. Civ. P. 23(c)(1)(A).

> **2.      The Settlement Agreement resulted from arm's length negotiations.**

The Settlement is the product of sustained negotiations between experienced counsel with a track record of success in antitrust and class-action matters. Negotiations occurred at arm's length, over many sessions over the course of more than a year, including before one of the nation's leading mediators, Prof. Eric Green. *See supra*, Section III.A. Having worked on this case for several years (and several other cases challenging NCAA compensation rules for more than fifteen years), including through class certification in *House*, counsel understand both the risks and potential recovery from further litigation. Counsel's determination that the settlement is fair and reasonable is afforded "great weight" in the settlement approval analysis. *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 229 F. Supp. 3d 1052, 1067 (N.D. Cal. 2017) (observing that "competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation"). Particularly when the settlement is the product of hard bargaining by experienced counsel with the active involvement of a skilled mediator, this supports a "presumption that the settlement is fair and reasonable." *Garner v. State Farm Mut. Auto Ins. Co.*, 2010 WL 1687832, at *13 (N.D. Cal. Apr. 22, 2010); *see also In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 327 (N.D. Cal. 2018) (noting that "the Settlement was negotiated at arms' length over several full-day mediation sessions with the help of an experienced mediator," and that "Courts in this district have recognized that the assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive").

> **3.      The Settlement provides extraordinary relief for the Classes.**

Preliminary approval requires consideration of whether the "relief provided for the class is adequate." Fed. R. Civ. P. 23(e)(2)(C). The historic relief provided here easily meets that test. Moreover, Settlement Class Members will receive notice and an opportunity to object or, for damages class members, to opt out, and this Court will be able to consider objections before final approval.

Defendants have committed to paying into a non-reversionary settlement fund $2.576 billion to the Settlement Damages Classes for the settlement of these claims. Section III.C.1, *supra.* That includes $1.976 billion for settlement of the NIL damages claims and $600 million for settlement of the additional compensation damages claims. Plaintiffs described the ground-breaking injunctive relief achieved in Section III.C.2 *supra*, which should also be considered alongside the monetary settlement amounts when determining the adequacy and economic value of the settlement. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig*., 2013 WL 12327929, at *29 & n.7 (C.D. Cal. July 24, 2013) (in valuing a settlement, "Plaintiffs' experts appropriately have included the non-monetary benefits").

### a.   The Settlement provides substantial monetary benefits.

Even looking at the benefits obtained by the damages and injunctive relief (which has both quantifiable and non-quantifiable portions) separately, it is clear the settlement warrants preliminary approval. The estimated single damages for the NIL claims asserted by the Settlement Classes during the settlement class period is $2.9332 billion. *See* Rascher Decl., ¶ 7. The $1.976 billion NIL settlement recovery is thus a remarkable 67.4% of total estimated damages for the NIL claims. *Id.* In Section III.D, *supra*, Plaintiffs explained that the $1.976 billion in NIL payments for the three NIL claims asserted – for BNIL damages, for videogame NIL damages, and for other lost compensation third-party NIL damages – will be allocated proportionately to their estimated single damages, so each of these claims will also receive, in gross, 67.4% of their estimate single damages, or $1.815 billion for BNIL, $71.5 million for video game NIL, and $89.5 million for other lost opportunities third party NIL. *Id.*, ¶¶ 22, 28, 32.

A recovery of 67.4% of estimated total NIL damages, and for each NIL damages claim is extraordinary, especially with settlement amounts of this magnitude (close to $2 billion). *See Alston*, Case No. 4:14-md-02541, ECF No. 746 at 7, Final Approval Order (finding "settlement fund [of] approximately

66% of total single damages [was] a tremendous result in comparison to most antitrust settlements"). A court in this district, while approving settlements equaling 20% of single damages, cited a survey of 71 settled cartel cases which showed that the weighted mean—weighting settlements according to their sales—was 19% of possible single damages recovery. *See In re: Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 3648478, at *7 (N.D. Cal. July 7, 2016). Another court in this district recently described a recovery of "11.7 percent of the single damages" as an "excellent" result for an antitrust class action. *In re Lithium Ion Batteries Antitrust Litig.*, 2020 WL 7264559, at *20 (N.D. Cal. Dec. 10, 2020).

Plaintiffs captured this exceptional percentage of NIL damages in the settlement despite the remaining litigation risks, including likely renewed *Daubert* challenges to experts and a jury trial, where plaintiffs would bear the burden to prove their liability and damages claims over Defendants' arguments, which would include arguments that Plaintiffs' damages models are inadequate, including likely contentions that estimated BNIL damages are insufficiently supported because they have never before been valued as a separate component of damages, that no college basketball video game would have existed during the relevant period as it does not now, and that the lost opportunity damages model relies on unreliable data.  Further, even if plaintiffs obtained a complete trial victory, they would face an appeal where Defendants would likely reassert these arguments and raise broader challenges, including relying on the Ninth Circuit decision in *O'Bannon* and arguing that no rights to NIL exist in a television sports broadcast.  At minimum, continuing litigation would cause significant delay in obtaining any relief for any of the classes in *House.*

The $600 million settlement for the athletic compensation claims is also an excellent recovery for class members. These claims faced substantial hurdles to recovery. This Court in *Alston* found prohibition of non-academic-related benefits, or pay for college athletes' athletic services, to be pro-competitive. *Alston*, 375 F. Supp. 3d 1058, 1083 (N.D. Cal. 2019). Moreover, injunctive-relief only classes were certified in *Alston*. Successfully obtaining certification of damages classes for claims by athletes for pay-for-performance would require overcoming daunting obstacles, given that these athletes play different positions in different sports at different levels, and Defendants would argue that they correspondingly have inherently different, potentially conflicting, and individualized claims for impact and damages. *See*

*In re NCAA 1-A Walk-on Football Players Litig.*, 2006 WL 1207915 at *7-8 (W.D. Wash. May 3, 2006); *Alston*, Case No. 4:14-md-02541, ECF No. 746 at 7, Final Approval Order (finding risks of maintaining class status as factor favoring final approval, noting "Defendants vigorously opposed plaintiffs' motion for certification of the damages classes"). This would have been a particularly challenging issue with Defendants arguing that true pay-for-performance benchmarks (such as those in development or professional league sports) reflect highly individualized compensation levels for athletes. While Plaintiffs believe these claims are viable, their path forward faced substantial peril both on class certification and the merits. As courts have recognized: "Antitrust cases are particularly risky, challenging, and widely acknowledge[d] to be among the most complex actions to prosecute." *Batteries*, 2020 WL 7264559, at *15. "The 'best' case can be lost and the worst case can be won, and juries may find liability but no damages. None of these risks should be underestimated." *Id.* "Complex antitrust litigation is rife with uncertainties, risks, and delays." *See Meijer, Inc. v. Warner Chilcott Holdings Co. Ill., Ltd.*, 565 F. Supp. 2d 49, 55 (D.D.C. 2008); *In re Vitamin C Antitrust Litig.*, 2012 WL 5289514, at *4 (E.D.N.Y. Oct. 23, 2012) ("Federal antitrust cases are complicated, lengthy, and bitterly fought, as well as costly" (internal quotation marks omitted)).

