UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

---

*House et al. v. NCAA et al.*

---

No. 4:20-cv-03919 CW

**DECLARATION OF DANIEL A. RASCHER**

July 26, 2024

1.   **Scope of Declaration** ........................................................................................................... 1
2.   **Summary of settlement** ...................................................................................................... 3
3.   **Settlement classes** .............................................................................................................. 3
4.   **NIL compensation estimated damages and settlement amounts** ................................. 5
     4.1   NIL damages and settlement amounts by category ....................................................... 6
          4.1.1   Video Game NIL damages compared to settlement amounts ................................ 6
          4.1.2   Broadcast NIL damages and settlement amounts ................................................ 10
          4.1.3   Lost NIL Opportunities damages and settlement amounts .................................. 13
     4.2   Damages and settlement amounts for all NIL compensation ....................................... 14
5.   **Estimated damages and settlement amounts for athletic services** ........................... 15
     5.1   Methodology and assumptions for estimating potential damages related to compensation for
     athletic services ...................................................................................................................... 16
     5.2   Comparison of settlement amount to potential damages related to compensation for athletic
     services ................................................................................................................................... 20
6.   **Allocation of settlement amount related to compensation for athletic services** ...... 21
     6.1   Power Five FB/BB portion ........................................................................................... 22
          6.1.1   Power Five FB portion ........................................................................................ 22
          6.1.2   Power Five MBB portion ..................................................................................... 25
          6.1.3   Power Five WBB portion ..................................................................................... 27
     6.2   Additional Sports portion ............................................................................................ 29
          6.2.1   Outlier Power Five sports within Additional Sports class .................................. 29
          6.2.2   Outlier analysis for non-Power Five football ..................................................... 31
          6.2.3   Outlier analysis for non-Power Five basketball .................................................. 33
          6.2.4   Allocation of proposed settlement within Additional Sports .............................. 34
7.   **Revenue pool projections for proposed injunctive relief** .......................................... 35
8.   **Signature** ........................................................................................................................... 39

## 1.   SCOPE OF DECLARATION

1.     My name is Daniel A. Rascher.  I have previously submitted five expert reports in this
       matter.[1]  A fuller list of my credentials appears in my initial merits report submitted in
       December 2023, and an updated current *curriculum vitae* (including a list of all cases in the
       last 4 years where I testified at trial or was deposed) is attached as Appendix A.  I am being
       compensated at $600 per hour, the usual and customary hourly rate that was effective at the
       time this engagement began, plus reimbursement of expenses.  In my work on this matter, I
       have been assisted by OSKR staff, working under my supervision and control.  I have no
       direct financial interest in the outcome of this matter.

2.     This declaration is one of two (in two different matters) that describe calculations of
       damages and settlement amounts for litigation related to NCAA Division I athlete

---

[1]   Expert Report of Daniel A. Rascher, Oct. 21, 2022 (class certification); Expert Reply Report of Daniel A.
      Rascher, July 21, 2023 (class certification); Expert Report of Daniel A. Rascher, Dec. 1, 2023 (merits); Expert
      PCJ Rebuttal Report of Daniel A. Rascher, Jan. 26, 2024; Expert Reply Report of Daniel A. Rascher, Feb. 23,
      2024 (merits) with Errata on April 10, 2024.

compensation, as well as the value of the injunctive relief in the *House* litigation.  It also describes the proposed distribution of settlement funds among class members.  The other declaration identifies the proposed distribution of settlement amounts for separate antitrust litigation related to compensation to college athletes for Academic Achievement Awards ("AAA"), *Hubbard v. NCAA.*

3.   I previously submitted expert reports in this litigation related to compensation to Division I college athletes for the use of their name, image and likenesses ("NIL").  The plaintiffs in this matter were grouped into three damage classes, along with an injunctive relief class.  My previous expert reports describe and calculate three types of NIL compensation damages, each of which is applicable to one or more of the NIL damage classes.  It is my understanding that the settlement includes payments for the NIL damages to classes similar to those certified in this matter and, for these same classes, additional payments to settle claims for compensation to Division I college athletes for athletic services, for which I have not previously submitted expert reports.

4.   The injunctive relief in this matter involves creating a pool based on Power Five member school revenues in specific revenue categories and allowing each member school to provide new compensations and benefits to its athletes in an amount up to its *pro rata* share of 22 percent of the pool.  Unless otherwise noted, "revenue" throughout this declaration means those specified revenue categories included in the pool.[2]

5.   Throughout this declaration, I present the settlement amounts without deductions for expenses or attorney costs, and I provide information on proposed allocations of those amounts across class members.  These allocations can be adjusted proportionately to cover attorney fees and other expenses authorized by the court.

6.   Section 2 provides a summary of the settlement.  Section 3 describes the settlement classes.  Section 4 describes my estimated damages related to NIL compensation, a comparison to the settlement amounts, a calculation of the settlement percentage of damages, and settlement allocation details.  Section 5 provides an estimate of potential damages related to

---

[2]   As discussed below, these revenue categories are Ticket Sales; Guarantees; Media Rights; NCAA Distributions; Conference Distributions; Royalties, Licensing, Advertisement and Sponsorships; and Football Bowl Revenues, which per Appendix A of the NCAA 2024 Agreed-Upon Procedures, are revenue categories 1, 7, 11, 12, 13, 13A, 15, and 19.

compensation for athletic services, a comparison to the settlement amounts, and a calculation of the settlement percentage of damages.  Section 6 provides allocation details for the settlement amount related to compensation for athletic services.  Section 7 provides information related to injunctive relief, projecting forward for 10 years the amount of athlete compensation that would be allowed.

## 2.   SUMMARY OF SETTLEMENT

7.   It is my understanding that the settlement amount related to claims for NIL compensation for the settlement damage classes is $1,976.0 million.  My estimate of damages for NIL compensation is $2,933 million.  The settlement amount is 67.4 percent of my estimate of damages for the settlement damage classes.

8.   It is my understanding that the settlement amount related to antitrust claims for additional compensation for athlete services (separate from existing scholarships and other existing compensation directly from schools to athletes, NIL compensation directly from schools or conferences to athletes and compensation from schools to athletes for Academic Achievement Awards) is $600 million.  My estimate of potential damages for additional compensation for athlete services is $1,898 million.  The settlement amount is 31.6 percent of my estimate of potential damages for the settlement damage classes.

9.   It is my understanding that the settlement injunctive relief involves rule changes that, among other things, allow each NCAA Division I school to compensate athletes each year up to a "pool" amount that is calculated based on 22 percent of the per school average revenue for schools in Power Five conferences.  This cap would allow for up to about $19.4 billion in compensation to athletes from schools in Power Five conferences.

## 3.   SETTLEMENT CLASSES

10.   It is my understanding that the three settlement damage classes and one settlement injunctive relief class are:

a)   Football and Men's Basketball class: All student-athletes who have received or will receive full GIA scholarships and compete on, competed on, or will compete on a Division I men's basketball team or an FBS football team, at a college or university that is a member of one of the Power Five Conferences (including Notre Dame), and who have been or

will be declared initially eligible for competition in Division I at any time from June 15, 2016 through September 15, 2024. This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

b) Women's Basketball class: All student-athletes who have received or will receive full GIA scholarships and compete on, competed on, or will compete on a Division I women's basketball team at a college or university that is a member of one the Power Five Conferences (including Notre Dame), and who have been or will be declared initially eligible for competition in Division I at any time from June 15, 2016 through September 15, 2024. This Class excludes the officers, directors, and employees of Defendants. This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

c) Additional Sports class: Excluding members of the Football and Men's Basketball Class and members of the Women's Basketball Class, all student-athletes who compete on, competed on, or will compete on a Division I athletic team and who have been or will be declared initially eligible for competition in Division I at any time from June 15, 2016 through September 15, 2024.[3] This Class excludes the officers, directors, and employees of Defendants. This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

d) Injunctive Relief class: All student-athletes who compete on, competed on, or will compete on a Division I athletic team at any time between June 15, 2020 through the end of the Injunctive Relief Settlement Term.[4] This Class excludes the officers, directors, and employees of Defendants. This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

11. It is my understanding that the settlement amounts related to NIL claims and compensation for athletic services are to settle the claims of and be distributed to members of these classes, net of attorneys' fees and other expenses approved by the Court.

---

[3]   I note that this settlement class includes participating athletes irrespective of whether the athlete was awarded grant-in-aid scholarship funds.

[4]   My understanding is that the "Injunctive Relief Settlement Term" is ten years from the date of Final Approval of the Settlement Agreement.

4.   **NIL** COMPENSATION ESTIMATED DAMAGES AND SETTLEMENT AMOUNTS

12.   In this section, I describe estimates of damages to the settlement classes arising from their NIL claims.

13.   In previous reports, I provided estimates for damages related to NIL compensation for each of three damage classes certified in *House*.  I understand that each of those three damage classes now generally corresponds to a similar settlement damage class.  The determination of class membership, either for the *House* damage classes or for settlement damage classes, is based on the nature of athletic participation each academic year.  An athlete who transferred during their college athletic career may be a member of one class for a given year, before transferring, and a member of a different class for another year, after transferring.  For this reason, all allocations of damages in my *House* reports, and of settlement amounts, occur for each individual academic year.[5]  For simplicity, many of the tables included here show only the total for the entire period covered by the damages or settlement.

14.   The correspondence between the damage classes in *House* and the settlement damage classes is close but not exact.  For any given academic year, every member of each certified *House* damage class is a member of the corresponding settlement damage class, but there are also additional athletes in each settlement damage class.  Membership in the previously certified damages classes was cut off at the time the Court granted class certification in November 2023, but membership in the settlement damage classes extends to all athletes who have qualified to participate in athletics in the 2024-25 academic year as of September 15, 2024.  Thus, the Football and Men's Basketball settlement class includes all members of the Football and Men's Basketball damage class in *House*, plus athletes whose first year of participation at a Power Five school occurs in 2024-25.  The Women's Basketball settlement class included all members of the Women's Basketball damage class in *House*, plus athletes whose first year of participation at a Power Five school occurs in 2024-25.  Finally, for any given academic year, the Additional Sports settlement class is broader tan

---

[5]   Throughout this declaration, "participation" during a given academic term means that an athlete is eligible to participate in Division I athletics, or temporarily ineligible only for medical reasons or because of a recent transfer.  Settlement allocations would not be made to athletes for academic terms during which they were ineligible for academic or conduct reasons, or after the exhaustion of their years of eligibility.  In addition, some of the specific allocations occur only for athletes with full scholarships ("full-GIA"), when noted.

the corresponding damage class in *House*, which included only Division I athletes for schools had produced at least one report of third-party NIL compensation occurring after July 1, 2021.

15.  My previously reported damage estimates in the *House* class certification reports and merits reports for the certified classes provided for three types of damages related to NIL compensation. The Video Game NIL damages applied to all members of the Football and Men's Basketball damage class and to those members of the Additional Sports damage class who participated in FBS football or Division I men's basketball. The Broadcast NIL ("BNIL") damages applied to all members of the Football and Men's Basketball damage class and all members of the Women's Basketball damage class. The Lost NIL Opportunity damages applied to all members of the Additional Sports damage class and to any members of the other damages classes for whom schools had produced at least one report of third-party NIL compensation occurring after July 1, 2021. None of my estimates of damages applied to athletes at service academies because, it is my understanding, that they are not permitted to receive these types of damages.

16.  To compare the settlement amounts to potential damages for the settlement damage classes, it is necessary to estimate damages for the settlement damage classes, which, as described above, include more athletes than the damage classes. For the three types of NIL compensation damages, I have calculated estimates that incorporate these additional athletes, which I detail in the remainder of this section.

## 4.1   NIL DAMAGES AND SETTLEMENT AMOUNTS BY CATEGORY

17.  In this section, I describe my estimates for each type of NIL compensation damages that accommodate the expansion of each damage class to the corresponding settlement damage class, and I calculate the percentage of settlement amount to damage estimate for each category of damage.

### 4.1.1   Video Game NIL damages compared to settlement amounts

18.  In this section, I describe my estimates for Video Game NIL damages for each settlement damage class and I calculate the percentage of settlement amount to damage estimate for Video Game NIL in the aggregate.

6

19. Exhibit 1 shows my estimates of damages related to Video Game NIL and the number of
FBS football athletes in the settlement damage classes eligible for these damages.  These
estimates follow the same methodology for estimating Video Game NIL damages that I
presented in my previous class certification and merits reports.  The calculations here do
not include any estimated damages for any service academy athletes, for any non-FBS
football athletes (whose teams, I understand, are not included in the EA Sports football
video game), or for any football athletes for academic year 2024-25 (as this is the year
when football athletes begin receiving third party payments for use of NIL in video games)
and would be distributed *pro rata* among all athletes within each sport and academic year.[6]

**Exhibit 1. Video Game NIL football: damages and number of settlement class athletes**

|  | Total NIL Royalty (000s) | FBS Football Athletes | Eligible Football Athlete Members | | | Damages | | |
|---|---|---|---|---|---|---|---|---|
|  |  |  | Football and Men's Basketball Class | Additional Sports Class | Total | Football and Men's Basketball Class (000s) | Additional Sports Class (000s) | Total (000s) |
| 2015-16 | $4,951 | 10,880 | 5,420 | 5,205 | 10,625 | $2,467 | $2,369 | $4,835 |
| 2016-17 | $5,872 | 10,880 | 5,392 | 5,233 | 10,625 | $2,910 | $2,824 | $5,735 |
| 2017-18 | $7,059 | 11,050 | 5,438 | 5,357 | 10,795 | $3,474 | $3,422 | $6,896 |
| 2018-19 | $7,274 | 11,050 | 5,479 | 5,316 | 10,795 | $3,607 | $3,499 | $7,106 |
| 2019-20 | $7,495 | 11,050 | 5,491 | 5,304 | 10,795 | $3,724 | $3,598 | $7,322 |
| 2020-21 | $7,723 | 11,050 | 5,562 | 5,233 | 10,795 | $3,887 | $3,657 | $7,545 |
| 2021-22 | $7,958 | 11,050 | 5,589 | 5,206 | 10,795 | $4,025 | $3,749 | $7,774 |
| 2022-23 | $8,200 | 11,135 | 5,482 | 5,398 | 10,880 | $4,037 | $3,975 | $8,012 |
| 2023-24 | $8,449 | 11,305 | 5,819 | 5,231 | 11,050 | $4,349 | $3,909 | $8,258 |
| Total | $64,981 |  |  |  |  | $32,480 | $31,004 | $63,484 |

20. Exhibit 2 shows my estimates of damages related to Video Game NIL and the number
Division I men's basketball athletes in the settlement damage classes eligible for damages.
These estimates follow the same methodology for estimating Video Game NIL damages
that I presented in my previous class certification and merits reports.  The calculations here

---

[6]   In the damage estimation, the number of athletes receiving Video Game NIL is limited to the roster limit of each
team.

do not include any estimated damages for any service academy athletes and would be distributed *pro rata* among all participating athletes within each sport and academic year.[7]

**Exhibit 2. Video Game NIL men's basketball: damages and number of settlement class athletes**

|  |  |  | Eligible Basketball Athlete Members | | | Damages | | |
|---|---|---|---|---|---|---|---|---|
|  | Total NIL Royalty (000s) | DI Basketball Athletes | Football and Men's Basketball Class | Additional Sports Class | Total | Football and Men's Basketball Class (000s) | Additional Sports Class (000s) | Total (000s) |
| 2015-16 | $1,939 | 4,563 | 764 | 3,760 | 4,524 | $325 | $1,598 | $1,922 |
| 2016-17 | $2,470 | 4,563 | 778 | 3,746 | 4,524 | $421 | $2,028 | $2,449 |
| 2017-18 | $3,210 | 4,563 | 803 | 3,721 | 4,524 | $565 | $2,618 | $3,183 |
| 2018-19 | $3,576 | 4,589 | 789 | 3,761 | 4,550 | $615 | $2,931 | $3,546 |
| 2019-20 | $3,983 | 4,589 | 803 | 3,747 | 4,550 | $697 | $3,252 | $3,949 |
| 2020-21 | $4,437 | 4,641 | 791 | 3,811 | 4,602 | $756 | $3,643 | $4,399 |
| 2021-22 | $4,942 | 4,654 | 824 | 3,791 | 4,615 | $875 | $4,025 | $4,900 |
| 2022-23 | $5,504 | 4,719 | 793 | 3,887 | 4,680 | $925 | $4,534 | $5,459 |
| 2023-24 | $6,131 | 4,706 | 842 | 3,825 | 4,667 | $1,097 | $4,983 | $6,080 |
| 2024-25 | $6,829 | 4,719 | 854 | 3,826 | 4,680 | $1,236 | $5,537 | $6,773 |
| Total | $43,022 |  |  |  |  | $7,512 | $35,149 | $42,661 |

21. I understand that the settlement amount for Video Game NIL is $71.5 million, to be allocated by academic year in proportion to damages, and, within each academic year, *pro rata* to each football and men's basketball athlete in the settlement damage classes.[8]

22. Exhibit 3 shows total Video Game NIL damages and the Video Game NIL settlement amount. The settlement amount represents approximately 67.4 percent of the estimated damages.

[7] In the damage estimation, the number of athletes receiving Video Game NIL is limited to the roster limit of each team.

