# EXHIBIT A

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Tamenang Choh and Grace Kirk, individually and on behalf of all others similarly situated

**(b)** County of Residence of First Listed Plaintiff   Middlesex, MA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See attached

## DEFENDANTS

Brown University et al. (See attached)

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [ ] 2  U.S. Government Defendant
- [x] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance<br>[ ] 120 Marine<br>[ ] 130 Miller Act<br>[ ] 140 Negotiable Instrument<br>[ ] 150 Recovery of Overpayment & Enforcement of Judgment<br>[ ] 151 Medicare Act<br>[ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>[ ] 153 Recovery of Overpayment of Veteran's Benefits<br>[ ] 160 Stockholders' Suits<br>[ ] 190 Other Contract<br>[ ] 195 Contract Product Liability<br>[ ] 196 Franchise | **PERSONAL INJURY**<br>[ ] 310 Airplane<br>[ ] 315 Airplane Product Liability<br>[ ] 320 Assault, Libel & Slander<br>[ ] 330 Federal Employers' Liability<br>[ ] 340 Marine<br>[ ] 345 Marine Product Liability<br>[ ] 350 Motor Vehicle<br>[ ] 355 Motor Vehicle Product Liability<br>[ ] 360 Other Personal Injury<br>[ ] 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>[ ] 365 Personal Injury - Product Liability<br>[ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>[ ] 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>[ ] 370 Other Fraud<br>[ ] 371 Truth in Lending<br>[ ] 380 Other Personal Property Damage<br>[ ] 385 Property Damage Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881<br>[ ] 690 Other | [ ] 422 Appeal 28 USC 158<br>[ ] 423 Withdrawal 28 USC 157<br><br>**INTELLECTUAL PROPERTY RIGHTS**<br>[ ] 820 Copyrights<br>[ ] 830 Patent<br>[ ] 835 Patent - Abbreviated New Drug Application<br>[ ] 840 Trademark<br>[ ] 880 Defend Trade Secrets Act of 2016 | [ ] 375 False Claims Act<br>[ ] 376 Qui Tam (31 USC 3729(a))<br>[ ] 400 State Reapportionment<br>[x] 410 Antitrust<br>[ ] 430 Banks and Banking<br>[ ] 450 Commerce<br>[ ] 460 Deportation<br>[ ] 470 Racketeer Influenced and Corrupt Organizations<br>[ ] 480 Consumer Credit (15 USC 1681 or 1692)<br>[ ] 485 Telephone Consumer Protection Act<br>[ ] 490 Cable/Sat TV<br>[ ] 850 Securities/Commodities/ Exchange<br>[ ] 890 Other Statutory Actions<br>[ ] 891 Agricultural Acts<br>[ ] 893 Environmental Matters<br>[ ] 895 Freedom of Information Act<br>[ ] 896 Arbitration<br>[ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>[ ] 950 Constitutionality of State Statutes |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | |
| [ ] 210 Land Condemnation<br>[ ] 220 Foreclosure<br>[ ] 230 Rent Lease & Ejectment<br>[ ] 240 Torts to Land<br>[ ] 245 Tort Product Liability<br>[ ] 290 All Other Real Property | [ ] 440 Other Civil Rights<br>[ ] 441 Voting<br>[ ] 442 Employment<br>[ ] 443 Housing/ Accommodations<br>[ ] 445 Amer. w/Disabilities - Employment<br>[ ] 446 Amer. w/Disabilities - Other<br>[ ] 448 Education | **Habeas Corpus:**<br>[ ] 463 Alien Detainee<br>[ ] 510 Motions to Vacate Sentence<br>[ ] 530 General<br>[ ] 535 Death Penalty<br>**Other:**<br>[ ] 540 Mandamus & Other<br>[ ] 550 Civil Rights<br>[ ] 555 Prison Condition<br>[ ] 560 Civil Detainee - Conditions of Confinement | [ ] 710 Fair Labor Standards Act<br>[ ] 720 Labor/Management Relations<br>[ ] 740 Railway Labor Act<br>[ ] 751 Family and Medical Leave Act<br>[ ] 790 Other Labor Litigation<br>[ ] 791 Employee Retirement Income Security Act<br><br>**IMMIGRATION**<br>[ ] 462 Naturalization Application<br>[ ] 465 Other Immigration Actions | |
| | | | **SOCIAL SECURITY**<br>[ ] 861 HIA (1395ff)<br>[ ] 862 Black Lung (923)<br>[ ] 863 DIWC/DIWW (405(g))<br>[ ] 864 SSID Title XVI<br>[ ] 865 RSI (405(g))<br><br>**FEDERAL TAX SUITS**<br>[ ] 870 Taxes (U.S. Plaintiff or Defendant)<br>[ ] 871 IRS—Third Party 26 USC 7609 | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. § 1

Brief description of cause:
Section 1 of the Sherman Act

## VII. REQUESTED IN COMPLAINT:

[x] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes  [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE   Mar 7, 2023

SIGNATURE OF ATTORNEY OF RECORD   /s/ Stephen M. Kindseth

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## Attachment to Civil Cover Sheet

**I(a): Defendants**

Brown University, The Trustees of Columbia University in the City of New York, Cornell University, Trustees of Dartmouth College, Harvard University, The Trustees of the University of Pennsylvania, Princeton University, Yale University, and the Council of Ivy League Presidents

**I(c): Attorneys for Plaintiffs**

Stephen M. Kindseth (ct14640)
James M. Moriarty (ct21876)
John L. Cesaroni (ct29309)
ZEISLER & ZEISLER, P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06605
Tel. 203-368-4234
Fax. 203-368-5485
skindseth@zeislaw.com
jmoriarty@zeislaw.com
jcesaroni@zeislaw.com

Eric L. Cramer*
Patrick F. Madden*
Alan K. Cotler*
Najah Jacobs*
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Phone: (215) 875-3000
ecramer@bm.net
pmadden@bm.net
alancotler@gmail.com
njacobs@bm.net

Robert E. Litan*
Dan Walker*
Hope Brinn*
BERGER MONTAGUE PC
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Phone: (202) 559-9745
rlitan@bm.net
dwalker@bm.net
hbrinn@bm.net

Velvel (Devin) Freedman*
Edward Normand*
Stephen Lagos*
FREEDMAN NORMAND
FRIEDLAND LLP
90 Park Avenue
Suite 1910
New York, N.Y. 10016
Phone: 646-970-7513
vfreedman@fnf.law
tnormand@fnf.law
slagos@fnf.law

*Applications for admission *pro hac vice* forthcoming

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

TAMENANG CHOH and GRACE KIRK, in-
dividually and on behalf of all others similarly
situated,

        Plaintiffs,

v.

BROWN UNIVERSITY, THE TRUSTEES
OF COLUMBIA UNIVERSITY IN THE
CITY OF NEW YORK, CORNELL UNI-
VERSITY, TRUSTEES OF DARTMOUTH
COLLEGE, HARVARD UNIVERSITY,
THE TRUSTEES OF THE UNIVERSITY
OF PENNSYLVANIA, PRINCETON UNI-
VERSITY, YALE UNIVERSITY, and THE
IVY LEAGUE COUNCIL OF PRESI-
DENTS,

        Defendants.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................ 1

II.     JURISDICTION AND VENUE ..................................................................... 7

III.    THE PARTIES ................................................................................................ 8

        A.    Plaintiffs ............................................................................................. 8

        B.    Defendants .......................................................................................... 9

IV.     FACTUAL AND LEGAL BACKGROUND ............................................... 15

        A.    Defendants Engage in Interstate Commerce ...................................... 15

        B.    Collegiate Athletics in the NCAA's Division I Are Big Business ...... 16

        C.    The University Defendants Constitute the Ivy League Athletic Conference ....... 18

        D.    Consistent with Its Strong Marketing, the Ivy League Is Unique and Has
              Substantial Brand Value ..................................................................... 19

        E.    Under the Antitrust Laws, Colleges and Universities Must Compete to
              Attract and Compensate Collegiate Athletes ..................................... 22

        F.    As the Defendants Recognize, They Cannot Prohibit Compensation That
              Third Parties Provide to the Schools' Division I Athletes .................. 26

V.      THE IVY LEAGUE AGREEMENT IS *PER SE* ILLEGAL ...................... 27

        A.    In Agreeing Through the Ivy League Agreement Not to Award Athletic
              Scholarships, Defendants Have Restricted Price Competition ........... 27

        B.    In Preventing Through the Ivy League Agreement
              Compensation/Reimbursement for Athletic Services, Defendants Have
              Restricted Price Competition .............................................................. 29

        C.    The Ivy League Agreement Is *Per Se* Illegal ..................................... 29

              1.    Defendants' Athletic Operations Are Commercial Enterprises ................. 31

              2.    Defendants Are Not Purely or Even Predominantly Altruistic .................. 34

              3.    The University Defendants Seek to Maximize Revenue in Pursuit of
                    Maintaining or Enhancing Their Prestige and Influence ....................... 37

              4.    The Law Has Changed Since the University Defendants Last Faced an
                    Antitrust Challenge to Their Collusion on Financial Aid ...................... 41

D.    The Ivy League Agreement Has Consistently Caused Direct
Anticompetitive Effects, to the Harm of the Class Members ............................ 43

VI.    IN THE ALTERNATIVE, THE IVY LEAGUE AGREEMENT IS ILLEGAL
UNDER THE RULE OF REASON MODE OF ANALYSIS ..................................... **44**

A.    There Are Two Relevant Product Markets .......................................... 45

1.    The AAHA Educational Services Market..................................... 45

2.    The AAHA Athletic Services Market.......................................... 47

B.    The Geographic Market Is the United States ..................................... 48

C.    The University Defendants Have Market Power ................................... 49

D.    There Are No Procompetitive Justifications for the Ivy League Agreement ....... 50

VII.    THE IVY LEAGUE AGREEMENT HAS NOT BEEN AND IS NOT EXEMPT
FROM THE ANTITRUST LAWS........................................................................ **52**

A.    While it was in Place, the 568 Antitrust Exemption Did Not Apply to
Defendants' Agreement Not to Award Athletic Scholarships............................ 53

B.    The 568 Antitrust Exemption Did Not Apply to Defendants' Agreement
Not to Compensate Ivy Athletes for Their Athletic Services ............................ 53

VIII.    CLASS ACTION ALLEGATIONS ..................................................................... **54**

IX.    CAUSE OF ACTION ......................................................................................... **55**

X.    REQUESTED RELIEF ....................................................................................... **56**

Plaintiffs Tamenang Choh and Grace Kirk, individually and on behalf of all others similarly situated, bring this proposed class action against Brown University ("Brown"), The Trustees of Columbia University in the City of New York ("Columbia"), Cornell University ("Cornell"), Trustees of Dartmouth College ("Dartmouth"), Harvard University ("Harvard"), The Trustees of the University of Pennsylvania ("Penn"), Princeton University ("Princeton"), Yale University ("Yale") (collectively, the "University Defendants"), and The Ivy League Council of Presidents (the "Council") (with the University Defendants, "Defendants" or the "Ivy League").

## I.    INTRODUCTION

1.    This action arises out of Defendants' ongoing price-fixing agreement (the "Ivy League Agreement"), in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, not to provide athletic scholarships to their Division I athletes ("Ivy League Athletes") and not to pay Ivy League Athletes any compensation (or reimbursement of education-related expenses) for the athletic services they provide to the University Defendants.[1]

2.    Plaintiffs bring suit on behalf of a proposed Class of all Ivy League Athletes recruited to play a sport by one or more University Defendants, and who, within the period of March

---

[1] The NCAA has three athletic Divisions. Division I contains approximately 350 colleges and universities and reflects the highest level of athletic competition among the three Divisions. According to the NCAA:

> Division I schools provide unmatched academic and athletic opportunities and support. This support includes full scholarships, cost-of-attendance stipends, degree completion programs and academic revenue distribution from the NCAA for schools that meet certain criteria. . . . Division I is unique in that it's subdivided based on football sponsorship. Schools in the Football Bowl Subdivision can compete in bowl games. This includes the College Football Playoff, which is managed by the 10 FBS conferences and Notre Dame outside the NCAA governance structure. Those that participate in the NCAA-run football championship belong to the Football Championship Subdivision. A third Division I group doesn't sponsor football at all. The subdivisions apply only to football; all other sports are considered simply Division I and compete in NCAA-run championships.

*Our Division I Story*, https://www.ncaa.org/sports/2021/2/16/our-division-i-story.aspx.

7, 2019, to the date the conduct challenged as illegal in this Complaint ceases (the "Class Period"), attended one of the University's undergraduate programs while playing a sport for that school.

3.      Plaintiff Choh played for Brown's men's basketball team from 2017 to 2022, and Plaintiff Kirk has played for Brown's women's basketball team since 2020. They each were recruited to play a sport by at least one of the University Defendants and received full cost-of-attendance athletic scholarship offers from at least one other Division I college. As a result of the Ivy League Agreement, however, Brown awarded Plaintiffs only need-based financial aid that did not cover either of their full costs of attendance—tuition, room, board, and incidental expenses—and paid them no other compensation or reimbursement for their athletic services to the school.

4.      Defendants' price-fixing agreement is *per se* illegal. It is a naked restraint of trade among horizontal competitors. The Ivy League Agreement has direct anticompetitive effects, raising the net price of education that Ivy League Athletes pay and suppressing compensation for the athletic services they provide to the University Defendants. Absent the Ivy League Agreement, these schools would determine unilaterally, and in competition with each other, how many athletic scholarships to provide, by sport, and in what amounts, and how much to compensate (either directly or through reimbursement of tuition, room, and board, or both) for athletic services.

