STEPHEN M. TILLERY *(pro hac vice forthcoming)*
  stillery@koreintillery.com
GARRETT R. BROSHUIS (Bar No. 329924)
  gbroshuis@koreintillery.com
CAROL O'KEEFE *(pro hac vice forthcoming)*
  cokeefe@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone:  (314) 241-4844
Facsimile: (314) 241-3525

GEORGE A. ZELCS *(pro hac vice forthcoming)*
  gzelcs@koreintillery.com
MARC WALLENSTEIN *(pro hac vice forthcoming)*
  mwallenstein@koreintillery.com
PAMELA I. YAACOUB
  pyaacoub@koreintillery.com *(pro hac vice forthcoming)*
**KOREIN TILLERY, LLC**
205 N. Michigan Ave., Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750

*Attorneys for Plaintiffs in the Colorado Cases*

CHRISTOPHER M. BURKE (Bar No. 214799)
  cburke@koreintillery.com
**KOREIN TILLERY, LLC**
401 West A. Street, Suite 1430
San Diego, CA 92101
Telephone: (619) 625-5620

ERIC OLSON *(pro hac vice forthcoming)*
eolson@olsongrimsley.com
SEAN GRIMSLEY *(pro hac vice forthcoming)*
sgrimsley@olsongrimsley.com
JASON MURRAY  *(pro hac vice forthcoming)*
jmurray@olsongrimsley.com
**OLSON GRIMSLEY KAWANABE
HINCHCLIFF & MURRAY LLC**
700 17th Street, Suite 1600
Denver, CO 80202
Telephone: (303) 535-9151

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION**

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | CASE NO. 4:20-cv-3919-CW <br><br> **CLASS ACTION** <br><br> **Plaintiffs in the Colorado Cases' Response in Opposition to Motion for Preliminary Approval** <br><br> Hearing date: Sep. 5, 2024 <br> Hearing Time: 2:30 p.m. <br> Courtroom: 2, 4th Floor <br> Judge: Hon. Claudia Wilken |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................... 1

BACKGROUND .............................................................................................................................. 2

ARGUMENT .................................................................................................................................... 4

    I.    With regards to the *Fontenot* fair pay claims, the proposed settlement suffers from inadequate representation and provides inadequate compensation. ........................ 5

        A.    Class members with *Fontenot* claims did not have adequate representation. ......................................................................................................... 5

        B.    Class members with *Fontenot* fair pay claims are receiving inadequate compensation .......................................................................................................... 8

    II.    With regards to the *Cornelio* partial scholarship claims, the proposed settlement provides no compensation for claims worth hundreds of millions of dollars ............. 10

        A.    Allowing the partial scholarship claims to be released would result in inequitable treatment of certain class members ................................................... 11

        B.    The representation was also inadequate for partial-scholarship class members. ...................................................................................................................... 12

        C.    The lack of compensation for partial-compensation claims is facially inadequate ............................................................................................................. 13

    III.    New counsel should be appointed to represent the injunctive relief class to avoid a thicket of ethical conflicts regarding the settlement of injunctive relief and damages claims by the same counsel .................................................................... 14

    IV.    The proposed settlement contains a number of unfair terms, including an attempt to bind unknown eight-year-old kids. ................................................................ 17

        A.    The parties are attempting to give Defendants protections from future antitrust lawsuits without going through collective bargaining. ......................... 17

        B.    Because of the policing of "untrue" NIL, this deal may result in some athletes actually receiving less money than they now receive, meaning it treats certain class members inequitably. .............................................................. 18

        C.    The proposed settlement would violate due process by binding future athletes who have no voice and no ability to participate in this approval process. ................................................................................................................. 21

        D.    The proposed settlement and supporting documents contain other improprieties. ...................................................................................................... 24

        E.    The *Fontenot* and *Cornelio* cases should not be enjoined. ..................................... 24

CONCLUSION ............................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Nat'l Colleg. Athletic Ass'n v. Alston*, 594 U.S. 69 .................................................10, 17, 19, 25

*Amchem Prod., Inc. v. Windsor*,
  521 U.S. 591 (1997)......................................................................................................*passim*

*Arena v. Intuit Inc.*,
  No. 19-cv-02546-CRB, 2021 WL 834253 (N.D. Cal. Mar. 5, 2021)..................................24

*In re Bluetooth Headset Prods. Liab. Litig.*,
  654 F.3d 935 (9th Cir. 2011).................................................................................................5

*Bridgeman v. Nat'l Basketball Ass'n*,
  675 F. Supp. 960 (D. N.J. 1987).........................................................................................23

*Brown v. Ticor Title Ins. Co.*,
  982 F.2d 386 (9th Cir. 1992)...............................................................................................22

*Clarke v. Advanced Priv. Networks, Inc.*,
  173 F.R.D. 521 (D. Nev. 1997) ...........................................................................................22

*In re Cmty. Bank of N. Virginia*,
  622 F.3d 275 (3d Cir. 2010), *as amended* (Oct. 20, 2010) ............................ 6, 8, 11, 12, 13

*In re Coll. Athlete Comp. Antitrust Litig.*,
  No. MDL 3105, 2024 WL 1597524 (J.P.M.L. Apr. 11, 2024) .............................................3

*Cornelio v. N.C.A.A.*,
  No. 1:24-cv-02178 (D. Col.) ..........................................................................................*passim*

*Fontenot v. N.C.A.A.*,
  No. 1:23-cv-03076 (D. Colo.)........................................................................................*passim*

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
  13-cv-7789 (S.D.N.Y.) ........................................................................................................16

*Gonzalez v. CoreCivic of Tennessee, LLC*,
  No. 116CV01891DADJLT, 2018 WL 4388425 (E.D. Cal. Sept. 13, 2018) ............................ 6, 12

*Guthrie v. ITS Logistics, LLC*,
  No. 21cv000729, 2023 WL 2784804 (E.D. Cal. Apr. 5, 2023), *report and
  recommendation adopted*, 2023 WL 4288943 (E.D. Cal. June 30, 2023) .............................14

*Haralson v. U.S. Aviation Servs. Corp.*,
  383 F. Supp. 3d 959 (N.D. Cal. 2019).....................................................................................4

**Response in Opposition to Motion for Preliminary Approval**

*Hesse v. Sprint Corp.*,
    598 F.3d 581 (9th Cir. 2010) ........................................................................... *passim*

*Hill v. Mercy Health Sys. Corp.*,
    No. 20 cv 50286, 2021 WL 5832787 (N.D. Ill. Nov. 24, 2021) ......................... 24

*Hunt v. VEP Healthcare, Inc.*,
    No. 16-cv-04790-VC, 2017 WL 3608297 (N.D. Cal. Aug. 22, 2017) ................. 25

*Lawlor v. Nat'l Screen Serv. Corp.*,
    349 U.S. 322 (1955) ......................................................................................... 23

*In re Literary Works in Elec. Databases Copyright Litig.*,
    654 F.3d 242 (2d Cir. 2011) ................................................................. 1, 6, 7, 13

*Murray v. Grocery Delivery E-Servs. USA Inc.*,
    55 F.4th 340 (1st Cir. 2022) ........................................................................... *passim*

*Nat'l Basketball Ass'n v. Williams*,
    857 F. Supp. 1069 (S.D.N.Y. 1994) ................................................................. 23

*O'Connor v. Uber Techs., Inc.*,
    No. 13-cv-03826-EMC, 2016 WL 3548370 (N.D. Cal. June 30, 2016) ......... 5, 16

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999) ........................................................................................ *passim*

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    827 F.3d 223 (2d Cir. 2016) ............................................................. 2, 4 15, 16, 17

*In re Payment Card Interchange Fee*,
    2024 WL 3236614 (E.D.N.Y. June 28, 2024) ............................................. 18, 23

*Redel's Inc. v. Gen. Elec. Co.*,
    498 F.2d 95 (5th Cir. 1974) ............................................................................. 22

*Robertson v. Nat'l Basketball Ass'n*,
    72 F.R.D. 64 (S.D.N.Y. 1976) ......................................................................... 23

*Schwartz v. Dallas Cowboys Football Club, Ltd.*,
    157 F. Supp. 2d 561 (E.D. Pa. 2001) ............................................................... 22

*Senne v. Office of the Commissioner of Baseball*,
    No. 14-cv-00608-JCS (N.D. Cal.) ................................................................... 16

*Silber v. Mabon*,
    18 F.3d 1449 (9th Cir. 1994) ........................................................................... 21

*White v. Nat'l Football League*,
    756 F.3d 585 (8th Cir. 2014) ........................................................................... 23

**Response in Opposition to Motion for Preliminary Approval**

*White v. Nat'l Football League,*
    822 F. Supp. 1389 (D. Minn. 1993) ...................................................................... 23

