STEPHEN M. TILLERY (*pro hac vice forthcoming*)
  stillery@koreintillery.com
GARRETT R. BROSHUIS (Bar No. 329924)
  gbroshuis@koreintillery.com
CAROL O'KEEFE (*pro hac vice forthcoming*)
  cokeefe@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone:  (314) 241-4844
Facsimile: (314) 241-3525

GEORGE A. ZELCS (*pro hac vice forthcoming*)
  gzelcs@koreintillery.com
MARC WALLENSTEIN (*pro hac vice forthcoming*)
  mwallenstein@koreintillery.com
PAMELA I. YAACOUB
  pyaacoub@koreintillery.com (*pro hac vice forthcoming*)
**KOREIN TILLERY, LLC**
205 N. Michigan Ave., Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750

CHRISTOPHER M. BURKE (Bar No. 214799)
  cburke@koreintillery.com
**KOREIN TILLERY, LLC**
401 West A. Street, Suite 1430
San Diego, CA 92101
Telephone: (619) 625-5620

ERIC OLSON (*pro hac vice forthcoming*)
eolson@olsongrimsley.com
SEAN GRIMSLEY (*pro hac vice forthcoming*)
sgrimsley@olsongrimsley.com
JASON MURRAY  (*pro hac vice forthcoming*)
jmurray@olsongrimsley.com
**OLSON GRIMSLEY KAWANABE
HINCHCLIFF & MURRAY LLC**
700 17th Street, Suite 1600
Denver, CO 80202
Telephone: (303) 535-9151

*Attorneys for Plaintiffs in the Colorado Cases*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION**

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | CASE NO. 4:20-cv-3919-CW |
| | **DECLARATION OF GARRETT R. BROSHUIS IN SUPPORT OF PLAINTIFFS IN THE COLORADO CASES' RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL** |
| | Hon. Claudia Wilken |

I, GARRETT R. BROSHUIS, declare as follows:

1.      I am an attorney and an active member of the State Bar of California (Bar No. 329924). I am a partner at Korein Tillery, LLC and counsel for Alex Fontenot, Mya Hollingshed, Sarah Fuller, Deontay Anderson, and Tucker Clark, who are plaintiffs in the case of *Fontenot v. National Collegiate Athletic Association*, No. 1:23-cv-03076 (D. Colo.), and who are members of the proposed settlement class in this action. I am also counsel for Riley Cornelio in the case of *Cornelio v. National Collegiate Athletic Association*, No. 1:24-cv-02178 (D. Col.), who is a member of the proposed settlement class in this action. The two cases will be referred to as the "Colorado Cases."

2.      I am personally familiar with the facts set forth in this declaration and, if called as a witness, I could and would competently testify to the matters stated herein.

3.      My full bio is found in our firm resume, attached as Exhibit A to this declaration, at pages 3-4. To briefly summarize, I am a former college athlete who earned All-American and Academic All-American honors at the University of Missouri in baseball and was elected by my peers to serve as president of the school's Student Athlete Advisory Committee. I then played six years of professional baseball in the San Francisco Giants' organization before going to law school. I was co-lead counsel in the landmark case of *Senne v. Office of the Commissioner of Baseball*, No. 14-cv-00608-JCS (N.D. Cal.), which we believe was the first case in history to bring wage-and-hour claims on behalf of professional athletes, and which, after nine years of litigation, resulted in a $185 million settlement for minor league baseball players—a result that Judge Spero called "exceptional" last year. While working on that case, I also co-founded and served as the first president of a nonprofit that became the driving force behind the recent unionization of close to 5,000 minor league baseball players.[1] For that work, the advocacy group Jobs with Justice named me as an honoree for their 2023 Eleanor Roosevelt Human Rights Award.

4.      More information about the key members of our attorney team, and about our firm and its experience in complex litigation matters, is found in Exhibit A to this declaration.

---

[1] *See How Minor League Ballplayers Won a Union*, The Nation (Mar. 6, 2023), https://www.thenation.com/article/society/minor-league-baseball-union-bill-fletcher/.

**DECLARATION OF GARRETT R. BROSHUIS**

5.      This spring, as media reports indicated that the parties in this case were discussing a global settlement that might impact the *Fontenot* case, I contacted counsel for the Defendants multiple times to indicate that there would be issues related to conflicts and adequacy of representation if they attempted to resolve all the various claims against the NCAA through the same case with a single group of plaintiffs' counsel. The last email was sent on May 10, 2024, and it received no response. We were not consulted or included in any of the settlement negotiations.

6.      Courtesy copies of the operative *Fontenot* and *Cornelio* complaints are provided as Exhibits B and C to this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 9, 2024 in St. Louis, Missouri.

_____
Garrett R. Broshuis

**DECLARATION OF GARRETT R. BROSHUIS**

## CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record registered for electronic filing.

s/ *Garrett R. Broshuis*
Garrett R. Broshuis

**DECLARATION OF GARRETT R. BROSHUIS**

# EXHIBIT A



Korein Tillery — based in Chicago and St. Louis — is one of the country's most successful plaintiffs' complex-litigation firms, representing a broad array of clients in high-stakes lawsuits and delivering over $18 billion in verdicts and settlements over the last 14 years. Most of our attorneys have represented both plaintiffs and defendants at some point in their careers, and, combined, we've handled cases covering virtually every conceivable substantive area of the law. We've litigated cases for clients ranging from individuals and certified classes to governmental entities and billion-dollar, multi-national corporations. Collectively, we've tried hundreds of cases to verdict, with several verdicts exceeding 10 figures. Our attorneys have been nominated for numerous regional and national trial lawyer awards, and we've won many landmark decisions in state and federal appellate courts, including the Supreme Court of the United States.

The National Law Journal has consistently deemed Korein Tillery to be one of the country's top plaintiffs' firms by naming it to its "Plaintiffs' Hot List" seven times in the past 15 years. In 2014 and 2015, Korein Tillery was named by the NLJ as a member of its top 50 Elite Trial Lawyers. The American Bar Association's Securities Litigation Journal deemed two of Korein Tillery's cases, *Kircher v. Putnam Funds Trust,* 547 U.S. 633 (2006) and *Merrill Lynch Pierce Fenner & Smth, Inc. v. Dabit,* 547 U.S. 71 (2006), the two most important securities law decisions in 2006. Securities Litigation Journal, *Top 10 Securities Law Decisions of 2006* (Winter 2006). In *Kircher,* Korein Tillery served as lead counsel for the plaintiffs' class from the initial trial court filing to the Supreme Court of the United States, where the Court reversed the Seventh Circuit in a 9-0 decision.

Korein Tillery has been appointed as class counsel in more than fifty class actions and has successfully negotiated some of the country's largest class action settlements. *See, e.g., Parker v. Sears Roebuck & Co.,* Case No. 04-L-716 (Ill. Cir. Ct. Jan. 16, 2008) (settlement valued at $544.5 million); *Cooper v. The IBM Pers. Pension Plan,* 2005 WL 1981501, 35 Employee Benefits Cas. 2488 (S.D. Ill. Aug. 8, 2005) ($325 million settlement); *Sparks v. AT&T Corp.,* 96-LM-983 (Ill. Cir. Ct. Nov. 4, 2002) ($350 million settlement); *Sullivan v. DB Investments, Inc.,* 04-2819 (D.N.J. May 22, 2008) ($323 million settlement); *Folkerts v. Illinois Bell Tel. Co.,* 95-L-912 (Ill. Cir. Ct. July 7, 1998) ($252 million settlement); *Berger v. Xerox Corp. Ret. Income Guar. Plan,* 2004 WL 287902, 32 Employee Benefits Cas. 1362 (S.D. Ill. Jan. 22, 2004) ($240 million settlement); *Malloy v. Ameritech,* 98-488-GPM (S.D. Ill. July 21, 2000) ($180 million settlement); *City of Greenville v. Syngenta Crop Prot., Inc.,* 3:10-CV-188-JPG-PMF, 2012 WL 1948153 (S.D. Ill. May 30, 2012) ($105 million settlement); *In Re: MCI Non-Subscriber Tel. Rates Litig.,* MDL 1275 (S.D. Ill. Apr. 19, 2001) ($99 million settlement); and *Dunn v. BOC Group Pension Plan,* 01-CV-382-DRH (S.D. Ill. Mar. 12, 2004) ($70 million settlement).

**Key Team Members:**

*Stephen M. Tillery*

Stephen Tillery is the senior and founding member of the firm. With more than 45 years of trial experience, Mr. Tillery has acted as lead counsel in hundreds of complex cases at both the trial and appellate levels that have resulted in some of the largest trial verdicts and settlements in the United States.

Mr. Tillery completed his undergraduate studies at Illinois College (B.A. *magna cum laude*, Phi Beta Kappa) in 1972. Thereafter he attended Saint Louis University School of Law (J.D. *cum laude*, Order of the Woolsack, 1976). While obtaining his law degree, Mr. Tillery was a law clerk for the Honorable James L. Foreman, United States District Court for the Southern District of Illinois. Following graduation from law school, he was a law clerk to the Honorable George J. Moran, Fifth District Court of Appeals of Illinois.

Mr. Tillery is a member of the Illinois Trial Lawyers Association, where he has been one of the elected Board of Managers since 1987, and for which he has chaired and served on numerous committees. Mr. Tillery is also a member of the Illinois Bar Association, the Missouri Association of Trial Attorneys, the St. Louis Metropolitan Bar Association, the St. Clair County Bar Association, and the American Association for Justice. He has served as a board member of Public Justice. Mr. Tillery was named one of the National Law Journal's 2023 Plaintiffs' Lawyer Trailblazers, in recognition of his 11 years of work to secure a massive settlement from Syngenta and Chevron for clients who developed Parkinson's disease and other neurological defects as a result of exposure to the weed killer Paraquat. He was also named Litigation Daily's Litigator of the Week on May 1, 2014, for successfully reinstating the trial court's $10.1 billion verdict in *Price v. Philip Morris, Inc.*, 2014 IL App (5th) 130017, 2014 WL 1696280 (Ill. App. Ct. Apr. 29, 2014).

Mr. Tillery has written numerous legal articles and has served as lecturer, moderator, and panel member at dozens of legal seminars relating to litigation and trial practice. He was an adjunct professor at Saint Louis University School of Law for eleven years, and was Co-Director of the Advanced Trial Advocacy Program there from 1983 to 1988.

*George A. Zelcs*

George Zelcs focuses his practice in the areas of complex commercial litigation including securities, antitrust, consumer fraud, qui tam/whistleblower, and pharmaceutical litigation in state and federal courts. Mr. Zelcs completed his undergraduate degree at Indiana University (B.A. Political Science, Urban Planning, and Sociology) in 1976. He received his law degree at Chicago-Kent College of Law and was admitted to practice law in Illinois in 1979. He is admitted to practice before the U.S. Court of Appeals for the Second Circuit (2013), Fifth Circuit (1999), Seventh Circuit (1980), Eighth Circuit (1996), Tenth Circuit (1982), and Eleventh Circuit (1993), the U.S. Tax Court (1984), the U.S. Court of Federal Claims (2013), the Supreme Court of the United States (2005), and the U.S. District Courts for the Northern and Southern District of Illinois.

Mr. Zelcs has frequently served as lead counsel in numerous complex multi-party litigations. Most recently, he is serving on the steering committee for the plaintiff consumer class in *In re Google Play Consumer Antitrust Litigation*, No. 3:20-cv-05761-JD (N.D. Cal.), and is instrumental for Korein Tillery in its role as interim co-lead counsel for the class of online publishers in *In re Google Digital Publisher Antitrust Litigation*, No. 5:20-cv-08984-BLF (N.D. Cal.). He has represented the National Credit Union Administration in mortgage back securities litigation against certain global investment backs resulting in over $5 billion in recoveries for the NCUA. He has served in an instrumental role in developing and litigating the claims in *In re: Foreign Exchange Benchmark Rates Antitrust Litigation* No. 13-cv-07789-LGS (S.D.N.Y.) (Schofield, J.), resulting in $2.3 billion in recoveries to date. He served as co-lead counsel in *Axiom Investment Advisors, LLC v. Barclays Bank PLC*, No. 15-cv-9323-LGS (S.D.N.Y.) (Schofield, J.), a class action regarding "last look" practices in foreign exchange trading, resulting in a $50 million settlement of breach of contract and other claims.

Mr. Zelcs has conducted bench and jury trials in state and federal courts throughout the United States. In *Price, et al vs. Philip Morris USA, Inc.*, No. 001-0112 (Third Judicial Circuit, Illinois) (Byron, J.) he co-tried a class action asserting consumer fraud claims and achieved a $10.1 billion dollar judgment.

He serves on the Chicago-Kent Board of Overseers and as a Trustee for the Chicago-Kent Institute on the Supreme Court of the United States. He has testified, at the invitation of the New York State Assembly, regarding financial guaranty insurance and representations and warranties made by mortgage originators in mortgage-backed securities.

### Garrett Broshuis

Garrett Broshuis is a nationally-recognized attorney who has performed prominent roles in some of the most complex cases in the country. He was the lead attorney in a landmark case challenging the pay scheme for minor league baseball players, which settled for $185 million in what is believed to be the largest settlement for minimum wage violations in history. Garrett led the case through a successful class certification appeal, *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 922 (9th Cir. 2019), and through summary judgment proceedings.

He was also part of a trial team that won a $40 million judgment in a class action against a major telecommunications company, which was affirmed on appeal. He currently represents classes of municipalities in several actions against Fortune 500 and other large companies, and has successfully represented cities in various appeals, including successful arguments before the Seventh Circuit and Eighth Circuit Courts of Appeals. He represents a class of retirees challenging the termination of their defined benefit plans by a Fortune 500 company that recently succeeded at summary judgment, and represents a putative class of college coaches in an antitrust case.

3

Garrett's work was recently recognized by the national labor group Jobs with Justice for its Eleanor Roosevelt Human Rights Award. The Daily Journal named him a Leading Commercial Litigator, and the National Law Journal named him to its Plaintiffs' Lawyers Trailblazers List in 2023. His work is regularly profiled in media outlets across the country, including HBO's Real Sports with Bryant Gumbel, MSNBC's various shows, NPR's various programs, The Washington Post, The Wall Street Journal, and many other publications.

He is an adjunct professor at Saint Louis University School of Law and often speaks at conferences and law school symposia. He received his J.D. from Saint Louis University, where he graduated valedictorian and served as Editor-in-Chief of the Law Journal. He is licensed in California, Missouri, Illinois, and New York, as well as the United States Supreme Court and many other federal courts.

Before law school, Garrett played six years as a pitcher in the San Francisco Giants' organization, working at all levels of minor league baseball. Garrett received his undergraduate degree from the University of Missouri, where he graduated summa cum laude and was inducted into the prestigious Phi Beta Kappa honors society. He earned both All-American and Academic All-American honors in baseball after recording a perfect 11-0 record in his final year at Mizzou. He was a finalist for the Big 12 Conference Male Athlete of the Year and also earned the school's Total Person Program Excellence Award three times.

### Carol O'Keefe

Carol O'Keefe is a partner at Korein Tillery's St. Louis office, and her story of returning to the legal profession is recounted in the national bestseller, "That's What She Said: What Men and Women Need to Know About Working Together," by former USA Today Editor in Chief, Joanne Lipman. Carol joined Korein Tillery as a practicing attorney in 2017, where she focuses on complex litigation, including representing antitrust plaintiffs in digital economy, commodity futures, and foreign exchange class actions. Carol is currently engaged in representing plaintiffs in a variety of class actions against Google, including claims for the conversion of cellular data on Android mobile devices, and violation of the antitrust laws relating to the Google Play Store and Google's publisher ad tech products.

An early beneficiary of Title IX, Carol received her B.A. from Yale College summa cum laude, Phi Beta Kappa, in 1983 after three years of study. At Yale, she lettered in volleyball and softball, for which she also received All-Ivy recognition and the Barbara Chou leadership award. Carol received her J.D. from Harvard Law School cum laude in 1986, and served as a judicial law clerk for Judge Michael A. Telesca of the U.S. District Court for the Western District of New York. Until 2008, Carol was an associate at Harter Secrest & Emery LLP, where she focused on complex litigation, including antitrust, securities, employment discrimination, and civil rights. Carol has significant court experience and has represented a wide variety of entities throughout her career, including consumers, investors, physicians, municipalities, school districts, prisoners, and religious corporations.

After taking time off from the practice of law to focus on raising her four children, Carol was an Adjunct Lecturer at the State University of New York at Brockport from 2012-2015, where she designed and taught courses in modern constitutional law and education law. After returning to the practice of law in 2017, Carol quickly rose to partnership at Korein Tillery. She is currently overseeing Korein Tillery's efforts as interim co-lead counsel in *In re Google Digital Publisher Antitrust Litigation*, No. 5:20-cv-08984-BLF (N.D. Cal.), and recently played an instrumental role in developing the claims of the proposed consumer class in *In re Google Play Consumer Antitrust Litigation*, No. 3:20-cv-05761-JD (N.D. Cal.), working directly with lead counsel to develop antitrust theories in the context of the Android operating system and Google Play store.

**Christopher M. Burke**:

Christopher Burke is a partner at Korein Tillery's San Diego office. Mr. Burke's principal practice  is complex antitrust litigation, particularly in the financial services industry. Mr. Burke received  his B.A. from The Ohio State University (1984), his Master's degree from William & Mary (1988),  and his M.A. (1989), and Ph.D. (1996) in political science from the University of Wisconsin. He  received his law degree from University of Wisconsin (1993).

