**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | CASE NO. 4:20-cv-3919-CW |
| | **DECLARATION OF TED TATOS** |
| | **AUGUST 9, 2024** |
| | Hon. Claudia Wilken |

Table of Contents

I.  Scope of Work ........................................................................................ 3

II.  Qualifications ..................................................................................... 4

III.  Economic Critiques of Revenue and Compensation Assumptions ........................ 5

   A.  Both the Revenue Pool and Dr. Rascher's Modification Thereof Exclude Funding Sources That Should Be Subject to a Revenue Sharing Agreement ........................ 6

     1)  Direct and Indirect Institutional Support ........................................... 9

     2)  Athletics-Restricted Endowment .................................................... 12

     3)  Contributions ............................................................................ 13

     4)  Concessions .............................................................................. 14

   B.  The Pecuniary Value of Athletic Aid Should Take Into Account the Economic Concept of Market Value .................................................................... 14

     1)  Grant-in-aid represents an *in-kind payment* to college athletes that differs from *monetary compensation* paid to professional athletes. .................... 15

     2)  Using the gross price of cost-of-attendance rather than the net price as "compensation" to athletes overvalues its true dollar value. ................ 19

     3)  The documentary record, scholars, and educators all recognize that college athletes, particularly those in high-revenue sports, receive a fraction of the true educational opportunities available to non-athlete students. ................ 20

   IV.  Estimate of Damages for Claims for Athletic Services from 2019-2024 ............ 21

   V.  The Present-Day Value of the $600 Million Fund Being Proposed in the Settlement for the Claims for Athletics Services ........................................................ 24

   VI.  The Value of Additional Equivalence Sports Scholarships ................................ 24

   VII.  Signature ............................................................................................ 26

## I.    Scope of Work

1.    My name is Ted Tatos. I am an economist and a statistician with EconONE Research. A substantial portion of my research has focused and continues to focus on antitrust issues involving intercollegiate athletics as well as the safety and well-being of collegiate athletes. I describe my research in the subsequent section detailing my qualifications.

2.    Counsel for Plaintiffs in *Fontenot et al. v. NCAA et al.* ("*Fontenot*") and *Cornelio v. NCAA et al. ("Cornelio")* has asked me to provide an economic critique and analysis of certain portions of the settlement agreement in *House et al. v. NCAA* ("*House*") and to the opinions detailed in the accompanying declaration from Plaintiffs' expert, Dr. Daniel Rascher dated July 26, 2024 (the "Rascher Declaration").

3.    Specifically, Plaintiffs' Counsel in *Fontenot* has asked me to address three specific aspects of the proposed settlement agreement in House and the related analysis of those aspects contained in the Rascher Declaration.

    i.    The methodology and assumptions that Dr. Rascher uses to estimate potential damages related to athlete compensation for athletic services

    ii.    The inputs to the proposed settlement agreement's "Revenue Pool" and Dr. Rascher's modification thereof in preparing his projections for proposed injunctive relief

    iii.    The value of the proposed claim release for additional scholarships for equivalence sports

4.    To summarize, Dr. Rascher estimates college athlete compensation based on certain categories of claimed benefits, such as cost-of-attendance (COA), medical care, Student Assistance Fund (SAF)[1], and settlement payments from other litigation such as *Alston v. NCAA* ("*Alston*"). The proposed settlement agreement prescribes certain revenue sources that contribute to the Revenue Pool subject to a percentage share allotted to college. For his damages calculation, Dr. Rascher modifies the proposed Revenue Pool, correctly observing that valid economic arguments support including some or all of the excluded revenue sources.[2] Dr. Rascher then applies a "yardstick" based on the revenue share that professional athletes in the NBA and NFL receive (approximately 50 percent) as a comparison to the claimed revenue share that collegiate athletes would receive under the proposed settlement agreement.

5.    I concur with Dr. Rascher's use of the yardstick approach methodology. I have used the same approach both in my research and in my litigation-related work. I also concur that the NBA/NFL revenue share serves as a reasonable proxy for what one would expect to result in collegiate athletics under a competitive counterfactual. Other possible yardsticks include European soccer. For example, in the English Premier League, athletes retain approximately 71 of total revenues.[3] For purposes of my preliminary analysis here, I adopt the same yardstick revenue share that Dr. Rascher uses, 50 percent (while reserving the right to adopt an alternative yardstick in

---

[1] The Student Assistance Fund consists of two parts: the Special Assistance Fund and the Student Athlete Opportunity Fund (SAOF).

[2] Declaration of Dr. Daniel Rascher, July 26, 2024, [hereafter "Rascher Declaration"] at ¶42,

[3] https://www.statista.com/statistics/1377940/sports-league-revenue-player-pay/. See also, KPMG, The Financial Landscape of European Football, Nov. 2020, available at https://europeanleagues.com/wp-content/uploads/REPORT-THE-FINANCIAL-LANDSCAPE-OF-EUROPEAN-FOOTBALL.pdf.

future analyses.)

6.     I do not disagree with the general methodology used by Dr. Rascher's assumption regarding the revenue shares for athletes, but I do disagree with some of the assumptions that he uses to justify his inputs. To the extent that the terms of the settlement agreement constrained Dr. Rascher's discretion as to revenue and cost inputs, I direct my economic criticism at the terms of the settlement agreement and not at Dr. Rascher's implementation of those terms. In particular, I agree with his decision to include certain revenue categories for purposes of his calculation of potential damages despite the exclusion of such categories from the Revenue Pool under the proposed settlement agreement.

7.     As I describe herein, the exclusions to the Revenue Pool under the proposed settlement agreement contradict the economic realities that characterize the market for college sports. Because Dr. Rascher still adopts a portion of those critical revenue exclusions in his analysis, I disagree with some of his assumptions. As a result, his revenue subject to apportionment to college athletes yields an artificially high athlete revenue share in my opinion, and overstates the true economic value that the proposed settlement would offer collegiate athletes.

8.     The market realities of intercollegiate athletics, in myriad internal documents, observations from educators and support staff, and statements from NCAA members themselves, directly contradict certain key bases for the proposed settlement agreement. Further, if accepted, the assumptions that sustain certain portions of the proposed settlement agreement and the Rascher Declaration that I have been asked to address would permit NCAA member institutions to exercise a degree of control over athletes directly inconsistent with economic competition and the very definition of market value.

## II.     Qualifications

9.     My work and research focuses on quantitative and qualitative analysis primarily in the field of economics. In addition to my research and consulting work, I have also served as an adjunct professor in the economics department at the University of Utah, where I recently taught Applied Econometrics for graduate students in the Spring 2023 semester. I have also previously co-taught graduate econometrics and undergraduate statistics for economics majors at the University of Utah. I hold a B.A. in Economics from Duke University and an M.S. in Statistics with a focus in Econometrics from the University of Utah.

10.     I have nearly thirty years of experience in economic, statistical, and econometric analysis for both public and private sector clients. I have been involved in many class action litigation matters as both a consulting and a testifying expert. I have testified on statistical and economic issues in both federal and state court and presented testimony in front of administrative law judges. I am currently the expert for various Plaintiff classes of students in matters involving tuition refunds for the Spring 2020 semester during which the COVID-19 pandemic began.[4]

11.     I have published on economic and statistical issues in various journals, including the *Antitrust Bulletin*, the *Journal of Antitrust Enforcement*, the *Harvard Journal of Sports and*

---

[4] I have been retained, submitted reports, declarations, or given testimony in the following matters involving student refunds: *Milanov v. Univ. of Michigan, Bunch v. Univ. of South Carolina, Zwiker v. Lake Superior State, Dalke v. Central Michigan University, Simmons v. Northern Michigan University, Horrigan v. Eastern Michigan University, Paymon v. Wayne State University, Garland v. Western Michigan University, Meng v. The New School, and Cross v. Univ. of Toledo.*

*Entertainment Law*, the *Texas Review of Entertainment and Sports Law*, and others.[5]  I currently serve on the editorial board of the *Antitrust Bulletin* journal as its associate economics editor. A significant portion of my research and publication work has involved higher education, particularly the interplay of athletics and academics within post-secondary institutions in the United States, as well as the health and safety of college athletes.[6] I have published multiple papers on antitrust issues in intercollegiate athletics, particularly those involving the NCAA. I have guest edited two symposia for the *Antitrust Bulletin*: a 2017 symposium on antitrust issues involving the NCAA generally and a 2021 symposium that addressed, *inter alia*, issues of antitrust and race in intercollegiate athletics.

12.     Over the last several years, my research work has involved analyzing a repository of nearly two million documents produced as a result of an academic fraud investigation at one major university in the United States.[7] Such documents detailed the administration of courses, financial aid assistance, exit interviews, and various intra- and inter-institutional academic and athletic endeavors, including tuition and aid distribution. Relying in part on this research, I have published several articles on these issues and continue to do so. In 2019, my paper on the use of college athletes in concussion studies formed the basis for a documentary by the sports journalism site *The Athletic* (now the *New York Times* sports department), which did its own nine-month investigation to confirm my findings. [8]

13.     The focus of my research and my corresponding published work is directly germane to the issues involved in the proposed settlement agreement between Plaintiffs and the NCAA in *House*, the same issues that Counsel for Plaintiffs in *Fontenot* have asked me to address.

14.     Exhibit 2 to this report contains a copy of my Curriculum Vitae, which details my qualifications, publications, presentations, and testimony (both deposition and trial) that I have offered. EconONE Research charges an hourly rate of $695 for my work on this matter. No part of my compensation depends on the outcome of this matter. Prior to this particular matter, I have not been engaged by any party in an antitrust action against the NCAA, nor have I received any compensation for my research related to such issues.

## III.    Economic Critiques of Revenue and Compensation Assumptions

15.     The empirical results of any methodological choice depend on assumptions and decisions regarding choices of inputs. Dr. Rascher's choices of what revenues to include and what inputs constitute compensation likewise inform his ultimate estimates of the share of total revenues that athletes will obtain both retrospectively over the 2019-2024 period and prospectively over the

---

[5] Publications that I have authored or co-authored are available online at https://utah.academia.edu/TedTatos
[6] Ted Tatos, Abuse and Mistreatment of Athletes at U.S. Universities: Legal Implications for Institutional Duty-to-Protect, Texas Review of Entertainment & Sports Law, Vol. 21, Fall 2020.
[7] Specifically, these documents were produced as part of the investigation into the academic fraud scandal at the University of North Carolina at Chapel Hill. The law firm Cadwallader conducted the investigation, led Kenneth Wainstein. The findings of that investigation, which further inform the opinions I offer in this declaration, can be found at https://carolinacommitment.unc.edu/wp-content/uploads/sites/350/2014/10/UNC-FINAL-REPORT.pdf.
[8] Ted Tatos and Don Comrie. *Cognitive Deficits and LD/ADHD Among College Football Athletes and Undisclosed Inclusion in Concussion Research*. Journal of Scientific Practice and Integrity 1(1), 2019. https://www.jospi.org/article/8883-cognitive-disorders-among-incoming-college-football-athletes-legal-and-medical-implications-of-undisclosed-inclusion-in-concussion-research. The three-part documentary, produced by filmmaker Andrew Moscato and narrated by 11-time Emmy-winning journalist Armen Keteyan, can be found on the NY Times site at https://www.nytimes.com/athletic/athletic/video/21-adhd/.

ten-year term of the settlement agreement.

16.     To summarize, Dr. Rascher estimates that the total damages that college athletes suffered over the 2019-Fall 2024 period equals approximately $1.898 billion. The proposed settlement agreement over this period equals $600 million, which Dr. Rascher calculates as 31.6 percent of the total damages he estimates. As I explain in this Declaration, Dr. Rascher's analysis, in my opinion, significantly underestimates the damages that college athletes have suffered over this period, because 1) he excludes revenues from the total amount shared with athletes, and 2) he overstates the value of the GIA as compensation.

17.     The critical assumptions that form the basis for the proposed settlement agreement with respect to damages for athletic services and the related future compensation rest with two key inputs: the revenues to be apportioned and the inputs used as compensation. As I explain, such assumptions result in estimates that do not reflect market values, casting in sharp relief the distinction between the collegiate athlete revenue share prescribed under the proposed settlement agreement versus the revenue share obtained by the professional athletes who constitute Dr. Rascher's yardstick. As a result, the true revenue share that college athletes would obtain under the proposed settlement agreement falls well short of his adopted yardstick. I address both key inputs, revenues, and compensation, seriatim.

18.     Given the limited data that I had available, and given the short timeframe to complete my declaration, my calculations are preliminary in nature. If asked to perform further work in this matter, I reserve the right to alter my calculations after receiving more comprehensive data and given more time to perform my analyses.

