Steven F. Molo (*pro hac vice* pending)
Eric A. Posner (*pro hac vice* pending)
Thomas J. Wiegand (*pro hac vice* pending)
Elizabeth K. Clarke (*pro hac vice* pending)
MOLOLAMKEN LLP
300 N. LaSalle Street
Chicago, IL  60654
smolo@mololamken.com
eposner@mololamken.com
twiegand@mololamken.com
eclarke@mololamken.com
(312) 450-6700

Lois S. Ahn (*pro hac vice* pending)*
MOLOLAMKEN LLP
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
lahn@mololamken.com
(202) 556-2000

*Admitted only in New York; practice limited
to matters before federal courts and federal
agencies*

William J. Cooper (CA Bar No. 304524)
Natalie Cha (CA Bar No. 327869)
CONRAD | METLITZKY | KANE LLP
217 Leidesdorff Street
San Francisco, CA  94111
wcooper@conmetkane.com
ncha@conmetkane.com
(415) 343-7100

Alexandra C. Eynon (*pro hac vice* pending)
Catherine Martinez (*pro hac vice* pending)
Swara Saraiya (*pro hac vice* pending)
Sara Tofighbakhsh (*pro hac vice* pending)
MOLOLAMKEN LLP
430 Park Avenue
New York, NY  10022
aeynon@mololamken.com
cmartinez@mololamken.com
ssaraiya@mololamken.com
stofighbakhsh@mololamken.com
(212) 607-8160

*Counsel for Objectors*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

IN RE COLLEGIATE ATHLETE NIL
LITIGATION

Case No. 4:20-cv-03919-CW

**OBJECTION TO SETTLEMENT
AGREEMENT AND OPPOSITION TO
MOTION FOR PRELIMINARY
SETTLEMENT APPROVAL**

Hon. Claudia Wilken
Hearing Date: September 5, 2024
Hearing Time: 2:30 p.m.
Location: Courtroom 2, 4th Floor

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 2

I.    The Objectors ........................................................................................ 2

II.    Procedural History ................................................................................ 3

III.    The Settlement ...................................................................................... 5

    A.    The Settlement Classes ............................................................. 5

    B.    The Settlement Payments ......................................................... 6

        1.    The NIL Claims Settlement Payments ......................... 6

        2.    The Additional Compensation Claims Settlement Payments ................... 7

    C.    The Injunctive Relief Settlement .............................................. 8

STATEMENT OF THE ISSUE TO BE DECIDED ........................................... 9

ARGUMENT ...................................................................................................... 9

I.    The Settlement Discriminates Against Women Athletes ...................... 10

    A.    The Settlement Undercompensates Women's NIL Damages ............................. 10

    B.    The Settlement Does Not Account for Lost Scholarships ..................... 12

II.    The Settlement Substitutes One Anticompetitive Agreement for Another ..................... 14

    A.    The Settlement Creates a Price-Fixing Cartel for Student Athletic Services ....... 14

    B.    The Settlement Creates a Price-Fixing Cartel for NIL Rights ............................. 17

III.    The Settlement Is a Backdoor Attempt To Cut Off Student-Athlete Claims for Fair Employment Compensation ................... 18

    A.    The Additional Compensation Settlement Fund Does Not Adequately Compensate Student-Athletes for Their Athletic Services ................... 18

i

B.    The Settlement Unfairly Forecloses Student-Athletes from Pursuing Employment-Related Claims Against the NCAA and Its Member Conferences and Schools ....................................................................... 20

IV.    Other Factors Cast Serious Doubt on Whether the Settlement Can Be Approved as Fair, Adequate, and Reasonable............................................................................ 21

CONCLUSION ............................................................................................................................ 23

ii

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Allen v. Bedolla*,
   787 F.3d 1218 (9th Cir. 2015) ...............................................................9

*Amchem Prod., Inc. v. Windsor*,
   521 U.S. 591 (1997)..............................................................................21, 22

*Arizona v. Maricopa Cnty. Med. Soc.*,
   457 U.S. 332 (1982)................................................................................18

*Briseño v. Henderson*,
   998 F.3d 1014 (9th Cir. 2021) ...............................................................23

*Catalano, Inc. v. Target Sales, Inc.*,
   446 U.S. 643 (1980) ...............................................................................16

*In re College Athlete NIL Litig.*,
   No. 20-cv-03919-CW, 2023 WL 7106483 (N.D. Cal. Sept. 22, 2023) ......................3, 4

*In re College Athlete NIL Litig.*,
   No. 20-cv-03919-CW, 2023 WL 8372787 (N.D. Cal. Nov. 3, 2023) ......................3

*In re Hewlett-Packard Co. S'holder Derivative Litig.*,
   No. 3:12-cv-06003-CRB, 2014 WL 7240144 (N.D. Cal. Dec. 19, 2014) ..............................20

*Johnson v. NCAA*,
   108 F.4th 163 (3d Cir. 2024) ..................................................................19

*Keener v. Exxon Co., USA*,
   32 F.3d 127 (4th Cir. 1994) ....................................................................18

*Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*,
   340 U.S. 211, 213 (1951) .......................................................................18

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*,
   375 F. Supp. 3d 1058 (N.D. Cal. 2019) ...............................................15, 17

*NCAA v. Alston*,
   594 U.S. 69 (2021)..............................................................14, 17, 18, 19

*NCAA v. Bd. of Regents of Univ. of Okla.*,
   468 U.S. 85 (1984).................................................................................14

iii

*O'Bannon v. NCAA,*
    802 F.3d 1049 (9th Cir. 2015) ............................................................14, 17

*Ollier v. Sweetwater Union High Sch. Dist.,*
    858 F. Supp. 2d 1093 (S.D. Cal. 2012) .........................................................11

*Texaco Inc. v. Dagher,*
    547 U.S. 1 (2006) .............................................................................................14

*Uschold v. NSMG Shared Servs., LLC,*
    333 F.R.D. 157 (N.D. Cal. 2019) ...............................................................9, 13

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.,*
    No. 16-md-02752-LHK, 2019 WL 387322 (N.D. Cal. Jan. 30, 2019) ...........20, 23

### STATUTES, REGULATIONS, AND RULES

15 U.S.C. § 1 ............................................................................................................14

20 U.S.C. § 1681 ......................................................................................................13

Fed. R. Civ. P. 23(e)(2) ...................................................................................2, 9, 16

Fed. R. Civ. P. 23(e)(3) ..............................................................................................9

34 C.F.R. § 106.37(c) ...............................................................................................13

34 C.F.R. § 106.41 ...................................................................................................13

34 C.F.R. § 106.41(c)(10) ........................................................................................11

44 Fed. Reg. 71417 (1979) .......................................................................................11

### OTHER AUTHORITIES

*Division I Athletics Finances 10-Year Trends from 2013-22*, NCAA Research
    (Dec. 2023), https://bit.ly/3WWI8cY .........................................................16

Dennis Dodd*, Why Revenue Sharing with College Athletes Remains Complicated
    amid Antitrust Settlement Pushing Forward*, CBS Sports (Aug. 1, 2024),
    https://bit.ly/3YD7f67 ........................................................................9, 17, 23

Seth Emerson & Scott Dochterman, *105 Is College Football's New Key Number.
    What Will It and Other NCAA Roster Caps Change?*, N.Y. Times
    (July 30, 2024), https://nyti.ms/3yo9wr8 ....................................................16

iv

Kaplan Hecker & Fink LLP, *NCAA External Gender Equity Review Phase I: Basketball Championships* (Aug. 2, 2021) ...........................................................11

*Historical U.S. Inflation Rate By Year: 1929 to 2024*, Investopedia (July 31, 2024), https://bit.ly/46CuBL3 .........................................15

