RICHARD J. VOLANTE, ESQ. (*pro hac vice forthcoming*)
ricky@volantelaw.com
**THE VOLANTE LAW FIRM, LLC**
7029 Longview Dr.
Solon, Ohio 44139
Telephone: (216) 282-6762

PETER L. KAUFMAN, ESQ. (SBN 143840)
pkaufman@ebizlegal.com
**KAUFMAN ENTERTAINMENT LAW GROUP, PC**
26565 West Agoura Road, Suite 200
Calabasas, California 91302
Telephone: (310) 294-1642

Attorneys for *Amici*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| **IN RE COLLEGE ATHLETE NIL LITIGATION** | Case No. 4:20-cv-03919-CW <br><br> **BRIEF OF *AMICI CURIAE* RICHARD J. VOLANTE AND DAVID M. WEST IN OPPOSITION TO PRELIMINARY SETTLEMENT** |

**BRIEF OF AMICI CURIAE
RICHARD J. VOLANTE & DAVID M. WEST
CASE NO. 4:20-CV-03919-CW**

# TABLE OF CONTENTS

INTRODUCTION……………………………………………………………………………......3

ARGUMENT……………………………………………………………………………….…..6

   I.   THE LACK OF REPRESENTATION FOR CURRENT AND FUTURE COLLEGIATE ATHLETES IN THE NEGOTIATION OF THE PRELIMINARY SETTLEMENT MAKES IT INHERENTLY FLAWED AND FUNDAMENTALLY UNFAIR ………….6

      A.  *The Preliminary Settlement Attempts to Resolve Matters That Are Suited for Collective Bargaining and Not a Class Action Settlement*…..…………………...6

      B.  *Current and Future Collegiate Athletes Are Unaware of the Effects of the Preliminary Settlement on their Legal and Economic Rights*……………………..8

   II.  THE NCAA HAS REPEATEDLY DEMONSTRATED THAT IT IS INCAPABLE OF SERVING THE BEST INTERESTS OF COLLEGIATE ATHLETES AND COLLEGE SPORTS AND SHOULD NOT BE ENTRUSTED WITH OVERSEEING THE IMPLEMENTATION AND GOVERNANCE OF AN NIL CLEARINGHOUSE THAT DETERMINES FAIR MARKET VALUE…………….………………………………8

   III.  THE CALCULATED SPENDING CAP ON SHARED REVENUE IS INSUFFICIENT IN LIGHT OF OTHER COLLECTIVE BARGAINING AGREEMENTS……..…….......10

   IV.  THE PRELIMINARY SETTLEMENT COULD HAVE A CHILLING EFFECT ON LABOR ORGANIZATION EFFORTS IN COLLEGE SPORTS……………………….12

CONCLUSION……………………………………………………………………………...13

CERTIFICATE OF SERVICE……………...……………………………………………..…..14

# INTRODUCTION

*Amici* are Richard J. Volante, Esq and David M. West.

Mr. Volante is a barred attorney in the State of Ohio specializing in legal issues related to collegiate and professional sports.  As an extension of his legal practice, Mr. Volante has been a contributor to several legal casebooks focusing on various legal issues in sports.[1]  Specifically related to collegiate sports, Mr. Volante was a co-founder and the Chief Executive Officer of the Professional Collegiate League, a private organization that attempted to create a market alternative to the NCAA starting with men's collegiate basketball.  Mr. Volante has also advised various state and federal elected officials on legislation related to issues affecting college sports and collegiate athletes, including, but not limited to, publicity rights (*i.e.*, NIL), Title IX, and whether collegiate athletes should be classified as employees.  Mr. Volante has served as a frequent expert on the record and on background for journalists and on-air media covering issues related to the business of college sports and the rights of collegiate athletes, and has been a frequent speaker on legal issues in professional and collegiate sports throughout the US, as well as in Brazil and the United Kingdom.  Mr. Volante's company, RVIS Media Partners LLC, is a minority owner of the professional Ligue 2 French football club, FC Martigues.  While in law school, Mr. Volante externed with the Mid-American Conference.  Mr. Volante was a collegiate baseball player, who played at the Division II and Division III levels before and after having reconstructive elbow surgery as a result of tearing his ulnar collateral ligament while playing college baseball.

