Steve W. Berman (*pro hac vice*)
Emilee N. Sisco (*pro hac vice*)
Stephanie Verdoia (*pro hac vice*)
Meredith Simons (SBN 320229)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com
emilees@hbsslaw.com
stephaniev@hbsslaw.com
merediths@hbsslaw.com

Benjamin J. Siegel (SBN 256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
bens@hbsslaw.com

*Class Counsel for Plaintiffs*

[Additional counsel on signature page]

Jeffrey L. Kessler (*pro hac vice*)
David G. Feher (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
Adam I. Dale (*pro hac vice*)
Neha Vyas (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
jkessler@winston.com
dfeher@winston.com
dgreenspan@winston.com
aidale@winston.com
nvyas@winston.com

Jeanifer E. Parsigian (SBN 289001)
WINSTON & STRAWN LLP
101 California Street, 34th Floor
San Francisco, CA 94111
Telephone: (415) 591-1000
jparsigian@winston.com

*Class Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | Case No. 4:20-cv-03919-CW |
| | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY SETTLEMENT APPROVAL** |
| | Hrg. Date:  September 5, 2024 |
| | Time:  2:30 p.m. |
| | Judge:  Hon. Claudia Wilken |
| | Courtroom:  2, 4th Floor |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................... 1

II.    ARGUMENT .................................................................................................. 2

    A.    All Classes Had Adequate Representation On All Claims With No Conflict ................................................................................................ 2

        1.    Negotiations were structured to prevent conflicts....................... 2

        2.    Under controlling law, representation has been not just adequate, but superior, for all classes and claims and there are no conflicts that indicate otherwise. ........................................ 5

        3.    There was adequate representation for the scholarship claims. ............................................................................................ 9

    B.    The Damages Relief Is Fair And Adequate ......................................... 11

        1.    The additional compensation fund is fair and adequate considering the substantial litigation risks and the actual revenues of the covered sports. ................................................. 12

        2.    The damages recovery for antitrust claims on scholarship limitations is reasonable. ............................................................ 15

    C.    The Injunctive Relief Settlement Is Fair And Adequate ..................... 17

    D.    The Release Is Appropriate ................................................................. 20

    E.    Any Quibbles With The Notice Document Or Proposed Preliminary Approval Order Can Be Remedied, But Are Largely, If Not Completely, Unnecessary ................................................................... 22

III.    CONCLUSION ............................................................................................ 24

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3  *Aarons v. BMW of N. Am., LLC*,
     2014 WL 4090564 (C.D. Cal. Apr. 29, 2014) ........................................................ 17

4
   *Agnew v. Nat'l Collegiate Athletic Ass'n*,
5     683 F.3d 328 (7th Cir. 2012) .................................................................... 4, 16

6  *Alston v. Nat'l Collegiate Athletic Ass'n*,
     958 F.3d 1239 (9th Cir. 2020) ......................................................................... 18
7

8  *Alvarez v. Sirius XM Radio Inc.*,
     2021 WL 1234878 (C.D. Cal. Feb. 8, 2021) .................................................... 17

9
   *Amchem Prods. v. Windsor*,
10    521 U.S. 591 (1997) .......................................................................................... 6

11 *In re Anthem, Inc. Data Breach Litig.*,
     327 F.R.D. 299 (N.D. Cal. 2018) ..................................................................... 22
12

13 *In re Apple iPhone/iPod Warranty Litig.*,
     2014 WL 12640497 (N.D. Cal. May 8, 2014) ................................................. 19

14
   *Arena v. Intuit Inc.*,
15    2021 WL 834253 (N.D. Cal. Mar. 5, 2021) .................................................... 23

16 *Asghari v. Volkswagen Grp. of Am., Inc.*,
     2015 WL 12732462 (C.D. Cal. May 29, 2015 ) .............................................. 12
17

18 *In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)*,
     770 F.2d 328 (2d Cir. 1985) ............................................................................ 23

19
   *Bergman v. Thelen LLP*,
20    2016 WL 7178529 (N.D. Cal. Dec. 9, 2016) .................................................... 8

21 *In re Blue Cross Blue Shield Antitrust Litig.*,
     85 F.4th 1070 (11th Cir. 2023) .......................................................................... 7
22

23 *Bridgeman v. Nat'l Basketball Ass'n*,
     675 F. Supp. 960 (D.N.J. 1987) ....................................................................... 19

24
   *Brown v. Hain Celestial Grp., Inc.*,
25    2014 WL 6483216 (N.D. Cal. Nov. 18, 2014) .................................................. 8

26 *Browne v. Am. Honda Motor Co., Inc.*,
     2010 WL 9499072 (C.D. Cal. July 29, 2010) ................................................. 12

27

28

-ii-

*Charron v. Wiener*,
    731 F.3d 241 (2d Cir. 2013)..................................................................... 11

*In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.*,
    357 F.3d 800 (8th Cir. 2004)..................................................................... 8

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998)..................................................... 5, 12, 18, 23

*Hesse v. Sprint Corp.*,
    598 F.3d 581 (9th Cir. 2010)..................................................................... 20

*Lane v. Facebook, Inc.*,
    696 F.3d 811 (9th Cir. 2012)..................................................................... 22

*In re Literary Works in Elec. Databases Copyright Litig.*,
    654 F.3d 242 (2d Cir. 2011)..................................................................... 3, 6

*In re Lithium Ion Batteries Antitrust Litig.*,
    2020 WL 7264559 (N.D. Cal. Dec. 10, 2020) ...................................... 15

*Lucas v. Kmart Corp.*,
    234 F.R.D. 688 (D. Colo. 2006)............................................................... 23

*In re MacBook Keyboard Litig.*,
    2023 WL 3688452 (N.D. Cal. May 25, 2023) ...................................... 22

*Murray v. Grocery Delivery E-Services USA Inc.*,
    55 F.4th 340 (1st Cir. 2022)............................................................. 6, 10

*Nat'l Collegiate Athletic Ass'n v. Alston*,
    594 U.S. 69 (2021) ..................................................................... *passim*

*In re NCAA Athlete Grant-in-Aid Cap Antitrust Litig.*,
    375 F. Supp. 3d 1058 (N.D. Cal. 2019) ........................................... 13, 18

*In re NCAA I-A Walk-On Football Players Litig.*,
    2006 WL 1207915 (W.D. Wash. May 3, 2006)................................ 4, 10, 13, 16

*In re NCAA Student-Athlete Name & Likeness Litig.*,
    2013 WL 5979327 (N.D. Cal. Nov. 8, 2013) ...................................... 13

*Nevarez v. Forty Niners Football Co., LLC*,
    474 F. Supp. 3d 1041 (N.D. Cal. Jul. 23, 2020)................................ 7

*Nguyen v. BMW of N. Am. LLC*,
    2012 WL 1677054 (N.D. Cal. Apr. 20, 2012) ...................................... 22

-iii-

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
    802 F.3d 1049 (9th Cir. 2015)...............................................................................18

*O'Bannon v. National Collegiate Athletic Ass'n*,
    7 F. Supp. 3d 955 (N.D. Cal. 2014), *aff'd in part, vacated in part by*
    *O'Bannon*, 802 F. 3d 1049 (9th Cir. 2015)...........................................................18

*Officers for Justice v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*,
    688 F.2d 615 (9th Cir. 1982)................................................................................18

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999).................................................................................................7

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    827 F.3d 223 (2d Cir. 2016).................................................................................3, 8

*Petrovic v. Amoco Oil Co.*,
    200 F.3d 1140 (8th Cir. 1999).................................................................................7

*Robertson v. Nat'l Basketball Ass'n*,
    72 F.R.D. 64 (S.D.N.Y. 1976) ..............................................................................19

*Rock v. Nat'l Collegiate Athletic Ass'n*,
    2016 WL 1270087 (S.D. Ind. Mar. 31, 2016).............................................4, 13, 16

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    2011 WL 13152270 (N.D. Cal. Aug. 24, 2011).....................................................8

*Vasquez v. USM Inc.*,
    2015 WL 12857082 (N.D. Cal. Apr. 13, 2015) ...............................................2, 13

*In re Volkswagen Clean Diesel Mktg., Sales Pracs. and Prods. Liab. Litig.*,
    895 F.3d 597 (9th Cir. 2018)...............................................................................5, 7

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
    396 F.3d 96 (2d Cir. 2016)...................................................................................11

*White v. Nat'l Football League*,
    756 F.3d 585 (8th Cir. 2014).................................................................................19

*Zakikhani v. Hyundai Motor Co.*,
    2023 WL 4544774 (C.D. Cal. May 5, 2023) .......................................................12

**Federal Statutes**

Fair Labor Standards Act ...............................................................................................1, 14

