| | |
|---|---|
| Steve W. Berman (*pro hac vice*) <br> Emilee N. Sisco (*pro hac vice*) <br> Stephanie Verdoia (*pro hac vice*) <br> Meredith Simons (SBN 320229) <br> HAGENS BERMAN SOBOL SHAPIRO LLP <br> 1301 Second Avenue, Suite 2000 <br> Seattle, WA 98101 <br> Telephone: (206) 623-7292 <br> Facsimile: (206) 623-0594 <br> steve@hbsslaw.com <br> emilees@hbsslaw.com <br> stephaniev@hbsslaw.com <br> merediths@hbsslaw.com <br><br> Benjamin J. Siegel (SBN 256260) <br> HAGENS BERMAN SOBOL SHAPIRO LLP <br> 715 Hearst Avenue, Suite 300 <br> Berkeley, CA 94710 <br> Telephone: (510) 725-3000 <br> Facsimile: (510) 725-3001 <br> bens@hbsslaw.com <br><br> *Class Counsel for Plaintiffs* | Jeffrey L. Kessler (*pro hac vice*) <br> David G. Feher (*pro hac vice*) <br> David L. Greenspan (*pro hac vice*) <br> Adam I. Dale (*pro hac vice*) <br> Sarah L. Viebrock (*pro hac vice*) <br> Neha Vyas (*pro hac vice*) <br> WINSTON & STRAWN LLP <br> 200 Park Avenue <br> New York, NY 10166-4193 <br> Telephone: (212) 294-4698 <br> Facsimile: (212) 294-4700 <br> jkessler@winston.com <br> dfeher@winston.com <br> dgreenspan@winston.com <br> aidale@winston.com <br> sviebrock@winston.com <br> nvyas@winston.com <br><br> Jeanifer E. Parsigian (SBN 289001) <br> WINSTON & STRAWN LLP <br> 101 California Street, 34th Floor <br> San Francisco, CA 94111-5840 <br> Telephone: (415) 591-1000 <br> Facsimile: (415) 591-1400 <br> jparsigian@winston.com <br><br> *Class Counsel for Plaintiffs* |

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | Case No. 4:20-cv-03919 CW <br><br> **JOINT DECLARATION OF STEVE W. BERMAN AND JEFFREY L. KESSLER IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY SETTLEMENT APPROVAL** <br><br> Hrg. Date: September 5, 2024 <br> Time: 2:30 p.m. <br> Judge: Hon. Claudia Wilken <br> Courtroom: 2, 4th Floor |

010912-11/2733995 V1

We, STEVE W. BERMAN and JEFFREY L. KESSLER, declare as follows:

1. We are attorneys duly licensed to practice law before this Court. We are members of the Washington and New York Bars, respectfully, and have been admitted to this Court *pro hac vice*. We are counsel for Plaintiffs Grant House, Sedona Prince, Tymir Oliver, Dewayne Carter, and Nya Harrison ("Plaintiffs") in this matter.

2. We submit this joint declaration in further support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement.

3. Represented by Hagens Berman Sobol Shapiro LLP ("Hagens Berman"), Plaintiffs Grant House and Sedona Prince filed the *House v. NCAA* case on June 15, 2020. At that time, appeal of this Court's post-trial decision and injunction in *In re Grant-in-Aid Cap Antitrust Litigation* ("*Alston*") was ongoing. Our firms represented the plaintiffs in *Alston* before this Court, including at trial, and throughout the appellate process. In *Alston*, plaintiffs challenged various NCAA restrictions, including rules prohibiting direct payments for athletic performance. After years of hard-fought litigation, this Court in *Alston* struck down the NCAA's rules limiting education-related compensation and benefits. Ultimately, this Court's decision was upheld by the Ninth Circuit and later affirmed by the Supreme Court in a 9-0 decision. But Defendants' NIL and pay-for-play rules remained in place and the legal attack on them was defeated.

4. Following the favorable *Alston* decision at the Supreme Court, we considered immediately filing new claims challenging Defendants' prohibition on pay-for-play compensation, but due to issues of res judicata, stare decisis, and collateral estoppel, we concluded that we needed to wait to be able to show changed facts to make the claims stronger. There is no question that these claims would be brought by our clients-the question was when the timing was best.

