UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

---

*House et al. v. NCAA et al.*

---

No. 4:20-cv-03919 CW

**REPLY DECLARATION OF DANIEL A. RASCHER**

August 16, 2024

1.   **Introduction** ................................................................................................................. 1
2.   **Summary of opinions** ................................................................................................... 4
3.   **Incorrectly inflated estimates of revenue** ................................................................ 6
   3.1   Tabulating asserted MFRS categories ..................................................................... 8
   3.2   The asserted MFRS categories are not appropriate for use with a professional CBA yardstick.................. 9
      3.2.1   Direct Institutional Support (DIS) ................................................................. 13
      3.2.2   Contributions ................................................................................................. 14
      3.2.3   Indirect Institutional Support ........................................................................ 16
      3.2.4   Other Operating Revenue .............................................................................. 17
      3.2.5   Endowment Income ....................................................................................... 17
      3.2.6   Sports Camp Revenues .................................................................................. 19
   3.3   Summary of inflation of estimated revenue ........................................................... 20
4.   **Inapt arguments to deflate GIA amounts.** ............................................................. 21
   4.1   The arguments that in-kind GIA compensation must be lower than full COA are inapt. ............... 22
   4.2   Asserted average prices are inaccurate estimates that bias downward the value of GIA compensation. .......... 23
   4.3   The arguments that athletes receive lower value education are invalid. ................... 24
5.   **The Tatos Declaration asserts an estimate of damages that is outside the scope of what is economically reasonable.** ........................................................................................... 26
6.   **Signature** ..................................................................................................................... 29

## 1.   INTRODUCTION

1.   My name is Daniel A. Rascher.  I have previously submitted a declaration and five expert reports in this matter.[1]  My credentials appear in my initial merits report submitted in December 2023, and an updated current *curriculum vitae* (including a list of all cases in the last 4 years where I testified at trial or was deposed) was attached to my declaration submitted in July 2024.  I am being compensated at $600 per hour, the usual and customary hourly rate that was effective at the time this engagement began, plus reimbursement of expenses.  In my work on this matter, I have been assisted by OSKR staff, working under my supervision and control.  I have no direct financial interest in the outcome of this matter.

2.   This declaration is a response to declarations submitted with briefs on August 9, 2024 in opposition to the proposed settlement for litigation related to the *House* litigation.  The briefs and opposing declarations, in particular the declaration submitted by Ted Tatos,[2]

---

[1]   Declaration of Daniel A. Rascher, July 26, 2024; Expert Report of Daniel A. Rascher, Oct. 21, 2022 (class certification); Expert Reply Report of Daniel A. Rascher, July 21, 2023 (class certification); Expert Report of Daniel A. Rascher, Dec. 1, 2023 (merits); Expert PCJ Rebuttal Report of Daniel A. Rascher, Jan. 26, 2024; Expert Reply Report of Daniel A. Rascher, Feb. 23, 2024 (merits) with Errata on April 10, 2024.

[2]   Declaration of Ted Tatos, August 9, 2024 ("Tatos Declaration").

address my calculations of damages and proposed distribution of proposed settlement amounts among the classes, as well as the value of the injunctive relief in the *House* litigation.

3.   I have been studying the economics of college sports since 1999 when I co-authored an article in *Antitrust* titled "Neither Reasonable nor Necessary: 'Amateurism' in Big-Time College Sports."[3]  I testified in front of a California State Senate Subcommittee on Entertainment in 2003, laying out the anticompetitive economics of major college sports as part of hearings involving State Senate bill 193.[4]  I worked on *White v. NCAA* in 2006-2008 and have testified in multiple antitrust cases involving the NCAA (*O'Bannon, Rock, Alston, House, Hubbard*) submitting dozens of expert reports and testifying in depositions and at trial multiple times.

4.   Additional academic research I have conducted includes:

- "Coaching Salary Disparity and Team Performance: Evidence from the Football Bowl Subdivision," with Alex Traugutt, Alan Morse, and Brian Fowler.  *Journal of Applied Business and Economics, 22*(1), 2020.

- "Because It's Worth It: Why Schools Violate NCAA Rules and the Impact of Getting Caught in Division I Basketball," with Andrey Tselikov, Andrew D. Schwarz, and Mark Nagel.  *Journal of Issues in Intercollegiate Athletics, 12,* 2019.  (Article of the year in the publication for 2019.)[5]

- "Cartel Behavior in US College Sports: An Analysis of NCAA Football Enforcement Actions from 1990-2011," with Mark Nagel,

---

[3]   Rascher, D., & Schwarz, A. (2000). "Neither Reasonable nor Necessary: "Amateurism" in Big-Time College Sports." *Antitrust*.  Spring, 51-56. I also presented this research at the Western Economics Association International in 1999.

[4]   More recently, I presented "An Economics Perspective on NIL at the Community College Level" at a public hearing of Senate Bill 206 (Skinner-D, 2019) Statutory Community College Athlete Name, Image, and Likeness Working Group, November 10, 2020.

[5]   I also presented this research at *Applied Business and Entrepreneurship Association International*, (2018).  I have also given multiple lectures on the economics of college sports at Stanford University, University of South Carolina, Ohio University, University of Oregon, University of Toronto, USF, Arizona State University, University of Northern Colorado, University of Delaware, University of West Florida, St. Mary's College, and the University of Arkansas.

Richard Southall, and Nick Fulton. *Journal of NCAA Compliance*, July-August, 2019.[6]

- "Competitive Equity: Can there be Balance between Athletes' Rights and a Level Playing Field?" with Andrew D. Schwarz in E. Comeaux (ed.), *College Athletes' Rights and Well-Being: Critical Perspectives on Policy and Practice*. Baltimore: Johns Hopkins University Press, 2017.

- "Where is Everyone? An Examination of Attendance at College Football Bowl Games," with Terence Eddy. In *International Journal of Sport Finance*, *11*(2), February 2016.[7]

- "A Smaller Window to the University: The Impact of Athletic De-Escalation on Status and Reputation," with Michael Hutchinson and Kimi Jennings. In *Journal of Intercollegiate Sport, 9*(1), June 2016.

- "The Impact on Demand from Winning in College Football and Basketball: Are College Athletes More Valuable than Professional Athletes?" with Chad McEvoy. In *Selected Proceedings of the Santa Clara University Sports Law Symposium*, September 2012.

- "An Analysis and Assessment of Intercollegiate Athletics at the University of San Francisco" with Jeremy Howell. 2011.[8]

5.   Finally, I have conducted 29 economic impact studies of major intercollegiate sporting events, including multiple bowl games and the College Football Playoff Championship game, and conducted analyses related to Univ. of Alabama-Birmingham,[9] the University of Maryland (regarding its move from the ACC to the Big Ten), and confidentially for a mid-major D1 university on the economic value of athletics.

---

[6]   I also presented this research at *Western Economics Association International* (2016). I also presented "College Football and Basketball Fans Don't Root for Laundry: A comparison of the effect of winning on attendance and television viewership between big-time college football and basketball and the NBA and NFL," with Mark Nagel at *Applied Business and Entrepreneurship Association International* (2017). (Voted Best Paper Award for session.)

[7]   I also presented this research at Collegiate Sports Research Institute conference (2014). I also presented "The College Basketball Players' Labor Market: *Ex Ante* versus *Ex Post* Valuations" with David Berri and Robert Brown at *Western Economics Association International* (2015).

[8]   I also presented this research at the Scholarly Conference on College Sport (2010). I also presented "The NCAA and the Prisoner's Dilemma" at the *Sports Law Symposium* hosted by Santa Clara University Law School (2010).

[9]   Rascher, D., Schwarz, A. and Orlando, J. (2015). "The Incremental Benefits and Costs of Football, Bowling, and Rifle at the University of Alabama at Birmingham (A Primary and Secondary Study)".

