Jacob K. Danziger (SBN 278219)
**ARENTFOX SCHIFF LLP**
44 Montgomery Street, 38th Floor
San Francisco, CA 94104 United States
Telephone: (734) 222-1516
Facsimile: (415) 757-5501
jacob.danziger@afslaw.com

Beth A. Wilkinson (*pro hac vice*)
Rakesh N. Kilaru (*pro hac vice*)
Kieran Gostin (*pro hac vice*)
Calanthe Arat (SBN 349086)
Tamarra Matthews Johnson (*pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com
kgostin@wilkinsonstekloff.com
carat@wilkinsonstekloff.com
tmatthewsjohnson@wilkinsonstekloff.com

Attorneys for Defendant
NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

[Additional Counsel Listed on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | Case No. 4:20-cv-03919-CW |
| | **DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY SETTLEMENT APPROVAL** |
| | Hon. Claudia Wilken |
| | Hearing Date: September 5, 2024 |
| | Hearing Time: 2:30 p.m. |
| | Location: Courtroom 2, 4th Floor |

**TABLE OF CONTENTS**

INTRODUCTION.................................................................................................1

I.    THE ADDITIONAL COMPENSATION CLAIMS SETTLEMENT IS ADEQUATE AND SHOULD BE APPROVED. ..................................................3

     A.    The Additional Compensation Claims Involved Substantial Litigation Risks. .......4

     B.    The Settlement Is Reasonable Even Accepting The Objectors' Damages Calculations...................................................................12

II.   THE COURT SHOULD ENTER THE PRELIMINARY APPROVAL ORDER AS DRAFTED. .....................................................................13

CONCLUSION. ................................................................................................14

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*Agnew v. Nat'l Collegiate Athletic Ass'n,*
    No. 1:11-CV-0293-JMS-MJD, 2011 WL 3878200 (S.D. Ind. Sept. 1, 2011) ................. 10

*Am. Honda Motor Co. v. Allen,*
    600 F.3d 813 (7th Cir. 2010) ............................................................................................. 6

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds,*
    568 U.S. 455 (2013) ........................................................................................................... 5

*Comcast Corp. v. Behrend,*
    569 U.S. 27 (2013) ........................................................................................................... 10

*Concord Boat Corp. v. Brunswick Corp.,*
    207 F.3d 1039 (8th Cir. 2000) ........................................................................................... 8

*Dolphin Tours, Inc. v. Pacifico Creative Service, Inc.,*
    773 F.2d 1506 (9th Cir. 1985) ........................................................................................... 6

*Domingo ex rel. Domingo v. T.K.,*
    289 F.3d 600 (9th Cir. 2002) ............................................................................................. 8

*Gen. Elec. Co. v. Joiner,*
    522 U.S. 136 (1997) ........................................................................................................... 8

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir. 1998) ......................................................................................... 13

*In re Asacol Antitrust Litig.,*
    907 F.3d 42 (1st Cir. 2018) ............................................................................................... 6

*In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.),*
    770 F.2d 328 (2d Cir. 1985) ............................................................................................. 13

*In re: Cathode Ray Tube (Crt) Antitrust Litigation,*
    2015 WL 9266493 (N.D. Cal. Dec. 17, 2015) .................................................................. 12

*In re Endosurgical Products Direct Purchaser Antitrust Litigation,*
    2008 WL 11504857 (C.D. Cal. Dec. 31, 2008) ................................................................ 12

*In re High-Tech Emp. Antitrust Litig.,*
    289 F.R.D. 555 (N.D. Cal. 2013) ....................................................................................... 6

*In re Hydrogen Peroxide Antitrust Litig.,*
    552 F.3d 305 (3d Cir. 2008) ............................................................................................... 6

**DEFENDANTS' REPLY ISO MOTION FOR**
**PRELIMINARY SETTLEMENT APPROVAL**

*In re National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust Litigation*,
    375 F. Supp. 3d 1058 (N.D.Cal., 2019) ................................................................ 10

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
    958 F.3d 1239 (9th Cir. 2020) ............................................................................... 10

*In Re New Jersey Tax Sales Certificates Antitrust Litig.*,
    2016 WL 7494259 (D.N.J., 2016) ......................................................................... 12

*In re Packaged Ice Antitrust Litigation*,
    2011 WL 6209188 (E.D.Mich.,2011) .................................................................... 12

*In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*,
    725 F.3d 244 (D.C. Cir. 2013) .............................................................................. 2,6

*In re NCAA I-A Walk-On Football Players Litigation*,
    2006 WL 1207915 (W.D.Wash.,2006) ............................................................. 2,3,7,9

*In Re: Nfl "Sunday Ticket" Antitrust Litig.*,
    No. ML 15-02668 PSG (SKX), 2024 WL 3628118 (C.D. Cal. Aug. 1, 2024) ................. 8

*Lucas v. Kmart Corp.*,
    234 F.R.D. 688 (D. Colo. 2006) ........................................................................... 13

*Meijer, Inc. v. 3M*,
    2006 WL 2382718 (E.D.Pa.,2006) ........................................................................ 12

*Nat'l Collegiate Athletic Ass'n v. Alston*,
    141 S. Ct. 2141 (2021)........................................................................................... 15

