| | |
|---|---|
| Steve W. Berman (*pro hac vice*) | Jeffrey L. Kessler (*pro hac vice*) |
| Emilee N. Sisco (*pro hac vice*) | David G. Feher (*pro hac vice*) |
| Stephanie Verdoia (*pro hac vice*) | David L. Greenspan (*pro hac vice*) |
| Meredith Simons (SBN 320229) | Adam I. Dale (*pro hac vice*) |
| HAGENS BERMAN SOBOL SHAPIRO LLP | Neha Vyas (*pro hac vice*) |
| 1301 Second Avenue, Suite 2000 | WINSTON & STRAWN LLP |
| Seattle, WA 98101 | 200 Park Avenue |
| Telephone: (206) 623-7292 | New York, NY 10166-4193 |
| steve@hbsslaw.com | Telephone: (212) 294-6700 |
| emilees@hbsslaw.com | jkessler@winston.com |
| stephaniev@hbsslaw.com | dfeher@winston.com |
| merediths@hbsslaw.com | dgreenspan@winston.com |
| | aidale@winston.com |
| Benjamin J. Siegel (SBN 256260) | nvyas@winston.com |
| HAGENS BERMAN SOBOL SHAPIRO LLP | |
| 715 Hearst Avenue, Suite 300 | Jeanifer E. Parsigian (SBN 289001) |
| Berkeley, CA 94710 | WINSTON & STRAWN LLP |
| Telephone: (510) 725-3000 | 101 California Street, 34th Floor |
| bens@hbsslaw.com | San Francisco, CA 94111 |
| | Telephone: (415) 591-1000 |
| *Class Counsel for Plaintiffs* | jparsigian@winston.com |
| [Additional counsel on signature page] | *Class Counsel for Plaintiffs* |

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | Case No. 4:20-cv-03919-CW |
| | **PLAINTIFFS' RESPONSE TO BRIEF OF *AMICI CURIAE* RICHARD J. VOLANTE AND DAVID M. WEST IN OPPOSITION TO PRELIMINARY SETTLEMENT (ECF NO. 485)** |
| | Hrg. Date: September 5, 2024 |
| | Time: 2:30 p.m. |
| | Judge: Hon. Claudia Wilken |
| | Courtroom: 2, 4th Floor |

...

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...................................................................................................................2

II. ARGUMENT .........................................................................................................................2

    A. Putative *amici* lack standing to raise their untimely objections. .......................................2

    B. Putative *amici*'s objections are meritless. ........................................................................3

        1. The Settlement would be a leg up, not a hindrance, in any collective bargaining negotiations that might take place if unions are recognized in the future. ...........................................................................3

        2. The terms of the Settlement are on par with revenue sharing in professional sports. ...................................................................................4

        3. The Settlement establishes a neutral arbitration system for resolving disputes arising from the Settlement. ..........................................4

    C. Putative *amici* lack sufficient experience to meaningfully assist the Court. ....................................................................................................................5

III. CONCLUSION ......................................................................................................................7

## I. INTRODUCTION

Plaintiffs hereby respond to putative *amici* Richard Volante's and David West's Brief in Opposition to Preliminary Settlement. The Court should reject the brief for at least four reasons. **First**, as non-class members who do not represent any members of the Settlement Classes, Mr. Volante and Mr. West have provided no basis to afford them standing to object to the Settlement in this case. **Second**, the brief was filed three days after the Court's deadline for filing objections to preliminary approval and is thus untimely. **Third**, even if the Court were to consider the arguments set forth in the brief, they lack merit because: (1) the Settlement would be a leg up in any future collective bargaining negotiations, (2) the Settlement is on par with revenue sharing models in professional sports, and (3) the Settlement establishes a neutral arbitration system for resolving disputes. And ***fourth***, because putative *amici* lack sufficient experience to offer any unique perspective or information beyond that presented by counsel for the Parties in this case, their brief is not appropriate or necessary to assist the Court in assessing the value of the settlement or its potential impact.

## II. ARGUMENT

### A. Putative *amici* lack standing to raise their untimely objections.

Two procedural defects doom putative *amici*'s brief from the start.

