Pages 1 - 111

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Claudia Wilken, Judge

IN RE: COLLEGE ATHLETE NIL          )
LITIGATION.                         )
                                    )   **NO. 20-03919 CW**
                                    )
_____)

                        Oakland, California
                        Thursday, September 5, 2024

               <u>**TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:  (via videoconference)

For Plaintiffs:
                    HAGENS BERMAN SOBOL SHAPIRO LLP
                    1301 Second Avenue - Suite 2000
                    Seattle, Washington  98101
             BY:    **STEVE W. BERMAN, ATTORNEY AT LAW**
                    **EMILEE SISCO, ATTORNEY AT LAW**
                    **STEPHANIE VERDOIA, ATTORNEY AT LAW**

                    HAGENS BERMAN SOBOL SHAPIRO LLP
                    715 Hearst Avenue - Suite 202
                    Berkeley, California  94710
             BY:    **BENJAMIN J. SIEGEL, ATTORNEY AT LAW**

                    WINSTON & STRAWN LLP
                    200 Park Avenue
                    New York, New York  10166
             BY:    **JEFFREY L. KESSLER, ATTORNEY AT LAW**
                    **DAVID L. GREENSPAN, ATTORNEY AT LAW**
                    **ADAM I. DALE, ATTORNEY AT LAW**
                    **NEHA VYAS, ATTORNEY AT LAW**

               **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

Remotely Reported:  Marla F. Knox, CSR No. 14421, RMR, CRR
                    United States Official Reporter

1    **APPEARANCES:**   (continued, via videoconference)

2    For Plaintiffs:
                          WINSTON & STRAWN LLP
3                         101 California Street - 35th Floor
                          San Francisco, California  94111
4                 BY:  **JEANIFER E. PARSIGIAN, ATTORNEY AT LAW**

5    For Defendants NCAA and Power Five Conferences:

6                         WILKINSON STEKLOFF LLP
                          2001 M Street, NW - 10th Floor
7                         Washington, D.C.  20036
                  BY:  **RAKESH KILARU, ATTORNEY AT LAW**
8                      **CALANTHE ARAT, ATTORNEY AT LAW**

9    For Atlantic Coast Conference:
                          LATHAM & WATKINS LLP
10                        505 Montgomery Street - Suite 2000
                          San Francisco, California  94111
11                BY:  **CHRISTOPHER S. YATES, ATTORNEY AT LAW**

12   For The Big Ten Conference, Inc.:
                          MAYER BROWN LLP
13                        71 South Wacker Drive
                          Chicago, Illinois  60606
14                BY:  **BRITT M. MILLER, ATTORNEY AT LAW**

15   For The Big 12 Conference, Inc.:
                          SIDLEY AUSTIN LLP
16                        2021 McKinney Avenue - Suite 2000
                          Dallas, Texas  75201
17                BY:  **NATALI WYSON, ATTORNEY AT LAW**
                       **ANGELA C. ZAMBRANO, ATTORNEY AT LAW**
18
     For Alex Fontenot:
19                        KOREIN TILLERY LLC
                          505 North 7th Street - Suite 3600
20                        St. Louis, Missouri  63101
                  BY:  **GARRETT R. BROSHUIS, ATTORNEY AT LAW**
21
                          KOREIN TILLERY LLC
22                        205 N. Michigan Plaza - Suite 1950
                          Chicago, Illinois  60601
23                BY:  **GEORGE A. ZELCS, ATTORNEY AT LAW**

24           **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

25

```
1   APPEARANCES:   (continued, via videoconference)

2   For Alex Fontenot:
                        OLSON GRIMSLEY KAWANABE HINCHCLIFF &
3                       MURRAY LLC
                        700 17th Street - Suite 1600
4                       Denver, Colorado  80202
               BY:  SEAN C. GRIMSLEY, ATTORNEY AT LAW
5
    For Pac-12 Conference:
6                       COOLEY LLP
                        3 Embarcadero Center - 20th Floor
7                       San Francisco, California  94111
               BY:  WHITTY SOMVICHIAN, ATTORNEY AT LAW
8
    For Grace E. Menke:
9                       MOLO LAMKEN LLP
                        430 Park Avenue
10                      New York, New York  10022
               BY:  STEVE F. MOLO, ATTORNEY AT LAW
11                  ALEXANDRA C. EYNON, ATTORNEY AT LAW
                    CATHERINE MARTINEZ, ATTORNEY AT LAW
12                  SWARA SARAIYA, ATTORNEY AT LAW
                    SARA TOFIGHBAKHSH,ATTORNEY AT LAW
13
                        MOLO LAMKEN LLP
14                      600 New Hampshire Avenue, N.W.
                        Washington, D.C.  20037
15             BY:  LOIS AHN, ATTORNEY AT LAW

16                      MOLO LAMKEN LLP
                        300 North LaSalle Street - Suite 5350
17                      Chicago, Illinois  60654
               BY:  ERIC POSNER, ATTORNEY AT LAW
18                  ELIZABETH K. CLARKE, ATTORNEY AT LAW

19                      CONRAD METLITZKY KANE LLP
                        217 Leidesdorff Street
20                      San Francisco, California  94111
               BY:  WILLIAM J. COOPER, ATTORNEY AT LAW
21
    For Southeastern Conference:
22                      ROBINSON BRADSHAW HINSON, P.A.
                        101 North Tryon Street - Suite 1900
23                      Charlotte, North Carolina  28246
               BY:  ROBERT W. FULLER, III, ATTORNEY AT LAW
24

25            (APPEARANCES CONTINUED ON THE FOLLOWING PAGE)
```

(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)

```
 1   APPEARANCES:   (continued, via videoconference)

 2   For Southeastern Conference:
                             WHEELER TRIGG O'DONNELL LLP
 3                           370 17th Street - Suite 4500
                             Denver, Colorado  80202
 4                  BY:  KATHRYN REILLY, ATTORNEY AT LAW

 5   For Amici Curiae:
                             THE VOLANTE LAW FIRM LLC
 6                           7029 Longview Drive
                             Solon, Ohio  44139
 7                  BY:  RICHARD J. VOLANTE, ATTORNEY AT LAW
                        DAVID M. WEST, ATTORNEY AT LAW
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   **Thursday - September 5, 2024**                    **2:30 p.m.**

2                   **P R O C E E D I N G S**

3                       ---oOo---

4       **THE CLERK:**  So, appearing for Plaintiffs presenting

5   argument is Steve Berman and Jeffrey Kessler.

6       Also appearing would be David Greenspan, Jennifer

7   Parsigian, Adam Dale, Neha Vyas, Benjamin Siegel, Emilee Sisco

8   and Stephanie Verdoia.

9       Defense Counsel for NCAA is Rakesh Kilaru.  Also appearing

10  is Calanthe Arat.

11      Defense Counsel for ACC is Chris Yates.

12      Defense Counsel for Big Ten is Britt Miller.

13      Defense Counsel for Big 12 is Natali Wyson and Angela

14  Zambrano.

15      Defense Counsel for Pac-12 is Whitty Somvichian.

16      Defense Counsel for SEC is Robert Fuller and Katie Reilly.

17              (Pause in proceedings.)

18      **THE CLERK:**  The Menke women objectors' Counsel

19  appearing -- making an appearance or speaking is Steven Molo.

20      Also appearing is Eric Posner, Elizabeth Clarke, William

21  Cooper, Alexandra Eynon, Catherine Martinez, Swara Saraiya,

22  Sara -- I'm not going to try it -- T-O-F-I-G-H-B-A-K-H-S-H --

23  and Lois Ahn.

24      And for the Colorado objectors oh, Mr. -- I have already

25  forgotten --

1          **MR. BROSHUIS:**  It's okay.

2          **THE CLERK:**  And also appearing with Mr. Garrett

3   Broshuis is Sean Grimsley and George Zelcs.

4      Amicus Curiae Counsel is Richard Volante and David West.

5               (Pause in proceedings.)

6          **THE CLERK:**  The Court is now in session.  The

7   Honorable Claudia Wilken is presiding.

8      Calling civil case numbers 20-3919, In Re: College Athlete

9   NIL Litigation and civil case number 23-1593, Hubbard versus

10  National Collegiate Athletic Association.

11     Counsel and all parties listening in, this proceeding is

12  being reported.  Any other recording of this proceeding either

13  by video, audio, including screenshots or other copying of the

14  hearing is strictly prohibited.

15     Also, any counsel that is not currently speaking to the

16  Court, please mute your microphones.

17     Thank you.

18               (Pause in proceedings.)

19          **THE COURT:**  Good afternoon, everybody.  We have a lot

20  to cover and a lot of people who want to talk.

21     So, I -- I think what I will do is start with some notice

22  and claim form kind of picayunish issues and then move onto the

23  more substantive issues and start by asking some of the many

24  questions that I have for some of you.

25     And then at some point I will ask if anybody really has

1    something to add that hasn't been discussed, and I will try to

2    give everyone some time to do that; but I'm most interested in

3    getting the answers to the questions that I have after reading

4    all your briefs and the declarations and the expert and the

5    cases and all of that.

6          So, with respect to the notice, I have some issues with

7    the notice in the claim form; and I don't quite know how to

8    deal with them.

9          I don't know if I can conveniently edit them or if I need

10   to tell you what they all are or what exactly to do, but I'm

11   just -- I will give you some ideas of some things that I would

12   like to have changed, and then we can talk later maybe about

13   how best to go about doing it.

14         One thing I always like to put in my notice is since this

15   happened to me once was a final hearing date had to be changed,

16   and the notice had said "it will be on such and such a date;"

17   and it was a big hassle trying to get everybody to change the

18   date.

19         So, any place where it says anything about the final

20   hearing date, it should say "subject to change."  There is one

21   place where it does do that, but I would like it to be every

22   place.

23             **THE CLERK:**  Your Honor, I'm so sorry to interrupt.  I

24   do need to start the recording.

25             **THE COURT:**  Oh, okay.

1          **THE CLERK:**  I'm so sorry.

2          **THE COURT:**  No problem.

3          **THE CLERK:**  Okay, thank you.

4          **THE COURT:**  Sure.  We have our court reporter.  And,

5  by the way, in addition to it being forbidden to record any --

6  privately any of the video or audio, it's also the case that

7  the official record of the proceeding is the court reporter's

8  transcript and although there might be a recording made by the

9  Zoom program or application, that -- neither that nor any

10  unauthorized recordings that anybody else might want to make

11  are not the official record of the case.

12          So, the continuance, I would like it to be clear to

13  everybody that in order to object, they need to make a written

14  objection.  And in order to speak -- and I don't like to use

15  the word "appear" because that -- some people think -- lay

16  people might think that "appear" means just be there; but they

17  can object but they must object in writing.

18          They can ask to speak, but I don't know how many people

19  are going to want to speak.  So, it may be the case that not

20  everybody who wants to speak will be allowed.

21          So, they need to be told that they may be allowed to speak

22  if they file a written objection and ask to speak.

23          **MR. BERMAN:**  May I ask a question on that, Your Honor?

24          **THE COURT:**  Yeah.

25          **MR. BERMAN:**  Steve Berman.  Because we are already

getting questions about this.

In the event that you gave preliminary approval is the final hearing going to be a video or in person?

**THE COURT:** What I'm thinking of doing -- and I have been checking around for this because I haven't done it before -- is what we call a hybrid proceeding in which I would be in court; the lawyers who are speaking would be in court, but we would also have availability of remote access so that others -- I'm just anticipating that, perhaps, there might be more people wanting to attend than we can fit in our courtroom.

So, my idea would be to have some people in person and then have remote access so that more people would have access to it.

I would give out certain number of seats to each party. You know, you can have four seats; and you can have four seats. The press can have X number of seats. Maybe we will have an overflow courtroom where there will be a monitor that will have a Zoom panelist application running.

And then other people could either be elsewhere in the courthouse or they can be at Starbucks across the street or whatever. That's what I have in mind, but let's wait and see how it looks.

Okay. So, I do think that the class definitions, very simple ones, but just a line of what the classes are should be in the notice because the FRCP says so.

1    I think there should be some explanation about the

2  damages; just a line, like, what you mean by lost

3  opportunities -- well, lost NIL opportunities and what's that.

4    I don't want to make this thing any longer than it has to

5  be, but I do think we should say something that a layperson

6  would grasp as to what the forms of damages are.

7    We have things like "you were denied compensation

8  opportunities."  Well, it's not -- I mean, that sort of makes

9  it -- you sound like you went to your athletic director and

10  said, "Can you please pay me a salary?"  And she said no.

11  That's not how it works, of course.

12    So, the persons -- people aren't actually denied

13  opportunities.  There is -- it's just understood by everyone

14  that there is no -- and I'm going to call it "pay-for-play"

15  because it is easier -- that there is no pay-for-play.

16    The distribution plan, I think, should have a little

17  something in it -- in the notice about how that's going to

18  work, and I also think -- this is out of order -- but I also

19  think the distribution plan or I'm wondering whether the

20  distribution plan ought not to be in the settlement agreement.

21    So why don't you-all give that some thought.  Again, I

22  don't want to drag everything out and make it a lot longer than

23  it needs to be, but there is nothing that explains how this

24  money will be distributed just logistically.

25    Are there checks?  I saw a mention of Venmo.  It's going

 1    to be every year for ten years.  How is -- who is going to keep

 2    track of that and how are they going to do it?

 3        We can't address everything, but I feel like there should

 4    be some explanation of how this money is going to be

 5    distributed.

 6        This is Hubbard -- and we will talk more about Hubbard

 7    later -- but I have a problem with the Hubbard claim form.

 8        It has these four criteria, and you are supposed to fill

 9    in a little box whether you were eligible, whether you were --

10    I don't know what they are.  There's four things there -- but

11    they aren't meaningful, at least the way you have got it fixed

12    up now.

13        The criteria for getting an academic achievement award

14    under this rubric is to -- that your school was giving out

15    those awards.  Your school had certain criteria and you met the

16    criteria.

17        So, to ask those four things about eligibility and

18    academic standing or whatever they are, may or may not be what

19    your school wanted nor is there any place for you to explain

20    how it is that you qualified.

21        And then in the sort of catchall provision at the bottom

22    where it says, "Well, do you think you ought to get paid anyway

23    even though you don't qualify?  If so, say why," and there is

24    no explanation for how a person might possibly qualify for that

25    because you are a nice person?  Because you are financially

1    needy?

2        What are -- are there criteria and what are they so they

3    know what to write down if they want to be considered for that.

4        Okay.  So remind me to get back to this and tell me at the

5    end how you think it would be best; if you want to take another

6    shot at these notices and claim forms or if you want me to try

7    to do it and give it to you and see what you think.

8        There is also some inaccuracies.  There is one place in

9    the house claim form -- it's the last page, shaded area --

10    where one place it says the start date is 2019 but it is really

11    2016.  So somebody needs to go through it with a fine tooth

12    comb and make sure it's all -- there is no inaccuracies.

13        I know that you did this under short notice and it was

14    very high pressure, and there is bound to be errors.  And I'm

15    not being judgmental, but we need to check them and make sure

16    they are all correct.

17                    (Pause in the proceedings.)

18                **THE COURT:**  Okay.  So, we had our litigation classes

19    and three damage classes were certified; one injunctive relief

20    class was certified.  There was a motion to certify in Hubbard,

21    but it wasn't ruled on because the settlement was in progress.

22        I -- if you could tell me briefly -- I guess, it might be

23    Mr. Berman who addressed this -- what the difference is between

24    the certified classes and the litigation classes.  And to the

25    extent there are differences, why are they?

1    I know that one is the certified class -- the settlement

2    classes add the scholarship limit claim and the pay-for-play

3    claim; but as far as either other claims or -- and/or the start

4    and stop dates and/or who is in it -- is it just P5 or is it

5    all of D1 -- are those factors different as between the

6    litigation certified classes and the settlement classes?

7        Can anyone do that off the top of their head briefly and

8    efficiently?

9            **MR. BERMAN:**  Jeff, do you have that off the top of

10   your head?

11           **THE COURT:**  If not, you can write it up later.

12           **MR. BROSHUIS:**  Your Honor, I can explain a little from

13   my point of view if you'd like me to.

14           **MR. KILARU:**  Your Honor, I can also explain from the

15   point of view of the parties, and Mr. Berman and Kessler can

16   correct me if I get anything wrong.

17       I believe -- and, again, they can correct me if I get any

18   of this wrong -- as far as the damages classes, I don't believe

19   that the house football and basketball players class, I think,

20   is largely, as you certified it, except it now folds in the

21   additional claims as you mentioned for pay-for-play.

22       The same is true of the women's basketball class.

23       The lost NIL opportunities class, what I think is what --

24   I think you called it that, has now been broadened in the house

25   to encompass claims for all of Division I.

1    And then the pay-for-play -- the additional sports class

2    similarly encompasses all of Division I and all athletes who

3    were not in Power Five basketball and football.

4    Is that about, right, Mr. Berman and Kessler?  I think

5    that's the general summary.

6    **MR. KESSLER:**  That is essentially correct.  The other

7    change is we have a cut-off date order for the damages classes

8    of September 15th, 2024.

9    When you did the certified classes, it was a cut-off date

10    for those litigated classes because there was a -- you know, a

11    different period at that time.

12    Now, that we know the end date, we put in that end date;

13    but other than that, it is essentially the changes that were

14    described by Mr. Rakesh.

15    **THE COURT:**  Okay.  So, football -- class 1 football

16    class and class 2 women's basketball class are still only P5?

17    They weren't expanded to D-I?

18    **MR. KESSLER:**  That's correct because we dealt with the

19    D-I issues in the other classes.  These classes are essentially

20    the same except for the cut-off date and adding new claims like

21    the pay-for-play claims.

22    **THE COURT:**  Okay.  Well, why was the other sports and

23    the injunctive relief, why were those expanded to D-I and not

24    just P5?

25    **MR. KESSLER:**  Well, because we -- the second amended

1  complaint -- our original complaint did not assert claims for

2  all of D-I with respect to the first two classes at all; okay.

3       In the second amended complaint, we assert pay-for-play

4  claims on behalf of all of D-I.

5       We always had all of D-I in the injunctive class.  That

6  has never changed.

7            THE COURT:  Okay.  Then it's just the other classes

8  that has changed, other sports.  Why has that changed?

9            MR. KESSLER:  Because we amended the second amended

10 complaint to add --

11           THE COURT:  Right, I know it is consistent with the

12 second amended complaint; but I want to know why --

13           MR. KESSLER:  We added in --

14           THE COURT:  -- the complaint then, if that's the

15 reason.

16           MR. KESSLER:  Yes.  We added in claims for damages for

17 the pay-for-play claims for all of D-I as well as -- so it

18 covered the existing P5 class members, we had to expand it

19 to --

20           THE COURT:  Okay.

21           MR. KESSLER:  -- the other ones.

22           THE COURT:  Okay.  So -- and then as Mr. Berman points

23 out, there is a different difference in the end date.

24       One ends on September 15, 2024; and the earlier one ended

25 in something that I don't understand -- hopefully you will be

