Steve W. Berman (*pro hac vice*)
Emilee N. Sisco (*pro hac vice*)
Stephanie Verdoia (*pro hac vice*)
Meredith Simons (SBN 320229)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com
emilees@hbsslaw.com
stephaniev@hbsslaw.com
merediths@hbsslaw.com

Benjamin J. Siegel (SBN 256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
bens@hbsslaw.com

*Class Counsel for Plaintiffs*

[Additional counsel on signature page]

Jeffrey L. Kessler (*pro hac vice*)
David G. Feher (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
Adam I. Dale (*pro hac vice*)
Neha Vyas (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
jkessler@winston.com
dfeher@winston.com
dgreenspan@winston.com
aidale@winston.com
nvyas@winston.com

Jeanifer E. Parsigian (SBN 289001)
WINSTON & STRAWN LLP
101 California Street, 34th Floor
San Francisco, CA 94111
Telephone: (415) 591-1000
jparsigian@winston.com

*Class Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | Case No. 4:20-cv-03919-CW<br><br>**PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY SETTLEMENT APPROVAL (ECF NO. 450)** |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ........................................................................................... 1

II.   DISCUSSION ................................................................................................. 5

A.   The provision in the Settlement Agreement that permits Defendants
     to continue some of their existing prohibitions against certain third-
     party payments improperly characterized as NIL, as revised after
     this Court's comments, is a small and appropriate aspct of an
     overall settlement compromise that will lead to revolutionary
     changes significantly benefitting the Injunctive Relief Class. ............................... 5

B.   Separate counsel is not required for Injunctive Relief and Damages
     Classes. ................................................................................................... 16

C.   Separate counsel is not required for the future members of the
     Injunctive Relief Class. .............................................................................. 19

D.   Plaintiffs have adequate class representatives for the scholarship
     claims. .................................................................................................... 21

E.   Plaintiffs have modified the *House* notice and claims documents in
     line with this Court's directions. ................................................................. 22

F.   The Amended Settlement Agreement and Third Amended
     Complaint clarify the scope of the release. .................................................... 23

III.  CONCLUSION ............................................................................................. 24

1

## <u>**TABLE OF AUTHORITIES**</u>

2

**Page(s)**

3

**Cases**

4

*Alvarez v. Sirius XM Radio Inc.*,
    2021 WL 1234878 (C.D. Cal. Feb. 8, 2021) ................................................................ 6

5

6

*Amchem Prods. v. Windsor*,
    521 U.S. 591 (1997) ................................................................ 4, 17, 19, 20

7

8

*Asghari v. Volkswagen Grp. of Am., Inc.*,
    2015 WL 12732462 (C.D. Cal. May 29, 2015 ) ...................................................... 14

9

10

*In re Blue Cross Blue Shield Antitrust Litig.*,
    85 F.4th 1070 (11th Cir. 2023) *cert. denied* 144 S. Ct. 2686 (2024) ....................................... 21

11

*Browne v. Am. Honda Motor Co., Inc.*,
    2010 WL 9499072 (C.D. Cal. July 29, 2010) ...................................................... 14

12

13

*Campbell v. Facebook, Inc.*,
    951 F.3d 1106 (9th Cir. 2020) ...................................................... 21

14

*In re Cmty. Bank of N. Va.*,
    622 F.3d 275 (3d Cir. 2010) ...................................................... 17

15

16

*Fata v. Pizza Hut of Am. Inc.*,
    2016 WL 7130932 (M.D. Fla Oct. 31, 2016) ...................................................... 17

17

*Gonzalez v. CoreCivic of Tenn., LLC*,
    2018 WL 4388425 (E.D. Cal. Sept. 13, 2018) ...................................................... 17, 18

18

19

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ...................................................... 2, 6

20

21

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
    958 F.3d 1239 (9th Cir. 2020) ...................................................... 15

22

*Nitsch v. DreamWorks Animation SKG Inc.*,
    2017 WL 399221 (N.D. Cal. Jan. 19, 2017) ...................................................... 6

23

24

*Officers for Justice v. Civ. Srv. Comm'n of City & Cnty. of San Francisco*,
    688 F.2d 615 (9th Cir. 1982) ...................................................... 14

25

26

*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico*,
    910 F. Supp. 2d 891 (E.D. La. 2012), *aff'd sub nom* 739 F.3d 790 (5th Cir.
    2014) ...................................................... 19

27

28

-ii-

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999) ................................................................................ 4, 17, 19

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   827 F.3d 223 (2d Cir. 2016) ................................................................... 4, 16, 18

*Senne v. Kansas City Royals Baseball Corp.*,
   2023 WL 2699972 (N.D. Cal. Mar. 29, 2023), *aff'd* 2023 WL 4824938 (9th
   Cir. June 28, 2023) ...................................................................................... 4, 17

*Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.*,
   2016 WL 7743407 (N.D. Cal. Dec. 7, 2016) (Wilken, J.) ......................................... 6

*Staton v. Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003) ................................................................................ 20

*Stephens v. Farmers Rest. Grp.*,
   329 F.R.D. 476 (D.D.C. 2019) .............................................................................. 17

*Stephens v. US Airways Grp., Inc.*,
   102 F. Supp. 3d 222 (D.D.C. 2015) ..................................................................... 15

*Trombley v. Nat'l City Bank*,
   826 F. Supp. 2d 179 (D.D.C. 2011) ..................................................................... 16

*Vasquez v. USM Inc.*,
   2015 WL 12857082 (N.D. Cal. Apr. 13, 2015) ............................................... 2, 6, 14

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prods. Liab.
   Litig.*,
   895 F.3d 597 (9th Cir. 2018) ................................................................................ 16

*White v. NFL*,
   41 F.3d 402 (8th Cir. 1994) ........................................................................... 20, 21

*White v. NFL*,
   756 F.3d 585 (8th Cir. 2014) ................................................................................ 20

*Zakikhani v. Hyundai Motor Co.*,
   2023 WL 4544774 (C.D. Cal. May 5, 2023) ......................................................... 14

**Federal Statutes**

Fair Labor Standards Act ............................................................................................ 5

**Federal Rules**

Fed. R. Civ. P. 23(e)(2)(C) ......................................................................................... 15

-iii-

**GLOSSARY OF TERMS**

| Term | Long Cite |
|------|-----------|
| *Alston* | *In re: National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust Litigation*, Case No. 14-md-2541 CW (N.D. Cal.) |
| Amended Injunctive Relief Settlement or Am. IRS | Amended Injunctive Relief Settlement, Appendix A to Exhibit 1 to Declaration of Steve W. Berman in Support of Plaintiffs' Supplemental Brief in Support of Motion for Preliminary Settlement Approval, concurrently filed herewith |
| Amended Settlement Agreement or Am. SA | Amended Settlement Agreement, Ex. 1 to Declaration of Steve W. Berman in Support of Plaintiffs' Supplemental Brief in Support of Motion for Preliminary Settlement Approval, concurrently filed herewith |
| Berman Opening Decl. | Declaration of Steve W. Berman in Support of Plaintiffs' Unopposed Motion for Preliminary Settlement Approval, filed July 26, 2024, ECF No. 450-2 |
| Berman Supp. Decl. | Declaration of Steve W. Berman in Support of Plaintiffs' Supplemental Brief in Support of Motion for Preliminary Settlement Approval, concurrently filed herewith |
| Colorado Objectors | Alex Fontenot, Mya Hollingshed, Sara Fuller, Deontay Anderson, and Tucker Clark, filers of the Colo. Opp. |
| Colo. Opp. | Plaintiffs in the Colorado Cases' Response in Opposition to Motion for Preliminary Approval, filed Aug. 9, 2024, ECF No. 473 |
| Ex. | Unless otherwise indicated, all Ex. references are to the Berman Supp. Decl. |
| *Fontenot* | *Fontenot v. National Collegiate Athletic Association, et al.*, Case No. 1:23-cv-03076 (D. Colo.) |
| Fontenot Plaintiffs | Plaintiffs that filed *Fontenot v. National Collegiate Athletic Association, et al.*, Case No. 1:23-cv-03076 (D. Colo.) |
| *Hubbard* | *Hubbard v. National Collegiate Athletic Association, et al.*, Case No. 4:23-cv-01593 CW (N.D. Cal.) |
| Injunctive Relief Settlement or IRS | Injunctive Relief Settlement, Appendix A to Ex. 1 to Declaration of Steve W. Berman in Support of Plaintiffs' Motion for Preliminary Settlement Approval, filed July 26, 2024, ECF No. 450-2 |
| *Johnson* | *Johnson v. National Collegiate Athletic Association*, Case No. 2:19-cv-05230 (E.D. Penn.) |
| Klonoff Decl. | Declaration of Robert H. Klonoff Addressing the Argument [Doc. 473] that Separate Counsel Must Be Appointed to Represent the Injunctive Class, concurrently submitted herewith |

