Michael P. Lehmann
CA Bar No. 77152
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel. No.: (415) 633-1908
mlehmann@hausfeld.com

Michael D. Hausfeld*
Nicholas Murphy*
Theodore DiSalvo*
**HAUSFELD LLP**
888 16th Street, NW, Suite 300
Washington, DC 200006
Tel. No.: (202) 540-7200
Fax No.: (202) 540-7201
mhausfeld@hausfeld.com
nmurphy@hausfeld.com
tdisalvo@hausfeld.com

*Pro Hac Vice forthcoming.

*Counsel for Objectors*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## (OAKLAND DIVISION)

| | |
|---|---|
| **IN RE: COLLEGE ATHLETE NIL LITIGATION** | Case No. 4:20-cv-03919-CW |
| | **OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS ON BEHALF OF CLASSES OF PAST, CURRENT AND FUTURE NCAA COLLEGE ATHLETES** |
| | Hon. Claudia Wilken |

1
2
**TABLE OF CONTENTS**

3  I.     INTRODUCTION ................................................................................................ 1

4  II.    ARGUMENT ...................................................................................................... 5

5      A.    The Damages Amount In The DCS Is Too Low. ................................... 5

6      B.    The Revenue Sharing Cap In The IRCS Is Unlawful And Unsupported. ........... 6

7          1.    The Terms Of The IRCS Violate Applicable Federal Antitrust Law ....... 7

8          2.    The Terms Of The IRCS Also Violate Applicable State Laws. ............... 8

9          3.    There Is No Reasonable Basis For A 22% Cap ........................................ 9

10         4.    The Proposed Revenue Sharing Is Illusory and Insufficient. ................ 11

11         5.    The Proposed Damages Payment Structure Is Unfair To Smaller
12             Member Institutions. ............................................................................. 13

13     C.    The IRCS Is Intended To Restrict Unfairly NIL Collectives. ............................ 14

14     D.    The NCAA Is Using The Settlements As A Stalking Horse For Federal
15         Legislation Granting It Antitrust Immunity And State Law Preemption. .......... 20

16     E.    The NCAA Is Also Using The IRCS To Promote Legislation Denying
17         Employee Status To College Athletes. .............................................................. 22

18 III.    CONCLUSION ................................................................................................ 25

19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alston v. NCAA,*
  141 S.Ct. 2141 (2021) ....................................................................................7

*In re Smith,*
  926 F.2d 1027 (11th Cir. 1991) ......................................................................9

*Jackson Purchase Rural Elec. Co-op. Ass'n v. Loc. Union 816,*
  646 F.2d 264 (6th Cir. 1981) ..........................................................................9

*Johnson v. NCAA,*
  108 F.4th 163 (3d Cir. 2024) .....................................................................2, 23

*Keith v. Volpe,*
  118 F.3d 1386 (9th Cir. 1997) ......................................................................8, 9

*League of Residential Neighborhood Advocs. v. City of Los Angeles,*
  498 F.3d 1052 (9th Cir. 2007) ......................................................................8, 9

*O'Bannon v. NCAA,*
  7 F.Supp.3d 955 (N.D. Cal. 2014) ..................................................................1

*State of Tennessee and Commonwealth of Virginia v. NCAA,*
  2024 WL 755528 (E. D. Tenn. Feb. 23, 2024) ..........................................4, 15, 16

**Statutes**

29 U.S.C. § 203(e)(1) ....................................................................................23

**Rules**

Fed. R. Civ. P. 23(e) ........................................................................................1

**Other Authorities**

2024 Virginia House Bill No. 1505 .................................................................17

Compl. (Sept. 9, 2024) in State of South Dakota, et al. v. NCAA, 05-CIV-24-00033 (S. Dakota
  Circuit Court Third Judicial Circuit) ..............................................................2

David Steele, NCAA Must Give Up Control To Reach Suitable NIL Settlement, Law 360
  (Sept. 18, 2024) ....................................................................................3, 7, 23

Decision and Direction of Election, Trs. Dartmouth Coll., No. 01-RC-325633 (NLRB Feb. 5, 2024) ............................................................................................... 2, 23

Diana L. Moss & Jason Gold, Federal Legislation, Not the NCAA Antitrust Settlements, Should Drive a New Model of College Sports (July 3. 2024) ............................................. 3, 25

Governor Brian Kemp, Exec. Order of Sept. 17, 2024, Regarding Fairness to Georgia's Student-Athletes in Compensation for their Name, Image, and Likeness ................. 2, 16, 17

Letter by Governors of the States of Idaho, Montana, North Dakota, South Dakota and Wyoming to NCAA (Sept. 17, 2024) .................................................................. 2, 14

Michael McCann, Congress To Consider Bill Declaring College Athletes Are Not Employees, Sportico (June 12, 2024) .................................................................... 3, 24

NCAA, Interim Name, Image and Likeness Policy Guidance Regarding Third Party Involvement (2022) ..................................................................... 15, 16, 18, 19

NCAA, NCAA Division I Institutional Involvement in a Student-Athlete's Name, Image and Likeness Activities (Oct. 26, 2022) ...................................................... 3, 15

NCAA, DI Council Approves NIL Reforms, Permits School Assistance with NIL Activity (Apr. 17, 2024) ......................................................................................... 16

Nicole Auerbach & Justin Williams, What to Know about House v. NCAA Settlement and a Historic Day for College Sports, The Athletic (May 24, 2024) ............................ 10

Patrick O'Rourke, NCAA Athlete Revenue Sharing, Scholarships & NIL Collectives by School (2024) ...................................................................................... *Passim*

Patrick O'Rourke, NIL Collectives – NCAA Athlete Revenue Sharing, Scholarships, NIL Collectives by School (2024) ..................................................................... 17

Professors J. Holden, M. Edelman, & M. McCann, (Still) Anticompetitive College Sports, 66 B.C. L. Rev. __ (Forthcoming 2025) ......................................... 3, 10, 20, 24

Protect the Benefits for Athletes and Limit Liability Act of 2024, H.R. 8304, 118th Cong. (2023) ......................................................................................... 21

Protecting Student Athletes' Economic Freedom Act of 2024, H.R. 8534, 118th Cong. (2023) .. ...................................................................................................... 24

Steve Berkowitz, Two U.S. House members introduce bill that would grant NCAA legal protection, USA Today (May 8, 2024) ........................................................... 21

Yaman Desai, Proposed NIL Deal Leaves NCAA Antitrust Liability Door Open, Law 360 (Aug. 2, 2024) .................................................................................... 3, 10

OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS ON BEHALF OF
CLASSES OF PAST, CURRENT AND FUTURE NCAA COLLEGE ATHLETES

## I.     INTRODUCTION

Pursuant to Fed. R. Civ. P. 23(e), Hausfeld LLP ("Hausfeld"),[1] on behalf of seven past, present, or future Division I college athletes (Liam Anderson, Jordan Bohannon, Kaira Brown, Talanoa Ili, Ezekiel Larry, Dyson McCutcheon, and R.J. Sermons) (collectively, "Objectors") hereby files objections to multiple aspects of Plaintiffs' Amended Motion for Approval of settlements for three proposed amended Damage Classes ("DCS") and for a proposed Injunctive Relief Class ("IRCS") (collectively, "Settlements"). The particulars regarding each of the Objectors are described in Appendix A.

