# APPENDIX B

| | | |
|---|---|---|
| STATE OF SOUTH DAKOTA | * | IN CIRCUIT COURT |
| COUNTY OF BROOKINGS | * SS. | THIRD JUDICIAL CIRCUIT |
| THE STATE OF SOUTH DAKOTA and THE SOUTH DAKOTA BOARD OF REGENTS on behalf of SOUTH DAKOTA STATE UNIVERSITY and THE UNIVERSITY OF SOUTH DAKOTA, | * | 05 CIV 24-_____ |
| Plaintiffs, | * | **COMPLAINT** |
| vs. | * | |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | * | |
| Defendant. | * | |

The State of South Dakota and the South Dakota Board of Regents on behalf of South Dakota State University and the University of South Dakota, by and through their undersigned counsel, Marty J. Jackley, Attorney General for the State of South Dakota, and Grant M. Flynn, Assistant Attorney General, Plaintiffs in the above-entitled matter, for their Complaint state and allege as follows:

## INTRODUCTION

1. The National Collegiate Athletic Association (hereinafter "NCAA") is a member-led voluntary unincorporated association comprised of approximately 1,100 different universities across the United States, Puerto Rico, and Canada.

2. NCAA members are organized into three divisions, known as Division I, Division II, and Division III.

3. Of those three divisions, schools in Division I generally have the largest student bodies and the most robust athletic programs which offer the highest number of athletic scholarships.

4. NCAA maintains several priorities designed to promote its mission of "[p]rovid[ing] a world-class athletics and academic experience for student-athletes that fosters lifelong well-being."[1]

5. These priorities include the NCAA's commitment to amateurism which it achieves by "maintaining a line of demarcation between student-athletes and professional athletes."[2]

6. In furtherance of their goal of amateurism, NCAA established as one of its guiding principles in its Constitution that "[s]tudent-athletes may not be compensated by a member institution."[3]

7. Moreover, NCAA forbade athletes from being compensated by outside entities for their participation in athletic programs.[4]

8. Pursuant to NCAA rules, athletes were barred from earning any compensation for their participation, but the NCAA and certain of its member institutions, particularly those with the most prominent programs, made significant profits from televising athletic events.[5]

9. In response to this inequitable revenue distribution, several collegiate athletes filed suit against the NCAA, seeking a portion of the revenue as well as injunctive relief which would permit athletes to profit from their own names, images, and likenesses.[6]

10. The NCAA negotiated a settlement with the plaintiffs in three of these cases (hereinafter "Settlement").[7]

11. The Settlement contemplates a $2.8 billion payment to past and present athletes. $1.15 billion will be paid from the NCAA's reserves while $1.65 billion will be paid "by reducing disbursements it makes to conferences from its Final Four Men's Basketball revenues by an average of 20 percent over the next ten years." "The Power Five conferences will pay 40 percent

---

[1] NCAA Mission and Priorities, NCAA Website, https://www.ncaa.org/sports/2021/6/28/mission-and-priorities.aspx (last visited August 8, 2024).
[2] Our Division I Priorities, NCAA Website, https://www.ncaa.org/sports/2021/5/11/our-division-i-priorities.aspx (last visited August 8, 2024).
[3] NCAA Constitution Art. 1, § B.
[4] See NCAA D-I Operating Bylaw, § 12.01 and 12.5.
[5] Associated Press, *NCAA generates nearly $1.3 billion in revenue for 2022-23*, ESPN (Feb. 1, 2024, 09:35 PM ET), https://www.espn.com/college-sports/story/_/id/39439274/ncaa-generates-nearly-13-billion-revenue-2022-23
[6] See House, et. al. v. NCAA, et. al., 4:20-cv-03919-CW (hereinafter "*House*"); *Hubbard, et. al. v. NCAA, et. al.*, 4:23-cv-01593 (N.D. Cal.); and *Carter et. al. v. NCAA et. al.*, 4:23-cv-06325-RS.
[7] See *House*, Doc. 450.

of the $1.6 billion and the remaining Division I conferences, none of which were named defendants in any of the three lawsuits, will pay 60 percent ...."[8]

12. While the non-Power 4 conferences will be shouldering the majority of the burden for the reduced disbursements, they were not named defendants in any of the three lawsuits because they reaped minimal benefits from the NCAA's policies.

