# APPENDIX G

Forthcoming 66 Boston College Law Review ___ (2025)

## (Still) Anticompetitive College Sports

John T. Holden* & Marc Edelman** & Michael A. McCann***

### *Abstract*

In May 2024, the college sports industry was reported to be on the precipice of entering a new era in which the industry's umbrella oversight association, the NCAA, would trade in its longstanding, anticompetitive practices for a new business model that would allow individual member colleges, subject to a salary cap, to compensate their athletes for providing labor services. The proposed, new business model had materialized, in large part, through negotiations between a team of lawyers who had represented three classes of college athletes and the lawyers who represent the NCAA member schools.

Some commentators, eagerly amplifying talking points shared by class action attorneys who stand to handsomely profit, have described this proposed settlement as a monumental step to resolve the longstanding labor strife within college sports. However, this rosy portrayal of the proposed settlement ignores that, as proposed, the settlement would continue to allow NCAA member schools to deny college athletes access to free labor markets, as well as would continue to deny them any meaningful voice in determining the future governance of the college sports industry. The settlement also ignores important questions in terms of implementation, including the role of Title IX on proposed revenue allocation. This article explains why, even in the proposed new era of intercollegiate sports, there remain *bona-fide* anticompetitive concerns pertaining the NCAA's rules, as well as meaningful concerns pertaining to the future representation and voice of college athletes.

## Table of Contents

*Abstract* ............................................................................................................................................1

**Table of Contents** ..........................................................................................................................1

**Introduction** ...................................................................................................................................2

**I.    The Rise of Professional College Sports** ............................................................................3

    *A.    The Birth of Sanctioned Collegiate Sports* ......................................................................3

    *B.    College Sports Sets Course to Modernization* .................................................................6

    *C.    The Development of Contemporary College Athletics* ....................................................9

    D. The NCAA Operating in a Time of Crisis .......................................................................11

*II.    The Cases Behind the Landmark Settlement* ......................................................................15

    A. The State Antitrust Cases ..................................................................................................15

    B. The Private Antitrust Cases ..............................................................................................16

        *1.    House v. NCAA* ..........................................................................................................17

        *2.    Hubbard v. NCAA* ......................................................................................................18

3.    Carter v. NCAA .............................................................................................19

4.    *The Proposed Settlement* ............................................................................20

III.    *The Settlement is Not a Fix-All* ..........................................................................21

A.    *Unsettled Antitrust Lawsuits Against the NCAA* ..........................................22

B.    *The Employment Law Cases* .........................................................................23

C.    *Unsettled Issues Related to Title IX* .............................................................26

D.    House *Settlement May Over Promise* ............................................................28

IV.    *Four Better Alternatives to Remove Anticompetitive Restraints in College Sports* .......29

A.    *True Free Market Approach* ..........................................................................29

B.    *Competitive Conference Approach* ................................................................31

C.    *Labor Union Approach* .................................................................................32

D.    *Athlete Equity Approach* ..............................................................................33

**Conclusion** ...................................................................................................................35

## Introduction

In May 2024, the college sports industry was reportedly on the precipice of entering a new era in which the industry's umbrella oversight association, the NCAA, would trade in its longstanding, anticompetitive practices for a new business model that would allow individual member colleges, subject to a salary cap, to compensate their athletes for the labor services provided to their schools.[1] This proposed new business model has materialized, in a large part, due to negotiations between a team of lawyers that represent NCAA member schools and a team of lawyers who had represented a class of college athletes who had challenged the NCAA's limits on athlete payments based on antitrust grounds. The players' legal team was led by Jeffrey Kessler, who also represents the players unions in the NFL and NBA and is arguably the most famous plaintiffs' side sports attorney of his generation.

Many leaders within the college sports industry have praised the proposed legal settlement negotiated between Kessler's team and the college sports industry and contend it will meaningfully resolve longstanding labor strife within college sports. Most notably, NCAA president Charlie Baker suggested in a June 2024 interview with ESPN that he believes the proposed settlement would avoid

*Associate Professor, Department of Business Law and Ethics, Kelley School of Business at Indiana University.

**Professor of Law, Baruch College, Zicklin School of Business, City University of New York; Director of Sports Ethics, Robert Zicklin Center for Corporate Integrity. Based on his previous research, Professor Edelman served as a consultant for multiple plaintiffs in *Ohio v. NCAA*; he also testified before the California state legislature on the legal basis for the Fair Pay to Play Act: the nation's first name, image and likeness reform law.

***Visiting Professor of Law, Harvard Law School; Professor of Law, Director of the Sports and Entertainment Law Institute, Associate Dean for Intellectual Life, University of New Hampshire Franklin Pierce School of Law. McCann thanks his research assistant, Cody Simonton, for his excellent contributions to this project.

[1]    Dan Murphy, *Baker: Antitrust Settlement Creates Certainty for New System*, ESPN (Jun. 10, 2024), https://www.espn.com/college-sports/story/_/id/40322936/antitrust-settlement-creates-certainty-new-system (quoting the actual article, not necessarily Baker's exact words).

Forthcoming 66 Boston College Law Review ___ (2025)

"catastrophic losses" and create "more certainty for schools to plan for a new system that will allow them to share more money with their athletes."[2]

This rosy portrayal of the proposed settlement and new labor system in college sports presents an overly optimistic view of a modestly improved, yet still deeply flawed, governance structure for intercollegiate sports. Most troublingly, the proposed settlement would not result in a competitive market for college athletes' labor. Nor would it provide a voice for college athletes in the future governance process. It would also continue to ignore the important question of whether some college athletes constitute "employees" under labor law and would skirt matters of distributive justice among athletes across various sports, given that different sports have different revenue-generating potential. These are all substantial shortcomings that indicate the college sports marketplace will remain substantially anticompetitive for college athletes, even post-settlement.

This article explains why, even in the proposed new era of intercollegiate sports, there remain *bona-fide* anticompetitive concerns pertaining to the NCAA's rules and regulations, as well as concerns pertaining to representation and voice of college athletes. The article begins by providing a discussion of the conditions that gave rise to the current college sports landscape. In Section II, this article discusses the cases behind the landmark settlement and the proposed settlement itself. Section III examines still pending litigation that continues to threaten the NCAA's authoritarian model and why the settlement does not resolve the threats to the NCAA's business model. Finally, Section IV analyzes a potential path forward for college sports where the NCAA, college conferences, or potentially even individual colleges could collectively bargain to achieve desirable working environments that are not achieved by the proposed settlement.

## I.    The Rise of Professional College Sports

College sports in the United States is an approximately $19 billion annual industry,[3] which, "maximizes profits beyond a competitive rate"[4] and, at least until recently, "maintain[ed] wealth in the hands of a select few administrators, athletic directors, and coaches."[5] This $19 billion industry, however, did not begin with the cartel arrangement that made a select few college administrators, athletic directors and coaches so wealthy. Rather, it emerged out of a culture of student-organized regattas that began at Ivy League schools in the early 1850s.[6] This first section of our article explores the history of college sports, dating back to its very first boat race. It proceeds to explore how the college sports industry morphed from a series of student-run regattas into a major commercial and college-operated enterprise.

### A.  The Birth of Sanctioned Collegiate Sports

---

[2] W. Burlette Carter, *The Age of Innocence: The First 25 Years of the National Collegiate Athletic Association, 1906 to 1931*, 8 VAND. J. ENT. & TECH. L. 211, 222 (2006).

[3] *See* Arthur Davis & James Davis, *How Much are Student Athletes Worth?*, USA TODAY (Mar. 16, 2021), https://www.usatoday.com/story/opinion/2021/03/16/how-much-student-athletes-worth-march-madness-returns-does-pay-debate-column/4667334001.

[4] Marc Edelman, note, *Reevaluating Amateurism Standards in Men's College Basketball*, 35 U. MICH. J. L. REF. 861, 864 (2002).

[5] *Id.*

[6] RONALD A. SMITH, SPORTS AND FREEDOM: THE RISE OF BIG-TIME COLLEGE ATHLETICS 3 (1988) (discussing this boat race); *see also* Davis & Davis, *supra* note 3 (valuing the college sports business at $19 billion).

Forthcoming 66 Boston College Law Review ___ (2025)

The $19 billion industry that is modern collegiate sports began humbly on August 3, 1852 with a Harvard-Yale regatta on "picturesque" Lake Winnipesaukee, New Hampshire.[7] This was an *ad hoc* race that was perhaps a bit removed from the collegiate missions of either of the two colleges.[8] The event was the progeny of a conversation between a railroad superintendent, James Elkins, and a college junior at Yale named James Whiton, who, at the time, was a member of the Yale Boat Club.[9] Elkins, who worked with the railroad, had sponsored the race to promote travel to the lake."[10] He "offered the competitors an all-expenses paid vacation with lavish prizes—along with unlimited alcohol."[11] Elkins's railroad-sponsored regatta, which Harvard won, enjoyed an overwhelmingly positive reception.[12] A New York newspaper described it as filled with "'life excitement,'"[13] while one of the competing rowers hailed the event as "'unique and irreproducible as the Rhodian colossus.'"[14] Ultimately, the regatta proved so popular that students at Harvard and Yale, as well at a handful of other elite, northeast colleges, scheduled more boating races against one another. To this date, crew remains an important and popular sport on many Ivy League campuses.

Intercollegiate sports would soon expand to team sports involving balls, with the first baseball game being played between Williams College and Amherst College on July 1, 1859, in Pittsfield, Massachusetts—nearly seventeen years prior to the founding of organized baseball's National League.[15] The first football game then followed roughly ten years later in 1869, when Rutgers College played and defeated the College of New Jersey (now Princeton University) by a score of 6-4.[16] This set off the first true rivalry in American collegiate sports, with Rutgers and Princeton playing each other in football seventy-one times between 1869 and 1980.[17] At one point, the rivalry between the two student bodies became so intense that Rutgers students, arguably as part of an ongoing prank, attempted to steal the Revolutionary War cannons from Princeton's campus.[18]

By the end of the 1800s, college sports were generating gate revenues,[19] but they were also raising serious concerns about athlete safety.[20] In particular, two uniquely dangerous plays were causing

---

[7] NCAA v. Alston, 594 U.S. 69, 74 (2021).

[8] *See, e.g.*, Marc Edelman & Michael A. McCann, *A Short Treatise on College-Athlete Name, Image, and Likeness Rights: How America Regulates College Sports' New Economic Frontier*, 57 GA. L. REV. 1, 23-24 (2023) [hereinafter *A Short Treatise on College-Athlete Name, Image, and Likeness Rights*] (discussing this race).

[9] *Id.*

[10] *Alston*, 594 U.S. at 74.

[11] *Id.*

[12] *Id.*

[13] *Id.* (citation omitted).

[14] *Id.* at 75 (citation omitted).

[15] Daniel Wilco, *The Story of the First-Ever College Baseball Game, in 1859*, NCAA (July 1, 2020), https://www.ncaa.com/news/baseball/article/2020-07-01/story-first-ever-college-baseball-game-1859. While the NCAA views the Williams-Amherst game as the first collegiate baseball game, few would likely recognize the game that was played at the time, which was played under the so-called Massachusetts rules, that included four-foot-high spikes for bases, and the ability to get a runner out by throwing the ball at him and striking him. *Id.*

[16] Marc Edelman, Michael A. McCann & John T. Holden, *The Collegiate Employee-Athlete,* 2024 U. ILL. L. REV. 1, 5-6 (2024) [hereinafter *The Collegiate Employee-Athlete*].

[17] *Id.* at 6.

[18] *Id.* at 6.

[19] Wilco, *supra* note 15.

[20] *See* Bill Carey, *Football was So Brutal in the 1890s that Many Called for Its Ban*, TENNESSEE MAG. (Nov. 1, 2022), https://www.tnmagazine.org/football-was-so-brutal-in-the-1890s-that-many-called-for-its-ban/ (noting "football

football players to suffer serious head and neck injuries: (1) the "flying wedge," in which offensive players would grab hands and collide full speed at a single defender to open up a running lane for a single ballcarrier; and (2) the "hurdle play," in which two teammates would lift a smaller player carrying the football and literally throw him feet-first over the defensive linemen.[21] It was rumored that during the 1905 college football season up to 21 college players died from injuries sustained on the field,[22] including Harold Moore, the right halfback on the Union College football team who suffered a cerebral hemorrhage in a game against New York University.[23]

The mounting injuries and concerns culminated in U.S. President Theodore Roosevelt assembling universities' leaders at the White House and pushing for a plan to implement safety guidelines.[24] In December 1905, leaders of 68 collegiate institutions met in New York and formed the Intercollegiate Athletic Association of the United States.[25] This organization would become the NCAA a short time later.[26] The 1905 meeting included the appointment of an executive committee tasked with drafting "a constitution and bylaw for the new entity."[27] The resulting documents gave birth to the concept of amateurism as an NCAA principle.[28] Article VI of the constitution established the "Principles of Amateur Sport" and enunciated prohibited behaviors. These principles prevented the offering of inducements to attend particular schools and blocked the use of ineligible players, including those who were not in good standing with their institution.[29] By the end of the NCAA's second decade, however, member schools were already waging an arms race for facilities.[30] Despite the ambitious goals of the NCAA, the organization lacked meaningful authority to discipline violators; this gave rise to an illicit market and the proliferation of payments and other inducements to athletes.[31]

By the 1930s, a new plan was introduced to reform college athletics, the *Graham Plan*, named for University of North Carolina president Frank P. Graham.[32] The Graham Plan, in essence, amounted

---

degraded in the 1890s to a sport that left many of its participants crippled, disfigured or worse. In 1897, a member of the Georgia football team died in a game against Virginia — an incident that nearly led the state of Georgia to ban football.").

[21] Marc Edelman, Thomas Baker III, John Holden & Dr. Andrew Shuman, *Exploring College Sports in the Time of Covid-19: A Legal, Medical, and Ethical Analysis*, 2021 MICH. ST. L. REV. 469, 496 (2021) [hereinafter *Exploring College Sports in the Time of Covid-19*].

[22] *See* Aaron Gordon, *Did Football Cause Up to 20 Deaths in 1905*, DEADSPIN (Jan. 22, 2014), https://deadspin.com/did-football-cause-20-deaths-in-1905-re-investigating-1506758181 (noting that there existed various accounts as to the number of college football players who died as a result of football-related injuries during the 1905 season, with the number ranging from as low as 13 to as high as 21, and that, by his account, only 11 of these deaths were documented with particularity).

[23] *See Union Football Player Dies after N.Y.U. Game*, N.Y. TRIB. (Nov. 26, 1905), https://www.newspapers.com/article/new-york-tribune-halfback-harold-moore-f/25700367/.

[24] *A Short Treatise on College-Athlete Name, Image, and Likeness Rights*, *supra* note 8, at 25.

[25] Carter, *supra* note 2, at 217. Professor Rodney K. Smith notes that sixty-two members initially formed the organization. *See* Rodney K. Smith, *A Brief History of the National Collegiate Athletic Association's Role in Regulating Intercollegiate Athletics*, 11 MARQ. SPORTS L. REV. 9, 12 (2000).

[26] *Id.*

[27] Carter, *supra* note 2, at 219.

[28] *Id.* at 222.

[29] *Id.*

[30] *Id.* at 236. After Ohio State University completed a stadium holding 64,000 people in 1921, various Big Ten schools had plans to build stadiums holding more than 50,000. *Id.*

[31] *See* Alfred C. Yen, *Early Scholarship Offers and the NCAA*, 52 B.C. L. REV. 585, 595-596 (2011) (noting that the lack of enforcement power made clear that institutional reform would be needed if these violations that were antithetical to amateur sports were to be eliminated from college sports).

[32] *The Collegiate Employee-Athlete*, *supra* note 16, at 7.

