# APPENDIX I



**Portfolio Media. Inc.** | 230 Park Avenue, 7th Floor | New York, NY 10169 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# Proposed NIL Deal Leaves NCAA Antitrust Liability Door Open

By Yaman Desai (August 2, 2024, 3:01 PM EDT)

For decades, the NCAA has built the billion-dollar business of college athletics on the central premise that its athletes were amateurs and therefore unpaid. While the NCAA and its member institutions raked in record revenue, student-athlete compensation was capped at scholarships and little else.



In recent years, that approach has drawn antitrust ire, as current and former student-athletes and a bipartisan coalition of state attorneys general challenged various NCAA policies across the county.

The NCAA **recently filed** a proposed settlement of perhaps the most prominent of those cases, House v. NCAA, which was filed in 2020 in the U.S. District Court for the Northern District of California.

Yaman Desai

As part of the settlement, the NCAA agreed to billions of dollars of back payments to former student-athletes and revenue sharing moving forward. But while the settlement opens the door to significant direct payments to student-athletes for the first time, it also creates a framework ripe for antitrust liability.

That is because the settlement still represents an agreement among competitors to limit labor costs, it is unlikely to withstand future antitrust scrutiny.

## House Challenges the NCAA's Foundation

The NCAA is built on its conception of "amateurism." The foundational pillar of this model has been labeling its labor as student -athletes that are not paid for their participation. But that framing has been under attack.

Concurring in the U.S. Supreme Court's 2021 NCAA v. Alston decision, Justice Brett Kavanaugh famously questioned the NCAA's so-called circular theory that it "can justify not paying student athletes a fair share of the revenue" by proffering a "defining characteristic of college athletics ... that colleges do not pay student athletes."[1]

Former swimmer Grant House sought to deal another blow to the NCAA's business model. The plaintiffs challenged a series of NCAA rules that restricted student-athlete compensation.

The first was the NCAA's prior total ban on student-athletes being paid for their name, image and likeness.

The second was the NCAA's subsequent interim policy that allows student-athletes to be paid for their NIL, but restricts any payments directly from a university or payments contingent on an athlete's participation, performance or enrollment.

The final challenged rule was the NCAA's exclusion of student-athletes from sharing in the billions of dollars of revenue generated from licensing deals and television contracts.

The House plaintiffs contended that each of these policies unreasonably restrained trade, resulting in an anticompetitive market that suppressed student-athlete compensation in violation of Section 1 of the Sherman Act.

They sought approximately $3 billion in actual damages, subject to be trebled to $9 billion. NCAA President Charlie Baker painted a potential adverse verdict as "devastating and unsustainable."[2]

## A Potentially Groundbreaking Settlement

On July 26, the plaintiffs filed a preliminary settlement of House and two related cases. The settlement contemplates the NCAA and its conferences paying former student-athletes approximately $2.78 billion in back pay over 10 years.

It also opened the door for future revenue sharing with student-athletes, permitting universities to pay athletes up to "22% of the average Autonomy 5 ticket and sponsorship revenue" starting in 2025.[3] With average revenue estimated to be approximately $100 million, the agreement would allow schools to directly pay athletes roughly $20 million per year.[4]

Though the settlement agreement details much of the payment regime, lingering questions remain. The settlement

allows current athletes to opt out, and allows for termination if a redacted threshold of athletes do so. Even for athletes that opt in, it is unclear how future revenue sharing will be distributed.

And courts have yet to weigh in as to whether the settlement implicates Title IX. Still, the settlement is expected to obtain court approval in the coming weeks.

**The Settlement Does Not Absolve Antitrust Liability**

In the wake of settlement, Baker declared that the agreement "ends decades of antitrust litigation."[5] But the NCAA's antitrust liability is far from resolved. Most notably, the 22% cap on revenue sharing is an agreement among NCAA member institutions to fix labor costs.

"[P]rice-fixing labor is ordinarily a textbook antitrust problem because it extinguishes the free market in which individuals can otherwise obtain fair compensation for their work," Justice Kavanaugh wrote in Alston.[6]

Though member universities are aligned under the NCAA banner, they are "separate economic actors" with independent management that "compete with one another, not only on the playing field, but to attract fans, for gate receipts, and for contracts with managerial and playing personnel," according to the Supreme Court's 2010 decision in American Needle Inc. v. National Football League.[7]

The cap is an agreement between these competitors to "suppress the pay of student-athletes who collectively generate billions of dollars in revenues for colleges every year,"[8] Justice Kavanaugh wrote in Alston. By agreeing to a ceiling on student-athlete compensation, competing universities are conspiring to limit their potential labor costs.

Similar agreements among competitors are routinely subject to antitrust scrutiny.[9] It is a test the NCAA would likely fail. The cap is significantly lower than the percentage of revenue dedicated to athletes in professional sports such as the NBA and NFL, both of which hover around 50%.[10]

Importantly, those amounts are collectively bargained between ownership and the respective players' unions, creating insulation from antitrust liability.[11]

Aware of this disparity, the NCAA seems to go out of its way to emphasize that fully participating universities "would be providing nearly 50 percent of athletics revenue to their student athletes."[12] This figure assumes that schools distribute revenue at the maximum allowed level. And it includes benefits such as academic support and nutrition services that are neither direct payments to athletes nor distinct from their athletic responsibilities.

