# APPENDIX K




Home > The Role of the State > Antitrust and Competition > Federal Legislation, Not the NCAA Antitrust Settlements, Should Drive a New Model...

The Role of the State   Antitrust and Competition   News   Commentary   The Equitable Economy   Labor

# Federal Legislation, Not the NCAA Antitrust Settlements, Should Drive a New Model of College Sports

By **Diana L. Moss and Jason Gold** -   July 3, 2024                    💬 0



*Stephanie Kim/ProMarket*

  

Diana Moss and Jason Gold write that the major private antitrust lawsuit involving how the National Collegiate Athletic Association governs compensation for college student athletes

overreaches by remaking the model of college sports in the United States. Instead, the paradigm shift in college athletics should be deliberated and decided through the legislative process.

---

The prospect of playing a sport in college has motivated countless young Americans. How could it not? The simultaneous benefits of getting a degree, athletic training and team camaraderie, representing a college, and the potential to carve out a future professional sports career are all in play. Since the first college varsity football challenge in 1869 between Princeton and Rutgers, colleges have been a major venue for young, amateur athletes to pursue these worthy goals.  Developments in the traditional college sports model of "amateurism" have, at times, put these considerations to the test. But it is the more recent changes in the legal and economic complexities around college sports that are now redefining the norm.

The fundamental shift in the National Collegiate Athletic Association's (NCAA) long-standing model came in the 2021 *Alston v. NCAA* case. There, the Supreme Court found that the league violated antitrust law by restricting athlete compensation to preserve the spirit of amateurism.

The NCAA's loss in court meant that college student athletes are now able to control and profit from Name, Image, and Likeness (NIL) agreements and other endorsements. However, settlements in ongoing private antitrust class action cases will also affect how colleges share revenue from sports programs by directly paying student athletes.

The speed at which changes to the model of college sports is occurring poses both significant potential and serious difficulties. Where college athletes went uncompensated per the NCAA's rules for decades, the reverse is now true. For example, NIL agreements currently total over $1 billion, and over 450,000 student athletes are potentially impacted. Some pundits say that the athlete compensation "train" left the station years ago and the paradigm change in the structure of college sports is a positive outcome.

However, this view overlooks the reality that the major catalyst for the sea change in the model of college sports is a collection of private antitrust class actions against the NCAA.

Private antitrust litigation is a vitally important tool for compensating victims of antitrust violations. But the settlements that are emerging from those antitrust cases reflect the interests of relatively few student athletes and yet have wide-ranging implications for *all* student athletes. As a result, such settlements are not "fit for purpose" to tackle the myriad policy issues that feature prominently in the model of college sports.

By far the most sweeping private antitrust case, *House v. NCAA* seeks compensation for financially injured Division I athletes. In addition to $2.75 billion in back damages, the proposed settlement also seeks injunctive relief for athletes moving forward. In crafting an expansive remedy for injunctive relief around future revenue sharing between schools and athletes, the settlement seeks, essentially, to create a new model of college sports. This model will, directly or indirectly, affect everything from what colleges can pay for athletes, to the potential unionization of college athletes, possible new antitrust immunities, and how many college conferences there will be.

The elephant in the room, however, is that college sports and athlete compensation is a "small numbers-big money" problem. Only a small proportion of college athletes, mostly in Division I football and basketball programs at large universities, are collecting significant NIL money and making six-figure salaries. Despite this, the proposed settlement will affect virtually *every* college athlete. Its provisions and consequences, therefore, have potentially enormous spillover effects.

For example, while top college athletes in major sports may benefit significantly from NIL deals and other compensation models, athletes in less commercialized sports might find their programs cut or underfunded as schools pivot resources to more lucrative departments. This could lead to a decrease in diversity and equity in sports programs, undermining efforts to provide broad opportunities across student demographics, and even affecting the Olympic development programs that are an important pathway for student athletes.

We will leave for another day the question of why the crafters of the settlement in *House v. NCAA* felt empowered to go so far as to reimagine college sports. What we do know is that the future of college sports should not be determined exclusively by a private antitrust

enforcement settlement. The settlement, which is not public, is emerging from opaque conversations that occur outside the public eye and may exclude the voice of the most directly impacted stakeholder—the student athletes themselves. The settlement has emerged from a process and incentives that are ill-suited to preserving the worthy goals, sorting through the complex policies, and addressing the many stakeholders that define the college sports enterprise.

