# APPENDIX M

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

STATE OF TENNESSEE,
STATE OF FLORIDA,
STATE OF NEW YORK,
DISTRICT OF COLUMBIA, AND
COMMONWEALTH OF VIRGINIA,

*Plaintiffs*,

v.

No. 3:24-cv-33

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION,

*Defendant*.

## AMENDED COMPLAINT

The States of Tennessee, Florida, New York, the District of Columbia, and the Commonwealth of Virginia bring this antitrust case against the National Collegiate Athletic Association. The NCAA started enforcing rules that unfairly restrict how athletes can commercially use their name, image, and likeness (better known as "NIL") at a critical juncture in the recruiting process. These anticompetitive restrictions violate the Sherman Act, harm the States' economies and the welfare of their athletes, and should be declared unlawful and enjoined.

## INTRODUCTION

1. The NCAA runs a business—a "massive business." *NCAA v. Alston*, 141 S. Ct. 2141, 2150 (2021). Despite having monopoly control over college sports, for decades the NCAA somehow escaped much antitrust scrutiny. That all changed in 2021, when the U.S. Supreme Court decided *Alston*. That case rejected the NCAA's long-held arguments about why its amateurism rules are exempt from the Sherman Act. Those rules—especially the restrictions on compensating college athletes—are in fact "subject to the Sherman Act," "subject to the rule of reason," and often plainly illegal. *Id.* at 2155-66. The Court there affirmed a decision invalidating one of those rules. *Id.* at 2166.

2. Enter NIL. In the aftermath of *Alston*, the NCAA understood that it could no longer ban college athletes from earning money from their name, image, and likeness. And States across the

country embraced college athletes' right to be compensated fairly and adequately for their remarkable gifts and the tremendous value they bring to their States, cities, and schools. Among them, Tennessee, Florida, New York, the District of Columbia, and Virginia ("Plaintiff States") have each expressed a clear state interest in protecting prospective and current college athletes' NIL opportunities. *See* Tenn. Code Ann. §49-7-2801, *et seq.*; Fla. Stat. Ann. §1006.74; N.Y. Educ. Law §6438-C; D.C. Code §38-1631.01 *et seq.*; Va. Code Ann. §23.1-408.1. Each Plaintiff State's law protects its student-athletes' right to "earn compensation for the use of [their] own name, image, or likeness." Tenn. Code Ann. §49-7-2802(a); *see also* Fla. Stat. Ann. §1006.74 (student-athletes must be allowed to "control and profit from the commercial use" of their NIL rights); N.Y. Educ. Law §6438-C.2(a) (prohibiting colleges from limiting or preventing students from earning NIL compensation); D.C. Code §38-1631.03 (protecting college athletes' right to earn compensation for the use of their name, image, or likeness); Va. Code Ann. §23.1-408.1(B)(1) (protecting the same right for "publicity rights of the student-athlete").

3.    Plaintiff States also each prohibit interference with athletes' ability to earn NIL compensation. Tenn. Code Ann. §49-7-2803 (athletic associations—including the NCAA—cannot "interfere" with athletes' ability to earn NIL compensation or otherwise limit athletes' eligibility for doing so); Fla. Stat. §1006.74 (similar); N.Y. Educ. Law §6438-C.2(b) (similar); D.C. Code §38-1631.03 (similar); Va. Code Ann. §23.1-408.1(B)(1)-(3) (similar). Plaintiffs, and many other States like them, have facilitated a vibrant and growing marketplace for NIL deals.

4.    Forced to recognize this legislative trendline in numerous states (not only Plaintiff States), as well as the devastating blow that *Alston* dealt to its so-called "amateur" model of college sports, the NCAA changed its rules to permit college athletes to earn certain types of compensation from their NIL. But, after allowing NIL licensing to emerge nationwide, the NCAA tried to stop that market from functioning. Earlier this year, the NCAA announced new proposals related to "student-athlete protections in NIL." These "protections" allow *current* athletes to pursue NIL compensation.

But they ban *prospective* college athletes (including current college athletes looking to transfer to another school who are in the "transfer portal") from discussing potential NIL opportunities before they actually enroll. It's like a coach looking for a new job, and freely talking to many different schools, but being unable to negotiate salary until after he's picked one (the depressive effect on coaches' wages in such a dysfunctional market is obvious).

5.    By prohibiting such interactions, the NCAA's approach restricts competition among schools and third parties (often NIL "collectives") to arrange the best NIL opportunities for prospective athletes. The NCAA bans the use of NIL contracts as a "recruiting inducement," meaning prospective athletes cannot negotiate NIL agreements *before* they commit to a member institution. A prospective athlete must commit, enroll, or transfer without understanding the NIL opportunities available at the destination or comparing those opportunities to the ones at competing schools. This NIL-recruiting ban limits competition and artificially decreases NIL compensation that college athletes could otherwise obtain in a free market.

