Steve W. Berman (*pro hac vice*)
Emilee N. Sisco (*pro hac vice*)
Stephanie Verdoia (*pro hac vice*)
Meredith Simons (SBN 320229)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com
emilees@hbsslaw.com
stephaniev@hbsslaw.com
merediths@hbsslaw.com

Benjamin J. Siegel (SBN 256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
bens@hbsslaw.com

*Class Counsel for Plaintiffs*

[Additional counsel on signature page]

Jeffrey L. Kessler (*pro hac vice*)
David G. Feher (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
Adam I. Dale (*pro hac vice*)
Sarah L. Viebrock (*pro hac vice*)
Neha Vyas (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
jkessler@winston.com
dfeher@winston.com
dgreenspan@winston.com
aidale@winston.com
sviebrock@winston.com
nvyas@winston.com

Jeanifer E. Parsigian (SBN 289001)
WINSTON & STRAWN LLP
101 California Street, 21st Floor
San Francisco, CA 94111
Telephone: (415) 591-1000
jparsigian@winston.com

*Class Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | Case No. 4:20-cv-03919-CW |
| | **PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND SERVICE AWARDS FOR CLASS REPRESENTATIVES** |
| | Hrg. Date:      April 7, 2025<br>Time:            10:00 a.m.<br>Judge:          Hon. Claudia Wilken<br>Courtroom:   2, 4th Floor |

<u>**NOTICE OF MOTION AND MOTION**</u>

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on April 7, 2025, at 10:00 a.m. in Courtroom 2 of the Honorable Claudia Wilken of the United States District Court for the Northern District of California, Oakland Division, located at 1301 Clay Street, Oakland, CA 94612, the Class Plaintiffs ("Plaintiffs") will and hereby do move the Court pursuant to Federal Rules of Civil Procedure 23 for an order awarding attorneys' fees, reimbursement of expenses, and service awards.

This motion is based on this Plaintiffs' Motion For Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards for Class Representatives, the accompanying memorandum of points and authorities, the declarations in support of the motion, the pleadings and papers on file in this action, and such other matters as the Court may consider.

- i -

PLS.' MOT. FOR ATTYS' FEES, REIMBURSEMENT OF LITIG. EXPENSES, AND SERVICE AWARDS FOR CLASS REPS
Case No. 4:20-cv-03919-CW

# TABLE OF CONTENTS

<u>Page</u>

I.    INTRODUCTION ..................................................................................................1

II.   BACKGROUND ....................................................................................................3

     A.    The Work Undertaken by Class Counsel ....................................................3

          1.    Class Counsel Obtained Substantial Discovery on Behalf of the Settlement Classes ...........................................................4

               a.    Written and Document Discovery .............................................4

               b.    Individual and 30(b)(6) Depositions .........................................5

               c.    Class Counsel Engaged in Critical, Extensive Third-Party Discovery .......................................................................5

          2.    Class Certification.......................................................................6

          3.    Merits Discovery and Expert Reports, Followed by Summary Judgment ....................................................................7

          4.    *Carter* .........................................................................................7

          5.    Defending Class Members' Interests with Federal and State Legislators..........................................................................8

     B.    Extensive Settlement Negotiations Resulted in a Ground-Breaking Settlement .................................................................................8

     C.    Further Proceedings ....................................................................................9

III.  ARGUMENT .......................................................................................................10

     A.    Class Counsel Request a Reasonable Percentage of the Funds .................11

          1.    Identifying the Quantifiable Common Fund...............................11

          2.    The Attorneys' Fees Requested .................................................14

          3.    Counsel Achieved Exceptional Results for the Settlement Class..............................................................................15

          4.    This Case Posed Enormous Risks and Challenges. ....................17

          5.    Counsel's Extensive Litigation on a Contingency Basis Supports the Fee Request.........................................................18

6.      The Market Rate for Antitrust Class Actions Supports the
        Fee Request. ........................................................................................19

B.      A Lodestar "Cross-Check" is Not Warranted Under the
        Circumstances of This Case, But if Completed, Would Confirm the
        Reasonableness of the Fee Request. ....................................................21

C.      Plaintiffs' Litigation Expenses Are Reasonable and Reimbursable. ............................24

D.      The Requested Service Awards For The Class Representatives are
        Warranted............................................................................................24

IV.     CONCLUSION ........................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ahmed v. HSBC BANK USA*,
  2019 WL 13027266 (C.D. Cal. Dec. 30, 2019) ...............................................................22

*Allapattah Servs., Inc. v. Exxon Corp.*,
  454 F. Supp. 2d 1185 (S.D. Fla. 2006) ...........................................................................21

*Andrews v. Plains All Am. Pipeline L.P.*,
  2022 WL 4453864 (C.D. Cal. Sept. 20, 2022) ..........................................18, 20, 21, 22

*In re Anthem, Inc. Data Breach Litig.*,
  2018 WL 3960068 (N.D. Cal. Aug. 17, 2018) ................................................................10

*In re Apple Inc. Device Perf. Litig.*,
  2021 WL 1022866 (N.D. Cal. Mar. 17, 2021) ................................................................10

*In re: Aqueous Film-Forming Foams Prod. Liab. Litig.*,
  2024 WL 4868615 (D.S.C. Nov. 22, 2024) .....................................................................24

*Bendon v. DTG Operations, Inc.*,
  2018 WL 4976511 (C.D. Cal. Aug. 22, 2018) ................................................................22

*Benson v. Doubledown Interactive, LLC*,
  2023 WL 3761929 (W.D. Wash. June 1, 2023).......................................................2, 20, 21

*In re Capacitors Antitrust Litig.*,
  2018 WL 4790575 (N.D. Cal. Sept. 21, 2018) ...............................................................10

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*,
  2016 WL 183285 (N.D. Cal. Jan. 14, 2016) ...................................................................20

*In re: Cathode Ray Tube (Crt) Antitrust Litig.*,
  2016 WL 364878 (N.D. Cal. July 7, 2016) .....................................................................15

*In re Checking Account Overdraft Litig.*,
  830 F. Supp. 2d 1330 (S.D. Fla. 2011) ...........................................................................21

*Cook v. Niedert*,
  142 F.3d 1004 (7th Cir. 1998) ........................................................................................25

*In re Corel Corp., Inc. Secs. Litig.*,
  293 F. Supp. 2d 484 (E.D. Pa. 2003) ..............................................................................16

- iv -

PLS.' MOT. FOR ATTYS' FEES, REIMBURSEMENT OF LITIG. EXPENSES, AND SERVICE AWARDS FOR CLASS REPS
Case No. 4:20-cv-03919-CW

*Craft v. Cnty. of San Bernardino,*
  624 F. Supp. 2d 1113 (C.D. Cal. 2008) ................................................................. 21

*de Mira v. Heartland Emp't Serv., LLC,*
  2014 WL 1026282 (N.D. Cal. Mar. 13, 2014) ....................................................... 11

*In re Facebook, Inc. Consumer Priv. User Profile Litig.,*
  2023 WL 8445812 (N.D. Cal. Oct. 10, 2023) ........................................................ 20

*Farrell v. Bank of Am. Corp., N.A.,*
  827 F. App'x 628 (9th Cir. 2020) ........................................................................... 21

*Fischel v. Equitable Life Assur. Soc'y,*
  307 F.3d 997 (9th Cir. 2002) .................................................................................. 10

*Glass v. UBS Fin. Servs., Inc.,*
  2007 WL 221862 (N.D. Cal. Jan. 26, 2007). .......................................................... 23

*Guippone v. BH S&B Holdings LLC,*
  2011 WL 5148650 (S.D.N.Y. Oct. 28, 2011) ......................................................... 25

*Hamilton v. Juul Labs, Inc.,*
  2021 WL 5331451 (N.D. Cal. Nov. 16, 2021) ........................................................ 11

*Hanlon v. Chrysler Corp.,*
  150 F.3d 1011 (9th Cir. 1998). ............................................................................... 12

*Hartless v. Clorox Co.,*
  273 F.R.D. 630 (S.D. Cal. 2011). ........................................................................... 24

*Herrera v. Wells Fargo Bank, N.A.,*
  2021 WL 9374975 (C.D. Cal. Nov. 16, 2021) ........................................................ 12

*In re High-Tech Empl. Antitrust Litig.,*
  2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) ......................................................... 25

*Hirsh v. WW N. Am. Holdings, Inc.,*
  2021 WL 4622394 (C.D. Cal. Feb. 12, 2021) ......................................................... 22

*In re HP Inkjet Printer Litig.,*
  716 F.3d 1173 (9th Cir. 2013) ................................................................................ 15

*In re Ikon Office Sols., Inc., Secs. Litig.,*
  194 F.R.D. 166 (E.D. Pa. 2000) ............................................................................. 21

*Jenson v. First Tr. Corp.,*
  2008 WL 11338161 (C.D. Cal. June 9, 2008) ........................................... 14, 17, 19, 22

*Larsen v. Trader Joe's Co.*,
    2014 WL 3404531 (N.D. Cal. July 11, 2014) ........................................................16

*In re Linerboard Antitrust Litig.*,
    2004 WL 1221350 (E.D. Pa. June 2, 2004) ..........................................................21

*In re Lithium Ion Batteries Antitrust Litig.*,
    2020 WL 7264559 (N.D. Cal. Dec. 10, 2020) ..............................................16, 17

*Lloyd v. Navy Fed. Credit Union*,
    2019 WL 2269958 (S.D. Cal. May 28, 2019) ......................................................23

*Lopez v. First Student, Inc.*,
    2022 WL 618973 (C.D. Cal. Feb. 8, 2022) ...........................................................22

*Lowery v. Rhapsody Int'l, Inc.*,
    75 F.4th 985 (9th Cir. 2023) ................................................................................15

*Martin v. Toyota Motor Credit Corp.*,
    2022 WL 17038908 (C.D. Cal. Nov. 15, 2022) .............................................11, 12

*Moodie v. Maxim Healthcare Servs., Inc.*,
    2019 WL 13108327 (C.D. Cal. Nov. 12, 2019) ...................................................22

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
    375 F. Supp. 3d 1058 (N.D. Cal. 2019) ...............................................................18

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
    958 F.3d 1239 (9th Cir. 2020) .............................................................................18

