The Honorable Claudia Wilken
United States District Court
Northern District of California
1301 Clay Street
Oakland, CA 94612

**FILED**

DEC 23 2024 

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Re: House v. NCAA, Case No. 4:20-cv-03919-CW

December 17, 2024

Dear Judge Wilken,

I write to you humbly to express my sincere concerns with the preliminarily approved *House v. NCAA* settlement. College athletes have forever been the recipients of unilateral NCAA decision-making that impacts the conditions of their athletic experience. This settlement is no exception. While many of the terms provide long-overdue steps toward equity, a sizable portion of student-athletes will be negatively and unnecessarily impacted without amendment to the preliminarily approved settlement.

I am a former non-revenue-generating student-athlete at Saint Joseph's University and member of the plaintiff class. Separately, I am a graduate of the University of Illinois College of Law, helped draft state NIL legislation, provide coverage for Sports Illustrated's NIL Daily, and am the Director of the Sport Management program at Loyola University Chicago.

In the 1982 season, before the *Board of Regents of the University of Oklahoma* case stripped the NCAA of its monopoly on monetizing game broadcasts, the University of Michigan football program stood to gain $130,000 in media rights earnings. In 2018, Michigan's total media rights earnings were $51,000,000. With the increased proliferation of streaming and sports gambling, the Big Ten Conference's current media contract nets Michigan nearly $100,000,000 annually.

In 1982, athlete exploitation was not an issue. However, with the changing market forces over the last four decades, the judiciary and NCAA have finally understood that a critical mass of revenue generation within the highest levels of college athletes has been reached (and was probably reached a long time ago) that demands college athletes be paid — not from illusory, booster-funded shell corporations known as NIL collectives but directly from the institutions themselves.

The settlement's "forward-facing" components, which address this longstanding inequity, raise significant alarm. The preliminarily approved roster limits and de facto salary cap raise valid antitrust concerns. Adding these components, which are commonplace in professional athletics, to college sports seems like an easy solution; however, due to the absence of a statutory exemption to antitrust law through a labor union(s) in college athletics, a fixture in every major American professional sport, these solutions are not a viable path forward in the long run.

**Roster Limits:**

Roster limits exist in every sports league. However, in professional sports, they are collectively bargained between the league office and the respective player's unions, not unilaterally imposed, as the NCAA intends to do through this settlement.

College athletes are not classified as employees and are unlikely to hold this designation anytime soon. Without the right to bargain, athletes are distanced from any meaningful negotiation power regarding rules that impact their terms of participation in collegiate sports.

The rich traditions of walk-ons are synonymous with collegiate sports. Sporting titans such as Clay Matthews, Baker Mayfield, Scottie Pippen, Ozzie Smith, J.J. Watt, and countless others have captivated the nation with their underdog stories and experienced tremendous professional athletic careers directly due to the opportunities they received as walk-ons in college.

Due to the settlement, thousands of athletes nationwide will be stripped of these opportunities. It is unfair to force these athletes to either relinquish their athletic aspirations or uproot their lives through the transfer portal. Such a rapid change in the landscape of college sports will strip prospective athletes of roster spots and create a mass migration of athletes to new conferences and programs or remove their opportunity to play sports altogether.

This situation could never occur in any other form of commercialized athletics. Without a labor union for college athletes, the NCAA looks to unilaterally impose a rule change that has *disastrous* outcomes for a hefty segment of the student-athlete population — something that would not be easily bargained away in the presence of a labor union.

**De Facto Salary Cap:**

The settlement also provides a de facto salary cap that Division I institutions may opt into. Beginning in the 2025-26 academic year, schools will be able to compensate athletes roughly $20,500,000 annually. For the first time, institutions can remove themselves from the antiquated amateurism model the NCAA has propagated.

This system is a monumental win for college athletes across the country who have been cut out of the revenues their labor has produced. Rather than institutions spending money on lavish locker rooms, hyper-inflated coaching salaries, and administrative bloat, athletes will receive compensation that can give them a financial head start.

However, this proposed revenue-sharing figure raises a similar issue to roster limits. Revenue sharing, another professional concept applied to college athletics, is negotiated between the player's unions and their respective league offices. While court documents indicate the 22% revenue-sharing figure has been carefully calculated to account for offsetting benefits like scholarships, housing, and other assistance, it does not change the fact that the salary cap was not negotiated at arm's length.

Once again, the NCAA and its member institutions have unilaterally imposed a compensation structure. While the settlement terms are much more favorable to athletes than the current system, the issue still exists; the NCAA has executed a price-fixing regime. It is perfectly reasonable to assume that the biggest brands in college athletics — Tennessee, Michigan, Alabama, and Texas, among many others — would be more than willing to compensate college athletes more than $20,500,000 if it meant they could field more competitive rosters.

