1  DOHA MEKKI
   *Acting Assistant Attorney General*
2  MICHAEL B. KADES
   JOHN W. ELIAS
3  *Deputy Assistant Attorneys General*
   DAVID B. LAWRENCE
4  *Policy Director*
   RYAN DANKS
5  *Director of Civil Enforcement*
   MIRIAM R. VISHIO
6  *Deputy Director of Civil Enforcement*
   YVETTE F. TARLOV
7  *Chief, Media, Entertainment, and Communications Section*
   JARED A. HUGHES
8  *Assistant Chief, Media, Entertainment, and Communications Section*
   ERIC D. DUNN (CSBN 312513)
9  *Assistant Chief, Competition Policy and Advocacy Section*
   ANDREW L. KLINE
10 *Counsel to the Assistant Attorney General*

11 JAMES H. CONGDON
12 *Trial Attorney*
   U.S. Department of Justice, Antitrust Division
13 450 Fifth St, N.W., Suite 7000
   Washington, DC 20530
14 Telephone: (202) 538-3985
   james.congdon@usdoj.gov
15

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE: COLLEGE ATHLETE NIL LITIGATION | Case No. 4:20-cv-03919-CW<br><br>**STATEMENT OF INTEREST OF UNITED STATES OF AMERICA**<br><br>Hon. Claudia Wilken |

**INTRODUCTION**

The United States respectfully submits this statement pursuant to 28 U.S.C. § 517, which permits the Attorney General to direct "any officer of the Department of Justice … to attend to the interests of the United States in a suit pending in a court of the United States." The United States enforces the federal antitrust laws and has a strong interest in addressing the proper application of the antitrust laws to labor markets. In particular, the United States has pursued or participated in cases involving labor market restraints, including cases involving the NCAA, *see, e.g.*, *Ohio et al. v. NCAA*, No. 1:23-cv-100 (N.D. W. Va); Brief for the United States as Amicus, *NCAA v. Alston*, 594 U.S. 69 (2021), and cases involving so-called "salary caps," *see United States v. Activision Blizzard, Inc.*, No. 1:23-cv-00895 (D.D.C. Apr. 3, 2023).

The Class Action Fairness Act of 2005, 28 U.S.C. §§ 1711–15 ("CAFA"), also requires class-action defendants to notify the Attorney General of proposed class action settlements. 28 U.S.C. § 1715. Congress included this notice provision to enable the Attorney General to "voice concerns if they believe that the class action settlement is not in the best interest of their citizens." The Class Action Fairness Act of 2005, S. Rep. No. 109-14, at 5 (2005).

The United States writes to express concerns that the Proposed Settlement may not "cure the ill effects of the illegal conduct, and assure the public freedom from its continuance," *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 88 (1950), which a full remedy to the alleged violations following a finding of liability would need to do. *See United States v. Microsoft*, 253 F.3d 34, 103 (D.C. Cir. 2001). Instead, the Proposed Settlement allows the NCAA, an adjudicated monopsonist, to continue fixing the amount its member schools can pay students for the use of their name, image, and likeness ("NIL").

Although the Proposed Settlement raises the level at which those payments are capped, that cap remains determined by agreement among competing employers (Division I colleges and universities) and restrains competition among schools for payments above the cap. Not only does this enshrine, for ten years, an agreement among competitors to limit compensation, a facially anticompetitive restraint, but the NCAA may attempt to use the cap's incorporation into a court-approved settlement as a shield against future antitrust actions seeking more complete

injunctive relief. Accordingly, the United States respectfully requests that the Court (i) decline to approve the Proposed Settlement or, in the alternative, (ii) make clear that approval of the Proposed Settlement does not constitute a judgment of the competitive impact of the Salary Cap Rule or a determination that the Salary Cap Rule complies with the antitrust laws.

## BACKGROUND

Plaintiffs in this case filed suit on June 15, 2020. ECF No. 1. The operative complaint alleges that the NCAA and its members "have adopted regulations governing all aspects of college sports, including the conduct of schools, conferences, third-party business partners, and student-athletes." ECF No. 533-1 at 2. Plaintiffs allege the "NCAA and its members have committed violations of the federal antitrust laws" by conspiring to "fix the amount that student-athletes may be paid for the licensing, use, and sale of their names, images and likeness." *Id.* at 3. "Absent the challenged restraints," Plaintiffs allege, "many student-athletes would receive additional compensation . . . for the use of their NILs and providing athletic services." *Id.* at 37. The complaint seeks both damages and injunctive relief. On September 22, 2023, the Court certified an Injunctive Relief Class. ECF No. 323. On November 3, 2023, the Court certified three damages classes. ECF No. 387.

