# EXHIBIT 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

IN RE: COLLEGE ATHLETE NIL
LITIGATION

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

No. 4:20-cv-03919 CW

**EXPERT REPORT OF DANIEL A.
RASCHER**

October 21, 2022

*CONFIDENTIAL*

1. **Qualifications** .................................................................................................................. 2
2. **Scope of Work** ............................................................................................................... 3
3. **Summary of Opinions** .................................................................................................... 6
4. **The Anticompetitive Effects of the Challenged NIL Rules Can Be Assessed by Means of Common Economic Proof** ......................................................................................... 8
   4.1. A direct effects analysis showing anticompetitive effects is common to all members of the proposed classes ...................................................................................................... 15
      4.1.1. Direct Effects analysis relating to Defendants' prohibition on third-party NIL deals ...................... 18
      4.1.2. Direct Effects analysis relating to video games and other group-licensed NIL products ................. 29
      4.1.3. Direct Effects analysis relating to payments for the use of college athletes Broadcast NILs ........... 33
   4.2. The indirect process of identifying relevant markets and demonstrating market power to show anticompetitive effects would also be through economic evidence common to all members of the proposed classes ................................................................................. 35
      4.2.1. Common evidence defining the relevant labor markets ........................................................... 35
      4.2.2. Market power and anticompetitive effects can also be demonstrated by common economic proof .. 40
5. **Any Asserted Procompetitive Justifications and Less Restrictive Alternatives Will Also Be Assessed Through Economic Evidence Common to All Members of the Proposed Classes** .......................................................................................................... 42
6. **All Members of Each Proposed Class Suffered Injuries Caused by Defendants' Challenged NIL Restraints** ................................................................................................ 47
   6.1. Football and Men's Basketball Class ................................................................................ 48
   6.2. Women's Basketball Class ............................................................................................. 49
   6.3. Additional Sports Class .................................................................................................. 50
   6.4. Injunctive Relief Class .................................................................................................... 51
7. **Class-wide Methodologies Are Available for Proving Damages** .................................... 57
   7.1. A Class-wide Methodology for Estimating Video Game Damages ....................................... 58
   7.2. A Class-wide Methodology for Estimating Broadcast NIL Damages ................................... 73
      7.2.1. Power Five Conferences would have competed to attract athletes by offering Broadcast NIL payments ............................................................................................................................... 75
      7.2.2. *Ex ante* conference competition would have resulted in equal payments for the use of class members' Broadcast NILs within each conference/sport ........................................................... 78
      7.2.3. Broadcast contracts that existed during the class period already incorporated the value of the Broadcast NILs of the Power Five football and basketball players ............................................... 83
      7.2.4. As a result, there is a class-wide common method for calculating damages ................................ 84
   7.3. A Class-wide Methodology for Estimating Damages from Lost NIL Opportunities ............... 94
      7.3.1. Identifying the universe of third-party after-period NIL transactions with class members ............ 102
      7.3.2. Comparisons between before and after periods .................................................................... 103
      7.3.3. General market conditions ................................................................................................ 104
      7.3.4. Adjustments for changes in school or participation in sport .................................................... 112
      7.3.5. "Before" damages for each class member ............................................................................ 116
8. **The Damages Models I Have Put Forward Are Not Impacted by Any Claimed "Substitution Effect"** ........................................................................................................ 117
9. **Conclusion** ...................................................................................................................... 121
10. **Signature** ...................................................................................................................... 122
**Appendix C: Video Game and Broadcast Damages** ............................................................ 123
**Appendix D: Athlete-Reported NIL Data Entry and Processing** ........................................... 131
D.1 Reported NIL Transactions ............................................................................................... 131

*CONFIDENTIAL*

D.1.1 Prepare NIL observations for consolidation ........................................................ 132
D.1.2 Consolidate and process NIL transactions ......................................................... 133
D.1.3 Verify accuracy of compensation value and other relevant fields ...................... 137
D.1.4 Database produced............................................................................................. 139
D.2 Reported NIL Earnings ................................................................................................ 139
**Appendix E: NCAA MFRS Data............................................................................... 143**

## 1. QUALIFICATIONS

1.    My name is Daniel A. Rascher.  At the University of San Francisco (USF), I am Professor and Director of Academic Programs for the Master of Science in Sport Management program.  I teach courses in sport economics and finance and applied research methods to graduate students.  I am also a Partner of OSKR, LLC, an economic consulting firm specializing in applying economic analysis to complex legal issues, as well as President of SportsEconomics, LLC, an economic, finance, and marketing research consulting firm focused on the sports industry.  Formerly, I was an Assistant Professor and Associate Professor at USF, an Assistant Professor at the University of Massachusetts, Amherst, and have taught courses at Stanford University, Northwestern University, and the IE Business School in Madrid, Spain.  I was also previously a Principal at LECG, LLC, a provider of expert economic consulting services.

2.    I received a Ph.D. in Economics from the University of California at Berkeley, having focused on the fields of industrial organization, econometrics, and labor economics.  I have published numerous articles, book chapters, and a textbook in the field of sports economics and finance and have worked on over one hundred consulting projects involving the sports, entertainment, and tourism industries.  I have consulted with counsel for both plaintiffs and defendants on a variety of lawsuits and non-litigation investigations, including the economics of antitrust, class certification, and the estimation of reasonable damages in cases involving athletes and/or sports governing bodies.

*CONFIDENTIAL*

3.      I am also certified as a valuation analyst (Certified Valuation Analyst) by the National
Association of Certified Valuators and Analysts.  Attached as Appendix A is my *curriculum
vitae*, which includes my qualifications as an expert witness and my testimonial experience,
including my publications from the last 10 years and all cases in the last 4 years where I
testified at trial or was deposed.

4.      I am being compensated at an hourly rate of $600 per hour, plus reimbursement of expenses.
In my work on this matter, I have been assisted by OSKR staff, working under my supervision
and control.  I have no direct financial interest in the outcome of this matter.  I reserve the right
to supplement this report.

## 2. SCOPE OF WORK

5.      At  issue in this case are two sets of NCAA rules which embody agreements among
Defendants[1] to prohibit colleges and conferences from permitting Division I college athletes to
receive compensation for the use of their names, images, and likenesses ("NIL" in the singular,
"NILs" in the plural): those in force prior to July 1, 2021 (which throughout I will call the
"Prior NIL Rules"); and those which came into force on July 1, 2021, albeit on an explicitly
interim basis, as the NCAA's "Interim NIL Policy"[2] and remain in force currently (which I
refer to throughout as the "Current NIL Rules").  Collectively, the Prior NIL Rules and the
Current NIL rules are referred to throughout this report as the "challenged NIL rules."

6.      These two sets of collusive rules differ primarily in that the Prior NIL Rules prohibited
college athletes from receiving any form of compensation for the use of their NILs under
penalty of a collective boycott by all NCAA member schools, whereas the Current NIL Rules

---

[1]  Defendants are the NCAA, Atlantic Coast Conference ("ACC"), Big Ten Conference, Big Twelve Conference, Pac-12 Conference, and Southeastern Conference ("SEC").

[2]  *Interim NIL Policy*.  (2021, July 1).  NCAA.  Accessed on October 18, 2022 at https://ncaaorg.s3.amazonaws.com/ncaa/NIL/NIL_InterimPolicy.pdf.

Page 3

have been relaxed so that some (but not all) forms of NIL compensation from third parties (but not the conferences and schools) are now permitted.

7.    Counsel for Plaintiffs ("House") have asked me to opine on whether economic evidence and methods that would be used to prove the anticompetitive effects of the challenged NIL rules, antitrust injury, and damages are common to the members of the proposed damages and injunctive relief classes (as defined in the Plaintiffs' accompanying motion for class certification). They have also asked me to include in my assessment of these issues whether class-wide impact and damages can be demonstrated by means of common economic evidence. For the purposes of this assessment, I have been asked to assume as the counterfactual for analysis of impact and damages that during the class period the challenged NIL rules did not exist, but that the remainder of Defendants' rules remained in place, including other NCAA rules related to restricting the compensation that NCAA Division I college athletes may receive. I have been asked to focus my attention to the impact which the challenged NIL rules have had on athletes who compete for Division I schools, and with respect to two of the three damages classes, for athletes who compete for schools in the so-called "Power Five" Conferences, plus Notre Dame (which competes as an Independent in football, but is a member of a Power Five Conference for other sports and which has comparable economics to the Power Five schools).

8.    As noted above, I have been asked to opine on whether I can develop and present common methods at a trial for proving class-wide injury and calculating damages to class members based on reliable methodologies. I have developed such methodologies and describe them in this report. However, I have not been asked to provide a final version of the damages calculations at this time, as damages to the class should not be finally assessed until after the completion of discovery, when additional data for use in my damages models covering a longer period of time will be available and additional refinements might be made in the damages models.

9.    I understand that Plaintiffs seek to certify an injunctive relief class and three damages classes. These are as follows:

Page 4

*CONFIDENTIAL*

a) **Injunctive Relief Class**: "All college athletes who compete on, competed on, or will compete on a Division I athletic team at any time between June 15, 2020 and the date of judgment in this matter.  This Class excludes the officers, directors, and employees of Defendants.  This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action."[3]

b) **Football and Men's Basketball Class**: "All current and former college athletes who have received full Grant-in-Aid (GIA) scholarships and compete on, or competed on, a Division I men's basketball team or an FBS football team, at a college or university that is a member of one of the Power Five Conferences (including Notre Dame), at any time between June 15, 2016 and the date of the class certification order in this matter.  This Class excludes the officers, directors, and employees of Defendants.  This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action."

c) **Women's Basketball Class:** "All current and former college athletes who have received full GIA scholarships and compete on, or competed on, a Division I women's basketball team, at a college or university that is a member of one of the Power Five Conferences (including Notre Dame) at any time between June 15, 2016 and the date of the class certification order in this matter.  This Class excludes the officers, directors, and employees of Defendants.  This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action."

d) **Additional Sports Class**: "Excluding members of the Football and Men's Basketball Class and members of the Women's Basketball Class, all current or former college athletes who competed on a Division I athletic team prior to July 1, 2021 and who received compensation while a Division I college athlete for use of their name, image, or likeness between July 1, 2021 and the date of the class certification order in this matter and who competed in the same Division I sport

---

[3]  All class definitions from Plaintiffs' Notice of Motion and Motion for Class Certification, October 21, 2022.

*CONFIDENTIAL*

prior to July 1, 2021.  This Class excludes the officers, directors, and employees of Defendants.  This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action."

10.    In carrying out this assignment, I have relied upon a number of information sources, including extensive discovery materials provided by counsel and third-party files, laid out in full in Appendix B.  I also rely on my years of experience and training as a sports economist and my knowledge of the sports economics literature.  To the extent I specifically cite to an article or study, I include that title in this report and in my list of relied upon materials in Appendix B.

### 3.  SUMMARY OF OPINIONS

11.    Based on my review of the information produced in discovery to date, my research and analysis, knowledge, and qualifications, it is my opinion that:

a) The economic conclusions related to anticompetitive effects, asserted pro-competitive justifications, less restrictive alternatives, class-wide injury, and class member damages can be proven by means of non-individualized economic evidence and methodologies common to class members.

b) Evidence common to the classes indicates that all members of each of the classes were injured as a result of the challenged NIL rules.

c) There are common, class-wide methodologies that I can apply to generate reasonable, non-speculative and reliable estimates of the damages incurred by the class members tied to the antitrust theories of competitive harm asserted by Plaintiffs.  In this regard, I have developed class-wide methodologies to estimate the damages from three sources: (1) the loss of opportunities to enter into video game group-license agreements for the use of athletes' NILs with respect to FBS football and Division I men's basketball players; (2) the loss of opportunities to enter into group-license agreements for the use of athletes' NILs in television broadcasts with respect to Power Five football and men's and women's basketball players; and (3) the loss of opportunities to enter into other NIL agreements by Division I athletes who have been able to enter into such

*CONFIDENTIAL*

agreements for the use of their NILs with third parties since the Prior NIL Rules were suspended.

d) In the course of describing the methodologies for demonstrating class-wide injury and measuring damages, I have generated preliminary estimates of class-wide damages set forth below. However, as noted above, these are not my final estimates of damages to class members, which I will not make until discovery is completed and additional information is available for input into my damages models, which also may be refined based on my analysis of further discovery, prior to my merits damages report.

e) The results of my preliminary calculations of damages in the aggregate and numbers of class members, at a minimum, for each of the classes are as follows:

- Football and Men's Basketball Class at least $23.5 million video game NIL damages (from Exhibits 3 and 4), at least $1,320.3 million Broadcast NIL[4] damages (from Exhibit 10), and at least $21.2 million other lost NIL opportunity damages (from Exhibit 14, for a total of at least $1,365.0 million damages for at least 6,280 class members (from Exhibit 11).
- Women's Basketball Class at least $49.8 million Broadcast NIL damages (from Exhibit 10) and at least $1.1 million other lost NIL opportunity damages (from Exhibit 14), for a total of at least $50.1 million damages for at least 856 class members (from Exhibit 11).
- Additional Sports Class at least $0.6 million video game NIL damages (from footnote 167) and at least $10.7 million other lost NIL opportunity damages (from Exhibit 14), for a total of at least $11.3 million damages for at least 7,384 class members (from Exhibit 11).
- Injunctive Relief Class: At least 184,000 class members.[5]

12.    In the remainder of this report, I lay out the bases for these opinions. Section 4 explains how the economic evidence related to liability, including Direct Effects evidence of

---

[4] Throughout this report, I use the term Broadcast NIL to refer to the specific use of an athletes' NIL related to participating as a member of a specific team in a broadcasted live event, such as a football or basketball game.

[5] NCAA participation data shows Division I women athletes at 87,425 and men at 99,950 in 2020-21, inclusive of "Nonchampionship" and "Emerging" sports, totaling to more than 187,000 Division I athletes. Without those categories, the reported figures are 86,024 for women and 98,198 for men. *NCAA Sports Sponsorship and Participation Rates Report (1956-57 through 2020-21)*. (2021). NCAA, pp. 85-86. Accessed on October 21, 2022 at https://ncaaorg.s3.amazonaws.com/research/sportpart/2021RES_SportsSponsorshipParticipationRatesReport.pdf.

*CONFIDENTIAL*

anticompetitive harm and Indirect Effects evidence of market definition and power as an
alternative method of assessing anticompetitive harm, can be proven by economic evidence and
methods that are common to the classes.  Section 5 addresses why an assessment of Defendants'
claimed procompetitive justifications (PCJs) and proof of any less restrictive alternatives
(LRAs) can be presented at trial by means of economic evidence common to the classes.
Section 6 summarizes the class-wide harm that every member of each of the classes, including
the Injunctive Relief Class, has suffered as a result of the Prior NIL Rules and the Current NIL
Rules.  Section 7 describes in more detail the common evidence that demonstrates these class-
wide injuries and how reliable common methodologies can be employed at trial to reasonably
estimate class-wide damages.  In Section 8, I address why previously raised concerns by the
NCAA about a so-called "Substitution Effect" do not apply to the members of the proposed
classes here.

4. **THE ANTICOMPETITIVE EFFECTS OF THE CHALLENGED NIL RULES CAN BE ASSESSED BY MEANS OF COMMON ECONOMIC PROOF**

13.    Through the Prior NIL Rules and Current NIL Rules, Defendants and the other Division I
member conferences and schools of the NCAA have agreed not to include or permit
compensation for the use of college athletes' NILs among the package of goods and services
offered to those athletes in the various college athletic labor markets they participate in.  That is,
they agreed to fix the price that schools and conferences may pay for the use of athletes' NILs at
zero.  They also agreed, through the Prior NIL Rules, to impose a group boycott on all college
athletes who accepted compensation from third parties for use of their NIL by denying any such
athlete eligibility to participate in NCAA intercollegiate sports.  Thus, no school or conference
was permitted to compete for athletes in the labor markets by allowing its athletes to accept
compensation from third parties for use of their NILs and remain eligible to participate in
intercollegiate sports at their schools or conferences.  The group boycott precluded that form of

*CONFIDENTIAL*

competition.  The Prior NIL Rules also prohibited schools from offering, as part of their

competition in the labor markets, to facilitate third-party[6] NIL deals in any way.

14.    The Current NIL Rules no longer restrict most forms of third-party NIL payments and allow

schools to play a role in facilitating third-party NIL deals, but they continue to prohibit any such

payments based on an athlete's performance on a team or on an athlete choosing to attend or

choosing to remain at a particular school (also known as "inducements").[7]  Joint marketing

deals between schools and athletes on the one hand and third-parties on the other also remain

prohibited under the Current NIL Rules, as do any forms of NIL payments from the conferences

or schools to the athletes.

15.    This is thus a case of collusion in the labor markets for Division I college athlete services

resulting in harm to competition.  That harm to competition causes class-wide antitrust injury to

members of each class in the form of lost opportunities to be compensated for the use of their

NILs, resulting in damages to class members.  It also causes anticompetitive harm in the form of

reduced output of NIL products in which class members can participate.

---

[6]    I use "third-party" throughout to refer to NIL transactions between athletes and third parties (not the schools or conferences).

[7]    The Interim Policy states: "NCAA Bylaws, including prohibitions on pay-for-play and improper recruiting inducements, remain in effect" but then explains that for schools in states without an NIL law or with an NIL law that allows for it, "if an individual elects to engage in an NIL activity, the individual's eligibility for intercollegiate athletics will not be impacted by application of Bylaw 12 (Amateurism and Athletics Eligibility)."  See *Interim NIL Policy*.  (2021, July 1).  NCAA.  Accessed on October 18, 2022 at https://ncaaorg.s3.amazonaws.com/ncaa/NIL/NIL_InterimPolicy.pdf.  Under the Prior NIL Rules, Bylaw 12 prohibited, *inter alia*, NIL conduct such as paid endorsements.  See *2017-18 NCAA Division I Manual*.  (2017).  NCAA, p. 75.  https://www.ncaapublications.com/productdownloads/D118.pdf:
**"12.5.2.1 Advertisements and Promotions After Becoming a Student-Athlete.**  After becoming a student-athlete, an individual shall not be eligible for participation in intercollegiate athletics if the individual:
(a) Accepts any remuneration for or permits the use of his or her name or picture to advertise, recommend or promote directly the sale or use of a commercial product or service of any kind; or
(b) Receives remuneration for endorsing a commercial product or service through the individual's use of such product or service."

*CONFIDENTIAL*

16.    On July 1, 2021, the NCAA significantly relaxed the previous ban on virtually all third-party NIL payments to athletes,[8] allowing athletes to engage in most previously impermissible third-party NIL transactions on their own and allowing schools to begin facilitating some forms of NIL marketing for their athletes.  However, these new rules did not eliminate the continued agreement of the NCAA and its members to enforce, *in toto*, their complete ban on conferences or schools offering compensation to their athletes for any use of athletes' NIL, even while continuing to use those NILs in broadcasts and other products.[9]

17.    As a result of the change to the Current NIL Rules, schools have started competing for the labor services of athletes on a new dimension: through the provision of services that assist their athletes in obtaining lucrative NIL deals from third parties.  This additional service adds a new element to the set of compensation and benefits schools and conferences use to compete for athletes' labor services in the relevant labor markets and is an increase in competition in these markets.  The change to permit increased competition and third-party NIL opportunities can be seen by comparing the two diagrams below.

---

[8]    Hosick, M. (2021, June 30).  *NCAA adopts interim name, image, and likeness policy*.  NCAA.  Accessed on June 30, 2021 at https://www.ncaa.org/news/2021/6/30/ncaa-adopts-interim-name-image-and-likeness-policy.aspx.

[9]    As mentioned above, the complete ban on conferences and schools offering additional compensation to their athletes for labor services also remains in place and continues to be enforced.

*CONFIDENTIAL*

**Exhibit 1: Labor Services Market Competition Under the Prior NIL Rules**



Athletes Provide:
‣ **Labor**
‣ **Use of NIL for Broadcasts**

Schools Provide:
‣ **Educational Services**
‣ **Capped Cash & Non-Cash Benefits**

‣ **$0 in compensation for NIL Usage**
‣ **Mandate no Third-Party Sales**
‣ **Agree not to compete to provide NIL Services**

# Challenged Conduct

**Exhibit 2: Competition Under Current NIL Rules:**



Athletes Provide:
‣ **Labor**
‣ **Use of NIL for Broadcasts**

Schools Provide:
‣ **Educational Services**
‣ **Capped Cash & Non-Cash Benefits**

‣ **Still offer $0 in compensation for NIL Usage**
‣ **Allow Third-Party Sales**
‣ **Compete Vigorously to provide NIL Services**

# Challenged Conduct

18.    The change from the Prior NIL Rules to the Current NIL Rules is not a complete cessation of the anticompetitive harms.[10]  However, the relaxation of the restraint on third-party NIL payments and school provision of NIL services, without other significant changes in the economic environment, is a form of a natural experiment which enables an economist to assess

---

[10]    E.g., as I understand the Interim Policy, schools are still prohibited from facilitating joint deals with incoming athletes and a common third-party.

*CONFIDENTIAL*

the anticompetitive effect of the Prior NIL Rules in comparison to the effect of the Current NIL Rules, through evidence that is common to all of the classes. It allows for a common economic assessment of the competitive effects that have resulted from the suspension of the Prior NIL Rules and can help identify whether Defendants have market power in the relevant labor markets. It also provides a common means of measuring the economic value of the anticompetitive harm imposed by the Prior NIL Rules on class members. In what follows, I first assess the class commonality of the economic evidence establishing the elements of anticompetitive harm, any claimed procompetitive justifications and less restrictive alternatives. I then assess class-wide anticompetitive impact and follow with an assessment of the common methodologies that can be used to estimate class-wide damages.

19.    In this Section 4, I begin with a discussion of each of the two approaches economists have developed (one direct, one indirect) to assess the anticompetitive effects of collusive agreements and other anticompetitive conduct. These approaches are common to all class members, as the challenged Prior NIL Rules and Current NIL Rules apply in a common way to all class members. They deny every class member the opportunity to participate in competitive labor markets in which they would not be restricted from commercializing their NILs, as they would be able to do in the but-for world absent such restrictions.

20.    I provide this analysis in order to show that at the merits stage of this case, it will be possible to demonstrate through common economic evidence that Defendants had sufficient market power to cause anticompetitive harm in the relevant labor markets, and that they did cause such anticompetitive harm. This demonstration will be done by means of economic evidence common to the classes, rather than having to resort to individualized inquiry of specific class member's individual facts and circumstances. Because questions of market power and competitive harm are, by definition, based on market-wide economic evidence, these issues are assessed by economic evidence common to the classes.

*CONFIDENTIAL*

21.    One of the common economic impact questions is whether, but-for the challenged NIL rules, class members would have otherwise had an opportunity available to them to market their NILs that was not available due to Defendants' collusive conduct.  The answer to that question is "yes" for all members of the classes.  And this class-wide anticompetitive harm in the form of the lost freedom to pursue NIL opportunities can be shown through common economic evidence.

22.    Starting on July 1, 2021, when the Current NIL Rules were put in place, the prior restraints on third-party NIL payments were substantially relaxed, albeit on an explicitly interim basis. As a result, we can observe the emergence of numerous, previously restrained third-party NIL opportunities for class members as the marketplace for NIL deals with college athletes exploded.  This emergence of an NIL marketplace for class members to seek out third-party NIL deals provides direct common economic evidence of how much third-party NIL commerce had been suppressed by the Prior NIL Rules in comparison to the Current NIL Rules.  This lost opportunity to pursue NIL deals with third parties caused an antitrust injury to all class members, as each one was denied the opportunity even to try to market their NILs to any third parties.

23.    Antitrust injury to all class members can also be shown, through common economic evidence, with respect to the impact of the Current NIL Rules, which continue to ban, among other things, any payments for NIL to athletes directly from schools or conferences.  Defendants have admitted that absent the Prior NIL Rules and Current NIL Rules, at least some Defendants and their member schools would seek to pay athletes in exchange for the use of athletes' NIL, because, in the words of Defendants, the "NCAA's rules would be superfluous if no Institution would make such payments."[11]  The Current NIL Rules, like the Prior NIL Rules, deprive all

---

[11]  Defendant The Big Ten Conf., Inc.'s Supplemental Objections & Responses to Plaintiffs' First Set of Interrogatories, August 2, 2022, ("*Big Ten PCJs*") p. 18: "The Big Ten has never contended that no Institution

*CONFIDENTIAL*

class members of the opportunity to even try to market their NILs directly to conferences and schools.

24.     Although the natural experiment of significantly relaxing the prior restrictions on third-party NIL payments to athletes has only been in effect for a little more than one academic year, it is already readily apparent from the competition that has emerged that Defendants have monopsony power in the relevant labor markets.  That power allows them to dictate the terms under which athletes can or cannot engage in NIL transactions.  Moreover, this evidence demonstrates that small changes in the basic labor-market price, along with access to better NIL opportunities, have proven insufficient to dislodge that monopsony from its position of dominance.  That monopsony power has been used, and continues to be used, to the detriment of competition and to cause anticompetitive harm to all class members who compete in the relevant labor markets.  Common economic evidence can be used to prove these anticompetitive effects with respect to each of the proposed classes.

25.     While this economic conclusion is readily evident from the natural experiment that has taken place, I will make a more formal assessment of whether the Prior NIL Rules and the Current NIL Rules have caused anticompetitive harm through two common class-wide methodologies: (1) directly (via a method known as "Direct Effects" analysis); and (2) indirectly ("Indirect Effects"), through a series of steps including: (a) determining relevant product and geographic markets, and (b) determining market power in the relevant market(s).

---

would offer compensation to any Class Members for the use of their NIL during the Class Period absent an NCAA rule prohibiting them from doing so.  The NCAA's rules would be superfluous if no Institution would make such payments." Similar claims are made in the other Conference Defendant PCJ documents.  See Defendant Atlantic Coast Conference's Supplemental Objections & Responses to Plaintiffs' First Set of Interrogatories, August 2, 2022, ("*ACC PCJs*"), p. 13; Defendant The Big 12 Conference, Inc.'s Supplemental Objections & Responses to Plaintiffs' First Set of Interrogatories, August 2, 2022, ("*Big 12 PCJs*"), p. 14; Defendant Pac-12 Conference's Amended Objections & Responses to Plaintiffs' First Set of Interrogatories, August 2, 2022, ("*Pac-12 PCJs*"), p. 20; Defendant Southeastern Conference's Supplemental Objections & Responses to Plaintiffs' First Set of Interrogatories, August 2, 2022, ("*SEC PCJs*"), p. 14.

*CONFIDENTIAL*

26.    Because, as a matter of economics, market power is needed for anticompetitive conduct to succeed,[12] evidence of the success of that conduct in causing anticompetitive harm proves the existence of market power in a relevant market.  That is the Direct Effects approach.

27.    The Indirect Effects approach – which involves first defining the relevant markets and determining whether the Defendants have market power – was developed because in many cases it is difficult to identify the direct anticompetitive harm being caused by firms engaging in a restraint.  Economists are thus often forced to fall back on indirect effects evidence because most anticompetitive conduct is not carried out in the open, written down in a 400-plus-page agreement that is revised and republished annually, or admitted by Defendants.  In this case, however, these conditions do all exist, so the question can be approached directly.

28.    In what follows, I first employ the Direct Effects approach before turning to the Indirect Effects approach.  I demonstrate that regardless of which approach is utilized, the methodology for assessing competitive effects will be common to all class members and not require individualized inquiry.

### 4.1. A DIRECT EFFECTS ANALYSIS SHOWING ANTICOMPETITIVE EFFECTS IS COMMON TO ALL MEMBERS OF THE PROPOSED CLASSES

29.    The natural economic experiment discussed above, contrasting the availability of NIL opportunities to class members under the Prior NIL Rules versus under the Current NIL Rules, is a "Direct Effects" analysis common to all class members for assessing the anticompetitive harm caused by the more restrictive Prior NIL Rules on third-party NIL opportunities.  In assessing anticompetitive harm, economists do not look for market power (and ask in what market that market power was exercised) as a goal in and of itself, but instead, as a step in a process.  The goal of the process is to assess whether the challenged conduct restrained the

---

[12]    Nowhere in this report do I intend to render a legal opinion.  In particular, I am aware that sometimes conduct can be illegal under the antitrust laws regardless of whether a firm is shown to have market power or not.  My statement above is an economic one, not a statement about (for example) whether under a *per se* standard, the absence of market power is material to whether conduct is illegal.

*CONFIDENTIAL*

market through anticompetitive impact on price or output.[13]  That intermediate step of defining a market may be bypassed where there is sufficient Direct Effects evidence of anticompetitive impact.

30.     As the U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines explain, "[s]ome of the analytical tools … to assess competitive effects do not rely on market definition."[14]  As Former FTC Commissioner Thomas Rosch explained, Direct Effects analysis allows for "'backing into' the market definition" by seeing where the restraint is binding, and thus, recognizing that location must capture the relevant market in which the restraint had impact.[15]  In the case of the Current NIL Rules and the Prior NIL Rules, the Direct Effects approach centers on the empirical question of whether the restraints in suit succeeded (and continue to succeed) in keeping the price of payments to class members for the use of their NILs lower than otherwise would have been (and would be) paid and permitted in competitive labor markets, and in precluding NIL opportunities that would otherwise have been (and would be) available in less restrained labor markets.

31.     The question for an economist is whether sufficient evidence exists to provide the foundation for the Direct Effects approach – namely, can it be shown that the challenged restraint constrained or is constraining competitive market terms, such as price or output, without going through the Indirect Effects process of defining relevant markets and assessing

---

[13]   Generally, market power in a relevant market is necessary for potentially anticompetitive conduct to succeed (be profitable) over the long term.  For example, price fixing without market power will tend to cause the firms in question to lose sales to competitors outside of the conspiracy and thus price fixing is generally only profitable if the participants in the agreement have sufficient market power to maintain market share in the face of the price increase.

[14]   *Horizontal Merger Guidelines.*  (August 19, 2010).  U.S. Department of Justice and Federal Trade Commission, p. 7.  Accessed on October 19, 2022 at https://www.ftc.gov/sites/default/files/attachments/merger-review/100819hmg.pdf

[15]   Rosch, J. (2011).  *The Past and Future of Direct Effects Evidence: Remarks of J. Thomas Rosch before the ABA Section of Antitrust Law's 59th Spring Meeting.*  Federal Trade Commission.  Accessed on October 19, 2022 at https://www.ftc.gov/sites/default/files/documents/public_statements/past-and-future-direct-effects-evidence/110330aba-directeffects.pdf.

Page 16

***CONFIDENTIAL***

market power.  Here, the evidence of Direct Effects is abundant.  There is no doubt the conduct occurred – the NCAA had explicit bylaws banning the commercialization of NIL and today has interim rules permitting some, but not all, categories of NIL commercialization.

32.    Direct Effect analysis is particularly useful as a methodology where, as here, there has been a change in the restraining conduct by the Defendants, so that an economist can measure the competitive impact of that change.  By accounting for the potential influence of other factors, an economist can attribute any change in competitive effects to the known change in the restraint.  Direct Effects can also be used in a forecast of a potential change in competitive behavior when the impact of a restraint is well understood.

33.    There are three aspects of Defendants' conduct that lend themselves to a Direct Effects competitive impact analysis in this case which can be applied through common evidence to all class members:

    a) Defendants' agreement in the Prior NIL Rules that, as a condition of participation in the market for college athlete labor services, no athlete could enter into any NIL deals for compensation with third parties.  As part of this arrangement, schools also agreed not to facilitate such third-party NIL deals.  This led to an absence of third-party NIL deals with Division I athletes prior to July 2021, when the Defendants adopted the Current NIL Rules.

    b) Defendants' agreement in the Prior NIL Rules that, as a condition of participation in the market for college athlete labor services, no college athlete could sell a license for the use of their NIL (by joining a group-license pool or signing a group-licensing deal with a third party) for use in video games, trading cards, or other products that incorporate group-licensing rights.  As part of this arrangement, schools also agreed not to facilitate such deals.  This led directly to the absence of NIL agreements for video games, trading cards and other group-licensed products by Division I college athletes.

    c) Defendants' agreement in both the Prior NIL Rules and the Current NIL Rules that no NCAA member conference or school can make any payments to college

*CONFIDENTIAL*

athletes for the use of their NILs in broadcasts or other products as part of the
bundle of goods and services schools provide in exchange for athletes' services
in the relevant labor markets.  This agreement has led directly to higher profits to
conferences and schools and the absence of any NIL compensation from the
conferences or schools to athletes for broadcast agreements or other products.

34.    As discussed in the subsections that follow, Direct Effects analysis of each of these
competitive harms can be used to provide common economic evidence of anticompetitive
effects that apply to all members of each of the proposed classes.[16]

### 4.1.1.  Direct Effects analysis relating to Defendants' prohibition on third-party NIL deals

35.    Rarely, as here, do all parties agree that the restraining conduct of Defendants in question is
the cause for the lack of commercial output with respect to a particular type of product.  In this
case, it is undisputed that the Prior NIL Rules barred third-party NIL deals with all members of
all proposed classes (indeed, all Division I NCAA college athletes), and that those rules were
the reason such deals did not exist prior to July 1, 2021.  That is when the Current NIL Rules
suspended most of the restrictions on third-party NIL deals, as well as the restrictions on
individual schools and conferences helping to facilitate third-party NIL deals.

36.    Although the Current NIL Rules still impose restraints on some categories of welfare-
enhancing commerce, since July 1, 2021, the Direct Effects result of the natural experiment of
ending most of the Defendants' restrictions on third-party NIL deals, albeit on an explicitly
interim basis, has been dramatic.  Specifically, there has been an explosion of third-party NIL

---

[16] In addition, all three of these aspects of Defendants' conduct have had the effect of making the provision of
labor to college sports teams less lucrative for athletes than it otherwise would be (and would have been in the
past) and therefore, at least on the margin, has lowered the quality of college sports by pushing a small fringe of
athletes out of college early.  It has similarly discouraged a smaller number of athletes from even attending
college at all.  Since the relaxation of the rules, one of the many positive benefits has been that a few college
athletes have chosen to stay in college an additional year and a few athletes entered college who have stated
that, absent the ability to commercialize their NILs, they would not have entered college at all.  I discuss how
this development, which is procompetitive, does not create any so-called "Substitution Effect" for the proposed
classes in Section 8 in the text, below.

*CONFIDENTIAL*

deals, and there is no dispute that this explosion was directly caused by the elimination of Defendants' third-party restrictions contained in the Prior NIL Rules. This natural experiment presents the Court with uncommonly strong Direct Effects evidence that the third-party restriction in the Prior NIL Rules had significant anticompetitive effects on each of the proposed classes and that the partial relaxation of that anticompetitive restraint has led to an increase in commerce, i.e., output growth, which benefitted each of the proposed classes. This, in a nutshell, is powerful common Direct Effects evidence that the Prior NIL rules caused anticompetitive harm both to class members (through a reduction in NIL opportunities and revenue) and to competition as a whole (through a reduction in output). This is also common economic evidence that the Defendants' possessed market power in the relevant labor markets. It would not have been possible for the Prior NIL Rules to have blocked all of this competitive third-party NIL agreement output if the Defendants did not have monopsony power in the relevant labor markets.

37.    While I understand that data are still being produced in discovery, and new third-party NIL deals continue to be developed, I have thus far been able to identify at least $43 million[17] in third-party NIL deals under the Current NIL Rules that would not have been permitted to occur before July 1, 2021, by the Prior NIL Rules. I expect this number to grow substantially as I get access to additional data.

38.    Each college athlete in the classes identified by Plaintiffs was deprived of the opportunity to seek third-party NIL deals by the Prior NIL Rules. Indeed, the empirical evidence produced in discovery to date shows that tens of thousands of third-party NIL transactions were prevented from taking place in a single year. Importantly, this lost opportunity to participate in a competitive market to seek NIL transactions from third parties caused a common economic injury to each class member, as members of the proposed classes were deprived of this

---

[17]    Exhibit 13, Section 7.3.1

*CONFIDENTIAL*

competitive market opportunity. Moreover, as discussed in Section 7 below, the three damages classes have been limited to members who could have entered into one or more NIL transaction in the but-for world if not for the challenged NIL rules.

39.    With respect to Defendants' ban under the Prior NIL Rules on third-party NIL deals, Defendants imposed a blackout in the marketplace, turning what would have been (and has since become) a vibrant commercial activity benefitting class members into mercantile emptiness. This is Direct Effects evidence of anticompetitive effects which is common to the classes by its ability to prevent thousands of transactions that would have taken place each academic year but for the Prior NIL Rules.

40.    At the one-year anniversary of the Current NIL Rules, the online publication On3 took a retrospective look at how the marketplace had evolved.[18] The publication concluded that, based on data from Opendorse and INFLCR (which operated as NIL platforms for mostly smaller NIL transactions), the evidence showed "the majority of NIL activities include posting content on social media platforms, the significant market share that football players hold and the increasing investment in NIL by brands, fans and donors."[19] Other facts from this economic data showed that:

> "The top transaction type was social media each month, peaking in February at 72.8 percent of all transactions. Roughly two-thirds – 67.6 percent, to be exact – of the NIL activities facilitated or disclosed through Opendorse between July 1, 2021 and June 20, 2022 were classified as 'posting content.' Football players earned roughly half of the compensation from NIL activities that were facilitated or disclosed on Opendorse. They earned roughly three times more than men's basketball

---

[18]  Wittry, A. (2022, July 4). *First year of NIL data shows trends favoring social media, football*. On3. Accessed on October 19, 2022 at https://www.on3.com/nil/news/nil-data-opendorse-inflcr-college-football-mens-womens-basketball-baseball/.

[19]  Wittry, A. (2022, July 4). *First year of NIL data shows trends favoring social media, football*. On3. Accessed on October 19, 2022 at https://www.on3.com/nil/news/nil-data-opendorse-inflcr-college-football-mens-womens-basketball-baseball/.

*CONFIDENTIAL*

players – 49.9 percent of all compensation compared to 17 percent, respectively."[20]

41.     Significantly, the emergence of third-party NIL activities under the Current NIL Rules was not limited to male athletes. "When football players are excluded from Opendorse's data, women were involved in nearly 53 percent of all activities."[21]  Less experienced athletes are also well represented.  Underclassmen took in 20 percent more in NIL compensation than upperclassmen, with freshmen making up 36 percent of total earnings.[22]

42.     While football has the greatest market share, other sports performed well and showed substantial seasonal spikes.  INFLCR reports that in December 2021, the majority of NIL transactions were for basketball players, with men's basketball making up 50 percent of transactions and women's basketball representing 14 percent.[23]  Similarly, women's volleyball and softball each made up about one-fifth of transactions during each of their seasonal peaks.[24]  At Power Five schools, women's gymnastics as well as swimming and diving each ranked in the top five sports for the number of NIL transactions during the first year.[25]  And at non-Power-Five schools, football was replaced by men's basketball in the top spot both in terms of transaction volume and total transaction value.[26]

---

[20]  Wittry, A. (2022, July 4).  *First year of NIL data shows trends favoring social media, football*.  On3.  Accessed on October 19, 2022 at https://www.on3.com/nil/news/nil-data-opendorse-inflcr-college-football-mens-womens-basketball-baseball/.

[21]  Wittry, A. (2022, July 4).  *First year of NIL data shows trends favoring social media, football*.  On3.  Accessed on October 19, 2022 at https://www.on3.com/nil/news/nil-data-opendorse-inflcr-college-football-mens-womens-basketball-baseball/.

[22]  *NIL One Year of Name, Image, and Likeness*.  (2022, July).  Opendorse, p. 7.  Accessed on October 19, 2022 at https://opendorse.com/wp-content/uploads/2022/07/N1L_Full_063022_3.pdf.

[23]  Wittry, A. (2022, July 4).  *First year of NIL data shows trends favoring social media, football*.  On3.  Accessed on October 19, 2022 at https://www.on3.com/nil/news/nil-data-opendorse-inflcr-college-football-mens-womens-basketball-baseball/.

[24]  Wittry, A. (2022, July 4).  *First year of NIL data shows trends favoring social media, football*.  On3.  Accessed on October 19, 2022 at https://www.on3.com/nil/news/nil-data-opendorse-inflcr-college-football-mens-womens-basketball-baseball/.

[25]  *INFLCR NIL Year 1 Report*.  (2022, July).  INFLCR.  Accessed on October 19, 2022 at https://www.inflcr.com/wp-content/uploads/2022/07/INFLCR-NIL-Year-1-Data-Report.pdf.

[26]  *INFLCR NIL Year 1 Report*.  (2022, July).  INFLCR.  Accessed on October 19, 2022 at https://www.inflcr.com/wp-content/uploads/2022/07/INFLCR-NIL-Year-1-Data-Report.pdf.

Page 21

*CONFIDENTIAL*

43.     The first year of data also made clear that payments by third parties for use of college athletes' NIL are still growing rapidly, with INFLCR's average compensation to college athletes for NIL activities reaching $2,370 per athlete in January 2022, more than double the July 2021 level of $1,040.[27]  Opendorse estimates that through May 2022, that figure was $3,438 across NCAA athletes, with Division I athletes receiving an average of $3,711.[28] College football in particular has seen a huge increase in transaction value.  In fall 2022, football players made an average of $3,162 per deal as compared to just $1,132 one year before.[29]

44.     Jim Cavale, the CEO of INFLCR, has stated that the market is growing, in part, because the first-year NIL strategies of brands were hindered by uncertainty about whether the NCAA was going to lift all of its restrictions on third-party deals or only do so with significant limitations, and this uncertainty initially kept many brands on the sidelines:

> "Brands didn't know how wide-scale NIL was going to be in 2021 because a lot of people assumed that if the NCAA wasn't going to set nationwide rules, it was only going to be limited to the schools and states that had laws.  But what happened with the waiver the NCAA passed at the end of June, it made it so any school could set its own policy. Businesses didn't know how it was going to shake out, so they didn't have it in their budget."[30]

45. In contrast, Cavale predicts that 2022-2023 will be a much higher year of third-party NIL deals because:

---

[27]  Wittry, A.  (2022, July 4).  *First year of NIL data shows trends favoring social media, football.*  On3.  Accessed on October 19, 2022 at https://www.on3.com/nil/news/nil-data-opendorse-inflcr-college-football-mens-womens-basketball-baseball/.

[28]  Hunzinger, E.  (2022, July 6).  One year of NIL: How much have athletes made?.  APNews.  Accessed on October 21, 2022 at https://apnews.com/article/college-football-sports-basketball-6a4a3270d02121c1c37869fb54888ccb.

[29]  Nakos, P.  (2022, October 12).  *Latest NIL data shows dollars continue to flow in college football.*  On3.  Accessed on October 12, 2022 at https://www.on3.com/nil/news/latest-nil-data-shows-dollars-continue-flow-college-football-inflcr-average-deal/.

[30]  Prisbell, E.  (2022, January 14).  *What will 2022 bring in the NIL space? We ask the experts.*  On3.  Accessed on October 19, 2022 at https://www.on3.com/nil/news/nil-what-will-2022-bring-we-ask-the-experts/.

*CONFIDENTIAL*

"These companies are going to come in this year with firepower, with a strategy, with money, ready to do influencer marketing and endorsement campaigns with student-athletes by the tens, by the hundreds, by even the thousands.  It's going to give student-athletes in those sports an opportunity to really promote and sell for that brand to their followers… It's simply that the multibillion-dollar market everyone said this would be is still a reality."[31]

46.    Under the Prior NIL Rules, the NCAA's ban on third-party NIL payments caused anticompetitive harm in the markets for college athletes' labor services.  In particular, under the Prior NIL Rules, college athletes were forced to forgo opportunities to commercialize their NILs within the for-profit sector as a condition of participating in the relevant labor markets.  This prevented the many NIL deals we are now seeing and caused college athletes to make a Hobson's choice: either lose their collegiate eligibility or give up lucrative third-party NIL opportunities that would otherwise be available.

47.    A few examples suffice to demonstrate how the third-party NIL arrangements, which are now commonplace under the Current NIL Rules, would cause athletes to lose their eligibility under the Prior NIL Rules:

a)  University of Central Florida kicker Donald De La Haye began a YouTube channel in 2015, posting training videos and behind-the-scenes content as a UCF player.[32]  Because those videos took in advertising revenue, the NCAA made clear that he would not be able to maintain both the monetized channel and his

---

[31]  Prisbell, E.  (2022, January 14).  *What will 2022 bring in the NIL space? We ask the experts*.  On3.  Accessed on October 19, 2022 at https://www.on3.com/nil/news/nil-what-will-2022-bring-we-ask-the-experts/.

[32]  Pedersen, J.  (2021, October 3).  Orlando social media stars: After choosing YouTube over UCF, former kicker is 'Deestroying.' *Orlando Sentinel*.  Accessed on October 19, 2022 at https://www.orlandosentinel.com/features/gone-viral/os-ne-youtube-deestroy-ucf-kicker-donald-de-la-haye-20211003-kycudfmz5ff4hfuy5dh6e3twke-story.html.

*CONFIDENTIAL*

eligibility.[33]  De La Haye refused to demonetize his videos, and in 2017, UCF declared him ineligible in accordance with NCAA rules.[34]

b) Adidas reportedly attempted to channel money to the families of several men's basketball players to wear their sneakers at Adidas-affiliated schools.[35]  Adidas is now tailoring this system to work within the NCAA's NIL rules,[36] but at the time these payments were considered violations of NCAA policy.  As a result of these payments, several players received lengthy suspensions, including Silvio De Sousa, Dewan Hernandez, and Brian Bowen.[37]  However, under the Current NIL Rules, Adidas would have been able to enter into sponsorship agreements with these players and pay for NIL activity.

48.    Schools were eager to begin facilitating third-party deals even before the relaxation of the Prior NIL Rules.                    REDACTED - Confidential


[38]  Since the Current NIL Rules have been in effect, schools have increasingly been competing for college-athlete labor by providing those athletes with increasingly robust NIL services to help them find third-party NIL deals.  In many cases, the

---

[33]  Gartland, D.  (2017, July 31).  *UCF Kicker Ruled Ineligible After YouTube Channel Gets Him in Trouble with NCAA*.  Sports Illustrated.  Accessed on October 19, 2022 at https://www.si.com/college/2017/07/31/ucf-kicker-donald-de-la-haye-ineligible-ncaa-youtube-videos.

[34]  Rapp, T.  (2017, July 31).  *Kicker Donald De La Haye Ruled Ineligible by UCF over YouTube Channel*.  Bleacher Report.  Accessed on October 19, 2022 at https://bleacherreport.com/articles/2724894-ucf-kicker-donald-de-la-haye-ruled-ineligible-by-ncaa-over-youtube-channel.

[35]  Forde, P., Thamel, P., and Wetzel, D.  (2019, September 23).  *Sources: Kansas men's basketball charged with multiple Level 1 allegations, including lack of institutional control*.  Yahoo! Sports.  Accessed on October 19, 2022 at https://sports.yahoo.com/sources-kansas-basketball-charged-with-multiple-level-1-violations-including-lack-of-institutional-control-210015300.html.

[36]  Specifically, Adidas is setting up a framework which will allow it to make NIL offers to athletes at schools affiliated with Adidas.  See, for example, Bieler, D.  (2022, March 24).  Adidas shakes up NIL landscape with offer for athletes at all of its affiliated D-I colleges.  *Washington Post*.  Accessed on October 19, 2022 at https://www.washingtonpost.com/sports/2022/03/24/adidas-nil-ncaa-college-athletes/.

[37]  Norlander, M.  (2019, February 1).  *NCAA's unfair 2-year suspension for Silvio De Sousa shows that players, not coaches or schools, are treated harshest*.  CBS Sports.  Accessed on October 19, 2022 at https://www.cbssports.com/college-basketball/news/ncaas-unfair-2-year-suspension-for-silvio-de-sousa-shows-that-players-not-coaches-or-schools-are-treated-harshest/.

[38]  REDACTED - Confidential

CONFIDENTIAL

schools have started to be assisted by "collectives" of alumni and other school supporters, who help facilitate, and even raise millions of dollars in funds to support, third-party NIL transactions.[39]  These developments are further common Direct Effects economic evidence of the robust marketplace for third-party NIL deals that has been able to develop once the Prior NIL Rules blocking such transactions, and school support for them, was suspended.

49.     There is extensive common evidence that many schools are now offering the sorts of third-party NIL deal facilitation Plaintiffs allege would have happened previously, but-for the Prior NIL Rules.  For example, in August 2022, the University of South Carolina announced that it had "hired Everett Sports Management (ESM) to launch Park Ave, an exclusive initiative that will provide NIL services for Gamecocks athletes."[40]  The benefit to athletes of this facilitation is quite clear, as the University is not only paying for the NIL platform, but also is paying the athletes' representation fees:

> "'Park Avenue will bring the deals to the student-athletes, they would help facilitate those deals through us, and then the student-athletes get the entire deal,' South Carolina senior deputy athletics director Chance Miller told ESPN.  '(Athletes) don't pay a percentage to any representation firm.  We are paying that fee for them.  You might have an

---

[39]  For example, The Matador Club was organized by several Texas Tech alumni, boosters, and former athletes to help the school's athletes monetize their NILs.  The collective creates avenues for Texas Tech athletes to make a positive impact with their NILs and uses fan donations to compensate the athletes (*A Community-Serving NIL Collective*.  Matador Club.  Accessed on October 19, 2022 at https://www.matadorclub.org/).  Similarly, a former University of Florida baseball player founded The Gator Collective, through which fans can purchase subscriptions in exchange for exclusive athlete-provided content, including autographs, interviews, and live engagements (*Connecting Fans, Empowering Athletes, Investing in Futures.*  Gator Collective.  Accessed on October 19, 2022 at https://gatorcollective.com/).  Another example of a collective is Cavalier Futures, which is headed by a former UVA baseball player.  Cavalier Futures arranges and facilitates NIL opportunities – such as personal appearances, meet and greets, and autograph signings – for UVA athletes across all sports (*Lifetime Branding*.  Cavalier Futures.  Accessed on October 19, 2022 at https://www.cavalierfutures.com/); Likewise, the Swarm Collective was formed to assist athletes on the University of Iowa's football and basketball teams.  The collective allows the athletes to benefit from their NILs by participating in charitable work with charities and non-profits (*Empowering Iowa Athletes*.  Iowa Swarm.  Accessed on October 19, 2022 at https://iowaswarm.com/).

[40]  Rittenberg, A.  (2022, August 30).  *South Carolina partners with sports marketing agency to become first major college program with in-house NIL firm*.  ESPN.  Accessed on August 31, 2022 at https://www.espn.com/college-sports/story/_/id/34489568/south-carolina-partners-sports-marketing-agency-become-first-major-college-program-house-nil-firm.

Page 25

agent, you might have a marketing rep, that's great.  You can still work with them, and (Everett Sports Management) can still bring you deals.'"[41]

50.    The University of Connecticut has responded to the suspension of the Prior NIL Rules by launching a new "Champions Lab" initiative with the goal of "connecting skilled students with student-athletes to help create a blueprint for building a personal brand" through networking opportunities and other programming.[42]  This new program is in the process of hiring a Content & Social Media Strategist who would work to "collaborate with NIL partners, recruit students, and share the work of the lab with alumni, donors, the media, and the public."[43]

51.    Similarly, many schools have hired or begun the process of hiring staff members to support college athletes in their NIL endeavors.  For example, the University of Arkansas now has an Athlete Brand Development (NIL) Coordinator;[44] the University of Louisville has a Director of NIL Services & Engagement;[45] Kansas has a Director of NIL Strategy;[46] and Auburn has begun

---

[41]  Rittenberg, A.  (2022, August 30).  *South Carolina partners with sports marketing agency to become first major college program with in-house NIL firm.*  ESPN.  Accessed on August 31, 2022 at https://www.espn.com/college-sports/story/_/id/34489568/south-carolina-partners-sports-marketing-agency-become-first-major-college-program-house-nil-firm.

[42]  Severance, J. (2022, September 13).  *Calling All Creators: Werth Institute Seeking Fellows to Join Championship Labs, Los Angeles Influencers Trip in November.*  UConn Today.  Accessed on October 19, 2022 at https://today.uconn.edu/2022/09/calling-all-creators-werth-institute-seeking-fellows-to-join-championship-labs-los-angeles-influencers-trip-in-november.

[43]  *Content & Social media Strategist (Publicity/Marketing Administrator).*  UConn Careers.  Accessed on October 19, 2022 at https://jobs.hr.uconn.edu/en-us/job/496826/content-social-media-strategist-publicitymarketing-administrator#.

[44]  *Director: NIL Directors and Staff.*  Business of College Sports.  Accessed on October 21, 2022 at https://businessofcollegesports.com/directory-nil-directors-and-staff/.  *Sydney McGlone.*  Arkansasrazorbacks.com.  Accessed on October 21, 2022 at https://arkansasrazorbacks.com/support-staff/sydney-mcglone/.

[45]  *Director: NIL Directors and Staff.*  Business of College Sports.  Accessed on October 21, 2022 at https://businessofcollegesports.com/directory-nil-directors-and-staff/.  Evans, N. (2022, May 16).  *UofL Adds McKay as Director of NIL Services & Engagement.*  Gocards.com.  Accessed on October 21, 2022 at https://gocards.com/news/2022/5/16/name-image-likeness-uofl-adds-mckay-as-director-of-nil-services-engagement.aspx.

[46]  *Director: NIL Directors and Staff.*  Business of College Sports. Accessed on October 21, 2022 at https://businessofcollegesports.com/directory-nil-directors-and-staff/.  *Kansas Athletics Hires Gillespie and Seberger as Directors of Name, Image, and Likeness.*  (2022, August 22).  KUAthletics.com.  Accessed on October 21, 2022 at https://kuathletics.com/kansas-athletics-hires-gillespie-and-seberger-as-directors-of-name-image-and-likeness/.

*CONFIDENTIAL*

hiring for the position of Associate Athletics Director of Name, Image and Likeness,[47] as well as partnering with INFLCR to launch the SPIRIT Exchange – an NIL business registry designed to connect businesses, alumni, and other interested third parties with Auburn athletes.[48]

52.    Many other schools have partnered with entities such as INFLCR and Opendorse to launch similar platforms to help facilitate NIL deals for athletes.  The following are just a sampling of these offerings:

a)  UCLA partnered with INFLCR to launch the Westwood Exchange, which is a business registry designed for companies, donors, fans and alumni that want to connect directly with athletes regarding NIL deals.[49]

b)  The University of Nebraska partnered with Opendorse to start the Nebraska Huskers Marketplace, which will help facilitate NIL opportunities for the athletes.[50]

c)  The University of Michigan partnered with INFLCR to launch the VICTORS Exchange to connect athletes with business partners and streamline the NIL transaction process.[51]

[47]  Cole, A. (2022, October 5).  Auburn seeks Associate Athletic Director of NIL, retains firm for search.  *Opelika-Auburn News*.  Accessed on October 6, 2022 at https://oanow.com/sports/college/auburn/auburn-seeks-associate-athletic-director-of-nil-retains-firm-for-search/article_e39c6e5c-4508-11ed-a1e5-3331af964720 html.

[48]  Auburn Athletics Unveils the SPIRIT Exchange as Part of NIL Program.  (2022, July 13).  *Opelika Observer*.  Accessed on October 19, 2022 at https://opelikaobserver.com/auburn-athletics-unveils-the-spirit-exchange-as-part-of-nil-program/.

[49]  Schulz, N. (2022, April 21).  *UCLA Athletics Launches INFLCR Powered Westwood Exchange*.  INFLCR.  Accessed on October 19, 2022 at https://www.inflcr.com/2022/04/21/ucla-athletics-launches-nil-exchange/?utm_source=rss&utm_medium=rss&utm_campaign=ucla-athletics-launches-nil-exchange#:~:text=UCLA%20Athletics%20today%20announced%20the,imagine%20and%20likeness%20(NIL)

[50]  Sertic, E. (2022, April 16).  *Nebraska Athletics announces new NIL partnerships with Altius Sports, Opendorse*.  Nebraska News Service.  Accessed on October 19, 2022 at https://nebraskanewsservice net/sports/a-big-week-for-nebraska-athletics-and-nil/?utm_source=rss&utm_medium=rss&utm_campaign=a-big-week-for-nebraska-athletics-and-nil.

[51]  Hutchinson, D. (2022, February 9).  *University of Michigan expands NIL program to help student-athletes find business partners*.  Allabout AnnArbor.  Accessed on October 19, 2022 at https://www.clickondetroit.com/all-about-ann-arbor/2022/02/09/university-of-michigan-expands-nil-program-to-help-student-athletes-find-business-partners/.

*CONFIDENTIAL*

    d)   The University of Wisconsin partnered with Opendorse to launch YouDub Marketplace, a dedicated platform to promote NIL opportunities for its athletes.[52]

    e)   The University of Alabama has partnered with Fanatics to open a store in the school's football stadium that will sell merchandise branded with athletes' NILs. The initiative is designed to facilitate opportunities for athletes to profit from their NIL through Fanatics' brands.[53]

53.    Beyond NIL-deal facilitation, schools are also creating programs and hiring professionals to help educate athletes on the value of their NIL and to give them the tools and trainings to take full advantage of their brands and platforms:

    a)   Texas A&M partnered with INFLCR to launch AMPLIFY, which is a comprehensive NIL program designed to equip college athletes with tools and trainings to maximize their brands and platforms.  Specific programs and topics covered will include, among others, financial workshops, mock job interviews, effective networking, evaluating job opportunities and negotiating offers, and building your digital brand.[54]

    b)   Penn State University partnered with Altius Sports Partners, an NIL advisory and education firm, to provide customized education workshops for its athletes, coaches and staff focused on, among other issues, group licensing, marketing, branding, and financial literacy.[55]

    c)   The University of Nebraska similarly partnered with Altius to bolster its NIL program.  Altius will, among other things, assess the athletic department's

---

[52]  Slusher, D. (2022, April 21).  Wisconsin athletics announces official NIL platform for student-athletes.  *Daily Cardinal*.  Accessed on October 19, 2022 at https://www.dailycardinal.com/article/2022/04/wisconsin-athletics-announces-official-nil-platform-for-student-athletes.

[53]  Edgar, M. (2022, October 17).  *Alabama-Fanatics tie-up, exclusive store could change the tide of future NIL deals and promotion*.  Sports Business Journal.  Accessed on October 17, 2022 at https://www.sportsbusinessjournal.com/Journal/Issues/2022/10/17/Upfront/Colleges.aspx?ana=mk_sbj_jo_emjo

[54]  Berrios, A. (2021, June 3).  *Texas A&M Announces NIL Program: Amplify*.  INFLCR.  Accessed on October 19, 2022 at https://www.inflcr.com/2021/06/03/texas-am-announces-nil-program-amplify/.

[55]  Engle, S. (2022, March 29).  Penn State Athletics Announces Partnership with Altius Sports Partners for continued NIL guidance.  *Daily Collegian*.  Accessed on October 19, 2022 at https://www.collegian.psu.edu/football/penn-state-athletics-announces-partnership-with-altius-sports-partners-for-continued-nil-guidance/article_dae8ef68-af78-11ec-9467-238ed55537cf.html.

*CONFIDENTIAL*

> initiatives and corporate-partner strategies; offer educational services regarding NIL opportunities; and assist athletes, coaches, and administrators with group licensing, marketing, branding, financial literacy, and recruiting.[56]

54.    This Direct Effects evidence relating to the competitive impact of the ban in the Prior NIL rules on third-party NIL transactions applies to all class members and will be presented through common economic evidence at the trial.

### 4.1.2.   Direct Effects analysis relating to video games and other group-licensed NIL products

55.    For video games and other group-licensed NIL products, the common Direct Effects evidence at trial will be both historical and prospective.  Historically, Defendants licensed their own IP to video game manufacturers including EA and Take-Two and those firms made video games focused on men's college basketball and football.  As EA's Senior Vice President told the NCAA in 2019,                    REDACTED - Confidential

[57]  These video games did not pay athletes to use their NILs, even though they were desired, because the Prior NIL Rules prevented them from doing so.

56.    The video games were removed from the market after college athletes challenged EA's use of their NILs without compensation in the *O'Bannon* case.  The lack of NILs had made the basketball product commercially unattractive, while the decision of EA after the *O'Bannon* settlement, to include (and pay for) athletes' NILs in any future football game led the NCAA

---

[56]  *Nebraska Partners with Altius Sports to Bolster NIL Program.*  (2022, April 12).  Huskers.com.  Accessed on October 19, 2022 at https://huskers.com/news/2022/4/12/athletics-nebraska-partners-with-altius-sports-to-bolster-nil-program.aspx.

[57]    REDACTED - Confidential                    REDACTED - Counsel Only

*CONFIDENTIAL*

and several Defendant conferences to end their licenses.[58] REDACTED - Counsel Only

[59] REDACTED - Counsel Only. As EA executive Joel Linzner testified during the *O'Bannon* trial, "We have found that it is pleasing to our customers to be able to use the real athletes depicted as realistically as possible and acting as realistically as possible."[60] This is the opposite of the NCAA's claim with respect to how consumer demand for college sports works, i.e., Linzner's testimony is that EA felt paying college athletes would grow demand, not harm it. Despite this, the NCAA rejected EA's overtures and instead, announced that it would no longer provide its IP if EA intended to pay college athletes for their NILs, and the other Defendants in this matter quickly followed suit.[61] As a result, the EA video game products in college football and basketball were taken off the market.

---

58 EA's Joel Linzner testified in his deposition in *O'Bannon* that the video game was cancelled after the 2010 edition because the lack of NIL made the product commercially undesirable: "if we weren't able … to enable the use of athlete name and likeness in the college basketball video game, it was not going to be a profitable franchise for us. And if it wasn't going to be a profitable franchise, given the economic conditions of the time, we could not afford to keep making it." Deposition of Joel Linzner (*O'Bannon)*, December 18, 2012, 186:4-12. For the football game cancellation, see Kirk, J. (2013 September 26). *EA Sports halting college football video game series after all*. SBNation. Accessed on October 19, 2022 at https://www.sbnation.com/college-football/2013/9/26/4774556/ea-sports-college-football-video-game-series and Berkes, p. (2013, August 14). *SEC, Big Ten, Pac-12 won't participate in EA Sports college football game*. SBNation. Accessed on October 19, 2022 at https://www.sbnation.com/college-football/2013/8/14/4620816/sec-teams-ea-sports-ncaa-football.

59 REDACTED - Counsel Only

60 *O'Bannon* Trial Transcript, Volume 8, 1658:3-6; see also REDACTED - Confidential .

61 See *O'Bannon*, 7 F.Supp.3d 955 at 970 (rejecting NCAA contention that because the NCAA had discontinued its license with EA, there would be no market for college athlete videogame group licensing since "the NCAA found it profitable to license its intellectual property for use in videogames [and] it continued to renew its annual licensing agreement with EA, even as the company evaded the NCAA's rules prohibiting it from using student-athletes' images and likenesses in videogames.") As discussed below, the *O'Bannon* court's conclusion was well-founded, EA is on the verge of releasing a college football videogame that includes the licenses of the NCAA, over 100 of its member schools and conferences, *and* college athlete NILs. Scott, J. (2022, June 17). *EA Sports Aims to Release College Football Game in July '23, per Letter*. Sports Illustrated. Accessed on October 20, 2022 at https://www.si.com/extra-mustard/2022/06/17/ea-sports-aims-release-college-football-video-game-july-2023-per-letter.

57.     After Defendants ended their participation in the video game agreements, they continued to enforce their ban in the Prior NIL Rules on any of their athletes signing a video game licensing agreement for using their NILs.[62] That ban also prohibited class members from entering into group licenses for the use of their NILs for other products, such as trading cards or collectibles, that have become ubiquitous in professional team sports such as the NFL and NBA.

58.     This Direct Effects evidence of the impact of the Prior NIL Rules in precluding any group licenses for the use of NILs in video games, is common for all members of the Football and Men's Basketball Class and FBS football and non-Power Five men's basketball class members in the Additional Sports Class, as video games in such sports existed prior to the NCAA rules having forced their discontinuance, rather than permit the games to compensate the athletes who participated in such sports for the use of their NILs.  Defendants' exercise of their monopsony power to preclude these video game NIL opportunities had a direct and common anticompetitive impact on the market for college athlete labor services.

59.     There is also prospective class-wide Direct Effects evidence on the evolving use of athletes' NIL in video games and other group-licensed products now that the Prior NIL Rules banning such group licensing of NILs have been repealed.  Since at least 2019 – when the push to relax the Prior NIL Rules gained significant momentum – Electronic Arts (EA) began working to reintroduce its college football video game when it would be able to compensate college athletes for the use of their NILs.[63]        REDACTED - Confidential

---

[62]  E.g., NCAA Bylaw 12.4.1.1 (prohibiting athletes from being paid based on their athletics reputation).  *Division I Legislation: 12.4.1.1 Athletics Reputation*.  NCAA.  Accessed on October 20, 2022 at https://web3.ncaa.org/lsdbi/search/bylawView?id=238.

[63]                    REDACTED - Counsel Only

*CONFIDENTIAL*

REDACTED - Confidential            .[64] REDACTED - Confidential

[65] REDACTED - Counsel Only
.

[66] REDACTED - Counsel Only
.

,,[67]            REDACTED - Counsel Only            .

60.            REDACTED - Confidential

[68]            REDACTED - Counsel Only

[69]

61.            REDACTED - Counsel Only

_____

[64] See                REDACTED - Confidential

[65] See REDACTED - Confidential
[66] REDACTED - Counsel Only
[67] REDACTED - Counsel Only
[68] REDACTED - Confidential            REDACTED - Counsel Only

[69] REDACTED - Counsel Only

Page 32

*CONFIDENTIAL*

REDACTED - Counsel Only

,,[70]

62.     There is also evolving Direct Effects evidence of the emergence of other group-licensed NIL products for class members, as organizations like OneTeam Partners and Fanatics have announced their efforts to collect group NIL agreements from college athletes for products like jerseys and trading cards.[71]  This Direct Effects evidence will continue to be developed prior to trial as the marketplace continues to develop.

63.     This Direct Effects evidence further supports the conclusion that the Defendants have monopsony power in the relevant labor markets because it shows that Defendants were able to preclude, under the Prior NIL Rules, third-party NIL payments for group-license NIL deals that would otherwise have existed.  Absent such monopsony power, these group-license transactions would have taken place because there was marketplace demand for them.  The Direct Effects evidence will further show at trial that with the introduction of the Current NIL Rules, athletes in those sports will have the opportunity to earn – and will earn – compensation in exchange for the right to use their NILs in video games and other group-license products so that the output of these products and NIL opportunities will grow.

### 4.1.3.  Direct Effects analysis relating to payments for the use of college athletes Broadcast NILs

64.     While Defendants' ban on conferences or schools directly paying athletes for the use of their NIL has not changed in the Current NIL Rules, there will be common Direct Effects evidence that such rules have had the continuing anticompetitive effect of prohibiting Power Five athletes in football and in men's and women's basketball from receiving payments for the use of their Broadcast NILs.  The common economic evidence will show that the conferences or schools

---

[70]  REDACTED -  Counsel Only

[71]  I provide examples of deals like this below in Section 6.4.

Page 33

would have paid for such NIL as part of the competitive market process if not for the ban on doing so contained in both the Prior NIL Rules and Current NIL Rules.

65.    College athletes' NILs contribute substantially to the highly lucrative Power Five football and basketball broadcasts that use them.  Because the players are integral to generating consumer interest in the Power Five football and basketball games that are being broadcast, those broadcast products would have a significantly reduced economic value if athletes' NILs were not used.  While I understand that Defendants dispute whether college athletes have a legal right of publicity that would prohibit the use of their NIL rights in broadcasts throughout the United States, that is a distinct question from whether in a but-for world in which the Power Five Conferences or schools *could* compete for athletes' services by making offers to pay for the use of their Broadcast NILs, they *would* do so.  The common economic evidence will demonstrate that competition would compel the Power Five Conferences to make such payments in a but-for world in which the challenged NIL rules did not prohibit them.

66.    As a matter of economics, absent the restraints in the Prior NIL Rules and Current NIL Rules against conferences or schools paying athletes for the use of their NILs, there would be sufficient competition for athletes' labor to cause the Power Five Conferences to share broadcast revenues with college athletes through NIL payments as a means of competing among themselves and against other FBS/Division I conferences to attract athletes to join their football and basketball broadcasts.  As Defendants have admitted, if it were not for the fact that competition would cause conferences or schools to pay for the use of athletes' Broadcast NILs, then the NCAA's Current NIL Rules banning this type of NIL compensation would be "superfluous."[72]

67.    Because Power Five college athletes' NILs contribute positive value to the highly lucrative football and basketball broadcast contracts entered into by the Power Five Conferences (and the

---

[72] *Big Ten PCJs*, p. 18.  See also *ACC PCJs*, p. 13; *Big 12 PCJs*, p. 14; *Pac-12 PCJs*, p. 20; *SEC PCJs*, p. 14.

*CONFIDENTIAL*

NCAA), the price for the use of those NILs in a competitive labor market would exceed zero. I will review this common evidence further in Section 7 below. For now, it is sufficient to note that this is another form of Direct Effects evidence of anticompetitive effects that will be common to all members of the Football and Men's Basketball Class and the Women's Basketball Class.

68.    In short, each of these three categories of Direct Evidence of anticompetitive effects will be presented at trial through economic evidence that is common to class members.

### 4.2. THE INDIRECT PROCESS OF IDENTIFYING RELEVANT MARKETS AND DEMONSTRATING MARKET POWER TO SHOW ANTICOMPETITIVE EFFECTS WOULD ALSO BE THROUGH ECONOMIC EVIDENCE COMMON TO ALL MEMBERS OF THE PROPOSED CLASSES

69.    While the Direct Effects approaches laid out above show the strong common evidence of anticompetitive effects, I would alternatively be able to present common economic evidence defining the relevant labor markets and demonstrating monopsony power in those markets for an Indirect Effects approach.

### 4.2.1.  Common evidence defining the relevant labor markets

70.    Based in part on my submissions of common economic evidence in prior antitrust cases against Defendants, this Court has previously recognized some of the relevant (labor) markets in which class members and Defendants participate, for football, and men's and women's basketball, writing:

> "Dr. Rascher's economic analyses show that the most talented athletes [in "national markets for Plaintiffs' labor in the form of athletic services"] are concentrated in the respective markets for Division I basketball and FBS football; possible alternatives, such as the National Association of Intercollegiate Athletics (NAIA) or the National Christian College Athletics Association (NCCAA), have not proved to be viable substitutes; none of the major professional sport s leagues in class members' sports provide competitive options for most college-aged talent; high barriers to entry into the market preclude any viable alternatives emerging for class members' athletic services; and the geographic scope of the markets is nationwide. … In sum, class members cannot obtain the same combination of a college education, high-level television exposure, and

Page 35

*CONFIDENTIAL*

opportunities to enter professional sports other than from Division I schools."[73]

71.    This led to the Court's conclusion that:

> "As discussed in the findings of fact, Plaintiffs produced sufficient evidence on summary judgment to establish the existence of a relevant market comprising national markets for Plaintiffs' labor in the form of athletic services in men's and women's Division I basketball and FBS football, wherein each class member participates in his or her sport-specific market."[74]

72.    These relevant market findings with respect to FBS football and men's and women's basketball were based on the common Indirect Effects evidence that I and other witnesses (such as Professor Roger Noll) presented to the Court in *Alston*. For these three sports, the relevant labor markets proven (via evidence common to the classes) in *Alston* are the same markets that would be proven through common economic evidence here. Moreover, similar common economic evidence for defining the relevant labor markets exists for the other sports in dispute in this matter. All of the economic evidence that an economist would present to define the relevant labor markets for each of the Division I sports at issue and to assess the monopsony

---

[73] The fuller quote explains that the Court, in its Finding of Fact and Conclusions of Law in *Alston*, was basing its relevant market finding on *the common economic evidence I presented:* "Dr. Rascher, Plaintiffs' economics expert, defined the relevant market here as comprising national markets for Plaintiffs' labor in the form of athletic services in men's and women's Division I basketball and FBS football, wherein each class member participates in his or her sport-specific market. In these markets, the class member recruits sell their athletic services to the schools that participate in Division I basketball and FBS football in exchange for grants-in-aid and other benefits and compensation permitted by NCAA rules. Dr. Rascher found that Defendants have monopsony power in all of these markets and exercise that power to cap artificially the compensation offered to recruits. Id. ¶37. Dr. Rascher's definition of these markets is based on economic analyses similar to those performed in the *O'Bannon* case. His analyses here are predicated on updated data and take into account women's Division I basketball, which was not at issue in *O'Bannon*. Id. ¶¶148-53. Dr. Rascher's economic analyses show that the most talented athletes are concentrated in the respective markets for Division I basketball and FBS football; possible alternatives, such as the National Association of Intercollegiate Athletics (NAIA) or the National Christian College Athletics Association (NCCAA), have not proved to be viable substitutes; none of the major professional sports leagues in class members' sports provide competitive options for most college-aged talent; high barriers to entry into the market preclude any viable alternatives emerging for class members' athletic services; and the geographic scope of the markets is nationwide. Id. ¶¶154- 85." See *Finding of Fact and Conclusions of Law* (*Alston*), Case No. 14-md-02541, ECF Document No. 1162, March 8, 2019, p. 12-13.

[74] *Finding of Fact and Conclusions of Law* (*Alston*), Case No. 14-md-02541, ECF Document No. 1162, March 8, 2019, p. 75.

CONFIDENTIAL

power of the Defendants therein will be common to the class members, just as it was in the *Alston* and *O'Bannon* cases.

73.    Plaintiffs allege the relevant markets in this case are labor markets, one for each sport in which Defendants acquire athletes' labor services using a variety of different "currencies" – both cash and in-kind – to purchase those labor services.[75]  In defining the relevant labor markets, and then assessing the competitive effects of the challenged restraints in those markets, I will use common evidence to distinguish the markets being restrained – the various markets for college athlete labor – from the currency that is or was (prior to July 2021) being denied to the athletes participating in these markets.  Most monopsonies deny suppliers cash, but here the transaction is primarily a barter transaction, where schools/conferences provide goods and services in-kind in exchange for the athletes' services.  In *Alston*, for example, one of the "currencies" with which schools paid athletes that was found to have been restrained was internship opportunities, but it was not necessary to prove that Defendants had market power across all internships in the United States to show that they had monopsony power in the college athlete labor markets to deprive athletes of internship opportunities.  Doing so would have confused the restrained market (labor) with the restricted currency (internship opportunities).

74.    The same analysis applies here.  The challenged restraints are labor market restraints.  But for the restraints, athletes would receive (or would have received) higher compensation in the labor market through opportunities for NIL deals being provided by their schools, unrestricted access to third-party NIL deals independent of their schools, and direct offers from their schools or conferences to pay for the use of their NILs.  Common economic evidence will show that the Prior NIL Rules and Current NIL Rules are labor market restraints which deprived class members of the unrestricted right to pursue NIL opportunities through common NCAA rules used to restrict competition in the relevant labor markets.

---

[75]  See *Consolidated Amended Complaint*, ¶105.

*CONFIDENTIAL*

75.     One place to start for an understanding of the common economic framework that would be used by an economist at the trial for defining the relevant labor markets in this case is the Merger Guidelines published jointly by the U.S. enforcement agencies for antitrust, namely the Department of Justice and the Federal Trade Commission.  The most recent version of these Guidelines was published in 2010 and can be found online at the Federal Trade Commission's website.[76]  In the case of an output market, the process starts from the perspective of customers of products sold by the firm (or firms) being studied (whether for a merger review or, as here, in a litigation context), and as the Guidelines state: "Market definition focuses solely on demand substitution factors, i.e., on customers' ability and willingness to substitute away from one product to another in response to a price increase or a corresponding non-price change such as a reduction in product quality or service."[77]

76.     In a case involving relevant input markets, such as the labor markets at issue here, the process is essentially reversed, with the common economic question being what sellers (athletes) would do when faced with a decrease in the terms of remuneration offered by the buyers (schools) for their athletic services.  The relevant product is the labor of the athletes and the evidence for defining the relevant labor markets will be common to the classes, as it was in *Alston*, where the relevant labor markets found were ultimately endorsed by the Supreme Court of the United States.

77.     For each relevant labor market, the products are distinct, non-substitutes, i.e., a college softball player's services are not generally substitutable for a gymnast's.  These markets can be defined through common economic evidence as a series of labor markets with common features even though each is itself a distinct market formed around a distinct reference labor product.

---

[76]  See *Horizontal Merger Guidelines.*  (August 19, 2010).  U.S. Department of Justice and Federal Trade Commission.  Accessed on October 19, 2022 at https://www.justice.gov/atr/horizontal-merger-guidelines-08192010.

[77]  *Horizontal Merger Guidelines.*  (August 19, 2010).  U.S. Department of Justice and Federal Trade Commission, p. 7.  Accessed on October 19, 2022 at https://www.justice.gov/atr/horizontal-merger-guidelines-08192010.

CONFIDENTIAL

78.     With each labor market product defined through common economic evidence, the next step would be to identify the smallest set of employers[78] that compete for the relevant labor market services under study and that is sufficient to constrain a reduction in the value of the package of compensation and benefits provided in exchange for such labor market services, including any restrictions on the right of the athletes to participate in NIL deals.  For a relevant labor market, the "sufficient" level of compensation constraint can be defined by envisioning a hypothetical monopsonist (i.e., a single purchaser) who controls all purchases of the relevant labor market services and asking whether that monopsonist could profitably decrease the labor market compensation paid below competitive levels, where "competitive levels" means the price that would occur absent the challenged restraints.  In this labor market case, we can think of this as the "wage" that would be paid to college athletes in a particular labor market through the existence or absence of NIL restraints, whether via the lack of restraints on direct NIL payments by conferences and schools, or by allowing and facilitating third-party NIL payments.

79.     One type of common economic evidence that can be used to assess whether the firms which purchase the relevant product (here the labor of the college athlete) participate in a relevant market is to conduct what is known as a hypothetical monopolist (or monopsonist) "SSNIP" test.  In a labor market, a SSNIP would actually be a small but significant non-transitory decrease in compensation, where that decrease is measured relative to the compensation that does or would exist absent the challenged restraints.  The test essentially asks if all of the purchasers of the labor services in the market were controlled by a single firm, would that firm be able to impose a small but significant compensation decrease in a profitable fashion.[79]  A hypothetical firm that has or receives market power in a labor market because of challenged

---

[78] I use the term "employer" here in the economic (and plain language) sense of someone who uses someone else's labor, independent of whether college athletes do, or do not, qualify as employees as a matter of any law.

[79] See *Horizontal Merger Guidelines.*  (August 19, 2010).  U.S. Department of Justice and Federal Trade Commission, Section 4.  Accessed on October 19, 2022 at https://www.justice.gov/atr/horizontal-merger-guidelines-08192010.

*CONFIDENTIAL*

conduct in a previously competitive labor market should be able to decrease the compensation for purchasing labor profitably.  In contrast, if the hypothetical monopsonist is not actually a monopsonist, but instead faces competition from other purchasers of the labor services outside the hypothetical monopsony, then a compensation decrease will cause the laborers who provide such services to substitute by selling their labor services outside of the proposed market, thwarting the compensation decrease.  When this happens, the labor market has been defined too narrowly.  The idea is that if a monopsonist can profitably lower compensation in a labor market by 5 percent (which is the common operationalization of a SSNIP in practice) below the competitive price by controlling the reference labor market product, then that labor market product is in its own market.  If the compensation reduction cannot be profitably imposed, then the process is repeated involving more employers until the relevant labor market is found.

80.    As is evident from the above discussion, the use of a SSNIP test is common economic evidence which would apply to define the relevant labor markets for all of the class members. This is the type of common economic evidence that I or any economist could use at a trial to define the relevant labor markets.

### 4.2.2.   Market power and anticompetitive effects can also be demonstrated by common economic proof

81.    As with market definition, the economic evidence needed to establish market power, and that the Prior NIL Rules and Current NIL Rules caused anticompetitive harm through the exercise of that power, will be presented through common economic proof that is not in any way individualized for different class members.

82.    For example, market power will be indirectly shown, once the relevant labor markets are defined, through common economic evidence of the fact that the NCAA and its Division I members command a dominant share of each of those relevant markets.  Indeed, it will be shown, as was the case in *Alston*, that the NCAA and its members are the only purchasers of the

*CONFIDENTIAL*

class members' services in the relevant labor markets so that monopsony power can be easily found.  As the Court wrote in *Alston*:

> "… the Court finds that Defendants, through the NCAA, have monopsony power to restrain student-athlete compensation in any way and at any time they wish, without any meaningful risk of diminishing their market dominance.  This is because the NCAA's Division I essentially <u>is</u> the relevant market for elite college football and basketball. And, because elite student- athletes lack any viable alternatives to Division I, they are forced to accept, to the extent they want to attend college and play sports at an elite level after high school, whatever compensation is offered to them by Division I schools, regardless of whether any such compensation is an accurate reflection of the competitive value of their athletic services.  Moreover, the compensation that class members receive under the challenged rules is not commensurate with the value that they create for Division I basketball and FBS football; this value is reflected in the extraordinary revenues that Defendants derive from these sports."[80]

83.    Common economic evidence will also be used to establish the barriers to entry which prevent other purchasers from entering the relevant Division I labor markets, further proving that such monopsony power can be exercised without being checked by substantial new entry.

84.     Evidence of anticompetitive effects in the relevant markets will also be shown through common economic evidence.  In essence, the common economic evidence described in Section 4.1 above on Direct Effects is the same type of common economic evidence of anticompetitive harm in the relevant markets that will apply on a class-wide basis.  This common economic evidence will show that each of the relevant markets has experienced anticompetitive effects which deprived all members of the classes the economic opportunity to market their NILs as a result of the exact same NCAA NIL rules which applied to all class members and caused a severe suppression of economic welfare.

---

[80] *Finding of Fact and Conclusions of Law* (*Alston*), Case No. 14-md-02541, ECF Document No. 1162, March 8, 2019, pp. 18-19, emphasis in original.

***CONFIDENTIAL***

**5. ANY ASSERTED PROCOMPETITIVE JUSTIFICATIONS AND LESS RESTRICTIVE ALTERNATIVES WILL ALSO BE ASSESSED THROUGH ECONOMIC EVIDENCE COMMON TO ALL MEMBERS OF THE PROPOSED CLASSES**

85.     As an economist, I have no legal opinion on whether this case involves a *per se* violation of the antitrust laws, quick-look analysis, or full-blown Rule of Reason analysis, as was the case in *Alston* and *O'Bannon*.

86.     However, if the full Rule of Reason applies and Defendants have the opportunity to assert procompetitive justifications for the Prior NIL Rules and the Current NIL Rules, an economic assessment of those claimed justifications will be made through economic evidence common to all members of the proposed classes.  This follows from the fact that any claimed justifications for the challenged rules will be for the rules themselves, and those rules have been applied in the same manner to all Division I college athletes.  In their Answers and interrogatory responses, Defendants assert procompetitive justifications that are similar to those alleged in prior cases challenging other NCAA compensation restraints: that the challenged NIL rules are necessary to preserve "amateurism" and the distinction between college and professional sports, to promote the integration of college athletes into their academic communities, to prevent "exploitation" of college athletes, to promote "competitive balance," to promote consumer demand for college education by creating a more diverse student body, and to expand output in the college education market by widening opportunities for athletes.[81]  Because asserted procompetitive justifications must provide market-wide procompetitive benefits, it will necessarily be a common issue, assessed through common economic proof, as to whether any procompetitive benefits actually exist that justify the restraints.

87.     Further, it is important to recognize that the terms "anticompetitive" and "procompetitive" have specific meanings within economics, focused on avoiding collusive transfers of wealth, avoiding reductions in the quality and quantity of consumption/output, and preventing market

---

[81]  See e.g., NCAA's Supplemental Responses and Objections to Plaintiffs' First Interrogatories to all Defendants, pp. 15-17.

*CONFIDENTIAL*

collapse.  To say something is "procompetitive" means that it has the net effect of increasing economic welfare, with welfare being measured through these dimensions of price and output. Procompetitive does *not* mean more "profitable" – if it did, every successful, rational price-fixing cartel would be deemed procompetitive because success for such price-fixing cartels implies growth in the cartel members' profits.  The term "procompetitive" is also unrelated to individual views of taste or propriety.  Thus, arguments that consumers or other market participants, if left to choose among the options available in a competitive market, might purchase the "wrong" kind of product or service (too inexpensive, déclassé, etc.) or that the market might settle on the "wrong" price is not procompetitive in the economic sense when the market outcome is welfare-enhancing compared to this more "tasteful" choice.  The issue of whether Defendants' claimed procompetitive justifications actually fit within the economic meaning of "procompetitive" will be determined at trial through an economic assessment that is inherently common to all class members.

88.    Most obviously, if Defendants continue to claim, as they did in *Alston*, that the Prior NIL Rules were justified by the need to preserve consumer demand for college sports, that issue will be addressed by the common economic evidence that demand for college sports has continued to grow and prosper despite the elimination of the Prior NIL Rules and the resulting explosion in third-party NIL payments and schools competing to facilitate third-party NIL deals for their athletes.  Economically, the question should not focus on whether athletes receive the "right amount" of money under competitive conditions, but rather whether that competitive market rate will somehow harm demand.  All of this economic evidence – showing unprecedented new televisions deals, strong attendance at games and massive revenues for schools despite the existence of NIL deals that Defendants have in the past argued would harm consumer demand – will be evidence that is common to all class members.

*CONFIDENTIAL*

89.     For example, over a year after the Current NIL Rules came into effect and third-party NIL deals exploded, with some well-publicized deals to athletes generating seven-figure payments,[82] the Big Ten Conference announced that it had agreed to new media deals with CBS, FOX, and NBC valued at over $7 billion over seven years.[83]  In the words of CBS Sports executive Sean McManus: "The Big Ten will be on network television from noon on most Saturdays to 11 o'clock at night, which is unheard-of," for a 14-team college conference (growing to 16 in 2024) that generally hosts 7 (soon to be 8) games a week during its regular season.[84]  This class-wide economic evidence of a network assessing the market and choosing to pay substantially more than they have in the past, despite consumers' having witnessed college athletes being paid six- and seven-figures annually by third parties for their NIL is strong evidence that consumer demand for college sports has not, and will not, be reduced by the elimination of the challenged NCAA rules restricting or prohibiting NIL deals.

90.     The common evidence of sustained and increasing consumer demand despite the natural experiment of suspending the Prior NIL Rules will be abundant and common to class members. As another example, class-wide common economic evidence will be used to show that television viewership of college football remains high, and in some cases has hit new highs not seen in several years, despite (or perhaps even because of) the explosion of third-party NIL

---

[82]   Bryce Young, the returning Heisman Trophy winner, has NIL deals that pay him over $1 million over the 2022-23 academic year and his coach, Nick Saban, has talked about this fact quite openly.  *The Athletic* reports a "five-star recruit" from the Class of 2023 has signed an NIL deal that could be worth more than $8mm over his college career.  Mandel, S. (2022, March 12).  *Five-star recruit in Class of 2023 signs agreement with collective that could pay him more than $8 million.*  The Athletic.  Accessed on October 19, 2022 at https://theathletic.com/3178558/2022/03/11/five-star-recruit-in-class-of-2023-signs-agreement-with-collective-that-could-pay-him-more-than-8-million/.

[83]   Smith, M. (2022, August 18).  Big Ten officially agrees to new media deals with CBS, Fox, NBC.  *Sports Business Journal.*  Accessed on October 19, 2022 at https://www.sportsbusinessjournal.com/Daily/Issues/2022/08/18/Media/Big-Ten-Media-Deal.aspx.

[84]   Blinder, A. & Draper, K. (2022, August 18).  Topping $1 Billion a Year, Big Ten Signs Record TV Deal for College Conference.  *New York Times.*  Accessed on October 19, 2022.  https://www.nytimes.com/2022/08/18/sports/ncaafootball/big-ten-deal-tv.html.  The Big Ten is comprised of 14 schools, but the conference only holds broadcast rights for home games.  See *2022 Football Standings.*  Bigten.org.  Accessed on October 19, 2022 at https://bigten.org/standings.aspx?path=football; *Big Ten Network FAQ.*  Btn.com.  Accessed on October 19, 2022 at https://btn.com/btn-faq/.

*CONFIDENTIAL*

deals.  The faceoff between Notre Dame and Ohio State that opened the 2022 Saturday Night Football series on ABC recorded the highest college-football viewership for the network since 2017, with an average of 10.53 million fans tuning in to watch.[85]  The Alabama-Texas broadcast on FOX just a week later exceeded that level with an average viewership count of 10.60 million.[86]  As of the second game of the season, average viewership for college football games on FOX was at a record high.[87]  By week seven of the season, it had become clear that the popularity of FBS football has not waned, and seems to be gaining in strength.  "Week 7 marked the fifth consecutive week that CBS' SEC game of the week package was the most-watched game of the day, and Alabama-Tennessee was the third game this season to top 10 million viewers, joining Alabama-Texas and the Week 1 Notre Dame-Ohio State primetime game on ABC (10.5 million).  In 2021, only two games – Ohio State-Michigan and Alabama-Auburn – topped 10 million viewers prior to conference championship weekend."[88]  Data of this sort will be common, class-wide economic evidence that the suspension of the Prior NIL Rules did not decrease consumer demand for college sports.

91.    Similarly, the common economic evidence will show that the 2022 NCAA basketball championship also reached a high point in viewership despite the pervasive introduction of third-party NIL deals.  Tournament viewership through the second round reached the highest

---

[85]  TV Ratings: Viewers were ready for college football.  (2022, September 8).  *Los Angeles Times*.  Accessed on October 19, 2022 at https://www.latimes.com/entertainment-arts/tv/story/2022-09-08/tv-ratings-viewers-were-ready-for-college-football.

[86]  Smith, M. (2022, September 27).  *SBJ College: Branding on Ole Miss helmet breaks new ground*.  Sports Business Journal.  Accessed on September 30, 2022 at https://www.sportsbusinessjournal.com/en/SB-Blogs/Newsletter-College/2022/09/27.

[87]  Karp, A. (2022, September 14).  *Early-season college football viewership trending upward*.  Sports Business Journal.  Accessed on October 19, 2022 at https://www.sportsbusinessjournal.com/Daily/Issues/2022/09/14/Media/College-Football-Viewership.aspx.

[88]  Mandel, S. (2022, October 18).  *Alabama-Tennessee tops 11.5M viewers; Tide in 4 of 8 most-viewed games this season*.  The Athletic.  Accessed on October 19, 2022 at https://theathletic.com/3705549/2022/10/18/alabama-tennessee-tv-viewers-cbs/.

*CONFIDENTIAL*

level since 2017,[89] and total audience delivery for the final game between Kansas and North Carolina increased 4 percent over the previous year.[90]  Notably, viewership for the women's championship game reached its highest level since 2004, with some 4.9 million households tuning in.[91]  And apart from the championship, viewership for women's college basketball surged during the regular season, returning to pre-pandemic levels.[92]  The Big Ten Network's ratings for women's basketball were the highest the network has ever recorded, and attendance at the Big Ten's women's basketball championship reached its highest levels in ten years.[93]

92.    Beyond football and basketball, the common economic evidence will also show that other Division I college sports are enjoying sustained consumer demand despite the suspension of the Prior NIL Rules.  In September 2022, for example, ESPN experienced its two highest rated broadcasts of women's volleyball since 2017.  The ESPN broadcast of the September 25, 2022, matchup between Purdue and Iowa had the second highest viewership ever[94] and the Louisville-Kentucky game played on September 14 set the all-time viewership record for NCAA volleyball on the network.[95]

93.    In women's gymnastics, a Florida-Alabama meet in January 2022 was the first to be broadcast on ABC and had the second-highest viewership of any ESPN-affiliated college-

---

89  Karp, A. (2022, March 22).  *Early NCAA tourney viewership best since '17.*  Sports Business Journal. Accessed on March 22, 2022 at https://www.sportsbusinessjournal.com/Daily/Closing-Bell/2022/03/22/NCAA-viewers.aspx.

90  *SBJ Unpacks: NCAA title game audience up for men & women.*  (2022, April 5).  Sports Business Journal. Accessed on April 6, 2022 at https://www.sportsbusinessjournal.com/SB-Blogs/SBJ-Unpacks/2022/04/05.aspx.

91  *SBJ Unpacks: NCAA title game audience up for men & women.*  (2022, April 5).  Sports Business Journal. Accessed on April 6, 2022 at https://www.sportsbusinessjournal.com/SB-Blogs/SBJ-Unpacks/2022/04/05.aspx.

92  Karp, A. (2022, March 21).  *College basketball ratings return to pre-pandemic levels.*  Sports Business Journal. Accessed on March 21, 2022 at https://www.sportsbusinessjournal.com/Journal/Issues/2022/03/21/Upfront/College-basketball.aspx.

93  See Delany Deposition Exhibit 13: "Big Ten excited for what lies ahead after a season of record-setting ratings, James Kay, March 18, 2022."

94  *Second Most-Viewed Regular Season Volleyball Match on ESPN Network Since 2017.*  (2022, September 28). ESPN Twitter.  Accessed on October 19, 2022 at https://twitter.com/espnpr/status/1575141028969037825.

95  Drummond, C. (2022, September 16).  'That delivered.' Kentucky, Louisville play epic volleyball match in rare ESPN broadcast.  *Lexington Herald Leader.*  Accessed on October 20, 2022 at https://www.kentucky.com/sports/college/kentucky-sports/article265656416 html.

CONFIDENTIAL

gymnastics broadcast.[96]  Softball has also seen a boost in fan engagement.  The 2022 Women's College World Series set the single-day attendance record for the event with 12,533 fans showing up for a double-header in Oklahoma City.[97]

94.     All of this economic evidence of the lack of any negative impact on consumer demand caused by over 20,000 NIL transactions that have taken place since July 1, 2021, will be common to the classes and will not vary by individual class members.[98]

95.     Further, if it becomes necessary to consider whether there are substantially less restrictive alternatives for achieving any procompetitive justification that is proven by Defendants, this issue too will be determined through common economic evidence.  Here, it is hard to imagine that a less restrictive alternative to the Prior NIL Rules will not be found to exist given the common evidence that the Prior NIL Rules have been suspended without any injury to consumer demand for college sports.  Once again, the evidence of this natural experiment will be common to all class members, as will be the economic evidence of any substantially less restrictive alternative that is presented.

### 6.  ALL MEMBERS OF EACH PROPOSED CLASS SUFFERED INJURIES CAUSED BY DEFENDANTS' CHALLENGED NIL RESTRAINTS

96.     This section summarizes the class-wide anticompetitive injuries caused by the Prior NIL Rules and the Current NIL Rules to each of the proposed classes: the Football and Men's Basketball Class, the Women's Basketball Class, the Additional Sports Class, and the Injunctive Relief Class.  The common evidence showing that all members of each class were injured by Defendants' challenged NIL rules is further discussed in Section 7 below, where I describe the

---

[96]  Schuman, R. (2022, January 26).  *College Gymnastics is Blowing Up*.  Slate.  Accessed on October 19, 2022 at https://slate.com/culture/2022/01/ncaa-gymnastics-popular-olympians-nil-suni-lee-ucla.html.

[97]  Scott, J. (2022, June 5).  *Women's College World Series Sets Attendance Record in Oklahoma City*.  Sports Illustrated.  Accessed on October 19, 2022 at https://www.si.com/softball/2022/06/05/womens-college-world-series-attendance-record-oklahoma-city.

[98]  See Exhibit 13 in Section 7.3.1.

*CONFIDENTIAL*

class-wide methodologies that may be used to estimate class-wide damages and to measure the damages to individual class members.

97.     The blanket prohibition of the Prior NIL Rules on third-party NIL payments and school facilitation of third-party NIL deals denied every member of each of the proposed classes an opportunity to pursue compensation for the use of their NIL from third parties.  Both the Prior and Current NIL Rules also have deprived every member of each of the proposed classes of the opportunity to seek to market their NILs directly to conferences and schools.  As the Court has already observed: the "loss of an opportunity may constitute injury, even though it is not certain that any benefit would have been realized if the opportunity had been accorded."[99]  This lost opportunity to participate in a competitive market by itself adversely affects all class members. As discussed in Section 4 above, common proof will be used to demonstrate this class-wide injury from the loss of the opportunity to compete for NIL deals in the market, a harm that has been uniformly inflicted on every member of each of the proposed classes by the challenged NCAA restraints.

## 6.1. FOOTBALL AND MEN'S BASKETBALL CLASS

98.     The common injuries suffered by each member of the Football and Men's Basketball Class (defined to include full GIA recipients from the Power Five Conferences including Notre Dame) will be proved through common economic evidence and methodologies.

99.     The blanket prohibition of the Prior NIL Rules on third-party NIL payments and school facilitation of third-party NIL deals denied each member of the Football and Men's Basketball Class an opportunity to pursue compensation for the use of his NIL from third parties. Common proof will be used to demonstrate this class-wide injury from the loss of the opportunity to compete for NIL deals in the market.

---

[99]   Order Granting in Part and Denying in Part Motions to Dismiss, June 24, 2021, p. 18.

*CONFIDENTIAL*

100.    In addition, common evidence shows that, in the but-for world, each member of the Football and Men's Basketball Class would have received compensation for the use of his NIL in video games.  The denial of these payments to class members as result of Defendants' collusive NIL restraints caused a common monetary injury to each member of this class.  I discuss the common evidence for proving this class-wide injury, as well as the methodology for assessing class-wide damages from this loss, in Section 7.1 below.

101.     There is also a common economic methodology and evidence that can be used to show that, in the but-for world, each member of the Football and Men's Basketball Class would have received compensation for the use of his Broadcast NIL directly from their conferences (or schools).  I discuss the common evidence for proving this class-wide injury, as well as for assessing class-wide damages, in Section 7.2 below.

102.    Finally, common economic methodology and evidence can be used to show the monetary compensation that members of the Football and Men's Basketball Class who received compensation for use of their NILs after July 1, 2021, would have received from third-parties for other uses of their NILs prior to July 1, 2021.  For this injury, I discuss the common evidence for assessing damages, in Section 7.3 below.

### 6.2. WOMEN'S BASKETBALL CLASS

103.    The common injuries suffered by each member of the Women's Basketball Class (defined to include full GIA recipients from the Power Five Conferences including Notre Dame) will be proved through common economic evidence and methodologies.

104.    The members of the Women's Basketball Class suffered the same lost opportunity to participate in a competitive market as the members of the other proposed classes.  The blanket prohibition of the Prior NIL Rules on third-party NIL payments and school facilitation of third-party NIL deals denied each member of the Women's Basketball Class an opportunity to pursue compensation for the use of their her from third parties.  Common proof will be used to

*CONFIDENTIAL*

demonstrate this class-wide injury from the loss of the opportunity to compete for NIL deals in the market.

105.    As explained in Section 7.2 below, all members of the Women's Basketball Class were also harmed because, absent the challenged NIL restraints, each class member would have received compensation for the use of her Broadcast NIL.  I discuss the common evidence for proving this class-wide injury, as well as for assessing class-wide damages, in Section 7.2 below.

106.    Finally, a common economic methodology and evidence can be used to show the monetary compensation that members of the Women's Basketball Class who received compensation for use of their NILs after July 1, 2021, would have received from third-parties for other uses of their NILs prior to July 1, 2021.  For this injury, I discuss the common evidence for assessing damages, in Section 7.3 below.

### 6.3. ADDITIONAL SPORTS CLASS

107.    The common injuries suffered by each member of the Additional Sports Class (which is defined to include the Division I athletes not included in the first two classes who have received or receive third party NIL deals in the period since July 1, 2021, and who competed in the same Division I sport prior to July 1, 2021) will be proved through common economic evidence and methodologies.

108.    The blanket prohibition of the Prior NIL Rules on third-party NIL payments and school facilitation of third-party NIL deals denied each member of the Additional Sports Class an opportunity to pursue compensation for the use of their NIL from third parties.  Common proof will be used to demonstrate this class-wide injury from the loss of the opportunity to compete for NIL deals in the market.

109.    Common evidence shows that, in the but-for world, each member of the Additional Sports Class received compensation after July 1, 2021, for the use of their NILs.  A common economic methodology and evidence can be used to show the monetary compensation that each member

*CONFIDENTIAL*

of the Additional Sports Class would have received from third-parties for other uses of their NIL prior to July 1, 2021. For this injury, I discuss the common evidence for assessing damages, in Section 7.3 below.

110.    In addition, common evidence shows that, in the but-for world, members of the Additional Sports Class who are FBS football or Division I men's basketball athletes would have received compensation for the use of their NILs in video games. The denial of these payments to class members as result of Defendants' collusive NIL restraints caused a common monetary injury to these class members. I discuss the common evidence for proving this injury, as well as the methodology for assessing class-wide damages from this loss, in Section 7.1 below.

### 6.4. INJUNCTIVE RELIEF CLASS

111.    Given the universal application of the challenged NIL rules, the injunctive and declaratory relief sought would provide uniform relief to all members of the proposed Injunctive Relief Class. Moreover, all Division I athletes currently in school are being deprived by the Current NIL Rules of the opportunity to enter into third-party NIL deals without the limitations imposed by the Current NIL Rules and the opportunity to receive NIL compensation directly from schools and conferences. Absent injunctive relief, they also face the continuing threat from the Prior NIL Rules, which are still part of the NCAA Bylaws and Constitution Articles, especially since the Current NIL Rules merely "suspend" the Prior NIL Rules and are explicitly called an "Interim" Policy.[100]

112.    Common economic evidence will be used to show the anticompetitive impact of the challenged NIL rules to the Injunctive Relief Class. This common economic evidence will additionally be relevant to the Court's assessment of the scope of the injunction to be entered, as

---

[100] For example, it has been reported that the NCAA has plans to modify its "Interim Policy" by issuing new guidance, as early as the week after this report is due. See Auerbach, N. (2022, October 20). *NCAA to send additional NIL rules guidance to schools next week: Sources.* The Athletic. Accessed on October 20, 2022 at https://theathletic.com/3711601/2022/10/20/ncaa-nil-rules-guidance-boosters.

Page 51

*CONFIDENTIAL*

injunctive relief would be applied in a common manner for the benefit of all class members.  As discussed above, the lost opportunity to pursue NIL deals without restrictions imposed by the challenged NIL rules is a common economic harm to all class members that can be shown through common economic evidence.  See discussion at Section 6, above.

113.    Common economic evidence will also show the variety of third-party NIL deals that would be available to Injunctive Relief Class members if an injunction is granted to prevent any end to the suspension of the Prior NIL Rules.  For example, on June 30, 2021, Opendorse announced that gopuff would be offering, as of the following day, July 1, 2021, $30 in cash and an additional $20 in gopuff credit to *any* college athlete who signed up to be a gopuff endorser. Essentially this was a Division I-wide group-license offer.[101]  This sort of opportunity was not available under the Prior NIL Rules.  As NCAA President Mark Emmert explained several weeks earlier, the Prior NIL Rules "… completely prohibit[ed] NIL activities…"[102]  Common economic evidence of this type will show the anticompetitive harm that all Division I athletes have suffered, and will suffer, if the requested injunction is not granted and the Defendants are permitted to end their suspension of the Prior NIL Rules.

114.    As another example of the type of common economic evidence that can be presented on the threat of wide-ranging competitive injury to the Injunctive Relief Class, Fanatics (a sports merchandising company) and OneTeam (a sports licensing agency) are currently offering customizable college football jerseys bearing the names of college athletes who opt into their program.[103]  Fanatics and OneTeam have announced plans to expand the program beyond

---

[101] *Delivering the First Deals of the NIL Era*.  (2021, June 30).  Opendorse Twitter.  Accessed on October 19, 2022 at https://twitter.com/opendorse/status/1410273864949567502.

[102] See *Mark Emmert Memo*.  (2021, June 18).  Ralph D. Russo Twitter.  Accessed on July 30, 2021 at https://twitter.com/ralphDrussoAP/status/1406003171030413312.

[103] *Fanatics and OneTeam Partners Announce College Athlete Group Rights Licensing Program for Jerseys*. (2022, February 3).  Learfield.  Accessed on October 19, 2022 at https://www.learfield.com/2022/02/fanatics-and-oneteam-partners-announce-college-athlete-group-rights-licensing-program-for-jerseys/.

*CONFIDENTIAL*

football to include additional men's and women's sports, and all Division I college athletes can register now in anticipation of the expansion.[104]

115.    Common evidence will also be presented that Fanatics plans to offer (in collaboration with Topps) physical and digital trading cards for roughly 100 Division I colleges and universities across the country.[105]  Athletes from participating Division I schools can currently opt into this program in anticipation of these deals taking effect, which will pay royalties for NIL.

116.    As another example of common evidence of a widespread NIL deal that will be available for Division I athletes if an injunction prevents the reinstatement of the Prior NIL Rules, in March 2022, Adidas announced that it is forming an NIL network that will include over 50,000 college athletes across Adidas' 109 NCAA Division I partner schools.[106]  Members of the Injunctive Relief Class may become brand ambassadors with Adidas and profit through commission links and other promotional activities.[107]

117.    Bumble (an online dating app) has similarly offered a widespread NIL deal to a group of female college athletes across the country extending throughout Division I and even beyond.[108] The athletes will receive equal pay amounts in exchange for providing social media promotions

---

[104] Williams, R. (2022, September 8).  *Fanatics & OneTeam Partners' NIL Jersey Collaboration Kicks Off.*  Boardroom.  Accessed on October 19, 2022 at https://boardroom.tv/fanatics-oneteam-partners-nil-jerseys/.

[105] Clinton, C. (2022, June 9).  *Fanatics, Topps announce trading card deal with schools, college athletes in NIL milestone.*  USA Today.  Accessed on October 19, 2022 at https://www.usatoday.com/story/sports/2022/06/09/fanatics-topps-nil-college-trading-card-deal/7571834001/. See also Hajducky, D. (2022, June 9).  *Fanatics and Topps announce trading card agreements for college football and basketball.*  ESPN.  Accessed on October 19, 2022 at https://www.espn.com/college-football/story/_/id/34060807/fanatics-topps-announce-trading-card-agreements-college-football-basketball.

[106] Swinton, E. (2022, March 23).  *Adidas Announces Creation of Wide-Reaching NIL Network.*  Sports Illustrated. Accessed on October 19, 2022 at https://www.si.com/college/2022/03/23/adidas-name-image-likeness-network.

[107] Swinton, E. (2022, March 23).  *Adidas Announces Creation of Wide-Reaching NIL Network.*  Sports Illustrated. Accessed on October 19, 2022 at https://www.si.com/college/2022/03/23/adidas-name-image-likeness-network.

[108] Miller, N. (2022, July 1).  *Bumble Signs NIL Deals with 50 Female Student-Athletes to Celebrate Title IX.*  Swim Swam.  Accessed on October 19, 2022 at https://swimswam.com/bumble-signs-nil-deals-with-50-female-student-athletes-to-celebrate-title-ix/.

*CONFIDENTIAL*

and appearing at events over the next year.[109]  This is further common evidence of the type of widely available third-party NIL deals that will be threatened without injunctive relief.

118.    There will also be common economic evidence of numerous group NIL deal opportunities offered to athletes on particular teams, at particular schools.  The following is a sampling of some of these group deal NIL opportunities:

> a) Just days after the Prior NIL Rules were repealed, American Top Team (a mixed martial arts gym) announced an NIL deal with the University of Miami's football team for the 2021-2022 school year, whereby each of Miami's scholarship football players received $6,000 for promoting the gym on social media.[110]

> b) Protein bar company Built Brands entered into an NIL deal with the Brigham Young University football team for the 2021-2022 school year.  BYU football players wore the "Built" logo on their practice helmets, promoted the company via social media, and participated in experiential events.[111]  In exchange for their participation, the scholarship players each received $1,000.[112]  The deal also included the walk-on players on the team REDACTED - Counsel Only

---

[109] Miller, N. (2022, July 1).  *Bumble Signs NIL Deals with 50 Female Student-Athletes to Celebrate Title IX*.  Swim Swam.  Accessed on October 19, 2022 at https://swimswam.com/bumble-signs-nil-deals-with-50-female-student-athletes-to-celebrate-title-ix/.

[110] Braiterman, C. (2021, July 7).  *American Top Team makes $540,000 NIL commitment to all Miami Hurricanes college football players*.  SBNation MMA Mania.  Accessed on October 19, 2022 at https://www.mmamania.com/2021/7/7/22566088/american-top-team-att-owner-sponsorship-miami-football-team-hurricanes-college-nil-payments.  See also UM-NIL0370.

[111] Pyne, B. (2021, August 25).  *BYU Football Touts Groundbreaking NIL Agreements with Built Brands*.  BYU.  Accessed on October 19, 2022 at https://byucougars.com/story/football/1297331/byu-football-touts-groundbreaking-nil-agreements-built-brands.

[112] Harmon, D. (2021, August 14).  *BYU Players' new NIL deal with Built Brands hits from inside out, bottom to top*.  Deseret.com.  Accessed on October 19, 2022 at https://www.deseret.com/2021/8/14/22616677/byu-built-bar-deal-is-unique-kalani-sitake-nick-greer-nil-college-football-dennis-dodd-cbssports#:~:text=The%20thing%20that%20struck%20me,or%20avarice%20in%20this%20deal.  See also

REDACTED - Counsel Only

*CONFIDENTIAL*

REDACTED - Counsel [113] Built Brands has renewed and expanded its deal with the BYU football team.[114]

c)  In September 2021, the Burnt Ends NIL program, sponsored by the Surly Horns online forum, provided annual NIL deals valued at $10,000 each to all seven tight ends on the football team at the University of Texas (Austin) in exchange for the players providing media content for the company and appearing at sponsored events.[115]

d)  In November 2021, College Hunks Hauling Junk (a moving company) offered each player on Howard University's men's basketball team REDACTED - Coun to promote the company.[116]

e)  FTX (a cryptocurrency exchange) offered a team-wide deal to the Florida State University softball team for the 2021-2022 school year. In exchange for promoting the company on social media, all participating players received anywhere from REDACTED - Confidential.[117]

f)  In July 2022, the Matador Club (a non-profit collective supporting college athletes at Texas Tech University) announced that it would offer $25,000 annually to 85 scholarship players and 20 walk-on players on Texas Tech's

---

[113]  Pyne, B. (2021, August 12). *BYU Football Touts Groundbreaking NIL Agreements with Built Brands*. BYU. Accessed on October 19, 2022 at https://byucougars.com/story/football/1297331/byu-football-touts-groundbreaking-nil-agreements-built-brands. See also REDACTED - Counsel Only.

[114]  *Built Brands and BYU Football Announce Continued Partnership*. (2022, August 23). Cision PR Newswire. Accessed on October 19, 2022 at https://www.prnewswire.com/news-releases/built-brands-and-byu-football-announce-continued-partnership-301611076.html.

[115]  Davis, D. (2021, September 17). 'This is something to root for': Texas tight ends partner with fans for unique NIL deal. *Austin American-Statesman*. Accessed on October 19, 2022 at https://www.statesman.com/story/sports/football/2021/09/17/texas-football-tight-ends-nil-deals-crowdsourced-burnt-ends-program/8349704002/. See also Counsel Only

[116]  VanHaaren, T. (2021, November 29). *Howard University men's basketball team signs NIL deal with moving company, College H.U.N.K.S.* Hauling Junk. ESPN. Accessed on October 19, 2022 at https://www.espn.com/mens-college-basketball/story/_/id/32745188/howard-university-men-basketball-team-signs-nil-deal-moving-company-college-hunks-hauling-junk. See also Counsel Only

[117]  Dosh, K. (2021, December 29). *FSU Softball Lands NIL Deal with Cryptocurrency Exchange FTX*. Forbes. Accessed on October 19, 2022 at https://www.forbes.com/sites/kristidosh/2021/12/29/fsu-softball-lands-nil-deal-with-cryptocurrency-exchange-ftx/?sh=6bc6f2717c88. See also    Confidential

*CONFIDENTIAL*

football team in exchange for their participation in community service and charitable work.[118]

g) Level 13 Agency (a marketing agency also supporting college athletes at Texas Tech University) offered to pay each player on the Texas Tech women's basketball team $25,000 for participating in NIL activities during the 2022-2023 school year.[119]

h) The Boulevard Collective will pay each member of the Southern Methodist University football and men's basketball teams $36,000 annually to perform a variety of NIL activities.[120]

i) Garnet Trust Collective (a collective supporting college athletes at the University of South Carolina) and NOCAP Sports (a sports marketing firm), recently announced that they will pay $25,000 to each member of the women's basketball team at the University of South Carolina for the 2022-2023 school year in exchange for their participation in community appearances, social media promotion, and sponsored interviews.[121]  The deal also includes a team-wide partnership with protein drink company, Slate Milk.[122]

j) The Matador Club announced another team-wide NIL deal in September 2022. The collective offered each player on the Texas Tech women's softball team

---

[118] Riker, J. (2022, July 22). *Texas Tech Football's Matador Club Partnership Continues Trend of Team-Wide NIL Deals*. Business of College Sports. Accessed on October 20, 2022 at https://businessofcollegesports.com/name-image-likeness/texas-tech-footballs-matador-club-partnership-continues-trend-of-team-wide-nil-deals/.

[119] Voepel, M. (2022, July 29). *Texas Tech women's basketball players to receive $25K NIL deals*. ESPN. Accessed on October 19, 2022 at https://www.espn.com/womens-college-basketball/story/_/id/34314841/texas-tech-women-basketball-players-receive-25k-nil-deals.

[120] Nakos, P. (2022, September 28). *South Carolina women's basketball players to each receive $25,000 in NIL deals*. On3. Accessed on October 20, 2022 at https://www.on3.com/nil/news/south-carolina-womens-basketball-players-to-each-receive-25000-in-nil-deals-garnet-trust/.

[121] Nakos, P. (2022, September 28). *South Carolina women's basketball players to each receive $25,000 in NIL deals*. On3. Accessed on October 20, 2022 at https://www.on3.com/nil/news/south-carolina-womens-basketball-players-to-each-receive-25000-in-nil-deals-garnet-trust/.

[122] Nakos, P. (2022, September 28). *South Carolina women's basketball players to each receive $25,000 in NIL deals*. On3. Accessed on October 20, 2022 at https://www.on3.com/nil/news/south-carolina-womens-basketball-players-to-each-receive-25000-in-nil-deals-garnet-trust/.

**CONFIDENTIAL**

$10,000 annually to perform community service work and make appearances at the collective's events.[123]

119.    Other school-oriented collectives have been formed to encourage more of these sorts of individual and group deals.  These include the University of Florida's Gator Collective, through which fans can purchase subscriptions in exchange for exclusive athlete-provided content, including autographs, interviews, and live engagements;[124] the University of Virginia's Cavalier Futures, which arranges and facilitates NIL opportunities – such as personal appearances, meet and greets, and autograph signings – for UVA athletes across all sports;[125] and the University of Iowa's Swarm Collective, which assists athletes on Iowa's football and basketball teams to benefit from their NILs by participating in work with charities and non-profits.[126]

120.    Common economic evidence will also show that all members of the Injunctive Relief Class are suffering from the Current NIL Rules, which deprive each of them of the opportunity to try to obtain direct payments from their conferences or schools for NIL or the opportunity to enter into third-party NIL deals which would reward them based factors that are currently prohibited, such as for remaining on a particular team.  Such lost opportunities are a form of common, ongoing competitive injury to all members of the Injunctive Relief Class.

### 7.  CLASS-WIDE METHODOLOGIES ARE AVAILABLE FOR PROVING DAMAGES

121.    Both the Prior NIL Rules and the Current NIL Rules have caused direct harm and damages to class members by preventing NIL transactions from taking place that would have been available in the but-for world without the challenged restraints.  In this section of the report, I

---

[123] Matador Club offering $10K annual contracts to all Tech softball players.  (2022, September 28).  *Lubbock Avalanche-Journal*.  Accessed on October 21, 2022 at https://www.lubbockonline.com/story/sports/college/red-raiders/2022/09/29/matador-club-offering-10k-contracts-to-all-texas-tech-softball-players/69526342007/.

[124] *Connecting Fans, Empowering Athletes, Investing in Futures.*  Gator Collective.  Accessed on October 19, 2022 at https://gatorcollective.com/.

[125] *Lifetime Branding*.  Cavalier Futures.  Accessed on October 19, 2022 at https://www.cavalierfutures.com/.

[126] *Empowering Iowa Athletes*.  Iowa Swarm.  Accessed on October 19, 2022 at https://iowaswarm.com/.

*CONFIDENTIAL*

explain that evidence common to the each of the three proposed damages classes indicates all members of each of these three classes were injured as a result of the challenged NIL rules, namely the Prior NIL Rules and the Current NIL Rules.

122.    I have been asked to develop methodologies for estimating damages on a class-wide basis.  I lay out three common methodologies that I could use to measure different categories of damages on a class-wide basis once discovery is completed.  While I am not yet in a position to offer final estimates of class-wide damages, my three methodologies are a demonstration of the ability to use common methodologies to prove class-wide damages at trial.

123.    Specifically, I have developed class-wide methodologies to estimate three types of damages to class members: (1) a methodology for measuring class-wide damages to all members of the Football and Men's Basketball Class from the loss of NIL compensation from video games; (2) a methodology for measuring class-wide damages to all members of both the Football and Men's Basketball Class and the Women Basketball Class from the loss of Broadcast NIL compensation from conferences; and (3) a methodology for measuring class-wide damages for all members of the Additional Sports Class as a result of being deprived by the Prior NIL Rules of the opportunity to enter into third-party NIL deals.  The first methodology can also be used to measure damages for members of the Additional Sports Class who are FBS football or Division I men's basketball athletes (and who received a full GIA) from the loss of NIL opportunities for video games.  The third methodology can also be used to measure such damages for members of the Football and Men's Basketball Class and the Women's Basketball Class, who likely would have received third-party NIL deals prior to July 1, 2021, the effective date of the Current NIL Rules.

### 7.1. A Class-wide Methodology for Estimating Video Game Damages

124.    History and documents produced in this litigation provide common evidence of the lost opportunity in video game NIL deals inflicted on all FBS football and Division I men's

*CONFIDENTIAL*

basketball players receiving a full GIA scholarship during the class period.  All of these individuals would have received compensation for use of their NILs in college football and basketball video games absent the challenged NIL rules.  All members of the Football and Men's Basketball Class – Power Five Conference football and men's basketball players who received a full GIAs during the class period – were damaged.  Further, because the Additional Sports Class includes FBS football and Division I men's basketball athletes who received a full GIA scholarship, those individuals suffered the same injury.  These conclusions, as well as the damages methodology that may be applied class-wide to the Football and Men's Basketball Class and the Additional Sports Class to measure video game damages, are discussed in this Section.

125.    As I discuss in Section 4.1.2, prior to the *O'Bannon* litigation, REDACTED - Confidential



[127]    As video game technology advanced, EA recognized that college-athlete NILs were an important component of a successful video game.  EA executive Joel Linzner testified during the *O'Bannon* trial that the company had "found that it is pleasing to our customers to be able to use the real athletes depicted as realistically as possible and acting as realistically as possible."[128]  As a result, EA "made a long-sustained effort to work with the NCAA and the schools to change the rules that – such that would have allowed EA, and other video games companies for that matter, to use the name and likeness of the athletes in video games."[129]  But

---

[127] REDACTED - Confidential
[128] *O'Bannon* Trial Tr. 1658:3-6 (June 18, 2014); see also          REDACTED - Confidential

[129] *O'Bannon* Trial Tr. 1662:23-1663:1 (June 18, 2014); see also *In re NCAA Student-Athlete Name & Likeness Litig.*, Deposition of Todd Stirin at 159:24-160:2 ("over a period of time we made – I made personally three presentations to the NCAA and/or CLC trying to get player names and likenesses."); see also
REDACTED - Counsel Only

the NCAA refused and EA was forced to use semi-generic player avatars in the EA game that were still based on real athletes' data[130] and were recognizable as representing their real-life counterparts.

126.                     REDACTED - Counsel Only

[131] The last college basketball video game had been released on November 17, 2009 (EA's NCAA Basketball 10)[132] and then, with the NCAA's decision (followed in rapid succession by the same decision by several Defendant conferences) to cease participating in the football game, the last new college football video game ended up being EA's NCAA Football 14, which was released on July 9, 2013.[133] The most recent iteration of the college football video game included every FBS football team at the time,[134] and the most recent iteration of the college basketball video game included virtually every Division

---

REDACTED - Counsel Only

[130]                 REDACTED - Counsel Only

[131] REDACTED - Counsel Only
[132]                 REDACTED - Counsel Only

[133] See Kirk, J. (2013, September 26). *EA Sports halting college football video game series after all.* SBNation. Accessed on October 19, 2022 at https://www.sbnation.com/college-football/2013/9/26/4774556/ea-sports-college-football-video-game-series and Berkes, P. (2013, August 14). *SEC, Big Ten, Pac-12 won't participate in EA Sports college football game.* SBNation. Accessed on October 20, 2022 at https://www.sbnation.com/college-football/2013/8/14/4620816/sec-teams-ea-sports-ncaa-football.

[134] See *NCAA Football 14*. (2022, October 13). Wikipedia. Accessed on October 20, 2022 at https://en.wikipedia.org/wiki/NCAA_Football_14 (reporting that all 126 FBS football teams were included in EA's NCAA Football 14); Fuhrmeister, C. (2013, June 11). *NCAA Football 14 team ratings reportedly revealed for all 126 teams.* SBNation. Accessed on October 20, 2022 at https://www.sbnation.com/college-football/2013/6/11/4420446/ncaa-football-14-team-ratings-rankings.

CONFIDENTIAL

I basketball team.[135]  In my model, I assume that every FBS football team and every Division I men's basketball team would have participated in the but-for versions of the game.

127.    Since then, Defendants have used their power in the relevant labor markets to block FBS football and Division I men's basketball players from entering into an NIL deal with EA, Take-Two, or any other video game publisher interested in football or men's basketball.  Defendants maintained these restraints despite being well-aware of the demand from video game manufacturers to engage in NIL transactions with football and men's basketball athletes.

128.    Moreover, documents produced in this litigation show EA has continually wanted to produce football and men's basketball games.    REDACTED - Confidential

[136]    REDACTED - Counsel Only

.[137]    REDACTED - Counsel Only

---

[135] Counsel had a staff member who owned the NCAA Basketball 10 game compare the teams available in the game against the Division I teams that competed in the 2009-2010 men's college basketball season.  There were 21 listed as teams competing in Division I during the 2009-2010 season that did not appear in the game.  None of the omitted schools was a member of a Power Five Conference.  Each omitted school fell into one of five clearly-defined categories: (1) it held *provisional* Division I status (Bryant, Central Arkansas, Florida Gulf Coast, Presbyterian, South Carolina Upstate); (2) it was not part of a conference for purposes of men's basketball (Cal State Bakersfield, North Carolina Central, Savannah State, Seattle, SIU-Edwardsville, Winston-Salem State); (3) it was in its first year as a fully-certified Division I program (Kennesaw State, NJIT, North Florida); (4) it was a member of the newly-formed Great West Conference, which itself, was in its first year as a Division I conference and was disbanded in 2013 (Chicago State, Houston Baptist, North Dakota, South Dakota, Texas-Pan American, Utah Valley); or (5) it was in the process of transitioning out of Division I (Centenary). See "Text Cite – Categories of NCAA Basketball 10 Omitted Schools.docx" for a list of the schools and sources for determining the categories.  It is my opinion that all Division I schools would be included in an NCAA basketball game in the but-for world.  However, if necessary, I could easily exclude from my class-wide damages methodology any Division I men's basketball player who played for a team that fell into any of these categories, which I expect would be a small number, if any.

[136] REDACTED - Confidential

[137] *See*    REDACTED - Counsel Only    .

*CONFIDENTIAL*

REDACTED - COUNSEL ONLY

138

129.          REDACTED - COUNSEL ONLY

139
.                        REDACTED - CONFIDENTIAL
140                            REDACTED - CONFIDENTIAL

,,141 REDACTED - COUNSEL ONLY

,,142

130.    The evidence laid out above – from prior to the last college football video game and since –
indicates that in the but-for world during the class period, EA or another video game company
would have offered to pay at least all 85-full scholarship athletes on all FBS college football
teams for the right to use their NILs in a video game.

131.          REDACTED - COUNSEL ONLY

<hr/>

138 REDACTED - COUNSEL ONLY

139 REDACTED - COUNSEL ONLY

140        REDACTED - CONFIDENTIAL                  .

141 REDACTED - CONFIDENTIAL

142 COUNSEL ONLY (emphasis added, capitalization in original).

*CONFIDENTIAL*

REDACTED - COUNSEL ONLY

[143]

132.                        REDACTED - COUNSEL ONLY

[144]  REDACTED - COUNSEL ONLY

[145] As

the Collegiate Licensing Corporation wrote to conference licensing directors in 2008:

REDACTED

[146]

In other words, basketball player NIL is especially important to any video game

produced, including a college basketball video game, and perhaps even more important

than NIL for a football video game.

133.    The economic evidence indicates that because basketball athlete NILs are especially

important to any college video game produced, in the but-for world EA or another video game

company would have offered to pay at least all 13 full-scholarship athletes on each Division I

---

[143] REDACTED - COUNSEL ONLY

[144] REDACTED - COUNSEL ONLY

[145]                        REDACTED - COUNSEL ONLY

[146] REDACTED - COUNSEL ONLY .

*CONFIDENTIAL*

men's basketball team for the right to use their NILs in a video game.  For example, when EA was still actively working with CLC (prior to the filing of the *O'Bannon* case) to try to convince the NCAA to expand the use of athlete NIL in video games, they reported the results of surveys of retailers.    REDACTED - CONFIDENTIAL

147

134.        REDACTED - CONFIDENTIAL

.148                    REDACTED - CONFIDENTIAL

149   REDACTED - CONFIDENTIAL

150
.

135.    The process of developing a common methodology for estimating damages from these lost NIL video game opportunities is straightforward.  While the rush of third-party deals for individual athletes that occurred right after July 1, 2021 is well-documented, deals involving group licensing, such as those involving a video game, have taken longer to develop.  Gathering

---

147 REDACTED - CONFIDENTIAL
148 REDACTED - CONFIDENTIAL
149 REDACTED - CONFIDENTIAL
150 REDACTED - CONFIDENTIAL

*CONFIDENTIAL*

up individuals' licensing agreements to create a group, marketing that group to the video game company, and getting a deal done is a time-intensive process. Similarly, the physical process of developing a top-of-the-line video game, once it has been discontinued for many years, can take time. As a result, while the evidence indicates that a return by EA to college football, and then basketball, video games is coming in the near future, such a game has not *yet* come to market. But all signs indicate it is coming soon.

136.    Damages, however, are measured in the but-for world, not in the future. In the but-for world in which the Prior NIL Rules did not exist, the previous iterations of the EA college football video game and basketball game (or the Take-Two video game) would have continued to exist, and the games would never have been cancelled because of the Prior NIL Rules preventing college football and basketball players from receiving payments for their video game NIL. Based on the existing business plans for the relaunch of the game, I assume that in the but-for world, EA and/or Take-Two would have made deals based on a common payment to at least all 85 GIA football athletes per team across FBS, and all 13 GIA men's basketball athletes per team across Division I for the right to use their NILs in video games for their respective sports, using a common offer price to each athlete (by sport) to be in the game. The common payment would be determined based on a fixed annual percentage royalty and set based on the maximum number of relevant sport athletes across the teams in the game.[151]

137.                    REDACTED - CONFIDENTIAL



                        [152]        REDACTED - CONFIDENTIAL

---

[151] One result of this assumption is that the offer EA makes does not vary based on the number of athletes who opt in; it is set *ex ante*.
[152] REDACTED - CONFIDENTIAL.

*CONFIDENTIAL*

REDACTED - CONFIDENTIAL

,,[153]

138.    Since then, EA has further stated internally:

REDACTED - COUNSEL ONLY

,,[154]

139.    A but-for world in which the marketing of college athlete group NILs for video games had

been allowed would have been one where EA, Take-Two, or perhaps a different video game

company, combined schools' and conferences' intellectual property (logos, fight songs, etc.)

with athlete NIL to produce college football and men's basketball video games with all of the

richness of the equivalent professional sports video games, like the EA Madden video game in

the NFL and the Take-Two NBA 2K video game.  While these game publishers may have

entered into NIL deals with additional college football and men's basketball players outside of

the FBS and Division I, it is conservative to make the assumption that these video game NIL

deals would have at least been presented to full-GIA recipients at FBS football and Division I

basketball schools, which are the most popular schools for football and men's basketball with

college fans.  This includes all class members in the Football and Basketball Class and many

class members in the Additional Sports Class.

140.    Similar video games were (and still are) sold for professional football and men's basketball

that use both league and team IP rights and athlete NILs, with payments going to both groups,

and their popularity has continued throughout the damages period.  These similar video games

[153] REDACTED - CONFIDENTIAL
[154] REDACTED - COUNSEL ONLY

*CONFIDENTIAL*

in the professional sports context provide a yardstick for the trajectory of sales that college video game products would have likely taken in the but-for world.[155]

141.    Further, the total revenues produced by the professional football and men's basketball video games, and the size of the royalty payments going to the professional leagues and their players, provide an upper bound for royalty rates that would likely have been paid for the value of the conference and school IP rights, and the value of class member NILs, in the but-for world in which college football and men's basketball video games would have been licensed and produced.[156]                REDACTED - COUNSEL ONLY

---

[155] See Appendix Exhibit C.1 for a comparison of college and professional football game sales during the years where both were sold.

[156] Specific to sports economics, published research shows that comparisons across sports leagues as a means of understanding questions that arise in sports economics is accepted in the literature. See, Owen, P., & King, N. (2015). Competitive balance measures in sports leagues: the effects of variation in season length. *Economic Inquiry*, 53(1), 731-744. https://doi.org/10.1111/ecin.12102. Peeters, T. (2015). Profit-maximizing gate revenue sharing in sports leagues. *Economic Inquiry*, 53(2), 1275-1291. https://doi.org/10.1111/ecin.12184. Velema, T. (2018). A game of snakes and ladders: Player migratory trajectories in the global football labor market. *International Review of the Sociology of Sport*, 53(6), 706-725. https://doi.org/10.1177/1012690216679967. Paul, R., Weinbach, A., & Small, K. (2014). The Relationship between Sportsbook Volume, Forecast Accuracy, and Market Efficiency: The NFL and NCAA Football. *Journal of Prediction Markets*, 8(2), 29-42. https://doi.org/10.5750/jpm.v8i2.888. Vrooman, J. (2000). The Economics of American Sports Leagues. *Scottish Journal of Political Economy*, 47(4), 364-298. https://doi.org/10.1111/1467-9485.00169. El Hodiri, M., & Quirk, J. (1971). An Economic Model of a Professional Sports League. *Journal of Political Economy*, 79(6), 1302-1319. http://www.jstor.org/stable/1830103. Fort, R., & Quirk, J. (1995). Cross-Subsidization, Incentives, and Outcomes in Professional Team Sports Leagues. *Journal of Economic Literature*, 33(3), 1265-1299. http://www.jstor.org/stable/2729122. Rascher, D. (1997). A model of a professional sports league. *International Advances in the Economic Research, 3*, 327-328. https://doi.org/10.1007/BF02294925. Szymanski, S., & Késenne, S. (2010). Competitive Balance and Gate Revenue Sharing in Team Sports. In S. Szymanski (Ed.), *The Comparative Economics of Sport*, 229–243. Palgrave Macmillan, London. https://doi.org/10.1057/9780230274273_7. Andreff, W. (2011). Some comparative economics of the organization of sports: Competition and regulation in north American vs. European professional team sports leagues. *The European Journal of Comparative Economics*, 8(1), 3-27. http://ejce.liuc.it/18242979201101/182429792011080101.pdf. Salaga, S., & Tainsky, S. (2015). The Effects of Outcome Uncertainty, Scoring, and Pregame Expectations on Nielsen Ratings for Bowl Championship Series Games. *Journal of Sports Economics*, 16(5), 439-459. https://doi.org/10.1177/1527002513497236. Tainsky, S. (2010). Television broadcast demand for National Football League contests. *Journal of Sports Economics*, 11(6), 629-640. https://doi.org/10.1177/1527002509355636. Brown, K. M., & Salaga, S. (2018). NCAA football television viewership: Product quality and consumer preference relative to market expectations. Sport Management Review, 21(4), 377-390. https://doi.org/10.1016/j.smr.2017.08.008. Tainsky, S., & Jasielec, M. (2014). Television Viewership of Out-of-Market Games in League Markets: Traditional Demand Shifters and Local Team Influence. Journal of Sport Management, 28(1), 94-108. https://doi.org/10.1123/jsm.2012-0341. Solberg, H. A. (2002). The Economics of Television Sports Rights. Europe and the US - A Comparative

*CONFIDENTIAL*

REDACTED - COUNSEL ONLY

.  However, to be conservative, I have chosen to use a lower royalty rate for the video game damages that is based on the internal planning documents of EA for re-introducing such games in the near future.

142.    Documents produced in discovery show that from at least 2019 through the present, EA has been preparing to re-introduce its college football video game and has been aiming for a launch in the next couple of years.[158]  Portions of EA's planning that have been made public show that EA has been quite clear that, ultimately, "*EA Sports WANTS to include player likeness in this game, and they want to pay athletes to do it*."[159]  REDACTED - COUNSEL ONLY

---

Analysis.  Norsk Medietidsskrift, 9(2).  57-80, https://doi.org/10.18261/ISSN0805-9535-2002-02-04.  Southall, R. M., Southall, C., & Dwyer, B. (2009).  2009 Bowl Championship Series Telecasts: Expressions of Big-Time College-Sport's Commercial Institutional Logics.  Journal of Issues in Intercollegiate Athletics, 2, 150-176.  http://csri-jiia.org/old/documents/publications/research_articles/2009/JIIA_2009_9_BCS_Institutional_Logics.pdf.

[157]     REDACTED - COUNSEL ONLY                          REDACTED - COUNSEL ONLY

[158] *Here's everything I know about EA Sports college football video game return*.  (2022, June 17).  Extra Points.  Accessed on June 17, 2022 at https://www.extrapointsmb.com/heres-everything-i-know-about-ea-sports-college-football-with-updated-info/.

[159] *Here's everything I know about EA Sports college football video game return*.  (2022, June 17).  Extra Points.  Accessed on June 17, 2022 at https://www.extrapointsmb.com/heres-everything-i-know-about-ea-sports-college-football-with-updated-info/.

Page 68

*CONFIDENTIAL*

REDACTED - COUNSEL ONLY

60

143.                    REDACTED - COUNSEL ONLY

.[161] REDACTED - COUNSEL ONLY

.[162]

144.    To estimate video game damages during the class period to FBS football and Division I men's basketball players, including members of the Football and Men's Basketball Class and members of the Additional Sports Class, I have constructed a model that takes into account the internal EA royalty payment projections and the yardstick sales trajectory performance of the professional sport video games in football and men's basketball.

145.    First, my model projects football and men's basketball college sports video games sales trajectory from the 2016 fiscal year (which largely coincides with the 2016 academic year for both firms) through the present, on the assumption that, in the but-for world, these video games would not have been withdrawn from the market.  I did so by calculating the trajectory of sales of the "yardstick" professional football and men's basketball video games (Madden for football and NBA 2K and NBA Live for basketball), from the last year a college sports video game came out (respectively, 2014 for football and 2010 for men's basketball).  Based on the path of sales in those years, I then predicted the growth in sales of "full" college video games and the growth in sales of game "extra" digital content for these games in the but-for world in which the games continued and existed with athletes' NIL rights.  This is a form of analysis known as a

---

[160] REDACTED - COUNSEL ONLY

[161]                    REDACTED - COUNSEL ONLY

[162] REDACTED - COUNSEL ONLY .

*CONFIDENTIAL*

"yardstick,"[163] which uses a comparable industry as a measure of growth and as a proxy for a product that has not been allowed to grow naturally.

146.    This yardstick analysis results in a reasonable, albeit conservative, estimate of the but-for revenue streams for EA's college football and EA's or Take-Two's men's college basketball game during the damages period.  My damages methodology then multiplies these projected revenues                         REDACTED - COUNSEL ONLY

.[164]  This value is then used to establish EA's per-athlete offer for each year, based on the assumption of what COUNSEL ONLY would correspond to if all eligible athletes accepted 85 football and 13 basketball scholarship players, per school in each video game) which then sets EA's common offer price to all athletes at all schools with FBS football teams for the football video game, and all schools with Division I basketball teams for the basketball video game. This determines what each video game payment would be for any given player in any given year during the damages period.[165]  This damages methodology applies class-wide to both the Football and Men's Basketball Class and to athletes who play football or men's basketball within the Additional Sports Class.  At the merits stage, this calculation of EA's per-athlete offer will allow me to both (1) calculate video game damages, in total, for each class, and (2) calculate damages to any member of those classes who would have received video game NIL

_____

[163] "Under the yardstick approach, damages are measured by obtaining a "but-for price" from a market (the "comparable market") that closely approximates the market in which the violation occurred.  The "but-for price" is a measure of what the price of the product would be if the wrongful behavior had not occurred.  A yardstick can come from a different, but related product market in the same or similar geographic market or from a different, but related geographic market in which the same product or products are sold." Rubinfeld, D. L. (2009).  Antitrust Damages.  In Elhauge (Ed.) *Research Handbook on the Economics of Antitrust Law*, Edward Edgar Publishing.  Footnotes omitted.

[164] See, for example,                        REDACTED - COUNSEL ONLY
.

[165] This imposes a conservative assumption that the video game manufacturers would offer 1/85 or 1/13 COUNSEL ONL to 85 players per football team and 13 athletes per basketball team, rather than simply an equal share that would vary based on the number of athletes in the pool that year.

Page 70

*CONFIDENTIAL*

payments during the class period. For demonstrative purposes, calculations based on the data available to me are provided below.

147.    This class-wide video game damages methodology is notable for how few assumptions are needed to construct the model; most of the parameters come directly from business documents produced by EA. The games were produced in the past, the games are going to be produced in the future, and comparable games in professional football and basketball were produced in the interim. Interpolating a reasonable, but conservative growth path for the period in which Defendants' conduct led to the cancellation of the college video games is a readily available, class-wide, common methodology that yields a conservative estimate of damages to class members. To be conservative, I am using the royalty rate which EA itself has indicated it would use to pay for athlete NIL in the games, rather than the higher rates the competitive market has generated for games like EA's "Madden NFL" or Take-Two's "NBA2K."

148.    Nor is there any reason to doubt that all 85 football and 13 men's basketball scholarship players on teams would be offered to be paid for the use of his NIL in video games. COUNSEL ONLY

                        ,"[166]    As a result, everyone who would have received these video game royalty payments, but did not, was damaged by Defendants conduct, which includes all members of the Football and Men's Basketball Class and objectively-defined members of the Additional Sports Class (i.e., FBS football players and Division I basketball players who received a full GIA). My methodology thus provides a common and reliable means of proving class-wide injury to the Football and Men's Basketball Class and estimating damages from lost video game NIL payments to all members of that class and to the FBS football and Division I basketball players who are members of the Additional Sports Class.

---

[166] REDACTED - COUNSEL ONLY

*CONFIDENTIAL*

149.    My methodology preliminarily estimates that video game damages to members of the Football and Men's Basketball Class would total[REDACTED - COUNSEL ONLY] for the period between 2016 and 2021 academic years.  Those estimates are also summarized in Exhibits 3 and 4 below.  After competition of discovery, applying the same methodology on a class-wide basis to members of the Additional Sports Class, at the merits stage I will be able to measure the video game damages to members of that class.[167]

**Exhibit 3: Summary of Basketball Video Game Damages[168]**

| NIL Royalty (000s) | DI Basketball Athletes | Per-Athelete Royalty (000s) | Power 5 Basketball Class Members | Per-Class-Member Damages (000s) | Total Class Member Damages (000s) |
|---|---|---|---|---|---|
| REDACTED - COUNSEL ONLY | | | | | |

_____

[167] I estimate the lower bound of these damages for non-Power Five football and non-Power Five men's basketball athletes in the Additional Sports Class.  For this lower bound, I assign the per-class member number for the most recent year of video game Power Five damages.    REDACTED - COUNSEL ONLY

[168] See    REDACTED - COUNSEL ONLY

*CONFIDENTIAL*

**Exhibit 4: Summary of Football Video Game Damages[169]**

| | FBS Football Athletes | Per-Athelete Royalty (000s) | Power 5 Football Class Members | Per-Class-Member Damages (000s) | Total Class Member Damages (000s) |
|---|---|---|---|---|---|
| NIL Royalty (000s) | | | | | |

# REDACTED - COUNSEL ONLY

## 7.2. A CLASS-WIDE METHODOLOGY FOR ESTIMATING BROADCAST NIL DAMAGES

150.    I have also constructed a methodology to estimate the class-wide Broadcast NIL damages to the members of the Football and Men's Basketball Class and to the Women's Basketball Class. While there likely would be other Division I football and basketball players who would have received Broadcast NIL payments in the but-for world in which such payments were permitted, it is conservative to conclude that, at the very least, all athletes in these two classes would have received such payments.

151.    Based on my study of the discovery record, and my expertise as a sports economist, it is my opinion that, in the but-for world in which the Defendants' restrictions on conferences and schools paying for college player NILs are eliminated, but all other rules remain in place (including other NCAA rules related to restricting the compensation NCAA Division I athletes may receive from schools or conferences), competition would have compelled at least the Power Five Conferences to offer Broadcast NIL payments to their football and basketball players. As Defendants have admitted, the "NCAA's rules would be superfluous if no

---

[169] See    REDACTED - COUNSEL ONLY

*CONFIDENTIAL*

Institution would make such payments."[170]  In the class-wide damages model I have formulated, competition among the Power Five Conferences and their schools for football and basketball players in the relevant labor markets leads organically to the Power Five Conferences, as the partners of the broadcast networks,[171] entering into *ex ante* group-licensing deals with incoming full GIA recipients in football and men's and women's basketball (both freshmen and transfers) to compensate these college athletes for the use of their Broadcast NILs.[172]  It is only the Prior NIL Rules and the Current NIL Rules which have prevented such payments from being made in the actual world.

152.    When conferences and schools expect that the NILs of athletes will improve the quality of the broadcasts (increasing fan engagement and revenue), there is an incentive to attract those athletes through Broadcast NIL payments.  If the ban had not existed, the competition to attract athletes would have driven up the Broadcast NIL payments from the collusive cap of zero that existed during the damages period to the value of the use of athletes' Broadcast NILs.  Even if there were no legal requirement to pay for them tied to a specific IP right, payments would still be made by the Power Five Conferences to attract the athlete to choose one conference over a rival conference.  Here, a Power Five Conference choosing not to pay for Broadcast NIL would fail to get the use of high-quality NIL would fail to produce a high-quality sports broadcast

---

[170] Big Ten PCJs, p. 18; ACC PCJs, p. 13; Big 12 PCJs, p. 14; Pac-12 PCJs, p. 20; SEC PCJs, p. 14.

[171] Each of the Power Five Conferences had broadcast agreements covering the broadcast of the vast majority of their member schools' football and men's and women's basketball games during the class period. See Exhibit 9, Appendix Exhibits C.4-C.8, as well as backup to these exhibits for annual figures and details. The majority of the broadcasts of these games during (and prior to) the class period were pursuant to broadcast agreements with the conferences.  While there are a few exceptions to this rule – such as the CBS-Turner Agreement with the NCAA to broadcast the March Madness NCAA basketball tournament – a substantial portion of the revenue generated by such agreements is distributed directly to the participating conferences, including the Power Five Conferences.

[172] Notre Dame and broadcast partner NBC are the only current exception.  The preliminary damage estimates presented herein do not include broadcast NIL damages for Notre Dame football athletes.  Those damages estimates will be completed in a manner consistent with my overall methodology.

*CONFIDENTIAL*

product, ultimately losing out on far more in revenue than the cost they save by not offering Broadcast NIL payments to their athletes.

153.    My model of the but-for world includes the following conclusions: (1) Power Five Conferences or their schools would have competed to attract athletes by offering Broadcast NIL payments; (2) this competition and the resulting agreements would have occurred *ex ante* when the athletes agreed to join the sports program of a member school, resulting in offers of equal payments within each sport for Broadcast NILs to all full GIA recipients in football and men's and women's basketball; and (3) the broadcast contracts that existed during the damages period already incorporated the value of the athletes' Broadcast NILs, as the Power Five Conferences represented in broadcast agreements.

### 7.2.1.   Power Five Conferences would have competed to attract athletes by offering Broadcast NIL payments

154.    Consistent with their behavior after the Supreme Court decision in *Board of Regents*,[173] schools in the Power Five Conferences would, in the but-for world, have likely chosen to band together to address NIL issues by forming conference-level group-licensing pools, and the Power Five Conferences would have rationally chosen to make Broadcast NIL payments to members of the Football and Men's Basketball Class, and to members of the Women's

---

[173] As I explained in my Damages Class Certification report in *Alston* (Expert Report of Daniel A. Rascher on Damages Class Certification, February 16, 2016, Section 6.4), when the NCAA's television cartel for football was found to violate the antitrust laws in the mid-1980s, the immediate effect of the ruling was to free the FBS schools to compete amongst each other for television rights and to massively expand industry output.  At first, CBS broadcasted Big Ten and Pac-10 games, while ABC broadcasted games played by members of the CFA (College Football Association), which included the SEC, SWC, ACC, Big Eight, WAC, Notre Dame, and Penn State.  In essence, the monopoly of the NCAA had broken into a duopoly.  In 1987, the two networks switched between these two groups of schools, but it wasn't until Notre Dame broke from the CFA ranks in 1990 by signing a separate deal with NBC, that the system began to move toward the truly more competitive market we know today.  By 1994, the SEC had left the CFA for a CBS contract (a relationship it has to this day, though it is moving to ESPN next year), the Southwest Conference collapsed in the wake of this move, with most of its teams joining the SEC or the Big 8 (which renamed itself the Big 12), and soon the broadcast world began to take the shape we see today, with each conference with its own television contract, negotiated without coordination with its competitors.  See Dunnavant, K. (2016).  *The Fifty-Year Seduction: How Television Manipulated College Football, from the Birth of the Modern NCAA to the Creation of the BCS* (1st Ed.). Thomas Dunne Books, pp. 203-237.

*CONFIDENTIAL*

Basketball Class.  Failure to do so would have allowed rival conferences to attract those college athletes that would add the most value through the use of their NIL to the conference's media rights agreements.  As a result of having all high-demand athletes being drawn away, a Power Five Conference would risk putting on a low-quality television product and earning lower media revenues in the long run.  The better option is to earn higher revenues by attracting more watchable talent by agreeing to share a portion of the higher revenues with that talent, rather than getting to keep 100 percent of a smaller pie.

155.    By modeling this competition as being among the Power Five Conferences competing to acquire pooled group licenses for the use of the Broadcast NILs from class members, I have chosen a conservative method to estimate damages, because such a model results in a much more muted form of competition than would a system that assumes sixty-five independent Power Five competitors, some of which are part of the same Broadcast contract, each making offers against each other.   With respect to Notre Dame, it is part of the ACC broadcast agreements for men's and women's basketball, but it currently has its own football broadcast agreement.  My final damages calculations will take into account both sources of broadcast revenues to Notre Dame in a manner consistent with my overall methodology.

156.    A school-by-school system of competition could also have developed in the but-for world, as shown by the natural experiment that occurred when the Board of Regents decision ended the NCAA broadcast cartel.  I adopt a model of competition in which the Power Five Conferences, who enter into the broadcast agreements that provide for NIL rights to the networks, compete with each other and make the Broadcast NIL payments to class members.  REDACTED - NSC

*CONFIDENTIAL*

REDACTED - NSC

.[174]

157.    In this but-for world, conferences have the incentive to engage in this competition to license the use of athletes' Broadcast NILs from class members because they want to maximize the value of the broadcasts they license to networks and they, the conferences, are the entities which contractually agree with the networks that they have the NIL rights of class members and indemnify the broadcast partners for such rights.[175]  The Power Five Conferences have an incentive to recruit watchable athletes to every one of their schools in order to produce the best media product.

158.    My model also assumes that the Power Five Conferences would act rationally to enter into Broadcast NIL agreements at the time that college athletes commit to a school within a conference.  This timing is likely to be driven by competition in recruiting, and it would limit transaction costs as the college athletes can sign the group license at the same time that they are doing paperwork for their full GIA and college entrance.  Such timing would also prevent any "hold up" problems of athletes entering school and trying to negotiate for a higher Broadcast NIL payment at a later date.  The amount of NIL compensation that the conferences could

---

[174]      REDACTED - NSC


[175]      REDACTED - NSC



REDACTED - NSC



REDACTED - NSC

*CONFIDENTIAL*

provide would be no more than the value of the NIL because of the other NCAA rules limiting compensation.

### 7.2.2. *Ex ante* conference competition would have resulted in equal payments for the use of class members' Broadcast NILs within each conference/sport

159.    All Power Five athletes in football and basketball at the existing GIA cap have positive value in the use of their Broadcast NILs.  For the purpose of producing a broadcast, or any other group-licensed activity where having the entire team is important, no specific athlete is the marginal athlete, or conversely, every athlete could be the last athlete into the pool.  Situations like these are solved in professional sports by separating pooled group licenses (where participants share equally) from individual opportunities (where star power drives value).

<div align="center">REDACTED - COUNSEL ONLY</div>

.[176]                    <div align="center">REDACTED - CONFIDENTIAL</div>

,,[177]                    <div align="center">REDACTED - COUNSEL ONLY</div>

.[178]

160.    Under competitive conditions, neither side of the transaction has a compelling interest in *ex post* contracting.  For athletes, because Defendants take the position that they can use athletes'

---

[176] See                    REDACTED - COUNSEL ONLY

<div align="center">REDACTED - COUNSEL ONLY</div>

[177] REDACTED - CONFIDENTIAL
[178] See                    REDACTED - COUNSEL ONLY

<div align="center">*CONFIDENTIAL*</div>

NILs without paying for it, the only way to ensure they are paid is to insist on a license prior to committing to the school, when they can use the threat to attend another school (and thus allow the other school's conference to use their Broadcast NILs) as their source of bargaining power. For conferences and schools, the desire might be to defer discussion of compensation until after the school decision, but this is not a non-collusive equilibrium because even if all-but-one conference insists on *ex post* contracting, it is not optimal for the last conference to mimic this behavior. Instead, by agreeing to *ex ante* deals, this conference can reap the benefit of landing almost any athlete it wants, given that athletes all know the *ex post* deal they will be offered could be zero. The result is that the only stable equilibrium is one where all schools show their commitment to the deal is sincere by putting it in writing prior to (or simultaneous with) the athlete committing to the school.

161.    Moreover, prior to the season or prior to the athlete enrolling at a school (when *ex ante* Broadcast NIL offers would be made), it is not certain which athlete will be the starter at each position, especially for future seasons, nor can injuries be predicted that may lead to an athlete for whom a redshirt year was planned, needing instead to step in and lead the team to victory. Even if the athletes are not playing in games, interviews will be needed and carefree moments will be caught on the bench, and prior to the season or prior to the athlete enrolling at a school (when *ex ante* offers are made), no one knows for sure which athlete will have more or less playing time in a given season. This further evens out the base NIL value of everyone in the pool and it explains why each conference's broadcast partner sees positive value from the conference acquiring the ability to use the Broadcast NILs of all class members.

162.    As an illustration of this dynamic, many players who enter college without much acclaim eventually go on to be stars. Some examples of this include:

*CONFIDENTIAL*

a) Both Rivals and 247Sports only ranked Isaiah Simmons as a middle of the pack, three-star high school athlete before he was recruited to Clemson in 2016.[179] After spending his freshman year as a redshirt, Simmons went on to become a top player for the Tigers.[180]  In his final college year, he won recognition as a unanimous All-American, was named ACC Defensive Player of the Year, and won the Butkus Award.[181]  Following four years at Clemson, Simmons was drafted by the NFL's Cardinals as a first-round pick.[182]

b) Trace McSorley had a similar career trajectory.  Leaving high school ranked modestly as a three-star athlete on Rivals and 247Sports,[183] McSorley was recruited to Penn State, where he became a starting quarterback in his sophomore season.[184]  As a college player, he was a finalist for the Campbell Trophy, the Johnny Unitas Golden Arm Award, and the Manning Award,[185] and after the close of his college career, was drafted into the NFL.[186]

c) Hunter Renfrow walked on at Clemson after finishing high school with only a two-star Rivals ranking.[187]  In 2018, he won the Burlsworth Trophy as college football's most outstanding player who began as a walk-on, and holds the school's record for starts by a receiver and for consecutive games with a

---

[179] *Isaiah Simmons*.  Rival.  Accessed on October 19, 2022 at https://n.rivals.com/content/prospects/2016/isaiah-simmons-3244.  *Isaiah Simmons*.  247sports.  Accessed on October 19, 2022 at https://247sports.com/player/isaiah-simmons-72679/.

[180] *#11 Isaiah Simmons Bio*.  Clemsontigers.com.  Accessed on October 19, 2022 at https://clemsontigers.com/sports/football/roster/isaiah-simmons/.

[181] *#11 Isaiah Simmons Bio*.  Clemsontigers.com.  Accessed on October 19, 2022 at https://clemsontigers.com/sports/football/roster/isaiah-simmons/.

[182] *Isaiah Simmons*.  Azcardinals.com.  Accessed on October 19, 2022 at https://www.azcardinals.com/team/players-roster/isaiah-simmons/.

[183] *Trace McSoreley*.  Rivals.  Accessed on October 19, 2022 at https://n rivals.com/content/prospects/2014/trace-mcsorley-25345.  *Trace McSoreley*.  247sports.  Accessed on October 19, 2022 at https://247sports.com/Player/Trace-McSorley-22462/.

[184] *Trace McSorley Bio*.  Gosusports.com.  Accessed on October 19, 2022 at https://gopsusports.com/sports/football/roster/trace-mcsorley/1376.

[185] *Trace McSorley Bio*.  Gosusports.com.  Accessed on October 19, 2022 at https://gopsusports.com/sports/football/roster/trace-mcsorley/1376.

[186] *Trace McSorley*.  Azcardinals.com.  Accessed on October 19, 2022 at https://www.azcardinals.com/team/players-roster/trace-mcsorley/.

[187] *Hunter Renfrow*.  Rivals.  Accessed on October 19, 2022 at https://n.rivals.com/content/prospects/2014/hunter-renfrow-17064.

*CONFIDENTIAL*

reception.[188]  In 2019, he too was drafted to the NFL, after four years as a starting player with the Tigers.[189]

163.    Because the broadcast partners would want to have the certainty that they could use the NILs of all player-participants, and because the precise participation of a player in a particular game cannot be known in advance (especially given the possibility of injuries), I have constructed my damages model to embody an equal Broadcast NIL payment to each class member in each sport within each conference.  Such an equal sharing model would be similar to the equal sharing that takes place at the professional level of football and basketball for products and services that have group licenses.  Moreover, the nature of conference-level competition makes equal sharing more likely than, say, tiered payments based on quality or individualized payments where a conference focuses its money on just a few superstars.[190]

164.    In the professional football and basketball leagues, payments for the use of athletes' Broadcast NILs are included in athletes' player contract forms, agreed to in collective bargaining.  No separate payment amount is delineated for these Broadcast NILs, which are bundled together with the other services that the players agree to perform, including playing the

---

[188] *Hunter Renfrow Bio*.  Clemsontigers.com.  Accessed on October 19, 2022 at https://clemsontigers.com/sports/football/roster/season/2018/hunter-renfrow/.

[189] *Hunter Renfrow*.  Accessed on October 19, 2022 at https://www.raiders.com/team/players-roster/hunter-renfrow/.

[190] While it might be in the interest of a specific team within a conference to target Broadcast NIL money at a few athletes under a school-based model of competition, potentially paying very large amounts to some and little or none to others, this is not the case for an entire conference under a conference-level competition model.  A conference is comprised of many schools that compete for talent both intraconference and interconference, but there are clear distinctions between the power schools within a conference and less dominant recruiters.  For example, while the Big Ten's Ohio State football program commonly recruits multiple 5-star athletes every year and vies to be among the top five recruiting classes annually, the Big Ten's Rutgers football program does not.  A conference needs to ensure that when Rutgers is competing with an ACC or SEC school for a 3-star player, that the Big Ten conference's Broadcast NIL offer for a 3-star is competitive with the other conferences.  Focusing the conference's money on 5-stars would result in the bulk of its schools, those lower down the competitive pyramid, losing out on talent, while helping the elite of the conference to win more often.  The result would be a conference intentionally choosing to hurt the majority of its teams and to weaken its internal competitive balance.  This would not be the outcome a conference would voluntarily choose in equilibrium.

*CONFIDENTIAL*

games.[191]  This absence of any separate identification of a specific payment for the use of Broadcast NILs at the professional level is consistent with the notion that the value provided by the players is essentially part of a joint pool, and is thus equal – broadcast partners desire the certainty of NIL usage of all players and it is not known which players will be shown in any given telecast.  The NIL portion is common to all; it is the pay for performance that varies.

165.     REDACTED - COUNSEL ONLY

.[192]     REDACTED - COUNSEL ONLY

[193]

---

[191] See 2020 NFL-NFLPA Collective Bargaining Agreement, App. A (NFL Player Contract) § 4(a). Accessed on October 20, 2022 at https://nflpaweb.blob.core.windows.net/website/PDFs/CBA/March-15-2020-NFL-NFLPA-Collective-Bargaining-Agreement-Final-Executed-Copy.pdf (Player and Union "do not and will not contest during or after the term of this agreement, and this hereby confirms their acknowledgment of, the exclusive rights of the League, Club and any NFL member club [] to telecast, broadcast, or otherwise distribute, transmit or perform, on a live, delayed, or archived basis, in any and all media now known or hereafter developed, any NFL games or any excerpts thereof"); 2017 NBA-NBAPA Collective Bargaining Agreement, Ex. A (Uniform Player Contract) § 14(e). Accessed on October 20, 2022 at https://cosmic-s3.imgix.net/3c7a0a50-8e11-11e9-875d-3d44e94ae33f-2017-NBA-NBPA-Collective-Bargaining-Agreement.pdf ("The Player does not and will not contest…and the Player hereby acknowledges, the exclusive rights of the NBA…and the Teams [] to telecast, or otherwise distribute, transmit, exhibit or perform, on a live, delayed, or archived basis, in any and all Media, any performance by the Player under this Contract or the CBA (including in NBA games or any excerpts thereof)"); 2020 WNBA-WNBPA Collective Bargaining Agreement, Art. XXVII § 1 and Ex. 1 § 16(b). Accessed on October 20, 2022 at https://wnbpa.com/wp-content/uploads/2020/01/WNBA-WNBPA-CBA-2020-2027.pdf  ("the Players Association agrees that the WNBA and its designees shall have the exclusive right to use, distribute, or license any performance rendered by the players (or excerpts or portions thereof) under this Agreement, and any associated Pictures, for [] any form of broadcast or telecast, including over-the-air television, cable television, pay television, or direct broadcast satellite television"; Player agrees that her contract "is subject to all the CBA's terms and provisions").

[192]     REDACTED - COUNSEL ONLY     ;REDACTED - COUNSEL ONLY

[193] See     REDACTED - COUNSEL ONLY          REDACTED - COUNSEL ONLY

REDACTED - COUNSEL ONLY

Page 82

*CONFIDENTIAL*

166.    I have reviewed the expert opinion of Edwin Desser, a sports media expert with decades of experience in negotiating and analyzing sports media agreements, and understand [REDACTED - CONFIDENTIAL]

.[194]  This desire of the broadcast partners to obtain the NIL rights from all potential player participants in the broadcast would have provided an additional incentive for the Power Five Conferences to have provided Broadcast NIL compensation to all class members.

167.    It is my expert opinion that the end result of these economic factors is a but-for world that will ultimately equilibrate with all Power Five Conferences competing in a similar fashion, making offers to athletes for the Broadcast NILs that involve participation in a sport-by-sport, conference-level, equally shared group-licensing pool.  And the evidence for this model, and the operationalization of the model for the specifics of estimating damages, is all done with evidence and data common to the class.

### 7.2.3.   Broadcast contracts that existed during the class period already incorporated the value of the Broadcast NILs of the Power Five football and basketball players

168.    Under broadcast agreements with the Power Five Conferences during the damages period, the price that broadcasters pay/paid to conferences or schools to license broadcast rights already incorporated the value of the use of class members' Broadcast NILs.  More to the point, as noted above, the broadcasters' media agreements with the Power Five Conferences routinely contained some form of assurances from the conferences to the broadcasters that they were receiving rights to, or clearances for, athletes' Broadcast NILs, or at least an indemnity

REDACTED - COUNSEL ONLY
        That circumstance is not analogous to the group of an athletic contest, which is a not a product where revenue can be attributed directly to a specific player's NIL
[194] *Expert Report of Edwin S. Desser in the Matter of House et al. v. NCAA et al.,*  Sections 6.4 and 6.5

*CONFIDENTIAL*

regarding NIL use.[195]  In either case, the transaction has all of the economic indicia of a purchaser paying the full value of the NIL contained within the broadcast, and thus it is my opinion that the price the broadcaster paid to the Power Five Conferences for media rights represented the broadcaster's valuation of the package of rights being provided, including the value of the conferences' assurance that the rights to Broadcast NILs of the athletes were being included.  Note that these assurances have an economic value regardless of the outcome of the debate over whether the laws of individual states do or do not protect such rights.[196]

### 7.2.4.   As a result, there is a class-wide common method for calculating damages

169.    My class-wide injury and damages model for the Broadcast NIL restrictions is thus based on my opinion that competition among the conferences in the but-for world would lead to all class members within a given conference receiving an equal Broadcast NIL payment, which would collectively be derived from the market value of the use of their Broadcast NILs.  All athletes valuable enough to merit a full GIA in football or basketball at a Power Five Conference would similarly merit entry into a conference group-licensing pool (by sport) for use of their Broadcast NILs.

170.    To determine the value conferences would pay for the use of class members' Broadcast NILs, specifically, it is necessary to estimate the portion of the media rights payments made to the Power Five Conferences that reflects the value of the Broadcast NILs of the Power Five football and basketball players.  Absent the challenged NIL Rules' restrictions on schools and conferences compensating college athletes for use of their NILs, competition between the Power Five Conferences would lead to each conference compensating football and basketball players

---

[195]                                    REDACTED - NSC

[196] The notion that a licensee would be interested in paying for NIL usage regardless of what the NIL rights are is exemplified by the facts about EA, discussed above, in which EA made it clear that it wanted to pay for the rights to athletes' NILs regardless of whether individual state laws did or did not protect such rights in specific cases.

*CONFIDENTIAL*

for the full value of the Broadcast NILs, which make up a portion of the media rights payments received by a conference in exchange for the rights to broadcast conference games. For an estimate of this value, I am relying on Mr. Desser. Mr. Desser has studied these media agreements and has come to the conclusion, for the reasons described in his report, that the value of the Broadcast NILs of the athletes is equivalent to approximately 10 percent of the value of each of these media agreements.[197]  I have reviewed the reasoning of the Desser report and believe that its analysis and conclusions are reasonable and reliable.

171.    As a sports economist, I have also undertaken steps to test and corroborate the value Mr. Desser has estimated for the use of class members' Broadcast NILs and my own analysis confirms the reasonableness of his estimate of the value of the NIL content of a sports program. Athlete NILs are commercialized often by groups of professional football and basketball athletes via group licenses, and I have examined data on the licensing activities from the NFLPA, which represents professional football players, and the NBPA, which represents professional basketball players. While these organizations do not specifically license these rights for the broadcasting of a game, the analogy is helpful as a test of the reasonableness of the value estimate made by Mr. Desser.

172.    As shown in Exhibits 5-7,          REDACTED - COUNSEL ONLY

---

[197]  *Expert Report of Edwin S. Desser in the Matter of House et al. v. NCAA et al.*, Section 14.5.

*CONFIDENTIAL*

**Exhibit 5: Selected NFLPA License Terms**[198]

| Licensee | License Term Start | License Team End | Product Type | Minimum Guarantee | Royalty Rate Description |
|---|---|---|---|---|---|

# REDACTED - COUNSEL ONLY

**Exhibit 6: Selected WNBPA License Terms**[199]

| Licensee | License Term | Product Type | Minimum Guarantee | Royalty Rate Description |
|---|---|---|---|---|

# REDACTED - COUNSEL ONLY

---

[198]     REDACTED - COUNSEL ONLY

[199]     REDACTED - COUNSEL ONLY

Page 86

*CONFIDENTIAL*

**Exhibit 7: Selected NBPA License Terms**[200]

| Licensee | License Term Start | License Team End | Product Type | Minimum Guarantee | Royalty Rate Description |
|---|---|---|---|---|---|

# REDACTED - COUNSEL ONLY

173.    The above group-licensing rates for professional football and basketball players provide confirmation that Mr. Desser's estimated 10 percent royalty rate for value of Broadcast NILs within a broadcast is within the reasonable range of the empirical comparables I have found.

---

[200]                    REDACTED - COUNSEL ONLY

*CONFIDENTIAL*

174.    Having determined that each class member would receive an equal royalty share payment in the but-for world, and that the value of the NIL payment paid to class members for each media contract can be conservatively estimated at 10 percent of each conference's media revenues, the next step in my class-wide damages model is to determine the value of each of the media agreements entered into by the Power Five Conferences and Notre Dame for the broadcast of football or basketball games, during the damages period.  Within each Power Five Conference, the damages amount for the athletes in each of the three sports is determined based on my estimate of the value of each sport within the conference's multisport media contracts, plus the full value of proceeds to the conference from any sport-specific media contract, e.g., the NCAA Men's Division I Basketball Championship (commonly referred to as "March Madness") contract between the NCAA and Turner Broadcasting, and the College Football Playoff contract to which the Power Five Conferences are all parties.

175.    For the multisport media contracts, my estimate of the value of each of the three sports is based on the expert opinion of Mr. Desser, and on my own review of three relevant data points: (1) the split between Football, Men's Basketball, and Women's Basketball revenues (total and contributions (or donations)) as found in school financial reports to the NCAA known as the MFRS,[201] (2)                            REDACTED - NSC

                , and (3)    REDACTED - COUNSEL ONLY
                                    [203]

_____

[201] My understanding is that this stands for "Membership Financial Reporting System."
[202]                            REDACTED - NSC


[203]                        REDACTED - COUNSEL ONLY

*CONFIDENTIAL*

176.    Based on his own expert analysis and decades of negotiating media agreements, Mr. Desser

concludes that the split in value between football and men's and women's basketball in the

media agreements with the Power Five Conference can be reasonably estimated as 75 per cent

for football, 15 percent for men's basketball, and 5 percent for women's basketball.[204]    I agree

that these are reasonable estimates that are broadly consistent with three data points that I have

examined on this issue.  I have corroborated these estimates with my own analysis of NCAA

MFRS data showing that both booster donations and total revenues (measures of other forms of

demand for college sports) across the three major sports are broadly consistent with Mr.

Desser's allocations, as shown below in Exhibit 8.

### Exhibit 8: Percent Distribution of Contributions and Total Revenues in Power-5 Conference Schools[205]

| | Contributions | | | | | |
|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
| Men's Football | 80.7% | 81.3% | 81.7% | 80.4% | 80.2% | 81.3% |
| Men's Basketball | 16.9% | 16.0% | 15.9% | 17.0% | 17.3% | 15.6% |
| Women's Basketball | 2.5% | 2.6% | 2.5% | 2.6% | 2.5% | 3.1% |

| | Total Revenues | | | | | |
|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
| Men's Football | 79.0% | 79.6% | 79.1% | 79.2% | 81.0% | 79.3% |
| Men's Basketball | 19.2% | 18.7% | 19.0% | 19.0% | 17.3% | 18.7% |
| Women's Basketball | 1.8% | 1.8% | 1.9% | 1.8% | 1.7% | 1.9% |

177.    To estimate broadcast damages, I first determined the amount of total annual media deal

rights fees from Power Five conference contracts.  The annual totals by conference are shown in

REDACTED - COUNSEL ONLY

---

[204] *Expert Report of Edwin S. Desser in the Matter of House et al. v. NCAA et al.*, Sections 17.1 – 17.4.

[205] Percentages calculated as the ratio of each sport to the sum total of the three sports.

*CONFIDENTIAL*

Exhibit 9 below.[206]  In this exhibit, I also show the total annual rights fees from the College Football Playoff, as well as total rights fees from the NCAA Tournament.  While these playoff and tournament funds are due to contracts outside of the Power Five conferences, a substantial portion of these are distributed to the Power Five conferences directly.[207]

**Exhibit 9: Summary of Basketball and Football Media Rights Deals**[208]

| Year | REDACTED - NSC | | Football Playoffs | NCAA Tournament |
|---|---|---|---|---|
| 2009 | REDACTED - NSC | | | |
| 2010 | | | | |
| 2011 | | | | |
| 2012 | | | | |
| 2013 | | | | |
| 2014 | | | | |
| 2015 | | | | |
| 2016 | | | | |
| 2017 | | | | |
| 2018 | | | | |
| 2019 | | | | |
| 2020 | | | | |
| 2021 | | | | |
| 2022 | | | | |

178.    I then apportioned these rights fees to football, men's basketball, and women's basketball, using the Desser multisport allocation factor.  For football, I added College Football Playoff

---

[206] For ease of presentation, these annual conference totals include revenues related to bowl games in addition to regular season revenues, with the exception of revenues from the College Football Playoff.

[207] See backup to Exhibits 9-12 & Appendix Exhibits C.4-C.8 for more detail on individual conference deals and playoff distributions.

[208] Football Playoffs includes the College Football Playoff and its predecessor, the Bowl Championship Series.

REDACTED - NSC

*CONFIDENTIAL*

distributions to conferences (and any other football-only game arrangements, such as Bowl games).[209]  For men's basketball, I added NCAA tournament distributions to conferences. These sources combined comprise the total stream of conference revenues, which I then multiply by the Desser athlete NIL factor, to determine the total athlete share of these revenues. Finally, I use my estimates of the number of class members to calculate the per-athlete damages, which vary by conference, year, and sport.  See Appendix Exhibits C.4-C.8 for more detail.  Within each group-license NIL usage royalty pool for each media agreement, all class members participating in sports covered by that media agreement share equally.  Based on MFRS data I estimated the number of full GIA athletes on each Power Five football, men's basketball, and women's basketball team, and, by extension, this number per Power Five Conference, for each year of the class period.[210] The resulting figures are shown in Exhibits 10 – 12 below.

---

REDACTED - NSC

[209] See Appendix Exhibits C.4-C.8 for more detail.

[210] Using team-level counts of athletes receiving grants-in-aid and the number of GIA equivalencies from MFRS data, I calculate the maximum possible number of athletes receiving full GIAs by season, conference, and sport. On teams where the number of aid recipients and GIA equivalencies are equal, I understand that all recipients are receiving full GIAs.  Otherwise, not all scholarships are full GIAs.  In these cases, I round the number of equivalencies for each team up to the nearest integer and subtract one.  I have also corroborated these numbers using a year in which MFRS data produced in this case overlaps with team Squad Lists produced in *Alston*.  On average, my methodology comes very close to tallies I created in *Alston*.  For example, in *Alston* I found the average number of 2016 academic year full GIAs for football in the  NSC  was 85.1, while using the MFRS data my estimate for the  NSC  average is 84.6 during the same year.  See "Text Cite - 2016 Squad List MFRS Comparison.xlsx".

*CONFIDENTIAL*

**Exhibit 10: Total Power Five Conference Broadcast Damages Summary[211]**

REDACTED - NSC

| Academic Year | Sport | | | | | | P5 Total (MM) |
|---|---|---|---|---|---|---|---|
| 2016 | Men's Football | | | | | | $141.7 |
| 2017 | Men's Football | | | | | | $149.7 |
| 2018 | Men's Football | | | | | | $179.2 |
| 2019 | Men's Football | | | | | | $189.8 |
| 2020 | Men's Football | | | | | | $194.6 |
| 2021 | Men's Football | | | | | | $184.9 |
| Total | | | | | | | $1,040.1 |
| 2016 | Men's Basketball | | | | | | $41.6 |
| 2017 | Men's Basketball | | | | | | $48.0 |
| 2018 | Men's Basketball | | | | | | $49.5 |
| 2019 | Men's Basketball | | | | | | $51.6 |
| 2020 | Men's Basketball | | | | | | $37.3 |
| 2021 | Men's Basketball | | | | | | $52.1 |
| Total | | | | | | | $280.2 |
| 2016 | Women's Basketball | | | | | | $6.5 |
| 2017 | Women's Basketball | | | | | | $6.9 |
| 2018 | Women's Basketball | | | | | | $8.8 |
| 2019 | Women's Basketball | | | | | | $9.2 |
| 2020 | Women's Basketball | | | | | | $9.3 |
| 2021 | Women's Basketball | | | | | | $9.0 |
| Total | | | | | | | $49.8 |
| Grand Total | | $242.6 | $351.9 | $200.5 | $218.7 | $356.3 | $1,370.1 |

---

[211] See Appendix Exhibits C.4-C.8 for detailed calculations.

*CONFIDENTIAL*

**Exhibit 11: Total Class Power Five Conference Class Members[212]**

| Academic Year | Sport | REDACTED - NSC | Total |
|---|---|---|---|
| 2016 | Men's Football | | 5,338 |
| 2017 | Men's Football | | 5,312 |
| 2018 | Men's Football | | 5,357 |
| 2019 | Men's Football | | 5,396 |
| 2020 | Men's Football | | 5,410 |
| 2021 | Men's Football | | 5,477 |
| 2016 | Men's Basketball | | 764 |
| 2017 | Men's Basketball | | 778 |
| 2018 | Men's Basketball | | 803 |
| 2019 | Men's Basketball | | 789 |
| 2020 | Men's Basketball | | 803 |
| 2021 | Men's Basketball | | 791 |
| 2016 | Women's Basketball | | 840 |
| 2017 | Women's Basketball | | 853 |
| 2018 | Women's Basketball | | 849 |
| 2019 | Women's Basketball | | 839 |
| 2020 | Women's Basketball | | 856 |
| 2021 | Women's Basketball | | 855 |

---

[212] See Appendix Exhibits C.4-C.8 for detailed calculations.

*CONFIDENTIAL*

Exhibit 12: Conference Broadcast Damages Per Class Member[213]

| Academic Year | Sport | REDACTED - NSC | | | | |
|---|---|---|---|---|---|---|
| | | (000s) | (000s) | (000s) | (000s) | (000s) |
| 2016 | Men's Football | $23.1 | $24.5 | $23.5 | $24.6 | $36.0 |
| 2017 | Men's Football | $24.2 | $25.4 | $27.6 | $26.6 | $36.8 |
| 2018 | Men's Football | $26.7 | $42.8 | $30.8 | $27.0 | $38.1 |
| 2019 | Men's Football | $28.0 | $44.4 | $34.0 | $28.6 | $39.4 |
| 2020 | Men's Football | $25.7 | $46.0 | $34.7 | $30.5 | $41.9 |
| 2021 | Men's Football | $26.0 | $37.2 | $32.4 | $29.8 | $42.5 |
| | | | | | | |
| 2016 | Men's Basketball | $46.6 | $63.7 | $47.8 | $47.7 | $64.5 |
| 2017 | Men's Basketball | $55.2 | $65.2 | $59.3 | $57.7 | $70.4 |
| 2018 | Men's Basketball | $52.5 | $85.2 | $57.5 | $50.3 | $61.3 |
| 2019 | Men's Basketball | $56.6 | $84.3 | $63.0 | $54.6 | $66.4 |
| 2020 | Men's Basketball | $33.3 | $65.1 | $43.7 | $36.0 | $52.6 |
| 2021 | Men's Basketball | $57.2 | $77.4 | $64.4 | $55.0 | $74.0 |
| | | | | | | |
| 2016 | Women's Basketball | $6.0 | $7.5 | $5.3 | $7.0 | $12.4 |
| 2017 | Women's Basketball | $6.1 | $7.4 | $6.5 | $7.1 | $13.3 |
| 2018 | Women's Basketball | $7.0 | $15.9 | $8.7 | $7.6 | $12.4 |
| 2019 | Women's Basketball | $7.3 | $16.0 | $9.2 | $8.4 | $13.5 |
| 2020 | Women's Basketball | $6.6 | $15.7 | $9.6 | $8.6 | $13.3 |
| 2021 | Women's Basketball | $6.8 | $12.6 | $9.5 | $8.9 | $14.1 |

### 7.3. A CLASS-WIDE METHODOLOGY FOR ESTIMATING DAMAGES FROM LOST NIL OPPORTUNITIES

179.    The final set of class-wide damages I have been asked to measure are the damages caused to all members of the Additional Sports Class, and to some members of the Football and Men's Basketball Class and of the Women's Basketball Class, as a result of being deprived of the ability to enter into third-party NIL agreements under the Prior NIL Rules. My methodology applies to any athlete (in any Class) who received compensation for use of their NIL after July 1, 2021 ("eligible class members") and excludes damages already estimated related to the use of NIL for video games or broadcasts.

---

[213] See Appendix C.4-C.8 for detailed calculations.

*CONFIDENTIAL*

180.    It is my conclusion that such damages can be reasonably estimated for those class members who, under the Current NIL Rules, have been able to enter into one or more third-party NIL agreements and who have in fact done so prior to the date of class certification (and who were restrained by the Prior NIL Rules by virtue of being a Division I athlete prior to July 1, 2021). Moreover, it is my conclusion, as explained further below, that all or nearly all members of the Additional Sports Class would have entered into one or more additional third-party NIL agreements absent the Prior NIL Rules and were in this way injured as a result of these restraints.  The "after period" in which the NCAA permits some third-party NIL transactions provides a reasonable and reliable measure for determining the total payments from similar third-party NIL transactions that eligible class members would have received in the "before period," had the Prior NIL Rules allowed such agreements.

181.    The observed after-period transactions show the extent of injury from lost opportunities. Athletes currently entering into such transactions include not only male football and basketball athletes in the Power Five Conferences, but also female athletes across a variety of sports including basketball, as well as male athletes outside of basketball and football.  For example, University of Connecticut women's basketball player Paige Bueckers signed third-party NIL deals with well-known companies such as StockX, Cash App, Chegg, and Crocks in just the first year of NIL.[214]  Bueckers was also the first NIL athlete to sign a high-profile deal with Gatorade, for which she has appeared in commercials and released a custom bottle.[215]  As another example, South Carolina's women's basketball player Aliyah Boston has reached

---

[214] Dosh, K. (2022, June 30).  *Paige Bueckers Unveils New Custom Gatorade Bottle*.  Forbes.  Accessed on October 20, 2022 at https://www.forbes.com/sites/kristidosh/2022/06/30/paige-bueckers-first-work-with-gatorade-unveiled/?sh=79272a78c69f.

[215] Dosh, K. (2022, June 30).  *Paige Bueckers Unveils New Custom Gatorade Bottle*.  Forbes.  Accessed on October 20, 2022 at https://www.forbes.com/sites/kristidosh/2022/06/30/paige-bueckers-first-work-with-gatorade-unveiled/?sh=79272a78c69f; Vanoni, M. (2022, August 9).  *UConn women's basketball star Paige Bueckers makes Gatorade commercial debut in 'All for Fun' campaign*.  CT Insider.  Accessed on October 4, 2022 at https://www.ctinsider.com/uconn/article/UConn-women-s-basketball-Paige-Bueckers-Gatorade-17361745.php.

*CONFIDENTIAL*

sponsorship deals with companies including Under Armour and Bose.[216]  In October 2022, Nike also announced a new slate of athlete sponsorships that include three top women's basketball players, Caitlin Clark, Haley Jones, and Judea Watkins.[217]  These examples of opportunities occurring in the present reveal the similar opportunities foreclosed in the past by the Prior NIL Rules.

182.    Outside of basketball, in August, the entire Michigan State women's gymnastics team signed a deal "This is Sparta!, a collective organized by Charitable Gift America, a 501(c)3 charitable organization," under which each athlete on the team is expected to receive $5,000 per person.[218]  In September United Wholesale Mortgage announced "it is offering NIL sponsorships to all Michigan State student-athletes on the women's basketball and volleyball teams. … United Wholesale Mortgage said it will provide all athletes up to $700 a month for the full year, pending the completion of social media promotional posts assigned by the company."[219]  "Also in September, the Boilermaker Alliance, a collective organized to support NIL opportunities for athletes at Purdue University announced that "all 385 scholarship student-athletes would receive a NIL offer."[220]

---

[216] McVeigh, G. (2022, April 26). *Aliyah Boston signs NIL deal with Under Armour.* On3. Accessed on October 20, 2022 at https://www.on3.com/nil/news/south-carolina-gamecocks-womens-basketball-aliyah-boston-under-armour-nil-deal/; Copeland, K. (2022, March 30). Who's making the most from NIL? Women's basketball is near the top. *Washington Post.* Accessed on October 20, 2022 at https://www.washingtonpost.com/sports/2022/03/30/womens-college-basketball-endorsements-nil/.

[217] Nakos, p. (2022, October 10). *Nike signs five basketball players to NIL deals.* On3. Accessed on October 10, 2022 at https://www.on3.com/nil/news/nike-basketball-mens-womens-bronny-james-nil-deal-caitlin-clark-haley-jones/.

[218] Nakos, p. (2022, August 25). *Michigan State Women's gymnastics signs team-wide deal with charitable NIL collective.* On3. Accessed on October 19, 2022 at https://www.on3.com/nil/news/michigan-state-womens-gymnastics-nil-charitable-gift-america-this-is-sparta/.

[219] Crabtree, J. (2022, September 8*). Michigan State women's basketball, volleyball players offered teamwide NIL deals.* On3. Accessed on October 20, 2022 at https://www.on3.com/nil/news/michigan-state-spartans-womens-basketball-volleyball-players-offered-teamwide-nil-deals/. United Wholesale Mortgage "also said it will continue its sponsorship of the men's basketball and football teams at Michigan State for the entire 2022-2023 seasons."

[220] Crabtree, J. (2022, September 8*). Michigan State women's basketball, volleyball players offered teamwide NIL deals.* On3. Accessed on October 20, 2022 at https://www.on3.com/nil/news/michigan-state-spartans-womens-basketball-volleyball-players-offered-teamwide-nil-deals/.

*CONFIDENTIAL*

183.    The scope and variety of third-party NIL transactions since the Prior NIL Rules were suspended is strong common economic evidence of market demand for the use of athletes' NIL across all Division I sports and the benefit for athletes from entering into such transactions. The relaxation of the Prior NIL Rules is the only substantial change between the before period of the Prior NIL Rules and the after period of the Current NIL Rules enabling those transactions. Thus, but for the Prior NIL Rules, there is strong common evidence that eligible class members who received such deals as college athletes in the after period would have received similar deals as college athletes in the before period.

184.    To estimate damages for eligible class members from lost third-party NIL agreements during the damages period in which the Prior NIL Rules were in effect, my methodology would first identify each eligible class member who received such a third-party NIL deal during the period since July 1, 2021, when such third-party NIL deals have been permitted.

185.    My common methodology for measuring these class-wide damages is then based on the well-established "before-and-after" approach. This widely used methodology provides a clear, simple, and reasonable estimate of damages that is economically sound and reliable. The use of a before-and-after method is common in antitrust damages calculations:

> "Under the before-and-after method, the plaintiff produces evidence about the market price before the alleged cartel was formed or after it ceased to exist, or both. From these data the fact finder is then asked to reconstruct a competitive price during the conspiracy period."[221]

---

[221] "Under the before-and-after method, the plaintiff produces evidence about the market price before the alleged cartel was formed or after it ceased to exist, or both. From these data the fact finder is then asked to reconstruct a competitive price during the conspiracy period." Hovenkamp, H. (2011). A Primer on Antitrust Damages. *Faculty Scholarship at Penn Law*. 1846. Accessed on October 21, 2022 at https://scholarship.law.upenn.edu/cgi/viewcontent.cgi?article=2848&context=faculty_scholarship. Also, "the benchmark approach evaluates prices only in the market at issue, comparing prices in the impact period to available prices **before and/or after** the alleged period of impact." McCrary, J & Rubinfeld, D. (2014). Measuring Benchmark Damages in Antitrust Litigation. *Journal of Econometric Methods, 3*(1), 63-74. Accessed on October 21, 2022 at https://www.law.berkeley.edu/files/mccrary_and_rubinfeld2014_JEM.pdf (emphasis added).

*CONFIDENTIAL*

186.    Here, the before period is the one in which the Prior NIL Rules prohibited third-party NIL transactions.  It is limited in time by the damages period for these damages: from the 2016-2017 academic year through July of 2021.[222]  The after period, in which third-party NIL agreements were allowed, started on July 1, 2021 when the Prior NIL Rules were suspended and continues through today.  Counsel has instructed that I should include in my model data for any third-party NIL deals I can identify through the date of class certification.

187.    In this case, the third-party NIL transactions that occurred in the after period provide a foundation for reconstructing the NIL compensation that would have occurred from transactions that the challenged conduct prevented during the before period.  This methodology will only determine damages for class members with compensation for a third-party NIL transaction through the date of class certification.  As a result, the methodology excludes any athletes who did not obtain compensation for NIL transactions even after such deals were allowed.  I use the lack of evidence of transactions in the after period as an indicator that such athletes might not have received deals even in the but-for world.  Thus, my methodology is conservative in limiting the damages to those class members who can be shown to be the most reasonably likely to have been able to earn compensation from NIL transactions during the damages period.

188.    The Additional Sports Class is limited to those athletes who have received a third-party NIL deal during the after period.  Accordingly, my damages methodology can reasonably estimate damages for all members of this class.

189.    In order to employ the before-and-after methodology, it is important to identify any factors which would have caused the before period to be materially different from the after period in

_____

[222] This methodology applies to athletes who received compensation for use of their NIL after July 1, 2021.  The class definitions delineate the span of the damage period.

Page 98

*CONFIDENTIAL*

ways that need to be accounted for in the comparison.  Here, I have identified those factors that I concluded I needed to adjust for in my before-and-after comparison.[223]

190.    First, under my methodology, I will only estimate damages if a class member with a third-party NIL agreement in the after period played in the same sport during the before period.  I will make an adjustment in the damages calculation if the class member transferred from a school in one conference during the before period to a different school or conference in the after period, but only if I find a different school or conference results in a statistically significant difference in demand for use of the transferred athlete's NIL.  These adjustments eliminate the possibility of damage payments for transactions that would not have occurred in the before period, because the athlete was not playing the same sport or only did so in a conference or school where sports were not as prominent from a demand standpoint, rather than because of the prohibition imposed by the Prior NIL Rules.  I will make these adjustments in my final damage calculations in my merits damages report, using the methodology I describe in Sections 7.3.4 below.

191.    Second, the model will account for changes in an athlete's role on the squad that are substantial enough to affect compensation for use of the athlete's NIL.  As an example, an athlete may have substantially higher public exposure and commercial notoriety by being the starting quarterback during the after period as compared to not being a starter and playing far fewer snaps in the before period.  Likewise, a basketball player becoming a starter during the after period will also typically have more exposure.  It is my opinion, based on examining the available information and my previous research, that an athlete's school and sport, along with the athlete's personal attributes, capture the effect that the important factors of Exposure and Familiarity materially have on NIL compensation, as explained in Section 7.3.4.  An adjustment

---

[223] "…markets change greatly through time, and the before-and-after model must be adjusted to account for these changes" and "If a substantial change in supply conditions or consumer preference causes a shift in the supply curve or demand curve of the cartelized product, the before-and-after method may substantially overstate or understate the true measure of damages." Hovenkamp, H.J.. (2011). *A Primer on Antitrust Damages.* Faculty Scholarship at Penn Law, pp. 32-22. Accessed on October 21, 2022 athttps://scholarship.law.upenn.edu/cgi/viewcontent.cgi?article=2848&context=faculty_scholarship.

*CONFIDENTIAL*

for the athlete's role on the team may be needed for the two very high revenue, high interest sports of football and basketball, where the role of the athlete can materially influence the amount of exposure and familiarity that the athlete has to the school fanbase and broadcast audience. I will incorporate those adjustments, if any, required for football and basketball athletes based on my analysis of the common data in the final calculation of damages in my merits report.

192.    Third, with respect to supply and demand factors, I have found that the only adjustment that should be made between the before and after periods would be to account for the negative impact of Covid on demand for Division I college sports during part of the before period. Otherwise, the demand for Division I college sports has been substantially robust in both the before and after periods so that no other adjustment in the comparison is required with respect to any changes in demand. However, I will also incorporate an adjustment for any overall changes in prices levels.

193.    Similarly, with respect to the supply of college athlete NIL, and as discussed in Section 8, because Defendants have monopsony power, the dramatic upward change in NIL prices has not led to a flood of new entry into the college labor markets. Thus, there has been no material change in the supply condition in the before and after periods other than the fact that Prior NIL Rules prohibited third-party NIL transactions during the before period. Accordingly, the before-and-after approach is a reliable methodology to estimate the compensation athletes would have received from third-party NIL transactions: compensation an athlete received from third-party NIL transactions during the after period is a reasonable estimate of the compensation the athletes would have received from such transactions in the before period, absent the prohibition. To the extent the third-party NIL deal market continues to grow and develop, it is conservative to use the after period as a measure of compensation that would have occurred in the before period, as such transactions will likely continue to grow in number and value over time during the after period (as explained below) and underestimate the but-for steady-state

*CONFIDENTIAL*

values. For this reason, I will continue to add after-period deals to my damages model through the time of my merits report on damages and through trial, as permitted.

194. In sum, the damage estimates for individual class members under my methodology are based upon the after-period NIL compensation for each class member adjusted for changes between the after period and the before period. These changes are the ones that I have concluded encompass substantial shifts in supply or demand, so that the before-and-after analysis will be an apples-to-apples comparison and a reliable basis upon which to model compensation from third-party NIL transactions for class members in the but-for world.

195. The after-period third-party NIL compensation to class members occurred in a market that emerged immediately after the suspension of the Prior NIL Rules on July 1, 2021. This ongoing natural experiment reveals that NIL compensation for class members, which was fixed at zero during the before period, was below competitive equilibrium; as a matter of economics, market participants will continue to make adjustments to increase NIL compensation to class members until such compensation reaches a competitive equilibrium.[224] The NIL marketplace itself will also continue to grow as transactions inform market participants how best to match the NIL supply with demand free of the past restraints previously imposed on them.[225] This process of adjustment during the after period would not have been necessary if the Prior NIL Rules had not blocked third-party NIL deals in the past. Thus, to the extent that these adjustments are continuing to take place, and to the extent the Current NIL Rules continue to prevent class

---

[224] Economists have a variety of models for how such adjustments occur, all of which agree that the adjustments do occur. See, for example, Nicholson, W. (1998). *Microeconomic Theory* (7th Edition). Dryden Press, pp. 524-28.

[225] "Competitive markets incorporate powerful incentives both to generate and to reveal information." Nicholson, W. (1998). *Microeconomic Theory* (7th Edition). Dryden Press, p. 531. "Brands didn't know how wide-scale NIL was going to be in 2021 because a lot of people assumed that if the NCAA wasn't going to set nationwide rules, it was only going to be limited to the schools and states that had laws. But what happened with the waiver the NCAA passed at the end of June, it made it so any school could set its own policy. Businesses didn't know how it was going to shake out, so they didn't have it in their budget." Prisbell, E. (2022, January 14). *What will 2022 bring in the NIL space? We ask the experts*. On3. Accessed on October 20, 2022 at https://www.on3.com/nil/news/nil-what-will-2022-bring-we-ask-the-experts/.

CONFIDENTIAL

members from receiving some forms of third-party NIL payments, my damages model will be conservative and, if anything, understate the full amount of class-wide damages during the before period.[226]

### 7.3.1.  Identifying the universe of third-party after-period NIL transactions with class members

196.    Division I NCAA schools have provided records of third-party NIL transactions reported by athletes after July 1, 2021.  I have tabulated the reported NIL transactions for athletes at these 126 Division I schools,[227] as shown on Exhibit 13 based on the discovery production to date]:

#### Exhibit 13:  NIL Transaction Summary Statistics

|  | Number of Schools | Total Athletes | Total NIL Transactions | Total NIL ($) |
|---|---|---|---|---|
| All | 126 | 9,385 | 21,217 | 43,681,264 |
| FBS | 107 | 8,953 | 20,104 | 42,836,807 |
| Power Five | 63 | 6,501 | 16,338 | 39,532,077 |

*Notes:*
  *Notre Dame considered part of Power Five.*
  *Athlete counts based off unstandardized names reported in university records.*

*Source:*
  *Reported NIL Transactions database.*

197.    This table relies on reports produced by schools through September 23, 2022.  However, the processing of the data for compensation amounts and number of athletes is ongoing, and even where data processing is complete, the data provided by schools can substantially lag behind the

---

[226] Also, not all schools require athletes to report NIL transactions.  The data presented here do not include transactions not reported to schools.  However, the model provides a method for calculating damages for any class members, provided the information on current NIL transactions is available at the time of the damage award.

[227] For these tabulations, there are 54 schools with transactions dated on or after April 1, 2022.  The reports for the remaining schools included in this tabulation may not encompass the full 2012-2022 academic year.

*CONFIDENTIAL*

pace of new deals.  I expect to receive substantial information on additional NIL transactions prior to the close of discovery, all of which I will then incorporate into my damages model.  For now, my preliminary estimate of damages is for illustrative purposes only: to demonstrate the class-wide methodology which I can employ for estimating lost NIL opportunity damages at trial on a class-wide basis.  Identification of athletes eligible for damages, and analysis of adjustments required to account for substantial changes in market factors, if any, between the before and after period may incorporate additional data that are available for many or all Division I NCAA schools.  This includes several types of data: 1) squad lists and team rosters,[228] 2) athlete and team performance statistics,[229] 3) REDACTED - COUNSEL ONLY,[230] and 4) internet search results data.[231]

### 7.3.2.  Comparisons between before and after periods

198.    The NIL compensation each athlete currently earns during the after period is the primary input into my damages model.  However, I consider further in this section whether and when the economic evidence indicates any adjustments are required to apply to that after-period compensation value in order to estimate damages during the before period that account for

---

[228] Schools have produced squad lists, although some squad lists do not have the information needed for this analysis.  Team rosters are available on school websites and provide information not available on produced squad lists that identify past athletic participation.

[229] Performance statistics can be a proxy for an athlete's role on the squad.  For example: for football, Pro Football Focus (www.pff.com/college); for Men's Basketball, Sports Reference (www.sports-reference.com/cbb); for Women's Basketball, Her Hoop Stats (www.herhoopstats.com).

[230] The NCAA has produced        REDACTED - COUNSEL ONLY

[231] Search quantity indices can be obtained from Google Trends (trends.google.com).  I use this only to verify changes in the overall market demand over time and in relation to the COVID-19 pandemic.  Peer-reviewed economic research that relies on search data includes the following: Depken, C. & Stephenson, E.F. (2017).  Copper Theft in the United States: 2006-2013.  *The American Economist, 62*(1), 66–76; Dergiades, T., Milas, C., & Panagiotidis, T. (2015).  Tweets, Google Trends, and Sovereign Spreads in the GIIPS.  *Oxford Economic Papers, 67*(2), 406–432; Kearney, M. & Levine, p. (2015).  Media Influences on Social Outcomes: The Impact of MTV's '16 and Pregnant' on Teen Childbearing.  *American Economic Review, 105*(12), 3597–3632; Reimers, I. (2016).  Can Private Copyright Protection Be Effective? Evidence from Book Publishing.  *The Journal of Law & Economics* 59(2), 411–440.

*CONFIDENTIAL*

material changes between the periods.  Exhibit 14 shows the total compensation for eligible class members in the after period, with breakouts for each class.[232]

**Exhibit 14: After-period Reported NIL Compensation for Eligible Class Members**

|  | Reported NIL Compensation for Eligible Athletes ($) | Number of Eligible Athletes |
|---|---|---|
| Power Five FB and MBB | 21,195,808 | 1,983 |
| Power Five WBB | 1,118,685 | 212 |
| Additional Athletes | 10,671,524 | 5,189 |
| **Total** | **32,986,017** | **7,384** |

*Note:*
  *Notre Dame included as part of Power Five.*
  *Eligible athlete counts based off standardized athlete names.*

***Source:***
  *Reported NIL Earnings Database*

### 7.3.3.  General market conditions

199.    I first consider whether there were any changes in general economic conditions between the before and after periods that require an adjustment in my damages model.  As I noted above, the only change in such conditions that I find require an adjustment in the model is the adverse impact of Covid on the demand for Division I college sports for part of the before period (and any change in overall price levels).

200.    Participation in Division I college athletics has grown at a steady pace for at least the past 20 years.  Since 2001, total Division I participation increased on average by 1.07 percent annually.  A steady and small increase in supply, without any other changes, would be consistent with stable prices.  I assume that athletes providing NIL would, absent the Prior NIL Rules or Current NIL Rules, be a consistent portion of all Division I athletes–this means there is a small and steady increase in the supply of college athletes who would obtain NIL

---

[232]  The Additional Sports Class includes 590 FBS football and 209 men's basketball athletes.  There were over 3,000 eligible athletes reporting earnings under $600.

*CONFIDENTIAL*

compensation.  A small and steady increase in the available capacity to supply NIL, without any other changes, would be consistent with stable quantities and prices.  Growth into the 2021 school year was below average.[233]  Exhibit 15 shows the participation amounts annually and the trend over time.  This factor thus indicates that the before and after period were comparable with respect to supply factors and these do not require any adjustment in my damages model.

**Exhibit 15: Division I Total Participation, 2001 – 2021**



*Source*
*NCAA Sports Sponsorship and Pariicipation Rates Report, January 6, 2022, (2020-2021), p. 89.*

---

[233] For the period from 2002 to 2020, the average annual growth rate was 1.075 percent, with a standard deviation 0.76 percent.  The 2021 growth rate was 0.08 percent.  To test whether the 2021 growth was significantly lower than 1.075 percent, I calculate the t-statistic (0.0008 - 0.01075) / 0.0076 = -1.309.  This has a p-value of 0.103 (there is about a 10 percent chance that a given year will have a growth rate this low or lower).  The only year with a lower growth rate in this period was 2002.

*CONFIDENTIAL*

201.    To evaluate the demand for college athlete NILs over time, I rely on proxies related to demand for college athletics in general.  Using financial data from MFRS, I tabulate the following information for all Power Five schools: total athletic program revenue, and total athletic program donations (contributions), total athletic program royalties / licenses / sponsorships.  All of these revenues are a reflection of demand for Division I college sports in different ways.  For example, contributions and sponsorships capture two different sources of demand that combine to drive compensation for use of an athlete's NIL as well as the beneficial impact of the athlete's NIL for marketing purposes.

202.    For each of these factors, I calculate the annual growth rate between 2016 and 2019 (omitting the potentially pandemic affected years 2020 and 2021) and the cumulative average growth rate for that period ("CAGR").  The trend in these data indicate growing revenue, with less growth in 2019 (negative growth, in fact, for donations).  This does not provide direct information on demand during the after period, but it does indicate a trend that, if carried into the after period, would lead to, at most, moderately higher demand than the before period.  Based on this, I do not see evidence that would require any adjustment in my damages model.  The CAGR for revenue can also proxy for changes in price/wage levels for athletes providing NIL licensing, which can be used to deflate current dollar damage calculations to contemporaneous dollar values in earlier periods (generally, the change in expenditures in a growing market will capture an upper bound on price changes, as expenditures constitute the product of prices and growing quantity demanded).

*CONFIDENTIAL*

**Exhibit 16: College Athletic Revenue – Division I schools**

| Actual Revenue | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|

# REDACTED - COUNSEL ONLY

*Source*
*NCAA MFRS Data*

203.    Clearly, the Covid-19 pandemic had a severe impact on the economy in general and specifically on events, including college sporting events.  Yet, college sports persevered with teams playing many games in the period between March 2020 through June 2021 (just before the suspension of the Prior NIL Rules).

204.    The Covid-19 pandemic began to affect college athletics in the United States during the latter portion of the school year ending in 2020.  The school revenue data indicates a substantial effect in the 2021 academic year, and possibly in 2020 as well.  I compared the revenues for 2020 and 2021 that would be forecasted by the cumulative average growth rates from 2016 through 2019 for each of the three categories of revenue.  In addition, I added a fourth category, which is total revenue net of ticket sales and other related revenue (parking, concessions, etc.).[234] From this, I find that the pandemic may have depressed demand for college athletics by about 5 to 9 percent in 2020 and a larger amount in 2021: about 24 to 32 percent based on the first three categories of revenue, but only about 15 percent based on total revenue net of game revenue.  Exhibit 17 shows these results.

---

[234] This tabulation does not include "Guarantees," which went up due to payments for cancellations.

Page 107

*CONFIDENTIAL*

**Exhibit 17: Effect of Pandemic on College Athletics Revenue – Division I Schools**

| Forecasted Revenue | 2016 | 2017F | 2018F | 2019 | 2020F | 2021F |
|---|---|---|---|---|---|---|

# REDACTED - COUNSEL ONLY

205.    As another measure to assess the demand for Division I college sports during the before and after periods, I have reviewed information from Google Trends for "NCAA Division I Football Bowl Subdivision" and "College Basketball" topics. This data confirms the depressing impact of Covid on the demand for these college sports, as shown in Exhibits 18 and 19, below.

*CONFIDENTIAL*

**Exhibit 18: Google Trends Interest: "NCAA Division I Football Bowl Subdivision" Topic**



Source  Google Trends
Note  "Interest" on a scale from 0 to 100, where highest-interest month is set to 100.

*CONFIDENTIAL*



Exhibit 19: Google Trends Interest: "College basketball" Topic

*Source  Google Trends*
*Note  "Interest" on a scale from 0 to 100, where highest-interest month is set to 100.*

206.    From this data, it is apparent that the pandemic had a depressing effect on Division I college

sports demand during the 2020 year, but that consumer interest and demand for Division I

college sports have been recovering since then.  Further, as discussed in Section 5 above, as

television deals are being renewed in the wake of the relaxation of the Prior NIL Rules, there

has not been the predicted decrease in broadcast rights fees, but instead all signs point to

booming demand for college sports programming, including record media deals and healthy and

substantial television ratings.

207.    The Covid pandemic has made comparisons of attendance during the first years of the NIL

era difficult, but 2022 has seen substantial post-Covid rebounds in attendance, and in some

sports where NIL has been prominent, e.g., women's volleyball, there appears to be a

*CONFIDENTIAL*

resurgence in live attendance.[235]  All of these factors indicate that the negative effect of the Covid-19 pandemic on demand for Division I college sports has been waning and decreasing over time so that it would be prudent to add an adjustment factor for the demand depressing impact of the pandemic during the part of the before damages period that took place during the peak of the pandemic, to make sure that damages are not overstated (based on the after period in which the impact of the pandemic on demand for Division I college sports has been decreasing).[236]

208.    To account for the impact of the Covid-19 pandemic, I will use the data and methodologies described above and common to the class to develop a Covid adjustment figure to my damages methodology for each sport.  My analysis of the NCAA MFRS data indicates a downward adjustment of 14.7 percent for the 2021 season and 6.1 percent for the 2020 academic year based on the deviation from forecast for net revenue excluding game revenue.[237]  For example, if an athlete who earned $10,000 in NIL in the 2022 academic year and participated in the same sport at the same school in 2021, 2020, and 2019 academic years, then this adjustment (without any other adjustment) would lead to damages of $8,530 for 2021, $9,390 for 2020, and $10,000 for 2019.

---

[235] *Women's college volleyball all-time attendance records*.  (2022, September 16).  NCAA.  Accessed on October 20, 2022 at https://www.ncaa.com/news/volleyball-women/article/2022-09-16/womens-college-volleyball-all-time-attendance-records.  Feinswong, L. (2021, December 22).  *Record attendance viewership for Wisconsin-Nebraska NCAA volleyball championship.* Volleyballmag.com.  Accessed on October 20, 2022 at https://volleyballmag.com/ncaa-volleyball-attendance-viewers-122221/.  The Reported NIL Earnings include 489 Volleyball athletes (Men's and Women's) with more than $500,000 total compensation.

[236] It is worth noting, however, that this is an example of how one can hypothesize that something might harm consumer demand for college sports and then see evidence of that hypothesis being true through class-wide data.  The hypothesized Covid effect *actually* had a negative effect on consumer demand for college sports, as can be seen in the data: schools lost revenue in 2020-21 because of Covid-19.  The *White, O'Bannon*, and (especially) *Alston* cases led to certain increases in athlete compensation that the NCAA had argued would decrease demand for college sports (because of "too much" compensation to athletes).  In contrast to the Covid effect, no such revenue decline can be seen after these cases.

[237] A full 2019-2020 season for fall sports, such as football, occurred prior to the start of the Covid-19 pandemic early in calendar year 2020.  However, the activities involved in NIL compensation occur outside of the playing season.  My analysis of the data at the level of sports indicated no material difference between football and the rest of the sports for the 2020 adjustment.

*CONFIDENTIAL*

209.    Apart from Covid, I find the before and after periods to be stable and thus comparable with respect to supply and demand and, thus, a reliable apples-to-apples comparison for purposes of my damages methodology.  In addition, I do not have an economic reason to adjust for changes in prices levels, but, if there were a need to do so, then the cumulative average growth rate in sports-related revenue for schools from 2016 to 2019 (prior to any impact of the Covid-19 pandemic) would provide an upper bound for such changes.

### 7.3.4.  Adjustments for changes in school or participation in sport

210.    Some class members have transferred to new schools to continue their athletic service on a new squad.[238]  I will apply a common methodology to determine the athletes in the classes who transferred to a school in the after period different from their school from the before period, and to determine whether any adjustment in the damages calculation is needed to account for this change.

211.    For this adjustment, I will first measure, at the sport level, the NIL compensation reported for the 2021-2022 school year by conference, and then test whether there are statistically significant differences across conferences within a given sport.  There may be material differences across conferences for higher-revenue sports such as football and men's and women's basketball, but no material differences across conferences for other sports.  In the event of lack statistical significance for variations in NIL across conferences for some sports, my damages model will make no transfer adjustment for athletes in those sports.  For the

---

[238] Squad lists for many schools show the first academic term that the athlete participated at that school and the first academic term the athlete participated at any school – the values in those fields differ for transfer students. [REDACT]

REDACTED - CONFIDENTIAL
and                    REDACTED - COUNSEL ONLY

Rosters on school websites provide links to athlete profiles.  A school transfers can be discerned from the available biographical information in these profiles.  See for example, Jack Stein (*Jack Stein TCU Profile*. Gofrogs.com.  Accessed on October 20, 2022 at https://gofrogs.com/sports/football/roster/jack-stein/15043), Dallas Wise (*Dallas Wise USC Profile*.  Usctrojans.com.  Accessed on October 20, 2022 at https://usctrojans.com/sports/track-and-field/roster/dallas-wise/14373), and Jayden De Laura (*Jayden De Laura Arizona Profile*.  Accessed on October 20, 2022 at https://arizonawildcats.com/sports/football/roster/jayden-de-laura/14706).

*CONFIDENTIAL*

remaining sports, I will proceed to assess whether there is a need to adjust for transfers among schools within the same conference.

212.    Next, I will measure, at the sport level, the NIL compensation reported for the 2021-2022 school year by school within each conference, and then test whether there are statistically significant differences across schools within each conference (for a given sport).  In the event of lack statistical significance for variations in NIL across schools within a conference for some sports, my damages model will make no transfer adjustment for athletes in those sports.  For the remaining sports, I will determine a transfer adjustment.  Based on the foregoing, I will then calculate a transfer adjustment to apply to the relevant athletes, which is the percentage difference between the average NIL payment for the two schools, for the given sport.  In my final damages report, I will make all of the required adjustments for class members.

213.    I will also make an adjustment if a class member who received a third-party NIL deal during the after period did not play that sport during any year of the before period.  For those athletes, I will not estimate any damages at all for the years in the before period in which the athlete did not participate in the sport.

### 7.3.4.1.    Adjustment For Changes in Athlete's Role on the Squad

214.    In the high revenue sports of Division I basketball and football, the role of the player on the team with respect to snaps or minutes played can have a material impact on the athlete's compensation for use of their NIL other than for video games or broadcasts or other group-license deals in which all athletes are paid the same amount or according to the same formula.

215.    There are public sources of statistics on athlete performance in college sports which provide data to assess material changes in the athlete's role on the squad.[239]  For example, Pro Football Focus provides information on "Snaps" for each football athlete.  Starters in a given position get

---

[239] For football, Pro Football Focus (www.pff.com/college); for Men's Basketball, Sports Reference, (www.sports-reference.com/cbb); for Women's Basketball, Her Hoop Stats (www.herhoopstats.com).

*CONFIDENTIAL*

more snaps (play more downs) relative to non-starters in the same position.  Similarly, Sports Reference and Her Hoop Stats provide information on basketball players that includes minutes played.

216.    Although these statistics display wide variation across athletes, an adjustment is required only to that extent that such variation correlates with different levels of NIL.  For example, football athletes in the top ten percent of performance statistics may not have materially different NIL compensation than players in the next ten percent, and thus would require no adjustment for changing their "role" (being in the top ten percent in the after period and the next ten percent in the before period).  However, football players in the top quartile (top 25 percent) may have a material difference in NIL compensation from football players in the bottom quartile (the bottom 25 percent).  When this is the case, I will make an adjustment: a football athlete earning NIL in the after period while being in the top quartile who was in the bottom quartile during the before period would be expected to earn less compensation during the before period.  This is an example of the starter-nonstarter difference for football athletes presented through a variable that is readily available and captures directly how the athletes' role on the team can influence NIL compensation.  As with school transfers, the adjustment would be to account for the percentage difference in average NIL compensation across the two categories of athletes.

217.    My previous research has shown that two of the primary drivers of endorsement earnings by top professional athletes are Exposure, the visibility that participating in a specific sport provides an athlete, and Familiarity, how well known is the athlete.[240]  The "structural" aspects of the sport matter (how often does the athlete compete each season) for providing visibility for the athlete.  In college athletics, with a broader variation of fanbase and television coverage than professional sports, the fanbase and broadcast presence of the athlete's school will also matter.

---

[240] Rascher, D., Eddy, T., & Hyun, G. (2017).  What drives endorsement earnings for superstar athletes? *Journal of Applied Sport Management, 9*(2).

*CONFIDENTIAL*

In other words, for college athletes, the athlete's sport and school capture similar information to what "Familiarity" and either "Exposure" or "Sport" capture for top professional athletes and are likely to be the primary drivers (other than the athlete) of endorsement earnings. In addition, for football and basketball, the two college sports with the largest television coverage, the athlete's role on the team can impact the athlete's visibility, particularly on television, and his or her Familiarity and Exposure and thus his or her NIL earnings. This television effect is specific for football and basketball – it would not be expected to exist for other Division I sports that do not receive substantial television coverage, which eliminates this reason why an athlete's role on their college squad would significantly impact their visibility or their NIL earnings. While I will study this issue further before completing my merits report on damages, I do not currently find that there is any need to make an adjustment based on an athlete's role in Division I sports other than in the high revenue sports of football and basketball.

218.    Outside of these factors, the other primary driver of endorsement earnings is Q Score, which captures survey responses about the athletes who are the survey respondents most and least favorite. This is the type of personal attribute that an athlete carries from year to year during their college athletic career and, as such, does not require adjustments. There can be substantial variation in NIL compensation for athletes in sports other than football and basketball–in those cases, the factors of school and sport, along with the athlete's continuing personal attributes, can be sufficient to explain the variation.

219.    Accordingly, I will include an adjustment in my damages methodology to exclude any damages attributable to material changes in a football or basketball athlete's role on the squad, as reflected in available performance statistics, and using a common methodology for all of these football and basketball athletes. These adjustments have not yet been made in my preliminary damages analysis but will be part of my methodology in my final damages report.

220.    By making this formulaic adjustment to account for an athletes' role on the team for basketball and football players, I am conservatively reducing damages where the change in the

*CONFIDENTIAL*

athletes' role might reduce his or her ability to obtain a similar third-party NIL deal during the before period as he or she obtained during the after period.

### 7.3.5.  "Before" damages for each class member

221.    The baseline for estimating damage for each class member is simply the amount that they earned in the after period projected back into the before period for the years that they played on the same team (or, when it is possible to account for transfers, in the same sport).  This accounts for the NIL market in general (e.g., the total damages amount), but also formulaically accounts for individual class members' circumstances, using methods that are common to the class. These damages estimates are conservative for at least two reasons.

222.    First, the damages estimates do not account for the growth that would have occurred in NIL deals during the before period over time (as the college athlete NIL market would have matured) if NIL payments had been allowed.  This means that the currently known after-period NIL payment amounts underestimate damages for the class members (all else equal).

223.    Second, these damages estimates are also conservative because they do not reflect the continued growth that is taking place during the after period and will only account for growth to the extent I am able to continue to enter new NIL deals into the damages model prior to trial. For example, we already see the growing impact of collectives of alumni supporting the availability of NIL deals for athletes at particular schools, and the increasing provision of NIL support and facilitation services by the schools.  See discussion at Section 6.4 above.  These factors will continue to increase the value of the NIL deals and reflect the deals that would have been available during the before period if the Prior NIL Rules did not exist to block the development of such deals.

224.    As discussed above, I will adjust the individual damages for the class members to account for transfers, changes in sport and, in the case of football and basketball, changes in starter status.  With those adjustments, it is my opinion that the model will yield both a reliable

*CONFIDENTIAL*

estimate of class damages as a whole, and a reasonable estimate of the damages to individual class members.

225.  The preliminary results of my damages model account for (1) reported NIL compensation for eligible class members, and 2) adjustments for Covid, are set forth in Exhibit 14 in Section 7.3.3.  However, these results will change materially when I am able to provide additional information on NIL deals during the after period into the model, and complete all of the adjustments to the individual damages calculations through the common methodologies that I have described in this report.

### 8.  THE DAMAGES MODELS I HAVE PUT FORWARD ARE NOT IMPACTED BY ANY CLAIMED "SUBSTITUTION EFFECT"

226.  Defendants have argued that there is a so-called "Substitution Effect" which takes place when more compensation is available to college athletes which makes it impossible to determine who will and will not be class members in the but-for world in which increased compensation would cause some athletes to stay in school longer and thus supposedly drive out other class members by taking away their opportunity to obtain one of the limited number of GIAs that is available for certain sports under NCAA rules.  Defendants also argue that this means that some class members would be better off if there was no additional compensation allowed, as doing so might cause them to lose their GIA.  These arguments are not a barrier to determining the identity of the class members that should be included in this case and in our damages models.  They also do not undermine my conclusion that every class member would be better off without the challenged NCAA restraints on NIL compensation.

227.  The premise behind the so-called "Substitution Effect" is that when athletes decide to stay in school because of the availability of more compensation while they are in school, they take up a scarce GIA slot, and in counter sports (where the NCAA restricts the number of GIAs a school

*CONFIDENTIAL*

may offer[241]), a team may hit its hard limit of GIAs so that someone else will be displaced. Defendants in *O'Bannon* and *Alston* argued that this process of athletes receiving extra compensation, such as the COA stipends that were enjoined by *O'Bannon*, would lead to a massive influx of new talent, and thus a large number of displaced class members. In reality, after the *O'Bannon* injunction was implemented, while there was some limited number of opportunities for athletes to stay in school longer, there was no evidence of the threatened influx and the threatened cascade and ultimate expulsion of scholarship athletes. Nor is there any evidence that such a Substitution Effect has taken place since *Alston* benefits became available in 2021.

228.    There are two reasons why the Substitution Effect has failed to materialize as the Defendants have unwound their anticompetitive conduct over the last decade. One reason is that that this particular aspect of the anticompetitive harm from Defendants' price fixing has never affected a significant number of individual athletes. As an example, in the NBA there are only 60 draft slots open each year, and commonly something on the order of 25 percent of those go to players from Europe, leaving around 45 for college draft choices. Many of these athletes are clearly leaving school in the year they choose, whether college is somewhat more lucrative or not, and so the scope for "tweeners"–athletes right on the margin for whom the change in COA value or NIL value, etc., can make the difference–is quite limited. There simply aren't enough would-be overly optimistic second-round draft picks out there to return to college to

---

[241] Interestingly, there have been discussions within the NCAA's Division I Transformation Committee to eliminate the number of athletic scholarships that a school can offer. "'This may not be fully fleshed out until later in the summer because it would require corresponding legislation regarding limits on roster size by sport. But the idea would be that conferences or schools could decide to offer as many full scholarships for as many sports as they can afford,' Auerbach said. "If you really want to be good at baseball, you can put every single player on the baseball roster on a full scholarship. The thinking behind this idea is simply: If college athletics is supposed to be about opportunities for young adults, then why are there arbitrary caps on team financial aid in any sport? If you can afford it, you can do more.'" See Pilgrim, J. (2022, May 11). *NCAA considering removal of scholarship, coach restrictions, among other changes*. On3. Accessed on October 20, 2022 at https://www.on3.com/teams/kentucky-wildcats/news/ncaa-considering-removal-of-scholarship-coach-restrictions-among-other-changes/.

*CONFIDENTIAL*

overwhelm the number of excess scholarship slots scattered across the more than 350 Division I schools.

229.    But the flip side of the coin for why the Substitution Effect has failed to materialize as the Defendants have unwound their anticompetitive conduct, is that a fundamental premise of the effect–that all of the scholarship slots across all of FBS football or Division I basketball are taken–turns out to be false.  I demonstrated this fact in *Alston*, showing, for example, that in FBS football, across the MAC and Sun Belt conferences, on average, "an average of 7.35 counters per school received less than 90 percent of a GIA" and "the five least compensated GIA recipients from each of the 24 teams in those two FBS conferences received an average of 30 percent of a GIA, well below what the top 120 of FCS athletes received from 2010 to 2015."[242]

230.    For the Defendants' Substitution Effect theory to make sense, when a player is displaced from a team in the hypothetical world, there needs to be nowhere else within FBS football or Division I basketball for him (or her) to go.  Defendants themselves have pointed out that the displaced players from the best teams would find new schools to play for at slightly lower quality schools (in terms of their sports prowess, not necessarily their academics), in what Defendants' past experts have referred to as a "cascading effect."[243]  But the next step in their prediction, that this leads to some class members being pushed out of FBS football or Division I basketball altogether, does not stand up to empirical scrutiny.

---

[242] See Expert Report of Daniel A. Rascher on Injunctive Class Certification, June 25, 2015.  This excerpt was filed in an unredacted form on PACER at *Grant-in-Aid Cap Antitrust Litigation*, Case 4:14-md-02541-CW Document 809-67 Filed April 6, 2018, p. 2.

[243] See for example, *O'Bannon*, Expert Report of Daniel L. Rubinfeld Regarding Class Certification, March 14, 2013, pp. 57-58: "A five star recruit choosing Kentucky instead of UCLA would have bumped another player off the Kentucky roster and created an opening on the UCLA roster.  These decisions would have a cascading effect, partly due to limited team roster sizes and restrictions on the number of available athletic scholarships colleges offer.  A student-athlete's alternative but-for decision in response to altered incentives would bump another student from a roster who might enroll elsewhere, bumping another student, and so on.  Furthermore, the re-shuffling of students would impact who would and would not receive athletic scholarships, which would further impact incentives and the choices students would make."

*CONFIDENTIAL*

231.    As a factual matter, for the Cascade Effect to occur, FBS football and Division I Squad Lists must be stuffed to the gills, too full of athletes to handle the fairly limited number of returning-to-school (or never-went-to-college) athletes who hypothetically might now take up a GIA slot. But the reality is that the rosters are not full to the point of exploding, as was the untested premise in *O'Bannon* when class certification was denied on that basis.  As shown in *Alston,* once data was made available, the average MAC and Sun Belt conference school has over 7 GIA slots in football that are not given to Full GIA athletes, sufficient to absorb over 150 of these hypothesized longer-attending athletes.[244]  This is far in excess of enough slack capacity to absorb the returners/newcomers and thus prevent any athletes from being pushed out of school because of this effect.  My review of the more recent Squad Lists produced in this matter shows the same situation to be true for FBS football and for Division I basketball, where there are more than enough GIA slots available.  I also have not seen any evidence that there is a shortage of scholarship spots in the additional sports for women where GIAs are limited by NCAA rules–volleyball, gymnastics, or tennis–to support a Substitution Effects argument.  Defendants did not offer any evidence in *O'Bannon* or *Alston* that even they would expect a Substitution Effect in such low revenue sports.

232.    Moreover, in this case, two of the three damages classes only include athletes at schools in the Power Five Conferences (including Notre Dame football) and to exclude any partial GIAs in "Counter" sports.  As a result, to the extent any class member is impacted by the Substitution Effect and begins to "cascade" down the chain, he/she would wind up at another highly regarded FBS football or Division I basketball program just outside of the Power Five Conference and would still receive increased access to NIL money in the but-for world.  Every such athlete would have rationally preferred the economic outcome in the but-for world to the actual world in which NIL earnings were not available.

---

[244] There were 24 schools in those two conferences at the time, 24*7=168.  There are now 26 teams, 26*7=182.

*CONFIDENTIAL*

233.    Finally, the so-called Substitution Effect is only even theoretically relevant to the NCAA's "Counter" sports: football and basketball for men, and basketball, volleyball, gymnastics, and tennis for women. These are the sports that limit the number of people who can receive grants-in-aid. Most NCAA sports are not "Counter" sports, but are instead "Equivalency" sports, where there is no limit on the number of athletes who can receive some level of grant-in-aid. In men's volleyball, for example, if somehow an athlete were to decide to stay in school an extra year rather than leave college to play professional men's volleyball in Europe, the decision of that athlete to return would not displace any GIA athlete. At most, the NCAA's restriction on scholarship aid for men's volleyball (where all members of the team must share 4.5 GIAs) might require an adjustment for how the aid got shared, but no one would need to be removed from the team in the but-for world because they were no longer a Division I GIA recipient in men's volleyball.

### 9. CONCLUSION

234.    Based on the foregoing, it is my economic opinion that:

d)  The economic conclusions related to anticompetitive effects, asserted pro-competitive justifications, less restrictive alternatives, class-wide injury, and class member damages can be proven by means of non-individualized economic evidence and methodologies common to class members.

e)  Evidence common to the classes indicates that all members of each of the classes were injured as a result of the challenged NIL rules.

f)  There are common, class-wide methodologies that I can apply to generate reasonable, non-speculative and reliable estimates of the damages incurred by the class members tied to the antitrust theories of competitive harm asserted by Plaintiffs. In this regard, I have developed class-wide methodologies to estimate the damages from three sources: (1) the loss of opportunities to enter into video game group-license agreements for the use of athletes' NILs with respect to FBS football and Division I men's basketball players; (2) the loss of opportunities to enter into group-license agreements for the use of athletes' NILs in television

Page 121

***CONFIDENTIAL***

broadcasts with respect to Power Five football and men's and women's basketball players; and (3) the loss of opportunities to enter into other NIL agreements by Division I athletes who have been able to enter into such agreements for the use of their NILs with third parties since the Prior NIL Rules were suspended.

g)  In the course of describing the methodologies for demonstrating class-wide injury and measuring damages, I have generated preliminary estimates of class-wide damages set forth below.  However, as noted above, these are not my final estimates of damages to class members, which I will not make until discovery is completed and additional information is available for input into my damages models, which also may be refined based on my analysis of further discovery, prior to my merits damages report.

h)  The results of my preliminary calculations of damages in the aggregate and numbers of class members, at a minimum, for each of the classes are as follows (see paragraph 11.e):

- o  Football and Men's Basketball Class at least $23.5 million video game NIL damages, at least $1,320.3 million Broadcast NIL damages, and at least $21.2 million other lost NIL opportunity damages, for a total of at least $1,365.0 million damages for at least 6,280 class members.
- o  Women's Basketball Class at least $49.8 million Broadcast NIL damages and at least $1.1 million other lost NIL opportunity damages, for a total of at least $50.1 million damages for at least 856 class members.
- o  Additional Sports Class at least $0.6 million video game NIL damages and at least $10.7 million other lost NIL opportunity damages, for a total of at least $11.3 million damages for at least 7,384 class members.
- o  Injunctive Relief Class: At least 184,000 class members.

## 10. SIGNATURE

235.  Executed under penalty of perjury this 21st day of October, 2022, at Orinda, California.

_Daniel A. Rascher_

Page 122

*CONFIDENTIAL*

# Appendix A

## DANIEL A. RASCHER, PH.D.

### EDUCATION

B.A., Economics, University of California at San Diego.

Ph.D., Economics, University of California at Berkeley.
Dissertation Title, *Organization and Outcomes: A Study of the Sports Industry*

Certified Valuation Analyst (CVA) by the National Association of Certified Valuators and Analysts

### PRESENT POSITIONS

University of San Francisco
<u>Director of Academic Programs for the Sport Management Program</u>, 2002-current
<u>Professor of Sport Management</u>, 2010-current
<u>Associate Professor of Sport Management</u>, 2005-2010
<u>Assistant Professor of Sport Management</u>, 2000-2005
<u>Adjunct Professor of Sport Management</u>, 1999-2000

- M.A. Course – Sport Economics and Finance
- M.A. Course – Master's Project in Sport Management
- M.A. Course – Sport Business Research Methods

SportsEconomics, LLC (www.sportseconomics.com)
<u>Founder and President</u>, 1998-current

Performed economic analysis for sports industry clients including multiple projects involving the NFL, NBA, NASCAR, NCAA, NHRA, NHL, MLS, ATP, AHL, professional cycling, media companies, sports commissions and government agencies, event management, B2B enterprises, and IHRSA. Specialized in industrial organization, antitrust, valuations, market research, labor issues, financial modeling, strategy, economic impact, and feasibility research.

OSKR, LLC (www.oskr.com)
<u>Co-Founder and Partner</u>, 2008-current

Performed economic analysis for clients involved in sports and other industries, including insurance, technology, automotive, television, and consumer products.

### PREVIOUS ACADEMIC EXPERIENCE

STANFORD UNIVERSITY, taught franchise relocation & stadium financing course, Summer 2020
NORTHWESTERN UNIVERSITY, taught sports economics and finance course, Winter 2014
IE BUSINESS SCHOOL (Madrid, Spain), taught sports economics and finance course, 2010-2013
UNIVERSITY OF MASSACHUSETTS AT AMHERST, Sport Management Department
<u>Assistant Professor</u>, 1997-1998

- \* M.S. Courses—Principles of Sport Business Management, Applied Sport Business Management
- \* B.S. Courses—Sport Business Finance, Sports Economics

UNIVERSITY OF CALIFORNIA AT BERKELEY, Department of Economics
<u>Teaching Assistant</u>

* Economic Principles & Intermediate Microeconomics.

Institute of Sports Law and Ethics (University of the Pacific).  Board Member, 2011-2017

PREVIOUS CONSULTING EXPERIENCE

LECG, LLC
<u>Affiliate</u>, 2003-2007; <u>Principal</u>, 2000-2003; <u>Senior Economist,</u> 1998-2000

* Performed economic analysis for sports industry clients including multiple projects involving the NFL, MLB, NBA, NHL, PGA, Formula One racing, CART, and Premier League Football (soccer).  Specialized in industrial organization, antitrust, M&As, valuations, and damages analysis.

* Provided testimony for cases involving sports industry clients, including damages analysis and liability.

* 40% of work related to antitrust litigation, 20% IP and breach of contract damages litigation, 20% merger related, and 20% management consulting.

* 60% of work involved the sports and entertainment industries, 15% involved technology, and 25% in other industries including agriculture, transportation, and energy.

UNIVERSITY OF CALIFORNIA AT BERKELEY, Competitive Semiconductor Manufacturing Program
<u>Visiting Scholar</u>, Institute of Industrial Relations, 1998-2000

<u>Research Fellow</u>, 1995-1997

* Funded by the Alfred P. Sloan Foundation, the CSM study is an interdisciplinary project that analyzes the determinants of high performance in semiconductor manufacturing.

* Research on HR, training, small sample analyses and generalizability of case study results.

NATIONAL ECONOMIC RESEARCH ASSOCIATES, Summer 1994; January-August 1995
<u>Research Assistant</u>

* Research on the energy industry, on transmission pricing, and on the economic damages of contract breaches.

QUANTUM CONSULTING, 1992-1994
<u>Research Assistant</u>

* Developed a model and a software package using spline techniques to weather-normalize energy usage, allowing the PUC to evaluate regulation policies.

HONORS AND AWARDS

Outstanding Antitrust Litigation Achievement in Economics (*American Antitrust Institute*), 2021

*Applied Sport Management Association* Lifetime Achievement Award, 2019

Research Fellow of the *North American Society for Sport Management*, 2009

College of Arts & Sciences Collective Achievement Award, 2009

Innovation Award Winner (for the innovative use of technology in teaching), 2004. From the *Center for Instruction and Technology*, University of San Francisco.

*Alfred P. Sloan Foundation* Research Grant for the Study of Human Resource Systems, 1995-1997.

Newton-Booth Fellowship for graduate study at University of California at Berkeley, 1990-1991.

## PEER-REVIEWED JOURNAL ARTICLES

"Who Are Our Fans: An Application of Principal Component-Cluster Technique Analysis to Market Segmentation of College Football Fans," with Kenneth Cortsen, Mark Nagel, and Tiffany Richardson. *Journal of Applied Sport Management, 13*(1), 2021.

"Economic Development Effects of Major and Minor League Teams and Stadia," with Nola Agha. *Journal of Sports Economics, 21*(1), 2020.

"Is there a Consensus?: An Experimental Trial to Test the Sufficiency of Methodologies Used to Measure Economic Impact," with Giseob Hyun and Mark Nagel. *Journal of Applied Business and Economics, 22*(11), 2020.

"Coaching Salary Disparity and Team Performance: Evidence from the Football Bowl Subdivision," with Alex Traugutt, Alan Morse, and Brian Fowler. *Journal of Applied Business and Economics, 22*(1), 2020.

"Cartel Behavior in US College Sports: An Analysis of NCAA Football Enforcement Actions from 1990-2011," with Mark Nagel, Richard Southall, and Nick Fulton. *Journal of NCAA Compliance*, July-August, 2019.

"The Unique Economic Aspects of Sports," with Joel Maxcy and Andrew D. Schwarz. *Journal of Global Sport Management* (July, 2019).

"Making a Difference: Bridging the Gap Between the Ivory Tower & the Community." *Journal of Applied Sport Management, 11*(2), 2019.

"Because It's Worth It: Why Schools Violate NCAA Rules and the Impact of Getting Caught in Division I Basketball," with Andrey Tselikov, Andrew D. Schwarz, and Mark Nagel. *Journal of Issues in Intercollegiate Athletics, 12,* 2019. *Article of the year in the publication for 2019*.

"Determining fair market value for Duke's Sporting Goods Store," with Michael Goldman. In *Case Studies in Sport Management, 6*(1), 2017.

"The Beckham Effect: Examining the Longitudinal Impact of a Star Performer on League Marketing, Novelty, and Scarcity," with Stephen Shapiro and Tim DeSchriver. In *European Sport Marketing Quarterly, 17*(5), 2017.

"What Drives Endorsement Earnings for Superstar Athletes?" with Terence Eddy and Giseob Hyun. In *Journal of Applied Sport Management*, Vol. 9, No. 2, Summer 2017.

"A Smaller Window to the University: The Impact of Athletic De-Escalation on Status and Reputation," with Michael Hutchinson and Kimi Jennings. In *Journal of Intercollegiate Sport,* Vol. 9, No. 1, June 2016.

"If We Build It, Will They Come?: Examining the Effect of Expansion Teams and Soccer-Specific Stadiums on Major League Soccer Attendance," with Steve Shapiro and Tim DeSchriver.  In *Sport, Business, and Management: An International Journal,* Vol. 6, No. 2, Spring 2016.

"An Explanation of Economic Impact: Why Positive Impacts Can Exist for Smaller Sports," with Nola Agha.  In *Sport, Business, and Management: An International Journal,* Vol. 6, No. 2, Spring 2016.

"Where is Everyone? An Examination of Attendance at College Football Bowl Games," with Terence Eddy.  In *International Journal of Sport Finance*, Vol. 11, No. 2, February 2016.

"Tracking the Dollars: How Economic Impact Studies can Actually Benefit Managerial Decision Making," with Michael Goldman.  In *Sport & Entertainment Review,* Vol 1, No. 1, February 2015.

"Sport Pricing Research: Past, Present, and Future," with Joris Drayer.  In *Sport Marketing Quarterly*, Vol. 22, No. 3, September 2013.

"The Antitrust Implications of "Paperless Ticketing" on Secondary Markets," with Andrew D. Schwarz.  In *Journal of Competition Law and Economics*, Vol. 9, No. 3, 2013.

"An Examination of Underlying Consumer Demand and Sport Pricing Using Secondary Market Data" with Joris Drayer and Chad McEvoy.  In *Sport Management Review*, Vol. 15, No. 4, November 2012.

"Smooth Operators: Recent Collective Bargaining in Major League Baseball" with Tim DeSchriver, 2012.  In *International Journal of Sport Finance*, 7(2).

"Financial Risk Management:  The Role of a New Stadium in Minimizing the Variation in Franchise Revenues" with Matt Brown, Mark Nagel, and Chad McEvoy.  In *Journal of Sports Economics*, Vol. 13, No. 3, August 2012.

"Factors Affecting the Price of Luxury Suites in Major North American Sports Facilities" with Tim DeSchriver and Steve Shapiro.  In *Journal of Sport Management,* Vol. 26, No. 3, May 2012.

"Free Ride, Take it Easy: An Empirical Analysis of Adverse Incentives Caused by Revenue Sharing" with Matthew Brown, Mark Nagel, and Chad McEvoy.  In *Journal of Sport Management,* Vol. 25, No. 5, September 2011.

"Simulation in Sport Finance," with Joris Drayer.  *Simulation & Gaming: An Interdisciplinary Journal of Theory, Practice, and Research* Vol. 41, No. 2, April 2010.

"Where did National Hockey League Fans go During the 2004-2005 Lockout?: An Analysis of Economic Competition Between Leagues," with Matthew Brown, Mark Nagel, and Chad McEvoy. In *International Journal of Sport Management and Marketing*, Vol. 5, Nos. 1, 2, January 2009.

"The Effects of Roster Turnover on Demand in the National Basketball Association," with Steve Shapiro, Alan Morse, and Chad McEvoy.  In *International Journal of Sport Finance*, Vol. 3, No. 1, February 2008.

"Variable Ticket Pricing in Major League Baseball" with Chad McEvoy, Mark Nagel, and Matthew Brown.  In *Journal of Sport Management*, Vol. 21, No. 3, July 2007.

"Do Fans Want Close Contests?: A Test of the Uncertainty of Outcome Hypothesis in the National Basketball Association" with John Paul Solmes.  In *International Journal of Sport Finance*, Vol. 3, No. 2, August 2007.

"The Use of Simulation Technology in Sport Finance Courses: The Case of the Oakland A's Baseball Business Simulator" with Joris Drayer.  In *Sport Management Education Journal* Vol. 1, No. 1, May 2007.

"Washington "Redskins" – Disparaging Term or Valuable Tradition?: Legal and Economic Issues Concerning *Harjo v. Pro-Football, Inc.*" with Mark Nagel.  In *Fordham Intellectual Property, Media, and Entertainment Law Journal*, Vol. XVII, No. 3, Spring 2007.

"Treatment of Travel Expenses by Golf Course Patrons: Sunk or Bundled Costs and the First and Third Laws of Demand," with Matthew Brown, Chad McEvoy, and Mark Nagel.  In *International Journal of Sport Finance*, Vol. 2, No. 1, February 2007.

"Major League Baseball Anti-Trust Immunity: Examining the Legal and Financial Implications of Relocation Rules" with Mark Nagel, Matthew Brown, and Chad McEvoy.  In *Entertainment and Sports Law Journal,* Vol. 4, No. 3, December 2006.

"The Use of Public Funds for Private Benefit: An Examination of the Relationship between Public Stadium Funding and Ticket Prices in the National Football League" with Matthew Brown and Wesley Ward.  In *International Journal of Sport Finance*, Vol. 1, No. 2, June 2006.

"An Analysis of Expansion and Relocation Sites for Major League Soccer" with Matthew Baehr, Jason Wolfe, and Steven Frohwerk.  In *International Journal of Sport Management,* Vol. 7, No. 1, January 2006.

"Revenue and Wealth Maximization in the National Football League: The Impact of Stadia" with Matthew Brown, Mark Nagel, and Chad McEvoy.  In *Sport Marketing Quarterly*, Vol. 13, No. 4, December 2004.

"NBA Expansion and Relocation: A Viability Study of Various Cities" with Heather Rascher.  In *Journal of Sport Management*, Vol. 18, No. 3, July 2004.

"Does Bat Day Make Cents?: The Effect of Promotions on the Demand for Baseball," with Mark McDonald.  In *Journal of Sport Management*, Vol. 14, No. 1, January 2000.

"The NBA, Exit Discrimination, and Career Earnings," with Ha Hoang.  In *Industrial Relations*, Vol. 38, No. 1, January 1999.

## BOOKS

"Financial Management in the Sport Industry" 3rd ed. with Matthew Brown, Mark Nagel, and Chad McEvoy.  Routledge, Inc., 2021.  A textbook.

"Financial Management in the Sport Industry" 2nd ed. with Matthew Brown, Mark Nagel, and Chad McEvoy.  Routledge, Inc., 2015.  A textbook.

"Financial Management in the Sport Industry" with Matthew Brown, Mark Nagel, and Chad McEvoy.  Holcomb Hathaway, Inc., June 2010.  A textbook.

**BOOK CHAPTERS**

"The Relevance of a Gamified Football/Soccer Development Platform," with Kenneth Cortsen in *Interactive Sports Technologies: Performance, Participation, Safety*, edited by Michael Filimowicz and Veronika Tzankova for Routledge (2022).

"Sporting Goods and Sports Licensing," with Mark Nagel in *The Governance of Sports*, edited by Bonnie Tiell for Human Kinetics, (2020).

"The application of sports technology and sports data for commercial purposes," with Kenneth Cortsen in *The Use of Technology in Sport – Emerging Challenges,* (2018).

"Valuing Highly Profitable Sports Franchises – A Hybrid Income and Market Approach," in *Sports Business* edited by Kenneth Cortsen (forthcoming).

"The Use of Price-to-Revenue Ratios in Valuing Sports Franchises," in *Sports Business* edited by Kenneth Cortsen (forthcoming).

"Competitive Equity: Can there be Balance between Athletes' Rights and a Level Playing Field?" with Andrew D. Schwarz in E. Comeaux (ed.), *College Athletes' Rights and Well-Being: Critical Perspectives on Policy and Practice*.  Baltimore: Johns Hopkins University Press, (2017).

"Illustrations of Price Discrimination in Baseball" with Andrew D. Schwarz in L. Kahane and S. Shmanske eds., *Economics Through Sports*, Oxford: Oxford University Press, (2012).

"The Expanding Global Consumer Market for American Sports: The World Baseball Classic" with Mark Nagel, Chad McEvoy, and Matt Brown in G. Mildner, and C. Santo, eds., *Sport and Public Policy*, Champaign, IL: Human Kinetics, 2010.

"Franchise Relocations, Expansions, and Mergers in Professional Sports Leagues." In B. Humphreys, and D. Howard, eds., *The Business of Sports*, pp. 67-106.  Westport, CT: Praeger, 2008.

"Collective Bargaining in Sport" with M. Nagel, M. Brown, and C. McEvoy.  In *Encyclopedia of World Sport*, pp.335-339. Great Barrington, MA: Berkshire Publishing, 2005.

"The Role of Stadia in the USA: Wealth Maximization in the National Football League" with Matthew Brown and Mark Nagel in G. Trosien & M. Dinkel (eds.), *Grenzen Des Sportkonsums* (Frontiers of Sport Commerce), Heidelberg, Germany: SRH Learnlife AG, 2003.

"A Test of the Optimal Positive Production Network Externality in Major League Baseball," in E. Gustafson and L. Hadley, eds., *Sports Economics: Current Research*, 1999.  Praeger Press.

"A Model of a Professional Sports League," in W. Hendricks (ed.), *Advances in the Economics of Sport*, vol. 2. June 1997, JAI Press, Inc.

## BOOK REVIEWS

"Review of: Much More Than a Game: Players, Owners, and American Baseball Since 1921", by Robert F. Burk in *Journal of Economic Literature*, Vol. 40(3), September 2002, pp. 949-951.

## NON-PEER REVIEWED ARTICLES

"Data Science for Football Business – Clustering Analysis," with Kenneth Cortsen and Bas Schnater in *FCBusiness*, 132, April 2021.

"Competitive Balance in Sports: "Peculiar Economics" over the last Thirty Years," with Andrew D. Schwarz.  In *Competition, 29*(2), Fall 2019.

"How The $200+ Million Settlement For COA Payments Was Calculated," with Andrew D. Schwarz.  In *Athletic Director U.*, May 2017.

"Rich Men's Toys – Applying Valuation Methods to the Business of Professional Sports" in *Valuation Strategies*, March/April 2015.

"Competitive Balance in Sports: "Peculiar Economics" Over the Last Quarter Century," with Andrew. D. Schwarz.  In *Entertainment, Arts, and Sports Law Journal*, 24(1), Spring 2013.

"The Impact on Demand from Winning in College Football and Basketball: Are College Athletes More Valuable than Professional Athletes?" with Chad McEvoy.  In *Selected Proceedings of the Santa Clara University Sports Law Symposium*, September 2012.

"The Economics of Competitive Balance on the Field and in the Courts" in *Selected Proceedings of the Santa Clara University Sports Law Symposium*, 2011.

"5 Themes from 50 Economic Impact Studies" in *SportsEconomics Perspectives*, Issue 5, 2010.

"What is the Value of Control of a Sports Enterprise?: Controlling Interest Premiums in Sports Valuations" in *SportsEconomics Perspectives*, Issue 4, April 2008.

"Executive Interview: Charlie Faas, Executive Vice President and CFO of Silicon Valley Sports and Entertainment." in *International Journal of Sport Finance*, Vol. 2, No. 2, June 2007.

"Executive Interview: Dan Champeau, Managing Director, and Chad Lewis, Analyst with Fitch." in *International Journal of Sport Finance*, Vol. 2, No. 1, February 2007.

"Executive Interview: Dennis Wilcox, Principal with Climaco, Lefkowitz, Peca, Wilcox & Garofoli Co., L.P.A." in *International Journal of Sport Finance*, Vol. 1, No. 4, November 2006.

"Executive Interview: Randy Vataha, Founder of Game Plan, LLC" with Dennis Howard in *International Journal of Sport Finance*, Vol. 1, No. 2, June 2006.

"Executive Interview: Mitchell H. Ziets, President and CEO of MZ Sports, LLC" in *International Journal of Sport Finance*, Vol. 1, No. 1, February 2006.

"The Oakland Baseball Simworld: Enabling Students to Simulate the Management of a Baseball Organization" in *Journal of Sports Economics*, Vol. 6, No. 3, August 2005.

"Examining the Viability of Various Cities for NBA Expansion or Relocation" with Heather Rascher in *SportsEconomics Perspectives*, Issue 2, April 2002.

"Following a Dollar: the economic impact of a sports event is greater than the sum of its parts" by Nola Agha in *SportsTravel Magazine*, Vol. 6, No. 10, November/December 2002.  Heather Rascher and Daniel Rascher contributed to the article.

"Real Impact: understanding the basics of economic impact generated by sports events" in *SportsTravel Magazine*, Vol. 6, No. 7, July/August 2002.  Reprinted in four regional sports commission newsletters.

"What is the Size of the Sports Industry?," in *SportsEconomics Perspectives*, Issue 1, August 2001.

"Neither Reasonable nor Necessary: "Amateurism" in Big-Time College Sports", with Andrew D. Schwarz.  In *Antitrust* (Spring 2000 Special Sports Issue).

"What Brings Fans to the Ballpark?," with Nola Agha in *FoxSportsBiz.com*, Spring 2000.

## RE-PUBLICATIONS

Republication of "Competitive Balance in Sports: "Peculiar Economics" over the last Thirty Years," with Andrew D. Schwarz.  In *Entertainment and Sports Law Journal, 31*(1), Winter 2020.

Republication of "Do Fans Want Close Contests? A Test of the Uncertainty of Outcome Hypothesis in the National Basketball Association", with John Paul G. Solmes in *Recent Developments in the Economics of Sport*, ed. Wladimir Andreff; *The International Library of Critical Writings in Economics*, 2011, Sudbury, MA: Jones & Bartlett.

Republication of "Variable Ticket Pricing in Major League Baseball", with Chad McEvoy, Mark Nagel, and Matthew Brown The Business of Sports, ed. Scott Rosner and Kenneth Shropshire, 2011, Elgar Pub., United Kingdom.

Republication of "What Brings Fans to the Ballpark?," with Nola Agha in *Brilliant Results* 2005.

Republication of "What is the Size of the Sports Industry?," in *Brilliant Results* 2005.

Republication of "Neither Reasonable nor Necessary: "Amateurism" in Big-Time College Sports", with Andrew D. Schwarz in *The Economics of Sport, Vol. I*, ed. Andrew Zimbalist; *The International Library of Critical Writings in Economics* 135, 2001, Elgar, Northampton, MA.

## MONOGRAPHS

"The Effect of Human Resource Systems on Fab Performance," with Clair Brown, in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  Final Report*, 1997.

"Inter-industry Comparisons: Lessons from the Semiconductor Industry," with Rene Kamita, in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  Final Report*, 1997.

"Problem-Solving Structures; A Case Study of Two U.S. Semiconductor Fabs," in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project: Final Report*, 1997.

"Transferability of Case Study Research: An Example from the Semiconductor Industry," with Clair Brown, in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project: 2nd Interim Report*, 1996.

"Headcount and Turnover," in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project: 2nd Interim Report*, 1996.

"Training," with Jumbi Edulbehram in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project: 2nd Interim Report*, 1996.

## WORKING PAPERS

"The Impact of COVID-19 on Employment and Output in the Leisure and Tourism Industries," with Lali Odosashvili and Mark Nagel. 2022.

"Commentary: Maximizing the Emergency Use of Public Stadiums and Arenas," with Mark Nagel and Tiffany Richardson. 2021.

"College Football and Basketball Fans Don't Root for Laundry: A Comparison of the Effect of Winning on Demand between College and Professional Football and Basketball," with Mark Nagel and Giseob Hyun. 2020.

"Optimal Markets for NFL Franchises." 2020.

"Would the Oakland A's Relocation to San Jose Harm the Sharks – A Case Study of Competition Across Professional Sports Teams" with Chad McEvoy, Matt Brown, and Mark Nagel. 2016.

"The Practical Use of Variable Ticket Pricing in Major League Baseball" with Chad McEvoy, Matt Brown, and Mark Nagel. 2012.

"Counting Local Residents in Economic Impact Analysis: New Findings from Sporting Events" with Richard Irwin. 2008.

"Perverse Incentives with the NCAA Basketball Tournament Seeding Process" with Matthew Brown, Chad McEvoy, and Mark Nagel. 2006.

"Do the Giants Compete with the A's: The Degree of Competition Between Teams" with Matthew Brown, Chad McEvoy and Mark Nagel. 2006.

"Forecasting Model of Airport Economic Impacts" with Alan Rozzi and Christopher Gillis. 2004.

"Psychic Impact of Professional Sports: A Case Study of a City Without Major Professional Sports" with Matthew Brown, Mark Nagel, and Chad McEvoy. 2003.

"The Use of New Technology and Human Resource Systems in Improving Semiconductor Manufacturing Performance", with Clair Brown and Greg Pinnsoneault, Working Paper, University of California at Berkeley, 1999.

**INVITED SPEAKING ENGAGEMENTS**

"An Economist Goes to the Game," invited co-host for *New Books Network* podcast, 2022.

"The Business of Sports."  Lecture at the Oregon Law Summer Sports Institute, University of Oregon, 2022.

"Big Stakes Antitrust Trial: In Re National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust Litigation," panelist at the 31st Golden State Institute Conference (2021).

"Economics of College Sports," guest speaking in Sports Finance, University of Delaware, 2021.

"The Business of Intercollegiate Sports," guest speaking in Issues in Sports Economics, University of West Florida, 2021.

"Professional Sports Franchise Location & Development."  Guest speaker in Sports Law & Ethics course at California Lutheran University.  2021.

"The Business of Sports." Guest speaker at Sport Administration course, University of Louisville, 2021.

"The Business of Sports."  Lecture at the Oregon Law Summer Sports Institute, University of Oregon, 2021.

"Sports Economics, Analytics, and Decision Making - 7 Case Studies," Theme Speaker 1, International Webinar on Sports Management, hosted by Sports Authority of India, Seshadripuram Educational Trust, Seshadripuram Evening Degree College, 2021.

"Economics of College Athletes," guest speaking in Sports Finance, University of Northern Colorado, 2021.

"Sports Antitrust Economics – Raiders & Regents," with Andy Schwarz in Sports Law, University of San Diego Law School, February, 2021.

"Research Thoughts & Methods" in Doctoral Research Seminar, Sport Management Department, University of South Carolina, January, 2021.

"Is there a Consensus?: An Experimental Trial to Test the Sufficiency of Methodologies Used to Measure Economic Impact in Sports."  Keynote Speaker at the 1st International Congress of Iranian Scientific Association of Sport Management, Tehran, Iran in March, 2021.

"Government Impact on Financial Aspects of Sports," at the International Conference on Governance and Integrity in Sport, Saudi Arabia, December, 2020.

"State of Play: Antitrust and the NCAA," panelist on a program hosted by the New York State Bar Association and the California Lawyers Association, November 19, 2020.

"Sports Commercialization and the Global Sports Economy" with Kenneth Cortsen.  Masterclass for Australian Sports Technologies Network, November 17, 2020.

"Economic and Financial Management of U.S. Professional Sports" presented at <u>Loyola University, Seville, Spain</u>, November 12, 2020.

"The Importance of Sound Data Analysis for Decision-Making in the Sports Industry" at <u>Sportin Global Summit</u>.  2020.

"The New Normal of the Sport Industry" at <u>HiVE 24HR Liveathon</u>.  2020.

"Play Time Sessions – A Series of Digital Conference Sessions on Gaming & Esports" presented by <u>GIMA Esports</u>.  2020.

"Practicing as a Sports Lawyer: Antitrust and Beyond."  Sponsored by the <u>American Bar Association's</u> Section of Antitrust Law and Trade, Sports and Professional Associations.  2020.

"Economics of Sports."  Lecture at the Oregon Law Summer Sports Institute, <u>University of Oregon</u>, 2020.

"Economics of College Sports," guest speaking in Sports Finance, <u>University of Delaware</u>, 2020.

"Economics of College Athletes," guest speaking in Sports Finance, <u>University of Northern Colorado</u>, 2020.

"Stadium Financing," guest speaking in Introduction to Sports Business, <u>UCLA's Anderson School of Business</u>, 2019.

"Economics of College Sports," discussion at the Oregon Law Summer Sports Institute, <u>University of Oregon</u>, 2019.

"Forging Industry Partnerships and Engaging in Applied Sport Management Research," with Weight, E., Love, A., McEvoy, C.  Presentation for the <u>Applied Sport Management Conference</u>, 2019.

"Making a Difference: Bridging the Gap Between the Ivory Tower & the Community."  Keynote Address, <u>Applied Sport Management Association</u>, 2019.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, <u>University of Oregon</u>, 2018.

"The Business of Sports", presented at the Sports Business Club at <u>Sonoma State University Business School</u>, May 2018.

"The Business of the Olympics," guest speaker in sports journalism course at Medill School of Journalism at <u>Northwestern University</u>, 2018.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, <u>University of Oregon</u>, 2017.

"College-Sport Research and Litigation: Theory and Practice Leading to Action." Panelist at College Sport Research Institute Symposium at the <u>University of South Carolina</u>, 2017.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, University of Oregon, 2016.

"The Business of Intercollegiate Sports," presented in the sport management department's sport law course, University of Toronto, 2016.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, University of Oregon, 2015.

"The Business of Intercollegiate Sports" presented in the sport management masters program, University of Arkansas, 2015.

Panelist on "The Future of Intercollegiate Athletics: The Players' Perspective," at the Sports Law and Business Conference at Arizona State University, 2015.

Panelist on "Intersection of Business and Sports Law," at the Sports and Entertainment Law Forum, presented by the University of Oregon Law School, 2015.

"The Economics of College Athletics Departments" presented in the masters in collegiate athletics program, college athletics in a digital era course, University of San Francisco, 2015.

"The Business of Intercollegiate Sports," presented in the sport management department's sport law course, University of Toronto, 2014.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, University of Oregon, 2014.

"The Finances of College Sports," presented in Matthew Brown's sport finance course, Ohio University, 2014.

"Antitrust Economics and Sports," presented in Professor Robert Elias's Politics and Sport course, University of San Francisco, 2014.

"The Economics of the Sports Industry," presented to the Haas School of Business, U.C. Berkeley, 2014.

"Economic Impact in Sports." Presentation in the masters in sports business program at New York University (NYU) as part of the Faculty-in-Residence program.  2013.

"Pricing the Game Experience," with Stephen Shapiro and Tim DeSchriver.  Invited research presentation at *Sport Entertainment & Venues Tomorrow* conference, 2013, University of South Carolina.

"Academia and the Industry: Opportunities for Meaningful Research Collaboration."  Invited panelist at *Sport Entertainment & Venues Tomorrow* conference, 2013, University of South Carolina.

"Sports Sponsorships in 2013," Panelist at Court Vision (Sheppard Mullin Sports Law Speaker Series and SLA).  Continuing Legal Education (CLE) units program.  2013.

"Using Contract Law to Tackle the Coaching Carousel – Commentary."  Presented at University of San Francisco, *Sports & Entertainment Law Association*, 2013.

"Sports Economics, Analytics, and Decision Making: 8 Examples." Invited speaker at the *IEG Sports Analytics Innovation Summit*, 2012

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz.  Presented at U.C. Berkeley, Boalt Law School's *Sports and Entertainment Law Society*, 2011.

"Financial Valuation of Sports Assets," presented at the *Sport Management Today Video Conference Series* at the IE Business School, 2011

"Financial Valuation of Sports Assets," presented to the *Sport Management Department* at the University of Northern Denmark, 2011.

"Economic Impact in Sports," presented to the *Sport Management Department* at the University of Northern Denmark, 2011.

"The Economics of the Sports Industry," presented to the *Sports Business Association* at U.C. Irvine, 2011.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at the *Economics Lecture Series* at Sonoma State University Business School, April 2010.

"Economics for Antitrust Lawyers: Application to Class Certification" presented to Lieff Cabraser Heimann & Bernstein for Continuing Legal Education (CLE) units.  November 2009.

"Economics for Antitrust Lawyers: Market Structure and Economic Modeling" presented to Lieff Cabraser Heimann & Bernstein for Continuing Legal Education (CLE) units.  October 2009.

"Sports Stadium Financing in Today's Economy" presented to the Rotary Club of San Jose, May 2009.

"The Economic Impact of Liberty Bowl Memorial Stadium," presented at the University of Memphis, *Issues in College Sports* lecture series (invited panelist), March 2007.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, U.C. Berkeley, January 2007.

"Stadium Financing – Dallas Cowboys Case," presented to the MBA Program at the Graduate School of Business, Stanford University, 2006.

"Taking the Gown to Town: Research and Consulting for the Sport Industry."  Invited presentation at the Past President's Workshop, *North American Society for Sport Management*, June 2006.

"Various Topics in Sports Economics," presented at the Wednesday Workshop on Economics Research, California State University, East Bay, 2005.

"Stadium Financing – Dallas Cowboys Case," presented to the MBA Program at the Graduate School of Business, <u>Stanford University</u>, 2005.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, <u>U.C. Berkeley</u>, 2005.

"The Economic Impact of General Aviation Airports: An Econometric Model," presented at <u>Niche Ventures</u> Spring Meeting, 2004.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, <u>U.C. Berkeley</u>, 2004.

"Oral Testimony Regarding California State Senate Bill 193, Student Athletes' Bill of Rights". 2003.  Testimony to the California State Senate Subcommittee on Entertainment.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, <u>U.C. Berkeley</u>, 2003.

"The Use of New Technology and Human Resource Systems in Improving Semiconductor Manufacturing Performance," with Clair Brown and Greg Pinsonneault.  Presented at *The Wharton School*, <u>University of Pennsylvania</u>, 1999.

**CONFERENCE PRESENTATIONS**

"Is there a Consensus?: An Experimental Trial to Test the Sufficiency of Methodologies Used to Measure Economic Impact," with Giseob Hyun and Mark Nagel.  Presentation at *Applied Sport Management Association*, February 2020.

"Is there a Consensus?: A Test of Methodologies Used to Measure Economic Impact," with Giseob Hyun and Mark Nagel.  Presentation at *Applied Business and Entrepreneurship Association International*, November 2019.

"Because It's Worth It: Why Schools Violate NCAA Rules and the Impact of Getting Caught in Division I Basketball," with Andrey Tselikov, Andrew D. Schwarz, and Mark Nagel.  Presentation at *Applied Business and Entrepreneurship Association International*, November 2018.

"College Football and Basketball Fans Don't Root for Laundry: A comparison of the effect of winning on attendance and television viewership between big-time college football and basketball and the NBA and NFL," with Mark Nagel.  Presentation at *Applied Business and Entrepreneurship Association International*, November 2017.  (voted Best Paper Award for session)

"Financial Valuation of a Sporting Goods Retail Store," with Mark Nagel and Matthew Brown. Poster presentation at *North American Society for Sport Management*, May 2016.

"Cartel Behavior in United States College Sports: An Analysis of National Collegiate Athletic Association Football Enforcement Actions from 1990 to 2011," with Mark Nagel, Richard Southall, and Nick Fulton.  Presented at *Western Economics Association International*, January 2016.

"The College Basketball Players' Labor Market: *Ex Ante* versus *Ex Post* Valuations" with David Berri and Robert Brown.  Presented at *Western Economics Association International*, July 2015.

"What drives Endorsement Values for Superstar Athletes?" with Terry Eddy and Giseob Hyun. Presented at *Sport Management Association of Australia and New Zealand*, November 2014.

"The Beckham Effect: David Beckham's Impact on Major League Soccer, 2007-2012," with Stephen Shapiro and Tim DeSchriver.  Presented at *North American Society for Sport Management*, May 2014.

"Where is Everyone? An Examination of Consumer Demand for College Football Bowl Games," with Terry Eddy and Rebecca Stewart.  Presented at *Collegiate Sports Research Institute* conference, April 2014.

"If We Build It, Will You Come?: Examining the Effect of Expansion Teams and Soccer-Specific Stadiums on Major League Soccer Attendance," with Stephen Shapiro and Tim DeSchriver. Presented at *North American Society for Sport Management*, May 2013.

"Should San Jose say 'No Way' to the Oakland A's," with Mark Nagel and Matt Brown.  Presented at *North American Society for Sport Management*, May 2013.

Panel member for "Financial Issues in Intercollegiate Sports." Presented at the *Santa Clara University Sports Law Symposium*, 2012.

"What's in a Name?: Does the Amount and Source of Public Financing Impact Team Names?" with Nola Agha and Matt Brown.  Presented at *Western Economics Association International*, July 2012.

"When Can Economic Impact be Positive?  Twelve conditions that explain why smaller sports have bigger impacts" with Nola Agha.  Presented at *Western Economics Association International*, July 2012.

"Reflections on the MLB Collective Bargaining Agreement."  Part of a symposium on the Economics of Labor-Management Relations in Sports Today at *Western Economics Association International*, July 2012.

"The Economics of Competitive Balance on the Field and in the Courts." Presented at the *Santa Clara University Sports Law Symposium*, 2011.

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz.  Presented at *International Association of Venue Managers*, July 2011.

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz.  Presented at *TicketSummit*, July 2011.

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz.  Presented at *Western Economics Association International*, July 2011.

"Financial Risk Management: The Role of a New Stadium in Minimizing the Variation in Franchise Revenues" with Matt Brown, Chad McEvoy, and Mark Nagel.  Presented at *Western Economics Association International*, July 2011.

"A Panel Study of Factors Affecting Attendance at Major League Soccer Contests: 2007-2010" with Tim DeSchriver.  Presented at the *Sport Marketing Association IX* conference in New Orleans, October 2010.

"The NCAA and the Prisoner's Dilemma".  Presented at the *Sports Law Symposium* at the University of Santa Clara Law School, September 2010.

"Financial Risk Management: The Role of a New Stadium in Minimizing the Variation in Franchise Revenues" with Matt Brown, Chad McEvoy, and Mark Nagel.  Presented at *North American Society for Sport Management*, May 2010.

"An Analysis of the Value of Intercollegiate Athletics to its University: Methods".  Presented at the *Scholarly Conference on College Sport*, April 2010.

"Demand, Consumer Surplus, and Pricing Inefficiency in the NFL: A Case Study of the Secondary Ticket Market Using StubHub" with Joris Drayer and Chad McEvoy.  Presented at *North American Society for Sport Management*, May 2009.

"Luxury Suite Pricing in North American Sports Facilities" with Tim DeSchriver.  Presented at *North American Society for Sport Management*, May 2009.

"A Smorgasbord of Lessons Learned from Economic Impact Studies"  Presented at *North American Society for Sport Management*, June 2008.

"Globalization and Sport Finance: What is True and What is Myth?" with Mark Nagel and Ross Booth.  Presented at the *Sport Management Association of Australia and New Zealand*, November 2007.

"Exploring the Myth that a Better Seed in the NCAA Men's Basketball Tournament results in an *ex ante* Higher Payout" with Mark Nagel, Matt Brown, and Chad McEvoy.  Presented at the *Sport Management Association of Australia and New Zealand*, November 2007.

"Oakland A's Baseball Simulator" with Joris Drayer.  Presented at *North American Society for Sport Management*, June 2007.

"Teaching Sport Financial Management: A Symposium" with Timothy DeSchriver, Matthew Brown, and Michael Mondello.  Presented at *North American Society for Sport Management*, June 2007.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, U.C. Berkeley, January 2007.

"Practical Strategies for Variable Ticket Pricing in Professional Sports" with Chad McEvoy, Matt Brown, and Mark Nagel.  Presented at *Sport Marketing Association IV*, November 2006.

"Do the Giants Compete with the A's: The Degree of Competition Between Teams", presented at *Western Economic Association International*, July 2006.

"Do the Giants Compete with the A's: The Degree of Competition Between Teams", presented at *North American Society for Sport Management*, June 2006.

"Measuring Sponsorship Return on Investment: A Need for Quantitative Analysis" with Matt Brown, Mark Nagel, and Chad McEvoy.  Presented at *Sport Marketing Association III*, November 2005.

"The Use of Economic Impact Analysis for Marketing Purposes" with Dick Irwin and Matt Brown.  Presented at *Sport Marketing Association III*, November 2005.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at *Western Economic Association International*, July 2005.

"Public Funds for Private Benefit: Equity Issues in Sport Stadia Funding and the Question of Who Really Pays," with Matt Brown and Mark Nagel.  Presented at *North American Society for Sport Management*, June 2005.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at *North American Society for Sport Management*, June 2005.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Accepted by *Sport Management Association of Australia and New Zealand*, Nov. 2004.

"Redskins: Legal, Financial, and Policy Issues relative to Harjo v. Pro-Football, Inc." with Richard Southall, Matt Brown, and Mark Nagel.  Presented at *North American Society for the Sociology of Sport*, Nov. 2004.

"An Analysis of Distance Traveled and Tourism Economic Impact: A Test of the Alchian-Allen Theorem" with Matt Brown, Mark Nagel, and Chad McEvoy.  Presented at *Sport Marketing Association II* conference, Nov. 2004.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at *Sport Marketing Association II* conference, Nov. 2004.

"Beyond The Economic Impact Study: Examining Economic Impact Data for Support of the Third Law of Demand" with Matthew Brown, Mark Nagel, and Chad McEvoy.  Presented at *North American Society for Sport Management*, 2004.

"Optimal Variable Ticket Pricing in Major League Baseball" with Mark Nagel, Chad McEvoy, and Matthew Brown.  Presented at *North American Society for Sport Management*, 2004.

"*Clarett v. NFL*: Age Eligibility Rules and Antitrust Law in Professional Sports" with Chad McEvoy, Mark Nagel, and Matt Brown.  Presented at *Sport and Recreation Law Association*, 2004.

"Variable Pricing in Baseball: Or, What Economists Would Just Call 'Pricing'," presented at *Western Economic Association International*, 2003.

"The Impact of Stadia on Wealth Maximization in the National Football League: To Build or Renovate?" with Matthew Brown, Mark Nagel, and Chad McEvoy.  Presented at *North American Society for Sport Management*, 2003.

"Major League Baseball's Antitrust Immunity: Examining the Financial Implications of Relocation Rules," with Matthew Brown and Mark Nagel.  Presented at *Society for the Study of the Legal Aspects of Sport and Physical Activity*, 2003.

"Locational Choice in the NBA: An Examination of Potential Cities for Expansion or Relocation," presented at *North American Society for Sport Management*, 2002.

Panel discussant on the effects of the economy on the business of sports at *Sports Facilities and Franchises Forum*, Dallas, TX 2002 (presented by SportsBusiness Journal).

"Psychic Impact Findings in Sports," presented at *Sport Management Association of Australia and New Zealand*, 2001.

"Locational Choice in the NBA: An Examination of Potential Cities for Expansion or Relocation" presented at *Sport Management Association of Australia and New Zealand*, 2001.

"Psychic Impact as a Decision Making Criterion," presented at the *North American Society for Sport Management*, 2000.

"Economic Impact Methods," presented at the *North American Society for Sport Management*, 2000.

"Valuation of Naming Rights," presented at the *Sports Finance Forum*, 2000.

" 'Amateurism' in Big-Time College Sports," presented at the *Western Economic Association International*, 1999.

"Does Bat Day Make Cents?: The Effect of Promotions on the Demand for Baseball," with Mark McDonald.  Presented at the *17th Annual Consumer Psychology Conference*, 1998.

"A Test of the Optimal Positive Production Network Externality in Major League Baseball," presented at the *North American Society for Sport Management Conference*, 1998.

"A Test of the Optimal Positive Production Network Externality in Major League Baseball," presented at the *Western Economic Association International*, 1998.

"The NBA, Exit Discrimination, and Career Earnings," presented at the *Western Economic Association International*, 1997.

"Sports Salary Determination," presented at the *International Atlantic Economic Society Conference*, 1997.

"A Model of a Professional Sports League," presented at the *International Atlantic Economic Society Conference*, 1996.

"Transferability of Case Study Research:  An Example from the Semiconductor Industry," presented at the *American Society of Training and Development Conference*, 1996.

**EDITORIAL/REVIEWER BOARDS OF PEER-REVIEWED JOURNALS**

*Frontiers in Sports and Active Living – Sports Management and Marketing,* 2020 – present
*International Journal of Sport Management and Marketing,* 2011 – present
*International Journal of Sports Marketing and Sponsorship,* 2021 – present
*International Journal of Sport Finance,* 2006 – present (founding member)
*Journal of Risk and Financial Management,* 2019 – present
*Journal of Sport Management,* 2003 – present
   Associate Editor, 2010 – 2012
   Co-Editor of Special Issue, 2022
*Journal of Quantitative Analysis in Sports,* 2005 – 2012 (founding member)
*Case Studies in Sport Management,* 2011 – 2019 (founding member)
*Sport Management Review,* 2001 – 2008

## REFEREE FOR PEER-REVIEWED JOURNALS & GRANTING AGENCIES

*American Behavioral Scientist*, 2008
*Applied Economics Letters,* 2018
*Applied Economics,* 2020, 2021
*Axioms,* 2017
*Case Studies in Sport Management,* 2012, 2014a, 2014b, 2015, 2017, 2019
*Communication & Sport,* 2019, 2020
*Contemporary Economic Policy,* 2004, 2021
*Eastern Economic Journal,* 2010
*Economic Inquiry,* 2008, 2010, 2011
*Economics and Business Letters,* 2018
*European Sport Management Quarterly,* 2012, 2020, 2021, 2022
*Frontiers in Sports and Active Living,* 2021a, 2021b, 2022
*Future Internet,* 2019, 2020
*Industrial Relations*, 1993, 2000, 2000, 2001, 2013
*International Journal of Financial Studies,* 2018
*International Journal of Sport Communication,* 2011
*International Journal of Sport Finance,* 2005, 2006a, 2006b, 2006c, 2007a, 2007b, 2008a, 2008b,
        2010, 2011, 2012, 2013, 2014a, 2014b, 2014c, 2015, 2017, 2018,
        2019, 2022a, 2022b
*International Journal of Sport Management and Marketing*, 2005, 2010, 2013, 2014, 2017, 2021
*International Journal of Sports Marketing and Sponsorship*, 2016, 2018a, 2018b, 2019, 2021a,
        2021b, 2021c, 2021d
*International Journal of Sport Policy and Politics,* 2014
*International Review for the Sociology of Sport*, 2012
*Journal for the Study of Sport and Athletes in Education,* 2021a, 2021b
*Journal of Functional Morphology and Kinesiology,* 2018
*Journal of Global Sport Management,* 2018
*Journal of Industrial Economics*, 1997
*Journal of Intercollegiate Sport*, 2016, 2021, 2022
*Journal of Issues in Intercollegiate Athletics,* 2021
*Journal of Sport Management,* 2001, 2002, 2003a, 2003b, 2004a, 2004b, 2004c, 2004d, 2004e,
        2005a, 2005b, 2005c, 2005d, 2006a, 2006b, 2006c, 2006d, 2006e,
        2006f, 2006g, 2006h, 2006i, 2007a, 2007b, 2007c, 2007d, 2008a,
        2008b, 2008c, 2008d, 2009a, 2009b, 2009c, 2009d, 2009e, 2009f,
        2009g, 2010a, 2010b, 2010c, 2010d, 2011a, 2011b, 2013, 2013b,
        2014, 2015a, 2015b, 2016a, 2016b, 2016c, 2016d, 2017a, 2017b,

2017c, 2017d, 2018a, 2018b, 2018c, 2018d, 2019a, 2019b, 2019c,
2019d, 2019e, 2020a, 2020b, 2020c, 2020d, 2021

*Journal of Sports Economics*, 2003, 2007, 2008a, 2008b, 2009, 2010, 2011, 2012a, 2012b, 2014a, 2014b, 2015a, 2015b, 2016, 2018, 2019a, 2019b, 2021, 2022

*Journal of Venue and Event Management,* 2012

*Journal of the Quantitative Analysis of Sports*, 2005, 2006a, 2006b, 2007

*Mathematical Problems in Engineering,* 2018

*Perceptual and Motor Skills*, 2009

*Review of Economics and Statistics,* 2017

*Review of Industrial Organization*, 2012, 2013, 2015

*SAGE Open,* 2021

*Soccer & Society*, 2014, 2015, 2020

*Southern Economic Journal*, 2001, 2007a, 2007b

*Sport, Business and Management: An International Journal*, 2011, 2012, 2013, 2017, 2018

*Sport Management Review*, 2002a, 2002b, 2003a, 2003b, 2003c, 2003d, 2004a, 2004b, 2004c, 2006a, 2006b, 2006c, 2007a, 2007b, 2007c, 2010a, 2010b, 2011, 2015, 2016, 2017, 2020

*Sport Marketing Quarterly*, 2015, 2018

*Sustainability,* 2018, 2021a, 2021b

External review of $250,000 grant proposal for the *Social Sciences and Humanities Research Council of Canada*, 2008

## PROFESSIONAL AFFILIATIONS (CURRENT AND PREVIOUS)

American Bar Association
American Economic Association
National Association of Certified Valuation Analysts
North American Society for Sport Management
North American Association of Sports Economists
Sport and Recreation Law Association
Sport Marketing Association
Sports Lawyers Association
Western Economic Association International

## TESTIMONY

Provided expert report in *In Re NFL Sunday Ticket Antitrust Litigation*.  2022.

Provided deposition and trial testimony regarding liability and economic damages in *San Francisco Federal Credit Union v. San Francisco Municipal Transportation Agency*.  2021.

Provided expert reports and deposition testimony regarding class certification and damages in *Shields et al. v. FINA*.  2021.

Provided expert report pertaining to alleged financial harm from lost career earnings related to RICO claims in *Bowen v. adidas*.  2021.

Provided expert report and trial testimony pertaining to financial harm of alleged mismanagement of professional tennis client in *Mirjana Lucic v. IMG Worldwide.*  2021.

"An Economics Perspective on NIL at the Community College Level" presented at a public hearing of the Senate Bill 206 (Skinner-D, 2019) Statutory Community College Athlete Name, Image, and Likeness Working Group, November 10, 2020.

Provided expert report and deposition pertaining to financial harm of alleged misleading advertising in *The People of the State of California v. Hertz et al.* 2019.

Financial and economic analysis and testimony at a hearing of baseball and *AT&T Park* for Assessment Appeals Board (property tax dispute). 2018.

Provided arbitration testimony on damages regarding an NBA agent and agency in *ISE v. Dan Fegan.* 2018.

Provided trial and deposition testimony and multiple expert reports pertaining to class certification, liability, damages, and injunction issues in college sports in the federal lawsuit *In Re: NCAA Athletic GIA Cap Antitrust Litigation.* 2015-18.

Provided expert report pertaining to damages in auto racing case between a driver and his agent in *Sports Management Network v. Kurt Busch.* 2018.

Public testimony on forecast of economic impact of Rocky Mountain Sports Park on Windsor, CO to the Windsor City Council. 2017.

Provided expert report pertaining to the economics of ticketing and personal seat licenses (PSLs) in *RCN Capital v. Los Angeles Rams.* 2017.

Provided trial testimony (and multiple reports and depositions) on financial harm pertaining to *FTC v. DirecTV.* 2017.

Provided declaration pertaining to the economics of ticketing for sports and entertainment in *Glickman et al. v. Live Nation et al.* 2016.

Provided declaration pertaining to the economics of ticketing for sports and entertainment in *Pollard v. AEG Live, et al.* 2016.

Provided declaration pertaining to the economics of ticketing for sports and entertainment in *Finkelman v. NFL.* 2016.

Provided deposition testimony and submitted two expert reports pertaining to class certification issues in college football in *Rock v. NCAA.* 2014-16.

Submitted an expert report on damages pertaining to an endorsement relationship in *Frank Thomas v. Reebok.* 2015.

Provided deposition testimony and submitted an expert report pertaining to the economic relationship between two boxing entities in *Garcia v. Top Rank, Inc.* 2015.

Provided trial testimony (and multiple reports and depositions) on class certification issues, damages, and antitrust economics in regards to group licensing for former and current college football and basketball players in *O'Bannon et al. v. NCAA.* 2013-14.

Submitted three expert reports regarding lost earnings for a Major League Baseball player in *Backe et al. v. Fertitta Hospitality, LLC et al.*  2013.

Submitted two expert reports on class certification issues in regards to ticket holder lawsuit in *Phillips et al. v. Comcast Spectacor et al.*  2013.

Submitted expert report in a federal case involving defamation of character in the boxing industry (*Pacquiao v. Mayweather Jr. et al.*).  2012.

Provided deposition testimony and prepared expert report regarding an alleged sponsorship breach of contract in motorsports (*Vici Racing, LLC v. T-Mobile USA, Inc.*).  2012.

Prepared expert witness testimony on trade secrets case involving the sports consulting industry (*Sport Management Research Institute v. Keehn*).  2011.

Provided deposition testimony on the value of a minor league baseball team and related damages from an alleged breach of a facility lease permit (*Long Beach Armada v. City of Long Beach*).  2011.

Provided deposition testimony on the value of athlete endorsements in a breach of contract case involving an NBA player and a charter school business in an arbitration proceeding (*D Wade's Place v. Dwyane Wade*).  2010.

Provided deposition testimony on the value of athlete endorsements in a breach of contract case involving an NBA player and a restaurant investment in a state court proceeding (*Rodberg v. Dwyane Wade*).  2010.

Submitted two reports and provided deposition and arbitration testimony regarding damages related to how media coverage has impacted an NFL team's brand (*Kiffin v. Raiders*).  2009.

Submitted expert report, rebuttal report, gave deposition and trial testimony in federal court (*Adderley et al. v NFLPA & NFLPI).*  2008.

Public testimony on economic impact of a Major League Soccer stadium in San Jose to the San Jose City Council.  2008.

Public testimony on economic impact of six sports and cultural events in San Jose to the San Jose City Council.  2007.

Submitted expert report, rebuttal report, and testified at arbitration hearing on the financial valuation of Major League Soccer (*Rothenberg v. Major League Soccer, LLC*).  2006.

Named expert witness for a Major League Baseball club to analyze a punitive damages claim from an injury at a baseball game (*Bueno v. Rangers*).  2006.

Prepared expert testimony on liability and damages related to the operations of a minor baseball league on behalf of the league's owner (*Don Altman et al., v. Jeffrey Mallet, et al.*).  Case was settled prior to deposition.  2004.

Public testimony on economic impact of an existing and new professional football stadium in Irving, TX to the Irving City Council (two council meetings).  2004.

Testimony on college athletics regarding Senate Bill 193 to the California State Senate Subcommittee on Entertainment.  2003.

Public testimony on economic impact of a downtown entertainment district in Sacramento to the Sacramento City Council (two council meetings).  2003.

Determination of IP valuation and damages from a clothing endorsement alleged breach of contract for PGA Tour player (*Stankowski v. Bugle Boy*).  Submitted expert report.  Case was settled prior to deposition.  2000.

Deposition testimony in breach of contract matter concerning sponsorship damages analysis in the auto racing industry (*Parente v. Della Penna Racing*).  2000.

Public testimony on forecast of economic impact of Pan Am Games on San Antonio to the San Antonio City Council.  1999.

Updated September 2022

# Appendix B

# Appendix B

## Documents Relied Upon

<u>**Legal Filings and Guidelines**</u>

7 F.Supp.3d 955, United States District Court, N.D. California, September 30, 2015 (O'Bannon)

802 F.3d 1049, United States Court of Appeals, Ninth Circuit, August 5, 2016 (O'Bannon)

Answer and Additional Defenses of Defendant Atlantic Coast Conference to Consolidated Amended Complaint, September 22, 2021

Answer and Additional Defenses of Defendant Pac-12 Conference to the Consolidated Amended Complaint, September 22, 2022

Answer and Additional Defenses of Defendant Southeastern Conference to Consolidated Amended Complaint, September 22, 2021

"Answer and Affirmative And Additional Defenses of Defendant the Big Ten Conference, Inc. to the Consolidated Amended Complaint," September 22, 2022

Answer of Defendant National Collegiate Athletic Association to Consolidated Amended Complaint, September 22, 2022

Answer of Defendant The Big 12 Conference, Inc., September 22, 2021

Consolidated Amended Complaint against NCAA, Pac-12, Big Ten, Big 12, SEC, ACC, July 26, 2021

Defendant Atlantic Coast Conference's Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories to All Defendants, August 2, 2022

Defendant NCAA's Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories to All Defendants, August 2, 2022

Defendant Pac-12 Conference's Amended Responses and Objections to Plaintiffs' First Set of Interrogatories, August 2, 2022

Defendant Southeastern Conference's Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories to All Defendants, August 2, 2022

Defendant the Big 12 Conference, Inc.'s Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories to All Defendants, August 2, 2022

Defendant the Big Ten Conference Inc.'s Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories to All Defendants, August 2, 2022

Finding of Fact and Conclusions of Law, March 8, 2019 (Alston)

Order Granting Final Approval of Class Action Settlement and Final Judgment, August 19, 2015 (Keller)

Order Granting Final Approval of Class Action Settlement and Final Judgment, August 19, 2015 (O'Bannon)

1

*CONFIDENTIAL*

Order Granting in Part and Denying in Part Motion for Class Certification, November 8, 2013 (Keller)

Order Granting in Part and Denying in Part Motion for Class Certification, November 8, 2013 (O'Bannon)

Order Granting in Part and Denying in Part Motions to Dismiss, June 24, 2021

Order Granting Motion for Rule 23(b) (2) Class Certification, December 4, 2015 (Alston)

Order Granting Plaintiffs' Supplemental Motion for Class Certification in High-Tech Employee Antitrust Litigation, October 24, 2013

Plaintiffs' First Set of Interrogatories to All Defendants, November 2, 2021

Plaintiffs' Notice of Motion and Motion for Class Certification, October 21, 2022

Reporter's Transcript of Proceedings, June 18, 2014 (O'Bannon)


**Depositions, Declarations and Expert Reports**

Deposition of James Delany, September 20, 2022

Declaration of Gary Arrick, October 14, 2022

Declaration of Steven J, Scebelo, September 26, 2022 (NFLPA_000001)

Expert Report of Edwin Desser, October 21, 2022

Expert Report of Daniel A. Rascher on Damages Class Certification, February 16, 2016 (Alston)

Expert Report of Daniel A. Rascher on Injunctive Class Certification, June 25, 2015 (Alston)

Expert Report of Daniel L. Rubinfeld Regarding Class Certification, March 14, 2013 (O'Bannon)

Deposition of Todd Stirin, January 25, 2013 (O'Bannon)

Deposition of Joel Linzner, December 18, 2012 (O'Bannon)

Backup to Expert Report of Daniel A Rascher on Economic Liability Issues March 21, 2017 (Alston): Exhibit 19. Percentage of Division I WBB GIA Recipients with Full GIAs


**Produced Bates Numbered Documents**

*All documents cited as sources in the produced NIL databases. (List of sources provided in backup.)*

ACC_HOUSE0130992

ACC-GIA130393

ACC-GIA130545

ACC-GIA130566

ACC-GIA130621

ACC-GIA130773

*CONFIDENTIAL*

ACC-GIA130898

ACC-GIA131046

ACC-GIA131115

ACC-GIA131127

ACC-GIA131142

ACC-HOUSE0000745

ACC-HOUSE0000799

ACC-HOUSE0000851

ACC-HOUSE0035559

ACC-HOUSE0121374

ACC-HOUSE0121390

ACC-HOUSE0121409

ACC-HOUSE0121429

ACC-HOUSE0121450

ACC-HOUSE0130449

ACC-HOUSE0227822

ACC-HOUSE0227974

ACC-HOUSE0228041

ACC-HOUSE0228053

ACC-HOUSE0228078

ACC-HOUSE0228205

ACC-HOUSE0228220

ACC-HOUSE0228278

ACC-HOUSE0228382

BIG12_HOUSE00000001

BIG12_HOUSE00000048

BIG12_HOUSE00000086

BIG12_HOUSE00000146

BIG12_HOUSE00013305

BIG12_HOUSE00033590

*CONFIDENTIAL*

BIG12_HOUSE00033607

BIG12_HOUSE00033624

BIG12_HOUSE00033642

BIG12_HOUSE00033662

BIG12_HOUSE00033684

BIG12_HOUSE00033695

BIG12_HOUSE00033708

BIG12_HOUSE00033710

BIG12_HOUSE00033712

BIG12_HOUSE00039677

BIG12-GIA_00272365

BIG12-GIA_00272568

BIG12-GIA_00273043

BIG12-GIA_00273107

BIG12-GIA_00273255

BIG12-GIA_00273536

BIGTEN-GIA 248486

BIGTEN-GIA 248499

BIGTEN-GIA 249005

BIGTEN-GIA 249010

BIGTEN-GIA 249183

BIGTEN-GIA 249200

BIGTEN-GIA 249340

BIGTEN-GIA 249355

BIGTEN-GIA 253025

BIGTEN-NIL_00000001

BIGTEN-NIL_00000072

BIGTEN-NIL_00000148

BIGTEN-NIL_00000205

BIGTEN-NIL_00041698

*CONFIDENTIAL*

BIGTEN-NIL_00111319

BIGTEN-NIL_00115836

BIGTEN-NIL_00143504

BIGTEN-NIL_00143533

BIGTEN-NIL_00143559

BIGTEN-NIL_00143587

BIGTEN-NIL_00143617

BIGTEN-NIL_00143751

BIGTEN-NIL_00143755

BIGTEN-NIL_00143844

BIGTEN-NIL_00149856

BIGTEN-NIL_00149995

BIGTEN-NIL_00263362

BIGTEN-NIL_00263413

BIGTEN-NIL_00263584

BIGTEN-NIL_00263737

BIGTEN-NIL_00263751

BIGTEN-NIL_00263760

BIGTEN-NIL_00263761

BYU000001

CLC000216

CLC000217

CLC-NIL0000001

CLC-NIL0000002

CLC-NIL0000003

CLC-NIL0000004

CLC-NIL0000005

CLC-NIL0000006

CLC-NIL0000007

CLC-NIL0000008

CLC-NIL0000009

CLC-NIL0000010

CLC-NIL0000011

CLC-NIL0000012

CLC-NIL0000013

CLC-NIL0000014

CLC-NIL0000015

CLC-NIL0000016

CLC-NIL0000017

CLC-NIL0000018

CLC-NIL0000019

CLC-NIL0000020

CLC-NIL0000021

CLC-NIL0000022

CLC-NIL0000023

CLC-NIL0000024

CLC-NIL0000025

CLC-NIL0000026

CLC-NIL0000027

CLC-NIL0000028

CLC-NIL0000029

CLC-NIL0000030

CLC-NIL0000031

CLC-NIL0000032

CLC-NIL0000033

CLC-NIL0000034

CLC-NIL0000035

CLC-NIL0000036

CLC-NIL0000037

CUSA-GIA_00000509

EA_NIL_00000001

EA_NIL_00000003

EA_NIL_00000006

EA_NIL_00000007

EA_NIL_00000009

EA_NIL_00000023

EA_NIL_00000028

EA_NIL_00000029

EA_NIL_00000031

EA_NIL_00000042

EA_NIL_00000057

EA_NIL_00000065

EA_NIL_00000068

EA_NIL_00000103

EA_NIL_00000116

EA_NIL_00000120

EA_NIL_00000121

EA_NIL_00000122

EA_NIL_00000123

EA_NIL_00000125

EA_NIL_00000129

EA_NIL_00000133

EA_NIL_00000142

EA_NIL_00000144

EA_NIL_00000149

EA_NIL_00000151

EA_NIL_00000152

EA_NIL_00000158

EA_NIL_00000163

EA_NIL_00000165

EA_NIL_00000169

EA_NIL_00000180

EA_NIL_00000181

EA_NIL_00000184

EA_NIL_00000186

EA_NIL_00000190

EA_NIL_00000199

EA_NIL_00000201

EA_NIL_00000205

EA_NIL_00000207

EA_NIL_00000212

EA_NIL_00000217

EA_NIL_00000218

EA_NIL_00000219

EA_NIL_00000224

EA_NIL_00000230

EA_NIL_00000235

EA_NIL_00000241

EA_NIL_00000245

EA_NIL_00000249

EA_NIL_00000251

EA_NIL_00000262

EA_NIL_00000266

EA_NIL_00000268

EA_NIL_00000272

EA_NIL_00000273

EA_NIL_00000276

EA_NIL_00000277

EA_NIL_00000281

EA_NIL_00000286

*CONFIDENTIAL*

EA_NIL_00000291

EA_NIL_00000295

EA_NIL_00000300

EA_NIL_00000305

EA_NIL_00000310

EA_NIL_00000311

EA_NIL_00000313

EA_NIL_00000316

EA_NIL_00000319

EA_NIL_00000323

EA_NIL_00000326

EA_NIL_00000334

EA_NIL_00000335

EA_NIL_00000341

EA_NIL_00000342

EA_NIL_00000344

EA_NIL_00000348

EA_NIL_00000359

EA_NIL_00000369

EA_NIL_00000370

EA_NIL_00000372

EA_NIL_00000380

EA_NIL_00000383

EA_NIL_00000391

EA_NIL_00000394

EA_NIL_00000404

EA_NIL_00000411

EA_NIL_00000412

EA_NIL_00000415

EA_NIL_00000419

*CONFIDENTIAL*

EA_NIL_00000421

EA_NIL_00000422

EA_NIL_00000428

EA_NIL_00000433

EA_NIL_00000436

EA_NIL_00000441

EA_NIL_00000446

EA_NIL_00000451

EA_NIL_00000454

EA_NIL_00000465

EA_NIL_00000470

EA_NIL_00000472

EA_NIL_00000474

EA_NIL_00000476

EA_NIL_00000479

EA_NIL_00000481

EA_NIL_00000483

EA_NIL_00000493

EA_NIL_00000503

EA_NIL_00000504

EA_NIL_00000514

EA_NIL_00000515

EA_NIL_00000518

EA_NIL_00000520

EA_NIL_00000523

EA_NIL_00000530

EA_NIL_00000531

EA_NIL_00000534

EA_NIL_00000537

EA_NIL_00000544

EA_NIL_00000547

EA_NIL_00000551

EA_NIL_00000552

EA_NIL_00000558

EA_NIL_00000566

EA_NIL_00000567

EA_NIL_00000569

EA_NIL_00000570

EA_NIL_00000571

EA_NIL_00000572

EA_NIL_00000573

EA_NIL_00000611

EA_NIL_00000613

EA_NIL_00000615

EA_NIL_00000617

EA_NIL_00000621

EA_NIL_00000626

EA_NIL_00000635

EA_NIL_00000643

EA_NIL_00000651

EA_NIL_00000659

EA_NIL_00000667

EA_NIL_00000669

EA_NIL_00000671

EA_NIL_00000672

EA_NIL_00000677

EA_NIL_00000678

EA_NIL_00000680

EA_NIL_00000685

EA_NIL_00000688

EA_NIL_00000690

EA_NIL_00000695

EA_NIL_00000697

EA_NIL_00000698

EA_NIL_00000700

EA_NIL_00000704

EA_NIL_00000714

EA_NIL_00000717

EA_NIL_00000720

EA_NIL_00000722

EA_NIL_00000725

EA_NIL_00000729

EA_NIL_00000734

EA_NIL_00000739

EA_NIL_00000744

EA_NIL_00000749

EA_NIL_00000750

EA_NIL_00000753

EA_NIL_00000758

EA_NIL_00000762

EA_NIL_00000765

EA_NIL_00000766

EA_NIL_00000772

EA_NIL_00000775

EA_NIL_00000780

EA_NIL_00000781

EA_NIL_00000783

EA_NIL_00000786

EA_NIL_00000800

EA_NIL_00000802

*CONFIDENTIAL*

EA_NIL_00000807

EA_NIL_00000809

EA_NIL_00000814

EA_NIL_00000825

EA_NIL_00000836

EA_NIL_00000848

EA_NIL_00000860

EA_NIL_00000874

EA_NIL_00000878

EA_NIL_00000883

EA_NIL_00000887

EA_NIL_00000890

EA_NIL_00000893

EA_NIL_00000897

EA_NIL_00000901

EA_NIL_00000908

EA_NIL_00000909

EA_NIL_00000915

EA_NIL_00000919

EA_NIL_00000920

EA_NIL_00000921

EA_NIL_00000926

EA_NIL_00000932

EA_NIL_00000935

EA_NIL_00000938

EA_NIL_00000940

EA_NIL_00000945

EA_NIL_00000951

EA_NIL_00000957

EA_NIL_00000962

*CONFIDENTIAL*

EA_NIL_00000964

EA_NIL_00000965

EA_NIL_00000969

EA_NIL_00000972

EA_NIL_00000973

EA_NIL_00000979

EA_NIL_00000985

EA_NIL_00000992

EA_NIL_00000995

EA_NIL_00000996

EA_NIL_00001001

EA_NIL_00001004

EA_NIL_00001005

EA_NIL_00001014

EA_NIL_00001015

EA_NIL_00001025

EA_NIL_00001026

EA_NIL_00001036

EA_NIL_00001047

EA_NIL_00001048

EA_NIL_00001057

EA_NIL_00001058

EA_NIL_00001062

EA_NIL_00001064

EA_NIL_00001069

EA_NIL_00001073

EA_NIL_00001077

EA_NIL_00001087

EA_NIL_00001092

EA_NIL_00001096

EA_NIL_00001099

EA_NIL_00001103

EA_NIL_00001107

EA_NIL_00001111

EA_NIL_00001116

EA_NIL_00001117

EA_NIL_00001120

EA_NIL_00001122

EA_NIL_00001125

EA_NIL_00001130

EA_NIL_00001149

EA_NIL_00001152

EA_NIL_00001153

EA_NIL_00001156

EA_NIL_00001158

EA_NIL_00001162

EA_NIL_00001163

EA_NIL_00001164

EA_NIL_00001170

EA_NIL_00001171

EA_NIL_00001175

EA_NIL_00001181

EA_NIL_00001183

EA_NIL_00001186

EA_NIL_00001194

EA_NIL_00001195

EA_NIL_00001199

EA_NIL_00001201

EA_NIL_00001205

EA_NIL_00001209

*CONFIDENTIAL*

EA_NIL_00001214

EA_NIL_00001218

EA_NIL_00001222

EA_NIL_00001228

EA_NIL_00001229

EA_NIL_00001230

EA_NIL_00001235

EA_NIL_00001236

EA_NIL_00001237

EA_NIL_00001239

EA_NIL_00001243

EA_NIL_00001248

EA_NIL_00001250

EA_NIL_00001297

EA_NIL_00001299

EA_NIL_00001302

EA_NIL_00001304

EA_NIL_00001306

EA_NIL_00001310

EA_NIL_00001313

EA_NIL_00001316

EA_NIL_00001320

EA_NIL_00001323

EA_NIL_00001324

EA_NIL_00001327

EA_NIL_00001337

EA_NIL_00001343

EA_NIL_00001355

EA_NIL_00001357

EA_NIL_00001358

EA_NIL_00001381

EA_NIL_00001385

EA_NIL_00001390

EA_NIL_00001391

EA_NIL_00001395

EA_NIL_00001398

EA_NIL_00001400

EA_NIL_00001403

EA_NIL_00001406

EA_NIL_00001409

EA_NIL_00001414

EA_NIL_00001417

EA_NIL_00001421

EA_NIL_00001426

EA_NIL_00001430

EA_NIL_00001432

EA_NIL_00001440

EA_NIL_00001442

EA_NIL_00001444

EA_NIL_00001445

EA_NIL_00001447

EA_NIL_00001452

EA_NIL_00001453

EA_NIL_00001455

EA_NIL_00001462

EA_NIL_00001466

EA_NIL_00001470

EA_NIL_00001477

EA_NIL_00001480

EA_NIL_00001490

*CONFIDENTIAL*

EA_NIL_00001492

EA_NIL_00001493

EA_NIL_00001495

EA_NIL_00001499

EA_NIL_00001502

EA_NIL_00001505

EA_NIL_00001509

EA_NIL_00001510

EA_NIL_00001512

EA_NIL_00001519

EA_NIL_00001520

EA_NIL_00001523

EA_NIL_00001524

EA_NIL_00001564

EA_NIL_00001566

EA_NIL_00001568

EA_NIL_00001570

EA_NIL_00001571

EA_NIL_00001572

EA_NIL_00001573

EA_NIL_00001574

EA_NIL_00001575

EA_NIL_00001576

EA_NIL_00001577

EA_NIL_00001578

EA_NIL_00001579

EA_NIL_00001580

EA_NIL_00001581

EA_NIL_00001582

EA_NIL_00001583

*CONFIDENTIAL*

EA_NIL_00001584

EA_NIL_00001585

EA_NIL_00001586

EA_NIL_00001587

EA_NIL_00001588

EA_NIL_00001589

EA_NIL_00001590

EA_NIL_00001593

EA_NIL_00001595

EA_NIL_00001603

EA_NIL_00001611

EA_NIL_00001619

EA_NIL_00001627

EA_NIL_00001629

EA_NIL_00001631

EA_NIL_00001639

EA_NIL_00001647

EA_NIL_00001655

EA_NIL_00001664

EA_NIL_00001665

EA_NIL_00001674

EA_NIL_00001681

EA_NIL_00001683

EA_NIL_00001685

EA_NIL_00001687

EA_NIL_00001688

EA_NIL_00001691

EA_NIL_00001694

EA_NIL_00001695

EA_NIL_00001697

*CONFIDENTIAL*

EA_NIL_00001700

EA_NIL_00001702

EA_NIL_00001703

EA_NIL_00001706

EA_NIL_00001710

EA_NIL_00001711

EA_NIL_00001713

EA_NIL_00001715

EA_NIL_00001717

EA_NIL_00001721

EA_NIL_00001725

EA_NIL_00001728

EA_NIL_00001731

EA_NIL_00001733

EA_NIL_00001740

EA_NIL_00001741

EA_NIL_00001743

EA_NIL_00001744

EA_NIL_00001755

EA_NIL_00001757

EA_NIL_00001760

EA_NIL_00001761

EA_NIL_00001764

EA_NIL_00001767

EA_NIL_00001770

EA_NIL_00001773

EA_NIL_00001776

EA_NIL_00001778

EA_NIL_00001781

EA_NIL_00001784

*CONFIDENTIAL*

EA_NIL_00001787

EA_NIL_00001790

EA_NIL_00001793

EA_NIL_00001794

EA_NIL_00001797

EA_NIL_00001800

EA_NIL_00001803

EA_NIL_00001806

EA_NIL_00001809

EA_NIL_00001811

EA_NIL_00001814

EA_NIL_00001815

EA_NIL_00001818

EA_NIL_00001827

EA_NIL_00001828

EA_NIL_00001829

EA_NIL_00001831

EA_NIL_00001834

EA_NIL_00001837

EA_NIL_00001840

EA_NIL_00001844

EA_NIL_00001845

EA_NIL_00001848

EA_NIL_00001851

EA_NIL_00001862

EA_NIL_00001863

EA_NIL_00001867

EA_NIL_00001870

EA_NIL_00001871

EA_NIL_00001873

EA_NIL_00001875

EA_NIL_00001877

EA_NIL_00001879

EA_NIL_00001882

EA_NIL_00001884

EA_NIL_00001887

EA_NIL_00001890

EA_NIL_00001894

EA_NIL_00001896

EA_NIL_00001900

EA_NIL_00001901

EA_NIL_00001903

EA_NIL_00001904

EA_NIL_00001907

EA_NIL_00001911

EA_NIL_00001915

EA_NIL_00001922

EA_NIL_00001925

EA_NIL_00001928

EA_NIL_00001930

EA_NIL_00001935

EA_NIL_00001937

EA_NIL_00001939

EA_NIL_00001943

EA_NIL_00001944

EA_NIL_00001946

EA_NIL_00001948

EA_NIL_00001949

EA_NIL_00001951

EA_NIL_00001953

*CONFIDENTIAL*

EA_NIL_00001956

EA_NIL_00001961

EA_NIL_00001963

EA_NIL_00001971

EA_NIL_00001977

EA_NIL_00001988

EA_NIL_00001991

EA_NIL_00001994

EA_NIL_00001996

EA_NIL_00001997

EA_NIL_00001999

EA_NIL_00002002

EA_NIL_00002005

EA_NIL_00002008

EA_NIL_00002017

EA_NIL_00002021

EA_NIL_00002024

EA_NIL_00002027

EA_NIL_00002030

EA_NIL_00002036

EA_NIL_00002046

EA_NIL_00002052

EA_NIL_00002060

EA_NIL_00002064

EA_NIL_00002066

EA_NIL_00002070

EA_NIL_00002073

EA_NIL_00002078

EA_NIL_00002081

EA_NIL_00002082

EA_NIL_00002087

EA_NIL_00002088

EA_NIL_00002090

EA_NIL_00002092

EA_NIL_00002093

EA_NIL_00002095

EA_NIL_00002103

EA_NIL_00002106

EA_NIL_00002113

EA_NIL_00002115

EA_NIL_00002131

EA_NIL_00002134

EA_NIL_00002135

EA_NIL_00002139

EA_NIL_00002143

EA_NIL_00002145

EA_NIL_00002147

EA_NIL_00002149

EA_NIL_00002156

EA_NIL_00002159

EA_NIL_00002162

EA_NIL_00002165

EA_NIL_00002168

EA_NIL_00002178

EA_NIL_00002180

EA_NIL_00002184

EA_NIL_00002185

EA_NIL_00002188

EA_NIL_00002191

EA_NIL_00002192

*CONFIDENTIAL*

EA_NIL_00002195

EA_NIL_00002224

EA_NIL_00002230

EA_NIL_00002235

EA_NIL_00002236

EA_NIL_00002240

EA_NIL_00002243

EA_NIL_00002250

EA_NIL_00002252

EA_NIL_00002254

EA_NIL_00002257

EA_NIL_00002260

EA_NIL_00002265

EA_NIL_00002269

EA_NIL_00002272

EA_NIL_00002277

EA_NIL_00002279

EA_NIL_00002287

EA_NIL_00002288

EA_NIL_00002305

EA_NIL_00002307

EA_NIL_00002328

EA_NIL_00002330

EA_NIL_00002335

EA_NIL_00002338

EA_NIL_00002342

EA_NIL_00002347

EA_NIL_00002352

EA_NIL_00002357

EA_NIL_00002359

EA_NIL_00002362

EA_NIL_00002364

EA_NIL_00002365

EA_NIL_00002366

EA_NIL_00002367

EA_NIL_00002368

EA_NIL_00002372

EA_NIL_00002373

EA_NIL_00002375

EA_NIL_00002376

EA_NIL_00002381

EA_NIL_00002383

EA_NIL_00002388

EA_NIL_00002389

EA_NIL_00002391

EA_NIL_00002400

EA_NIL_00002407

EA_NIL_00002410

EA_NIL_00002415

EA_NIL_00002425

EA_NIL_00002429

EA_NIL_00002437

EA_NIL_00002441

EA_NIL_00002446

EA_NIL_00002451

EA_NIL_00002458

EA_NIL_00002461

EA_NIL_00002466

EA_NIL_00002468

EA_NIL_00002470

*CONFIDENTIAL*

EA_NIL_00002472

EA_NIL_00002474

EA_NIL_00002478

EA_NIL_00002479

EA_NIL_00002714

EA_NIL_00002719

EA_NIL_00002720

EA_NIL_00002955

EA_NIL_00002957

EA_NIL_00002959

EA_NIL_00002961

EA_NIL_00002962

EA_NIL_00002964

EA_NIL_00002967

EA_NIL_00002969

EA_NIL_00002970

EA_NIL_00002971

EA_NIL_00002972

EA_NIL_00002974

EA_NIL_00002977

EA_NIL_00002980

EA_NIL_00002982

EA_NIL_00002986

EA_NIL_00002991

EA_NIL_00002993

EA_NIL_00002999

EA_NIL_00003006

EA_NIL_00003007

EA_NIL_00003012

EA_NIL_00003017

*CONFIDENTIAL*

EA_NIL_00003019

EA_NIL_00003021

EA_NIL_00003023

EA_NIL_00003028

EA_NIL_00003031

EA_NIL_00003032

EA_NIL_00003035

EA_NIL_00003038

EA_NIL_00003044

EA_NIL_00003046

EA_NIL_00003051

EA_NIL_00003053

EA_NIL_00003055

EA_NIL_00003057

EA_NIL_00003062

EA_NIL_00003066

EA_NIL_00003070

EA_NIL_00003072

EA_NIL_00003077

EA_NIL_00003080

EA_NIL_00003083

EA_NIL_00003084

EA_NIL_00003086

EA_NIL_00003088

EA_NIL_00003090

EA_NIL_00003093

EA_NIL_00003095

EA_NIL_00003097

EA_NIL_00003099

EA_NIL_00003105

*CONFIDENTIAL*

EA_NIL_00003107

EA_NIL_00003114

EA_NIL_00003117

EA_NIL_00003120

EA_NIL_00003123

EA_NIL_00003126

EA_NIL_00003129

EA_NIL_00003131

EA_NIL_00003133

EA_NIL_00003136

EA_NIL_00003137

EA_NIL_00003145

EA_NIL_00003149

EA_NIL_00003150

EA_NIL_00003152

EA_NIL_00003154

EA_NIL_00003156

EA_NIL_00003158

EA_NIL_00003159

EA_NIL_00003191

EA_NIL_00003193

EA_NIL_00003195

EA_NIL_00003197

EA_NIL_00003205

EA_NIL_00003208

EA_NIL_00003216

EA_NIL_00003218

EA_NIL_00003219

EA_NIL_00003220

EA_NIL_00003223

*CONFIDENTIAL*

EA_NIL_00003225

EA_NIL_00003228

EA_NIL_00003232

EA_NIL_00003241

EA_NIL_00003242

EA_NIL_00003244

EA_NIL_00003249

EA_NIL_00003252

EA_NIL_00003254

EA_NIL_00003256

EA_NIL_00003258

EA_NIL_00003259

EA_NIL_00003263

EA_NIL_00003264

EA_NIL_00003265

EA_NIL_00003266

EA_NIL_00003270

EA_NIL_00003274

EA_NIL_00003277

EA_NIL_00003282

EA_NIL_00003287

EA_NIL_00003288

EA_NIL_00003290

EA_NIL_00003291

EA_NIL_00003298

EA_NIL_00003305

EA_NIL_00003313

EA_NIL_00003321

EA_NIL_00003328

EA_NIL_00003330

*CONFIDENTIAL*

EA_NIL_00003334

EA_NIL_00003336

EA_NIL_00003340

EA_NIL_00003342

EA_NIL_00003344

EA_NIL_00003346

EA_NIL_00003348

EA_NIL_00003350

EA_NIL_00003352

EA_NIL_00003354

EA_NIL_00003356

EA_NIL_00003358

EA_NIL_00003360

EA_NIL_00003362

EA_NIL_00003364

EA_NIL_00003366

EA_NIL_00003368

EA_NIL_00003370

EA_NIL_00003372

EA_NIL_00003374

EA_NIL_00003376

EA_NIL_00003384

EA_NIL_00003390

EA_NIL_00003391

EA_NIL_00003392

EA_NIL_00003400

EA_NIL_00003401

EA_NIL_00003402

EA_NIL_00003403

EA_NIL_00003404

*CONFIDENTIAL*

EA_NIL_00003407

EA_NIL_00003414

EA_NIL_00003418

EA_NIL_00003420

EA_NIL_00003424

EA_NIL_00003426

EA_NIL_00003427

EA_NIL_00003428

EA_NIL_00003438

EA_NIL_00003447

EA_NIL_00003448

EA_NIL_00003450

EA_NIL_00003458

EA_NIL_00003464

EA_NIL_00003476

EA_NIL_00003483

EA_NIL_00003489

EA_NIL_00003496

EA_NIL_00003504

EA_NIL_00003506

EA_NIL_00003522

EA_NIL_00003528

EA_NIL_00003533

EA_NIL_00003537

EA_NIL_00003538

EA_NIL_00003544

EA_NIL_00003553

EA_NIL_00003560

EA_NIL_00003562

EA_NIL_00003564

*CONFIDENTIAL*

EA_NIL_00003566

EA_NIL_00003568

EA_NIL_00003570

EA_NIL_00003571

EA_NIL_00003587

EA_NIL_00003588

EA_NIL_00003604

EA_NIL_00003608

EA_NIL_00003609

EA0127854

HU00369

In re NCAA - ND004688

In re NCAA - ND004690

In re NCAA - ND004692

INFLCR_000001

INFLCR_000011

INFLCR_000023

INFLCR_000034

INFLCR_000036

INFLCR_000039

INFLCR_000041

INFLCR_000065

INFLCR_000076

INFLCR_000101

INFLCR_000116

INFLCR_000140

INFLCR_000145

INFLCR_000166

INFLCR_000170

INFLCR_000174

INFLCR_000199

INFLCR_000203

INFLCR_000206

INFLCR_000210

INFLCR_000213

INFLCR_000238

INFLCR_000241

INFLCR_000245

INFLCR_000249

INFLCR_000269

INFLCR_000273

INFLCR_000298

INFLCR_000302

INFLCR_000329

INFLCR_000333

INFLCR_000358

INFLCR_000381

INFLCR_000385

INFLCR_000389

INFLCR_000414

INFLCR_000416

INFLCR_000420

INFLCR_000423

INFLCR_000426

INFLCR_000429

INFLCR_000433

INFLCR_000437

INFLCR_000441

INFLCR_000445

INFLCR_000468

*CONFIDENTIAL*

INFLCR_000492

INFLCR_000517

INFLCR_000520

INFLCR_000524

INFLCR_000528

INFLCR_000532

INFLCR_000535

INFLCR_000560

INFLCR_000564

INFLCR_000568

INFLCR_000572

INFLCR_000574

INFLCR_000577

INFLCR_000580

INFLCR_000584

INFLCR_000587

INFLCR_000588

INFLCR_000589

INFLCR_000590

INFLCR_000591

NBPA_000084

NBPA_000086

NCAAGIA02196312

NCAAGIA02196735

NCAAGIA03941962

NCAAHOUSE00002343

NCAAHOUSE00002503

NCAAHOUSE00002661

NCAAHOUSE00002817

NCAAHOUSE00002927

NCAAHOUSE00002929

NCAAHOUSE00002931

NCAAHOUSE00002933

NCAAHOUSE00002935

NCAAHOUSE00002937

NCAAHOUSE00002939

NCAAHOUSE00002941

NCAAHOUSE00002943

NCAAHOUSE00002945

NCAAHOUSE00002947

NCAAHOUSE00002949

NCAAHOUSE00002951

NCAAHOUSE00002953

NCAAHOUSE00002955

NCAAHOUSE00002957

NCAAHOUSE00002959

NCAAHOUSE00002991

NCAAHOUSE00003027

NCAAHOUSE00003062

NCAAHOUSE00003097

NCAAHOUSE00003134

NCAAHOUSE00003257

NCAAHOUSE00003274

NCAAHOUSE00003300

NCAAHOUSE00003328

NCAAHOUSE00003355

NCAAHOUSE00003380

NCAAHOUSE00003407

NCAAHOUSE00003424

NCAAHOUSE00003441

*CONFIDENTIAL*

NCAAHOUSE00003457

NCAAHOUSE00003477

NCAAHOUSE00003497

NCAAHOUSE00072616

NCAAHOUSE00077783

NCAAHOUSE00078239

NCAAHOUSE00078491

NCAAHOUSE00081585

NCAAHOUSE00085980

NCAAHOUSE00100027

NCAAHOUSE00114599

NCAAHOUSE00114600

NCAAHOUSE00114601

NCAAHOUSE00114602

NCAAHOUSE00114603

NCAAHOUSE00114604

NCAAHOUSE00114605

NCAAHOUSE00114606

NCAAHOUSE00114607

NCAAHOUSE00114608

NCAAHOUSE00114609

NCAAHOUSE00114610

NCAAHOUSE00114611

NCAAHOUSE00114612

NCAAHOUSE00114613

NCAAHOUSE00114614

NCAAHOUSE00179453

NCAAHOUSE00180803

NCAAHOUSE00180804

NCAAHOUSE00180805

*CONFIDENTIAL*

NCAAHOUSE00180806

NCAAHOUSE00180807

NCAAHOUSE00180808

NCAAHOUSE00237163

NCAAHOUSE00248478

NCAAHOUSE00248480

NCAAHOUSE00249520

NCAAHOUSE00249521

NCAAHOUSE00249537

NCAAHOUSE00249638

NCAAHOUSE00249739

NCAAHOUSE00249760

NCAAHOUSE00249761

NCAAHOUSE00249762

NCAAHOUSE00249763

NCAAHOUSE00249764

NCAAHOUSE00249779

NCAAHOUSE00249780

NCAAHOUSE00249781

NCAAHOUSE0179453

NCAAPROD00083052-109

NCAAPROD190585-657

NFLPA_000010

OPENDORSE000035

OPENDORSE000036

OPENDORSE000037

OPENDORSE000038

PAC 12GIA_00205839

PAC 12GIA_00206026

PAC12GIA_00205607

PAC12GIA_00205839

PAC12GIA_00205980

PAC12GIA_00206026

PAC12GIA_00230208

PAC12HOUSE_00000616

PAC12HOUSE_00000923

PAC12HOUSE_00001911

PAC12HOUSE_00001987

PAC12HOUSE_00002988

PAC12HOUSE_00132486

PAC12HOUSE_00132508

PAC12HOUSE_00132531

PAC12HOUSE_00132559

PAC12HOUSE_00132593

PAC12HOUSE_00132615

PAC12HOUSE_00132650

PAC12HOUSE_00132665

PAC12HOUSE_00132687

PAC12HOUSE_00132722

PAC12HOUSE_00132801

PAC12HOUSE_00134715

PAC12HOUSE_00134770

PAC12HOUSE_00134777

PAC12HOUSE_00134795

PAC12HOUSE_00134920

PAC12HOUSE_00134939

PAC12HOUSE_00134953

PAC12HOUSE_00163255

PAC12HOUSE_00163279

PAC12HOUSE_00163343

SEC00309370

SEC00309586

SEC00310260

SEC-HOUSE0001436

SEC-HOUSE0001487

SEC-HOUSE0001539

SEC-HOUSE0001590

SEC-HOUSE0001640

SEC-HOUSE0031963

SEC-HOUSE0047742

SEC-HOUSE0047791

SEC-HOUSE0047841

SEC-HOUSE0047887

SEC-HOUSE0047932

SEC-HOUSE0047950

SEC-HOUSE0047966

SEC-HOUSE0047982

SEC-HOUSE0047998

SEC-HOUSE0076657

SEC-HOUSE0112405

SEC-HOUSE0112732

SEC-HOUSE0112781

SEC-HOUSE0113362

TAKETWO-NIL-00000001

TAKETWO-NIL-00000070

TAKETWO-NIL-00000072

TAKETWO-NIL-00000147

TAKETWO-NIL-00000153

TAKETWO-NIL-00000155

UFL_000994

*CONFIDENTIAL*

UMC001439

UM-NIL0370

WNBPA-000001


**Produced Documents (Reviewed in Native Format)**

*All documents cited as sources in the produced NIL databases. (List of sources provided in backup.)*

      <u>Alston</u>

Plaintiffs Comments MFRS Data - Additional Offer of Production - 11 09 15 (Alston)

      <u>Big Ten</u>

9.7.22 Ltr to Plaintiffs re Media Agreements

FW In re College Athlete NIL Litigation Case No. 420-cv-03919-CW

FW_ In re College Athlete NIL Litigation, Case No. 4_20-cv-03919-CW

      <u>EA</u>

Ltr to Counsel from Apfeld

      <u>MFRS</u>

MFRS Sport Code Key

NCAA INTERNAL - unique_id_key_2021

      <u>NBPA</u>

2K NBA 2K Retail Product License Agreement.October 1,2018

2K_NBA 2K_License_NBPA_Extension Letter_FINAL 2018-09-05 (fully signed)

2K_NBA2KOL_License_NBPA_China Transition Agreement.December 19,2018

      <u>Emails</u>

Email from Jacob Danziger, "RE: MFRS Data Letter", September 7, 2022.

Email from Jacob Danziger, "RE: RE: 2022-09-12 Ltr. S. Verdoia to NCAA re Financial Data", September 26, 2022

Email from Clarence Nesbitt, "Re: Subpoena to NBPA", October 18, 2022.


**Literature, Articles and Publications**

2017-18 NCAA Division I Manual

Andreff, W. (2011). "Some Comparative Economics of the Organization of Sports: Competition and Regulation in North American vs. European Professional Team Sports Leagues". The European Journal of Comparative Economics, 8(1), 3-27.

Brown, K. M., and Salaga, S. (2018). "NCAA Football Television Viewership: Product Quality and Consumer Preference Relative to Market Expectations". Sport Management Review, 21(4), 377-390.

College Football Playoff Media Guide, 2014-15 Edition

College Football Playoff Media Guide, 2015-16 Edition

College Football Playoff Media Guide, 2016-17 Edition

College Football Playoff Media Guide, 2017-18 Edition

College Football Playoff Media Guide, 2018-19 Edition

College Football Playoff Media Guide, 2019-20 Edition

College Football Playoff Media Guide, 2021-22 Edition

Craig A. Depken and E. Frank Stephenson (2017). "Copper Theft in the United States: 2006-2013". The American Economist 62, no. 1.

Daniel Rascher, Terry Eddy, and Giseob Hyun (2017). "What Drives Endorsement Earnings for Superstar Athletes?" Journal of Applied Sport Management, Vol. 9, No. 2, Summer 2017.

Daniel Rubinfeld (2009). "Antitrust Damages". Research Handbook on the Economics of Antitrust Law (ed. Einer Elhauge).

El Hodiri, M., and Quirk, J. (1971). "An Economic Model of a Professional Sports League". Journal of Political Economy, 79(6), 1302-1319.

Fort, R., and Quirk, J. (1995). "Cross-Subsidization, Incentives, and Outcomes in Professional Team Sports Leagues". Journal of Economic Literature, 33(3), 1265-1299.

Herbert J. Hovenkamp (2011). "A Primer on Antitrust Damages". Faculty Scholarship at Penn Law. 1846.

Imke Reimers (2016). "Can Private Copyright Protection Be Effective? Evidence from Book Publishing". The Journal of Law & Economics 59, no. 2.

Interim NIL Policy. https://ncaaorg.s3.amazonaws.com/ncaa/NIL/NIL_InterimPolicy.pdf.

J. Thomas Rosch (2011). "The Past and Future of Direct Effects Evidence". Remarks of J. Thomas Rosch before the ABA Section of Antitrust Law's 59th Spring Meeting.

Justin McCrary and Daniel L. Rubinfeld (2014). "Measuring Benchmark Damages in Antitrust Litigation". Journal of Econometric Methods, 3(1).

Keith Dunnavant (2004). "The Fifty-Year Seduction: How Television Manipulated College Football, from the Birth of the Modern NCAA to the Creation of the BCS". Macmillan.

Melissa S. Kearney and Phillip B. Levine (2015). "Media Influences on Social Outcomes: The Impact of MTV's '16 and Pregnant' on Teen Childbearing". American Economic Review 105, no. 12.

CONFIDENTIAL

Owen, P., and King, N. (2015). "Competitive balance measures in sports leagues: the effects of variation in season length". Economic Inquiry, 53(1), 731-744.

Paul, R., Weinbach, A., and Small, K. (2014). "The Relationship between Sportsbook Volume, Forecast Accuracy, and Market Efficiency: The NFL and NCAA Football". Journal of Prediction Markets, 8(2), 29-42.

Peeters, T. (2015). "Profit-maximizing gate revenue sharing in sports leagues". Economic Inquiry, 53(2), 1275-1291.

Rascher, D. (1997). "A Model of a Professional Sports League". International Advances in the Economic Research, 3, 327-328.

Salaga, S., and Tainsky, S. (2015). "The Effects of Outcome Uncertainty, Scoring, and Pregame Expectations on Nielsen Ratings for Bowl Championship Series Games". Journal of Sports Economics, 16(5), 439-459.

Solberg, H. A. (2002). "The Economics of Television Sports Rights. Europe and the US - A Comparative Analysis". Norsk Medietidsskrift, 9(2). 57-80.

Southall, R. M., Southall, C., and Dwyer, B. (2009). "2009 Bowl Championship Series Telecasts: Expressions of Big-Time College-Sport's Commercial Institutional Logics". Journal of Issues in Intercollegiate Athletics, 2, 150-176.

Szymanski, S., and Késenne, S. (2010). "Competitive Balance and Gate Revenue Sharing in Team Sports". In S. Szymanski (Ed.), The Comparative Economics of Sport (pp. 229–243). Palgrave Macmillan, London.

Tainsky, S. (2010). "Television broadcast demand for National Football League contests". Journal of Sports Economics, 11(6), 629-640.

Tainsky, S., and Jasielec, M. (2014). "Television Viewership of Out-of-Market Games in League Markets: Traditional Demand Shifters and Local Team Influence". Journal of Sport Management, 28(1), 94-108.

Theologos Dergiades, Costas Milas, and Theodore Panagiotidis (2015). "Tweets, Google Trends, and Sovereign Spreads in the GIIPS". Oxford Economic Papers 67, no. 2.

Velema, T. (2018). "A game of snakes and ladders: Player migratory trajectories in the global football labor market". International Review of the Sociology of Sport, 53(6), 706-725.

Vrooman, J. (2000). "The Economics of American Sports Leagues". Scottish Journal of Political Economy, 47(4), 364-298.

Walter Nicholson (1998). "Microeconomic Theory : Basic Principles and Extensions (7th ed.)". Dryden Press.

## Third Party Sources

*All documents cited as sources in the produced NIL databases. List of sources provided in backup.*

http://archive.today/2022.10.10-003003/https://seekingalpha.com/article/3996068-take-two-interactive-software-ttwo-strauss-h-zelnick-on-q1-2017-results-earnings-call?part=single

http://archive.today/2022.10.10-003737/https://seekingalpha.com/article/2385265-take-two-interactive-softwares-ttwo-ceo-strauss-zelnick-on-q1-2015-results-earnings-call-transcript

http://archive.today/2022.10.10-065109/https://seekingalpha.com/article/4531746-take-two-interactive-software-inc-ttwo-ceo-strauss-zelnick-on-q1-2023-results-earnings-call

http://www.cluster-text.com/confidence_interval.php

https://247sports.com/player/isaiah-simmons-72679/

https://247sports.com/Player/Trace-McSorley-22462/

https://apnews.com/article/college-football-sports-basketball-6a4a3270d02121c1c37869fb54888ccb

https://archive.naplesnews.com/news/fgcu--officially-becomes-member-of-ncaa-division-i-ep-391222834-342851852.html/

https://arizonawildcats.com/sports/football/roster/jayden-de-laura/14706

https://arkansasrazorbacks.com/support-staff/sydney-mcglone/

https://biz.opendorse.com/nil-insights/

https://bleacherreport.com/articles/2724894-ucf-kicker-donald-de-la-haye-ruled-ineligible-by-ncaa-over-youtube-channel

https://boardroom.tv/breaker/nfl-nflpa-nba-top-shot-nft/

https://boardroom.tv/fanatics-oneteam-partners-nil-jerseys/

https://btn.com/btn-faq/

https://businessofcollegesports.com/directory-nil-directors-and-staff/

https://businessofcollegesports.com/name-image-likeness/texas-tech-footballs-matador-club-partnership-continues-trend-of-team-wide-nil-deals/

https://byucougars.com/story/football/1297331/byu-football-touts-groundbreaking-nil-agreements-built-brands

https://clemsontigers.com/sports/football/roster/isaiah-simmons/

https://clemsontigers.com/sports/football/roster/season/2018/hunter-renfrow/

https://cosmic-s3.imgix.net/3c7a0a50-8e11-11e9-875d-3d44e94ae33f-2017-NBA-NBPA-Collective-Bargaining-Agreement.pdf

https://en.wikipedia.org/wiki/NCAA_Football_14

https://frontofficesports.com/nil-billion-dollar-industry/

https://gatorcollective.com/

https://gobluehose.com/news/2012/3/1/205389540.aspx

https://gocards.com/news/2022/5/16/name-image-likeness-uofl-adds-mckay-as-director-of-nil-services-engagement.aspx

https://gopsusports.com/sports/football/roster/trace-mcsorley/1376

https://herhoopstats.com/

https://huskers.com/news/2022/4/12/athletics-nebraska-partners-with-altius-sports-to-bolster-nil-program.aspx

https://iowaswarm.com/

https://issuu.com/totallicensing/docs/total_brand_licensing_oct_20/s/11089265

https://jobs.hr.uconn.edu/en-us/job/496826/content-social-media-strategist-publicitymarketing-administrator#

https://ksuowls.com/news/2009/8/7/GEN_0807095612

https://kuathletics.com/kansas-athletics-hires-gillespie-and-seberger-as-directors-of-name-image-and-likeness/

https://law.justia.com/cases/federal/district-courts/FSupp/893/1497/1795179/

https://legiscan.com/AZ/text/SB1296/2021

https://legiscan.com/TX/text/SB1385/id/2407682/Texas-2021-SB1385-Enrolled.html

https://n.rivals.com/content/prospects/2014/hunter-renfrow-17064

https://n.rivals.com/content/prospects/2014/trace-mcsorley-25345

https://n.rivals.com/content/prospects/2016/isaiah-simmons-3244

https://ncaaorg.s3.amazonaws.com/ncaa/finance/2022NCAAFIN_AgreedUponProcedures.pdf

https://ncaaorg.s3.amazonaws.com/research/sportpart/2021RES_SportsSponsorshipParticipationRatesReport.pdf

https://nebraskanewsservice.net/sports/a-big-week-for-nebraska-athletics-and-nil/?utm_source=rss&utm_medium=rss&utm_campaign=a-big-week-for-nebraska-athletics-and-nil

https://news.uscupstate.edu/ncaa-grants-usc-upstate-full-division-i-certification/

https://nflpa.com/partners/posts/altered-reality-corp-in-partnership-with-the-nflpa-presents-first-ever-holograms-of-nfl-players-within-its-play3d-augmented-reality-app

https://nflpa.com/partners/posts/avatar-leader-genies-nflpa-to-bring-nfl-players-into-the-digital-world

https://nflpa.com/partners/posts/bit-fry-game-studios-announces-licensing-agreement-with-oneteam-partners-and-the-nflpa

https://nflpa.com/partners/posts/fanduel-joins-surging-roster-of-nflpa-licensees

https://nflpa.com/partners/posts/nflpa-expands-business-with-eight-new-licensees

https://nflpa.com/partners/posts/nflpa-mobile-game-maker-tinyco-introduce-nfl-players-as-characters-into-family-guy-universe

https://nflpa.com/partners/posts/nfl-players-association-and-quintevents-announce-agreement-to-deliver-licensed-fan-experience-packages

https://nflpa.com/partners/posts/nfl-players-association-launches-first-athlete-driven-accelerator-oneteam-collective-to-help-start-ups-incorporate-sports-strategies-for-growth

https://nflpa.com/partners/posts/nfl-players-association-takes-ownership-stake-in-monkey-knife-fight-orchestrated-through-oneteam-partners

https://nflpa.com/partners/posts/nfl-superstars-take-a-run-in-subway-surfers

https://nflpa.com/partners/posts/oneteam-collective-new-partners

https://nflpa.com/partners/posts/the-national-football-league-the-nfl-players-association-and-dapper-labs-announce-new-nft-deal-to-create-exclusive-digital-video-highlights

https://nflpa.com/partners/posts/the-nfl-nflpa-and-nifty-games-collaborate-for-worldwide-launch-of-nfl-clash-a-quick-session-head-to-head-nfl-mobile-game

https://nflpaweb.blob.core.windows.net/website/PDFs/CBA/March-15-2020-NFL-NFLPA-Collective-Bargaining-Agreement-Final-Executed-Copy.pdf

https://njithighlanders.com/documents/2008/8/28/GENERAL.pdf?id=19

https://oanow.com/sports/college/auburn/auburn-seeks-associate-athletic-director-of-nil-retains-firm-for-search/article_e39c6e5c-4508-11ed-a1e5-3331af964720.html

https://opelikaobserver.com/auburn-athletics-unveils-the-spirit-exchange-as-part-of-nil-program/

https://opendorse.com/wp-content/uploads/2022/07/N1L_Full_063022_3.pdf

https://rawthrills.com/games/

https://seekingalpha.com/article/4444196-take-two-interactive-software-inc-s-ttwo-ceo-strauss-zelnick-on-q1-2022-results-earnings-call

https://slate.com/culture/2022/01/ncaa-gymnastics-popular-olympians-nil-suni-lee-ucla.html

https://sports.yahoo.com/sources-kansas-basketball-charged-with-multiple-level-1-violations-including-lack-of-institutional-control-210015300.html

https://sportstailgateshow.com/nflpa-partners-for-themed-emojis/

https://sportstailgateshow.com/nflpi-announces-multiple-licensing-deals/

https://swac.org/news/2020/6/25/general-swac-announces-addition-of-bethune-cookman-as-full-member.aspx

https://swac.org/news/2020/6/4/general-swac-adds-florida-am-as-full-member.aspx

https://swimswam.com/bumble-signs-nil-deals-with-50-female-student-athletes-to-celebrate-title-ix/

https://theathletic.com/3178558/2022/03/11/five-star-recruit-in-class-of-2023-signs-agreement-with-collective-that-could-pay-him-more-than-8-million/

https://today.uconn.edu/2022/09/calling-all-creators-werth-institute-seeking-fellows-to-join-championship-labs-los-angeles-influencers-trip-in-november

https://trends.google.com/trends/explore?date=all&geo=US&q=%2Fm%2F012hfxch

https://trends.google.com/trends/explore?date=all&geo=US&q=%2Fm%2F039yzs

https://twitter.com/espnpr/status/1575141028969037825

https://twitter.com/opendorse/status/1410273864949567502

https://twitter.com/ralphDrussoAP/status/1406003171030413312

https://usctrojans.com/sports/track-and-field/roster/dallas-wise/14373

https://valley-football.org/news/2017/6/21/general-this-is-the-missouri-valley-conference.aspx

https://venturebeat.com/games/civilization-series-tops-31m-units-sold/

https://volleyballmag.com/ncaa-volleyball-attendance-viewers-122221/

https://web.archive.org/web/20201022214353/https://www.gamesindustry.biz/articles/nba-2k9-reaches-2-million-sales-worldwide

https://web.archive.org/web/20201022221212/https://www.engadget.com/2013-02-05-nba-2k13-sets-franchise-records-ships-4-5-million-copies.html

https://web.archive.org/web/20201022225605/https://www.dualshockers.com/nba-2k17-8-5-million-sold/

https://web.archive.org/web/20201022231700/https://ir.take2games.com/news-releases/news-release-details/nba-2k18-hits-franchise-sales-record?ID=2361684&c=86428&p=irol-newsArticle

https://web.archive.org/web/20201022232615/https://www.gameinformer.com/2019/08/05/nba-2k19-is-the-series-best-selling-game

https://web.archive.org/web/20201022233346/https://www.gamesindustry.biz/articles/2020-08-03-take-two-ceo-its-a-matter-of-time-before-the-business-is-entirely-digital

https://web.archive.org/web/20210315203726/https://collegefootballplayoff.com/sports/2017/9/20/revenue-distribution.aspx

https://web.archive.org/web/20211130080110/https://collegefootballplayoff.com/sports/2017/9/20/revenue-distribution.aspx

https://web3.ncaa.org/lsdbi/search/bylawView?id=238

https://wnbpa.com/wp-content/uploads/2020/01/WNBA-WNBPA-CBA-2020-2027.pdf

https://www.azcardinals.com/team/players-roster/isaiah-simmons/

https://www.azcardinals.com/team/players-roster/trace-mcsorley/

https://www.bryantbulldogs.com/information/Division_I_Information

https://www.businesswire.com/news/home/20150813005264/en/Glu-Tackles-the-Gridiron-in-Tap-Sports-Football-Featuring-Drew-Brees

https://www.cameo.com/about

https://www.cavalierfutures.com/

https://www.cbssports.com/college-basketball/news/ncaas-unfair-2-year-suspension-for-silvio-de-sousa-shows-that-players-not-coaches-or-schools-are-treated-harshest/

https://www.clickondetroit.com/all-about-ann-arbor/2022/02/09/university-of-michigan-expands-nil-program-to-help-student-athletes-find-business-partners/

https://www.cnbc.com/2011/09/21/The-Best-Selling-Video-Games-of-2011.html

https://www.collegian.psu.edu/football/penn-state-athletics-announces-partnership-with-altius-sports-partners-for-continued-nil-guidance/article_dae8ef68-af78-11ec-9467-238ed55537cf.html

https://www.ctinsider.com/uconn/article/UConn-women-s-basketball-Paige-Bueckers-Gatorade-17361745.php

https://www.ctpost.com/uconn/article/UConn-officially-leaving-AAC-in-2020-14178493.php

https://www.d3hoops.com/notables/2009/07/centenary-moves-to-division-iii

https://www.dailycardinal.com/article/2022/04/wisconsin-athletics-announces-official-nil-platform-for-student-athletes

https://www.deseret.com/2021/8/14/22616677/byu-built-bar-deal-is-unique-kalani-sitake-nick-greer-nil-college-football-dennis-dodd-cbssports#:~:text=The%20thing%20that%20struck%20me,or%20avarice%20in%20this%20deal

https://www.destructoid.com/nba-2k10-sells-2-million-brings-back-mike-wang-for-2k11/

https://www.draftkings.com/about/news/2021/12/the-nflpa-and-draftkings-unveil-plans-for-gamified-nft-collaboration/

https://www.engadget.com/2012-06-28-get-a-damn-basketball-with-your-fancy-copy-of-nba-2k13.html

https://www.espn.com/college-football/standings/_/season/2004

https://www.espn.com/college-football/standings/_/season/2004/view/fcs-i-aa

https://www.espn.com/college-football/standings/_/season/2005

https://www.espn.com/college-football/standings/_/season/2005/view/fcs-i-aa

https://www.espn.com/college-football/standings/_/season/2006

https://www.espn.com/college-football/standings/_/season/2006/view/fcs-i-aa

https://www.espn.com/college-football/standings/_/season/2007

https://www.espn.com/college-football/standings/_/season/2007/view/fcs-i-aa

https://www.espn.com/college-football/standings/_/season/2008

*CONFIDENTIAL*

https://www.espn.com/college-football/standings/_/season/2008/view/fcs-i-aa

https://www.espn.com/college-football/standings/_/season/2009

https://www.espn.com/college-football/standings/_/season/2009/view/fcs-i-aa

https://www.espn.com/college-football/standings/_/season/2010

https://www.espn.com/college-football/standings/_/season/2010/view/fcs-i-aa

https://www.espn.com/college-football/standings/_/season/2011

https://www.espn.com/college-football/standings/_/season/2011/view/fcs-i-aa

https://www.espn.com/college-football/standings/_/season/2012

https://www.espn.com/college-football/standings/_/season/2012/view/fcs-i-aa

https://www.espn.com/college-football/standings/_/season/2013

https://www.espn.com/college-football/standings/_/season/2013/view/fcs-i-aa

https://www.espn.com/college-football/standings/_/season/2014

https://www.espn.com/college-football/standings/_/season/2014/view/fcs-i-aa

https://www.espn.com/college-football/standings/_/season/2015

https://www.espn.com/college-football/standings/_/season/2015/view/fcs-i-aa

https://www.espn.com/college-football/standings/_/season/2016

https://www.espn.com/college-football/standings/_/season/2016/view/fcs-i-aa

https://www.espn.com/college-football/standings/_/season/2017

https://www.espn.com/college-football/standings/_/season/2017/view/fcs-i-aa

https://www.espn.com/college-football/standings/_/season/2018

https://www.espn.com/college-football/standings/_/season/2018/view/fcs-i-aa

https://www.espn.com/college-football/standings/_/season/2019

https://www.espn.com/college-football/standings/_/season/2019/view/fcs-i-aa

https://www.espn.com/college-football/standings/_/season/2020

https://www.espn.com/college-football/standings/_/season/2020/view/fcs-i-aa

https://www.espn.com/college-football/standings/_/season/2021

https://www.espn.com/college-football/standings/_/season/2021/view/fcs-i-aa

https://www.espn.com/college-football/story/_/id/34060807/fanatics-topps-announce-trading-card-agreements-college-football-basketball

https://www.espn.com/college-sports/story/_/id/34489568/south-carolina-partners-sports-marketing-agency-become-first-major-college-program-house-nil-firm

https://www.espn.com/mens-college-basketball/standings/_/season/2005

https://www.espn.com/mens-college-basketball/standings/_/season/2006

https://www.espn.com/mens-college-basketball/standings/_/season/2007

https://www.espn.com/mens-college-basketball/standings/_/season/2008

https://www.espn.com/mens-college-basketball/standings/_/season/2009

https://www.espn.com/mens-college-basketball/standings/_/season/2010

https://www.espn.com/mens-college-basketball/standings/_/season/2011

https://www.espn.com/mens-college-basketball/standings/_/season/2012

https://www.espn.com/mens-college-basketball/standings/_/season/2013

https://www.espn.com/mens-college-basketball/standings/_/season/2014

https://www.espn.com/mens-college-basketball/standings/_/season/2015

https://www.espn.com/mens-college-basketball/standings/_/season/2016

https://www.espn.com/mens-college-basketball/standings/_/season/2017

https://www.espn.com/mens-college-basketball/standings/_/season/2018

https://www.espn.com/mens-college-basketball/standings/_/season/2019

https://www.espn.com/mens-college-basketball/standings/_/season/2020

https://www.espn.com/mens-college-basketball/standings/_/season/2021

https://www.espn.com/mens-college-basketball/standings/_/season/2022

https://www.espn.com/mens-college-basketball/story/_/id/32745188/howard-university-men-basketball-team-signs-nil-deal-moving-company-college-hunks-hauling-junk

https://www.espn.com/womens-college-basketball/standings/_/season/2005

https://www.espn.com/womens-college-basketball/standings/_/season/2006

https://www.espn.com/womens-college-basketball/standings/_/season/2007

https://www.espn.com/womens-college-basketball/standings/_/season/2008

https://www.espn.com/womens-college-basketball/standings/_/season/2009

https://www.espn.com/womens-college-basketball/standings/_/season/2010

https://www.espn.com/womens-college-basketball/standings/_/season/2011

https://www.espn.com/womens-college-basketball/standings/_/season/2012

https://www.espn.com/womens-college-basketball/standings/_/season/2013

https://www.espn.com/womens-college-basketball/standings/_/season/2014

*CONFIDENTIAL*

https://www.espn.com/womens-college-basketball/standings/_/season/2015

https://www.espn.com/womens-college-basketball/standings/_/season/2016

https://www.espn.com/womens-college-basketball/standings/_/season/2017

https://www.espn.com/womens-college-basketball/standings/_/season/2018

https://www.espn.com/womens-college-basketball/standings/_/season/2019

https://www.espn.com/womens-college-basketball/standings/_/season/2020

https://www.espn.com/womens-college-basketball/standings/_/season/2021

https://www.espn.com/womens-college-basketball/standings/_/season/2022

https://www.espn.com/womens-college-basketball/story/_/id/32745945/uconn-star-paige-bueckers-signs-nil-deal-gatorade

https://www.espn.com/womens-college-basketball/story/_/id/34314841/texas-tech-women-basketball-players-receive-25k-nil-deals

https://www.extrapointsmb.com/heres-everything-i-know-about-ea-sports-college-football-with-updated-info

https://www.flsenate.gov/Session/Bill/2020/646/BillText/er/PDF

https://www.forbes.com/sites/kristidosh/2021/12/29/fsu-softball-lands-nil-deal-with-cryptocurrency-exchange-ftx/?sh=6bc6f2717c88

https://www.forbes.com/sites/kristidosh/2022/06/30/paige-bueckers-first-work-with-gatorade-unveiled/?sh=30a86379c69f

https://www.forbes.com/sites/kristidosh/2022/06/30/paige-bueckers-first-work-with-gatorade-unveiled/?sh=79272a78c69f

https://www.fromthebenchgames.com/

https://www.inflcr.com/2021/06/03/texas-am-announces-nil-program-amplify/

https://www.inflcr.com/2022/04/21/ucla-athletics-launches-nil-exchange/?utm_source=rss&utm_medium=rss&utm_campaign=ucla-athletics-launches-nil-exchange#:~:text=UCLA%20Athletics%20today%20announced%20the,imagine%20and%20likeness%20(NIL)

https://www.inflcr.com/wp-content/uploads/2022/07/INFLCR-NIL-Year-1-Data-Report.pdf

https://www.justice.gov/atr/horizontal-merger-guidelines-08192010

https://www.kentucky.com/sports/college/kentucky-sports/article265656416.html

https://www.latimes.com/entertainment-arts/tv/story/2022-09-08/tv-ratings-viewers-were-ready-for-college-football

https://www.learfield.com/2022/02/fanatics-and-oneteam-partners-announce-college-athlete-group-rights-licensing-program-for-jerseys/

*CONFIDENTIAL*

https://www.licenseglobal.com/sports/nflpa-preps-super-bowl-stickers

https://www.licenseglobal.com/sports/nflpa-signs-six-new-deals

https://www.licenseglobal.com/sports/nflpi-signs-seven-new-licensees

https://www.lubbockonline.com/story/sports/college/red-raiders/2022/09/29/matador-club-offering-10k-contracts-to-all-texas-tech-softball-players/69526342007/

https://www.matadorclub.org/

https://www.mmamania.com/2021/7/7/22566088/american-top-team-att-owner-sponsorship-miami-football-team-hurricanes-college-nil-payments

https://www.ncaa.com/news/volleyball-women/article/2022-09-16/womens-college-volleyball-all-time-attendance-records

https://www.ncaa.org/news/2021/6/30/ncaa-adopts-interim-name-image-and-likeness-policy.aspx

https://www.on3.com/nil/news/latest-nil-data-shows-dollars-continue-flow-college-football-inflcr-average-deal/

https://www.on3.com/nil/news/nike-basketball-mens-womens-bronny-james-nil-deal-caitlin-clark-haley-jones/

https://www.on3.com/nil/news/nil-data-opendorse-inflcr-college-football-mens-womens-basketball-baseball/

https://www.on3.com/nil/news/nil-what-will-2022-bring-we-ask-the-experts/

https://www.on3.com/nil/news/smu-mustangs-football-basketball-boulevard-collective-nil-name-image-likeness-payment-plans/

https://www.on3.com/nil/news/south-carolina-gamecocks-womens-basketball-aliyah-boston-under-armour-nil-deal/

https://www.on3.com/teams/kentucky-wildcats/news/ncaa-considering-removal-of-scholarship-coach-restrictions-among-other-changes/

https://www.orlandosentinel.com/features/gone-viral/os-ne-youtube-deestroy-ucf-kicker-donald-de-la-haye-20211003-kycudfmz5ff4hfuy5dh6e3twke-story.html

https://www.pff.com/college

https://www.polygon.com/2015/6/17/8797051/joe-montana-football-16-mobile-ios-android-pc

https://www.polygon.com/gaming/2012/8/10/3231973/nba-2k13-preview

https://www.prnewswire.com/news-releases/built-brands-and-byu-football-announce-continued-partnership-301611076.html

https://www.prnewswire.com/news-releases/cardcom-introduces-a-new-officially-licensed-nflpa-themed-set-of-cardcom-visa-prepaid-cards-featuring-over-200-nfl-player-designs-300739766.html

https://www.prnewswire.com/news-releases/former-nfl-superstar-demarcus-ware-launches-new-fitness-app-called-driven-to-win-301188970.html

52

*CONFIDENTIAL*

https://www.prnewswire.com/news-releases/nflpa-oneteam-collective-and-bytecubed-labs-join-forces-to-revolutionize-the-fan-experience-300870536.html

https://www.prnewswire.com/news-releases/topps-and-nfl-players-association-launch-topps-huddle-a-casual-social-game-for-football-fans-175626081.html

https://www.raiders.com/team/players-roster/hunter-renfrow/

https://www.run-games.com/

https://www.sbnation.com/college-football/2013/6/11/4420446/ncaa-football-14-team-ratings-rankings

https://www.sbnation.com/college-football/2013/8/14/4620816/sec-teams-ea-sports-ncaa-football

https://www.sbnation.com/college-football/2013/9/26/4774556/ea-sports-college-football-video-game-series

https://www.si.com/college/2017/07/31/ucf-kicker-donald-de-la-haye-ineligible-ncaa-youtube-videos

https://www.si.com/college/2022/03/23/adidas-name-image-likeness-network

https://www.si.com/extra-mustard/2022/06/17/ea-sports-aims-release-college-football-video-game-july-2023-per-letter

https://www.si.com/media/2016/09/14/sportsmanias-nfl-players-association-realtime-emojis

https://www.si.com/softball/2022/06/05/womens-college-world-series-attendance-record-oklahoma-city

https://www.southland.org/news/2010/7/16/18210.aspx

https://www.sportingnews.com/us/nfl/news/nfl-digital-trading-cards-neonmob-collectible-portraits-art-hometown-heroes-of-the-game/6cuhnyympl591r3yb1847ugkq

https://www.sportsbusinessjournal.com/Daily/Closing-Bell/2022/03/22/NCAA-viewers.aspx

https://www.sportsbusinessjournal.com/Daily/Issues/2018/09/27/Marketing-and-Sponsorship/NFLPA.aspx

https://www.sportsbusinessjournal.com/Daily/Issues/2022/08/18/Media/Big-Ten-Media-Deal.aspx

https://www.sportsbusinessjournal.com/Daily/Issues/2022/09/14/Media/College-Football-Viewership.aspx

https://www.sportsbusinessjournal.com/en/SB-Blogs/Newsletter-College/2022/09/27

https://www.sportsbusinessjournal.com/Journal/Issues/2022/03/21/Upfront/College-basketball.aspx

https://www.sportsbusinessjournal.com/Journal/Issues/2022/10/17/Upfront/Colleges.aspx?ana=mk_sbj_jo_emjo

https://www.sportsbusinessjournal.com/SB-Blogs/SBJ-Unpacks/2022/04/05.aspx

https://www.sports-reference.com/cbb/

https://www.sports-reference.com/cbb/conferences/great-west/

https://www.sports-reference.com/cbb/conferences/great-west/2010.html

*CONFIDENTIAL*

https://www.sports-reference.com/cbb/conferences/independent/2010.html

https://www.sporttechie.com/fanexperiences-startup-vaunt-raises-5m-investors-include-justin-tuck-michele-roberts-dodgers-elysian-park-ventures

https://www.sporttechie.com/hashletes-nflpa-licensed-fantasy-football-crypto-collectibles-app/

https://www.statesman.com/story/sports/football/2021/09/17/texas-football-tight-ends-nil-deals-crowdsourced-burnt-ends-program/8349704002/

https://www.take2games.com/ir/news/2k-announces-partnership-oneteam-partners-nfl-players

https://www.unf.edu/info/timeline/

https://www.usatoday.com/story/sports/2022/06/09/fanatics-topps-nil-college-trading-card-deal/7571834001/

https://www.vendingtimes.com/news/andamiro-usa-signs-licensing-deal-with-nfl-players-association-nflpa-super-star-football-coins-is-partnerships-first-arcade-game/

https://www.washingtonpost.com/sports/2022/03/24/adidas-nil-ncaa-college-athletes/

https://www.washingtonpost.com/sports/2022/03/30/womens-college-basketball-endorsements-nil/

vgchartz.com

# Appendix C

APPENDIX C: VIDEO GAME AND BROADCAST DAMAGES

# REDACTED - COUNSEL ONLY

*CONFIDENTIAL*

**Appendix Exhibit C.2: Forecasting Basketball Video Game Revenues**

| Full Game Revenue (EA) (000s) | Extra Content Revenue as % of Total | Extra Content Revenue (000s) | Estimated Total Revenue (000s) | NIL Royalty Rate | NIL Royalty (000s) |
| --- | --- | --- | --- | --- | --- |

# REDACTED - COUNSEL ONLY

Page 124

*CONFIDENTIAL*

**Appendix Exhibit C.3: Forecasting Football Video Game Revenues**

| | Extra Content | | Estimated | | |
| Full Game Revenue (000s) | Revenue as % of Total | Extra Content Revenue (000s) | Total Revenue (000s) | NIL Royalty Rate | NIL Royalty (000s) |

# REDACTED - COUNSEL ONLY

*CONFIDENTIAL*

## Appendix Exhibit C.4: REDACTED - NSC

| Academic Year | Sport | Conference Non-Bowl Agreements (MM) | Multisport Allocation Factor | Total Post Allocation (MM) | Conference Bowl Agreements (MM) | CFP Distributions (MM) | NCAA Distributions (MM) | Total (MM) | Athlete NIL Factor | Total Athlete Share (MM) | # Class Members in Conference | Per-Class-Member Damages (000s) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | REDACTED - NSC | | | | | | | | REDACTED - NSC | | |
| 2016 | Men's Football | | 75% | | | | | | 10% | | | $23 1 |
| 2017 | Men's Football | | 75% | | | | | | 10% | | | $24 2 |
| 2018 | Men's Football | | 75% | | | | | | 10% | | | $26 7 |
| 2019 | Men's Football | | 75% | | | | | | 10% | | | $28 0 |
| 2020 | Men's Football | | 75% | | | | | | 10% | | | $25 7 |
| 2021 | Men's Football | | 75% | | | | | | 10% | | | $26 0 |
| Total | | | | | | | | | | | | |
| 2016 | Men's Basketball | | 15% | | | | | | 10% | | | $46 6 |
| 2017 | Men's Basketball | | 15% | | | | | | 10% | | | $55 2 |
| 2018 | Men's Basketball | | 15% | | | | | | 10% | | | $52 5 |
| 2019 | Men's Basketball | | 15% | | | | | | 10% | | | $56 6 |
| 2020 | Men's Basketball | | 15% | | | | | | 10% | | | $33 3 |
| 2021 | Men's Basketball | | 15% | | | | | | 10% | | | $57 2 |
| Total | | | | | | | | | | | | |
| 2016 | Women's Basketball | | 5% | | | | | | 10% | | | $6 0 |
| 2017 | Women's Basketball | | 5% | | | | | | 10% | | | $6 1 |
| 2018 | Women's Basketball | | 5% | | | | | | 10% | | | $7 0 |
| 2019 | Women's Basketball | | 5% | | | | | | 10% | | | $7 3 |
| 2020 | Women's Basketball | | 5% | | | | | | 10% | | | $6 6 |
| 2021 | Women's Basketball | | 5% | | | | | | 10% | | | $6 8 |
| Total | | $1,543 7 | | | | | | | | $7 7 | 1,163 | |

REDACTED - NSC

Notes:
See backup to Appendix Exhibits C 4-C 8,
Multisport allocation from Desser Report
CFP (College Football Playoff) distributions are based on CFP public announcements and media guides, and are projected baseline distributions before 2019-2020 season, and actual baseline distributions for 2019-20 season and after  Note that these distributions are conservative since they do not include CFP funds distributed for conference playoff performance  See backup to Appendix Exhibits C 4-C 8, tab CFP for more detail
NCAA distributions are total annual distributions from reports produced by the NCAA, see NCAAHOUSE00249760, NCAAHOUSE00249762, NCAAHOUSE00249763, NCAAHOUSE00249779, NCAAHOUSE00249780, NCAAHOUSE00249781, NCAAHOUSE00249761  See backup to Appendix Exhibits C 4-C 8, tab NCAA for more detail
Athlete NIL Factor from Desser Report
Class members in conference are calculated as the maximum estimated number of athletes receiving full GIAs, as calculated from MFRS data (see NCAAHOUSE00180803-8, NCAAHOUSE00249520)  For teams where the number of aid recipients is equal to the number of GIA equivalencies, I assume that all recipients receive full GIAs  Otherwise, I round the number of reported equivalencies up to the nearest integer and subtract one  See backup to Appendix Exhibits C 4-C 8, tab CFP, tab ClassMemberCount

*CONFIDENTIAL*

## Appendix Exhibit C.5: REDACTED - NSC

| Academic Year | Sport | Conference Non-Bowl Agreements (MM) | Multisport Allocation Factor | Total Post Allocation (MM) | Conference Bowl Agreements (MM) | CFP Distributions (MM) | NCAA Distributions (MM) | Total (MM) | Athlete NIL Factor | Total Athlete Share (MM) | # Class Members in Conference | Per-Class-Member Damages (000s) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2016 | Men's Football | REDACTED - NSC | 75% | | | | | | 10% | REDACTED - NSC | | $24 5 |
| 2017 | Men's Football | | 75% | | | | | | 10% | | | $25 4 |
| 2018 | Men's Football | | 75% | | | | | | 10% | | | $42 8 |
| 2019 | Men's Football | | 75% | | | | | | 10% | | | $44 4 |
| 2020 | Men's Football | | 75% | | | | | | 10% | | | $46 0 |
| 2021 | Men's Football | | 75% | | | | | | 10% | | | $37 2 |
| Total | | | | | | | | | | | | |
| 2016 | Men's Basketball | | 15% | | | | | | 10% | | | $63 7 |
| 2017 | Men's Basketball | | 15% | | | | | | 10% | | | $65 2 |
| 2018 | Men's Basketball | | 15% | | | | | | 10% | | | $85 2 |
| 2019 | Men's Basketball | | 15% | | | | | | 10% | | | $84 3 |
| 2020 | Men's Basketball | | 15% | | | | | | 10% | | | $65 1 |
| 2021 | Men's Basketball | | 15% | | | | | | 10% | | | $77 4 |
| Total | | | | | | | | | | | | |
| 2016 | Women's Basketball | | 5% | | | | | | 10% | | | $7 5 |
| 2017 | Women's Basketball | | 5% | | | | | | 10% | | | $7 4 |
| 2018 | Women's Basketball | | 5% | | | | | | 10% | | | $15 9 |
| 2019 | Women's Basketball | | 5% | | | | | | 10% | | | $16 0 |
| 2020 | Women's Basketball | | 5% | | | | | | 10% | | | $15 7 |
| 2021 | Women's Basketball | | 5% | | | | | | 10% | | | $12 6 |
| Total | | $2,750 8 | | $137 5 | | | | $137 5 | | $13 8 | 1,101 | |

Notes:
See backup to Appendix Exhibits C 4-C 8,    REDACTED - NSC
Multisport allocation from Desser Report
CFP (College Football Playoff) distributions are based on CFP public announcements and media guides, and are projected baseline distributions before 2019-2020 season, and actual baseline distributions for 2019-20 season and after  Note that these distributions are conservative since they do not include CFP funds distributed for conference playoff performance  See backup to Appendix Exhibits C 4-C 8, tab CFP for more detail
NCAA distributions are total annual distributions from reports produced by the NCAA, see NCAAHOUSE00249760, NCAAHOUSE00249762, NCAAHOUSE00249763, NCAAHOUSE00249779, NCAAHOUSE00249780, NCAAHOUSE00249781, NCAAHOUSE00249761  See backup to Appendix Exhibits C 4-C 8, tab CFP, tab NCAA for more detail
Athlete NIL Factor from Desser Report
Class members in conference are calculated as the maximum estimated number of athletes receiving full GIAs, as calculated from MFRS data (see NCAAHOUSE00180803-8, NCAAHOUSE00249520)  For teams where the number of aid recipients is equal to the number of GIA equivalencies, I assume that all recipients receive full GIAs  Otherwise, I round the number of reported equivalencies up to the nearest integer and subtract one  See backup to Appendix Exhibits C 4-C 8, tab CFP, tab ClassMemberCount

*CONFIDENTIAL*

## Appendix Exhibit C.6: REDACTED - NSC

| Academic Year | Sport | Conference Non-Bowl Agreements (MM) | Multisport Allocation Factor | Total Post Allocation (MM) | Conference Bowl Agreements (MM) | CFP Distributions (MM) | NCAA Distributions (MM) | Total (MM) | Athlete NIL Factor | Total Athlete Share (MM) | # Class Members in Conference | Per-Class-Member Damages (000s) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2016 | Men's Football | REDACTED - NSC | 75% | | | | | | 10% | REDACTED - NSC | | $23 5 |
| 2017 | Men's Football | | 75% | | | | | | 10% | | | $27 6 |
| 2018 | Men's Football | | 75% | | | | | | 10% | | | $30 8 |
| 2019 | Men's Football | | 75% | | | | | | 10% | | | $34 0 |
| 2020 | Men's Football | | 75% | | | | | | 10% | | | $34 7 |
| 2021 | Men's Football | | 75% | | | | | | 10% | | | $32 4 |
| Total | | | | | | | | | | | | |
| 2016 | Men's Basketball | | 15% | | | | | | 10% | | | $47 8 |
| 2017 | Men's Basketball | | 15% | | | | | | 10% | | | $59 3 |
| 2018 | Men's Basketball | | 15% | | | | | | 10% | | | $57 5 |
| 2019 | Men's Basketball | | 15% | | | | | | 10% | | | $63 0 |
| 2020 | Men's Basketball | | 15% | | | | | | 10% | | | $43 7 |
| 2021 | Men's Basketball | | 15% | | | | | | 10% | | | $64 4 |
| Total | | | | | | | | | | | | |
| 2016 | Women's Basketball | | 5% | | | | | | 10% | | | $5 3 |
| 2017 | Women's Basketball | | 5% | | | | | | 10% | | | $6 5 |
| 2018 | Women's Basketball | | 5% | | | | | | 10% | | | $8 7 |
| 2019 | Women's Basketball | | 5% | | | | | | 10% | | | $9 2 |
| 2020 | Women's Basketball | | 5% | | | | | | 10% | | | $9 6 |
| 2021 | Women's Basketball | | 5% | | | | | | 10% | | | $9 5 |
| Total | | $1,294 3 | | $64 7 | | | $64 7 | | | $6 5 | 800 | $9 5 |

REDACTED - NSC

Notes:
See backup to Appendix Exhibits C 4-C 8,
Multisport allocation from Desser Report
CFP (College Football Playoff) distributions are based on CFP public announcements and media guides, and are projected baseline distributions before 2019-2020 season, and actual baseline distributions for 2019-20 season and after  Note that these distributions are conservative since they do not include CFP funds distributed for conference playoff performance  See backup to Appendix Exhibits C 4-C 8, tab CFP for more detail
NCAA distributions are total annual distributions from reports produced by the NCAA, see NCAAHOUSE00249760, NCAAHOUSE00249762, NCAAHOUSE00249763, NCAAHOUSE00249779, NCAAHOUSE00249780, NCAAHOUSE00249781, NCAAHOUSE00249761  See backup to Appendix Exhibits C 4-C 8, tab CFP, tab NCAA for more detail
Athlete NIL Factor from Desser Report
Class members in conference are calculated as the maximum estimated number of athletes receiving full GIAs, as calculated from MFRS data (see NCAAHOUSE00180803-8, NCAAHOUSE00249520)  For teams where the number of aid recipients is equal to the number of GIA equivalencies, I assume that all recipients receive full GIAs  Otherwise, I round the number of reported equivalencies up to the nearest integer and subtract one  See backup to Appendix Exhibits C 4-C 8, tab CFP, tab ClassMemberCount

*CONFIDENTIAL*

## Appendix Exhibit C.7: REDACTED - NSC

| Academic Year | Sport | Conference Non-Bowl Agreements (MM) | Multisport Allocation Factor | Total Post Allocation (MM) | Conference Bowl Agreements (MM) | CFP Distributions (MM) | NCAA Distributions (MM) | Total (MM) | Athlete NIL Factor | Total Athlete Share (MM) | # Class Members in Conference | Per-Class-Member Damages (000s) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2016 | Men's Football | REDACTED - NSC | 75% | | | | | | 10% | REDACTED - NSC | | $24 6 |
| 2017 | Men's Football | | 75% | | | | | | 10% | | | $26 6 |
| 2018 | Men's Football | | 75% | | | | | | 10% | | | $27 0 |
| 2019 | Men's Football | | 75% | | | | | | 10% | | | $28 6 |
| 2020 | Men's Football | | 75% | | | | | | 10% | | | $30 5 |
| 2021 | Men's Football | | 75% | | | | | | 10% | | | $29 8 |
| Total | | | | | | | | | | | | |
| 2016 | Men's Basketball | | 15% | | | | | | 10% | | | $47 7 |
| 2017 | Men's Basketball | | 15% | | | | | | 10% | | | $57 7 |
| 2018 | Men's Basketball | | 15% | | | | | | 10% | | | $50 3 |
| 2019 | Men's Basketball | | 15% | | | | | | 10% | | | $54 6 |
| 2020 | Men's Basketball | | 15% | | | | | | 10% | | | $36 0 |
| 2021 | Men's Basketball | | 15% | | | | | | 10% | | | $55 0 |
| Total | | | | | | | | | | | | |
| 2016 | Women's Basketball | | 5% | | | | | | 10% | | | $7 0 |
| 2017 | Women's Basketball | | 5% | | | | | | 10% | | | $7 1 |
| 2018 | Women's Basketball | | 5% | | | | | | 10% | | | $7 6 |
| 2019 | Women's Basketball | | 5% | | | | | | 10% | | | $8 4 |
| 2020 | Women's Basketball | | 5% | | | | | | 10% | | | $8 6 |
| 2021 | Women's Basketball | | 5% | | | | | | 10% | | | $8 9 |
| Total | | $1,471 6 | 5% | | $73 6 | | | $73 6 | | $7 4 | 928 | |

Notes:
See backup to Appendix Exhibits C 4-C 8,        REDACTED - NSC
Multisport allocation from Desser Report
CFP (College Football Playoff) distributions are based on CFP public announcements and media guides, and are projected baseline distributions before 2019-2020 season, and actual baseline distributions for 2019-20 season and after  Note that these distributions are conservative since they do not include CFP funds distributed for conference playoff performance  See backup to Appendix Exhibits C 4-C 8, tab CFP for more detail
NCAA distributions are total annual distributions from reports produced by the NCAA, see NCAAHOUSE00249760, NCAAHOUSE00249762, NCAAHOUSE00249763, NCAAHOUSE00249779, NCAAHOUSE00249780, NCAAHOUSE00249781, NCAAHOUSE00249761  See backup to Appendix Exhibits C 4-C 8, tab CFP, tab NCAA for more detail
Athlete NIL Factor from Desser Report
Class members in conference are calculated as the maximum estimated number of athletes receiving full GIAs, as calculated from MFRS data (see NCAAHOUSE00180803-8, NCAAHOUSE00249520)  For teams where the number of aid recipients is equal to the number of GIA equivalencies, I assume that all recipients receive full GIAs  Otherwise, I round the number of reported equivalencies up to the nearest integer and subtract one  See backup to Appendix Exhibits C 4-C 8, tab CFP, tab ClassMemberCount

*CONFIDENTIAL*

## Appendix Exhibit C.8: REDACTED - NSC

| Academic Year | Sport | Conference Non-Bowl Agreements (MM) REDACTED - N | Multisport Allocation Factor | Total Post Allocation (MM) | Conference Bowl Agreements (MM) | CFP Distributions (MM) | NCAA Distributions (MM) | Total (MM) | Athlete NIL Factor | Total Athlete Share (MM) REDACTED - NSC | # Class Members in Conference | Per-Class-Member Damages (000s) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2016 | Men's Football | | 75% | | | | | | 10% | | | $36 0 |
| 2017 | Men's Football | | 75% | | | | | | 10% | | | $36 8 |
| 2018 | Men's Football | | 75% | | | | | | 10% | | | $38 1 |
| 2019 | Men's Football | | 75% | | | | | | 10% | | | $39 4 |
| 2020 | Men's Football | | 75% | | | | | | 10% | | | $41 9 |
| 2021 | Men's Football | | 75% | | | | | | 10% | | | $42 5 |
| Total | | | | | | | | | | | | |
| 2016 | Men's Basketball | | 15% | | | | | | 10% | | | $64 5 |
| 2017 | Men's Basketball | | 15% | | | | | | 10% | | | $70 4 |
| 2018 | Men's Basketball | | 15% | | | | | | 10% | | | $61 3 |
| 2019 | Men's Basketball | | 15% | | | | | | 10% | | | $66 4 |
| 2020 | Men's Basketball | | 15% | | | | | | 10% | | | $52 6 |
| 2021 | Men's Basketball | | 15% | | | | | | 10% | | | $74 0 |
| Total | | | | | | | | | | | | |
| 2016 | Women's Basketball | | 5% | | | | | | 10% | | | $12 4 |
| 2017 | Women's Basketball | | 5% | | | | | | 10% | | | $13 3 |
| 2018 | Women's Basketball | | 5% | | | | | | 10% | | | $12 4 |
| 2019 | Women's Basketball | | 5% | | | | | | 10% | | | $13 5 |
| 2020 | Women's Basketball | | 5% | | | | | | 10% | | | $13 3 |
| 2021 | Women's Basketball | | 5% | | | | | | 10% | | | $14 1 |
| Total | | $2,902 4 | | | $145 1 | | | $145 1 | | $14 5 | 1,100 | |

Notes:
See backup to Appendix Exhibits C 4-C 8,    REDACTED - NSC
Multisport allocation from Desser Report
CFP (College Football Playoff) distributions are based on CFP public announcements and media guides, and are projected baseline distributions before 2019-2020 season, and actual baseline distributions for 2019-20 season and after  Note that these distributions are conservative since they do not include CFP funds distributed for conference playoff performance  See backup to Appendix Exhibits C 4-C 8, tab CFP for more detail
NCAA distributions are total annual distributions from reports produced by the NCAA, see NCAAHOUSE00249760, NCAAHOUSE00249762, NCAAHOUSE00249763, NCAAHOUSE00249779, NCAAHOUSE00249780, NCAAHOUSE00249781, NCAAHOUSE00249761  See backup to Appendix Exhibits C 4-C 8, tab NCAA for more detail
Athlete NIL Factor from Desser Report
Class members in conference are calculated as the maximum estimated number of athletes receiving full GIAs, as calculated from MFRS data (see NCAAHOUSE00180803-8, NCAAHOUSE00249520)  For teams where the number of aid recipients is equal to the number of GIA equivalencies, I assume that all recipients receive full GIAs  Otherwise, I round the number of reported equivalencies up to the nearest integer and subtract one  See backup to Appendix Exhibits C 4-C 8, tab CFP, tab ClassMemberCount

*CONFIDENTIAL*

# Appendix D

APPENDIX D: ATHLETE-REPORTED NIL DATA ENTRY AND PROCESSING

236.    Plaintiffs subpoenaed Division I schools to provide 2021/2022 squad lists and

documentation of NIL transactions after July 1, 2021, that were reported by athletes (RFP#4).

These sources and other information lead to two databases: Reported NIL Transactions and

Reported NIL Earnings.

### D.1 REPORTED NIL TRANSACTIONS

237.    The first database consolidates all NIL transaction information, as reported by athletes and

provided, for this litigation, by schools.

238.    Requirements for athletes to report compensation for NIL transactions vary by conference,

school and state.  For example, the NIL laws of some states (such as Texas)[245] require athletes to

disclose potential NIL agreements to schools prior to signing; other states (such as Florida)[246]

require that NIL agreements be disclosed after they are signed; and still other states (such as

Arizona)[247] contain no athlete disclosure requirement whatsoever.  As of September 23, 2022,

126 schools had provided documents and/or summaries of athlete reports of compensation for

NIL transactions.

239.    I instructed staff to consolidate all of the information provided by schools into a single

database. The first stage of this process is to prepare all of the NIL transaction observations for

consolidation by checking for typographical errors, removing duplicate transactions[248] and then

---

[245] *See* Texas S.B. 1385 (2021-2022 Legislative Session) at Sec. 51.9426(g)(1), *available at* https://legiscan.com/TX/text/SB1385/id/2407682/Texas-2021-SB1385-Enrolled html ("A student athlete participating in an intercollegiate athletic program at an institution to which this section applies…shall, before entering into the contract, disclose to the institution, in the manner prescribed by the institution, any proposed contract the student athlete may sign for use of the student athlete's name, image, or likeness").

[246] *See* Florida S.B. 646 (2020 Legislative Session) at Sec. 2(i), *available at* https://www.flsenate.gov/Session/Bill/2020/646/BillText/er/PDF ("An intercollegiate athlete who enters into a contract for compensation for the use of her or his name, image, or likeness shall disclose the contract to the postsecondary educational institution at which she or he is enrolled, in a manner designated by the institution.").

[247] *See* Arizona S.B. 1296 (2021 Legislative Session), *available at* https://legiscan.com/AZ/text/SB1296/2021.

[248] Some schools produced multiple rounds of NIL data.  The consolidated data filters out duplicate observations produced in separate rounds.  When subsequent rounds of NIL data production from the same school contain

*CONFIDENTIAL*

organizing the information for each school into a uniform set of fields.  The second stage is to combine the transactions into a consolidated table, remove non-relevant observations,[249] standardize the school, dates, sport names, and extract numerical compensation values from text.  Finally, verification of a random sample of entries confirmed the accuracy rate for the relevant information.

### D.1.1 Prepare NIL observations for consolidation

240.    The first stage is to prepare the information provided from each production from each school for consolidation into a common database.  Schools have produced NIL observations in three formats: 1) native spreadsheets, 2) tabulated pdfs converted from native spreadsheets, 3) non-tabulated pdfs or other images of documents.

> o   Native: for native spreadsheets, staff first checked for typographical errors.  Then, for each school, staff reviewed all the data from various productions and removed duplicate observations.[250]  Afterwards, staff removed any extraneous formatting (e.g., titles, blank rows above column labels, notes at the bottom of the document) before saving the data as a

---

insufficient information to determine duplicates (e.g., a school providing two different productions with overlapping dates but missing athlete names), the consolidated data only uses the most current production.

[249] Non-relevant observations are reports of NIL transactions that the production identify as prohibited, rejected, disputed, impermissible, withdrawn, not pursuing; non-NIL entries (including marketing representation and management agreements), blank rows and rows used for testing purposes; and NIL transactions with no athlete participation.

[250] Duplicate identification based off reported athlete name, date(s), company, NIL compensation and sport.  Staff reviewed all production data associated with each school, and flagged a transaction as a duplicate if it met any of the following criteria, otherwise it was considered a unique entry:
  a.   Reported athlete name, date(s), company, NIL compensation and sport were the exact same between two different production datasets.
  b.   NIL transaction was the same between two production datasets and only showed up once in each dataset. This includes same dates or difference of one day (or missing values), naming or not naming the NIL platform generating the report, amount the same or missing value.  All Cameo deemed unique, not duplicates, because Cameo is a platform that can generate many otherwise identical NIL transactions from different parties (Cameo allows a consumer to "access thousands of celebrities and request a personalized video message for any occasion." See *Cameo is where you connect with your favorite stars*.  Cameo.com. Accessed on October 20, 2022 at https://www.cameo.com/about).

*CONFIDENTIAL*

.csv file.[251]  Finally, staff identified the columns in the produced

document that aligned with the variables in the Reported NIL

Transactions database.

- o  Converted: for tabulated pdfs, staff converted the pdf into a spreadsheet

   by first using pdf readers to output the tables into excel format, and then

   manually verifying the accuracy of the reported values.  From that point

   on, processing was the same as it was for native spreadsheets.

- o  Manual: for non-tabulated pdfs or other images of documents, it was

   necessary to enter the data manually.[252]  Research staff entered each field

   based on a set of commonly applicable rules. Staff provided by the legal

   team conducted this work for some of the school productions – in those

   cases, my research staff reviewed initial entries and spot-checked the

   entries as the work progressed.[253]

241.    There were a total of 183 productions that schools provided in time to consolidate for this

report.

### D.1.2 Consolidate and process NIL transactions

242.    The next stage is to combine and process the consolidated data, in order to store the

information from multiple sources and formats in a common and accessible fashion.  This

process occurred in batches as entry of new productions proceeded.

---

[251] In some production data, athlete first and last names were reported in separate columns.  In these cases, a new column with full name was also created.

[252] For schools that produced a small number of transaction data in both native spreadsheets and non-tabulated pdfs or other images of documents, staff manually consolidated the produced information into one table.  These are included in manual entry.

[253] For detailed manual entry instructions, see "Manual Data Entry Instructions.docx" provided in the report backup.

*CONFIDENTIAL*

243.    There are four steps to complete this stage, which proceed as a combination of programs and manual steps guided by common instructions.

    i)   Step one: Import school data into SAS, remove non-relevant columns (in the previous stage, staff identified the relevant columns in the produced data for each school that aligned with the variables to be consolidated into the final database) and rename relevant columns to their corresponding variable names:

- Data_Type: identifies the type of production (native spreadsheets, tabulated pdfs, non-tabulated pdfs or other images of documents).
- Business_Name: identifies the company associated with a NIL transaction.
- Athlete_Name: full name of the athlete.
- Sport: sport of the athlete.
- Submission_Dates: dates labelled as "Submission Date". If not available, then date the form was completed/made/signed.
- Amount_Received: NIL amount received. Sometimes these are text descriptions rather than straight dollar amounts.
- Amount_Received2: occasionally schools will have two columns that report NIL amounts.
- Activity_Type: what activity is the NIL transaction associated with.
- Activity_Type2: occasionally schools will have two columns that describe the NIL activity.
- Decision_Dates: dates labelled as "Decision Date". If not available, date that school approves NIL transaction.
- Transaction_Dates: dates the activity occurred. i.e. social media post date, etc.
- Payment_Type: how the athlete is being compensated (i.e., cash, in-kind, etc.).
- University: university reporting data.
- Note: any additional notes related to a transaction entry. Can be from the production data, or from staff (e.g., noting that a document was unsigned).

*CONFIDENTIAL*

- Source: source of the transaction entry.

- NewEntry: flags if the transaction was entered after 9/13/2022. Used for verifying the accuracy of the consolidated database.

- Filter: used in step three to filter out non-relevant transactions.

j) Step two: Consolidate the school data together into one large SAS dataset.

k) Step three: Remove non-relevant entries[254] and standardize most of the NIL compensation values,[255] dates, and sports using SAS. This added the following variables to the dataset:

- Standardized_date: standardized date. Based off "Submission_Dates" where possible. If not available, then "Decision_Dates" and "Transaction_Dates" are used, in that order of priority.

- Standardized_Sport: standardized sport. Based off a manually created key that maps each reported sports value to a standardized sports value.

- Standardized_NIL: standardized NIL dollar value. This is a combination of cash and, if provided, product value.

l) Step four: Some entries, flagged by the SAS program,[256] required manual review, either because SAS was unable to assign a standardized compensation value/date, or because the observations contained details that may make the automated standardization unreliable.[257] Staff manually reviewed these entries. This added the following variables to the dataset:

---

[254] NIL transactions that the documents identify as prohibited, rejected, disputed, impermissible, withdrawn, or not pursuing; non-NIL entries including marketing representation and management agreements; blank rows and rows used for testing purposes; NIL transactions where the athlete did not participate; old NIL data productions in instances where the NIL data contains insufficient information to determine duplicates (e.g., a school providing two different productions with overlapping dates but missing athlete names).

[255] For compensation reported as text, extract dollar amounts where possible.

[256] Using the following variables: "manual_entry_flag" for entries where SAS was unable to assign a standardized compensation value; "manual_date_flag" for entries where SAS was unable to assign a standardized date; "manual_check_flag" and "manual_check_flag_2" for observations that contain details which may make the automated standardization unreliable.

[257] For example, an entry with both a NIL compensation value and an activity description that expands on the NIL payment.

*CONFIDENTIAL*

- Manual_NIL: manually standardized NIL value.

- Manual_date: manually standardized date.

- NIL_Final_Std: Final version of the standardized NIL value. Uses "Manual_NIL" where available, and "Standardized_NIL" otherwise. Rounded to the nearest integer.

- Date_Final_Std: Final version of the standardized date. Uses "Manual_date" where available, and "Standardized_date" otherwise.

244.   The SAS and manual NIL value standardizations used the same approach:

- If the listed compensation is a single dollar figure, then the NIL value standardizes to that dollar figure (rounded to the nearest whole dollar).

- If listed compensation is blank, none, or n/a, then the NIL value standardizes to $0.

- If the listed compensation contains text, then:

    I.   If the compensation text does not list any numbers, then the NIL value standardizes to $0. This means that for cases where a product compensation is provided without a dollar value (e.g., the reported compensation is "received free gear"), the recorded NIL value does not capture any value for the product.

    II.   If the only number listed are percentages, then NIL standardizes to $0. This means the recorded NIL value does not capture the value of compensation based on percentage commissions, unless the document provides a specific dollar amount.

    III.   If the document provides one dollar figure in the text, then the NIL value standardizes to that dollar figure. This means that for cases where the document identifies product compensation with a dollar value (*e.g.*, the reported compensation is "received free gear worth $50"), the

*CONFIDENTIAL*

recorded NIL value captures the listed value ($50 in this example). This also means that for cases where compensation is based on the number of units produced or specific milestones achieved (i.e. $x per Instagram Post, $x per hour worked), the recorded NIL value captures the compensation for one unit or one milestone, unless the document provides further detail to determine the units or milestone.

- For transactions that involve compensation from multiple dollar sources (*e.g.*, "$500 and t-shirt worth $50"), the NIL value standardizes to the sum of listed values (*i.e.*, from both cash and product – or $550).

- For transactions that involve a dollar range the NIL value standardizes to the midpoint of the dollar range.

245.    When these steps are complete for any large subset of reported NIL transactions, it is then possible to continue on to the third stage.

### D.1.3 Verify accuracy of compensation value and other relevant fields

246.    This stage is the verification of the accuracy of the processed data.  This occurred in two cohorts – first for observations processed by September 13, 2022, and again for observations processed after September 13, 2022.

247.    The procedure is the same for both cohorts: draw a random sample of 120 processed NIL transactions from each format of production (native, converted, manual).  A researcher who was not involved in entering the data then retrieved the source documents for each of the sample observations and verified the information for the following fields: school, athlete name, standardized sport, standardized dollar amount of NIL compensation.[258]  If the first 75 observations of dollar amount NIL compensation reviewed have no errors, then the review

---

[258] I.e., the variables "University", "Athlete_Name", "Standardized_Sport", "NIL_Final_Std."

*CONFIDENTIAL*

process stops; otherwise, the review continues through 120 observations.  The final database incorporates any reviewer corrections.

248.    In the event that 75 observations had no errors, the accuracy is greater than 96 percent (fewer than 4 percent of observations have errors, with a confidence level of 95 percent).[259]  In the event that there any corrections, I can calculate a 95 percent confidence interval for the error rate.[260]  Appendix Exhibit D.1 shows the results:

### Appendix Exhibit D.1: NIL Observations – Verification Results

| | School Errors | Athlete Name Errors | Sport Errors | NIL Compensation Errors | Total Transactions Reviewed | Number of Transactions in Population |
|---|---|---|---|---|---|---|
| **Processed by 9/13/2022** | | | | | | |
| Native Excel | 0 | 0 | 0 | 0 | 75 | 6,411 |
| Converted PDF | 0 | 2 | 0 | 0 | 75 | 6,723 |
| Manual | 0 | 1 | 0 | 3 | 120 | 1,125 |
| | | | | | | |
| **Processed after 9/13/2022** | | | | | | |
| Native Excel | 0 | 0 | 0 | 1 | 120 | 3,085 |
| Converted PDF | 0 | 0 | 0 | 0 | 75 | 2,693 |
| Manual | 0 | 0 | 2 | 4 | 120 | 2,560 |

*Notes:*

*The Manual sample of the cohort processed by 9/13/2022 contained five non-NIL transactions. The sample also contained 14 cases where Men's Basketball was not distinguished from Women's Basketball - these were not considered errors.*

*The Native Excel sample of the cohort processed after 9/13/2022 contained one observation marked as an error because "15%" read in as "$0.15". However, the standardized NIL rounded the compensation to $0, which was the correct amount for this entry.*

---

[259] A random sample of 75 observations from a population with 4 percent errors has less than a 5 percent chance of having no errors (the relevant calculation is $0.96^{\wedge}75 << 0.047$).  For any higher rate of errors in the population, the likelihood of drawing a random sample of 75 observations with no errors is lower.

[260] For example, a sample of 120 observations with 3 errors provides an estimated population error rate of 2.5 percent ($3/120 = 0.025$), with a 95 percent confidence interval of (0.62%, 6.84%).  That means that the 1,000 observations not sampled have an estimated 25 errors, with a 95% confidence interval ranging from 6 to 68 errors.  When the 3 sampled errors are corrected, the full set of 1,120 has 6 to 68 errors (with a 95 percent level of confidence), which is 0.5% to 6.1% ($6/1,120=0.54\%$, $68/1,120 = 6.07\%$).  Thus, the 95% confidence interval for the estimated percentage of errors remaining in the data set after the sampling and correction procedure is (0.5%, 6.2%), with the best point estimate equal to 2.2% ($25/1,120 = 2.23\%$).  For the full dataset, the results are 8 errors out of 585 sampled, or 1.37 percent error rate, with a 95 percent confidence interval of (0.6%, 2.7%)

*CONFIDENTIAL*

### D.1.4 Database produced

249.    The final result of these three stages is the database called "Reported NIL

Transactions.xlsx".  This is the database for counting the number of NIL transactions reported

since July 1, 2021 by Division I athletes, and the date when those transactions occurred.

250.    The backup to accompany the report includes a copy of this database, along with source

documents other than the produced Bates and non-Bates numbered documents, the instructions

for manual data entry, and the programs and manual instructions for the data processing stage.

### D.2 REPORTED NIL EARNINGS

251.    The second database itemizes earnings by athletes and identifies which athletes can

currently be identified as eligible for NIL Earnings damages.

252.    For earnings, this database tabulates the dollar amounts recorded in Reported NIL

Transactions, providing a total for each athlete.[261]

253.    The criteria for eligibility are that the athlete on the tabulated list (which means there is at

least one reported NIL transaction for the athlete) and that the athlete was previously providing

athletic services[262] at a Division I school (and, thus, would have been able to earn NIL

compensation previously, absent the restraint in suit).

254.    The determination of eligibility recorded in the database relies on squad lists produced by

the schools.  A 2021-2022 squad list that identifies an athlete as participating before that season,

or any previous squad list identifying the athlete, sets the eligibility flag to 1.  A squad 2021-

2022 squad list that identifies an athlete as participating starting that season sets the eligibility

---

[261] More specifically, for any given school, the NIL earnings associated with each athlete/sport pair is the sum of all of the individual observations for that athlete/sport that have a dollar value (some transactions have unvalued in-kind compensation or commission percentage with no base sales amount, for example).  Staff also manually standardized athlete names within each school and sport category at this stage – the backup includes a list of athlete name standardizations.

[262] Excluding non-NCAA sports, such as cheerleading, dance, pistol, sailing, squash, synchronized swimming, men's rowing.

Page 139

*CONFIDENTIAL*

flag to 0.  Some schools did not provide squad lists or provided squad lists with insufficient information.  When there is insufficient information from produced squad lists to determine eligibility, the rosters from the school web sites and online athlete profiles provide supplemental records to make the same determination.[263]

255.    Upon completion of the determination of eligibility, a verification stage proceeded in a manner similar to the Reported NIL Transactions database. A random sample of 120 athletes is drawn from each school type (Power Five, non-Power Five).  A researcher then retrieved the squad lists and web rosters associated with each athlete and verified the eligibility flag.  If the first 75 observations reviewed have no errors, then the review process stops; otherwise, the review continues through 120 observations.  The final database incorporates any reviewer corrections.   Appendix Exhibit D.2 shows the results – overall error rate is 0.8 percent and the 95 percent confidence interval is (0.1%, 2.9%):

**Appendix Exhibit D.2: Eligibility for NIL Earnings Damages – Verification Results**

|  | Eligibility Flag Errors | Total Observations Reviewed | Number of Observations in Population |
|---|---|---|---|
| Power Five | 1 | 120 | 6,343 |
| Non-Power Five | 1 | 120 | 2,850 |

256.    The final result is the database called "Reported NIL Earnings.xlsx."  This is the database for determining the earnings by Plaintiffs from NIL transactions in the 2021-2022 academic year, reported since July 1, 2021. This database contains the following variables:

---

[263] The squad list and web roster review included filling in the sport for any athletes with missing information. Also, research staff identified during this process several instances where NIL transactions reported non-athlete names as well as one instance where the NIL transaction reported multiple athlete names – the final Reported NIL Earnings database does not use these transactions.  For detailed eligibility determination instructions, see "Eligibility Determination Instructions.docx" provided in the report backup.

*CONFIDENTIAL*

- Standardized_Athlete_Name: standardized athlete name based off the Reported NIL Transactions database, the squad lists, web rosters, and athlete profile. Full names are used where possible.

- Standardized_Sport: standardized athlete sport. Where possible, men's basketball is distinguished from women's basketball and men's rowing distinguished from women's rowing. This field also fills in missing athlete sports using information in the squad lists, web rosters, and athlete profiles.

- University: the athlete's university.

- Total_NIL: total NIL compensation reported by the athlete in the Reported NIL Transactions database.

- Max_NIL_Entry: maximum compensation value reported by the athlete in the Reported NIL Transactions database.

- Zero_Comp_Observations: number of zero compensation NIL transactions reported by the athlete in the Reported NIL Transactions database.

- NIL_Observations: total number of NIL transactions reported by the athlete in the Reported NIL Transactions database.

- Damages_Eligibility_Flag: identifies if the athlete is eligible for NIL Earnings damages. "1" if athlete is eligible, "0" if not eligible, and blank if athlete does not show up in squad lists/web rosters/profiles.

- Damages_Eligibility_Source: source of eligibility determination (roster, squad list, or profile).

- Notes: notes that flag 1) if the athlete could not be identified in squad lists or online and 2) if the athlete's sport is non-NCAA and therefore the athlete is not eligible.

- FBS: identifies whether the athlete's university is FBS.

- P5: identifies whether the athlete's university is Power Five.

Page 141

*CONFIDENTIAL*

- Category: categorizes the athlete into one of the following buckets: 1) Power Five FB and MBB, 2) Power Five WBB, 3) Additional Athletes.

- Class: identifies an eligible athlete's class. The classes are 1) Power Five FB and MBB, 2) Power Five WBB, 3) Additional Athletes.

257.    The backup to accompany the report includes a copy of this database, along with source documents other than the produced Bates and non-Bates numbered documents, the instructions for manual eligibility determination, and the programs for the earnings aggregation stage.

*CONFIDENTIAL*

# Appendix E

258.    The NCAA has produced          REDACTED - COUNSEL ONLY

[264]  Each of these spreadsheets represents school-level financial data for a single academic year.  I combine these data into a single database in which each row represents a single school in a single academic year.

259.    The MFRS data identify schools using a unique_id field. The NCAA has produced a key that maps school names to this unique_id identifier.[265]  This allows me to identify a school for each row in the MFRS data.[266]  The data contain a field that identifies whether a school is FBS, FCS, or a Division I school without a football program in a given year.  Using a lookup table that maps schools to conferences for each academic year, I can also identify the conference associated with each row and therefore identify whether or not that row represents a Power Five school.

260.    Financial data include 21 revenue categories and 29 expense categories.  Amounts for each category appear across multiple columns, each of which represents a specific sport.  Each category also has a column reporting amounts unallocated by sport, as well as columns with men's, women's, and coed totals.  Calculating the sum of all sport columns – as well as the unallocated column – for a given revenue or expense category provides a school total for that category in a given year.  Alternatively, the same total can be calculated by adding the men's, women's, and coed columns. For example, the rev1_MFB column reports a school's total football-related ticket sales in a given year; calculating the sum of rev1 columns for all sports and unallocated provides total ticket sales, regardless of their source.

---

[264]                 REDACTED - COUNSEL ONLY

[265] NCAA INTERNAL - unique_id_key_2021.xlsx.

[266] Indiana University-Purdue University, Fort Wayne and Indiana University-Purdue University at Indianapolis have the same unique_id value and therefore cannot be distinguished in the MFRS data.

CONFIDENTIAL

261.    In Section 7.2.4 (Exhibit 18), I calculate the percentage of donations and of total revenue attributable to football, men's basketball, and women's basketball.  To produce those revenue splits, I have calculated the totals for the field<sup>COUNSEL ONLY</sup>, which is Contributions (i.e., donations),[267] separately for Football, Men's Basketball, and Women's Basketball in each year. In addition, I have calculated the same totals using the sum of all revenue categories reported in the MFRS data. I then calculate the portion of contributions and total revenue that each of these three sports represented on an annual basis as a percentage of their combined total. This analysis is restricted only to Power 5 schools.

262.    In Section 7.3.3, I calculate totals across various revenue categories for Division I schools. Specifically, I calculate totals of the fields rev1 (Ticket Sales),[268] rev4a (Contributions),[269] rev11 (Program, Novelty, Parking and Concession Sales),[270] and rev12 (Royalties, Licensing, Advertisement and Sponsorships),[271] as well as the sum across all revenue fields.[272] I sum the

---

[267]    REDACTED - COUNSEL ONLY                         . Contributions includes "Amounts received from individuals, corporations, associations, foundations, clubs, or other organizations used for the operations of the athletics program," "Funds contributed by outside contributors for the payment of debt service, lease payments or rental fee expenses for athletic facilities in the reporting year," and "Amounts received above face value for tickets used within the reporting year." *NCAA 2022 Agreed-Upon Procedures*. (2022).  NCAA.  Accessed on October 20, 2022 at https://ncaaorg.s3.amazonaws.com/ncaa/finance/2022NCAAFIN_AgreedUponProcedures.pdf.

[268]    Ticket Sales are comprised of "[i]nput revenue received for sales of admissions to athletic events." *NCAA 2022 Agreed-Upon Procedures*. (2022).  NCAA.  Accessed on October 20, 2022 at https://ncaaorg.s3.amazonaws.com/ncaa/finance/2022NCAAFIN_AgreedUponProcedures.pdf.

[269]    Includes "Amounts received from individuals, corporations, associations, foundations, clubs, or other organizations used for the operations of the athletics program," "Funds contributed by outside contributors for the payment of debt service, lease payments or rental fee expenses for athletic facilities in the reporting year," and "Amounts received above face value for tickets used within the reporting year." *NCAA 2022 Agreed-Upon Procedures*. (2022).  NCAA.  Accessed on October 20, 2022 at https://ncaaorg.s3.amazonaws.com/ncaa/finance/2022NCAAFIN_AgreedUponProcedures.pdf.

[270]    Includes "[i]nput revenues from […] Game Programs[,] Novelties[,] Food and Concessions[, and] Parking." *NCAA 2022 Agreed-Upon Procedures*. (2022).  NCAA.  Accessed on October 20, 2022 at https://ncaaorg.s3.amazonaws.com/ncaa/finance/2022NCAAFIN_AgreedUponProcedures.pdf.

[271]    Includes "[i]nput revenues from […] Sponsorships[,] Licensing Agreements[,] Advertisement[,] Royalties[, and] In-kind products and services as part of sponsorship agreements." *NCAA 2022 Agreed-Upon Procedures*. (2022).  NCAA.  Accessed on October 20, 2022 at https://ncaaorg.s3.amazonaws.com/ncaa/finance/2022NCAAFIN_AgreedUponProcedures.pdf.

[272]    For the mapping of revenue categories in the MFRS data to descriptions, see REDACTED - COUNSEL ONLY

*CONFIDENTIAL*

men's, women's, and coed columns for each of these revenue categories and aggregate across schools to calculate annual totals by revenue category.

263.    In multiple analyses, I use MFRS data to estimate the number of athletes receiving full grants-in-aid.                    REDACTED - COUNSEL ONLY

.[273] Like other revenue and expense fields, values are reported by school, season, and sport.

264.    Using the number of GIA equivalencies and the number of athletes receiving aid, I can calculate the maximum possible number of full grants-in-aid offered.  On teams where the number of aid recipients and equivalencies are equal, I understand that all aid recipients are receiving full GIAs and take the number of recipients.  Otherwise, not all aid recipients are receiving full GIAs.  In these cases, I round equivalencies up to the nearest integer value and subtract one. If, for example, a Football team shared 83.1 equivalencies among 84 athletes, it is possible that as many 83 athletes receive full GIAs.  However, if a team shared exactly 83 equivalencies among 84 athletes, it is not possible that any more than 82 of those athletes received full GIAs.  In my analysis, I restrict the data only to Power Five schools and take the sum of this maximum-full-GIA metric across schools by season, conference, and sport.

---

[273]                    REDACTED - COUNSEL ONLY

*CONFIDENTIAL*