# EXHIBIT 2



# EXPERT REPORT
# OF EDWIN S. DESSER

### IN THE MATTER OF

# House et al. v. NCAA et al.

President

Desser Sports Media, Inc.

October 21, 2022

# 1. ASSIGNMENT

I have been engaged by Plaintiffs in In re College Athlete NIL Litigation, No. 4:20-cv-03919-CW (N.D. Cal.) to offer my expert opinion as to certain matters relating to college programming products in the sports media marketplace in support of class certification. In particular, I am providing the Court with an understanding of the importance and estimated market value of the athlete Name, Image, and Likeness (NIL) contained within, and related to, the telecast of NCAA Division I Football Bowl Subdivision (FBS) games, and men's and women's Division I basketball games, as set forth below. As my report makes clear, my analysis and methodology is common to all proposed class members. I am being compensated at my current standard hourly rate for such testimony of $1875, which is not in any way dependent upon the outcome of this matter, and the opinions I offer herein are mine alone.

My assignment here is analyzing athlete NILs used in connection with the licensing and production of games for broadcasting for the classes of Power 5 (and Notre Dame) football and men's and women's basketball players. I will consider the various licensing broadcast agreements that have been in effect during the Class Period (between June 15, 2016 and the date of the class certification order in this matter) for these entities and place them in historical and operational industry context. In particular, I estimate an appropriate financial allocation for the NIL portion of the rights granted in those agreements relating to class members.

Because this report is being provided for class certification purposes at this juncture and not merits, it is intended to show how my analysis and methodology can be applied on a class-wide basis. I reserve the right to update or supplement the opinions offered in this report as additional documents or other information is furnished through discovery or otherwise, upon the introduction of other expert reports, and as the case progresses.

A list of publications I have authored over the past ten years and the documents I have relied upon in the development of this report are included in the appendix hereof.

CONFIDENTIAL                    ©2022 DESSER SPORTS MEDIA, INC.

# Table of Contents

1. ASSIGNMENT: .................................................................................................. 2
2. EXECUTIVE SUMMARY ..................................................................................... 6
3. QUALIFICATIONS ............................................................................................. 9
   3.1. LOCAL SPORTS MEDIA .............................................................................. 9
   3.2. NATIONAL BASKETBALL ASSOCIATION ...................................................... 9
   3.3. DESSER SPORTS MEDIA, INC. ................................................................... 10
   3.4. TESTIMONY/EDUCATION ......................................................................... 10
4. STRUCTURE/OPERATION OF SPORTS MEDIA BUSINESS .................................... 11
   4.1. ATHLETES, SCHOOLS, AND TEAMS ............................................................ 11
   4.2. CONFERENCES ......................................................................................... 11
   4.3. COLLEGE MEDIA RIGHTS SELLERS ............................................................ 12
   4.4. COLLEGE MEDIA RIGHTS BUYERS ............................................................. 12
   4.5. PROGRAMMING PACKAGES AND DISTRIBUTORS ........................................ 13
   4.6. CONSUMERS ........................................................................................... 13
5. THE VALUE DRIVERS OF SPORTS CONTENT ....................................................... 14
   5.1. LIVE ........................................................................................................ 14
   5.2. EXCLUSIVE ............................................................................................... 15
   5.3. LARGE AUDIENCES ................................................................................... 16
   5.4. PREDICTABLE AUDIENCES ........................................................................ 17
   5.5. AUDIENCE COMPOSITION. ....................................................................... 18
   5.6. PRIMARY PROGRAMMING PROPERTIES ................................................... 19
   5.7. NEW DISTRIBUTION OPPORTUNITIES ...................................................... 19
   5.8. SPORTS BETTING/POOLS/FANTASY LEAGUES ........................................... 20
   5.9. SCARCITY ................................................................................................ 21
6. KEY BROADCAST AGREEMENT ELEMENTS: THE MEDIA RIGHTS AND OPPORTUNITIES PACKAGE .........22
   6.1. PROGRAMMING ...................................................................................... 22
   6.2. PRODUCTION RIGHTS ............................................................................... 22
   6.3. INTERVIEWS ............................................................................................ 22
   6.4. GRANT OF RIGHTS/CLEARANCES .............................................................. 23
   6.5. SAMPLE CLEARANCE PROVISIONS ............................................................ 24
   6.6. STATE VARIATIONS .................................................................................. 24

6.7.ONE-STOP SHOPPING.................................................................................................25

6.8.PROFESSIONAL SPORTS NIL....................................................................................27

6.9.DISTRIBUTION RIGHTS .............................................................................................29

6.10SALES RIGHTS...........................................................................................................29

6.11.CONSIDERATION ......................................................................................................29

6.12.PROTECTIONS ..........................................................................................................29

6.13.TERM/BACK-END RIGHTS .......................................................................................29

7.    THE INDISPENSIBLE NATURE OF NIL IN SPORTS MEDIA CONTACTS ...................31

7.1.HOW IMPORTANT IS NIL?.........................................................................................31

7.2.LICENSORS DEMAND ASSURANCE ........................................................................31

7.3.THE APPLICATION OF NIL ........................................................................................32

7.4.TELECAST VALUE ......................................................................................................33

7.5.ATHLETE BACKSTORIES...........................................................................................33

7.6.THE WHOLE ................................................................................................................33

7.7.SOCIAL MEDIA ...........................................................................................................34

7.8.SEARCH RESULTS......................................................................................................34

7.9.THE IMPORTANCE OF PLAYER BODIES .................................................................34

8.    MEDIA-RELATED USE OF NIL ......................................................................................35

8.1.PRIOR PROMOTION ...................................................................................................35

8.2.PRODUCTION OF GAME TELECASTS ......................................................................36

8.3.IN SUMMARY...............................................................................................................39

9.    BROADCASTERS NEED RIGHTS TO ALL ATHLETES, EVEN THOSE WHO RARELY PLAY............................40

9.1.NOW LET'S IMAGINE SPORTS TELECAST WITHOUT NIL.....................................41

10.  ORGANIZATION OF COLLEGE SPORTS MEDIA RIGHTS ...........................................46

10.1.REGULAR SEASON ..................................................................................................46

10.2.FOOTBALL POST-SEASON .....................................................................................47

10.3.MEN'S BASKETBALL POST-SEASON .....................................................................48

10.4.WOMEN'S BASKETBALL POST-SEASON ...............................................................48

11.  "FOLLOW THE MONEY"................................................................................................49

11.1.LONG-TERM MULTI-SPORT .....................................................................................49

11.2.FIXED FEES ...............................................................................................................49

11.3.BULK PAYMENTS......................................................................................................49

11.4.ALLOCATIONS OF MULTI-SPORT DEAL TO PARTICULAR CONTENT ................49

**11.5. THE MEDIA RIGHTS FUNNEL** ........................................................................... 49

**12.   MAJOR COLLEGE SPORTS MEDIA AGREEMENTS** ........................................... 51

**13.   HOLISTIC PLAYER CONTRIBUTION TO MEDIA RIGHTS VALUE** ............................ 52

**14.   ATHLETE NIL CONTRIBUTION** ........................................................................ 53

**14.1. MEDIA AGREEMENT ELEMENTS** ...................................................................... 53

**14.2. THE GAME PERFORMANCE** ............................................................................. 53

**14.3. NIL PORTION** ................................................................................................ 53

**14.4. LIVE PERFORMANCE** ...................................................................................... 53

**14.5. NIL/LIVE PERFORMANCE ALLOCATION SPLIT** ................................................. 53

**14.6. RASCHER EXPERT REPORT** ............................................................................ 54

**15.   ANALOGOUS INDUSTRY ROYALTY RATES** ..................................................... 55

**15.1. NIL VALUE ANALOGOUS TO A ROYALTY** ......................................................... 55

**15.2. PROFESSIONAL LEAGUE MERCHANDISE LICENSING** ....................................... 56

**15.3. NFLPA AND NBPA GROUP LICENSING AGREEMENTS** ..................................... 56

**16.   VIDEO GAME LICENSING** ............................................................................... 58

**17.   ALLOCATION OF NIL-RELATED REVENUE BY SPORT** ....................................... 60

**17.1. FOOTBALL IS KEY DRIVER** ............................................................................. 60

**17.2. MEN'S BASKETBALL COMES IN SECOND** ....................................................... 60

**17.3. WOMEN'S BASKETBALL** ................................................................................ 61

**17.4. OTHER SPORTS** ............................................................................................ 61

**18.   SUMMING UP** ................................................................................................ 63

**19.   APPENDIX** ..................................................................................................... 64

**19.1. ED DESSER BIO & CV** .................................................................................... 64

**19.2. ED DESSER PUBLISHED ARTICLES** ................................................................. 70

**19.3. DOCUMENTS RELIED UPON** .......................................................................... 72

CONFIDENTIAL                                    ©2022 DESSER SPORTS MEDIA, INC.

## 2. EXECUTIVE SUMMARY

For the past four decades, the sports and media businesses have enjoyed a highly successful and symbiotic relationship, propelling each other to wide distribution and substantial revenue growth. Today, sports programming is by far the number one driver of the value equation for most linear TV networks (i.e., traditional networks like NBC and ESPN that distribute real-time programming to consumers). This relationship has materially benefited the Defendants in this case, who have seen their media revenues expand to about $3 billion per year; and, together with recently negotiated and anticipated deals, industry expectations are that these annual revenues will soon be close to $5 billion. The plaintiffs in this case have received none of this revenue, despite the fact that all the programming being sold is completely dependent upon their skilled labor and the commercial use of their NIL in connection with the game telecasts.

When a broadcaster pays hundreds of millions or billions of dollars for college sports broadcast media rights, that consideration is paid for a bundle of different rights and opportunities, including the use of player NIL. A principal part of my analysis for this case is to isolate the value of the players' NIL from the value of their athletic performance on the field or court (among other things). NIL use by broadcasters is an indispensable element in the produced game telecast feed. Watching a sports broadcast without athlete NIL would be an absurd exercise, and it is hard to imagine media companies entering into sports broadcast agreements without securing these rights. And the importance of athlete NIL extends well beyond the live telecast – it is instrumental in the promotion of the game telecast, the actual event, the game telecast within a schedule of game telecasts for the carrying network, and the distributor of the network – not just on TV but across traditional and social media channels. Athlete NIL is indispensable in order to generate large audiences for the games themselves.

Because athlete NILs are so important to a sports broadcast, media partners require contractual assurances from the Power 5 conferences or the NCAA that all rights to use such athlete NILs are being conveyed or that the conferences or the NCAA are indemnifying media partners for their use. These contractual assurances have been deemed by the broadcast partners to be necessary despite any claims by the NCAA that such rights are not legally protected under a particular state's laws, as each media partner has to be certain that it has the rights to use athlete NIL throughout the country for all potential participants in the games.

As sports events are virtually always shown live or same-day (particularly those involving the members of the plaintiff classes in this lawsuit), broadcasters need these rights for all the participants well in advance of the game. However, as with almost all parts of any media contract, NIL is not customarily (if ever) sold separately from the other elements conveyed in the contract, with a separate contractual value assigned. Almost always, the package in a sports

CONFIDENTIAL                                    ©2022 DESSER SPORTS MEDIA, INC.

media contract is paid for with an aggregate payment that does not break down the value of each component granted in the contract – indeed, subdividing the overall payment to be made in a media rights contract generally would serve no business purpose.

A practical comparison is when a consumer buys a car. In that case, the buyer doesn't separately pay for the engine, the wheels, the seats, etc., even though (1) each component is essential for the entire purchase and (2) the car company needs to acquire the ability to sell each part of the car (such as a Bose sound-system or a third-party specialty brand such as a Ford "Shelby" Mustang). Think of the NIL as analogous to the exterior body of a car. Without it, the "car" can get you from one place to another, but few would be interested in driving just the car chassis. In fact, the car's exterior body is an essential part of the product, providing its personality and style. Absent the body, the car simply doesn't look the same, and it isn't particularly practical to use. And without the nameplate, it becomes a generic utility, not an experience. Like a sports media agreement, the sales contract for the car has a bottom-line price for the entire vehicle. In the case of the media deal, that bottom-line amount is typically paid off in annual increments as the media rights are used during the agreement term.

A principal part of my analysis is to isolate the value of NIL from the value of athletic performance on the field or court (among other things). In this report, I demonstrate that this analysis can be done using a common class-wide methodology relying on the existing discovery available to me. Because this report is being provided for class certification purposes at this juncture and not merits, it is intended to show how my analysis and methodology can be applied on a class-wide basis. Thus, I reserve the right to alter and supplement the merits opinion as more evidence is uncovered.

The ability to use NIL is specifically included in professional sports media agreements through the different sports' collective bargaining agreements (CBAs). These specific NIL grants are not trivial; they are defined in multiple detailed paragraphs. As will be discussed in the body of this report, professional players receive about half the overall league revenue (including media revenues) for the combined value of their on-field/on-court performance and their NIL.

Based on my professional experience valuing and negotiating billions of dollars in sports and media deals, as well as my review of the relevant information in the record, it is my opinion that at least 10-15% of the media agreement license fees that are paid to the Power 5 conferences (and Notre Dame) are fairly attributed to the economic value of the players' collective NILs (about one-fifth to one-third of the approximately one-half of broadcast revenues that professional athletes in these sports receive under their collective bargaining agreements for all of the elements they contribute). To be conservative, I have determined that the lower end of the range in my analysis – 10% – is a reasonable estimate of the collective

7

value of the class members' NILs used in broadcasts of Power 5 football and men's and women's basketball games (including Notre Dame).

To determine the NIL value of class members used in broadcast agreements that cover multiple sports, an allocation has to be made among the sports that are covered. Based on my analysis of the relevant data, as well as my decades of experience in negotiating sports broadcasting deals, it is my opinion that where a sports broadcasting agreement covers multiple sports of a Power 5 conference, approximately 75% of the NIL value is attributable to the football NIL, 15% of the NIL Value is attributable to the men's basketball NIL, and 5% of the NIL value is attributable to the women's basketball NIL. The remaining 5% of NIL value is attributable to other college sports (such as volleyball, softball and gymnastics) which are not the subject of my analysis.

CONFIDENTIAL                                    ©2022 DESSER SPORTS MEDIA, INC.

# 3. QUALIFICATIONS

I have continuously been active professionally in the sports media business for more than 40 years.  I specialize in all issues involving the business, production, valuation, licensing, and operations facets of sports media.  My sports media career is divided into three primary chapters:

## 3.1.   LOCAL SPORTS MEDIA

I worked in local sports media as a broadcast producer and as an executive starting in 1977.  I was first the Executive Producer of the Los Angeles Lakers Radio Network. Then I was Director of Broadcasting and Executive Producer for California Sports, the owner and operator of the Los Angeles Lakers, Los Angeles Kings, and The Forum arena.

## 3.2.   NATIONAL BASKETBALL ASSOCIATION

Beginning in 1982, I served in multiple positions over 23 years as the senior media executive in the National Basketball Association (NBA) Commissioner's Office.

- First, I was the Director of Broadcasting and Executive Producer, responsible for the administration and operations of the league's media agreements with CBS Sports, USA Network, ESPN, Mutual Broadcasting, and ABC Radio and coordination of all local media operations in association with the NBA teams and their numerous respective local broadcast partners from 1982-1987.
- Next, from 1984-1992, I was the Vice President/General Manager of NBA Entertainment, Inc. the league's in-house media production and distribution company, which produced public service and promotional announcements, produced and licensed distribution of home videos for sale to consumers, licensed a footage library, produced halftime programming and ultimately NBC's "NBA Inside Stuff" weekly television show.
- Then, simultaneously, I served as the first Vice President of Television for NBA International from 1986-1994, where I spearheaded the distribution of NBA programming to more than 200 countries on a world-wide basis.
- Next, I was President at NBA Television and New Media Ventures from 1994 to 2003, which included research, the development and launch of nba.com, NBA TV, and NBA League Pass, as well as the Women's National Basketball Association (WNBA) versions of those businesses, and negotiations of deals in excess of $10 billion with media companies including ESPN/ABC, Turner Broadcasting, Yahoo, AOL, DIRECTV, Sirius Satellite Radio, and NBC Sports.  I also led the NBA's overall annual business planning efforts during the period.
- Finally, I served as Executive Vice President, Strategic Planning and Business Development, Office of the Commissioner, from 2002 to 2005.

