# EXHIBIT 4

Steve W. Berman (*pro hac vice*)
Emilee N. Sisco (*pro hac vice*)
Stephanie Verdoia (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
emilees@hbsslaw.com
stephaniev@hbsslaw.com

Benjamin J. Siegel (SBN 256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
bens@hbsslaw.com

*Counsel for Plaintiffs and the Proposed Classes*

Jeffrey L. Kessler (*pro hac vice*)
David G. Feher (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
Adam I. Dale (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4698
Facsimile: (212) 294-4700
jkessler@winston.com
dfeher@winston.com
dgreenspan@winston.com
aidale@winston.com

Jenifer E. Parsigian (SBN 289001)
101 California Street, 34th Floor
San Francisco, CA 94111
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
jparsigian@winston.com

*Counsel for Plaintiffs and the Proposed Classes*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | **Case No. 4:20-cv-03919 CW**<br><br>**EXHIBIT 61 TO THE DECLARATION OF STEVE W. BERMAN IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF HAGENS BERMAN SOBOL SHAPIRO LLP AS CO-LEAD CLASS COUNSEL**<br><br>**[REDACTED VERSION]** |

# EXHIBIT 61

# FILED UNDER SEAL

BARBARA OSBORNE  Network Strictly Confidential                June 15, 2023
HOUSE AND PRICE vs NCAA

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION


GRANT HOUSE and SEDONA PRICE,  )

on behalf of themselves and    )

all others similarly situated, )

        Plaintiffs,            ) Civil Action No.

  v.                            ) 4:20-cv-03919-CW

NATIONAL COLLEGIATE ATHLETIC    )

ASSOCIATION; PAC-12 CONFERENCE;)

THE BIG TEN CONFERENCE, INC.;  )

THE BIG TWELVE CONFERENCE,      )

INC.; SOUTHEASTERN CONFERENCE; )

and ATLANTIC COAST CONFERENCE, )

        Defendants.            )

_____ )


** NETWORK STRICTLY CONFIDENTIAL **


VIDEO DEPOSITION OF BARBARA OSBORNE

June 15, 2023, 9:41 a.m. CST

150 North Riverside Plaza

Chicago, Illinois 60606


Job No. J9780979

BARBARA OSBORNE  Network Strictly Confidential                          June 15, 2023
HOUSE AND PRICE vs NCAA

Page 20

1    question is:

2          You don't teach any courses in the

3    economics department, do you?

4          A  No, I do not.

5          Q  Okay.  So staying on page 1 to 2 of your

6    résumé, this shows your professional experience

7    going back to -- let's see, it goes back even

8    longer than I thought.  Sorry.  It goes back to

9    19 -- 1983; is that correct?

10         A  Correct.

11         Q  Okay.  And on page 2, it shows that you

12   worked for several years at Brandeis University in

13   Waltham, Massachusetts --

14         A  Yes.

15         Q  -- is that correct?

16         A  Yes.

17         Q  Okay.  Like I said, my mom went there, as

18   did my first cousin, so very familiar with the

19   school.  Great school.

20         Brandeis University competes in NCAA

21   athletics at the Division III level, correct?

22         A  Yes, it does.

23         Q  Okay.  And that's lower than Division I

24   and lower than Division II, correct?

25         A  Yes.

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 30

1    Q  Okay.  Thank you.  Thank you for when you

2  remembered today --

3    A  Yeah.

4    Q  -- volunteering that.

5       Just to go back, where was -- I was asking

6  about different types of expert analysis or

7  testimony you've given.

8       So this is the first time you're analyzing

9  an expert's proposed model for measuring past

10  damages; is that correct?

11       MS. CAPPS:  Objection, form.

12       THE WITNESS:  Yes, it is.

13  BY MR. SIEGEL:

14    Q  Okay.  Prior to this case, have you ever

15  been employed in a permanent or contracting

16  position by any of the defendants in this case?

17       MS. CAPPS:  Objection, form.

18       THE WITNESS:  No.

19  BY MR. SIEGEL:

20    Q  Okay.  So you've never worked for the NCAA

21  before?

22    A  No.

23    Q  Or any of the Power Five conferences?

24    A  No.

25    Q  And just to be clear, you understand that

BARBARA OSBORNE  Network Strictly Confidential
HOUSE AND PRICE vs NCAA                                    June 15, 2023

Page 47

1    BY MR. SIEGEL:

2        Q  Sure.  I'm just -- so you -- so

3    in -- generally, your conclusion as you're

4    expressing in this paragraph, is that

5    Professor Rascher's broadcast NIL model implicates

6    the Title IX obligations of the Power Five member

7    schools; is that right?

