# EXHIBIT 5

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

IN RE: COLLEGE ATHLETE NIL
LITIGATION

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

No. 4:20-cv-03919 CW

**EXPERT REPLY REPORT OF DANIEL A. RASCHER**

July 21, 2023

*CONFIDENTIAL*

1.  Qualifications ............................................................................................. 3
2.  Scope of Work ............................................................................................ 3
3.  Summary of Opinions ................................................................................ 5
4.  It is Undisputed By Defendants' Experts That The Anticompetitive Effects of the
    Challenged NIL Rules Can Be Assessed by Means of Common Economic Proof ........ 11
5.  Defendants' Experts Do Not Dispute That Any Asserted Procompetitive Justifications
    and Less Restrictive Alternatives Can Also be Assessed Through Economic Evidence
    Common to All Members of the Proposed Classes ........................................... 12
6.  All Members of Each Proposed Class Suffered Injuries Caused by Defendants'
    Challenged NIL Rules ............................................................................... 13
6.1.  Dr. Tucker's disputes to my opinions regarding class-wide injury are without merit ........ 14
    6.1.1.  There is no basis to dispute my opinion that all class members suffered a common economic injury
            from being denied the opportunity to pursue NIL compensation ..................................... 15
    6.1.2.  There is no basis to dispute my opinion that all Power 5 football and basketball players have suffered
            injury from denial of the opportunity to receive compensation for Broadcast NIL ......................... 20
    6.1.3.  There is no basis to dispute my opinion that all FBS football and men's Division I basketball players
            have suffered injury from the denial of the opportunity to receive compensation for Video Game NIL
            ........................................................................................................................ 24
    6.1.4.  There is no basis to dispute my opinions about class-wide injury based on any claims with regard to
            Title IX or state NIL laws ................................................................................................. 24
    6.1.5.  The existence of professional athlete players unions do not make the NBA and NFL group license
            agreements inappropriate yardsticks for college athlete broadcast NILs ........................................ 26
6.2.  Football and Men's Basketball Class ........................................................... 26
6.3.  Women's Basketball Class ......................................................................... 28
6.4.  Additional Sports Class ............................................................................. 29
6.5.  Injunctive Relief Class .............................................................................. 29
7.  Class-wide Methodologies Are Available for Proving Damages ..................... 30
7.1.  My Class-Wide Methodology for Estimating Video Game Damages Is Well-Supported . 31
    7.1.1.  Basketball game viability ................................................................................................ 41
    7.1.2.  Football game viability .................................................................................................. 42
7.2.  My Class-wide Methodology for Estimating Broadcast NIL Damages Is Well-Supported 44
    7.2.1.  My model uses a competitive equilibrium of conferences competing to provide Broadcast NIL
            payments, consistent with the NCAA's prohibition on compensation for athletic services, to estimate
            damages ....................................................................................................................... 47
    7.2.2.  It is reasonable to model that the conferences would pay equal shares of Broadcast NIL to athletes
            notwithstanding competitive differences among the athletes ................................................... 52
    7.2.3.  My model based on the assumption that the value of Broadcast NIL would be at least 10 percent of
            broadcast revenues is well-supported ................................................................................ 56
    7.2.4.  Title IX considerations do not undermine my Broadcast NIL methodology ................................... 58
7.3.  My Class-wide Methodology for Estimating Damages from Lost NIL Opportunities Is
      Well-Supported ....................................................................................... 60
    7.3.1.  The evolving market for NIL transactions ........................................................................... 66
    7.3.2.  Adjustment of the before-and-after analysis for changes in supply and demand ............................ 69
8.  My Opinions on Class-Wide Injury and Damages Are Not undermined By Any Claimed
    "Substitution Effect" .............................................................................. 82
8.1.  My assessment of class-wide injury is not undermined by claimed substitution effects .... 82
8.2.  Defendants' claimed "ripple effect" of substitution does not undermine my methodology
      for estimating class-wide injury and damages ................................................. 93

*CONFIDENTIAL*

8.3.   Dr. Tucker provides no reliable analysis regarding athlete choices ................................... 96

**9.   Conclusion** ....................................................................................................................**101**

**10.  Signature** .........................................................................................................................**102**

*CONFIDENTIAL*

# 1. QUALIFICATIONS

1. My name is Daniel A. Rascher. At the University of San Francisco (USF), I am Professor and Director of Academic Programs for the Master of Science in Sport Management program. I previously set forth my qualifications and will not repeat them here. Attached as Appendix A is my *curriculum vitae*, which includes my qualifications as an expert witness and my testimonial experience, including my publications from the last 10 years and all cases in the last 4 years where I testified at trial or was deposed.

2. I have previously submitted one expert report in this matter, referred to herein as the "Rascher Report."[1] I am being compensated at an hourly rate of $600 per hour, plus reimbursement of expenses. In my work on this matter, I have been assisted by staff working under my supervision and control at OSKR, LLC, an economic consulting firm where I am a Partner. I have no direct financial interest in the outcome of this matter. I reserve the right to supplement this report.

# 2. SCOPE OF WORK

3. Counsel for Plaintiffs ("House") previously asked me to opine on whether, among other things, I can develop and present common methods at a trial for proving class-wide injury and calculating damages to members of the defined classes based on reliable methodologies.[2] They have now asked me to review the reports and deposition testimony of Professor Catherine Tucker, Mr. Bob Thompson, and Professor Barbara Osborne ("Defendants' Experts," collectively),[3] along with any new relevant information. Based

---

[1] Expert Report of Daniel A. Rascher, October 21, 2022.

[2] Rascher Report, p. 4.

[3] Expert Report of Catherine Tucker, Ph.D., April 28, 2023 ("Tucker Report"), Report of Bob Thompson, Thompson Sports Group, LLC, April 28, 2023 ("Thompson Report"), Expert Report of Barbara Osborne, April 27, 2023 ("Osborne Report"), Deposition of Catherine Tucker, Ph.D. (May 31, 2023, "Tucker Deposition"), Deposition of Bob Thompson (June 8, 2023, "Thompson Deposition"), Deposition of Barbara Osborne (June 15, 2023, "Osborne Deposition").

*CONFIDENTIAL*

on my analysis of these reports, depositions, and new evidence, I have found nothing to cause me to change my previous opinions.

4.    I based my analysis in the Rascher Report, and again here, on the understanding that Plaintiffs seek to certify an injunctive relief class and three damages classes.  These classes are defined as follows:

a)  **Injunctive Relief Class**: "All college athletes who compete on, competed on, or will compete on a Division I athletic team at any time between June 15, 2020 and the date of judgment in this matter.  This Class excludes the officers, directors, and employees of Defendants.  This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action."[4]

b)  **Football and Men's Basketball Class**: "All current and former college athletes who have received full Grant-in-Aid (GIA) scholarships and compete on, or competed on, a Division I men's basketball team or an FBS football team, at a college or university that is a member of one of the Power Five Conferences (including Notre Dame), at any time between June 15, 2016 and the date of the class certification order in this matter.  This Class excludes the officers, directors, and employees of Defendants.  This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action."

c)  **Women's Basketball Class:** "All current and former college athletes who have received full GIA scholarships and compete on, or competed on, a Division I women's basketball team, at a college or university that is a member of one of the Power Five Conferences (including Notre Dame) at any time between June 15, 2016 and the date of the class certification order in this matter.  This Class excludes the officers, directors, and employees of Defendants.  This Class also

---

[4] All class definitions are from Plaintiffs' Notice of Motion and Motion for Class Certification, October 21, 2022.

*CONFIDENTIAL*

excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action."

d) **Additional Sports Class**: "Excluding members of the Football and Men's Basketball Class and members of the Women's Basketball Class, all current or former college athletes who competed on a Division I athletic team prior to July 1, 2021 and who received compensation while a Division I college athlete for use of their name, image, or likeness between July 1, 2021 and the date of the class certification order in this matter and who competed in the same Division I sport prior to July 1, 2021. This Class excludes the officers, directors, and employees of Defendants. This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action."

5.     In the report which follows, I have organized my response in a manner similar to my initial report. I begin with a summary of opinions, which in this report includes responses to the opinions and analysis offered by the Defendants' Experts.

6.     In carrying out this assignment, I have relied upon a number of information sources, including extensive discovery materials provided by counsel and third-party files, laid out in full in Appendix B. I also rely on my years of experience and training as a sports economist and my knowledge of the sports economics literature. To the extent I specifically cite to an article or study, I include that title in this report and in my list of relied upon materials in Appendix B.

## 3.   SUMMARY OF OPINIONS

7.     In my first report, I opined that:

a) The economic issues related to anticompetitive effects, asserted pro-competitive justifications, less restrictive alternatives, class-wide injury, and class member damages can be proven by means of economic evidence and methodologies common to class members.

*CONFIDENTIAL*

b) Evidence common to the classes indicates that all members of each of the classes were injured as a result of the challenged NIL rules.

c) There are common, class-wide methodologies that I can apply to generate reasonable, non-speculative, and reliable estimates of the damages incurred by the class members tied to the antitrust theories of competitive harm asserted by Plaintiffs.[5]

8.  With respect to injury, I opined that, "common proof will be used to demonstrate class-wide injury from the loss of the opportunity to compete for NIL deals in the market, a harm that has been uniformly inflicted on every member of each of the proposed classes by the challenged NCAA restraints."[6]  I proceeded to demonstrate that, "the lost opportunity to pursue NIL deals without restrictions imposed by the challenged NIL rules is a common economic harm to all class members that can be shown through common economic evidence," with several examples of such evidence.[7]  In this report, I demonstrate that Dr. Tucker's disagreements with my opinions about injury are without merit and, in any event, raise disputes common to all class members.

9.  In addition to explaining how this injury to all class members can be shown with common evidence, in my opening report, I described class-wide methodologies to show additional specific injuries to members of each of the proposed damages classes and to estimate class-wide damages for these additional specific injuries, including: (1) foregone compensation for the Video Game use of NILs of class members who were FBS football and Division I men's basketball players, (2) foregone compensation for Broadcast use of NILs of Football and Men's Basketball Class members and Women's Basketball Class members, and (3) foregone compensation of other third-party use of NILs of class

---

[5] Rascher Report, p. 6.
[6] Rascher Report, p. 48.
[7] Rascher Report, pp. 51-57.

*CONFIDENTIAL*

members who were Division I athletes and have been able to enter into one or more third-party NIL agreements under the Current NIL Rules.[8]

10. I found nothing in the Defendants' Experts' reports or testimony disputing my analysis of the anticompetitive effects of the Defendants' conduct, my opinions that those effects can be assessed on a class-wide basis, or my opinion that any claimed procompetitive justifications for the conduct or any less restrictive alternatives can be assessed on a class-wide basis, and I found no analysis that provides any alternative methodologies for estimating damages. Therefore, this report focuses on challenges to my opinions that class-wide injury and class member damages can be proven by means of economic evidence and methodologies common to class members.

11. With respect to my opinion regarding common proof of class-wide injury, the Defendants' Experts focus on the unsubstantiated assertion (as stated by Dr. Tucker) that proof of injury requires "determining which schools proposed class members would have attended in the but-for world."[9] To begin with, this "substitution effect" argument does not apply to my opinions regarding common evidence of class-wide injury from the loss of the opportunity to compete for third-party NIL deals in the market, an injury that is unrelated to the school attended. Common evidence will show that such injury occurred for athletes at any school attended by any class members and would likewise have occurred at any other Division I school. Indeed, Dr. Tucker agreed that class members faced common restrictions to their NIL opportunities.[10] This is true irrespective of the institutions they attended or might have attended in the but-for world.

---

[8] Rascher Report, pp. 58-9, 73, 94.

[9] Tucker Report, p. 21. See Tucker Deposition, 95:12 – 101:15. Dr. Tucker also claims that in the but-for world, one must identify which companies would have contracted with each class member for the use of their NIL. (Tucker Report, pp. 174-181). I address this erroneous claim in Section 7.3.

[10] Tucker Deposition, pp. 64-65.

*CONFIDENTIAL*

12. Nor does the "substitution effect" argument undermine any of my opinions regarding common evidence of injury and damages for foregone compensation. As I explain in detail in Section 8, the common evidence shows that differences in school attendance options from any displacement that might have occurred absent the NIL restrictions would not have been material. Not only is the effect limited in scope because it would have involved only marginal athletes and very few athletes who would have foregone professional opportunities or had the opportunity to and would have made a different choice to attend a Power Five school, but also the data show that there were already sufficient open spots at schools to absorb the small number of athletes who potentially would have made relevant different decisions. Moreover, the small number of potentially displaced athletes would have had substantially similar non-NIL benefits if displaced. For example, any Full GIA FBS football or Division I basketball athlete who might, in a but-for world absent NIL restrictions, have attended a different school would nevertheless have remained within FBS football or Division I basketball with substantially equivalent non-NIL compensation (e.g., their tuition, room, board, books, and miscellaneous expenses to cover their cost of attending school). In this regard, no class member was made better off by the Defendants' NIL restrictions, not by the restrictions directly nor by any putative effect of the restrictions on the availability of slots at top schools. As common evidence demonstrating anticompetitive effects will show, removing the NIL restrictions would provide only economic benefit and never harm to the class members. Dr. Tucker's analysis purporting to show widespread substitution relies on a faulty understanding of the data that 247Sports provided regarding school choices available to incoming athletes.

13. Dr. Tucker presents a number of attacks on my opinions regarding injury. I consider her claims here and demonstrate that her critiques are incorrect as to the economic evidence of injury. Moreover, I explain how her critiques raise only common issues that can be

*CONFIDENTIAL*

addressed through evidence common across class members. Even if her critiques had analytical substance, which I believe they do not, her critiques address the merits of the liability claims and subsequent damages allocations after class-wide damages are established. They are not relevant to determining whether liability issues and class-wide damages can best be addressed for the class(es) using a common methodology and common evidence.

14. With respect to my proposed class-wide methodologies to estimate damages related to additional specific injuries, Defendants' Experts have not demonstrated any substantive critique that causes me to change my previous opinions:

a) I found nothing to undermine the methodology for estimating foregone compensation for use of Video Game NIL. The evidence I present in support of that methodology's assumptions (that the games would exist in the but-for world and result in equal NIL payments to all athletes) is the type of material economists rely on and disproves Dr. Tucker's assertions that the methodology is speculative.[11]

b) I found nothing to undermine my methodology for estimating foregone compensation for use of Broadcast NIL. I demonstrate that my methodology is non-speculative and consistent with the economics of competition for talent in the context of NCAA Division I sports during the damages period for this matter, and derives from a credible economic equilibrium outcome, despite Dr. Tucker's contrary assertions, which fail to account for the context.[12]

c) I found nothing to undermine my methodology for estimating foregone compensation for other use of NIL. In order to provide more detail on the implementation of the methodology that I described in the Rascher Report, I provide in this report a further demonstration regarding adjustments to estimate damages for each year of class member athletic participation.

---

[11] Tucker Report, pp. 229, 237, 242-3. See Section 7.1 below.
[12] Tucker Report, pp. 81, 90, 100, 127, 129, 137, 144-5. See Section 7.2 below.

*CONFIDENTIAL*

15. Dr. Tucker also claims that the proposed damages methodology creates class conflicts. It is my understanding that this is a legal determination and, as such, I have no opinion on the legal question. With respect to economic evidence that may be relevant to this issue, however, I note that there is no economic reason to presume damage awards in an antitrust class action case would be identical for all class members (across multiple classes), which implies that there will be some class members with higher damage awards and some with lower damage awards. It is entirely consistent with economic theory that class members with lower damage awards would desire to have higher damage awards, but it is my understanding that does not constitute a class conflict. Dr. Tucker herself agreed with this at her deposition, explaining that it was "precisely her opinion" that a "soundly based" damages methodology does not create a conflict, "even though it might affect class members differently."[13] My methodologies meet the criteria for a soundly based damages methodology.

16. Specific class conflict issues raised by Dr. Tucker are: (1) possible elimination of some sports (in response to decreased revenues); (2) broadcast NIL damages (a) going to mostly football and men's basketball players, (b) differences across conferences, and (c) not providing superstars more payment from Broadcast NIL and Video Game NIL for unique and relatively higher contribution; and (3) claimed over- and under-compensation for Lost NIL Opportunities due to incomplete information about other NIL transactions that have already occurred. I address each of these below. I include evidence about the general equality of *Alston* payments to qualifying college athletes, not based on athletic desirability, which shows the likelihood of equal payments, along with other evidence demonstrating economic support for equal payments to athletes involved in video game deals and Broadcast NIL licensing as a group. I demonstrate why the fact that some

---

[13] Tucker Deposition, 204:3-205:3.

*CONFIDENTIAL*

recruits may be "more valuable" than others would not lead to unequal Broadcast NIL compensation within conferences.  I show that the payment structure that makes sense for Broadcast NIL in the context of the economics of college sports would be equal payments to each participating athlete from each conference.[14]  Dr. Tucker's contention that conferences would not accept that BNIL compensation limits would be different across conferences ignores the fact that broadcast revenue distributions to schools are already substantially different across conferences.

17.   I also explain that my use of Mr. Desser's 10% Broadcast NIL value percentage and allocation estimates is not speculative, that my Broadcast NIL damages model has payments that are consistent with economic theory and that there are no economic considerations with respect to Title IX that undermine my opinions.  I also demonstrated that my Lost NIL Opportunities damages analysis is fully grounded in standard economic methodologies for valuation and damages assessment.

**4.   IT IS UNDISPUTED BY DEFENDANTS' EXPERTS THAT THE ANTICOMPETITIVE EFFECTS OF THE CHALLENGED NIL RULES CAN BE ASSESSED BY MEANS OF COMMON ECONOMIC PROOF.**

18.   In my previous report, I provided three categories of direct evidence of the anticompetitive effects caused by the challenged NIL Rules that can be presented at trial through economic evidence that is common to the class.[15]  I also demonstrated that the same economic evidence common to the class delineates relevant labor markets, establishes market power and barriers to entry, and that common evidence will show that each of the relevant labor

---

[14]   Some outcomes expected to occur in college sports can differ from professional sports, in part because NCAA rules (beyond just NIL compensation restrictions) impose requirements not present in professional sports and NCAA athletics involves securing the services of participating athletes not represented by unions.  Simplified, professional sports compensation from teams can include both the use of the professional athletes' services, which can be compensated at very different amounts for different athletes, and the use of the athletes' NIL (compensated equally).  Collegiate sports has rules limiting compensation (other than the challenged NIL Rules), which is why there would be distinct payments for broadcast use of the NIL of collegiate athletes.

[15]   Rascher Report, Section 4.1.

*CONFIDENTIAL*

markets has experienced anticompetitive effects.[16]  My opinion was, and remains, that the economic issues related to anticompetitive effects can be resolved by means of economic evidence and methodologies common to class members.[17]  Based on my review of the Defendants' Experts' reports and deposition testimony, this conclusion appears to be undisputed.[18]

5.  **DEFENDANTS' EXPERTS DO NOT DISPUTE THAT ANY ASSERTED PROCOMPETITIVE JUSTIFICATIONS AND LESS RESTRICTIVE ALTERNATIVES CAN ALSO BE ASSESSED THROUGH ECONOMIC EVIDENCE COMMON TO ALL MEMBERS OF THE PROPOSED CLASSES**

19.  In my previous report, I opined that common economic evidence was available to assess any claimed procompetitive justifications for the Prior NIL Rules[19] and analyze less restrictive alternatives.[20]  Based on my review of the Defendants' Experts' reports and deposition testimony, this opinion appears to be undisputed.[21]

20.  Since my first report was submitted, the evidence is still clear that the availability of NIL payments to college athletes has not adversely impacted demand for college sports. Viewership for the recent NCAA Division I Men's basketball tournament continued with similar viewership from the years prior to 2021, despite general declines in sports television viewership (as media, including sports media, continues to fragment onto

---

[16]  Rascher Report, Section 4.2.

[17]  Rascher Report, p. 6.

[18]  Dr. Tucker stated in her deposition that she had not been asked to offer an opinion on relevant markets and that she would have to look more carefully before offering an opinion (Tucker Deposition, 39:16 – 40:5).  She also said she had not studied whether the NCAA has monopsony power in any labor markets for college athletics and that was not something on which she would be able to give an opinion (Tucker Deposition: 40:13-18).

[19]  I use the term "Prior NIL Rules" in this report as that term was defined in my opening expert report: The Prior NIL Rules are the set of NCAA rules which were in force prior to July 1, 2021 and embody agreements among Defendants to prohibit colleges and conferences from permitting Division I college athletes to receive compensation for the use of their NILs.  (Rascher Report ¶5).  The NIL rules which came into force on July 1, 2021, albeit on an explicitly interim basis, as the "Interim NIL Policy" and remain in force currently are referred to as the "Current NIL Rules." *Id.*  Collectively, the Prior NIL Rules and the Current NIL Rules were referred to in the Rascher Report, and are referred to again here, as the "challenged NIL rules." *Id.*

[20]  Rascher Report, Section 5.

[21]  Dr. Tucker stated in her deposition that she had not been asked to offer an opinion on whether the challenged rules are procompetitive.  (Tucker Deposition, 38:19-39:9).

*CONFIDENTIAL*

streaming and second screens).[22]  The women's NCAA basketball tournament saw its highest ratings for the Final Four ever.[23]  The NCAA Men's College World Series saw its highest rated game and series ever this past June.[24]  The Women's College World Series ratings were up over last year.[25]

### 6.  ALL MEMBERS OF EACH PROPOSED CLASS SUFFERED INJURIES CAUSED BY DEFENDANTS' CHALLENGED NIL RULES

21.    In the Rascher Report, I explained that common economic evidence shows that the blanket prohibition of the Prior NIL Rules on third-party NIL payments and school facilitation of third-party NIL deals, along with the restrictions imposed by Current NIL Rules, have denied every member of each of the proposed classes opportunities to pursue compensation for the use of their NIL from third parties.[26]  Additionally, members of each class suffered economic harm by being denied various forms of compensation for three distinct uses of their NIL, which I review by class in each subsection below.[27]  In my previous report, I described a common methodology to estimate class-wide damages for

---

[22]    See Statista. (2023, June 23). "NCAA March Madness basketball tournament average TV viewership from 2013 to 2023." Accessed July 20, 2023 at https://www.statista.com/statistics/251560/ncaa-basketball-march-madness-average-tv-viewership-per-game/; also Gupta, M. (2023, March 19). "TV Viewership Statistics & Data (2023) – Advertising, Ratings." New Vision Blog. Accessed July 20, 2023 at https://www.newvisiontheatres.com/tv-viewership-statistics, showing streaming services growing relative to television; and Weprin, A. (2021, October 12). "TV Ads in Flux: $60B in Limbo Amid Changing Viewer Habits and Nielsen Upheaval." Hollywood Reporter. Accessed July 20, 2023 at https://www.hollywoodreporter.com/business/business-news/tv-ads-viewers-streaming-broadcast-1235025916/, showing viewership splintering in general.

[23]    See Elchlepp, K. (2023, April 5). "ESPN Platforms Set Unparalleled Records with NCAA Division I Women's Basketball." ESPN Press Room. Accessed July 20, 2023 at https://espnpressroom.com/us/press-releases/2023/04/espn-platforms-set-unparalleled-records-with-ncaa-division-i-womens-basketball/.

[24]    See Lewis, J. (2023, June 26). "Milestone viewership for LSU-Florida MCWS Final." Sports Media Watch. Accessed July 20, 2023 at https://www.sportsmediawatch.com/2023/06/lsu-florida-record-college-world-series-ratings-viewership-espn/.

[25]    See Caron, E. (2023, June 11). "Oklahoma's College World Series Three-Peat Scores TV Ratings Win." Sportico. Accessed July 20, 2023 at https://sports.yahoo.com/oklahoma-college-world-series-three-040100082.html.

[26]    Rascher Report, Section 6.  Every member of each of the damages classes who participated in college athletics prior to July 1, 2021 was not allowed to engage in any NIL transaction.  Any class member who began participating in college athletics after July 1, 2021 would have to be a member of either the Football and Men's Basketball Class or the Women's Basketball Class and, thus, was not allowed to engage in any Broadcast NIL transaction.

[27]    See subsections 6.2, 6.3, 6.4, and 6.5.

Page 13

***CONFIDENTIAL***

these distinct uses of athlete NIL,[28] which I discuss further in the next section of this report.

### 6.1. DR. TUCKER'S DISPUTES TO MY OPINIONS REGARDING CLASS-WIDE INJURY ARE WITHOUT MERIT

22.    Dr. Tucker disputes my opinions that there are common evidence and reliable methodologies to prove economic injury for all class members: "Applying economic principles and accounting for individualized considerations indicates that there are proposed class members who are uninjured."[29]  Some of the analysis in support of this claim is what she presents in the Substitution Effect section of her report,[30] which I address in Section 8 of this report.  In addition to failing to show that speculative "substitution effects" should impact my opinions, Dr. Tucker also fails to provide any substantive support to dispute my opinions about common evidence and a reliable methodology for proving economic injury to all members of the proposed classes.

23.    For example, Dr. Tucker makes several contentions about my analysis being speculative or inconsistent with economic theory.  Such contentions may or may not have bearing on the determination of damages at a later stage of this proceeding but they are not arguments against my opinion that there is a class-wide common methodology for assessing injury.  For example, she offers no basis to dispute my opinion that a common class-wide economic injury is established by the fact that all class members were deprived by the challenged NIL rules of the opportunity to market their NIL.  That lost economic opportunity is, by itself, an injury common to all class members.  To illustrate the point, consider a rule that prohibited all women from applying for a particular job that they wished to apply for.  All such women would suffer a lost opportunity injury from being

---

[28]  Rascher Report, Section 7.
[29]  Tucker Report, p. 10.
[30]  Tucker Report, Section III.

*CONFIDENTIAL*

deprived of the ability to submit their applications, regardless of which particular women would get the jobs (which is an issue that goes to the amount of damages suffered by a particular class member, not the existence of the lost opportunity injury itself).

24.   Dr. Tucker presents other arguments that relate to the methodologies for determining how to allocate damages to individual class members, which she conflates with the issue of class-wide injury.  I will address those contentions here to the extent that Dr. Tucker argues that they somehow relate to my opinions about proving class-wide injury.

### 6.1.1.   There is no basis to dispute my opinion that all class members suffered a common economic injury from being denied the opportunity to pursue NIL compensation

25.   Dr. Tucker does not offer anything substantive to dispute my opinion that all class members suffer an injury from the denial of opportunity to pursue NIL compensation (an issue she does not directly address in her report).  The denial of opportunity to pursue NIL compensation, by which the challenged NIL Rules injured every class member, involved deprivation of potential economic gain, as well as deprivation of valuable information.  In her deposition, Dr. Tucker questioned whether every class member would have had some non-*de minimis* expectation of economic value from NIL.[31]  This is incorrect for two reasons: (1) there was a non-*de minimis* expectation of economic value from NIL for every class member, and (2) there was valuable information that the opportunity to pursue NIL deals would have provided to every class member.

26.   The relevant concept for economic injury related to the possibility for compensation is expected value: the average amount that a given class member would reasonably expect to have earned through NIL transactions.  In mathematical terms, expected value is the average value of each possible outcome, weighted by the probability of each outcome

---

[31]   Tucker Deposition, 65:14-66:8.

*CONFIDENTIAL*

occurring.[32]  The wide reporting of NIL transactions occurring across all sports and schools (subject to limitations on reporting at some schools) and many group NIL deal opportunities and activity of NIL collectives demonstrates that no class members would have had a zero expectation of earnings from NIL.[33]

27.  For example, I have identified a specific NIL opportunity that has already been made available to all members of the damages classes: Opendorse announced at least one NIL earnings opportunity available to any Division I athlete, who could each earn at least $30 endorsing gopuff.[34]  The expected value for any class member from just this one example is at least $30.  When addressing Lost NIL opportunity damages and injury, Dr. Tucker states that my use of this example implies the assumption the gopuff deal would have been made available in a previous year: "The Rascher Report's proposed methodology would assume that each of these promotional deals tied specifically to the lifting of the NCAA regulations on July 1, 2021 would have occurred every year in the before period."[35]  This is false.  The gopuff deal is economic evidence that exemplifies a division-wide no-cost opportunity that the market provided for athletes to earn money from the use of their NIL when such earnings were permitted.  It does not assume that this specific opportunity would exist in a particular year in the but-for world, but it is evidence that an opportunity of this type would have existed in the but-for world.

28.  There have been other opportunities that have been made widely available to class members, or large groups of class members, which further demonstrate that no class

---

[32]  "The expected value associated with an uncertain situation is a weighted average of the payoffs or values associated with all possible outcomes.  The probabilities of each outcome are used as weights." Pindyck, R. & Rubinfeld, D. (2018). *Microeconomics*. (9th ed.). Pearson, (p. 159).

[33]  I cited numerous public news reports in my previous report (Rascher Report, Appendix B) and listed many examples of group NIL deal opportunities and collectives (Rascher Report, pp. 54-57), as well as student-reported NIL information totaling over $40 million (Rascher Report, p. 102).  At her deposition, Dr. Tucker focused only on student-reported NIL information, which I discuss in the text below.

[34]  Rascher Report, p. 52.

[35]  Tucker Report, p. 166.

Page 16

*CONFIDENTIAL*

member would have an expected NIL value in the but-for world of zero.  Examples of these group opportunities include: (1)  Redacted - Counsel Only

(2) Redacted - Confidential

[36] (3) Redacted - Counsel O

;[37] (4) Redacted - Confidential

;[38] and (4) the opportunity provided by Hooters, which offered group NIL payments for all football "offensive line players from Auburn, LSU, University of Miami (FL), Texas A&M, Georgia Tech, Missouri, Vanderbilt, Florida Atlantic University, University of South Florida and others."[39]

29.    The relevant concept for economic injury related to the loss of valuable information is that if the market information had been available, it would have provided the recipients with the opportunity to do better.  Information is valuable when it can be used to inform actions that can increase expected value – either through better estimates of value for different outcomes or through improved estimation of the probability of each outcome.[40]  The very

---

[36] Redacted - Confidential

[37] Redacted - Counsel Only  See also, Chengelis, A. (2021, September 23). "UM student-athletes to profit from launch of 'Michigan vs. Everybody' T-shirts." *The Detroit News*. Accessed July 20, 2023 at https://www.detroitnews.com/story/sports/college/university-michigan/2021/09/23/michigan-wolverines-athletes-profit-michigan-vs-everybody-shirts/5829011001/.

[38] Redacted - Counsel Only  and related documents previously cited within my analysis of self-reported NIL.

[39] Hooters. (2022, August 22). "Hooters Signs Offensive Linemen – The Unsung Heroes of College Football – to NIL Deals Across the Country." Accessed July 20, 2023 at https://www.hooters.com/about/news/hooters-signs-offensive-linemen-the-unsung-heroes-of-college-football-to-nil-deals-across-the-country.

[40] See, for example, "… the individual will choose whichever act has highest expected utility, ….  What we are concerned with here is the value of an *informational action*, that is, the expected utility gain from using an information service. … After a particular message *m* has been received from such a service, the decision-maker would [assess expected utility] once again, employing now the *posterior* probabilities. [A difference in maximum expected utility] is the expected gain from the revision of optimal action, calculated in terms of the individual's

*CONFIDENTIAL*

existence of a market itself generates valuable information about NIL valuations, even prior to a specific athlete seeking or securing NIL earnings.[41]  Preventing all NIL transactions for college athletes thus had the effect of preventing all such athletes from having this market information about the value of their NIL, which is itself economic injury.

30.    I describe, in Section 7.3, an analysis published by Opendorse demonstrating that the NIL market is vibrant and growing.  Data produced by Defendants also support this point.  My previous report analyzed data produced by schools of NIL compensation reported by students, primarily for the 2021-2022 academic year.  Among schools that previously provided such data, there are a small number that have produced data since that encompass the 2022-2023 academic year (in that their productions include transactions as late as May or June of 2023).  Of these, I have reviewed data provided by Texas A&M and Texas Tech.



in the but-for world, it would be expected that there would have been an

---

_revised_ probabilities." (Hirshleifer, J. & Riley, J. (1992). _The Analytics of Uncertainty and Information_. Cambridge University Press, pp. 179-80).  Thus, the value of information is the increase (if any) in the value of the expected optimal action that would be chosen with the information, relative to the value of the expected optimal action that would be chosen without the information.

[41]  See, for example, "Competitive markets incorporate powerful incentives both to generate and to reveal information."  Nicholson, W. (1998).  _Microeconomic Theory_ (7th Edition).  Dryden Press, p. 531.

