# EXHIBIT 6



# REPLY REPORT OF EDWIN S. DESSER

## IN THE MATTER OF:

## In: Re College Athlete NIL Litigation

### (Case No. 4:20-cv-03919-CW)

President

Desser Sports Media, Inc.

July 21, 2023

# Table Of Contents

1   **EXECUTIVE SUMMARY** ................................................................................................. **3**
    1.1.   Broadcast NIL Opinion ......................................................................................... 3
    1.2.   Allocation Opinion ............................................................................................... 4

2   **ED DESSER: EXPERT OVERVIEW** ........................................................................... **6**
    2.1.   46 Years in the Industry ........................................................................................ 6
    2.2.   Decades of Experience Negotiating Broadcasting Agreements ............................ 6
    2.3.   Extensive Experience with Broadcast NIL ........................................................... 6
    2.4.   Direct Experience with College Sports Media Rights ........................................... 7
    2.5.   Work for Media Companies .................................................................................. 8
    2.6.   Prior Testifying Experience in O'Bannon ............................................................ 8

3   **OPINION 1: AT LEAST 10%** ........................................................................................ **9**
    3.1   Broadcast NIL Has Significant Value .................................................................... 9
      3.1.1   Broadcast NIL is Part of Negotiated Value ............................................... 9
      3.1.2   It Would Be Impossible to Broadcast FBS Football or Division I Basketball Games Without Broadcast NIL. ......................................................................................................... 10
      3.1.3   All Players' NIL are Required in Advance ............................................... 11
      3.1.4   No Prior Reason to Break Out NIL Values ............................................. 12

    3.2   Comparable NIL Deals Confirm Reasonableness of My 10% Valuation Opinion for Broadcast NIL ............ 13
      3.2.1   Professional Sports Royalty Rates ........................................................... 14
      3.2.2   Trademark and Patent Royalties ............................................................. 16

    3.3   Summary of Support for My 10% Valuation Opinion ........................................ 17

4   **PER-SPORT MEDIA REVENUE ALLOCATION OPINION** ................................ **18**
    4.1   FBS Football Drives Broadcast Values .............................................................. 18

    4.2   Thompson's Testimony Supports My Specific Allocation Percentages ............... 19

    4.3   In Addition to Thompson's Testimony, My Allocation Estimates Are Supported By A Wide Variety Of Data Points: ..................................................................................................... 20
      4.3.1.   <mark>SEC Financials</mark> ........................................................................................ 20
      4.3.2.   <mark>CBS/SEC</mark> Contract ................................................................................. 21
      4.3.3.   <mark>SEC</mark> Prior Rights Agreements Overall ...................................................... 21
      4.3.4.   <mark>Conference USA Contract</mark> ........................................................................ 21
      4.3.5.   Notre Dame Allocation ............................................................................ 22
      4.3.6.   ACC Bylaws & Notre Dame ..................................................................... 23
      4.3.7.   Big East Contract .................................................................................... 23
      4.3.8.   Audience Data ......................................................................................... 25
      4.3.9.   Big 12 Revenues Study ............................................................................ 25
      4.3.10.   NCAA Gender Equity Study ..................................................................... 25
    4.4   Thompson's Inconsistencies ................................................................................ 26

5   **IN CONCLUSION** ........................................................................................................ **29**

6   **EXHIBIT A** ..................................................................................................................... **30**

7   **EXHIBIT B** ..................................................................................................................... **32**

8   **EXHIBIT C** ..................................................................................................................... **36**

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

# 1 EXECUTIVE SUMMARY

On October 21, 2022, I filed my Expert Report in this case.[1] The core of my conclusions included my opinions: that (1) a minimum of 10% of the overall value of Defendants' college sports media rights agreements is attributable to the athletes' NIL contained in and supporting broadcasts thereof ("Broadcast NIL" or "BNIL"), and (2) within college sports broadcast agreements which cover multiple sports, approximately 75% of the revenue is attributable to football, 15% to men's basketball, 5% to women's basketball, and 5% to all other sports. On April 28, 2023, Defendants filed an expert report by Bob Thompson and a *Daubert* Motion to exclude my Report.

I have examined Thompson's Report and nothing in it undermines my opinions. He characterizes my analysis and methods as "impossible" and pulled from thin air. But my opinions are based on my decades of experience in negotiating and valuing sports broadcasting agreements and are tested and validated through an examination of the relevant available data. My opinion is further supported by Thompson's statement at his deposition that it is possible to provide the estimates I have offered based on industry experience, and by Thompson's own public estimates, which are very similar to my own.

In my Reply Report, I will respond to Thompson's opinions and testimony in detail. However, there are several points that warrant emphasis at the outset.

## 1.1. Broadcast NIL Opinion

There can be no serious dispute that Broadcast NIL provides economic value to broadcasters. Thompson doesn't dispute that broadcasters bargain to secure these rights (for example, including through representations, warranties, and indemnifications for their use of such rights) in every college media rights agreement. Thompson himself admits that he has never, and would never, execute a college sports broadcast agreement without securing from Defendants either the grant of the right to use, or an indemnity for using, Broadcast NIL.[2] Nor does he dispute that without such Broadcast NIL, games can't be telecast.[3] From these two premises, it necessarily follows that Broadcast NIL has an economic value which Defendants have taken from college athletes without compensation. The lack of dispute on these points fully supports my prior opinion that Broadcast NIL provides value.

When Thompson says there is no "separate market" for Broadcast NIL, that may be accurate, but it is not relevant to the issue of value. To begin, sports leagues other than the NCAA permit the players to be compensated for their performance and for their NIL, and therefore, there is no need to segregate

---

[1] Expert Report of Edwin S. Desser in the matter of *House et al. v. NCAA et al.*, October 21, 2022.
[2] Bob Thompson Deposition Transcript, June 8, 2023, page 50, line 22 to page 51, line 15.
[3] *Id.* at page 81, line 23 to page 82, line 13.

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

the value that the athletes provide for playing on the field or court from the value they provide in the form of Broadcast NIL. Put differently, it is Defendants' *sui generis* "amateurism" restrictions on compensation that create the need to "separately" value Broadcast NIL for purposes of litigation challenging Defendants' NIL restrictions. Furthermore, and as Thompson acknowledges in support of my opinion, even where rights in a media agreement typically are not assigned a "separate" value, that right or obligation can still have "a material impact on the amount of the rights fee," as I have shown with respect to Broadcast NIL.[4] Specifically, I have provided this minimum 10% estimate based on my decades of industry experience and a review of data from analogous situations in which professional football and basketball players have separately and collectively licensed their NIL rights for use in various products. Such license agreements provide valuable benchmarks because they compensate the players for their NILs but not their performances. Thompson's response that video games are not the same product as a telecast misses the point about what makes the comparison apt.

### 1.2.  Allocation Opinion

In his Report, Thompson repeatedly asserted that it is "impossible" to allocate value among the sports in multi-sports college broadcast contracts.[5] But Thompson's deposition confirmed that my Allocation Opinion is not only very much "possible," but Thompson largely agrees with it. For starters, Thompson agrees that 1) football, 2) men's basketball, and 3) women's basketball is the correct pecking order in terms of relative value within a multi-sport contract. More specifically, Thompson believes that football drives most of the revenue, and men's basketball is a distant but still significant second, followed by women's basketball. As for the percentages that I have opined about (75% for football, 15% for men's basketball, and 5% for women's basketball), Thompson testified to having given nearly the same Allocation Opinion numerous times before he was retained by Defendants. For example, he said, "as anybody will tell you, the value in these rights deals is usually ascribed 75, 80 percent to football and the rest to the basketball product,"[6] and "[y]ou know, and normally, [ ] the – football gets all the – all of the credit for these deals, but, you know, in my mind, basketball is always worth 20 to 25 percent of the total value."[7] In short, Thompson criticized my Allocation Opinion as "impossible" in his Report, but then at his deposition he confirmed that my Allocation Opinion is in fact the conventional wisdom in college sports broadcasting. This is unsurprising because Defendants' own Bylaws and

---

[4] Expert Report of Bob Thompson, *In re: College Athlete NIL Litigation*, April 28, 2023, page 4.
[5] *Id.* at 6.
[6] Thompson Deposition, page 170, lines 1–4.
[7] *Id.* at page 161, lines 18–22.

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

audited financial statements include similar allocations—none of which Thompson has a cogent response to, and some of which he did not even study.[8]

I also note that Thompson's main critiques of my opinions – especially in light of his deposition testimony – largely do not bear on class certification and instead go to merits arguments that apply to class members the same basic way. Even if Thompson were correct that 10% of the overall value of the media rights is not the right number, both sides would still be in position at trial to argue their views on the "material impact on the amount of the rights fee" that results from BNIL. That difference applies to the entire class of athletes the same. And, even if Thompson disagrees with my allocations among the sports, the issue of the exact percentage that applies to a particular sport – whether football should be 75% or 80%, to note two percentages that Thompson has publicly used – is the same for every class member. The fact that Thompson publicly is on the same page as me that an overall percentage can be applied to a sport shows that this is a common issue to the class.

