# EXHIBIT 7

Steve W. Berman (*pro hac vice*)
Emilee N. Sisco (*pro hac vice*)
Stephanie Verdoia (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
emilees@hbsslaw.com
stephaniev@hbsslaw.com

Benjamin J. Siegel (SBN 256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
bens@hbsslaw.com

Jeffrey L. Kessler (*pro hac vice*)
David G. Feher (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
Adam I. Dale (*pro hac vice*)
Sarah L. Viebrock (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4698
Facsimile: (212) 294-4700
jkessler@winston.com
dfeher@winston.com
dgreenspan@winston.com
aidale@winston.com
sviebrock@winston.com

Jeanifer E. Parsigian (SBN 289001)
WINSTON & STRAWN LLP
101 California Street, 34th Floor
San Francisco, CA 94111
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
jparsigian@winston.com

*Counsel for Plaintiffs and the Proposed Classes*

[Additional counsel on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | Case No. 4:20-cv-03919-CW |
| | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS, REPORTS, AND TESTIMONY OF EDWIN DESSER AND DR. DANIEL RASCHER** |
| | **[FILED UNDER SEAL]** |
| | Date:      Sept. 21, 2023 |
| | Time:      2:30 p.m. |
| | Judge:     Hon. Claudia Wilken |
| | Courtroom: 2, 4th Floor |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   STATEMENT OF FACTS .................................................................................... 2

    A.    The Desser Report ..................................................................................... 3

    B.    The Rascher Report .................................................................................... 5

III.  LEGAL STANDARD ........................................................................................... 7

IV.   ARGUMENT ........................................................................................................ 8

    A.    Desser's Testimony Is Admissible for Class Certification ......................... 8

        1.    The 10% Opinion is properly rooted in Desser's extensive industry experience and validated by real-world evidence. ................................. 8

            a.    Industry experience is a proper foundation for the 10% Opinion. ........ 8

            b.    Desser validated his 10% Opinion with real-world comparators. ....... 10

            c.    Defendants baselessly claim that Desser cannot offer reliable testimony on BNIL value because it is not separately valued. .............................. 11

        2.    Desser's Allocation Opinion properly derives from his industry experience and real-world data—and Defendants' expert agrees with it. ....................................................................................................... 13

    B.    Rascher's Testimony Is Also Admissible for Class Certification ................ 15

        1.    Defendants' disputes with the sources and accuracy of Rascher's BNIL damages model provide no basis for exclusion at class certification. ............ 15

        2.    Defendants' disputes with Rascher's before-and-after methodology are not a basis for excluding his opinions at class certification. ............................ 18

V.    CONCLUSION .................................................................................................... 20

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*,
738 F.3d 960 (9th Cir. 2013) .................................................................................... 11

*Ang v. Bimbo Bakeries USA, Inc.*,
2018 WL 4181896 (N.D. Cal. Aug. 31, 2018) ........................................................... 19

*In re BofI Holding, Inc. Sec. Litig.*,
2021 WL 3742924 (S.D. Cal. Aug. 24, 2021) ............................................................ 20

*Dalton v. McCourt Elec., LLC*,
2013 WL 6667755 (E.D. Pa. Dec. 17, 2013) ............................................................. 18

*Daubert v. Merrell Dow Pharm.*,
43 F.3d 1311 (9th Cir. 1995) ................................................................................. 2, 15

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) .................................................................................................... 7

*Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*,
773 F.2d 1506 (9th Cir. 1985) ..................................................................... 12, 19, 20

*Donovan v. Catlin Specialty Ins. Co.*,
2015 WL 10487712 (D. Mont. Nov. 2, 2015) ........................................................... 12

*In re DRAM Antitrust Litig.*,
2006 WL 1530166 (N.D. Cal. June 5, 2006) ............................................................. 10

*Giuliano v. Sandisk Corp.*,
2015 WL 10890654 (N.D. Cal. May 14, 2015) .......................................................... 17

*In re Glumetza Antitrust Litig.*,
336 F.R.D. (N.D. Cal. 2020) ......................................................................... 15, 16, 17

*Goodness Films, LLC v. TV One, LLC*,
2014 WL 12780291 (C.D. Cal. May 19, 2014) .......................................................... 10

*GPNE Corp. v. Apple, Inc.*,
2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ............................................................. 9

*Ibekwe v. White*,
2016 WL 6963051 (C.D. Cal. Feb. 23, 2016) ............................................................. 9

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
451 U.S. 557 (1981) .................................................................................................... 9

*Jimenez v. Allstate Ins., Inc.*,
    765 F.3d 1161 (9th Cir. 2014) ........................................................................ 17

*Knutson v. Daily Rev., Inc.*,
    468 F. Supp. 226. (N.D. Cal. 1979), *aff'd*, 664 F.2d 1120 (9th Cir. 1981) .............. 13

*Knutson v. Daily Rev., Inc.*,
    548 F.2d 795 (9th Cir. 1976) .......................................................................... 9

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012) ......................................................................... 10

*Lehrman v. Gulf Oil Corp.*,
    500 F.2d 659 (5th Cir. 1974) ......................................................................... 19

*In re Lidoderm Antitrust Litigation*,
    2017 WL 679367 (N.D. Cal. Feb. 21, 2017) ....................................................... 16

*In re Lithium Ion Batteries Antitrust Litig.*,
    2017 WL 1391491 (N.D. Cal. Apr. 12, 2017) ...................................................... 15

*Longoria v. Kodiak Concepts LLC*,
    2021 WL 1100373 (D. Ariz. Mar. 23, 2021) ...................................................... 12

*Mansourian v. Bd. of Regents*,
    816 F. Supp. 2d 869 (E.D. Cal. 2011) .............................................................. 12

*Michery v. Ford Motor Co.*,
    2017 WL 10362135 (C.D. Cal. Oct. 23, 2017) .................................................... 11

*Mulderrig v. Amyris, Inc.*,
    340 F.R.D. 575 (N.D. Cal. 2021) .................................................................... 20

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
    2023 WL 1813530 (C.D. Cal. Feb. 7, 2023) ................................................ 11, 16

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
    933 F.3d 1136 (9th Cir. 2019) ....................................................................... 11

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*,
    375 F. Supp. 3d 1058 (N.D. Cal. 2019), *aff'd, Alston*, 141 S. Ct. 2141 (2021) ...................... 5

*O'Bannon v. NCAA*,
    7 F. Supp. 3d 955 (N.D. Cal. 2014) ................................................................. 3

*Open Text S.A. v. Box, Inc.*,
    2015 WL 349197 (N.D. Cal. Jan. 23, 2015) ........................................................ 9

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
    2019 WL 4780183 (N.D. Cal. Sept. 30, 2019), *aff'd*, 20 F.4th 466 (9th Cir. 2021) .............. 8

*In re PFA Ins. Mktg. Litig.*,
2021 WL 5994908 (N.D. Cal. Nov. 3, 2021) ................................................................. 1

*Potter v. Bowman*,
2006 WL 3760267 (D. Colo. Dec. 18, 2006) ................................................................ 12

*S.S. v. Peloton Interactive, Inc.*,
2023 WL 2993391 (S.D. Cal. Apr. 17, 2023) ................................................................ 9

*Sidibe v. Sutter Health*,
333 F.R.D. 463 (N.D. Cal. 2019) .................................................................................. 17

*Tait v. BSH Home Appliances Corp.*,
289 F.R.D. 466 (C.D. Cal. 2012) .................................................................................... 8

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011) ..................................................................................... 10

*Vaquero v. Ashley Furniture Indus., Inc.*,
824 F.3d 1150 (9th Cir. 2016) .................................................................................17, 20

*Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*,
2021 WL 2352016 (E.D. Pa. June 9, 2021) ................................................................. 18

**FEDERAL RULES**

Fed. R. Evid. 702 .......................................................................................... *passim*

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.    INTRODUCTION**

3

Defendants' motion to exclude the expert opinions of Edwin Desser and Dr. Daniel Rascher

4

ignores that "[a]t the class certification stage, the relevant inquiry is a tailored *Daubert* analysis which

5

scrutinizes the reliability of the expert testimony in light of the criteria for class certification and the

6

current state of the evidence." *In re PFA Ins. Mktg. Litig.*, 2021 WL 5994908, at *2 (N.D. Cal. Nov.

