David M. Given (State Bar No. 142375)
Michael D. Levinson (State Bar No. 271556)
PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP
39 Mesa Street, Suite 201
The Presidio
San Francisco, CA 94129
Telephone:  415-398-0900
Fax:         415-398-0911
Email: dmg@phillaw.com
       mdl@phillaw.com

Counsel for *Amicus Curiae*

Leonard B. Simon (State Bar No. 58310)
LAW OFFICES OF LEONARD B. SIMON P.C.
1939 Via Casa Alta
La Jolla, CA 92037
Telephone: 619-818-0644
Email: lens@rgrdlaw.com
Of counsel

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE: COLLEGE ATHLETE NIL LITIGATION | Case No. 4:20-cv-03919-CW |
| | **BRIEF OF *AMICUS CURIAE* LEONARD B. SIMON IN OPPOSITION TO FINAL APPROVAL OF THE INJUNCTIVE ASPECTS OF THE SETTLEMENT** |
| | Hon. Claudia Wilken |

# TABLE OF CONTENTS

I.    INTEREST OF AMICUS CURIAE........................................................................1

II.    ARGUMENT ......................................................................................................1

A.    THE INJUNCTIVE SETTLEMENT CONSTITUTES AN UNLAWFUL PRICE FIX ............................1

B.    THE PRICE FIX HARMS COMPETITION AT MANY SCHOOLS IN MANY WAYS ......................2

C.    THE PRICE FIX IS NOT "REVENUE SHARING" AND CANNOT BE DEFENDED AS
COMPARABLE TO UNIONIZED PROFESSIONAL SALARY STRUCTURES OR ANTITRUST
SETTLEMENTS ..................................................................................................3

   1.    The Injunction Does Not Call for "Revenue Sharing" as that Term Is Commonly
   Understood .................................................................................................3

   2.    Every Comparison Made Between College Athletes and Unionized Professionals Fails
   and Demonstrates Why the Injunction Is Contrary to Law ....................................4

   3.    The Letter to the Court by Class Representatives Underscores That This Settlement
   Will Not Work in the Absence of a Union ...........................................................5

D.    NEITHER THE RIGHT TO OPT OUT NOR THE RIGHT TO OBJECT CAN SOLVE THE PROBLEMS
IDENTIFIED ABOVE ............................................................................................6

E.    ALTHOUGH THE NCAA SAYS IT WILL NOT ACCEPT THE DAMAGE SETTLEMENT WITHOUT
THE INJUNCTIVE SETTLEMENT, THE TERMS OF THE SETTLEMENT SUGGEST OTHERWISE ............6

III.    CONCLUSION ....................................................................................................7

# TABLE OF AUTHORITIES

Cases                                                                                      Page(s)

*Bridgeman v. Nat'l Basketball Ass'n*,
   675 F. Supp. 960 (D.N.J. 1987) ................................................................. 5

*Brown v. Pro Football, Inc.*,
   518 U.S. 231 (1996) ................................................................................. 3

*Grunin v. Int'l House of Pancakes*,
   513 F.2d 114 (8th Cir. 1975) ................................................................... 2

*Nat'l Basketball Ass'n v. Williams*,
   857 F. Supp. 1069 (S.D.N.Y. 1994) ........................................................ 5

*NCAA v. Alston*,
   594 U.S. 69 (2021) ................................................................................... 3

*Robertson v. Nat'l Basketball Ass'n*,
   72 F.R.D. 64 (S.D.N.Y. 1976) ................................................................. 5

*White v. NFL*,
   822 F. Supp. 1389 (D. Minn. 1993) ......................................................... 5

Rules

Fed. R. Civ. P. 23(c)(2)(B)(v) ..................................................................... 6

## I.    INTEREST OF AMICUS CURIAE

*Amicus curiae* Leonard B. Simon has practiced law for over 50 years in complex civil litigation, class actions, and sports law. His sports clients have included Major League Baseball, the San Diego Padres, professional basketball and soccer players, sports agents, college coaches, and female high school athletes seeking equal treatment under Title IX. In addition, Mr. Simon has served as an Adjunct Professor of Law at Duke University, the University of San Diego, the University of Southern California, and the University of California, Irvine, offering courses in Complex Civil Litigation or Sports Law nearly every spring semester since 2000.

