FILED
JAN 27 2025
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Gannon Flynn

265 S 1850 E unit 5445

Salt Lake City, Utah 84112

January 19, 2025

Re: In re: College Athlete NIL Litigation, Case No. 4:20-cv-03919

Dear Judge Wilken,

My name is Gannon Flynn, I am a freshman Division 1 swimmer at the University of Utah. My NCAA ID is 2203480546 and I am a member of the Injunctive Relief Class in *In re: College Athlete NIL Litigation, Case No. 4:20-cv-03919*. For reasons stated in my attached decorrelation I object to roster limits and the fundamental principle of universities paying athletes directly for Name Image and Likeness (NIL). I make this objection individually and on behalf of the Injunctive Relief Class. I request the ability to speak at the final hearing on April 7th, 2025.

Sincerely,

Gannon Flynn

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

In re: College Athlete NIL Litigation, Case No. 4:20-cv-03919

The Honorable Claudia Wilken

# DECOLORATION OF GANNON FLYNN

I, Gannon Flynn, hereby declare as follows pursuant to 28 U.S.C. §1746:

House v. NCAA is a landmark case that will forever affect college sports. Its ramifications will spread beyond Division 1 sports and eventually reach the lower levels as well.

I am a swimmer at the University of Utah, and while this case was brought by a swimmer, I and many others do not believe this settlement should take effect. This settlement will not benefit the NCAA as a whole, and the injunctive relief part of it will cause more harm than good.

In general, the revenue-generating sports for D1 schools are football and men's basketball. While women's basketball and volleyball can generate revenue at some schools, these are typically not primary generators. With a rough estimate of around 30,000 people participating in those sports, they make up just under 16% of the Division 1 athletes who will be

affected by this settlement. That leaves 160,000 other student-athletes who are not in revenue-generating sports that will be affected by this case.

I believe that NIL has a place in college athletics; however, there should be limitations to that. College was never intended and never should be a means to become rich off sports. It has always been a platform to grow and attract possible sponsors or pro teams after college. Players should be able to get paid for clothing with their names on them or for doing commercials for private organizations; however, athletes should not get paid directly from their institutions.

I agree that athletes should be rewarded for putting in the additional work and all the time into our sports; that is exactly what scholarships are. We as athletes receive discounted or even free education because we are athletes. Additionally, we are eligible to receive academic stipends established from National Collegiate Athletic Association v. Alston, a case that you presided over.

However, this case is very different from the previous cases. This case will completely throw the NCAA's amateurism model out the door. In the Supreme Court case NCAA v. Board of Regents of the University of Oklahoma (1984), Justice Stevens wrote in the majority opinion, "The NCAA plays a critical role in the maintenance of a revered tradition of amateurism in college sports. There can be no question but that it needs ample latitude to play that role." If passed, this settlement will violate the precedent that the Supreme Court has established. This settlement will change college from being about getting an education to making money, and we will no longer be student athletes but athlete students.

The Ninth Circuit Court of Appeals, which has jurisdiction over California, has already rejected pay-to-play models in O'Bannon v. NCAA, where the court allowed scholarships to cover the full cost of attendance but did not allow for paying athletes directly for their athletic participation. The court acknowledged that the NCAA's rules are in place to promote competitiveness; the majority opinion written by Judge Jay Bybee of the Ninth Circuit Court of Appeals states that, "We therefore conclude that the NCAA's compensation rules serve the two procompetitive purposes identified by the district court: integrating academics with athletics, and 'preserving the popularity of the NCAA's product by promoting its current understanding of amateurism.'" Additionally, the court highlighted the importance of maintaining the distinctions between college and professional sports with, "The NCAA's commitment to amateurism plays a 'critical role in the maintenance of the revered tradition of amateurism in college sports.' Maintaining this distinction between college and professional sports is necessary to preserve the character and quality of the NCAA's 'product.'". The court illustrated its reasoning as to why it rejected pay-to-play, showing the importance of amateurism; something that this settlement would throw out the window.

While the Supreme Court case NCAA v. Alston (2021) did change the rules regarding covering more than the cost of attendance, Justice Gorsuch's majority opinion emphasized that allowing the education-related benefits such as graduate school scholarships and other benefits did not violate amateurism, nor did it blur the lines between professional and amateur. House v. NCAA does. It completely throws amateurism out the door and paves the way for college athletics to be pay-to-play.

This settlement would also institute roster limits for all sports. Some conferences are planning on instituting lower roster limits than specified due to Title IX rules. For example, the limit for swimming and diving is 30 guys and 30 girls by the NCAA; however, the SEC will have to limit guys to 22 due to Title IX. That will lead to even more athletes who have worked their whole lives to get to this level who will have their dreams taken from them just so revenue-generating athletes can get paid more. ESPN estimates that over 10,000 Division 1 athletes will lose their spots due to this limit.

