Michael P. Lehmann (CA Bar No. 77152)
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel. No.: (415) 633-1908
mlehmann@hausfeld.com

Michael D. Hausfeld (*pro hac vice*)
Nicholas Murphy (*pro hac vice*)
Theodore DiSalvo (*pro hac vice*)
**HAUSFELD LLP**
888 16th Street, NW, Suite 300
Washington, DC 200006
Tel. No.: (202) 540-7200
Fax No.: (202) 540-7201
mhausfeld@hausfeld.com
nmurphy@hausfeld.com
tdisalvo@hausfeld.com

*Counsel for Objectors*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## (OAKLAND DIVISION)

| | |
|---|---|
| **IN RE: COLLEGE ATHLETE NIL LITIGATION** | Case No. 4:20-cv-03919-CW |
| | **OBJECTION TO SETTLEMENTS ON BEHALF OF CLASSES OF PAST, CURRENT AND FUTURE NCAA COLLEGE ATHLETES** |
| | Hon. Claudia Wilken |

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................. 1

II.    ARGUMENT ....................................................................................................... 2

A.  The IRCS Should Not Receive Final Approval. ................................................ 2

  1.  The Negotiation Of The IRCS Raises Significant Concerns. ........................ 2

  2.  Legal Issues Raised In Connection With The IRCS. .................................... 6

    a.  The Terms Of The IRCS Violate Federal Antitrust Law. ........................... 6

    b.  The Terms Of The IRCS Also Violate Applicable State Laws..................... 9

    c.  The Terms Of The IRCS Violate The NCAA's Constitution. ................... 11

  3.  Structural And Procedural Issues With The IRCS. ...................................... 12

    a.  There Is No Basis for a $21 Million Cap And No Floor. ......................... 14

    b.  The IRCS Improperly Limits What Revenue Will Be Shared. ................. 15

    c.   Revenue Sharing Under The IRCS Is Illusory In Other Ways................. 18

    d.  The IRCS Is Intended To Unfairly Restrict NIL Collectives................... 21

B.  The DCS Should Not Receive Final Approval. ............................................... 23

III.   CONCLUSION ................................................................................................. 25

OBJECTION TO SETTLEMENTS ON BEHALF OF CLASSES OF PAST, CURRENT
AND FUTURE NCAA COLLEGE ATHLETES

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.D. Bedell Wholesale Co., Inc. v. Philip Morris, Inc.*,
   263 F.3d 239 (3d Cir. 2001) ................................................................................1

*Brown v. Pro Football Inc.*,
   518 U.S. 231 (1996) ...........................................................................................13

*Carson v. American Brands, Inc.*,
   450 U.S. 79 ..........................................................................................................1

*Citizens United v. Federal Election Comm'n*,
   558 U.S. 310 (2010) ...........................................................................................23

*Crue v. Aiken*,
   370 F.3d 668 (7th Cir. 2004) .............................................................................22

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) .............................................................................2

*In re Smith*,
   926 F.2d 1027 (11th Cir. 1991) .........................................................................10

*Jackson Purchase Rural Elec. Co-op. Ass'n v. Loc. Union 816*,
   646 F.2d 264 (6th Cir. 1981) .............................................................................10

*Johnson v. NCAA*,
   108 F.4th 163 (3d Cir. 2024) ...............................................................................9

*Keith v. Volpe*,
   118 F.3d 1386 (9th Cir.1997) .........................................................................9, 10

*League of Residential Neighborhood Advocs. v. City of Los Angeles*,
   498 F.3d 1052 (9th Cir. 2007) ........................................................................9, 10

*NCAA v. Alston*,
   141 S. Ct. 2141 (2021) ...............................................................................6, 7, 21

*NCAA v. Bd. Of Regents of Univ. of Okla.*,
   468 U.S. 85 (1984) ...............................................................................................6

*O'Bannon v. NCAA*,
   7 F.Supp.3d 955 (N.D. Cal. 2014) .......................................................................6

*San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon*,
   359 U.S. 236 (1959) ............................................................................................9

*Tennessee v. NCAA*,
   2024 WL 755528 (E. D. Tenn. Feb. 23, 2024) ............................................15, 21

*Travis Unified Sch. Dist. v. Bell*,
   2017 WL 3208715 (E.D. Cal. July 28, 2017) ....................................................2

**Statutes**

20 U.S.C. §1681 ......................................................................................................23, 24

29 U.S.C. §157 ..............................................................................................................9

29 U.S.C. §158 ..............................................................................................................9

**Rules**

Fed. R. Civ. P. 23 ......................................................................................................1, 2

**Other Authorities**

Audrey sports!, @audreydevaughn,
   (TikTok), https://www.tiktok.com/@audreydevaughn/video/7450660320835
   603758 (Dec. 21, 2024) ...............................................................................23

Ben Fowles, *How To Bet On College Football In 2025* (Oct. 17, 2024)
   (available at https://www.legalsportsreport.com/how-to-bet/college-football/
   (last visited Jan. 10, 2025)) ...........................................................................16

Compl. (Dec. 1, 2023), *Schroeder v. University of Oregon* (Dist. Or.) ....................23

Compl. (Sept. 9, 2024), *State of South Dakota, et al. v. NCAA* (S. Dakota Circuit
   Court Third Judicial Circuit) .........................................................................11

Dan Murphy*, Plaintiffs' letter adds wrinkle to $1.8 billion NCAA settlement*
   (Dec. 10, 2024), https://www.espn.com/college-
   sports/story/_/id/42893047/ncaa-house-settlement ........................................6

David Steele, *NCAA Must Give Up Control To Reach Suitable NIL Settlement*,
   Competition Law 360 (Sept. 18, 2024). ..........................................................8

Letter by Governors Of Idaho, Montana, North Dakota, South Dakota and
   Wyoming To NCAA (Sep. 17, 2024)..............................................................11

Marc Edelman & Michael Carrier, *Of Labor, Antitrust, and Why the Proposed House Settlement Will Not Solve the NCAA's Problem*, Fordham L. Rev. (Forthcoming 2025) ............................................................................................. 7

Nicole Auerbach & Justin Williams, *What to Know about House v. NCAA Settlement and a Historic Day for College Sports*, Athletic (May 24, 2024) ..................... 14

On3 NIL Valuations, https://www.on3.com/nil/rankings/player/nil-valuations/ (last visited Jan. 28, 2025) .......................................................................... 19

Opendorse, https://opendorse.com/about/ (last visited Dec. 20, 2024) ....................................... 21

Ross Dellenger, *Historic House-NCAA settlement leaving hundreds of Olympic sport athletes in peril*, Yahoo!Sports (Oct. 25, 2024) ........................................................ 5, 6

Virginia HB 1505, *Intercollegiate athletics; student-athletes, compensation for name, image, or likeness* (2024 Session), https://legacylis.virginia.gov/cgi-bin/legp604.exe?241+sum+HB1505 .......................................................... 11

Yaman Desai, *Proposed NIL Deal Leaves NCAA Antitrust Liability Door Open*, Competition Law 360 (Aug. 2, 2024) .................................................................................. 14, 15

## I.     INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 23(e), Hausfeld LLP ("Hausfeld"), on behalf of eight past, present, or future Division I college athletes (Liam Anderson, Jordan Bohannon, Kaira Brown, Talanoa Ili, Ezekiel Larry, Dyson McCutcheon, and R.J. Sermons) (collectively, "Objectors"), hereby files objections to three proposed amended Damage Classes Settlements (collectively "DCS") and a proposed Injunctive Relief Class Settlement ("IRCS") (collectively, "Settlements"), negotiated by Class Counsel and the National Collegiate Athletic Association ("NCAA") and members of its Power 5 conferences. The particulars regarding each of the Objectors are described in Appendix A.

On October 7, 2024, this Court entered an order approving preliminarily the proposed Settlements. It instructed potential objectors to file any objections by January 31, 2025. ECF No. 544 at 9. This filing, including the appendices thereto, contains those objections. The Court has scheduled a hearing on final approval of the proposed Settlements for April 7, 2025, at which counsel from the Hausfeld firm requests an opportunity to be heard. *Id*. at 10.

In order for the proposed Settlements to receive final approval, at least three conditions must be satisfied, none of which are met here. *First*, the proposed Settlements themselves must not be illegal. *See A.D. Bedell Wholesale Co., Inc. v. Philip Morris, Inc*., 263 F.3d 239, 249-250 (3d Cir. 2001), *cert. denied*, 534 U.S. 1081 (2002) (footnotes omitted) (holding that plaintiffs properly pled an antitrust violation by alleging defendants agreed to form an output cartel through the Multistate Tobacco Settlement Agreement). The proposed Settlements violate multiple federal and state laws. The United States Department of Justice ("DOJ") agrees with Objectors that the revenue sharing structure in the IRCS violates federal antitrust law. ECF No. 595 at 6-8. The DOJ's brief has an appendix (ECF No. 595-2) that reveals the NCAA's overarching plan: convince this Court to give final approval to the proposed Settlements and then rely on that ruling as a "defense to liability" in future antitrust challenges to it, while having a decade (the period covered by the IRCS) to convince the United States Congress to give it antitrust immunity. The Court is respectfully requested not to allow such a misuse of Fed. R. Civ. P. 23. *See Carson v. American*

1    *Brands, Inc.*, 450 U.S. 79, 88 n. 14 (1981) (in approving proposed settlements, courts "do not

2    decide the merits of the case or resolve unsettled legal questions." *See* ECF No. 595 at 10.

3         *Second*, the terms of the proposed Settlements should not be so vague, uncertain, or one-

4    sided as to be unenforceable. *E.g., Travis Unified Sch. Dist. v. Bell*, Civ. No. 2:17-0808 WBS AC,

5    2017 WL 3208715, at *5 (E.D. Cal. July 28, 2017) (citing California law). Here, terms like

6    "revenue", "benefits", or "third parties" are critical to the proposed Settlements, but are not well

7    defined or inexplicably exclude items that the NCAA has commonly treated as being encompassed

8    within those terms and will be a source of continuing dispute. Thus, the finality and certainty one

9    would expect the proposed Settlements to achieve is absent under both federal and state laws.

10         *Third*, the proposed Settlements must be "fair, adequate, and reasonable" pursuant to

11    Federal Rule of Civil Procedure 23(e). *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th

12    Cir. 1998). Here, the DCS fails to compensate college athletes adequately for use of their names,

13    images and likenesses ("NIL"), compared with what college athletes have been paid for such use

14    since July of 2021, when the NCAA's formal policy changed. The IRCS imposes an unfair cap

15    (but, significantly, no floor) on revenue sharing by colleges, detrimentally excludes revenue

16    sources that should have been included, requires that NIL payments and other items be unfairly

17    offset against the revenue each college athlete will get, deprives current college athletes of critical

18    existing scholarships, and operates restrictively against NIL collectives. The recommendations of

19    Class Counsel are not dispositive here, given their conflict of interest discussed below.

20    **II.    ARGUMENT**

21        **A.    The IRCS Should Not Receive Final Approval.**

22            **1.    The Negotiation Of The IRCS Raises Significant Concerns.**

23         In order to understand the problems inherent in the IRCS, it is first necessary to recount

24    briefly the circumstances under which it was negotiated and summarize the terms that the NCAA

25    insisted be included in it that raise serious concerns about its fairness, reasonableness, and

26    adequacy.

27

28

**OBJECTION TO SETTLEMENTS ON BEHALF OF CLASSES OF PAST, CURRENT**
**AND FUTURE NCAA COLLEGE ATHLETES**

1    According to Class Counsel, they first negotiated the DCS with the Defendants and then

2    commenced discussing the IRCS with the NCAA and Power 5 conferences. As stated by Steve

3    Berman ("Berman") in the hearing on preliminary approval (Tr. 45, ECF No. 525), when he and

4    Jeffrey Kessler ("Kessler") "floated" the idea of "revenue sharing both for compensation and NIL

5    [name, image, and likeness]", Defendants told them that "might be a good solution." Neither

6    Berman or Kessler anticipated that response. Both of them "fell off our chairs, literally." Berman

7    added that "I was so surprised that when I got out of my Uber, I left my luggage on the curb

8    because it was such a shocking development."

9    Berman claimed that Class Counsel got for college football and basketball the "home run"

10   of a "50 percent revenue share" similar to what professional athletes earn and that therefore, no

11   "indicia of any conflict" existed. However, as explained below, the 50% figure is illusory, and

12   ignores: (a) the far greater scope of revenue sources encompassed in collective bargaining

13   agreements ("CBAs") between professional athletes and entities such as the National Football

14   League ("NFL") and the National Basketball Association ("NBA"); and (b) the deceptive revenue

15   accounting methods used by the NCAA in the IRCS. Far from providing college athletes with the

16   same share of revenue that their professional counterparts are guaranteed, the IRCS is riddled with

17   conditions, omissions, and loopholes that make it very uncertain what colleges will actually pay

18   athletes, but ensure that any payment will likely be far less than professionals get and subject to

19   many exceptions not present in CBAs between teams and players in the NFL or NBA.

20   There are numerous "indicia of conflict" embedded in the IRCS. Given that it was the

21   NCAA that proposed this deal, it came with extensive restrictions and requirements, as also

22   explained in detail below. The amounts of revenue to be shared were capped at 22% ($21 million)

23   and had no floor; thus, colleges were under no legal obligation to pay that or any lesser amount.

24   In fact, colleges could choose to offer zero dollars in shared revenues. The revenue to be shared

25   was subject to an inordinate number of spurious setoffs that reduced its value considerably. The

26   monetary streams identified for sharing in the ICRS excluded many lucrative sources that the

27   NCAA routinely characterizes as "revenue."  The sharing mechanism was closely overseen by the

28

NCAA and disputes concerning the amounts given to college athletes are subject to mandatory arbitration where IRCS members are compelled to use the services of only Berman's and/or Kessler's firms for the ten years following the effective date of the IRCS. The revenue sharing came with cuts in existing college athlete rosters that are already wreaking havoc, and artificial limits on new scholarships that will injure non-revenue creating sport programs at numerous colleges. And most importantly, if a Court-approved final settlement cannot fully shield the NCAA from antitrust liability, it plans to seek such relief from the United States Congress--**with Class Counsel's active support**. The IRCS also contemplates the NCAA getting preemption of the many state laws that conflicted with its proposed revenue sharing structure.

The agreement by Class Counsel to support the position that the Court's approval of the proposed Settlements provides an automatic antitrust defense and to support an effort to secure Congressional antitrust immunity if that argument falls reflects an irreconcilable conflict due to the disparate interests of the members of the proposed Classes. The result is a conflict between Class Counsel and those Classes. *See also* ECF Nos. 602, 605.

The actions of Class Counsel themselves reflect this conflict. In his declaration in support of attorneys' fees, Berman stated in ECF No. 583-2 at 11 (footnote admitted):

> [t]hroughout this litigation, Defendants engaged in an aggressive, years-long campaign to lobby for legislation that would exempt them from the antitrust laws and allow them to continue their unfair restrictions on college athletes, collectively spending nearly $10 million dollars on lobbying between 2021 and 2024. Class Counsel expended significant effort and resources, to protect the classes' interests against Defendants' attempts to kill this lawsuit…. [ECF No. 583-2 at 11 (footnotes omitted).]

As an example, in a July 3, 2020 letter to Congress (Appendix B), Berman opposed the request for antitrust immunity by the NCAA on the grounds that it would impair the legal rights of college athletes and undermine the purpose of those laws.

Yet under the IRCS:

> ***Class Counsel will use reasonable efforts to support the portions of any proposed federal or state legislation implementing/codifying this Injunctive Relief Settlement, including reasonably cooperating to support antitrust immunity for conduct undertaken by Defendants in compliance with or to implement the terms***

***of this Injunctive Relief Settlement during the Term or any court-approved extension thereof, and preemption of any state law existing before or as of the date of Final Approval in conflict with this Injunctive Relief Settlement. Class Counsel will not oppose, advocate against, lobby in any way against, or otherwise attempt or seek to undermine legislation implementing/codifying this Injunctive Relief Settlement.*** Class Counsel further agree, during the Term, to take no position and thus be neutral on any proposed, pending, or future local (e.g., city/county), state, or federal legislation provisions which would provide student-athletes with benefits in addition to those permitted by this Injunctive Relief Settlement.

ECF No. 535-1, Appendix A at 27 (emphases added).

This about face significantly implies divided loyalties that do not serve the interests of the Classes.

College athletes and/or their parents, such as John Weidenbach, Dawn Jevnick, Noah Henderson, Kevin Cunneen Jr., Camden Dempsey, Emma Reathaford and anonymous persons have expressed great concerns about how the IRCS is causing reductions in existing rosters and affecting adversely existing sports scholarships even ***before*** this Court has finally approved it. ECF Nos. 574-75, 579, 589, 592, 597, 602, 604-05. Indeed, Grant House ("House"), one of the named plaintiffs, is on record as saying that he did not agree to any such roster limitations that could cost his sport hundreds of lost positions, Class Counsel rarely communicate with him, and he was "shocked" at their $700 million fee request (Appendix W). An objection submitted by the Recruiting Class of 2025 noted that "you [the Court] may be unaware of the impact the NCAA case is having on the recruiting class of 2025. The newly proposed roster limits are taking a disproportionate number of recruiting/roster spots away from the class of 2025--in comparison to both prior and future recruiting years." ECF No. 573.[1]

---

[1] *See* Ross Dellenger, *Historic House-NCAA settlement leaving hundreds of Olympic sport athletes in peril*, Yahoo!Sports (Oct. 25, 2024), https://sports.yahoo.com/historic-house-ncaa-settlement-leaving-hundreds-of-olympic-sport-athletes-in-peril-125238713.html (Appendix C) ("Hundreds of college prospects, many of them participating in Olympic sports, are in a precarious position as the signing date approaches. Schools have eliminated roster spots and, for some, scholarship offers that they were once promised. Meanwhile, several dozen current college athletes are being notified that they are no longer part of their teams — some of the notifications arriving after the fall semester even began. The actions are a result of a significant and overshadowed roster change affiliated with the NCAA's historic settlement of an antitrust lawsuit (*House*). While the NCAA

OBJECTION TO SETTLEMENTS ON BEHALF OF CLASSES OF PAST, CURRENT
AND FUTURE NCAA COLLEGE ATHLETES

The adverse effects of the proposed Settlements were also discussed in an open letter to the Court from three of the named plaintiffs (House, Sedona Price, and Nya Harrison):

> ***Currently, <u>the NCAA, conferences, schools, and their respective collectives are using the proposed settlement to define financial frameworks, consider restrictive contracts for athletes, adjust rules that infringe on athletes' rights, and lobby Congress for an antitrust exemption</u>***….Without independent, formal representation separate from schools or their affiliates, ***athletes will inevitably remain in a vulnerable position, perpetuating the cycle of inequity and paving the way for continued litigation***.

ECF No. 580 at 2 (emphases added). This is an admission by these Plaintiffs that the ***IRCS is being used by the NCAA***, ***its conferences, and schools to exploit and injure the members of the IRCS Class***. Kessler is on record as being aware of the contents of this letter.[2]

### 2.    Legal Issues Raised In Connection With The IRCS.

#### a.    The Terms Of The IRCS Violate Federal Antitrust Law.

For the last 40 years, the federal antitrust laws have been the optimal tool for challenging the anticompetitive conduct of the NCAA and its conferences and colleges, beginning with the United States Supreme Court's decision in *NCAA v. Bd. Of Regents of Univ. of Okla.*, 468 U.S. 85 (1984); continuing with *O'Bannon v. NCAA*, 7 F.Supp.3d 955 (N.D. Cal. 2014), *aff'd and rev'd in part*, 802 F.3d 1049 (2015), *cert. denied*, 580 U.S. 815 (2016) ("*O'Bannon*"); and most recently manifested in the Supreme Court's unanimous ruling in *NCAA v. Alston*, 141 S. Ct. 2141 (2021) ("*Alston*"). The terms of the IRCS on their face violate existing federal antitrust law established by these and other cases. As Justice Brett Kavanaugh said in his concurring opinion in *Alston*, "***[p]rice-fixing labor is price-fixing labor. And price-fixing labor is ordinarily a textbook antitrust problem*** because it extinguishes the free market in which individuals can otherwise

---

and power conferences agreed to expand upon scholarships as part of the settlement, they also imposed roster limits for sports, many of which did not previously exist. Such a change will result in thousands of lost roster spots for mostly walk-on athletes and those on partial scholarship — a consequence that, while previously reported by Yahoo Sports, has now sparked outrage from hundreds of parents of athletes or prospective athletes whose spots have been or will soon be eliminated.").

[2] *See* Dan Murphy, *Plaintiffs' letter adds wrinkle to $1.8 billion NCAA settlement* (Dec. 10, 2024), https://www.espn.com/college-sports/story/_/id/42893047/ncaa-house-settlement.

1 obtain fair compensation for their work. …Businesses like the NCAA cannot avoid the

2 consequences of price-fixing labor by incorporating price-fixed labor into the definition of the

3 product." *Id*. at 2167-68 (emphases added). Here, the IRCS embodies a written agreement among

4 Division I colleges to cap the amount of revenue shared with (and hence a portion of the

5 compensation given to) college athletes.

6       In order for the IRCS to pass muster, it **requires a grant of antitrust immunity** from the

7 United States Congress, as discussed in Article 7, Section 1 of its provisions (ECF No. 535-1,

8 Appendix A at 27). Without such immunity, it **would be deemed unlawful on its face**. The DOJ

9 agrees. ECF No. 595 at 6-8. Thus, to the extent that the NCAA will argue that any final approval

10 of the IRCS operates as an antitrust defense without more, it is simply wrong. *See id.* at 10. As

11 Marc Edelman ("Edelman"), a Professor of Law, Baruch College, Zicklin School of Business and

12 Director of Sports Ethics, Robert Zicklin Center for Corporate Integrity, put it in discussing the

13 IRCS, "[p]arties to a settlement cannot engineer their own exemption from antitrust law."[3]

14       The IRCS also operates to prevent the Court from exercising authority over its illegal terms.

15 Any future rule changes or modifications to it do not require submission to the Court; they only

16 require that "Class Counsel" get to review and provide approval. *See* Section 3(d) of the IRCS.

17 This underscores the built-in mechanism that Class Counsel and NCAA have agreed to, which is

18 premised on the assumption that the Court will bless this unlawful agreement in such a way that

19 the NCAA can use its decision as a complete defense against further antitrust liability.[4]

20       The myriad antitrust problems posed by the IRCS have been noted by legal commentators

21 who have been highly critical of it. For example, in one article, Kate Roggio Buck, a partner at

22

23

---

24 [3] Marc Edelman & Michael Carrier, *Of Labor, Antitrust, and Why the Proposed House Settlement*
25 *Will Not Solve the NCAA's Problem*, Fordham L. Rev. (Forthcoming 2025) ("Edelman & Carrier")
(Appendix D).
26 [4] The most recent example of such proposed legislation, as noted in a May 8, 2024 article in *USA*
*Today* (Appendix E), is a bill proposed by two Republican Congressmen "that would give the
27 NCAA, conferences and colleges the type of protections from antitrust lawsuits they are seeking",
which the article ties to the settlement discussions in this case.

28

McCarter & English LLP and a well-recognized legal expert on compliance with NCAA and state regulations governing NIL policies, explained:

> It's like, Wow, big settlement, we're gonna pay athletes a lot of money, but we're still gonna limit the fair market competition, essentially. They say they want athletes to be paid, they want athletes to be paid fair market value, they're supporting athletes and all of that, but it seems that they're trying to leave it to themselves to decide what fair market value is.[5]

In her view, the proposed IRCS is illusory-- a subterfuge because "[t]hat's the crux of all this in the first place. There has to be a legitimate release of that control, and fair market has to truly mean fair market." Instead, "the NCAA is sending the message that it will operate as it always has: 'We're going to repaint it. It's going to look completely different, but it's actually still the same structure.'"

In the same article, Edelman voiced similar concerns: "[s]imply trying to put new restraints into practice via settlements that restrict free market competition for college athlete services, and that at the same time are not collectively bargained, is not a viable path."[6] In his accompanying declaration ("ED"), he reiterates that the revenue sharing limits of the IRCS function as the equivalent of a "salary cap" and are inherently unlawful. ED at 2-4 (Appendix F). Stephen Ross ("Ross"), a Professor of Law and the Lewis H. Vovakis Distinguished Faculty Scholar at the Penn State Center for the Study of Sport in Society at the Pennsylvania State University and a Co-Director of the Penn State Center for the Study of Sport in Society at that institution, expresses a similar view at pages 1-4 of his accompanying declaration ("RD"). Appendix G. So do emeritus economic professors Rodney Fort ("Fort") and Roger Noll ("Noll"), who specialize in antitrust and sports economics and have served as expert witnesses in cases involving such issues, at page 20 of their joint declaration ("FND"). Appendix H. All of these concerns are why the NCAA now expects Class Counsel to help in achieving its goal of antitrust immunity.

---

[5] David Steele, *NCAA Must Give Up Control To Reach Suitable NIL Settlement*, Competition Law 360 (Sept. 18, 2024). (Appendix I).
[6] *Id.*

1   Antitrust immunity for the NCAA on the basis of the proposed Settlements will have
2   significant adverse effects on current and future college athletes. For example, without the benefit
3   of collective bargaining and with a grant of immunity, the Division I colleges would be permitted
4   to collude on athlete compensation and neglect issues concerning such athletes' health and safety
5   (its original mission), and academic concerns with impunity. The antitrust laws are the bulwark
6   that has so far prevented the NCAA, its conferences, and its colleges from trampling over the rights
7   of college athletes; the IRCS will irrevocably change that.[7]

8   **b.    The Terms Of The IRCS Also Violate Applicable State Laws.**

9   It is well-settled that a federal settlement cannot trump contrary state laws.[8] Here, the terms
10  of the IRCS are directly contrary to numerous state laws that expressly prohibit the limitations on
11  NIL and NIL Collectives this Settlement seeks to impose. *See* Appendix J (summarizing these
12  state laws). Significantly, however, a federal settlement is not part the United States Constitution,
13  nor is it a law of the United States to which the Constitution's Supremacy Clause applies.

---

[7] In terms of federal law violations, the entire IRCS is likely preempted by federal labor law. In *San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon*, 359 U.S. 236, 245 (1959)the Supreme Court held that federal courts must defer to the exclusive competence of the National Labor Relations Board ("NLRB") when adjudicating matters that even "arguably" relate to rights provided under the National Labor Relations Act ("NLRA"), such as the right of employees to bargain collectively through representatives of their own choosing. *See* 29 U.S.C. §157. Because college athletes are arguably employees (*see Johnson v. NCAA*, 108 F.4th 163 (3d Cir. 2024)) and the IRCS constitutes a substitute for collective bargaining, final approval of it would be preempted by the NLRA. In addition, the IRCS may also violate Section 8(a)(2) of the NLRA, which provides that it is an unfair labor practice for an employer "to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it." 29 U.S.C. §158(a)(2). Objectors believe that is occurring here. However, in the amended DCS, Class Counsel and the NCAA agreed that "unreleased claims" include claims under any federal labor law. ECF No. 535-2 at (A)(vv). Terms that are defined in the DCS apply to the IRCS as well. *See id.*, Appendix A, Article 1, Section 2. Objectors therefore reserve the right to bring this issue to the attention of the NLRB.

[8] *See, e.g.*, *League of Residential Neighborhood Advocs. v. City of Los Angeles*, 498 F.3d 1052, 1055 (9th Cir. 2007) ("*LRNA*") (explaining that "[a] federal consent decree or settlement agreement cannot be a means for state officials to evade state law."); *Keith v. Volpe*, 118 F.3d 1386, 1393 (9th Cir.1997) ("*Keith*") (holding that state officials "could not agree to terms which would exceed their authority and supplant state law.").

28

The NCAA's proffered solution is to ask for preemption of any existing state laws in conflict with the IRCS. Unless that happens, the IRCS is unlawful on this ground as well. Yet courts, including those in the Ninth Circuit, have repeatedly found that efforts to do so are improper and invalidate the terms of the settlement agreement as unenforceable and/or void against public policy.[9]  They have long recognized the principle of comity as it applies to federal settlements and their applicability to state law. Specifically, as the Ninth Circuit explained in *LRNA*:

> By placing its imprimatur on the Settlement Agreement, the district court effectively authorized the City to disregard its local ordinances in the name of RLUIPA. Such judicial action is authorized only when the federal law in question mandates the remedy contained in the settlement. *See Keith,* 118 F.3d at 1393 ('Under the Constitution, the district court could not supersede California's law unless it conflicts with any federal law.'). As summarized by the Seventh Circuit: [U]pon properly supported findings that such a remedy is *necessary* to rectify a *violation of federal law,* the district court can approve a consent decree which overrides state law provisions. Without such findings, however, parties can only agree to that which they have the power to do outside of litigation.

498 F.3d at 1058 (emphases in original).

This principle is significant here because several states have laws that strictly prohibit the NCAA, athletic conferences, and member schools from interfering *in any respect* (including caps) with a college athlete earning NIL compensation and/or the existence of NIL Collectives. *See* Appendix J. Indeed, five states (California, Georgia, Ohio, Illinois and Virginia) have laws or executive orders that allow universities to pay players **without limits**. *Id.*

Some of these states expressly prohibit colleges and universities from providing NIL benefits, instead implicitly delegating such authority to the market forces represented by NIL Collectives. *Id.* (entries on Montana and Oregon laws). As another example, on April 18, 2024,

---

[9] *See LRNA*, 498 F.3d at 1056 (finding "the Settlement Agreement…invalid and unenforceable under state law" because the conduct sought to be remedied did not violate federal law yet attempted to circumvent state law by including language in the settlement agreement directly contrary to state law); *In re Smith*, 926 F.2d 1027, 1029 (11th Cir. 1991) (explaining that settlements are void against public policy where they directly contravene a state or federal statute or policy); *Jackson Purchase Rural Elec. Co-op. Ass'n v. Loc. Union 816,* 646 F.2d 264, 267 (6th Cir. 1981) ("As the authorities cited above make clear, there is a strong presumption that agreements in violation of a statute will not be sanctioned by the courts.").

**OBJECTION TO SETTLEMENTS ON BEHALF OF CLASSES OF PAST, CURRENT AND FUTURE NCAA COLLEGE ATHLETES**

Governor Glenn Youngkin signed the nation's first legislation providing Virginia's college athletes a private right of action against the NCAA, or any athletic conference, for interfering with a college athlete's NIL rights.[10]

### c.    The Terms Of The IRCS Violate The NCAA's Constitution.

Multiple state officials have been critical of the proposed Settlements because colleges and universities in those states were not given a chance to review them in advance of presentation to this Court. The South Dakota Attorney General filed a lawsuit in state court (since removed to this Court) alleging that "[n]o part of the Settlement[s], including financial components or the injunctive relief fundamentally altering the NCAA's structure, was presented to the full membership for a vote" and that the decision to enter into the proposed Settlements violated the NCAA Constitution and, by extension, the agreement between the NCAA and its member institutions.[11]

Likewise, a letter from five state governors asserted that:

> Additionally, as Big Sky conference Commissioner Tom Wistrcill recently noted, only Power Five conferences were parties to and participated in settlement negotiations. Despite these facts, the proposed settlement puts programs in every state, including small and medium sized programs in our states, on the hook of payment.[12]

Thus, the proposed Settlements--which applies to all colleges in Division I, but was only negotiated and agreed to by the NCAA and the Power 5 conferences--appear to have been executed in violation of the NCAA's own Constitution and in derogation of the agreements between the NCAA and its own members. Their enforceability is therefore highly dubious.

---

[10] *See* Virginia HB 1505, *Intercollegiate athletics; student-athletes, compensation for name, image, or likeness* (2024 Session), https://legacylis.virginia.gov/cgi-bin/legp604.exe?241+sum+HB1505.

[11] Compl. (Sept. 9, 2024), *State of South Dakota, et al. v. NCAA* (S. Dakota Circuit Court Third Judicial Circuit) (now before this Court) (alleging that the Settlements unfairly favor large universities and disfavors female competitors) (Appendix K).

[12] Letter by Governors Of Idaho, Montana, North Dakota, South Dakota and Wyoming To NCAA (Sep. 17, 2024) (Appendix L).

### 3. Structural And Procedural Issues With The IRCS.

The preceding sections have dealt with legal impediments to the IRCS. This portion of the brief will deal with its structural and procedural shortcomings.

It is important to describe briefly the key aspects of the IRCS and the ways in which it caps revenue to be shared. The proposed IRCS permits, but does not require, schools to: (1) continue compensation at the level the NCAA currently allows and (2) provide college athletes with additional compensation from a so-called "benefits pool" (the "Pool") of "revenue" earned each year by "Member Institutions", which are defined as "any college, school, or university that is a member in any sport of NCAA Division I and/or a Conference Defendant, together with any entity owned, controlled, funded, or operated by said college, school, or university (or any division or department thereof)." ECF No. 535-1, Appendix A at Article 1, Section 1(l). These institutions operate as "marketing agents" for college athletes. *Id*. Art 2, Section 2. The Pool cannot exceed 22% of "Average Shared revenue" (capped at $21 million per school) and may stay that way throughout the ten-year term of the injunction period. *Id*. Article 3, Section 1(f). Class counsel's expert, Dr. Daniel Rascher ("Rascher"), speculates without any factual support that colleges will distribute the full value of the pool in 2025-26. Dr. Michael CD ("Cragg"), a former economics professor at Columbia University and the University of California, Los Angeles and now a Senior Partner at Keystone Strategy, says in his accompanying declaration (Appendix M) ("CD") that smaller Division I schools would be unlikely to spend up to the cap and that the Ivy League schools, for example, will likely opt out entirely from revenue sharing. CD at 17 & n. 39.

According to Class Counsel, pursuant to the IRCS, "college athletes **may have** the ability to receive the same percentage of revenues as professional athletes in the NFL, NBA, and other professional leagues." ECF No. 450 at 2 (citing Rascher) (emphases added). Thus, even they concede that what **will** happen under the IRCS is **unclear** and **uncertain**.

More importantly, however, Class Counsel's previously discussed comparison to professional leagues is completely misleading. The NFL and the NBA are national sports leagues where the players are fully unionized and enter into collective bargaining agreements CBAs with

the respective leagues. As explained by Fort and Noll, those CBAs differ substantially from the IRCS (FND at 8-9):

> A striking difference between the IRS and the CBAs is their length and complexity. The IRCS weighs in at 82 pages, consisting of 32 pages of double-spaced main text, a 45-page appendix that describes the NCAA's mandatory Membership Financial Reporting System (MFRS), and 5 pages of another appendix containing proposed roster limits for all Division I sports to replace the current scholarship limits. By comparison, the NBA CBA consumes 676 pages, including a 24-page Table of Contents, 560 single-spaced pages of main text, and 92 pages of exhibits. The NFL CBA has 455 single-spaced pages, including 15 pages for the Table of Contents, 334 pages of main text, and 106 pages of appendixes.
>
> The documents differ in length for two reasons. First, for topics covered in both the IRCS and the CBAs, the latter are much longer and more detailed. Second, the CBAs address many other issues concerning the relationship between a league and its players that the IRCS does not mention. The second category of topics for the most part cover various non-salary benefits and working conditions, and so are mandatory issues for collective bargaining. Thus, excluding them from the IRCS enables the NCAA to exercise unilateral control of these issues as long as athletes do not unionize.
>
> The importance of these differences arises from the fact that the value of a CBA to a professional athlete is the net effect of all of its provisions, reflecting the fact that during the negotiation of a CBA each party may make concessions on some terms in return for better outcomes on other terms. Hence, a ***CBA is not a valid benchmark without further adjustments unless all other features of the CBA deliver no additional net benefits to athletes***. Obviously having a say in determining the amount and nature of non-salary benefits and working conditions is of value to athletes. (Emphases added).

The DOJ has expressed a similar view. ECF No. 595 at 8-10.

The nature of the CBAs negotiated between players and the NFL or NBA has another differentiating consequence. Those two leagues can claim a nonstatutory antitrust exemption that the NCAA cannot. *See* ED at 3 (citing *Brown v. Pro Football Inc.*, 518 U.S. 231, 236 (1996)). *Accord*, ECF No. 595 at 8-9. Ross notes that the NCAA is attempting to engage in an "unwarranted expansion" of principles derived from this exemption. RD at 1-2. One of the uncertainties created by the IRCS is that some colleges may focus on giving scholarships to participants in moneymaking sports. FND at 14-15 & Table 2. This potential differential impact raises the issue

of whether "any private university can remain competitive in FBS football under the IRCS scholarship and salary caps." *Id.* at 17.

Fort and Noll make another related point. The two professional CBAs to which Class Counsel point cover only two sports, whereas the IRCS encompasses ***all*** Division I sports. "The resulting distortion in the market for Division I athletes is new--it does not exist in the pre-settlement world in which the number of scholarships, not their aggregate value, was capped. Thus, under the old rules all schools could have the same number of scholarships regardless of the sticker price of attending the university." *Id.* at 14.

With these differences in mind, Objectors now turn to specific problems inherent in the IRCS.

### a.    There Is No Basis for a $21 Million Cap And No Floor.

There is no sound basis for the 22% figure with a cap of $21 million per school and no floor; it is totally arbitrary. As noted at page 23 of the Holden Article, "as both the [attorneys in the] *Fontenot* complaint [*see* ECF No. 473 at 17], and journalists Nicole Auerbach and Justin Williams observed, ***the 22 percent of revenue to be shared with athletes is significantly less than the amount shared in professional sports that have collective bargaining agreements in place.***" (citing Nicole Auerbach & Justin Williams, *What to Know about House v. NCAA Settlement and a Historic Day for College Sports*, Athletic (May 24, 2024) (Appendix N) (emphases added); *Accord*, Yaman Desai, *Proposed NIL Deal Leaves NCAA Antitrust Liability Door Open*, Competition Law 360 (Aug. 2, 2024) ("Desai Article") (Appendix O) ("The cap is significantly lower than the percentage of revenue dedicated to athletes in professional sports such as the NBA and NFL, both of which hover around 50%"). Fort and Noll note that the CBAs of the NFL and NBA have both caps ***and*** floors. FND at 9. In comparison, the "value of the [IRCS] to athletes is lower because no floor is included." *Id*.

As also noted in the Desai Article, "in addition, the NCAA's cap is tied to the average revenue of five autonomy conference schools….. But the wide disparity in revenue generated by those universities will result in Southeastern Conference and Big Ten Conference schools, which

**OBJECTION TO SETTLEMENTS ON BEHALF OF CLASSES OF PAST, CURRENT AND FUTURE NCAA COLLEGE ATHLETES**

make the highest revenues, allocating far less than 22% of their revenue to student-athletes. These shortcomings will likely subject the NCAA to future antitrust liability."[13] As Judge Clifton Corker said in *Tennessee v. NCAA*, No. 3:24-CV-0003-DCLC-DCP, 2024 WL 755528, at *5 (E. D. Tenn. Feb. 23, 2024) ("Tennessee Case") (Appendix P), without a free market, college athletes have no knowledge of their true NIL value.

The proposed revenue sharing cap IRCS has other significant consequences, none of which were agreed to by past, current or future college athletes via a collective bargaining process, as is typical when a revenue cap is imposed in sports. The DOJ has underscored the importance if this omission. ECF No. 595 at 8. As an example, Member Institutions and conferences can unilaterally reduce the roster size and the number of athletic scholarships available in any given sport, a problem noted by other objectors. Article 4, Section 1 (ECF No. 535-1, Appendix A at 19).

In short, as Ross observes, the proposed Settlements offer a grossly unfair trade-off of money for present and past Division I college athletes through the DCS against a vague and potentially illusory promise of significant shared revenue for future players through the IRCS. RD at 2-4. This cannot be accomplished fairly by a deal assented by conflicted Class Counsel in the absence of true collective bargaining. *Id*. at 1-2. *See also* ECF No. 595 at 9.

        **b.**    **The IRCS Improperly Limits What Revenue Will Be Shared.**

The revenue cap is illusory, based on both what it includes and the various loopholes built into what it includes, but also as a result of what the NCAA and Power 5 excluded. "Revenue" is a term that is restrictively defined in the IRCS. The IRCS defines "shared revenue" as limited to categories 1, 7, 11, 12, 13, 13A, 15 and 19 of the "NCAA 2024 Agreed-Upon Procedures" ("AUPs"); those categories are found in Appendix A of the IRCS, at pages 17-19, which describe typical sources of "intercollegiate athletic revenues." Among the "typical sources" that the NCAA *excluded from "shared revenues" are such things* as: (a) "direct state or other governmental

---

[13] The Desai Article also references in this discussion the "all but defunct Pac-12", but the Pac-12 has recently been adding new schools to the conference. However, they are relatively poorer schools that are unlikely to want to share anything near 21% of revenue.

OBJECTION TO SETTLEMENTS ON BEHALF OF CLASSES OF PAST, CURRENT
AND FUTURE NCAA COLLEGE ATHLETES

1  support specifically earmarked for the athletics department"; (b) "direct institutional support" for

2  the "operations of intercollegiate athletics", including endowment unrestricted income and other

3  investment income; (c) "[a]mounts received from individuals, corporations, associations,

4  foundations, clubs, or other organizations used for the operations of athletics programs"; (d)

5  "[a]mounts received above face value for tickets"; (e) revenues from game programs, novelties,

6  food and concessions, and parking; and (f) sports camp revenues.

7          These exclusions only make sense if the goal is to deflate the value of the revenue share

8  pool available to college athletes. One of the exclusions also specifically targets lucrative funds

9  presently distributed by NIL Collectives that would most likely take the form of unrestricted gifts

10  to the schools (rather than direct payments to the athletes). Another exclusion ignores government

11  appropriations, which as Fort and Noll point out, is unwarranted, given that "functionally state

12  governments serve as a kind of sponsor for their universities, implying that appropriations to

13  support athletics properly should be regarded as sports-related revenues." FND at 19. Moreover,

14  several of the exclusions ignore that fans drive cars to games and park them at stadium lots, and

15  buy tickets, food and merchandise at games, and also ignore the lucrative secondary resale market

16  for tickets (for example, resale tickets for the College Football Playoff Championship *start* at over

17  $1,300 per ticket for a pair).

18          Fort and Noll also discuss how these types of these excluded items ***are*** found in the NFL

19  and NBA CBAs. FND at 17-20. They also note that revenue derived from gambling is ***not*** included

20  in either the IRCS or the AOPs, even though NCAA President Charles Baker is on record as saying

21  that it is a potentially important future source of income for college sports and even though the

22  CBAs for the NFL and NBA list it as a revenue source for determining salary caps. *Id*. at 18.[14]

23

24  _____

25  [14] For example, at last count, 39 states permit gambling on the outcome of college football games.
   Ben Fowles, *How To Bet On College Football In 2025* (Oct. 17, 2024) (available at

26  https://www.legalsportsreport.com/how-to-bet/college-football/ (last visited Jan. 10, 2025)). Some
   states exclude in-state games from this permission. A number of states do not permit "proposition

27  bets", a bet regarding the occurrence or non-occurrence during a game of an event not affecting
   directly the game's outcome.

28

**OBJECTION TO SETTLEMENTS ON BEHALF OF CLASSES OF PAST, CURRENT
AND FUTURE NCAA COLLEGE ATHLETES**

Rascher relied on its data in his December 2022 class certification report. ECF No. 598-1 at 20-21.

The lack of clarity inherent in this definition of "revenue" in the IRCS is ***supported*** by Rascher, Class Counsel's own expert, in a 2015 report discussing the incremental costs of football, bowling and rifle at the University of Alabama at Birmingham co-authored by him and Andrew Schwarz, another economist who has knowledge on antitrust laws. (Appendix Q). There, he noted that "[f]rom the literature, we show that Athletic Department financial reporting has a ***systematic tendency to understate revenues and overstate costs from athletics***. The result is that ***standard athletic department accounting provides poor insight into the financial impact of sports programs on the university as a whole….*** That is, while the reporting may meet all relevant accounting standards, systematic issues in those standards tend to bias expenses (generally upward) and bias revenues (generally downward)." *Id*. at i, v (emphases in original). Rascher went on to identify as undervalued sports-related revenue such things as concessions, sports camps, licensing, merchandise, and parking; he further identified as unlisted revenues such things as athletic donations directly to tuition, enrollments, donations more generally, and media coverage. *Id*. at 5. As he later put it, "[r]eaders familiar with 'Hollywood Accounting' (where results can be manipulated so that actors who receive a share of the net, rather than a share of the gross, often find a hugely successful movie appears to have lost money) may see a parallel." *Id*. at 8.

Other commentators have also noted some of these omissions from shared revenue. In a 2024 report (Appendix R), prepared by Patrick O'Rourke, a Certified Public Accountant who operates the business Scholarship Stats.com, it was noted that the NCAA's estimation of what constitutes "revenue" for Division I schools does "not include direct or indirect school support, student fees or unrecompensed (*i.e.,* charitable) contributions to the athletic department from alumni."

Finally, Fort and Noll observe that even if the sources of revenue excluded from the ICRS but utilized by the NFL and NBA in their respective CBAs were added, the proposed revenue sharing cap would ***still*** be fatally inadequate because colleges can and do tap revenue sources

unavailable to professional sports leagues, such as tax-exempt contributions, or appropriations from governments. As they note at pages 4-5 of the FND:

> An example is tax-exempt contributions to the athletics program that qualify donors for access to premium seating areas, which is functionally equivalent to fees levied by professional teams that grant access to such amenities as luxury boxes, premium seating areas, and private clubs. Other examples are appropriations from governments, especially those that are based on enrollment, and student fees, which functionally are forms of sponsorships for values that these benefactors derive from a school's athletics program.

### c.    Revenue Sharing Under The IRCS Is Illusory In Other Ways.

The revenue sharing pursuant to the IRCS is illusory in other ways as well. It requires certain "benefits"--an undefined term--to be counted against the Pool. ECF No. 535-1, Appendix A at 13-15. Rascher's "Hollywood accounting" remark is relevant to two of the offsets that are used in the IRCS to reduce the revenue to be shared with college athletes: NIL payments and new athletic scholarships.

***NIL Payments.*** As noted above, Class Counsel are under the mistaken belief that the IRCS will provide revenue sharing at the same percentage level that professional athletes in the NBA and NFL receive. Rascher believes that athlete compensation through the Pool would equal $1.618 billion. ECF No. 450-4 at 38.

These representations and beliefs fail to take adequately into account reality in a number of ways, some of which have been discussed. But additionally, one of the benefits designated to count against the Pool is "[a]ll payments to student-athletes (for NIL, institutional brand promotion, or otherwise) and personal benefits (*e.g.*, vehicles, travel expenses not permitted as of the date of Preliminary Approval by NCAA Division I, and the like) that are provided to a student-athlete or the family of a student-athlete by a Member Institution over and above the payments and personal benefits permitted by the NCAA rules as of the day of Preliminary Approval." *Id*. at 15. This offset will result in significant erosion of any revenue that college athletes receive.

Since, as noted above, Class Counsel cited the examples of what happens in professional sports leagues, Cragg, like Fort and Noll, looked at them. He found that:

1
2
3
4
5
6

> Professional athletes get two distinct streams of compensation: revenue-sharing and NIL payments. In the National Basketball Association ("NBA"), for example, players receive salaries, which give them a share of NBA revenue, and sponsorship deals, which are separate from and outside the scope of their contracts with the NBA. For the 2022-23 NBA season, for instance, players earned a total of $4.53B in cash salaries, with the median salary being $4.6M. At the same time, players received sponsorship deals worth an estimated $1.66B. For NBA players during this period, therefore, sponsorship deals comprised an additional 36% in compensation for athletes over and above the revenue-sharing represented by their salaries.

7
8

CD at 13-14. In the United States, a celebrity's income for work that he or she does on the field or

in a motion picture is separate from earnings from endorsements that use his or her NIL. *Id*. at 14.

9
10
11
12
13
14
15

Cragg thus concluded that "there is no economic basis for entangling college athletes' earnings from the intellectual property rights in their brands with revenue from their labor as athletes", noting that Rascher himself carefully distinguished between damages for use of college athletes' NIL and athletic services. *Id*. And NIL compensation in professional sports can vastly exceed compensation for athletic performance. As examples, 2022-23, LeBron James earned $44.5 million on court and $75 million for endorsements and in 2024, Shohei Ohtani earned $2 million per year in cash, $68 million deferred to 2034, and almost $100 million in endorsements. *Id.* at 15.

16
17
18
19
20
21
22
23

While NIL payments to college athletes are not always in that stratosphere, at least 35 college athletes receive payments exceeding $1 million and many others receive payments worth tens of thousands to hundreds of thousands of dollars; the most successful to date is Shedeur Sanders, who plays football at the University of Colorado Boulder, and has endorsement deals worth $6.2 million.[15] Earlier this month, the former University of Georgia quarterback, Carson Beck, transferred to the University of Miami, in part based on a $4 million NIL agreement for the upcoming 2025-26 college football season; by comparison, the starting quarterback for much of the Tennessee Titans NFL this past season earned a base salary of $950,000.

24
25
26
27
28

---

[15] *See* On3 NIL Valuations, https://www.on3.com/nil/rankings/player/nil-valuations/ (last visited Jan. 28, 2025).

*New Athletic Scholarships*. The IRCS treats new or incremental athletic scholarships up to $2.5 million as counting against the Pool. ECF No. 535-1, Appendix A at 14. This is both unfounded and inappropriate.

Fort and Noll demonstrate that any rule limiting increases in the number of scholarships should not be expressed as a dollar cap, but should instead be identified with reference to the number of additional scholarships that are allowed. FND at 6. Doing what the IRCS proposes "advantages public universities at the expense of private colleges. This outcome arises due from two features of the IRCS. First, the existing scholarship cap for each sport is increased substantially by expanding the number of scholarships allowed to a far greater number than any school would offer. Second, the increase in the budget for scholarships is capped at $2.5 million [Article 3 Section 3(b)], which causes the number of permitted new scholarships to vary enormously among colleges." *Id.* at 13-14. As they point out, the accounting cost of a scholarship varies dramatically, from $20,000 at the least expensive public colleges to $90,000 at some private universities, with the result that under the NCAA's proposed scheme, some schools can create over 100 new scholarships, while others can create fewer than 30. *Id.* at 6.

Cragg also identifies numerous other concerns. As he notes, only 2.5% of students at Division I schools receive some form of academic aid. CD at 6-7. Valuing Grants-In-Aid ("GIAs") at full cost is inappropriate if the marginal costs are negligible. There is no additional instructional cost for teaching a college athlete, and having a student use an already empty bed at school is minimal. Cragg cites academic studies showing that the incremental cost of enrolling an additional student is lower than the average cost. *Id.* at 7-8. He further discusses reports indicating that numerous colleges are operating at less than capacity. *Id.* at 8-9. Finally, he cites studies demonstrating that "the average cost to supply education to a college athlete is lower compared to a non-college-athlete, making the gap between an athlete's GIA and the incremental cost to supply education even larger." *Id.* at 10. Thus, it is *inherently unfair* to use the full-price cost of a scholarship as an offset against shared revenue. Accordingly, Cragg concludes that far more than 51% of revenue will be taken by schools; "for every additional dollar of new lines of scholarships

that schools create, they get to reduce the amount they pay out for athletic services by one dollar." *Id*. at 11.

Cragg further concludes that GIA scholarships should not be treated as income to college athletes and are not fungible with revenue sharing. *Id*. at 13. As he points out, this is consistent with the Internal Revenue Service's view that GIA scholarships ***ought not*** to be treated as compensation. *Id*.

### d.    The IRCS Is Intended To Unfairly Restrict NIL Collectives.

According to Opendorse,[16] 80% of the revenue earned by college athletes is paid directly through NIL Collectives. The IRCS serves as a blatant attempt by the NCAA to gain control of a free market they have no legal authority to control under the false premise of "amateurism."[17] The NCAA seeks to limit the opportunities created by NIL collectives, so that money from donors goes directly to colleges and universities. In doing so, it attempts to circumvent the decision by the court in the Tennessee Case that preliminarily enjoined implementation of an NCAA rule requiring that potential college athletes refrain from discussing NIL deals until they commit to a particular school. 2024 WL 755528, at *4, 6.

The IRCS, as amended, seeks to enshrine the NCAA's control over the free market for college athletes' NIL by permitting the NCAA to create institutional and conference rules that "prohibit NIL payments by Associated Entities or Individuals (***individually or collectively***) of a Member Institution from entering into NIL licenses with or for the benefit of current or prospective student-athletes at a given Member Institution unless the license/payment is for a valid business purpose related to the promotion or endorsement of goods or services provided to the general

---

[16] As stated at its website, Opendorse "is the leading athlete marketplace and NIL technology company, providing technology and services to the athlete endorsement industry. We serve the full lifecycle of supporting athletes: educating, assessing, planning, sharing, creating, measuring, tracking, disclosing, regulating, listing, browsing, booking, and more." Opendorse, https://opendorse.com/about/ (last visited Dec. 20, 2024). Rascher relied on its data in his class certification report filed in December of 2022. ECF No. 598-1 at 20-22.

[17] To the extent that the NCAA still relies on the outmoded defense of "amateurism," Justice Kavanaugh in *Alston* noted that this justification was no longer a valid excuse. 141 S.Ct. at 2167 (Kavanaugh, J, concurring).

public for profit, with compensation at rates and terms commensurate with compensation paid to similarly situated individuals with comparable NIL value who are not current or prospective student-athletes at the Member Institution" ECF No. 535-1, Appendix A at 20 (emphases added). This language simply eliminates the term "booster", maintains the same references and restrictions, and allows the NCAA to continue to prohibit "pay for play" agreements by affiliated third parties. ECF No. 534 at 8.

To begin with, this attempt to expunge the term "booster" from the IRCS only creates more confusion when it is compared with the use of that term in the DCS (to which the IRCS is an appendix) and the NCAA's own AUPs. The DCS defines "Related Injunctive Relief NCAA & Conference Rules", which contain prohibitions on "Boosters (individually or collectively)" and releases any claims DCS members may have based on those rules. See AUPs, DCS at Section A (pp) & ("qq"). Similarly, "Associated Entities or Individuals of a Member Institution" refer repeatedly to provisions concerning "boosters." ECF No. 535-2 at 89, 91, 92, 93, 126.

More importantly, the phrase "Associated Entities or Individuals of a Member Institution." is one created specifically for this case and is not defined in any of the NCAA's existing guidance or bylaws. It is not found in the NCAA's AUPs. The term "pay for Play" is not self-explanatory and could be interpreted by the NCAA to encompass NIL Collectives other than those operating as supporters of specific Member Institutions.

Last but certainly not least, there are also problems under the First and Fourteenth Amendments to the United States Constitution if a public university's compliance with the proposed Settlements would in any way deny the free speech rights of college athletes to deal with NIL collectives. *See, e.g., Crue v. Aiken*, 370 F.3d 668, 679-80 (7th Cir. 2004) (in a suit by students and faculty members challenging a rule by the University of Illinois banning speech directed to recruitment of prospective college athletes without preclearance by the college's chancellor violated the First Amendment rights of both faculty and potential students). Notably, a number of NIL collectives pay athletes NIL compensation in order to exercise speech protected by the First Amendment by promoting nonprofit organizations' charitable missions regarding matters of public

concern. *See, e.g., Citizens United v. Federal Election Comm'n,* 558 U.S. 310, 351 (2010)) ([a]ll speakers, including individuals and the media, use money amassed from the economic marketplace to fund their speech. The First Amendment protects the resulting speech…").

### B.    The DCS Should Not Receive Final Approval.

The DCS should not receive final approval for several reasons.

*First,* The DCS raises issues appears to under Title IX of the of the Education Amendments of 1972, 20 U.S.C. §1681, *et seq.*, that only underscore the uncertainty and lack of finality inherent in the proposed Settlements. NCAA colleges have been criticized for not taking into account gender equity in paying female college athletes for use of their NIL. *See* Compl. (Dec. 1, 2023), *Schroeder v. University of Oregon* (Dist. Or.) at ¶ 11 (Appendix S) (accusing the University of Oregon of discriminatory treatment of female college athletes in connection with NIL practices). One commentator has criticized the proposed Settlements on this ground and urged female athletes to object to the DCS.[18]

These uncertainties have recently become more prominent. Two weeks ago, the United States Department of Education's Office for Civil Rights ("OCR"), which last year, had indicated that NIL payments to college athletes were subject to Title IX, issued a "Fact Sheet" on the topic. Appendix T. It stated unequivocally at pages 5-6 (emphases added) that:

 Schools remain responsible for ensuring that they are offering equal athletic opportunities in their athletic programs, including in the NIL context. A school may violate Title IX if the school fails to provide equivalent benefits, opportunities, and treatment in the components of the school's athletic program that relate to NIL activities. ***Thus, schools must be mindful of their Title IX obligations regarding the components of their athletic programs as they navigate the NIL landscape. These obligations apply regardless of whether student-athletes ultimately secure NIL benefits through their school or with third parties.***

This principle applies as well to forms of financial assistance other than scholarships and grants that provide compensation for use of college athletes' NIL. *Id.* at 8. It should apply with equal

---

[18]                    Audrey                    sports!,                    @audreydevaughn, TikTok), https://www.tiktok.com/@audreydevaughn/video/7450660320835603758 (Dec. 21, 2024).

force to the distribution of compensation by colleges pursuant to the DCS for past uses of such athletes' NIL.

In their supplemental brief for preliminary approval, Class Counsel told this Court in response to an argument that the DCS released Title IX claims that "the Settlement does not release any such claims." ECF No. 534 at 23. ***That is incorrect***. The amended DCS, unlike its predecessor, was modified to define "Unreleased Claims" and included within that definition "Claims under Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq*., ***other than any claims arising out of or relating to the distribution of the Gross Settlement Fund***." ECF No. 535-2 at 15 (emphases added). That fund encompasses the "NIL Claims Settlement Amount" and the "Additional Compensation Claims Settlement Amount" that are the subject of the DCS. ECF No. 535-1 at 7-8.

*Second*, The DCS is economically unfair to college athletes. Class counsel and their expert estimated that damages caused by the NCAA's refusal to permit college athletes to be compensated for use of their NIL was $2.694 billion for the period from June 15, 2016 to September 15, 2024—a period of over eight years. The proposed DCS classes will receive for that eight-year period $1.976 billion for their NIL damages and another $600 million in additional compensation, primarily for athletic services claims; the former figure was said by Class Counsel in connection with their initial motion for preliminary approval to represent 67.4% of NIL damages. ECF No. 450 at 8. This amount was based on Rascher's damages calculations for class certification, but did not take into account ***actual or likely*** NIL payments from July of 2021, when the NCAA began to permit college athletes to obtain compensation for use of their NIL, through the 2025-26 season. *See* ECF No. 450-4 at 5-6. Given the inadequate benchmark used by Rascher, the full amount of NIL damages during the relevant eight-year period is severely understated. *See* CD at 21.

Each year, Opendorse does projections for the amount of such compensation to college athletes. Its most recent publication on the topic, published in 2024, is "NIL at 3" (Appendix U). Page 3 of that document lists its market projections going back to Year 1 (2021-22) and continuing

to Year 5 (July 1, 2025-June 30, 2026), showing that NIL payments skyrocketed from $917 million in the former to *$2.55 billion in the latter*.

Cragg examined the declaration of Rascher in support of estimated damages and found it to be fatally erroneous based on what happened in the real world. Cragg estimates projected unadjusted NIL payments plateaued at Opendorse's current projections for the 2025-26 season, which is a conservative assumption. He found that for the period from 2016 through 2024, college athletes could have earned $12.9 billion, compared to the $3.2 billion they did earn. That difference amounts to *$9.7 billion, 231% more than Rascher estimated*. Even if this figure was deflated by 67.4%, it would nonetheless yield $6.5 billion in additional damages, not the $2.6 billion estimated by Class Counsel and their expert. *Id*. These differentials are not accounted for in the proposed DCS.

*Finally*, there is reason to believe that DCS members are being told things that conflict with what the terms of the DCS state. For example, one former college athlete—Frank Mason III, who played college basketball for the University of Kansas in 2013-17, was selected the Big 12 Player of the Year and national player of the year during his senior season, and was a consensus first team All-American selection, has been advised that college athletes playing before 2019 are not eligible for lost NIL compensation, even though the DCS and the "Frequently Asked Questions" on the player settlement website plainly state that the relevant damage class period extends back to athletes as of June 15, 2016. *See* ECF No. 535-1 (A)(n); *and* https://www.collegeathletecompensation.com/house-frequently-asked-questions.aspx (last visited Jan. 16, 2025). Mason's declaration on this topic is attached as Appendix V. There are thus serious questions as to how the DCS fund will actually be distributed if it is approved and whether members of the DCS classes are likely to be shortchanged. *See also* ECF No. 601.

## III.    CONCLUSION

For all of the foregoing reasons, the proposed Settlements should be rejected in their totality.

1

2    Dated: January 29, 2025                    */s/ Michael P. Lehmann*
                                              Michael P. Lehmann (CA Bar No. 77152)
3                                             **HAUSFELD LLP**
                                              600 Montgomery Street, Suite 3200
4                                             San Francisco, CA 94111
                                              Tel. No.: (415) 633-1908
5                                             mlehmann@hausfeld.com

6
                                              Michael D. Hausfeld (*pro hac vice*)
7                                             Nicholas Murphy (*pro hac vice*)
                                              Theodore DiSalvo (*pro hac vice*)
8                                             **HAUSFELD LLP**
                                              888 16th Street, NW, Suite 300
9                                             Washington, DC 200006
                                              Tel. No.: (202) 540-7200
10                                            Fax No.: (202) 540-7201
                                              mhausfeld@hausfeld.com
11                                            nmurphy@hausfeld.com
                                              tdisalvo@hausfeld.com
12

13                                            *Counsel for Objectors*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**OBJECTION TO SETTLEMENTS ON BEHALF OF CLASSES OF PAST, CURRENT
AND FUTURE NCAA COLLEGE ATHLETES**