# APPENDIX D

*Of Labor, Antitrust, and Why the Proposed House Settlement Will Not Solve the NCAA's Problem*

Marc Edelman[1] & Michael A. Carrier[2]

Submitted Draft, Forthcoming, Fordham Law Review (2025)

## ABSTRACT

The NCAA recently settled three antitrust lawsuits. With a significant payout, it hopes to put its antitrust worries behind it. In doing so, it seeks to follow in the footsteps of the National Football League ("NFL"), which has enjoyed 30 years of labor peace. But there is a big difference between these two situations. The NFL's 1993 settlement in *White v. NFL* was shielded from antitrust scrutiny by the *non-statutory labor exemption*, which encourages collective bargaining activity. No such exemption protects the NCAA's settlement. This Essay explains why the NCAA cannot establish a salary cap through its antitrust settlement. If it wishes to do so, it needs to take a page out of the NFL's handbook, recognizing a players' union and engaging in collective bargaining over the terms of participating in college sports.

## TABLE OF CONTENTS

[to be added]

## ESSAY

For years, college athletes have not received compensation. That began to change after the Supreme Court in *NCAA v. Alston* unanimously held that restrictions on education-related compensation violated antitrust law.[3] In October 2024, the Northern District of California court granted preliminary approval to a class-action settlement (the "House Settlement") that resolved three antitrust challenges to various compensation restraints: *House v. NCAA*, *Hubbard v. NCAA*, and *Carter v. NCAA*.[4] The settlement disposes of these cases. And it seeks to replace the NCAA's Principle of Amateurism, which "prevent[ed] [college athletes] from profiting from their athletic abilities"[5] with a new system by which schools would directly pay their athletes up to an

---

[1] Professor of Law, Baruch College, Zicklin School of Business, City University of New York; Director of Sports Ethics, Robert Zicklin Center for Corporate Integrity.

[2] Board of Governors Professor, Rutgers Law School. Copyright © 2025 Marc Edelman and Michael A. Carrier.

[3] 594 U.S. 69 (2021).

[4] *See* Complaint, House v. NCAA, No. 4:20-CV-03919 (N.D. Cal. June 15, 2020); Complaint, Hubbard v. NCAA, No. 4:23-CV-01593 ¶¶ 11, 119 (N.D. Cal. Apr. 4, 2023); Complaint, Carter v. NCAA, No. 3:23-CV-06325 (N.D. Cal. Dec. 7, 2023). *See also* Justin Williams, *House v. NCAA Settlement Granted Preliminary Approval, Bringing New Financial Model Closer*, N.Y. TIMES (Oct. 7, 2024), https://www.nytimes.com/athletic/5826004/2024/10/07/house-ncaa-settlement-approval-claudia-wilken/ (final approval hearing for settlement tentatively scheduled for April 7, 2025).

[5] Marc Edelman, Note, *Reevaluating Amateurism Standards in Men's College Basketball*, 35 U. MICH. J. LAW REFORM 861, 865 (2002); *see also* Tennessee v. NCAA, 3:24-CV_00033-DCLC-DCP, 2024 WL 75528, at *1 (explaining NCAA's original Principle of Amateurism and subsequent revisions). This Principle had already been reformed when the NCAA decided on June 30, 2021 (after losing the *Alston* decision and facing state laws allowing athletes to endorse products) to reinterpret the Principle to allow athletes to sign endorsement deals for money without violating its rules. *See* Tennessee, *id.*.

aggregate cap of (roughly) $21 million per year[6] and continue to allow the athletes to sign endorsement deals with third parties unaffiliated with NCAA institutions.[7]

Not surprisingly, the parties to the litigation support the settlement. NCAA President Charlie Baker promised that the settlement would "create predictability and stability for schools" while also "creat[ing] a tremendous opportunity for student-athletes."[8] And one of the plaintiffs' lawyers, Steve Berman, stated that the settlement would lead to "revolutionary change . . . that will allow billions in revenue sharing,"[9] comparing it to the NFL's 1993 *White* settlement, which has led to more than thirty years of labor peace.[10] It goes without saying that the plaintiffs' lawyers—like those in most class action settlements—have a strong monetary incentive to support the outcome.[11]

But despite the settling parties' optimistic tone, the settlement will not resolve the legal woes of college sports. The reason is simple. The 1993 *White* settlement was ratified by the NFL players union and thus *exempt from antitrust scrutiny* because of the "non-statutory labor exemption."[12] This exemption shields from scrutiny the outcomes of good-faith collective bargaining negotiations between a multi-employer bargaining unit and its union.[13] In stark contrast, the House Settlement reflects a much different situation. NCAA college athletes are not

---

[6] John T. Holden, Marc Edelman & Michael A. McCann, *(Still) Anticompetitive College Sports*, 66 B.C. L. REV. __ (SSRN version at *29) (2025).

[7] *See* Redlined Stipulation and Settlement Agreement, Ex. 2, Case 4:20-cv-03919-CW, *House v. NCAA* (Aug. 26, 2024) (hereinafter "House Settlement Agreement"), at 58/134 (document on file with authors) ("The NCAA shall not have any Division I rules prohibiting [college athletes] from receiving payments from third parties for NIL, other than as set forth in this Injunctive Relief Settlement" and [f]or the avoidance of doubt, entities or organizations that are owned, controlled, or operated by Member Institutions and/or conferences are not third parties").

[8] Nicole Auerbach, *Amid House Settlement Talks, Charlie Baker Seeks 'Clarity' for Future of College Sports*, THE ATHLETIC (May 13, 2024), https://www.nytimes.com/athletic/5490924/2024/05/13/house-ncaa-settlement-charlie-baker.

[9] Eddie Pells, *NCAA's $2.78 Billion Settlement with Colleges to Allow Athlete Payments Gets Preliminary Approval*, YAHOO! (Oct. 7, 2024), https://sports.yahoo.com/judge-gives-preliminary-approval-2-183455567.html.

[10] *See, e.g.*, Pete Thamel & Dan Murphy, *Why an NCAA Antitrust Settlement will Leave Lots of Questions Unanswered*, ESPN (May 16, 2024), https://www.espn.com/college-football/story/_/id/40158775/ncaa-house-antitrust-settlement-billions-dollars-unanswered-questions (Berman states that "terms are fair to athletes because they can opt out of the settlement").

[11] *See* House Settlement Agreement, at 27-28 (Attorneys' Fees & Expenses section provides that settlement includes $20 million in attorneys' fees plus at least 0.75% of the amount that NCAA Division I schools spend on athlete compensation during the time the agreement is in force).

[12] White v. NFL, 836 F. Supp. 1458, 1485, 1500 (D. Minn. 1993).

[13] *See* Brown v. Pro Football, 116 S. Ct. 2116, 2119 (1996) (describing the scope of the non-statutory labor exemption). The reason why the non-statutory labor exemption pertains to multiemployer bargaining units rather than single employer bargaining units is because the agreement to terms of employment in a multiemployer bargaining unit naturally entails horizontal agreement among competitors in a manner that would otherwise give rise to scrutiny under antitrust law. *See generally* American Needle v. NFL, 560 U.S. 182, 190 (2010) (explaining that Section 1 of the Sherman Act applies to "concerted action that restrains trade").

unionized, and NCAA schools have not recognized college athletes as employees.[14] As a result, the settlement is not the product of collective bargaining.[15]

The gulf between the two situations means the House Settlement is fully subject to antitrust review. And it is here that the NCAA runs into trouble. For when applying federal antitrust law to the proposed House Settlement, the $21 million per year salary cap almost certainly constitutes an illegal arrangement to fix athlete wages below the free-market rate. Salary caps, by their very nature, are a form of wage fixing because they limit the amount of money that any team may spend directly on player contracts.[16] Once a team reaches the salary cap, it cannot sign additional players. As a result, salary caps require teams with higher spending budgets to forgo signing certain players, while also making below-market contract offers to other players.[17]

As another example of the antitrust concerns presented by the arrangement, a court recently found that it likely violated antitrust law to restrain the payment of name, image and likeness ("NIL") money to college athletes even when the payments came from entities affiliated with individual colleges.[18] The court explained that the court's role in an antitrust case "is not to question whether competition is good or bad" and that social concerns do not affect antitrust legality.[19]

This Essay explains why the House Settlement, which seeks to establish a salary cap in college sports without allowing for college athletes' unionization is not legally tenable. NCAA member schools may oppose athletes' efforts to form unions, but they cannot simultaneously seek to avail themselves of the non-statutory labor exemption. Nor should NCAA member colleges be able to avail themselves of some new, court-created exemption for the terms of their antitrust settlement. The fact that the plaintiffs' lawyers have agreed to this settlement does not mean, nor should it mean, that the NCAA's obligations to comply with antitrust law have been extinguished.

---

[14] *See, e.g.,* Holden, *supra* note 6*,* at *33; Michael McCann, *Dartmouth Challenges NLRB Complaint in Men's Basketball Case*, SPORTICO (Sept. 25, 2024), https://www.sportico.com/law/analysis/2024/dartmouth-college-nlrb-answer-complaint-1234798663.

[15] *See* House Settlement; *see also* Amanda Christovich, *The House v. NCAA Settlement Looks Like a CBA. But It Isn't*, FRONT OFFICE SPORTS (Aug. 23, 2024), https://frontofficesports.com/the-house-v-ncaa-settlement-looks-like-a-cba-but-it-isnt/ (explaining that, despite how the proposed House Settlement may appear, it was not negotiated by any union body).

[16] *See* Kevin Skiver, *NFL Salary Cap, Explained*, THE SPORTING NEWS (Mar. 31, 2022), https://www.sportingnews.com/us/nfl/news/nfl-salary-cap-space-2022-explained/uqpk28bey7jsnjyz873d1nca.

[17] Some sports leagues attempt to defend their salary caps on the basis of promoting competitive balance in terms of game results. Closer game scores in themselves, however, do not constitute a procompetitive benefit under antitrust law. *See* Smith v. Pro Football Inc., 593 F.2d 1173, 1186 (D.C. Cir. 1186) (rejecting "competitive balance" as a procompetitive benefit offsetting anticompetitive effect of a league draft); Law v. NCAA, 134 F.3d 1010, 1023-24 (10th Cir. 1998) (rejecting competitive balance argument in context of salary cap for class of college sports coaches). And, even if they did, a salary cap that does not also include a salary floor is unlikely to effectuate on-field competitive balance because there would still be a difference among the teams in terms of their spending on labor.

[18] *Tennessee*, at *2 (granting Tennessee and Virginia an injunction preventing the NCAA from enforcing an "NIL-recruiting ban" because the "NCAA's prohibition [on college athletes signing licensing deals with collectives] likely violates antitrust law and harms college athletes").

[19] *See id.* at *4.

3

I.   **The Proposed *House* Settlement**

The proposed *House* Settlement, entered into on July 26, 2024, and revised on September 26, 2024, emerged out of a creative attempt by NCAA lawyers to resolve three lawsuits challenging restraints on college athletes.[20] The first, *House v. NCAA*, alleged that NCAA member colleges restrained trade in endorsement markets by collusively restricting athletes' ability to monetize their publicity rights and share in the broadcast revenues derived from college sports.[21] The second, *Hubbard v. NCAA*, alleged that the schools restrained trade in the market for college-athlete labor by reducing scholarship amounts below the full cost of attending college.[22] And the third, *Carter v. NCAA*, challenged the entirety of the NCAA's labor-market restraints on athletes, contending that NCAA rules that prevented schools' direct pay to college athletes constituted the clear antitrust violation of wage fixing.[23]

There are at least four ways these lawsuits collectively could have been resolved. *First*, the NCAA member colleges could have paid the plaintiffs to resolve the NCAA's alleged past antitrust violations and proceeded with litigation over the restraints' legality moving forward. *Second*, the NCAA could have lifted its compensation restraints and replaced them with free market principles in which individual colleges compete with each other for athletes' services.[24] *Third*, compensation restraints could have shifted from the level of the national trade association to that of individual conferences, allowing for the conferences to bid against one another for athlete services.[25] Or *fourth*, the NCAA could have devised new rules that are insulated from antitrust scrutiny through collective bargaining negotiations.[26]

The NCAA did not adopt any of these approaches. Instead, it chose a fifth option that was not on the legal menu. Under this approach, the NCAA member schools would pay $2.8 billion to the plaintiffs to settle the *House*, *Hubbard*, and *Carter* litigations[27] while also entering into a

---

[20] *See* House Settlement Agreement at 2, 44.

[21] *See* Jeremy Cluff, *Who is Grant House? Former Arizona State Swimmer at Center of NCAA Lawsuit, Settlement*, ARIZONA REPUBLIC (May 24, 2024), https://www.azcentral.com/story/sports/college/asu/2024/05/24/grant-house-ncaa-nil-lawsuit-settlement-arizona-state/73838058007; *see also* Holden, *supra* note 6, at *17; Complaint, *House v. NCAA*, No. 4:20-CV-03919 ¶ 268 (N.D. Cal. June 15, 2020) (alleging that NCAA and schools violate antitrust law by restraining trade "for the use of, and to limit supply for, licensing and sale of [college athlete] images, likenesses and/or names").

[22] Complaint, *Hubbard v. NCAA*, No. 4:23-CV-01593, ¶¶ 11, 119 (N.D. Cal. Apr. 4, 2023) (explaining that "*Hubbard* plaintiffs seek payment and treble damages for the gap between scholarships and the actual cost of attendance during their time in college").

[23] Holden, *supra* note 6, at *18 (describing *Carter* Complaint as "attacking the NCAA's ban on paying athletes for competing" and "a knock-out blow on amateurism").

[24] *See id.* at **29-31 (describing "True Free Market Approach").

[25] *See* Alston v NCAA, 594 U.S. 69, 85 (2021) (explaining that injunction preventing NCAA from restraining in-kind compensation to college athletes "applied only to the NCAA and multi-conference agreements—thus allowing individual conferences (and the schools that constitute them) to impose tighter restrictions if they wish"); *see also* Holden, *supra* note 6, at **31-32 (describing "Competitive Conference Approach").

[26] *See* Holden, *supra* note 6, at **32-33 (describing "Labor Union Approach").

[27] We believe this component of the settlement—the payment of damages for past violations—is a reasonable and traditional resolution of past antitrust violations. *See, e.g., Long-Running Antitrust Lawsuit Ends in $2.8 Billion Settlement Paid to Providers*, AMERICAN HOSPITAL ASSOCIATION (Oct. 15, 2024), https://www.aha.org/news/headline/2024-10-15-long-running-antitrust-lawsuit-ends-28-billion-settlement-paid-providers (discussing settlement by which Blue Cross Blue Shield agreed to pay $2.8 billion to settlement fund for

settlement with the plaintiffs' lawyers that established new rules to govern college sports including a new $21 million salary cap.

To try to make up for the lack of a collective bargaining relationship, the proposed House Settlement sought to preclude future antitrust scrutiny contractually. In particular, it included clauses making it difficult for the plaintiffs in the settled lawsuits, their successors in interest, and their lawyers to bring antitrust lawsuits against the NCAA.[28] Among these clauses, the settlement requires athletes who would now be permitted to accept payment directly from their colleges to agree not to file future lawsuits based on the restraints challenged in *House*, *Hubbard*, and *Carter*.[29] The settlement also requires the plaintiffs' lawyers to cooperate in helping NCAA schools seek dismissal of future challenges on these grounds.[30] And it includes language by which the parties agree that the settlement "shall not be deemed an admission . . . as to the merits of any claim or defense."[31]

The settling parties' efforts notwithstanding, this approach should not evade antitrust scrutiny. As one of us has previously explained: "Even though . . . college athletes . . . receiving $21 million may seem fairer than . . . receiving nothing," both approaches keep in place a salary cap that "disrupts the basic principles of supply and demand and arguably may deflate aggregate college athlete compensation."[32] Parties to a settlement cannot engineer their own exemption from antitrust law.

II. **The Non-Statutory Labor Exemption**

The House Settlement could have been justified if it was the outcome of collective bargaining. Because it was not, it is not shielded by the non-statutory labor exemption. This exemption is the focus of this Part.

### A. Overview of the Non-Statutory Labor Exemption

Despite the importance of labor law, antitrust law "often forbids or discourages the kinds of joint discussions and behavior that the collective-bargaining process invites or requires."[33] A statutory labor exemption—arising primarily under Sections 6 and 20 of the 1914 Clayton Act[34] and the 1932 Norris-LaGuardia Act[35]—provides that the collective behavior of union members does not fall within the reach of federal antitrust laws,[36] at least if the union members are

---

health care providers to resolve antitrust lawsuit). *See also* Holden, *supra* note 6, at *20; House Settlement Agreement, at 15-19 ("Damages Settlement Classes Settlement Funds").

[28] House Settlement Agreement, at 24-25 ("Release of Injunctive Class").

[29] *Id.* at 25 ("No Future Actions Following Release").

[30] *Id.* ("Covenant Not to Sue") ("[S]hould there be a breach of this covenant not to sue by any member of the Injunctive Relief Settlement Class, Plaintiff and Class Counsel will cooperate with Defendants'" efforts to seek the dismissal of any such claim or action.").

[31] *Id.* at 34 ("Final and Complete Adjudication").

[32] Holden, *supra* note 6, at *29.

[33] Brown v. Pro Football, Inc., 518 U.S. 231, 242 (1996).

[34] *See* 15 U.S.C. § 17; 29 U.S.C. § 52.

[35] 29 U.S.C. § 101 et. seq.

[36] *See* Brady v. NFL, 644 F.3d 661, 669 (8th Cir. 2011); Collins v. National Basketball Players Ass'n, 850 F.Supp. 1468, 1476 (D. Col. 1991) (explaining scope of statutory labor exemption)

5

engaging in their "legitimate self interest" and are not combining with any non-labor group.[37] The exemption allows workers to "speak with one voice"[38] and engage in collective behaviors like strikes without court findings of their illegal collusion.[39]

In addition, for conduct not covered by the labor exemption, the courts have created a non-statutory labor exemption.[40] As the Supreme Court explained in *Brown v. Pro Football*, this exemption is implied "from federal labor statutes, which set forth a national labor policy favoring free and private collective bargaining . . .; which require good-faith bargaining over wages, hours, and working conditions . . .; and which delegate related rulemaking and interpretive authority to the National Labor Relations Board (Board) . . . ."[41]

The Court explained that "[t]his implicit exemption reflects both history and logic."[42] As "a matter of logic, it would be difficult, if not impossible, to require groups of employers and employees to bargain together [under federal labor law], but at the same time to forbid them [under antitrust law] to make among themselves or with each other any of the competition-restricting agreements potentially necessary to make the process work or its results mutually acceptable."[43] For that reason, the *Brown* Court explained that the exemption was needed to "allow meaningful collective bargaining to take place."[44] And the Court in *United Mine Workers v. Pennington* discussed the need for the exemption for "harmonizing the Sherman Act with the national policy expressed in the National Labor Relations Act of promoting 'the peaceful settlement of industrial disputes by subjecting labor-management controversies to the mediatory influence of negotiation.'"[45]

The Court also explained that the exemption reflected history. Congress "intended the labor statutes . . . in part to . . . interpret broadly a different *explicit* 'statutory' labor exemption that Congress earlier (in 1914) had written directly into the antitrust laws."[46] In the 1930s,

---

[37] Collins v. National Basketball Players Ass'n, 850 F.Supp. 1468, 1477 (D. Col. 1991) (*citing* United States v. Hutcheson, 312 U.S. 219, 232 (1941)).

[38] *See* Collins, 850 F. Supp. at 1476 ("If the Sherman Act were strictly applied, the formation of a labor union as an exclusive bargaining representative would be proscribed," but "labor laws were enacted to allow workers to speak with one voice and to exert leverage over their employers").

[39] *See* Jessica Cohen, *Sharing the Wealth: Don't Call Us. We'll Call You: Why Revenue Sharing is a Permissive Subject and Therefore the Labor Exemption Does Not Apply*, 12 FORDHAM INTELL. PROP. MEDIA & ENT. L. J. 609, 621 (2002) (explaining that "the statutory labor exemption protect[s] collective action by a union, such as strikes, picketing, and boycotts").

[40] Brown v. Pro Football, 116 S. Ct. 2116, 2119 (1996).

[41] 518 U.S. at 236. We note that there is an issue, outside the scope of this Essay, about the contours of the non-statutory labor exemption. The Eighth Circuit, among others, has adopted a narrow version of this exemption, finding that it applies only where an alleged restraint of trade: (1) involves mandatory subjects of bargaining; (2) primarily affects the parties involved; and (3) is reached through bona fide, arm's-length bargaining. Mackey v. NFL, 543 F.2d 606, 614 (8th Cir. 1976). By contrast, the Second Circuit has explained that "[it] never regarded the Eighth Circuit's test in *Mackey* as defining the appropriate limits of the non-statutory exemption" and that the exemption must apply most broadly where "[the] only alleged anticompetitive effect of the challenged restraint is on a labor market organized around a collective bargaining relationship." Clarett v. NFL, 369 F.3d 124, 133, 134 (2d Cir. 2004).

[42] 518 U.S. at 236.

[43] *Id.*

[44] *Id.*

[45] 381 U.S. 657, 665 (1965).

[46] 518 U.S. at 236.

6

Congress, in enacting the labor statutes, had "hoped to prevent judicial use of antitrust law to resolve labor disputes—a kind of dispute normally inappropriate for antitrust law resolution."[47] The non-statutory labor exemption "limit[s] an antitrust court's authority to determine, in the area of industrial conflict, what is or is not a 'reasonable' practice, . . . thereby substitut[ing] legislative and administrative labor-related determinations for judicial antitrust-related determinations as to the appropriate legal limits of industrial conflict."[48]

As the Supreme Court said in *Brown*: "to subject the practice to antitrust law is to require antitrust courts to answer a host of important practical questions about how collective bargaining over wages, hours, and working conditions is to proceed—the very result that the implicit labor exemption seeks to avoid."[49] And "it is to place in jeopardy some of the potentially beneficial labor-related effects that multiemployer bargaining can achieve."[50] The reason is that "unlike labor law, which sometimes welcomes anticompetitive agreements conducive to industrial harmony, antitrust law forbids all agreements among competitors (such as competing employers) that unreasonably lessen competition among or between them in virtually any respect whatsoever."[51]

The problem with holding employers in a multiemployer bargaining unit subject to both statutory schemes is shown in the context of recent 2023 collective bargaining negotiations between the 30 National Basketball Association ("NBA") teams and the players union.[52] During the negotiations leading to the agreement currently in force, the union sought to raise players' minimum salary and negotiate a minimum cap on team spending.[53] In a hypothetical world in which both antitrust and labor law applied to the actions of the NBA's 30 team owners, the owners would have found themselves in an impossible Catch-22. On the one hand, agreeing to uniformly impose a minimum cap would violate antitrust law. But on the other, refusing to discuss the caps would violate labor law. By necessity, then, one statute must take precedence over the other. The Supreme Court's recognition of the non-statutory labor exemption reveals labor law's dominance.

### B. The NFL's White Stipulation and Settlement

The NFL provides the setting that the plaintiffs' lawyers seek to emulate in the House Settlement.[54] In *White v. NFL*, the District of Minnesota court held that the non-statutory labor exemption applied to the settlement of several class-action, labor-side antitrust lawsuits filed by

---

[47] *Id.*
[48] *Id.*
[49] 518 U.S. at 240-41.
[50] *Id.* at 241.
[51] *Id.*
[52] For a general discussion of the 2023 NBA collective bargaining agreement, see Sam Quinn, *NBA CBA 101*, CBS SPORTS (Apr. 3, 2023), https://www.cbssports.com/nba/news/nba-cba-101-everything-to-know-about-new-agreement-from-salary-cap-to-free-agency-and-beyond.
[53] *See generally* Mike Vorkunov, *How NBA's New Collective Bargaining Agreement Will Impact this Offseason and Beyond*, THE ATHLETIC (Jun. 28, 2023), https://www.nytimes.com/athletic/4607105/2023/06/28/nba-cba-new-rules/ (discussing NBA "salary floor" imposed in 2023 collective bargaining agreement).
[54] *See* Thamel & Murphy, *supra* note 10 (Steve Berman, co-lead counsel for the plaintiffs in *House v. NCAA*, "compared the proposed solution to how the NFL handled a labor dispute in the early 1990s in . . . White v. NFL").

7

NFL players against their teams.[55] The reason is that the settlement's free agency and group licensing rules were incorporated into the collective bargaining agreement.[56] Although the *White* settlement was initially reached when the players believed they had decertified their union,[57] the court acknowledged that between the court's preliminary approval of the settlement and its final approval, the NFL Players Association ("NFLPA") formally recertified as a union and entered into a collective bargaining agreement that incorporated the terms of the settlement and other rules regarding NFL player-employees.[58] The final terms of the *White* settlement, which included new rules pertaining to future player free agency,[59] entailed mandatory subjects of collective bargaining because they affected the movement and salaries of players.[60] They also primarily affected the parties to the relationship and reflected bona-fide arms' length collective bargaining.[61]

      The process by which the NFL players recertified their union before the court's final approval of the *White* settlement was comprehensive.[62] After the parties reached a tentative agreement to settle *White*, the board members of the purportedly decertified NFLPA passed a resolution seeking to once again "become the collective bargaining representative of the players."[63] The members then collected authorization cards from players designating the NFLPA as their exclusive collective bargaining representative and sent a letter to the NFL indicating that a majority of players had signed union cards.[64]

      After that, the American Arbitration Association confirmed the authenticity of the union vote, and the NFL teams voluntarily recognized the NFLPA as the exclusive representative of the players for collective bargaining purposes, thereafter commencing negotiations with the union.[65] The new agreement included most of the terms of the originally proposed *White* settlement, as well as new terms reflecting the NFLPA's additional progress through collective bargaining.[66] Ultimately, 96 percent of NFLPA members voted to ratify the agreement that included the proposed *White* settlement.[67]

---

[55] *See* White v. NFL, 836 F. Supp. 1458, 1487, 1495-96, 1500-01 (D. Minn. 1993); *see also* White v. NFL, 41 F.3d 402, 406 (8th Cir. 1994) ("In early 1993, the parties to *White v. NFL* agreed to settle that case as well as other litigation related to the ongoing employment dispute.").

[56] *White*, 836 F. Supp. at 1487, 1495.

[57] *See id.* at 1465 n.16.

[58] *White*, 41 F.3d at 407. *See also Mackey*, 543 F.2d at 615 (NFL rule affecting player movement and salaries constitutes mandatory subject of bargaining under National Labor Relations Act).

[59] White v. NFL, 41 F.3d 402, 406 (8th Cir. 1994) (*White* settlement agreement "purports to end a six-year dispute between the NFL member teams and their player-employees" for which "[t]he central issue . . . was the conflict between the players' desire for complete free agency and the NFL's desire to maintain competitive balance among its teams").

[60] *White*, 836 F. Supp. at 1471, 1495-97, 1500-01 (explaining that Eighth Circuit had previously held in *Mackey* that the exemption applies when the three factors are met).

[61] *White*, 836 F. Supp. at 1471, 1495-97, 1500-01.

[62] *See infra* notes __ - __ and accompanying text.

[63] *White*, 836 F. Supp. at 1465.

[64] *Id.*

[65] *Id.*

[66] *Id.* at 1471, 1473-75.

[67] *Id.* at 1485.

8

This painstaking process showed that the adopted version of the *White* settlement was a product of union negotiation and agreement. But even if this detailed process of recertification were not enough, the District of Minnesota court did not grant final approval to the *White* settlement upon its initial review, which occurred before recertification, but waited until after the recertification and completion of good-faith collective bargaining on the proposed settlement terms.[68] During this lengthy process, the NFLPA negotiated and obtained further concessions, including an increase to the proposed salary cap.[69] The court explicitly recognized the importance of this subsequent process in upholding its final approval of the *White* settlement.[70]

### C. The House Settlement

This exhaustive process puts an exclamation point on why the House Settlement falls nowhere near the non-statutory labor exemption. There is no evidence relating to the formation of a duly recognized union bargaining on behalf of college athletes,[71] much less good-faith collective bargaining between the NCAA and its athletes. To the contrary, throughout the entire process in which the NCAA's lawyers were attempting to negotiate the House Settlement, NCAA leadership was paying lobbyists to try to convince Congress to pass a statute *prohibiting* college athletes from unionizing.[72]

Given that Congress has not, to date, adopted the NCAA's recommendation of passing a bill to curtail the prospect of unionization, college athletes still could unionize and enter into good-faith collective bargaining with NCAA member colleges over the terms of the House Settlement prior to final adjudication, much as the NFL players did in *White*. Notably, Jeffrey Kessler, who helped orchestrate the NFLPA recertification process and later argued in favor of the *White* settlement,[73] is co-lead counsel in the *House* litigation.[74]

But unlike the NFL attorneys who favored, if not demanded, that the NFLPA reconstitute itself as a union, the plaintiffs' lawyers in *House*, including Kessler, may have reason to fear that NCAA lawyers would attempt to pull their client out of the proposed House Settlement if the plaintiffs' lawyers took steps toward unionizing college athletes before final adjudication of the settlement. If so, that might help explain why Kessler, perhaps the most famous sports union lawyer in the country, has not pushed further in favor of unionizing college athletes. And without a players union, labor law cannot shield the House Settlement.[75] To state the obvious, the interest

---

[68] *See id.* at 1465; *see generally id.* at 1471 (settlement was "product of arm's length negotiations").
[69] *Id.* at 1471, 1473-75.
[70] *White*, 41 F.3d at 407.
[71] *See* Holden, *supra* note 6, at *32 (explaining that college athletes are not unionized).
[72] *See* Matt Ford, *The NCAA's Plot to Protect Its Riches from Labor Unions*, NEW REPUBLIC (Oct. 24, 2023), https://newrepublic.com/article/176393/congress-ncaa-college-athlete-unions ("Putting an end to the threat of unionized college athletes is a priority for [Senator Joe] Manchin, the NCAA, the athletic conferences, and the schools themselves").
[73] *See White*, 41 F.3d at 406; *White*, 836 F. Supp. at 1461.
[74] *See* Ross Dellenger, *NCAA Settlement Q&A: How Will Schools Distribute Revenue, What is the Future of NIL Collectives and More*, YAHOO! SPORTS (May 24, 2024), https://sports.yahoo.com/ncaa-settlement-qa-how-will-schools-distribute-revenue-what-is-the-future-of-nil-collectives-and-more-125519681.html.
[75] *White*, 41 F.3d at 407.

of lawyers on both sides of the House Settlement to forestall antitrust scrutiny does not serve as an effective substitute for the non-statutory labor exemption.

### III.   An Alternative Public Policy Exemption for Litigation Settlements

Given the clear inapplicability of the non-statutory labor exemption to the House Settlement,[76] it would seem that antitrust scrutiny cannot be avoided. Despite that, lawyers involved in the settlement have suggested that this case is unique and thus calls for broader insulation from antitrust scrutiny.[77]

The argument in favor of extending the non-statutory exemption beyond the scope of collective bargaining stems from the claims that the settlement is fair to all parties and better than what could be achieved through collective bargaining.[78] For example, Jeffrey Kessler described the proposed settlement as "fair and transformative for the athletes" and the product of the work of legal teams that "have been fighting for the rights of college athletes for well more than a decade."[79] His co-counsel Steve Berman has similarly defended the settlement as providing compensation "comparable" to what the athletes "might achieve at trial 'but only after more years of litigation facing an uncertain outcome.'"[80]

Even if the plaintiffs were correct, however, that the settlement's salary terms were "fair" (however defined), there are at least four reasons why that would not support a new antitrust exemption protecting the settlement. First, the fairness of the terms is not relevant under antitrust law,[81] which ensures not fair prices but free market prices.[82] And even if one were to find the

---

[76] *See supra* notes __ - __ and accompanying text.

[77] *See generally* Pete Thamel & Dan Murphy, *Why an NCAA Antitrust Settlement will Leave Lots of Questions Unanswered*, ESPN (May 16, 2004), https://www.espn.com/college-football/story/_/id/40158775/ncaa-house-antitrust-settlement-billions-dollars-unanswered-questions (explaining that "Steve Berman, co-lead counsel for the plaintiffs in the House case, said he believes he has devised a mechanism" to insulate the NCAA from antitrust scrutiny for the restraints imposed by the House settlement); Marc Edelman interview of Jeffrey Kessler, Fordham Law Review Symposium, Nov. 1, 2024, 1:56 PM (Kessler states that "antitrust injunctions can allow for less than full relief and we know they can allow for that in class action settlements"); Pete Thamel, *NCAA Settlement a Historic Day for Paying College Athletes. What Comes Next?* ESPN (May 23, 2024), https://www.espn.com/college-football/story/_/id/40206469/ncaa-settlement-pay-college-players-analysis (explaining that "college leaders are also hoping they can lay their new settlement at the feet of Congress as a show of good faith" and that "[i]n turn, they hope to spur some momentum for a federal law that gives them increased protection from lawsuits in the future"). For an analogous theme in a different setting, see *FTC v. Actavis*, 570 U.S. 136 (2013) (rejecting argument that public policy favoring settlements shielded agreements by which brand-name drug companies paid generics to delay entering market).

[78] *See infra* notes __ - __ and accompanying text.

[79] Daniel Libit, *Kessler Defends House v. NCAA Deal Amid Fontenot Case Flak*, SPORTICO (May 22, 2024), https://www.sportico.com/leagues/college-sports/2024/kessler-house-ncaa-deal-fontenot-1234780034.

[80] Michael McCann, *NCAA Fires Back on Objectors, Defends House Settlement*, SPORTICO, https://www.msn.com/en-us/sports/other/ncaa-fires-back-at-objectors-defends-house-settlement/ar-AA1p0T36 (last visited Nov. 21, 2024).

[81] *See* United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 331-32 (1897) (antitrust law does not allow court to assess "reasonable rate"). Courts similarly have not accepted defenses that a restraint serves some other social value or protects society from ruinous competition. *E.g.*, FTC v. Super. Ct. Trial Lawyers Ass'n, 493 U.S. 411, 421–22 (1990); FTC v. Ind. Fed'n of Dentists, 476 U.S. 447, 463 (1986); Nat'l Soc'y of Pro. Eng'rs v. United States, 435 U.S. 679, 692 (1978); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 222 (1940).

[82] 166 U.S. at 337 ("Competition, free and unrestricted, is the general rule which governs all the ordinary business pursuits and transactions of life.").

10

establishment of a fair price to be sufficient, any maintenance of such a price most likely would only be fleeting. As the Supreme Court explained in *United States v. Socony-Vacuum*: "Those who fixed reasonable prices today would perpetuate unreasonable prices tomorrow, since those prices would not be subject to continuous administrative supervision and readjustment in light of the changed conditions."[83]

The second reason why the settlement should not be entitled to a new exemption is that antitrust law promotes the welfare of consumers, not just the litigants in a lawsuit. Making this clear, at the same time the plaintiffs' lawyers were litigating the private actions that gave rise to the House Settlement, attorneys general for the states of Tennessee and Virginia were litigating another antitrust lawsuit, *Tennessee v. NCAA*, that challenged a *different* aspect of NCAA rules that had prevented colleges from negotiating with collectives, which alumni, boosters, and businesses have created to provide NIL opportunities to their school's athletes during the recruitment period.[84]

Tennessee and Virginia explained in their pleadings that these NCAA restraints not only operated to the detriment of college athletes in their states, but also did not serve the broader interests of the consumers of college sports.[85] This makes sense. It is a basic principle of free-market economics that "[i]f the working of the market is trusted to produce the greatest number of goods at the lowest possible price, anything that interferes with the market necessarily lowers consumer welfare."[86] Recognizing as much, the U.S. District Court for the Middle District of Tennessee issued a preliminary injunction that prevented NCAA-affiliated entities from enforcing their rules prohibiting college athletes from negotiating compensation with any third-party entity, including boosters or collectives.[87] This injunction arguably benefited a broader consumer class than just the athletes' themselves. So would a settlement of the underlying claims in *House*, *Hubbard* and *Carter*, claims that affect not just the plaintiff athletes, but also a broader class of consumers that seek to express their preferences for seeing the best college athletes play for their local school through their willingness to pay more money to attend games featuring the most elite athletes.

The lawyers who drafted the House Settlement, to state the obvious, do not directly represent the consumer interest or account for the loss of consumers' ability to signal their preference for their favorite teams signing certain college athletes based on the imposition of a salary cap that limits the ability to signal preference through their spending. In addition, the lawyers who drafted the House Settlement, in agreeing to a salary cap, appear to have undermined the unlimited, free market opportunities for boosters or collectives to induce college

---

[83] 310 U.S. at 221.

[84] *See Tennessee Sues NCAA Challenging its NIL-Recruiting Ban* (Jan. 31, 2024), https://www.tn.gov/attorneygeneral/news/2024/1/31/pr24-10-tennessee-sues-ncaa.html; *see also* Complaint, *Tennessee v. NCAA*, No. 3:24-cv-33 (E.D. Tenn. Jan. 31, 2024); Tennessee v. NCAA, 2024 WL 755527 (Feb. 23, 2024), at **1, 6-7 (preliminarily enjoining NCAA from enforcing restraints on payments from collectives, including collectives of boosters).

[85] Complaint, *Tennessee v. NCAA*, No. 3:24-cv-33 ¶11 (E.D. Tenn. Jan. 31, 2024); Tennessee v. NCAA, 2024 WL 755527, at *5 (Feb. 23, 2024).

[86] Robert L. Heilbroner, The Worldly Philosophers 70 (1995) (in chapter entitled "The Wonderful World of Adam Smith").

[87] Tennessee v. NCAA, 2024 WL 755527, at *6 (Feb. 23, 2024).

athletes to attend particular schools, as was enabled by the preliminary injunction that the court issued in the *Tennessee* case.

Third, expanding the non-statutory labor exemption to encompass the House Settlement in the absence of any union relationship would deter employers in other joint venture industries from recognizing the unionization of their workers.[88] Such an expansion is adverse to "a national labor policy favoring free and private collective bargaining."[89] Indeed, one of the reasons why one rarely, if ever, sees club owners in a professional sports league contesting athletes' efforts to unionize is that the traditional tradeoff for voluntarily entering into good-faith collective bargaining negotiations with athletes over working terms and conditions is freedom from challenges to industry-wide rules under antitrust law.[90] If a non-statutory exemption were extended to litigation settlements outside collective bargaining, professional sports teams would be able to have their cake and eat it too. In other words, they could avoid antitrust law while *also* avoiding good-faith bargaining. As a result, there would no longer be any incentive to recognize the athletes' effort to unionize as part of a quid pro quo for an antitrust exemption.[91] Sports associations would simply seek to resolve antitrust litigation filed by athletes through private settlements.

Finally, immunizing settlement terms from antitrust scrutiny would leave college athletes inadequately protected if the negotiated agreement is arbitrary, discriminatory, or in bad faith. Normally, where the non-statutory labor exemption applies, courts have held that "[i]n seeking the best deal for [player labor], the representative has the ability to advantage certain categories of players over others," but only "subject . . . to the representative's duty of fair representation."[92] As a result, if the terms of a collectively bargained agreement are found to be arbitrary, discriminatory, or in bad faith, athletes would be able to challenge it.[93] Even the *threat* of such action could ensure that the union considers the interests of future athletes to whom it would owe such a duty.[94]

---

[88] As one recent example, team owners in the USL Super League, one of the two U.S. Division I women's professional soccer leagues, voluntarily recognized a proposed players union. *See* Jeff Carlisle, *USL Super League Players Join USLPA, Seek to Ratify CBA*, ESPN (Nov. 8, 2024), https://www.espn.com/soccer/story/_/id/42265788/usl-super-league-players-join-uslpa-seek-ratify-cba. If union recognition was not a prerequisite for garnering the legal benefits of the non-statutory labor exemption, league owners might not have granted recognition voluntarily and instead required the USL players to seek union approval from the NLRB.

[89] Clarett v. NFL, 369 F.3d 124, 130 (2d Cir. 2004).

[90] *See generally* Alston v NCAA, 594 U.S. 69, 111 (2021) (Kavanaugh, J., concurring) (discussing how professional sports leagues can legally maintain wage-fixing restraints that NCAA cannot because they collectively bargain over those terms).

[91] By contrast, absent the creation of a new, special antitrust exemption of this nature, employers in joint ventures have an incentive to support employee unionization to enjoy the benefits of the non-statutory labor exemption, thereby avoiding potential liability under federal antitrust laws.

[92] Clarett v. NFL, 369 F.3d 124, 139 (2d Cir. 2004).

[93] *See* Marc Edelman & Joseph A. Wacker, *Collectively Bargained Age/Education Requirements: A Source for Antitrust Risk Among Sports Club-Owners or Labor Risks for Players Unions?*, 115 PENN ST. L. REV. 341, 368-69 (2010) (National Labor Relations Act (NLRA) provides that "once a union has been selected as the exclusive representative of the employees in a bargaining unit," it "owes a duty of fair representation to all members of the unit," which "is akin to the duty owed by other fiduciaries to their beneficiaries") (internal quotations and citations omitted).

[94] *E.g., id.* at 371-74.

By contrast, outside a collective bargaining relationship, a college athlete or class of athletes who believe they are not adequately represented by the negotiation would have no such economic remedy. While the House Settlement includes a procedure for current and future athletes to opt out of the agreement, it does not create an equivalent cause of action to one that exists in the event of the breach of a duty of fair representation.[95] While the exact contours of this difference are beyond the scope of this Essay, at a minimum it is safe to recognize that NLRB-recognized unions owe a legal duty to prospective, future athletes in their sports in a manner in which plaintiffs' lawyers do not.[96]

### IV.   Conclusion

Upon first glance, the House Settlement seems to be the best of both worlds: a large settlement to athletes and antitrust peace. But it is not so easy. Lawyers for plaintiffs in a particular case cannot bind all future plaintiffs. And they certainly cannot do so without an exemption from antitrust law like the non-statutory labor exemption. Even if the House Settlement is approved, future plaintiffs will be waiting in the wings, and the settlement will do nothing to stop them from filing suit and holding the NCAA to account for antitrust violations.

---

[95] *See* Vaca v. Sipes, 386 U.S. 171, 177 (1967) (explaining that NLRB-recognized unions incur "a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct").

[96] *See generally* Clarett v. NFL, 369 F.3d 124, 139, 140-41 (2d Cir. 2004) (subject to NLRA's duty of fair representation, union allowed to bargain over draft eligibility rules that may affect future employees, potentially establishing legally binding relationship between union leaders and future employees).