# APPENDIX G

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
(OAKLAND DIVISION)

| | |
|---|---|
| IN RE: COLLEGE ATHLETE NIL LITIGATION | Case No. 4:20-cv-03919-CW |
| | **DECLARATION OF PROFESSOR STEPHEN F. ROSS IN SUPPORT OF OBJECTION TO SETTLEMENTS ON BEHALF OF CLASSES OF PAST, CURRENT AND FUTURE NCAA COLLEGE ATHLETES** |
| | Hon. Claudia Wilken |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.    INTRODUCTION AND SUMMARY

1.  My name is Stephen Ross. I am a Professor of Law and the Lewis H. Vovakis Distinguished Faculty Scholar at the Penn State Center for the Study of Sport in Society at the Pennsylvania State University. I am also a Co-Director of the Penn State Center for the Study of Sport in Society at that institution. Before joining the academy, I was an attorney at the Federal Trade Commission and the Department of Justice Antitrust Division.  I have written extensively on sports topics, including collegiate athletics administered by the National Collegiate Athletic Association ("NCAA"). I have also consulted globally with leagues, sports federations, and players' unions concerning the design of sporting competitions and the regulations of competition for players' services.  My CV is attached as Exhibit A to this declaration.

2.  I submit this declaration in opposition to the proposed injunctive relief settlement ("IRS") negotiated between Class Counsel in the *House* and related cases and the NCAA. I have reviewed both the proposed IRS and the overall proposed settlement to which it was appended. I have read all of the briefing submitted for and against preliminary approval of the proposed settlement.

3.  It is my considered opinion that the proposed IRS should not be given final approval by this Court for several reasons. *First*, it represents an unprecedented and unwarranted extension of the nonstatutory antitrust exemption recognized under federal labor law. *Second*, it trades monetary benefits for current members of the class and uncertain potential economic benefits for some future athletes in exchange for broad antitrust immunity in a manner likely to injure many future college athletes and fans of Division I college football and basketball. *Third*, it creates an unprecedented cap on revenue sharing with Division I college athletes that has no corresponding floor, which is both unfairly one-sided and likely to create a competition unresponsive to consumer preference.

## II.    THE PROPOSED IRS CONSTITUTES AN UNPRECEDENTED AND UNWARRANTED EXPANSION OF PRINCIPLES DERIVED FROM THE NON-STATUTORY LABOR EXEMPTION TO THE SETTLEMENT OF A CLASS ACTION UNDER FEDERAL RULE OF CIVIL PROCEDURE 23

4.  Based on the distinctive need to balance the potentially conflicting policies reflected the Sherman Act (15 U.S.C. §§ 1-8) and the National Labor Relations Act ("NLRA") (29 U.S.C. §§ 151-169), the United States Supreme Court has held that anti-consumer and anti-labor employer restraints are immunized from antitrust scrutiny when they arise out of a collective bargaining relationship between employers and the NLRA-mandated exclusive bargaining representatives of workers in a bargaining unit designated by the National Labor Relations Board ("NLRB"). *See Brown v. Pro-Football*, *Inc*., 518 U.S. 231, 250 (1996). This permits workers seeking their own objectives to agree with employers to restrain output in a manner unresponsive to consumer preference, *Local U. No. 189, Amalgamated Meat Cutters & Butcher Workmen of No. Am., AFL-CIO v. Jewel Tea Co.,* 381 U.S. 676, 689-91 (1965) (agreement barring supermarket from selling meat after 6 p.m. upheld).  It also allows workers to gain substantial concessions in collective bargaining on other

matters in return for, in effect, selling antitrust immunity to an employer group through bargaining that was not in good faith. *See McCourt v. California Sports, Inc.,* 600 F.2d 1193, 1199-1202 (6th Cir. 1979) (significant anticompetitive restraints on player market exempt from antitrust scrutiny when agreed to by union in return for significant concessions on other matters). Universities seeking to gain antitrust immunity through collective bargain could arrange for players to become employees of their athletic conferences and negotiate such a bargain. *See* William W. Berry, III, *Beyond NIL,* 26 Vand. J. Ent. & Tech L. 275, 294 (2024). Such policies would therefore come into play if successors to the college athletes currently in the certified class were to vote to form a union and engage in collective bargaining.

5. There is no precedent for granting this power to counsel for the representative of a class certified pursuant to Fed. R. Civ. P. 23(b)(1). Neither policies of civil procedure nor antitrust policy support the idea that various stakeholders in an industry may agree to restrain trade that harms some groups for the benefit of others. Indeed, while the NLRA and non-statutory labor exemption jurisprudence explicitly contemplate that, as part of its duty of fair representation, unions may trade off benefits to some members against harms to others, *see, e.g., Wood v. Nat'l Basketball Ass'n,* 809 F.2d 954, 961 (2d Cir. 1987), Fed. R. Civ. Pr. 23(e)(2) requires equitable treatment of all members of a class. As noted herein, the settlement provides substantial compensation to those members of the class who have or are about to end their college careers, but it imposes substantial restrictions on the ability of elite athletes currently in high school to receive market-based compensation for their services to top football and basketball programs.

6. The IRS ultimately reflects the parties' collective judgment that competition is not in the public interest; rather, in their view, the public interest would be served by a discretionary cash payment to college football players and a scheme that limits future compensation. However, the Supreme Court has clearly rejected the notion that federal courts can approve this sort of arrangement. *Nat'l Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 693-96 (1978) (ban on competitive bidding was a *per se* violation of the Sherman Act). In so doing, the Court wisely followed the sage admonition of Chief Justice William Howard Taft in his path marking decision in *United States v. Addyston Pipe & Steel Co.,* 85 Fed. 271 (6th Cir. 1898) *aff'd as modified,* 175 U.S. 211 (1899) that to allow judges and private parties to determine when competition should be supplanted would be to "set sail on a sea of doubt." 435 U.S. at 696.

### III.     THE PROPOSED IRS IMPROPERLY TRADES SHORT-TERM MONETARY BENEFITS TO MEMBERS OF THE PLAINTIFF CLASS FOR IMMUNITY FOR ANTICOMPETITIVE RESTRAINTS THAT HARM FUTURE CLASS MEMBERS AND CONSUMERS, BY RENDERING FUTURE OUTPUT UNRESPONSIVE TO CONSUMER PREFERENCE.

7. Were the proposed IRS unilaterally adopted by NCAA member schools, the effective "salary cap" on the amount of compensation that top college football programs can spend on player talent would constitute an unreasonable restraint of trade in violation of Section 1 of the Sherman Act. Precedents establish that neither elite college football players, nor

fans, find other products to be reasonable substitutes for Division I Football Bowl Subdivision football. There is no plausible, pro-competitive justification for the salary cap. In fact, the IRS' supporters promote the settlement as equating college with professional sports by reason of the alleged equal sharing of revenue. *See* ECF No. 450 at 22. Although courts have recognized that competitive balance is a potentially viable justification, this is only where the degree of competitive balance that the defendants seek to achieve will increase fan appeal, and only where the challenged restraint actually furthers that objective. In light of the historic imbalance in college football, concurrently with the sport's exploding commercial popularity, there is no evidence that college football fans desire significant competitive balance.[1]  Moreover, it is highly doubtful that the proposed salary cap will actually achieve such balance.  The agreement sets a maximum salary without limits to the many other ways in which the historically dominant programs maintain their position.  The absence of a floor provides no assurance that programs that are weaker because of a lack of sufficient team-specific revenue to compete will actually spend funds necessary to compete more effectively against dominant programs.  For this reason, absent immunity through the labor exemption or a court-approved settlement agreement, the proposed cap is clearly unlawful.  *Cf. Robertson v. Nat'l Basketball Ass'n,* 556 F.2d 682, 686 (2d Cir. 1977) (court concluded that modified labor restraints in professional basketball league, where player draft can significantly improve poor teams quickly and with plausible claims for output-enhancing competitive balance, were not "clearly unlawful").

8.  Indeed, in the short run, the cap is likely to harm competitive balance as applied to well-funded programs who do poorly. If the cap were in place following this season, it would substantially constrain the Alabama Crimson Tide, USC Trojans, Michigan Wolverines, Florida State Seminoles, and others from improving to a level demanded by their fans. Moreover, because of the difficulty in challenging well-established rivals (detailed in global soccer by economist Stefan Szymanski), only programs prepared to invest huge sums of money in excess of those spent by dominant rivals can hope to join the elite group.[2]

9.  Absent the salary cap, elite players would receive more compensation from the top programs than they would receive under the proposed settlement's anticompetitive scheme, and programs would spend money to develop the level of athletic programs its fans wish to support.  In light of the Supreme Court's admonition that the Sherman Act is a "consumer welfare prescription," *NCAA v. Bd. Of Regents of Univ. of Okla.,* 468 U.S. 85, 107 (1984) ("*Board of Regents*") (*citing Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979)), consumer welfare is not advanced when output is unresponsive to consumer preference. *See Board of Regents*, 468 U.S. at 106 n.30 ("[b]ecause of the NCAA controls,

---

[1] In this regard, consumer preference is measured by overall attendance or television ratings, not a one-person/one-vote preference of consumers of smaller programs who ideally would like their alma mater to compete against elite schools but lack the willingness to pay for it.

[2] Stefan Szymanski, *Money and Soccer: A Soccernomics Guide; Why Chievo Verona, Unterhaching, and Scunthorpe United Will Never Win the Champions League, Why Manchester City, Roma, and Paris St. Germain Can, and Why Real Madrid, Bayern Munich, and Manchester United Cannot Be Stopped* (2015), ch. 2.

**DECLARATION OF PROFESSOR STEPHEN F. ROSS IN SUPPORT OF OBJECTION TO SETTLEMENTS ON BEHALF OF CLASSES OF PAST, CURRENT AND FUTURE NCAA COLLEGE ATHLETES**

the price which is paid for the right to televise any particular game is responsive neither to the relative quality of the teams playing the game nor to viewer preference.").

10. The parties expressly agreed (ECF No. 535-1 at 24) that an essential element of the IRS is that all members of the injunctive class are barred from challenging the terms of the salary cap arrangement. If a union, which exercises a statutory right to serve as the exclusive representative of all current and future members of a bargaining unit, wishes to exercise is duty of fair representation to reach an agreement that favors some members of the bargaining unit, even if others are worse off, that is the policy of the National Labor Relations Act. *J.I. Case Co. v. NLRB,* 321 US. 332, 338-39 (1944) (generally); *Clarett v. NFL,* 369 F.3d 124 (2d Cir. 2004) (Sotomayor, J) (union agreements can disadvantage those not yet in the bargaining unit). I am unaware, however, of any precedent where a court approved a settlement purportedly fair to the entire class (because of a large cash settlement to those directly affected by pre-existing antitrust violation) by disadvantaging future victims who are members of the injunctive class.

11. Class counsel's view that their role here is closely analogous to the role of counsel for professional athletes who have settled an antitrust class action under Fed. R. Civ. P. 23 settlement in combination with a new collective bargaining agreement (*see, e.g., White v. NFL,* 41 F.3d 402, 406 (8th Cir. 1994)) is evident in their Supplemental Motion (ECF No. 534 at 2), when they suggest that the "critical inquiry" for this Court is to determine whether a particular aspect of conduct expressly permitted by the injunctive relief settlement is "fair and reasonable to the injunctive class where it is more than offset by the tens of billions of dollars in other benefits the Agreement allows." This is only an important inquiry for this Court after it first determines that the standard for approval of injunctive relief under Rule 23 that significantly affects third party consumers whose welfare is the prime object of the Sherman Act, and significantly affects future members of the class who will recover nothing in monetary damages and will receive reduced economic benefits than would exist were it not for the injunction--should indeed focus solely on the interests of the injunctive class as a whole.

12. Class counsel seeks to assuage any concerns of the Court with regard to continuing NCAA regulations permitted by the IRS to prevent "faux" NIL payments by boosters that reflect supplemental compensation to athletes for their playing services, rather than legitimate payments for publicity rights. *Id.* They observe that these regulations are reasonable to prevent cap evasion. The Court seemed concerned that these regulations would limit individual athletes' opportunities, but the fundamental flaw is not ancillary restraints to a salary cap, but the salary cap itself. These regulations are only necessary because salary caps artificially restrain compensation to talented players. In an unrestrained market, colleges would pay their athletes their market value and boosters would donate to the colleges, not pay the players separately through phony NIL licenses.

**IV.   THE IRS' INTRODUCTION OF AN UNPRECEDENTED REVENUE SHARING CAP WITHOUT A REVENUE SHARING FLOOR IS FURTHER EVIDENCE THAT IT REFLECTS A CARTEL ARRANGEMENT AMONG NCAA SCHOOLS TO IMPROPERLY PROP UP PROGRAMS UNABLE TO COMPETE IN A FREE MARKET.**

13. In *Board of Regents,* the NCAA attempted to justify a significant restraint on output unresponsive to consumer preference – a fixed limit on the number of television appearances of the most popular teams – based on a desire to allow less popular programs to compete at the top level of intercollegiate athletics. The Supreme Court expressly rejected the legality of this scheme under the Sherman Act. Absent a congressional exemption, the risk that competition from the most successful programs would inhibit the ability of lesser programs to compete is part of the competitive process that the Sherman Act protects.

14. Any argument that the proposed IRS resembles in some respects salary caps imposed by professional sports leagues is unavailing here. Caps in such leagues all reflect a collectively bargained floor that promotes competitive balance, and they protect the consumer interest in maintaining loyalty to weaker teams, by insisting that clubs must spend a fixed *minimum* amount on player talent. In the National Football League, for example, the amount is 89% of the maximum permitted under the salary cap. Indeed, noted observers have criticized Major League Baseball ("MLB") and its players for not agreeing to a similar scheme to protect the interest of consumers from small market teams like the Oakland A's or Pittsburgh Pirates.[3]

15. Here, the proposed IRS has a cap on revenue sharing with college athletes, *but no floor*. As Article 3 of the IRS states: "Each Member Institution *will be permitted, but not required*, to distribute, each Academic Year, additional payments and/or benefits to student-athletes over and above annual existing scholarships and all other benefits currently permitted by NCAA rules as of the date of the filing of the motion for final approval up to a certain amount (the 'Pool')." ECF No. 535-1 at 61. Colleges thus are free to engage in *no* such sharing if they so wish.

16. Without a salary floor, the proposed IRS means that well-funded but under-performing programs (such as USC, Alabama, Florida State, etc.) are *precluded* from spending funds necessary to respond to their fans' preferences, but there is no guarantee that traditionally weaker and underfunded programs (such as Northwestern, Vanderbilt, or California) will spend the money needed to be competitive with the currently dominant teams (Oregon, Notre Dame, Texas, Penn State, Ohio State). This reflects the goal of a classic cartel: fix prices or spending so that the weak and inefficient programs that cannot compete in a free market can continue to function at minimal levels, while allowing more successful firms

---

[3] *See, e.g.*, Joel Litvin, *Salary cap is the best-long term system for MLB*, Sports Business Journal, (Jan. 10, 2022), https://www.sportsbusinessjournal.com/Journal/Issues/2022/01/10/Opinion/Litvin.aspx.

**DECLARATION OF PROFESSOR STEPHEN F. ROSS IN SUPPORT OF OBJECTION TO SETTLEMENTS ON BEHALF OF CLASSES OF PAST, CURRENT AND FUTURE NCAA COLLEGE ATHLETES**

to reap vast profits as the cap prevents them from spending revenues on continuous improvement of talent.

## V.    CONCLUSION

17. For all of the foregoing reasons, it is my considered opinion, based on my extensive knowledge and expertise, that the proposed IRS should not be granted final approval by this Court.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct based on information known to me.


DATED: <u>January 21, 2025</u>                    <u>*/s/ Stephen F. Ross*        </u>
                                              STEPHEN F. ROSS

# APPENDIX A

**STEPHEN F. ROSS**
The Pennsylvania State University
332 Katz Building
University Park, PA 16802
e-mail: sfr10@psu.edu

<u>Professional History</u>

Professor of Law and Co-Director, Center for the Study of Sports in Society, The Pennsylvania State University, 2006 through present, Lewis H. Vovakis Distinguished Faculty Scholar, 2008-present. Courses taught: Contracts, Comparative Constitutional Law, Common Law Reasoning and Statutory Interpretation, Constitutional Law, Sports Law, Sports & Public Policy, Statutory Interpretation, Special project in Baseball Salary Arbitration

Visiting Professor, University of Sydney Faculty of Law, 2013-15. Courses taught: Canadian Constitutional Law

Senior Fellow, Sports Law Program, Melbourne Law School, University of Melbourne, 2013-20. Courses taught: Comparative Sports and Competition Law

Professeur associé, Faculty of Law, University of Montreal, 2014, 2020-2021. Course taught: Comparative Constitutional Law (via teleconferencing to American and UdeM students)

Visiting Scholar in Law and Sproul Fellow in Canadian Studies, University of California (Berkeley), 2012-13

Visiting Professor, Cass Business School, City University of London, 2009-10. Courses taught: Sports Business

Visiting Professor of Law, University of British Columbia Faculty of Law, 2000-09, 2013 Course taught: Comparative U.S./Canadian Law (via teleconferencing to American and UBC students)

Professor of Law, University of Illinois College of Law, 1986-2006 (Associate Professor, 1989-91, Assistant Professor, 1986-89). Courses taught: Antitrust, Advanced Antitrust, Antitrust & Intellectual Property (both U.S. and Comparative U.S./ Canadian/ European), Canadian Competition Law, Comparative Constitutional Law (U.S./ Canada), Government Regulation, Legislation, Real Property, Sales, Sports Law, Sports Law & Economics, Statutory Interpretation (Voting Rights Act), Statutory Interpretation (Welfare Legislation). Seminars and projects supervised: Appellate Advocacy, Baseball and Antitrust, Baseball and Public Policy (undergraduate course), Baseball Salary Arbitration, Canadian Constitutional Law, Legislative Drafting, N.C.A.A. Rulemaking

Visiting Professor of Law, University of New Brunswick Faculty of Law, 2005 Course taught: Canadian Competition Law

(cont'd)

Stephen F. Ross
Resume
Page 2

Professional History, cont'd

Visiting Scholar, University of British Columbia Faculty of Law, January-June 1999

Contributing Editor, Antitrust magazine of the Section on Antitrust Law of the American Bar
Association, 1991-99 (founding Editor-in-Chief, 1986-91)

Minority Counsel, Committee on the Judiciary, United States Senate, 1983-85

Attorney, Appellate Section, Antitrust Division, United States Department of Justice, 1981-83

Law Clerk, Hon. Ruth Bader Ginsburg, United States Court of Appeals for the District of
Columbia Circuit, 1980-81

Attorney, Office of General Counsel, Federal Trade Commission, 1979-80

Education

J.D., 1979, University of California (Berkeley)

Associate Editor, California Law Review, 1977-79.
Member, Order of the Coif.
American Jurisprudence Awards in Crimes, Constitutional Law, and Evidence.
Finalist, Jamison Award for Law and Advocacy.

A.B., 1976, cum laude, University of California (Berkeley) (departmental honors in political
science)

Publications

BOOKS:

**Sports and the Law**, 7th ed. (co-authored by Paul C. Weiler, Jodi Balsam, Will Berry, and
Michael C. Harper) (Thomson/West 2023)
**Derecho Deportivo Global** (Thomson-Reuters 2022) (with Sergio Gonzalez Garcia)
**Advanced Introduction to Global Sports Law** (Edward Elgar 2021)
**Comparative Constitutional Law: A Contextual Approach** (with Helen Irving and Heinz
Klug) (Lexis/Nexis Publishing 2014)
**Handbook of International Sports Law** (co-edited with James A. Nafziger) (Edward Elgar
Press (2011) (including own chapter on Competition Law and Labor Markets).

(cont'd)

Stephen F. Ross
Resume
Page 3

<u>Academic Publications</u>, (cont'd)

BOOKS (cont'd)

**Fans of the World, Unite! A (Capitalist) Manifesto for Sports Consumers** (with Stefan Szymanski) (Stanford Univ. Press 2008)
**Principles of the Law of Antitrust** (Foundation Press 1993)

LAW REVIEW AND ECONOMIC JOURNAL ARTICLES AND ACADEMIC BOOK CHAPTERS:

<u>Would Jackie Robinson play baseball today?  How baseball owners conspire to restrain trade and foster unequal opportunities for player development,</u> Marq. Sports Law Review (2025) (forthcoming)

<u>Applying the FTC Act to Anti-Consumer Contract Terms that are not Key Salient Terms to Most Consumers,</u> 53 Univ. of Balt. L. Rev. Issue #1, Art. No. 5 (2024) (symposium)

<u>Promoting Female Sporting Opportunities Without Title IX: The Spanish Experience,</u> 33 Marq. Sports L. Rev. 607 (2022) (co-authored with Maria Josefa Garcia Cirac).

<u>Is It Ever Too Soon to Call a Penalty? A Philosophical Investigation on the Role Discretion in Considering Commercial Interests Should Play in Sport Refereeing,</u> in **Jurisprudence of Sport** (Miroslav Imbrisovic, ed. Routledge Press 2022) (with Francisco Javier López Frías)

<u>Proportionality Review in Pennsylvania Courts,</u> 2021 Pa. Bar Ass'n Q. 109 (with Jud Mathews)

<u>Solving the Problem of Social Cost through Legislative Pressure: A Case Study of the Coase Theorem as Applied to the College Basketball Shoe Scandal,</u> 30 Marq. Sports L. Rev. 9 (2019) (with Miles J. Gueno)

<u>The Political Process and Substantive Due Process,</u> 20 U. Penn. J. Const'l L. 983 (2018) (with Jesse H. Choper)

<u>Clear Statement Rules and the Integrity of Labor Arbitration,</u> 10 Arbitration L. Rev. 1 (2017) (with Roy Eisenhardt)

<u>The Single-Entity Doctrine of Antitrust as Applied to Sports Leagues</u> in **The Oxford Handbook of American Sports Law** (Michael A. McCann, ed.) (Oxford University Press 2018))

<u>Litigation as Strategy to Overcome Monopolistic Inefficiency in Sports,</u> 386 Managerial and Decision Econ. 644 (2016)

(cont'd)

Stephen F. Ross
Resume
Page 4

Academic Publications (cont'd)

A Strategic Legal Challenge to the Unforeseen Anticompetitive and Racially Discriminatory Effects of Baseball's North American Draft, 115 Colum L. Rev. Sidebar 127 (2015) (with Michael James, Jr.)

Reform of Sports Gambling in the United States: Lessons from Down Under, 5 Ariz. St. Sports & Ent. L.J. 7 (2015) (with James Gorman III and Ryan Mentzer)

A Rapid Reaction to O'Bannon: The Need for Analytics in Applying the Sherman Act to Overly Restrictive Joint Venture Schemes,  119 Penn St. L. Rev. Penn Statim 43 (2015) (with Wayne S. DeSarbo)

Insights from Canada for American Constitutional Federalism, 16 U.Pa. J. Const'l L. 891 (2014)

A Regulatory Solution to Better Promote the Educational Values and Economic Sustainability of Intercollegiate Athletics, 92 U. Ore. L. Rev. 837 (2014) (with Matthew J. Mitten)

Judicial Review of NCAA Eligibility Decisions: Evaluation of the Restitution Rule and a Call for Arbitration (with Richard T. Karcher & S. Baker Kensinger), 40 J. Coll. & Univ. L. 101 (2014)

Accommodating Labor and Antitrust, 2013 Utah L. Rev. OnLine No. 1

Using Contract Law to Tackle the Coaching Carousel (with Lindsay Berkstressser), 47 U.S.F. L. Rev. 709 (2013)

Radical Reform of Intercollegiate Athletics: Antitrust, Title IX, and Public Policy Implications, 86 Tulane L. Rev. 933 (2012) (symposium)

The Supreme Court's Renewed Focus on Inefficiently Structured Joint Ventures, 14 U. Pa. Bus. L. Rev. 261 (2012)

The Story of *Flood v. Kuhn*: Dynamic Statutory Interpretation, At the Time, in **Statutory Interpretation Stories** (William Eskridge, Philip Frickey, and Elizabeth Garrett, eds. Foundation 2010)

Seizing the Moment: A Blueprint for Reform of World Cricket (with Ian Preston and Stefan Szymanski) in Stefan Szymanski, **The Comparative Economics of Sport** (Palgrave 2010) (originally web published 2001)

Statutory Interpretation as a Parasitic Endeavor, 44 U.S.D. L. Rev. 1027 (2008) (symposium)

(cont'd)

Stephen F. Ross
Resume
Page 5

Academic Publications (cont'd)

The Concept of the Residual Claimant and Sports League Governance in **Governance and Competition in Professional Sports Leagues** (Placido Rodriguez Guerrero, Stefan Kesenne, Jaume Garcia, eds.) (Univ. of Oviedo Press 2007)

Governance and Vertical Integration in Team Sports (with Stefan Szymanski), 25 Contemporary Econ. Pol. 616 (2007)

Antitrust and Inefficient Joint Ventures: Why Sports Leagues Should Look More Like McDonald's and Less Like the United Nations, 16 Marquette Sports L.J. 213 (2006)

The Effect of Baseball's Status as a Legal 'Anomaly and Aberration', in **Legal Issues in Professional Baseball** (L. Kurlantzik, ed.) (Academic Press, 2005)

Player Restraints and Competition Policy Throughout the World, 15 Marquette Sports L. Rev. 49 (2004) (symposium on international sports law and business)

The NHL Labour Dispute and the Common Law, the Competition Act, and Public Policy, 37 U.B.C. L.Rev. 343 (2004)

Some Outside Observations on Overly Restrictive Agreements and the *Souths* Rugby Case, 12 Australian Consumer & Comp. L. J. 83 (2004)

Competition Law as a Constraint On Monopolistic Exploitation by Sports Leagues and Clubs, 19 Oxford Rev. of Econ. Policy 569 (2004)

Antitrust, Professional Sports, and the Public Interest, 4 J. Sports Econ. 318 (2003) (symposium on baseball and economics)

The Political Economy of the Efficiency Defence, 21 Canadian Competition Record 89 (2003)

Some Useful Charter Insights for American Equality Jurisprudence, *in* XXI **Windsor Yearbook of Access to Justice** (2003) (symposium on 20th anniversary of the Canadian Charter of Rights and Freedoms)

Location and Limits of Dynamic Statutory Interpretation in Modern Judicial Reasoning, Issues in Legal Scholarship (Boalt Hall faculty journal) (2003) (symposium on dynamic statutory interpretation), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=420500

(cont'd)

Stephen F. Ross
Resume
Page 6

Academic Publications (cont'd)

Light, Less Filling, It's Blue Ribbon!, 23 Cardozo L.J. 1675 (2002) (symposium on legal issues in baseball)

Open Competition in League Sports, 2002 Wisconsin L. Rev. 625 (with Stefan Szymanski)
Antitrust Options to Redress Anticompetitive Restraints and Monopolistic Practices by Sports Leagues, 52 Case Western L.J. 133 (2001) (symposium)

Promotion and Relegation, 2 World Economics 179 (2001) (with Stefan Szymanski)

Network Economic Effects and the Limits of Efficiency, 68 Antitrust L.J. 945 (2001) (symposium)

Myths, Realities, and Creative Approaches to Antitrust and Franchise Relocation Issues, 14 Antitrust 57 (Spring 2000)

Legalizing Merger to Monopoly and Higher Prices, Antitrust 71 (fall 2000)

Necessary Restraints and Inefficient Monopoly Sports Leagues, 1 Int'l Sports L. Rev. 27 (2000) (with Stefan Szymanski)

Statutory Interpretation in the Courtroom, the Classroom, and Canadian Legal Literature, 31 Ottawa L. Rev. 39 (2000)

Myths, Realities, and Creative Approaches to Antitrust and Franchise Relocation Issues, 14 Antitrust 57 (Spring 2000)

Anti-competitive aspects of sports, 7 (Australian) Competition & Consumer L.J. 125 (1999)

Restraints on Player Competition that Facilitate Competitive Balance and Player Development and their Legality in the United States and Europe, in **Competition Policy and Professional Sports** (C. Jenrenaud & S. Késenne, ed.) (International Center for Sports Studies, Neuchatel, Switzerland 1999).

The Modern Parol Evidence Rule and its Implications for New Textualist Statutory Interpretation, 87 Georgetown L.J. 195 (1998) (with Daniel Tranen)

"Pro-Competitive Executive Compensation" as a Condition for Approval of Mergers that Simultaneously Exploit Consumers and Enhance Efficiency, Canadian Competition Record (spring 1998) (with Ian Ayres)

(cont'd)

Stephen F. Ross
Resume
Page 7

Academic Publications (cont'd)

Light, Less Filling, It's Blue Ribbon!, 23 Cardozo L.J. 1675 (2002) (symposium on legal issues in baseball)

Open Competition in League Sports, 2002 Wisconsin L. Rev. 625 (with Stefan Szymanski)

The Misunderstood Alliance Between Sports Fans, Players, and the Antitrust Laws, 1997 Univ. of Illinois L. Rev. 519

Lessons from the "True North Strong and Free", 65 Antitrust L.J. 467 (1997) (symposium on Canadian competition law)

Did the Canadian Parliament Really Permit Mergers that Exploit Canadian Consumers So the World Can be More Efficient?, 65 Antitrust L.J. 641 (1997) (symposium)

The Evolving Tort of Conspiracy to Restrain Trade Under Canadian Common Law, 75 Canadian Bar Rev. 193 (1996)

Reconsidering Flood v. Kuhn, 12 U. Miami J. Ent. & Sports Law 169 (1995)

The Limited Relevance of Plain Meaning, 73 Washington U. L. Q. 1057 (1995) (symposium)

Justice Breyer and the Fault Lines of Antitrust, 40 Antitrust Bulletin 169 (1995)

Where Have You Gone, Karl Llewellyn? Should Congress Turn Its Lonely Eyes To You?, 45 Vand. L. Rev. 561 (1992)

Comment on Spulber & Besanko's Delegation, Commitment and the Regulatory Mandate, 8 Journal of Law, Economics, and Organization 155 (March 1992) (symposium)

Break Up the Sports League Monopolies, in **The Business of Professional Sports** (P. Staudohar & J. Mangan, eds.) (Univ. of Illinois Press 1991)

An Antitrust Analysis of Sports League Contracts with Cable Networks, 39 Emory L.J. 463 (1990)

Reaganist Realism Comes to Detroit, 1989 University of Illinois L. Rev. 399

Monopoly Sports Leagues, 73 Minnesota L. Rev. 643 (1989)

Legislative Enforcement of Equal Protection, 72 Minnesota L. Rev. 311 (1987)

Stephen F. Ross
Resume
Page 8

PROFESSIONAL AND STUDENT PUBLICATIONS:

Cung Le v. Zuffa Promised To Change the UFC. What the Settlement Means for MMA Fighters and the Industry, ProMarket (Univ. of Chicago Stigler Center for the Study of the Economy and the State), April 17, 2024 (with Gurtej Grewal)

Sports & competition law: An overview of EU and national case law, 21 March 2024, e-Competitions Sports & Competition Law, Art. N° 117120SHME (with Sergio Gonzalez Garcia)

NCAA proposal for athletes' image rights falls short of athlete-welfare protection, Sports Business Journal (May 28, 2020) (with Doug Allen)

Learning from Laurier About American Constitutional Federalism, The Federal Idea: A Quebec Think Tank on Federalism (February, 2017)

The Commissioner's Power to Redress Systematic Club Mismanagement, Sports Litigation Alert 9:10 (June 1, 2012)

La Jurisprudence des Ligues Américaines en Quelques Cas Majeurs (Major Cases in American Sports Law Jurisprudence), 119 Jurisport: Revue Juridique et Economique Du Sport 28 (April 2012)

A Roundtable Discussion for the Digital Age: Brady v. NFL, 29 Ent. & Sports Lawyer 1 (Summer 2011) (with numerous co-participants)

Judicial Review of NFL Drug Cases: Backgrounder on the Minnesota Vikings steroids case and Judge Magnuson's injunction against discipline, available at http://law.psu.edu/academics/research_centers/sports_law/topical_discussion

Exploiting Kids: The Scandal in Agent Recruiting of Athletically-Gifted Teens (with Raynell Brown and S. Douglas Webster), Policy Paper for Penn State Institute for Sports Law, Policy and Research (June, 2009), available at http://law.psu.edu/academics/research_centers/sports_law/topical_discussion

Interpreting the Canada Pipe Decision (roundtable for American Bar Association Sherman Act Section 2 Committee Newsletter, Fall 2006)

A Framework for Policymakers to Analyze Proposed and Existing Antitrust Immunities and Exemptions (with Darren Bush & Gregory K. Leonard), Antitrust Modernization Commission, October, 2005

(cont'd)

Stephen F. Ross
Resume
Page 9

<u>Non-Academic and Student Publications, cont'd:</u>

<u>English Cricket: Lifting Cricket's Fortunes</u>, The Sports Nexus Report 2004 (with Oliver Hylton, Philip Snape, Philip de Nahlik, Ian Preston, and Stefan Szymanski)

<u>The Baseball Antitrust Exemption Lives, But with Criticism, in the Eleventh Circuit</u>, American Antitrust Institute Website, May 31, 2003 ([www.antitrustinstitute.org](http://www.antitrustinstitute.org))
<u>Legalizing Merger to Monopoly and Higher Prices: The Canadian Competition Tribunal Gets it Wrong</u>, Antitrust magazine (2001)

<u>Fan-friendly competition is open competition</u>, Sports Business Journal (July 17-23, 2000)

<u>Verbot der zentralen Vermarktung bringt nur Vorteile</u> (The Prohibition of Centralized Marketing Brings Advantages), Frankfurter Allgemeine Zeitung, January 3, 1998

<u>Losing the Football Game</u>, Legal Times, July 29, 1996

<u>Consumers lose in recent sports labor exemption cases</u>, Antitrust magazine (summer 1995)

<u>A Solution to return to the ballpark</u>, Indianapolis Star, Aug. 28, 1994

<u>After McNeil: How About Plan "F" (For Fans)?</u>, For the Record (Marquette Univ. Nat'l Sports Law Inst.), Oct./Nov. 1992

<u>Recent Sports Antitrust Developments: Another Perspective</u>, The Sports Lawyer, Mar.-Apr. 1992

<u>Notre Dame's maverick deal demands action</u>, The National Sports Daily, Mar. 12, 1990

<u>Standards for Judging Allegedly Anticompetitive Agreements Between Leagues and Players</u>, Antitrust magazine, summer 1987

<u>Power Play: The NFL Wins, Arizonans Lose in Antitrust Case Brought By USFL</u>, Arizona Republic, August 10, 1986

Comment, <u>Exclusionary Zoning in California: A Statutory Mechanism for Judicial Nondeference</u>, 68 Calif. L. Rev. 1154 (1979) (with Edward G. Weil)

Note, Bordenkircher v. Hayes: <u>Ignoring Prosecutorial Abuses in Plea Bargaining</u>, 67 Calif.L. Rev. 675 (1978)

Stephen F. Ross
Resume
Page 10

<u>Original Teaching Materials</u>

Law and Strategy in the Sports Business (2024) (class for law and undergraduate business students)
Comparative Constitutional law (2021-present) (with Heinz Klug & Jean Leclair)
Elements of the Law (2010-present) [1st year required course, then seminar]
Comparative Canadian/U.S. Law (2000-14)
Interpreting the Voting Rights Act [1st year statutory interpretation elective) (2001-05)
Interpreting Welfare Legislation [1st year statutory interpretation elective] (1996-98)
Comparative Canadian Competition Law (1997)
Sports Law (1989)

<u>Academic Presentations</u>

"Fair Play": Fútbol Profesional contra Derecho de la competencia (Universidad de Pacifico, Lima, Peru, 2024)

The Coase Theorem and sports league revenue sharing (Columbia Univ. 2024)

The Unique and Essential Functions of sports governing boards (Columbia Univ. 2023)

A Comparatively Paradoxical View on Australian Constitutional Formalism (Australian Ass'n of Constitutional Law 2022)

Insights from global sports law for Indian sports (Nirma Univ. 2021)

Common Law & Commandments: How Judges Reason About Precedents As a Method for Jews to "Wrestle with the Torah" (Penn State University 2020)

Interpreting Texts, Including Contracts (Univ. of Pretoria 2019)

Remedies for Breach of Contract by Professional Athletes (Univ. of Adelaide 2018)

The Constitutional Right to Human Dignity in Comparative Perspective (Univ. of Haifa 2017, Univ. of Sydney 2018)

Redefining the Mission of Sports Governing Boards (Monash Univ. 2018, Columbia Law School 2017, Univ. of Melbourne 2009)

The Contested Values of College Sports (Univ. of Michigan 2014)

(cont'd)

Stephen F. Ross
Resume
Page 11

Academic Presentations, cont'd

An Outsider's Perspective on Canadian Originalism (Univ. of Montreal 2014)

Why Federalism?  Judicial Arbitration of Federalism in the Absence of Regional Majorities that are National Minorities (Univ. of Sydney 2013)

The Value of Advisory Opinions on Conventions in Sports and Constitutional Law (Univ. New South Wales 2014)

 "Bodyline" and "Cheating" in Sports and Constitutional Law (Univ. of Sydney 2009)

Designing a Sports League (C 5 Sports Law & Business Conference, London 2009)

A Trans-Atlantic Conversation: What Americans Can Learn from European Sports, and Some Outsider Observations About European "Football" (Birkbeck Univ. London 2009)

Legal Lessons from Baseball (Penn State 2007)

Invited Expert Testimony

Bold in Substance and Meek in Procedure, Knight Commission on Intercollegiate Athletics, May 2016

If it Walks Like a Duck and Quacks Like a Duck, It's Not a Goose: Why North American Sports Leagues Should Be Single Entities, But They Are Not Now, House Subcommittee on Courts and Competition Policy, January 2010

Crisis and Competition Policy, Turkish Competition Authority, March 2009

Restoring the Market for Out-of-Market Baseball, Senate Committee on Commerce, Science and Transportation, March 2007

A Framework for Policymakers to Analyze Proposed and Existing Antitrust Immunities and Exemptions, Antitrust Modernization Commission, December, 2005 (with Darren Bush and Gregory K. Leonard) (*available at* www.amc.gov/commission_hearings/statutory_immunities_exemptions.htm)

Options for Amending the *Competition Act*, Canadian Competition Bureau, September, 2003

(cont'd)

Stephen F. Ross
Resume
Page 12

<u>Invited Expert Testimony</u> (contd)

Competition Policy for Ordinary Canadians, Not Economists, Canadian House of Commons Standing Committee on Industry, Science, and Technology, April 2003

A US Perspective on Competition Law Reform, Canadian Bureau of Competition, May, 2000

<u>In the Matter of An Agreement Between the Football Association Premier League</u> <u>et al</u>, British Restrictive Practices Court (1996 No 1 (E&W)), October, 1998 (testimony on American sports and antitrust jurisprudence applicable to sports league sales of television rights)

Competition Policy toward Joint Ventures, Federal Trade Commission, October 1997 and March 1998

Protecting Fans and Taxpayers Against Exploitation by Monopoly Sports Leagues, House Committee on the Judiciary, February, 1996

Franchise Relocations by Monopoly Sports Leagues, Senate Committee on the Judiciary, Subcommittee on Antitrust, Business Rights, and Competition, November, 1995

Repealing baseball's antitrust exemption, House Committee on the Judiciary, Subcommittee on Economics and Commercial Law, March, 1993 (together with supplemental testimony concerning the effect of the baseball exemption on minor league baseball)

Antitrust Implications of Compulsory License Repeal for Sports Broadcasting, Senate Committee on the Judiciary, Subcommittee on Patents, Copyrights and Trademarks, April, 1992 (together with supplemental testimony concerning abuses of the antitrust exemption by Major League Baseball)

The Attack on Legislative History as a Tool for Statutory Interpretation, House Committee on the Judiciary, Subcommittee on Courts, Intellectual Property, and the Administration of Justice, April, 1990

Antitrust and Policy Implications of Increased Cablecasting of Sports Programming, Senate Committee on the Judiciary, Subcommittee on Antitrust, Monopolies, and Business Rights, November, 1989

Sports Broadcasting, Antitrust, and Public Policy, Senate Committee on the Judiciary, Subcommittee on Antitrust, Monopolies, and Business Rights, October 1987

Judge Bork, Judicial Activism, and Antitrust, Senate Committee on the Judiciary, 1987

Stephen F. Ross
Resume
Page 13

Conference & Workshop Participation

"The Concept of the Residual Claimant in Sports: Why Sports Leagues Should Resemble
McDonald's Rather than the United Nations", Bocconi University, May 2009

"The Role of the Academic as an Advisor to Sports Entities," C5 Conference on Sports Law and
Business, London, April 2009

"A Trans-Atlantic Conversation: What Americans can Learn from European Sport, and Some
Outsider Observations About European 'Football'", Birkbeck College Sports
Management Lecture Series, March, 2009

"How Australian Law Teaches an American Law Professor How To Advise a British Sports
Manager Helping Build an Indian Sports League", University of Melbourne Sports Law
Centre, May 2008

"MLB/DirecTV as a Case of Anti-consumer Exclusive Dealing Without Foreclosure," Federal
Communications Bar Ass'n and Stanford Institute of Economic Policy Research, April
2007

"New Frontiers in International and Comparative Sports Law," Association of American Law
Schools Sections on Law and Sports and Comparative Law, January 2007

"The Antitrust Modernization Commission at Mid-Course," American Bar Association Section
on Antitrust Law, June, 2006

"*Dagher* and *Illinois Tool Works*: The Supreme Court Steps In," American Bar Association
Section on Antitrust Law, March, 2006

"Robinson-Patman Act Reform," American Bar Association Section on Antitrust law, May 2005

"Competition Policy and Sports Leagues," University of British Columbia Division of Strategy
and Business Economics, February 2005

"Sports League Restraints and the *Clarett* care", AALS Annual meeting, January 2005

"A Statutory Charter for Social and Economic Rights," University of British Columbia Faculty
of Law, September, 2004

(cont'd)

Stephen F. Ross
Resume
Page 14

Conference & Workshop Participation, cont'd

"The Limits of Efficiency," Ass'n of American Law Schools Annual meeting, January, 1999

"Interpreting Different Texts," Ass'n of American Law Schools Annual meeting, January, 1999 (organizer, moderator, and author of discussion materials)

"The Labor Exemption and Professional Sports," Sports Law Conference sponsored by the Association of American Law Schools Section on Sports Law and the National Sports Law Institute of Marquette University, November, 1998

"Current Issues in Professional Sports," American Bar Association Forum on Entertainment and Sports Law, October, 1998

"Fan Oriented Enforcement Initiatives by State Attorneys General," National Association of Attorneys General Sports Summit, November, 1996

"Textualism and the 104th Congress," Ass'n of American Law Schools annual meeting, January, 1996

"The Unreasonableness of Sports League Salary Caps under Antitrust Statutes and the Common Law," New York Bar Ass'n Section on International Law, October, 1995

"Franchise relocation and antitrust", ABA Section on Antitrust Law, April 1995

"Inferring conspiracies under the Sherman Act," Conference Board Antitrust Seminar, 1993

"Myth of Amateurism and the Reality of the Cartel," Chicago Bar Association Antitrust Section/University of Illinois Alumni Association, February 1992

"Distinguishing price and non-price restraints," Conf. Bd. Annual Antitrust Seminar,  March 1991

Stephen F. Ross
Resume
Page 15

## University Service

Director, Center for the Study of Sports in Society, 2016-present

Member, University Committee on Promotions & Tenure, Penn State University, 2009-11

Chair, Sports-Interested Interdisciplinary Faculty Group, Penn State University, 2007-16

Chair, Professional Sports Counseling Panel, University of Illinois, 1990-2006

Member, University Senate, University of Illinois,1987-89, 1994-96

Member, University of Illinois Athletic Board, 1988-93 (Chair, Committee on Athletic Progress and Eligibility, 1989-91)

Member, various doctoral and masters committees, Institute for Labor and Industrial Relations, University of Illinois, 1988-2004

Member, University of Illinois Senate Committee on Admissions, 1987-88

## Professional Activities

American Association of Law Schools, sections on Legislation, Antitrust, and Sports Law
    Sports Law Section Executive Committee, 1988-90, 2007-present
    Antitrust Section Executive Committee, 1993-96
    Legislation Section Executive Committee, 1994-2000

American Bar Association, Section on Antitrust Law
    Member, Monograph Committee, 1989-93
    Member, Task Force on Robinson-Patman recommendations for the Antitrust Modernization Commission Committee, 2005-07

American Antitrust Institute
    Member, Advisory Board, 1998-present
    Chair, Sports and Antitrust Task Force, 2000-present
    Senior Fellow, 2004-2012

Sports Lawyers Association: Lifetime Achievement Award 2021

Marquette University National Sports Law Institute
    Member, Advisory Board, 2002-06

Stephen F. Ross
Resume
Page 16

<u>Public Service Activities</u>

Consultant, Canadian Competition Bureau, November 2002 (with regard to role of efficiencies in merger litigation)

Consultant, United States Department of Justice, November 2002 (with regard to antitrust policy re professional and college sports)

Consultant to Antitrust Modernization Commission re immunities and exemptions, 2005-06

Counsel for <u>amicus curiae</u> Consumer Federation of America, <u>Chicago Professional Sports Ltd. Partnership v. National Basketball Association</u>, No. 91-1434 (7th Cir.) (pro bono)

Counsel for <u>amici curiae</u> American College of Nurse-Midwives and American Medical Students Association, <u>National Organization for Women v. Scheidler</u>, No. 91-2468 (7th Cir.) (pro bono)

Counsel for <u>amici curiae</u> Consumer Federation of America and Sports Fans United, <u>Butterworth v. National League of Professional Baseball Clubs</u>, No. 82,287 (Fla. S.Ct.) (pro bono) (challenge to baseball's antitrust exemption)

Counsel for <u>amici curiae</u> Consumer Federation of America and Sports Fans United,  <u>National Basketball Association v. Williams</u>, No. 94-7709 (2d Cir.) (pro bono) (challenge to salary cap and other labor market restraints)

Counsel for <u>amici curiae</u> Antitrust Law Professors, <u>NYNEX Corp. v. Discon, Inc.</u>, No. 96-1570 (U.S. S.Ct.) (pro bono) (antitrust standard for vertical exclusionary conspiracies)

Counsel for <u>amici curiae</u> Consumer Federation of America and FANS, Inc., <u>Minnesota Twins Partnership v. State of Minnesota by Humphrey</u>, No. C9-98-890 (Minn. S. Ct) (pro bono) (challenge to baseball's antitrust exemption)

Counsel for <u>amicus curiae</u> Consumer Federation of America, <u>State of Minnesota by Hatch v. Minnesota Twins Partnership</u>, No. 99-414 (U.S. S. Ct.) (pro bono) (same)

Counsel for Appellant, <u>South Austin Coalition Community Council v. SBC Communications, Inc.</u>, No. 00-3864 (7th Cir.) (pro bono) (challenge to phone company merger)

Counsel for <u>amici curiae</u> Consumer Federation of America and American Antitrust Institute, <u>Major League Baseball v. Butterworth</u>, No. 02-10333-C (11th Cir.) (pro bono) (challenge to baseball's antitrust exemption)

(cont'd)

Stephen F. Ross
Resume
Page 17

Public Service Activities (cont'd)

Consultant to counsel for respondents, <u>News Ltd. v. South Sydney District Rugby League Football Club</u>, No. S34 (High Ct. of Australia) (2002) (pro bono) (challenge to rugby league contraction that excluded respondent club)

Co-author on behalf of American Antitrust Institute, <u>In the Matter of Nestle Holdings; Dreyer's Grand Ice Cream Holdings, Inc.</u>, Docket No. C-4082 (Federal Trade Commission) (2003) (pro bono) (comments on proposed consent decree in merger case)

Counsel for <u>amicus curiae</u> American Antitrust Institute, <u>Texaco, Inc. v. Dagher</u>, No. 04-805 (U.S.) (2004) (pro bono) (antitrust review of joint ventures)

Counsel for <u>amici curiae</u> American Antitrust Institute and Consumer Federation of America, <u>American Needle, Inc. v. National Football League</u>, No. 08-661 (U.S.) (2008) (pro bono) (whether sports leagues are 'single entities' for antitrust purposes)

Consultant for The Sports Nexus and co-author, <u>State of Sport Britain 2010: A reforming sports policy for the new coalition government</u> (advocating reform of national governing boards to be trustees for the game rather than serving parochial self-interests)

Counsel for <u>amicus curiae</u> Sports Fans Coalition, <u>Brady v. National Football League</u>, No. 11-1898 (8th Cir.) (2011) (pro bono) (whether lockout of decertified union can be enjoined)

Counsel for amici curiae Sports and Labor Law Scholars, <u>United States Soccer Federation, Inc. v. United States National Soccer Team Players Association,</u> No. 15-3402 (7th Cir. 2016) (whether arbitrator's contract interpretation can be overturned if contrary to plain meaning)

Counsel for amici curiae sports law and economic scholars, <u>Relevent Sports LLC v. United States Soccer Federation</u>, No. 21-2088 (2d Cir. 2021) (whether sports federations policies are agreements subject to section 1 of Sherman Act)