# APPENDIX I



Portfolio Media. Inc. | 230 Park Avenue, 7th Floor | New York, NY 10169 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# NCAA Must Give Up Control To Reach Suitable NIL Settlement

By **David Steele**

Law360 (September 18, 2024, 5:35 PM EDT) -- The date set by a California federal judge for the NCAA and the athletes suing it over name, image and likeness compensation to iron out issues with their proposed $2.78 billion settlement is fast approaching, and according to experts, a rational solution that would satisfy the two sides and the law might not exist.

The parties have until Thursday, Sept. 26, to come back to U.S. District Judge Claudia Wilken with updates to the settlement, after she **denied preliminary approval** on Sept. 5 and sent the two sides "back to the drawing board" on some of its terms.

"It's a legal impossibility to simultaneously avoid both antitrust law and labor law," Marc Edelman, law professor at Baruch College's Zicklin School of Business, told Law360 soon after Judge Wilken denied approval.

The NCAA, however, attempted that "legal impossibility" when it imposed certain restrictions on its athletes' NIL as part of the settlement, even though the athletes and their attorneys agreed to them in the deal, he added.

"What the NCAA wants here is for lawyers representing a class of plaintiffs to agree to a salary cap without formulating a collective bargaining unit that could negotiate over that topic moving forward," Edelman said. "So in essence, this proposed settlement would continue to expose the NCAA to very serious antitrust liability. And while both sides tried to push through the settlement, Judge Wilken astutely saw that problem."

It was a problem anybody involved in the ongoing battle to fairly compensate college athletes could see, but one that was not known until the details of the settlement of the class action led by former swimmer Grant House came out in court, said Kate Roggio Buck, partner at McCarter & English LLP and its NCAA compliance expert.

"It's like, 'Wow, big settlement, we're gonna pay athletes a lot of money, but we're still gonna limit the fair market competition,' essentially," she said of the NCAA's position. "They say they want athletes to be paid, they want athletes to be paid fair market value, they're supporting athletes and all of that, but it seems that they're trying to leave it to themselves to decide what fair market value is."

The NCAA's inclusion of limits and controls on NIL disbursement in the settlement also seemed in clear contrast to previous court rulings on NIL, Buck added — particularly the injunction against NCAA enforcement of its NIL policy in the federal suit led by the states of Tennessee and Virginia.

Also, the House settlement does not preclude athletes continuing to sue under antitrust or labor law, which Edelman said made the NCAA's stance on restricting NIL even more curious. Since the court session earlier this month in which Judge Wilken pushed back against the settlement, the state of **South Dakota** sued the NCAA in state court accusing it of shortchanging smaller schools in the settlement; former athletes at the **University of Michigan** have sued the NCAA for $50 million over use of their NIL; and Georgia issued an **executive order** blocking the NCAA from taking "any adverse action" against state schools providing NIL to athletes.

"Even though the plaintiffs' lawyers may have been comfortable with the settlement for purposes of

1/22/25, 3:22 PM
Case 4:20-cv-03919-CW NCAA Must Give Up Control To Reach Suitable NIL Settlement - Law360 Document 613-9 Filed 01/29/25 Page 3 of 3

zealously advocating on behalf of their class members, Judge Wilken astutely recognized that the settlement would lead to future problems for college athletes and the need for future antitrust litigation to resolve new restraints that would be put in place by the settlement,'' Edelman said.

The potential classes — in the House settlement and in all the other cases pending and potentially in the future — are so large that problems were inevitable, Buck said, and it was inevitable that Judge Wilken would recognize that.

"In the age of social media and so much information available online, I just don't think you can pull a fast one on a big group of people like that,'' she said. "Even if you got past this preliminary stage, I think there were gonna be problems in that next stage. 'Hey, wait a minute, this is just us agreeing to continue to be restricted, just maybe in slightly different ways.' I'm not sure really what the overall strategy was here, but it doesn't seem surprising that it didn't fly.''

Edelman noted that paths to an agreement that would avoid antitrust and labor violations were possible, which he detailed in an upcoming article for the Boston College Law Review co-authored by Indiana University associate business law professor John T. Holden and University of New Hampshire Franklin Pierce School of Law professor Michael A. McCann. The paths would require the NCAA to adopt some version of a free market approach to competing for athletes between either the individual schools or the conferences, or to give the athletes the ability to collectively bargain, or to have equity within a completely new business model for the schools.

All of them, however, would mean a radical reconstruction of how the NCAA operates and how it relates to its athletes, Edelman added.

"Simply trying to put new restraints into practice via settlement that restrict free market competition for college athlete services, and that at the same time are not collectively bargained, is not a viable path,'' he said.

Radical reconstruction is not something the NCAA seems interested in undergoing, though, Buck said, pointing out that the underlying theme of all its legal conflicts with athletes has been to keep them under its control.

"That's the crux of all this in the first place,'' she said. "There has to be a legitimate release of that control, and fair market has to truly mean fair market.'' If it makes compromises to remove the restrictions in the current version of the settlement and changes the nature of its relationship to athletes, Buck added, it would satisfy all parties and the existing law.

"The NCAA could still have a really important role there, to still be a type of governing body that really works to protect athletes,'' she said, adding that this could include a system of vetting compensation deals in the athletes' best interest, rather than in the NCAA's.

Instead, Buck continued, the NCAA is sending the message that it will operate as it always has: "We're going to repaint it. It's going to look completely different, but it's actually still the same structure.''

It has been the same structure for more than half a century, Edelman said, pointing out that in September 1971, James V. Koch, then an economics professor at Illinois State University and later president of Old Dominion University, famously described the NCAA as "a cartel.''

"Fifty-three years later, NCAA leadership continues to ignore the legal ramifications of being such,'' Edelman said.

--Additional reporting by Dorothy Atkins. Editing by Adam LoBelia.

All Content © 2003-2025, Portfolio Media, Inc.

https://www.law360.com/articles/1877286/print?section=california 2/2