# APPENDIX K

| | | |
|---|---|---|
| STATE OF SOUTH DAKOTA<br>COUNTY OF BROOKINGS | * <br> * SS.<br> * | IN CIRCUIT COURT<br>THIRD JUDICIAL CIRCUIT |

THE STATE OF SOUTH DAKOTA
and THE SOUTH DAKOTA BOARD
OF REGENTS on behalf of SOUTH
DAKOTA STATE UNIVERSITY and
THE UNIVERSITY OF SOUTH
DAKOTA,

05CIV24-000320
05 CIV 24-_____

              *Plaintiffs,*

    vs.

**SUMMONS**

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION,

              *Defendant.*

### TO THE ABOVE-NAMED DEFENDANT:

YOU ARE HEREBY SUMMONED and required to serve upon the undersigned Plaintiffs' attorney, whose post office address is 1302 E. Hwy. 14, Suite 1, Pierre, South Dakota 57501, an Answer to the Complaint which is herewith served upon you, within thirty (30) days after the service of this Summons upon you, exclusive of the date of service.

Failure to do so will result in default judgment being taken against you for the relief requested in the Complaint.

Dated this 9th day of September 2024.

Grant M. Flynn
Assistant Attorney General
1302 E. Hwy. 14, Suite 1
Pierre, South Dakota 57501
Telephone: (605) 773-3215
Email: grant.flynn@state.sd.us

**EXHIBIT**

1

| | | |
|---|---|---|
| STATE OF SOUTH DAKOTA<br>COUNTY OF BROOKINGS | * ss. | IN CIRCUIT COURT<br>THIRD JUDICIAL CIRCUIT |
| THE STATE OF SOUTH DAKOTA<br>and THE SOUTH DAKOTA BOARD<br>OF REGENTS on behalf of SOUTH<br>DAKOTA STATE UNIVERSITY and<br>THE UNIVERSITY OF SOUTH<br>DAKOTA, | * | 05 CIV 24-_____ 05CIV24-000320 |
| *Plaintiffs*, | | **COMPLAINT** |
| vs. | | |
| NATIONAL COLLEGIATE ATHLETIC<br>ASSOCIATION, | | |
| *Defendant*. | | |

The State of South Dakota and the South Dakota Board of Regents on behalf of South Dakota State University and the University of South Dakota, by and through their undersigned counsel, Marty J. Jackley, Attorney General for the State of South Dakota, and Grant M. Flynn, Assistant Attorney General, Plaintiffs in the above-entitled matter, for their Complaint state and allege as follows:

## INTRODUCTION

1. The National Collegiate Athletic Association (hereinafter "NCAA") is a member-led voluntary unincorporated association comprised of approximately 1,100 different universities across the United States, Puerto Rico, and Canada.

2. NCAA members are organized into three divisions, known as Division I, Division II, and Division III.

3. Of those three divisions, schools in Division I generally have the largest student bodies and the most robust athletic programs which offer the highest number of athletic scholarships.

**EXHIBIT**

2

4. NCAA maintains several priorities designed to promote its mission of "[p]rovid[ing] a world-class athletics and academic experience for student-athletes that fosters lifelong well-being."[1]

5. These priorities include the NCAA's commitment to amateurism which it achieves by "maintaining a line of demarcation between student-athletes and professional athletes."[2]

6. In furtherance of their goal of amateurism, NCAA established as one of its guiding principles in its Constitution that "[s]tudent-athletes may not be compensated by a member institution."[3]

7. Moreover, NCAA forbade athletes from being compensated by outside entities for their participation in athletic programs.[4]

8. Pursuant to NCAA rules, athletes were barred from earning any compensation for their participation, but the NCAA and certain of its member institutions, particularly those with the most prominent programs, made significant profits from televising athletic events.[5]

9. In response to this inequitable revenue distribution, several collegiate athletes filed suit against the NCAA, seeking a portion of the revenue as well as injunctive relief which would permit athletes to profit from their own names, images, and likenesses.[6]

10. The NCAA negotiated a settlement with the plaintiffs in three of these cases (hereinafter "Settlement").[7]

11. The Settlement contemplates a $2.8 billion payment to past and present athletes. $1.15 billion will be paid from the NCAA's reserves while $1.65 billion will be paid "by reducing disbursements it makes to conferences from its Final Four Men's Basketball revenues by an average of 20 percent over the next ten years." "The Power Five conferences will pay 40 percent

---

[1] NCAA Mission and Priorities, NCAA Website,
https://www.ncaa.org/sports/2021/6/28/mission-and-priorities.aspx (last visited August 8, 2024).
[2] Our Division I Priorities, NCAA Website, https://www.ncaa.org/sports/2021/5/11/our-division-i-priorities.aspx (last visited August 8, 2024).
[3] NCAA Constitution Art. 1, § B.
[4] See NCAA D-I Operating Bylaw, § 12.01 and 12.5.
[5] Associated Press, *NCAA generates nearly $1.3 billion in revenue for 2022-23*, ESPN (Feb. 1, 2024, 09:35 PM ET), https://www.espn.com/college-sports/story/_/id/39439274/ncaa-generates-nearly-13-billion-revenue-2022-23
[6] See *House, et. al. v. NCAA, et. al.*, 4:20-cv-03919-CW (hereinafter "*House*"); *Hubbard, et. al. v. NCAA, et. al.*, 4:23-cv-01593 (N.D. Cal.); and *Carter et. al. v. NCAA et. al.*, 4:23-cv-06325-RS.
[7] See *House*, Doc. 450.

of the $1.6 billion and the remaining Division I conferences, none of which were named defendants in any of the three lawsuits, will pay 60 percent ....["8]

12. While the non-Power 4 conferences will be shouldering the majority of the burden for the reduced disbursements, they were not named defendants in any of the three lawsuits because they reaped minimal benefits from the NCAA's policies.

13. Further, the NCAA failed to thoroughly vet the impact of the Settlement and to abide by its own Bylaws when it established the distribution model for the Settlement payment.[9]

14. The Settlement was negotiated by the NCAA in violation of the NCAA's Bylaws and at the expense of many of its members.

## PARTIES

15. Plaintiffs are the State of South Dakota, which governs the State's public postsecondary educational institutions via the State Board of Regents.[10]

16. Defendant is the NCAA, a voluntary unincorporated association led by its members who are postsecondary education institutions across the United States and elsewhere with collegiate athletic departments. The NCAA governs the athletic competition amongst its members and distributes revenue generated by the competitions back to its members.[11]

## JURISDICTION & VENUE

17. This Court has personal and subject matter jurisdiction over this matter pursuant to SDCL 15-7-2 because the NCAA has transacted business within this state and the Plaintiff universities are members of the NCAA.

18. Venue is appropriate in this Court pursuant to SDCL 15-5-8.

---

[8] *EXECUTIVE SUMMARY - Congressional Briefing Paper Preliminary Assessment: Title IX and Other Implications of the Proposed Settlement of House v. NCAA, Hubbard v. NCAA, and Carter v. NCAA on Intercollegiate Athletics Programs*, The Drake Group website, https://www.thedrakegroup.org/wp-content/uploads/2024/07/EXECUTIVE-SUMMARY-Congressional-Briefing-Paper-1.pdf (last visited August 21, 2024). The Power Five conferences have since reorganized into a structure referred to as the "Power 4," which will be the descriptor used for purposes of this Complaint.
[9] Exhibit 1.
[10] *See* SDCL ch. 13-49.
[11] NCAA Overview, NCAA Website, https://www.ncaa.org/sports/2021/2/16/overview.aspx (last visited 8/21/24); Division I Finances, NCAA Website, https://www.ncaa.org/sports/2021/5/11/division-i-finances.aspx (last visited 8/21/14).

3

## NCAA MEMBERSHIP & GOVERNANCE

19. The University of South Dakota and South Dakota State University are members of the Summit League Basketball Conference.[12]

20. The Summit League is a member of the NCAA.[13]

21. NCAA member conferences are informally categorized as the Power 4 conferences and the non-Power 4 conferences. The Power 4 Conferences consist of the Southeastern Conference, the Big 12 Conference, the Big 10 Conference, and the Atlantic Coast Conference which encompass the most prominent programs and universities in collegiate athletics.[14]

22. The Summit League is considered a non-Power 4 conference.

23. The NCAA Division I Board of Directors is the "overall governing body for Division I, with responsibility for strategy, policy, legislative oversight and management oversight."[15]

24. The Board of Directors is comprised of 25 members and includes 20 presidents or chancellors, one director of athletics, one senior woman administrator, one faculty athletics representative and two student-athletes.[16]

25. The Summit League, representing its nine members, is one of eleven conferences that share five seats on the Board of Directors.[17]

26. The NCAA Board of Governors is the association's highest governing body.[18]

27. The Board of Governors consists of nine voting members and seven, nonvoting, *ex officio* members. The nine voting members are made up of four Division I members, one member from the Division II Executive Board, one member from the Division III President's Council, two independent

---

[12] Summit League Quick Facts, The Summit League Website, https://thesummitleague.org/sports/2020/5/26/Quick%20Facts.aspx (last visited 8/21/24).
[13] Summit League Compliance, The Summit League Website, https://thesummitleague.org/sports/2020/5/6/compliance-index.aspx (last visited 8/21/24).
[14] Pat Ford, *Welcome to the New College Landscape: How Each Power Four Conference Stacks Up*, (July 1, 2024) https://www.si.com/college/welcome-to-the-new-college-landscape-how-each-power-four-conference-stacks-up.
[15] NCAA D-I Operating Bylaw, § 21.1.2.
[16] NCAA D-I Operating Bylaw, § 21.1.1.
[17] *Id.*
[18] Governance, NCAA Website, https://www.ncaa.org/sports/2021/2/9/governance.aspx (last visited 8/21/24).

4

members, and one graduated NCAA student-athlete.[19]

28. The NCAA's principles, as laid out in Article 1 of its Constitution, explicitly state that student-athletes may not be compensated by member institutions.[20]

29. The NCAA's Constitution may only be amended upon a two-thirds vote of all delegates present and voting at the NCAA's annual Convention.[21]

30. The Board of Governors is vested with the following authority: enterprise risk management, establishing policies related to fiduciary responsibility, adopting and implementing legal strategy, Association risk mitigation, and others.[22]

31. The Board of Directors has broader authority relating to governance of the NCAA.[23]

32. Neither Board is granted explicit authority to settle litigation within the NCAA's Bylaws.

33. The NCAA Constitution further provides that "[a]uthorities not explicitly enumerated in this Constitution for Association-wide governance are reserved to the divisions or, at their discretion, to subdivisions, conferences or individual institutions."[24]

34. Title IX of the Education Amendments of 1972 (hereinafter "Title IX") prohibits discrimination on the basis of sex in education programs and activities that receive federal financial assistance. 20 U.S.C. § 1681.

35. Under Title IX, Plaintiffs and other member schools of the NCAA are prohibited from providing financial assistance disproportionately between sexes.

36. Plaintiffs are subject to Title IX through the public universities as recipients of federal financial assistance.

37. The Settlement provides "financial assistance" inequitably between male and female athletes in violation of the NCAA constitution.[25]

---

[19] NCAA Constitution Art. 1, § A, 3.
[20] NCAA Constitution Art. 1, § B.
[21] NCAA Constitution Art. 5, § A.
[22] NCAA Constitution Art. 2, § A, 3, d.
[23] NCAA D-I Operating Bylaw, § 21.1.2.
[24] NCAA Constitution Art. 2, § B, 12
[25] The US Department of Education has yet to clarify whether revenue share dollars would be considered "financial assistance" under Title IX, requiring such dollars to be distributed

5

38. Member schools, including Plaintiff institutions are prohibited from approving of, providing facilities or other services to, or assisting any organization which provides assistance to its students in a manner which discriminates on the basis of sex. 34 C.F.R. § 106.37.

39. Member schools are prohibited from making revenue share payments to student athletes disproportionate to their participation rates. Categorizing "revenue sharing payments" as something other than "financial assistance" by an institution or the NCAA severely undermines the legislative intent of Congress in enacting Title IX and is not consistent with the NCAA's constitutional mandate of gender equity nor the NCAA's constitutional commitment to gender equity.

## NCAA LAWSUITS & SETTLEMENT

40. The Settlement resolves three separate class-action lawsuits filed by former student-athletes against the NCAA.[26]

41. The Settlement encompasses two broad components:  injunctive relief and monetary damages.[27]

42. In short, the injunctive relief sets forth a path by which institutions will be able to compensate players not only for their participation in competition but also for their name, image, and likeness.[28]

43. These Settlement provisions directly contradict the NCAA's long held policy of amateurism as set forth in its Mission Statement and Constitution.[29]

44. The monetary relief amounts to approximately $2.8 billion in payments to former student-athletes.[30]

---

proportional to participation by each sex. See https://www.espn.com/college-sports/story/_/id/40567726/title-ix-college-athlete-revenue-share-nil.   However, in the 1979 Policy Guidance on Title IX, the Department of Education asserted that "When financial assistance is provided in forms other than grants, the distribution of non-grant assistance will also be compared to determine whether equivalent benefits are proportionately available to male and female athletes. A disproportionate amount of work-related aid or loans in the assistance made available to the members of one sex, for example, could constitute a violation of Title IX."

[26] *See House; Hubbard;* and *Carter. See also House,* Doc. 450.
[27] *Id.*
[28] *Id.*
[29] *See* Our Division I Priorities, NCAA Website, https://www.ncaa.org/sports/2021/5/11/our-division-i-priorities.aspx (last visited August 8, 2024).  *See also* NCAA Constitution Art. 1, § B.
[30] *EXECUTIVE SUMMARY - Congressional Briefing Paper Preliminary Assessment:  Title IX and Other Implications of the Proposed Settlement of House v. NCAA, Hubbard v. NCAA, and Carter v. NCAA on Intercollegiate Athletics Programs,* The Drake Group website,

6

45. $1.65 billion of that amount will be withheld from NCAA disbursements made to the schools over the next ten years, 60% of which will be withheld from disbursements made to non-defendant, non-Power 4 conferences and their member institutions.

46. It is common knowledge that the most prominent institutions amongst collegiate athletics are found in the Power 4 Conferences, and these institutions reaped the greatest benefits from the NCAA's amateurism rules. Further, the Power 4 schools are responsible for the vast majority of the damages for which the Settlement is intended to compensate. However, the Settlement requires them to shoulder less of a financial burden than that of their less prominent counterparts.

47. The Settlement was reviewed by the NCAA's Division I Finance Committee, the Division I Board, the Board of Governor's Finance and Audit Committee, and the Board of Governors. The Board of Governors gave final approval of the Settlement.[31]

48. No part of the Settlement, including the financial components or the injunctive relief fundamentally altering the NCAA's structure, was presented to the full membership for a vote.[32]

49. Additionally, multiple conferences were given no seat at the table with regard to discussion and vetting of the Settlement.[33]

50. The Settlement further requires disbursement of settlement funds in a manner that treats male and female athletes differently, resulting in significantly higher payments to male versus female athletes.[34]

## IMPACT ON SOUTH DAKOTA

51. Both South Dakota State University and the University of South Dakota are Division I schools, members of the Summit League Basketball Conference, the Missouri Valley Football Championship Subdivision Conference, and the NCAA.

52. As a result of Defendant's conduct, Plaintiffs have been damaged in an amount to be determined by a jury.

---

https://www.thedrakegroup.org/wp-content/uploads/2024/07/EXECUTIVE-SUMMARY-Congressional-Briefing-Paper-1.pdf (last visited August 21, 2024).
[31] Exhibit 2.
[32] Id.
[33] Exhibit 3.
[34] See House, Doc. 450-4, 35.

7

## CLAIMS FOR RELIEF

### CLAIM I: BREACH OF CONTRACT

53. Plaintiffs restate and incorporate by reference the foregoing paragraphs as though fully set forth herein.

54. The NCAA Constitution establishes amateurism as one of its guiding principles.

55. The NCAA Constitution may only be amended by a vote of the full membership at the Annual Convention.

56. No such vote was taken.

57. The decision to enter into the Settlement was made by the following entities despite components that fundamentally change the NCAA Constitution: Division I Finance Committee, the Division I Board, the Board of Governor's Finance and Audit Committee, and the Board of Governors.

58. This act violated the NCAA Constitution and, by extension, the agreement between the NCAA and its member institutions.

59. As a result of this contract breach, the University of South Dakota, South Dakota State University, and the State of South Dakota have been injured.

### CLAIM II: BREACH OF CONTRACT

60. Plaintiffs restate and incorporate by reference the foregoing paragraphs as though fully set forth herein.

61. Neither the NCAA Constitution nor Bylaws grants explicit authority for the Board of Directors or Board of Governors to settle litigation.

62. Authority not explicitly granted to the governing bodies of the NCAA is reserved to the divisions.

63. The NCAA lacked authority pursuant to the NCAA Constitution and Bylaws to enter into the Settlement.

64. As a result of this contract breach, the University of South Dakota, South Dakota State University, and the State of South Dakota have been injured.

8

## CLAIM III: BREACH OF FIDUCIARY DUTIES OF CARE AND LOYALTY

65. Plaintiffs restate and incorporate by reference the foregoing paragraphs as though fully set forth herein.

66. Members owe a fiduciary duty of care and loyalty to the other members and the organization, requiring diligence, due care, and the exercise of the utmost good faith and fair dealing. Members must act in good faith and refrain from transactions in which they receive an improper personal benefit.

67. NCAA leadership is weighted in favor of representatives from the Power 4 Conferences.

68. NCAA leadership, without consulting the full membership, placed the bulk of the hardship of the disbursement reductions on the non-Power 4 conferences to the benefit of the Power 4 Conferences.

69. In doing so, their decisions were designed to benefit their own institutions at the expense of the less prominent institutions.

70. As a result of these breaches of fiduciary duty, the University of South Dakota, South Dakota State University, and the State of South Dakota have been injured.

## CLAIM IV: UNJUST ENRICHMENT

71. Plaintiffs restate and incorporate by reference the foregoing paragraphs as though fully set forth herein.

72. The NCAA governing bodies are led by representatives from the Power 4 Conferences.

73. The Settlement, entered into by the NCAA governing bodies, places the bulk of the financial burden for the cost of the Settlement on the non-Power 4 Conferences.

74. These decisions were made to and for the benefit of the Power 4 Conferences.

75. As a result of these decisions, the University of South Dakota, South Dakota State University, and the State of South Dakota have been injured.

9

## CLAIM V: DERIVATIVE ACTION TO ENFORCE RIGHT OF MEMBERS TO VOTE ON CHANGES TO NCAA CONSTITUTION

76. Plaintiffs restate and incorporate by reference the foregoing paragraphs as though fully set forth herein.

77. Plaintiffs are members of the NCAA by and through the public universities.

78. Plaintiffs were members of the NCAA at the time of the approval of the settlement by the NCAA Board of Governors.

79. Members of the NCAA have a right to vote on changes in the NCAA Constitution.

80. Approval of the Settlement by the NCAA Board of Governors effectively changed or violated the NCAA Constitution's prohibition on compensating student-athletes for athletic performance, a guiding principle upon which Plaintiffs and other similarly situated schools have relied.

81. The NCAA Constitution may only be amended by a vote of the full membership at the Annual Convention.

82. No such vote was taken.

83. Plaintiffs attempted to persuade the NCAA to take alternative action to no avail.

84. The decision to enter into the Settlement was made by the following entities despite components that fundamentally change the NCAA Constitution: Division I Finance Committee, the Division I Board, the Board of Governor's Finance and Audit Committee, and the Board of Governors.

85. Approval of the Settlement violated the NCAA Constitution and, by extension, the mutual agreement of association between the NCAA and its member institutions.

86. As a result of this violation, the University of South Dakota, South Dakota State University, and the State of South Dakota, as well as similarly situated member schools, have been injured.

10

## CLAIM VI: DERIVATIVE ACTION TO ENFORCE GENDER EQUITY

87. Plaintiffs restate and incorporate by reference the foregoing paragraphs as though fully set forth herein.

88. The NCAA Constitution provides that the "[a]ctivities of the Association, its divisions, conferences and member institutions shall be conducted in a manner free of gender bias." Further, it is a responsibility of the NCAA to "[P]romote gender equity . . . in all aspects of intercollegiate athletics."

89. This commitment to gender equity mirrors the responsibility of member schools under Title IX which prohibits discrimination on the basis of sex in education programs and activities that receive federal financial assistance. 20 U.S.C. § 1681.

90. The Settlement inequitably distributes the Additional Compensation Fund dollars between male and female athletes, with more than 90% of the Fund being distributed to male student-athletes, in violation of the NCAA Constitution.

91. The reduction of future revenue distributions, which would be spent equitably by member institutions between men's and women's sports, to pay former male student athletes, further violates the NCAA Constitution's prohibition on gender bias and commitment to gender equity.

92. The NCAA Constitution may only be amended by a vote of the full membership at the Annual Convention.

93. No such vote was taken.

94. Plaintiffs attempted to persuade the NCAA to take alternative action to no avail.

95. The decision to enter into the Settlement was made by the following entities despite components that fundamentally change the NCAA Constitution: Division I Finance Committee, the Division I Board, the Board of Governor's Finance and Audit Committee, and the Board of Governors.

96. Approval of the Settlement violated the NCAA Constitution and, by extension, the mutual agreement of association between the NCAA and its member institutions.

11

97. As a result of this violation, the University of South Dakota, South Dakota State University, and the State of South Dakota, as well as similarly situated member schools, have been injured.

WHEREFORE, Plaintiffs pray as follows:

1. For judgment in Plaintiffs' favor on all claims and issues;

2. For damages, in an amount to be determined by a jury, and other appropriate relief;

3. For a declaration of the rights and responsibilities of the NCAA Members and for an order for Defendant to specifically perform its obligations to Plaintiffs in the NCAA Constitution, Bylaws, and agreements with Plaintiffs;

4. For an injunction protecting Plaintiffs from unjust disbursements based on the Settlement;

5. For Plaintiffs' costs, disbursements, and attorney's fees; and

6. For such other and further relief as the Court deems just and equitable.

**PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY.**

*--Signature on Following Page--*

12

Dated this 9th day of September 2024.

**MARTY J. JACKLEY**
**SOUTH DAKOTA ATTORNEY GENERAL**


Marty J. Jackley
Attorney General
1302 E. Hwy. 14, Suite #1
Pierre, South Dakota 57501
Telephone: (605) 773-3215
Email: marty.jackley@state.sd.us


Grant M. Flynn
Assistant Attorney General
1302 E. Highway 14, Suite #1
Pierre, South Dakota 57501
Telephone: 605-773-3215
Email: grant.flynn@state.sd.us

*Attorneys for Plaintiffs*

13

Jere Morehead, Ph.D.
University of Georgia, President
NCAA Division I Board of Directors, Chair

Per the request made during the June 5 NCAA Division I Board of Directors meeting, we are submitting this letter to formally register our concerns regarding the process the Board followed to approve the allocation of damages from the recent antitrust settlement. As we have indicated, we are supportive of the settlement. However, we believe that the process followed to secure Board approval for the distribution of damages was flawed in several respects. As set forth in more detail below, there was inadequate time for all members of the Board of Directors to consider and discuss the allocation model proposed by the NCAA staff. As a result, Board members were not able to understand the impact of the proposed model across Division I members or meaningfully consider alternative funding models. Additionally, we would like to raise the question of whether the Board has the authority to alter for ten years the percentage allocation of revenue distributions per NCAA Bylaws.

We believe the process should have included a comprehensive presentation of all details and models, more thorough discussion involving all Board members, and confirmation that NCAA bylaws for adjusting revenue distributions were followed properly. Consequently, we request the Division I Board of Directors reconsider the vote taken on May 22, using an appropriate process for an organization that follows a shared governance structure.

**Lack of Information & Reasonable Vetting.** The Board discussed the *House* settlement and a model to allocate damages for a total of two hours at two separate meetings with variable attendance. During the first meeting on May 8, 2024, the NCAA staff presented only one proposed model: the eventually approved model for allocating the damages. As many have noted since, this model had a disproportionate financial impact on the non-Autonomy 5 conferences. There was very little opportunity during the meeting for Board members to provide constructive feedback or engage in beneficial dialogue. When questioned about other possible models, NCAA leadership responded quickly indicating the presented model was the option the Board was being asked to endorse.

The second meeting, on May 22, included only a brief reference to alternative funding models and once again focused heavily on the NCAA's proposed model. Despite concerns previously expressed by the commissioners of the non-Autonomy conferences to NCAA staff and members of the various NCAA Finance Committees, the actual impact of the proposed model across all Division I members was not presented to the Board or discussed. In addition, the information shared with the Board did not include recognition or details regarding important differences across Division I members (e.g., damages as a percentage of per school athletics revenue, percentage of student-athletes likely to receive damages) that warrant consideration of alternative models. There should have been time allotted for all Board members to thoroughly analyze the NCAA's model and alternatives that should have been sent to Board members in advance of the meeting, allowing for a fair, healthy and robust discussion.

---

**EXHIBIT**

**1**

Additionally, it was apparent during the May 22 meeting that some of the Board members did not fully understand the specifics of the vote and some have indicated that they voted in favor of the motion because they supported the settlement, even though they did not support the revenue distribution allocation model. With approximately three minutes remaining in the scheduled 60-minute meeting, as there were several Board members with their hands raised indicative of remaining questions and/or comments, you asked whether the Board should schedule another meeting or vote on the issue. A member of the NCAA staff indicated that the Board should call for the vote and the vote occurred, despite the fact that questions remained unanswered and comments remained unheard. This process is contrary to Robert's Rules of Order which do not allow for a vote on a question if there is still debate or discussion pending unless a vote to end debate occurs first (which did not happen). Allowing staff to end the debate in this manner was inappropriate in our opinion.

The rushed Board of Directors process, which did not allow time for thorough vetting of various models or consideration of the impact on all members, is inconsistent with a shared governance system. The NCAA staff works for and represents the entire membership and should have shared various membership perspectives to the Board for full consideration. This operational manner runs counter to a healthy governance process within a membership association, including our own professed values of collaboration and inclusivity.

**Following NCAA Bylaws.** Based on the attached bylaw excerpts, it appears the Board voted to change the allocation and formula for Division I revenue distribution for ten years. We question whether the Board has authority to change the percentages as these provisions are division dominant legislation, which require a 2/3 vote of the entire Division I membership for any modifications. Per the rationale provided when the Division I membership moved these provisions as part of the work of the Constitution Committee in 2022, "Updating the legislation through adoption of this proposal would ensure that the revenue distribution funds and formulas would continue as currently constituted unless and until they are changed through a future legislative action of the membership at an annual or special Convention." Thus, a full membership vote is required at a Convention.

We appreciate the opportunity you have offered Board members to provide written statements of concerns. We respectfully hope that you, the Board of Directors and NCAA leadership will take our concerns seriously and consider how these issues might be fully addressed.

Sincerely,

Ora Hirsch Pescovitz, M.D.      John Bravman, PhD            Peter Salovey, PhD
Oakland University, President    Bucknell University, President    Yale University, President

cc: NCAA Division I Board of Directors
    Charlie Baker, President

June 19, 2024

Ora Hirsch Pescovitz, M.D.    John Bravman, PhD      Peter Salovey, PhD
Oakland University, President   Bucknell University, President  Yale University, President

Dear Presidents Pescovitz, Bravman, and Salovey,

Division I Board Chair Jere Morehead has asked me to respond to your June 17, 2024 letter regarding the May 21, 2024 meeting of the Division I Board of Directors and the process by which settlement approval of the California antitrust cases occurred. The settlement proposal avoids existential risk for all Division I schools and conferences, and the Association as a whole. It is critical that the California antitrust settlement proposal reach final approval to address damage claims and to create a more stable structure that allows college sport opportunities to continue in the manner which each member school chooses. Failure to get the settlement approved could expose the entire NCAA membership to extraordinary liability, regardless of the size of their athletics budget or portion of revenue distribution received from the Association. And, the settlement proposal allows for damages payments over 10 years, instead of in the form of an immediate judgment. However, the assertions made in your letter challenge the validity of perhaps the most important decision ever made by the governors of the Association. As general counsel of the NCAA, with accountability to both boards, I believe the decision-makers acted according to the authority and process approved by the membership.

As you know, important decisions often need to be made urgently based on the best available information at the time, in reliance upon others who have engaged in diligence, and using best judgment under the circumstances. The timeframe for the Board of Governors to approve the settlement proposal was necessary based on advice of legal counsel that the NCAA had the best opportunity to negotiate a settlement prior to upcoming court deadlines. The approval of the settlement proposal certainly fits within those parameters, and I believe that the Division I Finance Committee, the Division I Board, the Board of Governors Finance and Audit Committee (BOGFAC), and the Board of Governors all acted appropriately. The representatives on each board and committee are experienced leaders who received information, asked questions, debated, considered options, and decided.

All applicable NCAA bylaws were followed throughout the course of the settlement approval. The Board of Governors has authority to settle litigation and is the overall steward of revenue received by the Association. In considering the settlement, the governors directed BOGFAC to work with President Baker and his senior staff to determine how much of the settlement could be funded without disruption to distribution of funds and without impairing essential national office services. With that financial information in mind, BOGFAC recognized that they could not recommend settlement to the governors without a temporary reduction of Division I revenue distribution, which is in the purview of the Division I Board based on the recommendation of the Division I Finance Committee.

The Governors met their obligation to consult with the Division I Board based on the litigation involving rules passed by the Division I governance process. They engaged in that consultation and went further by requesting the Division I Board to approve a framework to temporarily reduce revenue distributions. The Division I Board in turn asked the finance committee to examine various models for temporary revenue distribution reduction. The finance committee and staff worked intensely to develop and consider several different models from a variety of membership sources. The chair of the finance committee reported to the Division I Board about the work that had been done, and the models considered, and offered a recommended framework for consideration by the Division I Board. Membership feedback was more than considered. It was acted on, as the finance committee made changes to better account for schools transferring between conferences over time. It is important to note that the Division I Board did not change

<div style="border:1px solid black; display:inline-block; padding:10px; text-align:center;">

**EXHIBIT**

**2**

</div>

the revenue distribution policy.   The board approved a reduction of distribution to cover negotiated settlement damages.  In reasonable reliance of the work done by the Division I Finance Committee, the Division I Board accepted that recommendation pursuant to the authority they have, and consistent with how the Division I Board acted during another disruption to Association revenues: the COVID-19 pandemic.

After carefully reviewing the concerns raised in your letter and conferring with the Division I Board Chair and the Board of Governors Chair, it is my opinion that the processes and obligations to approve the settlement were met under exceedingly challenging conditions.

Next, let me address the allegations made about the role of national office staff. The chair retained control of the meeting, and there was material debate among the Division I board members. As the appointed time was at hand to end the meeting, the chair asked the will of the group:  vote while on the call, vote via BoardVantage, or schedule more time.  A staff member did suggest a vote be taken, and the chair proceeded to call the question. All members of the board present on the video call participated in the vote, without calling one of the other alternative approaches suggested by the chair.  As that meeting has adjourned, any request for reconsideration of the action is not in order. An attempt to undo the action at the next meeting, which would be based on a change of mind, would be destabilizing to the organization and ultimately could unravel the settlement proposal before it even has a chance to be considered by the court.  The Board of Governors approval of the settlement proposal is contingent on the commitment by President Baker to pay as much of the settlement damages from available national office funds, as well as Division I Board approval of the projected temporary reductions to Division I schools. And, settlement approval by the co-defendant conference boards is contingent upon Board of Governors approval. Those contingencies are failed if a material element of the Board of Governors' decision to approve the proposal is removed.

We are past the point of revisiting Division I Board actions that were relied upon by the Board of Governors in agreeing to a comprehensive settlement. However, I understand from Chair Morehead that at the next meeting he is prepared to have the board discuss other possible ways to lessen the financial burden on all institutions, through new funding sources identified by the finance committee in the future.

Sincerely,

Scott Bearby

Senior Vice President and General Counsel


cc:     NCAA Division I Board of Directors

        Charlie Baker, President

To the Members of the Division I Board of Directors Finance Committee, Division I Board of Directors, Board of Governors Finance Committee and Board of Governors:

**Introduction:** We understand and support the need for a settlement in the *House, Hubbard* and *Carter* lawsuits, and are thankful for the hard work by NCAA staff on this challenging endeavor. However, as commissioners of non-defendant Division I conferences, we do not support the current model proposed by the NCAA for allocating back damages, which unreasonably impacts our conferences. We have not been involved in the settlement negotiations or damage allocation modeling, and learned of the settlement status two weeks ago. We have a fiduciary responsibility to our schools to ensure the allocation manner is done in a reasonable and fair manner.

We understand the timetable for approving the settlement is narrow and are requesting that any immediate settlement approval not include the proposed allocation for the damages. As NCAA revenue distributions comprise a much higher portion of our budgets, we believe a more proportionate allocation of damages derived from actual assignment of damages reflective of classes certified in federal court and/or an equitable percentage reduction of conference/school revenues is appropriate. With reductions impacting all of Division I, it is important we have a more consultative process.

**Key Concerns:**
- **Allocation of Responsibility:** The proposed assignment of back damages to the autonomy conferences, given their status as defendants in these lawsuits, is disproportionate to other conferences.
  - The NCAA model results in non-autonomy conferences bearing 60% of the burden even though 90% or more of the back damages will likely accrue to student-athletes from the autonomy conferences.
- **Serious Impact:** The proposed NCAA model will result in a greater percentage reduction of total per school revenue among non-autonomy institutions. This reduction is exacerbated when considering revenue without institutional support and/or student fees.
  - The lost revenue at non-autonomy schools will likely force challenging financial decisions to be made at the campus and conference levels (e.g., scholarships, student-athlete experiences, staffing, sport programs).

**Other Important Considerations**
- The use of existing NCAA resources to pay the first 40% of the damages is likely to have a negative impact across student-athletes in the Association.
- The misaligned allocation of NCAA revenues at an equal percentage to pay for damages is unjust considering that the plaintiffs' attorney (Jeffrey Kessler) has publicly stated that the business model of FBS football and the CFP, where the economic activity exists outside the NCAA, prompted his involvement.
  - Kessler recently stated in a panel discussion 'We have to think about autonomy schools as different. The reason we get tied in knots is because we conflate those schools who have developed these gigantic independent

```
EXHIBIT
3
```

commercial businesses with the schools who are still just educational institutions with extracurricular activities.' It is clear from the plaintiff attorney's intent that the responsibility largely rests with autonomy schools.

- The NCAA's rationale for paying the entirety of the settlement ('it's a Division I rule') disregards the classes proposed and certified in federal court.
    - *House:* The litigation specifies three classes of student-athletes with three different categories in applying damages to each class. We believe more than 90% of the back damages are attributable to A5 student-athletes.
    - *Carter:* The class sought in *Carter* is specific to the five autonomy conferences (and Notre Dame), not the other 27 conferences.
    - *Hubbard:* Class certification is outstanding, but it is reasonable to assume that most of the damages calculated are attributable to the five autonomy conferences because they have provided the majority of Academic Achievement Awards to date (e.g., *Altson* Award).

**The Future:** While we understand the autonomy conferences are likely to incur additional financial obligations in the future, these settlement terms are distinct from the back damages at issue here. We are concerned the NCAA's proposed allocation model sets a precedent for future settlements while leaving the governance issues that have contributed to this situation unaddressed. Accordingly, particularly given the growth and success of the CFP and the alternative revenue sources it provides FBS conferences and schools, it is imperative that the NCAA commit to meaningful Division I championship access for all 32 conferences and an evaluation of the role football plays within the NCAA Division I structure.

**Closing:** We fully support the NCAA moving forward with a settlement. However, we believe one of the following more balanced and reasonable approaches to allocate back damages must be used instead to address the concerns outlined above:

1) The allocation of back damages utilizes an alternative model, including one based on class certification and assignment of damages referenced in the litigation OR one based on a consistent percentage of lost revenue across all Division I schools. The enclosed model represents a 60/40 split between autonomy conferences and rest of Division I. This model produces an equitable impact on per school revenue, ensuring that certain conferences/schools are not impacted more than others. Anything more than a 40 percent share would cause more harm to non-autonomy schools.
2) The Division I Board of Directors selects a balanced group of commissioners representing all Division I conferences to work with the NCAA staff to develop an agreeable compromise to allocate damages while settlement discussions with the plaintiffs proceed.

Thank you for your consideration,

Brad Walker, America East Conference
Jeff Bacon, Atlantic Sun Conference
Bernadette McGlade, Atlantic-10 Conference
Val Ackerman, Big East Conference
Tom Wistrcill, Big Sky Conference
Sherika Montgomery, Big South Conference
Dan Butterly, Big West Conference
Joe D'Antonio, Coastal Athletic Association
Julie Roe Lach, Horizon League
Robin Harris, Ivy League
Travis Tellitocci, Metro Atlantic Athletic Conference
Sonja Stills, Mid-Eastern Athletic Conference
Jeff Jackson, Missouri Valley Conference
Noreen Morris, Northeast Conference
Board of Presidents, Ohio Valley Conference
Jennifer Heppel, Patriot League
Michael Cross, Southern Conference
Chris Grant, Southland Conference
Charles McClelland, Southwestern Athletic Conference
Josh Fenton, Summit League
Stu Jackson, West Coast Conference
Brian Thornton, Western Athletic Conference

## AFFIDAVIT OF SERVICE

IN THE CIRCUIT COURT OF BROOKINGS COUNTY
STATE OF SOUTH DAKOTA

Case #: 05CIV24-000320

The State of South Dakota, et al.

Plaintiff

· vs. ·

National Collegiate Athletic Association

Defendant

State of Indiana, County of Johnson SS:

The undersigned, being first duly sworn, on oath deposes and says: That s(he) is now and at all the times herein mentioned was a citizen of the United States, over the age of 18, not a party to nor interested in the above entitled action, is competent to be witness therein, and that I served copies of the:

### Summons & Complaint

| | |
|---|---|
| PARTY SERVED: | **NATIONAL COLLEGIATE ATHLETIC ASSOCIATION** |
| PERSON SERVED: | **TAMMY LAPOINTE -POTTER, LEGAL** |
| METHOD OF SERVICE: | **Corporate** - By leaving copies with the person identified above, apparently in charge at the office or usual place of business. I informed him/her of the general nature of the papers. |
| DATE & TIME OF DELIVERY: | **9/23/2024 at 9:21 AM** |
| ADDRESS, CITY AND STATE: | **700 W WASHINGTON ST, INDIANAPOLIS, IN 46204** |

Race: **White**   Sex: **Female**   Age: **50**
Height: **5'5"**   Weight: **145**   Hair: **Brown**   Glasses: No

SUBSCRIBED AND SWORN to before me on the 23rd day of September, 2024.

_____
NOTARY PUBLIC

I declare under penalties of perjury that the information contained herein is true and correct.

_____
Ryan David Fortune

AMY LYNN FORTUNE
Notary Public, State of Indiana
Johnson County
Commission # 711595
My Commission Expires
March 18, 2026
SEAL

**EXHIBIT**

tabbies'

3

Judicial Attorney Services, Inc. PO Box 583 Geneva, IL 60134, (630) 221-9007

CLIENT: South Dakota Office of Attorney General
FILE #:

Job #: 589681