# APPENDIX N



# What to know about House v. NCAA settlement and a historic day for college sports



By Nicole Auerbach and Justin Williams    May 24, 2024                               💬 151

The NCAA and its power conferences agreed on Thursday to allow college athletes to receive pay directly from the universities they compete for, setting up a potential break from the organization's century-old system of amateurism.

The two sides in the House v. NCAA class-action lawsuit formally announced terms of a multi-billion-dollar settlement that stands to reshape college sports, including $2.75 billion in back-pay damages the NCAA will owe to former Division I athletes, as well as a future revenue sharing model between power-conference schools and athletes.

ADVERTISEMENT



"This landmark settlement will bring college sports into the 21st century, with college athletes finally able to receive a fair share of the billions of dollars of revenue that they generate for their schools," Steve Berman, one of lead plaintiff attorneys, said in a news release.

The announcement comes after a week in which the NCAA Board of Governors and leaders from the Power 5 conferences — ACC, Big 12, Big Ten, Pac-12 and SEC — all voted to approve the proposed terms. NCAA president Charlie Baker described it as an "important step in the continuing reform of college sports," an enterprise that has faced an onslaught of legal challenges and policy changes in recent years.

Describing EVERY Big 12 team in one word + What House vs NCAA approval means
May 24 · Until Saturday: A show about college football
Save on Spotify
1:08:16

"We have been marching down this long legal road seeking economic justice in college sports for more than a decade, but the time to bring a fair compensation system to college athletes has finally arrived," said Jeffrey Kessler, another lead plaintiff attorney.

Here's what you need to know from a historic day for college athletics, and what to keep an eye on.

## Settlement revelations

Many of the settlement details — including the headlining broad strokes and nitty-gritty payment models — were reported over the past weeks.

 GO DEEPER
How the House v. NCAA settlement could reshape college sports: What you need to know

The announcement confirmed the total back-pay damages figure to be "more than $2.75 billion" and paid out over a 10-year period. In a letter Baker sent to NCAA membership on Friday, he stated that the NCAA losing the House case at trial could have been "financially devastating and unsustainable."

When it comes to revenue sharing, the release specified that the 22 percent of the average of power-conference programs revenues allotted for revenue sharing is for the first year of the settlement — it will increase over time — and that the 22 percent would translate to an amount projected to be "significantly more than $20 million per school, per year." The $20 million number had been widely referenced as a ballpark figure based on recent power-conference revenues, and it is indeed a good starting point. It is also optional; schools can opt into the revenue distribution model and determine which athletes in which sports they want to pay. The cap on the money used to pay athletes would grow slightly each year as the power conferences' projected overall revenues increase.

Case 4:20-cv-03919-CW   Document 612-14   Filed 01/29/25   Page 4 of 9



The release also describes the revenue sharing as an "addition to scholarships, third-party NIL payments, health care and other benefits that college athletes already receive," and estimates that over the 10-year settlement period, the total value would "exceed $20 billion, making it one of the largest antitrust class-action settlements in history."

As far as the payment breakdown for the "more than $2.75 billion" in retroactive damages over 10 years, the NCAA would be responsible for roughly $1.2 billion from reserves, or 41 percent. The power conferences would be available for about 24 percent in withheld future revenues, the Group of 5 for about 10 percent, FCS schools for about 13 percent, and non-football DI schools about 12 percent.

There is a sentiment among the smaller programs that the model puts a disproportionate financial responsibility on them, particularly when the House suit was aimed largely at power conference programs.

"I understand this change will not be easy to manage, but given the challenges facing college sports over the last few decades, change is inevitable," Baker wrote in the letter sent out on Friday.



NCAA scholarship caps would also be eliminated by the settlement and give way to roster limits. No details or specifics were provided in the release and haven't been fully ironed out, but schools are expected to have some flexibility on how scholarships are distributed among sports. It could also create some numbers challenges in adapting from the current model of scholarship limits within larger roster limits, possibly eliminating walk-on athletes.

ADVERTISEMENT

get Allstate,
save money and be protected from mayhem

quote now

## Other antitrust lawsuits

The House settlement would in fact resolve Hubbard v. NCAA and Carter v. NCAA, two other high-profile antitrust suits in which the plaintiffs are represented by Berman and Kessler in the Northern District of California. Sources briefed on the negotiation process told *The Athletic* resolving those additional cases was an important aspect of the settlement terms for the NCAA, which it hopes will provide some degree of litigation relief.


GO DEEPER
Why is the NCAA proposing a new subdivision? Explaining the related legal battles

The extent of that relief remains to be seen, as evidenced by a decision in a different antitrust case. Fontenot v. NCAA is a separate lawsuit filed in Colorado that is also seeking class-action certification and has asserted that rules prohibiting "pay for play" compensation violate antitrust law. These are similar to the claims asserted in Carter v. NCAA. The NCAA request to transfer the Fontenot case to the same Northern District of California court and consolidate it with Carter was denied on Thursday. The Fontenot case will instead stay in Colorado court, where representatives for the plaintiffs believe their claims are broader than the Carter case and could potentially influence other college athletes to opt out of or object to the House settlement classes and pursue a different resolution.

"We brought the Fontenot case to fight for better rights for the next generation of college athletes and while we're still waiting to fully assess this proposed settlement agreement, we do have some concerns based on what is reported," Garrett Broshuis, a plaintiff attorney in the Fontenot case, told *The Athletic*. "We will continue to fight for these college athletes that deserve continued representation."

The full impact of Fontenot remaining in Colorado is to be determined. Both the plaintiff lawyers and the NCAA believe resolving the Carter case as part of the House settlement will cover the Fontenot claims and prevent it from moving forward. That decision will ultimately depend on the fine print of the House settlement and whether Judge Claudia Wilken, who is presiding over the House case, approves those terms.

"Judge (Wilken) made it clear that if there is a settlement covering the Fontenot claims, she won't allow those claims to be continued in Colorado on a class basis," Berman told *The Athletic*. "So at best, Fontenot is short lived as a proposed class action and will not impact the (House) settlement."

"If a settlement in the House case is approved, it will resolve all of the claims in the Fontenot case, and it won't really matter where Fontenot is being heard," Kessler told *The Athletic*.

## Next steps in the settlement process

Despite an announced agreement between the two sides, none of the settlement details are finalized. For a class-action settlement, the terms must be submitted for preliminary approval to Judge Wilken, which is expected to be done within the next 30-45 days. If preliminary approval is granted, there would then be a set period of several months in which those in the retroactive damages and future revenue-sharing classes are notified and have an opportunity to either opt out or object to the terms of the agreement, depending on the judge's ruling. That's followed by a final approving hearing, at which point, if the judge approves it, the settlement officially goes into effect.

ADVERTISEMENT



So even without any revisions, the settlement wouldn't be finalized until much later this year, at the earliest.

"If there is a settlement, it will lead for the first time to a truly equitable compensation system in which athletes can receive a historic return on the contributions they make to their sports," Kessler said in an interview with *The Athletic* earlier this week, prior to the formal announcement. "That will be transformative for these athletes and it will do so in real time. If we don't settle, I think we will still get there, but it will take years more of litigation."


**GO DEEPER**
Mandel: What college sports' pay-for-play era will mean — and won't mean

## Unresolved issues

Regardless of what comes of the Fontenot lawsuit, the contention over that case is one example of the unanswered questions hovering over the settlement process. For example, the 22 percent average annual revenue allotment that would be available for power-conference revenue sharing was negotiated without any athlete input and is a much lower rate than what is distributed to athletes in most American professional leagues, an issue that could further ignite discussion over unionizing efforts and employment status for college athletes.

The NCAA, however, will continue to pursue Congressional antitrust exemptions, even describing the settlement as "a road map for college sports leaders and Congress" in a statement. The organization believes the House settlement provides significant protections and advantages, and that a collective bargaining approach is unnecessary.

"It creates a framework that makes it possible to then have a different kind of conversation with Congress," Baker said at ACC spring meetings earlier this month. "So, in many ways, I'm hopeful."

In the meantime, more questions linger. Will the settlement's revenue-sharing model for power-conference athletes be beholden to Title IX policy, with proportional payments required to men's and women's athletes? If tested, the matter could spark additional litigation. It's also unclear what impact, if any, the House settlement could have on the role of third-party NIL collectives, which currently operate outside athletic departments and have developed an unregulated culture of pay-for-play payments. There has been talk in recent months of the NCAA allowing athletic departments to operate those NIL collectives in house.

9/25/24, 12:21 PM
Case 4:20-cv-03919-CW    Document 613-14    Filed 01/29/25    Page 7 of 9
What to know about House v. NCAA settlement and a historic day for college sports - The Athletic


GO DEEPER
College football portal confidential: How tampering, NIL deals and portal chaos happen

There are concerns of the trickle-down effect these new financial requirements will have on athletic departments as well, including the possibility of schools cutting sports, athlete resources or administrative positions at both power-conference and non-power-conference schools. At the same time, the House settlement would further establish the gap between those two groups, and could fuel the debate over a years-from-now separation of high-revenue football programs into some version of super conferences or a super league.

ADVERTISEMENT



So much will still need to be addressed in the months and years ahead. But for now, the NCAA progresses toward a settlement and future where unpaid, amateur athletes are no longer a defining pillar of college sports.

"The legacy (of the House case) is the most fundamental and revolutionary change in the history of college sports," Berman told *The Athletic*. "It's paving the way for unrestrained revenue sharing that will change the lives of college athletes."

*(Photo: Mitchell Layton / Getty Images)*

## Get all-access to exclusive stories.

Subscribe to The Athletic for in-depth coverage of your favorite players, teams, leagues and clubs. Try a week on us.

Start Free Trial

COMMENTS

*Subscribe* to join the conversation.

M   **Mike M.** · May 24
The ripple effect of this will be felt for years. Kids 20 years from now won't even be able to understand what college sports used to be.

J   **Jim F.** · May 24

This is the end.

---

J   **Jp K.** · May 24

So this is all on top of the perks already in place: tuition, housing, food, books, tutors, clothing, travel, fine hotels...all tax free (something that virtually no other paid employee on a college campus can boast)!

"No greater deal has ever existed for a high school graduate than an athletic scholarship for college in the United States. While the average earnings of a high school graduate are around $20,000.00 a year, the value of an athletic scholarship can be worth over $150,000.00 annually," according to an article in Forbes in 2018.

When the attorney for the plaintiffs says that "college athletes finally able to receive a fair share of the billions of dollars of revenue that they generate for their schools", he creates an image that universities all have massive vaults stacked with cash. If only. According to a 2023 PBS report, only 25 of the 130 FBS schools reported positive net revenues in 2019. " the median athletic program in FBS in 2019 (the last pre-pandemic year) had an operating deficit of $18.8 million."

Lots of talk about generated revenue in pieces like this. Little if any on expenditures.

READ MORE

## From unranked to unbeaten (so far): Are these 9 teams College Football Playoff sleepers?

By Scott Dochterman

4h ago

### Recruiting mailbag: Texas, Oregon or Miami? Which program has a brighter future on the trail?

Grace Raynor   7h ago   15 Comments

### UCF hopes to 'seize the moment' as Colorado takes Coach Prime effect to Orlando

Justin Williams   7h ago   3 Comments

### Mandel's Mailbag: Are megaconferences good after all, what's going on with Pac-12, MWC?

Stewart Mandel   7h ago   154 Comments

### After 3-0 start, UNLV QB Matthew Sluka says he'll sit rest of season over unfulfilled 'commitments'

Antonio Morales   9h ago   301 Comments

### ACC men's basketball schedule highlights Duke, UNC, Cal, Stanford and SMU

**Brendan Marks**   14h ago   13 Comments

### What's next in Pac-12 realignment? Plus, the 7 winless teams in FBS

**Jayna Bardahl**   19h ago   5 Comments

### Pac-12 files lawsuit against Mountain West over more than $50 million in poaching fees

**Chris Vannini**   22h ago   176 Comments

| National | | US | | Canada | Subscribe |
|---|---|---|---|---|---|
| Boxing | Men's World Cup | Arizona | Memphis | Calgary | Start Subscription |
| Bundesliga | Mixed Martial Arts | Atlanta | Miami | Edmonton | Buy a Gift |
| Champions League | MLB | Baltimore | Minnesota | Montreal | Student Discount |
| Championship | MLS | Bay Area | Nashville | Montréal (français) | Group Subscriptions |
| College Football | Motorsports | Boston | New Orleans | Ottawa | |
| College Sports | NASCAR | Buffalo | New York | Toronto | HQ |
| Copa America | NBA | Carolina | Oklahoma | Vancouver | About Us |
| Copa del Rey | NFL | Chicago | Oregon | Winnipeg | Careers |
| Culture | NHL | Cincinnati | Orlando | | Code of Conduct |
| Europa League | NWSL | Cleveland | Philadelphia | Partners | Editorial Guidelines |
| European Championship | Olympics | Columbus | Pittsburgh | Collectibles by eBay | Business Inquiries |
| FA Cup | Opinion | Dallas | Sacramento | Odds by BetMGM | Press Inquiries |
| Fantasy Baseball | Premier League | Denver | San Antonio | Tickets by StubHub | |
| Fantasy Basketball | Scottish Premiership | Detroit | San Diego | | Support |
| Fantasy Football | Serie A | Houston | Seattle | | FAQ |
| Fantasy Hockey | Soccer | Indiana | St. Louis | | Forgot Password? |
| Fantasy Premier League | Sports Betting | Jacksonville | Tampa Bay | | Redeem Gift |
| Formula 1 | Sports Business | Kansas City | Utah | | Contact Us |
| Gaming | Tennis | Las Vegas | Washington DC | | Terms of Service |
| Golf | Top Sports News | Los Angeles | Wisconsin | | |
| International Football | UK Women's Football | | | | Newsletters |
| La Liga | WNBA | | | | The Pulse |
| League Cup | Women's College Basketball | | | | The Bounce |
| League One | Women's Euros | | | | The Windup |
| League Two | Women's Hockey | | | | Prime Tire |
| LNH | Women's World Cup | | | | Full Time |
| Memorabilia & Collectibles | The Athletic Ink | | | | Until Saturday |
| Men's College Basketball | Podcasts | | | | Scoop City |
| Headlines | | | | | The Athletic FC |

©2024 The Athletic Media Company, A New York Times Company    Privacy Policy    Your Ad Choices    Support    Sitemap    

