# APPENDIX P

2024 WL 755528
Only the Westlaw citation is currently available.
United States District Court, E.D. Tennessee,
Knoxville Division.

State of TENNESSEE and
Commonwealth of Virginia, Plaintiffs,
v.
NATIONAL COLLEGIATE
ATHLETIC ASSOCIATION, Defendant.

3:24-CV-00033-DCLC-DCP
|
Filed February 23, 2024

**Synopsis**
**Background:** State of Tennessee and Commonwealth of Virginia filed suit, as parens patriae on behalf of their student-athletes, against National Collegiate Athletic Association (NCAA), claiming illegal agreement to restrain and suppress competition within labor market of Division I athletics in violation of Sherman Act by NCAA's rules, clarifying that collectives, created by alumni, boosters, or businesses to provide to their school's athletes opportunities to earn compensation for their name, image, and likeness (NIL), were considered boosters, so NIL collectives were prohibited from engaging in recruiting activities on behalf of particular school and from guaranteeing or promising student-athletes any NIL agreement that was contingent on initial or continuing enrollment at particular institution, which were considered impermissible inducements under NCAA rules, with result that student-athletes were prohibited from discussing potential NIL deals until after they had already committed to particular school. State and Commonwealth moved for preliminary injunction preventing enforcement of NCAA's NIL-recruiting ban.

**Holdings:** The District Court, Clifton L. Corker, J., held that:

Sherman Act applied to NCAA's NIL-recruiting ban;

Tennessee and Virginia had strong likelihood of success on merits of Sherman Act claim;

student-athletes would suffer irreparable harm absent injunction;

substantial harm to others would result absent injunction; and

public interest supported granting preliminary injunction.

Motion granted.

**Procedural Posture(s):** Motion for Preliminary Injunction.

**Attorneys and Law Firms**

Adam K. Mortara, Lawfair LLC, Nashville, TN, Ethan Bowers, Pro Hac Vice, Lacey E. Mase, Marilyn Guirguis, Pro Hac Vice, Tyler Corcoran, Pro Hac Vice, J. David McDowell, Office of the Attorney General and Reporter, Nashville, TN, David L. Rosenthal, Pro Hac Vice, Thomas R. McCarthy, Pro Hac Vice, Cameron T. Norris, Consovoy McCarthy PLLC, Arlington, VA, Patrick Strawbridge, Pro Hac Vice, Consovoy McCarthy PLLC, Boston, MA, for Plaintiff State of Tennessee.

Adam K. Mortara, Lawfair LLC, Nashville, TN, Andrew N. Ferguson, Jonathan M. Harrison, II, Pro Hac Vice, Tyler T. Henry, Pro Hac Vice, Steven G. Popps, Office of the Attorney General, Richmond, VA, David L. Rosenthal, Pro Hac Vice, Thomas R. McCarthy, Pro Hac Vice, Cameron T. Norris, Consovoy McCarthy PLLC, Arlington, VA, Patrick Strawbridge, Pro Hac Vice, Consovoy McCarthy PLLC, Boston, MA, for Plaintiff Commonwealth of Virginia.

David Zeitlin, Pro Hac Vice, Taylor Askew, Pro Hac Vice, Robert E. Boston, Holland & Knight, LLP, Nashville, TN, Rakesh N. Kilaru, Pro Hac Vice, Wilkinson Stekloff LLP, Washington, DC, for Defendant.

### MEMORANDUM OPINION AND ORDER

Clifton L. Corker, United States District Judge

 ***1** In July 2021, the National Collegiate Athletic Association ("NCAA") drastically changed the landscape of college athletics by allowing student-athletes to earn compensation for their name, image, and likeness ("NIL"). Naturally, this opened the floodgates, and a collegiate NIL market formed overnight. Some student-athletes facilitated their own NIL deals, but fans, alumni, and businesses also recognized an opportunity in the market and started forming NIL collectives to facilitate deals for their school's athletes. Problems began to arise, however, when the NCAA realized that these third-party collectives could offer NIL

deals to induce student-athletes to commit to a particular school. In an apparent attempt to prohibit those inducements, the NCAA issued guidance classifying NIL collectives as "boosters" to prevent them from negotiating with student-athletes during the recruiting and transfer processes. For the reasons stated herein, the NCAA's prohibition likely violates federal antitrust law and harms student-athletes. Accordingly, Plaintiffs State of Tennessee and Commonwealth of Virginia, who initiated this action as *parens patriae* on behalf of their student-athletes, are entitled to a preliminary injunction enjoining enforcement of the NCAA's "NIL-recruiting ban."

**I. BACKGROUND**
Since its inception, the NCAA, the governing body of intercollegiate athletics, has limited compensation of student-athletes in an attempt to maintain amateurism across college sports. The original 1906 bylaws provided that " '[n]o student shall represent a College or University in any intercollegiate game or contest who is paid or receives, directly or indirectly, any money, or financial concession.' " Joseph Ranieri, *The First Step: Student-Athletes Finally Get the Right to Be Compensated for Their Names, Images, and Likenesses*, 18 DePaul J. Sports L. 1, 4 (2022) (quoting Intercollegiate Athletic Association of the United States Constitution By-Laws, Art. VII, § 3 (1906)). In 1948, however, the NCAA "authorized colleges and universities to pay athletes' tuition." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 77, 141 S.Ct. 2141, 210 L.Ed.2d 314 (2021) (citation omitted). Almost ten years later, "the NCAA expanded the scope of allowable payments to include room, board, books, fees, and 'cash for incidental expenses such as laundry.' " *Id.* (citation omitted). Then, in 2014, the NCAA permitted conferences "to increase scholarships up to the full cost of attendance." *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1055 (9th Cir. 2015).

Despite the foregoing evolution of student-athlete compensation, the NCAA has long prohibited student-athletes "from receiving any 'pay' based on ... athletic ability, whether from boosters, companies seeking endorsements, or would-be licensors of [athletes' NIL]." *Id.* But that changed in July 2021 when the NCAA's Interim NIL Policy went into effect, allowing student-athletes to engage in NIL activity and to be compensated accordingly [Doc. 2-14]. This change created a market for student-athletes' NIL, which quickly led to the creation of NIL collectives, e.g., "organizations created by alumni, boosters, or businesses with the purpose of providing NIL opportunities to their school's athletes." Kassandra Ramsey, *NIL Collectives-Title IX's Latest Challenge*, 41 Cardozo Arts & Ent. L.J. 799, 801 (2023). The first known collective, the Gator Collective, launched merely two months after the NCAA's interim policy went into effect. *Id.* Since then, "approximately 200 NIL collectives have been created across several colleges and universities." *Id.* at 802.

**\*2** With the rise of NIL collectives, the NCAA issued supplemental guidance regarding the involvement of third parties in the NIL landscape. The guidance clarifies that NIL collectives are considered "boosters" to the extent their "overall mission ... is to promote and support a specific NCAA institution by making available NIL opportunities to prospective student-athletes (PSA[s]) and student-athletes (SAs) of a particular institution[.]" NCAA, *Interim Name, Image and Likeness Policy: Guidance Regarding Third Party Involvement* (May 2022), https://www.ncaa.org/sports/2021/2/8/about-taking-action.aspx (last accessed February 14, 2024). The guidance reiterates that boosters, which now include NIL collectives, are prohibited "from engaging in recruiting activities, including recruiting conversations, on behalf of a school." *Id.* Boosters are also prohibited from guaranteeing or promising student-athletes an NIL agreement that is contingent on initial or continuing enrollment at a particular institution. *Id.* Because the NCAA classifies NIL collectives as boosters, any NIL discussions between collectives and student-athletes are considered impermissible inducements under the NCAA rules. Thus, student-athletes are prohibited from discussing potential NIL deals until they commit to a particular school.

Plaintiffs initiated this action, alleging that the foregoing prohibition, referred to as the "NIL-recruiting ban," constitutes an "illegal agreement to restrain and suppress competition" within the labor market of Division I athletics [Doc. 1 at ¶¶ 48, 54]. Plaintiffs also moved for a temporary restraining order ("TRO") and a preliminary injunction (1) "enjoining the [NCAA]; its servants, agents, and employees; and all persons in active concert or participation with them, from enforcing its NIL-recruiting ban or taking any other action to prevent prospective college athletes and transfer candidates from engaging in NIL discussions prior to enrollment" and (2) enjoining enforcement of the "Rule of Restitution (NCAA Bylaw 12.11.4.2) as applied to the NIL-recruiting ban" [Doc. 2].[1] The Court denied Plaintiffs' Motion for a Temporary Restraining Order due to the failure to demonstrate irreparable harm [Doc. 29]. Thereafter, the parties provided supplemental briefing [Docs. 32, 37], and,

on February 13, 2024, the parties presented oral argument on Plaintiffs' Motion for a Preliminary Injunction. The motion is now ripe for review.

## II. ANALYSIS

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council*, Inc., 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (citation omitted). In determining whether to grant a motion for a preliminary injunction, the Court must balance the following four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (citation omitted). Each of the four factors are examined in turn.

### A. Likelihood of Success on the Merits

"In order to establish a likelihood of success on the merits of a claim, a plaintiff must show more than a mere possibility of success." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997) (citation omitted). Here, Plaintiffs allege that the NCAA's NIL-recruiting ban violates Section 1 of the Sherman Antitrust Act of 1890 ("the Sherman Act"), which provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. To succeed under Section 1 of the Sherman Act, Plaintiffs must show that the NCAA "(1) participated in an agreement that (2) unreasonably restrain[s] trade in the relevant market." *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir. 2003). The parties do not dispute the existence of an agreement among NCAA member institutions regarding the challenged rules. Rather, they focus solely on whether those rules unreasonably restrain trade in the market of Division I athletics.

**\*3** While neither Plaintiffs nor the NCAA raise the issue, the Court must also consider whether Section 1 of the Sherman Act even applies to the challenged rules. The Sixth Circuit has held that Section 1, "[b]y its plain language," applies "only if the rule is commercial in nature." *Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*, 388 F.3d 955, 958 (6th Cir. 2004); see *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 433 (6th Cir. 2008) ("In order to state a claim under the Sherman Act there must be a commercial activity implicated."). And the Sixth Circuit in *Bassett* held that the NCAA's recruiting rules prohibiting improper inducements "are all explicitly *non-commercial*." 528 F.3d at 433 (emphasis added). But *Bassett* predated the NIL era of college athletics. Agreements between NIL collectives and student-athletes are undoubtedly commercial transactions. It necessarily follows that NCAA rules restricting negotiations of those agreements are also explicitly commercial in nature. Thus, *Bassett* is distinguishable because it was decided in a different context when NIL did not exist. Accordingly, the Sherman Act applies to the challenged rules.

The Court turns to whether Plaintiffs are likely to succeed on the merits of their claim that the NIL-recruiting ban unreasonably restrains trade in the market of Division I athletics. As this Court previously held, the reasonableness of the NCAA's restraints is reviewed under the Rule of Reason. *Alston*, 594 U.S. at 88, 141 S.Ct. 2141 (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 541, 138 S.Ct. 2274, 201 L.Ed.2d 678 (2018)). The "three-step burden-shifting framework" of the Rule of Reason requires the plaintiff to first show "that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Am. Express Co.*, 585 U.S. at 541, 138 S.Ct. 2274. If the plaintiff satisfies this burden, the defendant must then "show a procompetitive rationale for the restraint." *Id.* The burden then "shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* at 542, 138 S.Ct. 2274.

#### 1. Substantial Anticompetitive Effect

Plaintiffs can demonstrate a substantial anticompetitive effect with direct evidence, i.e., "proof of actual detrimental effects [on competition] ... in the relevant market[,]" or indirect evidence, i.e., "proof of market power plus some evidence that the challenged restraint harms competition." *Id.* (citations omitted). Plaintiffs proceed on the latter. The NCAA's market power over Division I athletics is undeniable. *See Alston*, 594 U.S. at 90, 141 S.Ct. 2141 ("The NCAA accepts that its members collectively enjoy monopsony power in the market for student-athlete services, such that its restraints can (and in fact do) harm competition."). Plaintiffs also present sufficient

evidence that the challenged rules likely harm competition. As the Court previously held, the NIL-recruiting ban is, in effect, "an agreement among competitors to refuse to discuss prices with [recruits] until after negotiations have resulted in the initial selection of [a school]." *Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). Such an agreement suppresses price competition by limiting negotiating leverage and, as a result, knowledge of value. The Supreme Court found a similar agreement to be anticompetitive "[o]n its face[.]" *Id.* Thus, Plaintiffs have met their burden to show that the NIL-recruiting ban has a substantial anticompetitive effect.

### 2. Procompetitive Rationales and Less Restrictive Alternatives

The NCAA offers various procompetitive justifications for the NIL-recruiting ban. First, the NCAA asserts that the rules preserve collegiate athletics as a unique offering by (1) promoting a balance of academics and athletics and (2) maintaining a distinction between collegiate and professional athletics [Doc. 27, pg. 18]. Specifically, the NCAA contends that allowing collectives to offer NIL deals as a recruiting inducement "would eviscerate the distinction between the collegiate structure and professional sports and undermine the unique balance of academics and athletics that the NCAA structure provides" [*Id.* at pg. 19]. The proffered reasons are not persuasive procompetitive rationales. While the NCAA permits student-athletes to profit from their NIL, it fails to show how the timing of when a student-athlete enters such an agreement would destroy the goal of preserving amateurism.

 *4  Even if the Court were to accept that the foregoing procompetitive benefits flow from the challenged NIL rules, these benefits can be accomplished through less restrictive rules already in place within the NCAA Bylaws. For example, student-athletes must maintain progress toward college degrees and meet minimum credit hour requirements and grade point averages. And the NIL rules that remain unchallenged in this action, i.e., those prohibiting agreements without *quid pro quo*, athletic performance as consideration, and compensation directly from member institutions, are arguably more effective in preserving amateurism than the NIL-recruiting ban.

The NCAA also asserts that "[t]he challenged rules foster competitive balance among [the] member[ ] institutions by promoting the distribution of talent across them" and such distribution "is a key component of ensuring that student-athletes are able to participate in meaningful athletic competition at the highest level" [*Id.* at pg. 20]. This justification is not devoid of logic. Without the NIL-recruiting ban, the top talent will likely follow the money, leaving the less affluent schools less likely to be able to compete on the court or the field. Nonetheless, that justification is not relevant to the instant inquiry. While maintaining competitive balance in college sports is "a legitimate and important endeavor" [*Id.* at pg. 21], spreading competition evenly across the member institutions by restraining trade is precisely the type of anticompetitive conduct the Sherman Act seeks to prevent. "The 'statutory policy' of the Act is one of competition and it 'precludes inquiry into the question whether competition is good or bad.' " *Alston*, 594 U.S. at 95, 141 S.Ct. 2141 (citation omitted). "The NCAA is free to argue that, 'because of the special characteristics of [its] particular industry,' it should be exempt from the usual operation of the antitrust laws—but that appeal is 'properly addressed to Congress.' " *Id.* at 96, 141 S.Ct. 2141 (quoting *Nat'l Soc. of Pro. Eng'rs*, 435 U.S. at 689, 98 S.Ct. 1355). And, up to this point, Congress has declined to do so.

Finally, the NCAA asserts that the challenged rules "act as a safeguard for prospective student-athletes" who are "particularly vulnerable to entering into abusive and unfair agreements for their NIL" [Doc. 27, pg. 22]. Again, the Court's role in this action is not to question whether competition is good or bad. Although protecting student-athletes from exploitation is undoubtedly a legitimate concern, "social justifications" for a restraint of trade "do not make it any less unlawful." *F.T.C. v. Superior Ct. Trial Laws. Ass'n*, 493 U.S. 411, 424, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990). Moreover, as the Court previously held, the challenged restraints likely foster economic exploitation of student-athletes by suppressing their negotiating leverage [Doc. 29, pgs. 8, 9]. Based on the foregoing, Plaintiffs have demonstrated a likelihood of success on their Sherman Act claim. Thus, this factor weighs in favor of granting a preliminary injunction.

### B. Irreparable Harm

Despite the strength of Plaintiffs' Sherman Act claim, "a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek v. Lamone*, 585 U.S. 155, 158, 138 S.Ct. 1942, 201 L.Ed.2d 398 (2018) (citation omitted). Rather, Plaintiffs must also show that unless the NCAA is enjoined from enforcing the NIL-recruiting ban during the pendency of

this action, "they will suffer 'actual and imminent' harm[.]" *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006) (citations omitted). Irreparable harm is "indispensable" and "dispositive" in that "a plaintiff *must* present the existence of an irreparable injury to get a preliminary injunction." *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019) (emphasis in original). Harm is irreparable if it "cannot be prevented or fully rectified by [a] final judgment after trial[.]" *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984).

**\*5** As an initial matter, the NCAA contends that, with respect to the State of Tennessee, the requested injunction will not prevent any harm, because Tennessee law, like the challenged rules, prohibits NIL compensation contingent on attendance at a particular school [Doc. 27, pg. 6]. To be sure, Tennessee law mirrors the Interim NIL Policy in that it allows student-athletes to earn NIL compensation but provides that "such compensation must not be provided in exchange for athletic performance or attendance at an institution." Tenn. Code Ann. § 49-7-2802(a). Plaintiffs assert that Tennessee law only prohibits "pay-for-play" [Doc. 28, pg. 7], but the plain language of the statute prohibits both pay-for-play (compensation in exchange for athletic performance) and improper inducements (compensation in exchange for attendance at an institution). Thus, it appears that Tennessee law prohibits the same conduct as the NCAA's Interim NIL Policy. Nonetheless, this fact alone does not extinguish claims of irreparable harm on behalf of Tennessee or Virginia student-athletes. Not all student-athletes will attend college in their home state. The NIL-recruiting ban still prohibits student-athletes from negotiating with collectives in states without NIL laws or states with NIL laws that do not prohibit NIL compensation as a recruiting inducement. Therefore, the Tennessee statute is not dispositive on the issue of irreparable harm.

Plaintiffs allege that the NIL-recruiting ban "shut[s] down free-market capitalism for NIL" and irreparably harms "thousands of prospective athletes and the States themselves" [Doc. 32, pg. 4]. As for the States themselves, Plaintiffs fail to demonstrate any actual or imminent harm. Plaintiffs assert that the challenged rules and "the hammer" the NCAA is "planning to drop on" the University of Tennessee harm their " 'quasi-sovereign interest' in the economic 'well-being ... of [their] residents in general.' " [*Id.* at pg. 6] (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982)). In support, they allege that the NIL-recruiting ban hinders recruiting and that schools accused of violating the ban lose players, scholarships, and postseason opportunities, which decreases competitiveness and fan interest [*Id.*]. They fervently assert that "[n]o damages could replace players lost, reputations harmed, games not played, or championships not won" [*Id.*]. But Plaintiffs' fears are both theoretical and chimerical. There is no evidence in the record of an impending enforcement action against any school in Tennessee or Virginia. In fact, counsel for the NCAA denied any knowledge of any pending investigations. There is also no proof that recruiting is impeded by the challenged rules. No Division I school can use NIL to induce attendance. Neither Tennessee nor Virginia face any distinct harms due to that prohibition.

With respect to the student-athletes, however, Plaintiffs stand on much sturdier ground. Although the Court previously held that Plaintiffs could not prove irreparable harm because the asserted harm (suppressed NIL compensation) was compensable by monetary damages [Doc. 29, pg. 10], it is now clear that the harm is not strictly monetary. To be sure, it is pure speculation to assume that student-athletes would receive more lucrative NIL deals in an open market. Fair market value may be equal to or less than the NIL deals student-athletes can currently receive after selecting a school. But without the give and take of a free market, student-athletes simply have no knowledge of their true NIL value. It is this suppression of negotiating leverage and the consequential lack of knowledge that harms student-athletes.

This harm is irreparable because a judgment in favor of Plaintiffs at the conclusion of this lawsuit will not make student-athletes whole. Prospective student-athletes have certain windows of time to commit to a school [*See* Doc. 2-9]. Student-athletes in the transfer portal have an even shorter window of time to make a commitment decision [*See* Doc. 2-18]. It is during these limited time periods that student-athletes have the most negotiating leverage with NIL collectives and the best chance to realize their true NIL value. Now that the NCAA allows it, it is undeniable that NIL compensation is an important factor for some student-athletes to consider during the recruiting process. It would be difficult, if not impossible, to recreate this negotiating environment after the signing periods close or after a student-athlete begins their college career at a particular school. Each student-athlete's NIL value is unique. In similar contexts, "[c]ourts have recognized that negotiating with respect to a unique asset with decreased leverage constitutes irreparable harm." *In re Los Angeles Dodgers LLC*, 465 B.R. 18, 36 (D. Del. 2011)

(citing *Brady v. Nat'l Football League,* 640 F.3d 785, 794 (8th Cir. 2011) (finding that the NFL demonstrated irreparable harm where there was "no way to measure and compensate" for loss of negotiating leverage)). Here too, the NIL-recruiting ban irreparably harms student-athletes by stripping them of their negotiating leverage and blinding them to their true NIL value.

**\*6** Despite the foregoing, the NCAA asserts that Plaintiffs' delay in seeking the requested injunction preponderates against a finding of irreparable harm [Doc. 27, pg. 9]. Specifically, the NCAA asserts the challenged rules "have been in effect for years, if not decades" and Plaintiffs offer no explanation for waiting years to challenge them [*Id.*]. Generally, "an unreasonable delay in filing for injunctive relief will weigh against a finding of irreparable harm." *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.,* 511 F. App'x 398, 405 (6th Cir. 2013). But there is no significant delay here. The Interim NIL Policy went into effect in July 2021 and, due to the uncertainties of the new policy, the NCAA had to issue supplemental guidance to explain the policy's application to the newly created NIL collectives. That supplemental guidance was issued sporadically, first in May 2022 and even as recent as February 2023. Thus, any delay in instituting this action was not unreasonable.

### C. Substantial Harm to Others

For the third factor, the harm to student-athletes in the absence of a preliminary injunction "must be weighed against the harm to others from the granting of the injunction." *United Food & Com. Workers Union, Loc. 1099 v. Sw. Ohio Reg'l Transit Auth.,* 163 F.3d 341, 363 (6th Cir. 1998). Here, the balance of the equities weighs heavily in favor of Plaintiffs because neither the NCAA nor any other affected individual or entity will face substantial harm with the issuance of an injunction, whereas, as explained above, student-athletes face irreparable harm. Nonetheless, the NCAA asserts that the requested relief "threatens to introduce immediate disarray into collegiate athletics" because it is overly broad [Doc. 27, pgs. 13–15]. Regardless of the relief sought, an injunction must be "strictly tailored to accomplish only that which the situation specifically requires[.]" *Aluminum Workers Int'l Union, AFL-CIO, Loc. Union No. 215 v. Consol. Aluminum Corp.,* 696 F.2d 437, 446 (6th Cir. 1982). Here, the situation requires no more and no less than permitting student-athletes to negotiate NIL deals with third parties prior to committing to a particular school. The NCAA fails to show how such relief will cause any harm that outweighs the irreparable harm that student-athletes will face in the absence of an injunction.

### D. Public Interest

Finally, the requested injunctive relief will serve the public interest because it will prevent anticompetitive behavior. *See Collins Inkjet Corp. v. Eastman Kodak Co.,* 781 F.3d 264, 280 (6th Cir. 2015) (holding in an antitrust action that "the public interest is served by the injunction if the injunction is itself pro-competitive[.]"). Moreover, "[f]ree and fair competition ... is essential to the American economy." *Ohio v. Nat'l Collegiate Athletic Ass'n*, No. 1:23-CV-100, ––– F.Supp.3d ––––, ––––, 2023 WL 9103711, at \*11 (N.D.W. Va. Dec. 13, 2023). Thus, encouraging free and fair price competition in the NIL market by enjoining the NCAA's NIL-recruiting ban will serve the public interest.

### III. CONCLUSION

For the reasons provided herein, Plaintiffs' Motion for Preliminary Injunction [Doc. 2] is **GRANTED.** It is hereby **ORDERED** that, effective immediately, Defendant NCAA; its servants, agents, and employees; and all persons in active concert or participation with the NCAA, are restrained and enjoined from enforcing the NCAA Interim NIL Policy, the NCAA Bylaws, or any other authority to the extent such authority prohibits student-athletes from negotiating compensation for NIL with any third-party entity, including but not limited to boosters or a collective of boosters, until a full and final decision on the merits in the instant action.

It is further **ORDERED** that, effective immediately, the NCAA is restrained and enjoined from enforcing the Rule of Restitution (NCAA Bylaw 12.11.4.2) as applied to the foregoing NIL activities until a full and final decision on the merits in the instant action.

**\*7** SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2024 WL 755528

## Footnotes

| | |
|---|---|
| 1 | The "Rule of Restitution" provides for potential retroactive punishments in the event an otherwise ineligible student-athlete is permitted to compete in accordance with the terms of a restraining order or injunction that is later voluntarily vacated, stayed, reversed, or if it is finally determined by the courts that injunctive relief was not justified [Doc. 2-10, pg. 79]. |

**End of Document**  © 2024 Thomson Reuters. No claim to original U.S. Government Works.