# APPENDIX T

UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS

**Fact Sheet: Ensuring Equal Opportunity Based on Sex in School Athletic Programs in the Context of Name, Image, and Likeness (NIL) Activities**

Title IX of the Education Amendments of 1972[1] (Title IX) prohibits discrimination on the basis of sex by schools that receive Federal financial assistance, including K-12 schools, colleges, and universities.[2] If a school receives Federal financial assistance, Title IX's prohibition on sex discrimination extends to all of the school's programs and activities, including its athletic program.

The U.S. Department of Education's Office for Civil Rights (OCR) enforces Title IX and its implementing regulations, which require that schools receiving Federal financial assistance provide equal athletic opportunities based on sex—including with respect to publicity, support services, and other benefits, opportunities, and treatment—and that schools not discriminate in the provision of athletic financial assistance.[3] As the types of benefits provided to student-athletes continue to evolve, including in the context of Name, Image, and Likeness (NIL) activities, schools may have questions regarding how NIL activities impact the provision of equal opportunities in their athletic programs.

OCR provides this Fact Sheet to clarify how OCR will evaluate equal opportunity in a school's athletic program under Title IX when student-athletes receive NIL-related compensation and benefits.[4]

Part One of this Fact Sheet describes the Title IX requirements to provide equal athletic opportunity based on sex. Part Two provides a brief background on NIL agreements. Part Three clarifies that Title IX's requirement that a school provide equivalent benefits, opportunities, and treatment in the components of the school's athletic program covers any benefits, opportunities, and treatment that a school provides related to NIL activities (particularly publicity and support services). Part Four explains that compensation from a school for use of a student-athlete's NIL

---

[1] 20 U.S.C. § 1681 *et seq.*

[2] Throughout this Fact Sheet, "school" is used generally to refer to elementary, secondary, and postsecondary educational institutions that are recipients of Federal financial assistance. This Fact Sheet uses the term "third party" to refer to an outside organization or individual, which includes a Name, Image, and Likeness (NIL) collective.

[3] 34 C.F.R. §§ 106.41(c) and 106.37(c). *See also* U.S. Dep't of Health, Educ., and Welfare, Office for Civil Rights, A Policy Interpretation: Title IX and Intercollegiate Athletics (1979 Policy Interpretation), 44 Fed. Reg. 71,413 (Dec. 11, 1979), https://tile.loc.gov/storage-services/service/ll/fedreg/fr044/fr044239/fr044239.pdf.

[4] The general principles of this Fact Sheet apply to both intercollegiate athletics and interscholastic athletics, although NIL activities less frequently involve K-12 schools. The general principles also apply regardless of what athletic association a school is a member of (e.g., National Collegiate Athletic Association (NCAA), National Association of Intercollegiate Athletics (NAIA), National Junior College Athletic Association (NJCAA), a state high school athletic association).

The Department's Title IX regulations assume that the receipt of financial assistance does not transform students, including student-athletes, into employees. *Compare* 34 C.F.R. § 106.37 (requirements regarding financial assistance for students), *with* 34 C.F.R. §§ 106.51-61 (requirements regarding employment). The analysis offered in this Fact Sheet operates under that same assumption. If the legal landscape around this issue changes, OCR would reevaluate this position.

Fact Sheet: Ensuring Equal Opportunity Based on Sex in School Athletic Programs in the Context of Name, Image, and Likeness (NIL) Activities

qualifies as athletic financial assistance which, under Title IX, must be made available to male and female student-athletes in a manner that is substantially proportionate to the number of students of each sex participating in interscholastic or intercollegiate athletics at that school. Finally, Part Five addresses NIL agreements between student-athletes and third parties.

OCR evaluates each matter on a case-by-case basis with due regard for the unique facts presented by each case.

### 1. Title IX and athletic opportunities in school athletic programs

The Title IX regulations require schools to provide equal athletic opportunity, regardless of sex.[5] Equal opportunity in athletic programs is assessed in three main areas[6]:

1. The benefits, opportunities, and treatment given to male and female athletic teams;
2. The athletic financial assistance, including athletic scholarships, that a school awards to student-athletes; and
3. A school's accommodation of the athletic interests and abilities of its students.

#### *Benefits, opportunities, and treatment*

The Title IX regulations require a school that operates an athletic program to offer equal athletic opportunity regardless of sex.[7] OCR compares the availability, quality, and kinds of benefits, opportunities, and treatment afforded to male and female student-athletes in the major components of a school's athletic program (e.g., equipment and supplies, facilities, schedules, travel and per diem allowances, housing and dining facilities and services, publicity, and recruitment) in determining whether the school is providing equal athletic opportunities.[8] If the compared program components are equivalent (i.e., equal or equal in effect), OCR considers a school to be in compliance with Title IX.[9] Under this standard, identical benefits, opportunities, or treatment are not required to show that program components are equivalent, as long as the overall effect of any differences is negligible.[10] Even if the benefits, opportunities, and treatment in the components of a school's athletic program are not equivalent in availability, quality, or kind, the school may nevertheless be in compliance with Title IX if the differences are the result

---

[5] 34 C.F.R. §§ 106.41(c) and 106.37(c).
[6] *See* 1979 Policy Interpretation, 44 Fed. Reg. at 71414.
[7] 34 C.F.R. § 106.41(c).
[8] *See* 1979 Policy Interpretation, 44 Fed. Reg. at 71,415 ("The Department will assess compliance with both the recruitment and the general athletic program requirements of the regulation by comparing the availability, quality and kinds of benefits, opportunities, and treatment afforded members of both sexes."); *see also, e.g., Parker v. Franklin Cty. Cmty. Sch. Corp.*, 667 F.3d 910, 918 (7th Cir. 2012) (deferring to the 1979 Policy Interpretation and stating that the Department assesses compliance "by comparing the availability, quality and kinds of benefits, opportunities, and treatment afforded members of both sexes" (quoting 1979 Policy Interpretation, 44 Fed. Reg. at 71,415)); *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 291-92 (2d Cir. 2004) (stating that the 1979 Policy Interpretation governs the court's inquiry and that the Department assesses compliance with "the general athletic program requirements of the regulation by comparing the availability, quality and kinds of benefits, opportunities, and treatment afforded members of both sexes" (quoting 1979 Policy Interpretation, 44 Fed. Reg. at 71,415)).
[9] 1979 Policy Interpretation, 44 Fed. Reg. at 71,415.
[10] *Id.*

Fact Sheet: Ensuring Equal Opportunity Based on Sex in School Athletic Programs in the Context of Name, Image, and Likeness (NIL) Activities

of nondiscriminatory factors.[11] Under such circumstances, OCR would still investigate whether any disparity in the benefits, opportunities, or treatment in the school's athletic program—that is not the result of nondiscriminatory factors—is substantial enough in and of itself to result in the denial of equal athletic opportunities with respect to individual program components or the athletic program as a whole.[12]

For example, at one school, the men's teams collectively play significantly more games on Friday nights and Saturdays than the women's teams. These times are considered primetime because attendance is higher, and the school has not offered a nondiscriminatory justification for the scheduling of games in this manner. OCR may find that the school is not providing equal athletic opportunity to members of the men's and women's teams with respect to scheduling games, as required by 34 C.F.R. § 106.41(c)(3).

At another school, there are multiple locker rooms for the men's athletic teams while there is only one locker room for the women's athletic teams. The location of the women's locker room is further away from their practice and competition facilities than the location of the men's locker rooms. The women's soccer, field hockey, and lacrosse teams share a practice field, while each men's team uses a practice field designated for each sport. The school has not offered a nondiscriminatory justification for the provision of locker rooms and practice facilities in this manner. OCR may find that the school is not providing equal athletic opportunity to members of the men's and women's athletic teams with respect to provision of locker rooms, practice facilities, and competitive facilities, as required by 34 C.F.R. § 106.41(c)(7).

The application of Title IX's requirements regarding equal athletic opportunity in the components of a school's athletic program to the NIL context is discussed in Part Three.

### Athletic financial assistance

If a school awards athletic financial assistance, the Title IX regulations require the school to "provide reasonable opportunities for such awards for members of each sex in proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics."[13] The

---

[11] For example, OCR has recognized that certain aspects of athletic programs may not be equivalent based on sex because of unique factors related to the operation of particular sports, such as the nature/replacement of equipment and the nature/maintenance of facilities required for competition. If a school is meeting sport-specific needs equivalently in the men's and women's programs, OCR will likely find the differences in particular program components to be justifiable. OCR has also recognized that, in certain circumstances, the operation of a competitive event may give rise to special demands or imbalances in particular program components, due to the costs and support needed to manage events with large crowds (historically associated with football and men's basketball). As long as any special demands are met to an equivalent degree for both men's and women's teams, OCR may find these differences to be nondiscriminatory. Under Title IX, the school must use sex-neutral criteria to determine the levels of event management support and must not limit the potential for women's athletic events to rise in spectator appeal. *See* 1979 Policy Interpretation, 44 Fed. Reg. at 71,415-16.

[12] *See id.* at 71,417 (stating that OCR considers, in part, "[w]hether disparities of a substantial and unjustified nature exist in the benefits, treatment, services, or opportunities afforded male and female athletes in the institution's program as a whole" and "[w]hether disparities in benefits, treatment, services, or opportunities in individual segments of the program are substantial enough in and of themselves to deny equality of athletic opportunity").

[13] 34 C.F.R. § 106.37(c).

Fact Sheet: Ensuring Equal Opportunity Based on Sex in School Athletic Programs in the Context of Name, Image, and Likeness (NIL) Activities

regulations do not require the same number of awards for male and female student-athletes or that individual awards be of equal value.

When evaluating a school's compliance with the Title IX regulations, OCR assesses whether the total amount of athletic financial assistance made available by the school to men and women is substantially proportionate to the number of students of each sex participating in interscholastic or intercollegiate athletics at that school.[14] OCR may find a school to be in compliance with Title IX if a disparity may be explained by legitimate nondiscriminatory factors, such as actions taken to promote athletic program development, legitimate efforts undertaken to comply with Title IX requirements, and unexpected fluctuations in the participation rates of males and females.[15] In assessing compliance with 34 C.F.R. § 106.37(c), OCR includes the amount of all compensation and other financial assistance provided by a school to its student-athletes when calculating the total amount of athletic financial assistance made available to men and women at a school.

Part Four of this Fact Sheet addresses how Title IX's athletic financial assistance requirements apply to compensation and other financial assistance that a school provides for use of a student-athlete's NIL.

### *Meeting students' athletic interests and abilities*

In determining whether equal opportunities in an athletic program are available, the Title IX regulations also require a school that operates an athletic program to effectively accommodate the athletic interests and abilities of its male and female students. This Title IX athletics requirement is not discussed in this Fact Sheet.[16]

### 2. NIL agreements in school athletic programs

An NIL agreement is a contract that allows a student-athlete to control the use of their NIL and receive compensation for it.[17] NIL collectives are organizations typically created by booster clubs, fans, alumni, and/or businesses to develop, fund, and facilitate NIL opportunities for student-athletes.[18] Until recently, student-athletes were prohibited from receiving any compensation based on their athletic ability, including "from boosters, companies seeking endorsements, or would-be licensors of the athlete's name, image, and likeness."[19] Following several court decisions striking down limitations on NIL activities and other compensation for student-athletes,[20] the NIL landscape has continued to evolve. States, schools, and athletic

---

[14] *See id.*; *see also* 1979 Policy Interpretation, 44 Fed. Reg. at 71,415.

[15] *See* 1979 Policy Interpretation, 44 Fed. Reg. at 71,415.

[16] For information on the three-part test that OCR uses to determine whether a school is effectively accommodating the interests and abilities of its male and female students, please see 1979 Policy Interpretation, 44 Fed. Reg. at 71,417-18.

[17] *See O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049 (9th Cir. 2015).

[18] *See Tennessee v. Nat'l Collegiate Athletic Ass'n*, 718 F. Supp. 3d 756, 759-60 (E.D. Tenn. 2024); Internal Revenue Service, Whether Operation of an NIL Collective Furthers an Exempt Purpose Under Section 501(c)(3) (June 9, 2023), https://www.irs.gov/pub/lanoa/am-2023-004-508v.pdf.

[19] *O'Bannon*, 802 F.3d at 1055.

[20] *See, e.g.*, *O'Bannon*, 802 F.3d at 1078-79 (holding that the NCAA must permit its member schools to award grants-in-aid up to the full cost of attendance to their student-athletes); *Nat'l Collegiate Athletic Ass'n v. Alston*, 594

Fact Sheet: Ensuring Equal Opportunity Based on Sex in School Athletic Programs in the Context of Name, Image, and Likeness (NIL) Activities

associations have responded to the increased interest in NIL activities by enacting laws or policies, which regulate NIL activities involving student-athletes.[21] As student-athletes take advantage of new opportunities to benefit from their NIL, it is important for schools to understand how Title IX may apply to these benefits.

### 3. Benefits, opportunities, and treatment provided by a school to assist its student-athletes in obtaining and managing NIL agreements (with schools or third parties)

Schools remain responsible for ensuring that they are offering equal athletic opportunities in their athletic programs, including in the NIL context. A school may violate Title IX if the school

---

U.S. 69 (2021) (upholding a permanent injunction barring the NCAA from limiting education-related compensation or benefits that member conferences or schools could provide to student-athletes); *Tennessee v. Nat'l Collegiate Athletic Ass'n*, 718 F. Supp. 3d at 766 (issuing a preliminary injunction enjoining the NCAA "from enforcing the NCAA Interim NIL Policy, the NCAA Bylaws, or any other authority to the extent such authority prohibits student-athletes from negotiating compensation for NIL with any third-party entity").

[21] *See, e.g.*, Ark. Code Ann. § 4-75-13 (2021) (student-athletes have the right to enter into a contract and receive compensation for the commercial use of the student-athlete's publicity rights); Fla. Stat. § 1006.74 (2020) (an intercollegiate athlete may earn compensation for the commercial use of their name, image, or likeness commensurate with market value, but such compensation may not be provided in exchange for athletic performance or attendance at a particular postsecondary institution and may only be provided by a third party unaffiliated with the student-athlete's postsecondary institution); Ill. Comp. Stat. act no. 190. sec. no. 110 (2021) (student-athletes have the right to earn compensation commensurate with market value for the use of their name, image, likeness, or voice while enrolled in a postsecondary institution, student-athletes may not earn compensation in exchange for their athletic ability or participation in intercollegiate athletics or sports competition or willingness to attend a postsecondary institution); Tenn. Code Ann. § 49-7-2802(a) (2024) (an intercollegiate athlete may earn compensation and perform diligence for the use of their name, image, and likeness, a postsecondary institution and its affiliated foundations shall not compensate an intercollegiate athlete for their name, image, or likeness unless expressly permitted by Federal law, a court order, or the postsecondary institution's athletic association); NCAA, *DI Council approves NIL reforms, permits school assistance with NIL activity* (Apr. 17, 2024), https://www.ncaa.org/news/2024/4/17/media-center-di-council-approves-nil-reforms-permits-school-assistance-with-nil-activity.aspx (adopting a proposal that allows Division I schools to assist in NIL activities for student-athletes, including identifying NIL opportunities and facilitating deals between student-athletes and third parties); NJCAA Handbook – Bylaws, at Article V, Section 4, D.3.c.i, https://d2o2figo6ddd0g.cloudfront.net/0/q/spevi1jotzaysv/NJCAA_Handbook_-_Bylaws_08-05-24.pdf (member institutions may allow student-athletes to receive NIL compensation, as long as it complies with applicable law and there is an exchange of good or services—but representatives of the institution cannot directly pay the athletes, and the NIL compensation cannot be contingent upon enrollment or based on athletic performance); NAIA, *Name, Image, and Likeness (NIL) Tips & Best Practices*, https://www.naia.org/name-image-likeness/archive-legislative/NIL-FAQ-Document.pdf (student-athletes have the right to profit off their NIL and must report any NIL compensation to their athletic director; an NIL agreement must contain a quid pro quo; institutions have the right to restrict NIL agreements that they view as a conflict of interest with their mission or current sponsorship agreements); California Interscholastic Federation Article 20 Rule 212 (a student-athlete may participate in a commercial endorsement, but may not wear a school team uniform or any identifying school insignia while appearing in any advertisement, promotional activity, or endorsement for any commercial product or service and may not lend their name and team affiliation for purposes of commercial endorsement); Colorado High School Athletics Association (CHSAA) 200.12 (student-athletes are permitted to monetize their name, image, and likeness so long as there is no affiliation with a CHSAA member school); Florida High School Athletic Association (FHSAA) Rule 9.9 (student-athletes may profit from the use of their name, image, and likeness provided they comply with FHSAA Bylaw 9.9, permissible activities include commercial endorsements, promotional activities, social media presence, product, or service endorsements, student-athletes are prohibited from monetizing their name, image, and likeness with the use of their school's uniform, equipment, logo, name, proprietary patents, products, and/or copyrights associated with an FHSAA member school, unless granted authorization by the school).

Fact Sheet: Ensuring Equal Opportunity Based on Sex in School Athletic Programs in the Context of Name, Image, and Likeness (NIL) Activities

fails to provide equivalent benefits, opportunities, and treatment in the components of the school's athletic program that relate to NIL activities. Thus, schools must be mindful of their Title IX obligations regarding the components of their athletic programs as they navigate the NIL landscape. These obligations apply regardless of whether student-athletes ultimately secure NIL benefits through their school or with third parties.

### Publicity

In determining whether a school is complying with Title IX as to the program component of publicity, OCR examines, among other factors, the equivalence for male and female student-athletes of: (1) the availability and quality of sports information personnel; (2) access to other publicity resources for men's and women's teams; and (3) the quantity and quality of promotional devices that feature the men's and women's teams.[22] This examination may include consideration of the coverage for men's and women's teams and student-athletes on a school's website, in its social media postings, and in its publicity materials (e.g., posters, press guides, recruitment brochures, game programs, pocket schedules). OCR considers the school's efforts to provide equivalent publicity to its men's and women's athletic teams, recognizing that television, newspapers, and other forms of media may not be equally responsive to the school's efforts to provide equivalent publicity.

Even if publicity is not equivalent based on sex, a school may comply with Title IX if the differences are the result of nondiscriminatory factors. For example, the unique circumstances of a particular student-athlete (e.g., a prospective Olympic athlete), team (e.g., the reigning state/national champion), or competitive event (e.g., a national competition) may cause unique demands or imbalances related to publicity.

A school's obligation to provide equivalent publicity based on sex continues to apply in the context of NIL. For example, if a school is not providing equivalent coverage for women's teams and student-athletes on its website, in its social media postings, or in its publicity materials, these student-athletes may be less likely to attract and secure NIL opportunities. In addition, if a school is publicizing student-athletes for the purposes of obtaining NIL opportunities, OCR would examine whether the school is providing equivalent publicity for male and female student-athletes (including by examining the quantity and quality of publications and other promotional devices that feature the men's and women's athletic teams).

### Support Services

Some schools offer support services to assist their student-athletes in securing NIL opportunities. Title IX's requirement that schools provide equal athletic opportunity based on sex includes any support services that a school provides to its student-athletes.[23] In determining whether a school is complying with Title IX as to support services, OCR examines, among other factors, the equivalence of the amount of administrative assistance provided to the men's and women's teams.[24]

---

[22] 34 C.F.R. § 106.41(c); 1979 Policy Interpretation, 44 Fed. Reg. at 71,417.
[23] *See* 34 C.F.R. § 106.41(c); 1979 Policy Interpretation, 44 Fed. Reg. at 71,417.
[24] *See* 1979 Policy Interpretation, 44 Fed. Reg. at 71,417.

Fact Sheet: Ensuring Equal Opportunity Based on Sex in School Athletic Programs in the Context of Name, Image, and Likeness (NIL) Activities

A school's obligation to provide equivalent support services continues to apply in the context of NIL activities, including any services that schools provide to assist student-athletes in securing or managing NIL opportunities.[25] For example, if a school provides training sessions to its student-athletes on brand building, finances, reporting, entrepreneurship, or similar topics, OCR would examine whether the school is providing this training equally to men's and women's teams. Likewise, if athletics department employees assist the school's student-athletes by obtaining and negotiating NIL agreements, OCR would examine whether the school is providing this assistance equally to student-athletes on men's and women's teams.

### 4. NIL agreements between schools and their student-athletes as a form of athletic financial assistance

As part of determining whether a school is providing equal athletic opportunity, OCR considers the total amount of athletic financial assistance made available by the school. Compensation provided by a school for the use of a student-athlete's NIL constitutes athletic financial assistance under Title IX because athletic financial assistance includes any financial assistance and other aid provided by the school to a student-athlete that is connected to a student's athletic participation; it is not limited to scholarships or grants.[26] Thus, the various forms of financial assistance that could be provided by a school to student-athletes include, but are not limited to, scholarships, cost-of-attendance awards, other types of compensation and financial assistance permitted to be provided by schools following a federal court injunction,[27] and compensation

---

[25] *See id.* (stating that OCR will consider, in part, "[w]hether disparities of a substantial and unjustified nature exist in the benefits, treatment, services, or opportunities afforded male and female athletes in the institution's program as a whole" and "[w]hether disparities in benefits, treatment, services, or opportunities in individual segments of the program are substantial enough in and of themselves to deny equality of athletic opportunity").

[26] *See* 1979 Policy Interpretation, 44 Fed. Reg. at 71,415 (noting that athletic financial assistance also includes work-related aid and loans); Letter from Catherine E. Lhamon to Marcia D. Greenberger and Deborah Slaner Larkin (Nov. 15, 2015) (stating that cost-of-attendance awards constitute athletic financial assistance under Title IX and noting that athletic financial assistance also includes exhausted eligibility awards and summer aid), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/correspondence/stakeholders/20151112-cost-attendance-ath-scholarships.pdf. This approach is also consistent with postsecondary schools' reporting obligations under the Equity in Athletics Disclosure Act (EADA), 20 U.S.C. § 1092(e). Separate from Title IX, the EADA requires postsecondary institutions to report the amount of athletically related student aid provided to men's, women's, and coed teams. *See also* 34 C.F.R. § 668.47. The User's Guide for the EADA Data Collection explains that "athletically related student aid is any scholarship, grant, or other form of financial assistance, offered by an institution, the terms of which require the recipient to participate in a program of intercollegiate athletics at an institution." U.S. Dep't of Educ., Office of Postsecondary Educ., User's Guide for the Equity in Athletic Disclosure Act Web-Based Data Collection at 53 (Sept. 2023), https://surveys.ope.ed.gov/athletics2023/wwwroot/documents/2023_EADA_Users_Guide.pdf.

[27] The *NCAA v. Alston* case involved a challenge to the NCAA's restrictions on providing college athletes participating in Division I women's and men's basketball and Football Bowl Subdivision football with non-cash compensation for academic-related purposes. The court ruled that these restrictions violated antitrust law and issued a permanent injunction. *See In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litigation*, No. 14-md-02541, 2019 WL 1593939, at *1 (N.D. Cal. Mar. 8, 2019). Per the injunction, the NCAA can limit cash or cash equivalent payments to student-athletes for academic achievements (e.g., graduating or maintaining a specific GPA) so long as the limit is not lower than the total amount a student-athlete can earn in athletics participation awards. The NCAA cannot limit education-related benefits to student-athletes, including computers, science equipment, musical instruments, and other items not currently included in the cost of attendance but related to the pursuit of a student's educational studies, as well as post-eligibility scholarships for undergraduate, graduate, and

---

Fact Sheet: Ensuring Equal Opportunity Based on Sex in School Athletic Programs in the Context of Name, Image, and Likeness (NIL) Activities

from schools for use of a student-athlete's NIL.[28] When a school provides athletic financial assistance in forms other than scholarships or grants, including compensation for the use of a student-athlete's NIL, such assistance also must be made proportionately available to male and female athletes.[29]

### 5. NIL agreements between student-athletes and third parties

As discussed in Part Four, compensation provided by a school for the use of a student-athlete's NIL constitutes athletic financial assistance under Title IX. By contrast, OCR does not view compensation provided by a third party (rather than a school) to a student-athlete for use of their NIL as constituting athletic financial assistance awarded by the school that must comply with 34 C.F.R. § 106.37(c).

However, OCR has long recognized that a school has Title IX obligations when funding from private sources, including private donations and funds raised by booster clubs, creates disparities based on sex in a school's athletic program or a program component.[30] The fact that funds are provided by a private source does not relieve a school of its responsibility to treat all of its student-athletes in a nondiscriminatory manner.[31] It is possible that NIL agreements between student-athletes and third parties will create similar disparities and therefore trigger a school's Title IX obligations. Because these NIL agreements vary widely and continue to evolve and because the application of Title IX's equal athletic opportunity requirements is a fact-specific inquiry, this Fact Sheet does not offer specific guidance on Title IX's application in the context of compensation provided for the use of a student athlete's NIL by a third party, including an NIL collective.

---

vocational programs at any school, tutoring, study-abroad expenses, and paid post-eligibility internships. The Supreme Court clarified that the NCAA could establish rules and criteria for these benefits, e.g., a "no Lamborghini rule." *Alston*, 594 U.S. at 106.

[28] This refers to compensation from NIL agreements between a school and a student-athlete and does not include payments from NIL agreements between a third party and a student-athlete. See Part Five in this Fact Sheet for information regarding how Title IX applies to NIL agreements between a third party and a student-athlete.

[29] 34 C.F.R. § 106.37(c); 1979 Policy Interpretation, 44 Fed. Reg. at 71,415 ("When financial assistance is provided in forms other than grants, the distribution of non-grant assistance will also be compared to determine whether equivalent benefits are proportionately available to male and female athletes.").

[30] *See, e.g.*, OCR's Letter to Chief State School Officers, Title IX Obligations in Athletics (1975), https://www.ed.gov/about/offices/list/ocr/docs/holmes ("[T]he fact that a particular segment of an athletic program is supported by funds received from various other sources (such as student fees, general revenues, gate receipts, alumni donations, booster clubs, and non-profit foundations) does not remove it from the reach of the statute and hence of the regulatory requirements.").

[31] *See Chalenor v. Univ. of N.D.*, 291 F.3d 1042, 1048 (8th Cir. 2002) ("[A] public university cannot avoid its legal obligations by substituting funds from private sources for funds from tax revenues."); *Cohen v. Brown Univ.*, 809 F. Supp. 978, 996 (D.R.I. 1992) ("[A]ll monies spent by Brown's Athletic Department, whether originating from university coffers or from the Sports Foundation, must be evaluated as a whole under § 106.41(c). Thus, Title IX covers all Sports Foundation funds allocated to Brown athletics. This position is consistent with the Investigator's Manual, which warns that where 'booster clubs' or other fundraising organizations help only members of one sex, the university must balance out these differences." (citing U.S. Dep't of Educ., Office for Civil Rights, Title IX Athletics Investigator's Manual (1990))); *Daniels v. Sch. Bd. of Brevard Cnty.*, 985 F. Supp. 1458, 1462 (M.D. Fla. 1997) (rejecting school district's argument that it cannot be held responsible for unequal booster club fundraising and holding that "[i]t is the Defendant's responsibility to ensure equal athletic opportunities, in accordance with Title IX").

Fact Sheet: Ensuring Equal Opportunity Based on Sex in School Athletic Programs in the Context of Name, Image, and Likeness (NIL) Activities

\*          \*          \*

For more information on benefits, opportunities, and treatment in a school's athletic program, you may find it helpful to review OCR's resources on Supporting Equal Opportunity in School Athletic Programs, Title IX and Athletic Opportunities in K-12 Schools, and Title IX and Athletic Opportunities in Colleges and Universities.

Anyone who believes that a school has engaged in discrimination may file a complaint with OCR. Information about filing a complaint is available on OCR's website at How to File a Discrimination Complaint with the Office for Civil Rights. Information about OCR's process for evaluating, investigating, and resolving complaints is available at How the Office for Civil Rights Handles Complaints.

To request language access services or resources, which may include oral technical assistance or written translation of Department information, free of charge, contact OCR@ed.gov. If you need more information about interpretation or translation services, call 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339). To request documents in alternate formats such as Braille or large print, contact the Department at 202-260-0818 or ofo_eeos@ed.gov.

*This Fact Sheet does not have the force and effect of law and is not meant to be binding, beyond what is required by statutory and regulatory requirements. All enforcement determinations made by OCR are based on the particular factual circumstances presented in each individual case.*