# APPENDIX W



# Who is House in House v. NCAA settlement? Meet the man behind the lawsuit that will change college sports forever



Ross Dellenger · Senior College Football Reporter
Mon, Dec 30, 2024 · 13 min read

13

Just a few short months ago, Grant House moved through life like any other former college athlete.

Sure, fans occasionally recognized him. Perhaps there was even a request for an autograph or picture too. But for the most part, he lived a quiet post-college existence.

Now, all of that has changed.

He's the target of verbal abuse, heckling and even death threats.

"It's been pretty wild," House told Yahoo Sports on Saturday in his first public interview in months.

House, a 26-year-old former Arizona State honor student and All-American swimmer, is a central figure in one of the most transformational moments in college athletics.

He is the leading named plaintiff in the antitrust lawsuit — House v. NCAA — that the association and power conferences are in the process of settling. The settlement, a groundbreaking and landmark event in the industry's history, will usher in direct revenue sharing from schools to athletes — the stroke that, finally, cripples the NCAA's amateurism façade.

While on its surface a boon for college athletes — more money and scholarships are available — the new athlete-revenue sharing model is expected to result in the elimination of thousands of Olympic sport roster spots, an overall decrease in resources to those non-revenue athletic programs and, possibly at some schools, the eventual discontinuation of those sports completely.

Not everyone is happy.

In fact, over the last several months, those against the settlement have sent their gripes to House. He's received dozens of messages, and even a phone call, from people threatening to violently harm him. He labels a few of them as "death threats."

"It was quite shocking and it's been emotionally challenging to work through," he said. "Never imagined it would escalate to that level."

Though many believe House to be the sole architect and benefactor of the settlement, that's anything but the case, he says. In reality, House holds some of the same, or similar, concerns and frustrations as many of those within college athletics.

The lead attorneys in the case have not communicated with him regularly enough, he says. In a point of clarity, House says he did not agree to the much-maligned roster limitations that could cost his own sport

https://sports.yahoo.com/who-is-house-in-house-v-ncaa-settlement-meet-the-man-behind-the-lawsuit-that-will-change-college-sports-forever-165955719.html

hundreds of positions and, like so many others, he was "shocked" earlier this month at the attorneys' requests for more than $700 million in fees.

He's even seeking adjustments to the settlement from the judge herself. He recently helped author a letter that, while praising the settlement, urged California District Judge Claudia Wilken to create more ability for athletes to hold a voice within college athletics' new model.

"It is about us, the athletes, and we need to be involved in these discussions and have thoughts heard," House said. "It was quite shocking that there wasn't more communication (from the attorneys). People say 'What else do we need? We've got NIL.' We need regulation, protections, clauses put in place to protect programs and athletes."

But for all the issues, House, a self-proclaimed "trailblazer," believes the settlement to be a "huge positive step," the first in what he expects to be a process to something much grander, such as a players association and bargaining agreement with schools and conferences. He supports Athletes.Org, a college sports players association founded by former NIL tech company executive Jim Cavale.

"This isn't the end-all be-all," House said. "It's not the answer we should stick with for the rest of time. It's a starting point and a leverage point to go forward and develop this over time."

**Who is Grant House?**

Grant House is the youngest of three children, raised by two lifetime swimmers and swim coaches, first in Indiana and then in Cincinnati.

He's a big fan of the Bengals and the Reds and, of course, the Sun Devils, who he watched "drum" Iowa State, he says, to win the Big 12 championship three weeks ago and punch their ticket to the College Football Playoff. They meet Texas in the Peach Bowl on New Year's Day in a quarterfinal.

House will be watching. He won't be at the game as he keeps a pretty busy schedule these days. Living in Tempe still, House is either training himself or training others. He's 18 months into a job as a strength and performance coach while he prepares for the World Championship trials in June.

There is another part of his life, too.

His passion for change dates back to an encounter early during his career at Arizona State. A dormitory mate with expertise in creating music jested with him that, as an NCAA athlete, House couldn't reap the benefits that come with selling music. Until state laws forced the association to change its rules in 2021, NCAA athletes could not earn compensation from their name, image and likeness (NIL) through commercial and endorsement deals or their own creations such as a music album.

"I kind of laughed it off," House said, "but it always sat with me."

Two years later, a teammate's parent — a lawyer — was searching for possible plaintiffs to be part of a lawsuit over backpay owed to athletes for lost NIL compensation. House checked all the boxes. Smart. Accomplished. Courageous.

https://sports.yahoo.com/who-is-house-in-house-v-ncaa-settlement-meet-the-man-behind-the-lawsuit-that-will-change-college-sports-forever-165955719.html

He was made to be one of two named plaintiffs, joining women's basketball player Sedona Prince.

Roughly four years later, this past May, the defendants of the suit (the NCAA and power conferences) struck a settlement agreement with plaintiff lawyers. The leagues avoided what would have likely been a more than $9 billion tab in back-damages for a near-certain loss in court, an amount that the [NCAA itself claims would have bankrupted the organization and its member schools](#).

The settlement features three main parts: (1) nearly $2.8 billion in backpay to former athletes (mostly who played in 2016-2021) distributed over a 10-year period through reductions in NCAA and school revenues; (2) a revenue-sharing concept permitting schools to share more than $20 million annually with their athletes under a quasi-salary cap; and (3) an overhauled roster structure.

Most of the anger directed toward House is related to the latter. While the NCAA and power conferences agreed to expand upon scholarships as part of the settlement, they also imposed per-sport roster limits, many of which did not previously exist.

Such a change will result in thousands of lost roster spots for mostly walk-on athletes and those on partial scholarship — a consequence that has sparked outrage from [hundreds of parents of athletes or prospective athletes whose spots have been or will soon be eliminated](#).

As such information on the settlement has trickled out, the attention on House, the person, has intensified through direct message, texts and even a threatening phone call.

"This fall," he said, "it took an aggressive turn."

*You are the worst human ever.*

*You are ruining lives.*

*You are an egotist.*

*You deserve the worst punishment in life.*

*I will kill you.*

**How settlement will impact non-revenue sports**

Bob Bowman recalls the day, in 2020, when his top swimmer at Arizona State, Grant House, approached him with news.

*I plan to be a named plaintiff in a lawsuit against the NCAA.*

"I did advise him not to put his name on it, but he chose to do it and I respected that," Bowman told Yahoo Sports. "While it seemed that (the suit) could be a big deal, at the time, it didn't necessarily seem like it. 'How far could this really go?'"

Bowman, 59, has worked as a swim coach for more than three decades. He's coached multiple Olympic teams and three power conference programs. He led the Arizona State men's team to the national

https://sports.yahoo.com/who-is-house-in-house-v-ncaa-settlement-meet-the-man-behind-the-lawsuit-that-will-change-college-sports-forever-165955719.html

championship last season before leaving for Texas this offseason in a jarring move that shocked the swimming community.

He knows swimming. And he knows that the settlement's new roster limits will adversely impact his sport.

For instance, the new swimming roster limit — 30 each for men and women's teams — will necessitate hundreds of cuts at programs, many of which carry more than 40 swimmers. At Texas, Bowman says, he has a roster of 41 men swimmers and divers that he needs to cut to 22 to meet the SEC's own conference-wide men's swim roster limit.

"That's going to be an agonizing process," he said. "We are going (to cut) by numbers. Let's say I can only have a team of 18-19 swimmers and 3-4 divers. They have to be NCAA scorers. It's going to eliminate what I love most about coaching — developing a diamond in the rough."

Grant House says he "never signed anything" to limit roster spots.

Commissioners and university presidents of the SEC, Big Ten, ACC and Big 12 were at the center of settlement negotiations and are expected to further assume more authority over the governance and enforcement in a post-settlement world, diminishing the authority of the NCAA.

According to those with knowledge of the negotiations, power conference leaders implemented the new roster structure as a way to preemptively avoid any legal action over the scholarship restrictions. They also wanted to give schools the opportunity to "increase the number of scholarships and support for players," Steve Berman, one of the leading plaintiff attorneys, told Yahoo Sports this fall.

Asked earlier this month about a possible phase-in approach to the roster limits, SEC commissioner Greg Sankey said he would not comment on "legal" matters. In the past, he's acknowledged that this transformation, like any monumental change, will be "messy." The roster limits, like the revenue sharing itself, take effect July 1.

Though the rosters are expected to be slashed, House and Berman direct attention to the increase in scholarships now available. Schools, previously under scholarship restrictions, can now distribute scholarships to every player within the new roster limits. However, schools are not required, only permitted, to increase scholarships.

For instance, Texas Tech recently announced that it would add zero new scholarships. Ohio State announced it is adding 91, and Clemson is adding 150.

While scholarships at some places rise, roster spots at all places fall. At its most extreme, Ohio State, one of the country's biggest athletic departments, will eliminate at least 150 roster spots.

The settlement's impact on Olympic sports programs has long been discussed and dissected. Those sports are often subsidized by revenues from football, the same revenues that, presumably, will be used to distribute to football and men's basketball players in any revenue-sharing model.

https://sports.yahoo.com/who-is-house-in-house-v-ncaa-settlement-meet-the-man-behind-the-lawsuit-that-will-change-college-sports-forever-165955719.html

Unlike most other countries around the globe, colleges serve as the very expensive farm system for the U.S. Olympic movement. At this year's Games in Paris, 75% of U.S. Olympians had or planned to compete collegiately. Universities spend more than $5 billion on Olympic sports each year — most of which never turn a profit.

At many schools — not Texas — Bowman believes Olympic sports are in "jeopardy" under the new settlement agreement as there is a "huge incentive," he says, for schools to cut non-revenue sports to reallocate the dollars to those more popular and money-producing programs like football and men's basketball.

Bowman and Grant House remain friendly. They last spoke over the summer at the Olympic trials.

Told about the threats made toward House, Bowman defends his former pupil.

"You do get a feeling that people are angry about it," Bowman said. "I'm not angry about it. It's not Grant. If it wasn't Grant's name on it, it would be someone else's."

**'Change is good'**

Two high school swimmers recently reached out to Grant House with a message.

*Thank you.*

The two swimmers signed with a Division I school and, as part of the process, they learned about an "extra NIL bonus on top" of their scholarships, presumably revenue share from their institution, House said.

House uses the story as an argument against critics who say that the settlement only benefits football and men's basketball players.

"Football and basketball should for sure get a large amount of it, but it doesn't mean they should get all of it," he said. "Every athlete in the NCAA has a contribution percentage point of their own. That needs to be acknowledged."

While the settlement is made to benefit all athletes, the "irony" is that it will truly benefit a small portion of them and will come at the "expense" of the others, says Jaime Gordon, the American Volleyball Coaches Association executive director.

The football revenue-generating giants of FBS plan to disburse the vast majority of the money, as much as or more than 90%, to football and men's basketball — the only two profit-turning sports at many universities. For schools offering the maximum under the rev-share cap, the formula means that football rosters would receive $13-16 million and men's basketball rosters $2-4 million, according to estimates.

That leaves roughly $1-2 million for all other sports.

"(The settlement) will only benefit a small fraction of the NCAA student-athlete population in a meaningful way," said Samantha Barany, executive director for the College Swimming and Diving Coaches Association of America. "Our hope is that effective measures can be implemented to safeguard

https://sports.yahoo.com/who-is-house-in-house-v-ncaa-settlement-meet-the-man-behind-the-lawsuit-that-will-change-college-sports-forever-165955719.html

opportunities and resources for the remaining 95%, especially for those who come from similar sporting backgrounds as Grant."

Is it possible to change the settlement with these "effective measures"? That question will soon be answered. A host of settlement objections is expected to be filed next month with the court, including over roster limits.

An in-person hearing before the judge to approve the settlement is scheduled for April 7, the day of the men's basketball national championship game. She will consider the objections as well as the "opt-outs."

Those former athletes receiving back-damage pay can opt out of the settlement if they are dissatisfied. Thousands of athletes began to receive their back-damage estimates earlier this month. They range widely depending on an athlete's playing time, school and market value. Some checks are expected to be as small as three figures. However, power conference football players have received notification estimates of up to $150,000 over the 10 years — or about $15,000 a year.

According to a court filing earlier this month, and pending judge approval, House will receive $125,000 as a bonus afforded to him.

But there is another number embedded in that filing that jarred many within college athletics: $725 million — the amount that plaintiff attorneys requested in fees. Attorneys requested $20 million in an up-front amount, plus 20% of the $2.8 billion in back-damages ($480 million) in addition to a 1% cut of all revenue that schools share with athletes over 10 years (as much as $250 million).

The figures "shocked" House, he says, especially considering that lead attorneys Berman and Jeffrey Kessler have won billions of dollars in previous class-action litigation and settlements.

"It's interesting how the finances are allocated for people (attorneys) who have already been very successful in the biggest class-action lawsuits and who have been some of the most successful lawyers in sports," he told Yahoo Sports. "It's interesting that they needed more money after all that."

All of that said, there is no regret from House in attaching his name to this lawsuit, he says. There is no doubt. There are no take-backs. He's pushing forward full-throttle with hopes that this is only a small step into better reform.

College athletics will forever be changed by an agreement that, while he had little involvement in negotiating, will always bear his name.

"Change is good," he said. "We need to embrace it because it's going to come whether we like it or not."

https://sports.yahoo.com/who-is-house-in-house-v-ncaa-settlement-meet-the-man-behind-the-lawsuit-that-will-change-college-sports-forever-165955719.html