Patrick A. Bradford, *pro hac vice* forthcoming
  pbradford@bradfordedwards.com
Denver Edwards, SBN 268822
  dedwards@bradfordedwards.com
Panda Kroll, SBN 211877
  pkroll@bradfordedwards.com
BRADFORD EDWARDS LLP
1150 S. Olive St., 10th Floor
Los Angeles, CA 90015
Telephone: (213) 868-3310

*Attorneys for Charles O'Bannon, Jr., and
K. Braeden Anderson*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: COLLEGE ATHLETE NIL LITIGATION | Case No. 4:20-cv-03919-CW |
| | **OBJECTIONS TO SETTLEMENTS ON BEHALF OF CERTAIN AFRICAN AMERICAN FORMER D1 NCAA COLLEGE ATHLETES** |
| | Hon. Claudia Wilken |

# TABLE OF CONTENTS

I.      Summary of Objections.......................................................................1

II.     Objectors' Interests..........................................................................2

III.    Notice to Black Athletes Was Inadequate..........................................3

IV.     The Claim Submission Process Suffered a Defect not Cured Until
        January 17, 2025, Days Before the Claims Period Expired.............................4

V.      Newly-Acquired Information About the Proposed Injunction'S
        Preclusive Effect on Claims Unrelated to Nil Warrants an Extension. ............6

VI.     The Absence of Separate Counsel for Subclasses ith Different Claims
        Renders The Settlements Inadequate And Inequitable .....................................8

VII.    Objections to Settlement Applicable to Injunctive Relief Subclass ...............16

VIII.   The Settlement Should Provide One Year From the Date of Approval
        To Provide Claim Information ....................................................................18

IX.     Additional Objections To Specific Provisions of the Settlements..................19

X.      Relief Requested.............................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591, 625-25 (1997) ........................................................................ 9

*In re Black Farmers Discrimination Litig.,*
856 F. Supp. 2d 1 ........................................................................................ 6

*In re Literary Works in Elex. Databases Copyright Litig.,*
654 F.3d 242 (2d Cir. 2011) ................................................................. 10, 11

*In re Orthopedic Bone Screw Prods. Liab. Litig.,*
246 F.3d 315, 318 (3d Cir. 2001) .............................................................. 6

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,*
827 F.3d 223 (2d Cir. 2016) ................................................... 9, 12, 13, 14

*NCAA v. Alston,*
594 U.S. 69 (2021) .................................................................................... 3

*Ortiz v. Fibreboard Corp.,*
527 U.S. 815 (1999) ................................................................................ 10

*United States v. Philip Morris USA Inc,*
No. 99-cv-2496 (D.D.C. Feb. 4, 2014) .................................................. 4

*United States v. Philip Morris USA Inc.,*
2014 U.S. Dist. LEXIS 75094, at *19 (D.D.C. June 2, 2014) ................. 4

**Rules**

Fed. R. Civ. P. 23(e) ............................................................................. 1, 10

Pursuant to this Court's Order Granting Plaintiffs' Motion for Preliminary Settlement Approval as Modified, ECF 544 at 9 and Federal Rule of Civil Procedure 23(e), Bradford Edwards LLP, on behalf of certain African American former D1 athletes Charles O'Bannon, Jr., and K. Braeden Anderson, submits these objections to certain terms of the proposed amended Damage Classes Settlements (collectively "DCS") and proposed Injunctive Relief Class Settlements ("IRCS") (collectively, "Settlements"), published at ECF 535-1. The Court has scheduled a hearing on final approval of the proposed Settlements for April 7, 2025, at which counsel from Bradford Edwards LLP requests an opportunity to be heard should the Court have any questions about this submission. ECF 544 at 10.

The undersigned respectfully submit these objections with an understanding that Class Counsel have worked in good faith to craft a proposed settlement that is legally permissible and will provide new benefits to the plaintiff athletes. However, certain aspects of the Settlements are objectionable and must be presented to the Court for consideration before finalized. We are concerned about the effect of the Settlements on all athletes, but particularly African American student-athletes whose labor has been essential to the financial success of the college football and basketball industry over the past several decades.

## I.    SUMMARY OF OBJECTIONS

Charles O'Bannon, Jr., and K. Braeden Anderson (collectively "Objectors") object to certain terms of the Settlements, on several grounds: First, notice of the Settlements as to African American Class Members has been inadequate because there was no Black-specific media marketing. Second, the claims submission process — which expires on January 31, 2025 — was defective until January 17, 2025 as to applicants without NCAA ID numbers. Third, the Settlements' potential preclusive effect is overbroad in scope and in time. Fourth, the Settlements lack the required structural assurance — separate counsel for subclasses with different claims — rendering the Settlements *per se* inequitable and inadequate. In addition, there are

certain proposed terms that are, from a practical point of view, detrimental to the rights of certain classes. By way of example, providing incoming Freshman who will matriculate over the proposed 10-year term of the IRCS only 60 days from notice to object is not enough time to permit these students — not now represented by any subclass member before the Court — to make an informed decision about their rights. We proposed six months from matriculation. As another example, the IRCS permits an extension of the proposed 10-year term upon agreement by the parties' counsel. Such an extension is not warranted.

Defendants have recently asserted that the proposed injunction may be raised by Defendants as a defense to liability on future antitrust claims brought by the federal government. ECF 595 (DOJ's January 17, 2025 submission). This prospective defense and potential forfeiture of rights have been given little attention and warrant additional consideration by class members.

Objectors request the Court extend all deadlines associated with the proposed Settlements by 60 days to permit adequate notice to African American class members, to remedy the defects in the claim submission process, and to permit all class members, especially those in the IRSC, an opportunity to evaluate the broad preclusive effect and prospective nature of the injunctive relief provision of the Settlement. Objectors additionally request modification of certain terms of the Settlements, as described below.

## II.    OBJECTORS' INTERESTS

Charles O'Bannon, Jr., and K. Braeden Anderson are African American former D1 basketball players who are eligible to receive the NIL payments contemplated by the Settlements.[1] *See* Declaration of Charles O'Bannon, Jr., ¶¶ 1-2 ("O'Bannon

[1] In addition to being a Class Member, Mr. Anderson is a graduate of Seton Hall Law School, a member of the New York and D.C. bars, and a former associate with Sidley & Austin and Kirkland & Ellis. Anderson Decl., ¶¶ 1-2.

Decl."); Declaration of K. Braeden Anderson ("Anderson Decl."), ¶¶ 3-4. Beyond their own interest in the Settlements and its terms, Objectors are concerned that all D1 athletes, especially Black athletes, have the opportunity to learn about the pending Settlements so that they can submit a claim form (including where applicable to correct any information and to elect a method of payment), opt-out, or submit an objection requesting modification of the Settlements. Anderson Decl., ¶ 7; O'Bannon Decl., ¶ 3. As for Mr. Anderson, he has written on the economics of college athlete compensation. Anderson Decl., ¶¶ 5-7.

## III.    NOTICE TO BLACK ATHLETES WAS INADEQUATE.

Notice to Black class members was inadequate due to the great number of such people in the class, and the lack of any Black-specific media notification. Mr. Anderson was unaware of the proposed Settlements until informed by counsel from Bradford Edwards LLP on January 16, 2025, in connection with an initiative by Bradford Edwards LLP to bring the proposed Settlements to the attention of the Black community via Black media outlets. Anderson Decl., ¶ 8; Declaration of Patrick A. Bradford ("Bradford Decl."), ¶¶ 4-7.

Upon inquiry, Mr. Anderson learned that many of his former D1 classmates also had no knowledge of the pending Settlements. Anderson Decl. ¶ 9. An effort to reach out to inform the Black community was not included in the approved notification procedures, even though Black D1 athletes have been essential to the creation of the multibillion-dollar industry that is D1 basketball and football. Bradford Decl., ¶ 4; *see also* Bradford Edwards LLP's Brief for African American Antitrust Lawyers as *amici curiae*, filed in *NCAA v. Alston,* 594 U.S. 69 (2021) ("*Alston*"); *cf.* ECF 450-5 - Declaration of Clara A. Peak Regarding Settlement Notice Program, ¶¶ 13-40 (searches of the term "Black" and the phrase "African American" return no hits).

In *United States v. Philip Morris USA Inc.,* known as the tobacco litigation, the National Newspapers Publishers Association (NNPA) and the National Association of Black Owned Broadcasters (NAOBOB) filed an amicus brief, successfully urging the

Court to include its members in the list of media outlets in which the defendants were required to publish corrective notice. *See* Brief for the NNPA and NAOBOB *amicus curiae*, *United States v. Philip Morris USA Inc,* No. 99-cv-2496 (D.D.C. Feb. 4, 2014), ECF No 6045. The *amici* pointed to data showing that smoking disproportionately harms African Americans, requiring notice specifically targeting the Black population. *Id.* at 4. The Court agreed and revised the notice provision of the consent decree accordingly. *See United States v. Philip Morris USA Inc.,* 2014 U.S. Dist. LEXIS 75094, at *19 (D.D.C. June 2, 2014).

Within the past two weeks, the undersigned have distributed a press release to hundreds of members of the Black press. This effort has prompted interviews with certain members of the Black press, including national radio host Tavis Smiley (KBLA 1580AM, Los Angeles), WOLB 1010 AM, the Donald Morton Glover morning show (Baltimore), 95.1 FM, the Omni Channel (Chicago), the Mississippi Free Press, and EurWeb/Electronic Urban Report (Los Angeles). In this short-lived Black media campaign, we have learned of Black members of the class who had not heard about the proposed Settlements. These efforts were undertaken *pro bono*, for the benefit of the Black community. Additional time is needed to ensure that as many class members can have the opportunity to participate if the Settlements are approved. Objectors request this Court extend the claims deadline for 60 days to permit the parties to give proper notice to the Black community via radio, social media, news outlets and publications that focus on Black communities.

## IV.    THE CLAIM SUBMISSION PROCESS SUFFERED A DEFECT NOT CURED UNTIL JANUARY 17, 2025, DAYS BEFORE THE CLAIMS PERIOD EXPIRED.

Independent grounds exist to extend the claims submission period, based on defects in the process that were only recently cured. Mr. Anderson submitted an online claim to participate in the NIL Settlements, although he did so with some difficulty. After counsel from Bradford Edwards LLP alerted him to the pending Settlements on

OBJECTIONS TO SETTLEMENTS ON BEHALF OF
CERTAIN AFRICAN AMERICAN FORMER D1 NCAA COLLEGE ATHLETES

January 16, 2025, Mr. Anderson attempted to submit a claim. Anderson Decl. ¶ 8. He did not have an NCAA Eligibility Center ID number when he first attempted to register on January 17, 2025. Anderson Decl. ¶ 12. After selecting the box on the online claim form indicating that he had no ID and leaving the field on the claim form requesting the ID number blank, the form could not be submitted because the applicant was required to complete the field requesting an ID (which was marked with an asterisk) as a prerequisite to submission. Anderson Decl. ¶¶ 11-12. Mr. Anderson requested information on how to submit the claim from the Settlement Administrator.

In response, the Settlement Administrator advised that Mr. Anderson did not need his ID number, and provided incorrect information on how to submit the claim.[2] Anderson Decl. ¶¶ 12-13. Counsel from Bradford Edwards, LLP then put Mr. Anderson in touch with a partner at Plaintiffs' counsel, Winston & Strawn, who provided the correct information: that is, claimants can submit the form without providing an NCAA Eligibility Center ID but must type the word "unknown" in the field requesting the ID. Anderson Decl. ¶¶ 14-15. Not "0," "N/A," or "Not Applicable," but "unknown," a required response that is not intuitive and should have been provided much earlier in the claims process. Certainly, the Settlement Administrator should have had this important information to distribute well before January 17, 2025.

Winston & Strawn advised Mr. Anderson that Plaintiffs' counsel had requested the claim registration website be updated with this information "weeks ago." Anderson Decl., ¶ 16. According to Plaintiffs' counsel, the claims website was updated on January 17, 2025, with the needed information. Anderson Decl., ¶ 16. But that left only

---

[2] The Claims Administrator directed Mr. Anderson to point his browser to a website that was supposed to provide him with his ID number. It did not. The Claims Administrator also advised Mr. Anderson he could submit the form without providing the ID number in the field. He was unable to do so. Anderson Decl., ¶ 12, *see also* Anderson Decl., Exh. B.

OBJECTIONS TO SETTLEMENTS ON BEHALF OF
CERTAIN AFRICAN AMERICAN FORMER D1 NCAA COLLEGE ATHLETES

fourteen (14) days before the expiration of the registration deadline. Who knows how many claimants attempted to register and gave up? Bradford Edwards LLP has learned from counsel representing other D1 athletes that there were additional problems with the online claims registration process, all satisfactorily resolved with the help of the claimants' counsel. Bradford Decl., ¶ 10.

Of course, not all claimants will have the benefit of counsel, and so an extension is necessary to ensure that the due process rights of all potential class members are protected. In light of the claim process challenges, the Court should extend the deadline. *See, e.g., In re Black Farmers Discrimination Litig.,* 856 F. Supp. 2d 1, 11 (D.D.C. 2011) (due to challenges in the claims process, many African American farmers were unsuccessful in filing claim packages after the deadline expired; Congress addressed the problem by resurrecting the claims of those who unsuccessfully petitioned to submit Black claim packages by enacting the Food, Conservation and Energy Act of 2008); *see also In re Orthopedic Bone Screw Prods. Liab. Litig.*, 246 F.3d 315, 318 (3d Cir. 2001) (claims deadline extended twice to account for administrative difficulties and to remedy difficulty of claimants in providing required documentation of injuries).

The Court should also not end claims registration without a full accounting from the Settlement Administrator about any similar problems, including a description of all updates to the registration website since it was first made public.

## V.    NEWLY-ACQUIRED INFORMATION ABOUT THE PROPOSED INJUNCTION'S PRECLUSIVE EFFECT ON CLAIMS UNRELATED TO NIL WARRANTS AN EXTENSION.

An extension is also warranted because of new information provided in the January 17, 2025 Statement by the Biden Administration's Antitrust Division of the Department of Justice. ECF 595 ("DOJ Statement"). In its brief, the DOJ, which takes no position on the Damages portion of the proposed Settlements, objects to certain terms of the proposed injunctive relief. The DOJ brief states that the DOJ reached out

to Defendants' counsel to gain clarity about the potential preclusive effect of the injunction provisions of the proposed Settlements and learned the following: "By e-mail of January 14, 2025, counsel for the National Collegiate Athletic Association ("NCAA") and the Defendants confirmed in writing their position that while the settlement do not provide immunity from future antitrust actions by the United States, Defendants' retain all rights to rely on the settlement and potential court approval thereof in any such action, including as a defense of liability.'" ECF 595 at 4 and ECF 595, Exh. 1 to Declaration of James H. Congdon. If the DOJ felt it necessary to seek clarification of the potential preclusive effect of the injunction provisions of the proposed Settlements, especially given the extensive filings in the case, how are members of the class supposed to understand what rights they may be forfeiting? Presumably, the NCAA would take the same position if federal antitrust claims were brought on behalf of D1 athletes by any state Attorney General.

Counsel for the parties, the media, and the NCAA have trumpeted the $2.8 billion NIL portion of the proposed Settlements. But the injunction provisions are intended by the NCAA to shield them from potential liability for claims wholly unrelated to the NCAA's NIL liability well in excess of $2.8 billion. And Plaintiffs' counsel admits as much in their August 16, 2024 Joint Declaration: "We were aware … that it was likely not possible to reach an injunctive relief settlement that resolved the NIL-compensation claims only and that an injunction relief settlement would need to make structural changes to college athletics that would address *all* of the NCAA's compensation rules." ECF 494-1, ¶ 9 (emphasis added). Plainly put, for those who accept NIL payments under the Settlements, the payments represent compensation for their athletic services, including pay-for-play claims, as *Carter v. NCAA* is being folded into the proposed Settlements. However, going forward, the injunctive relief permits payments of $21 million annually to students, but only under the title of NIL payments, while pay-for-play prohibitions remain. While the DOJ and other objectors have rightly noted that the proposed injunction's cap simply swaps one illegal price

fix for another, there is another illegal price fix involved. This is because NIL payments alone will always be less than NIL payments and payments for direct athletic services.

## VI.    THE ABSENCE OF SEPARATE COUNSEL FOR SUBCLASSES WITH DIFFERENT CLAIMS RENDERS THE SETTLEMENTS INADEQUATE AND INEQUITABLE

The Settlements specifically identify two Settlement subclasses: the "Damages Settlement Classes" (subdivided into three further subclasses) and the "Injunctive Relief Settlement Class." *See* ECF 535-1 at 4. The damages classes share the common limitation of "student-athletes who compete on, competed on, or will compete on a Division 1 athletic team at any time from June 15, 2016 to September 15, 2024." The injunctive class includes "all student-athletes who compete on, competed on, or will compete on Division I athletic team at any time between June 15, 2020 through the end of the Injunctive Relief Settlement Term." That term is ten academic years from the effective date of the Settlements. Clearly, there are subclasses within the injunctive class, and some class members are years away from their college careers and others are currently enrolled students.

The "injunctive relief" contemplated by the Settlements is a *de facto* prophylactic resolution of future claims and provides much greater "relief" to the Defendants than to Class Members. "Injunctive relief" to a player who is no longer playing (i.e. those who competed between 2020 and 2024) is meaningless to that player. The prospective nature of a 10-year injunction, which is subject to even further extension, is intended to foreclose similar claims by future student-athletes who remain unrepresented. As new individuals mature into class members by attending an eligible institution or joining an eligible team, the Settlements afford them only 60 days' notice to object. There is no possibility of opting out. The vast majority of this IRSC (student-athletes beginning their careers *after* September 2024 and through the entire 10-year term) did not even receive the benefit of a damages payout in exchange for the

extensive release of not-yet-existing claims foreclosed by the "injunctive relief." Now the Defendants have expressed their intent, in written communication to the DOJ, to use the broad 10-year injunctive relief as a defense to all future antitrust claims by student-athletes. Thus, the IRSC members are, *sub silentio*, forced to relinquish (or at the very least severely diminish the viability of) their claims, in exchange for nothing — an "agreement" argued, negotiated and mediated without the benefit of counsel to represent their specific interests. This Court should reject the injunctive portion of the Settlements on this ground alone.

Aside from the impact on unrepresented post-2024 claimants discussed above, the existence of separate damages and injunctive subclasses without representation by separate counsel raises a host of due process issues and renders the Settlements inadequate and inequitable. The lumping together of student-athletes who have long ended their careers with those who are just beginning their careers in both the damages relief and injunctive relief subclasses is flawed because these groups of student-athletes have vastly different interests that are in tension with each other. For example, significant tension exists between holders of "pay for play" compensation claims — those who belong to the original class of plaintiffs in *Carter and Fontenot*, who have been swept into these Settlements and must opt out to preserve those claims — and holders of NIL claims. Under the Settlements, NIL claims are valued much higher, and a pool of $1.976 billion is set aside to pay out those claims. By contrast, a fund of $600 million is reserved for "additional compensation," including various other claims such as "pay for play" compensation claims.

The adequacy inquiry under Rule 23(a)(4) serves to uncover such conflicts of interest. To satisfy adequacy, the named plaintiffs must "possess the same interest[s] and suffer the same injur[ies] as the class members." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625-25 (1997) ("*Amchem*"). "Adequacy is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." *In re*

1    *Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223 (2d Cir.

2    2016) ("*Payment Card*") (internal citations omitted). As evidenced by the case law

3    that follows, settlements that are approved simultaneously with class certification are

4    "especially vulnerable to conflicts of interest," and are scrutinized "more closely." *Id.*

5    at 235-36, referencing *Amchem, Ortiz v. Fibreboard Corp.,* 527 U.S. 815 (1999)

6    ("*Ortiz*"), and *In re Literary Works in Elex. Databases Copyright Litig*., 654 F.3d 242

7    (2d Cir. 2011) (*"Literary Works"*). Here, the classes conditionally certified by

8    stipulation as settlement classes cannot survive that scrutiny. The two Supreme Court

9    decisions, *Amchem* and *Ortiz,* which have shaped adequacy jurisprudence should guide

10    the Court, as follows.

11       In *Amchem*, the Court found that the interests of those who had already

12    manifested asbestos-related injuries were not aligned with the interests of those who

13    had been exposed to asbestos but had not yet shown signs of injury. *Amchem*, *supra*,

14    521 U.S. at 626. The holders of present claim were interested in "generous immediate

15    payments," whereas the holders of future claims sought to ensure an ample fund for

16    the future. *Id.* These two subgroups who occupied a single class had competing

17    interests in a settlement whose terms addressed "essential allocation decisions

18    designed to confine compensation and to limit defendants' liability." *Id.* at 627. This

19    was fatal to class certification. Even if the class representatives "thought that the

20    settlement serves the aggregate interests of the entire class[,]…the adversity among

21    subgroups requires that the members of each subgroup cannot be bound to a settlement

22    except by consent given by those who understand that their role is to represent solely

23    the members of their respective subgroups." *Id.* Because there were no "structural

24    assurances of fair and adequate representation for the diverse groups and individuals

25    affected," the class failed Rule 23(a)(4)'s adequacy requirement.

26       In *Ortiz,* The Supreme Court reaffirmed the requirement for "reclassification

27    with separate counsel" when the class suffered from two fault lines: between present

28    and future claims, and between "more valuable" and "less valuable" claims. *Ortiz,*

*supra,* 527 U.S. at 856-57. Some claims were more valuable because they were incurred while the defendant was still insured, and other claims were less valuable because they occurred after the insurance expired. *Id.* at 823 n.2. Applying *Amchem*, the Supreme Court rejected the settlement as failing to differentiate between these groups of claims.

Much like the concerns raised by the Supreme Court in *Amchem*, the presence of student-athletes whose careers have long ended alongside student-athletes whose careers are only beginning in the same subclasses (both in the damages subclasses and the injunctive subclass and across these classes) reveals antagonistic interests. Student-athletes whose NCAA participation has concluded stand to gain only from "generous immediate payments," whereas student-athletes whose careers are just beginning stand to gain far more from fewer restrictions on student-athlete compensation going forward, or at least a higher cap on such payments. Most members of the damages class are indifferent to the rules going forward.

Another important fault line is present in the identified subclasses, much like the concerns raised by the Supreme Court in *Ortiz*. Student-athletes whose careers predated the Supreme Court's decision in *Alston* — who had no incentive or opportunity to pursue or respond to then-forbidden NIL deals — stand to gain from a "generous immediate payment," but current (and even some former) student-athletes in a post-*Alston* world, whose NIL claims are categorically more valuable and sometimes documented by actual offers, stand to gain more from higher NIL payments going forward, unrestricted by the restraints imposed by the injunctive portion of the Settlements. *Amchem* and *Ortiz* instruct that the absence of "structural assurance of fair and adequate representation" in this case, for individuals with diverse interests, is fatal to the Settlements.

The Second Circuit Court of Appeals applied *Amchem* and *Ortiz* in cases that are similar to this one. In *Literary Works*, the Court rejected a settlement that divided class claims into three categories, capping overall liability at $18 million, and where

OBJECTIONS TO SETTLEMENTS ON BEHALF OF
CERTAIN AFRICAN AMERICAN FORMER D1 NCAA COLLEGE ATHLETES

all class members were represented by the same counsel. The settlement was less generous to claims in the third category. *Literary Works, supra,* 654 F.3d at 242. The court recognized the great risk of "selling out one category of claim for another." *Id.* at 252. This was true even though some class members held claims across all three categories of recovery, because, in the interest of maximizing recovery, those members would choose to sacrifice their category three claims to capitalize on their other claims. *Id.* Informed by *Amchem* and *Ortiz,* the Court determined that no authority existed to permit the Court to approve a settlement without the creation of subclasses, each of which required advocacy by an unconflicted attorney. *Id.* at 252-254. The same is true in this case, where members of all classes potentially hold both less-valuable "pay for play" claims, and more-valuable NIL claims. Some student-athletes hold only the less-valuable "pay for play" claims. The risk that holders of "pay for play" claims will be shortchanged is great. As in *Literary Works,* these subgroups cannot be represented by the same counsel.

The Second Court's decision in *Payment Card* is especially instructive because of its striking similarity to the case at hand. The court articulated the obvious disparate interests of a damages class and an injunctive relief class: "The former would want to maximize cash compensation for the past harm, and the latter would want to maximize [its position with regard to] rules to prevent harm in the future." *Id.* at 233. Regarding such disparate interests, the court stated in no uncertain terms:

> *Amchem* tells us that such divergent interests require separate counsel when it impacts the "essential allocation decisions" of plaintiffs' compensation and defendants' liability. *Amchem,* 521 U.S. at 627. The Settlement Agreement does manifest tension on an "essential allocation decision": merchants in the [damages] class would share in up to $7.25 billion of damages, while merchants in the [injunctive relief] class would enjoy the benefit of some temporary changes to the defendants' network rules. The same counsel represented both [ ] classes. The class counsel and class representatives who negotiated and entered into the Settlement Agreement were in the position to trade diminution of [injunctive] relief for increase of  [damages] relief. However, "it is

OBJECTIONS TO SETTLEMENTS ON BEHALF OF
CERTAIN AFRICAN AMERICAN FORMER D1 NCAA COLLEGE ATHLETES

> obvious after *Amchem* that a class divided between holders of present
> and future claims ... requires division into homogenous subclasses ...
> with separate representation." *Ortiz*, 527 U.S. at 856.

*Id*. at 233-34.

Furthermore, the Court explained that the members of the damages class have "little or no interest in the efficacy of injunctive relief because they no longer operate … ." *Id.* at 234. By the same token, many members of the injunctive relief class had little to no interest in the size of the damages award because they did not operate during the requisite time. *Id*. Identical concerns are attendant to this case, which also differentiates between three damages subclasses and one injunctive relief subclass. As in *Payment Card,* the problem of conflicting interests and unitary representation is only exacerbated because members of the injunctive relief class cannot opt out — they are "stuck with this deal." *Id.*

The Second Circuit was not blind to the elephant in the courtroom: "Class counsel stood to gain enormously." *Id.* at 234. The same can be said in this case. The Settlements provide for enormous compensation to Class counsel, including $20 million as an upfront injunctive fee, an increasing annual percentage of the roughly $23 million of the total amount spent under the Pool per year, above and beyond the hefty counsel fee expected for the damages portion.  Total attorneys' fees in this case may be $725 million. *See* ECF 583, Plaintiffs' Motion for Attorney Fees (Fee request includes 20% of the NIL Settlement Fund ($395.2 million), 10% of the Additional Compensation Fund ($60 million), an upfront injunctive relief award of $20 million and an additional percentage of the Pool distribution amounting to $250 million or so over the 10-year Term). As the Supreme Court recognized in *Ortiz*, and the Second Circuit echoed in *Payment Card,* "when 'the potential for gigantic fees' is within counsel's grasp for representation of one group of plaintiffs, but only if counsel resolves another group of plaintiff's claims, a court cannot assume class counsel adequately represented the latter groups interests." *Id.* at 234, citing *Ortiz*, 527 U.S. at

OBJECTIONS TO SETTLEMENTS ON BEHALF OF
CERTAIN AFRICAN AMERICAN FORMER D1 NCAA COLLEGE ATHLETES

853. Even without impugning class counsel's motives, the Second Circuit determined that "class counsel was charged with an inequitable task." *Id.*

The same can be said in the case at bar. Class counsel made passing mention of these two important Second Circuit cases in their joint declaration and described their attempts to impose "structural assurances" in their mediation to avoid the adequacy kibosh of *Amchem, Ortiz, Literary Works* and *Payment Card.* ECF 494-1 at ¶ 14. Specifically, Class counsel sought to quiet concerns of tradeoffs between damages and injunctive relief by "first exclusively discuss[ing] and resolv[ing] injunctive relief issues" and by "refus[ing] to negotiate damages amounts before the terms of the injunctive relief settlement was agreed upon." *Id.* However, counsels' own statements belie the fairytale that injunctive relief and damages were not conflated:

> We were aware … that it was likely not possible to reach an injunctive relief settlement that resolved NIL compensation claims only and that an injunctive relief settlement would need to make structural changes to college athletics that would address *all of the NCAA's compensation rules.* Defendants indicated that they shared this view.

*Id.* at ¶ 9 (emphasis added).

Indeed, at the hearing for preliminary approval, the NCAA suggested it will not agree to approval of damages relief without simultaneous approval of injunctive relief, leaving prohibitions of pay-for-play intact. Transcript of Sept. 5, 2024 Hearing, ECF 525 at 70 ("for us [the ban on pay-for-play] is an essential part of the deal,") and at 78-79 (a prohibition on boosters, reflecting a broad prohibition on pay-for-play "is an essential part of the deal. And without it, I'm not sure there will be a settlement to submit"); *see also id.* at 97-98. These admissions underscore that "the only unified interests served by herding these competing [damages and injunction] claims into one … are the interests served by settlement: (i) the interest of class counsel in fees, and (ii) the interest of defendants in a bundled group of all possible claimants who can be precluded … ." *Payment Card, supra,* 927 F.3d at 236.

The Court recognized the serious legal issues raised by the manner in which these Settlements were negotiated during the Sept. 5, 2024 hearing. ECF 525 at 102 (The Court: Well, there is a potential conflict of attorneys representing both damage — present damage class members and future injunctive relief classes members *a la Amchem, Oritz, Payment Card* and *Literary*. Some have argued that there is a sort of inherent conflict between the same attorneys representing both those types of classes.")

Counsel for the parties cited no legal authority for their position that the staged and logistically segregated nature of their negotiations is an equivalent structural assurance of adequacy.[3] Just as the assistance of judges and mediators in the bargaining process "emphatically cannot remedy the inadequate representation," *Payment Card, supra,* 927 F.3d at 234-35, the purportedly staged nature of the negotiation cannot remedy the inadequate representation in this case. "[E]ven 'an intense, protected, adversarial mediation, involving multiple parties' including 'highly respected and capable' mediators and associational plaintiffs, does not 'compensate for the absence of independent representation.'" *Id.*, citing *Literary Works,* 654 F.3d at 252-53. There is simply no substitute for independent counsel when due process rights of disparately situated plaintiffs are at stake. The court in *Payment Card* concluded that, as in *Literary Works,* "[t]he benefits of litigation peace do not outweigh class members' due process right to adequate representation." *Id.* at 240.

---

[3] The *Volkswagen* case mentioned during the preliminary approval hearing (ECF 525 at 44) is inapposite for many reasons. First, the court in *Volkswagen* did not condone staged negotiation but rather found that the subgroups did not have a serious enough conflicts to require any structural assurances of separate counsel. The alleged conflict of interest in that case came nowhere close to the web of conflicting interests in this case. Second, there was no divide between a damages class and in injunctive class without opt-out. Third, the court noted the severe insurmountable questions of causation and damages of the group possessing the weaker claims, justifying the *advantage* to that group of being herded together with those possessing stronger claims, a division that is absent in this case. Fourth, and unlike in this case, there were no unrepresented future class members being bound by the settlement.

OBJECTIONS TO SETTLEMENTS ON BEHALF OF
CERTAIN AFRICAN AMERICAN FORMER D1 NCAA COLLEGE ATHLETES

## VII.   OBJECTIONS TO SETTLEMENTS APPLICABLE TO INJUNCTIVE RELIEF SUBCLASS

When examining the terms of the injunctive relief portion of the Settlements, separate problems of reasonableness emerge. This is particularly problematic against the backdrop of the adequacy of representation identified above, stemming from inherent tensions and competing interests within the classes, who were unitarily represented. The duration of the release, especially considering the potential extension, should be seen through the same disapproving lens that the Second Circuit saw the injunctive provisions of the settlement in *Payment Card.* Essentially, it is a bargain struck for relief on behalf of absent class members. *See id.,* 827 F.3d at 236.

If that weren't troubling enough, the Settlements' injunctive relief terms erect a structure that flaunts the antitrust laws just as the NCAA has before, replacing one illegal cap with another. While athletes will receive some compensation that they did not previously receive, at bottom, the NCAA Division schools are still agreeing to operate as a price-fixing cartel. Only, instead of using the now-worthless shield of "amateurism" to justify their cartel, they will now have the imprimatur of court-approved settlements.[4] *See generally,* DOJ Statement, ECF 595.

The "six-year-old who is playing kickball on the asphalt" contemplated in the September 5, 2024 Hearing (ECF 525 at 45-46) will not have the opportunity to raise antitrust challenges to the NCAA compensation structure. When that six-year-old enrolls in school and receives his notice of eligibility from the NCAA in the summer

---

[4] The Settlements themselves contemplate an even higher inference of court approval beyond approval of the parties' settlement, requiring a joint request of the parties for court blessing of all compensation limits in the NCAA Rules. ECF 535-1 at 71-72 ("The Parties shall request that the Court approve all existing NCAA rules regarding compensation and benefits that may or may not be provided by Division 1 conferences or schools to student-athletes").

prior to starting school,[5] he will receive the notice mandated by the Settlements, among many other papers. He has not yet started school and will not know the significance of these papers. The 60-day clock has just begun ticking for him to file an objection. Although he didn't know it, while he was playing kickball, he already became a future member of the IRSC, with no possibility to opt out. Although he technically has 60 days to object, this young college freshman, reluctant to rock the boat, is unlikely to have interacted with an attorney in his life and is unlikely to know what to make of the notice. These future class members are not given a true opportunity to object. Every party to this litigation cannot but know that no student will object within this time frame. And this is especially true for minority students from meager backgrounds.

While counsel for the parties represented to the court that future class members would still be able to bring a lawsuit for class action damages, with an attorney of their choice, in any venue (ECF 525 at 47:6-48:18), in practice, the Settlements bar future class members from antitrust enforcement actions and do limit choice of counsel and venue. Section E, entitled "Release of Injunctive Claims" (¶¶ 19-26), acts as a release of all "Injunctive Class Claims" and includes a covenant not to sue. This entire section should be omitted from the Settlements, as future athletes should not be bound by a decade-old release of claims negotiated without representation. Even when student athletes dispute matters relating to Settlements and their enforcement, the Settlements force them to use Class Counsel, ECF 535-1 at ¶ 45. "Any and all" future student athlete challenges, including "antitrust or other violations of law" based on Defendants' structure or implementation of the new compensation structure "must, to the fullest extent legally permissible, be asserted exclusively in the Action," in this court. *Id.* ¶ 46. Furthermore, if any such "new claim" is brought against Defendants in any venue other than this court "seeking to invalidate or recover damages" based on

---

[5] *See* ECF 525 at 47:2-9, where Class Counsel Mr. Berman explained the NCAA eligibility notice is usually received the summer before starting school.

1    the Defendants' implementation of the new compensation structure, Class counsel will

2    join Defendants in efforts to have the new claim enjoined. *Id.* Clearly, the

3    representations made during the hearing for preliminary approval are not borne out in

4    the proposed Settlement.

5           These provisions together have the practical effect of depriving future student

6    athletes of any meaningful way to assert or enforce their rights. As currently proposed,

7    the parties' current counsel might agree to an extension of the 10-year term as it

8    expires. *See* ECF 535-1 at 83 (Appendix A to Amended Stipulation and Settlements

9    Agreement, Article 9, Section 2, "Potential Extension"). This Court should eliminate

10   this grossly overbroad provision. It has the effect of making an already prophylactic

11   release even more permanent. It reaches beyond the six-year-old on the asphalt to the

12   fetus doing summersaults in the womb.

## VIII.  THE SETTLEMENTS SHOULD PROVIDE ONE YEAR FROM THE DATE OF APPROVAL TO PROVIDE CLAIM INFORMATION

15          Hagens Berman has published a website that states that the estimated class of

16   D1 football and men's basketball claimants is 19,000.[6] Winston & Strawn has

17   confirmed that 30,000+ of these players do not have to register to claim their NIL

18   payments, only to make corrections (if any) and to state their form of payment.

19   Bradford Decl., ¶ 15. Neither Winston & Strawn, nor the Settlements, however, have

20   provided a date by which these players can make corrections and state their form of

21   payment. Bradford Decl., ¶ 15. Accordingly, the Court should expressly require the

22   Settlements to provide that such players have at least one year from the date of any

23   approval of the Settlements, including the resolution of any appeals, to provide any

24   claim information, including any corrections and their preferred method of payment.

25

26

_____

27   [6] *See* https://www.hbsslaw.com/ncaa-student-athlete-name-image-and-

28   likeness/settlement-payout-estimates.

## IX.    ADDITIONAL OBJECTIONS TO SPECIFIC PROVISIONS OF THE SETTLEMENTS

What follows are Objectors' criticisms and proposals regarding specific provisions of the Settlements:

1. Paragraph 14.[7]

   a. Notice should be explicitly required to be given only after a student has entered the eligible institution, to avoid the possibility of the notice period beginning before a student-athlete has formally begun their career.

   b. The notice period should be changed from 60 days to 6 months, to afford some meaningful possibility of objection.

   c. To ensure that notice is effective, this provision should contain language similar to that in Injunctive Relief Settlement, Article 2, Section 2, which would require the student to be assisted by a parent, guardian, lawyer or other competent representative in understanding the implication of the notice. Written acknowledgement or waiver of such assistance should be required before the notice period is triggered.

2. Paragraph 16.

   a. Reference to *Fontenot* should be removed. Revision is required to clarify that this provision applies only to Class Members who do not opt out.

3. Section E, "Release of Injunctive Claims" (¶¶19-22) should be removed in its entirety for the reasons discussed above.

---

[7] All references are to ECF 535-1 ("Amended Stipulation and Settlement Agreement").

4.      Section F,[8] "Attorneys' Fees & Expenses" (¶¶ 27-29)

      a.      Plaintiffs' Counsel have applied for approximately $725 million in fees, an amount that should be carefully scrutinized by the Court to ensure that the fees reflect work done in this case, and not any related earlier cases.

5.      Paragraph 45. Student-athletes should expressly be given the option of choosing their own counsel.

6.      Paragraph 46 should be eliminated in its entirety. Alternatively, future student athletes should be given the choice of venue to voice their objections to the Settlements.

7.      Paragraph 47 should be eliminated in its entirety. Any settlement in this case is between the Plaintiffs, Class Members who have not opted out, and Defendants. It should not reach beyond these parties to impact the rights of third parties to seek legal redress or the outcome of enforcement efforts by those third parties. This provision clearly seeks to leverage the power and reputation of Class Counsel by quashing the voice of anyone who disagrees. This is far beyond the scope of the issues raised between the parties in this litigation, unnecessarily disadvantages and punishes class members who opted out, and has no place in a reasonable settlement of the claims *in this case*. It should be flatly rejected.

8.      Paragraph 48 should be modified to permit future student athletes to engage counsel of their choice in opposing or challenging the structure, application or enforcement of the Injunctive Relief Settlements.

9.      Injunctive Relief Settlement. Article 2, Section 2. Representation by counsel (and not merely a parent, guardian or other competent

---

[8] There are two sections labeled "F" – this refers to the second "F."

representative) should be required for all NIL contracts to ensure that under-privileged student-athletes are adequately represented.

10. Injunctive Relief Settlement, Article 3, Section 1 should be revised to reset the formula each academic year, instead of applying an artificially low annual 4% increase. In its current form, there are various types of multimillion dollar contracts that could be excluded or intentionally delayed by Member Institutions to artificially reduce the Average Shared Revenue for three years at a time. There is no justification for not requiring accurate annual calculation.

11. Injunctive Relief Settlement, Article 4, Section 2. The second sentence of this section should be stricken. ("The Parties shall request that the Court approve all existing NCAA rules regarding compensation and benefits that may or may not be provided by Division 1 conferences or schools to student-athletes, revised as necessary to conform to the terms of this Injunctive Relief Settlement"). There is no need, nor justification, for additional court blessing on NCAA rules that squarely violate antitrust law. It is one thing to approve a settlement as a reasonable resolution of a conflict between parties. It is quite another to request court approval of all NCAA rules regarding compensation and benefits. This is far beyond the scope of the issues raised in this litigation and has no place in a reasonable settlement of the claims *in this case*. The Defendants have already signaled their intent to use any approval of this court as a shield for any and all antitrust liability. This court should not lend a hand to that effort.

12. Injunctive Relief Settlement, Article 6.

   a. Section 1 should be revised to provide that student-athletes may choose their own counsel.

b.  Sections 1 and 2 should be revised to provide that if a student-athlete prevails on any portion of their claim, the defending Member Institution or other Defendants should be required to pay reasonable attorneys' fees.

13. Injunctive Relief Settlement, Article 7 should be eliminated in its entirety. Requiring counsel not only to remain neutral, but to actively support NCAA lobbying efforts is outrageous and has no place in a reasonable settlement. Lobbying efforts will certainly go far beyond the scope of the issues raised in this litigation and has no place in a reasonable settlement of the claims *in this case*. (And certainly, any attorneys' fees for such work should not come out of the settlement pool, but be paid by Defendants.) Again, these Settlements purport to be a settlement of *this litigation,* between the *parties to this litigation.* Striking a deal to end litigation should not include much broader collusion and partnership to immunize the NCAA from antitrust law, whether in court or in congress. Leveraging of Class Counsels' reputation and power in that effort — essentially coopting them to become advocates for the adversary — ought to have no place in a settlement. Indeed, it should raise eyebrows about the equity and adequacy of the Settlements in their entirety.

14. Injunctive Relief Settlement, Article 9 Section 2 should be eliminated in its entirety. Conforming amendments should be made to remove all references to "any extension" of the Term through the Settlements agreement.

## X.  RELIEF REQUESTED

We respectfully ask that the court grant the relief requested above. For those who opt out of damages classes, there should be no limits or restrictions on their right to sue Defendants for illegal pay-for-play limitations, or for any other relief.

1

2

3    Dated: January 31, 2025                    Respectfully submitted,

4                                                By: _/s/ Patrick A. Bradford_

5                                                Patrick A. Bradford (*pro hac vice* forthcoming)

6                                                Denver Edwards (SBN 268822)
                                                 Panda Kroll (SBN 211877)

7                                                **BRADFORD EDWARDS LLP**

8                                                1150 S. Olive St., 10th Floor
                                                 Los Angeles, CA 90015

9                                                Telephone: (213) 868-3310

10                                               dedwards@bradfordedwards.com
                                                 pkroll@bradfordedwards.com

11                                               pbradford@bradfordedwards.com

12
                                                 *Counsel for Objectors*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OBJECTIONS TO SETTLEMENTS ON BEHALF OF
CERTAIN AFRICAN AMERICAN FORMER D1 NCAA COLLEGE ATHLETES