Rebecca Peterson-Fisher (SBN 255359)
KATZ BANKS KUMIN LLP
235 Montgomery St., Ste. 665
San Francisco, CA 94104
Telephone: (415) 813-3271
Email: peterson-fisher@katzbanks.com

John Clune, (Pending Pro Hac Vice)
Ashlyn L. Hare, (Pending Pro Hac Vice)
HUTCHINSON BLACK AND COOK, LLC
921 Walnut Street, Suite 200
Boulder, CO 80302
Telephone: (303) 442-6514
Email: john.clune@hbcboulder.com
        ashlyn.hare@hbcboulder.com

*Counsel for Objectors*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

|  |  |
|---|---|
| IN RE: COLLEGE ATHLETE NIL LITIGATION | Case No.: 4:20-CV-03919-CW<br><br>**OBJECTION TO AMENDED SETTLEMENT AGREEMENT AND OPPOSITION TO FINAL SETTLEMENT APPROVAL BASED ON FAILURE TO APPLY TITLE IX AND REQUEST TO SPEAK AT APPROVAL HEARING**<br><br>Hon. Claudia Wilken |

# Table of Contents

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 2

    I.    The Objectors ................................................................................ 2

    II.   The Amended Settlement Agreement ............................................ 3

LEGAL STANDARD ........................................................................................... 5

ARGUMENT ........................................................................................................ 5

    I.    The Suggested "But-For" BNIL And ASC Damages Are Fictitious And Would Not Have Been Possible Due To Title IX. .................................. 5

        A.    Title IX Applies to Any Financial Aid and Educational Benefits Provided by or on Behalf of an Institution That Receives Federal Funding. ..................................................... 7

        B.    The Settlement's "BNIL" and "ASC" Damages Violate Title IX Whether Payment Would Have Come from the Schools or the Conferences. ................................................... 10

            *1.*    *The Settlement's suggestion that conferences would have paid the institutions' athletes directly is an impermissible extension of the "but-for world."* ................... 10

            *2.*    *Even if conferences would have paid BNIL to athletes directly, those payments would still be governed by Title IX because the conferences are indirect recipients of federal funding that exercise controlling authority over their member institutions.* ............................................... 12

    II.   The Title IX Release Language Is Unfair To Female Athletes As Legitimate Title IX Claims Exist. .......................................... 14

    III.  Releasing All Institutions From Liability Is Unfair, Unreasonable, And Inadequate As Legitimate Title IX Claims Exist Against Them.......... 15

    IV.  Opting Out Is Not A Viable Alternative Given The Age Of This Case And The Relevant Statutes Of Limitations. .................................... 16

CONCLUSION.................................................................................................... 17

i

1

2

**TABLE OF AUTHORITIES**

3

<u>Cases</u>

4

5

6
*A.B. by C.B. v. Haw. State Dep't of Educ.*, 386 F. Supp. 3d 1352, 1357-58 (D. Haw. 2019) ....................................................................................................................... 12, 13

7
*Anders v. Cal. State Univ.*, No. 1:21-cv-00179, 2021 WL 3115867, at *3 (E.D. Cal. July 22, 2021)................................................................................................................ 8

8

9
*Barrs v. Se. Conf.*, 734 F. Supp. 2d 1229, 1234 (N.D. Ala. 2010) ................................ 10, 12

10
*Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 752 F.2d 802, 812 (3d Cir. 1984) ........... 11

11
*Centaur Classic Convertible Arbitrage Fund Ltd. v. Countrywide Fin. Corp.,* 878 F. Supp. 2d 1009, 1014 (C.D. Cal. 2011) ............................................................................ 16

12
*Cohen v. Brown Univ.*, 1010 F.3d 155, 176 (1st Cir. 1996).................................................. 7

13
*Daniels v. School Board of Brevard County*, 985 F. Supp. 1458, 1462 (M.D. Fla. 1997) . 13

14
*Equity in Athletics, Inc. v. Dep't of Educ.*, 675 F. Supp. 2d 660, 664 (W.D. Va. 2009)....... 9

15
*Grady v. RCM Techs., Inc.*, 671 F. Supp. 3d 1065, 1082 (C.D. Cal. 2023) ......................... 5

16
*Graham v. City of Manassas Sch. Bd.*, 390 F.Supp.3d 702 (E.D. Va. 2019)..................... 16

17
*Grant House v. Nat'l Collegiate athletic Ass'n,* 545 F. Supp 3d 804, 816 (N.D. Cal, 2021) ................................................................................................... 4, 7

18

19
*ICTSI Oregon, Inc. v. Int'l Longshore and Warehouse Union,* No. 3:12-cv-1058-SI, 2022 WL 16924139, at *6 (D. Or. Nov. 14, 2022) ..................................................... 7, 10

20
*In re Stable Rd. Acquisition Corp.*, No. 2:21-CV-5744-JFW(SHKX), 2024 WL 3643393, at *3 (C.D. Cal. Apr. 23, 2024.) ............................................................................ 15

21

22
*Kane v. Mount Pleasant Cent. Sch. Dist.*, 80 F.4th 101 (2023) ......................................... 16

23
*Litton Systems v. American Telephone and Telegraph Co.,* 700 F.2d 785, 822–23 (2d Cir. 1983) ...................................................................................... 11

24
*Mansourian v. Regents of Univ. of California*, 602 F.3d 957, 964 (9th Cir. 2010) ............. 8

25
*NCAA v. Smith,* 525 U.S. 459, 461 (1999) ....................................................................... 12

26

ii

27

28

OBJECTION TO AMENDED SETTLEMENT AGREEMENT AND OPPOSITION TO FINAL
SETTLEMENT APPROVAL BASED ON VIOLATIONS OF TITLE IX AND REQUEST TO
SPEAK AT APPROVAL HEARING
CASE NO. 4:20-CV-03919-CW

*Officers for Justice v. Civ. Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982) (citing Fed. R. Civ. P. 23(e)) ........................................................................ 5

*Ploeger v. Tr. of Univ. of Pa.*, 653 F.Supp.3d 188, 199 ............................................... 16

*Williams v. Bd. of Regents of Univ. Sys. of Georgia,* 477 F.3d 1282, 1294 (11th Cir. 2007) ........................................................................................ 13

## Other Authorities

120 Cong. Rec. 15,322 (1974) ...................................................................................... 9

20 U.S.C. § 1681 ..................................................................................................... 7, 14

Civil Rights Restoration Act of 1987, Pub. L. No. 100-259 (102 Stat. 28) .................. 9

Justine S. Hastings & Michael A. Williams, *What is a "But-for" World?,* 31 ANTITRUST 102, 102 (Fall 2016) ...................................................................................... 10

## Rules

34 C.F.R. § 106.2 ....................................................................................................... 12

34 C.F.R. § 106.31(b)(2), (6) ...................................................................................... 8

34 C.F.R. § 106.37 .................................................................................................... 7, 8

34 C.F.R. 106.41(c) ..................................................................................................... 7

Federal Rule of Civil Procedure 23(e) ...................................................................... 1,5

## Regulations

44 Fed. Reg. 71,415 (Dec. 11, 1979) ........................................................................ 10

OBJECTION TO AMENDED SETTLEMENT AGREEMENT AND OPPOSITION TO FINAL
SETTLEMENT APPROVAL BASED ON VIOLATIONS OF TITLE IX AND REQUEST TO
SPEAK AT APPROVAL HEARING
CASE NO. 4:20-CV-03919-CW

# INTRODUCTION

Pursuant to Fed. R. Civ. P. 23(e), Kacie Breeding, Eden Hardy, Hannah Taylor, Alexis Drumm, Emmie Wannemacher, Savannah Baron, Riley Haas, Emma Appleman, Kate Johnson and Elizabeth Arnold ("Objectors"), by and through their undersigned counsel Hutchinson Black and Cook, LLC and Katz Banks Kumin LLP, hereby submit this objection opposing final approval of the Amended Stipulation and Settlement Agreement (the "Settlement").  ECF No. 535-1.  Objectors are ten current and former Division I athletes and members of the Additional Sports Class who will be grossly undercompensated due to the Settlement's fundamentally flawed damages calculations that failed to apply Title IX.  Specifically, Objectors maintain that the Settlement's "but for" damages could not have been paid to the athletes as suggested due to Title IX regulations requiring proportionate distribution of benefits and financial aid to male and female athletes.

Plaintiffs' counsel has asserted that Title IX does not and could not apply to the Settlement damages, where over 90% of the damages would be paid to male athletes, because allegedly 1) Title IX does not apply to damages in an antitrust case based upon NCAA and conference rules, and 2) those entities are not required to follow Title IX.  Tr. of Videoconference Proceedings at 31:8-17 (Sept. 5, 2024).  Yet the question is not only whether Title IX applies to the Settlement distribution, but whether Title IX impacts the amount of damages class members would have incurred.  This Objection argues that for the two categories of damages that would have been paid by either the schools or conferences but-for the unlawful restraint on athlete earnings, the Broadcast NIL ("BNIL") and Athlete Services Compensation ("ASC") damages, Title IX would have prevented the athletes from ever incurring such disproportionate damages in the first place and, as such, the damages calculations are grossly inaccurate.

Both the BNIL and ASC damages analyses are predicated on the mistaken assumption that the schools would have paid athletes in some proportion to the media market value of the individual sport in which each athlete participates.  However, these calculations are amiss, as any payments

1

made to class members for BNIL and ASC damages would have been required to be made proportionately to male and female athletes due to Title IX. The result is that most female athletes will take home a meager $125 per year of eligibility, while male athletes will be given tens if not hundreds of thousands of dollars. Accordingly, Objectors ask the court to reject the Settlement as proposed based upon its critically flawed damage calculations or, alternatively, to require the Parties to submit a revised settlement allocation formula consistent with the mandate of Title IX and this Objection.

## BACKGROUND

### I.      The Objectors

- Kacie Breeding was a cross county and track and field athlete competing for the Southeastern Conference's Vanderbilt University from the fall of 2016 to the Spring of 2020. Ms. Breeding has filed a claim and is estimated to receive $188 in ASC. Her NCAA Eligibility ID is 1311528533.

- Eden Hardy was a soccer player at the University of Oregon in the Pac-12 Conference from the summer of 2017 until December 2021. Ms. Hardy's eligibility number was not available but she will supplement this filing.

- Hannah Taylor was a soccer player at the University of Oregon in the Pac-12 Conference from the summer of 2017 until June 2021. Ms. Taylor's estimate was unavailable. Her NCAA Eligibility ID is 1411923749.

- Kate Johnson is a volleyball player at the University of Virginia in the Atlantic Coast Conference from the fall of 2022 to the present. Ms. Johnson's estimate was unavailable. Her NCAA eligibility number is 1903443501.

- Lexi Drumm is a soccer player competing for the College of Charleston from 2021 to the present. Ms. Drumm has filed a claim and is estimated to receive $426 in ASC. Her NCAA Eligibility ID is 2008903787.

2

- Emmie Wannemacher is a soccer player competing for the College of Charleston from 2021 to the present. Ms. Drumm has filed a claim and is estimated to receive $456 in ASC. Her NCAA Eligibility ID is 2008904246.

- Savannah Baron is a soccer player competing for the College of Charleston from 2021 to the present. Ms. Drumm has filed a claim and is estimated to receive $456 in ASC. Her NCAA Eligibility ID is 2001782845.

- Riley Haas is a soccer player who competed for the College of Charleston from 2020-2024. Ms. Haas has filed a claim and is estimated to receive $312.57 in ASC. Her NCAA eligibility number is 1811344623.

- Emma Appleman is a volleyball player who competed for the College of Charleston from 2021 to the present. Ms. Appleman has filed a claim and is estimated to receive $426 in ASC. Her NCAA eligibility number is 1906611343.

- Elizabeth Arnold is a soccer player competing for the College of Charleston from 2023 to the present. Ms. Arnold has filed a claim and is estimated to receive $222 in ASC. Her NCAA Eligibility ID is 2201426913.

## II.     The Amended Settlement Agreement

The Settlement in this matter is broken into two primary categories: 1) a past damages settlement for monies owed to athletes for restricting their right to earn money; and 2) future injunctive relief providing a method for the schools to share revenue with athletes for use of their Name Image and Likeness ("NIL") rights. Though Objectors' arguments here will apply equally to any future payments pursuant to the injunctive portion of the Settlement, this Objection itself is limited to the past damages. The past damages are comprised of three types of NIL damages totaling $1.976 billion: 1) Video Game NIL ("VNIL") in an amount of $71.5 million, 2) Broadcast NIL ("BNIL") in amount of $1.815 billion, and 3) Lost NIL Opportunities in an amount of $89.5 million, as well as a separate category of non-NIL damages in the amount of $600 million called Athlete

3

Services Compensation ("ASC"), which represents money damages for the athletes labor services to the institutions. This Objection pertains to the "BNIL" damages and the "ASC" damages only.[1]

According to Plaintiff's economist, Daniel Rascher, the Settlement suggests that "BNIL" damages represents money owed to the athletes for the use of their NIL rights in broadcasts of the schools' athletic competitions. Decl. of Daniel A. Rascher, ECF No. 450-4 ¶ 26. The Settlement's $1.815 billion in BNIL damages pays 90%, or roughly $1.63 billion, to the Football and Men's Basketball Class. The compensation for BNIL varies by conference based on each conference's respective revenue and is then disbursed on a pro rata basis to athletes according to their sport. *See* Decl. of Daniel A. Rascher, ECF No. 450-4 ¶ 26.[2] Other than 5% of BNIL damages going to female basketball players, remaining female athletes are collectively being paid nothing out of the $1.815 billion for BNIL settlement damages as "they add little to no value." Decl. of Daniel A. Rascher, ECF No. 450-4 ¶ 25 n. 11.

The "ACS" damages category is compensation from schools to its athletes in a but-for world where a labor market existed to pay athletes for their work on behalf of their schools. Mr. Rascher's declaration proposes the same percentage distribution for ASC without any rationale other than the fact that it is his understanding that these damages should be divided similarly to the other damage classes: "I further understand that the proposed allocation across settlement damage classes provides 5% to the Additional Sports settlement damage class and 95% distributed in a ratio of 75/15/5 to athletes across the three sports (football, men's basketball, and women's basketball) in the other two

---

[1] Arguably, "Lost NIL" and "VNIL" damages represent money that would have been paid directly by third parties (such as private retailers and EA Sports) to the class members but-for the unlawful restraint on earning. Those amounts, though perhaps also unfair and unreasonable for other reasons, are not the subject of this Objection.

[2] In reality, the BNIL damages class functions more like money paid to athletes as a cut of the school's profit off of that athlete's individual sport rather than NIL value. Football players who never played a minute in a game or even suited up in the given year will still get a far larger share of money than even the highest profile female Additional Sports Class members. *See* Ex. A, Decl. of Andrew Zimbalist Regarding the Settlement in *House v. NCAA.*

4

settlement damage classes." Decl. of Daniel A. Rascher, ECF No. 450-4 ¶ 48. Thus, without any analysis, the proposed distribution of ASC is the same as BNIL with 75% to Football, 15% to Men's Basketball, 5% to Women's Basketball, and 5% to the Additional Sports Class. Under this category, some male athletes could be paid over $15,000 while most female athletes will likely earn only $125. Decl. of Daniel A. Rascher, ECF No. 450-4 ¶¶ 61, 81.

## LEGAL STANDARD

Federal Rule of Civil Procedure 23(e) requires judicial review and approval of any class settlement. *See* Fed. R. Civ. P. 23(e) ("The claims, issues, or defenses of a certified class—or a class proposed to be certified for purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the court's approval.") In order to pass muster for final approval, a class action settlement must be "fair, reasonable, and adequate to all concerned." *Officers for Justice v. Civ. Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982) (citing Fed. R. Civ. P. 23(e)). To make this determination, courts consider several factors, including whether "the class representatives and class counsel have adequately represented the class" and whether "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2). Additionally, the court must evaluate whether the scope of the release may impact class members differently, which could influence the distribution of relief. *Grady v. RCM Techs., Inc.*, 671 F. Supp. 3d 1065, 1082 (C.D. Cal. 2023) (quoting Fed. R. Civ. P. 23(e)(2)(D) advisory committee's note to 2018 amendment).

## ARGUMENT

**I.      The Suggested "But-For" BNIL And ASC Damages Are Fictitious And Would Not Have Been Possible Due To Title IX.**

This Settlement suffers from a mistaken assumption that schools or conferences would have paid athletes of the same institution widely varying amounts of money in proportion to their

5

individual sport's market value contribution to the schools' media rights revenue.[3] Daniel Rascher, with reliance on information from Plaintiffs' media expert Ed Desser, determined the allocation of the Gross Settlement Fund. Notably, both Mr. Desser and Mr. Rascher acknowledge that they were not asked to consider the application of Title IX in their opinions. *See* Defs.' Joint Opp'n to Pls.' Motion for Class Certification, ECF. No 249 at 15-16 ("Neither Desser nor Rascher considered Title IX."); Videotaped Dep. of Edwin Desser, ECF No. 251-6 at 64:9–15 (Title IX considerations are not "within what [he] was assigned to work on"); Dep. of Daniel Rascher, ECF No. 251-7 at 111:19–21 (Rascher has not "tried to account for Title IX in any of [his] damages models in this case."). Had the Settlement applied Title IX, the damages to the athletes would have necessarily been compliant with federal anti-discrimination law and made in proportion by gender.

Put simply, Rascher's analysis based on market value is fundamentally flawed because the damages he valued are athletic benefits and/or financial aid under Title IX and thus not subject to a market value analysis. For an antitrust settlement paying out past "but-for" damages owed to students from their institution or conference, all other laws, including Title IX, must apply when calculating those claimed losses. Prior to reaching a settlement, the Conferences and NCAA wholeheartedly agreed. "The gaping disparity yielded by Plaintiffs' BNIL injury and damages formula violates Title IX—and does so in a way that cannot be solved." Defs.' Joint Opp'n to Pls.' Motion for Class Certification, ECF. No 249 at 16. Counsel for Plaintiffs have been equally circumspect, stating to the media, "We told the court well, we don't think Title IX applies because in our world, this is money that goes to the conferences. And then the conferences are allowing schools to pay it, so it's not directly from schools. Not sure that argument is now going to fly given

---

[3] Though this issue was addressed in cursory fashion in the Plaintiff's Motion for Class Certification and the Court's order granting that motion, the issue requires deeper analysis for Settlement approval as acknowledged by Plaintiffs' counsel. "[Title IX] is just another argument that goes to the ultimate merits and is totally unrelated to class certification." Pls.' Reply Mem. in Supp. of Mot. for Class Certification, ECF No. 598-3 at 18.

OBJECTION TO AMENDED SETTLEMENT AGREEMENT AND OPPOSITION TO FINAL
SETTLEMENT APPROVAL BASED ON VIOLATIONS OF TITLE IX AND REQUEST TO
SPEAK AT APPROVAL HEARING
CASE NO. 4:20-CV-03919-CW

the structure." Kristi Dosh, *10 Things to Know About The NCAA's House Settlement*, FORBES (May 24, 2024, 6:07 PM), https://www.forbes.com/sites/kristidosh/2024/05/24/10-things-to-know-about-the-ncaas-house-settlement/ (quoting Plaintiffs' counsel, Steve Berman). For the following reasons, that argument, in fact, does not fly.

**A.    Title IX Applies to Any Financial Aid and Educational Benefits Provided by or on Behalf of an Institution That Receives Federal Funding.**

The proposed settlement ignores Title IX's application to the but-for damages analysis. In antitrust litigation, the "but-for" framework is utilized to calculate the damages owed to members of a class based upon the earnings they would have made but-for the unlawful conduct of the Defendants. *Grant House v. Nat'l Collegiate athletic Ass'n,* 545 F. Supp 3d 804, 816 (N.D. Cal, 2021) ("A plaintiff can show that it was injured in fact by alleging that it was deprived of the opportunity to receive compensation it otherwise would have received but for the challenged conduct."); *see also ICTSI Oregon, Inc. v. Int'l Longshore and Warehouse Union,* No. 3:12-cv-1058-SI, 2022 WL 16924139, at *6 (D. Or. Nov. 14, 2022) ("The "but-for world" is necessary to calculate damages here and is not used in causation. The real world is required for causation and is the comparator against the "but-for-word" in calculating damages.").

Title IX provides that "[n]o person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX's implementing regulations mandate that schools provide equal opportunities for their athletes regardless of sex. 34 C.F.R. 106.41(c). Though the opportunities need not be identical, they must be generally proportionate to the gender composition of the student body. *See* 34 C.F.R. § 106.37(c); *Cohen v. Brown Univ.*, 1010 F.3d 155, 176 (1st Cir. 1996). Where a school provides financial assistance to its athletes, such assistance must be in proportion to the number of students of each sex participating in the institution's athletic programs. 34 C.F.R. § 106.37(c)(1). The federal

7

regulations governing Title IX's requirements for equal benefits, opportunities and financial assistance unambiguously prohibit disproportionate payments on the basis of sex:

Except as provided in this subpart, in providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex:

(2) Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner;

AND

(6) Aid or perpetuate discrimination against any person *by providing significant assistance to any agency, organization, or person which discriminates on the basis of sex in providing any aid, benefit or service to students or employees.*

34 C.F.R. § 106.31(b)(2), (6) (emphasis added).

Except as provided in paragraphs (b) and (c) of this section, in providing financial assistance to any of its students, *a recipient shall not*:

(1)    On the basis of sex, *provide different amount or types of such assistance, limit eligibility for such assistance which is of any particular type or source, apply different criteria,* or otherwise discriminate;

(2) Through solicitation, listing, approval, provision of facilities or other services, *assist any foundation, trust, agency, organization, or person which provides assistance to any of such recipient's students in a manner which discriminates on the basis of sex.*

34 C.F.R. § 106.37 (emphasis added).

The regulations require educational institutions receiving federal funds to provide members of both sexes equal athletic financial assistance and equal athletic opportunity. *Anders v. Cal. State Univ.*, No. 1:21-cv-00179, 2021 WL 3115867, at *3 (E.D. Cal. July 22, 2021). Courts have similarly held that Title IX's "equal treatment" standard requires "equivalence in the availability, quality and kinds of other athletic benefits and opportunities provided male and female athletes." *Mansourian*

8

*v. Regents of Univ. of California*, 602 F.3d 957, 964 (9th Cir. 2010).

Moreover, despite what Mr. Rascher's damages allocation suggests, there is no exception to Title IX for revenue-generating sports. Though there have long been attempts to carve out special treatment for football and men's basketball, those efforts have been repeatedly quashed. In 1974, Senator John Tower attempted an amendment to Title IX's implementing regulations to exempt "revenue producing sports." *Equity in Athletics, Inc. v. Dep't of Educ.*, 675 F. Supp. 2d 660, 664 (W.D. Va. 2009). The proposed amendment stated that Title IX "shall not apply to an intercollegiate athletic activity to the extent that such activity does or may provide gross receipts or donations to the institution necessary to support that activity." 120 Cong. Rec. 15,322 (1974). In other words, Senator Tower wanted revenue producing sports to be able to keep the money they produced for themselves. Congress flatly rejected both the Senator's first and second proposals and each died in committee. *Id.* In 1987 Congress spoke again, making clear that Title IX applies to all programs under a federal funding recipient, including athletics. *See* Civil Rights Restoration Act of 1987, Pub. L. No. 100-259 (102 Stat. 28). No existing case law or statute holds otherwise.

Here, the Settlement proposes that schools or conferences would have shared $1.815 billion from its media rights deals and distributed at least 90% of the money to male athletes and at least 5% of the remainder to female athletes without any consideration as to whether such a historical but-for payment would have been permissible under Title IX. Instead, the Settlement reflects an analysis that relies on the market value of the relative sports. But federal funding recipients are not private corporations, and behaviors that may be appropriate in a professional sports league are not permissible for federal funding recipients subject to federal civil rights laws. Whether described as benefits or financial aid, payment to athletes by or on behalf of schools must be proportionate to the number of athletes by gender at the institution in order to accurately calculate the damages athletes would have earned but for the Defendants' unlawful conduct.

The Department of Education recently agreed: "When a school provides athletic financial

9

assistance in forms other than scholarship or grants, including compensation for the use of a student athletes NIL, such assistance must also be made proportionally available to male and female athletes." U.S. Dep't of Educ. Off. For Civ. Rights, Fact Sheet: Ensuring Equal Opportunity Based on Sex in School Athletic Programs in the Context of Name, Image, and Likeness (NIL) Activities, (citing Title IX and Intercollegiate Athletics, 44 Fed. Reg. 71,415 (Dec. 11, 1979) ("When financial assistance is provided in forms other than grants, the distribution of non-grant assistance will also be compared to determine whether equivalent benefits are proportionately available to make and female athletes.")). Conversely, there is no authority to suggest that Title IX would not apply to these payments to the athletes.

**B.** **The Settlement's "BNIL" and "ASC" Damages Violate Title IX Whether Payment Would Have Come from the Schools or the Conferences.**

There can be no dispute that the ASC payments are school money paid by the schools directly to their athletes. As such, Title IX's application to those payments is unequivocal. With regard to BNIL, Plaintiffs' counsel asserts that those damages do not implicate Title IX because the money would have been paid by the conferences, despite the fact that conferences have never directly been involved with financial aid or benefits provided to athletes. This suggested "but-for world" has no credible basis. It is merely an attempt to avoid a Title IX roadblock to the settlement. Moreover, the BNIL damages implicate Title IX regardless of whether they would have been paid by the schools or the conferences because the conferences are also subject to Title IX here, both as indirect recipients of federal funding and through their exercise of controlling authority over their member institutions, who are recipients of federal funding. *See Barrs v. Se. Conf.*, 734 F. Supp. 2d 1229, 1234 (N.D. Ala. 2010). Thus, Mr. Rascher's declaration envisions a but-for world of vastly disproportionate damages to male and female athletes that can not pass muster under Title IX.

*1.* *The Settlement's suggestion that conferences would have paid the institutions' athletes directly is an impermissible extension of the "but-for world."*

10

As an initial matter, Mr. Rascher's conclusion that in a but-for world, conferences would have, for the first time ever, provided financial aid and educational benefits *directly* to the athletes at their member institutions exceeds the scope of the but-for analysis. See *ICTSI Oregon, Inc.*, 2022 WL 16924139, at *8 (citing Justine S. Hastings & Michael A. Williams, *What is a "But-for" World?*, 31 ANTITRUST 102, 102 (Fall 2016) ("[T]he but-for world differs from what actually happened *only with respect to the harmful act*, that is, the but-for world holds all other factors except one—the alleged conduct—the same in order to measure what [profits] would have been but for the alleged conduct.")) (emphasis added). "It requires consideration of actual real-world conditions during the entire damages period, with the only fantastical element being that the unlawful conduct did not occur." *Id.*  See also *Litton Systems v. American Telephone and Telegraph Co.,* 700 F.2d 785, 822–23 (2d Cir. 1983); *Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 752 F.2d 802, 812 (3d Cir. 1984) (highly speculative predictions of a but-for world are impermissible).  The parties cannot create a fantasy but-for world that changes additional real-world conditions.

Conferences have stated in this litigation that they do not provide and have never provided benefits or financial aid to athletes.  ECF 249 at 13. Joint Opposition to Plaintiff's Motion for Class Certification.  ("[T]here is nothing to support such a payment model. Schools, not conferences, compete with each other in recruiting, and schools, not conferences, decide what amount of scholarship aid to give to individual students.") *Id*. Schools have always been the provider of educational and financial benefits to their athletes.  Thus, this Settlement asks the Court to remove not only the unlawful restraint, but then to manufacture a "fantastical" damages model in which conferences, not schools, would provide aid and benefits for athletes.  Such a proposal plainly violates permissible methodology for calculating "but-for" damages and disregards the fundamental and historical process for how schools provide benefits to students.  Indeed, even the current operative Complaint filed after the Notice of Settlement blurs the line between conference and school BNIL money alleging that the class members: "On behalf of the previously certified Football

OBJECTION TO AMENDED SETTLEMENT AGREEMENT AND OPPOSITION TO FINAL
SETTLEMENT APPROVAL BASED ON VIOLATIONS OF TITLE IX AND REQUEST TO
SPEAK AT APPROVAL HEARING
CASE NO. 4:20-CV-03919-CW

and Men's Basketball Class, as amended herein. Plaintiffs seek the compensation that class members would have received *from their schools or conferences* absent Defendants' unlawful restraints on pay-for-play compensation, a share of game telecast revenue and compensation that these class members would have received from their schools or conferences for their Broadcast NILs ("BNIL"). Third Amended Complaint, ECF No. 533-1 ¶ 9 (emphasis added).  The assumption that conferences would have paid athletes for BNIL directly seems to serve little purpose other than to address a Title IX challenge to this settlement.

  2. *Even if conferences would have paid BNIL to athletes directly, those payments would still be governed by Title IX because the conferences are indirect recipients of federal funding that exercise controlling authority over their member institutions.*

  Title IX's prohibition against discrimination on the basis of sex applies to BNIL payments made by the conferences because they are indirect recipients of federal funding from their members institutions, and the schools have ceded controlling authority over their athletic programs to the conference.  A federal funding recipient is defined as, "[A]ny State or political subdivision thereof, or any instrumentality of a State or political subdivision thereof, any public or private agency, institution, or organization, or other entity, or any person, to whom Federal financial assistance is *extended directly or through another recipient* and which operates an education program or activity which receives such assistance, including any subunit, successor, assignee, or transferee thereof." 34 C.F.R. § 106.2.  Courts have found that athletic associations—including the Southeastern Conference (the "SEC"), a Defendant in this case—are subject to Title IX when they exercise controlling authority over federal funding recipients.[4]  In *Barrs v. Southeastern Conference*, the

_____

[4] Title IX's application to the conferences (and even the NCAA) is not foreclosed by *NCAA v. Smith*, which found that membership dues were insufficient to establish federal funding under Title IX, but expressly declined to consider the arguments that the schools had ceded controlling authority over federally funded programs to the NCAA, or the NCAA indirectly or directly received federal funding because they were not raised in the trial court. 525 U.S. 459, 461 (1999).

court held that the plaintiffs had plausibly stated a Title IX claim against the SEC where the conference was alleged to have ceded control over portions of the schools' athletic programs. 734 F. Supp. 2d at 1234; *see also A.B. by C.B. v. Haw. State Dep't of Educ.*, 386 F. Supp. 3d 1352, 1357-58 (D. Haw. 2019) (collecting cases recognizing the controlling authority rule).

Where, as is the case here, the conferences control institutions' rulemaking, tournament schedules, publicity, promotion and, (as proposed) even distribution of financial benefits to a school's athletes, the conferences invariably exercise controlling authority over school programs and are subject to Title IX's anti-discrimination mandate. *See A.B. by C.B.*, 386 F. Supp. 3d at 1358; *see also Williams v. Bd. of Regents of Univ. Sys. of Georgia,* 477 F.3d 1282, 1294 (11th Cir. 2007). Notably, in the context of BNIL payments, a conference could not permissibly distribute broadcasting revenue from its media rights deal—money that ordinarily passes to the schools— directly to the conference's athletes without authorization from its member institutions. *See, e.g.*, Southeastern Conference Constitution & Bylaws (2024) (requiring a vote by the institutions to amend the breakdown on the allocation of media rights revenue to schools). Thus, the result of the parties' suggestion that conferences would have paid BNIL to the class members is simply a shift of controlling authority over athletic payments from the schools to the conferences, thereby implicating the conferences under Title IX.

Title IX cannot be avoided by a mere accounting exercise. Passing the checkbook, and the money, from the institution to the institution-controlled conference does not change Title IX's equity obligation to athletes. *Williams*, 477 F.3d at 1294 (11th Cir. 2007) ("We are persuaded . . . by the analysis of the Western District of Michigan, noting that if we allowed funding recipients to cede control over their programs to indirect funding recipients but did not hold indirect funding recipients liable for Title IX violations, we would allow funding recipients to receive federal funds but avoid Title IX liability."). Moreover, where federal funding recipients acquiesce to a funding system that results in inequitable distribution of benefits, they too are individually liable. *Daniels v. School*

13

1  *Board of Brevard County*, 985 F. Supp. 1458, 1462 (M.D. Fla. 1997) ("This funding system is one

2  to which the Defendant has acquiesced; Defendant is responsible for the consequences of that

3  approach."). The Conferences agree: "There is no basis to ignore Title IX requirements, gender

4  equity considerations, or multiple state laws which outright prohibit conferences (and institutions)

5  from making BNIL payments to student-athletes." Defs.' Joint Opp'n to Pls.' Mot. for Class

6  Certification, ECF No. 249 at 24.

7  Accordingly, this Court must reject the Settlement because the proposed damages for BNIL

8  and ASC—which combined total approximately $2.415 of the Settlement's past damages—could

9  never have been distributed so grossly and inequitably to male and female athletes in violation of

10  Title IX.

11  **II.    The Title IX Release Language Is Unfair To Female Athletes As Legitimate Title**

12  **IX Claims Exist.**

13  At the preliminary approval hearing, this Court expressed concerns regarding a lack of

14  clarity around whether class members are waiving Title IX claims and asked the parties to address

15  those concerns. The parties essentially responded that Title IX is not affected by the Settlement or

16  its releases. Plaintiffs' counsel assured the Court that there were no Title IX implications:

17  With respect to Title IX, there is no disagreement about this and it has to do with the release

18  language. The release language is of NCAA rules. NCAA rules cannot be a Title IX violation. What

19  could be a Title IX violation is the decisions by individual schools as to how or not they pay out

20  future benefits or money so there's nothing that releases that at all in the agreement at all. There is

21  no release of any individual school conduct for anything in the current releases or settlement

22  agreement. *So, Title IX is completely preserved.*

23  Tr. of Videoconference Proceedings at 31:8-17 (Sept. 5, 2024) (emphasis added). But the

24  NCAA had a less assuring response:

25

26  14

27

I'm not sure I agree with it precisely as Mr. Kessler put it. There are release provisions that apply to individual institutions for the claims that we discussed. But if the question is as relates to *future* Title IX liability, that's not something we are releasing through the settlement.

Tr. of Videoconference Proceedings at 33:25-34:5 (Sept. 5, 2024) (emphasis added).

Following the hearing, the parties submitted a revised motion for settlement approval as well as an amended Settlement Agreement. The revised Settlement Agreement only somewhat clarified the claims released. That language now reads that "Unreleased Claims" include "Claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., *other than any claims arising out of or relating to the distribution of the Gross Settlement Fund.*" (emphasis added). Am. Stipulation and Settlement Agreement, ECF No. 535-1 at 15. That means claims contesting the distribution of the settlement fund must be waived by anyone participating in the settlement. It is worth noting that Title IX—the claim that is allegedly "completely preserved"—is the only claim in the entire Settlement that includes this extra release language.

Regardless, such a release is inappropriate here given the rather large Title IX problems in the damages assessment discussed above. And if Title IX is truly not being implicated as represented, then the parties should have no concern about removing that extraneous language.

**III.    Releasing All Institutions From Liability Is Unfair, Unreasonable, And Inadequate As Legitimate Title IX Claims Exist Against Them.**

Though not parties to the litigation, the Settlement improperly releases all 365 Division I institutions from any claims that could have been brought in the litigation along with *any claims arising out of or relating to the distribution of the Gross Settlement Fund*. Whether or not such a release of non-parties is permissible in the Ninth Circuit is contingent upon whether the claims against a third party arise from the same operative facts and theories at issue in the litigation. *In re Stable Rd. Acquisition Corp.*, No. 2:21-CV-5744-JFW(SHKX), 2024 WL 3643393, at *3 (C.D. Cal. Apr. 23, 2024.). However, here, the facts and theories of liability carry a significant distinction.

As stated above, the money payments that constitute the but-for damages are school money merely withheld from its normal distribution to the conferences. And though conferences may dispute whether Title IX applies to them, there is no question that it applies to the schools that directly receive significant federal funding. As such, legitimate related antitrust and Title IX claims may exist against the non-party schools for their part in both the antitrust scheme as well as this discriminatory damage analysis and distribution of the gross settlement fund. Accordingly, Title IX claims against the non-party schools must be preserved.

**IV.    Opting Out Is Not A Viable Alternative Given The Age Of This Case And The Relevant Statutes Of Limitations.**

For many class members, this litigation may be their only opportunity to recover their proportionate share of past NIL damages. The Plaintiffs themselves have recognized that there is historical discrimination against women that is reflected in their disproportionately low damages as calculated in this settlement. Plaintiffs' counsel acknowledged as much and suggested that claims regarding the inherent discrimination against women in collegiate sports might be brought in another forum: "I'm deeply sympathetic to sex discrimination claims. That's not what our damages address. That's not what our antitrust claims address. It is not an antitrust violation to engage in sex discrimination. It may violate Title IX or some other discrimination law, none of which are released. And so, if there are damages claims for that, they should be asserted by someone in some other forum." Tr. of Videoconference Proceedings at 36:17-24 (Sept. 5, 2024).

However, at this late date, only the class members who competed in the most recent years of the classes may be able to bring claims. Though the filing of this matter is likely to toll antitrust claims similar to the ones brought here, that is likely not the case for Title IX claims. *See Centaur Classic Convertible Arbitrage Fund Ltd. v. Countrywide Fin. Corp.,* 878 F. Supp. 2d 1009, 1014 (C.D. Cal. 2011) (where a class member relies on the filing of a class action to vindicate their rights, the statute of limitations may be tolled for separate filing of the same claims). Since Title IX does

16

not have its own statute of limitations, it instead borrows a state's most applicable statute, and most states apply a two- or three-year statute of limitations. *See, e.g., Kane v. Mount Pleasant Cent. Sch. Dist.*, 80 F.4th 101 (2023) (applying New York's three-year statute of limitations for non-specified personal injury claims to claims brought under Title IX), *Ploeger v. Tr. of Univ. of Pa.*, 653 F.Supp.3d 188, 199 ("Under Pennsylvania law, Title IX claims are governed by a two-year statute of limitations."), *Graham v. City of Manassas Sch. Bd.*, 390 F.Supp.3d 702 (E.D. Va. 2019) (applying Virginia's two-year statute of limitations period for personal injury actions to Title IX claims). Many female class members who may have relied on the filing of this lawsuit to vindicate their claims, who will only now find out that their damages are being deeply discounted based upon discriminatory factors, will be out of time. Since their claims to address these deficient damages are based on Title IX, their statute of limitations has likely run.

## CONCLUSION

The parties ask this Court to approve a Settlement where over 90% of the damages will go to men's athletes in a manner that is unfair, inadequate, and unreasonable. For the BNIL and ASC damages in particular, that damages allocation plainly ignores that schools and conferences could never have paid male and female athletes in disproportionate amounts without violating Title IX. Accordingly, on behalf of themselves and all other female athletes given short shrift under this Settlement, Objectors ask this Court to reject the Settlement.


Dated January 31, 2025

By: */s/ John Clune*
John Clune (Pending Pro Hac Vice)
Ashlyn L. Hare (Pending Pro Hac Vice)
HUTCHINSON BLACK AND COOK
912 Walnut Street, Ste. 200
Boulder, CO 80302
Email: john.clune@hbcboulder.com
        Ashlyn.hare@hbcboulder.com
Telephone: (303) 442-6514

17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Rebecca Peterson-Fisher (SBN 255359)
KATZ BANKS KUMIN LLP
235 Montgomery St., Ste. 665
San Francisco, CA 94104
Email: peterson-fisher@katzbanks.com
Telephone: (415) 813-3271

*Counsel for Objectors*

18

**FILER'S ATTESTATION**

I, John Clune, am the ECF user whose identification and password are being used to file **OBJECTION TO AMENDED SETTLEMENT AGREEMENT AND OPPOSITION TO FINAL SETTLEMENT APPROVAL BASED ON FAILURE TO APPLY TITLE IX AND REQUEST TO SPEAK AT APPROVAL HEARING.** In compliance with Local Rule 5-1(h)(3), I hereby attest that all signatories hereto concur in this filing.

By: _/s/ John Clune_
John Clune

OBJECTION TO AMENDED SETTLEMENT AGREEMENT AND OPPOSITION TO FINAL
SETTLEMENT APPROVAL BASED ON VIOLATIONS OF TITLE IX AND REQUEST TO
SPEAK AT APPROVAL HEARING
CASE NO. 4:20-CV-03919-CW