Rebecca Peterson-Fisher (SBN 255359)
KATZ BANKS KUMIN LLP
235 Montgomery St., Ste. 665
San Francisco, CA 94104
Telephone: (415) 813-3271
Email: peterson-fisher@katzbanks.com

John Clune, (Pending Pro Hac Vice)
Ashlyn L. Hare, (Pending Pro Hac Vice)
HUTCHINSON BLACK AND COOK, LLC
921 Walnut Street, Suite 200
Boulder, CO 80302
Telephone: (303) 442-6514
Email: john.clune@hbcboulder.com
        ashlyn.hare@hbcboulder.com

*Counsel for Objectors*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

IN RE: COLLEGE ATHLETE NIL
LITIGATION

Civil Action No.: 4:20-CV-03919-CW

**DECLARATION OF ANDREW ZIMBALIST REGARDING THE SETTLEMENT IN *HOUSE ET AL. V. NCAA ET AL.***

**JANUARY 30, 2025**

Hon. Claudia Wilken

I.        Introduction

My name is Andrew Zimbalist.  I am the Robert A. Woods Professor Emeritus of Economics at Smith College in Northampton, Massachusetts.  I received my B.A. in Economics from the University of Wisconsin-Madison in 1969 and my M.A. and Ph.D. in Economics from Harvard University in 1972 and 1974, respectively.  I have served as a visiting professor at Doshisha University in Kyoto, Japan, the University of Geneva in Geneva, Switzerland, and Hamburg University in Hamburg, Germany.  I have studied and consulted extensively within the intercollegiate and professional sports industry for leagues, teams, players' associations, governments, citizen groups, and athletes for over thirty-three years.  I have published twenty-eight books and dozens of articles in the fields of sports economics, comparative economic systems and development economics.  Among my books are five on the economics of college sports, including one entitled *Equal Play: Title IX and Social Change*.  I am a founding member and serve on the editorial board of the *Journal of Sports Economics*.  I have served as an expert witness and consultant in several dozen sports industry cases and given testimony in over twenty-five cases.

II.    Opinions

I have been asked to opine on the following in this matter:   1) the aggregate damage calculations that would have made up the gross settlement distribution had Title IX been appropriately considered, and 2) whether the damages labeled BNIL are actual Name, Image, and Likeness damages.  While many elements of the damages model and results presented by Dr. Daniel Rascher in *House* are presented with proper methodology and rigorous reasoning, the conclusions reached suffer from two fatal conceptual flaws.  The first and most basic flaw is that Dr. Rascher's declaration misconstrues what constitutes an antitrust damage.

An antitrust damage occurs when an illegal restraint of trade precludes a benefit

DECLARATION OF ANDREW ZIMBALIST REGARDING THE SETTLEMENT
IN *HOUSE ET AL. V. NCAA ET AL.*
JANUARY 30, 2025

accruing to a plaintiff that otherwise would have accrued absent the illegal restraint. Stated differently, in the but-for world where no restraint took place, the plaintiff would have received more compensation than he or she did in practice. The difference between these two levels of compensation constitutes antitrust damages.

With regard to the two largest elements in Dr. Rascher's damages estimate (broadcast NIL or BNIL, and athletic services compensation) the plaintiffs would not have received any remuneration even absent any restrictive practices by the NCAA, other than an equitable distribution of revenue as allowed by Title IX and outlined in the Objection.

The distributions presently proposed in the settlement are as follows:

- **BNIL**                                                  **$1.815 billion**
- Video Game NIL                                      $71.5 million
- Lost NIL Opportunities                            $89.5 million
- **Athletic Services Compensation (ASC)**      **$600 million**

Assuming these sources were properly identified, $2.415 billion of these funds would have been subject to an equitable distribution absent restrictive NCAA rules. Under both current and then-existing federal law, these monies could *not* have been paid out by market distribution criteria as called for by Dr. Rascher. Therefore, NCAA restrictive practices did not cause the disproportionate damages proposed by Dr. Rascher.

Applying Title IX, Dr. Rascher would have needed to calculate damages proportionate to the men and women participating in college sports. In 2022, for example, women were 47 percent of NCAA athletes in Division I. Any payments to student-athletes for their athletic contributions by their universities (or conferences) would have required approximately 47 percent of such payments to go to women, with the specific breakdown being governed by the gender ratio on a school-by-school basis. Instead, according to the commercial "market value" criteria applied incorrectly by Dr. Rascher, approximately 90 percent of BNIL and ASC monies is being paid to football and male basketball players.

Absent NCAA restrictive practices, during 2016-17 through 2023-24, rather than

DECLARATION OF ANDREW ZIMBALIST REGARDING THE SETTLEMENT
IN *HOUSE ET AL. V. NCAA ET AL.*
JANUARY 30, 2025

male athletes receiving $2.174 billion (90 percent of $2.415 billion) and women receiving $121 million (5 percent of $2.415 billion), men would have received $1.28 billion (53 percent of $2.174 billion) and women $1.14 billion (47 percent of $2.174 billion).[1]

A second conceptual flaw in Dr. Rascher's analysis is that the settlement fund in his largest category of BNIL bears little resemblance to reality or to the underlying professional model that he uses to establish his estimates. Briefly, in pro sports the massive television contracts garnered by the big four leagues are based upon team performance and team brand. To the extent that pro athlete publicity or NIL rights are involved, they are diminutive and basically occur in the form of video clips to promote forthcoming telecasts. The television network signs long-term deals with the leagues and teams, not even knowing the composition of their rosters for many of the covered years. The same pattern of multi-year contracting applies to the sale of telecasting rights by NCAA conferences to the networks, again with little knowledge of the underlying team rosters. The value of these contracts is based on the school's performance, its following, its spirit, its brand, the school's investment in coaches and facilities, the population of sports bettors, and so on. The value of the athletes' name, image and likeness shrinks in comparison to these basic factors. The vast majority of fans do not watch the games to see the face of the quarterback or his name on the back of his jersey. They tune in to watch the competition and root for their team.[2]

Thus, the Dr. Rascher's estimate is based on a false analogy. The plaintiffs have invented a term and acronym, BNIL, that has little basis in economic reality.

---

[1] The Rascher analysis leaves undefined how the remaining 5 percent of settlement funds would be distributed among subdivision, sports and men and women.

[2] To be sure, plaintiff's expert Ed Dresser acknowledged that "there have been no prior instances in which BNIL has been negotiated or valued separately from other components of broadcast agreements" either at the collegiate or professional level. *Order Granting Motion for Certification of Damages Classes*, November 3, 2023, at 11.

---

4

DECLARATION OF ANDREW ZIMBALIST REGARDING THE SETTLEMENT IN *HOUSE ET AL. V. NCAA ET AL.*
JANUARY 30, 2025

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct based on information known to me.


/s/ Andrew Zimbalist

Andrew Zimbalist

January 30, 2025

DECLARATION OF ANDREW ZIMBALIST REGARDING THE SETTLEMENT
IN *HOUSE ET AL. V. NCAA ET AL.*
JANUARY 30, 2025