STEPHEN M. TILLERY *(admitted pro hac vice)*
  stillery@koreintillery.com
GARRETT R. BROSHUIS (Bar No. 329924)
  gbroshuis@koreintillery.com
CAROL O'KEEFE *(admitted pro hac vice)*
  cokeefe@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone:  (314) 241-4844
Facsimile: (314) 241-3525

GEORGE A. ZELCS *(admitted pro hac vice)*
  gzelcs@koreintillery.com
MARC WALLENSTEIN *(admitted pro hac vice)*
  mwallenstein@koreintillery.com
PAMELA I. YAACOUB
  pyaacoub@koreintillery.com *(admitted pro hac vice)*
**KOREIN TILLERY, LLC**
205 N. Michigan Ave., Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750

ERIC OLSON *(admitted pro hac vice)*
  eolson@olsongrimsley.com
SEAN GRIMSLEY (Bar No. 216741)
  sgrimsley@olsongrimsley.com
JASON MURRAY *(admitted pro hac vice)*
  jmurray@olsongrimsley.com
SAMARA HOOSE (Bar No. 337713)
  shoose@olsongrimsley.com
**OLSON GRIMSLEY KAWANABE
HINCHCLIFF & MURRAY LLC**
700 17th Street, Suite 1600
Denver, CO 80202
Telephone: (303) 535-9151

*Attorneys for Objector Alex Vogelsong*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION**

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | CASE NO. 4:20-cv-3919-CW <br><br> **CLASS ACTION** <br><br> **OBJECTION TO FINAL APPROVAL BY ALEX VOGELSONG** <br><br> Hearing date: April 7, 2025 <br> Hearing Time: 10:00 a.m. <br> Courtroom: 2, 4th Floor <br> Judge: Hon. Claudia Wilken |

**TABLE OF CONTENTS**

INTRODUCTION.................................................................................................................1

BACKGROUND.................................................................................................................3

ARGUMENT .....................................................................................................................5

I.    For the *Fontenot* fair pay claims, the proposed settlement suffers from inadequate
      representation. ..........................................................................................................5

      A.    Class members with *Fontenot* claims did not have adequate representation and
            were treated inequitably.................................................................................6

      B.    Class members with *Fontenot* fair pay claims are receiving inadequate
            compensation and inequitable treatment.........................................................9

II.   For the *Cornelio* partial-scholarship claims, the proposed settlement provides no
      compensation and exemplifies inequitable treatment and inadequate representation. .............. 11

      A.    Settling the *Cornelio* claims for no money is facially inadequate. ...................... 12

      B.    The representation was also inadequate for partial scholarship class members........... 14

III.  The damages and injunctive relief sub-classes should have had separate representation
      as shown by the inequitable treatment and inadequate injunctive relief. ...................... 15

CONCLUSION.................................................................................................................. 21

# TABLE OF AUTHORITIES

**Cases**

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)...................................................................................................2, 5, 7, 8

*Gonzalez v. CoreCivic of Tenn., LLC*,
No. 16-cv-01891, 2018 WL 4388425 (E.D. Cal. Sept. 13, 2018).......................7, 13, 14

*Guthrie v. ITS Logistics, LLC*,
No. 1:21-cv-000729, 2023 WL 2784804 (E.D. Cal. Apr. 5, 2023) ..............................12

*Haralson v. U.S. Aviation Servs. Corp.*,
383 F. Supp. 3d 959 (N.D. Cal. 2019).............................................................................5

*Hesse v. Sprint Corp.*,
598 F.3d 581 (9th Cir. 2010) ...........................................................................5, 8, 11, 15

*In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) ...........................................................................................5

*In re Cmty. Bank of N. Va.*,
622 F.3d 275 (3d Cir. 2010)..........................................................................7, 12, 14, 15

*In re Coll. Athlete Comp. Antitrust Litig.*,
No. 730 F.Supp.3d 1378 (J.P.M.L. 2024) ........................................................................4

*In re High-Tech Emp. Antitrust Litig.*,
2015 WL 5159441 (N.D. Cal. Sept. 2, 2015) ................................................................17

*In re Literary Works in Elec. Databases Copyright Litig.*,
654 F.3d 242 (2d Cir. 2011)...............................................................................2, 7, 8, 15

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
827 F.3d 223 (2d Cir. 2016).................................................................................... passim

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
No. 05-md-1820, 2024 WL 3236614 (E.D.N.Y. June 28, 2024) .............................17, 18

*In re: High-Tech Emp. Antitrust Litig.*,
No. 11-cv-02509-LHK, 2014 WL 3917126 (N.D. Cal. Aug. 8, 2014)..........................17

*Lawlor v. Nat'l Screen Serv. Corp.*,
349 U.S. 322 (1955)........................................................................................................19

*Murray v. Grocery Delivery E-Servs. USA Inc.*,
55 F.4th 340 (1st Cir. 2022) ..............................................................................6, 7, 8, 15

*Nat'l Collegiate Athletic Ass'n v. Alston*,
594 U.S. 69 (2021)..........................................................................................................11

*O'Connor v. Uber Techs., Inc.*,
No. 13-cv-03826-EMC, 2016 WL 3548370 (N.D. Cal. June 30, 2016)......................5, 6

Objection to Final Approval by Alex Vogelsong

*Ortiz v. Fibreboard Corp.,*
    527 U.S. 815 (1999)..................................................................................................7, 16

*Redel's Inc. v. Gen. Elec. Co.,*
    498 F.2d 95 (5th Cir. 1974).................................................................................. 18

*Schwartz v. Dallas Cowboys Football Club, Ltd.,*
    157 F. Supp. 2d 561 (E.D. Pa. 2001) .................................................................. 19

**Other Authorities**

1 McLaughlin on Class Actions § 4:30 (21st ed.)........................................................ 6

**INTRODUCTION**

Under Rule 23(e)(5), Alex Vogelsong objects to the proposed settlement of the entire class.[1] Class members were not adequately represented in the negotiation process, leading to inadequate compensation and inequitable treatment. The parties transformed a case originally focused on payment for the use of names, images, and likenesses (NILs) into a vehicle for releasing nearly every antitrust claim a college athlete might have. That includes the claims for two cases being litigated in the District of Colorado: the *Fontenot* case demanding a fair share of revenue generated by college sports ("fair pay"), and the *Cornelio* case brought on behalf of athletes receiving partial scholarships.[2]

Before those cases were filed, movants had never shown any interest in litigating the *Fontenot* and *Cornelio* claims. Now their proposed settlement undervalues them. For instance, movants value the *Fontenot* TV-revenue fair pay claims at a little over $1.8 billion. They do so by inappropriately adopting economic assumptions favorable to the NCAA, essentially assuming a jury would side with the NCAA on what goes into the revenue pool and what credits should be deducted. By contrast, the *Fontenot* Plaintiffs obtained an independent, preliminary estimate from a respected economist, who valued the claims at over $24 billion. Movants plan to allocate only $600 million of the settlement fund to the *Fontenot* claims, meaning movants are proposing to settle the claims for just pennies on the dollar—before trebling. That alone should invalidate the proposed settlement.

The settlement's treatment of the *Cornelio* partial-scholarship claims—allocating *no money* for claims that have demonstrable value—is even more troubling. The putative class there asserts that members would have received more scholarship money—larger partial-scholarships or full scholarships—had Defendants not imposed an artificial cap on the number of scholarships member schools could give. The NCAA belatedly lifted the caps there at issue, and schools have already announced more scholarships in response. For example, Clemson University announced 35.3 more

---

[1] Mr. Vogelsong was a golfer on partial scholarship at Auburn University from 2019 to 2024. His declaration is attached as Exhibit 1.

[2] *See* Broshuis Decl., ECF No. 473-1, Exs. B & C (operative complaints for *Fontenot v. N.C.A.A.*, No. 1:23-cv-03076 (D. Colo.) and *Cornelio v. N.C.A.A.*, No. 1:24-cv-02178 (D. Col.) (collectively the "Colorado Cases")).

baseball and softball scholarships, amounting to $6.6 million in additional scholarship money not available when the cap was in place. Releasing the *Cornelio* claims for nothing is fundamentally unfair, violating due process and Supreme Court precedent, especially since partial-scholarship athletes otherwise stand to gain the least from the proposed settlement. *See, e.g.*, *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 250 (2d Cir. 2011) (following *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 627 (1997) and rejecting a proposed settlement under similar circumstances because class members with different claims should be subclassed with separate representation).

The injunctive-relief component of the settlement is similarly inadequate and plagued by ethical conflicts. The class representatives themselves have complained to this Court about the adequacy of the proposed injunctive relief:

> Without independent, formal representation separate from schools or their affiliates, athletes will inevitably remain in a vulnerable position, perpetuating the cycle of inequity and paving the way for continued litigation.

ECF No. 580 (letter from Grant House, Sedona Prince, and Nya Harrison). That the injunctive relief is lacking is hardly surprising. First, like the damages release, movants' proposed injunction seeks to resolve a myriad of claims that were never contemplated—much less litigated—in the case. This narrow NIL case now seeks to insert an artificial cap on overall *revenue* sharing; calls for movants' counsel to lobby arm-in-arm with the NCAA; would give the NCAA the right to "police" what constitutes true NIL money (a power that may actually reduce the amount of money going to many athletes); changes rules on scholarship limits and releases all scholarship-related claims; and binds ten years' worth of future athletes without giving them any ability to participate in settlement negotiations. The parties used this NIL case to craft a collective bargaining agreement, but without any of labor law's protections. That's great for Defendants and movants' counsel. It's not great for current and future athletes.

Second, as Professor Silver explains in the attached declaration, insurmountable conflicts of interest made it impossible for class counsel—no matter how well meaning—to negotiate vigorously on behalf of damages and injunctive relief subgroups having such disparate interests. This case is similar to *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 233 (2d Cir.

1    2016), where the Second Circuit overturned one of the largest proposed antitrust settlements in

2    history because the same counsel could not adequately represent both a damages class and an

3    injunctive-relief class in the same settlement.

4        Movants' counsel have accomplished a great deal litigating antitrust claims against Defendants

5    and should be lauded for their efforts over the past two decades. But this is not a lifetime achievement

6    award. Counsels' prior successes do not warrant the parties' transforming the settlement of a narrow

7    NIL case into a vehicle for appeasing Defendants' desire for global peace as to any and all antitrust

8    claims no matter how tangential. It does not warrant undervaluing (or placing no value on) the release

9    of claims added at the last minute. And it does not warrant looking the other way while the same

10   counsel represents and negotiates on behalf of sub-classes having widely divergent interests. Where, as

11   here, global relief seeks to resolve disparate claims of plaintiffs with conflicting interests in allocation,

12   it must be negotiated by independent counsel advocating for each plaintiff subgroup to ensure

13   adequate representation and relief.

14       Final approval should not be granted.

15                          **BACKGROUND**

16       On November 20, 2023, Alex Fontenot filed a complaint in the District of Colorado to

17   pursue claims that were not being brought in this case or any other. *See* Broshuis Decl., ECF No. 473-

18   1 Ex. B (operative complaint). There are currently five named plaintiffs: Mr. Fontenot (a former

19   starting running back at the University of Colorado); Mya Hollingshed (a former star women's

20   basketball player for the University of Colorado); Sarah Fuller (the first woman to score a point in a

21   Power 5 football game); Deontay Anderson (a former top recruit and starting defensive lineman at

22   Houston); and Tucker Clark (a current golfer at Colorado). *See id.*

23       The *Fontenot* action takes aim at the full cut of revenue that Defendants reap from the fruits of

24   these athletes' labor. Absent Defendants' unlawful restraints, college athletes "would have received a

25   competitive share of the television and other revenue being brought in by Defendants and their

26   member schools." *Id.* ¶ 123. In addition to damages, the *Fontenot* Plaintiffs seek to enjoin Defendants

27   from continuing their unlawful practices, and to represent a class of "[a]ll persons who worked as

28

1  athletes for a Division I athletic team at an NCAA Division I school, from the beginning of the

2  statute of limitations period, as determined by the Court, through judgment in this matter." *Id.* ¶ 39.

3      Focused on the full and fair pay that college athletes would receive in an unrestrained market,

4  the *Fontenot* action differs from this case. As its name implies, the *In re College Athlete NIL Litigation*

5  challenged restrictions on earnings for the use of names, images, and likenesses. The *Fontenot* action,

6  however, argues for a competitive cut of all revenue earned from the athletes' labor. *See* Broshuis

7  Decl., ECF No. 473-1 Ex. B ¶ 106. Recognizing the limitations of the *NIL Litigation*, movants'

8  counsel filed another case, the *Carter* action (No. 4:23-cv-6325), a few weeks after *Fontenot*. Within a

9  month, and without notice or any effort at private ordering, the *Carter* Plaintiffs—with Defendants'

10  support—moved for an MDL, seeking to gain control over both *Carter* and *Fontenot* in consolidated

11  proceedings. The JPML denied the motion on April 11, 2024. *In re Coll. Athlete Comp. Antitrust Litig.*,

12  No. 730 F. Supp. 3d 1378, 1380 (J.P.M.L. 2024). Defendants then unsuccessfully moved to transfer

13  the *Fontenot* action to this District.

14      Meanwhile, the parties in *NIL Litigation* were working behind the scenes on a kitchen-sink

15  settlement. Media reports revealed that the contemplated settlement would include a broad release of

16  all antitrust claims, which could impact the broader and more valuable *Fontenot* claims. *Fontenot* counsel

17  asked to be included in any settlement communications that might affect the *Fontenot* case—and

18  warned of potential ethical ramifications stemming from the same counsel seeking to settle so many

19  different types of claims without independent counsel—but the *NIL Litigation* parties pressed

20  forward. Broshuis Decl., ECF No. 473-1 ¶ 5. On May 23, 2024, the parties in *NIL Litigation*

21  announced that they had agreed to terms on a broad, comprehensive settlement.

22      The parties moved for preliminary approval on July 26, 2024, revealing the exact terms of the

23  proposed settlement for the first time. The same day, the parties agreed to file an amended complaint.

24  For the first time in this *NIL Litigation*, Plaintiffs included allegations related to the *Fontenot* fair pay

25  claims and scholarship limits. ECF No. 448. Recognizing that the settlement significantly short-

26  changed the partial-scholarship claims, *Cornelio* filed suit on August 6, 2024 in District of Colorado.

27  *Cornelio* challenges Defendants' arbitrary scholarship limits imposed for certain sports across all

28  membership institutions—a policy that prevented many partial-scholarship athletes from receiving

1  larger or full scholarships. That case remains pending but is stayed by operation of the Court's

2  Preliminary Approval Order in this case. ECF No. 544.

3  **ARGUMENT**

4  To receive final approval, parties pursuing a class settlement must establish the settlement is

5  fair, reasonable and adequate under Rule 23(e)(2). To do so, movants must show that: (1) class

6  members have been adequately represented, (2) "the proposal was negotiated at arm's length," (3) the

7  proposed relief is adequate, and (4) the "proposal treats class members equitably relative to each

8  other." Rule 23(e)(2). "Courts 'must be particularly vigilant not only for explicit collusion, but also for

9  more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain

10  class members to infect the negotiations.'" *Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959,

11  966 (N.D. Cal. 2019) (quoting *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir.

12  2011)).

13  "Rule 23(a)(4), which requires that 'the representative parties . . . fairly and adequately protect

14  the interests of the class,' 'serves to uncover conflicts of interest between named parties and the class

15  they seek to represent,' as well as the '. . . conflicts of class counsel.'" *In re Payment Card Interchange Fee*,

16  827 F.3d at 231 (quoting *Amchem*, 521 U.S. at 625). "Class actions and settlements that do not comply

17  with Rule 23(a)(4) and the Due Process Clause cannot be sustained." *Id.*; *accord Hesse v. Sprint Corp.*,

18  598 F.3d 581, 588 (9th Cir. 2010) ("Without adequate representation, a court order approving a claim-

19  preclusive class action settlement agreement cannot satisfy due process as to all members of the

20  class.").

21  **I.    For the *Fontenot* fair pay claims, the proposed settlement suffers from inadequate**

22  **representation.**

23  When, as here, a proposed settlement expands a previously certified class to include additional

24  class members and to release other claims that had not been certified, "a more probing inquiry is

25  warranted." *O'Connor v. Uber Techs., Inc.*, No. 13-cv-03826-EMC, 2016 WL 3548370, at *5 (N.D. Cal.

26  June 30, 2016); *see also In re Bluetooth*, 654 F.3d at 976 ("Prior to formal class certification, there is an

27  even greater potential for a breach of fiduciary duty owed the class during settlement. Accordingly,

28  such agreements must withstand an even higher level of scrutiny for evidence of collusion or other

1  conflicts of interest ….").  Under such circumstances, "the Court must be sensitive to the risk of

2  collusion or at least less than a full adversarial process with respect to the release of claims pending in

3  other cases." *O'Connor*, 2016 WL 3548370, at *5.

4       As one treatise cautions, when there are class members with different claims and a single

5  counsel group attempts to represent all the disparate groups of class members, it:

6       create[s] a tension in the class representation (for both the
         representatives and class counsel). . . . When this occurs, only the
7       creation of subclasses, and representation by a separate class
         representative and counsel looking out for each subclass, can ensure that
8       the interests of each subgroup are in fact adequately represented.

9  1 McLaughlin on Class Actions § 4:30 (21st ed.). That "tension" exists here because a large segment

10 of class members with additional, multibillion-dollar claims are being asked to release those claims for

11 a relatively small amount of money—and to do so without the protections of separate counsel. The

12 result is inadequate representation, inadequate relief, and inequitable treatment.

13      **A.    Class members with *Fontenot* claims did not have adequate representation and**

14           **were treated inequitably.**

15      It is undisputed that, because of statute-of-limitations issues, thousands of proposed

16 settlement class members have *Fontenot* fair pay claims that the parties are attempting to release, while

17 thousands of other proposed settlement class members do not. *See* Rascher Decl., ECF No. 450-4

18 (evaluating the NIL-related claims covered by this case to 2016 but evaluating the pay for services

19 claims to 2019); *see also* ECF No. 535-3. To ensure that both groups—those with *Fontenot* fair pay

20 claims and those without—receive a fair piece of the pie, each subclass deserves independent counsel

21 "owing allegiance only to that group." *Murray v. Grocery Delivery E-Servs. USA Inc.*, 55 F.4th 340, 346

22 (1st Cir. 2022). This provides structural assurance that any settlement adequately accounts for class

23 members' differing interests. *See id.* at 346–47 ("[I]f groups of class members with

24 significantly different claims do not have separate representation in determining how the settlement

25 should be split, the court lacks structural assurance that the settlement treats each group fairly."').

26 There is no such structural assurance here. The same counsel represented class members with *Fontenot*

27 fair pay claims and those without. The settlement therefore fails to meet Rule 23(e)'s "fair, reasonable

28 and adequate" criteria.

1    The Supreme Court condemned a similarly deficient structure in *Ortiz v. Fibreboard Corp.*, 527

2    U.S. 815, 857 (1999). There, the proposed settlement class included "those exposed to Fibreboard's

3    asbestos products both before and after 1959," the date an insurance policy expired. *Id.* Those with

4    pre-1959 claims thus "had more valuable claims" than those that post-dated 1959. *Id.* By trying to

5    represent both groups in the same settlement, counsel created a conflict—an "instance of disparate

6    interests"—that should have been addressed with subclassing and separate representation. *Id.* The

7    Court had reached a similar result two years earlier in *Amchem*, 521 U.S. 591.

8    Following *Amchem* and *Ortiz*, circuit courts have consistently held that subclassing and

9    separate counsel should be used where subgroups of plaintiffs possess distinct claims of differing

10   value. *See, e.g.*, *In re Literary Works*, 654 F.3d at 250 ("The two subgroups in *Amchem* had competing

11   interests in the distribution of a settlement whose terms reflected 'essential allocation decisions

12   designed to confine compensation and to limit defendants' liability.'"); *Murray*, 55 F.4th at 346–47

13   (rejecting proposed settlement where some class members had claims that others did not have and

14   same counsel represented all class members); *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 284–85 (3d Cir.

15   2010), *as amended* (Oct. 20, 2010) (following *Amchem* and *Ortiz* and rejecting settlement); *see also*

16   *Gonzalez v. CoreCivic of Tenn., LLC*, No. 16-cv-01891, 2018 WL 4388425, at *12 (E.D. Cal. Sept. 13,

17   2018) (court "must be vigilant" when settlement releases claims not litigated).

18   Here, too, "[t]he settling parties, in sum, achieved a global compromise with no structural

19   assurance of fair and adequate representation for the diverse groups and individuals affected."

20   *Amchem*, 521 U.S. at 627. Despite attempts to "compartmentalize" the settlement, there is only one

21   bucket of settlement money. Under *Ortiz* and *Amchem*, separate counsel should have represented the

22   interests of those with *Fontenot* fair pay claims. *See Ortiz*, 527 U.S. at 856 (discussing "homogeneous

23   subclasses … with separate representation"); *see also Murray*, 55 F.4th at 345 (discussing the "zero-sum

24   circumstances" of a common fund settlement involving multiple types of claims).

25   In seeking preliminary approval, movants addressed the conflicts issue by pointing to the

26   extended mediation process, use of an experienced mediator, and the sequenced negotiation

27   process—settling the injunctive claims before addressing each type of damages claim. *See* Berman

28   Decl., ECF 450-2 ¶¶ 8–9. But as Professor Silver explains, such things cannot replace the essential

protections provided by separate representation when one segment of plaintiffs has valuable claims that another segment does not have. Ex. 2, Silver Decl. ¶¶ 9–10, 43. This is especially true where, as here, class counsel chose not to litigate the *Fontenot* claims for *years*, adding them only after the original, more limited class had been certified. *See Hesse*, 598 F.3d at 589 ("Class representation is inadequate if the named plaintiff fails to prosecute the action vigorously on behalf of the entire class . . . ."). The Second Circuit rejected similar arguments under nearly the same circumstances: "The rationale is simple: how can the value of any subgroup of claims be properly assessed without independent counsel pressing its most compelling case? It is for this reason that the participation of impartial mediators and institutional plaintiffs does not compensate for the absence of independent representation." *In re Literary Works*, 654 F.3d at 253; *see also Murray*, 55 F.4th at 346–47 (following *Literary Works*).

It is no answer to argue that the parties negotiated the sum to be paid for the fair pay claims separate from other claims. *See* Berman Decl., ECF No. 450-2 ¶ 8. Movants still made "essential allocation decisions designed to confine compensation and to limit defendants' liability." *Amchem*, 521 U.S. at 627. Nearly every defendant seeks a global resolution when settling. When *Fontenot* was filed, movants were already years into settlement negotiations, and Defendants likely refused to settle the *NIL Litigation* claims with *Fontenot*'s fair pay claims on the horizon. Movants' counsel rushed to file *Carter* and instantly sought to move *Fontenot* to California. Defendants aligned with movants on those procedural moves and proposed a settlement of the fair pay claims in record time. Movants' counsel had an incentive to get a deal done, and Defendants surely wanted to negotiate with a single group of attorneys, fearful that including *Fontenot* counsel in settlement discussions would require more time and money to settle the fair pay claims. That is precisely why separate counsel was required.

To be clear, objector Vogelsong does not oppose the concept of a global settlement, but any such settlement requires independent evaluation and zealous advocacy by separate counsel for the *Fontenot* Plaintiffs. Counsel for *Fontenot* repeatedly warned Defendants that it was improper for the same plaintiffs' counsel to settle all claims at once. Broshuis Decl., ECF No. 473-1 ¶ 5. These warnings fell on deaf ears. Under Rule 23 and this District's Procedural Guidance for Class Action Settlements, that is cause for rejecting the settlement.

**B.    Class members with *Fontenot* fair pay claims are receiving inadequate compensation and inequitable treatment.**

The lack of structural protections will cause real harm to the *Fontenot* fair pay class by devaluing its claims and treating it inequitably. When valuing the NIL claims, which proposed settlement counsel have litigated from the outset, the starting point for negotiations was the full amount that movants advocated for in the adversarial process. By contrast, for the fair pay claims, movants bypassed the adversarial process and made assumptions favorable to Defendants—excluding whole categories of athlete-generated revenue and allocating certain revenue to *House* claims instead of *Fontenot* fair pay claims. A look at the *Fontenot* valuation in the proposed settlement reveals movants' desire to get a deal done rather than extract the most for *Fontenot* class members.

Movants contended in their Motion for Preliminary Approval that the $600 million devoted to the fair pay claims amounts to 31.6% of the estimated single damages. ECF No. 450 at 8. But that estimate excludes huge sources of revenue—like direct and indirect institutional support, contributions, programs and concessions, sports camp revenues, and athletics restricted endowment—amounting to *at least* one-third of total revenues attributable to class members' labor. Tatos Decl., ECF No. 473-3 ¶¶ 22, 27. Even movants' own expert recognizes "there are valid economic arguments to include some or all of those categories." Rascher Decl., ECF No. 450-4 ¶ 42. Schools certainly don't exclude them when determining how many millions of dollars to pay college coaches.

In the declaration filed with the Colorado Plaintiffs' Response, economic expert Ted Tatos explains why the omitted categories of revenues must be included. Tatos Decl., ECF No. 473-3 ¶¶ 22–49. For example, schools receive institutional sources of revenue to offset the costs of athlete attendance. *Id.* ¶¶ 29–37. Though directly attributable to the athletes, these funds are not counted as part of the athletic department revenue. *Id.* Yet the settlement counts these institutional revenues as compensation to the athletes. *Id.* By excluding direct institutional funding for the athletes' costs of attendance from the revenue pool (the denominator) but then including it as "compensation" to athletes (in the numerator), the settlement skews the revenue ratio in favor or Defendants. *Id.* Similarly, as Tatos explains, *all* revenues from concessions generated at sporting events should be

included in the revenue pool because they are a natural complement to ticket sales. *Id.* ¶¶ 47–49. An exclusion like this would only encourage a school to divert ticket sales to concessions for its own benefit. *Id.* Those are just two examples.[3]

By simply including the other sources of revenue, Tatos values the fair play claims at over $24 billion—or over $30 billion if the value of grant-in-aid is reduced.[4] Tatos Decl., ECF No. 473-3 ¶¶ 81–83 & Table 6. The proposed settlement allocates just $600 million to these claims. That is roughly 2.5% of their possible value—before trebling. *Id.* The percentage is even lower when accounting for the time value of money; the settlement proposes to pay out over ten years, which reduces the fund's value by roughly $167 million. *Id.* ¶¶ 87–89. Meanwhile, movants are proposing to settle the NIL claims at closer to 70% of their possible value, a direct result of those claims having been litigated for years. The inequities are stark. *See* Rule 23(e)(2).

Movants argue that the greater discount for *Fontenot* fair pay claims is warranted because the *Fontenot* claims have additional "procedural and merits-based challenges." Mot., ECF No. 450 at 19. But there is reason to distrust this self-interested assessment. From a class certification standpoint, the fair pay claims should be just as strong as the *NIL Litigation* claims. The Court certified the *NIL Litigation* classes based on movants' argument that athletes were owed a certain percentage of revenue; there is no reason to believe a court would do anything different at the class certification stage when the percentage of revenue going to athletes is simply higher. Nor are the merits-based challenges materially different from those in the *NIL Litigation*. Movants rely principally on the *Alston* decisions.

---

[3] Movants' counsel also made certain assumptions about the broadcast NIL claims that likewise devalued the *Fontenot* fair pay claims. They estimated the percentage of revenue going to broadcast NIL at 10% of revenue when valuing the *House* BNIL claims, an amount that Defendants vehemently challenged as being too high. ECF No. 250. When valuing the *Fontenot* fair pay claims, they removed the full 10% for BNIL from the calculation. Rascher Decl., ECF No. 450-4 ¶¶ 45–46. Movants thus made allocation decisions that pitted one group of class members (those with *Fontenot* fair pay claims) against another (those without) when valuing the *House* BNIL claims versus the *Fontenot* fair pay claims.

[4] It is inappropriate to give Defendants full credit for grant-in-aid scholarships because (1) scholarships are in-kind payments that differ from actual monetary compensation, (2) the net price of school is different from the sticker price, and (3) research shows that athletes do not receive the full value of the educational benefits. Tatos Decl., ECF No. 473-3 ¶¶ 52–74.

1    *See* Mot., ECF 450 at 18–20. *See Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021). But as

2    movants have repeatedly argued, the foundational premises of those decisions have changed in the

3    intervening years. After California passed its NIL bill in 2019, other states followed. When the NCAA

4    relaxed its NIL rules in 2021, athletes began receiving large sums of money, which put the nail in the

5    coffin for "amateurism." College sports did not crumble after some starting quarterbacks began

6    earning a million dollars. Viewership continued to rise. These developments should lead to a win in

7    *Fontenot* just as they support a win in this case. *See Alston*, 594 U.S. at 110 (Kavanaugh, J., concurring)

8    ("[T]he NCAA's business model of using unpaid student athletes to generate billions of dollars in

9    revenue for the colleges raises serious questions under the antitrust laws.").

10        In the end, the subgroup of athletes with *Fontenot* claims is being asked to release an estimated

11    $24+ billion in damages for pennies on the dollar. The lack of structural protections infected the

12    negotiations, with the movants devaluing the fair pay claims and failing to advocate for them as

13    strongly as independent counsel would. For a fair, reasonable, and adequate settlement under Rule

14    23(e)(2), the same counsel cannot represent both the athletes with *Fontenot* claims and those without.

15    Nor can it treat the subgroups wholly inequitably—fervently litigating one group's claims for years

16    while ignoring the other group's claims and ultimately valuing the latter at a fraction of the former as

17    almost an afterthought.

18    **II.    For the *Cornelio* partial-scholarship claims, the proposed settlement provides no**

19    **compensation and exemplifies inequitable treatment and inadequate representation.**

20        The *Fontenot* claims are not the only ones being devalued. There is another set of valuable

21    claims being released without providing *any* money to class members. These are the *Cornelio* claims by

22    athletes who received only partial scholarships but would likely have received larger or even full

23    scholarships had Defendants not imposed limits capping the number of scholarships available for

24    certain sports like baseball, softball, and golf. No. 1:24-cv-02178 (D. Colo.). During the more than

25    four years of litigating the *NIL Litigation*, the parties never included allegations related to scholarship

26    limits or partial scholarship claims. These allegations were not included in *Carter* or *Hubbard* either.

27        The claims could not have been brought under the allegations of the existing cases and hence,

28    under Ninth Circuit law, could not be released. *Hesse*, 598 F.3d at 590 (internal quotation marks and

citations omitted) ("A settlement agreement may preclude a party from bringing a related claim in the future . . . but only where the released claim is based on the identical factual predicate as that underlying the claims in the settled class action."). That is why the parties hastily agreed to an amended complaint at the last minute. A case that had focused on NIL damages now suddenly includes unrelated allegations going to scholarship limits and releases partial scholarships for no compensation. This treatment of the *Cornelio* claims cannot pass muster under Rule 23.

Recent developments show that the *Cornelio* claims have real and significant value. Clemson University, for example, has announced plans to lift the scholarship limits at issue. As the attached analysis shows, that change has resulted in more than $6 million in additional scholarship money for baseball and softball athletes alone. Ex. 3, Tatos Second Decl. ¶¶ 5–11. Based on data from just two sports at one school, the *Cornelio* Plaintiffs stand to forfeit hundreds of millions in damages—if not more—under the proposed settlement.

The *Cornelio* claims are not mere stocking stuffers to be gifted to Defendants for nothing. *See In re Cmty. Bank of N. Va.*, 622 F.3d at 284–85 ("We have already noted that class counsel never asserted colorable TILA and HOEPA claims. However, those claims were part of the settlement release. Failure to pursue such claims may suggest that class counsel [abdicated] their duty to the class in favor of the enormous class-action fee offered by defendants.") (citation omitted). A settlement of claims that were not litigated until the last minute and released for no money by conflicted counsel cannot be "fair, reasonable, and adequate." The settlement should not go forward with respect to the *Cornelio* claims.

**A.    Settling the *Cornelio* claims for no money is facially inadequate.**

The parties did not even try to value the partial-scholarship claims being released. That alone is a reason to be wary of their last-minute inclusion. *See* Rule 23(e)(2); *Guthrie v. ITS Logistics, LLC*, No. 1:21-cv-000729, 2023 WL 2784804, at *12 (E.D. Cal. Apr. 5, 2023), *report and recommendation adopted*, 2023 WL 4288943 (E.D. Cal. June 30, 2023) (denying preliminary approval where parties insufficiently justified valuation of various claims).

The partial-scholarship claims have real value. Take college baseball players for example. For years, the NCAA arbitrarily limited the sport to 11.7 scholarships that must be spread out between 27

and 32 players (depending on the year). *See* Broshuis Decl., ECF No. 473-1 Ex. C (operative complaint). Several SEC schools average over 10,000 fans per game for 30+ games in baseball and bring in large amounts of revenue. If given the choice, these schools would have awarded more scholarships to baseball players. When it comes to NIL money awarded to athletes from NIL collectives, baseball players are third on the list. Yet these schools could not offer more scholarship money because of the 11.7 scholarship rule.

That rule was yet another horizontal restraint that inflicted great harm on partial scholarship athletes. To assess the magnitude of that harm, Tatos looked at what has happened at Clemson. For the 2025-26 season, Clemson has announced plans to raise the scholarships for baseball from 11.7 per year to 34 and for softball from 12 to 25. As his analysis shows, this horizontal restraint resulted in over $6.6 million being withheld from class members over just 4 years:

TABLE 2. VALUE OF ADDITIONAL SCHOLARSHIPS

| Academic Year | Value of Additional Scholarships | |
| --- | --- | --- |
| | Baseball | Softball |
| 2021-22 | $1,018,218 | $593,580 |
| 2022-23 | $1,041,901 | $607,386 |
| 2023-24 | $1,055,013 | $615,030 |
| 2024-25 | $1,080,881 | $630,110 |
| **Totals by Sport** | **$4,196,013** | **$2,446,106** |
| **Overall Total** | **$6,642,119** | |

This damages estimate for just two sports at one school makes clear that class-wide *Cornelio* damages are substantial. Ex. 3, Tatos Second Decl. ¶¶ 9–10. Extrapolated to all sports at all Power 5 Conference schools, the damages are many hundreds of millions of dollars if not more.

It would be manifestly unfair to allow the parties to settle claims worth at least nine figures for $0. *See* Rule 23(e)(2) (in approving a settlement under this Rule, courts should look to whether the proposed relief is adequate and "treats class members equitably relative to each other"). Courts have repeatedly condemned similar practices as an "indelible stain for the settlement agreement." *Gonzalez*, 2018 WL 4388425, at *5–6. In *Gonzalez*, when the "defendants sought a broad waiver from plaintiff, which included claims plaintiff did not allege, did not litigate, and did not believe had any value[,]" the

1    court warned "this is the sort of behavior about which reviewing courts must be vigilant, because it is

2    suggestive of collusion." *Id.* at \*12; *see, e.g.*, *In re Cmty. Bank of N. Va.*, 622 F.3d at 284–85.

3         That the *overall* settlement may be large is no salve for aggrieved athletes being asked to release

4    their claims for peanuts. Because of the sports they work in, partial scholarship athletes are set to

5    receive the least money from the settlement. For example, they will receive no broadcast NIL money.

6    *See* Rascher Decl., ECF No. 450-4 ¶ 28, Ex. 5. Most will not receive any Lost NIL Opportunities

7    money unless they fall within the specific pre-2021 and post-2021 pigeonhole *and* submit a claim

8    form. *See id.* ¶ 31. And for the *Fontenot* fair pay claims, only $30 million is being allocated for *all athletes*

9    outside of Power 5 basketball and football players, *id.* ¶ 50, Ex. 9, which is to be divided between over

10   *180,000* athletes, *id.* ¶ 80, Ex. 24. Most of that $30 million will go to non-Power 5 football and

11   basketball players—not athletes with partial scholarship claims. *Id.* At the end of the day, most of

12   these athletes are looking at roughly $50 from the settlement—barely enough to buy a tank of gas. *See*

13   *also* Mot., ECF No. 450 at 41 (estimating payout at just $50 per athlete in remaining "Additional

14   Sports"). For *Cornelio* class members, the value of the released partial scholarship claims dwarfs this

15   amount.

16        Objector Alex Vogelsong is one such class member. He stands to gain very little from the

17   settlement. He is not receiving any pay for athletic services or broadcast NIL money under the

18   settlement. Yet he and most of his teammates were on partial scholarships while part of one of the

19   top college golf programs in the country. The settlement pays Mr. Vogelsong a fraction of his total

20   potential claims and *nothing* for his partial scholarship claims—and it is unfair.

21       **B.**    **The representation was also inadequate for partial scholarship class members.**

22        It is little wonder movants' counsel agreed to release the partial scholarship claims for nothing.

23   Allegations regarding partial scholarships were absent from the pleadings for over four years. Movants

24   never expressed any interest in litigating these claims. It was not until October 7, 2024—just over

25   three months ago—that movants amended the complaint to add allegations about partial scholarships.

26   *See* ECF Nos. 533, 543. Regardless, even with that amendment, only a subset of class members have

27   partial scholarship claims. The proposed settlement disregards the interests of those class members.

28

1   As the First Circuit stated in *Murray*, if class members "have significantly different claims, or if

2   their claims are subject to significantly different defenses, the lack of separate representation" in a

3   proposed settlement "presents an actual and substantial risk of skewing available relief in favor of

4   some subset of class members." 55 F.4th at 346 (citation omitted); *see also Hesse*, 598 F.3d at 589 (if a

5   class representative of a settlement class does not share the claims of class members, then the

6   representation is inadequate and "an insurmountable conflict of interest" exists). Under such

7   circumstances, "[i]t is unreasonable to expect" the same group of attorneys "to properly advocate for

8   each such group." *Murray*, 55 F.4th at 346. Following *Amchem* and *Ortiz*, there must be separate

9   representation. *Id.*; *see also In re Literary Works*, 654 F.3d at 253 (same); *In re Cmty. Bank of N. Va.*, 622

10  F.3d at 311 (same).

11  The *Cornelio* claims were never pursued in any of the cases being settled, and the failure to

12  vigorously pursue them (or to pursue them at all) makes the proposed representation inadequate. In

13  their effort to achieve a global settlement, movants put Defendants' interest in finality and the

14  interests of full-scholarship athletes ahead of partial scholarship athletes. That conflict leads to real

15  problems under Rule 23(e)(2).

16  **III.   The damages and injunctive relief sub-classes should have had separate**

17  **representation as shown by the inequitable treatment and inadequate injunctive relief.**

18  Class members received inequitable treatment and inadequate representation in yet another

19  way: dual representation of the injunctive relief and damages sub-classes by the same counsel, leading

20  to irreconcilable conflicts of interest. *See* Rule 23(e)(2) (inadequate representation and relief and

21  inequitable treatment among class members are three of the four factors indicating a settlement is not

22  "fair, adequate, or reasonable").

23  Three of the *named class representatives* sent a letter identifying the insufficiency of the injunctive

24  relief obtained:

25          Without independent, formal representation separate from schools or
            their affiliates, athletes will inevitably remain in a vulnerable position,
26          perpetuating the cycle of inequity and paving the way for continued
            litigation.

27  ECF No. 580 (letter from Grant House, Sedona Price, and Nya Harrison).

28

1    Professor Silver explains in the attached declaration that conflicts infecting class counsel's

2   representation prevented them from seeking aggressive injunctive relief, leading to this inadequacy.

3   While class counsel recognized that structural conflicts pervaded their claimed representation, the

4   steps they took to address those conflicts and comply with their fiduciary duties to each subgroup

5   were inadequate on their face. Ex. 2, Silver Decl. ¶¶ 17–39. Because this is a class case, movants'

6   counsel could not obtain informed consent to continue unitary representation despite obvious

7   conflicts of interest—informed consent being the only solution recognized by fiduciary law for

8   representing clients with divergent interests. *Id.* ¶¶ 15–20. That is exactly the issue the Supreme Court

9   warned about in *Ortiz*:

> [I]t is obvious after *Amchem* that a class divided between holders of
> present and future claims (some of the latter involving no physical injury
> and attributable to claimants not yet born) requires division into
> homogeneous subclasses under Rule 23(c)(4)(B), with separate
> representation to eliminate conflicting interests of counsel. … As we
> said in *Amchem,* "for the currently injured, the critical goal is generous
> immediate payments," but "[t]hat goal tugs against the interest of
> exposure-only plaintiffs in ensuring an ample, inflation-protected fund
> for the future." 521 U.S., at 626, 117 S.Ct. 2231.

15   527 U.S. at 856.

16    Following *Ortiz* and *Amchem*, the Second Circuit rejected a $7 billion proposed antitrust

17   settlement because the same counsel represented one class seeking monetary relief and another

18   seeking injunctive relief. *See In re Payment Card Interchange Fee*, 827 F.3d at 233. The court reasoned that

19   "[u]nitary representation of separate classes that claim distinct, competing, and conflicting relief

20   create[s] unacceptable incentives for counsel to trade benefits to one class for benefits to the other."

21   *Id.* at 234. As here, that conflict was magnified by the fact that, under the proposed settlement,

22   members of the (b)(2) injunctive relief class could not opt out. *Id.*

23    In this case, the damages and injunctive relief subclasses have widely divergent interests.

24   College athletes whose careers ended years ago and seek only damages have different priorities than

25   college athletes beginning their careers next season who likely have no idea what future practices

26   might offend the antitrust laws. Yet to secure the settlement, movants' counsel has agreed to preclude

27   future college athletes—some of whom are in third grade right now—from bringing yet unknown

28   claims. It is no cure to point to a partial overlap between the sub-classes. *Id.* at 235 ("The force of

1   *Amchem* and *Ortiz* does not depend on the mutually exclusivity of the classes; it was enough that the

2   classes did not perfectly overlap."). The gap between the damages and injunctive class interests will

3   only widen going forward.

4         As the named class representatives' letter to the Court makes clear, the proposed injunctive

5   relief is inadequate. Not only does it fail to provide for collective bargaining, but it also imposes an

6   artificial and arbitrary salary cap of 22% on some (but not all) types of revenue. Such a one-sided

7   settlement should not be approved.

8         The concern raised by the three class representatives mirrors the concerns raised by one of the

9   class representatives in *In re: High-Tech Employee Antitrust Litigation*. There, one of the four class

10  representatives raised concerns with the adequacy of the proposed settlement in a letter to the court.

11  No. 11-cv-02509-LHK, 2014 WL 3917126, at *1 (N.D. Cal. Aug. 8, 2014). Judge Koh, relying heavily

12  on that concern, denied the Motion for Preliminary Approval, finding the settlement outside of "the

13  range of reasonableness." *Id.* at *3–4. Only after a 28% increase in total recovery—which led to the

14  class representative withdrawing his objection—did the court approve the settlement. 2015 WL

15  5159441, at *2–3 (N.D. Cal. Sept. 2, 2015).

16        In *In re Payment Card Interchange Fee*, the Eastern District of New York recently denied

17  preliminary approval for a proposed settlement under similar circumstances. Counsel for the

18  injunctive relief class had reached an agreement that would have reduced interchange fees and would

19  have provided relief from rules prohibiting merchants from surcharging. *In re Payment Card Interchange*

20  *Fee & Merch. Disc. Antitrust Litig.*, No. 05-md-1820, 2024 WL 3236614, at *2 (E.D.N.Y. June 28, 2024).

21  The relief was valued at nearly $30 billion over a five-year period. And of note, the same mediator

22  served in that case as here. *Id.* at *20. The problem, as here, was that the injunctive relief was too

23  limited. *Id.* at *27–28. "[T]he surcharging provisions would still prohibit surcharging at the issuer

24  level." *Id.* at *27. And while the agreement made some changes to "honor" rules between credit cards,

25  it fell well short of what many class members sought: "elimination of the Honor All Cards rules." *Id.*

26  The reduction in interchange fees was also a halfway measure. It set limits on the fees that could be

27  charged, but they were "significantly above rates that experts in this litigation have previously

28

1    described as an 'upper limit'" of what the rates might have been in the but-for world without the

2    existing agreements. *Id.* at *28.

3        The injunctive relief being offered here is also a halfway measure: it swaps one arbitrary cap

4    for another without giving the athletes any tools to protect themselves going forward. *See* ECF No.

5    580. And that cap of 22% is well below what experts have testified would be the cap in the but-for

6    world. Further, the plan unfairly excludes several important types of revenue from the Revenue Pool

7    that should be included—and that greatly lessens the proposed amount to be shared. Tatos Decl.,

8    ECF No. 473-3 ¶¶ 19–74.

9        Movants' counsel's agreement to sequence the negotiations—negotiating injunctive relief first

10   and then turning to monetary relief—did not *cure* the conflicts problem. It *highlighted* it. As Professor

11   Silver explains, "[t]he decision to sequence the negotiations to avoid helping the damages claimants at

12   the expense of the injunctive claimants shows clearly that the two mandates conflicted and could not

13   be honored concurrently." Ex. 2, Silver Decl. ¶ 26. Lawyers have a duty to zealously represent their

14   clients. The damages class deserved representation that would pursue its best interests, even if at the

15   expense of the injunctive class (and vice versa). Movants' counsel's decision to prioritize the injunctive

16   class to safeguard its claims from being "trade[d] away," Klonoff Decl., ECF No. 536 ¶ 40, for greater

17   damages awards was "conflicted judgment." Ex. 2, Silver Decl. ¶ 25. Because Defendants have only

18   one pot of money, attorneys participating in sequenced negotiations "know that demanding more

19   relief in earlier stages will leave less money available to bargain for in later ones[,]" which "predictably

20   cause[s] lawyers to reserve funds for later stages by moderating their demands in earlier ones." *Id.*

21   ¶ 27.

22       There is every reason to believe movants' counsel made such tradeoffs here. The proposed

23   injunctive relief binds future athletes to this deal—including an arbitrary 22% revenue-sharing cap

24   that itself would violate the antitrust laws—for ten years without an opportunity to opt out. Any

25   current third grader playing kick ball on the blacktop is a possible class member. These underage kids

26   have no say in this approval process, yet movants are unfairly releasing unripe future claims on their

27   behalf. *See Redel's Inc. v. Gen. Elec. Co.*, 498 F.2d 95, 99 (5th Cir. 1974) ("Releases may not be executed

28   which absolve a party from liability for future violations of our antitrust laws."); *Schwartz v. Dallas*

*Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561, 578 (E.D. Pa. 2001) ("[T]he legality of these practices under the antitrust laws was not litigated in the present suit. Because public policy prohibits a release from waiving claims for future violations of antitrust laws, and given that under the proposed release class members would be releasing unlitigated future claims, the releases are too broad."); *see also Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955) ("Acceptance of the respondents' novel contention would in effect confer on them a partial immunity from civil liability for future violations."). Independent counsel dedicated solely to representing the injunctive relief class would not so eagerly agree to such terms.[5]

Nor does use of an experienced mediator cure the conflicts. While "[m]ediators can report on what they observe during negotiations," they "cannot know about the effects of conflicts, which are often hidden." Ex. 2, Silver Decl. ¶ 22. As the Second Circuit observed in the credit card case:

> One aspect of the Settlement Agreement that emphatically cannot remedy the inadequate representation is the assistance of judges and mediators in the bargaining process. True, a court-appointed mediator's involvement in precertification settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure. But even an intense, protected, adversarial mediation, involving multiple parties, including highly respected and capable mediators and associational plaintiffs, does not compensate for the absence of independent representation. The mission of mediators is to bring together the parties and interests that come to them. It is not their role to advance the strongest arguments in favor of each subset of class members entitled to separate representation, or to voice the interests of a group for which no one else is speaking.

*In re Payment Card Interchange Fee*, 827 F.3d at 234–35 (internal quotation marks and citations omitted). Sequencing and use of a mediator are not cures for the conflicts problem but manifestations of it.

---

[5] The preliminary approval motion claims that the agreement will not bar claims for damages brought by future athletes. But language in the proposed settlement agreement is murkier. In Article 6, governing enforcement of the injunctive relief portion, the agreement states that only movants' counsel can bring enforcement actions "concerning compliance with, the validity of, interpretation or enforcement of the terms and conditions" of the injunctive relief deal is at issue. ECF No. 535-1, Appendix A at Art. 6. If a future athlete brought an antitrust damages action that challenged the cap put in place by this agreement, would that be an action turning on the "interpretation" or "validity of" the agreement, meaning that only the movants' counsel could bring the case? There would be little incentive for them to do so given that they are simultaneously committing to advocate publicly that the agreement should pass antitrust muster.

1    Concerns over conflicts between the damages and injunctive relief subclasses are especially

2    acute here because movants' counsel stands to benefit more from the damages award than the

3    injunctive relief. Movants' counsel is requesting "20% of the NIL Settlement Fund" and "10% of the

4    Additional Compensation Fund" along with an "upfront injunctive relief award of $20 million." Ex. 2,

5    Silver Decl. ¶ 29, *see also* ECF No. 535-5 at 11. "It is plain that this arrangement creates incentives to

6    move money in arbitrary ways," and "because the $20 million upfront fee isn't tied to the dollar value

7    of the injunctive relief, the incentive to disserve the injunctive subclass is obvious." *Id.* ¶ 30. Concerns

8    like these are precisely why the law governing fiduciaries does not permit lawyers to represent clients

9    with conflicting interests by sequencing negotiations or involving a mediator. Obtaining informed

10   consent—something that cannot be done in the class context—is the only solution. *Id.* ¶¶ 18–19.

11       The resulting inequities between damages and injunctive relief subclasses in this case require

12   rejecting the settlement just as in *Amchem*, *Ortiz*, and the credit card case. "Class counsel stood to gain

13   enormously if they got the deal done." *In re Payment Card Interchange Fee*, 827 F.3d at 234. Media

14   interviews show that movants' counsel badly wanted to get a deal done.[6] "As the Supreme Court

15   recognized in [*Ortiz*]: when 'the potential for gigantic fees' is within counsel's grasp for representation

16   of one group of plaintiffs, but only if counsel resolves another group of plaintiffs' claims, a court

17   cannot assume class counsel adequately represented the latter group's interests." *In re Payment Card*

18   *Interchange Fee*, 827 F.3d at 234 (quoting *Ortiz*, 527 U.S. at 852).

19       "[T]he benefits of litigation peace do not outweigh class members' due process right to

20   adequate representation." *Id.* at 240. The different subgroups of the settlement—those with *Fontenot*

21   claims and those without, those with *Cornelio* claims and those without, and those with damages claims

22   and the future athletes limited to injunctive relief—deserved separate counsel to protect their

23   interests. They did not have it, and they will suffer as a result. The class representatives themselves

24   have already raised concerns about the adequacy of injunctive relief. ECF No. 580. "[T]he only

25   unified interests served by herding these competing claims into one class are the interests served by

26

27   ─────────────────

28   [6] *NCAA settlement Q&A*, Yahoo!Sports (May 24, 2024), *available at* https://tinyurl.com/yh83xkw6.

Objection to Final Approval by Alex Vogelsong

settlement: (i) the interest of class counsel in fees, and (ii) the interest of defendants in a bundled group of all possible claimants who can be precluded by a single payment." *In re Payment Card Interchange Fee*, 827 F.3d at 236. The settlement should not be approved. *See* Rule 23(e)(2).

## CONCLUSION

Objector Alex Vogelsong respectfully asks that the Court deny final approval of the settlement, and requests that his attorneys be permitted to speak at the Fairness Hearing.

DATED: January 31, 2025                     Respectfully submitted,

                                            By: /s/ Sean Grimsley
                                            STEPHEN M. TILLERY (*pro hac vice forthcoming*)
                                            stillery@koreintillery.com
                                            GARRETT R. BROSHUIS (Bar No. 329924)
                                            gbroshuis@koreintillery.com
                                            CAROL O'KEEFE (*pro hac vice forthcoming*)
                                            cokeefe@koreintillery.com
                                            **KOREIN TILLERY, LLC**
                                            505 North 7th Street, Suite 3600
                                            St. Louis, MO 63101
                                            Telephone: (314) 241-4844
                                            Facsimile: (314) 241-3525


                                            GEORGE A. ZELCS (*pro hac vice*)
                                            gzelcs@koreintillery.com
                                            MARC A. WALLENSTEIN (*pro hac vice*)
                                            mwallenstein@koreintillery.com
                                            PAMELA I. YAACOUB (*pro hac vice*)
                                            pyaacoub@koreintillery.com
                                            **KOREIN TILLERY, LLC**
                                            205 N. Michigan Ave., Suite 1950
                                            Chicago, IL 60601
                                            Telephone: (312) 641-9750


                                            ERIC OLSON (*pro hac vice*)
                                            eolson@olsongrimsley.com
                                            SEAN GRIMSLEY (Bar No. 216741)
                                            sgrimsley@olsongrimsley.com
                                            JASON MURRAY (*pro hac vice*)
                                            jmurray@olsongrimsley.com
                                            SAMARA HOOSE (Bar No. 337713)
                                            shoose@olsongrimsley.com
                                            **OLSON GRIMSLEY KAWANABE**
                                            **HINCHCLIFF & MURRAY LLC**
                                            700 17th Street, Suite 1600
                                            Denver, CO 80202

                                            *Attorneys for Objector Alex Vogelsong*

1

## <u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on January 31, 2025, I electronically filed the foregoing with the Clerk of

3

the Court using the CM/ECF system, which will send notification of such filing to all attorneys of

4

record registered for electronic filing.

5

*/s/ Sean Grimsley*
Sean Grimsley

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Objection to Final Approval by Alex Vogelsong