# Exhibit 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

IN RE COLLEGE ATHLETE NIL
LITIGATION

Case No. 4:20-cv-03919-CW

**DECLARATION OF PROFESSOR CHARLES SILVER ADDRESSING CONFLICTS OF
INTEREST IN THE PROPOSED SETTLEMENT AND CLASS STRUCTURE**

## I.   SUMMARY OF OPINIONS

- The interests of different groups of class members differed significantly: some stood to gain only from the recovery of damages for wrongs that occurred in the past, while others were interested mainly or exclusively in injunctive relief that would govern the flow of funds in the future.

- Because neither sequencing negotiations nor employing a special master ameliorated this conflict, Class Counsel were conflicted and class members were represented inadequately.

## II.   CREDENTIALS

1.      I hold the Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure at the University of Texas School of Law.  I joined the Texas faculty in 1987, after receiving an M.A. in political science at the University of Chicago and a J.D. at the Yale Law School.  I received tenure in 1991.  Since then, I have been a Visiting Professor at the University of Michigan School of Law (twice), the Vanderbilt University Law School, and the Harvard Law School.

2.      The study of aggregate litigation and related issues, especially attorneys' fees, has been a principal focus of my academic career.  I published my first article on the subject shortly after I joined the law faculty at the University of Texas at Austin.  *See* Charles Silver, *A Restitutionary Theory of Attorneys' Fees in Class Actions*, 76 CORNELL L. REV. 656 (1991).  Since then, I have published many more, including two empirical studies of fee awards in class actions: Lynn A. Baker, Michael A. Perino, and Charles Silver, *Setting Attorneys' Fees In Securities Class Actions: An Empirical Assessment*, 66 Vanderbilt L. Rev. 1677 (2013); and Lynn A. Baker, Michael A. Perino, and Charles Silver, *Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions*, 115 COLUM. L. REV. 1371 (2015).

3.      I have also written extensively about the professional responsibilities of lawyers who handle aggregate proceedings, judicial management techniques, and settlements. *See, e.g.*, Charles Silver, *Comparing Class Actions and Consolidations*, 10 REV. LITIG. 495 (1991); Charles Silver and Lynn A. Baker, *Mass Lawsuits and the Aggregate Settlement Rule*, 32 WAKE FOREST L. REV. 733 (1997); Lynn A. Baker and Charles Silver, *I Cut, You Choose: The Role of Plaintiffs' Counsel in Allocating Settlement Proceeds*, 84 VA. L. REV. 1465 (1998); Charles Silver and Geoffrey P. Miller, *The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and A Proposal*, 63 VAND. L. REV. 107 (2010); Charles Silver, *The Responsibilities of Lead Lawyers and Judges in Multidistrict Litigations*, 79 FORDHAM L. REV. 1985 (2011); Lynn A. Baker and Charles Silver, *Fiduciaries and Fees: Preliminary Thoughts*, 79 FORDHAM L. REV. 1833, 1866–67 (2011); Robert J. Pushaw & Charles Silver, *The Unconstitutional Assertion of Inherent Powers in Multi-District Litigation*," B.Y.U. L. REV. (2023); and Charles Silver, *The Suspect Restitutionary Basis for Common Fund Fee Awards in Multidistrict Litigations*, 101 TEXAS L. REV. 1653 (2023).

4.      From 2003 through 2010, I served as an Associate Reporter on the American Law Institute's PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION (2010).  Many courts have cited the PRINCIPLES with approval, including the U.S. Supreme Court. Following the death of Richard Nagareda, who also served as an Associate Reporter on the PRINCIPLES, I assembled a team of scholars to revise and update his casebook on complex litigation.  *See* Richard Nagareda, Robert Bone, Elizabeth Burch, Charles Silver and Patrick Woolley, THE LAW OF CLASS ACTIONS AND OTHER AGGREGATE LITIGATION, 2D (West Academic, 2013).

5.      My writings are also cited and discussed in leading treatises and other authorities, including the MANUAL FOR COMPLEX LITIGATION, THIRD (1996), the MANUAL FOR COMPLEX LITIGATION, FOURTH (2004), the RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS, and the RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT.

6.      I have testified as an expert on aggregate litigation procedures many times.  For example, judges cited my opinions when awarding fees in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 2019 WL 6888488 (E.D.N.Y. 2019), *In re Enron Corp. Securities, Derivative & "ERISA" Litigation*, 586 F. Supp. 2d 732 (S.D. Tex. 2008), and *Allapattah Services, Inc. v. Exxon Corporation*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006), all of which settled for amounts exceeding $1 billion.  I have also submitted reports on ethics issues and amicus briefs on class action procedures.  For example, I was the principal drafter of an amicus brief submitted in support of the objecting class members in *Amchem v. Windsor*, 521 U.S. 591 (1997), one of the leading cases on class action conflicts.

7.      I have attached a copy of my resume as Appendix I to this declaration.

## III.    ANALYSIS

8.      Counsel for the Fontenot Objectors asked me to express my opinions on the conflict analysis provided by Professor Robert H. Klonoff.  *See Declaration of Professor Robert H. Klonoff*

*Addressing the Argument [Doc. 473] that Separate Counsel Must be Appointed to Represent the Injunctive Class,* Doc. 536 ("*Klonoff Dec.*").  As the Court will see, my views differ considerably from his.  The disagreement between us arises not because of any personal animus, but because we think differently about the fiduciary duty to which class action lawyers are subject.

9.      We agree that class counsel must operate free of significant pressures that may cause them to serve claimants with anything less than complete devotion and unalloyed zeal.  But we disagree over the means by which such pressures, when they exist, are properly dealt with.  Professor Klonoff believes that technical arrangements, such as bifurcated settlement negotiations and the appointment of prominent mediators, can ensure undivided loyalty.  I do not.  I believe that absent informed client consent, which cannot be obtained in class actions, serious conflicts require separate representation.

10.     Professor Klonoff and I appear to agree that conflicts with significant potential to deprive class members of adequate representation exist when lawyers concurrently represent groups of claimants whose interests differ, as is true here.  Had such potential conflicts not been present, the lawyers who negotiated the proposed settlement ("Class Counsel") could have dispensed with the prophylactic steps they took "'to ensure no conflicts arose in this case.'" *Klonoff Dec.,* ¶ 21 (quoting *Joint Declaration of Steve W. Berman and Jeffrey L. Kessler in Further Support of Plaintiffs' Motion for Preliminary Settlement Approval*, Doc. 494-1, ¶ 14) ("*Berman/Kessler Dec.*").  The steps included (1) considering whether the opinion requiring separate representation of injunctive and damages claimants in *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223 (2d Cir. 2016) weighed in favor of separate representation here, (2) separating negotiations over injunctive relief from negotiations relating to damages and conducting the latter only after the former concluded, (3) delaying negotiations over the fees class counsel

4

would be paid for securing injunctive relief until "the other terms of the injunction were agreed to," and (4) employing Eric Green to mediate settlement discussions and ensure that negotiations followed the proper course. *Klonoff Dec.*, ¶¶ 21 & 22 (quoting *Berman/Kessler Dec.*, ¶ 14). The point of taking these steps was to attempt to neutralize conflicts that would otherwise have rendered Class Counsel inadequate.

11.     Professor Klonoff believes that the precautions had the desired effect. He repeatedly describes the settlement as "extraordinary" and "historic." *See, e.g.*, *Klonoff Dec.*, ¶¶ 18, 25, & 49. If one believes that the proof of adequacy is "in the pudding," so to speak, these observations have a point. Class Counsel must have been adequate, the argument runs, because they secured a spectacular result.

12.     It is convenient to begin my critique of Professor Klonoff's opinion with the point just made, for in *Amchem v. Windsor*, 521 U.S. 591 (1997), a case in which I was the primary drafter of an amicus brief in support of the objectors, the Supreme Court squarely rejected the contention that a settlement, even an outstanding one, eliminates the need to scrutinize adequacy of representation separately, as required by FRCP 23(a)(4). To the contrary, when a district court certifies a class and approves a settlement concurrently, the requirements of Rule 23(a) "demand undiluted, even heightened, attention." *Id.* at 620. Simply put, when considering whether class members received the caliber of representation that Rule 23(a)(4) requires, the size of a settlement is irrelevant. *See also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d at 232 ("'Adequacy must be determined independently of the general fairness review of the settlement'") (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006)).

13.     In my opinion, the Supreme Court got this right because the impact of conflicts is impossible to gauge. No one can know (1) whether unconflicted counsel would have secured a

better settlement than conflicted counsel did or (2) how much better a settlement negotiated by unconflicted counsel would have been.  A basic lesson of fiduciary theory is that it is impossible to know whether or how seriously a conflict undermined a fiduciary's judgment and efforts, and that it therefore makes sense to enforce the conflict prohibitions even when it seems clear that a fiduciary acted with the intent to help the beneficiary.  The reason for doing so is that interest conflicts color fiduciaries' judgments insidiously.  As Professor Lionel Smith, the leading writer, explains:

> A conflict ... creates a situation in which an external influence has the potential to affect, in an inappropriate way, the fiduciary's judgment.... A trustee is selling land held in trust, and proposes to sell it to a company in which the fiduciary has a financial interest.... The presence of his own financial interest on the other side of the contract does more than just create a risk of corruption. *It actually makes it impossible to know whether his judgment was untainted. This is why such a contract is voidable: it is impossible to know whether the fiduciary power was used in the only way it could properly be used, that is, solely for the benefit of the beneficiaries.*

Lionel Smith, *Prescriptive Fiduciary Duties*, 261 UNIVERSITY OF QUEENSLAND LAW REVIEW, 37 (2018) (emphasis added). When "it is impossible to know whether the fiduciary power was used ... properly," a blanket prohibition on conflicts can sensibly be applied.  Lionel Smith, THE LAW OF LOYALTY (2023).

14.     The point just made explains why the law entitles beneficiaries to unwind transactions entered into by conflicted agents and other fiduciaries without proving harm.  Such transactions can be nullified because conflicts undermine the inference that a fiduciary acted with the sole object of helping the beneficiary by making it impossible to know.  Intent to disserve a beneficiary is not required either.  The transactions may be undone even if the fiduciary honestly and genuinely sought to put the beneficiary's interests ahead of all others.  Conflicts undermine the integrity of judgments insidiously and invisibly, including seemingly honest judgments regarding what is best for others.

15.     I know Steve Berman, one of the lawyers serving as Class Counsel.  I doubt neither that he sought to serve all class members well nor that he sincerely believes that he did.

16.     But lawyers who represent plaintiff classes are fiduciaries.  Consequently, they must operate free of conflicts with the potential to undermine their judgment.  Here, I believe, because Class Counsel represented people whose interests diverged, their judgment, including the innumerably many discretionary decisions they made while negotiating the proposed settlement, cannot be trusted.  Neither they nor anyone else can know that they would have made the same subjective calls had they represented only people whose interests converged.

17.     As I said, I think Professor Klonoff agrees that conflicts existed because class members' interests strongly diverge.   His point is that the prophylactic steps identified above prevented the conflicts from influencing Class Counsel judgments and decisions.

18.     A start at critiquing his position can be made by observing that fiduciary law has not embraced the view that prophylactic measures can cure conflicts.  The only curative measure fiduciary law recognizes is informed client consent, which cannot be obtained in class suits.  *See* RESTATEMENT (THIRD) OF AGENCY § 8.06 (2006) ("Conduct by an agent that would otherwise constitute a breach of [the fiduciary duty of loyalty because of a conflict] … does not constitute a breach of duty if the principal consents to the conduct" after full disclosure ….); RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 121 (2000) ("Unless all affected clients and other necessary persons consent to the representation" after being fully informed, "a lawyer may not represent a client if the representation would involve a conflict of interest").

19.     What Professor Klonoff proposes, then, is a special rule that permits attorneys representing classes to handle conflicts in ways that other fiduciaries may not.  Other attorneys must either obtain clients' informed consent to conflicts or represent only clients whose interests

coincide. But Professor Klonoff would give lawyers serving as class counsel a third option: that of employing technical measures to ensure what he refers to as "structural integrity."

> Designating separately represented subclasses is not the only method for eliminating potential conflicts. Here, the parties and the experienced mediator ensured structural integrity—and the avoidance of any potential conflicts—by finalizing an agreement on the injunctive claims before commencing negotiations regarding the damages claims."

*Klonoff Dec.*, ¶ 2.

20.    I am not certain what the phrase "structural integrity" means. Professor Klonoff uses it repeatedly, but he does not define it. Although I fear that I may be putting words in his mouth, my guess is that the word "integrity" refers to class counsel's judgment and means that it is uncorrupted, while "structural" refers to the conflict-ameliorating arrangements—bifurcated negotiations and the participation of a settlement mediator—that were built into the settlement negotiations. The point of the phrase, then, is that the protections built into the negotiations led Class Counsel to act as they would have had class members' interests been harmonious rather than divergent. In other words, Professor Klonoff's claim is that the structure of the negotiations enabled class counsel to represent each subgroup with undivided loyalty even though the members of each subgroup stood to benefit at other claimants' expense by garnering a larger portion of the relief for themselves.

21.    If I have described Professor Klonoff's view correctly, and if he is right that the technical mechanisms employed in the negotiations had the described effect, one may reasonably wonder why the law does not permit attorneys in general to address conflicts by such means. I know of no authority holding that plaintiffs' lawyers can cure conflicts among co-clients by employing mediators when negotiating settlements or by negotiating injunctive relief before

damages.[1]  The usual view is that lawyers must address interest conflicts, by eliminating them or obtaining informed consent, *before* acting on clients' behalf.

22.     Nor do I think it possible that the arrangements Class Counsel employed eliminated or even ameliorated the conflicts that existed.  Consider the use of a settlement mediator.  Meaning no disrespect to Professor Eric Green, who is highly accomplished, it is obvious that mediators cannot know whether conflicts taint lawyers' subjective judgments because they cannot read lawyers' minds.  Mediators can report on what they observe during negotiations, but they cannot know about the effects of conflicts, which are often hidden.  Neither Professor Green nor even Class Counsel themselves can know whether the lawyers subconsciously sought to benefit one subclass of claimants by pulling their punches when representing another.

23.     The Second Circuit got this right in *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig*.

> One aspect of the Settlement Agreement that emphatically cannot remedy the inadequate representation is the assistance of judges and mediators in the bargaining process. True, a court-appointed mediator's involvement in pre-certification settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure. But even an intense, protected, adversarial mediation, involving multiple parties, including highly respected and capable mediators and associational plaintiffs, does not compensate for the absence of independent representation. The mission of mediators is to bring together the parties and interests that come to them. It is not their role to advance the strongest arguments in favor of each subset of class members entitled to separate representation, or to voice the interests of a group for which no one else is speaking.

827 F.3d at 234–35 (internal quotation marks and citations omitted).

---

[1] Mass tort lawyers can avoid allocation-related conflicts by negotiating for lump sums and turning the allocation process over to court-appointed administrators.  This arrangement resembles the use of settlement mediators but is importantly different.  By using court-appointed administrators or masters to handle allocations, plaintiffs' attorneys withdraw from the process (other than by providing documents and other information) and avoid having to decide how much any client will receive.  Here, of course, Class Counsel personally negotiated the allocation.

24.    Staging negotiations so that injunctive remedies are addressed before damages cannot cure an inter-class conflict either.  In fact, Class Counsel's recognition of the need to structure the negotiations as they did implies that (at least) one subclass was disserved.[2]

25.    The need for the injunction-first strategy existed because Class Counsel saw a risk that negotiating damages first would have worked to the disadvantage of class members to whom the injunctive relief mattered most.  In Professor Klonoff's words, the damages-first approach would have created an opportunity for Class Counsel to "trade away the claims of the injunctive segment" for greater monetary relief.  *Klonoff Dec*., ¶ 40.  That, obviously, is exactly what class members with only damages claims would have wanted Class Counsel to do: maximize their share of the recovery, even by subordinating other claimants' interests to theirs, if need be.  By employing the injunction-first strategy, then, Class Counsel exercised conflicted judgment and rejected the strategy that would have served damages claimants best.[3]

26.    Class Counsel may argue that the decision to negotiate injunctive relief first was made with the object of treating all class members fairly.  By making that argument, though, they would concede that a conflict existed and that a violation of the fiduciary duty occurred.  A lawyer's job is not to treat a client fairly; it is to serve a client zealously and exclusively, regardless of the consequences for others, as Lord Brougham famously observed.[4] Because Class Counsel owed a fiduciary duty to class members with damages claims, the duty of loyalty required them to use all

---

[2] I say "at least" because the problem I describe also afflicted the negotiations of the various damages claims, which Class Counsel bargained over serially to avoid conflicts stemming from the claims' "different associated damages and litigation risks."  *Berman/Kessler Dec*. ¶ 15.l

[3] The bargaining structure may also have led Class Counsel to subordinate injunctive claimants' interests to those of damages claimants, as I explain when discussing the difference between the fees to be earned on the different types of relief.

[4] *See* Henry Lord Brougham, Trial of Queen Caroline (1821) ("an advocate, in the discharge of his duty, knows but one person in all the world, and that person is his client").

lawful means to advance their interests. And because the lawyers owed class members with injunctive claims the same duty, they were bound to do the same for them. The decision to sequence the negotiations to avoid helping the damages claimants at the expense of the injunctive claimants shows clearly that the two mandates conflicted and could not be honored concurrently.

27.    When one sees conflicts clearly, one recognizes that their effects cannot be cured by sequencing negotiations. Even wealthy defendants like the NCAA have limits on the total amount they will pay to settle litigation. Knowing this, plaintiffs' attorneys participating in sequenced negotiations also know that demanding more relief in earlier stages will leave less money available to bargain for in later ones. This knowledge will predictably cause lawyers to reserve funds for later stages by moderating their demands in earlier ones. Because neither lawyers, settlement mediators, nor judges reviewing proposed class settlements can know whether or how greatly class counsel pulled their punches, neither staged negotiations nor judicial review of settlements can prevent conflicts from harming class members.[5]

28.    Instead of curing this problem, the manner in which Class Counsel handled attorneys' fees exacerbated it. The hybrid fee structure, described below, created one of the problems that existed in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), namely, the possibility of increasing fees by moving dollars in the direction of claimants who are charged at higher rates. In *Ortiz*, the lawyers, who concurrently negotiated both a proposed class settlement and a mass inventory settlement for thousands of signed clients outside the class, stood to collect 40%

---

[5] The Second Circuit stated the limit on judges' ability to police conflicts correctly in *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 253 (2d Cir. 2011), where it wrote: "[W]e have no basis for assessing whether the discount applied to Category C's recovery appropriately reflects that weakness. We know that Category C claims are worth less than the registered claims, but not by how much. Nor can we know this, in the absence of independent representation."

contingent fees from the latter but only 25% fees from the former. Consequently, every dollar "transferred" from the class settlement to the inventory settlement put an extra 15 cents in the lawyers' pockets. With billions of dollars at stake, the difference mattered enormously. Not surprisingly, the inventory settlement treated class counsel's signed clients considerably better than the proposed class settlement treated the absent class members, a fact of which the Supreme Court took note. *Id*. at 855.

29.    Here, Class Counsel requests

> 20% of the NIL Settlement Fund [], 10% of the Additional Compensation Fund [], an upfront injunctive relief award of $20 million to be paid by Defendants, and the right to apply to the Court or special master for an award of a percent of the total amount spent by Division I member institutions under the Pool for each academic year (with the percent increasing from .75[%] to a maximum of 1.25%). In the aggregate, Class Counsel request 18.3% of the cash common funds, before any cash value is assigned to the injunctive relief, ….

*Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards for Class Representatives*, Doc. 583, pp. 12-13.

30.    It is plain that this arrangement creates incentives to move money in arbitrary ways. For example, every dollar moved from the Additional Compensation Fund to the NIL Settlement Fund increases the fee award by 10 cents. And because the $20 million upfront fee isn't tied to the dollar value of the injunctive relief, the incentive to disserve the injunctive subclass is obvious. By moving money from the injunctive recovery to the Additional Compensation Fund, Class Counsel could increase their fees by 10% per dollar. The fee increase to be gained by shifting funds into the NIL Settlement Fund is 20%. These incentives are incompatible with zealous representation of absent class members with injunctive claims.[6]  See *In re Payment Card*

---

[6] This paragraph may slightly overstate the gains to be had by shifting funds away from the injunctive package. The settlement entitles Class Counsel to apply for a percent ranging from .75% to 1.25% of the total amount spent by Division I institution. Thus, Class Counsel have some

*Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d at 234 (finding inadequate representation because "[t]he class counsel and class representatives who negotiated and entered into the Settlement Agreement were in the position to trade diminution of (b)(2) relief for increase of (b)(3) relief.").

31.     The passage quoted above also reveals another problem that often arises when injunctive relief and damages are negotiated together.  Judges often ignore or heavily discount the value of injunctive relief when awarding fees to offset the tendency of lawyers to exaggerate it. The Ninth Circuit took note of this tendency when discussing coupon settlements in *In re HP Inkjet Printer Litig.*, 716 F.3d 1173 (9th Cir. 2013).

> [W]here class counsel is paid in cash, and the class is paid in some other way, for example, with coupons, comparing the value of the fees with the value of the recovery is substantially more difficult. Unlike a cash settlement, coupon settlements involve variables that make their value difficult to appraise, such as redemption rates and restrictions…. And perhaps more importantly, the additional complexity also provides class counsel with the opportunity to puff the perceived value of the settlement so as to enhance their own compensation.

*Id.* at 1179.[7]  No such problem arises when "both the class and its attorneys are paid in cash," because "[t]he district court can … simply [] compar[e] that amount of cash paid to the attorneys with the amount of case paid to the class.  The more valuable the class recovery, the greater the fee award."  *Id.* at 1178.

---

contingent percentage fee interest in the injunctive relief.  This payment is not guaranteed, however—the Court may deny a request for additional fees if it deems the compensation paid on the cash recovery sufficient—and the percentage is also small relative to the other fee provisions. Consequently, I feel comfortable ignoring it when discussing the incentive to move dollars into the cash components.

[7] The Ninth Circuit also noted the tendency of conflicts to influence lawyers' judgment invisibly. "'[E]ven if the plaintiff's attorney does not consciously or explicitly bargain for a higher fee at the expense of the beneficiaries, it is very likely that this situation has indirect or subliminal effects on the negotiations." *In re HP Inkjet Printer Litig.*, 716 F.3d at 1179 (quoting *Staton v. Boeing Co.,* 327 F.3d 938, 964 (9th Cir. 2003)).

32.     Here, Class Counsel acknowledged the tendency of judges to discount injunctive relief by asserting that the requested fee, "18.3% of the cash common funds," is reasonable "before any cash value is assigned to the injunctive relief." *Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards for Class Representatives*, Doc. 583, p. 13.  The argument, in other words, is that the fee request is reasonable even if the value of the injunctive relief is set to $0.  If (and assuming that) Class Counsel knew they would try to justify their fee request without assigning any value to the injunctive relief, their incentive to maximize this portion of the recovery was clearly nil.  Once they secured enough injunctive relief to justify the $20 million upfront fee, they had no incentive to hold out for more.

33.     Sequencing settlement negotiations did not eliminate the conflict just described.  Nor did it address other conflicts that existed between the subclasses.  Sequencing cannot eliminate fee-related conflicts between class members and their attorneys either.

34.     Admittedly, and as Professor Klonoff rightly observes, judges have approved many settlements in which class counsel negotiated fees for themselves after discussions of the relief for class members concluded.  *See, e.g.*, *Klonoff Dec.*, ¶¶ 2 & 25.  But this does not show that sequencing brings the fee-related interests of class members and class counsel into alignment.  The conflict persists.  It only shows that judges have accepted the practice, despite the obvious violation of the fiduciary duty that occurs when lawyers treat settlement negotiations as an opportunity to enrich themselves.

35.     I have made this point repeatedly.  Here is an excerpt from an article that appeared in 2010:

> When a lawyer representing a plaintiff bargains with a defendant over fees, a conflict arises. This is well understood in class actions. When a defendant controls the amount class counsel is paid, the defendant can offer red-carpet treatment on fees in return for favorable terms elsewhere. In other words, the defendant can trade

higher fees for lower relief. Class counsel is willing to play along because class counsel receives the fee, not the relief. Courts and commentators have highlighted this conflict repeatedly. Professor [John C.] Coffee[, Jr.] framed it as problem of structural collusion in which class counsel and a defendant naturally settle on terms that are good for the negotiators but bad for the class.

Charles Silver & Geoffrey P. Miller, *The Quasi-Class Action Method of Managing MultipDistrict Litigations: Problems and a Proposal*, 63 VAND. L. REV. 107, 133-134 (2010) (citations and internal quotation marks omitted). Sequencing negotiations, so that fees are discussed after other relief, does not eliminate this conflict. With both sides knowing that fees will be on the table later, little more than a wink and a nod are needed to get to the negotiators' desired result: a settlement that rewards the plaintiffs' lawyers handsomely for tempering their demands.

36.    I framed the point more generally in an article entitled "Fiduciaries and Fees" that appeared the following year, writing that

there is no reason for issues involving the allocation of the gross settlement proceeds between the plaintiffs and their attorneys to be included in the settlement negotiations between the plaintiffs' attorneys and the defendant. Matters of interest only to claimants and their lawyers should be addressed in negotiations in which only they are involved…. [P]laintiffs' lawyers should enter into settlement negotiations with a single goal: getting the most money possible for their clients…. When plaintiffs' lawyers invite, or permit, the defendant to be involved in [fee-related] matters of interest only to the claimants and their lawyers, they inevitably and unnecessarily provide the defendant an opportunity to play those attorneys off against their own clients and thereby to undermine the adequacy of the plaintiffs' representation.

Lynn A. Baker and Charles Silver, *Fiduciaries and Fees: Preliminary Thoughts*, 79 FORDHAM L. REV. 1833, 1866–67 (2011).

37.    The point is not hard to grasp. When plaintiffs' attorneys negotiate their fees with defendants, they give defendants leverage that the latter will predictably use to benefit themselves by reducing the amount they pay in settlement. Because lawyers have seats at the bargaining table but absent class members do not, the savings will predictably come at the latter's expense. Because

courts control fees in class actions, no need to negotiate provisions relating to fees usually exists. Class counsel can bargain for the largest possible recovery and let the court set the compensation.[8]

38.    If sequencing does not eliminate fee-related conflicts between lawyers and claimants, why do judges so often approve class action settlements with negotiated fee provisions? The Court is better placed to answer this question than I am, but I suspect that judges do so because they believe that fee negotiations are unlikely to have harmful effects.  Judges have the final say on fees, after all, and can use their authority to prevent class members from being overcharged— the most obvious problem that is likely to arise when lawyers set their own compensation.  In other words, judges may see negotiated fee provisions in proposed class settlements as mere recommendations that impose no burden on class members unless and until they approve them.[9]

39.    If the preceding is correct, then judges' willingness to allow sequenced negotiations in which fees are discussed after merits relief does not show that sequencing assures "structural integrity."  The only way to do that is by harmonizing the interests of class members and their attorneys.  Sequencing cannot accomplish this, but having different lawyers for subclasses with conflicting interests can, as long as the lawyers are paid from the relief they recover for the persons they represent.

40.    When opining in support of the proposed settlement, Professor Klonoff sensibly worries about certain costs, including those that stem from the appointment of separate counsel for subclasses and the sunk costs whose value will be lost if the settlement is rejected and the parties must begin the bargaining process anew.  I share these concerns, but because they exist whenever

---

[8] I have repeatedly urged judges to set lawyers' compensation terms when class litigation commences, partly because by doing so they would eliminate the need for these terms to become a topic of discussion in settlement negotiations.

[9] By saying this, I do not mean to endorse this position.  To the contrary, I believe that fees should not be on the table during settlement negotiations.

judges reject proposed settlements, they cannot be dispositive.  Significant litigation costs were also incurred in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), *Ortiz*, 527 U.S. 815, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,* 827 F.3d 223 (2d Cir. 2016), and *In re Roundup Prods. Liab. Litig.,* 541 F. Supp. 3d 1004 (N.D. Cal. 2021), all massive litigations in which enormous proposed settlements were rejected.

41.     In my view, the lesson to be learned from the possibility that time will be lost and sunk costs devalued is that lawyers should err on the side of caution when designing representation structures for use in class action settlement negotiations.  When large class actions settle, it is utterly predictable that objections will be filed and that objectors will look for conflicts that may have disfavored them.  It is predictable, in other words, that representation structures will be put under the microscope and that trial and appellate court judges will be asked to review any flaws, perceived or actual, that are discovered.  It is also predictable that judges will take the review process seriously and give objectors a fair shake, despite any inclination they may have to look favorably upon settlements recommended by attorneys they appoint and respect.  As Professor Klonoff observed, "[a] court that reviews a class settlement acts as a fiduciary for the class and thus cannot approve a settlement with a fatal conflict of interest." *Klonoff Dec.*, ¶ 39.

42.     In this case, a conservative approach would have entailed the appointment of (at least) two teams of attorneys—one to negotiate the damages recovery and one to bargain for injunctive relief—with each team being compensated solely out of the relief it recovered.  This structure, which mirrors the arrangement the Second Circuit required in *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.* would have eliminated the conflicts I have identified and could have produced a simple fee award formula, with each team of attorneys being compensated on a contingent percentage basis from the relief it recovered. 827 F.3d 223.

43.     To be clear, I am not saying that separate representation is always required when a class action complaint demands both monetary and injunctive relief.  When all class members stand to benefit from both forms of relief, the conflict over allocation may not be fundamental because class counsel may have no reason to shortchange anyone.  The case for requiring separate representation is strongest in cases like this one, where class members stand to benefit from some remedies but not others.  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 at 234 (recognizing a need for subclasses because "many members of the (b)(3) class have little to no interest in the efficacy of the injunctive relief, . . . [and] many members of the (b)(2) class have little to no interest in the size of the damages award . . . Unitary representation of separate classes that claim distinct, competing, and conflicting relief create unacceptable incentives for counsel to trade benefits to one class for benefits to the other in order somehow to reach a settlement.").  Joint representation may also be proper when class actions are tried, for the desire to maximize the jury award should then motivate class counsel to advocate zealously for everyone.[10]  Whether a conflict requiring separate representation exists depends upon the facts.

---

[10] The Second Circuit emphasized the bearing of settlement on the need to use subclasses to ensure zealous representation.

> None of this is to say that (b)(3) and (b)(2) classes cannot be combined in a single case, or that (b)(3) and (b)(2) classes necessarily and always require separate representation. Problems arise when the (b)(2) and (b)(3) classes do not have independent counsel, seek distinct relief, have non-overlapping membership, and (importantly) are certified as settlement-only. The requirements of Rule 23(a) are applied with added solicitude in the settlement-only class context because "the certification of a mandatory settlement class 'effectively concludes the proceeding save for the final fairness hearing,' and there is thus a heightened risk of conflating the fairness requirements of Rule 23(e) with the independent requirement of 'rigorous adherence to those provisions of the Rule designed to protect absentees,' such as Rules 23(a) and (b).

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d at 235.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 27th day of January, 2025.

_____
                          Charles Silver

Appendix I:  CV of Professor Charles Silver

# CHARLES SILVER

csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

## CONTACT INFORMATION

School of Law
University of Texas
727 East Dean Keeton Street
Austin, Texas 78705

(512) 232-1337 (voice)

## ACADEMIC EMPLOYMENTS

School of Law, University of Texas at Austin, 1987-Present
Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure
W. James Kronzer Chair in Trial & Appellate Advocacy
Cecil D. Redford Professor
Robert W. Calvert Faculty Fellow
Graves, Dougherty, Hearon & Moody Centennial Faculty Fellow
Assistant Professor

University of Michigan Law School, Fall 2018
Visiting Professor

Harvard Law School, Fall 2011
Visiting Professor

Vanderbilt University Law School, Fall 2003
Visiting Professor

University of Michigan Law School, Fall 1994
Visiting Professor

University of Chicago, 1983-1984
Managing Editor, *Ethics: A Journal of Social, Political and Legal Philosophy*

## EDUCATION

Yale Law School, JD (1987)
University of Chicago, MA (Political Science) (1981)
University of Florida BA (Political Science) (1979)

## PUBLICATIONS

### SPECIAL PROJECTS

PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION (with Samuel Issacharoff, Reporter, and Robert Klonoff and Richard Nagareda, Associate Reporters) (American Law Institute 2010).

# CHARLES SILVER

csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

Invited Academic Member, ABA/Tort Trial & Insurance Practice Section, Task Force on Contingent Fees, "Report on Contingent Fees In Class Action Litigation," 25 Rev. Litig. 459 (2006).

Invited Academic Member, ABA/Tort Trial & Insurance Practice Section, Task Force on Contingent Fees, "Report on Contingent Fees In Mass Tort Litigation," 42 Tort Trial & Insurance Practice Law Journal 105 (2006).

Invited Academic Member, ABA/Tort Trial & Insurance Practice Section, Task Force on Contingent Fees, "Report on Contingent Fees In Medical Malpractice Litigation," 25 Rev. Litig. 459 (2006).

PRACTICAL GUIDE FOR INSURANCE DEFENSE LAWYERS (2002) (with Ellen S. Pryor and Kent D. Syverud, Co-Reporters); published on the IADC website (2003); revised and distributed to all IADC members as a supplement to the Defense Counsel J. (2004).

## BOOKS

MEDICAL MALPRACTICE LITIGATION: HOW IT WORKS, WHAT IT DOES, AND WHY TORT REFORM HASN'T HELPED (with Bernard S. Black, David A. Hyman, Myungho Paik, and William M. Sage) (Cato Institute, 2021).

OVERCHARGED: WHY AMERICANS PAY TOO MUCH FOR HEALTH CARE (with David A. Hyman) (Cato Institute, 2018).

HEALTH LAW AND ECONOMICS, Vols. I and II (coedited with Ronen Avraham and David A. Hyman) (Edward Elgar 2016).

LAW OF CLASS ACTIONS AND OTHER AGGREGATE LITIGATION, (coedited with Richard Nagareda, Robert Bone, Elizabeth Burch and Patrick Woolley) (Foundation Press, 2nd Ed. 2012) (updated annually through 2020).

PROFESSIONAL RESPONSIBILITIES OF INSURANCE DEFENSE COUNSEL (with William T. Barker) (LexisNexis 2012) (updated annually through 2017).

## ARTICLES AND BOOK CHAPTERS BY SUBJECT AREA (* INDICATES PEER REVIEWED)

### Health Care Law & Policy

1.  "Leveraging Medicare: How to Deliver Affordable, High-Quality Health Care," Murphy St. Thomas Journal of Law & Public Policy (forthcoming 2024) (with David A. Hyman) (invited symposium contribution).

2.  "Leveraging The Medicaid Expansion," 9 University of Pennsylvania Journal of Law and Public Affairs 217 (2024) (with David A. Hyman).

3.  "Regulating Health Care: Perspectives From Government Failure During the COVID-19 Pandemic," 71 DePaul L. Rev. 361 (2022) (with David A. Hyman).

## CHARLES SILVER

csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

4.      "Are We 'Paying Twice' for Pharmaceuticals?," <u>Regulation</u> 14 (Winter 2020-2021) (with David A. Hyman).

5.      "Paying Beneficiaries, Not Providers," <u>Regulation</u>, 34 (2020) (with David A. Hyman).

6.      "Pharmaceutical Pricing When Success Has Many Parents," 37 <u>Yale J. Reg.</u> 101 (2020) (with David A. Hyman).

7.      "Pricing and Paying for Cancer Drugs: Policy Options for Fixing A Broken System," 26:4 <u>The Cancer Journal</u> 298-303 (2020) (with David A. Hyman).*

8.      "Medicare For All: Four Inconvenient Truths," 20 <u>Hous. J. of Health L. & Policy</u> 133 (2020) (with David A. Hyman).

9.      "Health Care's Government Bureaucracy: A Comment on *Health Care's Market Bureaucracy*, by Allison K. Hoffman," (unpublished) (with David A. Hyman).

10.     "Surprise Medical Bills: How To Protect Patients and Make Care More Affordable," 108 <u>Georgetown L. J.</u> 1655 (2020) (with David A. Hyman and Ben Ippolito).

11.     "There is a Better Way: Make Medicaid and Medicare More Like Social Security," 18 <u>Georgetown J. of L. & Pub. Pol'y</u> 149 (2020) (with David A. Hyman).

12.     "Why Are We Being Overcharged for Pharmaceuticals? What Should We Do About It?" 39 <u>J. Legal Med.</u> 137 (2019) (with David A. Hyman).

13.     "Regulating Pharmaceutical Companies' Financial Largesse," 7:25 <u>Israeli J. Health Policy Res.</u> (2018), https://doi.org/10.1186/s13584-018-0220-5 (with Ronen Avraham).*

14.     "Medical Malpractice Litigation," (with David A. Hyman) OXFORD RESEARCH ENCYCLOPEDIA OF ECONOMICS AND FINANCE (2019), DOI: 10.1093/acrefore/9780190625979.013.365.*

15.     "It Was on Fire When I Lay Down on It: Defensive Medicine, Tort Reform, and Healthcare Spending," (with David A. Hyman) OXFORD HANDBOOK OF AMERICAN HEALTH LAW, I. Glenn Cohen, Allison Hoffman, and William M. Sage, eds. (2017).*

16.     "Compensating Persons Injured by Medical Malpractice and Other Tortious Behavior for Future Medical Expenses Under the Affordable Care Act," (with Maxwell J. Mehlman, Jay Angoff, Patrick A. Malone, and Peter H. Weinberger)25 <u>Annals of Health Law</u> 35 (2016).

17.     "Double, Double, Toil and Trouble: Justice-Talk and the Future of Medical Malpractice Litigation," (with David A. Hyman) 63 <u>DePaul L. Rev.</u> 574 (2014) (invited symposium).

18.     "Five Myths of Medical Malpractice," (with David A. Hyman) 143:1 <u>Chest</u> 222-227 (2013).*

## CHARLES SILVER

csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

19.    "Health Care Quality, Patient Safety and the Culture of Medicine: 'Denial Ain't Just A River in Egypt,'" (with David A. Hyman), 46 New England L. Rev. 101 (2012) (invited symposium).

20.    "Medical Malpractice and Compensation in Global Perspective: How Does the U.S. Do It?" (coauthored with David A. Hyman) MEDICAL MALPRACTICE AND COMPENSATION IN GLOBAL PERSPECTIVE (Ken Oliphant & Richard W. Wright, eds. 2013)*; originally published in 87 Chicago-Kent L. Rev. 163 (2012).

21.    "Justice Has (Almost) Nothing to Do With It: Medical Malpractice and Tort Reform," in Rosamond Rhodes, Margaret P. Battin, and Anita Silvers, eds., MEDICINE AND SOCIAL JUSTICE, Oxford University Press 531-542 (2012) (with David A. Hyman).*

22.    "Medical Malpractice Litigation and Tort Reform: It's the Incentives, Stupid," 59 Vanderbilt L. Rev. 1085 (2006) (with David A. Hyman) (invited symposium).

23.    "Medical Malpractice Reform Redux: Déjà Vu All Over Again?" XII Widener L. J. 121 (2005) (with David A. Hyman) (invited symposium).

24.    "Speak Not of Error, Regulation (Spring 2005) (with David A. Hyman).

25.    "The Poor State of Health Care Quality in the U.S.: Is Malpractice Liability Part of the Problem or Part of the Solution?" 90 Cornell L. Rev. 893 (2005) (with David A. Hyman).

26.    "Believing Six Improbable Things: Medical Malpractice and 'Legal Fear,'" 28 Harv. J. L. and Pub. Pol. 107 (2004) (with David A. Hyman) (invited symposium).

27.    "You Get What You Pay For: Result-Based Compensation for Health Care," 58 Wash. & Lee L. Rev. 1427 (2001) (with David A. Hyman).

28.    "The Case for Result-Based Compensation in Health Care," 29 J. L. Med. & Ethics 170 (2001) (with David A. Hyman).*

### Studies of Medical Malpractice Litigation

29.    "Fictions and Facts: Medical Malpractice Litigation, Physician Supply, and Health Care Spending in Texas Before and After HB 4," 51 Tex. Tech L. Rev. 627 (2019). (with David A. Hyman and Bernard Black) (invited symposium on the 15th anniversary of the enactment of HB4).

30.    "Insurance Crisis or Liability Crisis? Medical Malpractice Claiming in Illinois, 1980-2010," 13 J. Empirical Legal Stud. 183 (2016) (with Bernard S. Black, David A. Hyman, and Mohammad H. Rahmati).

31.    "Policy Limits, Payouts, and Blood Money: Medical Malpractice Settlements in the Shadow of Insurance," 5 U.C. Irvine L. Rev. 559 (2015) (with Bernard S. Black, David A. Hyman, and Myungho Paik) (invited symposium).

## CHARLES SILVER

csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

32. "Does Tort Reform Affect Physician Supply? Evidence from Texas," Int'l Rev. of L. & Econ. (2015) (with Bernard S. Black, David A. Hyman, and Myungho Paik), available at http://dx.doi.org/10.1016/j.irle.2015.02.002.*

33. "How do the Elderly Fare in Medical Malpractice Litigation, Before and After Tort Reform? Evidence From Texas" (with Bernard S. Black, David A. Hyman, Myungho Paik, and William M. Sage), Amer. L. & Econ. Rev. (2012), doi: 10.1093/aler/ahs017.*

34. "Will Tort Reform Bend the Cost Curve? Evidence from Texas" (with Bernard S. Black, David A. Hyman, Myungho Paik), 9 J. Empirical Legal Stud. 173-216 (2012).*

35. "O'Connell Early Settlement Offers: Toward Realistic Numbers and Two-Sided Offers," 7 J. Empirical Legal Stud. 379 (2010) (with Bernard S. Black and David A. Hyman).*

36. "The Effects of 'Early Offers' on Settlement: Evidence From Texas Medical Malpractice Cases, 6 J. Empirical Legal Stud. 723 (2009) (with David A. Hyman and Bernard S. Black).*

37. "Estimating the Effect of Damage Caps in Medical Malpractice Cases: Evidence from Texas," 1 J. Legal Analysis 355 (2009) (with David A. Hyman, Bernard S. Black, and William M. Sage) (inaugural issue).*

38. "The Impact of the 2003 Texas Medical Malpractice Damages Cap on Physician Supply and Insurer Payouts: Separating Facts from Rhetoric," 44 The Advocate (Texas) 25 (2008) (with Bernard S. Black and David A. Hyman) (invited symposium).

39. "Malpractice Payouts and Malpractice Insurance: Evidence from Texas Closed Claims, 1990-2003," 3 Geneva Papers on Risk and Insurance: Issues and Practice 177-192 (2008) (with Bernard S. Black, David A. Hyman, William M. Sage and Kathryn Zeiler).*

40. "Physicians' Insurance Limits and Malpractice Payments: Evidence from Texas Closed Claims 1990-2003," 36 J. Legal Stud. S9 (2007) (with Bernard S. Black, David A. Hyman, William M. Sage, and Kathryn Zeiler).*

41. "Do Defendants Pay What Juries Award? Post-Verdict Haircuts in Texas Medical Malpractice Cases, 1988-2003," J. Empirical Legal Stud. 3-68 (2007) (with Bernard S. Black, David A. Hyman, William M. Sage, and Kathryn Zeiler).*

42. "Stability, Not Crisis: Medical Malpractice Claim Outcomes in Texas, 1988-2002," 2 J. Empirical Legal Stud. 207–259 (July 2005) (with Bernard S. Black, David A. Hyman, and William S. Sage).*

### Empirical Studies of the Law Firms and Legal Services

43. "Screening Plaintiffs and Selecting Defendants in Medical Malpractice Litigation: Evidence from Illinois and Indiana," 15 J. Empirical Legal Stud. 41-79 (2018) (with Mohammad Rahmati, David A. Hyman, Bernard S. Black, and Jing Liu)*

# CHARLES SILVER

csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

44.    "Medical Malpractice Litigation and the Market for Plaintiff-Side Representation: Evidence from Illinois," 13 J. Empirical Legal Stud. 603-636 (2016) (with David A. Hyman, Mohammad Rahmati, Bernard S. Black).*

45.    "The Economics of Plaintiff-Side Personal Injury Practice," U. Ill. L. Rev. 1563 (2015) (with Bernard S. Black and David A. Hyman).

46.    "Access to Justice in a World without Lawyers: Evidence from Texas Bodily Injury Claims," 37 Fordham Urb. L. J. 357 (2010) (with David A. Hyman) (invited symposium).

47.    "Defense Costs and Insurer Reserves in Medical Malpractice and Other Personal Injury Cases: Evidence from Texas, 1988-2004," 10 Amer. Law & Econ. Rev. 185 (2008) (with Bernard S. Black, David A. Hyman, and William M. Sage).*

### Attorneys' Fees—Empirical Studies and Policy Analyses

48.    "Third Party Litigation Funding: Panacea or More Tsuris," Theoretical Inquiries in Law (forthcoming 2024) (with David A. Hyman).

49.    "The Mimic-the-Market Method of Regulating Common Fund Fee Awards: A Status Report on Securities Fraud Class Actions," RESEARCH HANDBOOK ON REPRESENTATIVE SHAREHOLDER LITIGATION, Sean Griffith, Jessica Erickson, David H. Webber, and Verity Winship, Eds. (2018).

50.    "Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions," 115 Columbia L. Rev. 1371 (2015) (with Lynn A. Baker and Michael A. Perino).

51.    "Regulation of Fee Awards in the Fifth Circuit," 67 The Advocate (Texas) 36 (2014) (invited submission).

52.    "Setting Attorneys' Fees In Securities Class Actions: An Empirical Assessment," 66 Vanderbilt L. Rev. 1677 (2013) (with Lynn A. Baker and Michael A. Perino).

53.    "The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal," 63 Vanderbilt L. Rev. 107 (2010) (with Geoffrey P. Miller).

54.    "Incentivizing Institutional Investors to Serve as Lead Plaintiffs in Securities Fraud Class Actions," 57 DePaul L. Rev. 471 (2008) (with Sam Dinkin) (invited symposium), reprinted in L. Padmavathi, Ed., SECURITIES FRAUD: REGULATORY DIMENSIONS (2009).

55.    "Reasonable Attorneys' Fees in Securities Class Actions: A Reply to Mr. Schneider," 20 The NAPPA Report 7 (Aug. 2006).

56.    "Dissent from Recommendation to Set Fees Ex Post," 25 Rev. of Litig. 497 (2006).

57.    "Due Process and the Lodestar Method: You Can't Get There From Here," 74 Tul. L. Rev. 1809 (2000) (invited symposium).

## CHARLES SILVER

csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

58. "Incoherence and Irrationality in the Law of Attorneys' Fees," 12 Tex. Rev. of Litig. 301 (1993).

59. "Unloading the Lodestar: Toward a New Fee Award Procedure," 70 Tex. L. Rev. 865 (1992).

**Liability Insurance and Insurance Defense Ethics**

60. "Liability Insurance and Patient Safety," 68 DePaul L. Rev. 209 (2019) (with Tom Baker) (symposium issue).

61. "The Treatment of Insurers' Defense-Related Responsibilities in the Principles of the Law of Liability Insurance: A Critique," 68 Rutgers U. L. Rev. 83 (2015) (with William T. Barker) (symposium issue).

62. "The Basic Economics of the Duty to Defend," in D. Schwarcz and P. Siegelman, eds., RESEARCH HANDBOOK IN THE LAW & ECONOMICS OF INSURANCE 438-460 (2015).*

63. "Insurer Rights to Limit Costs of Independent Counsel," ABA/TIPS Insurance Coverage Litigation Section Newsletter 1 (Aug. 2014) (with William T. Barker).

64. "Litigation Funding Versus Liability Insurance: What's the Difference?," 63 DePaul L. Rev. 617 (2014) (invited symposium).

65. "Ethical Obligations of Independent Defense Counsel," 22:4 Insurance Coverage (July-August 2012) (with William T. Barker), available at http://apps.americanbar.org/litigation/committees/insurance/articles/julyaug2012-ethical-obligations-defense-counsel2.html.

66. "Settlement at Policy Limits and The Duty to Settle: Evidence from Texas," 8 J. Empirical Leg. Stud. 48-84 (2011) (with Bernard S. Black and David A. Hyman).*

67. "When Should Government Regulate Lawyer-Client Relationships? The Campaign to Prevent Insurers from Managing Defense Costs," 44 Ariz. L. Rev. 787 (2002) (invited symposium).

68. "Defense Lawyers' Professional Responsibilities: Part II—Contested Coverage Cases," 15 G'town J. Legal Ethics 29 (2001) (with Ellen S. Pryor).

69. "Defense Lawyers' Professional Responsibilities: Part I—Excess Exposure Cases," 78 Tex. L. Rev. 599 (2000) (with Ellen S. Pryor).

70. "Flat Fees and Staff Attorneys: Unnecessary Casualties in the Battle over the Law Governing Insurance Defense Lawyers," 4 Conn. Ins. L. J. 205 (1998) (invited symposium).

## CHARLES SILVER
csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

71.  "The Lost World: Of Politics and Getting the Law Right," 26 Hofstra L. Rev. 773 (1998) (invited symposium).

72.  "Professional Liability Insurance as Insurance and as Lawyer Regulation: A Comment on Davis, Institutional Choices in the Regulation of Lawyers," 65 Fordham L. Rev. 233 (1996) (invited symposium).

73.  "All Clients are Equal, But Some are More Equal than Others: A Reply to Morgan and Wolfram," 6 Coverage 47 (1996) (with Michael Sean Quinn).

74.  "Are Liability Carriers Second-Class Clients? No, But They May Be Soon-A Call to Arms against the Restatement of the Law Governing Lawyers," 6 Coverage 21 (1996) (with Michael Sean Quinn).

75.  "The Professional Responsibilities of Insurance Defense Lawyers," 45 Duke L. J. 255 (1995) (with Kent D. Syverud); reprinted in IX INS. L. ANTHOL. (1996) and 64 Def. L. J. 1 (Spring 1997).

76.  "Wrong Turns on the Three Way Street: Dispelling Nonsense about Insurance Defense Lawyers," 5-6 Coverage 1 (Nov./Dec.1995) (with Michael Sean Quinn).

77.  "Introduction to the Symposium on Bad Faith in the Law of Contract and Insurance," 72 Tex. L. Rev. 1203 (1994) (with Ellen Smith Pryor).

78.  "Does Insurance Defense Counsel Represent the Company or the Insured?" 72 Tex. L. Rev. 1583 (1994); reprinted in Practicing Law Institute, INSURANCE LAW: WHAT EVERY LAWYER AND BUSINESSPERSON NEEDS TO KNOW (1998).

79.  "A Missed Misalignment of Interests: A Comment on *Syverud, The Duty to Settle*," 77 Va. L. Rev. 1585 (1991); reprinted in VI INS. L. ANTHOL. 857 (1992).

### Class Actions, Mass Actions, and Multi-District Litigations

80.  "The Suspect Restitutionary Basis for Common Fund Fee Awards in Multidistrict Litigations," 101 Texas L. Rev. 1653 (2023) (symposium issue).

81.  "The Unconstitutional Assertion of Inherent Powers in Multi-District Litigation," B.Y.U. L. Rev. (2023) (with Robert J. Pushaw).

82.  "In Defense of Private Claim Resolution Facilities," 84 J. of L. and Contemporary Problems 45 (2021) (with Lynn A. Baker).*

83.  "What Can We Learn by Studying Lawyers' Involvement in Multidistrict Litigation?  A Comment on *Williams, Lee, and Borden, Repeat Players in Federal Multidistrict Litigation*," 5 J. of Tort L. 181 (2014), DOI: 10.1515/jtl-2014-0010 (invited symposium).

## CHARLES SILVER

csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

84.     "The Responsibilities of Lead Lawyers and Judges in Multi-District Litigations," 79 Fordham L. Rev. 1985 (2011) (invited symposium).

85.     "The Allocation Problem in Multiple-Claimant Representations," 14 S. Ct. Econ. Rev. 95 (2006) (with Paul Edelman and Richard Nagareda).*

86.     "A Rejoinder to *Lester Brickman, On the Theory Class's Theories of Asbestos Litigation,*" 32 Pepperdine L. Rev. 765 (2005).

87.     "Merging Roles: Mass Tort Lawyers as Agents and Trustees," 31 Pepp. L. Rev. 301 (2004) (invited symposium).

88.     "We're Scared To Death: Class Certification and Blackmail," 78 N.Y.U. L. Rev. 1357 (2003).

89.     "The Aggregate Settlement Rule and Ideals of Client Service," 41 S. Tex. L. Rev. 227 (1999) (with Lynn A. Baker) (invited symposium).

90.     "Representative Lawsuits & Class Actions," in B. Bouckaert & G. De Geest, eds., INT'L ENCY. OF L. & ECON. (1999).*

91.     "I Cut, You Choose: The Role of Plaintiffs' Counsel in Allocating Settlement Proceeds," 84 Va. L. Rev. 1465 (1998) (with Lynn A. Baker) (invited symposium).

92.     "Mass Lawsuits and the Aggregate Settlement Rule," 32 Wake Forest L. Rev. 733 (1997) (with Lynn A. Baker) (invited symposium).

93.     "Comparing Class Actions and Consolidations," 10 Tex. Rev. of Litig. 496 (1991).

94.     "A Restitutionary Theory of Attorneys' Fees in Class Actions," 76 Cornell L. Rev. 656 (1991).

95.     "Justice in Settlements," 4 Soc. Phil. & Pol. 102 (1986) (with Jules L. Coleman).*

### General Legal Ethics and Civil Litigation

96.     "A Private Law Defense of Zealous Representation" (in progress), available at http://ssrn.com/abstract=2728326.

97.     "The DOMA Sideshow" (in progress), available at http://ssrn.com/abstract=2584709.

98.     "The Responsibilities of Lead Lawyers and Judges in Multidistrict Litigations," 79 Fordham L. Rev. 1985 (2011).

99.     "Fiduciaries and Fees," 79 Fordham L. Rev. 1833 (2011) (with Lynn A. Baker) (invited symposium).

## CHARLES SILVER

csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

100. "Ethics and Innovation," 79 George Washington L. Rev. 754 (2011) (invited symposium).

101. "In Texas, Life is Cheap," 59 Vanderbilt L. Rev. 1875 (2006) (with Frank Cross) (invited symposium).

102. "Introduction: Civil Justice Fact and Fiction," 80 Tex. L. Rev. 1537 (2002) (with Lynn A. Baker).

103. "Does Civil Justice Cost Too Much?" 80 Tex. L. Rev. 2073 (2002).

104. "A Critique of *Burrow v. Arce*," 26 Wm. & Mary Envir. L. & Policy Rev. 323 (2001) (invited symposium).

105. "What's Not To Like About Being A Lawyer?" 109 Yale L. J. 1443 (2000) (with Frank B. Cross) (review essay).

106. "Preliminary Thoughts on the Economics of Witness Preparation," 30 Tex. Tech L. Rev. 1383 (1999) (invited symposium).

107. "And Such Small Portions: Limited Performance Agreements and the Cost-Quality/Access Trade-Off," 11 G'town J. Legal Ethics 959 (1998) (with David A. Hyman) (invited symposium).

108. "Bargaining Impediments and Settlement Behavior," in D.A. Anderson, ed., DISPUTE RESOLUTION: BRIDGING THE SETTLEMENT GAP (1996) (with Samuel Issacharoff and Kent D. Syverud).

109. "The Legal Establishment Meets the Republican Revolution," 37 S. Tex. L. Rev. 1247 (1996) (invited symposium).

110. "Do We Know Enough about Legal Norms?" in D. Braybrooke, ed., SOCIAL RULES: ORIGIN; CHARACTER; LOGIC: CHANGE (1996) (invited contribution).

111. "Integrating Theory and Practice into the Professional Responsibility Curriculum at the University of Texas," 58 Law and Contemporary Problems 213 (1995) (with Amon Burton, John S. Dzienkowski, and Sanford Levinson,).

112. "Thoughts on Procedural Issues in Insurance Litigation," VII INS. L. ANTHOL. (1994).

### Legal and Moral Philosophy

113. "Elmer's Case: A Legal Positivist Replies to Dworkin," 6 L. & Phil. 381 (1987).**

114. "Negative Positivism and the Hard Facts of Life," 68 The Monist 347 (1985).**

115. "Utilitarian Participation," 23 Soc. Sci. Info. 701 (1984).**

# CHARLES SILVER

csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

### Practice-Oriented Publications

116.   "Your Role in a Law Firm: Responsibilities of Senior, Junior, and Supervisory Attorneys," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (3D) (Texas Center for Legal Ethics and Professionalism 1996).

117.   "Getting and Keeping Clients," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (3D) (Texas Center for Legal Ethics and Professionalism 1996) (with James M. McCormack and Mitchel L. Winick).

118.   "Advertising and Marketing Legal Services," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (Texas Center for Legal Ethics and Professionalism 1994).

119.   "Responsibilities of Senior and Junior Attorneys," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (Texas Center for Legal Ethics and Professionalism 1994).

120.   "A Model Retainer Agreement for Legal Services Programs: Mandatory Attorney's Fees Provisions," 28 Clearinghouse Rev. 114 (June 1994) (with Stephen Yelenosky).

### Miscellaneous

121.   "Public Opinion and the Federal Judiciary: Crime, Punishment, and Demographic Constraints," 3 Pop. Res. & Pol. Rev. 255 (1984) (with Robert Y. Shapiro).*

## PERSONAL

Daughter, Katherine

Consults with attorneys and serves as an expert witness on subjects in his areas of expertise.

First generation of family to attend college.