# EXHIBIT A

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
### No. 1:24-CV-00238-CCE-JEP

| | |
|---|---|
| REESE BRANTMEIER and MAY JOINT, on behalf of themselves and all others similarly situated,<br><br>*Plaintiff,*<br><br>*v.*<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,<br><br>*Defendant.* | **FIRST AMENDED COMPLAINT – CLASS ACTION**<br><br>(Jury Trial Demanded) |

Plaintiffs Reese Brantmeier and Maya Joint, on behalf of themselves and all persons similarly situated, by and through undersigned counsel, and complaining of Defendant National Collegiate Athletic Associate ("NCAA"), allege as follows:

## <u>INTRODUCTION</u>

1.      This lawsuit is brought on behalf of an Injunctive Relief Class and a Damages Class of student-athletes who compete in, competed in, or seek to

compete in, NCAA Division I Tennis[1] and who intend to compete in non-NCAA athletic events that award prize money based on finish or performance in such events (collectively, the "Classes").[2]  Plaintiffs and the Classes challenge the NCAA's arbitrary prize money restrictions, seeking damages and declaratory and injunctive relief to strike such restrictions that prevent Plaintiffs and the Classes from retaining the full amount of monetary prizes earned through their athletic performance in non-NCAA competitions without jeopardizing their collegiate eligibility.

2.    The NCAA has long instituted a money first, student-athletes second approach in its operations, rules, and regulations.  For over a century, from its inception until July 1, 2021, the NCAA prohibited the gifted student-athletes at its member institutions[3] from receiving any compensation for their athletic performance and services beyond an athletic scholarship and certain other educational-related benefits.

3.    During the same period, the NCAA has generated billions of dollars in income, primarily from the NCAA Division I Men's Basketball

---

[1] Throughout this Complaint, "Tennis" means NCAA Division I women's tennis, men's tennis, and all related team aspects.

[2] *See infra* ¶¶ 151-52 (definitions of the "Classes").

[3] As used in this Complaint, "member institutions" refers to the colleges and universities, both public and private, that are members of the NCAA and agree to be bound by its bylaws.

2

Tournament, and many NCAA administrators, conference commissioners, athletics directors, and coaches have commanded and continue to command seven-figure, and occasionally eight-figure, annual salaries.

4.     In the 40 years since the NCAA's monopoly on regular season college football telecasts was broken up by the U.S. Supreme Court[4], the NCAA and its most prominent members have chased television revenue via the ever-expanding geographic footprints of their conferences notwithstanding the deleterious effect on the academic and athletic performance of student-athletes.

5.     Commencing with the 2024-25 academic year, three of the four remaining "Power Conferences" will have conference members thousands of miles and three time zones apart.  The Big Ten Conference will stretch from Washington State and California to Maryland and Pennsylvania, the Big 12 Conference from Utah and Arizona to West Virginia and Florida, and the Atlantic Coast Conference from California to Florida and Massachusetts.

6.     Unlike the football programs of these Power Conference members, which charter planes and play almost exclusively on Saturdays, the vast majority of the "non-revenue" sports programs of these institutions will fly

---

[4] *See NCAA v. Board of Regents*, 468 U.S. 85, 119 (1984).

commercial (in many cases with connecting flights) from coast to coast to play weekday contests, resulting in missed class time and mental and physical fatigue of the student-athletes.

7.    Commencing the 2024-25 academic year, CBS and Warner Bros. Discovery will reportedly pay the NCAA an average of $1.1 billion annually for the television rights to the Division I Men's Basketball Tournament, and ESPN will reportedly pay an average of $115M annually to the NCAA for the television rights to other NCAA championships.[5]

8.    Over the last three years, tens of millions of dollars have flowed, with the NCAA's knowledge and acquiescence, to mostly male student-athletes in the Power Conferences from third-party, booster-funded and operated collectives (the "Collectives") that are associated with virtually all NCAA FBS-level athletics departments and which sprung up in 2021 in the wake of the NCAA's temporary suspension of its rules prohibiting name, image, and likeness ("NIL") payments.

---

[5] *Turner, CBS and the NCAA Reach Long-Term Multimedia Rights Extension for D1 Men's Basketball*, NCAA.com (Apr. 16, 2016), https://www.ncaa.com/news/basketball-men/article/2016-04-12/turner-cbs-and-ncaa-reach-long-term-multimedia-rights; *ESPN and NCAA Reach New, Eight-Year Media Rights Agreement*, NCAA.com (Jan. 4, 2024), https://www.ncaa.com/news/ncaa/article/2024-01-04/espn-and-ncaa-reach-new-eight-year-media-rights-agreement.

4

9. While these tens of millions of dollars have been paid to student-athletes under the guise of acquiring rights to utilize their NIL, the vast majority of the money is in reality "pay-for-play" compensation to student-athletes that has little or no relation to the actual market value for the supposed NIL services that the student-athletes must provide "in exchange" for that compensation.

10. It is common knowledge that the primary purpose of the NIL payments made by these Collectives is to recruit high school athletes and transfer portal student-athletes to the institutions associated with the Collectives and to prevent currently enrolled student-athletes from transferring to other universities.

11. Nonetheless, with certain minor exceptions, the NCAA continues to prohibit student-athletes at those same institutions, who compete in sports that do not generate massive profits, from accepting cash awards, bonuses, and other monetary prizes (collectively, "Prize Money") awarded through non-NCAA competitions. The NCAA's farcical and anachronistic justification for such restrictions on payments is that the acceptance of money by student-athletes would destroy the NCAA's concept of "amateurism."

12. While the NCAA allows its member institutions to financially benefit from the publicity associated with the student-athletes who compete in

non-NCAA competitions, the NCAA prohibits the student-athletes from accepting Prize Money earned for their athletic performance in such competitions, except to cover "actual and necessary expenses." Violation of these restrictions results in a loss of the student-athlete's eligibility to play his or her sport at the varsity collegiate level.

13. Plaintiffs seek to lift the veil of hypocrisy on the NCAA's practice of allowing primarily Division I football and men's basketball student-athletes, who play profit-generating sports in the Power Conferences, to receive virtually all of the pay-for-play money distributed by Collectives while prohibiting student-athletes who compete in Tennis from accepting Prize Money earned in non-NCAA competitions, including but not limited to the US Open Tennis Championships, the Australian Open, Roland Garros a/k/a the French Open, and the Championships, Wimbledon.

14. This lawsuit challenges the NCAA's arbitrary and anticompetitive Prize Money restrictions, seeking to strike such restrictions and allow Plaintiffs and the Classes to retain full compensation of monetary prizes earned through their athletic performance in non-NCAA competitions, and receive restitution for such Prize Monies earned but forfeited due to the NCAA's Prize Money restrictions.

6

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1337, and 15 U.S.C. § 4, as this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 26.

16.    This Court has personal jurisdiction over Defendant because, *inter alia*, the NCAA has: (i) transacted business throughout the United States, including in this District; (ii) participated in organizing intercollegiate athletic contests throughout the United States, including in this District; (iii) had substantial contacts with the United States, including in this District; and (iv) engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.  Moreover, several NCAA member institutions with Division I Tennis teams are found within this District: the University of North Carolina at Chapel Hill, The University of North Carolina at Greensboro, Duke University, Wake Forest University, North Carolina Central University, North Carolina A&T State University, Elon University.

17.    Venue is proper pursuant to 28 U.S.C. § 1391 because Defendant has agents and transacts business in this District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

### A.    Plaintiffs

18.    Plaintiff Reese Brantmeier ("Brantmeier") is a resident of Chapel Hill, Orange County, North Carolina, and currently a junior student-athlete at the University of North Carolina at Chapel Hill ("UNC" or the "Tar Heels"), competing for its NCAA Division I women's tennis team.

19.    Prior to college, Brantmeier was a heavily recruited star athlete from Whitewater, Jefferson County, Wisconsin.  She was the No. 1 ranked tennis player in the United States, Great Lakes Region, and the state of Wisconsin for the 2022 high school class and was ranked as high as No. 411 in the Women's Tennis Association ("WTA") singles rankings.

20.    Brantmeier received full scholarship offers from over 200 colleges and universities, including Stanford University, University of Texas at Austin, and University of California, Los Angeles, among others.  Brantmeier ultimately signed and accepted a full scholarship offer from UNC and enrolled in August of 2022.

8

21.    In her true freshman season, Brantmeier played the No. 1 position for the Tar Heels, which defeated rival North Carolina State University to win the 2023 NCAA Division I Women's Tennis Team National Championship, and she also finished runner-up in the 2023 NCAA Division I Women's Tennis Doubles National Championship, alongside teammate Elizabeth Scotty.

22.    In February 2024, Brantmeier was ranked No. 2 in singles and No. 1 in doubles by the Intercollegiate Tennis Association ("ITA").

23.    As a result of her achievements, Brantmeier amassed numerous accolades, including but not limited to 2023 ITA All-American honors in both singles and doubles, 2023 NCAA Championship All-Tournament Team honors, 2023 First-Team All-ACC honors in singles and doubles, four-time ACC Freshman of the Week (Jan. 24, Feb. 14, Mar. 7, and Mar. 14), and she was named to the 2023 USTA Collegiate Summer Team, the prestigious development program for the top ten American collegiate players.

24.    In addition to her on-court success, Brantmeier is an outstanding student, earning 2023 All-ACC Academic Team honors and 2023 ACC Honor Roll honors.  She currently holds approximately a 3.956 GPA and is double majoring in exercise and sports science and studio art, with a minor in global cinema.

9

25.    Plaintiff Maya Joint ("Joint") is a resident of Austin, Travis County, Texas, and currently a freshman student-athlete at the University of Texas at Austin ("Texas" or the "Longhorns"), competing for its NCAA Division I women's tennis team.

26.    Prior to college, Joint was a prodigious and heavily recruited tennis player out of Grosse Pointe, Wayne County, Michigan. She was the No. 3 ranked women's tennis player in the United States and the No. 1 ranked women's tennis player in Michigan for the 2024 high school class. As of July 2024, she is ranked No. 179 and No. 282 in the world in women's singles and doubles tennis, respectively, by the WTA.

27.    Joint received full scholarship offers from colleges and universities throughout the United States but ultimately accepted a full scholarship offer from Texas. She signed her National Letter of Intent in November 2023 and enrolled at Texas in August of 2024.

28.    As a dual citizen of Australia and the United States, Joint currently competes under the Australian flag. For the calendar year preceding her enrollment at Texas, Joint competed and trained through Tennis Australia, the national governing body of tennis in Australia and analogous to the United States Tennis Association.

**B.    Defendant**

29.    The NCAA is a self-described unincorporated, not-for-profit educational organization founded in 1906, and maintains its principal place of business in Indianapolis, Marion County, Indiana.

30.    The NCAA is comprised of more than 1,100 colleges, universities, and athletic conferences throughout the United States, and through its Constitution and Bylaws,[6] the NCAA governs all aspects of college sports. Such regulations are adopted by the member institutions and enforced through the NCAA's established enforcement program.

31.    Currently, the NCAA's members are classed into three (3) Divisions, including 353 Division I universities and colleges. Such members operate the highest level and most lucrative college sports programs in the United States and are governed by the Division I rules and regulations issued by the NCAA.

**C.    Co-Conspirators**

32.    Various persons, firms, corporations, organizations, and other business entities, known and unknown, have participated as unnamed co-

---

[6] Throughout this Complaint, "NCAA Bylaw_and " "NCAA Consitution" refers to the Bylaws and Constitution published in the NCAA Manual (the "Manual") NCAA, *Division I 2024-25 Manual* (Aug. 9, 2024), available at https://www.ncaapublications.com/skins/Skin_1/images/product_download_btn.png

conspirators in the violations alleged herein, including the NCAA's member institutions and NCAA Division I athletic conferences not named as defendants. Representatives of those schools and conferences serve on NCAA committees which promulgate rule changes. Representatives of those schools and conferences voted to adopt the NCAA's rules illegally restricting trade, and thus agreed to impose the restraint on trade described herein. All Division I schools and conferences continue to benefit from those restraints of trade by virtue of their agreement to abide by the NCAA's restraints.

**FACTUAL ALLEGATIONS**

**A.    Overview of the NCAA**

33.    The NCAA states that it "was founded in 1906 to protect young people from the dangerous and exploitative athletics practices of the time." Motivated by the governance of early college football, several meetings of colleges and universities were convened to initiate changes to college football playing rules, and as a result, in early-1906, such institutions became charter members of the Intercollegiate Athletic Association of the United States, which later became the NCAA.

34.    According to the NCAA, "as college athletics grew, the scope of the nation's athletics programs diverged, forcing the NCAA to create a structure that recognized varying levels of emphasis. In 1973, the [NCAA's] membership

12

was divided into three legislative competitive divisions—I, II, and III. Five years later, Division I members voted to create subdivisions I-A and I-AA (renamed the Football Bowl Subdivision and the Football Championship Subdivision in 2007)."[7]

35. The NCAA began administering women's athletics programs in 1980 when Divisions II and III established ten (10) championships for the 1981-82 academic year.

36. Article I of the NCAA Constitution states that the NCAA's basic purpose is "to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body and, by doing so, retain a clear line of demarcation between intercollegiate athletics and professional sports."[8]

37. The NCAA describes itself as an unincorporated not-for-profit educational organization through which the colleges and universities of the nation speak and act on athletic matters at the national level.

38. The NCAA further describes itself as a voluntary association of more than 1,200 institutions, conferences, and organizations devoted to the

---

[7] Rodney K. Smith, *A Brief History of the National Collegiate Athletic Association's Role in Regulating Intercollegiate Athletics*, 11 Marquette Sports L. Rev. 9, 15 (2000).

[8] NCAA Const. art. I.

13

sound administration of intercollegiate athletics in all its phases, and that through the NCAA, its members consider any athletics issue that crosses regional or conference lines and is national in character.

39.     The NCAA oversees 89 championships in 23 sports and more than 400,000 student-athletes competing in three divisions at approximately 1,100 colleges and universities.

40.     According to the NCAA, each of Division I, II, and III creates its own rules governing personnel, amateurism, recruiting, eligibility, benefits, financial aid, and playing and practice season—consistent with the overall governing principles of the NCAA.

41.     The NCAA Board of Governors, comprised of institution presidents, chancellors, ex-student-athletes, and other chief executives, is the highest governing body and is charged with ensuring that each division operates consistently with the basic purposes, fundamental policies, and general principles of the NCAA.  Within the Board of Governors is a six-member Executive Committee that oversees the NCAA's governance process and proceedings.

42.     In Division I, the legislative system is based on conference representation and an eighteen-member Board of Directors, composed primarily of institution presidents or chancellors, that approves legislation.

14

43.    The NCAA and its members govern themselves through the NCAA Manual, which is promulgated annually and contains, among other things, the NCAA's Constitution and operating Bylaws, which include nearly 500 pages of regulations governing all aspects of college sports (the "Bylaws"). The NCAA's Constitution and Bylaws were adopted—and may be amended—by the votes of the NCAA membership.  The Manual also contains extensive provisions requiring member schools to follow NCAA rules and providing for discipline of members that fail to do so.

## B.    The NCAA's Restrictions on Student-Athlete and Prospective Student-Athlete Compensation

44.    According to the NCAA, there are essentially two categories of student-athlete compensation—both of which have been prohibited by the NCAA under its discredited and illegal "amateurism" rules.

45.    The first category is compensation associated with the use of a student-athlete's NIL rights.  As discussed below, NIL compensation for student-athletes was prohibited until July 1, 2021.  But following the U.S. Supreme Court's unanimous ruling in *NCAA v. Alston* and the enactment of various state laws that prevented the NCAA from enforcing its NIL rules in

15

those states, the NCAA temporarily suspended its prohibition on NIL-related compensation.[9]

46.    The second category of student-athlete compensation is what the NCAA refers to as "pay-for-play." Although virtually all the current publicity and media reporting surrounding the NCAA centers on its anticompetitive "pay-for-play" rules, and specifically NCAA member institutions directly paying their student-athletes for athletic services, the NCAA's pay-for-play prohibitions extend even further.

47.    While the NCAA allows student-athletes who compete in Tennis to participate in non-NCAA competitions, it prohibits them from retaining Prize Money offered by third-parties related to their athletic performance and achievement in such events in excess of their "actual and necessary expenses."[10]

48.    Moreover, the NCAA allows prospective student-athletes to participate in non-NCAA competitions, and allows them to retain up to $10,000 in Prize Money as well as "actual and necessary expenses exceeding that

---

[9] *See NCAA v. Alston* 141 S. Ct. 2141 (2021); Michelle Brutlag Hosick, *NCAA Adopts Interim Name, Image, and Likeness Policy*, NCAA.org (June 30, 2021), https://www.ncaa.org/news/2021/6/30/ncaa-adopts-interim-name-image-and-likeness-policy.aspx.

[10] NCAA Bylaws 12.1.2.4.1 and 12.1.2.4.2.2.

16

amount, but prohibits them from retaining amounts in excess of these arbitrary limits for their athletic performance and achievement.

49.  At issue in the present case are the NCAA's rule regarding "Amateur Status" under Bylaw 12.1.2 and various "Exceptions to Amateurism Rules" including those under Bylaw 12.1.2.4.2, which specifically govern Tennis players' acceptance of Prize Money for athletic performance in certain non-NCAA competition.

50.  As an initial matter, a student-athlete is permitted to enter non-NCAA competitions against or with professional athletes:

> **12.2.3.1 Competition Against Professionals.** An individual may participate singly or as a member of an amateur team against professional athletes or professional teams.
>
> **12.2.3.2 Competition With Professionals.** An individual shall not be eligible for intercollegiate athletics in a sport if the individual ever competed on a professional team (per Bylaw 12.02.12) in that sport. However, an individual may compete on a tennis . . . team with persons who are competing for cash or a comparable prize, provided the individual does not receive payment or prize money that exceeds actual and necessary expenses, which may only be provided by the sponsor of the event.[11]

---

[11] NCAA Bylaws 12.2.3.1 and 12.2.3.2.

17

51.     However, a student-athlete is barred from competing in collegiate athletics if he or she receives Prize Money for competing in such non-NCAA competitions:

> **12.1.2 Amateur Status.** An individual loses amateur status and thus shall not be eligible for intercollegiate competition in a particular sport if the individual:
>
> (a) Uses athletics skill (directly or indirectly) for pay in any form in that sport;
>
> (b) Accepts a promise of pay even if such pay is to be received following completion of intercollegiate athletics participation;
>
> (c) Signs a contract or commitment of any kind to play professional athletics, regardless of its legal enforceability or any consideration received, except as permitted in Bylaw 12.2.5.1;
>
> (d) Receives, directly or indirectly, a salary, reimbursement of expenses or any other form of financial assistance from a professional sports organization based on athletics skill or participation, except as permitted by NCAA rules and regulations;
>
> (e) Competes on any professional athletics team per Bylaw 12.02.12, even if no pay or remuneration for expenses was received, except as permitted in Bylaw 12.2.3.2.1;
>
> (f) After initial full-time collegiate enrollment, enters into a professional draft (see Bylaw 12.2.4); or
>
> (g) Enters into an agreement with an agent.[12]

---

[12] NCAA Bylaw 12.1.2.

18

52.     Nonetheless, the NCAA allows current student-athletes competing in Tennis to accept Prize Money up to but not exceeding the amount of their "actual and necessary expenses," or up to $10,000 for prospective student-athletes prior to collegiate enrollment, as follows:

**12.1.2.4.2 Exception for Prize Money — Tennis.**

**12.1.2.4.2.1 Prior to Full-Time Collegiate Enrollment.** In tennis, prior to full-time collegiate enrollment, an individual may accept up to $10,000 per calendar year in prize money based on place finish or performance in athletics events. Such prize money may be provided only by the sponsor of an event in which the individual participates. Once the individual has accepted $10,000 in prize money in a particular year, the individual may receive additional prize money on a per-event basis, provided such prize money does not exceed the individual's actual and necessary expenses for participation in the event. The calculation of actual and necessary expenses shall not include the expenses or fees of anyone other than the individual (e.g., coach's fees or expenses, family member's expenses).

**12.1.2.4.2.2 After Initial Full-Time Collegiate Enrollment.** In tennis, after full-time collegiate enrollment an individual may accept prize money based on place finish or performance in an athletics event. Such prize money may not exceed actual and necessary expenses and may be provided only by the sponsor of the event. The calculation of actual and necessary expenses shall not include the expenses or fees of anyone other than the individual (e.g., coach's fees or expenses, family member's expenses).[13]

53.     Going back decades, the highest and most prestigious levels of non-NCAA competition in Tennis have been open to college student-athletes,

---

[13] NCAA Bylaws 12.1.2.4.1 and 12.1.2.4.2.

19

including but not limited to the US Open Tennis Championships, the Australian Open, Roland Garros a/k/a the French Open, and Wimbledon.

54.    Moreover, such competitions have included prodigious Prize Money for individual performances—the 2024 US Open Tennis Singles Champions and the 2024 Australian Open Singles Champions took home $3,600,000.00 and $3,150,000.00 in Prize Money, respectively.[14]

55.    As a result, the Prize Money restrictions under Bylaw 12.1.2.4.2 impact the earning ability of student-athletes competing in Tennis.

56.    However, the NCAA's application of its Prize Money restrictions has been remarkably inconsistent.  In certain instances, such application turns on the specific competition at issue or the certain governing body's terminology for monies awarded based on athletic performance in non-NCAA competition.

57.    Under Bylaws 12.1.2.1.4.1.2 and 12.1.2.1.5.1, the NCAA allows prospective student-athletes and enrolled student-athletes to accept funds that are administered by the U.S. Olympic and Paralympic Committee pursuant to its Operation Gold program.[15]  In part, such programs allow student-athletes

---

[14] *2024 US Open Prize Money*, usopen.org (2024), https://www.usopen.org/en_US/visit/prize_money.html; *Australian Open Prize Money Hits Record High With $10 Million Increase In 2024*, ausopen.com (Dec. 29, 2023), https://ausopen.com/articles/news/australian-open-prize-money-hits-record-high-10-million-increase-2024.

[15] *See* NCAA Bylaws 12.1.2.1.4.1.2 and 12.1.2.1.5.1.

to earn and keep Prize Money dispensed by the Olympic governing bodies for medaling in the Olympics, and such grant programs have been expanded to account for certain other non-NCAA competitions as well.

## C.     Challenges to the NCAA's Compensation Restrictions

58.     It is no secret that the NCAA has come under fire for its unyielding stance against student-athlete rights and compensation.  The American public, including student-athletes themselves, has challenged the NCAA's continued monopsony[16] and oppression of student-athlete rights under the guise of "amateurism."  As widely reported, a number of student-athletes have filed class action antitrust lawsuits seeking redress for the harm caused by the NCAA's anticompetitive and illegal rules prohibiting various forms of student-athlete compensation.

59.     In 2015, the U.S. Court of Appeals for the Ninth Circuit ruled in favor the plaintiffs in a class action lawsuit brought against the NCAA challenging certain of its compensation restrictions.[17]  *O'Bannon* paved the way for full cost-of-attendance scholarships for student-athletes and the challenging of other NCAA compensation restrictions.

---

[16] "A market situation in which one buyer controls the market."  *Monopsony*, Black's Law Dictionary (10th ed. 2014).

[17] *O'Bannon v. NCAA*, 802 F.3d 1049, 1072-79 (9th Cir. 2015).

21

60.    A short time later, in *In re Athletic Grant-in-Aid Cap Antitrust Litigation*, the U.S. District Court for the Northern District of California ruled in favor of the plaintiffs in a class action lawsuit and struck down the NCAA's long-running prohibition on certain additional educational-related compensation, such as graduate or vocational school scholarships, among other things.[18] The decision in *In re Athletic Grant-in-Aid Cap Antitrust Litigation* was later affirmed by the U.S. Court of Appeals for the Ninth Circuit and the U.S. Supreme Court.[19]

61.    In *Alston*, the U.S. Supreme Court stated that, "the NCAA *accepts* that its members collectively enjoy monopsony power in the market for student-athlete services, such that its restraints can (and in fact do) harm competition."[20]

62.    In his concurrence, Justice Kavanaugh laid bare the NCAA's use of the concept of "amateurism" as a justification for its rule prohibiting student-athlete compensation: "[t]he bottom line is that the NCAA and its member colleges are suppressing the pay of student-athletes who collectively generate

---

[18] *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1074 (N.D. Cal. 2019).

[19] *In re Athletic Grant-in-Aid Cap Antitrust Litigation*, 958 F.3d 1239, 1249 (9th Cir. 2020); *Alston*, 141 S. Ct. 2141.

[20] *Alston*, 141 S. Ct. at 2156 (emphasis in original).

22

billions of dollars in revenues for colleges every year.... Nowhere else in America can businesses get away with agreeing not to pay their workers a fair market rate on the theory that their product is defined by not paying their workers a fair market rate."[21]

63.    Some of the more recent litigation challenging the NCAA's unlawful restrictions has centered on student-athlete compensation related to their NIL rights.  As discussed above, the NCAA had long prohibited any forms of compensation related to student-athletes' use of their NIL rights and aggressively enforced such rules.  Class actions lawsuit were filed in the Northern District of California challenging the NCAA's NIL prohibitions.[22]

64.    However, the NCAA temporarily suspended its prohibition on certain types of NIL compensation on July 1, 2021 as a result of the *Alston* ruling as well as the passage of legislation in several states authorizing student-athletes to receive third-party NIL compensation notwithstanding any NCAA rules to the contrary.[23]

65.    In December of 2023, a class of Division I student-athletes filed suit against the NCAA seeking a permanent injunction restraining the NCAA

---

[21] *Id.* at 2168-69 (Kavanaugh, J., concurring).

[22] Complaint, *House v. NCAA*, No. 4:20-cv-03919-CW (N.D. Cal. June 15, 2020); Complaint, *Oliver v. NCAA*, No. 4:20-cv-04527-CW (N.D. Cal. July 8, 2020).

[23] *See* Hosick, *supra* note 10.

from enforcing all its anticompetitive rules related to student-athlete compensation.[24]    In addition, Plaintiffs are seeking damages for the compensation such student-athletes would have received but for the NCAA's unlawful restraints on pay-for-play and related NIL compensation.

66.    As a result of amassing legal challenges and court rulings, the NCAA's rules prohibiting educational-related compensation, NIL-related compensation, and certain other benefits beyond "cost of attendance" scholarships have been suspended or struck down.

67.    Most recently, on January 31, 2024, the attorneys general of Tennessee and Virginia filed an antitrust lawsuit against the NCAA in the U.S. District Court for the Eastern District of Tennessee, challenging the NCAA's prohibition on NIL related compensation in the recruiting process of college athletes.[25]  On or about February 23, 2024, the district court granted a preliminary injunction against the NCAA and its enforcement of such rules.[26]

---

[24] Complaint, *Carter v. NCAA*, No. 4:23-cv-06325 (N.D. Cal. Dec. 7, 2023).  The plaintiffs' complaint in *Carter* provides a comprehensive history of the NCAA's regulations restraining fair competition in the relevant markets, the current financial status of college sports, as well as the litigation chipping away at the unfair confines of the NCAA's rules.  *See id.* at 1-10, 39-44.

[25] Complaint, *Tennessee v. NCAA*, No. 3:24-CV-00033 (E.D. Tenn. Jan. 31, 2023).

[26] *Tennessee v. National Collegiate Athletic Association,* 718 F.Supp.3d 756 (E.D. Tenn. 2024).

24

68.    In response, the NCAA halted enforcement and investigations into third-party participation in NIL related activities—namely, the Collectives that pay student-athletes pay-for-play compensation to attend or stay at the NCAA's member institutions.[27]

69.    The NCAA recently received preliminary approval for a Class Action settlement in *In re College Athlete NIL Litigation*, No. 4:20-CV-03919-CW (N.D. Cal. June 15, 2020), a case that concerns the NCAA's past prohibition on student-athletes' receiving compensation for use of their NIL for commercial purposes, such as product endorsements.  In the proposed settlement, the NCAA has agreed to pay certain student-athletes about $2.8 billion to compensate student-athletes for past damages from the NCAA's prohibition, change a number of its rules regarding athletes' acceptance of money for use of their NIL, and change certain other rules, including permissible limits on the number of athletes on Division I teams.[28]

---

[27] *NCAA Halts Investigations into Third-Party NIL Deals*, Sports Business Journal (Mar. 3, 2024), https://www.sportsbusinessjournal.com/Articles/2024/03/03/ncaa-halts-investigations-into-third-party-nil.

[28] Order Granting Plaintiffs' Motion for Preliminary Settlement Approval as Modified, *In re College Athlete NIL Litigation*, No. 4:20-CV-03919-CW (N.D. Cal. Oct. 7, 2024).

25

70.    The settlement will primarily benefit past, present, and future football and basketball student-athletes, although student-athletes competing in other sports (including Tennis) are included in the settlement.  However, the settlement does not provide for any change in the rules governing the acceptance of Prize Money and NCAA eligibility, and it does not provide any monetary relief for individuals who have been injured by the Prize Money Rules in the past.[29]

71.    Even with regard to pay-for-play, NCAA President Charlie Baker has proposed a shift in the governance of college sports to allow high-revenue athletic programs to pay certain of their student-athletes at least $30,000 annually in pay-for-play compensation through certain trust funds.[30]

72.    However, for reasons that are neither clear nor rational, the erosion of the NCAA's prohibitions and its suspension or rescission of education-related compensation, NIL-related compensation, and certain pay-for-play compensation rules has not been extended to include the NCAA's

---

[29] *Id.*

[30] Ralph D. Russo, *NCAA President Charlie Baker Calls for New Tier of Division I Where Schools Can Pay Athletes*, AP News (Dec. 5, 2023), https://apnews.com/article/ncaa-baker-nilc26542c528df277385fea7167026dbe6.

26

restrictions on student-athletes accepting Prize Money paid by third parties in connection with non-NCAA competitions.

73.    The NCAA is proposing that its member institutions pay their student-athletes directly for their performance as athletes while at the same time insisting that Tennis players retaining Prize money would constitute pay-for-play, which would destroy the NCAA's definition of "amateurism."

**D.    Plaintiff Brantmeier's Injury from Prize Money Restrictions**

74.    In August 2021, Brantmeier was a finalist and first runner-up in the United States Tennis Association ("USTA") Billie Jean King Girls 18's National Championship in singles, which qualified her to play in the 2021 US Open Qualifying Tournament at the US Open in Flushing Meadows, New York.

75.    Brantmeier advanced to the third round of singles in the 2021 US Open Qualifying Tournament and lost in the first round of the main draw of the 2021 US Open Mixed Doubles Championship, playing with Nick Monroe.

76.    During her 2021 tennis season as a high school junior, Brantmeier requested guidance from the NCAA regarding the acceptance of Prize Money and cataloging of expenses in connection with her prospective collegiate

27

eligibility. The only guidance provided by the NCAA was a copy of Bylaw 12.1.2.4.2.1.[31]

77. As a result of her performance in the 2021 US Open, Brantmeier was entitled to receive $49,109.00 in total Prize Money from the USTA— $45,109,00 for advancing to the third round in singles, and $3,900.00 for playing in the first round of mixed doubles. After deducting an automatic racquet stringing charge, Brantmeier earned a total of $48,913.00 in Prize Money.

78. However, Brantmeier did not receive all of the Prize Money earned at the 2021 US Open because of the NCAA's Prize Money restrictions.

79. Specifically, under the above-cited Bylaw 12.1.2.4.2.1, she was only permitted to accept up to $10,000.00 in Prize Money on a total annual basis for all competitions during 2021, as well as reimbursement for undefined expenses associated with such competitions.

80. Accordingly, Brantmeier was forced to forfeit much of the Prize Money earned at the 2021 US Open as well as other tournaments in 2021, lest she jeopardize her eligibility to play college Tennis. In total, the NCAA's Prize Money restrictions illegally deprived her of such money earned at the 2021 US Open and caused economic damage in the amount of $35,040.66.

---

[31] *See supra* ¶52.

81.    Even then, after Brantmeier enrolled at UNC in August 2022, the NCAA refused to certify her as an "amateur" for the fall 2022 season, her first on the Tar Heels' women's Tennis team.

82.    Specifically, the NCAA challenged that some of the expenses submitted to the NCAA by Brantmeier incurred during the course of her 2021 US Open participation were not "actual and necessary" under NCAA Bylaws, and therefore, Brantmeier had retained Prize Money in excess of her "actual and necessary" expenses in violation of NCAA Bylaws.

83.    To illustrate the farcical nature of the NCAA's enforcement, Brantmeier and her mother purchased a portable scanner in order to track and catalog receipts incurred during competitions solely for the accurate accounting of expenses to the NCAA.   The NCAA asserted that was an "unnecessary" expense.

84.    Likewise, the NCAA objected to Brantmeier's expense for a racket restringing fifteen (15) days prior to the competition, stating such expense fell outside an alleged fourteen (14) day pre-competition window that it "generally applied."  Such restriction is notably absent from the relevant NCAA Bylaws.

85.    When Brantmeier included the cost of the single hotel room that she shared with her mother during tennis tournaments as part of her expenses, the NCAA denied her mother's half of the hotel room costs.  In other words, the

NCAA asserted that fifty percent (50%) of the hotel room costs should have been attributed to her mother and therefore was not an "actual and necessary" expense for Brantmeier—notwithstanding the fact she was a sixteen (16) year old minor at the time.

86.    During the course of the dispute with the NCAA, Brantmeier was held out of the Tar Heels' lineup for the fall 2022 NCAA Tennis season because if Brantmeier played and was later declared ineligible by the NCAA, the Tar Heels would be forced to forfeit any matches in which Brantmeier played.

87.    In January 2023, after requiring her to make a $5,100.00 contribution to a charity, Brantmeier's eligibility was finally certified by the NCAA, and she was cleared to play for the Tar Heels.[32]

88.    While Brantmeier's Prize Money pales in comparison to the pay-for-play amounts received by many student-athletes in profit-generating sports, these amounts are even more critical to Tennis players, where professional opportunities to earn compensation after college may be fleeting

---

[32] Brantmeier donated such amount to the Patrick W. Ryan Memorial Tennis Foundation, a 501(c)(3) non-profit which aims to promote the growth of tennis in southern Wisconsin.

and where the highest and most-prestigious levels of competition are open to student-athletes.[33]

89.    Ironically, if the USTA had labeled the payment to Brantmeier as a "grant," the NCAA would have allowed her to keep the Prize Money without sacrificing her collegiate eligibility.

90.    Similarly, if Brantmeier was paid an exorbitant amount of money by a Collective, the USTA, or a fan to attend a party or make a personal appearance in conjunction with the US Open, that would be permitted NIL-related revenue, and she would be allowed to keep this money without jeopardizing her collegiate eligibility.

91.    The NCAA's rules related to Prize Money restrictions for student-athletes and prospective student-athletes in Tennis are completely arbitrary—particularly when viewed in the context of its other rules, restrictions, exceptions, and enforcement practices in the overall present landscape of college athletics.

---

[33] Seven of the top ten highest NIL valuations are male Division I football or basketball student-athletes, and eight of the top ten highest women's NIL valuations are Division I basketball student-athletes. *See On3 NIL 100*, On3 NIL (Mar. 14, 2024), https://www.on3.com/nil/rankings/player/nil-100/; *On3 Women's NIL 100*, On3 NIL (Mar. 14, 2024), https://www.on3.com/nil/rankings/player/womens-nil-100/.

92.    Moreover, being forced to forgo such Prize Money presents particularly acute harm when a student-athletes and prospective student-athletes faces the prospect of injury while competing in collegiate sports that could significantly hinder his or her ability to later earn compensation for athletic performance.

93.    To that end, in February of 2024, Brantmeier tore her meniscus while practicing with the UNC for a team tournament in Seattle, Washington, requiring immediate surgery, and she will miss the entire spring 2024 season following surgery as she continues rehabilitation.

94.    Unfortunately, Brantmeier's meniscus was not healing properly after the initial operating and rehab, and she was forced to undergo a second surgery in October of 2024 and has yet to return to competition as of the date of this First Amended Complaint.

## E.    Plaintiff Joint's Injury from Prize Money Restrictions

95.    Over the course of Joint's junior tennis career, she competed in numerous national and international tournaments that awarded Prize Money based on a player's placement or finish.  Most notably and in the last calendar year, Joint competed in the 2024 Australian Open, 2024 Wimbledon, and 2024 US Open.

96.    Through a qualifying wildcard, Joint competed in the 2024 Australian Open in Melbourne, Australia.  Joint advanced to the third round of singles in the Qualifying Tournament and lost in first round of the mixed doubles main draw.

97.    As a result of her performance, Joint earned and was entitled to $68,450.00 AUD ($45,163.00 USD)[34] in Prize Money from Tennis Australia— $65,000.00 AUD for advancing to the third round in singles and $3,450.00 AUD for the first round of mixed doubles.

98.    As a junior tennis player, and in order to preserve her eligibility to play collegiate tennis in the United States, Joint was then subject to the NCAA's Prize Money restrictions, specifically Bylaw 12.1.2.4.2.1 applying to Prize Money acceptance prior to college enrollment.

99.    By operation of such restrictions, Joint was only permitted to accept, and did accept, $8,987.00 AUD ($5,929.00 USD) in Prize Money for my finish in the 2024 Australian Open, forfeiting the remaining $59,463.00 AUD ($39,234.00 USD).

100.    In July 2024, Joint competed in the Qualifying Competition at the 2024 Wimbledon in London, England, where she advanced to the second round

---

[34] "AUD" denotes Australian Dollars, and "USD" denoted United States Dollars.  The closing exchange rate of the Australian Dollar to the United States Dollar on January 20, 2024, was 0.6598.

in the singles competition.  As a result, Joint earned and was entitled to £25,000.00 GBP ($32,282.00 USD)[35] in Prize Money from the All England Lawn Tennis & Croquet Club.

101.  However, by operation of the above Prize Money restrictions, I was again forced to forfeit approximately £15,000.00 GBP ($19,370.17 USD) in Prize Money funds.

102.  In late-August 2024, Joint competed in the 2024 US Open in Flushing Meadows, New York.  Joint won all three of her matches in the Qualifying Tournament to advance to the main draw of the US Open.

103.  Joint advanced to the second round of the main draw, where she lost to the No. 14 overall seed in the US Open, Madison Keys.  As a result of her performance, Joint earned and was entitled to $146,657.00 Prize Money from the USTA, including stipends and per diems.

104.  As of August 10, 2024, and prior to her participation in the 2024 US Open, Joint was enrolled and considered an active student-athlete at Texas.  Accordingly, she was subject to, and continues to be subject to, Bylaw 12.1.2.4.2.2 of the NCAA's Prize Money restrictions, which eliminate the $10,000.00 cap applicable to athletes pre-collegiate enrollment.

---

[35] "GBP" denotes British Pounds.  The closing exchange rate of the British Pound to the United States Dollar on July 14, 2024, was 1.30/1.

105.   By operation of such Prize Money restriction, Joint was once more forced to forfeit a substantial portion of the Prize Money earned at the conclusion of the US Open on September 8, 2024.

106.   In total, across the 2024 Australian Open, 2024 Wimbledon, and 2024 US Open, Joint forfeited tens of thousands of dollars in Prize Money earned through her performance in such events as a result of the NCAA's draconian Prize Money restrictions.

107.   For the duration of her collegiate career, Joint intends to compete in non-NCAA competitions, as permitted by the NCAA, including but not limited to the US Open, Australian Open, French Open, Wimbledon, and other WTA tournaments.

108.   However, the continued enforcement of the NCAA's Prize Money restrictions will have an immediate and damaging effect on Joint as she will be forced to forfeit any Prize Money earned in such competitions.

109.   Earning an undergraduate degree and playing on a Division I tennis team, specifically at Texas, have been long-held goals of Joint's. Nonetheless, given her level of skill, Joint will very likely earn substantial sums of Prize Money in non-NCAA tournaments such that she will be forced to accept it in order to provide for herself and her family and thus forfeit her scholarship and collegiate eligibility.

35

110.   Joint, alongside Brantmeier, has filed this action to seek an injunction restraining the NCAA from continued enforcement of its anticompetitive and unlawful Prize Money restrictions on behalf of themselves and all other Tennis student-athletes and prospective student-athletes who have been wrongfully deprived of the fruits of their athletic achievement.

### ILLEGAL AGREEMENT TO RESTRAIN COMPETITION

111.   Plaintiffs have filed this action to seek an injunction to restrain Defendant from the continued enforcement of its anticompetitive and unlawful Prize Money restrictions on behalf of themselves and all other Division I student-athletes and prospective student-athletes in Tennis who have been wrongfully deprived—and will continue to be wrongfully deprived absent injunctive relief—of Prize Money earned for their athletic performance and achievement.

112.   Plaintiffs also seek damages for themselves and for the Damages Class, consisting of the amounts that they earned in Prize Money tournaments, but were forced to forfeit in order to maintain NCAA eligibility.

113.   For example, Plaintiffs are aware of at least six current student-athletes who won prize money at the 2024 US Open and were forced to forfeit a portion of the Prize Money they earned in order to maintain their NCAA eligibility: Joint; Valerie Glozman (Stanford University), Matthew Forbes

36

(Michigan State University), Michael Zheng (Columbia University), Nikita Filin (Ohio State University), and Alexander Razeghi (Stanford University).

114.  The NCAA's oft-repeated "amateurism" argument is not a legitimate procompetitive justification for its Prize Money restrictions.  The NCAA has repeatedly attempted to alarm courts and the American public by arguing that the payment of athletic awards by NCAA member institutions, the continuation and expansion of full-cost-of-attendance scholarships, and the payment of compensation from third parties for NIL rights would adversely affect consumer demand for Division I college athletics.  Such alarms have proven to be false.  Even the NCAA now concedes that these payments and benefits to student-athletes have not diminished consumer demand.

115.  The NCAA should be working to support and encourage student-athletes in Tennis to compete in the highest and most prestigious competitions, including non-NCAA events.  Yet, for far too long, through its rules and regulations on Prize Money and expenses, the NCAA has acted to hinder and impede student-athletes in such pursuits.

116.  The NCAA cannot defend its Prize Money restrictions based on the alleged need to preserve "amateurism" and maintain the consumer demand.  The NCAA's rules capping the amount that Division I student-athletes and prospective student-athletes may be compensated for their athletic

37

performance to the amount they spend in costs and expenses to participate in non-NCAA competitions has damaged and will continue to damage these student-athletes and prospective student-athletes absent a Court-imposed remedy.

117.   While allowing NIL payments and "pay-to-play" compensation in certain aspects of college sports, the NCAA maintains its arbitrary prohibition on compensation in other areas.

118.   In the face of numerous court rulings that certain of its prohibitions are unlawful, the NCAA continues enforcement of other facially illegal restrictions on Prize Money and will continue do so until a court intervenes and strikes down these restrictions.

119.   The restrictions on Prize Money have deprived and continue to deprive student-athletes and prospective student-athletes of compensation earned for athletic performance and achievement in non-NCAA competitions. Such restrictions unlawfully suppress the earning ability of student-athletes and prospective student-athletes competing in Tennis.

120.   The NCAA's anticompetitive agreements are not secret or disputable.  They are a matter of public record, codified in the NCAA Division I Manual.[36]

---

[36] *See supra* note 1.

121.   Such rules are horizontal agreements that unreasonably restrain trade by prohibiting student-athletes and prospective student-athletes from obtaining more than a fixed amount of compensation (primarily in the form of a financial-aid scholarship) for their services, including by prohibiting the earning of Prize Money in non-NCAA competitions beyond the NCAA-approved expenses incurred in participating in such non-NCAA events.

122.   The NCAA rules are proposed, drafted, voted upon, and agreed to by the NCAA member institutions which compete for the services of college athletes in the relevant labor markets.  These anticompetitive rules are also strictly enforced, so that the competing NCAA student-athletes and prospective student-athletes have no choice but to comply with them or face severe penalties, including the loss of athletic eligibility.

123.  Article 4 of the NCAA Constitution ("Rules, Compliance and Accountability") provides: "Each member institution . . . shall hold itself accountable to support and comply with the rules and principles approved by the membership. Further, each school shall ensure that its staff, student-athletes, and other individuals and groups representing the institution's athletics interests comply with applicable rules (institutional, conference,

39

divisional and Association-wide) in the conduct of the institution's intercollegiate athletics program."[37]

124.    The challenged NCAA rules that prohibit, cap, or otherwise limit the compensation that student-athletes and prospective student-athletes may receive for their athletic services are illegal agreements.  Such rules include but are not limited to NCAA Bylaws 12.01.4, 12.1.2, 12.1.2.1, 12.1.2.1.4.1, 12.1.2.1.5, 15.02.2, 15.02.6, 15.1, 16.02.3, 16.1.4, and 16.11.2 (individually, and as interpreted and applied in conjunction with one another).

125.    Article 12 of the NCAA Bylaws ("Amateurism and Athletics Eligibility") is the foundation of the NCAA's unlawful agreements to prohibit compensation that may be paid to college athletes for their athletic services. Bylaw 12.1.2 provides:

> A [college athlete] loses amateur status and thus shall not be eligible for intercollegiate competition in a particular sport if the individual: (a) [u]ses athletics skill (directly or indirectly) for pay in any form in that sport; [or] (b) [a]ccepts a promise of pay even if such pay is to be received following the completion of intercollegiate athletics participation …

126.    Notwithstanding the NCAA's rules prohibiting student-athletes and prospective student-athletes from retaining earnings for non-NCAA tournament play, the NCAA allows certain types of athletic-related

---

[37] NCAA Const. art. IV.

40

compensation that clearly are not financial aid.  For example, the NCAA's rules allow schools or conferences to provide specified amounts of monetary awards for "winning an individual or team conference or national championship" (NCAA Bylaw 16.1.4.2); for "special achievements, honors and distinctions" (NCAA Bylaw 16.1.4.3); and as academics or graduation incentives (NCAA Bylaw 16.1.4.5).

127.  The NCAA also allows funds paid by the US Olympic and Paralympic Committee (USOPC) for its "Operation Gold Program," as well as similar awards for international athletes granted by their country's national Olympic and/or Paralympic governing body.[38]

128.  The NCAA calls a prospective student-athlete who retains $10,000.00 in Prize Money an "amateur," but a prospective student-athlete who retains $10,000.01 a professional who is disqualified from participating in NCAA athletics.

129.  The NCAA does not have any coherent economic explanation for why certain categories of compensation are consistent with its concept of "amateurism," while others are not.[39]

---

[38] *See* NCAA Bylaws 12.1.2.1.4.1.2 and 12.1.2.1.5.1.

[39] *See*, *e.g.*, Sept. 18, 2018 Trial Transcript, at 1302:14–21, *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.* (testimony of Kevin Lennon, NCAA Vice President for Division I Governance) ("[O]ur institutions have always been able

130.  The collective purpose and effect of the NCAA's anticompetitive rules is to suppress and restrict the amount of compensation that can be provided to student-athletes and prospective student-athletes for their services, so that the amount actually paid is significantly less than what would be provided in competitive labor markets for the athletes' services.

131.  In sum, the NCAA's anticompetitive, horizontal agreements fix and significantly limit the amount of compensation that student-athletes and prospective student-athletes may receive for their athletic services.  While the NCAA has imposed many other anticompetitive rules as detailed above, this Complaint is directed at its rules that prohibit or restrict the acceptance of Prize Money by student-athletes and prospective student-athletes in Tennis for athletic services provided in non-NCAA competitions.

132.  The enforcement procedures for the NCAA's rules are codified in Article 19 ("Infractions Program") of the NCAA Bylaws.  Pursuant to Bylaw 19.01.2, "The [NCAA] infractions program shall hold institutions, coaches, administrators, other representatives and student-athletes who violate NCAA

---

to provide educational expenses to student-athletes to support their educational pursuits and they've been able to provide benefits incidental to participation to student-athletes. And while those have changed over time, they certainly have not impacted the principle of amateurism which is we just don't pay student-athletes.").

42

bylaws accountable for their conduct."  Penalties include fines, scholarship reductions, postseason bans, and even the "death penalty," where a member institution, or specific varsity sport therein, is banned from the multi-billion-dollar business of college sports for a year or more.

## **RELEVANT MARKETS**

133.    The relevant markets in this matter are the nationwide market for the labor of NCAA Division I student-athletes and prospective student-athletes competing in (1) Men's Tennis and (2) Women's Tennis (the "Markets").

134.    In these Markets, current and prospective student-athletes compete for roster spots on the various Division I Tennis teams.  NCAA member institutions recruit and retain the best players by offering bundles of goods and services including scholarships to cover the cost of attendance, education-related benefits and awards, as well as access to state-of-the-art athletic training facilities, premier coaching, medical treatment, and opportunities to compete at the highest level of college sports, often in front of large crowds and television audiences.  In exchange, student-athletes provide their athletic services.

135.    There are no reasonable substitutes for the educational and athletic opportunities offered by NCAA Division I schools in the Markets.  Full-time professional touring offers neither the opportunity for intercollegiate

43

competition nor a college education nor the college experience, and is thus a fundamentally different experience than that of a collegiate tennis player.

136.  Even absent the restraints at issue in this case, being a full-time professional on a touring circuit is not a functional or economic substitute for being a full-time Division I athlete who also participates in occasional non-collegiate tournaments.  It does not provide the same benefits, and for virtually all Division I athletes is not a financially viable alternative.

137.  The NCAA itself defines Division I varsity athletics as the highest level of competition in college sports.[40]  No other division or association of intercollegiate athletics provides the same combination of goods, benefits, and services offered in Division I.

138.  NCAA Division II schools, for example, provide fewer athletic scholarships than Division I schools, which results in a lower level of athletic competition and much lower notoriety.  Schools in NCAA Division III do not provide athletic scholarships of any kind. [41]

---

[40]  *See*  *e.g.,*  https://www.ncaa.org/sports/2021/2/16/our-division-i-story.aspx ("Division I schools provide unmatched academic and athletic opportunities and support.")

[41] Defining the Markets to include the NCAA's Divisions II and III would not in any way decrease Defendants' monopsony power over suppliers of labor, as those markets are also under the control of Defendant. Hence even under  market definitions that span the entire NCAA, the NCAA's monopsony power remains absolute.

44

139.   As monopsony buyers in the Markets, the NCAA and its member institutions have the power to control prices and exclude competition.  All NCAA members agree to abide by the NCAA's eligibility restrictions, which are used to fix the prices student-athletes and prospective student-athletes can be paid for their athletic services, including but not limited to the prohibition on Prize Money earnings.

140.   Furthermore, the NCAA and its members have the monopsony power to exclude from the Markets any institution or conference that violates or fails to enforce the NCAA's rules.

141.   As detailed herein, the NCAA imposes a wide variety of restraints on student-athletes and prospective student-athletes as a condition for them being able to play at the Division I level.  If student-athletes and prospective student-athletes had the opportunity to receive a college education while competing at an elite level of intercollegiate competition without these restrictions, most would choose to do so.

142.   The fact that the student-athletes and prospective student-athletes subject themselves to such restrictions illustrates the market power of the NCAA and their members in the Markets.

143.   In July 2021, the NCAA temporarily suspended most of its restrictions on athletes' ability to earn compensation from third parties in

45

exchange for the use of student-athletes' NIL rights.[42]    Several recent settlements have also provided or will provide monetary relief to student-athletes injured by these practices. But there has been no similar suspension of the NCAA's rules restricting Prize Money in the Markets.

144.    The economic injury from the NCAA's Prize Money restrictions to Division I student-athletes and prospective student-athletes in the Markets is indisputable.    Student-athletes and prospective student-athletes in Tennis have made substantial economic contributions to their schools and conferences, and hence, the NCAA, through their athletic abilities and performance.

145.    They have driven the NCAA and their respective schools' and conferences' broadcast, sponsorship and ticket revenues and have increased the brand value of their schools, which has led to significant monetary donations from alumni and others.

146.    Increasing the brand value and prestige of the member institutions drives attendance at said institutions leading to more revenue.

147.    Absent the challenged restraints, in competitive labor markets, Tennis student-athletes and prospective student-athletes would receive more compensation for their athletic services than they currently do.

---

[42] *See* Hosick, *supra* note 10.

148. All of the student-athletes and prospective student-athletes competing in Tennis have been denied the opportunity to pursue economic benefits in competitive markets free of the NCAA's restraints. Thus, the Prize Money restrictions harm competition as well as the competitors in Tennis.

149. The harm to competition also results in antitrust injury to the Classes, which is exacerbated by the reality that only a small percentage of these student-athletes continue their careers at the professional level. For many student-athletes, college is where the value of their athletic skill is at or close to its peak and is the optimal time to realize that value. Yet, the NCAA's anticompetitive restraints prohibit them from doing so.

150. Accordingly, on behalf of Classes of past, current, and future NCAA Division I student-athletes competing in Tennis, Plaintiffs request monetary damages and declaratory judgment that the NCAA's rules regarding accepting Prize Money in non-NCAA competitions are unlawful as well as an injunction permanently restraining the NCAA from enforcing such unlawful and anticompetitive restrictions.

## CLASS ALLEGATIONS

151.   Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(2), on their own behalf and on behalf of the following Injunctive Relief Class:

> All persons in the United States who:
>
> (a) At any time after March 19, 2020 and the date of judgment in this matter, competed in tennis tournaments and were entitled to receive Prize Money, and who meet all eligibility requirements to participate in NCAA intercollegiate competition, or would now meet all such eligibility requirements if they had not accepted Prize Money; or
>
> (b) currently participate in NCAA Division I Tennis and intend to compete in tennis tournaments that award Prize Money based on place finish or performance.

152.   Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(3) on their own behalf and on behalf of the following Damages Class:

> All current, former, and prospective student-athletes who compete in, competed in, intend to compete in, or intended to compete in NCAA Division I Tennis, and who, at any time between March 19, 2020 and the date of judgment in this matter, forfeited Prize Money earned in tennis tournaments in order to preserve their NCAA eligibility or lost their NCAA eligibility as a result of the Prize Money restrictions.

153.   Unless specifically identified, the Injunctive Relief Class and the Damages Class are referred to herein collectively as the "Classes."

154.   Each Class is so numerous that joinder of all members is impracticable.  The exact number of Class members is unknown to Plaintiffs

48

at this time and can only be discerned through discovery, Plaintiffs are informed and believe that there are over 30 members in each of the Classes.

155.  With respect to the Injunctive Relief Class, more than 5,000 student-athletes and prospective student-athletes are currently members of Division I Tennis teams, many of whom also compete, or would like to compete, in professional tournaments.  The Injunctive Relief Class also includes individuals who may seek to join Division I Tennis teams in the future.

156.  The Injunctive Relief Class also includes the numerous Tennis student-athletes and prospective student-athletes who desire to play in non-NCAA events that offer small amounts of Prize Money without going through the time-consuming, arbitrary, and burdensome exercise of cataloging and submitting their expenses for approval to the NCAA—done so with the hope that the NCAA will validate that their expenses are "actual and necessary."

157.  With respect to the Damages Class, Plaintiffs have identified more than 30 Tennis student-athletes and prospective student-athletes who were reported to have won Prize Money in non-NCAA tournaments in the past four years and either subsequently competed in NCAA Division I or lost their eligibility due to the Prize Money restrictions.  These putative Class members attend or attended college in 15 different states, rendering joinder impractical.

49

158. Plaintiffs' claims are typical of the claims of other Class members. Plaintiffs and Class members sustained damages arising out of the NCAA's common course of conduct in violation of law as detailed herein. The injuries and damages of each member of the Classes were a direct and proximate cause of the NCAA's unlawful conduct as alleged herein.

159. Plaintiffs will fairly and adequately protect the interests of the Class members and has retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

160. Numerous common questions of law and fact exist as to all members of the Classes, and these common questions predominate any questions affecting solely individual members of the Classes. The questions of law and fact common to the Classes include but are not limited to:

a. Whether the NCAA acted or refused to act on grounds generally applicable to the members of the Classes, causing harm to the Classes and thereby making final injunctive relief appropriate for the members of the Injunctive Relief Class as a whole;

b. Whether the NCAA engaged in a contract, combination, or conspiracy to unreasonably restrain trade by limiting the compensation available to members of the Classes;

50

c.    Whether such conduct caused members of the Classes to receive less compensation than they would have received in truly competitive markets;

d.    The duration of the contract, combination, or conspiracy alleged herein;

e.    Whether the NCAA violated Section 1 of the Sherman Act;

f.    Whether the conduct of the NCAA and its co-conspirators caused injury to Plaintiffs and Class members;

g.    Whether the Injunctive Relief Class is entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief;

h.    Whether the Members of the Damages Class are entitled to monetary relief, and if so, the manner in which damages (including treble damages authorized by the Sharman Act) should be determined.

161.  Plaintiffs' claims are typical of the Classes as the challenged restraints have injured Plaintiffs and members of both Classes.

162.  Plaintiffs are adequate representatives of the Classes and will protect the claims and interest of the Class members.  Plaintiffs do not have interests that conflict with those of the Classes, and Plaintiffs will vigorously prosecute the claims set forth herein.  Plaintiffs are each members of both

51

Classes, because they forfeited Prize Money in the past in order to maintain NCAA eligibility, and also intend to compete in non-NCAA tournaments in the future.  There is no conflict between the interests of the Classes because they are seeking different kinds of relief.

163.  A class action is superior to other methods for the fair and efficient resolution of this controversy.  The class action device presents fewer management difficulties, and provides the benefit of a single adjudication, economy of scale, and comprehensive supervision by a single court.

164.  The injury suffered by Plaintiffs and Class members is relatively small compared to the significant expense and burden of individual prosecution of the claims asserted in this litigation.

165.  The NCAA has acted on grounds that apply generally to all Injunctive Class Members, so that injunctive relief is appropriate respecting the Class as a whole.

166.  With respect to the Damages Class, common questions of law and fact predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

167.  Thus, absent class certification, it would not be feasible for Plaintiffs and Class members to effectively redress the wrongs alleged herein.

It also would be grossly inefficient for the judicial system to preside over large numbers of individual cases.

168.  Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the judicial system.  Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

## <u>ANTITRUST ALLEGATIONS</u>

169.  The challenged Prize Money restrictions constitute a contract, combination, and conspiracy in unreasonable restraint of trade, consisting of a continuing horizontal agreement, understanding, and concert of action among the NCAA and its co-conspirators, the substantial terms of which were to artificially fix, depress, maintain, and/or stabilize prices received by Plaintiffs and Class members for their athletic services in the Markets within the United States, its territories and possessions.

170.  In formulating and effectuating such contract, combination, or conspiracy, the NCAA and its co-conspirators unlawfully combined and conspired to, among other things:

a.    agree to artificially fix, depress, maintain, and/or stabilize Prize Money received by Plaintiffs and Class members for their athletic services;

b.    agree to promote and engage in a group boycott of any Division I student-athlete or prospective student-athlete, or NCAA member who violates the restrictions prohibiting the acceptance of prize money by student-athletes and prospective student-athletes; and

c.    implement and monitor the conspiracy among cartel members.

171.    The activities described above have been engaged in by the NCAA and its co-conspirators for the purpose of effectuating the unlawful agreement to fix, depress, maintain and/or stabilize prices paid to Plaintiffs and Class members for their athletic services.

172.    Defendant's actions constitute an unreasonable restraint of trade.

## FIRST CLAIM FOR RELIEF
## Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1
### *Price Fixing Conspiracy*

173.    The allegations contained in the preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

174.    The NCAA and its co-conspirators, by and through its and its co-conspirators' officers, directors, employees, agents, or other representatives,

54

have entered into a continuing horizontal combination and conspiracy in unreasonable restraint of trade in the relevant labor markets to artificially depress, fix, maintain, and/or stabilize the prices paid to members of the Classes for the use of, and to limit supply for, their athletic services in the United States and its territories and possessions, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

175.    The NCAA's unlawful conduct deprived Plaintiffs and members of the Classes of unrestrained market-value compensation for the use of their athletic services.  This unreasonable restraint on competition that fixed prices has artificially limited supply and depressed compensation paid to Plaintiffs and members of the Classes and deprived them of meaningful athletic opportunities outside of NCAA play.

176.    Plaintiffs and members of the Classes received less compensation and fewer benefits than they otherwise would have received for the use of their athletic services in competitive labor markets, and thus suffered antitrust injuries and seek to recover for such injuries.

177.    The NCAA has always conditioned eligibility to play Tennis on the relinquishment to the NCAA and its members by the student-athlete of all rights to be compensated for their athletic services except in the limited circumstances dictated and enforced by the NCAA.

55

178.  The NCAA and its co-conspirators' abridgment of Plaintiffs and Class members' compensation rights is not justified by any legitimate procompetitive purpose.  The NCAA's actions are solely to enhance revenue for itself and its co-conspirators by limiting compensation to student-athletes and prospective student-athletes for their athletic services.  The NCAA's actions cannot be justified by any alleged goal of "amateurism" or any legitimate purpose. The NCAA's concerted actions directly restrain the Markets without any procompetitive justification and are therefore unlawful.

179.  As a direct and proximate result of the NCAA's anticompetitive price-fixing actions, Plaintiffs and Class members have been injured and financially damaged.  Plaintiffs and Class members' injuries consist of receiving lower compensation and fewer benefits for use of their athletic services than they would have received absent Defendant's anticompetitive price-fixing conduct.  Plaintiffs and Class members' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes the NCAA's price-fixing conduct unlawful.

180.  The NCAA and its co-conspirators have collectively conspired to illegally fix, limit, and depress the compensation to student-athletes and prospective student-athletes for their athletic services.  This anticompetitive and illegal scheme has unreasonably restrained trade.

56

181. The anticompetitive effects of the NCAA's scheme substantially outweigh any alleged procompetitive effects that may be asserted by the NCAA, including but not limited to that such collusive conduct is justified by the NCAA's concept of "amateurism." Moreover, reasonable and substantially less restrictive alternatives are available to the NCAA's price-fixing restraints on compensation to Division I student-athletes and prospective student-athletes for their athletic services, to the extent any procompetitive justification for such restraints may be found to exist.

182. Alternatively, the NCAA's restraints on Plaintiffs and Class members' ability to earn compensation for their athletic services should be determined to be either *per se* unlawful or unlawful under the quick-look rule of reason, given the experience the courts have now had in evaluating the legality of such restraints.

183. Plaintiffs and the Injunctive Relief Class seek a judicial declaration that the NCAA's Bylaws restricting the acceptance of Prize Money by student-athletes and prospective student-athletes competing in Tennis in non-NCAA competitions are illegal and unenforceable.

184. Plaintiffs and the Injunctive Relief Class seeks a permanent injunction against the challenged NCAA Prize Money restrictions. Plaintiffs and Class members have suffered, and will continue to suffer, antitrust

57

injuries by being deprived of the opportunity to market their athletic services in competitive labor markets until injunctive relief is granted.

185.   Plaintiffs and the Damages Class seek damages in this action in an amount not yet ascertained.   Pursuant to Section 4 of the Clayton Act, Plaintiffs and the Class are entitled to recover from the NCAA treble the amount of such actual damages as well as an award of reasonable attorneys' fees and costs of suit.

## SECOND CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1
### *Group Boycott*

186.   The allegations contained in the preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

187.   The NCAA and its co-conspirators, by and through their officers, directors, employees, agents, or other representatives, entered into a continuing horizontal contract, combination, and conspiracy in restraint of trade to effectuate a group boycott of any members of the Classes who do not abide by the NCAA's compensation restrictions.   The NCAA's group boycott/refusal to deal encompasses the NCAA's concerted acts to prevent Class members from being compensated for their athletic services and/or their concerted refusal to permit compensation to be paid to Class members for their

athletic services, in the United States and its territories and possessions, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

188.  The NCAA's group boycott/refusal to deal includes the NCAA's concerted action to require all Class members to abide by the regulations and bylaws that require each of them to relinquish the rights to compensation for their athletic services in a competitive market.

189.  The NCAA uses its eligibility rules and Bylaws as a threat of a group boycott to force all Class members, including Plaintiff, to abide by their restrictions, including the prohibition on acceptance of Prize Money.

190.  Plaintiffs and Class members received less compensation and fewer benefits than they otherwise would have received for the use of their athletic services in competitive labor markets, and thus suffered antitrust injuries.

191.  The NCAA has always conditioned eligibility to play Tennis on the relinquishment to the NCAA and its members by the student-athlete of all rights to be compensated for his or her athletic services except in the limited circumstances dictated and enforced by the NCAA.

192.  The NCAA and its co-conspirators' abridgment of Plaintiffs and Class members' compensation rights is not justified by any legitimate procompetitive purpose.  The NCAA's actions are solely to enhance revenue for

59

itself and its co-conspirators by limiting compensation to student-athletes and prospective student-athletes for their athletic services. The NCAA's actions cannot be justified by any alleged goal of "amateurism" or any legitimate purpose. The NCAA's concerted actions directly restrain the Markets without any procompetitive justification and are therefore unlawful.

193. As a direct and proximate result of Defendant's group boycott, Plaintiffs and Class members have been injured and financially damaged. Plaintiffs and Class members' injuries consist of receiving lower compensation and fewer benefits for use of their athletic services than they would have received absent the NCAA's agreements to engage in a group boycott. Plaintiffs and Class members' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes the NCAA's conduct unlawful.

194. The NCAA and their co-conspirators have collectively conspired to engage in a group boycott to illegally limit and depress the compensation to student-athletes and prospective student-athletes for their athletic services. This anticompetitive and illegal scheme has unreasonably restrained trade.

195. The anticompetitive effects of the NCAA's group boycott substantially outweigh any alleged procompetitive effects that may be asserted by the NCAA, including but not limited to that such collusive conduct is

justified by the NCAA's concept of "amateurism."  Moreover, reasonable and substantially less restrictive alternatives are available to the NCAA's group boycott restricting compensation to Division I student-athletes and prospective student-athletes for their athletic services, to the extent any procompetitive justification for such restraints may be found to exist.

196.  Alternatively, the NCAA's group boycott that has prevented Plaintiffs and Class members from earning fair-market compensation for their athletic services should be determined to be either *per se* unlawful, or unlawful under the quick-look rule of reason, given the experience the courts have now had in evaluating the legality of such restraints.

197.  Plaintiffs and the Classes seek a judicial declaration that the NCAA's Bylaws restricting the acceptance of Prize Money by student-athletes and prospective student-athletes competing in tennis in non-NCAA competitions are illegal and unenforceable.

198.  Plaintiffs and the Damages Class seek damages in this action in an amount not yet ascertained.  Pursuant to Section 4 of the Clayton Act, Plaintiffs and the Classes are entitled to recover from the NCAA treble the amount of such actual damages as well as an award of reasonable attorneys' fees and costs of suit.

61

199.   Plaintiffs and the Classes seek a permanent injunction against the challenged NCAA Prize Money restrictions.   Plaintiffs and Class members have suffered, and will continue to suffer, antitrust injuries by being deprived of the opportunity to market their athletic services in competitive labor markets until injunctive relief is granted.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs Reese Brantmeier and Maya Joint, individually and on behalf of the Classes, respectfully request the Court grants them relief as follows:

1.      For a trial by jury on all claims and issues so triable;

2.      For entry of an Order certifying the Classes, as set forth above in Paragraphs 151 and 152, and appointing Plaintiffs as Class Representatives and the undersigned attorneys as Class Counsel;

3.      For entry of judgment against the NCAA for Plaintiffs and the Damages Class members' actual damages according to the proof at trial;

4.      For all damages awarded to Plaintiffs and the Damages Class to be trebled pursuant to 15 U.S.C. § 15;

5.      For entry of Declaratory Judgment that the NCAA's Bylaws restricting the acceptance of Prize Money by student-athletes and prospective

62

student-athletes competing in non-NCAA tennis competitions are illegal and unenforceable;

6.    For entry of an Injunction restraining the NCAA from enforcing its Bylaws that restrict student-athletes and prospective student-athletes' ability, before and during their collegiate careers, to accept Prize Money in connection with non-NCAA tennis competitions;

7.    For pre-judgment interest at the legal rate on all amounts awarded to Plaintiffs and the Damages Class from the date of this filing;

8.    For an award of Plaintiffs' reasonable attorneys' fees, costs, and expenses; and

9.    For such further relief as the Court may deem just and proper.

This the 8th day of November 2024.

MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC

By:    /s/ *Peggy J. Wedgworth*
        PEGGY J. WEDGWORTH*
        New York State Bar No. 2126159
        405 East 50th Street
        New York, New York 10022
        (212) 594-5300
        pwedgworth@milberg.com

        DANIEL K. BRYSON
        North Carolina State Bar No. 15781
        LUCY N. INMAN

63

North Carolina State Bar No. 17462
ARTHUR M. STOCK
North Carolina State Bar No. 1761
900 W Morgan Street
Raleigh, North Carolina 27603
(919) 600-5000
astock@milberg.com
dbryson@milberg.com
linman@milberg.com

**MILLER MONROE & PLYLER, PLLC**

JASON A. MILLER
North Carolina State Bar No. 39923
ROBERT B. RADER III
North Carolina State Bar No. 55184
WILLIAM W. PLYLER
North Carolina State Bar No. 10475
JOEL L. LULLA* (*Of Counsel*)
New York State Bar No. 1865823
1520 Glenwood Avenue
Raleigh, North Carolina 27608
(919) 809-7346
jmiller@millermonroe.com
rrader@millermonroe.com
wplyler@millermonroe.com
joel_lulla@yahoo.com

*Counsel for Plaintiffs and Proposed Classes*

* Specially Admitted

64

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 11, 2024, the foregoing was electronically filed with the Clerk of the U.S. District Court, Middle District of North Carolina, using the CM/ECF system, which will serve and send notification of such filing to all parties:

Calanthe Arat
Rakesh N. Kilaru
Tamarra D. Matthews Johnson
Matthew Skanchy
WILKINSON STEKLOFF
2001 M Street NW, 10th Floor
Washington, DC 20036
carat@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com
tmatthewsjohnson@wilkinsonstekloff.com
mskanchy@wilkinsonstekloff.com


Mattie Bowden
ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006

mattie.bowden@afslaw.com


Alan M. Ruley
Bell, Davis & Pitt
PO Box 21029
Winston-Salem NC  27120
aruley@belldavispitt.com


By: <u>/s/ Peggy J Wedgworth</u>