Steven F. Molo (*pro hac vice*)
Eric A. Posner (*pro hac vice*)
Thomas J. Wiegand (*pro hac vice*)
Bonnie K. St. Charles (*pro hac vice*)
MOLOLAMKEN LLP
300 N. LaSalle Street
Chicago, IL  60654
smolo@mololamken.com
eposner@mololamken.com
twiegand@mololamken.com
bstcharles@mololamken.com
(312) 450-6700

Alexandra C. Eynon (*pro hac vice*)
Pratik K. Raj Ghosh (*pro hac vice*)
Sara Tofighbakhsh (*pro hac vice*)
MOLOLAMKEN LLP
430 Park Avenue
New York, NY  10022
aeynon@mololamken.com
prajghosh@mololamken.com
stofighbakhsh@mololamken.com
(212) 607-8160

William J. Cooper (CA Bar No. 304524)
Natalie Cha (CA Bar No. 327869)
CONRAD | METLITZKY | KANE LLP
217 Leidesdorff Street
San Francisco, CA  94111
wcooper@conmetkane.com
ncha@conmetkane.com
(415) 343-7100

Arthur H. Bryant (CA Bar No. 208365)
CLARKSON LAW FIRM, P.C.
95 3rd Street, 2nd Floor
San Francisco, CA  94103
abryant@clarksonlawfirm.com
(213) 788-4050

*Counsel for Objectors*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

|  |  |
|---|---|
| IN RE COLLEGIATE ATHLETE NIL LITIGATION | Case No. 4:20-cv-03919-CW<br><br>**OBJECTION TO AMENDED SETTLEMENT AGREEMENT AND OPPOSITION TO FINAL APPROVAL**<br><br>Hon. Claudia Wilken<br>Hearing Date: April 7, 2025<br>Hearing Time: 10:00 a.m.<br>Courtroom: 2, 4th Floor |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 1

I.      The Objectors ........................................................................................................ 1

II.     Procedural History ................................................................................................ 2

III.    The Amended Settlement ...................................................................................... 3

        A.      The Damages Settlement ........................................................................... 3

                1.      The NIL Claims Settlement Payments ........................................... 4

                2.      The Additional Compensation Claims Settlement Payments ................... 5

        B.      The Injunctive Relief Settlement ............................................................... 5

        C.      The Releases .............................................................................................. 8

        D.      The Amendments ....................................................................................... 9

ARGUMENT ...................................................................................................................... 9

I.      The Amended Settlement Discriminates Against Women Athletes ................................. 10

        A.      The Amended Settlement Undercompensates Women Class Members .............. 11

        B.      The Amended Settlement Violates Title IX ................................................... 12

                1.      The Amended Settlement Discounts Title IX ..................................... 12

                2.      Title IX Applies to Past Revenue-Sharing Damages ............................. 14

                3.      Title IX Applies to the NCAA and Conference Defendants .................... 15

                4.      The Title IX Release Reveals Inadequate Representation ...................... 16

II.     The Roster Limits Render the Settlement Unfair .......................................................... 17

        A.      Roster Limits Are Harming Class Members .................................................. 17

        B.      Roster Limits Create Irreconcilable Intra-Class Conflict and Reveal
                Inadequate Representation ........................................................................ 19

III.    The Amended Settlement Violates Antitrust Law ......................................................... 20

i

A.     The Amended Settlement Fixes the Price of NIL and Athletic Services.............. 20

B.     Roster Limits Are a Horizontal Agreement Lacking Procompetitive Rationale ...................................................................................................... 23

IV.    The Amended Settlement Releases the *Carter* Claims Too Cheaply and Without Discovery ......................................................................................................... 23

CONCLUSION.................................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

Page(s)

CASES

*A. B. by C.B. v. Haw. State Dep't of Educ.*,
   386 F. Supp. 3d 1352 (D. Haw. 2019) ......................................................15

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ......................................................................19

*Arizona v. Maricopa Cnty. Med. Soc'y*,
   457 U.S. 332 (1982) ......................................................................22

*In re Bluetooth Headset Prods. Liab. Litig.*,
   654 F.3d 935 (9th Cir. 2011) .............................................................24

*Brown v. Pro Football, Inc.*,
   518 U.S. 231 (1996) ......................................................................23

*Chalenor v. Univ. of N. Dakota*,
   291 F.3d 1042 (8th Cir. 2002) ...........................................................13

*In re College Athlete NIL Litig.*,
   No. 20-cv-03919-CW, 2023 WL 7106483 (N.D. Cal. Sept. 22, 2023) ...................2

*In re College Athlete NIL Litig.*,
   No. 20-cv-03919-CW, 2023 WL 8372787 (N.D. Cal. Nov. 3, 2023) .................2, 14

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ...........................................................24

*Hunt v. VEP Healthcare, Inc.*,
   No. 16-CV-04790-VC, 2017 WL 3608297 (N.D. Cal. Aug. 22, 2017) ..................14

*Johnson v. NCAA*,
   108 F.4th 163 (3d Cir. 2024) ............................................................24

*Kim v. Allison*,
   8 F.4th 1170 (9th Cir. 2021) ..........................................................9, 10

*Lane v. Facebook, Inc.*,
   696 F.3d 811 (9th Cir. 2012) ...........................................................24

*In re Literary Works in Elec. Databases Copyright Litig.*,
   654 F.3d 242 (2d Cir. 2011)..............................................................19

*NCAA v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984) ................................................................................23

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*,
    375 F. Supp. 3d 1058 (N.D. Cal. 2019) ........................................21, 22

*NCAA v. Alston*,
    594 U.S. 69 (2021) ........................................................................21, 23

*NCAA v. Smith*,
    525 U.S. 459 (1999) .............................................................................15

*O'Connor v. Uber Techs., Inc.*,
    No. 13-CV-03826-EMC, 2016 WL 3548370 (N.D. Cal. June 30, 2016) ...............................24

*Ollier v. Sweetwater Union High Sch. Dist.*,
    858 F. Supp. 2d 1093 (S.D. Cal. 2012) ...............................................13

*Rodriguez v. West Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ...............................................................18

*Shane Grp. v. Blue Cross Blue Shield of Mich.*,
    825 F.3d 299 (6th Cir. 2016) ...............................................................14

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006) .................................................................................20

*Uschold v. NSMG Shared Servs., LLC*,
    333 F.R.D. 157 (N.D. Cal. 2019) .........................................................16

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
    895 F.3d 597 (9th Cir. 2018) ...............................................................19

### STATUTES, REGULATIONS, AND RULES

15 U.S.C. § 1 ..............................................................................................20

20 U.S.C. § 1681 ........................................................................................15

20 U.S.C. § 1681(a) ...................................................................................13

34 C.F.R. § 106.37(c) .................................................................................13

34 C.F.R. § 106.41(c)(10) ..........................................................................13

Fed. R. Civ. P. 23(e)(2) ..........................................................9, 10, 12, 14

Fed. R. Civ. P. 23(e)(2)(B) ........................................................................19

iv

Fed. R. Civ. P. 23(e)(2)(D) .................................................................................19

**OTHER AUTHORITIES**

*2024 NIL Store Report: Edey, Bueckers, Jeanty Highlight Top-Sellers*,
    NILNewsstand.com (Dec. 31, 2024), https://bit.ly/4hDL45T ................................11

Kurt Badenhausen, *NBA Players Score as Shared Revenue Grows by $250m in
    New CBA*, Yahoo! Sports (Apr. 24, 2023), https://bit.ly/3WJMsMp .....................22

In re: College Athlete NIL Litigation (House) *Frequently Asked Questions*,
    College Athlete Compensation, https://www.collegeathletecompensation.com/
    house-frequently-asked-questions.aspx (last visited Jan. 31, 2025).......................18

Lindsey Darvin, *Women Athletes Are Reshaping College Sports' Financial
    Landscape Through NIL Success,* Forbes (Oct. 28, 2024),
    https://bit.ly/3EfmQAq ...........................................................................................11

Ross Dellenger, *'Creating Havoc Everywhere'* – House-*NCAA Settlement
    Causing Crunch for Olympic Sports as Roster Limits Come into Focus*,
    Yahoo! Sports (Jan. 30, 2025), https://bit.ly/3WFS0rh ........................................19

*Division I Athletics Finances 10-Year Trends from 2013-22*, NCAA Research
    (Dec. 2023), https://bit.ly/3WWI8cY ...................................................................21

Dan Graziano, *NFL Players Approve New CBA, Runs Through 2030,* ESPN
    (Mar. 15, 2020), https://bit.ly/4hk799P ................................................................22

Sean Gregory, *2024 Athlete of the Year: Caitlin Clark*, Time (Dec. 10, 2024),
    https://bit.ly/40WRY0o...........................................................................................11

Kaplan Hecker & Fink LLP, *NCAA External Gender Equity Review Phase I:
    Basketball Championships* (Aug. 2, 2021), https://bit.ly/3Cx3whB ................11, 12

Chantel Jennings & Nicole Auerbach, *What Does the NCAA's New Media Rights
    Agreement Mean for Women's College Basketball?*,
    N.Y. Times: The Athletic (Jan. 4, 2024), https://bit.ly/3PVQLjZ .......................12

Sophie Kaufman, *Sources: SEC Will Set Men's Swim & Dive Roster Limits at 22
    Athletes in Wake of* House v. NCAA, SwimSwam (Oct. 18, 2024),
    https://bit.ly/4gh0BaH..............................................................................................8

Alyssa Meyers, *NIL Deals Are Distributed Evenly Between Men and Women,
    Report Says*, Marketing Brew (Apr. 15, 2024), https://bit.ly/3EfXylP....................11

*Minimum Wage*, U.S. Dep't of Lab., https://bit.ly/4fvCJRs
    (last accessed Jan. 31, 2025)..................................................................................24

Dan Murphy & Michael Rothstein, *Pending NCAA Settlement, Roster Limits Pose National Signing Day Uncertainty*, ESPN (Nov. 11, 2024), https://bit.ly/4hERguk ............................................................................20

*NCAA Convention, GOALS Study: Understanding the Student-Athlete Experience*, https://bit.ly/3WE7BXm .............................................................................24

*NCAA Sports Sponsorship and Participation Rates Report (1956-57 through 2023-24)* (Sept. 19, 2024), https://bit.ly/3WE9jIW ..................................7, 8

Dep't of Edu., Off. for Civil Rights, *Fact Sheet: Ensuring Equal Opportunity Based on Sex in School Athletic Programs in the Context of Name, Image, and Likeness (NIL) Activities* (Jan. 2025), https://bit.ly/3CrlYZ8 ....................................13

Eddie Pells, *Objections Flow in on NCAA Settlement Over 'Unnecessarily Harsh' Impact of Roster Limits,* Associated Press (Jan. 29, 2025), https://bit.ly/40HnQ7U ............................................................................20

Eddie Pells, *Roster Limits in College Small Sports Put Athletes on Chopping Block While Coaches Look for Answers,* Associated Press (Nov. 12, 2024), https://bit.ly/3P4xigj.............................................................................7

Vanessa Romo, *Women's NCAA Championship TV Ratings Crush the Men's Competition,* NPR (Apr. 10, 2024), https://n.pr/3WB04Zv....................................12

vi

## INTRODUCTION

The Amended Settlement Agreement is not "fair, reasonable, and adequate."

First, it discriminates against women class members, who lacked independent representation, and violates Title IX. While women account for 46% of the class, they receive less than 10% of the settlement proceeds. Significantly, the Department of Education agrees.

Second, its roster limits prejudice less-successful athletes, who also lacked independent representation, to benefit other class members, like the class representatives, who are stars. The mere anticipation of these roster limits is wreaking havoc on the lives of many current and future student athletes, as detailed in the 159 affidavits supporting this Objection.

Third, it violates antitrust law by substituting one restraint of trade for another – merely increasing the fixed price of student-athlete labor and allowing the NCAA to reclaim veto power over NIL deals. Significantly, the Department of Justice agrees.

Fourth, it releases the athletic services compensation claims too cheaply and without adequate discovery.

This Court should deny final approval.

## BACKGROUND

### I.    THE OBJECTORS

Objectors are student-athletes who are members of the "Additional Sports Class" and the "Injunctive Relief Settlement Class" as defined in the Amended Settlement (the "Menke-Weidenbach Objectors"). *See* Dkt. 535-1 ("Am. Settlement") § A.1(n)(3), (z).

Ten Objectors are women athletes in the Additional Sports Class who competed on NCAA Division I teams during the relevant period. *See* Ex. A. They are led by Grace E. Menke, who was a member of Yale University's NCAA Division I crew team for four years, serving as its captain during her senior year, 2023-2024. *Id.* at 1. Menke is currently preparing to apply to medical school. *Id.*

Three Objectors are current student-athletes who have been cut, or are at risk of being cut, from their teams due to the Amended Settlement. *See* Ex. C. They are led by John Weidenbach,

1   a sophomore at the University of Michigan and a member of its NCAA Division I football team.

2   *See* Ex. C at 1-6 ("Weidenbach Decl.") ¶ 1.  Weidenbach is a preferred walk-on athlete and a 2024

3   Academic All-Big Ten honoree.  *Id.* ¶ 1; Ex. A at 2.

4        An additional 152 class members have filed objections that support arguments made by

5   the Menke-Weidenbach Objectors.  *See* Exs. D, E.  They are current Division I student-athletes

6   playing a range of sports – football, swimming, golf, water polo, tennis, volleyball, soccer, and

7   track and field, among others – at universities across the country.  Others are high school students

8   or younger aspiring recruits who have worked their whole lives to join a Division I team, and are

9   members of the Injunctive Relief Settlement Class.

10       All the Menke-Weidenbach Objectors have been or will be harmed by the Amended

11  Settlement.  They object individually and on behalf of their respective classes.

12  ## II.   PROCEDURAL HISTORY

13       This consolidated class action began in 2020.  *See* Dkt. 154 (consolidation).  Plaintiffs

14  allege that the National Collegiate Athletic Association ("NCAA") and Power Five conference

15  defendants ran a price-fixing cartel that fixed college athlete NIL compensation "at zero."  *See*

16  Dkt. 164 ¶¶ 11-12.  Plaintiffs also alleged that women were particularly harmed by the NCAA's

17  restraints because, among other things, the NCAA failed to promote women's sports to the same

18  extent as their male counterparts.  *Id.* ¶ 227.  In 2023, the Court certified three damages classes

19  and an injunctive relief class, and appointed Class Counsel to represent all four.  *In re College*

20  *Athlete NIL Litig.*, No. 20-cv-03919-CW, 2023 WL 8372787, at *3-4, *27 (N.D. Cal. Nov. 3,

21  2023) ("*NIL I*"); *In re College Athlete NIL Litig.*, No. 20-cv-03919-CW, 2023 WL 7106483, at

22  *7 (N.D. Cal. Sept. 22, 2023) ("*NIL II*").

23       Soon after, Class Counsel filed *Carter v. NCAA*, No. 3:23-cv-06325 (N.D. Cal.),

24  challenging the NCAA's anticompetitive restrictions on "athletic services" compensation.

25  *Carter*, however, never advanced.  Defendants have not filed responsive pleadings, no discovery

26  has been conducted, and no class has been certified.  *Carter*, No. 3:23-cv-06325, Dkt. 100.

27

28

Class Counsel and defendants, who had been negotiating a settlement since November 2022, incorporated *Carter* into their discussions. Dkt. 450-2 ¶¶ 4, 8. They reached a settlement of all cases in spring 2024, *id.,* and moved for preliminary approval in July, Dkt. 450. Class Counsel simultaneously submitted a Second Consolidated Amended Complaint ("SCAC") for the purpose of settlement. *See* Dkt. 448-2. The SCAC added, among other things, the athletic services allegations in *Carter*, as well as new claims that the NCAA's scholarship caps violated antitrust law. *Id.* The SCAC also sought certification of an even broader damages class for the purposes of settlement, expanding the "Additional Sports Class" to include ***all*** Division I athletes who were not full scholarship football or basketball players. Dkt. 448-1 ¶ 303.

## III.   THE AMENDED SETTLEMENT

Objectors summarized the terms of the original Settlement in the initial objection and opposition to preliminary approval. *See* Dkt. 475 at 5-8. That Settlement has been replaced by the Amended Settlement, but most of its terms remain the same. The parties amended only provisions relating to the scope of release and the proposed NCAA "veto" over NIL compensation to student-athletes. *See* Dkt. 535-2 (redline). Class Counsel also submitted a Third Consolidated Amended Complaint, which added a named class representative. *See* Dkt. 533-1 ("TCAC"). The Court granted preliminary approval on October 7. Dkt. 544.

### A.   The Damages Settlement

The damages settlement awards $2.576 billion to student-athletes – nearly all to male football and basketball players. The money will be divided between three Settlement classes: (1) the Football and Men's Basketball Class; (2) the Women's Basketball Class; and (3) the Additional Sports Class. Am. Settlement § A.1(n). The first two classes consist of full-scholarship football and basketball Division I student-athletes eligible to compete between June 15, 2016 through September 15, 2024. *Id.* The Additional Sports Class covers all other Division I student-athletes – whether or not they received a scholarship – eligible in the same period. *Id.*

The Amended Settlement provides for two types of settlement payments: (1) NIL Claims Settlement payments and (2) Additional Compensation Claims Settlement payments. Am.

Settlement § A.1(w).   Nearly 77% of the $2.576 billion settlement pool, or $1.976 billion, is allocated to the NIL claims.  *Id.* § A.1(ee).  The remaining $600 million compensates for so-called "athletic services."  *Id.* § A.1(c); Dkt. 450-4 ("Rascher Decl.") ¶ 3.  That amount is intended to cover all other (non-NIL) claims released under the Amended Settlement.  Am. Settlement § C.3.

### 1.   The NIL Claims Settlement Payments

Plaintiffs' economic expert, Daniel A. Rascher, formulated the methodology allocating settlement funds to members of the three Settlement Classes.  Rascher Decl. ¶¶ 7-8.  Rascher divides the $1.976 billion NIL Claims Settlement payments into (1) Video Game NIL payments ($71.5 million), (2) Broadcast NIL payments ($1.815 billion), and (3) Lost NIL Opportunity payments ($89.5 million).  *Id.* ¶ 15.[1]  He distributes the NIL Claims Settlement payments among student-athletes based on the market demand for the use of their NILs.  *See id.*

Football and male basketball athletes get the lion's share of the NIL Claims Settlement payments.  Male athletes will receive 100% of Video Game NIL payments ($71.5 million), 96% of Broadcast NIL payments ($1.815 billion, or 92% of the entire Settlement), and about 60% of the Lost NIL Opportunity payments.  *See* Rascher Decl. ¶ 15; *id.* Exs. 3. 5, & 6.

Hardly anything will be paid to women athletes.  Less than 4% of the Lost NIL Opportunity payments go to the Women's Basketball Class, and approximately 37% goes to the Additional Sports Class.  Rascher Decl. ¶ 31 & Ex. 6.  Even under the conservative assumption that all of the Additional Sports Class payments go to women athletes, the majority (nearly 60%) of the overall Lost NIL Opportunity payments still go to men.  *Id.* Ex. 6.  And ***almost 95%*** of the total NIL payments, approximately $1.872 billion, would go to football and male basketball players.  *Id.*

---

[1] Video Game NIL payments represent the royalty payments student-athletes would receive as compensation for the use of their NIL in video games.  Rascher Decl. ¶ 19 & Exs. 1, 2.  Broadcast NIL payments represent the share of the Power Five conferences' broadcast revenue student-athletes would receive for the use of their NIL.  *Id.* ¶ 25.  Lost NIL Opportunity payments are intended to compensate for lost NIL earning opportunities and would be paid only to student-athletes across the three damages classes with verifiable third-party NIL compensation after July 1, 2021.  *Id.* ¶ 31.

2.    *The Additional Compensation Claims Settlement Payments*

The Additional Compensation settlement pool, which is intended to compensate for the *Carter* "athletic services" claims, totals $600 million – with **90%** ($540 million) going to male Power Five football and basketball players.   Rascher Decl. ¶48.   Just 5% ($30 million) goes to female basketball players.  *Id.*  The remaining 5% ($30 million) is divided among members of the Additional Sports Class – that is, ***all other Division I athletes***.  *Id.*  Even if all Additional Sports Class damages were allocated to female athletes, male athletes would still receive **90%** ($540 million) of the Additional Compensation Claims Settlement Amount.

Under Rascher's method for compensating student-athletes for their athletic services, an average football player at a Power Five school is compensated approximately $12,000 to $14,000 per year for "athletic services."  *See* Rascher Decl. ¶56.  An average men's basketball player is compensated approximately $16,000 to $18,000 per year.  *See id.* ¶61.  An average women's basketball player is compensated approximately $4,500 to $5,300 per year.  *See id.* ¶66.  And a female Division I rower is compensated approximately $125 per year.  *See id.* ¶81.[2]

**B.    The Injunctive Relief Settlement**

There is a single class for the injunctive relief settlement, consisting of all athletes who "compete on, competed on, or will compete on a Division I athletic team at any time between June 15, 2020 through the end of the Injunctive Relief Settlement Term."   Am. Settlement § A.1(z).   The injunctive relief settlement proposes three transformational changes to college sports: direct revenue-sharing, potential NCAA vetoes of NIL compensation, and roster limits.

***Direct Revenue-Sharing.***  For the next ten years, the injunctive relief settlement permits schools to pay students for their athletic services (over and above the scholarships and other benefits currently permitted by the NCAA) up to an annual per-school cap.  Am. Settlement App'x A ("Injunctive Relief Settlement").  That cap is set at 22% of the average of the schools'

---

[2] The payout may be significantly less.  The reason for the disparity between Class Counsel's estimate that the vast majority of "Additional Sports" athletes will receive just $50, Dkt. 450 at 41, and Rascher's $125-per-year figure is unclear.

OBJECTION TO AMENDED SETTLEMENT AGREEMENT AND
OPPOSITION TO FINAL APPROVAL
CASE NO. 4:20-CV-03919-CW

1  shared revenue, which Rascher estimates at $23.1 to $32.9 million annually.  *Id.*, art. 3, § 1(d)-

2  (e); Rascher Decl. Ex. 25.[3]  Within that cap, schools may allocate compensation as they choose.

3  Injunctive Relief Settlement, art. 3, § 2.

4  **NCAA Veto.**  The original Settlement authorized the NCAA and the Power Five

5  conferences to prohibit student-athletes from entering into private NIL agreements with

6  "Boosters," a term that was broadly defined.  Any NIL deals valued over $600 had to be submitted

7  by the student-athletes to their schools and the NCAA.  Injunctive Relief Settlement, art. 2, § 4.[4]

8  At the preliminary approval hearing, the Court expressed concern that the definition of "Boosters"

9  was so broad that it could encompass third parties rather than NIL collectives associated with a

10  single school, and as a result, "some people who are getting large sums of money in third party

11  NIL right now will no longer" get it.  Dkt. 525 ("Hr'g Tr.") at 64:12-24, 80:12-21.

12  The Amended Settlement removes any reference to "Boosters," but continues to regulate

13  equivalent entities.  Instead, the Amended Settlement creates a new definition – "Associated

14  Entity" – for entities and their agents that exist to "promot[e] or support[ ]" an athletic department,

15  Injunctive Relief Settlement, art. 1, § 1(c)(a)-(b); individuals who have given more than $50,000

16  to a Member Institution or an entity described in Article 1 Section 1(c)(a), *id.*, art. 1, § 1(c)(c); or

17  an entity or individual who participates in recruiting athletes, *id.*, art. 1, § 1(c)(d).

18  These changes do not alter the scope of the NCAA's control over NIL compensation to

19  student-athletes from the original Settlement.  The thrust of the veto is the same:  The NCAA is

20  permitted to prohibit boosters and collectives from contracting with athletes for their NIL unless

21  the deal is for "a valid business purpose" and for fair market value.  Injunctive Relief Settlement,

22  art. 4, § 3.

23

24  ───────────────

25  [3] Over the course of the ten-year settlement term, the average shared revenue that serves as the basis for the per-school cap would be recalculated every three years, and in between recalculation years, the average shared revenue would increase annually by 4%.  Injunctive Relief Settlement, art. 3, § 1(e)-(f).

27  [4] The disclosure must be made to an undefined "Designated Reporting Entity."  Am. Settlement, art. 1, § (1)(i); art. 2, §§ 4, 5.  The Amended Settlement is unclear as to whether the NCAA, the conferences, or the schools will police the NIL deals.

28

***Roster Limits.***  The NCAA currently imposes scholarship limits per sport at each school but does not restrict the size of team rosters.  *See* Injunctive Relief Settlement, art. 4, § 1.  The Amended Settlement replaces scholarship caps with roster limits for those institutions that "opt-in" to the Amended Settlement by choosing to provide revenue-sharing payments or incremental athletic scholarships to student-athletes.  *Id.*, art. 2, § 6; art. 3, § 3(b); art. 4, § 1; *see* Am. Settlement at 130-35 ("App'x B").  The roster limits set a maximum team size for each sport, and permit schools to further "unilaterally" reduce the number of sports offered.  App'x B, art. 1, § 3.[5]  They will be imposed "during the first Academic Year following Final Approval" – potentially mere months from now – with no phase-in period and no exceptions offered to current or incoming student athletes.  *Id.*, art. 1, § 1.  "Final Approval" means the date of entry of the final approval order, and the Injunctive Relief Settlement – including the roster limits – "shall be effective as of" that date, "***regardless of any appeal***."  Am. Settlement §§ A(1)(v), D(18) (emphasis added).[6]

Roster limits are entirely new.  Schools can currently have as many athletes on their teams as they want.  Under the Amended Settlement, however, team sizes must be within roster limits.  Injunctive Relief Settlement, art. 4, § 1.  Universities can offer full scholarships to any athlete on the team, *id.*, but whether to do so is discretionary.  The Amended Settlement only permits – it does not require – schools to offer more athletic financial aid.

The roster limits are, in many cases, significant reductions relative to current average roster sizes.  Football will be limited to just 105 spots.  App'x B, art. 1, § 1.  The average Division I football program, however, carries 130.8 players on the team.[7]  Aside from football, the most

---

[5] At least one conference is slashing roster sizes further.  The Amended Settlement proposes a men's swimming roster limit of 30, and the Southeastern Conference has reportedly proposed a limit of only ***22*** athletes.  *See* Eddie Pells, *Roster Limits in College Small Sports Put Athletes on Chopping Block While Coaches Look for Answers*, Associated Press (Nov. 12, 2024), https://bit.ly/3P4xigj.

[6] This contrasts with the damages settlement, as "***[n]o payments shall be made to Class Members***" until all appeals are "exhausted."  Am. Settlement § D(18) (emphasis added).

[7] *See NCAA Sports Sponsorship and Participation Rates Report (1956-57 through 2023-24)* 126 (Sept. 19, 2024), https://bit.ly/3WE9jIW ("*NCAA Participation Report*").  In 2023-2024, Football Bowl Subdivision (FBS) rosters – half of Division I football programs – had an average of 142.4 players, while the Football Championship Subdivision (FCS) had an average of 118.7.  *Id.* at 91.

1  severe limits are for men's soccer (28, 14% less than current average); women's soccer (28, 11%

2  less than current average); men's wrestling (30, 14% less than current average); men's lacrosse

3  (48, 9% less than current average); men's golf (9, 10% less than current average); and men's ice

4  hockey (26, 9% less than current average).  Others, like men's and women's swimming and diving

5  (30), are adversely affected even though the roster limit exceeds the average roster size because

6  they are set at a limit significantly less than existing powerhouse school team sizes.[8]  For example,

7  premier women's crew teams can have more than 100 team members.  The roster limits make the

8  maximum team size 68.  *See* Ex. D at 1-4 ("Farooq Decl.") ¶4.

9      **C.    The Releases**

10      The release of claims in the Amended Settlement extends beyond the NIL claims initially

11  alleged in *In re NIL*, and the athletic services claims alleged in *Carter*.  The "Released Damages

12  Class Claims" releases "all manner of claims, demands, actions, suits, causes of action," "known

13  or unknown," relating to "all previously existing NCAA and conference rules regarding monies

14  and benefits that may be provided to student-athletes" by the defendants "and/or Division I

15  Member Institutions," or "relating in any way" to the NCAA's scholarship caps.  Am. Settlement

16  § A(1)(oo).  The "Released Injunctive Class Claims" similarly releases all claims "regarding

17  monies and benefits that may be provided to student-athletes by the NCAA" and "NCAA roster

18  and scholarship limits."  *Id.* § A(1)(pp).  As for who the claims are released against, the Amended

19  Settlement proposes immunizing all the defendants in the action as well as "***all Division I***

20  ***Member Institutions***" – who are ***not*** parties to this action.  *Id.* § A(1)(rr) (emphasis added).

21      At the preliminary approval hearing, Objectors' counsel raised concerns that the release

22  gave up far more claims than the antitrust claims alleged in the complaint, including Title IX

23  claims.  Hr'g Tr. at 28:24-29:21, 35:23-36:12, 38:6-39:10.  Class Counsel represented that all

---

[8] In 2023-2024, the average men's swimming and diving roster size was 29.2, and women's was 30.8. *NCAA Participation Report* at 91-92.  Many schools maintain much larger rosters.  For example, the University of Florida had 41 male swimmers.  Sophie Kaufman, *Sources: SEC Will Set Men's Swim & Dive Roster Limits at 22 Athletes in Wake of* House v. NCAA, SwimSwam (Oct. 18, 2024), https://bit.ly/4gh0BaH.

Title IX claims against schools for "individual school conduct" were not released, but the NCAA's counsel was "not sure" he "agree[d]." *Id.* at 31:8-17, 31:24-32:5.  The Court directed the parties to revise the release language to something that would "make the objectors comfortable." *Id.* at 32:7-8.

The parties then included a new definition for "Unreleased Claims," which are carved out from the "Released Damages Class Claims."  Am. Settlement § A(1)(vv).  Among other things, the Amended Settlement carves out "Claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, ***other than any claims arising out of or relating to the distribution of the Gross Settlement Fund***." *Id.* § A(1)(vv)(3) (emphasis added).  The "Gross Settlement Fund" is "the NIL Claims Settlement Amount and the Additional Compensation Claims Settlement." *Id.* § A(1)(w).

The Amended Settlement also states that if student-athletes are permitted to collectively bargain, it does not prohibit the NCAA or schools from engaging in "bona fide collective bargaining activities."  Am. Settlement, art. 5, § 1.

### D.    The Amendments

The fundamentally unfair aspects of the agreement remain unchanged.  It still awards $2.576 billion to student-athletes – mostly male football and basketball players – and allows schools to compensate their students for athletic services annually up to a defined per-school cap. Am. Settlement § A(1)(w), (ee), (c); *id.* § B(2).  It still provides for two types of settlement payments: (1) the NIL Claims Settlement payments and (2) the Additional Compensation Claims Settlement payments.  *Id.* § A(1)(w).  And it still awards almost ***95% of the total NIL payments to male football and basketball players***, Rascher Decl. ¶¶ 15, 31; *id.* Exs. 3, 5, as well as ***90%*** of the Additional Compensation Claims Settlement Amount, *id.* ¶ 48.

### ARGUMENT

The Amended Settlement must be "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  When scrutinizing the "fairness" of the Amended Settlement, the Court acts as a "fiduciary" to "protect[] . . . the interests of absent class members." *Kim v. Allison*, 8 F.4th 1170,

1178 (9th Cir. 2021). Rule 23(e) requires consideration of whether "(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2). This Circuit further requires "comprehensive" consideration of eight additional factors[9] – including "the reaction of the class members of the proposed settlement." *Kim,* 8 F.4th at 1178 (internal quotation marks omitted).

The Amended Settlement fails that test. It discriminates against women, needlessly strips thousands of their roster spots, violates antitrust laws, and releases claims for next to nothing. Scores of Objectors oppose it. Its deficiencies are too pervasive to be remedied by sending the parties "back to the drawing board." Hr'g Tr. 83:17-21.

## I.  THE AMENDED SETTLEMENT DISCRIMINATES AGAINST WOMEN ATHLETES

The Amended Settlement allocates more than 90% of funds to football and men's basketball players and leaves less than 10% for *all* women. *See* Rascher Decl. ¶48. This staggering imbalance discounts the NCAA's decades-long failure to promote women's sports, which, in conjunction with its price-fixing conspiracy, devalued women's NILs. It also violates Title IX. Far from adequate compensation to women, the Amended Settlement compounds the inequity Title IX was enacted to remedy.

---

[9] The eight *Churchill* factors are: "(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement." *Kim,* 8 F.4th at 1178 (internal quotation marks and citation omitted).

### A.    The Amended Settlement Undercompensates Women Class Members

Women's sports have exploded in popularity – and profits – since the NCAA suspended enforcement of its anti-NIL compensation rules in 2021.  Women college athletes have attracted unprecedented acclaim.[10]  The NIL Store, an online storefront for college athlete merchandise, reported that, when considering sales by sport, women's merchandise accounted for six of the top ten sellers in 2024.[11]  NIL valuations of the top three female earners in 2024 each topped a million dollars, and women accounted for more than half – specifically 52 – of the top 100 NIL deals reported in 2023.[12]

The Amended Settlement ignores this reality.  Instead, it allocates past NIL compensation based on historic revenues, to astoundingly biased results.  Many football and men's basketball players will receive more than $100,000.  The average female sprinter will receive ***$125*** (if she receives anything at all).  Class Counsel excuses that disparity as "based on market realities," Dkt. 494 at 12 n.10, but that is untrue.  It is based on market ***distortions.***

By failing to invest in women's sports, the NCAA depressed the value of women's NILs relative to their male counterparts.  The parties know this.  The complaint alleges that female athletes were uniquely harmed by defendants' anticompetitive conduct due to the NCAA's failure to promote women's sports, *see* TCAC ¶¶244-248, and a 2021 report ***commissioned by the NCAA itself*** concluded that every facet of its culture, organization, and practices "create[d], normalize[d], and perpetuate[d] gender inequities."  Kaplan Hecker & Fink LLP, *NCAA External Gender Equity Review Phase I: Basketball Championships* 2 (Aug. 2, 2021), https://bit.ly/3Cx3whB ("Kaplan Hecker Phase I Report").

---

[10] *Time* magazine named college basketball sensation and WNBA rookie Caitlin Clark its 2024 "Athlete of the Year."  Sean Gregory, *2024 Athlete of the Year: Caitlin Clark*, Time (Dec. 10, 2024), https://bit.ly/40WRY0o.

[11] Those sports are women's basketball, softball, volleyball, soccer, lacrosse, and gymnastics.  *2024 NIL Store Report: Edey, Bueckers, Jeanty Highlight Top-Sellers*, NILNewsstand.com (Dec. 31, 2024), https://bit.ly/4hDL45T.

[12] Lindsey Darvin, *Women Athletes Are Reshaping College Sports' Financial Landscape Through NIL Success*, Forbes (Oct. 28, 2024), https://bit.ly/3EfmQAq; Alyssa Meyers, *NIL Deals Are Distributed Evenly Between Men and Women, Report Says*, Marketing Brew (Apr. 15, 2024), https://bit.ly/3EfXylP.

"March Madness" tells the story in large, bold print. Prior to 2022, the NCAA refused to extend the lucrative "March Madness" brand, reserved for the men's basketball, to the women's tournament. Kaplan Hecker Phase I Report 8-9, 37-40. Just two years later, the 2024 women's March Madness final drew *18.7 million viewers, outstripping the men's final* for the first time.[13] Had the NCAA fairly promoted women's sports, those ratings would have come much earlier. Instead, the NCAA boosted men's publicity – and NILs – while artificially depressing women's.

Women's damages are extraordinary and very real. The 2021 report found, among other things, that the NCAA "significantly undervalu[ed] . . . women's basketball as an asset" by failing to capture hundreds of millions in broadcasting revenues in its ESPN contract. *Id.* at 9, 37-40.[14] In 2024, the NCAA and ESPN negotiated a new 8-year, $940 million contract that valued "women's basketball at $65 million per year, about *10 times more*" than the contract it replaced. Chantel Jennings & Nicole Auerbach, *What Does the NCAA's New Media Rights Agreement Mean for Women's College Basketball?*, N.Y. Times: The Athletic (Jan. 4, 2024), https://bit.ly/3PVQLjZ (emphasis added). Women athletes would have received millions more in NIL compensation but for the defendants' conduct. The Amended Settlement rewards the NCAA's discrimination by underpricing women's NIL damages and relieving the NCAA of the cost of paying for their injuries.

## B.    The Amended Settlement Violates Title IX

### 1.    *The Amended Settlement Discounts Title IX*

Class Counsel insists that Title IX is irrelevant to this case. *See* Dkt. 494 at 12 n.10; Hr'g Tr. 36:17-37:25. It is not. A settlement that violates federal law through its discriminatory treatment of women cannot be "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be

---

[13] Vanessa Romo, *Women's NCAA Championship TV Ratings Crush the Men's Competition*, NPR (Apr. 10, 2024), https://n.pr/3WB04Zv.

[14] The report's conclusions relied on the analysis of media expert Ed Desser, who is the same media expert engaged by Class Counsel in this action. *See* Dkt. 209-3 (Desser report, sealed); Dkt. 598-2 (same, redacted).

denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). In furtherance of that goal, Title IX requires, among other things, that schools distribute athletic financial assistance in substantial proportion to gender enrollment, 34 C.F.R. § 106.37(c), and apply equal resources for "publicity," *id.* § 106.41(c)(10).

Title IX applies to NIL revenue-sharing. Title IX's regulator, the Office for Civil Rights ("OCR") in the Department of Education, confirmed as much. On January 16, 2025, OCR issued a Fact Sheet explaining that:

> [C]ompensation from a school for use of a student-athlete's NIL qualifies as athletic financial assistance which, under Title IX, must be made available to male and female student-athletes in a manner that is substantially proportionate to the number of students of each sex participating in . . . intercollegiate athletics at that school.

OCR, *Fact Sheet: Ensuring Equal Opportunity Based on Sex in School Athletic Programs in the Context of Name, Image, and Likeness (NIL) Activities* 1-2 (Jan. 2025), https://bit.ly/3CrlYZ8 ("OCR Title IX Fact Sheet"). OCR also advised that third-party NIL payments to student-athletes could trigger Title IX's antidiscrimination provisions "when funding from private sources, including private donations and funds raised by booster clubs, creates disparities based on sex in a school's athletic program or a program component." *Id.* at 8.

OCR's conclusions are no great surprise. Title IX regulations requiring equal treatment of athletic publicity squarely govern schools' treatment of student-athletes' NILs derived from publicity rights. *Cf. Ollier v. Sweetwater Union High Sch. Dist.*, 858 F. Supp. 2d 1093, 1107 (S.D. Cal. 2012). Moreover, no matter the source or intent of "outside funding," "[o]nce a university receives a monetary donation, the funds become public money, subject to Title IX's legal obligations in their disbursement." *Chalenor v. Univ. of N. Dakota*, 291 F.3d 1042, 1048 (8th Cir. 2002); *see* OCR Title IX Fact Sheet at 8. Revenues from live sports events distributed to schools fit that bill, as do direct booster-funded NIL payments to student-athletes.

2.      *Title IX Applies to Past Revenue-Sharing Damages*

When negotiating the settlement, Class Counsel were required to adequately represent the interests of women by advocating that Title IX applies to past NIL damages caused by the defendants' anticompetitive conduct.  Their excuses to the contrary are unconvincing, as is the contention that the Court found that Title IX was irrelevant to this antitrust action at class certification.  *See* Dkt. 494 at 12 n.10.  Not so.  The narrow question at class certification was whether class-wide damages could be determined by common proof.  *NIL I*, 2023 WL 8372787, at *12-16.  The Court properly left substantive questions about the **persuasiveness** of plaintiffs' damages model to the jury.  *Id.* at *17.  At final approval of a class action settlement, the standard for interrogating the settlement's substantive "fair[ness], reasonable[ness], and adequa[cy]" is different and more exacting.  Fed R. Civ. P. 23(e)(2).

Further, Rascher's key assumption at class certification – that **conferences** would have paid students directly – is ridiculous.  At the time, Rascher avoided Title IX by assuming that conferences would have bypassed schools and distributed revenues directly to student-athletes.  *NIL I*, No. 2023 WL 8372787, at *14.[15]  That's not been done.  Indeed, when the parties hashed out how revenue-sharing would work in the Amended Settlement, **they put schools in charge**.  Injunctive Relief Settlement, art. 3, §2.  The assumption that past revenue-sharing would have been administered in a different way to sidestep Title IX is ridiculous – a mere fiction to try to circumvent an obvious problem with the settlement.

---

[15] Rascher's settlement opinion relies on his earlier merits report, which remained under seal until January 23, 2025.  The parties belatedly complied with the Court's Order to publish redacted versions of expert reports submitted in support of class certification only after Objectors' counsel raised the issue.  *See* Dkts. 598, 600.  Given that the heavily redacted expert reports were only recently made public – at the very end of the class notice period – the extent of prejudice to absent class members' right to information to determine for themselves whether they wish to object is not yet known.  *See Shane Grp. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 302 (6th Cir. 2016); *Hunt v. VEP Healthcare, Inc.*, No. 16-CV-04790-VC, 2017 WL 3608297, at *1 n.1 (N.D. Cal. Aug. 22, 2017) (it is inappropriate to seal materials related to settlement approval "because it may interfere with the right of class members to make an informed decision about whether to object or opt out").  Objectors reserve the right to seek reopening of the objection deadline on additional review of the reports.

14

3.    *Title IX Applies to the NCAA and Conference Defendants*

Even accepting Rascher's assumption, the conferences and NCAA **are not exempt from Title IX**.  Title IX applies to educational programs that receive "Federal financial assistance."  20 U.S.C. § 1681.  On different facts, the Supreme Court in *NCAA v. Smith* held that "[e]ntities that receive federal assistance, whether directly or through an intermediary, are recipients within the meaning of Title IX; entities that only benefit economically from federal assistance are not."  525 U.S. 459, 468 (1999).  *Smith*, however, did not hold that the NCAA and defendant conferences were immune from Title IX.

*Smith* pointedly did not decide whether Title IX applies when covered schools cede controlling authority over their athletic programs to another entity.  *See* 525 U.S. at 468.  The member schools have done just that.  Among other things, schools outsource disciplinary rulemaking, tournament and championship scheduling, and publicity and promotion of their student-athletes to the NCAA and conferences.  The NCAA and defendant conferences are thus "instrumentalit[ies] of, and controlled by," their federally funded member schools, with which they are "pervasively entwined."  *A. B. by C.B. v. Haw. State Dep't of Educ.*, 386 F. Supp. 3d 1352, 1354 (D. Haw. 2019) (internal quotation marks omitted) (applying Title IX to interscholastic athletic association as indirect recipient of federal funds).  Title IX applies where, as here, the member schools ceded controlling authority over their athletic financial aid, recruiting, and revenue-sharing decisions to the NCAA and conferences, which act as their agents.

*Smith* rejected only the argument that the payment of member schools' dues to the NCAA made the NCAA a recipient of federal financial assistance under Title IX.  *See* 525 U.S. at 468.  *Smith* otherwise explicitly noted that Title IX applies where entities receive federal financial assistance "**through an intermediary**."  *Id.* (emphasis added).  That is precisely what the NCAA and defendant conferences do.

Class Counsel failed to represent women by giving up early on Title IX.  At the preliminary approval hearing, Class Counsel lamented that Title IX does not apply to the NCAA and conferences, but did not even **attempt** to distinguish *Smith* or analyze how the distribution of

15

settlement proceeds implicates Title IX. *See* Hr'g Tr. 31:8-17. Defendants raised Title IX in opposing class certification, *see* Dkt. 249 at 15, 28, but have since gone silent now that a broad release is in sight. The parties' shared interest in avoiding the issue now smacks of collusion.

### 4. The Title IX Release Reveals Inadequate Representation

The Amended Settlement will extinguish Title IX claims relating to the allocation of settlement funds, raising the question of just what women athletes are getting in exchange. At the preliminary approval hearing, Objectors' counsel raised concerns about the scope of the original Settlement's release. Hr'g Tr. 31:15-32:5. Class Counsel reassured the Court that Title IX claims were "completely preserved," and defendants' counsel somewhat agreed. *Id.* The Court instructed the parties to come up with revised release language that would "make the objectors comfortable." *Id.* at 32:6-9. After the hearing, Objectors' counsel notified the parties they were available to talk, but neither party responded. *See* Dkt. 587-1. When Class Counsel reemerged with the Amended Settlement, they proclaimed that the agreement had been amended to "expressly provide that the release of claims by class members does not extend to . . . ***any*** Title IX claims." Dkt. 534 at 5 (emphasis added).

That is untrue. The Amended Settlement releases Title IX claims "arising out of or relating to the distribution of the Gross Settlement Fund," Am. Settlement § A.1(vv), against the parties and "***all Division I Member Institutions***," *id*. § A.1(rr) (emphasis added). If the parties believe defendants are not subject to Title IX, the release has no value to them. The purpose is to immunize schools, which are unquestionably subject to Title IX and also are covered by the release. The parties fail to explain what women athletes – who lacked their own representation as a sub-class – are receiving in return for giving up their claims against all "Member Institutions" for Title IX violations. The revised release confirms that Title IX applies and women were not adequately represented. This is exactly the type of "preferential treatment" – here, for men at the expense of women – that Rule 23 prohibits. *Uschold v. NSMG Shared Servs., LLC*, 333 F.R.D. 157, 169 (N.D. Cal. 2019).

II.    **THE ROSTER LIMITS RENDER THE SETTLEMENT UNFAIR**

The Amended Settlement proposes replacing NCAA scholarship caps with roster limits that are considerably lower than existing headcounts, eliminating thousands of athletic positions overnight. Anticipating final approval, schools have begun making abrupt roster cuts, pressuring student-athletes to try their luck in flooded transfer portals, and rescinding recruiting offers to high schoolers. Thousands of class members are left stranded, their identities as athletes stripped by a settlement that should have delivered them relief. The chaos unleashed by roster limits has already destroyed young lives and exposed serious intra-class conflict. Class Counsel's failure to even address the fallout underscores the need to appoint independent counsel for student-athlete class members subject to roster limits.

A.    **Roster Limits Are Harming Class Members**

Countless student-athletes who honored one set of rules are seeing their lives upended and dreams shattered because another set of rules is being arbitrarily forced on them. Walk-on football players are witnessing their talent and loyalty rewarded by being shown the door. *See, e.g.,* Weidenbach Decl ¶¶7-12; Ex. E at 357, 451. Swimmers who just want to represent their schools in the pool are being abruptly kicked out. *See, e.g.*, Ex. E at 3, 216, 321, 421-22, 458. Cross-country and track and field rosters, which universities rely on to balance athletic gender participation in compliance with Title IX, have been decimated. *See, e.g.,* Ex. C at 12-13 ("Wheatley Decl.") ¶¶4-5; Ex. E at 24, 55, 131, 141, 302-03, 533. The list goes on and on. *See, e.g.,* Ex. C at 9-10 ("Hollingshead Decl.") ¶¶9-12 (men's golf); Ex. E at 229 (women's beach volleyball), 310 (men's soccer), 525-26 (men's water polo), 546 (men's tennis), 579-80 (women's soccer).

Coaches also oppose the roster limits. *See* Ex. D. Some roster cuts will be so large under the Amended Settlement that entire teams must be cut to rebalance available athletic opportunities under Title IX. *See* Ex. D at 5-8 ("Gardner Decl.") ¶¶4-8. The Amended Settlement will also prevent the development of Olympic-level athletes, many of whom are walk-ons who will be prematurely cut under the roster limits. *See id.* ¶¶10-12; Farooq Decl. ¶¶7-8.

17

This terrible situation would not have occurred without the roster limits. Affected students and parents have begged the Court to reject them. *See* Dkts. 572, 573, 574, 575, 579, 589, 592, 594, 597, 602, 604, 605, 606, 607, 608, 610, 611. After other students and parents sought help from Objectors' counsel, we raised the issue with Class Counsel. *See* Dkt. 587-1. But the parties have done nothing to help.[16]

This Court observed that "taking . . . things away from people is usually not too popular." Hr'g Tr. at 71:17-18. That is exactly what roster limits are doing. Schools are breaking their promises to young athletes who arranged their entire futures in reliance on those promises. The unjust consequences of this cruel game of musical chairs are material and heartbreaking.

The "reaction of the class," moreover, is overwhelmingly negative. *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 963 (9th Cir. 2009). The 155 objections filed in support of this Objection, as well as many others submitted directly to the Court, come only from student-athletes who both knew about the Amended Settlement and had the courage to object under their own names. *See* Exs. C, E. Objectors' counsel consulted with many more who asked to remain anonymous for fear of retaliation or online harassment. Ex. B ("Wiegand Decl.") ¶ 7. Their fear is understandable; power dynamics inherent in college athletics train young people not to be seen as "troublemakers." *Id.* ¶ 5.[17] Many parents and students also expressed reluctance to write down their objections because of the mental and emotional stress of being cut, or risking being cut. *Id.* ¶ 8. The true extent of objections to the Amended Settlement's roster limits may never be known.

---

[16] On December 20, 2024, Objectors partially opposed the NCAA's "question-and-answer" ("Q&A") because it misled class members about the Amended Settlement's roster limits. Dkt. 587. The Court modified the Q&A before permitting publication to the class. *See* Dkt. 588-1. The parties have not otherwise addressed the impact of the roster limits.

[17] Ineffective notice to the class also appears to be responsible. Some Objectors report that they never received any correspondence notifying them of the settlement or how to object. *See, e.g.,* Weidenbach ¶ 13; Ex. E at 367. The objection procedure is also buried in the settlement website. *See* In re: College Athlete NIL Litigation (House) *Frequently Asked Questions*, College Athlete Compensation, https://www.collegeathletecompensation.com/house-frequently-asked-questions.aspx (last visited Jan. 31, 2025) ("What if I disagree with the settlement?").

### B.    Roster Limits Create Irreconcilable Intra-Class Conflict and Reveal Inadequate Representation

The Court must scrutinize the Amended Settlement "to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).  The thoughtless implementation of roster limits creates pervasive intraclass conflicts.  Each of the named representatives is a nationally recognized elite athlete who would have never been cut under ***any*** roster limit.  *See* TCAC ¶¶ 15-86.  They broke records and competed internationally, *id.* ¶¶ 18-20, 22, 24; received awards for superlative performance, *id.* ¶¶ 56-58; competed in an NCAA National Championship, *id.* ¶ 70; and represented Team USA, *id.* ¶¶ 30-32.  Their interests as elite athletes are not aligned with the average student-athlete.

"[S]ome proposed agreements are so unfair in their terms to one subset of class members that they cannot but be the product of inadequate representation of that subset." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 895 F.3d 597, 608 (9th Cir. 2018). The Amended Settlement is one such agreement because the proposed roster limits pit class members against each other.  For one class member to "win" by staying on their team or landing on a new one, ***another class member must lose***.  A class member forced off her team, moreover, cannot receive the benefit of increased scholarship caps.  Creating a zero-sum competition to access the so-called benefits of the Amended Settlement is the furthest thing from supplying "adequate" relief to the class.  Fed. R. Civ. P. 23(e)(2)(B); *id.* 23(e)(2)(D) (proposed settlement must "treat[ ] class members equitably relative to each other").

The disaster created by roster limits demonstrates the class representatives' (all stars) "fundamental conflict" with – and inadequate representation of – this subset of the class.  *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 256 (2d Cir. 2011).[18]  Roster limits are new.  Defendants apparently demanded them in the settlement negotiations.[19]  Class

---

[18] Class Counsel seek $475.2 million in attorneys' fees, $400,000 in incentive awards, and the right to apply for up to 1.25% of revenue-sharing distributions per year for ten years. Dkt. 583 at 25-26, 36.

[19] *See* Ross Dellenger, *'Creating Havoc Everywhere'* – House-*NCAA Settlement Causing Crunch for Olympic Sports as Roster Limits Come into Focus*, Yahoo! Sports (Jan. 30, 2025), https://bit.ly/3WFS0rh;

Counsel has failed to explain why roster limits are needed to provide antitrust relief to the class. They are not.  Worse, they violate antitrust law themselves.  *See* p. 23, *infra.*  The value of this so-called "relief" is zero.  Roster limits hurt, rather than help, class members.

Anticipating the devastation of implementing roster limits all at once, Class Counsel at a minimum could have sought their gradual implementation.  Inexplicably, they did not.  And after Objectors' counsel alerted them to the issue in September 2024, Class Counsel brushed it off.  *See* Dkt. 587-1.  Five months later, nothing has been done.

## III.    THE AMENDED SETTLEMENT VIOLATES ANTITRUST LAW

The Amended Settlement imposes a system that is no less price fixing than the system this lawsuit attacks.  The Department of Justice, in its January 17, 2025 "Statement of Interest of [the] United States of America," agrees.  Dkt. 595.  The Amended Settlement's revenue-sharing caps and roster limits thwart the market's role in deciding the worth of student-athletes' publicity rights and labor.  A class action settlement trying to pitch itself as a professional sports collective bargaining agreement – without any collective bargaining – cannot withstand antitrust scrutiny.

### A.    The Amended Settlement Fixes the Price of NIL and Athletic Services

Horizontal price-fixing arrangements are "*per se* unlawful" under Section 1 of the Sherman Act.  *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006); 15 U.S.C. § 1.  By permitting the NCAA to continue controlling **how much** student-athletes can be paid and **by whom**, the Amended Settlement binds the class in a horizontal price-fixing arrangement.  *See* Injunctive Relief Settlement, art. 3, § 1(a); Dkt. 595 at 6 ("While the Proposed Settlement allows for some relief, it still functions as an artificial price cap on what free market competition may otherwise yield.").

The Amended Settlement caps the amount that schools can pay athletes directly.  And it prevents what were previously called "collectives" or "boosters," now ill-defined "Associated

---

Eddie Pells, *Objections Flow in on NCAA* Settlement *Over 'Unnecessarily Harsh' Impact of Roster Limits*, Associated Press (Jan. 29, 2025), https://bit.ly/40HnQ7U; Dan Murphy & Michael Rothstein, *Pending NCAA Settlement, Roster Limits Pose National Signing Day Uncertainty*, ESPN (Nov. 11, 2024), https://bit.ly/4hERguk.

OBJECTION TO AMENDED SETTLEMENT AGREEMENT AND
OPPOSITION TO FINAL APPROVAL
CASE NO. 4:20-CV-03919-CW

Entit[ies]," from paying athletes without the NCAA's review and sign-off.  Injunctive Relief Settlement, art. 4, § 3.  The NCAA decides the cap on student-athlete pay until *2036*.  Rascher Decl. ¶ 85.  The cap only increases by 4% most years, even though NCAA Division I schools reported a *31% increase* in revenue between 2021 and 2022.  Injunctive Relief Settlement, art. 3, § 1(g); *Division I Athletics Finances 10-Year Trends from 2013-22*, NCAA Research (Dec. 2023), https://bit.ly/3WWI8cY.  As a result, the NCAA will go on "profit[ing] in a different way than the student-athletes whose activities they oversee." *NCAA v. Alston*, 594 U.S. 69, 80 (2021); *see also In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1070 (N.D. Cal. 2019) (student-athletes should be paid "commensurate with the value that they create").  And the Amended Settlement ignores this Court's admonishment that "fix[ing]" student-athlete compensation, regardless of "the amount at which these prices are fixed," is "anticompetitive." *Grant-in-Aid*, 375 F. Supp.3d at 1095.

The spending cap alone warrants the rejection of the Amended Settlement.  The spending cap works only if the NCAA bars certain third-party NIL payments.  Thus, the Amended Settlement allows the NCAA to "continue" to "pass new rules . . . prohibit[ing]" NIL transactions with "Associated Entities and Individuals" unless, in the *NCAA's* discretionary judgment, the deal is for "a valid business purpose" and at fair market value.  Injunctive Relief Settlement, art. 4, § 3.

At the preliminary approval hearing, the Court expressed serious reservations about the Settlement effectively permitting the NCAA to ban third-party NIL payments.  Hr'g Tr. at 64:1-21.  The parties' revisions still grant the NCAA that power.  The Amended Settlement does not "merely" clarify that the NCAA may enforce "rules which already prohibit so-called 'faux' NIL payments."  Dkt. 534 at 2.  It entrenches *yet another* antitrust violation: allowing the NCAA to substitute its judgment for the free market.  *See* Dkt. 595 at 6-8.

The parties frame the Amended Settlement's restriction on third-party NIL payments as necessary to prevent schools from exceeding the revenue-sharing cap, like measures "in professional leagues."  Dkt. 534 at 8.  But players in professional leagues *collectively bargain* for

their salary caps.  And they get much more.  Both the NBA and NFL allocate roughly 50% of their revenue to athletes.[20]  The proposed spending cap for student-athletes is less than half that.

The Amended Settlement would make the NCAA the "judge and jury" of whether a third-party NIL payment is permissible.  Dkt. 534 at 11.  The NCAA *first* gets to decide whether an NIL deal with an Associated Entity is permissible.  *Id.* at 9-10.  If it disallows the deal, the student-athlete may "reform and resubmit" the deal *to the NCAA* or to a neutral arbitrator.  *Id.* at 10.  The parties insist that such arbitrations will "occur quickly."  *Id.*  But they've offered no basis for that and have supplied no details.  And while "no penalties can be imposed" on student-athletes while the arbitration is "pending," *id.*, the Amended Settlement is conspicuously silent about penalties imposed *after* arbitration.

The adjudicatory processes envisioned by the Amended Settlement restrain the free market from determining the "fair market price" the NCAA claims it can be trusted to police.  The Amended Settlement leaves the NCAA firmly and illegally in control of the market for student-athletes' NILs, and the parties' complex dispute-resolution process does not change that.

As the Court noted when denying preliminary approval, the class currently enjoys unrestricted access to third-party NIL deals.  *See* Hr'g Tr. 80:12-25.  By appointing the NCAA as the gatekeeper of those deals, the Amended Settlement prevents student-athletes from profiting off their NILs "in accordance with their own judgment."  *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 346 (1982).

Even if every school paid the "maximum amount" of direct revenue-sharing "allowed under the Settlement Agreement," Dkt. 534 at 7, the spending cap and *de facto* third-party NIL ban "deprive[s]" student-athletes of compensation they could receive "in the absence of the restraints," *Grant-in-Aid*, 375 F. Supp. 3d at 1068.  The result is an unlawful price-fixing scheme.

---

[20] Dan Graziano, *NFL Players Approve New CBA, Runs Through 2030*, ESPN (Mar. 15, 2020), https://bit.ly/4hk799P; Kurt Badenhausen, *NBA Players Score as Shared Revenue Grows by $250m in New CBA*, Yahoo! Sports (Apr. 24, 2023), https://bit.ly/3WJMsMp.

1    **B.    Roster Limits Are a Horizontal Agreement Lacking Procompetitive Rationale**

Under the Amended Settlement, the number of scholarships that a school can award student-athletes is capped by the size of their limited rosters.  That is a plain horizontal agreement by the schools not to compete for talent.  The parties have failed to meet their burden to offer any procompetitive justification that might save the clear anticompetitive effect of the roster limits.

No procompetitive reason exists to justify the roster limits under federal antitrust law.  They do not "maintain[ ] a competitive balance among amateur athletic teams" comparable to roster caps in professional leagues.  *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 117 (1984).  As with spending caps, the fact that the professional leagues ***agree through collective bargaining*** to limit their rosters does not justify the Amended Settlement's imposition of the same model on college sports in the absence of collective bargaining.  *See* Dkt. 595 at 8-9 (United States Department of Justice's position that salary caps in professional sports are incomparable to the Amended Settlement's proposed caps).

The only reason anticompetitive roster limits are legal in professional athletic leagues is the nonstatutory labor exemption.  *See Brown v. Pro Football, Inc.*, 518 U.S. 231 (1996).  Professional athletes, unlike college athletes, are represented by unions that negotiate collective bargaining agreements, which sometimes include roster limits, on their behalf.  *Id. Brown* and its progeny did not hold that roster limits are *per se* procompetitive.  In fact, the application of the nonstatutory labor exemption in *Brown* implies the opposite.  If roster limits had a procompetitive rationale, a labor exemption from antitrust laws would not be necessary.

**IV.    THE AMENDED SETTLEMENT RELEASES THE *CARTER* CLAIMS TOO CHEAPLY AND WITHOUT DISCOVERY**

"Price-fixing labor is price-fixing labor."  *Alston*, 594 U.S. at 110 (Kavanaugh, J., concurring).  The NCAA has done so for years, "control[ling] the market for college athletes" and "set[ting] the price of student athlete labor at a below-market rate."  *Id.* at 109.  Student-athletes have possessed "no meaningful ability to negotiate" compensation with the NCAA, *id.*, even though playing college sports "can certainly constitute compensable work," *Johnson v.*

23

1    *NCAA*, 108 F.4th 163, 178 (3d Cir. 2024) (holding that athletes may qualify as employees under

2    the Fair Labor Standards Act).  The Court should not tolerate – much less approve – another

3    decade of this illegal behavior.

4         The *Carter* claims were settled unfairly and without adequate information or advocacy.

5    The Amended Settlement sets the price of labor **below minimum wage**.  *See Minimum Wage*,

6    U.S. Dep't of Lab., https://bit.ly/4fvCJRs (last accessed Jan. 31, 2025).  Objectors do not know

7    the value of these compensation claims because they have never been subject to discovery.

8    Indeed, the NCAA never even answered the *Carter* complaint.  While the Amended Settlement

9    provides some bare compensation for their "athletic services," Am. Settlement § A(1)(vv), class

10   members will never know how good a deal they might have gotten because the *Carter* claims

11   were **never litigated**.  That alone renders the Amended Settlement's "Additional Athletic

12   Services" provisions inadequate and unfair.  *See In re Bluetooth Headset Prods. Liab. Litig.*, 654

13   F.3d 935, 946 (9th Cir. 2011) (a "high[] level of scrutiny" should be applied to settlements

14   "[p]rior to formal class certification").  Whatever the proper value of these claims, it is something

15   more than the minimum wage students would receive if they worked in the cafeteria or university

16   library, instead of on the soccer field.  *See NCAA Convention, GOALS Study: Understanding the*

17   *Student-Athlete Experience* 19, https://bit.ly/3WE7BXm (Division I student-athletes spent a

18   median of 30 to 40 hours per week on in-season athletic activities in 2019).

19        Settlements reached before class certification are held to a "higher standard of fairness."

20   *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (internal quotation marks omitted).

21   "The reason for more exacting review of class settlements reached before formal class

22   certification is to ensure that class representatives and their counsel do not secure a

23   disproportionate benefit 'at the expense of the unnamed plaintiffs who class counsel had a duty

24   to represent.' "  *Id.* (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026-27 (9th Cir. 1998)).

25   A mere $600 million allocated for athletic services fails this exacting review.

26        The release of the compensation claims bears all the hallmarks of collusion.  *See*

27   *O'Connor v. Uber Techs., Inc.*, No. 13-CV-03826-EMC, 2016 WL 3548370, at *5 (N.D. Cal.

28

June 30, 2016). In the Amended Settlement, Class Counsel committed to forego any future advocacy about compensation, agreeing they will:

> [T]ake no position, and thus be neutral, in all instances and in all forums and venues, ***on the issue of whether student-athletes should be considered/deemed "employees" or whether collective bargaining should be permitted for compensation of student athletes***.

Injunctive Relief Settlement, art. 7, § 1 (emphasis added). Class Counsel told the Court that the Amended Settlement takes a neutral position regarding collective bargaining. Dkt. 450 at 10. But that's not true. The Amended Settlement *requires* Class Counsel to take a neutral position. The class representatives and their counsel have failed to show they have adequately represented the class on these claims.

## CONCLUSION

Class Counsel's plainly inadequate representation of the class renders the Amended Settlement anything but fair, reasonable, and adequate. Approval should be denied.

Dated: January 31, 2025

Respectfully submitted,

*/s/ Steven F. Molo*
Steven F. Molo (*pro hac vice*)
Eric A. Posner (*pro hac vice*)
Thomas J. Wiegand (*pro hac vice*)
Bonnie K. St. Charles (*pro hac vice*)
MOLOLAMKEN LLP
300 N. LaSalle Street
Chicago, IL 60654

Alexandra C. Eynon (*pro hac vice*)
Pratik K. Raj Ghosh (*pro hac vice*)
Sara Tofighbakhsh (*pro hac vice*)
MOLOLAMKEN LLP
430 Park Avenue
New York, NY 10022

*/s/ William J. Cooper*
William J. Cooper (CA Bar No. 304524)
Natalie Cha (CA Bar No. 327869)
CONRAD | METLITZKY | KANE LLP
217 Leidesdorff Street
San Francisco, CA 94111

*/s/ Arthur H. Bryant*
Arthur H. Bryant (CA Bar No. 208365)
CLARKSON LAW FIRM, P.C.
95 3rd Street, 2nd Floor
San Francisco, CA 94103

*Counsel for Objectors*

OBJECTION TO AMENDED SETTLEMENT AGREEMENT AND
OPPOSITION TO FINAL APPROVAL
CASE NO. 4:20-CV-03919-CW