# **EXHIBIT C**

John Weidenbach
844 Woodlawn Avenue
Naperville, IL 60540

January 7, 2025

      Re:    *In re College Athlete NIL Litigation*, No. 4:20-cv-03919-CW

Dear Judge Wilken:

    My name is John Weidenbach. I am a current Division I athlete at the University of Michigan and my NCAA ECID number is 2301761096. For the reasons stated in my attached declaration, I object to the roster limits in the settlement agreement in *In re College Athlete NIL Litigation*, No. 4:20-cv-03919-CW. I am a member of the Injunctive Relief Class. I make this objection individually and on behalf of the Injunctive Relief Class.

    I designate Steven F. Molo and the firm of MoloLamken LLP to speak on my behalf at the Fairness Hearing on April 7, 2025.

                                        Sincerely,
                                      John Weidenbach

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

IN RE COLLEGIATE ATHLETE NIL
LITIGATION

Case No. 4:20-cv-03919-CW

Hon. Claudia Wilken

NCAA ECID No.: 2301761096
Objection to Settlement Roster Limits

**DECLARATION OF JOHN WEIDENBACH**

I, John Weidenbach, hereby declare as follows pursuant to 28 U.S.C. § 1746:

1. I am a sophomore and walk-on football player at the University of Michigan, Ann Arbor (Michigan). As a member of the Injunctive Relief Settlement Class, I feel compelled to object on behalf of my fellow student-athletes in the class. I submit this declaration to supplement the objection I filed with the Court on December 11, 2024. *See* Dkt. 579.

2. Michigan football runs deeper than maize and blue in my blood – it's my family's legacy. My great uncle, Jack Weidenbach, served as the Athletic Director and Administrator at Michigan, helping guide the athletic department during a crucial period in the early 1990s. His dedication to Michigan athletics inspired generations of our family, creating a tradition of unwavering Michigan pride that spans decades. Every time I step onto that field, I carry not just my own dreams, but the weight and honor of our family's connection to this storied program. Attending Michigan and playing football here isn't just my personal goal – it's the culmination of a legacy that began long before me.

3. Football has been my constant companion since kindergarten, shaping every decision, every early morning workout, every late-night study session. Through four grueling high school years as a varsity letterman, I poured my heart and soul into becoming worthy of Michigan's standards – both on the field and in the classroom. As team captain, I led my team in tackles for three seasons at Benet Academy, earned first-team Chicago Catholic League All-Conference honors twice, and capped my career with Naperville Sun 1st Team All Area Honors and Chicago Sun-Times' All-Area team honorable mention recognition, validating years of

relentless dedication and sacrifice. These personal accolades caught the attention of a number of colleges and universities, sparking interest in me playing at the next level.

4. When the time came to think about life after high school, Michigan seemed like a pipe dream. Growing up watching Michigan football and hearing stories about my family's connection to the program, I could only dream of one day being a part of it. However, in December 2022, during the College Football Playoffs, I received an unexpected call from Michigan's linebacker coach, who told me he thought I could play at Michigan and wanted to talk about me being a preferred walk-on. My heart skipped a beat. Over the next several months, even as the coaching staff changed, I stayed in contact with Michigan's recruiting staff. By April 2023, my dream became a reality when I was officially offered a preferred walk-on position. For me, wearing the maize and blue wasn't about making money – it was about fulfilling a lifelong dream of representing the winningest program in college football history while earning a world-class education.

5. I enthusiastically accepted the preferred walk-on role, graduated from high school at the end of May 2023, and reported to Michigan for summer training on May 30, 2023. My prayers were answered, and my journey began.

6. Football and academics are inseparable parts of my identity at Michigan. Earning my degree from this prestigious institution while playing for the football team represents everything I've worked toward. When classes began in fall of 2023, I committed myself fully to excellence in both areas. Between classes and coursework, I dedicated myself to daily practice, conditioning, and weight training sessions, all while pursuing my academic goals with the same intensity and dedication.

7. Maize and blue blood runs thick within the Weidenbach family. The roots of the Ann Arbor institution are deeply entrenched within our family tree – my grandfather Chuck was the brother of former Michigan Athletic Director Jack Weidenbach. Before my grandfather passed away in 2022, he always said that before he left this earth, he wanted to see me coming out of that tunnel. Though he didn't get to witness my high school career due to his deteriorating health, I know he now has the best seat in the house. This achievement meant everything to me

and my family, as I'm not just achieving a dream but honoring a profound family legacy. Even without an athletic scholarship, NIL compensation, or stipend support, I take immense pride in carrying forward our family's dedication to Michigan football. My mindset has always been to do whatever I can to help this team win, knowing that with great challenges come great opportunities. I will do anything for this team, carrying with me the knowledge that my family's love and legacy run deeper than just wearing the maize and blue – it's forever.

8. Being part of the Michigan football team demands significant commitment. We participate in daily practices and meetings while maintaining high academic standards. I embrace these challenges and consistently give my best effort in both athletics and academics.

9. The *House v. NCAA* settlement, which I learned about in July 2024, proposes limiting Division I football teams to 105 players starting in 2025. Upon approval, this roster limit would effectively end not only my athletic career but also impact thousands of other college athletes. The majority of Division I football programs currently maintain rosters exceeding 105 players. Reports widely indicate that finding positions for all affected players across different schools would be impossible, leading to widespread concern among players and coaches. *See* Dkt. 579.

10. Many of my teammates are devastated. I am devastated. We worked hard our entire lives to prove ourselves. We never expected anything but the promises that were made to us to be kept. I have been on an emotional roller coaster, and I am not alone. I have spoken to many athletes at Michigan who are undergoing the same experience of being torn apart by anxiety, uncertainty, and fear of being cut.

11. I don't know why there must be roster limits in the settlement at all. I understand that the number of available football scholarships is being increased to 105 from the current 85 available scholarships. While that is a welcome change, players like me never expected to get a scholarship. And even when scholarship opportunities arise, they typically don't materialize until senior or fifth year. Michigan currently has 137 players on its roster. That means that 52 players, or 39% of the roster, couldn't receive scholarships and yet are committed to playing anyway.

12.  Walk-on athletes like me must already overcome higher hurdles to make it on the team without help. In my mind, that is the greatest thing about college sports: proving yourself when the odds are against you. Destroying that opportunity for student-athletes diminishes college sports.

13.  I resolved to shine a light on the harm that the roster limits will certainly bring to college athletes on my own initiative. I never received notice – neither an email nor a mailer – informing me about the details of the settlement or how to object. I did my own research and wrote the letter that I submitted to this Court on December 11, 2024 (Dkt. 579). It is incredibly important that the Court understands the immense scale of the disaster that roster limits will impose on current and future athletes.

14.  I also explained these concerns to the student Vice Chair of the NCAA D1 Council in November of 2024, detailing the profound impact that the roster limits will have on college athletes and our families. While she was sympathetic to our situation, she was powerless to effect any change.

15.  Yet the solution, as I explained in my letter to the Court, is straightforward. There is no need for roster limits to apply instantly in the 2025-2026 season. A phase-in period would allow for gradual adjustment to any new roster limits, while a grandfathering provision would enable schools to honor their commitments to current college athletes, including walk-ons, and incoming recruits who have already planned out the next 4 to 5 years of their lives. This compromise would allow student athletes like me to complete what we've started at our original institutions, both athletically and academically.

16.  The NCAA and Class Counsel could readily incorporate this proposal into the settlement. Their failure to do so is baffling, especially given the damage already being done. I know of several football players who, in absence of any clear direction from the NCAA and power conferences, will not return to Michigan after this season. Prematurely ending our athletic careers represents an unnecessary waste of our talent and drive. A gradual implementation of roster limits would be a simple way to mitigate the ongoing fallout while preserving the settlement's beneficial changes. No explanation has been provided for why such a transition

period cannot be implemented.

17. For walk-ons like me, who came to Michigan to get a degree and play football, the impact is particularly severe. We are now forced to alter our carefully planned academic paths, trying to balance our desire to graduate with preserving our football eligibility. Many of us are considering accelerating our academic programs, despite the challenges this poses to completing our rigorous coursework.

18. These changes are causing significant stress as we attempt to navigate both our academic and athletic commitments. We must now consider whether we can complete our desired degrees in a compressed timeframe while maintaining the high standards expected of Michigan student-athletes.

19. Given these serious concerns and the absence of any reasonable justification for immediate implementation, I respectfully ask that the Court reject approval of the settlement agreement.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Naperville, Illinois
January 7, 2025

*John Weidenbach*
John Weidenbach
NCAA ECID No.: 2301761096
844 Woodlawn Avenue
Naperville, IL 60540

Lance Hollingshead
60 Deer Ridge Road
Basking Ridge, NJ 07920


January 11, 2025

      Re:    *In re College Athlete NIL Litigation*, No. 4:20-cv-03919-CW

Dear Judge Wilken:

      My name is Lance Hollingshead. I am a current Division I athlete at the University of Notre Dame and my NCAA ECID number is 2009915830. For the reasons stated in my attached declaration, I object to the roster limits in the settlement agreement in *In re College Athlete NIL Litigation*, No. 4:20-cv-03919-CW. I am a member of the Injunctive Relief Class. I make this objection individually and on behalf of the Injunctive Relief Class.

      I designate Steven F. Molo and the firm of MoloLamken LLP to speak on my behalf at the Fairness Hearing on April 7, 2025.

      Sincerely,
Lance Hollingshead

7

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

IN RE COLLEGIATE ATHLETE NIL LITIGATION

Case No. 4:20-cv-03919-CW

Hon. Claudia Wilken

## DECLARATION OF LANCE HOLLINGSHEAD

I, Lance Hollingshead, hereby declare as follows, pursuant to 28 U.S.C. § 1746:

1. I am a 19-year-old college freshman at the University of Notre Dame in Notre Dame, Indiana. I am a member of the NCAA Division I golf team and thus a member of the Injunctive Relief Class. I am writing to oppose the roster limits, and my objection applies to that class.

2. I started playing golf when I was 3 years old, and it quickly became my goal to play professional golf. Since most professional golfers play on Division I collegiate teams before joining the professional ranks, I knew that I wanted to play college golf and use those years to develop under coaches with a proven track record of growing players. It was also important to me to be a part of a team in this very individualized sport; I love the camaraderie and lifelong friendships I knew I would make.

3. I worked very hard to improve my golf game. My family sacrificed a lot so that I could play golf, even moving in the winters from New Jersey to West Palm Beach, Florida, when I was in seventh grade so I could work on my golf game year-round. My parents continued to pay for my private school education, which allowed me to attend classes online and added support from tutors. At the same time, I maintained a full-time practice and workout schedule. All of this was designed to maximize my chances to play collegiate, and, later, professional golf.

4. I began the recruiting process during my junior year of high school. In February of my junior year, I signed with Notre Dame to play on their Division I men's golf team.

5. I turned down other offers from universities when I committed to Notre Dame. It

1

was important to me that I attend a university with strong academics, and Notre Dame fit the bill perfectly.

6. I started at Notre Dame in August 2024. I was thrilled to meet my new teammates and to work on my golf game at the collegiate level. I received extra academic support, access to Notre Dame's world-class Division I training facilities—including the indoor golf facilities—and made friends quickly with my teammates. All of this was in addition to my scholarship, which covered part of my tuition, room, and board.

7. In late October, the coach called a team meeting. He told us that roster limits would likely be enacted for the following year because of the *House* settlement, and that our team size would have to be reduced. He said that he would be cutting two athletes in the fall—before the spring golf season even started—so that those athletes could enter the transfer portal immediately.

8. Some of my teammates wrote letters asking the Atlantic Coast Conference to not opt-in to the settlement so that the roster limits would not go into effect. I hoped that Notre Dame would be able to avoid cutting roster spots across all of its sports—not just golf. But the ACC and Notre Dame have made it clear they will opt in to the settlement.

9. The first week of November, only two months after starting at Notre Dame, I got the news: I will be cut from the golf team for the next year because of the roster limits. Another teammate was also informed that he will not be able to play on the team next year, either.

10. My coach told us that he wanted to make cuts early so that I could get into the transfer portal before the spring, when many other programs will be faced with the same decision. Other schools will also be cutting golfers, who will also likely enter the transfer portal. All of us will be competing for fewer spots than existed last year. Nevertheless, on my coach's advice, I entered the transfer portal in December.

11. This puts me in a very difficult position. My goal is to play professional golf, but I planned on getting a degree in Finance from a top university so that I could have a career after golf if needed. I signed with Notre Dame not only because it has a great golf program, but also because it is a great university. Even if I am offered a chance to play on the golf team at another

school, I would likely be faced with the decision of playing golf at a less well-rounded university or staying at Notre Dame and jeopardizing my professional golf career.

12. I never planned to make money playing college golf. All I wanted was to continue honing my game while getting a world-class education. Now, all of that is in jeopardy if this settlement goes through.

I declare under penalty of perjury that the foregoing is true and correct.

West Palm Beach, Florida
January 11, 2025

Lance Hollingshead
NCAA ECID No. 2009915830
60 Deer Ridge Road
Basking Ridge, NJ 07920

Rachel Wheatley
1738 Cakebread Court
Port Orange, Florida 32128

January 29, 2025

   Re: *In re College Athlete NIL Litigation*, No. 4:20-cv-03919-CW

Dear Judge Wilken:

  My name is Rachel Wheatley.  I am a current Division I athlete at Florida State University and my NCAA ECID number is 2002812316.  For the reasons stated in my attached declaration, I object to the roster limits in the settlement agreement in *In re College Athlete NIL Litigation*, No. 4:20-cv-03919-CW.  I am a member of the Injunctive Relief Class.  I make this objection individually and on behalf of the Injunctive Relief Class.

  I designate Steven F. Molo and the firm of MoloLamken LLP to speak on my behalf at the Fairness Hearing on April 7, 2025.

Sincerely,<br>
Rachel Wheatley

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

IN RE COLLEGIATE ATHLETE NIL LITIGATION

Case No. 4:20-cv-03919-CW

Hon. Claudia Wilken

**DECLARATION OF RACHEL WHEATLEY**

I, Rachel Wheatley, hereby declare as follows pursuant to 28 U.S.C. § 1746:

1. I am a senior at Florida State University and, up until this past fall, was a member of its Women's Cross Country and Women's Indoor and Outdoor Track and Field teams. I am a member of the Injunctive Relief Settlement Class and object both individually and on behalf of the class.

2. In high school I ran on both our cross country and track and field teams. One of my proudest accomplishments is having qualified for the Florida 4A state championships in the 4 x 800m with teammates three times – as a freshman, sophomore, and senior. As a senior I was named First Team All Area for both cross country and track. Academics also were important to me. I graduated *summa cum laude* and was a member of the National Honor Society.

3. I started college at the University of Central Florida, where I ran on its cross country and indoor and outdoor track and field teams during both freshman and sophomore years. Then at the end of my sophomore year, I entered the portal and transferred to run at FSU starting my junior year. I was promised a walk-on roster spot by FSU's long-term coach Bob Braman, and I was thrilled to be running for him.

4. At FSU, I ran during my junior year on all three of its long-distance running teams – cross country and both indoor and outdoor track. The year ended well and I looked forward to running during my senior year. But when I arrived at school in August 2024, the cross country team was told that because roster limits were forced onto the team by the NCAA settlement, we were going to run a time trial that it would result in cuts in order to reach the roster limit. I am

1

one of six girls cut from the team after the time trial.

5. After I was cut, I was no longer allowed to run with the cross country team. This has been difficult physically because it is more difficult to run and train on one's own without the energy of the group. It has also been difficult emotionally, both for me and for the other girls cut from the team. We had all formed close friendships on the team, but our time together was being taken away because of roster limits. Those of us who were cut no longer share meals together as much with the rest of the team, both because meals are an athletic benefit and because we don't just go eat after practice when we aren't *at* practice. We have also lost academic tutoring and other benefits that were provided to us as team members. One of those benefits is tickets to home games, which all athletes receive, and so going to games with my teammates happens less. We did a lot more together than running and training. That's over now.

6. Even though I now understand that roster limits proposed under the NCAA settlement are not to take place until the 2025-2026 school year, they caused my school to cut its team sizes early. This is my senior year, so this never had to happen. If a change to the proposed language regarding roster limits can be made quickly, I hope to get my roster spot back and finish my year running for the track and field team. But that is not the only reason why I am objecting: I am hoping that by sharing my experience I can help explain why roster limits are hurtful to the student athletes who are cut, especially when we are ripped apart for no reason. I am asking the Court to reject roster limits as part of the settlement.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Tallahassee, Florida
January 29, 2025

*Rachel Wheatley*

Rachel Wheatley
1738 Cakebread Court
Port Orange, Florida  32128
NCAA ECID No. 2002812316