# EXHIBIT D

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

IN RE COLLEGIATE ATHLETE NIL
LITIGATION

Case No. 4:20-cv-03919-CW

Hon. Claudia Wilken

## DECLARATION OF YASMIN FAROOQ

I, Yasmin Farooq, hereby declare as follows pursuant to 28 U.S.C. §1746:

1.    I am in my ninth season as Head Coach of the Women's Rowing Team at the University of Washington.  During that time my women athletes have won the NCAA national championship title twice, and we have finished on the podium (top four) in eight of nine years. Immediately before my current position I served as the Head Coach of the Division I Women's Rowing Team at Stanford University, where my team won the NCAA national championship in 2009.

2.    I grew up in Wisconsin and began my rowing career as a walk-on freshman coxswain at the University of Wisconsin in 1984.  After graduating I served as the coxswain for the United States National Team women's eight from 1989 to 1996, which included competing at the 1992 Olympics Games in Barcelona and the 1996 Games in Atlanta.  I was the U.S. captain of our team in Atlanta.  I was named National Coach of the Year by the Collegiate Rowing Coaches Association three times and have been inducted into both the National Rowing Foundation Hall of Fame and the Wisconsin Athletic Hall of Fame.

3.    I submit this declaration because I know the harms that will be forced onto women athletes if the roster limits that are included in the settlement of the House litigation are implemented.  I want to be sure the Court understands these harms and I hope that the Court has the courage to not implement them.

4.    The proposed settlement includes a roster limit for women's rowing that is unrealistic and would seriously harm the opportunities for women athletes.   Women's rowing

1

requires more athletes than any other NCAA Division I sport because our competitions require 51 separate athletes. In our sport an "8" has eight rowers and a coxswain, totaling 9 athletes, and a "4" has four rowers and a coxswain, or five athletes. The Big Ten Conference championships race four 8's and three 4's, totaling 51 separate positions that have to be filled by 51 separate athletes (nobody doubles up). The finish position of each team in each race is combined to determine the overall team championship. My team at Washington currently has 102 women athletes. The proposed roster cap of 68 for women's rowing leaves little room for illness or injury, and leaves no room to develop women athletes.

5. Football has a much larger proposed roster in the House settlement, at 105, in order to fill 22 positions, 11 on each of offense and defense, as well as some specialized positions like kickers. There are of course other differences between the sports, and I am not advocating for roster limits to be adopted for any sports. But limiting the roster size of women's rowing in this way would discriminate against women athletes.

6. It is also important to understand that it takes time during college to develop rowers. Teams like ours, who contend perennially for conference and national titles, are made up of athletes who develop physically and technically over four years. It's not unusual for a student athlete to learn and develop for a year or more before competing in a conference or NCAA championship. The roster cap would remove these student-athletes at a peak stage of development and before they are able to compete at a conference or NCAA level.

7. Historically, nearly half of the incoming freshman on our team have not rowed before college. Some of our best rowers have come from this group. In fact, every NCAA national champion team that I have coached has included walk-on athletes. I started my rowing career as a walk-on in college, and at Washington we have a separate recruitment coach for novice rowers – women who have never pulled an oar. Just one example is Anna Michelson, a track athlete, who learned how to row in her freshman year, and won an NCAA national championship in the varsity eight two years later. Anna went on to win an Olympic gold medal at the 2008 Beijing Olympic Games in the United States Women's 8. Anna likely would never have had the chance to learn to row, and then to realize her potential as an athlete, if the proposed roster limits had been in place

2

at the time – the program would not have had any room to take those kinds of risks. Many of my fellow Olympic teammates would have been cut under the proposed settlement—including myself.

8.      Our walk-on athletes are also vital for the energy and drive of our teams.  Walk-on athletes often show everyone on the team what hard work and resilience look like.  This happens when, despite not being a top performer on the team, an athlete works just as hard or harder than everyone else, displays a positive attitude and love for the sport, and steadily improves their results. In this way walk-ons can be role models – inspiring everyone to push harder and improve their own performance.  In rowing, roster limits would force us to lose many of these inspiring athletes who are so important to the spirit and performance of our teams. One such walk-on was Brooke Mooney, who was a junior in college when I came to Washington. At the time she was struggling in the lower third of the team. Through hard work and perseverance, Brooke eventually earned a spot in the varsity eight, won an NCAA Championship, competed in the Tokyo Olympics, and now holds the all-time world record for fastest time on the rowing ergometer for a race distance of 2000m. Had roster limits existed during her development her Olympic dreams and record-breaking achievements may have never come to fruition.

9.      The proposed roster caps also would work against the well-being of our student athletes.  First, roster limits work against internal team supports.  Now when an athlete achieves a new personal best she is heralded by all – but reactions can change when your teammate's success places you at risk of being cut.   It is simply self-preservation.  Without the risk of being cut, it is instead healthy internal competition and no single metric is permanent, nobody is being cut and everyone continues on the path to betterment.

10.      Roster limits could also add pressure on the athletes to perform all of the time, at risk to themselves.  Currently, when a rower suffers injury, such as strain to the lower back, they can alter their training and receive physical therapy until they are fully healed and can safely race again.  Those recoveries can take months or longer.  Roster limits could necessitate that injured athletes be cut from the team because the limit is barely above the required number of competitors.

3

I do not want to risk that my rowers' desire to compete compels them to under-report their injuries, or the progress of their recoveries, in order to preserve a spot on the team.

11.    Aside from injury, my athletes sometimes face a period of academic pressure, whether during mid-term or final exams, or when they fall behind in a course, where they have to devote themselves more fully to academics and let the rowing wane. Without a specific roster limit they do not have to worry about whether they can devote themselves to their studies as needed, because they are not at risk of being cut.  Roster limits could change their internal assessments and harm their studies. The proposed timing for the roster cap for spring sports, including rowing, is slated to take effect upon the first competition or December 1, whichever comes first. Our team and many others will likely forego fall competitions for the December 1 date to give their student-athletes the best chance to develop, as noted above. Unfortunately, this creates additional academic pressure and stress given that final exams are only days away. Further, these student-athletes are then faced with three terrible options mid-year: 1) ceasing involvement in a sport they love to stay at their academic institution of choice, 2) enter the transfer portal-mid year (hoping to be picked up by another team that has room under the cap), or 3) training on their own for the remainder of the year while waiting for an opportunity to enter the transfer portal six months later at the end of the school year.

12.    The settlement, because of its proposed roster limits, harms far more student athletes physically, educationally, and emotionally, than the very few who will benefit monetarily.

I declare under penalty of perjury that the foregoing is true and correct.

Seattle, Washington

January 27, 2025

Yasmin Farooq

DECLARATION OF YASMIN FAROOQ
CASE NO. 4:20-CV-03919-CW

1

2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

3

4

IN RE COLLEGIATE ATHLETE NIL
LITIGATION

5

6

7

Case No. 4:20-cv-03919-CW

Hon. Claudia Wilken

Objection to Settlement Roster Limits

8

## DECLARATION OF GARY GARDNER

9

I, Gary Gardner, hereby declare as follows pursuant to 28 U.S.C. § 1746:

10    1.    I am the Head Coach of the Men's and Women's Track and Field and Cross

11 Country teams at the University of Massachusetts Lowell (known as UMass Lowell).  I have

12 been coaching for 21 seasons and have been named Coach of the Year by the U.S. Track and

13 Field and Cross Country Coaches Association.  While I am not a class member, I coach and

14 recruit dozens of class members each year.

15    2.    UMass Lowell Track and Field and Cross Country would like the court to

16 understand the implications of the House v. NCAA Settlement before the clock runs out.

17 Although we found out on December 18th, 2024, that UMass Lowell will not be opting into the

18 settlement, thus allowing us control over our roster limits, we had spent months preparing

19 mentally and emotionally for the worst.

20    3.    I can say with certainty that these have been the most trying few months of my

21 nearly 30-year career. If we opted into the settlement, there would be 50 or so conversations I

22 would need to have with athletes cutting them from the team, breaking my promise to them that

23 we would provide them with an opportunity to be a part of our track and field family and help

24 them reach their full potential here. There have been countless sleepless nights thinking about

25 the tears from our whole team of athletes and coaches as I might have to dismantle something

26 that I spent my entire professional life building. It got to the point that I announced in a head

27 coaches and administrators meeting that if we opted in, I would retire. I will not allow the selfish,

28 short-sightedness of others define my legacy and break the promises I made to athletes and their

1

1    families.

2         4.      Before I provide additional information about the downside for the athletic

3    department and the school, let me first describe our situation. We at UMass Lowell have a

4    student-body population that is approximately 60% male and 40% female, which is the opposite

5    of most schools. In order for schools to be Title IX complaint, the genders of the student-athlete

6    population must match within 1% of the student-body.

7         5.      Without football, the duty of helping the department remain compliant falls on

8    our track and field teams. If we opted into the settlement and moved our rosters down to the

9    limits of 45 athletes per team, the athletic department would no longer be Title IX compliant.

10   As a result, UMass Lowell determined that if the Roster Limits were adopted, it would have to

11   eliminate one of its existing women's sports teams.

12        6.      For context, the Men's Track and Field team at UMass Lowell currently has 89

13   student athletes. Because the Roster Limits set 45 as the maximum number of athletes for Men's

14   Outdoor Track and Field, if UMass Lowell had opted into the settlement, I would have had to

15   reduce the team by 44 athletes. Because I did not know if UMass Lowell would ultimately opt-

16   in, I already greatly reduced the number of high school athletes who we have recruited for the

17   2025-2026 school year. But I would have also had to cut athletes who currently are on the team.

18        7.      The Women's Outdoor Track and Field team currently has 52 athletes and would

19   have had to meet the same Roster Limit of 45, requiring a reduction of 7 athletes. The Men's

20   team is significantly larger to maintain compliance with Title IX. But the net reduction of 36

21   male athletes would have caused the school to be far out of compliance with Title IX.

22        8.      The implementation of roster limits would have been catastrophic for our squads.

23   There have been numerous circumstances where we have given athletes a chance who may not

24   have had access to the best coaches or training locations prior to arriving on campus. If we had

25   limitations, we wouldn't have the opportunity to give these athletes a chance for development

26   athletically and could drastically alter their academic careers.

27        9.      One specific story I'd like to share is that of a current student-athlete, who was a

28   local, unrecruited javelin thrower, James Kotowski.

2

10.     James tried out for our team in the fall of 2021. At the end of his two-week tryout, we decided to give him the year to train on the team since he had potential, we had no hard roster limits and my staff and I enjoy the opportunity to develop talent.

11.     James began to excel immediately when outdoor track started, and by the end of his first year he was 18th at the NCAA East Regional Championship in 2022. In 2023, James continued to break school records, won our conference championship and earned 20th at the NCAA East meet. In 2024, James threw an Olympic Trials qualifying mark, was unfortunately injured later that same meet, but still managed to place 13th at the NCAA East meet five weeks later.

12.     James continued to rehab. He later earned 5th place and was the top collegiate javelin thrower at the USA Olympic Trials. None of this would have been a possibility if the roster limits were in effect when he came to us in 2021. His Olympic Trials performance has rallied countless donors and alums to engage further with our program and he's been a true inspiration to his family of teammates and coaches. His is only one prominent example of many developmental success stories that never would be able to come to fruition under the new roster restraints.

13.     Apart from coaching, I have a son who is a sophomore in high school who competes in both track and basketball. My son aspires to compete in one of those sports in college, but if the Roster Limits are adopted he will have a much smaller chance of running on a track and field team.

14.     I truly do not believe it was the goal of the House v. NCAA settlement to extinguish current and future student-athlete careers, but here we are. Something must be done to not only protect countless athletes but the future of track and field and potentially other sports livelihoods.

1    I declare under penalty of perjury that the foregoing is true and correct.

2    Dated: Middlesex County, Massachusetts
          January 16, 2025

3

4

5                                                    Gary Gardner

6                                           178 Brigham Hill Rd
                                            North Grafton, MA 01536
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                            4

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

IN RE COLLEGIATE ATHLETE NIL
LITIGATION

Case No. 4:20-cv-03919-CW

Hon. Claudia Wilken

**DECLARATION OF MARK FAIRLEY**

I, Mark Fairley, hereby declare as follows pursuant to 28 U.S.C. § 1746:

1.     I am the Meet Director and Assistant Coach for the women's cross country team at Liberty University. I have been coaching at Liberty for 7 years and have served as the Meet Director for 4 years. I have previously served in the roles of volunteer assistant, graduate assistant, and interim assistant coach.

2.     The Liberty University women's cross country team currently has a roster size of 32 runners. I am responsible for coaching 17 of those runners who are a part of the development squad. I have put in a great deal of work recruiting and developing these runners. The runners that I coach are an integral part of our program, contributing not only in their capacities as competitors, but also by helping Liberty maintain compliance with its Title IX obligations.

3.     If the roster limits in the settlement agreement in this lawsuit are imposed, it would require Liberty University to cut 15 runners from the women's cross country team. The runners that I coach are already being deeply affected by the uncertainty caused by the prospect of these roster cuts. Some of the student athletes I coach have entered the transfer portal, with one student who confirmed that she is transferring and two others exploring their options.

4.     The emotional toll caused by the possibility of these roster cuts has been evident in the students that I coach. These young women have expressed significant anxiety, frustration, and sadness about the fact that their collegiate athletic careers could be cut short due to factors entirely beyond their control. Each of the student athletes I coach put in an incredible amount of hard work to continue to develop themselves in their athletic careers.

5.      Injuries will further compound the challenges posed by reduced roster sizes. Fielding a competitive cross country team requires at least 7 healthy runners. With fewer student athletes on the roster, any injury could prevent Liberty from fielding a team and could severely undermine the team's performance and cohesion.

6.      I have previously voiced my concerns regarding the imposition of these roster limits in a letter to Congress, emphasizing the harmful effects of these roster limits on athletes and programs like ours. I strongly believe that the roster limits will disproportionately harm women, reduce opportunities, and undermine the long-term benefits of collegiate athletics.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Lynchburg, Virginia
       January 16, 2025

_____
Mark Fairley

2

DECLARATION OF MARK FAIRLEY
CASE NO. 4:20-CV-03919-CW

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION**

| | |
|---|---|
| IN RE COLLEGIATE ATHLETE NIL LITIGATION | Case No. 4:20-cv-03919-CW |
| | Hon. Claudia Wilken |

**DECLARATION OF REBEKAH RICKSECKER**

I, Rebekah Ricksecker, hereby declare as follows pursuant to 28 U.S.C. §1746:

1.      I am the head coach of the NCAA Division I cross country team and the assistant coach of the NCAA Division I track and field team at James Madison University ("JMU").

2.      Before coaching at JMU, I served as an assistant coach for the cross country and track teams at Liberty University, and then as the head cross country coach at Sweet Briar College. I have over 12 years of experience coaching cross country and track and I have coached hundreds of student athletes so far.

3.      The 2024 JMU women's cross country team consisted of 21 student athletes. The 2024-2025 JMU women's track and field team consists of 45 student athletes. Approximately half of the student athletes on these rosters are walk-on athletes who do not receive an athletic scholarship.

4.      In my experience, collegiate runners often perform their best in their junior and senior years. The training and development that we provide during the freshman and sophomore years are crucial to achieving peak performance.

5.      Some of the walk-on athletes that I have coached who are given time to develop often match and indeed can out-perform our scholarship athletes. It is incredibly difficult to assess a runner's long-term potential in high school, which is why I have always emphasized the

1

importance of the developmental process when recruiting student athletes.

6.      The student athletes I coach have the expectation that they will remain on the team for the full four years they are here at JMU, assuming that they maintain academic eligibility and comply with the team's rules.  Runners are told that their best performance will be in their senior and junior years.  I have always placed a strong emphasis on developing the athletes I coach so that they can fully realize their potential.

7.      If the roster limits in the proposed settlement in this lawsuit are approved, I will be forced to cut approximately half of our walk-on athletes from the team.  These student athletes would have their collegiate running careers cut short, or be forced to disrupt their lives to transfer, for no good reason.  It would be incredibly unfair for the student athletes.

8.      My philosophy as a coach has always centered around taking the time to work with student athletes so that they can develop and realize their full potential.  This takes time.  The purpose of collegiate athletics is allowing these student athletes to have that time to develop and improve.  The proposed roster limits are inconsistent with the spirit of collegiate athletics.  For these reasons, I am opposed to the proposed settlement and respectfully request that the Court deny final approval.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Harrisonburg, Virginia
        January 30, 2025

_Rebekah Ricksecker_
Rebekah Ricksecker