## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

| | | |
|---|---|---|
| **DIEGO PAVIA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.** |
| | ) | |
| **NATIONAL COLLEGIATE ATHLETIC** | ) | **COMPLAINT FOR** |
| **ASSOCIATION,** | ) | **INJUNCTIVE RELIEF** |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT FOR INJUNCTIVE RELIEF

1.      Plaintiff Diego Pavia brings this action to challenge Bylaws 12.8, 12.02.6, and 14.3.3 (the "JUCO Eligibility Limitation Bylaws") of Defendant, the National Collegiate Athletic Association ("NCAA"). These bylaws reduce the number of years former junior college football players can play Division I NCAA football after transferring to an NCAA Division I school and unjustifiably restrains the ability of these college athletes to earn money through use of their name, image, and likeness ("NIL") connected to their work as a Division I football player. This action seeks declaratory and injunctive relief against Defendant for a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## INTRODUCTION

2.      In a landmark 2021 decision (*NCAA v. Alston*, 594 U.S. 69 (2021)), a unanimous U.S. Supreme Court paved the way for college athletes[1] to receive compensation for use of their names, images, and likenesses ("NIL Compensation") due to the NCAA's violation of antitrust

---

[1] The lawsuit avoids using the term "student athlete" because it "is an NCAA marketing invention designed to 'conjure the nobility of amateurism,' assert 'the precedence of scholarship over athletic[s],' and 'obfuscate the nature of the legal relationship at the heart of a growing commercial enterprise.'" *Johnson v. NCAA,* No. 12-1223 (3rd Circuit Jul. 11, 2024).

1

laws. The market realities of college sports have changed tremendously over the last forty years. For instance, from 1982 to 1984, CBS paid $16 million per year to televise the March Madness Division I men's basketball tournament. In 2016, those annual television rights brought in closer to $1.1 billion. As a result, the NCAA is no longer even arguably entitled to entitled to any "sort of judicially ordained immunity from the terms of the Sherman Act for its restraints of trade." *Id.*

3.      Reacting to the lecture it received in *Alston*, the NCAA lifted its prohibition on NCAA athletes receiving NIL Compensation on July 1, 2021. In the three years since, the market for NIL Compensation opportunities available to NCAA Division I athletes has exploded, with the 2024 college football NIL market estimated at $1.1 billion.[2] Significantly, those NIL Compensation opportunities are virtually only available to NCAA Division 1 athletes. In fact, **only $6.5 million – less than six tenths of one percent of the $1.1 billion in football NIL Compensation this year projects to go to non-NCAA Division 1 football players**.[3]

4.      In other words, athletes playing football outside of the NCAA monopoly have no meaningful opportunity to profit off their name, image, or likeness. Even so, JUCO Eligibility Limitation Bylaws restrict the ability of athletes who begin their college football careers in junior colleges from having the same opportunity to profit from NIL as students who enter an NCAA institution as freshmen. Specifically, the JUCO Eligibility Bylaws limit athletes who begin their college careers at junior colleges to only two or three seasons of NCAA Division I football, as opposed to the four seasons of competition (and NIL Compensation opportunities) available to all other NCAA Division I football players.

5.      The JUCO Eligibility Limitation Bylaws neither promote competition nor benefit

---

[2] *See* Ex. 1, "NIL at 3: The Annual Opendorse Report" at p. 4.
[3] *Id.*

2

college athletes with respect to their impact on persons who attend junior colleges before transferring to NCAA schools. These rules stifle the competition in the labor market for NCAA Division I football players, harming college athletes and degrading the quality of Division I football consumed by the public. These harms are contrary to Defendant's stated mission of promoting the well-being of college athletes and are the very ills federal antitrust law seeks to remedy. Pavia, and other former JUCO football players who are harmed by this illegal restraint have a small window of time to compete in Division I football. Because Pavia cannot relive his short college career, the harm inflicted by the JUCO Eligibility Limitations Bylaws is irreparable and ongoing, and temporary and preliminary injunctive relief is necessary.

6.     Pavia brings this action to put a stop to the unjustified anticompetitive restriction on universities who seek to compete for college athletes, and to restore freedom of economic opportunity for himself and other college football players.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, Sections 4 and 26 of the Clayton Act, 15 U.S.C. § 26, and under 28 U.S.C. §§ 1331 and 1337.

8.     This Court may exercise personal jurisdiction over Defendant NCAA because Defendant currently transacts business in the Nashville Division of the Middle District of Tennessee. Defendant and its member institutions conduct athletic competitions, ticket and merchandise sales, television agreements, and other revenue-generating activities in the Middle District of West Virginia.

9.     Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. 22, and under 28 U.S.C. § 1391(b)(2).

3

## THE PARTIES

10.    Plaintiff Diego Pavia is a college football player at Vanderbilt University and resides in Nashville, Tennessee. He played college football at a junior college for two years before transferring to an NCAA Division I college.

11.    Defendant NCAA is an unincorporated association that acts as the governing body of college sports. The NCAA includes more than 1,100 member colleges and universities throughout the United States, including institutions in the Middle District of Tennessee. These member institutions are organized into three divisions, and Division I includes over 350 schools. Through the NCAA Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports, including specifically, the Bylaws at issue in this case, Division I Bylaws 12.8, 12.02.6, and 14.3.3. The NCAA Constitution and Bylaws were adopted by votes of the member institutions and various NCAA councils, and they may be amended by votes of the member institutions or NCAA councils. Thus, the rules set forth in the NCAA Constitution and Bylaws constitute horizontal agreements between the NCAA and its member institutions and among NCAA member institutions.

12.    As a practical matter, an academic institution that wishes to participate in any meaningful way in the highest and most popular level of collegiate athletics must maintain membership in the NCAA and abide by the Division I rules and regulations promulgated by the NCAA and its members. Failure to abide by these rules and regulations risks subjecting sports programs at the academic institution to punitive measures from the NCAA that include reduced athletic-scholarships, suspensions, prohibition on post-season eligibility, vacating previously earned wins, monetary fines, and the so-called "death penalty."

13.    The NCAA and its member institutions control the highest and most popular level

4

of collegiate athletics. Therefore, any individual who wishes to provide athletic services in exchange for the payment of partial or full tuition for an undergraduate academic education and wishes to derive the substantial benefits from competing at the highest level of collegiate athletics must by necessity attend an NCAA Division I member institution.

14.    There are zero practical alternatives that can provide the unique combination of attributes offered by Division I NCAA athletic schools: (i) the ability to exchange athletics services for the payment of the partial or full cost of an education plus room and board, (ii) high quality academic educational services, (iii) top-of-the-line training facilities, (iv) high quality coaches that will best be able to launch players to professional careers, (v) national publicity through national championships and nationwide broadcasting contracts, (vi) opportunities to profit from NIL agreements, and (vii) competition at the highest level of collegiate athletics.

## **FACTUAL BACKGROUND**

## I.    **Four Year Colleges Are Governed by The NCAA.**

15.    The NCAA "is a voluntary, self-governing organization of four-year colleges, universities and conferences committed to the well-being and development of student-athletes, to sound academic standards and the academic success of student-athletes, and to diversity, equity and inclusion."[4] "The NCAA, then known as the Intercollegiate Athletic Association (IAA), was founded in 1905 to regulate college football. Today, the NCAA and its members collectively issue rules that govern many aspects of athletic competitions among NCAA member schools. The NCAA comprises three Divisions. Of the NCAA's eleven hundred schools, approximately three hundred and fifty schools compete in Division I. Division I itself is divided, for the purposes of football competition, into two subdivisions, one of which is the FBS. There are thirty-two

---

[4] 2024-25 NCAA Division I Manual, attached hereto as Exhibit 2.

5

conferences in Division I. Conferences may enact and enforce conference-specific rules, but these must be consistent with the NCAA's own rules. The NCAA rules governing participation in Division I generally are enacted by the Division I Board of Directors."[5]

16.    But while the NCAA started out as a small nonprofit organization, its economic power has grown exponentially over the last 120 years. Today, "the NCAA generates approximately one billion dollars in revenues each year…. The FBS conferences have a multi-year media contract with ESPN for the College Football Playoff, the total value of which is $ 5.64 billion. The five conferences with the largest revenues, known as the Power Five Conferences, each generate hundreds of millions of dollars in revenues per year, in addition to the money that the NCAA distributes to them…. [The] SEC made more than $ 409 million in revenues from television contracts alone in 2017, with its total conference revenues exceeding $ 650 million that year[]. The revenues of the Power Five [now Power 4] have increased over time and are projected to continue to increase."[6]

17.    It is the NCAA's mission to "provide student-athletes with the opportunity to **participate in sports and compete as a vital, co-curricular part of their educational experience**.... The basic purpose of the Association is to support and promote healthy and safe intercollegiate athletics, including national championships, as an **integral part of the education program** and the student-athlete as an integral part of the student body." 2024-25 NCAA Manual (emphasis added). In other words, the NCAA concedes that the ability to participate in college sports is both "vital" and "integral" to the four-year college experience.

---

[5] *In re National Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litigation*, 375 F. Supp. 3d 1058, 1062 (N.D. Cal. 2019) (internal citations omitted) (invalidating other NCAA rules limiting the ability of college athletes to earn money).
[6] *Id.* at 1063.

## II.    Junior College Are Governed by The NJCAA.

18.    In contrast to the four-year colleges governed by the NCAA, most two-year colleges ("Junior Colleges") are governed by the National Junior College Athletic Association ("NJCAA"),[7] which has no affiliation with the NCAA. Each year, more than 60,000 student-athletes from 500 member colleges compete in 27 different sports. While the NCAA generates billions of dollars in revenue while televising nearly all Power 5 [now Power 4] conference games, it took the NJCAA until 2022 to reach an agreement with ESPN to nationally televise just one NJCAA game (the junior college national championship game), with 13 additional games available through an online streaming platform.[8]  To be clear, while the NJCAA streams a total of 13 games over its entire season, the NCAA televised forty games just last Saturday alone, and televises a similar number every single week of the season (not to mention several games on other nights of the week).[9]  In short, playing for a junior college is not a comparable alternative to playing Division I College Football in terms of exposure—either to generate income while in college through NIL Compensation or to NFL scouts for future career opportunities.

19.    Indeed, while the 2024 NIL market for college football is estimated at $1.1 billion, **only $6.5 million – less than six tenths of one percent – went to non-NCAA Division 1 football players**.[10]

---

[7] One hundred junior colleges in California are governed by the California Community College Athletic Association, which also has no affiliation with the NCAA.

[8] *See* 2022-23 NJCAA Annual Report at p. 18 (last viewed on November 3, 2024 at https://www.njcaa.org/about/annual_report/index).

[9] *See*, e.g. https://www.usatoday.com/story/sports/ncaaf/2024/11/02/college-football-schedule-week-10-saturday/75918275007/ (last accessed Nov. 3, 2024).

[10] *See* Ex. 1, "NIL at 3: The Annual Opendorse Report" at p. 4.

7

### III.    The NCAA Is Governed by Self-Created Bylaws That Discriminate Against Junior College Athletes.

20.    Each NCAA division maintains its own bylaws, with amendments proposed by member institutions. *See* Ex. 2 at pp. 14, 17-18. Each NCAA member school is required to "hold itself accountable to support and comply with the rules and principles approved by the membership." *Id.* at p. 9. Several of the bylaws applicable to Division I schools are at issue in this lawsuit.

#### A.    The Five-Year Rule and Eligibility Clock: NCAA Bylaw 12.8

21.    Under NCAA Bylaw 12.8, an athlete has five years of eligibility to play four seasons of "intercollegiate competition" in his or her chosen sport (the "Five-Year Rule"). The athlete's five-year window is known as an "Eligibility Clock" and starts to run from the date on which an athlete registers as a full-time student at any "collegiate institution," whether or not such institution is a member of the NCAA and whether or not the athlete competes in any sport at the non-NCAA institution. Ex. 2, at p. 66, NCAA Bylaw 12.8.1

22.    The NCAA's Guide for Two Year Transfers has a section on the Eligibility Clock, where it explains that the purpose of the five-year rule is to "move student-athletes toward graduation in a timely manner." Ex. 3, NCAA Guide for Two Year Transfers 2024-25 at p. 21. In other words, the NCAA concedes that the Five-Year Rule is not designed for any pro-competitive purpose.

23.    The irrelevance of the Eligibility Clock start date to competitive balance becomes even more apparent when one realizes that the five-year clock begins to run whether a student plays a sport or not. Under the Bylaw, a student can attend a junior college for two years without playing any sports, obtain an associates degree, transfer to a four-year NCAA school, and the student still only has three years of eligibility to play three seasons of football—and earn NIL.

8

24.     In contrast, a student who graduates from high school, plays football at a prep school for a post-grad year, and then attends an NCAA school still receives five years of eligibility to play four seasons.  Similarly, a student who graduates high school and becomes a professional athlete in another sport can play that other sport for years, then go to college and still have five years of eligibility to play four seasons of a sport – as long as it is a different sport than they played professionally.  The NCAA rules do not limit the ability of the former professional athlete to profit from NIL while playing Division I football, even though they have had a chance to physically mature well beyond a typical 18-year-old college freshman.  For instance, Chris Weinke entered Florida State University as a freshman following a six-year professional baseball career and ended up winning the Heisman Trophy, awarded annually to the most outstanding player in college football, at 28 years of age.[11]  Accordingly, it is apparent that the Five-Year Rule does not exist for reasons of competitive balance else it would preclude other older athletes from competing in Division 1 NCAA sports.

### B.    The "Intercollegiate Competition Rule": NCAA Bylaw 12.02.6

25.     The NCAA defines "intercollegiate competition" as "occur[ring] when a student-athlete in either a **two-year** or a four-year collegiate institution does any of the following: ... (a) Represents the institution in any contest against outside competition." Ex. 2 at p. 46, NCAA Bylaw 12.02.6.  In other words, while junior colleges are not part of the NCAA monopoly and JUCO athletes have no meaningful opportunity to earn NIL Compensation, the NCAA still subtracts one season of NCAA Division I eligibility from an athlete for each year he/she competes at a junior college.

---

[11] *See* https://en.wikipedia.org/wiki/Chris_Weinke (last accessed on Nov. 6, 2024).

9

### C.    The "Three Year Transfer Limitation": NCAA Bylaw 14.3.3

26.    In addition to the Five-Year Rule and the Intercollegiate Competition Rule, the NCAA also limits all junior college attendees to a maximum of three years of NCAA Division 1 competition – regardless of whether they compete in a junior college sport: "A student who transfers to a Division I member institution from another collegiate institution shall not engage in more than four seasons of competition with not more than three of those seasons in Division I." Ex. 2 at p. 161, NCAA Bylaw 14.3.3.  There is no pro-competitive justification for this rule that takes away one year of Division I football competition (with corresponding NIL Compensation opportunities) from students who choose to attend junior college before transferring to an NCAA school, as compared with athletes who enroll directly in a school that is a member of the NCAA monopoly.

27.    The NCAA amplified the magnitude of the anticompetitive nature of the Three Year Transfer Limitation during the Covid pandemic when it issued guidance allowing some students to compete for more than four years in a window greater than five years.  Specifically, any student that enrolled at an NCAA Division 1 school in the Fall of 2020 received a one-year extension on their Eligibility Clock **and** had their 2020 disregarded as a season of participation, effectively giving them six years to play five seasons at the NCAA Division 1 level (the "Covid Extension").[12] For instance, one athlete, Bo Nix, started at quarterback for Auburn University for three seasons, then transferred to the University of Oregon and started at quarterback for two additional seasons, starting in a record total of 61 Division 1 football games during his career before being selected in

---

[12] *See* Ex. 4, NCAA Division I COVID-19 Self-Applied Waiver Relief for Season of Competition and Extension of Eligibility.  The NCAA subsequently extended the Covid Extension to non-NCAA athletes, like Pavia, who were both eligible and competed at non-NCAA schools in 2020. However, this extension did not appear to remove the Thee-Year Transfer Limitation for such athletes.

the first round of the 2024 NFL draft.[13]

28.     The anti-competitive nature of the Covid Extension combined with the Three-Year Transfer Limitation is facially apparent. Under the Three-Year Transfer Limitation, the NCAA already disadvantaged former junior college players by limiting them to three seasons of Division I competition in comparison to the four seasons granted to all other football players. Then, the Covid Extension increased the four-season limit to five seasons for football players who enrolled in Division I schools upon high school graduation, while leaving the three-season limit in place for JUCO transfer athletes. Instead of having one less year of NCAA Division I competition, former JUCO football players (like Pavia) now have two fewer years. JUCO football players immediately felt the impact of the Covid Extension on their Division I opportunities as the number of junior college football transfers to "Power 5 Conferences," the most well-known (and lucrative) Division I college football conferences, dropped in half, from an average of 114 per year before the Covid Extension (2018-2020) to 54 per year in the first three years after the Covid Extension became effective (2021-23).[14]

### E.     Application of JUCO Eligibility Limitation Bylaws to Plaintiff Diego Pavia.

29.     Plaintiff Diego Pavia was a three-time New Mexico state finalist in wrestling at the 160 lbs. weight class, winning one state championship. But at that weight class and at only six feet tall, Pavia had no offers to play Division I football when he graduated from high school in 2020. As a result, he enrolled at the New Mexico Military Institute in the Fall of 2020, right in the middle of the Covid lockdown gripping America. He only got to play eight games of a partial season that year due to Covid. Pavia had no opportunity to earn NIL Compensation in 2020.

---

[13] *See* https://en.wikipedia.org/wiki/Bo_Nix.
[14] https://www.nytimes.com/athletic/4157194/2023/02/08/transfer-portal-junior-college-recruiting/ (last visited on Nov. 5, 2024).

11

30.     In 2021, Pavia led the New Mexico Military Academy to the NJCAA National Football Championship. Despite winning a national championship, Pavia had no opportunity to earn NIL Compensation in 2021.

31.     In 2022, Pavia transferred to New Mexico State University, an NCAA Division I member school. Pavia excelled as the starting quarterback for the New Mexico State football team in the 2022 and 2023 seasons and was named the 2023 Conference USA Offensive Player of the Year. Pavia graduated from New Mexico State in 2024.

32.     In 2024, after playing only two years of Division I football, Pavia transferred to Vanderbilt University, an NCAA Division I Institution and member of the Southeastern Conference. On October 5, 2024, Pavia led Vanderbilt to an upset victory over University of Alabama, the top ranked team in the United States. On November 2, 2024, Pavia led Vanderbilt to a road victory over Auburn, making Vanderbilt bowl eligible for the first time since 2018. *Id.*

33.     Applied collectively, the JUCO Eligibility Limitation Bylaws violate Section 1 of the Sherman Act by restraining the market for NCAA Division I college football players by precluding Diego Pavia and other similarly situated football players who enrolled in junior colleges from having an opportunity to earn NIL Compensation while playing four years of NCAA Division I college football.

34.     Specifically, the Five-Year Rule violates the Sherman Act by starting each athlete's Eligibility Clock while the athlete is attending non-NCAA institution and is unable to earn NIL Compensation. The Intercollegiate Competition Rule violates the Sherman Act by wrongfully equating competition at the junior college level (where little to no NIL is available) as reasonably commensurate with the opportunity to earn NIL Compensation while playing NCAA Division I football. The Three-Year Limitation violates the Sherman Act by taking a year of NCAA Division

I football and NIL earning potential away from athletes as punishment for their decision to attend a non-NCAA monopoly school prior to transferring to a four-year NCAA institution. The 2020 Covid Extension exacerbated the problem by creating opportunities for NCAA Division I athletes to extend the number of seasons in which they could play Division I football and earn NIL without providing the same opportunities to junior college athletes. Without application of the JUCO Eligibility Limitation Bylaws, there would be tremendous demand amongst NCAA institutions seeking to compete for the services of Diego Pavia and similarly situated athletes for the 2025 football season.

35.     If Pavia, a high school champion wrestler, had chosen to become a pro wrestler for two years after graduating high school, then entered NCAA Division I college New Mexico State as a freshman in 2020, he would now be completing his third year of Division I NCAA football and would have the opportunity to earn NIL Compensation while playing Division I football for one more year. However, because he chose to work toward an associate's degree at a junior college for two years, the NCAA's JUCO Eligibility Limitation Bylaws (if not enjoined by this Court), will prevent him from earning NIL Compensation in his fourth year of NCAA Division I football.

36.     Likewise, if Pavia had taken 2020 off due to Covid, attended an NCAA Division I school in 2021 and played in four nationally televised football games as part of a redshirt year, rather than playing in no televised games at a junior college, he would still have another year of Division I eligibility remaining after this season.

37.     Meanwhile, as set forth above Bo Nix started at quarterback for five years of Division I football, forty quarterbacks were able to play their sixth year of NCAA football in 2023

due to Covid waivers,[15] and Oregon's starting quarterback, Dillon Gabriel, is currently in his **sixth season** as a Division I starting quarterback.[16]  The disparate treatment resulting from the NCAA's JUCO Eligibility Limitation Bylaws, the Redshirt Rule, and the NCAA's approach to Covid have injured and continue to injury Pavia and similarly situated athletes and this Court should immediately enjoin them as to Pavia to prevent irreparable harm.

### F.    Redshirting and the Five-Year Rule

38.    Under NCAA Bylaw 12.8.3.1.6, a football player can be a member of an NCAA Division I football team, practice with the team every day, attend all team meetings, without using one of his four seasons of competition (the "Redshirt Rule"). Ex. 2 at p. 70, Bylaw 12.8.3.1.6. Under the Redshirt Rule, a football player participates in all the grinding day-to-day challenges of college football without the reward of competition. Practicing with one's teammates and competing on gameday are not the same thing. Competition is fundamentally different. College athletes' opportunities to show the world the fruits of their labor occur in such competition and missing even a single game can negatively impact a college athlete's future earning potential. National television broadcasts provide significant exposure for college athletes. One game can take a college athlete from a local fan favorite to a household name. When even the slightest differences among players can affect positioning and earning potential in professional league drafts, every game is vital for college athletes and can significantly impact their future earning potential.  And the vast majority of athletes have no opportunity to earn NIL Compensation when they are not playing in the games.  As a result, prohibiting football players from playing in games while they are in college and on a Division I college football team is a restraint on trade.

---

[15] https://www.nytimes.com/athletic/4967146/2023/10/19/michael-penix-jr-jordan-travis-sam-hartman-6th-year-senior-qbs/ (last visited on Nov. 4, 2024).
[16] https://en.wikipedia.org/wiki/Dillon_Gabriel (last visited on Nov. 4, 2024).

39.    Over time, the Redshirt Rule has evolved as the NCAA recognizes the challenges involved in its implantation.  First, Bylaw 12.8.3.1.6 was created to allow football players (but not other Division I athletes) to play up to four games per season without losing a year of eligibility.  Then, in August of this year, the NCAA passed Bylaw 17.11.6.2.1, excluding all post season competition from the Redshirt Rule, which increased the exemption from four games to a potential of nine games for a team competing in its conference championship game and advancing to the finals of the new 12 team national championship playoff.[17]

40.    Prior to the advent of NIL Compensation, the Redshirt Rule was possibly justifiable for competitive reasons.  However, market conditions have changed due to NIL and the Redshirt Rule no longer complies with antitrust laws.  Specifically. so long as a player is on Division I football team and participating in all other team activities, he should be permitted to compete in all games, providing him with media exposure and NIL Compensation opportunities.  Further, the NCAA has made an arbitrary distinction between:

- Player A.  Plays on a very successful NCAA team.  Competes in up to **nine NCAA Division I games** on national television games.  Receives significant NIL compensation as a result of TV exposure.  Does not lose a year of eligibility; and

- Player B.  Plays on a mediocre NCAA team.  Competes in **five NCAA Division I games** with regional television exposure. Receives some NIL compensation as a result of TV exposure.

Player A plays in more games and, as a result, has more opportunities to make money, but keeps his year of eligibility while Player B loses his.  There is no legitimate competitive basis to distinguish between the two and certainly not one that justifies the anticompetitive impact on Player B.

41.    The Redshirt Rule also distorts the market when players opt out of a season after

---

[17] https://www.cbssports.com/college-football/news/ncaa-rules-postseason-contests-no-longer-count-against-four-game-max-for-redshirt-eligibility/ (Last accessed on Nov. 7, 2024).

playing well in their first four games because they plan to transfer to another school and want to maximize their eligibility.[18] While a player is certainly within his rights to transfer, the Redshirt Rule incentivizes situations where a student may feel compelled financially to leave his team in a lurch to protect his own NIL Compensation opportunities for the following year.

42.    Of course, former junior college players like Pavia are even worse off.  At a junior college, they play zero Division I games, receive zero television exposure, make zero in NIL Compensation, and are still docked a year of eligibility by the NCAA.  Meanwhile, Football Player A who enrolled directly in an NCAA monopoly school can play up to 9 games on national television while earning NIL **and still have an additional four years of NCAA Division I competition available to him**.  The expansion of the Redshirt Rule has destroyed any procompetitive basis for its existence.

43.    The NCAA is currently considering a proposal to allow all athletes five years to play five seasons.[19] In other words, the NCAA has already identified a less restrictive alternative to fix the anticompetitive problems inherent in the current Redshirt Rule when viewed in combination with the JUCO Eligibility Restriction Bylaws.  With approval of such a rule change and approval of a waiver covering Pavia's 2020 Covid season, he would be eligible to play for Vanderbilt in 2025.  However, approval of the potential five-year change is uncertain and, at a minimum, months (if not years) away, so it will come too late to help Pavia.

---

[18]    See    https://www.usatoday.com/story/sports/ncaaf/mwest/2024/09/25/matthew-sluka-unlv-redshirt-unfulfilled-commitments/75373808007/ ("The Rebels are ranked No. 23 in the US LBM Coaches Poll after Sluka led them to victories in each of their first three games this season.… The move to redshirt before playing in more than four games allows the senior, who spent the first four seasons of his college career at Holy Cross, to enter the transfer portal and find another school for next year.") (Last accessed Nov. 7, 2024).
[19]    https://theyellowjacket.org/the-ncaa-begins-discussions-to-give-all-student-athletes-the-chance-for-a-fifth-year-option/  (Last accessed Nov. 7, 2024).

16

G.    The "Rule of Restitution": NCAA Bylaw 12.11.4.2

44.    If the Court grants Pavia injunctive relief, it must also address NCAA Bylaw 12.11.4.2, commonly known as the "Rule of Restitution," which provides:

> If a student-athlete who is ineligible under the terms of the bylaws or other legislation of the Association is permitted to participate in intercollegiate competition contrary to such NCAA legislation but in accordance with the terms of a court restraining order or injunction operative against the institution attended by such student-athlete or against the Association, or both, and said injunction is voluntarily vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified, the Board of Directors may take any one or more of the following actions against such institution in the interest of restitution and fairness to competing institutions . . .

Ex. 2 at 65-66, NCAA Bylaw 12.11.4.2. Potential punishments under the Rule of Restitution include vacating wins, postseason bans, return of television revenue, and financial penalties, among others. *Id.* To make a temporary restraining order and preliminary injunction meaningful in this case, Pavia respectfully requests that the Court enjoin the NCAA's application of the Rule of Restitution against Pavia, Vanderbilt University, or any other NCAA Division I college to which Pavia could transfer because its "purpose is to punish challenges to the NCAA's anticompetitive rules by attempting to deprive courts of the ability to grant effective relief and depriving individual student-athletes and member institutions of the practical ability to rely on court orders in their favor." *State of Ohio*, 706 F.Supp.3d at 601.

## RELEVANT MARKETS

45.    The JUCO Eligibility Limitation Bylaws affects one labor market: the market for Division 1 football players. Within this market, college athletes like Pavia compete for roster spots on Division I football teams and those NCAA Division I colleges compete against each other to recruit the best college athletes to compete on their athletic teams. Junior college transfer student-athletes are an important subgroup of the transfer student population, representing 7.9% of the

male-student athlete population in the 2021-2022 academic year.[20]

46.    The relevant geographic market is the United States.  The NCAA and its member institutions are located across the country, and they engage in on-field competition and competition in the relevant labor markets throughout the United States.

47.    There are no alternatives to the NIL Compensation opportunities or other benefits college football players receive from participating in NCAA Division I football.[21]  The opportunity to showcase athletic skills at the highest level of amateur athletic competition while pursuing a college degree from a Division I institution makes participation in this market unique.  Within this market, the NCAA and its member institutions maintain exclusive market power, with the sole ability to dictate the rules and regulations for participation in Division I athletics. The transactions in which the NCAA and its member institutions engage in this market with college athletes are commercial in nature, as they significantly affect the future earning potential of college athletes and yield significant financial revenue for the member institutions from the sizable consumer interest in college athletics. And, as a practical matter, NIL opportunities are only available college athletes competing at NCAA Division I institutions as more than 99% of NIL dollars are paid to those athletes. *Id.* at footnote 17. Pavia had no reasonable opportunity to earn any NIL Compensation, and earned none, when he played at junior college.

48.    Although the NCAA is a non-profit organization, the transactions that member institutions make with college athletes yield significant financial revenue for the member institutions and have significant effects on the future earning potential of those college football

---

[20] Aldridge, D., "*Do Baseball Community College Transfers Have a Fair Shot*" at p. 14 (Available at file:///C:/Users/rdown/Downloads/Aldridge_unc_0153M_21643.pdf and last viewed on Nov. 6, 2024).
[21] *See* Ex. 1, "NIL at 3: The Annual Opendorse Report" at p. 4.

players. Namely, these transactions include partial or full scholarships in exchange for the college athlete's services. The college athletes, in return, receive the means to develop, refine, and showcase their skills—essential inputs to their future earning potential. NCAA athletic events in which these college athletes compete are marketed to consumers who view both in-person and via broadcasts of these sporting events, yielding significant revenue to the NCAA's member institutions and conferences. Accordingly, the transactions between these member institutions and the college athletes are inherently commercial in nature and fall under the purview of the Sherman Act.

## **ANTICOMPETITIVE EFFECTS**

49.    The NCAA enacts and enforces rules that it claims promote the well-being of college athletes and preserve the amateurism aspect of Division I college sports.

50.    The NCAA and its member institutions adopt these rules through the member institutions and the Division I Council, making these rules equivalent to horizontal agreements among the NCAA and its member institutions who compete against one another for the labor of Division I college football players.

51.    Despite what the NCAA may claim, the JUCO Eligibility Limitation Bylaws restrain college athletes from improving their economic opportunity, personal growth, and well-being with NIL opportunities, through a full four-year college playing experience, a freedom afforded to all athletes who enroll at NCAA Division 1 members as freshman, but not to junior college football player transfers. This restriction violates the Sherman Act because it has direct anticompetitive effects that harm college football players and consumers of college football.

## I.    The JUCO Eligibility Limitation Bylaws' Effects on College Football Players

52.    In essence, the JUCO Eligibility Limitation Bylaws amount to no more than an agreement to limit the amount of time athletes may play Division I football because they have

19

chosen to attend a non-NCAA institution prior to transferring to a Division I NCAA college. These same restrictions are not placed on athletes who choose to delay entry to a Division I NCAA college to attend prep school, serve in the military, or even to compete professionally in another sport.

53.    The JUCO Eligibility Limitation Bylaws harm junior college and former junior college football players in four main areas of the relevant markets: (1) when an athlete is deciding whether to attend a JUCO after high school graduation; (2) when an athlete is deciding whether to play a sport while attending a JUCO; (3) when an athlete is deciding whether to attend a JUCO for a second year or transfer to an NCAA Division I College; and (4) when an athlete has transferred from a JUCO to a NCAA Division I College and has his/her eligibility limited to two or three years.

54.    First, the JUCO Eligibility Limitation Bylaws harms athletes when they are deciding what to do after graduating from high school. Upon graduating from high school, an athlete can choose between several options including, but not limited to, attending a Division I NCAA School, attending a JUCO, going to prep school, joining the military, playing a professional sport, or taking a gap year or non-sport job. All those options provide the possibility of the athlete competing for four plus years at a Division I NCAA School except one: going to JUCO.

55.    Second, the JUCO Eligibility Limitation Bylaws harms athletes attending a JUCO when they decide whether to participate in a sport while at that college. Specifically, if an athlete either forgoes participation in their sport of choice or limits that participation to a single year while at a JUCO, the NCAA bylaws allow them to transfer to an NCAA Division I School and play for three years.

56.    Third, because the NCAA counts every JUCO season against the athlete's four

20

seasons of allowed competition at an NCAA Division I School under Bylaw 12.02.6, the JUCO Eligibility Limitation Bylaws harm each athlete after their first year of JUCO by giving them an unfair set of three choices: (A) the athlete can transfer from the JUCO (without an associates' degree) to an NCAA Division 1 School with three years of eligibility remaining; (B) The athlete can choose to stay at the JUCO, play his/her sport, and obtain a degree; but by doing so, forfeit another year of NCAA Division 1 eligibility and have only two remaining; or (C) the athlete can stay at the JUCO to obtain his/her degree, but sit out from competition in his/her second year to maintain the maximum three years of eligibility allowed by the NCAA to JUCO transfers.

57.     Fourth, the JUCO Eligibility Limitation Bylaws harm athletes after they transfer from JUCO to an NCAA Division I institution by limiting them to two or three years of competition. At this point, the Redshirt Rule also hurts former junior college football players because it places them on an unfair playing field as compared with Division I college football players who were allowed to play in at least four Division I games (and maybe as many as nine this year) without losing a year of eligibility. Economically, the one- or two-year reduction in playing time for the former junior college player represents a one- or two-year reduction in NIL earnings. For some players, like Pavia, that can be a million dollar plus reduction per year. Additionally, each year competing at the NCAA Division I level provides athletes unparalleled training and exposure that makes them desirable to professional teams and/or leagues in their chosen sport, so the eligibility restriction potentially reduces future earning potential. Finally, the NCAA frequently touts the benefits of competing in college athletics for college athletes, especially for college athletes who will not move on to professional athletics. *See, e.g.*, *The Value of College Sports*, NCAA, https://www.ncaa.org/sports/2014/1/3/the-value-of-college-sports.aspx (accessed Nov. 3, 2024) (the value of college sports includes unparalleled exposure and

experiences through "the opportunity to travel across the country and around the world for regular-season contests, NCAA championships and foreign tours" which "can open doors for the few who will compete professionally and for the majority who will go pro in something other than sports.").

58.    The JUCO Bylaw Limitations deny these benefits to former JUCO college athletes for one to two seasons. The lost opportunity that comes with missing an entire college athletics season is significant, as the lost time and economic opportunity cannot be easily remedied. For athletes in the market to provide athletic services in Division I football, the impact of a missed season is even more pronounced in its effect on the athletes' future earning potential. Each game missed is a lost opportunity to showcase a college athlete's elite skills in front of national audiences and professional scouts. Each season of missed competition causes immeasurable and irreparable harm to college athletes like Pavia.

## II.    The JUCO Eligibility Limitation Bylaws' Effects on Consumers

59.    The JUCO Eligibility Limitation Bylaws also cause negative downstream effects on nationwide consumers who attend college football games and watch college football on television. When college athletes are prevented from competing simply because the previously attended a junior college, the value of the product that the NCAA provides to consumers is diminished. Teams may be less competitive without the ability to retain skilled transfer players for an additional season, fans lose the opportunity to see those college athletes compete for their favorite teams on gameday, and the product of NCAA athletics is less compelling for consumers. With Pavia at quarterback, Vanderbilt beat the number one ranked team in the country for the first time. Losing Pavia after this season will cause Vanderbilt to have find a new starting quarterback instead of keeping Pavia, a strong leader and great player for the Vanderbilt program that would love to have him back next year. Losing Pavia will make Vanderbilt less competitive in the

22

Southeastern Conference next year, making Vanderbilt games less interesting to watch—both for Vanderbilt fans and all other consumers of college football.  Likewise, other college football teams will be less competitive if they are not able to retain their junior college transfer players for four or five seasons.

<u>**LACK OF PROCOMPETITIVE JUSTIFICATION**</u>

**I.     There is No Procompetitive Justification for the JUCO Eligibility Limitation Bylaws**

60.     Because the above demonstrates the anti-competitive effect of the JUCO Eligibility Limitation Bylaws on the Division I labor market for football players, like Pavia, and the consumer market for persons watching college football, the burden shifts to the NCAA to prove a procompetitive justification for the JUCO Eligibility Limitation Bylaws.

61.     Based on its historical arguments, the NCAA may offer two potential justifications for the JUCO Eligibility Limitation Bylaws. First, the NCAA may argue the JUCO Eligibility Limitation Bylaws promote the academic well-being of college athletes. Second, the NCAA may argue the JUCO Eligibility Limitation Bylaws preserve the amateurism model of the NCAA. Both arguments are pretextual.

62.     In guidance to college athletes on the transfer process, the NCAA has stated that its Eligibility Clock is "designed to move student-athletes toward graduation in a timely manner." Ex. 3, 2024-25 NCAA Guider for Two Year Transfers at p. 21. But starting a JUCO athlete's Eligibility Clock one or two years before the athlete arrives on the NCAA member institutions campus does nothing to help an athlete earn his degree. The NCAA does not mandate how many transfer credits from a JUCO that each member institution must accept. Indeed, JUCO transfers to elite academic schools, such as Vanderbilt, may have few acceptable transfer credits, forcing them to take classes over again and necessitating more semesters of school to earn a degree than

the two or three years of eligibility the NCAA allows them to play football.  *See* Aldridge, D., "*Do Baseball Community College Transfers Have a Fair Shot*"[22] at pp. 1-16 ("Oftentimes, classes may transfer as electives but may not transfer as required general education courses. It is even harder for higher level classes to transfer as they are often very different at each institution. Thus, this method can be costly to certain transfer students who wish to earn their bachelor's degree as they lose a lot of credits during the transfer process.").  Indeed, "academic counselors who work directly with these [former junior college] athletes claim that NCAA bylaws make it difficult to serve this vulnerable population." *Id.* at p. 38.

63.      Furthermore, the JUCO Eligibility Limitation Bylaws do not aid the NCAA in maintaining consumer interest through its "amateurism model" as distinct from professional sports. As an initial matter, the NCAA has never developed a cohesive, coherent, or consistent definition of "amateurism."  Regardless, nothing in the JUCO Eligibility Limitation Bylaws affects the amateur status of college athletes as referenced in the NCAA Bylaws. Specifically, NCAA Bylaw 12.1.2 requires that Division I college athletes maintain amateur status to be eligible for NCAA competition. Exhibit 2 at 37. This bylaw states:

> An individual loses amateur status and thus shall not be eligible for intercollegiate competition in a particular sport if the individual:
>
> (a) Uses athletics skill (directly or indirectly) for pay in any form in that sport;
>
> (b) Accepts a promise of pay even if such pay is to be received following completion of intercollegiate athletics participation;
>
> (c) Signs a contract or commitment of any kind to play professional athletics, regardless of its legal enforceability or any consideration received, except as permitted in Bylaw 12.2.5.1;
>
> (d) Receives, directly or indirectly, a salary, reimbursement of expenses or any other form of financial assistance from a professional sports organization based on athletics skill or participation, except as permitted by NCAA rules and regulations;

---

[22] (Available at file:///C:/Users/rdown/Downloads/Aldridge_unc_0153M_21643.pdf and last viewed on Nov. 6, 2024).

(e) Competes on any professional athletics team per Bylaw 12.02.12, even if no pay or remuneration for expenses was received, except as permitted in Bylaw 12.2.3.2.1;

(f) After initial full-time collegiate enrollment, enters into a professional draft (see Bylaw 12.2.4); or

(g) Enters into an agreement with an agent.

*Id.* Nothing in the JUCO Eligibility Limitation Bylaws relates to this definition in any way. Instead, a JUCO football player is merely transferring from one school as an amateur athlete to another school as an amateur athlete. Preventing college athletes from competing in NCAA football games solely because they decided in their own best interest to start college at a non-NCAA institution has no relationship with the amateur status of those athletes. Any NCAA arguments to the contrary are pretextual and do not justify such anticompetitive restrictions.

64.    Additionally, as a matter of law, supposed benefits in the market for *consumers* of college athletic events cannot counterbalance harms in the distinct, sport-specific markets for student athlete *labor*.  Accordingly, any supposed consumer desire for college athletes to complete all post-graduate education within four or five years (of which the NCAA has presented no evidence) cannot balance against the harm caused to those students through elimination of their ability to earn NIL Compensation. Instead, the NCAA must show that the bylaws have a pro-competitive effect in the damaged market; in this case, the *labor* market for Division I college football players. Regardless, even if this cross-market balancing was legally cognizable, the JUCO Eligibility Restriction Bylaws have nothing to do with college athletes maintaining amateur status.

II.     **Any Potential Procompetitive Justifications for the JUCO Eligibility Limitation Bylaws Could Be Accomplished by Less Restrictive Means**

65.     Even if the academic and amateurism goals of the NCAA were valid procompetitive justifications (and they are not), both goals could be accomplished through less restrictive alternatives, some of which are already in place within the NCAA bylaws.  For example, NCAA Bylaws already require college athletes to maintain progress toward degrees to be eligible to compete in NCAA events.  *See* NCAA Bylaw 14.4.1. Other NCAA Bylaws require minimum credit hour and grade point averages for college athletes to be eligible for competition.  These bylaws related to academic progress, GPA, and in-season transfers accomplish the NCAA's academic and amateurism goals without the unjustified restrictions imposed by the JUCO Eligibility Limitation Bylaws.

66.     Additionally, minor revisions to the JUCO Eligibility Limitation Bylaws themselves could maintain any procompetitive intent by the NCAA without damaging JUCO athletes.  For instance, the start of the Eligibility Clock in Bylaw 12.8.1 and 12.8.1.1 could be triggered based on when the athlete first registered for classes at "an **NCAA member** institution" instead of when they register at a "**collegiate** institution" as in the current bylaws.  Likewise, the definition of "Intercollegiate Competition" in Bylaw 12.02.6 could be changed to reference when an athlete is "in a **NCAA member** institution" as opposed to "in either a **two-year or a four-year collegiate** institution" as in the current bylaws.  Additionally, the line "A student who transfers to a Division I member institution from another collegiate institution shall not engage in more than four seasons of competition with not more than three of those seasons in Division I" from bylaw 14.3.3 should simply be deleted.  Finally, problems caused by the Redshirt Rule could be corrected by changing the "**four** seasons" of competition listed in the Five-Year Rule (Bylaw 12.8) to "**five** seasons," allowing all athletes to compete in as many seasons as they can within five years.  Thus,

26

procompetitive justifications for the JUCO Eligibility Limitation Bylaws can be accomplished through less restrictive alternatives.

## COUNT 1: VIOLATION OF SECTION 1 OF THE SHERMAN ACT: THE JUCO ELIGIBILTY LIMITATIONS BYLAWS

67.     Pavia repeats and realleges each allegation set forth in the preceding paragraphs as if fully set forth herein.

68.     Defendant NCAA, by and through its officers, directors, employees, agents or other representatives, and its member institutions have entered an illegal agreement to restrain and suppress competition in the relevant markets through the adoption and enforcement of the JUCO Eligibility Limitation Bylaws: NCAA Bylaws 12.8 (the Five Year Rule), 12.02.6 (the Intercollegiate Competition Rule), and 14.3.3 (the Three Year Transfer Limitation). Specifically, the NCAA and NCAA member institutions have agreed to unlawfully restrain the ability of Division I college athletes who transfer to the NCAA from a non-NCAA institution to play for the same number of years offered to every other college football player.  The restraint imposed by the JUCO Eligibility Limitation Bylaws cannot withstand analysis under the rule of reason.

69.     The market for athletic services Division I football is the relevant antitrust market. The transactions between NCAA member institutions and college football players in this market are commercial in nature and fall under the purview of the Sherman Act.

70.     This unlawful agreement among horizontal competitors has unreasonably restrained competition among schools for the college athletes competing in the relevant markets, as colleges are prohibited from retaining the services of a junior college transfer, like Pavia, for the four or five years they are permitted to retain the services of other college football players. This limitation disadvantages junior college football players seeking to transfer to an NCAA Division I college along with former junior college football players currently playing for an NCAA Division

I college, and prevents such football players from realizing the benefits of competing in NCAA Division 1 football games for the same length of time available to all other college football players, harming their current and future earning potential.

71.    As a direct result of Defendant's conduct, junior college football players seeking to transfer to an NCAA Division I college along with former junior college football players currently playing for an NCAA Division I college and consumers of college athletics have suffered and continue to suffer antitrust injury due to the reduction in competition among Division I schools for college athletes through the restrictions imposed by the JUCO Eligibility Limitation Bylaws.

72.    The JUCO Eligibility Limitation Bylaws yield few, if any, benefits to competition in Division I football to the NCAA's member institutions, to college football players, or to consumers of NCAA Division 1 football games contests. Any such benefits are far outweighed by the harm to competition and to the college football players who are subject to the JUCO Eligibility Limitation Bylaws. Furthermore, the NCAA bylaws already contain less restrictive alternatives that accomplish the NCAA's goals for the JUCO Eligibility Limitation Bylaws and/or such Bylaws could be easily modified to address such concerns.

73.    Defendant's conduct is ongoing and will continue to impose injury on current and former junior college football players and consumers of college football unless injunctive relief is granted. This ongoing harm from the JUCO Eligibility Limitation Bylaws has caused, and continues to cause, direct harm to Plaintiff Diego Pavia by restricting his ability to sign contracts for NIL Compensation extending beyond the 2024 football season and limiting his future opportunities to showcase his skills and talent for NFL personnel, and does so as an unreasonable restraint on the labor markets for college football players.

74.    Defendant and its member institutions' anticompetitive acts were intentionally

directed at the United States market and had a substantial and foreseeable effect on interstate commerce.

75.    Pavia asks for a preliminary restraining order, preliminary injunction, and permanent injunction enjoining Defendant from continuing to violate Section 1 of the Sherman Act by enforcing NCAA Bylaws 12.8, 12.02.6, and 14.3.3 as to Pavia, and from enforcing NCAA Bylaw 12.11.4.2 to punish Pavia, Vanderbilt University, and any other NCAA member institution for actions taken in compliance with any orders from this Court. Pavia also asks the Court to explicitly rule that he is entitled to play Division I college football in the 2024-25 school year.

## COUNT 2: VIOLATION OF SECTION 1 OF THE SHERMAN ACT: THE REDSHIRT RULE COMBINED WITH THE FOUR SEASON LIMIT

76.    Pavia repeats and realleges each allegation set forth in the preceding paragraphs as if fully set forth herein.

77.    Defendant NCAA, by and through its officers, directors, employees, agents or other representatives, and its member institutions have entered an illegal agreement to restrain and suppress competition in the relevant markets through the adoption and enforcement of the Redshirt Rule in connection with the limitation that an athlete can only play four seasons of any sport at the NCAA Division I level. Specifically, the NCAA has distorted the labor market for college football players by creating an official limit of four seasons of competition, but providing an exception that allows some players to compete in up to nine nationally televised games in a fifth season.

78.    Precluding any athlete who has not utilized a redshirt season in their first four seasons of NCAA Division I competition, like Pavia, from utilizing that redshirt season in their fifth year wrongfully limits the athlete's ability to earn money based on his name, image, and likeness while playing football. Further, limiting a football player to only four regular season games along with any post season games in that redshirt unduly restricts competition to secure that

29

players services in the fifth year while limiting the player's potential NIL income in such a manner that cannot withstand analysis under the rule of reason.

79.     The market for athletic services Division I football is the relevant antitrust market. The transactions between NCAA member institutions and college football players in this market are commercial in nature and fall under the purview of the Sherman Act.

80.     This unlawful agreement among horizontal competitors has unreasonably restrained competition among schools for the college athletes competing in the relevant markets, as colleges are prohibited from playing football players in every game of every season during their redshirt season while they are a student at the college. This limitation disadvantages college football players from receiving NIL Compensation opportunities available to other college football players who are able to play in every game in any particular season, harming their current and future earning potential. This limitation also disadvantages college football players by limiting their exposure to NFL scouts during the games in which they are not permitted to participate, harming their current and future earning potential.

81.     If football players were permitted to play five full years of football, there would be increased demand for many such players as graduate transfer students, meaning that college football players who are unable to play five full years of Division I football have suffered and continue to suffer antitrust injury due to the reduction in competition among Division I schools for college athletes through the restrictions imposed by the Redshirt Rule combined with the four season competition limit.

82.     The Redshirt Rule limiting football players to four regular season games plus any post seasons games in their redshirt season offers few, if any, benefits to competition in Division I football to the NCAA's member institutions, to college football players, or to consumers of

NCAA Division 1 football games contests. Any such benefits are far outweighed by the harm to competition and to the college football players by the limitations of the Redshirt Rule. Furthermore, the NCAA bylaws already contain less restrictive alternatives that accomplish the NCAA's goals for the Redshirt Rule and/or the NCAA Bylaws could be easily modified to address such concerns.

83.    Defendant's conduct is ongoing and will continue to impose injury on Pavia and other current and former junior college football players and consumers of college football unless injunctive relief is granted. This ongoing harm from Redshirt Rule acting in conjunction with the four-year limit on competition has caused, and continues to cause, direct harm to Plaintiff Diego Pavia by restricting his ability to sign contracts for NIL Compensation extending beyond the 2025 football season and limiting his future opportunities to showcase his skills and talent for NFL personnel, and does so as an unreasonable restraint on the labor markets for college football players.

84.    Defendant and its member institutions' anticompetitive acts were intentionally directed at the United States market and had a substantial and foreseeable effect on interstate commerce.

85.    Pavia asks for a permanent injunction enjoining Defendant from continuing to violate Section 1 of the Sherman Act by enforcing the competition limitations in NCAA Bylaws 12.8.3.1.6 and 17.11.6.2.1 as to Pavia if he chooses to pursue a redshirt year in the 2024-25 school year. Pavia also asks the Court to explicitly rule that he is entitled to play Division I college football as a redshirt in the 2026-27 school year.

**PRAYER FOR RELIEF**

WHEREFORE, Pavia respectfully requests that this Court:

1. Adjudge and decree that Defendant's enforcement of NCAA Bylaw 12.8, 12.02.6, and 14.3.3 violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

2. Enter a permanent injunction, in a form that the Court deems just and proper, pursuant to 15 U.S.C. § 26, enjoining Defendant from continuing to violate Section 1 of the Sherman Act by enforcing NCAA Bylaws 12.8, 12.02.6, and 14.3.3 as to Pavia, and from enforcing NCAA Bylaw 12.11.4.2 to punish Pavia, Vanderbilt University, and any other NCAA member institution for actions taken in compliance with any orders from this Court;

3. Award Pavia a fourth season of NCAA Division I competition and eligibility to take place in 2025-26 to avoid harm caused by NCAA Bylaws 12.8, 12.02.6, and 14.3.3;

4. Adjudge and decree that Defendant's enforcement of the competition limitations in the NCAA Bylaws 12.8.3.1.6 and 17.11.6.2.1 violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

5. Award Pavia a fifth season of NCAA Division I competition and eligibility to take place in 2026-27 as a redshirt to avoid additional harm caused by NCAA Bylaws 12.8.3.1.6 and 17.11.6.2.1;

6. Award Plaintiff Pavia his costs, including reasonable attorneys' fees; and

7. Order any other relief that this Court deems just and proper.


Respectfully submitted,

/s/ Salvador M. Hernandez
Ryan Downton (*Pro Hac* Pending)
Texas Bar No. 24036500
The Texas Trial Group
875 Carr 693, Ste. 103
Dorado, PR 00646*
Phone: 512-680-7947
Ryan@TheTexasTrialGroup.com
*Ryan Downton is licensed in Texas, not Puerto Rico

32

and

Salvador M. Hernandez (# 020121)
Riley & Jacobson, PLC
1906 West End. Ave.
Nashville, TN 37205
P: (615) 320-3700
F: (615) 320-3737
shernandez@rjfirm.com

## CERTIFICATION OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served upon the following person(s) via e-mail prior to filing on the ECF system and U.S. Mail on the 8th day of November 2024:

> Jared Tidemann
> Director of Legal Affairs
> Senior Counsel of Government Relations & Sports Administration
> National Collegiate Athletic Association
> PO Box 6222
> Indianapolis, IN 46206-6222
> jtidemann@ncaa.org

/s/ Salvador M. Hernandez
Salvador M. Hernandez

34