TO:     **The Honorable Claudia Wilken**
         Ronald v. Dellums Federal Building & United States Courthouse
         c/o Class Action Clerk
         1301 Clay Street
         Oakland, CA 94612

**FILED**

FEB 0 3 2025

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

FROM:   **Katherine McCabe Ernst**
         Vanderbilt University – Women's Lacrosse (2026)

         NCAA Eligibility Center ID 1911746845

CC:     **Leigh Ernst Friestedt**

RE:     **Objection**
         *In re: College Athlete NIL Litigation*, Case No. 4:20-cv-03919 (N.D. Cal)

DATE:   January 30, 2025



Dear Judge Wilken:

My name is **Katherine McCabe Ernst**, and I am a Division I student-athlete at Vanderbilt University ("Vanderbilt") where I have been on a partial athletic scholarship as a member of the Women's Lacrosse Team from the Fall of 2022 until the Present (January 2025). I am currently a Junior and scheduled to graduate from Vanderbilt in May 2026. My full player biography and academic transcript are detailed in **Appendix A**.

My mom, **Caroline Ernst** (Vanderbilt 1994), and my aunt, **Leigh Ernst Friestedt** (Vanderbilt Law 1996), helped to start the Vanderbilt Women's Varsity Lacrosse program in 1995. Three decades later, I am a proud member of the Women's Lacrosse team, extremely appreciative of the opportunity to receive an outstanding education and play Division I athletics. Recognizing that many women have helped to create the opportunities that my teammates and I benefit from, I felt that it was important that I advocate for women to receive an equal opportunity in athletics.

I am writing you today on behalf of not only myself, but more importantly, the millions of female student-athletes who deserve an equal opportunity to play sports in college and receive equal treatments and benefits under **Title IX of the Education Amendments Act of 1972** ("Title IX").

Based on the terms set forth in the Amended Settlement Agreement, I object to *In re: College Athlete NIL Litigation - House* Settlement, Case No. 4:20-cv-03919 (N.D. Cal), and request that you not approve the *House* Settlement at the Final Approval Hearing, scheduled for April 7, 2025.

1

According to the website www.collegeathletecompensation.com, my **Estimated Allocation** as a member of the **Additional Sports Class** (Women's Lacrosse) at Vanderbilt is detailed below.

| Type of Damage | Katherine Ernst – Est. Allocation | |
|---|---|---|
| **Name, Image & Likeness (NIL)** | **Vanderbilt** | |
| Broadcast NIL | Not Eligible | **Object** |
| Videogame NIL | Not Eligible | --- |
| Lost NIL Opportunities | Not Eligible | --- |
| | | |
| **Athletic Services** | **$326.24** | **Object** |
| | | |
| *Hubbard* **Academic / (***Alston* **Award)** | Not Eligible | **Object** |
| | | |
| **Total Estimated Settlement Payment** | **$326.24** | |

The *House* Distribution Plan is based on three **Settlement Damage Classes**:

1. **Football & Men's Basketball** – Power 5
2. **Women's Basketball** – Power 5
3. **Additional Sports**: Football, Men's Basketball, Women's Basketball and Other Sports

As illustrated by the chart below, my Estimated Allocation of **$326.24** is significantly lower than the average payment for other Classes: **Football & Men's Basketball**, and **Women's Basketball**.

| Type of Damage | Estimated Settlement Damages | | |
|---|---|---|---|
| **Name, Image & Likeness (NIL)** | **Football & Men's Basketball – P5** | **Women's Basketball – P5** | **Katherine Ernst** |
| Broadcast NIL | $91,000 | $23,000 | Not Eligible |
| Videogame NIL | $300 - $4,000 | --- | Not Eligible |
| Lost NIL Opportunities | $17,000 | $8,500 | Not Eligible |
| **Athletic Services - Additional** | $40,000 | $14,000 | **$326.24** |
| | | | |
| **Total** | **~$150,000** | **$45,500** | **$326.24** |

*Source:* Exhibit A – Settlement Recovery Information by Class and Type of Claimed Damages
*House v. NCAA*, Plaintiff's Motion for Preliminary Settlement Approval, July 26, 2024.

I believe my Estimated Settlement Allocation is considerably lower than the actual value of my NIL, Athletic Services and Academic Achievements as a student-athlete at Vanderbilt. Additionally, I believe the low valuation of my Estimated Allocation reflects longstanding gender equity issues in intercollegiate athletics and is a violation of Title IX.

2

**Title IX** is a federal civil rights law passed in 1972, to prohibit sex-based discrimination in any education program or activity, which includes intercollegiate athletics. Title IX states:

> *"No person in the United States, shall on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance."*

According to the *House* **Distribution Plan**, the allocation of the Gross Settlement Fund **$2.576 Billion** is divided into: (1) **NIL** Claims Settlement Amount ($1.976 billion), and (2) **Additional Compensation** Claims Settlement Amount ($600 million). The Settlement Amount is calculated using a percentage (NIL *67.4%*, Additional Compensation *31.6%*) of the Total Estimated Damages provided in an economic report prepared by Dr. Daniel Rascher ("**Rascher**").

| Claims | Total Est. Damages | Settlement % | Settlement Amount |
|---|---|---|---|
| **NIL** | $2,933 | *67.4%* | $1,976 |
| **Athletic Services - Additional** | 1,898 | *31.6%* | 600 |
| **Total *House* Settlement** | $4,831 | *100%* | **$2,576** |
| ***Alston* Academic - *Hubbard*** | $200 | | $200 |
| *($ in millions)* | **Total Settlement (*House* + *Hubbard*)** | | **$2,776** |

As illustrated by the charts below, the *House* Settlement significantly benefits men who receive *94%* (**$2.425 billion**) compared to women who would only receive *4%* (**$102 million**) of the total *House* Settlement Damages (**$2.576 billion**).

| *($ in millions)* | Broadcast | | Video | | Lost NIL | | Total NIL | |
|---|---|---|---|---|---|---|---|---|
| **Men** | $1,748 | *96%* | $72 | *100%* | $65 | *73%* | **$1,885** | *95%* |
| **Women** | 68 | *4* | --- | --- | 5 | *5* | **72** | *4%* |
| Other | --- | --- | --- | --- | 19 | *22* | 19 | *1%* |
| **Total** | **$1,816** | *100%* | **$72** | *100%* | **$90** | *100%* | **$1,976** | *100%* |

| *($ in millions)* | Athletic Services | | NIL + Athletic Services = | Total *House* | |
|---|---|---|---|---|---|
| **Men** | **$540** | *90%* | | **$2,425** | *94%* |
| **Women** | **30** | *5* | | **102** | *4%* |
| Other | 30 | *5* | | 49 | *2%* |
| **Total** | **$600** | *100%* | | **$2,576** | *100%* |

*Source*: *House v. NCAA*, Declaration of Daniel A. Rascher (July 26, 2024).

The reason for the significant disparities between the amounts allocated to men and women in the *House* Settlement was explained by the Class Counsel (Steve Berman and Jeffrey Kessler) in the Factual Allegations of the Third Consolidated Amended Complaint dated Sept. 26, 2024.

**"Female Athletes Have Been Especially Adversely Impacted by NIL Restrictions and Will Profit in the New NIL Era"**

> "The ***NIL rules adversely impacted female athletes more than their male counterparts*** because (1) they have fewer professional opportunities and they must use their time in school to monetize, and (2) because the ***NCAA promotes female sports less than it does male sports*** and thus many female athletes are not as well known…"

> "There was an unanswered demand for the use of NIL of female athletes before interim NIL rules..."

> "A study conducted by the website AthleticDirectorU and the marketing firm Navigate Research found that 13 of the 25 college athletes with the greatest annual endorsement potential between **$46,000** and **$630,000** were female athletes."

> *Source*: *House v. NCAA*, Third Cons. Am. Class Action Complaint, p. 74.

The NCAA's failure to promote women's sports equitably is also supported by an independent gender equity review of all NCAA Championships in 2021. The law firm Kaplan Hecker & Fink ("**Kaplan**") found significant disparities between men's and women's intercollegiate sports. The source of the disparities is the NCAA structure, which is designed to maximize revenues from the most lucrative source of funding for the NCAA and its members – Division I Men's Basketball. According to Kaplan,

> "The NCAA's broadcast agreements, corporate sponsorship contracts, distribution of revenue, organizational structure, and culture all prioritize Division I Men's Basketball over everything else in ways that create, normalize, and perpetuate gender inequities."

> *Source*: Kaplan Hecker & Fink LLP, *NCAA External Gender Equity Review* (2021).

Despite these gender inequities, Rascher used revenue-generating men's sports as a basis to calculate the *House* Settlement Damages awarded to each Settlement Class. As a result of this sex-based analysis, the *House* Settlement has a disparate impact on all female Class Members.

I believe that I was adversely impacted by NIL restrictions and the NCAA's failure to promote female sports equally to men. Therefore, based on my **Estimated Allocation** in the amount of **$326.24**, I object to the following:

1. *House* **Settlement Damages**
    i. **Name Image Likeness**: Broadcast NIL
    ii. **Athletic Services – Additional Compensation**
2. *Hubbard* **Academic Achievement (*Alston* Award)**, and
3. **Title IX Release**

**OBJECTIONS:**

*House* **Settlement Damages**

**Name, Image & Likeness ("NIL") – Broadcast NIL**

**#9 Ernst – Vanderbilt University (Nike, STX)**

According to the *House* Settlement, Women's Lacrosse is classified as an **Additional Sports Class** and is "**Not Eligible**" to receive a Broadcast NIL payment. The classification of my sport – rather than the actual commercial use of my NIL – establishes whether I am eligible for a Broadcast NIL payment. Based on my Broadcast NIL valuation of $0, I object to the *House* Settlement.

As a <u>Vanderbilt Commodore</u>, my black, white and gold jersey displays **9** on my back. My uniform and cleats are sponsored by **Nike**, I use a **STX Lacrosse** stick and wear **STX** googles. As a draw specialist, my NIL appears at the center of the field to start the game and second half and after a goal is scored. Every time I take a draw the announcer says my full name over a loudspeaker and zooms in on the two centers (I am one of the centers) with the ball in between our sticks.

As a Freshman (2022-23), I recorded my first collegiate draw control against James Madison University ("JMU"). JMU won the NCAA DI Women's Lacrosse Championship in 2018. As a Sophomore (2023-24), I appeared in 15 games (two starts) and registered 22 draw controls against top Division I programs including: Stanford, Johns Hopkins, Florida, Penn State and JMU.

All Vanderbilt home Women's Lacrosse games air live on **ESPN**+. As a midfielder who specializes in draws – my family, friends and fans can watch me in person or online, run to the center of the field to take the draw. Therefore, I believe that I am entitled to a Broadcast NIL payment which is not currently reflected in my Estimated Allocation of "Not Eligible."

**Full Grant-in-Aid ("GIA") Scholarship vs. Equivalency Athletic Scholarship**

Pursuant to current NCAA Rules, Football, Men's Basketball and Women's Basketball are Head Count sports providing those DI student-athletes with Full scholarships. The *House* Settlement limits Broadcast NIL payments to **Full Grant-in-Aid ("GIA")** scholarships for the two Classes: (1) **Football and Men's Basketball**, and (2) **Women's Basketball**.

Pursuant to NCAA Rules, DI Women's Lacrosse is limited to 12 **Equivalency** scholarships per team, which are divided into Partial scholarships for many players on a team. During my career at Vanderbilt, our roster size is approximate 40 female student-athletes. Therefore, due to the NCAA Scholarship Cap of 12 Equivalency scholarships, it is very unusual for a DI Lacrosse student-athlete (male of female) to receive a Full scholarship.

My athletic scholarships at Vanderbilt are summarized below:
- Freshman (2022-23) – 30%
- Sophomore (2023-24) – 30%
- Junior (2024-25) – 30%

I was a multi-sport athlete in high school (lacrosse, basketball, tennis) at the Agnes Irwin School where I was recognized for both my academic and athletic accomplishments: PAISAA All-American, Inter-AC Team 2, AIS Outstanding Athlete, Leadership by Example Award and Carter Mannion Award. However, at Vanderbilt I was only awarded an Equivalency scholarship of 30%. The fact that I only received a Partial scholarship did not reflect my athletic ability, but rather the limitations set forth by current NCAA scholarship cap rules.

According to the *House* Settlement, as an Equivalency sport, I am "*Not Eligible*" to receive a Broadcast NIL. This limitation is based on the classification of Women's Lacrosse as an Additional Sport and the amount of my athletic scholarship (Full vs. Partial), rather than the commercial use of my NIL. The **classification** of sports established by the *House* Settlement Classes appears to violate the **Policy Interpretation** of Title IX, which prohibits classifying sports in a manner that *disproportionately offers benefits* or *opportunities* to members of one sex. See **Appendix B**.

One of the key issues the *House* Settlement seeks to remedy are NCAA rules limiting scholarships available to college athletes. The *House* **Injunctive Relief** (Article 4) states that all NCAA DI athletic scholarship limits will be eliminated, and all scholarships will be equivalency awards. Accordingly, the NCAA would move from a scholarship cap to a roster cap model that would permit all student-athletes on any team to be eligible for a full GIA scholarship. Under new NCAA Injunctive Relief rules, I would have been eligible to receive Full GIA scholarships, like the Football and Basketball Settlement Damages Classes. Therefore, I believe that I should be eligible to receive a Broadcast NIL payment based on the commercial use of my NIL, and object to the *House* Settlement.

### Athletic Services – Additional Compensation

My Estimated Allocation for **Athletic Services** is valued at **$326.24**. This amount is significantly lower than the average payments for other Classes: (1) **Football and Men's Basketball ($40,000)**, and (2) **Women's Basketball ($14,000)**. Based on my estimated hours of NCAA permitted athletic services (20 hours per week), I played ~1,500 hours of lacrosse over my three-year career at Vanderbilt, which equates to approximately $0.22 per hour. This does not include the hundreds of hours that I train beyond the officially permitted practice time and travel that is required to fly from Nashville to many of our games.

While I recognize Women's Lacrosse has not gained the same notoriety as our Men's Football team did this year when they beat Alabama and students celebrated by carrying the goalposts to downtown Nashville, we work just as hard as they do. In 2024, the Vanderbilt Women's Lacrosse Team was named the Intercollegiate Women's Lacrosse Coaches Association ("IWLCA") **DI Academic Honor Roll** with 17 members of our team achieving a cumulative GPA of 3.5 or greater. Additionally, the entire Vanderbilt Women's Lacrosse program was named an **IWLCA Academic Honor Squad** for the 2023-24 academic year, achieving a cumulative team GPA of above 3.2. I believe the Women's Lacrosse team exemplifies excellence on the field and in the classroom which contributes to the Vanderbilt community in ways that transcend the value of our performance on an athletic field.

6

The proposed *House* Settlement of **$600 million** for **Athletic Services** disproportionally favors male student-athletes, as illustrated by the chart below providing **Football & Men's Basketball $540 million** representing *90%* of the Settlement amounts.

| House Settlement – Athletic Services – Additional Compensation | | |
|---|---|---|
| **Damages Class** | **Amount** | **%** |
| **Football & Men's Basketball - P5** | **$540 Million** | *90%* |
| Women's Basketball – P5 | 30 | 5 |
| Additional Sports | 30 | 5 |
| **Estimated Total** | **$600 Million** | |

According to NCAA rules, all DI student-athletes are limited to a **maximum of 20 hours per week** of countable athletically related activities ("CARAs") during the playing season. During the off-season, student-athletes are allowed significantly lower CARAs, typically 8 hours per week. Therefore, if DI student-athletes are participating in athletics an equal number of hours per week (20 regular season, 8 off-season), then all DI athletes should be compensated equally for their Athletic Services under the *House* Settlement.

Instead of using current NCAA rules which limit athletic participation for all DI athletes to calculate Athletic Services, the *House* Settlement relies on an economic report prepared by Rascher. Estimated settlement amounts for Athletic Services are calculated using a "**yardstick**" approach by obtaining a "*but-for-price*" from a "*comparable market.*" This comparable market analysis uses a distribution of salaries in professional leagues to derive an estimate salary for college athletes.

The comparable market analysis is fundamentally flawed because it is **sex-based**, using collective bargaining agreements from the professional male leagues: NFL, NBA and NHL, as a yardstick, and then estimating athlete compensation to be 50% of a professional league revenue. Professional sports operate to make a profit which is fundamentally different than the NCAA, athletic conferences and universities who operate not-for-profit business models. The resulting analysis is further sex-based because it allocates damages based on the estimated share of the value each sport contributes to regular season broadcast deals. This sex-based allocation is the same proportion Rascher used to calculate NIL damages and explains why there is a disparate impact on female student-athletes. Therefore, I object to the *House* Settlement and believe the Athletic Services calculations are a violation of Title IX.

I believe that I should receive an Athletic Services payment based on the number of hours that I participated in athletically related activities per week, not based on the Classification of Women's Lacrosse as an Additional Sport and a yardstick that relies on historical gender inequities. Therefore, pursuant to NCAA Rules limiting all DI student-athletes' athletic activities, I believe that my Athletic Services payment should be equal to the amounts awarded to Football and Men's Basketball. Additionally, I believe that Women's Basketball and all other women's sports should receive equal Athletic Services payments based on their participation in NCAA DI sports.

**_Hubbard_ Academic Achievement (_Alston_ Award)**:

Based on my Estimated Payment, I am "Not Eligible" to receive a _Hubbard_ Academic Achievement ("_Alston_") Award payment. I believe this is an error and that I should be entitled to an _Alston_ Payment Award based on my following academic achievements as a student-athlete at Vanderbilt:

- GPA above 3.0 every semester (Fall 2022 – Fall 2024)
- Cumulative GPA 3.567
- Two-time ACC All-Academic (2023, 2024)
- SEC Spring Honor Roll (2024)

Based on my academic achievements, I received an _Alston_ payment from Vanderbilt University in the amount of **$5,980** on June 21, 2024, and **$5,980** on June 21, 2023. To date, I have received total _Alston_ payments in the amount of **$11,960**. My academic achievements, transcripts and _Alston_ payments are detailed in **Appendix A**.

**Title IX Release – Gross Settlement Fund:**

The _House_ Settlement contains a specific provision releasing a Class Member's **Title IX** rights with respect to the **Gross Settlement Fund**. "**Unreleased Claims**" is defined in the Amended Stipulation and Settlement Agreement (not defined in the Class Action Notice) as the following:

> "_The Settlement Agreement does not release… claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., **other than any claims arising out of or relating to the distribution of the Gross Settlement Fund.**_"

The referenced terms associated in the Title IX Release are further defined in the Amended Stipulation and Settlement Agreement (not in the Class Action Notice) as the following:

> Gross Settlement Fund is defined as "_the NIL Claims Settlement Amount and **Additional Compensation** Claims Settlement Amount plus any interest that may accrue._"
>
> NIL Claims Settlement Amount = **$1.976 Billion**
>
> Additional Compensation Claims Settlement Amount = **$600 Million**

Simply stated – this is **confusing language on an important point which adversely impacts all past, current and future female Class Members.** All DI student-athletes who are or will be Class Members need to understand: (1) What is Title IX (nowhere is the federal law explained or defined), and (2) What Title IX claims is a Class Member releasing.

For a Class Member to properly understand his or her Title IX claims under the Gross Settlement Fund, there needs to be full transparency with respect to the Estimated Allocation amounts. While the Rascher report provides a framework for the calculations, based on my comparison with other lacrosse players, the amounts vary significantly and are difficult to understand. A helpful reference point would have been to provide the Estimated Allocation amounts for the named Plaintiffs in the _House_ Settlement, but according to Class Counsel these amounts are "_confidential._"

Both the *House* Settlement Damages (NIL Claims $1.976 billion + Additional Compensation Claims $600 million = $2.776 billion) and future **Injunctive Relief** of Shared Revenues from a ***"Benefits Pool"*** created by a university who participates ($20 million per year) violate Title IX as a form of *"financial assistance,"* which must be *"proportional"* to athletic participation rates, or ***"benefits"*** that must be *"equivalent"* to those provided for a men's athletic program. The Dept. of Education Office for Civil Rights ("OCR") recently issued a Fact Sheet to ensure an equal opportunity, regardless of sex, for NIL activities in athletic programs. The OCR stated that NIL agreements between a university and student-athletes constitute a form of athletic *"financial assistance"* under Title IX. See **Appendix B.**

The Title IX Release in the *House* Settlement is unreasonable for women because neither of the Plaintiff's experts (Edwin Dresser, Daniel Rascher) factored Title IX into their financial analysis to calculate the Settlement amounts or opinions to justify them. The failure to include Title IX in the calculations of the Estimated Allocation amounts explains why there is such a significant disparity between the amounts for men versus women. As stated by both experts at deposition:

> Q: Have you tried to account for Title IX in any of your damage's models in this case?
>
> A: **No.**
>
> *Source*: Rascher Dep. Tr. at 64:12-19.
>
> Q: Have you given any consideration to the Title [IX] in your preparation of this report?
>
> A: That's not within the scope of what I was assigned to work on.
>
> Q: So, the answer is: 'No' you have not given any consideration to it, because you weren't asked to do that?
>
> A: **No, I have not.**
>
> *Source*: Desser Dep. Tr. at 64:12-19.

The Plaintiff's experts justify their calculations based on the proportion of revenues generated by a sport. Revenue generation by a sport, however, has never been a basis to exempt compliance with Title IX. The *House* Settlement calculations contradict the **legislative history** of Title IX. Since the inception of Title IX legislation, advocates for men's sports tried to exclude revenue-generating sports from Tile IX coverage. Opponents proposed multiple amendments to exclude athletics and limit the reach of the federal law. However, Congress repeatedly rejected these efforts and refused to carve out revenue-generating sports from Title IX coverage. See **Appendix B**.

Congress enacted Title IX to prevent the use of federal funds to support discriminatory practices in education. The *House* Settlement payments are funded by the NCAA, Power Five Conferences and NCAA DI member institutions (universities/colleges). It is well established that universities are a *"recipient of federal financial assistance"* and, therefore, are subject to Title IX. While the NCAA and Athletic Conferences are not a *"direct"* recipient of federal financial assistance, there is a strong argument that athletic conferences are an *"indirect"* recipient of federal funds and, therefore, should be subject to Title IX.

Justice Ginsburg in the landmark U.S. Supreme Court case *NCAA v. Smith* (1999), found that the NCAA's receipt of **membership dues** from educational institutions did not constitute "receipt" of federal aid. Based on this narrow ruling, the NCAA was not subject to Title IX. As a result of this

"*recipient loophole*," the NCAA has been operating *"above the law"* for decades, resulting in significant gender disparities detailed in the Kaplan Report and directly impacting the *House* Settlement calculations. However, Justice Ginsburg left open an alternative legal theory to bring the NCAA and athletic conferences under the scope of Title IX. The mere receipt of membership dues, without something "***more***," was insufficient to trigger Title IX coverage in *Smith*. However, the NCAA's ***"controlling authority"*** over federally funded educational institutions athletic programs is the something "*more*" that brings the NCAA under the scope of Title IX as an "***indirect recipient***." See **Appendix B**.

The class action lawsuit, *In re: College Athlete NIL Litigation*, exemplifies how the NCAA's Eligibility Rules had controlling authority over student-athletes participation in college sports, limited the use of their NIL, and limited the availability of athletic scholarships. The NCAA, Power Five Conferences and DI NCAA member institutions were "*pervasively entwined*" and conspired together to enact and enforce the NCAA's anticompetitive Eligibility Rules. To the extent the NCAA and Power Five Conferences try to circumvent coverage of Title IX under the "*recipient loophole,*" I request that the Court carefully consider Justice Ginsburg's alternative "*controlling authority*" theory.

Antitrust (Sherman Act) is a fundamentally different issue than antidiscrimination (Title IX), so it incomprehensible why a female student-athlete would be required to release her Title IX rights to participate in an antitrust settlement. In the landmark U.S. Supreme Court Case, *NCAA v. Alston* (2021), Justice Kavanaugh in his concurring opinion specifically raised this issue, ***"How would any compensation regime comply with Title IX?"*** Title IX was enacted to prevent the unequal treatment of female student-athletes which is precisely what the *House* Settlement would do if approved. Therefore, I object to the *House* Settlement and believe it is a violation of Title IX.

I object to releasing my Title IX claims "*arising out of or relating to the distribution of the Gross Settlement Fund.*" There is a significant disparity between *House* Settlement Amounts based on the sex of an athlete, with male athletes receiving a disproportionately higher amount than women. Therefore, I object to the *House* Settlement and request that the Court consider this matter very carefully given the significant consequences of approving the Title IX Release for all female Class Members.

**<u>Future - Injunctive Relief</u>**:

If the Court approves the *House* Settlement, and Vanderbilt decides to participate in the $20 million "revenue sharing" pool for student-athletes, I request that "revenue sharing" payments comply with Title IX, and that Vanderbilt be required to provide full disclosure to the Court and Equity in Athletics Disclosure Act ("EADA") so that there is full transparency on these payments.

**<u>Request to Speak at Final Hearing – Legal Representation</u>**:

I have retained an independent attorney because I believe there is a conflict of interest with the Class Counsel (Winston & Strawn LLP and Hagens Berman Sobol Shapiro LLP) who has negotiated a *House* Settlement that disproportionately favors men and failed to take Title IX into consideration. I am currently being represented by **Leigh Ernst Friestedt**, a New York attorney

who specializes in Title IX and sports law matters. Leigh is also a former DI Women's Lacrosse player, who has a strong understanding of the issues raised in my objection. I will be in-season this spring, so unable to attend the Approval Hearing. In my absence, I request that Leigh be permitted to speak on my behalf at the Final Approval Hearing, schedule for April 7, 2025.

Leigh's full contact information is listed below. Please include her on any future correspondence.

**Leigh Ernst Friestedt**
Equity IX, LLC
40 Mercer St. #15
New York, NY 10013
leigh@equityix.com
(917) 513-5541

**Claim Forms**

I have updated my contact and payment information and submitted Claim Forms that would be required to participate in the *House* and *Hubbard* Settlements. Should the Court approve the *House* Settlement, I request that the Court recalculate my Estimated Allocation amounts to reflect my full information.

If you need any additional information, please feel free to contact me – my full contact information is listed below.

**Katherine Ernst**
2312 Elliston Place #118
Nashville, TN 37203
katherine.m.ernst@vanderbilt.edu
(484) 433-8231

Thank you for your consideration of my objections.

Sincerely,

*Katherine Ernst*

**Katherine McCabe Ernst**
Vanderbilt University – Women's Lacrosse (2021 – Present)

cc: Leigh Ernst Friestedt

*Leigh Ernst Friestedt*
1/30/ 25

11



# APPENDIX A
# Katherine Ernst

**Table of Contents**

1. **Athletic Honors and Academic Achievements**

2. **Professional Resume**

3. **Vanderbilt – Transcript**

4. *Alston* **Academic Payments**

Katherine Ernst                                                    APPENDIX

# Katherine Ernst
## Vanderbilt University – Women's Lacrosse
NCAA Eligibility ID # 1911746845

### HONORS AND ACHIEVEMENTS

**Vanderbilt University**
| | |
|---|---|
| Two-time ACC All-Academic | 2023, 2024 |
| SEC Spring Honor Roll | 2024 |
| IWLCA Academic Honor Squad | 2024 |

**Agnes Irwin School**
| | |
|---|---|
| PAISAA All-American | 2022 |
| Academic All-American | 2022 |
| Inter-AC Team 2 | 2022 |
| Carter Mannion Award | 2020 |
| Leadership by Example Award | 2020 |
| AIS Outstanding Athlete | 2018 |

2

**Katherine Ernst**                                                                                          **APPENDIX**

### Katherine Ernst
Vanderbilt University Division I Women's Lacrosse Student-Athlete
Katherine.m.ernst@vanderbilt.edu | 484-433-8231 | Bryn Mawr, PA | https://www.linkedin.com/in/katherineernst13

#### EDUCATION

**Vanderbilt University**                                                                                    Nashville, TN
*Bachelor of Science in Human Organizational Development and Computer Science; Minor in Business*    Expected May 2026
- Honors: Dean's List, SEC Academic Honor Roll
- Memberships: D1 Women's Lacrosse Leadership Team | Pi Beta Phi Leadership Nomination Committee | Kappa Theta Pi (Professional Technology Fraternity) | Women in Business | Vanderbilt Undergraduate Consulting Club

#### PROFESSIONAL EXPERIENCE

**Northwind Partners**                                                                                       Franklin, TN
*Research Intern*                                                                                           June - July 2024
- Conducted a comprehensive market analysis of the Big Pharma sector, identifying and profiling 100+ key manufacturers and distributors, which provided actionable insights that facilitated Northwind's market entry.
- Led a strategic project to identify critical research gaps in candidate selection processes, directly engaging with C-suite executives to centralize and enhance alignment for high-level hiring objectives within Northwind and client databases.
- Orchestrated end-to-end executive recruitment initiatives, successfully placing 4 candidates in C-suite positions.

**Madaket Millies**                                                                                          Nantucket, MA
*Point Hostess, Food Runner, Takeout, Busser*                                                          May-August 2023
- Coordinated customer seating, reservations, and waitlist management for up to 50 guests at a time to optimize service flow and enhance the dining experience resulting in 5 of the restaurant's busiest days of 1200+ guests.
- Led takeout operations, contributing to daily sales of approximately $8,000+ and accurate order fulfillment.

**Coded Website for College Counseling at Agnes Irwin**                                                     Rosemont, PA
*Coder*                                                                                                   Dec 2020-June 2021
- Collaborated within a Computer Science group to develop a centralized student data solution.
- Designed and implemented the website, catering to College Counselors' needs and streamlining data collection.
- Spearheaded the user experience aspect, optimizing analytics collection and facilitating counselor feedback.

#### EXTRACURRICULAR EXPERIENCE

**Pi Beta Phi Fraternity**                                                                                   Nashville, TN
*Leadership Nomination Committee (LNC) & Rush Committee*                                                June - July 2024
- Collaborated with a team of 6 members (LNC) to conduct in-depth interviews with candidates for 20 leadership positions, resulting in a 100% fulfillment rate of leadership roles and enhancing overall chapter functionality.
- Dedicated over 80 hours to match potential new members' interests with chapter values and current members interests.
- Led the decoration and organization of events, including coordinating presentations and logistics for a week-long rush, ensuring a seamless experience for over 500 participants, and enhancing the fraternity's reputation on campus.

**Human Organizational Development (HOD) Vanderbilt Capstone**                                               Nashville, TN
*Student*                                                                                                  June - July 2024
- Created a map the systems analysis on how AI affects financial fraud, utilizing research and supporting graphics including a challenge map, solution mapping and an impact gaps assessment in a group of four people.
- Produced a website and documentary to highlight my learning goal: watch 65+ Ted Talks.
- Embraced the HOD capstone design mindsets and built a story deck to demonstrate ability to empathize, synthesize information, communicate deliberately, learn from others, experiment rapidly, and navigate ambiguity.

**The Agnes Irwin School Student Ambassador Leadership Team**                                                Rosemont, PA
*Head Tour Guide*                                                                                        Sept 2021-May 2022
- Led an average of **three weekly school tours**, showcasing the school's programs and facilities to prospective families.
- Participated in 10+ panel discussions for open houses, effectively communicating the school's values and culture, which enhanced visitor engagement and provided insights into the student and athletic experience.
- Orchestrated comprehensive training for new tour guides by standardizing the training manual and creating a detailed tour route guide, improving consistency and effectiveness in the tour delivery.

**Lymphoma & Leukemia Society Student of the Year Campaign**                                                 Rosemont, PA
*Team Member*                                                                                            January-May 2022
- Raised over $30,000 as a team, with over $5,000 raised individually through networking and raising awareness.
- Organized a successful Valentine's Day fundraiser with Valley Forge Flowers, while supporting local businesses.
- Managed advertising, designed promotional materials, and coordinated a lacrosse tournament for middle schoolers.

#### SKILLS

- Technical Skills: Python, C++, JavaScript, HTML, CSS, Racket, Java
- Interests: Game of Thrones, ice cream, concerts, Philadelphia sports, hiking, trying new foods

**Katherine Ernst**                                                    **APPENDIX**

UNOFFICIAL DOCUMENT ISSUED TO STUDENT – NOT OFFICIAL

Name       : Katherine McCabe Ernst
Student #  : 000828583
Birth Date : 03/29

Academic Program(s)

Peabody College Undergraduate
Human & Organizational Development Major
Computer Science Major
Business Minor

Undergraduate Academic Record (4.0 Grade System)

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  |  |  |  |  | **2022 Fall** |
| CS | 1101 | Programming & Prob Solv | 3.00 | A- | 11.10 |
| ENGL | 1111 | First-Year Writing Sem | 3.00 | B+ | 9.90 |
| Course Topic: | | FYS:Women Poets America | | | |
| MATH | 1300 | Accel Single-Var Calc I | 4.00 | B+ | 13.20 |
| SPAN | 1103 | Intensive Elementary Spanish | 3.00 | B+ | 9.90 |

|  | EHRS | QHRS | QPTS | GPA |
|---|---|---|---|---|
| SEMESTER: | 13.00 | 13.00 | 44.10 | 3.392 |
| CUMULATIVE: | 13.00 | 13.00 | 44.10 | 3.392 |

|  |  |  |  |  | **2023 Spring** |
|---|---|---|---|---|---|
| CMST | 1500 | Fund Of Public Speaking | 3.00 | A | 12.00 |
| CS | 2201 | Prog Design Data Struct | 3.00 | B | 9.00 |
| CS | 2212 | Discrete Structures | 3.00 | B- | 8.10 |
| ENGL | 1100 | Composition | 3.00 | A | 12.00 |
| GSS | 1160 | Sex and Society | 3.00 | A | 12.00 |

|  | EHRS | QHRS | QPTS | GPA |
|---|---|---|---|---|
| SEMESTER: | 15.00 | 15.00 | 53.10 | 3.540 |
| CUMULATIVE: | 28.00 | 28.00 | 97.20 | 3.471 |

|  |  |  |  |  | **2023 Summer** |
|---|---|---|---|---|---|
| HOD | 1300 | Small Group Behavior | 3.00 | A | 12.00 |

|  | EHRS | QHRS | QPTS | GPA |
|---|---|---|---|---|
| SEMESTER: | 3.00 | 3.00 | 12.00 | 4.000 |
| CUMULATIVE: | 31.00 | 31.00 | 109.20 | 3.522 |

|  |  |  |  |  | **2023 Fall** |
|---|---|---|---|---|---|
| CS | 2281 | Computer Architecture | 3.00 | B | 9.00 |
| CS | 2281L | Computer Architecture Lab | 1.00 | A | 4.00 |
| CS | 3251 | Intermed Software Design | 3.00 | B | 9.00 |
| ECON | 1010 | Princ Macroeconomics | 3.00 | A | 12.00 |
| HOD | 1250 | Applied Human Developmnt | 3.00 | A- | 11.10 |
| HOD | 2400 | Talent Managemnt&Org Fit | 3.00 | A | 12.00 |

|  | EHRS | QHRS | QPTS | GPA |
|---|---|---|---|---|
| SEMESTER: | 16.00 | 16.00 | 57.10 | 3.568 |
| CUMULATIVE: | 47.00 | 47.00 | 166.30 | 3.538 |

|  |  |  |  |  | **2024 Spring** |
|---|---|---|---|---|---|
| CS | 3281 | Principles Operating Systems I | 3.00 | B+ | 9.90 |
| ECON | 1020 | Princ Microeconomics | 3.00 | A- | 11.10 |
| HOD | 2100 | Understanding Organizatns | 3.00 | B | 9.00 |
| HOD | 2500 | Systematic Inquiry | 3.00 | A- | 11.10 |
| HOD | 2700 | Public Policy | 3.00 | A | 12.00 |
| HOD | 4949 | Capstone Design | 0.00 | P | 0.00 |

|  | EHRS | QHRS | QPTS | GPA |
|---|---|---|---|---|
| SEMESTER: | 15.00 | 15.00 | 53.10 | 3.540 |
| CUMULATIVE: | 62.00 | 62.00 | 219.40 | 3.538 |

|  |  |  |  |  | **2024 Summer** |
|---|---|---|---|---|---|
| HOD | 4950 | Capstone Partnership | 3.00 | P | 0.00 |
| HOD | 4951 | Crit Reflex & Systems Thinking | 3.00 | A | 12.00 |
| HOD | 4952 | Map Future Personal & Prof Dev | 3.00 | A | 12.00 |
| HOD | 4953 | Analysis and Contribution | 3.00 | A | 12.00 |

|  | EHRS | QHRS | QPTS | GPA |
|---|---|---|---|---|
| SEMESTER: | 12.00 | 9.00 | 36.00 | 4.000 |
| CUMULATIVE: | 74.00 | 71.00 | 255.40 | 3.597 |

|  |  |  |  |  | **2024 Fall** |
|---|---|---|---|---|---|
| CS | 3250 | Algorithms | 3.00 | B | 9.00 |
| CS | 3270 | Programming Languages | 3.00 | B | 9.00 |
| EES | 1030 | Oceanography | 3.00 | A- | 11.10 |
| HODL | 3254 | Human Resource Managment | 3.00 | A | 12.00 |
| MENT | 1120 | Business Of Music | 3.00 | A | 12.00 |
| PSY-PC | 2110 | Intro Statistical Analys | 3.00 | B | 9.00 |

|  | EHRS | QHRS | QPTS | GPA |
|---|---|---|---|---|
| SEMESTER: | 18.00 | 18.00 | 62.10 | 3.450 |
| CUMULATIVE: | 92.00 | 89.00 | 317.50 | 3.567 |

---------- NO ENTRIES BELOW THIS LINE ----------

Date: 01/07/2025

4

Katherine Ernst                                                        **APPENDIX**

UNOFFICIAL DOCUMENT ISSUED TO STUDENT – NOT OFFICIAL

Name        : Katherine McCabe Ernst
Student #   : 000828583
Birth Date  : 03/29

Date: 01/07/2025

5

Katherine Ernst                                                                    APPENDIX

**Katherine Ernst**
***Alston* Payments**
Vanderbilt University – Women's Lacrosse

| *Alston* Academic Payments | | | |
|---|---|---|---|
| **Date** | **Payment** | **Payer** | **Amount** |
| 6/21/23 | *Alston* Academic | Vanderbilt University | $5,980 |
| 6/21/24 | *Alston* Academic | Vanderbilt University | 5,980 |
| | | **Total** | **$11,960** |

6

Katherine Ernst



# APPENDIX B
# Title IX

| Table of Contents |
| --- |
| 1. **Title IX 1972 Educational Amendments Act** |
| 2. **Title IX – Regulations** |
| 3. **Title IX – Policy Interpretation** |
| 4. **Dept. of Education OCR – Fact Sheet** |

Katherine Ernst                                                                    **APPENDIX**

### Title IX of the Education Amendments Act of 1972
20 U.S.C. § 1681, et seq.

In June 1972, President Nixon signed **Title IX of the Education Amendments of 1972** into law. Title IX is a federal law that states:

*"No person in the United States shall, on the basis of sex, be excluded from participation, in be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."* 20 U.S.C. § 1681, et seq.

Title IX applies to ***all aspects of education programs or activities*** operated by recipients of federal financial assistance. In addition to educational institutions such as colleges, universities, and elementary and secondary schools, Title IX also applies to any education or training program operated by a "*recipient of federal financial assistance.*"

### Civil Rights Restoration Act of 1987

In response to the Supreme Court's decision in *Grove City College v. Bell*, 465 U.S. 555, 571-72 (1984) that Title IX and other similar nondiscrimination statutes were *program-specific* and only applied to the particular portion of a recipient's program that actually received federal financial assistance, Congress passed the **Civil Rights Restoration Act of 1987** which clarified the definition of ***"program or activity"*** to cover **all the operations** of an entity receiving federal financial assistance.

### Purpose

Congress enacted Title IX with two principal objectives: to avoid the use of federal resources to support discriminatory practices in education programs, and to provide individual citizens effective protection against those practices. See *Cannon v. University of Chicago*, 441 U.S. 677, 704 (1979).

Congress consciously modeled Title IX on **Title VI of the Civil Rights Act of 1964**, as amended, 42 U.S.C. § 2000d et seq., which prohibits discrimination on the basis of race, color, or national origin in programs or activities that receive federal funds. Title VI's protections are not limited to "*education*" programs and activities, as are those of Title IX.

The two statutes both **condition an offer of federal funding on a promise by the recipient not to discriminate**, in what is essentially a contract between the government and the recipient of funds.

### Federal Financial Assistance

Title IX prohibits (limited exceptions) any entity that receives "***federal financial assistance***" from discriminating against individuals on the basis of sex in education programs or activities. 20 U.S.C. § 1681(a) The clearest example of federal financial assistance is the award or grant of money.

### Direct and Indirect Receipt of Federal Assistance

Federal financial assistance may be received directly or indirectly. For example, colleges indirectly receive federal financial assistance when they accept students who pay, in part, with federal financial aid directly distributed to the students. *Grove City College v. Bell*, 465 U.S. 555, 564 (1984); see also *Bob Jones Univ. v. Johnson*, 396 F. Supp. 597, 603 (D. S.C. 1974), aff'd, 529 F.2d 514 (4th Cir. 1975).

8

Katherine Ernst                                                    **APPENDIX**

### Recipient (Regulations)

A "***recipient***" is an entity that receives federal financial assistance and that operates "***an education program or activity,***" and is thus subject to Title IX. The Title IX common rule provides as follows:

The term *recipient* means any State or political subdivision thereof, or any instrumentality of a State or political subdivision thereof, any public or private agency, institution, or organization, or other entity, or any person, to whom Federal financial assistance is extended directly or through another recipient and that operates an education program or activity that receives such assistance, including any subunit, successor, assignee, or transferee thereof. 65 Fed. Reg. 52866 at § 1211.105 (2000).

### Indirect Recipient – *NCAA v. Smith*

A recipient may receive funds either directly or indirectly. *Grove City College*, 465 U.S. at 564-65. For example, educational institutions receive federal financial assistance indirectly when they accept students who pay, in part, with federal loans. Although the money is paid directly to the students, the universities and other educational institutions are the indirect recipients. Id.; *Bob Jones Univ.*, 396 F. Supp. at 602.

The U.S. Supreme Court in *NCAA v. Smith*, 525 U.S. 459, 470 (1999), citing both *Grove City* and *Paralyzed Veterans*, stated that while **membership dues** paid to an entity (NCAA) by colleges and universities, who were recipients of federal financial assistance, "at most ... demonstrates that it [NCAA] indirectly benefits from the federal assistance afforded its afforded members." But the Court stated, "This showing, ***without more***, is insufficient to trigger Title IX coverage. *Smith*, 525 U.S. at 468.

### Controlling Authority – *NCAA v. Smith*

However, the U.S. Supreme Court in *Smith* did not address the argument that "when a recipient cedes **controlling authority** over a federally funded program to another entity, ***the controlling entity is covered by Title IX regardless whether it is itself a recipient.***" *Smith*, 525 U.S. at 469-471.

### Disparate Treatment

Disparate treatment refers to actions that treat similarly situated persons differently on the basis of a prohibited **classification**. In the case of Title IX, the prohibited classification is sex. Under the disparate treatment theory of discrimination, the core question is whether a recipient, through its officials, has *treated people differently on the basis of sex.*

### Disparate Impact

In contrast to disparate treatment, which focuses on the intent to cause sex-based results, disparate impact focuses on the consequences of a facially sex-neutral policy or practice. Under this theory of discrimination, the core inquiry focuses on the results of the action taken, rather than the underlying intent. Because of this difference in focus, evidence of a discriminatory intent or purpose is not required. Indeed, "intent" is not an element in the disparate impact analysis.

*Source*: Civil Rights Division – Title IX – www.justice.gov

9

Katherine Ernst                                                    APPENDIX

## Title IX Regulations

### § 106.1 Purpose.

The purpose of this part is to effectuate Title IX, which is designed to eliminate (with certain exceptions) discrimination on the basis of sex in any education program or activity receiving Federal financial assistance, whether or not such program or activity is offered or sponsored by an educational institution as defined in this part.

### § 106.37 Financial assistance.

(a) *General.* Except as provided in paragraphs (b) and (c) of this section, in providing financial assistance to any of its students, a recipient shall not:

(1) On the basis of sex, provide different amount or types of such assistance, limit eligibility for such assistance which is of any particular type or source, apply different criteria, or otherwise discriminate;

(2) Through solicitation, listing, approval, provision of facilities or other services, assist any foundation, trust, agency, organization, or person which provides assistance to any of such recipient's students in a manner which discriminates on the basis of sex; or

(3) Apply any rule or assist in application of any rule concerning eligibility for such assistance which treats persons of one sex differently from persons of the other sex with regard to marital or parental status.

(b) *Financial aid established by certain legal instruments.*

(1) A recipient may administer or assist in the administration of scholarships, fellowships, or other forms of financial assistance established pursuant to domestic or foreign wills, trusts, bequests, or similar legal instruments or by acts of a foreign government which requires that awards be made to members of a particular sex specified therein; *Provided,* That the overall effect of the award of such sex-restricted scholarships, fellowships, and other forms of financial assistance does not discriminate on the basis of sex.

(2) To ensure nondiscriminatory awards of assistance as required in paragraph (b)(1) of this section, recipients shall develop and use procedures under which:

(i) Students are selected for award of financial assistance on the basis of nondiscriminatory criteria and not on the basis of availability of funds restricted to members of a particular sex;

(ii) An appropriate sex-restricted scholarship, fellowship, or other form of financial assistance is allocated to each student selected under paragraph (b)(2)(i) of this section; and

(iii) No student is denied the award for which he or she was selected under paragraph (b)(2)(i) of this section because of the absence of a scholarship, fellowship, or other form of financial assistance designated for a member of that student's sex.

(c) *Athletic scholarships.*

(1) To the extent that a recipient awards athletic scholarships or grants-in-aid, it must provide reasonable opportunities for such awards for members of each sex in proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics.

(2) Separate athletic scholarships or grants-in-aid for members of each sex may be provided as part of separate athletic teams for members of each sex to the extent consistent with this paragraph and § 106.41.

10

Katherine Ernst                                                                **APPENDIX**

### § 106.41 Athletics.

(a) *General.*  No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

(b) *Separate teams.*  Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport.  However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport.  For the purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact.

(c) *Equal opportunity.*  A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes.  In determining whether equal opportunities are available the Director will consider, among other factors:

(1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;

(2) The provision of equipment and supplies;

(3) Scheduling of games and practice time;

(4) Travel and per diem allowance;

(5) Opportunity to receive coaching and academic tutoring;

(6) Assignment and compensation of coaches and tutors;

(7) Provision of locker rooms, practice and competitive facilities;

(8) Provision of medical and training facilities and services;

(9) Provision of housing and dining facilities and services;

(10) Publicity.

Unequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams if a recipient operates or sponsors separate teams will not constitute noncompliance with this section, but the Assistant Secretary may consider the failure to provide necessary funds for teams for one sex in assessing equality of opportunity for members of each sex.

[45 FR 30955, May 9, 1980, as amended at 85 FR 30579, May 19, 2020; 89 FR 33888, Apr. 29, 2024]

(c) *Athletic scholarships.*

(1)  To the extent that a recipient awards athletic scholarships or grants-in-aid, it must provide reasonable opportunities for such awards for members of each sex in proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics.

(2)  Separate athletic scholarships or grants-in-aid for members of each sex may be provided as part of separate athletic teams for members of each sex to the extent consistent with this paragraph and § 106.41.

[45 FR 30955, May 9, 1980, as amended at 85 FR 30579, May 19, 2020]

11

Katherine Ernst                                                          **APPENDIX**

<u>**Policy Interpretation – Title IX and Intercollegiate Athletics**</u>

**Title IX - Background**

§ 901(a) of Title IX of the Education Amendments of 1972 provides:

> "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

§ 844 of the Education Amendments of 1974 further provides:

> "The Secretary of [of HEW] shall prepare and publish proposed regulations implementing the provisions of Title IX of the Education Amendments of 1972 relating to the prohibition of sex discrimination in federally assisted education programs which shall include with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports.

Congress passed § 844 after the Conference Committee **deleted** a Senate floor **amendment that would have exempted *revenue-producing* athletics from the jurisdiction of Title IX.**

**Purpose of Policy Interpretation**

By the end of July 1978, the Department had received nearly 100 complaints alleging discrimination in athletics against more than 50 institutions of higher education. In attempting to investigate these complaints, and to answer questions from the university community, the Department determined that it should provide further guidance on what constitutes compliance with the law. Accordingly, this Policy Interpretation explains the regulation so as to provide a framework within which the complaints can be resolved, and to provide institutions of higher education with additional guidance on the requirements for compliance with Title IX in intercollegiate athletic programs.

**Summary of Final Policy Interpretation**

The final Policy Interpretation clarifies the meaning of "**equal opportunity**" in intercollegiate athletics. It explains the factors and standards set out in the law and regulation which the Department will consider in determining whether an institution's intercollegiate athletics program complies with the law and regulations. It also provides guidance to assist institutions in determining whether any disparities which may exist between men's and women's programs are justifiable and nondiscriminatory. The Policy Interpretation is divided into three sections:

- ***Compliance in Financial Assistance (Scholarships) Based on Athletic Ability:*** Pursuant to the regulation, the governing principle in this area is that all such assistance should be available on a ***substantially proportional basis*** to the number of male and female participants in the institution's athletic program.

- *Compliance in **Other Program Areas** (Equipment and supplies; games and practice times; travel and per diem, coaching and academic tutoring; assignment and compensation of coaches and tutors; locker rooms, and practice and competitive facilities; medical and training facilities; housing and dining facilities; publicity; recruitment; and support services):* Pursuant to the regulation, the governing principle is that male and female athletes should receive **equivalent treatment, benefits, and opportunities**.

- *Compliance in Meeting the **Interests and Abilities** of Male and Female Students:* Pursuant to the regulation, the governing principle in this area is that the **athletic interests and abilities** of male and female students must be **equally effectively accommodated**.

*Source*: U.S. Department of Education, *A Policy Interpretation: Title IX and Intercollegiate Athletics*.

12