**TO:**      **The Honorable Claudia Wilken**
Ronald v. Dellums Federal Building & United States Courthouse
c/o Class Action Clerk
1301 Clay Street
Oakland, CA 94612

**FILED**

**FEB 0 3 2025**

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**FROM:**   **Mai Nirundorn**
University of Georgia – Women's Tennis (2021-Present)

NCAA Eligibility Center ID #2012971965

**CC:**      **Leigh Ernst Friestedt**

**RE:**      **Objection**
*In re: College Athlete NIL Litigation*, Case No. 4:20-cv-03919 (N.D. Cal)

**DATE:**   January 31, 2025

Dear Judge Wilken:

My name is **Mai Nirundorn**, and I am a NCAA Division I student-athlete at the University of **Georgia** ("Georgia") where I have been on a **Full Scholarship** as a member of the Women's Tennis Team from the Fall of 2021 until the Present (January 2025). Georgia is currently the **#1 ranked NCAA DI Women's Tennis Team**. I am a senior and scheduled to graduate from Georgie in May 2025. My full player biography, athletic scholarships and transcript are detailed in **Appendix A**.

During my career as a student-athlete at Georgia, I have achieved the highest levels of recognition for my accomplishments both on the tennis court and in the classroom: NCAA DI Championships Finalist (2024), NCAA DI Championships Semi-Finalist (2023), SEC Tournament Champion (2023-24), ranked #2 in the country (2023-24), SEC Honor Roll Recipient (2021-24), ITA All-Academic Team and J. Reid Parker Director of Athletics Honor Roll Recipient (2022-24).

Prior to Georgia, I earned a career high tennis ranking of **#20** in the world and **#3** in Asia. I traveled the world competing in the Junior **Grand Slams** (Australian Open, Wimbledon and the US Open). Competing at the international level as a junior required significant funding and I was sponsored by top companies: Nike, Fila and Dunlop. In 2019, I moved from the US to Thailand where I trained as a member of the Thailand National Team and was selected to represent Thailand as one of the country's elite tennis amateur athletes. My full player biography, athletic and academic achievements are detailed in **Appendix A**.

As an elite female tennis player, the prospect of turning "*pro*" was something that I considered before I decided to go to college. Having traveled the world at an early age (I was a teenager wearing braces), I understood the extreme demands required to train and compete at the highest level. While tennis has been my life since I was a young child, my parents always instilled in me the importance of an education, which is why I decided to forgo playing professional tennis for an opportunity to be a student-athlete at Georgia.

1

Attending Georgia on a full scholarship, has afforded me the opportunity to receive an excellent education (Management & Finance), and the opportunity to be a member of a team. Tennis is an individual sport, so playing on a team with teammates who are committed to playing at the highest level, support each other and value their education has been an invaluable life experience.

I am writing you today on behalf of not only myself, but more importantly, the millions of female student-athletes who deserve an equal opportunity to play sports in college and receive equal treatments and benefits under **Title IX of the Education Amendments Act of 1972** ("Title IX").

Based on the terms set forth in the Amended Settlement Agreement, I object to *In re: College Athlete NIL Litigation - House* Settlement, Case No. 4:20-cv-03919 (N.D. Cal), and request that you not approve the *House* Settlement at the Final Approval Hearing, scheduled for April 7, 2025.

According to the website www.collegeathletecompensation.com, my **Estimated Allocation** as a member of the **Additional Sports Class** (Women's Tennis) at Georgia are detailed below.

| Type of Damage | Mai Nirundorn – Est. Allocation | |
|---|---|---|
| **Name, Image & Likeness (NIL)** | **Georgia** | |
| Broadcast NIL | Not Eligible | **Object** |
| Videogame NIL | Not Eligible | --- |
| Lost NIL Opportunities | Not Eligible | **Object** |
| | | |
| **Athletic Services** | $426.00 | **Object** |
| | | |
| *Hubbard* **Academic** / (*Alston* **Award**) | 813.36 | **Object** |
| | | |
| **Total Estimated Settlement Payment** | **$1,239.36** | |

The *House* Distribution Plan is based on three **Settlement Damage Classes**:

1. **Football & Men's Basketball** – Power 5
2. **Women's Basketball** – Power 5
3. **Additional Sports**: Football, Men's Basketball, Women's Basketball and Other Sports

I am writing you on behalf of two separate groups of the *House* Settlement:

1. **Women** – All DI Female student-athletes
2. **Tennis** – All DI Tennis (**Men** and **Women**)

**Tennis** is a unique class because it is an **individual** sport, many of the athletes were sponsored by major brands before college, and many athletes compete in pro tournaments before and during their collegiate career. However, NCAA Eligibility Rules limit prize money an athlete can receive from a pro tournament and prior to the *Alston* decision prohibited sponsorships.

2

As illustrated by the chart below, my Estimated Allocation of **$426.92** is significantly lower than the average payment for other Classes: **Football & Men's Basketball**, and **Women's Basketball**.

| Type of Damage | Estimated Settlement Damages | | |
|---|---|---|---|
| Name, Image & Likeness (NIL) | Football & Men's Basketball – P5 | Women's Basketball – P5 | Mai Nirundorn |
| Broadcast NIL | $91,000 | $23,000 | Not Eligible |
| Videogame NIL | $300 - $4,000 | --- | Not Eligible |
| Lost NIL Opportunities | $17,000 | $8,500 | Not Eligible |
| **Athletic Services - Additional** | $40,000 | $14,000 | **$426.92** |
| | | | |
| **Total** | **~$150,000** | **$45,500** | **$426.92** |

*Source:*  Exhibit A – Settlement Recovery Information by Class and Type of Claimed Damages
*House v. NCAA*, Plaintiff's Motion for Preliminary Settlement Approval, July 26, 2024.

As a top nationally ranked player on one of the best DI Women's Tennis teams, I believe my Estimated Settlement Allocation is considerably lower than the actual value of my NIL, Athletic Services and Academic Achievements as a student-athlete at Georgia.  Additionally, I believe the low valuation of my Estimated Allocation reflects longstanding gender equity issues in intercollegiate athletics and is a violation of Title IX.

**Title IX** is a federal civil rights law passed in 1972, to prohibit sex-based discrimination in any education program or activity, which includes intercollegiate athletics.  Title IX states:

> *"No person in the United States, shall on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance."*

According to the *House* **Distribution Plan**, the allocation of the Gross Settlement Fund **$2.576 Billion** is divided into: (1) **NIL** Claims Settlement Amount ($1.976 billion), and (2) **Additional Compensation** Claims Settlement Amount ($600 million).  The Settlement Amount is calculated using a percentage (NIL *67.4%*, Additional Compensation *31.6%*) of the Total Estimated Damages provided in an economic report prepared by Dr. Daniel Rascher ("**Rascher**").

| Claims | Total Est. Damages | Settlement % | Settlement Amount |
|---|---|---|---|
| **NIL** | $2,933 | *67.4%* | $1,976 |
| **Athletic Services - Additional** | 1,898 | *31.6%* | 600 |
| **Total *House* Settlement** | $4,831 | *100%* | **$2,576** |
| ***Alston* Academic - *Hubbard*** | $200 | | $200 |
| *($ in millions)* | **Total Settlement (*House* + *Hubbard*)** | | **$2,776** |

As illustrated by the charts below, the *House* Settlement significantly benefits men who would receive **94%** (**$2.425 billion**) compared to women who would only receive **4%** (**$102 million**) of the total *House* Settlement Damages (**$2.576 billion**).

| *($ in millions)* | Broadcast | | Video | | Lost NIL | | Total NIL | |
|---|---|---|---|---|---|---|---|---|
| **Men** | $1,748 | *96%* | $72 | *100%* | $65 | *73%* | **$1,885** | *95%* |
| **Women** | 68 | *4* | --- | --- | 5 | *5* | **72** | *4%* |
| Other | --- | --- | --- | --- | 19 | *22* | **19** | *1%* |
| **Total** | **$1,816** | *100%* | **$72** | *100%* | **$90** | *100%* | **$1,976** | *100%* |

| *($ in millions)* | Athletic Services | | NIL + Athletic Services = | Total *House* | |
|---|---|---|---|---|---|
| **Men** | $540 | *90%* | | $2,425 | *94%* |
| **Women** | 30 | *5* | | 102 | *4%* |
| Other | 30 | *5* | | 49 | *2%* |
| **Total** | **$600** | *100%* | | **$2,576** | *100%* |

*Source*: *House v. NCAA*, Declaration of Daniel A. Rascher (July 26, 2024).

The reason for the significant disparities between the amounts allocated to men and women in the *House* Settlement was explained by the Class Counsel (Steve Berman and Jeffrey Kessler) in the Factual Allegations of the Third Consolidated Amended Complaint dated Sept. 26, 2024.

**"Female Athletes Have Been Especially Adversely Impacted by NIL Restrictions and Will Profit in the New NIL Era"**

> "The **NIL rules adversely impacted female athletes more than their male counterparts** because (1) they have fewer professional opportunities and they must use their time in school to monetize, and (2) because the **NCAA promotes female sports less than it does male sports** and thus many female athletes are not as well known…"

> "There was an unanswered demand for the use of NIL of female athletes before interim NIL rules..."

> "A study conducted by the website AthleticDirectorU and the marketing firm Navigate Research found that 13 of the 25 college athletes with the greatest annual endorsement potential between **$46,000** and **$630,000** were female athletes."

> *Source*: *House v. NCAA*, Third Cons. Am. Class Action Complaint, p. 74.

The NCAA's failure to promote women's sports equitably is also supported by an independent gender equity review of all NCAA Championships in 2021. The law firm Kaplan Hecker & Fink ("**Kaplan**") found significant disparities between men's and women's intercollegiate sports. The source of the disparities is the NCAA structure, which is designed to maximize revenues from the

most lucrative source of funding for the NCAA and its members – Division I Men's Basketball. According to Kaplan,

> "The NCAA's broadcast agreements, corporate sponsorship contracts, distribution of revenue, organizational structure, and culture all prioritize Division I Men's Basketball over everything else in ways that create, normalize, and perpetuate gender inequities."

> *Source*: Kaplan Hecker & Fink LLP, *NCAA External Gender Equity Review* (2021).

Despite these gender inequities, Rascher used revenue-generating men's sports as a basis to calculate the *House* Settlement Damages awarded to each Settlement Class. As a result of this sex-based analysis, the *House* Settlement has a disparate impact on all **female Class Members**. I believe that I am an excellent example of a female student-athlete who was adversely impacted by NIL restrictions and the NCAA's failure to promote female sports equally to men.

Additionally, I believe that the NCAA has not promoted DI **Tennis** (Men and Women) equally to Football and Basketball. Rascher did not consider the value of the professional tennis tour, which many of us have already played on, and generates over $500 million in revenue at the US Open.

Therefore, based on my **Estimated Allocation** in the amount of **$1,239.36**, I object to the following:

1. ***House* Settlement Damages**
   i. **Name Image Likeness**: Broadcast NIL and Lost NIL Opportunities
   ii. **Athletic Services – Additional Compensation**
2. ***Hubbard* Academic Achievement (*Alston* Award)**, and
3. **Title IX Release**

**OBJECTIONS:**

*House* **Settlement Damages**

**Name, Image & Likeness ("NIL") – Broadcast NIL**

**Mai Nirundorn – University of Georgia (Nike, Babolat, SEC)**

According to the *House* Settlement, Women's Tennis is classified as an **Additional Sports Class** and is "**Not Eligible**" to receive a Broadcast NIL payment. The classification of my sport – rather than the actual commercial use of my NIL – establishes whether I am eligible for a Broadcast NIL payment. Based on my Broadcast NIL valuation of $0, I object to the *House* Settlement.

As a <u>Georgia Bulldog</u>, I wear bright red, black and white tennis outfits that prominently display "Georgia," a big "G" or sometimes even a **Bulldog** with a spiked collar to signify the "*Dawgs*." Our tennis apparel and shoes are sponsored by **Nike** – the Nike swoosh is featured on my tennis skirt, tank top, shoes, socks, wristbands and visor. The back of my tank top also features a "**SEC**" emblem to signify that I play in the Power Five athletic conference. My teammates and I all play with **Babolat** rackets and use Babolat strings. Every time we travel to/from the courts for practice or to play a match, we carry large Babolat tennis bags to accommodate our rackets and gear.

I have a unique style of play - I am one of the very few players (male or female) to play tennis **double-handed** on both sides, meaning I hit both my forehand and my backhand groundstrokes with two hands on the racket. This unique style of play has brought me a lot of attention, and people are always asking me how do I hit the ball like that?

During my tennis career at Georgia, my NIL was broadcast on ESPN, ESPNU, ESPN+, ESPN3, the ACC Network and SEC Network. As a top nationally ranked player on the top team in the nation, our matches are played in tennis stadiums and broadcast on air and the over internet for our fans to watch our regular season tournaments and high-profile post-season tournaments: SEC Championships (2021-2024) and NCAA Championships (2021-2024).

Tennis is different than many other sports in college sports because we play **year-round** from September until mid-May for the NCAA Championships. The Fall Season is team play versus the Spring is individual play. Georgia and other DI Tennis programs in the SEC, ACC (Power Five) provide a "**Live Video**" feed of all the tennis courts (#1– #6) with "**Live Scoring**" features so fans can watch multiple matches in progress at the same time or really focus in on the player they want to watch.

As a top women's tennis player on one of the best teams in the NCAA, I was featured in countless interviews, promotional materials, social media, photographs, and video highlights to promote telecasts, broadcasts, and other electronic distributions of Women's Tennis for the NCAA, SEC, other Power Five conferences, Georgia and other Universities. The podcast, "**Cracked Racquets**," interviews me and my teammates during the SEC and NCAA Championships, and the **"Red & Black"** produces video interviews and articles of my team. But my favorite promotional memorabilia are the **Player Magnets** that we give our fans who attended our matches.

Based on the significant use of my NIL – my name, picture, unique double-handed groundstrokes, signature visor look and other identifiable features – which are used to promote and help distribute Tennis during my four-year career at Georgia, I believe that I am entitled to a significant NIL Broadcast payment which is currently not reflected in my Estimated Allocation of "*Not Eligible*".

## Full Grant-in-Aid ("GIA") Scholarship vs. Equivalency Athletic Scholarship

The *House* Settlement limits Broadcast NIL payments to **Full Grant-in-Aid ("GIA")** scholarships for the two Classes: (1) **Football and Men's Basketball**, and (2) **Women's Basketball**.

According to the *House* Settlement, I am "*Not Eligible*" to receive a Broadcast NIL payment. This limitation is based on the classification of Tennis as an Additional Sport, rather than the commercial use of my NIL. The **classification** of sports established by the *House* Settlement Classes appears to violate the **Policy Interpretation** of Title IX, which prohibits classifying sports in a manner that *disproportionately offers benefits* or *opportunities* to members of one sex. See **Appendix B**.

I and am the recipient of the **Dole E. Mote Women's Tennis Scholarship** and have been on a **Full GIA** scholarship during my four-year career at Georgia. Therefore, it is not clear to me why my Full scholarship is treated differently than a Football or Basketball player's Full Scholarship? Therefore, I believe that I should be eligible to receive a Broadcast NIL payment based on the commercial use of my NIL, and object to the *House* Settlement.

## Name, Image & Likeness ("NIL") – Lost NIL Opportunities

Pursuant to the *Alston* Supreme Court decision on June 21, 2021, the NCAA implemented an Interim NIL policy on June 30, 2021, permitting DI athletes to monetize from their NIL.

As a top ranked junior player, I was sponsored by several companies who provided funding to support my international tennis training and tournament expenses, which included travel, food and accommodations. Additionally, I was sponsored by major athletic brands: Nike, Fila and Dunlop. However, when I became a DI Athlete, pursuant to NCAA Eligibility Rules, I was no longer allowed to have these sponsors. Accordingly, I did not enter into any NIL deals, even post *Alston*.

During college, I played in several professional tournaments, reaching the semi-finals in two. However, pursuant to NCAA Eligibility Rules, I was limited in accepting prize money. As a result of the NCAA Eligibility Rules, I stopped trying to make money or enter into endorsement deals. Instead, I focused on being a student-athlete, recognizing that I was not willing to forgo my NCAA Eligibility to play professional tennis.

According to my Estimated Allocation, my **Lost NIL Opportunities** are "*Not Eligible.*" While I have not entered into any NIL deals post-*Alston*, it is clear that based on my historical deals as a junior tennis player, I could have. I am objecting to **Tennis** (Men and Women) from being excluded from Lost NIL Opportunities based on the Classification of Tennis as an Additional Sport.

## Athletic Services – Additional Compensation

My Estimated Allocation for **Athletic Services** is valued at **$426.92**. This amount is significantly lower than the average payments for other Classes: (1) **Football and Men's Basketball ($40,000)**, and (2) **Women's Basketball ($14,000)**. Based on my estimated hours of NCAA permitted athletic services (20 hours per week), I played ~2,000 hours of tennis over my four-year career at Georgia, which equates to approximately $0.21 per hour. This does not include the hundreds of hours that I train off the courts, the travel required to play a full schedule year-round, and medical treatments required to rehabilitate an elbow injury that I sustained from playing earlier this year.

The proposed *House* Settlement of **$600 million** for **Athletic Services** disproportionally favors male student-athletes, as illustrated by the chart below providing **Football & Men's Basketball $540 million** representing **90%** of the Settlement amounts.

| *House* Settlement – Athletic Services – Additional Compensation | | |
|---|---|---|
| **Damages Class** | **Amount** | **%** |
| **Football & Men's Basketball - P5** | **$540 Million** | *90%* |
| Women's Basketball – P5 | 30 | *5* |
| Additional Sports | 30 | *5* |
| **Estimated Total** | **$600 Million** | |

According to NCAA rules, all DI student-athletes are limited to a **maximum of 20 hours per week** of countable athletically related activities ("CARAs") during the playing season. During the off-season, student-athletes are allowed significantly lower CARAs, typically 8 hours per week. Therefore, if DI student-athletes are participating in athletics an equal number of hours per week (20 regular season, 8 off-season), then all DI athletes should be compensated equally for their Athletic Services under the *House* Settlement.

Instead of using current NCAA rules which limit athletic participation for all DI athletes to calculate Athletic Services, the *House* Settlement relies on an economic report prepared by Rascher. Estimated settlement amounts for Athletic Services are calculated using a "**yardstick**" approach by obtaining a "*but-for-price*" from a "*comparable market*." This comparable market analysis uses a distribution of salaries in professional leagues to derive an estimate salary for college athletes.

The comparable market analysis is fundamentally flawed because it is **sex-based**, using collective bargaining agreements from the professional male leagues: NFL, NBA and NHL, as a yardstick, and then estimating athlete compensation to be 50% of a professional league revenue. Additionally, the Plaintiffs experts failed to consider the most obvious comparable market for Tennis – the **Women's Tennis Association Tour** ("WTA") and **ATP Tour** for men.

Many top male and female tennis players have turned "pro" after playing college tennis. Examples of former DI Tennis players who currently play on the pro tour today include: **Emma Navarro** played at the University of Virginia ("UVA") from 2020-22 – Emma reached the Quarter-Finals at Wimbledon (2024) and Australian Open (2025) and Semi-Finals at the US Open (2024). **Danielle**

**Collins** played one season at University of Florida ("Florida") and then transferred to UVA (2014-16) – Collins reached the Australian Open Finals (2022) and Quarter-Finals of the French Open (2020). **Ben Shelton**, who just reached the Australian Open Semi-Finals (2025), played tennis at Florida until his junior year (2022-23), when he announced he would forgo his college eligibility and turn professional.

Professional sports operate to make a profit which is fundamentally different than the NCAA, athletic conferences and universities who operate not-for-profit business models. The resulting analysis is sex-based and does not value Tennis properly because it allocates damages based on the estimated share of the value each sport contributes to regular season broadcast deals. This allocation is the same proportion Rascher used to calculate NIL damages and explains why there is a disparate impact on female student-athletes and undervaluation of Tennis. Therefore, I object to the *House* Settlement.

I believe that I should receive an Athletic Services payment based on the number of hours that I participated in athletically related activities per week, not based on the Classification of Tennis as an Additional Sport and a yardstick that relies on historical gender inequities and fails to consider the professional tennis tour. Therefore, pursuant to NCAA Rules limiting all DI student-athletes' athletic activities, I believe that my Athletic Services payment should be equal to the amounts awarded to Football and Men's Basketball. Additionally, I believe that Tennis (Men and Women) should receive equal Athletic Services payments based on their participation in NCAA DI sports.

### *Hubbard* Academic Achievement (*Alston* Award):

My Estimated Allocation values my *Hubbard* Academic Achievement ("*Alston*") Award in the amount of **$813.36**. A summary of my Academic Achievements at Georgia is listed below.

### Academic Achievements:
- SEC Honor Roll Recipient (2021, 2022, 2023, 2024)
- ITA All-Academic Team
- J. Reid Parker Director of Athletics Honor Roll Recipient (2022, 2023, 2024)
- Cumulative GPA 3.5 (Management and Finance)

I have received *Alston* Award payments in the amount of $5,980 per year for all four years in total **$17,940**. It is not clear to me how my *Hubbard* award is calculated, but I believe it is undervalued and request that this amount be recalculated based on all of my academic achievements. My academic achievements and transcripts are detailed in **Appendix A**.

### Title IX Release – Gross Settlement Fund:

The *House* Settlement contains a specific provision releasing a Class Member's **Title IX** rights with respect to the **Gross Settlement Fund**. "**Unreleased Claims**" is defined in the Amended Stipulation and Settlement Agreement (not defined in the Class Action Notice) as the following:

> *"The Settlement Agreement does not release… claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., **other than any claims arising out of or relating to the distribution of the Gross Settlement Fund**."*

The referenced terms associated in the Title IX Release are further defined in the Amended Stipulation and Settlement Agreement (not in the Class Action Notice) as the following:

> Gross Settlement Fund is defined as "*the NIL Claims Settlement Amount and **Additional Compensation** Claims Settlement Amount plus any interest that may accrue.*"

> NIL Claims Settlement Amount = **$1.976 Billion**

> Additional Compensation Claims Settlement Amount = **$600 Million**

Simply stated – this is **confusing language on an important point which adversely impacts all past, current and future female Class Members.** All DI student-athletes who are or will be Class Members need to understand: (1) What is Title IX (nowhere is the federal law explained or defined), and (2) What Title IX claims is a Class Member releasing.

For a Class Member to properly understand his or her Title IX claims under the Gross Settlement Fund, there needs to be full transparency with respect to the Estimated Allocation amounts. A helpful reference would be to provide the Estimated Allocation amounts for the named Plaintiffs in the *House* Settlement, but according to Class Counsel these amounts are "*confidential.*"

Both the *House* Settlement Damages (NIL Claims $1.976 billion + Additional Compensation Claims $600 million = $2.776 billion) and future **Injunctive Relief** of Shared Revenues from a ***"Benefits Pool"*** created by a university who participates ($20 million per year) violate Title IX as a form of "***financial assistance,***" which must be "*proportional*" to athletic participation rates, or "***benefits***" that must be "*equivalent*" to those provided for a men's athletic program. The Dept. of Education Office for Civil Rights ("OCR") recently issued a Fact Sheet to ensure an equal opportunity, regardless of sex, for NIL activities in athletic programs. The OCR stated that NIL agreements between a university and student-athletes constitute a form of athletic "*financial assistance*" under Title IX. See **Appendix B.**

The Title IX Release in the *House* Settlement is unreasonable for women because neither of the Plaintiff's experts (Edwin Dresser, Daniel Rascher) factored Title IX into their financial analysis to calculate the Settlement amounts or opinions to justify them. The failure to include Title IX in the calculations of the Estimated Allocation amounts explains why there is such a significant disparity between the amounts for men versus women. As stated by both experts at deposition:

> Q:  Have you tried to account for Title IX in any of your damage's models in this case?
> A:  **No.**
>    *Source*: Rascher Dep. Tr. at 64:12-19.

> Q:  Have you given any consideration to the Title [IX] in your preparation of this report?
> A:  That's not within the scope of what I was assigned to work on.
> Q:  So, the answer is: 'No' you have not given any consideration to it, because you weren't asked to do that?
> A:  **No, I have not.**
>    *Source*: Desser Dep. Tr. at 64:12-19.

The Plaintiff's experts justify their calculations based on the proportion of revenues generated by a sport. Revenue generation by a sport, however, has never been a basis to exempt compliance with Title IX. The *House* Settlement calculations contradict the **legislative history** of Title IX.

Since the inception of Title IX legislation, advocates for men's sports tried to exclude revenue-generating sports from Tile IX coverage. Opponents proposed multiple amendments to exclude athletics and limit the reach of the federal law. However, Congress repeatedly rejected these efforts and refused to carve out revenue-generating sports from Title IX coverage. See **Appendix B**.

Congress enacted Title IX to prevent the use of federal funds to support discriminatory practices in education. The *House* Settlement payments are funded by the NCAA, Power Five Conferences and NCAA DI member institutions (universities/colleges). It is well established that universities are a *"recipient of federal financial assistance"* and, therefore, are subject to Title IX. While the NCAA and Athletic Conferences are not a "*direct*" recipient of federal financial assistance, there is a strong argument that athletic conferences are an "*indirect"* recipient of federal funds and, therefore, should be subject to Title IX.

Justice Ginsburg in the landmark U.S. Supreme Court case *NCAA v. Smith* (1999), found that the NCAA's receipt of **membership dues** from educational institutions did not constitute "receipt" of federal aid. Based on this narrow ruling, the NCAA was not subject to Title IX. As a result of this "*recipient loophole,*" the NCAA has been operating *"above the law"* for decades, resulting in significant gender disparities detailed in the Kaplan Report and directly impacting the *House* Settlement calculations. However, Justice Ginsburg left open an alternative legal theory to bring the NCAA and athletic conferences under the scope of Title IX. The mere receipt of membership dues, without something "***more***," was insufficient to trigger Title IX coverage in *Smith*. However, the NCAA's **"*controlling authority*"** over federally funded educational institutions athletic programs is the something "*more*" that brings the NCAA under the scope of Title IX as an "***indirect recipient***." See **Appendix B**.

The class action lawsuit, *In re: College Athlete NIL Litigation*, exemplifies how the NCAA's Eligibility Rules had controlling authority over student-athletes participation in college sports, limited the use of their NIL, and limited the availability of athletic scholarships. The NCAA, Power Five Conferences and DI NCAA member institutions were "*pervasively entwined*" and conspired together to enact and enforce the NCAA's anticompetitive Eligibility Rules. To the extent the NCAA and Power Five Conferences try to circumvent coverage of Title IX under the *"recipient loophole,"* I request that the Court carefully consider Justice Ginsburg's alternative *"controlling authority"* theory.

Antitrust (Sherman Act) is a fundamentally different issue than antidiscrimination (Title IX), so it incomprehensible why a female student-athlete would be required to release her Title IX rights to participate in an antitrust settlement. In the landmark U.S. Supreme Court Case, *NCAA v. Alston* (2021), Justice Kavanaugh in his concurring opinion specifically raised this issue, ***"How would any compensation regime comply with Title IX?"*** Title IX was enacted to prevent the unequal treatment of female student-athletes which is precisely what the *House* Settlement would do if approved. Therefore, I object to the *House* Settlement and believe it is a violation of Title IX.

I object to releasing my Title IX claims *"arising out of or relating to the distribution of the Gross Settlement Fund."* There is a significant disparity between *House* Settlement Amounts based on the sex of an athlete, with male athletes receiving a disproportionately higher amount than women. Therefore, I object to the *House* Settlement and request that the Court consider this matter very carefully given the significant consequences of approving the Title IX Release for all female Class Members.

11

**Request to Speak at Final Hearing – Legal Representation**:

I have retained an independent attorney because I believe there is a conflict of interest with the Class Counsel (Winston & Strawn LLP and Hagens Berman Sobol Shapiro LLP) who has negotiated a *House* Settlement that disproportionately favors men and failed to take Title IX into consideration. I am currently being represented by **Leigh Ernst Friestedt**, a New York attorney who specializes in Title IX and sports law matters. Leigh is a formerly ranked national tennis player and has a strong understanding of the issues raised in my objection. I will be in-season travelling from Missouri to Texas the week of the Final Hearing and unable to attend. In my absence, I request that Leigh be permitted to speak on my behalf at the Final Approval Hearing, schedule for April 7, 2025.

Leigh's full contact information is listed below. Please include her on any future correspondence.

**Leigh Ernst Friestedt**
Equity IX, LLC
40 Mercer St. #15
New York, NY 10013
leigh@equityix.com
(917) 513-5541

**Claim Forms**

I have updated my contact and payment information and submitted Claim Forms that would be required to participate in the *House* and *Hubbard* Settlements. Should the Court approve the *House* Settlement, I request that the Court recalculate my Estimated Allocation amounts to reflect my full information.

If you need any additional information, please feel free to contact me – my full contact information is listed below.

**Mai Nirundorn**
314 Barnet Shoals Road, Unit 442
Athens, GA 30605
nirundornmai@gmail.com
(810) 428-9687

Thank you for your consideration of my objections.

Sincerely,

**Mai Nirundorn**
University of Georgia – Women's Tennis (2021-Present)

cc: Leigh Ernst Friestedt

1/31/25

12



# APPENDIX A
# Mai Nirundorn

# MAI NIRUNDORN

314 Barnet Shoals Road, Unit 442 | Athens, GA 30605 | (810) 428-9687 | nirundornmai@gmail.com

## EDUCATION

**University of Georgia,** *Bachelor of Business Administration* **– Athens, GA**                **Expected May 2025**
- Major Concentration: Management and Finance
- GPA: 3.5
- Southeastern Conference Honor Roll Recipient: 2021, 2022, 2023, 2024
- J. Reid Parker Director of Athletics Honor Roll Recipient: 2022, 2023, 2024
- Member of ITA All-Academic Team

## PROFESSIONAL EXPERIENCE

**East Hampton Indoor Tennis,** *Coach* **– East Hampton, NY**                **June – August 2023, 2024**
- Responsible providing skill instruction and critique to young and adult athletes on the game of tennis

## CAMPUS LEADERSHIP EXPERIENCE & COMMUNITY INVOLVEMENT

**University of Georgia Women's Tennis Team,** *Student-Athlete* **– Athens, GA**        **August 2021 – Present**
- Dedicate over 20 hours per week to practice, conditioning and competition while balancing a rigorous academic schedule
- Gain valuable skills in dealing with pressure and adversity, as well as team-building experiences
- Recipient of the Dole E. Mote Women's Tennis Scholarship

**UGA Student-Athlete Advisory Committee,** *Member* **– Athens, GA**        **August 2023 – Present**
- Selected by coaching staff as a representative on behalf of the women's tennis team to participate in monthly meetings promoting the student-athlete experience with administration
- Assist with facilitating volunteer and leadership activities within the athletics community

**UGA Athletic Association Diversity, Equity & Inclusion,** *Member* **– Athens, GA**        **August 2022 – Present**
- Serve as a diversity ambassador to the Women's Tennis team, working collaboratively with teammates, coaches, UGA Athletic Association staff, and campus/community partners to foster an inclusive athletic environment
- Connect teammates with administration to facilitate DEI development and campus engagement

## AMATEUR ATHLETIC EXPERIENCE

**Thailand National Team,** *Player* **– Bangkok, Thailand**                **June 2019 – August 2021**
- Selected to represent Thailand amongst the country's elite tennis amateur athletes
- Competed in 3 of 4 Junior Grand Slam events, including: Australian Open, Wimbledon and US Open
- Earned a career high ranking of #20 in the world and #3 in Asia

**UGA Women's Tennis,** *Player* **- Athens, GA**                **August 2021 - Present**
- 2024 NCAA Championships Finalist
- 2023 NCAA Championships Semi-Finalist
- 2023, 2024 SEC Tournament Champion
- 2024 SEC Regular Conference Champion
- Finished number 2 in the country in 2023 and 2024

## SKILLS

- Fluent in Thai and English
- Proficient in Microsoft Office
- Excellent written and verbal communicator

- Time management driven and team-oriented

Mai Nirundorn

**WOMEN'S TENNIS SCHOLARSHIP DETAILS**
**Fall 2024/Spring 2025**
**Off-campus out-of-state student**

You are on a full scholarship.   Please look at your student account to confirm payments and notify me at glada@uga.edu if there is a problem.

**TUITION**
If you are registered for fall classes, your tuition should show paid on your student account by mid-July.

**HOUSING**
I have you listed as an off-campus out-of-state student and the maximum amount we can provide you for housing with documented lease/utilities is $3594 per semester.

**MEALS**
Your scholarship covers meals.  A $2222 meal stipend will be provided to you as part of the deposits listed below.  Various meals will be provided by the athletic association to your sport.  More details will be available closer to the start of Fall Semester.

**MISCELLANEOUS EXPENSE STIPEND**
NCAA rules allow us to provide a miscellaneous expense stipend which is $3217 per semester to out-of-state off-campus students.  It will be disbursed along with other funds awarded as shown below.

**BOOKS**
Go to class and then work with Whitney Burton at the Rankin Smith Center for the latest information on how to charge books at the UGA Bookstore.

**DEPOSIT DATES AND AMOUNTS**
*(total stipend is $3594 housing + $2222 meals + $3217 misc exp = $9033 per semester divided by 5)*

| Fall | | Spring | |
|---|---|---|---|
| Aug 14 | $1806 | Jan 6 | $1806 |
| Aug 30 | $1806 | Jan 31 | $1806 |
| Sept 30 | $1807 | Feb 28 | $1807 |
| Oct 31 | $1807 | March 31 | $1807 |
| Nov 29 | $1807 | April 30 | $1807 |

# APPENDIX B
# Title IX

Charlotte North                                                      APPENDIX

## Title IX of the Education Amendments Act of 1972
20 U.S.C. § 1681, et seq.

In June 1972, President Nixon signed **Title IX of the Education Amendments of 1972** into law. Title IX is a federal law that states:

*"No person in the United States shall, on the basis of sex, be excluded from participation, in be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681, et seq.*

Title IX applies to ***all aspects of education programs or activities*** operated by recipients of federal financial assistance. In addition to educational institutions such as colleges, universities, and elementary and secondary schools, Title IX also applies to any education or training program operated by a "*recipient of federal financial assistance.*"

### Civil Rights Restoration Act of 1987

In response to the Supreme Court's decision in *Grove City College v. Bell*, 465 U.S. 555, 571-72 (1984) that Title IX and other similar nondiscrimination statutes were *program-specific* and only applied to the particular portion of a recipient's program that actually received federal financial assistance, Congress passed the **Civil Rights Restoration Act of 1987** which clarified the definition of *"program or activity"* to cover **all the operations** of an entity receiving federal financial assistance.

### Purpose

Congress enacted Title IX with two principal objectives: to avoid the use of federal resources to support discriminatory practices in education programs, and to provide individual citizens effective protection against those practices. See *Cannon v. University of Chicago*, 441 U.S. 677, 704 (1979).

Congress consciously modeled Title IX on **Title VI of the Civil Rights Act of 1964**, as amended, 42 U.S.C. § 2000d et seq., which prohibits discrimination on the basis of race, color, or national origin in programs or activities that receive federal funds. Title VI's protections are not limited to "*education*" programs and activities, as are those of Title IX.

The two statutes both **condition an offer of federal funding on a promise by the recipient not to discriminate**, in what is essentially a contract between the government and the recipient of funds.

### Federal Financial Assistance

Title IX prohibits (limited exceptions) any entity that receives "***federal financial assistance***" from discriminating against individuals on the basis of sex in education programs or activities. 20 U.S.C. § 1681(a) The clearest example of federal financial assistance is the award or grant of money.

### Direct and Indirect Receipt of Federal Assistance

Federal financial assistance may be received directly or indirectly. For example, colleges indirectly receive federal financial assistance when they accept students who pay, in part, with federal financial aid directly distributed to the students. *Grove City College v. Bell*, 465 U.S. 555, 564 (1984); see also *Bob Jones Univ. v. Johnson*, 396 F. Supp. 597, 603 (D. S.C. 1974), aff'd, 529 F.2d 514 (4th Cir. 1975).

11

Charlotte North                                                          **APPENDIX**

**Recipient (Regulations)**

A **"*recipient*"** is an entity that receives federal financial assistance and that operates **"*an education program or activity,"*** and is thus subject to Title IX. The Title IX common rule provides as follows:

The term *recipient* means any State or political subdivision thereof, or any instrumentality of a State or political subdivision thereof, any public or private agency, institution, or organization, or other entity, or any person, to whom Federal financial assistance is extended directly or through another recipient and that operates an education program or activity that receives such assistance, including any subunit, successor, assignee, or transferee thereof. 65 Fed. Reg. 52866 at § 1211.105 (2000).

**Indirect Recipient – *NCAA v. Smith***

A recipient may receive funds either directly or indirectly. *Grove City College*, 465 U.S. at 564-65. For example, educational institutions receive federal financial assistance indirectly when they accept students who pay, in part, with federal loans. Although the money is paid directly to the students, the universities and other educational institutions are the indirect recipients. Id.; *Bob Jones Univ.*, 396 F. Supp. at 602.

The U.S. Supreme Court in *NCAA v. Smith*, 525 U.S. 459, 470 (1999), citing both *Grove City* and *Paralyzed Veterans*, stated that while **membership dues** paid to an entity (NCAA) by colleges and universities, who were recipients of federal financial assistance, "at most ... demonstrates that it [NCAA] indirectly benefits from the federal assistance afforded its afforded members." But the Court stated, "This showing, ***without more***, is insufficient to trigger Title IX coverage. *Smith*, 525 U.S. at 468.

**Controlling Authority – *NCAA v. Smith***

However, the U.S. Supreme Court in *Smith* did not address the argument that "when a recipient cedes **controlling authority** over a federally funded program to another entity, ***the controlling entity is covered by Title IX regardless whether it is itself a recipient.***" *Smith*, 525 U.S. at 469-471.

**Disparate Treatment**

Disparate treatment refers to actions that treat similarly situated persons differently on the basis of a prohibited **classification**. In the case of Title IX, the prohibited classification is sex. Under the disparate treatment theory of discrimination, the core question is whether a recipient, through its officials, has *treated people differently on the basis of sex*.

**Disparate Impact**

In contrast to disparate treatment, which focuses on the intent to cause sex-based results, disparate impact focuses on the consequences of a facially sex-neutral policy or practice. Under this theory of discrimination, the core inquiry focuses on the results of the action taken, rather than the underlying intent. Because of this difference in focus, evidence of a discriminatory intent or purpose is not required. Indeed, "intent" is not an element in the disparate impact analysis.

*Source*: Civil Rights Division – Title IX – www.justice.gov

12

Charlotte North                                                    **APPENDIX**

<u>**Title IX Regulations**</u>

**§ 106.1 Purpose.**

The purpose of this part is to effectuate Title IX, which is designed to eliminate (with certain exceptions) discrimination on the basis of sex in any education program or activity receiving Federal financial assistance, whether or not such program or activity is offered or sponsored by an educational institution as defined in this part.

**§ 106.37 Financial assistance.**

(a) ***General.*** Except as provided in <u>paragraphs (b)</u> and <u>(c)</u> of this section, in providing financial assistance to any of its students, a recipient shall not:

(1) On the basis of sex, provide different amount or types of such assistance, limit eligibility for such assistance which is of any particular type or source, apply different criteria, or otherwise discriminate;

(2) Through solicitation, listing, approval, provision of facilities or other services, assist any foundation, trust, agency, organization, or person which provides assistance to any of such recipient's students in a manner which discriminates on the basis of sex; or

(3) Apply any rule or assist in application of any rule concerning eligibility for such assistance which treats persons of one sex differently from persons of the other sex with regard to marital or parental status.

(b) ***Financial aid established by certain legal instruments.***

(1) A recipient may administer or assist in the administration of scholarships, fellowships, or other forms of financial assistance established pursuant to domestic or foreign wills, trusts, bequests, or similar legal instruments or by acts of a foreign government which requires that awards be made to members of a particular sex specified therein; *Provided,* That the overall effect of the award of such sex-restricted scholarships, fellowships, and other forms of financial assistance does not discriminate on the basis of sex.

(2) To ensure nondiscriminatory awards of assistance as required in <u>paragraph (b)(1)</u> of this section, recipients shall develop and use procedures under which:

(i) Students are selected for award of financial assistance on the basis of nondiscriminatory criteria and not on the basis of availability of funds restricted to members of a particular sex;

(ii) An appropriate sex-restricted scholarship, fellowship, or other form of financial assistance is allocated to each student selected under <u>paragraph (b)(2)(i)</u> of this section; and

(iii) No student is denied the award for which he or she was selected under <u>paragraph (b)(2)(i)</u> of this section because of the absence of a scholarship, fellowship, or other form of financial assistance designated for a member of that student's sex.

(c) ***Athletic scholarships.***

(1) To the extent that a recipient awards athletic scholarships or grants-in-aid, it must provide reasonable opportunities for such awards for members of each sex in proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics.

(2) Separate athletic scholarships or grants-in-aid for members of each sex may be provided as part of separate athletic teams for members of each sex to the extent consistent with this paragraph and <u>§ 106.41</u>.

13

Charlotte North                                                            **APPENDIX**

## § 106.41 Athletics.

(a) ***General.***  No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

(b) ***Separate teams.***  Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport.  However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport.  For the purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact.

(c) ***Equal opportunity.***  A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes.  In determining whether equal opportunities are available the Director will consider, among other factors:

(1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;

(2) The provision of equipment and supplies;

(3) Scheduling of games and practice time;

(4) Travel and per diem allowance;

(5) Opportunity to receive coaching and academic tutoring;

(6) Assignment and compensation of coaches and tutors;

(7) Provision of locker rooms, practice and competitive facilities;

(8) Provision of medical and training facilities and services;

(9) Provision of housing and dining facilities and services;

(10) Publicity.

Unequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams if a recipient operates or sponsors separate teams will not constitute noncompliance with this section, but the Assistant Secretary may consider the failure to provide necessary funds for teams for one sex in assessing equality of opportunity for members of each sex.

[45 FR 30955, May 9, 1980, as amended at 85 FR 30579, May 19, 2020; 89 FR 33888, Apr. 29, 2024]

(c) ***Athletic scholarships.***

(1)  To the extent that a recipient awards athletic scholarships or grants-in-aid, it must provide reasonable opportunities for such awards for members of each sex in proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics.

(2)  Separate athletic scholarships or grants-in-aid for members of each sex may be provided as part of separate athletic teams for members of each sex to the extent consistent with this paragraph and § 106.41.

[45 FR 30955, May 9, 1980, as amended at 85 FR 30579, May 19, 2020]

14

Charlotte North                                                        **APPENDIX**

## Policy Interpretation – Title IX and Intercollegiate Athletics

### Title IX - Background

§ 901(a) of Title IX of the Education Amendments of 1972 provides:

> "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

§ 844 of the Education Amendments of 1974 further provides:

> "The Secretary of [of HEW] shall prepare and publish proposed regulations implementing the provisions of Title IX of the Education Amendments of 1972 relating to the prohibition of sex discrimination in federally assisted education programs which shall include with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports.

Congress passed § 844 after the Conference Committee **deleted** a Senate floor **amendment that would have exempted *revenue-producing* athletics from the jurisdiction of Title IX.**

### Purpose of Policy Interpretation

By the end of July 1978, the Department had received nearly 100 complaints alleging discrimination in athletics against more than 50 institutions of higher education. In attempting to investigate these complaints, and to answer questions from the university community, the Department determined that it should provide further guidance on what constitutes compliance with the law. Accordingly, this Policy Interpretation explains the regulation so as to provide a framework within which the complaints can be resolved, and to provide institutions of higher education with additional guidance on the requirements for compliance with Title IX in intercollegiate athletic programs.

### Summary of Final Policy Interpretation

The final Policy Interpretation clarifies the meaning of "**equal opportunity**" in intercollegiate athletics. It explains the factors and standards set out in the law and regulation which the Department will consider in determining whether an institution's intercollegiate athletics program complies with the law and regulations. It also provides guidance to assist institutions in determining whether any disparities which may exist between men's and women's programs are justifiable and nondiscriminatory. The Policy Interpretation is divided into three sections:

- *Compliance in Financial Assistance (Scholarships) Based on Athletic Ability:* Pursuant to the regulation, the governing principle in this area is that all such assistance should be available on a *substantially proportional basis* to the number of male and female participants in the institution's athletic program.

- *Compliance in **Other Program Areas** (Equipment and supplies; games and practice times; travel and per diem, coaching and academic tutoring; assignment and compensation of coaches and tutors; locker rooms, and practice and competitive facilities; medical and training facilities; housing and dining facilities; publicity; recruitment; and support services):* Pursuant to the regulation, the governing principle is that male and female athletes should receive **equivalent treatment, benefits, and opportunities**.

- *Compliance in Meeting the **Interests and Abilities** of Male and Female Students:* Pursuant to the regulation, the governing principle in this area is that the **athletic interests and abilities** of male and female students must be **equally effectively accommodated**.

*Source*: U.S. Department of Education, *A Policy Interpretation: Title IX and Intercollegiate Athletics*.

15



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS

**Fact Sheet: Ensuring Equal Opportunity Based on Sex in School Athletic Programs in the Context of Name, Image, and Likeness (NIL) Activities**

Title IX of the Education Amendments of 1972[1] (Title IX) prohibits discrimination on the basis of sex by schools that receive Federal financial assistance, including K-12 schools, colleges, and universities.[2] If a school receives Federal financial assistance, Title IX's prohibition on sex discrimination extends to all of the school's programs and activities, including its athletic program.

The U.S. Department of Education's Office for Civil Rights (OCR) enforces Title IX and its implementing regulations, which require that schools receiving Federal financial assistance provide equal athletic opportunities based on sex—including with respect to publicity, support services, and other benefits, opportunities, and treatment—and that schools not discriminate in the provision of athletic financial assistance.[3] As the types of benefits provided to student-athletes continue to evolve, including in the context of Name, Image, and Likeness (NIL) activities, schools may have questions regarding how NIL activities impact the provision of equal opportunities in their athletic programs.

OCR provides this Fact Sheet to clarify how OCR will evaluate equal opportunity in a school's athletic program under Title IX when student-athletes receive NIL-related compensation and benefits.[4]

Part One of this Fact Sheet describes the Title IX requirements to provide equal athletic opportunity based on sex. Part Two provides a brief background on NIL agreements. Part Three clarifies that Title IX's requirement that a school provide equivalent benefits, opportunities, and treatment in the components of the school's athletic program covers any benefits, opportunities, and treatment that a school provides related to NIL activities (particularly publicity and support services). Part Four explains that compensation from a school for use of a student-athlete's NIL

---

[1] 20 U.S.C. § 1681 *et seq.*

[2] Throughout this Fact Sheet, "school" is used generally to refer to elementary, secondary, and postsecondary educational institutions that are recipients of Federal financial assistance. This Fact Sheet uses the term "third party" to refer to an outside organization or individual, which includes a Name, Image, and Likeness (NIL) collective.

[3] 34 C.F.R. §§ 106.41(c) and 106.37(c). *See also* U.S. Dep't of Health, Educ., and Welfare, Office for Civil Rights, A Policy Interpretation: Title IX and Intercollegiate Athletics (1979 Policy Interpretation), 44 Fed. Reg. 71,413 (Dec. 11, 1979), https://tile.loc.gov/storage-services/service/ll/fedreg/fr044/fr044239/fr044239.pdf.

[4] The general principles of this Fact Sheet apply to both intercollegiate athletics and interscholastic athletics, although NIL activities less frequently involve K-12 schools. The general principles also apply regardless of what athletic association a school is a member of (e.g., National Collegiate Athletic Association (NCAA), National Association of Intercollegiate Athletics (NAIA), National Junior College Athletic Association (NJCAA), a state high school athletic association).

The Department's Title IX regulations assume that the receipt of financial assistance does not transform students, including student-athletes, into employees. *Compare* 34 C.F.R. § 106.37 (requirements regarding financial assistance for students), *with* 34 C.F.R. §§ 106.51-61 (requirements regarding employment). The analysis offered in this Fact Sheet operates under that same assumption. If the legal landscape around this issue changes, OCR would reevaluate this position.

Fact Sheet: Ensuring Equal Opportunity Based on Sex in School Athletic Programs in the Context of Name, Image, and Likeness (NIL) Activities

qualifies as athletic financial assistance which, under Title IX, must be made available to male and female student-athletes in a manner that is substantially proportionate to the number of students of each sex participating in interscholastic or intercollegiate athletics at that school. Finally, Part Five addresses NIL agreements between student-athletes and third parties.

OCR evaluates each matter on a case-by-case basis with due regard for the unique facts presented by each case.

### 1. Title IX and athletic opportunities in school athletic programs

The Title IX regulations require schools to provide equal athletic opportunity, regardless of sex.[5] Equal opportunity in athletic programs is assessed in three main areas[6]:

1.  The benefits, opportunities, and treatment given to male and female athletic teams;
2.  The athletic financial assistance, including athletic scholarships, that a school awards to student-athletes; and
3.  A school's accommodation of the athletic interests and abilities of its students.

#### *Benefits, opportunities, and treatment*

The Title IX regulations require a school that operates an athletic program to offer equal athletic opportunity regardless of sex.[7] OCR compares the availability, quality, and kinds of benefits, opportunities, and treatment afforded to male and female student-athletes in the major components of a school's athletic program (e.g., equipment and supplies, facilities, schedules, travel and per diem allowances, housing and dining facilities and services, publicity, and recruitment) in determining whether the school is providing equal athletic opportunities.[8] If the compared program components are equivalent (i.e., equal or equal in effect), OCR considers a school to be in compliance with Title IX.[9] Under this standard, identical benefits, opportunities, or treatment are not required to show that program components are equivalent, as long as the overall effect of any differences is negligible.[10] Even if the benefits, opportunities, and treatment in the components of a school's athletic program are not equivalent in availability, quality, or kind, the school may nevertheless be in compliance with Title IX if the differences are the result

---

[5] 34 C.F.R. §§ 106.41(c) and 106.37(c).
[6] *See* 1979 Policy Interpretation, 44 Fed. Reg. at 71414.
[7] 34 C.F.R. § 106.41(c).
[8] *See* 1979 Policy Interpretation, 44 Fed. Reg. at 71,415 ("The Department will assess compliance with both the recruitment and the general athletic program requirements of the regulation by comparing the availability, quality and kinds of benefits, opportunities, and treatment afforded members of both sexes."); *see also, e.g., Parker v. Franklin Cty. Cmty. Sch. Corp.*, 667 F.3d 910, 918 (7th Cir. 2012) (deferring to the 1979 Policy Interpretation and stating that the Department assesses compliance "by comparing the availability, quality and kinds of benefits, opportunities, and treatment afforded members of both sexes" (quoting 1979 Policy Interpretation, 44 Fed. Reg. at 71,415)); *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 291-92 (2d Cir. 2004) (stating that the 1979 Policy Interpretation governs the court's inquiry and that the Department assesses compliance with "the general athletic program requirements of the regulation by comparing the availability, quality and kinds of benefits, opportunities, and treatment afforded members of both sexes" (quoting 1979 Policy Interpretation, 44 Fed. Reg. at 71,415)).
[9] 1979 Policy Interpretation, 44 Fed. Reg. at 71,415.
[10] *Id.*

Fact Sheet: Ensuring Equal Opportunity Based on Sex in School Athletic Programs in the Context of Name, Image, and Likeness (NIL) Activities

of nondiscriminatory factors.[11] Under such circumstances, OCR would still investigate whether any disparity in the benefits, opportunities, or treatment in the school's athletic program—that is not the result of nondiscriminatory factors—is substantial enough in and of itself to result in the denial of equal athletic opportunities with respect to individual program components or the athletic program as a whole.[12]

For example, at one school, the men's teams collectively play significantly more games on Friday nights and Saturdays than the women's teams. These times are considered primetime because attendance is higher, and the school has not offered a nondiscriminatory justification for the scheduling of games in this manner. OCR may find that the school is not providing equal athletic opportunity to members of the men's and women's teams with respect to scheduling games, as required by 34 C.F.R. § 106.41(c)(3).

At another school, there are multiple locker rooms for the men's athletic teams while there is only one locker room for the women's athletic teams. The location of the women's locker room is further away from their practice and competition facilities than the location of the men's locker rooms. The women's soccer, field hockey, and lacrosse teams share a practice field, while each men's team uses a practice field designated for each sport. The school has not offered a nondiscriminatory justification for the provision of locker rooms and practice facilities in this manner. OCR may find that the school is not providing equal athletic opportunity to members of the men's and women's athletic teams with respect to provision of locker rooms, practice facilities, and competitive facilities, as required by 34 C.F.R. § 106.41(c)(7).

The application of Title IX's requirements regarding equal athletic opportunity in the components of a school's athletic program to the NIL context is discussed in Part Three.

### *Athletic financial assistance*

If a school awards athletic financial assistance, the Title IX regulations require the school to "provide reasonable opportunities for such awards for members of each sex in proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics."[13] The

---

[11] For example, OCR has recognized that certain aspects of athletic programs may not be equivalent based on sex because of unique factors related to the operation of particular sports, such as the nature/replacement of equipment and the nature/maintenance of facilities required for competition. If a school is meeting sport-specific needs equivalently in the men's and women's programs, OCR will likely find the differences in particular program components to be justifiable. OCR has also recognized that, in certain circumstances, the operation of a competitive event may give rise to special demands or imbalances in particular program components, due to the costs and support needed to manage events with large crowds (historically associated with football and men's basketball). As long as any special demands are met to an equivalent degree for both men's and women's teams, OCR may find these differences to be nondiscriminatory. Under Title IX, the school must use sex-neutral criteria to determine the levels of event management support and must not limit the potential for women's athletic events to rise in spectator appeal. *See* 1979 Policy Interpretation, 44 Fed. Reg. at 71,415-16.

[12] *See id.* at 71,417 (stating that OCR considers, in part, "[w]hether disparities of a substantial and unjustified nature exist in the benefits, treatment, services, or opportunities afforded male and female athletes in the institution's program as a whole" and "[w]hether disparities in benefits, treatment, services, or opportunities in individual segments of the program are substantial enough in and of themselves to deny equality of athletic opportunity").

[13] 34 C.F.R. § 106.37(c).

Fact Sheet: Ensuring Equal Opportunity Based on Sex in School Athletic Programs in the Context of Name, Image, and Likeness (NIL) Activities

regulations do not require the same number of awards for male and female student-athletes or that individual awards be of equal value.

When evaluating a school's compliance with the Title IX regulations, OCR assesses whether the total amount of athletic financial assistance made available by the school to men and women is substantially proportionate to the number of students of each sex participating in interscholastic or intercollegiate athletics at that school.[14] OCR may find a school to be in compliance with Title IX if a disparity may be explained by legitimate nondiscriminatory factors, such as actions taken to promote athletic program development, legitimate efforts undertaken to comply with Title IX requirements, and unexpected fluctuations in the participation rates of males and females.[15] In assessing compliance with 34 C.F.R. § 106.37(c), OCR includes the amount of all compensation and other financial assistance provided by a school to its student-athletes when calculating the total amount of athletic financial assistance made available to men and women at a school.

Part Four of this Fact Sheet addresses how Title IX's athletic financial assistance requirements apply to compensation and other financial assistance that a school provides for use of a student-athlete's NIL.

### *Meeting students' athletic interests and abilities*

In determining whether equal opportunities in an athletic program are available, the Title IX regulations also require a school that operates an athletic program to effectively accommodate the athletic interests and abilities of its male and female students. This Title IX athletics requirement is not discussed in this Fact Sheet.[16]

## 2. NIL agreements in school athletic programs

An NIL agreement is a contract that allows a student-athlete to control the use of their NIL and receive compensation for it.[17] NIL collectives are organizations typically created by booster clubs, fans, alumni, and/or businesses to develop, fund, and facilitate NIL opportunities for student-athletes.[18] Until recently, student-athletes were prohibited from receiving any compensation based on their athletic ability, including "from boosters, companies seeking endorsements, or would-be licensors of the athlete's name, image, and likeness."[19] Following several court decisions striking down limitations on NIL activities and other compensation for student-athletes,[20] the NIL landscape has continued to evolve. States, schools, and athletic

---

[14] *See id.*; *see also* 1979 Policy Interpretation, 44 Fed. Reg. at 71,415.
[15] *See* 1979 Policy Interpretation, 44 Fed. Reg. at 71,415.
[16] For information on the three-part test that OCR uses to determine whether a school is effectively accommodating the interests and abilities of its male and female students, please see 1979 Policy Interpretation, 44 Fed. Reg. at 71,417-18.
[17] *See O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049 (9th Cir. 2015).
[18] *See Tennessee v. Nat'l Collegiate Athletic Ass'n*, 718 F. Supp. 3d 756, 759-60 (E.D. Tenn. 2024); Internal Revenue Service, Whether Operation of an NIL Collective Furthers an Exempt Purpose Under Section 501(c)(3) (June 9, 2023), https://www.irs.gov/pub/lanoa/am-2023-004-508v.pdf.
[19] *O'Bannon*, 802 F.3d at 1055.
[20] *See, e.g., O'Bannon*, 802 F.3d at 1078-79 (holding that the NCAA must permit its member schools to award grants-in-aid up to the full cost of attendance to their student-athletes); *Nat'l Collegiate Athletic Ass'n v. Alston*, 594

Fact Sheet: Ensuring Equal Opportunity Based on Sex in School Athletic Programs in the Context of Name, Image, and Likeness (NIL) Activities

associations have responded to the increased interest in NIL activities by enacting laws or policies, which regulate NIL activities involving student-athletes.[21] As student-athletes take advantage of new opportunities to benefit from their NIL, it is important for schools to understand how Title IX may apply to these benefits.

> ### 3. Benefits, opportunities, and treatment provided by a school to assist its student-athletes in obtaining and managing NIL agreements (with schools or third parties)

Schools remain responsible for ensuring that they are offering equal athletic opportunities in their athletic programs, including in the NIL context. A school may violate Title IX if the school

---

U.S. 69 (2021) (upholding a permanent injunction barring the NCAA from limiting education-related compensation or benefits that member conferences or schools could provide to student-athletes); *Tennessee v. Nat'l Collegiate Athletic Ass'n*, 718 F. Supp. 3d at 766 (issuing a preliminary injunction enjoining the NCAA "from enforcing the NCAA Interim NIL Policy, the NCAA Bylaws, or any other authority to the extent such authority prohibits student-athletes from negotiating compensation for NIL with any third-party entity").

[21] *See, e.g.*, Ark. Code Ann. § 4-75-13 (2021) (student-athletes have the right to enter into a contract and receive compensation for the commercial use of the student-athlete's publicity rights); Fla. Stat. § 1006.74 (2020) (an intercollegiate athlete may earn compensation for the commercial use of their name, image, or likeness commensurate with market value, but such compensation may not be provided in exchange for athletic performance or attendance at a particular postsecondary institution and may only be provided by a third party unaffiliated with the student-athlete's postsecondary institution); Ill. Comp. Stat. act no. 190. sec. no. 110 (2021) (student-athletes have the right to earn compensation commensurate with market value for the use of their name, image, likeness, or voice while enrolled in a postsecondary institution, student-athletes may not earn compensation in exchange for their athletic ability or participation in intercollegiate athletics or sports competition or willingness to attend a postsecondary institution); Tenn. Code Ann. § 49-7-2802(a) (2024) (an intercollegiate athlete may earn compensation and perform diligence for the use of their name, image, and likeness, a postsecondary institution and its affiliated foundations shall not compensate an intercollegiate athlete for their name, image, or likeness unless expressly permitted by Federal law, a court order, or the postsecondary institution's athletic association); NCAA, *DI Council approves NIL reforms, permits school assistance with NIL activity* (Apr. 17, 2024), https://www.ncaa.org/news/2024/4/17/media-center-di-council-approves-nil-reforms-permits-school-assistance-with-nil-activity.aspx (adopting a proposal that allows Division I schools to assist in NIL activities for student-athletes, including identifying NIL opportunities and facilitating deals between student-athletes and third parties); NJCAA Handbook – Bylaws, at Article V, Section 4, D.3.c.i, https://d2o2figo6ddd0g.cloudfront.net/0/q/spevi1jotzaysv/NJCAA_Handbook_-_Bylaws_08-05-24.pdf (member institutions may allow student-athletes to receive NIL compensation, as long as it complies with applicable law and there is an exchange of good or services—but representatives of the institution cannot directly pay the athletes, and the NIL compensation cannot be contingent upon enrollment or based on athletic performance); NAIA, *Name, Image, and Likeness (NIL) Tips & Best Practices*, https://www.naia.org/name-image-likeness/archive-legislative/NIL-FAQ-Document.pdf (student-athletes have the right to profit off their NIL and must report any NIL compensation to their athletic director; an NIL agreement must contain a quid pro quo; institutions have the right to restrict NIL agreements that they view as a conflict of interest with their mission or current sponsorship agreements); California Interscholastic Federation Article 20 Rule 212 (a student-athlete may participate in a commercial endorsement, but may not wear a school team uniform or any identifying school insignia while appearing in any advertisement, promotional activity, or endorsement for any commercial product or service and may not lend their name and team affiliation for purposes of commercial endorsement); Colorado High School Athletics Association (CHSAA) 200.12 (student-athletes are permitted to monetize their name, image, and likeness so long as there is no affiliation with a CHSAA member school); Florida High School Athletic Association (FHSAA) Rule 9.9 (student-athletes may profit from the use of their name, image, and likeness provided they comply with FHSAA Bylaw 9.9, permissible activities include commercial endorsements, promotional activities, social media presence, product, or service endorsements, student-athletes are prohibited from monetizing their name, image, and likeness with the use of their school's uniform, equipment, logo, name, proprietary patents, products, and/or copyrights associated with an FHSAA member school, unless granted authorization by the school).

Fact Sheet: Ensuring Equal Opportunity Based on Sex in School Athletic Programs in the Context of Name, Image, and Likeness (NIL) Activities

fails to provide equivalent benefits, opportunities, and treatment in the components of the school's athletic program that relate to NIL activities. Thus, schools must be mindful of their Title IX obligations regarding the components of their athletic programs as they navigate the NIL landscape. These obligations apply regardless of whether student-athletes ultimately secure NIL benefits through their school or with third parties.

### Publicity

In determining whether a school is complying with Title IX as to the program component of publicity, OCR examines, among other factors, the equivalence for male and female student-athletes of: (1) the availability and quality of sports information personnel; (2) access to other publicity resources for men's and women's teams; and (3) the quantity and quality of promotional devices that feature the men's and women's teams.[22] This examination may include consideration of the coverage for men's and women's teams and student-athletes on a school's website, in its social media postings, and in its publicity materials (e.g., posters, press guides, recruitment brochures, game programs, pocket schedules). OCR considers the school's efforts to provide equivalent publicity to its men's and women's athletic teams, recognizing that television, newspapers, and other forms of media may not be equally responsive to the school's efforts to provide equivalent publicity.

Even if publicity is not equivalent based on sex, a school may comply with Title IX if the differences are the result of nondiscriminatory factors. For example, the unique circumstances of a particular student-athlete (e.g., a prospective Olympic athlete), team (e.g., the reigning state/national champion), or competitive event (e.g., a national competition) may cause unique demands or imbalances related to publicity.

A school's obligation to provide equivalent publicity based on sex continues to apply in the context of NIL. For example, if a school is not providing equivalent coverage for women's teams and student-athletes on its website, in its social media postings, or in its publicity materials, these student-athletes may be less likely to attract and secure NIL opportunities. In addition, if a school is publicizing student-athletes for the purposes of obtaining NIL opportunities, OCR would examine whether the school is providing equivalent publicity for male and female student-athletes (including by examining the quantity and quality of publications and other promotional devices that feature the men's and women's athletic teams).

### Support Services

Some schools offer support services to assist their student-athletes in securing NIL opportunities. Title IX's requirement that schools provide equal athletic opportunity based on sex includes any support services that a school provides to its student-athletes.[23] In determining whether a school is complying with Title IX as to support services, OCR examines, among other factors, the equivalence of the amount of administrative assistance provided to the men's and women's teams.[24]

---

[22] 34 C.F.R. § 106.41(c); 1979 Policy Interpretation, 44 Fed. Reg. at 71,417.
[23] See 34 C.F.R. § 106.41(c); 1979 Policy Interpretation, 44 Fed. Reg. at 71,417.
[24] See 1979 Policy Interpretation, 44 Fed. Reg. at 71,417.

Fact Sheet: Ensuring Equal Opportunity Based on Sex in School Athletic Programs in the Context of Name, Image, and Likeness (NIL) Activities

A school's obligation to provide equivalent support services continues to apply in the context of NIL activities, including any services that schools provide to assist student-athletes in securing or managing NIL opportunities.[25] For example, if a school provides training sessions to its student-athletes on brand building, finances, reporting, entrepreneurship, or similar topics, OCR would examine whether the school is providing this training equally to men's and women's teams. Likewise, if athletics department employees assist the school's student-athletes by obtaining and negotiating NIL agreements, OCR would examine whether the school is providing this assistance equally to student-athletes on men's and women's teams.

#### 4. NIL agreements between schools and their student-athletes as a form of athletic financial assistance

As part of determining whether a school is providing equal athletic opportunity, OCR considers the total amount of athletic financial assistance made available by the school. Compensation provided by a school for the use of a student-athlete's NIL constitutes athletic financial assistance under Title IX because athletic financial assistance includes any financial assistance and other aid provided by the school to a student-athlete that is connected to a student's athletic participation; it is not limited to scholarships or grants.[26] Thus, the various forms of financial assistance that could be provided by a school to student-athletes include, but are not limited to, scholarships, cost-of-attendance awards, other types of compensation and financial assistance permitted to be provided by schools following a federal court injunction,[27] and compensation

---

[25] *See id.* (stating that OCR will consider, in part, "[w]hether disparities of a substantial and unjustified nature exist in the benefits, treatment, services, or opportunities afforded male and female athletes in the institution's program as a whole" and "[w]hether disparities in benefits, treatment, services, or opportunities in individual segments of the program are substantial enough in and of themselves to deny equality of athletic opportunity").

[26] *See* 1979 Policy Interpretation, 44 Fed. Reg. at 71,415 (noting that athletic financial assistance also includes work-related aid and loans); Letter from Catherine E. Lhamon to Marcia D. Greenberger and Deborah Slaner Larkin (Nov. 15, 2015) (stating that cost-of-attendance awards constitute athletic financial assistance under Title IX and noting that athletic financial assistance also includes exhausted eligibility awards and summer aid), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/correspondence/stakeholders/20151112-cost-attendance-ath-scholarships.pdf. This approach is also consistent with postsecondary schools' reporting obligations under the Equity in Athletics Disclosure Act (EADA), 20 U.S.C. § 1092(e). Separate from Title IX, the EADA requires postsecondary institutions to report the amount of athletically related student aid provided to men's, women's, and coed teams. *See also* 34 C.F.R. § 668.47. The User's Guide for the EADA Data Collection explains that "athletically related student aid is any scholarship, grant, or other form of financial assistance, offered by an institution, the terms of which require the recipient to participate in a program of intercollegiate athletics at an institution." U.S. Dep't of Educ., Office of Postsecondary Educ., User's Guide for the Equity in Athletic Disclosure Act Web-Based Data Collection at 53 (Sept. 2023), https://surveys.ope.ed.gov/athletics2023/wwwroot/documents/2023_EADA_Users_Guide.pdf.

[27] The *NCAA v. Alston* case involved a challenge to the NCAA's restrictions on providing college athletes participating in Division I women's and men's basketball and Football Bowl Subdivision football with non-cash compensation for academic-related purposes. The court ruled that these restrictions violated antitrust law and issued a permanent injunction. *See In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litigation*, No. 14-md-02541, 2019 WL 1593939, at *1 (N.D. Cal. Mar. 8, 2019). Per the injunction, the NCAA can limit cash or cash equivalent payments to student-athletes for academic achievements (e.g., graduating or maintaining a specific GPA) so long as the limit is not lower than the total amount a student-athlete can earn in athletics participation awards. The NCAA cannot limit education-related benefits to student-athletes, including computers, science equipment, musical instruments, and other items not currently included in the cost of attendance but related to the pursuit of a student's educational studies, as well as post-eligibility scholarships for undergraduate, graduate, and

Fact Sheet: Ensuring Equal Opportunity Based on Sex in School Athletic Programs in the Context of Name, Image, and Likeness (NIL) Activities

from schools for use of a student-athlete's NIL.[28] When a school provides athletic financial assistance in forms other than scholarships or grants, including compensation for the use of a student-athlete's NIL, such assistance also must be made proportionately available to male and female athletes.[29]

### 5. NIL agreements between student-athletes and third parties

As discussed in Part Four, compensation provided by a school for the use of a student-athlete's NIL constitutes athletic financial assistance under Title IX. By contrast, OCR does not view compensation provided by a third party (rather than a school) to a student-athlete for use of their NIL as constituting athletic financial assistance awarded by the school that must comply with 34 C.F.R. § 106.37(c).

However, OCR has long recognized that a school has Title IX obligations when funding from private sources, including private donations and funds raised by booster clubs, creates disparities based on sex in a school's athletic program or a program component.[30] The fact that funds are provided by a private source does not relieve a school of its responsibility to treat all of its student-athletes in a nondiscriminatory manner.[31] It is possible that NIL agreements between student-athletes and third parties will create similar disparities and therefore trigger a school's Title IX obligations. Because these NIL agreements vary widely and continue to evolve and because the application of Title IX's equal athletic opportunity requirements is a fact-specific inquiry, this Fact Sheet does not offer specific guidance on Title IX's application in the context of compensation provided for the use of a student athlete's NIL by a third party, including an NIL collective.

---

vocational programs at any school, tutoring, study-abroad expenses, and paid post-eligibility internships. The Supreme Court clarified that the NCAA could establish rules and criteria for these benefits, e.g., a "no Lamborghini rule." *Alston*, 594 U.S. at 106.

[28] This refers to compensation from NIL agreements between a school and a student-athlete and does not include payments from NIL agreements between a third party and a student-athlete. See Part Five in this Fact Sheet for information regarding how Title IX applies to NIL agreements between a third party and a student-athlete.

[29] 34 C.F.R. § 106.37(c); 1979 Policy Interpretation, 44 Fed. Reg. at 71,415 ("When financial assistance is provided in forms other than grants, the distribution of non-grant assistance will also be compared to determine whether equivalent benefits are proportionately available to male and female athletes.").

[30] *See, e.g.*, OCR's Letter to Chief State School Officers, Title IX Obligations in Athletics (1975), https://www.ed.gov/about/offices/list/ocr/docs/holmes ("[T]he fact that a particular segment of an athletic program is supported by funds received from various other sources (such as student fees, general revenues, gate receipts, alumni donations, booster clubs, and non-profit foundations) does not remove it from the reach of the statute and hence of the regulatory requirements.").

[31] *See Chalenor v. Univ. of N.D.*, 291 F.3d 1042, 1048 (8th Cir. 2002) ("[A] public university cannot avoid its legal obligations by substituting funds from private sources for funds from tax revenues."); *Cohen v. Brown Univ.*, 809 F. Supp. 978, 996 (D.R.I. 1992) ("[A]ll monies spent by Brown's Athletic Department, whether originating from university coffers or from the Sports Foundation, must be evaluated as a whole under § 106.41(c). Thus, Title IX covers all Sports Foundation funds allocated to Brown athletics. This position is consistent with the Investigator's Manual, which warns that where 'booster clubs' or other fundraising organizations help only members of one sex, the university must balance out these differences." (citing U.S. Dep't of Educ., Office for Civil Rights, Title IX Athletics Investigator's Manual (1990))); *Daniels v. Sch. Bd. of Brevard Cnty.*, 985 F. Supp. 1458, 1462 (M.D. Fla. 1997) (rejecting school district's argument that it cannot be held responsible for unequal booster club fundraising and holding that "[i]t is the Defendant's responsibility to ensure equal athletic opportunities, in accordance with Title IX").

Fact Sheet: Ensuring Equal Opportunity Based on Sex in School Athletic Programs in the Context of Name, Image, and Likeness (NIL) Activities

\*       \*       \*

For more information on benefits, opportunities, and treatment in a school's athletic program, you may find it helpful to review OCR's resources on Supporting Equal Opportunity in School Athletic Programs, Title IX and Athletic Opportunities in K-12 Schools, and Title IX and Athletic Opportunities in Colleges and Universities.

Anyone who believes that a school has engaged in discrimination may file a complaint with OCR. Information about filing a complaint is available on OCR's website at How to File a Discrimination Complaint with the Office for Civil Rights. Information about OCR's process for evaluating, investigating, and resolving complaints is available at How the Office for Civil Rights Handles Complaints.

To request language access services or resources, which may include oral technical assistance or written translation of Department information, free of charge, contact OCR@ed.gov. If you need more information about interpretation or translation services, call 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339). To request documents in alternate formats such as Braille or large print, contact the Department at 202-260-0818 or ofo_eeos@ed.gov.

*This Fact Sheet does not have the force and effect of law and is not meant to be binding, beyond what is required by statutory and regulatory requirements. All enforcement determinations made by OCR are based on the particular factual circumstances presented in each individual case.*