January 7, 2025

FILED
JAN 09 2025
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

The Honorable Claudia Wilken
United States District Court
Northern District of California
1301 Clay Street
Oakland, CA 94612

**Subject:** Concerns Regarding Roster Caps in the *House v. NCAA* Case No. 4:20-cv-03919-CW

Dear Judge Wilken:

I am writing to express my support for the historic House v. NCAA settlement, particularly its profit-sharing model. This settlement is long overdue and rightly acknowledges the contributions of collegiate athletes. It represents a landmark moment in addressing the inequities in college sports that have existed for decades.

**However, I am deeply concerned about this settlement's unintended consequences for Olympic sports, or what athletic directors often call "non-revenue sports." Implementing roster caps undermines the settlement's spirit, particularly in men's Olympic sports, like swimming and diving, with which I am most familiar.**

### The Human Cost

Collegiate swimming has been a beacon of opportunity for young men, producing champions and leaders for decades. Today, we are already seeing the devastating impact of these roster caps. Athletes are being cut and left to their own devices to figure out how to continue their education. There is no transition plan—just a "sorry" and "good luck." This abrupt loss leaves many young men grappling with profound disruption to their lives and futures.

### The Damage to Young Men

The harm caused by these roster cuts cannot be overstated:

1. **Loss of Opportunity:** In the coming days, young men who have spent their lives training to compete at the collegiate level will face the heartbreak of being cut

1

from teams. These are not just athletes; they are students who have dedicated themselves to embodying the values of discipline, teamwork, and perseverance. Their dreams of competing for their schools will be abruptly taken away, leaving a profound void in their lives.

2. **Disruption of Education:** For many, being part of a collegiate team is a cornerstone of their educational experience. Losing their spot on a team often forces athletes to consider transferring, which can disrupt their academic progress, sever friendships, and create logistical and emotional upheaval. This displacement is a high price to pay, particularly for those who contribute so much to the ethos of their schools.

3. **Mental Anguish:** The mental toll of these roster cuts cannot be ignored. Being told you are no longer part of a team—after years of sacrifice and dedication—can lead to feelings of rejection, anxiety, and depression. The abrupt loss of a community (many swimmers call it "family") and identity many young men find in their sport exacerbates this anguish.

**Real-World Examples**

Swimming is a particularly poignant example of the harm caused by such reductions:

- **Development is Stifled:** Programs need rosters larger than the championship meet requirements to allow for the development of younger athletes, manage injuries, and ensure competitiveness. With a 22-athlete cap, these essential dynamics are stripped away, leaving no room for athletes to grow and mature into champions. My analysis of championship teams shows that, on average, they have 35 athletes. Even the settlement's 30-man recommendation is a reduction from this proven best practice.

- **The Pipeline to Team USA is Threatened:** Collegiate swimming has historically been the backbone of Team USA's Olympic dominance, training 75 percent of the athletes who won more than 80 percent of our medals in Paris. The reduced roster caps risk disrupting this critical development system, weakening the nation's standing on the global stage. We will start to see the effects of roster cuts at the LA 2028 Olympics.

- **Success Stories Would Have Been Lost:** At Texas alone, Shaun Jordan, Clark Smith, and Dax Hill are prime examples of athletes who likely never would have made the team—or would have been cut their freshman "development"

2

year—under a 22-athlete roster cap. Yet they became NCAA champions and Olympians, contributing immeasurably to the legacy of their programs.

**Why 22 Falls Short**

The rationale for 22—reportedly chosen because it aligns with the number of athletes a school can bring to the SEC championship—ignores the real-world demands of running a successful program. Coaches and experts, including legendary figures like Eddie Reese, have long advocated for rosters of at least 1.5 times the championship meet size to ensure depth and flexibility. The SEC's decision to adopt 22, and the possibility that other conferences may follow, creates a ripple effect that could irreparably harm young men and the sport.

Though the NCAA only requires teams to implement roster caps in the Fall, some teams are moving forward as I write this. Immediate action is necessary to prevent irrevocable harm.

**A Path Forward**

I respectfully urge the Court to consider several steps to address this issue and preserve the intent of the settlement:

1. **Encourage SEC Leadership to Revisit the Decision:** The SEC's decision to cap rosters at 22 undermines the settlement's intent of providing fairness and opportunity for all athletes. I respectfully urge the Court to encourage the SEC and all conferences to reassess their roster cap decisions. This could be done by emphasizing the reputational harm and competitive disadvantages it creates. Highlighting how the SEC's actions impact athletes' opportunities and the broader Olympic sports landscape may push the conference to align with the settlement's recommended 30-roster cap.

2. **Encourage Creative Compliance Solutions:** Increasing women's roster sizes or expanding existing women's programs would help achieve Title IX compliance while preserving spots for men. Such solutions offer a win-win scenario that benefits everybody.

3. **Require Uniform Implementation of the Settlement Guidelines:** Mandating adherence to the 30-athlete cap across all conferences would create a level playing field and ensure fairness. Uniformity would prevent any single conference from undermining the spirit of the settlement and protect athletes' opportunities.

4. **Incorporate Transparency and Accountability:** To ensure fairness and maintain the spirit of the settlement, I propose that conferences publicly disclose their roster cap decisions, the rationale behind them, and their anticipated impact on athletes. Transparency measures like these would allow stakeholders, including athletes and their families, to understand the decision-making process better and hold conferences accountable. Few people—including current coaches and athletes—know how the roster cap numbers in the settlement were derived today. Public accountability can serve as a powerful motivator for conferences to align with the more athlete-friendly 30-roster cap, ensuring decisions are made in the athletes' best interest.

5. **Advocate for Regular Reviews of Roster Caps:** Establishing a periodic review and adjustment mechanism of roster caps would allow data-driven decisions that reflect each sport's evolving needs. This approach would ensure that caps are fair and effective over time.

**A Call to Action**

Your leadership, in this case, has the potential to shape the future of college athletics and ensure that opportunities for young men and women are preserved for generations to come. By addressing the collateral damage to Olympic sports with the same thoughtfulness that brought about the profit-sharing model, we can maintain the legacy of collegiate athletics and its vital role in developing young people.

Thank you for your time and for diligently overseeing this transformative case.

Respectfully,

*[signature: Paul Walker]*

Paul Walker

13304 Lone Rider Trail, Austin, TX 78738
paulbwalker@gmail.com
1-512-632-8765

4

PAUL WALKER
13304 Lone Rider Trail
Austin, Texas 78738



AUSTIN TX 786
RIO GRANDE DISTRICT
8 JAN 2025    PM 2    L

The Honorable Claudia Wilken
United States District Court
Northern District of California
1301 Clay Street
Oakland, CA 94612

94612-520001

