FILED ORIGINAL

JAN 3 0 2025

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

FILED

DEC 3 0 2024

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

BY FAX

January 28, 2025

The Honorable Claudia Wilken
United States District Court Northern District of California
1301 Clay Street Oakland, CA 94612

Re: *In re College Athlete NIL Litig. ("House")*, No. 4:20-CV-03919 (N.D. Cal.)

Dear Judge Wilken,

This letter identifies and addresses our concerns with the proposed "*House*" settlement and its broader implications for college sports and athletes' rights.

We respectfully request this document be included in the docket and considered by the Court.[1]

## I.    Introduction

This Court has navigated the delicate balance between institutional interests and athlete rights for fifteen years with great care, sensitivity, and wisdom.

We appreciate the difficulty of that task—for the Court and Class Counsel—particularly when the competing interests seem irreconcilable.

Is it possible to equitably balance institutional principles that hold that college athletes cannot be paid with principles of American law that demand athletes have the opportunity to seek their value in free markets?

Our concerns with the settlement are based around the belief that this balancing should always err on the side of American freedoms, rather than private interests that benefit from economic restraints.

We believe the settlement reconciles these competing interests—perhaps irrevocably—in favor of deeply rooted institutional power.

Broadly, we believe the settlement produces a newer version of an old status quo where athletes may have more money but no more power.

---

[1] Michele Roberts is the former National Basketball Players Association Executive Director, former litigation attorney, and advisor to Did You Know Media (DYK). Ms. Roberts was the first woman to lead a major professional sports union in North America. During her years in private practice, the media described her as the "finest pure trial lawyer" in Washington, D.C. Among her many accolades, Ms. Roberts is a fellow in the American College of Trial Lawyers. Richard Ford is the CEO and Co-founder of DYK (www.dykmedia.io), a former litigation attorney, and Duke basketball player. Casey Floyd is Co-founder of DYK and NOCAP Sports. Full bios can be found here. DYK is an education and advocacy platform designed to inform athletes and stakeholders about college sports' legal and regulatory environments, emphasizing unreported and underreported issues and narratives.

Specifically, we question whether the settlement meets Rule 23 requirements because it: (1) imposes a revenue sharing cap that may be unlawful, (2) acts as a collective bargaining agreement without including the laborers in the negotiations, (3) impedes, rather than promotes, future collective bargaining for athletes (with employee status and protectable rights under the National Labor Relations Act), (4) may lead to federal legislation that makes Defendants' regulatory authority unchallengeable and permanently impairs athletes' rights (5) preserves and extends the NCAA's amateurism-based regulatory authority, (6) uses *Carter's* pay-for-play claims to serve primarily strategic settlement purposes rather than genuine compensatory purposes, and (7) unfairly excludes Division I men's basketball players from class representation.

We want to be clear that by critiquing the settlement, we do not question Class Counsels' commitment to a just result for college athletes.

Nevertheless, given the settlement's complexity[2] and its potential as an industry-shifting milestone, we believe the approval process should be informed by a broad range of perspectives.

Ours is but one perspective, and we offer it in the spirit of constructive engagement[3] and the best possible outcome for athletes.

## II.    The Cap on Revenue Sharing Violates Antitrust Laws and is Not Protected by the Collective Bargaining Non-Statutory Labor Exemption

The parties have agreed to a cap on athlete compensation via revenue sharing that is no different in theory or purpose than previous caps found to violate antitrust laws. In essence, the parties seek to solve existing antitrust violations by creating new ones that look better than the old ones.

In its Statement of Interest, the United States said, "[t]he proposed settlement...continues to restrict the compensation college athletes may receive from their school, replacing one cap with another....under the Proposed Settlement, a Member Institution is ***not*** permitted to spend what it wants—or what the market would dictate—to compete for the services of college athletes. The Proposed Settlement increases the cap on what college athletes can be paid for the use of their NIL from zero to a new amount. But that new amount is still fixed by agreement among organizations that collectively control the entire labor market."[4] (emphasis in original)

Because the cap was not negotiated through collective bargaining under the National Labor Relations Act, it cannot be insulated from antitrust scrutiny by the non-statutory labor exemption

---

[2] Since July 26, 2024, the parties have filed approximately two thousand pages of documents memorializing and defending the settlement. The settlement is so complex (and vague on key components) that even the parties who drafted it cannot seem to agree on what it permits and prohibits. During the September 5, 2024, preliminary approval hearing, the parties expressed confusion or disagreement over the settlement's most material terms, including (1) the scope of the released claims, (2) the regulation of third-party NIL deals post-settlement, and (3) the NCAA's ability to enforce amateurism rules after making payments for athletic services in the settlement.

[3] We are mindful that we do not have standing to offer a legal objection to the settlement. Thus, this letter is akin to an amicus brief.

[4] Statement of Interest of the United States of America (SOI of USA) (ECF No. 595 at 6, 1/17/2025)

or any other labor exemption,[5] yet the settlement *acts as a substitute* for a collective bargaining agreement.[6]

Class Counsel appear to concede the revenue sharing cap is vulnerable under antitrust laws. A primary reason the parties jointly seek statutory antitrust immunity from Congress—via the promises in Article 7 of the Injunctive Relief Settlement—is to obtain iron-clad protection for the cap in the future.

In comments to *CBS Sports* in May 2024, Mr. Kessler said, "[w]e would support a limited antitrust exemption [from Congress], so when they implement this great new system to give all these benefits to the athletes, someone can't say, well, the settlement itself, that sets a 22% cap on new benefits is an antitrust violation."[7]

Similarly, Mr. Berman told the *Washington Post* in June 2024[8] that "[i]f the NCAA asks us, we will go to the Hill and say we think [the settlement] is a great solution for college athletes and that the NCAA should be given antitrust immunity for pay for play and for NIL. That's all we're willing to do. We're not going to advocate for about the employment issue or unionization, or any of that. We're not involved with that."[9]

Class Counsel have also suggested that in settlement discussions, the NCAA and Conference Defendants "conspir[ed] to fix the price of paying college athletes."[10]

In short, Defendants have engaged in "collective bargaining" negotiations with Class Counsel and Congress—everyone except the athletes—to shape college sports' legal and regulatory environments to their liking.

Now, "an adjudicated monopsonist seeks this Court's imprimatur to impose a salary cap that may suppress competition in unforeseen ways."[11] And that suppression of competition may then be

---

[5] SOI of USA at 8, 9
[6] Id, at 8 (citing from Plaintiffs' Motion for Preliminary Settlement Approval that the settlement was "an extraordinary recovery given that plaintiffs didn't have the leverage of a collective bargaining agreement")
[7] *Gut-wrenching choices, Title IX complications face college athletics in wake of House v NCAA settlement* (Brandon Marcello, CBS Sports, May 30, 2024)
[8] *Why Capitol Hill remains a key battleground in college sports* (Jesse Dougherty, Washington Post, June 7, 2024)
[9] Notably, Class Counsel made these comments before the parties filed their settlement documents on July 26, 2024. As discussed in more detail in Section IV, Article 7 of the Injunctive Relief Settlement *requires* Class Counsel to lobby Congress for antitrust immunity, preemption of state laws (which has nothing to do with issues raised in the underlying litigation or the settlement), and to remain "neutral" on any bill that would strip athletes of employee status, thus permanently eliminating the possibility of protectable collective bargaining rights under the NLRA. Article 7 also requires that Class Counsel "not oppose, advocate against, lobby in any way against, or otherwise attempt or seek to undermine legislation implementing/codifying this Injunctive Relief Settlement."
[10] During a podcast interview the day after Class Counsel filed their amended settlement documents, Steve Berman said of the settlement negotiations: "…[t]he very first time we met, we were at the O'Hare Hilton—a very depressing place—and the mediator comes down and he goes, we're going to start half an hour later because they're all meeting upstairs. I turned to Kessler…in most antitrust cases, we try to find evidence that they met. Here, they're asking us to wait while they're all upstairs *conspiring on how to fix the price of paying college athletes.* There were a lot of ironies in the settlement process." (SportsWise podcast, Episode 74: *The Latest on the House Settlement with Co-Counsel for the Plaintiffs, Steve Berman*, September 27, 2024, at approx. 14:00 – 15:20) (emphasis added)
[11] SOI of USA at 7

adopted through a bill in Congress permanently ending athletes' quest for fair treatment under American laws.

In the underlying litigation, Class Counsel made compelling arguments that the nascent, less regulated third-party NIL market has not brought college sports to a fatal collapse or caused any measurable economic harm.

Since the adoption of the NCAA's Interim NIL Policy on June 30, 2021,[12] (the day before several state NIL laws became effective), the college sports marketplace has enjoyed a historic bull market with increasingly lucrative broadcast media deals, football-driven conference consolidation that brings big-time college football even closer to an NFL-like product, an expanded College Football Playoff (CFP) worth additional billions of dollars, an explosion in the value of Division I women's basketball, increasing coach salaries, and new revenue streams from emerging technologies.

Even assuming that *every* payment from an NIL collective to an athlete is outright "pay-for-play,"[13] the evidence suggests that college sports can accommodate *that* market without harm to institutions or consumers.

Indeed, "the games go on."[14]

### III.    The Settlement Preserves and Expands the NCAA's Amateurism-Based Regulatory Authority

Among the many myths the settlement has spawned is that it marks the "end of amateurism." In fact, the settlement preserves and expands the NCAA's authority to arbitrarily determine what constitutes impermissible "pay," and what does not.

The concept of "pay" in NCAA regulation has been at the center of class action antitrust litigation since *White v NCAA* in 2006.

---

[12] *NCAA adopts interim name, image, and likeness policy* (June 30, 2021); The Interim Policy marked the beginning of the "NIL era."

[13] As used by the NCAA, "pay-for-play" is an amateurism-based pejorative because it assumes there is something morally corrupt with college athletes receiving payment for their athletic services. In fact, since the advent of the athletic scholarship in 1956, college athletes have received "pay-for-play." The NCAA uses the term "grant-in-aid" to suggest the athletic scholarship is an educational benefit and disguise its pay-for-play purpose. However, in the settlement, the NCAA now appears to acknowledge the athletic scholarship as payment for athletic services because Dr. Daniel Rascher's July 26, 2024, expert report treats the athletic scholarship as pay in his analysis of the *Carter* claims. (ECF No. 450, #4, at Pars. 45, 46, and Exhibit 7 ["Estimated damages for additional compensation for athletic services"]). We use the terms "pay-for-play," payment for "athletic services," and payment for "athletic performance" interchangeably to mean the same thing.

[14] "'That *some* restraints are necessary to create or maintain a league sport does not mean *all* 'aspects of elaborate interleague cooperation are.' While a quick look will often be enough to approve the restraints 'necessary to produce a game,' a fuller review may be appropriate for others. The NCAA's rules fixing wages for student-athletes fall on the far side of this line. Nobody questions that Division I basketball and FBS football can proceed (and have proceeded) without the education-related compensation restrictions the district court enjoined; the games go on." *NCAA v Alston*, 594 U.S. 69 (2021), at 91(emphasis in original, cites omitted)

In *Alston*, this Court offered the definitive description of the NCAA's conceptualization of "pay" as expressed through amateurism rules:

"...the rules that permit, limit, or forbid student-athlete compensation and benefits do not follow any coherent definition of amateurism, including Defendants' proffered definition of no 'pay for play,' or even 'pay.' The only common thread underlying all forms and amounts of currently permissible compensation is that the NCAA has decided to allow it."[15]

The settlement permits the NCAA to continue its Alice in Wonderland[16] application of amateurism by explicitly making "pay for play" payments via the *Carter* claims—and receiving broad releases from liability on those claims—while at the same time preserving its authority to enforce all existing (and undisclosed new) NCAA rules prohibiting "pay for play."

In essence, the NCAA is paying athletes for the value of their athletic services to preserve the authority to prohibit such payments going forward.

At the September 5, 2024, hearing on preliminary approval, this Court exposed the absurdity of the NCAA's position and logic:

**THE COURT**: But in this House settlement if it is approved, you will be explicitly paying for play or allowing schools to pay-for-play. So, this no play for pay thing isn't going to be there anymore, is it?

**MR. KILARU**: It is, Your Honor. There is still going to be a prohibition on pay-for-play, and there is discretion for schools to make payments as they see fit under the new regime.

**THE COURT**: And that won't be pay-for-play?

**MR. KILARU**: No, Your Honor. But, I mean, whatever -- I think that's correct, but I think setting that aside, the fact of the matter is bans on pay-for-play have been upheld time and time again. This is litigation challenging bans on pay-for-play. This is something that came out of the settlement process. I believe Plaintiffs believe it is an improvement for the status quo, and for us it is an essential part of the deal.

**THE COURT**: Wow.

(Tr., pp 69-70)

Logical inconsistency notwithstanding, buried in the byzantine settlement documents is a two-sentence provision that asks this Court to bless as legitimate and unchallengeable *all* NCAA amateurism-based compensation and benefits rules.

---

[15] *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-In-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1074 (N.D. Cal. 2019)

[16] "When I use a word, Humpty Dumpty said, in a rather scornful tone, it means what I choose it to mean—neither more nor less." Lewis Carroll, *Through the Looking Glass* (1871)

Article 4 (NCAA and Conference Rules), Section 2 (Existing NCAA Compensation Rules) of the Amended Injunctive Relief Settlement provides that:

"Except to the extent that modification or elimination is required by the terms of this Injunctive Relief Settlement, *the NCAA's and conferences' existing rules limiting the amount of compensation and benefits* to *Division I student- athletes may remain in effect. The Parties shall request that the Court approve all existing NCAA rules regarding compensation and benefits that may or may not be provided by Division I conferences or schools to student-athletes*, revised as necessary to conform to the terms of this Injunctive Relief Settlement." (emphasis added)

Thus, the language in Article 4, Section 2 appears to confer upon the NCAA something that neither the settlement releases nor prior court decisions do: a definitive legal determination that all NCAA amateurism-based compensation limits—notably including prohibitions on pay-for-play—are valid.[17]

We don't have to speculate how the NCAA will use this sweeping language in future litigation if the settlement is approved.

In the pending *Brantmeier v NCAA* class action suit[18] involving a challenge to the NCAA's limits on prize money NCAA tennis players may receive from non-NCAA entities, the NCAA specifically invokes Article 4, Section 2 to bolster its amateurism-based regulatory authority, attempting to turn the clock back to a pre-*O'Bannon* legal environment.

In briefing on Plaintiff's motion for a preliminary injunction[19], the NCAA relied on a Declaration from Jenn Fraser (NCAA Vice President of Division I Governance) that listed NCAA Bylaws prohibiting pay-for-play to support its amateurism-based defenses.[20]

The NCAA also addressed the impact of the settlement on its amateurism rules:

---

[17] Relying on *O'Bannon II* and *Alston I, II, and III*, the NCAA suggests this provision merely *affirms* the legitimacy of NCAA compensation limits including pay-for-play restrictions. However, the history and current state of "pay-for-play" rules is more nuanced than Defendants' portray. Thus, when Defendants' say the Supreme Court in *Alston* "did not question the basic prohibition on pay-for-play" (see, Defendants' Reply ISO Motion for Preliminary Settlement Approval, ECF No. 495 at 10, 1), they overstate the Supreme Court's ruling. Class Counsel *abandoned* their pay-for-play claims in the Supreme Court by not cross-appealing to keep them alive. (see exchange between Justice Sotomayor and Class Counsel during oral argument on March 31, 2021 [Oral Argument Transcript, at 53]) Accordingly, the Supreme Court was not called upon to decide, nor did it decide, that the NCAA's amateurism-based compensation limits banning pay-for-play were presumptively legitimate under antitrust laws.

[18] *Brantmeier v. Nat'l Collegiate Athletic Ass'n*, 1:24-CV-238 (M.D.N.C. Oct. 7, 2024). Mr. Rakesh Kilaru is lead counsel for the NCAA in *Brantmeier* and *House/Hubbard/Carter*.

[19] This briefing occurred after the parties filed their settlement papers in *House*.

[20] *Brantmeier* ECF No. 33, Exhibit A, Par. 24 Decl. of Jenn Fraser (July 30, 2024)  ("The Division I members adopted parameters for eligibility whereby an 'individual loses amateur status and thus shall not be eligible for intercollegiate competition in a particular sport if the individual: (a) *Uses athletics skill (directly or indirectly) for pay in any form in that sport*; (b) *Accepts a promise of pay* even if such pay is to be received following completion of intercollegiate athletics participation…'") (emphasis added) The NCAA's use of these principles and rules in a post-settlement environment harkens back to the "magic dicta" from *Board of Regents* which the Supreme Court rejected in *Alston*.

"Nothing about the NCAA's recent settlement of broad-ranging antitrust lawsuits challenging its compensation and benefits rules changes the validity of these rules. *See* Mot. for Prelim. Settlement Approval, ECF 450, *In re College Athlete NIL Litig. ("House")*, No. 4:20-CV-03919 (N.D. Cal. July 26, 2024). The settlement, if approved, would be effective in the 2025-26 academic year. While the settlement does modify some of the rules mentioned above on a forward-going basis, *it will not write them out of the rulebook or undermine their validity under the antitrust laws. See id.* at 9-11; ECF 450-3 at 68-70, *House*, No. 4:20-CV-03919 (N.D. Cal. July 26, 2024). *On the contrary, the parties to the settlement will jointly request that the court approve these rules and their continued enforcement in light of their validity under the antitrust laws.*"[21] (emphasis added)

At the hearing on the motion for preliminary injunction on August 15, 2024, the NCAA cited specifically to Article 4, Section 2 for the proposition that the settlement preserves and protects all post-settlement amateurism rules including rules limiting tennis prize money:

**[NCAA ATTORNEY]**: For the record, we're now at page 68 of 133. It talks about Section[2], existing NCAA compensation rules. That section states: Except to the extent that modification or elimination is required by the terms of this injunctive relief settlement, the NCAA's conferences existing rules limiting amount of compensation and benefits to Division 1 student-athletes may remain in effect. *The parties shall request that the court approve all existing NCAA Rules regarding compensation and benefits that may or may not be provided by Division 1 conferences or schools to student-athletes revised as necessary to conform to the terms of this injunctive relief settlement*, and that's -- and there is additional --

**THE COURT**: So what does all that mean?

**]NCAA ATTORNEY]**: What all that means, Your Honor, and why it is outside of what has been approved in the settlement, *the other rules remain unchanged, and that includes these prize money rules.*[22] (emphasis added)

The NCAA also attempted to revive an argument that died in *O'Bannon* a decade ago: that NCAA compensation limits are merely "eligibility rules" rather than rules limiting compensation and therefore are"not subject to the Sherman Act because they do not regulate commercial activity. To support this argument, the NCAA relied on precedent from the 1970s, 1980s, 1990s and pre-*O'Bannon* 21st century.[23]

---

[21] *Brantmeier,* ECF No. 33, at 6
[22] *Brantmeier,* ECF No. 40 at 46, 47
[23] *Brantmeier,* ECF No. 33 at 17, 18; In *O'Bannon II*, the Ninth Circuit forcefully rejected this word play argument: "The mere fact that a rule can be characterized as an 'eligibility rule,' however, does not mean the rule is not a restraint of trade; were the law otherwise, the NCAA could insulate its member schools' relationships with student-athletes from antitrust scrutiny by renaming every rule governing student-athletes an 'eligibility rule.' The antitrust laws are not to be avoided by such 'clever manipulation of words'… [t]he NCAA's argument that its compensation rules are "eligibility" restrictions, rather than substantive restrictions on the price terms of recruiting agreements, is but a sleight of hand. There is real money at issue here." *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1064, 1065 (9th Cir. 2015)

*Brantmeier* demonstrates that the NCAA is already using the settlement and will continue using it "as a defense to antitrust liability...in [cases] brought by a future plaintiff seeking to achieve more fulsome protections for the free market opportunities of student-athletes than the [settlement] affords. The risk that defendants will attempt to use a private, negotiated settlement as a shield in future litigation underscores the importance of determining carefully whether it is fair and adequate."[24]

## IV.    Article 7 of the Injunctive Relief Settlement is Designed to Permanently Strip Athletes of Antitrust Protection, the Benefit of State Laws, and Labor Rights

Article 7 (Legislation and Alternative Structures) represents an unprecedented attempt to leverage a private settlement agreement to achieve sweeping federal protections and immunities for the NCAA and Power 5[25] conference that would eliminate athletes' ability to assert their rights through antitrust laws, federal labor laws, or state legislation.

Article 7 is directly linked to Defendants' five-year campaign in Congress for federal protections and immunities that would eliminate athletes' rights and grant the NCAA absolute regulatory supremacy.

### A. Article 7, Section 1 (Legislation)[26]

Article 7, Section 1 extracts promises from Class Counsel, ostensibly for the purpose of "implementing/codifying" the settlement in Congress.

Class Counsel must:

1. not oppose or undermine any legislation "implementing/codifying" the Injunctive Relief Settlement

2. take no position and thus be "neutral" on any legislation that would provide athletes additional benefits

3. lobby with the NCAA *for antitrust immunity*[27]

---

[24] SOI of USA (*House* ECF No. 595 at 10, 1/17/2025)

[25] We use the terms "Power 5" (ACC, Big Ten, Big 12, Pac-12, and SEC) and "Power 4" (ACC, Big Ten, Big 12, SEC), as appropriate.

[26] ECF No. 535-1, Exhibit 1, Appendix A (Amended Injunctive Relief Settlement) at 27, 28

[27] Prior to the settlement, Class Counsel lobbied in Congress *against* statutory antitrust immunity: "Throughout this litigation, Defendants engaged in an aggressive, years-long campaign to lobby for legislation that would exempt them from the antitrust laws and allow them to continue their unfair restrictions on college athletes, collectively spending nearly $10 million dollars on lobbying between 2021 and 2024. Class Counsel expended significant effort and resources, to protect the classes' interests against Defendants' attempts to kill this lawsuit, including by meeting with legislators, analyzing proposed legislation and advising Congressional committees, and submitting written testimony before Congressional panels. That included expending significant funds on lobbyists, for which Class Counsel does not seek direct reimbursement." Class Counsels' promise to now lobby in *favor* of statutory antitrust immunity for a recidivist antitrust violator is a stunning reversal. Antitrust law has been the primary vehicle for

4. lobby with the NCAA *for preemption of state laws*[28]

5. take no position and thus be "*neutral*" on whether athletes should be considered/deemed "employees" (or whether collective bargaining should be permitted for compensation of athletes)[29]

These are extraordinary promises and Court approval of Article 7 would have far-reaching implications.

First, it would transform Class Counsel from advocates for their clients into lobbyists for the NCAA, creating a conflict of interest.

Second, the Court would tacitly endorse Defendants' narrative that federal legislation "codifying" the settlement is not only reasonable but desirable.

Third, Class Counsels' endorsement of Defendants' congressional asks presumes that hundreds of thousands of athletes have consented to legislation that impairs their rights. Athletes have no idea what is happening in Congress or that Class Counsel has promised to lobby against their interests. Approval of Article 7 may suggest that this Court is satisfied that athletes understand and agree with its consequences.

Fourth, this Court could be perceived as wading into a partisan political debate in a separate branch of government, placing its thumb on the scale in favor of sweeping federal legislation that would permanently limit athletes' rights.

The NCAA (and its allies in Congress and the media) have pitched Congress' role as merely complementary to the settlement and the need to tie up a few loose ends the settlement can't address.

In fact, the opposite may be more accurate.

The settlement is an appeasement to Congress that serves as a temporary financial offering to athletes to achieve Defendants' ultimate goal of permanent regulatory supremacy in college

---

athletes to protect their economic rights in response to Defendants' unlawful market behavior. It is also the only leverage athletes have until they may secure protectable collective bargaining rights under the NLRA.

[28] Through preemption, the NCAA and Power 5 seek to eliminate states from the college sports regulatory field. Preemption would nullify any state laws that conflict with NCAA rules and regulatory authority. Preemption has nothing to do with the underlying litigation cases or the settlement's substantive terms. Some objectors have pointed out that the settlement may conflict with a number of state laws or governors' executive orders that, for example, permit schools to make direct NIL payments to athletes with few restrictions. Preemption would nullify those state laws.

[29] As discussed below, Defendants quest to deny athletes employee status is designed to permanently deprive athletes of the protections of America's foundational labor laws. Without employee status, athletes could not seek protectable, enforceable collective bargaining rights under the NLRA. Thus, in any non-NLRA "bargaining," athletes would be left to the mercy of the very institutional power structures that have refused to even listen to their concerns, much less change their behavior to accommodate them. We believe that "neutrality" on this core issue is acquiescence to the existing power imbalance between athletes and institutions.

sports. It ties up a substantial loose end for lawmakers who have grown skeptical of the NCAA's willingness and ability to solve its own problems,[30] and weary of Defendants' sky is falling narratives on NIL that never came to fruition.

To make sense of Article 7, it's important to understand Defendants' five-year campaign in Congress.[31]

### 1. The Origins of Defendants' Congressional Campaign

For nearly 70 years, the NCAA enjoyed monopoly control over college sports regulation and athlete labor. The NCAA has come to believe that it, and it alone, should continue to be the sole regulator in college sports. It wants plenary authority to make, interpret, and enforce the rules governing college sports.

This institutional hubris has been the hallmark of the NCAA's regulatory reign. The NCAA's stubborn refusal to modify its rules to align with the times and the increasing professionalization and commercialization of college sports has inspired compelling critiques on the disconnect between the NCAA's mythology-based values and the reality of its business model.[32]

Heading into the 21st century, various external regulators began challenging the NCAA's regulatory hegemony. These threats came from federal class action litigation, federal administrative agencies (primarily the National Labor Relations Board), Congress, state legislatures, and in the NIL era, free markets.[33]

---

[30] See, e.g., *Baker: Antitrust settlement creates certainty for new system*, Dan Murphy, *ESPN*, June 10, 2024 ("[NCAA President] Baker and many others in college sports are hoping the plans to share revenue with athletes in the future will spur Congress to write a new law that will prevent athletes from becoming employees. 'If the court blesses [the pending settlement], then it puts [the NCAA] in a position where we can go to Congress and say '*One of the three branches of the federal government blessed this as a model to create compensation without triggering employment…I think that's a good place to start a conversation with Congress.*'" (emphasis added); see also, *How the NCAA Plans to Stop Employment in its Tracks After the Settlement*, Amanda Christovich *Front Office Sports*, June 5, 2024)

[31] DYK has researched and analyzed the NCAA/Power 5 congressional campaigns. Our data includes a comprehensive timeline of congressional activity beginning in February 2019, congressional hearing information with hearing summaries and links to hearing videos, a federal legislation chart that includes key bills/discussion drafts introduced with bill summaries, analysis, and links to each bill, overall lobbying expenditures, and all Senate Lobbying Disclosure Reports since 2020 with links to each.

[32] See, generally, Southall, R. M., Nagel, M. S., Staurowsky, E. J., Karcher, R. T., & Maxcy, J. G. (2023, May 4) *The NCAA and the Exploitation of College Profit-Athletes: An Amateurism That Never Was.*, Zimbalist, A. (1999, July1), *Unpaid Professionals: Commercialism and Conflict in Big-Time College Sports.*, Sack, A. L., & Staurowsky, E. J. (1998, January 1) *College Athletes for Hire: The Evolution and Legacy of the NCAA's Amateur Myth*, Byers, W., & Hammer, C. (1995, October 3) *Unsportsmanlike Conduct: Exploiting College Athletes.*, Smith, R. A. (1988, November 3) *Sports and Freedom: The Rise of Big-Time College Athletics.*, Devenzio, D. (1986, January 1) *Rip-Off U: The Annual Theft and Exploitation of Major College Revenue Producing Student-Athletes.*

[33] Free markets may be the most efficient external regulator of all. Free markets have quickly ripped through Defendants' fearmongering narratives on the necessity for government intervention. In the "natural" economic experiment of a largely unregulated NIL market—whether "true" NIL or "pay-for-play"—none of the harms Defendants predicted came to pass. This is a primary reason Defendants have aggressively pressed for a quick pullback on free market NIL activity. The longer the market is operating outside Defendants' control, the weaker their case for regulating it.

Historically, the NCAA and power conferences would deal with external regulatory threats one at a time—a "wac-a-mole" approach.

However, in 2019, the NCAA and Power 5 began formulating a comprehensive strategy to address and eliminate all external regulatory threats simultaneously with one powerful blow.

A critical inflection point came in February 2019 with the introduction of California's name, image, and likeness law, SB 206 (the "Fair Pay to Play Act")[34] that permitted NIL payments from third parties only, and a federal NIL bill proposal in the House of Representatives.[35]

While aggressively opposing both laws,[36] the NCAA formed a working group[37] on May 14, 2019, to decide whether to continue its opposition to NIL or change NCAA rules to permit some NIL activity.

In late 2019, the working group issued an interim report that recommended the NCAA consider changing its rules to permit NIL within amateurism-based "guardrails."[38] The NCAA Board of Governors adopted the working group's recommendations and asked the Divisions to have NIL legislation ready for consideration and possible enactment by January 2021.[39]

However, at the same time, the NCAA and Power 5 launched a historic campaign in Congress—under the guise of "NIL compensation"—to eliminate any legal and regulatory pathway athletes might have to protect their rights as American citizens.

Thus, for public consumption, the NCAA was leading stakeholders to believe it would change its own NIL rules, but behind the scenes, it was launching the most audacious regulatory power grab in the history of American sports.

    *2. The Asks*

---

[34] SB 206 (September 30, 2019).

[35] H.R. 1804 ("Student-Athlete Equity Act"), March 14, 2019, Mark Walker (R-NC).

[36] The NCAA threatened to sue the state of California under a dormant commerce clause theory.

[37] NCAA Board of Governors Federal and State Legislation Working Group announcement and Charge

[38] Almost all of the state bills that followed SB 206 contained amateurism-based" guardrails" that aligned with the Working Group's recommendations.

[39] To this day, the NCAA has not made good on its promise. The Interim Policy and the muddled "guidance" memos that followed are not *rules* changes. The Interim Policy is "interim" until one of two things occurs: (1) the NCAA actually changes its rules, which has not happened or (2) the NCAA receives federal protections and immunities from Congress that would permit the NCAA to do whatever it wants with the NIL market without any legal accountability.

From a secret Power 5 meeting in December 2019[40], and the Final Report of the Working Group in April 2020[41], the NCAA and sought three extraordinary federal protections and immunities from Congress unprecedented in colleges sports:

(1) antitrust immunity to eliminate federal antitrust litigation from the regulatory field,

(2) preemption of state laws to eliminate states from the regulatory field, and

(3) a statutory prohibition on athletes being employees which would remove athletes from the protection of labor laws that require employee status.

In essence, these powerful immunities would make the NCAA—a private nonprofit entity—a sovereign regulatory state with full governmental powers and complete governmental immunity.

As evidenced by Article 7, these three essential components of the Defendants' congressional campaign have not changed since 2019.

### 3. The lobbyists

Rather than change their unlawful business practices, the NCAA and Power 5 seek to change the law.

This is no small task. The NCAA and Power 5 therefore turned to the most powerful lobbyists in Washington, D.C to do their bidding. [42]

The NCAA and Power 5 have amassed a veritable army of highly skilled lobbyists.

More than eight lobbying firms and approximately thirty-five lobbyists work for the NCAA and Power 5 at any given time and have coordinated their efforts.

---

[40] *Power Five document: "We don't think Mark [Emmert] or the NCAA should be taking the lead in Washington,* Andy Wittry, *Out of Bounds* (November 10, 2020)
[41] NCAA Board of Governors Federal and State Legislation Working Group Final Report (April 17, 2020, p. 27) "In light of the above and driven by our desire to do what is best for our student-athletes, the Presidential Subcommittee urges the NCAA Board of Governors to:

1.  Support the ongoing modernization effort of NCAA rules in areas of student-athlete well- being, including student-athlete experience, health and safety and academic success; and
2.  **Immediately engage Congress** to accomplish the following:
    1. Ensure **federal preemption** over state name, image, and likeness laws;
    2. Establish an **antitrust exemption** for the Association;
    3. Safeguard the **nonemployment status** of student-athletes;
    4. Maintain the distinction between students-athletes and professional athletes; and
    5. Uphold the NCAA's values including diversity, inclusion and gender equity." (emphasis added)

[42] *'A Breathtaking Lobbying Campaign': The NCAA's Sophisticated Effort to Save Amateurism,* Amanda Christovich, *Front Office Sports*, May 18, 2024 (utilizing DYK's lobbying research)

The NCAA also has an in-house Office of Government Relations in D.C whose lobbyists work full-time to influence Congress.

The NCAA's and Power 5's outside lobbying firms are the very best in the business and some are consistently ranked among the top firms in D.C.[43]

The NCAA retains Brownstein Hyatt (BH), the number 1 ranked lobbying firm in D.C.

BH's lobbying division has a "Crisis Management and Strategic Response" team with expertise in helping clients protect their "bottom line" and their "brand."[44]

Three members of BH's twelve-member Crisis Management team currently lobby for the NCAA, including the Crisis Management Department Chair.[45] That number has been higher in prior years.

These same lobbyists have also lobbied for opioid manufacturer Purdue Pharma.[46]

Purdue Pharma's crisis is obvious: they produced a dangerous, addictive drug and misled the public.

What is the NCAA's "crisis?"

Having to comply with America's foundational free competition and labor laws.

To support the lobbying campaign, NCAA executives, Power 5 conference power brokers, university presidents, and Hall of Fame coaches have worn a path to Washington, D.C. in their quest for regulatory supremacy and control of the athlete labor force.[47]

Importantly, athlete labor funds all of these expenses.[48]

---

[43] Most of these lobbyists were onboarded in early 2020 as the NCAA and Power 5 launched their congressional campaign in earnest. On February 13, 2020, the SEC hired the number 2 ranked lobbying firm, Akin Gump. On March 20, 2020, the Pac-12 retained the 14th ranked firm, Cassidy and Associates. On May 18, the Big Ten hired FGS Global. On July 9, 2020, the ACC retained DLA Piper. The Big 12 used Kit Bond Strategies, a firm it hired in 2015. And on March 9, 2020, all Power 5 conferences retained Subject Matter (f/k/a Elmendorf Ryan) ranked number 17 and Marshall and Popp, an influential boutique firm.

[44] See, BH Website

[45] See, BH's Q4 2024 Lobbying Report for the NCAA

[46] See, BH's Q3 2024 Lobbying Report for Purdue Pharma

[47] See, e.g., *NCAA leaders warn college sports at risk of 'permanent' damage without action from Congress, Manu Raju, CNN* (December 3, 2023); *Saban goes to Washington: Alabama coach set to lead SEC contingent on lobbying trip*, Ralph Russo, *Associated Press* (June 1, 2023); *Notre Dame implores Congress to save 'great American institution' after 'undesirable' $2.8B NCAA settlement*, Bridget Reilly, *New York Post* (May 24, 2024); *Members, student-athletes picking up steam on congressional engagement*, NCAA website (July 28, 2023)

[48] Since 2019, the NCAA and Power 5 have spent approximately $12 million on professional lobbying expenses. This amount reflects only figures disclosed in lobbying disclosure reports. The NCAA and Power 5 have also engaged in "grassroots" lobbying and many member institutions have also used their in-house lobbyists.

As discussed in Section VI below, revenue from the labor of Division I men's basketball players pays for *all* of the NCAA's lobby costs. Power 5 lobbyists are likewise paid from athlete-generated revenue from both football and basketball.

In essence, the athletes whose labors underwrite the entire college sports industry are funding the weapons being used to limit their rights as Americans.

### 4. The Hearings

Beginning with a hearing in a Senate Commerce Subcommittee on February 11, 2020—stacked with NCAA/Power 5 witnesses—the NCAA laid the foundation for federal legislation that would place the NCAA on the Iron Throne of college sports regulation and end the athletes' rights movement.[49]

In an eight-month period in 2020, the Republican-controlled Senate held four hearings in three key committees: Commerce (2), Judiciary, and Health, Education, Labor and Pensions (HELP).[50] Under the banner of preserving the "integrity of college sports," and through NCAA mythologies of amateurism, the "student-athlete," and the "collegiate model," the Committee Chairs[51] dutifully promoted the NCAA/Power 5 party-line on preemption, antitrust immunity, and no-employee.

Notably, three of these hearings occurred during the COVID lockdowns. While America was sheltering in place and Congress was struggling to keep Americans safe and our economy functioning, the NCAA and Power 5 sought and were granted an audience with the United States Senate to promote legislation that would strip college athletes of basic free market and labor rights.[52]

In this critical time frame, the NCAA and Power 5 accomplished several important goals.

---

[49] The ratio of NCAA-friendly witnesses to athletes advocates was 5-1. NCAA witness included former House member Anthony Gonzalez, former NCAA President Mark Emmert, former Big 12 Conference Commissioner Bob Bolwsby, and University of Kansas Chancellor Doug Girod.

[50] The jurisdiction of these committees aligns perfectly with Defendants' "asks." Commerce has original jurisdiction over sports matters and also regulates interstate commerce and would therefore "bless" federal preemption. Judiciary has jurisdiction over antitrust issues and would approve any antitrust exemption. HELP has jurisdiction over labor matters and approve a no-employee prohibition.

[51] Roger Wicker (R-MS) Commerce, Lindsey Graham (R-SC) Judiciary, and Lamar Alexander (R-TN) HELP

[52] See, _Proposed NCAA NIL Legislation Is A Restrictive First Step for Student-Athletes_, Ross Dellenger *Sports Illustrated* (July 17, 2020) ("Power 5 athletic leaders, feverishly working this summer [2020] on NIL legislation, plan to present the semi-finished product to Congress next week in a Senate Judiciary Committee hearing on Capitol Hill, the latest step in advancing NIL down the path to a universal Congressional bill."); see also, NCAA Board of Governors Federal and State Legislation Working Group Final Report p. 3 ("Finally, the working group is mindful of the COVID-19 pandemic as it delivers this report, and the impact the pandemic is having on higher education and college sports. The effects of the pandemic have caused enormous disruption to many, including student-athletes. Although the ultimate impact of the pandemic remains uncertain, this uncertainty must not hinder the efforts to modernize NIL rules intended to benefit student-athletes.")

First, they normalized protective federal legislation as an inevitable necessity. There was never a debate about *whether* the federal government should pass college sports legislation to protect the economic interests of a group of private, education nonprofits; the only questions were *how* and *when*.

Second, through their "crisis management" lobbyists and allies in the sports and mainstream media, the NCAA and Power 5 created a nationwide crisis mentality around the prospect of NIL compensation. The hearings were flooded with sky is falling narratives, none of which occurred.

The NCAA and Power 5 wanted to Congress, stakeholders and consumers to believe that if athletes got paid for their NIL in a market the NCAA/Power 5 did not control, chaos would reign, and athletics departments nationwide would go broke leaving thousands of athletes—particularly "Olympic" sport athletes—without a scholarship of an opportunity to participate in college sports.

Third, through the "crisis" mindset, stacked witness lists[53], and repetitive talking points, the NCAA, Power 5, and their lobbyists have created the illusion of "consensus" on the need for protective legislation.[54]

### 5. The Bills

By hitting the ground running in Congress in 2020, the NCAA and Power 5 scored another victory in shaping the debate to fit their goals: the first three bill proposals gave the NCAA and Power 5 everything they asked for.

---

[53] Through twelve hearings over four years, there were sixty-two witness slots (a number of witnesses testified more than once). Thirty-one of those slots went to institutional representatives, including NCAA Presidents (6 slots), conference commissioners (6 slots), university presidents/chancellors (6 slots), and athletics directors (9 slots). In eight of the hearings (accounting for the purpose of the hearing), there was only *one* athlete advocate. Ten athletes (current or recently graduated) testified. Nine participated in non-revenue sports and eight were women. There was only *one* Power 5 athlete (football) and, stunningly, *not a single* Division I men's basketball player. Moreover, Defendants have used NCAA-sanctioned and controlled Student Athlete Advisory Committees to lobby for Defendants' goals in Congress to falsely suggest athlete consensus. (see, <u>DYK Congressional Hearings Chart</u>)

[54] A noteworthy example of this manipulative dynamic occurred during the October 17, 2023, hearing in the Senate Judiciary Committee. Seven witnesses testified: (1) Charlie Baker, NCAA President (2) Tony Petitti, Big Ten Conference Commissioner (3) Jack Swarbrick, Notre Dame Athletics Director (4) Walker Jones, Exec. Dir. of The Grove Collective (5) Jill Bodensteiner, St. Joseph's Athletic Director (6) Trinity Thomas, University of Florida gymnast, and (7) Ramogi Huma, Exec. Dir. National College Players Association. Sen. Ted Cruz asked the group: "Going down the panel, do you believe student-athletes should be treated as employees, yes or no? **No. No. No. Yes** (for FBS football, Division I men and women's basketball). **No. No. No.**" The lone yes was Mr. Huma. To anyone watching that hearing, and to other lawmakers who know very little about college sports, the chorus of "no" was a powerful, "consensus" condemnation of athletes as employees. However, four of the no votes came from people with disqualifying conflicts of interest. The NCAA, Big Ten, and Notre Dame representatives in particular (Baker, Petitti, and Swarbrick) make millions and millions of dollars from the status quo and their task at this hearing was to protect it. See, "*Name Image, and Likeness and the Future of College Sports*", Senate Judiciary Committee (October 17, 2023) at approx. 2:04:50 – 2:06:20

On June 18, 2020, Sen. Marco Rubio introduced the first federal "NIL" law.[55] It offered little in terms of NIL benefits but provided the NCAA with preemption, antitrust immunity, and no-employee status.

The NCAA lauded the bill on its website the day it was introduced saying "We commend Senator Rubio for introducing this critical piece of federal legislation…[h]is bill sets out federal parameters for allowing student-athletes to profit from the use of their name, image and likeness without turning them into employees; preempts legislation at the state level; and importantly protects the Association from ongoing litigation as we move forward with establishing national rules on name, image and likeness."[56]

On September 24, 2020, Ohio Representative Anthony Gonzalez (R-OH)[57] and Missouri Representative Emanuel Cleaver introduced H.R. 8382 ("Student-Athlete Level Playing Field Act") which likewise contained preemption, antitrust protection, and no-employee statusprovisions.[58]

Then, on December 10, 2020, Sen. Roger Wicker (R-MS) (then-Commerce Committee Chair) introduced S. 5003 ("Collegiate Athlete Compensation Rights Act") which provided the NCAA and Power 5 expansive versions of these three extraordinary federal protections and immunities.[59]

In response to these naked power grabs, Democrats began to push back with the introduction of S. 5062 ("College Athletes Bill of Rights")[60] on December 20, 2020, which offered revenue sharing, health and safety benefits and standards, and a federal corporation to administer the bill that explicitly excluded from membership any person who was, or had been, employed by the NCAA, a conference, or a school.

The primary sponsors of the bill were Sens. Cory Booker (D-NJ) and Richard Blumenthal (D-CT). The bill leaned into the civil rights implications of college sports business model and the exploitation of African American labor (in Power 5 football and men's basketball).

On May 27, 2021, Sens. Chris Murphy (D-CT) and Bernie Sanders (I-VT) introduced S. 1929 the "College Athlete Right to Organize Act." The bill would amend the NLRA to make universities employers and scholarship athletes employees. The bill would also make conferences multiemployer bargaining units.[61]

The NCAA aggressively pushed back against the bill.[62]

---

[55] S. 4004 ("Fairness in Collegiate Athletics Act").
[56] NCAA statement on Sen. Marco Rubio bill (6/18/2020)
[57] Rep. Gonzalez was the first witness to testify at the first hearing on February 11, 2020.
[58] H.R. 8382 (September 24, 2020) (see Sections 6 and 7)
[59] S. 5003 ("Collegiate Athlete Compensation Rights Act")
[60] S. 5062 ("College Athletes Bill of Rights") (December 20, 2020) (see, Sections 5, 6, 7, 11(c)(E)(i) and (ii))
[61] S. 1929 ("College Athlete Right to Organize Act") (May 27, 2021) (Sec. 3)
[62] See, *NCAA statement on Murphy-Sanders bill* (May 27, 2021)

The College Athletes Bill of Rights and the College Athlete Right to Organize Act were the high-water marks for athletes.[63]

From 2021 through 2024, a variety of bills have been proposed that have moved the debate in Congress closer to NCAA/Power 5 interests.

Proposals by Senators Jerry Moran (R-KS),[64] Tommy Tuberville (R-AL)/Joe Manchin (D-WV),[65] Ted Cruz (R-TX; discussion draft),[66] and House members Gus Bilirakis (R-FL; discussion draft),[67] Mike Carey (R-OH)/ Greg Landsman (D-OH),[68] Russell Fry (R-SC)/Barry Moore (R-AL),[69] and Bob Good (R-VA)[70] contain all or some combination of preemption, antitrust immunity, and no-employee.

The Cruz, Bilirakis, Moore-Fry, and Good[71] bills are naked power grabs.

To "codify/implement" the settlement, the NCAA and Power 5 are seeking a "bipartisan compromise bill" framed around existing proposals.

The most likely candidate is a discussion draft proposal by Sens. Moran, Booker and Blumenthal released on July 20, 2023, titled "College Athletes Protection and Compensation Act."[72] (CAPCA) This bill is a combination of Moran's 2021 bill and the second version of the Athletes Bill of Rights (without revenue sharing).

The CAPCA, like Moran's original bill (and both versions of the Athletes Bill of Rights) uses a federal corporation to operate the federalized compensation market. However, where the Athletes Bill of Rights *prevented* NCAA and Power 5 insiders from serving on the corporation's board, the CAPCA *requires* them.[73]

This bill essentially replicates the NCAA bureaucracy under federal law.

By acquiescing to this fundamental shift in decision-making structures, Sens. Booker and Blumenthal appear to be advocates for the status quo more than athletes' rights.

---

[63] The Athletes Bill of Rights was re-released in 2022. The new version (S. 4724) removed the revenue sharing component which was a retreat from its original civil rights focus. The College Athletes Right to Organize Act was re-released twice but failed to gain support.

[64] S. 414 ("Amateur Athletes Protection and Compensation Act of 2021") (February 24, 2021) (Secs. 5, 12, 13)

[65] S. 2495 ("Protecting Athletes, Schools, and Sports Act of 2023") (July 25, 2023) (Secs. 10, 11, 12(b))

[66] Cruz discussion draft (untitled, July 21, 2021) (Secs. 7, 8(a), 8(b))

[67] H.R. ("Fairness, Accountability, and Integrity in Representation of College Sports Act") (Secs. 106, 201, 301(c))

[68] H.R. 3630 ("Student Athlete Level Playing Field Act") (May 24, 2023) (Secs. 7, 8(c), and 8(d))

[69] H.R. ("Protecting the Benefits for Athletes and Limit Liability Act of 2024") (May 8, 2024) (Sec. 3)

[70] H.R. ("Protecting Student Athletes' Economic Freedom Act") (May 23, 2024) (Sec. 2)

[71] Good's bill is a single-issue bill that makes it impossible for athletes to be employees. The Power 4 conference commissioners issued a statement endorsing it and the SEC's lobbying firm—Akin Gump—added it to their 2024 Q2 disclosure report as a "specific lobbying issue." (Line 16)

[72] "College Athletes Protection and Compensation Act" (July 20, 2023)

[73] CAPCA (Secs. 8 (c) and (d))

The CAPCA illustrates how Defendants' relentless five-year campaign in Congress has moved the debate quietly but unmistakably towards Defendants' agenda.[74]

Despite recent movement towards a "bipartisan" bill, the debate in Congress has evolved though an undeniable partisan lens. Republicans in both chambers have uniformly supported some form of protective legislation for the NCAA and Power 5 while Democrats have been more cautious on protecting institutional priorities and somewhat more attuned to athlete interests.

The new Congress—with Republicans controlling both chambers—is the ideal political landscape for Defendants and their lobbyists. Even skeptics who believe Congress will never pass a bill substantively regulating college sports have to concede it is more likely now than ever, particularly with the settlement as leverage.

In the new Senate, Sen. Cruz is Chair of the Commerce Committee, the most influential committee in Congress on college sports and the committee from which any bill "codifying/implementing" the settlement is likely to originate. Sen. Cruz is expected to join Sens. Moran, Booker, and Blumenthal in the "compromise" bill.[75]

Cruz's discussion draft proposal is among the most regressive on athletes' rights. It is also quite efficient. In less than a page it kills the athletes' rights movement through expansive preemption, antitrust immunity, no-employee provisions.[76]

As the new Commerce Chair, Senator Cruz has said he will make college sports legislation a "very, very high priority."[77]

With Republicans in control of the key committees, they have control over the legislative agenda.[78]

It's also noteworthy that John Thune (R-SD) is the new Senate Majority Leader. Sen. Thune has been attentive to college sports issues. His views are aligned with Defendants, and he may play a crucial role in moving and promoting legislation favoring institutional interests.[79]

The history of Defendants' congressional campaign and the current lay of the land in Congress puts Article 7, Section 1 and its likely impact in proper perspective.

---

[74] The filibuster (at least for now) would be available to opponents of a compromise bill that goes too far in protecting Defendants' interests and would require sixty votes to pass. However, assuming that all fifty-three Republicans supported such a bill and with Sens. Booker and Blumenthal on board, Defendants and their lobbyists would need to secure only five Democrat votes.

[75] *Texas senator aims to help NCAA regulate athlete payments*, Dan Murphy *ESPN* (January 9, 2025)

[76] Cruz discussion draft (untitled, July 21, 2021) (Secs. 7, 8(a), 8(b))

[77] "*This could be the most consequential election in college sports history*", Ross Dellenger, *Yahoo! Sports* (November 4, 2024)

[78] In Commerce, Cruz is Chair and Maria Cantwell (D-WA) is the Ranking Member. In Judiciary, Charles Grassley (R-IA) is Chair and Dick Durbin (D-IL) is the Ranking Member. In HELP, Bill Cassidy (R-LA) serves as Chair and Bernie Sanders (I-VT) is the Ranking Member.

[79] "*NCAA Scores Win With Thune As Senate Majority Leader*", Daniel Libit, *Sportico* (November 13, 2024);

Class Counsels' promise to become Defendants' lobbying agents will likely carry great weight in Congress.

This Court's tacit approval of it may carry even greater weight.

### B. Article 7, Section 2 (Alternative Structures)[80]

Section 2 suggests that athletes may utilize "alternative structures" that could provide additional benefits to athletes, including "collective bargaining."

Class Counsel and Defendants appear to have two irreconcilable views of the prospects for future "collective bargaining."

Class Counsel pitches Section 2 and the settlement as a viable bridge to collective bargaining.[81]

Conversely, Defendants appear to believe the settlement meets all athlete needs, which obviates the need for additional bargaining or employee status.[82]

In essence, Defendants' suggest the settlement *is* the "collective bargaining" and the final say on athletes' negotiation rights.

So, which of these two scenarios is most likely post-settlement?

A quick read of Section 2 suggests that Class Counsels' may be correct.

However, there are significant issues with Section 2 that cut the other way.

---

[80] *House* ECF No. 535-1, Exhibit 1, Appendix A (Amended Injunctive Relief Settlement) at 28
[81] *House* ECF No. 494 at 19 ("The Injunctive Relief Settlement *explicitly allows collective bargaining in the future* if the law permits, including to 'agree[] upon additional, expanded or different benefits than those permitted by this Injunctive Relief Settlement.' The Injunctive Relief Settlement would thus be a leg up to athletes in any collective bargaining negotiations that might take place if unions are recognized in the future.") (emphasis added)
[82] According to Defendants' lead counsel Rakesh Kilaru: "We have come up with a structure that we think works, that we think is durable, that provides additional benefits to student athletes without needing collective bargaining without needing employment. And I think there was a real question about whether you can build that. We think we built it. And so I think we're hopeful coming out of that, that we'll be able to *make it permanent in the courts*, but then also be able to make it *permanent in other ways* [via Congress] *as well.*" (SportsWise podcast, Episode 63: *Breaking Down the Landmark House v NCAA Settlement with Rakesh Kilaru*, May 24, 2023 at approx. 36:00 – 36:30) (emphasis added); More from Mr. Kilaru: "I think it's notable to just take a step back and look at what happened here, which is we negotiated this settlement with a group of lawyers who are not shy about suing, not just the NCAA, but professional sports leagues, and engage in collective bargaining with professional sports leagues and vigorously negotiate in those negotiations. And the fact that they came to the table in this case and negotiated what we negotiated without going through collective bargaining…*tells you whether or not it's really necessary to do collective bargaining in college sports or whether employment is actually a good idea for college athletes versus the structure that we've built* that I think is consistent with the values of college sports, and will continue to provide broad opportunities to a broad group of people." (SportsWise podcast, Episode 68: *Lead Counsel for the NCAA, Rakesh Kilaru, on what the finalized House settlement means for the future of college sports*, July 31, 2024, at approx. 53:11 – 54:01) (emphasis added)

One is that Section 2 does not explicitly distinguish between true collective bargaining with employee rights under the NLRA or some model that envisions bargaining rights without employee status.[83] The use of the term "alternative structures" could suggest the latter even though Section 2 speaks in terms of "collective bargaining."

The other is the use of the term "student-athlete."

Article 7—a very short provision—uses the term "student-athlete" eight times (it is used liberally throughout the settlement documents as well), including this:

"Class Counsel will also take no position, and thus be neutral, in all instances and in all forums and venues on the issue of whether *student-athletes should be considered 'employees'* or *whether collective bargaining should be permitted for compensation of student-athletes.*"

The term "student-athlete" has an ignominious history. It was invented out of whole cloth in the 1950s by former NCAA Executive Director Walter Byers and NCAA lawyers to combat workers' compensation claims filed by injured athletes (or deceased athletes' relatives). Workers' compensation benefits require employee status.

Since its invention, the term "student-athlete" has been ensconced into the language of college sports to reinforce the NCAA's view that athletes are students first which aligns with the NCAA's stated educational purpose.[84]

In courts and Congress, Defendants use "student-athlete" to mean the legal *opposite* of employee. To Defendants, it is a legal immunity shield from any labor laws that require employee status.

---

[83] This could be a key distinction. "Bargaining" rights (through an athlete association, for example) without employee status would not solve the power imbalance and athletes would be at the mercy of institutional authority. Some commentators and some in Congress have suggested a statutory bargaining model with "special status" for athletes and precludes employee status and NLRA protections, but theoretically provides athletes some leverage. (see, ECF 596) This option is illusory because it would be an indirect way to give the NCAA and Power 4 permanent protection from the NLRA. Moreover, by suggesting that a "special status" is necessary to deprive athletes of employee status, Defendants may unintentionally concede that athletes (or certain classes of them) are indeed employees.( see, NCAA Request for Athlete 'Special Status' Could Backfire in Court, Michael McCann, *Sportico* (October 23, 2023); "No special status would be needed—unless the athletes are, in fact, employees.") In a similar vein, at a Temple Law Review Symposium in October 2024, former NLRB General Counsel Jennifer Abruzzo questioned the purpose of a "special status" designation arguing that we already have a law that governs athletes' labor status: the NLRA. Under the NLRA, workers are *presumed* to be employees. The NLRA places the burden of proof on the putative employer to prove a worker is not an employee.

[84] Byers was the NCAA's first and longest serving CEO (1951-1987). He built the modern NCAA regulatory model. In his 1995 tell-all book, *Unsportsmanlike Conduct: Exploiting College Athletes*, Byers turned against the very principles he once aggressively defended, including the "student-athlete." (Byers, *Unsportsmanlike Conduct*, Chapter 5: "Full Rides in the Name of Amateurism," pp. 67-70) ("That threat [full athletics scholarship as "pay for play" which implies employee status] was the dreaded notion that NCAA athletes could be identified as employees by state industrial commissions and the courts. We crafted the term student-athlete, and soon it was embedded in all NCAA rules and interpretations as a mandated substitute for such words as players and athletes. We told college publicists to speak of "college teams," not football or basketball "clubs," a word common to the pros").

Thus, when Section 2 says "…whether student-athletes should be 'employees,'" it presents a logical absurdity under the NCAA's definition and use of the term. Moreover, by placing employees in quotes standing next to student-athletes, Section 2 delegitimizes any claim that college athletes are or could become employees.

This is not mere word play.

The term leads athletes to believe they have no protectable labor rights. This effect alone may be a violation of the NLRA.[85]

Defendants' use of the term "student-athlete," and Class Counsels' acquiescence to it suggests that the settlement, if approved, supports Defendants' no-employee campaign in Congress.

Two other things are important in assessing Section 2 and the wisdom of this Court endorsement of Article 7.

First, because of fears that the new administration and the NLRB may not support athletes' labor rights, movants in the pending NLRB actions (Dartmouth, USC/Pac-12/NCAA, and several others) have dismissed their petitions or charges to preserve favorable precedent and avoid creating bad precedent.

This has created a perception that athletes as employees has hit a roadblock[86] which gives life to the no-employee campaign either as a blunt force "no," or as a "special status" bill.

Second, as schools participating in the revenue sharing component of the settlement "negotiate" with athletes,  schools are using what look very much like employment contracts instead of the bare-boned traditional scholarship offer. Many of these "employment" contracts contain language and provisions that limit athletes rights but afford maximum protection to schools. Ironically, a common provision asks athletes to represent that they are *not employees*.[87]

As always, Defendants' want to have it both ways. They want the benefits and protections of employment contracts while denying athletes employee rights.

---

[85] On September 29, 2021, Ms. Abruzzo published a policy memorandum saying the use of the term "student-athlete" may be a substantive violation of the NLRA as to certain athletes because it misclassified them as non-employees. Ms. Abruzzo refused to use the term because it "was created to deprive those individuals of workplace protections." (see, Memorandum GC 21-08, 9/29/21)

[86] It appears that the only remaining case seeking employee status is *Johnson v NCAA* under the Fair Labor Standards Act. The parties, with this Court's approval, "carved out" *Johnson* (and the NLRB actions) from the settlement so it can proceed. However, if Congress passes a bill that prohibits employee status, *Johnson* may be in peril as well.

[87] See, e.g., *Inside a Big Ten Athlete Revenue Sharing Agreement*, Daniel Libit, Eben-Novy Williams, Michael McCann *Sportico* (January 19, 2025) ("The [Big Ten Memorandum of Understanding] aggressively attempts to extinguish the prospect of an athlete arguing the deal reflects an employment agreement. Most directly, one clause is bluntly coined "No Employment." It states the MOU "does not create a fiduciary relationship," and that the athlete "acknowledges and agrees" they are not an employee and, further, "waives," "forever discharges" and agrees "not to sue the [college], NCAA [and] Conference" on the basis of them being an employee because of the MOU or by "serving as a marketing agent" as part of the deal.")

This new environment places enormous pressure on Defendants to get a bill from Congress that prohibits employee status. Without it, these contracts will undoubtedly be challenged in court. If those challenges are successful, it may move athletes *closer* to employee status.

Defendants' are essentially playing a game of high stakes "chicken" on employee status. In their quest for control over the athlete labor force, they may unwittingly be barreling full speed towards losing it.

In light of all of these factors relating to the entirety of Article 7 and context in which it arises, we believe this Court should not provide its imprimatur on a congressional campaign that would result in athletes losing fundamental protections under American law.[88]

### V.    *Carter's* Pay for Play Claims and the Massive Expansion of Those Claims Serve Primarily a Strategic Settlement Purpose Rather Than a Genuine Compensatory Purpose

*Carter* is a critical piece of the settlement but has received the least scrutiny.

*Carter* made pay-for-play claims and sought damages in addition to injunctive relief. The *Carter* damages class was comprised of Power 5 football, men's basketball, and women's basketball athletes only.

The damages claim in *Carter* was precedent-setting in Class Counsels' body of work because it sought for the first time ever to establish the actual dollar value of Power 5 profit athletes.

In *Jenkins-Alston*, Class Counsel sought injunctive relief only.

Despite its potentially historic impact, the media largely ignored *Carter* and it quickly became a parenthetical subsumed by *House*.[89]

---

[88] Class Counsel may argue that if the settlement is denied, Congress could still pass protective legislation, including antitrust immunity. Then athletes would be stripped of their legal rights and receive *no* compensation. This is a false choice. Without the settlement as leverage, Defendants' power grab is laid bare, and Congress would have to analyze it on those terms. In this scenario, even with a favorable Congress, it is likely that lawmakers will be as skeptical of blunt force protective legislation—particularly antitrust immunity—as they have been prior to the settlement. Moreover, given the undervaluation of athlete labor in the settlement, a denial affords athletes the opportunity to receive more compensation. Denying the settlement doesn't mean zero compensation for athletes. It simply preserves athletes the opportunity to fight for better outcomes without appearing to endorse Defendants' congressional playbook.

[89] Prior cases that were less ambitious—such as *White* and *O'Bannon* and *Jenkins-Alston*—received extensive media coverage when they were filed. Each was portrayed as potentially *the* case that would deliver a shock to the system of big-time college sports and move athletes closer to their ultimate goal of receiving fair pay for the value of their athletic services.

In theory, *Carter* could have yielded the highest damage value among the three settlement cases. However, based on expert testimony, it has been assigned a settlement value that is only 21% of total damages.[90]

In the settlement, the pay-for-play damages class expanded from approximately 16,000 in *Carter* (Power 5 football and men's/women's basketball only), to approximately 390,000 (all Division I athletes).[91]

Thus, *Carter's* initial focus on fair pay for the athletes whose labors underwrite the entire college sports industry was conflated with and diluted by the massive expansion of the pay-for-play class.

Importantly, there has been no substantive litigation in *Carter*. The NCAA and Power 5 have not even filed a response to Class Counsels' complaint.[92]

In questioning during the September 5, 2024, hearing on preliminary approval this Court asked the parties to explain *why* the settlement pay-for-pay class extended to all D-I athletes rather than P5 athletes only.

This line of questioning went to the heart of the origin and purpose of *Carter*, yet Class Counsel and the NCAA referred only to the expansion of claims in *House* through the second amended complaint without mentioning *Carter*.[93]

In Class Counsels' motion for attorneys' fees, Mr. Kessler offered a description of the origin and purpose of *Carter*. He suggests that *Carter* was at least in part the product of the settlement discussions to expand the claims to include pay-for-play damages and injunctive relief in a global settlement.[94]

---

[90] The total damages settlement value of *House*, *Hubbard*, and *Carter* is $2,776,000,000. *Carter's* pay-for-play claims are valued at $600,000,000, or 21%. In reaching the pay-for-play figure, we wonder whether Dr. Rascher included the scholarship costs of all Division I athletes over the five-year class term to deduct from revenues as compensation received, rather than scholarship costs for the original *Carter* damages class of Power 5 football, men's basketball, and women's basketball only. Given that Power 5 football, men's basketball, and women's basketball generate 90% of revenue, taxing them with the costs of all Division I scholarships would substantially and artificially reduce their pay-for-play damages payouts. Rascher 7/26/24 Decl., ECF No. 450, #4, at Pars. 44-46, (see specifically, Exhibit 7 p. 20)

[91] *House* ECF 450 Exhibit A to the Stipulation and Settlement Agreement

[92] In their Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards for Class Representatives, Class Counsel conflate *Carter's* lodestar costs with *House*. *(see, Berman Decl. ECF No. 583-2, Exhibits 1 – 6 and Kessler Decl. ECF No. 583-3 Exhibits A, B, and C)* Thus, it is difficult to discern exactly how much time and money Class Counsel devoted to *Carter*.

[93] House ECF No. 521 at 12 - 15

[94] "On December 7, 2023, Plaintiffs DeWayne Carter, Nya Harrison, and Sedona Prince filed *Carter v NCAA* [cite omitted], which alleged that the NCAA's rules prohibiting payments for athletic services violate the antitrust laws. During injunctive relief settlement discussions in *House*, and prior to filing of the *Carter* complaint, the parties had discussed the concept of expanding the *House* injunctive relief settlement to include the pay-for-play claims that would eventually be alleged (and were ultimately alleged in *Carter*) to globally address Defendants' compensation and benefit rules on a going-forward basis. Plaintiffs made clear that any broadening of the *House* settlement to include pay-for-play damages would require a separate, independent, discussion of damages. Plaintiffs used Dr.

Whatever the motivations for filing *Carter*, we know how the parties have used *Carter* and the massive expansion of pay for play claims class from P5 football, men's basketball, and women's basketball athletes (*Carter* complaint) to *all* D-I athletes (settlement class) to achieve their settlement goals.

This much seems clear:

>   *1.  House explicitly did not include claims for athletic services.*

The *House* record is clear that Class Counsels' NIL-based theories of liability and damages specifically excluded any damages claim for athletic services.[95] The fact that Plaintiffs' filed a separate suit to make pay-for-play claims is the best evidence that *House* did not address pay-for-play.

This raises the fundamental question of whether there is any "pay-for-play" evidence in the record that would support a reliable valuation of the *Carter* damages claims.

>   *2.  To obtain the broadest settlement-based antitrust immunity possible for the NCAA and Conference Defendants, "pay for play" claims—including damages— had to be in a procedural posture for settlement.*

After losing their quest for judicially created antitrust immunity in *Alston*, and with their five-year quest for statutory antitrust immunity losing steam in Congress (notably because the unregulated post-Interim Policy NIL market caused none of the harm the NCAA and conference defendants claimed it would), the NCAA and conference defendants turned to settlement-based antitrust immunity as a stop gap alternative.

Settling only *House* (NIL) and *Hubbard* (*Alston* education) which involved specific subsets of NCAA compensation limits, would not have eliminated the NCAA's greatest antitrust threat: a renewal of the original *Jenkins-Alston* injunctive relief claims to strike down *all* NCAA compensation limits and let free markets determine the value of athletes' services.

Moreover, a renewal of the *Jenkins-Alston* injunctive relief claims alone would not provide maximum protection to Defendants in a settlement scenario.

*Carter's* pay-for-play *damages* claims permit Defendants to benefit from releases for those claims as well.

---

Rascher to evaluate damages for those pay-for-play claims and to aid the pre-*Carter* settlement discussions and to prepare for the filing of the *Carter* complaint." ECF No. 583-3 at p. 6, Par. 23

[95] Order Denying NCAA Motion to Exclude Experts Opinions of Desser and Rascher. ECF 386 at 20, 21 ("Dr. Rascher's BNIL methodology assumes that the NCAA's restrictions on performance-based compensation will remain in place because Plaintiffs do not challenge them in this action.");see also, Defendants' Notice of Filing Redacted Materials, ECF No. 600 Exhibit 1, Deposition of Daniel Rascher (1/10/23), pp. 19-23 ("So sort of -- that broad set of rules coming from different places, I'm modeling as if they change the NIL-related rules but not, for instance, the rules on pay for performance as an example...")

*3. The massive expansion of pay-for-play claims allow the NCAA and Class Counsel to argue that class-wide pay-for-play damages would be impossible to quantify or get certified.*

In briefing during the preliminary approval process, the NCAA and Class Counsel argued that class damages for pay-for-play are difficult, if not impossible, to quantify or get certified.

They attribute this difficulty directly to the size and diversity of the expanded athletic services class across 350 D-I schools, dozens of sports, and hundreds of thousands of D-I athletes.

This argument supports the parties' claims that settlement damages for athletic services are a windfall to athletes because those claims are virtually unwinnable in litigation.

The expanded damages class for athletic services gives life to the NCAA characterization of those claims as "sprawling in nature, covering hundreds of thousands of student-athletes in a variety of different sports at over 350 member institutions in Division I," and that it would "be impossible to develop the essential prerequisite to class certification of these claims: a working economic model capable of determining whether and which student-athletes at each of these hundreds of schools would have been injured."[96]

Class Counsel similarly relies on the expanded class claims to argue "that the [pay-for-play] claims here are even more precarious than those in *Alston*, in which the injunctive-class members were limited to football and basketball players in the Power Five Conferences. The [athletic services damage class], by contrast, encompasses exponentially more athletes, *outside* the Power Five, in non-revenue generating sports."[97]

The NCAA and Class Counsel also concede that with the exception of Power 5 football, men's basketball, women's basketball, and select "outlier" conferences, schools, and sports in the pay-for-play class, almost all other sports and athletes in the expanded pay-for-play class *lose* money and therefore have little, if any, monetary value in the broader college sports marketplace. Moreover, Dr. Rascher (relying on the claims administrator's projections) estimates a settlement claims rate for these athletes of only 15%[98]

This characterization of the pay-for-play class raises several issues.

First, it is fair to assume that Class Counsel believed when it filed *Carter* (with a pay-for-play damages class limited to Power 5 scholarship athletes in football, men's basketball, and women's

---

[96] Defendants' Reply ISO Motion for Preliminary Settlement Approval, ECF No. 495, p. 4 [8/16/2024])

[97] (Plaintiffs' Reply Brief ISO Motion for Preliminary Settlement Approval, ECF No. 494, pp. 13-14 [8/16/24]); Class Counsels' characterization is at odds with their portrayal of pay-for-play claims in the *Carter* complaint, which asserted that the NCAA's amateurism-based procompetitive justification was "factually bankrupt." (*Carter* ECF No. 1, p. 51, Par. 150). Moreover, in a podcast interview on December 8, 2023 (the day after *Carter* was filed), Mr. Kessler said because the NCAA could not offer *any* defensible procompetitive justifications of the pay-for-play restrictions, he expected to win *Carter* on summary judgment. (SportsWise podcast, Episode 56: <u>*Sports Law Legend Jeffrey Kessler on the Antitrust Threats Facing the NCAA*</u> December 8, 2023, at approx. 24:45 – 26:07)

[98] ECF No 450-4 at. Pars. 70-81 (Declaration of Danial A. Rascher)

basketball) that it would be possible, perhaps likely, to achieve class certification with a workable class damages economic model.

Otherwise, *Carter* would be a meritless suit.

Second, while the parties contend that a D-I pay-for-play damages class makes it impossible to "produce a working economic model" for class damages, that appears to be precisely what Dr. Rascher did in his July 26, 2024, expert report.

The NCAA and Defendants have accepted Dr. Rascher's damages model for athletic services payments as good enough for settlement purposes but suggest—perhaps unintentionally—it may not survive the class certification process and a *Daubert* motion in litigation.

Dr. Rascher does not say whether his athletic services analysis was prepared to reconcile a pre-negotiated damage amount within the overall settlement or whether his analysis could have been offered in *Carter* if *Carter* were actually litigated as an stand-alone suit.

Dr. Rascher does, however, concede that "[u]nlike NIL compensation, I have not previously provided reports containing analyses and estimates of damages related compensation for athletic services. I do not provide here a full damage analysis in relation to compensation for athletic services. Instead, I provide here a methodology and set of assumptions and procedures that are within the scope of economically reasonable approaches for estimating damages related to compensation for athletic services. I then apply the methodology and assumptions to calculate an estimate of potential damages."[99]

### 4. Carter permitted Class Counsel and the NCAA to attempt to eliminate the Fontenot pay-for-play suit.

On November 20, 2023, shortly after this Court certified the damages class in *House*, a group of athletes filed a class action antitrust suit against the NCAA and Power 5 in Colorado (*Fontenot v NCAA*)[100] making "fair pay" (pay-for-play) claims. The *Fontenot* class is comprised of Power 5 (plus Notre Dame), full scholarship athletes in football, men's basketball, and women's basketball.

Class Counsel filed *Carter* seventeen days later making claims that aligned perfectly with *Fontenot*. Class Counsels' first move was a procedural one, asking the Multidistrict Litigation Panel on January 29, 2024, to transfer *Fontenot* to the Northern District of California for "coordination and consolidation."[101]

This motion began a five-month series of procedural maneuverers by parties in both cases to have the cases combined in one court or the other. Both parties were unsuccessful. When the

---

[99] *House* ECF No. 450-4 at 15, Par. 35
[100] *Fontenot v. Nat'l Collegiate Athletic Ass'n*, Civil Action 23-cv-03076-CNS-STV (D. Colo. May. 23, 2024)
[101] *Carter* ECF, No. 73; Through "consolidation," Class Counsel (with Defendants' support) would presumably ask this Court to appoint Class Counsel as counsel for the *Fontenot* plaintiffs, which would permit Class Counsel to control *Fontenot*.

Colorado court denied the NCAA's motion to transfer *Fontenot* to the Northern District of California on May 10, 2024, Class Counsel and the NCAA—who worked together to get *Fontenot* moved to this Court—had exhausted all of their procedural options.

Twenty days later, on May 20, 2024, Class Counsel and the NCAA announced the settlement and filed a Joint Stipulation and Proposed Order to Extend  Case Deadlines in Light of Settlement. Judge Seeborg signed the proposed order the same day.[102]

In their settlement papers and at the September 5, 2024, preliminary approval hearing, Class Counsel and Defendants' renewed their request to stay and consolidate *Fontenot* by asking this Court to assert jurisdiction over it. This Court asked Defendants' to first take up their issues with the Colorado judge, then if they don't get what they want, this Court would dismiss the request without prejudice, allowing the parties to renew it at a later date.[103]

The parties should not be permitted to use *Carter* to (1) compromise pay-for-play damage claims without litigating or developing evidence on them, (2) expand the pay-for-play class from 16,000 athletes in the lawsuit (Power 5 profit athletes in football, men's basketball, and women's basketball) to 390,000 athletes in the settlement (all of Division I) to argue that the pay-for-play payments are a windfall to athletes because they would never achieve class certification on the settlement classes, and (3) attempt to eliminate the only other pending suit that is positioned to actually litigate and develop evidence on the true value of athletes' services.


### VI.    The Exclusion of Power 5 Men's Basketball Athletes from Class Representation is a Substantial Flaw in the Litigation and the Settlement

Rule 23(a)(4) requires that class representatives "fairly and adequately protect the interests of the class." That standard has not been met in the settlement cases because no Division I men's basketball player is a class representative.

Across the three suits, there are eight class representatives[104] representing six Division I sports: men's swimming and diving, women's basketball, women's soccer, women's track and field, men's lacrosse, and football (3).

As discussed below, the unique and critical role of Division I men's basketball players in the overall college sports business model, the increased reliance on men's basketball revenue under

---

[102] *Carter* ECF Nos. 99, 100
[103] House ECF No. 521 at 87, 88
[104] *House/Carter* class representatives are Grant House (Arizona State swimming and diving), Sedona Prince (University of Oregon and Texas Christian University women's basketball), Tymir Oliver (University of Illinois football), DeWayne Carter (Duke University football), Nya Harrison (Stanford University women's soccer), and Nicholas Solomon (University of North Carolina men's lacrosse); see, Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards for Class Representatives, Declarations of Class Representatives, *House* ECF No. 583; *Hubbard* class representatives are Chuba Hubbard (Oklahoma State football) and Keira McCarrell (Auburn women's track and field); see, Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards for Class Representatives, Declarations of Class Representatives, *Hubbard* ECF No. 253

the settlement as compared to the theories of liability and damages models in *House*, and the unprecedented publicity of the settlement highlight the absence of men's basketball in the class representative profile.[105]

> *1. Division I Men's Basketball Plays a Critical and Unique Role in the Business of College Sports*

Division I men's basketball plays a unique and critical role in the business of college sports because the Division I Men's Basketball Tournament—which the NCAA owns—funds the entire NCAA administrative state.

The NCAA doesn't receive a penny of big-time football money.

This fundamental reality (and inequity) in the college sports business and regulatory models is rarely discussed and poorly understood, yet it is critically important and, as discussed below, has implications in the settlement and for the future of college sports.

The Football Bowl Subdivision (FBS) football championship is owned and controlled by the College Football Playoff, LLC (CFP) which operates entirely outside NCAA control.[106]

This dysfunctional financial and regulatory framework is the product of the *Board of Regents* decision in 1984 in which powerful football interests sued under antitrust laws to end the NCAA's thirty-year monopoly over televised football.

*Board of Regents* is the most important legal decision in college sports history and has implications today as big-time football continues its imperial march to create the most professionalized, NFL-like product the college sports marketplace can accommodate.

Nearly every structural, regulatory, financial, and values-based change in college sports is football-driven and tied to *Board of Regents*, including (1) the massive escalation in output of sports products and the value of broadcast media contracts, (2) football-driven conference destructions and consolidations (commonly referred to as "realignments"), (3) the increasing separation of Power conference interests from the rest of college sports under the NCAA umbrella[107] (4) big-time football's rolling, hostile takeover of NCAA governance, (5) increased

---

[105] We are mindful that the Court addressed this issue in the damages certification process in *House*. This Court found that Tymir Oliver, a University of Illinois football player, was an adequate representative of men's basketball interests and possessed the same interests and suffered the same injury as men's basketball players with no evidence that he had a conflict of interest. (*House* ECF No. 387, at 11, 12) However, the burden Division-I men's basketball players bear in the settlement could not be considered in the underlying litigation.

[106] The NCAA plays a minor, technical role in "certifying" the bowl games associated with the CFP. Beyond that, the NCAA has no more connection to the CFP than to the NFL playoffs.

[107] Power conference football interests have bullied the NCAA over the years to achieve increased power, control, and independence while remaining in the NCAA. The Power 5 have threatened several times to leave the NCAA altogether unless their demands were met. The most publicized threat occurred during in 2014 when the Power 5 sought independent legislative prerogatives through Autonomy legislation. The NCAA accedes to these threats out of fear that if the Power conferences leave the NCAA, they will take the Division I men's basketball tournament with them and leave the NCAA without its March Madness bonanza. The Power 4 are currently pressing for a further concentration of power under the NCAA umbrella that would allow it to have more control over NCAA post-

pressure from external regulatory threats (e.g., courts, legislatures, administrative agencies) to enhance athlete benefits and protections, (6) the NCAA and Power 5's campaign (2019 - present) for protective federal legislation in response to external regulatory pressures, (7) increased dissonance between the values of higher education and the college sports entertainment industry, and (8) perceived tensions between the interests of revenue-producing sports and athletes and non-revenue ("Olympic") sports and athletes.

As a consequence of losing its football empire, the NCAA turned to the Division I Men's Basketball Tournament for replacement revenue.

Due in large measure to aggressive marketing and branding, the Tournament has become one of the most popular and lucrative sporting events in history.

According to the NCAA's 2022-2023 Consolidated Financial Statements (CFS), broadcast rights—along with ticket sales—are worth approximately $1.2 billion.[108]

About sixty percent of NCAA revenue ($695 million) trickles back to Division I schools in the form of various funds controlled by Division I conferences and schools.[109]

The remaining forty percent ($483 million) includes expenditures for:

a. NCAA national office expenses, including lavish, excessive executive salaries, benefits, and golden parachute payments costing $89,899,314[110], and travel including private jets for select NCAA executives and companions.[111]

b. Professional services costing $123,677,962.[112]

c. NCAA national championship expenses for *every* sport in *every* Division (ninety championships total), costing $192,143,193.[113]

d. Block grants to Divisions II ($57,787,273) and III ($42,395,482) which appear to include national championship costs.[114]

---

season championships—including the men's and women's basketball championships. (see, *Power 4 Proposal Seeks Control of NCAA Championships, Revenue*, *Sports Illustrated*, January 9, 2025) The Power 5 have yet to make good on their threats. Given the windfall benefits that Power 5 football receives from the NCAA and men's basketball revenue, there is little incentive for the Power 5 to disrupt this aspect of the status quo business and regulatory models.

[108] 2022-2023 Consolidated Financial Statements, Note 16 (Revenue)

[109] 2022-2023 CFS, Note 17 (Expenses by Nature)

[110] 2022-2023 CFS, Note 17 ("Compensation") Over the years, multiple former NCAA executives have received substantial payments after leaving the NCAA. For example, in 2022, former NCAA COO Donald Remy received a payout of **$2,411,813** (NCAA Form 990 for the tax year ending 8/31/2022, Schedule J Supplemental Information Part I, Line 4a). The following year, former NCAA President Mark Emmert received a golden parachute payment of **$4,281,279** (NCAA Form 990 for the tax year ending 8/31/2023, Schedule J Supplemental Information Part I, Line 4a). For the sixteen executives listed on the NCAA's 2023 Form 990 Schedule J, the average salary was **$776,971**.

[111] NCAA 2022 and 2023 Form 990 tax returns, Schedule J Supplemental Information, Part I, Line 1a (charter travel and travel for companions) These costs are not itemized in the NCAA's overall "travel" expenses.

[112] 2022-2023 CFS, Note 17

[113] 2022-2023 CFS (Supplementary Information)

[114] 2022-2023 CFS (Supplementary Information)

  e. A captive insurance company, the 1910 Collective (as of March 1, 2022) established as "alternative risk management platform." In 2022, the NCAA diverted $83,997,737 to the Collective and $98,328,214 more in 2023. The Collective had an ending balance of $83,997,737 in 2022, and $79,782,377 in 2023 (total balance of $163,780,114).[115] These funds could conceivably be used to pay settlement damages.[116]

  f. Lobbying costs (the NCAA/Power 5 lobbying campaign for protective federal legislation is discussed in more detail below) that fund the NCAA Office of Government Relations, the NCAA's external professional lobbying firm, Brownstein Hyatt (the number 1 ranked lobbying form in Washington) and their "grassroots" lobbying through public relations firms.[117]

These expenditures pale in comparison to what the NCAA—through the labor of Division I men's basketball athletes—pays for litigation (attorneys' fees for both sides and settlements) in cases in which the NCAA and Power 5 conferences are joint defendants. This includes the major class action antitrust cases such as *O'Bannon*, *Alston*, *House*, *Hubbard*, and *Carter*.[118]

The combined costs of these cases (including damages and attorneys' fees in the settlement cases) now substantially exceed *$3 billion*.

The Power 5 have made only modest contributions to these costs over the years, yet they have played a crucial role in dictating litigation and settlement strategy.[119]

In the settlement, Division I men's basketball labor would pay for over *half-a-billion dollars* of Class Counsels' requested attorneys' fees and expenses,[120] and *all* of the NCAA's fees and

---

[115] 2022 -2023 CFS, Note 15 (Risk Management)

[116] While the fund has been used to finance Director and Officer and Event Cancellation/Loss of Revenue policies, there do not appear to be limitations on its use for risk management purposes.

[117] The NCAA's grassroots lobbying costs are difficult to quantify because those lobbying efforts have become embedded in the NCAA's normal operations and public relations. At the 2024 convention (January 9-13), the NCAA held a "Featured Session" titled "Safeguarding the Future of College Sports: Congressional Advocacy Tools for Campuses and Conferences" led by Robert Gibbs, former Press Secretary under President Obama. At the time, Gibbs was a partner with Bully Pulpit International (f/k/a Bully Pulpit Interactive Inc.). Bully Pulpit is a prominent public relations firm based in Washington D.C. that has worked for the NCAA since 2015 to shape the NCAA's public image. Since 2015, the NCAA has paid Bully Pulpit at least $40 million. At this year's convention (January 14 – 17) Baker again used his "State of the Association" speech to lobby for congressional action. This time In the context of the settlement (see, *NCAA to dole out $1.2 billion to help pay for House settlement. Its president asks for Congress to step in*, Eddie Pells, Associated Press, January 14, 2025).

[118] In the past, some of these expenses have been paid by the NCAA's liability insurance.

[119] Class Counsel Steve Berman describing the power dynamics during settlement negotiations: "...[i]t was also a very interesting dynamic at the really serious sessions. The conference commissioners did the negotiating. They pushed the lawyers to the side and wanted to talk one-on-one with us. So that was a pretty interesting dynamic. That doesn't happen very often where let's say I'm suing Apple, the executives are not in the room talking to me, the lawyers are. But here, the conference commissioners were very keen on trying to make us understand the issues that they faced." (SportsWise podcast, Episode 74: *The Latest on the House Settlement with Co-Counsel for the Plaintiffs, Steve Berman*, September 27, 2024, at approx. 14:00 – 15:20)

[120] These fees are based on percentages from 10% - 20% for damages (20% in *House* and *Hubbard* and 10% in *Carter*) and an "upfront" fee of $20 million. In addition, Class Counsel seeks a percentage of revenue sharing from .075" – 1.25 % per year of total payouts. Class Counsel estimate that revenue sharing fees will be worth (conservatively) an additional $250 million over the ten-year settlement term. ECF No. 583-5 (Par. 49)

expenses.[121] This includes all expert fees, travel/lodging/meals, settlement administration fees, and millions in miscellaneous expenses.

In essence, Power 5 football receives a free ride financially for all of these expenses, while the NCAA takes money from Division I men's basketball athletes, the overwhelming majority of whom are African American, and spreads it around to mostly white stakeholders across all three Divisions.[122] The result is a regressive economic spoils system that beneficiaries have come to view as an entitlement.[123]

*2. Men's Basketball Labor and March Madness Revenue Funds 100% of the NIL Damages in the Settlement Which is Inconsistent with the Plaintiffs' Theories of Liability and Damage Models in House*

The financial burden for NIL damages payments has shifted from the Power 5 conferences and Power 5 football revenues in *House* to men's basketball and the NCAA in the settlement.

BNIL damages, which constituted the lion's share of NIL damages in *House*, were based on a model of *conference* responsibility (and competition), through Power 5 conferences' single sport and multisport broadcast media deals.

Under the economics theories developed by Plaintiffs' expert Dr. Daniel Rascher in *House*, in a hypothetical "but for" world in which the NCAA's NIL prohibitions did not exist, *conferences* would make BNIL payments directly to athletes rather than schools, or, as in the settlement, the NCAA.

---

[121] The NCAA doesn't disclose its fees and expenses in the litigation. Class Counsels' combined lodestar is $68 million. It may be fair to assume the NCAA has spent at least that much.

[122] The NCAA's relevance in the post-*Board of Regents* era has been called into question many times. The NCAA's role in spreading March Madness money around and now its ten-year long pay-out obligations give the NCAA an odd form of relevance. NCAA President Charlie Baker has conceded as much. ("Baker also said that he thinks the 10-year span of the settlement will serve as 'glue' to help bind together the larger group of Division I schools, avoiding the potential for power conferences to form a separate entity with their own rules. Keeping all of Division I together will allow the NCAA to maintain the March Madness basketball tournament that generates the overwhelming majority of money that the association distributes to its schools. 'We now have the ability to move forward with the assumption that we're all going to be one, big, maybe happy, family moving forward,' Baker said.") (see, *Baker: Antitrust settlement creates certainty for new system*, Dan Murphy, *ESPN*, June 10, 2024)

[123] When the NCAA Board of Governors Constitution Committee made its case to stakeholders, it recognized that to obtain the two-thirds supermajority necessary to change the Constitution, it needed the votes of Division II and Division III members. Robert Gates, the Chair of the Committee, said that the one "non-negotiable" item was the block grants—totaling $100 million—Divisions II and III receive each year from March Madness revenues: "…just to be clear, that one thing that's pretty obvious to me and of particular importance to Division II and III is the percentage allocation of the funding that they get from the NCAA. The reality we have to bear in mind is that we need two-thirds of the membership to vote in favor of a proposed constitution. Divisions II and III by themselves have about two-thirds of the votes…[i]f I had to pick one thing that probably is not negotiable, it would be the percentage allocations for Division II and III." ( NCAA's Social Series podcast on September 10, 2021, (at 17:43 – 19:00)

During briefing on Plaintiffs' motion to certify damages, Defendants' argued that Dr. Rascher's damages model was inconsistent with Plaintiff's theories of NIL liability because only schools, not conferences, would make BNIL payments in the hypothetical "but for" world.

Citing the Plaintiffs' Consolidated Amended Complaint (CAC), this court rejected the NCAA's argument and concluded that Dr. Rascher's conference revenue and payment model satisfied the standard for class damages certification.[124]

In allocating BNIL damages for multisport contracts, Dr. Rascher relied on the framework offered by Plaintiffs' expert Ed Desser.

In assessing the value of athletes' NIL in broadcast media deals, Mr. Desser first concluded that approximately *fifty percent* of the total value of sports broadcasts "is attributable to athletes contributions (with that total value including the value of NIL, as well as their value for athletic performance)."[125]

Of that fifty percent, Mr. Desser estimated that "the *majority of the value of athletes' NIL is attributable to the athletes' athletic performance*, while a minority of that value, from *twenty to thirty percent*, is attributable to their NIL," and that "[b]ased on those estimates and his experience, Desser concluded that *ten percent* is a *conservative estimate* of the value of student-athletes' NIL in the broadcasts of Power 5 FBS football and Division I men's and women's basketball." (emphasis added)[126]

Mr. Desser also opined that the appropriate allocation among members of the Football and Men's and Women's Basketball classes for multisport contracts was 75% to football, 15% to men's basketball, and 5% to women's basketball, and 5% to all other sports, which corresponds to the value each product has in the overall college sports marketplace.[127]

In allocating BNIL damages in the settlement, Dr. Rascher's report adopts Mr. Desser's 75/15/5 framework. After discounting thirty-seven percent from total BNIL damages and before

---

[124] See, *House* Order Granting Motion for Certification of Damages Classes ECF No. 387 at 28, 29 ("Dr. Rascher's BNIL methodology is consistent with Plaintiffs' theory of liability. In the operative complaint, Plaintiffs aver that the challenged rules caused them injury and damages because, "[a]bsent these nationwide restraints, *Division I conferences and schools would compete* amongst each other by allowing their athletes to take full advantage of opportunities to utilize, license, and profit from their NIL in commercial business ventures and promotional activities and *to share in the conferences' and schools' commercial benefits received from exploiting student-athletes' names, images, and likenesses.*" *See* CAC ¶ 112 (emphasis added). Dr. Rascher's BNIL methodology establishes that members of the Football and Men's Basketball and Women's Basketball proposed classes would have received BNIL compensation from conferences in the absence of the challenged rules that prohibit conferences and schools from sharing the commercial benefits they receive from exploiting student-athletes' BNIL, consistent with the theory of liability alleged in the CAC.")

[125] *House* ECF No. 386 at 20, 21 (Order Denying Motion to Exclude Desser and Rascher Opinion)

[126] Because the *House* Plaintiffs explicitly did not seek damages for the value of athletic services, Desser had to separate the NIL value from the athletic performance value. Thus, it appears approximately 70% to 80% of athletes' overall value in broadcast media deals was extracted from Desser's analysis. After the importation of *Carter's* payments for athletic services claims into *House* via the second amended complaint, it is difficult to discern whether Dr. Rascher's compensation for athletic services analysis accounts for the substantial value of athletic performance in broadcast media deals. ECF No. 450-4

[127] Order Denying Motion to Exclude Desser and Rascher Opinions, ECF No. 386 at 20, 21

attorneys' fees, Dr. Rascher's total BNIL pot is $1,815,00,000. The per-sport allocations are $1,361,250,000 (75%) for football, $272,250,000 (15%) for men's basketball, and $90,750,000 for women's basketball.[128]

Yet in the transition from *House/Carter* to the settlement, except for small reductions in March Madness distributions,[129] football money and football labor contributes *nothing* for BNIL (or any other) damages.

Thus, the Power 5 conferences and football money have essentially been written out of the script in the settlement.[130]

This fundamental shift from the underlying litigation theories of financial responsibility (75% of source revenue and labor from football) to the settlement theories of financial liabilities (100% of source revenue and labor from men's basketball) highlights the fundamental unfairness of excluding Division I men's basketball players from class representation.

Moreover, in the settlement's calculations of revenues, Division I men's basketball players receive no economic credit for the windfall benefits they provide to stakeholders system-wide.

   *3. Some Class Representatives Have Used Their Status to Raise Issues Important to Their Interests and Affiliations*

The *House* settlement may be among the most publicized class action settlements in history. From the time rumors of the settlement made their way into the public domain in late April 2024, the college sports media and commentariat have been obsessed with it. Strategic, selective leaks have shaped media and public narratives and Class Counsel and NCAA lawyers have stepped outside the traditional proscription on commenting on pending legislation.[131]

Much of the public commentary has been devoted to "selling" the settlement to stakeholders, decision-makers, and the public. The media is fascinated with the word "billions" (and it surely draws eyeballs and clicks), sensationalizing the financial aspects of the settlement while ignoring or downplaying substantial flaws in the non-economic components of the settlement.

---

[128] ECF No. 450-4 at Pars. 24-29 (see specifically, Exhibit 5)

[129] Under the settlement, NCAA revenue generated from the labor of Division I men's basketball players will pay for the entire damages amount of $2.796 billion. The NCAA is directly responsible for $1.2 billion (43%). The Division I conferences will share the remaining liability of $1.56 billion (57%) through reduced March Madness distributions. Of the reduced March Madness distributions, only 40% will be "paid" by the Power 5 conferences. All payments will be spread over ten years.

[130] Class Counsel will no doubt argue that none of this matters because the settlement is the product of compromise, and it makes no difference where the money comes from. That position would be somewhat ironic in litigation and a settlement that have been framed as equity based. Moreover, the fundamental disconnect between the underlying litigation and the settlement is relevant to whether the settlement meets Rule 23 requirements.

[131] See, e.g., *The Unusually Public-Facing Push to Settle House v NCAA*, Michael McCann, *Sportico*, May 20, 2024

Several athletes (Grant House, Sedona Prince, and Nya Harrison) used their status and megaphones as class representatives to advocate for a particular players association.[132] While supportive of the settlement and Class Counsel, the class representatives also raised issues one might expect to find in an *objection* to the settlement.[133]

In a recent article,[134] Mr. House raised additional concerns regarding communications with Class Counsel and attorneys' fees.

Because of their exclusion from class representation, men's basketball players have been denied the similar opportunity influence and critique a process that purports to reshape an industry in which they play a critical and unique role.

### VII. Additional Issues

We have other concerns relating to (1) athletes' due process rights in the arbitration process and the consent to jurisdiction provisions, (2) the quality of the data that will be used to determine "fair market value" of third party NIL deals and the use of data from the *House* case that is under seal, and (3) why the settlement provides releases from liability for the College Football Playoff, LLC, who is not a party to any of the underlying litigation cases and has not made any payments in the settlement.

We trust these issues will be addressed by other stakeholders who have expressed or may express concerns with the settlement.

### VIII. Conclusion

We appreciate the difficult task this settlement presents to the Court and sincerely hope our contribution adds value to the Court's deliberations.

We have two closing thoughts.

First, we believe this settlement is happening *to* athletes, not *with* them.

Second, the question is not simply whether athletes will receive incremental financial gains, but whether those gains come at the expense of the freedom and leverage necessary for athletes to protect their broader rights in the years ahead.

---

[132] See, e.g., *Plaintiffs' letter adds wrinkle to $2.8 billion NCAA Settlement*, Dan Murphy, *ESPN*, December 10, 2024; see also, *How is a judge supposed to create a college player's association?* Matt Brown, Extra Points, December 11, 2024
[133] ECF No. 580
[134] See, *Who is House in the House v NCAA Settlement? Meet the man behind the lawsuit that will change college sports forever*, Ross Dellinger, Yahoo! Sports, December 30, 2024

Respectfully,

Michele Roberts

Richard Ford

Casey Floyd