F I L E D

FEB 1 8 2025

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Senior District Judge Claudia Wilken
Oakland Courthouse
1301 Clay Street, Oakland, CA 94612
10 February 2025

Dear Judge Wilken,

I am writing to share my personal experience as it relates to the *House v. NCAA* case that is
before you. My daughter is currently a sophomore cross country and track athlete supported by a
partial athletic scholarship at a Big-10 university. The athletic scholarship, in concert with her
*Alston* award, provides just enough financial aid for us to afford to send her out of state to study,
learn, and compete as a student-athlete. I am deeply concerned by the potential outcome of the
*House v. NCAA* settlement, specifically the roster limits, as this may lead to my daughter's
removal from the team on very short notice. I am writing to you in her stead, as she has indicated
that she is not comfortable going on record to share her experiences and object to the settlement.
She has indicated it would go "against the culture of the team" to object rather than to simply
perform at the highest level and secure a roster spot. The team coaches have provided very little
information about the *House* case or athletes' options to object, and overall there is an
atmosphere of tension and anxiety on her team that roster cuts could occur at any time. For these
reasons, I also feel I need to keep myself anonymous in the interest of protecting her anonymity.

The prospect of roster caps being implemented for fall 2025 is already proving to be extremely
disruptive to my daughter's team and teammates and many other NCAA student-athletes across
the country. I implore you to take a hard look at the implications of the currently-proposed roster
limits – and the timing of their imposition – and reconsider the remedy currently set forth as part
of this case.

To provide just a bit of background: my daughter was recruited in cross country and track by a
number of colleges and made her choice of schools due to its high standards in academics and
athletics. She was offered full-ride scholarships at non-Power 4 Conferences and turned them
down in order to compete at the highest level. She also was drawn to the developmental
philosophy of the women's distance running coaching staff at the program she selected, which
has established a laudable record of working with student-athletes to improve over the course of
their college careers. In order to do this, the cross country program at her universtiy (and a
number of other schools devoted to developing their athletes) routinely carries 25-40 or more
women on the roster. Many of these student-athletes are walk-ons or partial scholarship athletes
who, as they improve over time, can earn their way into new or larger scholarships. The result is
a team dynamic that is supportive and patient and able to compete at the highest level of the sport
as younger athletes develop and improve during the course of their college careers. This is
different from some other high-performing programs – Stanford, Virginia, and NC State, for

example – that typically roster just 16-20 student-athletes because they can cherry-pick the very best high school runners who are ready to compete at the D1 varsity level even as freshmen. Applying roster caps as proposed in the current *House* agreement would therefore only exacerbate existing disparities between programs, effectively expanding the gap between the most exclusive programs and all the rest.

The specter of limiting cross country to just 17 roster spots as early as fall 2025 clearly disrupts and destroys the developmental approach that my daughter's coaches and a number of others have long cultivated (notably, University of Nebraska head football coach Matt Ruhle and University of Texas swim coach Bob Bowman have spoken out about this same dynamic impacting their programs, so this is not limited to cross country and track or even non-revenue sports). Throughout this academic year, since word of the pending *House* settlement spread, teams including my daughter's have already experienced clear negative impacts. Student-athletes who suffer injuries no longer can expect to be granted the time they need to rehabilitate and return to full competitive stature before coaches face decisions to cut rosters (two of my daughter's teammates have already left the team with this in view and two others were medically retired). Or, they have to return to training and competition too quickly in order to try to earn a roster spot, thereby reinjuring themselves.

My daughter has been facing similar pressure: following two serious leg injuries her freshman year, which required rehabbing throughout her first year and most of the fall semester of her sophomore year, she now faces time pressure to perform during the indoor track season in order to try to avoid being cut if roster limits are imposed this spring for fall 2025. I think it worth emphasizing that the team is a source not only of financial and athletic support for my daughter and many of her teammates, but also the epicenter of social and academic support. It would be terribly destructive in multiple ways for a significant portion of the team to be abruptly removed due to the *House*-imposed roster caps, but this is exactly what the athletes and coaches anticipate happening.

I request that you consider these broader ramifications as you evaluate and work toward a final resolution of this case. Much of the publicity surrounding *House* has focused on payments for athletes; however, the more dramatic and almost entirely negative effects of the settlement as currently designed will come from the imposition of roster caps. Although the settlement technically proposes to increase roster spots for a number of sports, based on the restructuring of scholarship terms, the actual effect – as coaches and student-athletes widely recognize – will be a drastic *reduction* in the number of student-athletes allowed to be involved in most programs. If you have not already done so, I hope you will look more carefully at the likely impacts of these changes as they reverberate across the D1 athletic landscape.

For the majority of D1 student-athletes affected by *House v. NCAA* roster limits, the impacts will almost certainly be adverse: a sizable *decrease* in rosters carried by many programs, leading to immediate student-athlete cuts from programs; the subsequent and abrupt termination of social, athletic, and financial support student-athletes have relied upon and been promised as members of athletic programs; and a drastic restructuring or elimination of developmental and walk-on programs that have long provided opportunities for committed student-athletes to improve and compete at the highest level. With this in mind, I ask you to reconfigure, delay, or remove the roster limits in the settlement. If you deem roster limits an essential component of the overall agreement, then at the very least delaying or phasing in the implementation of these (effectively "grandfathering" existing rosters during a transition period) could mitigate the negative impacts and allow programs and student-athletes to adjust incrementally to the new landscape of college athletics.

I am confident that you and I hold in common the view that the remedy provided by the *House v. NCAA* settlement should not disproportionately damage student-athletes' lives. I urge you to reconsider the terms and timing of the roster limits, in particular, to help ensure that this is the case.

Sincerely,

Anonymous parent of D-1 athlete

621 [illegible]
Colorado Springs, CO
      80903



14 FEB 2025   PM 2   L

FOREVER USA

Claudia Wilken, Senior District Judge

Oakland Courthouse

1301 Clay St.

Oakland, CA  94612


Re: NCAA v. House



CLERK, U.S. DISTRICT CO
NORTH DISTRICT OF CALI
OAKLAND OFFICE

RECEIVED

FEB 18 2025