Despite these risks, Plaintiffs obtained $600 million for settlement of the athletic compensation claims, which is 31.6% of the estimated single damages to members of the Settlement Classes. Rascher Decl., ¶ 49. As the cases above—including *CRT* and *Batteries*—demonstrate, that is an excellent recovery for any antitrust case, let alone one with such a large settlement amount and obstacles to recovery in litigation. Notably, for the Football and Men's Basketball Class and Women's Basketball Class, their recovery of the additional compensation settlement funds is on top of receiving BNIL, videogame, and third-party NIL payments (where applicable), valued at 67.4% of these estimated NIL damages.

In light of these risks, Class Counsel reasonably concluded that a $600 million recovery was an outstanding result for the additional compensation claims. As previewed above, there are procedural and merits-based challenges which make the additional compensation class claims especially risky. Plaintiffs faced the hurdle of obtaining class certification for claims on behalf of classes of athletes who played different sports, with different associated revenues, in different conferences (both inside and outside the

Power Five). Even within those sports, Defendants have strong arguments that determining the damages for each specific class member would require an individualized analysis, given, for example, the wide range of performance-based salaries for professional athletes in the same sports.

There are also substantial merits-based challenges to proving that rules restricting additional compensation violate the antitrust laws. Defendants have long argued, with success in this Court and in this Circuit, that there are procompetitive justifications for their rules under the rule-of-reason Sherman Act analysis. As discussed above, in *Alston* this Court held that "some of the challenged compensation rules may have an effect on preserving consumer demand for college sports as distinct from professional sports to the extent that they prevent unlimited cash payments unrelated to education such as those seen in professional sports leagues." *Alston*, 375 F. Supp. 3d at 1101. That aspect of this Court's post-trial decision was specifically upheld by the Ninth Circuit. *See In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1264-65 (9th Cir. 2020) ("*Alston II*"). This precedent presents a risk for Plaintiffs' additional compensation claims. The merits defenses advanced by Defendants and their economic experts with respect to the NIL claims—including that NCAA institutions do not have monopsony power when it comes to compensation of student-athletes for their NIL and that any such restrictions are justified in order for institutions to produce greater output of student-athlete opportunities and collegiate sports—would arguably be stronger in the pay-for-play context, given this Court's and the Supreme Court's recognition of potential procompetitive benefits to restrictions on pay-for-performance. As alleged in the Complaint, Plaintiffs believe that, among other things, subsequent legal and factual developments support their claims on the merits and establish the insufficiency of Defendants' defenses, but there is a material risk that they would not succeed.

That is particularly so because there are many hurdles left to overcome for the additional compensation claims just to reach a jury. Plaintiffs' damages classes for these claims would need to be certified and the claims would have to survive summary judgment before reaching trial. Further, even if Plaintiffs were to reach trial and prevail on the issue of liability for the additional compensation claims, Defendants would argue there are questions and risks around the amount of damages that would be awarded. For example, Defendants submitted an expert report in the *Hubbard* case asserting that any

damages for NIL, pay-for-performance, and *Alston* awards would all be overlapping and duplicative of each other. *Hubbard*, Dkt. 166-4 at ¶¶ 33-37; *see also Hubbard*, Dkt. 164 at 33.  Defendants' defenses against the lack of damages would arguably be more robust in the pay-for-play context, given that the vast majority of collegiate sports at issue do not generate positive revenues and so many student-athletes might not expect to be compensated more than for their NILs, the value of their scholarships, and/or other existing benefits in exchange for their athletic performance. Though Plaintiffs dispute these assertions, there is nonetheless a risk that any damages for the additional compensation claims would not be awarded at all, or would be minimal if offset against amounts recovered for NIL and academic achievement awards. Moreover, taking trial and subsequent appeals into account, it would be years before the class received any relief. Given the challenges inherent in litigating antitrust class actions, obtaining a payment of damages without waiting for years of litigation weighs in favor of approving this Settlement. *See, e.g.*, *Stephens v. US Airways Grp., Inc.*, 102 F. Supp. 3d 222, 227 (D.D.C. 2015) ("'[T]he delay in providing relief to the class if this case were to be litigated is a factor strongly supporting the compromise reached by the parties.'" (quotation omitted)); *Trombley v. Nat'l City Bank*, 826 F. Supp. 2d 179, 195 (D.D.C. 2011) (same).

> **b.** **The Settlement provides ground-breaking injunctive relief.**

In addition to monetary damages, the settlement provides for ground-breaking injunctive relief that will fundamentally change the structure of NCAA sports and provide massive benefits to college athletes. Section II.C.2, *supra*. For ten years following final approval, class members will—for the first time—be able to receive benefits directly from Division I schools. Every Division I school in the country will be permitted (but not required) to provide these benefits in competition with the other Division I schools. Plaintiffs' expert estimates those payments and other benefits will likely be worth more than $19 billion dollars over the ten-year injunctive period for just the Power Five schools. Rascher Decl., ¶ 84. These new benefits are in addition to the existing scholarships and other benefits athletes are already eligible to receive and in addition to the opportunity for third-party NIL deals, totaling hundreds of millions of dollars, which athletes are able to receive, and the injunction makes permanent. Dr. Rascher estimates that, in 2025-2026, the combined value of these existing benefits to Division I athletes and the

1   new 22% Pool benefits is 51% of Division I revenues—meaning college athletes will earn the same

2   percentage of revenues as professional athletes in the NFL, NBA, and other professional leagues.  Rascher

3   Decl., ¶¶ 39, 82-87. This calculation assumes that Power 5 schools spend the maximum 22% of Pool

4   revenues, but that non-Power 5 schools provide no additional benefits to student-athletes under this

5   system. *Id.* ¶ 87. The former assumption is reasonable given the intense competitive forces; the latter is

6   conservative as it is likely other schools will provide at least some additional benefits to compete for top

7   talent. This is an extraordinary recovery given plaintiffs didn't have the leverage of a collective bargaining

8   agreement or the possibility of threatening a walkout if the terms were not agreed to.

9        The injunction will also eliminate all limitations on the number of scholarships that a school can

10   provide to members of a team, which will be of particular benefit to athletes in "non-revenue" sports,

11   where existing limits prohibit many student-athletes from receiving full scholarships. These changes, as

12   well as those discussed in more detail in Section III.C.2, *supra*, will provide enormous benefits, both those

13   quantifiable and not, for college athletes during the Injunctive Settlement Term. These benefits are a

14   significant, additional value that should be considered in assessing the settlement.  *See In re Toyota Motor*,

15   2013 WL 12327929, at *29 n.7 (discussed above); *Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir. 2003)

16   (explaining that structural relief may be of such importance that it may be considered as a "'relevant

17   circumstance' in determining what percentage of the common fund class counsel should receive as

18   attorneys' fees").

19        Notably, the ten-year Injunctive Relief Term is similar to the multiyear injunctions that were used

20   in previous injunctive settlements resolving antitrust class actions that challenged athlete compensation

21   restraints. *See, e.g.*, *Robertson v. Nat'l Basketball Ass'n*, 72 F.R.D. 64, 69-70, 69 n.1 (S.D.N.Y. 1976),

22   *aff'd*, 556 F.2d 682, 686 (2d Cir. 1977) (ten-year settlement term approved); *Robertson v. Nat'l Basketball*

23   *Ass'n*, 389 F. Supp. 867, 896-903 (S.D.N.Y. 1975) (certifying class of past, present, and future active

24   players in the NBA); *Nat'l Basketball Ass'n v. Williams*, 857 F. Supp. 1069, 1072 (S.D.N.Y. July, 18,

25   1994) (discussing *Bridgeman v. Nat'l Basketball Ass'n* antitrust lawsuit (675 F. Supp. 960 (D. N.J. 1987))

26   that resulted in six-year settlement agreement); *White v Nat'l Football League*, 822 F. Supp. 1389, 1436-

27   37 (D. Minn. 1993) *(seven-year settlement term approved); *White v. Nat'l Football League*, 756 F. 3d

28

585, 589 (8th Cir. 2014) (noting that "the League and Association agreed to extend the [*White*] SSA four times" through 2010, for a total settlement term of 17 years).

In *Robertson*, for example, a ten-year antitrust class action settlement injunction, supervised by the court, was used to introduce restricted free agency rules (and eventually a salary cap and revenue sharing system) into the NBA. *Robertson*, 72 F.R.D. at 69 n.1; *Williams*, 857 F. Supp. at 1072 (discussing *Lanier v. Nat'l Basketball Ass'n*, 82 Civ. 4935 (S.D.N.Y. 1983), which ultimately resulted in a modification of the *Robertson* settlement). In *Bridgeman*, a six-year settlement injunction, supervised by the court, was used to introduce unrestricted free agency rules into the NBA with a salary cap. *See Williams*, 857 F. Supp. at 1072-73 (discussing *Bridgeman* settlement). And in *White*, a seven-year settlement injunction, extended four times to last seventeen years, was supervised by the court and used to set the rules of the free agency-salary cap system in the NFL. *See* 822 F. Supp. at 1436-37; *White*, 756 F. 3d at 589. In each of these cases, where the leagues contended the rule of reason applied, the settlement injunction represented a compromise of the parties' legal positions. That enabled the class members to benefit from enhanced competition without risking the uncertainties of trial. And just as is proposed here, in each case the court retained jurisdiction to settle any disputes under the class action settlement agreement.

The use of an antitrust injunction to permit some forms of athlete compensation, but not unlimited compensation, is also familiar to this Court. In *O'Bannon* and *Alston*, the Court issued injunctive relief that permitted some forms of compensation to the athletes, but not unlimited compensation. For example, in *O'Bannon*, the Court issued an injunction which permitted schools to compensate athletes for their NIL rights through full cost-of-attendance scholarships, which was affirmed by the Ninth Circuit. *O'Bannon v. NCAA*, 7 F. Supp. 3d 955, 1007-08 (N.D. Cal. 2014), *aff'd in part, vacated in part O'Bannon v. NCAA*, 802 F. 3d 1049 (9th Cir. 2015). In *Alston*, the Court permitted all forms of education compensation, but no cash compensation for performance, and also permitted cash compensation for academic achievement awards up to the amount that the NCAA permitted for athletic achievement awards. *See Alston*, 375 F. Supp. 3d at 1109-10 (post-trial order); Permanent Injunction, *Alston*, No. 14-md-02541, ECF No. 1163 (N.D. Cal. Mar. 8, 2019). That aspect of this Court's post-trial decision was specifically upheld by the

Ninth Circuit, *Alston II*, 958 F.3d at 1264-65, and affirmed by the Supreme Court. *See NCAA v. Alston*, 594 U.S. 69 (2021).

The injunction settlement here follows these precedents to provide for an enhanced, but not unlimited, system of new compensation and benefits for all Division I athletes in an amount that will total tens of billions of dollars during the injunction period. It is thus fair and reasonable for members of the Settlement Injunctive Relief Class, who would otherwise be deprived of this landmark breakthrough in enhanced competition and increased financial benefits in college sports.

### 4. The Settlement treats Class Members equitably.

In addition to evaluating the adequacy of the Settlement overall, the Court should consider whether the "proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). A plan of allocation is "governed by the same standards of review applicable to approval of the settlement as a whole: the plan must be fair, reasonable and adequate." *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, 2015 WL 9266493, at *7 (N.D. Cal. Dec. 17, 2015). Courts routinely uphold allocation plans that divide settlement funds on a *pro rata* basis. *See id.* (collecting cases); *see also In re Resistors Antitrust Litig.*, 2020 WL 2791922, at *2 (N.D. Cal. Mar. 24, 2020) (finding plan to allocate "on a pro rata basis based on the dollar value of approved purchases . . . [to be] fair, reasonable, and adequate").

The allocation plan here provides payments to members of the Settlement Classes proportionate to Dr. Rascher's estimated damages for their BNIL, Videogame NIL, and Lost Opportunity NIL claims. Those who have higher estimated damages will have the opportunity to recover more than Settlement Class Members with lower estimated damages. This is an equitable methodology of allocation because it ties payments to each Settlement Class Member's estimated damages *pro rata* and graduates payments based on Plaintiffs' theory of injury and damages.

Similarly, the allocation plan for the additional compensation settlement fund is equitable. The settlement makes 95% of the funds available to the class members who, in Dr. Rascher's opinion, would most likely receive additional benefits in the but-for world. Those funds are allocated starting with an individual compensation minimum that Dr. Rascher believes would likely occur in these high revenue

sports, and accounts for recruiting and performance metrics that would likely affect an individual athlete's compensation, as well as revenue variation among schools in the but-for world. For the 5% of the additional compensation settlement that has been allocated to athletes in Division I sports that Dr. Rascher opines would have little demand for additional performance-based compensation in the but-for world because of their low revenues, it is equitable to divide those funds equally among the applicable settlement class members, with enhancement for certain athletes. Rascher Decl., ¶¶ 50-81.

### 5. The Settlement satisfies the factors set forth in the Northern District of California's Procedural Guidance.

This District's Procedural Guidance for Class Action Settlements ("Procedural Guidance") instructs parties to address certain factors at preliminary approval.[8] Many of these factors have been discussed already in this Motion and are not repeated here. The remaining factors are addressed below.

### a. The differences between the settlement classes and certified classes properly reflect the contours of the settlement.

The Procedural Guidance explains that, in the preliminary approval motion, the movant should discuss "any differences between the settlement class and the class proposed in the operative complaint (or, if a class has been certified, the certified class) and an explanation as to why the differences are appropriate." Procedural Guidance § 1(a). Courts in in this District have explained that "[c]lass definitions are often revised, for example, to reflect the contours of the settlement." *Brown v. Hain Celestial Grp., Inc.*, 2014 WL 6483216, at *6 (N.D. Cal. Nov. 18, 2014); *see e.g., Bergman v. Thelen LLP*, 2016 WL 7178529, at *3, *10-11 (N.D. Cal. Dec. 9, 2016) (finally approving class action settlement where settlements classes "add some vacation classes" and "modify how some of the class definitions are phrased" but in general are similar to previously certified classes); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 13152270, at *9 (N.D. Cal. Aug. 24, 2011) ("courts have generally certified settlement classes broader than the previously-certified litigation classes; the claims released are typically more extensive than the claims stated"); *see also In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.*, 357 F.3d 800,

---

[8] *See* https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-settlements/.

805 (8th Cir. 2004).[9] Here, the settlement classes, like in *Brown*, have been modified to "reflect the contours of the settlement," are similar to those previously certified, and make sense in the context of the claims alleged in the operative complaint.

The certified litigation classes for both the Football and Men's Basketball Class and Women's Basketball Class (*see* ECF No. 387 at 5-6), are different from the corresponding settlement classes only in that the litigation classes go through the date of the certification order (November 3, 2023), and the settlement classes go through September 15, 2024, which makes sense given that plaintiffs challenge conduct that continued after the certification order. That is also of no consequence here, as any additional class members will receive a proportional share of damages. While it does not change the class definitions, these class members will also receive money from the additional compensation settlement fund. That does not result from the change to the class definition, but rather because the amended complaint combines the certified NIL claims in *House* with the pleaded claims in *Carter*.

For the Additional Sports Class, the certified class (*see* ECF No. 387 at 6) and the corresponding settlement class both include athletes who received NIL compensation after July 1, 2021 and competed in the same sports prior to that date. The settlement class has been expanded to include other partial or full GIA recipients during the class period who played sports other than Power Five football or basketball. This is because the amended complaint brings in the additional compensation claims of these athletes, for which the settlement provides monetary relief, as well as claims for videogame NIL damages.

The certified Injunctive Relief Class and the corresponding settlement class both begin on the same date (June 15, 2020, the date of the filing of *House v. NCAA*). The certified class ends at the date of judgment, while the settlement class continues through the Injunctive Relief Settlement Term. The modification of the end date reflects the settlement's provision of structural relief, binding Defendants, through the end of the Injunctive Relief Settlement Term. During that term, as discussed, incoming student-athletes will receive notice of the terms of the injunctive relief settlement and will have the right to file written objections to a continuation of the settlement. Given this additional notice and opportunity to file objections, this end date for the class appropriately reflects the contours of the settlement.

---

[9] *See also Spann v. J.C. Penney Corp.*, 314 F.R.D. 312, 318 (C.D. Cal. 2016) (court can "expand the scope of a settlement class") (citing *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 325-26 (3d Cir. 1998)); *In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 172 (same).

**b.** **The settlement releases are appropriate for this settlement.**

The Procedural Guidance also asks for identification of "any differences between the claims to be released and the claims in the operative complaint (or, if a class has been certified, the claims certified for class treatment) and an explanation as to why the differences are appropriate." Procedural Guidance § 1(c). The damages settlement release here includes the NIL claims certified by this Court, the additional compensation claims alleged in *Carter*, and claims relating to scholarship and roster limits, which are now part of the operative complaint and for which the settlement provides relief. That makes sense, since the release should reflect the contours of the settlement, and Defendants have provided substantial consideration for those releases, *i.e.*, the $600 million Additional Compensation Settlement Fund. It is also appropriate for the Classes to release claims against scholarship limits as Defendants are agreeing, as part of the settlement, to eliminate all such limits going forward.

The release extends beyond the specific claims in the operative complaint, but only to encompass potential claims "prior to Final Approval" "(1) on account of, arising out of, or resulting from any and all previously existing NCAA and conference rules regarding monies and benefits that may be provided to student-athletes by the NCAA, Division I conferences and/or Division I Member Institutions, or (2) relating in any way to any NCAA or conference limitations on the numbers of scholarships allowed or permitted in any sport." SA ¶ 1(oo). Here, the claims in the complaint are based on an extensive and broad set of facts which, Plaintiffs allege, show Defendants' rules regarding monies and benefits, including scholarships and roster positions, that may be provided to student-athletes, violate the antitrust laws. Thus, in substance, the release complies with the Ninth Circuit's test of "claims depend[ing] on the same set of facts." *See Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010). And if a plaintiff believes the release extended unlawfully to their claims, they can argue that to the court where the claims are being made.

As for the injunctive relief claims, the release similarly reflects the contours of the settlement, and it encompasses settlement of the injunctive relief requested in the operative complaint. *Compare* Complaint at 103-04 (Request for Relief), *with* SA ¶ 1(pp). One aspect of the release tied to the particular needs of the case is its release of declaratory and injunctive relief claims during the Injunctive Settlement Term. That is proper because "releases of future claims are an important part of many settlement

agreements" and are commonly approved and enforced in the class action context. *In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, 85 F.4th 1070, 1088 (11th Cir. 2023); *see also In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 248 (2d Cir. 2011) ("the Settlement's release of claims regarding future infringements is not improper"). And in this case, as explained, all incoming NCAA athletes will receive notice of the injunctive settlement terms and have an opportunity to object.

### c.     Other cases affected by the settlement.

The amended complaint filed in *Fontenot, et al. v. Nat'l Collegiate Athletic Ass'n, et al.*, No. 1:23-c-03076-CNS-TV (D. Colo.) on February 5, 2024 (the initial complaint was filed on November 20, 2023), alleges Sherman Act claims on behalf of the following putative class: "All persons who worked as athletes for a Division I athletic team at an NCAA Division I school, from the beginning of the statute of limitation period, as determined by the Court, through judgment in this matter." *See id.*, ECF No. 78 at 9, 30-31. At least through the end date of the damages release here (September 15, 2024), all members of the putative *Fontenot* class are class members here. If this settlement is approved, it would release the *Fontenot* damages claims for those individuals who do not opt out through the end date of the damages release here (September 15, 2024), as well *Fontenot*'s injunctive relief claims (to the extent *Fontenot* plaintiffs have standing to raise them).  Further, the preliminary approval order (at paragraph 23) would stay *Fontenot* due to the overlap in claims until Final Approval, which if granted, would release those claims. A stay was entered in the preliminary approval order in the *Alston* case as well. *See Am. Order Granting Pls.' Unopposed Mot. for Prelim. Approval of Class Action Settlement*, ¶ 22 (Mar. 29, 2017, ECF No. 615).

### d.     Verita was selected as settlement administrator through a competitive bidding process.

After a competitive bidding process, Class Counsel selected Verita (previously known as KCC) to serve as the Notice and Claims Administrator. Prior to engaging Verita, Class Counsel sent a Request for Proposal ("RFP") to three other leading settlement administrators. The RFP included a carefully drafted outline requiring the respondents to make the same fixed assumptions about notice and settlement administration. All respondents provided comparable bids. All four proposed direct notice through email and notice postcards and indirect supplemental notice through media and publication. Verita offered

competitive pricing, with the advantage of having served as the administrator for the comparable settlement achieved in the *In re: NCAA Grant-In-Aid Cap Antitrust Litigation*, Case No. 4:14-md-02541-CW. Verita also previously handled the litigation notice in this case and is well-positioned with institutional knowledge of the process of providing notice to these Classes. Berman Decl., ¶ 10.

Class Counsel concluded that Verita would provide the best value for the Settlement Classes. In the last two years, Verita has worked with Class Counsel on two other cases. Verita estimates the costs of notice and settlement administration through the initial distribution to eligible Settlement Class Members to be $297,053—a tiny fraction of the overall Settlement Fund. Peak Decl., ¶ 48. This is an estimate, given that the administration has not yet commenced, and final Notice and Administration costs will largely depend upon the number of Notices mailed and the number of Claim Forms submitted for processing.

### e. Counsel will request reasonable attorneys' fees and reimbursement of costs.

The Procedural Guidance asks for certain information about the fees and costs that Settlement Class Counsel intends to request. Procedural Guidance § 6.  As explained in the Settlement Agreement, with regard to the damages portion of the settlement, Settlement Class Counsel may submit an application for (a) an award of attorneys' fees plus (b) reimbursement of expenses incurred in connection with prosecuting the Action; plus (c) any interest on such attorneys' fees and expenses (until paid), as appropriate, and as may be awarded by the Court. These distributions will be requested from the gross settlement funds for the Damages Classes. *See* SA ¶ 28.  In a class action, it is common that attorneys' fees and costs are awarded from the damages settlement funds. *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949, 955 (9th Cir. 2015) (also explaining that when a percentage-of-the fund method is used to award fees, the Ninth Circuit has established a benchmark percentage of 25 percent to be used as the "starting point" for analysis).  Plaintiffs' counsel will seek no more than 20% of the NIL Settlement Fund and 10% of the Additional Compensation Settlement Fund, plus reimbursement of expenses. Defendants may challenge the amount requested. SA ¶ 28. These fees will be paid over the same ten-year period as the class damage and future revenue payments are made. Any fee award requested will be subject to the Court's approval. As the notice documents describe, a motion for fees and costs will be filed 45 days prior to the proposed opt out and objection deadline, as required. *See* Procedural Guidance § 9 (class

members should have at least 35 days to object to fees and costs requested). Although the attorneys' fees are ongoing in this case, the lodestar for Class Counsel and supporting counsel Kodroff on this case (including work for the predecessor *Carter* case with respect to the additional compensation claims) is approximately $46.5 million, with hours totaling approximately 67,635. Expenses on this case are also ongoing, but are approximately $8.36 million. *See* Berman Decl., ¶¶ 11-12. This information will be updated in any motion for reimbursement of fees and costs. This information will be updated in any motion for reimbursement of fees and costs.

With regard to the injunctive relief portion of the settlement, the Settlement Agreement also provides that Class Counsel may apply to the Court for, and Defendants shall not oppose, an upfront injunctive fee and cost award of $20 million, which shall be paid by Defendants. SA ¶ 27(a). The agreement also states that, for so long as the injunctive relief agreement remains in effect without material modification, Class Counsel may apply to the Court, or a special master appointed by the Court, for an award of a percentage of the total amount spent by Division I member institutions under the Pool for each academic year (with the percentage increasing from .75 to 1.25%), which shall be credited against the Pool the following academic year. *See* SA ¶ 27(a). In the Ninth Circuit, attorneys' fees may be based on injunctive relief obtained, particularly where, as here, at least a portion of that relief can be reasonably ascertained and valued. *See Toyota Motor*, 2013 WL 12327929, at *29 & n.7; *see also Staton.*, 327 F.3d at 973-74; *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998), *overruled in part on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)); *cf. Online DVD*, 779 F.3d at 954-55; *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1049 (9th Cir. 2002).

### 6. Counsel will request reasonable class representative service awards

Class Counsel also intend to seek service awards for each of the Class Representatives. Based on their contributions and commitments, the Settlement Agreement contemplates awards of up to $125,000 each for Grant House, Sedona Prince and Tymir Oliver (the "*NIL* Plaintiffs"), and up to $10,000 each for DeWayne Carter and Nya Harrison (the "*Carter* Plaintiffs").

The Ninth Circuit has recognized that named plaintiffs are eligible for reasonable service awards. *Staton*, 327 at 977. Indeed, "incentive awards that are intended to compensate class representatives for

work undertaken on behalf of a class 'are fairly typical in class action cases.'" *Online DVD*, 779 F.3d at 943 (citing *Rodriguez v. West Pub'l Corp.*, 563 F.3d 948, 958 (9th Cir. 2009)). Such awards are intended to compensate class representatives in recognition of their efforts on behalf of the class, the financial or reputational risks undertaken in bringing the action, and the degree to which the class has benefitted from their actions. *Stanton*, 327 F.3d at 977. There is no bright line minimum or maximum for service awards, and courts have awarded payments within the range sought here. For example, in *In re High-Tech Employment Antitrust Litigation*, this Court authorized a service award of $120,000 to one class representative and $80,000 each to the other four class representatives from a $415 million settlement fund. 2015 WL 5158730, at *17 (N.D. Cal. Sept. 2, 2015).[10] As explained in greater detail below, the requested service awards are reasonable and appropriate here.

First, all the Class Representatives have been actively involved in their respective cases from inception. The *House* Plaintiffs in particular have each expended a substantial amount of time and effort over the past four years assisting Class Counsel with the prosecution of their claims. This has included meeting with counsel, preparing the complaint, reviewing drafts of documents, responding to extensive discovery requests, gathering and producing thousands of pages of documents, preparing for and attending lengthy in-person depositions, and otherwise devoting hundreds of hours to consulting with Class Counsel regarding fact development and strategy.

Second, each of the Class Representatives—four of whom were still competing in college under the NCAA rules, and one of whom was a former NCAA athlete pursuing a professional football career, when their cases began—incurred substantial risks and costs in taking on leadership roles in this high-profile litigation against the NCAA and the most prominent conferences in college sports. The circumstances here are analogous to other cases where courts have found that the class representatives assumed a heightened risk warranting a larger service award. For example, courts have recognized that when a class representative is a current or former employee of the defendant, the class representative's "present position or employment credentials or recommendation may be at risk by reason of having

---

[10] *See also In re Titanium Dioxide Antitrust Litig.*, 2013 WL 6577029, at *1 (D. Md. Dec. 13, 2013) (awarding $125,000 to lead class representative and $25,000 to other two class representatives); *Velez v. Novartis Pharm. Corp.*, 2010 WL 4877852, at *4 (S.D.N.Y. Nov. 30, 2010) (awarding $125,000 to each named plaintiff).

prosecuted the suit, who therefore lends his or her name and efforts to the prosecution of litigation at some personal peril. *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 201 (S.D.N.Y. 1997). These concerns are particularly strong in highly publicized cases like this one, where the Class Representatives' roles are unusually visible.

The Class Representatives also assumed additional risk because this is an antitrust case. By definition, antitrust cases are brought against defendants who have power in the markets in which plaintiffs were injured. The NCAA is the most powerful athletic association in college sports and, collectively, the six Defendants wield tremendous influence in the athletics, even beyond the collegiate level. This could have presented risks to Class Representatives who were still playing in college during this litigation, as well as the possibility that they would be ostracized by their teammates for their involvement in this case. Although Tymir Oliver was no longer competing in college when he joined the lawsuit, he also put his personal reputation and ability to pursue future opportunities as a professional athlete at risk. Finally, the requested service awards are appropriate in light of the substantial recovery achieved. The Class Representatives' efforts and sacrifices have paid off in an exceptional settlement that provides Class Members substantial cash payments and meaningful injunctive relief.

**B.     The Proposed Notice Program Satisfies Rule 23**

Rule 23(e)(1) requires that a court approving a class action settlement "direct notice in a reasonable manner to all class members who would be bound by the proposal." For a Rule 23(b)(3) class, the Rule requires the court to "direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Notice "is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004); *see also* Fed. R. Civ. P. 23(c)(2)(B) (describing specific information to be included in the notice).

The notice plan proposed here is the best practicable under the circumstances and, given the contact information requested from Defendants and NCAA member schools, should reach a substantial segment of the Settlement Classes. As set forth in the accompanying declaration of Carla Peak, the Administrator

will use the contact information to direct both email or postcard notice to large segments of members of the Settlement Classes. Verita will employ email verification tools to facilitate delivery, and further notice will be provided through the earned media this Settlement will garner. *See* Peak Decl. ¶¶ 20-23.

Notice will be provided in plain terms and easy-to-understand language. To encourage engagement, Verita's initial email and mailed notices will be in short-form versions of the long-form notice, which will be accessible on a settlement website Verita will create and maintain. *See id.* All forms of notice will contain the information required by Rule 23(c)(2)(B). *See id.* Ex. 1 (Email Notice), Ex. 2 (Postcard Notice), Ex. 6 (Class Notice). All forms of notice will identify the total settlement fund, important deadlines, and will direct Settlement Class Members to a website where they can input their unique identification information to learn about their approximate share of certain settlement funds (60 days after notice begins) and related data. *See id.*, ¶ 27.

A single claim form is available for Settlement Class Members to submit for eligibility of videogame damages, additional compensation damages, and lost opportunity damages. As part of the Distribution Plan, class members will receive a proportional distribution from the corresponding Settlement Funds. Upon Final Approval of the Settlement, and upon completion of the claims process, athletes who submit a valid claim will receive payment. Based on Verita's experience with similar settlements, Verita estimates that 10-20% of the Additional Sports Class will file a Claim Form for their additional compensation damages. *Id.* ¶ 47.

These notice provisions satisfy Rule 23 and will provide the Settlement Class with a fair opportunity to review and respond to the proposed Settlement.

## C.   The Settlement Classes Merit Certification

At the preliminary approval stage, the Court must determine whether it is likely to certify the settlement class for purposes of judgment on the proposal. *See* Fed. R. Civ. P. 23(e)(1)(B)(ii). The proposed settlement class must satisfy the Rule 23(a) requirements that "the class is so numerous that joinder of all parties is impracticable); (2) there are questions of law and fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

Additionally, the proposed classes must meet one of the Rule 23(b) requirements. Here, Plaintiffs seek certification of the proposed Settlement Classes pursuant to Rule 23(b)(3) and 23(b)(2).

The Court already certified similar classes during the course of this litigation. *See* ECF No. 323 (certifying Declaratory and Injunctive Relief Class under Fed. R. Civ. P. 23(b)(2)) and ECF No. 387 (certifying Football and Men's Basketball Class, Women's Basketball Class, and Additional Sports Class under Fed. R. Civ. P. 23(b)(3)). As discussed below, the proposed Settlement Classes also satisfy the requirements of Rule 23. *See also* Section V.A.5.a, *supra* (describing changes to settlement classes).

### 1. The Proposed Settlement Classes Satisfy the Requirements of Rule 23(a)

#### a. Numerosity.

The numerosity requirement is clearly met because the proposed Settlement Classes are broader, both in time period and number of Class Members included, than the classes that the Court already certified. *See* ECF No. 387 at 7.

#### b. Commonality.

The commonality requirement is satisfied because several questions of law and fact are common to members of the Settlement Classes and can be resolved via common proof. The same common questions of law and fact cited by the Court in certifying the litigation classes are applicable to the Settlement Classes, including "(1) whether the challenged rules constitute a horizontal agreement, contract, or combination that caused significant anticompetitive effects in the relevant markets for student-athletes' labor services; (2) whether Defendants' procompetitive justifications for the challenged NCAA rules are valid; and (3) whether any procompetitive justifications for the challenged NCAA rules can be achieved with less restrictive alternatives." ECF No. 387 at 8.

#### c. Typicality.

Typicality is met as well. *See* Fed. R. Civ. P. 23(a)(3); *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 408 (9th Cir. 1992) (requiring named plaintiffs claims be representative and their interests aligned with the class). Here, the Class Representatives' interests continue to be aligned with the interests of the absent Class Members. Each of the named Plaintiffs are or were Division I athletes and allege the same antitrust violations as the members of the proposed Settlement Classes, namely that the challenged

restrictions are anticompetitive and caused them cognizable antitrust injury by depriving them of compensation they would have received if the rules had not been in place.

> **d.** **Adequacy of Representation.**

The adequacy requirement is also met because the named Plaintiffs and their counsel have prosecuted, and will continue to prosecute, the action vigorously on behalf of the Settlement Classes. As this Court already concluded in certifying classes with the same law firms as Co-Lead Class Counsel, the Class Representatives' "interests are aligned with members of those classes in challenging the lawfulness of the challenged rules and in proving that those rules damaged class members" and "that they will prosecute the action vigorously on behalf of the proposed classes." ECF No. 387 at 11.

> **2.** **The Proposed Settlement Declaratory and Injunctive Relief Class Satisfies the Requirements of Rule 23(b)(2)**

Plaintiffs move to certify the proposed Declaratory and Injunctive Relief Settlement Class under Rule 23(b)(2). Fed. R. Civ. P. 23(b)(2). This Court previously certified a nearly identical litigation class under Rule 23(b)(2), observing that "[t]he injunctive and declaratory relief that Plaintiffs seek in the CAC, which would enjoin the enforcement of the challenged NCAA rules and would declare the challenged rules as void, respectively, would provide uniform relief to all members of the proposed class." ECF No. 323 at 9. The same logic supports certification here under Rule 23(b)(2) here.

> **3.** **The Proposed Settlement Damages Classes Satisfy Rule 23(b)(3)**

Plaintiffs also move to certify the three proposed damages Settlement Classes under Rule 23(b)(3), which allows for certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) is satisfied because questions common to Settlement Class Members predominate over individual questions, and the class action device provides the best method for the fair and efficient resolution of Settlement Class Members' claims.

As the Court found when it certified similar litigation classes, the questions that are central to Plaintiffs' antitrust claims—including whether the NCAA's NIL rules violate Section 1, whether the

members of the proposed classes suffered antitrust injury as a result of that violation, and the amount of damages—are capable of resolution on a class-wide basis using common proof. ECF No. 387 at 47. For the same reasons that the Court cited in its class certification order, common questions predominate and a class action is superior to individual litigation. ECF No. 387 at 48–51.

All of this is true for claims arising from Defendants' restriction on compensation for athletic services as well. The questions of whether Defendants' prohibition on compensation for athletic services violates the antitrust law and whether the members of the proposed classes suffered antitrust injury are susceptible to class-wide resolution based on common proof, and these common questions predominate over individual inquiries. As for superiority, most class members would not be incentivized to pursue individual claims against these Defendants, and of course this Court has considerable experience presiding over similar actions. However, Defendants would have had stronger arguments regarding the importance of individualized issues to claims for compensation for athletic services. For example, Defendants would likely have argued that proof of antitrust impact and damages required individualized evidence, and the need for this proof would make a class action unmanageable. These arguments present a risk for Plaintiffs' claims, and the settlement amount reflects that risk. *See* Section V.A.3.a, *supra*.

However, these arguments do *not* preclude certification for settlement purposes. For one thing, Defendants do not oppose provisional certification. For another, manageability is irrelevant to certification for settlement purposes because trial is unnecessary. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998). Thus, even though certification of a litigation class in *Carter* would not have been guaranteed, certification of settlement classes asserting claims for compensation for athletic services against Defendants more than satisfies Rule 23(b)(3).

**D.   The Court Should Appoint Hagens Berman and Winston & Strawn as Settlement Class Counsel**

An order that certifies a class action "must appoint class counsel under Rule 23(g)." Fed. R. Civ. Proc. 23(c)(1)(B). All Rule 23(g) factors weigh in favor of appointing Hagens Berman and Winston & Strawn as Settlement Class Counsel. The Court appointed these firms as Class Counsel for the certified injunctive relief and damages classes. *See* ECF No. 323, 387. The same considerations that guided those

orders apply here. If appointed, counsel will continue to vigorously pursue this action and devote all necessary resources toward obtaining the best possible result for the Settlement Class.

**E.      Proposed Schedule for Notice and Final Approval**

| EVENT | DEADLINE |
|---|---|
| Entry of Order Granting Preliminary Approval and Directing Notice | Subject to Court's Discretion |
| Notice Campaign and Claims Period Begins ("Notice Date") | October 1, 2024 or two weeks after Preliminary Approval Order (whichever is later) |
| Allocation Estimate Available | 60 Days after Notice Date |
| Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards | 60 Days after Notice Date |
| Exclusion and Objection Deadline | 105 Days after Notice Date |
| Motion for Final Approval and Response to Objections | 135 Days after Notice Date |
| Final Approval Hearing | At least 150 Days after Notice Date (at the convenience of the Court) |
| Claims Period Closes | 165 Days after Notice Date |

## VI.      CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that their motion for Preliminary Settlement Approval be granted.

Dated: July 26, 2024

Respectfully submitted,

By _/s/ Steve W. Berman_

    Steve W. Berman (*Pro hac vice*)
    Emilee N. Sisco (*pro hac vice*)
    Stephanie Verdoia (*pro hac vice*)
    Meredith Simons (SBN 320229)
    HAGENS BERMAN SOBOL SHAPIRO LLP
    1301 Second Avenue, Suite 2000
    Seattle, WA 98101
    Telephone: (206) 623-7292
    Facsimile: (206) 623-0594
    steve@hbsslaw.com
    emilees@hbsslaw.com
    stephaniev@hbsslaw.com
    merediths@hbsslaw.com

    Benjamin J. Siegel (SBN 256260)
    HAGENS BERMAN SOBOL SHAPIRO LLP
    715 Hearst Avenue, Suite 300
    Berkeley, CA 94710
    Telephone: (510) 725-3000
    Facsimile: (510) 725-3001
    bens@hbsslaw.com

    Jeffrey L. Kodroff (*pro hac vice*)
    Eugene A. Spector (*pro hac vice*)
    SPECTOR ROSEMAN & KODROFF, PC
    2001 Market Street, Suite 3420
    Philadelphia, PA 19103
    Telephone: (215) 496-0300
    Facsimile: (215) 496-6611
    jkodroff@srkattorneys.com
    espector@srkattorneys.com

    *Class Counsel for Plaintiffs*

By _/s/ Jeffrey L. Kessler_

    Jeffrey L. Kessler (*pro hac vice*)
    David G. Feher (*pro hac vice*)
    David L. Greenspan (*pro hac vice*)
    Adam I. Dale (*pro hac vice*)
    Sarah L. Viebrock (*pro hac vice*)
    Neha Vyas (*pro hac vice*)
    WINSTON & STRAWN LLP
    200 Park Avenue
    New York, NY 10166-4193
    Telephone: (212) 294-6700
    Facsimile: (212) 294-4700
    jkessler@winston.com
    dfeher@winston.com
    dgreenspan@winston.com
    aidale@winston.com
    sviebrock@winston.com
    nvyas@winston.com

    Jeanifer E. Parsigian (SBN 289001)
    Drew H. Washington (SBN 350107)
    WINSTON & STRAWN LLP
    101 California Street, 34th Floor
    San Francisco, CA 94111
    Telephone: (415) 591-1000
    Facsimile: (415) 591-1400
    jparsigian@winston.com
    dwashington@winston.com

    *Class Counsel for Plaintiffs*

1

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)

2

Pursuant to Civil Local Rule 5-1(i)(3), the filer of this document attests that concurrence in the

3

filing of this document has been obtained from the signatories above.

4

By: */s/ Steve W. Berman*

5

STEVE W. BERMAN

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## EXHIBIT A

2

## Settlement Recovery Information by Class and Type of Claimed Damages

3

4

| Class | Type of Claimed Damages | Estimated Number of Unique Athletes (approximate) | $ Value of Claims (rough estimates) |
|---|---|---|---|
| Football and Men's Basketball | BNIL (no claim required) | 19,000 | Average approx. $91,000. Range from $15,000 to $280,000. |
| Football and Men's Basketball | Videogame (no claim required) | 18,000 | Range from approx. $300 to $4,000 per athlete. |
| Football and Men's Basketball | Lost Opportunities[11] | 3,000 | Average approx. $17,000. Range from less than $1 to approx. $800,000. |
| Football and Men's Basketball | Additional Compensation (no claim required) | 14,000 | Average approx. $40,000. |
| Women's Basketball | BNIL (no claim required) | 3,000 | Average approx. $23,000. Range from $3,000 to $52,000. |
| Women's Basketball | Lost Opportunities[12] | 400 | Average approx. $8,500. Range from less than $1 to $300,000. |
| Women's Basketball | Additional Compensation (no claim required) | 2,000 | Average approx. $14,000. |
| Additional Sports | For FB/MBB players, Videogame (claim required) | 26,000 | Range from approx. $300 to $4,000. |
| Additional Sports | Additional Compensation (claim required) | 390,000 | Average approx. $80 (see breakout by subcategories in chart below). |
| Additional Sports | Lost Opportunities[13] | 6,000 | Average approx. $5,300. Range from less than $1 to $1,859,000. |

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

---

[11] Those class members whose schools submitted NIL deal data to plaintiffs during the litigation do not have to submit claims to receive a settlement payment. Other members of the class will have the opportunity to submit claims to receive a payment.

27

[12] *Ibid.*

[13] *Ibid.*

28

**Further Detail Regarding Pay-for-Play Settlement Recovery Information For Members of Additional Sports Class**

| Class | Damage | Subcategory | Estimated Number of Unique Athletes (approximate) | $ value of claims (rough average) |
|-------|--------|-------------|---------------------------------------------------|-----------------------------------|
| Additional Sports | Additional Compensation (claim required) | Power Five Baseball | 3,500 | Average approx. $400 |
| Additional Sports | Additional Compensation (claim required) | Top Non-Power Five Football (AAC and Mountain West conferences plus BYU) | 4,000 | Average approx. $1,400 |
| Additional Sports | Additional Compensation (claim required) | Big East Men's Basketball | 300 | Average approx. $6,700 |
| Additional Sports | Additional Compensation (claim required) | Top Non-Power Five Men's Basketball (AAC, Atlantic 10, and Mountain West conferences plus Gonzaga) | 1,000 | Average approx. $2,400 |
| Additional Sports | Additional Compensation (claim required) | Top Non-Power Five Women's Basketball (AAC and Big East conferences plus Gonzaga) | 700 | Average approx. $300 |
| Additional Sports | Additional Compensation (claim required) | All Others | 380,000 | Average approx. $50 |