[8] The total number of athletes receiving Video Game NIL settlement allocations is expected to be lower than the aggregate of the roster limits of all of the teams. Members of the Football and Men's Basketball class would, by definition of the class, be within the roster limit for their team. It is my understanding that members of the Additional Sports class will need to file claims to receive an allocation of the Video Game NIL settlement amount and that it is unlikely that all athletes would file claims.

8

**Exhibit 3. Video Game NIL: estimated damages and settlement amount**

| Class | Video Game NIL Estimated Damages |
|---|---|
| Football and Men's Basketball | |
| P5 Football | $32,480,000 |
| P5 Men's Basketball | $7,512,000 |
| SUBTOTAL | $39,992,000 |
| | |
| Women's Basketball | |
| P5 Women's Basketball | |
| | |
| Additional Sports | |
| Football | $31,004,000 |
| Men's Basketball | $35,149,000 |
| Women's Basketball | |
| Other sports | |
| SUBTOTAL | $66,153,000 |
| | |
| TOTAL Video Game NIL Damages | $106,145,000 |
| | |
| Settlement amount | $71,500,000 |
| *Settlement / Damages* | *67.4%* |

23. Based on my estimated damages and number of class members for each sport and multiplying the damages per class member by the fixed proportion of settlement amounts to estimated damages, the settlement amount per year per football athlete ranges from about $307 in 2015-16 ($455 * 67.4%) to about $503 in 2023-24 ($747 * 67.4%), and the settlement amount per men's basketball athlete each year ranges from about $286 in 2015-16 ($425 * 67.4%) to about $975 in 2024-25 ($1,447 * 67.4%), before deduction of any attorneys' fees and other expenses approved by the Court.

9

### 4.1.2   Broadcast NIL damages and settlement amounts

24.  In this section, I describe my estimates for BNIL damages for each settlement damage class and I calculate the percentage of settlement amount to damage estimate for BNIL, in the aggregate.[9]

25.  These estimates follow the same methodology for estimating BNIL damages that I presented in my previous class certification and merits reports.  For this estimation of damages for the settlement damage classes, I include for 2024-25 freshman athletes and SMU athletes (I excluded both groups in my previous estimates).[10]  The distribution of damages between football, men's basketball, and women's basketball follows the estimated distribution of contribution of value to each Power Five conference's broadcast revenue for regular season (75% for football, 15% for men's basketball, and 5% for women's basketball), along with sport-specific post-season broadcast revenue for Power Five conferences.[11]  This is the damages allocation methodology that I presented in my class certification reports and my merits reports.[12]

26.  Exhibit 4 shows my estimates of damages related to BNIL for athletes in the settlement classes.  The damage amounts across each conference vary in proportion to broadcast revenue, and within each conference the damages are distributed *pro rata* among all participating athletes within each sport for each academic year.

---

[9]  It is my understanding that Defendants contest that college athletes have legally cognizable BNIL rights, and similarly contest that college athletes have a right to compensation for their BNIL rights.

[10]  As previously announced, SMU joins the Atlantic Coast Conference of the Power Five beginning in the 2024-25 school year. https://theacc.com/news/2024/7/1/general-acc-officially-welcomes-cal-smu-and-stanford-to-the-league.aspx

[11]  Throughout my previous reports, BNIL damages were limited to full-GIA Power Five football and men's and women's basketball athletes, consistent with the opinion of the media expert, Mr. Desser, that other sports add little or no value to the conferences' media contracts (Expert Report of Edwin S. Desser, October 21, 2022, p. 61).  The broadcasting contracts for non-Power Five conferences have, in general, materially smaller revenues.

[12]  Rascher Merits Report, Exhibit 12; paragraphs 239–40.

**Exhibit 4. BNIL damages for settlement classes**

| Academic Year | Men's Football | Men's Basketball | Women's Basketball |
|---|---|---|---|
| | (MM) | (MM) | (MM) |
| 2015-16 | $144.7 | $41.8 | $6.6 |
| 2016-17 | $153.0 | $48.3 | $7.0 |
| 2017-18 | $182.6 | $49.7 | $8.9 |
| 2018-19 | $192.9 | $51.8 | $9.3 |
| 2019-20 | $203.5 | $38.6 | $9.8 |
| 2020-21 | $197.6 | $54.2 | $9.7 |
| 2021-22 | $225.5 | $59.9 | $10.9 |
| 2022-23 | $236.3 | $62.3 | $11.4 |
| 2023-24 | $247.4 | $65.6 | $11.9 |
| 2024-25 | $293.0 | $45.1 | $15.0 |
| Total | $2,076.5 | $517.3 | $100.5 |

27. I understand that the settlement amount for BNIL is $1,815.0 million, to be allocated to academic years, conferences. and sports in proportion to damages, and, within each academic year, conference, and sport, *pro rata* among all corresponding athletes in the settlement damage classes.

28. Exhibit 5 shows BNIL damages and the proposed BNIL settlement amount.

11

**Exhibit 5. BNIL: estimated damages and settlement amount**

| Class | Broadcast NIL Estimated Damages |
|---|---|
| Football and Men's Basketball | |
| P5 Football | $2,076,500,000 |
| P5 Men's Basketball | $517,300,000 |
| SUBTOTAL | $2,593,800,000 |
| | |
| Women's Basketball | |
| P5 Women's Basketball | $100,500,000 |
| | |
| Additional Sports | |
| Football | |
| Men's Basketball | |
| Women's Basketball | |
| Other sports | |
| SUBTOTAL | |
| | |
| TOTAL Broadcast NIL Damages | $2,694,300,000 |
| | |
| Settlement Amount | $1,815,000,000 |
| *Settlement / Damages* | *67.4%* |

29. Based on my estimated damages and number of class members for each sport and multiplying the damages per class member by the fixed proportion of settlement amounts to estimated damages, the settlement amount per year per football athlete ranges from about $15,177 in 2015-16 ($22,518 * 67.4%) to about $41,932 in 2024-25 ($62,214 *67.4%). The damage amount per men's basketball athlete per year ranges from about $20,243 in 2024-25 ($30,034 * 67.4%) to about $61,428 in 2022-23 ($91,139 * 67.4%). The damage amount per women's basketball athlete per year ranges from about $3,297 in 2015-16 ($4,892 *67.4%) to about $13,099 in 2024-25 ($19,435 * 67.4%). The ranges result from differences in damages across years and conferences. The amounts provided here as individual athlete allocations are before deduction of any attorneys' fees and other expenses approved by the Court.

### 4.1.3   Lost NIL Opportunities damages and settlement amounts

30.   In this section, I describe my estimates for NIL Opportunities damages for the settlement damage classes and I calculate the percentage of settlement amount to damage estimate for Lost NIL Opportunities, in the aggregate.

31.   These estimates follow the same methodology for estimating Lost NIL Opportunity damages that I presented in my previous class certification and merits reports.  I have previously estimated $132,786,761 for total damages for all athletes (in any settlement damage class) who received compensation from a third-party for use of their NIL after July 1, 2021 and participated in Division I college athletics prior to that date.[13]  There is no change to these estimates from my corresponding estimates for the damage classes previously in this matter.  This is $78.66 million for the Football and Men's Basketball settlement damage class ($60.49 million for football athletes and $18.17 million for men's basketball athletes), $4.98 million for the Women's Basketball settlement damage class, and $49.14 million for the Additional Sports settlement damage class.[14]  My estimate of Lost NIL Opportunities damages applies only to the members of the settlement damage classes for whom schools previously produced at least one report of an NIL transaction that identified a dollar value of compensation.  Additional information on NIL earnings for members of the settlement damages classes could lead to additional damage estimates, relying on the same methodology.[15]

32.   I understand that the settlement amount for Lost NIL Opportunities is $89.5 million, which is 67.4 percent of the damage estimate of $132,786,761.  The settlement is to be allocated in proportion to damages for each athlete.  Based on my estimated damages for individual class members and multiplying the damages per class member by the fixed proportion of settlement amounts to estimated damages, individual settlement amounts (for the full damages period) among eligible members of the various settlement damage classes for whom the schools reported third-party NIL compensation ranges from small amounts to

---

[13]   See Errata for the Rascher Merits Reply Report, April 10, 2024, Corrected Exhibits 10, 11, and 12

[14]   See Errata for the Rascher Merits Reply Report, April 10, 2024, Corrected Exhibits 10, 11, and 12.

[15]   The methodology includes, for some sports and some athletes, adjustments across years related to athletes being in different performance categories.  Additional damage estimates will rely on these previously identified sports and previously determined boundaries for performance categories.

about $1.86 million.  Among eligible Power Five football athletes, range is from small amounts to over $800,000.  Among eligible Power Five men's basketball athletes, the range from small amounts to about $680,000.  Among eligible Power Five women's basketball athletes, the range is from small amounts to about $300,000.  Among eligible Additional Sports athletes, the range is from small amounts to about $1.86 million.[16]  These estimated ranges are before deduction of any attorneys' fees and other expenses approved by the Court.

**4.2    DAMAGES AND SETTLEMENT AMOUNTS FOR ALL NIL COMPENSATION**

33.    Exhibit 6 shows total NIL damages and NIL settlement amounts by class and the proposed settlement as a percentage of the estimated damages for the settlement damage classes, which is 67.4 percent.

---

[16]    See Text Cite – Lost NIL Opp Ranges.

**Exhibit 6. NIL: estimated damages and settlement amounts**

| Class | Video Game NIL Estimated Damages | Broadcast NIL Estimated Damages | Lost NIL Opportuntities Estimated Damages | ALL NIL Estimated Damages |
|---|---|---|---|---|
| Football and Men's Basketball | | | | |
| P5 Football | $32,480,000 | $2,076,500,000 | $60,494,357 | $2,169,474,357 |
| P5 Men's Basketball | $7,512,000 | $517,300,000 | $18,169,213 | $542,981,213 |
| SUBTOTAL | $39,992,000 | $2,593,800,000 | $78,663,570 | $2,712,455,570 |
| | | | | |
| Women's Basketball | | | | |
| P5 Women's Basketball | | $100,500,000 | $4,983,587 | $105,483,587 |
| | | | | |
| Additional Sports | | | | |
| Football | $31,004,000 | | $11,838,377 | $42,842,377 |
| Men's Basketball | $35,149,000 | | $6,704,556 | $41,853,556 |
| Women's Basketball | | | $1,823,497 | $1,823,497 |
| Other sports | | | $28,772,875 | $28,772,875 |
| SUBTOTAL | $66,153,000 | | $49,139,305 | $115,292,305 |
| | | | | |
| TOTAL NIL Damages | $106,145,000 | $2,694,300,000 | $132,786,461 | $2,933,231,461 |
| | | | | |
| Settlement Amounts | $71,500,000 | $1,815,000,000 | $89,500,000 | $1,976,000,000 |
| *Settlement / Damages* | *67.4%* | *67.4%* | *67.4%* | *67.4%* |

**5.  ESTIMATED DAMAGES AND SETTLEMENT AMOUNTS FOR ATHLETIC SERVICES**

34.  In this section, I describe my estimate for potential damages related to compensation for athletic services, in aggregate for all settlement classes, for comparing the settlement amount to potential damages related to compensation for athletic services.

35.  Unlike NIL compensation, I have not previously provided reports containing analyses and estimates of damages related to compensation for athletic services.  I do not provide here a full damage analysis in relation to compensation for athletic services.  Instead, I provide here a methodology and set of assumptions and procedures that are within the scope of economically reasonable approaches for estimating damages related to compensation for athlete services.  I then apply the methodology and assumptions to calculate an estimate of potential damages.

36. For the purpose of comparing the settlement amount to potential damages, I provide the following calculations of potential damages for compensation for athletic services.

## 5.1 METHODOLOGY AND ASSUMPTIONS FOR ESTIMATING POTENTIAL DAMAGES RELATED TO COMPENSATION FOR ATHLETIC SERVICES

37. One of the common and standard methodologies that economists use to estimate damages relies on outcomes from a market not affected by the challenged conduct to estimate outcomes but-for the challenged conduct in the market in which damages occurred. This is a form of analysis known as a yardstick,[17] which I used previously when estimating NIL damages. This method requires selecting a comparable industry and assessing whether adjustments are required to account for differences between the target of the analysis and the comparable industry.

38. I am employing a method first developed separately by David Berri (2014) and Brian Goff (2014). This approach has been employed in a number of academic studies.[18] Essentially, the Berri-Goff approach – when it is applied to a college labor market – employs the distribution of salaries seen in professional leagues to estimate what salaries would be for college athletes.

39. I select major professional sports in the United States to provide a yardstick ratio of total athlete compensation to revenue. I have reviewed information on the collective bargaining agreements ("CBAs") covering athlete compensation for each of the following leagues:

---

[17] "Under the yardstick approach, damages are measured by obtaining a "but-for price" from a market (the "comparable market") that closely approximates the market in which the violation occurred. The "but-for price" is a measure of what the price of the product would be if the wrongful behavior had not occurred. A yardstick can come from a different, but related product market in the same or similar geographic market or from a different, but related geographic market in which the same product or products are sold." Rubinfeld, D. L. (2009). Antitrust Damages. In Elhauge (Ed.) *Research Handbook on the Economics of Antitrust Law*, Edward Edgar Publishing. Footnotes omitted.

[18] The Berri-Goff approach is used to measure the economic value of athletes in both a professional and collegiate setting. The list of academic studies employing this approach includes Berri, D.J. (2016) "Paying NCAA Athletes." *Marquette Sports Law Review*, 26(2): 479-491; Berri, D.J. (2018) *Sports Economics*, Worth Publishers/ Macmillan Learning; Berri, David J. and Anthony Krautmann (2019). "How Much Did Baseball's Antitrust Exemption Cost Bob Gibson?" *The Antitrust Bulletin*. p. 1-18; Garthwaite, C., Keener, J., Notowidigdo, M. J., & Ozminkowski, N. F. (2020). Who Profits From Amateurism? Rent-Sharing in Modern College Sports (No. w27734), National Bureau of Economic Research. https://www.nber.org/papers/w27734; McFall, T. and Tatich, K. (2022). Federal Baseball Turns 100: The Long Legal Game of Athletes Gaining Economic Rights in the United States. *Wake Forest Journal of Business & Intellectual Property Law* (Spring), v22, n3. pp. 314-370; and several forthcoming papers.

NFL, NBA, NHL.[19]  This review confirms a ratio of athlete compensation to league or team revenue to be approximately 50 percent.[20]  This ratio is commonly known among sports economists.  I used this ratio to estimate college athlete compensation in relation to revenue from college athletics.

40.  Between professional sports and college athletics, much of the revenue and compensation amounts are directly comparable.  However, there are some differences that could result in adjustments in the context of a full damage analysis.  It is these possible adjustments that give rise to a range of potential damages that would be economically reasonable estimates, and the determination of the best adjustments could narrow the range to a single point or a smaller range of estimates.

41.  Professional and college sports both earn revenue through sale of media rights and tickets directly related to team events (and programs, parking, concessions, etc.), as well as merchandise sales and sponsorships.[21]

42.  Within the revenue that NCAA member schools report to the NCAA, some distinctions from professional leagues arise.  For example, college athletics revenue reports include institutional or government support, which I exclude from revenues for this analysis because such support is not fairly analogous to any revenues in the professional leagues.  Further, college athletics reported revenues may include sports camps, voluntary contributions, third-parties covering non-athlete compensation or benefits, endowment income, and other operating income.  Similarly, these are not fairly analogous to the

---

[19]   NFL Collective Bargaining Agreement, August 4, 2011; Highlights of the 2011 Collective Bargaining Agreement Between the National Basketball Association (NBA) and the National Basketball Players Association (NBPA), September 2014; Collective Bargaining Agreement Between National Hockey League and National Hockey League Players Association, September 16, 2012.  I did not use CBAs from MLB, WNBA, and MLS because MLB guarantees team revenue share not player revenue share, WNBA has conditional player revenue sharing with no guaranteed percentage of revenue, and MLS does not mention a player revenue share. See MLB and MLBPA Basic Agreement, December 1, 2016; Women's National Basketball Association Collective Bargaining Agreement, March 5, 2014; Collective Bargaining Agreement Between Major League Soccer and Major League Soccer Players Union, February 1, 2015.

[20]   For seasons from 2011-12 through 2020-21, the NBA and the NFL CBAs required, respectively, at least 49 percent and 47 percent of revenue to be spent on athlete compensation.  For the NHL from 2012-2013 through 2021-22, the number was 50 percent. See Text Cite – Player Revenue Sharing by League.

[21]   As a source for college revenues for my calculations in this declaration, I use the same MFRS data reported by the NCAA that I used in previous reports, from 2019-20 through 2021-22.  For more recent periods of 2022-23, 2023-24, and Fall 2024, I increase the amounts from 2021-22 by 3 percent each year, which results in a cumulative average growth rate of 4.4 percent from 2019-20 through 2023-24.

professional league revenues.[22]  I note that the estimates of revenue used to calculate "pool" revenue for the proposed injunctive relief (described in Section 7 of this declaration) omit these categories of revenue (and omit programs, parking, and concessions).  There are valid economic arguments to include some or all of those categories.[23]

43.  For my calculations of potential damages here, I use a middle ground estimate of revenue as follows.  Similar to "pool" revenue, I exclude institution and government support, and omit third-party payments, sports camps and other operating income.  However, I include programs, parking, and concessions.  For voluntary contributions, which in college athletics can be tied together with attendance privileges (tickets), I include half of the reported amount and for endowment income, which may in some cases compare directly to professional team investment income and in other cases may involve unrelated educational institution endowments, I also include half of the reported amount.  For my estimate of potential damages, 50 percent of this measure of college athletic revenue is the college athlete share for compensation.

44.  With respect to compensation, professional and college sports both provide compensation to athletes.  The largest source of compensation for professional athletes is salary, whereas the largest source for college athletes, and one of the key recruitment tools, is grant-in-aid scholarships ("GIA").  Medical insurance and related expenses are compensation categories for both college and professional athletes.  The MFRS data mentioned above is a source for these two categories of college athlete compensation for my calculations in this declaration.  In addition, the proposed settlement of the NIL claims includes direct BNIL compensation, and the other litigation matter (*Hubbard*) includes AAA compensation.  There are also other forms of compensation for college athletes, such as disbursement from the NCAA's

---

[22]  For example, both professional leagues and colleges may have sports camps, but not with fairly analogous revenue.  For colleges, sports camps can be a means to scout and recruit athletes. (The definition of "sports camps" in NCAA regulations is constrained to events "in which prospective student-athletes participate." NCAA Division I Manual 2023-24, 13.12.1.1. See also https://recruitlook.com/can-a-college-camp-help-with-your-college-recruiting/). This is not the case for professional sports that athletes would not join for many years after camp age. (Camps run by the Dallas Cowboys, for example, are offered to participants aged 6–16. https://www.dallascowboys.com/youth-camps/).

[23]  The NCAA has a reported category of "generated revenue" including all the types of revenues referenced above, except institutional and government support. https://ncaaorg.s3.amazonaws.com/research/Finances/2023RES_DI-RevExpReport_FINAL.pdf

Student Assistance Fund ("SAF") and other compensation allowed after *Alston* for educational expenses such as computers, study abroad, internships, and graduate scholarships.

45. For my calculations of potential damages here, I deduct from the college athlete share of revenue for compensation an estimate of other compensation as follows. I include GIA and medical, as reported in MFRS data. I also include estimated BNIL compensation, as determined by the BNIL damage estimates for the settlement class (not the settlement amounts) and the estimated AAA compensation, as determined by the annual expected AAA payments I reported for the *Hubbard* matter. I also include an annual estimate for SAF disbursements and for additional Alston compensation for educational expenses.[24]

46. Exhibit 7 shows this calculation for each of the academic years 2019-20 through 2023-24, plus the first half of the 2024-25 academic year.

---

[24] For Alston benefits, I net out every year my estimated annual AAA compensation I reported in the *Hubbard* litigation. I also net out SAF and other NCAA fund payments that go to athletes (NCAA reports distributing approximately $90 million to conferences per year to cover SAF & SAOF disbursements, see, for example, https://ncaaorg.s3.amazonaws.com/ncaa/finance/d1/2024D1Fin_RevenueDistributionPlan.pdf), and an estimated value for Alston benefits other than academic achievement and graduation awards that I previously described in my declaration for *Alston* (using the lower bound of my estimated range of $71 to $90 million per year, see Declaration of Daniel A. Rascher on Economic Value of Ordered Injunctive Relief, March 26, 2018. p. 2.).

**Exhibit 7. Estimated damages for additional compensation for athletic services**

| ($millions) | Estimated damage for additional compensation for athlete services, 2019-20 through Fall 2024 |
|---|---|
| Revenue | $46,395 |
| Athlete Share of Revenue | 50% |
| **Estimated Athlete Compensation** | **$23,197** |
| | |
| **Estimated Athlete Compensation Received** | |
| GIA | $16,688 |
| Medical | $1,327 |
| House (BNIL) | $1,798 |
| Hubbard (AAA) | $669 |
| Other Alston | $391 |
| SAF/SAOF | $428 |
| Total Estimated Athlete Compensation Received | **$21,299** |
| **Estimated Athlete Compensation minus** | |
| **Total Estimated Athlete Compensation Received** | **$1,898** |

**5.2    COMPARISON OF SETTLEMENT AMOUNT TO POTENTIAL DAMAGES RELATED TO COMPENSATION FOR ATHLETIC SERVICES**

47.  I understand that the settlement amount related to compensation for athletic services is $600 million.

48.  I further understand that the proposed allocation across settlement damage classes provides 5% to the Additional Sports settlement damage class and 95% distributed in a ratio of 75/15/5 to athletes across the three sports (football, men's basketball, and women's basketball) in the other two settlement damage classes.  As a result, the proposed settlement of $600 million allocates to settlement damage classes as follows: 1) $540 million, which is 90% of $600 million, for the Football and Men's Basketball settlement damage class – this includes $460 million for football athletes and $90 million for men's basketball athletes; 2) $30 million, which is 5% of $600 million, for the Women's Basketball settlement damage class; and 3) $30 million, which is 5% of $600 million, for the Additional Sports settlement damage class.  These allocations result from applying here the same percentage allocations

described earlier in this declaration for distributing Broadcast NIL across sports in proportion to the estimated share of value each sport contributes to the value of regular season broadcast deals.  Broadcast revenues account for a large share of athletic revenue, and the share of value each sport contributes to regular season broadcast revenue serves as a reasonable proxy for the share of value for all revenue to support these allocations.

49.   Exhibit 8 shows the potential damages for compensation for athletic services for all members of the settlement damage classes as compared to the settlement amount, with both potential damages and settlement amounts distributed across the settlement damage classes as described above.  The settlement amount is about 31.6 percent of the amount I estimate for potential damages.

**Exhibit 8. Compensation for athletic services: estimated damages and settlement amount**

| Class | Compensation for athletic services |
|---|---|
| | **Potential Damages** |
| Football and Men's Basketball | |
| P5 Football | $1,423,800,000 |
| P5 Men's Basketball | $284,760,000 |
| SUBTOTAL | $1,708,560,000 |
| | |
| Women's Basketball | |
| P5 Women's Basketball | $94,920,000 |
| | |
| Additional Sports | |
| All | $94,920,000 |
| | |
| TOTAL | $1,898,400,000 |
| | |
| Settlement Amount | $600,000,000 |
| *Settlement / Damages* | *31.6%* |

**6.   ALLOCATION OF SETTLEMENT AMOUNT RELATED TO COMPENSATION FOR ATHLETIC SERVICES**

50.   In this section, I describe the proposed allocation of the settlement amount, $600 million (prior to deductions for approved expenses and attorney's fees).  This settlement amount

covers athletic participation for academic years 2019-20 through 2023-24 and athletes eligible as of September 15, 2024 to participate during the 2024-25 academic year.  The proposal first allocates the settlement amount by year, with each year getting near-equal allocated amounts, allowing for average annual growth across the period in proportion to athletic revenue growth.  The allocated amount per academic year will then be further allocated across the settlement damage classes as shown on Exhibit 9.[25]  Within each class, I describe allocations to each class member in the sections that follow.

**Exhibit 9. Compensation for athletic services settlement amounts**

| Compensation for athletic services Settlement amounts  (millions) | | | 2019-20 | 2020-21 | 2021-22 | 2022-23 | 2023-24 | 2024-25 |
|---|---|---|---|---|---|---|---|---|
| Athletic Revenue | CAGR: | 4.4% | $8,026 | | | | $9,525 | |
|   Annual Index | | | 1.000 | 1.044 | 1.089 | 1.137 | 1.187 | 1.239 |
|   Annual Share | | | 14.9% | 15.6% | 16.3% | 17.0% | 17.7% | 18.5% |
| | | | | | | | | |
| Damage Class | | | | | | | | |
| Football and Men's Basketball | | | | | | | | |
|   P5 Football | $450 | 75% | $67.2 | $70.1 | $73.2 | $76.4 | $79.8 | $83.2 |
|   P5 Men's Basketball | $90 | 15% | $13.4 | $14.0 | $14.6 | $15.3 | $16.0 | $16.6 |
|   SUBTOTAL | $540 | | $80.7 | $84.2 | $87.9 | $91.7 | $95.7 | $99.9 |
| | | | | | | | | |
| Women's Basketball | | | | | | | | |
|   P5 Women's Basketball | $30 | 5% | $4.5 | $4.7 | $4.9 | $5.1 | $5.3 | $5.5 |
| | | | | | | | | |
| Additional Sports | | | | | | | | |
|   All | $30 | 5% | $4.5 | $4.7 | $4.9 | $5.1 | $5.3 | $5.5 |
| | | | | | | | | |
| TOTAL | $600 | | $89.6 | $93.5 | $97.6 | $101.9 | $106.3 | $111.0 |

## 6.1   POWER FIVE FB/BB PORTION

51.   For each academic year, the athletes with athletic participation at Power Five Football or Basketball programs with a full scholarship share will receive, in aggregate, 95% of the annual proposed allocation of the athletic services compensation settlement.

### 6.1.1   Power Five FB portion

52.   Exhibit 10 shows the proposed allocation of the settlement amount each year for football.

---

[25]   Revenue growth measured as CAGR of "pool" revenue change from 2019-20 through 2023-24.

**Exhibit 10. Compensation for athletic service proposed settlement, Power Five Football**

| Power Five Football | 2019-20 | 2020-21 | 2021-22 | 2022-23 | 2023-24 | 2024-25 |
|---|---|---|---|---|---|---|
| Annual P5 FB Settlement Share (millions) | $67.2 | $70.1 | $73.2 | $76.4 | $79.8 | $83.2 |

53.  The proposed allocation of the amount for football each year to each athlete consists of two portions.

54.  A minimum share to all Power Five football athletes that is in proportion to the minimum compensation that NFL players receive, according to their collective bargaining agreement ("CBA").  This minimum settlement amount is equal to the minimum compensation to each NFL player, scaled down to the Power Five football settlement share (minimum NFL salary times the ratio of the Power Five settlement share per athlete to the athlete compensation share of NFL revenue per athlete).  Exhibit 11 shows the minimum amount for each Power Five football athlete for each academic year from 2019-20 through 2024-25.  In other words, the proposed allocation assigns the same aggregate proportion of compensation to covering minimum compensation received by each class member (in a given season) as the CBA between the NFL and NFLPA assigns to aggregate minimum salaries paid to all NFL players (in a given season).

**Exhibit 11. Proposed minimum settlement for compensation for athletic services, Power Five Football**

| Power Five Football | | | | | | |
|---|---|---|---|---|---|---|
| Minimum compensation | 2019-20 | 2020-21 | 2021-22 | 2022-23 | 2023-24 | 2024-25 |
| NFL minimum salary (2023) | | | | | $750,000 | |
| NFL average salary cap hit per athlete (2023) | | | | | $2,305,077 | |
| NFL minimum as share of cap | | | | | 32.5% | |
| P5 FB Settlement Share (millions) | $67.2 | $70.1 | $73.2 | $76.4 | $79.8 | $83.2 |
| **P5 FB Aggregate minimum settlement ($millions)** | **$21.9** | **$22.8** | **$23.8** | **$24.9** | **$26.0** | **$27.1** |
| Number of P5 FB athletes | 5,525 | 5,525 | 5,525 | 5,525 | 5,865 | 5,950 |
| P5 FB athlete minimum settlement | $3,958 | $4,131 | $4,312 | $4,500 | $4,425 | $4,552 |

55.  As proposed, the remainder of the settlement amounts would be allocated on a school-by-school basis in relation to football revenue (for academic year 2021-22), by position in relation to share of NFL athlete compensation to athletes for each position, and then to athletes within each position by count of snaps, as shown on Exhibit 12.  To account for freshman talent level and demand for their athletic services, incoming freshmen, who are recruited *ex ante* their freshman year performance, and who sometimes do not play much

during their freshman year (due, for example, to red-shirting), snaps would be assigned as the maximum of two options: 1) actual snaps, or 2) expected snaps (average snaps among non-freshmen on the same or similar teams with equivalent position and star-rating).[26]  For example, an incoming freshman linebacker with a five-star recruitment rating would be assigned the maximum of either actual snaps or expected snaps based on an average (or median) of snaps played by other linebackers on the same (or similar) team, who share a five-star recruitment rating.

**Exhibit 12. Proposed settlement allocation above minimum for compensation for athletic services, Power Five Football by position**

**Power Five Football**

| Allocation by position, school and snaps | | | 2019-20 | 2020-21 | 2021-22 | 2022-23 | 2023-24 | 2024-25 |
|---|---|---|---|---|---|---|---|---|
| Settlement remaining after minimum | | | **$45.3** | **$47.3** | **$49.4** | **$51.6** | **$53.8** | **$56.2** |
| Allocated to schools based on FB revenue | | | | | | | | |
| Average school share (example) | | | $697,570 | $728,072 | $759,909 | $793,137 | $779,829 | $802,301 |
| | | | | | | | | |
| NFL Aggregate compensation by Position (millions) | | | Share per school allocated to FB athletes by snaps. Average school example: | | | | | |
| Quarterback | $528 | 9% | $62,916 | $65,667 | $68,539 | $71,536 | $70,335 | $72,362 |
| Running Back | $304 | 5% | $36,156 | $37,737 | $39,387 | $41,109 | $40,419 | $41,584 |
| Wide Receiver | $722 | 12% | $85,975 | $89,734 | $93,658 | $97,754 | $96,113 | $98,883 |
| Offensive Line | $1,185 | 20% | $141,187 | $147,361 | $153,805 | $160,530 | $157,837 | $162,385 |
| Tight End | $299 | 5% | $35,636 | $37,194 | $38,820 | $40,518 | $39,838 | $40,986 |
| Linebacker | $702 | 12% | $83,559 | $87,213 | $91,027 | $95,007 | $93,413 | $96,105 |
| Defensive Tackle | $508 | 9% | $60,497 | $63,142 | $65,903 | $68,785 | $67,630 | $69,579 |
| Defensive End | $488 | 8% | $58,090 | $60,630 | $63,282 | $66,049 | $64,940 | $66,812 |
| Safety | $419 | 7% | $49,923 | $52,106 | $54,385 | $56,763 | $55,810 | $57,419 |
| Cornerback | $531 | 9% | $63,229 | $65,994 | $68,880 | $71,891 | $70,685 | $72,722 |
| Kicker | $81 | 1% | $9,609 | $10,029 | $10,467 | $10,925 | $10,742 | $11,051 |
| Punter | $54 | 1% | $6,374 | $6,653 | $6,944 | $7,248 | $7,126 | $7,331 |
| Long Snapper | $37 | 1% | $4,419 | $4,612 | $4,814 | $5,024 | $4,940 | $5,082 |

56.   The proposed settlement allocation results in a minimum annual settlement amount for a Power Five football athlete ranging from $3,958 for 2019-20 to $4,552 for 2024-25, plus an additional annual amount (for athletes with non-zero snaps), depending on position and snaps.  For a team with an average revenue, the average additional amount per athlete would range from $8,207 ($697,570 / 85) for 2019-20 to $9,439 ($802,301 / 85) for 2024-25 (these averages include any athletes with zero snaps. who would get no additional

---

[26]   Recruitment star ratings are assigned by college sports recruitment analysis websites like Rivals.com, 247sports.com, espn.com, and prospectsnation.com.

settlement amount above the minimum).  These estimates are before deduction of any attorneys' fees and other expenses approved by the Court

### 6.1.2   Power Five MBB portion

57.   Exhibit 13 shows the allocation of the settlement amount each year for men's basketball.

**Exhibit 13. Compensation for athletic service proposed settlement, Power Five Men's Basketball**

| Power Five Men's Basketball | All years | 2019-20 | 2020-21 | 2021-22 | 2022-23 | 2023-24 | 2024-25 |
|---|---|---|---|---|---|---|---|
| Annual P5 MBB Settlement Share (millions) | | **$13.4** | **$14.0** | **$14.6** | **$15.3** | **$16.0** | **$16.6** |

58.   For men's basketball, the proposed allocation of the amount to each athlete will also consist of two portions.

59.   A minimum share to all Power Five men's basketball athletes that is in proportion to the minimum compensation that NBA players receive, according to their CBA.  This minimum settlement amount is equal to the minimum compensation each NBA player, scaled down to the Power Five (divided by aggregate NBA revenue per athlete and multiplied by aggregate Power Five men's basketball revenue per athlete).  As with football described above, the proposed allocation assigns the same aggregate proportion of compensation to covering minimum compensation received by each class member (in a given season) as the CBA between the NBA and NBPA assigns to aggregate minimum salaries paid to all NBA players (in a given season).  Exhibit 14 shows the minimum amount for each Power Five men's basketball athlete for each academic year from 2019-20 through 2024-25.

**Exhibit 14. Proposed minimum settlement for compensation for athletic services, Power Five Men's Basketball**

| Power Five Men's Basketball | | | | | | |
|---|---|---|---|---|---|---|
| Minimum compensation | 2019-20 | 2020-21 | 2021-22 | 2022-23 | 2023-24 | 2024-25 |
| NBA minimum salary (2023) | | | | $1,119,563 | | |
| NBA average salary per athlete (2023) | | | | $7,929,218 | | |
| NBA minimum as share of cap | | | | 14.1% | | |
| P5 MBB Settlement Share (millions) | $13.4 | $14.0 | $14.6 | $15.3 | $16.0 | $16.6 |
| **P5 MBB Aggregate minimum settlement ($millions)** | **$1.9** | **$2.0** | **$2.1** | **$2.2** | **$2.3** | **$2.4** |
| Number of P5 MBB athletes | 845 | 845 | 845 | 845 | 897 | 910 |
| P5 MBB athlete minimum settlement | $2,246 | $2,344 | $2,447 | $2,554 | $2,511 | $2,583 |

60.  As proposed, the remainder of the settlement amounts would be allocated on a school-by-school basis in relation to men's basketball revenue (for academic year 2021-22), and then to athletes within each school in relation to the value of the athlete's performance, as measured by additional team wins produced predicted by performance statistics, as shown on Exhibit 15.[27]  To account for freshman talent level and demand for their athletic services, incoming freshmen, who are recruited *ex ante* their freshman year performance, and who sometimes do not play much during their freshman year (due, for example, to red-shirting), wins produced would be assigned as the maximum of two options: 1) actual wins produced, or 2) expected wins produced (average wins produced among non-freshmen on the same or similar teams with equivalent star-rating.[28]  So, for example, an incoming freshman with a five-star recruitment rating would be assigned the maximum of either actual wins produced or expected wins produced based on an average (or median) of wins produced by other members of the same (or similar) team who share a five-star recruitment rating.)

**Exhibit 15. Proposed settlement allocation above minimum for compensation for athletic services, Power Five Men's Basketball**

| Power Five Men's Basketball | | | | | | |
|---|---|---|---|---|---|---|
| Allocation by position, school and wins produced | 2019-20 | 2020-21 | 2021-22 | 2022-23 | 2023-24 | 2024-25 |
| Settlement remaining after minimum (millions) | **$11.5** | **$12.0** | **$12.6** | **$13.1** | **$13.7** | **$14.3** |
| Allocated to schools based on MBB revenue | | | | | | |
| Average school share (example) | $177,601 | $185,367 | $193,473 | $201,933 | $198,544 | $204,266 |

---

[27]  As detailed in Berri (2018), pp. A-9 – A-16, the box score statistics tracked in basketball can be used to measure each basketball player's wins produced.

[28]  Recruitment star ratings are assigned by college sports recruitment analysis websites like Rivals.com, 247sports.com, espn.com, and prospectsnation.com.

61.  The proposed settlement allocation results in a minimum annual settlement amount for a Power Five men's basketball athlete ranging from $2,246 for 2019-20 to $2,583 for 2024-25, plus an additional annual amount, depending on wins produced.  For a team with an average revenue, the average additional amount per athlete would range from $13,662 ($177,601 / 13) for 2019-20 to $15,713 ($204,266 / 13) for 2024-25.  These estimates are before deduction of any attorneys' fees and other expenses approved by the Court.

### 6.1.3  Power Five WBB portion

62.  Exhibit 16 shows the allocation of the settlement amount each year for women's basketball.

**Exhibit 16. Compensation for athletic service proposed settlement, Power Five Women's Basketball**

| Power Five Women's Basketball | 2019-20 | 2020-21 | 2021-22 | 2022-23 | 2023-24 | 2024-25 |
|---|---|---|---|---|---|---|
| Annual P5 WBB Settlement Share (millions) | $4.5 | $4.7 | $4.9 | $5.1 | $5.3 | $5.5 |

63.  For women's basketball, the proposed allocation of the amount to each athlete will also consist of two portions.

64.  A minimum share to all Power Five women's basketball athletes that is in proportion to the minimum compensation that WNBA players receive, according to their CBA.  This minimum settlement amount is equal to the minimum compensation each WNBA player, scaled down to the Power Five (divided by aggregate WNBA revenue per athlete and multiplied by aggregate Power Five women's basketball revenue per athlete).  As with football and men's basketball described above, the proposed allocation assigns the same aggregate proportion of compensation to covering minimum compensation received by each class member (in a given season) as the CBA between the WNBA and WNBPA assigns to aggregate minimum salaries paid to all WNBPA players (in a given season).  Exhibit 17 shows the minimum amount for each Power Five women's basketball athlete for each academic year from 2019-20 through 2024-25.

**Exhibit 17. Proposed minimum settlement for compensation for athletic services, Power Five Women's Basketball**

| Power Five Women's Basketball | | | | | | |
|---|---|---|---|---|---|---|
| Minimum compensation | 2019-20 | 2020-21 | 2021-22 | 2022-23 | 2023-24 | 2024-25 |
| WNBA minimum salary (2023) | | | | | $62,285 | |
| WNBA average salary per athlete (2023) | | | | | $147,745 | |
| WNBA minimum as share of cap | | | | | 42.2% | |
| P5 WBB Settlement Share (millions) | $4.5 | $4.7 | $4.9 | $5.1 | $5.3 | $5.5 |
| **P5 WBB Aggregate minimum settlement ($millions)** | **$1.9** | **$2.0** | **$2.1** | **$2.1** | **$2.2** | **$2.3** |
| Number of P5 WBB athletes | 975 | 975 | 975 | 975 | 1,035 | 1,050 |
| P5 WBB athlete minimum settlement | $1,937 | $2,022 | $2,110 | $2,203 | $2,166 | $2,228 |

65. As proposed, the remainder of the settlement amounts would be allocated on a school-by-school basis in relation to women's basketball revenue (for academic year 2021-22), and then to athletes within each school in relation to the value of the athlete's performance, as measured by additional team wins produced predicted by performance statistics (as described for men's basketball in the previous section), as shown on Exhibit 18. To account for *ex ante* recruiting of incoming freshmen, who are often highly recruited but sometimes do not play much during their freshman year, the approach would be modified to account for freshman talent level and demand for their athletic services. This modification will be made for Power Five WBB class members using additional team wins produced as predicted by performance statistics – the same method described above for Power Five MBB class members.

**Exhibit 18. Proposed settlement allocation above minimum for compensation for athletic services, Power Five Women's Basketball**

| Power Five Women's Basketball | | | | | | |
|---|---|---|---|---|---|---|
| Allocation by position, school and wins produced | 2019-20 | 2020-21 | 2021-22 | 2022-23 | 2023-24 | 2024-25 |
| **Settlement remaining after minimum (millions)** | **$2.6** | **$2.7** | **$2.8** | **$2.9** | **$3.1** | **$3.2** |
| Allocated to schools based on WBB revenue | | | | | | |
| Average school share (example) | $39,873 | $41,617 | $43,436 | $45,336 | $44,575 | $45,860 |

66. The proposed settlement allocation results in a minimum annual settlement amount for a Power Five women's basketball athlete ranging from $1,937 for 2019-20 to $2,228 for 2024-25, plus an additional annual amount, depending on wins produced. For a team with an average revenue, the average additional amount per athlete would range from $2,658 ($39,873 / 15) for 2019-20 to $3,057 ($45,860 / 15) for 2024-25. These estimated ranges are before deduction of any attorneys' fees and other expenses approved by the Court.

28

## 6.2   ADDITIONAL SPORTS PORTION

67.   For each academic year, the athletes with athletic participation not at a Power Five Football or Basketball program with a full scholarship receive, in aggregate, 5% of the annual allocation of the settlement.

68.   Exhibit 19 shows the allocation of the settlement amount each year for all Additional Sports class athletes.

**Exhibit 19. Compensation for athletic service settlement, Additional Sports**

| Additional Sports | 2019-20 | 2020-21 | 2021-22 | 2022-23 | 2023-24 | 2024-25 |
|---|---|---|---|---|---|---|
| Annual Additional Sports Settlement Share (millions) | $4.5 | $4.7 | $4.9 | $5.1 | $5.3 | $5.5 |

69.   The Additional Sports settlement class includes a set of athletic programs with distinctly lower revenue than the other classes, but also with teams that have a diverse range of revenues within the class.  For allocation of the proposed settlement related to compensation for athletic services within this class, I have analyzed the revenues by conference, school, and sport to identify categories of "outlier" programs within this group that have relatively much higher revenue.[29]  The allocation of the proposed settlement to this set of outlier athletic categories is proposed to be in proportion to relative revenue, and then pro rata across athletes within each category.

### 6.2.1   Outlier Power Five sports within Additional Sports class

70.   I first consider Power Five sports within the Additional Sports class.  Exhibit 20 lists the revenue for top five men's sports and a revenue sum for all other sports, and then the same for women's sports.

---

[29]   Throughout this section, revenue is "pool" revenue, as described for the proposed injunctive relief, for 2021-22. MFRS data identifies revenue by sport, as well as unallocated revenue.  This analysis apportions the unallocated amounts to the various sports in proportion to the total reported revenue for each sport among four distinct groups of institutions, those that fall into Power 5, Group of 5, FCS, and "No Division I Football" categories.

29

**Exhibit 20. Top five men's and women's Power Five sports**

| Men's Power Five Sports | Aggregate Revenue | Percentage of Total |
|---|---|---|
| Football | $4,468,835,248 | 79.2% |
| Men's Basketball | $1,056,674,070 | 18.7% |
| Baseball | $72,400,017 | 1.3% |
| Men's Ice Hockey | $16,499,008 | 0.3% |
| Men's Cross Country | $8,499,120 | 0.2% |
| Other Sports | $21,191,825 | 0.4% |
| **Total** | **$5,644,099,288** | **100.0%** |

| Women's Power Five Sports | Aggregate Revenue | Percentage of Total |
|---|---|---|
| Women's Basketball | $52,891,908 | 41.2% |
| Women's Volleyball | $16,887,357 | 13.2% |
| Softball | $14,971,706 | 11.7% |
| Women's Cross Country | $9,744,284 | 7.6% |
| Women's Soccer | $9,658,423 | 7.5% |
| Other Sports | $24,262,083 | 18.9% |
| **Total** | **$128,415,761** | **100.0%** |

*Notes:*
*Power Five only. Includes Notre Dame.*
*Excludes mixed gender sports.*

*Source:*
*MFRS Data.*

71.  As is evident from the exhibit, none of the men's sports other than football or men's
basketball account for a substantial share of Power Five men's sports revenue, and none of
the sports other than women's basketball account for a substantial share of Power Five
women's sports revenue.  It is evident, however, that Power Five baseball accounts for a
higher amount of revenue than women's basketball.  I then proceed to compare Power Five
baseball to women's basketball by conference, as shown on Exhibit 21.

**Exhibit 21. Comparison of Power Five baseball and women's basketball**

| Conference | Baseball Revenue | Women's Basketball Revenue |
|------------|------------------|---------------------------|
| SEC | $37,466,052 | $18,923,507 |
| Big 12 | $10,678,508 | $8,841,103 |
| ACC | $10,584,277 | $9,603,222 |
| Pac-12 | $7,849,801 | $7,287,244 |
| Big Ten | $5,821,379 | $8,236,832 |
| **Total** | **$72,400,017** | **$52,891,908** |

*Note:*
*Notre Dame included as part of ACC.*

*Source:*
*MFRS Data.*

72.  It is evident from the exhibit that revenues for baseball exceed revenues for women's basketball for four of the five Power Five conferences.  For this reason, I include Power Five baseball as one category, called Power Five Baseball, for an enhanced share in the settlement allocation.

### 6.2.2   Outlier analysis for non-Power Five football

73.  Next, I consider revenue for football programs outside of the Power Five (and within the FBS) in comparison to Power Five programs, by conference.  The revenues for the ten FBS conferences (and the independent schools – BYU, Connecticut, Liberty, Massachusetts, New Mexico, and Notre Dame – as one group), including the Power Five, are shown on Exhibit 22.

**Exhibit 22. FBS conferences football revenue**

| Conference | Football Revenue |
|---|---|
| Big Ten | $1,158,659,600 |
| SEC | $1,126,105,500 |
| ACC | $732,473,280 |
| Pac-12 | $670,002,700 |
| Big 12 | $647,489,648 |
| Division I-A Independents | $206,383,231 |
| AAC | $135,579,556 |
| Mountain West | $131,681,578 |
| CUSA | $79,570,872 |
| MAC | $72,782,228 |
| Sun Belt | $62,361,133 |
| **Total** | **$5,023,089,325** |

*Source:*
*MFRS Data.*

74.  As is evident from the exhibit, football revenues for AAC and for Mountain West are much lower than Power Five, but also substantially higher than the other three conferences. A statistical analysis determines those two conferences are significantly higher.[30] I also consider revenue for football programs for individual schools outside of the Power Five (and within the FBS) in comparison to Power Five schools. The football revenue for BYU is higher than a small set of Power Five schools.[31]

75.  For these reasons, I include AAC football, Mountain West football, and BYU football as one category, Top Non-Power Five Football, for an enhanced share in the settlement allocation.

---

[30]  The statistical test is as follows: 1) calculate the median revenue by conference, 2) calculate the absolute deviation from the median revenue by conference (revenue minus median revenue, in absolute value), 3) calculate the *median* of the absolute deviations ("MAD" – using Median Absolute Deviation due to small number of conferences), 4) measure the absolute deviation for each conference in proportion to the MAD, 5) any conference with an absolute deviation exceeding two MAD is an outlier. See Text Cite - MAD Test.

[31]  See Text Cite - BYU FB. Notre Dame athletes are part of the Football and Men's Basketball class. I do not include service academies in this analysis.

### 6.2.3   Outlier analysis for non-Power Five basketball

76.   Next, I consider revenue for basketball programs outside of the Power Five in comparison to Power Five basketball programs, by conference.  The men's basketball revenues for the top 15 Division I conferences, including the Power Five, are shown on the left side of Exhibit 23. The women's basketball revenues for the top 15 Division I conferences, including the Power Five, are shown on right side of Exhibit 23.

**Exhibit 23. Top 15 Division I conferences basketball revenue**

| Conference | Men's Basketball Revenues | Conference | Women's Basketball Revenues |
|---|---|---|---|
| Big Ten | $264,135,116 | SEC | $18,923,507 |
| SEC | $260,899,955 | ACC | $9,603,222 |
| ACC | $252,226,756 | Big 12 | $8,841,103 |
| Big 12 | $142,033,192 | Big Ten | $8,236,832 |
| Pac-12 | $137,379,051 | Pac-12 | $7,287,244 |
| Big East | $111,291,513 | Big East | $6,378,325 |
| AAC | $45,260,297 | AAC | $3,656,878 |
| Atlantic 10 | $39,306,068 | Mountain West | $2,705,895 |
| Mountain West | $35,299,626 | Summit League | $2,635,285 |
| West Coast | $23,786,697 | CUSA | $2,373,055 |
| Summit League | $18,233,568 | West Coast | $2,257,125 |
| CUSA | $16,866,896 | MAC | $1,983,275 |
| Missouri Valley | $15,107,009 | Atlantic 10 | $1,873,175 |
| MAC | $13,299,481 | Ohio Valley | $1,816,571 |
| CAA | $12,736,969 | Big Sky | $1,794,855 |
| **Top 15 Total** | **$1,387,862,194** | **Top 15 Total** | **$80,366,347** |

*Source:*
*MFRS Data.*

77.   As is evident from the exhibit, men's basketball revenues for Big East are close to Power Five conferences, and for AAC, Big East, Atlantic 10 and Mountain West are much lower than Power Five, but also higher than the West Coast Conference and the other approximately 25 conferences that are part of Division I (most of which are not displayed on the exhibit).  A statistical analysis determines those four conferences are significantly

33

higher compared to other conferences (including many not shown on the table).[32]  The same
analysis for women's basketball identifies two conferences: Big East and AAC.[33]

78.  I also consider revenue for basketball programs for individual schools outside of the Power
Five and the additional conferences added above.  For both men's and women's basketball,
the revenues for Gonzaga are higher than many of the schools included in the Power Five
and additional conferences.[34]

79.  For these reasons, I include Big East men's basketball as a separate category and include
AAC men's basketball, Atlantic 10 men's basketball, and Mountain West men's basketball,
and Gonzaga men's basketball as a category, Top Non-Power Five Men's Basketball, for
enhanced shares in the settlement allocation, and I include AAC women's basketball, Big
East women's basketball, and Gonzaga women's basketball as one category, Top Non-
Power Five Women's Basketball, for an enhanced share in the settlement allocation.

### 6.2.4   Allocation of proposed settlement within Additional Sports

80.  The "outlier" categories described above are:  1) Power Five Baseball, 2) Top Non-Power
Five Football (AAC and Mountain West conferences plus BYU), 3) Big East Men's
Basketball, 4) Top Non-Power Five Men's Basketball (AAC, Atlantic 10 and Mountain
West conferences plus Gonzaga), and 4) Top Non-Power Five Women's Basketball (AAC
and Big East conferences plus Gonzaga).  Exhibit 24 shows the revenues for each of those
categories and the total revenue for all other sports, along with the corresponding proposed
allocation percentage to each category.  Within each category, the proposed allocation is
pro rata to each participating athlete (each year).

---

[32]   The statistical test is as follows: 1) calculate the median revenue by conference, 2) calculate the absolute
deviation from the median revenue by conference (revenue minus median revenue, in absolute value), 3)
calculate the *mean* of the absolute deviations ("MAD" – using Mean Absolute Deviation due to large number of
conferences), 4) measure the absolute deviation for each conference in proportion to the MAD, 5) any
conference with an absolute deviation exceeding two MAD is an outlier.  See Text Cite - MAD Test 2+3.

[33]   See Text Cite - MAD Test 2+3.

[34]   See Text Cite - Gonzaga MBB and Text Cite - Gonzaga WBB.

**Exhibit 24. Proposed allocation for Additional Sports**

| Category | Revenue | Allocation Percentage | Proposed Settlement | Number of Athletes Each Year |
|---|---|---|---|---|
| Power Five Baseball | $72,400,017 | 4.38% | $1,313,140 | 1,647 |
| Top Non-Power Five Football | $305,720,578 | 18.48% | $5,544,942 | 1,870 |
| Big East Men's Basketball | $111,291,513 | 6.73% | $2,018,526 | 143 |
| Top Non-Power Five Men's Basketball | $128,454,128 | 7.77% | $2,329,809 | 468 |
| Top Non-Power Five Women's Basketball | $10,950,334 | 0.66% | $198,609 | 345 |
| All Other Additional Sports | $1,025,234,652 | 61.98% | $18,594,974 | 180,285 |
| **Total Additional Sports** | **$1,654,051,221** | **100.00%** | **$30,000,000** | **184,758** |

*Notes:*
*Number of Athletes Each Year calculation assumes:*
  *85 athletes per football team,*
  *13 athletes per men's basketball team,*
  *15 athletes per women's basketball team,*
  *27 athletes per baseball team.*
*These are based on the maximum number of counters allowed for each sport.*
*Total Number of Athletes Each Year in Additional Sports calculated as total number of D-I athletes (2021-22, as reported by NCAA) minus estimated number of Power Five football and basketball athletes.*

*Sources:*
*MFRS Data.*
*NCAA Sports Sponsorship and Participation Rates Report (1956-57 through 2021-22).*
*2021-22 NCAA Division I Manual.*

81. It is my understanding that there is an estimated rate of claims for these groups, which would lead to an estimated annual settlement claim per athlete as follows: 1) Power Five baseball, about $966 ($1,313,140 / 5.5 / 1,647 / 15% claim rate); Top non-Power Five football, about $3,594 ($5,544,942 / 5.5 / 1,870 / 15%); Big East men's basketball, about $17,110 ($2,018,526 / 5.5 / 143 / 15%); Top non-Power Five men's basketball, about $6,034 ($2,329,809 / 5.5 / 468 / 15%); Top non-Power Five women's basketball, about $698 ($198,609 / 5.5 / 345 / 15%); and other Additional Sports, about $125 ($18,594,974 / 5.5 / 180,285 / 15%).  These estimated ranges are before deduction of any attorneys' fees and other expenses approved by the Court.

## 7. REVENUE POOL PROJECTIONS FOR PROPOSED INJUNCTIVE RELIEF

82. It is my understanding that, in addition to the settlement amounts discussed above, the injunctive settlement includes a commitment going forward to rule changes that would allow NCAA schools to provide new forms of direct athlete compensation, including related to NIL and athletic performance, up to a certain amount each year.  The proposed maximum amount per school is based on a specific set of athletic revenues (denoted as

"pool" revenues) at Power Five schools, projected forward with a fixed annual growth rate that resets every three years.

83.  I understand that revenue for the purposes of the pool calculation consists of Ticket Sales, Guarantees, Media Rights, NCAA Distributions, Conference Distributions, Royalties, Licensing, Advertisement and Sponsorships, and Football Bowl Revenues as reported in NCAA MFRS data.[35]  For Media Rights, in order to account for changes in conference membership subsequent to 2021-22, I rely on projected media-revenue totals I reported for 2024-25 in my Merits Report.  These totals are adjusted based on the portion of media revenue for each conference that was ultimately reported in member institution's MFRS reports for 2015-16 through 2021-22.  For the remaining revenue categories, I rely on MFRS data for the most recent year available (2021-22).  To project forward in time, I assume that all of these revenue streams will grow at a 4% annual rate.[36]

84.  To estimate the maximum payments each school would be permitted to make, I project pool revenue for Power Five institutions,[37] multiply by 22%, and divide by the total number of Power Five institutions.  These estimated per-school payment caps are detailed in the Exhibit 25 below for the first ten academic years of the settlement.  Over the course of this period, I estimate that if all Power Five institutions were to pay the maximum amount permitted, which would be economically reasonable to expect due to competition, they would pay an aggregate amount of $19.4 billion to athletes during the ten-year period of the injunction.  Likewise, it would be economically reasonable to expect, also due to competition, that non-Power Five schools, in aggregate, would increase spending for athlete compensation more than enough to bring the aggregate amount, for both Power Five and non-Power Five schools, above $20 billion: this would require an increase across all non-Power Five schools, in aggregate, exceeding $57.3 million per year.[38]  Such an increase

---

[35]  Specifically, these are revenue categories 1, 7, 11, 12, 13, 13A, 15, and 19 as currently detailed in Appendix A of the NCAA 2024 Agreed-Upon Procedures.

[36]  I understand that this 4% rate is specified in the Settlement Agreement.  This projection omits the resets every three years that might change the rate.

[37]  Power Five institutions are identified based on anticipated conference membership in the 2025-26 season. Notre Dame is included.

[38]  ($20,000 million - $19,427 million) / 10 years.

would be modest, amounting to less than 3 percent relative to non-Power Five scholarship plus medical spending for 2021-22.[39]

85.  Exhibit 25 shows the aggregate projected spending cap applied to all Power Five schools and to all Division I schools for the academic years 2025-26 through 2034-35:

**Exhibit 25. Proposed injunctive relief projected spending caps**

| Academic Year | Number of Power 5 Schools | Power 5 Nonmedia Pool Revenue (millions) | Power 5 Media Revenue (millions) | Total Power 5 Pool Revenue (millions) | Power 5 Payment Cap (millions) | Cap Per School (millions) |
|---|---|---|---|---|---|---|
| 2025-26 | 70 | $4,278.1 | $3,076.8 | $7,355.0 | $1,618.1 | $23.1 |
| 2026-27 | 70 | $4,449.3 | $3,199.9 | $7,649.2 | $1,682.8 | $24.0 |
| 2027-28 | 70 | $4,627.2 | $3,327.9 | $7,955.1 | $1,750.1 | $25.0 |
| 2028-29 | 70 | $4,812.3 | $3,461.0 | $8,273.4 | $1,820.1 | $26.0 |
| 2029-30 | 70 | $5,004.8 | $3,599.5 | $8,604.3 | $1,892.9 | $27.0 |
| 2030-31 | 70 | $5,205.0 | $3,743.4 | $8,948.5 | $1,968.7 | $28.1 |
| 2031-32 | 70 | $5,413.2 | $3,893.2 | $9,306.4 | $2,047.4 | $29.2 |
| 2032-33 | 70 | $5,629.8 | $4,048.9 | $9,678.7 | $2,129.3 | $30.4 |
| 2033-34 | 70 | $5,854.9 | $4,210.9 | $10,065.8 | $2,214.5 | $31.6 |
| 2034-35 | 70 | $6,089.1 | $4,379.3 | $10,468.4 | $2,303.1 | $32.9 |
| **Total** | | **$51,363.9** | **$36,940.8** | **$88,304.7** | **$19,427.0** | **$277.5** |

86.  The payment cap allows for a substantial increase in athlete compensation.  Section 5 of this declaration describes the use of professional sports as a yardstick and calculates the additional compensation that it would take for college athletes to have compensation that, as a percentage of revenue, is similar to professional athletes.  Similar calculations show that the injunctive relief would provide Division I athletes, in aggregate, with compensation relative to revenue that is similar to professional leagues, as shown on Exhibit 26.

---

[39]   Text Cite - Non-P5 Athlete Compensation.

**Exhibit 26. Projected Division I total athlete compensation relative to revenue, 2025-26**

|  | ($millions) |
|---|---|
| **Estimated Revenue** | **$10,938** |
|  |  |
| GIA | $3,519 |
| Medical | $264 |
| Other Alston | $71 |
| SAF/SAOF | $89 |
| Additional Compensation | $1,618 |
| **Total Estimated Athlete Compensation** | **$5,561** |
|  |  |
| *Athlete Share of Revenue* | *51%* |

87.   Adopting the delineation of revenue described in Section 5.1 (which is greater than the
delineation of revenue used to calculate the injunctive relief payment cap), the projected
revenue for 2025-26 for all Division I schools would be $10,938 million (based on MFRS
public reported revenue in 2021-22 and the forward projection methodology used here).
With respect to athlete compensation, similar projections identify about $3,943 million in
compensation already allowed, in the form of: scholarships (GIA) at $3,519 million,
Medical at $264 million, Other *Alston* benefits at $71 million, and Student Assistance Fund
benefits at $89 million.  Adding compensation that will be allowed under the injunctive
settlement equal to the entire Pool amount that Power Five schools could pay in 2025-26,
which would be economically reasonable to expect due to competition, would increase
athlete compensation by $1,618 million.  This would bring athlete compensation to about
$5,561 million (without assuming any change in compensation by non-Power Five
schools), which is about 51 percent of the projected revenue of $10,938 million.

## 8.   SIGNATURE

I certify that, to the best of my knowledge and belief:

- The statements of fact in this report are true and correct.
- The reported analyses, opinions and conclusions are limited only by the reported assumptions and are my personal, unbiased and professional analyses, opinions and conclusions.
- I have no personal interest or bias with respect to the parties involved.
- My compensation is not contingent on an action or event resulting from the analyses, conclusions or opinions of this report.

DANIEL A. RASCHER declares under penalty of perjury, pursuant to 28 U.S.C. §1746, that the preceding is true and correct.

Signed on the 26th of July, 2024, in Orinda, CA

Daniel A. Rascher

# Appendix A

## DANIEL A. RASCHER, PH.D.

### EDUCATION

B.A., Economics, University of California at San Diego.

Ph.D., Economics, University of California at Berkeley.
Dissertation Title, *Organization and Outcomes: A Study of the Sports Industry*

Certified Valuation Analyst (CVA) by the National Association of Certified Valuators and Analysts

### PRESENT POSITIONS

University of San Francisco
Director of Academic Programs for the Sport Management Program, 2002-current
Professor of Sport Management, 2010-current
Associate Professor of Sport Management, 2005-2010
Assistant Professor of Sport Management, 2000-2005
Adjunct Professor of Sport Management, 1999-2000

- M.A. Course – Sport Economics and Finance
- M.A. Course – Master's Project in Sport Management
- M.A. Course – Sport Business Research Methods

SportsEconomics, LLC (www.sportseconomics.com)
Founder and President, 1998-current

Performed economic analysis for sports industry clients including multiple projects involving the NFL, NBA, NASCAR, NCAA, NHRA, NHL, MLS, ATP, AHL, professional cycling, media companies, sports commissions and government agencies, event management, B2B enterprises, and IHRSA. Specialized in industrial organization, antitrust, valuations, market research, labor issues, financial modeling, strategy, economic impact, and feasibility research.

OSKR, LLC (www.oskr.com)
Co-Founder and Partner, 2008-current

Performed economic analysis for clients involved in sports and other industries, including insurance, technology, automotive, television, and consumer products.

### PREVIOUS ACADEMIC EXPERIENCE

STANFORD UNIVERSITY, taught franchise relocation & stadium financing course, Summer 2020

NORTHWESTERN UNIVERSITY, taught sports economics and finance course, Winter 2014

IE BUSINESS SCHOOL (Madrid, Spain), taught sports economics and finance course, 2010-2013

UNIVERSITY OF MASSACHUSETTS AT AMHERST, Sport Management Department
Assistant Professor, 1997-1998

- \* M.S. Courses—Principles of Sport Business Management, Applied Sport Business Management
- \* B.S. Courses—Sport Business Finance, Sports Economics

UNIVERSITY OF CALIFORNIA AT BERKELEY, Department of Economics
<u>Teaching Assistant</u>

* Economic Principles & Intermediate Microeconomics.

Institute of Sports Law and Ethics (University of the Pacific).  Board Member, 2011-2017

PREVIOUS CONSULTING EXPERIENCE

LECG, LLC
<u>Affiliate</u>, 2003-2007; <u>Principal</u>, 2000-2003; <u>Senior Economist,</u> 1998-2000

* Performed economic analysis for sports industry clients including multiple projects involving the NFL, MLB, NBA, NHL, PGA, Formula One racing, CART, and Premier League Football (soccer).  Specialized in industrial organization, antitrust, M&As, valuations, and damages analysis.

* Provided testimony for cases involving sports industry clients, including damages analysis and liability.

* 40% of work related to antitrust litigation, 20% IP and breach of contract damages litigation, 20% merger related, and 20% management consulting.

* 60% of work involved the sports and entertainment industries, 15% involved technology, and 25% in other industries including agriculture, transportation, and energy.

UNIVERSITY OF CALIFORNIA AT BERKELEY, Competitive Semiconductor Manufacturing Program
<u>Visiting Scholar</u>, Institute of Industrial Relations, 1998-2000

<u>Research Fellow</u>, 1995-1997

* Funded by the Alfred P. Sloan Foundation, the CSM study is an interdisciplinary project that analyzes the determinants of high performance in semiconductor manufacturing.

* Research on HR, training, small sample analyses and generalizability of case study results.

NATIONAL ECONOMIC RESEARCH ASSOCIATES, Summer 1994; January-August 1995
<u>Research Assistant</u>

* Research on the energy industry, on transmission pricing, and on the economic damages of contract breaches.

QUANTUM CONSULTING, 1992-1994
<u>Research Assistant</u>

* Developed a model and a software package using spline techniques to weather-normalize energy usage, allowing the PUC to evaluate regulation policies.

HONORS AND AWARDS

Sonny Vaccaro Impact Award (*College Sport Research Institute, Univ. of South Carolina*), 2023

Outstanding Antitrust Litigation Achievement in Economics (*American Antitrust Institute*), 2021

Lifetime Achievement Award (*Applied Sport Management Association*), 2019

Research Fellow of the *North American Society for Sport Management*, 2009

College of Arts & Sciences Collective Achievement Award, 2009

Innovation Award Winner (for the innovative use of technology in teaching), 2004.  From the *Center for Instruction and Technology*, University of San Francisco.

Research Grant for the Study of Human Resource Systems (*Alfred P. Sloan Foundation*), 1995-1997.

Newton-Booth Fellowship for graduate study at University of California at Berkeley, 1990-1991.

## PEER-REVIEWED JOURNAL ARTICLES

"Who Are Our Fans: An Application of Principal Component-Cluster Technique Analysis to Market Segmentation of College Football Fans," with Kenneth Cortsen, Mark Nagel, and Tiffany Richardson.  *Journal of Applied Sport Management, 13*(1)*,* 2021.

"Economic Development Effects of Major and Minor League Teams and Stadia," with Nola Agha. *Journal of Sports Economics, 21*(1), 2020.

"Is there a Consensus?: An Experimental Trial to Test the Sufficiency of Methodologies Used to Measure Economic Impact," with Giseob Hyun and Mark Nagel.  *Journal of Applied Business and Economics, 22*(11), 2020.

"Coaching Salary Disparity and Team Performance: Evidence from the Football Bowl Subdivision," with Alex Traugutt, Alan Morse, and Brian Fowler.  *Journal of Applied Business and Economics, 22*(1), 2020.

"Cartel Behavior in US College Sports: An Analysis of NCAA Football Enforcement Actions from 1990-2011," with Mark Nagel, Richard Southall, and Nick Fulton.  *Journal of NCAA Compliance*, July-August, 2019.

"The Unique Economic Aspects of Sports," with Joel Maxcy and Andrew D. Schwarz.  *Journal of Global Sport Management* (July, 2019).

"Making a Difference: Bridging the Gap Between the Ivory Tower & the Community." *Journal of Applied Sport Management, 11*(2), 2019.

"Because It's Worth It: Why Schools Violate NCAA Rules and the Impact of Getting Caught in Division I Basketball," with Andrey Tselikov, Andrew D. Schwarz, and Mark Nagel.  *Journal of Issues in Intercollegiate Athletics, 12,* 2019.  <u>*Article of the year in the publication for 2019*</u>.

"Determining fair market value for Duke's Sporting Goods Store," with Michael Goldman.  In *Case Studies in Sport Management, 6*(1), 2017.

"The Beckham Effect: Examining the Longitudinal Impact of a Star Performer on League Marketing, Novelty, and Scarcity," with Stephen Shapiro and Tim DeSchriver.  In *European Sport Marketing Quarterly, 17*(5), 2017.

"What Drives Endorsement Earnings for Superstar Athletes?" with Terence Eddy and Giseob Hyun.  In *Journal of Applied Sport Management*, Vol. 9, No. 2, Summer 2017.

"A Smaller Window to the University: The Impact of Athletic De-Escalation on Status and Reputation," with Michael Hutchinson and Kimi Jennings.  In *Journal of Intercollegiate Sport,* Vol. 9, No. 1, June 2016.

"If We Build It, Will They Come?: Examining the Effect of Expansion Teams and Soccer-Specific Stadiums on Major League Soccer Attendance," with Steve Shapiro and Tim DeSchriver.  In *Sport, Business, and Management: An International Journal,* Vol. 6, No. 2, Spring 2016.

"An Explanation of Economic Impact: Why Positive Impacts Can Exist for Smaller Sports," with Nola Agha.  In *Sport, Business, and Management: An International Journal,* Vol. 6, No. 2, Spring 2016.

"Where is Everyone? An Examination of Attendance at College Football Bowl Games," with Terence Eddy.  In *International Journal of Sport Finance*, Vol. 11, No. 2, February 2016.

"Tracking the Dollars: How Economic Impact Studies can Actually Benefit Managerial Decision Making," with Michael Goldman.  In *Sport & Entertainment Review,* Vol 1, No. 1, February 2015.

"Sport Pricing Research: Past, Present, and Future," with Joris Drayer.  In *Sport Marketing Quarterly*, Vol. 22, No. 3, September 2013.

"The Antitrust Implications of "Paperless Ticketing" on Secondary Markets," with Andrew D. Schwarz.  In *Journal of Competition Law and Economics*, Vol. 9, No. 3, 2013.

"An Examination of Underlying Consumer Demand and Sport Pricing Using Secondary Market Data" with Joris Drayer and Chad McEvoy.  In *Sport Management Review*, Vol. 15, No. 4, November 2012.

"Smooth Operators: Recent Collective Bargaining in Major League Baseball" with Tim DeSchriver, 2012.  In *International Journal of Sport Finance*, 7(2).

"Financial Risk Management:  The Role of a New Stadium in Minimizing the Variation in Franchise Revenues" with Matt Brown, Mark Nagel, and Chad McEvoy.  In *Journal of Sports Economics*, Vol. 13, No. 3, August 2012.

"Factors Affecting the Price of Luxury Suites in Major North American Sports Facilities" with Tim DeSchriver and Steve Shapiro.  In *Journal of Sport Management,* Vol. 26, No. 3, May 2012.

"Free Ride, Take it Easy: An Empirical Analysis of Adverse Incentives Caused by Revenue Sharing" with Matthew Brown, Mark Nagel, and Chad McEvoy.  In *Journal of Sport Management,* Vol. 25, No. 5, September 2011.

"Simulation in Sport Finance," with Joris Drayer.  *Simulation & Gaming: An Interdisciplinary Journal of Theory, Practice, and Research* Vol. 41, No. 2, April 2010.

"Where did National Hockey League Fans go During the 2004-2005 Lockout?: An Analysis of Economic Competition Between Leagues," with Matthew Brown, Mark Nagel, and Chad McEvoy. In *International Journal of Sport Management and Marketing*, Vol. 5, Nos. 1, 2, January 2009.

4

"The Effects of Roster Turnover on Demand in the National Basketball Association," with Steve Shapiro, Alan Morse, and Chad McEvoy.  In *International Journal of Sport Finance*, Vol. 3, No. 1, February 2008.

"Variable Ticket Pricing in Major League Baseball" with Chad McEvoy, Mark Nagel, and Matthew Brown.  In *Journal of Sport Management*, Vol. 21, No. 3, July 2007.

"Do Fans Want Close Contests?: A Test of the Uncertainty of Outcome Hypothesis in the National Basketball Association" with John Paul Solmes.  In *International Journal of Sport Finance*, Vol. 3, No. 2, August 2007.

"The Use of Simulation Technology in Sport Finance Courses: The Case of the Oakland A's Baseball Business Simulator" with Joris Drayer.  In *Sport Management Education Journal* Vol. 1, No. 1, May 2007.

"Washington "Redskins" – Disparaging Term or Valuable Tradition?: Legal and Economic Issues Concerning *Harjo v. Pro-Football, Inc.*" with Mark Nagel.  In *Fordham Intellectual Property, Media, and Entertainment Law Journal*, Vol. XVII, No. 3, Spring 2007.

"Treatment of Travel Expenses by Golf Course Patrons: Sunk or Bundled Costs and the First and Third Laws of Demand," with Matthew Brown, Chad McEvoy, and Mark Nagel.  In *International Journal of Sport Finance*, Vol. 2, No. 1, February 2007.

"Major League Baseball Anti-Trust Immunity: Examining the Legal and Financial Implications of Relocation Rules" with Mark Nagel, Matthew Brown, and Chad McEvoy.  In *Entertainment and Sports Law Journal,* Vol. 4, No. 3, December 2006.

"The Use of Public Funds for Private Benefit: An Examination of the Relationship between Public Stadium Funding and Ticket Prices in the National Football League" with Matthew Brown and Wesley Ward.  In *International Journal of Sport Finance*, Vol. 1, No. 2, June 2006.

"An Analysis of Expansion and Relocation Sites for Major League Soccer" with Matthew Baehr, Jason Wolfe, and Steven Frohwerk.  In *International Journal of Sport Management,* Vol. 7, No. 1, January 2006.

"Revenue and Wealth Maximization in the National Football League: The Impact of Stadia" with Matthew Brown, Mark Nagel, and Chad McEvoy.  In *Sport Marketing Quarterly*, Vol. 13, No. 4, December 2004.

"NBA Expansion and Relocation: A Viability Study of Various Cities" with Heather Rascher.  In *Journal of Sport Management*, Vol. 18, No. 3, July 2004.

"Does Bat Day Make Cents?: The Effect of Promotions on the Demand for Baseball," with Mark McDonald.  In *Journal of Sport Management*, Vol. 14, No. 1, January 2000.

"The NBA, Exit Discrimination, and Career Earnings," with Ha Hoang.  In *Industrial Relations*, Vol. 38, No. 1, January 1999.

**BOOKS**

"Handbook of Sport Finance" with Mark Nagel.  Edward Elgar Publishing.  (forthcoming).

"Financial Management in the Sport Industry" 4th ed. with Matthew Brown, Mark Nagel, and Chad McEvoy.  Routledge, Inc., (forthcoming).  A textbook.

"Financial Management in the Sport Industry" 3rd ed. with Matthew Brown, Mark Nagel, and Chad McEvoy.  Routledge, Inc., 2021.  A textbook.

"Financial Management in the Sport Industry" 2nd ed. with Matthew Brown, Mark Nagel, and Chad McEvoy.  Routledge, Inc., 2015.  A textbook.

"Financial Management in the Sport Industry" with Matthew Brown, Mark Nagel, and Chad McEvoy.  Holcomb Hathaway, Inc., June 2010.  A textbook.

## BOOK CHAPTERS

"Sporting Goods and Sports Licensing," with Mark Nagel in *The Governance of Sports*, edited by Bonnie Tiell for Human Kinetics, (2024 – 2nd ed., 2020 – 1st ed.).

"The Relevance of a Gamified Football/Soccer Development Platform," with Kenneth Cortsen in *Interactive Sports Technologies: Performance, Participation, Safety*, edited by Michael Filimowicz and Veronika Tzankova for Routledge (2022).

"The application of sports technology and sports data for commercial purposes," with Kenneth Cortsen in *The Use of Technology in Sport – Emerging Challenges,* (2018).

"Valuing Highly Profitable Sports Franchises – A Hybrid Income and Market Approach," in *Sports Business* edited by Kenneth Cortsen (forthcoming).

"The Use of Price-to-Revenue Ratios in Valuing Sports Franchises," in *Sports Business* edited by Kenneth Cortsen (forthcoming).

"Competitive Equity: Can there be Balance between Athletes' Rights and a Level Playing Field?" with Andrew D. Schwarz in E. Comeaux (ed.), *College Athletes' Rights and Well-Being: Critical Perspectives on Policy and Practice*.  Baltimore: Johns Hopkins University Press, (2017).

"Illustrations of Price Discrimination in Baseball" with Andrew D. Schwarz in L. Kahane and S. Shmanske eds., *Economics Through Sports*, Oxford: Oxford University Press, (2012).

"The Expanding Global Consumer Market for American Sports: The World Baseball Classic" with Mark Nagel, Chad McEvoy, and Matt Brown in G. Mildner, and C. Santo, eds., *Sport and Public Policy*, Champaign, IL: Human Kinetics, 2010.

"Franchise Relocations, Expansions, and Mergers in Professional Sports Leagues." In B. Humphreys, and D. Howard, eds., *The Business of Sports*, pp. 67-106.  Westport, CT: Praeger, 2008.

"Collective Bargaining in Sport" with M. Nagel, M. Brown, and C. McEvoy.  In *Encyclopedia of World Sport*, pp.335-339. Great Barrington, MA: Berkshire Publishing, 2005.

"The Role of Stadia in the USA: Wealth Maximization in the National Football League" with Matthew Brown and Mark Nagel in G. Trosien & M. Dinkel (eds.), *Grenzen Des Sportkonsums* (Frontiers of Sport Commerce), Heidelberg, Germany: SRH Learnlife AG, 2003.

"A Test of the Optimal Positive Production Network Externality in Major League Baseball," in E. Gustafson and L. Hadley, eds., *Sports Economics: Current Research*, 1999.  Praeger Press.

"A Model of a Professional Sports League," in W. Hendricks (ed.), *Advances in the Economics of Sport*, vol. 2. June 1997, JAI Press, Inc.

## BOOK REVIEWS

"Review of: Much More Than a Game: Players, Owners, and American Baseball Since 1921", by Robert F. Burk in *Journal of Economic Literature*, Vol. 40(3), September 2002, pp. 949-951.

## NON-PEER REVIEWED ARTICLES

"Special Issue Introduction: Name, Image, and Likeness and the National Collegiate Athletic Association," with Steven Salaga, Natasha Brison, Joseph Cooper, and Andy Schwarz in *Journal of Sport Management*, 2023.

"Data Science for Football Business – Clustering Analysis," with Kenneth Cortsen and Bas Schnater in *FCBusiness*, 132, April 2021.

"Competitive Balance in Sports: "Peculiar Economics" over the last Thirty Years," with Andrew D. Schwarz.  In *Competition, 29*(2), Fall 2019.

"How The $200+ Million Settlement For COA Payments Was Calculated," with Andrew D. Schwarz.  In *Athletic Director U.*, May 2017.

"Rich Men's Toys – Applying Valuation Methods to the Business of Professional Sports" in *Valuation Strategies*, March/April 2015.

"Competitive Balance in Sports: "Peculiar Economics" Over the Last Quarter Century," with Andrew. D. Schwarz.  In *Entertainment, Arts, and Sports Law Journal*, 24(1), Spring 2013.

"The Impact on Demand from Winning in College Football and Basketball: Are College Athletes More Valuable than Professional Athletes?" with Chad McEvoy.  In *Selected Proceedings of the Santa Clara University Sports Law Symposium*, September 2012.

"The Economics of Competitive Balance on the Field and in the Courts" in *Selected Proceedings of the Santa Clara University Sports Law Symposium*, 2011.

"5 Themes from 50 Economic Impact Studies" in *SportsEconomics Perspectives*, Issue 5, 2010.

"What is the Value of Control of a Sports Enterprise?: Controlling Interest Premiums in Sports Valuations" in *SportsEconomics Perspectives*, Issue 4, April 2008.

"Executive Interview: Charlie Faas, Executive Vice President and CFO of Silicon Valley Sports and Entertainment." in *International Journal of Sport Finance*, Vol. 2, No. 2, June 2007.

"Executive Interview: Dan Champeau, Managing Director, and Chad Lewis, Analyst with Fitch." in *International Journal of Sport Finance*, Vol. 2, No. 1, February 2007.

"Executive Interview: Dennis Wilcox, Principal with Climaco, Lefkowitz, Peca, Wilcox & Garofoli Co., L.P.A." in *International Journal of Sport Finance*, Vol. 1, No. 4, November 2006.

"Executive Interview: Randy Vataha, Founder of Game Plan, LLC" with Dennis Howard in *International Journal of Sport Finance*, Vol. 1, No. 2, June 2006.

"Executive Interview: Mitchell H. Ziets, President and CEO of MZ Sports, LLC" in *International Journal of Sport Finance*, Vol. 1, No. 1, February 2006.

"The Oakland Baseball Simworld: Enabling Students to Simulate the Management of a Baseball Organization" in *Journal of Sports Economics*, Vol. 6, No. 3, August 2005.

"Examining the Viability of Various Cities for NBA Expansion or Relocation" with Heather Rascher in *SportsEconomics Perspectives*, Issue 2, April 2002.

"Following a Dollar: the economic impact of a sports event is greater than the sum of its parts" by Nola Agha in *SportsTravel Magazine*, Vol. 6, No. 10, November/December 2002.  Heather Rascher and Daniel Rascher contributed to the article.

"Real Impact: understanding the basics of economic impact generated by sports events" in *SportsTravel Magazine*, Vol. 6, No. 7, July/August 2002.  Reprinted in four regional sports commission newsletters.

"What is the Size of the Sports Industry?," in *SportsEconomics Perspectives*, Issue 1, August 2001.

"Neither Reasonable nor Necessary: "Amateurism" in Big-Time College Sports", with Andrew D. Schwarz.  In *Antitrust* (Spring 2000 Special Sports Issue).

"What Brings Fans to the Ballpark?," with Nola Agha in *FoxSportsBiz.com*, Spring 2000.

RE-PUBLICATIONS

Republication of "Competitive Balance in Sports: "Peculiar Economics" over the last Thirty Years," with Andrew D. Schwarz.  In *Entertainment and Sports Law Journal, 31*(1), Winter 2020.

Republication of "Do Fans Want Close Contests? A Test of the Uncertainty of Outcome Hypothesis in the National Basketball Association", with John Paul G. Solmes in *Recent Developments in the Economics of Sport*, ed. Wladimir Andreff; *The International Library of Critical Writings in Economics*, 2011, Sudbury, MA: Jones & Bartlett.

Republication of "Variable Ticket Pricing in Major League Baseball", with Chad McEvoy, Mark Nagel, and Matthew Brown The Business of Sports, ed. Scott Rosner and Kenneth Shropshire, 2011, Elgar Pub., United Kingdom.

Republication of "What Brings Fans to the Ballpark?," with Nola Agha in *Brilliant Results* 2005.

Republication of "What is the Size of the Sports Industry?," in *Brilliant Results* 2005.

Republication of "Neither Reasonable nor Necessary: "Amateurism" in Big-Time College Sports", with Andrew D. Schwarz in *The Economics of Sport, Vol. I*, ed. Andrew Zimbalist; *The International Library of Critical Writings in Economics* 135, 2001, Elgar, Northampton, MA.

## MONOGRAPHS

"The Effect of Human Resource Systems on Fab Performance," with Clair Brown, in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  Final Report*, 1997.

"Inter-industry Comparisons: Lessons from the Semiconductor Industry," with Rene Kamita, in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  Final Report*, 1997.

"Problem-Solving Structures; A Case Study of Two U.S. Semiconductor Fabs," in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  Final Report*, 1997.

"Transferability of Case Study Research:  An Example from the Semiconductor Industry," with Clair Brown, in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  2nd Interim Report*, 1996.

"Headcount and Turnover," in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  2nd Interim Report*, 1996.

"Training," with Jumbi Edulbehram in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  2nd Interim Report*, 1996.

## WORKING PAPERS & ARTICLES UNDER REVIEW

"The Impact of COVID-19 on Employment and Output in the Leisure and Tourism Industries," with Lali Odosashvili and Mark Nagel.  *In Review*.  2023.

"Commentary: Maximizing the Emergency Use of Public Stadiums and Arenas," with Mark Nagel and Tiffany Richardson.  2021.

"College Football and Basketball Fans Don't Root for Laundry: A Comparison of the Effect of Winning on Demand between College and Professional Football and Basketball," with Mark Nagel and Giseob Hyun. 2020.

"Optimal Markets for NFL Franchises."  2020.

"Would the Oakland A's Relocation to San Jose Harm the Sharks – A Case Study of Competition Across Professional Sports Teams" with Chad McEvoy, Matt Brown, and Mark Nagel.  2016.

"The Practical Use of Variable Ticket Pricing in Major League Baseball" with Chad McEvoy, Matt Brown, and Mark Nagel.  2012.

"Counting Local Residents in Economic Impact Analysis: New Findings from Sporting Events" with Richard Irwin.  2008.

"Perverse Incentives with the NCAA Basketball Tournament Seeding Process" with Matthew Brown, Chad McEvoy, and Mark Nagel.  2006.

"Do the Giants Compete with the A's: The Degree of Competition Between Teams" with Matthew Brown, Chad McEvoy and Mark Nagel.  2006.

"Forecasting Model of Airport Economic Impacts" with Alan Rozzi and Christopher Gillis.  2004.

"Psychic Impact of Professional Sports: A Case Study of a City Without Major Professional Sports" with Matthew Brown, Mark Nagel, and Chad McEvoy.  2003.

"The Use of New Technology and Human Resource Systems in Improving Semiconductor Manufacturing Performance", with Clair Brown and Greg Pinnsoneault, Working Paper, University of California at Berkeley, 1999.

## INVITED SPEAKING ENGAGEMENTS

"Getting into the Sports Industry," panelist, The Young Sports Talent Investment Forum, 2023.

"The Business of Sports."  Lecture at the Oregon Law Summer Sports Institute, University of Oregon, 2023.

"Economics of College Sports," guest speaking in Intercollegiate Sports Management, St. Mary's College, 2023.

"Economics of College Sports," guest speaking in Sports Finance, University of Delaware, 2023.

"Financial Management in the Sport Industry," invited masterclass presentation for Sportin Global, 2023.

"Legal and Economic Issues in the NCAA: A Review of 20 Years of Litigation," with Andy Schwarz and Mark Nagel, University of South Carolina, College Sport Research Institute, 2023.

"The Business of Intercollegiate Sports," invited guest speaker in Andy Dolich's Make Sense of the Madness course on college sports, Stanford University, 2023.

"An Economist Goes to the Game," invited co-host for New Books Network podcast, 2022.

"The Business of Sports."  Lecture at the Oregon Law Summer Sports Institute, University of Oregon, 2022.

"Big Stakes Antitrust Trial: In Re National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust Litigation," panelist at the 31st Golden State Institute Conference (2021).

"Economics of College Sports," guest speaking in Sports Finance, University of Delaware, 2021.

"The Business of Intercollegiate Sports," guest speaking in Issues in Sports Economics, University of West Florida, 2021.

"Professional Sports Franchise Location & Development."  Guest speaker in Sports Law & Ethics course at California Lutheran University.  2021.

"The Business of Sports." Guest speaker at Sport Administration course, University of Louisville, 2021.

"The Business of Sports."  Lecture at the Oregon Law Summer Sports Institute, University of Oregon, 2021.

"Sports Economics, Analytics, and Decision Making - 7 Case Studies," Theme Speaker 1, International Webinar on Sports Management, hosted by Sports Authority of India, Seshadripuram Educational Trust, Seshadripuram Evening Degree College, 2021.

"Economics of College Athletes," guest speaking in Sports Finance, University of Northern Colorado, 2021.

"Sports Antitrust Economics – Raiders & Regents," with Andy Schwarz in Sports Law, University of San Diego Law School, February, 2021.

"Research Thoughts & Methods" in Doctoral Research Seminar, Sport Management Department, University of South Carolina, January, 2021.

"Is there a Consensus?: An Experimental Trial to Test the Sufficiency of Methodologies Used to Measure Economic Impact in Sports."  Keynote Speaker at the 1st International Congress of Iranian Scientific Association of Sport Management, Tehran, Iran in March, 2021.

"Government Impact on Financial Aspects of Sports," at the International Conference on Governance and Integrity in Sport, Saudi Arabia, December, 2020.

"State of Play: Antitrust and the NCAA," panelist on a program hosted by the New York State Bar Association and the California Lawyers Association, November 19, 2020.

"Sports Commercialization and the Global Sports Economy" with Kenneth Cortsen.  Masterclass for Australian Sports Technologies Network, November 17, 2020.

"Economic and Financial Management of U.S. Professional Sports" presented at Loyola University, Seville, Spain, November 12, 2020.

"The Importance of Sound Data Analysis for Decision-Making in the Sports Industry" at Sportin Global Summit.  2020.

"The New Normal of the Sport Industry" at HiVE 24HR Liveathon.  2020.

"Play Time Sessions – A Series of Digital Conference Sessions on Gaming & Esports" presented by GIMA Esports.  2020.

"Practicing as a Sports Lawyer: Antitrust and Beyond."  Sponsored by the American Bar Association's Section of Antitrust Law and Trade, Sports and Professional Associations.  2020.

"Economics of Sports."  Lecture at the Oregon Law Summer Sports Institute, University of Oregon, 2020.

"Economics of College Sports," guest speaking in Sports Finance, University of Delaware, 2020.

"Economics of College Athletes," guest speaking in Sports Finance, <u>University of Northern Colorado</u>, 2020.

"Stadium Financing," guest speaking in Introduction to Sports Business, <u>UCLA's Anderson School of Business</u>, 2019.

"Economics of College Sports," discussion at the Oregon Law Summer Sports Institute, <u>University of Oregon</u>, 2019.

"Forging Industry Partnerships and Engaging in Applied Sport Management Research," with Weight, E., Love, A., McEvoy, C.  Presentation for the <u>Applied Sport Management Conference</u>, 2019.

"Making a Difference: Bridging the Gap Between the Ivory Tower & the Community."  Keynote Address, <u>Applied Sport Management Association</u>, 2019.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, <u>University of Oregon</u>, 2018.

"The Business of Sports", presented at the Sports Business Club at <u>Sonoma State University Business School</u>, May 2018.

"The Business of the Olympics," guest speaker in sports journalism course at Medill School of Journalism at <u>Northwestern University</u>, 2018.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, <u>University of Oregon</u>, 2017.

"College-Sport Research and Litigation: Theory and Practice Leading to Action." Panelist at College Sport Research Institute Symposium at the <u>University of South Carolina</u>, 2017.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, <u>University of Oregon</u>, 2016.

"The Business of Intercollegiate Sports," presented in the sport management department's sport law course, <u>University of Toronto</u>, 2016.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, <u>University of Oregon</u>, 2015.

"The Business of Intercollegiate Sports" presented in the sport management masters program, <u>University of Arkansas</u>, 2015.

Panelist on "The Future of Intercollegiate Athletics: The Players' Perspective," at the Sports Law and Business Conference at <u>Arizona State University</u>, 2015.

Panelist on "Intersection of Business and Sports Law," at the Sports and Entertainment Law Forum, presented by the <u>University of Oregon Law School</u>, 2015.

"The Economics of College Athletics Departments" presented in the masters in collegiate athletics program, college athletics in a digital era course, University of San Francisco, 2015.

"The Business of Intercollegiate Sports," presented in the sport management department's sport law course, University of Toronto, 2014.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, University of Oregon, 2014.

"The Finances of College Sports," presented in Matthew Brown's sport finance course, Ohio University, 2014.

"Antitrust Economics and Sports," presented in Professor Robert Elias's Politics and Sport course, University of San Francisco, 2014.

"The Economics of the Sports Industry," presented to the Haas School of Business, U.C. Berkeley, 2014.

"Economic Impact in Sports." Presentation in the masters in sports business program at New York University (NYU) as part of the Faculty-in-Residence program.  2013.

"Pricing the Game Experience," with Stephen Shapiro and Tim DeSchriver.  Invited research presentation at *Sport Entertainment & Venues Tomorrow* conference, 2013, University of South Carolina.

"Academia and the Industry: Opportunities for Meaningful Research Collaboration."  Invited panelist at *Sport Entertainment & Venues Tomorrow* conference, 2013, University of South Carolina.

"Sports Sponsorships in 2013," Panelist at Court Vision (Sheppard Mullin Sports Law Speaker Series and SLA).  Continuing Legal Education (CLE) units program.  2013.

"Using Contract Law to Tackle the Coaching Carousel – Commentary."  Presented at University of San Francisco, *Sports & Entertainment Law Association*, 2013.

"Sports Economics, Analytics, and Decision Making: 8 Examples." Invited speaker at the *IEG Sports Analytics Innovation Summit*, 2012

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz.  Presented at U.C. Berkeley, Boalt Law School's *Sports and Entertainment Law Society*, 2011.

"Financial Valuation of Sports Assets," presented at the *Sport Management Today Video Conference Series* at the IE Business School, 2011

"Financial Valuation of Sports Assets," presented to the *Sport Management Department* at the University of Northern Denmark, 2011.

"Economic Impact in Sports," presented to the *Sport Management Department* at the University of Northern Denmark, 2011.

13

"The Economics of the Sports Industry," presented to the *Sports Business Association* at U.C. Irvine, 2011.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at the *Economics Lecture Series* at Sonoma State University Business School, April 2010.

"Economics for Antitrust Lawyers: Application to Class Certification" presented to Lieff Cabraser Heimann & Bernstein for Continuing Legal Education (CLE) units.  November 2009.

"Economics for Antitrust Lawyers: Market Structure and Economic Modeling" presented to Lieff Cabraser Heimann & Bernstein for Continuing Legal Education (CLE) units.  October 2009.

"Sports Stadium Financing in Today's Economy" presented to the Rotary Club of San Jose, May 2009.

"The Economic Impact of Liberty Bowl Memorial Stadium," presented at the University of Memphis, *Issues in College Sports* lecture series (invited panelist), March 2007.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, U.C. Berkeley, January 2007.

"Stadium Financing – Dallas Cowboys Case," presented to the MBA Program at the Graduate School of Business, Stanford University, 2006.

"Taking the Gown to Town: Research and Consulting for the Sport Industry."  Invited presentation at the Past President's Workshop, *North American Society for Sport Management*, June 2006.

"Various Topics in Sports Economics," presented at the Wednesday Workshop on Economics Research, California State University, East Bay, 2005.

"Stadium Financing – Dallas Cowboys Case," presented to the MBA Program at the Graduate School of Business, Stanford University, 2005.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, U.C. Berkeley, 2005.

"The Economic Impact of General Aviation Airports: An Econometric Model," presented at Niche Ventures Spring Meeting, 2004.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, U.C. Berkeley, 2004.

"Oral Testimony Regarding California State Senate Bill 193, Student Athletes' Bill of Rights". 2003.  Testimony to the California State Senate Subcommittee on Entertainment.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, U.C. Berkeley, 2003.

"The Use of New Technology and Human Resource Systems in Improving Semiconductor Manufacturing Performance," with Clair Brown and Greg Pinsonneault.  Presented at *The Wharton School*, University of Pennsylvania, 1999.

CONFERENCE PRESENTATIONS

"Is there a Consensus?: An Experimental Trial to Test the Sufficiency of Methodologies Used to Measure Economic Impact," with Giseob Hyun and Mark Nagel.  Presentation at *Applied Sport Management Association*, February 2020.

"Is there a Consensus?: A Test of Methodologies Used to Measure Economic Impact," with Giseob Hyun and Mark Nagel.  Presentation at *Applied Business and Entrepreneurship Association International*, November 2019.

"Because It's Worth It: Why Schools Violate NCAA Rules and the Impact of Getting Caught in Division I Basketball," with Andrey Tselikov, Andrew D. Schwarz, and Mark Nagel.  Presentation at *Applied Business and Entrepreneurship Association International*, November 2018.

"College Football and Basketball Fans Don't Root for Laundry: A comparison of the effect of winning on attendance and television viewership between big-time college football and basketball and the NBA and NFL," with Mark Nagel.  Presentation at *Applied Business and Entrepreneurship Association International*, November 2017.  (voted Best Paper Award for session)

"Financial Valuation of a Sporting Goods Retail Store," with Mark Nagel and Matthew Brown. Poster presentation at *North American Society for Sport Management*, May 2016.

"Cartel Behavior in United States College Sports: An Analysis of National Collegiate Athletic Association Football Enforcement Actions from 1990 to 2011," with Mark Nagel, Richard Southall, and Nick Fulton.  Presented at *Western Economics Association International*, January 2016.

"The College Basketball Players' Labor Market: *Ex Ante* versus *Ex Post* Valuations" with David Berri and Robert Brown.  Presented at *Western Economics Association International*, July 2015.

"What drives Endorsement Values for Superstar Athletes?" with Terry Eddy and Giseob Hyun. Presented at *Sport Management Association of Australia and New Zealand*, November 2014.

"The Beckham Effect: David Beckham's Impact on Major League Soccer, 2007-2012," with Stephen Shapiro and Tim DeSchriver.  Presented at *North American Society for Sport Management*, May 2014.

"Where is Everyone? An Examination of Consumer Demand for College Football Bowl Games," with Terry Eddy and Rebecca Stewart.  Presented at *Collegiate Sports Research Institute* conference, April 2014.

"If We Build It, Will You Come?: Examining the Effect of Expansion Teams and Soccer-Specific Stadiums on Major League Soccer Attendance," with Stephen Shapiro and Tim DeSchriver. Presented at *North American Society for Sport Management*, May 2013.

"Should San Jose say 'No Way' to the Oakland A's," with Mark Nagel and Matt Brown.  Presented at *North American Society for Sport Management*, May 2013.

Panel member for "Financial Issues in Intercollegiate Sports." Presented at the *Santa Clara University Sports Law Symposium*, 2012.

"What's in a Name?: Does the Amount and Source of Public Financing Impact Team Names?" with Nola Agha and Matt Brown.  Presented at *Western Economics Association International*, July 2012.

"When Can Economic Impact be Positive?  Twelve conditions that explain why smaller sports have bigger impacts" with Nola Agha.  Presented at *Western Economics Association International*, July 2012.

"Reflections on the MLB Collective Bargaining Agreement."  Part of a symposium on the Economics of Labor-Management Relations in Sports Today at *Western Economics Association International*, July 2012.

"The Economics of Competitive Balance on the Field and in the Courts." Presented at the *Santa Clara University Sports Law Symposium*, 2011.

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz.  Presented at *International Association of Venue Managers*, July 2011.

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz.  Presented at *TicketSummit*, July 2011.

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz.  Presented at *Western Economics Association International*, July 2011.

"Financial Risk Management: The Role of a New Stadium in Minimizing the Variation in Franchise Revenues" with Matt Brown, Chad McEvoy, and Mark Nagel.  Presented at *Western Economics Association International*, July 2011.

"A Panel Study of Factors Affecting Attendance at Major League Soccer Contests: 2007-2010" with Tim DeSchriver.  Presented at the *Sport Marketing Association IX* conference in New Orleans, October 2010.

"The NCAA and the Prisoner's Dilemma".  Presented at the *Sports Law Symposium* at the University of Santa Clara Law School, September 2010.

"Financial Risk Management: The Role of a New Stadium in Minimizing the Variation in Franchise Revenues" with Matt Brown, Chad McEvoy, and Mark Nagel.  Presented at *North American Society for Sport Management*, May 2010.

"An Analysis of the Value of Intercollegiate Athletics to its University: Methods".  Presented at the *Scholarly Conference on College Sport*, April 2010.

"Demand, Consumer Surplus, and Pricing Inefficiency in the NFL: A Case Study of the Secondary Ticket Market Using StubHub" with Joris Drayer and Chad McEvoy.  Presented at *North American Society for Sport Management*, May 2009.

"Luxury Suite Pricing in North American Sports Facilities" with Tim DeSchriver.  Presented at *North American Society for Sport Management*, May 2009.

"A Smorgasbord of Lessons Learned from Economic Impact Studies"  Presented at *North American Society for Sport Management*, June 2008.

"Globalization and Sport Finance: What is True and What is Myth?" with Mark Nagel and Ross Booth.  Presented at the *Sport Management Association of Australia and New Zealand*, November 2007.

"Exploring the Myth that a Better Seed in the NCAA Men's Basketball Tournament results in an *ex ante* Higher Payout" with Mark Nagel, Matt Brown, and Chad McEvoy.  Presented at the *Sport Management Association of Australia and New Zealand*, November 2007.

"Oakland A's Baseball Simulator" with Joris Drayer.  Presented at *North American Society for Sport Management*, June 2007.

"Teaching Sport Financial Management: A Symposium" with Timothy DeSchriver, Matthew Brown, and Michael Mondello.  Presented at *North American Society for Sport Management*, June 2007.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, U.C. Berkeley, January 2007.

"Practical Strategies for Variable Ticket Pricing in Professional Sports" with Chad McEvoy, Matt Brown, and Mark Nagel.  Presented at *Sport Marketing Association IV*, November 2006.

"Do the Giants Compete with the A's: The Degree of Competition Between Teams", presented at *Western Economic Association International*, July 2006.

"Do the Giants Compete with the A's: The Degree of Competition Between Teams", presented at *North American Society for Sport Management*, June 2006.

"Measuring Sponsorship Return on Investment: A Need for Quantitative Analysis" with Matt Brown, Mark Nagel, and Chad McEvoy.  Presented at *Sport Marketing Association III*, November 2005.

"The Use of Economic Impact Analysis for Marketing Purposes" with Dick Irwin and Matt Brown.  Presented at *Sport Marketing Association III*, November 2005.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at *Western Economic Association International*, July 2005.

"Public Funds for Private Benefit: Equity Issues in Sport Stadia Funding and the Question of Who Really Pays," with Matt Brown and Mark Nagel.  Presented at *North American Society for Sport Management*, June 2005.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at *North American Society for Sport Management*, June 2005.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Accepted by *Sport Management Association of Australia and New Zealand*, Nov. 2004.

"Redskins: Legal, Financial, and Policy Issues relative to Harjo v. Pro-Football, Inc." with Richard Southall, Matt Brown, and Mark Nagel.  Presented at *North American Society for the Sociology of Sport*, Nov. 2004.

"An Analysis of Distance Traveled and Tourism Economic Impact: A Test of the Alchian-Allen Theorem" with Matt Brown, Mark Nagel, and Chad McEvoy.  Presented at *Sport Marketing Association II* conference, Nov. 2004.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at *Sport Marketing Association II* conference, Nov. 2004.

"Beyond The Economic Impact Study: Examining Economic Impact Data for Support of the Third Law of Demand" with Matthew Brown, Mark Nagel, and Chad McEvoy.  Presented at *North American Society for Sport Management*, 2004.

"Optimal Variable Ticket Pricing in Major League Baseball" with Mark Nagel, Chad McEvoy, and Matthew Brown.  Presented at *North American Society for Sport Management*, 2004.

"*Clarett v. NFL*: Age Eligibility Rules and Antitrust Law in Professional Sports" with Chad McEvoy, Mark Nagel, and Matt Brown.  Presented at *Sport and Recreation Law Association*, 2004.

"Variable Pricing in Baseball: Or, What Economists Would Just Call 'Pricing'," presented at *Western Economic Association International*, 2003.

"The Impact of Stadia on Wealth Maximization in the National Football League: To Build or Renovate?" with Matthew Brown, Mark Nagel, and Chad McEvoy.  Presented at *North American Society for Sport Management*, 2003.

"Major League Baseball's Antitrust Immunity: Examining the Financial Implications of Relocation Rules," with Matthew Brown and Mark Nagel.  Presented at *Society for the Study of the Legal Aspects of Sport and Physical Activity*, 2003.

"Locational Choice in the NBA: An Examination of Potential Cities for Expansion or Relocation," presented at *North American Society for Sport Management*, 2002.

Panel discussant on the effects of the economy on the business of sports at *Sports Facilities and Franchises Forum*, Dallas, TX 2002 (presented by SportsBusiness Journal).

"Psychic Impact Findings in Sports," presented at *Sport Management Association of Australia and New Zealand*, 2001.

"Locational Choice in the NBA: An Examination of Potential Cities for Expansion or Relocation" presented at *Sport Management Association of Australia and New Zealand*, 2001.

"Psychic Impact as a Decision Making Criterion," presented at the *North American Society for Sport Management*, 2000.

"Economic Impact Methods," presented at the *North American Society for Sport Management*, 2000.

"Valuation of Naming Rights," presented at the *Sports Finance Forum*, 2000.

" 'Amateurism' in Big-Time College Sports," presented at the *Western Economic Association International*, 1999.

"Does Bat Day Make Cents?: The Effect of Promotions on the Demand for Baseball," with Mark McDonald.  Presented at the *17th Annual Consumer Psychology Conference*, 1998.

"A Test of the Optimal Positive Production Network Externality in Major League Baseball," presented at the *North American Society for Sport Management Conference*, 1998.

"A Test of the Optimal Positive Production Network Externality in Major League Baseball," presented at the *Western Economic Association International*, 1998.

"The NBA, Exit Discrimination, and Career Earnings," presented at the *Western Economic Association International*, 1997.

"Sports Salary Determination," presented at the *International Atlantic Economic Society Conference*, 1997.

"A Model of a Professional Sports League," presented at the *International Atlantic Economic Society Conference*, 1996.

"Transferability of Case Study Research:  An Example from the Semiconductor Industry," presented at the *American Society of Training and Development Conference*, 1996.

## EDITORIAL/REVIEWER BOARDS OF PEER-REVIEWED JOURNALS

*Frontiers in Sports and Active Living – Sports Management and Marketing,* 2020 – present
*International Journal of Sport Management and Marketing,* 2011 – present
*International Journal of Sports Marketing and Sponsorship,* 2021 – present
*International Journal of Sport Finance,* 2006 – present (founding member)
*Journal of Risk and Financial Management,* 2019 – present
*Journal of Sport Management,* 2003 – present
   Associate Editor, 2010 – 2012
   Co-Editor of Special Issue, 2022
*Journal of Quantitative Analysis in Sports,* 2005 – 2012 (founding member)
*Case Studies in Sport Management,* 2011 – 2019 (founding member)
*Sport Management Review,* 2001 – 2008

## REFEREE FOR PEER-REVIEWED JOURNALS & GRANTING AGENCIES

*American Behavioral Scientist,* 2008
*Applied Economics Letters,* 2018

*Applied Economics,* 2020, 2021

*Axioms,* 2017

*Case Studies in Sport Management*, 2012, 2014a, 2014b, 2015, 2017, 2019

*Communication & Sport*, 2019, 2020

*Contemporary Economic Policy,* 2004, 2021

*Eastern Economic Journal,* 2010

*Economic Inquiry,* 2008, 2010, 2011

*Economics and Business Letters,* 2018

*European Sport Management Quarterly,* 2012, 2020, 2021, 2022

*Frontiers in Sports and Active Living,* 2021a, 2021b, 2022

*Future Internet,* 2019, 2020

*Industrial Relations,* 1993, 2000, 2000, 2001, 2013

*International Journal of Financial Studies,* 2018

*International Journal of Sport Communication,* 2011

*International Journal of Sport Finance,* 2005, 2006a, 2006b, 2006c, 2007a, 2007b, 2008a, 2008b, 2010, 2011, 2012, 2013, 2014a, 2014b, 2014c, 2015, 2017, 2018, 2019, 2022a, 2022b, 2023

*International Journal of Sport Management and Marketing,* 2005, 2010, 2013, 2014, 2017, 2021

*International Journal of Sports Marketing and Sponsorship,* 2016, 2018a, 2018b, 2019, 2021a, 2021b, 2021c, 2021d, 2022, 2023a, 2023b

*International Journal of Sport Policy and Politics,* 2014

*International Review for the Sociology of Sport,* 2012

*Journal for the Study of Sport and Athletes in Education,* 2021a, 2021b

*Journal of Economic Surveys,* 2024

*Journal of Functional Morphology and Kinesiology,* 2018

*Journal of Global Sport Management,* 2018, 2024

*Journal of Industrial Economics,* 1997

*Journal of Intercollegiate Sport,* 2016, 2021, 2022

*Journal of Issues in Intercollegiate Athletics*, 2021

*Journal of Sport Management,* 2001, 2002, 2003a, 2003b, 2004a, 2004b, 2004c, 2004d, 2004e, 2005a, 2005b, 2005c, 2005d, 2006a, 2006b, 2006c, 2006d, 2006e, 2006f, 2006g, 2006h, 2006i, 2007a, 2007b, 2007c, 2007d, 2008a, 2008b, 2008c, 2008d, 2009a, 2009b, 2009c, 2009d, 2009e, 2009f, 2009g, 2010a, 2010b, 2010c, 2010d, 2011a, 2011b, 2013, 2013b, 2014, 2015a, 2015b, 2016a, 2016b, 2016c, 2016d, 2017a, 2017b, 2017c, 2017d, 2018a, 2018b, 2018c, 2018d, 2019a, 2019b, 2019c, 2019d, 2019e, 2020a, 2020b, 2020c, 2020d, 2021, 2023

*Journal of Sports Economics*, 2003, 2007, 2008a, 2008b, 2009, 2010, 2011, 2012a, 2012b, 2014a, 2014b, 2015a, 2015b, 2016, 2018, 2019a, 2019b, 2021, 2022a, 2022b, 2023

*Journal of Venue and Event Management,* 2012

*Journal of the Quantitative Analysis of Sports*, 2005, 2006a, 2006b, 2007

*Mathematical Problems in Engineering,* 2018

*Perceptual and Motor Skills*, 2009

*Review of Economics and Statistics,* 2017

*Review of Industrial Organization*, 2012, 2013, 2015

*SAGE Open,* 2021

*Soccer & Society*, 2014, 2015, 2020

*Southern Economic Journal*, 2001, 2007a, 2007b

*Sport, Business and Management: An International Journal*, 2011, 2012, 2013, 2017, 2018, 2023a, 2023b

*Sport Management Review*, 2002a, 2002b, 2003a, 2003b, 2003c, 2003d, 2004a, 2004b, 2004c, 2006a, 2006b, 2006c, 2007a, 2007b, 2007c, 2010a, 2010b, 2011, 2015, 2016, 2017, 2020
*Sport Marketing Quarterly*, 2015, 2018
*Sustainability,* 2018, 2021a, 2021b

External review of $250,000 grant proposal for the *Social Sciences and Humanities Research Council of Canada*, 2008

## PROFESSIONAL AFFILIATIONS (CURRENT AND PREVIOUS)

American Bar Association
American Economic Association
National Association of Certified Valuation Analysts
North American Society for Sport Management
North American Association of Sports Economists
Sport and Recreation Law Association
Sport Marketing Association
Sports Lawyers Association
Western Economic Association International

## TESTIMONY

Provided expert reports, deposition, and trial testimony in *In Re NFL Sunday Ticket Antitrust Litigation*.  2024.

Provided expert reports and deposition testimony in *Hubbard v. NCAA*.  2024.

Provided expert reports and deposition testimony in *In Re College Athlete NIL Litigation*.  2024.

Provided deposition and trial testimony regarding liability and economic damages in *San Francisco Federal Credit Union v. San Francisco Municipal Transportation Agency*.  2021.

Provided expert reports and deposition testimony regarding class certification and damages in *Shields et al. v. FINA*.  2021.

Provided expert report pertaining to alleged financial harm from lost career earnings related to RICO claims in *Bowen v. adidas*.  2021.

Provided expert report and trial testimony pertaining to financial harm of alleged mismanagement of professional tennis client in *Mirjana Lucic v. IMG Worldwide*.  2021.

"An Economics Perspective on NIL at the Community College Level" presented at a public hearing of the <u>Senate Bill 206 (Skinner-D, 2019) Statutory Community College Athlete Name, Image, and Likeness Working Group</u>, November 10, 2020.

Provided expert report and deposition pertaining to financial harm of alleged misleading advertising in *The People of the State of California v. Hertz et al.*  2019.

Financial and economic analysis and testimony at a hearing of baseball and *AT&T Park* for Assessment Appeals Board (property tax dispute).  2018.

Provided arbitration testimony on damages regarding an NBA agent and agency in *ISE v. Dan Fegan*.  2018.

Provided trial and deposition testimony and multiple expert reports pertaining to class certification, liability, damages, and injunction issues in college sports in the federal lawsuit *In Re: NCAA Athletic GIA Cap Antitrust Litigation*.  2015-18.

Provided expert report pertaining to damages in auto racing case between a driver and his agent in *Sports Management Network v. Kurt Busch*.  2018.

Public testimony on forecast of economic impact of Rocky Mountain Sports Park on Windsor, CO to the Windsor City Council.  2017.

Provided expert report pertaining to the economics of ticketing and personal seat licenses (PSLs) in *RCN Capital v. Los Angeles Rams*.  2017.

Provided trial testimony (and multiple reports and depositions) on financial harm pertaining to *FTC v. DirecTV*.  2017.

Provided declaration pertaining to the economics of ticketing for sports and entertainment in *Glickman et al. v. Live Nation et al*.  2016.

Provided declaration pertaining to the economics of ticketing for sports and entertainment in *Pollard v. AEG Live, et al*.  2016.

Provided declaration pertaining to the economics of ticketing for sports and entertainment in *Finkelman v. NFL*.  2016.

Provided deposition testimony and submitted two expert reports pertaining to class certification issues in college football in *Rock v. NCAA*.  2014-16.

Submitted an expert report on damages pertaining to an endorsement relationship in *Frank Thomas v. Reebok*.  2015.

Provided deposition testimony and submitted an expert report pertaining to the economic relationship between two boxing entities in *Garcia v. Top Rank, Inc.*  2015.

Provided trial testimony (and multiple reports and depositions) on class certification issues, damages, and antitrust economics in regards to group licensing for former and current college football and basketball players in *O'Bannon et al. v. NCAA*.  2013-14.

Submitted three expert reports regarding lost earnings for a Major League Baseball player in *Backe et al. v. Fertitta Hospitality, LLC et al*.  2013.

Submitted two expert reports on class certification issues in regards to ticket holder lawsuit in *Phillips et al. v. Comcast Spectacor et al*.  2013.

Submitted expert report in a federal case involving defamation of character in the boxing industry (*Pacquiao v. Mayweather Jr. et al.*).  2012.

Provided deposition testimony and prepared expert report regarding an alleged sponsorship breach of contract in motorsports (*Vici Racing, LLC v. T-Mobile USA, Inc.*).  2012.

Prepared expert witness testimony on trade secrets case involving the sports consulting industry (*Sport Management Research Institute v. Keehn*).  2011.

Provided deposition testimony on the value of a minor league baseball team and related damages from an alleged breach of a facility lease permit (*Long Beach Armada v. City of Long Beach*).  2011.

Provided deposition testimony on the value of athlete endorsements in a breach of contract case involving an NBA player and a charter school business in an arbitration proceeding (*D Wade's Place v. Dwyane Wade*).  2010.

Provided deposition testimony on the value of athlete endorsements in a breach of contract case involving an NBA player and a restaurant investment in a state court proceeding (*Rodberg v. Dwyane Wade*).  2010.

Submitted two reports and provided deposition and arbitration testimony regarding damages related to how media coverage has impacted an NFL team's brand (*Kiffin v. Raiders*).  2009.

Submitted expert report, rebuttal report, gave deposition and trial testimony in federal court (*Adderley et al. v NFLPA & NFLPI*).  2008.

Public testimony on economic impact of a Major League Soccer stadium in San Jose to the San Jose City Council.  2008.

Public testimony on economic impact of six sports and cultural events in San Jose to the San Jose City Council.  2007.

Submitted expert report, rebuttal report, and testified at arbitration hearing on the financial valuation of Major League Soccer (*Rothenberg v. Major League Soccer, LLC*).  2006.

Named expert witness for a Major League Baseball club to analyze a punitive damages claim from an injury at a baseball game (*Bueno v. Rangers*).  2006.

Prepared expert testimony on liability and damages related to the operations of a minor baseball league on behalf of the league's owner (*Don Altman et al., v. Jeffrey Mallet, et al.*).  Case was settled prior to deposition.  2004.

Public testimony on economic impact of an existing and new professional football stadium in Irving, TX to the Irving City Council (two council meetings).  2004.

Testimony on college athletics regarding Senate Bill 193 to the California State Senate Subcommittee on Entertainment.  2003.

Public testimony on economic impact of a downtown entertainment district in Sacramento to the Sacramento City Council (two council meetings).  2003.

Determination of IP valuation and damages from a clothing endorsement alleged breach of contract for PGA Tour player (*Stankowski v. Bugle Boy*).  Submitted expert report.  Case was settled prior to deposition.  2000.

Deposition testimony in breach of contract matter concerning sponsorship damages analysis in the auto racing industry (*Parente v. Della Penna Racing*).  2000.

Public testimony on forecast of economic impact of Pan Am Games on San Antonio to the San Antonio City Council.  1999.

                                                            Updated July 2024

# Appendix B

# Appendix B

## Documents Relied Upon

*All documents relied upon in Errata for the Rascher Merits Reply Report, April 10, 2024; Expert Reply Report of Daniel A. Rascher, Feb. 23, 2024; Expert PCJ Rebuttal Report of Daniel A. Rascher, Jan. 26, 2024; Expert Report of Daniel A. Rascher, Dec. 1, 2023; Expert Reply Report of Daniel A. Rascher, July 21, 2023; Expert Report of Daniel A Rascher, Oct. 21, 2022.*


### Manuals and Collective Bargaining Agreements

Collective Bargaining Agreement Between Major League Soccer and Major League Soccer Players Union, February 1, 2015.

Collective Bargaining Agreement Between National Hockey League and National Hockey League Players Association, September 16, 2012.

Highlights of the 2011 Collective Bargaining Agreement Between the National Basketball Association (NBA) and the National Basketball Players Association (NBPA), September 2014.

MLB and MLBPA Basic Agreement, December 1, 2016.

NCAA 2024 Agreed-Upon Procedures.

NCAA Division I Manual 2023-24, 13.12.1.1.

NCAA Division I Manual 2021-22.

NFL Collective Bargaining Agreement, August 4, 2011.

Women's National Basketball Association Collective Bargaining Agreement, March 5, 2014.


### Expert Reports and Exhibits

Errata for the Rascher Merits Reply Report, April 10, 2024, including backup materials.

Expert Reply Report of Daniel A. Rascher, Feb. 23, 2024, including backup materials (merits).

Expert PCJ Rebuttal Report of Daniel A. Rascher, Jan. 26, 2024, including backup materials.

Expert Report of Daniel A. Rascher, Dec. 1, 2023, including backup materials (merits).

Expert Reply Report of Daniel A. Rascher, July 21, 2023, including backup materials.

Expert Report of Daniel A Rascher, Oct. 21, 2022, including backup materials.

Expert Report of Edwin S. Desser, Oct.21 2022, including backup materials.

Declaration of Daniel A. Rascher on Economic Value of Ordered Injunctive Relief, March 26, 2018 (*Alston*).


### Literature, Articles and Publications

1

Berri, David J. and Anthony Krautmann (2019). "How Much Did Baseball's Antitrust Exemption Cost Bob Gibson?' The Antitrust Bulletin. p. 1-18.

Berri, D.J. (2016) "Paying NCAA Athletes." Marquette Sports Law Review, 26(2): 479-491.

Berri, D.J. (2018) *Sports Economics*, Worth Publishers/ Macmillan Learning.

Garthwaite, C., Keener, J., Notowidigdo, M. J., & Ozminkowski, N. F. (2020). Who Profits From Amateurism? Rent-Sharing in Modern College Sports (No. w27734). National Bureau of Economic Research. https://www.nber.org/papers/w27734.

McFall, T. and Tatich, K. (2022). Federal Baseball Turns 100: The Long Legal Game of Athletes Gaining Economic Rights in the United States. Wake Forest Journal of Business & Intellectual Property Law (Spring), v22, n3. pp. 314-370.

NCAA Sports Sponsorship and Participation Rates Report (1956-57 through 2021-2022).

Rubinfeld, D. L. (2009). Antitrust Damages. In Elhauge (Ed.) Research Handbook on the Economics of Antitrust Law, Edward Edgar Publishing.

**Third Party Sources**

https://hoopshype.com/salaries/players/2022-2023/

https://ncaaorg.s3.amazonaws.com/ncaa/finance/d1/2023D1Fin_RevenueDistributionPlan.pdf

https://ncaaorg.s3.amazonaws.com/ncaa/finance/d1/2024D1Fin_RevenueDistributionPlan.pdf

https://ncaaorg.s3.amazonaws.com/research/Finances/2023RES_DI-RevExpReport_FINAL.pdf

https://recruitlook.com/can-a-college-camp-help-with-your-college-recruiting/

https://theacc.com/news/2024/7/1/general-acc-officially-welcomes-cal-smu-and-stanford-to-the-league.aspx

https://www.dallascowboys.com/youth-camps/

https://www.sportingnews.com/us/wnba/news/wnba-highest-paid-average-salary-rookie-deals-2024/def661966f0f9625d5427326

https://www.spotrac.com/nfl/cba/minimum

https://www.spotrac.com/nfl/rankings/player/_/year/2023/sort/cap_total

https://www.spotrac.com/wnba/cba/minimum

https://www.statista.com/statistics/1009569/minimum-nba-salary/