5.      The Ivy League Agreement is governed by the antitrust laws. The University Defendants operate as commercial enterprises, with each employing over 100 individuals in its athletic department or in positions relating to inter-collegiate athletic competition. The Council, the governing body of the Ivy League, coordinates the common rules, procedures, and initiatives among the University Defendants, including by setting the rules they must follow as part of the Ivy League athletic conference. The Council thus creates and enforces the rules the University Defendants agree to follow under the Ivy League Agreement.

6.      Defendants cannot reasonably claim to act with purely altruistic motives. Instead, seeking to maximize revenue (and prestige), the University Defendants monetize the athletic services that Ivy League Athletes provide, by participating in, and earning revenue from, intercollegiate athletic competitions, including ticket sales, television rights, merchandise sales, and increased donations from alumni. The Council negotiates and seeks to maximize revenue from broadcast rights for athletic competitions between teams from the University Defendants and distributes the revenues to the schools. The University Defendants also work assiduously to increase their multi-billion-dollar endowments, which have grown astronomically over the past three decades and which collectively exceed $170 billion.

7.      The Ivy League Agreement is illegal, moreover, even if the "Rule of Reason" mode of antitrust analysis were to apply. The misconduct at issue occurs in two related markets: (1) the market for educational services for athletically and academically high-achieving ("AAHA") students who seek to graduate from college and play Division 1 sports in the National Collegiate Athletic Association ("NCAA"), and (2) the market for the athletic services of the AAHA students who seek to play for the University Defendants.

8.      Under the Ivy League Agreement, out of the over 350 colleges and universities whose students participate in Division 1 athletics, only the University Defendants refuse to provide any athletic scholarships or other compensation/reimbursement for athletic services. The Agreement reflects that, as the University Defendants have themselves long understood, they compete in a distinct market for educational services provided to AAHA students and a distinct market for their athletic services. The University Defendants compete in multiple ways against each other for AAHA students and their athletic services, but they have agreed *to limit* the scholarship amounts

they provide to these students and the price they pay for athletic services—to the obvious harm of Ivy League Athletes.

9. The University Defendants aggressively compete with each other—without any agreed upon limits—on wages and compensation paid to faculty, administrative staff, development officers, professors, teaching assistants, financial advisors, marketing professionals, business managers, lobbyists, public-relations professionals, facilities managers and other facilities workers, healthcare professionals and other healthcare workers, investment professionals, fraternity officials, maintenance workers, career advisors, alumni relations personnel, housing officials, admissions directors and personnel, trustees, and other university professionals, including their respective highly compensated university presidents. The University Defendants also aggressively compete—without any agreed upon limits—on wages and compensation paid to sports coaches, trainers, analysts, psychologists, and staff.

10. The Ivy League Agreement, however, unlawfully limits competition on price to attract and retain Ivy League Athletes. It has no procompetitive justifications.

11. The Ivy League Agreement is not necessary, for example, for the University Defendants to preserve the unique nature of Ivy League athletics, where academic excellence is paramount. Other academically selective universities—such as Stanford University, Duke University, the University of Notre Dame, and Rice University—award athletic scholarships and compensate/reimburse their athletes up to the limits the Supreme Court and the NCAA have allowed. These schools are not part of the Ivy League, but they demonstrate they can maintain stellar academic standards while competing for excellent athletes, and without agreed upon limits on price.

12. In *NCAA v. Alston*, 141 S. Ct. 2141 (2021), the Supreme Court struck down NCAA limits on athletic scholarships for Division I football and basketball athletes for education-related

benefits as a violation of Section 1 of the Sherman Act. As Justice Kavanaugh stated in his concurring opinion in *Alston*: "Nowhere else in America can businesses get away with agreeing not to pay their workers a fair market rate on the theory that their product is defined by not paying their workers a fair market rate." Yet that is precisely what the University Defendants have done through the Ivy League Agreement. The University Defendants can assure the academic quality of their institutions through the less restrictive alternative of agreement on minimum academic admissions standards.

13.     Similarly, the Ivy League Agreement is not necessary to maintain competitive balance in the sports in which the University Defendants are active, and which in any event has not existed for decades. To the contrary, if all University Defendants could choose to provide athletic scholarships and compensate their athletes up to the permissible limits, competitive balance in Ivy League sports would not be harmed, as demonstrated across the rest of Division I, where competitive balance exists alongside athletic scholarships.

14.     The restrictions on price competition that lie at the heart of this case are analogous to other restrictions on collegiate athletes' compensation that the Supreme Court unanimously struck down in *Alston.* Several years earlier, *O'Bannon v. NCAA*, 802 F.3d 1049 (9th Cir. 2015), similarly held that the NCAA's restrictions prohibiting collegiate athletes from licensing their names, images, and likenesses ("NIL rights") violated Section 1 of the Sherman Act.

15.     On June 30, 2021, in the wake of *Alston*, the NCAA formally acknowledged that all "incoming and current" collegiate athletes, in all NCAA Divisions, are free to license NIL rights.[2] The money that collegiate athletes earn from their NIL rights, albeit from third parties, is

---

[2] Michelle Brutlag Hosick, *NCAA adopts interim name, image and likeness policy*, https://www.ncaa.org/news/2021/6/30/ncaa-adopts-interim-name-image-and-likeness-policy.aspx.

a further recognition of their athletic prowess, their contributions, and their value—and Defendants have adopted the NCAA's NIL policy. Defendants have thus recognized that Ivy League Athletes provide valuable athletic services to the institutions they attend and for which these athletes compete. Defendants have thereby conceded, through their NIL policies, the right of these athletes to benefit from market competition. Yet the Ivy League Agreement limits such competition.

16. The Ivy League Agreement has caused and is causing substantial antitrust injury to Plaintiffs and the other members of the proposed Class. The University Defendants are among the most expensive undergraduate institutions in the country, with "sticker" prices for tuition, room, board, and incidental expenses—the full cost of attendance—exceeding $80,000 annually. The need-based financial aid that the University Defendants tout does not even cover the full cost of attendance for those who qualify, often amounting to a shortfall of thousands of dollars each year. As a result, even with the opportunity to obtain need-based financial aid, recruited athletes frequently need to pay (or borrow) many thousands of dollars a year, which is especially onerous for athletes from lower-income families. The Ivy League Agreement, in short, has stymied competition that would have lowered and would lower the net cost of attendance for the Class Members.

17. These injuries are particularly unfair given what is required of Ivy League Athletes and how their services benefit their schools and the Ivy League brand. Ivy League Athletes devote substantial time—at least 20 hours per week during their official sports seasons, the purported maximum allowed under NCAA rules, and comparable amounts off-season—in formal practices, athletic conditioning, film sessions, injury treatment, team meetings, and travel to and participation in formal competitions. These collegiate athletes do all this work and compete in the NCAA's highest athletically competitive Division while also preparing for and attending classes and completing homework assignments at among the most academically rigorous institutions of higher

education in the country. Without these students meeting both their academic and athletic commitments, the University Defendants would not have their athletic accomplishments—and by implication, the schools' accomplishments—to market to prospective students, alumni, and the world.

18. Plaintiffs are well-positioned and highly motivated to seek relief for themselves and the other Class Members, and Defendants' misconduct has not harmed any other group of individuals more directly than Plaintiffs and the other Class Members. Defendants are jointly and severally liable for their violation of Section 1 of the Sherman Act. On behalf of the proposed Class, Plaintiffs bring this action for damages and a permanent injunction seeking to undo the Ivy League Agreement and its anticompetitive effects and/or any equivalent contract, combination, or conspiracy amongst the Defendants.

## II.   JURISDICTION AND VENUE

19. Plaintiffs' claim arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, giving the Court subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337, and under 28 U.S.C. § 1332(d) because many of the Class Members are from different states than the Defendants and the total amount in controversy exceeds $5 million.

20. This Court has personal jurisdiction over each University Defendant on multiple bases, including that each has: (1) transacted business in the United States and in this District, including by recruiting and advertising for students residing in this District; (2) transacted business with Class Members throughout the United States, including Class Members residing in this District; (3) committed substantial acts in furtherance of an unlawful scheme in the United States in violation of the federal antitrust laws, including in this District; and/or (4) recruited, accepted, enrolled, and charged artificially high net prices of attendance to, and thus injured, individuals residing within this District. In addition, all Defendants have arranged for the University Defendants' athletic teams to compete in athletic competitions in this District featuring the athletic

services of Ivy League Athletes. One of the Defendants (Yale University) resides in this District and meetings related to the alleged conspiracy occurred in this District.

21.    Venue is proper in this District under 15 U.S.C. §§ 15, 22, and 26 and 28 U.S.C. § 1391(b), (c), and (d) because each Defendant transacted business, was found, had agents, and/or resided in this District; a substantial part of the events giving rise to the claim at issue arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District. One of the Defendants (Yale University) resides in the District and meetings related to the alleged conspiracy occurred in this District.

22.    Defendants' conduct has had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States and in this District. Defendants' conduct affects admitted students throughout the United States, including through transactions with parties residing in different states. Defendants do business across state lines.

## III.    THE PARTIES

### A.    Plaintiffs

23.    Plaintiff Tamenang Choh, a resident of Lowell, Massachusetts, attended Brown University from September 2017 until May 2022, when he graduated. After his standout high school basketball years at the Brooks School in North Andover, Massachusetts, Choh was recruited to play basketball by multiple Division I colleges and received a full athletic scholarship from at least three of them. Brown recruited, accepted, and enrolled Choh, providing him need-based financial aid, which did not cover the full cost of his tuition, room, and board, and incidental expenses. During his years playing basketball at Brown, Choh advanced from being a role player into one of the top starters on the team during his last three years. But for the Ivy League Agreement, Brown would have awarded Choh a full athletic scholarship and compensated/reimbursed

him for the athletic services he provided to Brown. Choh is now playing professional basketball in Europe.

24.     Plaintiff Grace Kirk, a resident of Duluth, Minnesota, is attending Brown. She is a junior. Kirk was recruited to play women's basketball by multiple Division I colleges and was offered a full athletic scholarship from one of them. Brown recruited, accepted, and enrolled Kirk, providing her need-based financial aid, which did not cover the full cost of her tuition, room, and board, and incidental expenses. But for the Ivy League Agreement, Brown would have awarded Kirk a full athletic scholarship and would be compensating/reimbursing her for the athletic services she provides to Brown.

**B.     Defendants**

25.     The University Defendants are institutions of higher education that have belonged to the Ivy League athletic conference since its formation in 1954.

26.     The Ivy League Council of Presidents (also known as the Council of Ivy Group Presidents) is the body that effectuates and enforces the Ivy League Agreement on behalf of the University Defendants.

27.     Under the Ivy League Agreement, each Defendant acted as the agent of the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

28.     Plaintiffs set out below more specific information about each of the Defendants, concerning their operations as commercial enterprises and their financial resources.[3]

---

[3] All annual financial and employment data for Defendants, except Harvard's financial data, are drawn from each institution's Form 990 filed with the Internal Revenue Service. Harvard's financial data are from its Fiscal Year 2021 annual report. Endowment data are reported in Appendix A.

**Brown**

29.     Brown University is a private, non-profit institution with its principal place of business in Providence, Rhode Island.

30.     Brown was established by a charter, approved by the Rhode Island legislature, as the "College of Rhode Island" in 1764. The school's name was changed to Brown in 1804.

31.     Brown employs approximately 12,500 people.

32.     For fiscal year 2020, Brown had revenues of $1.48 billion and functional expenses of $1.20 billion, realizing a net operating profit of approximately $290 million.

33.     Brown had an endowment of $575 million in 1993, which had grown to $6.9 billion as of 2021.

34.     Approximately 950 Brown students compete in 36 NCAA sports.

**Columbia**

35.     Trustees of Columbia University in the City of New York is a private, non-profit institution with its principal place of business in New York, New York.

36.     Columbia was established as King's College by royal charter of King George II of Great Britain in 1754. It was renamed Columbia College in 1784. In 1896, the campus was moved to its current main location in Morningside Heights and renamed Columbia University.

37.     Columbia employs approximately 38,000 people.

38.     For fiscal year 2020, Columbia had revenues of $5.94 billion and functional expenses of $5.53 billion, realizing a net operating profit of $410 million. In the same year, Columbia earned $30 million in royalty income from the university's patent rights.

39.     Columbia had an endowment of $2 billion in 1993, which had grown to $14.3 billion as of 2021.

40.     Approximately 900 Columbia students compete in 33 NCAA sports.

**Cornell**

41.     Cornell University is organized as a private, non-profit institution with its principal place of business in Ithaca, New York.

42.     Cornell was founded in 1865, as a private, land-grant institution of New York.

43.     Cornell employs approximately 43,000 people.

46.     For fiscal year 2020, Cornell had revenues of $5.13 billion and functional expenses of $5.18 billion, with a net operating loss of approximately $50 million. In the same year, Cornell earned $31 million in royalties from the university's patent rights.

44.     Cornell had an endowment of $884 million in 1993, which had grown to approximately $10 billion as of 2021.

45.     Approximately 1,100 Cornell students compete in 39 NCAA sports.

**Dartmouth**

46.     Trustees of Dartmouth College is a private, non-profit institution with its principal place of business in Hanover, New Hampshire.

47.     Dartmouth employs approximately 10,800 people.

48.     For fiscal year 2020, Dartmouth had revenues of $1.58 billion and functional expenses of $1.09 billion, realizing a net operating profit of approximately $490 million.

49.     Dartmouth had an endowment of $824 million in 1993, which had grown to $8.5 billion as of 2021.

50.     Approximately 900 Dartmouth students participate in 39 NCAA sports.

**Harvard**

51.     Harvard University is a private, non-profit institution with its principal place of business in Cambridge, Massachusetts.

52.     Harvard is the nation's oldest university, founded in 1636.

53.     Harvard employs approximately 38,000 people.

54.     For fiscal year 2021, Harvard had revenues of $5.25 billion and functional expenses of $4.97 billion, realizing a net operating profit of $280 million. In the same year, Harvard earned $107 million from its patent rights.

55.     Harvard's endowment has invested more than $2.5 billion in real estate in the United States and elsewhere around the world.[4] Harvard's 250-acre development in Allston, Massachusetts, was described in 2018 as possibly "the largest university-led urban development project in the country."[5]

56.     Harvard's endowment is the largest of any university in the United States, having grown from $5.8 billion in 1993 to over $53 billion as of 2021.

57.     Approximately 1,100 Harvard students compete in 41 NCAA sports.

**Penn**

58.     The Trustees of the University of Pennsylvania is a private, non-profit institution with its principal place of business in Philadelphia, Pennsylvania.

59.     Penn was founded in 1740 by Benjamin Franklin.

60.     Penn employs approximately 55,500 people.

---

[4] Calculated from financial information in HARVARD FINANCIAL REPORT FISCAL YEAR 2020-2021, at 9 (Oct. 2021), available at: https://finance.harvard.edu/files/fad/files/fy21_harvard_financial_report.pdf. All other data in this section for Harvard come from this report.

[5] Henry Grabar, *City Planning 101: Why universities became big-time real estate developers*, SLATE, https://slate.com/business/2018/05/universities-like-harvard-and-yale-are-real-estate-titans-too.html.

61.     For fiscal year 2020, Penn had revenues of $7.62 billion and functional expenses of $7.21 billion, realizing a net operating profit of approximately $410 million. In the same year, Penn earned $70 million from its patent rights.

62.     Penn had an endowment of $1.1 billion in 1993, which had grown to $20.5 billion as of 2021.

63.     Approximately 900 Penn students compete in 34 NCAA sports.

### Princeton

64.     Trustees of Princeton University is a private, non-profit institution with its principal place of business in Princeton, New Jersey.

65.     Princeton was originally organized, in 1746, as the College of New Jersey.

66.     Princeton employs approximately 15,700 people.

67.     For fiscal year 2020, Princeton had revenues of $2.12 billion and functional expenses of $2.14 billion, essentially breaking even.

68.     Princeton had an endowment of 2.5 billion in 1993, which had grown to approximately $38 billion as of 2021.

69.     Approximately 1,000 Princeton students compete in 39 NCAA sports.

### Yale

70.     Yale University is a private, non-profit institution with its principal place of business in New Haven, Connecticut.

71.     Yale was originally chartered by the legislature of Connecticut as the Collegiate School in 1701 in multiple locations. That school was moved to New Haven in 1716 and renamed Yale in 1718.

72.     Yale employs approximately 31,000 people.

13

73.     For fiscal year 2020, Yale had revenues of $5.60 billion and functional expenses of $4.58 billion, realizing a net operating profit of approximately $1 billion.

74.     Yale had an endowment of $3.2 billion in 1993, which had grown to $42.3 billion as of 2021.

75.     Approximately 1,000 Yale students compete in 37 NCAA sports.

### Ivy League Council of Presidents

76.     The Ivy League Council of Presidents is an unincorporated association with offices in Princeton, New Jersey. At all relevant times, it has acted as an agent of the University Defendants with respect to the Ivy League Agreement.

77.     The Council, through its executive director and administrative staff, coordinates the athletic activities of the Ivy League schools, including the negotiation of television rights for Ivy League athletic competitions, most recently a ten-year partnership with ESPN, including for the broadcast of over 1,100 athletic events annually through the Ivy League Network ("ILN").[6]

78.     Prior to the ESPN deal, the Council formed league-wide television agreements with national broadcasting networks, including NBC Sports, ESPN, CBS Sports Network, Fox Sports, American Sports Network, and Eleven Sports.

79.     The Council also entered the University Defendants into a long-term partnership agreement with JMI Sports to introduce new league-wide sponsorship deals that have "increased exposure of the League's prestigious brand."[7] Indeed, in 2018 and 2019, the Ivy League had sixteen national champions.[8]

---

[6] *See* https://ivyleague.com/staff.aspx?staff=1.

[7] *Id.*

[8] *Id.*

80.     The Council also organizes meetings of the Ivy League schools, which representatives of the University Defendants attend.

81.     The Council is a creature of the Ivy League Agreement. The Council was formed, in part, to both create and enforce rules and restraints that are part of the Ivy League Agreement. The Council also negotiates on behalf of the University Defendants for revenues generated by Ivy League athletic competitions and distributes the proceeds due to the University Defendants.

82.     The Council focuses on efforts to strengthen the model of the Ivy League as a "nationally regarded, premier collegiate athletic conference."[9] The Council is a tool the University Defendants use to communicate their core message that the Ivy League is an athletic conference that is unique and distinct from any other Division I conference. It is a message of both academic and athletic national excellence.

## IV.     FACTUAL AND LEGAL BACKGROUND

### A.     Defendants Engage in Interstate Commerce

83.     Defendants all work to arrange athletic competitions for the University Defendants' athletic teams throughout the United States.

84.     The University Defendants compete with each other in recruiting and enrolling highly selective undergraduate student bodies and in providing undergraduate education. Students throughout the United States apply for admission to, and are accepted into, the University Defendants' undergraduate programs. The students' payment of tuition in return for educational services constitutes commerce.

85.     The University Defendants annually send out solicitations and mailings and receives thousands of admission applications that cross state lines, including applications from Class

---

[9] *Id.*

15

Members. Out-of-state students make up a substantial percentage of each University Defendant's undergraduate population.

86. In addition, each year, the University Defendants receive millions of dollars that flow across state lines in tuition payments, grants, donations, and athletic ticket sales and/or sponsorships, as well as for television and streaming rights. Each University Defendant markets its undergraduate programs and markets tickets for athletic events to the public across state lines.

87. Athletic competitions in multiple Ivy League sports are televised every year to viewers across the country pursuant to contracts negotiated by the Council on its own behalf and on behalf of the University Defendants.

88. Defendants earn revenue from the broadcast rights from these athletic contests through revenue-sharing agreements with the Ivy League, which has the sole broadcast rights for the games the University Defendants' athletic teams play.

89. Plaintiffs and the other Class Members have provided and are providing athletic services to the University Defendants. These services include participation in athletic competitions throughout the United States, which generate revenue for all Defendants. The provision of these services likewise constitutes interstate commerce.

**B.    Collegiate Athletics in the NCAA's Division I Are Big Business**

90. As Defendants' activities in interstate commerce indicate, collegiate sports are big business, especially among the roughly 350 colleges and universities in the NCAA's Division I.

91. The NCAA brings in, as prominent examples, approximately $1 billion annually from the sale of television rights for its annual March Madness championship basketball tournament and approximately $470 million annually from television rights revenue from its Football Bowl Subdivision ("FBS") games.

16

92.     Division I athletic conferences earn substantial revenue from regular season basketball and football games through ticket sales and multi-year television rights deals. The Big Ten conference, for example, recently negotiated a seven-year, $7 billion media rights agreement with Fox, CBS, and NBC for televising Big Ten athletic events.

93.     Similarly, many Division I schools receive substantial payments from apparel companies that "sponsor" athletes on the field. In the academic year 2017-18, for example, sponsorship spending on collegiate athletic departments, conferences, bowl games, and other athletic endeavors totaled $1.24 billion.[10]

94.     All told, NCAA Division I schools and conferences, through their own media deals, sponsorship arrangements, ticket sales, and other means, have generated nearly $20 billion in revenue related to athletic competitions. In 2022, the NCAA distributed $625 million to Division I schools, most of which comes from the March Madness tournament.

95.     The individuals in charge of collegiate athletics also earn substantial incomes from the athletes' services. The NCAA's president earns more than $4 million annually. Commissioners of the top conferences earn between $2 million and $5 million. Athletic directors at Division I schools average $1 million, while many Division I coaches, and even assistant coaches, earn that amount or substantially more.[11] Indeed, many Ivy League athletic coaches earn annual salaries that substantially exceed those of many, if not most, tenured professors.

---

[10] *See* Christina Gough, *College athletics sports sponsorship spending in the United States from 2005 to 2018 (in million U.S. dollars)*, STATISTA, https://www.statista.com/statistics/607861/college-sports-sponsorship-spending/#:~:text=In%202017%2F18%2C%20college%20sports,around%201.24%20billion%20U.S.%20dollars.

[11] *Alston*, 141 S. Ct. at 2151.

C.     **The University Defendants Constitute the Ivy League Athletic Conference**

96.     The "Ivy League" is an athletic conference. Within that conference, the University Defendants have participated in and enjoyed extraordinary athletic success in intercollegiate sports in the NCAA's Division I.

97.     The Ivy League competes on a national level in all Division I sports and does not let its high academics and rigorous acceptance standards interfere with its goal and efforts to win national athletic championships. The Ivy League's mission has long included recruiting students with the highest academic qualifications with nationally ranked athletic skills. The Ivy League proudly promotes, for example, that through 2019 its academically and athletically high-achieving students have won 292 team national championships and 556 individual/event championships.

98.     The Ivy League maintains an extensive body of rules and regulations that govern its intercollegiate sports activities. Under the latest edition of the "Ivy Manual" (2017-18), these rules and regulations govern, for example, the eligibility of Ivy League students for intercollegiate sports competitions, multiple aspects of competitions themselves and when they are held, and dates for the "seasons" for individual sports.[12]

99.     The Ivy League operates through multiple standing committees, principally the Council, but also the Policy Committee, the Committee on Administration, the Committee on Admissions, and the Committee on Financial Aid.[13]

100.     The Ivy League's Executive Director is responsible for implementing the rules set forth in the Ivy League Manual and the relevant national rules pertaining to intercollegiate athletics, and for imposing "penalties as may be appropriate and the implementation of such procedures

---

[12] IVY MANUAL (2017-18), available at: https://pennathletics.com/documents/2018/9/14/Ivy_Manual_2017_18.pdf.

[13] *See id.*

for exceptions to Ivy rules as may be established by the Committee with authority in such areas."[14]

### D. Consistent with Its Strong Marketing, the Ivy League Is Unique and Has Substantial Brand Value

101.    The name "Ivy League" has brand value, which each of the Defendants use in marketing efforts, including efforts to attract students and faculty and to sell tickets and media rights to athletic competitions. The Ivy League rules require prominent display of the "Ivy League" logo—evidencing the value of the "Ivy League" brand—at events and in promotional materials. There are detailed rules governing the logo and how it is to be displayed.[15]

102.    In the years before the NCAA permitted its athletes to earn money from their NIL rights, as an article in the *Harvard Crimson* recognized in 2018, the Ivy League had entered a "new commercial age" and was "increasingly embracing the 'normal' economic model of larger Division I conferences: using its prestigious school brands, select sports, and high-income supporter base as revenue streams for athletic departments."[16]

103.    The Ivy League has rules that promote its unique brand on television broadcasts. The rules state in that regard: "League-wide programming should emphasize the distinguishing characteristics of Ivy League athletics and institutions: in particular, wide participation in a variety of sports, equal opportunity for women and equal emphasis upon women's athletics, and the comprehensive excellence of each of the eight Ivy League institutions."[17]

---

[14] *Id*. at 18.

[15] *Id*. at 99.

[16] Henry Zhu, *A New Commercial Age for the Ivy League*, THE CRIMSON (Apr. 4, 2018), https://www.thecrimson.com/column/kazhu-kid/article/2018/4/4/column-april3-hz-ivyleague/.

[17] IVY MANUAL at 133.

104.   The Ivy League rules further state: "No broadcast arrangements or package may use the Ivy League® name or logo without specific approval from the Ivy Office."[18] In addition, television exposure "should involve outlets and times that have the basis for securing a good audience and for portraying Ivy League athletics as an activity worth watching in its own right, not simply as another collegiate athletic broadcast."[19]

105.   The Ivy League has consummated its own media rights deals, as noted, including a 2018 agreement with ESPN granting the network exclusive media rights (streaming and television) to over 1,100 Ivy League athletic events for undisclosed benefits to the Ivy League.

106.   Indicative of the distinct value of the Ivy League brand, Japan's National Football Association partnered with the Ivy League to participate in the "Japan-U.S. Dream Bowl," held in Tokyo, Japan, in January 2023. The Ivy League team, with a 52-person roster, comprised athletes from all of the University Defendants.

107.   Defendants further promote their unique Ivy League brand when recruiting students by showcasing that over 500 Ivy League athletes have been recognized as academic All-Americans. Defendants recruit students and market themselves as a unique league by breaking down the specifics of all the academic All-American awards by sport, year, and school.

108.   On the Ivy League website, Defendants market the Ivy League "as the top academic conference, and with more national championships, than any other athletic conference."[20] Defendants espouse the Ivy League's uniqueness and superiority over other conferences when it "showcased over 240 nationally-ranked programs over the past three years and prides itself on sponsoring

---

[18] *Id.* at 135.

[19] *Id*. at 134.

[20] *About the Ivy League*, https://ivyleague.com/sports/2017/8/13/HISTORY_0813173057.aspx.

34 sports, the highest number of any NCAA conference, with more than 8,000 student-athletes competing annually."[21] Defendants assert that they "serve as the standard bearers for inspiring and transforming student-athletes to boldly take on the world's challenges and lead lives of great impact."[22]

109.    The Ivy League promotes markets itself through its website to students, athletes, and the nation as the only league that, top to bottom, "stands at the pinnacle of higher education and Division I athletics, rooted in the longstanding, defining principle that intercollegiate athletics competition should be kept in harmony with the essential educational purposes of the institution."[23] Defendants further proclaim, on the website, the uniqueness of the Ivy League conference, with a brand that is "[u]nrivaled in its legacy," and that "the Ivy League provides the true test of academic and co-curricular rigor – fostering an enduring culture that celebrates a storied-tradition, thrives on shared values and holds paramount the academic and personal growth of students."[24] Within the Ivy League, athletes competing in Division I sports constitute anywhere from 8% (Cornell) to 21% (Dartmouth) of the undergraduate student bodies of University Defendants.[25]

110.    In addition, each University Defendant publicly promotes that it is part of a conference that stands out in Division I as the conference for the student who excels both athletically and academically. Yale proclaims, for example, that its mission is to attract "outstanding student athletes, who aspire to undertake the challenge of a high-level education while proudly representing

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *See Ivy League Schools & the Recruited Athlete*, https://scholarshipstats.com/ivies.

Yale University in the pursuit of championships."[26] Harvard emphasizes that its athletes "are held to the same standards as every other Harvard student."[27]

111.    Penn proudly states that 200 Penn athletes have represented the university in every summer Olympic games from 1900 through 2012. Penn markets heavily its special Ivy Penn Athletics Wharton Leadership Academy that draws on the Wharton Business School's faculty to "turn varsity athletes into lifelong masters of team dynamics."[28] This program is emblematic of the unique way in which the Ivy League relates to its athletic recruits.

112.    As a result of Defendants' own promotion, marketing, and recruiting, Plaintiffs and the other Class Members have sought to graduate from Ivy League universities, as opposed to any other universities, and to enjoy the unique experience and benefits that Defendants extoll.

113.    Industry participants recognize the Ivy League's unique and distinct status in offering academic and athletic excellence. As one example, the country's largest college athletic recruiting network, Next College Student Athlete ("NCSA"), cites the Ivy League's "ultra-high level of competition in both athletics and academics."[29]

E.    **Under the Antitrust Laws, Colleges and Universities Must Compete to Attract and Compensate Collegiate Athletes**

114.    The NCAA was formed in 1906, initially to govern the safety of intercollegiate athletics. In 1948, the NCAA adopted its "Sanity Code," permitting colleges to award athletic scholarships to collegiate athletes, but based only on their financial need.

---

[26] YALE ATHLETICS MISSION STATEMENT, available at: https://yale.prestosports.com/information/mission.

[27] HARVARD ATHLETICS MISSION STATEMENT, available at: https://gocrimson.com/sports/2020/5/5/mission-statement.aspx.

[28] THE PENNSYLVANIA GAZETTE, available at: https://thepenngazette.com/obstacle-course/.

[29] *The Differences Between NCAA Divisions*, NCSA COLLEGE RECRUITING, https://www.ncsasports.org/recruiting/how-to-get-recruited/college-divisions.

115.    In 1956, the NCAA dropped the financial-need condition for athletic scholarships, while expanding their scope to include payments for board, books, fees, and cash for incidental expenses. In 2014, as a result of the permanent injunction under *O'Bannon*, the NCAA authorized its Division I schools to offer athletes competing for these institutions compensation and reimbursement up to the "full cost of attendance," or "COA."

116.    The NCAA has also created the "Student Assistance Fund" and the "Academic Enhancement Fund," which allow member schools to provide collegiate athletes "postgraduate scholarships" and "school supplies," as well as "benefits that are not related to education," such as "loss-of-value insurance premiums," "travel expenses," "clothing," and "magazine subscriptions." Member schools may make payments "incidental to athletics participation," including awards for "participation or achievement in athletics" (such as "qualifying for a bowl game") and certain "payments from outside entities" (such as for "performance in the Olympics"). Member schools also may award up to two annual "Senior Scholar Awards" of $10,000 for students to attend graduate school after their athletic eligibility expires.

117.    The NCAA has not expanded compensation for athletic services or the commercial use of collegiate athletes' names, images, and likenesses in the foregoing ways without judicial pressure. It was only after the NCAA settled the *White v. NCAA* lawsuit, Civil Case No. 06–999, Docket No. 72 (C.D. Cal. Sept. 20, 2006), that the NCAA allowed its member schools to purchase health insurance for athletes, while combining two funds that provided benefits to student-athletes and expanding their permitted uses. The NCAA, at that time, still prohibited schools from offering athletes compensation for their "full" cost of attendance.

118.    In *O'Bannon*, the District Court for the Northern District of California held, and the Ninth Circuit affirmed, that the NCAA's prohibition against full COA scholarships violated

23

Section 1 of the Sherman Act. A few months after the district court's ruling in *O'Bannon,* but before the appellate court decision, the five major or "power" Division I conferences—not including the Ivy League—began allowing their member institutions to award COA athletic scholarships in compliance with *O'Bannon's* injunction.

119.    In June 2021, the Supreme Court in *Alston* struck down as a violation of Section 1 of the Sherman Act, any NCAA limits on athletic scholarships for Division I football and basketball athletes for education-related benefits. The Court upheld the district court's ruling that NCAA schools could award additional academic awards to their athletes up to $5,950 annually.

120.    Shortly thereafter, the NCAA permitted all its member schools, across all Divisions, to compete with each other by enabling their collegiate athletes to earn revenues from their NIL rights. The NCAA's NIL decision responded to several states that had already enacted or were considering legislation compelling the same thing for collegiate athletes attending colleges and universities in those states. These NIL payments constitute an additional form of compensation—albeit from third parties—to collegiate athletes.

121.    These NIL payments, as industry participants have recognized, are valuable to collegiate athletes and do not conflict with the academic mission of the colleges and universities. As former Villanova basketball coach Jay Wright, who led his teams to two national collegiate basketball championships, stated in announcing his retirement: "NIL is good: I'm so impressed with how we handled NIL as a team. So some of our guys made some really good money, and they had 3.8 GPAs, and they went to a Final Four. So it didn't affect what our goal here is at Villanova for these guys to grow to be the best men the best students—the best players—they can be. So it was

our first experience where we really saw that these guys made good money, and they were great

students and great men, and they played great, so I'm excited."[30]

122.    In January 2023, the NCAA's "Division I Transformation Committee" recom-

mended that the NCAA extend additional benefits to Division I athletes.[31] The Committee included

representatives for all Division I athletic conferences, including Robin Harris, the Executive Di-

rector of the Ivy League. The additional benefits that the Transformation Committee recommended

include enhanced mental health support; greater participation by athletes in decision-making pro-

cesses affecting them; increased career preparation and support; ongoing education and program-

ming; additional health and safety measures for Division I athletes; requiring Division I schools to

provide medical insurance coverage for their athletes after they graduate or finish providing their

services; additional scholarship protections; and requiring Division I schools to offer degree com-

pletion funds for 10 years following athletes' separation from providing athletic services.

123.    There is thus a national trend toward recognizing the rights of college athletes to

realize their market values in terms of educational benefits and compensation for their athletic

services. The trend is evident at the state level as well. For example, there is a proposal in the

California state legislature that would create a pathway for direct compensation from schools to

athletes. The proposed College Athlete Protection Act would require Division I schools to pay

scholarship athletes in the NCAA's "headcount" sports their "fair market value," which the bill

defines as an equal share of half their team's annual revenues minus the cost of the athlete's grant-

---

[30] Transcribed from YOUTUBE, available at: https://m.youtube.com/watch?v=OUd6choLqi8.

[31] NCAA Division I Transformation Committee, FINAL REPORT (Jan. 3, 2023), available at:
https://ncaaorg.s3.amazonaws.com/committees/d1/transform/Jan2023D1TC_FinalReport.pdf.

in-aid.[32] The bill's sponsor, Rep. Chris Holden, states that his "goal is for athletes to play hard and study harder without fear of losing access to what they've trained and worked for."[33]

124.    Yet against the increased national recognition that college athletes are legally entitled to the fair market value of their athletic services and that schools and entities should compete for those services, the University Defendants continue to adhere to an anachronistic, unfair, and illegal horizontal agreement that severely restricts competition for Ivy League Athletes with respect to the most foundational element of competition: price.

### F.    As the Defendants Recognize, They Cannot Prohibit Compensation That Third Parties Provide to the Schools' Division I Athletes

125.    On July 1, 2021, the Ivy League officially endorsed the NCAA's NIL policy, allowing Ivy League Athletes for the first time to earn money for their NIL rights. The League's Executive Director, Robin Harris, stated: "One of the fundamental philosophies of the Ivy League is that student-athletes should have the same opportunities as all students, including the option to engage in projects that use their name, image and likeness."[34]

126.    The Ivy League's NIL policy is a recognition by Defendants that Ivy League Athletes should benefit from competition (like other Division I athletes)—at least when it comes to third parties that provide compensation to Ivy League Athletes.

---

[32] California Assembly Bill 252 (2022).

[33] Daniel Libit & Michael McCann, *California D-1 Athlete Pay Bill Seeks to Avoid Title IX Pitfalls*, SPORTICO (Jan. 19, 2023), https://www.sportico.com/leagues/college-sports/2023/california-ncaa-pay-for-play-bill-chris-holden-1234706713/.

[34] *Ivy League Permits Student-Athlete Name, Image and Likeness Opportunities*, https://ivyleague.com/news/2021/7/1/general-ivy-league-permits-student-athlete-name-image-and-likeness-opportunities.aspx.

## V.    THE IVY LEAGUE AGREEMENT IS *PER SE* ILLEGAL

127.    Section 1 of the Sherman Act was enacted to preserve price competition. Agreements to limit price competition have therefore long been condemned as *per se* violations of the Sherman Act—conduct that is so pernicious that it cannot be justified by any claimed procompetitive purpose or effect.

### A.    In Agreeing Through the Ivy League Agreement Not to Award Athletic Scholarships, Defendants Have Restricted Price Competition

128.    The University Defendants compete with each other to offer educational services for AAHA students who seek to graduate from college and play Division 1 sports. This competition includes (but is not limited to): touting the quality of their academic programs; the quality of their athletic programs; the job placements of their graduates; the quality of student life on campus; and the quality of their coaches, athletic training programs, and athletic facilities.

129.    The University Defendants also compete, on price, for graduate students. In early 2023, for example, due to competitive pressure, Penn increased its minimum stipend for its doctoral students by 25%, the largest one-time boost in the school's history, to a minimum of $38,000. Penn announced the compensation increase will help "ensure that Penn remains competitive in recruiting 'exceptional scholars.'"[35] Penn's move followed Princeton's 25% increase in 2022, the largest one-time increase for Princeton, to $40,000. In the same year, Yale increased its minimum graduate student stipend by as much as 14%.

130.    By express agreement, however, the University Defendants do *not* compete for AAHA students by offering them athletic scholarships. Instead, the Defendants have engaged in a long-running illicit conspiracy not to engage in such competition—a conspiracy that was

---

[35] *Penn to Increase Minimum PhD Stipend in 2023-24*, UNIVERSITY OF PENNSYLVANIA ALMANAC (Jan. 10, 2023), https://almanac.upenn.edu/articles/penn-to-increase-minimum-phd-stipend-in-2023-2024.

memorialized long ago in the Ivy League Agreement, which the Defendants have collectively up-dated and enforced for decades, to the present.

131.    The original Ivy League Agreement, from 1954, states in relevant part: "The members of the Group reaffirm their prohibition of athletic scholarships. Athletes shall be admitted as students and shall be awarded financial aid only on the basis of economic need."[36]

132.    Defendants reaffirmed in 1977: "The principle of need as the basis for financial aid for student-athletes is a cornerstone of Ivy belief. The Ivy Group has consistently adopted positions with the objective of requiring need as the basis for all such aid."[37]

133.    Defendants again reaffirmed in 1979: "Financial aid for student-athletes must be awarded and renewed on the sole basis of economic need with no differentiation in amount or in kind (e.g., in packaging) based on athletic ability or participation, provided that each school shall apply its own standard of economic need."[38]

134.    Defendants again reaffirmed in 2017: "All the Ivy League institutions follow the common policy that any financial aid for student-athletes will be awarded and renewed on the sole basis of economic need with no differentiation in amount or in kind (e.g. packaging) based on athletic ability or participation."[39]

135.    The foregoing affirmations mean that, as under the original Ivy League Agreement, the University Defendants have agreed not to award athletic scholarships, which fall into the category of financial aid based on athletic ability or participation.

---

[36] IVY MANUAL at 39 (quoting the 1954 Ivy League Agreement).

[37] *Id.* at 5 (quoting the 1977 IVY MANUAL).

[38] *Id.* at 39; *see also id.* at 4.

[39] *Id.* at 149.

136.    The Ivy League is the only Division I athletic conference that enforces an agreement prohibiting member schools from offering any athletic scholarships.[40]

137.    The Ivy League Agreement has thus limited and continues to limit competition among the University Defendants on the basis of price.

**B.      In Preventing Through the Ivy League Agreement Compensation/Reimbursement for Athletic Services, Defendants Have Restricted Price Competition**

138.    Defendants have also agreed, through the Ivy League Agreement, that the University Defendants will not compensate Ivy League Athletes or reimburse them for education-related expenses for their athletic services.

139.    Accordingly, Ivy League Athletes do not benefit from the competition for their athletic services as do AAHA students at other Division I colleges and universities that compete with each other by awarding, for example, full scholarships providing the full cost of attendance (tuition, room, board, and a cost of attendance allowance for incidental expenses) and an allowance for academic awards, currently up to $5,950 per year.

140.    The Ivy League Agreement has thus limited and continues to limit competition among the University Defendants on the basis of price.

**C.      The Ivy League Agreement Is *Per Se* Illegal**

141.    The University Defendants are horizontal competitors in the commercial activities in the Relevant Service Markets. The Supreme Court has long regarded horizontal agreements on

---

[40] Beginning in 1956, the NCAA capped athletic scholarships independent of need. *See* Roger Noll, *Sports Economics on Trial: NCAA v. Alston*, J. SPORTS ECON. (Mar. 29, 2022), https://journals.sagepub.com/doi/full/10.1177/15270025221078504. The Supreme Court struck down the cap for educated-related expenses in *Alston*, 141 S. Ct. 2141. The Patriot League abandoned its prohibition against awarding athletic scholarships in 2012.

price restraints with respect to commercial activities as *per se* illegal under the Sherman Act. Under the Ivy League Agreement, Defendants have agreed on just such restraints.

142.    In the AAHA Educational Services Market, the University Defendants compete with each other, albeit in ways restricted by the Ivy League Agreement, to attract AAHA students' purchase of educational services. In the AAHA Athletic Services Market, the University Defendants compete with each other, albeit in ways restricted by the Ivy League Agreement, to attract AAHA students to provide their athletic services to the University Defendants.

143.    The Ivy League Agreement restricts price competition among the University Defendants in the AAHA Educational Services Market (*i.e.*, the University Defendants have agreed not to offer athletic scholarships to AAHA students to reduce the overall cost of attendance to attract such AAHA students).

144.    The Ivy League Agreement restricts price competition among the University Defendants by prohibiting compensation or reimbursement of education-related expenses in the AAHA Athletic Services Market (*i.e.*, the University Defendants have agreed not to offer compensation or reimbursement to AAHA students in return for the students' athletic services).

145.    If this precedent were deemed relevant, moreover, the Ivy League Agreement satisfies the criteria for application of the *per se* standard under *United States v. Brown University*, 5 F.3d 568, 572 (3d Cir. 1992) (declining to apply the *per se* standard to the "Ivy Overlap" agreement because of defendant MIT's alleged pure altruistic motive and alleged absence of a revenue-maximizing purpose).

146.    The Ivy League Agreement meets the *Brown* standard because the University Defendants' athletic operations are commercial enterprises and are not purely altruistic. This is consistent with the fact that, as a general matter, the University Defendants do not operate purely

30

altruistically and they seek to maximize revenue, broadly defined to include both revenue from operations and donations.

147.     The Ivy League Agreement also meets the *Brown* standard based on the changed "market realities" that *Alston* identifies as relevant.[41] The courts have developed ample experience and familiarity with the commercial nature of college athletics, and specifically the commercial nature of the athletic services that college athletes provide, such as reflected in *Alston* and *O'Bannon*. Such changes in market realities underscore the propriety of treating agreements restricting compensation for athletic services, such as the Ivy League Agreement, as *per se* illegal.

### 1.     Defendants' Athletic Operations Are Commercial Enterprises

148.     The University Defendants operate as commercial enterprises, both as a general matter and within the Relevant Services Markets.

149.     The Ivy League's official website, ivysports.com, is a commercial website.[42] The website offers Ivy League-branded merchandise for sale, a link for purchasing tickets to Ivy League athletic events, and general information about Ivy League sports.

150.     The Council, which operates the Ivy League commercial enterprise, has an administrative staff, with an executive director and multiple other staff with various titles.

151.     The Ivy League conducts playoffs or championships in certain sports. The University Defendants' agreed rules require equal sharing of net revenues or deficits from these events.[43]

---

[41] *Alston*, 141 S. Ct. at 2158.

[42] "The term .com stands for 'commercial' and is used for business or commercial websites representing companies that sell goods or services for a profit." Mara Calvello, *.Org v. .Com: Which Domain Is Right for Your Website?*, G2, https://www.g2.com/articles/org-vs-com#:~:text=The%20term%20.com%20stands%20for,51.6%25%20of%20websites%20use%20it.

[43] Ivy Manual at 55-56.

31

By agreement, institutions that host Ivy League Championships must submit budgets in advance and are compensated at stated amounts.[44]

152.    Under the Ivy League Agreement, with the involvement of the Council, the Ivy League retains all rights to negotiate television broadcasts of its athletic competitions: "League-wide packages will be negotiated and administered by the Ivy Office, subject to advice and agreement from the Committee on Administration and will be submitted for approval to the Council or the Council Chair as appropriate."[45] The revenue from television broadcast rights fees is to be shared equally among the University Defendants.[46]

153.    The University Defendants also engage in commercial activity though their engagement in intercollegiate athletics. Each University Defendant brings in substantial revenue—via ticket sales, televisions rights fees, merchandise sales, and other sources—from its intercollegiate sports programs.

154.    According to the most recent data available, as shown in Appendix B, the University Defendants' annual sports revenue ranges from $24 million annually at Brown to a high of $47 million at Yale, and an average of $33 million across all University Defendants.

155.    In addition, each University Defendant earns money from licensing its "brand" to apparel companies (and possibly other companies). In 2016, Yale struck a ten-year branding rights deal worth $16.5 million with Under Armour.[47] In 2021, Penn struck a branding-rights deal with

---

[44] *Id.* at 57.

[45] *Id.* at 135.

[46] *Id.* at 131.

[47] Daniela Brighenti, *Under Amour deal historic for Ivy League*, YALE DAILY NEWS (Jan. 20, 2016), https://yaledailynews.com/blog/2016/01/20/under-armour-deal-historic-for-ivy-league/.

Nike, while also maintaining similar arrangements with STX for men's and women's lacrosse, Easton for baseball and softball, and TYR for men's and women's swimming and diving.[48]

156.   The University Defendants also all seek donations from alumni and other sources to support their athletic programs. Penn announced in 2022, for example, that it had begun construction on a new donor-financed $69 million track and field facility.[49]

157.   Penn has demonstrated its commercial zeal by selling the naming rights for its iconic Palestra basketball stadium to raise money for its athletic program. Penn has not disclosed how much it charged to change the name of that venue to the "Macquarie Court at the Palestra," but announced that it was "far and away the largest sponsorship Penn athletics has entered into, and that we feel is really going to visibly change the way we are able to sponsor our programs."

158.   As an additional example of Penn's athletic fund-raising prowess, the Penn Championship Club achieved record-setting fundraising results for 2018-19, bringing in $63 million to fund "Penn Athletics' highest priorities." That fundraising accomplishment helped the Penn Champions Club surpass its ultimate fundraising goal of $150 million for the "Game Onward Campaign for the Future of Penn Athletics."

159.   In 2021, Penn advertised the millions of dollars raised to building and modernizing track and field facilities; football, soccer, and softball fields; football locker rooms; and crew facilities. The new state-of-the-art center for track and field is under construction, with plans to open

---

[48] *Penn Athletics Renews Relationship with Nike*, PENN ATHLETICS (May 5, 2021), https://pennathletics.com/news/2021/5/5/general-penn-athletics-renews-relationship-with-nike.aspx#:~:text=PHILADEL-PHIA%20%2D%20The%20University%20of%20Pennsylvania,the%202025%2D26%20athletic%20year.

[49] Matthew Frank, *Penn Athletics announces construction on new $69.35 million track and field center*, THE DAILY PENNSYLVANIAN (Mar. 14, 2022), http://www.thedp.com/article/2022/03/ott-center-track-and-field-penn-athletics-announces.

in 2024, at a cost of $70 million. Penn's athletic director proclaimed that this new facility will be a boon for recruiting track and field athletes.

160.    Other University Defendants tout the major donations to their athletic programs as well. This statement on Brown's giving website is typical: "*Brown Athletics is a cornerstone of the University*. And it's made possible by our community of dedicated supporters. Gifts to the Brown University Sports Foundation (BUSF) help our programs achieve a competitive edge."[50]

161.    The Ivy League and the University Defendants' athletic operations, in short, are major commercial enterprises.

### 2.    Defendants Are Not Purely or Even Predominantly Altruistic

162.    In multiple other ways, none of the University Defendants operates in a purely or even predominantly altruistic fashion. Instead, each University Defendant is engaged in multiple commercial activities, with annual revenues and expenses measured in the billions of dollars.

163.    Each University Defendant is either the largest or among the largest of the employers and landowners in the city or locality in which it resides.

164.    In making admissions decisions, the University Defendants take into account the financial circumstances of applicants for admission or those of their family. A purely altruistic institution, devoted to admitting all students without regard to their financial need, would not bias its admission process in favor of—as all University Defendants do—wealthy applicants who can afford to pay the full cost of attendance without financial assistance from the school.

165.    All University Defendants give admissions preference to students from families who have made large donations to the schools or who indicate their intention to do so. This

---

[50] *Athletics: Through gifts to the Brown University Sports Foundation, we're supporting our scholar-athletes on and off the field*, https://alumni-friends.brown.edu/giving/athletics (emphasis added).

practice, which is not characteristic of institutions operating with pure altruistic motives, is widely followed. Gordon Gee, currently the President of West Virginia University and who has held more university presidencies than any other individual, stated in 2019 that any university president under "truth serum" would concede that donor connections make a difference in admissions.[51]

166.    Maria Laskaris, a former admissions dean at Dartmouth, acknowledged in 2019: "The ultra-rich have an additional advantage in their ability to donate large sums of money to universities, which can boost their kids' chances of acceptance." According to Laskaris, admissions officers are "made aware of" this factor because "colleges are always in fundraising mode."[52] Each year, up to 50 applicants on a list created by staff from the admissions and development offices, may be considered through a special process, most of whom are admitted, accounting for 4-5% of Dartmouth's student body.[53]

167.    One study of Harvard's admissions practices revealed that of the more than 400 members of Harvard's Committee on University Resources, a group of wealthy donors to Harvard, more than half had at least one child admitted to the university.[54]

---

[51] Jack Stripling, *It's an Aristocracy: What the Admissions-Bribery Scandal Has Exposed About Class on Campus*, THE CHRONICLE OF HIGHER EDUCATION (Apr. 17, 2019), https://www.chronicle.com/article/its-an-aristocracy-what-the-admissions-bribery-scandal-has-exposed-about-class-on-campus/.

[52] Jill Tucker, *In the College Admissions Game, Even the Legal Kind, Money Has Always Mattered*, SAN FRANCISCO CHRONICLE (Mar. 12, 2019), https://www.sfchronicle.com/bayarea/article/In-the-collegeadmissions-game-even-the-legal-13683518.php.

[53] Joseph Asch, *Donor Admissions: How It Works Now*, DARTBLOG (Sept. 29, 2014), http://www.dartblog.com/data/2014/09/011686.php.

[54] Daniel Golden, THE PRICE OF ADMISSIONS; HOW AMERICA'S RULING CLASS BUY ITS WAY INTO ELITE COLLEGES – AND WHO GETS LEFT OUTSIDE THE GATES 25 (New York: Crown, 2007).

168.     Penn tags the applications of "children of donors or potential donors," among others, giving those applicants "the proverbial golden ticket."[55] The university has "spots reserved" for these "development cases," whose "parents have already given significant money to the institution, or plan to."[56]

169.     In addition, in admitting transfer and waitlisted applications, all of the University Defendants take into account whether the applicants have sought or need financial aid.

170.     Penn's former Associate Dean of Admissions, Sara Harberson, acknowledged in 2021: "When I worked as the associate dean of admissions at the University of Pennsylvania, a need-blind institution, the office was not forthright about the fact that needing financial aid kept a student from being considered or admitted from the waitlist. Many need-blind universities are not open about their policies when it comes to whom they admit off the waitlist."[57]

171.     The University Defendants have among the largest endowments of universities in the nation, ranging from nearly $7 billion (Brown) to over $53 billion (Harvard).

172.     As illustrated in Appendix A, each University Defendant's endowment has increased enormously since the litigation in *Brown*. For those University Defendants for which the information is publicly available, the growth of their endowments has substantially outpaced the growth in their annual revenues and operating expenses, which in turn have grown at a faster pace than the economy generally.

---

[55] Sarah Harberson, *The Truth about 'Holistic" College Admissions*, LOS ANGELES TIMES (Jun. 9, 2015), https://www.latimes.com/opinion/op-ed/la-oe-harberson-asian-american-admission-rates-20150609-story.html.

[56] Vice News, *How Broken the College Admissions Process Is*, YOUTUBE (Mar. 13, 2019) (Harberson quoted at 5:20), https://www.youtube.com/watch?v=0v5yHnWCiLE&feature=emb_logo.

[57] Sara Harberson, *How Colleges Play the Waitlist Game*, COURIER TIMES (May 17, 2021), https://www.buckscountycouriertimes.com/story/opinion/2021/05/17/op-ed-how-colleges-play-waitlist-game-students-detriment/5071470001/.

173.    The University Defendants' endowments, as of 2021, collectively exceeded $170 billion. These collective endowments, from 1992 to 2013, averaged annualized returns of 10.9%,[58] substantially more than the annualized 4.5% drawdown rate on those endowments.[59] Given investment returns since 2013, these endowments have continued to realize long-run annualized gains well in excess of drawdown rates. Indeed, in 2021, *Forbes* projected that by 2048 these endowments will collectively exceed $1 *trillion*.[60]

174.    The excess of the rate of returns over drawdown rates for endowments at each of the University Defendants demonstrates that—without even reducing the total amount of its endowment—each of them could award more financial aid than they do. That they do not is evidence that they do not operate with purely altruistic motives.

### 3.    The University Defendants Seek to Maximize Revenue in Pursuit of Maintaining or Enhancing Their Prestige and Influence

175.    A primary goal of all academically selective colleges and universities, including all University Defendants, is to maintain and ideally enhance their prestige and influence.[61] As former Harvard President Derek Bok wrote in 2003, universities' "most comprehensive object, however, is academic distinction or prestige."[62] This is especially true for Ivy League universities, which all

---

[58] Peter Mladina, Charles Grant, & Abdul Nimeri, *Illuminating the Returns of Elite Investors*, NORTHERN TRUST (Apr. 2014), https://www.northerntrust.com/documents/commentary/illuminating-returns-of-elite-investors.pdf.

[59] The estimated 4.5% spending average is based on the spending average for schools with endowments of $1 billion or more, from American Council on Education, UNDERSTANDING COLLEGE AND UNIVERSITY ENDOWMENTS 13 (2021), https://www.acenet.edu/Documents/Understanding-College-and-University-Endowments.pdf.

[60] Adam Andrzejewski, *Ballooning Ivy League Endowment Projected to Top $1 Trillion by 2048*, FORBES (Oct 31, 2021), https://www.forbes.com/sites/adamandrzejewski/2021/10/31/ballooning-ivy-league-endowment-forecasted-to-top-1-trillion-by-2048/?sh=59f40fd73a37.

[61] Howard R. Bowen, THE COSTS OF HIGHER EDUCATION: HOW MUCH DO COLLEGES AND UNIVERSITIES SPEND PER STUDENT AND HOW MUCH SHOULD THEY SPEND? (1980).

[62] Derek Bok, UNIVERSITIES IN THE MARKETPLACE: THE COMMERCIALIZATION OF HIGHER EDUCATION 159 (2003).

use the "Ivy League" brand that is synonymous in American culture with prestige in their marketing. As Bok wrote again in 2013: "The more prominent colleges and universities constantly vie with one another for prestige, aware that the better their reputation, the easier it will be to make money and attract able students and faculty."[63]

176.    The University Defendants prize their admissions selectivity because it is critical to maximizing their prestige. As a direct result, the University Defendants admit and enroll only a small fraction of their students from low-income families. All University Defendants give admissions preferences to "legacy" applicants—namely, those with one or both parents who graduated from the same university. The primary reason the University Defendants give legacy preferences is to maximize donations from applicants' families, and later from the legacy students themselves.

177.    All Defendants seek to maximize revenue, broadly defined to include both operating revenue and donations, through various means, in pursuit of each of their goals to maintain or augment prestige. As Howard Bowen, former president of Grinnell College, the University of Iowa, and Claremont Graduate University, has stated, universities "raise all the money t[hey] can" so they "can spend all they raise."[64] This statement, now widely recognized as "Bowen's Rule" of "Bowen's Law" has been validated by various research studies, for both public and private research universities.[65]

---

[63] Derek Bok, HIGHER EDUCATION IN AMERICA 19 (2015).

[64] Bowen, *supra*, at 19.

[65] *See, e.g.*, Robert E. Martin & R. Carter Hill, *Measuring Baumol and Bowen Effects in Public Research Universities*, DEPARTMENTAL WORKING PAPERS 2012-05, Department of Economics, Louisiana State University (Dec. 2012), https://ideas.repec.org/p/lsu/lsuwpp/2012-05.html, and Robert E. Martin, R. Carter Hill, & Melissa S. Waters, *Baumol and Bowen Cost Effects in Research Universities*, LSU DEPARTMENT OF ECONOMICS WORKING PAPER 2017-03, https://www.lsu.edu/business/economics/files/workingpapers/pap17_03.pdf.

178.    All Defendants operate as commercial enterprises, akin to for-profit conglomerates engaged in multiple revenue-generating activities. For all University Defendants, these activities include generating revenues from undergraduate, graduate, and professional education; substantial research operations, which attract funding from the federal and state governments, corporations, among others, and which also generate patent royalties on faculty-developed innovations; major commercial real estate investments near their campuses and elsewhere; and through their endowments and investments in a wide range of securities and other income-generating assets, including limited partnerships in private equity and venture capital funds. The Council seeks to maximize revenues through various athletics-related activities it organizes and runs on behalf of the University Defendants.

179.    The importance of revenue generation to the University Defendants is underscored by the million dollar-plus salaries paid to their Presidents and other high-ranking officials, and to those who manage their investments. All Ivy League university presidents are paid salaries above $1 million, with Penn paying its former president nearly $4 million, and Columbia paying its president $4.6 million.[66] At Harvard, the two senior individuals in charge of the university's real estate activities earn over $5 million annually. Top endowment officials earn between $4 million and $5 million.[67] Individuals engaged in similar activities at other University Defendants also are paid annual salaries well over $1 million.[68]

---

[66] This information is taken from the University Defendants' IRS Form 990s.

[67] Harvard salary figures are taken from *Harvard Discloses Top Earners*, HARVARD MAGAZINE (July 10, 2020, https://www.harvardmagazine.com/2020/07/harvard-highest-paid-employees#:~:text= HMC%20president%20and%20CEO%20N.P.the%20head%20of%20Columbia's%20endowment.

[68] Anne Paddock, EXECUTIVE COMPENSATION AT UNIVERSITY OF PENNSYLVANIA, https://paddock-post.com/2018/09/15/executive-compensation-at-university-of-pennsylvania/; and Nora Doyla-Burr, *Pay Creeps Higher for top Dartmouth College Officials*, VALLEY NEWS, https://www.vnews.com/Dartmouth-President-Hanlon-got-raise-in-2018-36158464.

180.    The annual operating revenues and expenses of each University Defendant, as shown above, are also measured in the billions of dollars. All but one of the University Defendants own and operate major medical centers with annual budgets in the hundreds of millions of dollars, some over $1 billion, which typically account for less than half of each of these University Defendant's total annual revenues.

181.    In important respects, moreover, Defendants have certain advantages that more traditional businesses do not have. Their operations and earnings, including from the University Defendants' endowments, are generally exempt from state and federal income taxes. In addition, donations from alumni and other donors are tax-exempt for the donors, unlike funding sources like loans and equity shares issued by private companies, which the providers of those funds cannot deduct for tax purposes. One leading scholar's observation of one of the University Defendants is broadly applicable to all the others: "Princeton has in recent years derived as much as four-fifths of its total revenues from tax-free endowment income and tax-deductible alumni donations, and the top twenty universities on average derive a third of their revenues from these sources."[69]

182.    Since 1993, the University Defendants have substantially increased their revenues and the scope of their activities in ways that maximize the annual increase in their net assets, the functional equivalent of profits. In 2003, former Harvard President Bok wrote a book whose title describes what major research universities, such as the University Defendants, have become. In *Universities in the Marketplace: The Commercialization of Higher Education*, Bok notes that "while commercial practices . . . are hardly a new phenomenon in American higher education . . . . What is new . . . is . . . their unprecedented size and scope."[70]

---

[69] Daniel Markovitz, THE MERITOCRACY TRAP 277 (2020).

[70] Bok, UNIVERSITIES IN THE MARKETPLACE, *supra*, at 2.

183.    Several University Defendants have earned substantial revenues from their share of commercializing innovations developed by their faculty, through patent sales or royalties. Columbia's "Axel patents," which claimed a scientific method to introduce foreign proteins into nucleated cells, earned over $500 million for the University. When the patents were up for renewal, Columbia fought so hard through fruitless litigation that, as scholars noted, the school "attracted intense criticism for behavior unbecoming a nonprofit academic institution."[71] Penn has realized close to $1 billion in royalties from COVID vaccines developed by university faculty.[72]

184.    In sum, as shown in Appendix C, taking all sources of annual revenue into account, at a minimum, most Defendants earn profits in the hundreds of millions of dollars.

### 4.    The Law Has Changed Since the University Defendants Last Faced an Antitrust Challenge to Their Collusion on Financial Aid

185.    The University Defendants previously faced an antitrust inquiry into their practice of colluding on financial aid. In 1991, the University Defendants entered into a Consent Decree (the "Ivy League Consent Decree") with the U.S. Department of Justice ("DOJ") following the DOJ's inquiry into the agreement among the University Defendants and the Massachusetts Institute of Technology ("MIT") (the "Overlap Agreement") to award financial aid (1) on the basis of an agreed formula, (2) considering only students' family income and assets, and (3) prohibiting financial aid awards based on "merit" (including athletic scholarships).[73]

---

[71] Alessandra Colaianni & Robert Cook-Deegan, *Columbia University's Axel Patents: Technology Transfer and Implications for the Bayh-Dole Act*, THE MILBANK QUARTERLY 87(3): 683–715 (Sept. 2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2750841/.

[72] *Research behind COVID-19 vaccines reaps close to $1 billion in royalties for Penn*, PHILADELPHIA INQUIRER (June 12, 2022), https://www.inquirer.com/business/penn-covid-vaccine-technology-mrna-royalties-revenue-20220612.html.

[73] *See* DOJ MEMO, available at https://www.justice.gov/archive/atr/public/press_releases/1991/325032.pdf.

186.    The Ivy League Consent Decree was designed to ensure that the University De-
fendants (and MIT) independently decided financial aid policies and independently calculated fi-
nancial aid awards to individual students. Congress's enactment of Section 568 of the Improving
America's Schools Act, discussed below, superseded The Ivy League Consent Decree.

187.    The University Defendants all joined the Ivy League Consent Decree, but MIT con-
tinued to litigate against the DOJ. In 1992, a federal district court ruled in favor of the DOJ, after
applying a so-called "quick look" analysis.[74] In *United States v. Brown*, 5 F.3d 658 (3d Cir. 1993),
the Third Circuit remanded for the district court to consider MIT's purported procompetitive ben-
efits, and less restrictive means for realizing any such benefits, reasoning that *per se* treatment did
not apply to the Overlap Agreement because MIT had alleged that it was acting out of "pure altru-
istic" motives and was not seeking to "increase revenues."[75] MIT settled with the DOJ shortly after
the Third Circuit's remand.

188.    Since then, the DOJ and courts have come to view labor-market restraints, such as
an agreement to fix compensation, as subject to the *per se* analytical framework. In 2016, for ex-
ample, the DOJ and the Federal Trade Commission ("FTC") issued guidance about anticompeti-
tive effects caused by agreements not to poach competitors' employees, finding such agreements
to "eliminate competition in the same irredeemable way as agreements to fix product prices or
allocate customers, which have traditionally been criminally investigated and prosecuted as hard-
core cartel conduct."[76] The DOJ and FTC thus made clear that horizontal restraints on compensa-
tion are "hardcore cartel conduct."

---

[74] *United States v. Brown Univ.,* 805 F. Supp. 288 (E.D. Pa. 1992).

[75] *Id*. at 672.

[76] DOJ NEWS, https://www.justice.gov/opa/pr/justice-department-and-federal-trade-commission-release-
guidance-human-resource-professionals.

189.    In 2019, as a further example, the DOJ concluded the following with respect to labor-market restraints: "Robbing employees of labor market competition deprives them of job opportunities, information, and the ability to use competing offers to negotiate better terms of employment. Under the antitrust laws, the same rules apply when employers compete for talent in labor markets as when they compete to sell goods and services."[77]

190.    The restraints at issue in the Ivy League Agreement are (1) fixing the price for athletic scholarships (at zero), and (2) fixing the compensation to Ivy League Athletes for provision of athletic services (also at zero). In either case, regardless of whether considered as a restraint on the price of education, the value of financial aid, the price of athletic services, or the level of compensation to Ivy League Athletes, the Ivy League Agreement is *per se* illegal.

### D.    The Ivy League Agreement Has Consistently Caused Direct Anticompetitive Effects, to the Harm of the Class Members

191.    The University Defendants recruit and compete with each other to provide their educational services to AAHA students, and for AAHA students' athletic services. At Harvard, for example, athletic coaches must recruit AAHA students. As Harvard's former swimming coach, Maura Scalise, noted in 2019: "In the sport of swimming, I'm only as good as the athletes I bring in: 95 percent of my success is due to recruiting."[78]

192.    Under the Ivy League Agreement and its implementation, however, the University Defendants have agreed to limit their competition on the basis of price of educational services for AAHA students or on the basis of compensation/reimbursement for AAHA students' athletic

---

[77] ANTITRUST DIVISION SPRING UPDATE, https://www.justice.gov/atr/division-operations/division-update-spring-2019/no-poach-approach.

[78] Craig Lambert, *From the Archives: The Professionalization of Ivy League Sports*, HARVARD MAGAZINE (Jun. 28, 2019), https://www.harvardmagazine.com/2019/06/professionalism-ivy-league-sports.

services. Specifically, University Defendants have eliminated, by agreement, both full and partial athletic scholarship slots.

193.    The natural, foreseeable, and intended result of the Ivy League Agreement is that Ivy League Athletes have paid more for their education and earned less in compensation or reimbursement than they would have in the absence of the Agreement.

194.    Under these circumstances, and as follows from its *per se* illegality, the Ivy League Agreement has caused and is causing Plaintiffs and the other Class Members to pay artificially inflated net prices for attending the University Defendants.

195.    The Ivy League Agreement, by design, has prevented and/or is preventing Plaintiffs and the other Class Members from earning compensation or reimbursement for education-related expenses from the University Defendants for the athletic services they have provided to the universities. But for the Ivy League Agreement, Plaintiffs and the other Class Members would have been compensated for those services.

196.    The injuries that Plaintiffs and the other Class Members have thus suffered and/or are suffering are of the type that the antitrust laws were intended to prevent and that flows from that which makes Defendants' acts unlawful.

197.    Plaintiffs and the other Class Members are naturally motivated to enforce the antitrust laws because they paid artificially inflated prices. There are no other persons who have been and/or are being more directly injured from, or more motivated to seek redress for, Defendants' misconduct than Plaintiffs and the other Class Members.

## VI.    IN THE ALTERNATIVE, THE IVY LEAGUE AGREEMENT IS ILLEGAL UNDER THE RULE OF REASON MODE OF ANALYSIS

198.    If the Rule of Reason (or "Quick Look") mode of analysis were to apply, the Ivy League Agreement fails to satisfy it, including because it has no procompetitive justifications.

## A. There Are Two Relevant Product Markets

199. Defendants' conduct through the Ivy League Agreement is a *per se* violation of Section 1 of the Sherman Act, and the Agreement has caused direct anticompetitive effects, obviating any precise market definition.

200. If any such definition were required, there are two relevant product markets at issue: the AAHA Educational Services Market, and the AAHA Athletic Services Market. These markets constitute the "Relevant Services Markets."

### 1. The AAHA Educational Services Market

201. The AAHA Educational Services Market comprises the University Defendants, which all compete to offer educational services to AAHA students. The existence of the Ivy League Agreement itself, and the fact that the Defendant Universities attract AAHA students despite the Agreement's prohibition of athletic scholarships or compensation for athletic services, is direct evidence that a distinct market for providing educational services for AAHA students exists and that the market comprises the University Defendants.

202. AAHA students highly and uniquely value both the high-level Division I athletics programs and the rigorous academic programs that the University Defendants offer. Absent the Ivy League Agreement, AAHA students would not view academically selective universities without athletic programs or colleges with Division II or Division III athletics programs (or no intercollegiate athletics programs) as reasonable substitutes for the Defendant Universities.

203. Similarly, in the absence of the Ivy League Agreement, and given the distinctive brand value of the Ivy League and an Ivy League education, AAHA students would not view colleges or universities outside the Ivy League with Division I athletics programs to be reasonable substitutes for the University Defendants.

204.    The University Defendants each highly and uniquely value AAHA students, in turn, because such students both help to maintain the schools' high academic standards and elevate the schools' athletic programs. These high-level athletic programs generate significant revenues for the institutions (through, for example, increased alumni donations and media rights deals).

205.    Without AAHA students, the University Defendants would lose these revenues and either fail to be competitive in Division I athletics (because the non-AAHA students who participated in the institutions' sporting events would not be athletically high-achieving) or cease to be academically selective or considered as such (because the institutions would accept students who are insufficiently high-achieving to keep the schools' academic reputations intact).

206.    Indeed, the University Defendants compete against each other, albeit in a limited way, to enroll AAHA students.[79]

207.    In the absence of the Ivy League Agreement, if the University Defendants imposed a small but significant non-transitory increase in the price of educational services provided to AAHA students, it would not result in sufficient AAHA student defections to educational institutions outside the Ivy League to make such price increase unprofitable.

208.    Indeed, under the Ivy League Agreement, the University Defendants have already imposed substantial price increases for their educational services provided to AAHA students,

---

[79] Some of the University Defendants have participated for many years in the 568 Presidents Group. Starting in 2003, the 568 Presidents Group comprised colleges and universities that had reached agreement on the use of a "Consensus Methodology" to determine financial aid for all eligible students (including those defined herein as AAHA students). Six University Defendants—Brown, Columbia, Cornell, Dartmouth, Penn, and Yale—were members of the 568 Presidents Group. In January 2022, these schools and eleven other elite, private national universities that were part of the 568 Presidents Group were named as defendants in a suit, in federal district court in the Northern District of Illinois, challenging the Group's agreement as a violation of Section 1 of the Sherman Act. The court denied defendants' motions to dismiss the lawsuit on August 15, 2022. *See Carbone v. Brown Univ.*, Case No. 22 C 125, 2022 WL 3357249 (N.D. Ill. Aug. 15, 2022). The 568 Presidents Group thereafter announced its disbandment on its website, and subsequently took down its website.

relative to other Division I universities and colleges that provide merit aid to AAHA students, and have not suffered sufficient defections of such students to make those price increases unprofitable.

209.    The AAHA Educational Services Market is a discrete product market. Only a small fraction of the more than approximately 1.5 million high school students who apply for admission to college each year are AAHA applicants. Only a limited number of universities genuinely compete for these students, and the competition is uniquely intense among the University Defendants.

210.    In the alternative, the AAHA Educational Services Market comprises both the Defendant Universities and a few other schools, including Stanford, Notre Dame, Duke, and Rice.

211.    This alternative market is a discrete market. In the absence of the Ivy League Agreement, if the University Defendants and these several other schools imposed a small but significant non-transitory increase in the price of educational services provided to AAHA students, it would not result in sufficient AAHA student defections to educational institutions outside these schools to make such price increase unprofitable.

## 2.    The AAHA Athletic Services Market

212.    The AAHA Athletic Services Market comprises AAHA students who sell their athletic services to the University Defendants.

213.    AAHA students are a distinct and unique group of college applicants and, later, students. The average graduation rate for athletes among Ivy League universities exceeds 98%, the highest average of any athletic conference in the nation for eleven straight years through 2021.[80] AAHA students are exceptionally high-achieving in both academics *and* athletics.

---

[80] *See Ivy League Leads in NCAA Graduation Success Rate*, https://ivyleague.com/news/2021/12/2/general-ivy-league-leads-in-ncaa-graduation-success-rate.aspx.

214.    In the absence of the Ivy League Agreement, in selling their athletic services, the overwhelming portion of AAHA students would not consider a college or university outside the Ivy League to be an adequate substitute.

215.    In the absence of the Ivy League Agreement, if the University Defendants constituted a hypothetical monopoly that reduced the compensation to AAHA students for their athletic services below competitive levels by even a small but significant degree for a substantial period of time, such a price increase would not cause sufficient numbers of AAHA students to switch to other colleges or universities to make such compensation suppression unprofitable.

216.    Indeed, under the Ivy League Agreement, the University Defendants have already imposed a substantial reduction in compensation to AAHA students for their athletic services below competitive levels (in fact, to zero) and have not suffered sufficient defection of such students to have made such compensation suppression unprofitable.

217.    The University Defendants, as shown, highly value AAHA students because they maintain the institutions' high academic standards while maintaining the high level of the institutions' athletic programs, leading to increasingly high revenues for the institutions. The athletic services these AAHA students provide thus have significant monetary value to these institutions.

218.    In the alternative, the AAHA Athletic Services Market comprises AAHA students who sell their athletic services to the University Defendants and a small number of other academically selective universities (those in the alternative AAHA Educational Services Market).

**B.    The Geographic Market Is the United States**

219.    The geographic market for the Relevant Services Markets is the United States.

220.    The University Defendants are all located in and offer educational services in the United States. The athletic competitions the Defendants arrange and in which the Ivy League

48

Athletes compete are in the United States. All of the services provided in the Relevant Services Markets are thus provided in the United States.

221.    A monopolist in the AAHA Educational Services Market would need to control only educational services provided to AAHA students in the United States to be able to increase the price of educational services to AAHA students substantially above competitive levels.

222.    A monopsonist in the AAHA Athletic Services Market would need to control only athletic services by AAHA students in the United States to be able to suppress compensation/reimbursement to AAHA students substantially below competitive levels.

### C.    The University Defendants Have Market Power

223.    The University Defendants, at all relevant times, have collectively had monopoly power in the AAHA Educational Services Market and monopsony power in the AAHA Athletic Services Market.

224.    The University Defendants are the dominant providers of educational services to AAHA students and purchasers of AAHA students' athletic services.

225.    Once a University Defendant recruits and enrolls an AAHA student, he or she will almost certainly continue to provide athletic services to that Defendant, barring injury or graduation, and will almost certainly continue to purchase the school's educational services.

226.    Very few colleges and universities come close to rivaling the University Defendants in academic selectiveness, rigor, and reputation. At most, under the alternative facts referenced above, only a small handful of schools other than the University Defendants can boast comparable academic selectivity and reputation while participating in Division I sports.

227.    The Ive League Agreement itself reflects the University Defendants' substantial market power in the Relevant Services Markets. In the absence of the Ivy League Agreement, the

University Defendants would be even more attractive and unique providers of educational services to AAHA students and purchasers of AAHA students' athletic services.

### D. There Are No Procompetitive Justifications for the Ivy League Agreement

228.   The Ivy League Agreement lacks any procompetitive justifications, and there are less restrictive means for achieving any purported benefits of the Agreement that the University Defendants may claim to be procompetitive.

229.   First, the Ivy League Agreement is not necessary to permit the University Defendants to field teams in large numbers of intercollegiate sports. The Supreme Court unanimously held in *Alston* that Division I colleges and universities may not conspire to limit compensation for the athletic services of football and basketball athletes in the form of "education-related expenses" or additional annual "academic awards" in excess of $5,950. In 2021, in the wake of *O'Bannon*, the NCAA formally acknowledged that all "incoming and current" collegiate athletes, in all NCAA Divisions, are free to license their NIL rights. These decisions show that the University Defendants could field their intercollegiate teams without agreeing to restrict price competition.

230.   Second, the Ivy League Agreement is not necessary to assure competitive balance in athletics among the University Defendants. As it is now, as shown in Appendix D, with full scholarships prohibited, there is little competitive balance within the Ivy League, by sport. In addition, if all University Defendants could choose to provide athletic scholarships and compensate their athletes up to the limits the Supreme Court and the NCAA have allowed, competitive balance in Ivy League sports would not be harmed, as demonstrated across the rest of Division I, where competitive balance exists alongside athletic scholarships.

231.   Third, the Ivy League Agreement is not necessary to maintain or enhance the academic excellence of the University Defendants. A handful of other academically selective institutions offer athletic scholarships along with need-based aid for all other students, without sacrificing

their academic standing. Through the 2018-19 academic year, for example, Stanford University had won the IMF/Learfield Director's Cup for the overall most successful intercollegiate athletic department in the nation for 25 consecutive years.[81] Simultaneously, Stanford ranks among the most academically prestigious universities in the country.

232.    Fourth, the Ivy League Agreement is not necessary to allow the University Defendants to provide financial aid, need-based or merit, to non-AAHA students. Any such claim rests on the false premise that each University Defendant has only a fixed and immutable amount of financial aid to award each year. Over the long run, as shown above, the annual earnings on the University Defendants' endowments have substantially exceeded estimates of their annual drawdowns from those endowment to fund annual expenses. In sum, the University Defendants have long had sufficient resources both to award athletic scholarships and continue to provide the same or more financial aid that they have been awarding to those who need it.

233.    Princeton's expenditures in support of its women's basketball team, which has achieved national prominence in recent years, illustrates the Ivy League's substantial resources. As *The Athletic* summarized in November 2022, regarding the team: "The program doesn't want for resources, relatively. Princeton has massage therapists. It has devices to track players' sleeping patterns. Two new shooting guns recently arrived. The shared facilities are not prohibitive to individual skill improvement. . . . Nor is the momentum slowing for infrastructure and resource improvements. In 2020, the university received an anonymous endowment for the women's basketball head coach position. Last season, the team room was renovated. Princeton's main varsity

---

[81] *Quarter Century of Excellence*, STANFORD ATHLETICS (June 28, 2019), https://gostanford.com/news/2019/6/28/athletics-quarter-century-of-excellence.aspx.

weight room is set for renovation in spring, and while that's not necessarily basketball-specific, Berube's program obviously will benefit from the upgrades."[82]

234.    Princeton does all of the foregoing to compete for AAHA women's basketball players *except* compete on price, by virtue of the Ivy League Agreement. Princeton acts no differently than any of the other Defendants by virtue of the Ivy League Agreement.

235.    In addition, the University Defendants could use less restrictive alternatives to achieve the purported procompetitive benefits of the Ivy League Agreement. In particular, while aggressively competing in the Relevant Markets, and within sporting events, the University Defendants could simultaneously maintain or enhance their academic excellence through agreement on minimum or average academic admissions standards, or both. This approach would preserve the Ivy League's "ultra-high level of competition in both athletics and academics."[83]

## VII.    THE IVY LEAGUE AGREEMENT HAS NOT BEEN AND IS NOT EXEMPT FROM THE ANTITRUST LAWS

236.    Section 568 of the Improving America's Schools Act of 1994 created an antitrust exemption for "2 or more institutions of higher education at which all students admitted are admitted on a need-blind basis, to agree or attempt to agree . . . to award such students financial aid only on the basis of demonstrated financial need for such aid."[84]

237.    This statutory exemption expired on September 30, 2022, and thus cannot provide any exemption for any of Defendants' conduct under the Ivy League Agreement since that time.

---

[82] Brian Hamilton, *How Princeton women's Basketball created the blueprint for national prominence in the Ivy League*, THE ATHLETIC (Nov. 2, 2022), https://theathletic.com/3748734/2022/11/02/princeton-ivy-league-womens-basketball/.

[83] NCSA COLLEGE RECRUITING, *supra*.

[84] 15 U.S.C. § 1 Note 1.

**A.** **While it was in Place, the 568 Antitrust Exemption Did Not Apply to Defendants' Agreement Not to Award Athletic Scholarships**

238.   Until the statutory exemption under Section 568 expired, its clear and explicit language, as well as its legislative history, make clear that to qualify for the exemption, a school must follow need-blind admissions with respect to all applicants.

239.   Section 568 defines the term "on a need-blind basis" to mean "without regard to the financial circumstances of the student involved or the student's family."[85]

240.   At all relevant times, as set forth above, each of the University Defendants has considered the financial circumstances of students in making admissions decisions.

241.   At all relevant times, each Defendant conspired to increase the net price of admission for Ivy League Athletes with at least one other Defendant that has taken the financial circumstances of some applicants into account in making admissions decisions.

242.   Accordingly, during that time, no University Defendant met the precondition for application of the Section 568 antitrust exemption.

**B.** **The 568 Antitrust Exemption Did Not Apply to Defendants' Agreement Not to Compensate Ivy Athletes for Their Athletic Services**

243.   The Section 568 exemption covered only agreements by colleges and universities meeting its preconditions relating to financial aid. It did not apply to agreements by any party relating to compensation for any type of personal service, including athletic services.

244.   Accordingly, at all times relevant to this Complaint, the Ivy League Agreement prohibiting any Defendant from providing any compensation for the athletic services of Ivy League Athletes was never exempt from the antitrust laws.

---

[85] *Id.*

## VIII.    CLASS ACTION ALLEGATIONS

245.    Plaintiffs seek certification of a Class under Federal Rules of Civil Procedure 23(b)(1), 23(b)(2), and 23(b)(3).

246.    The proposed Class is all Ivy League Athletes recruited to play a sport by one or more University Defendants, and who, within the Class Period, attended one of the University Defendants' undergraduate programs while playing a sport for that school.

247.    The Class excludes Defendants' officers, directors, management, employees, subsidiaries, or affiliates, and the children our spouses of Defendants' employees; and the judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.

248.    Members of the Class ("Class Members") are readily ascertainable and identifiable from Defendants' records because Defendants maintain the relevant records, because the Class Members' identities are known to Defendants, and because the Class Members may be notified of the pendency of this action by forms of notice customarily used in class actions.

249.    There are over 10,000 Class Members, who are geographically dispersed around the country, so that joinder of all of them is impracticable.

250.    Defendants have acted or refused to act on grounds that apply generally to the Class Members so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

251.    There are questions of law and fact common to the Class Members, including but not limited to the following:

- Whether the Ivy League Agreement is *per se* illegal under the Sherman Act;
- If relevant to the *per se* analysis, whether the Relevant Services Markets are cognizable antitrust markets;

- If the Rule of Reason analysis applies, whether there are procompetitive benefits of the Ivy League Agreement;

- If the Rule of Reason analysis applies, whether there are less restrictive alternatives for achieving any procompetitive benefits of the Ivy League Agreement;

- If the Rule of Reason analysis applies, whether the Ivy League Agreement under that analysis, is illegal under the Sherman Act;

- Whether Plaintiffs and the Class Members suffered antitrust injury as a result of the Ivy League Agreement; and

- Whether the Ivy League Agreement was exempt from the antitrust laws for any portion of the Class Period.

252. Plaintiffs' claims are typical of the other Class Members' claims, including because Defendants' common course of conduct damaged both Plaintiffs and the other Class Members.

253. Plaintiffs will fairly and adequately protect the Class's interests. Plaintiffs' interests within and among the Class are aligned with, and not adverse to, those of the other Class Members.

254. Plaintiffs will fully and adequately protect the other Class Members' interests. Plaintiffs have retained competent counsel, experienced in the prosecution of antitrust class action litigation, and with the necessary resources, to represent themselves and the Class.

## IX.   CAUSE OF ACTION

### COUNT I
### Section 1 of the Sherman Act, 15 U.S.C. § 1

255. Plaintiffs incorporate the allegations above.

256. The Ivy League Agreement, in prohibiting the University Defendants from awarding athletic scholarships to the Class Members, has been a horizontal agreement among competitors in violation of the Sherman Act throughout the Class Period.

257. The Ivy League Agreement, in prohibiting the University Defendants from making payments to the Class Members for their athletic services, has been a horizontal agreement among competitors in violation of the Sherman Act throughout the Class Period.

258.    In each of the foregoing respects, the Ivy League Agreement has been *per se* illegal throughout the Class Period. In the alternative, the Ivy League Agreement has been illegal throughout that time under either the Quick Look or Rule of Reason modes of antitrust analysis.

259.    Each Defendant has been a participant in the unlawful contract, combination, and conspiracy that has constituted the Ivy League Agreement throughout the Class Period, and each Defendant is jointly and severally liable for the compensatory, trebled damages that Plaintiffs seek for themselves and for the other Class Members.

260.    Plaintiffs and the other Class Members have suffered and will continue to suffer antitrust injury by reason of the continuation of the Ivy League Agreement.

261.    Plaintiffs, on behalf of the other Class Members, therefore seek compensatory, trebled damages, and permanent injunctive relief.

## X.   REQUESTED RELIEF

WHEREFORE, for their proposed relief, Plaintiffs ask that the Court:

A.  Determine that this action may be maintained as a class action under Fed. R. Civ. P. 23(a), (b)(2), (b)(3), and direct that notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Class Members;

B.  Award Plaintiffs and the other Class Members trebled damages, their costs of suit, including reasonable attorneys' fees and expenses, and pre-judgment interest;

C.  Impose a permanent injunction, under the Clayton Act, enjoining Defendants from abiding by the Ivy League Agreement or any equivalent horizontal agreement, combination, or conspiracy; and

D.  Award Plaintiffs and the other Class Members such other relief as the Court may deem just and proper.

Dated: March 7, 2023

By:    */s/ Stephen M. Kindseth*

Stephen M. Kindseth (ct14640)
James M. Moriarty (ct21876)
John L. Cesaroni (ct29309)
ZEISLER & ZEISLER, P.C.
10 Middle Street, 15th Floor
Bridgeport, CT  06605
Tel. 203-368-4234
Fax. 203-368-5485
skindseth@zeislaw.com
jmoriarty@zeislaw.com
jcesaroni@zeislaw.com

Eric L. Cramer*
Patrick F. Madden*
Alan K. Cotler*
Najah Jacobs*
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Phone: (215) 875-3000
ecramer@bm.net
pmadden@bm.net
alancotler@gmail.com
njacobs@bm.net

Robert E. Litan*
Dan Walker*
Hope Brinn*
BERGER MONTAGUE PC
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Phone: (202) 559-9745
rlitan@bm.net
dwalker@bm.net
hbrinn@bm.net

Velvel (Devin) Freedman*
Edward Normand*
Stephen Lagos*
FREEDMAN NORMAND
FRIEDLAND LLP
90 Park Avenue
Suite 1910
New York, N.Y. 10016
Phone: 646-970-7513
vfreedman@fnf.law
tnormand@fnf.law
slagos@fnf.law

*Counsel for Plaintiffs and the Proposed Class*

*Applications for admission *pro hac vice* forthcoming

## Appendix A

### Ivy League University Endowment and Operating Expense Data

| | 1993 Endowment[86] | 2021 Endowment |
|---|---|---|
| Harvard | $5.8 billion | $53.2 billion[87] |
| Yale | $3.2 billion | $42.3 billion[88] |
| Princeton | $2.5 billion | $37.7 billion[89] |
| Brown | $575 million | $6.9 billion[90] |
| Dartmouth | $824 million | $8.5 billion[91] |
| Columbia | $2 billion | $14.3 billion[92] |
| Cornell | $884 million | $10 billion[93] |
| Penn | $1.1 billion | $20.5 billion[94] |

---

[86] https://nces.ed.gov/programs/digest/d95/dtab346.asp.

[87] https://finance.harvard.edu/files/fad/files/fy21_harvard_financial_report.pdf.

[88] https://news.yale.edu/2021/10/14/yale-endowment-earns-402-investment-return-fiscal-2021.

[89] https://www.princeton.edu/news/2021/10/29/princetons-endowment-returns-continue-support-university-mission-and-impact.

[90] https://investment.brown.edu/sites/g/files/dprerj681/files/Reports/INV_Endowment %20Report%20FY21_MP-1458-WEB.pdf.

[91] https://www.dartmouth.edu/finance/documents/financial_management_tab_documents/2021_financialstmt.pdf.

[92] https://www.finance.columbia.edu/sites/default/files/content/Finance%20Documents/Financial%20Reports/2021_Columbia_UG_Final.pdf.

[93] https://news.cornell.edu/stories/2021/10/markets-restructuring-lift-endowment-new-high-fy-2021.

[94] https://www.finance.upenn.edu/wp-content/uploads/Penn-Division-of-Finance-FY21-Annual-Report.pdf.

## Appendix B

## Annual Athletic Revenues, Millions of Dollars (Rounded)
## 2020-21[95]

| | |
|---|---|
| Brown | 24 |
| Columbia | 31 |
| Cornell | 28 |
| Dartmouth | 30 |
| Harvard | 30 |
| Penn | 44 |
| Princeton | 33 |
| Yale | 47 |

---

[95] Compiled from data reported at www.collegefactual.com.

**Appendix C**

**Revenue, Expenses, Net Profit and Employment for Ivy League Universities,**

**Fiscal Year 2020[96]**

|  | Revenue (Billions) | Expenses (Billions) | Net Profit (Billions) | Employment |
|---|---|---|---|---|
| Brown | 1.48 | 1.20 | 0.29 | 12,575 |
| Columbia | 5.94 | 5.53 | 0.41 | 38,186 |
| Cornell | 5.13 | 5.18 | -0.05 | 43,316 |
| Dartmouth | 1.58 | 1.09 | 0.49 | 10,785 |
| Harvard[97] | 5.25 | 4.97 | 0.28 | 38,263 |
| Penn | 7.62 | 7.2 | 0.41 | 55,450 |
| Princeton | 2.12 | 2.14 | -.02 | 15,752 |
| Yale | 5.60 | 4.58 | 1.01 | 31,333 |

---

[96] All data from the FY20 Form 990s for each Defendant.

[97] For Fiscal year 2020-21.

**Appendix D**

**Ivy League Conference Championships or Equivalents, By Sport, 1956-2021**[98]


**Football (solo/shared titles):**

Dartmouth 20

Penn 18

Harvard 17

Yale 16

Princeton 13

Brown 4 (last in 2008)

Cornell 3 (last in 1990)

Columbia 1 (1961)


**Men's Basketball (NCAA Tournament Bids):**

Princeton 25

Penn 24

Dartmouth 7 (last in 1959)

Yale 6

Harvard 5

Cornell 5

Columbia 3 (last in 1968)

Brown 2 (last in 1986)


**Women's Basketball (solo/shared titles since 1975)**

Dartmouth 17 (last in 2009)

Princeton 16 (except for a couple of Penn wins, total domination since 2010)

Harvard 11 (last in 2008)

Penn 6

Brown 6 (last in 2006)

Yale 1 (last in 1979)

---

[98] Compiled from data reported at https://ivyleague.com/.

Cornell 1 (last in 2008)

Columbia 0

**Men's Lacrosse (solo/shared titles):**

Cornell 29

Princeton 27

Brown 10

Yale 8

Penn 5

Harvard 4

Dartmouth 3

Columbia does not play men's lacrosse

**Women's Lacrosse (solo/shared titles since 1980)**

Princeton 13

Penn 13

Dartmouth 12

Harvard 11 (last in 1993)

Yale 2

Cornell 2

Brown 0

Columbia 0 (from 2010-2019, Lions were 9-61 in League play)

**Wrestling (Yale and Dartmouth no longer wrestle)**

Cornell 39

Princeton 12

Penn 11

Columbia 4 (last in 1982)

Yale 3 (last in 1979)

Harvard 1

Brown 0

**Women's Soccer (since 1978)**

Brown 13

Harvard 13

Princeton 10

Dartmouth 6

Penn 4

Yale 2

Cornell 2 (last in 1991)

Columbia 1


**Women's Softball (since 1980)**

Princeton 19

Harvard 8

Brown 5

Cornell 5

Dartmouth 3

Penn 2

Yale 2

Columbia does not play women's softball.


**Women's Tennis (since 1979)**

Harvard 19

Princeton 14

Yale 8

Penn 3

Dartmouth 2

Brown 2

Columbia 1

Cornell 1

Dartmouth 1

**Men's Tennis**

Harvard 29

Princeton 17

Columbia 15

Penn 6

Yale 4 (last in 1993)

Dartmouth 3

Brown 3

Cornell 2


**Women's Swimming & Diving (since 1977)**

Princeton 23

Harvard 14

Yale 7

Brown 5 (not since 1999)

No one else has won


**Men's Swimming & Diving**

Princeton 31

Harvard 27

Yale 15 (last in 1993)

Penn 4 (last in 1971)

Columbia 2 (last in 1989)

Cornell 1

Dartmouth and Brown have never won


**Brown and Columbia have never won a men's outdoor track championship. Dartmouth won once, in 1988.**