**Court Rules**

Rule 23(a)(4) ............................................................................................................... 4

Rule 23(b)(1) ............................................................................................................. 22

Rule 23(b)(2) ............................................................................................................. 22

Rule 23(e)(1)(B) .......................................................................................................... 4

Rule 23(e)(2) ............................................................................................................... 4

**Other Authorities**

1 McLaughlin on Class Actions § 4:30 (20th ed.) .................................................... 5

4 Newberg and Rubenstein on Class Actions § 13:19 (6th ed.) .......................... 24, 25

4 Newberg and Rubenstein on Class Actions § 13:56 (6th ed. 2022) .................... 11

*As NIL Turns Three, Collectives and Football Still Control the Industry,* Front Office Sports
    (July 1, 2024), *available at* https://tinyurl.com/t4aruufu .................................. 19, 20

*Div. I Athletics Finances 10-Year Trends from 2013 to 2022, available at*
    https://tinyurl.com/bddrkc6j ............................................................................... 19

*Great Osobor transferring to Washington with big NIL deals,* ESPN (May 13, 2024), *available
    at* https://tinyurl.com/hncpjjp .............................................................................. 19

*How the House v. NCAA settlement could reshape college sports,* The Athletic, (May 20, 2024),
    *available at* https://tinyurl.com/ykebpraw ........................................................... 20

*Inside the college football NIL market,* CBSSports (May 20, 2024), *available at*
    https://tinyurl.com/4ac9tzzy ............................................................................ 19, 20

*NCAA settlement Q&A,* Yahoo!Sports (May 24, 2024), *available at*
    https://tinyurl.com/yh83xkw6 .......................................................................... 16, 20

*Ohio State Athletic Director Ross Bjork Says School's NIL Collectives, Brand Affiliates Disbursed
    "Over 20 Million" to Football Players This Year,* Buckeye Sports Bull. (July 24, 2024),
    *available at* https://tinyurl.com/3n54a98n ........................................................... 21

*Texas Tech Poaches Softball Star with $1 Million NIL Deal,* Front Office Sports (July 25,
    2024), *available at* https://tinyurl.com/mr9r2snf ................................................. 20

*Title IX will apply to college athlete revenue share, feds say* (July 16, 2024), *available at*
    https://tinyurl.com/bzshckkb ............................................................................... 21

**Response in Opposition to Motion for Preliminary Approval**

*With revenue sharing coming to college sports, are NIL collectives a problem or part of a solution?*,
    AP (May 25, 2024), *available at* https://tinyurl.com/mvaj99jx ...........................................................20

*Your college football team is about to pay players. What can Utah and BYU afford?*, Salt Lake
    Trib. (May 24, 2024), *available at* https://tinyurl.com/4csfpwnp...........................................................20

**INTRODUCTION**

Under Rule 23(e), a proposed settlement should not receive preliminary approval unless all class members are receiving adequate representation, adequate compensation, and equitable treatment. This proposed settlement checks none of those boxes. The parties took a case focused on payment for the use of names, images, and likenesses (NILs) and transmogrified it into a vehicle to release nearly every antitrust claim that a college athlete might have. That includes the claims for two cases being litigated in Colorado: the *Fontenot* case demanding fair pay for college athletes, and the *Cornelio* case brought on behalf of athletes receiving only partial scholarships.[1]

The movants did not express any interest in litigating those claims, and the proposed settlement undervalues them. The movants value the *Fontenot* fair pay claims at a little over $1.8 billion. That evaluation, however, adopts economic assumptions favorable to the NCAA, essentially assuming that a jury would side with the NCAA on what goes into the revenue pool and what credits the NCAA might be granted towards the fair pay calculation. To calculate the *possible* value of the claims, the *Fontenot* plaintiffs obtained an independent, preliminary estimate from a respected economist: over $24 billion. The movants plan to devote $600 million of the fund to these claims, meaning movants are proposing to settle the claims for just pennies on the dollar—before trebling.

Worse still, *no money* is being devoted to the *Cornelio* partial scholarship claims. A preliminary analysis shows that these claims are likely worth over $300 million in damages. Releasing these claims for nothing is fundamentally unfair, especially since these partial scholarship athletes (who have, in part, essentially paid the schools to work) stand to gain the least from the settlement.

To remedy the inadequate representation and inequitable treatment, the partial scholarship claims should be carved out of the release, and the fair pay claims should either be carved out or *Fontenot*'s counsel should be appointed to represent athletes with those claims in another round of negotiations. Due process and Supreme Court precedent require nothing less. *See, e.g., In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 250 (2d Cir. 2011) (following *Amchem Prod., Inc. v.*

---

[1] *See* Broshuis Decl., Exs. B & C (operative complaints for *Fontenot v. N.C.A.A.*, No. 1:23-cv-03076 (D. Colo.) and *Cornelio v. N.C.A.A.*, No. 1:24-cv-02178 (D. Col.) (collectively the "Colorado Cases")).

**Response in Opposition to Motion for Preliminary Approval**

1    *Windsor*, 521 U.S. 591, 627 (1997) and rejecting a proposed settlement under similar circumstances

2    because class members with different claims should be subclassed with separate representation).

3        Similar problems plague the injunctive relief portion of this proposed settlement. The Second

4    Circuit overturned one of the largest proposed antitrust settlements in history because the same

5    counsel could not adequately represent both a damages class and an injunctive relief class in the same

6    settlement. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 233 (2d Cir.

7    2016). Given all that is at stake here—for both past athletes owed damages and current/future

8    athletes—the two groups deserve separate representation to ensure that the representation of one

9    group does not compromise the zealous advocacy for the other group. Indeed, like the damages

10   release, the proposed injunctive component became untethered from the theory of this case.

11   Somehow this NIL case morphed into a case that seeks to insert a new artificial cap on overall

12   revenue sharing; that calls for movants' counsel to lobby arm-in-arm with the NCAA; that would give

13   the NCAA the right to "police" true NIL money from untrue NIL money (which may actually reduce

14   the amount of money going to many athletes); that changes rules on scholarship limits and releases all

15   scholarship-related claims; and that binds ten years' worth of future athletes without giving them any

16   right to participate. The parties used this NIL case to try to write a collective bargaining agreement,

17   but without any of labor law's protections.

18       Movants' counsel have accomplished a great deal and should be lauded for their efforts. But

19   they are now seeking to appease Defendants' desire for broad-ranging relief without ensuring that

20   needed structural protections are in place. Indeed, the current settlement allows the NCAA to check

21   multiple items off its litigation wish list, while creating a byzantine system to insulate it from future

22   lawsuits. Where, as here, global relief seeks to resolve disparate claims with divergent interests in

23   allocation, the settlement must be negotiated by independent counsel advocating for each plaintiff

24   subgroup to ensure adequate representation and relief. The settlement will not survive without it.

25                                    **BACKGROUND**

26       On November 20, 2023, Alex Fontenot filed a complaint in the District of Colorado to

27   pursue claims that were not being brought in this case or any other. *See* Broshuis Decl., Ex. B

28   (operative complaint). There are currently five named plaintiffs: Mr. Fontenot (a former starting

running back at the University of Colorado); Mya Hollingshed (a former star women's basketball player for Colorado); Sara Fuller (the first woman to score a point in a Power 5 football game); Deontay Anderson (a former top recruit and starting defensive lineman at Houston); and Tucker Clark (a current golfer at Colorado). *See id.*

The *Fontenot* action takes aim at the full cut of revenue that Defendants reap from the fruits of these athletes' labor. Absent Defendants' restraint, college athletes "would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools." *Id.* ¶ 123. The *Fontenot* Plaintiffs seek to enjoin Defendants from continuing their unlawful practices and seek to represent a class of "[a]ll persons who worked as athletes for a Division I athletic team at an NCAA Division I school, from the beginning of the statute of limitations period, as determined by the Court, through judgment in this matter." *Id.* ¶ 39.

Being focused on the full and fair pay that college athletes would receive in an unrestrained market, the *Fontenot* action differs from this case. As its name implies, the *In re College Athlete NIL Litigation* focused on the restrictions on earnings for the use of names, images, and likenesses. The *Fontenot* action, however, argues for a competitive cut of all revenue earned from the athletes' labor. Recognizing the limitations of the *NIL Litigation*, movants' counsel filed another case, the *Carter* action (No. 4:23-cv-6325), a few weeks after *Fontenot*. Within a month, and without notice or any efforts at private ordering, the *Carter* plaintiffs moved for an MDL, seeking to gain control over both *Carter* and *Fontenot* in consolidated proceedings. Defendants supported that motion by agreeing that *Fontenot* should be sent to this District. The JPML denied the motion on April 11, 2024. *In re Coll. Athlete Comp. Antitrust Litig.*, No. MDL 3105, 2024 WL 1597524, at *2 (J.P.M.L. Apr. 11, 2024). Defendants then moved to transfer the *Fontenot* action to this District, but the motion was denied.

Meanwhile, the parties in *NIL Litigation* were working behind the scenes on a kitchen-sink settlement. Media reports indicated that the contemplated settlement would include a broad release of all antitrust claims, which could impact the broader and more valuable *Fontenot* claims. *Fontenot* counsel asked to be included in any settlement communications that might affect the *Fontenot* case—and warned of potential ethical ramifications stemming from the same plaintiffs' counsel attempting to settle so many different types of claims without independent counsel—but the *NIL Litigation* parties

1    pressed forward. Broshuis Decl. ¶ 5. On May 23, 2024, the parties in *NIL Litigation* announced that

2    they had agreed to terms on a broad, comprehensive settlement.

3          The parties moved for preliminary approval on July 26, 2024, revealing the exact terms of the

4    proposed settlement for the first time. The same day, the parties agreed to file an amended complaint

5    that, for the first time in this *NIL Litigation*, included a few paragraphs discussing scholarship limits

6    and included allegations related to the *Fontenot* fair pay case. ECF No. 448.

7                                           **ARGUMENT**

8          At preliminary approval, the parties pursuing a class settlement must show "that the court will

9    likely be able to ... (i) approve the proposal under Rule 23(e)(2)." Rule 23(e)(1)(B). "In other words, a

10   court must make a preliminary determination that the settlement 'is fair, reasonable, and adequate'

11   when considering the factors set out in Rule 23(e)(2)." *Haralson v. U.S. Aviation Servs. Corp.*, 383 F.

12   Supp. 3d 959, 966 (N.D. Cal. 2019). Those factors include (1) whether class members have been

13   adequately represented, (2) whether "the proposal was negotiated at arm's length," (3) whether the

14   proposed relief is adequate, and (4) whether the "proposal treats class members equitably relative to

15   each other." Rule 23(e)(2). "Courts 'must be particularly vigilant not only for explicit collusion, but

16   also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that

17   of certain class members to infect the negotiations.'" *Haralson*, 383 F. Supp. 3d at 966 (quoting *In re*

18   *Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011)).

19         Due process and class action principles animate the analysis. "Rule 23(a)(4), which requires that

20   'the representative parties ... fairly and adequately protect the interests of the class,' 'serves to uncover

21   conflicts of interest between named parties and the class they seek to represent," as well as "conflicts

22   of class counsel.'" *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d at 231

23   (quoting *Amchem*, 521 U.S. at 625). "Class actions and settlements that do not comply with Rule

24   23(a)(4) and the Due Process Clause cannot be sustained." *Id.*; *accord Hesse v. Sprint Corp.*, 598 F.3d 581,

25   588 (9th Cir. 2010) ("Without adequate representation, a court order approving a claim-preclusive

26   class action settlement agreement cannot satisfy due process as to all members of the class.").

27         This District has issued Procedural Guidance for Class Action Settlements. At preliminary

28   approval, the Guidance calls for information regarding, among other things, differences between the

settlement class and class certified; differences between the claims being released and those pursued in the operative complaint; the value of the relief provided versus what could have been recovered "claim by claim"; and a discussion of other cases that would be affected by the settlement—including the claims that would be affected, "whether plaintiffs' counsel in those cases participated in the settlement negotiations," and a history of discussions with plaintiffs in those cases.

## I.  With regards to the *Fontenot* fair pay claims, the proposed settlement suffers from inadequate representation and provides inadequate compensation.

When, as here, a proposed settlement expands a previously certified class to include additional class members and to release additional claims that were not certified, "a more probing inquiry is warranted." *O'Connor v. Uber Techs., Inc.*, No. 13-cv-03826-EMC, 2016 WL 3548370, at *5 (N.D. Cal. June 30, 2016); *see also In re Bluetooth*, 654 F.3d at 976 ("Prior to formal class certification, there is an even greater potential for a breach of fiduciary duty owed the class during settlement. Accordingly, such agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest …."). Under such circumstances, "the Court must be sensitive to the risk of collusion or at least less than a full adversarial process with respect to the release of claims pending in other cases." *O'Connor*, 2016 WL 3548370, at *5.

As one treatise counsels, when there are class members with different claims and a single counsel group attempts to represent all the disparate groups of class members, it

> create[s] a tension in the class representation (for both the representatives and class counsel) …. When this occurs, only the creation of subclasses, and representation by a separate class representative and counsel looking out for each subclass, can ensure that the interests of each subgroup are in fact adequately represented.

1 McLaughlin on Class Actions § 4:30 (20th ed.). That "tension" is present here because a large segment of class members with additional, high-value claims are being asked to release claims worth billions for a relatively small amount of money—without the protections of separate counsel for those claims and class members. The result is inadequate representation and inadequate relief.

### A.  Class members with *Fontenot* claims did not have adequate representation.

Thousands of proposed settlement class members have *Fontenot* fair pay claims that the parties are attempting to release. Yet thousands of other proposed settlement class members do not. That results from statute of limitations issues because this case was filed several years before *Fontenot*. *See*

1   Rascher Decl., ECF No. 350-4 (evaluating the NIL-related claims covered by this case to 2016, but

2   evaluating the pay for services claims to 2019).

3        To ensure that both groups—those with *Fontenot* fair pay claims and those without—receive a

4   fair piece of the pie, subclasses and independent counsel are needed. *See Murray v. Grocery Delivery E-*

5   *Servs. USA Inc.*, 55 F.4th 340, 346 (1st Cir. 2022) ("That structural assurance is absent when a single

6   lawyer represents groups with significantly different claims in the context of allocating a lump-sum

7   settlement. … [I]f groups of class members with significantly different claims do not have separate

8   representation in determining how the settlement should be split, the court lacks structural assurance

9   that the settlement treats each group fairly.").

10       The Supreme Court condemned something similar in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815,

11  857 (1999). The proposed settlement class included "those exposed to Fibreboard's asbestos products

12  both before and after 1959," the date an insurance policy expired. *Id.* Those with pre-1959 claims thus

13  "had more valuable claims" than those that post-dated 1959. *Id.* That resulted in an "instance of

14  disparate interests" that should have been addressed with subclassing and separate counsel because of

15  the potential conflict that counsel had in trying to represent both groups in the same settlement. *Id.*

16       The Court had reached a similar result two years earlier in *Amchem Prod., Inc. v. Windsor*, 521

17  U.S. 591, 627 (1997). And following *Amchem* and *Ortiz*, circuit courts have consistently held that

18  subclassing and separate counsel should be used where subgroups of plaintiffs possess distinct claims

19  of differing value. *See In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 250 (2d Cir.

20  2011) ("The two subgroups in *Amchem* had competing interests in the distribution of a settlement

21  whose terms reflected 'essential allocation decisions designed to confine compensation and to limit

22  defendants' liability.'"); *Murray*, 55 F.4th at 346-47 (rejecting proposed settlement where some class

23  members had claims that others did not have and same counsel represented all class members); *In re*

24  *Cmty. Bank of N. Virginia*, 622 F.3d 275, 284–85 (3d Cir. 2010), *as amended* (Oct. 20, 2010) (following

25  *Amchem* and *Ortiz* and rejecting settlement); *see also Gonzalez v. CoreCivic of Tennessee, LLC*, No.

26  116CV01891DADJLT, 2018 WL 4388425, at *5-6 (E.D. Cal. Sept. 13, 2018) (court "must be vigilant"

27  when settlement releases claims not litigated).

28

1    Here too, "[t]he settling parties, in sum, achieved a global compromise with no structural

2 assurance of fair and adequate representation for the diverse groups and individuals affected."

3 *Amchem*, 521 U.S. at 627. Despite attempts to "compartmentalize" the settlement, there is only one

4 overall bucket of settlement money, and under *Ortiz* and *Amchem*, separate counsel should have

5 represented the interests of those with *Fontenot* fair pay claims. *See Ortiz*, 527 U.S. at 856 (discussing

6 "homogenous subclasses … with separate representation"); *see also Murray*, 55 F.4th at 345 (discussing

7 the "zero-sum circumstances" of a common fund settlement involving multiple types of claims).

8    The parties will likely point to the fact that some class representatives have both types of

9 claims; to the extended mediation process; and to the plaintiffs' attorneys' long history of advocating

10 for college athletes. That is no substitute, however, for the protections offered by independent

11 counsel when one segment of plaintiffs has valuable claims that another segment does not have—

12 especially when proposed settlement class counsel showed little interest in litigating or even bringing

13 these valuable claims. *See Hesse*, 598 F.3d at 589 ("Class representation is inadequate if the named

14 plaintiff fails to prosecute the action vigorously on behalf of the entire class …."). The Second Circuit

15 rejected similar arguments under nearly identical circumstances. *In re Literary Works*, 654 F.3d at 253.

16 "The rationale is simple: how can the value of any subgroup of claims be properly assessed without

17 independent counsel pressing its most compelling case? It is for this reason that the participation of

18 impartial mediators and institutional plaintiffs does not compensate for the absence of independent

19 representation." *Id.*; *see also Murray*, 55 F.4th at 346-47 (following *Literary Works*).

20    The proposed settlement class counsel may claim that they negotiated the sum to be paid for

21 the fair pay claims separate from the sum to be paid for other claims. *See* Mot. at 6 (saying the

22 discussions were "compartmentalized"). That is procedural whitewashing. The movants still made

23 "essential allocation decisions designed to confine compensation and to limit defendants' liability."

24 *Amchem*, 521 U.S. at 627. Nearly every defendant seeks a global resolution when settling. When

25 *Fontenot* was filed, the movants were already deep in settlement negotiations, and Defendants likely

26 would not agree to settle the *NIL Litigation* claims with fair pay claims on the horizon. Movants'

27 counsel rushed to file *Carter* and instantly sought to move *Fontenot* to California. Defendants and the

28 movants aligned on those procedural moves, and proposed a settlement of the fair pay claims in

**Response in Opposition to Motion for Preliminary Approval**

1   record time. Movants had an incentive to get a deal done, and Defendants likely wanted to deal with

2   just a single group of attorneys, fearful that including *Fontenot* counsel in negotiations would require

3   them to pay more money for fair pay claims.

4          To be clear, *Fontenot* counsel does not object to the concept of a global settlement, but any

5   such settlement requires independent evaluation and zealous advocacy by separate counsel for the fair

6   pay plaintiffs. Counsel for *Fontenot* repeatedly warned Defendants that it was improper for the same

7   plaintiffs' counsel to settle all claims at once. Broshuis Decl. at ¶ 5. The warnings fell on deaf ears.

8   Under this District's Procedural Guidance for Class Action Settlements, that is cause for pause.

9          The cure is simple. The claims should be carved out, or, following *Amchem* and *Ortiz*, and their

10  progeny, the Court should appoint separate counsel to lead another round of negotiations to ensure

11  that the athletes with *Fontenot* fair pay claims are adequately represented. *See Murray*, 55 F.4th at 346–

12  47 (discussing the "structural assurance" gained by separate counsel); *In re Cmty. Bank of N. Virginia*,

13  622 F.3d at 284–85 ("Failure to pursue such claims may suggest that class counsel [abdicated] their

14  duty to the class in favor of the enormous class-action fee offered by defendants.").

15         Counsel for the *Fontenot* plaintiffs respectfully ask the Court to appoint them. They are uniquely

16  situated to fulfil this role, being the first to bring the fair pay claims and being the only group

17  expressing a real desire to litigate those claims. They also possess a huge amount of experience in high

18  stakes antitrust cases and sports cases, including in this District.[2]

19      **B.  Class members with *Fontenot* fair pay claims are receiving inadequate compensation.**

20         The lack of structural protections resulted in real harm to the *Fontenot* fair pay class, as the

21  movants devalued these claims. The movants claim (at 18-19) that the $600 million devoted to these

22  claims amounts to 31.6% of "the estimated single damages." Not so.

23         This estimate assumes that huge categories of revenue would not be included in the starting

24  number for overall revenue, like institution support, third-party payments, and some booster support.

25  Rascher Decl., ECF No. 450-4, at 18. But this revenue stems from the work being performed by the

---

26

27  [2] *See* Broshuis Decl., Ex. A (firm resume for Korein Tillery, LLC); Olson Decl. ¶¶ 1-4 (attorney bios

28  for Olson Grimsley Kawanabe Hinchcliff & Murray, LLC).

athlete, so there is no reason to automatically assume it should be excluded—it certainly isn't excluded as a source of revenue when the schools are paying the coaches millions of dollars. As movants' expert declaration recognizes, "there are valid economic arguments to include some or all of those categories" instead of excluding them. Rascher Decl., ECF No. 450-4, at 18. There are indeed valid economic arguments to support their inclusion. Tatos Decl. ¶¶ 22-49.

The movants' estimate also assumes that Defendants should be given a full credit for items such as scholarships. Yet scholarships are not seen in pro sports any more than booster support, so it is unfair to assume that one should be excluded while the other is included. And it also is unfair to give a full credit because (1) they are in-kind payments that differ from actual monetary compensation, (2) the net price of school is different than the sticker price, and (3) research shows that athletes do not receive the full value of the educational benefits. Tatos Decl. ¶¶ 52-74.

In contrast, when valuing the NIL claims, the starting point for negotiations was the full amount that the movants advocated for in the adversarial process. The fair pay claims did not go through that adversarial process, and the movants made assumptions favorable for Defendants.

Relatedly, proposed settlement counsel made certain assumptions about the broadcast NIL claims that likewise devalued the *Fontenot* fair pay claims. They estimated the percentage of revenue going to broadcast NIL at 10% of revenue when valuing the *House* BNIL claims, an amount that Defendants vehemently challenged as being too high. ECF No. 250. When valuing the *Fontenot* fair pay claims, they removed the full 10% for BNIL from the calculation. The movants thus made allocation decisions that pitted one group of class members (those with *Fontenot* fair pay claims) against others (those without) when valuing the *House* BNIL claims versus the *Fontenot* fair pay claims.

The *Fontenot* plaintiffs retained an expert to do an independent evaluation of the *Fontenot* claims. The expert had limited time and limited data, and the *Fontenot* plaintiffs reserve the right to provide more accurate numbers and to revise their methodology at the expert stage of the *Fontenot* case. But by including the additional sources of revenue, this expert estimated that these claims have a potential value of over $24 billion—or over $30 billion if the value of grant-in-aid is reduced. Tatos Decl. ¶¶ 81-83 & Table 6.

**Response in Opposition to Motion for Preliminary Approval**

The proposed settlement devotes just $600 million to these claims. That is roughly 2.5% of their possible value—before trebling. *Id.* The percentage is even less if taking the present day value of the $600 million into account; the settlement proposes to pay this money over ten years, which reduces the fund's value by over $100 million. *Id.* ¶¶ 87-89. Meanwhile the movants are proposing to settle the NIL claims at closer to 70% of their possible value.

The movants argue (at 19) that the *Fontenot* claims had additional "procedural and merits-based challenges." From a class certification standpoint, however, these claims should be just as strong as the *NIL Litigation* claims. In this case, the movants relied on the argument that athletes were owed a percentage of revenue and the Court certified the classes; there is no reason to believe that a court would do anything different at class certification when the percentage of revenue going to athletes is simply higher. Nor are the merits-based challenges that different from *NIL Litigation*. The movants cite (at 20) the *Alston* decisions. But as movants have repeatedly argued, things have changed in the intervening years. After California passed its NIL bill in 2019, other states followed. When the NCAA relaxed its NIL rules in 2021, athletes began receiving large sums of money, which put the nail in the coffin for "amateurism." College athletics did not suddenly die after some starting quarterbacks began earning a million dollars. Instead, viewership continued to rise. That should lead to a win in *Fontenot* just as it should support a win in this case. *See Alston*, 594 U.S. at 110 (Kavanaugh, J., concurrence) ("[T]he NCAA's business model of using unpaid student athletes to generate billions of dollars in revenue for the colleges raises serious questions under the antitrust laws.").

In the end, the subgroup of athletes with *Fontenot* claims are being asked to release an estimated $24+ billion in damages for pennies on the dollar. The lack of structural protections infected the negotiations, with the movants devaluing these claims and failing to advocate for them as strongly as independent counsel would. To ensure fairness and adequacy, the same counsel cannot simultaneously represent both those with *Fontenot* claims and those without.

## II. With regards to the *Cornelio* partial scholarship claims, the proposed settlement provides no compensation for claims worth hundreds of millions of dollars.

The *Fontenot* claims are not the only ones being devalued. There is another set of valuable claims being released without providing *any* money to class members. These are the claims by athletes

No. 4:20-cv-3919-CW

**Response in Opposition to Motion for Preliminary Approval**

1  receiving only partial scholarships—the *Cornelio* claims also being litigated in Colorado. No. 1:24-cv-

2  02178 (D. Colo.).

3      During over four years of litigating *NIL Litigation*, these claims were never mentioned. Neither

4  *Carter* nor *Hubbard* mentioned them either. These claims could not have been brought under the

5  allegations of the existing cases, so under the Ninth Circuit's *Hesse* standard, they could not be

6  released. That is why the parties agreed to an amended complaint at this late juncture. A case focused

7  on NIL damages suddenly also included wholly unrelated allegations going to scholarship limits.

8      These claims are not stocking stuffers to be gifted to Defendants without requiring any

9  compensation. *See In re Cmty. Bank of N. Virginia*, 622 F.3d 275, 284–85 (3d Cir. 2010), *as amended* (Oct.

10 20, 2010) ("We have already noted that class counsel never asserted colorable TILA and HOEPA

11 claims. However, those claims were part of the settlement release. Failure to pursue such claims may

12 suggest that class counsel [abdicated] their duty to the class in favor of the enormous class-action fee

13 offered by defendants."). The settlement should not go forward with respect to these claims.

14     **A. Allowing the partial scholarship claims to be released would result in inequitable treatment of certain class members.**

15     When evaluating a settlement, "the court's goal is to ensure that similarly situated class

16 members are treated similarly and that dissimilarly situated class members are not arbitrarily treated as

17 if they were similarly situated." 4 Newberg and Rubenstein on Class Actions § 13:56 (6th ed. 2022); *see*

18 *also Murray*, 55 F.4th at 346 ("Significant differences in contested claims or defenses have the potential

19 to cause significant differences in claim value, which should be reflected in any fair settlement.").

20     Many class members do not have partial scholarship claims, and 95% of the proposed

21 settlement money is going to athletes who were on full scholarships, such as football and basketball

22 players. *See* ECF No. 450-4 at ¶ 48. But many other class members (likely a majority) *do* have partial

23 scholarship claims, and they are legally sound and have significant value. Take college baseball players.

24 For years, the NCAA has arbitrarily limited the sport to 11.7 scholarships that must be spread out

25 between 27 and 32 players (depending on the year). *See Cornelio*, ECF No. 1, at 1-2. Several SEC

26 schools average over 10,000 fans per game for 30+ games in baseball and bring in large amounts of

27 revenue from the sport. If given the choice, these schools would likely award a greater number of

scholarships to baseball players. Indeed, when it comes to NIL money awarded to athletes from NIL collectives, baseball players are third on the list, after football and men's basketball. Yet these schools cannot offer more scholarship money because they are bound by the 11.7 scholarship rule.

It's another horizontal restraint, and it has inflicted great harm on partial-scholarship athletes. For example, Stanford is a school with a rich tradition in college baseball, and the total cost of attendance is over $80,000 annually. For a hypothetical player on a 30% scholarship (which is not atypical), the player pays over $50,000 per year because of the NCAA's restraint. When multiplied by four years at the school, the player is suffering six figures in damages before trebling.

While data is very limited, and the *Cornelio* plaintiffs will more accurately estimate damages at a later date once discovery is complete in that case, a preliminary analysis shows the potential for large damages; the potential damages likely eclipse $335 million. Tatos Decl. ¶¶ 90-95. The claims are being released for nothing. Courts have repeatedly condemned similar practices as an "indelible stain for the settlement agreement." *Gonzalez*, 2018 WL 4388425, at *5-6 ("[D]efendants sought a broad waiver from plaintiff, which included claims plaintiff did not allege, did not litigate, and did not believe had any value. … [T]his is the sort of behavior about which reviewing courts must be vigilant, because it is suggestive of collusion."); *see, e.g.*, *In re Cmty. Bank of N. Virginia*, 622 F.3d 275, 284–85.

Athletes with these partial scholarship claims are arbitrarily being treated the same as those who received full scholarships; this is an inequitable result and a fatal flaw. To move forward, these claims should be carved out, and *Cornelio* should be permitted to move forward in Colorado.

**B. The representation was also inadequate for partial-scholarship class members.**

"[A] settlement agreement's bare assertion that a party will not be liable for a broad swath of potential claims does not necessarily make it so" because only claims based on "the identical factual predicate as that underlying the claims" may be released. *Hesse*, 598 F.3d at 590. And just because the parties took a left turn and threw in some last-minute allegations related to scholarships does not mean it is fair to release these claims or that adequate representation occurred: "[i]t seems to us unlikely that a plaintiff class's claims would ever be based on the identical factual predicate as the claims of a third party who did not adequately represent the class's interests." *Id.*

It is little wonder that the partial-scholarship claims are being released for nothing. Allegations regarding partial scholarships were utterly absent from the pleadings for over four years. The movants never expressed any interest in litigating these claims—and the named plaintiffs in this case did not have standing to pursue them. That is a problem. As the First Circuit stated in *Murray*, if class members "have significantly different claims, or if their claims are subject to significantly different defenses, the lack of separate representation" in a proposed settlement "presents an actual and substantial risk of skewing available relief in favor of some subset of class members." 55 F.4th at 346. Under such circumstances, "[i]t is unreasonable to expect" the same group of attorneys "to properly advocate for each such group." *Id.* at 346. Following *Amchem* and *Ortiz*, there must be separate representation. *Id.*; *see also Literary Works*, 654 F.3d at 253 (same); *In re Cmty. Bank of N. Virginia*, 622 F.3d at 311 (same).

The lack of standing is also a problem. *See Hesse*, 598 F.3d at 589 (if a class representative of a settlement class does not share the claims of class members, then the representation is inadequate and "an insurmountable conflict of interest" exists). The class representatives in the complaint that governed this case for years alleged they were on full scholarships—not partial scholarships. ECF No. 164 ¶¶ 44, 57, 70. Those plaintiffs lack standing. The last-minute amended complaint added plaintiffs, but it still does not contain any allegations claiming that *any* of the class representatives received only a partial scholarship. *See In re Cmty. Bank of N. Virginia*, 622 F.3d at 311 (class representatives' claims fell under different statute of limitations, which made them inadequate to represent other class members).

Even if the movants attempted to add another named plaintiff (or to again amend to add allegations about an existing plaintiff), the inadequacy cannot be cured. These claims were never pursued in any of the cases being settled, and the failure to vigorously pursue them (or to pursue them at all) makes the proposed representation inadequate. In their effort to achieve a global settlement, the movants put the Defendants' interest in finality and the interests of full-scholarship athletes ahead of partial-scholarship athletes. That conflict leads to a classic adequacy problem.

**C.  The lack of compensation for partial-compensation claims is facially inadequate.**

The parties did not even try to value the partial scholarship claims being released. Under this District's guidance for settlements, that alone is a reason to be wary of their inclusion, as it suggests

that these claims were thrown into the release at the request of Defendants. *See Guthrie v. ITS Logistics, LLC*, No. 21cv000729, 2023 WL 2784804, at \*12 (E.D. Cal. Apr. 5, 2023), *report and recommendation adopted*, 2023 WL 4288943 (E.D. Cal. June 30, 2023) (denying preliminary approval where parties insufficiently justified valuation of various claims).

It would be manifestly unfair to allow the parties to settle claims worth nine figures for $0. The proposed settlement class counsel may point to the overall settlement value to support the broad release. But that is no salve for the aggrieved athletes being asked to release these claims. Because of the sports they work in, these athletes are set to receive the least money from the settlement. They will receive no video game NIL money. *See* Rascher Decl., ECF No. 450-4 at 9. They will receive no broadcast NIL money. *See id.* at 12. Most will not receive any Lost NIL Opportunities money unless they fall within the specific pre-2021 and post-2021 pigeonhole, *and* submit a claim form. *See id.* at 13. And for the *Fontenot* fair pay claims, only $30 million is being allocated for *all athletes* outside of Power 5 basketball and football players, *id.* at 22, which is to be divided between over *180,000* athletes, *id.* at 35. Most of that $30 million will go to non-Power 5 football and basketball players—not the athletes who have these partial scholarship claims. *Id.* Most of these athletes may only receive $18 per year—if they all happen to submit a claim form (it is assumed in calculations that only 15% of athletes will submit claim forms, which leads to a different number than if 100% is assumed, *see id.*). The payout may barely be enough to buy a tank of gas. *See also* ECF No. 450 at 41 (estimating payout at just $50 per athlete in remaining "Additional Sports").

Given the high cost of college, it is likely that many partial-scholarship athletes have claims worth six figures. They are being asked to release those claims for nothing. That is facially inadequate.

## III. New counsel should be appointed to represent the injunctive relief class to avoid a thicket of ethical conflicts regarding the settlement of injunctive relief and damages claims by the same counsel.

Similar problems plague the dual representation of the injunctive relief and damages classes by the same counsel. Returning to *Ortiz*, the Supreme Court explained:

> it is obvious after *Amchem* that a class divided between holders of present and future claims (some of the latter involving no physical injury and attributable to claimants not yet born) requires division into homogeneous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel. … As we said in *Amchem,* "for the currently injured, the critical goal is generous immediate payments," but

"[t]hat goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future." 521 U.S., at 626, 117 S.Ct. 2231.

527 U.S. at 856.

Following *Ortiz* and *Amchem*, the Second Circuit rejected a proposed antitrust settlement much larger than this one due to unitary representation of both (b)(2) and (b)(3) settlement classes. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 233 (2d Cir. 2016). The proposed settlement secured over $7 billion for a damages class of merchants who had been charged credit card fees, and contained changes to the credit card companies' practices for the (b)(2) class. "The conflict is clear between merchants of the (b)(3) class, which are pursuing solely monetary relief, and merchants in the (b)(2) class, defined as those seeking only injunctive relief." *Id.* While the (b)(3) class "would want to maximize cash compensation for past harm," the (b)(2) class "would want to maximize restraints on network rules to prevent harm in the future." *Id.* Thus, "[u]nitary representation of separate classes that claim distinct, competing, and conflicting relief create unacceptable incentives for counsel to trade benefits to one class for benefits to the other." *Id.* at 234.

In this case, college athletes whose careers ended years ago have different priorities than college athletes beginning their careers next season. As in the credit card case, that concern is magnified because, under the proposed settlement, members of the (b)(2) class cannot opt out. *Id.* And it is no cure to point to the partial overlap between the classes. *Id.* at 235. "The force of *Amchem* and *Ortiz* does not depend on the mutually exclusivity of the classes; it was enough that the classes did not perfectly overlap." *Id.* And because this settlement attempts to preclude future college athletes from bringing claims—some of whom are in third grade right now—the "initial overlap will be reduced, and the gap between the interests of the (b)(3) and (b)(2) classes will continue to widen." *Id.*

While some cases have distinguished the credit card case on the ground that the proposed settlement was reached before class certification, that distinction has no bearing here. The parties made significant changes to the previously certified classes—expanding the (b)(3) class so that it matched *Fontenot*, greatly expanding the (b)(2) class to ten years of future athletes (more than doubling the scope of the previously certified classes), and significantly increasing the claims supposedly at issue by re-writing the complaint. Those expanded claims did not go through class certification—they were

1   not litigated at all. A more heightened inquiry is warranted. *O'Connor*, 2016 WL 3548370, at *5 ("a

2   more probing inquiry is warranted" when a proposed settlement expands a previously certified class

3   to include additional class members and to release additional claims that were not certified).

4       The resulting inequities give rise to the same concerns as *Amchem*, *Ortiz*, and the credit card

5   case. "Class counsel stood to gain enormously if they got the deal done." *In re Payment Card Interchange*

6   *Fee*, 827 F.3d at 234. "As the Supreme Court recognized in [*Ortiz*]: when 'the potential for gigantic

7   fees' is within counsel's grasp for representation of one group of plaintiffs, but only if counsel

8   resolves another group of plaintiffs' claims, a court cannot assume class counsel adequately

9   represented the latter group's interests." *Id.* (quoting 527 U.S. at 852).

10      Media interviews show that movants' counsel badly wanted to get a deal done.[3] And once a

11  tentative deal was reached, the proposed class counsel inexplicably (and without provocation) began

12  denigrating the *Fontenot* case and their counsel, repeatedly telling media outlets that the *Fontenot* case

13  would be short-lived and implying that *Fontenot*'s counsel lacked experience—despite the fact that

14  team members in *Fontenot* have led some of the largest antitrust cases in history,[4] served as co-lead

15  counsel in the landmark minor league baseball case litigated in this District,[5] and helped unionize

16  nearly 5,000 minor league baseball players.[6]

17      "[T]he benefits of litigation peace do not outweigh class members' due process right to

18  adequate representation." *In re Payment Card Interchange Fee*, 827 F.3d at 240. The different subgroups

19  of the settlement—those with *Fontenot* claims and those without, those with *Cornelio* claims and those

20  without, and those with damages claims and the future athletes limited to injunctive relief—deserve

21  separate counsel to protect their interests. They did not have it, and they suffered as a result. "[T]he

22  only unified interests served by herding these competing claims into one class are the interests served

23

---

24

25  [3] *NCAA settlement Q&A*, Yahoo!Sports (May 24, 2024), *available at* https://tinyurl.com/yh83xkw6.

26  [4] *See, e.g.*, *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 13-cv-7789 (S.D.N.Y.) ($2.3 billion settlement, with Korein Tillery attorney Christopher Burke serving as co-lead counsel).

27  [5] *Senne v. Office of the Commissioner of Baseball*, No. 14-cv-00608-JCS (N.D. Cal.).

28  [6] *See* Broshuis Decl. ¶ 3.

by settlement: (i) the interest of class counsel in fees, and (ii) the interest of defendants in a bundled group of all possible claimants who can be precluded by a single payment." *Id*. at 236. The proposed settlement should not be approved, and separate counsel should be appointed to represent the injunctive relief class during negotiations. If *Fontenot* counsel are not appointed to separately represent those with *Fontenot* fair pay claims, they respectfully ask to be considered for the appointment.

**IV.  The proposed settlement contains a number of unfair terms, including an attempt to bind unknown eight-year-old kids.**

Other parts of the deal further show that it indeed suffered from a lack of structural protections: an imposition of a salary cap without going through collective bargaining; judicial blessing of NCAA policing "untrue" NIL payments; and an attempt to bind unknown future athletes.

**A.  The parties are attempting to give Defendants protections from future antitrust lawsuits without going through collective bargaining.**

When it comes to the injunctive relief in the proposed settlements, the parties stray far from the bounds of the operative complaint in an effort to give Defendants as much future antitrust protection as possible. The parties are attempting to give Defendants some of the benefits that they would gain through collective bargaining, like antitrust protections, without requiring Defendants to go through collective bargaining—and without giving athletes the participation and voice that they would have in that process.

In the sports world, salary caps are generally illegal unless collectively bargained for (which triggers the non-statutory labor exemption to antitrust suits). *See Alston*, 594 U.S. at 110 (Kavanaugh, J., concurring) ("price-fixing labor is ordinarily a textbook antitrust problem"). Federal policy favors collective bargaining because of the many protections it offers to workers. A union election allows the workers to elect their representatives in a democratic fashion. The workers then typically have union representatives that participate in the bargaining, providing updates and soliciting feedback and working directly with negotiators. The workers then vote on the final deal before it takes effect.

This settlement process lacked those protections and lacked that worker input. And yet it introduces a strict salary cap of 22% of some (but not all) types of revenue and asks the Court to bless it alongside a release of future antitrust claims. The Court should decline to do so. Multiple efforts are underway to unionize college athletes, and one local effort (involving Dartmouth basketball players)

1   has succeeded. The proposed antitrust protections in this agreement run the risk of stifling these

2   movements because they take away an important tool—the threat of antitrust lawsuits—that athletes

3   and labor groups have when trying to organize. If Defendants want a salary cap and protections from

4   antitrust laws, they should go through the collective bargaining process.

5        In the same credit card fee case discussed above, the court recently denied preliminary

6   approval for a proposed settlement under similar circumstances. Counsel for the injunctive relief class

7   had reached an agreement that would have reduced interchange fees and would have provided relief

8   from rules prohibiting merchants from surcharging at the point of sale. *In re Payment Card Interchange*

9   *Fee*, 2024 WL 3236614, at *2 (E.D.N.Y. June 28, 2024). The relief was valued at nearly $30 billion

10  over a five-year period. And of note, the same mediator served in that case as here. *Id.* at *20.

11       The problem, though, was that the injunctive relief was too limited. *Id.* at *27-28. "[T]he

12  surcharging provisions would still prohibit surcharging at the issuer level." *Id.* at *27. And while the

13  agreement made some changes to "honor" rules between credit cards, it fell well short of what many

14  class members sought: "elimination of the Honor All Cards rules." *Id.* The reduction in interchange

15  fees was also a halfway measure: it set limits on the fees that could be charged, but they were

16  "significantly above rates that experts in this litigation have previously described as an 'upper limit' of

17  what the rates" might have been in the but-for world without the existing agreements. *Id.* at *28.

18       The injunctive relief being offered here is likewise a halfway measure: it swaps one arbitrary cap

19  for another arbitrary cap. And that cap of 22% is well below what experts have testified would be the

20  cap in the but-for world. Further, the plan unfairly excludes several important types of revenue from

21  the Revenue Pool that should be included—and that greatly lessens the proposed amount to be

22  shared. Tatos Decl. ¶¶ 19-74. Settlements are creatures of compromise, but future athletes should not

23  have a new artificial cap forced upon them unless it goes through collective bargaining.

24      **B. Because of the policing of "untrue" NIL, this deal may result in some athletes**
        **actually receiving less money than they now receive, meaning it treats certain class**

25      **members inequitably.**

26       Putting aside the procedural concerns with how the salary cap came about, there are also

27  substantive concerns. The proposed cap is set at the aggregate level instead of the school level, and it

28  proposes to treat all schools the same, no matter the revenue coming in. Ohio State, with its over

$279 million in revenue last year, can spend the same amount on its athletes as Cleveland State, with its $14 million in revenue. Put differently, Ohio State will only be sharing around 7.8% of its revenue, a much lower percentage than other schools.

Further, the revenue at issue omits an important category: donations from boosters, which amounted to 24% of Power 5 school's revenue in 2022.[7] And the proposed deal allows the schools to get a $2.5 million credit (10% of revenue sharing) for making *Alston* payments that many were already making. The proposed deal similarly allows for another $2.5 million credit (another 10% of revenue sharing) for increasing scholarship numbers. When taking those credits into account, the effective revenue share is more like 15%.

Even that effective cap of 15% is likely illusory because of other provisions that appear to be aimed at taking money *away* from athletes. This proposed agreement gives the NCAA the right to "police" NIL money, distinguishing between "true" NIL money and "false" NIL money. Depending on how the NCAA interprets those powers, that could result in many athletes actually receiving *less* in compensation after this settlement. The NIL collectives currently induce athletes to attend a particular school by funneling money from donors to the athletes. An industry report states that NIL Collectives for the Power 4 conferences will distribute an average of $13.9 million this year to athletes.[8] A recent basketball player reportedly received $2 million from an NIL collective to transfer to Washington,[9] and the "high-end price for a Power Four starting quarterback is in the $2 million range," with most quarterbacks being in the "$500,000 to $800,000 range."[10] Even talented defensive players command

---

[7] *See Div. I Athletics Finances 10-Year Trends from 2013 to 2022*, NCAA.org, *available at* https://tinyurl.com/bddrkc6j.

[8] *As NIL Turns Three, Collectives and Football Still Control the Industry*, Front Office Sports (July 1, 2024), *available at* https://tinyurl.com/t4aruufu.

[9] *Great Osobor transferring to Washington with big NIL deals*, ESPN (May 13, 2024), *available at* https://tinyurl.com/hncpjjp.

[10] *Inside the college football NIL market*, CBSSports (May 20, 2024), *available at* https://tinyurl.com/4ac9tzzy.

high dollars: "You can generally get a quality edge-rusher in the neighborhood of $500,000 or slightly more."[11] Recently, a softball player received a million dollars to transfer to Texas Tech.[12]

The NCAA hates that system because it lacks control over it. Policing that money as "untrue" NIL money is likely about regaining control, by encouraging donors to make contributions directly to the schools to be used for the revenue-sharing instead of funneling money through NIL collectives. According to comments made from industry leaders, schools are indeed discussing the "economic incentives" in this settlement "to bring collectives in-house."[13] The money that donors are giving to collectives would then be "absorbed" by the athletic department and be used to pay the revenue share "without cutting current expenses."[14] An industry report therefore predicts that payments to athletes from NIL collectives will plummet if the settlement goes through, with the dollars instead essentially going through the revenue-sharing model.[15]

As movants' counsel told a reporter, "[W]e've heard from some of the collectives and their reaction was, 'Thank you. We're getting out of the collective business.'"[16] When asked about it by another reporter, he stated: "I don't know and, frankly, I don't care. … It's beyond my worries."[17]

That flippant view towards an important source of current compensation for athletes is concerning. The movants are agreeing, as part of the deal, to include provisions about policing NIL money (and agreeing to allow the NCAA to arbitrarily decide what is "true" versus "untrue" NIL), so they should worry about the future of NIL collectives. Top NIL collectives currently distribute $20

---

[11] *Id.*

[12] *Texas Tech Poaches Softball Star with $1 Million NIL Deal*, Front Office Sports (July 25, 2024), *available at* https://tinyurl.com/mr9r2snf.

[13] *How the House v. NCAA settlement could reshape college sports*, The Athletic, (May 20, 2024), *available at* https://tinyurl.com/ykebpraw.

[14] *Your college football team is about to pay players. What can Utah and BYU afford?*, Salt Lake Trib. (May 24, 2024), *available at* https://tinyurl.com/4csfpwnp.

[15] *As NIL Turns Three, Collectives and Football Still Control the Industry*, Front Office Sports (July 1, 2024), *available at* https://tinyurl.com/t4aruufu.

[16] *With revenue sharing coming to college sports, are NIL collectives a problem or part of a solution?*, AP (May 25, 2024), *available at* https://tinyurl.com/mvaj99jx.

[17] *NCAA settlement Q&A*, Yahoo!Sports (May 24, 2024), *available at* https://tinyurl.com/yh83xkw6.

1   million or more per year to athletes.[18] If that money is simply being brought in-house and then used

2   for the "new" revenue sharing, the proposed settlement would be just transferring money from one

3   bucket to another rather than actually adding to the money going to athletes.

4        Further, the settlement does not speak to how the salary cap will be administered with respect

5   to Title IX, instead leaving that issue for another day. Some conferences have stated an intent to

6   divide the money equally between male and female athletes while others have indicated otherwise.[19]

7   That could result in class members being treated drastically differently based on which conference

8   they happen to be in. The import is magnified by the "policing" of NIL collective money. If much of

9   the NIL collective money is brought in-house at a large school, and if the school then splits the

10   revenue sharing money equally between male and female athletes, then male football and basketball

11   players at that school would likely receive *less* money after the settlement than before.[20] By contrast,

12   female athletes at those schools would be poised to receive an enormous increase in the amount of

13   money going to them. At other schools, the female athletes may stand to gain very little.

14        Class members are being asked to decide whether to object or not without knowing how this

15   important issue will be dealt with. And unlike with collective bargaining, the athletes had zero input

16   on these critical issues, and will have no future input. These decisions will instead continue to be made

17   by the traditional power brokers.

18   **C. The proposed settlement would violate due process by binding future athletes who have no voice and no ability to participate in this approval process.**

19

20        Perhaps the most egregious forward-looking term is the attempt to bind future athletes to this

21   deal for ten years without an opportunity to opt out. Members of an involuntary (b)(2) class *cannot*

22   release damages claims. *Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994) ("Relying on *Shutts,* we held

23   _____

24   [18] *See Ohio State Athletic Director Ross Bjork Says School's NIL Collectives, Brand Affiliates Disbursed "Over 20 Million" to Football Players This Year*, Buckeye Sports Bull. (July 24, 2024), *available at*

25   https://tinyurl.com/3n54a98n.

26   [19] *See Title IX will apply to college athlete revenue share, feds say*, ESPN.com (July 16, 2024), *available at* https://tinyurl.com/bzshckkb.

27   [20] *See id.* ("[F]ootball players on those teams who remain in the settlement would give up their right to

28   sue the NCAA for any future antitrust violations, and in exchange, their income would likely shrink.").

1    in *Brown* that a judgment for injunctive relief in a class action certified under Rules 23(b)(1) and (b)(2),

2    which do not provide for the right to opt out, could not constitutionally bar an absent but known

3    class member's subsequent suit for money damages.") (citing *Brown v. Ticor Title Ins. Co.*, 982 F.2d 386,

4    392 (9th Cir. 1992)). To the extent this agreement is attempting to foreclose future suits for damages

5    from members of the (b)(2) class, it is *per se* violative of Ninth Circuit law and must be scuttled. *Clarke*

6    *v. Advanced Priv. Networks, Inc.*, 173 F.R.D. 521, 522 (D. Nev. 1997) ("Because under *Brown* the

7    provision of the proposed settlement purporting to release all claims is unsound as a matter of law,

8    the court finds the proposed settlement is not fair, adequate and reasonable.").

9         The preliminary approval motion claims that the agreement will not bar claims for damages

10   brought by future athletes. But language in the proposed settlement agreement is murkier. On page 22

11   of the injunctive relief portion, the agreement states that only the movants' counsel can bring

12   enforcement actions when the "interpretation, compliance, validity of, or enforcement" of the deal is

13   at issue. If a future athlete brought an antitrust damages action that challenged the cap put in place by

14   this agreement, would that be an action turning on the "interpretation" or "validity of" the agreement,

15   meaning that only the movants' counsel could bring the case? There would be little incentive for them

16   to do so given that they are simultaneously agreeing to argue at all times that the agreement should

17   pass antitrust muster. That language should be changed to make clear that a future athlete can indeed

18   bring an antitrust action for damages challenging the cap being put in place by this agreement, with an

19   attorney of their choosing should they decide to bring it.

20        Beyond this, the binding of ten years of future athletes is still unfair and should be rejected.

21   Who these athletes will be is a mystery. Any current third grader playing kick ball on the blacktop is a

22   possible class member. These underage kids have no say in this approval process, and it is unfair for

23   anyone to release their unripe future claims on their behalf. *See Redel's Inc. v. Gen. Elec. Co.*, 498 F.2d

24   95, 99 (5th Cir. 1974) ("Releases may not be executed which absolve a party from liability for future

25   violations of our antitrust laws."); *Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561,

26   578 (E.D. Pa. 2001) ("[T]he legality of these practices under the antitrust laws was not litigated in the

27   present suit. Because public policy prohibits a release from waiving claims for future violations of

28   antitrust laws, and given that under the proposed release class members would be releasing unlitigated

1   future claims, the releases are too broad."); *see also Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328

2   (1955) ("Acceptance of the respondents' novel contention would in effect confer on them a partial

3   immunity from civil liability for future violations."). Returning to the credit card case, the court held

4   that the agreement could not bind class members who "come into existence and join the class

5   between the deadline to raise objections and final settlement approval." *In re Payment Card Interchange*

6   *Fee*, 2024 WL 3236614, at *35. "These prospective class members will be deprived of both 'voice' and

7   'exit,' which is incompatible with the strictures of Rule 23 and the Due Process Clause, because class

8   members are entitled to voice their concerns with the court prior to final approval." *Id.* (internal

9   quotations omitted).

10      Those concerns are magnified here; this proposed settlement attempts to rope in ten years of

11   potential future athletes. They will have no voice in the approval process. And providing some future

12   notice and objection process does nothing to allay that concern: by then, the settlement will already be

13   approved by the Court, and judgment will be entered.

14      Proposed settlement counsel point (at 22-23) to other settlements of sports cases for support.

15   But the settlements reached in those cases were enmeshed with collective bargaining, so more

16   protections were in place. In the NBA settlement cited, for instance, the NBA Players Association

17   was one of the main negotiators of the settlement and was tasked with the distribution plan. *Robertson*

18   *v. Nat'l Basketball Ass'n*, 72 F.R.D. 64, 66-67 (S.D.N.Y. 1976); *see also Nat'l Basketball Ass'n v. Williams*,

19   857 F. Supp. 1069, 1072 (S.D.N.Y. 1994) (discussing *Bridgeman v. Nat'l Basketball Ass'n*, 675 F. Supp.

20   960 (D. N.J. 1987), which was resolved as part of "the 1988 Collective Bargaining Agreement"); *White*

21   *v. Nat'l Football League*, 822 F. Supp. 1389, 1405 (D. Minn. 1993) (union temporarily decertified just to

22   avoid the non-statutory labor exemption, but "NFLPA [] paid most of class counsel's fees as they

23   have accrued," was involved in the negotiations, and re-certified and reached a collective bargaining

24   agreement consistent with the settlement agreement it had reached); *White v. Nat'l Football League*, 756

25   F.3d 585, 589 (8th Cir. 2014) (noting that it was the union that voted to extend the settlement). And

26   while movants' counsel cites the 1993 Minnesota decision in *White*, they do not mention that the

27   Eighth Circuit decision in that case was abrogated by *Amchem* for improperly considering issues of

28   adequacy of representation. 521 U.S. at 618. That calls into question the entire line of cases.

1   The resolution of those cases also more closely tracked what was actually litigated. This

2   proposed settlement, on the other hand, took a case rather narrowly focused on NIL and transformed

3   it into an attempted collective bargaining agreement with a hodgepodge of wholly unrelated items.

4   **D.  The proposed settlement and supporting documents contain other improprieties.**

5   Other provisions in the settlement agreement and supporting documents need revisions:

6   • The proposed notice forms say nothing about what is being released; the proposed

7   short form and email do not even mention a release, and the long form mentions a

8   release one time without indicating what is being released—the long form should

9   include this information and should be sent in its entirety by email and should be sent

    by mail to those without email addresses;

10  • The proposed order requires objections to be mailed or filed in person, when this

    District's guidance makes clear that electronic filing of objections is permissible as well.

11  **E.  The _Fontenot_ and _Cornelio_ cases should not be enjoined.**

12  Finally, the proposed order contains a provision (at paragraph 23) stating that the Court will

13  enjoin other litigation as part of the preliminary approval process. That would be improper. "A court's

14  preliminary approval of a proposed class settlement—in and of itself—has no effect on parallel

15  actions." 4 Newberg and Rubenstein on Class Actions § 13:19 (6th ed.). "But sometimes, proposed

16  preliminary orders seek 'so-called antisuit injunctions.'" _Arena v. Intuit Inc._, No. 19-cv-02546-CRB,

17  2021 WL 834253, at *11 (N.D. Cal. Mar. 5, 2021).

18  > Such injunctions raise serious concerns. "[P]erhaps most importantly, at the preliminary
    > stage of a class action settlement, the court has not given notice to the class, not heard
19  > objections to the settlement, not weighed the settlement's strengths and weaknesses in an
    > adversarial setting, and likely not finally certified a class." Thus, although courts sometimes
20  > "simply sign the moving parties' proposed preliminary approval order without focusing on
    > the fact that they are thereby enjoining parallel litigation," issuing such an injunction at
21  > the preliminary approval stage "would be an extraordinary measure best reserved for
    > extraordinary circumstances."
22
23  _Id._ (quoting Newberg § 13:19); _see also Hill v. Mercy Health Sys. Corp._, No. 20 cv 50286, 2021 WL

24  5832787, at *2 (N.D. Ill. Nov. 24, 2021) ("[T]he Court will not sign the proposed preliminary

25  approval order containing a preliminary injunction.").

26  There are no extraordinary circumstances here. If the Court grants preliminary approval (and it

27  should not based on what is currently before it), the court in Colorado is perfectly capable of deciding

28  whether the Colorado cases should fully or partially move forward (as individual cases if nothing else).

1    *See Hunt v. VEP Healthcare, Inc.*, No. 16-cv-04790-VC, 2017 WL 3608297, at *2 (N.D. Cal. Aug. 22,

2    2017) (denying preliminary approval of settlement that contained this provision because "the decision

3    of whether to stay or dismiss related cases" should be left "to the judges to whom those cases are

4    assigned"). The parties can meet and confer over the next steps in those cases and either reach an

5    agreement or present a dispute to the Colorado court.

6         The movants argue (at 28) that the Court included something similar in a 2017 *Alston* order.

7    Plaintiffs are unaware of other parallel litigation taking place in 2017 when the Court entered that

8    order, and it went unopposed and likely unnoticed. But not here. The parties are including it for a

9    reason: to prevent a larger case from moving forward, even for the individual plaintiffs. "Quite often,

10   the presence of such a provision in a preliminary approval order is evidence that the parties are

11   settling the present case precisely to enjoin collateral litigation, a practice that raises a red flag about

12   whether the present settlement is a collusive suit aimed at foreclosing a stronger suit in the collateral

13   forum." Newberg § 13:19. That is yet one more reason to deny this motion.

14   **CONCLUSION**

15        The *Fontenot* plaintiffs respectfully ask that the Court deny the motion, and to the extent

16   further negotiations occur, to put structural protections in place, such as the inclusion of counsel in

17   the Colorado cases.

18

19   DATED: August 9, 2024            Respectfully submitted,

20                                 By: */s/ Garrett R. Broshuis*
     STEPHEN M. TILLERY (*pro hac vice forthcoming*)
     stillery@koreintillery.com

21   GARRETT R. BROSHUIS (Bar No. 329924)
     gbroshuis@koreintillery.com

22   CAROL O'KEEFE (*pro hac vice forthcoming*)
     cokeefe@koreintillery.com

23   **KOREIN TILLERY, LLC**
     505 North 7th Street, Suite 3600

24   St. Louis, MO 63101
     Telephone: (314) 241-4844

25   Facsimile: (314) 241-3525

26   GEORGE A. ZELCS (*pro hac vice forthcoming*)
     gzelcs@koreintillery.com

27   MARC A. WALLENSTEIN (*pro hac vice forthcoming*)
     mwallenstein@koreintillery.com

28

25           No. 4:20-cv-3919-CW

PAMELA I. YAACOUB (*pro hac vice forthcoming*)
pyaacoub@koreintillery.com
**KOREIN TILLERY, LLC**
205 N. Michigan Ave., Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750

CHRISTOPHER M. BURKE (Bar No. 214799)
cburke@koreintillery.com
**KOREIN TILLERY, LLC**
401 West A Street, Suite 1430
San Diego, CA 92101
Telephone: (619) 625-5620

ERIC OLSON (*pro hac vice forthcoming*)
eolson@olsongrimsley.com
SEAN GRIMSLEY (*pro hac vice forthcoming*)
sgrimsley@olsongrimsley.com
JASON MURRAY (*pro hac vice forthcoming*)
jmurray@olsongrimsley.com
**OLSON GRIMSLEY KAWANABE
HINCHCLIFF & MURRAY LLC**
700 17th Street, Suite 1600
Denver, CO 80202

*Attorneys for Plaintiffs in the Colorado Cases*

## CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record registered for electronic filing.

/s/ *Garrett R. Broshuis*
Garrett R. Broshuis

**Response in Opposition to Motion for Preliminary Approval**