Mr. Burke has been lead counsel in some of the world's largest financial services antitrust matters.  He is currently co-lead counsel in *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 13- cv-7789 (S.D.N.Y.) (FX litigation) ($2.3 billion settlement). He previously served as co-lead  counsel in *In re GSE Bonds Antitrust Litig.*, Case No. 19-cv-01704 (S.D.N.Y.) ($386.5 million  settlement) and *Alaska Electrical Pension Fund v. Bank of America Corp.*, 14-cv-7126  (S.D.N.Y) (ISDAfix litigation) ($504.5 million settlement). Mr. Burke has served as co-lead counsel in *Dahl v. Bain Capital Partners*, 07-cv-12388 (D. Mass.) ($590.5 million settlement); A*xiom Investment Advisors, LLC, by and through its Trustee, Gildor Management LLC v. Barclays Bank PLC*, 15-cv-09323 (S.D.N.Y.) ($50 million settlement); *In re Currency Conversion Antitrust Litig.*, MDL No. 1409 (S.D.N.Y.) ($336 million settlement); *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, MDL No. 1720 (E.D.N.Y.) ($5.6 billion settlement); *LiPuma v. American Express Co.*, No. 1:04-cv-20314 (S.D. Fla.) ($90 million settlement).

Mr. Burke was also co-lead counsel for indirect purchasers in *In re Korean Air Lines Co., Ltd.  Antitrust Litig.*, MDL No. 1891 (C.D. Cal.) ($86 million settlement), and *In re Prudential Ins. Co.  of America SGLI/VGLI Contract Litig.*, No. 11-md-2208 (D. Mass.) ($40 million settlement). He  was one of the original lawyers in the *In re Wholesale Elec.* antitrust cases in California, which  settled for over $1 billion.  Mr. Burke also investigated and filed the first complaint in *In re Credit  Default Swaps Antitrust Litig.*, 13-md-2476 (S.D.N.Y.).

Mr. Burke was lead trial counsel in the FX litigation and one of the trial counsel in *Schwartz v. Visa*, No. 822505-4 (Alameda Cty. Super. Ct.) ($780 million plaintiff's judgment after six months  of trial); *In re Disposable Contact Lens Antitrust Litig.*, MDL No. 1030 (M.D. Fla.) ($90 million  settlement with final settlements occurring during trial); and *Ross v. Bank of America*

*N.A.*, No.  05-cv-7116, MDL No. 1409 (S.D.N.Y.) and *Ross v. American Express Co.*, No. 04-cv-5723, MDL  No. 1409 (S.D.N.Y.).

Mr. Burke frequently lectures at professional conferences and CLEs on competition matters,  including litigation surrounding financial benchmarks, class-barring arbitration clauses, the effects   of *Twombly* in 12(b)(6) motions, and the increasing use of experts at class certification and trial.  The American Antitrust Institute ("AAI") honored Mr. Burke with an Outstanding Antitrust  Litigation Achievement in Private Law Practice award at their 2020 and 2018 Antitrust  Enforcement Awards for efforts in the *GSE Bonds* and *ISDAfix* litigations, respectively.  In 2014, he was also recognized for his exemplary work in the *Dahl v. Bain Capital Partners* matter by the  AAI and has regularly been designated as a Super Lawyer by Thomson Reuters.

Mr. Burke has also served as an Assistant Attorney General at the Wisconsin Department of Justice  and has lectured on law-related topics, including constitutional law, law and politics, and civil  rights at the State University of New York at Buffalo and at the University of Wisconsin.  Mr.  Burke's book, *The Appearance  of Equality:  Racial Gerrymandering, Redistricting, and the  Supreme Court* (Greenwood, 1999), examines conflicts over voting rights and political  representation within the competing rhetoric of communitarian and liberal strategies of  justification.

Mr. Burke co-authored an article with Stephanie A. Hackett, David W. Mitchell, Simon J. Wilke,  Melanie Stallings Williams, Michael A. Williams, and Wei Zhao, "Masters of the Universe: Bid  Rigging by Private Equity Firms in Multibillion Dollar LBOs," 87 U. Cin. L. Rev. 29 (2018).

## *Marc A. Wallenstein:*
Marc A. Wallenstein is a partner at the firm. He is a former federal prosecutor who has more than a decade of experience in federal public service. Mr. Wallenstein has tried numerous cases to verdict and has appeared in court on a regular basis for much of his career.

Mr. Wallenstein is currently pursing three class action lawsuits against Google, seeking redress for Google's unlawful consumption of Android users' cellular data, its anticompetitive conduct in the market for online advertisements, and anticompetitive conduct in the Google Play Store.  Mr. Wallenstein recently served as trial counsel for a class of thousands of minor league baseball players seeking to be paid minimum wage by Major

6

League Baseball, which resulted in a landmark $185 million settlement three weeks before trial in the Northern District of California.

Mr. Wallenstein is a graduate of Harvard College and Yale Law School.  After law school, he served as a law clerk in the Southern District of New York and on the United States Court of Appeals for the Ninth Circuit.

Before joining Korein Tillery, Mr. Wallenstein served for six years as an Assistant U.S. Attorney for the District of Hawaii, where he gained expertise in national security matters, financial crime, procurement fraud, health care fraud, public corruption, cyber-crime, environmental crime, and crimes against children.  Mr. Wallenstein served as Computer Hacking and Intellectual Property (CHIP) Coordinator, responsible for complex issues related to computer crime and electronically stored information, as an Anti-Terrorism Advisory Coordinator (ATAC), responsible for national security investigations and prosecutions, and as a member of the Department of Justice's Cryptocurrency Working Group.  Mr. Wallenstein prosecuted the first terrorism case against an active duty member of the U.S. military, and obtained record fines in numerous environmental cases, including the largest marine pollution fine in District history.  Mr. Wallenstein has received several awards from the Department of Justice and the Federal Bureau of Investigation for his work.

Prior to his time at the Department of Justice, Mr. Wallenstein served for three years as a Prosecutor at the Office of the Chief Prosecutor of Military Commissions, U.S. Department of Defense.  In that capacity, Mr. Wallenstein prosecuted violations of the law of war committed by enemy alien belligerents before a military commission in Guantanamo Bay, Cuba.  Among other responsibilities, Mr. Wallenstein served as a litigation team chief, managing attorneys, paralegals, FBI agents, analysts, and staff.  Mr. Wallenstein also served as an appellate and pretrial motions attorney on a range of cases, including the prosecution of Khalid Shaikh Mohammed and four others accused of perpetrating the attacks of September 11, 2001. Mr. Wallenstein maintained an active Top Secret/SCI security clearance throughout his federal employment.

Mr. Wallenstein previously worked for three years at Kellogg, Hansen, Todd, Figel, and Frederick PLLC, in Washington DC, where he conducted complex civil litigation.  Among other matters, he represented the National Credit Union Administration against Wall Street banks for failed investments in residential mortgage-backed securities, with co-counsel from Korein Tillery.

Mr. Wallenstein is admitted to practice law in New York, Washington DC, Texas, and Hawaii, and numerous federal district and circuit courts around the country.

### *Pam Yaacoub*

Pam Yaacoub is an experienced attorney in Korein Tillery's Chicago office, focusing on antitrust and complex commercial litigation.

Pam is a skilled advocate and storyteller, contributing to every stage of the case. She has developed litigation strategy, drafted pleadings and dispositive motions, managed discovery, participated in depositions, and prepared for trial and argument. She also has extensive appellate experience, having briefed appeals before the Seventh Circuit, Federal Circuit, and Illinois Appellate Court.

Before joining Korein Tillery, Pam clerked for the Honorable Jane Kelly of the United States Court of Appeals for the Eighth Circuit and the Honorable Edmond E. Chang of the United States District Court for the Northern District of Illinois. She also worked as an associate at a litigation boutique and at an international law firm—both in Chicago.

Pam received her J.D. in 2017 from Harvard Law School.  While in law school, she served as a member of the Harvard Legal Aid Bureau, representing low-income clients in divorce, custody, and social security benefits proceedings. Since then, Pam has worked pro bono on prisoners' rights, eviction defense, and asylum cases.

Pam was born in Tripoli, Lebanon and came to the U.S. when she was seven. She completed her undergraduate studies at the University of Michigan in Dearborn and currently resides in Chicago with her husband, Damir, and their four pets. Pam is fluent in Arabic, proficient in Spanish, and conversational in Bosnian-Croatian-Serbian.

**The Firm's Recent Work:**

**CLASS ACTION AND COMPLEX LITIGATION**
*National Credit Union Administration Mortgage-Backed Securities Litigation.*
The National Credit Union Administration ("NCUA") is the independent federal agency created by the U.S. Congress to regulate, charter, and supervise federal credit unions. On behalf of the NCUA, Korein Tillery and co-counsel Kellogg, Hansen, Todd, Figel & Frederick filed approximately 20 federal lawsuits throughout 2011-2013 alleging that Wall Street investment banks misled credit unions about the quality of certain residential mortgage-backed securities ("RMBS"), causing billions of dollars of losses that the NCUA insured. More specifically, NCUA alleged that these banks violated the Federal Securities Act by representing in federally-regulated offering documents that all loans backing the RMBS complied with originator underwriting guidelines or had sufficient compensating factors to allow exceptions to the guidelines when in fact the majority of the loans did not.

Throughout several years of contentious litigation, involving several successful appeals, Korein Tillery and Kellogg Hansen obtained more than $5.1 billion in legal settlements on NCUA's behalf, including but not limited to:

- *NCUA v. JP Morgan Chase Bank*, 2:13-cv-02012-JWL (D. Kan.) (obtained $1.4 billion settlement in Dec. 2013);

- *NCUA v. RBS Sec., Inc.*, 1:13-cv-06726-DLC (S.D.N.Y.) (accepted offer of judgment for $129.6 million plus fees in Sept. 2015);
- *NCUA v. Barclays Capital, Inc.*, 1:13-cv-06727-DLC (S.D.N.Y.) & 2:12-cv-02631-JWL (D. Kan.) (obtained $325 million combined settlement in Oct. 2015);
- *NCUA v. Wachovia Capital Markets LLC*, 1:13-cv-06719-DLC (S.D.N.Y.) & 2:11-cv-02649-JWL (D. Kan.) (obtained $53 million combined settlement in Oct. 2015);
- *NCUA v. Morgan Stanley & Co., Inc.*, 1:13-cv-06705-DLC (S.D.N.Y.) & 2:13-cv-02418-JWL (D. Kan.) (obtained $225 million combined settlement in Dec. 2015);
- *NCUA v. Goldman Sachs and Co.*, 1:13-cv-06721-DLC (S.D.N.Y.) & 2:11-cv-06521-GW-JEM (C.D. Cal.) (obtained $575 million combined settlement in Apr. 2016);
- *NCUA v. RBS Sec., Inc. et al.*, 11-cv-2340- JWL-JPO (D. Kan.) & 2:11-cv-05887 GW-JEM (C.D. Cal.) (obtained $1.1 billion combined settlement in Sept. 2016);
- *NCUA v. UBS Securities, LLC*, 2:12-cv-02591-JWL (D. Kan.) (obtained $445 million settlement in Mar. 2017); and
- *NCUA v. Credit Suisse Sec. (USA) LLC*, 2:12-cv-02648-JWL (D. Kan.) (obtained $400 million settlement in Mar. 2017).

NCUA was the first federal regulatory agency for depository institutions to recover losses from investments in these securities on behalf of failed financial institutions. NCUA uses the net proceeds to reduce Temporary Corporate Credit Union Stabilization Fund (Stabilization Fund) assessments charged to federally insured credit unions to pay for the losses caused by the failure of five corporate credit unions.

Korein Tillery and Kellogg Hansen continue to prosecute several lawsuits on behalf of the NCUA against certain RMBS trustees regarding their alleged failure to perform their duties.

### *In re: Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13-cv-07789-LGS (S.D.N.Y.) (Schofield, J.)

The global foreign exchange ("FX") market for currency is a $1-trillion-per-day market, with the dominant dealers representing over 90 percent of the global FX market. Beginning as early as 2003 and continuing through 2013, these dealers used communications in multiple secret chat rooms to conspire to fix spot prices in dozens of currency pairs, manipulate FX benchmark rates, and exchange key confidential customer information in an attempt to trigger client stop loss orders and limit orders. These dealers constituted some of the largest financial institutions in the world, including Bank of America, Barclays, BNP Paribas, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan Chase & Co., Morgan Stanley, Royal Bank of Scotland, and UBS.

Korein Tillery, working with co-counsel Scott+Scott Attorneys at Law, LLP and Hausfeld LLP, developed and filed a class action on behalf of individuals who entered into FX transactions in over-the-counter exchanges and/or on exchanges with these dealers, alleging violations of Sections 1 and 3 of the Sherman Antitrust Act and violations of the Commodity Exchange Act. As a result of nearly 6 years of work by Korein Tillery and its

co-counsel costing the firms nearly $30 million in case-related expenses, $2.3 billion in court-approved settlements have been reached with 15 of the 16 defendants, constituting one of the largest antitrust class action recoveries in history.  Mediator Kenneth Feinberg concluded that this settlement would "represent[ ] some of the finest lawyering toward a negotiated resolution that I have witnessed in my career" and described Korein Tillery and its co-counsel as "superlative, sophisticated, and determined plaintiffs' lawyers."

*Senne v. The Office of the Comm'r of Baseball*, No. 14-CV-00608-JCS (N.D. Cal.).
In this action, Korein Tillery was co-lead counsel for a class of minor league baseball players who alleged that MLB and MLB's member franchises failed to pay the players minimum wage, required overtime pay, or sometimes any wages at all. The players asserted two claims under the federal Fair Labor Standards Act ("FLSA") and an additional thirty-one under the wage-and-hour laws of several states.

On October 20, 2015, the Court granted the players conditional certification of a collective under the Fair Labor Standards Act. *Senne*, 2015 WL 6152476 (N.D. Cal. Oct. 20, 2015). A court-directed notice was sent, and around 2,300 players joined the collective. In March 2017, the court certified a Rule 23 class of minor leaguers who played in California. *Senne*, 2017 WL 897338 (N.D. Cal. Mar. 7, 2017).

The parties cross-appealed, with MLB arguing that no class should have been certified, and the players arguing that the court should have certified additional classes. On August 16, 2019, the Ninth Circuit agreed with the players. It affirmed the certification of the class of players who worked in California, and it certified additional classes for players who worked during spring training and other periods in Arizona and Florida. MLB petitioned the Ninth Circuit for an en banc re-hearing, which was denied, and then petitioned the U.S. Supreme Court for review, which was also denied. 934 F.3d 918 (9th Cir. 2019), cert. denied, 141 S. Ct. 248 (2020).

On March 29, 2023, the Court granted final approval of a $185 million settlement in the case, one of the largest wage-and-hour settlements in history.

*United States ex rel. Garbe v. Kmart Corp.*, 3:12-cv-00881-NJR-PMF (S.D. Ill.).
Since 2004, Kmart pharmacies have charged low, flat-rate prices for certain generic drug prescriptions when those drugs are purchased by customers who paid entirely out of their own pockets with no insurance coverage. Since the beginning of the Medicare Part D drug program on January 1, 2006, however, Kmart has charged higher prices—often significantly higher prices—to customers with Medicare Part D coverage than it charges self-paying customers for the same prescription. For example, Kmart charged cash customers $10 for a 60-day supply of 500 mg Naproxen (available in non-prescription strength as Aleve®), but charged the Government $58.79 for the same prescription.

Korein Tillery and co-counsel Phillips & Cohen filed a False Claims Act case against Kmart after the Government declined to intervene. In the litigation, Kmart never disputed that it

charges cash-paying customers lower prices than it charges to the Government. Instead, Kmart contended that it was never required to charge the Government the lower prices because those are not the prices Kmart charges to "the general public." Rather, Kmart claimed its cash-customers are not the "general public" but rather members of an exclusive "club" through which they are offered the discount prices, even though as a practical matter the discount prices are the prices Kmart charges to all its cash customers. Kmart also has no record of denying any cash-paying customer "membership" in Kmart's "club." The U.S. District Court for the Southern District of Illinois rejected Kmart's arguments and denied its motions for summary judgment. Kmart appealed, but the Seventh Circuit affirmed the district court in large part. *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632 (7th Cir. 2016). After remand, the case settled in late 2017 with Kmart agreeing to pay approximately $59 million.

### *Lightfoot v. Arkema, Inc. Ret. Benefits Plan,* CIV. 12-773 JBS/JS (D.N.J.).

After the court certified a class of present and former retirement benefits plan participants, plaintiffs filed a motion for partial summary judgment on the issue of whether the COLAs the Plan promised to participants who elected annuities were part of participants' "accrued benefit" under ERISA. The Plan countered with a motion for summary judgment arguing the statute of limitations had run on all class members' claims owing to statements in a 1994 Summary Plan Description (SPD) and other plan documents. Although the same judge had previously ruled that the statements in the SPD and Plan were "clear repudiations" in a companion case, Korein Tillery convinced the court to deny the Plan's motion for summary judgment and to grant plaintiffs' motion for partial summary judgment, finding that the COLAs promised annuitants were accrued benefits. 2013 WL 3283951 (D.N.J. June 27, 2013). The case settled in 2014 with the average class member receiving $11,000 in cash that could be rolled into a retirement account.

### *City of Greenville v. Syngenta Crop Prot., Inc.,* 3:10-CV-188-JPG-PMF (S.D. Ill.).

On October 23, 2012, the U.S. District Court for the Southern District of Illinois entered an order approving a $105 million class-action settlement designed to compensate Community Water Systems throughout the United States for the cost of removing the pesticide atrazine from public drinking water. The litigation between class members and Syngenta dated back to July 2, 2004, when Holiday Shores Sanitary District filed six separate lawsuits against manufacturers and distributors of atrazine and atrazine-containing products in the Illinois Circuit Court in Madison County.

Atrazine is used to control broadleaf and grassy weeds in a variety of crops, but is applied primarily to corn fields. Atrazine has been one of the most heavily used pesticides in the U.S. Two of atrazine's key chemical characteristics—that it does not readily bind to soil and that it persists in the environment—dramatically increase atrazine's effectiveness as an herbicide. However, because atrazine does not bind to soil, it easily runs off of fields with rainfall and contaminates surface waters such as rivers, lakes, and reservoirs that act as drinking-water supplies for public water providers.

Plaintiffs alleged that atrazine had continuously entered their water supplies, and, as a result of this contamination, they had to filter atrazine from their water sources. After eight years of litigation, Korein Tillery secured a $105 million settlement fund to be distributed to several hundred community water systems for costs of filtration of atrazine from their drinking-water supplies. *City of Greenville v. Syngenta Crop Prot., Inc.,* No. 3:10-CV-188-JPG-PMF, 2012 WL 1948153 (S.D. Ill. May 30, 2012); *see also* 904 F. Supp. 2d 902 (S.D. Ill. 2012) (granting final approval of settlement and attorneys' fees). The settlement amounted to approximately 76 percent of the $139 million estimated to be the Class's maximum potential recovery.

To facilitate the settlement claims process, Korein Tillery lawyers collected 20 years of atrazine testing data into a database that was made available to each class member through a settlement website. From there, Claimants were able to view the test data already collected for their system and provide additional evidence of atrazine contamination to claim their share of the settlement fund. Although many class actions experience claims rates of less than 15 percent, in this case virtually all settlement funds were distributed to class members.

Public Justice honored the Korein Tillery lawyers representing the plaintiffs in this case as finalists for its Trial Lawyer of the Year award.

### Missouri Utility Tax Litigation
Since 2007, Korein Tillery has represented Missouri municipalities in class action litigation that sought to recover unpaid license taxes. In suits against wireless and wireline carriers, Korein Tillery attorneys recovered hundreds of millions of dollars of license tax revenues—both retrospectively and prospectively—for more than 350 cities throughout Missouri. Korein Tillery has recovered more than $1 billion for Missouri municipalities. As a result of their work in these cases, the Missouri Lawyers Weekly recognized Korein Tillery partners John W. Hoffman and Douglas R. Sprong with awards in the "largest plaintiff wins" category in 2007, 2009, 2010, 2015, and 2017.

In 2012, Korein Tillery was successful in persuading the Supreme Court of Missouri to issue an extraordinary writ (mandamus) declaring unconstitutional a state statute that sought to sweep away this litigation by barring cities and towns from serving as class representatives. *State ex rel. Collector of Winchester v. Jamison*, 357 S.W.3d 589 (Mo. 2012).

### Mansfield v. ALPA, 06-c-6869 (N.D. Ill.).
Beginning in 2001, United Airlines encountered financial difficulties that ultimately culminated in its filing for bankruptcy protection. During the course of United's reorganization in bankruptcy, United sought to terminate its pilots' defined benefit pension plan. In exchange for ALPA's agreement not to oppose the termination of the pension plan, United agreed to provide ALPA with $550 million in convertible notes. ALPA, through its United Airlines Master Executive Council ("MEC"), was tasked with allocating the proceeds from the sale of the convertible notes among the pilots. The MEC selected an allocation

method that divided the note proceeds based upon each pilot's lost accrued benefits and lost projected benefits.

Korein Tillery filed this case in 2006 contending that ALPA breached its duty of fair representation in discriminating between its members in allocating the proceeds from the sale of $550 million in convertible notes. Korein Tillery prevailed on a number of complex and novel issues in the trial court. For example, ALPA moved to exclude retirees from the class, arguing that a union owes no duties to retired pilots under the Railway Labor Act. The court denied ALPA's motion, agreeing with plaintiffs that because ALPA represented the retirees when it negotiated the convertible notes, it owed them a duty even though the retirees were no longer a part of the bargaining unit. *Mansfield v. ALPA*, 2007 WL 2903074 (N.D. Ill. Oct. 1, 2007). After Korein Tillery also successfully opposed motions for summary judgment, 2009 WL 2386281 (N.D. Ill. Jul. 29, 2009), and to decertify the class, 2009 WL 2601296 (N.D. Ill. Aug. 20, 2009), the parties reached a settlement two weeks before trial. Per the settlement, ALPA funded an aggregate settlement fund of $44 million to be paid directly to class members. *Mansfield v. ALPA*, No. 06C6869 (N.D. Ill. Dec. 14, 2009). The settlement is believed to be one of the largest ever in a duty of fair representation case, in which unions are sued over their responsibility to fairly represent their members.

### *Williams v. Rohm & Haas Pension Plan*, 4:04-cv-0078-SEB-WGH (S.D. Ind.).
Korein Tillery filed this class action in 2002 alleging that the Rohm & Haas Pension Plan violated ERISA by failing to include the value of future cost-of-living adjustments (COLA) in calculating lump-sum distributions from the Plan. After eight years of litigation, Korein Tillery obtained one of the largest settlements in the history of ERISA—$180 million. In 2006, the case was certified and Korein Tillery won summary judgment convincing the district court that the terms of the Plan violated ERISA because a COLA is an "accrued benefit" requiring that it be included in lump-sum distributions. The district court's decision was affirmed on interlocutory appeal. *Williams v. Rohm & Haas Pension Plan*, 497 F.3d 710, 714 (7th Cir. 2007) ("If a defined benefit pension plan entitles an annuitant to a COLA, it must also provide the COLA's actuarial equivalent to a participant who chooses instead to receive his pension in the form of a one-time lump sum distribution."), *cert. denied*, 128 S. Ct. 1657 (2008). Settlement approval and the fee award were later affirmed. 658 F.3d 629 (7th Cir. 2011).

### *Parker v. Sears, Roebuck & Co.*, Case No.: 04-L-716 (Ill. Cir. Ct. Sept. 18, 2007).
Korein Tillery brought this action against Sears in 2004 to remedy Sears's failure to install anti-tip safety devices, which prevent ranges from tipping over and severely burning or injuring unsuspecting consumers, on ranges that it sold, delivered, and set-up in customers' homes. In the 1960s and 1970s, kitchen range manufacturers started reducing the weight of metal in an effort to competitively lower the price of kitchen ranges. Over the course of several years, advances in materials allowed manufacturers to produce ranges which were durable and light weight. However, because the oven doors on the front of the ranges serve as a lever and fulcrum, the light weight of the new ranges created an extremely dangerous tipping hazard. For example, if a person were to place a turkey roaster on an open and

13

horizontal oven door, the added weight would cause these newly designed ranges to tip forward, spilling the hot contents onto anyone standing in the vicinity.  Children who opened the range and used the door as a step could unwittingly tip boiling liquids onto themselves. Dozens of people had been killed and hundreds had been maimed as a result of this problem.

Recognizing the need for a solution to this dangerous hazard, manufacturers and regulators began requiring installation of an anti-tip bracket that could be attached to the wall or floor at the back end of the range, preventing any forward tipping and maintaining complete stability. The installation is simple and the lightweight bracket costs pennies. The rule making bodies of most codes (BOCA Code, National Electrical Code; numerous other industry codes) thereafter required the installation of anti-tip brackets in all range installations in the United States. Even Sears acknowledged that a properly installed anti-tip bracket completely eliminates the hazards of tipping stoves.

Sears, Roebuck & Company at the time was the largest retail seller of kitchen ranges in the United States—averaging more than 800,000 ranges sold every year. When selling a gas or electric range, Sears generally includes delivery, installation, and hookup in customers' homes; thus, Sears became the largest installer of kitchen ranges in the United States. To increase its profits, Sears adopted a policy of refusing to install anti-tip brackets during normal installation unless the customer agreed to incur a substantial cost. At the same time, Sears failed to disclose the hazards associated with forgoing anti-tip bracket installation.

In January 2008, the Court granted final approval of a settlement which provided complete relief to the class by requiring Sears to install anti-tip brackets for the affected members of the class as well as requiring the installation of such brackets in the future. The settlement is valued at more than $544.5 million.

This settlement was touted by the public interest organization Public Citizen as an example of how consumer class actions benefit society. Public Citizen nominated Stephen Tillery as Trial Lawyers for Public Justice's Trial Lawyer of the Year based upon his role in this case.

*Hoormann v. SmithKline Beecham Corp.*, **04-L-715 (Ill. Cir. Ct. May 17, 2007).**
In July 2004, Korein Tillery filed suit on behalf of a nationwide class of purchasers alleging that SmithKline Beecham promoted Paxil® and Paxil CR™ for prescription to children and adolescents despite having actual knowledge that these drugs exposed children and adolescents to dangerous side effects while failing to treat their symptoms. Following three years of litigation, Korein Tillery obtained a settlement that established a $63.8 million dollar fund to reimburse class members 100 percent of their out-of-pocket expenses. This case was featured in The American Lawyer, Aruna Viswanatha, *King & Spalding Lawyer Stirs State Judge's Ire*, [29] 1 Am.Law., Jan. 2007, at 50, and mentioned in the National Law Journal. *The Plaintiffs' Hot List*, 30 Nat'l L.J. S8 (Nov. 22, 2007).

14

*CUNA Mutual Mortgage-Backed Securities Litigation.*
CMFG Life Insurance Company, CUMIS Insurance Society, Inc., and MEMBERS Life Insurance Company (collectively referred to as "CUNA Mutual") are financial services and insurance firms that offer insurance, investment, and retirement products and services to credit unions and their members. Korein Tillery and Kellogg Hansen filed a series of individual lawsuits in 2011 and 2013 on behalf of CUNA Mutual against eight Wall Street investment banks seeking to recover losses on $300 million of RMBS purchases using the novel common-law theory of contract rescission.

As in NCUA, CUNA Mutual alleged that the banks misrepresented in offering documents that all loans backing the RMBS complied with originator underwriting guidelines or had sufficient compensating factors to allow exceptions to the guidelines. CUNA Mutual also alleged that the banks misrepresented that it conducted due diligence to verify the accuracy of its offering document representations. In mid-2015, an appellate court issued a favorable opinion in CUNA Mutual's bellwether case approving of CUNA Mutual's primary litigation arguments. *CMFG Life Ins. Co. v. RBS Sec., Inc.*, 799 F.3d 729 (7th Cir. 2015). On remand, the case settled in December 2015 for a confidential amount. CUNA Mutual eventually settled its remaining RMBS cases over the next two years for confidential amounts. *See, e.g., CMFG Life Ins. Co. v. Credit Suisse Sec. (USA) LLC*, 3:14-cv-00249-wmc (W.D. Wis.) (settled in Oct. 2017); *CMFG Life Ins. Co. v. Morgan Stanley & Co., LLC*, 3:13-cv-00577-jdp (W.D. Wis.) (settled in Sept. 2017); *CMFG Life Ins. Co. v. J.P. Morgan Sec, LLC*, 3:13-cv-00580-wmc (W.D. Wis.) (settled in Mar. 2016).

*Axiom Investment Advisors, LLC v. Barclays Bank PLC*, **No. 15-cv-9323-LGS (S.D.N.Y.) (Schofield, J.).**
From 2008 to 2015, Barclays Bank PLC acted as both a buyer and seller of various foreign and domestic currencies through various trading platforms. Instead of executing foreign exchange orders placed by Barclays' customers on these platforms, Barclays instituted a secret "last look" policy that delayed execution of matched trades for several hundred milliseconds or even several seconds which allowed Barclays to determine through its algorithms whether the trade would be unfavorable to its position. If the matched trade would be unfavorable, Barclays reneged on the agreed price and rejected the trade or placed the order at a worse price. Barclays used last look to reject millions of trades that would otherwise have been executed.

Korein Tillery, along with its co-counsel Scott+Scott, Attorneys at Law, LLP and Hausfeld LLP, filed a class action against Barclays Bank PLC regarding its use of "last look," raising breach of contract and other claims. The court appointed Korein Tillery and Scott+Scott as class counsel. Counsel was successful in securing a $50 million settlement from Barclays on behalf of the class, which the court ultimately approved.

**ANTITRUST LITIGATION**

*In re GSE Bonds Antitrust Litig.*: Korein Tillery, along with co-counsel, alleged antitrust violations arising from coordinated price-fixing in the secondary market for bonds issued by the government-sponsored entities Federal National Mortgage Association, Federal Home Loan Mortgage Corporation, Federal Farm Credit Banks, and Federal Home Loan Banks ("GSE Bonds"). Plaintiffs defeated two motions to dismiss and reached a settlement with all defendants, including Deutsche Bank Securities Inc., First Tennessee Bank, N.A., FTN Financial Securities Corp., Goldman Sachs & Co. LLC, Barclays Capital Inc., BNP Paribas Securities Corp., Cantor Fitzgerald & Co., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, HSBC Securities (USA) Inc., J. P. Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Inc., Morgan Stanley & Co., LLC, Nomura Securities International, Inc., SG Americas Securities LLC, TD Securities (USA) LLC, and UBS Securities LLC. The combined settlement provided $386.5 million to class members and was approved by the court on June 18, 2020.

*Sullivan v. DB Investments, Inc.:* Korein Tillery represented a nationwide class of diamond purchasers in an antitrust case against the country's largest diamond distributor. That case was consolidated with others in the Eastern District of Pennsylvania and Korein Tillery was appointed co-lead counsel. In that role, the firm helped negotiate injunctive relief and a nationwide settlement that created a $323 million fund to compensate diamond purchasers.

*In re In re Google Digital Publisher Antitrust Litigation:* Korein Tillery has been appointed interim co-lead counsel representing a class of online publishers that sell ad space on their websites using tools that they purchase from Google. Plaintiffs allege that Google engaged in a series of mutually reinforcing anticompetitive acts in adjoining markets to acquire and maintain monopoly power over the markets for these tools, in violation of the Sherman Act and California's Unfair Competition Law.

*In re: Google Play Consumer Antitrust Litigation:* Korein Tillery, working with co-counsel, filed the first consumer class action in the nation alleging that Google's operation of Google Play Store and Google Play Billing, among other actions, created a wrongful monopoly over the distribution of applications and payment for in-application purchases in the Android ecosystem. Over ten similar complaints followed and are now consolidated before Judge James Donato in the Northern District of California, where Korein Tillery serves as a member of the consumer class steering committee.

# EXHIBIT B

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| ALEX FONTENOT, MYA HOLLINGSHED, SARAH FULLER, DEONTAY ANDERSON, and TUCKER CLARK, Individually and on Behalf of All Those Similarly Situated, | CASE NO. 1:23-cv-03076-CNS-STV **CLASS ACTION** |
| Plaintiffs, | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION; SOUTHEASTERN CONFERENCE; PAC-12 CONFERENCE; THE BIG TEN CONFERENCE, INC.; THE BIG TWELVE CONFERENCE, INC.; and ATLANTIC COAST CONFERENCE; | |
| Defendants. | |

> *"What I don't understand, is how the NCAA, television networks,*
> *conferences, universities and coaches can continue to pull in millions*
> *and in some cases billions of dollars in revenue off the efforts of college*
> *student-athletes across the country without providing enough opportunity*
> *to share in the ever-increasing revenues."*

-Jim Harbaugh, then-Head Football Coach, University of Michigan (Aug. 28, 2023)[1]

Plaintiffs Alex Fontenot, Mya Hollingshed, Sarah Fuller, Deontay Anderson, and Tucker Clark, on behalf of themselves and all others similarly situated, bring this amended class action complaint alleging antitrust violations. Plaintiffs allege as follows:

## INTRODUCTION

1.      The score was 14-10, and the game between two top-ten college football teams was in its last minute. Notre Dame's defense had stifled the Ohio State offense for most of the day. But Ohio State was on the move, and they neared the goal line as the seconds counted down. One final play to score a touchdown and win—or not, lose. The ball was handed to Chip Trayanum, an Ohio State running back. With a plunge, he found the end zone. The Buckeyes scored, and the game was over.

2.      Over 77,000 fans attended that September game in South Bend this year—most of them Notre Dame fans who left the game stunned. Far more people watched on television. The game peaked at 14.2 million viewers during the final scoring drive, and an average of 10.6 million tuned in throughout the game. It was the most-watched regular season college football game on NBC in 30 years.

3.      Because of moments like these, millions of viewers tune in to watch college football and basketball athletes perform on a weekly basis. These college football and basketball players bring in billions of dollars in television revenue for

---

[1] *Michigan's Jim Harbaugh backs student-athlete revenue sharing*, ESPN, Aug. 28, 2013, *available at* https://www.espn.com/college-football/story/_/id/38277849/michigan-jim-harbaugh-backs-student-athlete-revenue-sharing.

**SECOND AMENDED CLASS ACTION COMPLAINT**

Defendants and their member schools. Everyone profits from their efforts: the NCAA, the conferences, the schools, and the coaches. Everyone, that is, except the players themselves, because the NCAA prohibits it.

4.      Defendants have spelled out the restraint in their bylaws. Bylaw 12 prohibits athletes from receiving "pay in any form" for the labor that they provide, no matter how valuable that labor is, and no matter how much the athletes would be paid in an unrestrained market.

5.      This lawsuit aims to change that. It focuses on the ever-increasing television revenue and other revenue brought in by these athletes' labor, of which the athletes would be entitled to receive a substantial portion, but for the NCAA's rules.

6.      There is big money in the television broadcasts of NCAA games. In August 2022, the Big Ten Conference inked a new television rights agreement with several broadcasters. It became operative this year, and pursuant to the agreement, broadcasters will pay $7 billion to the Big Ten Conference over just seven years, in exchange for the right to televise the conference's college football games, as well as a certain number of the conference's college basketball games. The conference is expected to distribute $80 million to $100 million annually to each of its member schools pursuant to the agreement. That's more than double what the Big Ten schools had been making under the previous agreement.

7.      Other conferences have billion-dollar television broadcast agreements as well. The Big 12 Conference has reportedly signed a television revenue agreement worth more than $2.2 billion. The SEC and ACC reportedly have contracts worth over $7 billion and $4 billion, respectively, while the Pac-12 has a $3 billion deal that was not rich enough to prevent most of its members from departing for greener pastures next year. These conferences are known as the "Power Five Conferences" due to the immense popularity of their sports.

**SECOND AMENDED CLASS ACTION COMPLAINT**

8.      Combined, the Power Five Conferences have signed contracts that will pay them more than $20 billion to broadcast their games on television. Their television revenues have increased by roughly 90% in recent years and are expected to continue to grow, as the below chart illustrates:



9.      Thousands of football and basketball athletes at the conferences' schools provide the labor that fuels these multi-billion dollar deals. These athletes are among the best in the world at their jobs. They are hard-working and uniquely talented individuals who have only a limited amount of time to earn money from their skilled labor. NCAA athletes have only four (sometimes five) years of eligibility to play college sports, and as the NCAA is fond of saying, most of these athletes will not work as athletes in professional sports leagues. For many, now is their only chance to earn just compensation for their immense talents, which bring joy to so many fans.

10.      It is the athletes that the viewer tunes in to watch. Yet the athletes are not being paid their fair share of this multi-billion dollar revenue, or any of the other revenue, even though they—the athletes—through their labor, are the most significant driver of that revenue. As Defendants' television and other revenues have increased

exponentially, the athletes' share has remained flat. Indeed, the athletes get nothing. The NCAA's rules prohibit them from receiving a portion of the revenue.

11.     Defendants are operating a cartel that fixes wages—a classic antitrust violation. The NCAA's members (which includes its schools and conferences) are horizontal competitors. In a competitive market, they would compete for players by providing them with salaries commensurate with the true value of their labor. That competition would lead to the athletes receiving a significant share of revenue, including the television revenue from these media agreements. Athletes in other leagues (such as in European soccer leagues, the National Football League, and the National Basketball Association) regularly receive 50-60% of revenue.

12.     By operating as a cartel, however, Defendants have for decades depressed the compensation paid for the athletes' labor. Defendants, via the NCAA rules that the schools and conferences have adopted, have forbidden the sharing of television or other revenue with the very people who deserve it the most. Meanwhile the NCAA's president, who no television viewer tunes in to watch, made nearly $3 million last year.

13.     Defendants' prohibition against compensating players is a horizontal restraint amongst competitors to purposefully restrict competition in the labor market for the athletes' services. The purpose and effect of this horizontal agreement was (and is) to fix and suppress prices so as to make them unresponsive to a competitive marketplace. This amounts to an unlawful restraint under antitrust laws, and it is illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.

14.     Defendants have traditionally argued that the concept of "amateurism" necessitates these rules—that the entire system would break if the athletes are compensated one cent beyond their education-related expenses, because consumer demand would plummet. That is a sham argument, as recent developments have shown. After prior court victories and state laws passed to protect college athletes, the

**SECOND AMENDED CLASS ACTION COMPLAINT**

NCAA recently issued a policy by which the athletes are finally allowed to earn money
from their names, images, and likenesses ("NILs"), as long as the payments come from
third parties. Before 2021, athletes could not even earn that NIL money because the
NCAA rules prohibited it, and they still prohibit athletes from earning NIL money directly
from NCAA members.

15.     Even though athletes are now earning some money (though not nearly
what they are entitled to earn) in the form of NIL payments, there has been no decrease
in viewership or public interest in NCAA sports. The sky has not fallen. Quite the
contrary, television ratings are higher than ever, and the money keeps rolling in. As one
industry insider recently remarked, "I don't know what in all of TV is trending any better
than [college football]."[2]

16.     In October 2023, the football players for the University of Utah received a
welcome surprise. They went to the stadium, and all 85 scholarship players were
handed the keys to a new Dodge Ram truck. According to reports, the trucks were
valued at over $60,000 apiece.

17.     The trucks' leases were paid for by some of the schools' boosters, and
were provided as compensation for a portion of the value of the players' NILs. At the
players' next game, more than 50,000 people attended. It was the 79th consecutive
sold-out football game at the school's stadium. Just a couple of weeks later, more than
three million people watched the school's game against University of Southern
California on television—one of the top-5 football games by ratings, and one of the top-
rated shows of any genre airing that day.

18.     These athletes should be compensated with more than just trucks—they
are entitled to their fair share of television revenue and overall revenue. The NCAA's
rules still prohibit the conferences and the schools from sharing revenue with the

---

[2] Michael Mulvihill, twitter.com,
https://twitter.com/mulvihill79/status/1711874853144543646.

**SECOND AMENDED CLASS ACTION COMPLAINT**

athletes. If a school or conference did so, the player would be ruled ineligible and the school or conference would be disciplined. The conferences and schools are raking in billions of dollars in television and other revenue without sharing a dime of it with the athletes.

19.     Instead, the money is flowing everywhere except the players' pockets. At least 25 coaches make more than $6 million per year. Schools are paying tens of millions of dollars to coaches who have been fired and are no longer working. And college football staffs now include armies of analysts on the payroll.

20.     Coach Jim Harbaugh, until recently of the University of Michigan, recognizes the injustice of the current system. He recently called for "a system that is fair, equitable and benefits all involved," saying "you can't say you're about diversity, equity and inclusion, if you aren't willing to include the student-athletes in revenue sharing."[3]

21.     This case is about allowing revenue to be allocated by the free market rather than the restrictive and unlawful rules of a labor cartel that takes advantage of the athletes that are the primary source of its massive income. Our country and its antitrust laws operate on the foundational principle that market forces should determine the compensation that a person receives for their labor. That should be as true in sports as in any other industry. The NCAA's stranglehold on athlete compensation must end.

22.     These athletes are entitled to the antitrust damages sustained as a result of these collusive and illegal practices. And the Court should enjoin the NCAA and its members from engaging in this conduct again so that these talented athletes can be fairly compensated for the valuable work they perform.

---

[3] *See supra* n.1.

**SECOND AMENDED CLASS ACTION COMPLAINT**

**PARTIES, JURISDICTION, AND VENUE**

23.     Plaintiff Alex Fontenot, an individual, is a resident of Colorado. He worked as a college football player at the University of Colorado from 2017 to 2022.

24.     Plaintiff Mya Hollingshed, an individual, is a resident of Colorado. She worked as a college basketball player at the University of Colorado from 2017 to 2022.

25.     Plaintiff Sarah Fuller, an individual, is a resident of Tennessee. She worked as a college soccer player and a college football player at Vanderbilt University from 2017 to 2020.

26.     Plaintiff Deontay Anderson, an individual, is a resident of Texas. He worked as a college football player at the University of Houston from 2018 to 2021, and at the University of Mississippi from 2016 to 2017.

27.     Plaintiff Tucker Clark, an individual, is a resident of Colorado and currently works as a golfer at the University of Colorado. He previously worked as a golfer at Notre Dame.

28.     Defendant NCAA is an unincorporated association that maintains its principal place of business in Indianapolis, Indiana. It has approximately 1,100 member schools. Its membership includes the public and private universities and colleges that conduct major athletic programs in the United States.

29.     The Pac-12 Conference ("Pac 12") is an unincorporated association with a principal place of business in San Francisco, California. During the relevant period, the Pac-12 Conference conspired with the NCAA and others to participate in the illegal restraint in the market and damaged (and continues to damage) class members.

30.     The Southeastern Conference ("SEC") is an unincorporated association with its principal place of business in Birmingham, Alabama. During the relevant period, the SEC conspired with the NCAA and others to participate in the illegal restraint in the market and damaged (and continues to damage) class members.

**SECOND AMENDED CLASS ACTION COMPLAINT**

31.     The Atlantic Coast Conference ("ACC") is an unincorporated association with a principal place of business in Greensboro, North Carolina. During the relevant period, the ACC conspired with the NCAA and others to participate in the illegal restraint in the market and damaged (and continues to damage) class members.

32.     The Big 12 Conference, Inc. ("Big 12") is a nonprofit corporation organized under the laws of Delaware, with a principal place of business in Irving, Texas. During the relevant period, the Big 12 conspired with the NCAA and others to participate in the illegal restraint in the market and damaged (and continues to damage) class members.

33.     The Big Ten Conference, Inc. ("Big Ten") is a nonprofit corporation organized under the laws of Delaware, with a principal place of business in Rosemont, Illinois. During the relevant period, the Big Ten and its member schools were co-conspirators; they participated in the illegal restraint in the market and damaged (and continues to damage) class members.

34.     Various other persons and entities engaged in concert with the named defendants in the conduct alleged herein, and are co-conspirators.

35.      Plaintiffs bring this class action pursuant to §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, for violations of §§ 1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 3. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1337 (commerce and antitrust regulation).

36.     Defendants' conduct had and continues to have a direct, substantial, and reasonably foreseeable effect on interstate commerce. Defendants and their member schools transact substantial business in multiple states. Defendants and their member schools routinely use instruments of interstate commerce, such as interstate railroads, highways, waterways, wires, wireless spectrum, and the U.S. mail, to carry out their operations.

37.     Venue is proper in this District because Defendants and some of their members reside, are found, and have agents in this District as provided in 28 U.S.C. §

1391(b) and (c) and in § 4 of the Clayton Act, 15 U.S.C. § 15. Alternatively, venue is proper under § 12 of the Clayton Act, 15 U.S.C. § 22, because Defendants and some of their members can be found in this District or transact business in this District. A substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. The bylaws at issue (discussed in greater detail below) apply to athletes who have worked, or currently work, for NCAA member institutions in this District, the NCAA sanctions Division I football and basketball events that regularly take place in this District, including games played by local members, and several Plaintiffs and other members of the proposed Class reside or work in this District. Indeed, in 2023, Denver hosted a portion of the NCAA's popular March Madness men's basketball tournament, and it will do so again in 2025.

38.     This Court has personal jurisdiction over Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, for the same reason that venue is proper under that Clayton Act, as described *supra*. It also has personal jurisdiction because, among other things, Defendants transact substantial, continuous business in this State and District; participate in organizing intercollegiate athletic contests that take place in this State and District, as well as licensing and selling merchandise and products in this State and District, and profiting from televising NCAA-sanctioned events that take place in this State and District; they have substantial contacts in this State and District and several of their members reside in this State and District; and they are engaged in an illegal anti-competitive scheme that was directed at, and had the intended effect of causing injury to, persons residing in, located in, or doing business throughout the United States, including in this State and District.

## CLASS ACTION ALLEGATIONS

39.     Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23, as a class action on behalf of the following:

**SECOND AMENDED CLASS ACTION COMPLAINT**

All persons who worked as athletes for a Division I athletic team at an
NCAA Division I school, from the beginning of the statute of limitations
period, as determined by the Court, through judgment in this matter.

40.     While Plaintiffs do not know the exact size of the proposed class, Plaintiffs
are informed and believe that the proposed class includes over 100 members residing
in various parts of the United States. The class is so numerous that joinder of all
members is impracticable.

41.     Plaintiffs' claims are typical of the claims of other members of the
proposed class. Plaintiffs and the members of the Proposed Class were subject to the
same or similar restraints and compensation practices arising out of Defendants'
common course of illegal conduct. Plaintiffs and the Proposed Class have sustained
similar types of damages as a result of these common practices.

42.     Common questions of fact or law exists, and they predominate over any
individualized questions. They include, *inter alia*:

     a.  Whether by enacting the bylaws, Defendants engaged in a contract,
        combination, or conspiracy to unreasonably restrain trade by capping
        the amount of compensation paid to class members;

     b.  Whether that conduct caused Plaintiffs and proposed class members
        to earn less than what they would have in a truly competitive market;

     c.  Whether Plaintiffs and the proposed class suffered antitrust injury or
        were threatened with injury; and

     d.  Whether Plaintiffs and the proposed class are entitled to damages and
        injunctive relief, and the type and scope of that relief.

43.     Plaintiffs will fairly and adequately protect the interests of class members
in that their interests are aligned, and Plaintiffs have retained counsel competent and
experienced in class-action litigation, including antitrust litigation and sports-related
litigation.

44.     A class action is superior to other methods of adjudication. Joinder is impracticable, and the prosecution of separate actions by individual class members would impose heavy burdens upon the courts and Defendants and create a risk of: (a) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for Defendants; and (b) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

45.     Conversely, a class action would save time, effort, and expense and assure uniformity of decision for persons similarly situated without sacrificing procedural unfairness or any undesirable result. Plaintiffs do not anticipate any difficulty in the management of this action as a class action, and the proposed class has a high degree of cohesion.

46.     Defendants have acted or refused to act—and continue to act—on grounds generally applicable to the class, thereby making appropriate final injunctive or declaratory relief with respect to the class as a whole.

## FACTUAL ALLEGATIONS

### A. The NCAA, its co-conspirators, and the exponential growth in revenue.

47.     More than a century ago, our nation's colleges and universities banded together to form the NCAA. The ostensible need for the association was to "protect" players because of the number of injuries occurring in college athletics at the time. Over the years, however, the association began focusing more on protecting its own financial interests, by limiting the compensation provided to athletes, than on actually protecting the athletes from injuries.

48.     As an unincorporated association, the NCAA is governed by its members, which include its schools and conferences. The NCAA has several governance committees, with representatives from member schools and conferences who sit on the

**SECOND AMENDED CLASS ACTION COMPLAINT**

committees and engage in NCAA rulemaking. The highest governing body, the Board of Governors, consists primarily of chancellors and presidents of member schools, and it also employs the NCAA's president and adopts and implements policies.

49.     The association has adopted a constitution and a number of bylaws. As a condition of membership, member schools and conferences must comply with the association's constitution and bylaws. Certain bylaws have been deemed so important by the association that they cannot be amended without a full vote of the members. One of these bylaws is Bylaw 12, entitled "Amateurism and Athletics Eligibility."

50.     Bylaw 12 states that "[o]nly an amateur student-athlete" can participate in the NCAA's sports. It goes on to say that a "grant-in-aid"—more commonly known as a scholarship—does not violate the amateurism rules. That grant-in-aid has generally been limited to the cost of tuition, room and board, books, and similar education-related expenses.

51.     As a condition of membership, the bylaws require schools to ensure that their athletes maintain their amateur status when participating in Division I athletics. The schools use an amateur certification process. An athlete must receive this amateur certification before participating in practices or competitions.

52.     An athlete loses his amateur status by using athletics skill "for pay in any form in that sport." NCAA Bylaw 12.1.2. Prohibited forms of pay include: "any direct or indirect salary, gratuity, or comparable compensation" or "any division or split of surplus (bonuses, game receipts, etc.)," such as television or other revenues. Likewise, cash awards or cash prizes for performance are prohibited. NCAA Bylaw 12.1.2.1.4. And the athletes "may participate in media activities," including television programs, but they "shall not receive any remuneration" from it. NCAA Bylaw 12.5.3.

53.     Penalties for violating these rules include, for the athlete, loss of ability to compete in NCAA events, and for the school, forfeiture of games, returning revenue, bans on post-season play, and the removal of scholarships. Additionally, in some

circumstances, if an ineligible athlete participates in a game, the NCAA has the right to require the school to pay to the NCAA the school's "share of television receipts" related to the game. NCAA Bylaw 19.13.

54.     The NCAA, its conferences, and its member schools enforce these rules, and many athletes and schools have been penalized for violating them. As Article 2.8 of the NCAA's governing constitution states, a non-compliant school will be subjected to discipline and corrective actions. That includes being "suspended, terminated or otherwise disciplined." NCAA Constitution Article 3.2.5.1.

55.     Indeed, according to Article 3.2 of the NCAA's governing constitution, a condition of membership in the NCAA is the agreement by a school to administer its agreements in accordance with the NCAA's rules. The member conferences likewise must comply with all the association's rules and regulations. And active members must refrain from competing in athletic contests with other schools who are found to be out of compliance. That is a quintessential way of enforcing a cartel's rules: through an agreement to boycott an entity that fails to follow the rules.

56.     The wage fix is thus codified in Defendants' own bylaws. This arrangement does not exist in other university contexts, including when it comes to other workers who are simultaneously attending a university and working for it. A graduate student is not barred from being paid to teach or assist in research or perform any other paid work. Neither should an athlete attending the same university.

57.     The NCAA is divided into three levels: Division I, Division II, and Division III. Division I schools generally have the largest athletics department budgets, the better athletes, and often have larger student bodies. There are more than 350 Division I schools. Sixty-nine (formerly 65) of these Division I schools make up the Power 5 Conferences. Notre Dame (which, though independent in football, competes against Power 5 schools and is a member of the ACC for men's and women's basketball) also operates at the Division I level.

58.     In 2022, the NCAA itself earned $1.14 billion. Much of that comes from television contracts for the broadcast of basketball games between NCAA member schools. At the end of each college basketball season, the NCAA hosts a "March Madness" tournament. Its popularity in 2010 garnered a television contract originally worth $10.8 billion over 14 years; the parties later agreed to extend the contract an additional 8 years for an additional $8.8 billion.

59.     Those numbers, of course, do not include the amount earned by the NCAA's members. In 2019, the NCAA Division I member schools generated close to $16 billion in total athletics revenue collectively.

60.     The Power 5 Conferences generated much of that revenue. In 2022-23, there were at least 22 universities with revenues exceeding $150 million. (Private schools like Duke and Notre Dame were not included in the study, meaning the number of such schools is likely higher.) All those schools were members of Power 5 Conferences. In 2022, the 13 public schools in the SEC reported a combined revenue of $2.17 billion, and the 13 public schools in the Big Ten combined for $2.04 billion in revenue.[4]

61.     On the low end, the average athletics department revenue for a Big 12 school amounted to over $110 million in 2022. On the high end, the average revenue for a SEC school amounted to $159.1 million. The other three conferences in the Power 5 fell between those numbers. The Power 5 Conferences enjoyed revenue growth of 260% from 2008 to 2018. Over the same time period, revenue growth for the NBA and NFL was around 100%. The growth has only continued in recent years.

62.     The huge television contracts signed by the Power 5 Conferences drive much of that revenue growth. With its new landmark deal, the Big Ten now earns $1.15 billion per year in television revenue. In 2024, the SEC will be earning over $700 million

---

[4] https://www.usatoday.com/story/sports/college/2023/06/14/sec-big-ten-2-billion-athletics-revenue-power-five/70313053007/

**SECOND AMENDED CLASS ACTION COMPLAINT**

per year in television revenue. The Big 12 earns an average of $220 million in annual

revenue, but that will increase to $380 million in 2025. The ACC earns an average of

$240 million in such revenue, and the Pac 12 earns $250 million.

63.     Approximately $470 million per year in television revenue is also earned

from the College Football Playoff series each year. When the current television deal for

the College Football Playoff expires in 2026, industry experts predict that Defendants

will be in a position to negotiate a deal that pays over $2 billion per year in television

broadcast revenue because of the increased popularity of college football.

64.     In total, the Power 5 conferences have signed television contracts that

exceed $20 billion. The annual revenue (which is distributed to the schools) has been

growing exponentially, and is expected to continue to grow exponentially, as the below

chart demonstrates:



**SECOND AMENDED CLASS ACTION COMPLAINT**

65.     Demand for college football and basketball, and corresponding television viewership ratings, is strong and increasing. For example, an average of 21.736 million people viewed the NCAA's College Football Playoff semifinal game in 2023 between Ohio State and Georgia. Meanwhile, an average of 14.69 million people watched the NCAA's March Madness men's championship basketball game. Ratings for the women's basketball championship game in 2023 reached 9.9 million, which shattered the prior record. In 2024, that record for women's college basketball was shattered again, as an average of over 18 million people watched the championship game.

66.     Each conference generally splits the revenue it receives from television contracts for the broadcast of games evenly amongst that conferences' member schools. That is because schools generally assign their broadcast rights to the conferences so the conferences can negotiate with the television networks. For example, the SEC receives money from its television contracts and then shares it equally with its own member schools. The schools of course have an incentive to try to position themselves in the best place to maximize their revenue, by joining the conference that takes in and then shares the most revenue. That results in revenue-chasing, which in turn has resulted in a significant amount of conference-jumping by schools.

67.     As one industry insider, Amy Perko, recently stated, "[c]onference realignment is driven by this continual chase of revenue. The winners, at least in the media, are being defined as the conferences that bring in the most revenue."

68.     For instance, several members of the Pac-12 have decided to abandon the conference to cash in on more lucrative television deals being negotiated by other Power 5 conferences. The Big Ten—traditionally a Midwestern conference—will soon include UCLA, USC, Washington, and Oregon as members. Why? Because of the Big Ten's huge new television deal, which they are in a position to share with schools who join their conference.

**SECOND AMENDED CLASS ACTION COMPLAINT**

69.     Similarly, the ACC traditionally has been a conference of eastern schools. Now the "Atlantic Coast Conference" will include members from the Pacific coast: Stanford and California-Berkeley. Instead of playing games a few hours south against USC or UCLA, the athletes at Stanford will have to travel cross-country to Boston, Chapel Hill, and Miami on a regular basis.

70.     As television revenues have skyrocketed, the schools and conferences have chased the almighty dollar. There is no end to this chase in sight. Clemson and Florida State continue to make noise about leaving the ACC for greener pastures. And while Defendants have long fussed about the need to protect athletes, they apparently have no problem with increasing the players' travel dramatically or, at times, expanding the number of games scheduled to increase revenue gains. Player welfare is taking a backseat to revenue.

71.     The increased travel caused by realignment hits athletes in sports other than basketball and football particularly hard. One head football coach put it this way: "[W]hat about softball and baseball who have to travel cross-country? Did we ask about the cost to them? Do we know what the number one cause of mental health is: it's lack of rest and sleep."[5]

72.     Or as a head basketball coach stated: "None of it is in the best interest of the student-athlete, no matter what anybody says. It's in the best interest of more money to cover the bills. That's it."[6]

---

[5] Jared Bush, *Mizzou head coach Eli Drinkwitz criticizes conference realignment*, Fox4, Aug. 6, 2023, *available at* https://fox4kc.com/sports/college/mizzou/mizzou-head-coach-eli-drinkwitz-criticizes-conference-realignment/.

[6] Jordan Mendoza, *UCLA coach Mick Cronin: Realignment not 'in the best interest of the student-athlete'*, USA Today, Aug. 17, 2023, *available at* https://www.usatoday.com/story/sports/ncaab/2023/08/17/ucla-coach-mick-cronin-realignment-thoughts/70615325007/.

**SECOND AMENDED CLASS ACTION COMPLAINT**

73.     The administrators and head coaches and nearly everyone else working in college athletics have seen salaries rise along with revenue. Everyone is cashing in, with one exception: the players themselves. That is solely because of Defendants' illegal restraint, which prohibits players from receiving any portion of revenue.

74.     In a competitive market, the athletes working at Power 5 schools would receive compensation that responded to market forces. Just as the schools compete for coaches by paying higher salaries, they would also compete for athletes by paying higher compensation. But the NCAA bylaws prohibit such payment. That amounts to a horizontal restriction amongst competitors that artificially restrains the compensation provided to players.

**B. College athletics programs have dramatically increased spending on coaching salaries and quality of facilities, and the compensation for the athletes would likewise increase in a competitive market.**

75.     Because the Power 5 schools compete with one another, they have increased their spending as their revenue has increased. That competition has resulted in higher coaches' salaries. In many states, the head football coach at the flagship college is the highest paid public employee in the state.

76.     Nick Saban, the former head football coach at the University of Alabama, earned $11.4 million per year as of 2023. All of the top-25 highest paid college football coaches in 2023 earned more than $6 million annually. The highest paid men's college basketball coach that year, John Calipari (who was then at the University of Kentucky), earned $8.6 million annually. The highest paid coach in women's college basketball, Kim Mulkey of Louisiana State University, recently signed a 10-year, $36 million contract.

77.     On average, head football coaches at Power 5 schools now earn over $6 million per year, an increase of over 14% in just one year. The head men's basketball coach at those schools earns an average of over $3 million per year. Even many

assistant coaches are now earning over $1 million annually. Meanwhile, the average salary for an athletic director at a Power 5 reportedly also exceeds $1 million.

78.     Many schools are in fact paying tens of millions of dollars to terminated coaches to *not* coach. Just recently, Texas A&M University fired their football coach, Jimbo Fisher. They reportedly will be paying him $76 million to no longer lead their football team. If that type of money can go to a fired coach, then surely the players on the team can be fairly compensated.

79.     As coaching salaries have increased, so too have the schools' armies of "analysts" and "recruiters." Staffs have grown as fast as the revenue has grown, with little end in sight.

80.     The schools have also increased their spending on athletics facilities. San Diego State University recently opened a new $310 million football stadium. Vanderbilt University is undergoing $300 million in renovations of athletics facilities, including its football stadium. One study showed that in 2014, just 48 schools spent $772 million on athletics facilities.

81.     Why are schools paying so much for coaches and facilities? Because they compete with one another. And without the ability to pay players, they spend money in other areas to outcompete each other. The spending on facilities and coaches is simply a proxy war for what should be occurring with respect to player compensation as teams try to attract top talent.

82.     Absent Defendants' restraint on compensation for the athletes, class members would be seeing their own compensation increase as well, as the competition for players is intense. The wage suppression has gone on for decades, and it is time for it to come to an end.

**SECOND AMENDED CLASS ACTION COMPLAINT**

C. **In a competitive market, the class members would be paid competitively for their labor.**

83.     To see the effect of this restraint, one need look no further than other sports leagues. In the NFL, players traditionally have received close to 50% of the revenue taken in by the league.[7] Players in the NBA receive a similar percentage, approximately 49-51%.[8]

84.     European soccer, with its strong emphasis on winning, is also an apt comparison. Elite soccer clubs often spend more than 60% of revenue on player compensation, because market forces place a premium on obtaining top players who can score goals and secure wins.

85.     In the absence of Defendants' restraint on compensation, Plaintiffs and the class members would be paid a significant percentage of revenue as well. That includes the revenue coming from Defendants' burgeoning television contracts.

86.     Because of Defendants' horizontal restraint on compensation, Plaintiffs and class members are being robbed of significant sums of money that they deserve. The amount of money paid to Plaintiffs and class members in the form of scholarships and similar education-related benefits is miniscule compared to the television and other revenue coming in, and the percentage pales in comparison to the percentage of revenue paid to athletes in leagues that lack such a restraint.

---

[7] *Players' share of revenue can go as high as 48.8 percent*, NBCSports.com, March 1, 2020 *available at* https://www.nbcsports.com/nfl/profootballtalk/rumor-mill/news/players-share-of-revenue-can-go-as-high-as-48-8-percent.

[8] Sam Quinn, *NBA players interested in negotiating for ownership stakes in teams in next CBA, says Michele Roberts*, CBSSports.com, Jan. 22, 2021, *available at* https://www.cbssports.com/nba/news/nba-players-interested-in-negotiating-for-ownership-stakes-in-teams-in-next-cba-says-michele-roberts/.

**D. The NCAA's prior antitrust losses.**

87.     This of course is not the first antitrust case brought against Defendants.
Just two years ago, the Supreme Court ruled against the NCAA in a case brought by
athletes seeking greater compensation. As the Court wrote, "Congress tasked courts
with enforcing a policy of competition on the belief that market forces 'yield the best
allocation' of the Nation's resources." *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct.
2141, 2147 (2021) (quoting *Nat'l Collegiate Athletic Ass'n v. Board of Regents of Univ.
of Okla.*, 468 U.S. 85, 104, n. 27 (1984)). The Court held that the NCAA could not limit
education-related compensation paid to its athletes, such as "limiting scholarships for
graduate school, payments for tutoring, and the like." *Id.* at 2164.

88.     In his concurrence, Justice Kavanaugh issued a warning to the NCAA
regarding its "remaining compensation rules," like "rules [that] generally restrict student
athletes from receiving compensation or benefits from their colleges for playing sports."
*Id.* at 2166. Those "rules also raise serious questions under the antitrust laws." *Id.* at
2166-67. He wrote that the "NCAA's business model would be flatly illegal in almost any
other industry in America." *Id.* at 2167. "Price-fixing labor is price-fixing labor," and that
is a "textbook antitrust problem because it extinguishes the free market in which
individuals can otherwise obtain fair compensation for their work." *Id.* at 2167-68.

89.     "Businesses like the NCAA cannot avoid the consequences of price-fixing
labor by incorporating price-fixed labor into the definition of the product." *Id.* at 2168.
That the NCAA has done so for decades does not excuse the behavior. It simply makes
it more egregious and makes change long overdue.

90.     The "remaining compensation rules" referenced by Justice Kavanaugh in
his concurrence were not before the Court, and so the majority opinion did not address
them. But those remaining rules are just as unlawful under the antitrust laws as the
restrictions on scholarships that were struck down by the Court.

91.     Although this case differs in some key respects from *Alston*, Justice
Kavanaugh's criticisms apply with equal force.

**E.  The NCAA's supposed need to preserve "amateurism" no longer has any
merit because athletes are now being paid for their NILs.**

92.     The NCAA's compensation rules have changed since *Alston* in a way that
has revealed the fallacy of the NCAA's traditional and chief procompetitive argument:
that amateurism must be preserved in order to maintain consumer demand. That fallacy
is both factually untrue and rests on a false premise.

93.     The NCAA recently relaxed its prohibition against paying compensation to
athletes by issuing a policy that allows athletes to be paid for their names, images, and
likenesses (NILs).[9]  Many athletes are now earning hundreds of thousands of dollars in
NIL money each year, and some are earning over $1 million per year. The quarterback
for the University of Colorado, Shedeur Sanders, is reportedly earning several million
dollars per year in NIL money, and has deals with Gatorade, Mercedes-Benz, and other
companies. Caleb Williams, then the quarterback for USC, also reportedly earned
several million dollars from NIL money, and had deals with United Airlines and Beats by
Dre.

94.     On the women's side, Angel Reese, a star basketball player at LSU,
reportedly earned well over $1 million in NIL money and had deals with Pepsi and many
others.

95.     Companies such as Pepsi and Mercedes are entering into these deals for
a reason: the athletes enjoy immense popularity with fans, and that popularity has great
value.

---

[9] NCAA Interim NIL Policy, *available at*
https://ncaaorg.s3.amazonaws.com/ncaa/NIL/NIL_InterimPolicy.pdf (last accessed Nov.
10, 2023).

**SECOND AMENDED CLASS ACTION COMPLAINT**

96.     That same athlete popularity has driven the record television deals signed by Defendants. Yet while the NCAA has relaxed its NIL rules, it still prohibits athletes from receiving any money tied to television or other revenue.

97.     In prior antitrust cases, the NCAA has warned that the sky would fall if athletes began receiving any money beyond that needed to pay for education-related expenses. The NCAA has cried out about a need to preserve "amateurism" to supposedly differentiate its product from professional sports. But the concept of "amateurism" has always been a moving target. Defendants have long allowed athletes to be paid in the form of scholarships in return for their labor. And Defendants have allowed other forms of remuneration as well, such as "athletic participation" awards in the form of Visa gift cards, disbursements from a "Student Assistance Fund" and an "Academic Enhancement Fund," graduation awards, tutoring, loss-of-value insurance policies, legal services, stipends of several thousands to cover the costs of attendance beyond tuition and room and board, and a variety of other payments. As the Ninth Circuit explained in *Alston*, "the NCAA does little to regulate or monitor the use of" some of these funds. 958 F.3d at 1244-45.

98.      "There is nothing amateur about a model that negotiates billion-dollar deals and pays its coaches and administrators millions while denying athletes the ability to share in the revenue or even have a voice in determining whether these deals are a good idea," as a trustee at a major university recently put it.[10] Defendants have turned college sports into a moneygrab for their own pockets in the name of amateurism.

99.     In any event, a purported desire to promote "amateurism" does not justify what amounts to illegal price fixing. Defendants have no exemption from the antitrust

---

[10] Jordan Acker, *The Only Way College Sports Can Begin to Make Sense Again*, N.Y. Times, Sep. 21, 2023, *available at* https://www.nytimes.com/2023/09/21/opinion/college-sports-broken.html (last visited November 10, 2023).

laws, and nowhere does the law allow competitors to agree on input pricing (here, labor) in order to promote some non-efficiency purported justification that does nothing to further consumer welfare.

100.    College sports are as popular as ever even though athletes have long been compensated in various ways, including the recent NIL payments, which are substantial in some cases. As the Big Ten's commissioner testified to Congress recently, "student-athletes are frequently being induced by collectives to attend specific institutions and transfer from one school to another—without a true NIL deal. This has resulted in a 'pay-for-play' system, primarily driven by boosters and executed under the guise of NIL."[11]

101.    Despite this, there has been no corresponding reduction in consumer demand—to the contrary, NCAA football and basketball viewership remain strong and are ever-increasing. The entire college sports world has focused on the large sums of money going to college players through NIL deals in recent years. Attendance has not dipped. Ratings have increased, not decreased. Sports programs remain just as (or more) popular. College sports have not only survived in the era of athletes being paid; they have thrived.

102.    The need for "amateurism" was always a fallacy. But the current state of college athletics has put the proverbial nail in the coffin for the NCAA's amateurism argument. The anticompetitive effect of Defendants' wage-fixing was always evident. Now it is equally apparent that there is no procompetitive justification. Indeed, recent surveys show that the majority of Americans believe that schools *should* in fact be able to directly pay their athletes.

---

[11] Testimony of Tony Petitti, Commissioner of the Big Ten Conference, U.S. Senate Committee on the Judiciary, Oct. 17, 2023, *available at* https://www.judiciary.senate.gov/imo/media/doc/2023-10-17_-_testimony_-_petitti.pdf.

**SECOND AMENDED CLASS ACTION COMPLAINT**

103.    Still, because of the NCAA's restraints, Defendants have prevented pay to
the athletes for anything beyond NIL money, such as the share of money that players
would receive from television revenue in a competitive market. A pending case against
the NCAA attempts to seek compensation from Defendants for the players' fair share of
television revenue related to NIL only. An expert in that case opined that value of the
television revenue attributable to players' NILs amounted to approximately ten percent
of total television revenue. *See In re: College Athlete NIL Litig.*, No. 20-cv-03919 (N.D.
Cal. Nov. 3, 2023) (the "*House*" case), ECF No. 387 at 24 (granting class certification
and discussing the ten percent estimate).

104.    But that is a thin slice of the overall share of revenue that Plaintiffs and
class members would receive in a market not restrained by Defendants' illegal
agreement. As demonstrated by the split of revenue in other leagues, the athletes'
competitive share would be substantially higher. Over the class period, that amounts to
billions of dollars that should belong to Plaintiffs and class members.

105.    Defendants realize that there is no longer any defense for the concept of
amateurism. They recently voted to move forward with a proposed settlement in the
*House* case that would usher in a form of "revenue sharing" that ostensibly would be
tied to NIL payments made by the NCAA's members. But even if that settlement is
approved, it would simply usher in a new, artificially low cap that is far below the
revenue sharing that a competitive market would yield. While it is an admission that
amateurism is not needed, it also simply substitutes one illegal price fix for another.

106.    This case seeks to recover the full amount of compensation that these
athletes truly deserve, and to enjoin Defendants from enforcing their illegal agreement
in the future. It is not just about NIL but is about full revenue sharing. As a result, this
case differs from *House*. It goes farther than *House*, by seeking to challenge the
NCAA's restraint on compensation, embodied by Bylaw 12 and other rules not
challenged in *House*, rather than merely challenging the NCAA's implementation of its

policy allowing payment for names, images, and likenesses. And it therefore takes aim at the full cut of television and other revenues that the athletes would receive in a truly open market.

**F.  The market at issue.**

107.    The NCAA's Division I promotes itself as the highest level of competition in college sports. That has created a nationwide labor market for college sports within the Division I segment. By creating a separate Division I with rules that are distinct from Divisions II and III, the NCAA has recognized that the lower divisions are not substitutes for Division I.

108.    Division I schools spend more on facilities and coaches and generally compete against each other for athletes. Meanwhile, the NCAA and its Division I members can control the price paid in this labor market for college athletes. They have in fact done so by passing the bylaws at issue in this case and strictly enforcing them. Those bylaws have had the very real effect of decreasing compensation far below what would have been paid to these athletes in an unrestrained, competitive market.

109.    The district court in *Alston* defined the market as one "for Plaintiffs' labor in the form of athletic services in men's and women's Division I basketball and FBS football, wherein each class member participates in his or her sport-specific market." *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1097 (N.D. Cal. 2019). The court found:

> Because of the absence of any viable substitutes for Division I basketball and FBS football, Defendants hold monopsony power in all of these markets and exercise that power to cap artificially the compensation offered to recruits. This is reflected in the high degree of concentration found in the relevant market. Class members cannot obtain the same combination of a college education, high-level television exposure, and opportunities to enter professional sports other than from Division I schools.

*Id.*

110.    The district court remarked there that the NCAA did not challenge that market at summary judgment. *Id.* And as the Supreme Court stated, Defendants did "not contest that the NCAA enjoys monopoly (or, as it's called on the buyer side, monopsony) control in that labor market—such that it is capable of depressing wages below competitive levels and restricting the quantity of student-athlete labor." *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2154 (2021).

111.    That the athletes agree to these conditions shows the market power that the NCAA and its members collectively possess. For an elite athlete, there is no reasonable substitute that combines the educational and athletic opportunities offered in the labor market at the Division I level. The other divisions do not offer the same level of competition, do not offer the same number of scholarships, do not offer the same amount of television exposure, and generally do not have as highly regarded coaches or athletic facilities. The same can be said for the National Intercollegiate Athletic Association or junior colleges' athletic programs.

112.    The NFL's, NBA's, and WNBA's rules do not permit players to enter their leagues directly after high school. This forces players to initially play in the college sports labor market. Also, there are other differences between the NFL, NBA, and WNBA as compared to college sports; college sports offer different opportunities by allowing athletes to receive a college education while working at the schools.

113.    Many of these athletes are from disadvantaged backgrounds. They have only a limited window to earn money based on their athletic talents, and they risk serious injury to compete in the sports that they, and fans, love. Only a small percentage of the athletes in the labor market at issue will ever play in the NFL, NBA, or WNBA, so for many of these athletes, college is their *only* chance to be compensated for their athletics skills.

114.    The NCAA's rules have inflicted very serious and very great harm on the thousands of athletes that work so hard to make the NCAA's product possible.

### G. The effect of Defendants' illegal conduct on Plaintiff Alex Fontenot.

115.     Plaintiff Alex Fontenot worked as college football player at the University of Colorado from 2017 to 2022.

116.     The labor provided by Mr. Fontenot was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

117.     He was a highly recruited prospect out of high school who possessed unique talent. He was a top high school recruit in the Houston area and helped his team win a state title by rushing for three touchdowns in the state championship game. Universities competed for his talent during the recruitment process, and continued to compete for his talent even after he went to the University of Colorado in the hopes that he would transfer to another school.

118.     His job as a college football player was essentially a full-time one, and an important and valuable one at that. During his football career, Mr. Fontenot was one of the University of Colorado's key running backs. He played in every game during his freshman year for a team that was at times ranked as one of the top 25 teams in college football. During his sophomore season, he started in eleven games and rushed for 874 yards and five touchdowns. That included a win at home over a ranked Nebraska team in front of over 52,000 fans.

119.     After working his way back from an injury, he was named to the preseason watch list for the nation's Doak Walker Award in both 2021 and 2022, which is awarded annually to the country's best college running back. In a 2022 game against University of Southern California, ranked eighth in the country at the time, he rushed for over 100 yards. He continued to consistently contribute as a running back in those seasons, and finished his career with over 1,500 yards rushing and 13 touchdowns.

**SECOND AMENDED CLASS ACTION COMPLAINT**

120.    During this time, the University of Colorado's games were carried on national television, often by either an ESPN network or the Pac 12's own network. (The University of Colorado is currently a member of the Pac 12 but will be joining the Big 12 in 2024.) An average of nearly 1.3 million people watched those games, and one game in 2021 that he played in had over 4.5 million viewers.[12] The Pac 12 distributed $37 million in 2022 to each of its member schools from television revenue.

121.    Yet Mr. Fontenot received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. And during most of his time at Colorado, he was not permitted to receive money from third parties for his NIL, which also harmed him.

122.    Mr. Fontenot was not drafted by the NFL. College football was his only opportunity to earn fair compensation for the immense work and all the sacrifices that went into being a highly skilled football player at a Power 5 conference school.

123.    Defendants' conspiracy greatly harmed Mr. Fontenot. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received, and would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

---

[12] *See* Matt Schubert, *Measuring CU Buffs, CSU Rams' football brand*, Denver Post, Aug. 2022, *available at* https://www.denverpost.com/2022/08/28/measuring-cu-buffs-csu-rams-football-brand/.

**SECOND AMENDED CLASS ACTION COMPLAINT**

**H.  The effect of Defendants' illegal conduct on Plaintiff Mya Hollingshed.**

124.   Plaintiff Mya Hollingshed worked as college basketball player at the University of Colorado from 2017 to 2022.

125.   The labor provided by Ms. Hollingshed was of great value to Defendants. And it was a significant amount of labor. During the season, she often worked six days per week, and often more than 40 hours per week. Even during the offseason, she worked a significant number of hours under the direction of the coaches at the school.

126.   She was a highly recruited prospect out of high school who possessed elite talent. She was a top high school recruit and was named an Adidas All-American and Under Armour All-American, and was a McDonald's All-American nominee. Universities competed for her talent during the recruitment process, and continued to compete for her talent even after she went to the University of Colorado in the hopes that she would transfer to another school.

127.   Her job as a college basketball player was essentially a full-time one, and an important and valuable one at that. During her basketball career, Ms. Hollingshed was one of the University of Colorado's key players. By her sophomore season, she became a full-time starter and averaged over 10 points a game. Her junior season, she led Colorado in scoring and rebounding. In her fourth season, she finished sixth in the Pac-12 in points per game and second in rebounds per game. In her fifth season, she again led Colorado in scoring, and also led them to their first NCAA Tournament appearance since 2013. She finished her career ranked sixth on Colorado's all-time scoring and rebounding lists.

128.   In 2022, Ms. Hollingshed was drafted 8th overall in the WNBA's annual draft.

129.   During this time, the University of Colorado's games were generally televised, often by either by the Pac 12's own network or by a streaming platform. (The University of Colorado is currently a member of the Pac 12 but will be joining the Big 12

**SECOND AMENDED CLASS ACTION COMPLAINT**

in 2024.) The Pac 12 distributed $37 million in 2022 to each of its member schools from television revenue.

130.    Yet Ms. Hollingshed received none of that revenue; nor was she otherwise compensated by Defendants for her labor other than by receiving a scholarship and other education-related expenses. And during most of her time at Colorado, she was not permitted to receive money from third parties for her NIL, which also harmed her.

131.    Defendants' conspiracy greatly harmed Ms. Hollingshed. It prevented her from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, she would have received greater remuneration for her services as a college basketball player than she received and would have received money for her NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, she would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured her.

**I.    The effect of Defendants' illegal conduct on Plaintiff Sarah Fuller.**

132.    Plaintiff Sarah Fuller worked as college soccer player at Vanderbilt University from 2017 to 2020, and as a college football player at Vanderbilt in 2020.

133.    The labor provided by Mrs. Fuller was of great value to Defendants. And it was a significant amount of labor. During the season, she often worked six days per week, and often more than 40 hours per week. Even during the offseason, she worked a significant number of hours under the direction of the coaches at the school.

134.    She was a highly recruited prospect out of high school who possessed sought-after talent. Universities competed for her talent during the recruitment process, and continued to compete for her talent even after she went to Vanderbilt University in the hopes that she would transfer to another school.

135.    Her job as a college athlete was essentially a full-time one, and an important and valuable one at that. During her senior year of her soccer career, Mrs. Fuller was one of Vanderbilt's key players. She started twelve games that season as a goalie, posting three clean sheets, and started all four games during Vanderbilt's 2020 SEC Tournament championship run. At one point, she had a shutout streak of over 300 minutes.

136.    During this time, Vanderbilt's soccer games were generally televised, often by the SEC Network. (Vanderbilt is a member of the SEC.) The SEC distributed over $50 million in 2020-2021 to each of its member schools from television revenue.

137.    As good as she was as a goalie in 2020, Mrs. Fuller will forever be remembered for her impact on American college football rather than traditional football (a.k.a. "soccer" in the U.S.). After the 2020 soccer season, Mrs. Fuller joined the Vanderbilt football team as place kicker. On November 28, 2020, with a kickoff to start the second half of a game against the University of Missouri, she became the first woman to play football in a Power Five conference. The moment went viral, with her kickoff producing the SEC Network's most viewed tweet and most-liked Instagram post in the network's history. Her name trended in the top two on Twitter for much of that day, and the video clip was the top clip on ESPN's digital platform that week. She was named SEC Co-Special Teams Player of the Week.

138.    On December 12, Mrs. Fuller entered a game against the University of Tennessee to kick an extra point. She succeeded, becoming the first woman to score in a Power Five Football game. She finished the game 2 for 2 on extra points, and again went viral.

139.    Yet Mrs. Fuller received none of the revenue generated by her work; nor was she otherwise compensated by Defendants for her labor other than by receiving a scholarship and other education-related expenses. And during most of her time at Vanderbilt, she was not permitted to receive money from third parties for her NIL, which

**SECOND AMENDED CLASS ACTION COMPLAINT**

also harmed her. She made history, and those historical and viral moments had great value, but Defendants' conspiracy prevented her from earning the money she would have otherwise earned from those moments.

140. Defendants' conspiracy greatly harmed Mrs. Fuller. It prevented her from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, she would have received greater remuneration for her services as a college soccer and football player than she received and would have received money for her NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, she would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured her.

**J. The effect of Defendants' illegal conduct on Plaintiff Deontay Anderson.**

141. Plaintiff Deontay Anderson worked as college football player at the University of Houston from 2018 to 2021, and at the University of Mississippi from 2016 to 2017.

142. The labor provided by Mr. Anderson was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the schools.

143. He was a highly recruited prospect out of high school who possessed elite talent. He was an Under Armour All-America selection in high school and a consensus 4-star recruit. ESPN ranked him as the number one recruit at his position his senior year of high school and the number 41 overall recruit in the country. Other recruiting outlets likewise ranked him as a top 100 recruit in the country. Universities competed for his talent during the recruitment process, and continued to compete for his talent even after he was in college in the hopes that he would transfer to another school.

**SECOND AMENDED CLASS ACTION COMPLAINT**

144.    His job as a college football player was essentially a full-time one, and an important and valuable one at that. During his football career, Mr. Anderson was a key contributor. After his freshman year at Mississippi, he was named to the Freshman All-SEC second team by Athlon. After he transferred to the University of Houston, he continued to make a valuable impact. In 2018, he started all 13 games at his position and finished the year fourth on the team in tackles. By his last season in 2021, he finished second on the team in total tackles.

145.    During this time, the University of Mississippi's and University of Houston's games were generally televised. Both schools received large sums of money from their conferences' television contracts for the broadcasting of those games.

146.    Yet Mr. Anderson received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses. And during most of his time in college, he was not permitted to receive money from third parties for his NIL, which also harmed him.

147.    Defendants' conspiracy greatly harmed Mr. Anderson. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college football player than he received and would have received money for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

**K. The effect of Defendants' illegal conduct on Plaintiff Tucker Clark.**

148.    Plaintiff Tucker Clark works as a golfer at the University of Colorado, and previously worked as a golfer at Notre Dame from 2020 to 2022.

149.    The labor provided by Mr. Clark was of great value to Defendants. And it was a significant amount of labor. During the season, he often worked six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the schools.

150.    He was a highly recruited prospect out of high school who possessed sought-after talent. Junior Golf Scoreboard ranked him as the number 15 player nationally in his high school class of 2020. Universities competed for his talent during the recruitment process, and continue to compete for his talent even now that he is in college in the hopes that he would (or will) transfer to another school.

151.    His job as a college golfer is essentially a full-time one, and an important and valuable one at that. During his freshman year at Notre Dame, he helped the school make its first NCAA regionals since 2012 and finished fourth on the team in stroke average. After he transferred to the University of Colorado, he continued to make a valuable impact. During his sophomore year, he had the third-best stroke average at the school and tied a school record for the best score in one round. The school went to the NCAA tournament that year, and Tucker shot a 3-under 67 in the second round of the tournament (the second best mark in the round).[13] At one point during his junior year he had 19 straight holes of par or better.

152.    During this time, the University of Colorado and Notre Dame generated large sums of money from their athletics program, and Mr. Clark contributed (and continues to contribute) to the generation of that revenue.

153.    Yet Mr. Clark has received none of that revenue; nor was he otherwise compensated by Defendants for his labor other than by receiving a scholarship and other education-related expenses.

---

[13] https://www.buffzone.com/2023/05/27/mens-golf-tucker-clark-again-keeps-cu-buffs-afloat-in-second-round-of-ncaa-championships/.

**SECOND AMENDED CLASS ACTION COMPLAINT**

154.    Defendants' conspiracy greatly harmed Mr. Clark. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place, he would have received greater remuneration for his services as a college golfer than he received. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member schools. Thus, Defendants' scheme directly injured him.

### COUNT I – Violations of Sections 1 & 3 of the Sherman Act
### (Brought by Plaintiffs on Behalf of the Class)

155.    Plaintiffs repeat, re-allege and incorporate by reference the preceding paragraphs of this Complaint as if more fully set forth herein.

156.    Defendants and others entered into and engaged in unlawful agreements in restraint of the trade and commerce described above. These actions violated and continue to violate Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3. Since at least four years before the filing of this action, the trusts formed by Defendants' cartel has restrained trade and commerce in violation of Sections 1 and 3 of the Sherman Act, and the behavior continues today.

157.    This combination and conspiracy by Defendants (which possess a dominant position in the relevant market) has resulted in, and will until restrained continue to result in, anti-competitive effects, including *inter alia*: (a) fixing the compensation of Plaintiffs and the Proposed Class at artificially low levels, since Plaintiffs and class members have been unable to negotiate for compensation in a free market; and (b) eliminating or suppressing, to a substantial degree, competition among Defendants for skilled labor in the market. It also had the effect of preventing the named Plaintiffs from receiving free market compensation for the use of their NILs (Plaintiffs are not pursuing NIL damages on behalf of a class at this time).

158.   As a direct and proximate result of Defendants' combinations and
contracts to restrain trade, suppress compensation, and eliminate competition for skilled
labor, Plaintiffs and members of the Proposed Class have suffered injury to their
property and have been deprived of the benefits of free and fair competition on the
merits. Absent Defendants' rules, Plaintiffs and Proposed Class Members would have
received a competitive share of the television revenue and other revenue being brought
in from Plaintiffs' and Class members' labor. The named Plaintiffs also would have
received compensation for the use of their NILs.

159.   As a result, Plaintiffs and the Proposed Class have suffered damages in
an amount to be proved at trial.

160.   Defendants' agreements or conspiratorial acts were authorized, ordered,
or done by their respective officers, directors, agents, employees, or representatives
while actively engaged in the management of Defendants' affairs.

161.   Defendants' agreements or conspiracies have no procompetitive effect or
purposes, or alternatively, even if they did, less restrictive alternatives can be
implemented to achieve any purported procompetitive objectives that Defendants might
prove.

162.   Plaintiffs and the Proposed Class seek treble damages caused by
Defendants' violations of the Sherman Act, the costs of bringing suit, reasonable
attorneys' fees, and a permanent injunction enjoining Defendants from ever again
entering into similar agreements in violation of the Sherman Act.

### Prayer for Relief

WHEREFORE, Plaintiffs, on their own and on behalf of all other similarly situated
persons, seeks the following relief:

- Certification of the Proposed Class, as set forth above, pursuant to Rule
  23 of the Federal Rules of Civil Procedure;

**SECOND AMENDED CLASS ACTION COMPLAINT**

- A finding that Defendants have violated Sections 1 and 3 of the Sherman Act by engaging in an illegal trust, contract, combination, or conspiracy, and that Plaintiffs and class members have been damaged and injured in their business and property as a result of this violation;

- A finding that the alleged combinations and conspiracy be adjudged and decreed as violations of the Sherman Act;

- Actual damages in an amount to be determined at trial;

- Treble damages awarded under the Sherman Act to Plaintiffs and class members for the damages sustained by them as a result of Defendants' conduct;

- Judgment entered against Defendants for the amount to be determined and as permitted by law and equity;

- Designation of Plaintiffs as class representatives and designation of counsel of record as Class Counsel;

- Pre-judgment and post-judgment interest as permitted by law;

- A declaratory judgment that the practices complained of herein are unlawful;

- A permanent injunction prohibiting Defendants from continuing or reinstating their unfair and unlawful policies and practices as described within this Complaint;

- Reasonable attorneys' fees and costs of the action;

- Reasonable incentive awards for the Plaintiffs;

- Such other relief as the Court shall deem just and proper.

### Demand for Jury Trial

Pursuant to Federal Rule of Civil Procedure Rule 38(a), Plaintiffs demand a jury trial as to all issues triable by a jury.

**SECOND AMENDED CLASS ACTION COMPLAINT**

DATED: July 23, 2024

By: /s/ *Eric Olson*  _____

ERIC OLSON
eolson@olsongrimsley.com
SEAN GRIMSLEY
sgrimsley@olsongrimsley.com
JASON MURRAY
jmurray@olsongrimsley.com
**OLSON GRIMSLEY KAWANABE
HINCHCLIFF & MURRAY LLC**
700 17th Street, Suite 1600
Denver, CO 80202
Telephone: (303) 535-9151

STEPHEN M. TILLERY
stillery@koreintillery.com
GARRETT R. BROSHUIS
gbroshuis@koreintillery.com
CAROL O'KEEFE
cokeefe@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone:   (314) 241-4844
Facsimile: (314) 241-3525

GEORGE A. ZELCS
gzelcs@koreintillery.com
MARC A. WALLENSTEIN
mwallenstein@koreintillery.com
**KOREIN TILLERY, LLC**
205 N. Michigan Ave., Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750

CHRISTOPHER M. BURKE
cburke@koreintillery.com
**KOREIN TILLERY, LLC**
401 West A Street, Suite 1430
San Diego, CA 92101
Telephone: (619) 625-5620

*Attorneys for Plaintiffs*

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| RILEY CORNELIO, Individually and on Behalf of All Those Similarly Situated, | CASE NO. |
| Plaintiff, | **<u>CLASS ACTION</u>** |
| vs. | **CLASS ACTION COMPLAINT** |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION; | **JURY TRIAL DEMANDED** |
| Defendant. | |

*"It's the worst part of the job. … I was meeting with kids from East St. Louis once, afraid to make an offer. You're waiting for the sticker shock when you say, 'We really love you but – oh by the way – your family will have to pay $30,000 the first year."*

-Tony Vitello, Head Baseball Coach, University of Tennessee (May 18, 2022).[1]

Plaintiff Riley Cornelio, on behalf of himself and all others similarly situated, brings this class action complaint alleging antitrust violations. Plaintiff alleges as follows:

## INTRODUCTION

1.      Over 25,000 fans were in the sold-out stadium in Omaha for the College World Series finale. They stood on their feet in the last inning as the University of Tennessee attempted to close out a tight game against Texas A&M. Nearly three million more fans watched on ESPN as the last pitch was thrown. The final out was recorded, and the Tennessee players sprinted to the center of the diamond to celebrate the school's first college baseball championship.

2.      For those Tennessee players, it was the 73rd game of their season. Close to half of those games had taken place on the road. The season had begun four months before in February, and practice had begun long before that. The players displayed athletic skills and a level of dedication that had great value to the school. Yet nearly all of those players celebrating that championship were on partial athletic scholarships.

3.      Why? Because of one specific NCAA bylaw—a bylaw that is yet another example of the NCAA's general efforts to deny athletes the value their labor creates. NCAA Bylaw 15.5.4 limits NCAA schools to only offering 11.7 baseball scholarships. But that's not nearly enough players for a college baseball team. These scholarships are spread amongst 27 players (or sometimes 32 in recent

---

[1] *SEC baseball keeps growing, but scholarships don't, Tony Vitello wants more.* Knoxville News Sentinel (May 18, 2022) https://www.knoxnews.com/story/sports/columnists/university-of-tennessee/john-adams/2022/05/18/sec-baseball-keeps-growing-but-scholarships-dont-john-adams/9760907002/.

**CLASS ACTION COMPLAINT**

years), so on average, each player is on a 43% scholarship. No matter the school's resources, and no matter how much a school wants to invest resources in baseball, the limit is the same.

4.      If permitted, NCAA schools would offer more scholarship money to their college baseball players. Certainly the better resourced schools would. The NCAA schools compete for talented baseball players for their baseball teams, and the 11.7 scholarship bylaw is an artificial cap on the amount of scholarship money that schools can provide. As the opening quote makes clear, the rule is harming thousands of baseball players every year.

5.      With the cost of attending college at a record high, the harm is substantial. At some schools with high-level baseball teams, like the University of Miami and Texas Christian University, the total cost of attendance now exceeds $70,000 each year. A talented player on a partial scholarship might be expected to pay $40,000 or more per year to attend one of these schools. Absent the bylaw, those same players would pay nothing because they would be on a full scholarship. Over the course of four years, that means the bylaw is harming many baseball players to the tune of six figures.

6.      These baseball players are not alone, as similar rules affect other sports with partial scholarships. NCAA Bylaw 15.5.3 lists over 30 other sports that are deemed "equivalency sports," meaning that schools make scholarship offers to their athletes in these sports that are not commensurate with what a competitive market would demand.

7.      After years of complaints from coaches about the unfairness of the rule, the NCAA recently announced a plan to scrap the arbitrary rules in the future. The reason is obvious. After years of losing antitrust cases—*see, e.g.*, *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141 (2021); *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010 (10th Cir. 1998)—the NCAA and its members no doubt recognize that the rules are indefensible. Defendant and its members operate as a cartel, and the capping of scholarship money at artificially low levels in these sports results in wage fixing amongst horizontal competitors in a market for services. The anticompetitive effects are as clear as

**CLASS ACTION COMPLAINT**

with any other wage fix, and it is an unlawful restraint under Section 1 of the Sherman Act, 15 U.S.C. § 1.

8.      Even if the rule is finally repealed, there will still be a need to make whole the athletes who suffered. Years of antitrust harm cannot be undone simply with the striking of a rule that already damaged thousands of athletes. And for now, of course, the rule persists and the harm continues.

9.      This suit seeks to ensure that the NCAA and its members follow through on the promise of eliminating this rule, and to recover the damages caused by their collusive and illegal practices.

## PARTIES, JURISDICTION, AND VENUE

10.     Plaintiff Riley Cornelio, an individual, is a resident of Colorado. He worked as a college baseball player at Texas Christian University from 2019 to 2022.

11.     Defendant NCAA is an unincorporated association that maintains its principal place of business in Indianapolis, Indiana. It has approximately 1,100 member schools. Its membership includes the public and private universities and colleges that conduct major athletic programs in the United States.

12.     Various other persons and entities engaged in concert with the named Defendant in the conduct alleged herein, and are co-conspirators.

13.      Plaintiff brings this class action pursuant to §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, for violations of §§ 1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 3. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1337 (commerce and antitrust regulation).

14.     Defendant's conduct had and continues to have a direct, substantial, and reasonably foreseeable effect on interstate commerce. Defendant and its member schools transact substantial business in multiple states. Defendant and its member schools routinely use instruments of interstate

commerce, such as interstate railroads, highways, waterways, wires, wireless spectrum, and the U.S. mail, to carry out their operations.

15. Venue is proper in this District because Defendant and some of its members reside, are found, and have agents in this District as provided in 28 U.S.C. § 1391(b) and (c) and in § 4 of the Clayton Act, 15 U.S.C. § 15. Alternatively, venue is proper under § 12 of the Clayton Act, 15 U.S.C. § 22, because Defendant and some of its members can be found in this District or transact business in this District. A substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. The bylaws at issue (discussed in greater detail below) apply to athletes who have worked, or currently work, for NCAA member institutions in this District, the NCAA sanctions Division I events that regularly take place in this District, including games played by local members, and Plaintiff and other members of the proposed Class entered into agreements, reside, or work in this District. Also, last year, Denver hosted a portion of the NCAA's popular March Madness men's basketball tournament, and it will do so again in 2025.

16. This Court has personal jurisdiction over Defendant pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, for the same reason that venue is proper under the Clayton Act, as described *supra*. The Court also has personal jurisdiction because, among other things, Defendant transacts substantial, continuous business in this State and District; participates in organizing intercollegiate athletic contests that take place in this State and District, as well as licensing and selling merchandise and products in this State and District, and profiting from televising NCAA-sanctioned events that take place in this State and District; it has substantial contacts in this State and District and several of its members reside in this State and District; and it is engaged in an illegal anti-competitive scheme that was directed at, and had the intended effect of causing injury to, persons residing in, located in, or doing business throughout the United States, including in this State and District.

**CLASS ACTION COMPLAINT**                                                                 NO.

## CLASS ACTION ALLEGATIONS

17.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23, as a class action on behalf of the following:

> All persons who received partial scholarships at an NCAA Division I school that is or was a member of one of the Power Five Conferences during the relevant time period, or at the University of Notre Dame, in the sports delineated in NCAA Bylaws 15.5.3, 15.5.4 (baseball) and 15.5.7 (hockey) from the beginning of the statute of limitations period, as determined by the Court, through judgment in this matter.

18.     While Plaintiff does not know the exact size of the proposed class, the proposed class includes well over 100 members residing in various parts of the United States. The class is so numerous that joinder of all members is impracticable.

19.     Plaintiff's claims are typical of the claims of other members of the proposed class. Plaintiff and the members of the Proposed Class were subject to the same or similar restraints and compensation practices arising out of Defendants' common course of illegal conduct. Plaintiff and the Proposed Class have sustained similar types of damages as a result of these common practices.

20.     Common questions of fact or law exists, and they predominate over any individualized questions. They include, *inter alia*:

a.   Whether by enacting the bylaws, Defendant engaged in a contract, combination, or conspiracy to unreasonably restrain trade by capping the amount of scholarship compensation paid to class members;

b.   Whether that conduct caused Plaintiff and proposed class members to earn less of a scholarship than what they would have in a truly competitive market;

c.   Whether Plaintiff and the proposed class suffered antitrust injury or were threatened with injury; and

d.   Whether Plaintiff and the proposed class are entitled to damages and injunctive relief, and the type and scope of that relief.

**CLASS ACTION COMPLAINT**

21.     Plaintiff will fairly and adequately protect the interests of class members in that their interests are aligned, and Plaintiff has retained counsel competent and experienced in class-action litigation, including antitrust litigation and sports-related litigation.

22.     A class action is superior to other methods of adjudication. Joinder is impracticable, and the prosecution of separate actions by individual class members would impose heavy burdens upon the courts and Defendant and create a risk of: (a) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for Defendant; and (b) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

23.     Conversely, a class action would save time, effort, and expense and assure uniformity of decision for persons similarly situated without sacrificing procedural unfairness or any undesirable result. Plaintiff does not anticipate any difficulty in the management of this action as a class action, and the proposed class has a high degree of cohesion.

## FACTUAL ALLEGATIONS

### A. The NCAA, its co-conspirators, and the anticompetitive restraint at issue.

24.     The NCAA is an unincorporated association governed by its members, which include its schools and conferences. The NCAA has several governance committees, with representatives from member schools and conferences who sit on the committees and engage in the NCAA legislative process. The highest governing body, the Board of Governors, consists primarily of chancellors and presidents of member schools, and it also employs the NCAA's president and adopts and implements policies.

25.     The association has adopted a constitution and a number of bylaws. As a condition of membership, member schools and conferences must comply with the association's constitution and bylaws. The bylaws are enacted and amended through the NCAA's legislative process.

**CLASS ACTION COMPLAINT**

26.     The NCAA bylaws distinguish between "head-count" sports and "equivalency" sports.

27.     In head-count sports, the NCAA bylaws allow for a number of scholarships that must be awarded to the same number of athletes. Every athlete that is on an athletic scholarship in a head-count sport receives a full scholarship. The Division I head-count sports are men's and women's basketball, football, women's gymnastics, women's tennis, and women's volleyball.

28.     In equivalency sports, by contrast, the NCAA bylaws allow for a set number of scholarships that are to be divided amongst a number of athletes that is greater than the number of scholarships; i.e., the set number is divided amongst the athletes, resulting in most of the athletes in equivalency sports (and sometimes all of them) receiving only a partial scholarship. The equivalency sports in Division I are all the other Division I sports that are not mentioned in the preceding paragraph.

29.     NCAA Bylaw 15.5.3.2 provides the rule for computing equivalencies: "each institutional financial aid award to a[n] [athlete] shall be computed" by counting "all institutional aid (per Bylaw 15.02.5.2) received up to the full grant-in-aid" for each athlete, with a fraction then created by using the "amount received" by the athlete as the numerator and the "full grant-in-aid value" for the athlete as the denominator. The "sum of all fractional and maximum awards received by [athletes] shall not exceed the total limit for the sport in question for the academic year as a whole."

30.     NCAA bylaws 15.5.3.1 and 15.5.3.2 set forth the scholarship limits for most of the equivalency sports. Thirteen men's sports are listed, and 19 women's sports.

31.     NCAA Bylaw 15.5.4 sets forth the scholarship limit for baseball: "There shall be an annual limit of 11.7 on the value of financial aid awards (equivalencies) to counters and an annual limit of 27 on the total number of counters in baseball." (A counter is an athlete receiving at least a

NO.

**CLASS ACTION COMPLAINT**

partial scholarship.) Further, a university must "provide each counter" in baseball a scholarship "that is equal to or greater than 25 percent of an equivalency."

32.     NCAA Bylaw 15.5.7 sets forth the scholarship limit for ice hockey: "There shall be an annual limit of 18 on the value of financial aid awards (equivalencies) to counters and an annual limit of 30 on the total number of counters in ice hockey at each institution."

33.     The NCAA, its conferences, and its member schools make and enforce these rules. If a member school violates the rules, the NCAA's governing constitution calls for disciplinary measures for the members and the athletes involved. Per Article 3.2 of the NCAA's governing constitution, a condition of membership in the NCAA is the agreement by a school to administer its agreements in accordance with the NCAA's rules. The member conferences likewise must comply with all the association's rules and regulations. And active members must refrain from competing in athletic contests with other schools who are found to be out of compliance. That is a quintessential way of enforcing a cartel's rules: through an agreement to punish and boycott an entity that fails to follow the rules.

34.     The limits set forth in these bylaws are all horizontal caps amongst competitors that artificially fix the scholarship money being offered to talented college athletes. This results in wage fixing because it artificially caps the compensation going to a group of workers. It is codified in Defendant's own bylaws, and it does not exist in other collegiate contexts. Universities have not colluded together to ensure that talented young mathematicians or musicians only receive partial scholarships. Neither should schools be permitted to collude to ensure that talented baseball players and other athletes receive only partial scholarships.

35.     The relevant bylaws are found in the NCAA's manual for Division I athletics. The NCAA is divided into three levels: Division I, Division II, and Division III. Division I schools generally have the largest athletics department budgets and often have larger student bodies. There are more than 350 Division I schools. Sixty-nine of these Division I schools make up the Power 5

**CLASS ACTION COMPLAINT**                                             NO.

Conferences. Notre Dame (which, though independent in football, competes against Power 5 schools and is a member of the ACC for baseball and many other sports) also operates at the Division I level.

36.     College sports at the Division I level have enjoyed tremendous revenue growth over the last two decades. In 2023, the NCAA itself earned $1.3 billion. That does not include the amount earned by the NCAA's members individually. "Division I institutions reported total revenue of almost $17.5 billion on athletics in 2022."[2]

37.     Much has been written about the revenue generated by college basketball and football in recent decades, but other sports have flourished as well. Take college baseball. In 2022, the University of Arkansas drew an average of 10,376 fans to each home baseball game, for a total of 363,153 fans. That narrowly edged out Louisiana State University's baseball team, which drew an average of 10,365 fans per game and a total of 362,759.

38.     By comparison, the University of Arkansas men's basketball team—also a top-level and popular program—drew less than 300,000 fans in a recent year, meaning that University of Arkansas's college baseball team drew more total fans than its college basketball team (though college baseball plays more games per year than basketball).

39.     In 2024, Arkansas was no longer the attendance leader for baseball. Mississippi State instead took that crown by averaging 10,906 fans per game.[3] Louisiana State was second at 10,834, and Arkansas third. Each of the three schools exceeded 370,000 attendees over the course of the 2024 season.

40.     At the end of each season, the NCAA hosts a baseball tournament that begins with 64 teams. Teams play the first round at 16 regional sites. The winner of each regional advances to

---

[2] https://ncaaorg.s3.amazonaws.com/research/Finances/2023RES_DI-RevExpReport_FINAL.pdf.

[3] https://247sports.com/college/mississippi-state/article/mississippi-state-baseball-leads-ncaa-in-campus-attendance-232857113/

NO.

**CLASS ACTION COMPLAINT**

one of eight super regional series. These super regionals are usually well attended; in 2021, one of the eight super-regional series drew 40,140 fans over three games, for an average of 13,380 fans per game. The games are also broadcast on television.

41.     The eight winners of the super regionals then advance to the College World Series, which is hosted by the NCAA. The 2024 event drew an average of 24,788 fans per game, with an overall attendance of 371,820 for the entire series.[4] The games aired on ESPN's channels, with the decisive game averaging 3.34 million viewers. ESPN contracted for the right to air the College World Series games as part of a $500 million broadcast deal that also gives ESPN the broadcast rights for college softball and other NCAA championship events.

42.     Aside from baseball, other sports are well attended as well. The University of North Dakota's men's hockey team averaged over 11,000 fans per game in 2024 and had 20 sellouts. The University of Wisconsin was not far behind at over 10,000 fans per hockey game. The NCAA's hockey championship game drew over 18,000 fans and was aired on ESPN2. Not to be outdone, the NCAA's Women's College World Series for softball averaged over 12,000 attendees, and 1.6 million viewers on ESPN's networks. And in 2023, the University of Nebraska's volleyball team set a record by having *92,003* fans attend a game at the school's football stadium.

43.     The schools in the Power 5 Conferences generate much of the overall revenue. In 2022-23, there were at least 22 universities with revenues exceeding $150 million. (Private schools like Duke and Notre Dame were not included in the study, meaning the number of such schools is likely higher.) All those schools were members of Power 5 Conferences. In 2022, the 13 public schools in the SEC reported a combined revenue of $2.17 billion, and the 13 public schools in the Big Ten combined for $2.04 billion in revenue.[5] On the low end, the average athletics department

---

[4] https://www.saturdaydownsouth.com/college-baseball/college-world-series-attendance-record-broken-by-2024-cws/

[5] https://www.usatoday.com/story/sports/college/2023/06/14/sec-big-ten-2-billion-athletics-revenue-power-five/70313053007/

**CLASS ACTION COMPLAINT**

revenue for a Big 12 school amounted to over $110 million in 2022. On the high end, the average

revenue for a SEC school amounted to $159.1 million. The other three conferences in the Power 5

fell between those numbers.

44.     In recent years, several schools have switched conferences as they chase more

money. For instance, most members of the Pac-12 have decided to abandon the conference to cash

in on more lucrative television deals being negotiated by other Power 5 conferences. The Big Ten—

traditionally a Midwestern conference—will now include UCLA, USC, Washington, and Oregon as

members.

45.     Similarly, the ACC traditionally has been a conference of eastern schools. Now the

"Atlantic Coast Conference" will include members from the Pacific coast: Stanford and California-

Berkeley. Instead of playing games a few hours south against USC or UCLA, the athletes at Stanford

will have to travel cross-country to Boston, Chapel Hill, and Miami on a regular basis.

46.     The NCAA and its members have long fussed about the need to protect athletes, but

they apparently have no problem with increasing the players' travel dramatically or, at times,

expanding the number of games scheduled to increase revenue. Player welfare is taking a backseat to

revenue. The increased travel caused by realignment hits athletes in sports other than basketball and

football particularly hard. One head football coach put it this way: "[W]hat about softball and

baseball who have to travel cross-country? Did we ask about the cost to them? Do we know what

the number one cause of mental health [problems] is: it's lack of rest and sleep."[6]

47.     Or as a head basketball coach stated: "None of it is in the best interest of the

student-athlete, no matter what anybody says."[7]

---

[6] Jared Bush, *Mizzou head coach Eli Drinkwitz criticizes conference realignment*, Fox4, Aug. 6, 2023, *available at* https://fox4kc.com/sports/college/mizzou/mizzou-head-coach-eli-drinkwitz-criticizes-conference-realignment/.

[7] Jordan Mendoza, *UCLA coach Mick Cronin: Realignment not 'in the best interest of the student-athlete'*, USA Today, Aug. 17, 2023, *available at* https://www.usatoday.com/story/sports/ncaab/2023/08/17/ucla-coach-mick-cronin-realignment-

NO.

**CLASS ACTION COMPLAINT**

48.     The administrators and head coaches and nearly everyone else working in college athletics have seen salaries rise along with revenue. In 2024, five SEC baseball coaches made $1.5 million or more, with Vanderbilt's coach leading the way at nearly $2 million.[8] Similarly, Oklahoma's softball coach earns $1.625 million annually.[9] And in Maine, the university's hockey coach is the highest paid public employee.[10]

49.     Meanwhile many of the players on these teams are on just partial scholarships—having to pay much of the cost of college despite playing in front of thousands of fans each game and even though their coaches are making hundreds of thousands and sometimes millions of dollars. That is solely because of Defendants' illegal restraint, which arbitrarily caps the scholarships in these sports in a way that forces schools to offer partial scholarships to athletes.

50.     Given the amount of work performed by these athletes and the revenue earned by NCAA member schools off their backs, a full scholarship is well earned. Being a college athlete at the Division I level is akin to having a full-time job. The athletes often work six days a week with long hours of travel when going to away games, and frequently work over 40 hours per week. Even during the "off-season," the work is substantial. The schools control much of their daily activities from the moment the athletes wake up. Athletes give much of their collegiate lives to these universities, and they should not be suffering financial losses and taking out student loans as a result of an arbitrary, anticompetitive rule.

51.     Absent the restraint, the athletes in the proposed class would be receiving more scholarship money. The schools in the relevant conferences compete with each other for talented

---

thoughts/70615325007/.

[8] https://www.tennessean.com/story/sports/college/SEC/2024/05/21/sec-baseball-coaching-salaries-2024-tim-corbin-jay-johnson-kevin-osullivan/73666535007/

[9] https://justwomenssports.com/reads/ncaa-softball-patty-gasso-contract-record/

[10] https://www.bangordailynews.com/2024/02/07/sports/maine-will-be-the-only-state-with-a-hockey-coach-as-its-highest-paid-public-employee/

NO.

**CLASS ACTION COMPLAINT**

athletes, and in a truly competitive market, that competition would lead to the schools increasing the scholarship money available to these athletes. If given the choice, Mississippi State, with its average of nearly 11,000 fans per baseball game, would give every baseball player a full scholarship, and other schools would follow. The same can be said for North Dakota's men's hockey team and the hockey schools they compete against. But they can't. They're bound by the NCAA's cartel-like rules, and the athletes are suffering as a result.

**B. The NCAA's prior antitrust losses.**

52.     This is not the first antitrust case brought against Defendants. Just three years ago, the Supreme Court ruled against the NCAA in a case brought by athletes seeking greater compensation. As the Court wrote, "Congress tasked courts with enforcing a policy of competition on the belief that market forces 'yield the best allocation' of the Nation's resources." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 73 (2021) (quoting *Nat'l Collegiate Athletic Ass'n v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 104, n. 27 (1984)). The Court held that the NCAA could not limit education-related compensation paid to its athletes, such as "limiting scholarships for graduate school, payments for tutoring, and the like." *Id.* at 103.

53.     In his concurrence, Justice Kavanaugh issued a warning to the NCAA regarding its "remaining compensation rules," like "rules [that] generally restrict student athletes from receiving compensation or benefits from their colleges for playing sports." *Id.* at 108. Those "rules also raise serious questions under the antitrust laws." *Id.* He wrote that the "NCAA's business model would be flatly illegal in almost any other industry in America." *Id.* at 109. "Price-fixing labor is price-fixing labor," he explained, and it is a "textbook antitrust problem because it extinguishes the free market in which individuals can otherwise obtain fair compensation for their work." *Id.* at 110.

54.     "Businesses like the NCAA cannot avoid the consequences of price-fixing labor by incorporating price-fixed labor into the definition of the product." *Id.* at 110. That the NCAA has

**CLASS ACTION COMPLAINT**

done so for decades does not excuse the behavior. It simply makes it more egregious and makes change long overdue.

**C. The NCAA has no procompetitive justifications for the restraint.**

55.     The NCAA has traditionally defended its antitrust cases by pointing to the need to preserve a tradition of "amateurism." That concept has always been a moving target, reconceptualized on an ad hoc basis to suit the NCAA's anticompetitive ends. *See Alston*, 594 U.S. at 101 ("While the NCAA asks us to defer to its conception of amateurism, the district court found that the NCAA had not adopted any consistent definition.").

56.     But the "amateurism" defense has no place in this case regardless. Defendant has long allowed athletes to be paid in the form of scholarships in return for their labor, so there is no justification for forcing some athletes to work for less scholarship money than they would otherwise receive in a competitive market while other athletes can work for full scholarships in other sports. The decision to place an artificially low cap in certain sports is arbitrary and unnecessary and has no procompetitive justification.

57.     It certainly is not needed for purposes of competition. The better-resourced schools already find ways to outcompete less-resourced schools. That is seen in the salaries of coaches discussed above. The schools with more resources generally pay higher salaries to coaches, and provide their coaches with more staff members. Why? Because it helps them recruit athletes, and ultimately helps them to compete.

58.     The same can be said about investments into facilities. How did Mississippi State leapfrog Arkansas in college baseball attendance? In part because they invested $68 million into a new stadium. Other schools are making similar investments. The University of Tennessee is re-building its baseball stadium at a cost of over $95 million. Oklahoma State did a $60 million renovation of its baseball stadium not long ago. Many others have followed along—or they are

NO.
**CLASS ACTION COMPLAINT**

planning to do so. They did so not only to draw more fans to games, but to also attract high-level recruits to their schools.

59.     Absent this bylaw, these schools would also compete for these athletes by offering more scholarship money. Antitrust laws demand competition in a labor market, but the NCAA and its members have colluded to stifle that competition. That amounts to a horizontal restriction amongst competitors that runs afoul of antitrust laws.

**D. The market at issue.**

60.     The NCAA's Division I is the highest level of competition in college sports. That has created a nationwide labor market for college sports within the Division I segment. By creating a separate Division I with rules that are distinct from Divisions II and III, the NCAA has recognized that the lower divisions are not reasonable substitutes for Division I.

61.     Division I schools spend more on facilities and coaches and generally compete against each other for athletes. Meanwhile, the NCAA and its Division I members can control (and suppress) the price paid in this labor market for college athletes. They have in fact done so by passing the bylaws at issue in this case and strictly enforcing them. Those bylaws have had the very real effect of decreasing scholarship money below what would have been paid to these athletes in an unrestrained, competitive market.

62.     The district court in *Alston* defined the market as one "for Plaintiffs' labor in the form of athletic services in men's and women's Division I basketball and FBS football, wherein each class member participates in his or her sport-specific market." *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1097 (N.D. Cal. 2019). The court found:

> Because of the absence of any viable substitutes for Division I basketball and FBS football, Defendants hold monopsony power in all of these markets and exercise that power to cap artificially the compensation offered to recruits. This is reflected in the high degree of concentration found in the relevant market. Class members cannot obtain the same combination of a college education, high-level television exposure, and opportunities to enter professional sports other than from Division I schools.

**CLASS ACTION COMPLAINT**                                                NO.

*Id.*

63.     The district court remarked there that the NCAA did not challenge that market at summary judgment. *Id.* And as the Supreme Court stated, Defendants did "not contest that the NCAA enjoys monopoly (or, as it's called on the buyer side, monopsony) control in that labor market—such that it is capable of depressing wages below competitive levels and restricting the quantity of student-athlete labor." *Alston*, 594 U.S. at 86.

64.     That the athletes agree to these conditions shows the market power that the NCAA and its members collectively possess. For an elite athlete, there is no reasonable substitute that combines the educational and athletic opportunities offered in the labor market at the Division I level. The other divisions do not offer the same level of competition, do not offer the same number of scholarships, do not offer the same amount of television exposure, and generally do not have as highly regarded coaches or athletic facilities. The same can be said for the National Association of Intercollegiate Athletics or junior colleges' athletic programs.

65.     Also, college sports offer different opportunities than professional sports leagues by allowing athletes to receive a college education while working at the schools. And only a small number of college athletes eventually work in professional sports leagues.

**E.  The effect of Defendant's illegal conduct on Plaintiff Riley Cornelio.**

66.     Plaintiff Riley Cornelio worked as college baseball player at Texas Christian University ("TCU") from 2019 to 2022.

67.     He was a highly recruited prospect out of high school who possessed unique talent. He was ranked as the number one baseball recruit in the state of Colorado during his senior year of high school and was named the Colorado Player of the Year by both Perfect Game and Gatorade.

68.     While a resident of Colorado, he was recruited by TCU and was offered a partial scholarship. He accepted that partial scholarship offer while residing in Colorado. But for the

NO.

**CLASS ACTION COMPLAINT**

NCAA rule restricting baseball scholarships to 11.7, TCU would have offered him more scholarship money.

69.     TCU prides itself on having a top baseball program; its games are well-attended; and it competes for high-level recruits like Mr. Cornelio. To remain competitive, and absent the NCAA's restrictions, TCU would increase the scholarship money going to athletes, including baseball players.

70.     The labor provided by Mr. Cornelio was of great value to Defendant and its member, TCU. And it was a significant amount of labor. During the season, he often worked six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

71.     His job as a college baseball player was essentially a full-time one, and it had great value. During his career, Mr. Cornelio was a key member of TCU's team. He started several games in his first two years at TCU. By his third year, in 2022, he led TCU in games started as a pitcher and tallied a team-high 77 strikeouts. He was named a 2nd-Team All-Big 12 selection and 1st-Team Academic All-Big 12 selection in 2022. Following that season, he was selected in the seventh round of Major League Baseball's draft by the Washington Nationals.

72.     During his time at TCU, the games he played in were usually televised, often by either an ESPN network or another network. An average of around 4,000 fans per game attended TCU's home games. In 2021 and 2022, TCU baseball was one of 64 teams selected to compete in an NCAA regional—the postseason event that allows teams to attempt to advance to the College World Series. In 2021, they were selected to host one of the 16 regionals.

73.     Mr. Cornelio only received a partial scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Cornelio. It prevented him from enjoying the benefit of bargaining for scholarship money in a competitive environment, forcing him to pay thousands of dollars that he would not have otherwise had to pay. Tuition and expenses at TCU neared $60,000 in 2022, and the full cost of attendance was much more when

taking into account room and board and other costs. The costs during other years that he attended were also very high.

74.     But for the illegal and unfair restraints put in place, he would have received a greater amount of scholarship money than he received. Thus, Defendants' scheme directly injured him.

### COUNT I – Violations of Sections 1 & 3 of the Sherman Act
### (Brought by Plaintiff on Behalf of the Class)

75.     Plaintiff repeats, re-alleges and incorporates by reference the preceding paragraphs of this Complaint as if more fully set forth herein.

76.     Defendant and others entered into and engaged in unlawful agreements in restraint of the trade and commerce described above. These actions violated and continue to violate Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3. Since at least four years before the filing of this action, the trusts formed by Defendant's cartel has restrained trade and commerce in violation of Sections 1 and 3 of the Sherman Act, and the behavior continues today.

77.     This combination and conspiracy by Defendant (which wholly controls the relevant market) has resulted in, and will until restrained continue to result in, anti-competitive effects, including *inter alia*: (a) fixing the scholarship money that Plaintiff and the Proposed Class received at artificially low levels, since Plaintiff and class members have been unable to negotiate for scholarship money in a free market; and (b) eliminating or suppressing, to a substantial degree, competition among Defendant's member schools when it comes to the scholarship money paid for skilled labor in the market.

78.     As a direct and proximate result of Defendant's combinations and contracts to restrain trade, suppress compensation, and eliminate competition for skilled labor, Plaintiff and members of the Proposed Class have suffered injury to their property and have been deprived of the benefits of free and fair competition on the merits. Absent Defendant's rules, Plaintiff and Proposed Class Members would have received more scholarship money in exchange for their services.

79.     As a result, Plaintiff and the Proposed Class have suffered damages in an amount to be proved at trial.

80.     Defendant's agreements or conspiratorial acts were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of Defendant's affairs.

81.     Defendant's agreements or conspiracies have no procompetitive effect or purposes, or alternatively, even if they did, substantially less restrictive alternatives can be implemented to achieve any purported procompetitive objectives that Defendant might prove.

82.     Plaintiff and the Proposed Class seek treble damages caused by Defendant's violations of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees.

**Prayer for Relief**

WHEREFORE, Plaintiff, on his own and on behalf of all other similarly situated persons, seeks the following relief:

- Certification of the Proposed Class, as set forth above, pursuant to Rule 23 of the Federal Rules of Civil Procedure;

- A finding that Defendant has violated Sections 1 and 3 of the Sherman Act by engaging in an illegal trust, contract, combination, or conspiracy, and that Plaintiff and class members have been damaged and injured in their business and property as a result of this violation;

- A finding that the alleged combinations and conspiracy be adjudged and decreed as violations of the Sherman Act;

- Actual damages in an amount to be determined at trial;

- Treble damages awarded under the Sherman Act to Plaintiff and class members for the damages sustained by them as a result of Defendant's conduct;

**CLASS ACTION COMPLAINT**

- Judgment entered against Defendant for the amount to be determined and as permitted by law and equity;

- Designation of Plaintiff as class representatives and designation of counsel of record as Class Counsel;

- Pre-judgment and post-judgment interest as permitted by law;

- A declaratory judgment that the practices complained of herein are unlawful;

- Reasonable attorneys' fees and costs of the action;

- Reasonable incentive awards for the Plaintiff;

- Such other relief as the Court shall deem just and proper.

## Demand for Jury Trial

Pursuant to Federal Rule of Civil Procedure Rule 38(a), Plaintiff demands a jury trial as to all issues triable by a jury.


DATED: August 6, 2024

By: */s/ Garrett Broshuis*

STEPHEN M. TILLERY
stillery@koreintillery.com
GARRETT R. BROSHUIS
gbroshuis@koreintillery.com
STEVEN M. BEREZNEY
sberezney@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

CHRISTOPHER M. BURKE
cburke@koreintillery.com
**KOREIN TILLERY, LLC**
401 West A. Street, Suite 1430
San Diego, CA 92101
Telephone: (619) 625-5620

20                          NO.

**CLASS ACTION COMPLAINT**

ERIC OLSON
eolson@olsongrimsley.com
SEAN GRIMSLEY
sgrimsley@olsongrimsley.com
JASON MURRAY
jmurray@olsongrimsley.com
**OLSON GRIMSLEY KAWANABE**
**HINCHCLIFF & MURRAY LLC**
700 17th Street, Suite 1600
Denver, CO 80202
Telephone: (303) 535-9151

*Attorneys for Plaintiff*

**CLASS ACTION COMPLAINT**