### A. Both the Revenue Pool and Dr. Rascher's Modification Thereof Exclude Funding Sources That Should Be Subject to a Revenue Sharing Agreement

19.     The proposed settlement agreement identifies the subset of all revenue categories collected in the NCAA Member Financial Reporting System (MFRS) that would be subject to revenue sharing.[9] Specifically, the proposed settlement agreements only include revenue categories 1 (Ticket Sales), 7 (Game Guarantees), 11 (Media Rights), 12 (NCAA Distributions), 13 (Conference Distributions), 13A (Conference Distributions-Football Bowl Revenue), 15 (Royalties/Licensing), and 19 (Football Bowl Revenues). Table 1 below provides the MFRS operating revenue categories, with the inclusions stipulated under the agreement shaded in gray.[10]

TABLE 1. OPERATING REVENUE CATEGORIES AND INCLUSIONS UNDER AGREEMENT

| ID | MFRS Revenue Category Description |
|----|-----------------------------------|
| 1 | Ticket Sales |
| 2 | Direct State or Other Government Support |
| 3 | Student Fees |
| 4 | Direct Institutional Support |

---

[9] Proposed Settlement Agreement at Article 3. I have previously analyzed MFRS data and have published a paper comparing these data with other sources of collegiate athletics financial information, such as data collected by the U.S. Department of Education under the Equity in Athletics Disclosure Act (EADA). *See*, Ted Tatos, *An Empirical Evaluation of EADA and NCAA College Sports Financial Data: Applications for Research and Litigation*. Marquette Sports Law Review, Vol. 29, No. 2 (May 2019. https://scholarship.law.marquette.edu/sportslaw/vol29/iss2/5/. EADA data are publicly available at https://ope.ed.gov/athletics/#/.

[10] Proposed Settlement Agreement, Attachment 1, Appendix A.

| 5 | Less – Transfers to Institution |
|---|---|
| 6 | Indirect Institutional Support |
| 6A | Indirect Institutional Support – Athletic Facilities Debt Service, Lease and Rental Fees |
| 7 | Guarantees |
| 8 | Contributions |
| 9 | In-Kind |
| 10 | Compensation and Benefits provided by a third party |
| 11 | Media Rights |
| 12 | NCAA Distributions |
| 13 | Conference Distributions (Non Media and Non- Football Bowl) |
| 13A | Conference Distributions of Football Bowl Generated Revenue |
| 14 | Program, Novelty, Parking and Concession Sales |
| 15 | Royalties, Licensing, Advertisement and Sponsorships |
| 16 | Sports Camp Revenues |
| 17 | Athletics Restricted Endowment and Investments Income |
| 18 | Other Operating Revenue |
| 19 | Football Bowl Revenues |

20.     As Table 1 indicates, although the agreement includes major external revenue sources, it excludes from consideration major athletic department revenue sources such as 4 (Direct Institutional Support), 8 (Contributions), 14 (Concessions, etc.), and 17 (Athletics Restricted Endowment). I concur with Dr. Rascher's observation that valid economic arguments support including any or all of these. As I explain below, each of these should be included in the Revenue Pool and should be included when analyzing revenue for the backpay for athletic services as well. Their exclusion under the settlement agreement artificially restricts college athlete compensation and serves to accentuate the distinction between the college athlete revenue share under competition versus its restricted counterpart under the settlement agreement.

21.     I do not have access to the same MFRS data used in the Rascher Declaration. While some public universities make such data available on their individual websites, few, if any, private universities do so. However, I have access to less granular, prior-year MFRS data that I have used in my published research, as well as more recent MFRS gathered by various third parties.[11] In addition, I have access to the Department of Education data collected pursuant to the Equity in Athletics Disclosure Act (EADA). These data contain, inter alia, total revenues and total athletic aid. For my calculations of damages for past athletic services I rely on EADA data as well as MFRS data below, highlighting the consequences of excluding key revenue categories under the proposed settlement agreement.

22.     As I explain below, economic justifications support the inclusion of seven

---

[11] Such third parties include, USA Today, Syracuse Newhouse School of Public Communications, the Knight Commission (in conjunction with the Syracuse Newhouse School). As part of my academic research, I have also collected various MFRS reports from individual schools.

additional MFRS revenue categories, currently excluded under the proposed settlement agreement, into the Revenue Pool:

      i.    Direct Institutional Support (ID#4),
      ii.   Indirect Institutional Support (ID#6),
     iii.   Contributions (ID#8),
     iv.   Program/Concessions (ID#14),
      v.   Sports Camp Revenues (ID#16),
     vi.   Athletics-Restricted Endowment (ID#17), and
    vii.   Other Revenue Sources (#18).

23.     The publicly-available MFRS data reports Contributions separately but aggregates Programs/Novelty/Concessions, Parking, Sports Camps, Athletics-Restricted Endowment, and Other Revenue Sources into one titled "Other Revenue" defined as follows:

> <u>Other Revenue:</u> Revenue from the following categories: Compensation and benefits provided by a third party; game program, novelty, parking and concession sales; sports camps and clinics; athletics restricted endowment and investments income; and, other operating revenue.

24.     Likewise, the MFRS data defines "Institutional/Government Support," which corresponds to the sum of "Direct Institutional Support" (ID#4) and Indirect Institutional Support (#6), as follows:

> <u>Institutional/Government Support:</u> Revenue received from governments, direct funds from the institution for athletics operations, and costs covered and services provided by the institution to athletics (and for athletics debt) but not charged to athletics.

25.     For purposes of this analysis, I use Institutional/Government Support, which combines Direct and Indirect Institutional Support. With access to more granular data, separating these two categories to the extent necessary is a ministerial task.

26.     As an expositive point, Table 2 below provides an example of the MFRS data that contains median values for the Football Bowl Subdivision Autonomy 5 conference members. I focus specifically on total revenues, athletic aid, and the exclusion of the three aforementioned combined revenue sources: Contributions, Other Revenues and Institutional/Government Support. I note that Autonomy 5 conference members depend far less on institutional support than other NCAA members with limited outside revenue sources. I detailed this dichotomy between such members and other FBS conference members in my previous research.[12] As a result, excluding such athletic department revenues would significantly reduce the Revenue Pool subject to revenue sharing with college athletes, particularly for non-Autonomy 5 conferences. Such exclusions would serve to further widen the gap between, in the words of former NCAA Vice President Wally Renfro, "the haves, the have nots, and the forget-about-its".[13] Such exclusions also significantly decrease the revenue side of the calculations for the backpay claims for athletics services.

---

[12] Ted Tatos. *NCAA Amateurism as an Anticompetitive Tying Restraint*. The Antitrust Bulletin, September 2019; 64(3). https://journals.sagepub.com/doi/10.1177/0003603X19863588 at Figures 1 and 2.

[13] O'Bannon v. NCAA, Trial Transcript at 237, 3-6. Comments originate from an October 17, 2010 email from Wally Renfro's comments to NCAA President Mark Emmert: "*The top 25 percent of the Division I is setting the spending pace for the rest of the division. Although the bottom 25 has largely stopped trying to compete and is content with the prestige that comes with being in the same neighborhood, the real issue appears to be with the middle 25 percent. So, what we really see are the haves, the have-nots, and forget-about-its.*" O'Bannon trial transcript at 1903.

27.     As Table 2 shows, by excluding "Other Revenues," "Institutional/Government Support," and "Contributions," the settlement agreement insulates approximately *one-third* of total Autonomy-5 conference athletic department revenues from the sharing agreement with college athletes. Such exclusions results in an artificially inflated estimate of portion of revenues that the proposed settlement agreement reserves for athletes.

TABLE 2. AUTONOMY 5 MEDIAN MEMBER REVENUES, 2005-2023

| Year | Athletic Student Aid | Total Revenues | Excluded Revenues | Other Revenue | Donor Contributions | Excluded Revenues That Should Be Included | % Excluded That Should Be Included |
|---|---|---|---|---|---|---|---|
| 2005 | $6,198,172 | $49,611,391 | $17,324,868 | $4,420,587 | $11,011,913 | $16,304,885 | 32.9% |
| 2006 | $6,637,033 | $52,898,726 | $20,443,102 | $5,172,768 | $12,596,548 | $19,353,942 | 36.6% |
| 2007 | $7,201,491 | $60,826,660 | $23,189,469 | $6,120,981 | $13,888,996 | $21,695,934 | 35.7% |
| 2008 | $7,521,420 | $66,148,186 | $23,934,631 | $6,074,276 | $15,138,000 | $22,730,728 | 34.4% |
| 2009 | $7,891,315 | $67,141,171 | $22,956,507 | $5,180,376 | $14,746,142 | $21,759,489 | 32.4% |
| 2010 | $8,645,957 | $73,943,001 | $25,032,488 | $5,499,879 | $16,417,784 | $23,668,892 | 32.0% |
| 2011 | $9,305,861 | $78,151,445 | $26,695,503 | $6,782,515 | $17,037,447 | $25,444,782 | 32.6% |
| 2012 | $9,649,557 | $81,631,252 | $28,783,144 | $6,272,005 | $19,703,260 | $27,659,295 | 33.9% |
| 2013 | $10,175,161 | $85,994,444 | $27,771,020 | $6,445,995 | $18,982,227 | $26,685,721 | 31.0% |
| 2014 | $10,869,906 | $95,741,591 | $31,996,233 | $8,000,731 | $21,898,857 | $30,956,202 | 32.3% |
| 2015 | $11,335,932 | $94,308,934 | $30,734,415 | $6,855,389 | $22,675,410 | $29,843,464 | 31.6% |
| 2016 | $12,302,965 | $104,981,713 | $31,803,292 | $6,833,136 | $24,084,147 | $31,358,263 | 29.9% |
| 2017 | $12,977,355 | $111,583,417 | $33,437,102 | $8,262,016 | $24,971,913 | $33,284,702 | 29.8% |
| 2018 | $13,154,584 | $121,537,401 | $33,534,638 | $8,187,639 | $24,976,695 | $33,331,293 | 27.4% |
| 2019 | $13,566,520 | $124,603,669 | $34,647,227 | $9,395,233 | $24,850,826 | $34,603,407 | 27.8% |
| 2020 | $13,300,502 | $120,230,670 | $32,482,481 | $7,572,025 | $23,682,617 | $32,428,971 | 27.0% |
| 2021 | $13,528,002 | $101,173,143 | $25,225,597 | $4,843,710 | $17,252,726 | $25,199,165 | 24.9% |
| 2022 | $13,914,333 | $142,817,376 | $39,694,947 | $8,783,929 | $28,476,589 | $39,694,947 | 27.8% |
| 2023 | $15,085,908 | $145,757,263 | $47,819,366 | $9,466,084 | $35,311,177 | $47,806,788 | 32.8% |

28.     For non-autonomy conferences, the total amount of revenues insulated is much larger, because 1) the athletic departments at such institutions rely in substantial part on institutional investment and 2) both Dr. Rascher and to an even greater extent, the proposed settlement agreement, exclude such revenues. I address the revenue sources that should be subject to a revenue sharing agreement individually.

**1)  Direct and Indirect Institutional Support**

29.     Direct support from the institutions consists of internal transfers such as revenues to cover athletic grant-in-aid ("GIA") or COA as well as other contributions to the athletic department. Specifically, such direct support for intercollegiate athletics includes:

- Unrestricted funds allocated to the athletics department by the university (e.g. state funds, tuition, tuition discounts/waivers, transfers);
- Federal work study support for student workers employed by athletics; and
- Endowment unrestricted income, spending policy distributions and other investment income distributed to athletics in the reporting year to support athletic operations.

30.     The exclusion of direct institutional funding for athletic scholarships from the Revenue Pool underscores the inconsistent treatment of revenues and compensation under the

settlement agreement. The "shared revenue" under the agreement equals the total "compensation" amount divided by the revenues counted toward the Revenue Pool. Yet the agreement excludes tuition payments from the Revenue Pool (reducing the total shared amount), but then *counts those funds against athlete revenue*. Institutional sources of revenue used to offset the costs of athlete GIA should be included as athletic department revenue.

31.      Excluding such institutional transfers from the Revenue Pool (denominator) but including them as "compensation" to athletes in the form of GIA in the numerator violates the concept of a revenue share. Even eliding the distinction between in-kind and monetary payments for the moment, for purposes of a revenue share calculation, direct institutional payments should also appear in the denominator. Otherwise, the result cannot be accurately labeled a "share" as this term implies that the numerator represents a subset of the denominator. The revenue share that the settlement agreement contemplates can be more accurately described as a "revenue ratio", not a share, thus rendering inapposite a comparison of this *revenue ratio* with a yardstick of *revenue share* of NBA/NFL athletes.

32.      Athletic scholarships represent the majority of the total "compensation" that athletes receive under the agreement as well as the majority of compensation under Dr. Rascher's damages calculation. According to Exhibit 7 of the Rascher Declaration, GIA equals approximately 78 percent of the total athlete compensation for athletic services from Fall 2019 through Spring 2024 ($16.7B/$21.3B). In Section II.B., I explain how such in-kind payments do not correspond to actual salaries that professional athletes who represent Dr. Rascher's yardstick receive. Nonetheless, by including such GIA in-kind payments in the numerator of the revenue share but excluding it from the denominator, the settlement agreement artificially inflates the athlete revenue share.

33.      Likewise, economic arguments support including GIA in both, though given the difference between in-kind and monetary payments, doing so overestimates the athlete revenue share. From an economic viewpoint, individuals and institutions make decisions consistent with maximizing a given objective function. The NCAA D-I colleges and universities purchase athletic skills and talents from prospective athletes, which the universities then use to market their names and reputations, attract downstream consumers of athletic competition, and potentially attract other talented individuals drawn by positive peer externalities. Increased reputation yields more donations, meaning a greater endowment, better facilities, ability to attract top academics (meaning more research grant dollars), and so on.[14]

34.      Increased visibility resulting from athletic participation reduces the search costs of prospective students, yielding a general institutional benefit.[15]  As University of Texas president

---

[14] The top 5 universities by endowment also boast top academic reputations: Harvard, Princeton, Stanford, Yale, and the Massachusetts Institute of Technology (MIT). See Farran Powell, 10 Universities with the Biggest Endowments, US NEWS (Sept. 28, 2017), https://www.usnews.com/education/best-colleges/the-short-list-college/articles/2017-09-28/10-universities-with-the-biggest-endowments

[15] Whether such a reduction in search costs is beneficial to prospective students has been questioned. In criticizing the "student-as-customer" model, Prof. Nate Kreuter notes, "*We turn universities into brands. Marquee universities…trade primarily on their brand names. This allows universities to sell the perception of what the university achieves, rather than focusing attention and resources on academics. It also justifies potentially corrupt and exploitative athletic programs in the name of brand recognition and alumni contentment*. See Nate Kreuter. Customer        Mentality,        Inside        Higher        Ed.,        Feb.        27,        2014,        available        at https://www.insidehighered.com/views/2014/02/27/essay-critiques-how-student-customer-idea-erodes-key-values-higher-education

Gregory Fenves noted in naming Mike Perrin the interim athletic director in 2015, "*For many, athletics is the front door to the university,*"[16] a comment echoed by the Bob Vecchione, executive director of the National Association of Collegiate Directors of Athletics, "*There's an old saying that the athletics department is the front porch of the university*."[17] Duke senior deputy athletic director Chris Kennedy also stressed the value of athletics on a university's brand in responding to whether lowering athletic practice time is feasible,

> That's possible. The [Ivy League schools] practice less than the rest of Division I does, they have more restrictive rules on practice and stuff. But that means that the University has reconsidered its commitment to Division-I athletics, to being in the ACC. And the University has decided at this point that has a university value, one of many, that whatever publicity, attention, brand is created or enhanced by athletics is worth having this kind of athletic program—with all the implications of that.[18]

35.    In a recent article, Whitney Wagoner, Director of the Warsaw Sports Marketing Center at the University of Oregon explained the role of sports in marketing the university,

> It is absolutely a driver for general university awareness, general university brand equity and enrollment of undergraduate students… The overall size of enrollment at this institution and the diversity and geographic reach of where students are coming from can be tied to Oregon football… No doubt, overall, a university attracts a broader and more diverse student body as a whole when the athletic programs are performing at a high level.[19]

NCAA President Mark Emmert wrote to Representatives Elijah Cummings and Tony Cardenas in 2014 and explained that, "*the Association does not perform econometric evaluations of the specific 'value' student-athletes provide to their institutions. Undoubtedly, they add significant value to their schools*…"[20] Such an acknowledgment reflects a reality that has historically characterized intercollegiate athletics. The 1929 Carnegie Report pointed out the value of college athletes to universities nearly a century ago:

> Into this game of publicity, the university of the present day enters eagerly…It wants students, it wants popularity, but above all it wants money and always more money. The athlete is the most available publicity material the college has. A great scientific discovery will make good press material for a few days, but nothing to compare to that of the performance of a first-class athlete. Thousands are interested in the athlete all the time, while the scientist is at best only a passing show.

---

[16] UT NEWS, *Fenves Names Mike Perrin as Interim UT Men's Athletics Director.* (Sept. 15, 2015), https://news.utexas.edu/2015/09/15/fenves-names-mike-perrin-interim-ut-men-s-athletics-director. Mr. Fenves repeated this comment in his interview with the NCAA's economic expert in the GIA litigation. Prof. Elzinga's interview notes show that "*GF* [Greg Fenves*] discussed the relationship between alumni and inter-collegiate athletics: This relationship is "really important." He described athletics as "the front door to the university for alumni." Nor is this limited to alumni. He believes that many people across the state, view the university through the lens of athletics*" See Exhibit F to Prof. Elzinga's March 21, 2017 report. Also see

[17] Steve Rosen. Finding new A.D. could hinge on signing the right executive search firm, HuskerOnline, Sept. 27, 2017, available at https://nebraska.rivals.com/news/finding-new-a-d-could-hinge-on-signing-the-right-executive-search-firm

[18] Id. 37.

[19] Carlos Mendez, Value of TCU in the Top 10? 'It's priceless. It's immeasurable.' Star Telegram, Dec. 1, 2017, http://www.star-telegram.com/sports/college/big-12/texas-christian-university/article187558348.html. Texas Christian University athletic director Chris Del Conte added, "*There is a direct correlation between the success of our football program on the national stage and a variety of areas. One is applicants. Two is the amount of people wanting to give back…a rising tide floats all boats.*"

[20] Mark A. Emmert, letter to Rep. Elijah Cummings and Rep. Tony Cardenas, June 13, 2014.

36.     The academic literature yields findings that confirm such sentiments. Pope and Pope found evidence that both football and basketball success can have a sizeable impact on the number of applications a school receives "*in the range of 2-15%, depending on the sport, level of success, and type of school.*"[21] Anderson used data on bookmaker spreads to estimate the probability of winning each game and then used a propensity score design to condition on these probabilities and estimate the effects of winning on donations, applications, and enrollment. The results showed that "*winning reduces acceptance rates and increases donations, applications, academic reputation, in-state enrollment, and incoming SAT scores.*"[22] Mixon and Ressler, in their paper analyzing the effect of athletics on university revenues, conclude that "*When examining the role of athletics within the mission of universities and colleges, one must take care to include all of the monetary rewards reaped by universities with successful athletic programmes.*"[23]

37.     The financial value of intercollegiate athletics to a university clearly transcends its dollar contribution to the athletic department coffers, underscoring administrators' decisions to engage in such sports. To the extent that athletic scholarships constitute "payment" to college athletes to further such goals, economic logic prescribes that the Revenue Pool should include institutional revenues that fund such grants.

**2)  Athletics-Restricted Endowment**

38.     The same economic logic for adding direct institutional support in the Revenue Pool also motivates including Athletics-Related Endowment. As a general matter, institutions of higher education in the United States rely on their endowments to fund merit-based and need-based grants and scholarships for the general student body. Endowments differ from other gifts because the institution invests the proceeds and pays out only a portion thereof each year, reflecting the goal of maintaining long-term stability and success.

39.     Endowment payouts commonly occur on a formulaic basis.[24] While payout policies differ among institutions, typical endowment spending protocols specify a payout rate applied to a multi-year moving average of the endowment value (e.g., year-end-balance). A school may choose to spend five percent of the three-year moving average year-end balance. Such an approach smooths out periodic shocks (e.g., recessionary effects).[25] Endowment payouts often represent a portion of institutional aid that discounts the sticker (list) price.

40.     Offering such discounts from sticker price benefits the school not only by increasing its enrollment but also by attracting qualified students who could not otherwise afford to attend. In turn, the student body benefits through direct network effects.

41.     Direct network effects are also common in higher education. In general, students

---

[21] Devin G. Pope and Jaren C. Pope, The Impact of College Sports Success on the Quantity and Quality of Student Applications, Southern Economic Journal, 2009, 75(3), 750-780.

[22] Michael Anderson, *The Benefits of College Athletic Success: An Application of the Propensity Score Design*, Review of Economics and Statistics 99(1), June 2012.

[23] Franklin G. Mixon, Jr and Rand W. Ressler, An empirical note on the impact of college athletics on tuition revenues, Applied Economics Letters, 2:10, 383-387, 1995.

[24] For details on such formulas, see Verne O. Sedlacek and William F. Jarvis, Endowment Spending: Building a Stronger Policy Framework, Commonfund Institute White Paper (2010), available at https://files.eric.ed.gov/fulltext/ED559301.pdf.

[25] Jeffrey R. Brown, Stephen G. Dimmock, Jun-Koo Kang, and Scott J. Weisbenner, How University Endowments Respond to Financial Market Shocks: Evidence and Implications, American Economic Review (2014), 104(3): 931–962 at 936.

benefit from the education they purchase from the university. But, students can also benefit from their peers, as evidenced by group-study sessions or the networking that occurs in business schools, for example. Rothschild and White's 1995 paper, which described students both as inputs into the education process and as outputs of higher education, proffered the "peer effects" concept, i.e., the idea that top students contribute to the education of their peers.[26] Likewise, Winston (2003) explained:

> a critically important input to the production of high quality education is the peer quality that can be bought only from a firm's own customers. Students educate students so the school that wants to produce high quality education will have to enroll high-quality students, not to act as passive buyers of the school's educational services, but as factors of its production.[27]

42.     In other words, the presence of other students at the school influences the output (education) each student receives, meaning that students function as inputs into the educational output other students experience. Geiger also highlighted these direct network effects, noting "*Due to their role in educating one another (peer effects), high-ability students have an incentive to cluster together. Better students contribute to higher quality, which in turn attracts better students.*"[28]

43.     Athletics-restricted endowment payouts serve much of the same purpose as endowments earmarked for academic aid: to attract qualified students, including those who could not otherwise afford to attend, thus furthering the institution's reputation, brand, and overall status. Excluding such aid from the Revenue Pool would cement a distinction between benefits available to students who are athletes versus those who are not.

### 3)  Contributions

44.     Contributions also serve to advance the fortunes and the status of the athletic department. As the athletes themselves are the sine qua non of the department, athletic success motivates donor funding, as the above references indicate. Because the donor funding is tied to the success of collegiate athletes, it should be included in the Revenue Pool.

45.     Former Nike CEO Phil Knight's well-chronicled donations to the University of Oregon and its athletic department exemplify the economic support for including contributions in the Revenue Pool. Recent reports that Oregon's athletic department has "unlimited" NIL backing from Knight underscores the aims of such contributions: to enhance athletic success.[29] Athletic success depends in large part on attracting top recruits, as further evidenced by the rise in booster-funded NIL collectives.

---

[26] Michael Rothschild and Lawrence J. White. The Analytics of the Pricing of Higher Education and Other Services in Which Customers are Inputs, Journal of Political Economy, Vol. 103, No.3, 1995, noting "*Many services provide outputs that depend partially on the customers as inputs; the presence of other customers often contributes to the output experienced by each purchaser. Higher education is the premier example…*" p. 573. The same is, of course, true for athletics, where the quality of an athlete's experience can be elevated by playing with other top athletes though increased skill by practicing against such players, increased likelihood of winning, greater exposure, and so forth.

[27] Gordon Winston. *Towards a Theory of Tuition: prices, peer wages, and competition in higher education*. 2003. Discussion Paper Number 65, Williams Project on the Economics of Higher Education. Williamstown: Williams College.

[28] Roger Geiger. Market Coordination of Higher Education: The United States, in P. Teixeira, B. Jongbloed, D. Dill and A. Amaral (eds), Markets in Higher Education: Rhetoric or Reality, 161–183. 2004, Woulters-Kluwer.

[29] Kristian Dyer, Oregon football has 'unlimited' NIL backing from Nike, Yahoo Sports, July 10, 2024, available at https://sports.yahoo.com/oregon-football-unlimited-nil-backing-203209065.html.

46.    Monetary compensation provides that remunerative medium for other members of the athletic department, including coaches. I understand that no such restriction exists on the use of contributions to compensate other members of the athletic department including coaches, administrative staff, and other support personnel. As such, excising contributions from the revenue pool available for athlete compensation effectively subordinates athletes, the primary drivers of athletic department success and revenues, to other members of the department.

### 4) Concessions

47.    As evidenced by Dr. Rascher's own damages calculation, which includes half of concession sales into his damages analysis, revenues from concessions (including game programs, parking, etc.) belong in the Revenue Pool. Such revenues are a natural complement to ticket sales. To wit, the current NBA Collective Bargaining Agreement that Dr. Rascher cites as basis for the 50 percent share, stipulates including the following as basketball-related income:

> *All proceeds of any kind, net of reasonable and customary expenses (including Taxes) related thereto, subject to the provisions of Section 1(a)(6) below, from: (A) in-arena (or in practice facility) sales of novelties and concessions (including revenues derived from the sale of novelties and concessions.*[30]

48.    Moreover, excluding such revenues creates opportunities for accounting practices that could divert revenues from ticket sales to concessions.

49.    For example, if an institution were to double the parking costs or concession costs but decrease the ticket prices accordingly, the result would simply shift revenues away from the Revenue Pool. Similarly, an institution could bundle tickets with concession sales and place the value on the latter over the former, again reducing the Revenue Pool and diminishing athlete compensation to the institution's benefit.

### B.  The Pecuniary Value of Athletic Aid Should Take Into Account the Economic Concept of Market Value

50.    For purposes of calculating a claimed "revenue share" paid to athletes, the proposed settlement agreement and the Rascher Declaration treat athletic GIA in the same manner as salaries paid to professional athletes. The Rascher Declaration explains that "The largest source of compensation for professional athletes is salary, whereas the largest source for college athletes, and one of the key recruitment tools, is grant-in-aid scholarships ("GIA")."[31] Of course, while athletes in both categories may perform similar, if not identical, work, the wage-fixing restraint at the heart of the ongoing litigation against the NCAA creates such payment dichotomy.

51.    Three critical economic problems undermine treatment of athletic aid as equivalent to monetary payment. First, GIA represents an in-kind payment and not monetary compensation. The former must be expressed in terms of the latter, which requires a calculation of the market value of an in-kind payment. Second, the value of an athletic scholarship as an offset to the cost of education falls well short of the value of an academic scholarship and should be evaluated as a net, not gross, offset. Third, as a result of athletic scheduling requirements, athletes do not have the same academic choices available to them. NCAA history contains myriad examples of

---

[30] NBA Collective Bargaining Agreement, Effective 7/2023 at 135. Available at https://imgix.cosmicjs.com/25da5eb0-15eb-11ee-b5b3-fbd321202bdf-Final-2023-NBA-Collective-Bargaining-Agreement-6-28-23.pdf.

[31] Rascher Declaration at ¶44.

institutional academic misconduct to the detriment of athlete education, perhaps the most high-profile of which occurred at the University of North Carolina at Chapel Hill. Such widespread episodes underscore the reduced value of academics available to college athletes, particularly those in high-revenue sports such as football and basketball. I address each point in turn. Each point motivates the application of a discount factor to the face value of GIA to the extent that the proposed settlement agreement contemplates treating GIA as compensation for revenue-sharing purposes.

### 1) Grant-in-aid represents an *in-kind payment* to college athletes that differs from *monetary compensation* paid to professional athletes.

52.    For decades, the NCAA has differentiated GIA from true compensation. To wit, the Supreme Court's NCAA v. Board of Regents decisions, which sustained the NCAA's antitrust arguments for over three decades explained that

> The identification of this "product" with an academic tradition differentiates college football from and makes it more popular than professional sports to which it might otherwise be comparable, such as, for example, minor league baseball. In order to preserve the character and quality of the "product", <u>athletes must not be paid</u>, must be required to attend class, and the like.[32]

53.    The settlement agreement now stipulates that tuition offsets for college athletes do constitute payment after all. Nonetheless, treating such in-kind payments as monetary compensation requires calculating their market value, expressed in dollar terms. The proposed settlement agreement ignores this concept, adopting the face value (sticker price) as the value of a scholarship. However, the sticker price simply represents the face value of a year of tuition/fees/room and board that the institution itself sets. In contrast, whether parties consummate a transaction at market value depends on *voluntary* willingness by both the buyer and the seller to enter into an agreement to exchange goods or services:

> The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.[33]

54.    The NBA Collective Bargaining Agreement (CBA) also contemplates in-kind transfers, often known as barter exchanges. The NBA CBA explains that

> "Basketball Related Income" ("BRI") for a Salary Cap Year means the aggregate operating revenues (including the value of any property or services received in any barter transactions), accounted for in accordance with Section 1(b)(1) below, received or to be received for or with respect to such Salary Cap Year by the NBA…[34]

Internal Revenue Service guidance explains that gross income calculations must include the "fair market value of goods and services received from bartering."[35] The NBA CBA also consistently

---

[32] *NCAA v. Board of Regents*, 468 US 85 (1984)

[33] *United States v. Cartwright*, 411 U.S. 546, 551 (1973) (quoting Treas. Reg. § 20.2031-1(b)).

[34] NBA Collective Bargaining Agreement, effective 7/2023, (hereafter, "NBA CBA"), at 131, available at, https://imgix.cosmicjs.com/25da5eb0-15eb-11ee-b5b3-fbd321202bdf-Final-2023-NBA-Collective-Bargaining-Agreement-6-28-23.pdf. The NBA CBA defines "barter" at 169, as " to trade by exchanging one commodity, service or other non-cash item for another."

[35] Internal Revenue Service, Topic no. 420, Bartering income, available at *https://www.irs.gov/taxtopics/tc420#*

notes that goods and services should be expressed in terms of "fair market value."[36]

55.     In the instant case, NCAA members' exchange of GIA for athletic services does not reflect the fair market value of the GIA but rather an inflated value. The proposed agreement would require any athlete to accept GIA at the full (sticker) price set by the institution as compensation as a requirement for participation in intercollegiate athletics. In other words, NCAA member institutions tied participation in athletics with their academic services, requiring purchase of the latter at full price in lieu of compensation for the former.[37] The proposed settlement agreement would effectively bind athletes to a tying arrangement. As an economic matter, the same logic applies to counting *Alston* settlement proceeds as "payment."

56.     Three additional factors support the conclusion that the sticker price of attendance does not reflect its market value. First, the marginal cost of additional scholarship is negligible. Announcements that an athlete has gone from "walk-on" status to "full scholarship" do not impose any substantial marginal cost on the institution: it does not have to hire additional staff or professors or measurably increase its meal-table budget. Under competitive conditions, if the institution priced at marginal cost, it would lower its price accordingly, further widening the gap between the sticker price and the actual market value of a GIA.

57.     Second, as this prior litigation as well as the relevant literature have observed, the NCAA has exercised buying power over college athletics in the form of under-payments. High school athletes in the U.S., particularly those in high-revenue sports, have virtually no outside options but to accept the GIA that NCAA members offer them in return for athletic services. Only recently, after the statutory intervention following court decisions, have NIL considerations motivated athlete choices among institutions. Nonetheless, such payments do not reflect the actual salary compensation that exists in the professional sports that Dr. Rascher uses as a yardstick.

58.     Third, information asymmetries characterize the market for higher education. Such asymmetries occur when one party in a transaction, generally the seller, has substantially greater information relevant to the transaction than the countervailing party (buyer). Such differences can result in adverse selection, a market failure[38] where one side, in this case the university/seller, exploits its information advantage to obtain benefits that it could otherwise not garner if the students/buyers were equally informed. For this reason, higher education has been called a "trust market," a term that refers to markets for goods where the purchaser relies on the assurances of and is thus vulnerable to the opportunism of the seller.[39] As Winston (1999) points out, "at the

---

[36] NBA CBA at 144, 149.

[37] I discussed the nature of such a bundled tie in my previous research. *See,* Ted Tatos, NCAA Amateurism as an Anticompetitive Tying Restraint. The Antitrust Bulletin, September 2019; 64(3).

[38] Market failure commonly refers to a violation of the assumptions underlying neoclassical economics. Generally, economists assume that given a set of assumptions that including competitive firms, few barriers to entry, and perfect information, a free market will result in an optimal production of goods and services. In the case of higher education, at least one of these assumptions, perfect information, is violated. This is because information asymmetry exists: students and parents, buyers of education, operate at an information deficit relative to the universities (sellers). As the literature observes, this situation exposes students and parents to schools' potential exploitation of this informational advantage.

[39] Gordon C. Winston. Subsidies, Hierarchy and Peers: The Awkward Economics of Higher Education. Journal of Economic Perspectives, Vol. 13, No. 1, (1999), 13–36. Also see Gordon Winston, Hostility, Maximization, & the Public Trust, Change: The Magazine of Higher Learning, July 9, 2010, at 22-23, ("Markets with asymmetric information can usefully be called "trust markets"…And, of course, higher education is sold in a trust market. Just like going to a doctor, our students come to colleges and universities in large part because they don't know what they'll get

extreme, consumers may not be informed about whether they have bought anything at all."[40]

59.     Blankenberger and Williams (2020), writing within the context of the COVID-19 pandemic, observe that:

> Higher education operates under conditions of market failure…students and parents operate at a severe information deficit compared to higher education institutions. Students transact for a credential and, more importantly, the knowledge they expect to obtain in a degree program. However, degree content, student outcomes, what and how much students need to know, how this is measured, and even assessment of whether the student has learned enough to be awarded credit is all in the hands of the institution and its faculty. Hence, higher education operates in what is known as a trust market, wherein students are extremely vulnerable to fraud and must rely on the honesty of the seller in the exchange.[41]

60.     These statements echo Birnbaum (2001), who explains that "Institutions of higher education (except in the proprietary sector) have no owners and cannot distribute profits, so there is less pressure to operate efficiently. They function in a "trust market", in which people do not know exactly what they are buying and may not discover its value for years."[42] Likewise, Hill (2015) notes the reliance of consumers on institutional claims when purchasing an education, "A college education is a complex good and will only be consumed by each student (hopefully) once in their lifetimes. It is difficult for families and students to evaluate the quality of the services supplied. The family has to place a good deal of trust in the institution offering these services."[43]

61.     Further, McPherson and Bacow (2015) explain that "Consumers cannot judge the quality of an education by inspection—it is a classic example of an 'experience good' (Nelson 1970)—so symbolic indicators like the degree of selectivity, the quality of the facilities, and the difficulty of admission are emphasized."[44]

62.     Former Harvard University president Derek Bok explained, [45]

"They [applicants] rarely possess either the time or the information to explore all the promising

---

from us…ultimately there remains a whole lot of asymmetric information between buyer and seller inherent in the educational process. We know more than they do, so we operate in a market that has to rely on trust…Kenneth Arrow, a Nobel in economics, recently said in a talk at Williams that "education is the supreme example of a product subject to asymmetric information.")

[40] *Id.* at 14.

[41] Bob Blankenberger & Adam M. Williams. COVID and the impact on higher education: The essential role of integrity and accountability, Administrative Theory & Praxis, 42:3, 404-423, (2020) at 406. Available at https://www.tandfonline.com/doi/pdf/10.1080/10841806.2020.1771907?needAccess=true.

[42] Robert Birnbaum. Management fads in higher education: Where they come from, what they do, why they fail. San Francisco, CA: Jossey-Bass (2001) at 216. Available online at https://archive.org/stream/managementfadsin0000birn#page/n9/mode/2up

[43] Catharine Hill, Higher Education and the Market, Journal of Educational Issues, 1(2), 2015 at 38, ("As mentioned earlier, access to higher education regardless of ability to pay is seen as an equity issue.") Available online at http://www.macrothink.org/journal/index.php/jei/article/view/8232/6850

[44] Michael McPherson and Lawrence Bacow. Online Higher Education: Beyond the Hype Cycle Journal of Economic Perspectives 29 4 135-54 (2015) at 139. Available at https://pubs.aeaweb.org/doi/pdfplus/10.1257/jep.29.4.135.

[45] Derek Bok, UNIVERSITIES IN THE MARKETPLACE: THE COMMERCIALIZATION OF HIGHER EDUCATION (Princeton University Press 2004) at 161–62. A detailed discussion that relates two dimensions relevant to this matter, uncertainty and quality, and information asymmetries that develop between sellers and buyers appears in George Akerlof's seminal paper. See George A. Akerlof, The Market for "Lemons": Quality Uncertainty and the Market Mechanism, The Quarterly Journal of Economics, Vol. 84, No. 3. (Aug. 1970), pp. 488-500

options available to them and usually have only a limited basis for comparing the options they do consider. Under these conditions, competition does not necessarily cause good instruction to drive out bad. Instead, students often flock to courses with superficial appeal or to institutions with established reputations even though the education they receive is only mediocre."

63.     Internal documents bear out such observations. The March 2011 Report of the Services Subgroup of the Academic Support Program for Student Athletes (ASPSA) Committee at the University of North Carolina at Chapel Hill highlighted the existence of information asymmetries by explaining that "Oftentimes, first-year students, especially those who are first generation college students, lack (sic) limited knowledge and exposure to higher education, hence, they and their families rely heavily upon the information provided by the University and its selected representatives (e.g., recruiters)."[46]

64.     A second document, again from UNC-Chapel Hill, highlights the adverse selection problem and the negative effects of the informational disadvantage in which college athletes in particular find themselves. An April 2012 email from UNC professor Deborah Stroman to the university faculty list server details both how information asymmetries can result in adverse selection as well as the principal-agent problem, where university agents have incentives that are not aligned with those of students (highlighted emphasis added in Figure 1 below).[47]

FIGURE 1. UNIVERSITY OF NORTH CAROLINA EMAIL

| From: | "Stroman, Deborah L" <dstro@unc.edu> |
|---|---|
| Sent: | Tuesday, April 10, 2012 2:30 PM |
| To: | cbcchair@unc.edu |
| Bcc: | Corey Holliday <cholliday@uncaa.unc.edu> |
| Subject: | FW: Clips eFLASH: "Football and Swahili" (NY Times Op-Ed) |
| Attach: | TEXT.htm; image.jpg; image003.jpg |

Hi All. This article is creating a buzz across campus. Many feel that Nocera embellished the lunch discussion. Many are happy that he at least drew attention to the matter. We all remain hopeful☺

Note: I reviewed the Nocera article with my first year seminar students (99% are student athletes from football, men's basketball, wrestling, rowing, and track/field) and the only concern they expressed was the fact that Nocera/Williams called out the wrong language -- Swahili instead of Portuguese!! A few also were disappointed that before they enrolled they received course recommendations for student athletes and they followed the advice. However, when they later got on Connect Carolina and saw all the other course options they were upset. One clearly was mad that he had to take AFAM 101 because it filled a requirement. One quote in response to their need to speak up as valued students, "Dr. Stroman, it just doesn't work that way. You can't beat the system. You have to follow along or my coach will take it out on me."

Needless to say, the discussion today was rather lively and engaging. We did end on a positive note too. That is, one student stated that "we should just take it as a challenge to do well in our sport and in class." ;)

d

Do Good.

Deborah L. Stroman, Ph.D. CLU
Engage. Explore. Empower.

65.     Student choices suffer from the information disadvantages at which they find themselves relative to institutions of higher education. Such information asymmetries give rise to the principal-agent problem, which describes the misaligned and often competing incentives between principals (the students who desire certain benefits) and the agents (universities and their officials) ostensibly acting in the best interests of the students. Given the state of market failure

---

[46] University of North Carolina at Chapel Hill, Report of the Services Subgroup of the Academic Support Program for Student-Athletes Committee, March 29, 2011 at 3. UNC document release, June 2018, PR8 at 6264
[47] UNC Document Release, June 2017, production #8, File #34 at 8800. Available online at https://s3.amazonaws.com/url-carolinacommitment-storage/Final+Release+34.pdf, *emphasis added*.

resulting from such information asymmetries in which higher education operates, using the face value of GIA as a proxy for market value ignores these economic precepts, yielding an artificially inflated value of the actual benefits that college athletes receive in the form of GIA. Further, such asymmetries indicate that college athletes will likely find themselves at an informational disadvantage when deciding whether to opt out of the settlement agreement, leaving them susceptible to manipulation.

2) **Using the gross price of cost-of-attendance rather than the net price as "compensation" to athletes overvalues its true dollar value.**

66.    The majority of students who attend non-profit institutions of higher education such as NCAA members do not pay the full (sticker) price. Rather institutions offset such costs with either financial or merit aid. Some institutions offer only the former, while others offer a combination of both. While financial aid sources include government aid (e.g., Pell Grants), state or local aid, for purposes of this declaration I use the terms financial or merit aid to refer to institutionally-funded aid.

67.    Such discounts reflect institutional realization that charging the sticker price would result in decreased enrollment as only students capable of paying full price would attend. Such elevated prices would also result in the exclusion of many highly qualified students, reducing the institution's reputation and standing. Institutions thus offer discounts in the form of grants and scholarships, i.e., funds that students do not have to repay.[48]

68.    Sticker price, various sources of aid, and net prices by institution and year are available in the Integrated Postsecondary Educational Data System (IPEDS), maintained by the U.S. Department of Education.[49] In addition, the National Association of College and University Business Officers (NACUBO) conducted a recent study that indicated that the vast majority of undergraduates receive such aid.[50] The study found that "In AY 2023-24, 90.3 percent of first-time undergraduates received grant aid from their institutions, which covered an average of 62.2 percent of published tuition and fees. Among all undergraduates, 83 percent received grant aid, covering an average of 58.3 percent of the published price."[51]

69.    Given the state of market failure in which higher education operates, the net price serves as an upper bound on the value of one year's worth of GIA. A non-athlete replacing an athlete as a student at a given institution would, on average, pay the net price. In other words, a college athlete at a given institution would expect to pay the *net price* if she were not an athlete, not the sticker price. If same student had obtained a full athletic scholarship, the value of that scholarship would offset the cost that she would have otherwise paid, i.e., the net price. The true value of the athletic scholarship would equal the price paid "but-for" the scholarship (i.e., the net price) minus the actual price paid with the scholarship (zero).

---

[48] The net price equals sticker price net of any grants or scholarships. It does not take into consideration self-help, such as loans or work study. The Department of Education defines net price as "A net price is an estimate of the actual cost you and your family need to pay in a year to cover education expenses for you to attend a particular college or career school. It is the institution's cost of attendance minus any grants and scholarships for which you may be eligible." See, https://studentaid.gov/help-center/answers/article/what-does-net-price-mean-for-college-costs.

[49] https://nces.ed.gov/ipeds/.

[50] 2023 NACUBO Tuition Discounting Study, available at https://www.nacubo.org/Press-Releases/2024/Annual-NACUBO-Tuition-Discounting-Study-Finds-Financial-Aid-Awards-on-the-Rise.

[51] *Id.*

70.    In contrast, the settlement agreement counts the full value of the GIA as payment. In doing so, the agreement violates basic principles of economic valuation, yielding an artificial "revenue share." At best, if no other considerations motivated further discounts of the true GIA value below net price, the upper bound of GIA value that should enter into the revenue share calculation (in both numerator and denominator) should equal the net price. As explained in this section, other factors do motivate a further discount.

### 3) The documentary record, scholars, and educators all recognize that college athletes, particularly those in high-revenue sports, receive a fraction of the true educational opportunities available to non-athlete students.

71.    Economic principles dictate that placing a restraint on the exchange of a good or service restricts its value relative to the unrestrained condition. This economic axiom applies with respect to the academic product that college athletes often receive. NCAA member institutions, college professors, and researchers have all recognized this basic reality, which renders the net price as a conservative estimate of the true compensatory value of GIA to college athletes.

72.    In her declaration submitted in the O'Bannon case, former learning instructor for athletes at UNC-Chapel Hill Mary Willingham, explained that,

> The college football and basketball players that I worked with sometimes earned a degree, but they did not get an education. They simply did not have equal access to a real education… They did not have access to all courses and degree programs. They did not participate in study abroad, internships or research opportunities. They were prohibited from enjoying any of these opportunities because they conflicted with practice, tournaments, summer school, or spring football.[52]

73.    Duke University has itself acknowledged the infringement of athletic responsibilities on education.[53] Cultural anthropology professor Orin Starn penned an op-ed describing the time constraints of athletes at Duke University, one of the top post-secondary educational institutions in the United States and a member of the Atlantic Coast Conference.[54] Starn's observations mirror those of the 1929 Carnegie Report, which commented that:

> Once in college the student who goes in for competitive sports, and in particular for football, finds himself under a pressure, hard to resist to give his whole time and thought to his athletic career. No college boy training for a major team can have much time for thought or study.[55]

74.    The fact that these findings describe the collegiate athletic system in the United

---

[52] IN RE NCAA STUDENT-ATHLETE NAME & LIKENESS LICENSING LITIGATION, Declaration of Mary C. Willingham In Support of Antitrust Plaintiffs' Combined Opposition to NCAA's Motion for Summary Judgment and Reply in Support of Motion for Summary Judgment, Feb. 20, 2014 at 3-4.

[53] Duke University, Unbridled Ambition – A Strategic Plan for Duke Athletics, April 26, 2008 at 11, ("We no longer determine at what time we will play our games, because they are scheduled by TV executives. This is particularly troubling for basketball, which may be required to play weeknight games away from home at 9:00 p.m. The potential impact on academic work is obvious, as students are required to board a flight at 2:00 a.m., arriving back at their dorms at 4:00 or 5:00 a.m., and then are expected to go to class, study, and otherwise act as if it were a normal school-day. In return for large television contracts, we have surrendered control over a function that can profoundly influence the experience of our students.") Available at, https://today.duke.edu/showcase/reports/athleticsstrategyfinal.pdf.

[54] Orin Starn, op-ed, College athletes' devil's bargain: play or learn, THE NEWS AND OBSERVER, Dec. 2, 2017, http://amp.newsobserver.com/opinion/op-ed/article187669478.html

[55] The Carnegie Foundation for the Advancement of Teaching. American College Athletics. Bulletin #23, 1929.

States with such consistency, despite being nearly a century apart, underscores the incongruity of high-profile athletics and the academic mission of the university, and lessens the value of the GIA that they receive. In short, athletes do not receive nearly the same education as other students, so even valuing their GIA at average net price paid by all students overstates the value they receive.

## IV.    Estimate of Damages for Claims for Athletic Services from 2019-2024

75.    I apply the adjustments I described above to both revenues and compensation to estimate damages for claims for athletic services at NCAA Division I member institutions. As noted above, I do not have access to the same granular data as Dr. Rascher. As a result, I rely on EADA data, which I supplement using the less granular MFRS data that I have available from public sources. The publicly-available MFRS data also do not include private university data. Private universities constitute approximately 32 percent (118/364) of NCAA Division I members.

76.    EADA data are available only through the 2022-2023 Academic Year. As a result, I estimate totals for 2023-2024 and 2024-2025. I can update these estimates with additional available data. I estimate the last two academic years using a trendline. For 2024-2025, I only consider one-half of the totals for the damages calculations to correspond to Dr. Rascher's calculations.

77.    Table 3 below provides the total revenues and the total GIA for NCAA Division I institutions over the 2019-2020 to 2024-2025. The data for the years shaded in gray are estimates.

TABLE 3. REVENUE AND GIA AID NCAA DIVISION I TOTAL, EADA

| Academic Year | # Institutions | Total Revenue | Total Athlete Aid |
|---|---|---|---|
| 2019-2020 | 349 | $14,556,536,221 | $2,792,176,596 |
| 2020-2021 | 346 | $12,549,739,572 | $2,813,994,182 |
| 2021-2022 | 350 | $16,242,520,658 | $2,921,538,177 |
| 2022-2023 | 354 | $18,062,173,281 | $3,052,100,550 |
| 2023-2024 | 354 | $18,905,165,500 | $3,116,781,341 |
| 2024-2025 | 354 | $20,326,134,726 | $3,205,512,926 |

**Totals**                        **$90,479,202,595   $16,299,347,309**

78.    To verify my calculations, I compare the total GIA I have computed for 2019-2022 and estimated for 2023-2024 against the total in Table 7 of the Rascher Declaration. Dr. Rascher reports a total of $16.7B, while I estimate a total of $16.3B. Our totals GIA figures are within 2 percent of each other.

79.    I then compare my revenue totals against the revenues that he reports. I report a total of $90.5 billion, while he only reports only $46.4 billion. Our results differ because Dr. Rascher's estimates exclude nearly one half of total athletic department revenues. The proposed Revenue Pool in the injunctive relief portion of the Agreement excludes an even greater

percentage, as Dr. Rascher's damages calculations include a portion of concessions and other sources.

80.     Such differences exist because I believe that it is proper to include two major sources of athletic department revenues for NCAA Division I members that were excluded: contributions and institutional investment. For most Autonomy 5 members, institutional investment constitutes a smaller part of total revenues than for non-Autonomy 5 members, though such investment plays a key role even for private Autonomy 5 schools.[56] The Revenue Pool also excludes contributions to the athletic department, even though, as noted previously, athletic success drives such contributions.

81.     I calculate potential damages under two scenarios. In Scenario 1, I use total athletic department revenues, without imposing any restrictions. I note that this scenario still underestimates the value of athletic services because it only considers the revenues to the athletic department, not the total benefits to the institution as a whole. Scenario 1 also gives full credit for GIA as compensation, as it does for the other compensation sources that Dr. Rascher includes. Even so, I estimate damages under Scenario 1 of approximately $24.3 billion, meaning the proposed settlement amount equals only 2.5 percent of total damages, not the 31.6 percent that Dr. Rascher estimates by using other assumptions.

82.     In Scenario 2, I keep the adjusted revenues and also adjust the value of the GIA provided in two ways. First, I use the NACUBO study cited previously as an estimate of institutional discounts offered to students off the list price. As the study shows, students pay, on average, a net price equal to approximately 50 percent of the sticker price. To the extent that this total does not include additional sources of aid, the net price would be even lower. Given additional time, I can perform this calculation at the institutional-year level using IPEDS data. Second, I adjust the GIA based on estimated classes that college athletes miss. This approach does not compensate athletes for restrictions in their choice of classes, but only for the class sessions they have to miss as a result of athletics. As a result, the discount of 22 percent is a conservative estimate. Given additional time, I can refine the missed class estimates using, *inter alia*, NCAA reports upon which I have relied for my previous research.

TABLE 5. CALCULATION OF MISSED CLASS GIA DISCOUNT

| | |
|---|---|
| Semester Class Weeks | 15 |
| Classes Taken | 4 |
| Class Meetings/Week | 10 |
| Missed Meetings/Week | 2.2 |
| Missed Class % | 22% |

83.     Table 6 below provides the damages under Scenarios 1 and 2. Overall, I estimate

---

[56] See, e.g., Duke University, Unrivaled Ambition, A Strategic Plan for Duke Athletics, April 28, 2008 at ("To continue to sponsor the broad-based, highly successful program that we currently enjoy, we need to provide an annual institutional subsidy of approximately $15 million per year, or double the current number. This would bring us into line with Boston College, Northwestern, Vanderbilt, Rice, and Wake Forest (other academically solid private research universities which compete in BCS Division intercollegiate athletics) and we believe below several members of the Ivy League, at least two of which spend more than $20 million per year.")

that, given the net price discount that would have been available to college athletes if they did not participate in athletics and the missed class time requirement, the market value of the GIA equals approximately 39 percent of its face value. Applying this adjustment results in estimated damages of $34.3 billion, meaning that the settlement amount only equals 1.8 percent of the total damages that athletes suffered.

TABLE 6. DAMAGES SCENARIOS 1 AND 2

|  | Rascher Declaration | Scenario 1 Calculations | Scenario 2 Calculations |
|---|---|---|---|
| Revenue | $46,395 | $90,479 | $90,479 |
| Athlete Share of Revenue | 50% | 50% | 50% |
| **Estimated Athlete "But-For" Compensation** | $23,197 | $45,240 | $45,240 |
| | | | |
| **Estimated Athlete Compensation Received** | | | |
| GIA | $16,688 | $16,299 | $6,357 |
| Medical | $1,327 | $1,327 | $1,327 |
| House (BNIL) | $1,798 | $1,798 | $1,798 |
| Hubbard (AAA) | $669 | $669 | $669 |
| Other Alston | $391 | $391 | $391 |
| SAF/SAOF | $428 | $428 | $428 |
| Total Estimated Athlete Compensation Received | $21,299 | $20,912 | $10,970 |
| | | | |
| GIA as % of Total Included Revenues | 36.0% | 18.0% | 7.0% |
| **Damages** | **$1,898** | **$24,327** | **$34,270** |
| Settlement Amount | $600 | $600 | $600 |
| **Settlement Amount Percentage of Damages** | **31.6%** | **2.5%** | **1.8%** |

84.    Further, I note that under Dr. Rascher's analysis, GIA constitutes approximately 36 percent of total included revenues. This result underscores the fact that in Power 5 Conferences, both athletics expense categories for (1) coach salaries and (2) administrative and support compensation exceed the total dollar value for athletic GIA. In other words, of these categories, athletes receive the least compensation even though they outnumber the other categories and they are the primary drivers of athletic revenue—and even if one accepts the full-value of the GIAs in this calculation. As a direct example, the University of Colorado's Fiscal Year 2021 MFRS report indicates that the institution reported $12,207,564 in athletic aid, $13,550,276 in coaching salaries and bonuses paid by the university, and $13,901,096 in compensation to athletic department support and administrative staff.[57]

85.    If GIA represents 36 percent and the other categories provide greater compensation, the simple mathematic conclusion is that the salaries of coaches and administrative/support personnel are not subject to the same restricted Revenue Pool that the settlement agreement prescribes.

---

[57] https://cubuffs.com/documents/2022/1/14/NCAA_MFRS_Report_FY21_Final.pdf.

86.     In addition, these preliminary scenarios all also understate damages if a benchmark like European soccer's 71% is used to determine the athlete share of revenue.

## V.     The Present-Day Value of the $600 Million Fund Being Proposed in the Settlement for the Claims for Athletics Services

87.     Counsel for the Plaintiffs in *Fontenot* have also asked me to calculate the net present value of the $600 million proposed settlement. I understand that the proposed agreement contemplates paying the $600 million in approximately equal-sized increments over the next ten years. Because of inflation, the present value of this settlement amount will be less than if the amount were paid in total at the time of settlement. Further, I understand that Counsel for Plaintiffs in House will ask for up to 10 percent of the total settlement in fees, plus out-of-pocket costs.

88.     The present value of an annuity can be calculated using the following formula:

$$PV = \left(\frac{Total}{r}\right) * (1 - \frac{1}{(1+r)^t})$$

Where

Total = the total payment amount ($540 million)

r  =  the interest rate per year (4.25%)

t = the number of years of payments (10 years)

89.     Based on the conditions above, athletes will receive approximately $54 million per year over the next ten years. This payment represents an annuity. The net present value of this annuity, discounted at the 10-year treasury bill rate of 4.25 percent as of July 2024 equals approximately $433 million.[58]

## VI.     The Value of Additional Equivalence Sports Scholarships

90.     Counsel for Plaintiffs in *Cornelio* have also asked me to provide a preliminary estimate on the GIA value that athletes have missed out on as a result of artificially low caps on the number of scholarships permitted in a variety of sports. While I would need more time and more data to fully analyze this question, some preliminary calculations illuminate the potential damages at issue. As part of the settlement agreement, the NCAA plans to expand roster limits in many sports.[59] The settlement agreement includes an increase in football rosters from 85 to 105 and men's and women's basketball from 13 to 15. Historically, such sports have been head-count sports, meaning that scholarships generally include full GIA and an individual GIA scholarship cannot be divided among multiple individual athletes, which occurs under equivalence sports.

91.     Given the nature of football as the primary driver of athletic revenue, with basketball generally second, NCAA Division I members can be expected to increase the total GIA offered by the amount equal to the full GIA value for each of the 24 additional football and basketball roster sports. Given Title IX considerations, institutions would need to increase the GIA in women's sports by an equivalent amount equal to full GIA times 20 spots, as the GIA increases in men's and women's basketball would offset each other. It is thus reasonable to conclude that at

---

[58] For the 10-Year Treasury Bill rate, see https://fred.stlouisfed.org/series/GS10.
[59] Stipulation and Settlement Agreement, 7/26/2024 at Appendix B, Article 1.

least 20 additional GIAs will be provided in equivalency sports.

92.    I understand that the proposed settlement agreement with respect to increases in roster sizes would go into effect in 2025. Plaintiffs for Fontenot have asked me to calculate the minimum additional GIA that Power 5 member institutions would have paid out had institutions implemented this plan in 2020, on the assumption that at least 20 additional GIAs would be provided in equivalency sports. To do so, I calculate the approximate value of the increase in full GIA by 20 spots for every Power 5 member institution for 2020-21 through 2024-25.

93.    To estimate the additional GIA that institutions would need to provide, I rely on the MFRS and IPEDS data. To do so, I multiply GIA x 20 spots x 5 years x 65 schools. I use the Institutional Characteristics data from IPEDS to calculate COA. Table 7 provides these results.

TABLE 7. COST OF ATTENDANCE FOR 20 ADDITIONAL ROSTER SPOTS, POWER 5 MEMBERS

| Year | Public Institutions | Total GIA for 20 Spots | Average COA | Total GIA for 20 Spots |
|------|---------------------|------------------------|-------------|------------------------|
| 2020 | 52 | $51,544,700 | $49,562 | $63,439,360 |
| 2021 | 52 | $52,356,680 | $50,343 | $64,439,040 |
| 2022 | 53 | $55,055,960 | $51,940 | $67,522,000 |
| 2023 | 53 | $56,497,040 | $52,993 | $68,890,900 |
| 2024 | 53 | $58,252,670 | $54,182 | $70,436,600 |

**Total Value of 20 Additional Full GIA Spots**      **$334,727,900**

94.    An argument might be made that this amount should be reduced by using the net value of the GIA rather than the full value. More analysis would be needed on that topic, and I do not take a position on the issue at this time.

95.    Again, this is a very preliminary estimate performed with limited time and very limited data, and it relies on the conservative assumption that these schools would only increase their scholarship numbers in equivalency sports by 20 each. Upon receipt of additional information and data, I can refine the preliminary calculations above and can use a more precise methodology or perhaps employ a different valuation methodology.

**VII.    Signature**

96.      I, Ted Tatos, certify that, to the best of my knowledge and belief,

- The statements of fact that I express in this Declaration are true and correct.
- I base the analysis contained herein and the supporting assumptions on my unbiased, professional opinion, with support as referenced herein.
- I have neither personal financial interest in the outcome of this litigation nor bias towards any of the parties.
- My compensation does not depend on the outcome of this matter.

Respectfully submitted this date of August 9, 2024,

_____

Ted Tatos

26

<u>Appendix 1 – Documents Relied Upon</u>

Declaration of Dr. Daniel Rascher

Proposed Settlement Agreement

EADA Data

MFRS Data

Documents as referenced in this Declaration

<u>Appendix 2 – Tatos Curriculum Vitae</u>



**Ted P. Tatos, MStat, PStat®**
**Economist and Statistician – EconONE**

Ted Tatos is an economist and statistician affiliated with EconONE Research. In addition to his consulting practice, where he specializes in empirical analysis, Mr. Tatos is an Adjunct Professor of economics at the University of Utah where he has taught econometrics. He is also the Associate Economics Editor of the *Antitrust Bulletin* journal, where he has also guest-edited two symposia. Mr. Tatos has an M.S. in Statistics with a focus in Econometrics from the University of Utah and has B.A. in Economics from Duke University. Mr. Tatos has earned the Professional Statistician (PStat ®) accreditation from the American Statistical Association. He has over twenty-five years of experience in litigation and non-litigation consulting, with a focus in antitrust, data analytics, higher education, healthcare, intellectual property, labor, and commercial damages. Mr. Tatos has advised both private sector and government clients, such as the Securities and Exchange Commission, on matters requiring complex economic and statistical analysis. He has published on various matters including antitrust issues, intellectual property matters, the use of hedonic analysis to estimate property values and investigate value diminution, labor rights, and athlete safety. His peer-reviewed paper in the Journal of Scientific Practice & Integrity on the use and misuse of college athletes as subjects in concussion research formed the basis of a 2019 documentary authored by the sports journalism outlet *The Athletic* and was produced by filmmaker Andrew Muscato and narrated by eleven-time Emmy winner Armen Keteyian. The documentary can be found at https://theathletic.com/video/21-adhd/.

| | |
|---|---|
| Email: | ttatos@econone.com |
| Web: | https://www.econone.com/staff-member/ted-tatos/ |
| Office: | (213) 612-7510 |
| Mobile: | (801) 541-6696 |
| Research: | https://utah.academia.edu/TedTatos |
| | https://www.researchgate.net/profile/Ted_Tatos |

*Professional Experience*

| | |
|---|---|
| August 2019-Present | EconONE Research |
| January 2010 to Present | Empirical Analytics Managing Director |
| July 2008 to January 2010 | Wasatch Economics Partner, Salt Lake City, Utah |
| January 2007 to July 2008 | Keystone Strategy/North Harvard Group Statistician, Salt Lake City, Utah |
| September 2001 to January 2007 | LECG, LLC Managing Economist, Washington DC & Salt Lake City, UT |
| January 2000 to September 2000 | DynCorp – Healthcare Information Technology Services Statistical Analyst, Reston, Virginia |



| March 1997 | LECG, LLC |
|---|---|
| to January 2000 | Research Analyst, Associate |
| | Washington, DC |

## *Education*

Duke University, Durham, NC
    A.B. Economics, 1995 (*double major, Economics, Psychology*)

University of Utah, Salt Lake City, Utah
    M.S. Statistics - Econometrics, 2005 – Thesis published in <u>Intellectual Property Damages:</u>
    <u>Guidelines and Analysis, 2004 Supplement</u> – *Applying Statistical Analysis to the Market*
    *Approach*

## *Published Research Papers*

Ted Tatos, *Upward Pricing Pressure from Digital Platforms' Imposition of Take Rates on App Developers*, CPI Antitrust Chronicle, February 2023

Ted Tatos and Hal Singer. *Alston v NCAA: lessons American college athletics can offer about concentration and monopsony power in labour markets*. Journal of Antitrust Enforcement, 2022, 00, 1–14, https://academic.oup.com/antitrust/advance-article-abstract/doi/10.1093/jaenfo/jnac007/6599234.

Ted Tatos and Hal Singer. *The Abuse of Offsets as Procompetitive Justifications: Restoring the Proper Role of Efficiencies after Ohio v. American Express and NCAA v. Alston*, Georgia State University Law Review, Vol. 38, No. 4, 2022, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4113547.

Ted Tatos and Hal Singer. *Antitrust Anachronism: The Interracial Wealth Transfer in Collegiate Athletics Under the Consumer Welfare Standard*, The Antitrust Bulletin, Vol. 63, Issue 3, Nov. 2021. https://journals.sagepub.com/doi/10.1177/0003603X211029481.

Hal Singer and Ted Tatos. *Intro to Antitrust and Race Symposium,* The Antitrust Bulletin, September 2021. https://journals.sagepub.com/doi/pdf/10.1177/0003603X211032773.

Ted Tatos. *Relevant Market Definition and Multi-Sided Platforms Post Ohio v. American Express: Evidence from Recent NCAA Antitrust Litigation*. Harvard Journal of Sports and Entertainment Law, 10.2, May 2019. https://harvardjsel.com/wp-content/uploads/sites/9/2019/05/HLS205.pdf.

Ted Tatos. *NCAA Amateurism as an Anticompetitive Tying Restraint*. The Antitrust Bulletin, September 2019; 64(3). https://journals.sagepub.com/doi/10.1177/0003603X19863588.

Keith Leffler and Ted Tatos. *Competitive Injury and Damages Under the Robinson-Patman Act - Morton Salt and Statistical Analysis*. The Antitrust Bulletin. December 2015 vol. 60 no. 4 318-344. https://journals.sagepub.com/doi/full/10.1177/0003603X15602400.



Hal Singer and Ted Tatos. *Understanding the Economics in the Dispute Between the Writers' Guild of America and the Big Four Talent Agencies*, Antitrust Chronicle, Jan. 23, 2020. https://www.econone.com/wp-content/uploads/2020/02/CPI-Singer-Tatos.pdf.

Ted Tatos. *Deconstructing the NCAA's Pro-Competitive Justifications to Demonstrate Antitrust Injury and Damages: The Evidence Against NCAA Amateurism*. The Antitrust Bulletin. March 2017; 62(1). (Special symposium guest editor). https://journals.sagepub.com/doi/full/10.1177/0003603X16688968.

Mark Glick, David Mangum, and Ted Tatos. *The 'Book of Wisdom' Contains Little Wisdom and Creates Significant Risk of Bias.* The Federal Circuit Bar Journal, 2017, Vol. 27, No. 1. https://heinonline.org/HOL/LandingPage?handle=hein.journals/fedcb27&div=5&id=&page=.

Ted Tatos, Troy Lunt, and Mark Glick. *Property Value Impacts from Transmission Lines, Sub-Transmission Lines, and Substations*. The Appraisal Journal Summer 2016 (featured article). https://www.appraisalinstitute.org/transmission-lines-increase-and-decrease-property-values-the-appraisal-journal/.

Ted Tatos, Troy Lunt, and Mark Glick. *Taking a Closer Look at Proximity Damages. –Results from Large Data Analytics*. Right of Way Magazine, March/April 2016. https://eweb.irwonline.org/eweb/upload/web_marapr16_Procimity.pdf.

Ted Tatos. *An Empirical Evaluation of EADA and NCAA College Sports Financial Data: Applications for Research and Litigation*. Marquette Sports Law Review, Vol. 29, No. 2 (May 2019). https://scholarship.law.marquette.edu/sportslaw/vol29/iss2/5/.

Ted Tatos. *Abuse and Mistreatment of Athletes at US Universities: Legal Implications for Institutional Duty-to-Protect*, Texas Review of Entertainment & Sports Law, Summer/Fall 2020. https://heinonline.org/HOL/LandingPage?handle=hein.journals/tresl21&div=3&id=&page=.

Ted Tatos and Don Comrie. *Cognitive Deficits and LD/ADHD Among College Football Athletes and Undisclosed Inclusion in Concussion Research*. Journal of Scientific Practice and Integrity 1(1), 2019. https://www.jospi.org/article/8883-cognitive-disorders-among-incoming-college-football-athletes-legal-and-medical-implications-of-undisclosed-inclusion-in-concussion-research.

Stephen T. Casper, Kathleen E. Bachynski, Michael E. Buckland, Don Comrie, Sam Gandy, Judith Gates, Daniel S. Goldberg, Kathryn Henne, Karen Hind, Daniel Morrison, Francisco Ortega, Alan J. Pearce, Sean Philpott-Jones, Elizabeth Sandel, Ted Tatos, Sally Tucker and Adam M. Finkel. *Toward Complete, Candid, and Unbiased International Consensus Statements on Concussion in Sport*, 49 Journal of Law, Medicine & Ethics 372–377 (2021). https://www.cambridge.org/core/journals/journal-of-law-medicine-and-ethics/article/toward-complete-candid-and-unbiased-international-consensus-statements-on-concussion-in-sport/54233A9E24B851E9288AEFD03E1C58CE.

Ted Tatos and Rick Hoffman. *Applying Statistical Analysis to the Market Approach.* Intellectual Property Damages: Guidelines and Analysis, 2004 Supplement



### *Published Articles*

Ted Tatos. The NCAA Goes After College Athletes' NIL Money—Here are the Antitrust Implications for Workers and Consumers, PROMARKET, May 20, 2022, available at https://www.promarket.org/2022/05/20/ncaa-goes-after-college-athletes-nil-antitrust/.

Ted Tatos. *NCAA's Mistreatment of Athletes Should Worry Workers Everywhere*, SPORTICO, April 13, 2022, *available at* https://www.sportico.com/leagues/college-sports/2022/ncaas-mistreatment-of-athletes-1234670609/.

Ted Tatos and Hal Singer. *College Sports Amateurism Costs Black Athletes Billions*, GLOBAL SPORTS MATTERS, Oct. 25, 2021, available at https://globalsportmatters.com/opinion/2021/10/25/college-sports-amateurism-costs-black-athletes-billions-nil/.

Hal Singer and Ted Tatos. *America's Owners Still Want More: How the MLB Lockout Mirrors the U.S. Economy*, GLOBAL SPORTS MATTERS, March 10, 2022, available at https://globalsportmatters.com/business/2022/03/10/how-mlb-lockout-mirrors-us-economy-labor-market/.

Ted Tatos and Stephen Casper. *Using College Athletes as Concussion Test Subjects Makes Nobody Safer*, THE AMERICAN PROSPECT, Aug. 27, 2019. https://prospect.org/culture/using-college-athletes-concussion-test-subjects-makes-nobody-safer/.

Ted Tatos. *College Athletes Should Be Able to Earn Money From Their Likeness*, THE AMERICAN PROSPECT, Sept. 16, 2019. https://prospect.org/education/college-athletes-should-be-able-to-earn-money-from-their-lik/.

Ted Tatos. *Playing Games with College Athletes' Lives*. THE AMERICAN PROSPECT, May 20, 2020. https://prospect.org/health/playing-games-with-college-athletes-lives/.

### *Presentations, Amicus Briefs, and White Papers*

Assisted in drafting and co-authored *Brief of Economists as Amici Curiae in Support of Plaintiffs-Appellants and Reversal*, State of New York et al. v. Facebook. Brief *available at* https://www.cohenmilstein.com/sites/default/files/New%20York%20v%20Facebook%20-%20Economists%20Amicus%20-%20Filed%2001282022.pdf

Hal Singer and Ted Tatos. Subsidizing Universal Broadband Through a Digital Advertising Services Fee: An Alignment of Incentives, October 2021, *available at* https://www.econone.com/wp-content/uploads/2021/09/Digital-Divide-HSinger-TTatos-2.pdf.

Hal Singer and Ted Tatos. Protecting the U.S. Postal Service from Amazon's Anticompetitive Assault. January 2022, *available at* https://www.econone.com/news-article/read-hal-singer-and-ted-tatos-article-protecting-the-u-s-postal-service-from-amazons-anticompetitive-assault/.

Relevant Market Definition and Multi-Sided Platforms After Ohio v. American Express: Evidence from Recent NCAA Monopsony Antitrust Litigation – Presentation at the University of Utah Antitrust Conference, October 2019, Panel discussion *available at*



https://www.youtube.com/watch?v=vjJahNWNkes&list=PLqm-AKklxwfYBpEX4vyd0CyKRZ2RiIAbl&index=5

Advanced Patent Litigation: *Maximizing Returns and Protecting Core Technologies* (CLE presentation), Santa Clarita, CA. Oct. 2018. With Bret Bocchieri, Aaron Fahrenkrog, Christine Yun Sauer of Robins Kaplan, LLC.

Clear Law Institute presentation. *Statistics in Class Certification and at Trial: Leveraging and Attacking Statistical Evidence*, with Paul Karlsgodt of Baker Hostetler, LLC, Feb. 25, 2019.

Paul Seabright and Ted Tatos. Presentation before the European Commission – Director General of Competition - Chief Economist's team, Brussels, Belgium pursuant to a white paper co-authored with Mark Glick and Paul Seabright regarding competition and antitrust issues in the computer mainframe industry. August 2009.

Presentation to the Utah Bar Association Annual Summer Convention, Jul. 15-18, 2009. *Economics and the Theory of Your Case*. With Hon. Clark Waddoups, Hon. Deno Himonas, Mark Glick, Steve Hill.

Steve Waters and Ted Tatos. *Determining the Choice Set in a Random Utility Model* - Presentation to American Agricultural Economics Association, Toronto, Ontario, Canada, July 1997

## *Teaching Credentials*

- Adjunct Professor – Spring 2023 – Economics 6630 – University of Utah

- Adjunct Professor – Spring 2006 – Economics 7801 – University of Utah

- Adjunct Professor – Spring 2005 – Economics 7801 – University of Utah

- Adjunct Professor – Spring 2004 – Economics 7801 – University of Utah

## *Testifying Credentials*

- Trial testimony in the matter of Sarah Price v. United States (DOJ Natural Resources Div.), United States Court of Federal Claims, July 2024.

- Deposition testimony in the matter of Garavanian et al. v. JetBlue Airways and Spirit Airlines (antitrust, merger), September 2023.

- Deposition testimony in the matter of Sarah Price v. United States (DOJ Natural Resources Div.), July 2023.

- Deposition testimony in the matter of Davia Bunch and Casey Kelly et al. v. the University of South Carolina (class action tuition refund matter), In the Court of



Common Pleas, Fifth Judicial Circuit, South Carolina, February 15, 2023

- Before the State of California Legislature, Judiciary Committee, pursuant to Assembly Bill 983, June 28, 2022.

- Trial testimony in the matter of Roberts v. Tim Dahle Imports, United States District Court, District of Utah, June 2022.

- Deposition testimony in the matter of Hunter v. Booz Allen Hamilton et al., August 2021 (class action)

- Deposition testimony in the matter of Sypherd v. Lazy Dog Restaurants, July 2021 (class action)

- Deposition testimony in the matter of Brittain v. United States (DOJ Natural Resources Div.), May 2021

- Deposition testimony in the matter of Michael Mendell v. American Medical Response, August 2020 (class action)

- Deposition testimony in the matter of Ademola Adetula and Homer Strickland v. United Parcel Service, January 2020.

- Hearing testimony – Cruz v. Chunga. August 2017.

- Trial testimony – Young Living Essential Oils v. doTerra. June 2017.

- 2nd deposition in the matter of Young Living Essential Oils v. doTerra. October 2016.

- Deposition in the matter of Kinum v. American Agencies. April 2016.

- Deposition in the matter of Young Living Essential Oils v. doTerra. February 2015.

- Deposition in the matter of the Utah Jazz NBA team v. individual members of the Jazz 100. October 2014.

- Deposition in the matter of California College, Inc. v. In Contact. September 2014.

- Testimony in arbitration hearing in Robinson-Patman price discrimination antitrust matter. MB Signal v. AT&T Wireless. June 2014.

- 2nd Deposition testimony in Robinson-Patman price discrimination antitrust matter. Cellular Cellutions/MB Signal v. AT&T Wireless. April 2014.



- Trial testimony in Robinson-Patman price discrimination antitrust matter – 3rd District Court, district of CO. Western Convenience Stores, Inc. v. Suncor Energy USA., March 2014.

- Deposition testimony in Robinson-Patman price discrimination antitrust matter. Cellular Cellutions v. AT&T Wireless. January 2014.

- Trial testimony in breach of contract involving alleged loss of employees to competitor, Layton Construction v. SIRQ, February 2013.

- Trial testimony in breach of contract claim involving purchase of residential and commercial development. Traverse Mountain Enterprise v. Fox Ridge Investments, November 2012

- Deposition testimony in breach of contract claim involving purchase of residential and commercial development. Traverse Mountain Enterprise v. Fox Ridge Investments, February 2011

- Presentation to Utah Public Service Commission on behalf of Utah Industrial Energy Consumers (UIEC) regarding Rocky Mountain Power's use of statistical sampling in estimating cost allocation among consumer classes. July 2010.

- Deposition testimony in matter involving alleged damages to an internet-based entertainment shopping site. PrizeWise v. Oppenheimer, November 2009.

- Presentation before the European Commission – Director General of Competition - Chief Economist's team pursuant to a paper co-authored with Mark Glick and Paul Seabright regarding competition in the computer mainframe industry. t3 Technologies v. IBM, August 2009.

- Deposition testimony in matter involving paid search advertisement bidding on competitor keywords on the Google search engine – 1-800 Contacts v. Lens.com, November 2008

- 2nd District Court, District of Utah. Trial testimony in breach of contract matter involving transfer of insurance agents to a rival firm. Farm Bureau v. American National Insurance Company, August 2008

- Testified before Administrative Law Judge on the use of the Consumer Price Index as a measure of inflation and offered testimony on inflationary pressure on fuel prices – July



2008

- Deposition testimony on statistical sampling issues, Catholic Healthcare v. Blue Cross/Blue Shield of California – March 2008

- Trial testimony in breach of contract matter involving transfer of insurance agents to a rival firm. Farm Bureau v. American National Insurance Company, November 2006

- Testified before Administrative Law Judge on the matter of whether taxicab rates in Salt Lake City should be increased as a result of increased gasoline prices resulting from Hurricanes Katrina and Rita. – January 2006

- Testified before Administrative Law Judge on the matter of whether taxicab rates in Salt Lake City should be increased to reflect inflationary trends – January 2005

- Testified before Administrative Law Judge on the matter of whether Salt Lake City should issue additional taxicab licenses – November 2004

### *Declarations*

- Dalke v. Central Michigan University, State of Michigan Court of Claims, Case No. 20-000068-MK, Nov. 17, 2020

- Horrigan v. Eastern Michigan University, State of Michigan Court of Claims, Case No. 20-000075-MK, January 29, 2021

- Stenger v. Ferris State University, State of Michigan Court of Claims, Case No. 20-000075-MK, January 29, 2021

- Zwiker v. Lake Superior State University, State of Michigan Court of Claims, Case No. 20-000070-MK, January 13, 2021

- Simmons v. Northern Michigan University, State of Michigan Court of Claims, Case No. 20-000083-MK, November 3, 2020

- Garland v. Western Michigan University, State of Michigan Court of Claims, Case No. 20-000063-MK, October 27, 2020

- Mendell v. American Medical Response, Case No. 3:19-cv-01227-BAS-KSC, Southern District of California, July 1, 2019

- Roberts v. CR England, Case No. 2:12-CV-00302-RJS-BCW, Utah, Central District



*Private & Public Sector Consulting and Litigation Experience*

**Selected Class Action, Antitrust and Intellectual Property Matters**

- Bunch et al. v. University of South Carolina (class action) – prepared expert report at class certification stage in matter involving tuition and fees refunds resulting from transition to emergency remote teaching in Spring 2020.

  *Client: Plaintiffs*

  *Law Firms: Kabat Chapman & Ozmer, Bayuk Pratt*

- Cross et al. v. University of Toledo (class action) – prepared expert report at class certification stage in matter involving tuition and fees refunds resulting from transition to emergency remote teaching in Spring 2020.

  *Client: Plaintiffs*

  *Law Firm: Milberg Coleman, New York, NY*

- Hunter et al. v. Booz Allen Hamilton et al. (class action) – prepared report in class action matter involving no-poach agreement between defense contractors

  *Client: Plaintiffs*

  *Law Firm: Saveri Law Firm, San Francisco, CA*

- Sypherd et al. v. Lazy Dog Restaurants (class action) – prepared expert report and offered deposition testimony in matter involving age discrimination claims against a restaurant chain

  *Client: Plaintiffs*

  *Law Firm: Hogue Belong, San Diego, CA*

- Michael Mendell v. American Medical Response (class action) – Prepared declaration and offered deposition testimony in class action matter involving notice of recording pursuant to California Invasion of Privacy Act (CIPA).

  *Client:  American Medical Response*

  *Law Firm: Akin Gump, Los Angeles, CA*

- Lenhoff Enterprises, Inc. v. United Talent Agency, Inc. & International Creative Management Partners, LLC:  Prepared statistical analysis and submitted declaration in the matter of regarding antitrust issues in the scripted television market.

  *Client:  Lenhoff Enterprises*

  *Firm:   Blecher Collins & Pepperman, Los Angeles, CA*



- <u>Luxe Hospitality Co. v. SBE et al.</u> - Prepared two expert reports and declaration in matter regarding trademark dispute. Prepared critique of consumer confusion and secondary meaning surveys prepared by SBE experts.

  *Client:  Luxe Hospitality Company*

  *Law Firm: Robins Kaplan, Los Angeles, CA*

- <u>Western Convenience v. Suncor</u> - Prepared expert reports and testified in deposition and trial on Robinson-Patman price discrimination matter dealing with competitive injury and antitrust damages in retail gasoline industry.

  *Client:  Western Convenience Stores*

  *Firms:  Polsinelli, Denver, CO*

  *Bennington Johnson, Biermann & Craigmile, Denver, CO.*

- <u>1-800 Contacts v. Lens.com</u> - Prepared expert report, declaration, and gave deposition testimony in matter involving trademark dispute and keyword bidding on online search engines. Prepared critique of reports prepared by 1-800 Contacts' damages and survey experts.

  *Client: Lens.com*

  *Firm: Ray Quinney & Nebeker, Salt Lake City, UT*

- <u>Sport Court v. Rhino Sports</u>: Prepared expert report in matter of in matter involving trademark dispute and keyword bidding on online search engines.

  *Client: SportCourt, Inc.*

  Law Firm: *Ray, Quinney & Nebeker, Salt Lake City, UT*

- <u>J.D. Fields, Inc. v. Nucor</u> - Retained as expert & prepared analysis on competitive injury in Robinson-Patman antitrust price discrimination matter in steel industry.

  *Client: J.D. Fields, Inc.*

  *Firm: Hill Rivkins, Houston, TX.*

- <u>Cellular Cellutions v. AT&T, M.B. Signal v. AT&T</u>: Prepared expert reports, declaration, and gave testimony at arbitration hearing in Robinson-Patman antitrust case involving price discrimination in retail cellular telephone industry.

  *Client: Cellular Cellutions, M.B. Signal*

  *Firm: Plunkett Cooney, Bloomfield Hills, MI.*

- Prepared econometric and statistical analysis in price-fixing matters in the following matters:

  *In Re Industrial Silicon Antitrust Litigation*

  *Contact Lens Antitrust Litigation*



*Commercial Tissue Antitrust Litigation*

*Flat Glass Antitrust Litigation*

*Vitamins Antitrust Litigation*

*Window Blinds Antitrust Litigation*

- Co-Authored report with Prof. Paul Seabright and Prof. Mark Glick regarding customer lock-in in the mainframe market. Presented results to European Commission-DG Comp Chief Economist's team. Matter: *t3 v. IBM litigation*.

- Prepared analysis of online advertising market pursuant to investigation of potential competitive effects of Google-DoubleClick merger.

- Prepared analysis of click-through rates, impressions, search terms, and usage rates for online search advertisements pursuant to proposed merger between Microsoft and Yahoo.

- Prepared geographic market analysis for various clients involving mergers in the defense, healthcare, explosives, aircraft engines, and others.


**Employment Discrimination, Fair Labor Standards Act, and Benefits Consulting**

- <u>Melissa Roberts v. Tim Dahle Imports</u> – Prepared expert report in matter involving the calculation of commissions on new and used automobiles.

  *Client: Tim Dahle Imports*

  *Law Firm: Ray Quinney & Nebeker, Salt Lake City*

- <u>Gutierrez v. Stericycle</u> - Prepared declaration in matter involving class action wage and hour claims for Stericycle employees in California.

  *Client: Stericycle*

  *Law Firm: Parsons Behle & Latimer, Salt Lake City, UT*

- <u>Land v. EG&G (and other cases in UT, OR, AL)</u> - Retained as expert to prepare analysis on wage and hour matters for various client locations in Utah, Oregon, Arkansas, and Alabama.

  *Clients: EG&G division of URS; Battelle Memorial Institute*

  *Law Firm: Holland & Hart, Salt Lake City, UT*

- <u>Jordt v. Federal Express</u> - Retained as consulting expert to advise on statistical matters involving claims of age discrimination.

  *Client: Federal Express Freight*

  *Law Firm: Ray Quinney & Nebeker, Salt Lake City, UT*



- <u>Gray v. Oracle</u> - Retained as consulting expert to analyze claims of age discrimination in layoff of employees from major information technology firm. Reviewed layoff records and performed logistic regression to analyze relevant factors in the layoff.

  *Client: Oracle, Inc.*

  *Law Firm: Parsons Behle & Latimer*

- Developed regression models to test for statistically significant differences in gender pay rates for big four accounting firm.

- Used parametric and nonparametric statistical techniques to compare gender promotion rates in employment discrimination litigation case.

- Developed statistical models to ensure a company undertaking layoffs is conducting the process randomly without discriminating with respect to gender, race, or age.

**Selected Breach of Contract, Non-Solicitation Provisions, and Fraud Matters**

- <u>Securities & Exchange Commission v. Colin McCabe/Elite Stock Report</u> – Prepared analysis of stock touting and impacts on stock prices. Issued expert report.

  *Client: Securities and Exchange Commission*

  *Law Firm: Securities and Exchange Commission-Nancy Ferguson-Denver Office*

- <u>Young Living Essential Oils v. doTERRA</u> – Prepared expert report, declaration, two depositions, and gave trial testimony in matter involving breach of non-solicitation agreement. Prepared statistical model of lost profits.

  *Client: Young Living Essential Oils*

  *Law Firm: Ray Quinney & Nebeker*

- LIMU v. Zija – submitted expert disclosure detailing calculation of lost revenues – case ongoing.

  *Client: LIMU*

  *Law Firm: Ray Quinney & Nebeker*

- <u>SIRQ, Inc. v. Layton Companies</u> – Prepared expert report, gave deposition and trial testimony in matter involving breach of non-solicitation agreement and breach of contract.

  *Client: Layton Companies*

  *Law Firm: Parr Brown Gee & Loveless, Salt Lake City, UT*

- Traverse Mountain Enterprises v. Fox Ridge, LLC. – Prepared expert reports, gave deposition testimony, and testified at trial in issue involving breach of contract. Valued property and investments at Traverse Mountain.

  *Client: Traverse Mountain Enterprises*

  *Law Firm: Durham Jones & Pinegar, Salt Lake City, UT*

- Farm Bureau v. American National – Gave deposition and trial testimony in matter involving non-solicitation and breach of contract.

  *Client: Farm Bureau Life Insurance*

  *Law Firm: Morgan Minnock Rice & James, Salt Lake City, UT*

- Prepared statistical and economic analysis in breach of contract/breach of non-solicitation matters in direct sales/multi-level marketing industry for clients including: Neways, Organo Gold, Max International, LIMU and others.