Kenny Jacoby, Rachel Axon, Lindsay Schnell & Steve Berkowitz, *Female Athletes Stiffed on Scholarships at Some of the Biggest Colleges in the Country*, USA Today (Aug. 17, 2022), https://bit.ly/4djiN2M ........................................12, 13

Brandon Marcello, *College Athletes Set to Get $2.8 Billion, Revenue-Sharing Model in Landmark House v. NCAA Settlement*, CBS Sports (May 23, 2024), https://bit.ly/4ddp6F5............................................................................9, 22

*Minimum Wage*, U.S. Dep't of Labor, https://bit.ly/4fvCJRs (last accessed Aug. 7, 2024) ....................................................................19

NCAA Convention, *GOALS Study: Understanding the Student-Athlete Experience*, https://bit.ly/3WE7BXm ...........................................................19

N.L.R.B. Gen. Couns. Mem. 21-08 (Sept. 29, 2021) ...........................................19

Vanessa Romo, *Women's NCAA Championship TV Ratings Crush the Men's Competition*, NPR (Apr. 10, 2024), https://n.pr/3WB04Zv...........................................11

Tom Schad & Steve Berkowitz, *Why College Football is King in Coaching Pay – Even at Blue Blood Basketball Schools*, USA Today (Oct. 3, 2023), https://bit.ly/3AinVFQ............................................................................15

U.S. Dep't of Educ. Office for Civil Rights, OCR-00019-20*, Dear Colleague Letter: Bowling Green State University*, (July 23, 1998), https://bit.ly/3SCCRoj............................................................................13

v

**<u>INTRODUCTION</u>**

Throughout the history of college athletics, women have been treated as second class citizens.  Notwithstanding the high level of competition and the excitement that they generate – one need look no further than Caitlin Clark and Katie Ledecky – women athletes have gotten the short end of the stick.  The settlement Class Counsel propose (the "Settlement") is more of the same.

Class Counsel proclaim they have negotiated a "revolutionary settlement agreement" that will "reshape the economic landscape of college sports" and benefit "future college athletes." Dkt. 450 ("Mot.") 1.  True – but only for male football and basketball players.  The bulk of the Settlement is dedicated to compensation for lost "NIL" opportunities, calculated in a way that vastly favors male athletes (especially football and basketball players).  And 90% of the "Additional Compensation" is reserved expressly for football and men's basketball.  Mot. 12. Just 5% will be allocated to women's basketball.  *Id.*  The remaining 5% will be divided among ***every other Division I college athlete***.  A male football player may receive hundreds of thousands of dollars, while a female swimmer might receive $125 or less.

The problems do not stop there.  The complaint alleges that the NCAA maintained an illegal price-fixing cartel.  Instead of remedying that violation, the Settlement simply establishes a new cartel with different terms.  A remedy that merely repeats the original illegal conduct is no remedy at all.

The Settlement's release is equally troubling.  For four years, the parties have litigated claims based on price-fixing relating to student-athlete ***NIL rights***.  But the release sweeps in ***all*** claims arising out of the NCAA and conference rules – including, among others, claims that athletes are entitled to be ***paid a fair wage*** for their labor.  Class Counsel's eleventh-hour amendment to the complaint does not cure this asymmetry.

The Settlement is also riddled with conflicts that call into question the adequacy of the class representatives and Class Counsel.  No student-athletes were offered a seat at the bargaining table.

1

The Settlement is deeply flawed and far from "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  Preliminary approval should be denied.

## BACKGROUND

### I.     THE OBJECTORS

Objectors are student-athletes who are members of the "Additional Sports Class" and the "Injunctive Relief Settlement Class" as defined in the Settlement.  *See* Dkt. 450-3 ("Settlement") ¶ 1(n)(3), (z).

Grace E. Menke was a member of Yale University's NCAA Division I crew team for four years, serving as its captain during her senior year, 2023-2024.  Menke began rowing at Yale in fall 2019, and missed the 2020-2021 season due to the COVID pandemic.  Menke is currently preparing to apply to medical school.

Flannery Dunn is a member of George Washington University's NCAA Division I crew team, attending school on an athletic scholarship since fall 2020.  Dunn plans to compete in the upcoming 2024-2025 season.  Dunn graduated with a B.A. degree in December 2023 and is currently a graduate student in George Washington's School of Media and Public Affairs.

Mia Levy is a member of Yale University's NCAA Division I crew team, and will be rowing as the team's captain during her senior year, 2024-2025.  Levy was named the 2023 U.S. Rowing Under-23 Female Athlete of the Year and won a gold medal at the World Rowing Championships as a member of the U.S. Under-23 National Team.  Levy is an English major who received Scholar Athlete honors from the Collegiate Rowing Coaches Association in 2024.

Madison Moore is a member of Yale University's NCAA Division I crew team, and will be rowing as a senior in 2024-2025.  Among her many accomplishments in the sport of rowing, Moore rowed as a member of the U.S. national team, competing at the Under-23 World Rowing Championships in 2023.  Moore is a Psychology major who received Scholar Athlete honors from the Collegiate Rowing Coaches Association in 2024.

Sierra Bishop was a member of Oregon State University's NCAA Division I crew team from 2018 to 2023.  Bishop attended Oregon State on an athletic scholarship and was a member

2

OBJECTION TO SETTLEMENT AGREEMENT AND
OPPOSITION TO MOTION FOR PRELIMINARY SETTLEMENT APPROVAL
CASE NO. 4:20-CV-03919-CW

1  of the 2021 U.S. Under-23 National Team.  Bishop won a gold medal at the World Rowing
2  Championships and was honored as an All-American athlete in 2021 and 2022, nominated for
3  NCAA woman of the year in 2022, received Scholar Athlete honors from the Collegiate Rowing
4  Coaches Association in 2022 and 2023, and awarded the PAC-12 Thomas C. Hansen Conference
5  Medal in 2023.  Bishop graduated with honors with a B.S. degree in business administration in
6  2022 and earned a M.B.A. in supply chain and logistics management in 2023.

7  Etta Carpender was a member of the University of Texas's NCAA Division I crew team
8  from 2018 to 2020 and 2021 to 2024.  Carpender competed as both an undergraduate and graduate
9  student and rowed for Texas when it won the NCAA Championship in 2022 and 2024.

## II.     PROCEDURAL HISTORY

11  This action began in 2020 as two separate lawsuits challenging the NCAA and conference
12  defendants' restrictions on college athletes' ability to profit from their "name, image, and
13  likeness," or "NIL."  *See* Dkt. 164 ¶ 3 & n.2.  In those lawsuits, which were consolidated as *In re*
14  *College Athlete NIL Litigation*, Dkt. 154, plaintiffs alleged that defendants conspired to fix the
15  compensation that Division I student-athletes could receive for use of their NIL, in violation of
16  the Sherman Act.  Dkt. 164 ¶¶ 96, 322-344.  The complaint alleged, among other things, that the
17  NIL restrictions "have adversely affected female athletes more than their male counterparts,"
18  because "the NCAA promotes female sports less than it does male sports."  *Id.* ¶ 227.

19  Based on that complaint, the Court certified three "damages classes": (1) the "Football
20  and Men's Basketball Class," consisting of male football and basketball players at "Power Five"
21  schools (and Notre Dame) who received full scholarships; (2) the "Women's Basketball Class,"
22  consisting of female basketball players at the same schools who received full scholarships; and
23  (3) the "Additional Sports Class," consisting of any Division I athletes who had received NIL
24  compensation and were not part of the other two classes.  *In re College Athlete NIL Litig.*, No.
25  20-cv-03919-CW, 2023 WL 8372787, at *3-4, *27 (N.D. Cal. Nov. 3, 2023) ("*NIL I*").  The
26  Court also certified an "Injunctive Relief Class" consisting of all athletes who competed on a
27  Division I athletic team during a specified time period.  *In re College Athlete NIL Litig.*, No. 20-

3

1    cv-03919-CW, 2023 WL 7106483, at *7 (N.D. Cal. Sept. 22, 2023).  The Court appointed Class

2    Counsel to represent all classes.  *Id.*; *NIL I*, 2023 WL 8372787, at *27.

3         In December 2023, after class certification in *NIL Litigation*, Class Counsel filed *Carter*

4    *v. NCAA*, No. 3:23-cv-6325-RS (N.D. Cal.).  Unlike *NIL Litigation*, which focused on NIL

5    restrictions, *Carter* challenged the NCAA's restrictions on compensation for "athletic services."

6    *Carter v. NCAA*, No. 3:23-cv-06325-RS (N.D. Cal. Dec. 7, 2023), Dkt. 1 ¶ 1.  The *Carter* plaintiffs

7    alleged that, due to the defendants' anticompetitive conduct, student-athletes were deprived of

8    their fair share of the "billions of dollars" they generated for the NCAA, the conferences, and

9    their schools.  *Id.* ¶¶ 1, 190-200, 202-212.  The *Carter* action is still in its infancy.  Defendants

10   have not responded to the complaint, discovery has not begun, and no class has been certified.

11   *Carter*, No. 3:23-cv-06325, Dkt. 100.

12        Since November 2022, Class Counsel and defendants have engaged in settlement

13   negotiations in *NIL Litigation*.  Dkt. 450-2 ("Berman Decl.") ¶ 4.  After *Carter* was filed, Class

14   Counsel and the defendants "included" it in their negotiations to settle *NIL Litigation*, even though

15   the allegations are different and the case is just getting off the ground.  Berman Decl. ¶ 8.

16        In spring 2024, Class Counsel and defendants reached a settlement covering both *NIL*

17   *Litigation* and *Carter*.  Berman Decl. ¶ 8.  To facilitate settlement approval, Class Counsel

18   prepared a Second Consolidated Amended Complaint in the *NIL Litigation* action.  That

19   complaint adds the claims raised in *Carter* relating to "athletic services."  *See, e.g.*, Dkt. 448-2

20   ¶¶ 6-11.  It also seeks to certify essentially the same damages and injunctive relief classes certified

21   in *NIL Litigation* – the only difference being that the "Additional Sports Class" now includes ***all***

22   Division I athletes, not just those who received NIL compensation, Dkt. 448-1 ¶ 303.  The new

23   consolidated complaint continues to allege that female athletes were uniquely harmed by

24   defendants' anticompetitive conduct due to, among other things, the NCAA's failure to promote

25   female sports.  *See id.* ¶¶ 229-233.

26

27

28

4

OBJECTION TO SETTLEMENT AGREEMENT AND
OPPOSITION TO MOTION FOR PRELIMINARY SETTLEMENT APPROVAL
CASE NO. 4:20-CV-03919-CW

III.     **THE SETTLEMENT**

The Settlement Agreement enacts sweeping changes to NCAA rules and "fully" and "finally" discharges "all claims that have been or could have been asserted against Defendants' rules regarding monies and benefits that may be provided to student-athletes, scholarship limits, and roster limits." Dkt. 450-3 ("Settlement") § B.2, at 2 & Recitals. It awards $2.576 billion to student-athletes – mostly male football and basketball players – and provides injunctive relief allowing schools to compensate their students for athletic services annually up to a defined per-school cap. Settlement § A.1(w), (ee), (c); *id.* § B.2.

A.     **The Settlement Classes**

Under the Settlement, payments would be made to members of three Settlement Classes: (1) the Football and Men's Basketball Class; (2) the Women's Basketball Class; and (3) the Additional Sports Class. Settlement § A.1(n). The members of the Football and Men's Basketball Class and the Women's Basketball Class are student-athletes who (i) have received or will receive full grant-in-aid scholarships, (ii) compete on, competed on, or will compete on a Football Bowl Subdivision ("FBS") football team or a Division I men's basketball team, or a Division I women's basketball team, at a Power Five school (including Notre Dame), and (iii) have been or will be declared initially eligible for competition in Division I at any time from June 15, 2016 through September 15, 2024. *Id.* The members of the Additional Sports Class are all student-athletes (other than members of the Football and Men's Basketball and Women's Basketball Classes) (i) who compete on, competed on, or will compete on a Division I athletic team and (ii) who have been or will be declared initially eligible for competition in Division I at any time from June 15, 2016 through September 15, 2024. *Id.*

There is a single class for the injunctive relief settlement, the Injunctive Relief Settlement Class, that consists of "[a]ll student-athletes who compete on, competed on, or will compete on a Division I athletic team at any time between June 15, 2020 through the end of the Injunctive Relief Settlement Term." Settlement § A.1(z).

5

OBJECTION TO SETTLEMENT AGREEMENT AND
OPPOSITION TO MOTION FOR PRELIMINARY SETTLEMENT APPROVAL
CASE NO. 4:20-CV-03919-CW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.      The Settlement Payments**

The Settlement provides for two types of settlement payments: (1) the Name, Image, and Likeness ("NIL") Claims Settlement payments and (2) the Additional Compensation Claims Settlement payments.  Settlement § A.1(w).  Nearly 77% of the $2.576 billion settlement pool, or $1.976 billion, is allocated to the NIL claims.  *Id.* § A.1(ee).  The remaining $600 million, broadly labeled the "Additional Compensation Claims Settlement Amount," compensates for so-called "athletic services."  *Id.* § A.1(c); Dkt. 450-4 ("Rascher Decl.") ¶ 3.  That amount is intended to cover all other (non-NIL) injuries released under the Settlement.  Settlement § C.3.

In support of their Motion for Preliminary Settlement Approval, Class Counsel submitted a declaration from their economic expert Daniel A. Rascher, who previously submitted reports in the litigation related to NIL compensation damages to Division I student-athletes.   Rascher proposes an allocation of settlement payments among the members of the three Settlement Classes.  Rascher Decl. ¶¶ 7-81.

*1.      The NIL Claims Settlement Payments*

Rascher divides the $1.976 billion NIL Claims Settlement payments into (1) the Video Game NIL payments ($71.5 million),[1] (2) the Broadcast NIL payments ($1.815 billion),[2] and (3) the Lost NIL Opportunity payments ($89.5 million).[3]  Rascher Decl. ¶ 15.  He distributes the NIL Claims Settlement payments among student-athletes based on the market demand for the use of their NIL.  *See id.*  In focusing solely on student-athletes' ability to achieve NIL earnings, Rascher ignores that men's sports, as compared to women's sports, have historically enjoyed far greater investment from the NCAA and schools, including in the promotion of their events.

---

[1] The Video Game NIL payments represent the royalty payments student-athletes would receive as compensation for the use of their NIL in video games.  Rascher Decl. ¶ 19 & Exs. 1, 2.

[2] The Broadcast NIL payments represent the share of the Power Five conferences' broadcast revenue student-athletes would receive for the use of their NIL.  Rascher Decl. ¶ 25.

[3] The Lost NIL Opportunity payments are intended to compensate for lost NIL earning opportunities and would be paid only to student-athletes across the three damages Settlement Classes with verifiable third-party NIL compensation after July 1, 2021, that participated in Division I college athletics prior to that date.  Rascher Decl. ¶ 31.

1    The Settlement reserves the lion's share of the NIL Claims Settlement payments for male
2    football and basketball athletes.  One hundred percent of the Video Game NIL payments, or $71.5
3    million, go to male football and basketball players.  *See* Rascher Decl. ¶15; *id.*, Ex. 3.  Ninety-
4    six percent of the Broadcast NIL payments – which total $1.815 billion or 92% of the overall NIL
5    Claims Settlement payments – are reserved for male athletes.  *See id.* ¶15 & Ex. 5.  Almost 60%
6    of the Lost NIL Opportunity payments go to the Football and Men's Basketball Class, less than
7    4% to the Women's Basketball Class, and approximately 37% to the Additional Sports Class.  *See*
8    *id.* ¶31.  Rascher does not state how the payments to the Additional Sports Class are distributed
9    between male and female athletes.  *See id.*  But even under the conservative (and unlikely)
10   assumption that all the Additional Sports Class payments go to women athletes, the majority
11   (nearly 60%) of the overall Lost NIL Opportunity payments still go to men.  And under that same
12   conservative assumption, ***almost 95%*** of the total NIL payments, approximately $1.872 billion,
13   are allocated to male football and basketball players.

14                    2.      *The Additional Compensation Claims Settlement Payments*

15   The Additional Compensation settlement pool, which is intended to compensate for
16   "athletic services," totals $600 million.  Of that $600 million, 90% ($540 million) goes to male
17   Power Five football and basketball players.  Rascher Decl. ¶48.  Just 5% ($30 million) goes to
18   female Power Five basketball players.  *Id.*  The remaining 5% ($30 million) is divided among the
19   Additional Sports Class – that is, all other Division I athletes.  Assuming again that all the
20   damages to the Additional Sports Class are allocated to female athletes (which, again, is not
21   likely), 90% ($540 million) of the Additional Compensation Claims Settlement Amount would
22   still be expressly reserved for male athletes.

23   Under Rascher's method for compensating student-athletes for their athletic services, an
24   average football player at a Power Five school is compensated approximately $12,000 to $14,000
25   per year for "athletic services."  *See* Rascher Decl. ¶56.  An average men's basketball player is
26   compensated approximately $16,000 to $18,000 per year.  *See id.* ¶61.  An average women's

27
28

1   basketball player is compensated approximately $4,500 to $5,300 per year.  *See id.* ¶66.  And a

2   female Division I rower is compensated approximately $125 per year.  *See id.* ¶81.[4]

3       ### C.      The Injunctive Relief Settlement

4           The injunctive relief component of the Settlement creates new NCAA and conference

5   rules for athlete compensation, effective for the next ten years.  Settlement App'x A ("Injunctive

6   Relief Settlement").

7           The Settlement permits schools to pay students for their athletic services (over and above

8   the scholarships and other benefits currently permitted by the NCAA) up to an annual per-school

9   cap.  That cap is set at 22% of the average of the schools' shared revenue, which Rascher estimates

10  at about $23.1 to $32.9 million annually.  Injunctive Relief Settlement art. 3, §1(d)-(e); Rascher

11  Decl. Ex. 25.[5]  Within that cap, schools can allocate compensation as they choose.  Injunctive

12  Relief Settlement art. 3, §2.

13          The Settlement authorizes NCAA and the Power Five conferences to prohibit student-

14  athletes from entering into private NIL agreements with "Boosters" – a term that encompasses

15  "any individual, independent agency, corporate entity (e.g. apparel or equipment manufacturer)

16  or other organization" that has promoted or assisted the school's athletic department or the

17  student-athlete – unless the NCAA or the conferences determine that the agreement is "for a valid

18  business purpose" on "terms commensurate with compensation paid to similarly situated

19  individuals."  Injunctive Relief Settlement art. 1, §1(c), art. 4, §3(a); NCAA Bylaw 13.02.16

20  (defining "representative of athletic interests").  Any NIL deals valued over $600 must be

21

22

23  [4] The payout may be significantly less.  The table of estimated settlement recoveries appended to Class
    Counsel's Motion for Preliminary Approval estimates that the vast majority of "Additional Sports" athletes
24  will receive just $50.  Mot. 41.  The reason for the disparity between that estimate and Rascher's $125-
    per-year figure is unclear.  It is worth noting that only athletes who make claims will be paid, and Rascher
25  estimates a claim rate of just 15%.  Rascher Decl. ¶81.

26  [5] Over the course of the ten-year settlement term, the average shared revenue that serves as the basis for
    the per-school cap would be recalculated every three years, and in between recalculation years, the average
27  shared revenue would increase annually by 4% over the previous year's amount.  Injunctive Relief
    Settlement, art. 3, §1(e)-(f).
28

1   submitted by the student-athlete to their schools and the NCAA.  Injunctive Relief Settlement art.

2   2, § 4.[6]

3                   **STATEMENT OF THE ISSUE TO BE DECIDED**

4           Whether the Court should preliminarily approve the Settlement.

5                                **ARGUMENT**

6           In deciding whether to grant preliminary approval to a class action settlement, the Court

7   must consider whether " 'the proposed settlement appears to be the product of serious, informed,

8   noncollusive negotiations, has no obvious deficiencies, does not improperly grant preferential

9   treatment to class representatives or segments of the class, and falls within the range of possible

10  approval.' "  *Uschold v. NSMG Shared Servs., LLC*, 333 F.R.D. 157, 169 (N.D. Cal. 2019).

11          Because " 'settlement class actions present unique due process concerns for absent class

12  members,' "  the court "has a fiduciary duty to look after the interests of those absent class

13  members."  *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015).   Approval requires a

14  determination that the Settlement is "fair, reasonable, and adequate."  In reaching its conclusion,

15  the court must consider whether "(A) the class representatives and class counsel have adequately

16  represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for

17  the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the

18  effectiveness of any proposed method of distributing relief to the class, including the method of

19  processing class-member claims; (iii) the terms of any proposed award of attorney's fees,

20  including timing of payment; and (iv) any agreement required to be identified under Rule

21  23(e)(3); and (D) the proposal treats class members equitably relative to each other." Fed. R. Civ.

22  P. 23(e)(2).

23

24  ────────────────

    [6] The Settlement requires that the disclosure be made to an undefined "Designated Reporting Entity."
25  Media reports explain that this will be an "NCAA clearinghouse."  The settlement is unclear as to whether
    the enforcement and policing of NIL deals will be done by the NCAA, the conferences, or the schools.
26  Dennis Dodd, *Why Revenue Sharing with College Athletes Remains Complicated amid Antitrust
    Settlement Pushing Forward*, CBS Sports (Aug. 1, 2024), https://bit.ly/3YD7f67; Brandon Marcello,
27  *College Athletes Set To Get $2.8 Billion, Revenue-Sharing Model in Landmark House v. NCAA Settlement*,
    CBS Sports (May 23, 2024), https://bit.ly/4ddp6F5.
28

                                           9

The Settlement fails to meet the standard for preliminary approval.  It discriminates against female athletes; establishes a price-fixing cartel; and bargains away claims that have nothing to do with the original complaint in this action.  The pervasive intraclass conflicts and attorney-fee provisions suggest potentially collusive negotiation.  In short, it is riddled with "preferential treatment" and "obvious deficiencies."

## I.     THE SETTLEMENT DISCRIMINATES AGAINST WOMEN ATHLETES

As the complaint recognizes, women athletes have been disproportionately harmed by the NCAA's anticompetitive rules and practices.  The NCAA's failure to promote women's sports depressed the value of female athletes' NIL over decades, and the NCAA's scholarship cap denied women scholarships that would otherwise have been available under Title IX.  Yet, instead of compensating those injuries, the Settlement perpetuates the same inequalities it should remedy.  The result is a stunning disparity in compensation – well over **90%** of the settlement proceeds will be paid to male athletes.  By reinforcing wrongful gender inequities instead of remedying them, the Settlement is a major setback for efforts to achieve gender equity in college athletics.

### A.     The Settlement Undercompensates Women's NIL Damages

Under the Settlement, nearly all women (aside from select basketball players) will be paid around $125, while thousands of male football players and basketball players will be paid more than $100,000.  *See* Rascher Decl. ¶33 & Ex. 6; *id.* ¶51.  That disparity occurs because settlement payments are allocated in proportion to historic college sports revenues.[7]  But those historic figures are a result of the NCAA's discriminatory practices, which specifically harmed women.

The NCAA historically depressed the value of women athletes' NIL by failing to invest in promoting women's sports.  A 2021 report commissioned **by the NCAA itself** found that "the

---

[7] Class Counsel's motion explains that the distributions are allocated across the three Settlement Classes according to Rascher's damages methodology previously presented in his class certification and merits reports. Mot. 11.  Rascher's declaration filed in support of the motion similarly refers to the methodology presented in those previous reports.  *See* Rascher Decl. ¶¶ 19, 25, 31.  Those reports are sealed or otherwise unavailable to Objectors.  In explaining his methodology for dividing the Athletic Services settlement amount across the classes, however, Rascher explains that the skewed allocations heavily favoring football and men's basketball classes track the "estimated share of value each sport contributed to the value of regular reason broadcast deals," which "account for a large share of athletic revenue." *Id.* ¶48.

NCAA's broadcast agreements, corporate sponsorship contracts, distribution of revenue, organizational structure, and culture all prioritize Division I men's basketball over everything else in ways that create, normalize, and perpetuate gender inequities."[8]   One high-profile example is the NCAA's exclusion of women's basketball from the highly valuable "March Madness" branding.  Prior to 2022, the NCAA reserved "March Madness" for men's basketball.[9]  This year's NCAA women's basketball championship game – promoted as part of "March Madness" – drew a television audience of *18.7 million viewers, a larger audience than the men's final*.  Vanessa Romo, *Women's NCAA Championship TV Ratings Crush the Men's Competition*, NPR (Apr. 10, 2024), https://n.pr/3WB04Zv.  That example illustrates that, properly promoted, women's sports are capable of generating interest and revenue equaling or surpassing men's sports.  But the NCAA's unfair promotion and investment have boosted men's marketability – and NIL rights – while artificially depressing women's.

Absent the NCAA's anticompetitive conduct, women's NIL values would have been higher.  Title IX regulations *require* schools to spend equal promotional resources on men's and women's teams.  *See* 34 C.F.R. § 106.41(c)(10); U.S. Dep't of Educ., Off. for Civil Rights, Policy Interpretation: Title IX and Intercollegiate Athletics, 44 Fed. Reg. 71417 (1979) (codified at 45 C.F.R. Part 86); *Ollier v. Sweetwater Union High Sch. Dist.*, 858 F. Supp. 2d 1093, 1107 (S.D. Cal. 2012) (finding Title IX violations for inequitable publicity allocated to girls' athletics).  Unquestionably, that hasn't occurred.  And but for the NCAA rules, female athletes could have promoted and monetized their own brands.  But the NCAA's prohibition on college athletes profiting from their NIL channeled athletes into relying on the NCAA for promotion of their teams, competitive events, and personal brands.  Thus, due to the NCAA's practices, women

---

[8] Kaplan Hecker & Fink LLP, *NCAA External Gender Equity Review Phase I: Basketball Championships* 2 (Aug. 2, 2021) ("Kaplan Hecker Phase I Report").

[9] Kaplan Hecker Phase I Report 8-9, 37-40.  The summary of the 2021 report, recounted above, hardly covers all the ways the NCAA failed to capture tens of millions, if not hundreds of millions, in revenue from media contracts for broadcasting women's college basketball.  *See id.* at 8-9.  The valuations cited in the report, moreover, relied on the independent analysis of the same sports media expert in this litigation, Ed Desser.  *See id.*

11

OBJECTION TO SETTLEMENT AGREEMENT AND
OPPOSITION TO MOTION FOR PRELIMINARY SETTLEMENT APPROVAL
CASE NO. 4:20-CV-03919-CW

athletes were systematically and disproportionately injured by the NCAA's anticompetitive conduct.

The lost value of these individual deals cannot be exaggerated. For instance, the plaintiffs allege that as soon as college superstars like Katie Ledecky and Sabrina Ionescu were free of the NCAA's rules, they succeeded wildly – and lucratively – in promoting and monetizing their athletic careers. Dkt. 448-1 ¶¶280-282. But for the NCAA's failure to promote women's sports, more women would have achieved similar opportunities at the college level.

The Settlement fails to account for those harms to women. Instead, it perpetuates the very inequities the NCAA itself created by distributing the NIL damages pool in proportion to the tainted NIL damages figures. The same inequities exist in the Additional Compensation pool, which also favors revenue-generating sports. The thousands of female athletes who are allocated $125 in recognition of the fact that they must have contributed *some* value to their schools – even if they did not generate revenues – are penalized because the NCAA and the schools never *tried* to monetize those sports. *See* Rascher Decl. ¶48. The deficient NIL calculations thus taint the entire damages settlement.

## B. The Settlement Does Not Account for Lost Scholarships

The Settlement also undercompensates women by omitting compensation for lost scholarship opportunities while forcing releases of claims for those losses. *See* Dkt. 448-2 ¶¶110-113, 122-23, 304 (amending complaint to add allegations related to lost scholarships); Settlement § A.1(oo). That omission disproportionately harms women athletes who have been systematically denied athletic scholarships due to the NCAA's anticompetitive scholarship caps.

Historically, NCAA rules have limited the overall number of athletic scholarships schools can offer per sport. Those limits are skewed against women. "While [NCAA] limits let schools place up to 85 football players on full-ride scholarships, no women's sport has a limit higher than 20." *See* Kenny Jacoby, Rachel Axon, Lindsay Schnell & Steve Berkowitz, *Female Athletes Stiffed on Scholarships at Some of the Biggest Colleges in the Country*, USA Today (Aug. 17, 2022), https://bit.ly/4djiN2M ("*Stiffed on Scholarships*"). Schools that exceed the caps are

subject to NCAA penalties, "including championship bans, scholarship reductions, and athletes being ruled ineligible." *Id.*

The NCAA's scholarship caps have reportedly caused many schools to flout their Title IX obligations, which require schools to award athletic scholarships equitably between men and women. *Stiffed on Scholarships*, *supra*; *see* 20 U.S.C. § 1681; 34 C.F.R. §§ 106.37(c), 106.41; U.S. Dep't of Educ. Office for Civil Rights, OCR-00019-20, *Dear Colleague Letter: Bowling Green State University*, at 2-4 (July 23, 1998), https://bit.ly/3SCCRoj.   This practice is widespread and highly damaging.   In the 2020-2021 academic year alone, most of the 134 members of the NCAA's "Football Bowl Subdivision" were reportedly in violation of Title IX's equal scholarships regulations. *Stiffed on Scholarships*, *supra*.   Women lost out on ***$23.7 million*** in scholarships in a single year that they were otherwise entitled to receive under Title IX due to the NCAA's rules. *Id.*

While the Settlement provides ***no damages*** for lost scholarships, it compels class members to release ***all*** scholarship claims against the NCAA and the defendant conferences, preventing any possibility of remedy in a separate suit.   Settlement § A.1(oo) (releasing all claims, "known or unknown," "relating in any way to any NCAA or conference limitations on the numbers of scholarships allowed or permitted in any sport").   The glaring omission of ***any*** negotiated damages settlement for the value of denied athletic scholarships is itself an "'obvious deficienc[y]'" that renders the Settlement far outside the "'range of possible approval.'" *Uschold* 333 F.R.D. at 169.   It is also obviously unfair to women athletes, who are giving up claims – which are of "astronomical value" to the class – in exchange for nothing at all.   Mot. 10.[10]

---

[10] Plaintiffs pointedly decline to put a value on the additional injunctive relief, including the replacement of scholarship caps with new NCAA rules imposing higher roster limits, insisting only that it is valuable indeed.   Mot. 10.   But forward-looking injunctive relief does nothing for Additional Sports class members who have already lost scholarships they ***should*** have received, which had concrete dollar values.

13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.    THE SETTLEMENT SUBSTITUTES ONE ANTICOMPETITIVE AGREEMENT FOR ANOTHER

Under the guise of remedying antitrust violations in the market for student-athletes' labor and NILs, the parties' "ground-breaking injunctive relief" creates a new cartel to stifle the competition that this litigation was meant to restart.  Mot. 8.  NCAA Division I schools – that compete against each other for top student-athlete talent – have agreed to pay no more than a set sum each year to their student-athletes for more than a decade.  While athletes will receive more money than they do now, the Settlement imposes a system that is no less price fixing than the system this lawsuit attacks.

### A.    The Settlement Creates a Price-Fixing Cartel for Student Athletic Services

The most basic principle of antitrust law is that a horizontal agreement to fix prices violates Section 1 of the Sherman Act.  15 U.S.C. § 1; *see, e.g.*, *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) ("Price-fixing agreements between two or more competitors, otherwise known as horizontal price-fixing agreements, fall into the category of arrangements that are per se unlawful.").  Courts have repeatedly held that the NCAA has violated that Act in fixing compensation that student-athletes can earn.  *See, e.g.*, *NCAA v. Alston*, 594 U.S. 69, 90-91 (2021) (agreement to restrict education-related benefits); *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85 (1984)  (agreement to fix the price of telecasts of college football); *O'Bannon v. NCAA*, 802 F.3d 1049, 1071-72 (9th Cir. 2015) (agreement to restrict compensation for NILs).

Undeterred, the NCAA seeks to continue to fix and depress the prices for student athletics for ten years through the Injunctive Relief Settlement.  The Settlement allows for the "distribut[ion of] additional payments and/or benefits" by each Division I school "***up to a certain amount***" each academic year.  Injunctive Relief Settlement, art. 3, § 1(a) (emphasis added).  In the words of Plaintiffs' expert, the Settlement creates a "spending cap" that prohibits NCAA Division I schools from paying student-athletes any more than the agreed-upon sum until 2036.  Rascher Decl. ¶85.  In 2025-2026, the first academic year of the Settlement, that payment is

1   capped at 22% of the schools' "Average Shared Revenue"[11] – an estimated $23.1 million per

2   school.  Injunctive Relief Settlement, art. 3, § 1(g); Rascher Decl. ¶85.

3       The underpayment created by the spending cap will grow more severe over the

4   Settlement's decade-long term.  The effective share of revenues allotted to student-athletes

5   declines in most years.  In the first, fourth, and seventh years, each school's spending cap is 22%

6   of the Average Shared Revenue.  For most of the Settlement's term, however, increases in the

7   spending cap are not tied to that year's revenue but are fixed and will increase by less than 1% of

8   the prior year's revenue.  Injunctive Relief Settlement, art. 3, § 1(g).[12]

9       The anticompetitive effect of the restraint on student-athlete compensation is all the more

10  clear when considering a market where schools *do* compete for talent – the market for head

11  coaches.  There is no cap on what coaches are paid, and they are paid a lot.  The Consolidated

12  Amended Complaint alleges the University of Michigan's former head football coach, Jim

13  Harbaugh, was paid over $8 million in 2021, Dkt. 167 ("Consol. Am. Compl.") ¶14; Duke

14  University's former head basketball coach, Mike Krzyzewski, was paid $8.98 million in 2017, *id*.

15  ¶167;  and the University of Alabama's former head football coach, Nick Saban, was paid $11

16  million that same year, *id.*  Those salaries have increased by double-digit percentages in the years

17  since the Complaint was filed.  Tom Schad & Steve Berkowitz, *Why College Football Is King in*

18  *Coaching  Pay – Even at Blue Blood Basketball Schools*, USA Today (Jan. 31, 2024),

19  https://bit.ly/3AinVFQ.  A top coach's salary equals about half the value of all the scholarships a

20  school might award in a year.  There is no reason student-athletes should be barred from receiving

21  the price that schools are willing to pay for their athletic talent.

22

23

24  [11] Average Shared Revenues are defined as the sum of the "Shared Revenue for all Conference Defendant
    Member Institutions, including Notre Dame, from the most recent Membership Financial Reporting

25  System Reports . . . divided by the total number of Conference Defendant Member Institutions plus Notre
    Dame." Injunctive Relief Settlement, art. 3, § 1(d).

26  [12] In most years, the settlement is the prior year's payment plus 4% of the payment.  Injunctive Relief

27  Settlement, art. 3, § 1(g).  That increase would not even keep pace with inflation.  *See Historical U.S.*
    *Inflation Rate By Year: 1929 to 2024*, Investopedia (July 31, 2024), https://bit.ly/46CuBL3 (noting

28  inflation rates between 1.4 to 8% in the last five years).

The artificially suppressed compensation that class members receive under the Injunctive Relief Settlement – unlike their coaches' free-market compensation – will not be "commensurate with the value that they create." *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1070 (N.D. Cal. 2019).  Division I annual revenues are expected to surge far past the incremental gains provided in the Settlement each year.  Between 2021 and 2022 alone, NCAA Division I schools reported a 31% increase in their total athletic revenues, jumping to $17.5 billion.  *Division I Athletics Finances 10-Year Trends from 2013-22*, NCAA Research (Dec. 2023), https://bit.ly/3WWI8cY.

The Settlement also limits the number of student-athletes that can be compensated.  Division I schools cannot award more scholarships than allotted by the sport's "roster," a set number of spots dictated by the Settlement.  Injunctive Relief Settlement, art. 4, § 1; *see also* Settlement, App'x B art. 1, § 1(g).  For many schools and sports, these roster sizes are below current and projected team sizes, which include walk-ons, and may impact their recruiting strategies.  Seth Emerson & Scott Dochterman, *105 Is College Football's New Key Number.  What Will It and Other NCAA Roster Caps Change?*, N.Y. Times (July 30, 2024), https://nyti.ms/3yo9wr8.  In a free market, schools with the resources and desire to build the best teams presumably would award scholarships beyond the settlement limit.

Moreover, like many cartel agreements, the Settlement threatens punitive discipline for those who step out of line.  Schools that seek to offer fair market compensation can suffer reduced distributions from the NCAA.  Injunctive Relief Settlement, art. 3, § 1(g).  Student-athletes who seek fair market compensation risk their eligibility.  *Id.*

That collusive, artificially depressed payment structure is not fair, reasonable, or adequate, even if it provides more compensation than student-athletes could have earned under the NCAA's previous anticompetitive restraints.  Fed. R. Civ. P. 23(e)(2); *see Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980) (per curiam).  As this Court has held, "[i]t is the fact that the prices of student-athlete compensation are fixed, as opposed to the amount at which these prices are

fixed, that renders the [NCAA's] agreements at issue anticompetitive." *Grant-in-Aid*, 375 F. Supp. 3d at 1095 (Wilkins, J.).

In sum, the Settlement – like the NCAA restrictions at the heart of this lawsuit – unlawfully "decrease[s] the compensation that student-athletes receive compared to what a competitive market would yield." *Alston*, 594 U.S. at 86.  By dictating who can receive compensation and the total compensation they can receive, the Settlement limits "competition among schools seeking to land recruits" both in dollar compensation and the number of athletes for which any school can compete. *O'Bannon*, 802 F.3d at 1071 (quotation marks omitted).  Thus, in lieu of real competition, the Settlement establishes a decade-long price-fixing cartel, perpetuating the very harm that the Sherman Act and this litigation were designed to remedy.

**B.     The Settlement Creates a Price-Fixing Cartel for NIL Rights**

The Settlement usurps the market's role in determining the fair market value for student-athletes' NIL and vests that power in the NCAA.  The Settlement also requires student-athletes to report any deals over $600 to their school and the NCAA.  Injunctive Relief Settlement, art 2, § 4.  It authorizes the NCAA and Power Five conferences to pass rules giving them veto power over student-athletes' private NIL agreements with "boosters" – a broadly defined term that encompasses "any individual, independent agency, corporate entity (e.g. apparel or equipment manufacturer) or other organization" that has promoted or assisted the school's athletic department or the student-athlete. *Id.* art. 1, § 1(c); *id.* art 4, § 3(a); NCAA Bylaw 13.02.16.  Those private agreements are prohibited unless the NCAA or the conference determines that the agreement is "for a valid business purpose" set at "terms commensurate with compensation paid to similarly situated individuals." *Id.* art. 4, § 3(a).

Thus, the Settlement transfers the right to set prices for student-athletes' NILs from the sellers and buyers to the NCAA and conferences, which are not parties to those transactions.  "College leaders" have said these provisions empower them to determine "fair market value" for NIL deals.  Dennis Dodd, *Why Revenue Sharing with College Athletes Remains Complicated amid Antitrust Settlement Pushing Forward*, CBS Sports (Aug. 1, 2024), https://bit.ly/3YD7f67

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(*"Revenue Sharing Remains Complicated"*).  But the measure of fair market value should not be set by the NCAA or conferences.  "[F]air market value" is "best set by the market itself."  *Keener v. Exxon Co., USA*, 32 F.3d 127, 132 (4th Cir. 1994).  The Settlement restrains student-athletes' " 'ability to sell in accordance with their own judgment.' "  *Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 346 (1982) (quoting *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 213 (1951)).  That restraint is illegal regardless of whether the NCAA plans to "rais[e], depress[ ], fix[ ], peg[ ], or stabiliz[e] the price" of NILs.  *Id.* at 347 (internal quotation marks omitted).

## III.   THE SETTLEMENT IS A BACKDOOR ATTEMPT TO CUT OFF STUDENT-ATHLETE CLAIMS FOR FAIR EMPLOYMENT COMPENSATION

"The NCAA's business model would be flatly illegal in almost any other industry in America" because it "suppress[es] the pay of student athletes who collectively generate **billions** of dollars in revenues for colleges every year."  *Alston*, 594 U.S. at 109-10 (Kavanaugh, J., concurring) (emphasis in original).  The Settlement does nothing to correct that injustice.  It forces class members to release their claims for compensation for their athletic services without sufficient consideration.

### A.   The Additional Compensation Settlement Fund Does Not Adequately Compensate Student-Athletes for Their Athletic Services

The Settlement purports to provide compensation for NIL and "athletic services" losses through the "Additional Compensation Settlement Fund."  *See* Mot. 18; Rascher Decl. ¶ 47 (noting that the "settlement amount related to compensation for athletic services is $600 million").  Objectors agree with Class Counsel that student-athletes deserve fair compensation for their athletic services to their schools.  But the Settlement does not provide that.  The vast majority of class members receive far less than the federal minimum wage for the hours of labor they provide to their schools and the NCAA.  That is not "adequate" in any sense.

Athletic services are real work.  Student-athletes are no different from students who serve as teaching assistants, residential advisors, or dining hall workers.  But because of the NCAA's restrictions on student-athlete compensation, student-athletes are not compensated for their labor

1    in the way other university student employees are.   Indeed, they do not receive an hourly

2    minimum wage for their services because such a wage is prohibited by the NCAA.

3        Both courts and the Executive Branch are beginning to recognize that this situation cannot

4    be squared with federal labor law.   As Justice Kavanaugh noted in his concurrence in *Alston*,

5    "[t]he NCAA concedes that its compensation rules set the price of student athlete labor at a below-

6    market rate."   *Alston*, 594 U.S. at 109.   The Third Circuit recognized just last month that

7    "[p]laying [college] sports can certainly constitute compensable work," holding that student-

8    athletes may qualify as employees under the Fair Labor Standards Act ("FLSA").   *Johnson v.*

9    *NCAA*, 108 F.4th 163, 178 (3d Cir. 2024).   The National Labor Relations Board, too, has

10   recognized that student-athletes are employees under the National Labor Relations Act.   *See*

11   N.L.R.B. Gen. Couns. Mem. 21-08 (Sept. 29, 2021).

12       Student-athletes are at the ***very least*** deserving of minimum wage under the FLSA.   But

13   the Settlement's Additional Compensation Settlement Fund – purportedly intended to compensate

14   student-athletes for their athletic services – would leave the majority of student-athletes

15   compensated at well below the federal minimum wage of $7.25 per hour.   *See Minimum Wage*,

16   U.S. Dep't of Labor, https://bit.ly/4fvCJRs (last accessed Aug. 7, 2024).   The Settlement provides

17   that most student-athletes in the Class – approximately ***380,000*** students, and by far the largest

18   single group of student-athletes overall – would receive a settlement payment of ***only $125***.   Mot.

19   40-41; Rascher Decl. ¶81.   That's less than ***seven*** hours of work per year at the federal minimum

20   wage – orders of magnitude less than the number of hours student-athletes provide to their schools

21   in athletic labor.   *See* NCAA Convention, *GOALS Study: Understanding the Student-Athlete*

22   *Experience*, at 19, https://bit.ly/3WE7BXm (citing a 2019 study showing the median number of

23   hours spent by Division I student-athletes on athletic activities in-season was 30 to 40 hours per

24   week).

25       Moreover, the Additional Compensation Settlement Fund simply adopts the same unequal

26   distribution method used with the NIL Settlement Fund, which unfairly awards the overwhelming

27   majority of money to men in the Football and Basketball Class.   *See* p. 10-12, *supra*; *see* Rascher

28

19

Decl. ¶48.  Thus, despite purporting to compensate student-athletes for their athletic services, the Additional Compensation Settlement Fund fails to account for why schools have student-athletes in the first place.  The Settlement assumes the primary value of athletic services is revenue generation, ignoring the fact that schools are non-profit organizations who employ student-athletes for other reasons.  Schools often run athletic programs to enhance school spirit or to satisfy alumni and encourage donations to the school.  Athletic programs also serve as recruitment tools to attract non-athletes to apply and attend.  The Additional Compensation Settlement Fund's inappropriate distribution of funds means that members of the Additional Sports Class – including Objectors – are vastly undercompensated for their labor in the form of athletic services.

### B.   The Settlement Unfairly Forecloses Student-Athletes from Pursuing Employment-Related Claims Against the NCAA and Its Member Conferences and Schools

The Settlement is an attempt by the NCAA and its member conferences and schools to cut off student-athletes' fair employment compensation claims at a bargain price.  Claims for "athletic services" – raised in *Carter* and still undeveloped in discovery and untested through the adversarial process – were only belatedly added to the Second Amended Consolidated Complaint.  And they were added ***solely*** for purposes of settlement.  *See* p. 4, *supra*.  Settling those claims now inappropriately gives up potentially immense value without adequate exploration of the merits.  *See, e.g.*, *In re Hewlett-Packard Co. S'holder Derivative Litig.*, No. 3:12-cv-06003-CRB, 2014 WL 7240144, at *5 (N.D. Cal. Dec. 19, 2014) ("The Court is unable to say that it is 'fundamentally fair, adequate and reasonable' to release claims unrelated to the gravamen of this case, claims whose scope and potential merit – and therefore value to the shareholders – cannot possibly be determined at this juncture."); *see also In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-md-02752-LHK, 2019 WL 387322, at *5 (N.D. Cal. Jan. 30, 2019) (rejecting release of claims not "based on the identical factual predicate" as those in the complaint).

While the athletic services claims have not yet been fully explored, there is every reason to think that settling them now for just $600 million leaves enormous value to the Class on the table.  The *Carter* plaintiffs allege that they "received less compensation and fewer benefits than

they otherwise would have received for the use of their athletic services in competitive labor markets." *Carter*, No. 3:23-cv-06325, Dkt. 1 ¶192.  And as employees, *see* p. 18-19, *supra*, student-athletes are entitled to compensation for their athletic services and entitled to pursue employment-related claims, such as those available under Title VII, Title IX, FLSA, and NLRA, against the NCAA and its member conferences and schools.

But the Settlement releases those employment-related claims.  It prevents student-athletes from ever pursing employment-related claims that could have arisen from the "previously existing NCAA and conference rules regarding monies and benefits that may be provided to student-athletes," including those rules that deprive student-athletes of fair compensation for their labor in the form of athletic services.  Mot. 10.  The Settlement therefore both severely undercompensates the vast majority of student-athletes while at the same time preventing them from ever pursuing employment-related claims under prior NCAA and conference rules.

## IV. OTHER FACTORS CAST SERIOUS DOUBT ON WHETHER THE SETTLEMENT CAN BE APPROVED AS FAIR, ADEQUATE, AND REASONABLE

The Settlement's pervasive intraclass conflicts likewise call its fairness and adequacy into question.  The Settlement strikes a single "global compromise" of *all* claims arising out of the NCAA and conference rules, regardless of the "diverse groups and individuals affected." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 627 (1997).  All classes share one damages pool; all are subject to the same injunctive relief provisions; and all give the same damages and injunctive relief releases.  *See* Settlement ¶1(c), (n), (z), (ee), (oo), (pp), (ss).  The same Class Counsel negotiated the agreement on behalf of all plaintiff groups.  Berman Decl. ¶¶4-9.  But the interests of the various class members are in conflict.

For example, the $600 million damages pool for "athletic services" is allocated according to the ***broadcast NIL revenue*** each class generates, even though the value generated by "athletic services" is not coextensive with broadcast NIL revenue.  Rascher Decl. ¶¶47-49.  That arrangement is clearly in the interests of male football and basketball players, who receive 90% of the "Additional Compensation" settlement pool.  But it is clearly not in the interests of all other

21

OBJECTION TO SETTLEMENT AGREEMENT AND
OPPOSITION TO MOTION FOR PRELIMINARY SETTLEMENT APPROVAL
CASE NO. 4:20-CV-03919-CW

athletes – women and non-football and basketball players – who are left to divide up the remaining 10%.

The Settlement likewise favors students at Power Five schools over students from all other schools. Students at Power Five schools are due to receive the lion's share of the damages pool, including *95%* of the "Additional Compensation" pool. Rascher Decl. ¶¶ 33, 48. But *all* students, from Power Five schools or otherwise, give the same settlement release. Settlement ¶¶ 19-26; *see id.* ¶ 1(n), (z), (oo), (pp). The Power Five conferences are the only defendants other than the NCAA, and plainly have used their influence on negotiations to ensure that their students and former students receive the greatest payouts from funds supplied by the NCAA and all schools with Division I teams.

The injunctive relief class is equally conflicted. By setting a cap on how much each school may pay its athletes, the Settlement entrenches a zero-sum game where class members must compete with one another for a share of the artificially limited compensation pool. *See* pp. 14-17, *supra*. In practice, those limited funds are likely to be allocated overwhelmingly to historically revenue-generating sports – particularly men's football and basketball – at the expense of all other sports. *See, e.g.*, Brandon Marcello, *College Athletes Set To Get $2.8 Billion, Revenue-Sharing Model in Landmark House v. NCAA Settlement*, CBS Sports (May 23, 2024), https://bit.ly/4ddp6F5 ("The unspoken truth among administrators is it seems unlikely they will advocate for equal pay for athletes whose sports earn less than football and men's basketball.").

Those pervasive conflicts suggest a fatal lack of adequate representation. Neither the "terms of the settlement" nor the "structure of the negotiations" here offer any assurance that the named plaintiffs "operated under a proper understanding of their representational responsibilities." *Amchem*, 521 U.S. at 627. Rather, the Settlement's extreme preferential treatment of male football and basketball players suggests that Class Counsel pursued those groups' interests to the near exclusion of the interests of other class members.

The Settlement's fee arrangement reinforces those concerns. The Settlement awards Class Counsel $20 million as an "upfront injunctive fee and cost award," which "Defendants shall not

1
2
3
4
5
6

oppose."  Settlement ¶27(a).  That is a classic "clear sailing provision" that raises the question what Class Counsel bargained away to get it.  *See Briseño v. Henderson*, 998 F.3d 1014, 1026-27 (9th Cir. 2021).  The Settlement also contains a reverter.  Because the injunctive relief fees are to be paid by the defendants, "any amount not awarded by the Court would effectively revert to Defendants rather than to the benefit of the class."  *Yahoo*, 2019 WL 387322, at *7 (N.D. Cal. Jan. 30, 2019).  The presence of such a reverter requires " 'greater scrutiny.' "  *Id.*

7
8
9
10
11
12
13

Class members have been left in the dark throughout the settlement process.  The media has reported that "[n]ot one athlete was at the table with a voice when the deal was hammered out."  *Revenue Sharing Remains Complicated*, *supra*.  Absent transparency, neither the Court nor the class members can be assured that Class Counsel zealously negotiated on behalf of absent class members – especially the women that the complaint itself recognizes were disproportionately harmed.  Based on the face of the Settlement, what they can be assured of is that their interests have not been properly accounted for.

14

## CONCLUSION

15
16

The Settlement's serious flaws render it anything but fair, reasonable, and adequate.  The Court should deny preliminary approval.

17
18
19
20
21
22
23
24
25
26
27
28

Dated: August 9, 2024

Respectfully submitted,

/s/ Steven F. Molo

Steven F. Molo (*pro hac vice* pending)
Eric A. Posner (*pro hac vice* pending)
Thomas J. Wiegand (*pro hac vice* pending)
Elizabeth K. Clarke (*pro hac vice* pending)
MOLOLAMKEN LLP
300 N. LaSalle Street
Chicago, IL  60654

Alexandra C. Eynon (*pro hac vice* pending)
Catherine Martinez (*pro hac vice* pending)
Swara Saraiya (*pro hac vice* pending)
Sara Tofighbakhsh (*pro hac vice* pending)
MOLOLAMKEN LLP
430 Park Avenue
New York, NY  10022

Lois S. Ahn (*pro hac vice* pending)*
MOLOLAMKEN LLP
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037

*Admitted only in New York; practice limited to matters before federal courts and federal agencies*

/s/ William J. Cooper

William J. Cooper (CA Bar No. 304524)
Natalie Cha (CA Bar No. 327869)
CONRAD | METLITZKY | KANE LLP
217 Leidesdorff Street
San Francisco, CA  94111

*Counsel for Objectors*