---

[1] Peter A. Carfagna, Sports and the Law, Examining the Legal Evolution of America's Three Major Leagues (2017), 3rd Ed., West Academic Publishing; Peter A. Carfagna, Representing the Professional Athlete (2018), 3rd Ed., West Academic Publishing; and Peter A. Carfagna, Negotiating and Drafting Sports Venue Agreements (2016), 2nd Ed., West Academic Publishing.

Mr. West is a former American professional basketball player whose career spanned 15 years in the NBA. He last played for the Golden State Warriors and was a part of their 2017 and 2018 championship teams. During the 2011 NBA Lockout, Mr. West was part of the negotiating team representing the NBPA and its members. A graduate of Xavier University (OH), Mr. West is Xavier's second all-time leading scorer and third all-time leading rebounder. Mr. West was a 2002-03 Associated Press, United States Basketball Writers Association, and Basketball Times National Collegiate Player of the Year. Mr. West was drafted into the NBA by the New Orleans Hornets as the 18th overall pick in the 2003 NBA Draft. Following his retirement, Mr. West was a Co-Founder and the Chief Operating Officer for the Professional Collegiate League, along with Mr. Volante. Mr. West's time as an athlete enabled him the opportunity to be a leader on issues that are close to him, such as youth and sustainable resource development. Mr. West is the principal and head of the West Group, an organization that facilitates strategic investments and the development of youth in sport, including individually-tailored mentorship programs located in Raleigh, North Carolina. Under the direction of the West Group, Mr. West operates a nationally recognized youth basketball development program, Garner Road Basketball Club, which carries out the mantra "No Books, No Ball." The West Group also operates the J.D. Lewis Multi-Purpose Center which services the community through programmatic initiatives. More than 7,000 individuals from the Raleigh-Durham area have benefited from Mr. West's direct contributions to his hometown and surrounding communities. Mr. West is also actively pursuing a master's degree at North Carolina Central University in History and African Studies.

*Amici* have met with current and future collegiate athletes (and their families) impacted by this proposed settlement to inform them of their rights in this proceeding and their ability to

object to this proposed settlement. Mr. Volante may ultimately represent an individual objector or group of objectors before this Court at a later date in conjunction with local counsel.

Given this background, *amici* respectfully submit this brief in opposition to the preliminary settlement being presented to this Court (the "Settlement"). This brief contends that the counsel for the Plaintiffs and Defendants were not appropriate representatives for the full set of proposed rights released by current and future collegiate athletes and failed to safeguard and consider these rights when negotiating the Settlement – highlighted by the lack of attempt to inform and engage the very athletes affected by the Settlement, beyond the named Plaintiffs. Further, this brief contends that the inclusion of revenue sharing for current and future collegiate athletes in this matter is a feckless and inappropriate attempt to replicate a negotiation that should be conducted in a broader collective bargaining process to ensure the needed impact and change to collegiate sports necessary for the health, wellness, and safety of collegiate athletes. This brief underscores the critical role that athletes generally play in labor unions in the sports sector, ensuring that the interests of the bargaining unit are considered and factored into the collective bargaining process, including ultimately requiring a majority vote to approve any terms, which is missing from the process involved in settling a class action. Further, this brief will address the flaws included in the calculations and spending cap related to the Settlement. Lastly, this brief looks at the potential chilling effect that the Settlement could have on future efforts to organize and/or unionize collegiate athletes.

# ARGUMENT

I. **THE LACK OF REPRESENTATION FOR CURRENT AND FUTURE COLLEGIATE ATHLETES IN THE NEGOTIATION OF THE PRELIMINARY SETTLEMENT MAKES IT INHERENTLY FLAWED AND FUNDAMENTALLY UNFAIR.**

   A. *The Preliminary Settlement Attempts to Resolve Matters That Are Suited for Collective Bargaining and Not a Class Action Settlement.*

While the interests of the Plaintiffs and Defendants were represented throughout the negotiation process of the Settlement before this Court, current and future collegiate athletes have not been represented in the negotiation – and most were not even aware that it was occurring. Further, given the inherent tradeoffs between retrospective damages and prospective injunctive-style relief, it is an impossibility that the legal counsel involved would be able to appropriately negotiate the portions of the Settlement related to all current and future collegiate athletes while upholding the duties owed to their clients.[2] Given the lack of representation and basic knowledge of the negotiation, as well as the inability for those involved to appropriately represent the interests of current and future collegiate athletes, the Settlement is inherently flawed and a fundamentally unfair means of resolving the future of the college sports labor markets.

Collective bargaining is a complex process. It is impossible to pull out a single issue for discussion and negotiation without it impacting multiple other issues – such is the very nature of collective bargaining. If collegiate athletes were to attempt to unionize or create a trade association to represent their interests, certain aspects of the Settlement would put them on the

---

[2] By way of example, collective bargaining agreements in sports have typically resulted in the athletes receiving approximately fifty percent (50%) of all revenues (not just media rights and ticket sales), however, were Plaintiffs' counsel to vigorously and appropriately push for an agreement that resembled such an arrangement, would the NCAA have been willing to agree to pay such significant damages to the Plaintiffs to settle the retrospective matters?

backfoot at best or potentially foreclose certain topics at worst. Unions representing professional athletes in the NBA, WNBA, MLB, NFL, NHL, MLS, and NWSL have taken various approaches to the process and identification of the most critical topics for the negotiation.[3] As Mr. West can attest from personal experience that having athletes in the room to negotiate the terms that this Settlement addresses is essential to achieving a fair and equitable agreement for those athletes. The efforts of the leadership committee during the 2011 NBA lockout were critical building blocks for the NBPA and its members to achieve the heights of their success today, which now sees its members signing lucrative long-term contracts with significant leverage to control their futures. Also, as seen during the 2021-2022 Major League Baseball lockout, the eight-man player executive committee played an outsized role in the negotiation of the next collective bargaining agreement and represented the interests of approximately 1,200 members.[4]

With a "salary cap" pre-negotiated outside of collective bargaining, a union or trade association may not have the luxury or leverage to offer to compromise on financial issues in order to address the NCAA's rules and regulations around player health, wellness, and safety which remain abysmal relative to the best practices established by the professional leagues via

---

[3] While the NBPA has been able to focus on the minutiae of revenue sharing which has resulted in rapidly increasing salaries across the league, the NFLPA has focused more on issues related to player health and safety and the MLBPA looked to avoid the inclusion of spending caps and find less restrictive ways for its members to reach free agency. The latter two have resulted in significant give and take between the respective leagues and the unions.

[4] Max Scherzer, Andrew Miller, Gerrit Cole, Francisco Lindor, Marcus Semien, Zack Britton, Jason Castro, and James Paxton served on the committee that played a critical role in representing the interests of the player representatives of all 30 teams and the overall membership consisting of approximately 1,200 players.

collective bargaining. This settlement creates a scenario wherein the union or trade association would have far less leverage to achieve better health, wellness, and safety protocols.

### B. *Current and Future Collegiate Athletes Are Unaware of the Effects of the Preliminary Settlement on their Legal and Economic Rights*

In meeting with current and future collegiate athletes and their families, as well as stakeholders that work with those individuals, *amici* have yet to speak with *a single individual* that was aware of this lawsuit or the proposed settlement before this Court, and how their rights and future earnings may be impacted. Based on the proposed settlement, the individuals that *amici* have met with will arguably be the most impacted by its terms. The omission of these athletes from this negotiation process is a continuation of the paternalistic dictation of how their rights, or lack thereof, will be recognized.

Given the 10-year term of the Settlement, the legal and economic rights of children currently as young as 6 years old will be impacted. While the option to opt-out has been presented, in practice, athletes that choose to do so could be black-listed by the NCAA and its member institutions. The "Syracuse 8," Walter Beach, Muhammad Ali, Tommie Smith and John Carlos, Craig Hodges, Mahmoud Abdul-Rauf, Colin Kaepernick, and Eric Reid can attest that a lack of conformity to the rules rarely has a positive outcome for individual athletes.

## II. THE NCAA HAS REPEATEDLY DEMONSTRATED THAT IT IS INCAPABLE OF SERVING THE BEST INTERESTS OF COLLEGIATE ATHLETES AND COLLEGE SPORTS AND SHOULD NOT BE ENTRUSTED WITH OVERSEEING THE IMPLEMENTATION AND GOVERNANCE OF AN NIL CLEARINGHOUSE THAT DETERMINES FAIR MARKET VALUE.

It has been a considerable period of time since the NCAA acted in a manner that was not focused on what was best for its bottom line – and that of its members, membership which excludes all collegiate athletes. They have been shown lacking in their stated mission to

"provide a world-class athletics and academic experience for student-athletes that fosters lifelong well-being," of which this Court is well aware. The NCAA's poor track record is not limited to only economic issues either. For example, rates of depression and death by suicide have increased amongst collegiate athletes in recent years, as has the mistreatment of collegiate athletes by their coaches and universities without meaningful repercussions to those involved.[5,6]

The NCAA's track record in this Court demonstrates it is not a credible source of information regarding the economic value of collegiate athletes. Yet, the Settlement seemingly will allow the NCAA to review all third-party agreements and make arbitrary decisions related to the fair market value of such agreements. The best judge of fair market value is what a buyer agrees to pay a seller in an open market when the parties are informed of the facts, have time to negotiate, are not acting out of compulsion, and are acting out of their own interests. To allow the NCAA to subjectively and unilaterally rewrite this definition would regressively restore power to the NCAA that this Court, and many state laws took away from it previously. Additionally, such a clearinghouse would likely have a chilling effect on the value of NIL deals and may run counter to US antitrust laws, as exhibited by U.S. District Judge Clifton Corker's

---

[5] Weber S.R., Winkelmann Z.K., Monsma E.V., Arent S.M., Torres-McGehee T.M. An Examination of Depression, Anxiety, and Self-Esteem in Collegiate Student-Athletes. Int. J. Environ. Res. Public Health. 2023;20:1211. doi: 10.3390/ijerph20021211. - DOI - PMC - PubMed. ["The prevalence of the risk of depression in collegiate student-athletes ranges from 15.6% to 33.2%, with first-year students and females typically reporting more symptoms."]
[6] Sally Jenkins, Culture didn't kill Jordan McNair. Negligence did. DJ Durkin is responsible for both. Washington Post, October 1, 2018. https://www.washingtonpost.com/sports/colleges/culture-didnt-kill-jordan-mcnair-negligence-did-dj-durkin-is-responsible-for-both/2018/10/01/29183052-c596-11e8-b1ed-1d2d65b86d0c_story.html [DJ Durkin will begin his first season as the Defensive Coordinator at Auburn University this fall.]

BRIEF OF AMICI CURIAE
RICHARD J. VOLANTE & DAVID M. WEST
CASE NO. 4:20-CV-03919-CW

decision in the Eastern District of Tennessee.[7] This effect will be most prominently felt by basketball players and female athletes, given that most universities and collectives will divert their capped resources and monitored agreements to football first based on that being the highest revenue-generating sport at most Division 1 institutions. A significant portion of Division 1 collegiate basketball players are minorities; hence the Settlement may have discriminatory effects on protected classes (race and gender), even if that is not the intention of the parties or this Court.

### III. THE CALCULATED SPENDING CAP ON SHARED REVENUE IS INSUFFICIENT IN LIGHT OF OTHER COLLECTIVE BARGAINING AGREEMENTS.

The specific terms and calculations included in the Settlement are far less favorable than revenue sharing models seen in professional sports leagues, which typically result in 48% to 52% shared with the players, and which typically include salary floors requiring teams to spend on the order of 90% of the cap as a guaranteed minimum – those revenue sharing models also account for all forms of sport revenue, not simply media rights and ticket sales. Here, the parties have agreed to a hard spending cap of twenty two percent (22%) (the "Cap"), however, the universities are not obligated to spend up to the Cap. Moreover, given the wide disparity of revenues in FBS football, compared to professional leagues where revenue is shared across all teams, the figure will be far smaller than 22% among the most well-resourced teams; while schools with lesser resources are unlikely to reach that level. This is a prime example of inadvertent flaws and the fundamental unfairness of allowing this faux-CBA to be negotiated without a proper representative of one of the affected parties (*i.e.*, current and future collegiate

---

[7] TENNESSEE v. NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (2024). United States District Court, E.D. Tennessee. 3:24-CV-00033-DCLC-DCP.

athletes). The NCAA and its members get the benefit of limiting their spending significantly below the standards of the sports industry, while also giving themselves the ability to unilaterally determine that they want to spend less.

There are also flaws in the economics that underpin the Settlement. The Cap is expected to equate to between $20 to $22 million per institution. As part of the Settlement, the restrictions on the number of scholarships per sport will be lifted, which is seemingly a positive outcome, however, the "cost" of these scholarships is applicable toward the pool of $20 to $22 million to be shared – and at the full rate that an institution charges a student. This is a foundational flaw. In this context, the only circumstance under which a scholarship "costs" an institution its full price is if the institution has one remaining seat at the school and is deciding between giving an athlete a scholarship or accepting a full-paying student that will receive no form of aid from the institution (an exceedingly rare occurrence). This approach could allow institutions to improperly apply up to $2 to $3 million per year of "paper expenses" towards the revenue sharing pool, reducing it by ten percent, assuming that the given institution is sharing revenue up to the Cap. Additionally, the costs of administering the Settlement over the next ten years will seemingly be applicable to the revenue sharing pool, which could result in the sharing pool being reduced by another $2 million.[8]

There is also the outstanding issue of whether Title IX will be applicable to the Settlement. The problematic nature of the Cap is especially on display when considering this. There are two options: (1) Title IX applies and the Cap will need to be proportionally distributed between male and female athletes, or (2) Title IX doesn't apply and the lion's share of the Cap

---

[8] This would mean that from the purported $20 to $22 million revenue sharing pool only $15 to $18 million would actually be available to collegiate athletes.

11

will be spent on football and men's basketball, leaving women's sports under invested in yet again. Had the Cap been negotiated in the context of that amount being made available for each of men's and women's sports, then it would be far more comparable to the levels achieved through collective bargaining in other leagues, however, it has been made clear by the parties that that is not the case here. As a result, we are left with the possibility of men's basketball players, in particular, seeing their revenue opportunities significantly reduced – since institutions will focus on the cash cow that is football – or female athletes being undervalued and undercompensated. Neither of these possible outcomes are fair or acceptable, especially given that neither was represented in the negotiation of the Settlement and both may be protected classes that are being discriminated against by the terms of the Settlement.

## IV. THE PRELIMINARY SETTLEMENT COULD HAVE A CHILLING EFFECT ON LABOR ORGANIZATION EFFORTS IN COLLEGE SPORTS.

Included in the Settlement, the parties have agreed to seek to memorialize its terms through federal legislation. The NCAA has made no secret of its efforts to seek an antitrust exemption or "safe harbor" to insulate itself from future antitrust litigation and to seek to classify collegiate athletes as non-employees. While those issues are not necessarily a concern for this Court, *amici* believe that based on the readings of your Honor's opinions in matters related to collegiate athletes, you have attempted to make systemic changes for the benefit of those athletes. With that being said, if the Settlement serves to support the NCAA's argument that it has done its part to merit federal legislation immunizing them from the potential of collegiate athletes unionizing or otherwise organizing to improve their compensation, working conditions, and terms of service. *Amici* respectfully urge this Court and your Honor to consider this possibility when reviewing the Settlement to ensure that the NCAA is not able to create an

impenetrable legal fortress that would bring an abrupt halt to the decades of work that athletes, advocates, and others have put towards the betterment of collegiate athletes.

## CONCLUSION

For the foregoing reasons, *amici* respectfully urge this Court to reject the Settlement in its current form. The Settlement, as it stands, does not adequately represent or protect the interests and legal and economic rights of current and future collegiate athletes. Current and future collegiate athletes were not engaged or involved in the negotiations of the Settlement. The imposed spending cap is insufficient, and the Settlement, if approved, may have a chilling effect on future efforts to confirm and expand upon the rights of current and future collegiate athletes.

August 9, 2024

Respectfully submitted,

By: */s/ Peter L. Kaufman*

PETER L. KAUFMAN, ESQ. (SBN 143840)
pkaufman@ebizlegal.com
**KAUFMAN ENTERTAINMENT LAW GROUP, PC**
26565 West Agoura Road, Suite 200
Calabasas, California 91302
Telephone: (310) 294-1642

RICHARD J. VOLANTE, ESQ. (*pro hac vice forthcoming*)
ricky@volantelaw.com
**THE VOLANTE LAW FIRM, LLC**
7029 Longview Dr.
Solon, Ohio 44139
Telephone: (216) 282-6762

Attorneys for *Amici*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 9, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record registered for electronic filing.

<u>*/s/ Peter L. Kaufman*</u>
Peter L. Faufman