Sherman Act...................................................................................................................13

-iv-

**Federal Rules**

Fed. R. Civ. P. 23 .................................................................................................................... 2, 9

# GLOSSARY OF TERMS

| Term | Long Cite |
|------|-----------|
| *Alston* | *In re: National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust Litigation*, Case No. 14-md-2541 CW (N.D. Cal.) |
| Berman Opening Decl. | Declaration of Steve W. Berman in Support of Plaintiffs' Unopposed Motion for Preliminary Settlement Approval, filed July 26, 2024, ECF No. 450-2 |
| *Carter* | *Carter v. National Collegiate Athletic Association, et al.,* Case No. 3:23-cv-06325-RS (N.D. Cal.) |
| Choh Objectors | Tamenang Choh and Grace Kirk, filers of the Choh Opp. |
| Colorado Objectors | Alex Fontenot, Mya Hollingshed, Sara Fuller, Deontay Anderson, and Tucker Clark, filers of the Colo. Opp. |
| Colo. Opp. | Plaintiffs in the Colorado Cases' Response in Opposition to Motion for Preliminary Approval, filed Aug. 9, 2024, ECF No. 473 |
| *Cornelio* | *Cornelio v. National Collegiate Athletic Association*, Case No. 1:24-cv-2178 (D. Colo.) |
| Menke Objectors | Grace E. Menke, Flannery Dunn, Mia Levy, Madison Moore, Sierra Bishop and Etta Carpender, filers of the Menke Opp. |
| Menke Opp. | Objection to Settlement Agreement and Opposition to Motion for Preliminary Settlement Approval, filed Aug. 8, 2024, ECF No. 475 |
| *Fontenot* | *Fontenot v. National Collegiate Athletic Association, et al.*, Case No. 1:23-cv-03076 (D. Colo.) |
| Fontenot Plaintiffs | Plaintiffs that filed *Fontenot v. National Collegiate Athletic Association, et al.*, Case No. 1:23-cv-03076 (D. Colo.) |
| Gowrisankaran Merits Rep. | Expert Report of Gautam Gowrisankaran, Exhibit 6 to Declaration of Steve W. Berman in Support of Plaintiffs' Motion for Summary Judgment and to Exclude the Opinions of Dr. Gautam Gowrisankaran and Barbara Osborne, filed Apr. 3, 2024, ECF No. 414-2 |
| Green Decl. | Declaration of Mediator Professor Eric D. Green of Resolutions LLC in Support of Plaintiffs' Motion for Preliminary Approval of Settlement, filed concurrently herewith |
| *Hubbard* | *Hubbard v. National Collegiate Athletic Association, et al.*, Case No. 4:23-cv-01593 CW (N.D. Cal.) |

| *Johnson* | *Johnson v. National Collegiate Athletic Association*, Case No. 2:19-cv-05230 (E.D. Penn.) |
|---|---|
| Joint Decl. | Joint Declaration of Steve W. Berman and Jeffrey L. Kessler in Further Support of Plaintiffs' Motion for Preliminary Settlement Approval, filed concurrently herewith |
| Mot. | Plaintiffs' Notice of Motion and Motion for Preliminary Settlement Approval, filed July 26, 2024, ECF No. 450 |
| Peak Decl. | Declaration of Carla A Peak Regarding Settlement Notice Program, filed July 26, 2024, ECF No. 450-5 |
| Rascher Opening Decl. | Declaration of Daniel A. Rascher, filed July 26, 2024, ECF No. 450-4 |
| Rascher Reply Decl. | Reply Declaration of Daniel A. Rascher, filed concurrently herewith |
| Second Am Compl. | [Proposed] Second Consolidated Amended Complaint, filed July 26, 2024, ECF No. 448-1 |
| Settlement Agreement | Stipulation and Settlement Agreement, attached as Exhibit 1 to the Declaration of Steve W. Berman in Support of Plaintiffs' Unopposed Motion for Preliminary Settlement Approval, filed July 26, 2024, ECF No. 450-2 |

## I.    INTRODUCTION

The Settlement before the Court provides close to $2.6 billion in past damages—one of the largest antitrust damages recoveries in history. It opens the door to an estimated $20 billion in new benefits to athletes over the next ten years—one of the most valuable injunctive relief settlements in antitrust history. It also eliminates all scholarship limitations, preserves existing benefits to athletes (including third-party NIL payments), and provides for a neutral arbitration system to ensure that the NCAA is no longer prosecutor, judge and jury of athlete rights. The Settlement was negotiated by Class Counsel who have decades of experience challenging the NCAA's compensation restraints, and with the assistance of one of the most respected mediators in the country. And, as that mediator attests, the negotiations for injunctive relief and each damages class were scrupulously separated so that there was no conflict of interest and no sacrifice of one class's interest for another's. If approved, the Settlement will transform college sports, allowing college athletes to share in future revenues at the same 50% level enjoyed by professional athletes.

Despite these unprecedented achievements, the few objectors—with virtually no experience challenging NCAA compensation rules—come to this Court misrepresenting the terms of the Settlement and complaining that it does not provide more. Objectors claim the Settlement releases future antitrust damages claims—it does not. They claim the Settlement releases Fair Labor Standards Act and other labor law claims—it does not. They claim the Settlement releases claims in the ongoing litigation against the Ivy League's scholarship rule—it does not. And they claim that the Settlement releases gender discrimination and Title IX claims—it does not.[1]

Moreover, the law is clear that complaints from a few objectors and their counsel that they could purportedly recover more for the class is not a reason to deny settlement approval. This is

---

[1] For the sake of efficiency and to save space in response to duplicative arguments, this Reply in Support of Motion for Preliminary Approval of Settlement jointly responds to three sets of objections: Plaintiffs in the Colorado Cases' Response in Opposition to Motion for Preliminary Approval, filed Aug. 9, 2024, ECF No. 473; Objection to Settlement Agreement and Opposition to Motion for Preliminary Settlement Approval, filed Aug. 8, 2024, ECF No. 475; and Opposition to Plaintiffs' Motion for Preliminary Approval by Tamenang Choh and Grace Kirk, on Behalf of a Proposed Class of Ivy League Athletes, filed Aug. 8, 2024, ECF No. 460. Plaintiffs have 45 pages in total to respond to each of the objections, but in this Reply respond to them all in fewer than 25 pages.

-1-

especially true at the preliminary approval stage, when the only issue is whether the proposed settlement comes within a *range* of fairness and adequacy to the class. *Vasquez v. USM Inc.*, 2015 WL 12857082, at *2 (N.D. Cal. Apr. 13, 2015). Objectors' attempt to argue that this landmark settlement fails to satisfy the preliminary approval test is frivolous. The relief is comparable to what class members might achieve at trial, but only after more years of litigation facing an uncertain outcome. This groundbreaking class action settlement easily meets the Rule 23 approval standards.

## II.  ARGUMENT

### A.  All Classes Had Adequate Representation On All Claims With No Conflict.

#### 1.  The negotiations were structured to prevent conflicts.

The history of these settlement negotiations—misstated by the Colorado Objectors—shows that Plaintiffs' Counsel has provided exceptional representation for all classes and claims, and that there are no conflicts requiring any remedy by this Court. The Settlement provides extraordinary monetary benefits to class members and ground-breaking injunctive relief. Mot. at 17–24; *see also* Sections II.B & II.C, *infra*. Moreover, as shown in the accompanying declarations of the Mediator, Prof. Eric Green ("Green Decl."), and Lead Counsel for Plaintiffs, Steve Berman and Jeffrey Kessler ("Joint Decl."), the settlement of each claim was negotiated separately based on an expert analysis of the economic damages and the specifics strengths and weaknesses of each of the claims. Green Decl., ¶ 9–10; Joint Decl., ¶¶ 14–15; Berman Opening Decl., ¶¶ 8–9. There were no "trade-offs" between the different classes or claims. To the contrary, the parties made sure to keep the negotiations for each class separate from each other and worked strenuously to avoid even the possibility of any conflicts.

After engaging Mediator Green in November 2022 at the first in-person mediation for *House* on May 25, 2023, well before the *Fontenot* Plaintiffs filed their complaint, Plaintiffs' counsel informed Defendants that, after the class certification decision in *House*, they intended to bring claims for additional compensation for athletic services (similar to the athletic services claims brought years before by the same counsel in *Alston*, which are the claims eventually pleaded in *Carter*). Green Decl., ¶¶ 6–7; Joint Decl., ¶ 9. Additionally—based on their extensive experience

challenging the NCAA's compensation rules, their extensive work with experts studying the relevant labor markets, and their deep experience with professional sports leagues' compensation systems (*e.g.*, the NBA and NFL)—Plaintiffs' counsel stated at that first mediation session that it likely would not be possible to reach an injunctive relief settlement that resolved NIL-compensation claims only. Instead, it was likely necessary for the Parties to reach an injunctive relief settlement that made structural change to college athletics and put in place a new system that addressed all the NCAA's compensation rules and fairly compensated college athletes. Joint Decl., ¶ 9. Defendants indicated that they were of the same view. *Id.* Therefore, at that mediation session, Plaintiffs proposed a new revenue sharing "pool" system to redress all the NCAA's compensation rules. *Id.* Defendants responded by expressing an interest in discussing the pool concept as part of a broad injunctive settlement. *Id.* This proposal became the foundation for the structure ultimately agreed to in the Injunctive Relief Settlement. *See id.*

Although the cases are not binding in the Ninth Circuit, the parties were aware of and discussed the Second Circuit cases relied on by the Colorado Objectors, as presenting possible conflict concerns that they would avoid by segregating settlement talks.[2] With that in mind, the parties structured settlement talks to negotiate, and ultimately agree to, the terms of the injunctive relief settlement before negotiating the settlement of each damages claim separately so that no claim was traded off for another. Green Decl., ¶¶ 9–10; Joint Decl., ¶¶ 14–15.

To prepare for the eventual negotiation of additional compensation for athletic-services damages, on May 25, 2023, Plaintiffs' counsel asked Dr. Rascher to begin analyzing damages for such claims based on a methodology using professional sports league compensation as a comparator. Counsel worked with Dr. Rascher and his team on valuing these damages claims for several months over the summer 2023, significantly before *Fontenot* was filed. Joint Decl., ¶ 10. The settlement of the NIL damages claims did not require any additional expert work because such work was conducted previously in support of class certification.

---

[2] *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223 (2d Cir. 2016); *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011).

Contrary to the Colorado Objectors' assertion, the proposed settlement is not attempting to sweep in claims for athletic-services compensation that were not previously contemplated by Plaintiffs' counsel in *House*. In fact, *House* Class Counsel brought and litigated each type of claim being settled years before *Fontenot*'s counsel entered the arena.[3] *House* Class Counsel first contested the NCAA's athletic-services compensation rules in *Alston*—a case that they litigated through trial and an appeal up to the Supreme Court. Indeed, *Fontenot* counsel copied language from the *Alston* complaint many years later when they filed their complaint.

After this Court granted certification of the damages and injunctive relief classes in *House* in fall 2023, the negotiations with Defendants first addressed the injunctive relief settlement, and then each damages claim separately because each claim has different associated damages and litigation risk. The amount for each damages claim was agreed to before negotiations of the next damages claim happened. And the *Hubbard* damages claims were also negotiated separately. The recovery for each released damages claim is a product of the damages and litigation risk associated with that claim. Green Decl., ¶ 10; Joint Decl., ¶¶ 11, 15. Notably, while the Colorado Objectors falsely state *repeatedly* that the *House* settlement involves one lump sum, in fact there is a specific $1.976 billion fund for settlement of the NIL damages claims and a separate $600 million fund for settlement of the athletic-services and scholarship compensation claims, and each fund has a

---

[3] The Colorado Objectors' claim that they are the first and only plaintiffs expressing a real interest in litigating antitrust claims for athletes' services is demonstrably false. As noted above, Class Counsel first brought those claims in this District in 2014 in the *Alston* litigation. *See Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021). The Colorado Objectors, by contrast, did not bring any claim on behalf of college athletes until nine years later—in December 2023—after this Court certified the classes in *House*. With regard to the NCAA's scholarship rules, Hagens Berman first brought additional claims challenging these rules on behalf of walk-on football players in 2004. Ultimately, class certification was denied in that action. *See In re NCAA I-A Walk-On Football Players Litig.*, 2006 WL 1207915, at *9-13 (W.D. Wash. May 3, 2006). Subsequently, Hagens Berman brought additional claims against the NCAA's scholarship limits in *Rock v. Nat'l Collegiate Athletic Ass'n*, where the court also denied class certification. 2016 WL 1270087 at *14 (S.D. Ind. Mar. 31, 2016). And Hagens Berman brought claims against the NCAA's scholarship rules in *Agnew v. Nat'l Collegiate Athletic Ass'n*, but that case was dismissed. 683 F.3d 328, 333 (7th Cir. 2012). By contrast, the Colorado Objectors first brought claims on behalf of partial scholarship recipients just a week and a half after Plaintiffs here filed their motion for preliminary settlement approval and only days before opposing this Settlement. *See Cornelio v. Nat'l Collegiate Athletic Ass'n*, No. 1:24-cv-02178 (D. Colo.), ECF No. 1 (complaint filed on August 6, 2024).

separate allocation method. *See* Mot. at 8, 11–13. The *Hubbard* settlement also has a separate settlement fund.[4]

### 2. Under controlling law, representation has been not just adequate, but superior, for all classes and claims and there are no conflicts that indicate otherwise.

In the Ninth Circuit, in assessing adequacy of representation in class action settlements, courts ask whether "the named plaintiffs and their counsel have any conflicts of interest with other class members." *See In re Volkswagen Clean Diesel Mktg., Sales Pracs. and Prods. Liab. Litig.*, 895 F.3d 597, 607 (9th Cir. 2018). Generally, inadequate representation may be shown by "irreparable conflict[s] of interest" as indicated by "serious conflicts" in either the structure of the class or the terms of the settlement. *Id.* at 607–08 (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998)). In *Volkswagen*, the court held that there was no indication of conflicts precluding adequate representation in a single settlement class comprised of different groups of vehicle owners with different claims because the settlement properly reflected the differing value of the claims and in fact, it was likely that the value of lesser-value claims were enhanced by being in the same class as the higher-value claims. *Id.* at 608–09 (holding that these facts did not indicate a conflict of interest "either in the structure of the class or the terms of the settlement that prevented" adequate representation of all class members). Here, the lack of any conflict of interest is even clearer—each claim was separately negotiated, and the damages amounts agreed to for each class reflect expert and counsel valuations, with no trade-off of any claim among the class members. Green Decl., ¶¶ 9–10; Joint Decl., ¶¶ 11, 14–15.

The Colorado Objectors wrongly contend that Plaintiffs' counsel provided inadequate and conflicted representation to the damages classes to settle their athletic-services compensation

---

[4] The attorneys-fee provisions in the Injunctive Relief Settlement were also separately negotiated after the parties agreed to the substantive settlement terms. Green Decl., ¶ 9. And contrary to the Menke Objectors' claim, the Settlement does not include a clear sailing provision. *See* Menke Opp. at 22–23. The upfront $20 million injunctive fee and cost award that Defendants agreed to pay Class Counsel (*see* Settlement Agreement ¶ 27(a)) was negotiated separately *after* the parties agreed to the entire Settlement—it was in no way used as a tradeoff for any Settlement term. *See* Green Decl., ¶ 9. Additionally, the $20 million does no harm to class members because it is not paid from the Pool. And any fee award Class Counsel seeks—including the $20 million injunctive fee and cost award—is subject to Court approval. Settlement Agreement ¶¶ 27–30.

-5-

PLAINTIFFS' REPLY IN SUPPORT OF MOTION                    Case No. 4:20-cv-03919-CW
FOR PRELIMINARY SETTLEMENT APPROVAL
010912-11/2706336 V3

claims because the Settlement also resolved the higher value NIL-based damages claims. *See* Colo. Opp. at 5–8. They ask that these claims be carved out of the release or that "*Fontenot*'s counsel . . . be appointed to represent athletes with those claims in another round of negotiations." *Id.* at 1. The Colorado Objectors rely primarily on the Second Circuit's decision in *Literary Works*, but greatly misstate the facts here in a futile attempt to fit that case's very different posture. In *Literary Works*, the court held that counsel provided inadequate representation to the holders of one of three types of claims because the settlement created a single, capped common settlement fund with an allocation formula to split the fund among the three groups and placed the risk that claims would exceed the capped amount *only* on the backs of the holders of one type of claim, as opposed to all three, "provid[ing] strong evidence—in the 'C' reduction—of inadequate representation." *See Literary Works*, 654 F.3d at 250–56.

By contrast, in this case, the NIL damages claims and the additional compensation claims were separately negotiated based on separate assessments of their value, resulting in separate settlement funds for each type of claim, with separate allocation formulas for each.[5] Further, unlike in *Literary Works*, Plaintiffs have put forward extensive evidence that the Additional Compensation Fund provides settlement class members with a strong recovery representing approximately 31.6% of the value of the claims, which face many litigation obstacles to a class recovery. *See* Mot. at 18—20; *infra* Section II.B; Rascher Opening Decl., ¶¶ 8, 47–49.

The facts here are also nothing like the conflict identified in the Supreme Court's *Amchem* decision, where the settlement attempted to aggregate into a single class holders of present asbestos-related claims who were interested in "generous immediate payments," and holders of future claims who sought to ensure "an ample, inflation-protected fund for the future." *Amchem Prods. v. Windsor*, 521 U.S. 591, 626 (1997). As discussed, the Injunctive Relief Settlement and the Damages Relief Settlement were separately negotiated, with no trade-off of injunctive relief benefits and damages amounts. Section II.A.1, *supra*; Green Decl., ¶¶ 9–10; Joint Decl., ¶¶ 11, 14–15.

---

[5] This also distinguishes this case from *Murray v. Grocery Delivery E-Servs. USA Inc.*, another case relied on by the Colorado Objectors, where there was a single lump settlement fund created for groups of class members with vastly different types of claims. *See* 55 F.4th 340, 346 (1st Cir. 2022).

The Supreme Court's decision in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), cited by the Colorado Objectors, only serves to underscore why there is no indication of any conflict indicating inadequate representation of the classes in this case. In *Ortiz*, the Supreme Court held that a conflict was evidenced in part by the fact that the settlement failed to differentiate between "much higher" settlement value claims than those with lesser value. *See id.* at 823, 857. By contrast, in this case, when individually negotiating the NIL Settlement Fund and the separate Additional Compensation Fund, counsel carefully considered the different settlement values and risks of each type of claim, aided by Rascher's expert analysis. *See* Mot. at 17–21. Indeed, in *Volkswagen*, as discussed above, the Ninth Circuit held that there was no conflict of interest in representation of claimants with claims of different values, even though they were to recover from a single fund, because the settlement allocation reflected the strengths and risks of the claims of each group of class members. *See Volkswagen*, 895 F.3d at 604, 606–609; *see also Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1146 (8th Cir. 1999) ("If the objectors mean to maintain that a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement, we think that the argument is untenable. It seems to us that almost every settlement will involve different awards for various class members.").

The Colorado Objectors also argue that conflicts precluded Plaintiffs' counsel from adequately representing the (b)(2) injunctive-relief class and the (b)(3) damages classes, and that new counsel—preferably their counsel—should be appointed to represent the injunctive relief class. Colo. Opp. at 14–17. However, class settlements are often approved in cases where both damages and injunctive relief claims are settled by the same counsel. *See Nevarez v. Forty Niners Football Co., LLC*, 474 F. Supp. 3d 1041 (N.D. Cal. Jul. 23, 2020) (granting final approval of settlement seeking injunctive relief and damages on behalf of disabled patrons and those who accompanied them to a football stadium); *see also In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th 1070, 1091 (11th Cir. 2023) (rejecting objection to settlement where objector contended it was improper that "same named plaintiffs and counsel represented the injunctive class and the damages class").

The issues are whether a conflict exists and whether there were improper tradeoffs between classes, not whether the same counsel represented both injunctive relief and damages classes.

Colorado Objectors rely heavily on the Second Circuit's decision in *In re Payment Card*, but in that case there was evidence that the injunctive relief obtained was feeble and traded in exchange for increased damages, including because a "vast number of [(b)(2)] class members" derived no benefit at all from the settlement's primary injunctive relief, and the injunctive relief terminated on a specific date while the release "ha[d] no end date." 827 F.3d at 229–230, 234.[6] By contrast, here, the Injunctive Relief Settlement permits a remarkable $20 billion worth of new benefits to the class, and there is no evidence that counsel traded any benefits between the injunctive and damages classes. To the contrary, the damages amounts were not negotiated until *after* the terms of the Injunctive Relief Settlement were agreed to, ensuring that each class would be settled on its own merit. Joint Decl., ¶ 14. Mediator Green confirms in his declaration that there were no discussions of trading off injunctive relief to obtain greater damages or vice versa. Green Decl., ¶ 9. In addition, while the settlement in *In re Payment Card* came prior to any certification decision in the case (*see* 827 F.3d at 235–36), the Settlement here was reached after certification of the injunctive relief and damages classes in *House*.[7]

The injunctive relief provides extraordinary benefits to the class, and the injunctive relief release extends no further than the relief. Mot. at 21–24; *see also infra* Section II.C. Indeed, Plaintiffs' economist, Dr. Rascher, estimates that, in 2025–2026, the combined value to Division I athletes of existing benefits and the new 22% Pool benefits will approach 51% of Division I

---

[6] Notably, in *In re Payment Card*, the court explained that it was not holding that (b)(2) and (b)(3) plaintiffs necessarily require representation by different counsel, i.e., it was a fact-dependent determination. *See In re Payment Card*, 827 F.3d at 233–36.

[7] The classes were modified for the settlement, but courts in in this District have explained that "[c]lass definitions are often revised, for example, to reflect the contours of the settlement." *Brown v. Hain Celestial Grp., Inc.*, 2014 WL 6483216, at *6 (N.D. Cal. Nov. 18, 2014); *see e.g.*, *Bergman v. Thelen LLP*, 2016 WL 7178529, at *3, *10-11 (N.D. Cal. Dec. 9, 2016) (finally approving class action settlement where settlements classes "add some vacation classes" and "modify how some of the class definitions are phrased" but in general are similar to previously certified classes); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 13152270, at *9 (N.D. Cal. Aug. 24, 2011) ("courts have generally certified settlement classes broader than the previously-certified litigation classes; the claims released are typically more extensive than the claims stated"); *see also In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.*, 357 F.3d 800, 805 (8th Cir. 2004).

revenues—meaning college athletes will earn the same percentage of revenues as professional athletes in the NFL and NBA, and even more than the percentage in some other professional leagues. *See* Mot. at 21–22 (citing Rascher declaration). Moreover, while the Colorado Objectors seek to be appointed to represent the injunctive relief class in new settlement negotiations, they have not shown that they have anything close to Plaintiffs' counsel's experience in negotiating the resolution of such claims or athlete compensation systems. Class counsel from Winston, for example, has negotiated the compensation systems in the NFL and NBA for more than thirty years. Joint Decl., ¶ 16.

Finally, the Colorado Objectors incorrectly claim that a conflict is revealed and the classes received inadequate representation because the "settlement attempts to preclude future college athletes from bringing claims—some of whom are in third grade now." Colo. Opp. at 15. That is demonstrably false. As discussed below, the Parties agreed that there is no release of any antitrust damages claims for any athletes who first play for a college Division I team after September 15, 2024. *See infra* Section II.D. If future college athletes, including those in third grade, believe Defendants are committing antitrust violations, the Settlement will not impede them from bringing future damages claims. Further, while there is no opt-out right for a b(2) class under Rule 23, the Settlement provides for a continuing notice and right to object for future injunctive class members, so that the Court can consider any such objections in the future if it finds there is any reason to reconsider the continued implementation of the injunctive relief settlement. Settlement Agreement ¶ 14.

### 3.    There was adequate representation for the scholarship claims.

The Colorado Objectors assert, incorrectly, that partial scholarship recipients in equivalency sports were not adequately represented because none of the named plaintiffs are partial scholarship recipients. Colo. Opp. at 13. In fact, Grant House is a swimmer and Nya Harrison is a soccer player, Second Am. Compl. ¶¶ 15–26, 62–72. Both swimming and soccer are equivalency sports. *See Cornelio* Compl. ¶¶ 27–28. Ms. Harrison did not receive an athletic scholarship at all, and during some of his time at Arizona State University, Mr. House received only a partial athletic

scholarship.[8] Thus, Mr. House would be a member of the partial scholarship group of athletes that Colorado Objectors wrongly claim has no class representative. And Ms. Harrison also has standing to bring a claim against the NCAA's scholarship limits because she did not receive either a full or partial athletic scholarship from her soccer team.

Colorado Objectors do not argue that either Mr. House or Ms. Harrison have failed to discharge their duties as class representatives; they only (incorrectly) assert that they each received full athletic scholarships. As a result, the Colorado Objectors' argument that Plaintiffs do not have the standing necessary to be adequate representatives is meritless.[9] *See* Colo. Opp. at 13.

Colorado Objectors also wrongly assert that there is such a profound conflict of interest between partial scholarship recipients in equivalency sports and other athletes in headcount sports that separate representation is required. *See* Colo. Opp. at 12–13. But "[n]ot all conflicts require separate representation." *Murray*, 55 F.4th at 345. "The standard ... is not 'perfect symmetry of interest' among the class." *Id.* (quotation omitted). Instead, "because the perfect is sometimes the enemy of the good, only those conflicts that are fundamental to the suit and . . . go to the heart of the litigation breach the adequacy-of-representation standard." *Id.* at 346 (quotation omitted). In other words, for separate representation to be required, "the intra-class conflict must be so substantial as to overbalance the common interests of the class members as a whole." *Id.*

Here, there is no conflict between partial scholarship recipients in equivalency sports and other athletes in headcount sports, let alone one that threatens to overwhelm the common interests of all class members. All current and former NCAA athletes are incentivized to seek as much money as they can reasonably expect to recover in past damages. All current athletes are incentivized to end the NCAA's restraints on competition and seek the broadest rights possible in an injunctive

---

[8] The Second Amended Complaint pleads that Mr. House "accepted a full scholarship offer" at Arizona State University, Second Am. Compl. ¶ 17, which is true, but that scholarship was not a full athletic scholarship. It included a partial athletic scholarship and partial academic scholarship.

[9] The Colorado Objectors' standing argument fails for the independent reason that standing is not an adequacy issue at all; it is "a requirement that must be met by every plaintiff, whether the suit is brought individually or on behalf of a class." *Walk-On*, 2006 WL 1207915, at *9 n.12. Plaintiffs each allege that they were injured by the Defendants' anticompetitive conduct, Second Am. Compl. ¶¶ 26, 41, 48, 61, 72, and therefore have standing to bring this antitrust action.

settlement. There is no reason to think—and Colorado Objectors articulate none—that athletes in equivalency sports have fundamentally different interests than athletes in headcount sports.

The Injunctive Relief Settlement eliminates all future scholarship limits in both equivalency and headcount sports, providing relief benefiting all class members. And as discussed below, the Damages Settlement provides fair and adequate consideration for all the released claims. That includes the scholarship claims. Given that prior litigation demonstrates that there would be virtually no chance of recovering damages for scholarship claims alone, releasing those claims was a reasonable part of the consideration for class members' additional compensation damages recoveries. "[D]ue process does not require that all class claims be pursued." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 113 (2d Cir. 2016). Where different claims within a class involve the same underlying factual predicate, "adequate representation of a particular claim is determined by the alignment of interests of class members, not proof of vigorous pursuit of that claim." *Id.* Indeed, "[a]ll class settlements value some claims more highly than others, based on their perceived merits, and strike compromises based on probabilistic assessments." *Charron v. Wiener*, 731 F.3d 241, 253 (2d Cir. 2013). These types of compromises do not "automatically create[] subclasses that require[] separate representation." *Id.* at 254.

Here, the named plaintiffs and all class members have claims arising from the fact that they compete or competed as collegiate athletes subject to the NCAA's constellation of restraints on compensation and benefits, including rules limiting compensation for athletic services, NIL payments, and the availability of scholarships in exchange for athletic services. Both the Injunctive Relief Settlement and the Damages Settlement provide relief for all of these claims. *See infra* Section II.B.

**B.      The Damages Relief Is Fair And Adequate.**

The $1.976 billion NIL Settlement Fund is one of the largest antitrust damage settlements in history and nothing short of extraordinary, comprising 67.4% of total estimated damages for the NIL claims. Objectors do not disagree.

The separate $600 million Additional Compensation Fund represents 31.6% of the total estimated damages for such claims. *See* Rascher Opening Decl., ¶¶ 22, 28, 32, 49. The Objectors' criticisms of the size of the Additional Compensation Fund are not only wrong, they are "merely argu[ments] that the settlement terms for Class Members could have been better [which] 'does not mean the settlement [is] not fair, reasonable or adequate.'" *Zakikhani v. Hyundai Motor Co.*, 2023 WL 4544774, at *6 (C.D. Cal. May 5, 2023) (quoting *Hanlon*, 150 F.3d 1011at 1027). Monday-morning quarterbacking does not impede settlements. *Asghari v. Volkswagen Grp. of Am., Inc.*, 2015 WL 12732462, at *26 (C.D. Cal. May 29, 2015 ) ("As an initial matter, the mere fact that the benefits provided under the settlement agreement will not make all class members 'whole,' and/or the possibility that a 'better' settlement might have been reached, do not provide a sufficient basis upon which to conclude that the settlement agreement is unfair."); *Browne v. Am. Honda Motor Co., Inc.*, 2010 WL 9499072, at *18 (C.D. Cal. July 29, 2010) (granting final approval of settlement and recognizing that "[w]hile the proposed settlement does not perfectly compensate every member of the class, it is unlikely that any settlement of the claims of a class of more than 740,000 members would achieve such a result").

### 1. The Additional Compensation Fund is fair and adequate considering the substantial litigation risks and the actual revenues of the covered sports.

Rightfully, no Objector even attempts to argue that the NIL Settlement Fund recovery across Plaintiffs' three categories of NIL claims—BNIL damages, videogame NIL damages, and lost compensation third-party NIL damages—is inadequate.[10] *See* Mot. at 17–18. The Colorado

---

[10] The argument that the NIL Damages Settlement undercompensates female athletes is misplaced. *See generally* Menke Opp. This is a damages settlement of past antitrust claims that must, as a matter of law, be based on market realities "but for" the challenged compensation rules. Plaintiffs did not sue over Title IX violations and the settlement does not address them. The NCAA made a similar argument in opposing class certification, and it was rejected. *See* Cert. Order re Damages Classes at 31, ECF No. 387. The NIL Settlement appropriately provides relief for antitrust violations that harmed Settlement class members' ability to earn NIL compensation in the constrained market, which, for better or for worse, has historically been driven by Division I football and men's basketball. For purposes of this antitrust case, "gender equity concerns . . . [are] irrelevant." *See id.* The Menke Objectors' complaint that "[o]ne hundred percent of the Video Game NIL payments, or $71.5 million, [will] go to male football or basketball players" illustrates the point: that outcome is merely a reflection of the market reality that no video game for women's college sports existed during the damages period. *See* Menke Opp. at 7. The Objectors' claims of historic gender discrimination belong in a different case in a different forum.

-12-

Objectors—whose counsel have little experience in litigating antitrust claims against the NCAA's compensation rules—engage in fantasy by pejoratively characterizing the $600 million Additional Compensation Fund as "pennies on the dollar" for allegedly fool-proof claims. *See* Colo. Opp. at 10. They are also profoundly wrong to pretend that *Fontenot* is first-of-its-kind litigation against NCAA athletic-services compensation rules. *Alston*—litigated for over seven years by Class Counsel before this Court—was the first case to challenge Defendants' restraints on compensation for athletic-services compensation and faced daunting obstacles at every turn.

At the preliminary approval stage, a settlement need only fall within the "range of possible approval." *See Vasquez*, 2015 WL 12857082, at *2. The Additional Compensation Fund unquestionably meets that standard.

For starters, *Alston* and other precedent establishes that certifying damages classes for the athletic-services claims would be very difficult. *See In re NCAA Student-Athlete Name & Likeness Litig.* ("*O'Bannon*"), 2013 WL 5979327, at *3 (N.D. Cal. Nov. 8, 2013) (denying certification of athlete damages class challenging NCAA rules); *Walk-On*, 2006 WL 1207915 at *3, *15 (denying certification of athlete damages class due to class conflicts); *Rock*, 2016 WL 1270087 at *14 (denying certification of athlete damages class where "anti-trust injury as to each member of the class cannot be proven without considering the facts surrounding each class member, including whether each member would have actually received a multi-year GIA"). In *Alston*, damages classes were certified only for the purpose of settlement and only seeking damages up to the cost of attendance for each class member, determined on a formulaic basis. *Alston*, Case No. 4:14-md-02541, ECF No. 746 at 7 (finding risks of maintaining class status as factor favoring final approval).

Even if Plaintiffs cleared the class-certification hurdle for tens of thousands of athletes playing different sports at different skill levels, they would still face challenges on the merits. *Alston* is again instructive. This Court found, after a 10-day trial, that the NCAA's rules prohibiting unlimited cash compensation for athletic services were *procompetitive* and not a violation of the Sherman Act. *See In re NCAA Athlete Grant-in-Aid Cap Antitrust Litig.* ("*Alston*"), 375 F. Supp. 3d 1058, 1083 (N.D. Cal. 2019). Only the NCAA rules limiting educational benefits were held

unlawful, and even so, the Court allowed the NCAA to cap academic achievement cash awards at the athletics participation award limit ($5,980). *Id.* at 1109–10. It is nothing short of absurd for the Colorado Objectors to chastise a $600 million settlement for claims that, when finally decided just *three years* ago, yielded no litigation damages classes and injunctive relief limited to education-related benefits.

The Colorado Objectors also ignore that the Additional Sports Class claims here are even more precarious than those in *Alston*, in which the injunctive-class members were limited to football and basketball players in the Power Five Conferences. The Additional Sports Class, by contrast, encompasses exponentially more athletes, *outside* the Power Five, in non-revenue generating sports. Defendants have claimed that removing the NCAA's compensation rules would lead to decreases in athlete benefits in sports beyond football and basketball because of the enormous revenue disparities between football and basketball and all the other sports. Gowrisankaran Merits Rpt. ¶¶ 68–71.

Not only do the Objectors defy reality about the prospects of *any* victory, they vastly overstate the size of an aspirational recovery. Specifically, as Rascher explains in his Reply Declaration, the Tatos Declaration—which cavalierly values the athletic-services claims at over $24 billion—is deeply flawed. As Rascher explains, Tatos includes several revenue categories that are not attributable to the performance of athletes (as broadcast, sponsorship, and ticket earnings are), but are instead generated by the schools from their general operations (*e.g.*, tuition, alumni contributions, and endowment income). Rascher Reply Decl., ¶¶ 31–59. No economic theory supports the conclusion that athletes would be compensated for these general operational revenues in the absence of the NCAA's restraints. These revenues are not comparable to the revenues generated by athletes in professional sports. *See id.*, ¶¶ 22–31, 34, 41, 46, 49, 53; Colo. Opp. at 8–9; Tatos Decl., ¶¶ 19–49, 75–86.[11] The institutional support revenue category—which is no different

[11] It likewise makes no sense to compare recoveries on antitrust claims—which would be based on the revenues different athletes generate—to what the Menke Objectors allege would be the required compensation under minimum-wage labor laws. *See* Menke Opp. at 18. This is an antitrust case, not an FLSA claim. Wage and hour claims are not being released in this settlement, Joint Decl. ¶ 18, they are being pursued in a different litigation and forum. *See Johnson v. Nat'l Collegiate Athletic Ass'n*, No. 19-5230 (E.D. Pa.).

-14-

from the institutional support that schools provide to the English department and chess club—accounts for approximately $22 billion of the $45 billion difference in Tatos's and Rascher's revenue estimates. Rascher Reply Decl., ¶ 38. And $18 billion of the $22 billion in institutional support is attributed to non-Power Five schools, whose sports generate very little revenue and who therefore would not be expected to provide any material compensation to their athletes beyond the athletic scholarships and medical benefits already provided. *Id.*, ¶ 37. Eliminating this single category of inapplicable revenues and using the more reliable MFRS data erases two-thirds of the difference between Tatos's and Rascher's revenue estimates. *See id.*, ¶¶ 33–38, 63.

The Colorado Objectors further overstate the calculations of the potential damages recovery by valuing GIA benefits to athletes at only 39% of their "sticker price," which Tatos justifies based on a wild guess at the percentage of classes that athletes miss, among other errors. Tatos Decl., ¶ 83. This assertion too is unreliable and naïve—no student's tuition correlates to her rate of attendance, and Tatos neglects to value the tutors and other academic support that schools provide for athletes. *See* Rascher Reply Decl., ¶¶ 77–83.

Weighing the substantial litigation risks against any well-reasoned if aspirational potential damages recovery, the $600 million Additional Compensation Settlement Fund is more than fair and adequate, representing 31.6% of estimated damages. Rascher Opening Decl., ¶ 49. As courts have recognized, this is an "excellent" result for an antitrust class action settlement. *In re Lithium Ion Batteries Antitrust Litig.*, 2020 WL 7264559, at *20 (N.D. Cal. Dec. 10, 2020).

### 2. The Settlement's approach to damages for antitrust claims on scholarship limitations is reasonable.

The Colorado Objectors derisively argue that the Settlement treats scholarship damages claims as "stocking stuffers [being] gifted to Defendants"—but these claims are more aptly characterized as coal. *See* Colo. Opp. at 11. There is virtually no chance of a class damages recovery for claims against the NCAA scholarship limits alone and, even so, class members with partial or no athletic scholarships *will* receive damages payments from the $600 million Additional Compensation Settlement Fund.

-15-

1    Colorado Objectors' counsel slapped together the *Cornelio* complaint challenging NCAA

2    scholarship limits in the week *following* Plaintiffs' Motion and apparently have not evaluated the

3    enormous barriers they will face in pursuing their claims. Not only do they inflate the potential

4    damages wildly, they provide no explanation of how they will get a partial-scholarship class claim

5    certified, *i.e*, how they will model class-wide antitrust impact and damages from the NCAA

6    scholarship limits alone.[12] This is a glaring omission given the history of litigation in this area. The

7    NCAA has prevailed in *three* prior class actions challenging the NCAA's scholarship limits.

8    Plaintiffs' counsel first challenged NCAA scholarship limits in 2004 in *In re NCAA I-A Walk-On*

9    *Football Players Litigation*. In that case, the court denied certification of a class of walk-on football

10   players at Division I schools who sought to challenge the NCAA's scholarships limits. *See* 2006

11   WL 1207915, at *1, *3, *15. In denying class certification, the court held that the purported class

12   members "ha[d] inherently conflicting interests" because "each class member would have an

13   incentive to prove that he would have received a scholarship while others would not have been

14   awarded the scholarship for which he would have been competing." *See id.* at *13.[13]

15   Most recently, in *Rock v. Nat'l Collegiate Athletic Ass'n*—yet another case Plaintiffs'

16   counsel led—class certification was again denied to a class of athletes challenging limits on the

17   number and duration of athletic scholarships, based on the court's finding that "[antitrust] injury as

18   to each member of the class cannot be proven without considering the facts surrounding each class

19   member, including whether each member would have actually received a multi-year GIA or would

20   not have otherwise had their GIA reduced or canceled." *Rock*, 2016 WL 1270087 at *14.

21   Given this litigation history, it was reasonable for Plaintiffs' counsel to conclude that past

22   damages for NCAA scholarship restrictions alone have *de minimis* value. But the Colorado

23   Objectors misapprehend the Settlement (again) in asserting that such damages claims were released

24   without any compensation. As Dr. Rascher's Declaration explains, the premise of his estimated

---

[12] Plaintiffs' counsel, by contrast, began working with experts to develop a model for showing
antitrust impact and damages for the additional compensation claims months before they filed suit
in *Carter*. Joint Decl., ¶ 10.

[13] Class counsel brought another antitrust litigation on behalf of college athletes that sought to
challenge NCAA scholarship restrictions that did not even survive the pleadings stage. *See Agnew*,
683 F.3d at 333.

damages for the NCAA compensation restrictions on athletic services is that class members would have received up to about 50% of NCAA revenues. To make this calculation, Dr. Rascher first calculated the 50% revenue figure ($23.2 billion), next deducted athlete compensation already accounted for (*e.g.*, GIA scholarships and medical and BNIL and *Hubbard* damages), and then concluded that the remainder—$1.9 billion—represented the highest-end of potential damages for athletic services. This economic analysis does not turn on whether, in the "but for" world, athletes would have received up to 50% of NCAA revenues for their athletic services in the form of additional education-related benefits, cash, *scholarships*, or any other form of compensation. It is simply a calculation of the maximum *value* class members could have received for their athletic services, and under the proposed Settlement, *all* class members will be compensated for releasing those claims, including those who only received partial scholarships in equivalency sports.

The Colorado Objectors' assertion that there should have been more or different scholarship-specific damages payments ignores that Dr. Rascher's analysis already accounts for athletes receiving the full 50% revenue share absent the restraints on compensation for athletic services (including the NCAA scholarship limits), *i.e.*, there are no more damages to claim without pursuing *more* than the 50% share that even the Colorado Objectors agree is a reasonable yardstick. Class counsel, accounting for the substantial litigation risks, settled for 31.6% of the estimated potential damages. This outcome is far more than reasonable. *See Aarons v. BMW of N. Am., LLC*, 2014 WL 4090564, at *13 (C.D. Cal. Apr. 29, 2014) (finally approving settlement and rejecting objection "that the settlement does not compensate" certain car owners who "would likely find it difficult to prove their damages").[14]

## C. The Injunctive Relief Settlement Is Fair And Adequate

There is similarly no merit to the Objectors' claim that the Injunctive Relief Settlement is inadequate because—even though it offers the prospect of over ***$20 billion in new benefits to athletes over the next ten years***—it does not remove all limits on compensation. It is not a valid objection to complain that a settlement, which "by its very nature [is] a compromise," does not

---

[14] The Parties agree that the Settlement does not release the *Choh* Plaintiffs' claims contesting the Ivy League rule prohibiting athletic scholarships that the NCAA rules permit. *See* Joint Decl., ¶ 17.

obtain all possible relief. *Alvarez v. Sirius XM Radio Inc.*, 2021 WL 1234878, at \*7 (C.D. Cal. Feb. 8, 2021) (overruling objection to settlement that allowed defendant to continue charging a fee after settlement because "a full recovery is often not possible in a settlement . . . and a partial recovery does not render a settlement unreasonable"); *see also Officers for Justice v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 624 (9th Cir. 1982) ("The very essence of a settlement is compromise, a yielding of absolutes . . . it is not to be judged against a hypothetical speculative measure of what might have been achieved.") (citation omitted); *Hanlon*, 150 F.3d at 1026 ("[settlement] is the offspring of compromise[,] the question is . . . not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate, and free from collusion").

Because an injunctive relief antitrust settlement is, by nature, a compromise, it need not remove all future limits on competition to be reasonable and adequate. This is particularly true with respect to the settlement of an antitrust claim where—as here—the rule of reason is the likely standard of review. *See Alston v. Nat'l Collegiate Athletic Ass'n*, 958 F.3d 1239, 1256–57 (9th Cir. 2020); *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1069 (9th Cir. 2015). Tellingly, both recent, successful antitrust cases in this Court that contested NCAA rules and were litigated *through trial* under the rule of reason resulted in injunctive relief that provided only a portion of the relief sought and permitted other NCAA restraints on compensation to continue. *See O'Bannon v. National Collegiate Athletic Ass'n*, 7 F. Supp. 3d 955, 1007–08 (N.D. Cal. 2014), *aff'd in part, vacated in part by O'Bannon*, 802 F. 3d 1049 (seeking injunctive relief to allow NCAA and its members to compensate college athletes for use of their NIL, but only granting injunctive relief permitting full cost-of-attendance scholarships after appeal); *Alston*, 375 F. Supp. 3d at 1109–10 (post-trial order); Permanent Injunction, *Alston*, No. 14-md-02541, ECF No. 1163 (N.D. Cal. Mar. 8, 2019) (seeking unrestrained free market competition for collegiate athletic services but only granting injunctive relief against restraints on education-related benefits and only permitting academic achievement cash awards up to $5,980 annually).

Moreover, the Injunctive Relief Settlement is hardly a "halfway measure." *See* Colo. Opp. at 18. It is an extraordinary revolution of college sports. It enables future college athletes throughout

Division I to receive tens of billions of dollars in new benefits over the next ten years in addition to benefits they already may receive, including third-party NIL payments.[15] As Rascher estimates, under the Settlement, the total benefits paid to Division I athletes in the future may achieve the same compensation-to-revenues ratio (50%) that is provided by the most economically successful professional sports leagues to their talented athletes. *See* Rascher Opening Decl., ¶¶ 39, 43. The Settlement is thus comparable to what might be achieved through a fully litigated result.

Significantly, previous injunctive settlements resolving antitrust class actions challenging athlete compensation restraints have allowed the defendants to impose some restraints going forward—like compensation caps—in exchange for the elimination of other restraints on athlete compensation. *See White v. Nat'l Football League*, 756 F.3d 585, 587–90 (8th Cir. 2014); *Bridgeman v. Nat'l Basketball Ass'n*, 675 F. Supp. 960, 962–63 (D.N.J. 1987); *Robertson v. Nat'l Basketball Ass'n*, 72 F.R.D. 64, 69–70 (S.D.N.Y. 1976). And, contrary to the proposed *amici*'s claim, *see* Br. of *Amici Curiae* Richard J. Volante & David M. West, ECF No. 485, the *White* Settlement shows that such an injunctive settlement does not impede the ability of a union formed after the class action settlement to subsequently negotiate a collective bargaining agreement covering health and safety issues and benefit terms not addressed by the injunction. *See White*, 756 F.3d at 589.[16] The Injunctive Relief Settlement explicitly allows collective bargaining in the future if the law permits, including to "agree[] upon additional, expanded or different benefits than those permitted by this Injunctive Relief Settlement." IRS Art. 7, § 2; s*ee* Mot. at 10. The Injunctive Relief Settlement would thus be a leg up to athletes in any collective bargaining negotiations that might take place if unions are recognized in the future.[17]

---

[15] Objectors quibble that these massive new benefits should be discounted because the Settlement allows schools to count limited amounts of *new* scholarship payments and Academic Achievement Awards. *See* Colo. Opp. at 19. But this does not diminish the fact that the Settlement will allow athletes to receive tens of billions of dollars in new benefits and payments, while retaining all existing benefits and payments, including third-party NIL. *See* Rascher Opening Decl., ¶¶ 39, 82–87; Mot. at 21–22.

[16] Class Counsel knows this well—Winston counsel served as Class Counsel in *White* and then counsel for the union that formed thereafter.

[17] Notably, the proposed *amici* do not represent any class member and thus lack standing to file an objection. *See In re Apple iPhone/iPod Warranty Litig.*, 2014 WL 12640497, at *7 (N.D. Cal.

It is also incorrect that the Injunctive Relief Settlement enacts a new, more severe, prohibition on NIL deals with boosters that reward athletes for their athletic performance, as opposed to compensating them for the use of their NIL rights. *See* Menke Opp. at 17. The NCAA *already* prohibits boosters from making such payments. *See* NCAA Interim NIL Policy Guidance Regarding Third Party Involvement.[18] The Settlement actually makes the administration of booster rules fairer and more transparent. It also mitigates the risk of abuse by the NCAA in its interpretation and enforcement because, for the first time, neutral arbitration will be available to challenge the NCAA's enforcement of such rules against athletes or their schools. *See* IRS Art. 6, § 2. The NCAA will no longer be the prosecutor, judge and jury for booster restrictions.

In sum, the Injunctive Relief Settlement is not just fair and adequate to class members. It is a historic change in the very fabric of college sports that allows college athletes to—for the first time—receive tens of billions of dollars in new benefits and substantially share in the revenues that they generate in a manner comparable to professional athletes. And this system comes with audit rights for class counsel and anti-collusion provisions that assure the class members that the fairness and implementation of the system will be monitored and enforced. *See id.* at Art. 3, § 6; Art. 5. Finally, because there is no release of future antitrust damages claims, *see infra* Section II.D, if Defendants violate the antitrust laws during the Injunctive Relief period, they will be subject to another antitrust damages action.

**D.    The Release Is Appropriate**

The Settlement's release is properly limited to damages claims that were raised or could have been raised in these cases. Although it extends beyond the specific claims in the Complaint, the damages settlement release only does so to encompass potential claims "Prior to Final Approval" . . . "(1) on account of, arising out of, or resulting from any and all previously existing NCAA and conference rules regarding monies and benefits that may be provided to student-athletes by the NCAA, Division I conferences and/or Division I Member Institutions, or (2) relating in any

---

May 8, 2014) ("[N]on-class members have no standing to object to a class action settlement.") (citation and internal quotation marks omitted).

[18] *Available at* https://ncaaorg.s3.amazonaws.com/ncaa/NIL/May2022NIL_Guidance.pdf.

way to any NCAA or conference limitations on the numbers of scholarships allowed or permitted in any sport." Settlement Agreement ¶ 1(oo); *see also* Mot. at 27. This damages release is tailored to the conduct at issue in these actions and is consistent with release provisions approved by courts in the Ninth Circuit. *See*, *e.g.*, *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) (release may extend to "claims not alleged in the underlying complaint where those claims depended on the same set of facts as the claims that gave rise to the settlement"). The injunctive claim release similarly reflects the contours of the Injunctive Relief Settlement and encompasses the injunctive relief requested in the operative complaint. *Compare* Second Am Compl. at 103–04 (Request for Relief), with Settlement Agreement ¶ 1(pp).

The Objectors challenge the scope of the releases by mischaracterizing them.

*First*, there is no release of future damages claims. Each damages class is limited to college athletes who joined their teams by September 15, 2024. *See* Mot. at 7. Athletes who join their teams thereafter are not in any damages class and do not release any damages claim. And the Colorado Objectors are wrong that only Class Counsel may represent athletes seeking to bring such damages claims in the future. The Injunctive Relief Settlement term they cite only allows Class Counsel to exclusively bring claims for violations of the Injunctive Relief Settlement. Any counsel may represent future athletes in unreleased damages claims. IRS Art. 5, § 1.

*Second*, the Parties agree that the release does not cover any of the Fair Labor Standard Act claims in *Johnson* or any other labor law claims.[19] Joint Decl., ¶ 18.

*Third*, contrary to the concerns expressed by the Menke objectors, the Settlement does not release any claims that could be brought under Title IX or other discrimination laws. Any such claims are for another case in another forum.

---

[19] Plaintiffs will amend the settlement notices to make clear that the Parties have agreed that the Fair Labor Standards Act claims in *Johnson* and any other labor law claims are not released by the Settlement. *See* Joint Decl., ¶ 18.

*Fourth*, contrary to the concerns of the *Choh* Objectors, the Parties agree that the release does not cover their claims against the pre-existing Ivy League rule against athletic scholarships permitted by NCAA rules.[20] Joint Decl., ¶ 17.

*Finally*, the Colorado Objectors' claim that the Settlement "attempts to rope in ten years of potential future athletes" with "no voice in the approval process," is false. As explained in Plaintiffs' Motion, the Settlement contains a notice procedure which provides additional protections for future athletes and ample opportunity to have their voices, including any objections to the continuation of the injunctive relief, heard. For the duration of the Injunctive Settlement Term, yearly notice will be provided to "all incoming Division I student-athletes" about the terms of the Injunctive Relief Settlement and their right to file objections. Settlement Agreement ¶ 14.

## E.   Any Quibbles With The Notice Document Or Proposed Preliminary Approval Order Can Be Remedied, But Are Largely, If Not Completely, Unnecessary

Contrary to the arguments of the Colorado Objectors, Class Counsel have drafted the proposed notice documents to provide sufficient detail for class members to determine whether to opt out or stay in the case. The Colorado Objectors incorrectly state that the draft notice documents "say nothing about what is being released." Colo. Opp. at 24. The long form notice, the postcard notice, and the email notice all separately and clearly state that athletes will not be able to sue the NCAA or any of the Power Five Conferences, or their member institutions about the same issues. *See* Peak Decl., Exs. 1, 2, 5. Virtually identical release provisions have been approved by courts in this District. *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 330 (N.D. Cal. 2018).

Further, the Ninth Circuit has held that notice "does not require detailed analysis of the statutes, or causes of action forming the basis for the plaintiff class's claims." *Lane v. Facebook, Inc.*, 696 F.3d 811, 826 (9th Cir. 2012). Instead, the purpose of notice is to "generally describe [] the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Id.*

---

[20] Plaintiffs will amend the settlement notices to make clear that the Parties have agreed that the *Choh* Objectors' claims against the pre-existing Ivy League rule against athletic scholarships and compensation or reimbursement for athletic services are not released by the Settlement. *See* Joint Decl., ¶ 17.

Class Counsel has done so here. The draft long form notice document—far from failing to indicate what is being released, as alleged by the Colorado Objectors—states six times that athletes will not be able to sue the Defendants about the issues in this case if they do not opt out. All three draft notice documents, additionally, direct athletes to the settlement website where the complaint, the full Settlement Agreement and the Court's Orders will be easily accessible. *See* Peak Decl., Exs. 1, 2, 5. Courts in this district have found that is sufficient for class members to "make an informed decision as to whether to opt-out or stay in the class." *See In re MacBook Keyboard Litig.*, 2023 WL 3688452, at *11–12 (N.D. Cal. May 25, 2023) (quoting *Nguyen v. BMW of N. Am. LLC*, 2012 WL 1677054, at *2 (N.D. Cal. Apr. 20, 2012)). Therefore, it is not necessary to email and mail the long form notice to class members, as requested by Colorado Objectors. To the extent the Court disagrees, Class Counsel are prepared to make any necessary revisions prior to sending notice.

Colorado Objectors also complain about the provision in the proposed preliminary approval order that would stay the *Fontenot* action pending resolution of this settlement. But district courts have the "authority and discretion to protect the interests and rights of class members and to ensure its control over the integrity of the settlement approval process." *Hanlon*, 150 F.3d 1011 at 1025. While not always necessary, courts have found stays of duplicative actions to be proper when there is a "threat to the federal court's ability to manage and resolve the actions," including the risk that duplicative litigation would impair the court's "flexibility and authority" to approve settlements. *See In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.*), 770 F.2d 328, 337–38 (2d Cir. 1985); *Lucas v. Kmart Corp.*, 234 F.R.D. 688, 697–98 (D. Colo. 2006) (enjoining class members' claims covered by the release in the preliminarily approved settlement on the ground that "it would aid in the protection of its jurisdiction and in the management of the settlement approval process")). This Court previously exercised its discretion to approve a stay of parallel proceedings in the preliminary approval order in *Alston*. See Am. Order Granting Pls.' Unopposed Mot. For Prelim. Approval of Class Action Settlement, ¶ 22 (Mar. 29, 2017, ECF No. 615).

-23-

Here, the Colorado Objectors have made it clear that duplicative actions will impair this settlement process—by filing a new case pursuing claims released in the Settlement after the parties filed for preliminary approval. *See Cornelio,* ECF No. 1 (August 6, 2024). Temporarily staying the pursuit of claims that are released in this Settlement could aid in the protection of this Court's jurisdiction and in the management of the settlement approval process. *See Lucas*, 234 F.R.D. 688 at 697–98. This Settlement is the result of robust litigation over years that will resolve a large and complex matter and should not be impeded by parallel actions that seek to undermine the Settlement.

Unlike the case relied on by Colorado Objectors, *Arena v. Intuit Inc.*, a temporary stay here would not foreclose class members' ability to seek damages relief on their own if they choose to opt out. 2021 WL 834253, at *11 (N.D. Cal. Mar. 5, 2021) (refusing to enjoin individual arbitration proceedings for "tens of thousands of class members"). Class members—including the *Fontenot* plaintiffs—have the same choice throughout the approval process, regardless of whether that action is stayed, to opt out and pursue their damages claims in a separate lawsuit or stay in this settlement and receive damages awards but release their past damages claims. The damages claims in *Fontenot* can go forward after final approval for any class members who choose to opt out. But there is no reason why that case should go forward while the approval process is pending, when it is uncertain how many, if any, class members will choose to opt out of the Damages Settlement classes.

Finally, Colorado Objectors assert that the preliminary approval order does not state that electronic filing of objections is allowed. Plaintiffs agree and ask that the preliminary approval order be amended to so state.

### III.   CONCLUSION

For all the reasons stated above and in Plaintiffs' moving papers, the Court should grant preliminary approval of the proposed Settlement and order a schedule for notice, opt out and final approval so that the Settlement can take effect, and end the exploitation of Division I college athletes, beginning with the 2025–26 academic year.

1

DATED: August 16, 2024

Respectfully submitted,

2

By  */s/ Steve W. Berman*

By  */s/ Jeffrey L. Kessler*

3

Steve W. Berman (*Pro hac vice*)
Emilee N. Sisco (*pro hac vice*)

Jeffrey L. Kessler (*pro hac vice*)
David G. Feher (*pro hac vice*)

4

Stephanie Verdoia (*pro hac vice*)
Meredith Simons (SBN 320229)

David L. Greenspan (*pro hac vice*)
Adam I. Dale (*pro hac vice*)

5

**HAGENS BERMAN SOBOL SHAPIRO LLP**

Sarah L. Viebrock (*pro hac vice*)
Neha Vyas (*pro hac vice*)

6

1301 Second Avenue, Suite 2000
Seattle, WA 98101

**WINSTON & STRAWN LLP**
200 Park Avenue

7

Telephone: (206) 623-7292
Facsimile: (206) 623-0594

New York, NY 10166-4193
Telephone: (212) 294-6700

8

steve@hbsslaw.com
emilees@hbsslaw.com

Facsimile:  (212) 294-4700
jkessler@winston.com

9

stephaniev@hbsslaw.com
merediths@hbsslaw.com

dfeher@winston.com
dgreenspan@winston.com

10

aidale@winston.com

11

Benjamin J. Siegel (SBN 256260)
**HAGENS BERMAN SOBOL SHAPIRO LLP**

sviebrock@winston.com
nvyas@winston.com

12

715 Hearst Avenue, Suite 300
Berkeley, CA 94710

13

Telephone: (510) 725-3000
Facsimile:  (510) 725-3001

Jeanifer E. Parsigian (SBN 289001)
**WINSTON & STRAWN LLP**

14

bens@hbsslaw.com

101 California Street, 34th Floor
San Francisco, CA 94111

15

Telephone: (415) 591-1000

16

Jeffrey L. Kodroff (*pro hac vice*)
Eugene A. Spector (*pro hac vice*)

Facsimile:  (415) 591-1400
jparsigian@winston.com

17

**SPECTOR ROSEMAN & KODROFF, PC**
2001 Market Street, Suite 3420

18

Philadelphia, PA 19103
Telephone: (215) 496-0300

*Class Counsel for Plaintiffs*

19

Facsimile:  (215) 496-6611
jkodroff@srkattorneys.com

20

espector@srkattorneys.com

21

*Class Counsel for Plaintiffs*

22

23

24

25

26

27

28

## <u>ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)</u>

Pursuant to Civil Local Rule 5-1(i)(3), the filer of this document attests that concurrence in the filing of this document has been obtained from the signatories above.

By: <u>/s/ *Steve W. Berman*</u>
    STEVE W. BERMAN

-26-