5. The NCAA's rule change allowing third-party NIL in July 2021 was part of the beginning of important changes to the factual landscape. We believed additional factual development would be helpful to strengthening the claims for additional compensation for athletic services, including through discovery in the *House* litigation, and that a subsequent lawsuit over athlete compensation would be aided by first obtaining class certification in *House*.

6. Plaintiffs filed their class certification briefing in *House* in October 2022, which laid out initial damages estimates for NIL claims.

7. The parties engaged Eric Green as the mediator for *House* in November 2022. The mediation process began with sharing case filings with Professor Green and calls with the mediator – some with one side only and some combined with all the parties.

8. Plaintiffs filed the *Hubbard v. NCAA* case on April 4, 2023, seeking damages for Academic Achievement Award payments during the pendency of the *Alston* appeal. At that point, there were two academic years showing the payment, requirements for, and distribution of *Alston* awards that could inform the damages methodology.

9. The first in-person mediation for *House* with the parties took place on May 25, 2023. During that mediation, we informed Defendants that it was our intention to bring claims for additional compensation for athletic services (similar to the claims in *Alston*, the claims that were eventually asserted in the *Carter* complaint). We were aware from our extensive knowledge of and experience with the NCAA compensation rules, past lawsuits challenging the NCAA compensation rules, working with our experts to study the relevant labor markets, and common sense, that it was likely not possible to reach an injunctive relief settlement that resolved NIL-compensation claims only and that an injunctive relief settlement would need to make structural changes to college athletics that would address all of the NCAA's compensation rules. Defendants indicated that they shared this view.  At the first mediation session, we proposed a compensation system for college sports that would address all of the NCAA's compensation rules and Defendants responded by indicating that they were interested in having discussions about such a comprehensive injunctive settlement structure. The proposal we made at that first mediation session was largely the same structure that we secured in final injunctive relief settlement now pending preliminary approval before the Court.

10. On the day of the first in-person mediation session, on May 25, 2023, we asked economist Dr. Daniel Rascher and his team at OSKR to begin analyzing damages for the additional compensation claims based on a methodology using professional league compensation—specifically the NBA and NFL, both of which pay approximately 50% of their revenues derived from player

athletic services and performance to their athletes—as benchmarks for a model of damages for additional compensation claims in college athletics. We worked with Dr. Rascher and his team on valuing these damages for several months over the summer of 2023.

11. We are, and were at the time of the mediation sessions, well-aware of the strengths and weaknesses of antitrust claims against various types of NCAA compensation rules, including (but not limited to) their rules prohibiting compensation to college athletes for their athletic services, prohibiting compensation from schools, conferences or third parties for NIL, prohibiting academic incentive awards, and limiting the number of available scholarships. One or both of us has led prior cases challenging each of these NCAA rules, with varying results. None of the counsel for any of the objectors has ever been lead counsel in any case challenging NCAA compensation or scholarship rules, nor litigated class certification in any such case.

12. Specifically concerning NCAA scholarship limits, Hagens Berman has tried and failed three times in three different courts to challenge these rules. First, class certification was denied based on class conflicts over which class members would have actually received scholarships in *In re NCAA I-A Walk-On Football Players Litig.*, 2006 WL 1207915, at *9-13 (W.D. Wash. May 3, 2006), a challenge to scholarship limits on behalf of walk-on football players in the Power 5. Next, Hagens Berman filed a class action lawsuit challenging the NCAA's then-prohibition on multiyear scholarships and the cap on the number of scholarships per team. This case was dismissed with prejudice by the district court and affirmed by the Seventh Circuit. *See Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328 (7th Cir. 2012). Finally, Hagens Berman filed *Rock v. National Collegiate Athletic Association*, 2016 WL 1270087, at *15-16 (S.D. Ind. Mar. 31, 2016), again challenging the multiyear scholarship and one-year limits imposed at that time by the NCAA. Both the damages and injunctive relief classes in *Rock* were denied class certification.

13. Following the May 25, 2023 mediation session, Plaintiffs and Defendants in the *House* case ("the Parties") met in person four times over the next year, on July 19, 2023, August 18, 2023, September 28, 2023, and April 24-25, 2024. In addition, the parties participated in multiple zoom meetings with the mediator and with each other.

14. We are, and were at the time of the mediation sessions, well-aware of the Second Circuit decisions in *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011) and *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223 (2d Cir. 2016). We were specifically aware of *Payment Card*'s discussion of potential conflicts in settlement of class action damages and injunctive relief claims and concerns that injunctive relief could be traded off in favor of increased damages (or vice-versa). We discussed the *Payment Card* case with the mediator and Defendants and structured the settlement negotiations so that we first exclusively discussed and resolved injunctive relief issues, to ensure no conflicts arose in this case. We paid careful attention to make sure there would be no discussion of, or any tradeoffs between, injunctive relief and damages. We made this point to Defendants repeatedly and refused to negotiate the damages amounts for the classes before the terms of the injunctive relief settlement was agreed upon. Additionally, the attorney fees provisions for the injunctive settlement were not negotiated until the other terms of the injunction were agreed to.

15. After the Parties agreed on injunctive relief terms, the negotiations addressed each damages claim separately because each claim has different associated damages and litigation risks and we wanted to make sure there would be no trade-offs between the damages claims. The final agreed-upon amount for each claim was determined before discussions of the next claim began. In particular, the damages negotiations were done on a case-by-case basis separately for NIL-related damages (the focus of *House*), Academic Achievement Award-related damages (the focus of *Hubbard*), and damages related to compensation for athletic services (the focus of *Carter*). The recovery for each aspect of the anticompetitive conduct that is released is a product of the damages estimate provided by Dr. Rascher, the procedural posture of the particular case, and risks and strengths of each particular claim. We further note that prior to commencing any of our NCAA cases we have asked experts how we would model class-wide impact and damages. And we have presented such models to the Court in *Alston*, *House* and *Hubbard*. The Colorado Objectors, by contrast, do not present any model they have for proving class-wide impact or damages for the fair play and partial scholarship claims.

16. Counsel from Winston & Strawn represents and has represented labor unions in collective bargaining and class action settlements for many professional leagues, including the NBA and NFL. Counsel has participated in the negotiation of every collective bargaining agreement ("CBA") in the NBA from 1988 to date (except 1995) and every CBA in the NFL from 1993 to date. Based on that experience, Counsel believes that the injunctive relief settlement will enhance, not detract from, the bargaining power of athletes if collective bargaining becomes possible because the principle of revenue sharing and many permitted benefits and payments will already be established. The settlement agreement also explicitly permits collective bargaining for additional benefits. In other words, if collective bargaining occurs during the injunctive relief settlement period, the terms of the settlement will likely be the baseline for those negotiations, with the potential for athletes to secure *additional* compensation and benefits. The unique experience of Winston counsel in negotiating revenue sharing systems for professional athletes provided Class Counsel with special expertise to negotiate the injunctive relief settlement here. Counsel for the Colorado Objectors do not have any such experience, which limits their ability to assess the value of the injunctive relief settlement terms.

17. The Parties have agreed that the Settlement Agreement is not intended to release, and does not release, the claims currently raised in the Complaint in *Choh v. Brown University et al.*, No. 3:23-cv-305 (D. Conn.) ("*Choh*"), against the Ivy League and Ivy League member institutions ("*Choh* Defendants"), challenging an alleged agreement among the *Choh* Defendants not to award athletic scholarships or otherwise provide any compensation or education-related reimbursements for athletic services as permitted under then-applicable NCAA rules. The previously filed *Choh* claims arise out of unique aspects of rules applicable within the Ivy League alone. The Settlement Agreement and its release provisions otherwise fully apply to student-athletes who are in the Settlement Classes, including but not limited to Ivy League student-athletes, and likewise otherwise fully apply to Releasees as defined in the settlement, which includes but is not limited to the Ivy League, Ivy League member institutions, and Defendants in this Action. We will amend the settlement notice documents to make this distinction clear for class members.

18. The Parties have also agreed that the Settlement Agreement was not intended to release, and does not release, the claims currently stated in the complaint in *Johnson, et al. v. National Collegiate Athletic Association, et al.*, 2:19-cv-05230-JP (E.D. Pa.), claims under the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. or any other federal labor laws, or claims under any analogous state labor laws. We will amend the settlement notice documents to make this distinction clear for class members.

19. Korein Tillery, counsel for the Colorado Objectors, has previously engaged in the same strategy that they are pursuing in this case – filing belated litigation based on the original work of other lawyers, and then seeking to block a settlement of the original litigation based on spurious objections about adequacy of representation and the scope of the released claims.

20. Hagens Berman, along with several other firms, filed a case in March 2019, *Moehrl v. National Association of Realtors*, 1-19-cv-01610 (N.D. Ill.), on behalf of home sellers. The case brought antitrust claims against the National Association of Realtors ("NAR"), as well as several defendant real estate brokerages, challenging rules related to real estate broker commissions promulgated by NAR. The case was the first of its kind to challenge these rules as anticompetitive. In October 2020, the Court denied Defendants' motion to dismiss. At that point, nearly two years after the original complaint, Korein Tillery filed a belated action, *Batton v. National Association of Realtors*, 1:21-cv-00430 (N.D. Ill.), on behalf of home buyers challenging the same rules with the same case theory. The *Batton* case made little progress. It was initially dismissed in 2022 (*Batton* ECF No. 81), partially dismissed in February 2024 (*Batton* ECF No. 125), and the parties are currently engaged in a third round of motion to dismiss briefing.

21. By contrast, during that same time, Plaintiffs in the *Moehrl* litigation certified a class of home sellers, completed fact discovery, and subsequently reached a set of settlements with defendants that involved sweeping changes to the real estate industry, including the elimination of the NAR rules that were the focus of the original litigation. *See generally Burnett v. National Association of Realtors, et al.*, W.D. Mo. 4-19-cv-00332, ECF 1458 at 2-5 (summarizing the history of the litigation). These settlements have been widely hailed for implementing significant reforms to the real estate industry and lower the $100 billion dollars per year that American consumers pay in

real estate commissions annually. The *New York Times* reported that housing experts stated that "expected savings for homeowners, could trigger one of the most significant jolts in the U.S. housing market in 100 years" and that "economists estimate that commission could now be reduced by 30 percent, driving down home prices across the board."[1] One housing expert, Norm Miller, a professor of real estate at the University of San Diego, stated that "This will blow up the market and would force a new business model."[2] As reported by the *Washington Post*, multiple independent analysts have predicted tens of billions of dollars a year in savings for consumers.[3] The Consumer Federation of America, a public interest group, has estimated that the reforms would save consumers $30 billion per year.[4]

22. Despite the lack of progress in their own case, Korein Tillery has actively sought to block the settlements in the *Moehrl* litigation and the billions of dollars in benefits that they will bring to consumers nationwide. They filed objections to the settlement, claiming that the class representatives were inadequate and the settlement released claims broader than those that had been initially brought. *Burnett*, ECF No. 1447. After filing objections, Korein Tillery even unsuccessfully sought a temporary injunction to stop a fairness hearing on the initial round of settlements that was pending in the Western District of Missouri. *Batton*, ECF No. 152. The request for injunction was denied by the court in the Northern District of Illinois, who held that "Plaintiffs' goal is to prevent the fairness hearing duly set…from going forward according to that court's orders. Such extraordinary action would be inappropriate." *Batton*, ECF No. 154, at 1.

23. Korein Tillery's objections to the settlement were then denied in their entirety by the district court in the Western District of Missouri. *Burnett*, ECF No. 1487. The Court held that Korein Tillery's objections about the scope of the release were meritless because "when approving a

---

[1] Debra Kamin, *Powerful Realtor Group Agrees to Slash Commissions to Settle Lawsuits*, New York Times, Mar. 15, 2024, https://www.nytimes.com/2024/03/15/realestate/national-association-realtors-commission-settlement.html.

[2] *Id*.

[3] Julian Mark, Aaron Gregg & Rachel Kurzius, *Realtors' Settlement Could Dramatically Change Cost of Housing Sales*, Washington Post, Mar. 15, 2024, https://www.washingtonpost.com/business/2024/03/15/nar-real-estate-commissions-settlement/.

[4] *Id*.

BERMAN, KESSLER JOINT DECL. IN FURTHER SUPPORT OF PRELIMINARY SETTLEMENT APPROVAL
Case No. 4:20-cv-03919-CW
- 7 -

proposed settlement, courts regularly certify broader classes and release broader claims than those originally pleaded in the action. Achieving this kind of broad relief is often a prerequisite to reaching a settlement in the first place, because a defendant will not agree to a meaningful settlement unless it can obtain global peace." ECF 1487 at 26. The Court also found that Korein Tillery's "complaints about adequacy are likewise unfounded." *Id*. at 28.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 16th day of August 2024 at Seattle, Washington.

*/s/ Steve W. Berman*<br>STEVE W. BERMAN

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 16th day of August 2024 at New York, New York.

*/s/ Jeffrey L. Kessler*<br>JEFFREY L. KESSLER