3

**2. SUMMARY OF OPINIONS**

6.   In my first declaration, based upon a methodology and set of assumptions and procedures that are within the scope of economically reasonable approaches for estimating damages related to compensation for athlete services, I calculated an estimate of potential damages ($1,898 million).  I have considered the points raised in the Tatos Declaration and my opinions and estimate as expressed in my first declaration remain the same.  As I explained in my previous declaration, the settlement amount of $600 million is 31.6 percent of the $1,898 million estimate of potential damages.

7.   In this declaration, I consider whether the Tatos Declaration provides a methodology and set of assumptions and procedures that are within the scope of economically reasonable approaches for estimating damages related to compensation for athlete services.  Based on my review, I cannot make a similar statement for the Tatos Declaration as I did for my initial declaration[10] – taken as a whole, the full set of assumptions and procedures presented in the Tatos Declaration are <u>not</u> within the scope of economically reasonable approaches for estimating damages for athlete services.

8.   While the Tatos Declaration is reasonable in using a yardstick methodology to compare college athlete compensation to athlete compensation in professional sports, as my previous declaration did, his declaration uses incorrectly inflated estimates of revenue and incorrectly deflated estimates of existing compensation from GIAs and excludes other benefits to college athletes.  As a result, the Tatos Declaration significantly overstates possible estimated damages for additional compensation to college athletes beyond what is economically reasonable.

9.   The Tatos Declaration argues for twice as much revenue as the amount of revenue I used in my calculations (overstating revenue by about $45 billion).  This is because the Tatos Declaration inappropriately includes categories of cash flow to athletic departments that are not revenue (meaning not generated by the sales of output of athletics) in any sense comparable to the yardstick professional league revenues included in collective bargaining agreements (CBAs).  For example, the Tatos Declaration counts 100 percent of inter-

---

[10]   Rascher Declaration, ¶¶40–43.

institutional transfers (transfers from the NCAA Member Institution to its athletic department) as athletic department revenues.  University money used to fund the athletic department are not economically comparable to the yardstick revenues for the purpose of calculating damages for athlete compensation.  These cash flows are not analogous to revenues included in the professional league revenues that serve as the yardstick for damages (and are not generated for the athletic department by sales of output from athlete performance or athlete NIL, as explained below).  The high revenue figure overstates the possible estimated damages to be about $24 billion, which would mean that the $600 million settlement amount would be only 2.5 percent of damages.

10. In addition to the overstated revenue estimate, the Tatos Declaration asserts the value of existing compensation college athletes receive to be substantially lower than the estimate used in my calculations.  This assertion derives entirely from challenging the use of the full COA value as a measure of existing GIA compensation during the damages period, and then providing an unsupported alternative (lower) value.  The lower value results from applying two different discounts to the full COA amount.  First, the Tatos Declaration asserts that the average price is only 50 percent of the full amount, based on an irrelevant and incorrect assessment of average price relative to full price.  Second, the Tatos Declaration asserts that athletes receive 22 percent less value from their education than the non-athletes receive, based on incorrect analysis and an unsupported (and irrelevant) estimate of missed classes.  Together, these two discounts would lead to a reduction in the measure of GIA compensation down to $6 billion (from $16 billion).  Combining this smaller estimate of existing compensation with the larger revenue estimate described above would increase the overstated damage estimate to about $34 billion, which would mean that the $600 million settlement amount would be only 1.8 percent of damages.

11. The Tatos Declaration provides a methodology and set of assumptions and procedures that are not within the scope of economically reasonable approaches for estimating damages, then applies these unreliable methods to estimate revenue and athlete compensation that lead to overstated estimates of damages: either $24 billion or $34 billion.  As I explain below, neither $24 billion nor $34 billion fall within the scope of economically reasonable damages for additional compensation.

**3.   INCORRECTLY INFLATED ESTIMATES OF REVENUE**

12. The Tatos Declaration suggests an estimation process that substantially biases the estimate of damages (to a much larger number) in two ways – it overstates revenues and understates existing compensation to college athletes.  In this section, I address the incorrect inflation of estimated athletic department revenue relevant for athlete compensation.  In section 4, I address the incorrect deflation of GIA amounts as measures of existing athlete compensation

13. Mr. Tatos states in his Declaration that he does not have access to the non-public MFRS data of athletic department cash flows that schools are required to provide to the NCAA, which, as he explains, include more granularity than the public MFRS and EADA data that he uses.[11]  Due to lack of access to the relevant detail for the calculation, the Tatos Declaration provides an alternative estimate based on EADA data.[12]  Relying on this less detailed data, the Tatos Declaration's alternative estimate overstates total relevant revenues, which I demonstrate below (in Section 3.1) by providing a tabulation of the categories within the MFRS data the Tatos Declaration asserts to be relevant.[13]

14. I also explain that the economic basis for identifying which cash flows that are labelled as "revenue" in the MFRS data are revenue relevant for athletic compensation – comparable to revenues in the major professional sports leagues (NFL, NBA, NHL) CBA yardstick.[14]  This economic basis does not support the inclusion of some of the cash flow categories the Tatos Declaration includes.  I conclude that the methodology asserted in the Tatos Declaration (the selection of cash flows categories to tabulate) would lead to an incorrectly high value for revenue relevant to athlete compensation (using the suggested data source of MFRS).

15. The Tatos Declaration acknowledges delineating categories that create a substantially higher estimate but asserts without support that those categories constitute revenue relevant to athlete compensation: "the settlement agreement insulates approximately one-third of

---

[11]   Tatos Declaration, ¶21.

[12]   Tatos Declaration, ¶¶21, 75-76.

[13]   Tatos Declaration, ¶22.

[14]   See Rascher Declaration, ¶39.

total Autonomy-5 conference athletic department revenues from the sharing agreement with college athletes."[15]  This statement reveals erroneous assumptions.

16.   First, characterizing the selection of categories of reported athletic department cash flows as "insulating" revenue from a sharing agreement presupposes that the categories are revenue, in the sense of being economically relevant to athlete compensation.  It is simply an assumption that MFRS data labelled as "revenue" are cash flows arising from the sales of output of the athletic programs in which the college athletes participate, economically parallel to cash flows that the CBAs for professional leagues attempt to incorporate into revenue sharing.  In this section, I explain why that assumption is incorrect.

17.   Second, the statement overlooks the context that this is a yardstick damage estimate against which to compare the settlement agreement.  The yardstick uses revenue-sharing/salary cap agreements collectively negotiated in the major North American professional leagues to approximate an upper bound on the ratio of compensation to specifically delineated revenue categories that can then be used to estimate college athlete compensation. The comparable leagues that demonstrate the 50% share provide, roughly, a high-water mark for athlete compensation in North American professional leagues (some are lower).  To the extent that this ratio may vary among professional leagues, such variation can be due to the delineation of cash flows identified for inclusion in the revenue-sharing pool – this is one of the reasons that the yardstick analysis requires aligning the college revenue categories with the revenue categories included in the CBAs used for the yardstick.

18.   Taking these considerations all together, the identification of cash flow categories that are revenue relevant to athlete compensation must incorporate sufficient care to prevent overinclusion.  Adhering to what is seen in the professional yardsticks helps provide a useful comparison, as I discuss below.  Including in the base for estimating athlete compensation large cash flows that in fact are irrelevant accounting categories (not analogous to the yardstick) results in an inflated estimate of athlete compensation far above what is already an upper bound established by the yardstick.

---

[15]   Tatos Declaration, ¶27, emphasis removed.

19.   In what follows, first I discuss the differences in our data sources, then I explain the economic criteria for assessing which cash flows are revenue relevant to athlete compensation (comparable to revenue that major professional sports leagues use to calculate athlete compensation).  Finally, I walk through each category of cash flow asserted in the Tatos Declaration that I dispute and explain why those selections would fail to provide a reliable and appropriately conservative estimate of damages, with an emphasis on comparability professional sports leagues that both Mr. Tatos and I use as yardsticks.

## 3.1   TABULATING ASSERTED MFRS CATEGORIES

20.   For his damages calculations, Mr. Tatos reports $90.5 billion in revenue.[16]  This is a total of all athletic-department revenue for Division I institutions as reported in publicly available EADA data.[17]

21.   The EADA data are generally accurate for men's sports' revenues (but, as I have shown in past litigation,[18] can tend to overstate women's revenue, relative to the actual values that schools submit to the NCAA via MFRS).  Furthermore, the EADA data does not provide sufficient detail to incorporate only the MFRS categories that the Tatos Declaration identifies as relevant.  Relative to the tabulation of these categories in MFRS data, the EADA tabulation of all revenue overstates the sum by approximately $8 billion over the class period.  Where EADA data tabulation sums to $90 billion for the damages period, the actual MFRS sum of asserted categories is $82 billion.[19]  The choice to use EADA was (as I understand it) simply as a second-best substitute due to lack of access to MFRS data.

---

16   Tatos Declaration, Tables 3 and 6.

17   Tatos Declaration, ¶¶75, 81–82.

18   See in particular, Exhibit 4 to my Merits report in Alston (available publicly in redacted form at Case 4:14-md-02541-CW Document 809-4, p. 22 [as filed, p. 24 of 186]).  There I show that EADA revenues for men's basketball and football generate values within 4% of the MFRS values, and an extremely high correlation (98-99%).  For women's basketball, however, there is only about a 50% correlation, and using EADA results in much larger revenues than MFRS, on the order of $2.32 of EADA revenue for every dollar of MFRS.

19   A portion of the difference may be due to different methods of projecting the data from the latest reported values to the end of the damages period.  Note that for this calculation, I assume that the Tatos Declaration proposes to include Category 6 but not the related Category 6A ("Indirect Institutional Support – Athletic Facilities Debt Service, Lease and Rental Fees").  The Tatos Declaration does not mention Category 6A specifically when detailing the revenue categories that should be included.  (See Tatos Declaration, ¶22.)  If I were to tabulate a sum for the MFRS data that included that category (6A), the MFRS sum of asserted

**3.2   THE ASSERTED MFRS CATEGORIES ARE NOT APPROPRIATE FOR USE WITH A
PROFESSIONAL CBA YARDSTICK.**

22.  The Tatos Declaration incorporates cash flow categories that economic analysis or
     modelling do not support as being revenue relevant to the yardstick methodology for
     estimating damages related to athlete compensation.

23.  In economic models of production, producers have a demand for factors of production, such
     as labor, because those factors or production combine to generate output that can be sold for
     revenue.[20]  The demand for labor, in combination with the willingness to supply labor at
     various wage rates, results in an equilibrium compensation from the producer to the
     laborer.[21]  In this way, athlete compensation is connected to revenue that the work of the
     athletes helps generate.  By the same argument, athlete compensation would not be
     expected to be connected to revenue that the work of the athletes does not help generate.

24.  Both my damages work in these cases and my analysis of the settlement are grounded in
     this understanding of the fundamental economic drivers of athlete compensation.  This
     economic model supports the use of the major professional sports leagues' CBAs as
     yardsticks and is consistent with the distinction between 1) revenues identified in CBAs as
     relevant to athlete compensation and 2) positive cash flows reported by school athletic
     departments that may or may not be relevant to athlete compensation.  Indeed, as I
     understand it, those CBAs are negotiated with the goal of identifying as "shareable" only/all
     revenues to which athletes' labor contributes, and then negotiating a split of those revenues,
     leaving sports leagues' (and the teams' owners') other revenues outside of the shareable
     pool, as I explain below.  Many aspects of the NFL's revenue generation process are shared
     in common with college football (and the same holds for the comparison between men's
     college basketball and the NBA), but, as with any yardstick analysis, the analogy is not a
     perfect one-to-one match.

---

categories would be $83 billion instead of $82 billion and the overstatement of the EADA sum would be $7
billion instead of $8 billion.

[20]   See, for example Pindyck, R. & Rubinfeld, D. (2018). *Microeconomics*. (9th ed.). Pearson: New York, pp. 522-
       27.

[21]   Pindyck, R. & Rubinfeld, D. (2018). *Microeconomics*. (9th ed.). Pearson: New York, p. 534.

25. The Tatos Declaration does not appear to offer any valid economic foundation for whether a given revenue category should be included as shareable.  The methodology there assumes that most cash flows into college athletic departments, whether paid from outside sources or internal, and whether driven by athletics success or non-athletic factors, should be included as revenue relevant to athlete compensation.  This deviates from the economic model of production by neglecting consideration of the source of the cash flows in favor of an almost all-in approach and fails to account for the necessary incorporation of the economics of sports compensation into proper damages estimation.

26. The language of the CBAs support the inference that the intent of each CBA is to incorporate specific (and large) categories of revenue, but not all revenue that professional teams generate.  For the NFL,

> "All Revenues ('AR') means the aggregate revenues received or to be received on an accrual basis, for or with respect to a League Year during the term of this Agreement, by the NFL and all NFL Clubs (and their designees), from all sources, whether known or unknown, **derived from, relating to or arising out of the performance of players in NFL football games,** with only the specific exceptions set forth below.[22]

27. The NBA CBA includes similar language:

> 'Basketball Related Income' ('BRI') for a Salary Cap Year means the aggregate operating revenues (including the value of any property or services received in any barter transactions), accounted for in accordance with Section 1(b)(1) below, received or to be received for or with respect to such Salary Cap Year by the NBA, NBA Properties, Inc., including any of its subsidiaries whether now in existence or created in the future (hereinafter, "Properties"), NBA Media Ventures LLC ("Media Ventures"), any other entity which is controlled, or in which at least fifty percent (50%) of the issued and outstanding ownership interests are owned, by the NBA, Properties, Media Ventures, and/or a group of NBA Teams (hereinafter, "League-related entity") (but excluding the amount of such League-related entity's revenues equal to the portion of its total revenues that is proportionate to the share of the entity's profits to which ownership interests not owned by the NBA, Properties, Media Ventures and/or a group of NBA Teams are entitled), all NBA Teams other than Expansion Teams during their first two (2) Salary Cap Years (but including the Expansion Teams' shares of national television, radio, cable and other broadcast revenues, and any other League-wide revenues shared by the

---

22   NFL 2020 CBA, Article 12, Section 1(a)(i).  Emphasis added.

Expansion Teams, provided such revenues are otherwise included in BRI) and Related Parties (in accordance with Section 1(a)(7)(i) below), from all sources, whether known or unknown, whether now in existence or created in the future, **to the extent derived from, relating to, or arising directly or indirectly out of, the performance of Players in NBA basketball games or in NBA-related activities**.[23]

28. The cash flow categories that the CBAs identify as revenue relevant to athlete compensation exclude many sources of income, such as income generated in the real estate developments that are part of stadium construction projects. These developments can be indirectly related to athletic activities (as events, including sporting events, at those stadiums may enhance demand for the developments), but nevertheless do not go into the revenue pool that the CBAs set for calculating athlete compensation – the connection is indirect and too tenuous to affect athlete pay. The categories that the CBAs identify as revenue relevant to athlete compensation also exclude many investments, like, as I understand, those by 32 Equity, a venture capital fund owned by the 32 NFL owners.[24]

29. Rather than identify the relevant cash flows in college athletics that economic models would connect with athlete compensation, the Tatos Declaration assumes that almost all reported cash flows into athletic departments should be included for estimating athlete compensation, regardless of the source of those cash flows.[25] The Tatos Declaration does not present valid economic foundation for the selection of cash flow categories asserted to be revenues relevant to athlete compensation. To establish a connection between cash flows into athletic departments and athlete compensation, it is not sufficient that the accounting data for college athletics departments label some cash flows as "revenue." That is not economic evidence – "revenue" in the MFRS data is not an informative label for the purpose of estimating athlete compensation, under the economic model of production,

---

[23] NBA 2023 CBA, Article VII, Section 1(a)(i). Emphasis added.

[24] Disputes between athletes and teams can exist on the margin regarding which categories of sales constitute revenue relevant for athlete compensation. See Trettor, J.C. (2021, October 27). "NFL Economics 101," Accessed on August 12, 2024 at https://nflpa.com/posts/nfl-economics-101. For example, the professional leagues may vary regarding which types of merchandise licensing revenue to include in the pool for sharing – all revenue, or only revenue that is athlete-specific. Likewise, the actual share going to professional athletes of differently defined delineations of revenue could be higher or lower. The outcomes that result from the collective bargaining process can have variation between leagues. Critically, however, with respect to the Tatos Declaration, there was a rigorous negotiation regarding the revenue to include in or exclude from the revenue pool for sharing under each the CBAs and not an assumption that all team revenue should be included.

[25] Tatos Declaration, ¶¶22, 81.

unless the cash flows are connected to the sales of output generated with the athletes' services.

30. A yardstick analysis must ensure comparable measures between the yardstick (professional sports compensation to revenue ratio) and the target for estimation (college sports compensation to revenue ratio). In other words, the specific positive cash flows to teams that are the basis for CBA revenue splits in professional sports serve as a guide, in a yardstick analysis, for the selection of cash flows into athletic departments that constitute revenue relevant for athlete compensation.

31. The Tatos Declaration fails to assess accurately which cash flows into athletic departments are comparable to revenue incorporated into the professional league CBA revenue-sharing pools and which are not. This leads to the incorrect inclusion of the full amount of six categories of cash flows labeled as "revenue" in the MFRS data that do not align with revenues relevant to the yardstick CBAs. For the remaining 16 categories of cash flows labelled as "revenue" in the MFRS data, Mr. Tatos and I agree as to their inclusion or exclusion from the analysis. The six categories over which we disagree are:[26]

- Direct Institutional Support (DIS)
- Contributions
- Indirect Institutional Support
- Other Operating Revenue
- Endowment Income
- Sports Camp Revenues

32. I address each of these categories below.

---

[26] See Tatos Declaration, ¶22 for details of the MFRS revenue categories it asserts should be included. The categories I list here are labelled slightly differently than the categories listed in Tatos Declaration, ¶22. I note that the "Other Revenue Sources" identified in ¶22 (MFRS revenue category 18, labeled as "Other Operating Revenue" in Table 1 to the Tatos Declaration) appears to be distinct from the larger category of "Other Revenue" that is discussed in ¶23 and for which public data is available. This latter category includes "Compensation and benefits provided by a third party; game program, novelty, parking and concession sales; sports camps and clinics; athletics restricted endowment and investments income; and, other operating revenue" (Tatos Declaration, ¶23). I exclude "Compensation and benefits provided by a third party" and include "game program, novelty, parking and concession sales". As I understand it, both of these are points of agreement with the Tatos Declaration. However, as I discuss in this section, I disagree with the Tatos Declaration's choice to include the entirety of revenues from "sports camps and clinics," "other operating revenue," and "athletics restricted endowment and investments income."

### 3.2.1  Direct Institutional Support (DIS)

33. The 2024 Agreed Upon Procedures instruct schools to enter "Direct Institutional Support" in MFRS as follows:

> Input direct funds provided by the institution to athletics for the operations of intercollegiate athletics including:
>
> - Unrestricted funds allocated to the athletics department by the university (e.g. state funds, tuition, tuition discounts/waivers, transfers).
> - Federal work study support for student workers employed by athletics.
> - Endowment unrestricted income, spending policy distributions and other investment income distributed to athletics in the reporting year to support athletic operations. Athletics restricted endowment income for athletics should be reported in Category 17.[27]

34. With respect to the CBA yardstick I am using, there exists no comparable revenue stream in any of the major professional leagues.  Because the focus of the yardstick analysis is on revenue streams comparable to those which form the basis of the revenue splits in the NFL, NBA, and NHL, and because those leagues' CBAs do not contemplate this sort of revenue being subject to sharing, including them in the pool would be mixing apples and oranges.

35. Nor has the Tatos Declaration provided valid economic support to assert what portions of this revenue are relevant to athlete compensation and how those portions would be shared with athletes. In contrast, the Tatos Declaration proposes including all DIS in the pool, and simply assuming that it would be split at the same percentage (i.e., 50%).  One consequence of this proposed approach is that for the large number of schools using DIS to cover the reciprocal payment that the athletic departments make back to the institution for GIAs, athletes would receive their full GIA scholarships *and also* half of the money that schools transfer internally to fund those same full GIA scholarships.  This would artificially inflate the relevant payment (in addition to being a revenue stream not considered by major professional leagues CBAs).

---

[27]  2024 Agreed Upon Procedures, p. 17. See Declaration of Steve W. Berman in Support of Plaintiff's Unopposed Motion for Preliminary Settlement Approval, Exhibit 1, Appendix A, Attachment 1.

36. DIS also includes payments to student workers in athletics departments, which is disconnected entirely from athletic services and, to the extent that any of the paid student workers are athletes, would result in artificially double-compensating for half of their student-worker pay.

37. That Tatos Declaration correctly acknowledges that DIS is a large category of cash flows into athletic departments and that it disproportionately comes from non-Power Five schools: "excluding such athletic department revenues would significantly reduce the Revenue Pool subject to revenue sharing with college athletes, particularly for non-Autonomy 5 conferences."[28] Of the approximate total of $22 billion of DIS for Division I, $18 billion is at non-Power Five conferences.[29] These are schools with lower revenues from their athletic departments (compared to Power Five schools) that are paying from their institutional revenue streams to support their athletic departments.

38. This category inflates by about $22 billion the total of all revenue categories delineated in the Tatos Declaration.

### 3.2.2  Contributions

39. The 2024 Agreed Upon Procedures instruct schools to enter "Contributions" in MFRS as follows:

> Input contributions <u>provided and used by athletics</u> in the reporting year including:
>
> - Amounts received from individuals, corporations, associations, foundations, clubs, or other organizations used for the operations of the athletics program.
> - Funds contributed by outside contributors for the payment of debt service, lease payments or rental fee expenses for athletic facilities in the reporting year.
> - Amounts received above face value for tickets used within the reporting year.
>
> Contributions shall include cash and marketable securities.
>
> Do not report:
>
> - Pledges until funds are provided to athletics for use.

---

[28]  Tatos Declaration, p. 8.

[29]  Text Cite - Non-Power Five DIS. Power Five membership is as of the 2024-25 academic year.

- Contributions to be used in future reporting years.[30]

40. The description of "Contributions" connects only a portion of these cash flows into athletic departments from their schools to sales of output generated by athletes, comparable to revenue that the CBAs designate.  Mr. Tatos argues these cash flows should be included at 100%.  I disagree with Mr. Tatos's choice because it does not recognize this revenue category is a mix of comparable and non-comparable moneys, vis-à-vis the CBA revenue pools I use as my yardstick.

41. As I described in my declaration, there is no analogy in professional sports to contributions or donations in general – major professional sports teams are not non-profits to which a philanthropist can donate.  In contrast, contributions to college programs are often truly philanthropic.  When a wealthy donor contributes money to build a new office for the athletic department, the school records the donation as contribution revenues.  There is no close analogy to this "contribution revenue" among the revenues shared by professional athletes and their leagues via a CBA/revenue sharing agreement.

42. However, in NCAA accounting conventions, some portion of this revenue category consists of the up-front portion of a two-part payment for tickets.  For this portion, where a fan might be required to donate $5,000 just for the right to then purchase season tickets in a premium location, contributions revenues are analogous to a PSL (personal seat license) or club fee, which is part of a major professional sports team's ticket revenue.  Consequently, I conclude that in no case is 100% the correct value (which is why in my analysis I used 50%) – using the 100% asserted in the Tatos Declarations incorporates some philanthropic donations and thus will overstate the revenues actually comparable to those in the yardstick CBAs.[31]

---

[30] 2024 Agreed Upon Procedures, p. 18. See Declaration of Steve W. Berman in Support of Plaintiff's Unopposed Motion for Preliminary Settlement Approval, Exhibit 1, Appendix A, Attachment 1. Emphasis in original.

[31] As further evidence against assuming 100% of donations are revenue relevant to athlete compensation, it is relevant that the initiation of third-party NIL compensation in 2021, through which wealthy donors could directly compensation athletes (either individually or through collectives) has resulted in no discernible shift away donor contributions to date.  See, for example, Akabas, L. & Novy-Williams, E. (2024, January 23). "Athletic Department Donations Up Despite Rise of NIL Collectives." Accessed on August 14, 2024 at https://www.sportico.com/leagues/college-sports/2024/college-sports-donations-nil-money-1234763721/.

43. The Tatos Declaration mentions that there are no restrictions limiting athletic departments from using contributions to fund payments to coaches.[32] This point is not relevant to whether contributions are connected to the sales of output generated by athletic departments, comparable to revenues designated by the yardstick CBAs.

44. Including 100 percent of this category inflates by about $6.9 billion the total of all revenue categories delineated in the Tatos Declaration.

### 3.2.3  Indirect Institutional Support

45. The 2024 Agreed Upon Procedures instruct schools to enter "Indirect Institutional Support" in MFRS as follows:

> Input value of costs covered, and services provided by the institution to athletics but not charged to athletics including:
>
> - Administrative services provided by the university to athletics, but not charged such as HR, Accounting, and IT.
> - Facilities maintenance.
> - Security.
> - Risk Management.
> - Utilities.
>
> Do not include depreciation.
>
> Note: This category should equal Category 36. If the institution is paying for debt service, leases, or rental fees for athletic facilities, but not charging to athletics, include those amounts in Category 6A.[33]

46. As defined, it is clear that Indirect Institutional Support is not a real source of revenue at all, but rather a sort of accounting fiction.  NCAA accounting conventions require that schools allocate some portion of their university-wide fixed costs to athletics, and also require that schools report this allocation as "revenue" (as well as an exactly equal "expense" in AUP Category 36, as the instructions specify).  As a result, schools include large cost centers, unrelated to the sales of output generated by the athletic programs, as revenue in EADA and MFRS data.  An example would be if a school chooses to allocate a slice of costs of

---

[32]  Tatos Declaration, p. 14.  Note that as stated, the claim is not accurate, at least during the damages period, prior to 2023-24 some assistant coaching positions (so-called "volunteer" positions) were capped at maximum compensation of $0.  See NCAA Division I Manual 2022-23, Sections 11.01.6 and 11.7.6.2.3.

[33]  2024 Agreed Upon Procedures, p. 18. See Declaration of Steve W. Berman in Support of Plaintiff's Unopposed Motion for Preliminary Settlement Approval, Exhibit 1, Appendix A, Attachment 1.

running its university-wide payroll system.  Because this allocation is always offset by an identical expense item, its inclusion as a revenue item is innocuous – adding and then subtracting a fictional number generates a zero.  However, this revenue category does not belong in any assessment of the share of college sports revenue that would fall into a revenue sharing agreement in a reasonable but-for world.  There is no equivalent in the CBA accounting for any of the leagues (NFL, NBA, or NHL) that I use as my yardsticks, as there is no reason to consider these cash flows to be sales of output generated by athletic programs.[34]

47.  This category inflates by $3.4 billion the total of all revenue categories delineated in the Tatos Declaration.

### 3.2.4  Other Operating Revenue

48.  The 2024 Agreed Upon Procedures instruct schools to enter "Other Operating Revenue" in MFRS as follows:

> Input any operating revenues received by athletics in the report year which cannot be classified into one of the stated categories.[35]

49.  The description of this category provides no information to support including this as comparable to revenue incorporated into CBA revenue-sharing pools or in any other way revenue relevant to athlete compensation.  The Tatos Declaration provides no economic support to justify including this category.

50.  This category inflates by $2.2 billion the total of all revenue categories delineated in the Tatos Declaration.

### 3.2.5  Endowment Income

51.  The 2024 Agreed Upon Procedures instruct schools to enter "Athletics Restricted Endowment and Investment Income" in MFRS as follows:

---

[34]  All of this would also apply to Category 6A, which the Tatos Declaration does not list to be included. See Tatos Declaration ¶22 and footnote 19 above.

[35]  2024 Agreed Upon Procedures, p. 20. See Declaration of Steve W. Berman in Support of Plaintiff's Unopposed Motion for Preliminary Settlement Approval, Exhibit 1, Appendix A, Attachment 1.

Please report spending policy distributions from athletics restricted endowments and investment income used for athletics operations in the reporting year.

This category only includes restricted investment and endowment income used for the operations of intercollegiate athletics; institutional allocations of income from unrestricted endowments qualify as "Direct Institutional Support" and should be reported in Category 4.

Note: Please make sure amounts reported are only up to the amount of expenses covered by the endowment for the reporting year. [36]

52.   Universities, especially large private universities, have accumulated large endowments over time, and the earnings of these endowments form a revenue source.  A small subset of these endowments are specifically linked to athletics – such as the endowment that funds an endowed coaching position or a named scholarship.[37]  The University then invests these funds and uses a portion of the returns to cover costs.  As I understand it, institutions report for MFRS the initial capital of an endowment as a Contribution (the category discussed above) and then report the subsequent earnings flowing from that initial capital in the Endowment Income category.

53.   There is no complete analogy between Endowment Income in the MFRS data and portions of income from some professional team investments that CBAs incorporate into revenue pools for athlete compensation in the major professional sports leagues.  When a professional team generates a profit and distributes the profit to the team owner the future earnings are then the owner's private income, not sports income related to the team or its athletes, and the CBAs do not include that income in the definition of revenue for calculating athlete compensation.  When a professional team reinvests profits, the income from those investments may or may not be related to sports, depending on the nature of the investment, and thus the CBAs may or may not include this income in the definition of revenue for calculating athlete compensation.  For example, when the NFL invests league revenues in sports-related ventures, my understanding is that the NFL CBA includes the

---

[36]   2024 Agreed Upon Procedures, p. 20. See Declaration of Steve W. Berman in Support of Plaintiff's Unopposed Motion for Preliminary Settlement Approval, Exhibit 1, Appendix A, Attachment 1.

[37]   As an example, at Stanford, an anonymous donor endowed a coaching position, called the Andew Luck Directorship of Offense, the proceeds of which are designated to paying the offensive coordinator, an assistant coach.  See (2012, May 22). "The Andrew Luck Directorship of Offense Endowed," Accessed on August 15, 2024 at https://gostanford.com/news/2012/05/22/the-andrew-luck-directorship-of-offense-endowed.

earnings of those investments (often made via NFL Ventures) as part of the revenue sharing pool.  However, when the team owners invest their own money jointly (e.g., through 32 Equity, a venture capital fund owned by the 32 NFL owners) in unrelated businesses or in real estate (including their stadiums and adjacent land), the NFL CBA does not include those proceeds as part of the revenue sharing pool.

54. Similar to Contributions, I conclude that in no case is 100% of Endowment Income the correct value to include as revenue relevant to athlete compensation (which is why in my analysis I used 50 percent) – using the 100% asserted in the Tatos Declarations incorporates income from some philanthropic donations and thus will overstate the revenues actually comparable to those in the yardstick CBAs.

55. Including 100 percent of this category inflates by about $1 billion the total of all revenue categories delineated in the Tatos Declaration.

### 3.2.6  Sports Camp Revenues

56. The 2024 Agreed Upon Procedures instruct schools to enter "Sports Camp Revenues" in MFRS as follows:

> Input amounts received by the athletics department for sports camps and clinics.[38]

57. As I noted in my original declaration, this category is not revenue relevant to athlete compensation.

> Both professional leagues and colleges may have sports camps, but not with fairly analogous revenue.  For colleges, sports camps can be a means to scout and recruit athletes. (The definition of "sports camps" in NCAA regulations is constrained to events "in which prospective student-athletes participate." NCAA Division I Manual 2023-24, 13.12.1.1. See also https://recruitlook.com/can-a-college-camp-help-with-your-college-recruiting/). This is not the case for professional sports that athletes would not join for many years after camp age. (Camps run by the Dallas Cowboys, for example, are offered to participants aged 6–16. https://www.dallascowboys.com/youth-camps/).

---

[38]  2024 Agreed Upon Procedures, p. 20. See Declaration of Steve W. Berman in Support of Plaintiff's Unopposed Motion for Preliminary Settlement Approval, Exhibit 1, Appendix A, Attachment 1.

58. In addition, it is my understanding that a common practice for college sports camps is to use the revenue to pay the coaches running the camp (not to pay athletes).[39]

59. Including this category inflates by about $0.3 billion the total of all revenue categories delineated in the Tatos Declaration.

### 3.3   SUMMARY OF INFLATION OF ESTIMATED REVENUE

60. In summary, the Tatos Declaration used a tabulation of revenue that is outside the scope of what would be economically reasonable for this damages estimation.

61. The Tatos Declaration begins the process of estimating damages by estimating total athlete compensation as 50 percent of $90.5 billion in revenue.[40]  As discussed above, this figure incorporates all athletic-department revenue for Division I institutions as reported in publicly available EADA data.[41]  The MFRS data I have at my disposal allows me to tabulate the specific revenue categories that the Tatos Declaration identifies as relevant to athlete compensation.  These categories sum to only $82.2 billion, $8.3 billion lower than the total of EADA revenues.

62. Among the seven categories that Mr. Tatos suggests adding to the "Revenue Pool" categories, there is one category that we agree is appropriately included when tabulating revenue for the purpose of estimating athlete compensation: Program, Novelty, Parking and Concession Sales.[42]  I describe in the previous section why it is incorrect to include the full amount of the other six categories for this purpose.

---

[39]   See, e.g., (2022, January 13). "University of Utah Intercollegiate Athletics Department Agreed-Upon Procedures Report for the Year Ended June 30, 2021," p. 13. Accessed on August 15, 2024 at https://reporting.auditor.utah.gov/servlet/servlet.FileDownload?file=0151K000005SotmQAC.

[40]   Tatos Declaration, Tables 3 and 6.

[41]   Tatos Declaration, ¶¶75, 81–82.

[42]   Concessions are a category included in my damages calculation.  It is not a category in the Revenue Pool for calculating the school-level athlete compensation cap incorporated into the injunctive relief.  On that issue, the Tatos Declaration express some concern that schools could grow concessions (not included in Revenue Pool) but lower ticket revenues (included in Revenue Pool) in order to lower some future payments to athletes (See Tatos Declaration, p. 14 (¶48: "Moreover, excluding such revenues creates opportunities for accounting practices that could divert revenues from ticket sales to concessions"),  This overlooks the fact that the injunctive relief establishes a cap, not a floor – if schools want to pay less to athletes, then they can simply pay less to athletes.  Also, the cap is calculated based on all P5/4 schools and recalibrated once every three years. One school trying to distort revenue is not going to significantly affect the cap.

63.   Exhibit 1 shows how each of these items inflates Mr. Tatos' estimate of revenue.

**Exhibit 1: Inflated Revenue in Tatos Declaration**

| (millions) | Full MFRS Amount | Amount that Aligns with Professional League Revenue | Revenue After Correction |
|---|---|---|---|
| Total Revenue in Tatos Declaration (No correction) | | | $90,479 |
| Total MFRS Revenue for Categories in Tatos Declaration | | | $82,220 |
| | | | |
| Categories incorrectly included with the full amount | | | |
| *Direct Institutional Support* | $21,972 | $0 | $60,248 |
| *Contributions* | $13,831 | $6,915 | $53,332 |
| *Indirect Institutional Support* | $3,429 | $0 | $49,903 |
| *Other Operating Revenue* | $2,191 | $0 | $47,712 |
| *Athletics Restricted Endowment and Investments Income* | $1,998 | $999 | $46,713 |
| *Sports Camp Revenues* | $318 | $0 | $46,395 |
| | | | |
| **Total Revenue relevant to estimating athlete compensation** | | | **$46,395** |

64.   For all six of the categories listed on this exhibit, the Tatos Declaration includes more revenue than what is comparable to the CBA-delineated revenue for revenue-sharing or than can be economically supported as revenue relevant to athlete compensation.

**4.   INAPT ARGUMENTS TO DEFLATE GIA AMOUNTS.**

65.   In addition to the incorrect calculation of revenue relevant to athlete compensation discussed in Section 3, the Tatos Declaration suggests incorrectly deflating GIA amounts as measures of existing athlete compensation, which would further biases the estimate of damages to an even large number.  The bases for this suggestion are as follows: First, the Tatos Declaration asserts that the full cost of attendance (COA) exceeds a relevant measure of market value for athlete compensation.  Second, the Tatos Declaration claims that what is asserted to be an average price (but is incorrect) would be a better estimate of the value of compensation.  Third, the Tatos Declaration asserts that college athletes get less educational value than other students at the same institutions and asserts that this warrants a further reduction in the value of compensation.[43]  The resulting calculations assert that the monetary compensation equivalent to athletes is at most 39% of the reported GIA amounts.

---

[43]   Tatos Declaration, ¶51

66.  As I describe in this section, the Tatos Declaration fails to establish that the full COA for student athletes is not a measure of market value for what the athletes receive. Furthermore, an inaccurately calculated average price provides no improvement for estimating athlete compensation.  Also, the position that athletes systematically receive less educational value than other students is incorrect.  Taken together, these false positions would lead to an incorrectly low value for existing compensation that would incorrectly inflate damages.

### 4.1   THE ARGUMENTS THAT IN-KIND GIA COMPENSATION MUST BE LOWER THAN FULL COA ARE INAPT.

67.  The Tatos Declaration fails to support the claim that full COA amounts are an invalid estimate of the value of in-kind GIA scholarships provided to college athletes.  A payment from the school covering tuition, room, board, books, and miscellaneous expenses is a payment to the athlete, for the purpose of procuring labor services; that is the focus of damages in the litigation concerning compensation for athletic services.

68.  In arguing that the list price for COA is not reflective of its value, the Tatos Declaration asserts incorrectly that the marginal cost of additional scholarships is negligible.  This is false.  The room and board payments to athletes (especially after their freshman year when housed off campus, and even in the case of on-campus housing for schools at capacity) are real out of pocket expenditures, as are COA payments.  This is in the tens of thousands of dollars for each athlete.

69.  The Tatos Declaration goes on to say, "Under competitive conditions, if the institution priced at marginal cost, it would lower its price accordingly, further widening the gap between the sticker price and the actual market value of a GIA."  Economic theory would not predict that differentiated sellers (schools) would price at marginal cost, especially those with high fixed costs (like a university).  There is competition, but it is not a textbook perfectly competitive market.  Schools compete with each other for students (tuition is competitive) and outside suppliers compete with each other to provide other goods and services that universities cover (prices for rent, travel, books, etc. are competitive) – all of these are market values.

70. In a detailed study of three sports requested by the University of Alabama-Birmingham (UAB) athletic department I performed with two co-authors, we found that GIAs had true costs to UAB, though less than the listed price. Where the university attributed $2.8 million to GIAs for the three sports under study, my co-authors and I found the true cost to be less than $1 million, just over one-third of the listed cost.[44]

71. The question of the cost of GIAs to the university is not the best means of assessing the market value of GIAs provided to athletes. While Mr. Tatos is correct that the list price of GIAs does not perfectly reflect the avoided costs, he is wrong to imply that this matters for the estimation of damages – the possibility that the list prices of GIAs can be higher than the marginal cost of providing those GIAs is not relevant to the market value of the GIAs.

**4.2   ASSERTED AVERAGE PRICES ARE INACCURATE ESTIMATES THAT BIAS DOWNWARD THE VALUE OF GIA COMPENSATION.**

72. Having failed to establish that full COA amounts are not outside of the scope of economically reasonable estimates of GIA to use when estimating damages related to additional compensation, the Tatos Declaration further fails to support the claim that an average price provides a more accurate estimate. In fact, the actual calculation presented for estimating an average price relies on private school data not confined to Division I, leading to a biased average estimate of the average discount students receive (and, thus, a flawed estimate not relevant to the value of athlete compensation).

73. The Tatos Declaration incorrectly claims to present estimates of average price:

> The [NACUBO] study found that "In AY 2023-24, 90.3 percent of first-time undergraduates received grant aid from their institutions, which covered an average of 62.2 percent of published tuition and fees. Among all undergraduates, 83 percent received grant aid, covering an average of 58.3 percent of the published price."[45]

74. First, this study covered 325 private schools, whereas the bulk of Power Five and many other Division 1 schools are public schools. The schools in the NACUBO study are generally not Division 1 and thus would not be part of the estimated damages (as I describe

---

44   Rascher, D., Schwarz, A. and Orlando, J. (2015). "The Incremental Benefits and Costs of Football, Bowling, and Rifle at the University of Alabama at Birmingham (A Primary and Secondary Study)," p. 80.

45   Tatos Declaration, ¶68.

below).  These mostly smaller schools may have larger tuition discounts than the overall larger schools in the damages.  Second, the analysis only looks at tuition discounts, not whether there are discounts off of the full cost of attendance (which includes tuition, as well as substantial expense for room, board, books, and miscellaneous expenses).[46]

75. The study that Mr. Tatos cites covers "325 **private**, nonprofit colleges and universities."[47] This is not representative of Division I institutions. As an initial matter, most of the institutions in the study are not Division I. Only 124 Division I institutions are private,[48] meaning that even if all private Division I institutions were included in the study, the majority of studied schools (201 of 325) would fall outside of Division I. Further, only around 34 percent[49] of Division I institutions are private.  It is not reasonable to use a study of only tuition and only at largely non-Division I private institutions to draw conclusions about cost of attendance at Division I schools, few of which are private.

76. The Tatos Declaration complains about the "tying" arrangement whereby athletes have to be students paying for tuition, room, and board in order to play their sport for the university (and says the same is true for Alston payments).  However, this is the essence of college sports.  Without the "tying" there is much lower value for college sports and it is outside the scope of economically reasonable damage estimates to assume that athletes would not be students at the academic institutions that they attend.

### 4.3    THE ARGUMENTS THAT ATHLETES RECEIVE LOWER VALUE EDUCATION ARE INVALID.

77. The Tatos Declaration fails to support the claim that athletes systematically receive less education value than other students.  In addition, he calculates an estimate of the difference

---

[46]  For example, IPEDS 2022-23 data shows that Cal in-state tuition costs were $14K and other costs of attendance for on-campus students were $29K each year, summing to $43K.  Thus a $7K tuition discount (50 percent) would be only a 16% discount ($7K divided by $43K) of the total cost of attendance. See https://nces.ed.gov/ipeds/institution-profile/110635.

[47]  (2024, May 14). "Annual NACUBO Tuition Discounting Study Finds Financial Aid Awards and Undergraduate Enrollment on the Rise at Private Colleges and Universities," Accessed on August 15, 2024 at https://www.nacubo.org/Press-Releases/2024/Annual-NACUBO-Tuition-Discounting-Study-Finds-Financial-Aid-Awards-on-the-Rise. Emphasis added.

[48]  See https://web3.ncaa.org/directory/memberList?type=12&division=I. Excludes University of Hartford, which is in the process of reclassifying to Division III. Includes the six schools in the process of reclassifying to Division I.

[49]  124 / 364. See https://web3.ncaa.org/directory/memberList?type=12&division=I.

using an unsupported estimated of missed classes and without any analysis connecting missed classes to lower education value.

78.   The Tatos Declaration claims that the existing restraint on athlete compensation lowered the value of GIA, because economics says that restraints lower value: "Economic principles dictate that placing a restraint on the exchange of a good or service restricts its value relative to the unrestrained condition. This economic axiom applies with respect to the academic product that college athletes often receive."[50]  However, the restraint here has been on cash compensation to athletes and not on educational services.  There has been no restraint on the amount in-kind compensation in the form of scholarships that the schools can provide to each athlete.  Whatever the arguments for or against a particular valuation of education services, there is no assertion of or valid economic reason to assert a suppression of demand or price for college education.

79.   The Tatos Declaration claims that athletes do not get the full value out of college because participation in athletics interferes with academic work.  He supports this claim with no economic analysis and instead cites a statement from the *O'Bannon* case, a Duke strategic plan from 2008, an op-ed from a Duke Anthropology professor, and a Carnegie report from 1929, which all mention the difficulty of dividing time between athletic participation and attending classes or otherwise pursuing academics.[51]

80.   By all the same arguments, any student who is also a full-time (or even part-time) employee would be getting less value from their education than other students.  But this claim is flawed.  Students that are attending college are demonstrating by their behavior that they value the educational experience above what it costs to get it.  This is true regardless of the employment status of the student.  Arguably, full-time employees are sacrificing more than many other students, because the opportunity cost of their time is high.  This opportunity cost can be represented as actual wages for paid employees, or as foregone time that could be used to improve athletic performance and the consequent expected future benefits of that improved performance (not necessarily monetary benefit).

---

[50]   Tatos Declaration, p. 20.

[51]   Tatos Declaration, ¶¶71–74.

81. Furthermore, schools provide athletes with other methods to meet learning outcomes. Athletes get tutoring.  The Tatos Declaration ignores not only the tutors (which non-athlete students don't get), but that the professors require the students to meet the learning outcomes in the course (so require the readings to be done, etc.). Also, the Tatos Declaration, by focusing only on missed classed to quantify the asserted diminution in value, assumes that ALL learning is done ONLY in the classroom. As we all know, a lot of learning is done outside of the classroom (reading, working on homework, googling topics, talking with other students, etc.).

82. The Tatos Declaration asserts that the value of a GIA is 22 percent lower for athletes because he estimates that athletes miss 22% of classes.[52]  I do not observe in the Tatos Declaration any support for this 22% estimate, only the earlier cites to the Duke strategic plan that address missed classes (without quantity estimate), and Duke Anthropology professor Orin Starn op-ed that claims athletes collectively missed "almost a hundred classes" (without measuring that against the total number of classes for those athletes).[53]

83. Thus, the Tatos Declaration asserts, without citation or support, that college athletes miss 22% of classes and therefore the value of the college education these athletes receive is no more than 78% of the value to other college students.  None of the articles he cites provide a basis for the 22% figure, and there is no basis for the implicit claim that the value of a college education is located exclusively in the number of class sessions a student is able to attend, as learning occurs outside of the classroom.

5. **THE TATOS DECLARATION ASSERTS AN ESTIMATE OF DAMAGES THAT IS OUTSIDE THE SCOPE OF WHAT IS ECONOMICALLY REASONABLE.**

84. In sum, the assessment of damages for additional compensation that the Tatos Declaration proposes involves incorrectly inflated estimates of revenue and incorrectly deflated estimates of actual compensation from GIAs.

---

[52]   Tatos Declaration, ¶82.

[53]   Starn, O. (2017, December 2). "College athletes' devil's bargain: play or learn," Accessed on August 15, 2024 at https://amp.newsobserver.com/opinion/op-ed/article187669478.html, cited at Tatos Declaration, ¶73.

85. A conservative approach to estimating damages is to identify gaps that arise due to time or information constraints and to determine from alternative sources of information or expertise the scope of economically reasonable methods or assumptions to complete the analysis.  That process requires care not to bias estimates in a particular direction.  The larger the gap, as might be expected for a case at the earliest stages of litigation, the more important becomes the care to avoid such bias.

86. Based on my analysis of the Tatos Declaration, the selections for "filling in the gaps" are in some cases outside the scope of what is economically reasonable.  Some examples mentioned earlier in this declaration are: 1) incorporating into the yardstick analysis 100 percent of large internal institutional transfers that are not connected to sales of output by the athletic department and have no comparable professional league cash flows, 2) using a study of only private schools and including some outside of Division 1 to estimate average price, and 3) proposing a 22 percent cut in valuation simply due to an estimate (that itself is unsupported by any analysis) of missed classes.

87. Furthermore, the selections almost fully go in a specific direction, which is to increase the size of the damage estimate – there are two exceptions: 1) offering two alternatives for GIA valuation and 2) excluding some small MFRS "revenue" categories.  Thus, the damage estimates in the Tatos Declaration are outside of the scope of what is economically reasonable and biased upward.  The resulting comparison of settlement to damages are therefore not economically supported and are biased downward.

88. The most biased result in the Tatos Declaration implies that but-for the challenged conduct, Division 1 schools would have made such sizable payments to athletes that the compensation during the damages period would have been higher by $34 billion.  There is no economic evidence that schools, especially the smaller schools, would have increased payments to athletes enough to reach this lofty estimate.  Nor is there any evidence that the marginal benefit to the schools from engaging the athlete services, over and above existing compensation (and other direct payments for BNIL and Academic Achievement Awards) approaches $34 billion.

89. The Tatos Declaration notes that compensation for coaches and administrators are not restricted in the same fashion as GIA for athletes.  There is no dispute that restrictions are

not the same.  Furthermore, to the extent that some expenditures by schools are unrestricted by NCAA rules, those expenditures are still voluntary limited by schools.  While it is true that schools could increase spending on coaches and administrative/support personnel by $34 billion, schools do not.

## 6. SIGNATURE

I certify that, to the best of my knowledge and belief:

- The statements of fact in this report are true and correct.
- The reported analyses, opinions and conclusions are limited only by the reported assumptions and are my personal, unbiased and professional analyses, opinions and conclusions.
- I have no personal interest or bias with respect to the parties involved.
- My compensation is not contingent on an action or event resulting from the analyses, conclusions or opinions of this report.

DANIEL A. RASCHER declares under penalty of perjury, pursuant to 28 U.S.C. §1746, that the preceding is true and correct.

Signed on the 16th of August, 2024, in Orinda, CA

Daniel A. Rascher

29

# Documents Relied Upon

*All documents relied upon in Declaration of Daniel A. Rascher, July 26, 2024; Errata for Expert Reply Report of Daniel A. Rascher, April 10, 2024; Expert PCJ Rebuttal Report of Daniel A. Rascher, January 26, 2024; Expert Reply Report of Daniel A. Rascher, February 23, 2024; Expert Reply Report of Daniel A. Rascher, July 21, 2023; Expert Report of Daniel A. Rascher, December 1, 2023; Expert Report of Daniel A. Rascher, October 21, 2022.*

## Collective Bargaining Agreements and Manuals

2023 NBA-NBPA Collective Bargaining Agreement.

2020 NFL-NFLPA Collective Bargaining Agreement.

NCAA Division I Manual 2022-2023.

## Legal Filings

Declaration of Steve W. Berman in Support of Plaintiff's Unopposed Motion for Preliminary Settlement Approval, September 5, 2024, including backup materials.

## Expert Reports and Exhibits

Declaration of Daniel A. Rascher, July 26, 2024.

Declaration of Ted Tatos, August 9, 2024.

Errata for Expert Reply Report of Daniel A. Rascher, April 10, 2024, including backup materials.

Expert PCJ Rebuttal Report of Daniel A. Rascher, January 26, 2024, including backup materials.

Expert Reply Report of Daniel A. Rascher, February 23, 2024, including backup materials.

Expert Reply Report of Daniel A. Rascher, July 21, 2023, including backup materials.

Expert Report of Daniel A. Rascher, December 1, 2023, including backup materials.

Expert Report of Daniel A. Rascher, October 21, 2022, including backup materials.

## Literature, Articles and Publications

Rascher, D., & Schwarz, A. (2000). "Neither Reasonable nor Necessary: "Amateurism" in Big-Time College Sports." *Antitrust.* Spring.

Rascher, D., Schwarz, A. and Orlando, J. (2015). "The Incremental Benefits and Costs of Football, Bowling, and Rifle at the University of Alabama at Birmingham (A Primary and Secondary Study)".

"Competitive Equity: Can there be Balance between Athletes' Rights and a Level Playing Field?" with Andrew D. Schwarz in E. Comeaux (ed.), *College Athletes' Rights and Well-Being: Critical Perspectives on Policy and Practice.*  Baltimore: Johns Hopkins University Press, 2017.

"A Smaller Window to the University: The Impact of Athletic De-Escalation on Status and Reputation," with Michael Hutchinson and Kimi Jennings.  In *Journal of Intercollegiate Sport, 9*(1), June 2016.

"An Analysis and Assessment of Intercollegiate Athletics at the University of San Francisco" with Jeremy Howell. 2011.

"Because It's Worth It: Why Schools Violate NCAA Rules and the Impact of Getting Caught in Division I Basketball," with Andrey Tselikov, Andrew D. Schwarz, and Mark Nagel.  *Journal of Issues in Intercollegiate Athletics, 12,* 2019.

"Cartel Behavior in US College Sports: An Analysis of NCAA Football Enforcement Actions from 1990-2011," with Mark Nagel, Richard Southall, and Nick Fulton.  *Journal of NCAA Compliance*, July-August, 2019

"Coaching Salary Disparity and Team Performance: Evidence from the Football Bowl Subdivision," with Alex Traugutt, Alan Morse, and Brian Fowler.  *Journal of Applied Business and Economics*, *22*(1), 2020.

"The Impact on Demand from Winning in College Football and Basketball: Are College Athletes More Valuable than Professional Athletes?" with Chad McEvoy.  In *Selected Proceedings of the Santa Clara University Sports Law Symposium,* September 2012.

"Where is Everyone? An Examination of Attendance at College Football Bowl Games," with Terence Eddy.  In *International Journal of Sport Finance, 11*(2), February 2016.

Pindyck, R. & Rubinfeld, D. (2018). *Microeconomics.* (9th ed.). Pearson: New York.

**Third Party Sources**

https://amp.newsobserver.com/opinion/op-ed/article187669478.html

https://gostanford.com/news/2012/05/22/the-andrew-luck-directorship-of-offense-endowed

https://nces.ed.gov/ipeds/institution-profile/110635

https://nflpa.com/posts/nfl-economics-101

https://reporting.auditor.utah.gov/servlet/servlet.FileDownload?file=0151K000005SotmQAC

https://web3.ncaa.org/directory/memberList?type=12&division=I

https://www.nacubo.org/Press-Releases/2024/Annual-NACUBO-Tuition-Discounting-Study-Finds-Financial-Aid-Awards-on-the-Rise

https://www.sportico.com/leagues/college-sports/2024/college-sports-donations-nil-money-1234763721/