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
    802 F.3d 1049 (9th Cir. 2015) ........................................................................... 10,11

*Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*,
    688 F.2d 615 (9th Cir. 1982) ................................................................................ 12

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018)................................................................................................ 8

*Rock v. National Collegiate Athletic Association*,
    2016 WL 1270087 (S.D.Ind., 2016) ..................................................................... 3,10

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016)............................................................................................. 9,10

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)............................................................................................. 9,10

-iii-

*Ward v. Apple Inc.*,
  2018 WL 934544 (N.D. Cal. 2018) ............................................................................ 5

*West v. Prudential Securities, Inc.*,
  282 F.3d 935 (7th Cir. 2002) .................................................................................... 6

Case No. 4:20-cv-03919-CW

DEFENDANTS' REPLY ISO MOTION FOR
PRELIMINARY SETTLEMENT APPROVAL

**INTRODUCTION**

The Settlement Agreement in this case, ECF No. 449-03, is the product of intense and carefully structured negotiations with attorneys who have repeatedly been recognized as adequate class counsel in student-athlete compensation cases, and who have vigorously and often successfully pursued damages and injunctive claims on behalf of college athletes over the last decade. Going forward, the settlement allows Defendants' member institutions to provide additional benefits to student-athletes, and many of those member institutions (including within the Autonomy Conferences) have made clear that they plan to do so, with all Defendants' full support. Looking backwards, the settlement provides substantial monetary compensation for the release of compensation-related claims.

Defendants support preliminary approval of the proposed settlement, and submit this Reply to respond to the claim, made by both the Colorado Objectors (ECF No. 473) and the Crew Objectors (ECF No. 475), that the Settlement Agreement provides inadequate consideration for damages claims unrelated to NIL—*viz.*, claims for additional institutional compensation (or so-called "pay-for-play"), and claims regarding alleged lost scholarships (collectively referred to in this brief as "additional compensation claims"). The Objectors' claim is without merit.

As an initial matter, the Settlement Agreement provides substantial consideration for the additional compensation claims. Defendants are paying the "NIL Claims Settlement Amount," which is $1.976 billion, and the "Additional Compensation Claims Settlement Amount," which is $600 million. Together, those sums resolve all damages claims that relate in any way to *both* "any and all previously existing NCAA and conference rules regarding monies and benefits that may be provided to student-athletes by the NCAA, Division I conferences and/or Division I Member Institutions," *and* "NCAA or conference limitations on the numbers of scholarships allowed or permitted in any sport."[1] Settlement Agreement at 9–10, 14 §§ A(1)(oo); C(3). As the name

---

[1] As set forth in more detail in concurrently-submitted filings, the Settlement Agreement does not release the claims currently raised in the complaint in *Choh v. Brown University*, No. 3:23-cv-305 (D. Conn.), or claims under federal or analogous state labor laws, including the claims currently raised in the complaint in *Johnson v. NCAA*, No. 2:19-cv-5230-JP (E.D. Pa.).

**DEFENDANTS' REPLY ISO MOTION FOR PRELIMINARY SETTLEMENT APPROVAL**

suggests, all released damages claims unrelated to NIL fall within the substantial "Additional Compensation Claims Settlement Amount." While Objectors' counsel baselessly claim there is insufficient consideration for a distinct subset of those claims relating to lost scholarships, ECF No. 473 at 10–14; ECF No. 475 at 12–13, they never filed or raised such allegedly distinct claims— nor suggested those claims have any merit whatsoever—at any point before now.

Objectors' opportunistic arguments about the Additional Compensation Claims Settlement Amount also ignore the extreme amount of litigation risk attending those claims, such that there was a substantial risk of the classes recovering nothing. All such claims seek damages for additional benefits that allegedly would have been provided by the more than 350 different schools in NCAA Division I. Those schools indisputably have different budgets, different sports offerings, and different athletic and academic priorities that shift from year to year. In a but-for world without a ban on pay-for-play or scholarship limits, each of those schools undoubtedly would have made different sets of highly individualized decisions about what benefits to offer to the hundreds of different student-athletes on their campuses. And given that most Division I schools already operate their athletic departments at a loss, it is indisputable that those reallocations would have left many student-athletes worse off, including by reducing or eliminating athletic scholarships in some sports at some schools. For all these reasons, it would be impossible to develop the essential prerequisite to class certification of these claims: a working economic model capable of determining whether and which student-athletes at each of these hundreds of schools would have been injured. *See In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 253 (D.C. Cir. 2013) ("No damages model, no predominance, no class certification."). Objectors' counsel do not provide such a model or even describe how one could be generated.

Objectors' case is even weaker with respect to lost scholarship claims. In addition to the practical difficulties described above, these claims have failed every time they have been litigated. In a directly on-point case, one court denied class certification of a football-only lost scholarship class, which was considerably less sprawling than the classes pleaded here. *See, e.g.*, *In re NCAA*

---

*See* Joint Decl. of Steve W. Berman and Jeffrey L. Kessler in Further Support of Plaintiffs' Mot. for Preliminary Settlement Approval, ¶¶ 17–18.

*I-A Walk-On Football Players Litig.*, 2006 WL 1207915 at *7–8 (W.D. Wash May 3, 2006). Other scholarship claims have failed at other stages, *see Rock v. Nat'l Collegiate Athletic Ass'n*, 2016 WL 1270087, at *7–9, *14 (S.D. Ind. Mar. 31, 2016) (class certification); *Agnew v. Nat'l Collegiate Athletic Association*, 2011 WL 3878200, at *10 (S.D. Ind. Sep. 1, 2011) (motion to dismiss), *aff'd*, 683 F.3d 328 (7th Cir. 2012). Based on this unbroken line of precedent, there is no reason to think that lost scholarship claims have any economic value. And the risks on the merits and on appeal make the additional compensation claims all the more speculative.

Finally, the settlement should be approved even accepting the Colorado Objectors' alternative projection of $24.3 billion in damages for the additional compensation claims. Even under that extremely implausible scenario, the settlement amount would represent 2.5% of single damages, which is well within the range of settlements that have previously been approved—especially given the early stage of the case and the litigation risks involved.

The Court should enter the proposed Preliminary Approval Order.

## I.    THE ADDITIONAL COMPENSATION CLAIMS SETTLEMENT IS ADEQUATE AND SHOULD BE APPROVED.

The Settlement Agreement provides that Defendants will pay $600 million over a ten-year period in "full, complete, and final settlement of any and all additional claims for damages" in the amended complaint in this case, beyond "claims for NIL-related damages." Settlement Agreement at 14, § C(3). The Second Amended Complaint ("Complaint"), in turn, pleads damages claims related not just to NIL and pay-for-play, but also to NCAA rules that "fix the amount that student-athletes may be paid for their athletic services at no more than the value of a scholarship; and [] limit the quantity of athletic scholarships available in the market for student-athletes' labor services." Complaint ¶ 7; *see id.* ¶¶ 96, 98, 110, 317–18. The $600 million payment thus plainly covers both claims for additional institutional compensation and lost scholarship claims. And notably, this treatment is consistent with how the *Fontenot* Complaint characterizes scholarships as just one piece of "[t]he amount of money paid to Plaintiffs and class members" to which they are allegedly entitled. *Fontenot* Second Am. Compl. ¶ 86; *see also id.* ¶ 97 (alleging that "Defendants have long allowed athletes to be paid in the form of scholarships in return for their

-3-

**DEFENDANTS' REPLY ISO MOTION FOR PRELIMINARY SETTLEMENT APPROVAL**

labor").

The question before the Court is therefore simple: Is $600 million "fair, reasonable, and adequate" consideration for the release of these claims? The answer is indisputably yes.

**A.    The Additional Compensation Claims Involved Substantial Litigation Risks.**

It is important to inject a dose of reality. The additional compensation claims are sprawling in nature, covering hundreds of thousands of student-athletes in a variety of different sports at over 350 member institutions in Division I. In the 2022-23 academic year alone, the more than 350 Division I member institutions organized athletics competition for over 188,000 student-athletes. *See, e.g.*, ECF No. 415-6, Dec. 2023 Expert Report of Gautam Gowrisankaran ("Gowrisankaran Rpt.") ¶ 15. Under current NCAA rules, each of these institutions can provide significant benefits to student-athletes, including any combination of: (i) full cost-of-attendance athletic scholarships that offset hundreds of thousands of dollars of educational costs and thus provide a pathway to higher education for many student-athletes; (ii) additional payments from NCAA funds like the Student Assistance Fund and the Student-Athlete Opportunity Fund to cover various other expenses; (iii) preferential admissions treatment and class scheduling; (iv) educational support; (v) medical insurance; (vi) meals; (vii) coverage of medical expenses; (viii) top-flight athletic training; and (ix) access to best-in-class facilities. *See, e.g.*, ECF No. 415-9, Jan. 2024 Expert Report of Ashley Langer ("Langer Rpt.") ¶¶ 26–41.

These benefits are often provided to student-athletes regardless of the general profitability of the sport they play, their individual playing time (if they play at all), or the popularity of the individual student-athlete or their sport. It is undisputed that at most schools, football is the only program that generates positive net revenue, meaning that virtually all other sports cost more money for the schools to offer than they can generate for the institution. *See, e.g.*, Gowrisankaran Rpt. ¶ 18. Yet schools nevertheless provide scholarships and benefits in many other sports. *See, e.g.*, Langer Rpt. ¶¶ 42–49. For example, a Division I institution may provide full cost-of-attendance scholarships to a star quarterback on the football team (which may generate positive revenue from media rights), a backup shooting guard who barely plays on the basketball team

**DEFENDANTS' REPLY ISO MOTION FOR PRELIMINARY SETTLEMENT APPROVAL**

(which may generate slightly positive revenue overall), and a men's lacrosse player and a women's field hockey player (two sports that do not generate positive net revenue at any Division I institution). Indeed, expert analysis in this case revealed that 97% of Division I sports programs *already* have expenses that exceed their revenues when excluding university subsidies. *See, e.g.*, Gowrisankaran Rpt. ¶¶ 18, 71.

Schools vary dramatically, however, in the level of individual benefits that they choose to provide each of their student-athletes. NCAA member institutions and their athletic programs vary in their economic resources and potential to generate revenue due to the size of their fan bases, histories of athletic performance, and myriad other factors. Langer Rpt. ¶¶ 57–58. Universities with greater athletic department revenues tend to expend more per student-athlete. Gowrisankaran Rpt. ¶¶ 70, 77–80, 119, 122. So there is huge variance across the putative classes, which span hundreds of institutions that offer different numbers of sports and different numbers and amounts of scholarships to hundreds of thousands of individual student-athletes. One recent and clear example of this significant variance is how each of the hundreds of Division I schools responded individually to this Court's injunction in *Alston* with respect to their approaches in offering individual student-athletes *Alston* awards. As Defendants recently explained, policies guiding implementation of *Alston* awards vary dramatically from school to school, student to student, and year to year, illustrating the different priorities and budgets of Division I member institutions. *See Hubbard v. NCAA*, Case No. 4:23-CV-01593-CW, ECF No. 164, Def. Joint Opp'n to Pls. Mot. for Class Cert. (May 16, 2024) at 6–10 (school to school), 12 (student to student), 18 (year to year).

These indisputable facts underscore why the putative classes faced a substantial set of hurdles in pursuing the additional compensation claims. Litigating any of those claims on a class-wide basis would require plaintiffs to produce a working economic model capable of establishing injury for all class members without resorting to individualized proof. *See Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013); *see Ward v. Apple Inc.*, 2018 WL 934544, at *3 (N.D. Cal. 2018), *aff'd*, 784 F. App'x 539, 540 (9th Cir. 2019) (experts' "failure to provide 'properly analyzed, reliable evidence that a common method of proof exists to prove impact on a

1  class-wide basis' is fatal" (simplified)); *In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555,

2  570 (N.D. Cal. 2013); *see also In re Asacol Antitrust Litig.*, 907 F.3d 42, 54–55 (1st Cir. 2018). A

3  valid economic model must be presented so that the court can then discharge its duty under Rule

4  23, which "not only authorizes a hard look at the soundness of statistical models that purport to

5  show predominance," but "commands it." *Rail Freight*, 725 F.3d at 253, 255.

6        Nor is it sufficient to generate a model that simply spits out a positive number for each

7  class member. *West v. Prudential Sec. Inc.*, 282 F.3d 935, 938 (7th Cir. 2002); *accord Am. Honda*

8  *Motor Co. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010); *In re Hydrogen Peroxide*, 552 F.3d 305,

9  323 (3d Cir. 2008). The model must be a *working* model—it must involve a but-for world grounded

10  in economic rationality. *See Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506,

11  1511 (9th Cir. 1985) ("[Plaintiff] must presume the existence of rational economic behavior in the

12  hypothetical free market."). If the model does not survive the rigorous scrutiny required by Rule

13  23—or the independent requirements of Rule 702—then certification is improper.

14        Plaintiffs would face insurmountable hurdles in trying to generate the requisite models.

15        <u>Substantial class certification risk for pay-for-play claims.</u>  First, any model for additional

16  institutional compensation claims would start out individualized and fractionalized because it

17  would have to account for the substantial differences between hundreds of Division I schools. As

18  noted above, Division I schools have vastly different budgets and priorities; some schools provide

19  limited scholarships in the bare minimum number of sports required to maintain Division I

20  membership, whereas others provide full scholarships, *Alston* payments, and other benefits in far

21  more sports. Any class-wide impact and damages model would somehow have to factor in the

22  unique circumstances of each Division I school in order to determine what, if any additional

23  payments—beyond the value of the benefits that certain schools already offer individual student-

24  athletes—might be offered, and would represent "rational economic behavior" absent the

25  limitations on pay-for-play. *Dolphin Tours*, 773 F.3d at 1511.

26        These school-level strategy decisions, which would vary school-by-school and sport-by-

27  sport, would surely result in some student-athletes being worse off, or at least no better off, in the

28

**DEFENDANTS' REPLY ISO MOTION FOR**
**PRELIMINARY SETTLEMENT APPROVAL**

but-for world. Lesser-resourced schools might cut certain sports in order to free up additional money to spend on student-athletes in sports where they are more competitive or that generate more alumni support or fan interest. As one example, a school might decide to cut men's lacrosse—creating many uninjured (in fact, worse-off) class members—to provide more funding for women's gymnastics because of recent Olympic success by student-athletes. These type of trade-offs would also create class conflicts that are fatal to class certification.  As described in more detail below, that type of conflict is exactly what doomed scholarship claims in *In re Walk-On Football Player Litigation,* 2006 WL 1207915 at *7–8. The same would be true of pay-for-play claims, as any but-for world would have to account for the different ways in which schools would shift their resources, resulting in both "winners" and "losers" within the putative class.

Second, these changes could not be assessed just at a school level. Determining which class members are injured would require consideration of the facts and circumstances of each individual putative class member. These athletes play different positions in different sports at different levels at hundreds of different Division I schools, and would correspondingly have inherently different, potentially conflicting, and individualized claims for impact and damages. If it was economically rational for a particular school to pay more money to the star quarterback on the football team, but no more to any other player, that would mean that every other player on the football team would be no worse off and thus an uninjured class member. If a school decided to provide fewer scholarships in baseball to free up more money to spend on basketball, then some of the baseball players might be uninjured or worse-off class members, with interests in conflict with those of other class members. Making things more complicated, baseball is an equivalency sport, meaning that cutting the cost equivalent of one scholarship might mean that three or four student-athletes lose all the scholarship aid they were receiving. ECF No. 251-01, Apr. 2023 Expert Report of Catherine Tucker ("Tucker Rpt.") ¶¶ 117–19 (equivalency scholarships can be divided between different players in different amounts). Properly modeling the but-for world would require a proper assessment of the individual welfare and circumstances of each student-athlete.

Third, all of this would be further complicated by the fact that these additional payments

**DEFENDANTS' REPLY ISO MOTION FOR PRELIMINARY SETTLEMENT APPROVAL**

1   would be made in a hypothetical world where schools were already providing substantial benefits

2   to student-athletes in the form of scholarships, *Alston* Awards and/or other benefits, as well as

3   possible *additional* compensation to student-athletes for NIL. *See Concord Boat Corp. v.*

4   *Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) (model must "incorporate all aspects of the

5   economic reality" of the market); *Ohio v. Am. Express Co.*, 585 U.S. 529, 547–48 (2018) (analysis

6   must consider outcomes "one would expect to find in a competitive market"). Assessing whether

7   any school would have provided *even more* additional compensation beyond the significant sums

8   Plaintiffs alleged in retrospective NIL damages would make for an even more complicated task,

9   and likely an even more implausible and indefensible model.

10          Nor could Plaintiffs avoid these intractable difficulties by shorthand. Under the law, it

11   would be insufficient to simply assert that schools would find more money without offering some

12   explanation of how they would do so. *In re: NFL "Sunday Ticket" Antitrust Litig.*, No. 15-ML-

13   2668 (PSG), 2024 WL 3628118, at *5 (C.D. Cal. Aug. 1, 2024) (merely asserting that things would

14   work out in the but-for world is not a valid economic analysis under *Daubert*); *see also Gen. Elec.*

15   *Co. v. Joiner*, 522 U.S. 136, 146 (1997) (expert cannot rely on *ipse dixit*); *Domingo ex rel.*

16   *Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002) (same). And the record indisputably shows

17   that the vast majority of Division I schools already make costly and broad-based investments to

18   the benefit of significant groups of student-athletes in non-revenue generating sports (*see* Langer

19   Rpt. ¶ 39), so Plaintiffs would unlikely be able to make any legitimate showing.

20          The simplifying assumptions that the *House* Plaintiffs used in their BNIL model would not

21   work either. There, Plaintiffs asserted that all scholarship football or basketball student-athletes in

22   a particular Autonomy 5 conference would receive the same amount of money because a broadcast

23   would require the use of all of their NILs.  Setting aside Defendants' objection to the very concept

24   of BNIL and to the use of that assumption in the *House* case, the assumption would make zero

25   sense in a case seeking additional compensation for labor in a sports labor market, where there is

26   "one wage per *unit of talent* where the market labor demand curve crossed the market labor supply

27   curve." Daniel A. Rascher, *A Model of a Professional Sports League*, International Advances in

28

-8-

**DEFENDANTS' REPLY ISO MOTION FOR
PRELIMINARY SETTLEMENT APPROVAL**

the Economic Research 14 (1997); *see* Tucker Report ¶¶ 97–98.

And even if, against all logic, Objectors could somehow generate a model of the compensation that some of the hundreds of thousands of student-athletes would allegedly have received over a multiple-year period at hundreds of schools, that would not end the inquiry. Defendants indisputably have the right to advance individualized defenses to each class member's claim, making a class action even less tenable. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011); *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 458 (2016).

<u>Substantial class certification risk for scholarship claims</u>.  Even more profound problems would plague any efforts to certify classes relating to lost scholarship amounts. Plaintiffs pursuing such a claim would have to show that in the but-for world, they would have received the additional scholarships that a school decided to provide. But figuring out what additional scholarships, if any, an individual school would have provided across its particular set of sports offerings would involve the exact same type of speculative, particularized analysis described above.

Even if that hurdle could be cleared, problems would persist, because claims for additional scholarships defy certification and have been uniformly rejected by the courts. Objectors do not distinguish—or stunningly, even mention—*In re NCAA I-A Walk-On Football Player Litigation*, a directly-on-point precedent that explains why these claims would fail. *See* 2006 WL 1207915, at *15 (W.D. Wash. May 3, 2006). As here, the plaintiffs in *Walk-On* alleged that scholarship limits are a "cost-containment practice" that injured them by denying them full or partial scholarships, and sought to pursue damages claims on a class basis. *Id.* at *1. The case involved claims by only football players, which itself represents a dramatic simplification of the claims alleged here. In fact, the putative class in *Walk-On* was further limited to a subset of walk-on players that had an arguably more realistic claim to have received scholarship aid. *Id.* at *2.

Even in that more limited context, the court denied certification. The court first concluded that the plaintiffs could not establish adequacy because the interests of class members were fundamentally antagonistic: "If, for example, the players can prove that each school would have awarded 20 additional scholarships, they then will have to prove *who* would have received those

-9-

**DEFENDANTS' REPLY ISO MOTION FOR
PRELIMINARY SETTLEMENT APPROVAL**

scholarships — and for each to prove that *he* would have been in that group, he will have to prove that others were not." *Id.* at *9 (emphases in original). The court further found that the putative class could not establish predominance, for reasons similar to those described above: "Antitrust injury *as to each member of the class* (proof of which is required) cannot be proven without considering the facts surrounding each class member, including whether each one of them would have actually been awarded one of the additional scholarships and which school he would have attended. Fully proving antitrust injury requires providing answers to highly individualized questions such as these." *Id.* at *12 (internal citation omitted) (emphasis in original).

Notably, the *Walk-On* decision preceded the Supreme Court's clarifications that the Rule 23 analysis requires considerable rigor. *See Wal-Mart*, 564 U.S. at 350–51; *Comcast v. Behrend*, 569 U.S. 27, 33 (2013); *Tyson*, 577 U.S. at 459. And *Walk-On* is not the only decision rejecting scholarship claims. *See Rock*, 2016 WL 1270087, at *10–17 (rejecting class certification of scholarship-related claims for damages and injunctive relief on several overlapping grounds, including adequacy and predominance); *Agnew*, 2011 WL 3878200, at *8–9 (rejecting such claims at motion to dismiss phase), *aff'd*, 683 F.3d 328. Objectors provide no explanation for how they could avoid the clear obstacles to certification identified in these opinions, which indicate that the claims would be doomed from the start and thus lack economic value.

<u>Substantial risk on the merits for both sets of claims.</u>  Setting aside the class certification risks, the Objectors ignore the substantial risk they would face on the merits. Even beyond the likelihood of the Court rejecting their implausible models, many courts have declined to call into question the validity of the fundamental prohibition on pay-for-play implicated by the additional compensation claims. *See In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1103–04 (N.D. Cal. 2019) ("The procompetitive effect of these caps is preventing unlimited, professional-level cash payments, unrelated to education, that could blur the distinction between college sports and professional sports."), *aff'd*, 958 F.3d 1239, 1264 (9th Cir. 2020) ("[L]imits on cash compensation unrelated to education do not . . . constitute anticompetitive conduct and, thus, may not be enjoined." (emphasis in original)); *O'Bannon v.*

-10-

**DEFENDANTS' REPLY ISO MOTION FOR PRELIMINARY SETTLEMENT APPROVAL**

*Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1076–77 (9th Cir. 2015) ("[T]he market for college football is distinct from other sports markets and must be differentiated from professional sports lest it become minor league football" (cleaned up)). And while both sets of Objectors cite one Justice's view in the Supreme Court's *Alston* decision, they ignore that *the Court's* opinion similarly did not question the basic prohibition on pay-for-play. *See, e.g.*, *Nat'l Collegiate Athletic Association v. Alston*, 141 S. Ct. 2141, 2164–66 (2021) (noting that relief sought by plaintiffs in that case, and ordered by this Court, did not undercut rules prohibiting compensation untethered to education). A court confronted with pay-for-play claims could find this judicial history compelling in upholding the ban on pay-for-play, particularly given that lifting the ban could result in realignment of sport, scholarship, and aid decisions at individual institutions that could leave many student-athletes in non-revenue-generating sports worse off. *See infra* at 6–7.

A jury could reach the same decision, choosing to reject either the Objectors' model or their proof, and leaving the entire class with nothing. *See, e.g.*, *In re HIV Antirust Litig.*, 2022 WL 19575576, *1 (N.D. Cal. Oct. 12, 2022) (jury verdict in favor of defendants in antitrust class action litigation by end purchasers involving pay-for-delay claims regarding drugs used to treat the Human Immunodeficiency Virus ("HIV")); Jury Verdict, *In re Korean Ramen Antitrust Litig.*, No. 13-CV-4115, ECF No. 920 (N.D. Cal. Dec. 17, 2018) (jury verdict for defendants in antitrust class action where plaintiffs sought approximately $246 million in single damages for antitrust claims alleging defendants engaged in a conspiracy to fix the price of ramen noodle products).

<u>Substantial appellate risk for both sets of claims.</u>  Last, all of the foregoing risks would be multiplied by the inevitability of appeals. Defendants would have the right to seek interlocutory review of any order granting class certification, which would surely stretch established Rule 23 law beyond any acceptable boundaries. Moreover, Defendants could appeal any adverse merits decisions to both the Ninth Circuit and the Supreme Court. Those appeals could completely extinguish the class members' claims (i.e., a recovery of $0 and an obligation to pay Defendants' costs), or at least delay any recovery for years.

1

2

### B.     The Settlement Is Reasonable Even Accepting The Objectors' Damages Calculations.

With all those risks in mind, $600 million represents more than an adequate recovery for the additional compensation claims. And that is so even accepting the Colorado Objectors' implausible damages calculations of $24.3 billion. The settlement amount would represent a recovery of 2.5% of that asserted amount, which is well within ranges approved by courts in other cases, even at later stages.  *See, e.g.*, *In re New Jersey Tax Sales Certificates Antitrust Litig.*, 2016 WL 7494259, at *1–2 (D.N.J. Sept. 30, 2016), aff'd, 750 F. App'x 73 (3d Cir. 2018) (settlement for 2% of claimed damages after partial denial of motion to dismiss); Final Judgment & Order Granting Final Approval of Class Settlement, *In re Dental Supplies Antitrust Litig.*, 16-CV-696 (BMC), ECF No. 341 (E.D.N.Y. June 25, 2019) (settlement for 3% of high-end damages claim after discovery was complete); *In re Cathode Ray Tube (Crt) Antitrust Litig.*, 2015 WL 9266493, at *5 (N.D. Cal. Dec. 17, 2015) ($9.75 million antitrust class action settlement following summary judgment briefing, where plaintiffs' maximum recovery "could exceed two billion dollars," and settlement thus represented 0.49% of maximum possible recovery); *In re Packaged Ice Antitrust Litig.*, 2011 WL 6209188, at *11 (E.D. Mich. Dec. 13, 2011) (settlement, prior to resolution of class certification motion, between direct purchaser plaintiff and one defendant for "approximately 2.2% of Arctic Glacier's United States sales of Packaged Ice during the proposed Settlement Class Period"); *In re Endosurgical Prod. Direct Purchaser Antitrust Litig.*, 2008 WL 11504857, at *6 (C.D. Cal. Dec. 31, 2008) (settlement for 1.7% of relevant sales); *Meijer, Inc. v. 3M*, 2006 WL 2382718, at *2, *16 (E.D. Pa. Aug. 14, 2006) (settlement, prior to resolution of class certification motion, for approximately 2% of class member sales to defendant).

In short, a fractional recovery is no bar to approval.  *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Franciso*, 688 F.2d 615, 628 (9th Cir. 1982) ("It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery will not per se render the settlement inadequate or unfair." (internal citation omitted)). That is particularly so here in light of the significant litigation risks and the fact that the recovery was obtained so early in the case without the need for costly and time-consuming litigation. And of course, if the Court

-12-

were to instead consider the estimates proffered by Class Counsel's expert, the case for approval is still stronger.

## II.   THE COURT SHOULD ENTER THE PRELIMINARY APPROVAL ORDER AS DRAFTED.

The Court should also disregard the Colorado Objectors' challenge to the provision of the preliminary approval order temporarily staying overlapping actions pursuing identical claims. This Court's preliminary approval order in *Alston* contained an identical provision. *See* Am. Order Granting Pls.' Unopposed Mot. For Prelim. Approval of Class Action Settlement, ¶ 22 (Mar. 29, 2017, ECF No. 615). It is appropriate here as well.

A district court has the "authority and discretion to protect the interests and rights of class members and to ensure its control over the integrity of the settlement approval process." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998). Stays of duplicative actions are proper when there is a "threat to the federal court's ability to manage and resolve the actions" including the risk that duplicative litigation would impair the court's "flexibility and authority" to approve settlements. *See In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)*, 770 F.2d 328, 337–38 (2d Cir. 1985); *Lucas v. Kmart Corp.*, 234 F.R.D. 688, 697–98 (D. Colo. 2006) (enjoining class members' claims covered by the release in the preliminarily approved settlement on the ground that "it would aid in the protection of its jurisdiction and in the management of the settlement approval process").

The Court should exercise that authority here. The Colorado Objectors are taking every step they can to impair the settlement process, including by filing a case pursuing claims released in the settlement only *after* the parties moved for preliminary approval. Temporarily staying pursuit of claims that are released in this settlement could aid in the protection of this Court's jurisdiction and in the management of the settlement approval process. *See Lucas*, 234 F.R.D. at 697–98. And it will not unduly prejudice anyone. The Colorado Objectors have made their voices heard here and will presumably continue to do so. They can also choose to opt out of the settlement at the appropriate time and pursue their damages claims individually in their chosen forum. But allowing them to maintain and aggressively litigate a separate putative class action completely

-13-

1   subsumed within this one, at the same time the approval process unfolds in this Court, does not

2   serve anyone except the attorneys in that case.

3                                    **CONCLUSION**

4           The Court should preliminarily approve the Settlement Agreement.

**DEFENDANTS' REPLY ISO MOTION FOR
PRELIMINARY SETTLEMENT APPROVAL**

Dated:  August 16, 2024                          Respectfully Submitted,

**WILKINSON STEKLOFF LLP**                       **COOLEY LLP**

By: /s/ Rakesh N. Kilaru                         By: /s/ Whitty Somvichian
Beth A. Wilkinson (*pro hac vice*)               Whitty Somvichian (SBN 194463)
Rakesh N. Kilaru (*pro hac vice*)                Kathleen R. Hartnett (SBN 314267)
Kieran Gostin (*pro hac vice*)                   Ashley Kemper Corkery (SBN 301380)
Calanthe Arat (SBN 349086)                       3 Embarcadero Center, 20th Floor
Tamarra Matthews Johnson (*pro hac vice*)        San Francisco, California 94111-4004
Matthew R. Skanchy (*pro hac vice*)              Telephone:  (415) 693-2000
2001 M Street NW, 10th Floor                     Facsimile:  (415) 693-2222
Washington, DC 20036                             wsomvichian@cooley.com
Telephone:  (202) 847-4000                       khartnett@cooley.com
Facsimile:  (202) 847-4005                       acorkery@cooley.com
bwilkinson@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com                    Mark Lambert (SBN 197410)
kgostin@wilkinsonstekloff.com                    3175 Hanover Street
carat@wilkinsonstekloff.com                      Palo Alto, CA  94304-1130
tmatthewsjohnson@wilkinsonstekloff.com           Telephone:  (650) 843-5000
mskanchy@wilkinsonstekloff.com                   Facsimile:  (650) 849-7400
                                                 mlambert@cooley.com
Jacob K. Danziger (SBN 278219)
ARENTFOX SCHIFF LLP                              Dee Bansal (*pro hac vice*)
44 Montgomery Street, 38th Floor                 1299 Pennsylvania Ave. NW, Suite 700
San Francisco, CA 94104                          Washington, DC 20004-2400
Telephone: (734) 222-1516                        Telephone:  (202) 842 7800
Facsimile: (415) 757-5501                        Facsimile:  (202) 842 7899
jacob.danziger@afslaw.com                        dbansal@cooley.com

Attorneys for Defendant                          Attorneys for Defendant
NATIONAL COLLEGIATE ATHLETIC                     PAC-12 CONFERENCE
ASSOCIATION

-15-

**MAYER BROWN LLP**

By: /s/ Britt M. Miller
Britt M. Miller (*pro hac vice*)
Daniel T. Fenske (*pro hac vice*)
71 South Wacker Drive
Chicago, IL 60606
Telephone:  (312) 782-0600
Facsimile:  (312) 701-7711
bmiller@mayerbrown.com
dfenske@mayerbrown.com

Christopher J. Kelly (SBN 276312)
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306
Telephone: (650) 331-2000
Facsimile: (650) 331-2060
cjkelly@mayerbrown.com

Attorneys for Defendant
THE BIG TEN CONFERENCE, INC.

**SIDLEY AUSTIN LLP**

By:  /s/ Natali Wyson
David L. Anderson (SBN 149604)
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-1200
Facsimile: (415) 772-7412
dlanderson@sidley.com

Angela C. Zambrano (*pro hac vice*)
Natali Wyson (*pro hac vice*)
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Telephone: (214) 969-3529
Facsimile: (214) 969-3558
angela.zambrano@sidley.com
nwyson@sidley.com

Attorneys for Defendant
THE BIG 12 CONFERENCE, INC.

-16-

**ROBINSON, BRADSHAW & HINSON, P.A.**

By: /s/ Robert W. Fuller
Robert W. Fuller, III (*pro hac vice*)
Lawrence C. Moore, III (*pro hac vice*)
Amanda P. Nitto (*pro hac vice*)
Travis S. Hinman (*pro hac vice*)
Patrick H. Hill (*pro hac vice*)
101 N. Tryon St., Suite 1900
Charlotte, NC 28246
Telephone: (704) 377-2536
Facsimile: (704) 378-4000
rfuller@robinsonbradshaw.com
lmoore@robinsonbradshaw.com
anitto@robinsonbradshaw.com
thinman@robinsonbradshaw.com
phill@robinsonbradshaw.com

Mark J. Seifert (SBN 217054)
SEIFERT ZUROMSKI LLP
One Market Street, 36th Floor
San Francisco, California 941105
Telephone: (415) 999-0901
Facsimile: (415) 901-1123
mseifert@szllp.com

Attorneys for Defendant
SOUTHEASTERN CONFERENCE

**LATHAM & WATKINS LLP**

By: /s/ Christopher S. Yates
Christopher S. Yates (SBN 161273)
Aaron T. Chiu (SBN 287788)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
chris.yates@lw.com
aaron.chiu@lw.com

Anna M. Rathbun (SBN 273787)
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-1061
Facsimile: (202) 637-2201
anna.rathbun@lw.com

**FOX ROTHSCHILD LLP**

By: /s/ D. Erik Albright
D. Erik Albright (*pro hac vice*)
Jonathan P. Heyl (*pro hac vice*)
Gregory G. Holland (*pro hac vice*)
230 North Elm Street, Suite 1200
Greensboro, NC 27401
Telephone: (336) 378-5368
Facsimile: (336) 378-5400
ealbright@foxrothschild.com
jheyl@foxrothschild.com
gholland@foxrothschild.com

Attorneys for Defendant
THE ATLANTIC COAST
CONFERENCE

-17-

<u>**SIGNATURE CERTIFICATION**</u>

I, Rakesh N. Kilaru, am the CM/ECF user whose ID and password are being used to file this Defendants' Reply In Support of Motion for Preliminary Settlement Approval.  In compliance with Local Rule 5-1(i)(3), I hereby attest that concurrence in the filing of this document has been obtained from each of the other signatories.

Dated:  August 16, 2024

Respectfully submitted,

**WILKINSON STEKLOFF LLP**

By:   */s/ Rakesh N. Kilaru*
Rakesh N. Kilaru
Attorney for Defendant
National Collegiate Athletic Association

-18-

**DEFENDANTS' REPLY ISO MOTION FOR
PRELIMINARY SETTLEMENT APPROVAL**