*First*, putative *amici* lack standing to object to the class Settlement. *See, e.g.*, *San Francisco NAACP v. San Francisco Unified Sch. Dist.*, 59 F. Supp. 2d 1021, 1032 (N.D. Cal. 1999) (holding that "nonclass members have no standing to object to the settlement of a class action"); *Californians for Disability Rights, Inc. v. Cal. Dep't of Transp.*, 2010 WL 2228531, at *8 (N.D. Cal. June 2, 2010) (a party that "does not profess to represent any class members [] lacks standing to object" to settlement).

Though stylized as an *amicus* brief, putative *amici*'s filing is nothing more than a backdoor objection to the Parties' Settlement. *See NGV Gaming, Ltd. v. Upstream Point Molate, LLC*, 355 F. Supp. 2d 1061, 1068 (N.D. Cal. 2005) ("Motions to file 'oppositions' . . . indicate that the [non-party] is attempting to exceed its stated role as amicus curiae" and "will not be considered by th[e] Court."). It is well established, however, that "non-class members have no standing to object to a class action settlement." *In re Apple iPhone/iPhone Warranty Litig.*, 2014 WL 12640497, at *7 (N.D. Cal. May 8, 2014). Neither Volante nor West is a class member, and they admit that they do not represent any class

member. *See Amici* Br. at 5 ("Mr. Volante may ultimately represent an individual objector or group of objectors before this Court ***at a later date*** in conjunction with local counsel.") (emphasis added).

*Second*, putative *amici*'s objections are untimely. Per the Court's order, any opposition to Plaintiffs' motion for preliminary approval was due on August 9. Putative *amici* filed their brief three days later on August 12. *See* Order Den. Mot. to Shorten Time (ECF No. 459).

For these two reasons alone, the Court should deny the motion and not consider putative *amici*'s arguments.

**B.     Putative *amici*'s objections are meritless.**

    **1.     The Settlement would be a leg up, not a hindrance, in any collective bargaining negotiations that might take place if unions are recognized in the future.**

Putative *amici* suggest that the Settlement could have a "chilling effect" on efforts to allow unionization and collective bargaining in college sports. But their argument ignores the fact that the Settlement explicitly preserves the opportunity for collective bargaining in the future if the law permits, including to "agree[] upon additional, expanded or different benefits than those permitted by this Injunctive Relief Settlement." IRS Art. 7, § 2. If unionization is authorized during the Injunctive Relief Settlement period, college athletes will be able to negotiate for additional compensation or benefits with the Settlement serving as a baseline for those negotiations. But this issue is speculative at best, as the law does not currently allow college athletes to collectively bargain.

Previous injunctive settlements resolving antitrust class actions challenging athlete compensation restraints have allowed the defendants to impose some restraints—like compensation caps—going forward, in exchange for the elimination of other restraints on athlete compensation. *See White v. Nat'l Football League*, 756 F.3d 585, 587–90 (8th Cir. 2014); *Bridgeman v. Nat'l Basketball Ass'n*, 675 F. Supp. 960, 962–63 (D.N.J. 1987); *Robertson v. Nat'l Basketball Ass'n*, 72 F.R.D. 64, 69–70 (S.D.N.Y. 1976). And, contrary to the putative *amici*'s claim, the *White* Settlement shows that such an injunctive settlement does not impede the ability of a union formed after the class action settlement to subsequently

negotiate a collective bargaining agreement covering health and safety issues and benefit terms not addressed by the injunction. *See White*, 756 F.3d at 589.[1]

### 2. The terms of the Settlement are on par with revenue sharing in professional sports.

Putative *amici* also make the unsupported claim that the terms of the Injunctive Settlement are "less favorable than revenue sharing models seen in professional sports leagues, which typically result in 48% to 52% shared with the players." *Amici* Br. at 10. Their argument on this point is off base for two reasons. First, as explained in Plaintiffs' Motion for Preliminary Approval, the Settlement will allow schools to provide athletes with previously prohibited payments and benefits worth up to 22% of the Power Five schools' average athletic revenues each year ***on top of*** the existing scholarship and other benefits that are already permitted, and which the Settlement requires remain permitted. Plaintiffs' experts estimate that the combined value of the existing benefits and the new 22% revenue-sharing benefits is approximately 51% of Division I revenues—meaning college athletes will receive the same percentage of revenues as professional athletes in the NFL and NBA, and more than the percentage in some other professional team sports leagues. Rascher Decl., ¶¶ 82–87 (ECF 450-4). Moreover, contrary to their characterization of the 22% Pool as a "hard spending cap," as explained above, there are many benefits that may be paid outside of the Pool (*i.e.*, exceptions to the cap), and some types of payments, like third-party NIL, do not count at all. *See* IRS Art. 3, § 3. Further, the Settlement merely establishes an initial baseline Pool for revenue sharing which is left open to the potential for further increases in the future through collective bargaining.

### 3. The Settlement establishes a neutral arbitration system for resolving disputes arising from the Settlement.

Putative *amici* are also wrong in claiming that the Settlement would "allow the NCAA to subjectively and unilaterally rewrite" the definition of fair market value for third-party NIL deals. *Amici* Br. at 9. Under the existing system, the NCAA has sole authority to make determinations about whether college athlete NIL deals comply with the current rules, including rules that prohibit deals that exceed fair market value or otherwise amount to "pay for play." The Settlement, by contrast, would establish a

---

[1] Class Counsel knows this well—we served as Class Counsel in *White* and then counsel for the union that formed thereafter.

new neutral arbitration system for resolving all eligibility disputes between individual athletes or schools and the NCAA or conferences arising from the Settlement, to ensure that the NCAA cannot abuse the rules to block legitimate third-party NIL deals without neutral review. *See* IRS, Art. 6. Although the Settlement allows the NCAA to maintain the requirement that NIL deals not be pure pay for play unrelated to NIL value, the neutral arbiter will have ultimate authority to decide the outcome of any eligibility disputes arising from the Settlement, including those involving determinations about the fair market value of third-party NIL deals. The Settlement is an improvement on the existing rules by ending the multiple roles of the NCAA as judge, jury and prosecutor for NIL rules compliance.

### C. Putative *amici* lack sufficient experience to meaningfully assist the Court.

In addition, putative *amici* fail to make the basic and requisite "showing that [their] participation is useful or otherwise desirable to the court." *See California v. U.S. Dep't of Interior*, 381 F. Supp. 3d 1153, 1164 (N.D. Cal. 2019). Instead, the putative *amici* are two non-parties who do not and cannot show that they have any "unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." *See Io Grp., Inc. v. Veo Networks, Inc.*, 2007 WL 2433385, at *1 (N.D. Cal. Aug. 22, 2007) (citation and internal quotation marks omitted) (denying motion for leave to appear as *amici* curiae).

At its core—and as detailed above (*see supra*)—putative *amici*'s objection to the settlement is premised on its purported interference with potential, future collective bargaining efforts of college athletes. *See generally Amici* Br. Not only are putative *amici* wrong in their assessment of this issue, they can offer nothing to aid the Court in evaluating it. Volante does not claim to have any experience in collective bargaining negotiations in sports or otherwise. *See id.* And West's experience with collective bargaining—*i.e.*, his participation as a player in 2011 NBA lockout negotiations between the National Basketball Players Association ("NBPA") and the NBA (*id.* at 4)—pales in comparison to Class Counsel's vast first-hand knowledge of collective bargaining in professional sports.

Specifically, counsel from Winston & Strawn ("Winston Counsel") has decades of experience representing players unions for various professional sports, including serving as primary outside counsel for the NBPA and the National Football League Players Association ("NFLPA"). And Winston Counsel

has served as lead class counsel for players asserting antitrust claims in these sports, including specific experience with the negotiation of antitrust class action settlements and how they can aid—not undermine—subsequent efforts to negotiate a collective bargaining agreement ("CBA") on behalf of players unions. *See* Joint Decl. of Steve W. Berman and Jeffrey L. Kessler (ECF No. 494-1) ¶ 16. Winston Counsel has participated in the negotiation of every NFL CBA from 1993 to the present, and in the negotiation of every NBA CBA from 1988 to the present (except 1995). *Id.* As part of those negotiations, Winston Counsel was actively involved in the negotiation, structuring, and implementation of professional-sports revenue-sharing systems. *Id.*

Winston Counsel's experience negotiating class action settlements and CBAs on behalf of athletes is unparalleled. For example, Winston Counsel was co-lead class counsel for NFL players in *White v. Nat'l Football League*, No. 92-cv-906 (D. Minn. 1992), in which they negotiated a class action settlement that led to the establishment of NFL free agency. Decl. of Jeffrey L. Kessler in Support of Plaintiffs' Mot. for Class Certification (ECF No. 208-2) ¶ 7. Winston Counsel continued to serve as co-lead class counsel for the *White* class for the next 18 years, bringing numerous proceedings to enforce the settlement and ensure the protection of the athletes' interests, while also negotiating CBAs for the players union during the term of the class settlement. *Id.* ¶¶ 7–8 (citing *White v. Nat'l Football League*, 822 F. Supp. 1389 (D. Minn. 1993)). In addition, Winston Counsel represented a putative class of NFL players in an antitrust action challenging the legality of the 2011 NFL lockout. *Id.* ¶ 10 (discussing representation in *Brady v. Nat'l Football League*, No. 11-cv-639 (D. Minn. 2011)). Following the negotiated settlement of that case, the 2011 NFL lockout ended and the NFL and NFLPA agreed to a new CBA. *Id.* Winston Counsel has also negotiated antitrust class action settlements that (i) led to the establishment of free agency in professional basketball, and (ii) ended the 2011 NBA lockout and led to a new NBA CBA that protected free agency and NBA players' other rights. *See id.* ¶ 11 (discussing representation in *Bridgeman v. Nat'l Basketball Ass'n*, No. 87-cv-4189 (D.N.J. 1987), and *Anthony v. Nat'l Basketball Ass'n*, No. 11-cv-5525 (N.D. Cal. 2011)).

Putative *amici*'s limited experience with collective bargaining during the 2011 NBA lockout as a player is thus no match for Class Counsel's four decades of collective bargaining experience as a principal

- 7 -

1  union negotiator, and thus is of no help to the Court in evaluating the Settlement.

### III. CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court reject putative *amici*'s Brief in Opposition to Preliminary Settlement.

| | |
|---|---|
| Dated: August 26, 2024 | Respectfully submitted, |
| By  */s/ Steve W. Berman* | By  */s/ Jeffrey L. Kessler* |
| Steve W. Berman (*pro hac vice*) | Jeffrey L. Kessler (*pro hac vice*) |
| Emilee N. Sisco (*pro hac vice*) | David G. Feher (*pro hac vice*) |
| Stephanie Verdoia (*pro hac vice*) | David L. Greenspan (*pro hac vice*) |
| Meredith Simons (SBN 320229) | Adam I. Dale (*pro hac vice*) |
| HAGENS BERMAN SOBOL SHAPIRO LLP | Sarah L. Viebrock (*pro hac vice*) |
| 1301 Second Avenue, Suite 2000 | Neha Vyas (*pro hac vice*) |
| Seattle, WA 98101 | WINSTON & STRAWN LLP |
| Telephone: (206) 623-7292 | 200 Park Avenue |
| Facsimile: (206) 623-0594 | New York, NY 10166-4193 |
| steve@hbsslaw.com | Telephone: (212) 294-6700 |
| emilees@hbsslaw.com | Facsimile: (212) 294-4700 |
| stephaniev@hbsslaw.com | jkessler@winston.com |
| merediths@hbsslaw.com | dfeher@winston.com |
| | dgreenspan@winston.com |
| Benjamin J. Siegel (SBN 256260) | aidale@winston.com |
| HAGENS BERMAN SOBOL SHAPIRO LLP | sviebrock@winston.com |
| 715 Hearst Avenue, Suite 300 | nvyas@winston.com |
| Berkeley, CA 94710 | |
| Telephone: (510) 725-3000 | Jeanifer E. Parsigian (SBN 289001) |
| Facsimile: (510) 725-3001 | WINSTON & STRAWN LLP |
| bens@hbsslaw.com | 101 California Street, 34th Floor |
| | San Francisco, CA 94111 |
| Jeffrey L. Kodroff (*pro hac vice*) | Telephone: (415) 591-1000 |
| Eugene A. Spector (*pro hac vice*) | Facsimile: (415) 591-1400 |
| SPECTOR ROSEMAN & KODROFF, PC | jparsigian@winston.com |
| 2001 Market Street, Suite 3420 | |
| Philadelphia, PA 19103 | *Class Counsel for Plaintiffs* |
| Telephone: (215) 496-0300 | |
| Facsimile: (215) 496-6611 | |
| jkodroff@srkattorneys.com | |
| espector@srkattorneys.com | |
| | |
| *Class Counsel for Plaintiffs* | |

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

Pursuant to Civil Local Rule 5-1(i)(3), the filer of this document attests that concurrence in the filing of this document has been obtained from the signatories above.

By: */s/ Steve W. Berman*
  STEVE W. BERMAN