```
 1   able to tell me -- when people were initially eligible to
 2   compete.
 3        What does it mean to be initially eligible to compete?  Do
 4   you get a letter, a piece of paper?  What do you get?  How do
 5   you know you are initially eligible to compete?  And how long
 6   before you actually start playing games does that happen to
 7   you?
 8        MR. KESSLER:  So, because of that uncertainty is why
 9   we put in September 15th as an end date.  In other words, what
10   that means -- what that means is that if by September 15th they
11   have joined a team and are eligible to complete on that team,
12   that they are in on that date.
13        We are essentially trying to identify the student athletes
14   who have joined the team, the NCAA certifies eligibility of
15   each member of the team.  And so, they have been joined and
16   certified by that date.
17        THE COURT:  Well, okay.
18        MR. KILARU:  Your Honor, if I might just briefly add
19   on that, Mr. Kessler is right that the NCAA does this; and it's
20   a known quantity in a defined group of individuals because you
21   do get a document of certification and there is a record of
22   certification.
23        THE COURT:  Is there a defined date that says "this is
24   the date upon which you were certified" --
25        MR. KILARU:  Yes.
```

1          **THE COURT:**  -- "as initially eligible to compete?"

2     There is a date certain because --

3          **MR. KILARU:**  Yes.

4          **THE COURT:**  -- if it is going to be a date potentially

5     of a class, it needs to be a date certain and not something

6     amorphous.

7          **MR. KILARU:**  I apologize, Your Honor.  For each

8     student there is a defined date, so students will know.

9          **THE COURT:**  Then what's the magic number of

10    September 15, 2024?  Is there a reason for that number being

11    changed too, instead of the other one?

12         **MR. KESSLER:**  So, the --

13         **MR. KILARU:**  Your Honor, I believe the earlier one was

14    tied to the date of class certification, so it wouldn't extend

15    forward in time.  So, we thought this was a reasonable way to

16    have an end to the date and --

17         **THE COURT:**  So, it was just built in as a date because

18    you needed a date to end things, which is fine.  I'm not

19    criticizing.  I'm just wondering.

20         **MR. KILARU:**  I would say in part but it also has the

21    effect of applying to many student athletes in the '24-'25 year

22    because many of these decisions are made in the fall of 2024

23    before students come to campus, enroll or begin playing their

24    sport.

25         **MR. KESSLER:**  Right.  The goal, Your Honor, is when we

1  did the negotiation for the damages, for example, we were

2  including the damages that would occur in the start of the

3  '24-'25 academic year.

4      So, we needed to advance the date from the class

5  certification date of the litigated classes to now include

6  athletes who would start or be eligible by September 15th so

7  that their claims were included, and they will get damages

8  attributable to that year in the allocation formula.

9      **THE COURT:**  Okay.  Here is a random question that's

10  unconnected to anything else.

11      I'm looking for -- I know the date when the NCAA suspended

12  its third party NIL rules.  And my question is -- that was July

13  of 2021.  My question is:  Did that also suspend the

14  prohibition on video game participation?  Or does anybody know

15  or does anybody care?

16      **MR. KESSLER:**  The same rules, Your Honor.  The video

17  game participation was that you couldn't sell your NIL rights

18  for a video game.  So, there is no difference between those

19  NIL.  It's the same.

20      **THE COURT:**  Okay, thank you.  Excuse me.  I need to

21  read my notes for a second.

22                  (Pause in proceedings.)

23      **THE COURT:**  Oh, when you are thinking about fixing the

24  notice form, if you look at the press release, the press

25  release actually -- I'm sorry to say -- does a slightly better

 1  way of describing briefly and simply what the damages, what the

 2  class, what the distribution are.

 3      So, if you are trying to write something better than

 4  "denied opportunities for compensation" or "lost

 5  opportunities," you might take a look at how it is phrased in

 6  the press releases.

 7          **MR. BERMAN:**  I think what we will do, Your Honor, is

 8  we will take a first stab at it.

 9          **THE COURT:**  Okay.

10          **MR. BERMAN:**  We will send you the Word documents

11  and -- in case you want to refine what we do.

12          **THE COURT:**  Okay.

13                  (Pause in proceedings.)

14          **THE COURT:**  Oh, and then it always needs to say -- we

15  don't want to mislead anybody.  There is places where it sort

16  of implies that you will get money.  And everywhere anything

17  like that is said it needs to say "you may get money" because

18  nobody knows who will get money.

19      And many of the things are only -- are "if your school

20  chooses to offer them."  So, it's not like everybody gets more

21  scholarships and everybody gets pay-for-play.  No.  Their

22  school has to offer them, and they need to understand it should

23  be -- and that should be clear to them as well as the ten-year

24  thing.  It should always say that this will be paid out over

25  ten years because that's a substantial difference.  Money now

1  versus money over a ten- year period is just a different number

2  and they need to know that and to know that attorneys' fees and

3  other costs will come out of it.

4      So, I just want at every turn for people to have certainly

5  an optimistic but also a realistic notion of what they are

6  going to get.  Everybody is not going to get a million dollars.

7                    (Pause in proceedings.)

8          **MR. BERMAN:**  No, but we were trying to -- can I speak

9  to that real briefly, Your Honor?

10         **THE COURT:**  Well, just -- yeah, I guess, go ahead.

11         **MR. BERMAN:**  There are some people we want to say you

12  will get paid.  So, if you are on a roster and you are getting

13  house broadcast NIL damages, you will get paid.  We are mailing

14  checks.  So we wanted people to know that.

15         **THE COURT:**  Okay.  Well, maybe you can make a

16  distinction then.  This would be the non-claim form people.

17  So, you could say they will get a check automatically, and the

18  claim form people may get a check; and it may depend on whether

19  their school is offering.

20                    (Pause in proceedings.)

21         **THE COURT:**  Let's see, okay.  So, let's turn to the

22  more substantive issues starting with the scholarship limits

23  claim.

24      I'm concerned about the argument by either some of the

25  objectors that there is no class representative who is making a

1    claim for a lost scholarship.

2        Plaintiff responds by saying that Mya Harrison never got a

3    scholarship and that Grant House got a partial scholarship.

4    However, those things are not in the complaint.

5        So, my question is:  Do we need such a class rep?  If we

6    do, do we have one?  If we do, can we amend the complaint?

7        And this is one reason I haven't actually filed the second

8    amended complaint yet.  Could we add -- if we need someone

9    else, add someone else in a third amended complaint?  So, if

10   somebody can address that and then whoever else can respond.

11            MR. BERMAN:  We can do it one of two ways, Your Honor.

12            MR. KESSLER:  Your Honor -- go ahead.

13            THE COURT:  Let's start with Mr. Berman.  Go ahead.

14            MR. BERMAN:  We can do it one of two ways.  We could

15   put that information in the complaint.  I was wondering why you

16   hadn't entered that stipulation.

17        Or we could file a declaration from those class

18   representatives attesting to the fact that they either had a

19   partial scholarship or no scholarship.

20            THE COURT:  Well, if you can and don't mind, I think

21   the cleanest way would be to amend the complaint.

22            MR. BERMAN:  No problem.  We will do it.

23            THE COURT:  Does anybody have a problem with that?

24            MR. BROSHUIS:  Your Honor, if I can just speak to that

25   for a moment, I don't know that that would even -- that would

1    still cure the problem.

2        And the reason is that our case is beyond -- on behalf of

3    people who are injured by partial scholarship rules.  And the

4    class is defined by those who got partial scholarships.

5        If they are saying that Ms. Harrison did not receive a

6    scholarship at all, she would not be in our class.  And I don't

7    know that she would have standing even with the amendment.

8        **THE COURT:**  What about Grant House?

9        **MR. BROSHUIS:**  And with Mr. House they are saying that

10   he received a partial scholarship but then received the rest of

11   his scholarship through academic scholarship then.

12       And so, I still don't know that he suffered an injury then

13   because they are saying he received a full scholarship.

14       **THE COURT:**  Okay.  Well, if you are worried about it,

15   Mr. Berman, maybe another thought would be to find another

16   Plaintiff to add who did not get a scholarship and one who got

17   a partial scholarship.

18       **MR. BERMAN:**  I will take that into account,

19   Your Honor.

20       **THE COURT:**  Okay.  Let's see.

21                   (Pause in proceedings.)

22       **THE COURT:**  Or you could just not add that claim.  I

23   don't suppose that's appealing, but that would be another way

24   around it.

25                   (Pause in proceedings.)

1    **MR. BROSHUIS:**  Which is what we would prefer

2    obviously, Your Honor.

3    **MR. KILARU:**  That would be a problem for us,

4    Your Honor.

5    **THE COURT:**  Okay.  The problem -- as long as we are on

6    the scholarships, there's that sort of technical problem with

7    the Plaintiffs; but in addition to that, there are complaints

8    that the full scholarships or the partial -- or even the

9    partial scholarships are not being compensated adequately.

10    So, if I could get somebody on the Plaintiffs' side to

11    explain or maybe this would be a good job for -- I'm sorry, I

12    have forgotten how to pronounce it again already -- Kilararoo

13    (phonetic) or Kilaru?

14    **MR. KILARU:**  Kilaru.  Thanks, Your Honor.

15    **THE COURT:**  Maybe you would be the one to say why it

16    is that the -- apart from the issue of class representation,

17    the scholarship limit or partial scholarship availability is --

18    is not a valuable claim or not a lot more valuable than what is

19    reflected in the proposed settlement.

20    **MR. KILARU:**  Sure, I'm happy to do that, Your Honor.

21    We think that the settlement does provide consideration

22    for those claims and that the additional compensation claim

23    settlement amount, the $600 million, includes scholarship

24    claims.

25    The history on those claims is quite clear.  They have

1  failed every single time they have been litigated.

2      They failed at the motion to dismiss in the *Agnew* case.

3  They failed at the class certification stage in the walk-on

4  case and the *Rock* case.  And there is really no reason to think

5  that the claims would be any different here.

6      In fact, the claims are even weaker in this sense because

7  they are brought whether in this case or the Colorado case on

8  behalf of all Division I athletes as opposed to the narrower

9  group of football players in the walk-on case.

10     So, we have even more of the conflicts and impossibilities

11  of predicting in this context than you did there.

12     So, we don't think that these claims had -- we think that

13  these claims would have failed on the merits.  But, as I think

14  the Plaintiffs have pointed out in their briefs, there is some

15  consideration being provided for these claims because they are

16  just part of the additional compensation that would have been

17  received in the but-for world that they alleged.

18         **THE COURT:**  Okay.  Mr. Broshuis, do you want to

19  respond to that?

20         **MR. BROSHUIS:**  Yes, and I would like to respond both

21  in the matter of substance and the matter of process.

22     For a matter of substance, we fundamentally disagree with

23  what Mr. Kilaru just said because these are viable claims.

24     These claims have never been litigated.  When we are

25  talking about the walk-on case, the *Agnew* case, we are talking

1    about walk-on football players.

2        Football player cases are different than partial

3    scholarship cases, and they are also litigated -- in some

4    instances the walk-on football player case was litigated 20

5    years ago, and things have obviously changed then from a

6    litigation standpoint, an NCAA liability standpoint since then.

7        And, you know, it is not that -- two of these cases, they

8    didn't fail on the merits.  They didn't fail at the motion to

9    dismiss stage.  It's that class certification was not granted.

10        In fact, Your Honor distinguished those cases on class

11    certification; and they have been criticized by other cases as

12    well.

13        So, we do think that they are strong cases on class

14    certification.  We have evaluated these cases for years.  It is

15    not like we just threw these together.

16        These personally affected me.  I'm a former All American

17    baseball player who was on a partial scholarship.  This is a

18    problem that is rampant in baseball and that every head

19    baseball coach out there complains about and has complained

20    about for a number of years.

21        And, in fact, the Movants said in their opening brief that

22    these had astronomical value when it comes to the injunctive

23    relief portion of the case.

24        But they didn't even try to value the claims when it came

25    from a damages standpoint.  They say that they are baked into

1   the $600 million; but it's very telling, Your Honor, that

2   Dr. Rascher's declarations, neither of them mention these

3   claims because he, in fact, did not do these calculations; and

4   he wouldn't do them in the fashion that they are suggesting.

5       No economist would do them in this fashion.  This is just

6   a post hoc argumentation provided by attorneys whenever they

7   weren't actually valued at all.

8       On an individual -- just on an individual level, you know,

9   we had an economist provide preliminary estimates of this and

10  said it is over $300 million.

11      Look at it just on an individual level.  Mr. Cornelio was

12  the number one recruit coming out of the State of Colorado in

13  baseball.

14          THE COURT:  No, we don't have time for that.  Just

15  tell me your legal views and then we will move on.

16          MR. BROSHUIS:  I'm explaining why they are valuable

17  because he provided -- he was provided a portion of a

18  scholarship.  And so, he ended up paying to work at TCU and it

19  results in probably a six-figure claim for him.

20      Now, he is -- and there is a lot of other people who have

21  six-figure claims for these partial scholarship claims; and

22  most of these people are only going to get 50 to a hundred

23  dollars in total out of this settlement.

24          THE COURT:  Okay.  You also wanted to talk about --

25          MR. BROSHUIS:  That's if --

1    **THE COURT:**  Excuse me.  You said you also wanted to

2    talk about the procedural issues.  You can have a couple more

3    minutes to add that, and then I will turn to one of the

4    Plaintiffs' attorneys if they have any reply.  Go ahead.

5    **MR. BROSHUIS:**  Thank you, Your Honor.

6    So, as a matter of process, these claims were not

7    litigated in this case.  They are fundamentally different from

8    what was being litigated in this case, and the cases -- and

9    other cases confirm that when counsel had no interest in

10   litigating these cases --

11   **THE COURT:**  No.  I thought you were going to talk

12   about adding a new class rep or --

13   **MR. BROSHUIS:**  Well, I'm talking about the fundamental

14   problem of lack of --

15   **THE COURT:**  It doesn't help you to interrupt me

16   because the person who is speaking has a little green box, and

17   I won't hear what you say if I have my little green box.

18   So, what I thought you meant when you talked about

19   procedural issues was that you were going to respond on the

20   issue of a class rep and whether allegations had to be in the

21   complaint and so on.

22   So, if that's not it, we will move onto Mr. -- one of the

23   Plaintiffs' attorneys and then move onto another subject.

24   Mr. Berman, Mr. Kessler, does either of you want to add

25   anything to --

1          **MR. BERMAN:**  I would add the following --

2          **THE COURT:**  Okay.

3          **MR. BERMAN:**  -- these claims, these scholarship

4    claims, might be good claims for an individual; but they cannot

5    be certified.  I tried it four times; okay.  I have lost it

6    four times.  And here is the simple reason, which we evaluated,

7    you cannot redo who would have gotten a scholarship.

8          Let's say that Berkeley had eight rowing scholarships

9    instead of four.  How would you decide who would have gotten

10   the other four?  It could have been some high schooler who

11   didn't go to Berkeley because there were no scholarships.  It

12   could have been someone at Berkeley who, "Oh, if I had known I

13   could have got a scholarship for rowing, I would have been on

14   the rowing team."  You can't certify it.

15         So, any individual who wants to bring a claim can bring

16   the claim.  So we value the claim at basically nothing on a

17   class basis; right.  And counsel valued it at nothing.

18         Those claims have been out there for ten years.  If there

19   was a $300 million case sitting out there, I guarantee you the

20   Plaintiffs' antitrust bar would not have let it sit out there.

21         And all of the sudden we settle it, the next day he files

22   it.  That speaks volumes to the value of that claim and the

23   class basis.

24         **THE COURT:**  Okay.  So, I don't know where this fits

25   in, in any sort of logical order; but I -- while we have got

1    Mr. Broshuis here, I wanted to raise one other issue.

2        A number of the objectors besides the Fontenot objectors

3    had issues about releases of other claims; and those were the

4    Choh release, the Johnson release, the FLSA release -- the

5    Federal Labor Standards Act wage and hour type claims -- other

6    labor claims and Title IX.

7        We got a brief from you, I think -- well, from the

8    Plaintiffs saying that certain of those were not released; and

9    then we got some revised notices that said certain of those

10   were not released; but they haven't all been addressed.

11       And I wondered if you can address all of them.  And if you

12   are looking quizzical, it is the Title IX that wasn't

13   addressed.

14       If you would tell me whether you can give me -- well,

15   whether this change of the notice is adequate, whether the

16   claim in the brief -- and I will say Defendant supported it --

17   is adequate or whether we should have an addendum to the

18   settlement agreement that would specifically state all those

19   things.

20       So, if you could address that for me briefly, I would

21   appreciate it.

22           MR. KESSLER:  Plaintiffs or Defendant, Your Honor?

23   Who should address it, Plaintiff?

24           THE COURT:  Mr. Kessler or Mr. Berman.

25           MR. KESSLER:  I will address it, Your Honor.

```
 1           THE COURT:  That's fine.  Between you and Mr. Berman,
 2    I don't know who is on what subject.
 3           MR. KESSLER:  I'm doing releases.  So, all of these
 4    issues have been addressed.
 5        With respect to Choh and the IME claim, the parties have
 6    agreed (inaudible).  Choh Defendants actually withdrew their
 7    objection because --
 8           THE COURT:  I know.  That's not what I'm asking.  I
 9    saw that, yeah.
10           MR. KESSLER:  So they agree to that.
11           THE COURT:  Yeah.
12           MR. KESSLER:  With respect to the Johnson and any
13    label --
14           THE COURT:  Were both mentioned in the notice.  But
15    actually even with them -- even -- I mean, maybe I'm being
16    overly cautious -- but even with them, I just wonder whether it
17    wouldn't be safer to have it in the settlement agreement
18    addendum.  But, go ahead.
19           MR. KESSLER:  Okay.  So, we will do whatever
20    Your Honor wants obviously, but there is no disagreement
21    between Defendants and Plaintiffs that the Johnson cases and
22    all the label law claims are not covered by the releases.
23        There is no -- there is no release of future damages
24    claims because of the way the damages are defined.  That's
25    already in the settlement agreement.
```

1          In other words, a cut-off with a damages class is final

2     approval.  So there is no release of damages claims for any

3     conduct after final approval.

4          There is also no members of the damages class after

5     September 15th if they start as a student in the future.  So

6     there are no release of that.  That's already in the settlement

7     agreement.

8          With respect to Title IX, there is no disagreement about

9     this and it has to do with the release language.  The release

10    language is of NCAA rules.

11         NCAA rules cannot be a Title IX violation.  What could be

12    a Title IX violation is the decisions by individual schools as

13    to how or not they pay out future benefits or money so there's

14    nothing that releases that at all in the agreement at all.

15         There is no release of any individual school conduct for

16    anything in the current releases or settlement agreement.  So,

17    Title IX is completely preserved.

18         **THE COURT:**  Okay.  Can you say that in an addendum to

19    the settlement agreement along with the other things you just

20    mentioned?

21         **MR. KESSLER:**  Again, we will have to get -- Defendants

22    have to agree too.  We are happy to make it an addendum that

23    way.

24         **THE COURT:**  What do you say, Mr. Kilaru?

25         **MR. KILARU:**  I'm not sure I agree with it precisely as

 1   Mr. Kessler put it.  There are release provisions that apply to
 2   individual institutions for the claims that we discussed.
 3       But if the question is as relates to future Title IX
 4   liability, that's not something we are releasing through the
 5   settlement.
 6       **THE COURT:**  Okay.  Well, why don't you get together
 7   and see if you can work out some wording that will make the
 8   objectors comfortable and that each of you can agree with.  I
 9   don't think there is any substantive dispute here.
10       **MR. KILARU:**  We don't either, Your Honor.
11       **THE COURT:**  It is just finding the right words and
12   putting them in the right place.
13                    (Pause in proceedings.)
14       **THE COURT:**  So, did you want to address that,
15   Mr. Broshuis?
16       **MR. BROSHUIS:**  Your Honor, I don't know that I'm best
17   positioned to do so since we didn't raise any Title IX issues.
18   It might be better for Mr. Molo to actually address more of
19   the --
20       **THE COURT:**  Oh, that's right.  I'm sorry.  I meant
21   Mr. Molo.  Yeah, go ahead. Sorry.
22       **MR. MOLO:**  Good afternoon, Judge.  I'm Steve Molo and
23   I'm not a former college All American baseball player.  I'm
24   happy to be here, and I want you to know we come here in good
25   faith.

1    Our concerns are legitimate concerns that we have

2   expressed on behalf of our clients, and we are -- all women.

3   And I want to thank the parties for the work that they have

4   done and congratulate them and the Court to get to this point.

5   It is not enough as far as we are concerned.

6    To be clear, we are not raising a specific Title IX claim

7   here.  We are saying that the conduct that the NCAA and the

8   Defendants engaged in was discriminatory to women and had an

9   anticompetitive effect, and that's alleged in the second

10   amended complaint.

11    Specifically, there are allegations of the NIL rules

12   adversely impacted female athletes more than their male

13   counterparts.  The impact of restraints on female athletes is

14   farther -- further exacerbated by the NCAA's unequal treatment

15   of female athletes.

16    So, our concern is that this conduct -- anticompetitive

17   conduct, which had an overly powerful effect on women, which is

18   set forth in the complaint, isn't fairly compensated in the

19   settlement.  And we can go through that --

20    **THE COURT:**  Evidence as to the reason that it all

21   turned out that way is because of the revenue producing

22   aspects, which, I agree, are based on history -- past

23   discrimination against women; but when you are thinking about

24   damages for past conduct, all you can give is damages for the

25   liability and not for other things.

1          **MR. MOLO:**  I understand what you are saying, Judge,

2   but the problem is -- and I have a couple slides I could put up

3   if that's okay.

4          **THE COURT:**  No.

5          **MR. MOLO:**  Okay, then I won't.  All right.  But the

6   problem is this:  The conduct that they engaged in is not

7   really accounted for -- the recent conduct is not really

8   accounted for in the expert's analysis.

9        Let me give you a very good concrete example that's set

10  forth in our brief.

11         **THE COURT:**  It has to be an antitrust violation.  This

12  case is an anti --

13         **MR. MOLO:**  I'm talking about antitrust violation.

14         **THE COURT:**  Okay.

15         **MR. MOLO:**  The part --

16         **THE COURT:**  Point me to it because I have read your

17  brief a couple of times.

18         **MR. MOLO:**  Okay.  The NCAA commissioned a study by a

19  law firm Kaplan Hecker & Fink, well regarded firm.  They

20  produced a two volume report, which indicated that it was about

21  gender equity in sports; okay.  We cite that in our brief as

22  well, and I can send the Court copies of it if you wish as well

23  as the other parties.

24        They clearly found that there was, you know, unequal or

25  inequitable spending, and they go through this whole series of

1  examples where the NCAA failed to promote -- the

2  anticompetitive conduct that they engaged in for women was much

3  more egregious than for men.  They failed to promote women's

4  sports.

5       So, for example, the -- the branding of March Madness --

6  which we all, you know, are well aware of and is very, very

7  valuable and has been identified as such -- up until 2022,

8  women could not use March Madness.  They were -- they asked for

9  the opportunity numerous times, and they were denied that

10  opportunity.  In 2022 they were allowed to do that.  The -- to

11  market under March Madness.

12       This year they went from 4 million viewers in 19 -- I'm

13  sorry -- in 2021 for their final game to over 18 million this

14  year.  It was the highest ranked game.  It outstripped men.

15       But-for that conduct women would have had historically

16  more revenue, more information that could be used by an expert.

17       And an expert could look at this conduct, look at what's

18  happened more recently, and conclude that, yes, but-for that

19  conduct, these people would have earned that much more money --

20  women would have earned that much more money; and they are

21  being denied that as a result of the way the settlement is

22  structured.

23            THE COURT:  Well, okay.  You were worried about FLSA

24  as well, the wage and hour claims, and maybe about the labor

25  claims or other claims.  Are you satisfied with the carve-out

1    that counsel is going to come up with the rest of those things?

2        MR. MOLO:  It clearly needs to be in the release and

3    not just in the notice.  So, an addendum to the settlement

4    agreement is fine; but it has got to be in the release because

5    the notice isn't a release.

6        THE COURT:  What do you mean a release?

7        MR. MOLO:  If they are saying they are carving claims

8    out, they need to specify that; and they can't just say, "We

9    didn't mean that" or "it is in the notice and it says that."

10   They have got to clearly --

11       THE COURT:  It has to be in the settlement agreement,

12   so, yeah.

13       MR. MOLO:  Right.

14       THE COURT:  Did you want to -- Mr. Kessler or

15   Mr. Berman, want to respond on the Title IX issue?  Maybe it's

16   not a Title IV issue.  Maybe it's a sex discrimination issue.

17       MR. KESSLER:  Yes, Your Honor.  I'm deeply sympathetic

18   to sex discrimination claims.  That's not what our damages

19   address.  That's not what our antitrust claims address.  It is

20   not an antitrust violation to engage in sex discrimination.  It

21   may violate Title IX or some other discrimination law, none of

22   which are released.

23       And so, if there are damages claims for that, they should

24   be asserted by someone in some other forum.  But, as Your Honor

25   pointed out, these antitrust claims are based on what

 1  compensation athletes would have got based on the revenues they

 2  generated.

 3      And, unfortunately, the revenues were mostly generated by

 4  male sports -- maybe because of sex discrimination -- but when

 5  we are looking at past damages for an antitrust case, we have

 6  to follow the money; and that's what our experts did, and I

 7  think that's the only thing we could do.

 8      I can't be a social policy advocate and, you know,

 9  rejigger the damages to right a sex discrimination wrong.  If

10  the law does that, they need to bring a claim for that

11  somewhere else.

12      **MR. BERMAN:**  There is another reason -- excuse me,

13  Your Honor.  I drafted those allegations that Mr. Molo was

14  referring to because my client -- our client, Sedona Prince, is

15  the one who outed the NCAA during a tournament when they shoved

16  the female athletes into a closet they turned into a weight

17  room, and the male athletes had this beautiful weight room and

18  it went viral.  So, we were very attune to the discrimination.

19      And so, I put those allegations in hoping that I might be

20  able to come up with a claim; but it turns out I can't because

21  Title IX doesn't apply to the NCAA.  It doesn't apply to the

22  conferences.

23      So, we couldn't do anything about it.  We had to focus on

24  our antitrust claims.  Doesn't mean we like it, but that's

25  just -- that's the law.

```
 1              THE COURT:  Okay.
 2          MR. MOLO:  May I respond briefly?
 3                      (No response.)
 4          MR. MOLO:  May I respond briefly?
 5          THE COURT:  Okay.
 6          MR. MOLO:  Just because something violates Title IX
 7    doesn't mean that it's not anticompetitive conduct that the
 8    NCAA had, just like the rules that had been challenged in this
 9    case.
10         So, the fact that it also may be discriminatory based on
11    sex doesn't mean that it is anticompetitive conduct and subject
12    to a remedy.  And so, I think that addresses Mr. Berman's
13    claim.
14         The other thing I want to point out is that there are the
15    settlements focused on revenue generating sports, football and
16    basketball, also ignores the fact that the schools literally
17    could not have the revenue of football and basketball without
18    these non-revenue generating sports, which are mostly sports
19    played by women.
20         The NCAA rules require schools to have as many as 16 teams
21    in order to have a football and basketball team.
22         So, if you are a rower, if you are a swimmer, if you are a
23    gymnast and you are putting in time for your school, that time
24    is necessary for there to be revenue in basketball and football
25    under the NCAA rules.  And that's completely ignored here.
```

 1  There is no compensation -- or no analysis done for that.

 2      And one other thing Mr. Berman said about the Title IX not

 3  applying to the conferences, I disagree with that.  It clearly

 4  applies to the schools.  I know there has been Court opinion --

 5          **THE COURT:**  No, not the schools.  What he said was it

 6  doesn't apply to the NCAA or to the conferences.  And, as far

 7  as I know, that's correct.

 8          **MR. MOLO:**  Right, I think as to the NCAA; but I

 9  believe as to the conferences, there is at least some dispute

10  about that.

11          **THE COURT:**  Not that I know of but maybe.  Okay.

12  Let's move on to pay-for-play damages.

13      I don't know if I can get an answer to this, and I suppose

14  it doesn't really matter and time is running out.  I was just

15  so curious.

16      From the *Fontenot* claim, you had a paragraph that talked

17  about pay-for-play damages due to the earlier filing, 2020, of

18  *House* than *Fontenot*, the damages start at 2019; but the other

19  *House* claims start in 2016.

20      The *Fontenot* claims are undervalued such that Plaintiffs

21  with and without *Fontenot* claims are treated differently.

22      What do you mean by "with or without *Fontenot* claims?"

23  Who is with and who is without?

24          **MR. BROSHUIS:**  Yeah, Your Honor, so, because *Fontenot*

25  was not filed until 2023, the statute of limitations only goes

back to 2019.  Whereas, because *House* was filed in 2020, the
statute of limitations goes back to 2016.

    So, there are some class members that only have *House*
claims and do not have fair pay claims.  And Dr. Rascher --

        **THE COURT:**  Why would that be?

        **MR. BROSHUIS:**  Because of the statute of limitations
purposes.  So if you played --

        **THE COURT:**  But there --

        **MR. BROSHUIS:**  If you played from 2014 to 2018 --

        **THE COURT:**  -- more people in it.

        **MR. BROSHUIS:**  Sorry, I didn't quite catch that, Your
Honor.

        **THE COURT:**  *House* was filed earlier.  So, the statute
of limitations would mean there would be more people in the
*House* class than there would be in the case that was filed
later.  That's what I don't get.

        **MR. BROSHUIS:**  Correct.  So some of those members of
*House* do not have fair pay claims.

        **THE COURT:**  Why not?

        **MR. BROSHUIS:**  Let's say, for instance --

        **THE COURT:**  What?

        **MR. BROSHUIS:**  Let's say, for instance, an athlete
played from 2014 to 2018, then because of statute of
limitations purposes, they have *House*, broadcast NIL claims;
but they do not have *Fontenot* claims.

1          **THE COURT:**  Because they have graduated and quit

2     playing.

3          **MR. BROSHUIS:**  Correct.  So, the statute of

4     limitations means that their claims have expired.

5          **THE COURT:**  I see.  I thought you were talking about

6     claims -- when the claims started, but you are talking about

7     when they expired.

8       So, you are talking about people with *Fontenot* claims are

9     people whose claims have not yet expired; and people without

10    *Fontenot* claims are people whose claims have expired.  Is that

11    the size of it?

12         **MR. BROSHUIS:**  People without *Fontenot* claims would,

13    yes, be those that have broadcast NIL claims, the claims being

14    litigated here; but their fair pay claims had expired because

15    there was no fair pay or pay-for-play case on file until 2023.

16         **THE COURT:**  Okay.

17         **MR. BROSHUIS:**  That's why there are two different

18    subgroups of people; some with those claims, some without.

19                      (Pause in proceedings.)

20         **THE COURT:**  Okay.  I guess I don't have much more on

21    pay-for-play.  We have an argument that it's not enough, but

22    that's the sort of, everybody thinks they can do better getting

23    more money than the other guy got.

24       So, I'm not -- I don't have any questions about that

25    claim.  I understand it.  I do want to talk about the future

1    class members about the injunctive relief claims but...

2                    (Pause in proceedings.)

3            **THE COURT:**  Let me ask the Plaintiffs:  Do you see a

4    problem with the settlement favoring athletes who played in

5    higher revenue sports?  Is there anything --

6            **MR. KESSLER:**  Are we talking about the injunction,

7    Your Honor, or the damages because they are two different

8    issues.  What is your question about now?

9            **THE COURT:**  The damages.

10           **MR. KESSLER:**  Okay.  So the damages, we don't believe

11   it favors that.  It applies a neutral expert methodology, which

12   traces what would be paid to these athletes in the competitive

13   market in the but-for world without the restraints; and the

14   economists have determined it would be a function of the

15   revenues that their individual sports generate.

16       So, we don't think it's biased to hire paid athletes.  It

17   applies a neutral formula.  And, in fact, we cited this in our

18   brief; that the Ninth Circuit has indicated you are required as

19   class counsel when you are doing allocations to have neutral

20   formulas that may favor some class members over the others

21   because the neutral formula indicates some suffered more

22   injury.

23       So, I don't think there is anybody who could look at this

24   as an economist and not say, for example, that football players

25   who generate much more money than a rower would get more

 1   compensation than a rower in a competitive market.

 2       I mean, it's the only neutral economic principle you could

 3   apply in an antitrust case.  So, I don't think there is any

 4   problem with it.  I think it is required actually for us to be

 5   fair to all the class members.

 6       **THE COURT:**  Okay, let's talk about the damages case

 7   versus the injunctive relief case, the present class members

 8   versus future class members.

 9       Can the Plaintiffs represent future class members?  Do the

10   future class members need representation by a class rep and

11   also, for that matter, by an unconflicted attorney?

12       **MR. BERMAN:**  And the answer to that is under Ninth

13   Circuit law, no, Your Honor.

14       So, we were very aware of the situation from the get-go.

15   We understood that some lawyer trying to get into this case

16   would look at the Second Circuit and claim the Second Circuit

17   says you have to have separate counsel.

18       The Second Circuit does not say that.  The Second Circuit

19   says you have got to look at the facts and see is there some

20   indicia that maybe there was a conflict.

21       And in those two cases -- the *Payment* case and the

22   *Literary* case -- there was an indicia that counsel had traded

23   off.

24       **THE COURT:**  You are not quite as loud as everybody

25   else.  Can you lean forward or pull your mic closer to you?

1      **MR. BERMAN:**  So, in those cases there were indicia of

2   a tradeoff; okay.  So, we went into this case and at the very

3   first session we told the Defendants and the mediator, "We have

4   to negotiate the injunction first and we will not talk about

5   anything else until the injunction is finished."  And that's

6   what happened.

7      **THE COURT:**  Okay.  I appreciate it, but what I want to

8   ask is:  Is there any authority for the proposition that that

9   solution solves the problem?

10     **MR. BERMAN:**  Yes, the *Volkswagen* case.

11     **THE COURT:**  Okay.

12     **MR. BERMAN:**  I was in that case.  We had people with

13  claims of different values, and the Ninth Circuit said that's

14  not a problem.

15     **THE COURT:**  Okay.  How did you distinguish *Payment*

16  *Card* and *Ortiz* or even *Literary* from --

17     **MR. BERMAN:**  In the Ninth Circuit the Court seemed to

18  say you have to show a serious conflict.  In those two cases --

19     **THE COURT:**  Wait.  In the Ninth Circuit?

20     **MR. BERMAN:**  Yeah.

21     **THE COURT:**  Which case are you talking about?

22     **MR. BERMAN:**  I will pull it up.

23     **THE COURT:**  Is it a Ninth Circuit case -- *Ortiz* and

24  *Payment Card* and *Literary* are all Second Circuit cases.

25     **MR. BERMAN:**  Yes, yes, but I don't think the Ninth

 1  Circuit has adopted the *Payment Card* standard.

 2          **THE COURT:**  Oh, I see what you are saying.  Okay.

 3  Well --

 4          **MR. BERMAN:**  Look at --

 5          **THE COURT:**  -- can you distinguish any of those cases?

 6          **MR. BERMAN:**  Yes.  In those cases there was some

 7  tradeoff where you had one group trading off the strength of

 8  their case at the expense of another group.

 9      We have the opposite here.  In the injunction case we had

10  a home-run; okay.  If you had said -- if I had said to you at

11  the beginning of this case, "We are going to get a revenue

12  sharing model of 50 percent," you would have said you're crazy.

13      And in the room that day when we floated the idea of

14  revenue sharing -- both for compensation and for NIL, and the

15  Defendants said that might be a good solution -- I mean, I

16  think Jeff and I fell off our chairs, literally.

17      I was so surprised that when I got out of my Uber, I left

18  my luggage on the curb because it was such a shocking

19  development.

20      So, what more could -- we got a 50 percent revenue share.

21  That's a home-run.  So, there is no indicia of any conflict

22  with respect to the injunction class.

23      Then you look at the damages class.  We hit home-runs

24  again.

25          **THE COURT:**  Well, before you go onto that, tell me

1    about the class rep for the injunctive class, the future class

2    members, the 6-year-old who is playing kickball on the asphalt.

3                      (No response.)

4              **THE COURT:**  I'm still green but I stopped talking.

5              **MR. BERMAN:**  I'm sorry.  So, the six-year-old, okay --

6              **THE COURT:**  That was a joke.  I just want to know

7    similar to the scholarship claim, whether we need -- whether we

8    have -- perhaps in Sedona Prince -- or whether we need or

9    whether we don't need anyway a class rep for future players.

10             **MR. BERMAN:**  Well, Sedona is currently still a

11   student.

12             **THE COURT:**  I know.

13             **MR. BERMAN:**  Okay.  And so what we contemplate --

14             **THE COURT:**  The case is going to last longer than

15   that.

16             **MR. BERMAN:**  That's right, and what we contemplate is

17   that each year we will add a new class rep.

18             **THE COURT:**  What about now?

19             **MR. BERMAN:**  Well, now we don't need one.

20             **THE COURT:**  Pardon?

21             **MR. BERMAN:**  We don't need one now.

22             **THE COURT:**  Oh, because of Ms. Prince.

23             **MR. BERMAN:**  Ms. Prince, okay, and then the next

24   season, okay -- the way we envision this is -- and I got this

25   idea because I was a college athlete -- and you get a --

1          **THE COURT:**  What sport?

2          **MR. BERMAN:**  Soccer.  And you get a notice from the

3     NCAA in the summer.  It's your notice of eligibility.  When I

4     played, it came from Shawnee, Kansas.  And you open it up and

5     you sign your papers and then you are eligible.

6          So, the class notice is going to go into -- going forward

7     every year an athlete will get that class notice and have the

8     opportunity -- if they didn't previously have the

9     opportunity -- to object to the (b)(2) part.

10         For the (b)(3) part, there is no release of that sixth

11    grader.  That sixth grader could bring a lawsuit for class

12    action damages.  There is no bar.

13         **THE COURT:**  Oh, they could bring a class action?

14         **MR. BERMAN:**  Absolutely, for damages.

15         **THE COURT:**  Can they have the attorney of their choice

16    or do they have to have you?

17         **MR. BERMAN:**  No, they don't have -- I might not even

18    be around then.  Who knows.  They can --

19         **THE COURT:**  They can pick the attorney of their

20    choice?

21         **MR. BERMAN:**  They can do it with the attorney of their

22    choice.

23         **THE COURT:**  Do they have to come to me in the Northern

24    District of California?

25         **MR. BERMAN:**  They do -- I have to look that up.  I

1  think they do.

2        **THE COURT:**  They do?

3        **MR. BERMAN:**  Yes.

4       **MR. KESSLER:**  No.  Your Honor, if they asserted -- if

5  they asserted a separate antitrust claim for future conduct,

6  they could choose their attorney and choose their forum.

7     Now, someone may move to transfer and say if a court is

8  familiar with these claims, but that's a whole different issue.

9        **THE COURT:**  What if it's for damages?

10       **MR. KESSLER:**  Damages are not released at all for the

11  future.

12        **THE COURT:**  Right.  Can they bring a damage claim with

13  their own attorney in a court of their choice?

14       **MR. KESSLER:**  Yes.

15       **MR. BERMAN:**  Yes.

16        **THE COURT:**  Yes?

17       **MR. KESSLER:**  Yes.

18       **MR. BERMAN:**  Yes.

19       **MR. KESSLER:**  And, Your Honor, Mya Harrison is another

20  current athlete in addition to Ms. Prince.

21     So, we have two current representatives with standing.  We

22  have two regarding the future injunction.

23        **THE COURT:**  There is something in there -- and now I

24  can't swear what it is -- but there is something in there that

25  requires somebody to bring some kind of claim in the Northern

 1    District of California.  Maybe it's not antitrust damage claim.

 2    Maybe it is an antitrust injunction claim.  I don't remember

 3    what it is, but there is something like that in there.  And

 4    what is it and is it okay or does anyone else remember?

 5              MR. KILARU:  Your Honor, I believe that --

 6              MR. KESSLER:  Well, I --

 7              MR. KILARU:  If you want to go ahead, Mr. Kessler

 8    that's fine.

 9              MR. KESSLER:  You can go, please.

10              MR. KILARU:  I believe that what the settlement

11    agreement says is that if anyone is challenging the settlement

12    agreement of the injunctive settlement, they have to go to the

13    Northern District of California, which makes sense because

14    that's the court that will be presiding over the injunction.

15        I think in the hypothetical scenario that was discussed of

16    damages claims, I believe that we and the Plaintiffs may move

17    to transfer the case to the Northern District of California;

18    but I don't think there is an obligation to file it there.

19              THE COURT:  What if the person wasn't suing about

20    the -- your antitrust settlement but was instead saying since

21    then, NCAA has come up with new antitrust violations and I want

22    to sue on those that are not the old ones, they are new ones

23    they just started doing recently?  Can they do that?

24              MR. KILARU:  Yeah.  I don't think those claims would

25    have merit, and you could (inaudible) position; but if that's

```
 1    their claim, they can bring that claim.  We would have the
 2    right, of course, to try to transfer that just as you can
 3    always transfer related cases implicating same -- similar
 4    issues.
 5              THE COURT:  Right, okay.
 6              MR. KESSLER:  There is nothing in the agreement that
 7    says such a claim has to be in this court or such a claim has
 8    to be by any particular counsel.  It's all just a normal
 9    situation.  They are unreleased claims that someone can bring
10    anywhere they like in the United States, and then it moves from
11    there.
12              THE COURT:  Did you have something, Mr. Berman?
13              MR. BERMAN:  Paragraph 46 that you recall in case you
14    want to read it again and it relates to someone challenging
15    compliance with the terms of the injunction.
16                        (Pause in proceedings.)
17              THE COURT:  Okay.  Okay.  So, Mr. -- let's see,
18    Mr. Broshuis, did you want to address this future injunction --
19    future injunctive relief class issue?
20              MR. BROSHUIS:  Yeah, and I want to go back to the
21    Volkswagen case that Mr. Berman mentioned because it doesn't
22    actually speak to potential conflicts between injunctive relief
23    class and damages class.  It contains some dicta about
24    conflicts and stuff, but then the issue there was purchasers of
25    Volkswagens; and it doesn't speak to injunctive relief.
```

1          **THE COURT:**  To damages, the people who had the old

2    cars and the people who had the new cars.  I know.

3          **MR. BROSHUIS:**  So, it doesn't speak to the injunctive

4    relief versus damages issue.  So, we think the Second Circuit

5    is still instructive on that.

6          **THE COURT:**  Then why is this case like those three

7    cases?

8          **MR. BROSHUIS:**  Your Honor, there are a few reasons

9    that this is like that and one is --

10         **THE COURT:**  And what is the case?

11         **MR. BROSHUIS:**  Sorry, what was that?

12         **THE COURT:**  Point me to the case.

13         **MR. BROSHUIS:**  Yes.  So, *Ortiz*, for instance, you had

14   people that had some claims that were before an important

15   insurance agreement and some that were after an important

16   insurance agreement; and we think *Ortiz* speaks more to our

17   *Fontenot* claims because there are some class members that have

18   *Fontenot* claims for the reasons --

19         **THE COURT:**  Can you refresh pay-for-play claims so I

20   know what they are?

21         **MR. BROSHUIS:**  Sure.  I don't like pay for play

22   because --

23         **THE COURT:**  Nobody does but it's shorter and it has a

24   little ring to it.

25         **MR. BROSHUIS:**  Can I call them "fair play" instead

```
 1   because that's what I like calling them?  But we can call them
 2   pay-for-play.
 3          THE COURT:  Sure.
 4          MR. BROSHUIS:  Some class members have pay-for-play.
 5   Others don't have pay-for-play.  And so that's why we think
 6   Ortiz really speaks to the Fontenot claims.
 7       Now, the Visa and Mastercard case, what you have there is
 8   you had a situation where the same --
 9          THE COURT:  What did you say about Ortiz?
10          MR. BROSHUIS:  So Ortiz, what it had to do with is you
11   had some people who had claims that predated an important
12   insurance agreement.
13          THE COURT:  Oh, yeah.
14          MR. BROSHUIS:  Others that didn't.
15          THE COURT:  Right.
16          MR. BROSHUIS:  So, that's why we think that's akin to
17   the situation that's going on with the pay-for-play claims
18   because some class members have those claims.
19          THE COURT:  Well, because some --
20          MR. BROSHUIS:  What's that?
21          THE COURT:  Because some of your people's claims have
22   expired?
23          MR. BROSHUIS:  Because some people don't have those
24   claims.  You have two subgroups of class members.
25          THE COURT:  They expired.
```

1          **MR. BROSHUIS:**  Yeah.  Some don't have them and some

2    do, and they weren't being litigated in this case.

3          And so what *Ortiz's* progeny -- and there is a Third

4    Circuit case called *In Re: Community Bank* that we cited

5    multiple times that wasn't distinguished on reply.

6          There is also the *Gonzalez* case in the Eastern District of

7    California that addresses this that they didn't address in

8    their reply.

9          And both of those cases say that in that type of

10   situation, when you have claims that weren't being litigated

11   and there are additional claims being released that only some

12   class members might have you, should have separate counsel to

13   represent the people with those claims.

14         Now, their answer to all of that is supposed

15   compartmentalization, which Mr. Berman said.

16         **THE COURT:**  Well, could you go on -- before you say

17   that -- and tell me why you think this case is like *Payment*

18   *Card* and *Literary*?

19         **MR. BROSHUIS:**  Yeah.  And so, *Literary* again I think

20   is more like *Fontenot* because you are talking about different

21   people with different damages cases.

22         But when it comes to *Visa/Mastercard* case, what you had

23   there is a situation where you had the same counsel

24   representing an important injunctive relief class and also

25   trying to represent a damages class; and there was a tremendous

1    amount of money at stake for both of those classes.

2        And with that much at stake and when you looked at the

3    relief at stake at all -- there was evidence of this -- it

4    turns out that you should have separate representation for both

5    the injunctive relief class and for the damages class.

6        Now, Mr. Berman says he hit a home-run.  I would agree

7    there are certain aspects of the injunctive relief component

8    that's good stuff; but there is other stuff like the policing

9    of NIL collective money that there are a lot of people that

10   have a problem with.

11           THE COURT:  We are going to get to that.

12           MR. BROSHUIS:  Say that again.

13           THE COURT:  We are going to get to that.

14           MR. BROSHUIS:  Yeah.  So, bottom line, we do think

15   that there is evidence that there is a problem here; that there

16   does need to be separate representation.

17        And could I just address the compartmentalization argument

18   in one minute?

19           THE COURT:  Okay.

20           MR. BROSHUIS:  Yeah.  So they, say, "Well, our answer

21   to that is compartmentalization and we did things separately."

22        But if you notice, they didn't support any case law to

23   support that because there isn't any case law to support that.

24   That's an entirely novel proposition.  And, in fact, we could

25   not find any cases --

1          **THE COURT:**  There are cases where people negotiate

2     their civil right substantive claims and then only then to be

3     ethical do they negotiate their attorneys' fee claims.

4          So, it's not entirely a whole cloth.  It is done in other

5     situations.

6          **MR. BROSHUIS:**  And I will say this about even that

7     scenario -- I think this is a little different -- and

8     especially when it comes to the pay-for-play claims, just

9     because they say they compartmentalize those, I think we end up

10    in the same position because there is the danger that if you

11    are within striking distance of a global settlement -- and you

12    have agreed to terms on the *House* damages -- I think there is

13    the danger that, okay, when we are separately negotiating the

14    pay-for-play damages, there is the damages that we are going to

15    undersell them.

16         And that's where we think our $24 billion estimate is

17    important because it does show that the amount that's actually

18    being included here is way too low.

19         And going to the attorneys' fee example that you provided,

20    *In Re: Bluetooth* actually speaks to this.  The *In Re:*

21    *Bluetooth* case says that it's not enough that attorneys' fees

22    were negotiated separately; that even if you do things

23    sequentially like that, it could still be problematic.

24         And so, I think the same logic applies outside of that as

25    well; and I do think this is a major issue.

1        **THE COURT:**  So, going back to the six-year-olds

2    playing kickball on the asphalt, let's say this is -- I'm just

3    sort of hypothesizing here -- let's say there was a lawsuit in

4    which some really good things were going to be done that would

5    be helpful to the third grader and -- but the third grader

6    couldn't have them because no one could represent the third

7    grader because no one would know if the third grader was going

8    to grow up to be a football player or not?

9        So, would the answer to that be:  Too bad, we can do

10    whatever we want until you hit 12th grade?  Or is there some

11    allowance that would or should or could be made to say that

12    there is a way to get benefits for people who are not yet in

13    need of them?

14        **MR. KESSLER:**  So, Your Honor, our --

15        **THE COURT:**  The *Payment Card* case, the merchants who

16    weren't taking payment cards were benefited.  When they ended

17    up getting -- opening a little store and wanting to take credit

18    cards, they were benefited by the fact that there was an

19    injunction that said you can't do whatever it was that they

20    were doing, re-up charges or so on.

21        And if you couldn't have a class of future people, you

22    couldn't have a benefit for future people.

23        Do you have any answer to that or any solution that a

24    person in that position might be able to come up with?

25        **MR. KESSLER:**  To whom are you addressing that,

1    Your Honor?

2         **THE COURT:**  Mr. Broshuis, but I will ask you next.

3    Don't worry.

4         **MR. BROSHUIS:**  Sorry, I thought you were addressing

5    Mr. Kessler or Mr. Berman with that question.

6         So, we also agree that it's very problematic, yes, that

7    you don't even know who these future class members are going to

8    be.

9         **THE COURT:**  Right.  So, should that mean they don't

10   get anything; that they don't get reforms to a system that they

11   might end up in?

12        **MR. BROSHUIS:**  I think the answer is that it cuts both

13   ways; right.  So, yeah, maybe some of these benefits they like.

14   Some of these things they don't like.  But the problem from a

15   due process standpoint is that they don't have a choice because

16   at that point -- at the time they become athletes, the train

17   has already left the station.  And so, they have had no input

18   in the process at all.

19        Now, Mr. Kessler will cite to you, you know, past cases

20   that involved athletics but all of those cases were meshed

21   within a union as well; and so the union had some involvement

22   with those cases.

23        And it's also important to note that one of those cases,

24   the Eighth Circuit case in *White*, was later aggregated in a

25   Supreme Court case when it comes to adequacy of the

1    representation.  So, I think it calls into question that entire

2    line of cases.

3            THE COURT:  Mr. Kessler, did you want to respond?

4            MR. KESSLER:  Yes, very briefly.  So, Your Honor, is

5    quite right.  The future settlement provides this incredibly

6    improved system for every future athlete who comes into the

7    NCAA into Division I where there is now going to be billions of

8    dollars of compensation available that was never available

9    before; no scholarship limits without having to wait and bring

10   their own antitrust case in the future taking years of

11   litigation and probably graduating before they ever get any

12   relief.

13       This is a game changing future, and the difference

14   between -- you asked with the Second Circuit cases -- is that

15   every one of the cases that has found a need for separate

16   counsel is because they found that there was evidence that the

17   injunctive class members were sold out in some way in exchange

18   for benefits to the damages class members, every one where that

19   has happened.

20       Here, the injunctive class members are frankly getting the

21   most historic unpredicted relief in the history of the NCAA,

22   and it was negotiated first.  And there are many, many cases,

23   which we cite in our brief including the sports cases, where

24   the same counsel negotiated -- like the *White* case, the same

25   counsel negotiated the injunctive relief and negotiated the

1  damages.

2      It was challenged by objectors.  The Eighth Circuit found

3  there was a wonderful benefit for all of the class, and he is

4  wrong to say, well, there was a union.  There actually was no

5  union at the time that the Reggie White settlement was done.

6  The union came later, and yet all of this relief was negotiated

7  together because in these sports cases you need these multiyear

8  settlements to create a new injunctive system that makes sense

9  to have a compromise.

10      Otherwise, it is endless litigation.  Your Honor knows we

11  have already been in ten years or more of litigation, if you go

12  back to *O'Bannon*, it may seem endless to those who have been

13  involved in it.

14      This injunction is a way of changing the world where these

15  future cases hopefully are not going to be needed.

16      **THE COURT:**  Okay.  Why don't we move onto -- there is

17  still a cap argument.  Some people -- objectors, I guess -- say

18  that while the cap used to be one dime, anything over -- or was

19  it a penny, Mr. Kilaru? -- anything over a penny was

20  pay-for-play, and now it's up to the -- some percentage of

21  20 million but it's still a cap.

22      So, is that wrong?

23      **MR. KESSLER:**  So, Your Honor, I will address that.

24      **THE COURT:**  Mr. Broshuis.

25      **MR. BROSHUIS:**  Yes, I can address that, Your Honor.

1        We do think it is problematic because all of these

2    changes, they are important changes to the industry.  They are

3    revolutionizing the industry, and it is outside of collective

4    gaining.  And the cases say that a new cap --

5            **THE COURT:**  Collective bargaining.  There are cases

6    like that floating around or being talked about, but there is

7    nothing I can do about that except to say it says in the

8    settlement agreement that they won't take any stance against

9    collective bargaining.  But, go ahead.

10        **MR. BROSHUIS:**  And the reason I mentioned collective

11   bargaining, Your Honor, is solely for the reason that outside

12   of collective bargaining, caps are generally illegal because

13   you still have horizontal competitors who are agreeing to cap

14   the amount in a certain way.

15        Now, through collective bargaining, you have the

16   non-statutory labor exemption come into play.  So, that's why a

17   cap is problematic still.  And it's not just us saying that.

18        **THE COURT:**  I don't get what you are saying.  Try that

19   point again.  I just didn't follow it.

20        **MR. BROSHUIS:**  You are substituting one cap for

21   another cap.

22        **THE COURT:**  Okay, a very much higher cap for an

23   illusory one.  But go ahead.

24        **MR. BROSHUIS:**  And it is not just us saying that.

25        One of the things that they pointed to in their opening

1    brief in footnote 7 is they had said they would ask the

2    National College Players Association led by Ramogi Huma for his

3    input on whether this makes sense from a cap perspective, from

4    the perspective of roping in new individuals.

5        Well, we know what his -- what his position is now because

6    his group, the National College --

7            THE COURT:  We are not trying this in the newspapers.

8    I saw the article too.  That's not evidence and that's not what

9    we are dealing with here.

10           MR. BROSHUIS:  It is indicia, I think, of class

11   members' reaction, though, and how important advocacy groups

12   are looking at this.  And so, that was my -- solely my point.

13           THE COURT:  I see, okay.  I can't remember if I said I

14   would let you talk on this point or not.

15           MR. KESSLER:  Would you like me to address the cap

16   issue or it's up to you.

17           THE COURT:  If you have anything you want to add,

18   yeah, go ahead.

19           MR. KESSLER:  Just so -- every settlement is a

20   compromise.  Your Honor knows that; right.

21       We sue.  We would have liked an injunction that said there

22   is no cap, right, but when you settle you get a compromise; and

23   the cap we agreed to -- our economist estimates -- will get

24   Division I athletes in the future about 51 percent of all the

25   revenues, which almost mirrors the competitive market outcome.

1    So, this is an extraordinarily beneficial cap.  And the

2 fact that you can have these is illustrated by all the sports

3 settlements.  In the *Reggie White* class, in the *Junior*

4 *Bridgeman* case, in the *Robertson* case, all those were antitrust

5 class action settlements that imposed -- they didn't get

6 complete free agency with no limits.  They got a new

7 compromised system.

8    Your Honor's own injunction in *Alston*, as you know, we

9 would have liked unlimited cash compensation.  We didn't get

10 unlimited cash compensation in all *Alston*.  You gave cash

11 compensation can only be for the scholarship awards, the

12 academic achievement awards up to $5,960, I think it is, which

13 is what they were doing for the athletic achievement awards.

14    You can say that's a cap in your injunction.  That's not a

15 cap.  What that is, is Your Honor said, "You can't have

16 restrictions that go beyond this.  You have to at least allow

17 that," a perfectly appropriate antitrust injunction.

18    What our injunction says, you can't have restrictions that

19 deprive the athletes from getting at least 22 percent in these

20 new benefits, which together with all these other benefits end

21 up equaling more than 50 percent.  There is nothing wrong with

22 that.

23    And if we are wrong, if this is a future antitrust

24 violation, there is no release of future damages claims.  I

25 don't think it is but this case is not resolving that issue,

1   but this type of compromise release is the only way to settle

2   and bring stability to these types of antitrust claims for

3   athletes as a class basis; and I believe it is totally

4   appropriate.  It's been affirmed by the Second Circuit in

5   *Robertson*.  It has been affirmed by the Eighth Circuit in

6   *White*.

7   　　　　　THE COURT:  Okay.

8   　　　　　MR. MOLO:  In the *White* case it was a 67 percent share

9   as opposed to 22 percent, the cap.  And *White* also allowed for

10  a further increase of that.  So, it is materially different in

11  terms of what we are talking about here qualitatively.

12  　　　This is still a restraint on trade.  It is.  And they have

13  got to offer a pro-competitive justification for it, as

14  Your Honor is well aware.  That hasn't been done.

15  　　　And the fact that someone is getting more money under a

16  cap than they would have in a prior cap doesn't make it any

17  less of a cap, any less of a restraint on trade.

18  　　　　　MR. KESSLER:  So, I will forgive Mr. Molo because it

19  is not his case.  It was my case.

20  　　　The idea that it was 67 percent of all revenues in *White*

21  is absolutely false.  It was a defined group of revenues that

22  if you compared to this settlement, the settlement percentage

23  of revenues in *White* was less than the settlement here.  And I

24  did both agreements.

25  　　　　　　　　　(Pause in proceedings.)

**THE COURT:**  Okay.  Let's talk about the third party NIL restrictions.  I'm quite concerned about those.

The state of the briefing is that the settlement agreement has some language about what kind of third party NIL that athletes can get, and it refers to the business purpose and something else.

**MR. KILARU:**  Your Honor, can I maybe assist on that?  But I'm happy to wait for your question if you would like.

**THE COURT:**  Yeah, I'm just trying to think.  There are two things that it asks for.  One is a business purpose and the other is something else.

What the Plaintiffs' answer to that is, oh, those things are already in effect, so it's not going to be any worse and please look at these guidelines at a certain web page, which I did.  And on that web page it did say things about third party NIL but it said slightly different things.

And what I'm concerned about is whether the change as to what's in the guidelines to what's in the settlement agreement is going to mean that some people who are getting large sums of money in third party NIL right now will no longer be able to get them.  That's my concern.

So, maybe -- it's a really addressed to Plaintiffs in the first instance.  So, let me ask them what they think and then you can respond.

**MR. KESSLER:**  So, Your Honor, I will take that first

1    and then Mr. Kilaru may want to --

2         THE COURT:  You are going to have to get closer to the

3    mic, though.

4         MR. KESSLER:  Sorry.  Your Honor, can you hear me now?

5    I will address that first and then maybe Mr. Kilaru wants

6    to add in from the Defendants' perspective.

7    So, first of all, let's distinguish third party NIL from

8    the issue of the collectives; right.  There is not limit --

9         THE COURT:  Distinguish them, aren't they the same?

10        MR. KESSLER:  No.  So, the agreement clearly says

11   there is no limitation at all on third party NIL, like from

12   Nike or from a car dealer or from some other brand or anyone

13   else who is there.  There is zero limitation in that.

14   And, in fact, the settlement agreement protects that by

15   saying the current NIL -- the current NCAA rules which do not

16   prohibit third party NIL must remain in effect.  They can't

17   adopt any new rules to make it more restrictive.  And, by the

18   way, that third party NIL doesn't even count against the pool

19   cap.  So, that's unchanged.

20        THE COURT:  No.  The things -- the thing that is

21   currently there -- at least the only thing that was pointed out

22   to me was these guidelines, which are quite strict.  They talk

23   about recruitment; that there can't be any recruitment.  And I

24   don't know if there is, but you certainly read about things in

25   the newspapers.

1          **MR. KESSLER:**  So again, Your Honor, I'm just talking

2    now about the settlement.

3          **THE COURT:**  Are you going to continue to go on?

4          **MR. KESSLER:**  So, the settlement agreement treats

5    collective rules different than the rules applicable to Nike or

6    to somebody else.  I just wanted to start with that.

7          **THE COURT:**  I don't see the difference.  What is

8    the -- what is the --

9          **MR. KESSLER:**  Well, the settlement --

10         **MR. KILARU:**  Your Honor, can I -- just briefly on

11   this, Your Honor, I think it is really important to understand

12   what the current rules are before we go to what the change is

13   in the rules.

14        So, the current rules are that pay-for-play is forbidden.

15   That's in the policy Your Honor was mentioning.  And that's

16   true in the context of institutions.  Also true in the context

17   of NIL.

18        The July 1st guidance -- which, I believe, is what you are

19   referring to -- says you can't have improper inducements,

20   pay-for-play, and you can't have recruiting that gets you to

21   come to a school.

22        So, that's still -- like today without the settlement,

23   there is a ban on pay-for-play.  And booster NIL payments or

24   NIL payments that are not for legitimate NIL are currently

25   prohibited.  That is the status of the rules that exist.

1          **THE COURT:**  What's going on about that?

2          **MR. KILARU:**  Your Honor, I'm not going to comment,

3    respectfully, on what is or is not going on in terms of NCAA

4    enforcement; but I will say that that is the rule that's on the

5    books.

6        And in this settlement that Mr. Kessler and Mr. Berman

7    mentioned earlier --

8          **THE COURT:**  What if we -- that we use that rule in the

9    settlement agreement and said the rule -- the rule for third

10   party NIL is and then quote your guidelines -- your guidance?

11   Would that work?

12         **MR. KILARU:**  No, Your Honor.  I mean, we --

13         **THE COURT:**  What they are doing now?

14         **MR. KILARU:**  Your Honor, we don't think that works --

15         **THE COURT:**  Why?

16         **MR. KILARU:**  -- because something that we negotiated

17   for -- and as Mr. Kessler and Mr. Berman said earlier is

18   inherent in a settlement -- you work out a compromise.

19       Our position is that pay-for-play is prohibited.  And

20   Your Honor -- I can explain why that matters, but Your Honor

21   and the Ninth Circuit have both agreed with that.

22       We think and maintain and even maintained in the *House*

23   litigation that third party payments that are not for true NIL

24   are pay-for-play and are banned.

25       That was our litigation position in the case and we pushed

 1    it through.  And, you know, the case didn't go final because we

 2    reached a settlement.  So, what we are doing in the

 3    settlement --

 4         **THE COURT:**  I'm sorry.  Which case are you talking

 5    about now?

 6         **MR. KILARU:**  In *House* there was a challenge to both

 7    the old NIL rules and even to the July 1st policy.  And our

 8    position in that case, our position publicly, our position

 9    generally is that it is pay-for-play if you don't have NIL

10    value that's actually NIL and is instead a booster trying to

11    pay someone to induce them to come to school or not.

12         So, we were defending that rule in court.  And in the

13    context of the settlement we reached a compromise, which is as

14    follows:  As Mr. Kessler said, if it is real NIL, there is not

15    a restriction on it.  If it comes from a booster, it gets

16    evaluated carefully for whether or not it is real NIL or not.

17         And then in the event that it is determined that it is not

18    real NIL, there is a new back-end procedure that doesn't exist

19    today.

20         So, today if the NCAA -- if we think that there is a rules

21    violation, we go into enforcement.  Tomorrow, if you approve

22    the settlement, that will go into an arbitration process.  So,

23    this is we think and then the Plaintiffs believe it is an

24    approved -- excuse me, Your Honor.

25         **THE COURT:**  Excuse me.  It goes first to a thing you

 1   are calling DEE -- which I forget what it stands for.  It is an

 2   NCAA agency as far as I can tell.  It is not clear to me who

 3   they are and where they come from and so on but that's where it

 4   goes.  And then after that, it goes to an arbitrator maybe.

 5        **MR. KILARU:**  That's correct, but there is always

 6   someone who makes an initial enforcement decision.  And the

 7   settlement is clear that the penalty doesn't take effect if

 8   there is a challenge at arbitration.

 9        So, that is all new.  That does not exist today.  So,

10   again, this goes into the context of things that we negotiated

11   in the discussions.

12        I'm sure the Plaintiffs believe -- and I'm sure they will

13   speak to this -- that it is an improvement from the status quo.

14        It is also defensible under the law given that

15   pay-for-play bans have been upheld by many courts including

16   this Court in the Ninth Circuit in *Alston*.

17        **THE COURT:**  But in this *House* settlement if it is

18   approved, you will be explicitly paying for play or allowing

19   schools to pay-for-play.  So, this no play for pay thing isn't

20   going to be there anymore, is it?

21        **MR. KILARU:**  It is, Your Honor.  There is still going

22   to be a prohibition on pay-for-play, and there is discretion

23   for schools to make payments as they see fit under the new

24   regime.

25        **THE COURT:**  And that won't be pay-for-play?

1          **MR. KILARU:**  No, Your Honor.  But, I mean, whatever --

2    I think that's correct, but I think setting that aside, the

3    fact of the matter is bans on pay-for-play have been upheld

4    time and time again.  This is litigation challenging bans on

5    pay-for-play.  This is something that came out of the

6    settlement process.  I believe Plaintiffs believe it is an

7    improvement for the status quo, and for us it is an essential

8    part of the deal.

9          **THE COURT:**  Wow.  I'm trying to find -- I have got so

10   many notes here.  I'm trying to find my notes of what the

11   settlement agreement says about third party NIL and how it

12   differs from -- how it differs from the guidance that's -- I

13   found on the web page, but my court reporter needs a break.

14   So, it's 4:00 o'clock.  We are going to break until -- it is

15   4:02.  We will break until 4:12 if that's enough for you,

16   Marla.

17        So we can all find what I'm talking about on the break.

18   What I would like you all to do, I think would work, would be

19   if everyone simply turned off their video and turned off their

20   audio and does whatever they want until 10 minutes from now;

21   and then we will come back and we turn on our video and turn on

22   our audio and we don't talk until everybody is back in.  Does

23   that work, Tracy?

24          **THE CLERK:**  That sounds great, Your Honor.

25          **THE COURT:**  Okay.

1          **THE CLERK:**  So, the court will be in recess until

2     4:12.

3                    (Recess taken at 4:02 p.m.)

4                    (Proceedings resumed at 4:12 p.m.)

5          **THE COURT:**  Hello, everybody.  It looks like we are

6     all here.  Maybe not Mr. Molo.  So, we will go ahead.  Okay,

7     thank you.  Are we ready otherwise, Tracy?  Oh, and there is

8     Mr. Molo.

9          So, I just heard from Mr. Kilaru and I found the thing I

10    was looking for.  The settlement agreement talks about a

11    business purpose for the NIL and the fair market value of the

12    NIL.  The guidance talks about the worth of the NIL and that

13    there can't be any recruitment.

14         So, what are we going to do with this?  Do we go with the

15    settlement agreement?  Do we go with the guidelines?  Do we

16    come up with something new?

17         I found that taking the things away from people is usually

18    not too popular.  So, I don't know who to call on, maybe

19    someone from Plaintiff or did I interrupt you in the middle of

20    your thought, Mr. Kilaru?

21         **MR. KILARU:**  No.  I think Mr. Kessler was going to

22    address it.

23         **THE COURT:**  Okay.

24         **MR. KESSLER:**  So, Your Honor, let me start out by

25    saying we are happy to change it to the guidelines, but I don't

think the NCAA is.  So, we don't have a meeting of the minds on

that; but from our perspective, we do not expect third party

payments from collectors to be reduced as a result of this

settlement.

And I will explain why.  If anything, we believe they are

going to continue to increase.  And, in fact, that's what's

happening right now every day.  The collectives are raising

more and more money to support the schools about this.

The reason we do not think this will decrease in any way

is we have to compare the world before the settlement and the

world after the settlement with regard to third party

collective payments.

And I want to be clear.  This only applies to collectives.

No one has ever challenged, will challenge, if Nike is going to

do a deal with athletes as they do or any of these other -- it

has nothing to do with collectives.

There is no rule about them regarding business purpose or

fair market value.  It specifically has to do with when

collectives are doing these NIL payments.  So, I just want to

put that aside.

**THE COURT:**  Collective, either in the guidelines or

the settlement agreements.  So, you are talking about some

difference between the collective and NIL, but I don't

understand what that is.  It seems to me that -- all I know is

what I read in the papers and what I have read in your papers;

1    but it seems to me that collectives --

2         **MR. KESSLER:**  Okay.  So the rule you are referring

3    to --

4         **THE COURT:**  Might be justified or perhaps

5    disingenuously justified by calling it NIL opportunities, and

6    either it is or it isn't; but what do you propose to do about

7    it?

8         **MR. KESSLER:**  Okay.  So, let me just refer to the

9    rule.  The rule that you are referring to in the settlement

10   agreement is Section 3A in the appendix, and Section 3A is

11   specifically about boosters and collectives.

12        You will see it says (as read:) "NCAA and conference rules

13   prohibiting individually or collectively of a -- "boosters,

14   individually or collectively" -- the collective of boosters is

15   what we call collective; okay -- "of a member, institution from

16   entering into NIL licenses with or for the benefit of current

17   NIL athletes."

18        That's where they say that it is allowed unless the

19   license payment is for a valid business purpose, et cetera.

20        So, I want to say this is only something that applies to

21   boosters individually or collectively, someone affiliated with

22   the school.  If you are not affiliated with the school like

23   Nike, this rule doesn't apply.

24        Okay.  It doesn't --

25                   (Pause in proceedings.)

1          **MR. KESSLER:**  You are shaking your head, Your Honor,

2    so I --

3          **THE COURT:**  These boosters, you can't prove that they

4    are connected with the school.  Maybe they live in the same

5    town.  Maybe they live in the same state.  Maybe they went to

6    school there.  Who knows why they want to do it, but some of

7    them at least clearly, I assume, have some sort of connection

8    to the school.

9       How are you going to adjudicate -- enforce something like

10   that?  Tell me the number again of the -- I have got the

11   injunctive relief settlement right here.  Tell me --

12         **MR. KESSLER:**  Section 3A, page 19 of the appendix.

13         **MR. MOLO:**  Article IV, Section 3A, page 18, yep.

14         **THE COURT:**  And what -- so, the way I shorthand this

15   is, is this purpose or fair market value versus worth of NIL

16   and no recruitment in the --

17         **MR. KESSLER:**  And I'm going to address that,

18   Your Honor, but I just want to maintain that if it's not a

19   booster -- and I understand you can argue who is a booster,

20   right, but everyone would say, for example, if Disney decides

21   to do an endorsement deal with an athlete, no one is going to

22   say Disney is a booster; right.

23      So people -- unrelated organizations are not at all going

24   to be subject to this.  I just wanted to make that point.

25         **THE COURT:**  That's not enough.  I mean, that doesn't

answer the question.  What if Mr. Fan loves his team and wants
to give them all a truck or wants to give them a million
dollars to get a new player or -- is that a booster?  I don't
know.  Is that a third party NIL giver?  I don't know.  Is it a
collective?  Maybe he has got a friend, there are two of them,
so it is a collective.

        **MR. KESSLER:**  So, booster is a defined --

        **THE COURT:**  Is having your team win a valid business
purpose?

        **MR. KESSLER:**  So --

        **THE COURT:**  Rates commensurate with compensation to
similarly situated individuals who are not at the
member/institution.

    So what, we look at other schools and see if anybody is
giving them a million dollars; and if the million dollars is
the test, then it's okay.  But if nobody else gets a million,
then you can't get a million either?  I mean, how does this --
how would this ever be interpreted?

        **MR. KESSLER:**  Okay.  So, first, to address booster, it
is a defined term, which is on page 2 under the things -- it's
someone who the NCAA regulations define as a booster, as a
representative of athletics interest.  You can say that's good
or bad, but it is a very specific term in their regulations now
that they have distinguished between boosters and non-boosters
that have different rules.

1    But I want to get to your more important, Your Honor.  The

2    more important point is that under their current rules all of

3    this is prohibited.  Anything that is -- they consider to be an

4    inducement for recruitment -- you know, helping to pay for the

5    athlete's services by a booster is prohibited.

6    The difference now is that if they decide to enforce it;

7    they bring their charges; they have an enforcement unit; they

8    have a decision unit; and they do the appeal and whatever they

9    decide goes.  That's the current situation.

10    In the new situation with the settlement, they can bring

11    the same type of claim against the booster but a neutral

12    arbitrator who will be jointly selected decides this and you

13    can challenge what they are doing.

14    So whatever their enforcement has been or not been, we

15    don't see this making it any worse.

16    Having said that, Your Honor, I have no problem using the

17    existing language.  That obviously came from the NCAA side in

18    terms of that.

19    **MR. KILARU:**  Your Honor, I don't know if you are

20    intending to let others speak on this but if you are, that's

21    fine.  We would like to say something on this, but I'm happy to

22    let others go if that's helpful.

23    **THE COURT:**  I don't think anybody else has much new to

24    say about it except the lead counsel for the parties.  So,

25    yeah, I would like to hear what you think could be done.

 1          **MR. KILARU:**  I think there is three issues,

 2   Your Honor, and I would say the bottom line from our

 3   perspective is there isn't anything that can be done.  Let me

 4   just explain why that is.  So, first of all --

 5          **THE COURT:**  Well, that's discouraging.

 6          **MR. KILARU:**  I don't think it needs to be

 7   discouraging, Your Honor, because it is about what Mr. Kessler

 8   said, which is compare the status quo before to the status quo

 9   after.

10      So, first of all, "booster" is a defined and understood

11   term.  It has been in the NCAA rulebook for decades.  It has

12   been operated.  It has been applied.  That's understood.  So,

13   that's not some new and amorphous term that's out there.

14   That's from the rulebook.

15      Currently, boosters cannot make payments that are

16   pay-for-play.  They cannot make payments that are inducements.

17   That is the rule.  And at any moment that rule can be enforced

18   by the NCAA in a proceeding that would say a payment is

19   impermissible; student is ineligible, so on and so forth.

20      And then that would have to go through a very complicated

21   legal process to challenge that.  That is the status quo today.

22          **THE COURT:**  What about if graduated and gotten a job

23   at the local McDonald's?

24          **MR. KILARU:**  The status quo today is that this rule

25   can be enforced and applied at any time.  That is what the rule

1    is right now.  It is the rule on the books.  It is the rule the

2    member institution has agreed to.  It is the rule that applies

3    to student athletes.

4        And we think that it is a manifestation of a broad

5    prohibition on pay-for-play that has been deemed

6    pro-competitive.  That's point number one.

7        Second, in the post world, the world if the settlement

8    goes through, that's a better regulatory environment for

9    student athletes because, as Mr. Kessler said, payments that

10   are not made by third parties -- excuse me -- payments that are

11   not made by boosters defined in NCAA rules are fine.

12       Payments that are made by boosters go through a process,

13   and that process is the enforcement entity that we talked about

14   reviewing.  And if there is a problem, unlike today, there is

15   arbitration before that penalty goes into effect.  That is an

16   improvement from student athletes' perspective on the status

17   quo.

18       If the NCAA enforced tomorrow against an institution or a

19   student athlete for an improper booster payment, that would

20   have immediate effect.

21       Last, to Mr. Kessler's point, pre versus post settlement.

22   Presettlement there is this third party NIL, and there is not

23   this potentially huge amount of new money that is being

24   provided directly from schools to student athletes.

25       Post, you will have not only third party NIL; but you will

1   also have substantial benefits flowing directly from

2   institutions to student athletes; and that is the appropriate

3   comparison because this provision was carefully negotiated.  It

4   is an essential part of the deal.  And without it, I'm not sure

5   there will be a settlement to submit.

6       We think you look at the pre without -- I think, like,

7   look at all of the things the Plaintiffs just said about the

8   benefits that are going to flow from schools, the billions of

9   dollars.  This is part and parcel of getting that in the

10  future.

11          **THE COURT:**  Yeah, except that the schools don't have

12  to pay those benefits; and the schools may or may not be able

13  to pay those benefits, but clearly the collectives or the

14  boosters or the third parties do have those resources and are

15  willing to pay them, apparently.  I mean, that's what I

16  understand.

17      But let me ask you this:  This definition of "booster" is

18  someone that you knew or should have known has assisted in

19  providing benefits to student athletes.

20      So, today's third party donor is tomorrow's booster

21  because by tomorrow you know that they are people who like to

22  give money to athletes and now they are a booster and now they

23  have to -- now, they can't do it anymore.

24          **MR. MOLO:**  Your Honor --

25          **MR. KILARU:**  Your Honor, I think --

1          **MR. MOLO:**  Under the definition, which is -- the

2    settlement agreement cites to the NCAA, you know, regulation of

3    the rule; and it says that a booster is defined as (as read:)

4    "any individual independent agency corporate entity; e.g.,

5    apparel or equipment manufacturer or other organization that

6    has promoted or assisted the school's athletic department or

7    the student athlete."

8          That's at -- we quote from that at page 17 of our brief,

9    we quote the actual rule.  So, it is broader.  You are correct

10   about that.  It is not just limited to somebody who was an alum

11   or a fan of the school.

12         **THE COURT:**  Well, I think we have got problems with

13   this, and I don't know -- I don't have a -- I don't have an

14   idea of how to fix them.

15         So, I think I'm just going to have to throw this back on

16   you-all to see if you can come up with something better,

17   something that's workable, that's consistent with what -- at

18   least acknowledges what it used to be and exchanges that with

19   something that makes sense and that's understandable and

20   enforceable and fair keeping in mind that taking things away

21   from people generally doesn't work well.

22         I saw a chart somewhere of all of the money that certain

23   athletes had received from collectives, and it was, like, the

24   first one on the list was 91,000; and there were others that

25   were more and some that were less but maybe --

1        **MR. KILARU:**  I think there is -- I guess I would say

2   two things, Your Honor.  I think the first is, again, if those

3   reports are true -- and I would like to address that -- all of

4   that could be prohibited by the drop of a pen at any point

5   under the current rules; but I would also note, as you said

6   earlier, this case isn't about the newspapers.  It is about the

7   record.

8        There is in the record in this case a massive amount of

9   data about NIL, and it doesn't match what these public reports

10  say because often these public reports are about contracts that

11  are never performed on, that involve terms being offered to

12  athletes that actually have all kinds of poison pills that

13  don't work that often never get realized because there is abuse

14  and other things that are built into this current marketplace.

15       So, that's the reality right now.  And if you look at the

16  evidence and the stuff -- the documents and the data you have

17  in this case, it doesn't match whatever newspaper reports are

18  saying.

19       And it is actually something that has been reported on

20  recently now that there is a tool in the NCAA called NIL Assist

21  that reflects what the deals actually are.

22       So, I don't think it is appropriate to blow up the deal on

23  the basis that there might be some payments that could be made

24  that may or may not exist after this rule.

25       If those payments are being made, there's not evidence of

them in the record in this case.  If those payments are being
made, they can be stopped through an enforcement action
tomorrow.

     And if the settlement is approved in its current form --
and this is an essential part of this being in its current
form -- those deals will go through a review process, and there
will be arbitration on the back end.

          **THE COURT:**  What is the tool you are referring to?
What's it called?

          **MR. KILARU:**  It is called NIL Assist.  There has been
reporting on this.  It basically puts out information on what
the deals are, but you have a lot of confidential information
in the *House* record that underlaid the damages models in this
case that shows what the deals were because that was something
that was provided in discovery.  And there just aren't these --

          **THE COURT:**  It was under seal and shouldn't have --

          **MR. BROSHUIS:**  Your Honor, if I can just speak to that
for one minute.

          **THE COURT:**  We are going to have to go on.  And I
think what occurs to me as you speak is that -- I haven't
talked about *Hubbard* yet -- but part of *Hubbard* is for everyone
to report their NIL deals.

     So, maybe -- I was going to ask you anyway whether we
shouldn't just proceed with *Hubbard*; preliminarily approve
*Hubbard* and go ahead and finalize *Hubbard*.

 1          While we do that, we will get all of this information

 2     about approximate NIL deals that we can then use to try to

 3     figure out what to do about *House*.

 4          **MR. KILARU:**  The approved requirement -- the reporting

 5     requirement is in *House*, not *Hubbard*.  *Hubbard* is about *Alston*.

 6     The approval is in *House*.  The requirement that you submit NIL

 7     payments is in *House*.

 8          **THE COURT:**  Right.

 9          **MR. KILARU:**  There is also data being generated in

10     real-time in *House* that is being reported through the NCAA.

11          **THE COURT:**  Okay, and that you have shared or will

12     share with the Plaintiffs so they can evaluate it?

13          **MR. KILARU:**  Well, they got it from us.  They

14     subpoenaed our institutions for the NIL data, so they have it;

15     and they had that when they agreed to this term as part of this

16     compromise.

17          **THE COURT:**  Okay.  Well, unless Mr. Berman or

18     Mr. Kessler can solve this problem or make a useful suggestion,

19     I think what I will do is just ask you to go back to the

20     drawing board on this point; and I will finish up today by

21     going on to my other questions.

22          **MR. KESSLER:**  I think, Your Honor, we are going to

23     have to discuss it with the NCAA.  We think it should be

24     possible to address Your Honor's concerns and address their

25     needs because I think the concept is that whatever is -- we are

1  not -- we were not trying to make anything prohibited that is

2  not already prohibited with respect to the boosters; and we

3  could add in language and things to make that clear, but let us

4  talk to the NCAA about that.

5       This was not designed to eliminate NIL from boosters that

6  currently has been permitted.  So, we can work that out, I

7  think, with them.

8          **THE COURT:**  That might be your view but I'm not sure

9  that's the NCAA's view; but anyway, let's go onto some other

10 points.  We still got things to talk about here.  Well, maybe

11 not so much anymore.

12                    (Pause in proceedings.)

13      **THE COURT:**  There are some objections about the pool

14 calculation being overstated, but I think I could just deal

15 with the briefs on that.

16      There was arguments about attorneys' fees and clear

17 sailing provisions and so on.  There is some dispute about

18 that.  I think I can figure that out unless the problem is the

19 definition of clear sailing agreement, which to me is the

20 attorneys get a fee that the Defendants agree not to object to

21 and nothing more, nothing less.  Is that what everyone is going

22 by?

23          **MR. BERMAN:**  That's my understanding.

24          **MR. KESSLER:**  I think those issues can be addressed

25 when we do our fee petition, which is separate.

1          **THE COURT:**  There is something wrong with your mic or

2    where you are standing or something.  I could turn you up, but

3    then I will be turning everybody up.  Maybe you've got your --

4          **MR. KESSLER:**  I'm sorry, Your Honor, I don't know why.

5    But I was going to say, we subsequently are going to file our

6    fee petition.  We don't think we have any clear sailing

7    provisions.  We can address all of that, you know, at the time

8    of our fee petition.

9          **THE COURT:**  Okay.  Oh, the stay.  What I thought about

10   the stay is it feels sort of unseemly to me to be telling

11   another judge what she can do with her cases.

12        What I would say is that I certainly would assume that

13   knowing what's going on in this case that another judge who had

14   a similar case or the attorneys who are handling it might see

15   there way clear or might see it is in everyone's interest not

16   to do a lot of time consuming and expensive work while they are

17   waiting to see what is going to happen.

18        And those of you who are in front of the Colorado judges,

19   I would assume could go to them and say, "Let's have a case

20   management proceeding whereby we will do maybe some discovery

21   to get things moving so it's not delayed too long, but we won't

22   do the class cert motion" or something along those lines.

23        I would be -- feel differently about staying *Cornelio* --

24   if that's how you pronounce it -- because that was filed after

25   the second amended complaint in *House*, and I would have a

 1    different feeling about any new cases.  If somebody starts

 2    filing them tomorrow or the next day, I wouldn't have any

 3    trouble staying those; but I'm reluctant to just out and out

 4    stay *Fontenot*.  So, I don't know if anybody is upset by that.

 5    Who wants to address that?

 6         **MR. KILARU:**  Yeah, Your Honor, we think it should be

 7    stayed.  And I think, first of all, there is no dispute, I

 8    think, among anyone that you can stay the case.  I think you

 9    did it in *Alston*.  I think you can do it.

10         **THE COURT:**  Well, should I or not?

11         **MR. KILARU:**  Right, but should you or not.  And I

12    think the key point to note is that this isn't sort of an

13    ordinary circumstance where you have different class actions.

14         The *Fontenot* proceeding is being used as a vehicle to

15    collaterally attack the settlement in front of the Court.

16    That's true and, in fact, they filed the *Cornelio* claim after

17    the settlement was submitted.

18         It is true in that in every filing they have made in the

19    *Fontenot* case, they have challenged the settlement including

20    most recently in a motion to oppose us getting a little more

21    time to respond to the compliant.

22         I don't know if I have ever heard of a motion to respond

23    to the complaint being opposed on substantive grounds, but they

24    threw in that there is a settlement approval and it is

25    collusive, et cetera.  And they are using discovery in that

1  case to try to probe the settlement discussions here.

2      So, I think there is a lot going on in that case that

3  warrants a stay because it's not being treated as an

4  independent litigation vehicle.  It is also being treated as a

5  way to probe and undermine the settlement here, which is very

6  much in Your Honor's jurisdiction.

7          **THE COURT:**  What about making such a motion before the

8  Judge who is handling the case?

9          **MR. KILARU:**  We can also do that, but I think

10  Your Honor has jurisdiction over the settlement if there is

11  one; and it's an appropriate exercise of jurisdiction here.

12          **THE COURT:**  Why don't you try first taking the

13  arguments that you just made to -- is it Judge Sweeney?

14          **MR. KILARU:**  Yes.

15          **THE COURT:**  Charlotte Sweeney, take those arguments to

16  her.  First, talk to the other side and see if you can't reach

17  some kind of agreement just as to efficiency and case

18  management.  And if you can't, then make some sort of a motion

19  to Judge Sweeney -- and you can tell her what I said.  I don't

20  know her.  I haven't spoken to her -- but take it to her and

21  tell her the problems you are having and ask her if she would

22  give you some relief.

23      And if none of that works and you really feel badly about

24  it, I will deny it without prejudice, you can come back and ask

25  again.

 1        Okay.  So let's talk about *Hubbard*.  Yes, sir.

 2        **MR. BROSHUIS:**  Yeah, just real quick, I want to -- I

 3   feel like I need to respond because Mr. Kilaru is suggesting

 4   that we have some sort of improper motives, and we certainly

 5   have zero improper motives.

 6        **THE COURT:**  I'm not positing any of that, and I didn't

 7   change my mind --

 8        **MR. BROSHUIS:**  Thank you, Your Honor.

 9        **THE COURT:**  -- so -- if you come back, which I hope

10   you won't, on this point.

11        **MR. BROSHUIS:**  Thank you, Your Honor.

12        **THE COURT:**  Okay.  So, I want to talk about *Hubbard*,

13   though, and let me find my notes on *Hubbard*.

14                    (Pause in proceedings.)

15        **THE COURT:**  Oh, I did have one other question back on

16   the injunction -- well, that's a can of worms.  I will wait on

17   that.

18                    (Pause in proceedings.)

19        **THE COURT:**  What would you say to the idea of

20   proceeding with *Hubbard*?  I know that you have got it set up

21   now so that they both have to settle before either of them

22   settles; but *Hubbard* is so much less complicated than *House*.

23        **MR. KILARU:**  Your Honor, we wouldn't agree to approve

24   one settlement without the other.  They were negotiated

25   separately and with all -- the mediator makes clear, but we

 1   wouldn't agree to approval or submission of one without the

 2   other.

 3          **MR. KESSLER:**  So, Your Honor, our view would be they

 4   have an agreement that they could -- they could in effect opt

 5   out of *Hubbard* if the other settlements did not agree to.  They

 6   are protected.  No money will be distributed if the other

 7   settlements are not done.

 8      But since there literally is no issue about *Hubbard* --

 9   other than the notice issue that Your Honor wants us to address

10   with the notice forms, which we will do -- other than that,

11   there is no reason not to just preliminarily approve *Hubbard*

12   and let it go in advance.

13      There is really no prejudice to the NCAA regarding that,

14   you know, because it is a very discrete issue.  It is just

15   damages.  It is just very specific for these academic

16   achievement award damages.  It is a separate class.  It is a

17   separate fund, and they are still protected because no money

18   will get paid out if it is not all approved if they don't want

19   it to be.

20          **THE COURT:**  There are two issues that I have

21   identified with *Hubbard*.  I hope I remember them now that I

22   found them in my notes.  One is the class period.  The only

23   time that people weren't doing academic achievement awards was

24   the three years between, what, 2020 -- three academic years.  I

25   forget which ones -- 2020 through 2023.

1      However, the *Hubbard* class identifies five years going up

2  to 2023 or '24, two more years.

3      Rascher doesn't give us the data for the second two years

4  or the last two years.  I don't understand why we have those

5  two years in there.  Why isn't it a three-year class?

6      **MR. KESSLER:**  I think the claims only continue through

7  when the damages -- when the benefits were prohibited, which

8  was until 2021, but that if in defining the class, if there is

9  someone who has those claims earlier -- in other words, there

10  are not five years of payouts in terms of that.

11      **MS. PARSIGIAN:**  Yeah.  Your Honor, I think I can speak

12  to this.  For the court reporter, I'm Jeanifer Parsigian.

13      So, for the *Hubbard* case we have a single year where we

14  are doing damages claims, the first year that the payments were

15  allowed but -- and our position has been that the schools

16  hadn't budgeted, hadn't caught up, and so athletes that would

17  have gotten those awards did not that year.

18      Then the future -- the forward date of the class extends.

19  Those individuals likely don't have any claims under *Hubbard*

20  but the release is coextensive with other releases just of how

21  we structured the classes here.

22      **MR. KESSLER:**  But Your Honor is right.  There are no

23  claims after -- after 2021, '22, there are no damage claims

24  asserted in *Hubbard*.  They were never asserted.

25      And so, even though we can make the *Hubbard* class period

1    earlier, the NCAA wanted all the class periods to be all the

2    same; but there are no claims after that date in there.

3        **MR. KILARU:**  Your Honor, the class wasn't certified so

4    the claim would have run past 2022.  I mean, typically these

5    things run from whatever the date of class certification is.

6        So, we think it is appropriate to have -- if we even are

7    talking about *Hubbard* -- but I want to go back to that in a

8    minute -- we think it is appropriate for the release to run to

9    when it runs to because there are zero value claims once *Alston*

10   payment was permitted; but there is a release and we want the

11   release.

12       **MR. KESSLER:**  Your Honor --

13       **THE COURT:**  Does this have anything to do with the

14   other non-academic achievement awards benefits that came out of

15   *Alston*; the laptop, the internship, the whatever else, is that

16   what's happening here?

17       **MR. KILARU:**  I think benefits are being provided post

18   *Alston* or they are not being provided all consistent with the

19   permissive injunction that Your Honor entered.

20       You can either do it or not do it.  That's been happening

21   for quite some time.  So, I don't think anyone would have a

22   valid claim that they are being denied *Alston* payments under

23   their school's criteria after the date on which their school

24   started making payments.

25       There is no reason to not include that in the scope of the

1    release because the case would have gone forward if it went

2    forward.

3         **THE COURT:**  Okay.  Here is another idea I have about

4    *Hubbard*.  You want to have everybody, I guess, find out -- or

5    maybe they already know -- what the qualification rules were

6    for each of the schools that a class member went to, and then

7    you want to find out which years that class member played; and

8    then you want to find out whether the class member qualified

9    under the qualifications, which are all different -- they are

10   not all different but some of them are different.

11        And they are under seal.  And that's another thing we have

12   got to get that resolved somehow with code names or something

13   because people want to know and they have good reason to.

14        But the athletes then have to show that they would have

15   qualified.  So, School A says you have to have a 2.0, and

16   School B says all you have to do is not flunk out; and School C

17   doesn't care what your grades are.  They just care if you went

18   to school or not.  It's all different.  And then some of them,

19   I guess, have different amounts.  Most people gave the 5,980

20   but not everybody.

21        So, and all of this has to be explained on the claim form;

22   and all of this has to be calculated out.  What if we just said

23   everybody who was on a team at a school that had an academic

24   achievement award gets $6,000 a year for every year they

25   played?

1      That's giving them an extra 20 bucks.  How about that?

2  Wouldn't that be really a lot easier and more understandable

3  than trying to figure out what all these different

4  qualifications --

5      **MR. KILARU:**  Your Honor, we negotiated for a defined

6  settlement amount.  That's not even close to what we negotiated

7  for; just say you have to pay everyone $6,000 if they claim

8  their school is making policies.  I mean, not every school

9  made --

10     **MS. PARSIGIAN:**  If I may, that's what we have

11  attempted to do by having the form look as it does.  As you

12  noted before, the vast majority of the criteria -- while they

13  look extremely different in the appendix that you have seen --

14  are -- go down to the reality that you are eligible,

15  academically, athletically, and on a team.

16     And we think we can do this claim just with those four

17  questions that we have asked and knowing the years and school

18  that they have attended.

19     So, we can explain that further to Your Honor if you would

20  like; but the vast majority of their claims were simply -- of

21  the criteria were simply these four issues.

22     And if you met those four -- for example, if you are

23  academically eligible, you have to have a 2.0.  So, while those

24  look different in all of the productions that the Defendants

25  made, they are actually virtually identical.

1    So, we have worked through all of it and come up with a

2    claim work that allows us if you have answers to those four

3    questions to determine that you are eligible; and it is very

4    similar, as Your Honor is saying, to the reality that they were

5    simply on a team.

6    Some of them required they had a scholarship and some of

7    them depend what sport it is on, but we know we can do it with

8    just the information that we have asked for on the claim form.

9    **MR. KESSLER:**  So, Your Honor, to make this very

10   simple, we are agreeing on a very simple criteria as Your Honor

11   is suggesting.

12   The only thing that Mr. -- that -- that NCAA counsel is

13   pointing out, we negotiated an overall settlement amount which

14   will not get $6,000 to every one of those athletes because it

15   is a compromise.  It is a percentage of that number, so it

16   won't be 6,000 but that just --

17   **THE COURT:**  *Hubbard* --

18   **MR. KESSLER:**  We got, like, 61 percent of the damages

19   or something.  So, it is not a definite number but they all

20   will get it.

21   **THE COURT:**  Okay.  Maybe it is not 5,980.  Maybe it's

22   some other number.  And that's another question I had is do we

23   have a number from Dr. Rascher or anybody else that says what

24   would the damages be if all these people did get everything

25   they were supposed to?

1    How many athletes were there?  How many schools had these

2    things?  How many of them were at the max?  How many -- you

3    know, there has got to be some sort of economic analysis that

4    could be done and maybe --

5         **MR. KESSLER:**  Yes, so --

6         **THE COURT:**  -- and I just don't know what it says or

7    maybe I do and don't have it in front of me, but that would be

8    of interest.  And then you can take that number, whatever it

9    was; divide it by the number of school years -- student school

10   years and give everybody however much it was supposed to be.

11        **MR. KESSLER:**  So, Your Honor, we already have from

12   Dr. Rascher an analysis which indicates he came up with what

13   would be the actual damages in total versus the 200 billion we

14   agreed to.  And we have gotten 63.9 percent of the total amount

15   of damages for everyone.

16        The only adjustment there is -- is if Your Honor awards

17   attorneys' fees and costs, that obviously will further change

18   the number at that point.

19        But we already know that, you know, subject to attorneys'

20   fees and costs it's going to be 63.9 percent of that full

21   number for all these athletes; and we have come up with a very

22   simple way to let them qualify with just a few questions rather

23   than having to show each individual tiny criteria that a school

24   might have had when they were opposing class certification.

25   So, we have come very close to what Your Honor is asking for.

1      **THE COURT:**  And is the Defendant in agreement with

2  that?

3      **MR. KESSLER:**  I believe so.  We only care about the

4  200 million.  They don't care about -- that we made very simple

5  criteria for people to get it because it is a fixed sum

6  settlement.  It doesn't go up if there are more recipients or

7  go down if there are fewer.  They pay the 200 million.  So, I

8  think they are deferring to us as to how to divide it up to

9  allocate it to the criteria.

10      **THE COURT:**  The report you are referring to, is that

11  in the record?  Rascher's --

12      **MR. KESSLER:**  Yes, the declaration is submitted.

13      **THE COURT:**  Where is it?

14      **MR. KILARU:**  It was filed along with their class

15  certification papers.  They filed class certification papers,

16  Your Honor.  It was filed with that.

17      **THE COURT:**  Okay.

18      **MR. KILARU:**  It was a total number of 313 million.  We

19  didn't file our opposition to that; but for purposes of

20  settlement, we agreed the 200 million is an appropriate

21  resolution.  And, as Mr. Kessler said, defer to them on the way

22  to allocating that to their putative class members.

23      **THE COURT:**  I see.  You don't care if they make

24  everybody show their grade point average or not.

25      **MR. KESSLER:**  So --

1          **MR. KILARU:**  Your Honor, I don't know if we have a

2     view on that, but I just want to be clear on something.  We

3     don't support preliminary approval of the *Hubbard* settlement

4     standing alone.

5          And we disagree with Mr. Kessler; that you can sort of say

6     it's okay and we can walk it back later depending on what

7     happens in *House*.  Like, we don't agree with that.

8          I mean, I guess, if the question is if there is not a

9     *House* settlement in its current form, what's our position on

10    *Hubbard*?  We don't agree.

11         **THE COURT:**  So, you don't -- going back to his first

12    point, which was why not just settle it but not pay any money

13    and you can withdraw if *House* doesn't go through, you don't

14    want to do that.

15         **MR. KILARU:**  No, we don't want preliminary approval

16    and sort of a notice process going forward if we don't have a

17    settlement on all the issues that we have negotiated and went

18    through negotiations.

19         **THE COURT:**  Okay.  It's not obvious that that would be

20    what someone in your position would want; but if that's what

21    you want, you can ask for it or hold out for it.

22         **MR. KILARU:**  I mean, we have to talk amongst our

23    clients; but going back to the earlier issue, it is a central

24    issue for us; and I think the Plaintiffs know that because we

25    discussed it at length.

1      I think representing their class, they agreed to it.  So,

2  I don't think -- really understand why in this hearing we are

3  hearing that actually changes to that are appropriate.  That's

4  part of the bargain that they struck, and they submitted for

5  preliminary approval.

6      **THE COURT:**  Oh, it was I who suggested it.  You are

7  talking about settling them separately.

8      **MR. KILARU:**  I was confusing the issues, Your Honor.

9  I was talking about the issue that came up in *House* related to

10  the third party boosters and saying how that issue --

11      **THE COURT:**  Oh, okay, well, that's different; but the

12  idea of settling them -- of preliminarily approving the

13  settlements and doing the notices separately is something I

14  raised, not something that they raised.  So don't blame.

15      **MR. KILARU:**  I wasn't suggesting that specific piece

16  of it; but to the extent there was a suggestion that that's

17  what we agreed to, I don't agree to that.

18      **THE COURT:**  No.  Okay.  All right.

19      **MR. KESSLER:**  Your Honor, the question about

20  Dr. Rascher, it's 227-5 in your ECF number -- 227-5 -- filed on

21  July 26th, 2024.  That Rascher declaration discusses his -- the

22  *Hubbard* damages -- it discusses many things, but it discusses

23  the *Hubbard* damages regarding that.

24      **THE COURT:**  Okay.  All right.  Well, what I want to --

25  I'm not prepared to make a ruling today, as you can probably

1  tell, whether to preliminarily approve the settlement.

2       I have -- I want to move forward on the notices and

3  claims.  I think it seems to me likely enough that there will

4  be a settlement even if there is some changes to what's been

5  agreed to so far; but it's worth working on the notices and

6  claims.

7       If you want to take a shot on it based on what I said,

8  that would be fine.  We did one, and I can send it to you for

9  what it's worth if you want to take a look at it.

10      And then on the other things, there are a few things I

11  might have asked you to talk to each other about a little more,

12  and maybe you will consider making some changes that would make

13  more likely that the settlement could be preliminarily approved

14  and perhaps more likely that it would hold up in future forums,

15  which is always something that you need to think about.

16      And if you are able to make some changes along the lines

17  of what we talked about, you could perhaps submit a new and

18  different motion -- a new and different motion for preliminary

19  approval or just come back and brief it and say, "Here is what

20  we can agree to; what about this" or you can come back and say,

21  "Forget it.  We now see that it is a bad idea.  We are just

22  going to try the case.  Give us a trial date" or whatever.

23      So, you can get started on the notice and claims, and you

24  can get started talking to each other about some of these other

25  ideas and maybe you want to book a session with Professor Green

```
 1   to talk with him about some of them.  Maybe you want to include
 2   Mr. Broshuis and Mr. Molo in a discussion and -- or at least
 3   consider what they had to say.
 4        MR. KILARU:  Your Honor, just so I can understand,
 5   when you say "work on the notice," I mean, I think we have a
 6   lot of -- based on your comments today, we have to talk about
 7   whether we have a deal; and we have to talk about the
 8   Plaintiffs.  We have to talk amongst each other.
 9        We can work on what notice documents would look like to
10   address your concerns earlier.  We can work on what orders
11   would look like based on your very initial comments about
12   forum.
13        But I don't know what it would mean to start providing
14   notice if we don't have a settlement yet.  So, if that's what
15   you meant in terms of the form, we can do that.
16        THE COURT:  No, no, no.  I didn't mean to say -- maybe
17   I wasn't clear.  I didn't mean to send out the notice.
18        MR. KILARU:  Okay.
19        THE COURT:  To draft a notice that resolved some of my
20   problems with the clarity of the current version.  One might
21   argue that that's a waste of time because you are not going to
22   settle anyway and we won't need any notices; but I'm suggesting
23   that in your spare time you could try and edit those notices so
24   that we will have them if we are able to come up with a
25   settlement.
```

1        **MR. KESSLER:**  So, Your Honor, if I can just make sure

2   we are all on the same understanding of where we are; okay.

3        Your Honor, raised a few different points.  One point you

4   raised about making the release clarifications part of the

5   settlement agreement where the parties are in agreement, I

6   think we can go do that.  I don't think there is going to be

7   any dispute.  We will be able to work that out and amend the

8   settlement agreement for that.  That's not going to be an

9   obstacle, at least as I understand what you want and what our

10   agreement is with the other side.

11        **THE COURT:**  Sure.

12        **MR. KESSLER:**  The second area where you asked us to go

13   back -- and I think there is only one other but you will tell

14   me if I'm missing something -- the second area is this booster

15   NIL language.  And that's one where -- you know, where my

16   colleague, Mr. Kilaru was saying he doesn't know if they are

17   willing to change or not.

18        So we have to sit down with them and that either we will

19   come back to you and say, "Yes, we have come up with some

20   changes that -- and now we would like you to approve it that

21   way."  Or if we can't reach an agreement with them, then we

22   will tell you that we couldn't reach an agreement; and you

23   either approve or disapprove.

24        And what I was going to suggest -- and I think those are

25   the only two areas.  If you think there is something else,

1    Your Honor --

2         **THE COURT:**  There is the future injunction.  There is

3    the two-sided problem of a class rep and an unconflicted

4    attorney to represent the class of future athletes in the

5    injunctive relief class and whether a -- whether a ten-year

6    class of people who are not ascertained and can't be

7    represented and can't be given notice -- I mean, we have talked

8    about possible solutions to that, and I will have to look into

9    that -- but that's one that I was quite concerned about.

10        **MR. KESSLER:**  Well, you are correct you wanted us to

11   be clear on the class reps, which I know we have to satisfy you

12   on that, but is there some -- I just didn't -- I know we

13   discussed the issue but I --

14        **THE COURT:**  Well, there is a potential conflict of

15   attorneys representing both damage -- present damage class

16   members and future injunctive relief class members a la *Amchem,*

17   *Ortiz,* *Payment Card* and *Literary.*

18        Some have argued that there is a sort of inherent conflict

19   between the same attorneys representing both those types of

20   classes.  You have got responses to them and I have heard them,

21   and I will think about it some more but I think that's an

22   issue.

23        **MR. KILARU:**  Your Honor, can I suggest something,

24   which is -- because I actually think there is work we need to

25   do, and I don't actually agree with Mr. Kessler that it's

1    necessarily a binary whether we have changes or we don't.

2        Can I suggest we confer with the Plaintiffs and come up

3    with a date on which to make a supplemental submission to you?

4    And that will contain our position on these issues; whether

5    there need to be changes on the booster piece, why there

6    shouldn't be a concern about the forwards/backwards, assuming

7    we can resolve the first, and amendments to the notices as

8    appropriate based on your comments.

9        And, you know, if we can -- we will submit to you what our

10   best effort is on that, and then at that point we think that

11   will be helpful as opposed to trying to do this kind of

12   onesie-twosie in a way that doesn't really follow.

13       **THE COURT:**  I'm not sure what the difference is

14   between what you just said and what we were talking about, but

15   what you just said sounds fine to me.

16                    (Pause in proceedings.)

17       **THE COURT:**  You could also negotiate.  I mean, there

18   are certain -- I guess, what you are talking about is a

19   negotiation, but you don't necessarily have to reach an

20   agreement on the third party NIL issue if you can offset that

21   with something else.  But then, of course, you get into the

22   whole conflict problem.  But as long as you stick, perhaps,

23   with damages and don't mix in injunctive relief, you will be

24   okay.

25       **MR. KESSLER:**  Your Honor, the only thing I would --

1    and I understand, I think, your direction.  I think it would be

2    helpful, at least from our standpoint, to set, like, a deadline

3    by which we get back to you because, frankly, from the

4    Plaintiffs' standpoint, if we are going to solve these issues

5    and go forward, that's great.

6        And if not, then we want a trial date.  If we are not

7    getting a deal, we don't want to push this off, you know, very

8    long.  So, I would say give us, like, three weeks or set a date

9    by which the parties come back to and either say, "Here is some

10   changes we have agreed to; here are proposals" and submit new

11   papers or we come back and say, "We can't agree to anything

12   other than what we have agreed to."  And if Your Honor rejects

13   it, then we will need a trial date.  So, I think we should have

14   a schedule.

15       **THE COURT:**  Okay.  Well, I was going to say a week to

16   come up with the easy things, like the changes to the notice,

17   the changes to the release, the changes to the settlement

18   agreement, everything that's just a matter of changing some

19   words around, you could maybe do in a week or maybe two; and

20   then another week or two after that to meet and confer and

21   negotiate and try to see if you can reach an agreement or at

22   least enough that you can feel confident that you will be able

23   to reach an agreement that you are all willing to work on it

24   some more and --

25       **MR. KILARU:**  Your Honor --

1          **THE COURT:**  -- you can get that done, let's say, in

2     four weeks.

3          **MR. KILARU:**  I think we can agree to three or four

4     weeks on everything, but I don't really understand --

5     respectfully, I don't understand the logic of making some

6     changes to the settlement agreement while we are still talking

7     about other changes to the settlement agreement, assuming we

8     are even willing to make those changes.  It seems to me much

9     more efficient to do it all together.

10          **THE COURT:**  Oh, sure.  You don't have to also make the

11     changes.  You will just agree on what they are going to be.

12          What I'm picturing is an addendum to the settlement

13     agreement which says, "Section X, Y and Z is amended to clarify

14     that you aren't waiving your Choh claims and your Johnson

15     claims."

16          And you won't file it.  You won't get it signed.  You

17     won't do anything with it.  You will just come up with the

18     verbiage and agree that if you -- everything else is resolved,

19     you will have that plug in, and we won't have to wait another

20     week for that to happen.

21          **MR. KILARU:**  And -- we can agree -- I suppose we could

22     try to do that with the Plaintiffs, but what goes in the notice

23     is pretty tied to what the settlement is.

24          **THE COURT:**  Well, there's other stuff.  You could have

25     two options -- I don't know.  If it doesn't work, it doesn't

1    work.  I'm not wedded to it.  And actually, it is really

2    something more for Plaintiffs to worry about than you since it

3    is their clients that they are communicating with.

4          **MR. KESSLER:**  So, Your Honor, why don't we agree that

5    we will report back to you on everything -- you know, three

6    weeks, you know, on everything.  And, you know, if we can do

7    some earlier, we will do some earlier, if we can move that

8    forward.  Then we know by the end of three weeks, we will

9    either have addressed these issues or not addressed them and we

10   will let you know.

11         **THE COURT:**  Okay.  Is that all right with you,

12   Mr. Kilaru?

13         **MR. KILARU:**  Yes, Your Honor.

14         **THE COURT:**  Okay.  So, I have got permission from my

15   court reporter and my law clerk and my clerk that I can go a

16   little bit beyond 5:00 o'clock, which I don't like to do, but I

17   want to go through my notes as quickly as I can and see if

18   there's any pressing questions that I didn't get to that I want

19   to ask you.

20      So, if you-all don't mind staying for a few more minutes.

21   I was also hoping to give everybody a short closing statement,

22   but I don't think we will have time for that; and it probably

23   won't be that helpful anyway.

24         But if you don't mind, give me a couple minutes to look at

25   my notes.

1                    (Pause in proceedings.)

2         **THE COURT:**  What would happen if we -- vis-a-vis the

3    ten-year term for the injunction, which ends up being an

4    injunctive relief class, that necessarily then ends in ten

5    years -- I don't know, maybe Defendant doesn't mind that.

6    I guess it's -- maybe it's just the objectors who mind that.

7         But what that made me question was:  Do you need to have a

8    ten-year class period in order to have a ten-year injunctive

9    relief period?

10    Maybe we just say the class has ended but the obligation

11    to obey the Court's orders carries on for ten years, and class

12    counsel are charged with monitoring and making sure that it

13    isn't changed.

14        **MR. KILARU:**  Your Honor, I don't think that works.  To

15    Mr. Kessler's point earlier, you need to have an injunction

16    that's binding on folks with the right to object as they see

17    fit for this to work.

18        It doesn't work to say there is a class of defined people

19    that are bound by this injunction, and then anyone on day two

20    can say actually it should be something different.

21        That's the reason it is a ten-year settlement, and there

22    is appropriate objections for people in the objections process.

23        **THE COURT:**  Okay.

24        **MR. KILARU:**  I would just note, for example,

25    Your Honor, you have entered injunctions in the past that had a

1    finite date; and it didn't stop another lawsuit from being

2    filed the date after that.  So, I think that's the concern we

3    have with not having the ten-year period.

4         **MR. KESSLER:**  Can I just note, Your Honor, that the

5    injunctive class doesn't give up any damages claims.  So if

6    anyone thinks during that period there is some violation of the

7    antitrust laws or otherwise -- including by what's being done

8    under the settlement -- they are not bound in any way, shape or

9    form.  They simply can't seek an injunction under the antitrust

10   laws to change the settlement terms.  That's the only

11   consequence in -- of that ongoing class membership.

12                    (Pause in proceedings.)

13        **THE COURT:**  Well, this is a really minor one, but

14   I guess I will say it as long as we have a little more time.

15        There is a question about whether NCAA rules are attacked

16   and also whether conference rules are attacked, and the second

17   amended complaint says the conference rules are attacked to the

18   extent that they incorporate objectionable NCAA rules.

19        In the release -- in the agreement, it says that it

20   objects to NCAA rules and conference rules and doesn't say

21   conference rules that incorporate NCAA rules.

22        So, it's potentially broader and potentially attacking

23   other rules that weren't mentioned in the second amended

24   complaint.

25        I don't know if this is a big deal or not.  I don't know

1    if it is meaningful or not.  I don't know if anybody even knows

2    what I'm talking about, but does anyone have any thoughts on

3    that?

4         **MR. KESSLER:**  The only thing I would note, Your Honor,

5    is the release is just for NCAA conference rules that limit

6    compensation and benefits, you know -- in other words, it is

7    the same subject matter area or which it is almost the same.

8    We can go look at that.  It is not a release of conference

9    rules in general that might relate to other subjects.

10        **THE COURT:**  Okay.  Why don't you take a look at that

11   language if you can find it and see if it needs to be tightened

12   up at all.

13        **MR. KESSLER:**  Okay.

14                   (Pause in proceedings.)

15        **THE COURT:**  Oh, there was an inconsistency in the

16   *Hubbard* damage calculations between the description of what

17   they would be in the motion versus Dr. Rascher's description.

18       The description in the motions talked about relative

19   amounts, and Rascher's report talked about pro rata amounts.

20       I'm assuming if there is some difference, you are going

21   with Rascher and not with what's in the motion.  Can I assume

22   that?

23        **MR. KESSLER:**  Rascher is the way we are going to

24   allocate.  I don't think there is any substantive difference.

25   I think Rascher uses a different word but it's the same thing.

1    **THE COURT:**  Okay.  Well, I think I have more

2  questions, but I don't think that it's a good time to try to

3  look for them now.

4      If I come up with something that I really want to know

5  about, I might ask you, let's say, for a further memo on a

6  certain point and have each of you give me a page or a letter

7  brief on something that I have a problem with.

8      Otherwise, I guess you have agreed to get back to me in

9  three weeks with a prognosis about all of the things that we

10  have talked about today and then we will take it from there.

11    **MR. KESSLER:**  Yes.

12    **THE COURT:**  Maybe you will give me a letter brief or a

13  stipulation or something to tell me what's going on.

14    **MR. KILARU:**  We will work out some kind of joint

15  submission, Your Honor.  I'm not sure we will agree on

16  everything, but we will file something that makes sense.

17    **MR. KESSLER:**  (Inaudible), Your Honor.

18    **THE COURT:**  And the harder stuff later, you could do

19  that; okay.  Anything else burning from anybody?

20                    (No response.)

21    **THE COURT:**  Okay.  Thank you everyone and thank you to

22  my staff for staying over.  And if I need a hearing after I get

23  your report, I will set one.  If I don't, I will just try to

24  rule on it.  Okay.

25    **MR. KESSLER:**  Thank you.

1          **MR. BERMAN:**  Thank you, Your Honor.

2          **MR. BROSHUIS:**  Thank you.

3          **THE CLERK:**  Court is in recess.

4              (Proceedings adjourned at 5:08 p.m.)

5                      ---oOo---

1

2

3                    <u>**CERTIFICATE OF REPORTER**</u>

4          I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7   DATE:    September 6, 2024

8

9

10

11   _____

12          Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
            United States District Court - Official Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25