| Term | Long Cite |
|---|---|
| Mot. | Plaintiffs' Notice of Motion and Motion for Preliminary Settlement Approval, filed July 26, 2024, ECF No. 450 |
| Peak Decl. | Declaration of Carla A Peak Regarding Settlement Notice Program, filed July 26, 2024, ECF No. 450-5 |
| Rascher Merits Report | Expert Report of Daniel A. Rascher, served on Dec 1, 2023 |
| Rascher Decl. | Declaration of Daniel A. Rascher, filed July 26, 2024, ECF No. 450-4 |
| Reply | Plaintiffs' Reply in Support of Preliminary Settlement Approval, filed August 16, 2024, ECF No. 495 |
| Third Am Compl. | Third Consolidated Amended Complaint, concurrently filed herewith |
| Settlement Agreement or SA | Stipulation and Settlement Agreement, attached as Exhibit 1 to the Declaration of Steve W. Berman in Support of Plaintiffs' Unopposed Motion for Preliminary Settlement Approval, filed July 26, 2024, ECF No. 450-2 |
| Tr. | Transcript of Videoconference Proceedings, September 5, 2024, ECF No. 525 |

1

## I.    INTRODUCTION

The Injunctive Relief Settlement will result in a foundational transformation to college sports, which will empower and benefit college athletes like never before. In a sea change to the NCAA's longstanding and long-defended rules, Division I college athletes will now be eligible to receive benefits collectively approximating 51% of future athletic revenues—comparable to professional sports. Economist Daniel Rascher has conservatively estimated that this revision to NCAA rules will result in *$20 billion more* flowing to student-athletes over the next ten years. The Settlement also for the first time delineates parameters on Defendants' existing regulatory authority over NIL transactions, permanently clearing the way for the vast majority of student-athletes' NIL deals with third parties. It also eliminates the NCAA's scholarship limits and replaces them with roster limits for all sports—limits that are higher than the previous scholarship caps. These developments are, standing alone, remarkable achievements for the Injunctive Relief Settlement Class.

The benefits of the settlement do not stop there, however. As further clarified by the amendments to the Injunctive Relief Settlement in response to the Court's questions at the preliminary approval hearing, Defendants' enforcement authority over third-party NIL deals will no longer extend to all third parties (as it did under the Interim NIL Rules) or the broadly defined term "boosters" (as it did under the prior Settlement Agreement presented to the Court). Rather, it will be limited to a narrower group of entities and individuals closely affiliated with the schools ("Associated Entities or Individuals") to prevent circumvention of the settlement. And, for the first time, any limitations on payments will be subject to neutral arbitration review so that the NCAA cannot act as judge, jury, and prosecutor.

Additionally, as this brief explains and the revised Injunctive Relief Settlement now makes explicit, the Agreement does not prohibit any third-party NIL payments that are not prohibited already by the NCAA's existing rules. Instead, the relevant section of the Agreement merely permits the NCAA to continue its **existing** prohibitions on "faux" NIL payments by the narrow category of Associated Entities or Individuals, as elaborated upon by clarifying rules that provide clearer and more objective guidance for assessing whether such payments are legitimate NIL

compensation. And the Settlement Agreement makes sure that the NCAA's enforcement authority with respect to these third-party payments will no longer be unchecked. Under the settlement, student-athletes or institutions can challenge any payment-related discipline before a neutral arbitrator. Those arbitrations will occur quickly, and importantly, no penalties can be imposed while arbitration is pending unless the arbitrator determines that good cause has been shown. And *if* the arbitrator sides with enforcement, then the student-athlete can terminate the NIL agreement at issue to avoid risking eligibility. This process is narrower, fairer, and more administrable than what exists today.

The Court asked important questions about Defendants' ability, under the Agreement, to prohibit certain third-party payments by entities and how allowing the NCAA to exercise such authority would impact class members. The parties have made changes in the Settlement Agreement language to clarify these provisions so that it is explicit that the Agreement is only allowing the continuation of existing NCAA rules which already prohibit so-called "faux" NIL payments in narrow and more objectively defined circumstances. But the critical inquiry for the Court in evaluating this provision of the Agreement is whether permitting this one category of NCAA NIL restrictions to continue to exist is fair and reasonable to the injunctive class where it is more than offset by the tens of billions of dollars in other benefits the Agreement allows. That is because the question before the Court is whether the Settlement Agreement *as a whole* comes within a range of fairness and adequacy to the class. *Vasquez v. USM Inc.*, 2015 WL 12857082, at *2 (N.D. Cal. Apr. 13, 2015). Settlements are the product of negotiations and compromise, and it is not relevant to ask "whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate, and free from collusion." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 338 (2011).

The answer to this controlling question is an unequivocal "yes," particularly considering the substantial direct payments that will be available to Division I college athletes at a percentage of revenues analogous to professional athletes, along with the other benefits provided by the Injunctive Relief Settlement. There can be no doubt that class members will collectively receive a

vastly larger—not a smaller—amount of payments and benefits under the injunctive settlement than they would be able to receive under existing NCAA rules.

Moreover, the Court should assess the adequacy of the settlement against the risk of future litigation. Considering prior rulings by the Court and the Ninth Circuit, there is a real risk that Plaintiffs could lose or that any injunctive relief ordered would not approach the settlement. The *O'Bannon* and *Alston* trials (and appeals) resulted in injunctions permitting additional cash payments of a few thousand dollars per student, per year (cost-of-attendance payments in *O'Bannon*, and academic incentive payments in *Alston*). The settlement here provides up to 22 percent revenue sharing over the next ten years—*billions* in new benefits for college athletes that will total more than a million dollars for many athletes per year. Further litigation is not only uncertain in outcome but certain in delaying the benefits of that relief for future college athletes who may graduate before any new relief can be provided through litigation.

Moreover, if future student-athletes believe that the NCAA's rules, as amended by this Settlement Agreement, continue to violate the law, they will have the opportunity to object to it. And in the unlikely event that future student-athletes wish to sue for damages notwithstanding the challenges that such a lawsuit would have given the substantial additional benefits flowing from the injunctive settlement if approved by this Court, they can do so, consistent with Paragraph 46 of the Settlement Agreement,[1] by having a lawyer of their choosing sue. So, on balance, permitting Defendants to retain some existing rules that prohibit affiliated parties from providing faux NIL payments that are not actual commercial transactions—is a fair exchange for the tremendous benefits the settlement provides.

In response to other questions raised by the Court at the hearing about conflicts of interest, Class Counsel consulted with Professor Robert H. Klonoff, a leading expert on class actions, including the settlement approval process and class conflicts. In a declaration accompanying this supplemental submission, Professor Klonoff confirms that there is no basis to conclude that the

---

[1] Paragraph 46 of the Settlement Agreement states: "Any and all claims by any Division I student-athlete seeking to challenge the structure or otherwise modify the Injunctive Relief Settlement, or alleging antitrust or other violations of law based on Defendant's implementation of the Injunctive Relief Settlement, must, to the fullest extent legally permissible, be asserted exclusively in the Action."

damages and injunctive relief classes in this action required separate representation; in fact, such separate representation would have been undesirable and could result in negative consequences for the classes. Professor Klonoff also surveyed the case law and found that courts, including in the Ninth Circuit, routinely approve damages and injunctive class settlements without separate counsel. Indeed, just last year, lead counsel for the objectors raising this issue—the Colorado Objectors—successfully secured approval of a class action settlement in this District where they simultaneously negotiated terms for both injunctive relief and damages claims.[2] And that was done without any indication that counsel took the phased, compartmentalized negotiation approach here, which Professor Klonoff explains is strongly supported by the well-accepted practice of phased negotiations of class recovery and attorneys' fees. Cited herein are several cases where courts found that compartmentalized settlement negotiations provided structural assurance of adequate and un-conflicted representations of settlement classes. Professor Klonoff also explains that the leading case cited by objectors, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223 (2d Cir. 2016), itself recognized that there is no per se ruling requiring separate representation of damages and injunctive relief classes, and that the relevant facts of that case bear little resemblance to those here, where there was no trade off in benefits between classes.

Indeed, in all the cases cited by Objectors, including the Supreme Court decisions in *Ortiz*[3] and *Amchem*,[4] there were unaddressed structural conflicts that rendered un-conflicted representation impossible and/or there was clear evidence that counsel's simultaneous representation of different classes or claims resulted in counsel trading off valuable relief for one group of claimants or claims for the benefit of others. Here, the opposite is true: The settlement opens the door to *billions* of dollars in new compensation for the Injunctive Relief Class every year; the settlement does not bind future student-athletes members to a perpetual release of all claims; and the settlement does not release claims against unchallenged NCAA rules. Then, after the injunctive settlement terms were fully negotiated, Class Counsel was able to negotiate billions of

---

[2] *Senne v. Kansas City Royals Baseball Corp.*, 2023 WL 2699972, at * 16 (N.D. Cal. Mar. 29, 2023), *aff'd* 2023 WL 4824938 (9th Cir. June 28, 2023).

[3] *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).

[4] *Amchem Prods. v. Windsor*, 521 U.S. 591 (1997).

dollars in relief for the damages classes through separate negotiations. At no time did any conflict of interest impact the negotiations or the settlement terms.

The Court also asked questions about the adequacy of the class representatives for the claims challenging Defendants' scholarship rules, in particular with respect to claims on behalf of partial scholarship recipients. Plaintiffs believe that their existing representatives are adequate, but in response to the suggestion of Court, now propose to add an additional class representative, Nicholas Solomon, in the [Proposed] Third Amended Complaint (concurrently submitted herewith), a partial scholarship recipient who unquestionably has standing for these claims and will be an adequate class representative.

In further response to the Court's questions and directions, the parties also have amended the Settlement Agreement to expressly provide that the release of claims by class members does not extend to any Fair Labor Standards Act or similar labor law claims, any claims asserted against the Ivy League rule in the *Choh* litigation, or any Title IX claims. Plaintiffs have also modified the notice and claim documents (concurrently submitted herewith) to address the various questions and concerns raised by the Court.

In sum, for the reasons discussed in this supplemental brief and accompanying documents, as well as those provided in previous briefing, Plaintiffs respectfully request that the proposed Amended Settlement Agreement be preliminarily approved and that notice be directed to the Settlement Classes.

## II.    DISCUSSION

**A.    The provision in the Settlement Agreement that permits Defendants to continue some of their existing prohibitions against certain third-party payments improperly characterized as NIL, as revised after this Court's comments, is a small and appropriate aspect of an overall settlement compromise that will lead to revolutionary changes significantly benefitting the Injunctive Relief Class.**

At the preliminary approval hearing, this Court asked about Article 4, Section 3 of the Injunctive Relief Settlement concerning regulation of third-party NIL payments from certain entities and individuals affiliated with the schools (referred to hereinafter as "Section 3") and tasked the Parties with revisiting this section for possible clarifying changes. The Parties have now revised Section 3 and related provisions to clarify and narrow who these regulations apply to and to clarify

that the section merely permits the continuation of existing NCAA prohibitions contained in the current rules. *See* Am. IRS Art. 1 § 1, Art. 4 § 3 (discussed *infra*).

The issue before the Court now is whether the Injunctive Relief Settlement *as a whole*— including Section 3 as revised and clarified—reflects an agreement that at this preliminary stage, "falls within the range of possible approval,"[5] "such that notice may be given to the class and the class may have a full and fair opportunity to consider the proposed [settlement] and develop a response."[6] Plaintiffs explain below that the answer to that question is a resounding "yes." The Injunctive Relief Settlement, including the revised Section 3, reflects in the aggregate an outstanding, ground-breaking result for the class. There is also nothing in Section 3 that presents an obstacle to settlement approval. Indeed, that section constitutes an improvement for class members with respect to the clarity and fairness of enforcement of existing NCAA rules that prohibit these types of payments.

The Objectors' pleas for the settlement to provide for even greater relief by banning all existing NCAA NIL and compensation rules are not a reason to deny approval. That is because a settlement is "by its nature a compromise." *Alvarez v. Sirius XM Radio Inc.*, 2021 WL 1234878, at *7 (C.D. Cal. Feb. 8, 2021) (overruling objection to settlement that allowed defendant to continue charging a fee after settlement because "a full recovery is often not possible in a settlement . . . and a partial recovery does not render a settlement unreasonable" (internal quotation marks omitted)); *see Hanlon*, 150 F.3d at 1026 ("[settlement] is the offspring of compromise[,] the question is . . . not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate, and free from collusion"). Plaintiffs explained in their previous briefing that the Injunctive Relief Settlement represents a revolutionary transformation of college sports that will vastly benefit class members. *See* Mot. at 21–24; Reply at 17–20. Perhaps most prominently, the injunction introduces rule changes that will allow *direct* payments by schools to Division I college athletes that, in

---

[5] *See Vasquez*, 2015 WL 12857082, at *2 (Preliminary approval is not a dispositive assessment of the fairness of the proposed settlement; rather, preliminary approval assesses whether the proposed settlement falls within the "range of possible approval."); *accord Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.*, 2016 WL 7743407, at *2 (N.D. Cal. Dec. 7, 2016) (Wilken, J.).

[6] *Nitsch v. DreamWorks Animation SKG Inc.*, 2017 WL 399221, at *1 (N.D. Cal. Jan. 19, 2017).

conjunction with other benefits, amounts to 51% of relevant revenues—meaning college athletes may obtain a similar percentage of revenues as professional athletes in the NFL, NBA, and other professional leagues. Rascher Decl., ¶¶ 39, 82–87. Plaintiffs' expert has conservatively estimated that this likely will result in more than *$20 billion* flowing to injunctive relief class members over the next ten years—a massive increase over the status quo. *Id.*, ¶¶ 84–85 & Ex. 25.

And these benefits are not just theoretical. News article after news article emphasizes that a host of schools, particularly within the Power Five, are gearing up to spend as much as they can on college athletes under this new system, with many schools publicly declaring they will hit the maximum amount allowed under the Settlement Agreement.[7] This is not surprising: The prospective loosening of restrictions to allow increased payments, and student-athletes' ability to transfer between schools, create competitive pressures that will induce schools to provide as much as they can to college athletes lest they transfer to another school that elects to provide more.[8]

In addition to challenging the restrictions on direct institutional payments, the *House* lawsuit—originally filed in June 2020, a year before the Interim NIL Rules, and amended following those rules' enactment—broadly challenged Defendant's third-party NIL restrictions, including restrictions imposed by the Interim NIL Rules. *See, e.g.*, ECF No. 164 at 3 (discussing the Interim

---

[7] As an example, the University of Tennessee recently announced that it will add a 10% "talent fee" to ticket prices to raise money to give to players, with the Tennessee athletic director anticipating that post-settlement his school could provide $30 million more to athletes per year, including a "raise [to] the number of available athletic scholarships." *See* https://www.on3.com/news/tennessee-to-add-10-percent-talent-fee-to-ticket-prices. *See also, e.g.*, Joey Kaufman, *Ohio State to pay athletes maximum allowed following NCAA settlement, AD Ross Bjork says*, The Columbus Dispatch (June 20, 2024), https://perma.cc/GAB7-49K7; Seth Emerson, *How is Georgia preparing for revenue sharing following House v. NCAA settlement?* The Athletic (May 23, 2024) https://perma.cc/26J6-MPYW; Matthew Sgroi, *TCU to participate at highest level in 'unprecedented' revenue-sharing model for student athletes*, Fort Worth Report (July 1, 2024) https://perma.cc/UL9X-3GF8; Alejandro Zuniga, *Michigan to pay athletes maximum allowed following NCAA settlement, AD Warde Manuel says*, 247 Sports (August 28, 2024), https://247sports.com/college/michigan/article/michigan-to-pay-athletes-maximum-allowed-following-ncaa-settlement-ad-warde-manuel-says-235246393/; Matt Baker, *USF football plans to 'max out' on NCAA revenue sharing with players*, Tampa Bay Times (July 23, 2024), https://www.tampabay.com/sports/bulls/2024/07/23/usf-football-aac-media-days-ncaa-revenue-sharing/.

[8] The settlement agreement also provides for anti-collusion protections to prevent schools from limiting their competition to make payments to athletes. The Injunctive Settlement Agreement, Article 5, Section 1, has been slightly modified to make it crystal clear that such anti-collusion provisions will not impede future collective bargaining.

NIL Rules). In the Injunctive Relief Settlement, Plaintiffs obtained an agreement that prohibits any restrictions on third-party NIL at all, except the Settlement's limited provisions allowing Defendants to prohibit payments by institutional affiliates that would circumvent the Settlement Agreement and are not true NIL payments at all. *See* Am. IRS Art. 2 § 3. This will permanently give the official green light for the vast majority of student-athletes' NIL deals with third parties (which do not count against the Pool limit), on top of the millions in direct payments now made possible by the settlement. The settlement also eliminates the NCAA's prior scholarship limits and replaces them with roster limits for all sports that are higher than the previous scholarship caps. These developments, standing alone, are massive wins for the Settlement Classes.

As part of the settlement compromise, the injunctive settlement does not prohibit the NCAA from continuing its existing rules that prohibit certain affiliated third parties from making "pay for play" payments that are contingent on an athlete coming to or continuing enrollment at a particular school, even if they are facially characterized as NIL payments. These NCAA rules avoid circumvention of the negotiated limits on revenue sharing established by the Pool calculation (as is the case in professional leagues, where there are rules to prohibit circumvention of salary caps). The prohibitions permitted in Section 3 are narrower than prohibitions this Court and the Ninth Circuit previously upheld. Moreover, Section 3 only permits the NCAA to continue to apply its existing prohibition on certain NIL payments to a narrow group of individuals and entities (further tailored following this Court's directions, *see* discussion *infra*), rather than all third parties. *See* Am. IRS Art. 1 § 1. In yet another win for college athletes, other provisions create new procedural due process protections and transparency for college athletes in the enforcement process of these few remaining NIL rules. Specifically, the Injunctive Relief Settlement mitigates the risk of abuse by the NCAA in its interpretation and enforcement of the rules permitted by Section 3 because, for the first time in the NCAA's long enforcement history, neutral arbitration will be available to challenge the NCAA's enforcement of such rules against athletes or their schools. *See* IRS Art. 6 § 2. The NCAA will no longer be the prosecutor, judge, and jury for these restrictions.

At the preliminary approval hearing, the Court expressed three concerns about Section 3. *First*, the Court indicated that Section 3 potentially applied to an overbroad and unclear set of

actors. The Court specifically focused on the definition of "boosters," because in the initial settlement proposed to the Court, Section 3 applied to boosters as defined in the Agreement. *See* IRS Art. 4 § 3. Of note, the NCAA's existing Interim NIL Rules and guidance that preceded the settlement, like the initial settlement agreement, defined "boosters" as "representatives of athletic interests," which is how that term is described in the NCAA Bylaws.[9] So, this was not new. Nonetheless, in light of the Court's guidance, the Parties have clarified Section 3 so that it now applies only to a narrower and better-defined group of entities and individuals who are closely affiliated with the schools. The Court noted at the hearing that the definition of "booster" under NCAA rules is broad, including anyone who has provided a donation to obtain season tickets, made financial contributions to an athletic department, provided benefits to student-athletes or their families, or "[b]een otherwise involved in promoting university athletics."[10] Following the hearing, the Parties replaced the defined term "booster" in the injunctive settlement with the term "Associated Entity or Individual," a narrower, more targeted, and objectively defined category that does not automatically sweep in "today's third party donor," Tr. 79:20–23, or a former student-athlete who wishes to continue to support his/her alma mater, *id.* Tr. 78:22–23. *See* Am. IRS Art. 1 § 1 (defining "Associated Entity or Individual").

Under the amended injunctive settlement, the NIL rules that the NCAA may continue to enforce under Section 3 will be limited to deals that involve an "Associated Entity or Individual," rather than the more broadly defined "boosters." Indeed, as the settlement currently stands, *all* third-party NIL deals that do *not* involve "Associated Entities or Individuals" are permissible (an

---

[9] *Compare* Settlement Agreement § A.1(f) (defining booster, as used in the prior Section 3 (IRS Art. 4, § 3)) *with* Interim Name, Image and Likeness Policy Guidance Regarding Third Party Involvement, dated May 2022, available at https://ncaaorg.s3.amazonaws.com/ncaa/NIL/May2022NIL_Guidance.pdf ("it is important to understand how *representative of athletics interest (booster) is defined by NCAA legislation*" and then quoting from that definition (emphasis added)) & Name, Image and Likeness Policy Question and Answer, dated July 2022, available at https://ncaaorg.s3.amazonaws.com/ncaa/NIL/July2022NIL_DIInterimPolicy.pdf (similarly defining "who is considered a booster" and adding: "If an individual or NIL entity's (e.g., collective) sole or primary purpose is to engage in NIL activities with student-athletes from a specific institution, such individual or NIL entity would be considered a booster. Further, if an individual or NIL entity is involved in recruiting activities for NIL purposes (e.g., collective engaging in recruiting activities), such an individual or entity would trigger booster status.").

[10] *See* https://www.ncaa.org/sports/2013/11/27/role-of-boosters.aspx#:~:text=Boosters%2C%20referred%20to%20by%20the,promoting%20the%20university's%20athletics%20programs.

improvement on the status quo, because the Interim NIL Rules' limitations apply to all third parties), and NIL payments by the narrowly defined "Associated Entities or Individuals" are also not automatically banned. Instead (and unlike all other third-party NIL deals), they simply receive more scrutiny to determine if they come within the existing NCAA prohibitions on "faux" NIL payments that are not actual commercial transactions. And if that scrutiny results in a deal being disallowed, student-athletes can reform and resubmit that deal for further consideration, or they or their institutions can challenge that determination before a neutral arbitrator. Am. IRS Art. 6 §§ 2(a)-(b). Those arbitrations will occur quickly, and importantly, *no penalties can be imposed* while arbitration is pending absent the arbitrator's finding good cause. *Id.*, Art. 6 § 2(d). And *if* the arbitrator sides with enforcement, then the student-athlete can terminate the agreement at issue to avoid risking eligibility. *Id.*, Art. 4 § 3(e). This process is narrower, fairer, and more administrable than what exists today.

The changes to Section 3 made since the hearing address the Court's concern about sweeping in ordinary supporters of a school in other ways. For example, Section 3 now states that for individuals not affiliated with a collective or involved with recruitment, the rules will only apply if the individual "directly or indirectly (including contributions by an affiliated entity or family member) has contributed more than $50,000 over their lifetime to the athletics department of a particular Member Institution" or collective. *See* Am. IRS Art. 4 § 3. This threshold should further allay concerns that the rules will impact loyal alumni who make modest contributions to their former school.

*Second*, at the hearing, the Court expressed concern that Section 3 could permit the NCAA to impose new prohibitions on third-party NIL payments that are not in the existing rules. It is true that Defendants' previous NIL guidance emphasized that third parties were prohibited from "paying for play" or making inducement payments for recruitment,[11] while the current Section 3 permits the NCAA to have clarifying rules requiring that NIL payments from Associated Entities or Individuals

---

[11] *See, e.g.*, Name, Image and Likeness Policy Question and Answer, available at https://ncaaorg.s3.amazonaws.com/ncaa/NIL/NIL_QandA.pdf (explaining that under Interim NIL Policy athletes may enter into NIL agreements with boosters provided the agreement "is not an impermissible inducement and it does not constitute pay-for-play").

must be for a "valid business purpose" and "at rates and terms commensurate with compensation paid to similarly situated individuals with comparable NIL value who are not current or prospective student-athletes at the Member Institution." *See* Am. IRS Art. 4 § 3. However, that is not a new prohibition. Rather, as the modified language makes explicit, Section 3 only permits the NCAA to continue to apply existing rules which prohibit certain types of payments by affiliated parties that are characterized as NIL but, in reality, are just pay-for-play compensation from a third party. The clarifying rules permitted by Section 3 simply provide clearer guidance for how such payments will be evaluated to determine whether they fall within the existing NCAA prohibitions. This is not something new: the May 2022 NIL Policy Guidance Regarding Third Party Involvement stated that "NIL agreements must be based on an independent, case-by-case analysis of the value that each athlete brings to an NIL agreement as opposed to providing compensation or incentives for enrollment decisions (e.g., signing a letter of intent or transferring), athletic performance (e.g., points scored, minutes played, winning a contest), achievement (e.g., starting position, award winner) or membership on a team (e.g., being on roster)."[12] The settlement language in Section 3 merely permits a clarification of the existing broad rule prohibiting certain types of third-party payments characterized as NIL, and further limits the prohibition to a narrow category of Associated Entities or Individuals, with *new* clarifying language sine the hearing stating that the Agreement only allows the "NCAA and Conference Defendants" to "continue, and pass new rules further clarifying and implementing, their *existing* prohibitions." *See* Am. IRS Art. 4 § 3 (emphasis added). Moreover, as previously noted, what has changed from the existing NIL rules is that the NCAA will no longer act as judge and jury to determine whether a payment is permissible. In sum, Section 3 merely permits clarifying rules to provide clear guidance along with the injunctive settlement's new and fair arbitration process with neutral decision-makers.

---

[12] *See* Interim Name, Image and Likeness Policy Guidance Regarding Third Party Involvement, dated May 2022, available at https://ncaaorg.s3.amazonaws.com/ncaa/NIL/May2022NIL_Guidance.pdf; *see also* Name, Image and Likeness Policy Question and Answer, available at https://ncaaorg.s3.amazonaws.com/ncaa/NIL/NIL_QandA.pdf (explaining that the following was prohibited under the interim rules: "NIL agreement without quid pro quo (e.g., compensation for work not performed). Student-athlete NIL agreements should include the expected NIL deliverables by a student-athlete in exchange for the agreed upon compensation and student-athletes must be compensated only for work actually performed.").

*Third*, the Court expressed concern that Section 3 could involve "taking things away from people." Tr. 80:20. As an initial matter, as explained *supra*, the existing third-party NIL rules already prohibit pay-for-play or inducement payments by third parties disguised as NIL payments so no payments currently permitted by the terms of existing NCAA rules will suddenly become prohibited. Moreover, to the extent members of collectives (or anyone else who might fall into the "Associated Entity or Individual" category) operate a business that provides goods or services to the public for profit, those entities can enter into NIL agreements—*i.e.*, sponsorship or endorsement agreements with student-athletes for use of their NIL for the promotion or endorsement of such goods and services—at fair market value—without limitation and without counting against the Pool limit. Collectives and other Associated Entities or Individuals may also act as marketing agents to find and facilitate sponsorship or endorsement agreements between student-athletes and businesses. So long as those contracting businesses do not themselves constitute Associated Entities or Individuals, there is zero regulatory obstacle to any such sponsorship or endorsement agreements. Individuals or entities currently providing money to collectives also can redirect those amounts to their preferred institution so that the school can itself make direct payments to athletes without any limitation other than the Pool limit. There is thus little reason to think that there will be situations where a class member receiving a current NIL payment from an Associated Entity or Individual will not be able to receive comparable, or even greater payments, under the terms of the Settlement either from the institution itself or from a combination of direct payments from the institution and permissible third-party payments for the commercial use of NIL. If there are boosters who would like to make payments for the athletes' benefit, they will have a variety of ways to make such payments under the Settlement Agreement, including by making contribution to the schools, who can then make the payments to the athletes. Tr. 79:11-16.

The post-Settlement picture is even brighter for college athletes because it is far from clear that NIL collectives actually provide lucrative deals at the levels suggested in the media. Those reports are unconfirmed hearsay. Class Counsel collected extensive information about NIL deals as part of discovery in *House* to support their claim for lost NIL opportunities. That evidence consisted of reported NIL transactions for student-athletes at 137 Division I schools. All told, the

-12-

data collected indicated that roughly $211 million in payments went to roughly 20,000 athletes over a two-year period (2021-2023). *See* Rascher Merits Report ¶ 252. Even if the data received was not comprehensive, whether viewed in the aggregate or as an average, these numbers are *far* lower than what media reports about collectives would suggest, and vastly outpaced by the over $20 billion in new institutional spending permitted by the Injunctive Relief Settlement. These new institutional payments would also come without the risks attending alleged booster or collective payments. Those risks include boosters not meeting promises to student-athletes,[13] and efforts to lock up student-athletes' future NIL rights, something that is precluded under the Settlement Agreement.[14]

Particularly after the revisions made in response to the Court's comments, it is clear that Section 3 only permits the NCAA to continue certain of its existing rules prohibiting specific forms of NIL payments by Associated Entities or Individuals and that no payments currently permitted by the NCAA rules will now be barred by the rules the NCAA may continue under Section 3. Additionally, Section 3 reduces the number of third-party entities subject to NCAA enforcement. And on top of all of that, the injunctive settlement adds greatly enhanced substantive and procedural protections for college athletes that have substantial NIL value and represent a marked improvement from the status quo third-party NIL rules, which allow the NCAA to be the judge and jury for all NIL-related discipline.

Moreover, and most importantly, as the cases cited in the beginning of this section explain, compromise is the nature of settlement, and the question before the Court is whether the Settlement Agreement *as a whole* comes within the range of fairness and adequacy to the Court. *Vasquez*, 2015

---

[13] *See, e.g.*, *Rashada v. Napier, et al.*, No. 3:24-cv-00219-MCR-HTC (N.D. Fla. May 21, 2024), Dkt. 37 (alleging star high school quarterback recruit was induced to flip his commitment from one university to another in exchange for a multi-million-dollar NIL deal with a collective—which then never materialized); Memorandum from the Members, Subcomm. on Innovation, Data, and Com. to the Comm. Majority Staff Regarding Legislative Hearing Entitled "NIL Playbook: Proposal to Protect Student Athletes' Dealmaking Rights" (Jan. 16, 2024), https://d1dth6e84htgma.cloudfront.net/01_18_2024_IDC_NIL_Hearing_Memo_2b714cbf5a.pdf (a recent report about a UNLV student-athlete sitting out the rest of their season because of failed NIL commitments).

[14] *Compare, e.g.*, *Dexter v. Big League Advance Fund II*, No. 1:23-cv-00228-AW-HTC (N.D. Fla. Sept. 1, 2023), Dkt. 1 (seeking to void a contract entered into by NFL Bears rookie while he was a student-athlete that gave him $436,485 in exchange for use of his NIL but required him to give up 15% of his pre-tax NFL earnings for 25 years if he later played in the NFL), *with* Am. IRS Art. 2, § 2 (prohibiting institutions from entering into licenses that last past eligibility).

WL 12857082, at *12. When considering the agreement as a whole, it is a more than a reasonable compromise for the injunctive class to accept the (now narrowed) Section 3 in light of the remarkable benefits that the Injunctive Relief Settlement will provide to the class, including the changes to the NCAA's compensation rules to permit schools to provide direct payments that along with existing benefits will be equivalent to compensation provided in the professional leagues, and to permanently allow true third-party NIL for the length of the injunctive relief term.[15] This compromise also was necessary for the settlement to include these benefits. Section 3 was an essential part of the compromise for Defendants, and it is the overall compromise, reflected in the Settlement Agreement as a whole, that is clearly in the best interests of the injunctive class. Whether particular provisions of the overall settlement could have been approached differently or how they compare to "a hypothetical speculative measure of what *might* have been achieved" is immaterial. *Officers for Justice v. Civ. Srv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). The controlling question for the Court is whether the overall deal is fair and reasonable to the class.

The overall compromise achieved through the settlement is particularly beneficial to the injunctive class in light of the risks associated with the alternative—continuing this case and potentially losing or obtaining lower-value injunctive relief for the class—which is a factor courts must consider in determining whether to approve a settlement. *See* Fed. R. Civ. P. 23(e)(2)(C) (in assessing settlement, court should consider whether relief was adequate, taking into account, *inter alia*, "the costs, risks, and delay of trial and appeal"); *see also* Mot. at 19-21 (cases explaining that risks of continuing litigation, particularly in antitrust cases, which are particularly risky, should be

---

[15] *See also Zakikhani v. Hyundai Motor Co.*, 2023 WL 4544774, at *6 (C.D. Cal. May 5, 2023) ("mere[] argu[ments] that the settlement terms for Class Members could have been better 'does not mean the settlement [is] not fair, reasonable or adequate'" (quoting *Hanlon*, 150 F.3d 1011 at 1027)). Monday-morning quarterbacking does not impede settlements. *Asghari v. Volkswagen Grp. of Am., Inc.*, 2015 WL 12732462, at *26 (C.D. Cal. May 29, 2015 ) ("As an initial matter, the mere fact that the benefits provided under the settlement agreement will not make all class members 'whole,' and/or the possibility that a 'better' settlement might have been reached, do not provide a sufficient basis upon which to conclude that the settlement agreement is unfair."); *Browne v. Am. Honda Motor Co., Inc.*, 2010 WL 9499072, at *18 (C.D. Cal. July 29, 2010) (granting final approval of settlement and recognizing that "[w]hile the proposed settlement does not perfectly compensate every member of the class, it is unlikely that any settlement of the claims of a class of more than 740,000 members would achieve such a result").

considered in determining whether to approve settlement). That risk here is real, considering that this Court held, only five years ago, that rules preventing unlimited pay-for-play cash compensation had a procompetitive justification, and specifically held that it would allow rules designed to maintain the demarcation between college sports and a professional sports league where athletes are provided compensation unrelated to education and "very large salaries." *Alston*, 375 F. Supp. 3d at 1082. That aspect of this Court's post-trial decision was not overturned on appeal. *See In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1264–65 (9th Cir. 2020). There is thus no assurance that the class could obtain the type of extensive injunctive relief—yielding a 51 percent revenue share for Division I athletes—provided by the settlement through continued litigation.

Moreover, the *Alston* injunction, where the Court limited the cash compensation to $5,980 (the amount that the NCAA permitted for athletic achievement awards) further shows the risk that a litigated injunction could provide far less relief than what plaintiffs request. *See Alston*, 375 F. Supp. 3d at 1109-10 (post-trial order); Permanent Injunction, *Alston*, No. 14-md-02541, ECF No. 1163 (N.D. Cal. Mar. 8, 2019). The settlement here provides far more relief than the injunctions obtained in any of the prior athlete compensation cases against the NCAA, including *O'Bannon* and *Alston*, which were litigated through trial and judgment.

Additionally, if the settlement is approved, increased compensation could flow to college athletes as early as 2025. And given the likely extensive appellate process if this case were brought to trial, obtaining that relief as soon as possible without going through additional years of litigation strongly weighs in favor of approving this Settlement so that class members do not continue to leave their institutions without any relief. *See, e.g.*, *Stephens v. US Airways Grp., Inc.*, 102 F. Supp. 3d 222, 227 (D.D.C. 2015) ("'[T]he delay in providing relief to the class if this case were to be litigated is a factor strongly supporting the compromise reached by the parties.'" (quotation omitted)); *Trombley v. Nat'l City Bank*, 826 F. Supp. 2d 179, 195 (D.D.C. 2011) (same).

Finally, if future student-athletes believe that the NCAA's rules, as amended by this Settlement Agreement, continue to violate the law, they will have the opportunity to object to the Settlement Agreement. And in the unlikely event that future student-athletes wish to sue for

damages notwithstanding the challenges that such a lawsuit would have given the substantial additional benefits flowing from the injunctive settlement, they can do so, consistent with Paragraph 46 of the Settlement Agreement, by having a lawyer of their choosing sue.

**B.    Separate counsel is not required for Injunctive Relief and Damages Classes.**

To help respond to the questions the Court asked on this issue at the preliminary approval hearing, Class Counsel consulted with Professor Robert H. Klonoff, a renowned expert on class actions, including settlement approval and class conflicts. *See* Klonoff Decl., ¶¶ 4–14. His accompanying Declaration offers strong, additional confirmation that separate counsel was unnecessary (and undesirable) for the settlement of both the damages and injunctive relief claims in this action. Professor Klonoff explains that courts across the country—including the Second and Ninth Circuits and district courts within them—regularly approve settlements where the same attorneys negotiate injunctive relief and damages. *See* Klonoff Decl., ¶¶ 37–39. While there is diversity among class members, there are no conflicts "that go[] to the very heart of the litigation" and thus no impediment to counsel negotiating settlement on behalf of injunctive relief and damages members. *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prods. Liab. Litig.*, 895 F.3d 597, 608 (9th Cir. 2018).

Indeed, there is no *per se* rule against the same counsel representing both the damages and injunctive relief classes. *See Payment Card*, 827 F.3d at 235 (making clear it was *not* holding "that (b)(3) and (b)(2) classes necessarily and always require separate representation"). The Colorado Objectors know this: just last year, lead counsel for the Colorado Objectors successfully secured approval of a class action settlement in this District where they simultaneously negotiated terms for both injunctive relief and damages claims (without any indication that counsel took the prophylactic steps that Class Counsel adopted here). *Senne*, 2023 WL 2699972, at * 16 (N.D. Cal. Mar. 29, 2023), *aff'd* 2023 WL 4824938 (9th Cir. June 28, 2023).

Critically, the negotiation and terms of the settlement here—particularly the compartmentalized settlement negotiations structure that Professor Klonoff calls the "gold standard" to address potential conflicts, Klonoff Decl., ¶ 43 & n.52 (collecting authorities)— "provide structural assurance of fair and adequate representation." *Fata v. Pizza Hut of Am. Inc.*,

-16-

2016 WL 7130932, at *3 (M.D. Fla Oct. 31, 2016) ("[I]n particular, the extensive, arms-length negotiations performed separately by counsel on behalf of each Subclass, with the assistance of an experienced mediator, at least at the conditional certification stage, provide 'structural assurance of fair and adequate representation.'"); *see also, e.g.*, *Stephens v. Farmers Rest. Grp.*, 329 F.R.D. 476, 485 (D.D.C. 2019) (holding "that the absent Rule 23 class members were adequately represented" based on the "representations" that counsel "negotiated the settlement amounts for the [two groups] separately" and "the apparent reasonableness of the settlement terms").

Further, Professor Klonoff opines that because appointing separate counsel is merely *one option* to address potential conflicts—and a costly and risky one at that—the careful, phased negotiations implemented by the Parties here more than adequately addressed any potential divergence of interest between the injunctive relief and damages classes. *See* 1 McLaughlin on Class Actions § 4:45 (20th ed. 2023) ("Absent the kind of stark divergence of interests that is present in mass tort cases between present and future claimants, the district court has considerable discretion to decide whether appointment of separate counsel is required for a particular subclass.").

The concerns that animated the cases cited by the Colorado Objectors and discussed by the Court at the hearing—*Payment Cards*, *Amchem*, *Ortiz*, and *Literary Works*[16]—do not call for a different conclusion. Those courts indicated that separate counsel was needed because there was clear evidence that the rights and relief for some categories of class members had been traded away to benefit others.

As Professor Klonoff has identified, the out-of-Circuit authority the Colorado Objectors rely on to claim that the injunctive relief class required separate counsel had myriad factual

---

[16] Colorado Objectors also mentioned *Community Bank* and *Gonzalez* at the hearing, but these cases are not even remotely on point. The Third Circuit in *Community Bank* rejected a proposed settlement and remanded for further proceedings because the district court failed to conduct a proper analysis of alleged inter-class conflicts and purported inadequacies of class counsel's representation. *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 304–08 (3d Cir. 2010). The Circuit Court "stress[ed] that [it] does not hold that class counsel are necessarily inadequate representatives for the class (or any subclass that is created)." *Id.* at 308. And *Gonzalez* declined to approve an "indelibl[y] stain[ed]" settlement agreement. *Gonzalez v. CoreCivic of Tenn., LLC*, 2018 WL 4388425, at *5 (E.D. Cal. Sept. 13, 2018). There, class counsel agreed to release certain claims without securing any relief, and when the district court pointed out that discrepancy, the parties amended the settlement agreement to cosmetically allocate $100,000 of the "already agreed-to total settlement amount" to those claims. *Id.*

distinctions from this case, rendering their conclusions inapplicable here. Klonoff Decl., ¶¶ 46–51. These distinctions include the facts that: (i) there was no indication that counsel in *Payment Card* made any effort to protect against (or even acknowledge) the myriad conflicts that permeated their settlement negotiations, and (ii) there was strong evidence that class counsel's simultaneous negotiations of injunctive relief and damages settlements actually resulted in them trading valuable injunctive relief for enhanced damages. *Id.* ¶ 47. The adverse results for the Injunctive Relief Class in *Payment Card* were at least threefold—the *Payment Card* settlement (i) left vast portions of the injunctive class with worthless relief which terminated after a fixed period, (ii) while still binding them to a *perpetual* release of injunctive and damages claims, (iii) against *all* Visa and Mastercard rules, including those unchallenged in the litigation. *See generally Payment Card*, 827 F.3d at 240.

None of these problems exist here. The injunctive relief that the parties negotiated is the opposite of worthless; it opens the door to *billions* of dollars in new compensation for the Injunctive Relief Class every year. The settlement does not bind injunctive relief class members to a perpetual release of claims. And the settlement does not release claims against unchallenged NCAA rules— for example, the settlement does not impact employment law claims. And this is all separate and apart from the billions of dollars in relief obtained for the damages classes through separate negotiations.

The absence of every *Payment Card* indicia of conflicts and tradeoffs between classes did not happen by accident—as Professor Klonoff explains, it was the result of the structure of the negotiations—and Class Counsel took great pains, with *Payment Card* at the front of their minds, to fully and finally negotiate the injunctive relief *before* negotiating damages to fully protect the interests of both the injunctive relief and damages classes. Klonoff Decl., ¶¶ 40–45. Against that backdrop, the Court should be able to easily conclude that Class Counsel did not trade injunctive relief benefits for damages (or vice versa). *Id.* Indeed, the separate negotiation structure ensured that there was no such trading between the benefits obtained for each class. *Id.*

As for *Ortiz* and *Amchem*, those cases involved attempts to settle millions of then-present and future mass tort damages claims covering decades of asbestos exposure. *See Ortiz v. Fireboard Corp.*, 527 U.S. 815, 823 (1999); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). This

"elephantine mass of asbestos cases," and the attempts to resolve them through class settlements, led the Supreme Court to proclaim that *Ortiz* and *Amchem* "suffice to show how [asbestos] litigation defies customary judicial administration and calls for national legislation." *Ortizi*, 527 U.S. at 821. The primary (though not only deficiency) in these cases was that they attempted to settle pending damages claims and anticipated future damages claims, which the Supreme Court held could not be fairly compensated through a single, joint fund. *Id.* at 842–44. Neither case involved injunctive relief. *See generally Ortiz*, 527 U.S. 815; *Amchem Prods.*, 521 U.S. 591. This makes them entirely inapposite here where no future damages claims have been released.

Lastly, in *Literary Works*, which did not involve injunctive relief either, a single settlement fund was split across class members with three categories of damages. 654 F.3d. 242, 246 (2d Cir. 2011). But, if damages claims for the first two categories—which were deemed to have a higher chance of recovery in litigation—exceeded the fund total, claimants in the third category would receive nothing. *Id.* The court had no assurance that class counsel did anything to account for that divergent interest when it negotiated on behalf of the entire class. *Id.* Here by contrast, each category of class members' damages was settled for a separate amount reflecting the different litigation risks and damages calculations. Moreover, class members' recovery for one category of damages is entirely independent of recovery for the other damages categories.[17]

## C.   Separate counsel is not required for the future members of the Injunctive Relief Class.

For similar reasons, separate counsel was not required for future members of the injunctive relief class. As an initial matter, there is no requirement that there be a separate class representative

---

[17] In this case, unlike in *Literary Works*, each category of damages claim will be compensated through a separate fund and each class member will recover according to a neutral formula designed to reflect the values of each class member's claims. Courts routinely approve settlements where "different payment levels reflect the relative value of different claims." *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico*, 910 F. Supp. 2d 891, 918 (E.D. La. 2012), *aff'd sub nom* 739 F.3d 790 (5th Cir. 2014) (courts "often" allow unitary counsel to represent classes with "different payment levels reflect[ing] the relative value of different claims. . . . Such rigid formalism [as requiring separate subclasses with separate counsel for every potential 'conflict' created by the different value of class claims] would produce enormous obstacles to negotiating a class settlement with no apparent benefit, is not required and could even reduce the negotiating leverage of the class."); *see also* 4 Newberg and Rubenstein on Class Actions § 13:56 (6th ed.) ("The inference that differential treatment is the sign of an unfair settlement can be rebutted by evidence that the class members should be treated differently because they are situated differently.").

for future athletes. *See, e.g.*, *Staton v. Boeing Co.*, 327 F.3d 938, 948 (9th Cir. 2003) (approving injunctive relief settlement class of Boeing employees including future employees, but rejecting the attorneys' fee provisions of the settlement). Rule 23 mandates only that class representatives "possess the same interest and suffer the same injury" as absent class members. Class Cert. Order (ECF No. 387), at 11 (quoting *Amchem Prods.*, 521 U.S. at 625–26). Sedona Prince and Nya Harrison easily fit that bill for both current and future college athletes. They are subject to the same NCAA and Conference Defendant rules as future athletes that limit or prohibit permissible forms and amounts of compensation and benefits.

Nor does the fact that the Injunctive Relief Settlement extends for ten years render the class representatives inadequate. Courts have often approved injunctive class settlements of a similar length, particularly in cases resolving the class claims of athletes in the sports industry, where long-term solutions are often desirable. *See* Mot. at 22–23 (collecting authorities).[18] The class representatives secured injunctive relief previously unimaginable in college sports—*e.g.*, revenue sharing comparable to professional athletes, uncapped scholarships and neutral arbitration—for themselves *and* future athletes. And, unlike prior long-term class action settlements for athletes (*e.g.*, *White*, *Robertson*, and *Bridgeman*), here, future athletes will receive notice of the settlement upon entering college and will have the opportunity to object to the continuation of the settlement. *Id*. at 14–15. Put differently, if, at some point in the future, any class member wishes to argue that the settlement is no longer fair to the class, the Court will have the opportunity to consider that objection at that time. In all events, in the unlikely event that future student-athletes wish to sue for damages notwithstanding the challenges that such a lawsuit would have given the substantial additional benefits flowing from the injunctive settlement, they can do so, consistent with

---

[18] The Colorado Objectors' assertion that the narrow abrogation of *White* by the Supreme Court in *Amchem* "calls into question that entire line of cases" is a red herring. Tr. 57:23–58:2. In *Amchem*, the Supreme Court criticized *White* for using an incomplete analysis to reject objectors' contentions that service awards and class counsel's past work on similar cases rendered them inadequate to represent the class. *Amchem*, 521 U.S. at 618; *White v. NFL*, 41 F.3d 402, 408 (8th Cir. 1994). The Supreme Court did not criticize the substantive terms or length of the *White* settlement. Notably, the *White* settlement was renewed and extended, with court oversight, three times (in 2000, 2002, and 2006) after *Amchem* was decided. *White v. NFL*, 756 F.3d 585, 589 (8th Cir. 2014).

Paragraph 46 of the Settlement Agreement.[19] *Id.* at 11. The settlement thus protects the interests of future class members, while also giving them the opportunity to receive tens of billions of dollars from revenue sharing with Division I schools, made possible by this landmark injunctive relief settlement. *See Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1124 (9th Cir. 2020) ("the settlement's benefits must be considered by comparison to what the class actually gave up by settling").

**D.      Plaintiffs have adequate class representatives for the scholarship claims.**

Plaintiffs stand by their position that Grant House and Nya Harrison adequately represent equivalency sport athletes who received partial scholarships and have claims challenging the NCAA's scholarship limits. As explained in Plaintiffs' Reply Brief, Mr. House and Ms. Harrison are adequate class representatives, with standing to bring these claims because they each participated in an equivalency sport, neither of them received a full athletic scholarship throughout their college career,[20] and they both allege that they were injured by Defendants' anticompetitive conduct. Third Am. Compl. ¶¶ 27, 75.

Nevertheless, to avoid any doubt about standing or adequacy of the named plaintiffs, Plaintiffs also move to add Nicholas Solomon as an additional class representative. As explained in Plaintiffs' proposed amended complaint, Mr. Solomon is a former college lacrosse player who competed for the University of North Carolina – Chapel Hill and Georgetown University from 2018 to 2023. Third Am. Compl. ¶ 76. During the undergraduate years he attended UNC, Mr. Solomon received a partial athletic scholarship but had to pay the difference to cover the full cost of his education. Third Am. Compl. ¶ 78. To the extent there is any concern about needing a class representative who received a partial athletic scholarship and did not receive any other

---

[19] Nor is there any basis to reject the settlement because some restrictions on athlete compensation remain in place. "So long as the conduct perpetuated under a settlement agreement does not per se violate antitrust law, the settlement may be approved, even if the perpetuated conduct might not withstand scrutiny under the rule of reason." *In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th 1070, 1089–90 (11th Cir. 2023) *cert denied* 144 S. Ct. 2686 (2024). Here, this Court has already held that the rule of reason applies to the NCAA's restraints. The rule of reason would likewise apply to the less restrictive "pool" system that is an agreed-to compromise in the injunctive relief settlement and enables the class members to receive nearly $20 billion in new benefits over the next ten years.

[20] Plaintiffs have submitted a proposed amended complaint which clarifies that Mr. House received a partial athletic scholarship and partial academic scholarship and Ms. Harrison did not receive an athletic scholarship. Third Am. Compl. ¶¶ 17, 67.

supplemental scholarship aid, Mr. Solomon meets those criteria. He alleges that he "has experienced anticompetitive harm due to the NCAA's restraints on athletic scholarships, which artificially limited his ability to earn an athletic scholarship and the amount thereof," Third Am. Compl. ¶ 86, and thus has standing to bring claims challenging those restraints. Accordingly, Plaintiffs request that Mr. Solomon be appointed as a class representative for the Additional Sports Class Declaratory and the Injunctive Relief Class. Third Am. Compl. ¶¶ 312, 318. Class Counsel intend to seek a service award for Mr. Solomon in recognition of his contribution to the case.

**E.      Plaintiffs have modified the *House* notice and claims documents in line with this Court's directions.**

Plaintiffs have modified the notice documents to address the Court's concerns expressed during the Preliminary Approval hearing on September 5, 2024. Specifically, Plaintiffs have clarified or added language regarding the following: (1) the potential for modification of time and date of the Final Approval Hearing, (2) the chance (but not guaranteed) opportunity to speak at Final Approval Hearing if a written objection has been submitted, (3) the class definition for each class, and (4) more detail explaining damages, distribution, and payment. Plaintiffs made these changes, where applicable, in both *House* and *Hubbard* notice documents. *See e.g.*, Berman Supp. Decl., Ex. 3-6, 8-11. These documents have been filed and submitted as new word versions to the Court to provide an opportunity for further revisions. In addition, the Court requested Plaintiffs check for inaccuracies—noting an incorrect date in the *House* claim form. Upon review, this date is referencing the time-period that athletes are eligible for damages for compensation for athletic services, not for NIL, and therefore based on the statute of limitations that period does start in 2019. Berman Supp. Decl., Ex. 6.

Plaintiffs additionally would like to provide the Court with a link to preview the settlement website that is designed to offer accessible, important information upon viewing by class members. For example, the website will automatically push the most frequently viewed questions to the front page for class members to get answers quickly. You can see it here: College Athlete Compensation. This is a preview link that will be disabled when the website goes live

with the correct link at the time the notice program begins. All language on the website will be updated to align with the notice documents approved by the Court.

The website has been specifically designed to appeal to this Settlement Class demographic and encourage participation. The website's focus is a primarily mobile friendly design utilizing imagery over text, plain language over complex legalese and interactive features more attuned to a social media website than a class action settlement. A key characteristic of the Settlement Class is their generational age group. Plaintiffs' belief is that we have a very minimal amount of time to engage these Class members once they visit the website and entice them to not only participate but share with their teammates. This website is a first-to-market example of a consumer-friendly website designed to engage more directly and clearly with class members.

## F.    The Amended Settlement Agreement and Third Amended Complaint clarify the scope of the release.

At the hearing, the Court raised two points regarding the scope of the release of future claims. The Amended Settlement Agreement and the Third Amended Complaint resolve these concerns.

*First*, the Court asked whether the Settlement purports to release: the *Choh* claims contesting the Ivy League's preexisting rule against athletic scholarships that are permitted by NCAA rules;[21] labor law claims like those raised in *Johnson*;[22] and Title IX claims. Tr. at 29:2–21. As Plaintiffs' counsel noted at the hearing, and as defense counsel agreed, the Settlement does not release any such claims. *Id.* at 30:19–31:17. Nevertheless, in response to the Court's concerns, the Amended Settlement Agreement affirmatively clarifies that these claims—defined therein as "Unreleased Claims"—are not released by the Settlement. *See* Am. SA ¶ 1(vv); *see also id.* ¶¶ 1(oo), 1(pp).

*Second*, the Court posited that the release in the Settlement may encompass Conference Defendants' rules that were not challenged in the Second Amended Complaint. *See* Tr. 108:13–109:3. Specifically, the Court queried whether the Second Amended Complaint only challenged

---

[21] *See Choh v. Brown et al.*, No. 3:23-cv-00305-AWT (D. Conn.).

[22] *Johnson v. National Collegiate Athletic Association*, No. 2:19-cv-05230 (E.D. Penn.).

the Conference Defendants' rules insofar as "they incorporate objectionable NCAA rules." *See id.* at 108:15–18. It did not—the Second Amended Complaint broadly challenged the "Conference Defendants' restraints that prohibit, cap, or otherwise limit the compensation that student-athletes may receive . . . including for the use of their names, images, likenesses . . ., as well as compensation for their athletic services." Second Am. Compl. (ECF 448-1), ¶ 96; *see also id.* ("Plaintiffs challenge the NCAA and Conference Defendants' restraints limiting the number of scholarships available to student-athletes"). As a result, the release in the Settlement properly covers the rules challenged in the Second Amended Complaint. The Third Amended Complaint contains revised language clarifying the challenged Conference rules, which are the same as those addressed by the Settlement release. *See, e.g.*, Third Am. Compl. ¶ 127.

### III.   CONCLUSION

For all the foregoing reasons, in addition to those expressed in Plaintiffs' prior briefing, Plaintiffs respectfully request that the Court grant preliminary approval of the proposed Settlement Agreement and direct notice to the Settlement Classes.

1    DATED: September 26, 2024

2    By  _/s/ Steve W. Berman_                     By  _/s/ Jeffrey L. Kessler_
3    Steve W. Berman (*pro hac vice*)              Jeffrey L. Kessler (*pro hac vice*)
     Emilee N. Sisco (*pro hac vice*)              David G. Feher (*pro hac vice*)
4    Stephanie Verdoia (*pro hac vice*)            David L. Greenspan (*pro hac vice*)
     Meredith Simons (SBN 320229)                  Adam I. Dale (*pro hac vice*)
5    **HAGENS BERMAN SOBOL SHAPIRO LLP**           Sarah L. Viebrock (*pro hac vice*)
     1301 Second Avenue, Suite 2000                Neha Vyas (*pro hac vice*)
6    Seattle, WA 98101                             **WINSTON & STRAWN LLP**
     Telephone: (206) 623-7292                     200 Park Avenue
7    Facsimile: (206) 623-0594                     New York, NY 10166-4193
8    steve@hbsslaw.com                             Telephone: (212) 294-6700
     emilees@hbsslaw.com                           Facsimile:  (212) 294-4700
9    stephaniev@hbsslaw.com                        jkessler@winston.com
     merediths@hbsslaw.com                         dfeher@winston.com
10                                                 dgreenspan@winston.com
11   Benjamin J. Siegel (SBN 256260)               aidale@winston.com
     **HAGENS BERMAN SOBOL SHAPIRO LLP**           sviebrock@winston.com
12   715 Hearst Avenue, Suite 300                  nvyas@winston.com
     Berkeley, CA 94710
13   Telephone: (510) 725-3000                     Jeanifer E. Parsigian (SBN 289001)
     Facsimile:  (510) 725-3001                    **WINSTON & STRAWN LLP**
14   bens@hbsslaw.com                              101 California Street, 34th Floor
                                                   San Francisco, CA 94111
15   Jeffrey L. Kodroff (*pro hac vice*)           Telephone: (415) 591-1000
16   Eugene A. Spector (*pro hac vice*)            Facsimile:  (415) 591-1400
     **SPECTOR ROSEMAN & KODROFF, PC**             jparsigian@winston.com
17   2001 Market Street, Suite 3420
     Philadelphia, PA 19103                        *Class Counsel for Plaintiffs*
18   Telephone: (215) 496-0300
19   Facsimile:  (215) 496-6611
     jkodroff@srkattorneys.com
20   espector@srkattorneys.com

21   *Class Counsel for Plaintiffs*

22

23

24

25

26

27

28

1

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)

2

Pursuant to Civil Local Rule 5-1(i)(3), the filer of this document attests that concurrence in

3

the filing of this document has been obtained from the signatories above.

4

By: /s/ *Steve W. Berman*

5

STEVE W. BERMAN

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28