On September 5, 2024, this Court held a preliminary approval hearing on the Settlements. It denied such approval, citing a number of concerns discussed herein that the present amendments do not explicitly address (including the conflict of interest created by having Class Counsel actively support the efforts of the National Collegiate Athletic Association ("NCAA") to obtain federal legislation granting it antitrust immunity and preemption of state laws). Several of the concerns underlying this objection were not raised by the parties before the Court and some are based on disclosures or criticisms that surfaced *after* the hearing.

The Settlements involve illusory, contradictory and overreaching terms; approval of them should be denied. The damages for participants in the DCS are not 67.4% of actual damages for failure to compensate college athletes (sometimes referred to as "student-athletes") for use of their Names, Images, and Likenesses ("NIL"), as Class Counsel claimed. ECF No. 450 at 8. Instead, based on NIL payments that actually have been made since 2021, that claim significantly

---

[1] Hausfeld is uniquely qualified to raise these objections. It was lead counsel for the class of college athletes in the seminal antitrust case that led the way to the creation of the current NIL market. *See O'Bannon v. NCAA*, 7 F.Supp.3d 955 (N.D. Cal. 2014), *aff'd in part and rev'd in part*, 802 F.3d 1049 (9th Cir. 2015), *cert. denied*, 580 U.S. 815 (2016).

undercounts monetary losses for the eight-year DCS period. As for the IRCS, the claimed revenues contemplated to be shared are not, as Class Counsel now tout, the same as what professional athletes receive. ECF No. 534 at 1, 7. Instead, in addition to being subject to an agreement that violates federal and state laws (as opposed to collective bargaining), the revenue sharing is subject to the absolute discretion of the NCAA and Division I colleges, excludes payments that should be treated as revenue, is unfairly capped, and benefits unfairly the top college football and basketball teams in the Power 5 conferences.

Indeed, since the September 5 hearing, much has happened. One state has sued the NCAA over the Settlements,[2] governors of five states have challenged it on behalf of Member Institutions (as defined below) in those states,[3] and the governor of Georgia issued an Executive Order fully allowing NIL payments to be made.[4] The Settlements ignore prior rulings of the Third Circuit and the National Labor Relations Board ("NLRB") that college athletes can be deemed to be "employees" for the purposes of the Fair Labor Standards Act ("FLSA")[5] and the National Labor Relations Act ("NLRA"). And the NCAA and Class Counsel have ignored economic studies and articles by legal commentators--many issued after the preliminary approval hearing--that have raised concerns about the flaws of the arguments presented to the Court concerning the fairness of

---

[2] *See* Compl. (Sept. 9, 2024) in *State of South Dakota, et al. v. NCAA*, 05-CIV-24-00033 (S. Dakota Circuit Court Third Judicial Circuit) (alleging that the Settlement unfairly favors large universities and disfavors female competitors) ("*SD Suit*") (attached as Appendix B).

[3] Letter by Governors of the States of Idaho, Montana, North Dakota, South Dakota and Wyoming to NCAA (Sept. 17, 2024) ("Governors' Letter") (attached as Appendix C).

[4] Governor Brian Kemp, Exec. Order of Sept. 17, 2024, Regarding Fairness to Georgia's Student-Athletes in Compensation for their Name, Image, and Likeness (attached as Appendix D).

[5] *Johnson v. NCAA*, 108 F.4th 163 (3d Cir. 2024) (*"Johnson"*) (attached as Appendix E); Decision and Direction of Election, Trs. Dartmouth Coll., No. 01-RC-325633 (NLRB Feb. 5, 2024) ("*Dartmouth*"), *appeal pending* (attached as Appendix F).

**OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS ON BEHALF OF CLASSES OF PAST, CURRENT AND FUTURE NCAA COLLEGE ATHLETES**

the Settlements.[6] These studies and commentaries have explained the illusory nature of the proposed revenue sharing plan in the IRCS.

At the hearing denying preliminary approval, the Court was acutely aware of and concerned about the myriad problems raised by the Settlements' proposal to eliminate NIL Collectives as they presently exist. Objectors share those concerns, which have been amplified by new information that has come out since the hearing concerning the economic impact of NIL Collectives on the IRCS and the true value of that market for college athletes.

Moreover, the Settlements' treatment of future college athletes is also very troubling. Future college athletes have a different interest than current college athletes and many members of the DCS. Yet, the Settlements seek to bind future college athletes to a ten-year contract that they played no role in negotiating, in a market that, but for the IRCS, would be unrestrained. Contrary to the best interests of future college athletes, the IRCS has united Class Counsel with Defendants in a quest to deny the rights of such athletes by seeking to secure antitrust immunity and preemption of state laws for the NCAA from the United States Congress that conflicts with Class Counsel's obligations.

Since the hearing, legal scholars and accounting professionals have highlighted the numerous ways the Settlements violate basic tenets of collective bargaining, applicable antitrust

---

[6] *See* Professors J. Holden, M. Edelman, & M. McCann, *(Still) Anticompetitive College Sports*, 66 B.C. L. Rev. __ (Forthcoming 2025) ("Holden Article") (attached as Appendix G); David Steele, *NCAA Must Give Up Control To Reach Suitable NIL Settlement*, Law 360 (Sept. 18, 2024) ("Steele Article")(attached as Appendix H); Yaman Desai, *Proposed NIL Deal Leaves NCAA Antitrust Liability Door Open*, Law 360 (Aug. 2, 2024) ("Desai Article") (attached as Appendix I); Patrick O'Rourke, *NCAA Athlete Revenue Sharing, Scholarships & NIL Collectives by School* (2024) ("O'Rourke Report") (attached as Appendix J), prepared by Patrick O'Rourke, a Certified Public Accountant who operates the website https://scholarshipstats.com/); Diana L. Moss & Jason Gold, *Federal Legislation, Not the NCAA Antitrust Settlements, Should Drive a New Model of College Sports* (July 3. 2024) ("Moss-Gold Article") (attached as Appendix K).

legal principles, and/or accounting guidelines. The antitrust laws do not permit the NCAA and the Power 5 conferences to band together to fix the compensation of college athletes without the benefit of collective bargaining. Yet, that is precisely what they have sought to do here by substituting one restraint (no pay at all for college athletes), with a slightly modified restraint (capped pay achieved via unlawful cooperation among competitors).

In addition, the parties before the Court ignore the fact that the terms of the Settlements violate federal law[7] and are directly contrary to numerous state NIL laws that protect the interests of college athletes.

Moreover, a primary goal underlying the Settlements is the NCAA's desire to use them as a stalking horse to finally obtain the antitrust immunity it has long sought (and been denied) from the United States Congress. As noted above, however, the NCAA intends to *use Class Counsel to jointly recommend such immunity* with the blessing of this Court, despite the obvious conflict thereby created. This is entirely unheard of in the history of sports antitrust litigation, particularly given the utter and complete lack of any collective bargaining between the NCAA and college athletes.

The concerns raised in these complaints, orders, judicial decisions and articles will be discussed in this filing. Hausfeld's clients also join in the objections raised by the plaintiffs in the *Fontenot* litigation (ECF No. 473).

---

[7] *See State of Tennessee and Commonwealth of Virginia v. NCAA*, No. 3:24-CV-0003-DCLC-DCP, 2024 WL 755528 (E. D. Tenn. Feb. 23, 2024) ("*Tennessee* Case", attached as Appendix L) (now filed on behalf of the states of Tennessee, Florida, New York, and Virginia, and the District of Columbia; *see* Am. Compl., ECF No. 52, attached as Appendix M)).

## II. ARGUMENT

### A. The Damages Amount In The DCS Is Too Low.

Class counsel and their expert estimated that damages caused by the NCAA's refusal to permit college athletes to be compensated for use of their NIL was $2.694 billion for the period from June 15, 2016 to September 15, 2024—a period of over eight years. The DCS participants will receive for that period $1.976 billion for their NIL damages and another $600 million in additional compensation, primarily for athletic services claims; the former figure was said by Class Counsel in their initial motion for preliminary approval to represent 67.4% of NIL damages. ECF No. 450 at 8.

There is reason to believe that the full amount of NIL damages during that eight-year period is significantly understated, as reflected in what happened in the real world commencing in 2021, when state laws encouraged the opening of the market for college athlete NILs and the NCAA began to permit compensation to college athletes for the use of them.

One source of data on this topic comes from Opendorse. According to its website, it "is the leading athlete marketplace and NIL technology company, providing technology and services to the athlete endorsement industry. We serve the full lifecycle of supporting athletes: educating, assessing, planning, sharing, creating, measuring, tracking, disclosing, regulating, listing, browsing, booking, and more."[8]

Each year, Opendorse does projections for the amount of such NIL compensation to college athletes. Its most recent publication on the topic, published in 2024, *NIL At 3 – The Annual Opendorse Report*, available at https://biz.opendorse.com/wp-content/uploads/2024/07/NIL-AT-3-The-Annual-Opendorse-Report-1.pdf. (attached as Appendix N). Page 3 of the Opendorse

[8] https://opendorse.com/about/.

Report lists its market projections going back to 2021-22 and continuing to Year 5 (July 1, 2025-June 30, 2026). The estimates for years 4 and 5 are based on data ending as of June 7, 2024. Here is what they show:



If college athletes were eligible to receive such payments starting in 2016 and if the trend in the but-for world for NIL Collective spending from 2016 onward mirrored the actual trend from 2021-24, then college athletes would have earned *at least* $6.4 billion from NIL Collectives from 2016-24, accounting for inflation. This $3.8 billion differential is not accounted for in the DCS.

### B.  The Revenue Sharing Cap In The IRCS Is Unlawful And Unsupported.

The cap on revenue sharing proposed by the Class Counsel and the NCAA is anticompetitive and has no pro-competitive justification. Specifically, the IRCS provides that future college athletes will share in a so-called "pool" of revenue earned each year by "Member Institutions", which are defined as "any college, school, or university that is a member in any sport of NCAA Division I and/or a Conference Defendant, together with any entity owned, controlled, funded, or operated by said college, school, or university (or any division or department thereof)." ECF No. 535-2 at Article 1, Section 1(l). These institutions can operate as "marketing agents" for college athletes. *Id*. Art 2, Section 2. The benefits pool is 22% of "Average Shared revenue" (capped at what is estimated to be $21 million per school) and may stay that way throughout the

ten-year term of the injunction period. See *id*. Article 3, Section 1(f). Benefits to college athletes (including Alston awards, new athletic scholarships, proceeds of third party arrangements, and other personal benefits) count against the Pool. *Id*. Article 3, Section 3.

### 1.   The Terms Of The IRCS Violate Applicable Federal Antitrust Law.

The terms of the IRCS on its face violate existing federal antitrust law. As Justice Brett Kavanaugh said in his concurring opinion in *Alston v. NCAA*, 141 S.Ct. 2141, 2167-68 (2021) ("*Alston*"), "*[p]rice-fixing labor is price-fixing labor. And price-fixing labor is ordinarily a textbook antitrust problem* because it extinguishes the free market in which individuals can otherwise obtain fair compensation for their work. …Businesses like the NCAA cannot avoid the consequences of price-fixing labor by incorporating price-fixed labor into the definition of the product." (Emphases added). The IRCS contemplates collusion among Division I schools and conferences. Thus, in order for it to function, a grant of antitrust immunity from the United States Congress is required, as discussed in Article 7, Section 1 of the provisions. Without such immunity, *the Settlements would be unlawful.*

The myriad antitrust problems posed by the Settlements have been noted by legal commentators who have been highly critical of it. For example, in the Steele Article referenced previously, Kate Roggio Buck, a partner at McCarter & English LLP and its NCAA compliance expert, was quoted as follows:

> It's like, Wow, big settlement, we're gonna pay athletes a lot of money, but we're still gonna limit the fair market competition, essentially… They say they want athletes to be paid, they want athletes to be paid fair market value, they're supporting athletes and all of that, but it seems that they're trying to leave it to themselves to decide what fair market value is.

In her view, the IRCS is nothing but a subterfuge because "[t]hat's the crux of all this in the first place… There has to be a legitimate release of that control, and fair market has to truly mean fair

market."  Rather, "the NCAA is sending the message that it will operate as it always has: 'We're going to repaint it. It's going to look completely different, but it's actually still the same structure.'"

Marc Edelman ("Edelman"), a law professor at Baruch College's Zicklin School of Business, voiced similar concerns: "[s]imply trying to put new restraints into practice via settlement that restrict free market competition for college athlete services, and that at the same time are not collectively bargained, is not a viable path."

### 2.   The Terms Of The IRCS Also Violate Applicable State Laws.

It is well-settled that a federal settlement cannot trump contrary state laws. *See, e.g., League of Residential Neighborhood Advocs. v. City of Los Angeles*, 498 F.3d 1052, 1055 (9th Cir. 2007) ("*LRNA*") (explaining that "[a] federal consent decree or settlement agreement cannot be a means for state officials to evade state law."); *Keith v. Volpe*, 118 F.3d 1386, 1393 (9th Cir. 1997) ("*Keith*") (holding that state officials "could not agree to terms which would exceed their authority and supplant state law.").  Here, the terms of the IRCS are directly contrary to numerous state laws that expressly prohibit the limitations on NIL and NIL Collectives this Settlement seeks to impose. *See* Appendix O (summarizing these state laws). Significantly, however, a federal settlement is not part of the Constitution, nor is it a law of the United States to which the Constitution's Supremacy Clause applies.

The parties' only proffered solution is to ask for "preemption of any state law existing before or as of the date of Final Approval in conflict with this Injunctive Relief Settlement." ECF No. 535-2, Article 7, Section 1 of the ICRS. Should the Court decline to grant this request, the IRCS is unlawful. Courts, including those in the Ninth Circuit, have repeatedly found that efforts to override state laws through a settlement are improper and invalidate the terms of the settlement

agreement as unenforceable and/or void against public policy.[9] This is because such courts have long recognized the principle of comity as it applies to federal settlements and their applicability to state law. Specifically, as the Ninth Circuit explained in *LRNA*:

> By placing its imprimatur on the Settlement Agreement, the district court effectively authorized the City to disregard its local ordinances in the name of RLUIPA. Such judicial action is authorized only when the federal law in question mandates the remedy contained in the settlement. *See Keith,* 118 F.3d at 1393 ("Under the Constitution, the district court could not supersede California's law unless it conflicts with any federal law."). As summarized by the Seventh Circuit: [U]pon properly supported findings that such a remedy is *necessary* to rectify a *violation of federal law,* the district court can approve a consent decree which overrides state law provisions. Without such findings, however, parties can only agree to that which they have the power to do outside of litigation.

498 F.3d at 1058 (emphasis in original).

This principle is significant here because several states have enacted laws that strictly prohibit the NCAA, athletic conferences, and member schools from interfering *in any respect* (including revenue sharing caps) with a college athlete earning NIL compensation and/or the existence of NIL Collectives. *See* Appendix O. Some of these states, expressly prohibit colleges and universities from providing NIL benefits, instead implicitly delegating such authority to NIL Collectives.

### 3. There Is No Reasonable Basis For A 22% Cap.

Even if the terms of the IRCS had no such threshold antitrust problems, there is no sound basis for a 22% figure with a cap of $21 million per school proposed by Class Counsel and the

---

[9] *See LRNA*, 498 F.3d at 1056 (finding "the Settlement Agreement…invalid and unenforceable under state law" because the conduct sought to be remedied did not violate federal law yet attempted to circumvent state law by including language in the settlement agreement directly contrary to state law); *In re Smith*, 926 F.2d 1027, 1029 (11th Cir. 1991) (explaining that settlements are void against public policy where they directly contravene a state or federal statute or policy); *Jackson Purchase Rural Elec. Co-op. Ass'n v. Loc. Union 816,* 646 F.2d 264, 267 (6th Cir. 1981) ("As the authorities cited above make clear, there is a strong presumption that agreements in violation of a statute will not be sanctioned by the courts").

NCAA; it is totally arbitrary. As noted in the Holden Article at 23, "as both the *Fontenot* complaint, and journalists Nicole Auerbach and Justin Williams observed, *the 22 percent of revenue to be shared with athletes is significantly less than the amount shared in professional sports that have collective bargaining agreements in place*." (citing Nicole Auerbach & Justin Williams, *What to Know about House v. NCAA Settlement and a Historic Day for College Sports*, The Athletic (May 24, 2024)) (attached as Appendix P) (emphases added); *accord*, Desai Article ("The cap is significantly lower than the percentage of revenue dedicated to athletes in professional sports such as the NBA and NFL, both of which hover around 50%"). As explained below, Class Counsel's arguments to the contrary are incorrect and misleading. ECF No. 534 at 1, 7.

As further noted in the Desai Article, "[i]n addition, the NCAA's cap is tied to the average revenue of five autonomy conference schools. But the wide disparity in revenue generated by those universities will result in Southeastern Conference and Big Ten Conference schools, which make the highest revenues, allocating far less than 22% of their revenue to college athletes. These shortcomings will likely subject the NCAA to future antitrust liability." The O'Rourke Report indicates that 20 major schools will end up paying *less than 20% of their revenue*, with Ohio State paying the least (11%).

Moreover, the solution proposed by the NCAA and accepted by Class Counsel is contrary to the resolution of competing tensions that Judge Clifton Corker addressed in the *Tennessee* Case at *5 (emphases added):

> Fair market value may be equal to or less than the NIL deals student-athletes can currently receive after selecting a school. *But without the give and take of a free market, student-athletes simply have no knowledge of their true NIL value. It is this suppression of negotiating leverage and the consequential lack of knowledge that harms student-athletes*."

The proposed revenue sharing cap in the IRCS has other significant collateral consequences, none of which were agreed to by past, current or future NCAA athletes through a collective bargaining process, as is typical when a revenue cap is imposed in professional football or basketball. For example, Member Institutions and conferences can unilaterally reduce the number of spots, the roster size, and the number of athletic scholarships available. ECF No. 535-2 at Article 4, Section 1. Disputes regarding the compliance and validity of the IRCS must be presented either to the Court or a special master appointed by the Court. *Id.* Article 6, Section 1. Indeed, even as to claims for violations of the IRCS, all disputes must be arbitrated and a Class member must be represented by Class Counsel. *Id.* at Section 2.

### 4.   The Proposed Revenue Sharing Is Illusory and Insufficient.

The IRCS seeks to eliminate billions of dollars of guaranteed money that college athletes currently receive or will receive annually in direct payments from NIL Collectives and replace it with non-guaranteed funds that the NCAA, conferences, and schools have built into the Settlement and are subject to numerous loopholes that would allow them to pay less or prohibit them from paying at all. For example, the Settlements allow collusion among the NCAA, conferences, and Member Institutions to reduce or prohibit compensation from the pool if circumstances or laws permit college athletes to collectively bargain.  The Settlements' language is so broad that it would allow such collusion regardless of whether college athletes even formed a union and regardless of who the employer is deemed to be.

Significantly, the O'Rourke Report notes that the NCAA's estimation of what constitutes "revenue" for Division I schools does "*not* include direct or indirect school support, student fees or unrecompensed (*i.e.,* charitable) contributions to the athletic department from alumni." (Emphasis in original). Under the terms of the Settlements, almost all of the monies previously provided by NIL Collectives directly to college athletes, would qualify as uncounted charitable

contributions to the athletic department from alumni excluded from the shared "pool." This is because the NCAA has its own version of "Hollywood" accounting (*i.e.*, the opaque or creative set of accounting methods used by the film, video, television and music industry to budget and record profits for creative projects).

This change is critical. The most recent Opendorse report cited earlier states at page 5 that "NIL collectives continue to shape over 80% of the total NIL market. Their activity plays a vital role in the recruitment and retention of college athletes and is heavily weighted toward Football and Men's Basketball. Commercial compensation now makes up less than 20% of the total market, with Women's Basketball leapfrogging Men's Basketball for the first time."

Thus, the NCAA's analysis of sports-based revenues severely *undercounts* the amount of them, even though these contributions for college athlete NIL payments are paid because of the notoriety that college athletes obtain by participating in their respective schools' sporting events. Moreover, the estimates from the O'Rourke Report for the 2025-26 year show that only the top 27 athletics departments would pay the $21 million maximum allowed amount to college athletes.

Future college athletes may well be *worse* off under the IRCS. The 2024 Opendorse report cited earlier estimates that the maximum amount that NCAA Division I schools could share with athletes in 2025-26 according to the Settlements would be $1.26 billion. Meanwhile, the NIL compensation is expected to reach $2.55 billion for college athletes in the same year, 80% of which comes from Collectives. If NIL Collective funding is restricted by the NCAA, college athletes will have significantly reduced earning potential.

In addition, fixing the revenue sharing cap for ten years reduces flexibility for college athletes to negotiate if market conditions change during that time. The college athletics market is quickly evolving, and the IRCS locks college athletes in for a long term with no opportunity to

negotiate more earnings if conditions change. The same is not true of colleges, since there is no floor on payment; if the market evolved in such a way that the market price of labor decreases for college athletes, that can be accommodated with the revenue cap, whereas an increase cannot.

Class Counsel assert that currently "many" college athletes may make a million dollars or more annually pursuant to the IRSC. ECF No. 534 at 3. That is not good enough for a proposed Division I-wide class action settlement if many more others are treated invidiously compared to those in the Power 5 conferences. Although the Settlements give conferences and colleges the discretion to cut sports, the best interests of athletes would prohibit them from doing so. Class counsel's expert, Dr. Robert Klonoff, also fails to discuss to address these issues. *See* ECF No. 536 at 31.

The Court should decline to approve such an arrangement, which is particularly troubling for future NCAA college athletes. Indeed, the IRCS imposes no temporal limit for future college athletes, while it simultaneously locks this currently unknown class into a system littered with hurdles to the acquisition of their fair NIL market value.

### 5. The Proposed Damages Payment Structure Is Unfair To Smaller Member Institutions.

Commentators have noted that college athletes are not the only ones affected adversely by the DCS. Colleges outside the Power 5 schools are treated unfairly pursuant to it. The O'Rourke Report at page 6 confirms this point. It notes as follows (emphases added):

> "Under the proposed $2.8 billion House settlement, the NCAA will pay $1.1 billion directly from its reserve funds and the remaining $1.665 billion will be paid by schools via reduced NCAA income distributions over the next ten years. But the proposed allocation of the amount due from schools is receiving some justified criticism. *Under the proposal, Power conference schools will be responsible for $675 million or about 40% and all other NCAA I schools will be responsible for $990 million or around 60%. The issue is that Power conference schools account for over 80% of athletic revenues while all other D1 schools account for less than 20%.* At first glance this appears inequitable, because as a percentage of annual

revenue, non-power schools are paying about 6 times more of the *House* settlement than Power 5 schools…."

The report goes on to note at page 7 that "[t]he plaintiffs in *House* are all former Power conference athletes, and it's not unreasonable to argue that it appears non-Power conference schools are being asked to pay for more than their fair share. Allocating the settlement instead to match school or conference revenues would result in *all* NCAA I schools paying about 2% of their annual revenue."

The adversely affected colleges realize this inequity and have taken action. The *SD Suit* alleges that "[n]o part of the Settlement[s], including financial components or the injunctive relief fundamentally altering the NCAA's structure, was presented to the full membership for a vote" and that the decision to enter into the Settlements "violated the NCAA Constitution and, by extension, the agreement between the NCAA and its member institutions."

Likewise, in the Governors' Letter, it was stated that:

Unfortunately, the proposed settlement is unfair for the colleges and universities in our states. Generally speaking, NIL sponsorships tend to be more popular among the bigger athletic conferences and not the smaller ones. Additionally, as Big Sky Conference Commissioner Tom Wistrcill recently noted, only Power Five conferences were parties to the lawsuit and participated in settlement negotiations. Despite these facts, the proposed settlement puts programs in every state, including small and medium-sized programs in our states, on the hook for payment.

**C. The IRCS Is Intended To Restrict Unfairly NIL Collectives.**

The NCAA, pursuant to the IRCS, asks this Court to ignore economic and market realities and permit the NCAA to gain control over a free market that it has no legal right to control. As noted in the *Tennessee* Case, "in July 2021 when the NCAA's Interim NIL Policy went into effect, [it] allow[ed] student-athletes to engage in NIL activity and to be compensated accordingly. *This change created a market for student-athletes' NIL, which quickly led to the creation of NIL collectives, e.g.,* 'organizations created by alumni, boosters, or businesses with the purpose of

providing NIL opportunities to their school's athletes.'" 2024 WL 755528, at *1 (emphases added) Collectives were popular and over 200 were created. *Id.*

The current economic reality in this recently-created market for use of college athletes NIL is that thousands of NCAA college athletes in conferences of varying sizes across the country have monetized their NIL through open competition in a free market that determines the value of their respective NIL, without any cap or restriction. The current overall value of this market for college athletes is stunning; they garner over $1 billion annually (and may garner at least $2.5 billion in the future) through NIL Collective deals alone. Their projected NIL earnings according to Opendorse have been described in Section II. A, above.

In view of the enormous funds currently and in the future that stand to be directly provided to college athletes via NIL Collectives, the IRCS serves as a blatant attempt by the NCAA to gain control of a free market they have no legal authority to control under the false premise of "amateurism." The NCAA seeks to end the opportunities created by NIL Collectives, so that money from so-called "boosters" goes directly to colleges and universities. Thus, the NCAA treated NIL collectives as "boosters" in guidance that it issued in May of 2022. *Tennessee* Case, 2024 WL 755528, at *2.[10]

The *Tennessee* Case exemplifies the faulty thinking of the NCAA. At issue there was  the fact that "[b]ecause the NCAA classifies NIL Collectives as boosters, any NIL discussions

---

[10] The May 2022 guidance was interim in nature. NCAA, *Interim Name, Image and Likeness Policy Guidance Regarding Third Party Involvement*, https://ncaaorg.s3.amazonaws.com/ncaa/NIL/May2022NIL_Guidance.pdf. (last visited Sept. 28, 2024). In October of 2022, it was codified in NCAA bylaws. NCAA, *NCAA Division I Institutional Involvement in a Student-Athlete's Name, Image and Likeness Activities* (Oct. 26, 2022), https://ncaaorg.s3.amazonaws.com/ncaa/NIL/D1NIL_InstitutionalInvolvementNILActivities.pdf. In June of 2023, the NCAA disseminated a "Q & A" sheet attempting to explain those bylaws. https://mc97gsxn49y6wmpf4p2n764zq7z1.pub.sfmc-content.com/2ezhy1105pc. (last visited Sept. 28, 2024).

between collectives and student-athletes are considered impermissible inducements under the NCAA rules. Thus, student-athletes were prohibited from discussing potential NIL deals until they commit to a particular school." *Id.* at *2. The court enjoined implementation of the ban, saying that such an agreement was facially anticompetitive and that any procompetitive justifications could be achieved by less restrictive means. *Id.* at *3-4. So, the NCAA lacks the authority under the antitrust laws to forbid conduct just because it attaches a particular derogatory label to such conduct.

On April 17, 2024, the NCAA changed course with revisions to its NIL guidance.[11]  The NCAA's Division I Council unanimously adopted a proposal that now allows member schools to provide assistance in supporting NIL activities for college athletes *who disclose NIL arrangements to their schools*. *Id.* This new rule now allows schools to provide enhanced NIL support for college athletes, including facilitating deals between college athletes and third parties, as well as identifying NIL opportunities for college athletes. However, the ban imposed on third partes was not changed and remains enjoined.

That may also explain why the Governor of Georgia issued an Executive Order saying that "neither the NCAA, an athletic conference, nor any other organization with authority over intercollegiate athletics shall take any adverse action against a postsecondary educational institution in the State of Georgia for such institution *facilitating compensation*, offering compensation, or compensating an intercollegiate student-athlete for the use of such student-athlete's NIL…." (Emphases added). Such facilitation can and should include efforts by NIL

---

[11] *See* NCAA, *DI Council Approves NIL Reforms, Permits School Assistance with NIL Activity* (Apr. 17, 2024), https://www.ncaa.org/news/2024/4/17/media-center-di-council-approves-nil-reforms-permits-school-assistance-with-nil-activity.aspx.

Collectives; indeed, the O'Rourke Second Report[12] identifies numerous colleges in the State of Georgia that received huge amounts of money from NIL Collectives in 2023-24, such as Southeastern Conference member the University of Georgia, Atlantic Coast Conference member Georgia Tech, and Georgia Southern and Georgia State.

Georgia's action was preceded by adoption of a new law in Virginia on April 17, 2024, where Governor Glenn Youngkin signed the nation's first legislation providing Virginia's college athletes a private right of action against the NCAA, or any athletic conference, for interfering with a college athlete's NIL rights.[13]

Class Counsel attempt to justify this restriction on NIL Collectives by saying that the IRSC provides tens of billions of dollars in other benefits. ECF No. 534 at 2. But college athletes should not be forced to make this choice; they deserve the freedom to receive money from Collectives as well as colleges. And, as noted above, much of the alleged countervailing benefits may well be illusory.

The IRCS seeks to solidify the NCAA's control over the free market for college athletes' NIL by permitting the NCAA to create systemwide and conference rules that "prohibit NIL payments by Associated Entities or Individuals (***individually or collectively***) of a Member Institution from entering into NIL licenses with or for the benefit of current or prospective student-athletes at a given Member Institution unless the license/payment is for a valid business purpose related to the promotion or endorsement of goods or services provided to the general public for profit, with compensation at rates and terms commensurate with compensation paid to similarly

---

[12] Patrick O'Rourke, *NIL Collectives – NCAA Athlete Revenue Sharing, Scholarships, NIL Collectives by School* (2024) (O'Rourke Second Report") (attached as Appendix Q).

[13] *See* 2024 Virginia House Bill No. 1505 (Adopted Apr. 17, 2024), https://legacylis.virginia.gov/cgi-bin/legp604.exe?241+ful+CHAP0837+pdf.

situated individuals with comparable NIL value who are not current or prospective student-athletes at the Member Institution" ECF No. 535-2, Article 4, Section 3 (emphases added).

Class Counsel argue that this language in the amended IRCS greatly narrows the language in the original IRCS by eliminating the term "booster" and replacing it with the allegedly much narrower phrase "Associated Entities or Individuals of a Member Institution." They say that "[a]s part of the settlement compromise, the injunctive settlement does not prohibit the NCAA from continuing its existing rules that prohibit certain affiliated third parties from making 'pay for Play' payments that are contingent on an athlete coming to or continuing enrollment at a particular school, even if they are facially characterized as NIL payments." ECF No. 534 at 8.

To begin with, this attempt to expunge the term "booster" from the IRCS only creates more confusion when it is compared with the use of that term in the DCS (to which the IRCS is an appendix) and the NCAA's "2024 Agreed-Upon Procedures" (incorporated by reference in the IRCS and appended to that document). The DCS defines "Related Injunctive Relief NCAA & Conference Rules", which contain prohibitions on "Boosters (individually or collectively)" and releases any claims DCS members may have based on those rules. ECF No. 535-2, DCS at Section A (pp) & ("qq"). Similarly, the NCAA's "2024 Agreed-Upon Procedures" refer repeatedly to provisions concerning "boosters." ECF No. 535-2 at 89, 91, 92, 93, 126.

More importantly, the phrase "Associated Entities or Individuals of a Member Institution." is one created specifically for this case and is not defined in any of the NCAA's existing guidance or bylaws. It is not found in the "2024 Agreed-Upon Procedures," nor is it mentioned in the 2022 guidance. The term "pay-for-play" is not self-explanatory and could be interpreted by the NCAA to encompass third parties (like NIL Collectives) other than those operating as shills for Member Institutions. Indeed, the definition acknowledges that there are entities whose primary purpose is

to create NIL deals for prospective and current college athletes *based on their status at a particular college*. The IRSC would ban all NIL payments based on the purpose of collectives which is to provide NIL deals based on athletes' status at a particular college.

Another phrase that Class Counsel newly created for this case in their amended approval motion is the term " 'faux' NIL." ECF No. 534 at 1-3, 10. That is not a term utilized before by the NCAA and its meaning in the present context is unclear at best. If it is intended to be a synonym for "pay-to-play", *that is precisely what revenue sharing with college athletes is.*

As the states' actions demonstrates, the parties to the IRCS have no authority to prevent NIL Collectives from working with or paying college athletes directly. The NCAA's goal is to have donors to NIL Collectives make contributions directly to the schools, rather than to the NIL Collectives. As explained in a note on methodology used to create the O'Rourke Report, "**Schools and collectives are competing for the same dollars – both are asking the same donors for contributions to the same cause: supporting the school's athletic programs.**"[14] (Emphases added).

 The IRCS is intended to allow the NCAA to eliminate that competition by requiring that it and Member Institutions have complete control over how much of donor funds are allocated to NIL compensation. It can choose to treat those donations as non-revenue for purposes of revenue sharing with college athletes. Schools can also use those donations to pay their required share, rather than treating them as additional funds available to compensate for NIL use. Or schools can divert these donations for uses unrelated to NIL, such as building more elaborate stadiums or inflating the salaries paid to coaches. Competition for donor dollars helped fuel the prices paid for use of NIL. The ICRS is intended to snuff out such competition.

---

[14] Patrick O'Rourke, *Methodology*, https://nil-ncaa.com/methodology/ (last visited Sept. 28, 2024).

**OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS ON BEHALF OF CLASSES OF PAST, CURRENT AND FUTURE NCAA COLLEGE ATHLETES**

Indeed, the Holden Article advocates the "true free market" approach, which is similar to what was envisioned by the court in the *Tennessee* Case. Holden describes the four advantages of this approach at page 30, as:

> The true free market approach is a superior way for allocating college sports revenue to the athletes than the proposed *House* settlement approach for at least four different reasons. First, to the extent one believes that the fair market price is the free market price, *all college athletes under the free market approach would receive their 'fair' wage* and not some wage designated through ad hoc mechanisms. Second, *a true free market approach would obviate NCAA member colleges' potential liability under federal antitrust law because schools would no longer be colluding to fix athlete salaries* and thus presumably not run afoul of Section 1 of the Sherman Act. Third, the free market approach would obviate any moral dilemmas in terms of determining how much each athlete deserves for their services as, in a free market system, such subjective judgments are replaced by principles of supply and demand. Fourth, unlike the proposed *House* settlement system, the free-market approach would not require special judicial oversight to ensure NCAA member school compliance."

(Emphases added).

### D. The NCAA Is Using The Settlements As A Stalking Horse For Federal Legislation Granting It Antitrust Immunity And State Law Preemption.

There is no economic policy or principle of antitrust law that would permit the NCAA and the defendant Power 5 conferences to band together to price fix the compensation of college athletes without the benefit of collective bargaining as they have sought to do so here via the terms of these litigation Settlements. The NCAA recognizes that the only way the terms of the Settlements are enforceable is via a determination by Congress that the agreements therein are immune from antitrust exposure. That is why the NCAA has repeatedly sought such immunity from Congress. Therefore, in Article 7 Section 1 of the DCS and Article 6, Section 3 of the IRCS (ECF No. 535-2), the NCAA says that it will request, and that Class Counsel are agreeing to support, efforts to have the United States Congress grant antitrust immunity under federal law and preemption of conflicting state law.

Associations of professional athletes addressed this topic in early 2024, telling Congress that any legislation to protect college athletes' NIL rights "should simply prohibit the NCAA and other related entities from denying athletes the right to profit from their NIL, consistent with existing laws, as a condition of their athletic participation," prohibit lifetime NIL contracts, and prohibit contracts that entitle third parties to receive a percentage of a college athlete's future earnings in college or beyond.[15] The professional athlete associations underscored the point that "[e]nactment of even the most player-friendly NIL regulations imaginable will represent an entirely pyrrhic victory if lawmakers simultaneously nullify athletes' rights under antitrust laws, labor laws, or any other federal or state laws that protect other adults in the American workforce."

The NCAA is not heeding this advice. As noted in an article by Steve Berkowitz, *Two U.S. House members introduce bill that would grant NCAA legal protection*, USA Today (May 8, 2024) (attached as Appendix R), the most recent NCAA immunity legislation proposed by its supporters in Congress--the "Protect the Benefits for Athletes and Limit Liability Act of 2024", H.R. 8304, 118th Cong. (2023, reintroduced in 2024)[16]—is quite broad:

> Two members of the U.S. House of Representatives on Wednesday introduced a bill that would give the NCAA, conferences and colleges the type of protections from lawsuits that they have been seeking as part of legislation aimed at creating federal rules regarding athlete compensation and other college-sports matters. The move by Rep. Russell Fry (R-S.C.) and Rep. Barry Moore (R-Ala.) comes against the backdrop of ongoing efforts to settle a set of lawsuits against the NCAA and major conferences that are seeking billions of dollars in damages and challenging the association's remaining rules regarding athlete compensation.

---

[15] Players Associations' Joint Statement On Legislation Affecting the Rights of College Athletes (Jan. 18, 2024) (attached as Appendix S).

[16] Protect the Benefits for Athletes and Limit Liability Act of 2024, H.R. 8304, 118th Cong. (2023), https://www.congress.gov/bill/118th-congress/house-bill/8304/text/ih?format=txt (last visited Oct. 1, 2024).

Significantly, any future rule changes or modifications of the IRCS do not require submission to the Court--only that Class Counsel get to review and provide approval. *See, e.g.,* Section 3(d) of the IRCS. This underscores the built-in mechanism Class Counsel and NCAA seek to use to propose to Congress that its desire for legislative antitrust immunity is ostensibly blessed by this Court.

A grant of legislative antitrust immunity for the NCAA on the basis of the Settlements will have significant adverse effects on current and future college athletes. For example, without the benefit of collective bargaining and with a grant of immunity, the NCAA would be permitted to neglect issues concerning the health and safety of college athletes (its original mission), and academic concerns with impunity. The contractual requirement that Class Counsel support such legislation, despite the recommendations of such bodies as professional player associations is a clear conflict of interest.

### E.  The NCAA Is Also Using The IRCS To Promote Legislation Denying Employee Status To College Athletes.

The IRCS is also being used by the NCAA as a stalking horse to promote federal legislation to deny college athletes the status of employees. Indeed, the IRCS says in Article 7 that Class Counsel must be neutral in all forums "on the issue of whether student-athletes should be considered/deemed 'employees' or whether collective bargaining should be permitted for compensation of student-athletes."

The NCAA's concerns about college athletes being treated as "employees" is obvious. This momentous change may arrive soon. In *Johnson*, the Third Circuit said that "for the purposes of the FLSA, we will not use a 'frayed tradition' of amateurism with such dubious history to define the economic reality of athletes' relationships to their schools… Accordingly, we also hold that college athletes cannot be barred as a matter of law from asserting FLSA claims simply by virtue

of a 'revered tradition of amateurism' in D-I athletics." 108 F.4th at 182. The Third Circuit thus ruled that:

> We therefore hold that college athletes may be employees under the FLSA when they (a) perform services for another party, (b) "necessarily and primarily for the [other party's] benefit," (c) under that party's control or right of control, and (d) in return for "express" or "implied" compensation or "in-kind benefits," If so, the athlete in question may plainly fall within the meaning of "employee" as defined in 29 U.S.C. § 203(e)(1). Ultimately, the touchstone remains whether the cumulative circumstances of the relationship between the athlete and college or NCAA reveal an economic reality that is that of an employee-employer.

*Id*. at 180 (citations and footnote omitted).

In addition, the NLRB in *Dartmouth* explicitly cited *O'Bannon* to find that college athletes could be viewed as employees: "[i]n *O'Bannon*, the Ninth Circuit explained that 'the modern legal understanding of "commerce" is broad' and, therefore, 'encompasses the transaction in which an athletic recruit exchanges his labor and NIL rights for a scholarship at a Division I school because it is undeniable that both parties to that exchange anticipate economic gain from it.'" *Dartmouth* at 17. The *Dartmouth* case is now on appeal. A similar challenge has been raised by the NLRB against USC, the Pac-12 and the NCAA that is ongoing.

The IRCS is completely vague about what happens to the relief set forth in it if *Johnson* and *Dartmouth* become the law of the land and that puts the future college athletes at some real risk. Indeed, as Edelman noted in the Steele Article, "It's a legal impossibility to simultaneously avoid both antitrust law and labor law….*The NCAA, however, attempted that 'legal impossibility'* when it imposed certain restrictions on its athletes' NIL as part of the settlement, even though the athletes and their attorneys agreed to them in the deal, he added." *Id.* (emphases added). Edelman went on to note:

> What the NCAA wants here is for lawyers representing a class of plaintiffs to agree to a salary cap without formulating a collective bargaining unit that could negotiate over that topic moving forward…So in essence, this proposed settlement would

continue to expose the NCAA to very serious antitrust liability. And while both sides tried to push through the settlement, Judge Wilken astutely saw that problem.

The NCAA is therefore seeking to use the IRCS as a means to convince Congress to enact legislation forbidding such a result. *See, e.g.,* Michael McCann, *Congress To Consider Bill Declaring College Athletes Are Not Employees*, Sportico (June 12, 2024) (attached as Appendix T). Indeed, Congress is considering a bill--H.R. 8534, the *Protecting Student Athletes' Economic Freedom Act of 2024*, which would deny college athletes the opportunity to be declared employees of their respective colleges.[17]

The NCAA and the Power 5 strongly endorse this legislation and have tied it to the Settlements: "NCAA president Charlie Baker hopes that reaching an agreement with attorneys for players to settle three antitrust cases…will earn the NCAA goodwill in Congress." *Id.* Similarly, "[i]n a statement released to the media Wednesday, the Power Five conferences urge the committee to support H.R. 8534. 'Protecting student-athletes' status as students, not employees, is vital for preserving athletic and educational opportunities,' the conferences insist. 'Categorizing student-athletes as employees of their institutions would cause harm to the future viability of many college sports programs, particularly women's and Olympic sports.'" *Id*.

However, if the NCAA is unwilling to abate its efforts to control the free market for college athletes' NIL, it could, and should, alternatively take the obvious step--recognize college athletes as employees, and bargain collectively with them. This option too presents numerous benefits, including the point as summarized in the Holden Article at page 32 that "the labor union approach would almost certainly produce a collectively bargained solution insulated from antitrust scrutiny based on the 'non-statutory labor exemption from antitrust law'…."

---

[17] Protecting Student Athletes' Economic Freedom Act of 2024, H.R. 8534, 118th Cong. (2023), https://www.congress.gov/bill/118th-congress/house-bill/8534/text. (last visited Sept. 28, 2024).

### III.     CONCLUSION

In sum, the Settlements go too far, offer too little, present too many contradictions, and should be rejected by this Court. As noted in the Moss-Gold Article, they "emerged from a process and incentives that are ill-suited to preserving the worthy goals, sorting through the complex policies, and addressing the many stakeholders that define the college sports enterprise."

They conclude that "[t]he settlement in *House v. NCAA* will ultimately land in the hands of a district court judge that must approve it under the Federal Rules of Civil Procedure as fair, reasonable, and adequate. At the Progressive Policy Institute (PPI) [a Democratic think tank] we strongly encourage the judge to reject the settlement, at least in its current form." The Objectors agree. Unlike Moss and Gold, however, the Objectors do not think the better solution is to divert the matter to Congress; a judicial resolution is advisable here.

In any event, the present Settlements should not be approved.

Dated: October 3, 2024

/s/ Michael P. Lehmann
Michael P. Lehmann (CA Bar No. 77152)
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel. No.: (415) 633-1908
mlehmann@hausfeld.com

Michael D. Hausfeld*
Nicholas Murphy*
Theodore DiSalvo*
**HAUSFELD LLP**
888 16th Street, NW, Suite 300
Washington, DC 200006
Tel. No.: (202) 540-7200
Fax No.: (202) 540-7201
mhausfeld@hausfeld.com
nmurphy@hausfeld.com
tdisalvo@hausfeld.com

**OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS ON BEHALF OF CLASSES OF PAST, CURRENT AND FUTURE NCAA COLLEGE ATHLETES**

*Pro Hac Vice forthcoming.

*Counsel for Objectors*

**OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS ON BEHALF OF CLASSES OF PAST, CURRENT AND FUTURE NCAA COLLEGE ATHLETES**