13. Further, the NCAA failed to thoroughly vet the impact of the Settlement and to abide by its own Bylaws when it established the distribution model for the Settlement payment.[9]

14. The Settlement was negotiated by the NCAA in violation of the NCAA's Bylaws and at the expense of many of its members.

**PARTIES**

15. Plaintiffs are the State of South Dakota, which governs the State's public postsecondary educational institutions via the State Board of Regents.[10]

16. Defendant is the NCAA, a voluntary unincorporated association led by its members who are postsecondary education institutions across the United States and elsewhere with collegiate athletic departments. The NCAA governs the athletic competition amongst its members and distributes revenue generated by the competitions back to its members.[11]

**JURISDICTION & VENUE**

17. This Court has personal and subject matter jurisdiction over this matter pursuant to SDCL 15-7-2 because the NCAA has transacted business within this state and the Plaintiff universities are members of the NCAA.

18. Venue is appropriate in this Court pursuant to SDCL 15-5-8.

---

[8] *EXECUTIVE SUMMARY - Congressional Briefing Paper Preliminary Assessment: Title IX and Other Implications of the Proposed Settlement of House v. NCAA, Hubbard v. NCAA, and Carter v. NCAA on Intercollegiate Athletics Programs*, The Drake Group website, https://www.thedrakegroup.org/wp-content/uploads/2024/07/EXECUTIVE-SUMMARY-Congressional-Briefing-Paper-1.pdf (last visited August 21, 2024). The Power Five conferences have since reorganized into a structure referred to as the "Power 4," which will be the descriptor used for purposes of this Complaint.
[9] Exhibit 1.
[10] *See* SDCL ch. 13-49.
[11] NCAA Overview, NCAA Website, https://www.ncaa.org/sports/2021/2/16/overview.aspx (last visited 8/21/24); Division I Finances, NCAA Website, https://www.ncaa.org/sports/2021/5/11/division-i-finances.aspx (last visited 8/21/14).

3

## NCAA MEMBERSHIP & GOVERNANCE

19. The University of South Dakota and South Dakota State University are members of the Summit League Basketball Conference.[12]

20. The Summit League is a member of the NCAA.[13]

21. NCAA member conferences are informally categorized as the Power 4 conferences and the non-Power 4 conferences. The Power 4 Conferences consist of the Southeastern Conference, the Big 12 Conference, the Big 10 Conference, and the Atlantic Coast Conference which encompass the most prominent programs and universities in collegiate athletics.[14]

22. The Summit League is considered a non-Power 4 conference.

23. The NCAA Division I Board of Directors is the "overall governing body for Division I, with responsibility for strategy, policy, legislative oversight and management oversight."[15]

24. The Board of Directors is comprised of 25 members and includes 20 presidents or chancellors, one director of athletics, one senior woman administrator, one faculty athletics representative and two student-athletes.[16]

25. The Summit League, representing its nine members, is one of eleven conferences that share five seats on the Board of Directors.[17]

26. The NCAA Board of Governors is the association's highest governing body.[18]

27. The Board of Governors consists of nine voting members and seven, nonvoting, *ex officio* members. The nine voting members are made up of four Division I members, one member from the Division II Executive Board, one member from the Division III President's Council, two independent

---

[12] Summit League Quick Facts, The Summit League Website, https://thesummitleague.org/sports/2020/5/26/Quick%20Facts.aspx (last visited 8/21/24).
[13] Summit League Compliance, The Summit League Website, https://thesummitleague.org/sports/2020/5/6/compliance-index.aspx (last visited 8/21/24).
[14] Pat Ford, *Welcome to the New College Landscape: How Each Power Four Conference Stacks Up*, (July 1, 2024) https://www.si.com/college/welcome-to-the-new-college-landscape-how-each-power-four-conference-stacks-up.
[15] NCAA D-I Operating Bylaw, § 21.1.2.
[16] NCAA D-I Operating Bylaw, § 21.1.1.
[17] *Id.*
[18] Governance, NCAA Website, https://www.ncaa.org/sports/2021/2/9/governance.aspx (last visited 8/21/24).

members, and one graduated NCAA student-athlete.[19]

28. The NCAA's principles, as laid out in Article 1 of its Constitution, explicitly state that student-athletes may not be compensated by member institutions.[20]

29. The NCAA's Constitution may only be amended upon a two-thirds vote of all delegates present and voting at the NCAA's annual Convention.[21]

30. The Board of Governors is vested with the following authority: enterprise risk management, establishing policies related to fiduciary responsibility, adopting and implementing legal strategy, Association risk mitigation, and others.[22]

31. The Board of Directors has broader authority relating to governance of the NCAA.[23]

32. Neither Board is granted explicit authority to settle litigation within the NCAA's Bylaws.

33. The NCAA Constitution further provides that "[a]uthorities not explicitly enumerated in this Constitution for Association-wide governance are reserved to the divisions or, at their discretion, to subdivisions, conferences or individual institutions."[24]

34. Title IX of the Education Amendments of 1972 (hereinafter "Title IX") prohibits discrimination on the basis of sex in education programs and activities that receive federal financial assistance. 20 U.S.C. § 1681.

35. Under Title IX, Plaintiffs and other member schools of the NCAA are prohibited from providing financial assistance disproportionately between sexes.

36. Plaintiffs are subject to Title IX through the public universities as recipients of federal financial assistance.

37. The Settlement provides "financial assistance" inequitably between male and female athletes in violation of the NCAA constitution.[25]

---

[19] NCAA Constitution Art. 1, § A, 3.
[20] NCAA Constitution Art. 1, § B.
[21] NCAA Constitution Art. 5, § A.
[22] NCAA Constitution Art. 2, § A, 3, d.
[23] NCAA D-I Operating Bylaw, § 21.1.2.
[24] NCAA Constitution Art. 2, § B, 12
[25] The US Department of Education has yet to clarify whether revenue share dollars would be considered "financial assistance" under Title IX, requiring such dollars to be distributed

38. Member schools, including Plaintiff institutions are prohibited from approving of, providing facilities or other services to, or assisting any organization which provides assistance to its students in a manner which discriminates on the basis of sex. 34 C.F.R. § 106.37.

39. Member schools are prohibited from making revenue share payments to student athletes disproportionate to their participation rates. Categorizing "revenue sharing payments" as something other than "financial assistance" by an institution or the NCAA severely undermines the legislative intent of Congress in enacting Title IX and is not consistent with the NCAA's constitutional mandate of gender equity nor the NCAA's constitutional commitment to gender equity.

## NCAA LAWSUITS & SETTLEMENT

40. The Settlement resolves three separate class-action lawsuits filed by former student-athletes against the NCAA.[26]

41. The Settlement encompasses two broad components: injunctive relief and monetary damages.[27]

42. In short, the injunctive relief sets forth a path by which institutions will be able to compensate players not only for their participation in competition but also for their name, image, and likeness.[28]

43. These Settlement provisions directly contradict the NCAA's long held policy of amateurism as set forth in its Mission Statement and Constitution.[29]

44. The monetary relief amounts to approximately $2.8 billion in payments to former student-athletes.[30]

---

proportional to participation by each sex. See https://www.espn.com/college-sports/story/_/id/40567726/title-ix-college-athlete-revenue-share-nil. However, in the 1979 Policy Guidance on Title IX, the Department of Education asserted that "When financial assistance is provided in forms other than grants, the distribution of non-grant assistance will also be compared to determine whether equivalent benefits are proportionately available to male and female athletes. A disproportionate amount of work-related aid or loans in the assistance made available to the members of one sex, for example, could constitute a violation of Title IX."

[26] See *House*; *Hubbard*; and *Carter*. See also *House*, Doc. 450.
[27] *Id.*
[28] *Id.*
[29] See Our Division I Priorities, NCAA Website, https://www.ncaa.org/sports/2021/5/11/our-division-i-priorities.aspx (last visited August 8, 2024). See also NCAA Constitution Art. 1, § B.
[30] *EXECUTIVE SUMMARY - Congressional Briefing Paper Preliminary Assessment: Title IX and Other Implications of the Proposed Settlement of House v. NCAA, Hubbard v. NCAA, and Carter v. NCAA on Intercollegiate Athletics Programs*, The Drake Group website,

6

45. $1.65 billion of that amount will be withheld from NCAA disbursements made to the schools over the next ten years, 60% of which will be withheld from disbursements made to non-defendant, non-Power 4 conferences and their member institutions.

46. It is common knowledge that the most prominent institutions amongst collegiate athletics are found in the Power 4 Conferences, and these institutions reaped the greatest benefits from the NCAA's amateurism rules. Further, the Power 4 schools are responsible for the vast majority of the damages for which the Settlement is intended to compensate. However, the Settlement requires them to shoulder less of a financial burden than that of their less prominent counterparts.

47. The Settlement was reviewed by the NCAA's Division I Finance Committee, the Division I Board, the Board of Governor's Finance and Audit Committee, and the Board of Governors. The Board of Governors gave final approval of the Settlement.[31]

48. No part of the Settlement, including the financial components or the injunctive relief fundamentally altering the NCAA's structure, was presented to the full membership for a vote.[32]

49. Additionally, multiple conferences were given no seat at the table with regard to discussion and vetting of the Settlement.[33]

50. The Settlement further requires disbursement of settlement funds in a manner that treats male and female athletes differently, resulting in significantly higher payments to male versus female athletes.[34]

## IMPACT ON SOUTH DAKOTA

51. Both South Dakota State University and the University of South Dakota are Division I schools, members of the Summit League Basketball Conference, the Missouri Valley Football Championship Subdivision Conference, and the NCAA.

52. As a result of Defendant's conduct, Plaintiffs have been damaged in an amount to be determined by a jury.

---

https://www.thedrakegroup.org/wp-content/uploads/2024/07/EXECUTIVE-SUMMARY-Congressional-Briefing-Paper-1.pdf (last visited August 21, 2024).
[31] Exhibit 2.
[32] Id.
[33] Exhibit 3.
[34] See House, Doc. 450-4, 35.

## CLAIMS FOR RELIEF

### CLAIM I: BREACH OF CONTRACT

53. Plaintiffs restate and incorporate by reference the foregoing paragraphs as though fully set forth herein.

54. The NCAA Constitution establishes amateurism as one of its guiding principles.

55. The NCAA Constitution may only be amended by a vote of the full membership at the Annual Convention.

56. No such vote was taken.

57. The decision to enter into the Settlement was made by the following entities despite components that fundamentally change the NCAA Constitution: Division I Finance Committee, the Division I Board, the Board of Governor's Finance and Audit Committee, and the Board of Governors.

58. This act violated the NCAA Constitution and, by extension, the agreement between the NCAA and its member institutions.

59. As a result of this contract breach, the University of South Dakota, South Dakota State University, and the State of South Dakota have been injured.

### CLAIM II: BREACH OF CONTRACT

60. Plaintiffs restate and incorporate by reference the foregoing paragraphs as though fully set forth herein.

61. Neither the NCAA Constitution nor Bylaws grants explicit authority for the Board of Directors or Board of Governors to settle litigation.

62. Authority not explicitly granted to the governing bodies of the NCAA is reserved to the divisions.

63. The NCAA lacked authority pursuant to the NCAA Constitution and Bylaws to enter into the Settlement.

64. As a result of this contract breach, the University of South Dakota, South Dakota State University, and the State of South Dakota have been injured.

## CLAIM III: BREACH OF FIDUCIARY DUTIES OF CARE AND LOYALTY

65. Plaintiffs restate and incorporate by reference the foregoing paragraphs as though fully set forth herein.

66. Members owe a fiduciary duty of care and loyalty to the other members and the organization, requiring diligence, due care, and the exercise of the utmost good faith and fair dealing. Members must act in good faith and refrain from transactions in which they receive an improper personal benefit.

67. NCAA leadership is weighted in favor of representatives from the Power 4 Conferences.

68. NCAA leadership, without consulting the full membership, placed the bulk of the hardship of the disbursement reductions on the non-Power 4 conferences to the benefit of the Power 4 Conferences.

69. In doing so, their decisions were designed to benefit their own institutions at the expense of the less prominent institutions.

70. As a result of these breaches of fiduciary duty, the University of South Dakota, South Dakota State University, and the State of South Dakota have been injured.

## CLAIM IV: UNJUST ENRICHMENT

71. Plaintiffs restate and incorporate by reference the foregoing paragraphs as though fully set forth herein.

72. The NCAA governing bodies are led by representatives from the Power 4 Conferences.

73. The Settlement, entered into by the NCAA governing bodies, places the bulk of the financial burden for the cost of the Settlement on the non-Power 4 Conferences.

74. These decisions were made to and for the benefit of the Power 4 Conferences.

75. As a result of these decisions, the University of South Dakota, South Dakota State University, and the State of South Dakota have been injured.

## CLAIM V: DERIVATIVE ACTION TO ENFORCE RIGHT OF MEMBERS TO VOTE ON CHANGES TO NCAA CONSTITUTION

76. Plaintiffs restate and incorporate by reference the foregoing paragraphs as though fully set forth herein.

77. Plaintiffs are members of the NCAA by and through the public universities.

78. Plaintiffs were members of the NCAA at the time of the approval of the settlement by the NCAA Board of Governors.

79. Members of the NCAA have a right to vote on changes in the NCAA Constitution.

80. Approval of the Settlement by the NCAA Board of Governors effectively changed or violated the NCAA Constitution's prohibition on compensating student-athletes for athletic performance, a guiding principle upon which Plaintiffs and other similarly situated schools have relied.

81. The NCAA Constitution may only be amended by a vote of the full membership at the Annual Convention.

82. No such vote was taken.

83. Plaintiffs attempted to persuade the NCAA to take alternative action to no avail.

84. The decision to enter into the Settlement was made by the following entities despite components that fundamentally change the NCAA Constitution: Division I Finance Committee, the Division I Board, the Board of Governor's Finance and Audit Committee, and the Board of Governors.

85. Approval of the Settlement violated the NCAA Constitution and, by extension, the mutual agreement of association between the NCAA and its member institutions.

86. As a result of this violation, the University of South Dakota, South Dakota State University, and the State of South Dakota, as well as similarly situated member schools, have been injured.

## CLAIM VI: DERIVATIVE ACTION TO ENFORCE GENDER EQUITY

87. Plaintiffs restate and incorporate by reference the foregoing paragraphs as though fully set forth herein.

88. The NCAA Constitution provides that the "[a]ctivities of the Association, its divisions, conferences and member institutions shall be conducted in a manner free of gender bias." Further, it is a responsibility of the NCAA to "[P]romote gender equity . . . in all aspects of intercollegiate athletics."

89. This commitment to gender equity mirrors the responsibility of member schools under Title IX which prohibits discrimination on the basis of sex in education programs and activities that receive federal financial assistance. 20 U.S.C. § 1681.

90. The Settlement inequitably distributes the Additional Compensation Fund dollars between male and female athletes, with more than 90% of the Fund being distributed to male student-athletes, in violation of the NCAA Constitution.

91. The reduction of future revenue distributions, which would be spent equitably by member institutions between men's and women's sports, to pay former male student athletes, further violates the NCAA Constitution's prohibition on gender bias and commitment to gender equity.

92. The NCAA Constitution may only be amended by a vote of the full membership at the Annual Convention.

93. No such vote was taken.

94. Plaintiffs attempted to persuade the NCAA to take alternative action to no avail.

95. The decision to enter into the Settlement was made by the following entities despite components that fundamentally change the NCAA Constitution: Division I Finance Committee, the Division I Board, the Board of Governor's Finance and Audit Committee, and the Board of Governors.

96. Approval of the Settlement violated the NCAA Constitution and, by extension, the mutual agreement of association between the NCAA and its member institutions.

97. As a result of this violation, the University of South Dakota, South Dakota State University, and the State of South Dakota, as well as similarly situated member schools, have been injured.

WHEREFORE, Plaintiffs pray as follows:

1. For judgment in Plaintiffs' favor on all claims and issues;

2. For damages, in an amount to be determined by a jury, and other appropriate relief;

3. For a declaration of the rights and responsibilities of the NCAA Members and for an order for Defendant to specifically perform its obligations to Plaintiffs in the NCAA Constitution, Bylaws, and agreements with Plaintiffs;

4. For an injunction protecting Plaintiffs from unjust disbursements based on the Settlement;

5. For Plaintiffs' costs, disbursements, and attorney's fees; and

6. For such other and further relief as the Court deems just and equitable.

**PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY.**

*--Signature on Following Page--*

Dated this 9th day of September 2024.

**MARTY J. JACKLEY**
**SOUTH DAKOTA ATTORNEY GENERAL**

_____
Marty J. Jackley
Attorney General
1302 E. Hwy. 14, Suite #1
Pierre, South Dakota 57501
Telephone: (605) 773-3215
Email: marty.jackley@state.sd.us

_____
Grant M. Flynn
Assistant Attorney General
1302 E. Highway 14, Suite #1
Pierre, South Dakota 57501
Telephone: 605-773-3215
Email: grant.flynn@state.sd.us

*Attorneys for Plaintiffs*

13