Forthcoming 66 Boston College Law Review ___ (2025)

to a ban on athletic scholarships.[33] Nevertheless, the Graham Plan, much like the NCAA's previous regulatory attempts, proved short-lived, and within two years, many athletic conferences were repealing their scholarship bans.[34] Schools complained that de-emphasizing college athletics did not, in fact, have the desired effect and instead beget a situation rife with "hypocrisy and evasion."[35]

The Graham Plan would serve as the undercard to the Sanity Code, introduced a decade later.[36] The Sanity Code intended to remove a special status from college athletes and place them in the same position as other students. Athletes could then receive the kinds of assistance made available to other students, but they could not receive aid or room and board that was tied to their athletic participation.[37] The Sanity Code also introduced several restrictions on athletic eligibility, including a maximum of three years of varsity eligibility, a requirement that athletes must be undergraduates, and a requirement that athletes who transfer must be in residence at a school for one year before becoming eligible to compete.[38] The Sanity Code, like the Graham Plan before it, encountered enforcement challenges when seven universities faced potential expulsion for rule violations.[39] Expulsion required a supermajority vote of two-thirds of members, and none of the seven schools was ousted.[40] The failure of the Graham Plan and Sanity Code put the NCAA at a crossroads; without the power to enforce policies, it was nothing more than a paper tiger.[41] The NCAA then thought it found the panacea in the shape of a twenty-nine year old college dropout and journalist and named him the organization's first full-time employee.[42]

### B. *College Sports Sets Course to Modernization*

The failures of the Graham Plan and Sanity Code set college sports on a new path, one that saw the appointment of Walter Byers as leader of the organization.[43] Not even 30 at the time of hiring, Byers served as the executive director of the NCAA for 36 years and was perhaps the most consequential figure in the history of the organization.[44] Byers not only inherited two decades of failed reform efforts, but he was tasked with handling a major match-fixing scandal involving players from multiple schools, including the University of Kentucky,[45] which was coached by basketball hall of famer Adolph Rupp.[46] University leaders expected Byers would rehabilitate college basketball's reputation.[47] Byers essentially organized a boycott of Kentucky by persuading other members of the Southeastern Conference to

---

[33] *Id.*

[34] *Id.*

[35] Barton Pattie, *Graham Plan Modified by Dixie League*, Danville Bee (Dec. 11, 1937), https://www.newspapers.com/article/the-bee-graham-plan-actually-eliminated/30990100/.

[36] Lee VanHorn, *When the Sanity Code Becomes the Insanity Code: Following O'Bannon's Lead is the Key to Solving Group Licensing for NCAA Student-Athletes*, 74 Ark. L. Rev. 117, 124 (2021).

[37] *Id.* at 124-25.

[38] Michael Oriad, *NCAA Academic Reform: History, Context and Challenges*, 5 J. Intercollegiate Sport 4, 10 (2012).

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.* at 8-9.

[43] William C. Rhoden, *The Vision of Walter Byers, a Flawed Leader, Still Shapes the NCAA*, N.Y. Times (May 30, 2015), https://www.nytimes.com/2015/05/31/sports/the-vision-of-walter-byers-a-flawed-leader-still-shapes-the-ncaa.html.

[44] *Id.*

[45] Becky Harris & John T. Holden, *Reshaping College Athlete Sports Betting Education*, 47 BYU L. Rev. 389, 414 (2022).

[46] *See Adolph F. Rupp*, Basketball Hall of Fame (last visited May 30, 2024), https://www.hoophall.com/hall-of-famers/adolph-rupp/.

[47] *The Collegiate Employee-Athlete*, *supra* note 16, at 9.

not schedule games against Kentucky during the 1952-53 season.[48] The boycott accomplished what the Graham Plan and Sanity Code had failed to procure: It established the engrained authority of the NCAA.[49]

Byers then set college sports on a path to rapid commercial growth.[50] In 1952, the NCAA signed its first college football broadcasting contract for $1.14 million with NBC.[51] Collectivizing the rights of schools to bundle and package as one to broadcasters was an innovative approach and proved exponentially more valuable than the NCAA's preceding deal with NBC. However, the early Byers era also saw the NCAA pivot the organization away from potential liability for injuries.[52] Indeed, while the NCAA's founding was connected to protecting athlete safety, the organization's first executive director played a critical role in development and use of the pejorative term "student-athlete."[53] The term was intended to distinguish athletes from employees, and thus attempt to protect NCAA institutions from workers' compensation premiums and claims that resulted from on field injuries.[54] The branding effort proved successful as the phrase became part of the college sports lexicon.[55] The purported protection against employment-related litigation and concentrated power in the NCAA's office set the organization on a path toward its modern incarnation.[56]

Professor Murray Sperber noted that during the 1970s and 80s, many big time collegiate athletic departments "became franchises in College Sports Inc., a huge commercial entertainment enterprise with operating methods and objectives frequently opposed to the educational missions of the host universities."[57] Driving these enterprises were broadcast revenues from television contracts.[58] From 1952-1983, the NCAA held and negotiated the rights for all college football games.[59] While Byers had negotiated the first football broadcast deal in his early days in office, interest in the sale of broadcasting of college basketball took off with the purchase of the rights to broadcast a 1968 game between top ranked UCLA and number two ranked Houston.[60] Following success of the marquee match-up, NBC

---

[48] SI Staff, *Hidden World,* SPORTS ILLUSTRATED (Nov. 6, 2017), https://vault.si.com/vault/2017/11/06/hidden-world.

[49] *The Collegiate Employee-Athlete, supra* note 16, at 9-10.

[50] *See* Rhoden, *supra* note 43 (noting that Byers "railed against commercialization even as he encouraged and courted it through the expansion of the basketball tournament.").

[51] *The Collegiate Employee-Athlete, supra* note 16, at 10. The deal excluded the University of Notre Dame and the University of Pennsylvania, however, who had negotiated their own deals. *Id.*

[52] *Id.*

[53] WALTER BYERS & CHARLES HAMMER, UNSPORTSMANLIKE CONDUCT: EXPLOITING COLLEGE ATHLETES 69 (1995); *The Collegiate Employee-Athlete, supra* note 16, at 11.

[54] *The Collegiate Employee-Athlete, supra* note 16, at 11. Various publications and style guides now advise against the use of the term "student-athlete." Molly Harry, *A Reckoning for the Term "Student Athlete,"* DIVERSE EDUCATION (Aug. 26, 2020), https://www.diverseeducation.com/sports/article/15107633/a-reckoning-for-the-term-student-athlete.

[55] Liz Clarke, *The NCAA Coined the Term 'Student-Athlete' in the 1950s. Its Time Might Be Up,* WASH. POST (Oct. 28, 2021), https://www.washingtonpost.com/sports/2021/10/27/ncaa-student-athlete-1950s/.

[56] JOE NOCERA & BEN STRAUSS, INDENTURED: THE BATTLE TO END THE EXPLOITATION OF COLLEGE ATHLETES 141 (2016).

[57] MURRAY SPERBER, BEER AND CIRCUS: HOW BIG-TIME COLLEGE SPORTS IS CRIPPLING UNDERGRADUATE EDUCATION 33 (2000).

[58] *Id.*

[59] Jason Kersey, *Exploring the History of College Football Media Rights*, OKLAHOMAN (Aug. 28, 2013), https://www.oklahoman.com/story/sports/college/cowboys/2013/08/25/exploring-the-history-of-college-football-media-rights/60887384007/.

[60] Kevin O'Malley, *How CBS Snared the NCAA Tourney Rights from NBC 40 Years Ago—In a Competitive World of 3 Networks,* SPORTS BROADCAST J. (Apr. 4, 2021), https://www.sportsbroadcastjournal.com/how-cbs-snared-the-ncaa-tourney-rights-from-nbc-40-years-ago-in-a-competitive-world-of-3-networks/.

secured the rights to the NCAA Final Four and select other tournament games.[61] 1979 saw perhaps the most anticipated college basketball game of all time as Larry Bird's Indiana State team faced off against Ervin 'Magic' Johnson's Michigan State Spartans, a match-up that went a long way to proving there was considerable consumer interest in college basketball broadcasts.[62] In 1981, CBS approached the NCAA with a plan to significantly expand coverage of the college basketball postseason tournament, a move that laid the groundwork for the billion dollar price tags attached to college sports broadcasting packages.[63]

The commercialization of college sports was not without disputes, though the disputes between schools and the NCAA centered mainly on control.[64] The NCAA limited the number of times a school's football team could appear on television, causing schools with dominant football programs like the University of Oklahoma and the University of Georgia to object, believing money was being left on the table.[65] In 1982, the University of Oklahoma and the University of Georgia sued the NCAA, alleging that restrictions on the number of times a school can appear on television during a season violated Section 1 of the Sherman Antitrust Act.[66] The schools would prevail, setting the stage for a much more lucrative college football media marketplace and one that now features nearly every major college football game broadcast over the air or online.[67] The NCAA also netted some potential legal maneuverability in the form of dicta from Justice John Paul Stevens, who opined the NCAA needs "ample latitude" to preserve the "revered tradition of amateurism in college sports."[68] In the decades that followed, the NCAA hoisted Stevens's generous passage as a shield against future antitrust lawsuits.[69]

The NCAA's heavy reliance on ambiguous dicta in *Board of Regents*, and a subsequent victory in *NCAA v. Tarkanian,* where the Court held that the NCAA was not a state actor and therefore did not need to provide due process protections, set the stage for continued autocratic rule.[70] The NCAA would continue to grow financially throughout the 1990s and early 2000s. College football's transition to the College Football Playoff saw ESPN pay $5.64 billion for broadcast rights to the first twelve years of the event.[71] The NCAA secured an extension on its broadcasting deal for the men's basketball

---

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *See* Kersey, *supra* note 59.

[65] *Id.*

[66] NCAA v. Bd. Of Regents, 468 U.S. 85, 88 (1984).

[67] *See, e.g., College Football TV Schedules,* FB SCHEDULES (last visited May 30, 2024), https://fbschedules.com/college-football-tv-schedule/ (detailing where a consumer can watch dozens of football games during week one of the 2024 college football season).

[68] *Board of Regents*, 468 U.S. at 120.

[69] Thomas A. Baker III & Natasha T. Brison, *From* Board of Regents *to* O'Bannon*: How Antitrust and Media Rights Have Influenced College Football,* 26 MARQ. SPORTS L. REV. 331, 333 (2016).

[70] *See* NCAA v. Tarkanian, 488 U.S. 179, 197 (1988) (observing "The NCAA enjoyed no governmental powers to facilitate its investigation. It had no power to subpoena witnesses, to impose contempt sanctions, or to assert sovereign authority over any individual. Its greatest authority was to threaten sanctions … with the ultimate sanction being expulsion of the university from membership.").

[71] Jerry Hinnen, *ESPN Reaches 12-Year Deal to Air College Football Playoffs*, CBS (Nov. 21, 2012), https://www.cbssports.com/college-football/news/espn-reaches-12-year-deal-to-air-college-football-playoffs/.

Forthcoming 66 Boston College Law Review ___ (2025)

tournament with CBS in 2016, extending the record $10.8 billion deal an additional eight years for $8.8 billion.[72]

### C. The Development of Contemporary College Athletics

The disparity between the amount of revenue generated by the college sports business and the benefits that athletes receive has been called, amongst other things, an "embarrassment of financial inequity."[73] For decades, NCAA revenues surged while the organization fought tooth and nail to ensure athletes only receive compensation in the form of scholarships and room and board.[74] Even as revenues from broadcasting contracts continued to rise and the size of athletic departments bloomed, the NCAA and its member institutions resisted allowing athletes to be paid by institutions or use their own likenesses to generate revenue.[75] While the NCAA opposed athletes monetizing their likenesses, even for none sports-related endeavors,[76] the organization benefited from the association between marquee college athletes and merchandise associated with those athletes.[77] The NCAA's exploitation of the commercial value of athlete likenesses culminated in the *O'Bannon v. NCAA* litigation.[78]

The *O'Bannon* case, and the associated *Keller* case, came after former UCLA basketball star, Ed O'Bannon, was at a friend's house and observed his friend's son playing a video game from EA

---

[72] Jon Lewis, *CBS, Turner, Extend NCAA Deal Through '32; No Changes to Final Four*, SPORTS MEDIA WATCH (Apr. 2016), https://www.sportsmediawatch.com/2016/04/cbs-turner-ncaa-march-madness-eight-year-extension-final-four-cable-2032/.

[73] Kevin Blackistone, *College Athletes are Learning their Worth. No Wonder the NCAA is Concerned,* WASH. POST (May 12, 2022), https://www.washingtonpost.com/sports/2022/05/12/nil-rules-ncaa/.

[74] Indeed, NCAA restrictions at one-point limited the amount of food that could be provided and while the rules at one time reportedly allowed institutions to provide fruit and bagels as snacks, they could not provide cream cheese. In another instance, the University of Oklahoma self-reported a violation after three athletes received too much pasta at a graduation banquet. In order to resolve the violation, the athletes were required to donate the value of the pasta, $3.83, to charity before their eligibility for competition could be reinstated. *See* Steven Muma, *NCAA Finally Ends the War on Snacks*, BACKING THE PACK (Apr. 15, 2014), https://www.backingthepack.com/2014/4/15/5618690/ncaa-finally-ends-the-war-on-snacks. The NCAA later clarified that large portion sizes do not actually violate the rules; however, the athletes had already made their charitable donations. *Id.* In 2014, the NCAA amended organization rules to permit athletes to receive unlimited meals and snacks in the interest of athlete *well-being*. Michelle Brutlag Hosick, *Council Approves Meals, Other Student-Athlete Well-Being Rules*, NCAA (Apr. 15, 2014), https://www.ncaa.org/news/2014/4/15/council-approves-meals-other-student-athlete-well-being-rules.aspx.

[75] *See* Tim Dahlberg, *NCAA President: Paying Athletes Could Destroy College Sports*, DIVERSE ED. (June 19, 2014), https://www.diverseeducation.com/sports/article/15094936/ncaa-president-paying-athletes-could-destroy-college-sports (noting former NCAA president Mark Emmert testified that allowing college athletes to be paid would turn college sports into a minor league system "and we know that in the U.S. minor league sprots aren't very successful either for fan support or for the fan experience."). While it may be Emmert's opinion that Americans do not care for minor league sports, Minor League Baseball's attendance statistics suggest that may not in fact be an accurate assessment. *See e.g.,* Kevin Richard, *2023 MiLB Attendance by Average*, BALLPARK DIGEST (Oct. 16, 2023), https://www.diverseeducation.com/sports/article/15094936/ncaa-president-paying-athletes-could-destroy-college-sports.

[76] Former University of Central Florida football player, Donald De La Haye, was ruled ineligible by the University because he had a YouTube channel that was monetized with more than 110,000 followers. Thomas A. Baker III & John T. Holden, *College Esports: A Model for NCAA Reform*, 70 S.C. L. REV. 55, 56 (2018).

[77] For example, at one point in 2013, a search on the NCAA's official store with the search term "Manziel" would return results featuring Texas A&M jerseys with the number two. The same jersey worn on the field by then-Texas A&M quarterback, Johnny Manziel. *See* Bill Chappell, *NCAA Will Stop Selling Player Jerseys, Takes Web Shop Down*, NPR (Aug. 9, 2013), https://www.npr.org/sections/thetwo-way/2013/08/09/210566486/ncaa-will-stop-selling-player-jerseys-takes-web-shop-down.

[78] O'Bannon v. NCAA, 802 F.3d 1049 (9th Cir. 2015).

Sports.[79] O'Bannon was surprised to see himself in the game, or at least a near identical virtual representation of him, as he "had never consented to the use of his likeness in the video game, and he had not been compensated for it."[80] While O'Bannon was an NBA lottery pick and had played 11 seasons of pro basketball, during which time he earned millions of dollars, most of his Bruins teammates never played professionally. Yet they too were in the game, which retailed for $60, and like O'Bannon had not been paid or granted consent.[81] For its part, UCLA received a little more than $26,000 for allowing the game company to use its branding.[82]

The U.S. Court of Appeals for the Ninth Circuit's decision in the *O'Bannon* case was significant for several reasons; first, it clarified that *Board of Regents* did not provide a blanket antitrust protection with regard to the NCAA's amateurism rules.[83] Second, and even more importantly, it held that NCAA rules violated the Sherman Act as the organization could have applied less restrictive regulations such as capping "the permissible amount of scholarships at the cost of attendance," as well as allowing athletes to receive payment for the use of their name, image, and likenesses.[84] The effect of the *O'Bannon* decision was well encapsulated by *New York Times* reporter Joe Nocera, who wrote: "Thanks to O'Bannon, the college sports establishment was forced to make life a little better for athletes. But it also raised the consciousness of many athletes, causing them to realize that the deal they had struck with the universities they played for was pretty one-sided."[85] Nocera would go on to highlight a second victory, which was that the *O'Bannon* case eviscerated the NCAA's arguments that it could engage in endless anticompetitive conduct in the name of "amateurism."[86]

The *O'Bannon* case was on a parallel track with growing impatience with the imbalances in college sports; athletes on the Northwestern University football team attempted to unionize in 2014.[87] While the NLRB members would eventually reverse a decision from Region 13 that football players at Northwestern met the agency definition of employees, the case powerfully displayed athletes organizing against the NCAA's status quo.[88] A year after the NLRB's decision, California State Senator Nancy Skinner was attending a Rotary Club event in Oakland, where a speaker who had served as an economist on O'Bannon's legal team, Andy Schwarz, was discussing the restrictions on college athletes.[89] Senator Skinner would return to the State Senate and propose legislation that would allow

---

[79] *Id.* at 1055. For a detailed first-hand account of the *O'Bannon* case, see ED O'BANNON & MICHAEL MCCANN, COURT JUSTICE: THE INSIDE STORY OF MY BATTLE AGAINST THE NCAA (2018).

[80] *Id.*

[81] O'Bannon & McCann, supra note 79, at 8-15.

[82] Kristi Dosh, *How Much Did Schools Make from EA Sports's NCAA Football Previously*, BUS. COLLEGE SPORTS (May 17, 2023), https://businessofcollegesports.com/name-image-likeness/how-much-did-schools-make-from-ea-sportss-ncaa-football-previously/.

[83] *O'Bannon*, 802 F.3d at 1061-64.

[84] *Id.* at 1074-76.

[85] Joe Nocera, *O'Bannon Ruling Stands, but N.C.A.A.'s Status Quo May Yet Collapse*, N.Y. TIMES (Oct. 3, 2016), https://www.nytimes.com/2016/10/04/sports/ncaa-obannon-case-ruling-supreme-court.html.

[86] *Id.*

[87] *See* Marc Edelman, *The Future of College Athlete Players Unions: Lessons Learned from* Northwestern University *and Potential Next Steps in the College Athletes' Rights Movement*, 38 CARDOZO L. REV. 1627, 1635-36 (2017) [hereinafter *The Future of College Athlete Players Unions*] (noting that the Northwestern unionization effort resulted from a meeting between Ramogi Huma, a college athletics reform advocate, and then Northwestern University quarterback Kain Colter who reached out to him about the possibility of organizing college athletes).

[88] Nw. Univ., 362 NLRB No. 167 (N.L.R.B. 2015); Edelman, *supra* note 87, at 1640.

[89] *A Short Treatise on College-Athlete Name, Image, and Likeness Rights*, *supra* note 8, at 33.

Forthcoming 66 Boston College Law Review ___ (2025)

athletes playing in California the legal ability to monetize their NIL rights.[90] Skinner would succeed in 2019, making California the first state to protect college athletes' rights to monetize their likenesses beginning in 2023.[91] A cascade of states would follow, however, others, unlike California, were set on having effective dates earlier, increasing the pressure on the NCAA.[92] More than two dozen states passed NIL legislation, fearing that their in-state schools would be at a recruiting disadvantage if they did not act.[93] The NCAA remained steadfast despite mounting pressure.[94]

As the NCAA continued to defend its prohibitions on athletes monetizing their NIL rights, the organization fought another battle that had culminated at the Supreme Court: *NCAA v. Alston*.[95] The *Alston* case centered on a class of plaintiffs who alleged that NCAA restrictions capping academically related aid violated antitrust laws.[96] In a unanimous decision, the Supreme Court struck down the NCAA's restrictions. Writing for the Court, Justice Gorsuch stressed how college sports had unquestionably become a business, noting the then-president of the NCAA earned a salary of about $4 million per year and that some conference leaders earned even more.[97] Gorsuch also highlighted the billion dollar annual value of the men's basketball tournament's broadcasting rights.[98] These points spurred a unanimous rebuke of the NCAA's arguments that their restrictions on academically related aid somehow served a pro-competitive purpose.[99] While the majority's opinion effectively elevated the Ninth Circuit's view in *O'Bannon* that *Board of Regents* did not extend some kind of antitrust invincibility cloak on the NCAA, Justice Brett Kavanaugh went even further in his concurrence.[100] Kavanaugh opened the concurrence by stating "I add this concurring opinion to underscore that the NCAA's remaining compensation rules also raise serious questions under the antitrust laws."[101] The concurrence all but invited future challenges to NCAA regulations, and offered a dire warning for the amateurism model: "the NCAA is not above the law."[102] The following part discusses the NCAA's response to the pressure from the *Alston* decision and widespread NIL legislation.

### D. The NCAA Operating in a Time of Crisis

June 2021 marked a major inflection point in the operation of intercollegiate sports.[103] On the afternoon of June 30, 2021, just nine days after the U.S. Supreme Court's decision in *Alston*, the NCAA publicly responded to another legal challenge facing the college sports system—new state laws to ensure college athletes the right to monetize their NIL, taking effect at 12:01 AM the following

---

[90] *Id.*

[91] 2019 Cal. Legis. Serv. Ch. 383 (S.B. 206) (West).

[92] *A Short Treatise on College-Athlete Name, Image, and Likeness Rights, supra* note 8, at 34.

[93] *Id.*

[94] *Questions and Answers on Name, Image and Likeness,* NCAA (Jan. 2021), https://www.ncaa.org/sports/2019/10/29/questions-and-answers-on-name-image-and-likeness.aspx.

[95] 594 U.S. 69 (2021).

[96] *Id.* at 80-81.

[97] *Id.* at 80.

[98] *Id.* at 79.

[99] *Id.* at 106-07.

[100] *Id.*

[101] *Id.*

[102] *Id.* at 112.

[103] *See generally* Alan Blinder, *College Athletes May Earn Money from their Fame, N.C.A.A. Rules,* N.Y. Times (June 30, 2021), https://www.nytimes.com/2021/06/30/sports/ncaabasketball/ncaa-nil-rules.html (observing the close succession of the *Alston* decision with the July 1, 2021, deadline for NIL laws to take effect).

morning. In essence, the NCAA decided it would essentially do nothing.[104] The interim policy adopted by the NCAA essentially allowed athletes nationwide, even in states without NIL laws, to make money from their own images subject to minor restrictions.[105] The NCAA had just emerged from the COVID-19 pandemic where the organization faced many questions about its handling of decisions surrounding various aspects of college sports,[106] and now a combination of the federal judiciary and state legislatures had undermined the organization's authoritarian model.[107]

The NCAA declined to pursue what likely would have been a quixotic litigation strategy to challenge state NIL statutes on Commerce Clause and Contract Clause constitutional grounds.[108] States adopting NIL statutes with varying language and policies, including as to permissible forms of NIL, could have triggered a so-called "patchwork problem." This phenomenon refers to states passing conflicting laws on the same topic.[109] At least in theory, conflicting states' NIL statutes precluded the NCAA, conferences and universities from complying with NIL statutes in each and every state.[110] The NCAA had a playbook to pursue restraining orders to stop states from enforcing NIL statutes. In *NCAA v. Miller*,[111] the NCAA successfully argued that a Nevada state statute guaranteeing due process protections in disciplinary proceedings precluded the NCAA from enforcing procedural rules intended to govern all member schools across the country and could have spurred other states to pass similar, but nonetheless differing, state statutes.[112] The Ninth Circuit found the Nevada statute to run afoul of the Commerce Clause, which as interpreted by courts bars states from regulating the economy in ways that unduly interfere other states' economies.[113] The NCAA also argued Nevada's statute violated the Contract Clause, which bars states from passing laws that impair contractual obligations.[114] Yet the NCAA declined to challenge states' NIL statutes, most likely its legal argument, in earnest, was questionable, and it would have necessitated the association "run the table" and secure a restraining order in every state with such a statute.[115] A failure in one state would have doomed the strategy since the NCAA would not have been able to enforce rules uniformly in every state.

---

[104] Michelle Brutlag Hosick, *NCAA Adopts Interim Name, Image and Likeness Policy,* NCAA (June 30, 2021), https://www.ncaa.com/news/ncaa/article/2021-06-30/ncaa-adopts-interim-name-image-and-likeness-policy.

[105] *Id.*

[106] *Exploring College Sports in the Time of Covid-19, supra* note 21, at 477-81.

[107] *Id.*

[108] Michael McCann, *A Legal Playbook For The NCAA To Challenge State NIL,* SPORTICO (July 24, 2023), https://www.sportico.com/law/analysis/2023/legal-how-ncaa-challenge-state-nil-1234731783/.

[109] Devon E. Winkles, *Weighing the Value of Information: Why the Federal Government Should Require Nutrition Labeling for Food Served in Restaurants,* 59 EMORY L. J. 549, 583 (2009); see also Jack L. Goldsmith & Alan O. Sykes, *The Internet and the Dormant Commerce Clause,* 110 YALE L.J. 785, 792 (2001) (explaining how a patchwork of states' Internet regulations violated the Commerce Clause).

[110] Michael A. McCann, *Jump Ball: The Unsettled Law of Representing College Basketball Stars and Monetizing Their Names, Images, and Likeness,* 61 SANTA CLARA L. REV. 177, 206 (2021).

[111] 10 F.3d 633, 640 (9th Cir. 1993).

[112] *Id.* at 639-40.

[113] *Id.; see also* John M. Greabe, *Remedial Discretion in Constitutional Adjudication,* 62 BUFF. L. REV. 881, 929-31 (2014) (detailing application of the Dormant Commerce Clause by the U.S. Supreme Court).

[114] McCann, *supra* note 108.

[115] Michael McCann et al., *Name, Image And Likeness: A Guide To College Athlete NIL Deals, Compensation,* SPORTICO (Mar. 7, 2023), https://www.sportico.com/feature/college-athletes-paid-name-image-likeness-deals-nils-1234616329/.

Forthcoming 66 Boston College Law Review ___ (2025)

The NCAA's allowance of athletes to monetize their NIL was not the only change brought about by the events of June 2021.[116] In order to comply with the *Alston* decision, schools began to award so-called *Alston* payments to athletes.[117] In 2022, the determination was made that schools could provide an additional $5,980 to athletes in the form of cash payments.[118] While schools were able to begin compensating athletes for the total cost of college attendance, the NCAA continued to sit back and largely watch what was developing in the NIL marketplace, occasionally, conducting investigations,[119] but rarely attempting to sanction schools.[120] The NCAA's primary response, based on various reports, has been to lobby Congress requesting a legislative fix to the organization's perceived woes.[121] The NCAA has made known that an antitrust exemption is at the top of its wish list from Congress, but Congress has not taken any meaningful steps towards granting this wish.[122]

While the NCAA has futilely tried to convince Congress to grant an antitrust exemption and declare that college athletes are not employees, athletic conferences in the aftermath of *Alston* have aggressively consolidated their power.[123] The most recent iteration of college conference consolidation began when the University of Southern California, UCLA, the University of Oregon, and the University of Washington announced that they were leaving the Pac-12 Conference for the Big Ten Conference.[124] These moves were followed by the departures of the University of Utah, the University of Arizona, and Arizona State University for the Big 12 Conference.[125] Stanford and the University of California, Berkeley also left for the Atlantic Coast Conference (ACC) leaving the Pac-12 Conference with only two members, Washington State University and Oregon State University.[126] The ACC, for its part, also added Southern Methodist University to the Conference.[127] The conference realignment was largely driven by the pursuit of lucrative broadcasting contracts, values for which have ballooned

---

[116] Andy Wittry, *The On3 Guide to* Alston *Awards—Education-Related Compensation*, ON3 (Sep. 20, 2022), https://www.on3.com/college/wisconsin-badgers/news/alston-awards-ncaa-v-alston-supreme-court-of-the-united-states-brett-kavanaugh/.

[117] *Id.*

[118] *Id.*

[119] Daniel Libit & Eben Novy-Williams, *NCAA Probes BYU, Miami NIL Deal for Potential Pay-for-Play Violation*, YAHOO (Dec. 10, 2021), https://sports.yahoo.com/ncaa-probes-byu-miami-nil-213627746.html.

[120] *See, e.g.,* Jacob Feldman, *NCAA Penalizes Florida State for NIL-Related Violations*, SPORTICO (Jan. 12, 2024), https://www.sportico.com/leagues/college-sports/2024/ncaa-fsu-punishment-nil-1234762667/ (noting that Florida State University was the first school punished for violating the NCAA's NIL policy after a booster offered a recruit a $15,000 per month NIL deal while on a recruiting visit. As part of a negotiated punishment, Florida State was fined, lost several scholarships for two years, and was placed on probation for two years.).

[121] Ben Nuckols, *NCAA President says Congress Must Act to Preserve Sports at Colleges that Can't Pay Athletes*, A.P. (Feb. 23, 2024), https://apnews.com/article/ncaa-charlie-baker-congress-lobbying-f5dfbcc5e8aba387d533b392f78c8be7.

[122] *See* Amanda Christovich, *Congress is Finally Talking About College Athlete Employment Status*, FRONT OFFICE SPORTS (Mar. 12, 2024), https://frontofficesports.com/congress-is-finally-talking-about-college-athlete-employment-status/ (noting that as of March 2024, Congress had already held eleven hearings with little evidence that legislative change was imminent).

[123] *Id.*; Ralph D. Russo, *Column: It's Not Conference Realignment. It's Consolidation and No One is Safe in the Dash for Cash*, A.P. (Aug. 7, 2023), https://apnews.com/article/big-ten-big12-realignment-pac12-2ab096bb273425903f3f0bf9a1b5a852#.

[124] Doug Lederman, *Conference Realignment Poses Threats to Big-Time Sports*, INSIDE HIGHER ED. (Sep. 5, 2023), https://www.insidehighered.com/news/students/athletics/2023/09/05/conference-realignment-poses-risks-big-time-college-sports.

[125] *Id.*

[126] Josh Dubow, *Cal and Stanford Believe Move to ACC Was Needed for Survival*, A.P. (Sep. 1, 2023), https://apnews.com/article/cal-stanford-acc-conference-realignment-2259a1439f112679950c48667c2ef5f8.

[127] Pete Thamel, *ACC Adding Stanford, Cal, SMU as New Members in 2024*, ESPN (Sep. 1, 2023), https://www.espn.com/college-sports/story/_/id/38304694/sources-acc-votes-invite-stanford-cal-smu.

in recent years.[128] The shuffle and effective extinction of the Pac-12 Conference consolidated what was once the Power Five into the Power Four.[129] It also left schools in the Big Ten and Southeastern Conference (SEC) positioned far better than those in the Big 12 or ACC.[130] The expanded Big Ten and SEC, which previously added the University of Oklahoma and the University of Texas, have arguably undermined the prestige of the other two Power Four conferences.[131] While the Power Five conferences previously gained some autonomy to regulate their members,[132] the reconfigured Big Ten and SEC could potentially monopolize much of the revenue at the highest levels of college football.[133]

The NCAA has largely stood idly by as conferences usurp and consolidate power and chosen, for much of the post-*Alston*-era, to beg Congress to resolve issues plaguing the organization.[134] While its lobbying efforts have fallen short, the governing body for the vast majority of college athletics has faced increased litigation surrounding its operating model.[135] The mounting litigation has raised significant questions about the NCAA's wherewithal to survive, not only as an authoritative body, but also as a financially viable entity. The organization reportedly faced tens of billions in potential liability if plaintiffs were successful on all the pending claims.[136] Facing the prospect of bankruptcy, the NCAA made waves in 2024 when announcing it would settle several of the most prominent antitrust lawsuits for a reported $2.7 billion or $2.8 billion and for accepting a stunning plan to morph big time college sports into de facto pro sports[137] The following section examines the cases that are part of the proposed settlement, the terms of the agreement and the likely effect of the settlement on college sports.

---

[128] *How TV Money Built the Modern Power 5. Then Destroyed It.*, FRONT OFFICE SPORTS (Aug. 5, 2023), https://frontofficesports.com/newsletter/the-week-that-destroyed-the-power-5/.

[129] Michael McCann, *Colorado's Big 12 Leap May Create Super Conferences … And Legal Issues*, SPORTICO (July 31, 2023), https://www.sportico.com/law/analysis/2023/colorado-big-12-ncaa-super-conferences-alston-1234732556/.

[130] Doric Sam, *SEC, Big Ten Would've Left CFP If New Contract Wasn't Reached, Say Sankey and Peitti*, BLEACHER REP. (Apr. 22, 2024), https://bleacherreport.com/articles/10118001-sec-big-ten-wouldve-left-cfp-if-new-contract-wasnt-reached-say-sankey-and-petitti.

[131] Ralph D. Russo, *Analysis: Big Ten and SEC Power Play Undermines Credibility of Playoff, Marginalizes ACC and Big 12*, A.P. (Feb. 29, 2024), https://apnews.com/article/cfp-expansion-1529fab79b2bbe9edce620505669077b.

[132] Jake New, *Autonomy Gained*, INSIDE HIGHER ED. (Aug. 7, 2014), https://www.insidehighered.com/news/2014/08/08/ncaa-adopts-structure-giving-autonomy-richest-division-i-leagues-votes-college.

[133] Nick Schultz, *Brett Yormack: SEC-Big Ten Partnership is 'Overstated,' Power Conference Chemistry is Strong*, ON3 (May 1, 2024), https://www.on3.com/news/brett-yormack-sec-big-ten-partnership-overstated-power-conference-chemistry-strong-12/.

[134] Debbie Spander, *NCAA's NIL Answer is Not in Congress—It's in Athlete's Rights*, SPORTICO (Nov. 1, 2023), https://www.sportico.com/leagues/college-sports/2023/ncaa-nil-congress-athletes-labor-market-1234744052/.

[135] Indeed, part of the spurt of litigation the NCAA faced in the wake of *Alston* was likely attributable to Justice Kavanaugh's concurrence, and seeming invitation, for others to more directly challenge the NCAA's restrictions on athletes. Sean Gregory, *Why the NCAA Should Be Terrified of Supreme Court Justice Kavanaugh's Concurrence*, TIME (June 21, 2021), https://time.com/6074583/ncaa-supreme-court-ruling/.

[136] Ross Dellenger, *Docs: NCAA Could Face $20B in Damages, Bankruptcy if Proposed Settlement Offer Isn't Agreed Upon*, YAHOO (May 14, 2024), https://sports.yahoo.com/docs-ncaa-could-face-20b-in-damages-bankruptcy-if-proposed-settlement-offer-isnt-agreed-upon-232315637.html.

[137] *See* Billy Witz, *The N.C.A.A.'s Landmark Athlete-Pay Settlement, Explained*, N.Y. TIMES (May 24, 2024), https://www.nytimes.com/2024/05/24/us/ncaa-settlement-college-athletes-payments.html; *see also* Michael McCann, *NCAA, Power Five Ok $2.7 Billion Antitrust Settlement*, SPORTICO (May 23, 2024), https://www.sportico.com/law/analysis/2024/ncaa-antitrust-settlement-1234780061 (describing the settlement as $2.7 billion).

Forthcoming 66 Boston College Law Review ___ (2025)

## II.    *The Cases Behind the Landmark Settlement*

For nearly forty years the NCAA attempted to use an overly broad reading of *Board of Regents* as a shield, and courts—perhaps misled by NCAA lawyers who repeatedly mischaracterized dicta from that case—often found NCAA's restrictions lawful because they supposedly served a pro-competitive purpose.[138] The NCAA also wisely settled challenges before they posed too much of a threat.[139] However, the *Alston* decision, and especially Justice Kavanaugh's scorching concurrence, invited further scrutiny of NCAA restrictions and past behavior.[140] Leading the charge was the lawyer behind the *Alston* case, Jeffrey Kessler.[141] After the Supreme Court's ruling in *Alston*, however, many of the NCAA's restrictions were suddenly more vulnerable to rebuke, both at the trial court and appellate court levels.[142] Prior to the groundbreaking settlement that will undoubtedly change college sports forever, the NCAA faced judicial setbacks in attempting to justify the organization's transfer guidelines and NIL restrictions.[143] This Section discusses the five cases that the NCAA has attempted to settle in an effort to maintain control over college sports and the settlement itself. The first two cases involve litigation filed by state attorneys' general against the NCAA. The latter three were brought by private parties, which gave rise to the settlement proposal that serves as the crux of this article.

### A. *The State Antitrust Cases*

In late 2023, the NCAA faced a barrage of new antitrust challenges, two of which were filed by public actors.[144] First, in Ohio v NCAA, seven states, on December 7, 2023, sued the NCAA, challenging Bylaw 14.5.5.1 on transfer eligibility.[145] The states alleged that the NCAA restriction requiring athletes to sit for one year after transferring to a new school "unjustifiably restrains the ability of these college athletes to engage in the market for their labor as Division I college athletes," in violation of Section 1 of the Sherman Act.[146] The attorneys general highlighted that not only does the rule harm competition, but it is "not universally applied."[147] In a blistering temporary restraining order, issued only six days after the complaint's filing, Judge Bailey of the Northern District of West Virginia ruled the plaintiffs had established a likelihood of success on the merits of the antitrust claim and, therefore, were entitled to an enjoining of the NCAA's transfer restrictions.[148] The 14-day temporary restraining

---

[138] *See, e.g.,* Tanaka v. Univ. of S. California, 252 F.3d 1059, 1064 (9th Cir. 2001) (affirming a district court decision that a plaintiff, a soccer player at the University of Southern California, "failed to allege that the transfer rule has had significant anticompetitive effects within a relevant market, however defined.").

[139] *See* Michelle Brutlag Hosick, *Court Initially Approves Settlement in White Case*, NCAA (Feb. 5, 2008), https://ncaanewsarchive.s3.amazonaws.com/2008/association-wide/ncaa-agrees-to-settlement---01-30-08-ncaa-news.html (announcing that the NCAA agreed to a settlement of a case alleging that the NCAA's caps on grants-in-aid violated antitrust law).

[140] Marcia Coyle, *'The NCAA is Not Above the Law': Justice Kavanaugh Invites More Student-Athlete Pay Challenges*, LAW (June 21, 2021), https://www.law.com/dailyreportonline/2021/06/21/the-ncaa-is-not-above-the-law-justice-kavanaugh-invites-more-student-athlete-pay-challenges/?region=none&slreturn=20240504152656.

[141] Daniel Libit & Michael McCann, *Alston Lawyer Kessler Welcomes NCAA NIL Police into House*, SPORTICO (May 10, 2022), https://www.sportico.com/leagues/college-sports/2022/kessler-welcomes-ncaa-nil-fight-1234674795/.

[142] Michael McCann, *Details Matter: NCAA Settling House and Carter Won't End Legal Woes*, SPORTICO (Apr. 30, 2024), https://www.sportico.com/law/analysis/2024/ncaa-settlements-house-carter-legal-problems-1234777448/.

[143] *Id.*

[144] *Id.*

[145] Complaint, Ohio v. NCAA, No. 1:23-CV-100 (N.D.W. Va. 2023).

[146] *Id.*

[147] *Id.*

[148] Ohio v. NCAA, No. 1:23-CV-100, 2023 WL 9103711 (N.D.W. Va. Dec. 13, 2023).

order would be voluntarily converted into a preliminary injunction through the end of the academic year.[149] On May 30, 2024, the NCAA announced that it had agreed to a settlement that would make the preliminary injunction permanent.[150] Not only would the NCAA not restrict athletes from transferring multiple times, but athletes denied eligibility "since the 2019-2020 academic year" would receive an additional year of eligibility to compete.[151]

A second case, *Tennessee v. NCAA*, challenged NCAA rules regarding a ban on the use of NIL deals as a means of recruiting college athletes, either initially or through the transfer portal.[152] Like the Northern District of West Virginia, the Eastern District of Tennessee found that the NCAA's restrictions likely had a "substantial anticompetitive effect in the relevant market."[153] The Tennessee-based federal court noted that the NCAA's regulations constitute "an absolute ban on competitive bidding."[154] Judge Corker went on to cite economist Andy Schwarz and poked holes in the NCAA's theory that the restrictions promoted competitive balance by noting that the NCAA's restrictions have minimal effect on levelling the balance of talent across collegiate athletics.[155] Corker further reasoned the plaintiffs had met the burden to issue a temporary restraining order preventing the NCAA from imposing penalties on schools who induced recruits through NIL deals.[156] After Corker signed the temporary restraining order, additional states and the District of Columbia signed onto the lawsuit.[157] The combination of courtroom losses and states perceiving the NCAA as a vulnerable antitrust target has likely contributed to the NCAA's willingness to resolve cases, rather than risk a further defeat.

### B. The Private Antitrust Cases

In addition to defending public sector litigation, the NCAA has faced three private lawsuits, which it is presently attempting to settle.[158] Each of these three private lawsuits arguably goes a step further than the one before it in trying to break apart an NCAA system that has historically denied college athletes access to compensation for their role in making intercollegiate sports into a successful business venture.

---

[149] Ross Dellenger, *NCAA Memo Paves Way for More Transferring Football Players to Be Immediately Eligible Next Season,* YAHOO (Dec. 22, 2023), https://sports.yahoo.com/ncaa-memo-paves-way-for-more-transferring-football-players-to-be-immediately-eligible-next-season-204804014.html.

[150] *NCAA, States Reach Agreement in Multiple-Transfer Athlete Lawsuit,* ESPN (May 30, 2024), https://www.espn.com/college-sports/story/_/id/40246638/ncaa-states-reach-agreement-multiple-transfer-athlete-lawsuit.

[151] *Id.*

[152] Tennessee v. NCAA, No. 324CV00033DCLCDCP, 2024 WL 464164 (E.D. Tenn. Feb. 6, 2024).

[153] *Id.*

[154] *Id.*

[155] *Id.* Andy Schwarz is, indeed, the same economist that led the discussion at the Oakland Rotary Club, which influenced Nancy Skinner to introduce legislation granting athletes in California NIL rights. Will Jarvis, *The California Bill Challenging NCAA Amateurism Just Cleared Another Hurdle. Here's How It Got Started,* CHRONICLE HIGHER ED. (July 9, 2019), https://www.chronicle.com/article/the-california-bill-challenging-ncaa-amateurism-just-cleared-another-hurdle-heres-how-it-got-started/.

[156] *Tennessee,* 2024 WL 464164.

[157] John DeWispelaere & Christopher J. Walsh, *Additional States Join Virginia and Tennessee's Lawsuit Against the NCAA; NCAA in Discussions to Settle Antitrust Claims,* MCLEAN MIDDLETON (May 9, 2024), https://www.mclane.com/insights/additional-states-join-virginia-and-tennessees-lawsuit-against-the-ncaa-ncaa-in-discussions-to-settle-antitrust-claims/.

[158] Cole Forsman, *NCAA Could Face Bankruptcy in Aftermath of Antitrust Lawsuits,* Sports Illustrated (May 15, 2024), https://www.si.com/college/gonzaga/ncaa-could-face-bankruptcy-in-aftermath-of-antitrust-lawsuits.

### 1. House v. NCAA

The most prominent of the three lawsuits that the NCAA is presently attempting to settle is *House v. NCAA*: an antitrust lawsuit led by former Arizona State University swimmer Grant House, former University of Oregon and Texas Christian University basketball player Sedona Prince, and former University of Illinois football player Tymir Oliver,[159] who are each named plaintiffs challenging the NCAA's compensation caps.[160] House became involved through a fortuitous connection with a teammate's mother, who was a lawyer at Hagens Berman, which served as co-counsel on the *Alston* case, along with Jeffrey Kessler's team at Winston & Strawn.[161] In June 2020, the lawsuit was filed in the Northern District of California.[162] The complaint opened by highlighting the very obvious effect that college athletes have on the value of college athletics, noting that during a Duke University basketball game in 2019, 4.34 million people watched presumed number one overall NBA draft pick Zion Williamson sprain his knee when the sole of the Nike shoe he was wearing gave way.[163] The highly public manufacturing defect correlated with a $1.1 billion decline in Nike's market capitalization the following day.[164] The complaint further stressed that college athletes are responsible for billion dollar television deals, along with the multi-million dollar coaching salaries that have become common place in college sports.[165] These developments have transpired while athletes remained prohibited from "receiving anything of value in exchange for the commercial use of their NILs."[166] The complaint would go on to allege that the NCAA's limits on compensation for Division I athletes constitute "illegal agreements to restrain competition."[167] The complaint further insisted the NCAA's conduct was anticompetitive because "among other things, it undermines schools' efforts to compete freely for the best college recruits. Absent these nationwide restraints, Division I conferences and schools would compete amongst each other by allowing their athletes to take advantage of opportunities."[168] Only amplifying these points was a five-page section detailing the NCAA's strikingly long history of antitrust violations.[169]

As told by the complaint, the NCAA and athletic conferences engaged in "a continuing horizontal and vertical contract, combination, and conspiracy in restraint of trade in the relevant market to artificially depress, fix, maintain, and/or stabilize the prices paid (specifically, depressing, fixing, maintaining and stabilizing them at zero dollars) to members of the Classes for the use of, and to limit supply for, licensing and sale of their images, likenesses and/or names in the United States and its territories and possessions, in violation of Section 1 of the Sherman Act."[170] The plaintiffs further claim the defendants have engaged in a group boycott and refusal to deal by restricting athletes from

---

[159] Dennis Dodd, *Meet Grant House, the Man Front and Center Fighting the NCAA's Last Gasp to Cap Athlete Compensation*, CBS SPORTS (May 15, 2023), https://www.cbssports.com/general/news/meet-grant-house-the-man-front-and-center-fighting-the-ncaas-last-gasp-to-cap-athlete-compensation/.

[160] *Id.*

[161] *Id.*

[162] Complaint, House v. NCAA, No. 4:20-CV-03919 (N.D. Cal. June 15, 2020).

[163] *Id.* at ¶ 1.

[164] *Id.*

[165] *Id.* at ¶ 3.

[166] *Id.* at ¶ 5.

[167] *Id.* at ¶ ¶ 72-73.

[168] *Id.* at ¶ 87.

[169] *Id.* at ¶ ¶ 150-158.

[170] *Id.* at ¶ 268.

Forthcoming 66 Boston College Law Review ___ (2025)

monetizing their NIL rights.[171] The final claim accuses the NCAA and member conferences of unjust enrichment through their "wrongful conduct."[172] This claim insists the defendants should be disgorged of profits gained by alleged anticompetitive actions.[173]

*House* became a more serious threat to the NCAA three days after the Supreme Court delivered its opinion in *Alston*, when Judge Claudia Wilken denied the NCAA's motion to dismiss the case in its entirety.[174] In November of 2023, Judge Wilken granted class status in regard to the damages portion of the *House* litigation, setting the NCAA's potential exposure from the case at a reported $4.2 billion.[175] Some have speculated the litigation could even bankrupt the NCAA.[176] While frightening for the NCAA on its own, *House* isn't the only antitrust challenge it faces.[177]

### 2. Hubbard v. NCAA

Building upon the claims alleged by the plaintiffs in *House*, the NCAA also found itself as a defendant in *Hubbard v. NCAA*. One of the named plaintiffs in this case, Carolina Panthers running back Chuba Hubbard, had one of the most impressive single season rushing performances in the history of college football, rushing for more than 2000 yards in 2019 as an Oklahoma State University football player.[178] The other, Keira McCarrell, was an Auburn University track athlete.

The *Hubbard* complaint, which like the *House* complaint was filed in the Northern District of California, alleges that the NCAA and collegiate conferences engaged in "a continuing horizontal agreement, understanding, and concert of action among the Defendants and their co-conspirators, the purpose and effect of which was to artificially fix, depress, maintain, and/or stabilize prices received by Plaintiffs and Class members for their athletic services."[179] The complaint further maintains that the defendants were collaterally stopped from challenging their antitrust liability by virtue of the *Alston* decision.[180] As such, *Hubbard* essentially demands *Alston* payments for those who played before the *Alston* decision was rendered. Along those lines, *Hubbard* plaintiffs seek payment and treble damages for the gap between scholarships and the actual cost of attendance during their time in college.[181] If certified as a class action, *Hubbard* would represent current and former DI athletes who (1) played "at

---

[171] *Id.* at ¶ 279.

[172] *Id.* at ¶ 291.

[173] *Id.* at ¶ 292.

[174] House v. NCAA, 545 F. Supp. 3d 804, 820 (N.D. Cal. 2021). Judge Wilken did grant the NCAA's motion to dismiss claims for injunctive relief. *Id.*

[175] *Athletes Granted Class-Action Status in* House v. NCAA *Antitrust Case*, SPORTS BUS. J. (Nov. 11, 2023), https://www.sportsbusinessjournal.com/Articles/2023/11/06/house-v-ncaa-lawsuit-antitrust-college-athlete-payments.

[176] Dellenger, *supra* note 136.

[177] *See* Kassandra Ramsey, *Breaking Down* Hubbard v. NCAA *Class Action Case*, BUS. COLLEGE SPORTS (Sep. 26, 2023), https://businessofcollegesports.com/football/breaking-down-hubbard-v-ncaa-class-action-case/ (noting that several former athletes filed a lawsuit seeking damages for the NCAA having restrained the athletes' ability to receive compensation for the total cost of attendance prior to the *Alston* case).

[178] Zach Lancaster, *Chuba Hubbard Eclipses 2,000 Yards*, SPORTS ILLUSTRATED (Dec. 27, 2019), https://www.si.com/college/oklahomastate/football/chuba-hubbard-hits-2000-yards.

[179] Complaint, Hubbard v. NCAA, No. 4:23-CV-01593, at ¶ 106 (N.D. Cal. Apr. 4, 2023).

[180] *Id.* at ¶ 107.

[181] Complaint, Hubbard v. NCAA, No. 4:23-CV-01593 ¶¶ 11, 119 (N.D. Cal. Apr. 4, 2023).

any time" between April 1, 2019, and a future date when the case would be certified as a class and (2) would have met their college's requirements for receiving an academic award.[182]

The NCAA is not without defenses in *Hubbard*. It is arguably speculative that college athletes would have necessarily received academic achievement awards. Colleges must offer these awards to players and the player must have been eligible to obtain them. Not all major program schools offer these awards.[183] The players also agreed to play in college without the assurance of these awards.[184] Meanwhile, some of the players in the putative class could have also turned pro if they wished greater compensation, though age and experience eligibility restrictions in the NFL, NBA and WNBA would in some cases precluded such moves.[185]

### 3. Carter v. NCAA

The *Hubbard* case would be followed by yet another case in the Northern District of California, *Carter v. NCAA*.[186] While *House* and *Hubbard* focused on the caps on NIL compensation and *Alston* payments to former athletes, the *Carter* case went further, attacking the NCAA's ban on paying athletes for competing.[187] *Carter* is led by Buffalo Bills and former Duke University football player DeWayne Carter, Stanford soccer player Nya Harrison and *House* class representative Sedona Prince in what the trio intends to become a class action on behalf of several classes. The injunctive relief classes collectively cover all DI athletes who played from Dec. 7, 2023, to judgment while the damages classes include all current and former Power Five football and basketball who played from Dec. 7, 2019, to judgment.

It is not an overstatement to surmise *Carter* seeks a knock-out blow on amateurism. The case imagines a world where college athletes are paid their market value and not restrained by NCAA rules limiting the compensation.[188] Along those lines, *Carter* draws from the original, broader version of *Alston*, where the plaintiffs sought a full rebuke on rules limiting school-funded athlete compensation.[189] The underlying thesis is colleges would prefer to pay the players as a means of recruitment and retention, but are blocked by NCAA rules. Those schools instead spend on other ways to attract elite athletes, such as building world-class facilities or spending on employment contracts for prominent coaches.[190] If Alabama, Clemson, Georgia, Ohio State, Michigan and other marquee schools could effectively bid for the number one high school football recruit, that player would undoubtedly net much more money than the value of a grant-in-aid.

But at the district and appellate court level in *Alston*, a conclusion that goes toward ensuring a free market for athlete pay "untethered to education" was never adopted.[191] And, the version of *Alston* that

---

[182] Michael McCann, *Alston Lawyer Seeks To Claw Back Scholastic Cash For NCAA Athletes*, Sportico (Apr. 5, 2023), https://www.sportico.com/law/analysis/2023/college-athlete-antitrust-lawsuit-1234718683/.

[183] Wittry, *supra* note 116.

[184] See McCann, *supra* note 182.

[185] *Id.*

[186] Complaint, Carter v. NCAA, No. 3:23-CV-06325 (N.D. Cal. Dec. 7, 2023).

[187] *Id.* at ¶ 11.

[188] Michael McCann, *New Antitrust Lawsuit Directly Attacks NCAA Amateurism*, Sportico (Dec. 8, 2023), https://www.sportico.com/law/analysis/2023/carter-v-ncaa-could-end-ncaa-amateurism-1234755447/.

[189] *Id.*

[190] *Id.*

[191] NCAA v. Alston, 594 U.S. 69, 85 (2021).

appeared before the U.S. Supreme Court only concerned restrictions on schools reimbursing athletes for their education-related costs, a subject matter explicitly tethered to education.

While a new case, one could expect the NCAA in defending itself against the *Carter* allegations to draw from the established language of "tethered to education" to bolster its defense. To that point, the NCAA has always connected the concept of amateurism to athletes not being paid and argued this position was essential to the very essence of college sports.[192] Yet reality offers a different narrative. The *Carter* complaint argues that whatever justification there may have been for claiming that athletes should not be paid has vanished.[193] The complaint cited both NCAA president Charlie Baker urging the establishment of a trust fund for athletes and then-University of Michigan football coach Jim Harbaugh stating "'we capitalize on the talent, we should pay the talent for their contributions to the bottom line,'" to insist that any pro-competitive justification for restricting direct payment of athletes is no longer justified.[194]

The complaint hammered away at the last remnants of NCAA amateurism, bluntly stating "there are no procompetitive purposes served by the NCAA's rules prohibiting college athletes from being compensated for their athletic services. All these rules must thus be permanently enjoined."[195] Success on the merits in *Carter* would eradicate amateurism.[196] The trilogy of cases represent a multi-pronged attack on the NCAA's compensation limits and expose the organization to the risk of paying billions of dollars in damages to athletes.[197]

### 4.   The Proposed Settlement

On May 23, 2024, the NCAA and the Power Five conferences voted to approve what has been described as about a $2.8 billion agreement in the form of a settlement term sheet ("term sheet" or "proposed settlement") with the plaintiffs in the *House, Hubbard,* and *Carter* cases.[198] A term sheet is distinguishable from a final agreement in that the former reflects consonance on certain concepts and some details, but requires additional negotiations—including on potentially problematic topics.[199] Exact provisions of the term sheet agreement were not public, but as a result of a highly public negotiation, it became known that current and former college athletes would be compensated for the use of their NIL rights in television broadcasts and for NIL monies they would have earned had NCAA rules permitted players to appear in video games.[200] More significantly, however, in the context of college sports and the concept of amateurism, is the announcement that institutions will be able to

---

[192] *See generally* Kristen Muenzen, *Weakening Its Own Defense? The NCAA's Version of Amateurism,* 13 MARQ. SPORTS L. REV. 257, 259-63 (2003) (providing a description of the historical development of the NCAA's conception of amateurism).

[193] Complaint, Carter v. NCAA, No. 3:23-CV-06325, at ¶ 12 (N.D. Cal. Dec. 7, 2023).

[194] *Id.*

[195] *Id.* at ¶ 13.

[196] *See* Michael McCann, *Year in Sports Law: The NCAA Amateurism Meltdown,* SPORTICO (Dec. 27, 2023), https://www.sportico.com/law/analysis/2023/biggest-sports-law-controversies-2023-ncaa-amateurism-1234760591/ (referring to the *Carter* case as a potential "knock out").

[197] Joel Klatt, *House v. NCAA Settlement: What It Means, Why it Happened and What Happens Next?,* FOX SPORTS (May 28, 2024), https://www.foxsports.com/stories/college-football/house-v-ncaa-settlement-what-means-why-happened-what-happens-next.

[198] McCann, *supra* note 137; Murphy, *supra* note 1 (describing the settlement as "nearly $2.8 billion").

[199] Courts do not regard term sheets as binding agreements. See Michael McCann, *Ed Orgeron Divorce Court Finds Loophole In 'Binding' Term Sheet,* SPORTICO (Apr. 30, 2024), https://www.sportico.com/law/analysis/2024/ed-orgeron-lsu-contract-divorce-ruling-1234777264/.

[200] *Id.*

share revenue directly with athletes.[201] While colleges would begin to share revenue directly with athletes under the details released, the amount would be capped at $21 million per year, subject to increases as revenues increase.[202] This model is akin to those used by pro leagues in that athletes will be paid to play. The settlement effectively ends the long-played myth that college sports are only viable if the athletes are unpaid, but many questions remain.

On July 26, 2024, the parties filed a proposed settlement to Judge Wilken.[203] The filing was consistent with earlier reporting about settlement details and noted the NCAA and member schools would be obligated to annually pay athletes about $280 million over a 10-year period that begins in the 2025-26 academic year. However, the filing punted on what appear to be key specifics; those matters will require further deliberations. For example, while the agreement contemplates review of NIL deals to ensure they are not pay-for-play payments by assessing their fair market value, the agreement neglects to explain how fair market value will be assessed.[204] The agreement also contemplates the reliance on arbitration services to handle disagreements between players, schools and the NCAA about compensation, but eschews particulars on the procedures for such services.[205]

The announcement of the settlement was a shocking and abrupt turn of events.[206] But, pressure has been building on the NCAA for decades. Revenues streaming to schools, conferences, and the NCAA have grown while coaching and administrative salaries have skyrocketed. It has become increasingly unconvincing for the NCAA to maintain there is some essential market benefit to consumers that comes from not paying athletes.[207] Despite proclamations about the effect of the *proposed* settlement as representing a panacea to the NCAA's woes, that is unlikely to be the case.[208] The following section discusses why the *House* settlement is only a bandage for an NCAA that, from a legal standpoint, is bleeding profusely. The organization faces additional challenges and problems stemming from the proposed settlement itself.

### III.      *The Settlement is Not a Fix-All*

Following the announcement of the settlement numerous questions surfaced, including those regarding Power Five conferences that have been tasked with funding a significant portion of the

---

[201] *Id.*

[202] *Id.*

[203] Michael McCann, *NCAA House Settlement Handed To Judge As Reviews, Challenges Loom*, SPORTICO (July 26, 2024), https://www.sportico.com/law/analysis/2024/ncaa-house-settlement-legal-hurdles-1234790331/.

[204] Assessment of fair market value is notoriously difficult given that it relies on subjective qualities. *See* Rachel D. Godsil, *Viewing the Cathedral From Behind the Color Line: Property Rules, Liability Rules, and Environmental Racism*, 53 EMORY L.J. 1807, 1819 (2004).

[205] See McCann, supra note 203.

[206] *See generally* Becky Sullivan, *What We Know and What We Don't About a Historic Settlement to Pay College Athletes*, NPR (May 24, 2024), https://www.npr.org/2024/05/24/nx-s1-4978680/house-ncaa-settlement-pay-college-athletes (describing the settlement and some of the questions left unanswered).

[207] *See* Jayson Jenks, *The NCAA and the Myth of Amateurism*, ATHLETIC (Feb. 8, 2021), https://www.nytimes.com/athletic/2316801/2021/02/08/ncaa-amateurism-supreme-court/ (noting the growth of college sports revenues).

[208] Indeed, counsel in another lawsuit challenging NCAA regulations, Garrett Broshuis, noted in a filing before a federal judge in Colorado that the *House* settlement should not swallow up the plaintiffs in their case, which serves as a vehicle for athletes to opt out of the *House* settlement and "seek better and fairer terms for athletes." Daniel Libit, *Kessler Defends* House v. NCAA *Deal Amid* Fontenot *Case Flak,* SPORTICO (May 22, 2024), https://www.sportico.com/leagues/college-sports/2024/kessler-house-ncaa-deal-fontenot-1234780034/.

Forthcoming 66 Boston College Law Review ___ (2025)

agreement.[209] The settlement does not end the NCAA's legal challenges, but it may well sideline the biggest thorn in their side, if they are able to sideline Kessler from bringing further antitrust litigation against the NCAA.[210] For its part the NCAA plans to continue lobbying Congress in hopes of averting future litigation over the employment status of athletes.[211] Despite the tentative settlement of athlete-led antitrust suits and separate agreements with state attorneys general, the NCAA remains committed to fighting athletes tooth and nail in courts and through Congress.[212] This section examines the challenges still facing the NCAA, beginning with a series of employment law cases, before discussing the matters that the settlement does not address, which remain areas for the NCAA to navigate.

*A. Unsettled Antitrust Lawsuits Against the NCAA*

One of the limits of the NCAA's proposed settlement of the *House* case is that while the *House* settlement ends the series of antitrust lawsuits filed by Kessler and his colleagues against the NCAA, it does not resolve other antitrust challenges faced by the college sports industry. The settlement does not even resolve antitrust challenges to NCAA rules prohibiting college athlete pay. The settlement is merely a contract that, if approved by the district judge and withstands potential legal challenge, extinguishes claims at issue in *House*, *Hubbard*, and *Carter*.[213]

By way of illustration, the NCAA continues to face the risk of antitrust liability for its limits on college athlete compensation that remain under challenge in the class action litigation *Fontenot v. NCAA*, which was filed against the NCAA by a different team of attorneys that does not include Kessler. The *Fontenot* case was brought by a former University of Colorado football player, as a representative of a prospective class of athletes.[214] It alleges that, in a competitive market, college athletes would be paid a competitive market rate for their efforts, noting that in the NFL players receive a 50 percent share of revenues, and NBA players receive between 49 and 51 percent of league revenue.[215]

The *Fontenot* litigation has fought to remain separate from the settled cases; in April of 2024, the plaintiffs were successful in defeating an effort to consolidate the California cases with the Colorado-based *Fontenot* case.[216] The *Fontenot* plaintiffs defeated another effort to move the litigation to the Northern District of California in the wake of the settlement and try to usurp the *Fontenot* plaintiffs

---

[209] *See* Shehan Jeyarajah, *Vexed by* House v. NCAA's *Huge Settlement, AAC Officials Shift to Survival Mode in College Athletics' New World*, CBS SPORTS (May 30, 2024), https://www.cbssports.com/college-football/news/vexed-by-house-v-ncaas-huge-settlement-aac-officials-shift-to-survival-mode-in-college-athletics-new-world/ (noting that 90 percent of the settlement money will go to Power Five conference athletes, but up to 60 percent of the portion paid by conferences will come from non-Power Five conferences).

[210] Arguably, Kessler or Berman would also not be able to bring cases within the realm of those settled. *See* Libit, *supra* note 205.

[211] Amanda Christovich, *How the NCAA Plans to Stop Employment in Its Tracks After Settlement*, FRONT OFFICE SPORTS (June 5, 2024), https://frontofficesports.com/how-the-ncaa-plans-to-stop-employment-in-its-tracks-after-settlement.

[212] *Id.*

[213] Lauren Clatch, S*hining a Light on the Shadow-of-Trial Model: A Bridge Between Discounting and Plea Bargaini*ng, 102 MINN. L. REV. 923, 945 (2017) (discussing settlements and plea deals in the context of contractual rights).

[214] Mike Scarcella, *NCAA Faces New Lawsuit Over Athletes' Drive for Compensation,* REUTERS (Nov. 21, 2023), https://www.reuters.com/legal/litigation/ncaa-faces-new-lawsuit-over-athletes-drive-compensation-2023-11-21/.

[215] Complaint, Fontenot v. NCAA, No. 1:23-CV-03076, at ¶ 79 (D. Col. Nov. 20, 2023).

[216] In re College Athlete Comp. Antitrust Litig., No. MDL 3105, 2024 WL 1597524 (U.S. Jud. Pan. Mult. Lit. Apr. 11, 2024).

under the master settlement.[217] The *Fontenot* attorneys have argued that the case remains a viable option for those athletes unhappy with the terms of the *House* settlement.[218]

Regardless of whether the *Fontenot* case continues or if similar lawsuits surface outside of the Northern District of California, the *House* settlement leaves many questions to be answered, including what happens for athletes who are dissatisfied with the terms of the agreement, as both the *Fontenot* complaint,[219] and journalists Nicole Auerbach and Justin Williams observed, the 22 percent of revenue to be shared with athletes is significantly less than the amount shared in professional sports that have collective bargaining agreements in place.[220] Indeed, there are questions about whether the *House* settlement will be approved as is currently contemplated.[221] Judges have rejected proposed class action settlements on several grounds, including when they go too far in reconfiguring industry practices, insufficiently compensate the plaintiffs, fail to procure necessary corrective action, postpone resolution on essential terms for future deliberations or are plagued by structural defects.[222] Class members can also opt-out, which would preserve their right to initiate their own litigation, and petition an appellate court to challenge an approved settlement.[223] All of those complications are potentially relevant to NCAA's tentative settlement and could, at a minimum, substantially delay final approval.[224] As the first of potentially several legal efforts to thwart the settlement, Houston Christian University in June 2024 motioned to intervene in the Northern District of California's proceedings on grounds the settlement would compel university officials to breach fiduciary duties and harm the school's relationship with students.[225] Wilken denied the school's motion, but the school could appeal or sue the NCAA in Texas state court on breach of duty and breach of contract claims.[226]

### B.   *The Employment Law Cases*

The proposed settlement also does not resolve the employment status of college athletes—a matter that NCAA leadership has argued should be decided in the negative on the basis of the proposed

---

[217] Ben Portnoy, Fontenot *Case Remains Ongoing Twist in* House *Settlement Saga*, SPORTS BUS. J. (May 24, 2024), https://www.sportsbusinessjournal.com/Articles/2024/05/24/alex-fontenot-case-house-settlement-twist.

[218] *Id.*

[219] Complaint, Fontenot v. NCAA, No. 1:23-CV-03076, at ¶ 111 (D. Col. Nov. 20, 2023).

[220] Nicole Auerbach & Justin Williams, *What to Know about* House v. NCAA *Settlement and a Historic Day for College Sports*, ATHLETIC (May 24, 2024), https://www.nytimes.com/athletic/5517461/2024/05/24/ncaa-lawsuit-house-paying-players/?redirected=1.

[221] Michael McCann, *NCAA's Billion Dollar Settlement Faces Google Book Deal Hurdle*, SPORTICO (June 4, 2024), https://www.sportico.com/law/analysis/2024/ncaa-antitrust-settlement-approval-rejection-1234782699/ [hereinafter McCann Google Books].

[222] *See* Authors Guild v. Google Inc., 770 F. Supp. 2d 666, 669 (S.D.N.Y. 2011) (court rejects settlement for too extensively reimagining an industry); Susan P. Koniak, Feasting While the Widow Weeps: *Georgine v. Amchem Products, Inc.*, 80 CORNELL L. REV. 1045, 1158 n. 530 (detailing the rejection of a class settlement on grounds it would not adequately address the concerns that sparked the litigation); Andrew B. Serwin, *Poised On The Precipice: A Critical Examination Of Privacy Litigation*, 25 SANTA CLARA COMPUTER & HIGH TECH. L.J. 883, 951-52 (discussing the rejection of a settlement for failing to meet procedural requirements).

[223] Susanna Kim, *Conflicting Ideologies Of Group Litigation: Who May Challenge Settlements In Class Actions And Derivative Suits?*, 66 TENN. L. REV. 81, 84, 117 (1998).

[224] Michael McCann, *NCAA's Antitrust Settlement has Plenty of Red Flags*, SPORTICO (May 22, 2024), https://www.sportico.com/law/analysis/2024/ncaa-antitrust-settlement-red-flags-1234780001/.

[225] Michael McCann, *NCAA Athlete Pay Plan Challenged By Small D1 School*, SPORTICO (June 25, 2024), https://www.sportico.com/law/analysis/2024/ncaa-antitrust-settlement-houston-christian-university-challenge-1234785408/.

[226] Michael McCann, *Houston Christian May Call Legal Audible After Loss to NCAA*, SPORTICO (July 25, 2024), https://www.sportico.com/law/analysis/2024/hcu-playbook-ncaa-settlement-1234790753/.

Forthcoming 66 Boston College Law Review ___ (2025)

settlement, without any good faith legal argument for their supposition. The NCAA's long reluctance to acknowledge that at least some athletes on college campuses are employees has resulted in athletes being denied the protections to workers provided by federal and state laws, including wage and hour restrictions, and workers compensation if they become injured.[227] Much like the mounting pressure of the antitrust lawsuits that built rapidly after the *Alston* decision, the NCAA, athletic conferences, and individual institutions are experiencing growing exposure to the risk of athletes being classified as employees, a classification the organization fervently resists.[228] These good faith legal arguments that at least some college athletes at certain schools constitute employees should not be dismissed simply based on the proposed *House* settlement.

The NCAA presently faces a trilogy of legal disputes pertaining to the employment status of college athletes.[229] The first of these matters pertains to the labor status of the Dartmouth College men's basketball team—a collection of fifteen players who compete for a college lying outside of one of the NCAA Power Five conferences. Seeking better terms and conditions pertaining to their work, many of the Dartmouth College men's basketball players sought to unionize and be represented in collective bargaining by Service Employees International Union, Local 560—the exclusive representative of unionized Dartmouth College employees.[230] On February 5, 2024, National Labor Relations Board's Region One regional director, Laura Sacks, ruled that "the petitioned-for basketball laborers are employees within the meaning of the [National Labor Relations] Act," and "asserting jurisdiction would not create instability in labor relations."[231] She also ordered a union election,[232] which, not surprisingly, Service Employees International Union, Local 560 decisively won.[233] The players' attorney, Jake Krupski, has noted the basketball players' union intends to negotiate wages, hours, life insurance, health insurance, disability insurance and workers' compensation policies.[234] He also stresses that while some commentators express concern that college athlete employment would complicate the immigration status of international athletes, a union and college-employer could negotiate a provision specifying that "work" must adhere to visa requirements. Such a provision would protect the athlete and obligate the school to ensure visa compliance.[235]

Dartmouth College has since requested the agency's board review Sacks's ruling. As of this writing, the board has not agreed to review the ruling, let alone reverse it. The board only grants a request to review when there are "compelling reasons" and when the board either concludes the regional director was "clearly erroneous" or the matter raises a substantial question of law or policy.[236] In the interim,

---

[227] *See generally The Collegiate Employee-Athlete*, supra note 16, at 2-4 (describing briefly the NCAA's reluctance to classify athletes as employees and the mounting challenges).

[228] Nicole Auerbach, *College Athletes are Getting Closer to Becoming Employees. What Would Happen Next?*, ATHLETIC (Mar. 4, 2024), https://www.nytimes.com/athletic/5313992/2024/03/04/college-athletes-employees-dartmouth/.

[229] *Id.*

[230] Decision and Direction of Elections, Trustees of Dartmouth College, No. 01-RC-325633, at 1 (Feb. 5, 2024) (Regional Directors' decision).

[231] *Id.* at 2.

[232] *Id.*

[233] *Dartmouth Refuses to Work with Basketball Players' Union, Potentially Sending Case to Federal Court*, A.P. (Mar. 18, 2024), https://apnews.com/article/dartmouth-basketball-union-b8a1f60322aca1208c6f5677b6bb8c8f.

[234] Michael McCann, *This Lawyer is Taking on Dartmouth to Fight for College Athletes*, SPORTICO (Mar. 25, 2024), https://www.sportico.com/law/analysis/2024/jake-krupski-dartmouth-players-attorney-1234772236/.

[235] *Id.*

[236] Michael McCann, *Dartmouth Basketball Players Move to Block College's NLRB Appeal*, SPORTICO (Apr. 2, 2024), https://www.sportico.com/law/analysis/2024/dartmouth-basketball-players-block-nlrb-1234773448/.

the college has refused to negotiate with the elected union over the terms of conditions of work related to their men's basketball team.[237] As Dartmouth employees, the players could sue the school, arguing it is violation of the Fair Labor Standards Act, which guarantees minimum wage, and accompanying state laws.[238] Thus far, however, the players have refrained from initiating such an action, which would risk review of their employment status by a court.

At the same time as Dartmouth College is awaiting an appeal of Region 1 of the National Labor Relations Board's decision to the full NLRB, the agency is weighing whether University of Southern California ("USC") football and men's and women's basketball players are employees within the meaning of the NLRA.[239] This matter, along with one regarding UCLA basketball players, stems from separate unfair labor practice charges filed by advocates for college athlete rights, Michael Hsu and Ramogi Huma.[240] In 2023, Region 31 issued an unfair labor practice charge against USC, the Pac-12 Conference and the NCAA as joint employers. The move reflected the viewpoints of NLRB general counsel Jennifer Abruzzo, who in 2021 wrote that college athletes have statutory rights consistent with employee recognition under the National Labor Relations Act ("NLRA").[241] The purported joint employers allegedly utilized handbook rules to suppress players' employment rights and misclassified employees as student-athletes.[242] An administrative law judge, Eleanor Laws, presided over a hearing and, as of this writing, no decision has been issued. Her decision can—and almost certainly will—be appealed to the agency's board, but a finding of joint employment would mean USC, their conference (now the Big Ten) and the NCAA become responsible to pay the players wages and furnish other employment benefits. The players could also seek to form a union that would seek to bargain with their employers. Athletes at other schools could also seek recognition as employees and rely on the USC decision to bolster their argument. This is even true of athletes at public universities, which are not governed by the NLRA but instead state laws. While those state laws vary widely with some likely prohibiting public universities from becoming athletes' employers, athletes at such schools theoretically could be found employees of their conference and the NCAA.

Meanwhile, the third matter involves the employment status of a wider range of college athletes under the Fair Labor Standards Act (FLSA). The *Johnson* case was initially filed in 2019, by Trey Johnson and other athletes who allege that they were employees under the FLSA, and that the NCAA and its relevant member institutions are required to comply with FLSA regulations, including the payment of at least minimum wage to employees.[243] The *Johnson* case represents a second prong of attacking the NCAA's classification as "student-athletes" as opposed to employees. While the Dartmouth and California based NLRB cases center on the right to organize and collectively bargain, the *Johnson* case looks at the benefits athletes may already be owed.[244] Oral arguments were made before the Third

---

[237] *Dartmouth Refuses to Work with Basketball Players' Union*, *supra* note 229.
[238] McCann *supra* note 236.
[239] *The Collegiate Employee-Athlete*, *supra* note 16, at 31.
[240] *Id.* Ramogi Huma was also influential in the Northwestern University football team's unionization efforts. *The Future of College Athlete Players Unions*, *supra* note 87, at 1633-38.
[241] Michael McCann, *College Athletes Are Employees, NLRB Counsel Says*, Sportico (Sept. 29, 2021), https://www.sportico.com/law/analysis/2021/nlrb-college-athlete-memo-1234641056/.
[242] *The Collegiate Employee-Athlete*, *supra* note 16, at 31.
[243] Johnson v. NCAA, 556 F. Supp. 3d 491, 498 (E.D. Pa. 2021).
[244] *See generally* Dan Murphy, *NCAA Changes: Reviewing the NLRB and Mounting Legal Challenges*, ESPN (Feb. 8, 2024), https://www.espn.com/college-sports/story/_/id/39485414/nlrb-lawsuits-mounting-legal-challenges.

Circuit Court of Appeals in February 2023 and in July 2024, the Third Circuit affirmed the dismissal of the NCAA's motion to dismiss.[245] In doing so the Third Circuit uncompromisingly rejected NCAA theories that college athletes cannot be students and employees at the same time and underscored that arguments depicting athletes as amateurs are "circular" and unconvincing.[246] The case is advancing towards a finding in favor of at least certain college athletes.[247] The developments could spur further efforts from the NCAA to attempt to settle yet another case, or they could try their luck with the Supreme Court.[248] While the *Alston* decision examined antitrust issues, the Supreme Court observed the "enterprise profit" of the NCAA and acknowledged the role that college athletes have played in the profit growth, which could indicate that discussion of the status of at least some athletes may receive a more thorough examination than desired by the NCAA.[249]

The employment law matters are not the only reason that the antitrust settlement is unlikely to foreclose on the NCAA's legal issues, as there remains at least one additional antitrust case that is unresolved and outside the settlement's scope.[250] NCAA leaders hope the proposed *House* settlement will implicitly answer in the negative the separate question of labor status of college athletes. Baker has directly suggested that if the court approves the *House* settlement, the NCAA would gain a favorable position to lobby Congress for a statutory exemption from federal labor law.[251] We disagree. The NCAA's settling of its class-action antitrust lawsuit involving college athletes should have no legal bearing on the entirely separate question of whether certain college athletes constitute employees. While there is ample legal precedent for exempting from antitrust scrutiny the product of good faith collective bargaining negotiations between a multiemployer bargaining unit and a class of unionized professional athletes,[252] there is no precedent for exempting from labor law the product of an antitrust settlement between ununionized athletes and their collective schools or teams.

### C.  Unsettled Issues Related to Title IX

Third, the proposed *House* settlement sidesteps the important question of how, if at all, Title IX of the Education Amendments plays into the new proposed system of schools allocating a set percentage of their athletic revenues to colleges athletes.[253] In many ways, an application of Title IX to this proposed

---

[245] Johnson v. NCAA, No. 22-1223, 2024 WL 3367646 (3d Cir. July 11, 2024).

[246] *Id.* at 12.

[247] Michael McCann, *NCAA Denied Appeal In College Athlete Employee Case*, SPORTICO (July 11, 2024), https://www.sportico.com/law/analysis/2024/third-circuit-johnson-ncaa-flsa-case-1234780117/.

[248] *Id.*

[249] NCAA v. Alston, 594 U.S. 69, 80 (2021).

[250] *See* Auerbach & Williams, *supra* note 220 (quoting *Fontenot* attorney Garrett Broshuis who stated: "We brought the Fontenot case to fight for better rights for the next generation of college athletes and while we're still waiting to fully assess this proposed settlement agreement, we do have some concerns based on what is reported.").

[251] Murphy, *supra* note 1.

[252] *See* Brown v. Pro Football, Inc., 518 U.S. 231, 236-37 (1996); *see also* Mackey v. National Football League, 543 F.2d 606, 614 (8th Cir. 1976) (explaining that the non-statutory labor exemption insulates from antitrust scrutiny agreements pertaining to mandatory subjects of bargaining that primarily affect the parties to the collective bargaining relationship and are reached through bona fide arms' length bargaining).

[253] *See Title IX Question Hangs Over NCAA's $2.8 Billion House Settlement*, N.Y. POST (May 24, 2024), https://nypost.com/2024/05/24/sports/title-ix-question-hangs-over-ncaas-2-8-billion-settlement (explaining that one of the unresolved questions with respect to the House settlement involves the implications, if any, of Title IX).

new system of athlete compensation presents an issue of first impression.[254] While Title IX states that "[n]o person … shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program,"[255] there is nothing in the text of Title IX or any readily available case law that addresses what constitutes discrimination with respect to allocating revenues for a shared work product, and thus no guidance on whether a revenue-related discrimination scheme with a disparate impact on gender would *per se* constitute "discrimination."[256] As colleges paying their athletes for the use of their likenesses and revenue-generating capability is something entirely new, perhaps the closest existing analog would be the legal status under Title IX of the Education Amendments to revenue sharing for patentable, scientific discoveries where Ph.D. students of different genders contribute differently to a scientific advancement. A Westlaw search of this topic, not surprisingly, also does not turn up any Title IX cases in this arena.

Even if Title IX were deemed to fully apply to payments made by colleges to athletes for their revenue-generation in intercollegiate sports, it is uncertain whether allocation of revenues in proportion to the profitability of a given sports team (rather than allocating an equal percentage based on gender) would meet the statute's requirement.[257] While recognizing that there are subtle differences in statutory language between Title IX and other equal rights statutes,[258] it is still, at a minimum, noteworthy that the U.S. Court of Appeals for the Ninth Circuit in *Stanley v. NCAA* held, under the federal Equal Pay Act, that "the plaintiff has the burden of establishing a *prima facie* case of discrimination by showing that employees of the opposite sex were paid different wages for equal work."[259] In addition, the Ninth Circuit in *Stanley* left open the possibility that a college might be able to justify higher pay to a men's coach in a men's sport than a women's coach in that same sport if the men's sport "generates more revenue for the [college]."[260]

Without opining on how a court would ultimately resolve the application of Title IX, it seems possible, if not likely, that the implementation of a system of compensating college athletes for their work product will lead to future Title IX litigation—unless Congress were to preempt such challenges by amending Title IX to directly address the new era in college sports. While NCAA member schools continue to lobby Congress to pass a statute excluding college athletes from the scope of labor and employment law, reports have not indicated the NCAA lobbying to address the Title IX situation.[261]

---

[254] *See generally* Heather Dinich & Pete Thamel, *SEC Leaders Await Clarity on How Title IX Ties into House Settlement*, ESPN (May 29, 2024), https://www.espn.com/college-sports/story/_/id/40242479/sec-leaders-await-clarity-how-title-ix-ties-house-v-ncaa-settlement (quoting University of Texas president Jay Hartzell as appropriately explaining that "the law was not written from the standpoint of this particular kind of payment" and that "[i]t's a new thing").

[255] Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) (1972).

[256] *Id.*

[257] *See* B.P.J. by Jackson v. W. Virginia State Bd. of Educ., 98 F.4th 542, 563 (4th Cir. 2024) (explaining that "not every act of sex-based classification is enough to show legally relevant 'discrimination' for purposes of Title IX," and that "under Title IX, 'discrimination means treating an individual worse than those similarly situated.'" (citations omitted)).

[258] *See, e.g.*, B.P.J. by Jackson v. W. Virginia State Bd. of Educ., 98 F.4th 542, 563 (4th Cir. 2024) ("Although Title IX and equal protection claims are similar, they are not wholly congruent.").

[259] Stanley v. Univ. of S. California, 178 F.3d 1069, 1073-74 (9th Cir. 1999).

[260] *Id.* at 1074.

[261] Brandon Marcello, *Gut-wrenching choices, Title IX complications face college athletics in wake of* House v. NCAA *settlement*, CBS Sports (May 30, 2024), https://www.cbssports.com/college-football/news/gut-wrenching-choices-title-ix-complications-face-college-athletics-in-wake-of-house-v-ncaa-settlement/ (discussing concerns by schools in regard to Title IX and the proposed settlement).

Forthcoming 66 Boston College Law Review ___ (2025)

D. House *Settlement May Over Promise*

A final concern of the proposed *House* settlement, drawing on each of the aforementioned matters, relates to whether the settlement is even one that a judge could reasonably approve, given that the members of the settlement class are far fewer than the number of parties with reasonable antitrust grievances against the NCAA,[262] and the resulting system of college sports that would emerge seems obscured, if not opaque, to a reasonable outsider.[263] Although one of the plaintiffs' lawyers in support of the settlement compared the proposed settlement to the early 1990s *White v. NFL* Stipulation and settlement that resolved outstanding antitrust challenges by NFL players against the league, a key difference between the *White* settlement and the proposed *House* settlement is that the White settlement was coupled with players re-unionizing and reaching a new collective bargaining agreement with the NFL teams that was insulated from antitrust scrutiny based on the non-statutory labor exemption.[264] By contrast, the *House* settlement lacks any form of collective bargaining that could justify a new, albeit different, form of cap on player compensation.

In addition, as mentioned earlier, a judge may regard the proposed settlement as going too far in reshaping an entire industry.[265] For example, a judge may look to support for rejecting the settlement to a 2011 case, where a then-federal district court judge rejected a settlement involving Google Books, arguing that it would serve to significantly alter the industry.[266] The case cited was filed in 2005 and centered on Google's efforts to digitize books.[267] The lawsuit centered on Google attempting to settle with various book publishers over a plan where Google would have been allowed to scan works with rights held by publishers, "sell them on the internet and have them pop up in search results, while allowing up to 20 percent of the text to display in a search."[268] Under the proposed agreement the rights holders would receive 67 percent of sales with Google receiving the remainder.[269] Much of the issue stemmed from protection granted from copyright liability for orphaned works.[270] The protection would be unprecedented in the publishing world and could be a significant competitive advantage for Google over competitors like Amazon.[271] While it is not known whether Judge Wilken will reach the same conclusion about the *House* settlement as Judge Denny Chin did in rejecting the Google Books settlement, when one considers how dramatically college sports may be changed, there is at least the

---

[262] *See, e.g., supra* text accompanying notes 211-216 (discussing ongoing *Fontenot* antitrust litigation).

[263] *See, e.g.,* David W. Chen, Jacey Fortin & Anna Betts, *N.C.A.A. Athletes' pay Deal Raises Questions about Future of College Sports,* N.Y. TIMES (May 24, 2024), https://www.nytimes.com/2024/05/24/us/ncaa-payments-athletes-reaction.html; Ben Portnoy, *As Landmark Settlement in House Case Nears, Here are the Questions that Remain for College Sports,* SPORTS BUSINESS J. (May 20, 2024), https://www.sportsbusinessjournal.com/Articles/2024/05/20/future-of-college-athletics.

[264] *See* Pete Thamel and Dan Murphy, *Why an NCAA Antitrust Settlement will Leave a Lot of Questions Unanswered,* ESPN (May 16, 2024), https://www.espn.com/college-football/story/_/id/40158775/ncaa-house-antitrust-settlement-billions-dollars-unanswered-questions.

[265] McCann Google Books, *supra* note 221.

[266] *Id.*

[267] David Kravets, *Google Books Settlement Rejected,* WIRED (Mar. 22, 2011), https://www.wired.com/2011/03/google-books-2/.

[268] *Id.*

[269] *Id.*

[270] *Id.* Orphaned works are those where the author is unknown or whose location is unknown. *Orphan Works, U.S. COPYRIGHT OFC.* (last visited June 7, 2024), https://www.copyright.gov/orphan/.

[271] Kravets *supra* note 267.

possibility that the settlement could be rejected.[272] In fact, the following Section discusses four alternatives that would be better for athletes long term than the proposed settlement.

### IV.    *Four Better Alternatives to Remove Anticompetitive Restraints in College Sports*

The proposed new business model of college sports does little, if anything, to relieve the underlying restraint that gave rise to the *House* litigation. Indeed, prior to the *House* settlement, more than 1,000 NCAA member colleges had colluded to set the share of media rights revenues allocated to college athletes at zero. In a post-settlement era, these same schools would collude to set the share of revenues allocated to college athletes at $21 million. Even though as a matter of substantive justice, college athletes at each school receiving $21 million may seem fairer than college athletes receiving nothing, under both the old and the new system there remains some form of a salary cap in place that disrupts the basic principles of supply and demand and arguably may deflate aggregate college athlete compensation. As such, the NCAA, even in the post-settlement environment, remains deservedly susceptible to antitrust challenges.

Given that the proposed college sports settlement is clearly not the panacea that some commentators have hailed it to be, one can reasonably ask whether there are preferable alternatives to reform the economics of college sports while adhering to core principles of federal antitrust law and general societal principles. To these ends, we propose four alternative approaches: (1) a true free market approach; (2) a competitive conference approach; (3) a labor-union approach; and (4) an athlete ownership and equity approach.

### A.    *True Free Market Approach*

The true free market approach lifts the underlying collusive restraint on college athlete compensation and replaces it with true free market principles in which individual colleges would compete against one another for recruiting college athletes,[273] much as colleges currently compete against each other for recruiting professors, researchers, administrators, and coaches.[274] Without any collective restraints on colleges paying their athletes, each NCAA member college would assess the value that each prospective athlete would generate toward college revenues and bid up the salary for college athletes' services up to that breakeven amount.[275] In theory, a college may bid more money for any college

---

[272] McCann Google Books, *supra* note 221

[273] *See generally* Andrew Zimbalist, *Baseball Economics and Antitrust Immunity*, 4 SETON HALL J. SPORTS L. 287, 290 (1994) (explaining both in the context of the sports industry, the principle of free labor markets entails "the right for players to receive competitive bids for their services").

[274] *See generally* Justin Williams, *Amid '25 Year Bull Market' College Football Coaches Continue to Cash In*, ATHLETIC (Jan. 8, 2024), https://www.nytimes.com/athletic/5181955/2024/01/08/college-football-coach-contracts-jim-harbaugh-kalen-deboer (explaining how free market competition has drastically increased the salary of college football coaches) ; Dave Zirin, *An Economist Explains Why College Athletes Should Be Paid*, NATION (Mar. 27, 2015), https://www.thenation.com/article/archive/economist-explains-why-college-athletes-should-be-paid (quoting economist Andy Schwarz explaining how college sports coaches take advantage of free labor markets).

[275] *C.f.* Percy L. Greaves Jr., *How Wages are Determined: The Effect of Interventions*, Foundation for Economic Education (July 1, 1970), https://fee.org/articles/how-wages-are-determined-the-effect-of-interventions (last visited June 14, 2024). Greaves explains that the free market system for acquiring labor services works as follows:

> The more workers you hire, the higher wage rate you will have to pay. And you must pay the higher wage to all who do similar work. As you produce and offer more goods on the market, you can only

athlete's services than their expected return on investment, but such an approach would constitute irrational economic behavior, much as it would constitute irrational economic behavior for a college to pay more money in salary for a professor than the expected value of the economic return on that professor's services.[276] A college administrator who regularly runs a budget deficit for overspending on college athletes would thus likely soon find herself unemployed. The likely consequence of implementing a true free market approach for retaining college athletes would be that prospective athletes who provide the most valuable labor would receive the greatest number, and most lucrative, bids for their services and thus the highest salaries.[277] While there is no way of predicting whether the true free market approach would lead to higher salaries for college athletes than under the *House* settlement, it is clear that market dynamics, rather than some arbitrary settlement number, would dictate future market realities. Such an outcome would enhance the equitability of the rate of individual athlete compensation. It also would likely help to ensure the most efficient allocation of player labor to individual colleges.

The true free market approach is a superior way for allocating college sports revenue to the athletes than the proposed *House* settlement approach for at least four different reasons. First, to the extent one believes that the fair market price is the free market price, all college athletes under the free market approach would receive their "fair" wage and not some wage designated through *ad hoc* mechanisms.[278] Second, a true free market approach would obviate NCAA member colleges' potential liability under federal antitrust law because schools would no longer be colluding to fix athlete salaries and thus presumably not run afoul of Section 1 of the Sherman Act.[279] Third, the free market approach would obviate any moral dilemmas in terms of determining how much each athlete deserves for their services as, in a free market system, such subjective judgments are replaced by principles of supply and demand. Fourth, unlike the proposed *House* settlement system, the free-market approach would not require special judicial oversight to ensure NCAA member school compliance.

---

sell them at lower prices. Eventually you reach the marginal point, where you make no profit on the last man you hire. Wage rates are ultimately set by the marginal productivity of labor, that is the market value added to the product produced by the marginal employee, the last man hired. This is the way the free market would work, if there were no interferences. Unfortunately, the free market is something that we have never had completely at any time and may never have. However, the nearer we get to it, the better off we shall all be.

Given the conditions which the employer faces, he must pay workers pretty much the values that consumers place on their contributions. If the employer pays a higher wage, he suffers a loss. If he does not then reduce his wage rate, his number of employees, and his production to what he can sell at a price that covers his costs, he will eventually be forced out of business. No businessman can long pay costs which he cannot get back from consumers.

*Id.*

[276] *See generally id.* (explaining that in a free market, presuming rational actors, "each employer seeks to hire as many workers as he profitably can. He hires employees up to the point at which it is no longer profitable for him to hire an additional worker because he cannot sell the product of that additional worker for the wage he must pay him").

[277] *See generally id.* (explaining why "[i]n the absence of any social interference [or collusion in the marketplace among competitors], workers tend to get the full value that consumers will pay for their contribution").

[278] *See generally* Selig v. U.S., 565 F. Supp. 524, 537 (E.D. Wisc. 1983) ("Where a free market exists for an item, the best method of determining its fair market value is to look at the free market price.").

[279] *See* Sherman Act, 15 U.S.C. § 1 (stating that "[e]very contract, combination … or conspiracy in restraint of trade or commerce … is [hereby] declared to be illegal").

Forthcoming 66 Boston College Law Review ___ (2025)

Nevertheless, the true free market approach would likely spark educational concerns. For example, the optimal allocation of college athlete labor to school athletic programs might lead to elite athletes choosing colleges that are suboptimal for them from an educational perspective based on the greater economic opportunities that college can provide for them in athletic labor markets. Consider an elite high school football player who has a 4.0 GPA. Under the true free market approach, this player might gain greater incentive to attend a college that prioritizes—and pays highly for—athletes but treats academics as secondary rather than a college that would offer a top football program without the same pay but with stellar academics and career services. Of course, nothing would compel a college athlete, even under a free market system, to accept their highest dollar-valued offer; just as in any free market, a prospective college athlete may choose an employment opportunity that provides less take-home pay but a superior life environment or fringe benefits (such as the quality of the available education).

### B. Competitive Conference Approach

A second, similar approach to replacing the longstanding NCAA system would be one in which the NCAA is altogether dissolved and individual athletic conferences replace the NCAA in terms of global, economic oversight, with each individual member conference (as its own mini-NCAA) competing for the services of college athletes.[280] Much as with the true free-market approach, under this second approach there would remain free market competition for athlete services with the conferences bidding against one another for athletes. While this second approach would continue to allow for collusion among members of any individual athletic conference, it would prohibit intra-conference collusion. This approach appears consistent with Justice Gorsuch's guidance in *Alston*, where he stressed, "individual conferences remain free to reimpose every single enjoined restraint tomorrow—or more restrictive ones still."[281] With at least four major athletic conferences still in existence (the Big Ten, SEC, ACC and the Big 12), inter-conference competition would preserve important elements of supply and demand in the labor markets because at least four separate and economically powerful sources would compete for athlete labor. At the same time, this approach would allow for some degree of coordination by colleges within conferences, thus facilitating the opportunity for individual colleges to negotiate revenue-sharing or salary caps.

Much like a true free market approach, a competitive conference approach would maintain principles of supply and demand (at least at the conference level) and would not impose an arbitrary salary cap on payments to college athletes. It would also reasonably end the consolidation of big-time college athletic conferences because any further consolidation of the power conferences could elevate the merged conference's market power to the degree where the conference would lose the ability to engage

---

[280] *See* Marc Edelman, *How Antitrust Law Could Reform College Football: Section 1 of the Sherman Act and the Hope for Tangible Change*, 68 RUTGERS U. L. REV. 809, 823 (2016) (explaining that "[o]ne option that might emerge [for the future of college sports] would be the shifting of amateurism rules from the national level to the conference level, with individual conferences competing against one another to set the most desirable terms of athlete employment."); *see also* NCAA v. Alston, 594 U.S. 69, 103 (2021) (explaining that the upheld district court injunction in *Alston* "applies only to the NCAA and multiconference agreements" and that "individual conferences remain free to reimpose every single enjoined restraint tomorrow" given that schools operating concertedly at the conference level would presumably lack market power); Marc Edelman, *A Short Treatise on Amateurism and Antitrust Law*, 64 CASE W. RES. L. REV. 61, 97 (2013) ("Rules governing [college athlete] pay at the conference level, as a matter of antitrust law, would likely be far less restrictive to [college athletes], colleges and consumers because individual conferences lack sufficient market power within any relevant market to illegal restrain trade.").

[281] *Alston*, 594 U.S. at 104-05.

in conference-wide restraints or collective bidding without running afoul to federal antitrust laws.[282] While the competitive conference approach would clearly not create perfect market competition, it would likely preserve monopolistic competition or, at worst, some form of oligopoly. In any event, the individual conferences would still have the economic incentive to compete against one another for elite athletes: a result that at least might lead to higher aggregate compensation to college athletes than under *House* negotiated levels. And, the resulting system would be reasonably unlikely to run afoul to Section 1 of the Sherman Act because any coordinated effects that emerge at the individual conference level, given four or more comparable market players, might be found to lack sufficient market power to run afoul to antitrust law's Rule of Reason.

### C.  Labor Union Approach

A third approach would entail devising new 'house rules' for the college sports industry through collective bargaining between the custodians of college sports and a union representing the athletes.[283] While college athletes are not presently recognized by any NCAA member college as employees, there are several ongoing legal matters, referenced in Section III(B) of this article, which reasonably may change that and facilitate the formation of one, if not more, college athlete players union.[284] If college athletes unionize, college-employers would garner the mandatory duty under federal labor law to bargain with their players over the mandatory terms and conditions of bargaining, including wages.[285] The scope of each bargaining unit would be determined by the players themselves, subject to a standard of reasonableness and as long as there were a "community of interest" among group members.[286]

Unlike the first two approaches, a union-negotiated approach for determining college athlete compensation would not necessarily lift the concerted conduct of NCAA member schools nor does it lead to free labor-market outcomes. To the contrary, much like the proposed *House* settlement, any collectively bargained outcome would simply replace the longstanding NCAA restraint on college athlete compensation with a new economic system for college sports that representatives on behalf of the unionized players approve. However, unlike with the proposed *House* settlement, the labor union approach would almost certainly produce a collectively bargained solution insulated from antitrust scrutiny based on the "non-statutory labor exemption from antitrust law,"[287] a special exemption from antitrust law that "set[s] forth a national policy favoring free and private collective bargaining" and "substitutes legislative and administrative labor-related determinations for judicial antitrust-related determinations as to the appropriate legal limits of industrial conflict."[288] This would provide all parties

---

[282] See Michael McCann, *ACC Adds Stanford, Cal, SMU and Antitrust Risk*, SPORTICO (Sept. 1, 2023), https://www.sportico.com/law/analysis/2023/acc-expansion-antitrust-employment-law-1234735969/.
[283] *See How Antitrust Law Could Reform College Football*, *supra* note 276: (introducing the "collectively bargained model for college athletics").
[284] *See supra* Section III (B).
[285] *Collegiate Employee-Athlete*, *supra* note 16, at 38.
[286] *Id.* at 43.
[287] *See* Marc Edelman, *The District Court Decision in O'Bannon v. National Collegiate Athletic Association: A Small Step Forward for College Athlete Rights and a Gateway for Far Grander Change*, 71 WASH. & LEE L. REV. 2319, 2356 (2014) (explaining that "if college football and men's basketball players unionize as part of a multiemployer bargaining unit, the NCAA would incur an immediate obligation to bargain with these athletes over the mandatory terms and conditions of employment [and] this, in turn, would grant the NCAA the benefit of antitrust law's non-statutory labor exemption—thus allowing for collective-bargaining over athlete pay without the risk of any further antitrust liability").
[288] Brown v. Pro Football, Inc., 518 U.S. 231, 236-37 (1996).

to the collectively bargained negotiations, including NCAA member schools, certainty of averting future antitrust risk.[289]

To be clear, the *House* settlement could have resolved the underlying antitrust issues involving college athlete compensation by including unionization as one of the terms of settlement and thus contending that the new workplace terms were a product of good faith collective bargaining, insulated from antitrust scrutiny by the non-statutory labor exemption. This approach would have largely mimicked the National Football League's Winter 1993 antitrust settlement with its players in *White v. NFL*, in which the NFL players, as part of the terms of settlement, agreed to re-unionize.[290] But, substantively that is not what the *House* settlement does. This likely is because the NCAA member schools, which remain defendants in the *Johnson* action and various similar proceedings, remain unwilling to recognize the employment status of any college athletes. As such, it would be legally untenable to insulate from antitrust scrutiny a collectively bargained solution to a labor-side antitrust restraint where the underlying labor continues to be denied such rights.

### D. *Athlete Equity Approach*

A final, and perhaps uniquely novel, approach to removing anticompetitive conduct for college sports would be a system in which colleges divested their athletic programs to independent third-party entities in which the athletes enjoy equity in the underlying venture. Perhaps one way this could occur would be for each college to spin off their athletic programs into a separate entity and to create a holding company in which individuals who are currently athletes at a school could acquire shares, which, under a shareholder agreement, the college athletes would be required to sell back to the holding company upon graduating from college, transferring to a different school, or joining a professional sports league.[291]

The idea of athletes, of any type, enjoying equity in a competitive sports league in which they play, while uncommon, is not entirely unprecedented. As far back as 1890, National League baseball player John Montgomery Ward, himself a graduate of Columbia Law School and author of the *Lippincott Magazine* article entitled "*Is the Base-Ball Player Chattel,*"[292] founded the Players' League—a professional baseball league in which the participating players owned a share of the league itself. Under this model, the players operated as partners with other equity-holders, including investors, and thus shared the financial incentive in the league's overall financial success. In 1890, the upstart Players' League drew more spectators than the National League, which was perceived as the dominant professional baseball

---

[289] *See generally id.* at 237 (explaining that "[a]s a matter of logic, it would be difficult, if not impossible, to require groups of employers and employees to bargaining together, but at the same time forbid them to make among themselves or which each other *any* of the competition restricting agreements potentially necessary to make the process work or its results mutually acceptable," and thus "the implicit exemption recognizes that, to give effect to federal labor laws and policies and to allow meaningful collective bargaining to take places, some restraints on competition imposed through the bargaining process must be shielded from antitrust sanctions").

[290] *See NFL Lawsuits on Free Agency are Settled*, L.A. TIMES (Feb. 27, 1993), https://www.latimes.com/archives/la-xpm-1993-02-27-sp-606-story.html; *see also* Jonathan S. Shapiro, note, *Warming the Bench: The Nonstatutory Labor Exemption in the National Football League*, 61 FORDHAM L. REV. 1203, 1213-15 (1993) (discussing the *White* settlement and its implications).

[291] *See generally* Christopher M. McLeod, *Are Athlete-Owned Leagues a Viable Alternative for Professional Sport?*, 46 J. SPORT & SOCIAL ISSUES 51, 53 (2022) (explaining that "[i]n labor-managed firms, workers usually sell their equity back to the firm, or to new employees, when they retire, so ownership stays with the workers").

[292] Ed Edmonds, *At the Brink of Free Agency: Creating the Foundation for the Messersmith-McNally Decision 1968-1975*, 34 S. ILL. U. L.J. 565, 570 (2010).

league in the United States at the time when the Players' League was formed.[293] Unfortunately, the Players' League folded after just one season due to financial challenges, including what George Mason University Law Professor Ross E. Davies described as "financial strain and suffering from a combination of mismanagement and defections."[294]

The concept of a player-owned professional sports league emerged again more recently in the 2018 upstart Players Lacrosse League, a professional sports league founded by professional lacrosse players in which the players shared profits and decision-making with outside financial backers including traditional investment and private equity firms.[295] Meanwhile, according to an academic article published by Christopher M. McLeod, an assistant professor of sports management at the University of Florida, "athlete ownership has also existed in bull-riding, surfing, soccer, and basketball."[296]

Beyond the realm of organized sports, employee-ownership has become increasingly popular in the business world. According to a recent article in *Harvard Business Review* written by Thomas Dudley, a practitioner, and Ethan Rouen, an associate professor at Harvard Business School, "companies where at least 30% of the shares are owned by a broad-based group of employees, where all employees have access to ownership, and where the concentration of ownership is limited are more productive, grow faster, and are less likely to go out of business than their counterparts." [297]

A players' ownership model within college sports could resolve the legal concerns of the college sports marketplace by establishing a new business model based on cooperative ownership rather than employer-employee relationships. Such a model would mercifully end the unholy, and entirely accidental, emergence of American institutions of higher education serving as owners of a highly professionalized sports enterprise. In theory, colleges would remain able to license their marks, for a fee, to this new private association, but U.S. colleges and their leadership would no longer brandish direct ownership capacity over intercollegiate sports. A players' ownership model would further obviate the players' need to unionize and, at the same time, potentially go beyond the benefits that would be provided to the players by unionizing. As McLeod astutely notes, "workers, including athletes, have used unions to win the actual right to be included in decision-making, but this is not the formal right associated with ownership—it is contingent on bargaining power, national labor laws, and collective action." [298]

For those who feel a moral aversion to the notion of college athletes forming labor unions and bargaining collectively against their college employers, the athlete equity approach may be more acceptable because, rather than create an adversarial relationship between college athletes and their schools, this model "aligns the interests of the leagues with the interests of the players."[299] In some ways, such a model may also comport with the model of shared governance between faculty (as the labor force) and administration that is prevalent throughout much of higher education. At the same

---

[293] McLeod, *supra* note 291, at 52.
[294] Ross E. Davies, *Along Comes the Players Association: The Roots and Rise of Organized Labor in Major League Baseball*, 16 N.Y.U. J. OF L. & PUB. POL'Y 321, 326 (2013).
[295] McLeod, *supra* note 291, at 52, 57.
[296] *Id.* at 52.
[297] Thomas Dudley & Ethan Rouen, *The Big Benefits of Employee Ownership*, HARV. BUS. REV. (May 13, 2021), https://hbr.org/2021/05/the-big-benefits-of-employee-ownership.
[298] McLeod, *supra* note 291, at 53.
[299] *Id.* at 57.

time, however, granting players equity in the college sports enterprise would not necessarily stave off all potential antitrust lawsuits, nor would collective decision-making on independent teams enjoy a *per se* exemption from federal antitrust law much as would agreements reached through *bona-fide* collective bargaining negotiations.

The details of this fourth proposal could be fleshed out much further, perhaps in a full, standalone law review article. But, at a minimum, this approach seems to offer a more favorable potential end game for intercollegiate sports than what has been offered by the proposed *House* settlement.

**Conclusion**

It is no secret that many in the college sports industry, including diehard fans and sports journalists who never went to law school, are exhausted from reading and writing about the NCAA's legal problems. The possibility that decades of controversies over college athlete compensation could be cured through a settlement is understandably enticing. The games would go on, the college bands would play on, and there would be closure to the dizzying complexity of antitrust battles and silencing of the rancor and vitriol voiced by the lawyers who wage those battles.

The problem, as this article details, is that there is no such magic potion for what ails the college sports industry. This industry is built on more than a century of immorally extracting value from young athletes and is grounded in exploitative rhetoric and manipulative terminology. It will take much more than resolution of a lawsuit or two to reconstruct such a pervasive and entrenched mode of thinking.

The *House* settlement, moreover, could be rejected because it goes too far in reshaping a marketplace. It is vulnerable to other structural critiques that have doomed would-be class action resolutions, too. Even if Judge Wilken gives a thumbs up, a settlement is merely a contract between parties in the litigation. It would neither constitute legal precedent and nor govern those outside the arrangement. There could also be opt-outs who pursue their own cases while the settlement itself could be challenged at the Ninth Circuit and the U.S. Supreme Court.

The settlement also appears to function as a labor agreement without the involvement of labor. It contemplates revenues sharing, salary caps and other pro sports-like features that are ordinarily negotiated by leagues and players' associations and gain protection from the non-statutory labor exemption. Here, players' associations are not possible since colleges, conferences and the NCAA have yet to recognize college athletes as employees and labor law requires that unions consist of employees. That raises a related complication for those seeking closure: there are multiple efforts afoot for college athletes to gain employment status. These efforts are also advancing and will take years to play out. While collectively bargained terms of employment benefit from the non-statutory labor exemption, imposed terms are ripe for antitrust scrutiny.

This article proposes four alternatives that would complement or substitute a settlement and, we contend, offer advantages (and disadvantages) that warrant further exploration.

The True Free Market Approach would let basic economics dictate outcomes, as it does for professors, administrators and staff. If a college wishes to pay a recruit to enroll or a current star

Forthcoming 66 Boston College Law Review ___ (2025)

athlete to not transfer, it can pay her. The athlete, in turn, can seek superior offers in a marketplace of university buyers. We recognize this concept is disruptive, unabashedly financial and might betray important educational goals. But it would accurately recognize athletes are economic actors who sell services.

The Competitive Conference Approach envisions conferences as leagues in the vein of mini-NCAAs. Member colleges would set economic and academic rules for sports. This approach is less egalitarian than, and not as competitive as, a free market, but it would carry several advantages. For starters, conferences have already moved away from the NCAA and functioned with greater autonomy in recent years. This approach would also see conferences compete with one another in ways that would improve athletes' conditions. Further, it would comply with the antitrust standard enunciated in *Alston*, where the Supreme Court states that conferences remain free to set their own rules.

The Labor Union Approach would recognize that many college athletes meet the legal definition of employees and should be able to unionize. This approach would engender equity in the form of treating collegiate employee-athletes appropriately under labor and employment laws, and union-bargained terms would be shielded from antitrust scrutiny. With antitrust worries likely to predominate for some time, the chance for colleges to negotiate workplace rules without accompanying risk of being sued over anticompetitive conduct has appeal.

Lastly, the Athlete Equity Approach would empower college athletes by making them owners in the college sports system. The athletes would gain shares and would be required to sell them when their collegiate athletic careers end or if they transfer schools. This may seem like a radical idea, but it is not unprecedented in American sports and is not quixotic when considering worker-ownership models in the business world.

While college sports has not always been welcoming to the marketplace of ideas, especially ideas that urge structural reforms, it is that marketplace that might save college sports. It would be worth it for the powerbrokers of this industry to shop around.