In addition, the NCAA's cap is tied to the average revenue of five autonomy conference schools, including those in the all-but-defunct Pac-12. But the wide disparity in revenue generated by those universities will result in Southeastern Conference and Big Ten Conference schools, which make the highest revenues, allocating far less than 22% of their revenue to student-athletes. These shortcomings will likely subject the NCAA to future antitrust liability.

Perhaps recognizing these pitfalls, the settlement reportedly requires opting-in student-athletes to agree to waive future antitrust claims against the NCAA. Assuming student-athletes opt in and agree to the waiver, it is unlikely to protect the NCAA.

Courts are skeptical of waivers of liability for future conduct.[13] A supposed release of antitrust liability for the revenue sharing cap, which is itself being created through the settlement, would thus likely be unenforceable.

**A Path Forward**

House is just one of numerous antitrust cases against the NCAA pending nationwide. In recent years, individual student-athletes and state governments have challenged various NCAA policies, ranging from compensation to transfer restrictions to limited academic benefits.

The NCAA has repeatedly lobbied for a federal waiver to swiftly resolve these lawsuits and avoid future liability. But so far, Congress seems uninterested.

Instead, the NCAA has an open pathway to both resolve current lawsuits and mitigate future antitrust claims. Much like professional leagues, the NCAA could collectively bargain with student-athletes. Collective bargaining would allow the NCAA to negotiate and reach an agreement on hot-button issues such as revenue sharing.

And any resulting agreement would likely be exempt from significant antitrust liability. The NCAA's unwillingness to engage in collective bargaining, particularly in light of the considerable leverage it would inevitably exercise in negotiations, is a significant error that continues to threaten the NCAA's viability.

Until the NCAA agrees to collectively bargain with student-athletes, it is unlikely to avoid the ongoing onslaught of antitrust liability.

*Yaman Desai is a senior associate at Lynn Pinker Hurst & Schwegmann LLP.*

*The opinions expressed are those of the author(s) and do not necessarily reflect the views of their employer, its clients, or Portfolio Media Inc., or any of its or their respective affiliates. This article is for general information purposes and is not intended to be and should not be taken as legal advice.*

[1] Nat. Collegiate Athletic Ass'n v. Alston 🔴 , 594 U.S. 69, 110, 141 S. Ct. 2141 (2021) (Kavanaugh, J., concurring).

[2] https://www.nytimes.com/athletic/5517461/2024/05/24/ncaa-lawsuit-house-paying-players/.

[3] https://www.ncaa.org/news/2024/7/26/media-center-settlement-documents-filed-in-college-athletics-class-action-lawsuits.aspx.

[4] https://abcnews.go.com/Sports/ncaa-power-conferences-agree-schools-pay-players/story?id=110522364#:~:text=If%20players%20opt%20out%2C%20they,covered%20by%20this%20week's%20agreement.

[5] https://www.nytimes.com/athletic/5517461/2024/05/24/ncaa-lawsuit-house-paying-players/.

[6] Alston, 594 U.S. at 110 (Kavanaugh, J., concurring) (citing Texaco Inc. v. Dagher 🔴 , 547 U.S. 1, 5, 126 S.Ct. 1276 (2006).

[7] Am. Needle, Inc. v. Nat. Football League 🔴 , 560 U.S. 183, 195 — 97, 130 S.Ct. 2201 (2010).

[8] Alston, 594 U.S. at 110 (Kavanaugh, J., concurring) (emphasis original).

[9] See, e.g., Am. Needle, Inc., 560 U.S. at 197.

[10] https://www.espn.com/nfl/story/_/id/28906786/nfl-players-approve-new-cba-2030; https://sports.yahoo.com/nba-players-score-shared-revenue-130000564.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS88&guce_referrer_sig=AQAAAEDpbU0aTetI64i1B86pkY2tYZny758NnXJybfQGOQVVaE0gyDsQPW-EFCo92gNKSPanzMbek2s1fmHusWcKxTXOxck8sDAQoLRN4Cow8W29VLpiIDiX5e7yrUYIMhuwIQgDraM1QjGra20MogAdqbOj_dU6TZGCg1wdUpd3GA3v.

[11] See Brown v. Pro Football, Inc. 🔴 , 518 U.S. 231, 236, 116 S.Ct. 2116 (1996).

[12] https://www.ncaa.org/news/2024/7/26/media-center-settlement-documents-filed-in-college-athletics-class-action-lawsuits.aspx.

[13] See Eichman v. Fotomat Corp. 🔴 , 759 F.2d 1434, 1439 (9th Cir. 1985); Frank v. United Airlines, Inc. 🔴 , 216 F.3d 845, 851 (9th Cir. 2000).

---

All Content © 2003-2024, Portfolio Media, Inc.