The *House v. NCAA* settlement is driving collegiate sports closer to a professional model at an unsustainable pace. The settlement stands to make lasting change without thought and debate given to adverse long-term effects, while skipping over the requisite, in-depth public policy study and discussion that, for example, a legislative process provides. This preferred policy path, while imperfect, is far more transparent and inclusive, and is especially relevant to the amateurism culture and academic goals of institutions of higher education.

The settlement in *House v. NCAA* will ultimately land in the hands of a district court judge that must approve it under the Federal Rules of Civil Procedure as fair, reasonable, and adequate. At the Progressive Policy Institute (PPI), we strongly encourage the judge to reject the settlement, at least in its current form. Rejecting its provisions as overreaching would slow roll the wholesale makeover of college sports it envisions. This will provide headroom to consider more appropriate policy tools. At PPI, we support a more cautious approach to a new model for collegiate athletics, based on three core principles:

1.      ***Identify a more appropriate process for designing a new model of college sports.*** A legislative process to create a national framework for the regulation of college sports is the best policy tool. To guarantee a thorough grasp of the ramifications of these developments, educators, legislators, sports experts, and most importantly, a range of athletes and students themselves, should work together to build such a framework. Over 30 states now have laws on the books governing NIL, and numerous bills are circulating in Congress on unionization of college athletes and other hot button issues. These legislative initiatives should be identified, closely scrutinized, and assessed in the context of a more coordinated and holistic legislative framework.

2.	*Consider the impact of a new model of college sports on amateurism.* Preserving amateurism, in some form, should not be an archaic adherence to tradition but a continued commitment to ensuring that college sports serve as a complement to education. The amateur athlete ideal, or students who play for the pleasure of the game while concurrently pursuing academic achievement, has historically served as the foundation for collegiate athletics. This paradigm has strengthened the fundamental function of higher education institutions foremost as centers of learning, in addition to adding to the rich tapestry of American college life. A new model of college sports should, therefore, include safeguards to protect the educational mission of institutions and preserve the balance between being "a student and an athlete."

3.	*Develop athlete compensation models that promote the long-term viability of all college sports.* If determined by the NCAA settlement, it is likely that many sports will be cut from college programs, potentially jeopardizing goals of diversity and equity, but also opportunity for all types of athletes. In addition to standardizing pay for student athletes across states and organizations, the framework should guarantee that modifications are carried out in a way that promotes the long-term viability of all collegiate athletic departments. This goal will require very close scrutiny of the many intended and unintended consequences of policies governing collective bargaining and the unionization of college athletes.

*Authors' Disclosures: Diana Moss and Jason Gold work for the Progressive Policy Institute. PPI is supported by foundations, individuals, and corporations. No funding source influenced the arguments expressed in this article or stands to benefit from them. Read ProMarket's disclosure policy here.*

*Articles represent the opinions of their writers, not necessarily those of the University of Chicago, the Booth School of Business, or its faculty.*

## Related Posts:

1. **Cung Le v. Zuffa Promised To Change the UFC. What the Settlement Means for MMA**

Fighters and the Industry
2. **The Kroger-Albertsons Merger Will Not Help Grocery Competition**
3. **The FTC Noncompete Ban Is Legal**
4. **The Legality of the FTC's Noncompete Ban Is Less Certain Than Masur and Posner Suggest**

TAGS | Alston V. NCAA | antitrust and competition | Antitrust and labor | NCAA | Sports Antitrust

Previous article                                                                                       Next article

Four Strengths of the Government's Lawsuit                    Minority and Labor Representation Helps
Against Live Nation-Ticketmaster: Part II                        Worker Welfare and Productivity



# Diana L. Moss and Jason Gold

# RELATED ARTICLES



### How Cultural Norms Help Companies Exploit Unpaid Workers

**Eric A. Posner**


### Draghi says "Revamping Competition," Not More of the Same
**Nicolas Petit**


### Proxy Voting's Hidden Influence on Corporate Takeovers and Activist Campaigns
**Roslyn Layton**



## ABOUT US

## FOLLOW US

Exit mobile version