6.    The NIL-recruiting ban is not the first time that the NCAA, after having been forced to allow a market to emerge post-*Alston*, tried to artificially restrict that market. A federal court, in a lawsuit joined by Tennessee, New York, the District of Columbia, and Virginia, recently stopped a similar maneuver by the NCAA, where the NCAA tried to restrict players from entering the transfer portal twice. There, the court found that "the NCAA's transfer rules" imposed a "direct restraint on trade" that implicates the Sherman Act. *Ohio v. NCAA*, 2023 WL 9103711, at *4 (N.D. W. Va.) (granting a TRO, which was later converted to a preliminary injunction). The NCAA's double-transfer ban "hamstrings student-athletes by limiting the choices they have within the relevant market to find a Division I institution that provides the best environment for their academic, mental, and economic well-being." *Id.* at *5. In a market that permits college athletes to transfer once, the NCAA's restriction on second transfers "restricts the options of affected college athletes," *id.*, and inhibits college athletes

from realizing "the present and future economic potential of their participation in college athletics," *id.* at \*11. The NCAA's NIL-recruiting ban does the same thing.

7.     This Court should declare unlawful and enjoin the NCAA's NIL-recruiting ban to allow this market—which already exists—to function fairly and competitively. Without relief, the NCAA will deprive Plaintiff States' athletes and prospective athletes of information about the market value for their NIL rights, thereby preventing them from obtaining full, fair-market value for those rights while also distorting the economies of Plaintiff States. The athletes' labor generates massive revenues for the NCAA, its members, and other constituents in the college-athletics industry—none of whom would dare accept such anticompetitive restrictions on their ability to negotiate their own rights. Those athletes shouldn't have to either.

## JURISDICTION AND VENUE

8.     This Court has subject-matter jurisdiction because this case arises under the laws of the United States, namely, section 1 of the Sherman Act, 15 U.S.C. §1. *See* U.S. Const. art III, §2; 28 U.S.C. §§1331, 1337; 15 U.S.C. §26.

9.     This Court has personal jurisdiction because the NCAA transacts business in the Eastern District of Tennessee. The NCAA and its member institutions conduct athletic competitions, ticket and merchandise sales, television agreements, and other revenue-generating activities here.

10.     Venue is proper here under section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. §1391(b)(2).

## THE PARTIES

11.     The attorneys general of the Plaintiff States, as the chief legal officers of their respective states, bring this action under their respective statutory, common law, and equitable powers, and in their quasi-sovereign capacities, to prevent anticompetitive conduct that harms the economies of the Plaintiff States and the economic welfare of present, future, and putative college athletes in and from the Plaintiff States. Plaintiff States have quasi-sovereign interests in protecting their residents—

including college athletes and prospective college athletes—from economic harm resulting from illegal anticompetitive conduct and in ensuring their economies and labor markets are not suppressed by unjustified restraints of trade. The Plaintiff States can file suit *parens patriae* to protect the economic welfare of their over 700,000 high-school and college athletes affected by the NCAA's restrictions. State attorneys general are specifically authorized to bring suits to secure injunctive relief for violations of the Sherman Act. 15 U.S.C. §26.

12.     By unlawfully restraining competition for NIL opportunities, the NCAA causes substantial harm to the general economies of the Plaintiff States and to the economic welfare of present, future, and putative college athletes in the Plaintiff States. But for the NCAA's actions, market forces would set NIL compensation to the benefit of those economies and those athletes.

13.     NIL compensation amounts to over $1 billion annually nationwide and constitutes significant economic activity in each Plaintiff State. This is because NCAA athletics are themselves a "massive business," including in each Plaintiff State. For example, each Plaintiff State is home to at least four Division I basketball programs with both men's and women's teams, and men's and women's basketball are respectively the second and third largest NIL compensation-generating NCAA sports. Each Plaintiff State has hosted since 2022, or is scheduled to soon host, NCAA Division I tournament basketball games, and each Plaintiff State hosted at least one multi-day men's basketball conference tournament in 2024. Similarly, each Plaintiff State is home to at least one Division I football program (the sport that generates the most NIL compensation). Because college sports are integral to the economies of the Plaintiff States, the NCAA's NIL-recruiting ban has had a substantial effect on the trade and commerce within each Plaintiff State.

14.     Defendant, the NCAA, is an unincorporated association that is the governing body of college sports. The NCAA has approximately 1,100 member colleges and universities, including institutions in each of the Plaintiff States. These member institutions compete against each other in

5

collegiate athletics, including in the recruitment of college athletes. The NCAA organizes member institutions into three divisions, with 350 schools in Division I. The NCAA has promulgated rules, guidance, and regulations governing college sports, including the restraints at issue here.

## BACKGROUND

**I.    The NCAA abuses its market power to exploit college athletes, artificially depressing their compensation.**

15.    The NCAA dominates collegiate sports. It sets the rules on and off the field, organizes championship events, and amasses billions of dollars of revenue in the process. As a practical matter, an academic institution that wants to participate in the highest and most popular level of collegiate athletics, NCAA Division I, must maintain NCAA membership and abide by the rules that the NCAA promulgates. Likewise, athletes who wish to compete at the highest level of college sports have no viable alternative to enrolling in an NCAA member school. Indeed, the NCAA has repeatedly touted its unique offering in this and past litigation. *See, e.g.*, *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1067 (9th Cir. 2020).

16.    The NCAA and its members govern themselves through the NCAA Manual. *NCAA Division I 2023-24 Manual,* NCAA (Aug. 5, 2023), perma.cc/2W7D-ATX5. The manual contains, among other things, the NCAA's Constitution and operating bylaws. Those rules are adopted by vote of the NCAA's member institutions. NCAA rules govern nearly all aspects of an athlete's life—not just once they enroll at a Division I university, but starting the moment the athlete begins ninth grade—and hamper athletes' ability to engage in the free market for their services.

17.    An alleged failure to follow the NCAA's rules can have dire consequences. For schools, punitive measures include reduced athletic scholarships, suspensions, loss of eligibility for postseason play, vacatur of previously earned wins, monetary penalties, and the so-called "death penalty"—a ban on competition lasting at least one year.

6

18.     For decades, the NCAA prohibited any sports-related compensation to college athletes, under the guise of "amateurism"—an amorphous concept that the NCAA insisted the fans demanded. Athletes who ran afoul of these rules became ineligible to compete and their schools suffered draconian penalties. Meanwhile, the NCAA raked in billions of dollars in revenues on the "backs of student athletes who are not fairly compensated." *Alston*, 141 S. Ct. at 2169 (Kavanaugh, J., concurring).

19.     Recently, in *Alston*, the Supreme Court clarified the NCAA's status under federal antitrust law. *See id.* at 2166 (majority). *Alston* rejected the NCAA's initial reliance on "amateurism" as a justification for its anticompetitive practices. *Id.* at 2158-60, 2163. Instead, the Court deemed the NCAA's conception of "amateurism" to lack "any coherent definition." *Id.* at 2152. The NCAA's frequent rule changes and arbitrary enforcement practices proved the point. *See, e.g.*, *id.* at 2150.

20.     While *Alston* itself involved only education-related compensation, Justice Kavanaugh's concurrence recognized that the opinion imperiled many of the NCAA's other restrictions on compensation for college athletes. *See id.* at 2168 (Kavanaugh, J., concurring) ("[I]t is not clear how the NCAA can legally defend its remaining compensation rules.").

21.     Seeing the writing on the wall, the NCAA reacted to *Alston* by permitting college athletes to obtain NIL compensation. But despite allowing college athletes to participate in NIL deals, the NCAA impairs their ability to obtain NIL compensation. "Put simply, this suit involves admitted horizontal price fixing in a market where the defendants exercise monopoly control." *Id.* at 2154 (majority). These anticompetitive restrictions deny athletes access to the free market, again in the name of that amorphous interest in "amateurism."

## II.     The NCAA's NIL policy imposes unlawful restrictions on the market.

22.     After the Supreme Court decided *Alston*, the NCAA adopted its Interim NIL Policy. NCAA, *Name, Image, Likeness Interim NIL Policy* (July 1, 2021), perma.cc/FFM3-KCUE.

23.     The interim policy temporarily suspended enforcement of some (but not all) restrictions on compensation and benefits to college athletes, meaning athletes were allowed to earn compensation for the use of their NIL rights under certain circumstances. But the NCAA's more recent actions are now significantly eroding college athletes' NIL rights.

24.     The interim policy states that "NCAA Bylaws, including prohibitions on pay-for-play and improper recruiting inducements, remain in effect," subject to an allowance for permissible NIL activities. *Id.* The policy facially allows college athletes to earn compensation through sponsorships or other appearance fees without violating the NCAA's rules, thus allowing athletes to commercialize some—but not all—of their value. But this concession has a glaring restriction: it prohibits the use of NIL as "recruiting inducements" for "prospective" college athletes. *Id.* A collective cannot, for example, condition NIL opportunities upon an athlete's attendance at a particular school.

25.     The NCAA issued public guidance on how it will apply its interim policy to prospective college athletes during the recruiting process—the key stage when prospective college athletes' bargaining power is at its highest, as schools compete for their labor. The guidance stated that NIL, if used to induce an athlete to commit to a particular school, is prohibited compensation under the NCAA's bylaws. NCAA, *Name, Image and Likeness Policy Question and Answer* (Feb. 2023), perma.cc/4QJ4-R332. But the NCAA does permit other forms of financial compensation to be used as an inducement (for example, athletic scholarships which are conditioned on a student's enrollment and athletic participation at a particular institution).

26.     The NCAA also classifies collectives as "boosters" and thus prohibits all NIL discussions between collectives and prospective college athletes prior to committing to a particular school. The NCAA defines a booster as "an individual, independent agency, corporate entity (e.g., apparel or equipment manufacturer) or other organization who is known (or who should have been known) by a member of the institution's executive or athletics administration to have participated in

or to be a member of an agency or organization promoting the institution's intercollegiate athletics program or to assist or to have assisted in providing benefits to enrolled student-athletes or their family members." NCAA, *Interim Name, Image and Likeness Policy Guidance Regarding Third Party Involvement* (May 9, 2022), perma.cc/3NMN-2CYB. "[B]oosters" may not engage in "recruiting activities, including recruiting conversations" or provide any other benefits to prospective college athletes. *Id.*

27.    Generally, a collective supports and promotes athletes and teams for a particular institution, but it is independent from the university. For most institutions, one "main" collective handles the vast majority of NIL activities. To fund and facilitate NIL deals, collectives commonly solicit and receive donations from alumni, boosters (individuals who represent a school's athletic interests), and businesses in the local community.

28.    Collectives generate significant opportunities for NIL compensation for athletes in a variety of sports. For instance, Spyre Sports Group associated with the University of Tennessee has deals with hundreds of student-athletes at the University of Tennessee across 11 sports. Sloan, *How Tennessee Athletes and a Knoxville Collective are Cleaning Up Big with NIL Deals,* Knoxville News Sentinel (Sep. 8, 2023), perma.cc/H9NS-UAR3. Orange United, Syracuse University's NIL Collective, launched a $500,000 campaign to support athletes across 20 varsity sports. Meo, *Syracuse NIL Collective Launches $500K Fundraising Campaign*, Sports Illustrated (Nov. 9, 2023), perma.cc/D449-5URR. And the Royal Blue Collective associated with Brigham Young University announced an NIL deal in September 2023 for a single sport, women's volleyball, valued at approximately $700,000. Mitch Harper, *BYU's NIL Collective Launches Team-Wide Deal For Women's Volleyball Program*, KSL Sports (Sep. 22, 2023), perma.cc/WQP8-BAQZ.

29.    Under the NCAA's guidance, prospective college athletes cannot encourage competition between collectives at different schools to obtain competing NIL offers. Indeed, the

9

practical application of the NCAA's restriction is that college athletes are prohibited from even speaking to collectives—who account for nearly 75% of all NIL compensation—prior to committing to a particular school. *See* OpenDorse, *NIL at Two*, at 17 (July 15, 2023), perma.cc/8974-S8T7 (collectives delivered nearly 75% of all NIL compensation during the 2022-23 academic year). Yet when schools compete for an athletes' labor, NIL compensation is one of the primary factors that a prospective college athlete considers—albeit in a market hindered by information asymmetry under the NIL-recruiting ban.

30.     The NCAA also restricts prospective athletes' interactions with college coaches and staff, who "may **not**" "organize, facilitate or arrange a meeting between a booster/NIL entity and a [prospective college athlete]" or "communicate directly or indirectly with a [prospective college athlete] on behalf of a booster/NIL entity." So it violates NCAA rules for personnel associated with its member institutions to (i) "enter into any agreements with the NIL entity to secure NIL deals for incoming [prospective college athletes];" (ii) "organize, facilitate, or arrange a meeting or conversations between the NIL entity and a [prospective college athlete], including a transfer student-athlete;" or (iii) "provide information or guarantees regarding NIL opportunities should the [prospective college athlete] attend their institution." NCAA, *Name, Image and Likeness Policy Question and Answer* (July 2022), perma.cc/WD9G-SYH7.

31.     Until now, the NCAA has not meaningfully enforced this mishmash of guidance and rules, which have been constantly in flux and never clear. On January 10, 2024, however, the NCAA published a series of posts on X (formerly Twitter) noting that the Division I Council had approved proposals relating to "student-athlete protections in NIL." @NCAA_PR, Twitter/"X" (11:23 AM Jan. 10, 2024), perma.cc/E5VX-2CJS. Importantly, the NCAA stated that schools and collectives "would continue to be prohibited from engaging in NIL discussions with prospects or potential transfer student-athletes." *Id.*

32.     The next day—on January 11, 2024—the NCAA issued a report on its first major NIL-related recruiting violation enforcement action. NCAA, *NIL-Related Recruiting Violation Occurred in Florida State Football Program* (Jan. 11, 2024), perma.cc/58PD-88Z6. The NCAA concluded that a "Florida State assistant football coach violated NCAA rules when he facilitated an impermissible recruiting contact between a transfer prospect and … the chief executive officer of an NIL collective" for discussion of "an NIL opportunity with the collective." *Id.* The NCAA imposed significant penalties on Florida State's football program, including two years of probation, a periodic disassociation from the collective and its former CEO, and a reduction in football scholarships. *Id.* All for giving a prospective student a ride to a meeting.

33.     Shortly thereafter—on January 20, 2024—news broke that the NCAA is also investigating the University of Florida football program "after a failed NIL deal" with a former recruit. *Florida Is Under NCAA Investigation* a *Year After* a *Failed NIL Deal With QB Signee Jaden Rashada*, CBS News (Jan. 20, 2024), perma.cc/9CE8-CNFQ.

34.     And, just days later, reports surfaced that the NCAA threatened the University of Tennessee with imminent enforcement actions as well. *Letter from Chancellor Plowman to President Baker* (Jan. 29, 2024), perma.cc/ZK4H-4LBJ.

35.     The NCAA's newfound interest in NIL enforcement actions highlights the suddenly urgent nature of the issues raised in this complaint. NCAA member institutions must abide by the NCAA's prohibitions on NIL discussions with prospective college athletes or risk severe sanctions. This chilling effect on NIL discussions means a college athlete cannot speak even with a single collective, let alone negotiate with multiple collectives for the best NIL compensation package. Absent the restraints imposed by the NCAA, schools supported by collectives with enthusiastic alumni networks and boosters would be able to freely offer NIL compensation to prospective college athletes,

and schools could facilitate those discussions as part of the recruiting process, including by providing services to help prospective college athletes navigate NIL discussions and compare NIL offers.

36.    By restricting NIL discussions for prospective college athletes, the NCAA's current policy restricts schools from competing to arrange NIL compensation for prospective college athletes and suppresses athletes' NIL compensation by deterring the free movement of labor. It also seriously distorts the incentives that collectives face to offer fair market compensation in an environment plagued by information asymmetry.

37.    The harm imposed by the NCAA's NIL restrictions is exacerbated by the significant time pressure imposed by the NCAA's recruiting calendar. NCAA rules define sport-specific windows in which coaches can contact, visit, or engage with an athlete. Additionally, the mechanism by which an athlete commits to a school affects the leverage that athlete has in negotiating compensation packages with colleges.

38.    Principally, for intensely recruited prospective athletes, colleges seek to obtain an athlete's commitment via a National Letter of Intent. If an athlete signs a National Letter of Intent to enroll at a particular institution, that athlete cannot renege on the commitment and enroll at another school with immediate eligibility. That is, a prospective athlete who executes a National Letter of Intent effectively provides the school with particular express assurances that it has secured that athlete's services for at least the athlete's first year of intercollegiate athletics.

39.    For most sports, athletes have two short recruiting windows when they can execute a National Letter of Intent—the "early signing period" and the "regular signing period." Schools are incentivized to secure an athlete's National Letter of Intent during the early signing period, which typically lasts for a matter of days. *NLI Signing Dates*, National Letter of Intent (2023), perma.cc/3RSH-PNRQ. But if an athlete does not commit during the early period, the regular period, which is usually several weeks, functions as the school's last chance to get an athlete (including the

most highly skilled, highly desired recruits) to commit to its team. These signing periods are when athletes have the strongest bargaining power for their NIL rights.

40.     Under the current restrictions, athletes must commit before knowing what NIL opportunities might be available. Very few collegiate athletes go "pro" in their sport, and thus their NIL value is at its highest during their short collegiate careers. Their ability to negotiate the most valuable NIL deal is critical. The NCAA's NIL-recruiting ban depletes this value at the time when schools have the highest demand (and athletes have the highest bargaining power) for their services. By blocking discussions of NIL opportunities with collectives, the ban deprives prospective and transferring college athletes of critical information about the availability and value of their NIL rights and forces them to commit to schools without fully understanding their earning potential. The natural result is the suppression of NIL compensation that college athletes receive.

41.     The NCAA itself acknowledges the obvious anticompetitive harms that its NIL-recruiting ban causes. The NCAA designed the NIL-recruiting ban to stop schools and affiliated collectives from competing for recruits in the relevant market on the basis of NIL compensation. Indeed, as the NCAA admits, but-for the NIL-recruiting ban, member institutions and collectives would compete for prospective athletes by offering "high-value and high-volume NIL compensation" in a way that "does not presently exist" because of the NCAA's anticompetitive rules. Consequently, the NIL-recruiting ban has distorted the competitive process, creating a price structure for NIL compensation that is unresponsive to the demand for those recruit's athletic services and unrelated to the prices that would prevail in a competitive market.

42.     Time is of the essence. The recruiting process operates on a preset calendar, under which the periods for prospective college athletes in different sports to sign with a school open and close in short order throughout the year.

13

43.    Only in response to this Court's award of a preliminary injunction did the NCAA temporarily halt enforcement of the NIL-recruiting ban. In the absence of a permanent injunction, the NCAA will be free to resume its anticompetitive conduct.

## RELEVANT MARKETS

44.    Within NCAA Division I athletics, the NIL-recruiting ban affects two broad categories of labor markets: (1) athletic services in men's and women's Division I basketball and football-bowl-subdivision football, wherein each college athlete participates in his or her sport-specific market, and (2) athletic services in all other men's and women's Division I sports, wherein each athlete participates in his or her sport-specific market. In these labor markets, current and prospective athletes compete for roster spots on the various Division I athletic teams. NCAA Division I member institutions compete to recruit and retain the best athletes by offering unique bundles of goods and services, including: scholarships to cover the cost of attendance, tutoring, and academic support services; access to state-of-the-art athletic training facilities, premier coaching, medical treatment; opportunities to compete at the highest level of college sports, often in front of large crowds and television audiences; and publicity through championships and broadcasting. College athletes also receive remuneration for their NIL from third parties like collectives, which are businesses that promote athletes who are enrolled in a particular Division I institution. By agreeing to enroll at a particular university, college athletes must provide their athletic services and acquiesce in the use of their NIL by the NCAA and its members for commercial and promotional purposes without compensation. College athletes also implicitly agree to pay any costs of attending college and participating in intercollegiate athletics that are not covered by their scholarships or other permissible benefits.

45.    The relevant geographic market is the United States. The NCAA and its member institutions are located throughout the country, and they compete in the relevant labor markets throughout the United States.

46.     Dictating the rules and regulations for participation in Division I athletics through the Division I Council and NCAA member institutions, the NCAA "controls the market for college athletes." *Alston*, 141 S. Ct. at 2167 (Kavanaugh, J., concurring).

47.     Though the NCAA is nominally organized as a nonprofit, its member institutions' transactions with college athletes generate significant financial revenue for the member institutions and greatly affect the future earning potential of those college athletes. In transacting with college athletes, member institutions offer partial or full athletic scholarships in exchange for the college athlete's services, who in return receive the means to develop, refine, and showcase their valuable skills.

48.     As the premiere showcases for college athletes' skills, the NCAA's athletic events are marketed to consumers, who attend in-person, watch via broadcast, and otherwise provide the NCAA's members and conferences with significant financial revenue. These transactions are unquestionably commercial in nature and are thus within the Sherman Act's purview. Yet the NCAA's NIL-recruiting ban denies prospective athletes the ability to meaningfully participate in this commercialization, and these restraints continue to suppress the commercial value of current athlete's NIL rights.

### COUNT
### Violations of Section 1 of the Sherman Act

49.     Plaintiffs repeat and reallege the allegations above.

50.     The NCAA has entered into an illegal agreement to restrain and suppress competition in the relevant markets through the adoption and enforcement of the NIL-recruiting ban, which prohibits prospective college athletes and collectives from open and transparent interactions relating to NIL compensation and thus denies these athletes the ability to effectively negotiate their NIL rights at the very time they would best be able to maximize the value of those rights.

51.    These restrictions fail the rule of reason applicable to antitrust claims. *See Alston*, 141 S. Ct. at 2155.

52.    The NCAA, by and through its officers, directors, employees, agents or other representatives, and its member institutions, have entered into an illegal horizontal group boycott of prospective college athletes who contract and negotiate NIL agreements with collectives.

53.    The group boycott/refusal to deal encompasses the NCAA's and its members' concerted acts to restrict prospective college athletes from negotiating NIL deals with collectives and from ultimately being fairly compensated for the use of their NILs, in the United States and its territories and possessions, in violation of section 1 of the Sherman Act.

54.    The markets for athletic services in Division I sports are relevant antitrust markets44. The NCAA has market power in these markets.

55.    The NCAA's unlawful conduct harms prospective college athletes from ascertaining the best NIL opportunities prior to enrollment, including by limiting competition between collectives that promote specific Division I schools. The NIL-recruiting ban is an unreasonable restraint on competition that has artificially limited supply and depressed compensation paid to college athletes for their NIL rights.

56.    This concerted action is in effect a refusal to deal with prospective college athletes on NIL compensation rights issues and forecloses them from full access to the marketplace.

57.    Prospective college athletes receive less compensation than they otherwise would receive for the use of their NILs in a competitive marketplace. The NCAA itself acknowledged that its NIL rules "preclude student-athletes from engaging in a wide range of promotional activities that are open to college students generally, a situation that is inconsistent with the NCAA's goal of treating student-athletes in the same manner as the student-body in general." *NCAA Federal and State Legislation Working Group Final Report and Recommendations*, NCAA (Apr. 17, 2020), perma.cc/7LAL-TYA5.

16

58.    The NIL-recruiting ban yields few, if any, procompetitive benefits in the relevant markets to the NCAA's member institutions, NIL entities, college athletes, and prospective college athletes. Any such benefits are far outweighed by the harm to the prospective college athletes who are subject to the NIL-recruiting ban.

59.    In *Alston*, the NCAA argued that "its rules preserve amateurism, which in turn widens consumer choice by providing a unique product — amateur college sports as distinct from professional sports." 141 S. Ct. at 2152. Yet the Supreme Court noted that the NCAA does not "define the nature of the amateurism they claim consumers insist upon," such that the lower court "struggled to ascertain for itself 'any coherent definition' of the term" and that even leaders of major college sports conferences have "never been clear on ... what is really meant by amateurism." *Id.* The scope of allowable compensation to athletes under the NCAA's definition of amateurism has changed time and time again over the years. *See* ROGER NOLL, *Collusion in College Sports: Edward O'Bannon, et al. v. NCAA, et al.*, in THE ANTITRUST REVOLUTION: ECONOMICS, COMPETITION, AND POLICY 6-12 (John Kwoka & Lawrence White eds., 7th ed. 2018).

60.    Despite the NCAA's claims that consumer demand for college sports is dependent on amateurism rules that limit athlete compensation, the *Alston* Court found that "consumer demand has increased markedly despite the new types of compensation that the NCAA has allowed in recent decades." *Alston*, 141 S. Ct. at 2153. Likewise, early data since the implementation of the interim NIL policy suggests that NIL compensation is associated with increases in consumer demand for collegiate sports. *See Playfly Fanscore: College Football Edition 2023*, Playfly Sports (Nov. 20, 2023) (finding increased viewership and attendance for Division I college football), perma.cc/KH8K-WHHE; *2023 Year In Review: Event Viewership Highlights*, ESPN (Dec. 3, 2023), perma.cc/32KZ-FBUL (record viewership for Division I women's basketball, volleyball, gymnastics, softball, and men's baseball, hockey, and

lacrosse). The same analysis defeats any pretextual procompetitive argument the NCAA could make in this case.

61.    Regardless, as a matter of law, any supposed benefits in the market for watching college athletics cannot counterbalance harms to the distinct, sport-specific markets for college athlete labor. *See Deslandes v. McDonald's United States*, LLC, 81 F.4th 699, 703 (7th Cir. 2023); *see also United States v. Topco*, 405 U.S. 596, 610 (1972) (holding that section 1 of the Sherman Act does not allow competition to "be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote greater competition in a more important sector of the economy").

62.    The NCAA's illegal conduct had just begun in earnest when this case was filed and, without an injunction, would continue to impose immediate, irreparable, and sustained harm on college athletes, prospective college athletes, and institutions.

63.    The NCAA and its member institutions' anticompetitive acts were intentionally directed at the United States market and had a substantial and foreseeable effect on interstate commerce.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment as follows:

64.    An order declaring that the NCAA's NIL-recruiting ban violates section 1 of the Sherman Act;

65.    A TRO, then preliminary injunction, then permanent injunction barring the NCAA from enforcing its NIL-recruiting ban or taking any other action to prevent prospective college

athletes and transfer candidates from engaging in meaningful NIL discussions prior to enrollment, including under the NCAA's Rule of Restitution[1];

66.    Plaintiffs' attorneys' fees, costs, and expenses;

67.    And other such relief that the Court may deem just and proper.

---

[1] The NCAA's "Rule of Restitution" provides that if a plaintiff obtains an injunction against the NCAA's unlawful conduct, and a college athlete and his or her school conduct themselves in conformity with that injunction, the NCAA may still retroactively punish both the athlete and the institution if the injunction is later "vacated, stayed or reversed" or otherwise invalidated. NCAA Bylaw 12.11.4.2. The purpose of the Rule of Restitution is "to punish challenges to the NCAA's anticompetitive rules by attempting to deprive courts of the ability to grant effective relief and depriving individual student-athletes . . . of the practical ability to rely on court orders in their favor." *Ohio*, 2023 WL 9103711, at *12.

Respectfully submitted,

Dated: January 31, 2024                    /s/ Cameron T. Norris
Amended: May 1, 2024

Adam K. Mortara                            JONATHAN SKRMETTI
LAWFAIR LLC                                ATTORNEY GENERAL OF TENNESSEE
40 Burton Hills Blvd., Suite 200
Nashville, TN 37215                         LACEY E. MASE
(773) 750-7154                             Chief Deputy Attorney General
mortara@lawfairllc.com
                                           J. DAVID MCDOWELL
Thomas R. McCarthy*                        Deputy, Consumer Protection Division
Cameron T. Norris                          ETHAN BOWERS*
David L. Rosenthal*                        Senior Assistant Attorney General
CONSOVOY MCCARTHY PLLC                      TYLER T. CORCORAN*
1600 Wilson Blvd., Suite 700               MARILYN GUIRGUIS*
Arlington, VA 22201                        Assistant Attorneys General
(703) 243-9423
tom@consovoymccarthy.com                   Office of the Attorney General and Reporter
cam@consovoymccarthy.com                   P.O. Box 20207
david@consovoymccarthy.com                 Nashville, TN 37202
                                           (615) 741-8722
Patrick Strawbridge*                       Ethan.Bowers@ag.tn.gov
CONSOVOY MCCARTHY PLLC                      Tyler.Corcoran@ag.tn.gov
Ten Post Office Square                     Marilyn.Guirguis@ag.tn.gov
8th Floor South PMB #706
Boston, Massachusetts 02109                *Counsel for Plaintiff State of Tennessee*
(617) 227-0548
patrick@consovoymccarthy.com               JASON S. MIYARES
                                           ATTORNEY GENERAL OF VIRGINIA
*Counsel for Plaintiffs*
                                           STEVEN G. POPPS
*admitted *pro hac vice*                   Deputy Attorney General, Civil Division
***pro hac vice* application forthcoming
                                            /s/ Tyler T. Henry
                                           TYLER T. HENRY*
                                           Assistant Attorney General & Manager, Antitrust Unit

                                            /s/ Jonathan M. Harrison II
                                           JONATHAN M. HARRISON II*
                                           Assistant Attorney General
                                           Consumer Protection Section

                                           *Counsel for Plaintiff Commonwealth of Virginia*

20

ASHLEY MOODY
ATTORNEY GENERAL OF FLORIDA

 /s/ Lizabeth A. Brady
LIZABETH A. BRADY
Director, Antitrust Division
GENEVIEVE HALL**
Special Counsel
COLIN G. FRASER**
Assistant Attorney General

Office of the Attorney General, Antitrust
Division
PL-01 The Capitol
Tallahassee, Florida 32399-1050
850-414-3300
Liz.Brady@myfloridalegal.com
Genevieve.Hall@myfloridalegal.com
Colin.Fraser@myfloridalegal.com

*Attorneys for Plaintiff State of Florida*

LETITIA JAMES
ATTORNEY GENERAL OF NEW YORK

 /s/ Elinor R. Hoffmann
ELINOR R. HOFFMANN**
Chief, Antitrust Bureau
AMY MCFARLANE**
Deputy Chief, Antitrust Bureau
BRYAN BLOOM**
Senior Enforcement Counsel, Antitrust
Bureau

New York State Office of the Attorney
General
28 Liberty Street
New York, NY 10005
Elinor.Hoffmann@ag.ny.gov
Amy.McFarlane@ag.ny.gov
Bryan.Bloom@ag.ny.gov

*Attorneys for Plaintiff State of New York*

BRIAN L. SCHWALB
ATTORNEY GENERAL FOR THE DISTRICT
OF COLUMBIA

 /s/ Seth Rosenthal
SETH ROSENTHAL**
Chief Deputy Attorney General

 /s/ Adam Gitlin
ADAM GITLIN**
Chief, Antitrust and Nonprofit Enforcement Section

Office of the Attorney General for the District of
Columbia
400 6th Street NW
Washington, D.C. 20001
202-727-3400
Seth.Rosenthal@dc.gov
Adam.Gitlin@dc.gov
Cole.Niggeman@dc.gov

*Counsel for Plaintiff the District of Columbia*

## CERTIFICATE OF SERVICE

I e-filed this document on May 1, 2024, which emailed everyone requiring service.

_/s/ Cameron T. Norris_