*Nat'l Collegiate Athletic Ass'n v. Alston*,
    594 U.S. 69 (2021) ..........................................................................................passim

*In re NCAA Grant-in-Aid Cap Antitrust Litig.*,
    2017 WL 6040065 (N.D. Cal. Dec. 6, 2017) ..........................................15, 16, 18

*Odom v. ECA Mktg., Inc.*,
    2021 WL 7185059 (C.D. Cal. Dec. 22, 2021) .....................................................22

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 934 (9th Cir. 2015) ............................................................................passim

*In re Optical Disk Drive Prods. Antitrust Litig.*,
    959 F.3d 922 (N.D. Cal. 2020) ............................................................................19

*In re Polyurethane Foam Antitrust Litig.*,
    2015 WL 1639269 (N.D. Ohio Feb. 26, 2015) ....................................................21

*Rankin v. Am. Greetings, Inc.*,
  2011 WL 13239039 (E.D. Cal. July 6, 2011) .................................................23

*Reyes v. Experian Info. Sols., Inc.*,
  856 F. App'x 108 (9th Cir. 2021) .................................................21

*Roberts v. Texaco, Inc.*,
  979 F. Supp. 185 (S.D.N.Y. 1997).................................................25

*Rodriguez v. West Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009) .................................................24

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003) .................................................12, 16, 24

*Stop & Shop Supermarket Co. v. Smithkline Beecham Corp.*,
  2005 WL 1213926 (E.D. Pa. May 19, 2005) .................................................16

*In re Syngenta AG MIR 162 Corn Litig.*,
  357 F. Supp. 3d 1094 (D. Kan. 2018).................................................21

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  2011 WL 7575003 (N.D. Cal. Dec. 27, 2011).................................................20

*Thomas v. Dun & Bradstreet Credibility Corp.*,
  2017 WL 11633508 (C.D. Cal. Mar. 22, 2017) .................................................22

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., &
  Prod. Liab. Litig.*,
  2013 WL 12327929 (C.D. Cal. July 24, 2013).................................................11, 12

*In re U.S. Bancorp. Litig.*,
  291 F.3d 1035 (8th Cir. 2002) .................................................25

*In re Urethane Antitrust Litig.*,
  2016 WL 4060156 (D. Kan. July 29, 2016) .................................................21

*In re Vitamins Antitrust Litig.*,
  2001 WL 34312839 (D.D.C. July 16, 2001).................................................21

*Vizcaino v. Microsoft Corp.*,
  290 F.3d 1043 (9th Cir. 2002) .................................................16, 19, 23

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005).................................................10

*Wannemacher v. Carrington Mortg. Servs., LLC*,
  2014 WL 12586117 (C.D. Cal. Dec. 22, 2014) .................................................22

### FEDERAL RULES

Fed. R. Civ. P. 23(f)......................................................................................................................6

Fed. R. Civ. P. 30(b)(6)..............................................................................................................5

### OTHER AUTHORITIES

Alba Conte, Herbert B. Newberg, William Rubenstein, *Newberg and Rubenstein on Class Actions* § 15:81 (6th ed. 2022) ...........................................................................19

## GLOSSARY OF DEFINED TERMS

| TERM | DEFINITION |
|---|---|
| Berman Decl. | Declaration of Steve W. Berman in Support of Plaintiffs' Motion For Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards for Class Representatives, concurrently filed herewith. |
| ECF No. | Unless otherwise indicated, docket references are to the docket in Case No. 4:20-cv-03919-CW (N.D. Cal.). |
| Ex. | Unless otherwise indicated, all Ex. references are to the Berman Decl. |
| Kessler Decl. | Declaration of Jeffrey L. Kessler in Support of Motion for Attorneys' Fees, Expenses, and Service Awards, concurrently filed herewith. |
| Motion | Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards for Class Representatives, concurrently filed herewith. |
| House Decl. | Declaration of Grant House in Support of Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards for Class Representatives, concurrently filed herewith. |
| Prince Decl. | Declaration of Sedona Prince in Support of Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards for Class Representatives, concurrently filed herewith. |
| Oliver Decl. | Declaration of Tymir Oliver in Support of Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards for Class Representatives, concurrently filed herewith. |
| Carter Decl. | Declaration of DeWayne Carter in Support of Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards for Class Representatives, concurrently filed herewith. |
| Harrison Decl. | Declaration of Nya Harrison in Support of Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards for Class Representatives, concurrently filed herewith. |
| Rascher Decl. | Declaration of Daniel A. Rascher, filed July 26, 2024, ECF No. 450-4. |
| Settlement Agreement or SA | Amended Stipulation and Settlement Agreement, Ex. 1 to Declaration of Steve W. Berman in Support of Plaintiffs' |

| TERM | DEFINITION |
|---|---|
|  | Supplemental Brief in Support of Motion for Preliminary Settlement Approval, filed Sept. 26, 2024, ECF No. 535. |
| Injunctive Relief Settlement or IRS | Appendix A to Amended Stipulation and Settlement Agreement, Ex. 1 to Declaration of Steve W. Berman in Support of Plaintiffs' Supplemental Brief in Support of Motion for Preliminary Settlement Approval, filed Sept. 26, 2024, ECF No. 535. |

## I. INTRODUCTION

The monumental settlement in this case is the culmination of a litigation campaign waged over a decade by Class Counsel to challenge Defendants' collusive agreements to restrict the rights of college athletes. In this bet-the-company case, Class Counsel overcame dispositive motions, obtained a massive discovery record from Defendants and close to 200 third parties, achieved class certification for an injunctive relief class and three large damages classes—on damages claims never before certified—with the aid of prominent experts, moved for partial summary judgment, and successfully opposed Defendants' efforts to end this case through antitrust exemptions sought in Congress. Due to the enormous pressure brought to bear by Class Counsel's efforts, and with the aid of one of the nation's preeminent mediators, Professor Eric Green, Class Counsel and Defendants hammered out a comprehensive, transformative settlement during multiple negotiation sessions conducted over more than a year that will provide the Settlement Classes with one of the largest recoveries in antitrust history.

Critical to this Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards ("Motion"), the settlement establishes, among other things, a $1.976 billion NIL Settlement Fund that is 67.4% of estimated single damages and a $600 million Additional Compensation Settlement Fund that is 31.6% of estimated single damages. Moreover, counsel obtained injunctive relief that revolutionizes college sports and NCAA rules to permit schools for the first time to provide billions of dollars in new benefits directly to college athletes (so-called "Pool benefits"), which will provide college athletes with the opportunity to earn the same percentage of revenues as professional athletes in the NFL and NBA. In monetary terms, expert and lay evidence indicates it is likely to increase benefits to college athletes by $20 billion or more over the course of the ten-year Injunctive Relief Settlement Term. The settlement will also remove all NCAA restrictions on scholarships and prohibit any NCAA limitations on bona fide third-party NIL payments, which will provide billions of dollars more in benefits to the classes.

In light of the substantial risks and complex issues in this litigation, as well as the achievements obtained for the Settlement Classes, Plaintiffs respectfully request an award of attorneys' fees, to be paid out over ten years with class member distributions, equivalent to 20% of the NIL Settlement Fund ($395.2 million), 10% of the Additional Compensation Fund ($60 million), an upfront injunctive relief award of

$20 million to be paid by Defendants, and the right to apply to the Court or special master for an award of a percentage of the total amount spent by Division I member institutions under the Pool for each academic year (with the percentage increasing from .75 to a maximum of 1.25%). In the aggregate, Class Counsel request 18.3% of the cash common funds, *before* any cash value is assigned to the injunctive relief, which the Ninth Circuit holds should be calculated as part of the common fund if quantifiable. If the injunctive relief is assigned the value estimated by Dr. Rascher ($20 billion), Class Counsel's potential fee request would drop to 3.2% of the total value of the settlement. Class Counsel also request reimbursement of $9,081,356.70 to cover the out-of-pocket litigation expenses incurred in connection with prosecuting this litigation, and class representative service awards of $125,000 each for Grant House, Sedona Prince, and Tymir Oliver (the "*NIL* Plaintiffs"), $10,000 each for DeWayne Carter and Nya Harrison (the "*Carter* Plaintiffs"), and $5,000 for Plaintiff Nicholas Solomon.

The attorneys' fees requested are warranted under the percentage-of-the fund analysis, which is the preferred methodology when common funds have been created for the class. Class action and settlement expert Professor Brian Fitzpatrick attests in his accompanying declaration ("Fitzpatrick Decl.") that the percentages requested, individually and in the aggregate, are reasonable. Indeed, based on much *lower* rates of recovery, decisions in the Ninth Circuit have awarded class counsel fees *above* the Ninth Circuit's 25% benchmark; here the fees requested, no matter how calculated, do not approach the benchmark. Moreover, Professor Fitzpatrick's empirical research confirms that the percentages requested are consistent with awards in analogous settlements, and he explains that the large size of the common funds provides no reason to award less. Indeed, recent decisions, in keeping with Ninth Circuit law, have refused to mechanically apply an "increase-decrease" rule for "megafunds." For example, in 2023, the district court in *Benson v. Doubledown Interactive, LLC* awarded fees of 29.3% of a $415 million "megafund" because "the size of the settlement fund is the result of Class Counsel's exceptional efforts, not merely the size of the class" and "Class Counsel's requested fee award is well-earned and would not constitute an unjustified windfall." 2023 WL 3761929, at *2 (W.D. Wash. June 1, 2023).

Professor Fitzpatrick also opines that given that all the percentage-of-the fund factors favor granting the fee request, this Court should use its discretion under Ninth Circuit law not to restrict the

award based on a lodestar crosscheck. That is consistent with the majority of decisions nationwide that use the percentage method and recent district court decisions in the Ninth Circuit, because applying the crosscheck would disincentivize lawyers to obtain the best and most efficient results for their clients. But if the Court does perform a lodestar crosscheck, the resulting multiplier of 8.74, while high, would be lower than multipliers approved in other settlements. Moreover, if the Court uses its discretion to consider the combined lodestar for Class Counsel in not just this litigation, but also the related cases of *Hubbard* and *Alston*, where counsel obtained permanent injunctive relief that became the precursor for this litigation and settlement, the multiplier is reduced to 5.94, further confirming the reasonableness of the fee request.

Beyond fees, the expenses incurred were all critical to representation of the Classes. Most importantly, the largest category of expenses—the amount spent on economic, media, and consumer survey experts, which constitutes approximately 85 percent of the total costs—was essential to obtaining class certification and completing the merits expert work, which exerted substantial settlement pressure on Defendants. Additionally, the requested service awards are reasonable given the named plaintiffs' significant commitment to the Classes and investment of time, and the risks they took suing the NCAA and major conferences in such a high-profile litigation, which for most of them occurred during their collegiate careers. Plaintiffs respectfully request that this Motion be granted.

## II.    BACKGROUND

### A.    The Work Undertaken by Class Counsel

Class Counsel have devoted significant resources to prosecuting this case against vigorous opposition by powerful, well-funded Defendants who were represented by more than a dozen of the best law firms in the world. A detailed description of the work performed by Class Counsel is set forth in the Declarations of Class Counsel submitted in support of this motion. Below is a summary.

Hagens Berman Sobol Shapiro pioneered the investigation and filing of this litigation. Hagens Berman began investigating this case nearly a year before filing a complaint, well before college athletes achieved a historic Supreme Court victory in *Alston*. These time-intensive pre-suit efforts included:

- Researching the commercial landscape surrounding Division I college athletics, along with the relationships between the NCAA, Conference Defendants, member schools, and their business partners;
- Analyzing legal theories and prospective remedies;

- Consulting with experts to discuss various issues that would be presented in the case, including relevant markets and less restrictive alternatives;
- Reviewing public information and statements from Defendants and their member institutions;
- Interviewing college athletes and prospective lead plaintiffs; and
- Conferring with advocacy groups and other college sports stakeholders to seek their advice on the litigation.

Berman Decl. ¶¶ 6-8. After completing this extensive preparation, Hagens Berman filed the initial complaint in *House v. NCAA* on June 15, 2020. On July 8, 2020, Spector, Roseman & Kodroff, P.C. filed the complaint in *Oliver v. NCAA*, which this Court subsequently related to *House*. ECF No. 92.

On September 11, 2020, Defendants moved to dismiss both cases, arguing primarily that Plaintiffs' claims were barred by this Court's prior decisions in *O'Bannon* and *Alston*. ECF No. 101. Defendants also advanced several arguments that Plaintiffs' proposed "Group Licensing Damages Subclass" should be dismissed. Plaintiffs vigorously opposed dismissal. Berman Decl. ¶¶ 9-10.

On June 21, 2021, the Supreme Court issued its unanimous decision in *Alston*, upholding this Court's injunction in favor of the plaintiffs. Three days later, this Court largely denied Defendants' motion to dismiss *House* and *Oliver*. ECF No. 152. Immediately following these victories, on July 1, 2021, the NCAA changed its rules to allow college athletes to earn NIL compensation from third parties. This change was a result in part of Class Counsel's successes in this litigation and in *Alston*, leading to a shift that has revolutionized college sports, immensely benefiting college athletes by creating a thriving nine-figure NIL market. Berman Decl. ¶ 11.

On July 19, 2021, Winston & Strawn joined the litigation as co-counsel for Plaintiffs and the cases were subsequently consolidated as *In re College Athlete NIL Litigation*. ECF No. 154.

1.     **Class Counsel Obtained Substantial Discovery on Behalf of the Settlement Classes.**

Often over Defendants' objections and the objections of scores of third parties, Class Counsel succeeded in obtaining broad discovery and devoted substantial resources to analyzing the complex information produced for both class certification and merits analysis.

a.     **Written and Document Discovery**

Class Counsel propounded detailed written discovery, including 79 document requests (in four sets) and five interrogatories on all six Defendants. Few, if any, of these discovery requests were

- 4 -

uncontested; therefore, responses and productions occurred after multiple rounds of telephonic and written meet-and-confer communications that spanned multiple years. Berman Decl. ¶¶ 13-15.

The parties' requests generated a large discovery record that Class Counsel analyzed to develop their claims. For example, Defendants ultimately produced 190,938 documents and 1,627,031 pages of documents, carefully reviewed by Class Counsel's document review teams. These document productions were in addition to hundreds of thousands of documents produced in previous related cases, including *Alston*, that were deemed produced in this case and make up a large portion of the discovery record that counsel and their experts had at their disposal. ECF No. 137. *Id.*

Defendants' productions included complex and highly confidential licensing contracts with broadcast networks that required notifying and conferring with multiple third parties before production. As litigation progressed, this also required production of recently announced broadcast agreements. Other important documents such as each Defendant's confidential financial data that were essential for class certification and any damages analysis were also produced. Berman Decl. ¶ 16.

### b.    Individual and 30(b)(6) Depositions

Class Counsel also pursued and conducted 40 individual fact depositions and introduced 979 exhibits. The deponents included the former president of the NCAA, current and former commissioners of each of the Conference Defendants, college athletic directors and coaches, and numerous other university representatives. Plaintiffs also conducted Rule 30(b)(6) depositions on six Defendants. Defendants chose to spread these topics over several witnesses, so Class Counsel questioned these witnesses as individuals as well as corporate representatives. Berman Decl. ¶ 19.

### c.    Class Counsel Engaged in Critical, Extensive Third-Party Discovery

The NCAA's new NIL rules, enacted on July 1, 2021, created an unprecedented "natural experiment" mirroring Plaintiffs' but-for world, and was crucial to document for class certification, expert reports, and merits arguments in the litigation.

NCAA Division I member schools alone accounted for over 300 new NIL databases where athletes reported third-party NIL deals. These schools and other third parties were not named as Defendants and required subpoenas to acquire this data that would be a foundation for damages models. Class Counsel

served over 150 third-party subpoenas on NCAA member schools, each of whom had their own internal or external counsel requiring separate negotiations for each school. Negotiations took place over many months, including delays and resources dedicated to FERPA notifications prior to production. Many of these negotiations were protracted and painstaking. In two instances, counsel secured documents only after successfully moving to compel. *See* Agreed Order on Petitioners' Motion to Compel Compliance with Rule 45 Subpoena, *House v. Florida Int'l Univ.*, No. 22-MC-20214-DPG, (S.D. Fla. Sept. 2, 2022), ECF No. 29. That success afforded Class Counsel greater leverage to secure critical documents from other schools that initially refused to comply with Plaintiffs' subpoenas, either in whole or in substantial part. Berman Decl. ¶¶ 20-22.

Class Counsel also subpoenaed over 26 third-party companies who previously or were currently involved in third-party deals with college athletes, and eight professional leagues and professional player associations to acquire pivotal licensing rates, revenue assessments, contractual agreements, and other necessary information for Plaintiffs' expert reports. Each of these third parties had separate counsel, separate requests, and required sustained negotiation. Class Counsel was able to reach agreements with nearly all third parties, as well as with Defendants, to stipulate to new confidentiality levels in the Protective Order and third-party productions between parties. ECF Nos. 177, 180.

In addition to written discovery, Class Counsel spent considerable time and resources deposing third parties, including individuals with high profiles in the world of college sports, such as Jim Harbaugh, Oliver Luck, Brett Rocky Harris, Frank Busch, and representatives from Michigan State University and the University of Oregon. Berman Decl. ¶¶ 23-24.

## 2. Class Certification

Plaintiffs achieved unprecedented success by obtaining class certification of an injunctive relief class and three large damages classes. In previous litigation challenging NCAA compensation rules, such as *O'Bannon*, certification of damages classes was denied. In certifying the damages classes here, the Court found Plaintiffs' experts' classwide damages methodologies reliable for three types of damages— NIL broadcast damages, NIL videogame damages, and individual lost opportunity NIL damages. Defendants asked the Ninth Circuit to review the class certification order under Rule 23(f), which

- 6 -

PLS.' MOT. FOR ATTYS' FEES, REIMBURSEMENT OF LITIG. EXPENSES, AND SERVICE AWARDS FOR CLASS REPS
CASE NO. 4:20-CV-03919-CW

1    Plaintiffs opposed and the Ninth Circuit denied. Berman Decl. ¶ 25.

2        To support class certification, Class Counsel worked closely with prominent testifying experts,

3    including renowned sports economist, Daniel Rascher, and industry broadcasting expert, Ed Desser. Mr.

4    Desser's testimony was essential in part due to the unique nature of Defendants' rules during the class

5    period that prohibited pay-for-performance and payments for broadcast NIL, and Plaintiffs' claim that

6    damages for denial of broadcast NIL payments could be specifically quantified. Berman Decl. ¶ 26.

7        Defendants vigorously opposed class certification with three experts and more than a dozen fact

8    declarations. The class certification expert reports supporting Plaintiffs' and Defendants' briefing totaled

9    1,009 pages, exclusive of backups. Plaintiffs successfully secured the exclusion of Defendants' expert,

10   Professor Barbara Osborne. All the class certification experts were deposed. Professor Rascher was

11   deposed twice. *See* ECF Nos. 303, 307, 308. Berman Decl. ¶ 27.

12       **3.    Merits Discovery and Expert Reports, Followed by Summary Judgment**

13       After class certification and the close of discovery, the parties proceeded to multiple rounds of

14   merits briefing and expert discovery, including 15 separate merits experts reports that totaled over 1,800

15   pages, requiring significant time and resources in a short timeframe of five months.

16       To effectively defend against Defendants' merits arguments, Class Counsel retained two additional

17   merits experts to address the proffered procompetitive justifications and effects put forth by the

18   Defendants. Plaintiffs' experts were also required to respond to five separate merits rebuttal reports—

19   alone totaling over 579 pages. Between March 5 and March 27, 2024, Class Counsel deposed five of

20   Defendants' merits experts and defended four of Plaintiffs' own merits experts' depositions. This

21   testimony, and the expert reports themselves, were then used extensively in Class Counsel's motion for

22   partial summary judgment. *See e.g.*, ECF No. 415, Exs. 1-10. Berman Decl. ¶¶ 29-32.

23       **4.    *Carter***

24       On December 7, 2023, *House* plaintiff Sedona Prince and two other current college athletes,

25   DeWayne Carter and Nya Harrison, filed *Carter v. NCAA*, No. 3:23-cv-06325-RS (N.D. Cal.), renewing

26   the challenge against the NCAA's prohibition on compensation for athletic services that began with

27   *Alston*. Class Counsel had conducted extensive discovery regarding the NCAA's restrictions on athlete

28

benefits during *Alston. See Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 80 (2021) (noting that the parties submitted "volumes of evidence and briefing" to this Court in *Alston*). They were thus well-aware of the legal issues that would be at play in any litigation challenging the NCAA's restrictions on athlete benefits, the evidence that existed related to those issues, and the challenges to (among other things) certifying damages classes. The evidence collected during discovery in *House* was also related to a variety of issues relevant to claims for additional compensation for athletic participation. For example, the evidence Plaintiffs had collected about Defendants' procompetitive justifications in *House* is relevant to their claims for additional compensation for athletic participation.

On July 26, 2024, the *Carter* claims were consolidated in the operative Second Amended Complaint, filed alongside the Motion for Preliminary Settlement Approval. Berman Decl. ¶¶ 33-34.

**5.     Defending Class Members' Interests with Federal and State Legislators**

In parallel with their efforts to prosecute this litigation, Class Counsel defended the Classes' interests with federal and state legislative bodies. During this case, Defendants engaged in an aggressive campaign to lobby for legislation exempting them from the antitrust laws and allow them to continue their restrictions on college athletes, spending nearly $10 million dollars on lobbying from 2021-2024.[1] Counsel expended significant effort and resources to protect the classes' interests against attempts to kill this case, including by meeting with legislators, analyzing proposed legislation and advising Congressional committees, and submitting testimony before Congressional panels. They also expended funds on lobbyists, for which Class Counsel does not seek direct reimbursement. Berman Decl. ¶ 35.

**B.     Extensive Settlement Negotiations Resulted in a Ground-Breaking Settlement**

Plaintiffs discussed in their motion for preliminary approval of settlement, and the supporting declarations, the extensive and complicated negotiations that led to this ground-breaking settlement. ECF Nos. 450, 450-2, 494, 494-1, 494-2. In sum, Plaintiffs and Defendants negotiated resolution of the claims during multiple mediation sessions conducted by renowned mediator Professor Eric D. Green, who has

---

[1] Sports Business Journal, *NIL and other financial questions have created a lot of talk in D.C., but no real action so far* (Oct. 28, 2024) https://www.sportsbusinessjournal.com/Articles/2024/10/28/college-nil-lobbying#:~:text=Federal%20disclosures%20show%20the%20NCAA,an%20average%20of%20%24484 5%2C000%20annually.

significant experience mediating disputes involving challenges to the NCAA's compensation rules. Settlement negotiations stretched over a year and a half—from fall 2022 to spring 2024—and were carefully structured based on different relief and claims. For example, throughout the negotiations, the discussions were separated for injunctive relief and the different types of damages claims. Following the hearing on the preliminary approval of settlement, based on issues identified by the Court, the parties negotiated further changes to the settlement agreement, and submitted the Amended Stipulation and Settlement Agreement on September 26, 2024. *See* ECF Nos. 535, 537. Berman Decl. ¶ 36.

The relief obtained for the Settlement Classes includes the following (*see* Berman Decl. ¶¶ 37-38):

- The $1.976 billion NIL Settlement Fund that is 67.4% of estimated single damages for the Settlement Classes' NIL-related claims.
- The $600 million Additional Compensation Settlement Fund that is 31.6% of the estimated single damages for the Settlement Classes' claims originally brought in *Carter*.
- Injunctive relief that makes permanent the NCAA's interim third-party NIL rules, under which athletes have received hundreds of millions of dollars from third parties for use of their NILs.
- Injunctive relief that revolutionizes NCAA rules to permit schools for the first time to provide billions of dollars in new benefits directly to college athletes (so-called "Pool benefits")—in addition to the existing scholarships and other benefits athletes are already eligible to receive. Plaintiffs' economic expert, Dr. Rascher estimates that, in 2025-2026, the combined value of existing benefits to Division I athletes and the new Pool benefits is 51% of Division I revenues—meaning college athletes may earn the same or a greater percentage of revenues as professional athletes in the NFL, NBA, and other professional leagues. Rascher Decl., ¶¶ 39, 82-87. Over the ten-year period of the Injunctive Settlement Term, the additional spending is likely to have a value of $20 billion dollars, and it could be significantly more. *See id.*
- Injunctive relief eliminating scholarship limits that will be particularly beneficial to athletes in low revenue sports, where scholarships have previously been severely restricted.

## C.    Further Proceedings

On July 26, 2024, Plaintiffs moved for preliminary approval of the settlement. ECF No. 450. After objections, response briefing, and the preliminary approval hearing, Class Counsel submitted subsequent briefing with a modified settlement agreement and notice documents. ECF Nos. 534, 535, 536, 537. Plaintiffs' motion was granted on October 7, 2024. ECF No. 544. Notice to the class commenced on October 18, 2024. Since then, Class Counsel in coordination with experts and the settlement administrator, have devoted many hours to notifying hundreds of thousands of athletes, coordinating and verifying data produced by over 200 NCAA member schools, and preparing allocation estimates for eligible class members prior to the opt-out and objection deadline of January 31, 2025. Berman Decl. ¶ 39.

### III.    ARGUMENT

In the Ninth Circuit, courts may use either the "percentage-of-the-fund" or "lodestar" method to calculate reasonable attorneys' fees. *Fischel v. Equitable Life Assur. Soc'y*, 307 F.3d 997, 1006 (9th Cir. 2002). Where, as here, the settlement includes a common fund, the percentage-of-the-fund methodology is "preferred." *In re Capacitors Antitrust Litig.*, 2018 WL 4790575, at *2 (N.D. Cal. Sept. 21, 2018) (citing cases). Whatever method is used, the ultimate question is whether "the [fee] award, like the settlement itself, is reasonable." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949 (9th Cir. 2015).

Decisions in this district and elsewhere have also emphasized the advantages of the percentage-of-the-fund method. The method ensures that "Class Counsel are incentivized to achieve the best possible result." *In re Anthem, Inc. Data Breach Litig.*, 2018 WL 3960068, at *5 (N.D. Cal. Aug. 17, 2018). It is also consistent "with contingency fee calculations in the private market." *In re Apple Inc. Device Perf. Litig.*, 2021 WL 1022866, at *2 (N.D. Cal. Mar. 17, 2021). And it "reduc[es] the burden on the courts that a complex lodestar calculation requires," permitting courts to instead "focus on showing that a fund conferring benefits on a class was created through the efforts of plaintiffs' counsel." *Id.*; *see Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) ("In contrast, the lodestar [method] create[s] an unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in a gimlet-eyed review of line-item fee audits.").

Professor Brian T. Fitzpatrick, a renowned class action expert who, among other things, has published what is perhaps the most comprehensive examination of federal class action settlements and attorneys' fees, opines in an accompanying declaration that in this case the percentage-of-the-fund method should be used. *See* Fitzpatrick Decl. ¶¶ 3, 14-16 (citing study). Professor Fitzpatrick explains that, among other things, the lodestar method has fallen out of favor with courts across the country because "it did not align the interests of counsel with the interests of their clients—to wit, counsel's recovery did not depend on how much was recovered, but rather on how many hours could be spent on the case"; by contrast, the percentage-of-the fund approach is popular "because it corrected the deficiencies of the lodestar method: it is less cumbersome, and, more importantly, it aligns the interests of counsel with the interests of their clients because the greater the recovery, the more counsel receives." *See id.*, ¶¶ 14-16. In this case, where the settlement consists of several large common funds, Professor Fitzpatrick opines that the percentage-

- 10 -

PLS.' MOT. FOR ATTYS' FEES, REIMBURSEMENT OF LITIG. EXPENSES, AND SERVICE AWARDS FOR CLASS REPS
CASE NO. 4:20-CV-03919-CW

of-fund method should be used, which is in accord with the consensus opinion of class action scholars. *Id.*, ¶ 16 (citing American Law Institute, Principles of the Law of Aggregate Litigation § 3.13(b) (2010)).

As explained below, Class Counsel's fee request is reasonable under the percentage-of-the fund analysis. Moreover, for the reasons explained above, as well as those discussed in further detail in Section III.B *infra*, a lodestar "crosscheck" is not warranted under the circumstances of this case. But if the Court were to perform a "crosscheck," that would confirm the reasonableness of the fee request.

## A.    Class Counsel Request a Reasonable Percentage of the Funds

The Ninth Circuit has established a 25 percent benchmark for common fund cases, as the "starting point." *Online DVD*, 779 F.3d at 955.[2] The percentage can "be adjusted upward or downward depending on the circumstances of the case." *de Mira v. Heartland Emp't Serv., LLC*, 2014 WL 1026282, at *1 (N.D. Cal. Mar. 13, 2014). "[I]n most common fund cases, the award exceeds the benchmark." *Id*. Here, Class Counsel request 20% of the $1.976 billion NIL Settlement Fund obtained for the Class, 10% of the $600 Additional Compensation Settlement Fund, and a $20 million upfront payment for the Injunctive Relief Settlement (paid by Defendants). Collectively, Class Counsel request 18.3% of the $1.976 billion cash common funds obtained for the Classes, *before* any monetary value is assigned to the Injunctive Relief Settlement. When the Injunctive Relief Settlement is assigned a cash value, Class Counsel's fee request could drop as low as 3.2% of the total settlement value.

### 1.    Identifying the Quantifiable Common Fund

The first step to assessing the reasonableness of the percentage request is to determine the quantifiable common funds at issue. In the Ninth Circuit, the common funds used for the percentage-of-the-fund analysis should encompass both the cash value of the settlement and the value of injunctive or other nonmonetary relief that can be "'accurately ascertained.'" *Hamilton v. Juul Labs, Inc*., 2021 WL 5331451, at *8 (N.D. Cal. Nov. 16, 2021) (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 973-74 (9th Cir. 2003)); *Martin v. Toyota Motor Credit Corp*., 2022 WL 17038908, at *11 (C.D. Cal. Nov. 15, 2022) (including value of injunctive relief in common fund); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig*., 2013 WL 12327929, at *29 & n.7 (C.D. Cal. July 24, 2013)

---

[2] Internal quotation marks omitted here and throughout, unless otherwise noted.

(same); *Herrera v. Wells Fargo Bank, N.A.*, 2021 WL 9374975, at *12 (C.D. Cal. Nov. 16, 2021) (same).[3] Unquantifiable injunctive relief is still "a relevant circumstance to consider in determining what percentage of the fund is reasonable as fee." *Staton,* 327 F.3d at 946.

The cash value of the common funds created by settlement of the Classes' damages claims are of certain and large amounts and are non-reversionary. They include the $1.976 billion NIL Settlement Fund and the $600 million Additional Compensation Settlement Fund, which together total $2.576 billion. The settlement also includes an agreement by Defendants to separately pay $20 million up front for securing the injunctive relief, and it should therefore be included as part of the value of the settlement. *See Toyota Motor*, 2013 WL 12327929, at *29 & n.7. That brings the total to $2.596 billion.

With respect to the injunctive relief, citing the Ninth Circuit decisions in *Staton* and *Hanson*, the court in *Toyota Motor* explained that the precise inquiry to determine whether nonmonetary relief should be calculated as part of the common fund is whether that relief for class members can be ascertained and "reasonably valued." *See Toyota Motor*, 2013 WL 12327929, at *29 & n.7 (citing *Staton*, 327 F.3d at 974 and *Hanlon*, 150 F.3d at 1029). In *Toyota Motor*, for example, the court held that the test was satisfied where plaintiffs submitted expert reports that estimated the value of two types of nonmonetary relief— offering Brake Override Systems and the operation of a Customer Support Program—at $877 million. *See id.; see also id.* at *34 (rejecting related objection). Analogously here, Professor Rascher has estimated that the additional direct benefits that NCAA Division I schools will provide to college athletes during the ten years of the Injunctive Relief Settlement Term has a value of $20 billion, and it could be much more. Rascher Decl. ¶¶ 84-85. This is the value of benefits that were previously prohibited by NCAA rules but are now available—and projected to be provided—under the terms of the injunctive relief. The settlement does not *require* that schools spend this amount of these newly available benefits on their athletes (just as the Court's injunctions in *Alston* or *O'Bannon* did not *require* academic incentive payments or full cost-of-attendance scholarships). However, the relevant question is whether the newly created benefits for the Settlement Classes can be ascertained and "reasonably valued," which Dr. Rascher has done. For example, in *Toyota Motor*, the Court included the value of the Customer Support Program—which would operate

---

[3] *See also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998), *overruled in part on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) (holding that plaintiffs' experts appropriately included non-monetary benefits in calculating total value of common fund).

as a form of extended warranty coverage for a certain number of years—at its market value, although there was no certainty the coverage would be needed or utilized by members of the class.

Here, the expert and factual evidence shows that it is likely additional spending under the settlement will be at least, if not greater than, $20 billion over a ten-year period. Dr. Rascher explains that even if *only* the Power Five institutions were to pay the maximum amount permitted under the Settlement, that would equal $19.4 billion in additional spending on athletes. Rascher Decl. ¶ 84. Given the competition that exists between these schools that would continue and likely intensify during the Injunctive Relief Term, Dr. Rascher concludes it is economically reasonable to expect that the Power Five schools will pay this maximum amount. *Id.* Dr. Rascher continues that it would also be economically reasonable, due to competition between the remaining Division I schools to at least expect that, for all non-P5 schools combined, there would be an increase in spending that would be "more than enough to bring the aggregate amount, for both Power Five and non-Power Five schools, above $20 billion[.]" *Id.*

Although the settlement was reached only a few months ago and is not yet final, the available factual evidence aligns with Dr. Rascher's opinion. Article after article emphasizes that a host of schools, particularly within the Power Five, are gearing up to spend substantially on new college athlete benefits.[4]

For these reasons, Class Counsel submit that the Court should conclude that the injunctive relief can be ascertained and "reasonably valued" at $20 billion, which is much less than the maximum value of new benefits that may be provided, but in line with Dr. Rascher's opinion and available evidence. If added to the cash settlement funds secured by the settlement—$2.596 billion—the settlement has a total value

---

[4] As an example, the University of Tennessee recently announced that it will add a 10% "talent fee" to ticket prices to raise money to give to players, with the Tennessee athletic director anticipating that post-settlement his school could provide $30 million more to athletes per year, including a "raise [to] the number of available athletic scholarships." *See* https://www.on3.com/news/tennessee-to-add-10-percent-talent-fee-to-ticket-prices. *See also, e.g.*, Joey Kaufman, *Ohio State to pay athletes maximum allowed following NCAA settlement, AD Ross Bjork says*, The Columbus Dispatch (June 20, 2024), https://perma.cc/GAB7-49K7; Seth Emerson, *How is Georgia preparing for revenue sharing following House v. NCAA settlement?* The Athletic (May 23, 2024) https://perma.cc/26J6-MPYW; Matthew Sgroi, *TCU to participate at highest level in 'unprecedented' revenue-sharing model for student athletes*, Fort Worth Report (July 1, 2024) https://perma.cc/UL9X-3GF8; Alejandro Zuniga, *Michigan to pay athletes maximum allowed following NCAA settlement, AD Warde Manuel says*, 247 Sports (August 28, 2024), https://247sports.com/college/michigan/article/michigan-to-pay-athletes-maximum-allowed-following-ncaa-settlement-ad-warde-manuel-says-235246393/; Matt Baker, *USF football plans to 'max out' on NCAA revenue sharing with players*, Tampa Bay Times (July 23, 2024), https://www.tampabay.com/sports/bulls/2024/07/23/usf-football-aac-media-days-ncaa-revenue-sharing/.

of $22.596 billion. Professor Fitzpatrick explains that if the future payments estimated by Dr. Rascher are made, that would make this the largest class action settlement in American history. *See* Fitzpatrick ¶ 49.

### 2. The Attorneys' Fees Requested

In this Motion, Class Counsel request attorneys' fees in line with the provisions of the Settlement Agreement. *See* SA ¶¶ 27-31. *First*, Class Counsel request 20% of the $1.976 billion NIL Settlement Fund obtained for the Class, or $395.2 million. *Second*, Class Counsel request 10% of the $600 Additional Compensation Settlement Fund obtained for the Class, or $60 million, which is tied to the claims originally brought in *Carter*. These fees will *not* be paid immediately, but rather over the same ten-year period as the class damage and future revenue payments will be distributed to class members. *See id.*

With regard to the injunctive relief portion of the settlement, Class Counsel request an upfront injunctive relief fee award of $20 million. If approved, this will be paid for by Defendants with funds separate from the common funds and from the Pool payments for the Class. *See* SA ¶ 27(a).

The Settlement Agreement also states that, for so long as the injunctive relief agreement remains in effect without material modification, Class Counsel may apply to the Court, or a special master appointed by the Court, for an award of a percentage of the total amount spent by Division I member institutions under the Pool for each academic year (with the percentage increasing from .75 to 1.25%), which shall be credited against the Pool the following academic year. *See* SA ¶ 27(b).[5] Class Counsel can conservatively estimate that if the new Pool benefits made by possible by the settlement total $20 billion over ten years, Class Counsel's fees, if the maximum request under the Settlement Agreement is granted each year, would be no more than 1.25% of that amount, or $250 million over ten years. Plaintiffs discuss *infra* that if one were to look at the percentages in fees of each common fund requested individually— ranging from 1.25% of the future injunctive relief to 10% of the Additional Compensation Fund to 20% of the NIL Settlement Fund—each is reasonable under Ninth Circuit law.

---

[5] Although it would be paid separately from any common fund that has been or will be created, the Settlement also states that Class Counsel may file a fee and cost application with the Court, or a special master appointed by the Court, each Academic Year of the Injunctive Relief Settlement Term to compensate Class Counsel based on their reasonable hourly fees and costs for their future work in monitoring and enforcing compliance with this Agreement. *See* SA ¶ 27(c). All fees and costs for monitoring and enforcing the settlement—which Defendants reserve the right to dispute—will be paid by the Defendants and *not* deducted from the Pool money or any common funds. *Id.*

Alternatively, one could look at the total fees currently requested as a percentage of the total funds in the aggregate. In connection with the *House* settlement, Class Counsel requests $475.2 million in total attorneys' fees (including the upfront $20 million payment for injunctive relief). That $475.2 million is 18.3% of the cash common funds of $2.596 billion. If the Court agrees that the injunctive relief discussed above can be reasonably valued at $20 billion, as Plaintiffs propose, one can conservatively add $250 million in maximum future attorneys' fees to Plaintiffs' request (even though those are subject to yearly request and approval), and Class Counsel are thus requesting potential fees of 3.2% of the value of the *House* settlement ($725.2 million of $22.596 billion). If one uses the aggregate approach, no matter what percentage is considered between the range of a minimum of 3.2% to a maximum of 18.3%, the aggregate fee percentage is also reasonable under Ninth Circuit law.

These conclusions are in accord with all applicable considerations identified by the Ninth Circuit: "[1] [T]he extent to which class counsel achieved exceptional results for the class, [2] whether the case was risky for class counsel, [3] whether counsel's performance generated benefits beyond the cash settlement fund, [4] the market rate for the particular field of law (in some circumstances), [5] the burdens class counsel experienced while litigating the case (e.g., cost, duration, foregoing other work), and [6] whether the case was handled on a contingency basis." *Online DVD*, 779 F.3d at 954-55.

### 3.    Counsel Achieved Exceptional Results for the Settlement Class.

When determining an award of attorneys' fees in a class action, "the most important factor is the results achieved for the class." *In re NCAA Grant-in-Aid Cap Litigation*, 2017 WL 6040065, at *3 (N.D. Cal. Dec. 6, 2017); *see Lowery v. Rhapsody Int'l, Inc.*, 75 F.4th 985, 988 (9th Cir. 2023). Typically, courts "aim to tether the value of an attorneys' fees award to the value of the class recovery." *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1178 (9th Cir. 2013). Here, Class Counsel has achieved exceptional results for the Settlement Classes.

Focusing first on the cash settlement funds, the $1.976 billion NIL Settlement Fund is a robust 67.4% of estimated single damages and the $600 million Additional Compensation Fund is 31.6% of estimated single damages. In *In re Cathode Ray Tube (CRT) Antitrust Litigation*, the court cited a survey of 71 settled antitrust cases that showed a weighted mean recovery of *19%* of single damages. 2016 WL

3648478, at *7 & n.19 (N.D. Cal. July 7, 2016). These results are well above that. Indeed, one court in this district recently described a recovery of 11.7% of single damages as an "excellent" result and awarded Class Counsel just under 30% of the settlement fund.[6] This Court has explained that, even in megafund cases,[7] "[f]ar lesser results (with 20% recovery of damages or less) have justified upward departures from the 25% benchmark."[8] In fact, courts, including in antitrust actions in this district, have awarded *33 percent* or more in fees where class plaintiffs recovered less than 20 percent of potential single damages for the class.[9] The quantifiable injunctive relief is also exceptional. Class Counsel obtained an estimated $20 billion in additional benefits for the Settlement Class that would make college athletes eligible for a share of relevant compensation comparable to that in professional leagues. Class Counsel are requesting only up to 1.25% of that future relief, plus $20 million in an upfront fee.

Moreover, even if the Court concludes that the injunctive relief should not be counted as a quantifiable common fund, the Ninth Circuit has held that the value of nonmonetary relief should be considered as a "'relevant circumstance' in determining what percentage of the common fund class counsel should receive as attorneys' fees, rather than as part of the fund itself."[10] The Ninth Circuit has held that "whether counsel's performance 'generated benefits beyond the cash settlement fund'" is an independent factor "courts may consider in assessing a request for attorneys' fees that was calculated using the percentage-of-recovery method."[11] Courts have cited non-monetary relief obtained in settlements as a factor supporting an upward departure from the 25 percent benchmark.[12] Here, the newly available

---

[6] *In re Lithium Ion Batteries Antitrust Litig.*, 2020 WL 7264559, at *20, 23 (N.D. Cal. Dec. 10, 2020).
[7] A megafund is generally defined as a "common fund[] of $100 million or more." *See Stop & Shop Supermarket Co. v. Smithkline Beecham Corp.*, 2005 WL 1213926, at *9 (E.D. Pa. May 19, 2005).
[8] *See In re NCAA Grant-in-Aid Cap Antitrust Litig.*, 2017 WL 6040065, at *3.
[9] *See* Order Granting Award of Attys.' Fees, Reimb. of Expenses & Incentive Payments, *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-md-1819-CW (N.D. Cal. Oct. 14, 2011), ECF No. 1407 (33 percent awarded to IPP counsel); *Id.* at ECF No. 1375 (showing that 33 percent awarded, $41.322 million, was 15% of possible damages estimated by IPPs' expert in *SRAM*); *In re Corel Corp., Inc. Secs. Litig.*, 293 F. Supp. 2d 484, 489-90, 498 (E.D. Pa. 2003) (1/3 fee awarded from settlement fund that comprised about 15% of damages).
[10] *Staton*, 327 F.3d at 974.
[11] *Online DVD*, 779 F.3d at 954-55 (quoting *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1049 (9th Cir. 2002)).
[12] *See, e.g.*, *Vizcaino*, 290 F.3d at 1049 (awarding counsel 28% of the cash settlement fund and explaining: "During the litigation, Microsoft agreed to hire roughly 3000 class members as regular employees and to change its personnel classification practices . . . ."); *Larsen v. Trader Joe's Co.*, 2014 WL 3404531, at *9 (N.D. Cal. July 11, 2014) (awarding fees of 28% and that "[t]he settlement agreement also provides the equitable relief that Trader Joe's will stop using the disputed labels")).

- 16 -

PLS.' MOT. FOR ATTYS' FEES, REIMBURSEMENT OF LITIG. EXPENSES, AND SERVICE AWARDS FOR CLASS REPS
CASE NO. 4:20-CV-03919-CW

Pool money represent a revolutionary change to the benefits available to college athletes. The injunctive relief also includes several other valuable changes benefitting college athletes, as well as procedural protections so that Class Counsel can ensure that the rules implementing the Injunctive Settlement will be followed. Moreover, this case, in combination with the Supreme Court victory in *Alston*, pushed Defendants to change their third-party NIL rules, which has already led to hundreds of millions of dollars being earned by college athletes, a change that the settlement makes permanent.

### 4.    This Case Posed Enormous Risks and Challenges.

That this recovery was obtained despite the case's risks, challenges, and complexities also supports the reasonableness of the fee request.[13] "Antitrust cases are particularly risky, challenging, and widely acknowledge[d] to be among the most complex actions to prosecute."[14] "The 'best' case can be lost and the 'worst' case can be won, and juries may find liability but no damages. None of these risks should be underestimated."[15] This litigation was particularly challenging and risky.

*First*, the *House* litigation was risky on the merits from the beginning, as Defendants argued forcefully that the central issues had already been decided against plaintiffs in *O'Bannon* and *Alston* (and that there was no market for Broadcast NIL). Class Counsel overcame these threshold challenges and then, employing enormous amounts of first and third-party discovery, as well as cutting edge legal and expert analysis, obtained class certification for an injunctive relief class and three large damages classes. That is despite the risk that a large damages class would not be certified, given failures in cases such as *O'Bannon*.

*Second*, the "bet-the-company" nature of Plaintiffs' challenges to Defendants' compensation rules meant that Plaintiffs had to litigate against six well-resourced Defendants and their high-powered law firms who fought every battle tooth and nail. To fend off these efforts, counsel conducted extensive written discovery and depositions, and submitted voluminous expert submissions and lengthy briefing. In addition, Class Counsel also had to bear the risk of perpetual legislative efforts to kill these cases.

*Third*, Class Counsel obtained settlement relief despite the remaining challenges and risks for their claims. These risks were discussed in Plaintiffs' preliminary approval motion (*see* ECF No.450 at 17-21)

---

[13] *See Online DVD*, 779 F.3d at 955 (identifying this factor).
[14] *Batteries*, 2020 WL 7264559, at *15 (citing cases).
[15] *Id.*

and include likely renewed *Daubert* challenges to experts and a jury trial, which would include arguments that Plaintiffs' damages models are inadequate. The $600 million settlement for the athletic compensation claims is particularly notable given that this Court in *Alston* found prohibition of non-academic-related benefits, or pay for college athletes' athletic services, to be procompetitive, *In re Nat'l Collegiate Athletic Ass'n Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1083 (N.D. Cal. 2019), and obtaining class certification for pay-for-performance claims would require overcoming daunting obstacles, given that these athletes play different positions in different sports at different schools at different levels. The injunctive relief obtained for the Settlement Classes was also excellent in light of the many risks that remained, including the argument that permitting this level of benefits is contrary to recognized procompetitive justifications, such as preserving competitive equity or "consumer demand for college sports as distinct from professional sports to the extent that they prevent unlimited cash payments unrelated to education such as those seen in professional sports leagues." *Id.* at 1101. Notably, that aspect of this Court's post-trial decision in *Alston* was specifically upheld by the Ninth Circuit. *See In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1264-65 (9th Cir. 2020). Indeed, in *Alston*, this Court's injunctive relief was limited to permitting new cash payments to athletes for academic achievement capped at $5,960 per year.

### 5. Counsel's Extensive Litigation on a Contingency Basis Supports the Fee Request.

Counsel's litigation of the case since 2020 on a contingency fee basis should be considered in assessing the percentage of the fund to award, and indeed, "an *upward departure* from the federal benchmark [of 25%] may be warranted when Class Counsel faced the risk of walking away with nothing after investing substantial time and resources in the matter." *Andrews v. Plains All Am. Pipeline L.P.*, 2022 WL 4453864, at *3 (C.D. Cal. Sept. 20, 2022) (awarding 32% of $320 million megafund based on part on this factor); *In re NCAA GIA Cap Antitrust Litig.*, 2017 WL 6040065, at *4 (attorneys who take on the risk of a contingency case should be compensated for the risk they assume); Fitzpatrick Decl. ¶ 40.

Class Counsel took this risky and challenging matter on a contingent basis with no guarantee of recovery and litigated it for several years, investing tens of millions of dollars' worth of their time, and millions of dollars in out-of-pocket expenses, before arriving at settlement. Berman Decl. ¶¶ 5, 47-63. In

- 18 -

PLS.' MOT. FOR ATTYS' FEES, REIMBURSEMENT OF LITIG. EXPENSES, AND SERVICE AWARDS FOR CLASS REPS
CASE NO. 4:20-CV-03919-CW

1    this case, the attorneys' fees will be paid over 10 years, and the longer class counsel must wait to get paid

2    for their work, the lower their "effective" fee becomes. *See* Fitzpatrick Decl. ¶ 38.

3          **6.**     **The Market Rate for Antitrust Class Actions Supports the Fee Request.**

4          A market-based analysis supports the percentages Class Counsel request. Sophisticated clients in

5    the market for high-stakes, high value plaintiffs' side litigation typically agree to pay their lawyers a fixed

6    percentage between 30% and 40% of the recovery. *See Jenson v. First Tr. Corp.*, 2008 WL 11338161, at

7    *13 n.15 (C.D. Cal. June 9, 2008) ("If this were non-representative litigation, the customary fee

8    arrangement would likely be contingent, on a percentage basis, and in the range of 30% to 40% of the

9    recovery."); *see also* Fitzpatrick Decl. ¶ 40 (citing empirical research).

10          Comparisons to judicially approved fees in class actions also supports the reasonableness of the

11    request. Professor Fitzpatrick explains in his declaration that the fees requested here are lower than the

12    most common percentages awarded by federal courts using the percentage method—25%, 30%, and 33%,

13    with nearly two-thirds of awards between 25% and 35%, and with a mean award of 25.4% and a median

14    award of 25%—and are consistent with other large-scale studies, including those focused on Ninth Circuit

15    cases. Fitzpatrick Decl. ¶¶ 25-26.

16          Professor Fitzpatrick also explains that the size of the settlement here does not warrant a lower

17    percentage award. *See* Fitzpatrick Decl. ¶¶ 28-32. His empirical research indicates that the requests here

18    are either below the averages of their settlement size ranges, or if higher, are within one standard deviation

19    of the mean—i.e., well within the "statistical mainstream." *See id.*, ¶¶ 29, 32. Moreover, the Ninth Circuit

20    has "declined to adopt a bright-line rule" requiring a reduction or "sliding-scale" for fee awards, *In re*

21    *Optical Disk Drive Prods. Antitrust Litig.*, 959 F.3d 922, 933 (N.D. Cal. 2020), recognizing the size of the

22    settlement fund as only "one relevant circumstance to which courts must refer" when determining the

23    reasonableness of a fee award. *Vizcaino*, 290 F.3d at 1047. The logic behind this consideration is set forth

24    in *ODD*, where the Court noted that "in many instances the increase in recovery is merely a factor of the

25    size of the class and has no direct relationship to the efforts of counsel." 959 F.3d at 933; *but see* Alba

26    Conte, Herbert B. Newberg, William Rubenstein, *Newberg and Rubenstein on Class Actions* § 15:81 (6th

27    ed. 2022) (criticizing this approach because "the 'mega-fund' concept is a crude proxy for windfall as it

28

may prove both under- and over-inclusive").

The windfall concern expressed in *ODD* does not apply here, where the size of the recovery is not "merely a factor of the size of the class." As discussed *supra*, Class Counsel obtained settlement funds that are well above the weighted mean percentages of single damages in other antitrust class actions—and courts in the Ninth Circuit have justified *upward* departures from the 25% benchmark based on percentage recoveries far inferior to what Class Counsel obtained here. The fantastic results Class Counsel achieved in this case despite the substantial risks confirm that the requested fee award, while certainly significant, is not fairly characterized as a windfall and is thus not a reason to reduce the fees awarded. *See Benson*, 2023 WL 3761929, at *3 (citing *ODD* and holding that awarding 29.3% of a $415 million megafund was appropriate because "the size of the settlement fund is the result of Class Counsel's exceptional efforts, not merely the size of the class" and "Class Counsel's requested fee award is well-earned and would not constitute an unjustified windfall"). Professor Fitzpatrick also opines that where, as in the Ninth Circuit, courts have discretion not to reduce the percentage based on the size of award, they should not do so because that ultimately hurts class members by giving their lawyers improper incentives, is contrary to the practices of sophisticated clients when they hire lawyers on a contingent fee basis (even in the largest cases), and it has been banned in at least one circuit because "[p]rivate parties would never contract for such an arrangement . . . ." Fitzpatrick Decl. ¶ 31 (citation and internal quotation marks omitted).

Moreover, as the district court held in *Benson*, the size of the settlement fund must be considered among all the other reasonableness factors, and when those factors support the percentage requested, the size of the fund does not justify reducing the award. 2023 WL 3761929, at *2. Several decisions in the Ninth Circuit and elsewhere agree and have awarded above-benchmarks fees in megafund cases (far in excess of what Class Counsel seek here). *See, e.g.*, *id.* at *3 (awarding 29.3% of $415 million common fund); *In re Facebook, Inc. Consumer Priv. User Profile Litig.*, 2023 WL 8445812, at *1-2 (N.D. Cal. Oct. 10, 2023) (awarding 25% in fees of $725 million common and rejecting megafund argument); *Andrews*, 2022 WL 4453864, at *4 (approving 32% fee award of $230 million settlement); *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 183285, at *2 (N.D. Cal. Jan. 14, 2016) (approving 30% fee award of $127.45 million settlement); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 7575003

(N.D. Cal. Dec. 27, 2011) (approving 30% fee award of $405.02 million settlement).[16] While $1+ billion settlements are rare, courts have awarded percentage fees in excess of what Class Counsel requests in those cases as well. *See, e.g.*, *In re Syngenta AG MIR 162 Corn Litig.*, 357 F. Supp. 3d 1094, 1115 (D. Kan. 2018), *aff'd* 2023 WL 2262878 (10th Cir. Feb. 28, 2023) (awarding a 33.33% fee award in a $1.51 billion settlement); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1210 (S.D. Fla. 2006) (awarding 31.33% fee on $1.075 billion settlement fund); *see also* Fitzpatrick Decl. ¶¶ 49-50.

**B.    A Lodestar "Cross-Check" is Not Warranted Under the Circumstances of This Case, But if Completed, Would Confirm the Reasonableness of the Fee Request.**

The Ninth Circuit has explained that, when a district court uses the percentage-of-the fund method to calculate fees, no lodestar cross-check is mandated and, indeed, it has "consistently refused to adopt a crosscheck requirement." *Farrell v. Bank of Am. Corp., N.A.*, 827 F. App'x 628, 631 (9th Cir. 2020). Recent decisions, including addressing fee requests in megafund settlements, have held that a lodestar crosscheck was not helpful in determining whether the fee request was "reasonable," the ultimate question before the Court. *See Benson*, 2023 WL 3761929, at *1 (lodestar crosscheck to assess percentage awarded "would not be a valuable tool to help assess the reasonableness of Class Counsel's fee request"); *Andrews*, 2022 WL 4453864, at *2 (declining to conduct a lodestar crosscheck); *Craft v. Cnty. of San Bernardino*, 624 F. Supp. 2d 1113, 1122 (C.D. Cal. 2008) (same). The Ninth Circuit has also recently found error in district court decisions for inappropriately applying a lodestar cross-check. *Reyes v. Experian Info. Sols., Inc.*, 856 F. App'x 108, 110-11 (9th Cir. 2021) (reversing district court decision that relied on a lodestar cross-check to limit a fee award below the Circuit benchmark).

Professor Fitzpatrick opines that the Court should use its discretion and not apply a lodestar crosscheck. Fitzpatrick Decl. ¶¶ 41-43. His research shows that only a minority of courts perform the

---

[16] *See also In re Urethane Antitrust Litig.*, 2016 WL 4060156 (D. Kan. July 29, 2016) (awarding 33.33% fee on $835 million settlement; "Counsel's expert has identified 34 megafund cases with settlements of at least $100 million in which the court awarded fees of 30 percent or higher."); *In re Polyurethane Foam Antitrust Litig.*, 2015 WL 1639269, at *7 (N.D. Ohio Feb. 26, 2015) (awarding 30% fee on $147.8 million settlement fund); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1366 (S.D. Fla. 2011) (awarding 33.3% fee on $510 million settlement fund); *In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *1 (E.D. Pa. June 2, 2004) (awarding 30% fee on $202.5 million settlement fund); *In re Cardizem CD Antitrust Litig.*, No. 99-md-1278 (E.D. Mich. Nov. 26, 2002), at 18-20 (awarding 30% of a $110 million dollar fund); *In re Vitamins Antitrust Litig.*, 2001 WL 34312839, at *9 (D.D.C. July 16, 2001) (awarding 34.6% fee on $365 million settlement fund); *In re Ikon Office Sols., Inc., Secs. Litig.*, 194 F.R.D. 166, 170 (E.D. Pa. 2000) (awarding 30 percent fee on $111 million settlement fund).

crosscheck with the percentage method, it is "unheard of" when clients hire lawyers on a contingency fee basis, and it ultimately hurts class members by "reintroduc[ing] the very same misaligned incentives that the percentage method was designed to correct in the first place." *Id.*

The circumstances here show that a lodestar crosscheck would be particularly unhelpful. *First*, this Court has been extensively involved in supervising the work of Class Counsel in these cases and related antitrust litigation against Defendants. *See Andrews*, 2022 WL 4453864, at *2 (declining to apply lodestar crosscheck due to "Court's extensive involvement in supervising" the case and exceptional results achieved). In this situation, where application of the Ninth Circuit's factors for determining the percentage of the fund to award support the fee request, courts have not performed a crosscheck. *See Ahmed v. HSBC BANK USA*, 2019 WL 13027266, at *6 (C.D. Cal. Dec. 30, 2019) ("In short, consideration of the foregoing factors supports class counsel's request for attorney's fees in the amount of 25% of the settlement fund . . . . The court, therefore, is satisfied that a lodestar 'cross-check' is not required."); *Moodie v. Maxim Healthcare Servs., Inc.*, 2019 WL 13108327, at *6 (C.D. Cal. Nov. 12, 2019) (same); *see also Lopez v. First Student, Inc.*, 2022 WL 618973, at *6 (C.D. Cal. Feb. 8, 2022) (approving 30% award after reviewing Ninth Circuit factors and stating, "The Court is satisfied that a lodestar 'cross-check' is not required").[17]

*Second*, the settlements followed litigation of several interrelated cases that were part of a broader litigation campaign challenging Defendants' anticompetitive rules, as well as a lobbying effort to stop bills that would have ended these cases and led to no class recovery. Thus, just looking at the lodestar in the *House* case would be misleading and undercount the work performed and expenses incurred by Class Counsel to obtain the settlement. *See Thomas v. Dun & Bradstreet Credibility Corp.*, 2017 WL 11633508, at *22 (C.D. Cal. Mar. 22, 2017) ("Courts have compensated class counsel for work performed in prior, related case where the work performed advanced [the instant] class action.").

*Third*, where class counsel quickly achieved a strong settlement, courts have eschewed a lodestar crosscheck, because doing so in those circumstances would incentivize counsel to continue the case (so

---

[17] *See also Odom v. ECA Mktg., Inc.*, 2021 WL 7185059, at *6 (C.D. Cal. Dec. 22, 2021); *Hirsh v. WW N. Am. Holdings, Inc.*, 2021 WL 4622394, at *1 (C.D. Cal. Feb. 12, 2021); *Bendon v. DTG Operations, Inc.*, 2018 WL 4976511, at *8 (C.D. Cal. Aug. 22, 2018); *Wannemacher v. Carrington Mortg. Servs., LLC*, 2014 WL 12586117, at *10 (C.D. Cal. Dec. 22, 2014).

as to run up their lodestar and lower their multiplier) despite their efficient success.[18] Here, one of the funds at issue in this settlement was achieve quickly—the $600 million Additional Compensation Fund to compensate the Class for the claims brought in *Carter*—but was an exceptional result, likely because Class Counsel was building on work it had done in *House* and *Alston*. Notably, due in part to that relatively quick result, Class Counsel only request 10% of that settlement fund. To penalize this strong early result would encourage counsel to rack up lodestar work before settlement, which is contrary to policy goals encouraged by relying primarily on the percentage of the fund method.

But even if the Court chooses to perform a lodestar crosscheck of the $475.2 million in fees requested now, that crosscheck would confirm that the fee request is reasonable. When courts do a lodestar crosscheck to assess a fee award, one of the factors considered is awards in similar cases. *See Bluetooth*, 654 F.3d at 941-42. If the Court were to only include the lodestar from *House* and *Carter* of $54.36 million, the resulting lodestar multiplier is 8.74. Berman Decl. ¶ 49. Professor Fitzpatrick explains that while multipliers in the largest settlements average less than 4, there are many settlements that have been approved with multipliers as high and higher than that requested here. *See* Fitzpatrick Decl. ¶ 42 (citing empirical research and cases); *e.g.*, *Vizcaino*, 290 F.3d at 1051 n.6 (noting multipliers of up to 19.6); *Lloyd v. Navy Fed. Credit Union*, 2019 WL 2269958, at *13 (S.D. Cal. May 28, 2019) (approving 25% fee award even though "a lodestar cross-check would likely result in a multiplier of around 10.96").

Moreover, as Professor Fitzpatrick explains, it is largely arbitrary to draw the line for the lodestar crosscheck at class counsel's time sheets in *House/Carter*. Fitzpatrick Decl. ¶¶ 47, 51-53. A crosscheck should also include hours expended and fees requested and awarded, respectively, by Class Counsel on the claims in *Hubbard* and the injunctive relief claims in *Alston*, since all of this work is part of the same interconnected litigation campaign, Class Counsel's recovery in *Alston* was limited to statutory fee-shifting (excluding, for examples, millions in non-reimbursable expenses and any multiplier on fees), and

---

[18] *See Glass v. UBS Fin. Servs., Inc.*, 2007 WL 221862, at *16 (N.D. Cal. Jan. 26, 2007), *aff'd*, 331 F. App'x 452 (9th Cir. 2009) ("Under the circumstances presented here, where the early settlement resulted in a significant benefit to the class, the Court finds no need to conduct a lodestar cross-check."); *Rankin v. Am. Greetings, Inc.*, 2011 WL 13239039, at *2 (E.D. Cal. July 6, 2011) ("Furthermore, in accordance with Ninth Circuit precedents, district courts within the Ninth Circuit have recognized that a lodestar cross check need not be performed where plaintiff's counsel achieves a significant result through an early settlement.").

- 23 -

PLS.' MOT. FOR ATTYS' FEES, REIMBURSEMENT OF LITIG. EXPENSES, AND SERVICE AWARDS FOR CLASS REPS
CASE NO. 4:20-CV-03919-CW

much of the discovery obtained in *Alston* was used in the later cases. If the Court were to do that, the multiplier requested would be 5.94. Berman Decl. ¶¶ 64-70; *see* Fitzpatrick Decl. ¶¶ 51-53. Other courts have taken this approach with interrelated litigation that unfolded over time, such as in the multi-billion-dollar PFAS litigation before Judge Gergel. *See In re: Aqueous Film-Forming Foams Prod. Liab. Litig.*, 2024 WL 4868615, at *5 (D.S.C. Nov. 22, 2024) (using "[t]he lodestar for the total cumulative work performed by Class Counsel . . . from the DuPont, 3M, Tyco, and BASF actions" for the crosscheck).

**C.    Plaintiffs' Litigation Expenses Are Reasonable and Reimbursable.**

Counsel who have created a common fund for the benefit of a class are entitled to be reimbursed for out-of-pocket expenses reasonably incurred in obtaining the settlement. *Hartless v. Clorox Co.*, 273 F.R.D. 630, 646 (S.D. Cal. 2011), *aff'd in part*, 473 F. App'x 716 (9th Cir. 2012). As the Ninth Circuit has recognized, "litigation expenses make the entire action possible." *Online DVD*, 779 F.3d at 953.

Here, Class Counsel's unreimbursed expenses of $9,081,356.70 were reasonably incurred and necessary for the litigation of the case. Berman Decl. ¶ 55. Class Counsel advanced these expenses interest free with no assurance of reimbursement. *Id.* Expert witnesses paid from the Litigation Fund constitute the largest expenditures, $7.7 million, or about 84.5% of all expenses, which were critical to the case's prosecution. *Id.* ¶¶ 26-32, 61. Class Counsel respectfully request they be reimbursed in full.

**D.    The Requested Service Awards For The Class Representatives are Warranted.**

Plaintiffs request awards of $125,000 each for Grant House, Sedona Prince, and Tymir Oliver (the "*NIL* Plaintiffs"), $10,000 each for DeWayne Carter and Nya Harrison (the "*Carter* Plaintiffs"), and $5,000 for Nicholas Solomon, who joined the case before the Third Amended Complaint.

Awards for class representatives are provided to encourage individuals to undertake the responsibilities of representing the class and recognize the time and effort spent in the case. *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009). Courts have discretion to approve awards based on the financial or reputational risks undertaken, the notoriety and personal difficulties encountered, the amount of time and effort, the case's duration and the degree the class has benefitted from their actions. *Stanton*, 327 F.3d at 977. Here, the class representatives have been actively involved in these cases. House Decl. ¶¶ 4-5; Prince Decl. ¶¶ 5-6; Oliver Decl. ¶¶ 4-5; Carter Decl. ¶¶ 4-5; Harrison Decl. ¶¶ 4-5.

Additionally, each of the named plaintiffs—four of whom were still competing in college, and one

- 24 -

PLS.' MOT. FOR ATTYS' FEES, REIMBURSEMENT OF LITIG. EXPENSES, AND SERVICE AWARDS FOR CLASS REPS
CASE NO. 4:20-CV-03919-CW

of whom was a former NCAA athlete pursuing a professional career, when their cases began—incurred risks in taking on leadership roles in this high-profile litigation against the NCAA. House Decl. ¶¶ 6-7; Prince Decl. ¶ 7; Oliver Decl. ¶ 6; Carter Decl. ¶¶ 6-7; Harrison Decl. ¶ 6. The circumstances here are analogous to cases where courts have found that the representatives assumed a heightened risk warranting a larger service award. For example, courts have recognized that when a class representative is a current or former employee of the defendant, the class representative's "present position or employment credentials or recommendation may be at risk by reason of having prosecuted the suit, [they] therefore lends his or her name and efforts to the prosecution of litigation at some personal peril." *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 201 (S.D.N.Y. 1997); *see, e.g.*, *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) (service award justified based on risk of "workplace retaliation"); *Guippone v. BH S&B Holdings LLC*, 2011 WL 5148650, at *7, *20 (S.D.N.Y. Oct. 28, 2011).

Plaintiffs recognize that the $125,000 awards requested for the *NIL* Plaintiffs is on the higher end of what courts award. But such awards are not unprecedented in cases where the value secured for the class is significant. For example, in *In re High-Tech Employment Antitrust Litigation*, this Court authorized a service award of $120,000 to one class representative and $80,000 each to the other four from a $415 million settlement fund. 2015 WL 5158730, at *17 (N.D. Cal. Sept. 2, 2015). And the justification for the requested awards is particularly strong here given the highly publicized nature of this litigation, where the class representatives' roles were unusually visible. *See Weeks v. Kellogg Co.*, WL 6531177, at *36 (C.D. Cal. Nov. 23, 2013); *see also* House Decl. ¶ 8; Prince Decl. ¶ 8.

Plaintiffs further note that the service awards requested for all named plaintiffs is $400,000, representing approximately .015% of the $2.596 billion cash settlement funds. This sum is modest in comparison to awards found acceptable in other cases. *See, e.g., Online DVD*, 779 F.3d at 941-43 (approving incentive awards totaling .17% of total settlement fund); *see also In re U.S. Bancorp. Litig.*, 291 F.3d 1035, 1038 (8th Cir. 2002) (total incentive payments did not exceed 0.35% of total settlement).

## IV.  CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that their Motion For Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards for Class Representatives be granted.

Dated: December 17, 2024                          Respectfully submitted,

By  _/s/ Steve W. Berman_                          By  _/s/ Jeffrey L. Kessler_

Steve W. Berman (*pro hac vice*)                  Jeffrey L. Kessler (*pro hac vice*)
Emilee N. Sisco (*pro hac vice*)                  David G. Feher *(pro hac vice)*
Stephanie Verdoia (*pro hac vice*)                David L. Greenspan *(pro hac vice)*
Meredith Simons (SBN 320229)                      Adam I. Dale *(pro hac vice)*
HAGENS BERMAN SOBOL SHAPIRO LLP                   Sarah L. Viebrock *(pro hac vice)*
1301 Second Avenue, Suite 2000                    Neha Vyas (*pro hac vice*)
Seattle, WA 98101                                 WINSTON & STRAWN LLP
Telephone: (206) 623-7292                         200 Park Avenue
Facsimile: ( 206) 623-0594                        New York, NY 10166-4193
steve@hbsslaw.com                                 Telephone:  (212) 294-6700
emilees@hbsslaw.com                               Facsimile: (212) 294-4700
stephaniev@hbsslaw.com                            jkessler@winston.com
merediths@hbsslaw.com                             dfeher@winston.com
                                                  dgreenspan@winston.com
Benjamin J. Siegel (SBN 256260)                   aidale@winston.com
HAGENS BERMAN SOBOL SHAPIRO LLP                   sviebrock@winston.com
715 Hearst Avenue, Suite 300                      nvyas@winston.com
Berkeley, CA 94710
Telephone: (510) 725-3000                         Jeanifer E. Parsigian (SBN 289001)
Facsimile:  (510) 725-3001                        WINSTON & STRAWN LLP
bens@hbsslaw.com                                  101 California Street, 21st Floor
                                                  San Francisco, CA 94111
Jeffrey L. Kodroff (*pro hac vice*)               Telephone: (415) 591-1000
Eugene A. Spector (*pro hac vice*)                Facsimile:  (415) 591-1400
SPECTOR ROSEMAN & KODROFF, PC                     jparsigian@winston.com
2001 Market Street, Suite 3420
Philadelphia, PA 19103                            *Class Counsel for Plaintiffs*
Telephone: (215) 496-0300
Facsimile:  (215) 496-6611
jkodroff@srkattorneys.com
espector@srkattorneys.com

*Class Counsel for Plaintiffs*

1

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)

2      Pursuant to Civil Local Rule 5-1(i)(3), the filer of this document attests that concurrence in the

3  filing of this document has been obtained from the signatories above.

4                                             By: */s/ Steve W. Berman*

5                                                 STEVE W. BERMAN