The athletes at the institutions above, who stand to make more money without a unilaterally imposed salary cap, are an injured party to such a price-fixing regime.

## **The Settlement Must Be Approved:**

The new changes to the NCAA model through this settlement will financially benefit many athletes. However, the highly specialized sports attorney stands to benefit the most from this proposal. This settlement has created a whirlwind of potential causes of action, not limited to those mentioned in this letter, that will follow these changes.

Athletes burdened by the unilaterally created NCAA rules will undoubtedly raise claims against the NCAA's continued monopolistic actions. While they may ultimately be found to be pro-competitive under a rule of reason analysis, these claims indeed hold enough merit to see the inside of a courtroom.

The settlement is not a solution but a mere band-aid that will only lead to more litigation. I understand you cannot stop this from the bench. The settlement is necessary to enshrine a vehicle for direct institutional athlete payment and retroactively compensate many athletes who were unjustly stripped of earnings.

Without the ability for athletes to collectively bargain, the need for congressional intervention is apparent. Sport and antitrust law have a rich and intertwined history; given the unique landscape of college sports, the model of professional athletics cannot easily be copy-pasted into the college world.

Modifications to the NLRA that permit athletes to collectively bargain or federal legislation providing limited antitrust exemptions to the NCAA are ultimately necessary. These changes are the only way to provide a framework for an equitable model of college athletics and end the never-ending cycle of litigation and instability created by the NCAA's consistently reactive policies.

The timing of the final settlement hearing on April 7th is troubling. Even today, schools and conferences have a tight window to adapt to this new landscape. Most, if not all, are actively preparing for a revenue-sharing regime to begin. NIL collectives have started closing shop, schools have begun hiring general managers to adapt to a new "professional" model, and third-party platforms have been procured to distribute funds to athletes.

Removing this system three months before revenue-sharing begins would be disastrous for institutions, resulting in hefty economic loss and frustration within the college sports landscape. More importantly, financial loss for athletes who have proactively been moved to institutional rev-share contracts would be unconscionable. While imperfect in many regards, **the settlement must be approved.**

## **The Solution for Unfairly Burdened Parties:**

I am writing to you today to express my concerns and propose a solution for the thousands of athletes who will be unfairly and unnecessarily burdened by the new roster limit rules. With thousands of athletes ready to be cut from rosters, the settlement must be promptly altered to avoid sudden and devastating impacts on college athletics.

This settlement will result in vast athlete displacement, harming current and prospective athletes. Numerous reports of high-school athletes having scholarship offers pulled due to the preliminary settlement approval are alarming. So, too, is the number of opportunities lost for current walk-ons and even scholarship athletes on rosters that exceed the newly created roster limits.

The domino effect created by this loss of opportunity impacts the transfer market significantly; with an influx of talent available, current college players may be cut for incoming transfers, prospective athletes can have offers rescinded, and mass athlete migration will lead to inefficiencies that strip opportunities from deserving athletes.

Current walk-ons and bench players will face an unfortunate reality: lose their status as student-athletes they have worked tirelessly to earn or uproot their friendships, studies, and other on-campus opportunities to chase athletic pursuits elsewhere. Those who transfer to new schools to continue their athletic journeys will not easily find the same programs of study or be able to transfer academic credit without difficulty. The human cost of roster limits extends far beyond the field of play.

**The NCAA has unilaterally imposed this dilemma, which is grossly unfair to thousands of affected athletes.**

Since the NCAA and plaintiffs' attorneys have eagerly implemented unilateral changes to NCAA rules that mirror the professional model, one more element of professional athletics must also be enshrined to promote fairness: a practice squad.

I desperately urge the court to modify the settlement to halt the negative impacts already occurring to athletes who occupy walk-on and depth positions on collegiate rosters. Every sport should be allowed to carry a practice squad of up to 20% of the newly imposed roster size limit.

Athletes who occupy these spots will not be permitted to travel with the team, dress for home games, receive a scholarship, or receive Alston payments. These athletes, however, will be able to obtain priority admission to the respective universities, attend practices, and utilize athletic resources made available to all rostered athletes. Time on a practice squad will also count toward collegiate athletic eligibility.

This is the most reasonable way to avoid substantial upheaval in collegiate sports and maintain opportunities for athletes who do not have a union to advocate for their interests. FRCP(e)(2) requires any settlement to be "fair, reasonable, and adequate" for those in the plaintiff class. The unjust displacement of athletes under the current settlement terms contradicts what the court is tasked to do. Implementing a practice squad to the settlement terms would alleviate this concern.

Thank you for your time and consideration.

Respectfully,
Noah Henderson