The parties announced a settlement in May 2024. ECF No. 420. After an initial hearing during which the Court expressed some concerns with certain aspects of the initial settlement agreement, the parties filed a revised proposed settlement agreement (the "Proposed Settlement") on September 26, 2024. ECF No. 535-1. If approved, the Proposed Settlement would resolve Plaintiffs' claims for both damages and injunctive relief. With respect to damages, the Proposed Settlement resolves Plaintiffs' claims for back damages with respect to their NIL with a payment of approximately $1.976 billion, to be paid to various classes of former college athletes, along with $600 million to be paid for additional claims for damages. *Id.* at 15. The United States takes no position on the damages provisions in the Proposed Settlement.

With respect to injunctive relief, the NCAA has agreed to promulgate rules to "permit payments to student-athletes" for the use of their NIL, but only as "contemplated by the terms of this Injunctive Relief Settlement." ECF No. 535-1, App'x A (Amended Injunctive Relief

Settlement) at 6.  Under the rule the NCAA has proposed to be enacted pursuant to Article 3 of the Proposed Settlement (the "Salary Cap Rule"), NCAA Division I member institutions have agreed not to pay student-athletes more than a specified amount: 22% of Average Shared Revenue, as defined by a formula.  *Id.* at 8-11.  The functional result is that Division I member institutions will not compete for student-athletes by offering them additional value beyond that limit for use of their name, image, and likeness. In addition, Article 5 of the Amended Injunctive Relief Settlement allows that "individual conferences (acting through their Member Institutions) shall be permitted to adopt and enforce rules applicable to their Member Institutions regarding benefits provided or not provided to student-athletes." *Id.* at 22.

The Proposed Settlement lasts for a term of 10 years.  ECF No. 535-1 at 7.  The Injunctive Relief Settlement Class includes all Division I college athletes over the next 10 years. *Id.*  In addition, the Proposed Settlement contemplates that "the Parties will negotiate in good faith, prior to the conclusion of the Term, as to whether to jointly seek an extension of the Term upon its expiration." ECF No. 535-1, App'x A at 31.

The United States is not a party to the settlement.  The United States therefore inquired with Defendants as to their position regarding the implications of the Proposed Settlement on future antitrust actions by the United States.  By e-mail of January 14, 2025, counsel for NCAA and the Conference Defendants confirmed in writing their position that while the settlement does not provide immunity from future antitrust actions by the United States, Defendants "retain all rights to rely on the settlement and potential court approval thereof in any such action, including as a defense to liability." *See* Decl. of James H. Congdon ("Congdon Decl.") Ex. 1.

## LEGAL STANDARDS

In the class-action settlement context, a court must determine whether a proposed settlement, "taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice v. Civil Service Com'n of City and County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982) (citing Fed. R. Civ. P. 23(e)).  In so doing, courts consider a variety of factors, including whether "(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate .

. . and (D) the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2). Courts also consider whether the settlement "furthers 'the objectives [of]' . . . and does not 'violate the statute upon which the complaint was based.'" *Sierra Club, Inc. v. Elec. Controls Design, Inc.*, 909 F.2d 1350, 1355 (9th Cir. 1990) (quoting *Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 525-26 (1986)); *see also Fraley v. Batman*, 638 Fed. Appx. 594, 597 (9th Cir. 2016) (court is required to set aside a settlement if it involves "clearly illegal" conduct).

The Sherman Act is "the Magna Carta of free enterprise . . . as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972). To remedy an antitrust violation, a court should "cure the ill effects of the illegal conduct, and assure the public freedom from its continuance." *U.S. Gypsum Co.*, 340 U.S. at 88. At a minimum, that means ensuring the same or similar conduct does not recur in the future. *See, e.g.*, *Nat'l Soc. Of Pro. Engineers v. United States*, 435 U.S. 679, 697 (1978). A class action settlement in an antitrust case that does not further these objectives may not be fair, adequate, or reasonable. That is particularly true if a settlement allows a party to continue violating the antitrust laws. A court should not "lend its approval to any contract or agreement that violates the antitrust laws." *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975); *see also Officers for Justice.*, 688 F.2d at 625 (citing *Grunin*); *Robertson v. Nat'l Basketball Ass'n*, 556 F.2d 682, 686 (2d Cir. 1977); *White v. Nat'l Football League*, 822 F. Supp. 1389, 1425 (D. Minn. 1993).

## ARGUMENT

### I.  The Proposed Settlement Provides Limited Compensation for College Athletes.

In assessing whether the Proposed Settlement "is fair, reasonable and adequate" under Rule 23(e), the Court should consider that the Proposed Settlement does not fully "unfetter [the] market from anti-competitive conduct" as a comprehensive antitrust remedy would do. *Microsoft*, 253 F.3d at 103.

### A. A Salary Cap Among Horizontal Competitors Raises Serious Antitrust Concerns.

The Proposed Settlement replaces an agreement among competitors to cap compensation for use of college athletes' NIL at $0 with an agreement among competitors to cap compensation at 22% of average revenue. While the Proposed Settlement allows for some relief, it still functions as an artificial price cap on what free market competition may otherwise yield.

As the litigants are well aware, the Sherman Act prohibits unreasonable restraints on competition in the labor market for college athletes. *See, e.g.*, *NCAA v. Alston*, 594 U.S. 69, 89 (2021) (applying Section 1 of the Sherman Act to "market for student-athletes' labor"). Indeed, agreements among competitors on the price they pay for workers are ordinarily *per se* unlawful. *Id.* at 110 (Kavanaugh, J., concurring) ("Price-fixing labor is price-fixing labor. And price-fixing labor is ordinarily a textbook antitrust problem because it extinguishes the free market in which individuals can otherwise obtain fair compensation for their work.").

This action was brought to enjoin rules that "restrict for all athletes, in whole or now in part, the compensation they may receive from their school, conferences, or third parties for their athletic services and the use of their [name, image, and likeness]." ECF No. 533-1 at 2. The Proposed Settlement, however, continues to restrict the compensation college athletes may receive from their school, replacing one cap with another. As described above, under the Proposed Settlement, a Member Institution is ***not*** permitted to spend what it wants—or what the market would dictate—to compete for the services of college athletes. The Proposed Settlement increases the cap on what college athletes can be paid for the use of their NIL from zero to a new amount. But that new amount is still fixed by agreement among organizations that collectively control the entire labor market.

The cap in the Proposed Settlement therefore "extinguish[es]" the free market that would otherwise determine how much college athletes get paid. *Alston*, 594 U.S. at 110 (Kavanaugh, J., concurring). This elimination of competition is sufficient to establish at least a prima facie case under Section 1 of the Sherman Act regardless of the precise analytical tool applied. *Alston*, 594 U.S. at 91 ("The NCAA's rules fixing wages for student-athletes fall on the far side of this line."); *see also Law v. NCAA*, 902 F. Supp. 1394, 1405, 1410 (D. Kan. 1995) (finding that an

NCAA rule establishing a cap on salaries for assistant coaches violated Section 1 of the Sherman Act), *aff'd* 134 F.3d 1010 (10th Cir. 1998). Indeed, in *Indiana Federation of Dentists*, competing dentists agreed not to submit x-rays to dental insurers, which was effectively a "refusal to compete"—no "'elaborate industry analysis [was] required to demonstrate the anticompetitive character of such an agreement'." *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986) (quoting *Nat'l Society of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978)). The Tenth Circuit affirmed in *Law* that a similar restriction—a cap on the amount of money that certain college coaches (rather than players) could receive as compensation—was a "horizontal price restraint on its face" that was "obviously anticompetitive." *Law*, 134 F.3d at 1020 (citing *NCAA v. Board of Regents*, 468 U.S. 85, 109-10 (1984)).

As the Plaintiffs in this case alleged, the "free and vigorous competition for the services of college athletes" that would exist absent a cap drives schools and conferences to "offer[] more . . . compensation for athletic services and the use of NILs." ECF No. 533-1 at 37. That is especially true here because the NCAA was recently found to be a monopsonist in the labor market at issue here. As the Supreme Court explained just four years ago, "[t]he NCAA *accepts* that its members collectively enjoy monopsony power in the market for student-athlete services, such that its restraints can (and in fact do) harm competition." *Alston*, 594 U.S. at 90 (emphasis in original). This is because "student-athletes have nowhere else to sell their labor." *Id.* Scrutiny is warranted where, as here, an adjudicated monopsonist seeks the Court's imprimatur to impose a salary cap that may suppress competition in unforeseen ways. ECF No. 533-1 at 36 (alleging the "monopsony power of the NCAA" in the labor markets at issue).

Accordingly, under the Proposed Settlement, there is not the same "free and vigorous competition" driving "more . . . compensation" for college athletes that would exist if the challenged rules were simply enjoined. The total compensation for players remains fixed by agreement. The Proposed Settlement thus leaves in place an agreement among competitors that causes the precise type of harm "to the free market" that the antitrust laws prohibit. *Alston*, 594 U.S. at 110 (Kavanaugh, J., concurring). Notably, the Proposed Settlement has potentially far-reaching consequences for the college athletes of the future. The Injunctive Relief Settlement


Class purports to include future college athletes who will compete through the end of the Injunctive Relief Settlement Term, which runs for ten years following the date of final approval.

Collectively, these issues raise important questions about whether the settlement is fair, reasonable, and adequate under Rule 23(e). *See, e.g.*, *Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666, 682-83, 686 (S.D.N.Y. 2011) (rejecting proposed class action settlement in part because of concerns that the settlement would violate the antitrust laws regardless of whether the underlying conduct was *per se* illegal).

### B. The Existence of Salary Caps in Professional Sports Leagues Is Not Relevant Here and No Labor Exemption to the Antitrust Laws Applies.

In justifying the payment cap in the Proposed Settlement, the parties suggest that, by their own calculations, the revenue sharing with players results in players receiving a "similar percentage of revenues as professional athletes in the NFL, NBA, and other professional leagues." ECF No. 534 at 7. Setting aside whether the parties' factual assertion is correct, it overlooks an important difference for antitrust purposes: while professional athletes can rely on their unions to bargain on their behalf, college athletes have no such union representation. The agreements in those professional sports leagues are legally distinct from the salary cap at issue here because they are the result of collective bargaining by labor unions. Both sides concede that the Proposed Settlement is not a collective bargaining agreement or a resolution of a "labor dispute" under the federal labor laws. *See, e.g.*, ECF No. 450 at 22 (describing the settlement as "an extraordinary recovery given plaintiffs didn't have the leverage of a collective bargaining agreement"). Moreover, while the Proposed Settlement represents a negotiation between players (via Plaintiffs' counsel for the Declaratory and Injunctive Relief Class) on the one hand and the NCAA and its member institutions on the other, there are several important differences between a collective bargaining agreement and the Proposed Settlement that make a substantive comparison inapposite.

*First*, salary caps in collective bargaining agreements are generally immune from antitrust scrutiny under the non-statutory labor exemption. *See Brown v. Pro Football, Inc.*, 518 U.S. 231, 235–37, 250 (1996). Accordingly, to the extent professional sports leagues have salary caps, it is not because those provisions necessarily are procompetitive under the antitrust laws,

but because they are exempt from antitrust scrutiny to begin with. *Id.*; *see also Wood v. Nat'l Basketball Ass'n,* 809 F.2d 954, 959-63 (2d Cir. 1987); *Nat'l Basketball Ass'n v. Williams*, 45 F.3d 684, 688 (2d Cir. 1995).[1]

*Second*, collective bargaining agreements are the result of a process whereby workers have different substantive and procedural rights than those available to plaintiffs under Rule 23. *See, e.g.*, *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 515 (2018) ("Union organization and collective bargaining in the workplace are the bread and butter of the NLRA, while the particulars of dispute resolution procedures in Article III courts or arbitration proceedings are usually left to other statutes and rules—not least the Federal Rules of Civil Procedure . . . ."); *Brady v. Nat'l Football League*, 644 F.3d 661, 664 (8th Cir. 2011) (in collective bargaining, "parties . . . [can] resolve their differences through the use of the 'offsetting tools' of labor law, including strikes, lockouts, and petitions for intervention by the NLRB"). The Proposed Settlement was negotiated without college athletes benefiting from these substantive and procedural rights. *See, e.g.*, ECF No. 450 at 22 (acknowledging "plaintiffs didn't have the leverage of a collective bargaining agreement"). If Defendants want to set compensation rules for present and future athletes, the proper way to do so would be a collective bargaining agreement.

## II. The Court Should Not Enter a Settlement Approval that NCAA Could Use to Defend the Salary Cap Rule.

All parties agree that even if the Court approves the Proposed Settlement under Rule 23, the Salary Cap Rule is not immune from future antitrust scrutiny by a potential party that is not bound by its terms. The United States is one such party, and compliance with the Proposed Settlement or new NCAA rules purporting to implement the settlement affords no immunity to any such enforcement actions. *See FTC v. Actavis, Inc.*, 570 U.S. 136, 141 (2013) (holding that settlement agreements are subject to the antitrust laws).

---

[1] Other common restraints on labor competition in professional sports leagues—such as the draft and other eligibility rules—are also generally immune from antitrust scrutiny to the extent they are properly part of collective bargaining agreements. *See Powell v. Nat'l Football League*, 930 F.2d 1293, 1303 (8th Cir. 1989); *Brown v. Nat'l Football League*, 518 U.S. 231, 240–42 (1996); *see Clarett v. Nat'l Football League*, 369 F.3d 124, 139–40 (2d Cir. 2004); *Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 474 (6th Cir. 2005).

The NCAA, however, has taken the position that it may use the Proposed Settlement in the future as a defense to antitrust liability in a case brought by a future plaintiff seeking to achieve more fulsome protection for the free and fair market opportunities of student athletes than the Proposed Settlement affords. *See* Congdon Decl. Ex. 1. The risk that defendants will attempt to use a private, negotiated settlement as a shield in future litigation underscores the importance of determining carefully whether it is fair and adequate. At a minimum, if the Court approves the Proposed Settlement, it should make clear that doing so is not a ruling on the legality of the Salary Cap Rule such that the approval could be used as a defense in future litigation. *See*, *e.g., White,* 822 F. Supp. at 1426 n.55 (noting that in approving the settlement the court was making "no ruling on the issue" of whether the rules enshrined in the settlement were legal under the antitrust laws and recognizing that a court might find they were not in a "in future litigation concerning the legality of [those rules].")

## CONCLUSION

The Proposed Settlement and accompanying Salary Cap Rule seek the Court's imprimatur for a restraint that facially suppresses how much college athletes can benefit from competition for the next decade. They bind the market opportunities of college athletes who have not yet begun their eligibility. And they risk allowing a monopsonist to use the Court's order opportunistically against parties that are not bound by the Proposed Settlement. Accordingly, the United States respectfully requests that the Court (i) decline to approve the Proposed Settlement or, in the alternative, (ii) make clear that approval of the Proposed Settlement does not constitute a judgment of the competitive impact of the Salary Cap Rule or a determination that the Salary Cap Rule complies with the antitrust laws.[2]

Dated: January 16, 2025                                              Respectfully submitted,

/s/ James H. Congdon

---

[2] Nor is any individual conference exempt from antitrust scrutiny based on the language of Article 5 of the Injunctive Relief Settlement, which appears to allow individual conferences to enact rules that cap payments or benefits below the agreed-upon Salary Cap Rule applicable to the NCAA. Whether any individual conference—at any point during the term of the settlement—is in violation of the antitrust laws is a fact-specific question.

DOHA G. MEKKI
*Acting Assistant Attorney General*
MICHAEL B. KADES
JOHN W. ELIAS
*Deputy Assistant Attorneys General*
DAVID B. LAWRENCE
*Policy Director*
RYAN DANKS
*Director of Civil Enforcement*
MIRIAM R. VISHIO
*Deputy Director of Civil Enforcement*
YVETTE F. TARLOV
*Chief, Media, Entertainment, and Communications Section*
JARED A. HUGHES
*Assistant Chief, Media, Entertainment, and Communications Section*
ERIC D. DUNN (CABN 312513)
*Assistant Chief, Competition Policy and Advocacy Section*
ANDREW L. KLINE
*Counsel to the Assistant Attorney General*

JAMES H. CONGDON
Trial Attorney
U.S. Department of Justice,
Antitrust Division
450 Fifth St, N.W., Suite 7000
Washington, DC 20530
Telephone: (202) 538-3985
james.congdon@usdoj.gov

*Counsel for the United States of America*