- During my NBA career, I testified in multiple matters, including Chicago Bulls and Tribune Broadcasting vs. NBA and NBA vs. Motorola and Stats Inc., as well as in various regulatory and copyright distribution proceedings in the U.S. and Canada.

## 3.3.  DESSER SPORTS MEDIA, INC.

Beginning in 2005, I have served as an independent sports media consultant and programming producer and marketer at Desser Sports Media, Inc. and Desser Media, Inc.  My work falls into essentially five areas, which include (1) rights valuations, (2) rights negotiations, (3) sports management and ownership consulting, (4) strategic sports media business planning, and (5) dispute resolution.  My testimony here is an example of the latter.  My consulting clients include or have included:

- Major collegiate sports organizations such as the National Collegiate Athletic Association (NCAA), and conferences such as the Big 12, American Athletic Conference (AAC), and the Big East;
- Major sports properties such as the National Football League (NFL), the NBA, Major League Baseball (MLB), World Wrestling Entertainment (WWE), Ultimate Fighting Championship (UFC), Canadian Football League (CFL), National Stock Car racing (NASCAR), National Hot Rod Association (NHRA), Major League Soccer (MLS), The International Swimming Federation (FINA), the Professional Golfers Association (PGA Tour), and US Olympic and Paralympic Properties;
- Media companies including FOX, Tribune, DIRECTV, NBC Universal, Time Warner Cable, and Disney/ESPN;
- Technology companies including Google/YouTube and Qualcomm;
- More than 30 major league professional sports teams across the NBA, National Hockey League (NHL), MLB, and MLS; and
- A variety of other major players in the sports media business, including McKinsey & Co., Goldman Sachs, Maple Leaf Sports + Entertainment (MLSE), and Anschutz Entertainment Group (AEG).

## 3.4.  TESTIMONY/EDUCATION

Relevant Expert testifying witness engagements have included in-court testimony in O'Bannon v. NCAA (2014), as part of the more than 20 cases I have worked on.

My formal education includes receiving a Bachelor of Arts (BA) in Economics from the University of California at Los Angeles in 1980 and a Master of Business Administration (MBA) in Marketing from the University of Southern California in 1984.[1]

---

[1] Please see Appendix Section 19.1 for detailed Ed Desser Curriculum Vitae.

CONFIDENTIAL                                    ©2022 DESSER SPORTS MEDIA, INC.

# 4.  STRUCTURE/OPERATION OF SPORTS MEDIA BUSINESS

For context, in this section I provide a basic description of the nature and operation of the sports media business in which college media agreements are made and performed.  The sports media business features many participants, each with its own interests, that interact to make sports media broadcasts happen.   Sports programming creators (such as major U.S. universities) package their rights with others (such as Stanford University and The University of California at Berkeley each placing their rights with other universities into the Pac-12 Conference) to create critical programming mass for efficiency and to respond to the demands of the marketplace; they license these packages of rights to broadcast and cable networks (e.g., FS1, ESPN, ABC) and owners of other forms of distribution (e.g., Apple, Hulu).  These networks, in turn, package those rights with other programming rights and sell multiple network packages of them (e.g., Disney sells ABC, ESPN, Disney Channel and FX) to distributors (such as Comcast Cable, DIRECTV satellite, YouTube TV and Sling TV streaming), which in turn sell and deliver the content to consumers.  The following is a more detailed description of this process as applied to this matter:

## 4.1.  ATHLETES, SCHOOLS, AND TEAMS

NCAA Division I member schools start the process by recruiting players (college athletes) to put on athletic events.  This involves scouting and recruiting athletes from high schools and offering them a package of benefits, often including college scholarships and other permitted benefits at the recruiting school, the opportunity to play for noteworthy coaching staffs and at well-known institutions, and the chance to be exposed to millions of sports fans via wide-ranging media platforms.  In addition to providing an educational opportunity, the schools train the athletes; house and feed them; provide facilities for practice; transport the athletes to "away" games and provide lodging; build and/or lease venues such as stadiums, arenas and training/practice facilities; and schedule, stage, sell and promote events in which the athletes participate.  The schools at issue in this matter operate NCAA Football Bowl Subdivision (FBS) programs in football and/or Power 5 Division I-level programs in men's and/or women's basketball.

## 4.2.  CONFERENCES

Division I schools (with the occasional exception such as University of Notre Dame in FBS football) each belong to a conference[2] that provides scheduling and officials

---

[2] The exceptions in 2022 include Notre Dame's football team, as well as Army, BYU, New Mexico State, Liberty, UConn and UMass.  *See* FBS Independents Standings, CBS SPORTS, *available at*: https://www.cbssports.com/college-football/standings/Conference/FBS/IA.  Several of these schools will soon become affiliated with a Division I conference.  *See* Zach Miller, *Conference Realignment: All the Moves Coming in 2022-25*, MEDIUM (Feb. 16, 2022), *available at*:  https://medium.com/run-it-back-with-zach/Conference-realignment-all-the-moves-coming-in-2022-25-130ef706da55.

CONFIDENTIAL                                        ©2022 DESSER SPORTS MEDIA, INC.

for the events, organizes conference standings against which each school can be measured and that elevate the importance of games in the context of conference play, and provides the opportunity potentially to win a conference championship and ultimately  an enhanced potential to win a College Football Playoff (CFP) Championship or NCAA Basketball Championship in "March Madness."  There are five so-called "Power Conferences," each of which is a defendant in this action – the Atlantic Coast Conference (ACC), Big Ten, Big 12, Pac-12, and Southeastern Conference (SEC), whose members are among the most well-known of Division I schools, in addition to the NCAA itself.

### 4.3.   COLLEGE MEDIA RIGHTS SELLERS

As rights owners for their respective members, the conferences and the NCAA (and Notre Dame) sell the rights to telecasts for member schools' events over a multi-year period to media and technology companies that own/operate networks and streaming platforms.  I will explore the nature, size, and elements (including NIL) contained in those agreements with regard to FBS football and men's and women's basketball in Section 6 of this report.

### 4.4.   COLLEGE MEDIA RIGHTS BUYERS

Media companies (like ESPN, CBS, Turner, NBC, and FOX) buy packages of media rights for multiple schools and games over a number of seasons from the NCAA or the athletic conferences (or Notre Dame) and combine those rights with other live sports events and recorded content and their own studio production (e.g., ESPN's SportsCenter) to create valuable linear programming (e.g., ESPN networks) and streaming packages sold directly to consumers (DTC) via the internet (e.g., ESPN+, Paramount+, Peacock).  They set a strategic programming calendar, produce the content (hiring directors, announcers, production equipment and technicians), develop and promote their respective brands and deliver the network to distributors for retransmission, and sell ads in the programming airing on these networks to advertisers and sponsors.  The largest expense by far for sports networks is paying for first, sports rights, and second, game production for the events networks carry.  As discussed in more detail below, media companies need to get these critical broadcast elements squared away at the earliest possible time (months or years prior to the actual game telecasts) – acquiring all of the rights needed for the telecast – in order to use these rights to their maximum effect and generate the most interest (and thereby value) from these telecasts.  For instance, if advertising for college sports broadcasts is not sold well in advance (the bulk, at least six months prior), ad buyers (which must carefully plan their media expenditures in order to help achieve quarterly sales goals for their clients) may purchase alternative programming or other content

CONFIDENTIAL                              ©2022 DESSER SPORTS MEDIA, INC.

instead. Media companies need to operate efficiently. It is thus important that the rights obtained and granted in connection with particular programming encompass both an extensive license and use period.

## 4.5.    PROGRAMMING PACKAGES AND DISTRIBUTORS

Distributors buy and package the rights to distribute multiple networks' programming, aggregate, sell, and deliver those rights collectively to paying consumers. In the case of technology companies, the distributors package sports rights with other services (e.g., Amazon Prime's free two-day shipping for purchased goods, movies, and other shows), or in the case of sports-specific streaming services (e.g., DAZN, FloSports), package rights only for sale direct-to-consumer (DTC). Note, these rights are distributed in multiple states/jurisdictions and, in certain cases, internationally, so programming rights grants must be very broad, as all buying parties desire to have wide use options in order to effectively exploit and monetize the rights.

## 4.6.    CONSUMERS

Viewers/fans fund the foregoing through their (i) purchase of programming packages and subscriptions from distributors and tech companies, (ii) viewership of programming which generates ratings, and (iii) purchase and consumption of products and services produced/offered by programming advertisers and rightsholders included in and surrounding the sports programming they watch.

CONFIDENTIAL                    ©2022 DESSER SPORTS MEDIA, INC.

# 5.  THE VALUE DRIVERS OF SPORTS CONTENT

It is worth pausing for a moment to explain why live sports media content in general is so valuable in today's media marketplace.

## 5.1.   LIVE

The high value of sports media content starts with the fact that the vast majority of the sports events are shown and viewed live, which makes them topical and virtually DVR (digital video recording)-proof.  Unlike most scripted shows that can be recorded, downloaded, streamed, and/or binged at the viewer's convenience (and commercials "zapped," lowering the value of commercial inventory contained therein), sports fans far prefer to watch events live, not afterwards when the results and performances are widely known.  Most general entertainment programming, in contrast, is pre-recorded.  There is a substantiative difference between the allure of live events, which develop on an unscripted basis before the viewers' eyes, and content that is scripted, recorded, edited, and available for viewing whenever it is convenient.  Since sports are mostly viewed live, they are topical, the subject of face-to-face discussions and social media interactions as they happen or immediately after.  Sports fans want to be part of the conversation.  Fans expect that a sports event will be the topic of talk the next day and will be debated on sports talk radio immediately after the final gun or buzzer.  In fact, sports are likely to be the subject of social media commentary even while they are going on.  Sports dominates social media conversations about TV on Twitter—making up 50% of conversations about TV)[3] and constantly ranking among its leading "Trending Topics"—with some top athletes so well known that they are customarily referred to by their first name only.  This can't happen if viewers watch at different times. There exists a palpable, material contrast between high-interest live sports content, and typical, more fungible, recorded entertainment.  Sports fans are, by definition, fanatical and passionate, and their consumption of live sports content across many media platforms drives immense engagement.  The word fan is derived from the word FANatic.  All of these factors collectively increase the proportion of viewership that takes place on a live rather than delayed basis.  In 2015, 95% of all sports viewing took place live, compared with only 66% for general

---

[3] Eddy Guerra & EJ Samson, *The Conversation: And the Crowd Goes Wild(er)!*, TWITTER MARKETING (June 11, 2021), *available at*: https://leadersinsport.com/sport-business/articles/unified-measurement/.

CONFIDENTIAL                    ©2022 DESSER SPORTS MEDIA, INC.

primetime entertainment programming.[4]  This further increases the relative value of sports because commercials and sponsored elements within the body of the program in live events are far more likely to be viewed, rather than zapped through, as is often the case with entertainment and other scripted programming.  Indeed, consider that during the Super Bowl, many viewers watch because of the commercials, which get even more attention than usual, further pumping up value.

## 5.2.    EXCLUSIVE

The vast majority of sports TV is only available on a single network, platform, or channel, which licenses the event on a proprietary basis.  It isn't on multiple services at multiple times; rather, it draws viewers to a single viewing location, which makes it more special and increases the value.  To see a game, the fan must "have" access to the channel or platform that carries it.  Each game is unique and differentiated.  A hit TV series like Modern Family was available on ABC stations, abc.com, Hulu; in syndication on Fox broadcast affiliates; and in re-runs on USA Network and E!.  Episodes may also be recorded on DVRs and downloaded from a multichannel video programming distributor's video on demand (MVPD VOD) platforms.[5]  All seasons' episodes have been released on DVD boxed sets available at retail (e.g., Target, Best Buy, etc.).  Each individual episode may also be purchased on Amazon, iTunes, eBay, Netflix, and Google, among others, and a Subscription VOD service (e.g., Netflix) may make the entire series available for binge viewing.  Even while various networks provide their own style for national news programming, essentially the same core information is nevertheless available on CBS, ABC, NBC, FOX, PBS, MSNBC, FOX News, CNN, Headline News, CNBC, Bloomberg, FOX Business, local broadcast stations, and many others.  In contrast to news and entertainment, when a college football or basketball championship  or other major game is taking place, the one and only place the

---

[4] Ken Fang, *Report Shows Americans Love to Watch Their Sports Live*, AWFUL ANNOUNCING (Apr. 7, 2016), *available at* https://awfulannouncing.com/2016/report-shows-americans-love-to-watch-their-sports-live.html.

[5] A multichannel video programming distributor (MVPD) means a cable, satellite, or telecommunications video provider.  *See* Frankie Karrer, *MVPD and vMVPD: Differences and Similarities Explained*, MNTN, *available at*:  https://mountain.com/blog/mvpd-and-vmvpd-differences-and-similarities-explained/.  Additionally, virtual MVPDs (vMVPDs) often offer video-on-demand services (VOD), which allows the subscriber to watch a particular program whenever he or she chooses, usually by pushing a button on their remote control, in contrast to on a pre-scheduled linear basis at a particular hour, as on a cable or broadcast network or channel.  *See id.*

CONFIDENTIAL                                              ©2022 DESSER SPORTS MEDIA, INC.

full live telecast will usually be available to be seen live is on a network-platform, often generating higher viewership than any competing linear TV programming airing at the same time.[6]  This is yet another way that major sports entertainment products are distinct from most entertainment and news programming, creating even more value for the media company to exploit and justifying ever-growing prices for sports media rights over time.  Further demonstrating the expansion and value of these rights, Amazon became the first technology company to acquire exclusive rights to NFL games (Thursday Night Football) and drew 13 million viewers for its first broadcast on September 15, 2022 (11.8 million watched on Prime Video while 1.2 million watched on over-the-air TV in the local markets of Los Angeles and Kansas City).[7]

## 5.3.  LARGE AUDIENCES

The very nature of the media business involves gathering large viewing audiences and then marketing them to advertisers and distributors.  In general, the larger the audience, the more valuable the property.  Today's major sports events draw some of the highest audiences on television, and most of the highest-rated shows each year are live sports.[8]  Another important fact is, as the size of the audience grows, the media value of that audience increases by an even larger extent because it is harder and harder to aggregate a significant viewing audience in today's increasingly fragmented media environment and because, as a result of the larger audience, there is less audience duplication.  In addition, unlike most entertainment programming

---

[6] *See* Austin Karp, *Sports' TV Dominance at New Heights in 2021*, SPORTS BUS. J. (Jan. 10, 2022), *available at*: https://www.sportsbusinessjournal.com/Journal/Issues/2022/01/10/Upfront/Ratings.aspx.

[7] Jimmy Traina, *Thoughts on Amazon Prime Video's Debut Rating for 'Thursday Night Football'*, SPORTS ILLUSTRATED (Sep. 22, 2022), *available at*: https://www.si.com/extra-mustard/2022/09/22/thursday-night-football-amazon-prime-ratings (describing viewing statistics for Thursday Night Football on September 15, 2022); *see* Sarah Vasile, *How to Watch Thursday Night Football on Amazon Prime*, SPORTS ILLUSTRATED (Sep. 22, 2022), *available at*: https://www.si.com/tv/nfl/2022/09/15/thursday-night-football-amazon-prime-streaming-nfl-watch-schedule-games (describing Amazon's exclusive rights to the majority of the NFL's Thursday Night Football games).

[8] Austin Karp, *Sports Continues to Dominate TV Viewership*, SPORTS BUS. J. (Apr. 4, 2022), *available at*: https://www.sportsbusinessjournal.com/Journal/Issues/2022/04/04/Upfront/Top-50-telecasts.aspx (showing that sports dominated the most-watched telecasts in the first quarter of 2022); Austin Karp, *Sports' TV Dominance at New Heights in 2021*, SPORTS BUS. J. (Jan. 10, 2022), *available at*: https://www.sportsbusinessjournal.com/Journal/Issues/2022/01/10/Upfront/Ratings.aspx (showing that sports was the most-watched category of television programming in 2021).

CONFIDENTIAL                              ©2022 DESSER SPORTS MEDIA, INC.

that is typically 30-60 minutes in length, sports events offer duration viewing. A typical college football telecast spans about three and one-half hours.

### 5.4.    PREDICTABLE AUDIENCES

Unlike many entertainment shows, which tend to either be hits (or much more often, misses), sports can be depended upon to deliver audiences within a fairly narrow range of expectations.  Sports is unique in that fandom starts early and often lasts for life, especially in college sports where personal, family, and community connections and traditions add to its powerful grip. The most valuable entertainment TV programs overall have a defined shelf-life, often just seven to ten years.  Most such programming reflects the "time" in which it was created, with its cultural touchstones often becoming obscure or worse in the future (for example, NBC's "Friends" with many episodes that have not aged well, and the "Dukes of Hazzard," whose central characters drove a car with Confederate imagery).  In sports, and especially in college sports, a fan never stops rooting for or watching their alma mater or hometown school, and new programming is created for new generations of viewers each sports season.  While it is true that a blowout or meaningless game, atypical competition, or a key player injury can result in lower ratings than originally expected, and a historic event or game with unusual playoff implications can make audience levels spike, the typical live sports event delivers a very reliable, predictable, and relatively stable audience level.  This predictability has lasted for decades.  The ability to bank on an audience makes sports programming more valuable because it lowers the licensee's risk compared with general entertainment programming.   And, unlike that entertainment programming, major sports programming is rarely if ever cancelled after a few episodes or seasons.  As such, live sports are a ready and ongoing stream of premium, first-run product.  The dominance is clear: in 2021, sports comprised 94 of the top 100 largest TV audiences – 75 of these were NFL games, 9 were college football or basketball games.[9]  The recent, record-breaking multi-billion dollar Big Ten media rights agreements shared

---

[9] Anthony Crupi, *NFL Games Account for 75 of the 100 Most-Watched Broadcasts of 2021*, SPORTICO (Jan. 7, 2022), *available at*: https://www.sportico.com/business/media/2022/nfl-games-account-for-75-of-the-100-most-watched-broadcasts-of-2021-1234657845/.

CONFIDENTIAL                                        ©2022 DESSER SPORTS MEDIA, INC.

by three networks (FOX, CBS and NBC) provide additional evidence of this value.[10]

### 5.5.    AUDIENCE COMPOSITION.

Another desirable feature of sports programming is the fact that, unlike most entertainment programming, sports viewership skews far more male than female.  Men are much more difficult to reach on television, because they simply watch much less of it, so advertising that reaches men tends to be far more highly valued, which is reflected in commercial pricing.  Further, sports also reaches younger people, another key group that is more challenging for marketers to attract via TV and which advertisers value more than older viewers because young consumers haven't yet set their brand preferences, providing an extended period to capitalize on current selections well into the future.  Another encouraging sign about Amazon's Thursday Night Football package is that, although its initial broadcast placed second-to-last in household ratings for the NFL time period windows to that point in the season, it actually delivered the fourth-highest demographic rating for adults aged 18-34 in those windows.[11]   In combination, these factors make advertising during live sports TV programming far more valuable per viewer than general entertainment.  As a result, advertising inventory within live sports programming sells for significantly higher rates per viewer[12] (higher cost per thousand or CPM) than the ads in most other forms of programming (e.g., news, entertainment, etc.), which thereby leads to networks generating ad revenue premiums, ultimately driving up the demand by networks for that form of programming, and thus the cost for live sports rights.

---

[10] *See* Michael Smith, *Breaking Down the New Big Ten Media Rights Deal*, SPORTS BUS. J. (Aug. 22, 2022), *available at*: https://www.sportsbusinessjournal.com/Journal/Issues/2022/08/22/In-Depth/Media-rights-side.aspx.

[11] *Impressive Start for Amazon Thursday Night Football*, SPORTS MEDIA WATCH (Sept. 2022), *available at:* https://www.sportsmediawatch.com/2022/09/amazon-thursday-night-football-ratings-impressive-debut-chargers-chiefs/.

[12] *All Impressions Are Equal, but Some Are More Equal Than Others*, TATARI (Nov. 29, 2018), *available at*: https://www.tatari.tv/insights/all-impressions-are-equal--but-some-more-equal-than-others (describing cost per thousand/CPM); John Consoli, *TV Sports Advertising Shifts into Juggernaut Mode*, TV NEWS CHECK (Jan. 12, 2022), *available at*: https://tvnewscheck.com/business/article/tv-sports-advertising-shifts-into-juggernaut-mode/ (showing that spending on sports advertising far exceeds spending on advertising for primetime entertainment programming).

CONFIDENTIAL                                        ©2022 DESSER SPORTS MEDIA, INC.

## 5.6.    PRIMARY PROGRAMMING PROPERTIES

Among the variety of collegiate sports which are contained in programming packages sold to networks, FBS college football and Division I men's and women's basketball are by far the most important and attract the largest overall audiences. Among these three, football received an average of 2.53 million average regular season viewers during the 2021-22 season, while men's basketball had 0.76 million and women's basketball just 0.37 million in nationally televised games.[13]  While it is true that the championship games of some other sports also attract significant viewership, the vast majority of the audience and value for college sports are attributable to FBS football and the Men's Division I Basketball Championship Tournament, followed by the Final Four and Championship games of the Women's Division I Basketball Championship Tournament, with lesser value to far more plentiful regular season men's and women's basketball games.  I will address the relative proportion of the value of these sports in Section 18 below.

## 5.7.    NEW DISTRIBUTION OPPORTUNITIES

Just like the development of cable television increased the options available to sports rights owners, enabling them to grow media revenue substantially, the emergence of Over-the-Top (OTT) and Subscription Video on Demand (SVOD) platforms is leading to more suitors for live sports rights.   As mentioned above, Amazon recently purchased exclusive rights to Thursday Night NFL games[14] and has delivered both sizable and younger audiences. Separately, Apple bought a package of Friday night MLB games[15] and rights to all MLS Soccer games.[16]  Although it was outbid, previous sports outlier Netflix placed a bid for live F1 races in the previous rights negotiation.  New

---

[13]  My analysis is based on AC Nielsen data compiled from sportsmediawatch.com and showbuzzdaily.com for the 2021-22 college sports season.  Only programs included in the top 100 cable programs for the week are included, so average audience numbers for the full season are lower, and considerably so in the case of basketball.  Far more basketball games are televised, and a large number of those games do not generate top 100 audience levels.

[14] Christopher Palmeri, *NFL Signs $105 Billion TV Deal, with Amazon Taking Thursdays*, BLOOMBERG (Mar. 18, 2021), *available at*: https://www.bloomberg.com/news/articles/2021-03-18/nfl-signs-historic-tv-deal-with-amazon-taking-thursday-rights.

[15] *Apple and Major League Baseball Announce First 12 Weeks of "Friday Night Baseball" Doubleheader Schedule Beginning April 8*, APPLE (Mar. 29, 2022), *available at*: https://www.apple.com/newsroom/2022/03/apple-and-mlb-announce-friday-night-baseball-schedule-beginning-april-8/.

[16] *Apple and MLS*, MAJOR LEAGUE SOCCER, *available at*: https://www.mlssoccer.com/apple/.

CONFIDENTIAL                                    ©2022 DESSER SPORTS MEDIA, INC.

players entering the ecosystem can't help but drive up values due to this new competition.  Indeed, additional digital era delivery opportunities are not just improving monetization and expanding audience potential; they are revolutionizing the experience:

- Mobile devices expand the viewing day, allowing for consumption of events away from home and the ability to watch more than one event at the same time.
- Streaming eliminates the previously limited shelf space of linear TV networks.  ESPN can now offer every ACC Football game each week in the fall – either via its traditional networks including the ACC Network or via streaming or DTC (ESPN+).
- TV Everywhere—the ability to watch shows on tablets and mobile devices, as well as on computers—enhances the value of an MVPD subscription by permitting the viewing experience to be untethered.  This is especially important for younger sports fans who tend to prefer viewing programming on tablets, wireless devices, and laptops, rather than traditional living room TV sets.
- Meanwhile, live sports is even more essential to classical linear TV networks and MVPDs to combat the rise of these SVOD services that are not part of the pay TV bundle (e.g., Netflix), giving both the programmer and the distributor reasons to continue to increase offers for sports rights, as incumbents continue to need sports programming as well to survive.

## 5.8.  SPORTS BETTING/POOLS/FANTASY LEAGUES

Live sports programming is also uniquely valuable due to viewer interest driven by sports betting and similar activities, which is a multi-billion-dollar industry in the U.S.  It has been an open secret for decades that sports viewership gets a powerful boost from viewers who have a direct stake in the outcomes of games and athlete performances as they occur, through wagers or participation in sports fantasy leagues where money is bet.  Viewers engage in social activity based on the performance of teams and athletes in live games.  That has been known for decades, with millions of viewers creating their own "brackets" for the NCAA March Madness Championship tournament, with office or friendly betting pools or through large amounts of entries collected in public forums (such as ESPN.com) determining monetary winners and losers.  This economic value of sports programming has increased even more since the 2018 U.S. Supreme Court decision that

CONFIDENTIAL                                ©2022 DESSER SPORTS MEDIA, INC.

greatly expanded the legal availability of sports gambling in the U.S.[17]  This attribute is simply not available in other programming.  It is also part of sports' demographic appeal.  Disney Chief Executive Officer Bob Chapek, who oversees ESPN, told Bloomberg, "Sports betting is a part of what our younger, say, under-35 sports audience is telling us they want as part of their sports lifestyle."[18]  The state-by-state rollout of legalized sports betting is driving the broadcast of more sports on more networks to more fans at more times of the day.  Media coverage of the national appeal of the Pac-12's West Coast primetime period for college football games is just the latest example.[19]

## 5.9.  SCARCITY

The foregoing facts collectively create strong demand for live sports programming, especially for football and basketball.  But live sports are unique in that materially more episodes of similar value simply can't be commissioned.  A sports event "producer" like a college conference can't just green-light more scripts in order to create additional product.  Leagues only expand occasionally, and then, very gradually.  The calendar and human body limit the number of games that a team can play.  There is just one NBA, NFL, Big Ten, SEC, or MLB.  Each of these brands resonates with sports fans in a particular way at a certain time of year.  And because each brand is on hiatus for a long period of time each year, the natural break creates pent-up interest upon the start of the next season.  Their games really matter to viewers and fans.  With growing demand from new platforms and essentially fixed supply, value and price continue to grow.

---

[17] *See* Kevin Draper & Adam Liptak, *Supreme Court Ruling Favors Sports Betting*, THE NEW YORK TIMES (May 14, 2018), *available at*:  https://www.nytimes.com/2018/05/14/us/politics/supreme-court-sports-betting-new-jersey.html.

[18] Ed Hammond & Crystal Tse, *ESPN Nears Large New Partnership with DraftKings*, BLOOMBERG (Oct. 6, 2022), *available at*: https://www.bloomberg.com/news/articles/2022-10-06/espn-said-to-be-near-large-new-partnership-with-draftkings.

[19] *See Pac-12 Networks Set to Feature Robust Coverage for the 2022 Football Season*, PAC-12 (July 27, 2022), *available at*:  https://pac-12.com/article/2022/07/26/pac-12-Networks-set-feature-robust-coverage-2022-football-season.

CONFIDENTIAL                              ©2022 DESSER SPORTS MEDIA, INC.

# 6.  KEY BROADCAST AGREEMENT ELEMENTS: THE MEDIA RIGHTS AND OPPORTUNITIES PACKAGE

Most sports media rights agreements are structured to deliver maximum value to a broadcaster. The elements are all part of a package designed to be mutually-reinforcing, and few of the elements, if any, are priced or sold separately.  Typically, there is significant value to these elements being furnished to broadcasters together (as a single basket of rights), in order to (1) maximize the ultimate marketplace value (thereby supporting the payment of higher prices for the seller), (2) create added efficiency (lowering the cost of production, and thereby enhancing what a licensee is willing to pay), and (3) reduce the broadcast entity's operational business risk.  The latter is achieved by being more efficient from an event production perspective and easier to exploit from a market perspective.  Broadcasters favor one-stop shopping to reduce transactional costs and risk.[20]  Each of the following key elements are usually included in a sports media rights agreement:

## 6.1.   PROGRAMMING

The nature of a sports programming package, including which specific events or games may be telecast (or selection priority vis-à-vis other rightsholders that share broadcast rights to events of a particular league/conference); rights to telecast non-game programs ranging from pre-game/post-game shows to highlight programs, specials, etc.; number of events or hours of each type of event; exclusivity rights, which enhance the package by limiting the others that may air and monetize it, including by medium of exhibition or telecast language; time-period allocations (such as early Saturday afternoon window vs. primetime window); and control over game selection process and scheduling obligations or preferences.

## 6.2.   PRODUCTION RIGHTS

A package of rights and opportunities enabling the creation of the audio/visual program feed.  This starts with venue access, providing personnel associated with the network the ability to gain early access to the space to position camera equipment, announcers, and other technical elements required for high quality production.  This provides personnel with the ability to plan for and execute the telecast.

## 6.3.   INTERVIEWS

Priority access to key game-related personnel to pre-tape interviews (with players, coaches, officials, or management).  Access is also provided to key personnel for live in-game, halftime, and post-game conversations prior to other press access for a general press conference Q&A (particularly access to those individuals whose

---

[20] See Sec. 6.7 in the text below for detailed discussion.

CONFIDENTIAL                                    ©2022 DESSER SPORTS MEDIA, INC.

contributions to the particular game were noteworthy, which can't usually be known until the game takes place). Such access is used for the production of game telecasts, and for use in the pre-promotion and sale of upcoming telecasts. This access is far more favorable, convenient, and exclusive compared with typical credentialed press access to participants, which is usually highly constrained in time periods and locations and lacks exclusivity.[21]

## 6.4.    GRANT OF RIGHTS/CLEARANCES

The process of obtaining the needed access to broadcast elements and permissions is called getting clearances, which enables the licensee (typically the network) to use key elements and assets (footage, trademarks, etc.) in connection with the production, distribution, sales, and promotion of game telecasts. These provisions typically describe a process of approvals and/or constraints that are placed on the use of these elements and assets but which are permitted for the core needed use cases.  Redacted - NSC

[22] The right to access and utilize these additive raw ingredients allow for telecast production and promotion for those involved in the delivery of the network, including distributors and parent companies. These rights are typically contained in a wide-ranging telecast "Grant of Rights" agreement. Examples of the elements include:

- **Names/images/likenesses** (NIL) of all players appearing on the telecast;[23]
- **Team, school, conference,** and stadium, arena, and venue trademarks, logos, seals, emblems, colors, and uniforms;[24]



[21] Redacted - NSC

[22] Redacted - NSC

[23] Redacted - NSC

[24] Redacted - NSC

- **Historical archive video footage** containing performances by players earlier in the season or in a prior season or seasons in order to provide context and support to the current event; and,
- **Use of state-of-the-art technology** (e.g., live wireless audio of players in-game or on the sidelines to capture sounds of the game, providing realistic, captivating experiences for viewers, etc.).

So important are such clearances that some media rights agreements contain provisions to adjust material terms, including payment of license fees, should the licensor be unable to deliver. For example, Redacted - NSC

## 6.5.    SAMPLE CLEARANCE PROVISIONS

In the media rights agreements, there is typically a recognition that the school, conference, or league has done what is needed to secure the needed consents from anyone whose cooperation or rights are needed, such as obtaining consent to use participants' NILs. The SEC Agreement with ESPN, dated June 13, 2013[27] provides that Redacted - NSC

The Agreement between the ACC and ESPN regarding the operation of the Conference network dated July 21, 2016 provides,[28] Redacted - NSC

## 6.6.    STATE VARIATIONS

Of course, national broadcasters broadcast nationally. Thus, if the conference/NCAA right to convey athlete NIL is legally uncertain anywhere within the United States, that is a fundamental issue for a national broadcaster. The

---

[25] Redacted - NSC
[26] Redacted - NSC
[27] SEC-HOUSE0113362 at 423.
[28] ACC-HOUSE0228382 at 400.

CONFIDENTIAL                                    ©2022 DESSER SPORTS MEDIA, INC.

networks need to acquire legal rights to all athletes' NIL if such rights might be needed in any state. It does not matter if one or more of a conference's schools is located in a state or states where it is legally uncertain whether athlete consent may not be needed. The variation in state law is irrelevant since any legal uncertainty anywhere in the country has the potential to be highly problematic and potentially very inefficient and costly for a network if all potentially needed rights are not included with certainty in the rights package from the beginning. This is also true regardless of the location of any particular college, because the major sports telecasts at issue here are available on a broad regional basis or throughout the entire country, and participating schools are most often from different states.[29]

### 6.7. ONE-STOP SHOPPING

Broadcasters need to secure the ability to use NIL for all athletes who may participate in the programming at once as part of the pre-telecast broadcast deal, thus securing the NIL for all potentially participating athletes before the telecast. There are so many potential items to sew up that broadcasters look to the licensors, most often the conferences, to handle the conveyance of rights for them. Typically, the conference guarantees to the broadcaster that it will secure the NIL of all potential participants in the programming.[30] In many cases, the agreement specifically grants the use of player NIL as part of the transfer of rights and opportunities.[31] However, in the past several years, following the filing of the *O'Bannon* case, some licensors Redacted - NSC                                      have chosen

---

[29] This issue is fully addressed in professional sports through provisions in the applicable collective bargaining agreement that convey to the league and teams the publicity/NIL of every player for use in telecasts. For example, as discussed in more detail below, in the NFL, Paragraph 4(a) of the standard form NFL Player Contract, which is required to be used by every player signing in the NFL, conveys to the league and the NFL Club the right to use the player's publicity rights/NIL in connection with game telecasts. 2020 NFL-NFLPA Collective Bargaining Agreement, dated Mar. 15, 2020, *available at*: https://nflpaweb.blob.core.windows.net/website/PDFs/CBA/March-15-2020-NFL-NFLPA-Collective-Bargaining-Agreement-Final-Executed-Copy.pdf ("2020 NFL CBA"), App. A, at 334−35.

[30] Redacted - NSC

[31] Redacted - NSC

CONFIDENTIAL                                                        ©2022 DESSER SPORTS MEDIA, INC.

to be less specific, simply claiming that all necessary rights have been obtained, without enumerating them or referring to athlete NIL specifically.[32]

The conferences have not paid athletes in the sports at issue here for the NIL used in broadcasts because the members of the NCAA (including the conferences) have agreed in the NCAA's rules to prohibit conferences and schools from paying athletes for NIL. At the same time, Redacted - NSC have given the broadcasters broad representations that they have all necessary rights for the broadcasts[33] (which is all the networks need, especially since in many cases they are

---

[32] Redacted - NSC

Redacted - NSC

Interestingly, the NCAA stopped requiring athletes to sign (without the benefit of counsel) its NIL release form in July 2014. *See* Dan Wolken and Steve Berkowitz, *NCAA removes name-likeness release from student-athlete forms*, USA TODAY (July 18, 2014), *available at*: https://www.usatoday.com/story/sports/college/2014/07/18/ncaa-name-and-likeness-release-student-athlete-statement-form/12840997/.

[33] Redacted - NSC

CONFIDENTIAL                                    ©2022 DESSER SPORTS MEDIA, INC.

Redacted - NSC . By contrast, as discussed in more detail below, in professional sports, NILs are explicitly obtained by the leagues and teams in collective bargaining agreements (which provide the athletes with billions of dollars in compensation and benefits), and then conveyed to the broadcasters.

## 6.8.    PROFESSIONAL SPORTS NIL

Professional sports teams and leagues obtain the NILs of everyone involved in a game through a variety of processes and Agreements. For athletes, these rights are explicitly and specifically provided through collective bargaining agreements. For example, in the NFL, Paragraph 4(a) of the standard form NFL Player Contract, which is required to be used for all player signings, provides, in pertinent part:

> Player hereby grants to Club and the League, separately and together, the right and authority to use, and to authorize others to use solely as described below, his name, nickname, initials, likeness, image, picture, photograph, animation, persona, autograph/signature (including facsimiles thereof), voice, biographical information, data concerning performance and/or movement collected from Sensors, as defined in Article 51, Section 14 of the CBA, in NFL games, and/or any and all other identifying characteristics (collectively, "Publicity Rights"), for any and all uses or purposes that publicize and promote NFL Football, the League or any of its member clubs in any way in any and media or formats, whether analog, digital or other, now known or hereafter developed, including, but not limited to, print, tape, disc, computer file, radio, television, motion pictures, other audio-visual and audio works, Internet, broadband platforms, mobile platforms, applications, and other distribution platforms. . . .

> Player and National Football League Players Association, including any of its affiliates ("NFLPA") do not and will not contest during or after the term of this agreement, and this hereby confirms their acknowledgment of, the exclusive rights of the League, Club and any NFL member club (i) to telecast, broadcast, or otherwise distribute, transmit or perform, on a live, delayed, or archived basis, in any and all media now known or hereafter developed, any NFL games or any excerpts thereof and (ii) to

produce, license, offer for sale, sell, market, or otherwise distribute or perform (or authorize a third party to do any of the foregoing), on a live, delayed, or archived basis, any NFL games or any excerpts thereof, in any and all media now known or hereafter developed, including, but not limited to, packaged or other electronic or digital media.[34]

The NBA CBA similarly gives the NBA and its teams the same types of NIL use, through Paragraph 14(e) of the standard (and required) "Uniform Player Contract:

> The Player does not and will not contest during or after the term of this Contract, and the Player hereby acknowledges, the exclusive rights of the NBA, all League-related entities that generate BRI [Basketball Related Income] and the Teams (i) to telecast, or otherwise distribute, transmit, exhibit or perform, on a live, delayed, or archived basis, in any and all Media, any performance by the Player under this Contract or the CBA (including in NBA games or any excerpts thereof) and (ii) to produce, license, offer for sale, sell, market, or otherwise, exhibit, distribute, transmit or perform (or authorize a third party to do any of the foregoing), on a live, delayed, or archived basis, any such performance in any and all Media, including, but not limited to, as part of programming or a content offering or in packaged or other electronic or digital media.[35]

These agreements and contracts provide the respective leagues and teams athlete NIL to use in game telecasts and related programming, even though these contracts are signed in different places, are effectuated in a variety of states, and the games themselves take place in multiple states as well. These contracts further evidence the point that, even when leagues or teams take the position that they are not legally required to secure NIL from players, there is nonetheless an economic incentive to do so—the billions of dollars in value that the players' performances and NIL combined together generate for them to share in. These grants of rights are quite lengthy and involved, demonstrating the variety of issues and clearances required. There are no such uniform contractual grants of right in the sports at issue here, where the NCAA and conferences instead have imposed the restrictive rules at issue in this litigation.

---

[34] 2020 NFL CBA at 334-35.

[35] *See* NBA-NBPA Collective Bargaining Agreement, dated Jan. 19, 2017, available at https://cosmic-s3.imgix.net/3c7a0a50-8e11-11e9-875d-3d44e94ae33f-2017-NBA-NBPA-Collective-Bargaining-Agreement.pdf ("2017 NBA CBA"), Ex. A, at 13.

CONFIDENTIAL                                        ©2022 DESSER SPORTS MEDIA, INC.

### 6.9.  DISTRIBUTION RIGHTS

The specific authorization to use and disseminate the audiovisual signals from the production of the game for commercial purposes, including the elements otherwise set forth in this section, in the authorized medium(s) of exhibition, within the extent of licensed exclusivity.

### 6.10.  SALES RIGHTS

The right to commercially exploit (and limits on the exploitation of) the programming licensed via various forms of advertising sales, including typical 30-second commercials, billboards, sponsor enhancements (including sponsor enhancements like "player of the game," for which sponsors pay a premium price). This provision may also specify restrictions on sales to particular categories (e.g., no ads for X-rated films, hard alcohol, gambling, etc.), procedures for the resolution of potential conflicts, and more.

### 6.11.  CONSIDERATION

All forms of compensation for the right to use the programming as specified in the broadcast agreement, including but not limited to, the payment of cash rights fees, signing bonuses, revenue sharing, as well as non-cash compensation such as the right to use some or all commercial inventory both in the telecast and visible on-screen signage, or the ability to sell naming rights and retain the proceeds from such use for the licensor's own account, etc.

### 6.12.  PROTECTIONS

Protections for the licensee and/or the licensor in the form of limitations on the permissible uses of content by third parties, adjustment provisions to the consideration in certain events, options for a party to do something in a certain event or at a particular time during the term, dispute resolution procedures, sublicensing provisions—all, collectively, to adjust for some of the events and situations that typically occur or to provide comfort that certain minimum elements/protections will be provided, notwithstanding a future material change.

### 6.13.  TERM/BACK-END RIGHTS

Term indicates the start and end-date of the agreement, typically including a number of seasons or annual events.  Back-end rights are contractual provisions that are activated at or near the end of the term and dictate issues like (1) precluding advance discussions by the licensor with potential third-party licensees prior to extension negotiations with the incumbent; (2) a period of exclusive negotiations between the parties; (3) certain rights to receive a final offer; and (4) provisions

CONFIDENTIAL                                              ©2022 DESSER SPORTS MEDIA, INC.

governing the acceptance of such final offer, including provisions to follow if the final offer is not accepted, etc. These provisions are not mere boilerplate, but have material value, particularly to the licensee, which competes with other similarly situated entities and speaks to the value that comes with incumbency. They are also designed to perpetuate a marriage between the parties and discourage "cheating."

CONFIDENTIAL                                ©2022 DESSER SPORTS MEDIA, INC.

# 7. THE INDISPENSIBLE NATURE OF NIL IN SPORTS MEDIA CONTACTS

Authorization to use the NILs of **all** athletes in a live sports telecast is essential, which is consistent with the detailed and extensive treatment of NIL broadcast use in professional sports CBAs and standard form player contracts that are required for all players. Importantly, use of the NIL of **all** participants in the athletic contest—the athletes especially—is a key component of the overall package of rights.

## 7.1.   HOW IMPORTANT IS NIL?

NIL is one of the most important/valuable elements in the package of rights that the telecasters are buying. It is a key embedded ingredient in this synergistic package of a variety of rights granted in a broadcast license agreement. It is also an element, as shown below, that is different from the athletes' on-field performances. Rather, NIL is the element that makes the broadcasts realistic and human, and which facilitates its promotion.

## 7.2.   LICENSORS DEMAND ASSURANCE

NIL is so essential that the licensors in these college sports (the NCAA and the Power 5 conferences) represent to broadcast partners that they (the licensors) have all rights necessary to put on the broadcast, regardless of whether they specifically mention NIL. Jim Delany, the Big Ten Commissioner from 1989 to 2020, Redacted - NSC



8

Broadcasters would not enter into these contracts, and pay the hundreds of millions

---

36 Redacted - NSC

37 Redacted -     Notably, there are some very prominent schools that still require athletes to sign
Redacted - Confidential

38 Redacted - NSC     *see also* Section 6.7 above.

CONFIDENTIAL                                    ©2022 DESSER SPORTS MEDIA, INC.

or billions of dollars that they do to acquire these media rights, without such assurances from the NCAA and the conferences.

In addition to stipulating to these binding and broad representations, the broadcast contracts referenced here also often include "hold harmless" clauses ensuring that the networks will not suffer economic injury if the licensor's representations that all necessary rights are being conveyed are not accurate.[39]  No serious negotiator would ignore the scope and potential impact of the assurances being provided by the NCAA and the conferences in these hold harmless provisions.

## 7.3.   THE APPLICATION OF NIL

Use of NILs in telecasts is essential to make the broadcast product realistic, exciting, and emotional, and make the fan experience far more similar to actually "being there."  It is needed to make the product more human and the participants more relatable, and the identity of the players plus the school uniform (and helmet) helps to create and foster rooting interest, a key value for any athletic event.  This is true for *all* players collectively, and it is common to all of them the same way.  Indeed, a single faceless, nameless player on the field or on the sideline would detract from the telecast experience that viewers want and expect—as the photo below illustrates, and as I further explain *infra*.

---

[39] Redacted - NSC

CONFIDENTIAL                              ©2022 DESSER SPORTS MEDIA, INC.



### 7.4.  TELECAST VALUE

The value and audience interest in the entire college sports broadcast product hinges on the players who are enrolled at the school and play the games on behalf of their respective institutions.  This includes the head-to-head matchups between opposing players, as well as the histories of the two schools, the players involved in the previous contests, and the history of the rivalry.

### 7.5.  ATHLETE BACKSTORIES

This value formula includes the personal backstories of the players, which are particularly attractive and a key element of the production.  It is the very diverse characteristics of the athletes that help differentiate and highlight college sports in the TV marketplace.  Storytelling contributes to the real-time drama (the outcomes are not known in advance), and it is part of what sells college athletics TV programming.

### 7.6.  THE WHOLE

There is also a multiplier effect, where the NIL of the college athletes, combined with their athletic performance and the contributions from the schools (e.g., school trademarked uniforms, etc.) creates additional value beyond that which any single element contributes.  Combined with the other telecast editions, the whole becomes greater than the sum of the parts.  This enhances the value of the NIL contribution.

CONFIDENTIAL                                    ©2022 DESSER SPORTS MEDIA, INC.

## 7.7.    SOCIAL MEDIA

The power of social media followers and distribution—players now draw social audiences that often dwarf their schools and conferences—is particularly important because social media is expected to drive viewing to an even greater extent in the future.  This enhances the ultimate value proposition of NIL, for both male and female athletes.

## 7.8.    SEARCH RESULTS

Another example is Google Search, now the standard for collective interest and intent.  For instance, search for "Rattler" and the first organic search result entry is Spencer Rattler, the University of South Carolina QB, not a rattlesnake.  This is consistent for most professional and college star athletes.

## 7.9.    THE IMPORTANCE OF PLAYER BODIES

Players have human physiques/bodies/forms that are distinct and are certainly a part of their image, including appearances that can be super-human-like and entertaining and add to audience appeal (e.g., the image of a 300+ pound lineman whose arms and legs can move two players at once, or a tall basketball player who can slam dunk with ease, or the colorful tattoos, haircuts/styles/colors or body piercings of players).  These attributes provide added entertainment and brand value to the product.



CONFIDENTIAL                                    ©2022 DESSER SPORTS MEDIA, INC.

## 8. MEDIA-RELATED USE OF NIL

NILs are an essential ingredient of a sports telecast, with their essential nature common to every single athlete on both teams participating in the contest. Without NILs for all athletes on both teams, you no longer have the same value in a commercial media property.

### 8.1. PRIOR PROMOTION

Live action game footage, still photographs, names, biographical information, statistics, and nicknames are commonly used in advance of a game telecast in order to promote wide consumption of the event, including:

- Viewing of the actual telecasts (tune-in promos,[40] general promotion of game telecasts). Players are often featured as the star attractions in such promotions.
- Lineups of networks carrying telecasts (promotion of the network, its lineup, program guides, to encourage wide distribution and ubiquitous availability).
- Sales by services of distributors that package networks carrying telecasts to subscribers and the ultimate viewers.
- The sale of sponsorship and advertising within telecasts.



---

[40] According to Chad Hawley, Senior Vice President for Policy and Compliance of the Big Ten, athlete NILs can be used in "tune-in" advertisements promoting those broadcasts or in "broadcast enhancements," such as a pre-recorded video of a player spinning a ball on his hand that is shown just before a commercial break. Chad Hawley Deposition Transcript at 189:16-191:5, 202:6-203:20.

CONFIDENTIAL                                                    ©2022 DESSER SPORTS MEDIA, INC.

## 8.2.    PRODUCTION OF GAME TELECASTS

Live action game footage; still photographs; names spoken and in graphical text; biographical information; game statistics; nicknames; and the players' image, voice, and play action (moves) are used in multiple ways:

- Announcer mentions the names of the players during play by play and expert analysis



- Shots of the players' faces prior to, during, and after live game play;
- Instant replays;
- Commercial break bumpers, typically a slow-motion replay before the start of the commercials, often with a player facial reaction tight shot filling most of the frame;
- Names on uniform during game action and on the bench, on the sidelines, and in huddles;



CONFIDENTIAL                                    ©2022 DESSER SPORTS MEDIA, INC.

- Graphics, including statistics and biographical information as appropriate, during the set-up and play of game (usually still photos, animations or artistic likenesses);
- Video footage of performances in prior games, including use in in-game opening;
- Interviews (pre-taped prior to the game, at halftime of the game being telecast and to and from other games being telecast at the same time and later in the day) and live in-game and post-game (including off camera) conversations/access from Point of View (POV) mics and cameras,[41]
- Preproduced features on player background, interests, biography, stats, and family;
- Highlights from game featuring players (e.g., used in commercial adjacencies, halftime and post-game shows). It is difficult to predict in advance who will be featured in these highlights, which is another reason why it is so important to obtain all potential participants' consent to use their NILs before the game telecast;



- News highlights showing player(s) and using descriptions from games, including interviews with player(s) and often video of and/or inclusion of family members in the stands, who themselves may also be former athletes;
- Sponsor features including photos, names, and game statistics with a sponsor logo in the telecast both in broadcast and within commercial inventory;

---

[41] Increasingly, more of the player content gathered by networks is actually off-camera (sometimes planned, sometimes not), and less is via on-camera sit-downs before or after a game, practice, or media availability sessions. Players and coaches are more likely to speak freely and share information and insight in this setting than with big professional cameras rolling right in their face. The on-air announcing talent simply refers back to these conversations later on-air during the live production, or uses the "hidden camera" technique or mic-only produced content.

CONFIDENTIAL                    ©2022 DESSER SPORTS MEDIA, INC.

- Novel "All Access" footage of players in the locker room, sidelines, or game action, or any "behind the scenes" access that provides the audience with the real sounds and images of player activity. This could include a player conversation or interactions with close-up isolated shots to provide the viewer a kind of "reality" view of what it's actually like to be a player. Sound effects mics on players (primarily centers and guards) improve audio for telecasts, providing coverage inside the huddle, in the locker room, on the bench, warming up, or in the field/court of play itself. Sometimes players can wear microphones specifically for this purpose with dedicated cameras and production teams deployed to document their actions.[42]



- Ambient game sounds of the players' interactions and performances for all sports productions to capture the unique player drama and action at live sports is standard. Special technologies enable audiences to hear things like the quarterback shouting out the play call at the line of scrimmage, a player arguing a call with an official, a player communicating verbally with a teammate, a player shouting in dramatic exaltation after scoring the game winning touchdown, or a shot in-action that sometimes may not even be accessible to be heard or seen by many of those in the venue itself. These enable unique player images (both verbal and visual) to be produced—even when the roar of the crowd might

---

[42] *See, e.g.*, Teddy Greenstein, *Video Cameras Becoming Fixture in College Locker Rooms*, CHICAGO TRIBUNE (Oct. 9, 2014), *available at*: https://www.chicagotribune.com/sports/ct-locker-room-speeches-on-camera-greenstein-spt-1-20141009-column.html (explaining that more collegiate locker rooms are embracing video cameras to film pre- and post-game speeches); *NFL Mic'd Up*, NFL, *available at*: https://www.nfl.com/videos/channel/nfl-mic-d-up-vc (showing NFL players and officials wearing microphones during games).
.

CONFIDENTIAL     ©2022 DESSER SPORTS MEDIA, INC.

otherwise drown out what might not be heard by all fans in the venue.  Images and audio of players breaking down and crying in victory or defeat are some of the most indelible parts of live sports broadcasts.

- Most of these same elements are also contained in coverage online pre- and post-game.
- I do not attempt to value many additional non-broadcast uses in the context of ticket sales, game presentation, team promotional appearances, and for institutional marketing and promotion of the school/conference (players, student, faculty recruitment)/NCAA, which are also typically negotiated and licensed.

### 8.3.   IN SUMMARY

Without access to NIL, game telecasts would be:

- Less interesting to watch for viewers, which therefore would…
- Attract smaller audiences, and therefore be…
- Less attractive and therefore less valuable to sponsors, and thus…
- Less valuable to networks, and…
- Less valuable to distributors, and provide…
- Less reason for viewers to pay for the programming through subscription fees.

The next question to be answered here is how much less?  In the following sections, I will begin to estimate the value attributable to college athlete NILs contained within college telecasts for the class members out of the overall pool of market telecast rights fees value.  Just as the professional players associations agree to convey the broadcast of NIL of players as a whole to the respective professional leagues, I too estimate the collective value of college athletes NILs to broadcast agreements.  My analysis is common to all class members, which is the natural result since NILs for all players are needed for the rights to be sellable.

CONFIDENTIAL                                    ©2022 DESSER SPORTS MEDIA, INC.

# 9. BROADCASTERS NEED RIGHTS TO ALL ATHLETES, EVEN THOSE WHO RARELY PLAY

The live, unscripted nature of sports makes it impossible to know which individuals will be necessary, important, or even which individuals will participate in advance of the event (apart from knowing all of those who are eligible to participate). Thus, the rights to show **all** potential participants in the game telecast must be obtained well **before** the event, and since most of the material exhibition is live, permissions after the fact are not practical and risk an individual declining to provide his or her rights or holding out for excessive compensation since the event has already occurred. It is impossible to ensure that these consents could be gathered after the fact, and no network wants to take the chance and have potential legal exposure after the telecast airs, so full participation in advance is fundamental. Indeed, there is a tendency for team/player churn during a season as a result of injuries, performance variation, etc., which is why obtaining NIL for the entire membership of a sports team is so critical. For example, Stetson Bennett, the winning quarterback in the 2021-22 College Football Playoff Championship game had been the University of Georgia's backup QB to start the season after returning to the team a second time. This type of "Cinderella Story"—the emergence of a sudden star—is a big part of the value of live sports properties. Also, even though players have different positions on the football field or basketball court, one never knows which player or players will make the key play at a critical moment in the spontaneous live broadcast, which is why **all** players need to be covered by the NIL access that a broadcaster can rely upon to use.

One can observe this approach in the analogous context of professional athlete licensing agreements. Take, for example, the NFLPA's[43] and NBPA's[44] Redacted - Counsel Only

---

[43] Redacted - Counsel Only

[44] Redacted - Counsel Only

CONFIDENTIAL                    ©2022 DESSER SPORTS MEDIA, INC.

## 9.1.    NOW LET'S IMAGINE SPORTS TELECAST WITHOUT NIL

### Example 1

Video that does not show the identity of the players, substituting blurred or masked faces, or using camera shots which omit the faces or bodies.  In essence, this would be a TV product which would more resemble "x's and o's" on a coach's clipboard (or an "ESPN GameCast," a game simulation product based on game statistics, but not including any live action video)[45] and not a valuable and highly marketable sports telecast.  The game would have no "stars," no underdog players overcoming adversity, and no individuals with personal stories that comprise a large part of the drama of live sports.  Even an unknown backup kicker who misses an extra point needs to have a name and identity so viewers are not simply watching non-human fungible automatons.  And even if only a few players on a team were blurred, the game would still be virtually unwatchable, as demonstrated by the still photo below where the players' faces are blurred.



---

[45] Gamecast is an application which features a graphical representation of where shots are taken on the basketball court or where plays take place the football field, showing those plays advancing the ball over a series of downs towards the endzone.  Per http://www.espn.com/college-football/gamecast/index_screen, "it allows you to enjoy live play-by-play action of all the games from the comfort of your own home, office or cube. With this kind of access, you'll never miss a game. Plus, you get all the game stats and inside data."

CONFIDENTIAL                                ©2022 DESSER SPORTS MEDIA, INC.

### Example 2

One wouldn't seriously compare an ESPN GameCast (as shown below), or an audio (radio) feed as a fully substitute product for a national TV broadcast even though it captures the players' athletic performances. The relative marketplace values of an animated data feed or a radio broadcast as compared to today's TV broadcast of a professional or collegiate football or basketball game are not close.



CONFIDENTIAL                              ©2022 DESSER SPORTS MEDIA, INC.

### Example 3

Imagine announcers using positions, not names, to identify individuals shown in TV live action and via announcer voice overs: "The Center hikes the ball, and the Quarterback falls back behind the line of scrimmage.  He looks right and pump-fakes a throw, then throws to his left towards the wide receiver running down the sideline who catches the ball at the 40-yard line, where he runs out of bounds for a first down."  Or, "the Center rebounds the ball, passes to the Point Guard, who brings the ball up the court, and bounce passes it to the Power Forward, who whips the ball back to the Center for a slam dunk!"  Not exactly scintillating entertainment, and these are examples of exciting plays!





CONFIDENTIAL                                        ©2022 DESSER SPORTS MEDIA, INC.

**Example 4**

Typically, telecasts include superimposed graphics including the names of the player, for example while at the free throw line, including their current season free throw percentage with a tight shot of their face, capturing the emotion, pressure and passion of the moment. Imagine instead a wide shot from high in the rafters where the player was not identifiable and there was no such graphic. This is even more profound in football where the players wear helmets and their faces are already partially covered.





CONFIDENTIAL                              ©2022 DESSER SPORTS MEDIA, INC.

### Example 5

What is described above is essentially an anonymous proposition, which would dehumanize the content, separating the audience from identifying or understanding the participants as people with lives with whom they can empathize (whether in celebration or sorrow with their own players, or antipathy with players on hated rivals), rendering it far less attractive to the audience. Without player NILs, you have no "stars," no "underdogs," no "supporting cast," no "teammates," no human-interest stories, and no humans at all.

**Without NIL**



**With NIL**



CONFIDENTIAL                              ©2022 DESSER SPORTS MEDIA, INC.

# 10. ORGANIZATION OF COLLEGE SPORTS MEDIA RIGHTS

While there are various buckets of college sports media rights, it is helpful to understand the overarching structure of the business operations to understand the context for the variety of media rights deals, and how these rights are assembled and then the revenues therefrom broken up among the creators/contributors. For purposes of this discussion, I will focus on the operations of Power Five conferences and Notre Dame because these conferences' players make up the classes relevant to my analysis.

## 10.1.  REGULAR SEASON

Virtually all Division I schools (e.g., Cal, Stanford) belong to a single conference or league (e.g., Pac-12). The best of these are known as the Power Five conferences. The other four are the Big Ten, Big 12, ACC, and SEC. Each conference has about 10-16[46] member schools. These schools assign the media rights for their respective regular-season or conference championship events for home football, men's and women's basketball, and other sports[47] (as opposed to the playoff or national championship events which are controlled by the NCAA or the College Football Playoff board of managers) to the respective conferences. The conferences in turn bundle those rights together and sell them to one or more network or other distributor, or retain them for use on the respective conference networks licensed by three of the five Power Five conferences (the ACC Network, Big Ten Network, and the SEC Network; the Pac-12 operates its own, and the Big 12 has a digital network on ESPN+) or, occasionally, for use on their own school network (e.g., The Longhorn Network and Sooner Sports Network). The revenues from these deals are shared and distributed, after certain expenses, to the

---

[46] Recent changes in conference composition have seen Texas & Oklahoma announce plans to leave the Big 12 and join the SEC, and for UCLA & USC to leave the Pac-12 to join the Big Ten when its existing conference media agreements expire. As a result, the numbers featured in the names of some of the conferences, which were formed based on the number of members, are ironically not always indicative of the current or future number of members at any time. Until recently, the Big 12 had just 10 members, while the Big Ten had 14, and Notre Dame is a member of the ACC for all sports except football, where it is independent.

[47] The "other sports," also known colloquially as Olympic Sports, are those other than football and basketball, most of which are featured in the Olympic Games, but which are not considered as "cash" sports (those that generate positive income after direct expenses). Some examples include softball, volleyball, wrestling, soccer, and ice hockey.

CONFIDENTIAL                                    ©2022 DESSER SPORTS MEDIA, INC.

members[48] of the particular conference based upon the agreements between the schools.[49]

## 10.2.    FOOTBALL POST-SEASON

The major conferences and individual schools participate in two types of post-season football contests.  These are Bowl Games and the College Football Playoff (CFP) the latter of which has been in place since the 2014-15 college football season.  Bowl Games such as the Rose Bowl or Sugar Bowl are traditional annual mid-December through New Year's Day events involving teams from two schools.  For example, the "Granddaddy" of bowl games is the Rose Bowl in Pasadena.  For that game, traditionally (with certain exceptions) the participating teams are the top Big Ten and Pac-12 schools.  The rights to televise the Rose Bowl are sold by those two conferences in association with the Rose Bowl itself.  The College Football Playoff currently includes a particular set of two bowl games that the various conferences have agreed to designate as the first part (Playoff Semifinals) of the CFP each year, and in which the top teams appear based on selections made by the CFP committee.[50]  Winners of those two particular bowl games (whose location rotates annually) compete in the College Football Championship game in early January.  The media rights for those three games are sold by the CFP, which has bundled rights from the Power Five and other conferences to the college football post-season championship.  Redacted - NSC

[51]  This past September, the CFP voted to expand the college football playoffs as early as 2024 to include a total of 12 teams,

---

[48] Redacted - Counsel Only

[49] Redacted - NSC

[50] *See* https://collegefootballplayoff.com/sports/2022/3/16/semifinals-2122.aspx.
[51] Redacted - NSC

a three-fold increase estimated to potentially more than triple the average annual rights fee to approximately $2 billion in revenue each year.[52]

## 10.3.  MEN'S BASKETBALL POST-SEASON

The NCAA conducts an annual Division I Men's Basketball event each year involving 68 of the best teams in the nation.[53]  This is known as "March Madness." This single-elimination tournament runs from mid-March until early April, when the champion is crowned.  The rights to the 67 games making up this event each year have been sold by the NCAA to CBS and Turner under a long-term agreement, the latest extension of which is worth [Redacted - NSC] [54]  The net revenues are distributed to the conferences based on a formula[55] determined by the NCAA, which considers member performance over a period of time.  Those funds are distributed to the members as determined by the respective conferences' rules.

## 10.4.  WOMEN'S BASKETBALL POST-SEASON

Much like with men's basketball, the NCAA also stages an annual Division I women's basketball elimination event which is also now called March Madness. There are the same number of teams, and it takes place during the same period of time; however, the media rights are currently sold as part of a multi-sport package by the NCAA to ESPN.  The package includes not only the women's basketball Championship, but also about 28 other NCAA Championship events like Softball, Volleyball, and the NIT Basketball event, for an average annual value of [Redacted - NSC] [56]

---

[52] Alan Blinder, *College Football Playoff Will Expand to 12 Teams*, THE NEW YORK TIMES (Sep. 2. 2022), *available at* https://www.nytimes.com/2022/09/02/sports/ncaafootball/college-football-playoff-expansion.html.

[53] There is also a postseason March event called the National Invitational Tournament, or NIT, featuring DI teams that are not selected to compete in March Madness, as well as other smaller postseason tournaments.

[54] Redacted - NSC

[55] *See* https://www.ncaa.org/sports/2013/11/22/distributions.aspx.  *See also* NCAA Gender Equity Review (Aug. 2, 2021)("The largest amount of revenue is distributed through two funds—the Basketball Performance Fund and the Equal Conference Fund which allocate revenue to conferences based on their participation in, and success at, the Division I Men's Basketball Championship.  There is currently no equivalent fund for participation in, or success at, the Division I Women's Basketball Championship."); Redacted - NSC

[56] Redacted - NSC

CONFIDENTIAL                    ©2022 DESSER SPORTS MEDIA, INC.

# 11. "FOLLOW THE MONEY"

The phrase "Follow the Money," made famous in the movie "All the President's Men," is also useful here. This approach helps the reader understand where and how the "television money" originates, how it flows from the networks to the conferences and the NCAA, and ultimately to member schools. Other distinguishing characteristics of these broadcast agreements include:

## 11.1. LONG-TERM MULTI-SPORT

The Rights payments, paid for in large programming packages (see Paragraph 12 below), are largely negotiated many years in advance and usually involve many dozens of annual live games[57] in multiple sports over multi-year contract terms.

## 11.2. FIXED FEES

Typically, the rights fee consideration amounts are mostly fixed, per-season or per-year amounts, increasing every year, in exchange for the entire package of rights described in Paragraph 6 above related to all of the games.

## 11.3. BULK PAYMENTS

In general, there is no delineation in conference or NCAA deal contracts for specific amounts to be paid to particular schools,[58] or for particular sports or games—just a total annual amount of cash to be split by the various licensors, usually in a manner of their choosing.

## 11.4. ALLOCATIONS OF MULTI-SPORT DEAL TO PARTICULAR CONTENT

In my many years as a sports media consultant, I have been involved with hundreds of sports media deals, dozens of which, like most conference media arrangements, cover football, men's and women's basketball, and many "Olympic sports." This has provided perspective for me on what the networks buying these rights packages value the most and in what relative amounts, as compared to other sports.

## 11.5. THE MEDIA RIGHTS FUNNEL

Estimating the value of broadcast-related NIL allocable to each of the plaintiff classes requires a series of steps, which are set forth below:

- First, I perform an analysis of the broadcast revenues generated by the NCAA and each of the major P5 conferences.
- Next, I estimate the proportion of this revenue which is fairly allocable to the players, as opposed to the other participants which create and organize athletic events such as the schools, conferences and the NCAA.

---

[57] One exception to this general rule is annual football bowl games.
[58] Exceptions include NBC's deal with Notre Dame and ESPN's earlier deal with BYU.

CONFIDENTIAL                                    ©2022 DESSER SPORTS MEDIA, INC.

- The third step involves estimating the proportion of the players' share that is attributable to the contribution of NIL, as opposed to their participation in the events.

- Finally, by multiplying my estimate of the NIL value percentage by the value of the overall payments made by the broadcasters for Power 5 FBS football and men's and women's basketball games, one can reasonably estimate the marketplace value of the NIL obtained by the broadcasters from the Power 5 conferences (or the NCAA, in the case of the NCAA Tournaments) in FBS football and men's and women's basketball.

CONFIDENTIAL                    ©2022 DESSER SPORTS MEDIA, INC.

## 12. MAJOR COLLEGE SPORTS MEDIA AGREEMENTS

At the top of the media revenue funnel are the various Agreements that the NCAA and Power 5 conferences (plus Notre Dame) have with broadcast and cable networks, and that additional revenue which is generated and/or distributed from the operation of the respective conference networks.  Each deal is different, and each conference has different arrangements for its games, but the pattern of regular season games together with conference championships being licensed to one or more major sports broadcasting platforms is common, as is the practice to license additional programming to a conference-branded network or digital platform.  The following subsections list the arrangements for each entity from 2016-17 through 2020-21 (with some explanation of future arrangements):[59]

- **SEC**: CBS, ESPN, SEC Network, and new SEC Agreement with ESPN/ABC starting in 2024
- **Big 12**: FOX, ESPN
- **ACC**: ABC/ESPN, ACC Network
- **Pac-12**: FOX/ESPN, Pac-12 Network (self-operated)
- **Big Ten**: FOX/ESPN, Big Ten Network through 2022, and new Big Ten Agreements with NBC, CBS, and FOX starting in 2023
- **Notre Dame:** Agreement between school and NBC for its home games.  Other sports participate in the ACC

[59] These agreements constitute less than the total media rights fees received as there are a variety of items which are not included.  For example, the University of Texas has an Agreement with ESPN concerning the operation of the Longhorn Network which pays millions of dollars per year and also includes telecasts involving members of the Classes in this case.  Many other schools retain rights to distribute certain programming beyond that which is featured on the conference networks.  There are also a large number of smaller bowl games.  In the interest of focusing on the most significant items at this juncture, I have not included the value of these many additional forms of distribution.  I reserve the right to include some or all of these additional agreements in my analysis in my merits report for trial.

CONFIDENTIAL                    ©2022 DESSER SPORTS MEDIA, INC.

## 13.  HOLISTIC PLAYER CONTRIBUTION TO MEDIA RIGHTS VALUE

When a broadcaster pays hundreds of millions or billions of dollars for college sports broadcast rights, that consideration is paid for a bundle of different contractual rights in addition to NIL.  There are no specific allocations in the contracts to any of the individual ingredient values contained in the overall basket of rights (production rights, use of trademarks, sales rights, right to use player NIL, athlete game performance, distribution rights, etc.).  Thus, I will estimate the relative, collective value of all Power 5 FBS football and men's and women's basketball class members' NIL as a subset.

The professional sports marketplace provides us with a good starting point to consider the value of all player contributions to the commercial value of sports game telecasts for basketball and football.  Professional players in the NBA, WNBA and NFL historically have collectively bargained for compensation for the use of their NIL and their performances together in connection with media rights agreements and the other services they perform.  Players in the NBA and NFL have compensation systems that specify the players' aggregate share of revenues is approximately fifty percent of aggregate revenues (the publicly-discussed share of revenues going to the players as a group), but these calculations also include various specified deductions for certain NBA expenses, and for stadium construction or renovation incentives in the NFL, among other specifics, which are relatively small compared to the massive media rights revenues in those sports.[60]  The NFL CBA also has an annual "Player Cost Amount" that is calculated based on a formula that assigns a value of 55% to "League Media" revenue, before those revenues are combined in a calculation with other revenue categories (such as gate revenue) which are calculated at a lower percentage, and before adjustments are made for stadium investments, etc.[61]  The players in these professional sports thus get in the range of half or somewhat less than half of all broadcast revenue, but this consideration is received for both performance and NIL elements, so further analysis and review of other analogous situations is required.

---

[60] *See, e.g.*, 2017 NBA CBA, Art. VII, Sec. 1(a)(1)(ix) & 1(a)(6)(ii) (reviewing treatment and allowable expenses for NBA Properties revenues).
[61] *See* 2020 NFL CBA, Art. 12, Sec. 6.

CONFIDENTIAL                                    ©2022 DESSER SPORTS MEDIA, INC.

# 14.  ATHLETE NIL CONTRIBUTION

The following looks at the proportion of Athlete contribution reasonably attributable to athlete NIL for the Classes of Power 5 football (and Notre Dame) and men's and women's basketball used in game telecasts:

## 14.1.  MEDIA AGREEMENT ELEMENTS

NIL is not customarily sold *separately* from the rights conveyed in media contracts, nor are specific values assigned to particular grants within an agreement.  It is necessary here to break down the value of player performance and NIL in each contract, though subdividing the overall payment in a media rights contract generally has no business purpose.

## 14.2.  THE GAME PERFORMANCE

As the core value conveyed to broadcasters includes the value of the athletic performance of the players on the field or the court in addition to the value of the players' NIL, my assignment was to isolate that value in particular, i.e., to exclude the value attributable to athletic performance.

## 14.3.  NIL PORTION

I have negotiated hundreds of agreements for sports media rights—close to $50 billion worth of such sports and media transactions during my nearly five decades in the media business, including at the NBA and as an independent consultant.  This provides me with a deep understanding of the elements of IP value conveyed to a broadcaster as part of those transactions and the strategic and actual business implication of including or excluding certain rights.   In my professional opinion, *the majority* of the value of a professional athlete's compensation relates to their actual performance in the game, but, the NIL necessarily represents a meaningful *minority* of the total value that college players contribute to broadcast agreements.

## 14.4.  LIVE PERFORMANCE

Unlike NIL, athletic performance requires material time to be invested by the athlete.  Players must practice, train, eat the right foods, learn the plays, travel to the game, and then be on-site at the game throughout.  The players must use their athletic skills in the performance, on a real time basis.  The essence of their performance is playing the games.

## 14.5.  NIL/LIVE PERFORMANCE ALLOCATION SPLIT

However, NIL is clearly very valuable and enhances the media value substantially (as discussed in the preceding pages), and in fact it would be impossible in my professional judgment to sell broadcast rights unless the broadcaster were receiving, one way or another, the NIL of all athletes potentially participating in the games.

CONFIDENTIAL                    ©2022 DESSER SPORTS MEDIA, INC.

Using a conservative approach, and based on my decades of experience negotiating sports broadcasting agreements, it is my opinion that the athlete value of NIL is at least between ten and fifteen percent (10-15%) of the total value of any broadcast deal that purports to transfer both performance rights and NIL of the athletes potentially participating in the games. To be conservative, I will use an estimate at the low end of this range – 10% – as a reasonable estimate of the value of the athletes' NIL in these broadcasts.

Looking at the professional sports example, my estimate of 10-15% for the value of athletes' NIL is between approximately twenty and thirty percent (20-30%) of the approximately one-half of broadcast revenues that professional athletes in these sports receive for all of the elements they contribute under their collective bargaining agreements. While there is no precise formula that can be applied, it is my expert opinion, based upon my professional judgement and decades of experience negotiating billions of dollars in sports broadcast deals involving athletes' NIL, that 10% is a conservative and reasonable estimate of the value of athlete NIL for the broadcast of Power 5 FBS football and men's and women's basketball games.

## 14.6.   RASCHER EXPERT REPORT

I have reviewed the expert report of Dan Rascher, which considers how my estimate of an 10% value for NIL in Power 5 FBS football (and Notre Dame) and men's and women's basketball broadcasts compares to other analogous industry royalty rates. His analysis confirms my opinion that 10% is a conservative and reasonable estimate of this value.

CONFIDENTIAL                    ©2022 DESSER SPORTS MEDIA, INC.

# 15. ANALOGOUS INDUSTRY ROYALTY RATES

In addition to the above base analysis, other evidence supports my professional opinion that 10% is a conservative and reasonable estimate of the value of Power 5 athlete NIL for the broadcast of FBS football and men's and women's basketball games.

## 15.1. NIL VALUE ANALOGOUS TO A ROYALTY

A payment for NIL as part of a media rights agreement is like the payment of a royalty. These are sums paid as part of a license with respect to a variety of products ranging from oil wells to the use of patents. They are typically calculated on a percentage basis of relevant defined revenues, in exchange for the right to use that particular property in a specific manner. Therefore, another way to help determine the appropriate value for college athlete NIL contained in sports media agreements is to observe royalty rates from similar products as a proxy for athlete NIL.

In the media business, royalties, or profit participation points, are often paid to certain actors who appear in a production based on the financial performance of a movie, or to producers or directors. In professional sports (discussed in the next section), royalties are paid to leagues and/or players' associations in connection with licensed merchandise, like t-shirts, hats and trading cards. Historically, royalties have also been paid for licenses featuring school trademarks for college-branded merchandise as well. Media royalties are also contracted for and paid based upon the sales of recorded media like DVDs produced by sports leagues. This kind of payment can also provide us with an additional point of reference in connection with my valuation of athlete NIL.

The royalty rates for the licensing of use of images, trademarks, and productions vary across platforms and industry subsections, but they are generally in the range of high single digit to low double-digit percentages of gross wholesale revenue for the particular licensed rights. Accounting firm KPMG reports that royalty payments are a profit-sharing mechanism.[62] By receiving royalty income, a licensor shares the profit streams generated by the licensee's effort in commercializing the underlying IP. These can be calculated as a percentage of gross revenue, or another financial or sales metric. "Sectors that are technology-intensive and produce differentiated products" (e.g., live game telecasts) "generally register high gross

---

[62] KPMG International, "Profitability and royalty rates across industries: Some preliminary evidence" (2012), *available at* https://assets.kpmg/content/dam/kpmg/pdf/2015/09/gvi-profitability.pdf.

CONFIDENTIAL                                        ©2022 DESSER SPORTS MEDIA, INC.

margins, and hence can afford higher royalty rates."[63]   Media royalty rates in this KPMG study came in at just under 13% of gross revenue.[64]

## 15.2.   PROFESSIONAL LEAGUE MERCHANDISE LICENSING

Each professional league engages in the licensing of trademarks, logos, and game-related indicia for use in apparel, and non-apparel products.   These deals are typically done for a particular group of products, based upon a royalty percentage paid against the wholesale revenue of the licensee for such products, usually with some minimum annual guaranteed payment.   As with most of Defendants' media agreements, the costs associated with producing and selling the products are borne by the licensee.   These licensing arrangements are usually for the team and league trademarks only.   From my personal experience in the sports industry, I am aware that most such licenses have royalties of 8-12%, not including any athlete NIL, depending on the product category and other aspects of the transaction.   Sometime licensees also (jointly license) or alternatively obtain a license from a particular Players' Association (PA-only licensee below) in order to use the names and images of the players in combination with the logos and marks of the teams (e.g., a licensed player uniform which includes both the name and number of a players as well as the team (and possibly league) logo and team colors, or trading cards which contain the players' images in uniform with their names and stats).

## 15.3.   NFLPA AND NBPA GROUP LICENSING AGREEMENTS

Of greater relevance to this analysis, apparel and merchandise licenses[65] that include players' names, images and/or likeness are more similar to the NIL contained in live game media rights agreements which we seek to estimate, though they are used in somewhat different forms and in a completely passive manner.

- ▪   **NFLPA.** The National Football League Players Association, on behalf of NFL players has many licenses granting use of players' NIL. Redacted - Counsel Only
  [66]

- ▪   **NBPA.** The National Basketball Players Association, on behalf of virtually all NBA players (but without league marks) has dozens of licenses granting use of

---

[63] *Id.* at 12.

[64] *Id.*

[65] Not included here are video games or digital playing card licenses, which will be addressed in the next section.

[66] Redacted - Counsel Only

CONFIDENTIAL                    ©2022 DESSER SPORTS MEDIA, INC.

players NIL to merchandise, apparel and physical trading card licensees. A
Redacted - Counsel Only.[67]

- ▪ **WNBPA.** The Women's National Basketball Players Association, on behalf of
  WNBA players has a more limited number of licensees; Redacted - Counsel
  Only.[68]

Though far less valuable than live game media rights, these data points support the
notion that player NIL is valued in the sports marketplace in these percentages.

---

[67] Counsel Only
[68] Counsel Only

CONFIDENTIAL    ©2022 DESSER SPORTS MEDIA, INC.

# 16.  VIDEO GAME LICENSING

As another data point relevant to estimating the value of NIL in a sports media telecast agreement, professional team athletes, through their respective players associations and/or the leagues, are active in licensing NIL for use in video games.[69]  These rights are even closer to live game NIL insofar as they are for video images and/or likenesses of players in a media-like form of a consumer product.  While such use does not, for the most part, require the actual presence of the athlete, it does use his or her name, image and/or likeness in a very similar manner as within a game telecast and in connection with the sales and marketing thereof, and the use of the NIL is often shown on a TV monitor or hand-held device.

- Video games rely upon a license that only involves a player's NIL (while the leagues also provide a license for the use of marks).  The use is highly analogous as it relates to the athletes' sports personas, using name, image and likeness only, and not the actual time-consuming athletic performance.  Redacted - Counsel Only
[70]

- In contrast, playing in a game requires practice time, travel, warm up, overnight stays, participation in pre- and post-game interviews (which illustrates how NIL for telecasts is more involved and more valuable than video games because of the live, unscripted and dynamic involvement of the players, including in off the court and off the field examples) and many other actions that are not required of an athlete who just provides access to use the NIL.  As such, the basic use in a video game would represent lower end of the range of NIL use values.

- This makes the payment associated with those licenses a strong minimum comparable for the NIL contained in telecasts of college football and basketball games.

---

[69] Redacted - Counsel Only

[70] Redacted - Counsel Only

- A review of the NFLPA and NBPA product licensing summaries informs us of the royalty rates paid to the players for professional NIL.

- The National Basketball Players Association, (and/or dba THINK450) on behalf of NBA players, has many licenses to various parties granting use of players' NIL for video games, digital games, fantasy basketball games, digital trading cards, physical trading cards, apps, and NFT (Non-Fungible Token) collectables. Redacted - Counsel Only

- The NFLPA, on behalf of NFL players, licenses the NIL to various parties for video games and digital products. Redacted - Counsel Only [72]

- These amounts are similar to the royalties paid for use of professional sports trademarks, separate from player NIL, as described in greater detail above. The wholesale rate packaging of NIL for video games is also similar to the packaging of television NIL rights. As video game technology has progressively advanced over time, its use of player NIL continues to evolve closer to television NIL usage.

- It is important to note that whatever the prevailing royalty structure, without player NIL there are no sports video games – EA discontinued its college football game once NIL was in dispute during the *Keller v. NCAA* case in 2013.

[71] Redacted - Counsel Only

CONFIDENTIAL                                          ©2022 DESSER SPORTS MEDIA, INC.

# 17. ALLOCATION OF NIL-RELATED REVENUE BY SPORT

As the vast majority of the Media Rights agreements are for a combination of different sports, and some of these are more valuable in the market than others, the final step in this analysis is to allocate the revenues by sport/class, so that the broadcast revenues attributable to athlete NIL can match up with each respective sport/class.

Based on my decades of experience negotiating sports media deals, discussions with many network and college conference executives during my career, and this section below, I believe that an overall average allocation of Power 5 conference media rights revenues to each sport should be as follows:

## 17.1. FOOTBALL IS KEY DRIVER

Far and away, the primary value driver in college telecast contracts is Power 5 FBS football. I value this content at approximately **75%** of the overall media rights package value, due to the popularity of football in the U.S. and the oversized ratings (2.5 million average viewers for regular season national college football telecasts in 2021-22)[73] it generates, and the relatively limited supply of this content available in the media marketplace.

This allocation aligns with the Power 5 conferences' audited financials that I reviewed. For example, in discussing its 2013 Amended and Restated Agreement with ESPN, Redacted - NSC

Redacted - NSC [4] The rights fees assigned to football Redacted - NSC Redacted of the total rights fees assigned by the conference.

## 17.2. MEN'S BASKETBALL COMES IN SECOND

While there is more of it than football (each school typically plays more than 30 games per regular season vs. just a dozen or so for football), the average audiences for men's basketball are typically significantly lower (0.7 million viewers in same period as paragraph above),[75] the duration is shorter (2 hours vs. 3.5 hours for

---

[73] *See* FN 13 above.
[74] SEC-HOUSE0047791 at 807. Redacted - NSC
Redacted *See* SEC-HOUSE0047742 at 758; SEC-HOUSE0047841 at 853.
[75] *Compare* National Football Foundation, *2019-20 Report: Amazing College Football Popularity Highlighted by Impressive Ratings and Attendance Data* (May 28, 2020), *available at* https://footballfoundation.org/news/2020/5/27/2019_Attendance_and_Ratings.aspx (showing that college football games on CBS, Fox, and ESPN respectively averaged 7.1 million, 3.7 million, and 1.7 million viewers during the 2019-20 regular season) *with* Austin Karp, *College basketball ratings return to pre-pandemic levels,* SPORTS BUSINESS JOURNAL (Mar. 21, 2022), *available at* https://www.sportsbusinessjournal.com/Journal/Issues/2022/03/21/Upfront/College-

CONFIDENTIAL                    ©2022 DESSER SPORTS MEDIA, INC.

football) and thus these rights are typically worth in the range of approximately **15%** of the overall value in conference deals across the class (e.g., closer to the higher end of the range in the case of a conference like the ACC, where the economic value of basketball compared to football matters somewhat more than other conferences such as the SEC).[76]

### 17.3.  WOMEN'S BASKETBALL

Depending upon the conference, women's basketball would fall in the vicinity of 5% of the value of conference media deals.  There are a similar number of games as men's basketball, but viewership is significantly lower (major national telecasts average just under 0.4 million viewers), so the value allocation is less.[77]

### 17.4.  OTHER SPORTS

It is my opinion that the value for athletes in sports other than Power 5 FBS football and DI men's and women's basketball—i.e., the Olympic sports—collectively make up the remaining **5%** of value.  It is conservative to use a 5% estimate for the value of the Olympics Sports when the goal is to determine the remaining value of football and basketball because 5% is probably the upper boundary of this value.  The networks often agree to carry the Olympics sports as part of an overall multi-sport deal even if some of those sports have little if any positive economic value.  Some of the Olympics sports do provide reasonably popular programming like the College World Series in baseball and softball, and the women's gymnastics and volleyball championships.  But others may have a negative value, since televising those games requires production costs, consumes airtime, and does not generate relatively significant ad revenue.   Often conferences even pay the cost of production for Olympics sports, so that the games are available to family members, hardcore fans, and for alumni and recruiting purposes, though most of these games end up on conference networks or only available via streaming platforms.

The above conclusions, based on my professional judgment, are supported by other data and analogous circumstances in the sports media industry:

---

basketball.aspx (showing that men's college basketball games on CBS, Fox, and ESPN respectively averaged 1.3 million, 0.86 million, and 0.96 million viewers during the 2019-20 regular season).  Note that not all games are included in these averages.

[76] With the exception of a conference like the Big East, which does not play football, so most of the value is attributable to basketball.

[77] *Compare NCAA Men's Final Four Ratings Hub*, SPORTS MEDIA WATCH, *available at* https://www.sportsmediawatch.com/ncaa-final-four-ratings-history-most-watched-games-cbs-tbs-nbc/, *with Women's Final Four Ratings Hub* SPORTS MEDIA WATCH, *available at* https://www.sportsmediawatch.com/womens-final-four-ratings-history-espn/ (showing higher ratings for men's college basketball).

CONFIDENTIAL                                    ©2022 DESSER SPORTS MEDIA, INC.

- **CBS Sports Agreement extension with Conference USA.** While this deal (dated June 2, 2010) neither involves a Power 5 conference nor allocates the rights fees from the deal specifically, Redacted - NSC

  Redacted - NSC

  This also is consistent with my view that the total value of Olympics sports is relatively small (Redacted - NSC Redacted - NSC

- **NCAA/ESPN "Other Championships" Agreement.** In 2011, the NCAA extended its agreement with ESPN covering championship events for a large number of sports, other than men's basketball. I did a publicly issued study for the NCAA on this Agreement, particularly with respect to women's basketball, in conjunction with the Kaplan gender equity study published August 2, 2021.[79] Of relevance here, the NCAA agreed over the term of that Agreement to add approximately five additional "Olympic Sport" Championship events to the Agreement, without adjusting the consideration paid to the NCAA. The value of producing and distributing the events was of sufficient value to the NCAA that it did not require ESPN to pay any additional rights fees in connection with adding the relevant rights to the existing package. This is consistent with my view that, at least to date, most Olympic Sports should receive a very small allocation of the media revenues in college media rights deals.

- **Rascher Report.** In addition to the above, I have reviewed the expert report of Dan Rascher, which reviews other economic data for allocating the value of FBS football and men's and women's basketball in comparison to other sports. These data further support the conclusion that my allocations of value are reasonable and reliable.

---

[78] Redacted - NSC

[79] Desser Media & Sponsorship Addendum to the NCAA External Gender Equity Review (Aug. 2, 2021), *available at* https://ncaagenderequityreview.com/.

## 18.  SUMMING UP

My professional opinion about the economic value of college athlete NIL from game telecast revenues to the Power 5 conferences (and Notre Dame) for FBS football and men's and women's basketball is as follows:

1.  It is my expert opinion that approximately 10% of the media broadcast revenue to the Power 5 conferences (and Notre Dame) for these sports is a reasonable and conservative estimate of the collective marketplace value of the NIL of college athletes provided via these media rights contacts.
2.  Of the athlete NIL revenue in multi-sports agreements, 75% should be allocated to football, 15% to men's basketball, 5% to women's basketball and 5% to Olympic Sports.

I hereby certify that this report is a complete and accurate statement of all of my opinions, and the basis and reasons for them, to which I will testify under oath.

Edwin S. Desser

President

Desser Sports Media, Inc.

October 21, 2022

CONFIDENTIAL                    ©2022 DESSER SPORTS MEDIA, INC.

## 19.  APPENDIX
### 19.1.  ED DESSER BIO & CV



**Ed Desser Biography & History of Desser Sports Media (2022 CV)**

**1. Education/Experience.** I am the Founder and President of Desser Sports Media, Inc. (DSM) and Desser Media, Inc. ("DMI"), a California-based consultancy serving the strategic media business needs of the sports television industry.  I have a Bachelor of Arts (BA) in Economics from the University of California at Los Angeles and a Masters of Business Administration (MBA) in Marketing from the University of Southern California.  I have more than 45 years of continuous experience and notable achievements working in the sports media industry, performing media rights valuations, negotiating major media deals in the local, national and international TV marketplaces, and serving a diverse group of sports and media ownership and senior management clients as a strategic planner, management advisor, and expert witness.

**2. Vocational History – National Basketball Association.** For 23 years, I served as the senior media executive in the Commissioner's Office of the National Basketball Association, ultimately serving as President of NBA Television and New Media Ventures, L.L.C., and Executive Vice President, Strategic Planning and Business Development, where I was the chief negotiator for all NBA and WNBA national media agreements, including those with CBS Sports, NBC Sports, ABC Sports, ESPN, Turner Sports (TBS and TNT), CTV, TSN, Sportsnet and The Score (Canada), USA Network, FOX, Comcast, and unaffiliated Regional Sports Networks ("RSNs"), as well as AOL, Yahoo, DIRECTV, DISH Network, Cox Communications, Time Warner Cable, Cablevision, In Demand, Intel, and Sirius Satellite Radio.  I served on the NBA Board of Governors Planning Committee.  I also invented and spearheaded the launch of NBA TV and NBA TV Canada, the first league-owned national cable sports network, personally handling the strategic plan and affiliate distribution agreement negotiations. In addition, I designed and launched nba.com; created the NBA League Pass outer-market games subscription package and negotiated all related carriage agreements with MVPDs; established and managed the league's broadcast regulatory framework (including rules pertaining to and fostering the development of RSNs) and assisted many NBA teams in connection with the negotiation of their respective regional media rights agreements.  I also served as NBA Director of Broadcasting/Executive Producer, handling administration and

CONFIDENTIAL                                    ©2022 DESSER SPORTS MEDIA, INC.

fulfillment of league media agreements; the first VP/International Television, growing the NBA's media footprint to nearly 200 countries; and as VP/General Manager of NBA Entertainment, Inc., the media production and licensing arm of the league.

**3. Vocational History – Local Media & Sports Management**. In the decade prior to joining the NBA, I was the Director of Broadcasting/Executive Producer for the Los Angeles Lakers, Los Angeles Kings, and The Forum, where, among other things, I did development work which led to the creation of the Prime Ticket RSN in Southern California, today known as Bally's Sports West/FOX Sports West—the area's first RSN. I started my career in local broadcasting, serving in functions which included production, programming, promotion, on-air talent, live remote, news, engineering, business operations, and live sports broadcasts. I produced Monday Night Football and NASCAR race broadcasts, and I was the Executive Producer for the Los Angeles Lakers Radio Network.

**4. Desser Media Inc./Desser Sports Media, Inc.** In 2005, I founded Desser Sports Media, Inc. (DSM), and in 2018 added Desser Media, Inc. (DMI), which today specializes in strategic media planning; performing rights valuations and creating business plans for networks and RSNs; conducting regional, national and international media rights negotiations, mergers & acquisitions support; providing expert litigation support; and generally assisting professional sports teams, leagues, college conferences, programmers and distributors in strategic planning and business development towards maximizing the value of their media rights. Combined, I have advised on over $30 billion in sports and media transactions to date, averaging 108% deal-over-deal increases for our clients. Today, Desser Media, Inc. handles consulting and Desser Sports Media, Inc. now concentrates in technology, sales and licensing.

**5. Regional Sports Media Rights.** I have personally negotiated more than 50 regional sports media rights deals. DSM/DMI has advised a substantial number of professional sports teams with respect to their media rights, including (i) negotiating or advising with respect to regional media agreements for the Detroit Pistons, Phoenix Suns, Miami Heat, Dallas Mavericks, San Antonio Spurs (twice), Oklahoma City Thunder, Minnesota Timberwolves (twice), Los Angeles Clippers (twice), Los Angeles Kings, Los Angeles Galaxy, Chivas USA, Seattle Sounders, Tampa Bay Lightning, Atlanta Hawks and Thrashers, San Jose Sharks, Calgary Flames Winnipeg Jets, Edmonton Oilers and Milwaukee Bucks franchises with FOX, Rogers, Bell and Comcast-owned RSNs in those teams' respective markets; (ii) advising the Houston Astros, Houston Rockets, Sacramento Kings, and Portland Trailblazers with respect to deals to launch new Comcast/NBC RSNs featuring those professional sports teams; and (iii) working with MLB clubs such as the Washington Nationals, Atlanta Braves and a media-related analysis of local media rights for the Office of the Commissioner of Major League Baseball (see www.desser.tv for additional company accomplishments and background). I have also worked with the Tribune Company in connection with strategic planning with

CONFIDENTIAL                                        ©2022 DESSER SPORTS MEDIA, INC.

respect to future sports media opportunities, as well as preparing a media valuation and rebuttal report relating to the Chicago Cubs local and national media rights, and well as Rogers Communications with respect to the Toronto Blue Jays rights.

**6. National and Regional Sports Networks (RSNs).** Throughout my career, I have developed a detailed understanding of the television, television network and RSN businesses in the US and Canada.  This includes a thorough understanding of the key revenue and expense drivers; customary practices and business terms; programming elements; event, studio and remote production; critical keys to success; and ad sales. I am generally familiar with each operational national sports network and RSNs, and with the history of the sports network and sports programming industry.  I am also generally familiar with each of the major MVPD's (and new VMVPDs), BDUs in Canada which affiliate with these networks, and RSNs, as well as a wide variety of other networks which program major sports.  Due to the overshadowing impact of affiliate distribution and revenues to all networks, I am particularly familiar with the details of the affiliation agreements between them and MVPDs and BDUs.

**7. Testimony/Conflict Resolution.** Other examples of my work include expert and fact witness services in arbitration, litigation, and mediation support of: (i) *the New Jersey Nets vs. the YES Network*, (ii) the Portland Trailblazers, (iii) a major MVPD and major regional sports programming networks, (iv) *the Miami Heat vs. Clear Channel Communications*, (v) *O'Bannon et. al. vs. NCAA*, (vi) *Jenkins et. al. vs. NCAA, Pac 12, Big 10, Big 12, ACC and SEC Conferences,* (vii) CRTC arbitrations on behalf of Canadian BDU TELUS, and one between Videotron and a major Canadian programmer, (viii) two LA Dodgers-related cases (see below), (ix) an arbitration between NBC Universal and a major US MVPD, (x) a programming rights matter between a Power 5 college conference and a major international entertainment company, (xi) World Wrestling Entertainment, (xii) NASCAR in securities-related litigations, (xiii) Altitude in an antitrust case against Comcast, and by (xiv) FINA in an antitrust case brought by ISL.  I also testified in US federal court in *Chicago Bulls and WGN/Tribune Broadcasting vs. NBA* and in *NBA vs. Motorola and Stats Inc.*  I served as an expert witness in copyright hearings at the Library of Congress on behalf of the Joint Sports Claimants, which includes the NFL, MLB, NBA, NHL, WNBA, and the NCAA, and have served as a witness in hearings before the Canadian Copyright Board.

**8. Mergers & Acquisitions.** DSM/DMI have also served a number of clients in connection with media property valuations and potential sports/media property acquisitions.  These included (i) the CFL's potential acquisition of a Canadian sports TV network; (ii) the Washington Nationals' valuation of its ownership interest in the MASN Network; (iii) the actual or potential purchases of the Houston Astros, Sacramento Kings, Chicago Cubs, Dallas Stars, and L.A. Dodgers (see below).  I also worked with Maple Leaf Sports + Entertainment in connection with its acquisition by a JV between Bell Media and Rogers Communications

and have also served a major league professional ownership group estimating media rights revenues for a potential expansion franchise.

**9. Distribution.** I participated in negotiations for programming rights and cable network distribution deals with major cable, telecommunications and satellite operators including Comcast, Time Warner Cable, Cox, Charter (Spectrum), Verizon, AT&T, DIRECTV, DISH, Bell, Rogers, Shaw, and Cablevision. In addition, I have provided sports media consulting services to MVPDs including DIRECTV, Time Warner Cable, Rogers Communications, TELUS, and Videotron.

**10. International.** As the founder of NBA's highly successful international TV business, I am knowledgeable about the inner workings of media rights agreements outside of North America as well. I have negotiated international distribution agreements on behalf of a number of my US and Canadian clients and advised world broadcasters in connection with the FIBA World Championships.

**11. Los Angeles Lakers/Time Warner Cable**. I led the NBA's Los Angeles Lakers in connection with then the largest regional sports media rights deal in TV history, and the country's most significant RSN transaction in nearly a decade. In connection with that transaction, DSM created a business plan for a two new Southern California RSNs (one in English and another in Spanish), performed team rights valuations, executed market research related to the attractiveness of various teams in the market to subscribers of major cable and satellite operators, and negotiated or discussed a potential business relationships with FOX, Time Warner Cable, AT&T, Verizon, DIRECTV, Root Sports (Liberty Communications, and now AT&T Sports Networks), CBS, and other potential team rights purchasers/backers, including investment bankers and private equity funds. DSM also provided the Lakers with negotiation assistance on Spanish and English flagship radio, and with radio network distribution agreements.

**12. Los Angeles Dodgers.** I participated in several ways with respect to the media rights of the L.A. Dodgers. I was (i) an expert witness for Major League Baseball in the first stage of the team's bankruptcy proceedings. Later, (ii) I was an expert witness for FOX Sports in connection with the second phase of the bankruptcy case. I then (iii) represented Joe Torre and Rick Caruso in connection with a bid to purchase the team. Later (iv), I wrote an article valuing the Dodgers media rights for the Hollywood Reporter (estimating a result very close to the amount ultimately negotiated), and finally (v) I represented Time Warner Cable in connection with its record-breaking Dodgers media rights acquisition in 2013.

**13. Los Angeles Olympics Organizing Committee; United States Olympics and Paralympics Properties, International Olympics Committee.** In connection with the

CONFIDENTIAL                    ©2022 DESSER SPORTS MEDIA, INC.

upcoming presentation of the next US-based Olympics Games, I performed an extensive analysis and made a variety of recommendations with respect to the future media exploitation of the Games in the United States.

**14. Other Major Engagements and Clients.** I have also negotiated on behalf of, advised, or performed analysis for the National Football League (NFL), California Interscholastic Federation (CIF), the PGA Tour, Major League Soccer (MLS), the Professional Rodeo Cowboys Association (PRCA twice), The Jockey Club, the NFL Network, the Western Collegiate Hockey Association (WCHA), the National Hot Rod Association (NHRA) twice (where I also currently serve on the organization's Board of Directors), The American Athletic Conference (AAC), and the Canadian Football League (CFL)multiple times for both Canadian and US media rights agreements. I have also worked on a variety of projects for or with Staples Center and professional sports team owner and developer Anschutz Entertainment Group (AEG), Kilmer Van Nostrand, Co., Ltd., McKinsey & Co., Goldman Sachs, Maple Leaf Sports + Entertainment (Toronto Maple Leafs, Raptors, TFC, Leafs TV, NBA TV Canada, GOL TV Canada), the National Basketball Association (NBA), the US Pro Cycling Challenge, the Professional Bowlers Association (PBA) and the Ultimate Fighting Championships (UFC). I also provided guidance to multiple parties in connection with the assessment and valuation of the FOX RSN's, which were ultimately sold by Disney to Sinclair.

**15. Digital Sports Media.** In addition to my early digital media work at the NBA establishing the league's digital business operations by developing a live statistics distribution network and launching nba.com and League Pass, I have been deeply involved in the development of Digital media projects. Some of the projects include work for Qualcomm, Google, and YouTube, as well as many of the media rightsholders I have served, as set forth above. Desser Sports Media has also developed business plans and worked to implement the launch of new digital video services for multiple major league franchises.

**16. NCAA.** In March 2021, after University of Oregon basketball star Sedona Prince posted an unfavorable comparison between the weight room facilities on TikTok from the Women's NCAA Basketball Championships, the NCAA commissioned Kaplan Hecker to perform a wide-ranging gender equity study. Desser Sports Media was selected to analyze the situation from a media perspective. In August 2021, the analysis was published, concluding that the women's basketball championship rights were substantially undervalued (worth between $81-112 million/year vs. the present package of 29 NCAA Championships sold for a total of $34 million/yr.); and that the design of sponsorship sales rights and the media rights were misaligned such that women's basketball sponsorship rights had just a 1/10 of 1% allocation compared with the men's rights. Our recommendations led to many changes including expanding the tournament, moving the finals into prime time, and using the March Madness moniker for women's Basketball.

CONFIDENTIAL                                   ©2022 DESSER SPORTS MEDIA, INC.

**17. Publishing and Public Speaking.** I have been quoted in many hundreds of newspaper, magazine and trade publication articles, scholarly works, and TV interviews throughout my career. I have written many dozens of articles for publications such as the Sports Business Journal, the leading sports business publication in North America, and Sportico (see appendix 2). I have spoken at multiple industry conferences, and I have guest-lectured at USC, USF, UCF, NYU, Columbia, UCLA, Cal Tech and Fordham University Business and graduate schools.

CONFIDENTIAL                    ©2022 DESSER SPORTS MEDIA, INC.

## 19.2.  ED DESSER PUBLISHED ARTICLES

- [The seven habits of highly effective media partners](#) (SportsBusiness Journal – October 17, 2022)

- [The NBA On NBC Partnership](#) (SportsBusiness Journal - September 19, 2022)

- [Make media and tech innovations work for you](#) (SportsBusiness Journal - August 29, 2022)

- [The sports streaming evolution halftime report](#) (SportsBusiness Journal - June 6, 2022)

- [How should smaller properties cope with the shrinking sports media pie?](#) (SportsBusiness Journal - April 18, 2022)

- [The end of "all or nothing" and what comes next for media consumption](#) (SportsBusiness Journal - February 21, 2022)

- [In a changing world, TV experts Ed Desser and John Kosner share how fans will watch sports in the future](#) (Sports Broadcast Journal - April 26, 2021)

- [Key questions teams should ask now about their RSN deal](#) (SportsBusiness Journal - April 5, 2021)

- ['Netflix of sports' hasn't arrived, but digital titans are setting the table](#) (SportsBusiness Journal - January 18, 2021)

- [The 'Fourth Quarter' of Sports Media: Streaming Invites New Bidders for Events and League Rights](#) (Sportico - January 15, 2021)

- [The Fourth Quarter of Sports Media: Falling Bundles, Rising Streams](#) (Sportico - January 8, 2021)

- [Sports Can Recover in 2021 But Must Adapt to a Changing Market](#) (Sportico - December 1, 2020)

- [The COVID-19 halftime report: Just warming up](#) (SportsBusiness Journal - October 26, 2020)

- [Sports Slogging Through Cruel Summer of 2020](#) (SportsBusiness Journal - August 5, 2020)

- [Thoughtful, creative planning will put new normal into focus](#) (SportsBusiness Journal - June 29, 2020)

- [Follow the money: Unpacking sports media from the coronavirus shutdown](#) (SportsBusiness Journal - May 18, 2020)

- [Looking for truth in programming and distribution? Follow the money](#) (SportsBusiness Journal - May 11, 2020)

- [The Coming Sports DTC Squeeze Play](#) (SportsBusiness Journal - Jan 13, 2020)

CONFIDENTIAL                                    ©2022 DESSER SPORTS MEDIA, INC.

- [What to Anticipate in Sports Media's Digital Transition Game](#) (SportsBusiness Journal - Oct 28, 2019)

- [Demystified: The Anatomy of a Media Rights Agreement](#) (SportsBusiness Journal - June 17, 2019)

- [Stream a Little Dream: Declining Sports Rights? We Think Not](#) (SportsBusiness Journal - Jan. 14, 2019)

- [Making Your Media Rights More Valuable](#) (SportsBusiness Journal - April 23, 2018)

- [Twelve Ways Sports Networks Will Adapt to Evolving Marketplace](#) (SportsBusiness Journal - Nov. 6, 2017)

- [Sports Media Marketplace Quickly Evolving But Still Robust](#) (SportsBusiness Journal - June 12, 2017)

- [Rethinking Media Mix: Developing Branded Streaming Video Service](#) (SportsBusiness Journal - Oct. 3, 2016)

- [Handicapping the Netflix of sports: Win, place, show, scratch](#) (SportsBusiness Journal - Mar. 28, 2016)

- [Weathering Climate Change In Sports Media](#) (SportsBusiness Journal - Sept. 21, 2015)

- [How A Sports Enterprise Can Succeed As A Content Factory](#) (SportsBusiness Journal - Mar. 9, 2015)

- [Critical Questions for Any Media Rights Deal](#) (SportsBusiness Journal - Nov. 3, 2014)

- [Capitalize on Sports Media Megatrends](#) (SportsBusiness Journal - Aug. 11, 2014)

- [Valuing the Dodgers TV Rights](#) (Hollywood Reporter - Aug. 17, 2012)

CONFIDENTIAL                                ©2022 DESSER SPORTS MEDIA, INC.

## 19.3.  DOCUMENTS RELIED UPON

A)  <u>Legal Filings and Case Documents</u>

- Chad Hawley Deposition Transcript
- Expert Report of Daniel A. Rascher, *In re: College Athlete NIL Litigation*
- Jim Delany Deposition Transcript
- *In re: College Athlete NIL Litigation* Amended Complaint

B)  <u>Produced Documents</u>

- ACC-HOUSE0130449
- ACC-HOUSE0227822
- ACC-HOUSE0227974
- ACC-HOUSE0228078
- ACC-HOUSE0228382
- AU-NIL 00546
- BIG12-GIA_00276416
- BIG12_HOUSE00039677
- BIGTEN-NIL_00143504
- BIGTEN-NIL_00143755
- BIGTEN-NIL_00143844
- BIGTEN-GIA252905
- CLEMSON_000045
- CUSA-GIA_00000509
- DUKE NIL 0000095
- EA_NIL_00000103
- KU00007646
- NBPA_000086
- NFLPA_0000010
- NCAAGIA00722989
- NCAAGIA02196735
- NCAAGIA03941962
- NCAAHOUSE00249333
- NCAAPROD00605421
- NFLPA_0000010
- PAC12HOUSE_00001911
- PAC12HOUSE_00143909
- SEC-HOUSE0047791
- SEC-HOUSE0113462
- VIL_000001

CONFIDENTIAL                    ©2022 DESSER SPORTS MEDIA, INC.

- WNBPA-000001

C) <u>Internet Sources</u>

- https://www.apple.com/newsroom/2022/03/apple-and-mlb-announce-friday-night-baseball-schedule-beginning-april-8/
- https://assets.kpmg/content/dam/kpmg/pdf/2015/09/gvi-profitability.pdf
- https://awfulannouncing.com/2016/report-shows-americans-love-to-watch-their-sports-live.html
- https://www.bloomberg.com/news/articles/2021-03-18/nfl-signs-historic-tv-deal-with-amazon-taking-thursday-rights
- https://www.bloomberg.com/news/articles/2022-10-06/espn-said-to-be-near-large-new-partnership-with-draftkings
- https://www.cbssports.com/college-football/standings/Conference/FBS/IA
- https://www.chicagotribune.com/sports/ct-locker-room-speeches-on-camera-greenstein-spt-1-20141009-column.html
- https://collegefootballplayoff.com/sports/2022/3/16/semifinals-2122.aspx
- https://cosmic-s3.imgix.net/3c7a0a50-8e11-11e9-875d-3d44e94ae33f-2017-NBA-NBPA-Collective-Bargaining-Agreement.pdf
- http://www.espn.com/college-football/gamecast/index_screen
- https://footballfoundation.org/news/2020/5/27/2019_Attendance_and_Ratings.aspx
- https://leadersinsport.com/sport-business/articles/unified-measurement/
- https://medium.com/run-it-back-with-zach/Conference-realignment-all-the-moves-coming-in-2022-25-130ef706da55
- https://www.mlssoccer.com/apple/
- https://mountain.com/blog/mvpd-and-vmvpd-differences-and-similarities-explained/
- https://www.ncaa.org/sports/2013/11/22/distributions.aspx
- https://ncaagenderequityreview.com/
- https://www.nfl.com/videos/channel/nfl-mic-d-up-vc
- https://nflpaweb.blob.core.windows.net/website/PDFs/CBA/March-15-2020-NFL-NFLPA-Collective-Bargaining-Agreement-Final-Executed-Copy.pdf
- https://www.nytimes.com/2018/05/14/us/politics/supreme-court-sports-betting-new-jersey.html
- https://www.nytimes.com/2022/09/02/sports/ncaafootball/college-football-playoff-expansion.html
- https://pac-12.com/article/2022/07/26/pac-12-Networks-set-feature-robust-coverage-2022-football-season
- https://www.showbuzzdaily.com
- https://www.si.com/extra-mustard/2022/09/22/thursday-night-football-amazon-prime-ratings
- https://www.si.com/tv/nfl/2022/09/15/thursday-night-football-amazon-prime-streaming-nfl-watch-schedule-games

CONFIDENTIAL                              ©2022 DESSER SPORTS MEDIA, INC.

- https://www.sportico.com/business/media/2022/nfl-games-account-for-75-of-the-100-most-watched-broadcasts-of-2021-1234657845/
- https://www.sportsbusinessjournal.com/Journal/Issues/2022/01/10/Upfront/Ratings.aspx
- https://www.sportsbusinessjournal.com/Journal/Issues/2022/03/21/Upfront/College-basketball.aspx
- https://www.sportsbusinessjournal.com/Journal/Issues/2022/04/04/Upfront/Top-50-telecasts.aspx
- https://www.sportsbusinessjournal.com/Journal/Issues/2022/08/22/In-Depth/Media-rights-side.aspx
- https://www.sportsmediawatch.com
- https://www.sportsmediawatch.com/2022/09/amazon-thursday-night-football-ratings-impressive-debut-chargers-chiefs/
- https://www.sportsmediawatch.com/ncaa-final-four-ratings-history-most-watched-games-cbs-tbs-nbc/
- https://www.sportsmediawatch.com/womens-final-four-ratings-history-espn/
- https://www.tatari.tv/insights/all-impressions-are-equal--but-some-more-equal-than-others
- https://tvnewscheck.com/business/article/tv-sports-advertising-shifts-into-juggernaut-mode
- https://www.usatoday.com/story/sports/college/2014/07/18/ncaa-name-and-likeness-release-student-athlete-statement-form/12840997/

CONFIDENTIAL                                    ©2022 DESSER SPORTS MEDIA, INC.