8            MS. CAPPS:  Objection, form.

9            THE WITNESS:  Yes, in this paragraph, it

10   describes the reasons why these payments would be

11   implicated by Title IX.

12   BY MR. SIEGEL:

13       Q  Right, these payments implicate -- I think

14   specifically -- I'm not -- I'm really trying to

15   get down exactly what your opinion is.

16           So based on these facts --

17       A  Mm-hmm.

18       Q  -- and your assessment of Dr. Rascher's

19   model, you believe that the broadcast NIL model

20   that he proposes implicates the Title IX

21   obligations of the schools, correct?

22           MS. CAPPS:  Objection, form.

23           THE WITNESS:  Actually, it says that it

24   applies to the broadcast revenue that the

25   conferences distribute to their member schools.

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 48

1    BY MR. SIEGEL:

2        Q   Right.  I -- yes, that aspect of his

3    model, that's a part of his model, right?

4        A   Correct.

5        Q   But you're saying -- I guess all I'm

6    trying to say is you believe that that aspect of

7    his model, when you look at the facts including

8    the relationship between the schools and the

9    conferences, you believe that that aspect of his

10   model implicates the Title IX obligations of the

11   schools?

12           MS. CAPPS:  Objection, form.

13           THE WITNESS:  Yes.

14   BY MR. SIEGEL:

15       Q   Okay.  Obligates, implicates, I'm not

16   trying -- I'm not trying to use the wrong word.

17   I'm just -- you know, okay.

18           I mean, I guess, this is another way to

19   say it, is that, you know, based on your review of

20   the statute, and I believe the regulations, and

21   you're looking at the relationship between the

22   schools and the conferences, again, you believe

23   that the model implicates the schools' Title IX

24   obligations; is that right?

25           MS. CAPPS:  Objection, form.

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 49

1              THE WITNESS:  So this is about -- the

2     model is about the conference payments --

3     BY MR. SIEGEL:

4         Q   Uh-huh.

5         A   -- and so because of how all of this works

6     together and because of the institutional

7     involvement, it -- Title IX is implicated in this

8     conference scheme.

9         Q   Right, but Title IX obligations of the

10    schools?

11        A   Schools do have Title IX obligation.

12        Q   Right.  So we're going to get to this

13    later but I think -- and I'm really just trying to

14    understand your opinion, because you -- we'll get

15    to this later, but you agree that the conferences

16    are not subject to Title IX?

17             MS. CAPPS:  Objection, form.

18    BY MR. SIEGEL:

19        Q   Is that true?

20        A   Yes.

21        Q   Okay.  And, however, because of the way

22    you understand this model to work and the

23    relationship between the conferences and the

24    schools, you believe that how the model works

25    would implicate the Title IX obligations of the

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 50

1    schools?

2          MS. CAPPS:  Objection, form.

3          THE WITNESS:  I believe that the way the

4    model works that Title IX would be applied to this

5    model.

6    BY MR. SIEGEL:

7      Q  Okay.  Applied to the schools'

8    responsibilities under the model?

9          MS. CAPPS:  Objection, form.

10         THE WITNESS:  The schools' involvement

11   under the model is part of what implicates

12   Title IX.

13   BY MR. SIEGEL:

14     Q  Part of what implicates the schools'

15   obligation under Title IX, right?  The schools are

16   the ones that have the obligations under Title IX,

17   right?

18     A  Schools --

19         MS. CAPPS:  Objection, form.

20         THE WITNESS:  Sorry.

21         Schools always have the obligation under

22   Title IX.

23   BY MR. SIEGEL:

24     Q  Okay.  And what you're saying is the way

25   this model work, some would argue, you know, that

Page 51

1   the schools -- the schools' Title IX obligations

2   are not implicated by the model, but you're

3   concluding that their obligations are implicated

4   by the way this model works, correct?

5          MS. CAPPS:  Objection, form.

6          THE WITNESS:  So, again, because of the

7   schools' involvement with the conferences, so the

8   plaintiffs' model is a model that requires direct

9   payments from the conferences to the

10  student-athletes.  Whereas the conferences in

11  general might not be or would not be subject to

12  Title IX because of the deep involvement of the

13  member institutions with the conferences.  I do

14  believe that this model and these transactions

15  would be subject to Title IX.

16  BY MR. SIEGEL:

17     Q  Right.  And, therefore, the schools'

18  responsibilities under Title IX would be

19  implicated?

20     A  I don't make that conclusion.

21     Q  So you don't make that -- so your -- I

22  guess I'm -- I guess I'm a little confused here,

23  because really I thought the whole -- the

24  whole -- the point of -- the point of this part of

25  your opinion was that Title IX obligations would

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 52

1    be implicated, and the schools would have to be

2    concerned about that because they're the ones that

3    have to comply with Title IX.

4         MS. CAPPS:  Objection, form.

5         THE WITNESS:  Yes, that is true, that the

6    schools would have to be concerned about this, and

7    it would, if applied.

8    BY MR. SIEGEL:

9      Q  And it would implicate their own Title IX

10   responsibilities, correct?

11     A  It has a dramatic impact on their own

12   Title IX responsibilities, yes.

13     Q  Okay.  It implicates them.  You don't like

14   the word "implicate"?  I mean, I'm --

15     A  Yes.

16     Q  Okay.  I don't think it's controversial.

17   It's part of your opinion.  But anyway...

18         MS. CAPPS:  Objection, form.

19   BY MR. SIEGEL:

20     Q  That was the hardest paragraph, I have to

21   admit, to discuss with you.  So I'm glad we got

22   through it.

23         MS. CAPPS:  Objection, form.

24   BY MR. SIEGEL:

25     Q  In paragraph 31, please, if you look at

BARBARA OSBORNE  Network Strictly Confidential                June 15, 2023
HOUSE AND PRICE vs NCAA

Page 57

1   reviewed the model and the facts and the

2   depositions under Title IX, which is your primary

3   area of research, your conclusion was that it

4   violated Title IX, right?

5          MS. CAPPS:  Objection, form, assumes facts

6   not in evidence, misstates her testimony and

7   misstates the report.

8          THE WITNESS:  So I believe I've answered

9   that question several times.  I'm not providing a

10  legal conclusion.  I'm providing my opinion about

11  how I would apply the law.

12  BY MR. SIEGEL:

13    Q  How you would apply the law to -- to the

14  model and the facts, right?

15         MS. CAPPS:  Objection, form.

16         THE WITNESS:  Yes.

17  BY MR. SIEGEL:

18    Q  And after you applied the model to the law

19  and the facts, you come to this conclusion that

20  the payment scheme is a violation of Title IX,

21  right?

22         MS. CAPPS:  Objection, form, misstates her

23  testimony and the report.

24         You can answer the question.

25         THE WITNESS:  Yes.

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 68

1    your opinion is that Title IX does not -- your

2    opinion, as you sit here today, is that Title IX

3    does not apply to the conference or the --

4    conferences or the NCAA?

5        A  Yes.

6        Q  Okay.  And you cite for that proposition,

7    footnote 57, which says:

8            National Collegiate Athletic Association,

9    it gives a Supreme Court cite but it's actually --

10       A  Smith.

11       Q  -- Smith.  NCAA vs Smith?

12       A  Right.

13       Q  Okay.  I make those mistakes in my briefs

14   all the time.

15           MS. CAPPS:  Objection, form.

16   BY MR. SIEGEL:

17       Q  So you rely on the Supreme Court's

18   decision in NCAA vs Smith for your conclusion that

19   the conferences are not subject to Title IX,

20   correct?

21       A  Yes.  Based on the Court's analysis in

22   that particular case, they conclude that the NCAA

23   is not subject to Title IX; and because

24   conferences are voluntary membership institutions

25   similar to the NCAA, I also assume that the

Page 69

1    conferences are not as well.

2        Q  You -- you assume or is that -- is that

3    your analysis?

4        A  I state.

5        Q  Is that your anal- -- is your analysis

6    that based on the Supreme Court's decision in

7    Smith, the conferences are also not subject to

8    Title IX under -- under the holding of Smith?

9        A  Yes.

10       Q  Okay.  Besides what you've already stated,

11   can you further elaborate on why the conferences

12   are not subject to Title IX under Smith?

13           MS. CAPPS:  Objection, form.

14           THE WITNESS:  Beyond what I already

15   stated, no.

16   BY MR. SIEGEL:

17       Q  Okay.  Can you restate that again, because

18   I just -- I think I might have missed that?

19           MS. CAPPS:  Objection, form.  There's no

20   question.

21   BY MR. SIEGEL:

22       Q  Can you restate your reasoning for why you

23   believe the Supreme Court's decision in NCAA vs

24   Smith would lead to the conclusion that the

25   conferences are also not subject to Title IX?

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 98

1    is one of your expert opinions that you're

2    expressing in this report that if -- the broadcast

3    model implicates the Title IX obligations of the

4    member schools of the conferences?

5          MS. CAPPS:  Objection, form.

6          THE WITNESS:  It has an impact on the

7    schools, absolutely, so implicates their

8    obligations, yes.

9    BY MR. SIEGEL:

10     Q  That is one of the expert opinions in your

11   report?

12     A  Yes.

13     Q  Okay.  Is -- is -- is it an expert opinion

14   in your report that the broadcast NIL model

15   implicates Title IX obligations for the

16   conferences?

17         MS. CAPPS:  Objection, form, asked and

18   answered.

19         THE WITNESS:  No.

20   BY MR. SIEGEL:

21     Q  Okay.  Okay.  In your report, did you

22   identify any case that found a school liable under

23   Title IX because of the actions of the conferences

24   of which it was a member?

25     A  No.

BARBARA OSBORNE  Network Strictly Confidential                              June 15, 2023
HOUSE AND PRICE vs NCAA

Page 99

 1      Q   Has any U.S. body with legal authority

 2   ever found a school liable under Title IX because

 3   of the actions of the conferences under which it

 4   was a member?

 5      A   Not to the best of my knowledge.

 6      Q   Okay.  Yet this is one of your opinions,

 7   as you just stated, based on your application of

 8   your view of the facts in this case as applied to

 9   Title IX statute, its governing regulations --

10          MS. CAPPS:  Objection, form.

11   BY MR. SIEGEL:

12      Q   -- that -- guidance letters and other

13   administrative guidance, correct?

14          MS. CAPPS:  Objection, form, asked and

15   answered.

16          THE WITNESS:  Yes, I conclude that this

17   model would be implicated by Title IX that I --

18   I'm not aware of anything else because that model

19   that is proposed by Mr. Rascher did not exist

20   until he created it.

21   BY MR. SIEGEL:

22      Q   Okay.

23      A   So --

24      Q   But there hasn't been any case that's ever

25   found a school --

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 102

1  detail on page 31, Section A.

2      A  Okay.

3      Q  Okay.  You say that one -- one factor for

4  this conclusion that we just discussed is that

5  conferences are governed and controlled, in your

6  opinion, by a board of directors and composed of

7  representatives of member institutions.  Correct?

8      A  Yes.

9      Q  Okay.  And, again, you didn't cite any

10 legal authority holding that this makes schools

11 liable for the actions of conferences, did you?

12     MS. CAPPS:  Objection, form.

13     THE WITNESS:  No.

14 BY MR. SIEGEL:

15     Q  Okay.  Are you an expert in entity law?

16     A  Can you tell me what entity law is?

17     Q  Like corporations law.

18     A  Oh, I -- no, I'm not an expert in

19 corporate law, no.

20     Q  Are you an expert in piercing the

21 corporate veil?

22     A  I'm not an expert in that area, no.

23     Q  Okay.  And for factual support for this

24 proposition, you cite only the declarations of

25 conference and school officials and the conference

Page 103

1    bylaws and the handbooks, correct?  And you can

2    look at your citations if you want.

3        A  Could you repeat the question?

4        Q  Sure.

5           On page 31 and 32, when you're discussing

6    that prong -- that factor of your analysis, you

7    cite only the declarations of conference officials

8    in various conference bylaws, handbooks and

9    constitutions.

10       A  Yes.

11       Q  Okay.  You don't cite anything else?

12       A  No, because this is just showing how the

13   conferences are made up of their member

14   institutions and how they operate.  So those would

15   be the appropriate documents to rely on in my

16   opinion.

17       Q  Okay.  But, again, you don't cite any case

18   law to support the position of this supposed

19   control of the schools, of the conferences,

20   subject schools to Title IX liability for the

21   actions of the conferences, right?

22       A  No.

23       Q  So I'm going to go through that, I'm going

24   to go through that list on 78 but -- so I want to

25   talk about the second bullet point, which I think

BARBARA OSBORNE  Network Strictly Confidential                     June 15, 2023
HOUSE AND PRICE vs NCAA

Page 123

1      Q  -- generally these provisions on financial

2   assistance apply to scholarship aid.  That's

3   generally what's at issue?

4          MS. CAPPS:  Objection to form.

5          THE WITNESS:  No, that's not correct.

6   Scholarship aid is included --

7   BY MR. SIEGEL:

8      Q  Okay.

9      A  -- but in financial assistance, it talks

10  about assisting anyone that provides any type of

11  assistance, not just --

12     Q  Okay.

13     A  -- aid.

14     Q  Yeah, I understand that.

15         What I'm saying is:  Are you aware of any

16  court cases that have addressed the question of

17  whether the regulations, provisions on financial

18  assistance apply to nonscholarship aid?  Any

19  courts that have interpreted that?

20     A  I am not aware of any cases.

21     Q  Okay.  Are you aware of any policy

22  interpretation or letter produced by the U.S.

23  Department of Education that has answered that

24  question?

25         MS. CAPPS:  Objection, form.

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 137

1    summing up -- the -- what the broadcast model will

2    do is the opposite of what happened in Cohen,

3    correct?  Why don't I just read you what you said.

4       A  Yes.  It says:

5          While the broadcast model does the

6    opposite of the action in Cohen -- and by that I

7    meant it doesn't demote teams, it elevates teams.

8    It says:

9          By elevating some teams to a higher level

10   of treatment to the exclusion of all others.

11         So, in essence, you're doing the same

12   thing.  You have unequal participation

13   opportunities based on sex, whether you're

14   demoting or elevating.

15      Q  Okay.  And again, you're not aware of any

16   legal authority that's analogous to the set of

17   facts here, as opposed to being the opposite, that

18   supports your conclusion that plaintiffs'

19   broadcast model would violate the participation

20   opportunities found with Title IX, correct?

21      A  No, I'm not aware of any.

22      Q  Okay.  So this is a novel conclusion based

23   on your legal analysis of that case law, correct?

24         MS. CAPPS:  Objection, form.

25         THE WITNESS:  It is, because I think it's

BARBARA OSBORNE  Network Strictly Confidential                June 15, 2023
HOUSE AND PRICE vs NCAA

Page 138

1    the appropriate application of the law.  But this

2    is a novel broadcast model that's never been

3    looked at before.

4    BY MR. SIEGEL:

5        Q   Okay.  And you've acknowledged

6    in -- you've acknowledged in the past that through

7    its bylaws, the NCAA controls the number of roster

8    spots and corresponding number of scholarships

9    that schools may provide, correct?

10       A   Yes, the NCAA does that.

11       Q   Okay.  And this -- this

12   interpretation -- whether you're right -- whether

13   you're right or wrong or not, whether or not this

14   opposite situation violates Title IX is another

15   example of an issue that -- whose answer would not

16   vary depending on the identity of the plaintiff,

17   correct?

18       A   No.  It depends on the situation, not the

19   identity of a party.

20       Q   Right.  But I'm saying whether or not

21   the -- the elevation of a team, meaning, you know,

22   the broadcast model versus -- your claimed

23   elevation of a team, I'm not agreeing with that,

24   but as opposed to the demotion of a team, whether

25   or not that is a corresponding situation that

BARBARA OSBORNE  Network Strictly Confidential                June 15, 2023
HOUSE AND PRICE vs NCAA

Page 144

 1   things.

 2       Q  I'm saying as a legal -- I'm not saying as

 3   a practical matter.  I'm saying as a legal matter.

 4          MS. CAPPS:  Objection.

 5   BY MR. SIEGEL:

 6       Q  Are you -- are you saying that --

 7          MS. CAPPS:  Form.

 8   BY MR. SIEGEL:

 9       Q  -- if -- are you saying that if a certain

10   amount of compensation is given to male athletes

11   and is held to be subject to Title IX, that you

12   cannot provide an equal amount of compensation to

13   female athletes to resolve any Title IX issues?

14          MS. CAPPS:  Object to form.

15          THE WITNESS:  Okay.  So you're saying

16   hypothetically --

17   BY MR. SIEGEL:

18       Q  Yes.

19       A  -- right?  Or are you saying specifically?

20       Q  I'm saying hypothetically.

21       A  Okay.  So hypothetically, if institutions

22   were providing unequal aid that they could -- that

23   they -- or if there was a source of -- so your

24   hypothetical is if there's a source that's coming

25   in to provide a benefit aid-wise to one sex --

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 145

1      Q   Mm-hmm.

2      A   -- the institution can just fix that by

3   providing an equal amount on the other side.

4      Q   Could they?

5          MS. CAPPS:  Objection, form.

6   BY MR. SIEGEL:

7      Q   Hypothetically?

8      A   Hypothetically, it's possible.

9      Q   There's no legal -- I'm saying it's not --

10   it wouldn't be -- it wouldn't be -- it wouldn't be

11   illegal to do that?

12          MS. CAPPS:  Objection, form, calls for a

13   legal conclusion.

14          THE WITNESS:  It would not be a violation

15   or it wouldn't be illegal as far as I know.  But

16   that's not Rascher's model.

17   BY MR. SIEGEL:

18      Q   Okay.  Does Rascher's model say anything

19   about what schools or conferences can or cannot

20   provide outside of what his model provides?

21      A   No.  Rascher's model says what needs to be

22   provided, and his model provides an enormous

23   amount of benefit to men and a teeny-tiny little

24   benefit to women.

25      Q   Well, it's not what needs to be provided.

BARBARA OSBORNE  Network Strictly Confidential                June 15, 2023
HOUSE AND PRICE vs NCAA

Page 158

1          THE WITNESS:  I understand that the
2     defendants have filed a motion in opposition of
3     the class action, and -- but other than that, I'm
4     not aware of any of the other legal proceedings --
5     BY MR. SIEGEL:
6          Q  Yeah, that --
7          A  -- in this case.
8          Q  Sorry.  You read plaintiffs' motion for
9     class certification, correct?
10         A  Yes.
11         Q  So you understand that plaintiffs have
12    moved to certify their damages classes?
13         A  Yes.
14         Q  And they have moved to certify an
15    injunctive relief class?
16         A  Yes.
17         Q  Okay.  And the claim that you've been
18    focused on is the claim in the absence of the NIL
19    rules.  There would have been compensation paid
20    to, at a minimum, Power Five full scholarship
21    football and men's and women's basketball players
22    for use of their NILs in broadcast?
23         A  I think you threw me off at the beginning
24    of that sentence.
25         Q  Sure.  I was saying one of their claims,

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 165

1          MS. CAPPS:  Objection, form.

2          THE WITNESS:  I -- yes, I looked at the

3     broadcast model and applied Title IX, and so I

4     offered my opinion as whether or not Title IX

5     would be implicated by that model.

6     BY MR. SIEGEL:

7        Q  Okay.  And again, you're opining about

8     Dr. Rascher's class-wide methodology for awarding

9     past damages to Power Five Conference football and

10    men's and women's basketball players, right?

11       A  Yes.

12       Q  Okay.  And, again, if you look at -- if

13    you look at your table of contents, Part V, one

14    conclusion is that plaintiffs' broadcast model

15    violates Title IX?

16       A  Yes.  I was going for a punchy headline.

17       Q  And you succeeded.

18          And, again, you understand that

19    Dr. Rascher's broadcast NIL damages model, in his

20    class certification report, is designed to explain

21    to the Court, among other things, how plaintiffs

22    can prove past class-wide impact and measure past

23    damages to award damages to members of the Power

24    Five men's football and basketball class and

25    women's basketball class?

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 176

1      Q   Okay.  And you also understand that your

2  report is not intended to be an expert report on

3  the merits, correct?

4      A   Of the case?

5      Q   The merits of the case, correct?

6      A   No.

7      Q   It's an -- opposing plaintiffs' motion for

8  class certification?

9      A   It is an expert report on how Title IX is

10 implicated by the plaintiffs' broadcast model.

11     Q   But it's intended to be an expert report

12 in support of defendants' opposition to

13 certification of plaintiffs' past damages

14 broadcast NIL class?

15     A   Yes.

16         MR. SIEGEL:  Okay.  It's fine for a break

17 now.

18         THE VIDEOGRAPHER:  We are going off the

19 record at 1:40.

20         (Recess taken.)

21         THE VIDEOGRAPHER:  We are back on the

22 record at 2:00 p.m.

23 BY MR. SIEGEL:

24     Q   Professor Osborne, you agreed at the

25 beginning of this deposition you don't have a

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 177

1  master's, Ph.D., or other advanced degree in

2  economics, right?

3      A  I do not.

4      Q  Okay.  And you don't teach any economics

5  courses, do you?

6      A  I do not.

7      Q  Okay.  And you're not offering an expert

8  economic opinion in your report?

9      A  Absolutely am not.

10     Q  And you've never been an administrator at

11 a school with a D1 athletic program, correct?

12     A  I have not.

13     Q  Or an administrator, permanent position,

14 at a school with a football team?

15     A  No.

16     Q  Okay.  And the last time you were part of

17 an athletic department's permanent staff was 1998,

18 correct?

19     A  Yes.

20     Q  Okay.  Can you turn to page 52 of your

21 report.

22        Are you there?

23     A  Um-hmm.

24     Q  Okay.  I just want to read to you

25 paragraph 131:

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 179

```
 1      A   Okay.

 2      Q   I'll just take your word for it there.

 3          Did you conduct any independent studies

 4   for this case of what the impact of Rascher's

 5   damages model would have been on Power Five

 6   athletic programs during the class period?

 7      A   No.

 8      Q   So you didn't do any empirical work on

 9   this point, correct?

10      A   No, I did not.

11      Q   And certainly nothing -- no independent

12   studies to show that it -- that it would require a

13   massive overhaul of any NCAA athletic programs?

14      A   What do you mean by "no independent

15   studies"?

16      Q   You didn't do any empirical independent

17   work to determine whether or not it would have

18   required a massive overhaul of any NCAA athletic

19   programs?

20      A   No.  I looked at past research that had

21   been done relative to Title IX.

22      Q   But none of the academic studies or

23   analyses that you cited was anything close to an

24   analysis of Rascher's damages proposal to support

25   the contention that a massive overhaul would have
```

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 180

1    been required, right?

2         MS. CAPPS:  Objection, form.

3         THE WITNESS:  No.  None of those other

4    studies involved the amount that Rascher's model

5    would have.  And again, Rascher's model is brand

6    new, so nobody else could have studied it or

7    implications of it.

8    BY MR. SIEGEL:

9         Q  But an economist or someone with the

10   proper credentials could have done an empirical

11   analysis to determine whether or not spending the

12   amount of money implicated by Dr. Rascher's model

13   would have required a massive overhaul of

14   Division I programs during the class period,

15   correct?

16        A  As I said, I'm not an economist, and I've

17   never studied that, so I can't give an opinion

18   about that.

19        Q  You certainly didn't do one?

20        A  I didn't do any economic studies relative

21   to this, no.

22        Q  And none of these studies that are -- that

23   you cited are of any circumstance closely

24   analogous to what you believe to be the

25   consequences of Rascher's damages model, correct?

Page 183

1    payments would require massive overhauls to

2    athletic programs.

3         A  Yes.

4         Q  So that necessarily would require looking

5    at the budgets and expenditures and resources of

6    athletic programs during the class period?

7         A  Yes.  And in doing a Title IX audit, you

8    regularly look at budgets and figures and all of

9    those things, but it is not an economic analysis.

10        Q  You don't cite any of those Title IX

11   audits or any other analyses that you or anyone

12   else has done that comes remotely close to

13   supporting what you're saying, do you?

14        MS. CAPPS:  Objection form.

15        THE WITNESS:  No, I'm just applying the

16   regulations, et cetera, and showing that impact,

17   but this is my conclusion, yes.

18   BY MR. SIEGEL:

19        Q  Okay.  Page 53, at the top you write:

20        It would be virtually impossible to locate

21   sufficient additional funds to ensure some form of

22   compensation for female student-athletes

23   proportional to the significant amount that

24   plaintiffs contemplate for male studies -- for

25   student-athletes under the broadcast model.

Page 184

1          Is that -- is that one of your expert

2     opinions in this report?

3       A  It is.

4       Q  Okay.  Again, you did no independent

5     studies to actually support that opinion --

6          MS. CAPPS:  Objection, form.

7     BY MR. SIEGEL:

8       Q  -- did you?

9       A  No, because --

10         MS. CAPPS:  Same objection.

11         THE WITNESS:  -- an independent study is

12    not necessary when you just look at the amounts

13    that are involved and how that impacts an

14    athletics department.

15         MR. SIEGEL:  I'll strike that as

16    nonresponsive.

17    BY MR. SIEGEL:

18      Q  In addition to no independent studies,

19    again, none of the secondary sources you cite are

20    doing any kind of analysis that would be relevant

21    to -- strike that.

22         None of the secondary sources you cite are

23    analyses of how many -- how much additional funds

24    would be needed to compensate female

25    student-athletes proportional to the amounts that

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 185

```
 1   plaintiffs contemplate for male student-athletes

 2   under the broadcast model --

 3          MS. CAPPS:  Objection, form.

 4   BY MR. SIEGEL:

 5      Q  -- correct?

 6          MS. CAPPS:  Same objection, form.

 7          THE WITNESS:  Can you repeat that, please?

 8   BY MR. SIEGEL:

 9      Q  Yeah.  I'm just asking if any of these

10   secondary sources are examining the amount of

11   additional funds that are necessary to compensate

12   female student-athletes for certain levels of

13   expenditures for male student-athletes?

14          MS. CAPPS:  Object to form.

15          THE WITNESS:  No, none of those -- I've

16   repeated this several times, that none of those

17   studies can contemplate something that was just

18   created.

19          But on the very next page, it explains how

20   we -- you know, that from Rascher's model, there

21   are these numbers.  And those numbers, I think,

22   speak for themselves in what kind of an impact

23   they would have on an athletics department.

24   BY MR. SIEGEL:

25      Q  Okay.  You looked at -- you looked at the
```

Page 186

1   spending on average in one conference.

2        Is that -- is that what you've done here?

3    A  To provide an example, yes.

4    Q  Okay.  But you don't look at the budget of

5   the schools in that conference to determine

6   whether or not a massive overhaul of the

7   expenditures would be necessary to compensate for

8   the expenditures you identify on page 54, do you?

9    A  I do not do that because a Title IX

10  analysis would have to be unique to each

11  institution, and it would take a while to do all

12  of that.  And it wasn't necessary to do that

13  for --

14   Q  Okay.

15   A  -- this report, because, again, these

16  numbers speak for themselves.

17   Q  Like, for example, you didn't look at --

18  at how conferences spend -- if -- if 10 percent of

19  the broadcast NIL money was provided to college

20  athletes, did you look -- did you do a careful

21  study of how the conferences spend the other

22  90 percent of their revenues --

23        MS. CAPPS:  Objection, form.

24  BY MR. SIEGEL:

25   Q  -- of -- from the broadcast agreements?

BARBARA OSBORNE  Network Strictly Confidential                    June 15, 2023
HOUSE AND PRICE vs NCAA

Page 187

1       A   I didn't do an economic analysis of that,

2   no.

3       Q   So -- and you realize -- 90 -- 90 percent

4   is billions of dollars.  You do understand that,

5   right --

6           MS. CAPPS:  Objection, form.

7   BY MR. SIEGEL:

8       Q   -- of these broadcast agreements during

9   the class period?

10      A   Yes, because this huge number here

11  reflects 10 percent.

12      Q   Right.  So the amount that's -- the

13  90 percent that would have been kept in this

14  but-for world is nine times that?

15      A   Yes, 90 percent is nine times that, yes,

16  math.

17      Q   Math --

18      A   Good.

19      Q   -- right?

20          Okay.  So you didn't -- and you didn't

21  look at, like, for example, how much the

22  conferences spend on their athletic -- on the

23  conference commissioners or how much the schools

24  spend on athletic directors, football coaches,

25  basketball coaches, assistant basketball coaches,

Page 188

1    or any of the other extremely high expenditures on

2    certain personnel --

3              MS. CAPPS:  Objection, form.

4    BY MR. SIEGEL:

5         Q   -- at their athletic department?

6              MS. CAPPS:  Same objection, form.

7              THE WITNESS:  I did not look at any of

8    those things specifically, no, because my job was

9    not to fix this model.  It was to show what the

10   Title IX implications of it would be.

11   BY MR. SIEGEL:

12        Q   I understand that.

13             But you're offering opinions on how

14   many -- the types of expenditures that would be

15   required to not -- the massive overall that would

16   be required of athletic department budgets or that

17   it would be virtually impossible to locate

18   additional funds.  I mean, that's going beyond

19   Title IX.  That's offering an opinion about

20   whether or not financially this is something that

21   would be feasible?

22        A   Right.  It's whether -- whether an

23   institution would be able to comply with Title IX

24   if this spending was required.

25        Q   And you're look -- and you're offering

Page 189

1    opinions on whether or not this financially

2    economically would be feasible?

3        A   That's correct.

4        Q   But you're not an economist.

5        A   No, but this is math.  Doesn't require --

6        Q   Please answer my question:

7            Are you an economist?

8        A   I have already answered that, that I am

9    not.

10        Q   And you've done no empirical studies to

11    support --

12            MS. CAPPS:  Please let her finish her --

13    BY MR. SIEGEL:

14        Q   -- these conclusions?

15            MS. CAPPS:  -- her answers.  You're

16    interrupting each other.

17            MR. SIEGEL:  Sorry.

18    BY MR. SIEGEL:

19        Q   And you've done no empirical studies to

20    support these conclusions?

21        A   No, I'm not an economist.

22        Q   Okay.  And I want you to look at

23    paragraph -- excuse me.

24            On page 53, the middle of page 53, and the

25    last sentence, "Any offsetting payments."

1    CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

2         I, Cynthia J. Conforti, Certified

3    Shorthand Reporter No. 084-003064, CSR, CRR, and a

4    Notary Public in and for the County of Cook, State

5    of Illinois, the officer before whom the

6    foregoing deposition was taken, do hereby certify

7    that the foregoing transcript is a true and

8    correct record of the testimony given; that said

9    testimony was taken by me stenographically and

10   thereafter reduced to typewriting under my

11   direction; that reading and signing was requested;

12   and that I am neither counsel for, related to, nor

13   employed by any of the parties to this case and

14   have no interest, financial or otherwise, in its

15   outcome.

16      IN WITNESS WHEREOF, I have hereunto set my

17   hand and affixed my notarial seal this 19th day of

18   June, 2023.

19

20   My commission expires: October 30, 2023

21

22

23   _____

24   Notary Public in and for the

25   State of Illinois