[42]  Redacted - Confidential

[43]  Redacted - Counsel Only

**_CONFIDENTIAL_**

even greater opportunity for NIL deals for class members than in the current market, which is still growing and becoming more vibrant with additional NIL activity.

31. Finally, Dr. Tucker has not offered any substantive disagreement with my opinion that a common economic methodology and evidence can be used to show class-wide injury and damages incurred by the class of athletes who have compensation for use of their NILs after July 1, 2021. Her substitution effect criticisms do not apply to this class, as the challenged NIL restrictions would apply regardless of what school a class member attended. And her claim that I am assuming in my analysis that the exact same NIL deal would have occurred in prior years is simply wrong. I use the existence of actual deals in the real world after July 1, 2021 to estimate the value of deals that would have existed for class members during the damage period. I do not assume that the exact same deals would have existed. This methodology is conservative, as the fact that the NIL market is still growing and vibrant indicates that the current deals are likely to be a lower bound estimate of this value.

32. In her deposition testimony, Dr. Tucker focused on student-reported NIL information and the fact that many reports of NIL transactions included no specific valuation estimate or only an in-kind compensation that she speculates might not have had net positive value.[44] These assertions do not provide any basis to challenge the fact that every reported NIL deal would have a positive economic value to an athlete or she would not enter into it. Moreover, there can be no dispute that this student-reported information is common evidence for assessing class-wide injury and damages. Any criticism of whether the information is complete or accurate is a common issue, but I have not seen any basis to

---

[44] Tucker Deposition, 68:19-25, 70:5-8, 73:8-13. The fact that the athletes voluntarily participate in an NIL deal is clear evidence, to an economist, that the deal has expected net positive value for the athletes.

*CONFIDENTIAL*

conclude that the data is not sufficiently reliable to use as a basis for estimating class-wide injury and damages.

### 6.1.2. There is no basis to dispute my opinion that all Power 5 football and basketball players have suffered injury from denial of the opportunity to receive compensation for Broadcast NIL

33.   Dr. Tucker contends that in but-for world absent the challenged NIL Rules, Broadcast NIL payments would go mostly to superstars and "would not necessarily result in all full-scholarship student-athletes receiving such compensation" and that "In the competition for superstars, it would be economically rational for individual schools or conferences to pay no broadcast-related compensation to non-superstar student-athletes on full scholarship."[45] I address this claim from a damages perspective in Section 7.2, but note here that, with respect to injury, Dr. Tucker's assertion would only theoretically be relevant for any class member for whom the value of the athletes' services and Broadcast NIL are exactly equal to the compensation the athlete already receives from scholarships and other permitted benefits.

34.   As a matter of economics, (1) the fact that schools already provide each of these athletes with all compensation and benefits allowed NCAA Rules (GIA, COA, etc.) is strong economic evidence that the marginal value of the athlete's services and Broadcast NIL is at least equal to the compensation already received, and (2) providing zero Broadcast NIL compensation for the athlete would mean that the athlete's value in terms of both athletic services and Broadcast NIL is no higher than the other compensation already received. Dr. Tucker provides no evidence that any class member fits this specific condition for not having experienced injury through the prohibition on Broadcast NIL compensation. Indeed, because no compensation was allowed for Broadcast NIL absent the rules, it is my opinion that it is extremely unlikely, and contrary to the common economic evidence

---

[45]   Tucker Report, p. 14.

*CONFIDENTIAL*

available, that there is any class member who would not receive compensation for his or her Broadcast NIL absent the rules (as competition among the conferences would cause such payments to be made and, as explained in the Desser Report,[46] the broadcasters require such clearances to be provided for all of the athletes on the teams whose games are being broadcast).

35. Dr. Tucker also claims that, in my damage calculations related to Broadcast NIL (where I show damages for each class member), the idea of not having payments go to walk-on (or non-scholarship) athletes is inconsistent with the notion that all athletes might appear in a broadcast and thus that their permission would be needed in order to show the broadcast.[47] My analysis is entirely consistent with this notion. First, walk-on athletes would still provide their NIL to be used in broadcast, as they do now with all other athletes, but without any compensation because of the challenged NIL rules. Second, they have already (through the economic concept of revealed preference[48]) shown that they are willing to provide their services and NIL for no money (as they play on teams without receiving any scholarship or other benefits). Third, the idea that schools would be competing over walk-ons in order to get them to attend their school does not fit with the evidence that they do not have scholarships in the actual world (i.e., there is not sufficient competition for those athletes to require that they receive any compensation).[49] Fourth, even if a factfinder were to determine that walk-on athletes would get paid for the use of

---

[46] Expert Report of Edwin Desser, October 21, 2022 ("Desser Report"), Sections 6.4, 6.5, 6.7, and 7.

[47] Tucker Report, pp. 89-90.

[48] Revealed preference means that "The individual's choice behavior *reveals* his preferences," Kreps, D. M. (1988). *Notes on the Theory of Choice*. Westview Press, p. 11.

[49] In her deposition, Dr. Tucker affirmed that she had not done independent analysis of this topic, saying "Q. Other than reading what Dr. Rascher has said or done, have you done anything yourself to study the differences in market power between someone who gets a scholarship and someone who's a walk-on in FBS football and Division I basketball? A. So, no. Again, my analysis was focused on Dr. Rascher. And I think the main point I say is given that he himself is drawing this distinction in market power between scholarship and non-scholarship players, that he should then recognize that within scholarship players there's also logically going to be differences in degree of market power. So that's really the analysis I've done. I haven't done independent analysis." (Tucker Deposition, 161:16–162:5).

*CONFIDENTIAL*

their Broadcast NIL, which is inconsistent with the economic evidence, that would not, in any event, detract from my opinion that all class members were harmed and would have been paid for their broadcast NIL in the but-for world.[50]  It would simply go to the issue of how to allocate the class-wide damages to individual class members.

36.    Dr. Tucker speculates that there might be an economic conflict among the classes because the payment of Broadcast NIL might have caused some schools to terminate some smaller sports.[51]  But there is no economic evidence to support this speculation.  In an aggregate sense, the possible impact of BNIL payments is not sufficiently large to cause schools any financial strain outside of the normal range of year-to-year changes.  According to NCAA research, broadcast rights generate about 24 percent of revenue (for the first quartile of schools by revenue).[52]  Thus, a 10 percent drop in broadcast rights revenue for NIL payments would diminish revenue by approximately 2.4 percent.  REDACTED - Confidential

.[53]  Thus, a portion of that additional revenue could have been used if needed to cover the Broadcast NIL payments to athletes without any impact on the funding of other sports.[54]

37.    This argument by Dr. Tucker was made by the Defendants in the *Alston* case, but my analysis showed that under prior situations when a cap on spending money on athletes had been removed, schools increased their spending in those areas without the need to drop

---

[50]  From a damages perspective, it would simply mean that the equal division of broadcast royalty payments would be spread over a larger number of aathletes, each of whom is known based on the rosters for each team.

[51]  Tucker Report, p. 20 and §VII.A.

[52]  NCAA Research. (2021, November). "Trends in Division I Athletics Finances, November 2021." Accessed July 20, 2023 at https://ncaaorg.s3.amazonaws.com/research/Finances/2021RES_D1-RevExpReport.pdf, slide 61. This is a smaller number than the 35 percent for the broader category of "Media Rights; NCAA/Conference Distribution; Bowl Revenues" reported on slide 21 for Power 5 institutions.

[53]  See "Text Cite – Power 5 Revenue Growth.xlsx." I use the terms Power 5, Power Five, and P5 interchangeably.

[54]  As Mr. Thompson acknowledged, broadcast rights fees today are as valuable as they've ever been. Thompson Deposition, 33:7-9 ("Q. Okay. You've said that college broadcast rights fees today are as valuable as they've ever been? A. I did.").

**CONFIDENTIAL**

sports teams. For instance, in Section 4.2.1.1 of my liability report in *Alston*, I showed how, when the NCAA relaxed the rule on capping how much food the athletes could receive from their schools, many universities upped the amounts by hundreds of thousands of dollars without any termination of other sports.[55]

38. Additionally, after the *O'Bannon* case, the universities were allowed to offer athletes payment for the miscellaneous expenses that when added to the prior full grant-in-aid added up to the full cost of attendance (usually a few thousand dollars each year). As described in that same liability report in *Alston* (Section 4.2.2), many universities began making these payments to the athletes, with some conferences mandating it.[56] In neither of these situations did universities decide to drop smaller sports teams in order to save money; in fact they added sports teams.[57] From 2016-2021, from the data reported in MFRS I estimate that schools in the Power 5 conferences Redacted - Confidential [58] Similarly, the NCAA's sports participation report shows that there were

---

[55] Expert Report of Daniel A. Rascher on Economic Liability Issues for the Injunctive Classes, March 21, 2017 (*Alston*), pp. 40-42.

[56] Expert Report of Daniel A. Rascher on Economic Liability Issues for the Injunctive Classes, March 21, 2017 (*Alston*), pp. 42-45.

[57] In the *Alston* case, I also showed how universities were paying for the additional expenditures included in full cost-of-attendance scholarships. These included: net funds remaining in the budget (given that revenues tend to grow each year), increased donations, increased legislative funding, cuts to non-sports elements of the athletic department, increased institutional support, and reallocated expenditures from coaches to the athletes. I also showed that the additional costs of COA were smaller than the annual average revenue increases, as I have shown here. See Section 6.5 of Expert Report of Daniel A. Rascher on Injunctive Class Certification (*Alston*), June 25, 2015.

[58] See "Text Cite – Added and Dropped Sports.xlsx". Redacted - Confidential

Page 23

more athletes (2.8% more) and teams (1.7% more) in Division I in 2018-19 than in 2015-16.[59]

### 6.1.3. There is no basis to dispute my opinion that all FBS football and men's Division I basketball players have suffered injury from the denial of the opportunity to receive compensation for Video Game NIL

39. Dr. Tucker asserts that there is doubt as to the injury that FBS football and men's Division I basketball players suffered from being prevented from receiving Video Game NIL compensation, due to the uncertainty she asserts exists as to the existence of video game products using these athletes' NILs. I address those arguments in detail in Section 7.1 with respect to my methodology for estimating class-wide damages. For now, I will note that none of Dr. Tucker's speculation about this would lead to a conclusion that class members would have an expectation of zero video game royalties.

### 6.1.4. There is no basis to dispute my opinions about class-wide injury based on any claims with regard to Title IX or state NIL laws

40. Dr. Tucker claims that the existence of Title IX and different state laws that prevent schools from making direct payments to college athletes for NIL are a basis for challenging my opinions of class-wide injury and damages, but these claims do not make any economic sense.[60]

41. First, absent the challenged NIL Rules, widespread payments to athletes for NIL use would have existed for some time and there is no basis for Dr. Tucker to speculate that state laws would have been enacted to prevent such payments. Indeed, no such laws were in effect prior to July 1, 2021. Sound economic theory for modeling the but-for world

---

[59] NCAA. (2022, October 27). "NCAA Sports Sponsorship and Participation Rates Report." Accessed July 20, 2023 at https://ncaaorg.s3.amazonaws.com/research/sportpart/2022RES_SportsSponsorshipParticipationRatesReport.pdf, pp. 75, 76, 81, 82.

[60] Tucker Report, pp. 15, 123-126. Although Dr. Tucker describes some of the laws, she does not provide a clear explanation for why the possibility of such laws would mean that a class member was not injured.

*CONFIDENTIAL*

would not speculate about additional state laws limiting NIL being enacted in world in which the NCAA permitted such payments.  In fact, state NIL laws – beginning with California's Fair Pay to Play Act in 2019 – were designed to *permit* college athletes to earn NIL compensation, despite NCAA rules prohibiting them from doing so.  Further, two states (Alabama and South Carolina) have repealed or suspended their NIL laws because the laws were overly restrictive,[61] while many other states have liberalized their laws for the same reason.  Since October 2022, when I filed my Opening Report, at least 10 state legislatures – including those of Arkansas, Colorado, Florida, Missouri, New York, Oklahoma, Pennsylvania, and Texas – have changed their NIL laws to allow for even more freedom for payments in the labor market, following in the footsteps of other states which had done so earlier in 2022.[62]

42. As for Title IX, even if it were to require a more equal payment of compensation for NIL between male and female athletes (a legal issues on which I have no opinion), it would only require the schools to pay more money to female athletes and thus possibly impact the allocation of damages.  Such a requirement would do nothing to detract from my opinion that all class members have been injured by the challenged NIL rules.  It also would not detract from my opinion that common evidence can be used to establish such class-wide injury.

---

[61] Alabama H.B. 76 (2022), available at https://legiscan.com/AL/text/HB76/id/2504502; South Carolina Act 35 (2021), available at https://www.scstatehouse.gov/sess124_2021-2022/bills/685 htm.

[62] Arkansas Act 589 (2023), available at https://www.arkleg.state.ar.us/Home/FTPDocument?path=%2FACTS%2F2023R%2FPublic%2FACT589.pdf; Colorado S.B. 23-293 (2023), available at https://leg.colorado.gov/sites/default/files/2023a_293_signed.pdf; Florida H.B. 7B (2023), available at https://www flsenate.gov/Session/Bill/2023B/7B/BillText/er/PDF; Missouri H.B. 417 (2023), available at https://house.mo.gov/billtracking/bills231/hlrbillspdf/1211S.10T.pdf; New York A. 7107 (2023), available at https://legiscan.com/NY/text/A07107/id/2817168/New_York-2023-A07107-Amended html; Oklahoma S.B. 840 (2023), available at http://webserver1.lsb.state.ok.us/cf_pdf/2023-24%20ENR/SB/SB840%20ENR.PDF; Pennsylvania H.B. 2633 (2022), available at https://www.legis.state.pa.us/CFDOCS/Legis/PN/Public/btCheck.cfm?txtType=PDF&sessYr=2021&sessInd=0&billBody=H&billTyp=B&billNbr=2633&pn=3593; Texas H.B. 2804 (2023), available at https://legiscan.com/TX/text/HB2804/id/2813374/Texas-2023-HB2804-Enrolled.html.

*CONFIDENTIAL*

### 6.1.5.  The existence of professional athlete players unions do not make the NBA and NFL group license agreements inappropriate yardsticks for college athlete broadcast NILs

43.  Dr. Tucker claims that the existence of professional player associations (NBA and NFL unions) make it inappropriate to use group licensing for players in those unions as yardsticks for college athlete group licensing.[63]  But she offers no support for this contention.  Nor does she dispute the fact that NBA and NFL players have generally used group licenses to distribute royalties equally when a very large number of players have entered into a group license for products such as video games, trading cards and collectibles.[64]  These arrangements are economic evidence of how similar group licensing would likely be done for Broadcast NIL in college sports in the but for world.

44.  Dr. Tucker cited one product, jerseys, in which equal sharing of group license royalties has not taken place in the professional sports.[65]  I had already explained this in my first report.[66]  This exception is what proves the rule, as jerseys do not combine the NIL of all players in a single product, like a video game or broadcast, but instead feature an individual player on a particular jersey.  It is my opinion that the equal sharing in products like video games and trading cards is much more analogous model for how group license revenues would be distributed with respect to Broadcast NIL.

### 6.2. FOOTBALL AND MEN'S BASKETBALL CLASS

45.  I have opined that there are multiple common methodologies that can be used to demonstrate class-wide injury to Football and Men's Basketball Class members.  Any of these methodologies alone would suffice to show impact to the class members.

---

[63]  Tucker Report, pp. 95-96.
[64]  Rascher Report. pp. 85-87.
[65]  Tucker Report, p.95; Tucker Deposition, 143:1-10, 151:15-152:4.
[66]  Rascher Report, n. 193.

*CONFIDENTIAL*

46. As I opined in my previous report, the blanket prohibition of the Prior NIL Rules on third-party NIL payments and school facilitation of third-party NIL deals denied each member of the Football and Men's Basketball Class an opportunity to pursue compensation for the use of his NIL from third parties.[67]  In addition, common evidence shows that, in the but-for world, each member of the Football and Men's Basketball Class would have received compensation for the use of his NIL in video games.[68]  The denial of these payments to class members as a result of Defendants' NIL restraints caused a common monetary injury to each member of this class.

47. There is also a common economic methodology and evidence that can be used to show that, in the but-for world, each member of the Football and Men's Basketball Class would have received compensation for the use of his Broadcast NIL from their conferences.[69]  I explain in Section 8 of this report that Dr. Tucker's analysis regarding "ripple" effects (substitution across conferences in the but-for world) challenges only the allocation of damages related to this injury and not the fact that such an injury occurred.

48. Finally, a common economic methodology and evidence can be used to show the class-wide compensation that members of the Football and Men's Basketball Class who received compensation for use of their NILs after July 1, 2021 would have received from third parties for other uses of their name, image, and likeness prior to July 1, 2021, as discussed in Section 7.

---

[67] Rascher Report, p. 48.
[68] Rascher Report, p. 49.
[69] Rascher Report, p. 49.

*CONFIDENTIAL*

### 6.3. WOMEN'S BASKETBALL CLASS

49.   I have opined that there are multiple common methodologies that can be used to demonstrate class-wide injury to Women's Basketball Class members.  Any of these methodologies alone would suffice to show impact to the class members.

50.   As I opined in my previous report, the blanket prohibition of the Prior NIL Rules on third-party NIL payments and school facilitation of third-party NIL deals denied each member of the Women's Basketball Class an opportunity to pursue compensation for the use of her NIL from third parties.[70]  The denial of these payments to class members as a result of Defendants' NIL restraints caused a common monetary injury to each member of this class.

51.   There is also a common economic methodology and evidence that can be used to show that, in the but-for world, each member of the Women's Basketball Class would have received compensation for the use of her Broadcast NIL from their conferences.[71]  I explain in Section 8 of this report that Dr. Tucker's analysis regarding "ripple" effects (substitution across conferences in the but-for world) challenges only the allocation of damages related to this class-wide injury and not the fact that such an injury occurred.

52.   Finally, a common economic methodology and evidence can be used to show the class-wide compensation that members of the Women's Basketball Class who received compensation for use of their NILs after July 1, 2021, would have received from third parties for other uses of their name, image, and likeness prior to July 1, 2021, as discussed in Section 7.

---

[70] Rascher Report, pp. 49-50.
[71] Rascher Report, p. 50.

*CONFIDENTIAL*

### 6.4. ADDITIONAL SPORTS CLASS

53.    I have opined that there are multiple common methodologies that can be used to demonstrate class-wide injury to the Additional Sports Class members.  Any of these methodologies alone would suffice to show impact to the class members.

54.    As I opined in my previous report, the blanket prohibition of the Prior NIL Rules on third-party NIL payments and school facilitation of third-party NIL deals denied each member of the Additional Sports Class an opportunity to pursue compensation for the use of his or her NIL from third parties.[72]  In addition, common evidence shows that, in the but-for world, members of the Additional Sports Class who are FBS football or Division I men's basketball athletes would have received compensation for the use of their NIL in video games.[73]  The denial of these payments to class members as result of Defendants' NIL restraints caused a common monetary injury to each member of this class.

55.    Common economic methodology and evidence can be used to show the class-wide compensation that members of the Additional Sports Class who received compensation for use of their NILs after July 1, 2021, would have received from third parties for other uses of their NILs prior to July 1, 2021, as discussed above.

### 6.5. INJUNCTIVE RELIEF CLASS

56.    As I opined in my previous report, the blanket prohibition of the Prior NIL Rules on third-party NIL payments and school facilitation of third-party NIL deals and the continuing restrictions imposed by the Current NIL Rules have denied each member of the Injunctive Relief Class an opportunity to pursue compensation for the use of his or her NIL from third parties.[74]  All Division I athletes currently in school are being deprived by the Current NIL Rules of the opportunity to enter into third-party NIL deals without the

---

[72]  Rascher Report, p. 50.
[73]  Rascher Report, p. 51.
[74]  Rascher Report, Section 6.4.

*CONFIDENTIAL*

limitations imposed by the Current NIL Rules and the opportunity to receive NIL

compensation directly from schools and conferences. Absent injunctive relief, they also

face the continuing threat from the Prior NIL Rules, which are still part of the NCAA

Bylaws and Constitution Articles, especially since the Current NIL Rules merely

"suspend" the Prior NIL Rules and are explicitly called an "Interim" Policy.[75]

### 7. CLASS-WIDE METHODOLOGIES ARE AVAILABLE FOR PROVING DAMAGES

57.    In my previous report, I developed methodologies to estimate class-wide damages related

to specific injuries, including: (1) foregone compensation for the Video Game use of NILs

of class members who were FBS football and Division I men's basketball players, (2)

foregone compensation for Broadcast use of NILs of Football and Men's Basketball Class

members and Women's Basketball Class members, and (3) foregone compensation of

other third-party use of NILs of class members who were Division I athletes and have

been able to enter into one or more third-party NIL agreements under the Current NIL

Rules.[76]

58.    In this Section, I review the fact that, notwithstanding the criticisms of Defendants'

experts, each of these economic methodologies is (1) based on well-accepted economic

analysis, (2) considers available evidence of the type that economists rely upon, and (3)

applies commonly and reliably to estimate class-wide damages and thereafter to reliably

propose methods for allocating damages among class members.

59.    In my opening report, I described in detail the methodology I propose for estimating

foregone compensation for other third-party use of NIL. In response to Dr. Tucker's

criticisms, I provide in this report a further demonstration of how that methodology can

---

[75] For example, on June 27, 2023, the NCAA released a memo providing "additional guidance" on its NIL rules based on actual circumstances posed by its member schools. See NCAA email found at https://mc97gsxn49y6wmpf4p2n764zq7z1.pub.sfmc-content.com/2ezhy1105pc and NCAA Name Image and Likeness Interim Policy at https://www.ncaa.org/sports/2021/2/8/about-taking-action.aspx.

[76] Rascher Report, Section 7.

*CONFIDENTIAL*

estimate damages for each year of a class member's athletic participation.  I have not reviewed any other methodology for estimating damages, as no other methodology has been proposed by Defendants' Experts.[77]

### 7.1. MY CLASS-WIDE METHODOLOGY FOR ESTIMATING VIDEO GAME DAMAGES IS WELL-SUPPORTED

60.   In my previous report, I developed class-wide methodologies to estimate damages related to foregone compensation for the Video Game use of NILs of class members who were FBS football and Division I men's basketball players.  Based on the economic evidence relating to video games before and during the class period, I concluded that EA or another video game company would have offered to pay, at a minimum, the full scholarship athletes in FBS football and Division I basketball for use of their NIL in video games, in the total amount on a class-wide basis of ⬛⬛Redacted - Counsel Only⬛⬛.[78]  I then projected what the expected sales would have been in order to calculate the class-wide damages amount.[79]  I also modeled a damages allocation in which the total amount of compensation would be divided among class members equally by sport.

61.   Dr. Tucker's critique of my video game damages methodology is comprised of two main points.  First, she criticizes me for not fully examining the video game industry and its evolution before and during the class period, for what she calls the "relevant economics of video games."[80]  Second, she critiques my opinion that, absent the NIL restraints, sales of

---

[77]   See, for example, Tucker Deposition, 82:2-3, "Q: Have you done anything yourself to propose a methodology for measuring class-wide damages in this case?  A: So no, it's not the case that I provided an affirmative methodology."

[78]   Rascher Report, Section 7.1.

[79]   Rascher Report, pp. 69–70.  At the class certification stage, I have measured damages through the 2020-21 academic year. The same common methodologies can be used to update these damages through trial at the merits stage.

[80]   Tucker Report, pp. 237 (quote), 229–237.

*CONFIDENTIAL*

the college basketball video game would have continued into, and throughout, the damages period.[81]

62.   Neither of Dr. Tucker's critiques undermine the reliability of my class-wide damages methodology.  She does not dispute my estimate of the Redacted - Counsel Only or my estimates of projected sales.  Nor do her critiques touch upon issues relevant to class certification.  Dr. Tucker contends that some evidence suggests that a college basketball game might not have been published absent the NIL restraints, but this speculation has no bearing on (1) whether there is class-wide evidence to determine that all Division I men's basketball class members were harmed by the NIL restraints on video games, and (2) whether common evidence prevails in the estimation of the amount that they would have been compensated for the use of their NIL in a college basketball video game if one were produced.  Nor does she question the fact that a college football video game would have been published during the damages period.

63.   In any event, evidence common to the class does indicate that there would have been a college basketball video game during the damages class period.  Generally, college sports video games existed as a sub-genre of sports video games before the damages period.[82] They were relatively successful despite a handicap – the inability of video game publishers to use athlete NIL in such games (as compared to professional sports video games, which could use athlete NIL).[83]  As described in the Rascher Report, following the

---

[81]  Tucker Report, pp. 238–243.  Also, Rascher Report, Section 7.1.

[82]  Redacted - Counsel Only

[83]  EA executive Joel Linzner testified during the *O'Bannon* trial that the company had "found that it is pleasing to our customers to be able to use the real athletes depicted as realistically as possible and acting as realistically as possible" but that such technology was not possible for the college video games because of NCAA opposition.  See Rascher Report, p. 59.  See also *O'Bannon* Trial Tr. 1658:3-6 (June 18, 2014); see also Redacted - Confidential He also testified that without NIL the basketball game would not be "profitable."  See *O'Bannon*, Deposition of Joel

CONFIDENTIAL

*Keller* litigation, EA's college basketball video game, which was published starting in 2006, was canceled after the release of the 2010 title.[84] EA's college football video game was canceled after the release of the 2014 title, in conjunction with the *O'Bannon* litigation.[85] ████████ Redacted - Counsel Only ████████

████████████████.[86] But for the challenged NIL rules, it is reasonable to assume that these games, or other, similar games, would have been published before and throughout the damages period. Dr. Tucker's attempts to cast doubt on the continued publishing of college sports basketball video game in the but-for world are unsupported speculation and, in any event, the question is a common issue for the class(es).

64.    A large proportion of Dr. Tucker's critique of my video game analysis consists of discussion of the fact that premium video game consoles (the target market of console sports video games) have been losing market share to mobile gaming, and other non-traditional, new gaming platforms.[87] I agree that this loss of console market share is occurring. The overall gaming market is changing, and was changing throughout the damages period, as I describe below. But these changes do not undermine my damages methodology.

65.    For example, as I showed in the backup to Rascher Report Appendix Exhibit C.3, during the damages period, the ████████ Redacted - Counsel Only ████████

---

Linzner Deposition, December 18, 2012, 186:5-12. ("if we weren't able … to enable the use of athlete name and likeness in the college basketball video game, it was not going to be a profitable franchise for us. And if it wasn't going to be a profitable franchise, given the economic conditions of the time, we could not afford to keep making it.").

[84] Rascher Report, pp 59-63.

[85] See Berkowitz, S. (2013, September 26). "EA drops football in '14, settles cases as NCAA fights." USA Today. Accessed July 19, 2023 at https://www.usatoday.com/story/sports/college/2013/09/26/ea-sports-ncaa-13-video-game-keller-obannon/2878307/

[86] ████████ Redacted - Counsel Only ████████

[87] Tucker Report, pp. 229-237.

Page 33

*CONFIDENTIAL*

Redacted - Counsel Only

[90]

66.    However, the fact that premium consoles have been losing relative market share as compared to the total video game market is not relevant to the estimation of expected sales for college sports video games during the damages period.  What matters is the absolute size of the market for premium console video games and, by extension, the installed base that determines the size of a sports video game category, within which sales of a college sports game would have occurred.  I examine the relevant overall size of sports video game sales first by examining sales of premium consoles, which did slow in the middle of the damages period, and then by examining sales of specific games, which have continued to grow even as console sales slowed.

---

[88]    See Rascher Report Backup, "Exhibit 3, 4; Appendix Exhibit C.1, C.2, C.3.xlsx," tab Redacted - Counsel Only

[89]    See notes to Rascher Report Appendix Exhibit C.3.

[90]    Rascher Report Appendix Exhibit C.3.  At times Dr. Tucker appears to conflate the growth in the mobile market and the growth in online and digital delivery, quoting "online delivery of games and game services to become an increasing part of our business over the long-term" (Tucker Report, p. 235).  I do not dispute this point.  In fact, as mentioned here, I've shown the extent of such growth for professional sports games in the Rascher Report.  Online delivery of games and game services does not mean that console games are necessarily losing market share, but simply that the channels of delivery of console games to the consumer are changing.

Page 34

*CONFIDENTIAL*

67. First, as shown on the chart below (Exhibit 1), annual sales of premium consoles did slow during the middle of the damage period, but one cannot draw the conclusion that they are falling into irrelevancy. Total annual console sales were relatively steady for the first three years (2016-2018), and then declined in 2019, before increasing again starting in 2020. This short decline can be attributed to the natural life cycle of premium consoles. The year 2019 was at the tail end of Gen 8 console sales – Gen 9 consoles were released the following year with strong sales. In fact, comparing the sales of PS5 (Gen 9) over the first calendar year shows that PS5 sold as many units as the previously released PS4 (Gen 4) – 4.9 million copies in 2020 and 2013, respectively.[91] Furthermore, despite any fluctuation in annual numbers, the total premium console user-base has grown linearly throughout the damages period, as shown in Exhibit 2.[92] Video game consoles have a useful life that is longer than just one year, as evidenced by the fact that EA still publishes its games for multiple consoles, including PS4, which was released almost a decade ago.[93]

---

[91] See VGChartz Monthly Hardware Comparisons accessed July 19, 2023 at https://www.vgchartz.com/tools/hw_date.php?reg=USA&ending=Monthly. Other sources reported an even higher number of consoles, at 7.8 million units of PS5 sold during the first 2 quarters of sales. See Grubb, J. (2021, April 28). "Sony has shipped 7.8 million PlayStation 5 consoles as of March." VentureBeat. Accessed July 20, 2023 at https://venturebeat.com/games/sony-has-shipped-7-8-million-playstation-5-consoles-as-of-march

[92] This is a conservative depiction, since it does not include the installed base of previous generation consoles (PS3 and Xbox360) which EA produced games for as late as 2016. See Mazique, B. (2016, August 17). "'Madden 17' Review: The Good, The Bad And The Traditional." Forbes. Accessed July 20, 2023 at https://www.forbes.com/sites/games/2016/08/17/madden-17-review-the-good-the-bad-and-the-traditional/.

[93] See Sony listing for PS4 version of Madden NFL 23, accessed on July 20, 2023 at https://store.playstation.com/en-us/product/UP0006-CUSA30657_00-MADDENNFL23GAME1.

*CONFIDENTIAL*



Exhibit 1. Annual Unit Sales of Premium Video Game Consoles[94]

*CONFIDENTIAL*



Exhibit 2. Cumulative Unit Sales of Premium Video Game Consoles[95]

68. Second, sales of sports video games have been strong. An installed base of 30-60 million consoles throughout the damages period (shown above) supported actual sales of professional sports video games during the damages period. As shown in Exhibit 3, [Redacted - Counsel Only]

[Redacted - Counsel Only]

[Redacted - Counsel Only]

Additionally, this chart does not take into account the [Redacted - Counsel Only]

[Redacted - Counsel Only][96].

---

[95] VGChartz Monthly Hardware Comparisons accessed July 19, 2023 at https://www.vgchartz.com/tools/hw_date.php?reg=USA&ending=Monthly.

[96] See backup to Rascher Report Appendix Exhibit C.3, [Redacted - Counsel Only]

*CONFIDENTIAL*



Redacted - Counsel Only

69.     Redacted - Counsel Only

                This evidence refutes Dr. Tucker's contention that a college
basketball video game would not have existed during this period if NIL payments had
been possible.  There is no reason to believe that such a college game, which could

[97]    Redacted - Counsel Only

*CONFIDENTIAL*

include player NIL, would not have been popular during this time period in the same

manner as the professional basketball video game.

Redacted - Counsel Only

70.    Dr. Tucker claims that creating and developing major video games is a costly endeavor.[99]

Dr. Tucker then proceeds to explain in detail how Take Two and EA both can bear the

cost of development of such games.[100] I do not dispute that there are costs and risks

---

[98]   Redacted - Counsel Only

[99]   "The development and production process for console games is notable for incurring substantial costs prior to
game release." Tucker Report, p. 231.

[100]   "Take-Two and EA are experienced console game developers that have published and marketed a broad portfolio
of games across diverse genres, including sports, racing, first-person shooting, action, role-playing, and
simulation. ... In the pursuit of hit titles across diverse genres, Take-Two and EA dedicate substantial resources to
both developing and marketing video games." Tucker Report, p. 232.

*CONFIDENTIAL*

involved in creating successful sports video games.  However, I dispute Dr. Tucker's inference that the historical cancellation of some professional sports video games by EA and Take Two support any claim that there is substantial doubt as to whether a college basketball game would have been made by either or both of those companies during the damages period.[101]  My modeling of the but-for world for video game NIL damages is consistent with the determination that at least one of the companies would have made a college basketball video game had college athlete NIL been available for use, which would have substantially added to the value of such a game (given the fact that basketball is a sport in which individual NILs are especially valued by consumers).[102]

71.    Dr. Tucker implies that the cancellation of Take Two's NHL game and EA's professional basketball games indicates that the college basketball game would have been canceled in the but-for world.  However, she fails to provide an economic analysis to support this inference.  Notably, Dr. Tucker neglects to consider the effect of competition for professional sports video games and whether equivalent competition would exist for college sports video games.  Both of the cancelled professional sports games were competing with major video game publishers who were selling video games involving the same sport – i.e., Take Two competed with EA in the NHL case,[103] and EA competed with Take Two in the NBA case; and the same was true for Take Two's baseball game (competing with Sony Entertainment's "The Show" video game franchise).[104]

---

[101] Tucker Report, p. 236-7.

[102] See Rascher, D., Eddy, T., & Hyun, G., (2017).  "What Drives Endorsement Earnings for Superstar Athletes?" *Journal of Applied Sport Management*, 9(2).  Also, see Rascher Report, pp. 63-64.

[103] Kato, M. (2009, December 21). "NHL 2K Series Over?." Game Informer. Accessed July 19, 2023 at https://www.gameinformer.com/b/news/archive/2009/12/21/news-nhl-2k-series-over.aspx.

[104] Good, O. (2019, October 29). "NBA Live 20 canceled as EA Sports looks to next-gen consoles." Polygon. Accessed July 20, 2023 at https://www.polygon.com/2019/10/29/20938853/nba-live-20-canceled-ea-sports-ps4-xbox-one-ps5-scarlett; Vandervoort, O. (May 2, 2021). "Why 2K Stopped Making Baseball Games." GameRant. Accessed July 20, 2023 at https://gamerant.com/mlb-2k-baseball-games-series-cancelled-mlb-the-show.

**CONFIDENTIAL**

72.  The possibility that the market might support one professional-sports video game, but not two, does not in any way undermine my methodology, which assumes that one college basketball video game would have continued to be published in the but-for world every year during the damages period.  Critically, in my Video Game Damages analysis, I make the (conservative) assumption that there would only be one college football and one college basketball video game produced during the damages period, even though there were two college basketball video games produced before the damages period.

### 7.1.1.  Basketball game viability

73.  Dr. Tucker claims that I have conducted no quantitative analysis nor cited quantitative evidence "regarding how Take-Two, EA, or any other video game company would have weighed the tradeoffs of potentially increased commercial demand for a college basketball video game versus increased licensing and development costs in the context of other priorities to which they could devote their internal resources in the but-for world."[105]  This is not correct.  I provided a quantitative analysis predicting the growth of sales and revenue of a college basketball video game in the but-for world, using prior performance as a baseline and using actual performance of professional basketball player video games (which includes any weighing of tradeoffs that the publishers may have made) as a yardstick.[106]  The speculation by Dr. Tucker that such a game would not exist is unsupported, and not a basis for challenging my damages methodology.

74.  Significantly, EA has publicly stated that the reason it previously canceled its college video game was because it was not able to use college player NIL.[107]  As I stated in my

---

[105]  Tucker Report, p. 239.

[106]  Rascher Report, Section 7.1.

[107]  See *O'Bannon* Deposition of Joel Linzner Deposition, December 18, 2012, 186:5-12. ("if we weren't able … to enable the use of athlete name and likeness in the college basketball video game, it was not going to be a profitable franchise for us.  And if it wasn't going to be a profitable franchise, given the economic conditions of the time, we could not afford to keep making it.").

*CONFIDENTIAL*

previous report, Redacted - Confidential

[108]

75.    Based on the evidence, there is no ground for Dr. Tucker to dispute my opinion that a college player basketball game would exist in the but-for world.  But in any event, any such dispute would, at best, be a common merits issue for the class and not grounds to challenge my opinions as a basis for class certification.

### 7.1.2.    Football game viability

76.    Dr. Tucker does not dispute my assumption that there would be a college football video game during the damages period, so that part of my opinion is unchallenged.  Indeed, she acknowledges that with the ability now to obtain NIL rights, EA is currently in the process of developing a college football game and is clear that it intends to pay for the use of athlete NIL in this planned game.[109]  I have previously described EA's eagerness for the creation of a college football video game using player NIL in the Rascher Report.[110]

77.    Since my report, EA has made additional statements about its intentions to produce a college football video game and it has entered into an agreement with OneTeam Partners to secure college player NIL rights for the game.[111]  Dr. Tucker agrees with me that such a game is currently under development.  While I reject any assertion that current development details are determinative for modeling development of a game during the damage period, recent developments (since the Rascher Report was filed) in EA's new

---

[108]    Rascher Report, pp. 63-64.
[109]    Tucker Report, p. 242.
[110]    See Rascher Report, pp. 58-64.
[111]    Brown, M. (2023, May 17). "EA Sports College Football *will* include player likenesses. Here's what else I've learned," Extra Points. Accessed July 20, 2023, at https://www.extrapointsmb.com/p/ea-sports-college-football-will-include-player-likenesses-heres-else-ive-learned.

*CONFIDENTIAL*

college football game bolster my assumption that such a game would have been published in the but-for world.

78.   In a November 2022 ESPN interview, EA Vice President and General Manager Daryl Holt confirmed the planned launch of an EA Sports college football game in the summer of 2024.  He stated that EA is "past the creative design and pre-production phases and ha[s] started production, having completed some prototypes and things they can look at. But it's still very early."  He provided other details such as confirming that over "120 schools" are in the game.[112]  Holt also confirmed that EA has secured the rights to the 10 FBS Conferences and College Football Playoff.[113]   Redacted - Counsel Only

---

[112]  See Rothstein, M. (2022, November 22). "What to know about the new EA Sports college football video game." ESPN. Accessed July 19, 2023 at https://www.espn.com/college-football/story/_/id/35063894/what-know-new-ea-sports-college-football-video-game.  In my model, I assume that every FBS football team and every Division I men's basketball team would have participated in the but-for versions of the game. The most recent iteration of the college football video game included every FBS football team at the time, and the most recent iteration of the college basketball video game included virtually every Division I basketball team.  See Rascher Report, footnote 135.

[113]  See Jeyarajah, S. (2022, November 22). "'EA Sports College Football' video game targeted for 2024 release with popular modes slated to return," CBS Sports. Accessed July 19, 2023 at https://www.cbssports.com/college-football/news/ea-sports-college-football-video-game-targeted-for-2024-release-with-popular-modes-slated-to-return

[114]  The Collegiate Licensing Company, founded in 1981, is an "innovative collegiate licensing agency, resulting from the merger of two industry pioneers, IMG College Licensing and Learfield Licensing Partners." See https://clc.com/home/about/.

[115]  Redacted - Counsel Only.

[116]  OneTeam Partners was founded in 2019 as a joint venture between the NFL Players Association (NFLPA), MLB Players Association (MLBPA), and RedBird Capital Partners to "maximize the collective value of athletes' rights through group licensing, marketing, media and other ventures." ("OneTeam Partners Announces Sale of RedBird Capital Stake to HPS, Atlantic Park and Morgan Stanley, Recapitalizing the Premier Athlete Licensing and Marketing Company," Morgan Stanley Press Release, accessed on July 20, 2023 at https://www.morganstanley.com/im/en-us/individual-investor/about-us/newsroom/press-release/oneteam-announces-sale-of-capital-stake-morgan-stanley.html).  Also, see NFLPA (2019, November 18). "NFLPA, MLBPA and Redbird Capital Launch A New Company Based on Athletes' Group Rights." Accessed July 20, 2021 at https://nflpa.com/partners/posts/nflpa-mlbpa-redbird-launch-new-company-based-on-athletes-rights.

*CONFIDENTIAL*

Redacted - Counsel Only

A May 2023 report from ExtraPoints confirmed that EA is actively working with OneTeam Partners on a plan to acquire player NIL rights through a group license agreement.[119]

79. *The Athletic* recently reported that "EA Sports remains several months away from determining how much money it will offer players to be in the game," also reporting that that EA intends to make equal payments to all athletes who participate in the video game.[120] This is consistent with the group license evidence, recognized by Dr. Tucker, in which NFL athletes receive equal payments for participating in video games and other group licensed products in which extensive player participation is required.[121] All of this evidence is supportive of the model I have developed for college football video game damages in the but-for world. While the intentions of EA going forward are not dispositive for modeling the EA college football video game that would have existed during the damages period, the development of such a game by EA today provides further support for the assumptions used in my class-wide damages model.

### 7.2. MY CLASS-WIDE METHODOLOGY FOR ESTIMATING BROADCAST NIL DAMAGES IS WELL-SUPPORTED

80. In my previous report, I developed class-wide methodologies to estimate damages related to foregone compensation for use of Broadcast NILs of Football and Men's Basketball

---

[117] Redacted - Counsel Only.

[118] See Rascher Report Exhibit 4.

[119] Brown, M. (2023, May 17). "EA Sports College Football *will* include player likenesses. Here's what else I've learned," Extra Points. Accessed July 20, 2023, at https://www.extrapointsmb.com/p/ea-sports-college-football-will-include-player-likenesses-heres-else-ive-learned; Redacted - Counsel Only.

[120] See Vannini, C. (2023, June 23). "EA Sports says college football video game won't be delayed; no offer to players yet." The Athletic. Accessed July 19, 2023 at https://theathletic.com/4635449/2023/06/23/ea-sports-college-football-game-lawsuit.

[121] Tucker Deposition, 142:23-146:2, 150:20-151:3.

CONFIDENTIAL

Class members and Women's Basketball Class members.[122]  Contrary to arguments Dr. Tucker makes, I demonstrated in my opening report, and elucidate here, why my methodology is non-speculative, consistent with the economics of permitted NCAA competition for football and basketball athletes during the damage period, and derives from a credible economic equilibrium outcome.

81.  My Broadcast NIL damages model reasonably assumes that in the but-for world in which NIL payments are permitted, the Defendant Conferences that engaged in broadcast licensing transactions during the class period also would have entered into group-licensing deals with students for the use of their NIL in the broadcasts.[123]  Absent the NIL restrictions, the conferences would have been allowed to use the revenue generated by the use of the NIL in the broadcasts to compensate athletes in conjunction with the group-licensing deals.  The choice to make that compensation, and how much to compensate athletes, would have been driven by competition among conferences (in a manner that competition between parties acquiring labor services in general puts upward pressure on compensation for the labor),[124] subject to the continuing existence of NCAA rules, not challenged in this litigation, which would prevent the Defendant Conferences from providing any compensation to the athletes in excess of the value of the Broadcast NIL.

---

[122] Rascher Report, Section 7.2.

[123] This is not a novel idea, but in fact has been discussed by leaders within the NCAA.  USA Today reported "Michigan head coach Jim Harbaugh was at the first day of Big Ten Media Days on Tuesday, and he has an idea for NIL in the Big Ten. He believes that once the Big Ten signs its mega TV deal, it should administer money to the student-athletes for using their Name, Image, and Likeness. He talked about how the television companies use the players' names, and how they show their image on the screen." See Knoop, T. (2022, July 27). "Jim Harbaugh believes the Big Ten should help out with an NIL plan." USA Today. Accessed July 19, 2023 at https://wolverineswire.usatoday.com/2022/07/27/michigan-football-coach-jim-harbaugh-has-nil-plan/.  See also FOX Sports (2023, April 20). "Penn State coach James Franklin: Revenue sharing with players 'inevitable.'" Accessed July 20, 2023 at https://www.foxsports.com/stories/college-football/penn-state-coach-james-franklin-revenue-sharing-with-players-inevitable.

[124] In labor markets, generally, employers (who are acquiring the services of labor) compete to attract labor up to the value of the product of that labor – see, for example, Pindyck, R & Rubinfeld, D. (2018). *Microeconomics*. (9th ed.). Pearson, pp. 534-535.

*CONFIDENTIAL*

82. My model of competition between conferences, subject to continued NCAA rules prohibiting compensation for athletic playing services but permitting compensation for Broadcast NIL, leads to my opinions that, absent the challenged NIL Rules: (1) competition between conferences for athletes would have driven BNIL payments all to full GIA athletes within each P5 conference to the highest amount allowed by the NCAA rules;[125] (2) while there would have been variation between conferences in the level of compensation per athlete that reached the "highest amount allowed" by the NCAA because of differences in the amount of broadcast revenues generated by their conference, there would not have been variation in compensation per full GIA athlete in each sport within each of the conferences;[126] and (3) each existing broadcast deal identifies the value of the aggregate BNIL for all athletes related to that deal (and, thus, the maximum compensation that a conference can pay athletes for use of their NIL in broadcasts).[127]  I rely on Mr. Desser's opinions, which I test and corroborate, to calculate this value for each of three sports (football, men's basketball, and women's basketball) within each of the Power 5 conferences.  To determine BNIL damages per class member (all of whom are full-GIA recipients, by class definition), I divide each value by the number of class members in each sport.[128]

---

[125] Rascher Report, pp. 75-78.  My damages methodology assumes a but-for world consistent with the liability findings regarding the challenged NIL rules: that the highest amount allowed by the NCAA rules absent the challenged NIL restrictions would include the value of athletes' NIL but would *not* include pay for the athletic performance of the athlete – in other words, NCAA rules prohibiting "pay for play" would have been the same as in the actual world.  In addition, the "full GIA" criterion identifies the athlete as not being on the margin (in terms of value to the conference) for participation in the P5 conference.  For athletes that were not full GIA recipients, conferences already indicated that the marginal value of the athlete to the conference was less than full GIA, and, thus, less than any additional BNIL compensation.  This is the basis for calculating BNIL compensation based only on full GIA athletes.

[126] Rascher Report, pp. 78-83.

[127] Rascher Report, pp. 83-84.  My analysis focuses on Power 5 schools because that set of schools contain all class members eligible for Broadcast NIL damages.  Similar considerations would apply to any conference that (1) has a pooled broadcast licensing deal and (2) competes with schools in Power 5 conferences to attract college athletes.

[128] Rascher Report, pp. 84-92.

*CONFIDENTIAL*

83.  Dr. Tucker disputes my opinions, describing my BNIL damages as not credible and not reliable for assessing damages using a common methodology.[129]  Below, I address each of these critiques.

### 7.2.1.  My model uses a competitive equilibrium of conferences competing to provide Broadcast NIL payments, consistent with the NCAA's prohibition on compensation for athletic services, to estimate damages

84.  With regard to my opinion that, absent the challenged NIL Rules, competition among conferences for athletes would drive BNIL payments to full GIA athletes within each P5 conference to the highest amount allowed by NCAA compensation rules, there is no dispute by Dr. Tucker with my basic opinion that the maximum amount permitted would be paid to these athletes.  Instead, Dr. Tucker disputes whether such competition would occur at the conference level (as opposed to the school level) and whether such conference competition would provide an economic equilibrium in which different conferences would be permitted to pay different maximum amounts to the athletes for Broadcast NIL.  As I explain in my original report, the economic evidence supports my model for conference-level competition, in which the NCAA would permit different maximum amounts of payments for Broadcast NIL because of differences in the value of conference broadcast rights, as evidenced by the differences in the revenues paid in their broadcast agreements.[130]

85.  One feature of a competitive economic equilibrium is efficiency – market forces tend to align transactions among buyers and sellers in the most cost-effective fashion.  The administration of payments to athletes of a portion of broadcast revenues for the use of the athletes' NIL would, if permitted by the NCAA, have most efficiently occurred at the conference level.  Conferences were the entities that granted the broadcast rights licenses,

---

[129] Tucker Report, pp. 81, 90, 100, 126, 129, 137, 144-5.

[130] Rascher Report, pp. 75-8.

*CONFIDENTIAL*

along with contractual assurances for the broadcasters' use of NIL.[131]  The revenues generated by the agreements flowed from the broadcasters to the conferences and the NIL rights flowed from the conferences to the broadcasters.

86.  Dr. Tucker acknowledges that the conferences aggregated the broadcast rights of their schools, negotiated the broadcast agreements, provided the clearances (i.e., for NIL rights) to the broadcasters, and received the broadcast revenues in return, which were then distributed by the conferences to the schools.[132]  This efficient structure of broadcast arrangements at the conference level demonstrates that it would be efficient for conferences to provide compensation for NIL rights to individual athletes, with or without the assistance of their schools, in the but-for world (as the conferences would have received the broadcast revenues from which the NIL payments would be made).[133]

87.  In addition, while Dr. Tucker claims that competition in the labor market would cause the conferences to pay larger amounts of NIL payments to star athletes for their more highly sought after services, she has neglected to consider sufficiently the economic incentives discussed in the Rascher Report for equal payments, including that no athlete is the marginal athlete that can be left out of the licensing pool when securing rights from every athlete is critical.  In professional sports, that issue is solved by group-licensing arrangements where every athlete is paid equally. Moreover, the need to secure BNIL rights for all potential participants *ex ante*, prior to a school or conference knowing which athletes will be star performers, and in an administratively feasible manner, incentivizes an equal-payments structure.[134]  Dr. Tucker also fails to consider the fact that in the but-for world, the NCAA would be continuing its rules prohibiting compensation to athletes for

---

[131] See Desser Report, Sections 6.4, 7.2.

[132] Tucker Deposition, 117:15-119:1; 123:7-124:12, and Thompson Report, Sections 3.B., 3.C.

[133] Regarding conferences arranging broadcast deals and receiving the revenue, Dr. Tucker's testimony concurs (Tucker Deposition, 117:15-118:23).

[134] Rascher Report, pp. 78-83.

*CONFIDENTIAL*

their athletic services. Dr. Tucker admitted at her deposition that she did not consider what other NCAA rules might exist to prohibit providing greater compensation to the best athletes for their athletic services.[135] Given the fact that the NCAA rules against compensating for athletic services would continue in the but-for world, it is necessary to model NIL compensation in which the maximum amount that can be paid is the value of the Broadcast NIL (estimated to be 10% of broadcast revenues) and in which greater compensation cannot be diverted to star athletes to compensate them for their athletic services.

88. Dr. Tucker also criticizes my methodology because she claims that the differences in priorities among the schools would lead to different amounts of NIL payments to athletes by the different schools within a conference.[136] However, Dr. Tucker did not even analyze the current equal sharing of broadcast revenues among schools in a conference (even though she referenced the data in her Table 4).[137] This existing equal distribution of broadcast revenue from conferences to schools demonstrates that conferences find it efficient to provide each of their schools with the same economic resources to use to compete, notwithstanding the differences that may exist among those schools in other respects. Defendant's broadcasting expert, Mr. Thompson, testified to the benefits for schools to join conferences in order to provide them with "uniformity and cohesiveness" –

---

[135] Tucker Deposition, 135:13-137:11.

[136] Dr. Tucker wrote that "substantial differences across schools" would lead to hindrances from any "conference-imposed mandate that does not reflect their individual priorities." (Tucker Report, p. 100).

[137] Tucker Report, p. 53. See also Thompson Deposition, 132:17-20 ("Q. …In general, conferences share their television broadcast revenues equally, correct? Power Five conferences. A. For the most part, yes."); ACC Manual 2020-2021, Section 2.5.2 ("the remainder of the Conference net revenue shall be divided equally among the Members"); Big Ten 2021-2022 Conference Handbook, Section 31.2 ("Revenues generated froDr. Tucker cited one productm Conference television agreements shall be shared equally after the payment of approved expenses, subject to any new member financial integration plan."); Big 12 2022-2023 Conference Handbook, Section 2.3.2 ("All Net Distributable Revenues other than those distributed pursuant to Section 2.3.14 above shall be distributed to each Member in equal proportions . . ."); Pac-12 2021-2022 Handbook, Chapter 1 (p. 22) ("All media rights net revenue generated by the Conference shall be distributed equally among all members."); SEC 2022-2023 Conference Constitution and Bylaws, Section 31.10-26 (calling for "equal shares" distribution of revenues).

*CONFIDENTIAL*

and that those benefits included distributing equal amounts of broadcast revenue and providing "basically the same amount of exposure" to member schools.[138]  The reasons that schools and conferences settled on an efficient allocation of broadcast revenues across schools being equal shares within each conference (for uniformity and cohesiveness) apply similarly to make the efficient allocation of broadcast NIL across athletes be equal shares within each conference.

89.    Dr. Tucker's claim that schools would not allow conferences to "impose" such uniformity upon the schools is disproven by the fact that schools within a conference already agree to receive equal shares of broadcast revenue regardless of relative quality differences.

90.    This principle of equal sharing in the economics of a conference is well-established in the actual world and there is no basis to assume that it would not continue with respect to the payment of Broadcast NIL in the but-for world.  The conferences would not want their schools to compete with each other by offering different amounts of Broadcast NIL because that would undermine conference uniformity and cohesiveness in negotiating their broadcast agreements.[139]

91.    There is also no basis for Dr. Tucker's argument that the conferences would not permit the NCAA to have a maximum Broadcast NIL rule based on differences in the broadcast revenues of the conferences because such a rule would give a competitive advantage to some conferences over others through their ability to offer higher Broadcast NIL payments.[140]  The facts are that the conferences already have vastly different amounts of

---

[138] Thompson Deposition, 142:21 – 143:9.

[139] I have reviewed the various fact declarations submitted in support of Defendants' opposition to class certification, in which lay witnesses claim that schools and conferences would not agree to an equal-sharing approach. Declaration of Greg Sankey, April 28, 2023, ¶¶42, 49−51; Declaration of Kerry Kenny, April 28, 2023, ¶14; Declaration of Chad Weiberg, April 28, 2023, ¶¶14−15, 18; Declaration of Ben Tario, April 28, 2023, ¶¶16, 23−24, 32; Declaration of James E. "Jimmy" Sexton, II, April 30, 2023 ¶¶10-11.  These declarations do not change my opinions, which are grounded in economic analysis.

[140] Tucker Report, pp. 141-143.

*CONFIDENTIAL*

broadcast revenues, which give one conference an advantage over another and the NCAA does not require any equalization of broadcast revenues among the conferences. The SEC, for example, generates far larger amounts of broadcast revenues than the PAC-12 and it can and does use these revenue advantages to compete for athletes by spending the greater amount of revenues it has available on more attractive athletic facilities, greater coaching resources, and other attributes that athletes would find attractive.

92. To the extent such revenue differences cause schools to move from one conference to another to gain a competitive advantage, that is already occurring in the market (as illustrated by the recent moves of UCLA and USC to the Big Ten and the move of the University of Texas to the SEC). Dr. Tucker claims that conferences competing to attract players with higher amounts of BNIL compensation would lead to incentives for schools to change conferences.[141] But the incentive to move conferences is actually reduced when ten percent of the differences in conference revenues is paid to the athletes for their BNILs as opposed to just kept by the individual schools for their own uses. The facts are that competitive differences among the conferences with respect to revenues is a fact of life in college sports, and my Broadcast NIL damages model would be consistent with, not a departure from, that reality which already exists.[142]

---

[141] Tucker Report, p. 129.

[142] UCLA and USC recently moved from the Pac-12 to the Big Ten. UCLA Athletic Director Martin Jarmond said: "I inherited a deficit with UCLA athletics…[s]o when you have a significant financial challenge, it's difficult to just maintain, never mind to invest. This move not only preserves the programs we have now but also allows us to invest in them in levels that can lead to more competitive success." See ESPN. (2022, July 11). "Inside the stunning USC-UCLA move to the Big Ten -- and the chaos that followed." Accessed July 19, 2023 at https://www.espn.com/college-football/story/_/id/34217498/inside-stunning-usc-ucla-move-big-ten-chaos-followed.

**CONFIDENTIAL**

### 7.2.2.  It is reasonable to model that the conferences would pay equal shares of Broadcast NIL to athletes notwithstanding competitive differences among the athletes

93.  As I explain in my previous report, it is reasonable to assume that the outcome of competition would have resulted in equal Broadcast NIL payments to athletes within each conference.[143]  Dr. Tucker claims that this opinion is "inconsistent with the economics of competition for talent and the economics of superstars."[144]

94.  This objection appears to arise from Dr. Tucker's failure to consider the economics of athletics under the NCAA system, which among other things, precludes schools from compensating athletes based on their individual athletic services or performance.  It also ignores the fact that, as explained by Mr. Desser, broadcasters are required to obtain NIL clearances for all athletes on a team, as there is no way for a broadcaster to know in advance which athletes' NILs will be needed in a broadcast.  Such a situation would be expected to lead to a group licensing arrangement, in which real world evidence shows that equal payments to athletes, regardless of talent, is the expected market outcome.

95.  First, as stated previously, it is the pooled NIL that has value for a broadcaster obtaining a license, not the individual athlete NIL.[145]  This fact is supported by the expert testimony of Mr. Desser and is not disputed by Defendants' experts.  As Mr. Desser explains, a broadcaster does not know in advance which athletes' NIL will be required for a particular broadcast so that it will equally value the collective rights.  Any athlete holding out could potentially stop a broadcast from taking place, as I stated in my first report.[146]  This is consistent with what the NCAA's own media expert, Mr. Thompson, opined in his report and at deposition.  He noted in reference to individual control of one's broadcast rights,

---

[143] Rascher Report, pp. 78-83.
[144] Tucker Report, p. 82.
[145] Rascher Report, p. 78.
[146] Rascher Report, pp. 77-8.

*CONFIDENTIAL*

that "**any** single participant could withhold those rights and prevent the broadcast from occurring."[147]  In deposition, he was asked "Okay. And it wouldn't matter if the participant is the quarterback or the punter; that's the problem that you are addressing in this sentence in your report, correct?"  He answered, "That's correct."[148]

96.    Such a situation, in which the NIL clearances for large groups of players are required, typically leads, in the actual world, to a group license agreement, in which, as discussed below, the market generally provides for equal share payments to the athletes. As Defendants' expert Mr. Thompson agreed, it would be "impracticable" to "negotiate individual licenses with all college athletes or all college football and basketball players."[149]  As a result, equal share payments are a market solution to manage the substantial administrative and transaction costs of reaching agreements with large numbers of athletes for their NILs.[150]  Equal share payments also maximize the conference-wide benefits of obtaining all of the athlete clearances necessary for the broadcast without creating inefficient intraconference bidding wars that would serve no conference objective as, in the end, all player NIL rights would have to obtained.

97.    Second, Dr. Tucker, as previously noted, fails to account for the fact that NCAA rules, in the but-for world, will prohibit compensation for athletic performance.[151]  The reason Dr. Tucker assumed conferences would pay more money to some athletes relative to others in the but-for world for Broadcast NIL is the expectation that those athletes would perform

---

[147] Thompson Report, p. 8.  Emphasis added.; Thompson Deposition, 52:7-53:8.
[148] Thompson Deposition, p. 53.
[149] Thompson Deposition, p. 62:4-13.
[150] Rascher Report, pp. 78, 81-2.
[151] "Q: Have you considered in a but-for world where the NCAA continues its rules against pay-for-play, whether the NCAA would permit higher amounts of NIL for broadcast to be paid to star players versus other players? Have you considered what the NCAA rules would allow, or not? A. So no, it's not the case I've done any independent analysis." (Tucker depo, 135:13-21).

**CONFIDENTIAL**

better and be "superstars."  But paying more to "superstars" would be paying for athletic performance, which the NCAA rules would not allow in the but-for world.[152]

98.    Economically, Dr. Tucker's claim that larger payments would be made to "superstars" relies on the assumption that Broadcast NIL payments would equal the marginal value of each athlete.  But a marginal value outcome cannot occur in a world in which NCAA rules prohibit any compensation for athletic services, as those services would account for the largest part of the marginal value of each athlete.  Simply put, Dr. Tucker is assuming outcomes that would only apply to a completely unconstrainted competitive labor market. Those outcomes have no application to but-for world in which the labor market retains some very substantial constraints (the NCAA rules restricting compensation for athletic services, which would still be in place).

99.    Third, Dr. Tucker ignores the fact that in the real world of group license arrangements in which the rights of a large number of athletes are required, like video games, trading cards, and collectibles, equal share payments are generally made to all of the participating athletes regardless of talent.[153]  In her deposition, Dr. Tucker was unable to explain why Tom Brady (a clear superstar) would be paid the same amount for the use of his NIL in

---

[152] See NCAA Division I Manual (2022-23) Bylaw 12.1.2.1.5 ("Payment Based on Performance. Any payment conditioned on the individual's or team's place finish or performance or given on an incentive basis that exceeds actual and necessary expenses, or receipt of expenses in excess of the same reasonable amount for permissible expenses given to all individuals or team members involved in the competition."); Bylaw 12.1.2.2. ("Use of Overall Athletics Skill -- Effect on Eligibility. Participation for pay in competition that involves the use of overall athletics skill (e.g., "superstars" competition) constitutes a violation of the Association's amateur-status regulations; therefore, an individual participating for pay in such competition is ineligible for intercollegiate competition in all sports."); NCAA Interim NIL Policy ("NIL agreements must be based on an independent, case-by-case analysis of the value that each athlete brings to an NIL agreement as opposed to providing compensation or incentives for enrollment decisions (e.g., signing a letter of intent or transferring), athletic performance (e.g., points scored, minutes played, winning a contest), achievement (e.g., starting position, award winner) or membership on a team." "Athletics participation for pay and payment based on performance or given on an incentive basis are prohibited." Accessed July 2021, 2023 at https://ncaaorg.s3.amazonaws.com/ncaa/NIL/May2022NIL_Guidance.pdf).

[153] Rascher Report, pp. 78, 82.

*CONFIDENTIAL*

NFL video games as the 53[154] person on the roster. But the answer is that this is the efficient market outcome in group license arrangements in which the licensor needs the NIL of a large number of athletes. I have reviewed widely reported group NIL deals from Power Five schools in the 2021-2022 academic year that make equal payments to all athletes involved (as described below).

100.    Significantly, Dr. Tucker does not dispute the fact that NCAA rules do not allow compensation to athletes for their athletic performance. For example, Dr. Tucker was asked "Does the NCAA allow for any extra payments of any kind of benefit to be based on whether or not you're a star player? Do they permit that in the NCAA?" She responded as follows: "A. So certainly if you think about something like the Alston payments that we've talked about before, it's not the case that there are different ceilings depending on your athletic aptitude."[155] She acknowledges that if she were "to independently analyze a but-for world in any antitrust case as an affirmative opinion, you know, I would try to make sure it matches institutional details,"[156] but she then criticizes my but-for world for incorporating the institutional details of the NCAA, which prohibit any compensation based on athletic performance, including superstar performance.

101.    Many other college athlete group NIL licensing arrangements through third parties provide for equal payments across participating athletes. For instance, there are many group licensing deals described in documents available through discovery (such as the sources I previously cited for the analysis of self-reported NIL earnings in my previous

---

[154] Q. "So do you have any opinion as an economist as to why a superstar like Tom Brady in the NFL … would receive the same video game payment as the 53rd person on the roster of his team, do you have as an economist any explanation as to why that money would be distributed that way, despite their vast difference in performance and notoriety? A. So I think I only allude to this when I talk about the differences in just the number of people and the structure and how negotiation is done in professional sports. It's not the case I've got a separate opinion on that." (Tucker Deposition, p. 144:6-21).

[155] Tucker Deposition, 136:5-13.

[156] Tucker Deposition, 141:4-7.

*CONFIDENTIAL*

report) or public media reports, that provide equal payments to all athletes involved (and the well-known BYU deal pays walk-ons <span style="background:gray">Redacted - Counsel Only</span>

).[157]  These deals (along with other evidence presented in this and my prior report) illustrate that equal payments are a likely market outcome in the but for world, and that a model with athletes receiving equal payments for their Broadcast NIL through a group license agreement at the conference level is reasonable.  And because schools have similar numbers of eligible athletes for each sport, this would lead to athletes at each school in a conference receiving, together, the same amount as the total for athletes at every other school in the conference.[158]

### 7.2.3.  My model based on the assumption that the value of Broadcast NIL would be at least 10 percent of broadcast revenues is well-supported

102.  Dr. Tucker claims that my 10% estimate for the reasonable collective value of college athletes' NILs for use in broadcasting is "based on speculation from the Desser Report and is without precedent."[159]  While she is correct that I rely on Desser's expert report for this estimate, that report is not based on speculation and the number is far from unprecedented. First, as I discuss further below, both media experts (Mr. Desser and Mr. Thompson) agree that athlete NIL has value and that media entities would not sign broadcast agreements that didn't include the rights to college athlete NIL.  Second, Mr. Desser's conservative estimate does have "precedent," as it is confirmed by the dozens of licensing deals from professional football and basketball, cited in my initial report, that include payments for the use of athlete NIL.[160]  These deals include royalties up to <span style="background:gray">Redacted - Couns</span> and

---

[157] There are at least 20 examples with strong evidence of equal payments across athletes, some of which I discuss in the text above (in section 6.1.1) and I expect that additional examples could be identified at the merits stage when discovery has been completed. See Text Cite - Group Deal Review.

[158] In football, for example, the total is the equal BNIL payments times 85 athletes at each school.

[159] Tucker Report, pp. 144-145.  To the extent that Dr. Tucker claims that a different percentage should be used, this is not an issue for class certification.

[160] Rascher Report, Section 7.2.4.

*CONFIDENTIAL*

Redacted - Counsel Only

[161]

103. Finally, Dr, Tucker argues that it is improper to use the 10% maximum for all conferences, because the conferences with lower broadcast revenues would want to use higher amounts rather than be "content to compete less aggressively for the superstar student-athletes."[162]  Once again, this analysis ignores the fact that NCAA rules in the but-for world would not permit larger payments based on athletic performance.  Further, it ignores the fact that differences in conference broadcast revenues already create a competitive environment in which smaller revenue conferences consistently invest less in recruiting, building facilities, paying coaches, etc. – all factors that affect athletes' decision-making on where to attend school and play their sport.  I noted in the *Alston* case that the "Delta Cost project showed that median spending per athlete varied greatly across conferences and was highly correlated with conference revenue."[163]  In other words, the conferences are already "content" with spending different amounts based on revenue differences and it is reasonable to assume that the same would be true in the but-for world in which Broadcast NIL payments were permitted.

104. Defendant's experts also criticize my use of Mr. Desser's estimate that the revenues for multi-sport broadcast agreements can be allocated among the sports based on a split of

---

[161] Desser Report, pp. 56-59.  Similarly, the Tucker Report says "the comparison of a hypothetical broadcast NIL to merchandise NIL is not credible because merchandise NIL involves physical goods rather than media content, and broadcasters are competing for attention while merchandisers are trying to respond to underlying willingness to pay." (p. 146).  As stated, the licensing deals from professional sports used actual video from games in some of the products.  Further, there is no difference between "competing for attention" and "respond[ing] to underlying willingness to pay."  Fans are choosing whether to watch games on television and also choosing whether to purchase products.

[162] Tucker Report, p. 137.  Similarly, the Tucker Report states "the Rascher Report fails to model an equilibrium because it does not model a credible competitive economic response by each conference" on p. 127.

[163] Expert Report of Daniel A. Rascher on Economic Liability Issues for the Injunctive Classes, March 21, 2017, p. 181.

*CONFIDENTIAL*

75% for football, 15% for men's basketball, and 5% for women's basketball, with the remaining 5% attributable to the other sports.  However, this allocation was confirmed by my own analysis, set forth in my original report,[164] as well as by Mr. Thompson, who admitted to endorsing very similar 75-80/20-25 splits in two tweets, a podcast and a webcast: "Q. And so in other words, the 20 to 25 percent range is higher than what you think Gonzaga men's basketball would contribute to the Big Twelve, but the Big Twelve would have to overpay a little bit to get Gonzaga men's basketball.  A. Correct."[165]  Mr. Thompson went on to state, "You know, and normally, at the -- football gets all the -- all of the credit for these deals, but, you know, in my mind, basketball is **always** worth 20 to 25 percent of the total value."[166]  Based on these admissions by Defendants' broadcasting expert, and the well-grounded analysis in the Desser report, there is no basis to challenge my use of this allocation of revenues in my damages methodology.

### 7.2.4.   Title IX considerations do not undermine my Broadcast NIL methodology

105.   There is also no basis for Dr. Tucker's contention that my Broadcast NIL but-for world could not exist because Title IX would require that damages be paid in a more equal proportion to female athletes.[167]  The application of Title IX to a but-for world in a damages analysis is a legal issue on which neither I nor Dr. Tucker can opine.  However, I do note that there is significant economic evidence that my but-for world would be consistent with the actual world in which the schools must comply with Title IX requirements.

106.   To begin with, the only reason I find much greater Broadcast NIL damages for male athletes than for female athletes in my but-for world is because the broadcast revenues

---

[164] Rascher Report, pp 89-94, Appendix C.4-C.8.
[165] Thompson Deposition, p. 153.
[166] Thompson Deposition, p. 161.  Emphasis added.  See also Thompson Deposition, pp. 156, 169.
[167] Tucker Report, p 122.

*CONFIDENTIAL*

generated by Power 5 football and men's basketball are already significantly greater than the broadcast revenues generated by Power 5 women's basketball in the actual world. Those revenue differences exist in the real world under Title IX and therefore those differences would have existed in the but-for world.

107.    Further, the evidence shows that in the existing world, subject to Title IX, schools already pay disproportionately more for male athletic programs than for female athletic programs. It is thus not obvious why Title IX would require any different conduct by the schools in a world in which Broadcast NIL payments are permitted. To investigate this issue, I analyzed reported expenses in MFRS data across all FBS schools (excluding the three military academies, which I understand are exempt from Title IX). Redacted - Confidential

[Redacted - Confidential]

[168]

108.    Redacted - Confidential

[Redacted - Confidential]

My but-for world is thus consistent with this reality and there is no reason to believe that Title IX would require a different result with respect to Broadcast NIL payments than it requires with respect to other school spending on male and female

---

[168] Based on revenues over 2015-16 – 2020-21 seasons. See "Text Cite – Spending and Participation by Gender.xlsx".

*CONFIDENTIAL*

sports.  This is especially true given the fact that Broadcast NIL would only constitute approximately 3% of the spending by these schools.[169]

109.  Finally, if Title IX did apply to require more equal spending, this could just lead to greater Broadcast NIL payments to female athletes in other sports in addition to my damages calculations.  There is no reason to believe that Title IX would preclude a Broadcast NIL damages award estimate that mirrors the disparity in broadcast revenues and school spending in the actual world, given the economic principle that the but-for world must be based on reasonable assumptions of what occurs in the actual world absent the challenged restraints.  And, as noted above, Broadcast NIL is only 3% of school spending, so there is no reason to believe that the schools could not afford to provide greater Broadcast NIL payments to female athletes if the law requires them to do so.

### 7.3. MY CLASS-WIDE METHODOLOGY FOR ESTIMATING DAMAGES FROM LOST NIL OPPORTUNITIES IS WELL-SUPPORTED

110.  In my previous report, I described a class-wide methodology to estimate damages related to foregone compensation for other third-party use of NILs of class members who were (1) Division I athletes and (2) have been able to enter into one or more third-party NIL agreements under the Current NIL Rules.[170]  I refer to these as "Lost NIL Opportunity" Damages.

111.  The "after period" in which the NCAA permits most third-party NIL transactions provides a reasonable and reliable measure for determining the total payments from similar third-party NIL transactions that class members would have received in the "before period," had the Prior NIL Rules allowed such payments.  This natural experiment provides a benchmark for how the but-for world would have played out in real life.  Because of this

---

[169] See Section 6.1.2; "Trends in Division I Athletics Finances, November 2021," Slide 61.
[170] Rascher Report, Section 7.3.

*CONFIDENTIAL*

natural experiment, the "after period" data have the substantial advantage of demonstrating how much each athlete actually was compensated when NIL payments were allowed.  These individual payments capture NIL value effects from the identity of the player and their sport, position, and school, all in one piece of information – real-world NIL earnings.[171]  And collectively, they provide a reliable measure of class-wide damages.  Indeed, this measure is conservative as the market for third-party NIL is still in in infancy and growing rapidly, while in the but-for world, NIL payments would have been permitted for a long period prior to the damages period, so NIL compensation would be expected to have been even higher.

112.    In my opening report, I tabulated the single year of "after period" transactions captured in the reports of NIL transactions provided by students to their schools.[172]  For those transactions that did identify athlete earnings, the total earnings provide an approximate lower bound for an estimate of Lost NIL Opportunity damages on a class-wide basis for a single year.  I will be updating this data through trial to include additional years and sources of information.  When all data is included, and adjustments are made to account for any supply and demand differences in the period at issue, my methodology will provide a reliable and conservative estimate of class-wide damages.

---

[171] The analysis described here and in my previous report relies on data provided by schools that required athletes to report NIL earnings.  However, the methodology would be equally applicable to any source of information on athlete NIL earnings.  For example, information regarding NIL transactions not included in the data provided by schools produced to date or for whom the data are missing dollar values can be supplemented by additional production and by publicly available information to establish evidence of NIL earnings during the "after" period.  There is no foundation for Dr. Tucker's class conflict assertion about over and under compensation for Lost NIL Opportunities due to incomplete information about other NIL transactions that have already occurred (Tucker Report, p. 21).

[172] Rascher Report, p. 102, Exhibit 13, showed all self-reported NIL transactions.  Rascher Report, p. 104, Exhibit 14, showed all self-reported NIL transactions for the subset of athletes that I identified as having previously participated in college athletics during the Prior NIL Rules period.  Not all schools required such reports and not all transactions included information to identify athlete earnings. However, the model provides a method for calculating damages for any class member, provided the information on current NIL transactions is available at the time of the damage award.

*CONFIDENTIAL*

113. To allocate the damages to individual members, there are a variety of other adjustments that I will make. These adjustments, which will account for things like changes in school and status as a starter or a backup player, are described in my opening report. In response to Dr. Tucker's critiques, below I provide illustrations of how those adjustments can be applied to class members. With these adjustments, my analysis will provide a reliable common methodology for estimating damages to individual class members as well as to the class as a whole.

114. Dr. Tucker asserts that my before-and-after approach cannot be used to estimate Lost NIL Opportunity damages because of what she asserts would be instability in the NIL market and lack of constancy in NIL transactions between the before and after periods, claiming (incorrectly) that I did not "examine the economic conditions in the before and after periods."[173] But, as I will discuss below, Dr. Tucker misrepresents my methodology, which does not assume that the exact same NIL transactions will take place in the before and after periods, and fails to recognize that I have, in fact, provided for adjustments to account for any material changes in the before and after periods that would impact the damages estimates.

115. Dr. Tucker correctly asserts that my methodology assumes that: "…third-party NIL deals in the after period are representative of the but-for world where third-party NIL deals were agreed upon in the before period."[174] However, she is incorrect when she claims that I have assumed that: "… if third-party NIL deals in the after period are shifted to an earlier point in time in the before period, then third-party NIL deals in the after period would not have been different in the but-for world."[175] I do not assume that the exact same deals

---

[173] Tucker Report, p. 154. Here, Dr. Tucker quotes Chapter 8, "Overcharges" in *Proving Antitrust Damages: Legal and Economic Issues*, Third Edition, American Bar Association, 2017, pp. 221-273, at 228.

[174] Tucker Report, p. 154.

[175] Tucker Report, pp. 154-5.

*CONFIDENTIAL*

would exist in the before and after periods.  Instead, I recognize that different deals might exist in the two periods, but correctly assume that the economic value of the deals in the after period will be a conservative estimate of the economic value of the deals that would have occurred in the before period in which I have modeled a but-for world.  Dr. Tucker's second claim represents a fundamental misunderstanding of the economics of the before-and-after approach that permeates and undermines many of her other specific critiques.

116.  From an economic perspective, the interaction of demand and supply in the period unaffected by the anticompetitive conduct determines an approximate market value for the transactions that would have occurred in the but-for world without the challenged restraints.[176]  This is the predicate economic basis for the before-and-after methodology: the assumption that transactions in the unaffected period are representative of the but-for world simply means that similar interactions would have occurred during the affected period, absent the anticompetitive conduct, leading to similar NIL earnings on a class-wide and individual basis (after incorporating appropriate adjustments for substantive changes in demand and/or supply).  It is not my assumption that every transaction would be identical between the before and after period.  Instead, my assumption is that the nature of demand and supply would be similar (after appropriate adjustments), so that the value of transactions during the after period can be used to reasonably estimate the value of transactions in the but-for world before period.[177]

---

[176] In this case, the approximate market value is a lower bound for price, because the after-period transactions may have occurred before the time it will take for the market to achieve equilibrium, with additional evidence showing that the market is still growing (see Section 7.3.1).

[177] Economic analysis for antitrust damages may start with an expansive vision of a but-for world, but the target for what to learn from the but-for analysis is more focused: "… antitrust damages can be quantified by comparing the plaintiff's actual … purchase prices (in an overcharge case) … against what the plaintiff would have enjoyed absent the illegal conduct." (American Bar Association. (2017). "Proving Antitrust Damages, Legal and Economic Issues." Third Edition, p. 89).  But-for prices are the specific focus for an overcharge (or, in this case, undercharge) arising from antitrust liability – see, for example, See, for example, McCrary, J. & Rubinfeld, D., (2014). "Measuring Benchmark Damages in Antitrust Litigation." *Journal of Econometric Methods*. 3(1), pp. 63-74 at 63: "[T]he benchmark approach evaluates prices only in the market at issue, comparing prices in the impact period to available prices before and/or after the alleged period of impact (the 'control period')."

*CONFIDENTIAL*

117. While it is true that a specific party purchasing NIL in the after period may not have had identical need for NIL in the before period (and, in fact, may not even have existed in the before period), the market demand for purchasing NIL in the before period would, in aggregate, be similar to the market demand in the after period (given appropriate adjustments for changes in demand). Likewise, while it is true that some class members may have individual characteristics related to the value of the NIL they supply in the after period, the transactions in the before period would have those same individual characteristics (given appropriate adjustments for changes in supply).[178]

118. Dr. Tucker erroneously claims that "The Rascher Report's proposed methodology would assume that each of these promotional deals tied specifically to the lifting of the NCAA regulations on July 1, 2021 would have occurred every year in the before period."[179] This is false. The appropriate, economically sound assumption embedded in the before-and-after approach is that market demand for promotional deals that occurred with the lifting of NCAA regulations also existed before the lifting of the NCAA regulations, but the supply from college athletes was not available to meet that demand.[180]

119. Dr. Tucker also erroneously asserts that "The Rascher Report does not consider the fact that the online and offline platforms that facilitate these third-party NIL interactions are dynamic and therefore cannot be used to predict its but-for world."[181] This is not correct. The before-and-after methodology only requires that a specific platform in place in the

---

[178] The fundamental economic principle of revealed preference ("The individual's choice behavior *reveals* his preferences," Kreps, D.M. (1988). *Notes on the Theory of Choice*, Westview Press, p. 11) models athletes' actual choices as revealing that the athlete expects to increase utility by engaging in each of the actual NIL transactions, which means that athlete's would generally have had similar preferences to engage in similar transactions during previous years of athletic participation.

[179] Tucker Report, p. 164.

[180] "Because the before-during-after approach looks outside the damages period in the same market, … one may need to examine changes in economic conditions over time …, the plaintiff's circumstances, or other variables which could affect prices …." (American Bar Association. (2017). "Proving Antitrust Damages, Legal and Economic Issues." Third Edition, p. 95).

[181] Tucker Report, p. 164.

*CONFIDENTIAL*

unaffected period also be in place in the affected period if the absence of that platform would be a substantial impediment to transactions occurring.  Even setting aside the obvious possibility for transactions to occur in the absence of a platform, Dr. Tucker cites a list of dozens of available platforms for NIL transactions.[182]  In other words, there is no specific platform necessary for athlete NIL transactions to occur in either the before or after periods.

120.  As an example, Opendorse launched in 2012, mostly focused on professional athletes, but also began building its capabilities for the college athlete market prior to 2021.[183]  Once it was likely that NIL payments to college athletes was going to happen, other platforms began operation (e.g., INFLCR launched in 2017).[184]

121.  The same is true of other facilitators of NIL licensing.  Different entities were always standing ready to help develop the market once the NCAA rules would permit NIL payments.  The BrandR Group (a group licensing agency, launched in 2014) explained this in the following:

> Beginning as early as 2017, TBG believed that college athletics was likely to undergo significant change with respect to NIL programs across the country to allow college athletes to benefit from the marketing of their own name, image and likeness.

> Specifically, at that time, TBG believed the prohibition on athletes marketing their own NIL was likely going to change or be eliminated, so it began developing a strategy to market its professional sports group licensing experience to college athletic departments.

> TBG invested significant time, effort, and money into this belief and strategy, even before the rules surrounding NIL were changed…[185]

---

[182] Tucker Report, pp. 165, n. 422.

[183] OPENDORSE000143 at 163, and Baker, K. (2019, May 23). "How Opendorse helps college athletes build their brands". Axios. Accessed July 20, 2023 at https://www.axios.com/2019/05/23/opendorse-athletes-social-media-distribution.

[184] Fanatics offered group licensing services prior to July 2021 for professional athletes and after July 2021 began offering services for college athletes.  This is similar for OneTeam also.

[185] *BrandR Group v. Electronic Arts et al.* Complaint, Case 4:23-cv-02994-HSG (6/20/2023), ¶¶23-25.

*CONFIDENTIAL*

122. Dr. Tucker asserts that it "is difficult to predict which types of platforms and third-party NIL deals would prevail in the before period."[186]  This may be true, but this uncertainty in no way undermines my before-and-after damages methodology.  To implement a before-and-after analysis, it is not necessary to predict every detail about institutions facilitating transactions in the but-for world, or even what specific deals have occurred.  As noted above, as long as the analysis accounts for any substantive changes in demand and supply, it will be a reliable predictor of the value of the NIL transactions that would have occurred in the but-for world.[187]

123. As I describe in Section 8.2, the before and after methodology does not require analysis showing that the NIL purchasers in every NIL transaction in 2021-2022 would have had made the exact same purchases prior to 2021, with the same parties.  Likewise, the economic standard for damages does *not* require analyses demonstrating that every class member who participated at a school within the boundaries defined for the class would have been able to attend that same school in the but-for world.

### 7.3.1.  The evolving market for NIL transactions

124. I discussed in my previous report the fact that the market for NIL transactions, including the "other" NIL transactions that form the basis for the Lost NIL Opportunities damages, is evolving and growing at a significant rate.  This means that a long-term equilibrium for the market would involve *more* transactions and *more* NIL earnings for college athletes.  As such, any estimate based only on the first year of NIL transactions is very conservative because had the Prior NIL Rules not existed, the long-term equilibrium that would have

---

[186] Tucker Report, p. 167.

[187] "Changes in market conditions during the damages period may raise doubts about the direct comparability of the damages period prices or profits to prices or profits and profits before or after. …However, a perfect comparator is not required, and adjustments may be used to account for the differences. … This is because only a reasonable approximation is necessary for damages, so a proxy can be applied even if it does not fully correspond to the plaintiffs' situation." (American Bar Association. (2017). "Proving Antitrust Damages, Legal and Economic Issues." Third Edition, pp. 94-5).

*CONFIDENTIAL*

been in place during the damages period would have involved *more* transactions and *more* NIL earnings for college athletes.

125. This assessment is supported by findings from Opendorse (one of the largest platforms in the college athlete NIL space, bringing together athletes and brands), which notes that in year 2 of college athlete NIL, "brand spend grew by nearly 300%," "brand activity is up 220%," and "brand compensation is up 144%" compared to year 1.[188]  Opendorse has reported that "as it stands today, the market shows no signs of slowing down."[189]  As shown in Exhibit 5, activity and payments per activity are more than twice as high for year 2 than for year 1.

Exhibit 5. Estimate of Year 2 Versus Year 1 NIL Activity and Payments



Source: OPENDORSE000143 at 150.

---

[188] OPENDORSE000143 at 145, 153, and 157.  Additionally, the engagement rate of athletes is higher than that of influencers in general.  See OPENDORSE000143 at 155 and OPENDORSE000083 at 97.
[189] OPENDORSE000143 at 147.

*CONFIDENTIAL*

126. Dr. Tucker argues that the fact that the NIL market is new makes it dynamic and unpredictable. But the economic facts show that the market is growing and that it is reasonable to use current demand as a conservative measure of what the but-for world would have looked like during the damages period with respect to the value of the transactions that would have occurred.

127. With respect to trends, Dr. Tucker describes growth "in influencer marketing throughout the before period" that she speculates could bias the estimate of "the value and the number of third-party NIL deals related to social media in the before period."[190] However, to the extent this growth occurred during the damages period, it would have reflected just a segment of marketing (influencer) and not the overall demand for NIL in marketing. Also, the constraint prohibiting college athletes from obtaining NIL earnings would have been a constraint on the growth of influencer marketing – absent that prohibition, the growth could have occurred sooner. Because the but for world does not exist, there will always be some uncertainty about its precise parameters. But the economics literature recognizes that a before-and after-analysis is nonetheless a reasonable basis to model such a world. And, in any event, all of Dr. Tucker's criticisms in this regard are common merits issues. They in no way impact the efficacy of my damages methodology for purposes of class certification.

128. The same problems infect Dr. Tucker's discussion of the prospect of "viral moments or rare sporting events."[191] By definition, such events would be very small in number and only affect the allocations of damages to a handful of class members. They have no bearing on the use of my methodology to estimate class-wide damages, and to the extent

---

[190] Tucker Report, pp. 182-3.
[191] Tucker Report, p. 183.

*CONFIDENTIAL*

that there are any "outlier" events in the data, they can be addressed, as is commonly done through statistical analysis or other means at the stage of damages allocation.[192]

### 7.3.2.  Adjustment of the before-and-after analysis for changes in supply and demand

129.  In my previous report, I provided an analysis of whether economic evidence indicates any adjustments related to substantive changes in demand or supply are required in the implementation of the before-and-after methodology.  I also provided an analysis to determine whether such adjustments could be implemented in a common methodology for all class members.[193]  I opined that there was such a methodology to identify changes in demand related to college athletics, that the impact of the COVID-19 pandemic represented a substantive shift in demand that required adjustments, and I described how to make such adjustments.[194]  I further opined that there was a such a methodology to identify athlete transfers, to assess when such transfers caused substantive shifts in demand that required adjustments, and I described how to make such adjustments.[195]  I also opined that there was a common methodology to identify changes in the role of an athlete on a football or basketball team, to assess when such changes would result in substantive shits in demand that required adjustments, and I described how to make those adjustments.[196]

130.  Dr. Tucker challenges my proposed adjustment methodology as being overly vague.[197]  However, at the class certification stage, I only need to determine that such an adjustment

---

[192] "First, the identification of outliers in the data is useful, particularly in relatively small cross sections in which the identity and perhaps even the ultimate source of the data point may be known.  Second, it may be possible to ascertain which, if any, particular observations are especially influential in the results obtained." Greene, W.H. (2003). *Econometric Analysis*. Fifth Edition. Pearson Education, p. 60.
[193] Rascher Report, Sections 7.3.2 – 7.3.4.
[194] Rascher Report, Section 7.3.3.
[195] Rascher Report, Section 7.3.4.
[196] Rascher Report, Section 7.3.4.1.
[197] Tucker Report, p. 190.

*CONFIDENTIAL*

methodology can be implemented at the merits stage when all data has been gathered, which I already have done in my opening report. Nonetheless, in response to Dr. Tucker's criticisms and to further demonstrate that my proposed adjustment methodology can be implemented on a class-wide basis, I have implemented the methodology for a subset of class members here, as an example to illustrate how this methodology can be applied on a class-wide basis at the merits stage after discovery is completed.[198]

### 7.3.2.1. Implementing my adjustment methodology

131. To demonstrate how my adjustments can be implemented to account for changes in supply and demand factors between the before and after periods, I have identified a subset of class members from the SEC and Big Ten Conference.

132. I provided a tabulation of NIL earnings from self-reported NIL transactions in my previous report.[199] I have now updated this tabulation with subsequent data productions and isolated only the transactions occurring during the 2021-2022 school year – the updated tabulation is shown on Exhibit 6 (this tabulation includes all athletes receiving NIL in the 2021-2022 academic year, including some who may not be class members due to not participating in college athletic prior to the 2021-2022 academic year). This exhibit includes all transactions that can be established, from the currently available data, to have occurred during the 2021-2022 academic year. There are now data for some transactions that occurred during the 2022-2023 academic year (and a small number for which the academic year is unclear), which are not included in this tabulation for the 2021-2022 academic year.

---

[198] The implementation I present here is restricted to a subset of class members, but every step can be applied to any class member using the same commonly available data.

[199] Rascher Report, Exhibit 13.

*CONFIDENTIAL*

Exhibit 6: NIL Transaction Summary Statistics

| | Number of Schools | Total Athletes | Total NIL Transactions | Total NIL ($) |
|---|---|---|---|---|
| All | 124 | 9,230 | 20,706 | 44,701,240 |
| FBS | 104 | 8,767 | 19,508 | 43,891,107 |
| Power Five | 60 | 6,206 | 15,218 | 39,632,313 |

*Notes:*
  *Figures based on NIL transactions for the 2021-2022 academic year.*
  *Notre Dame considered part of Power Five.*
  *Athlete counts based off unstandardized names reported in university records.*

*Source:*
  *Updated Reported NIL Transactions database.*

133. To identify class members' college athletics participation from year to year during the damages period, I relied on information the schools report about athletes on their websites.[200] This information identifies whether an athlete participated in Division I college athletics during a previous academic year, which is a necessary condition for there to have been damages for the athlete that year. The information also identifies which years the athlete participated at which different schools (if the athlete transferred schools).

134. For the example presented here, I limited this collection of data to athletes who participated in college athletics in 2021-2022 at SEC or Big Ten schools. The tabulation of NIL earnings from produced documents for these schools identified about 3,000 athletes with NIL transactions. The data review process located the desired information

---

[200] Specifically, an athlete's online school profile. The information gathered for each season (going back to 2015-2016) includes the athlete's grade, redshirt status, school information for transfers (and whether the school is a Division I college listed in NCAA's school index), and if the athlete did not compete that season. In instances where school profiles are unavailable or contain limited information, I relied on relevant information from available third-party sources including, but not limited to, school articles, TFRRS stats pages, ESPN profiles, and 247Sports profiles. A verification of a random sample of entries from the completed dataset confirmed the accuracy rate for the gathered information. For details, see backup documentation for the SEC & Big Ten Eligibility Project.

*CONFIDENTIAL*

about college athletic participation prior to 2021-2022 for over 99 percent of those athletes. Among the athletes with the desired information, there are 925 that participated in football, 179 that participated in men's basketball, and 129 that participated in women's basketball.[201] This is the subset of data I used to demonstrate how my adjustment can be implemented.

135. Although the examples provided here are limited to class members at schools in the SEC and Big Ten conferences, the same methodology can be applied at the merits stage to other class members. The examples are further limited to class members participating in football, men's basketball, and women's basketball who reported at least one NIL transaction under the Current NIL Rules with a non-zero value. The athlete statistics I use for football, men's basketball, and women's basketball come from three different sources (one for each sport). I then address whether there is any indication that such adjustments would be necessary for students participating in other sports and how that would proceed in a similar fashion based on different athlete participation statistics (from a single source, the NCAA, for all other sports).

136. A cross-sectional analysis can show whether some of the variation in NIL earnings relates to a specific characteristic for athletes, such as event participation. Event participation statistics by sports reflect how an athletes' amount of play (and role on the team) leads to broader exposure and familiarity, which may affect the value of the athlete's NIL.

137. For football, I categorized event participation based on number of snaps (the number of plays the athlete participates in, over the course of the season).[202] The categories I use are the Upper Quartile (the 25 percent of athletes with the highest number of snaps), the Interquartile Range (the 50 percent of athletes with number of snaps less than the highest

---

[201] See Text Cite – Summary Stats SEC BT Eligibility.

[202] Football snaps data retrieved from Pro Football Focus. See backup for data.

*CONFIDENTIAL*

25 percent and more than the lowest 25 percent) and the Lower Quartile (the 25 percent of athletes with the least number of snaps).  For men's basketball, I used similar categories based on playing time, and I use the same for women's basketball.[203]

138. For all three sports, the median NIL earnings are higher for athletes in the Upper Quartile than for athletes in the Interquartile Range, and higher for athletes in the Interquartile Range than for athletes in the Lower Quartile, as shown on Exhibit 7.  Furthermore, it is evident from the tabulation of NIL earnings that the values are not symmetrically distributed in a normal "bell curve."  The presence of a few high values within different categories can distort whether average (mean) values across categories accurately represent meaningful earnings differences for all of the athletes.  The central value within each category, the median, is not subject to this distortion.[204]

---

[203] Men's basketball playing time data retrieved from Sports Reference.  Women's basketball playing time data retrieved from Her Hoop.  See backup for data.  There are a small number (eight percent) of athletes in this example who have non-zero self-reported NIL earnings and participated in the sport for at least one year before the Current NIL Rules, but do not appear in performance statistics under the same name or a name similar enough for me to match them programmatically.  In these cases, I do not apply a participation NIL adjustment.  See Text Cite - Unmatched Athlete Stats.

[204] Dr. Tucker suggested that "a student-athlete's adjusted compensation would be unduly affected by the presence of outliers, such as a very high-earner." (Tucker Report, p. 197).  This is not the case when using median values.

*CONFIDENTIAL*

Exhibit 7: Summary Non-zero Self-reported NIL Statistics by Event Participation Quartile

|  | Mean NIL ($) | Median NIL ($) | Min NIL ($) | Max NIL ($) |
|---|---|---|---|---|
| **Football** | | | | |
| Upper Quartile | 42,054 | 3,600 | 4 | 1,603,225 |
| Interquartile Range | 11,537 | 1,100 | 1 | 294,500 |
| Lower Quartile | 4,174 | 350 | 3 | 250,000 |
| | | | | |
| **Men's Basketball** | | | | |
| Upper Quartile | 34,479 | 6,550 | 50 | 380,500 |
| Interquartile Range | 23,466 | 2,000 | 25 | 336,805 |
| Lower Quartile | 8,691 | 1,009 | 6 | 60,000 |
| | | | | |
| **Women's Basketball** | | | | |
| Upper Quartile | 6,388 | 1,715 | 15 | 86,100 |
| Interquartile Range | 1,469 | 500 | 20 | 16,336 |
| Lower Quartile | 631 | 450 | 20 | 5,000 |

*Notes:*
*For SEC and Big Ten athletes who reported nonzero 2021-22 NIL earnings.*
*Quartile groupings calculated using snap counts for Football and minutes played for Basketball.*
*Athletes not matched to event participation metrics are excluded.*

139. For asymmetric financial data with a few high values, a common approach is to use the logarithm of the value – here, this is ln(NIL).[205] This standard transformation reduces the impact of large outliers.[206] Exhibit 8 repeats the tabulation using ln(NIL) instead of NIL.

---

[205] See, for example, Greene, W.H. (2003). *Econometric Analysis*. Fifth Edition. Pearson Education, p. 854.

[206] Brown, G. & Sanders, J.W. (1981, June). "Lognormal Genesis." *Journal of Applied Probability*, 18(2), pp. 542-7.

*CONFIDENTIAL*

Exhibit 8: Summary Non-zero Self-reported ln(NIL) Statistics by Event Participation Quartile

|  | Mean Ln(NIL) | Median Ln(NIL) | Min Ln(NIL) | Max Ln(NIL) |
|---|---|---|---|---|
| **Football** | | | | |
| Upper Quartile | 8.21 | 8.19 | 1.39 | 14.29 |
| Interquartile Range | 6.97 | 7.00 | 0.00 | 12.59 |
| Lower Quartile | 6.00 | 5.86 | 1.10 | 12.43 |
| **Men's Basketball** | | | | |
| Upper Quartile | 8.61 | 8.79 | 3.91 | 12.85 |
| Interquartile Range | 7.92 | 7.60 | 3.22 | 12.73 |
| Lower Quartile | 6.98 | 6.92 | 1.79 | 11.00 |
| **Women's Basketball** | | | | |
| Upper Quartile | 7.24 | 7.43 | 2.71 | 11.36 |
| Interquartile Range | 6.21 | 6.21 | 3.00 | 9.70 |
| Lower Quartile | 5.81 | 6.10 | 3.00 | 8.52 |

*Notes:*
*For SEC and Big Ten athletes who reported nonzero 2021-22 NIL earnings.*
*Quartile groupings calculated using snap counts for Football and minutes played for Basketball.*
*Athletes not matched to event participation metrics are excluded.*

140.    The substantial individual variation in NIL earnings across athletes is the beneficial information that the "natural experiment" allowing most third-party NIL beginning in the 2021-2022 academic year provides for the before-and-after analysis, because this variation is indicative of how each athlete's specific characteristics translate into NIL earnings. The cross-sectional analysis is a means to assess whether the characteristics of athletic participation, as categorized into quartile groups, provides information about the relative value of the different groups. To determine which category differences would be meaningful for NIL earnings, I used a standard statistical test to evaluate the statistical significance of the differences, with the results shown on Exhibit 9.[207]

---

[207] The table omits comparisons between Upper Quartile and Lower Quartile, which, in the case of ln(NIL), are just the sum of the difference between Upper Quartile and Interquartile Range and the difference between Interquartile Range and Lower Quartile. The Wilcoxon ranked sum test is a nonparametric test that compares the medians of

**CONFIDENTIAL**

Exhibit 9: Significance of Difference in Non-zero Self-reported ln(NIL) Medians Between Quartiles

**Football**

| Group 1 (Quartile) | Group 2 (Quartile) | Difference in Median Ln(NIL) | Percentage Difference in Median | Statistic | P-value | Significance |
|---|---|---|---|---|---|---|
| Upper | Interquartile Range | 1.1856 | 227% | 31,617 | 0.0000 | *** |
| Interquartile Range | Lower | 1.1451 | 214% | 30,675 | 0.0000 | *** |

**Men's Basketball**

| Group 1 (Quartile) | Group 2 (Quartile) | Difference in Median Ln(NIL) | Percentage Difference in Median | Statistic | P-value | Significance |
|---|---|---|---|---|---|---|
| Upper | Interquartile Range | 1.1863 | 228% | 1,675 | 0.1302 | |
| Interquartile Range | Lower | 0.6847 | 98% | 1,670 | 0.0811 | * |

**Women's Basketball**

| Group 1 (Quartile) | Group 2 (Quartile) | Difference in Median Ln(NIL) | Percentage Difference in Median | Statistic | P-value | Significance |
|---|---|---|---|---|---|---|
| Upper | Interquartile Range | 1.2186 | 238% | 945 | 0.0077 | *** |
| Interquartile Range | Lower | 0.1116 | 12% | 775 | 0.3739 | |

*Notes*
*Uses Wilcoxon rank sum test.*
*For SEC and Big Ten athletes who reported non-zero 2021-22 NIL transactions.*
*Quartile groupings calculated using snap counts for Football and minutes played for Basketball.*
*Athletes not matched to event participation metrics are excluded.*
*\*, \*\*, \*\*\* for p-values less than 10%, 5%, 1%, respectively.*

141.    The consistent pattern of Upper Quartile higher than Interquartile higher than Lower

Quartile indicates that this could be a persistent relationship. However, the statistical tests

for the basketball players show that the differences do not always rise to the level of

statistical significance. In this example, I apply adjustments only when the change across

two groups. Because it is nonparametric, this test does not require any assumption that the data values are normally distributed (in a symmetrical bell curve). This is appropriate here because the data are asymmetric, even with the log transformation. With that assumption, the results of a two-sample t-test, which are qualitatively similar, are also valid. I also conducted the same tabulation and testing separately for the SEC athletes and for the Big Ten athletes, which then allowed me to identify when there was significant variation between conferences. See, for example, Mood, A.M., Graybill, F.A. & Boes, D.C. (1974). *Introduction to the Theory of Statistics*. Third Edition. McGraw-Hill. pp. 522-4; and Larsen, R.J.. and Marx, M.L. (1986). *An Introduction to Mathematical Statistics and its Applications.* Second Edition. Prentice-Hall, pp. 555-6, 562.

*CONFIDENTIAL*

categories is statistically significant (a p-value under 10 percent).  In other words, (1) I apply the adjustment to any category change for Football, (2) for men's basketball, I apply the adjustment to any change from either Upper Quartile or Interquartile Range to Lower Quartile (or vice versa), and (3) I apply the adjustment to any change from Upper Quartile to either Intermediate Quartile or Lower Quartile (or vice versa) for women's basketball.

142. The final step to estimate damages related to Lost NIL Opportunities for each class member is to apply these (and any other time-related adjustments) to the class members' current NIL earnings for each year that the class member was eligible.

143. The adjustment calculation is as follows.  For a given year, $y$, of athletic participation prior to 2021-2022, the adjustment is the difference between median NIL earnings for the athlete's participation category in 2021-2022 and the athlete's participation category in year $y$.  For example, an athlete participating in 2021-2022 in the Interquartile Range earns $1,000 in NIL.  In 2020-2021, that athlete participated in the Lower Quartile.  The difference in the logged values of the median NIL amounts is 0.6847, which means median NIL for the Interquartile Range was almost double (98% more than) the median NIL for the Lower Quartile.  The estimated NIL earnings for this athlete for 2020-2021 would be about half of the athlete's 2021-2022 NIL earnings at $504.[208]

144. Another adjustment I described in my opening report was to account for athlete transfers.  When there is a transfer, the adjustment would need to take into account whether there are substantial differences across conferences AND across participation quartile.[209]  The

---

[208] In logarithmic form, ln(1000) = 6.9078, then the adjustment is 6.9078 − 0.6847 = 6.2231, and ln(504) = 6.2231. Another way of expressing the same result, without using logarithms, would be that 1000 * 1009 / 2000 = 504.

[209] The review of athlete information for eligibility that I describe earlier in this section also provided information on athlete transfers.  Among the 1,048 football, men's basketball, and women's basketball SEC and Big Ten athletes in this analysis, there were 171 transfers prior to the 2021-2022 academic year (some athletes transferred multiple times).  Of those, there were 19 transfers between the SEC and Big Ten conferences.  For football only, there were 778 athletes in this analysis, with 97 transfers, of which 13 were between SEC and Big Ten conferences.  For the purposes of this example, I only incorporate conference change into the adjustment for those athletes transferring between the SEC and Big Ten conferences, because that is the current scope of the data preparation.

*CONFIDENTIAL*

process described above for adjusting the damages estimate for individual athletes can also be applied to information on each athlete's conference. For example, for an athlete participating at an SEC school in 2021-22 who previously participated at a Big Ten school, the adjustment would need to include any substantial difference between median NIL earnings within the SEC and median NIL earnings within the Big Ten. Exhibit 10 shows these comparisons.

Exhibit 10: Significance of Difference in Non-zero Self-reported ln(NIL) Medians Between Conferences

**Football**

| Group 1 (Conference) | Group 2 (Conference) | Difference in Median Ln(NIL) | Percentage Difference in Median | P-value | Significance |
|---|---|---|---|---|---|
| Big Ten | SEC | -1.4673 | -77% | 0.0000 | *** |

**Men's Basketball**

| Group 1 (Conference) | Group 2 (Conference) | Difference in Median Ln(NIL) | Percentage Difference in Median | P-value | Significance |
|---|---|---|---|---|---|
| Big Ten | SEC | -0.4810 | -38% | 0.2225 | |

**Women's Basketball**

| Group 1 (Conference) | Group 2 (Conference) | Difference in Median Ln(NIL) | Percentage Difference in Median | P-value | Significance |
|---|---|---|---|---|---|
| Big Ten | SEC | -0.0953 | -9% | 0.2161 | |

*Notes:*

*Uses Wilcoxon rank sum test.*

*For SEC and Big Ten athletes who reported non-zero 2021-22 NIL transactions, irrespective of athlete participation stats.*

*\*, \*\*, \*\*\* for p-values less than 10%, 5%, 1%, respectively.*

*CONFIDENTIAL*

145. Given that there is a significant difference across the two conferences only for football, the adjustment would incorporate only that difference.[210]  In addition, I also incorporate the adjustments for the demand shock of the COVID pandemic that I discussed in my previous report.[211]  This leads to an estimated NIL value for each year of eligible participation.

146. After I applied these adjustments to the class members included in the example, I tabulated the resulting damages estimates.  Exhibit 11 shows, for each sport, the total 2021-2022 season reported NIL earnings (my previously reported minimum threshold for damages) for each group of athletes in this example, along with the new total damage estimate that incorporates all years of eligibility and adjustments over time.

---

[210] While I believe that the analysis here is sufficient to provide a reasonable estimate of damages, one could (if needed) conduct a combined assessment using the exact same methodologies, but just applied to the combined categories of conference and participation level: comparing, for example, the median NIL earnings for SEC athletes participating in the Interquartile Range minus the median NIL earnings for Big Ten athletes participating in the Lower Quartile.

[211] Rascher Report, p. 111.  The adjustment for 2020-2021 is 14.7 percent (in logarithms, the difference in values between 2021-2022 and 2020-2021 will be 0.159).  The adjustment for 2019-2020 is 6.1 percent (in logarithms, the difference in values between 2021-2022 and 2019-2020 will be 0.063).  A convenient feature of using logarithms is that multiple adjustments are additive.  For example, a participation quartile adjustment of 0.6847 reduces $1,000 of NIL earnings to $504.25: $\ln(1000) - \ln(504.25) = 0.6847$.  A further adjustment of 0.159 for COVID reduces $504.25 to $430.13: $\ln(504.25) - \ln(430.13) = 0.159$.  The total of those two adjustments is $0.6847 + 0.159 = 0.844$, which directly reduces $1,000 down to $430.13: $\ln(1000) - \ln(430.13) = 0.844$.

CONFIDENTIAL

Exhibit 11: Total Adjusted Lost NIL Opportunities Damages Estimate for Football, Men's Basketball, Women's Basketball

| | 2020-2021 | 2019-2020 | 2018-2019 | 2017-2018 | 2016-2017 | 2015-2016 | Total |
|---|---|---|---|---|---|---|---|
| **Football (in Dollars)** | | | | | | | |
| **Big Ten** | | | | | | | |
| Minimum Threshold | 1,551,768 | | | | | | **1,551,768** |
| New: Adjusted | 1,566,872 | 1,129,313 | 404,930 | 293,623 | 11,552 | 0 | **3,406,289** |
| **SEC** | | | | | | | |
| Minimum Threshold | 9,604,574 | | | | | | **9,604,574** |
| New: Adjusted | 8,188,176 | 4,238,340 | 2,336,405 | 257,259 | 111,894 | 0 | **15,132,075** |
| **Big Ten and SEC** | | | | | | | |
| Minimum Threshold | 11,156,342 | | | | | | **11,156,342** |
| New: Adjusted | 9,755,048 | 5,367,653 | 2,741,335 | 550,882 | 123,446 | 0 | **18,538,364** |
| **Men's Basketball (in Dollars)** | | | | | | | |
| **Big Ten** | | | | | | | |
| Minimum Threshold | 998,903 | | | | | | **998,903** |
| New: Adjusted | 814,125 | 978,023 | 371,989 | 207,820 | 6,835 | 0 | **2,378,792** |
| **SEC** | | | | | | | |
| Minimum Threshold | 1,142,333 | | | | | | **1,142,333** |
| New: Adjusted | 1,071,376 | 877,455 | 334,622 | 85,218 | 53,372 | 0 | **2,422,043** |
| **Big Ten and SEC** | | | | | | | |
| Minimum Threshold | 2,141,236 | | | | | | **2,141,236** |
| New: Adjusted | 1,885,501 | 1,855,478 | 706,612 | 293,038 | 60,207 | 0 | **4,800,835** |
| **Women's Basketball (in Dollars)** | | | | | | | |
| **Big Ten** | | | | | | | |
| Minimum Threshold | 74,218 | | | | | | **74,218** |
| New: Adjusted | 88,176 | 59,625 | 17,975 | 13,666 | 1,339 | 3,500 | **184,282** |
| **SEC** | | | | | | | |
| Minimum Threshold | 181,716 | | | | | | **181,716** |
| New: Adjusted | 142,774 | 64,465 | 42,979 | 16,414 | 2,816 | 0 | **269,448** |
| **Big Ten and SEC** | | | | | | | |
| Minimum Threshold | 255,934 | | | | | | **255,934** |
| New: Adjusted | 230,950 | 124,090 | 60,954 | 30,080 | 4,155 | 3,500 | **453,730** |

*Notes*

*Minimum threshold estimate is 2021-2022 NIL for one year.*

*For each athlete, NIL damages only calculated for eligible seasons.*

*Adjusted estimate based on athlete NIL during the 2021-22 season and takes into account athlete participation metrics. Athletes without participation metrics receive no participation NIL adjustment.*

*Adjusted estimate includes COVID adjustment  downward adjustment of 14.7 percent for the 2021 season and 6.1 percent for 2020. See Expert Report of Daniel A. Rascher, October 21, 2022, paragraph 208.*

*Adjustment estimate includes a NIL adjustment for students who transferred between Big Ten and SEC.*

*Sources*

*Reported athlete NIL data.*

*Athlete eligibility from squad lists and online sources.*

*Athlete participation metrics from sports-reference.com, herhoopstats.com, pff.com.*

*CONFIDENTIAL*

147. These results further demonstrate in detail how it is possible to apply the common methodology I described in my opening report to make any required adjustments to estimate the damages for individual class members.

148. In addition to the three sports described above that generate the highest amount of school and conference revenues, I have further considered whether such adjustments would also be necessary for three other sports: women's gymnastics, baseball, and softball.[212] Athletes participating in the sports included in the adjustment example above (Football, Men's Basketball, and Women's Basketball) account for 43 percent of athletes reporting NIL earnings (at any school and for any sport) and about 71 percent of the reported value. Athletes participating in the additional three sports with further consideration here (women's gymnastics, baseball, and softball) account for 16 percent of athletes reporting NIL earnings and about 14 percent of the reported value.[213]  The cross-sectional analysis shows substantial and statistically significant differences between Upper Quartile and Interquartile Range of Women's Gymnastics, between Upper Quartile and Interquartile Range in baseball, but not between categories in softball.  The Women's Gymnastics difference holds up (similar magnitude and statistical significance) after setting aside two outliers (Olivia Dunne and Sunisa Lee).[214]

149. In summary, the above analysis demonstrates that a common methodology of adjustments can be applied at the merits stage for additional sports using NCAA data.  It will not be

---

[212] Baseball and softball participation metric is the number of games played by athletes each season.  The data is retrieved from NCAA (https://stats.ncaa.org/), which provides data for 20 NCAA sports.  Women's gymnastics participation metric for each athlete is the number of events with NQS scores.  This data is retrieved from NCAA's official website for gymnastic scores and statistics.  See https://roadtonationals.com/results/.  The datasets for these sports are provided in the backup.

[213] See Text Cite - Analyzed Sports Stats.xlsx. The Updated Reported NIL Earnings database does not currently distinguish between men's and women's gymnastics.  Figures based on gymnastics as a whole which includes a small number of athletes in men's gymnastics.

[214] See Text Cite - Cross sectional analysis GYM MBA WSB.

*CONFIDENTIAL*

necessary for adjustments to be made for every sport in the database, but this can be determined after all discovery is completed and prior to trial.

8.   **MY OPINIONS ON CLASS-WIDE INJURY AND DAMAGES ARE NOT UNDERMINED BY ANY CLAIMED "SUBSTITUTION EFFECT"**

150.   As I have previously addressed, my assessments of injury and damages for class members are not undermined by any so-called "substitution effect" – the theory that NIL compensation may cause some college athletes to stay in school longer (or to choose more frequently schools or conferences perceived to have higher expected values for NIL compensation), possibly displacing some other athletes from the limited number of GIA spots at Power 5 schools.[215]  In response to Dr. Tucker's specific critiques, I explain in more detail here why it is the case that the possibility of such substitution creates no obstacle to identifying members of the classes, determining that all class members are injured, or otherwise applying my damages methodology.

   8.1.   **MY ASSESSMENT OF CLASS-WIDE INJURY IS NOT UNDERMINED BY CLAIMED SUBSTITUTION EFFECTS**

151.   As an initial matter, NIL compensation to class members would have led to no displacement that would have interfered with or substantially diminished any class member's receipt of non-NIL compensation or other benefits of attending college and participating in college athletics.

152.   The classes cover categories of students, as delineated by schools attended, who were restrained from receiving NIL compensation.  Each class of athletes is situated within a larger set of competing Division I schools with related NIL opportunities.  Those NIL opportunities would have been available during the damages period in the but-for world at all Division I schools.  Thus, but for the challenged NIL Rules, it is possible that divergent

---

[215] Rascher Report, Section 8.

*CONFIDENTIAL*

prospects for NIL compensation could have influenced some students to attend schools other than the ones they actually attended. In other words, for each class there is a set of inframarginal students (students attending schools to be included in the class who could be displaced by a sufficient influx of additional athletes) and also a set of extramarginal students (students not attending schools to be included in the class, but who could alternatively have been attending one of those schools).

153.   I conclude that the possibility of a set of inframarginal members of a class (and a corresponding set of extramarginal athletes not in the class) has no bearing on my economic analysis of whether each class member suffered injury. This conclusion follows from two facts. First, the NIL restrictions applied to athletes at all Division I schools and thus would have applied to any class member even had that class member been at a different Division I school. Therefore, the common injury from being prevented or inhibited from participating in a market for NIL transactions that occurred for all class members would also have occurred even if some of those class members had been at different Division I schools. Second, the non-NIL benefits of attending college and participating in college athletics would have been available at a substantially similar level to any class member at alternative schools. For example, a Men's Basketball player at a Power 5 school can and would receive comparable GIA, COA, SAF, and all other benefits from participating in basketball at the competing schools outside of the Power 5. Thus, being at the school that puts the athlete into one of the classes for this case does not bring substantial additional benefits that would offset injury from the NIL restraints.

154.   I also conclude that the possibility of a set of inframarginal members of a class (and a corresponding set of extramarginal athletes not in the class) has no bearing on my economic analysis related to damages for each class member. The damages I estimate relate to antitrust "underpayments" – prices paid below the level that would have been set for those same transactions had competition not been restrained (the competitive price).

*CONFIDENTIAL*

Accounting for these "but-for" prices for each "actual" transaction restores the injured participant to the same financial position had the transactions occurred at the competitive price. The injured party here is a class member and the transactions are the NIL transactions that could have occurred for that student (at the school where they participated in college athletics) absent the restraint. The comparison of prices involves only the prices (actual or but-for prices) for actual transactions. There is no calculation of damages for antitrust underpayments (or overcharges) that involves comparing prices for actual transactions to prices for but-for transactions.

155. Having established that no "substitution effect" related to membership in any of the proposed classes creates any impediment to the analysis of class-wide injury or damage assessment, I further conclude that no substantial number of class members would have been displaced from attending any of the schools defining the scope of each of the proposed classes. This is based on observations of the effects of previous changes in athletic compensation and is also on the limited amount of extramarginal substitution that would occur relative to the capacity at relevant schools to include additional GIA-recipient athletes.

156. For example, some of the Power 5 schools have a slot open within their allotted 85 GIA slots for football.[216] I estimate approximately 30 open football slots among the Power 5 schools and compare that to the number of football players who might have been on the margin between staying at college or playing in the NFL.[217] NFL minimum guarantee

---

[216] Men's basketball is limited to 13 slots and women's basketball is limited to 15 slots. See NCAA Division I Manual. (2022, August 1). Accessed July 20, 2023 at https://www.ncaapublications.com/productdownloads/D123.pdf, §§15.5.5 and 15.5.6.

[217] I determine the number of available slots by using squad list data produced in the *Alston* matter. Institutions mark on these squad lists which athletes are "counters," and I total the number of football counters for each Power 5 institution in the final season of the data (2015-16). I do not count those marked as "exempt" as well as a small number of athletes who only received $1 in countable aid. However, some institutions failed to mark any athletes as counters and others marked more athletes as counters than the 85 allowed by NCAA regulations. I therefore

*CONFIDENTIAL*

salaries compare favorably to NIL payments, at over half a million dollars per year, versus the maximum $46,000 in BNIL payments.[218]  Therefore, the likelihood of an athlete choosing to stay in school rather than earning an NFL salary as a result of the opportunity to receive a BNIL payment is very low.

157.  The NFL pro football draft typically absorbs about 200 football athletes from Power 5 conferences, including some who have already played their fifth year and do not have an option to defer joining a professional team in order to play another season in college.[219]  Of the 189 Power Five conference athletes who were drafted in the 2016 draft, I consider the smaller number, 26, who did not end up playing in the NFL, or left after a single season (because those who did have a strong likelihood of earning an NFL salary, as evidenced by actually making a team roster, would have strongly preferred the larger NFL salary to the smaller BNIL payment).[220]  Of these 26 draftees, 9 were fifth-year seniors who had exhausted their eligibility, and another 5 were fourth-year seniors who had likely exhausted their eligibility, leaving only 12 athletes for whom staying in college for an extra year would have been both possible and possibly economically beneficial.[221]

---

compare these counts to those derived from a similar NCAA-produced source of 2015-16 squad list data and select the total that is closest to 85.  I take the difference between this number and the 85-counter maximum for each school to calculate available slots per school and sum the total of available slots across schools.  This approach is conservative, as I resolve discrepancies between the datasets generally in the direction of fewer available counter slots.  There is a single case [REDACTED - Counsel Only] in which both data sources indicate football counter totals above 88.  This total is not plausible given the 85-counter maximum under NCAA regulations, and I therefore conservatively assume that [REDACTED - Counsel Only] had zero counter slots available.  Using the same approach, I estimate that Power 5 institutions had approximately 20 slots available for Men's Basketball and 90 slots available for Women's Basketball. (See "Text Cite – Available Counter Slots.xlsx".)

[218]  NFL 2020 season minimum rooky salary was $610,000. See NFL-NFLPA Collective Bargaining Agreement. (2020). Accessed July 20, 2023 at https://nflpaweb.blob.core.windows.net/media/Default/NFLPA/CBA2020/NFL-NFLPA_CBA_March_5_2020.pdf at p. 172.  Maximum BNIL payment per athlete would be Men's Football BNIL damages, see Rascher Report, Exhibit 12.

[219]  (2020, April 20). "Football: Probability of competing beyond high school." NCAA. Accessed July 17, 2023 at https://www.ncaa.org/sports/2015/3/6/estimated-probability-of-competing-in-professional-athletics.aspx.

[220]  See "Text Cite – 2016 Draft Analysis.xlsx". The proportion of athletes who are drafted but do not end up playing for multiple seasons generally holds across different draft years.

[221]  See "Text Cite – 2016 Draft Analysis.xlsx".

**CONFIDENTIAL**

158. On the other end of the collegiate athletic career arc, there would be no substantial change in the number of new athletes entering each year.[222]  Within that flow of entering athletes, any substitution would have occurred only among extramarginal athletes who each not only had the actual opportunity to choose a non-P5 school over a P5 school but also were more highly valued by P5 schools than inframarginal athletes – in other words, it is not enough that an athlete may have had an actual offer from a P5 school, but it would also have to be the case that the athlete still would have been able to make that choice in the but-for world when competing against other athletes on the margin.

159. A key problem with Dr. Tucker's substitution effect argument is that all class members would have been better off in the but-for world, because in the but-for world they all would have had the opportunity to engage in the NIL marketplace and would have also had substantially all of the non-NIL benefits of participating in college athletics.  The opportunity to engage in the NIL marketplace would have existed in the but-for world for all class members: all class members would still have been eligible to be paid for their NIL even if the relative marketability of that school (in terms of NIL) would have been different than the school they actually attended.  This holds true for the broad set of different schools where class members could have participated in Division I college athletics, including schools for which, in this matter, there are no class members.

160. I further explained in my previous report that any concern about class members being "crowded out" is alleviated by the fact that two of the three classes include only Power 5, full-scholarship athletes.  Top schools outside of the Power 5 have numerous full-scholarship positions for the same sports as the Power 5 class members here.  If the

---

[222] P5 schools make offers to prospective students with the expectation that a sufficient percentage will accept the offer (sufficient to complete the team) and that excess offers can be withdrawn in the event that there are too many athletes accepting (relative to capacity on the team).  In the event that increased NIL compensation in the but-for world changes the probability of prospective students accepting offers, schools would adjust their offerings to maintain the same expected flow of new athletes.

*CONFIDENTIAL*

absence of NIL restrictions would have resulted in a class member from the Power 5 being, instead, at a school outside of the Power 5, then this would have little to no effect on the benefits that athlete would have received from participating in college sports – the but-for world is, for such an athlete, similar to the actual world: the athlete would continue to get full scholarship and COA, as well as the other educational and vocational benefits of attending college.[223]  The only difference would be the school and its conference. Moreover, the number of actual choices that a given recruit has in terms of which college to attend is much smaller than what Dr. Tucker claims (see my analysis in Section 8.3 below).

161. Dr. Tucker challenges whether there is sufficient evidence for me to rebut a claim that some class members who participated in college athletics at a Power 5 school would have been worse off without the NIL restrictions.  The claim is that the additional compensation from NIL opportunities, such as Broadcast NIL payments, would attract players to extend their collegiate athletic participation, thus diminishing the availability to class members of full-scholarship slots with the possibility of displacing some class members into schools outside of the class.

162. I disagree that any college athlete would be worse off absent the NIL restrictions.  As a foundational matter, Dr. Tucker makes an error that substantially undermines her analysis: she compares (1) but-for Broadcast NIL opportunities in Power 5 schools to (2) but-for Broadcast NIL opportunities in non-Power 5 schools.[224]  She then proceeds to address the same comparison for Lost NIL Opportunities at Power 5 vs. non-Power 5 schools,

---

[223] Rascher Report, p. 120.

[224] "While the Rascher Report claims that these displaced student-athletes would receive 'increased access to NIL money in the but-for world,' it does not establish that these student-athletes would be better off in the but-for world. The Rascher Report also does not propose a methodology for identifying which proposed class members would have received the broadcast-related compensation that the Rascher Report proposes would be made to A5 student-athletes in the but-for world." (Tucker Report, pp. 65-6).

*CONFIDENTIAL*

ignoring the fact that, under the Prior Rules, there was no difference: there were no NIL opportunities allowed at any Division I school.

163. Dr. Tucker misapprehends the premise that assessing whether an athlete would be worse off absent the NIL restrictions requires comparing the *actual* situation of a student at a Power 5 school to the hypothetical but-for situation for that student at a non-Power 5 school. The NIL limitations restricted opportunities everywhere in Division I, including Power 5 schools. In other words, the relevant analysis is to compare (1) *actual* NIL opportunities in Power 5 schools (limited or non-existent during most of the years that class members have been participating in college athletics) to (2) but-for NIL opportunities in non-Power 5 schools. Her complaint that I provided no analysis of "the different third-party NIL opportunities at A5 schools compared to non-A5 schools"[225] ignores the fact that third-party opportunities have only existed at *any* Division I school since the Current NIL Rules started. Thus, such analysis would be irrelevant for the class-wide economic analysis to assess whether injury occurred and, because the estimation of damages assesses the difference in compensation that would have occurred for each athlete (without any change of schools), such analysis would be irrelevant for the economic analysis to estimate the damages for such injury.[226]

164. I stated in my previous report that neither the implementation of the *O'Bannon* injunction nor the availability of the *Alston* benefits led to any substantial retention of athletes at the collegiate level. There has been no consequent crowding out of other scholarship athletes. First, there were never enough professional draft slots, relative to the number of

---

[225] Tucker Report, p. 66.

[226] In her deposition, Dr. Tucker stated that "It's not the fact that I think substitution effects means that you can't certify a class, but instead that any damages methodology has to sort of account for substitution effects potential in the but-for world, and to do that you have to think, number one, how important they're going to be, and then think, well, given if they're going to be important, how can you adjust your model to think about them." (Tucker Deposition, 199:7-16).

*CONFIDENTIAL*

potentially graduating college athletes, for there to be enough opportunity for compensation to increase retention substantially.[227]  Second, the hypothesized constraint on the number of GIA slots available to absorb athletes has turned out not to be binding – schools have been leaving sufficient slots open to absorb any influx that occurred.[228]

165.  Dr. Tucker does not dispute these empirical findings but instead challenges whether previous experience with compensation changes are applicable in this matter (because the changes in compensation would have been relatively higher for some class members in this matter than the changes in compensation in previous matters).[229]  However, her speculation fails to support her argument.

166.  The average class member increase in compensation is not the same as the overall increase.  As I noted above (in Section 6.1.2), the change in net revenue that BNIL might cause for schools is not substantially different from increases in costs from previous changes in athlete compensation.  Here, even though BNIL would be substantially larger than any previous compensation change per athlete, the total amount to the school is similar because the previous compensation applied to more athletes.

167.  In my opening report, I estimated that an average of approximately 7,018 class members would have received broadcast NIL payments each year in the but-for world.[230]  Spread over the 65 Power 5 schools, this is an annual average of about 108 players per school.[231]  With average total damages of $228 million annually across all schools, this works out to

---

[227] Rascher Report, pp. 118-9.
[228] Rascher Report, pp. 119-20.
[229] Tucker Report, pp. 64-5.
[230] Rascher Report, Exhibit 11. Annual average of approximately 5,382 football players, 788 men's basketball players, and 849 women's basketball players.
[231] 7,018 / 65 = 108.

*CONFIDENTIAL*

about $3.5 million per school, or about $32,000 per athlete per year.[232]  While benefits resulting from the implementation of the *O'Bannon* and *Alston* judgments were smaller for each athlete, they also covered a larger number of athletes.

168.  As a result of the *Alston* decision, schools can now provide athletes with up to $5,980 in awards beyond the amount previously permitted.  Many schools have made these awards available to all athletes receiving athletic aid, and some have even extended them to walk-on athletes who receive no aid.[233]  In the 2020-21 season, Power 5 institutions offered aid to an average of 442 athletes – for that number of students, schools could offer as much as approximately $2.6 million.[234]

---

[232] Rascher Report, Exhibits 10 and 11. Total damages across all conferences for the six-year period are $1,370.1 million. The annual average is $1,370.1 million / 6 = $228.4 million. The average annual per-school amount is $228.4 / 65 = $3.5 million. Given a total of 42,110 athlete-years, the average annual per-athlete amount is $1,370.1 million / 42,110 = $32,536.

[233] Dr. Tucker points to University of Wisconsin as an example of institutions granting Alston awards (see Tucker Report, p. 110). All athletes at Wisconsin are eligible to receive these awards, including walk-ons. Wittry, A. (2022, September 19). "Wisconsin's Alston Awards Offer up to $25,000 upon Graduation." On3.com. Accessed July 20, 2023 at https://www.on3.com/news/wisconsins-alston-awards-badgers-policy-academic-achievement-ncaa-supreme-court/.

[234] Wisconsin indicates that it is committing over $3.8 million annually to these awards. See (2022, July 27). "Wisconsin Commits to Full Academic Award Plan." UWBadgers.com. Accessed on July 20, 2023 at https://uwbadgers.com/news/2022/7/27/general-news-wisconsin-commits-to-full-academic-award-plan.aspx. In practice, many institutions offer Alston awards in proportion with an athlete's financial aid, such that athletes getting a full ride receive the full $5,980 and athletes getting a half ride receive $2,990 each season. The average P5 school offered 286 full-scholarship equivalencies during the 2020-21 season.  This equates to 286 * $5,980 = $1.7 million in Alston payments.  Both Iowa and Indiana, which Dr. Tucker also discusses in the context of Alston payments, use such a scheme to distribute Alston awards, which, based on the information Dr. Tucker provided, total to $5,980 per athlete per year (with some of the payments deferred).  Tucker Report, ¶¶ 120–121; Wittry, A. (2022, August 16). "Hawkeye Academic Advantage Program Details Iowa's Alston Awards." On3.com. Accessed on July 20, 2023 at https://www.on3.com/news/university-iowa-hawkeyes-college-football-alston-awards-hawkeye-academic-advantage-program/; (2022, June 23) "IU Athletics Establishes New Financial Academic Achievement Awards For Its Student-Athletes." IUHoosiers.com. Accessed July 20, 2023 at https://iuhoosiers.com/news/2022/6/23/academic-services-iu-athletics-establishes-new-financial-academic-achievement-awards-for-its-student-athletes.  Alston awards being equal among full scholarship athletes means that, based on the average annual number of scholarship equivalencies these schools offer, Indiana likely awards approximately 324 * $5,980 = $1.9 million, while Iowa awards approximately 311 * $5,890 = $1.8 million in Alston payments annually.  (See "Text cite – Power 5 Scholarship Athletes.xlsx") Texas Tech reports that it awarded $786,950 to 285 athletes in the first semester of the program alone and expected to award $1.8 million for the full academic year. (2023, February 8). "Strive Program Successful in First Semester at Tech." TexasTech.com. Accessed July 20, 2023 at https://texastech.com/news/2023/2/8/academics-strive-program-successful-in-first-semester-at-tech.

*CONFIDENTIAL*

169.  In addition, the increase in allowable athletic aid up to the cost of attendance (COA) provided by the *O'Bannon* judgment increased the amount that all athletic-aid recipients could expect to receive.  These COA awards have now been instituted for over seven years and have been implemented across Division I.  I have reviewed the NCAA Compliance Assistant data provided by three Power 5 schools in this matter and estimate that these institutions made an average of $5.9 million in COA awards over the course of the 2016-17 through 2021-22 seasons, or an annual total of about $1 million per school per year.[235]

170.  Second, the standalone BNIL amount is not the change in *relative* compensation for members of the classes that receive BNIL – the top sports of football, men's basketball, and women's basketball.  Recruitment efforts for these top sports have been and would have been intense regardless of BNIL.  Thus, the few non-Power 5 athletes who might have been swayed (with more BNIL) to choose a Power 5 school were highly valued by the non-Power 5 schools they chose.  These athletes received overall deals to play at the non-Power 5 schools that, absent NIL compensation, were better than their Power 5 options available (or, as described in Section 8.3 below, some of these athletes would not actually have been able to choose to attend a Power 5 school anyway).  In a but-for world absent NIL restrictions, those same non-Power 5 schools would still have valued those athletes and, absent the NIL restrictions, also would have been permitted to offer BNIL compensation, as well as to offer opportunities for other NIL compensation.  The relative compensation difference within and outside of the Power 5 is not measured by the amount of BNIL for the athlete in the Power 5, but by the difference in the amount of total

---

[235] REDACTED - Counsel Only paid an average of $1.3 million annually, REDACTED - Confidential paid $0.9 million, and REDACTED - Counsel Only paid $0.7 million.  (See "Text Cite – COA Awards.xlsx") Using current student budgets at schools used in the example above, Iowa and Indiana, I estimate that these schools annually spend approximately $1.3 million and $1 million, respectively. (See "Text cite – Power 5 Scholarship Athletes.xlsx", tab "Select Schools COA".)

*CONFIDENTIAL*

compensation and other benefits within and without the Power Five. Dr. Tucker does not address these issues at all and thus provides no support for her claim that there would be a material substitution effect.

171. Specifically, Dr. Tucker provides no evidence that the relative difference in BNIL compensation at the college level would create any substantial change in the rate that college athletes would leave college athletics to become professional athletes (where BNIL compensation already exists). The capacity for professional leagues to absorb college athletes would have been the same. The number of college athletes interested in participating in professional sports has been higher than the capacity for professional sports leagues to acquire new athletes.

172. College athletes continue to seek professional athletic and other careers that forego NIL opportunities newly available at the collegiate level. For example, "Aliyah Boston was chosen as the No. 1 pick in the Draft by the Indiana Fever last night at Spring Studios in New York, choosing to pursue a professional career as opposed to remaining at South Carolina for her senior season. Boston, who had one year of eligibility left, 'can make more money from collectives and endorsements' as a college athlete than she can earn from a WNBA salary alone."[236] Earlier this year, Hanna and Haley Cavinder (the "Cavinder Twins"), two college athletes who are some of the highest NIL earners, "announced that they would not be returning to school for their fifth-year of eligibility at Miami" – according to Haley Cavinder, "Obviously, it's such a difficult position to be in, because we wanted to take our fifth year and continue to play, but I think it came down to

---

[236] (2023, April 11). "Aliyah Boston chooses WNBA career over NIL cash." Sports Business Journal, Morning Buzz. Accessed April 11, 2023 at https://www.sportsbusinessjournal.com/Daily/Morning-Buzz/2023/04/11/wnba-draft-aliyah-boston-goes-no-1.aspx.

CONFIDENTIAL

just optimizing all the opportunities that we have ahead of us." [237]  These examples illustrate the weakness in Dr. Tucker's speculation that the ability to earn large amounts of NIL compensation in college will materially increase substitution effects.

173.  Finally, I note that there is no claim by Dr. Tucker that my methodology for estimating video game damages would be impacted by any claimed substitution effect.  As such, this issue does not even exist for that part of my injury and damages analysis, which by itself establishes injury and damages for all members of the Football and Men's Basketball Class.

### 8.2. DEFENDANTS' CLAIMED "RIPPLE EFFECT" OF SUBSTITUTION DOES NOT UNDERMINE MY METHODOLOGY FOR ESTIMATING CLASS-WIDE INJURY AND DAMAGES

174.  In addition to the substitution effect described above, Defendants' Experts now claim that the assessment of class-wide injury and damages for class members must also take into account substitution between members of the class (the "ripple effect").  I disagree.  The possibility that some class members could be close substitutes for class members who attended different schools has no bearing on my methodology for assessment of injury or damages.

175.  With respect to the so-called "ripple-effect," there is no economic rationale for Dr. Tucker's claim that assessment of injury and damages requires matching each class member to which school they would have attended in the but-for world, without which, she claims, the methodology would be unreliable.[238]

---

[237]  McDaniel, M. (2023, April 13). "Cavinder Twins Expand on Decision to Leave Miami, College Basketball." Sports Illustrated (si.com). Accessed July 15, 2023 at https://www.si.com/extra-mustard/2023/04/13/cavinder-twins-hanna-haley-decision-to-leave-miami-college-basketball-today-show-wwe-rumors.

[238]  "Any assessment of injury and damages would require determining, at minimum, (i) which student-athletes would make different decisions in the but-for world; (ii) which student-athletes would be displaced in the but-for world; (iii) which schools these displaced student-athletes would attend in the but-for world; (iv) whether these displaced student-athletes would not be worse off in the but-for world; and (v) whether any broadcast-related payments and/or third-party NIL payments available at their alternate school would be sufficient to compensate any worse-

*CONFIDENTIAL*

176. Dr. Tucker's discussion of matching in the context of college athletics has no economic basis. She adopts a broad definition of matching that appears to encompass nearly all types of consensual human interactions, economic and otherwise: "Matching refers to the process whereby two separate entities embark on a relationship together which they think will be fruitful."[239] She then asserts, without analysis, that the matching process for college athletics requires some unusual amount of time or effort to achieve a stable equilibrium, as compared to any of the many other labor markets that align differentiated buyers and sellers through competitive search effort and compensation. In reality, the same economic consideration that goes into acquiring the labor of specific college athletes at specific schools also goes into the acquisition of the labor of specific athletes for specific professional teams (post-draft), the labor of specific writers or performers for specific television series, the labor of specific nurses or doctors at specific hospitals, or the labor of specific code developers at specific software firms.

177. The one-to-one or many-to-one (or even one-to-many) matching that occurs in the college athletic labor market is not in any substantial fashion different from the same sort of matching that occurs in the other labor markets. There is no cascade of displacement that could make college athlete matching substantially less stable. The prospect of NIL does not substantially change the number of athletes receiving full scholarships at the schools of the class members – in other words, there is no change in the athletes available to schools. With respect to schools available to each athlete, the only change that matters to any specific athlete would be the removal of the option to choose the school that the athlete actually chose. With respect to compensation and other benefits offered by schools available to an athlete, NIL compensation opportunities are only part of a variety of

---

off student-athletes for the loss of benefits associated with attending a less preferred school in the but-for world." (Tucker Report, p. 48).

[239] Tucker Report, p. 22.

*CONFIDENTIAL*

factors affecting athlete decisions, and a change in NIL compensation only matters when it elevates to a student's top spot a school different from the school actually chosen.[240] Finally, in the event that an athlete would have chosen school B instead of the school they actually chose (A), that choice would only affect the choices of other athletes if it reached the capacity of school B to offer GIA scholarships.

178. It is helpful to consider an example of damages for antitrust price-fixing overcharges analogous to compensation undercharges to college athletes, but inflated prices occurring for buyers of products instead of deflated prices occurring to sellers of services. This example, which comes from a Georgetown University Law Center Professor Dale Collins' course Applied Antitrust Law, involves an economic expert report that includes assessment of injury and damages for purchasers of Vitamin C products alleged to have had inflated pricing due to collusion among multiple Defendant manufacturers.[241] The economic expert, Dr. Bernheim, provided analysis to assess damages class members incurred when purchasing various products from various manufacturers.[242] The multiple producers charged similar but differing prices.[243] The damages analysis consisted of determining the difference between but-for and actual prices and then applying that

---

[240] Based on revealed preference ("The individual's choice behavior *reveals* his preferences," Kreps, D.M. (1988). *Notes on the Theory of Choice*. Westview Press, p. 11), each athlete revealed their preferred school among the choices actually available. It is possible that shift in relative compensation would change an athlete's top choice, but that shift would have to be large enough to overcome the other factors that determined the athlete's actual choice.

[241] The court certified the class, and this matter proceeded to a jury trial that resulted in a $147 million damages award. Subsequently, legal determinations related to international comity and unrelated to antitrust class certification resulted in reversal of the trial result. (Arguello, S. and Neuner, T.J. (2021, August 17). "Chinese Vitamin Defendants Prevail Again, Showing Limits of U.S. Antitrust Law's Extraterritorial Reach," Winston & Strawn's Competition Corner. Accessed July 15, 2023 at https://www.winston.com/en/competition-corner/chinese-vitamin-defendants-prevail-again-showing-limits-of-us-antitrust-laws-extraterritorial-reach.html.)

[242] Dr. Bernheim identified himself as "the Edward Ames Edmunds Professor of Economics at Stanford University. I am also CoDirector of the Tax and Budget Policy Program at the Stanford Institute for Economic Policy Research (SIEPR), a Senior Fellow of SIEPR, and a Partner with Bates White, LLC." (Expert Report of B. Douglas Bernheim, Ph.D., November 14, 2008, In Re; Vitamin C Antitrust Litigation, accessed on July 15, 2023 at https://appliedantitrust.com/04_private_actions/damages/vitamin_c/vitamin_c_edny_bernheim_report11_14_2008.pdf, hereinafter "Bernheim Vitamin C Report", at p. 2, ¶1).

[243] Bernheim Vitamin C Report, p. 26, ¶47.

*CONFIDENTIAL*

overcharge to actual purchases by class members.  There was no analysis to determine whether the purchase amounts and specific product suppliers would have been the same or different in the but-for world or whether the volume of purchasers from each specific sellers by any of the specific plaintiff buyers (or, indeed, other possible buyers) would have been different – only whether prices would have been lower (showing overcharges).[244]  This is consistent with standard economic principles for damages assessment: "antitrust damages can be quantified by comparing the plaintiff's actual profits (in a lost profits case), purchase prices (in an overcharge chase), or the like, against what the plaintiff would have enjoyed absent the illegal conduct."[245]  Substitution effects, which are always theoretically possible, are not a part of this damages assessment, just as there is no need to make them a part of this damages assessment.

### 8.3. DR. TUCKER PROVIDES NO RELIABLE ANALYSIS REGARDING ATHLETE CHOICES

179.  Dr. Tucker overstates the complications related to athlete/college matching and conducts a flawed empirical analysis of school offers to athletes.  Dr. Tucker claims that many athletes who did not attend Power 5 schools could have done so because there is information about offers to athletes.  Her analysis to support this claim relies on offers that a third-party (247Sports) website reported were available to each of the top incoming

---

[244] "I computed damages in four main steps. First, based on the manner in which Vitamin C prices varied with supply and demand conditions outside the period in which the cartel is thought to have operated effectively, I forecasted the prices that would have prevailed during the cartel period but for the conspiracy. Second, I made an appropriate adjustment for SARS. Third, I determined average overcharges by computing the difference between the actual average price and the adjusted but-for price in each month. Fourth, I multiplied the overcharges by the amounts sold in each month, net of transactions covered by arbitration clauses." (Bernheim Vitamin C Report, p. 86, ¶90); "To compute damages, I multiply the overcharge for each month by the affected quantity" (Bernheim Vitamin C Report, p. 99, ¶128); "Where available, I used transactional data provided by the defendants to measure total sales, which is available for Hebei from 2002 to 2007. When transactional data is not available, I used Chinese customs data found in defendant documents. These data reported export quantities, by firm, from China to the U.S. I used the trade data to provide volumes for JJPC, NEPG, and other conspirators during the entire period." (Bernheim Vitamin C Report, pp. 105-6, ¶138, internal footnotes removed); "I determined damages by applying the overcharges … to the sales volumes." (Bernheim Vitamin C Report, p. 108, ¶142).

[245] American Bar Association. (2017). *Proving Antitrust Damages, Legal and Economic Issues*. Third Edition, p. 89.

*CONFIDENTIAL*

college athletes.[246]  The conclusions that she reaches from her analysis of these data are unreliable, reflecting insufficient knowledge about the data source.

180. The incorrect assumption underlying Dr. Tucker's analysis of offers to athletes is that the presence of a reported offer from a school to an athlete would be sufficient information to infer that the athlete would have been able to choose to attend the school.  She demonstrates that there are athletes who the data identify as receiving offers from Power 5 schools and who ended up attending non-Power 5 schools.  However, she fails to recognize that not all offers could possibly have been fulfilled simultaneously – all teams were already substantially close to the maximum number of GIA athletes when only a portion of offers were fulfilled.  All the information that the offer data tells us is that there is a report that, at some point in time, the school had some interest in having the student participate on their team.  The data do not tell us which of the many unfulfilled offers occurred because the student chose otherwise and which were unfulfilled because the school chose otherwise.  There is substantial evidence that 247Sports data contain offers that ultimately were NOT choices of schools available to athletes.

181. It is readily apparent the 247Sports data show schools making many more offers than they have slots on their rosters, something that Dr. Tucker failed to assess.[247]  Of the schools that made football offers each year in 2016-22, 40% of them made more than 85 football offers in each of those years – and 85 is the number of scholarship slots available on the entire team.  Furthermore, while there are 85 scholarship slots available on an FBS team in any given year, there is an NCAA-imposed cap on the number of incoming freshmen who can receive a scholarship, which was 25 for 2016-21, 32 for 2022, and has been dropped

---

[246] Tucker Report, pp. 49-50, Table 3.

[247] "Q: Did you determine whether in looking at the data whether that the scholarship offers attributed to individual schools for a particular team exceeded the number of scholarships that team was allowed to actually provide under NCAA rules? … A: So, again, I have not done that check" (Tucker Deposition, 57:2-9).

*CONFIDENTIAL*

for the forthcoming 2023 and 2024 seasons.[248]  Over half of the schools made more than

32 offers, and 75 percent of schools averaged more than 32 offers each year.

182. The most offers in a single year were from Tennessee, which in 2022 sent out 469 football

offers – of all the 2022 football students in Dr. Tucker's analysis, slightly more than one

in five received an offer from Tennessee, according to the 247Sports data.  Drilling down

deeper, the 247Sports data report that 99% of FBS schools made more than 25 offers each

year and the minimum yearly number of offers for any Power 5 school for any year was

55.[249]  Therefore, Dr. Tucker's analysis of this data is not reliable evidence of how many

choices (and at which schools) college football players had in their college choices.

183. For basketball, the data show Virginia Tech making the most offers in a single year (82

offers in 2019).  The maximum number of scholarships for Division I MBB is 13 and for

WBB it is 15.  Dr. Tucker's 247Sports data does not include WBB athletes.  For MBB the

247Sports data show 23% percent of schools had above 13 for MBB for each year in

2016-2022.  Schools offering, on average, more than 13 slots were 44% of all schools and

92% of only Power 5 schools.[250]

184. In the cases of both the 2022 Tennessee Football and 2019 Virginia Tech Basketball

offers, the data show that only 5 percent of the offers resulted in a match between the

athlete and the school.  The school with the highest average basketball conversion rate was

Duke University, who was able to convert an average 46% of offers into selections,

---

[248] See NCAA Division I Manual (2022-23), p. 200; McAllister, M. (2021, September 15). "NCAA to Expand College Football Class Signing Limit." FanNation. Accessed July 21, 2023 at https://www.si.com/college/syracuse/recruiting/ncaa-expand-college-football-class-signing-limit, reporting that the NCAA would pass a one-year waiver to increase the signing limit to 32; Alexander, W. (2022, May 18). "Football signing class limits removed for the next 2 years. Here's what it means for LSU." The Advocate. Accessed July 21, 2021 at https://www.theadvocate.com/baton_rouge/sports/lsu/football-signing-class-limits-removed-for-the-next-2-years-heres-what-it-means-for/article_dab793f0-d6e2-11ec-a3a4-4b2f5c7574e9.html, reporting that the limit would be removed entirely for the following two years.

[249] Text Cite – 247Sports.xlsx

[250] Text Cite – 247Sports.xlsx

*CONFIDENTIAL*

according to the data.  In comparison, the highest conversion rate for football, for schools that had at least one acceptance in each year, was UTEP with 39%.  Alabama had an average conversion factor of just 11% for football.[251]

185.    Omari Spellman is an example of an athlete who appears to have chosen a non-Power 5 school (Villanova) over the possibility of playing at Power 5 school (Kentucky).  The presupposition from that example is that the existence of an offer from Kentucky establishes the possibility of Mr. Spellman playing at a Power 5 school, University of Kentucky.  In the year that Mr. Spellman accepted the offer from Villanova, Kentucky made 22 offers.  Given that five other athletes accepted their offers from Kentucky that year and that the number of offers exceeded the maximum roster size, the existence of an offer cannot, by itself, establish that Mr. Spellman had a guaranteed slot at Kentucky.[252]

186.    The 247Sports data include offers that are only preliminary and could later be rescinded. Schools use offers in a variety of ways that may not reflect actual choices for the athlete. Offers can be contingent on availability at the position, in addition to the student having to meet the school's requirements for admission.[253]  Schools use offers to establish the possibility of bringing an athlete onto a team, while continuing to gather more information: "So you get your foot in the door with an 'offer', and then evaluate him.  If he's a player you want, then you become the first school to offer him, and he remembers that and it's your advantage.  If he's a player you do not want, then you just forget to call him come spring."[254]  The 247Sports website on interested schools for a given college

---

[251] Text Cite – 247Sports.xlsx

[252] In 2016, Villanova made 10 offers, of which 2 accepted and Kentucky made 22 offers of which 5 accepted (Text Cite – 247Sports.xlsx).

[253] Perroni, B. (2018, August 1). "What Does a Written Offer Letter Actually Look Like?" 247Sports. Accessed July 21, 2023 at https://247sports.com/college/texas-am/contentgallery/texas-am-football-recruiting-what-does-a-written-offer-letter-ac-120269438/#939325.

[254] Hokanson, J. (2009, June 17). "College Football Recruiting 101: The 'Offer' Game, How It All Works." Bleacher Report. Accessed July 21, 2023 at https://bleacherreport.com/articles/201519-college-football-recruiting-101-the-offer-game-how-it-all-works.

*CONFIDENTIAL*

athlete includes the roster outlook for each school which breaks down the number of students currently on the roster for the student's position and the number of students who have already committed, further showing that position availability is taken into consideration when making and accepting offers.[255]

187.    According to a leading recruiting business (NCSA), verbal offers and commitments are unofficial contracts between the athlete and the coach that the NCAA does not track.[256] Even after a verbal commitment, it is possible to not get an official offer on signing day due to coaching changes, over-signing, or other reasons.  The NCAA only formally recognizes a commitment when a college athlete signs a National Letter of Intent during the signing period.[257]  Even after the signing period, scholarships may be pulled (and the athlete might not stay with the school for all eligible years).[258]  Specific examples of pulled offers (confirmed by public sources) include the following, both of whom appear in Dr. Tucker's 247Sports Data: (1) Erik Swenson had committed to Michigan who reopened recruitment and claimed that they had pulled his offer;[259] and (2) Ben Bryant had his scholarship pulled after tweeting about an offer from a different school.[260]

188.    In sum, none of these data are reliable to show which non-Power 5 athletes had the actual choice to accept a GIA scholarship from a Power 5 school.  Dr. Tucker's analysis of these

---

[255] "Omari Spellman: Interests." 247Sports. Accessed July 21, 2023 at https://247sports.com/Recruitment/Omari-Spellman-45297/RecruitInterests/.

[256] "Verbal Offers and Commitments: FAQs and Answers." NCSA. Accessed July 21, 2023 at https://www.ncsasports.org/recruiting/managing-recruiting-process/verbal-offers-and-commitments.

[257] Leccesi, J. (2017, April 27). "Five Most common Questions About Verbal Commitments." USA Today, High School Sports. Accessed July 21, 2023 at https://usatodayhss.com/2017/five-most-common-questions-about-verbal-commitments.

[258] Drotar, B. "Surprise! You Lost Your Athletic Scholarship." Therecruitingcode.com. Access July 21, 2023 at https://therecruitingcode.com/lost-athletic-scholarship/.

[259] Flaherty, K. (2016, January 20). "Report: Michigan Pulled Recruit's Scholarship Offer." 247Sports. Accessed July 21, 2023 at https://247sports.com/article/report-michigan-pulled-recruits-scholarship-offer-42994354/.

[260] Johnson, R. (2017, May 15). "QB Commit Ben Bryant Says Wisconsin Pulled Offer After He Tweeted About Georgia Offer." SB Nation. Accessed July 21, 2023 at https://www.sbnation.com/college-football-recruiting/2017/5/15/15637674/wisconsin-pulls-qb-ben-bryant-scholarship-offer.

*CONFIDENTIAL*

data is unreliable and uninformed.  It provides no support for her substitution effects argument.

## 9.  CONCLUSION

189.  In this report, I demonstrate that Dr. Tucker's disagreements with my opinions about injury are without merit and, in any event, are disputes common to all class members.  I further demonstrate that there is no basis for disputing the class-wide methodologies I developed to show additional specific injuries to members of each of the proposed damages classes and to estimate class-wide damages for these additional specific injuries, and I provide additional detail about how to implement the methodology to estimate damages related to other third-party use of NILs.

190.  As I found nothing in the Defendants' Experts' reports or testimony disputing my other opinions, this report focuses on challenges to my opinions that class-wide injury and class member damages can be proven by means of economic evidence and methodologies common to class members.

191.  The "substitution effect" argument does not apply to my opinions regarding common evidence of class-wide injury from the loss of the opportunity to compete for third-party NIL deals in the market, an injury that is unrelated to the school attended.  Nor does the "substitution effect" argument undermine any of my opinions regarding common evidence of injury and damages for foregone compensation.  No class member was made better off by the Defendants' NIL restrictions, not by the restrictions directly nor by any putative effect of the restrictions on the availability of slots at top schools.  As common evidence demonstrating anticompetitive effects will show, removing the NIL restrictions would provide only economic benefit and never harm to the class members.  Dr. Tucker's analysis purporting to show widespread substitution relies on a faulty understanding of the data that 247Sports provided regarding school choices available to incoming athletes.

*CONFIDENTIAL*

192. Dr. Tucker presents a number of attacks on my opinions regarding injury, which raise only common issues that can be addressed through evidence common across class members. Even if her critiques had analytical substance, which I believe they do not, her critiques address the merits of the liability claims, and subsequent damages allocations after class-wide damages are established. They are not relevant to determining whether liability issues and class-wide damages can best be addressed for the class(es) using a common methodology and common evidence.

193. With respect to my proposed class-wide methodologies to estimate damages related to additional specific injuries, Defendants' Experts have not demonstrated any substantive critique that causes me to change my previous opinions.

194. With respect to economic evidence that may be relevant to the issue of class conflicts, I note that there is no economic reason to presume damage awards in an antitrust class action case would be identical for all class members (across multiple classes), and my methodologies meet the criteria for a soundly based damages methodology that does not create any conflict within the class.

## 10. SIGNATURE

195. Executed under penalty of perjury this 21st day of July, 2023, at Orinda, California.

_Daniel A. Rascher_

Daniel A. Rascher

*CONFIDENTIAL*

# APPENDIX A

## CURRICULUM VITAE

## DANIEL A. RASCHER, PH.D.

### EDUCATION

B.A., Economics, University of California at San Diego.

Ph.D., Economics, University of California at Berkeley.
Dissertation Title, *Organization and Outcomes: A Study of the Sports Industry*

Certified Valuation Analyst (CVA) by the National Association of Certified Valuators and Analysts

### PRESENT POSITIONS

University of San Francisco
  Director of Academic Programs for the Sport Management Program, 2002-current
  Professor of Sport Management, 2010-current
  Associate Professor of Sport Management, 2005-2010
  Assistant Professor of Sport Management, 2000-2005
  Adjunct Professor of Sport Management, 1999-2000

  - M.A. Course – Sport Economics and Finance
  - M.A. Course – Master's Project in Sport Management
  - M.A. Course – Sport Business Research Methods

SportsEconomics, LLC (www.sportseconomics.com)
  Founder and President, 1998-current

  Performed economic analysis for sports industry clients including multiple projects involving the NFL, NBA, NASCAR, NCAA, NHRA, NHL, MLS, ATP, AHL, professional cycling, media companies, sports commissions and government agencies, event management, B2B enterprises, and IHRSA.  Specialized in industrial organization, antitrust, valuations, market research, labor issues, financial modeling, strategy, economic impact, and feasibility research.

OSKR, LLC (www.oskr.com)
  Co-Founder and Partner, 2008-current

  Performed economic analysis for clients involved in sports and other industries, including insurance, technology, automotive, television, and consumer products.

### PREVIOUS ACADEMIC EXPERIENCE

STANFORD UNIVERSITY, taught franchise relocation & stadium financing course, Summer 2020

NORTHWESTERN UNIVERSITY, taught sports economics and finance course, Winter 2014

IE BUSINESS SCHOOL (Madrid, Spain), taught sports economics and finance course, 2010-2013

UNIVERSITY OF MASSACHUSETTS AT AMHERST, Sport Management Department
Assistant Professor, 1997-1998

* M.S. Courses—Principles of Sport Business Management, Applied Sport Business Management

* B.S. Courses—Sport Business Finance, Sports Economics

UNIVERSITY OF CALIFORNIA AT BERKELEY, Department of Economics
Teaching Assistant

* Economic Principles & Intermediate Microeconomics.

Institute of Sports Law and Ethics (University of the Pacific).  Board Member, 2011-2017

PREVIOUS CONSULTING EXPERIENCE

LECG, LLC
Affiliate, 2003-2007; Principal, 2000-2003; Senior Economist, 1998-2000

* Performed economic analysis for sports industry clients including multiple projects involving the NFL, MLB, NBA, NHL, PGA, Formula One racing, CART, and Premier League Football (soccer).  Specialized in industrial organization, antitrust, M&As, valuations, and damages analysis.

* Provided testimony for cases involving sports industry clients, including damages analysis and liability.

* 40% of work related to antitrust litigation, 20% IP and breach of contract damages litigation, 20% merger related, and 20% management consulting.

* 60% of work involved the sports and entertainment industries, 15% involved technology, and 25% in other industries including agriculture, transportation, and energy.

UNIVERSITY OF CALIFORNIA AT BERKELEY, Competitive Semiconductor Manufacturing Program
Visiting Scholar, Institute of Industrial Relations, 1998-2000

Research Fellow, 1995-1997

* Funded by the Alfred P. Sloan Foundation, the CSM study is an interdisciplinary project that analyzes the determinants of high performance in semiconductor manufacturing.

* Research on HR, training, small sample analyses and generalizability of case study results.

NATIONAL ECONOMIC RESEARCH ASSOCIATES, Summer 1994; January-August 1995
Research Assistant

* Research on the energy industry, on transmission pricing, and on the economic damages of contract breaches.

QUANTUM CONSULTING, 1992-1994
Research Assistant

* Developed a model and a software package using spline techniques to weather-normalize energy usage, allowing the PUC to evaluate regulation policies.

HONORS AND AWARDS

Sonny Vaccaro Impact Award (*College Sport Research Institute, Univ. of South Carolina*), 2023

Outstanding Antitrust Litigation Achievement in Economics (*American Antitrust Institute*), 2021

Lifetime Achievement Award (*Applied Sport Management Association*), 2019

Research Fellow of the *North American Society for Sport Management*, 2009

College of Arts & Sciences Collective Achievement Award, 2009

Innovation Award Winner (for the innovative use of technology in teaching), 2004. From the *Center for Instruction and Technology*, University of San Francisco.

Research Grant for the Study of Human Resource Systems (*Alfred P. Sloan Foundation*), 1995-1997.

Newton-Booth Fellowship for graduate study at University of California at Berkeley, 1990-1991.

## PEER-REVIEWED JOURNAL ARTICLES

"Who Are Our Fans: An Application of Principal Component-Cluster Technique Analysis to Market Segmentation of College Football Fans," with Kenneth Cortsen, Mark Nagel, and Tiffany Richardson. *Journal of Applied Sport Management, 13*(1)*,* 2021.

"Economic Development Effects of Major and Minor League Teams and Stadia," with Nola Agha. *Journal of Sports Economics, 21*(1), 2020.

"Is there a Consensus?: An Experimental Trial to Test the Sufficiency of Methodologies Used to Measure Economic Impact," with Giseob Hyun and Mark Nagel. *Journal of Applied Business and Economics, 22*(11), 2020.

"Coaching Salary Disparity and Team Performance: Evidence from the Football Bowl Subdivision," with Alex Traugutt, Alan Morse, and Brian Fowler. *Journal of Applied Business and Economics, 22*(1), 2020.

"Cartel Behavior in US College Sports: An Analysis of NCAA Football Enforcement Actions from 1990-2011," with Mark Nagel, Richard Southall, and Nick Fulton. *Journal of NCAA Compliance*, July-August, 2019.

"The Unique Economic Aspects of Sports," with Joel Maxcy and Andrew D. Schwarz. *Journal of Global Sport Management* (July, 2019).

"Making a Difference: Bridging the Gap Between the Ivory Tower & the Community." *Journal of Applied Sport Management, 11*(2), 2019.

"Because It's Worth It: Why Schools Violate NCAA Rules and the Impact of Getting Caught in Division I Basketball," with Andrey Tselikov, Andrew D. Schwarz, and Mark Nagel. *Journal of Issues in Intercollegiate Athletics, 12,* 2019. <u>*Article of the year in the publication for 2019*</u>.

"Determining fair market value for Duke's Sporting Goods Store," with Michael Goldman. In *Case Studies in Sport Management, 6*(1), 2017.

"The Beckham Effect: Examining the Longitudinal Impact of a Star Performer on League Marketing, Novelty, and Scarcity," with Stephen Shapiro and Tim DeSchriver. In *European Sport Marketing Quarterly, 17*(5), 2017.

"What Drives Endorsement Earnings for Superstar Athletes?" with Terence Eddy and Giseob Hyun. In *Journal of Applied Sport Management*, Vol. 9, No. 2, Summer 2017.

"A Smaller Window to the University: The Impact of Athletic De-Escalation on Status and Reputation," with Michael Hutchinson and Kimi Jennings.  In *Journal of Intercollegiate Sport,* Vol. 9, No. 1, June 2016.

"If We Build It, Will They Come?: Examining the Effect of Expansion Teams and Soccer-Specific Stadiums on Major League Soccer Attendance," with Steve Shapiro and Tim DeSchriver.  In *Sport, Business, and Management: An International Journal,* Vol. 6, No. 2, Spring 2016.

"An Explanation of Economic Impact: Why Positive Impacts Can Exist for Smaller Sports," with Nola Agha.  In *Sport, Business, and Management: An International Journal,* Vol. 6, No. 2, Spring 2016.

"Where is Everyone? An Examination of Attendance at College Football Bowl Games," with Terence Eddy.  In *International Journal of Sport Finance*, Vol. 11, No. 2, February 2016.

"Tracking the Dollars: How Economic Impact Studies can Actually Benefit Managerial Decision Making," with Michael Goldman.  In *Sport & Entertainment Review,* Vol 1, No. 1, February 2015.

"Sport Pricing Research: Past, Present, and Future," with Joris Drayer.  In *Sport Marketing Quarterly*, Vol. 22, No. 3, September 2013.

"The Antitrust Implications of "Paperless Ticketing" on Secondary Markets," with Andrew D. Schwarz.  In *Journal of Competition Law and Economics*, Vol. 9, No. 3, 2013.

"An Examination of Underlying Consumer Demand and Sport Pricing Using Secondary Market Data" with Joris Drayer and Chad McEvoy.  In *Sport Management Review*, Vol. 15, No. 4, November 2012.

"Smooth Operators: Recent Collective Bargaining in Major League Baseball" with Tim DeSchriver, 2012.  In *International Journal of Sport Finance*, 7(2).

"Financial Risk Management:  The Role of a New Stadium in Minimizing the Variation in Franchise Revenues" with Matt Brown, Mark Nagel, and Chad McEvoy.  In *Journal of Sports Economics*, Vol. 13, No. 3, August 2012.

"Factors Affecting the Price of Luxury Suites in Major North American Sports Facilities" with Tim DeSchriver and Steve Shapiro.  In *Journal of Sport Management,* Vol. 26, No. 3, May 2012.

"Free Ride, Take it Easy: An Empirical Analysis of Adverse Incentives Caused by Revenue Sharing" with Matthew Brown, Mark Nagel, and Chad McEvoy.  In *Journal of Sport Management,* Vol. 25, No. 5, September 2011.

"Simulation in Sport Finance," with Joris Drayer.  *Simulation & Gaming: An Interdisciplinary Journal of Theory, Practice, and Research* Vol. 41, No. 2, April 2010.

"Where did National Hockey League Fans go During the 2004-2005 Lockout?: An Analysis of Economic Competition Between Leagues," with Matthew Brown, Mark Nagel, and Chad McEvoy. In *International Journal of Sport Management and Marketing*, Vol. 5, Nos. 1, 2, January 2009.

"The Effects of Roster Turnover on Demand in the National Basketball Association," with Steve Shapiro, Alan Morse, and Chad McEvoy. In *International Journal of Sport Finance*, Vol. 3, No. 1, February 2008.

"Variable Ticket Pricing in Major League Baseball" with Chad McEvoy, Mark Nagel, and Matthew Brown. In *Journal of Sport Management*, Vol. 21, No. 3, July 2007.

"Do Fans Want Close Contests?: A Test of the Uncertainty of Outcome Hypothesis in the National Basketball Association" with John Paul Solmes. In *International Journal of Sport Finance*, Vol. 3, No. 2, August 2007.

"The Use of Simulation Technology in Sport Finance Courses: The Case of the Oakland A's Baseball Business Simulator" with Joris Drayer. In *Sport Management Education Journal* Vol. 1, No. 1, May 2007.

"Washington "Redskins" – Disparaging Term or Valuable Tradition?: Legal and Economic Issues Concerning *Harjo v. Pro-Football, Inc.*" with Mark Nagel. In *Fordham Intellectual Property, Media, and Entertainment Law Journal*, Vol. XVII, No. 3, Spring 2007.

"Treatment of Travel Expenses by Golf Course Patrons: Sunk or Bundled Costs and the First and Third Laws of Demand," with Matthew Brown, Chad McEvoy, and Mark Nagel. In *International Journal of Sport Finance*, Vol. 2, No. 1, February 2007.

"Major League Baseball Anti-Trust Immunity: Examining the Legal and Financial Implications of Relocation Rules" with Mark Nagel, Matthew Brown, and Chad McEvoy. In *Entertainment and Sports Law Journal,* Vol. 4, No. 3, December 2006.

"The Use of Public Funds for Private Benefit: An Examination of the Relationship between Public Stadium Funding and Ticket Prices in the National Football League" with Matthew Brown and Wesley Ward. In *International Journal of Sport Finance*, Vol. 1, No. 2, June 2006.

"An Analysis of Expansion and Relocation Sites for Major League Soccer" with Matthew Baehr, Jason Wolfe, and Steven Frohwerk. In *International Journal of Sport Management,* Vol. 7, No. 1, January 2006.

"Revenue and Wealth Maximization in the National Football League: The Impact of Stadia" with Matthew Brown, Mark Nagel, and Chad McEvoy. In *Sport Marketing Quarterly*, Vol. 13, No. 4, December 2004.

"NBA Expansion and Relocation: A Viability Study of Various Cities" with Heather Rascher. In *Journal of Sport Management*, Vol. 18, No. 3, July 2004.

"Does Bat Day Make Cents?: The Effect of Promotions on the Demand for Baseball," with Mark McDonald. In *Journal of Sport Management*, Vol. 14, No. 1, January 2000.

"The NBA, Exit Discrimination, and Career Earnings," with Ha Hoang. In *Industrial Relations*, Vol. 38, No. 1, January 1999.

**BOOKS**

"Financial Management in the Sport Industry" 3rd ed. with Matthew Brown, Mark Nagel, and Chad McEvoy.  Routledge, Inc., 2021.  A textbook.

"Financial Management in the Sport Industry" 2nd ed. with Matthew Brown, Mark Nagel, and Chad McEvoy.  Routledge, Inc., 2015.  A textbook.

"Financial Management in the Sport Industry" with Matthew Brown, Mark Nagel, and Chad McEvoy.  Holcomb Hathaway, Inc., June 2010.  A textbook.

**BOOK CHAPTERS**

"The Relevance of a Gamified Football/Soccer Development Platform," with Kenneth Cortsen in *Interactive Sports Technologies: Performance, Participation, Safety*, edited by Michael Filimowicz and Veronika Tzankova for Routledge (2022).

"Sporting Goods and Sports Licensing," with Mark Nagel in *The Governance of Sports*, edited by Bonnie Tiell for Human Kinetics, (2020).

"The application of sports technology and sports data for commercial purposes," with Kenneth Cortsen in *The Use of Technology in Sport – Emerging Challenges,* (2018).

"Valuing Highly Profitable Sports Franchises – A Hybrid Income and Market Approach," in *Sports Business* edited by Kenneth Cortsen (forthcoming).

"The Use of Price-to-Revenue Ratios in Valuing Sports Franchises," in *Sports Business* edited by Kenneth Cortsen (forthcoming).

"Competitive Equity: Can there be Balance between Athletes' Rights and a Level Playing Field?" with Andrew D. Schwarz in E. Comeaux (ed.), *College Athletes' Rights and Well-Being: Critical Perspectives on Policy and Practice.*  Baltimore: Johns Hopkins University Press, (2017).

"Illustrations of Price Discrimination in Baseball" with Andrew D. Schwarz in L. Kahane and S. Shmanske eds., *Economics Through Sports*, Oxford: Oxford University Press, (2012).

"The Expanding Global Consumer Market for American Sports: The World Baseball Classic" with Mark Nagel, Chad McEvoy, and Matt Brown in G. Mildner, and C. Santo, eds., *Sport and Public Policy*, Champaign, IL: Human Kinetics, 2010.

"Franchise Relocations, Expansions, and Mergers in Professional Sports Leagues." In B. Humphreys, and D. Howard, eds., *The Business of Sports*, pp. 67-106.  Westport, CT: Praeger, 2008.

"Collective Bargaining in Sport" with M. Nagel, M. Brown, and C. McEvoy.  In *Encyclopedia of World Sport*, pp.335-339. Great Barrington, MA: Berkshire Publishing, 2005.

"The Role of Stadia in the USA: Wealth Maximization in the National Football League" with Matthew Brown and Mark Nagel in G. Trosien & M. Dinkel (eds.), *Grenzen Des Sportkonsums* (Frontiers of Sport Commerce), Heidelberg, Germany: SRH Learnlife AG, 2003.

"A Test of the Optimal Positive Production Network Externality in Major League Baseball," in E. Gustafson and L. Hadley, eds., *Sports Economics: Current Research*, 1999. Praeger Press.

"A Model of a Professional Sports League," in W. Hendricks (ed.), *Advances in the Economics of Sport*, vol. 2. June 1997, JAI Press, Inc.

## BOOK REVIEWS

"Review of: Much More Than a Game: Players, Owners, and American Baseball Since 1921", by Robert F. Burk in *Journal of Economic Literature*, Vol. 40(3), September 2002, pp. 949-951.

## NON-PEER REVIEWED ARTICLES

"Data Science for Football Business – Clustering Analysis," with Kenneth Cortsen and Bas Schnater in *FCBusiness*, 132, April 2021.

"Competitive Balance in Sports: "Peculiar Economics" over the last Thirty Years," with Andrew D. Schwarz. In *Competition, 29*(2), Fall 2019.

"How The $200+ Million Settlement For COA Payments Was Calculated," with Andrew D. Schwarz. In *Athletic Director U.*, May 2017.

"Rich Men's Toys – Applying Valuation Methods to the Business of Professional Sports" in *Valuation Strategies*, March/April 2015.

"Competitive Balance in Sports: "Peculiar Economics" Over the Last Quarter Century," with Andrew. D. Schwarz. In *Entertainment, Arts, and Sports Law Journal*, 24(1), Spring 2013.

"The Impact on Demand from Winning in College Football and Basketball: Are College Athletes More Valuable than Professional Athletes?" with Chad McEvoy. In *Selected Proceedings of the Santa Clara University Sports Law Symposium*, September 2012.

"The Economics of Competitive Balance on the Field and in the Courts" in *Selected Proceedings of the Santa Clara University Sports Law Symposium*, 2011.

"5 Themes from 50 Economic Impact Studies" in *SportsEconomics Perspectives*, Issue 5, 2010.

"What is the Value of Control of a Sports Enterprise?: Controlling Interest Premiums in Sports Valuations" in *SportsEconomics Perspectives*, Issue 4, April 2008.

"Executive Interview: Charlie Faas, Executive Vice President and CFO of Silicon Valley Sports and Entertainment." in *International Journal of Sport Finance*, Vol. 2, No. 2, June 2007.

"Executive Interview: Dan Champeau, Managing Director, and Chad Lewis, Analyst with Fitch." in *International Journal of Sport Finance*, Vol. 2, No. 1, February 2007.

"Executive Interview: Dennis Wilcox, Principal with Climaco, Lefkowitz, Peca, Wilcox & Garofoli Co., L.P.A." in *International Journal of Sport Finance*, Vol. 1, No. 4, November 2006.

"Executive Interview: Randy Vataha, Founder of Game Plan, LLC" with Dennis Howard in *International Journal of Sport Finance*, Vol. 1, No. 2, June 2006.

"Executive Interview: Mitchell H. Ziets, President and CEO of MZ Sports, LLC" in *International Journal of Sport Finance*, Vol. 1, No. 1, February 2006.

"The Oakland Baseball Simworld: Enabling Students to Simulate the Management of a Baseball Organization" in *Journal of Sports Economics*, Vol. 6, No. 3, August 2005.

"Examining the Viability of Various Cities for NBA Expansion or Relocation" with Heather Rascher in *SportsEconomics Perspectives*, Issue 2, April 2002.

"Following a Dollar: the economic impact of a sports event is greater than the sum of its parts" by Nola Agha in *SportsTravel Magazine*, Vol. 6, No. 10, November/December 2002.  Heather Rascher and Daniel Rascher contributed to the article.

"Real Impact: understanding the basics of economic impact generated by sports events" in *SportsTravel Magazine*, Vol. 6, No. 7, July/August 2002.  Reprinted in four regional sports commission newsletters.

"What is the Size of the Sports Industry?," in *SportsEconomics Perspectives*, Issue 1, August 2001.

"Neither Reasonable nor Necessary: "Amateurism" in Big-Time College Sports", with Andrew D. Schwarz.  In *Antitrust* (Spring 2000 Special Sports Issue).

"What Brings Fans to the Ballpark?," with Nola Agha in *FoxSportsBiz.com*, Spring 2000.

## RE-PUBLICATIONS

Republication of "Competitive Balance in Sports: "Peculiar Economics" over the last Thirty Years," with Andrew D. Schwarz.  In *Entertainment and Sports Law Journal, 31*(1), Winter 2020.

Republication of "Do Fans Want Close Contests? A Test of the Uncertainty of Outcome Hypothesis in the National Basketball Association", with John Paul G. Solmes in *Recent Developments in the Economics of Sport*, ed. Wladimir Andreff; *The International Library of Critical Writings in Economics*, 2011, Sudbury, MA: Jones & Bartlett.

Republication of "Variable Ticket Pricing in Major League Baseball", with Chad McEvoy, Mark Nagel, and Matthew Brown The Business of Sports, ed. Scott Rosner and Kenneth Shropshire, 2011, Elgar Pub., United Kingdom.

Republication of "What Brings Fans to the Ballpark?," with Nola Agha in *Brilliant Results* 2005.

Republication of "What is the Size of the Sports Industry?," in *Brilliant Results* 2005.

Republication of "Neither Reasonable nor Necessary: "Amateurism" in Big-Time College Sports", with Andrew D. Schwarz in *The Economics of Sport, Vol. I*, ed. Andrew Zimbalist; *The International Library of Critical Writings in Economics* 135, 2001, Elgar, Northampton, MA.

MONOGRAPHS

"The Effect of Human Resource Systems on Fab Performance," with Clair Brown, in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  Final Report*, 1997.

"Inter-industry Comparisons: Lessons from the Semiconductor Industry," with Rene Kamita, in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  Final Report*, 1997.

"Problem-Solving Structures; A Case Study of Two U.S. Semiconductor Fabs," in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  Final Report*, 1997.

"Transferability of Case Study Research:  An Example from the Semiconductor Industry," with Clair Brown, in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  2nd Interim Report*, 1996.

"Headcount and Turnover," in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  2nd Interim Report*, 1996.

"Training," with Jumbi Edulbehram in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  2nd Interim Report*, 1996.

WORKING PAPERS & ARTICLES UNDER REVIEW

"The Impact of COVID-19 on Employment and Output in the Leisure and Tourism Industries," with Lali Odosashvili and Mark Nagel.  *In Review*.  2023.

"Commentary: Maximizing the Emergency Use of Public Stadiums and Arenas," with Mark Nagel and Tiffany Richardson.  2021.

"College Football and Basketball Fans Don't Root for Laundry: A Comparison of the Effect of Winning on Demand between College and Professional Football and Basketball," with Mark Nagel and Giseob Hyun. 2020.

"Optimal Markets for NFL Franchises."  2020.

"Would the Oakland A's Relocation to San Jose Harm the Sharks – A Case Study of Competition Across Professional Sports Teams" with Chad McEvoy, Matt Brown, and Mark Nagel.  2016.

"The Practical Use of Variable Ticket Pricing in Major League Baseball" with Chad McEvoy, Matt Brown, and Mark Nagel.  2012.

"Counting Local Residents in Economic Impact Analysis: New Findings from Sporting Events" with Richard Irwin.  2008.

"Perverse Incentives with the NCAA Basketball Tournament Seeding Process" with Matthew Brown, Chad McEvoy, and Mark Nagel.  2006.

"Do the Giants Compete with the A's: The Degree of Competition Between Teams" with Matthew Brown, Chad McEvoy and Mark Nagel.  2006.

"Forecasting Model of Airport Economic Impacts" with Alan Rozzi and Christopher Gillis.  2004.

"Psychic Impact of Professional Sports: A Case Study of a City Without Major Professional Sports" with Matthew Brown, Mark Nagel, and Chad McEvoy.  2003.

"The Use of New Technology and Human Resource Systems in Improving Semiconductor Manufacturing Performance", with Clair Brown and Greg Pinnsoneault, Working Paper, University of California at Berkeley, 1999.

## INVITED SPEAKING ENGAGEMENTS

"The Business of Sports."  Lecture at the Oregon Law Summer Sports Institute, University of Oregon, 2023.

"Economics of College Sports," guest speaking in Intercollegiate Sports Management, St. Mary's College, 2023.

"Economics of College Sports," guest speaking in Sports Finance, University of Delaware, 2023.

"Financial Management in the Sport Industry," invited masterclass presentation for Sportin Global, 2023.

"Legal and Economic Issues in the NCAA: A Review of 20 Years of Litigation," with Andy Schwarz and Mark Nagel, University of South Carolina, College Sport Research Institute, 2023.

"The Business of Intercollegiate Sports," invited guest speaker in Andy Dolich's Make Sense of the Madness course on college sports, Stanford University, 2023.

"An Economist Goes to the Game," invited co-host for *New Books Network* podcast, 2022.

"The Business of Sports."  Lecture at the Oregon Law Summer Sports Institute, University of Oregon, 2022.

"Big Stakes Antitrust Trial: In Re National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust Litigation," panelist at the 31st Golden State Institute Conference (2021).

"Economics of College Sports," guest speaking in Sports Finance, University of Delaware, 2021.

"The Business of Intercollegiate Sports," guest speaking in Issues in Sports Economics, University of West Florida, 2021.

"Professional Sports Franchise Location & Development."  Guest speaker in Sports Law & Ethics course at California Lutheran University.  2021.

"The Business of Sports." Guest speaker at Sport Administration course, University of Louisville, 2021.

"The Business of Sports."  Lecture at the Oregon Law Summer Sports Institute, <u>University of Oregon</u>, 2021.

"Sports Economics, Analytics, and Decision Making - 7 Case Studies," Theme Speaker 1, International Webinar on Sports Management, hosted by <u>Sports Authority of India, Seshadripuram Educational Trust, Seshadripuram Evening Degree College</u>, 2021.

"Economics of College Athletes," guest speaking in Sports Finance, <u>University of Northern Colorado</u>, 2021.

"Sports Antitrust Economics – Raiders & Regents," with Andy Schwarz in Sports Law, <u>University of San Diego Law School</u>, February, 2021.

"Research Thoughts & Methods" in Doctoral Research Seminar, Sport Management Department, <u>University of South Carolina</u>, January, 2021.

"Is there a Consensus?: An Experimental Trial to Test the Sufficiency of Methodologies Used to Measure Economic Impact in Sports."  Keynote Speaker at the <u>1st International Congress of Iranian Scientific Association of Sport Management</u>, Tehran, Iran in March, 2021.

"Government Impact on Financial Aspects of Sports," at the <u>International Conference on Governance and Integrity in Sport, Saudi Arabia</u>, December, 2020.

"State of Play: Antitrust and the NCAA," panelist on a program hosted by <u>the New York State Bar Association and the California Lawyers Association</u>, November 19, 2020.

"Sports Commercialization and the Global Sports Economy" with Kenneth Cortsen.  Masterclass for <u>Australian Sports Technologies Network</u>, November 17, 2020.

"Economic and Financial Management of U.S. Professional Sports" presented at <u>Loyola University, Seville, Spain</u>, November 12, 2020.

"The Importance of Sound Data Analysis for Decision-Making in the Sports Industry" at <u>Sportin Global Summit</u>.  2020.

"The New Normal of the Sport Industry" at <u>HiVE 24HR Liveathon</u>.  2020.

"Play Time Sessions – A Series of Digital Conference Sessions on Gaming & Esports" presented by <u>GIMA Esports</u>.  2020.

"Practicing as a Sports Lawyer: Antitrust and Beyond."  Sponsored by the <u>American Bar Association's</u> Section of Antitrust Law and Trade, Sports and Professional Associations.  2020.

"Economics of Sports."  Lecture at the Oregon Law Summer Sports Institute, <u>University of Oregon</u>, 2020.

"Economics of College Sports," guest speaking in Sports Finance, <u>University of Delaware</u>, 2020.

"Economics of College Athletes," guest speaking in Sports Finance, <u>University of Northern Colorado</u>, 2020.

"Stadium Financing," guest speaking in Introduction to Sports Business, UCLA's Anderson School of Business, 2019.

"Economics of College Sports," discussion at the Oregon Law Summer Sports Institute, University of Oregon, 2019.

"Forging Industry Partnerships and Engaging in Applied Sport Management Research," with Weight, E., Love, A., McEvoy, C.  Presentation for the Applied Sport Management Conference, 2019.

"Making a Difference: Bridging the Gap Between the Ivory Tower & the Community."  Keynote Address, Applied Sport Management Association, 2019.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, University of Oregon, 2018.

"The Business of Sports", presented at the Sports Business Club at Sonoma State University Business School, May 2018.

"The Business of the Olympics," guest speaker in sports journalism course at Medill School of Journalism at Northwestern University, 2018.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, University of Oregon, 2017.

"College-Sport Research and Litigation: Theory and Practice Leading to Action." Panelist at College Sport Research Institute Symposium at the University of South Carolina, 2017.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, University of Oregon, 2016.

"The Business of Intercollegiate Sports," presented in the sport management department's sport law course, University of Toronto, 2016.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, University of Oregon, 2015.

"The Business of Intercollegiate Sports" presented in the sport management masters program, University of Arkansas, 2015.

Panelist on "The Future of Intercollegiate Athletics: The Players' Perspective," at the Sports Law and Business Conference at Arizona State University, 2015.

Panelist on "Intersection of Business and Sports Law," at the Sports and Entertainment Law Forum, presented by the University of Oregon Law School, 2015.

"The Economics of College Athletics Departments" presented in the masters in collegiate athletics program, college athletics in a digital era course, University of San Francisco, 2015.

"The Business of Intercollegiate Sports," presented in the sport management department's sport law course, University of Toronto, 2014.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, <u>University of Oregon</u>, 2014.

"The Finances of College Sports," presented in Matthew Brown's sport finance course, <u>Ohio University</u>, 2014.

"Antitrust Economics and Sports," presented in Professor Robert Elias's Politics and Sport course, <u>University of San Francisco</u>, 2014.

"The Economics of the Sports Industry," presented to the Haas School of Business, <u>U.C. Berkeley</u>, 2014.

"Economic Impact in Sports." Presentation in the masters in sports business program at <u>New York University (NYU)</u> as part of the Faculty-in-Residence program.  2013.

"Pricing the Game Experience," with Stephen Shapiro and Tim DeSchriver.  Invited research presentation at *Sport Entertainment & Venues Tomorrow* conference, 2013, <u>University of South Carolina.</u>

"Academia and the Industry: Opportunities for Meaningful Research Collaboration."  Invited panelist at *Sport Entertainment & Venues Tomorrow* conference, 2013, <u>University of South Carolina.</u>

"Sports Sponsorships in 2013," Panelist at Court Vision (Sheppard Mullin Sports Law Speaker Series and SLA).  Continuing Legal Education (CLE) units program.  2013.

"Using Contract Law to Tackle the Coaching Carousel – Commentary."  Presented at <u>University of San Francisco</u>, *Sports & Entertainment Law Association*, 2013.

"Sports Economics, Analytics, and Decision Making: 8 Examples." Invited speaker at the *IEG Sports Analytics Innovation Summit*, 2012

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz.  Presented at <u>U.C. Berkeley</u>, Boalt Law School's *Sports and Entertainment Law Society*, 2011.

"Financial Valuation of Sports Assets," presented at the *Sport Management Today Video Conference Series* at the <u>IE Business School</u>, 2011

"Financial Valuation of Sports Assets," presented to the *Sport Management Department* at the <u>University of Northern Denmark</u>, 2011.

"Economic Impact in Sports," presented to the *Sport Management Department* at the <u>University of Northern Denmark</u>, 2011.

"The Economics of the Sports Industry," presented to the *Sports Business Association* at <u>U.C. Irvine</u>, 2011.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at the *Economics Lecture Series* at Sonoma State University Business School, April 2010.

"Economics for Antitrust Lawyers: Application to Class Certification" presented to Lieff Cabraser Heimann & Bernstein for Continuing Legal Education (CLE) units.  November 2009.

"Economics for Antitrust Lawyers: Market Structure and Economic Modeling" presented to Lieff Cabraser Heimann & Bernstein for Continuing Legal Education (CLE) units.  October 2009.

"Sports Stadium Financing in Today's Economy" presented to the Rotary Club of San Jose, May 2009.

"The Economic Impact of Liberty Bowl Memorial Stadium," presented at the University of Memphis, *Issues in College Sports* lecture series (invited panelist), March 2007.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, U.C. Berkeley, January 2007.

"Stadium Financing – Dallas Cowboys Case," presented to the MBA Program at the Graduate School of Business, Stanford University, 2006.

"Taking the Gown to Town: Research and Consulting for the Sport Industry."  Invited presentation at the Past President's Workshop, *North American Society for Sport Management*, June 2006.

"Various Topics in Sports Economics," presented at the Wednesday Workshop on Economics Research, California State University, East Bay, 2005.

"Stadium Financing – Dallas Cowboys Case," presented to the MBA Program at the Graduate School of Business, Stanford University, 2005.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, U.C. Berkeley, 2005.

"The Economic Impact of General Aviation Airports: An Econometric Model," presented at Niche Ventures Spring Meeting, 2004.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, U.C. Berkeley, 2004.

"Oral Testimony Regarding California State Senate Bill 193, Student Athletes' Bill of Rights". 2003.  Testimony to the California State Senate Subcommittee on Entertainment.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, U.C. Berkeley, 2003.

"The Use of New Technology and Human Resource Systems in Improving Semiconductor Manufacturing Performance," with Clair Brown and Greg Pinsonneault.  Presented at *The Wharton School*, University of Pennsylvania, 1999.

## CONFERENCE PRESENTATIONS

"Is there a Consensus?: An Experimental Trial to Test the Sufficiency of Methodologies Used to Measure Economic Impact," with Giseob Hyun and Mark Nagel.  Presentation at *Applied Sport Management Association*, February 2020.

"Is there a Consensus?: A Test of Methodologies Used to Measure Economic Impact," with Giseob Hyun and Mark Nagel.  Presentation at *Applied Business and Entrepreneurship Association International*, November 2019.

"Because It's Worth It: Why Schools Violate NCAA Rules and the Impact of Getting Caught in Division I Basketball," with Andrey Tselikov, Andrew D. Schwarz, and Mark Nagel.  Presentation at *Applied Business and Entrepreneurship Association International*, November 2018.

"College Football and Basketball Fans Don't Root for Laundry: A comparison of the effect of winning on attendance and television viewership between big-time college football and basketball and the NBA and NFL," with Mark Nagel.  Presentation at *Applied Business and Entrepreneurship Association International*, November 2017.  (voted Best Paper Award for session)

"Financial Valuation of a Sporting Goods Retail Store," with Mark Nagel and Matthew Brown.  Poster presentation at *North American Society for Sport Management*, May 2016.

"Cartel Behavior in United States College Sports: An Analysis of National Collegiate Athletic Association Football Enforcement Actions from 1990 to 2011," with Mark Nagel, Richard Southall, and Nick Fulton.  Presented at *Western Economics Association International*, January 2016.

"The College Basketball Players' Labor Market: *Ex Ante* versus *Ex Post* Valuations" with David Berri and Robert Brown.  Presented at *Western Economics Association International*, July 2015.

"What drives Endorsement Values for Superstar Athletes?" with Terry Eddy and Giseob Hyun.  Presented at *Sport Management Association of Australia and New Zealand*, November 2014.

"The Beckham Effect: David Beckham's Impact on Major League Soccer, 2007-2012," with Stephen Shapiro and Tim DeSchriver.  Presented at *North American Society for Sport Management*, May 2014.

"Where is Everyone? An Examination of Consumer Demand for College Football Bowl Games," with Terry Eddy and Rebecca Stewart.  Presented at *Collegiate Sports Research Institute* conference, April 2014.

"If We Build It, Will You Come?: Examining the Effect of Expansion Teams and Soccer-Specific Stadiums on Major League Soccer Attendance," with Stephen Shapiro and Tim DeSchriver.  Presented at *North American Society for Sport Management*, May 2013.

"Should San Jose say 'No Way' to the Oakland A's," with Mark Nagel and Matt Brown.  Presented at *North American Society for Sport Management*, May 2013.

Panel member for "Financial Issues in Intercollegiate Sports." Presented at the *Santa Clara University Sports Law Symposium*, 2012.

"What's in a Name?: Does the Amount and Source of Public Financing Impact Team Names?" with Nola Agha and Matt Brown.  Presented at *Western Economics Association International*, July 2012.

"When Can Economic Impact be Positive?  Twelve conditions that explain why smaller sports have bigger impacts" with Nola Agha.  Presented at *Western Economics Association International*, July 2012.

"Reflections on the MLB Collective Bargaining Agreement."  Part of a symposium on the Economics of Labor-Management Relations in Sports Today at *Western Economics Association International*, July 2012.

"The Economics of Competitive Balance on the Field and in the Courts." Presented at the *Santa Clara University Sports Law Symposium*, 2011.

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz.  Presented at *International Association of Venue Managers*, July 2011.

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz.  Presented at *TicketSummit*, July 2011.

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz.  Presented at *Western Economics Association International*, July 2011.

"Financial Risk Management: The Role of a New Stadium in Minimizing the Variation in Franchise Revenues" with Matt Brown, Chad McEvoy, and Mark Nagel.  Presented at *Western Economics Association International*, July 2011.

"A Panel Study of Factors Affecting Attendance at Major League Soccer Contests: 2007-2010" with Tim DeSchriver.  Presented at the *Sport Marketing Association IX* conference in New Orleans, October 2010.

"The NCAA and the Prisoner's Dilemma".  Presented at the *Sports Law Symposium* at the University of Santa Clara Law School, September 2010.

"Financial Risk Management: The Role of a New Stadium in Minimizing the Variation in Franchise Revenues" with Matt Brown, Chad McEvoy, and Mark Nagel.  Presented at *North American Society for Sport Management*, May 2010.

"An Analysis of the Value of Intercollegiate Athletics to its University: Methods".  Presented at the *Scholarly Conference on College Sport*, April 2010.

"Demand, Consumer Surplus, and Pricing Inefficiency in the NFL: A Case Study of the Secondary Ticket Market Using StubHub" with Joris Drayer and Chad McEvoy.  Presented at *North American Society for Sport Management*, May 2009.

"Luxury Suite Pricing in North American Sports Facilities" with Tim DeSchriver.  Presented at *North American Society for Sport Management*, May 2009.

"A Smorgasbord of Lessons Learned from Economic Impact Studies"  Presented at *North American Society for Sport Management*, June 2008.

"Globalization and Sport Finance: What is True and What is Myth?" with Mark Nagel and Ross Booth.  Presented at the *Sport Management Association of Australia and New Zealand*, November 2007.

"Exploring the Myth that a Better Seed in the NCAA Men's Basketball Tournament results in an *ex ante* Higher Payout" with Mark Nagel, Matt Brown, and Chad McEvoy.  Presented at the *Sport Management Association of Australia and New Zealand*, November 2007.

"Oakland A's Baseball Simulator" with Joris Drayer.  Presented at *North American Society for Sport Management*, June 2007.

"Teaching Sport Financial Management: A Symposium" with Timothy DeSchriver, Matthew Brown, and Michael Mondello.  Presented at *North American Society for Sport Management*, June 2007.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, U.C. Berkeley, January 2007.

"Practical Strategies for Variable Ticket Pricing in Professional Sports" with Chad McEvoy, Matt Brown, and Mark Nagel.  Presented at *Sport Marketing Association IV*, November 2006.

"Do the Giants Compete with the A's: The Degree of Competition Between Teams", presented at *Western Economic Association International*, July 2006.

"Do the Giants Compete with the A's: The Degree of Competition Between Teams", presented at *North American Society for Sport Management*, June 2006.

"Measuring Sponsorship Return on Investment: A Need for Quantitative Analysis" with Matt Brown, Mark Nagel, and Chad McEvoy.  Presented at *Sport Marketing Association III*, November 2005.

"The Use of Economic Impact Analysis for Marketing Purposes" with Dick Irwin and Matt Brown.  Presented at *Sport Marketing Association III*, November 2005.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at *Western Economic Association International*, July 2005.

"Public Funds for Private Benefit: Equity Issues in Sport Stadia Funding and the Question of Who Really Pays," with Matt Brown and Mark Nagel.  Presented at *North American Society for Sport Management*, June 2005.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at *North American Society for Sport Management*, June 2005.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Accepted by *Sport Management Association of Australia and New Zealand*, Nov. 2004.

"Redskins: Legal, Financial, and Policy Issues relative to Harjo v. Pro-Football, Inc." with Richard Southall, Matt Brown, and Mark Nagel.  Presented at *North American Society for the Sociology of Sport*, Nov. 2004.

"An Analysis of Distance Traveled and Tourism Economic Impact: A Test of the Alchian-Allen Theorem" with Matt Brown, Mark Nagel, and Chad McEvoy.  Presented at *Sport Marketing Association II* conference, Nov. 2004.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at *Sport Marketing Association II* conference, Nov. 2004.

"Beyond The Economic Impact Study: Examining Economic Impact Data for Support of the Third Law of Demand" with Matthew Brown, Mark Nagel, and Chad McEvoy.  Presented at *North American Society for Sport Management*, 2004.

"Optimal Variable Ticket Pricing in Major League Baseball" with Mark Nagel, Chad McEvoy, and Matthew Brown.  Presented at *North American Society for Sport Management*, 2004.

"*Clarett v. NFL*: Age Eligibility Rules and Antitrust Law in Professional Sports" with Chad McEvoy, Mark Nagel, and Matt Brown.  Presented at *Sport and Recreation Law Association*, 2004.

"Variable Pricing in Baseball: Or, What Economists Would Just Call 'Pricing'," presented at *Western Economic Association International*, 2003.

"The Impact of Stadia on Wealth Maximization in the National Football League: To Build or Renovate?" with Matthew Brown, Mark Nagel, and Chad McEvoy.  Presented at *North American Society for Sport Management*, 2003.

"Major League Baseball's Antitrust Immunity: Examining the Financial Implications of Relocation Rules," with Matthew Brown and Mark Nagel.  Presented at *Society for the Study of the Legal Aspects of Sport and Physical Activity*, 2003.

"Locational Choice in the NBA: An Examination of Potential Cities for Expansion or Relocation," presented at *North American Society for Sport Management*, 2002.

Panel discussant on the effects of the economy on the business of sports at *Sports Facilities and Franchises Forum*, Dallas, TX 2002 (presented by SportsBusiness Journal).

"Psychic Impact Findings in Sports," presented at *Sport Management Association of Australia and New Zealand*, 2001.

"Locational Choice in the NBA: An Examination of Potential Cities for Expansion or Relocation" presented at *Sport Management Association of Australia and New Zealand*, 2001.

"Psychic Impact as a Decision Making Criterion," presented at the *North American Society for Sport Management*, 2000.

"Economic Impact Methods," presented at the *North American Society for Sport Management*, 2000.

"Valuation of Naming Rights," presented at the *Sports Finance Forum*, 2000.

" 'Amateurism' in Big-Time College Sports," presented at the *Western Economic Association International*, 1999.

"Does Bat Day Make Cents?: The Effect of Promotions on the Demand for Baseball," with Mark McDonald.  Presented at the *17th Annual Consumer Psychology Conference*, 1998.

"A Test of the Optimal Positive Production Network Externality in Major League Baseball," presented at the *North American Society for Sport Management Conference*, 1998.

"A Test of the Optimal Positive Production Network Externality in Major League Baseball," presented at the *Western Economic Association International*, 1998.

"The NBA, Exit Discrimination, and Career Earnings," presented at the *Western Economic Association International*, 1997.

"Sports Salary Determination," presented at the *International Atlantic Economic Society Conference*, 1997.

"A Model of a Professional Sports League," presented at the *International Atlantic Economic Society Conference*, 1996.

"Transferability of Case Study Research:  An Example from the Semiconductor Industry," presented at the *American Society of Training and Development Conference*, 1996.

## EDITORIAL/REVIEWER BOARDS OF PEER-REVIEWED JOURNALS

*Frontiers in Sports and Active Living – Sports Management and Marketing,* 2020 – present
*International Journal of Sport Management and Marketing,* 2011 – present
*International Journal of Sports Marketing and Sponsorship,* 2021 – present
*International Journal of Sport Finance,* 2006 – present (founding member)
*Journal of Risk and Financial Management,* 2019 – present
*Journal of Sport Management,* 2003 – present
  Associate Editor, 2010 – 2012
  Co-Editor of Special Issue, 2022
*Journal of Quantitative Analysis in Sports,* 2005 – 2012 (founding member)
*Case Studies in Sport Management,* 2011 – 2019 (founding member)
*Sport Management Review,* 2001 – 2008

## REFEREE FOR PEER-REVIEWED JOURNALS & GRANTING AGENCIES

*American Behavioral Scientist,* 2008
*Applied Economics Letters,* 2018
*Applied Economics,* 2020, 2021
*Axioms,* 2017

*Case Studies in Sport Management*, 2012, 2014a, 2014b, 2015, 2017, 2019
*Communication & Sport*, 2019, 2020
*Contemporary Economic Policy*, 2004, 2021
*Eastern Economic Journal,* 2010
*Economic Inquiry,* 2008, 2010, 2011
*Economics and Business Letters,* 2018
*European Sport Management Quarterly,* 2012, 2020, 2021, 2022
*Frontiers in Sports and Active Living,* 2021a, 2021b, 2022
*Future Internet,* 2019, 2020
*Industrial Relations*, 1993, 2000, 2000, 2001, 2013
*International Journal of Financial Studies,* 2018
*International Journal of Sport Communication,* 2011
*International Journal of Sport Finance*, 2005, 2006a, 2006b, 2006c, 2007a, 2007b, 2008a, 2008b,
   2010, 2011, 2012, 2013, 2014a, 2014b, 2014c, 2015, 2017, 2018,
   2019, 2022a, 2022b, 2023
*International Journal of Sport Management and Marketing*, 2005, 2010, 2013, 2014, 2017, 2021
*International Journal of Sports Marketing and Sponsorship*, 2016, 2018a, 2018b, 2019, 2021a,
   2021b, 2021c, 2021d, 2022, 2023
*International Journal of Sport Policy and Politics,* 2014
*International Review for the Sociology of Sport*, 2012
*Journal for the Study of Sport and Athletes in Education,* 2021a, 2021b
*Journal of Functional Morphology and Kinesiology,* 2018
*Journal of Global Sport Management,* 2018
*Journal of Industrial Economics*, 1997
*Journal of Intercollegiate Sport*, 2016, 2021, 2022
*Journal of Issues in Intercollegiate Athletics*, 2021
*Journal of Sport Management,* 2001, 2002, 2003a, 2003b, 2004a, 2004b, 2004c, 2004d, 2004e,
   2005a, 2005b, 2005c, 2005d, 2006a, 2006b, 2006c, 2006d, 2006e,
   2006f, 2006g, 2006h, 2006i, 2007a, 2007b, 2007c, 2007d, 2008a,
   2008b, 2008c, 2008d, 2009a, 2009b, 2009c, 2009d, 2009e, 2009f,
   2009g, 2010a, 2010b, 2010c, 2010d, 2011a, 2011b, 2013, 2013b,
   2014, 2015a, 2015b, 2016a, 2016b, 2016c, 2016d, 2017a, 2017b,
   2017c, 2017d, 2018a, 2018b, 2018c, 2018d, 2019a, 2019b, 2019c,
   2019d, 2019e, 2020a, 2020b, 2020c, 2020d, 2021
*Journal of Sports Economics*, 2003, 2007, 2008a, 2008b, 2009, 2010, 2011, 2012a, 2012b, 2014a,
   2014b, 2015a, 2015b, 2016, 2018, 2019a, 2019b, 2021, 2022a,
   2022b
*Journal of Venue and Event Management,* 2012
*Journal of the Quantitative Analysis of Sports*, 2005, 2006a, 2006b, 2007
*Mathematical Problems in Engineering,* 2018
*Perceptual and Motor Skills*, 2009
*Review of Economics and Statistics,* 2017
*Review of Industrial Organization*, 2012, 2013, 2015
*SAGE Open,* 2021
*Soccer & Society*, 2014, 2015, 2020
*Southern Economic Journal*, 2001, 2007a, 2007b
*Sport, Business and Management: An International Journal*, 2011, 2012, 2013, 2017, 2018, 2023
*Sport Management Review*, 2002a, 2002b, 2003a, 2003b, 2003c, 2003d, 2004a, 2004b, 2004c,
   2006a, 2006b, 2006c, 2007a, 2007b, 2007c, 2010a, 2010b, 2011,
   2015, 2016, 2017, 2020
*Sport Marketing Quarterly*, 2015, 2018

*Sustainability,* 2018, 2021a, 2021b

External review of $250,000 grant proposal for the *Social Sciences and Humanities Research Council of Canada*, 2008

**PROFESSIONAL AFFILIATIONS (CURRENT AND PREVIOUS)**

American Bar Association
American Economic Association
National Association of Certified Valuation Analysts
North American Society for Sport Management
North American Association of Sports Economists
Sport and Recreation Law Association
Sport Marketing Association
Sports Lawyers Association
Western Economic Association International

**TESTIMONY**

Provided expert reports and deposition testimony in *In Re College Athlete NIL Litigation*.  2023.

Provided expert reports and deposition testimony in *In Re NFL Sunday Ticket Antitrust Litigation*.  2023.

Provided deposition and trial testimony regarding liability and economic damages in *San Francisco Federal Credit Union v. San Francisco Municipal Transportation Agency*.  2021.

Provided expert reports and deposition testimony regarding class certification and damages in *Shields et al. v. FINA*.  2021.

Provided expert report pertaining to alleged financial harm from lost career earnings related to RICO claims in *Bowen v. adidas*.  2021.

Provided expert report and trial testimony pertaining to financial harm of alleged mismanagement of professional tennis client in *Mirjana Lucic v. IMG Worldwide.*  2021.

"An Economics Perspective on NIL at the Community College Level" presented at a public hearing of the Senate Bill 206 (Skinner-D, 2019) Statutory Community College Athlete Name, Image, and Likeness Working Group, November 10, 2020.

Provided expert report and deposition pertaining to financial harm of alleged misleading advertising in *The People of the State of California v. Hertz et al.*  2019.

Financial and economic analysis and testimony at a hearing of baseball and *AT&T Park* for Assessment Appeals Board (property tax dispute).  2018.

Provided arbitration testimony on damages regarding an NBA agent and agency in *ISE v. Dan Fegan*.  2018.

Provided trial and deposition testimony and multiple expert reports pertaining to class certification, liability, damages, and injunction issues in college sports in the federal lawsuit *In Re: NCAA Athletic GIA Cap Antitrust Litigation*.  2015-18.

Provided expert report pertaining to damages in auto racing case between a driver and his agent in *Sports Management Network v. Kurt Busch*.  2018.

Public testimony on forecast of economic impact of Rocky Mountain Sports Park on Windsor, CO to the Windsor City Council.  2017.

Provided expert report pertaining to the economics of ticketing and personal seat licenses (PSLs) in *RCN Capital v. Los Angeles Rams*.  2017.

Provided trial testimony (and multiple reports and depositions) on financial harm pertaining to *FTC v. DirecTV*.  2017.

Provided declaration pertaining to the economics of ticketing for sports and entertainment in *Glickman et al. v. Live Nation et al*.  2016.

Provided declaration pertaining to the economics of ticketing for sports and entertainment in *Pollard v. AEG Live, et al*.  2016.

Provided declaration pertaining to the economics of ticketing for sports and entertainment in *Finkelman v. NFL*.  2016.

Provided deposition testimony and submitted two expert reports pertaining to class certification issues in college football in *Rock v. NCAA*.  2014-16.

Submitted an expert report on damages pertaining to an endorsement relationship in *Frank Thomas v. Reebok*.  2015.

Provided deposition testimony and submitted an expert report pertaining to the economic relationship between two boxing entities in *Garcia v. Top Rank, Inc.*  2015.

Provided trial testimony (and multiple reports and depositions) on class certification issues, damages, and antitrust economics in regards to group licensing for former and current college football and basketball players in *O'Bannon et al. v. NCAA*.  2013-14.

Submitted three expert reports regarding lost earnings for a Major League Baseball player in *Backe et al. v. Fertitta Hospitality, LLC et al.*  2013.

Submitted two expert reports on class certification issues in regards to ticket holder lawsuit in *Phillips et al. v. Comcast Spectacor et al.*  2013.

Submitted expert report in a federal case involving defamation of character in the boxing industry (*Pacquiao v. Mayweather Jr. et al.*).  2012.

Provided deposition testimony and prepared expert report regarding an alleged sponsorship breach of contract in motorsports (*Vici Racing, LLC v. T-Mobile USA, Inc.*).  2012.

Prepared expert witness testimony on trade secrets case involving the sports consulting industry (*Sport Management Research Institute v. Keehn*).  2011.

Provided deposition testimony on the value of a minor league baseball team and related damages from an alleged breach of a facility lease permit (*Long Beach Armada v. City of Long Beach*). 2011.

Provided deposition testimony on the value of athlete endorsements in a breach of contract case involving an NBA player and a charter school business in an arbitration proceeding (*D Wade's Place v. Dwyane Wade*).  2010.

Provided deposition testimony on the value of athlete endorsements in a breach of contract case involving an NBA player and a restaurant investment in a state court proceeding (*Rodberg v. Dwyane Wade*).  2010.

Submitted two reports and provided deposition and arbitration testimony regarding damages related to how media coverage has impacted an NFL team's brand (*Kiffin v. Raiders*).  2009.

Submitted expert report, rebuttal report, gave deposition and trial testimony in federal court (*Adderley et al. v NFLPA & NFLPI*).  2008.

Public testimony on economic impact of a Major League Soccer stadium in San Jose to the San Jose City Council.  2008.

Public testimony on economic impact of six sports and cultural events in San Jose to the San Jose City Council.  2007.

Submitted expert report, rebuttal report, and testified at arbitration hearing on the financial valuation of Major League Soccer (*Rothenberg v. Major League Soccer, LLC*).  2006.

Named expert witness for a Major League Baseball club to analyze a punitive damages claim from an injury at a baseball game (*Bueno v. Rangers*).  2006.

Prepared expert testimony on liability and damages related to the operations of a minor baseball league on behalf of the league's owner (*Don Altman et al., v. Jeffrey Mallet, et al.*).  Case was settled prior to deposition.  2004.

Public testimony on economic impact of an existing and new professional football stadium in Irving, TX to the Irving City Council (two council meetings).  2004.

Testimony on college athletics regarding Senate Bill 193 to the California State Senate Subcommittee on Entertainment.  2003.

Public testimony on economic impact of a downtown entertainment district in Sacramento to the Sacramento City Council (two council meetings).  2003.

Determination of IP valuation and damages from a clothing endorsement alleged breach of contract for PGA Tour player (*Stankowski v. Bugle Boy*).  Submitted expert report.  Case was settled prior to deposition.  2000.

Deposition testimony in breach of contract matter concerning sponsorship damages analysis in the auto racing industry (*Parente v. Della Penna Racing*).  2000.

Public testimony on forecast of economic impact of Pan Am Games on San Antonio to the San Antonio City Council.  1999.

Updated July 2023

# Appendix B

## Documents Relied Upon

*All documents relied upon in Expert Report of Daniel A. Rascher, October 21, 2022*

### Legal Filings and Guidelines

Plaintiffs' Notice of Motion and Motion for Class Certification, October 21, 2022

Defendants' Joint Opposition to Plaintiffs' Motion for Class Certification, April 28, 2023

Defendants' Motion to Exclude the Opinions of Edwin Desser and Daniel Rascher, April 28, 2023

Declaration of Greg Sankey, April 28, 2023

Declaration of Kerry Kenny, April 28, 2023

Declaration of Chad Weiberg, April 28, 2023

Declaration of Ben Tario, April 28, 2023

Declaration of James E. "Jimmy" Sexton, II, April 30, 2023

*BrandR Group v. Electronic Arts et al.* Complaint, Case 4:23-cv-02994-HSG (6/20/2023)

Reporter's Transcript of Proceedings, June 18, 2014 (*O'Bannon*)

### Expert Reports

Expert Report of Catherine Tucker, Ph.D., April 28, 2023, including backup materials

Report of Bob Thompson, Thompson Sports Group, LLC, April 28, 2023

Expert Report of Barbara Osborne, April 27, 2023

Expert Report of Daniel A. Rascher, October 21, 2022, including backup materials

Expert Report of Edwin Desser, October 21, 2022

Expert Report of Daniel A. Rascher on Economic Liability Issues for the Injunctive Classes, March 21, 2017 (*Alston*), including backup materials

Expert Report of Daniel A. Rascher on Injunctive Class Certification, June 25, 2015 (*Alston*)

### Depositions

Deposition of Catherine Tucker, Ph.D., May 31, 2023

Deposition of Bob Thompson, June 8, 2023

Deposition of Barbara Osborne, June 15, 2023

Deposition of Joel Linzer, December 18, 2012 (*O'Bannon*)

**Produced Bates-Numbered Documents**

*All documents cited as sources in the produced updated NIL databases. (List of sources provided in backup.)*

*All documents cited as sources in the produced athlete NIL eligibility databases for SEC and Big Ten. (List of sources provided in backup.)*

*All documents cited as sources in the produced athlete participation databases and lookups used in athlete lost NIL opportunities adjustment. (List of sources provided in backup.)*

BYU000001

EA_NIL_00000121

EA_NIL_00003608

EA_NIL_00003641

EA_NIL_00003837

EA_NIL_00005728

HU00369

MSU00706-MSU00715

MSU00716

MSU00719

NCAAGIA03993242

NCAAHOUSE00180803

NCAAHOUSE00180804

NCAAHOUSE00180805

NCAAHOUSE00180806

NCAAHOUSE00180807

NCAAHOUSE00249520

NCAAHOUSE-ARIZONA-0001

NCAAHOUSE-ARIZONA-0002

NCAAHOUSE-ARIZONA-STATE-0001

NCAAHOUSE-ARIZONA-STATE-0002

NCAAHOUSE-SOUTHERN-CALIFORNIA-0001

*CONFIDENTIAL*

NCAAHOUSE-SOUTHERN-CALIFORNIA-0002

NCAAPROD190585

OPENDORSE000083

OPENDORSE000143

TAKETWO-NIL-00000155

Texas_A&M_000538

Texas_A&M_000684

Texas_A&M_000686

TTU001037

U OF ALABAMA001291

U_OF_OREGON_000394

U_of_Utah_002656

UFL 000645-000676

UFL001096

UMICH0000088

UM-NIL0370

UT-AUS000798


**Produced Documents (Reviewed in Native Format)**

*All documents cited as sources in the produced updated NIL databases. (List of sources provided in backup.)*

*All documents cited as sources in the produced athlete NIL eligibility databases for SEC and Big Ten. (List of sources provided in backup.)*

*All documents cited as sources in the produced athlete participation databases and lookups used in athlete lost NIL opportunities adjustment. (List of sources provided in backup.)*

Alston

Plaintiffs Comments MFRS Data - Additional Offer of Production - 11 09 15 (Alston)

MFRS

MFRS Sport Code Key

NCAA INTERNAL - unique_id_key_2021

Emails

Email from Jacob Danziger, "RE: MFRS Data Letter", September 7, 2022.

Email from Jacob Danziger, "RE: RE: 2022-09-12 Ltr. S. Verdoia to NCAA re Financial Data",
September 26, 2022

**Literature, Articles and Publications**

ACC Manual 2020-2021

American Bar Association. (2017). "Proving Antitrust Damages, Legal and Economic Issues." (3rd ed.).

Big 12 2022-2023 Conference Handbook

Big Ten 2021-2022 Conference Handbook

Brown, G. & Sanders, J.W. (1981, June). "Lognormal Genesis." *Journal of Applied Probability*, 18(2).

Greene, W.H. (2003). *Econometric Analysis*. (5th ed.). Pearson Education.

Hirshleifer, J. & Riley, J. (1992). *The Analytics of Uncertainty and Information*. Cambridge University
Press.

Kreps, D. M. (1988). *Notes on the Theory of Choice*. Westview Press.

Larsen, R.J.. and Marx, M.L. (1986). *An Introduction to Mathematical Statistics and its Applications*.
(2nd ed.). Prentice-Hall.

McCrary, J. & Rubinfeld, D.L. (2014). "Measuring Benchmark Damages in Antitrust Litigation." *Journal
of Econometric Methods*, 3(1).

Mood, A.M., Graybill, F.A. & Boes, D.C. (1974). *Introduction to the Theory of Statistics*. (3rd ed)
McGraw-Hill.

NCAA Division I Manual (2022-2023)

Nicholson, W. (1998). *Microeconomic Theory*. (7th ed.). Dryden Press.

Pac-12 2021-2022 Handbook

Pindyck, R. & Rubinfeld, D. (2018). *Microeconomics*. (9th ed.). Pearson.

Rascher, D., Eddy, T. & Hyun, G. (2017). "What Drives Endorsement Earnings for Superstar Athletes?"
*Journal of Applied Sport Management*, 9(2).

SEC 2022-2023 Conference Constitution and Bylaws

**Third Party Sources**

*All documents cited as sources in the produced updated NIL databases. (List of sources provided in
backup.)*

*All documents cited as sources in the produced athlete NIL eligibility databases for SEC and Big Ten.
(List of sources provided in backup.)*

*CONFIDENTIAL*

*All documents cited as sources in the produced athlete participation databases and lookups used in athlete lost NIL opportunities adjustment. (List of sources provided in backup.)*

http://webserver1.lsb.state.ok.us/cf_pdf/2023-24%20ENR/SB/SB840%20ENR.PDF

https://247sports.com/article/report-michigan-pulled-recruits-scholarship-offer-42994354/

https://247sports.com/college/texas-am/contentgallery/texas-am-football-recruiting-what-does-a-written-offer-letter-ac-120269438/#939325

https://247sports.com/Recruitment/Omari-Spellman-45297/RecruitInterests/

https://admissions.uiowa.edu/finances/estimated-costs-attendance

https://appliedantitrust.com/04_private_actions/damages/vitamin_c/vitamin_c_edny_bernheim_report11_14_2008.pdf

https://arkansasrazorbacks.com/roster/sebastian-tretola/

https://baylorbears.com/sports/football/roster/jimmy-landes/1269

https://bceagles.com/sports/football/roster/steven-daniels/4117

https://bleacherreport.com/articles/201519-college-football-recruiting-101-the-offer-game-how-it-all-works

https://byucougars.com/story/football/1297331/byu-football-touts-groundbreaking-nil-agreements-built-brands

https://clc.com/home/about/

https://clemsontigers.com/sports/football/roster/zac-brooks/

https://en.as.com/nfl/what-percentage-of-drafted-players-make-an-nfl-roster-n/

https://espnpressroom.com/us/press-releases/2023/04/espn-platforms-set-unparalleled-records-with-ncaa-division-i-womens-basketball/

https://finance.yahoo.com/news/nba-players-score-shared-revenue-130000564.html

https://financialaid.wisc.edu/cost-of-attendance/

https://gamerant.com/mlb-2k-baseball-games-series-cancelled-mlb-the-show

https://gofrogs.com/sports/football/roster/kolby-listenbee/1187

https://gohuskies.com/sports/football/roster/travis-feeney/2144

https://hokiesports.com/sports/football/roster/dadi-lhomme-nicolas/7209

https://house.mo.gov/billtracking/bills231/hlrbillspdf/1211S.10T.pdf

https://influxermerch.com/pages/florida-sports

https://iuhoosiers.com/news/2022/6/23/academic-services-iu-athletics-establishes-new-financial-academic-achievement-awards-for-its-student-athletes

*CONFIDENTIAL*

https://kslsports.com/485578/navigating-nil-how-c-w-urban-is-helping-the-utes/

https://leg.colorado.gov/sites/default/files/2023a_293_signed.pdf

https://legiscan.com/AL/text/HB76/id/2504502

https://legiscan.com/NY/text/A07107/id/2817168/New_York-2023-A07107-Amended.html

https://legiscan.com/TX/text/HB2804/id/2813374/Texas-2023-HB2804-Enrolled.html

https://lithtoken.io/lith-token-partners-with-dreamfield-to-offer-team-wide-athlete-nil-deal-for-the-florida-gators-2/

https://mc97gsxn49y6wmpf4p2n764zq7z1.pub.sfmc-content.com/2ezhy1105pc

https://msuspartans.com/sports/football/roster/aaron-burbridge/1700

https://msuspartans.com/sports/football/roster/connor-cook/1711

https://msuspartans.com/sports/football/roster/donavon-clark/1706

https://ncaaorg.s3.amazonaws.com/ncaa/NIL/May2022NIL_Guidance.pdf

https://ncaaorg.s3.amazonaws.com/research/Finances/2021RES_D1-RevExpReport.pdf

https://ncaaorg.s3.amazonaws.com/research/sportpart/2022RES_SportsSponsorshipParticipationRatesReport.pdf

https://nflpa.com/partners/posts/nflpa-mlbpa-redbird-launch-new-company-based-on-athletes-rights

https://nflpaweb.blob.core.windows.net/media/Default/NFLPA/CBA2020/NFL-NFLPA_CBA_March_5_2020.pdf

https://olemisssports.com/sports/football/roster/fahn-cooper/683

https://roadtonationals.com/results/

https://sports.yahoo.com/oklahoma-college-world-series-three-040100082.html

https://stats.ncaa.org/

https://store.playstation.com/en-us/product/UP0006-CUSA30657_00-MADDENNFL23GAME1

https://studentcentral.indiana.edu/pay-for-college/cost-of-iu/estimated-cost.html

https://texastech.com/news/2023/2/8/academics-strive-program-successful-in-first-semester-at-tech

https://theathletic.com/4635449/2023/06/23/ea-sports-college-football-game-lawsuit

https://therecruitingcode.com/lost-athletic-scholarship/

https://thesundevils.com/sports/football/roster/devin-lucien/2414

https://uclabruins.com/sports/football/roster/devin-fuller/4065

https://uclabruins.com/sports/football/roster/jordan-payton/4111

https://universe.byu.edu/2021/09/21/smartystreets-enters-into-nil-deal-with-all-female-athletes-at-byu/

*CONFIDENTIAL*

https://usatodayhss.com/2017/five-most-common-questions-about-verbal-commitments

https://uwbadgers.com/news/2022/7/27/general-news-wisconsin-commits-to-full-academic-award-plan.aspx

https://venturebeat.com/games/sony-has-shipped-7-8-million-playstation-5-consoles-as-of-march

https://web.archive.org/web/20160108064618/http://footballdrafting.com/keith-marshall-could-be-the-darkhorse-rb-in-the-2016-nfl-draft-32720/

https://wolverineswire.usatoday.com/2022/07/27/michigan-football-coach-jim-harbaugh-has-nil-plan/

https://wvusports.com/sports/football/roster/kj-dillon/3732

https://www.arkleg.state.ar.us/Home/FTPDocument?path=%2FACTS%2F2023R%2FPublic%2FACT589.pdf

https://www.axios.com/2019/05/23/opendorse-athletes-social-media-distribution

https://www.businesswire.com/news/home/20221027006132/en/Charitable-Gift-America-Announces-Teamwide-Giving-Based-NIL-Deals-with-MSU-Women%E2%80%99s-Soccer-MSU-Men%E2%80%99s-Golf-and-MSU-Women%E2%80%99s-Golf

https://www.cbssports.com/college-football/news/ea-sports-college-football-video-game-targeted-for-2024-release-with-popular-modes-slated-to-return

https://www.depts.ttu.edu/financialaid/costtoattend.php

https://www.deseret.com/2021/8/14/22616677/byu-built-bar-deal-is-unique-kalani-sitake-nick-greer-nil-college-football-dennis-dodd-cbssports#:~:text=The%20thing%20that%20struck%20me

https://www.detroitnews.com/story/sports/college/university-michigan/2021/09/23/michigan-wolverines-athletes-profit-michigan-vs-everybody-shirts/5829011001/

https://www.espn.com/college-football/story/_/id/34217498/inside-stunning-usc-ucla-move-big-ten-chaos-followed

https://www.espn.com/college-football/story/_/id/35063894/what-know-new-ea-sports-college-football-video-game

https://www.espn.com/mens-college-basketball/story/_/id/32745188/howard-university-men-basketball-team-signs-nil-deal-moving-company-college-hunks-hauling-junk

https://www.espn.com/womens-college-basketball/story/_/id/34314841/texas-tech-women-basketball-players-receive-25k-nil-deals

https://www.extrapointsmb.com/p/ea-sports-college-football-will-include-player-likenesses-heres-else-ive-learned

https://www.flsenate.gov/Session/Bill/2023B/7B/BillText/er/PDF

https://www.forbes.com/sites/games/2016/08/17/madden-17-review-the-good-the-bad-and-the-traditional/

https://www.forbes.com/sites/kristidosh/2021/12/27/alabama-womens-gymnastics-scores-teamwide-nil-deal-with-crowdpush/?sh=652626f93209

*CONFIDENTIAL*

https://www.foxsports.com/stories/college-football/penn-state-coach-james-franklin-revenue-sharing-with-players-inevitable

https://www.gameinformer.com/b/news/archive/2009/12/21/news-nhl-2k-series-over.aspx

https://www.greenvilleonline.com/story/sports/college/usc/2022/09/28/south-carolina-womens-basketball-nil-deal-gives-players-25000-each/69524279007/

https://www.hollywoodreporter.com/business/business-news/tv-ads-viewers-streaming-broadcast-1235025916/

https://www.hooters.com/about/news/hooters-signs-offensive-linemen-the-unsung-heroes-of-college-football-to-nil-deals-across-the-country

https://www.ksl.com/article/50247317/why-provo-based-smartystreets-and-its-girldad-ceo-entered-into-2m-agreement-with-every-byu-female-athlete

https://www.legis.state.pa.us/CFDOCS/Legis/PN/Public/btCheck.cfm?txtType=PDF&sessYr=2021&sessInd=0&billBody=H&billTyp=B&billNbr=2633&pn=3593

https://www.lubbockonline.com/story/sports/college/red-raiders/2022/07/18/matador-club-offers-25k-contracts-to-100-tech-football-players/65375501007/

https://www.lubbockonline.com/story/sports/college/red-raiders/2022/09/29/matador-club-offering-10k-contracts-to-all-texas-tech-softball-players/69526342007/

https://www.mmamania.com/2021/7/7/22566088/american-top-team-att-owner-sponsorship-miami-football-team-hurricanes-college-nil-payments

https://www.morganstanley.com/im/en-us/individual-investor/about-us/newsroom/press-release/oneteam-announces-sale-of-capital-stake-morgan-stanley.html

https://www.nbcsports.com/nfl/profootballtalk/rumor-mill/news/players-share-of-revenue-can-go-as-high-as-48-8-percent

https://www.ncaa.org/sports/2015/3/6/estimated-probability-of-competing-in-professional-athletics.aspx

https://www.ncaa.org/sports/2021/2/8/about-taking-action.aspx

https://www.ncaapublications.com/productdownloads/D123.pdf

https://www.ncsasports.org/recruiting/managing-recruiting-process/verbal-offers-and-commitments

https://www.newvisiontheatres.com/tv-viewership-statistics

https://www.on3.com/news/university-iowa-hawkeyes-college-football-alston-awards-hawkeye-academic-advantage-program/

https://www.on3.com/news/wisconsins-alston-awards-badgers-policy-academic-achievement-ncaa-supreme-court/

https://www.on3.com/nil/news/michigan-state-womens-gymnastics-nil-charitable-gift-america-this-is-sparta/

*CONFIDENTIAL*

https://www.on3.com/nil/news/smu-mustangs-football-basketball-boulevard-collective-nil-name-image-likeness-payment-plans/

https://www.onlineathens.com/story/sports/high-school/football/2012/12/31/freshman-ol-john-theus-tough-kid-huge-upside-bulldogs/15586766007/

https://www.polygon.com/2019/10/29/20938853/nba-live-20-canceled-ea-sports-ps4-xbox-one-ps5-scarlett

https://www.pro-football-reference.com/years/2016/draft.htm

https://www.pro-football-reference.com/years/2019/draft.htm

https://www.sbnation.com/college-football-recruiting/2017/5/15/15637674/wisconsin-pulls-qb-ben-bryant-scholarship-offer

https://www.scstatehouse.gov/sess124_2021-2022/bills/685.htm

https://www.si.com/college/michiganstate/other-sports/former-michigan-state-walk-on-mat-ishbia-reaches-nil-agreement-msu-football-basketball-mel-tucker-tom-izzo

https://www.si.com/college/syracuse/recruiting/ncaa-expand-college-football-class-signing-limit

https://www.si.com/extra-mustard/2023/04/13/cavinder-twins-hanna-haley-decision-to-leave-miami-college-basketball-today-show-wwe-rumors

https://www.sportsbusinessjournal.com/Daily/Morning-Buzz/2023/04/11/wnba-draft-aliyah-boston-goes-no-1.aspx

https://www.sportsmediawatch.com/2023/06/lsu-florida-record-college-world-series-ratings-viewership-espn/

https://www.sports-reference.com/cfb/players/alex-mccalister-1.html

https://www.sports-reference.com/cfb/players/cardale-jones-1.html

https://www.sports-reference.com/cfb/players/christian-hackenberg-1.html

https://www.sports-reference.com/cfb/players/kelvin-taylor-1.html

https://www.sports-reference.com/cfb/players/kenny-lawler-1.html

https://www.sports-reference.com/cfb/players/malcolm-mitchell-2.html

https://www.sports-reference.com/cfb/players/roberto-aguayo-1.html

https://www.sports-reference.com/cfb/players/thomas-duarte-1.html

https://www.sports-reference.com/cfb/players/zack-sanchez-1.html

https://www.statesman.com/story/sports/football/2021/09/17/texas-football-tight-ends-nil-deals-crowdsourced-burnt-ends-program/8349704002/

https://www.statista.com/statistics/251560/ncaa-basketball-march-madness-average-tv-viewership-per-game/

*CONFIDENTIAL*

https://www.theadvocate.com/baton_rouge/sports/lsu/football-signing-class-limits-removed-for-the-next-2-years-heres-what-it-means-for/article_dab793f0-d6e2-11ec-a3a4-4b2f5c7574e9.html

https://www.usatoday.com/story/sports/college/2013/09/26/ea-sports-ncaa-13-video-game-keller-obannon/2878307/

https://www.vgchartz.com/tools/hw_date.php?reg=USA&ending=Monthly

https://www.winston.com/en/competition-corner/chinese-vitamin-defendants-prevail-again-showing-limits-of-us-antitrust-laws-extraterritorial-reach.html

*CONFIDENTIAL*