Finally, there is no basis for Defendants, or Thompson, to question whether I have the relevant industry experience to present the opinions in my Report. As I will review below, I have spent more than four decades negotiating and valuing sports broadcast agreements. And I have extensive experience going back more than a decade valuing media rights for Division I college sports, including for Defendants the NCAA and Big 12 Conference, which has enabled me to formulate the opinions I presented in my Expert Report and reaffirm here.

---

[8] *Id.* at page 133, line 13 to page 135, line 3 (showing that Thompson did not study the ACC Bylaws, which provide for an 80/20 allocation between football and all other sports).

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

## 2 ED DESSER: EXPERT OVERVIEW

There is no basis for defendants to question the relevance of my industry experience to provide opinions on the value of Broadcast NIL for college football and basketball players and the relative broadcast value among different college sports.

### 2.1. 46 Years in the Industry

Continuously since 1977, I have been employed in multiple senior positions, full-time, exclusively in sports media management, operations, production, distribution, negotiation and valuation. During my nearly 20-year consulting career, I have negotiated and/or advised on over $50 billion in sports and sports media transactions. In addition to rights deals, this also includes sports asset sales and transactions involving sports media TV networks.

### 2.2. Decades of Experience Negotiating Broadcasting Agreements

I have substantial experience negotiating sports media agreements and performing valuations. I was the senior media executive at the National Basketball Association (NBA) in the Commissioner's Office for more than two decades. I managed all league media operations, handled negotiations with major broadcast entities (including those which are also licensees of the Defendants), and did strategic planning and media business development.[9] During my tenure at the NBA, I negotiated most of the league's media deals (including substantially all of the league's high value deals). At the NBA, as in college sports, player NIL is present and is a key element included in all media deals. Since leaving the NBA, I have served over one hundred different sports media and related technology clients, including the NFL, MLB, NASCAR, PGA Tour, MLS, UFC, CFL, about 50 professional teams, the NCAA, Big 12 Conference, American Athletic Conference (AAC), and the Big East, some on multiple assignments.

### 2.3. Extensive Experience with Broadcast NIL

The use of player Broadcast NIL in the NBA and other professional sports entities I have worked for is very similar to the use of Broadcast NIL in college sports. The main difference is that the professional sports entities compensate athletes for their Broadcast NIL and for their playing services in the same compensation package, while Defendants' rules prevent Defendants from compensating college athletes for either their Broadcast NIL or their labor. I understand that this litigation challenges the former restriction. While I have not separately negotiated agreements for Broadcast NIL, no one else has either, because there would be no business reason to do so. In this litigation, however, I was asked to isolate the value of Broadcast NIL in a "but-for world" where

---

[9] *See* my CV contained in my Expert Report in this case, dated October 21, 2022.

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

college athletes are allowed to receive compensation for their NIL but not for their playing services.

My experience negotiating professional league broadcast agreements in which athletes' Broadcast NIL was included provides me with the expertise needed to estimate the minimum value that college athletes' NIL supplies in a sports broadcasting agreement. There is a substantial similarity between professional and college sports broadcast agreements. Both professional and college sports broadcasting deals use similar forms of media license agreements; have the same networks as licensees; have the same TV producers, directors, and often announcers creating the media product; and use the same equipment to capture the games. Furthermore, most of the same sponsors support the programming, the same distributors (cable, satellite, and vMVPDs) deliver game telecast signals to consumers, and many of the same viewers are watching.[10] I am thus able to use my extensive experience negotiating media agreements in professional sports to formulate opinions about the valuation of college sports agreements as well.

### 2.4. Direct Experience with College Sports Media Rights

Despite what Defendants claim in their motion to exclude my testimony,[11] I have also negotiated and consulted with respect to college media rights. To start, I worked with the Commissioner and key executive staff negotiating the current ESPN media rights agreement for the American Athletic Conference. I have additionally done work on media projects concerning four of the top seven Division I conferences, including conferences that are Defendants in this lawsuit. This has ranged from negotiating media agreements, to performing valuations, to developing strategy, to working on new media projects, to expert witness work. I have performed expert work in two previous cases involving different Defendant Power Five conferences. One was on behalf of the Big 12. The other was on behalf of ESPN in a dispute with a different conference. And I was twice solicited to respond to NCAA RFPs for media consulting, valuation, and strategy services, including as recently as this year. I was also one of the authors of the landmark 2021 NCAA Gender Equity Media Report, which included the standalone Desser Media & Sponsorship Addendum.[12] The NCAA commissioned this Report after a viral video from Oregon women's basketball player Sedona Prince (a Plaintiff in this lawsuit) helped

---

[10] *See* Exhibit A, Excerpt from the Expert Rebuttal Report of Edwin S. Desser in the matter of *O'Bannon v. NCAA*, November 5, 2013, ¶ 18.

[11] Defendants stated, "Desser has never negotiated a college sports media agreement." Defs.' Motion to Exclude the Opinions, Reports, and Testimony of Edwin Desser and Daniel Rascher in the Matter of *House v. NCAA*, April 28, 2023, page 3.

[12] Desser Media & Sponsorship Addendum to the NCAA External Gender Equity Review (Aug. 2, 2021), *available at* https://ncaagenderequityreview.com/.

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

expose significant inequities between the Men's and Women's Division I basketball tournaments, leading NCAA President Mark Emmert to acknowledge that it was "pretty self-evident that we dropped the ball in supporting our women's athletes."[13]  In connection therewith, I worked with NCAA and conference executives and committees in researching, drafting, and delivering this work product, which led to the NCAA's current initiative to value and potentially sell the broadcast rights for the Women's NCAA Basketball Tournament as a stand-alone product.  This extensive experience with college sports media rights gives me a further foundation for providing the opinions I offered in my Expert Report.

### 2.5.  Work for Media Companies

While much of my work centers on providing services to sports entities, I have also done significant work for many media and technology companies. These clients have included ESPN, Fox, Tribune Television, DIRECTV, Time Warner Cable, Google/YouTube, Qualcomm, and NBC Universal. I also invented and launched the first league-owned sports network, NBA TV.  This provides me with rounded experience, from both sides of the negotiating table, that I have employed in formulating my opinions here.

### 2.6.  Prior Testifying Experience in *O'Bannon*

I gained additional experience studying the issues surrounding Broadcast NIL in college sports from my work in the *O'Bannon* litigation. In that case, I authored a declaration and an expert rebuttal report, was deposed, and testified in court with respect to various college sports broadcast agreement issues, including issues relevant to Broadcast NIL.

In short, I have extensive experience with issues surrounding the negotiation and valuation of sports media agreements, including college sports media agreements.

---

[13] Heather Dinich, *NCAA President Mark Emmert Admits Inequality But Wants Women's Basketball Leaders To Push Progress*, ESPN (Mar. 31, 2021), https://www.espn.com/womens-college-basketball/story/_/id/31172132/ncaa-president-mark-emmert-admits-inequality-wants-women-basketball-leaders-push-progress.  Despite Defendants' stated desire to combat these systemic inequities, Thompson argues that I actually *overvalue* women's basketball. *See* Thompson Deposition, page 111, lines 11–13.

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

# 3  OPINION 1: BROADCAST NIL IS WORTH AT LEAST 10% OF DEFENDANTS' MEDIA AGREEMENTS

My opinion that Broadcast NIL for NCAA Division I Football Bowl Subdivision (FBS) Football and Men's and Women's Division I Basketball is at least 10% of broadcast license value is based on my industry experience and reinforced by the available data.

## 3.1  Broadcast NIL Has Significant Economic Value

Defendants claim that my opinion is flawed because there is "no separate market for Broadcast NIL."[14]  They suggest that somehow this renders BNIL "impossible" to value and therefore to have a value of "zero."[15]  My experience with how BNIL is contracted for and used in pro and college sports telecasts and promotions thereof clearly demonstrates that BNIL has substantial value, which I have conservatively estimated to be at least 10% of Defendants' broadcast revenues.

### 3.1.1  Broadcast NIL is Part of Negotiated Value

Media companies value each element of a college sports broadcasting deal as part of the negotiation process.  They evaluate a variety of factors, including the number of games, the type of games, the history of the conference, the rivalries, the level of exclusivity, the number of commercials that can be sold, the permitted distribution platform(s), the back-end extension rights, and many other elements in order to determine what they consider to be the fair market value of a bucket of media-related rights.  While many of these detailed elements of a media rights agreement will vary by deal and conference, every agreement includes, as one of its core elements, the conveyance of Broadcast NIL. As I explained in my *O'Bannon* testimony: "A telecaster would simply not agree to enter into a sports event coverage contract which excluded or prohibited including the performances, names, images, and likenesses of the players."[16]

Thompson concurs.  At his deposition, when asked as a former network executive if he would ever sign a media rights agreement without an express conveyance or protection for using the athlete participants' BNIL, Thomson replied:

> I would not enter into an agreement, and I would assume that people in my position at other places would not enter in that situation, without the express, you know, representation and

---

[14] Thompson Report, pages 35–37.
[15] Thompson Deposition, page 78, lines 14 to 24.
[16] *O'Bannon* Expert Rebuttal Report, Ex. A, ¶ 21.

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

warranties from the different conferences that they would provide those warranties [sic].[17]

Thompson further testified:

> Q. When a network enters into a college media rights agreement, is it fair to say that the network just sort of takes as a given that it will have rights or protections for the use of the name, image, and likeness of the college athletes? …
>
> THE WITNESS: I take nothing as a given in the sports world.
>
> Q. And that's why it's in the agreements.
>
> A. Correct.[18]

For that reason, all broadcast companies require either that the conferences and/or the NCAA expressly convey BNIL rights to the broadcaster or that the licensor (conference or the NCAA) provide contractual assurances that all necessary rights have been provided.[19] Thompson agrees that broadcasters bargain to secure these rights (or at least to secure indemnifications for their use of such rights) in every college media rights agreement.[20] Thus, my opinion about the value of BNIL is valid as originally stated in my Report, and nothing in the Thompson Report undermines it. Instead, as noted above, his testimony provides additional support for my opinion.

### 3.1.2    It Would Be Impossible to Broadcast FBS Football or Division I Basketball Games Without Broadcast NIL

I stated in my original Report that it is not possible to broadcast FBS football or Division I basketball games without BNIL.[21] Nothing in the Thompson Report undermines this conclusion; in fact, his opinions are again supportive of my own. Thompson admits that he has never done a broadcast deal without BNIL being included.[22] Neither has anyone else.[23] Nor would a broadcast without BNIL be accepted by college sports fans. A broadcaster cannot technically nor competitively black-out some or all of the players and have a watchable, entertaining, or

---

[17] Thompson Deposition, page 50, line 22 to page 51, line 15.
[18] *Id.* at page 50, lines 8−18.
[19] Desser Opening *House* Report, page 6.
[20] Thompson Deposition, page 44, line 21 to page 45, line 17; page 49, line 16 to page 50, line 5; page 78, lines 6−11.
[21] Desser Opening *House* Report, pages 31−39.
[22] Thompson Deposition, page 77, line 9 to page 78, line 11.
[23] *See id.* at page 78, lines 6−11 ("Q. …but even today, networks are still entering into media rights agreements that either convey the right to show the names and faces in the games or protect the network for doing so.  A. That's correct.").

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

competitively saleable college sports broadcast product. In his deposition, Thompson responded to the question, "…in the history of televised sports…there's never been a televised game that doesn't show – that blurs out the faces and doesn't identify the names of the athletes participating?" with the following response: "…no, not that I'm aware of."[24] As Thompson further testified, "it kind of goes against the whole idea of televising sports" to have a college sports broadcast that does not use Broadcast NIL.[25]

This is another fact that supports my opinion that Broadcast NIL has a value equal to at least 10% of the total rights fee paid. These are not incidental rights, but rather *required, essential* ones.

### 3.1.3   All Players' NIL Required in Advance

I opined previously that broadcasters must have the right to show the NILs of all players on a FBS football or Division I basketball team participating in a broadcast game.[26] One of the compelling things about live sports is that no one knows before the game takes place who the newsworthy participants will be. In 2014, few if any college football fans believed that sophomore Cardale Jones, the team's third-string QB, would play a significant role for powerhouse Ohio State, and yet Jones stepped in for the Buckeyes' last three games (the only three he had ever started) to lead them to the school's most recent football national championship. Likewise, Stetson Bennett, star QB for the Georgia back-to-back 2022-23 football national champions, joined the Bulldogs as a *walk-on*. In the 2013 NCAA Basketball Championship Game, the first half's leading scorer was Michigan's freshman guard, Spike Albrecht who hit four straight three-pointers and totaled 17 points against Louisville.[27] Coming into the game, he was averaging 1.8 points per game and had not scored more than seven points all regular season.[28] Had the ability to show each of the players not been secured, the network could have been unable to show what turned out to be the most important players and plays.

In addition, in the course of covering a game, TV cameras routinely record every player on both teams' rosters whether they actually play in the game or not. For example, after an exciting or important play in a basketball game, broadcasters often show the players on the bench

---

[24] *Id.* at page 82, lines 6−13.
[25] *Id.* at page 81, line 23 to page 82, line 4.
[26] Desser Opening *House* Report, page 40.
[27] https://www.ncaa.com/game/basketball-men/d1/2013/04/08/michigan-louisville/play-by-play.
[28] https://www.espn.com/mens-college-basketball/recap?gameId=330980097.

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

reacting. During the 2015-16 season, Monmouth University's men's basketball team became famous for their over-the-top bench celebrations during games, earning the nickname the "Bench Mob."[29] Because no one knows in advance which players will be shown on the field or the benches, every player has an NIL value which must be provided to the broadcaster.

The Thompson Report does not undermine my opinion—his admissions support my opinion. For example, Thompson acknowledged that if the broadcasters did not secure athletes' BNIL rights well in advance, a single player could withhold his or her BNIL rights and prevent the entire broadcast from occurring.[30] Thompson testified that this would be true whether the player was a star quarterback or a punter.[31] Thompson's acknowledgement further makes my point that networks value the Broadcast NILs of all game participants. Broadcasters need to secure (and in practice do secure via contract) all players' BNIL well in advance of any broadcast.[32] A single faceless, nameless player on the field or on the sideline would detract from the telecast experience that viewers want and expect. My opinion on this point—which Thompson does not dispute—that there is value in all class members' BNIL is the natural result since NILs for all players are needed in order for the broadcast media rights to be sellable.[33]

Taking all of these points together, it is erroneous for Thompson to opine that Broadcast NIL rights—without which (1) he would not sign a broadcast agreement, and (2) a sports contest would not be televised—have no value.

### 3.1.4 No Prior Reason to Break Out NIL Values

Broadcast contracts, as a matter of industry practice, generally do not break out the value of individual rights when they are conveyed/acquired in a bundle, unless there is a specific business reason to do so. Broadcast contracts will include bundled rights to broadcast the game live; use participants' BNIL; broadcast delayed excerpts and repeats; promote the game; and engage in particular activities prior to and during the

---

[29] Adam Woodard, *A Night with the Most Famous Bench in College Basketball*, USA TODAY (Dec. 16, 2015), https://www.usatoday.com/story/sports/ncaab/maac/2015/12/16/monmouth-bench-mob-celebrations-college-basketball-georgetown/77405260/.
[30] Thompson Deposition, page 52, line 7 to page 53, line 8.
[31] *Id.* at page 53, lines 4−8.
[32] Another reason that broadcasters need the rights in advance is in order to promote the telecast. While Thompson claims in his report that "the NIL of only a handful of student athletes is ever used to promote a broadcast," he is wrong. For example, here is a link to a Fox promotional announcement for the 2018 Ohio State vs. Michigan game in which at least 79 players are identifiable: https://streamable.com/wupzj.
[33] Desser Opening *House* Report, pages 32−33.

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

broadcast such as accessing venues, using particular camera and announcer locations, and facilitating halftime interviews of coaches, among many other rights. All of these activities require the acquisition of the right to do them, but the value of each such right is not broken out separately in the typical contract, any more than the individual parts of a car (e.g., the steering wheel as opposed to options) are itemized on a window sticker.

Despite the fact that there is no breakdown of separate values for these various elements, it is my opinion from my decades of experience that each of the key elements, including Broadcast NIL, has a material value. Although Thompson and I disagree on the value of Broadcast NIL—I believe it is worth at least 10% of the value of college broadcast agreements and Thompson claims to believe Broadcast NIL is worth nothing—Thompson readily agrees that just because there is not a "separate market" for a particular right does not mean the right does not "ha[ve] a material impact on the amount of the rights fee" paid by networks.[34] For example, as Thompson also admitted at his deposition, there is no separate market for media contract back-end rights (e.g., a right of first refusal to extend the current agreement),[35] but they are still economically valuable, and he would be able to determine their value.[36]

Notably, to opine on a value for Broadcast NIL, Thompson, like me, would do so by relying on his "experience." He agrees that this is in fact how many elements of broadcast deals get valued and negotiated.[37] My industry experience supports my opinion that the value of Broadcast NIL is at least 10% of the total rights fee paid, a conservative estimation that is further supported by additional data that I reviewed.

## 3.2 Comparable NIL Deals Confirm the Reasonableness of My 10% Valuation Opinion for Broadcast NIL

Thompson claims that "None of the materials, documents, or examples Desser relies upon to support his 10% Opinion are comparable, related, or in any manner relevant[.]"[38] This is incorrect. Each of the data points I examine individually and collectively support my opinion that Broadcast NIL should be valued at an amount equivalent to at least 10% of the rights fees paid. For example, it is common that existing comparators are relied on in the broadcast industry when new things need to be valued. When Video on Demand (VOD) and live streaming was introduced in the last two decades, broadcasters and

---

[34] Thompson Report, page 4.
[35] Thompson Deposition, page 70, lines 16–21.
[36] *Id.* at page 70, line 16 to page 76, line 9.
[37] *Id.* at page 75, line 23 to page 76, line 9.
[38] Thompson Report, page 5.

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

licensors looked at the preexisting value of (1) OTA/Cable broadcasts and (2) non-live video products to determine how much to charge for a streaming game/package. BNIL is not a novel notion for which there is neither precedent nor relevant comparisons. Instead, as is customary in the broadcast industry, I can (and do) use existing comparators to validate my 10% Opinion.

### 3.2.1 Professional Sports Royalty Rates

One very analogous comparison is the amount of royalties that professional basketball and football players generate for the use of their NIL rights for various licensed products. These transactions are good benchmarks because they isolate the value of player NIL from the value of players' participation in games and the value of league IP used in a wide variety of products. For example, in a football- or basketball-themed video games, players collectively are not paid for any performance; they are simply paid for the right to include their NILs in the product. That dynamic makes group license agreements particularly well-suited to test my opinions about the value of Broadcast NIL isolated from the value that participants additionally contribute through their on-field or on-court performance.

As I explained in my Report—and as shown in the chart below—the royalty percentages generated by these deals for NFL and NBA player NIL are very comparable to, and supportive of, my 10% minimum estimate.[39]



| PLAYERS ASSOCIATION/CATEGORY | Median Wholesale Royalties |
|---|---|
| NFLPA Video Games (& Digital) | Redacted - Counsel Only |
| NFLPA Licensed Hardline & Apparel | |
| NBAPA Video Games | |
| NBAPA Licensed Products | |
| Desser College BNIL Minimum Estimate | 10% |

In response, Thompson first argues that the group license NIL deals for NFL, NBA, and WNBA players are not comparable because they "represent[] a very small portion of the compensation received by many,

---

[39] Desser Opening *House* Report, pages 56-59 (WNBAPA also has a limited number of licenses with royalties from Counsel

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

if not most, professional athletes."[40]  The second portion of this is a true statement, but it is irrelevant.  Professional players receive the bulk of their income from salaries for playing, a compensation opportunity that the NCAA precludes for college athletes.  If NCAA rules permitted player salaries, then the licensing element for college player BNIL would also represent a small portion of total player income.

If anything, Thompson's criticism is supportive of my opinion.  As noted in my Report, I estimate that players' contributions account for approximately 50% of the broadcast revenues Defendants receive, but players' BNIL only accounts for 10% of the broadcast revenues.[41]  In other words, even when it comes to broadcasts (where NIL is a significant aspect), BNIL represents a small portion of the value that players contribute.

Thompson's argument that the group licenses for NIL are not relevant because these "group licenses are for products, not broadcasts" is similarly misguided.[42]  While it is true that broadcasts and video games or trading cards are different end-products, that is not the point of my comparison.  The group license agreements I examined assign a percentage value to be paid for professional athletes' NILs on a standalone basis from their performances.  Thompson does not offer any explanation for why the percentage value of Broadcast NIL would be any less than the percentage value of NIL in a product like a video game or trading card.  In both products (licensed consumer goods like video games and broadcasts), fans are ultimately valuing players' NIL rights—which are bundled together with other product attributes—through viewing or purchasing.  And Thompson also ignores the fact that a broadcast, like a video game, is a virtual form of a product.  He is simply offering a distinction without a difference.

In my opinion, the player NIL royalties for video games are the most analogous comparison to the Broadcast NIL at issue here.  Thompson asserts that video games are "totally different," but they are not.  Both video games and sports broadcasts use player NIL.  Both are commercially viable products in which it is essential that all the players' NILs are included.  Both involve player video images showing them playing a game.  And both involve the same sports—football and basketball, respectively.

---

[40] Thompson Report, page 37.
[41] Desser Opening *House* Report, pages 7−8, 54.
[42] Thompson Report, page 42.

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

But video games are particularly useful analogues here because they exclude the value of players actually performing in games or practices. Video games do not rely on the actual playing of a game in real life—the key value that my analysis is intended to exclude. <mark>And those values, as shown in the chart above,</mark> demonstrate that my 10% minimum value estimate is sound.

Finally, Thompson argues that group licenses "are negotiated in a marketplace that actually exists (unlike the non-existent marketplace for Broadcast NIL)."[43]  But that is exactly the point.  Because group NIL licenses are negotiated in an existing market and convey very similar rights as BNIL, while not requiring player performance, they are very useful benchmarks.

### 3.2.2 Trademark and Patent Royalties

Thompson is also critical of my use of analogous trademark royalties. First, as Thompson correctly observes, each broadcast agreement also contains a grant of trademark use in connection with the telecasts.  These grants, like BNIL, are also not valued separately, but they are nevertheless vital to the core value of the telecasts, which is conveyed. The inability to mention the conference, school, or team nickname or to use school or conference logos (in promotion or in the telecast) would similarly be harmful to the telecaster.  As stated in my report, pro leagues also license their trademarks for a variety of sports products (including telecasts), and generally receive licensed product royalties.[44]  While these licenses focus on trademarks and not NIL, they do provide additional support for the relative range of such marketplace royalties.   Thompson also complains[45] that the KPMG report— "Profitability and royalty rates across industries," which I cited[46] as additional support for my BNIL valuation—focuses on patent royalties, but he ignores that it also includes media products data from 157 companies with an average royalty rate of 12.9%, consistent with my minimum figure.

---

[43] *Id.*
[44] Desser Opening *House* Report, page 56.
[45] Thompson Report, page 42.
[46] Desser Opening *House* Report, page 55.

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT



### 3.3  Summary of Support for My 10% Valuation Opinion

Despite Thompson's claims to the contrary, my 10% minimum valuation opinion applies to all members of the Men's Basketball and Football Class and all members of the Women's Basketball Class and is strongly supported by both my decades of industry experience and my examination of analogous data points, including pro athlete NIL transactions.  I will continue to examine the evidence prior to my trial merits report.

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

# 4   Per-Sport Media Revenue Allocation Opinion

My estimated per-sport revenue allocation for multi-sport agreements is also strongly supported by my experience, the relevant data, and by Thompson himself.

Across all of Defendants' multi-sport media rights arrangements, it is my opinion that approximately 75% of the value is allocable to football, 15% is allocable to men's basketball, 5% is allocable to women's basketball, and the remaining 5% is allocable to the "Olympic" sports collectively.  This allocation is not conference-specific, season-specific, nor school-specific, but rather serves as a reasonable allocation to apply across the multi-sport college broadcast agreements I have examined in this case.

In his Report, Thompson opined that "[g]iven that there is no specific value assigned to any single sport, it is impossible to determine the relative values of broadcast rights fees (i.e., the percentage of the rights fees attributable to football, men's basketball or women's basketball) paid to any conference or group of conferences pursuant to a multi-sport rights agreement in which the rights fees are not segregated by sport."[47] He further asserted that "[t]he relative value of a license to broadcast events in one sport as compared to another sport varies from school to school, from conference to conference, from school to school within the same conference, from network to network, and from year to year."[48]  Thompson also claimed that even looking at a single, multi-sport contract, it would still be "impossible" to offer an Allocation Opinion.[49]

At his deposition, however, Thompson conceded that, prior to this litigation, he offered the very type of allocation opinion that he claimed in his Report was "impossible" to do, and that the allocations he estimated were similar to my own and are commonly accepted industry estimates.  Notably, none of Thompson's estimates were "school to school," "conference to conference," "network to network," or "year to year."  Further still, Thompson had no meaningful response for the myriad examples where Defendants themselves allocated the relative value in multi-sport agreements in amounts very similar to my own Allocation Opinion.[50]

## 4.1   FBS Football Drives Broadcast Values

There is no dispute that FBS football drives college broadcast values, followed by men's basketball and then women's basketball.

Every one of the Defendants' multi-sport broadcast packages that includes a meaningful amount of football games generates most of its value from that single sport.  Despite claiming in his Report that no allocation of any kind is possible,

---

[47] Thompson Report, page 6.
[48] Id.
[49] Id.
[50] This includes the ACC Bylaws, SEC financial statements, and a number of broadcast contracts, which I discuss further below.