7

3, 2021). "[I]f the proponent demonstrates that: (i) the expert is qualified; (ii) the evidence is relevant

8

to the suit; and (iii) the evidence is reliable," their opinions are admissible to help the Court assess

9

whether there are common methods of proving class-wide antitrust injury and damages. *Id.* Desser

10

and Rascher easily clear these modest hurdles.

11

Desser opines—based on decades of experience in the industry and comparisons to analogous

12

real-world NIL licenses—that, at a minimum, 10% of Defendants' broadcasting revenues for Division

13

I FBS football and Division I men's and women's basketball is attributable to the value of college

14

athletes' NILs ("10% Opinion"). And Desser separately opines that for Defendants' multisport

15

broadcasting contracts, approximately 75% of the value is attributable to football, 15% to men's

16

basketball, and 5% to women's basketball ("Allocation Opinion"). Defendants first claimed that this

17

Opinion was "impossible," but their expert later admitted that it is well-accepted.

18

Notably, Defendants do not claim that Desser lacks expertise to serve as an expert on these

19

issues. He has four decades of experience negotiating sports broadcasting agreements and valuing

20

sports broadcast rights—including for Defendants NCAA and the Big 12 Conference—and has

21

provided expert testimony on sports-broadcasting-related issues in over 20 cases. Instead, Defendants

22

contend that Desser's opinions should be excluded because he purportedly "pick[s] a number based

23

on 'experience' and ask[s] the Court to take his word for it." Mot. at 8. But as *Defendants'* expert

24

testified, experience is the cornerstone of sports broadcast negotiations and valuations. Ex. 58 to

25

Berman Decl. (hereinafter "Thompson Tr."), at 75:23–76:9. An opinion based on experience does not

26

mean it is "made up," much less inadmissible (Mot. at 1): "[i]n certain fields, experience is the

27

predominant, if not sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702 advisory

28

committee's note to 2000 amendment. And here, Desser goes many steps further to test and validate

his experience-based opinions, including analyzing sports licensing agreements and Defendants' own practices. That said, Defendants' criticisms go to the **weight** of Desser's opinions at the **merits** stage.

Defendants' efforts to exclude Rascher's opinions fare no better. He is one of the leading sports economists in the country and was accepted by this Court in *Alston*. Rascher opines that: (i) the "economic evidence and methods that would be used to prove the anticompetitive effects of the challenged NIL rules, antitrust injury, and damages are common to the members of the proposed damages and injunctive relief classes"; and (ii) "class-wide impact and damages can be demonstrated by means of common economic evidence." Rascher Opening Report (ECF No. 209-2) (hereinafter "Rascher Rep."), at 4. Defendants first seek to exclude Rascher's expert opinions because his class-wide damages model produces what Defendants and their expert believe are inaccurate results. But Defendants' vigorous dispute of Rascher's tentative results do not provide grounds for excluding expert testimony, particularly at class certification. "[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311, 1318 (9th Cir. 1995).

Defendants' disagreements with Rascher's reliance on Desser's opinions and the reliability of Rascher's other "inputs" for his methodologies are, at best, "a battle-of-the-experts" for the jury to resolve at trial. Defendants' expert, Dr. Catherine Tucker, admitted to using the same methodology Rascher uses to prove class-wide damages in her own practice. There can be no serious dispute that Rascher presents reliable methodologies to show that antitrust injury and damages can be proven on a class-wide basis. That is all that is required to admit his testimony at the class certification stage.

## II.    STATEMENT OF FACTS

In support of their motion for class certification, Plaintiffs submitted an expert sports broadcasting industry report from a veteran broadcasting executive, Desser, and an expert economic report from esteemed sports labor economist, Dr. Rascher. Defendants move to exclude these reports because their detailed methodologies are purportedly unreliable. But in reality, Defendants and their experts disagree with the *merits* of Desser's and Rascher's expert opinions—disagreements which, at most, go to the weight of their testimony, not their admissibility.

## A.    The Desser Report

Over the last four decades, Desser has developed a unique and specialized expertise in sports broadcast rights negotiations and valuations. Beginning in 1982, Desser spent over 23 years as the senior media executive for the NBA, negotiating broadcast distribution deals worth more than $10 billion with some of the largest media companies in the world, including ESPN/ABC, Turner Broadcasting, and NBC Sports. Desser Opening Report (ECF No. 209-3) (hereinafter "Desser Rep."), at 9–10. In 2005, Desser founded Desser Sports Media, Inc., through which he has advised some of the nation's most prominent sports organizations—including Defendants NCAA and Big 12 Conference—on broadcast rights negotiations and valuations. *Id.* at 10. Desser has provided expert testimony on sports-broadcasting-related issues in over 20 cases (*id.*), including *O'Bannon v. NCAA*, where this Court qualified him to testify as an expert on college athletes' NILs and their value to sports broadcasts. 7 F. Supp. 3d 955, 969 (N.D. Cal. 2014).

Given Desser's unparalleled industry experience, Plaintiffs retained him to: (i) opine on the importance broadcasters place on securing athletes' NILs for broadcasts of college football and basketball; (ii) opine on the portion of broadcast revenue that is attributable to the value of athletes' NILs in FBS football and Division I men's and women's basketball; and (iii) for any relevant broadcasting agreement that covers multiple college sports, opine on the appropriate allocation of revenues among those three sports. *See generally* Desser Rep. at 2.

Desser's Report sets out a three-step methodology for estimating the proportion of the value of Defendants' broadcast revenue attributable to athletes' NILs. First, Desser estimates the "holistic player contribution to media rights value," *i.e.*, the *entire* value that the players add to the commercial worth of basketball and football telecasts, including both the value of their athletic performances *and* the value of their NILs. *Id.* at 52. To do this, Desser applies his decades of experience in negotiating and valuing sports broadcast agreements. He also examines the collective bargaining agreements for the NBA, the WNBA, and the NFL, each of which allocates roughly half of the league's broadcasting revenues to the contributions of the players. *Id.* Desser opines, based on his industry experience and review of relevant data points, that it is reasonable to estimate that 50% of the value of Defendants' broadcast rights agreements in FBS football and Division I basketball are attributable to the

1    contributions of college athletes. *See id.* at 52–54.