In 2019, Mr. Simon worked closely with California State Senator Nancy Skinner, at her request, to help pass California Senate Bill 206, which requires California universities to allow their athletes to monetize their names, images and likenesses ("NIL"). His CV is attached as Exhibit 1.

As set forth below, Mr. Simon has no objection to the damage settlement but believes that the injunctive settlement is inappropriate, counterproductive, and violative of the Sherman Act.

It is notable that the letter to the Court from the three class representatives, without intending to, supports the views stated herein that this settlement does not work without unionization. This point is discussed in more detail below.

## II.    ARGUMENT

### A.    The Injunctive Settlement Constitutes an Unlawful Price Fix

The strength of the damage settlement and weakness of the injunctive settlement suggests that the NCAA, having been forced to pay billions for its misconduct in the past, seeks in exchange permission from the Court to violate the antitrust laws and place an artificial cap on athlete compensation for the next ten years. This is improper and contrary to public interest as

1

well as the interests of future college athletes. Settlements of class actions should not be approved if they allow, encourage, or even bless, a violation of law. *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975). Whether the imprimatur of this Court on this price fix creates antitrust immunity, or a legal defense to antitrust claims, or even a strong talking point in defending such conduct, approval of the injunctive settlement is harmful to the rights of college athletes. The Court should not countenance such a term as a tradeoff for damages for a different class.

### B.    The Price Fix Harms Competition at Many Schools in Many Ways

The injunction remedy is a price fix and harms athletes who will play at many Division I schools in the future. For example, if the injunctive relief were approved, a football powerhouse like Alabama might spend $15 million on football, $3.5 million on men's basketball, $1 million on women's basketball, and $500,000 on all their athletes in eleven other varsity sports. Alabama will then be *prohibited by the injunction* from spending a penny more on compensation to any athlete, whether football, basketball, or exceptional athletes in minor sports, who might similarly be snubbed by dozens of schools choosing who are capped out by other priorities, although they would pay these athletes well but for the cap. Competition for those athletes will be limited by the cap.

The problem persists at schools with other priorities. If Stanford—a school that seeks to be athletically competitive in as many sports as possible and which regularly wins the Directors' Cup for best overall collegiate athletics program—spends the $20 million equitably over 15 sports teams, male and female, then a star Stanford athlete or applicant seeking a more competitive compensation offer may be forced to matriculate at, or transfer to a school that allocates its cap differently, even though Stanford is his or her preferred school, in his or her

preferred location, with a strong program in his or her sport, and even if Stanford would be pleased to offer him or her more money but for the cap.

Nor is the restraint limited to schools like Alabama or Stanford; *all* schools spending the full $20 million will have an artificial constraint on their offers. For an athlete seeking a school that could compete for a national championship, or a state university in his or her home area, or a particular academic strength, the constrained schools may comprise all the schools that are attractive to him or her. Dozens of schools and hundreds of student athletes will face this dilemma.

This is far from the antitrust law's goal of open and free competition, which applies with full force in college sports. *NCAA v. Alston*, 594 U.S. 69 (2021). Athletes will be compensated by the schools, but their compensation and/or choice of schools will be diminished and hampered by the cap. The Court should not be a party to this illegal price fix and limitation on competition.

### C.    The Price Fix is Not "Revenue Sharing" and Cannot Be Defended as Comparable to Unionized Professional Salary Structures or Antitrust Settlements

Settling parties proudly call the settlement "revenue sharing," and seek to defend the price fix by reference to salary limitations in unionized professional sports where antitrust cases are limited by the labor exemption to the antitrust laws. *Brown v. Pro Football, Inc.* 518 U.S. 231 (1996). Neither gambit works here.

#### 1.    The Injunction Does Not Call for "Revenue Sharing" as that Term Is Commonly Understood

The settlement cannot fairly be called "revenue sharing." If a friend asks me to provide him with two hours of help per month on his work, and says he *might* share his salary with me, no one would call that revenue sharing. And if he added that he would cap the amount he would

give me at 25% of his salary, we still would not call it revenue sharing since he might give me nothing. That is what we have here—schools *may* pay their athletes nothing, a little, or as much as $20 million per year per school. They can share if they like, and as much or as little as they like, to whichever athletes they choose, up to the artificial cap.

There is certainly no promise of revenue sharing for all class members, or indeed for the vast majority of them, since the money may be spent on football and basketball, or only on star players in those sports, which are crucial to the schools' athletic budgets and prestige.