Additionally, non-revenue-generating sports rely on the money generated by football and basketball to survive. The athletics budget is made up of the revenue from all sports. Every dollar that is paid out to athletes will need to be made back by the athletics departments either by raising prices for fans or by cutting expenses such as non-revenue-generating sports. Sports Illustrated estimates that in addition to the 10,000 people who will lose their roster spot due to roster limits, an additional 15,000 athletes will lose their sports entirely due to programs getting cut. Athletic departments need to make up for the massive amounts of money that this settlement will cost them. There is no free lunch; the money has to come from somewhere, and it will end up hurting the fans and ultimately it will hurt other athletes that have spent their entire lives working to compete in college. These athletes have poured their blood, sweat, and tears into their sport only to lose their opportunity because the revenue-generating sport athletes want to get paid more than they already do.

The revenue-generating athletes already get paid in the form of scholarships/Alston money and their NIL deals with companies and NIL collectives that provide benefits such as leased free cars for them and cash rewards already. This settlement serves no other purpose

than to make those athletes as much money as possible while penalizing the other 160,000 athletes who work just as hard. This settlement will only benefit a very small number of athletes while harming the overwhelming majority.

This settlement claims that student athletes have the right to revenue generated by the school. Coming from Texas where high school football generates a large amount of revenue and where stadiums are larger and better than some colleges, where does this "right" to the revenue being generated stop? Going by the logic in this case, it would open the floodgates to high schoolers suing their schools for the revenue generated by their games, or even the middle school football players claiming their "right" to money generated by theirs. This settlement completely takes away the reason why we go to school. We are STUDENT ATHLETES, not athlete students.  Even the Supreme Court has recognized the importance of amateurism in college sports; and yet this settlement seems to completely ignore the founding principles of college sports that have been previously established.

Team USA's Paris Olympic team was made up of 75% current, former, or future NCAA athletes, with 14 teams being completely NCAA athletes. Additionally, 800 people competing for foreign Olympic teams were from the NCAA. These roster limits will severely harm the US Olympic team in the future. The International Olympic Committee does not pay Olympians for their participation despite how much they make from the Olympics. While individual countries can pay the professional athletes for the medals that they take home, they do not share in the broadcasting rights or revenue generated by the Olympics. The NCAA should be no different in that sense. Athletes do not and should not have a right to the direct revenue generated from their athletic events.

Even Grant House, the face case of this class action, admitted to Yahoo News that he never wanted or agreed to institute such restrictive roster limits. This case has turned into something that the head plaintiff doesn't agree with and something that tens of thousands of other student athletes don't either. This case will hurt college athletics more than it helps.

This case, while on the surface seems to be an amazing thing for college athletics, it isn't. The money that revenue-generating athletes will get will be taken away from Olympic sports and non-revenue-generating sports, with tens of thousands of student athletes losing their dreams of being Division 1 athletes. Many schools have said that while they are allowed to up the amount of scholarships that can be given to athletes, they are unlikely to do so in sports other than football. Even the schools that are planning on upping the available scholarships in select sports, there are many more who will lose their roster spots in order to compensate for that cost. The money has to come from somewhere, and it will hurt college athletics overall.

Your Honor, if you approve this settlement, it will cripple non-revenue-generating sports. Tens of thousands of Division 1 athletes will lose the dreams they are living today and that they have spent over a decade working towards. This case will do more harm than good and only serves to benefit a very small portion of the NCAA while harming the majority. Most teams will be forced to say goodbye to members of their college families just so some people can get a payday.  This settlement will tear the NCAA apart, an American icon like no other. On behalf of the non-revenue-generating sports and the tens of thousands of student athletes who will lose their roster spots: Please do not approve this settlement. We have worked just as hard as the revenue-generating sports' athletes in order to reach this level and earned the privilege to

compete for our schools. This settlement tilts the balance too far, sacrificing our dreams so the revenue-generating sports athletes can be paid-to-play directly by the college.

I declare under penalty of perjury that the forgoing is true and correct.

01/19/2025

P
usps.com
$12.04
US POSTAGE
9410 8301 0935 5002 2265 38 0083 4000 0209 4612
01/21/2025
US POSTAGE PAID
Click-N-Ship®
Mailed from 84112 097346239462652
PRIORITY MAIL®
GANNON FLYNN
UNIT 5445
265 S 1850 E
SALT LAKE CITY UT 84112-0910
01/24/2025
RDC 03
SIGNATURE REQUIRED
C037
RONALD V. DELLUMS FEDERAL BUILDING &
C/O CLASS ACTION

CLAY ST # 1350N
OAKLAND CA 94612-5217
USPS SIGNATURE TRACKING #
9410 8301 0935 5002 2265 38
RECEIVED
JAN 27 2025
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA