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

Thompson testified that when he "assign[s] the value" to a broadcast contract, his allocation includes a "[s]ignificant portion for college football [and a] secondary position for men's basketball."[51] And Thompson confirmed that, as a general matter, the "pecking order" of broadcast value in college sports is (1) football, (2) men's basketball, and (3) women's basketball.[52] Or, as he put it, "I would say that football is clearly the driver; basketball a distant second; women's basketball [third] . . ."[53]

Defendants' economic expert, Catherine Tucker, also agreed with this ranking of the relative value of the three sports. In her deposition, Dr. Tucker testified that on average, the consumer demand (and therefore the value) of FBS football is greater than the consumer demand for other college sports, including women's college sports, and that men's and women's basketball follow FBS football, in that order.[54]

## 4.2  Thompson's Testimony Supports My Specific Allocation Percentages

Although Thompson initially testified at his deposition that—like he wrote in his Report—it is "impossible" to do any allocation estimate for multi-sport agreements, he later admitted that he would have nonetheless undertaken such an assignment if he was hired to do so.[55] Even more significantly, Thompson admitted that, prior to being retained by Defendants to opine that my Allocation Opinion was impossible, he had made the same type of allocation estimates himself, and his estimates are consistent with, and supportive of, my estimates, i.e., that FBS football constitutes 75% of broadcast value, men's basketball constitutes 15%, and women's basketball constitutes 5%.

For example, on a September 2022 podcast, Thompson stated that "normally football gets all of the credit for these deals, but in my mind, basketball is always worth 20 to 25 percent of the total value."[56] During his deposition, Thompson testified that these percentages were not made up on the fly and he had offered them in the past, although he could not remember how many times or when.[57] Thompson also testified that this allocation is "a general statement applicable to collegiate sports in general as to how I assign the value"—contrary to the claim in his report that broadcast value changes "school to school," "conference to conference," "network to network," and "year to year."[58]

---

[51] Thompson Deposition, page 162, line 24 to page 163, line 4.
[52] *Id.* at page 110, line 16 to page 111, line 1.
[53] *Id.* at page 111, lines 8–10.
[54] Catherine Tucker Deposition Transcript, May 31, 2023, page 47, line 9 to page 48, line 18.
[55] Thompson Deposition, page 103, line 25 to page 104, line 16.
[56] *Id.* at page 159, line 11 to page 162, line 23.
[57] *Id.* at page 163, line 15 to page 164, line 3.
[58] *Id.* at page 162, line 19 to page 163, line 8; Thompson Report, page 6.

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

Likewise, during an August 2022 webinar for Lead1 (the association of NCAA Division I athletic directors), Thompson stated "as anybody will tell you, the value in these rights deals is usually ascribed 75, 80 percent to football and the rest to the basketball product."[59]

Thompson made similar admissions on Twitter, where he frequently touts his experience as a former media executive when answering questions and offering insight into the sports broadcasting industry. Ever since Texas and Oklahoma left the Big 12 for the SEC, there has been speculation in the sports media industry about schools the Big 12 might solicit to join the conference. One of those is Gonzaga, which has a highly successful basketball team, but no football team. Thompson stated that Gonzaga, without football, would get a 20-25% share of a typical Big 12 school's broadcast revenue split by going to the Big 12.[60] This too is consistent with my allocation estimates in this case.

In another tweet, Thompson discussed the Big Ten's broadcast agreement with CBS and said, "We'll put 80 percent or 280 million [of the $350 million contract value] against … football."[61] Thompson acknowledged that this was the same value the ACC applied to football and—far from claiming that allocations vary from conference to conference—stated that this 80 percent figure was a "commonly used number."[62]

During his deposition, Thompson also admitted that he largely agrees with my Allocation Opinion. When asked if "in a multi-sport contract, your back-of-the-envelope estimation is that 80% of the value is attributable to football," Thompson testified: "Yeah. I've never disputed that football drives the train."[63] He also testified that "those two properties [football and men's basketball] make up the bulk of the multi-sport contract, which I don't dispute."[64]

All of these statements are supportive of my Allocation Opinion.

## 4.3   In Addition to Thompson's Testimony, My Allocation Estimates Are Supported By A Wide Variety Of Data Points:

### 4.3.1.   SEC Financials
The Southeastern Conference (SEC) financial statements referenced in my Report showed a NSC allocation to football for a major multi-sport agreement with ESPN.[65] The exact same NSC allocation is also used for

---

[59] *Id.* at page 168, line 16 to page 170, line 6.
[60] *Id.* at page 149, line 4 to page 154, line 2.
[61] *Id.* at page 154, line 9 to page 156, line 14.
[62] *Id.* at page 156, lines 15−19.
[63] *Id.* at page 156, lines 10−14.
[64] *Id.* at page 120, lines 11−22.
[65] Desser Opening *House* Report, page 60.

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

years ended 2017, 2018, 2019, 2020 and 2021.[66] Redacted - NSC
Importantly, as the SEC's Commissioner has testified, and as Thompson has conceded, this allocation has been the same for "decades," i.e., the SEC does not do a new allocation from year to year, or even decade to decade.[67]

### 4.3.2. CBS/SEC Contract

With respect to the expiring CBS agreement with the Southeastern Conference, the SEC allocates NSC of revenue from that contract to football. There is a simple reason for this: Redacted - NSC

it is only logical that the SEC would state in their financial reports that the allocation value of football is Redacted - NSC

### 4.3.3. SEC Prior Rights Agreements

When the SEC's own football revenue allocations are applied to its agreements with CBS (Redacted - NSC and ESPN Redacted - NSC Redacted - NSC and those revenue allocations are combined and compared with the total SEC revenues from the CBS and ESPN agreements for fiscal year 2018 (Redacted - NSC of the total revenues from those two agreements is allocated to football—a number that is, again, consistent with my allocation estimate. While the Redacted - NSC coming from the SEC Network was not specifically allocated by sport in the conference's financial statements, it is reasonable to assume that the bulk of the value is also consistent with the allocations—mainly attributable to football, and to a lesser extent, basketball.

### 4.3.4. Conference USA Contract

The binding term sheet between Conference USA and CBS Sports Network (term sheet agreements are sometimes not reduced to long-form agreements, rendering them the best source of information)—which I acknowledged in my Report was not from one of the Defendants—is also consistent with my allocation estimates, with NSC Redacted - NSC

---

[66] Redacted - NSC

[67] Declaration of Greg Sankey, April 11, 2023, page 17; Thompson Deposition, page 120, line 2 to page 121, line 25; page 123, lines 2–18.

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

Redacted - NSC                                    Though
Thompson calls this contract "quite dated" in his Report,[68] he
acknowledged during his deposition that Redacted - NSC
NSC   Redacted - NSC        He also tried to criticize the allocation
as somehow distinguishable because it Redacted - NSC
Redacted - NSC        but conceded in his deposition that Redacted -
NSC
Redacted - NSC

[70]

### 4.3.5. Notre Dame Allocation

Notre Dame is unique in college football, because unlike most other DI
schools, it is a football "independent," meaning that its football team
does not participate in any conference. At the same time, Notre Dame
does compete in the ACC in sports other than football, and the school
is included in the conference's media agreements for those other sports.
There is also a discrete football television agreement between Notre
Dame and NBC covering all the school's home regular season football
games. As shown in the chart below, adding together the revenue Notre
Dame receives in rights fees from NBC (for football) together with the
revenue from the ACC (for everything else, non-football), Notre Dame's
actual revenue allocation is Redacted - NSC              for all other sports,
consistent with my allocation estimates in this case.

| NOTRE DAME FOOTBALL & OTHER SPORTS REVENUE COMPARISON | | | | | | | |
|---|---|---|---|---|---|---|---|
| $ Million | 2013-2014 | 2014-2015 | 2015-2016 | 2016-2017 | 2017-2018 | 2018-2019 | Average 2013 (July 1) to 2018 (June 30) |
| ACC Tax Form 990 - Amount of Monetary Support to Notre Dame | 4.9 | 6.2 | 4.3 | 5.8 | 7.9 | 6.8 | 6.0 |
| % Share Other Sports | Redacted - NSC | | | | | | |
| Notre Dame Football NBC Total Rights Fees and Adjustments | | | | | | | |
| % Share Football | | | | | | | |

*[71]

---

[68] Thompson Report, page 53.

[69] Thompson Deposition, page 129, lines 8–23.

[70] *Id.* at page 129, lines 8–12.