2          Because this 50% contribution includes all the "individual ingredient values contained in the

3    overall basket of rights" conveyed in a broadcast contract, the second step of Desser's methodology

4    seeks to isolate the portion of the players' value that is attributable to the players' NILs (and not their

5    labor). *Id.* at 52. Desser's opinion about the isolated value of Class Members' NILs is indeed *sui*

6    *generis*, but that is only because *Defendants* operate a *sui generis* sports business in which pay-for-

7    performance is prohibited. The WNBA and the NFL, for example, do not pay specific amounts of

8    broadcast revenues for athletes' NILs because those leagues permit pay for the athletes' services, and

9    therefore compensation is an all-in amount. *Id.* Insofar as there are no examples of NIL-specific

10   payments for *broadcasts* outside of this litigation, that is a result of Defendants' unique rules, not

11   Desser offering an unreliable opinion or one that was "fabricated for this litigation." *But see* Mot. at

12   3. Based on his extensive experience negotiating sports broadcasting agreements, Desser concludes

13   that, at a minimum, players' NILs contribute to 10% of Defendants' broadcast revenues from FBS

14   football and Division I basketball. Desser Rep. at 53–54.

15         Finally, Desser validates his 10% Opinion by looking to NIL-specific payments to athletes in

16   sports group licensing arrangements (*i.e.*, pay-for-NIL isolated from pay-for-performance). The

17   median royalty rates for the National Football League Players Association's ("NFLPA's"), the

18   National Basketball Players Association's ("NBPA's"), and the Women's National Basketball Players

19   Association's ("WNBPA's") apparel and merchandise agreements for player NIL Redacted - Counsel Only

20   . *Id.* at 56–57. In videogame license agreements—which Desser opined to be the

21   most analogous because "[v]ideo games rely upon a license that only involves a player's NIL,"

22   separate from "the actual time-consuming athletic performance"—the median royalty rates are Counsel

23   Redacted - Counsel Only . *Id.* at 58–59. These datapoints in the comparable circumstance where

24   *only* athlete NILs are purchased—not their labor—support Desser's Opinion.

25         Separately, for Defendants' broadcast agreements that cover multiple college sports, Desser's

26   Allocation Opinion apportions revenues among the three college sports for which broadcast NIL

27   ("BNIL") damages are sought. To do this, Desser relies on his broadcast valuation experience,

28   including in college sports, to conclude that "approximately 75% of the NIL value is attributable to

football NIL, 15% of the NIL [v]alue is attributable to men's basketball NIL, and 5% of the NIL value is attributable to women's basketball NIL."[1]  *Id.* at 8, 60–62.  Desser tests and validates these estimates by examining Defendants' own broadcast revenue allocations—including in their bylaws and audited financials.  Defendants blithely call Desser's opinion "impossible" and "precarious" because it is based (in part) on "experience," but at his deposition, Defendants' broadcast expert, Bob Thompson, admitted to having essentially *the same opinion* based on his *experience*.  Thompson Tr. at 161:17–22 ("[I]n my mind, basketball is always worth 20 to 25 percent of the total value."); *id.* at 169:24–170:6 ("[A]s anybody will tell you, the value in these [multisport] rights deals is usually ascribed 75, 80 percent to football and the rest to the basketball product.").

### B.    The Rascher Report

Daniel Rascher is one of the foremost experts in sports economics.  He holds a Ph.D. in Economics from the University of California at Berkeley, is a Professor and Director of Academics Programs for the Master of Science in Sport Management program at the University of San Francisco, and is a partner of OSKR, LLC, an economic consulting firm.  Rascher Rep. at 2.  Rascher submitted expert reports accepted by this Court on similar issues regarding the economics of college sports labor markets at class certification in *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litigation* ("*Alston*") and *O'Bannon v. NCAA*, and was a testifying expert in *Alston*, presenting analyses that the Supreme Court discussed with approval.  Rascher Rep. App. A at 21; *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058 (N.D. Cal. 2019), *aff'd*, *Alston*, 141 S. Ct. 2141 (2021).

Rascher offers his expert opinion that "economic evidence and methods that would be used to prove the anticompetitive effects of the challenged NIL rules, antitrust injury, and damages are common to the members of the proposed damages and injunctive relief classes" and that "class-wide impact and damages can be demonstrated by means of common economic evidence."  Rascher Rep. at 4.  Defendants seek to exclude Rascher's proposed class-wide methodologies for estimating damages for class-members' lost BNIL payments and lost third-party NIL opportunities.[2]

---

[1] Desser opines that the remaining 5% of NIL value is attributable to other college sports covered by the agreements (such as volleyball, softball, and gymnastics).  Desser Rep. at 8, 61.

[2] Defendants do not seek to exclude Rascher's expert opinion addressing class-wide issues of antitrust

Rascher opines that class-wide damages can be estimated for lost BNIL payments that the members of the proposed classes would have received absent the challenged restrictions. Rascher Rep. at 89–94. To do so, Rascher first determines the total annual broadcast rights fees from Power Five conference contracts. *Id*. at 89–90. He then applies the Desser Allocation Opinion to isolate the revenues in multisport contracts attributable to FBS football, Division I men's basketball and Division I women's basketball. *Id*. Finally, he takes the total revenues for FBS football, Division I men's basketball, and Division I women's basketball and applies Desser's 10% Opinion to estimate per-athlete damages, which vary by conference, year, and sport. *Id*.; *see also id*. at App. Ex. C.4–8.

Rascher further opines, based on his study of the economics of college sports labor markets, that in the but-for world where the challenged NIL restrictions do not exist, BNIL payments would be divided equally among all class members on a given team, which is consistent with how the conferences share broadcast revenue, *i.e.*, equally among members regardless of the value of their rights. Rascher Reply Report (hereinafter "Rascher Reply"), at 52–56; *see also* Desser Reply Report at 28; Thompson Tr. 132:17–20. Rascher's opinion is also based on his analysis of how college athlete compensation and benefits are already required to be provided, as well as the equal sharing of licensing revenues by NFL and NBA players under agreements where essentially all players are licensed. *See* Rascher Rep. at 81–82; Thompson Tr. at 85:21–89:24; Ex. 68 to Berman Decl. §§ 12.1.2.1.5, 12.1.2.2 (NCAA Bylaws); Ex. 54 to Berman Decl. ISO Plaintiffs' Class Cert. Mot. (ECF No. 208-1) (NCAA Guidance re NIL Policy). The latter comparison rings true for Defendants' television agreements because their broadcast partners require that Defendants convey the right to use *all* players' NILs long before any broadcast. *See* Rascher Rep. at 81–82 & n.190; Thompson Tr. at 44:21–45:17 (NIL rights always obtained in advance); *id*. at 50:08–51:15 (would never sign a broadcast agreement without NIL rights included). And *all* Class Members have BNIL value because "any single participant could withhold those [NIL] rights and prevent the broadcast from occurring." *See* Ex. 2 to Kilaru Decl. (ECF No. 251-2) (hereinafter "Thompson Rep."), at 8. Finally, Rascher considers the administrative costs and feasibility of individual negotiations to opine that BNIL payments would be equally divided

---

liability, nor Rascher's methodology for estimating the value of lost videogame NIL payments. Plaintiffs therefore do not address them further. *See generally* Mot.