> **2.      Every Comparison Made Between College Athletes and Unionized Professionals Fails and Demonstrates Why the Injunction Is Contrary to Law**

Because unionized professional sports leagues have collective bargaining agreements ("CBAs") which often include caps on salaries, settling parties try to equate their $20 million cap with caps in those CBAs, going so far as to try to equate the college athletes' likely income with those of the professional athletes. This analogy is flawed at its core, since unionized pro athletes with CBAs are governed by a comprehensive system negotiated by their union leaders, whom they elect, and who protect their interests through the negotiation and administration of the CBA, battle for the best possible deal, file grievances and the like if CBA terms are not followed, and seek salary floors rather than caps, sometimes compromising and getting both. A union leader would be fired if he or she negotiated a deal similar to the injunctive settlement.

College and professional athletes are far different, well beyond having compensation floors more often than caps. The pros do not need to compete with athletes in other sports for a common pot of income. Moreover, the pro athletes are typically living under a CBA that a majority voted for, and they typically elect their leaders, who negotiate the CBA. Finally, pro athletes are employees with all the rights that state and federal laws give them, while college athletes are not. Not a single one of those things is present in college athletics.

4

Relatedly, the pro sports antitrust settlement approvals relied upon by settling parties all involve unionized professional sports, and there is union involvement in each settlement. In *Robertson v. Nat'l Basketball Ass'n,* 72 F.R.D. 64, 69-70, 69 n.1 (S.D.N.Y. 1976), aff'd, 556 F.2d 682, 686 (2d Cir. 1977) settlement "discussions involved not only class counsel … but … general counsel for the NBA Players Association." In *Bridgeman v. Nat'l Basketball Ass'n*, 675 F. Supp. 960 (D.N.J. 1987), there was a union in place, but when the CBA had expired, antitrust litigation was brought to force improvements in a new CBA, which were obtained via settlement, and a new CBA. Six years later, the NBA repeated this minuet in *Nat'l Basketball Ass'n v. Williams*, 857 F. Supp. 1069 (S.D.N.Y. 1994), another case settled with a new CBA. And the one football case, *White v. NFL*, 822 F. Supp. 1389, 1421 (D. Minn. 1993), is the same, where the Court found it to be "significant that class counsel consulted with the NFLPA in negotiating the settlement."

All of these cases approve compensation rules agreed to by a labor union—or by class action counsel *and* a labor union—and are thus protected by the labor exemption to the antitrust laws. And all of these cases involve comprehensive CBAs, which provide far more than a salary cap, creating many rights for the athletes. A naked salary cap in college sports has no similarity to what occurred in any of these four cases.

### 3. The Letter to the Court by Class Representatives Underscores That This Settlement Will Not Work in the Absence of a Union

Three class representatives have written to the Court directly, asking for representation by a union or the like to "effectuate the changes [they] intended" in bringing this case. The letter is attached hereto as Exhibit 2. The class representatives go on to say that college athletes "must have independent representation [and] equitable minimum payments" and conclude that "we need a players association."

These brave class representatives are right that they need a union or similar organization, and that any salary cap should be paired with salary floors (amongst many other athlete-friendly elements), but they are wrong to think these matters can be addressed later. The injunctive settlement simply does not work with an artificial cap, no floor, no union to administer the system, process grievances, respond to new circumstances, and negotiate a new deal when the current one runs out. A union created down the road (which will not be easy) and saddled with this ten-year court injunction would have great difficulty getting anything done. A union must be in place *before* compensation terms are set for the athletes, and a union is legally necessary to obtain antitrust immunity for the cap.

**D.      Neither the Right to Opt out nor the Right to Object Can Solve the Problems Identified Above**

The right of class members to opt out or object to settlements cannot save the day for this settlement, as it does not solve any of the problems presented above. First, since we are talking about injunctive relief, opt outs are not permitted. Fed. R. Civ. P. 23(c)(2)(B)(v).

Second, the right of future class members to object as they enter college carries with it several disincentives and practical difficulties. High school seniors will have difficulty finding counsel, will be seriously challenged in obtaining class certification, and may not wish to create friction with their college coaches. They will be months away from starting school under capped compensation, and at best, they could try to get a better deal as a sophomore or transfer schools later. All of this would be quite unattractive to any high school senior. Objecting is simply an awkward and ineffective remedy for these legal infirmities.