[71] Excludes most recent years available due to COVID impact. Source 1: Tax Form 990 and other financial
information for the Atlantic Coast Conference (including tax years 2014-2020) can be found at the following
public source website: https://projects.propublica.org/nonprofits/organizations/560599082. Source 2: NS
Redacted - NSC

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

### 4.3.6.  ACC Bylaws & Notre Dame

Notre Dame's unique situation in which it packages its sports other than football with the ACC offers yet another observation about the relative broadcast value of football compared to other sports.  Because Notre Dame is a football "independent," the ACC's by-laws state that:

> The University of Notre Dame shall not participate in any allocation or distribution of conference revenues attributable to football media or broadcast rights.  For purposes of this provision, eighty percent (80%) of total media and broadcast right revenues of the Conference in any particular fiscal year, after determination of amounts reserved or used for Conference office expenses, shall be deemed to be attributable to football, and the remaining twenty percent (20%) of such revenues shall be deemed to be attributable to other sports.[72]

These estimates are consistent with my Allocation Opinion.  It is also telling that the ACC's 80/20 allocation to football is the same as Redacted - NSC and almost the same as the Redacted - NSC  This is despite Thompson's claim about differences from conference to conference, including his suggestion that "ACC college men's basketball broadcast rights may have more value than the rights in other conferences because of the ACC's tradition of competition, long-standing rivalries, and school-specific traditions (such as the "Cameron Crazies" at Duke University)."[73]  Moreover, Thompson admitted that the ACC has never once adjusted its allocation for non-football broadcast revenues despite Thompson's claim that value changes from year to year.[74]

Finally, Thompson admitted that he did not even consider the ACC's Bylaws vis-à-vis Notre Dame when criticizing my Allocation Opinion as impossible.[75]

### 4.3.7.  Big East Contract

Another useful data point comes from the Big East conference.  The Big East is unusual because it is a significant Division I conference, but none

---

Redacted - NSC    3. Accounts for Redacted - NSC

[72] 2020-2021 Atlantic Coast Conference Manual (ACC-HOUSE0000582), Bylaw 2.12(e), page 46.
[73] Thompson Report, page 49.
[74] Thompson Deposition, page 135, line 14 to page 138, line 17; Thompson Report, page 18.
[75] *Id.* at page 134, line 22 to page 135, line 3.

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

of its schools field a FBS football team.[76] I have reviewed its media rights revenue (obviously without football) and compared it with a composite group of the other, most similar conferences, which do offer football. In doing so, I excluded the SEC, ACC, and Big Ten, which are the leading P5 conferences in media revenue overall, and thus the least similar in value compared with the Big East.   The comparator conferences I selected for this analysis are the American Athletic Conference (AAC), which includes a number of former Big East institutions, the Big 12 Conference, and the Pac-12 Conference (all with football). Collectively, the comparator conferences generated roughly $16.3MM in average media rights fees per school (2014-2022).  The Big East (without football) generated roughly Redacted - NSC NSC   This provides additional support for football being worth approximately 75% of the total media rights value, while all other sports together generate about 25% of the value.  Thompson concurred with this analysis in a tweet and in his deposition, which further supports my allocation estimates here:

> "Q. And the point here is that because the Big East is only supplying effectively basketball rights and not football, they're only going to be able to earn the balance of the 75 to 80 percent that is usually ascribed to football rights.
>
> A.  Correct."[77]

| BIG EAST VS THREE CONFERENCE MEDIA REVENUE PER SCHOOL | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| $ Millions | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Annual Average Value (AAV) Per School | % of 3 Conference Per School Average |
| Big East | Redacted - NSC | | | | | | | | | | |
| AAC, Big 12, Pac 12 | 10.5 | 12.7 | 13.2 | 14.8 | 16.5 | 17.5 | 19.8 | 20.3 | 21.5 | 16.3 | |

*78

---

[76] The exception is UConn, which is an independent like Notre Dame.  Therefore, its football team does not play in the Big East, and its football rights are not licensed by the Big East in its agreement with Fox.  It recently left the American Athletic Conference to rejoin the Big East Conference.

[77] Thompson Deposition, page 170, lines 13–18.

[78] Relies on A) Big East-Fox Agreement media reports (*see New Big East, Fox Sports Formally Ink 12-Year, $500M Deal; ESPN Signs Mountain West*, SPORTS BUS. J. (Mar. 21, 2013), https://www.sportsbusinessjournal.com/Daily/Issues/2013/03/21/Media/Big-East-MWC.aspx and DSM assumed escalator 3%); B) Redacted - NSC    C) Big 12 media rights agreements (*see* Expert Report of Daniel A. Rascher in the Matter of *House v. NCAA*, October 21, 2022, page 90); D) Pac-12 media rights agreements (*see* Rascher's *House* Report, page 90); E) AAC media rights (*see* Matt

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

### 4.3.8. Audience Data

One of the data sources I reviewed when drafting my October 2022 expert report was Nielsen ratings. I do not currently have access to all college games audience data, so I could only include the public data my team and I could access ourselves. The limitations of this data are noted in my original report. I have expanded on this dataset so that it now goes back to the start of the Class period. The full dataset remains broadly consistent with the other data I have discussed above and with my allocation estimates in this case.[79]

### 4.3.9. Big 12 Revenues Study

Furthermore, a recent study of the Big 12 by KCEN-TV of 2018-19 average school revenues by sport confirmed the relative ratio of the revenue for the three relevant sports here, with football generating 79.8%, men's basketball generating 16.7%, and women's basketball generating 3.4% of that figure, inclusive of ticket sales and sponsorships.[80] Because these revenue figures reflect consumer demand for the different sports, they also support my allocation estimates for the value of the broadcast rights of these sports in a college multi-sport broadcast media agreement.

| BIG 12 CONFERENCE AVERAGES | Revenue | Expenses | Net | % of 3 Sport Revenue Share |
|---|---|---|---|---|
| Football | $62,616,439 | $29,869,112 | $32,747,326 | 79.8% |
| Men's Basketball | $13,146,688 | $10,540,855 | $2,605,834 | 16.7% |
| Women's Basketball | $2,688,333 | $5,413,878 | $(2,725,545) | 3.4% |

### 4.3.10. NCAA Gender Equity Study

In August 2021, my company authored a media analysis for the NCAA as part of the Gender Equity study the organization commissioned following the public controversy which emerged from the disparate treatment of college athletes at the Men's and Women's Basketball Championships earlier that year.[81] Thompson claims our "Media and Sponsorship" analysis from that study is inconsistent with my allocation estimate in this case because the value of the Women's Tournament I

---

Brown, *The American Athletic Conference Is Reportedly Getting a Healthy Raise Without Sacrificing Flexibility*, SBNATION (Mar. 19, 2019), https://www.sbnation.com/college-football/2019/3/19/18273232/aac-television-deal-espn-conference-realignment and DSM assumed escalator 3%).

[79] See Appendix B for AC Nielsen data compiled from sportsmediawatch.com and showbuzzdaily.com.

[80] Kurtis Quillin, *Inside the numbers | Why college football's status for 2020 is so important*, KCEN-TV (May 10, 2020), https://www.kcentv.com/article/sports/inside-the-numbers-why-college-footballs-status-for-2020-is-so-important/500-54037858-70d3-4965-9085-53ce05e67956.

[81] Desser Media & Sponsorship Addendum.

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

projected was lower in comparison to the value of the Men's Tournament than the regular season allocation I opine should apply here.

The values projected in my Media and Sponsorship analysis were a projection of how increased revenues could be obtained by marketing the media rights for the Women's NCAA Tournament as a separate event, and unlocking the value currently buried in an ESPN agreement also including 28 other sports. It was not a comparison with the value of the Men's NCAA Tournament, and it certainly was not a comparison of the broadcast values of regular season men's and women Division I basketball games. Thompson does nothing to adjust for any of the different issues raised by his own comparison of the Men's and Women's Tournaments.[82]

## 4.4    No Need to Adjust for Individual School, Conference or Network Variations

Variations from "school to school," "conference to conference," "year to year," or "network to network," do not require an adjustment in my allocation estimates.

Thompson is correct that schools or conferences may have up or down years. But, insofar as he implies that such a hindsight approach should be taken to valuing media agreements, he is incorrect.

With respect to Thompson's statement in his Report that media rights must be valued "school to school," he conceded at his deposition that is not how networks value rights:

> Q: So when a network buys an entire package of rights, it doesn't look at the rights school by school?

> A: No.[83]

Similarly, with respect to Thompson's claim that conference variations make it impossible to provide an overall Allocation Opinion,[84] that is belied by his deposition testimony: "basketball is always worth 20 to 25 percent of the total

---

[82] For example, Thompson failed to match the rights fees to the corresponding time period or account for the many suggested changes we proposed which would further increase the NCAA rights values.
[84] *Id.* at page 143, lines 19−21. Thompson appeared on a podcast and similarly stated: "when you're buying an entire package of rights, you don't really look at it school-by-school." *8/11 Bob Thompson (Former Fox Sports President) Joins to Talk Big Ten, Realignment, FOX vs ESPN, Notre Dame, Expansion & More*, WINNING CURES EVERYTHING (Aug. 11, 2022), at 34:00−34:45, https://podcasts.apple.com/us/podcast/8-11-bob-thompson-former-fox-sports-president-joins/id1144599550?i=1000575859157.
[84] Thompson Report, pages 48−49.