1    among class members on each team.  *See* Rascher Rep. at 78–83.

2        Separately, Rascher proposes a class-wide methodology to estimate the damages for athletes'

3    lost third-party NIL opportunities (third-party NIL sponsorship and endorsement deals that athletes

4    have been permitted to procure since July 2021).  Rascher uses a "before-and-after" yardstick

5    approach.  The value of NIL deals that college athletes obtained after the NCAA's July 1, 2021 rule

6    change (the "after" period) is used as a benchmark to estimate the value of the NIL compensation that

7    the athletes would have received during the damages period before July 1, 2021 (the "before" period).

8    *Id.* at 116–17.  He then proposes to adjust this benchmark to account for factors that would have caused

9    the "before" period to be different from the "after" period, such as an athlete transferring from one

10   school to another, changes in an athlete's public exposure due to an improvement in performance or

11   change in role (*e.g.*, shifting from a backup player to a starter), and the effect of COVID on demand

12   for Division I sports.  *Id.* at 98–102.  As Defendants' expert Tucker testified, the before-and-after

13   approach is a well-accepted methodology for estimating damages in antitrust cases and one she has

14   used herself.  *See* Ex. 57 to Berman Decl. (hereinafter "Tucker Tr."), at 140:9–142:2 (explaining her

15   use of the before-and-after methodology in a prior litigation); *id.* at 52:3–53:7 (admitting that

16   American Bar Association treatise discussing the before-and-after approach—"certainly seemed

17   solid").  While Tucker offers many criticisms of Rascher's opinions and methodology, she does not

18   offer any alternative means of estimating class-wide damages.  *Id.* at 81:23–82:5.  Nor does she dispute

19   that class members faced common restrictions on their NIL opportunities.  *See id.* at 64:6–65:13.

20   ## III.    LEGAL STANDARD

21        "[T]he rejection of expert testimony is the exception rather than the rule."  Fed. R. Evid. 702

22   advisory committee's note to 2000 amendment.  Accordingly, the *Daubert* standard for relevance and

23   reliability must be applied "flexibl[y]" and in light of "the 'liberal thrust' of the Federal Rules."

24   *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588, 594 (1993).  For all but the most egregious

25   of "junk science," "[v]igorous cross-examination" and the "presentation of contrary evidence"—not

26   preclusion—are the "appropriate means of attacking" expert testimony.  *Id.* at 596.

27        The *Daubert* standard is even more permissive at class certification.  In light of the incomplete

28   state of discovery—including the ongoing formulation of final expert opinions—the Court need not

decide whether an expert's testimony will ultimately be admissible at trial. Rather, the Court need only conduct a "tailored" *Daubert* analysis to determine whether the experts' opinions are sufficiently reliable "for the purpose of proving or disproving Rule 23 criteria." *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 495 (C.D. Cal. 2012). The operative question is whether Desser's and Rascher's opinions are admissible to help the Court determine whether injury and damages may be proven through common evidence on a class-wide basis. The answer is "yes."

## IV.    ARGUMENT

### A.    Desser's Testimony Is Admissible for Class Certification

Defendants take no issue with Desser's qualifications to offer expert testimony on BNIL valuations or allocations. Nor could they. *Supra* Section II.A. Instead, they challenge Desser's 10% Opinion and Allocation Opinion on grounds that fail to undermine their admissibility.

#### 1.    The 10% Opinion is properly rooted in Desser's extensive industry experience and validated by real-world evidence.

##### a.    Industry experience is a proper foundation for the 10% Opinion.

Defendants' contention that Desser's 10% Opinion should be excluded because it is based on his industry experience rather than a mathematical model misapplies the law and misstates the facts. *See* Mot. at 10–11. An industry expert like Desser may testify "on the basis of experience" alone or "experience in conjunction with other knowledge, skill, training or education," so long as the expert can "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. The Federal Rules of Evidence "expressly contemplate that an expert may be qualified on the basis of experience [and] [i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." *Id.*

Desser does not have to proffer any mathematical formulae or scientific model to reach his experience-based expert opinions. *See Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 2019 WL 4780183, at *3 (N.D. Cal. Sept. 30, 2019) (holding that even if an experience-based expert's methodology "is not replicable, is not subject to peer review, and has no known error rate—in short, that it is 'unsupported' and is therefore *ipse dixit*," that fact "is not disqualifying" as long as the expert

"provides a sufficient basis for understanding how he reached his opinions and to show that they are supported"), *aff'd*, 20 F.4th 466 (9th Cir. 2021). The valuation of the various elements of broadcast rights is, by Defendants' expert's own admission, "not all 100 percent black-and-white"; it requires professionals to rely on "experience." Thompson Tr. at 74:25–75:20; *see also id.* at 75:23–76:9 (Q: "Is it fair to say that when networks or conferences negotiate media agreements and they make valuations, they are, in part, relying on, as you put it, their gut or their experience in the industry?" A: "I like to call it more experience than gut, but yes, you're correct."). That admission alone defeats Defendants' *Daubert* challenge. Desser explains in detail how his extensive industry experience led him to reach his 10% Opinion. *See* Desser Rep. at 53–57. This is precisely the type of industry opinion that courts have repeatedly found to be admissible. *See, e.g.*, *S.S. v. Peloton Interactive, Inc.*, 2023 WL 2993391, at *5–6 (S.D. Cal. Apr. 17, 2023) (qualifying expert based on her "extensive experience" and review of evidentiary record in rendering her opinion); *Ibekwe v. White*, 2016 WL 6963051, at *2 (C.D. Cal. Feb. 23, 2016) (finding testimony "to be admissible" where it was "based on [expert's] own experience and expertise regarding [the] industry").

Defendants' cases do not undermine the admissibility of Desser's experience-based opinion. Rather, those cases involve highly technical damages opinions and turn on patent-specific Federal Circuit standards for estimating royalty rates at the *merits* phase of a *patent litigation*. *See Open Text S.A. v. Box, Inc.*, 2015 WL 349197, at *5 (N.D. Cal. Jan. 23, 2015) (excluding patent expert's royalty rate opinion as only a "superficial recitation of the [Federal Circuit's] *Georgia-Pacific* factors, followed by conclusory remarks"); *GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247, at *4–5 (N.D. Cal. Apr. 16, 2014) (excluding patent expert's royalty rate opinion where, in part, he failed to conduct "an explicit apportionment analysis, or explain[] [] why apportionment [wa]s inappropriate" as required by Federal Circuit law). Those standards have nothing to do with the admissibility of Desser's expert opinions on the value of athletes' BNIL.

Moreover, there is "a relaxed standard for proving the amount of damages in an antitrust case," which need only be based on "just and reasonable inference, although the result be only approximate." *Knutson v. Daily Rev., Inc.*, 548 F.2d 795, 811 (9th Cir. 1976); *see also J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 565 (1981) (damages issues in antitrust cases "are rarely susceptible of

1    the kind of concrete, detailed proof of injury which is available in other contexts"). And "at the

2    certification stage of an antitrust class action, plaintiffs have a limited burden with respect to showing

3    that individual damages issues do not predominate." *In re DRAM Antitrust Litig.*, 2006 WL 1530166,

4    at *10 (N.D. Cal. June 5, 2006).