**E.      Although the NCAA Says It Will Not Accept the Damage Settlement Without the Injunctive Settlement, the Terms of the Settlement Suggest Otherwise**

At the hearing for preliminary approval, the NCAA suggested that it will not agree to approval of the damage relief without simultaneous approval of the injunctive relief. The Court may accept that view—in which case the entire settlement must be rejected—but the NCAA's view seems inconsistent with the settlement it agreed to.

Under the terms of the settlement, if there were full approval of the settlement this spring, the billions of dollars of damages would flow, but the next class of high school athletes entering college in September 2025 would get notice and an opportunity to object. Although objection will be difficult, if one brave athlete did object successfully to the cap, the injunctive portion of the settlement would be overturned, and the NCAA would be living with payment of the $2.6 billion without its desired prospective relief.

So, what the NCAA considers unthinkable, non-negotiable, and completely unacceptable could happen next year or any time in the next ten years. The Court should consider whether it can happen now.

In any event, the injunctive relief is illegal and cannot be approved. The consequences of and breadth of that disapproval are a matter for the Court to consider.

## III.    CONCLUSION

The Court should reject the injunctive settlement.

Dated: January 27, 2025                    Respectfully submitted,

                                           By: /s/ David M. Given
                                               David M. Given
                                               Michael D. Levinson
                                               PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP
                                               Counsel for *Amicus Curiae*

                                               Leonard B. Simon
                                               LAW OFFICES OF LEONARD B. SIMON P.C.
                                               Of counsel

# EXHIBIT 1

LEONARD B. SIMON
655 West Broadway, Suite 1900
San Diego, CA 92101
Phone (619) 818-0644 (c)
lens@rgrdlaw.com

## CURRENT EMPLOYMENTS

*Law Offices of Leonard B. Simon P.C.*, *San Diego*. I am engaged in complex civil litigation, trial and appellate, principally in the areas of securities, antitrust and consumer class actions, and sports-related work.

*Of Counsel*, *Robbins, Geller, Rudman & Dowd LLP*, *San Diego*. I also remain affiliated with this firm, where I was previously a managing partner, with a similar practice to that described above. I have handled trials and appeals in federal and state courts nationwide, including oral argument in the U.S. Supreme Court.

*Sports Practice*. I have represented Major League Baseball, the San Diego Padres, the leading agents in the NBA, Callaway Golf, agents and athletes. I have also handled matters adverse to the NBA, the NFL, NWSL, and the NCAA. My sports representations have included antitrust law, Title IX, labor law, and college and high school sports issues.

*Adjunct Professor of Law*. I have taught law nearly every academic year since 2000, focusing on Complex Civil Litigation and Sports and the Law, at Duke, U of San Diego, USC and UC Irvine. I have also lectured at Stanford Business School, UCLA Law School, and Thomas Jefferson Law School.

## PRIOR EMPLOYMENT

*Attorney*, *Arnold & Porter*, *Washington, D.C.*, 1974-1982. Complex litigation, primarily in the federal courts. Represented major businesses, including Ford Motor Company, Major League Baseball, Philip Morris, Monsanto, Bendix Corp., Xerox Corp. Coordinated the firm's pro bono practice, including a death penalty appeal and a suit against Richard Nixon concerning his White House papers and tapes.

*Law Clerk*, *The Hon. Irving Hill*, *U.S. District Judge*, *Los Angeles*, 1973-74. Assisted the Judge in all phases of civil and criminal litigation.

## PROFESSIONAL AND COMMUNITY ACTIVITIES

Board of Directors, San Diego Padres, 2003-2011.

Member of Athletic Council, Duke University (advises President, Board of Trustees, and Athletic Director on issues of intercollegiate sports), 2012-2018.

Co-owner, Lake Elsinore Storm minor league baseball team, since 2002. The Storm is a San Diego Padres affiliate.

Advisor to California State Senator Nancy Skinner on SB 206, first bill in the nation to allow college athletes to monetize their names, images and likenesses, and a subsequent bill amending SB 206. I remain involved in that space through teaching, lecturing and writing.

Member, City of San Diego Task Force on San Diego Chargers.

Judge Pro Tem, San Diego Superior Court.

Board of Directors, American Civil Liberties Union, San Diego, 1998-2008.