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

value"[85]; "as anybody will tell you, the value in these rights deals is usually ascribed 75, 80 percent to football and the rest to the basketball product"[86]; and testifying to allocations that are "not applicable to any particular conference or team" but rather a "general statement applicable to collegiate sports in general."[87]

Moreover, reviewing the SEC audited financials, the ACC Bylaws, Thompson's opinions about the value of Gonzaga basketball to the Big 12, and Thompson's opinions about the potential value of Notre Dame football should it move to the Big Ten in the future, there is evidence about allocable value for four out of five Defendant Power Conferences plus Notre Dame, and they are all largely the same, without any material differences among the conferences.

In short, while there may be some variations due to differences between conferences, it is reasonable to use an overall estimate across all Conference Defendants given the small impact that such conference idiosyncrasies will have on comparative broadcast values (negotiated before the fact) and the evidence I have seen that conferences and the broadcast industry use the same allocations for different conferences.

Thompson opines that my per-sport estimated allocation across all conferences is inconsistent with the actual value conveyed to broadcasters due to the ebb and flow of success in sports. Thompson states in his Report that "the relative value of a license to broadcast events in [a] sport … varies from school to school, conference to conference, and year to year,"[88] and therefore it is necessary to calculate the value on a backwards-looking basis, because nobody can project when a conference or a team or a sport is going to have an up or down year from a TV value perspective. However, this is simply not how a rights seller or buyer could or would value rights in a media agreement. Rights deals are made many years in advance, not after the game concludes and conference performance is known, as Thompson recognized in his deposition:

> Q. You agree that broadcast rights fees need to be agreed to before the broadcast.
>
> A. I've found that to be a good policy.[89]

It thus is not possible for a broadcaster to bargain for different media values, after the fact, based on the up and down performances of the conferences or their individual schools.

---

[85] Thompson Deposition, page 161, lines 21−22.
[86] *Id.* at page 170, lines 1−4.
[87] *Id.* at page 162, line 24 to page 163, line 2.
[88] Thompson Report, page 49.
[89] Thompson Deposition, page 143, lines 22−24.

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

As for the claim in Thompson's Report that "year to year" valuations are needed, Defendants' own practices confirm that this is not correct (e.g., the <mark>SEC's media contract</mark> allocations that have been in place for "decades" and the ACC's long-term allocations, which are cemented in its Bylaws, for Notre Dame's non-football sports revenue). As Thompson conceded at his deposition, "[i]t's not feasible to change [allocations] year over year,"[90] and Conferences and schools value sharing TV revenue equally—rather than year-to-year or school-to-school—"because it creates uniformity and cohesiveness"[91]

More broadly, for all the supposed variations in media rights values for different sports across different conferences, years, and networks, Thompson conceded during his deposition that those variations all ultimately boil down to the price a broadcast network pays for the package of college sports broadcast rights:

> Q. But the whole – if we think of the circles [on page 29 of Thompson's report listing "questions and factors a network evaluates when calculating a media rights fee"] as ingredients, is it your opinion that both the identity of the ingredients and the value of the ingredients differs from contract to contract?
>
> A. That is correct. ..."
>
> Q. … these are the ingredients. They're present/they're not present. It's a good ingredient/it's a bad ingredient when it is present. It all distills down to the media rights fee at the center of the diagram.
>
> A. That's correct.[92]

In other words, any "school-to-school," "conference-to-conference," "year-to-year," "network-to-network" or other variation is factored into the final rights fee (or price) a broadcaster is willing to pay. Because my Allocation Opinion is applied to the final rights fees Defendants receive (i.e., after any such variations have been factored in), my opinion already accounts for any impact of such variations.

---

[90] *Id.* at page 138, lines 8−17.
[91] *Id.* at page 138, lines 10-17; page 142, line 21 to page 143, line 9.
[92] *Id.* at page 66, line 13 to page 67, line 14.

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

## 5. CONCLUSIONS

The following summarizes my basic conclusions:

- I am an expert in valuing both professional and college sports media rights, having practiced in the field for more than four decades, and have deep and highly relevant experience in the industry, including work for multiple college sports conferences and the NCAA.
- BNIL is an essential and valuable element of all major collegiate sports media rights agreements, and no broadcaster would enter into such agreements without BNIL rights included in one fashion or another.
- Based on my extensive experience in the sports media business, as well as the wide variety of data points I have described in my Reports, it is my opinion that a minimum of 10% of college broadcast revenues is a reasonable and reliable estimate of the value of BNIL.
- Based on my extensive experience in the sports media business, as well as the allocation evidence I have reviewed from multiple conferences and deposition testimony from Defendants' expert witness, it is my opinion that my estimated by-sport allocation for multi-sport college broadcast agreements of 75% football, 15% men's basketball, 5% women's basketball, and 5% for all other sports, is both reasonable and reliable.

I hereby certify that this report is a complete and accurate statement of all my opinions, and the basis and reasons for them, to which I will testify under oath.

_____

Edwin S. Desser

President

Desser Sports Media, Inc.

July 21, 2023

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

# 5   EXHIBIT A

## Excerpt from Desser Expert Rebuttal Report in O'Bannon (November 2013)

16. From the point of view of a broadcast television or cable network seeking to negotiate rights to telecast live football and basketball games and re-telecast football and basketball game footage, there are substantial similarities, and no material differences, between professional sports and the collegiate sports programming agreements at issue in this case in general, i.e., Division I ("DI") men's intercollegiate basketball and Division I Football Bowl Subdivision ("FBS") intercollegiate football.

17. The telecast of professional and collegiate football and basketball games are similar commercial endeavors with similar business goals, requirements, and expectations. Production and distribution of a collegiate athletic broadcast, like production of a professional athletic broadcast, requires that the parties agree well in advance on certain essential business and licensing terms. For example, the broadcaster will negotiate for the right to promote the event to an audience and sell commercials to advertisers and distribution opportunities to affiliates in advance, to make certain uses of and changes to the site of the event (such as placing equipment on the field and in the press box, changing the lighting, or eliminating seating in order to place cameras), obtaining access to electrical power and transmission facilities, in order to originate TV coverage of the event and to distribute it over a negotiated geography and within a negotiated time-frame, over agreed-upon media platform(s), and the right to preclude third parties from similarly telecasting the event in a competitive manner.

18. Professional and collegiate sports TV programming are substantially similar entertainment products and have many similar characteristics. For example, each has a similar viewing audience. Professional and collegiate sports TV programming are sold to similar entertainment companies and networks, which, in turn, sell the advertising contained in the programming to similar advertisers. Professional and collegiate sports TV programming are produced in the same manner by many of the same production companies using many of the same technical facilities. They are distributed via similar TV stations, cable affiliates and via digital applications on the internet. The funding of programming rights acquisitions in both cases is via a combination of cable fees and advertising sales. They are both distributed in similar geographic territories, generally on a live, real-time basis. In numerous prior engagements for DSM clients, I have used each as a reasonable value proxy for the other.

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

19. The collegiate telecast contracts that I have reviewed (except for the monetary consideration) are substantively identical to the contracts that I have negotiated in professional sports. For example, the performance of athletes is the essential element of both collegiate and professional broadcast contracts. Both parties to the contract understand that the telecast of a sports "event" that does not include the participation of the athletes has virtually no value. In other words, the telecast contracts are not simply access contracts for the purpose of shooting empty football stadiums or basketball courts, but rather for the right to capture and commercially disseminate the essence of the event: competitive sport.

20. Collegiate broadcast contracts with various broadcasters often state that the NCAA or other licensing entity has all rights to game footage and/or no other payments, approvals or licenses are necessary to enable the licensee to capture and distribute the performance consistent with the terms of the agreement. Thus, in collegiate sports, just as in professional sports, the networks negotiate for the complete bundle of intellectual property rights that are required to telecast a football or basketball game, including the rights to BNIL of members of the team, the coaches, and even the referees.

21. In my experience, team members' NIL rights are either expressly conveyed in a contract, or implicitly included as part of the package of rights that are conveyed and that broadcasters expect to receive. In other words, the contracts convey the rights to telecast the entire athletic event, including the NIL of the athletes. A telecaster would simply not agree to enter into a sports event coverage contract which excluded or prohibited including the performances, names, images and likenesses of the players. The broadcaster relies on the licensor to deliver the complete performance, and that is what it pays a license fee to obtain.