5                    **b.      Desser validated his 10% Opinion with real-world comparators.**

6            Although Desser *could* have relied solely on his experience, he additionally tests and validates

7    his 10% Opinion by examining the closest analogous datapoints: royalty rates for the use of

8    professional football and basketball player NIL for apparel, merchandise, and videogames. *See* Desser

9    Rep. at 55–59. Desser considered all these analogues—which isolate the value of professional football

10   and basketball players' NILs from the value of their playing services—and found that they support his

11   10% Opinion. *Id.* Defendants sometimes ignore the benchmarks (*e.g.*, claiming the 10% Opinion is

12   "made up"), and other times criticize them, all while failing to proffer (or even allege) that there are

13   better, or for that matter any, alternative reference points. *See* Mot. at 9–10. Defendants' facile

14   criticism of the benchmarks at issue—that looking to the percentage value assigned "for commercial

15   use of NIL in *non*-broadcast products . . . are not sufficiently comparable to provide a reliable basis

16   for estimating a 'broadcast NIL' license"—is not persuasive. *Id.* at 10.

17           Once again, the cases Defendants cite to critique Desser's comparators are inapposite, non-

18   class-certification decisions specific to patent infringement cases. In *Uniloc USA, Inc. v. Microsoft*

19   *Corp.*, the plaintiff received a jury award of nearly $400 million for patent infringement based on an

20   expert damages report that did not look for comparable licenses; instead, the expert simply applied a

21   "25% rule of thumb as an arbitrary, general [royalty rate], unrelated to the facts of the case." 632 F.3d

22   1292, 1318 (Fed. Cir. 2011). In *Goodness Films, LLC v. TV One, LLC*, the plaintiff's damages expert

23   at trial had not looked at a single comparator license; instead, he looked at "a law review article" and

24   "case law," which plaintiff's counsel expressly said were "not meant to be comparisons." 2014 WL

25   12780291, at *2 (C.D. Cal. May 19, 2014). And in *LaserDynamics, Inc. v. Quanta Computer, Inc.*,

26   the plaintiff's trial expert excluded past licenses for the patent at issue from his analysis, instead relying

27   on unrelated patent licenses, which resulted in a number that could not be "reconciled with the actual

28   licensing evidence." 694 F.3d 51, 80–81 (Fed. Cir. 2012).

Here, Desser has not ignored other BNIL licensing agreements to focus on *non*-BNIL licenses, nor has he declined to look at comparable licenses. Rather, because other broadcast agreements valuing athletes' NILs separately do not exist, Desser examined agreements that pay for the NILs of NFL, NBA and WNBA players in isolation from pay for their labor—the precise question here. Indeed, the Ninth Circuit and the Central District of California have recognized that college football is a "close analog." *See In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 2023 WL 1813530, at *8 (C.D. Cal. Feb. 7, 2023) (accepting the "college football market" as a "yardstick" in an antitrust case involving NFL telecast arrangements) (citing *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1151 (9th Cir. 2019)). Those professional-sports group license agreements reinforce Desser's 10% Opinion (in fact, they show it is conservative). *See* Desser Rep. at 55–57. "Whether [Plaintiffs' expert] relied on facts Defendant[s] disagree[] with," specifically data on comparators, "does not affect the admissibility of his testimony." *Michery v. Ford Motor Co.*, 2017 WL 10362135, at *3 (C.D. Cal. Oct. 23, 2017); *see Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 970 (9th Cir. 2013) (rejecting challenge to expert's comparators and market reference points, finding those arguments "go to the weight of the testimony and its credibility, not its admissibility").

### c. Defendants baselessly claim that Desser cannot offer reliable testimony on BNIL value because it is not separately valued.

Defendants argue that Desser cannot reliably testify to the value of college athletes' BNIL because, *up until now*, there has been no business purpose to value, and no standalone market for, college athlete NILs in broadcast agreements. Mot. at 7. But that is only because no other sports league permits NIL compensation while banning pay-for-performance. Defendants admit as much, noting that in all "other contexts" athlete NIL rights "are addressed contractually in a labor market that compensates the athlete not [just] for NIL, but for [overall] athletic services." *Id.* Desser, however, was tasked with offering an opinion that fits the needs of this litigation: isolating the value of BNIL while assuming that Defendants' pay-for-play restrictions remain in effect. If the unopposed injunctive relief class succeeds in proving that Defendants' prohibition on compensating college football and basketball players for the use of their NILs in broadcasts is illegal, then valuations like Desser's will be commonplace. And even if BNIL valuation were "a concept fabricated for this

1    litigation" (Mot. at 3), it is one that "the unique nature of the quasi-factual, quasi-legal issues" of this

2    litigation requires. *See Mansourian v. Bd. of Regents*, 816 F. Supp. 2d 869, 886 n.16 (E.D. Cal. 2011).

3        The fact that there has never been a business purpose to isolate the value of BNIL has no

4    bearing on the admissibility of Desser's 10% Opinion. As Defendants' expert testified, there are

5    several valuable elements of a broadcast agreement that are not routinely valued in isolation but could

6    be valued if there was a reason to do so. *See* Thompson Tr. at 70:16–73:22. And after claiming that

7    it is "impossible" to isolate the value of BNIL and thus the value must be "zero," Thompson conceded

8    that: (i) broadcasters always require Defendants to either convey athletes' NIL rights or to indemnify

9    broadcasters for using such rights, (ii) he himself would not sign a media agreement without such

10    rights or protections, and (iii) college football and basketball games simply could not be televised

11    without NIL. *Id.* at 44:21–45:17, 70:17–73:22, 81:23–82:13. BNIL thus indisputably *has* value, and

12    any debate about whether 10% is the right figure is not relevant to class certification.

13        There is simply no evidentiary rule that an expert cannot testify on a novel issue presented for

14    the first time in a litigation. *See Donovan v. Catlin Specialty Ins. Co.*, 2015 WL 10487712, at *3 (D.

15    Mont. Nov. 2, 2015) (denying defendant's motion to exclude where defendant argued, in part, that

16    expert's "opinions are novel" because defendant "w[ould] be free to cross examine [expert] on the

17    claimed novel nature of his opinions"); *Potter v. Bowman*, 2006 WL 3760267, at *3 (D. Colo. Dec.

18    18, 2006) ("If the reliability and relevance requirements of Rule 702 are otherwise satisfied, the

19    expert's opinion is admissible regardless of its novelty *vel non*."); *see also Longoria v. Kodiak

20    Concepts LLC*, 2021 WL 1100373, at *8 (D. Ariz. Mar. 23, 2021) (permitting expert opinion on fair

21    market value of models' images to compensate for their unauthorized use, where the expert "appl[ied]

22    his years of experience to the hypothetical situation at hand—a negotiation that never took place").

23        Nor may Defendants hide behind their cobweb of compensation restraints to exclude Desser's

24    opinions. As the Ninth Circuit explained, an antitrust defendant may not rely on the uncertainty that

25    its own conduct created to oppose damages estimates that model the but-for world that defendant

26    prevented from coming into existence. *See Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773

27    F.2d 1506, 1511 (9th Cir. 1985) ("Defendants, whose illegal conduct operates to exclude others from

28    the relevant market, should not benefit because their wrongdoing makes it more difficult for the

plaintiff to establish the precise amount of injury."); *Knutson v. Daily Rev., Inc.*, 468 F. Supp. 226, 229 n.4. (N.D. Cal. 1979) ("[C]ourts have recognized that to allow defendants to escape payment of damages because they have made it difficult for the plaintiff to prove the exact amount of injury would be to permit a wrongdoer to profit by his own wrongdoing."), *aff'd*, 664 F.2d 1120 (9th Cir. 1981).