Arbitrator and Mediator.

Lawyer Representative, Ninth Circuit Judicial Conference, 2006-2011; Ninth Circuit Conference Executive Committee, 2009-2011.

Testimony before U.S. Congressional Committee (securities fraud issues) and California Senate Committee (name, image and likeness issues)

## EDUCATION

J.D., Duke University School of Law, 1973. Order of the Coif; *Duke Law Journal*, editorial board member; Moot Court Board President, and national and regional moot court team member.

B.A., Union College, Schenectady, New York, 1970.

## PUBLICATIONS

Authored one academic article, edited and coordinated publication of one book, wrote one long-form magazine article for the Washington Monthly (on college sports) and have written dozens of columns, op-eds and the like on a variety of subjects.

## AWARDS

American Antitrust Institute, Private Antitrust Case of the Year, 2022, *Moultrie v. NWSL*.

EXHIBIT 2

Grant House, Sedona Prince & Nya Harrison
214 20th Street North, Suite 301
Birmingham, AL 35203

December 2nd, 2024

Senior District Judge Claudia Wilken
United States District Court for the Northern District of California
Oakland Courthouse
1301 Clay Street
Oakland, CA 94612

**F I L E D**

DEC 12 2024

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

C 20-3919 CW

Dear Judge Wilken,

We, the college athlete plaintiffs and class representatives in the *In Re College Athlete NIL Litigation* matter, express our gratitude for the landmark settlement agreement that has been proposed to resolve the matter.  If granted final approval, the settlement agreement's terms will unlock billions of dollars for athletes past, present and future. This would be a monumental step in recognizing our contributions to the financial success of college athletics, our universities, their communities, and the many third parties that operate within the college athletics ecosystem.

As plaintiffs and class representatives, we recognize that it is unusual to communicate directly with the Court. We believe our class lawyers have done a magnificent job for college athletes in effecting the proposed settlement, but we also recognize that they are limited in their ability to effectuate the changes we intended to make in college athletics. We are writing to Your Honor directly because you have played a critical role over the past decade in establishing and protecting the rights of college athletes in a variety of ways.

While the proposed settlement is a significant step forward, there still remains a critical need for structural changes to protect athletes and to prevent the failures of the past. College athletes must have independent representation to standardize NIL compensation contracts they will be entering into with their universities, to establish equitable minimum payments, to provide true health protections, and to create an ecosystem where athletes can thrive, as the current system is saturated with misaligned incentives that jeopardize the holistic development of the athletes that drive it.

We need a players' association. After exploring existing options we believe Athletes.org (AO) is the solution, therefore we have all become members. Here's why. AO has nearly 4000 college athlete members and currently helps its members navigate critical issues like reviewing NIL agreements, agent verification, and provides opportunities for our voices to be organized and heard on the policies shaping our collegiate experience. Led by current college athletes who are supported by a team of former athletes and esteemed legal counsel, AO is built to advocate for us today. With a Board composed of sports industry experts like former coaches,

commissioners, athletic directors, and media execs, we are able to get multiple perspectives on issues that college athletics is faced with.

Currently, the NCAA, conferences, schools, and their respective collectives are using the proposed settlement to define financial frameworks, consider restrictive contracts for athletes, adjust rules that infringe on athletes' rights, and lobby Congress for an antitrust exemption. While professional leagues include athletes in these decisions through their respective players associations, the college system continues to prevent our players association from representing us at the decision making tables. School leaders claim to "hear from athletes," but existing mechanisms like Student Athlete Advisory Committees (SAAC) lack the resources, authority, independence, and inclusion to truly represent college athletes on these issues.

Without independent, formal representation separate from schools or their affiliates, athletes will inevitably remain in a vulnerable position, perpetuating the cycle of inequity and paving the way for continued litigation.

AO provides the infrastructure to offer the collective voice, legal guidance and resources we need to address these challenges constructively, ensuring a fair and sustainable future for college athletics.

We respectfully ask the Court to lend its imprimatur to our efforts to ensure that college athletes have a voice in building the structure of college athletics moving forward. Additionally, we request that this letter be made part of the case record to highlight the importance of these issues.

If the Court has any questions, the undersigned plaintiffs would be happy to respond.

Thank you for your continued commitment to justice and equity for college athletes.

Respectfully,
Grant House, Sedona Prince, Nya Harrison