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

# 6   EXHIBIT B

## DOCUMENTS RELIED UPON

A) <u>Legal Filings and Case Documents</u>

- Bob Thompson Deposition Transcript
- Catherine Tucker Deposition Transcript
- Chad Hawley Deposition Transcript
- Declaration of Greg Sankey, *In re: College Athlete NIL Litigation*
- Defendants' Notice of Motion, Motion, and Memorandum of Points and Authorities in Support Thereof To Exclude The Opinions, Reports, and Testimony of Edwin Desser and Daniel Rascher
- Expert Report of Bob Thompson, *In re: College Athlete NIL Litigation*
- Expert Report of Catherine Tucker, Ph.D, *In re: College Athlete NIL Litigation*
- Expert Report of Daniel A. Rascher, *In re: College Athlete NIL Litigation*
- Expert Reply Report of Daniel A. Rascher, *In re: College Athlete NIL Litigation*
- Expert Rebuttal Report of Edwin S. Desser in the matter of *O'Bannon v. NCAA* (Nov. 5, 2013)
- *In re: College Athlete NIL Litigation* Amended Complaint
- Jim Delany Deposition Transcript

B) <u>Produced Documents</u>

- ACC-HOUSE0000582
- ACC-HOUSE0130449
- ACC-HOUSE0227822
- ACC-HOUSE0227974
- ACC-HOUSE0228078
- ACC-HOUSE0228382
- Redacted - NSC
- AU-NIL 00546
- BIG12-GIA_00276416
- BIG12_HOUSE00039677
- BIGTEN-NIL_00143504
- BIGTEN-NIL_00143755
- BIGTEN-NIL_00143844
- BIGTEN-GIA252905
- CLEMSON_000045
- CUSA-GIA_00000509

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

- DUKE NIL 0000095
- EA_NIL_00000103
- KU00007646
- NBPA_000086
- NCAAGIA00722989
- NCAAGIA02196735
- NCAAGIA03941962
- NCAAHOUSE00249333
- NCAAPROD00605421
- Redacted - NSC
- NFLPA_0000001
- NFLPA_0000010
- PAC12HOUSE_00001911
- PAC12HOUSE_00143909
- Redacted - NSC
- Redacted - NSC
- Redacted - NSC
- Redacted - NSC
- Redacted - NSC
- SEC-HOUSE0113462
- VIL_000001
- WNBPA-000001

C) <u>Internet Sources</u>

- https://www.apple.com/newsroom/2022/03/apple-and-mlb-announce-friday-night-baseball-schedule-beginning-april-8/
- https://assets.kpmg/content/dam/kpmg/pdf/2015/09/gvi-profitability.pdf
- https://awfulannouncing.com/2016/report-shows-americans-love-to-watch-their-sports-live.html
- https://www.bloomberg.com/news/articles/2021-03-18/nfl-signs-historic-tv-deal-with-amazon-taking-thursday-rights
- https://www.bloomberg.com/news/articles/2022-10-06/espn-said-to-be-near-large-new-partnership-with-draftkings
- https://www.cbssports.com/college-football/standings/Conference/FBS/IA
- https://www.chicagotribune.com/sports/ct-locker-room-speeches-on-camera-greenstein-spt-1-20141009-column.html
- https://collegefootballplayoff.com/sports/2022/3/16/semifinals-2122.aspx
- https://cosmic-s3.imgix.net/3c7a0a50-8e11-11e9-875d-3d44e94ae33f-2017-NBA-NBPA-Collective-Bargaining-Agreement.pdf

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

- http://www.espn.com/college-football/gamecast/index_screen
- https://www.espn.com/mens-college-basketball/recap?gameId=330980097
- https://www.espn.com/womens-college-basketball/story/_/id/31172132/ncaa-president-mark-emmert-admits-inequality-wants-women-basketball-leaders-push-progress
- https://footballfoundation.org/news/2020/5/27/2019_Attendance_and_Ratings.aspx
- https://leadersinsport.com/sport-business/articles/unified-measurement/
- https://www.kcentv.com/article/sports/inside-the-numbers-why-college-footballs-status-for-2020-is-so-important/500-54037858-70d3-4965-9085-53ce05e67956
- https://medium.com/run-it-back-with-zach/Conference-realignment-all-the-moves-coming-in-2022-25-130ef706da55
- https://www.mlssoccer.com/apple/
- https://mountain.com/blog/mvpd-and-vmvpd-differences-and-similarities-explained/
- https://www.ncaa.com/game/basketball-men/d1/2013/04/08/michigan-louisville/play-by-play
- https://projects.propublica.org/nonprofits/organizations/560599082
- https://www.ncaa.org/sports/2013/11/22/distributions.aspx
- https://ncaagenderequityreview.com/
- https://www.nfl.com/videos/channel/nfl-mic-d-up-vc
- https://nflpaweb.blob.core.windows.net/website/PDFs/CBA/March-15-2020-NFL-NFLPA-Collective-Bargaining-Agreement-Final-Executed-Copy.pdf
- https://www.nytimes.com/2018/05/14/us/politics/supreme-court-sports-betting-new-jersey.html
- https://www.nytimes.com/2022/09/02/sports/ncaafootball/college-football-playoff-expansion.html
- https://pac-12.com/article/2022/07/26/pac-12-Networks-set-feature-robust-coverage-2022-football-season
- https://www.sbnation.com/college-football/2019/3/19/18273232/aac-television-deal-espn-conference-realignment
- https://showbuzzdaily.com
- https://www.si.com/extra-mustard/2022/09/22/thursday-night-football-amazon-prime-ratings
- https://www.si.com/tv/nfl/2022/09/15/thursday-night-football-amazon-prime-streaming-nfl-watch-schedule-games
- https://www.sportico.com/business/media/2022/nfl-games-account-for-75-of-the-100-most-watched-broadcasts-of-2021-1234657845/
- https://www.sportsbusinessjournal.com/Daily/Issues/2013/03/21/Media/Big-East-MWC.aspx
- https://www.sportsbusinessjournal.com/Journal/Issues/2022/01/10/Upfront/Ratings.aspx

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

- https://www.sportsbusinessjournal.com/Journal/Issues/2022/03/21/Upfront/College-basketball.aspx
- https://www.sportsbusinessjournal.com/Journal/Issues/2022/04/04/Upfront/Top-50-telecasts.aspx
- https://www.sportsbusinessjournal.com/Journal/Issues/2022/08/22/In-Depth/Media-rights-side.aspx
- https://sportsmediawatch.com
- https://www.sportsmediawatch.com/2022/09/amazon-thursday-night-football-ratings-impressive-debut-chargers-chiefs/
- https://www.sportsmediawatch.com/ncaa-final-four-ratings-history-most-watched-games-cbs-tbs-nbc/
- https://www.sportsmediawatch.com/womens-final-four-ratings-history-espn/
- https://streamable.com/wupzj
- https://podcasts.apple.com/us/podcast/8-11-bob-thompson-former-fox-sports-president-joins/id1144599550?i=1000575859157
- https://www.tatari.tv/insights/all-impressions-are-equal--but-some-more-equal-than-others
- https://tvnewscheck.com/business/article/tv-sports-advertising-shifts-into-juggernaut-mode
- https://www.usatoday.com/story/sports/college/2014/07/18/ncaa-name-and-likeness-release-student-athlete-statement-form/12840997/
- https://www.usatoday.com/story/sports/ncaab/maac/2015/12/16/monmouth-bench-mob-celebrations-college-basketball-georgetown/77405260/

D) Audience Data from sportsmediawatch.com and showbuzzdaily.com

| NCAA NIELSEN AUDIENCE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sport | Game Type | 2016-2017 | 2017-2018 | 2018-2019 | 2019-2020 | 2020-2021 | 2021-2022 | 2022-2023 | Average Annual 2016/17-2022-23 AVG |
| Football | Reg Season + Champ Games | 2.56 | 2.20 | 2.02 | 2.17 | 1.79 | 1.93 | 2.14 | **2.12** |
| MBB | Reg Season + Conf Tour | 0.89 | 0.96 | 0.84 | 0.71 | 0.66 | 0.65 | 0.67 | **0.77** |
| WBB | Reg Season + Conf Tour | 0.26 | 0.37 | 0.27 | 0.37 | 0.28 | 0.28 | 0.41 | **0.32** |

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT

# 7   EXHIBIT C

## Ed Desser Articles Published Since October 21, 2022 Report

- Trends bubble up as media whirlpool keeps spinning (SportsBusiness Journal - May 22, 2023)
- How to weather uncertainty in RSN marketplace (SportsBusiness Journal - March 20, 2023)
- NFL has aggressive, calculated game plan, but they make it look easy. (SportsBusiness Journal - February 13, 2023)
- We've officially crossed the sports media Rubicon (SportsBusiness Journal - December 5, 2022)

© 2023 Desser Sports Media, Inc. CONFIDENTIAL WORK PRODUCT