##### 2.    Desser's Allocation Opinion properly derives from his industry experience and real-world data—and *Defendants'* expert agrees with it.

Desser again relies on his expertise in sports broadcast rights negotiation and valuation—which he then tested and verified by examining relevant real-world allocations *from Defendants*—to opine that, in Defendants' multisport broadcast contracts, "approximately 75% of the NIL value is attributable to the football NIL, 15% of the NIL [v]alue is attributable to the men's basketball NIL, and 5% of the NIL value is attributable to the women's basketball NIL." Desser Rep. at 8, 60–62. As discussed above, this provides a more than adequate basis for Desser's Allocation Opinion. *See supra* Section IV.A.i.a–b. Defendants retort that "the evidence shows that broadcast revenue is almost never allocated among sports, let alone in a consistent ratio across conferences." Mot. at 11. Defendants' broadcast expert, Thompson, further claimed that "it is *impossible* to determine the relative value of broadcast rights fees" in multisport contracts (*i.e.*, "the percentage of the rights fees attributable to football, men's basketball or women's basketball"). Thompson Rep. at 6 (emphasis added).

But after Thompson's deposition, Defendants' position is incredible.  It turns out that Thompson not only believes an allocation opinion is possible, he largely agrees with Desser's Allocation Opinion.  Thompson admitted that it is *common industry knowledge* that in any multisport college broadcasting contract, between 75% and 80% of the value is attributable to football, and 20% and 25% to basketball, which is nearly the same as Desser's Allocation Opinion.  Per Thompson: "as anybody will tell you, the value in these [multisport] rights deals is usually ascribed 75, 80 percent to football and the rest to the basketball product"; and as "a general statement applicable to collegiate sports in general as to how [he] assign[s] the value," "normally football gets . . . all of the credit for these deals, but in [his] mind, basketball is always worth 20 to 25 percent of the total value." Thompson Tr. at 161:17–163:18, 169:24–170:18; *see also* Ex. 59 to Berman Decl. ("We'll put 80 percent [of the Big Ten's multisport media agreement] or $280m against the football."); Ex. 60 to

Berman Decl. ("I assume MBK [men's basketball] represents around 20-25% of the value of the [Big 12's multisport broadcast rights agreement].").[3]  Thompson's disagreement with Desser—initially existential, later a matter of single-digit percentage points—is not grounds for exclusion.  *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("[The] trial court [is not authorized] to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.").

There is more.  Defendants' own conduct belies their Motion.  Defendants argue that Desser's Allocation Opinion should be excluded because he does not account for variations from conference-to-conference, school-to-school, sport-to-sport, and year-to-year.  Mot. at 11–12.  But in Defendants' *own* Bylaws and audited financial statements, *they* account for no such variation.  *See, e.g.*, Thompson Tr. at 120:2–123:18 (Redacted - NSC

); *id.* at 137:13–138:17 (80%/20% allocation between football and basketball broadcast revenues in contract between the ACC and Notre Dame remained the "same" from 2013 to the present, and "conferences typically . . . don't alter those type of a payments. . . . It's 80/20 year one and . . . [i]t's 80/20 year ten."); *cf.* Ex. 69 to Berman Decl. (Redacted - NSC

.  Nor is "school-to-school" or "year-to-year" how networks value the rights they purchase.  *See* Thompson Tr. 143:10–144:7 ("when a network buys an entire package of rights, it doesn't look at the rights school by school" and "[t]he rights fees are fixed—annual rights fees in a media agreement, they're fixed before the seasons are played").  These examples undermine the claim that conference variation is inevitable: they show the ACC—which Defendants and their experts claim have more valuable basketball properties—and Redacted - NSC *both* allocate 75-80% to football and 20-25% to basketball.  *See* Mot. at 11–12; Thompson Rep. at 49–50; Ex. 1 to Kilaru Decl. (ECF No. 251-1) (Tucker Rep.), at 138.

---

[3] As Defendants note, the Court must be wary of paid expert opinions that are contradicted by their prior work. Mot. at 17 n.7 (collecting authorities).

**B.    Rascher's Testimony Is Also Admissible for Class Certification**

Defendants assert that Rascher's damages models for class members' lost BNIL payments and lost third-party NIL deals should be excluded because the inputs Rascher uses and assumptions he relies on are inaccurate.[4] But Defendants have not cited a single case that excluded an expert on these grounds at the class certification stage. And for good reason. Defendants' argument for exclusion is essentially that the results produced by Rascher's class-wide damages models are inaccurate. "[T]he test under *Daubert*," however, "is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert*, 43 F.3d at 1318. Rascher's methodology for measuring class-wide BNIL damages and his methodology for measuring lost third-party NIL opportunities each easily satisfy the "tailored" *Daubert* test at the class certification stage, which requires only that he present a "plausible methodology" to establish that antitrust injury and damages can be proven on a class-wide basis. *See In re Lithium Ion Batteries Antitrust Litig.*, 2017 WL 1391491, at *6, *8 (N.D. Cal. Apr. 12, 2017).

**1.    Defendants' disputes with the sources and accuracy of Rascher's BNIL damages model provide no basis for exclusion at class certification.**

Defendants contend that, because Desser's opinions are purportedly inadmissible, Rascher's reliance on them as inputs into his damages model renders Rascher's opinions inadmissible as well. *See* Mot. at 14–15. This argument fails twice-over: Desser's opinions are admissible and, regardless, Rascher's reliance on them is not a basis to exclude his testimony.[5] The question at class certification is not whether Rascher has accurate inputs to plug into his model—if warranted, the inputs can be altered or corrected with Rascher's merits opinions. Rather, the only issue before the Court now is whether the model Rascher created can plausibly prove class-wide injury and damages using common proof. For this reason, court after court has admitted expert damages models at class certification despite potential issues with the model's factual inputs.

For example, in *In re Glumetza Antitrust Litigation*, the "defendants broadly contest[ed]

---

[4] Defendants do not dispute the admissibility of Rascher's opinions on class-wide injury. *See generally* Mot.

[5] Defendants say "Rascher admitted" that "NIL licenses in the promotional and endorsement contexts [] have nothing to do with BNIL." Mot. at 4 (citing Ex. 70 to Berman Decl. (hereinafter "Rascher Tr."), at 51:3–20). What Rascher "admitted" was that these licensing agreements did not "involve payments related to the use of NIL in a live telecast of a sporting event." Rascher Tr. at 51:16–20.

various inputs into [plaintiff's expert]'s damages model" at class certification.  336 F.R.D. 468, 480 (N.D. Cal. 2020).  As this court stated: "we can quibble about the particular inputs for [the expert]'s model later," "[f]or now, it suffices that his model employs common data and applies class wide."  *Id.* Similarly, in *In re Lidoderm Antitrust Litigation*, defendants argued that plaintiffs' damages expert used unreliable inputs in his class certification damages model, but the court found that "[t]hose disputes are not appropriately resolved at this juncture; that the experts dispute what the appropriate inputs should be does not undermine the approach or the reliability of [the plaintiff's expert]'s model." 2017 WL 679367, at *12 (N.D. Cal. Feb. 21, 2017).  Most recently, the Central District of California denied a motion to exclude Rascher's damages model at class certification because "Defendants' arguments against . . . Rascher—that this-or-that figure . . . should not have been used—go to weight," not admissibility.  *Sunday Ticket*, 2023 WL 1813530, at *8–9.

Defendants' disputes with other aspects of Rascher's model for estimating BNIL damages are more of the same.  They claim that Rascher's opinion that each conference would have made equal BNIL payments to all class members in each sport is "unsupported" and "inconsistent with economic theory."  Mot. at 15–16.  Yet this is just another disagreement that goes to the weight, not the admissibility, of Rascher's opinion.  Rascher provides both economic theory and factual analysis to support his equal-payment opinion based on ample real world evidence of equal sharing: equal sharing of broadcast revenue among schools in any given Power Five conference, equal sharing of group licensing revenue among NFL and NBA players, Defendants' broadcast partners' need for assurance that they have the right to use *all players*' NILs, the many instances in which schools and conferences provide equal compensation and benefits to all team members, and the NCAA's categorical bar on pay-for-performance which would prevent schools from varying BNIL payments based on athletic accomplishments.  Rascher Rep. at 81–82 & n.190; Rascher Reply 47–56; Thompson Tr. 132:17–20; Ex. 68 to Berman Decl.; Ex. 54 to Berman Decl. ISO Plaintiffs' Class Cert. Mot.; *see also* Thompson Tr. at 44:21–45:17; Tucker Tr. at 148:18–151:10 (confirming many examples in the record of schools and conferences making equal payments to athletes regardless of position or skill).

Defendants may disagree with Rascher's reliance on these data sources, but that is not fodder for a motion to exclude at class certification.  *See Sunday Ticket*, 2023 WL 1813530, at *8 ("[C]ritiques

about unsupported assumptions properly go to weight, not admissibility.").[6]  Even if Rascher were

wrong that conferences would distribute BNIL money equally, that would still not be a basis for

exclusion at class certification.  *See Giuliano v. Sandisk Corp.*, 2015 WL 10890654, at *10 (N.D. Cal.

May 14, 2015) ("[A]rguments regarding [expert]'s flawed assumptions go to the weight, not the

admissibility, of his impact and damages opinions.").

     Even more critically, Rascher's opinion about how conferences would distribute broadcast NIL

payments has nothing to do with his methodology for estimating class-wide damages.  Instead,

Rascher's distribution opinion only applies to *allocating* damages, which is not at issue at the class

certification stage.  *See Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016)

("We have repeatedly confirmed the [] holding that the need for individualized findings as to the

amount of damages does not defeat class certification."); *Jimenez v. Allstate Ins., Inc.*, 765 F.3d 1161,

1168 (9th Cir. 2014) ("[I]t would drive a stake through the heart of the class action device . . . to

require that every single member of the class have identical damages.").

     In a final effort to exclude Rascher's BNIL damages opinion, Defendants object to his but-for

world, claiming that it purportedly fails to account for Title IX and state laws.  Mot. at 17–18.  But

this too is not a class certification dispute.  *See, e.g.*, *Sidibe v. Sutter Health*, 333 F.R.D. 463, 490 n.117

(N.D. Cal. 2019) ("[Defendant]'s disagreement with the plaintiffs' but-for world may be a merits issue,

but it does not defeat class certification.").  Put differently, it is "difficult, scratch that, impossible to

know what would have happened absent defendants' unlawful conduct because, assuming the class

wins, the unlawful scheme itself deprived us of that information," and thus an expert's "[e]stimates"

as to what would have happened in the but-for world are "the only way to replay the film without the

violation."  *In re Glumetza Antitrust Litig.*, 336 F.R.D. at 480.  Against that legal context, Defendants'

arguments about the application of Title IX are unsupportable and hotly disputed.  *See* Mot. at 17–18;

Ex. 61 to Berman Decl. (Osborne Tr.), at 51:6–15 (Defendants' Title IX expert admitting that "the

---

[6] Defendants' argument that Rascher's opinions are contrary to his own academic scholarship (Mot. at 16) is incorrect.  In the article Defendants cite, Rascher stated that "*[i]n a pure free agent market*, . . . [t]here would be one wage per unit of talent where the market labor demand curve crossed the market labor supply curve."  Ex. 71 to Berman Decl. (Daniel Rascher, *A Model of a Professional Sports League*, Int'l Advances in Econ. Rsch., at 14 (1996)) (emphasis added).  But there is no "pure free agent market" for athletes' labor in the but-for world, so Rascher's article does not apply here.

conferences in general might not be or would not be subject to Title IX"). Defendants cannot credibly criticize Rascher for not considering speculation about how Title IX applies to his damages methodologies.

Similarly, Defendants' contentions about what state laws would and would not have permitted in the but-for world are more rank speculation that cannot be a basis to exclude expert testimony. *See Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, 2021 WL 2352016, at *10 (E.D. Pa. June 9, 2021) (finding that "[d]efendants' speculative criticism [wa]s not sufficient to justify exclusion of [expert's] regression model as an unreliable methodology"); *Dalton v. McCourt Elec., LLC*, 2013 WL 6667755, at *4 (E.D. Pa. Dec. 17, 2013) (rejecting, "[b]ecause of its speculative nature," defendant's argument to exclude plaintiff's expert's testimony). And Defendants' conjecture is backwards: state NIL laws came into effect to force Defendants to *permit* NIL compensation, not to limit it.[7] There thus would have been no reason for states to enact laws on college athlete NIL in the but-for world where Defendants' unlawful restrictions did not exist. As Defendants concede, California—the first such law—set off a domino effect which led to "[t]hirty one states and the District of Columbia enact[ing] similar laws permitting NIL compensation." Opp. at 4.[8] In any event, no state NIL law took effect until the end of the Additional Sports Class damages period (*i.e.*, until July 1, 2021), when Defendants temporarily lifted some of their NIL restraints.

## 2. Defendants' disputes with Rascher's before-and-after methodology are not a basis for excluding his opinions at class certification.

Rascher presents a before-and-after methodology to estimate class-wide damages from lost third-party NIL opportunities (*e.g.*, product endorsements). Rascher Rep. at 97–102. As Defendants' expert Tucker acknowledged, the before-and-after approach is not just plausible, it is accepted as a reliable method to measure class-wide damages in an antitrust litigation, and one she has used herself.

---

[7] Ex. 63 to Berman Decl. (Dan Murphy, *California Defies NCAA as Gov. Gavin Newsom Signs Into Law Fair Pay to Play Act*, ESPN.com (Sept. 30, 2019)).

[8] This directly contradicts Defendants' erroneous assertion that "the state laws were a direct response" to "the NCAA interim policy permitting third-party NIL payments to student-athletes." Mot. at 18. The interim policy was a direct response to state laws, not vice versa. *See* Ex. 72 to Berman Decl. (Alan Blinder, *N.C.A.A. Chief, Pressured by State Laws, Pushes to Let Athletes Cash In*, NYTimes.com (May 8, 2021)).

*See* Tucker Tr. at 52:3–53:7 (referring to ABA treatise discussion of the before-and-after approach as "solid"); *id.* at 140:9–142:2 (describing her prior use of before-and-after methodology); *see also* Rascher Rep. at 97; *Dolphin Tours, Inc.*, 773 F.2d at 1511 ("Among the methods by which an antitrust plaintiff can establish lost profits are [] comparing the plaintiff's profits before or after the alleged anticompetitive activity with the profits made while the plaintiff was subjected to the anticompetitive activity . . . ."); *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 667 (5th Cir. 1974) (crediting "the before and after theory" as one of "two generally recognized methods of proving lost profits").

At this stage, Rascher's before-and-after model need not be finalized. Rascher only has to demonstrate that he will be able to create a plausible model for class-wide damages using common proof. *See, e.g.*, *Ang v. Bimbo Bakeries USA, Inc.*, 2018 WL 4181896, at *8 (N.D. Cal. Aug. 31, 2018) (denying motion to exclude expert on the basis that he "failed to run his proposed damages model in advance of class certification" because "[a]t class certification . . . a plaintiff's damages expert need only propose a plausible model for calculating damages"). Rascher has done this. Because Defendants did not permit any third-party NIL compensation until July 1, 2021, Rascher looks at the third-party NIL compensation that class members received in the "after" period to create a baseline estimate of the payments that class members would have received in the "before" period (2016-17 academic year until July 1, 2021). Rascher then proposes to adjust the results to account for factors that would have caused the before period to be materially different from the after period. Rascher Rep. at 99–102.

Defendants seek to exclude Rascher's class-wide damages methodology by mischaracterizing it, claiming that Rascher assumed that "NIL value in the marketplace is the same every year, such that post-July 1, 2021 reported NIL deal value is perfectly predictive of the NIL deal value every student-athlete would have achieved in the before period." Mot. at 18. But Rascher's model uses post-July 1, 2021 NIL earnings as a "*baseline* for estimating damage[s]" (pre-July 1, 2021 earnings), which will be "*adjusted*" to account for "changes between the after period and the before period." Rascher Rep. at 101, 116 (emphases added); *see also id.* at 99–101, 103–04, 115–17. Rascher proposes adjustments related to (i) COVID's impact, (ii) college athlete transfers, and (iii) changes in playing time (*e.g.*, a bench player becoming a starter). Rascher Reply at 69–83. For COVID, he analyzes the percentage reduction in college sports revenues in 2020 and 2021 and adjusts estimated NIL earnings down by a

corresponding percentage. Rascher Rep. at 107–11. For transfers and playing time, Rascher analyzes the NIL earnings to determine whether there is a statistically significant relationship between NIL earnings and playing time or conference. *Id.* at 112–16. Where he finds statistically significant differences, he applies an adjustment based on the difference in median NIL earnings to account for changes in playing time or transfers. *Id.* To test this methodology, Rascher did a study where he applied the above adjustments to football players and men's and women's basketball players in the Big Ten and the SEC. Rascher Reply at 70–83. He shows that these adjustments can be made and applied to *all* athletes on a class-wide basis.

Defendants' suggestion that they might make different adjustments once again goes to the weight, not the admissibility, of Rascher's opinion. *See, e.g.*, *Mulderrig v. Amyris, Inc.*, 340 F.R.D. 575, 588 (N.D. Cal. 2021) ("To the extent that defendants' argument seeks to challenge [the expert's] ability *in practice* to adjust for [potentially] confounding factors . . . , this is an inquiry to consider at the merits stage."); *In re BofI Holding, Inc. Sec. Litig.*, 2021 WL 3742924, at *9 (S.D. Cal. Aug. 24, 2021) (rejecting claim that plaintiffs "must demonstrate that the [damages] model will be successful at eliminating the effect of other variables . . . at [] class certification"). And to the extent Defendants disagree with Rascher's proposed methodology for allocating class-wide damages among class members, that issue should not be resolved now. *See Vaquero*, 824 F.3d at 1155.

Notably, Defendants' economist, Tucker, who has never previously studied the college or any other sports labor market, does not offer any alternative methodology or propose corrections. *See* Tucker Tr. at 31:1–8, 81:23–82:13. She simply opines that estimating class-wide damages for lost third-party NIL opportunities is "problematic and difficult" because no one can perfectly recreate the but-for world. *Id.* at 82:16–25. Such a criticism could be offered in every antitrust case, but the law does not give Defendants the benefit of their misconduct. *See Dolphin Tours, Inc.*, 773 F.2d at 1511.

## V.    CONCLUSION

For all these reasons, Defendants' Motion to Exclude the Opinions, Reports, and Testimony of Edwin Desser and Daniel Rascher should be denied.

1  Dated: July 21, 2023                    Respectfully submitted,

2  HAGENS BERMAN SOBOL SHAPIRO LLP         WINSTON & STRAWN LLP

3  By:   /s/ Steve W. Berman               By:   /s/ Jeffrey L. Kessler
4        Steve W. Berman (*pro hac vice*)        Jeffrey L. Kessler (*pro hac vice*)
   Emilee N. Sisco (*pro hac vice*)        David G. Feher (*pro hac vice*)
5  Stephanie Verdoia (*pro hac vice*)      David L. Greenspan (*pro hac vice*)
   HAGENS BERMAN SOBOL SHAPIRO LLP         Adam I. Dale (*pro hac vice*)
6  1301 Second Avenue, Suite 2000          Sarah L. Viebrock (*pro hac vice*)
   Seattle, WA 98101                       WINSTON & STRAWN LLP
7  Telephone: (206) 623-7292               200 Park Avenue
   Facsimile: (206) 623-0594               New York, NY 10166-4193
8  steve@hbsslaw.com                       Telephone: (212) 294-4698
   emilees@hbsslaw.com                     Facsimile: (212) 294-4700
9  stephaniev@hbsslaw.com                  jkessler@winston.com
                                           dfeher@winston.com
10                                         dgreenspan@winston.com
   Benjamin J. Siegel (SBN 256260)         aidale@winston.com
11 HAGENS BERMAN SOBOL SHAPIRO LLP         sviebrock@winston.com
12 715 Hearst Avenue, Suite 202
   Berkeley, CA 94710
13 Telephone: (510) 725-3000               Jeanifer E. Parsigian (SBN 289001)
   Facsimile: (510) 725-3001               WINSTON & STRAWN LLP
14 bens@hbsslaw.com                        101 California Street, 34th Floor
                                           San Francisco, CA 94111
15 Jeffrey L. Kodroff                      Telephone: (415) 591-1000
16 SPECTOR ROSEMAN & KODROFF PC            Facsimile: (415) 591-1400
   Two Commerce Square                     jparsigian@winston.com
17 2001 Market Street, Suite 3420
   Philadelphia, PA 19103
18 Telephone: (215) 496 0300
   Facsimile: (215) 496 6611
19 jkodroff@srkattorneys.com

20

21                    *Counsel for Plaintiffs and the Proposed Classes*

22

23

24

25

26

27

28

1

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)

2      Pursuant to Civil Local Rule 5-1(i)(3), the filer of this document attests that concurrence in the

3   filing of this document has been obtained from the signatories above.

4

5                                                        */s/ Steve W. Berman*
                                                         STEVE W. BERMAN

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28